1                   UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                        EASTERN DIVISION

4                           - - -

5          HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                           - - -

7   MATTEL, INC.,                    )
                                     )
8                   Plaintiff,       )
                                     )
9            vs.                     )   No. CV 04-09049
                                     )
10  MGA ENTERTAINMENT, inc., et. Al., )   trial day 16
                                     )   AFTERNOON session
11                  Defendants.      )   Pages 3320-3468
    _____)
12  AND CONSOLIDATED ACTIONS,        )
    _____)
13

14

15          REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                   Riverside, California

17                   Friday, June 20, 2008

18                       1:41 P.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
                Federal Official Court Reporter
24              3470 12th Street, Rm. 134
                Riverside, California  92501
25                   951-274-0844
                WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2
     On behalf of MATTEL, INC.:
 3
                          QUINN EMANUEL
 4                        By:  JOHN QUINN
                               JON COREY
 5                             MICHAEL T. ZELLER
                               HARRY OLIVAR
 6                             TIMOTHY ALGER
                               William price
 7                        865 S. FIGUEROA STREET,
                          10TH FLOOR
 8                        LOS ANGELES, California  90017
                          213-624-7707
 9


10
     ON BEHALF OF MGA ENTERTAINMENT:
11
                          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
12                        BY:  THOMAS J. NOLAN
                               Matthew sloan
13                             RAOUL KENNEDY
                               Lauren aguiar
14                             Carl roth
                          300 SOUTH GRAND AVENUE
15                        LOS ANGELES, CALIFORNIA  90071-3144
                          213-687-5000
16

17

18

19

20

21

22

23

24

25
```

FRIDAY, JUNE 20, 2008                    TRIAL DAY 16, AFTERNOON SESSION

```
 1                          I N D E X

 2                                                  Page

 3    Plaintiff case (cont'd)......................   3323

 4


 5


 6    PLAINTIFF
      WITNESS          DIRECT      CROSS      REDIRECT      RECROSS
 7    LLOYD CUNNINGHAM (CONTINUED)

 8    BY MR. QUINN     3323                   3415
      BY MR. Sloan                 3353                     3426
 9


10


11          EXHIBITS          RECEIVED

12          (None)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

FRIDAY, JUNE 20, 2008                    TRIAL DAY 16, AFTERNOON SESSION

```
 1          RIVERSIDE, CALIFORNIA; FRIDAY, JUNE 20, 2008; 1:41 P.M.

 2                              -oOo-

 3          (JURORS ENTER COURTROOM.)

 4          THE COURT:  GOOD AFTERNOON, MEMBERS OF THE JURY.

 5          MR. CUNNINGHAM.                                        00:23

 6          COUNSEL, YOU MAY PROCEED.

 7          MR. QUINN:  THANK YOU, YOUR HONOR.

 8                  DIRECT EXAMINATION(continued)

 9  BY MR. QUINN:

10  Q    WE WERE LOOKING AT EXHIBIT 5-39 WHEN WE BROKE,          00:23

11  MR. CUNNINGHAM.

12          MR. QUINN:  IF WE COULD HAVE THAT BACK UP ON THE

13  SCREEN.

14  BY MR. QUINN:

15  Q    IN YOUR EXAMINATION OF THE PAGES IN THE NOTEBOOK,      00:23

16  MR. CUNNINGHAM, DID YOU FIND ANY INDENTATIONS FROM THIS

17  DRAWING, EXHIBIT 5-39?

18  A    I DID, SIR.

19  Q    WAS THIS DRAWING PREPARED THE SAME WAY AS THE OTHER

20  DRAWING WE LOOKED AT, THE BALLPOINT PEN, THE FELT-TIP PEN?   00:23

21  A    YES.  IT WAS PREPARED VERY SIMILARLY, ON VERY SIMILAR

22  SPIRAL-RING BINDER PAPER, AS EXHIBIT 5-42.

23  Q    AND HAVE YOU PREPARED SOME DEMONSTRATIVE EXHIBITS TO HELP

24  US UNDERSTAND YOUR FINDINGS WITH RESPECT TO THE INDENTATION

25  WITH RESPECT TO EXHIBIT 5-42?                                00:23
```

1   A    I DID, SIR.

2   Q    IF WE COULD TAKE A LOOK AT DEMONSTRATIVE C-14.

3        WHAT IS THIS?

4   A    C-14 IS AN ENLARGEMENT OF A SECTION OF EXHIBIT 5-39; THAT

5   WOULD BE THE HEAD, PORTIONS OF THE HAIR, THE NECK, THE ARM, AND    00:24

6   A LITTLE BIT OF THE UPPER TORSO.

7   Q    AND DEMONSTRATIVE C-15?

8   A    C-15 IS MY ACTUAL INDENTATION DEVELOPMENT.  IT'S NOT VERY

9   CLEAR, it's HARD TO SEE, BUT I'LL USE THE POINTER; THE

10  EYEBROWS, THE OUTLINE OF THE EYE, ANOTHER PARTIAL OUTLINE OF       00:24

11  ANOTHER EYE, AND ANOTHER EYEBROW.

12  Q    AND DEMONSTRATIVE C-16?

13  A    NOW, I HIGHLIGHTED THIS BECAUSE IT'S A LITTLE EASIER TO

14  SEE.  I DIDN'T HIGHLIGHT THE OTHER EYE.  YOU CAN JUST SEE THE

15  TOP OF THE CONTOUR OF THE EYE; HOWEVER, THIS EYE IS HIGHLIGHTED    00:24

16  AND BOTH the EYEBROWS ARE HIGHLIGHTED.

17  Q    AND DEMONSTRATIVE C-17, WHAT IS THAT?

18  A    THIS IS MY OVERLAY.  THIS IS THE ORIGINAL DRAWING, THE

19  ENLARGED PORTION, AND IT SHOWS THE EYEBROWS, THE OUTLINE OF

20  BOTH EYES.                                                        00:25

21        AND COULD YOU GO BACK TO THE PREVIOUS OUTLINE,

22  PLEASE.

23  Q    C-16?

24  A    YES.

25        HERE'S WHAT I DEVELOPED ON PAGE 63 IN THE SPIRAL-RING       00:25

1  NOTEBOOK:  THE EYEBROWS; A PARTIAL OUTLINE OF THE RIGHT EYE,

2  WHICH IS ON THE LEFT SIDE HERE; AND THE OUTLINE OF THE LEFT

3  EYE, WHICH IS ON THE RIGHT HERE.

4  Q    IS THIS INDENTATION ANALYSIS THAT YOU DID, MR. CUNNINGHAM,

5  IN YOUR PROFESSIONAL OPINION, SUFFICIENT TO ESTABLISH, WITH          00:25

6  CERTAINTY, THAT THOSE TWO LOOSE NOTEBOOK PAGES WHICH HAVE THE

7  DRAWINGS ON THEM WERE CREATED IN CONTACT WITH PAGES 61 AND 63

8  OF THE BLACK NOTEBOOK?

9  A    YES, SIR.

10  Q    LET'S STEP BACK FOR A SECOND AND TALK A LITTLE BIT ABOUT        00:25

11  INDENTATION ANALYSIS IN GENERAL.

12          DOES EVERY PIECE OF WRITING ON A PAGE LEAVE AN

13  INDENTATION ON THE FOLLOWING PAGES?

14  A    OH, NO, SIR.

15  Q    WHY NOT?                                                        00:26

16  A    IT DEPENDS ON THE WRITING INSTRUMENT.  FOR EXAMPLE, A

17  SHARP HEAD ON A BALL-POINT PEN VERSUS A SOFTER FIBER-TIP HEAD,

18  THE BALL-POINT PEN WILL LEAVE BETTER INDENTATIONS ON THE

19  FOLLOWING PAGE OR PAGES THAN, SAY, A DULL PENCIL, EVEN.

20          IT ALSO DEPENDS ON THE PEN PRESSURE THAT THE WRITER        00:26

21  EXERTS WHILE USING THE PEN.  SOME PEOPLE WRITE WITH A NICE,

22  SOFT FLOW WRITING THAT HARDLY INDENTS INTO PAPER.  OTHER PEOPLE

23  PRESS PRETTY HARD WHEN THEY USE A WRITING INSTRUMENT.  THAT'S

24  ANOTHER FACTOR THAT'S VERY IMPORTANT.  AND IT ALSO DEPENDS ON

25  THE GAUGE OR THE THICKNESS OF THE PAPER.                            00:26

```
1   Q    DO ALL OF THE INDENTATIONS THAT YOU FIND ON A DOCUMENT

2   NECESSARILY COME FROM THE SAME SHEET OF PAPER?

3   A    OH, NO.  NO, SIR.

4   Q    WHY IS THAT?

5   A    IT'S VERY COMMON THAT IF AN INDIVIDUAL -- AND I'LL USE MY    00:27

6   YELLOW TABLET AGAIN -- THE SUBJECT PAPER, FOR EXAMPLE, IS THE

7   FOURTH PAGE DOWN.  THAT'S THE ONE I'M GOING TO CONDUCT MY

8   EXAMINATION FOR INDENTED WRITING ON.  WHILE IT'S POSSIBLE THAT

9   AT SOME POINT SOMEONE WROTE ON THE PAGE RIGHT ABOVE IT -- MAYBE

10  THE SAME PERSON OR ANOTHER PERSON WROTE ON THE PAGE ABOVE THAT    00:27

11  PAGE, AND THEN MAYBE THE SAME PERSON OR ANOTHER PERSON WROTE ON

12  THE PAGE ABOVE THAT PAGE.  WELL, IF A PERSON IS USING PRETTY

13  NORMAL PEN PRESSURE AND A BALL-POINT PEN, THE INDENTATIONS FROM

14  ALL THREE OF THESE PAGES ARE GOING TO INDENT ONTO THE SUBJECT

15  PAGE THAT I AM EXAMINING FOR INDENTED WRITING; AND, THEREFORE,    00:27

16  I'M GOING TO HAVE INDENTATIONS FROM THREE PAGES THAT HAVE KIND

17  OF INTERMINGLED WITH EACH OTHER.

18  Q    DID YOU FIND THAT IN THIS CASE; THAT IS TO SAY, DID YOU

19  FIND INDENTATIONS ON PAGES IN THE NOTEBOOK THAT CAME FROM MORE

20  THAN ONE SHEET OF PAPER?                                         00:28

21  A    I DID.

22  Q    AND HOW WAS THAT APPARENT TO YOU?

23  A    ON PAGE 61, MY INDENTATIONS DEVELOPED WERE THAT OF THE

24  DRAWN IMAGE OF THE DOLL, WHICH IS EXHIBIT 5-42; BUT THERE WERE

25  OTHER IMAGES, SUCH AS A DRAWING OF, APPARENTLY, A BOY ON A BOAT   00:28
```

1   WITH A FISHING POLE AND AN UMBRELLA, INDENTED AS WELL.

2   Q    USING INDENTATION ANALYSIS, CAN YOU EVER DETERMINE WITH

3   CERTAINTY EXACTLY WHAT PAGE WAS THE NEXT ONE BELOW, IF YOU

4   WILL, OR THE NEXT ONE ABOVE?

5   A    WELL, JUST BASED ON THE INDENTATION ANALYSIS ALONE, IT'S A   00:28

6   VERY, VERY DIFFICULT TASK TO BE ABLE TO CONCLUSIVELY STATE THAT

7   ONE PAGE WAS IN DIRECT CONTACT WITH ANOTHER PAGE.  AND THE

8   REASON FOR THAT IS, SOMETIMES WE'LL DEVELOP MORE INTENSE

9   INDENTED WRITING FROM MAYBE TWO PAGES AWAY, OR EVEN THREE PAGES

10  AWAY, ONCE AGAIN, DEPENDING ON THE WRITING INSTRUMENT, AND   00:29

11  DEPENDING, MAINLY, ON HOW MUCH PRESSURE THAT PERSON HAS APPLIED

12  TO THE PEN WHEN THEY'RE DRAWING OR WRITING.  SO TO SAY JUST

13  BECAUSE THE INTENDED WRITING lifts, AS I'M SHOWING YOU, SHOW

14  DARKER LINES OR MORE INTENSE LINES, IT DOESN'T NECESSARILY

15  MEAN, JUST BECAUSE THEY'RE A LITTLE DARKER OR MORE INTENSE,   00:29

16  THAT THAT WAS THE PAGE DIRECTLY ON TOP OF THE PAGE I EXAMINED.

17  IT COULD HAVE BEEN ANOTHER PAGE AWAY OR EVEN TWO PAGES AWAY.

18  Q    SO, MR. CUNNINGHAM, WHAT WERE YOUR CONCLUSIONS WITH

19  RESPECT TO WHERE IN THE BLACK NOTEBOOK THESE LOOSE PAGES, 5-39

20  AND 5-42, WERE LOCATED?   00:30

21  A    EXHIBIT 5-42, THE DRAWING OF THAT DOLL, WAS LOCATED ON TOP

22  OF PAGE 61 IN THE SPIRAL NOTEBOOK; AND EXHIBIT 5-39, THE

23  DRAWING OF THE DOLL, WAS LOCATED EITHER ABOVE OR IN CLOSE

24  PROXIMITY TO PAGE 63 IN THE SPIRAL NOTEBOOK.  BUT REGARDLESS OF

25  THE LOCATIONS OF PAGES ABOVE, THEY WERE BOTH PRESENT IN THAT   00:30

1    NOTEBOOK WHEN THEY WERE DRAWN UPON.

2    Q    AND IN RELATIONSHIP TO THAT LAST DIVIDER PAGE IN THE

3    NOTEBOOK, CAN YOU TELL US WHERE THEY WERE?

4    A    OH, YES.

5         IN RELATIONSHIP TO THE LAST DIVIDER PAGE, THEY WERE          00:30

6    THE NEXT TWO PAGES AFTER THE LAST DIVIDER PAGE.

7    Q    AND THAT'S RIGHT AFTER THE PAGES THAT HAVE THOSE BANKING

8    CALCULATIONS THAT WE LOOKED AT?

9    A    YES.  THE BANKING CALCULATIONS, THEN THE DIVIDER PAGE, AND

10   THEN THE TWO PAGES THAT I EXAMINED FOR THE INDENTED WRITING.      00:31

11   Q    MR. CUNNINGHAM, LET'S TURN NOW, PLEASE, TO THE NOTARY

12   BOOK.

13        YOU CALL IT A NOTARY JOURNAL, WHICH, I GUESS, IS THE

14   CORRECT NAME.

15   A    YES.  THE ACTUAL TITLE ON THE BOOK IS "JOURNAL OF NOTARIAL   00:31

16   ACTS."

17   Q    THAT'S BEEN MARKED AS EXHIBIT 60.

18        AND LET ME JUST ASK YOU, IN THE FORENSIC DOCUMENT

19   EXAMINATION PROFESSION, IS THERE A RECOGNIZED TERM KNOWN AS

20   "SUSPICIOUS OR UNUSUAL"?                                          00:31

21   A    OH, YES.  THE TERM "SUSPICIOUS AND UNUSUAL" ALWAYS POPS UP

22   IN OUR PROFESSION.  THAT'S WORDS THAT OUR CLIENTS USE ALL OF

23   THE TIME AND WORDS THAT WE USE VERY COMMONLY IN THE FIELD.

24   Q    DID YOU FIND AN ENTRY IN EXHIBIT 60 WHICH YOU FOUND TO BE

25   SUSPICIOUS AND UNUSUAL?                                           00:32

1    A    YES, I DID.

2    Q    AND WHERE IS THAT?

3    A    IT IS ON PAGE 11 IN THE NOTARY JOURNAL, AND IT'S UNDER THE

4    HEADING OF "DOCUMENT KIND OR TYPE," AND IT IS FIVE LINES OF

5    WRITING.  AND I FOUND THAT LINE NUMBER 5 IN THE FIVE LINES OF          00:32

6    WRITING, IN THAT ONE LITTLE SECTION, WAS, OR IS, SUSPICIOUS AND

7    UNUSUAL; AND I ALSO FEEL THAT THe FIFTH LINE OF WRITING WAS NOT

8    INTENDED TO BE A CONTINUOUS PART OF THE FIRST FOUR LINES OF

9    WRITING.

10   Q    HAVE YOU PREPARED A DEMONSTRATIVE EXHIBIT TO HELP US             00:32

11   UNDERSTAND YOUR ANALYSIS OF THIS ENTRY THAT YOU FOUND TO BE

12   SUSPICIOUS OR UNUSUAL?

13   A    I HAVE, SIR.

14   Q    AND IS THAT DEMONSTRATIVE EXHIBIT C-22?

15   A    THAT, IT IS.                                                      00:32

16        **MR. QUINN:**  IF WE COULD PUT THAT ON THE SCREEN,

17   PLEASE.

18   **BY MR. QUINN:**

19   Q    WHAT IS IT THAT WE'RE LOOKING AT HERE?

20   A    WE'RE LOOKING AT A PART OF THE ENTRY FOR THE CARTER BRYANT       00:33

21   NOTARIAL ENTRY IN THIS BOOK ON PAGE 11 AND PAGE 12.  AND THIS

22   PORTION IS UNDER THE SECTION OF "DOCUMENT KIND OR TYPE."

23   Q    WHAT IS IT ABOUT THIS ENTRY THAT YOU FOUND TO BE

24   SUSPICIOUS OR UNUSUAL?

25   A    WELL, IT'S NOT ONE ELEMENT OF THE ENTRY; THERE ARE VARIOUS       00:33

1    ELEMENTS OF THIS ENTRY THAT FORMED THE ENTIRE PICTURE.

2    Q    WHAT WOULD BE THE FIRST ONE THAT YOU CAN TELL US ABOUT?

3    A    THE FIRST ONE IS THAT IT'S QUITE OBVIOUS THE FIFTH LINE,

4    "FROM 1998 MISSOURI," IS WRITTEN SMALLER THAN THE WRITING ON

5    THE OTHER FOUR LINES; THAT IT'S SQUEEZED IN TO A MUCH SMALLER          00:33

6    SPACE IN THIS BLOCK.  AND WHEN I REFER TO A BLOCK, I'LL OUTLINE

7    IT WITH THE LASER PRINTER.  THE BLOCK IS THE MACHINE-PRINTED

8    SECTION UNDER "DOCUMENT KIND OR TYPE."  THAT'S THE FIRST

9    ELEMENT.

10   Q    ALL RIGHT.                                                       00:34

11        ANYTHING ELSE THAT YOU FOUND TO BE SUSPICIOUS OR

12   UNUSUAL?

13   A    YES, SIR.

14        THE FIRST LINE, "ORIGINAL SKETCHES OF," IT'S QUITE

15   OBVIOUS, ONCE AGAIN, THAT THESE LETTER FORMS ARE WRITTEN MUCH         00:34

16   LARGER THAN THE LETTER FORMS ON THE SECOND, THIRD, FOURTH, AND

17   FIFTH LINES.  AND "ORIGINAL SKETCHES OF" WAS WRITTEN RIGHT ON

18   THE MACHINE-PRINTED LINE IN THE BLOCK.

19        NOW, THE SECOND LINE, HOWEVER, "DOLL IDEA -

20   CHARACTERS," THAT WASN'T WRITTEN ON THE SECOND LINE, WHICH IS A       00:34

21   MACHINE-PRINTED LINE.  RATHER, "DOLL IDEA - CHARACTERS" WAS

22   WRITTEN ABOVE THE SECOND LINE.

23        THAT CERTAINLY IMPRESSED ME THAT THE WRITER AT THAT

24   POINT, WHEN THEY RAISED "DOLL IDEA - CHARACTERS" ABOVE THE

25   SECOND PRINTED LINE, MADE AN ADJUSTMENT.  AND WHAT THE                00:35

```
 1   ADJUSTMENT IS IS THIS PERSON ANTICIPATED ENTERING MORE

 2   HANDWRITTEN MATERIAL IN THIS BLOCK THAN THE THREE

 3   MACHINE-PRINTED LINES COULD ACCOMMODATE; SO THE PERSON HAD TO

 4   MAKE AN ADJUSTMENT BY RAISING "DOLL - IDEA CHARACTERS" ABOVE.

 5         NOW, THE THIRD LINE, "SIX-TOTAL = NAMES ARE:  ZOE,"        00:35

 6   THAT'S WRITTEN RIGHT THROUGH THE SECOND PRINTED LINE, NOT ON

 7   IT; AND THE FOURTH LINE, "LUPE, HALLIDAE, JADE, TWO MALES." WAS

 8   WRITTEN JUST SLIGHTLY ABOVE THE BOTTOM MACHINE-PRINTED LINE.

 9         NOW, THE PERSON DID A VERY, VERY GOOD JOB OF

10   ANTICIPATING FOUR LINES OF WRITING.  AS YOU'LL NOTICE, THE      00:36

11   SPACE BETWEEN THE FIRST AND SECOND LINE IS QUITE AMPLE; THE

12   SPACE BETWEEN THE SECOND AND THIRD LINES IS QUITE AMPLE; THE

13   SPACE BETWEEN THE THIRD AND FOURTH LINES IS QUITE AMPLE.

14         IF THIS INDIVIDUAL HAD ANTICIPATED WRITING FIVE

15   LINES, WHICH ARE THERE, INSTEAD OF FOUR LINES, THEN THERE'S     00:36

16   PLENTY OF SPACE BETWEEN EACH LINE THAT THE PERSON COULD HAVE

17   TIGHTENED UP A LITTLE BIT ON.  AND IF THE PERSON DID TIGHTEN UP

18   IN THESE SPACES, THAT WOULD HAVE LEFT ENOUGH SPACE AT THE

19   BOTTOM WHERE THEY WOULDN'T HAVE HAD TO SQUEEZE "FROM 1998

20   MISSOURI" IN.                                                   00:37

21         BUT THERE'S ANOTHER AREA THAT I'M QUITE CONCERNED

22   WITH.

23         THE THREE COMMAS.  THESE THREE COMMAS ARE VERY LONG

24   AND EXTENDED, AND COME JUST ABOUT TO THE BOTTOM PRINTED LINE.

25         MAY I HAVE THE NEXT SLIDE, PLEASE.                        00:37
```

1    Q    THAT WOULD BE DEMONSTRATIVE C-23.

2    A    YES.

3         WHAT I DID HERE IS, I ELIMINATED THE BOTTOM LINE.

4    YOU CAN SEE -- AND WE'LL GO BACK AGAIN WITH THAT -- I TOOK IT

5    OUT, JUST SO YOU COULD SEE THE GOOD SPACING AND AMPLE SPACING          00:37

6    BETWEEN THE FIRST FOUR LINES; AND THERE WAS ROOM, AS I

7    MENTIONED, TO ADJUST EVEN MORE, TO MAKE AMPLE SPACING FOR THE

8    FIFTH LINE.  BUT I'M CONCERNED WITH THESE COMMAS.

9    Q    WHY IS THAT?  WHY ARE YOU CONCERNED WITH THE COMMAS?

10   A    BECAUSE THEY EXTEND DOWN TO THE BOTTOM MACHINE-PRINTED           00:38

11   LINE.  AND IF A PERSON KNEW THAT THEY WERE GOING TO WRITE A

12   FIFTH LINE IN THERE, WHY WOULD THEY PLACE THESE OBSTRUCTIONS IN

13   THAT SPACE?

14   Q    WELL, MAYBE THIS WRITER ALWAYS WRITES LONG COMMAS?

15   A    NOT TRUE.  I EXAMINED ANOTHER ENTRY IN THE JOURNAL, AND I        00:38

16   FOUND THAT THIS PERSON IS VERY CAPABLE OF MAKING SHORT COMMAS.

17        NOW, IF I COULD HAVE THE FIRST DEMONSTRATIVE BACK,

18   PLEASE.

19   Q    THAT'S C-22.

20   A    YES.                                                            00:38

21        AS I MENTIONED, AN OBSTRUCTION BY THESE COMMAS.  THE

22   PRINTED WORD "FROM" IS PLACED WHERE IT SHOULD BE PLACED, BUT

23   "1998," THE WRITER HAD TO JUMP FROM THE END OF "FROM" ALL THE

24   WAY TO THE RIGHT SIDE OF THE FIRST COMMA TO PUT "1998" IN,

25   BECAUSE OBVIOUSLY, THEY DIDN'T WANT "1998" TO BE WRITTEN             00:39

1  THROUGH THE COMMA.  OTHERWISE, THEY COULD HAVE WRITTEN IT MUCH

2  CLOSER.

3          THEN "MISSOURI."

4          WELL, THEY DIDN'T HAVE MUCH OF A CHOICE THERE,

5  BECAUSE WE HAVE TWO COMMAS LEFT, AND "MISSOURI" IS SUCH A LONG          00:39

6  NAME, THEY COULDN'T FIT IT, OBVIOUSLY, BETWEEN THE OTHER TWO

7  COMMAS, AND THEY DID HAVE TO WRITE THROUGH A COMMA.

8  Q    WHERE IS THAT?

9  A    "MISSOURI" IS RIGHT HERE.

10          AND HERE'S THE COMMA, RIGHT ABOVE THE "O."          00:39

11          ANOTHER ELEMENT THAT CONCERNED ME WAS THAT IF AN

12  INDIVIDUAL INTENDED TO WRITE CONTINUOUSLY THE FIRST FOUR LINES

13  AND THE FIFTH LINE, WHY WOULD THEY PROTRUDE INTO THE NEXT

14  BLOCKS, OR THE NEXT BLOCK, WITH "MALES."  PERIOD.

15          IF THEY HAD INTENDED TO WRITE MORE INFORMATION IN          00:40

16  THIS FIFTH LINE, THEY COULD HAVE RETURNED "MALES."  PERIOD.

17  OVER TO THE LEFT OF THE FIFTH LINE AND STILL HAD ROOM TO WRITE

18  "FROM 1998 MISSOURI."

19          SO THOSE ARE THE ELEMENTS THAT I FOUND QUITE

20  SUSPICIOUS AND UNUSUAL ABOUT THIS ENTRY.          00:40

21  Q    YOU SAID YOU FOUND SOME INSTANCES OF THIS WRITER, WHOEVER

22  IT WAS, BEING ABLE TO WRITE SHORT COMMAS WHERE THEY NEEDED TO.

23  A    YEAH.  I FOUND, I BELIEVE, ONE INSTANCE.  THERE WEREN'T

24  MANY COMMAS WRITTEN IN THIS NOTARY JOURNAL, NOR WERE THERE MANY

25  PERIODS WRITTEN IN THIS NOTARY JOURNAL.          00:40

```
 1  Q    CAN YOU POINT US TO THAT PLACE WHERE YOU FOUND THE SHORT

 2  COMMAS.

 3  A    IT WILL TAKE ME A MINUTE TO LOOK FOR THEM.

 4  Q    WHY DON'T WE JUST MOVE AHEAD, THEN.

 5  A    SURE.

 6  Q    WAS THERE ANYTHING ELSE THAT YOU FOUND SUSPICIOUS OR

 7  UNUSUAL ABOUT THIS ENTRY?

 8  A    YES, I DID.

 9        IN HANDWRITING -- WE EXAMINE HANDWRITING FOR ITS

10  NATURALNESS.                                                   00:41

11  Q    WHAT DO YOU MEAN, "NATURALNESS"?

12  A    THAT IF A PERSON WRITES SOMETHING NATURAL, LIKE YOUR

13  SIGNATURE, OR YOU'RE WRITING A NOTE TO SOMEONE, YOU'RE NOT

14  THINKING ABOUT HOW YOU WRITE IT.  SO WHAT HAPPENS WHEN YOU

15  WRITE YOUR SIGNATURE, YOU'RE WRITING IT VERY QUICKLY WITH A LOT 00:41

16  OF FLUENCY AND SPEED, AND YOU WRITE VERY SPONTANEOUSLY AND

17  NATURALLY.

18        BUT IN THIS PARTICULAR CASE, THE FIRST FOUR LINES

19  WERE WRITTEN VERY NATURALLY, WITH A LOT OF SPEED.  THE FIFTH

20  LINE -- IF YOU GO BACK -- THAT WAS WRITTEN EXTREMELY SLOW.  IN  00:41

21  FACT, IT WAS WRITTEN SLOWLY AND DELIBERATELY, ALMOST IN A DRAWN

22  MANNER.

23        MR. SLOAN:  OBJECTION.  MOVE TO STRIKE THAT FOR LACK

24  OF FOUNDATION.

25        THE COURT:  WHY DON'T YOU HAVE THE WITNESS EXPLAIN,       00:41
```

```
 1   COUNSEL.

 2           SUSTAINED.

 3   BY MR. QUINN:

 4   Q    MR. CUNNINGHAM, YOU JUST TESTIFIED IN TERMS OF HOW QUICKLY

 5   HANDWRITING IS WRITTEN.                                              00:42

 6           HOW IS IT THAT YOU, AS A PROFESSIONAL DOCUMENT

 7   EXAMINER, CAN FORM JUDGMENTS AS TO HOW QUICKLY SOMETHING HAS

 8   BEEN WRITTEN?

 9   A    WELL, OF COURSE, I EXAMINED ALL OF THE WRITING IN THAT

10   BLOCK, AND I USED HAND-HELD MAGNIFIERS AS WELL AS A                  00:42

11   STEREOSCOPIC MICROSCOPE.  AND BASED UPON MY EDUCATION AND

12   TRAINING IN THE FIELD OF HANDWRITING IDENTIFICATION, THE SPEED

13   AND NATURALNESS OF WRITING IS PROBABLY THE MOST IMPORTANT

14   ELEMENT WE LOOK FOR IN EVERY SINGLE HANDWRITING CASE.

15           SO FOR 28 YEARS, I'VE BEEN LOOKING AT THE SPEED AND          00:42

16   FLUENCY OF HANDWRITING, AND I CAN CERTAINLY TELL, WITH THE USE

17   OF HAND-HELD MAGNIFIERS AND A STEREO MICROSCOPE, IN COMPARISON

18   OF THOSE FIVE LINES, THAT THE FIRST FOUR LINES WERE WRITTEN

19   VERY FLUENTLY AND NATURALLY, AND THE FIFTH LINE WAS SLOWLY

20   DRAWN; IT WAS NOT WRITTEN FLUENTLY.                                  00:42

21   Q    WHAT ARE THE GIVE-AWAYS?  WHAT IS IT THAT YOU CAN TELL,

22   THAT YOU CAN SEE, THAT INDICATES TO YOU THAT SOMETHING IS

23   WRITTEN FAST OR IS WRITTEN SLOW?

24   A    WHEN WRITING IS WRITTEN FAST, I WILL SEE, GENERALLY, SOFT

25   UP STROKES, HEAVIER DOWN STROKES IN THE WRITING; I WILL SEE          00:43
```

```
 1   TAPERED BEGINNING STROKES, TAPERED ENDING STROKES; AND I'LL SEE
 2   WHAT'S CALLED THE LINE QUALITY OF THE PEN STROKE, WHICH IS SOFT
 3   AND IT GLIDES OVER THE PAPER.
 4         AND "FROM 1998 MISSOURI," THESE WERE DULL, SLOW,
 5   ALMOST DRAWN LETTER FORMS.                                        00:43
 6   Q   WHAT'S THE SIGNIFICANCE OF THAT TO YOU, SIR?
 7   A   WELL, THE SIGNIFICANCE IN THIS PARTICULAR MATTER, "FROM
 8   1998 MISSOURI" COULD HAVE BEEN DONE VERY SLOWLY BY THE WRITER
 9   OF THE FIRST FOUR LINES BECAUSE THE PERSON HAD TO SQUEEZE "FROM
10   1998 MISSOURI" INTO THAT SMALL SPACE.                             00:44
11         THAT COULD BE ONE REASON.
12         BUT ANOTHER REASON THAT "FROM 1998 MISSOURI" WAS
13   SLOWLY DRAWN INTO THAT SPACE IS BECAUSE ANOTHER PERSON OTHER
14   THAN THE WRITER OF THE FIRST FOUR LINES COULD HAVE TRIED TO
15   IMITATE THE OTHER WRITER'S WRITING AND IT COULD HAVE BEEN DONE    00:44
16   BY ANOTHER PERSON AS WELL.
17   Q   LET'S BE CLEAR.  DO YOU, SIR, HAVE ENOUGH INFORMATION TO
18   HAVE A PROFESSIONAL OPINION AS TO WHETHER ALL FIVE LINES WERE
19   WRITTEN BY THE SAME PERSON, OR THE FIRST FOUR LINES were
20   WRITTEN BY ONE PERSON AND THE LAST LINE BY A DIFFERENT PERSON?    00:44
21   DO YOU HAVE A PROFESSIONAL OPINION?
22   A   NO, I DO NOT HAVE ANY CONCLUSION AS TO WHETHER IT WAS
23   WRITTEN ALL BY ONE INDIVIDUAL OR THAT ANOTHER PERSON ATTEMPTED
24   TO ENTER "FROM 1998 MISSOURI" AND TRIED TO IMITATE SOME OF THE
25   WRITING OF THE FIRST PERSON.  BUT BASED UPON THAT, BOTH          00:44
```

```
 1   POSSIBILITIES EXIST.

 2   Q    ALL RIGHT.

 3            LET'S TURN THE PAGE TO A DIFFERENT SUBJECT NOW.

 4            THE COURT:  COUNSEL, IF YOU'RE GOING TO A DIFFERENT

 5   SUBJECT, WE NEED TO TAKE ABOUT A FIVE-MINUTE BREAK.  THERE'S AN      00:45

 6   EMERGENCY CRIMINAL MATTER THAT THE COURT MUST TAKE UP.

 7            EVERYONE CAN JUST STAND BY.  I'M GOING TO ASK THE

 8   JURY TO GO TO THE JURY ROOM JUST FOR ABOUT FIVE MINUTES.  DON'T

 9   GO ANYWHERE FAR.

10            THE WITNESS CAN STEP DOWN.                                 00:45

11            (Whereupon, jurors exit courtroom.)

12            (Brief recess taken.)

13            (WHEREUPON, JURORS ENTER COURTROOM.)

14            THE COURT:  COUNSEL, YOU MAY PROCEED.

15            MR. QUINN:  THANK YOU, YOUR HONOR.                         00:58

16   BY MR. QUINN:

17   Q    MR. CUNNINGHAM, DID YOU EXAMINE OTHER EXEMPLARS OF THE

18   OTHER HANDWRITING IN THE NOTARY BOOK TO DETERMINE WHETHER OTHER

19   ENTRIES IN THE NOTARY BOOK WERE ALL WRITTEN BY THE SAME

20   HANDWRITER?                                                         00:58

21   A    YES.  I DID EXAMINE SOME OF THE OTHER ENTRIES, AND I FOUND

22   COMMON AUTHORSHIP BETWEEN THE WRITINGS ON ENTRIES NOT RELATED

23   TO THE BRYANT MATTER THAT ARE IN COMMON WITH THE FIRST FOUR

24   LINES OF INFORMATION IN THE "DOCUMENT KIND AND TYPE" SECTION.

25   Q    WERE THERE ANY OTHER ENTRIES IN THE NOTARY JOURNAL, OTHER      00:58
```

1   THAN THAT FIFTH LINE, AS TO WHICH YOU COULD NOT SAY THAT IT WAS

2   WRITTEN BY THE SAME PENMAN, OR THE SAME PERSON?

3   A    NO.  THAT PROBLEM DID NOT EXIST.

4   Q    IN THE FIELD OF forensic DOCUMENT EXAMINATION, IS THERE A

5   CONCEPT KNOWN AS A SELF-SERVING HANDWRITTEN ENTRY?          00:59

6   A    YES.  QUITE OFTEN, WE ENCOUNTER SELF-SERVING ENTRIES IN

7   THE FIELD.

8   Q    WHAT DOES THAT MEAN TO A PROFESSIONAL DOCUMENT EXAMINER,

9   THE CONCEPT OF A SELF-SERVING HANDWRITTEN ENTRY?

10  A    A SELF-SERVING ENTRY IN ANY TYPE OF JOURNAL OR NOTE OR     00:59

11  BOOK OR WILL IS GENERALLY AN ENTRY THAT'S A VERY IMPORTANT

12  ENTRY.

13  Q    WHAT WOULD BE AN EXAMPLE?

14  A    WELL, A GOOD EXAMPLE IN CASES THAT I EXAMINE QUITE

15  OFTEN -- JUST FOR EXAMPLE, HOLOGRAPHIC WILLS.  A HOLOGRAPHIC    00:59

16  WILL IS A WILL THAT A PERSON WILL WRITE OUT COMPLETELY BY HAND.

17  AND I'VE EXAMINED CASES OVER THE YEARS WHERE I FOUND MANY

18  SELF-SERVING ENTRIES ADDED TO HOLOGRAPHIC WILLS BY PEOPLE

19  INSERTING THEIR OWN NAMES IN THE HOLOGRAPHIC WILL SO THEY CAN

20  BECOME THE BENEFICIARY.  I FOUND WHERE PEOPLE HAVE INSERTED     01:00

21  SELF-SERVING ENTRIES WHERE THE WILL LEAVES THEM THINGS THAT

22  THEY'RE REALLY NOT ENTITLED TO.  AND WHEN WE EXAMINE THESE,

23  SOMETIMES THE WORDS ARE SQUEEZED IN; SOMETIMES THEY'RE WRITTEN

24  A LITTLE MORE SLOWLY.  SO THOSE ENTRIES ARE SUSPICIOUS; AND

25  THEN AFTER EXAMINING THEM, WE FIND OUT THAT THEY ARE IMPORTANT, 01:00

1    SELF-SERVING ENTRIES.

2    Q    DID YOU FIND ANY ENTRIES IN THE NOTARY BOOK WHICH, IN YOUR

3    OPINION, WERE SELF-SERVING HANDWRITTEN ENTRIES?

4            **MR. SLOAN:**  OBJECTION.  LACK OF FOUNDATION.

5            **THE COURT:**  LAY A FOUNDATION FOR THAT.                    01:00

6    **BY MR. QUINN:**

7    Q    DO YOU HAVE AN UNDERSTANDING, BASED UPON INFORMATION

8    PROVIDED TO YOU, THAT IT WOULD BE OF BENEFIT FOR CARTER BRYANT

9    IF CERTAIN SKETCHES HAD BEEN CREATED IN 1998?

10           **MR. SLOAN:**  YOUR HONOR, I'M GOING TO OBJECT.  I DON'T     01:01

11   THINK THIS IS PROPER.

12           **THE COURT:**  WHAT'S THE OBJECTION?

13           **MR. SLOAN:**  FOUNDATION.  I DON'T THINK THIS IS A

14   PROPER AREA FOR EXPERT TESTIMONY.

15           **THE COURT:**  OVERRULED.                                    01:01

16           **THE WITNESS:**  YES.  I RECEIVED INFORMATION THAT THE

17   LAST LINE, "FROM 1998 MISSOURI", WOULD SUPPORT CARTER BRYANT'S

18   CONTENTION THAT HE PREPARED THE DRAWINGS IN 1998 IN MISSOURI.

19           AND BASED UPON THAT, I FELT THAT THIS WAS AN

20   IMPORTANT ENTRY.  AN ENTRY THAT IS OF IMPORTANCE LIKE THAT, I        01:01

21   ALSO CONCLUDED, IS ONE THAT A PERSON WOULDN'T FORGET.  IT'S

22   IMPORTANT ENOUGH, I DON'T THINK A PERSON WOULD FORGET THIS.

23   AND ANOTHER ISSUE IS THAT I DON'T THINK A PERSON WOULD ADD SUCH

24   AN IMPORTANT ENTRY AS AN AFTERTHOUGHT.

25           **MR. SLOAN:**  YOUR HONOR, I'M GOING TO MOVE to STRIKE       01:02

```
 1   THIS.  THERE'S NO FOUNDATION FOR THIS TESTIMONY.

 2         THE COURT:  I'M MINDFUL OF YOUR EARLIER OBJECTION,

 3   COUNSEL.

 4         HAVE THE WITNESS EXPLAIN WHERE HE HAS THIS

 5   INFORMATION FROM, WHAT INFORMATION HE'S REFERRING TO.        01:02

 6   BY MR. QUINN:

 7   Q   WHERE DID YOU GET THE INFORMATION THAT IT WOULD BE OF SOME

 8   BENEFIT TO MR. BRYANT OR CONSISTENT WITH HIS ACCOUNT OF THINGS

 9   IF IT WERE THE CASE THAT CERTAIN DRAWINGS WERE CREATED IN 1998?

10   WHERE DID YOU GET THAT INFORMATION?                         01:02

11   A   I WAS WORKING WITH AN ATTORNEY FROM THE QUINN EMANUEL FIRM

12   BY THE NAME OF DIANE HUTNYAN.  SHE'S VERY FAMILIAR WITH THE

13   CASE, AND SHE ADVISED ME OF THIS.

14   Q   AND IF I JUST ASKED YOU TO MAKE THE ASSUMPTION AS AN

15   EXPERT -- I ASSUME IT'S HAPPENED TO YOU MANY TIMES AS AN EXPERT 01:02

16   THAT YOU TESTIFY AND are PRESENTED WITH HYPOTHETICALS AND YOU

17   TESTIFIED BASED UPON A HYPOTHETICAL STATE OF FACTS?  THAT'S

18   HAPPENED SOMETIMES?

19   A   MANY TIMES AS AN EXPERT, I'M ASKED HYPOTHETICALS.

20   Q   SO IF WE JUST ASK YOU TO ASSUME THAT IT WOULD BE          01:03

21   CONSISTENT WITH MR. BRYANT'S ACCOUNT THAT CERTAIN DRAWINGS WERE

22   CREATED IN 1998, IF YOU ASSUME THAT TO BE TRUE, WOULD YOU

23   REGARD THIS AS AN EXAMPLE OF A SELF-SERVING HANDWRITTEN ENTRY?

24   A   YES.  BUT --

25         MR. SLOAN:  OBJECTION.  LEADING.                        01:03
```

1          **THE COURT:**  I'M SORRY?

2          **MR. SLOAN:**  WITHDRAWN.

3          **THE COURT:**  VERY WELL.

4          **THE WITNESS:**  YES.  NOT BASED UPON THE ENTRY OF THE

5    FIFTH LINE ALONE, BUT BASED UPON EVERYTHING I TESTIFIED; IN          01:03

6    OTHER WORDS, THE WHOLE PICTURE OF EVERYTHING WRITTEN IN the

7    "DIFFERENT KIND OR TYPE" SECTION.

8    **BY MR. QUINN:**

9    Q    NOW, YOU'RE NOT SAYING THAT THE FACT THESE WERE NOTARIZED

10   IN 1999 IS ANY EVIDENCE THAT, IN FACT, THESE DRAWINGS WERE          01:03

11   CREATED IN 1998?

12         **MR. SLOAN:**  OBJECTION, YOUR HONOR.  LACK OF

13   FOUNDATION; CALLS FOR SPECULATION.

14         **THE COURT:**  SUSTAINED.

15         REPHRASE, COUNSEL.          01:04

16   **BY MR. QUINN:**

17   Q    DO YOU HAVE AN OPINION AS TO WHETHER OR NOT THE FACT THAT

18   THESE DOCUMENTS WERE NOTARIZED IN 1999 IS, IN FACT, ANY

19   EVIDENCE THAT THE DOCUMENTS WERE CREATED IN 1998?

20         **MR. SLOAN:**  OBJECTION.  LACKS FOUNDATION.          01:04

21         **THE COURT:**  SUSTAINED.

22   **BY MR. QUINN:**

23   Q    DO YOU KNOW WHEN THE DOCUMENTS WERE CREATED?

24         **MR. SLOAN:**  OBJECTION.  LACK OF FOUNDATION.

25         **THE COURT:**  OVERRULED.          01:04

1          **THE WITNESS:**  NO, I DON'T KNOW WHEN THE DRAWINGS WERE

2    CREATED.

3    **BY MR. QUINN:**

4    Q    YOUR TESTIMONY THAT YOU'VE GIVEN THE JURY ABOUT THE

5    SPACING OF THE ENTRY, THE FORMAT, THE HABITS OF THE WRITER, THE          01:04

6    COMMAS, THE CONCEPT OF THE SELF-SERVING HANDWRITTEN ENTRY, IS

7    THIS TESTIMONY SUPPORTED BY WELL-RECOGNIZED PRINCIPALS OF

8    HANDWRITING IDENTIFICATION?

9    A    YES.  AND THESE ARE ISSUES THAT I AM INVOLVED WITH QUITE

10   OFTEN DURING MY EXAMINATIONS.                                            01:04

11   Q    AND BASED ON YOUR EXAMINATION OF THIS ENTRY IN THE NOTARY

12   BOOK, WHAT, IN THE END, WAS YOUR CONCLUSION?

13   A    MY CONCLUSION IS THAT THE FIRST FOUR LINES WERE WRITTEN

14   AND SPACED APPROPRIATELY and THE SIZE OF THE WRITING OF THE

15   SECOND, THIRD, AND FOURTH LINE IS VERY SIMILAR.  NATURALLY,              01:05

16   THERE WILL BE AN "A," FOR EXAMPLE, IN "Hallidae" ON LINE THREE

17   THAT'S A LITTLE LARGER THAN AN "A" IN "cHARACTERS" ON THE

18   SECOND LINE, AND I WOULD EXPECT TO SEE A LITTLE DIFFERENCE IN

19   CERTAIN LETTER FORMS BECAUSE NO ONE WRITES A LETTER FORM

20   EXACTLY THE SAME SIZE AND THE SAME WAY TWICE.                            01:05

21          BUT OVERALL, THE THREE LINES OF WRITING, WHICH ARE

22   THE SECOND, THIRD, AND FOURTH LINES, ARE VERY SIMILAR SIZED.

23   THERE WAS AMPLE ROOM, IF THE PERSON INTENDED TO WRITE A FIFTH

24   LINE, TO SQUEEZE UP OR TIGHTEN UP THE FIRST FOUR LINES.  AND

25   BASED UPON ALL OF THE ELEMENTS THAT I TESTIFIED ON, I FIND THAT         01:06

```
 1   THE FIRST FOUR LINES WERE DESIGNED AND SPACED FOR FOUR LINES
 2   ALONE, ESPECIALLY WITH THOSE LONG PROTRUDING COMMAS THAT COME
 3   DOWN TO THE BOTTOM PRINTED LINE; AND THE FIFTH LINE WAS NOT
 4   WRITTEN CONTINUOUSLY RIGHT AFTER THE FIRST FOUR LINES OF
 5   WRITING.                                                        01:06
 6   Q   DO YOU HAVE AN OPINION AS TO WHETHER THE PERSON WHO WROTE
 7   THE FIRST FOUR LINES, AS THAT PERSON WAS WRITING THEM, INTENDED
 8   AT THAT TIME TO WRITE A FIFTH LINE?
 9           MR. SLOAN:  OBJECTION, YOUR HONOR.  LACK OF
10   FOUNDATION; CALLS FOR SPECULATION.                             01:06
11           THE COURT:  LAY A FOUNDATION FOR THIS, COUNSEL.
12   BY MR. QUINN:
13   Q   BASED UPON YOUR ANALYSIS, THE SPACING, THE SPEED WITH
14   WHICH THE WRITER WROTE, AND THE OTHER FACTORS YOU'VE
15   IDENTIFIED, DO YOU HAVE AN OPINION WHETHER OR NOT THE PERSON    01:06
16   WHO WROTE THE FIRST FOUR LINES, AT THE TIME THEY WERE WRITING
17   IT, INTENDED TO WRITE A FIFTH LINE?
18           MR. SLOAN:  YOUR HONOR, CALLS FOR SPECULATION.
19           THE COURT:  OVERRULED.
20           MR. SLOAN:  LACK OF FOUNDATION.                        01:07
21           THE COURT:  OVERRULED.
22           IT'S JUST A YES OR NO QUESTION, THOUGH.  HE ASKED YOU
23   IF YOU HAD AN OPINION.
24           THE WITNESS:  YES.
25           THE COURT:  FOUNDATION FOR THE OPINION, COUNSEL.       01:07
```

1    BY MR. QUINN:

2    Q    WHAT IS THE BASIS FOR YOUR OPINION AS TO WHETHER OR NOT

3    THE WRITER INTENDED TO WRITE THAT FIFTH LINE AT THE TIME?

4         THE COURT:   WITHOUT GIVING THE CONCLUSION, JUST THE

5    BASIS OF THE OPINION.                                          01:07

6         THE WITNESS:   THE BASIS OF THE OPINION, AS I

7    TESTIFIED BEFORE, AS YOU CAN SEE ON THIS DEMONSTRATIVE, WITHOUT

8    THE FIFTH LINE, THE FIRST FOUR LINES ARE SPACED APART QUITE

9    CONSISTENTLY; THE COMMAS EXTEND TO THE BOTTOM LINES.  THE FIRST

10   FOUR LINES OF WRITING WAS WRITTEN VERY FLUENTLY AND NATURALLY,   01:07

11   AND THE COMMAS ALSO ACT AS AN OBSTRUCTION.  THE FIFTH LINE WAS

12   WRITTEN VERY SLOW AND DELIBERATELY.

13        IN OTHER WORDS, THE SPONTANEITY, THE RHYTHM, AND THE

14   TYPE OF WRITING, EVEN THE LETTER FORMS, ARE DIFFERENT IN SOME

15   REGARDS.  THEREFORE, I BELIEVE THAT --                         01:08

16        THE COURT:   LET ME STOP YOU THERE.

17   BY MR. QUINN:

18   Q    LET ME ASK YOU NOW THE PUNCH LINE, YOUR OPINION.

19        BASED UPON THAT ANALYSIS, WHAT IS YOUR OPINION AS TO

20   WHETHER OR NOT THE WRITER, THE PERSON WHO WROTE THE FIRST FOUR   01:08

21   LINES, INTENDED TO WRITE THE FIFTH LINE AT THE TIME THAT THE

22   PERSON WROTE THOSE LINES?

23        MR. SLOAN:   OBJECTION.  LACK OF FOUNDATION; CALLS FOR

24   SPECULATION.

25        THE COURT:   OVERRULED.                                   01:08

1          YOU MAY ANSWER.

2          **THE WITNESS:**  IT'S MY OPINION THAT THE PERSON

3   INTENDED TO WRITE THE FOUR LINES AND AFTER THE PERIOD IN

4   "MALES," THAT WAS THE COMPLETED ENTRY.  AT A LATER POINT, THE

5   WORDS "FROM 1998 MISSOURI" WERE SQUEEZED INTO THAT POSITION.          01:08

6   **BY MR. QUINN:**

7   Q    THANK YOU, MR. CUNNINGHAM.

8          NOW, LET ME ASK YOU ABOUT DR. LYTER.

9          HAVE YOU LEARNED THAT MGA IN THIS CASE HAS RETAINED A

10  PERSON TO TESTIFY BY THE NAME OF DR. LYTER?          01:09

11  A    I DO HAVE THAT INFORMATION, SIR.

12  Q    AND DO YOU KNOW DR. LYTER?

13  A    I DO KNOW DR. LYTER.

14  Q    WHAT IS DR. LYTER'S BACKGROUND?

15         WELL, LET ME ASK, HOW MANY TIMES HAVE YOU WORKED WITH          01:09

16  DR. LYTER, OR ON THE SAME MATTER AS DR. LYTER?

17         **MR. SLOAN:**  YOUR HONOR, OBJECTION.  RELEVANCE.

18         **THE COURT:**  COUNSEL, WHERE ARE YOU GOING WITH THIS?

19         **MR. QUINN:**  TO CRITIQUE THE OTHER OPINION, YOUR

20  HONOR, RATHER THAN BRING HIM BACK.          01:09

21         **THE COURT:**  ARE YOU GOING TO BE CALLING DR. LYTER?

22         **MR. SLOAN:**  WE WILL BE CALLING DR. LYTER.

23         **THE COURT:**  OVERRULED.

24         YOU MAY PROCEED.

25  / / /          01:09

1    **BY MR. QUINN:**

2    Q    ON HOW MANY DIFFERENT OCCASIONS HAVE YOU WORKED ON THE

3    SAME MATTER WITH DR. LYTER?

4    A    I DON'T KNOW EXACTLY, BUT APPROXIMATELY 15 CASES OVER MY

5    CAREER.                                                                 01:09

6    Q    AND WOULD THAT INCLUDE CASES WHERE YOU AND HE HAVE BEEN

7    RETAINED EXPERTS TO THE SAME PARTY, AS WELL AS CASES WHERE YOU

8    WERE ADVISING OPPOSITE SIDES IN THE CASE?

9    A    NOT REALLY.  THERE WERE CASES WHERE I EXAMINED AND WORKED

10   ON DOCUMENT CASES AND I SUGGESTED MY CLIENT HIRE DR. LYTER FOR        01:10

11   AN INK ANALYSIS PROBLEM WITHIN THE CASE.

12   Q    AND IN THAT CONNECTION, DID YOU END UP WORKING WITH HIM IN

13   SOME FASHION?

14   A    I DID, SIR.

15   Q    AND ARE YOU FAMILIAR WITH DR. LYTER'S BACKGROUND AND            01:10

16   CREDENTIALS and AREAS OF EXPERTISE?

17   A    I HAVE READ HIS RESUMÉ AND I'VE SPOKEN TO DR. LYTER ON

18   MANY OCCASIONS PERSONALLY, AND I AM FAMILIAR WITH HIS LINE OF

19   EXPERTISE.

20   Q    AND HAVE YOU ALSO READ SOME OF HIS EXPERT REPORTS THAT          01:10

21   HE'S DONE?

22   A    OVER THE YEARS, I HAVE.

23   Q    IS DR. LYTER A QUESTIONed DOCUMENT EXAMINER OR A forensic

24   DOCUMENT EXAMINER?

25         **MR. SLOAN:**  OBJECTION, YOUR HONOR.  VAGUE AND              01:11

```
 1   AMBIGUOUS; CALLS FOR SPECULATION; LACK OF FOUNDATION;

 2   IRRELEVANT.

 3          THE COURT:  OVERRULED.

 4          THE WITNESS:  DR. LYTER --

 5          THE COURT:  THE ONE OBJECTION THAT I DID HEAR THERE      01:11

 6   IS FOUNDATION, COUNSEL.

 7          LET'S ESTABLISH WHAT HE'S BASING HIS ASSESSMENT OF

 8   DR. LYTER ON.

 9          MR. QUINN:  THANK YOU, YOUR HONOR.

10   BY MR. QUINN:                                                  01:11

11   Q   WHAT IS THE BASIS FOR WHATEVER -- DON'T TELL ME YET WHAT

12   IT IS, BUT WHAT IS THE BASIS FOR THE INFORMATION THAT YOU HAVE

13   CONCERNING DR. LYTER'S EXPERTISE AND BACKGROUND?  HOW IS IT

14   THAT YOU KNOW WHAT YOU kNOW?

15   A   PERSONAL KNOWLEDGE.                                        01:11

16   Q   CAN YOU GIVE US A LITTLE MORE?  HOW DID YOU ACQUIRE THIS

17   PERSONAL KNOWLEDGE?

18   A   PERSONAL KNOWLEDGE FROM READING HIS RESUMÉ, FROM TALKING

19   WITH HIM, BY COLLABORATING ON CERTAIN CASES WITH HIM, AND FROM

20   DISCUSSING CERTAIN CASES WITH HIM.                             01:11

21   Q   AND YOU'VE WORKED WITH HIM PROFESSIONALLY; IS THAT

22   CORRECT?

23   A   WELL, NOT TOGETHER.  WE WORK SEPARATELY ON A CASE BECAUSE

24   WHAT HE DOES IS COMPLETELY DIFFERENT THAN WHAT I DO.

25   Q   BASED UPON YOUR EXPERIENCE WITH DR. LYTER, AS YOU'VE       01:12
```

1    DESCRIBED IT, WHAT IS YOUR UNDERSTANDING OF DR. LYTER'S AREA OF

2    EXPERTISE?

3            **MR. SLOAN:**  YOUR HONOR, OBJECTION.

4            COULD I ASK FOR A SIDE-BAR, YOUR HONOR?

5            **THE COURT:**  SURE.                                          01:12

6            (WHEREUPON, THE FOLLOWING PROCEEDINGS

7            WERE HELD AT SIDE-BAR:)

8            **MR. SLOAN:**  YOUR HONOR, I THINK IT'S APPROPRIATE, IF

9    MR. QUINN WANTS TO CROSS-EXAMINE THE WITNESS ON HIS RESUME,

10   THEN THAT'S FAIR GAME.  I ALSO THINK IT'S FAIR FOR HIM -- I       01:12

11   THINK IT'S BEYOND THE SCOPE, BUT I UNDERSTAND YOU DON'T WANT TO

12   HAVE TO CALL HIM BACK; SO GIVEN THAT CONTEXT, I THINK

13   PERHAPS --

14           **THE COURT:**  BEYOND THE SCOPE OF WHAT?

15           **MR. SLOAN:**  DR. LYTER HAS NOT TESTIFIED YET, SO MY       01:13

16   INITIAL OBJECTION WAS I THINK IT'S INAPPROPRIATE FOR HIM TO

17   COMMENT ON DR. LYTER AT ALL.  I UNDERSTAND --

18           **THE COURT:**  BOTH COUNSEL HAVE, WITH A PREVIOUS

19   WITNESS AND WITH MR. BRYANT, DONE SOME FORESHADOWING OF

20   WITNESSES TO COME.                                               01:13

21           **MR. SLOAN:**  I'M NOT GOING TO ARGUE THAT ISSUE.  WHAT

22   I'M GOING TO ARGUE IS I THINK IT MAY BE APPROPRIATE FOR

23   MR. QUINN TO ASK MR. CUNNINGHAM ABOUT HIS OPINION ABOUT

24   DR. LYTER'S REPORT.  THAT'S ONE THING.  BUT I DON'T THINK IT'S

25   APPROPRIATE FOR HIM TO ASK FOR MR. CUNNINGHAM'S COMMENTS ON      01:13

| 1 | DR. LYTER'S CREDENTIALS.  I THINK HE CAN ESTABLISH THAT THROUGH |
|---|---|

1   DR. LYTER'S CREDENTIALS.  I THINK HE CAN ESTABLISH THAT THROUGH

2   CROSS-EXAMINATION.  I DON'T THINK AN EXPERT'S VIEW OF THE

3   CREDENTIALS OF ANother EXPERT ARE APPROPRIATE.

4           **THE COURT:**  THANK YOU, COUNSEL.

5           MR. QUINN?                                                  01:13

6           **MR. QUINN:**  WHAT HE WOULD SAY IS HE KNOWS HIM THROUGH

7   PROFESSIONAL ORGANIZATIONS AND THAT HE'S AN INK EXPERT AND HE

8   IS RECOGNIZED AS AN INK EXPERT AND HE HAS RECOMMENDED THAT

9   CLIENTS RETAIN HIM AS SUCH.  BUT HE'S NOT WHAT MR. CUNNINGHAM

10  IS.  HE'S NOT A forensic DOCUMENT EXAMINER.                        01:14

11          **THE COURT:**  AND WHAT'S THE FOUNDATION FOR HIM KNOWING

12  HE'S NOT A forensic DOCUMENT EXAMINER?

13          **MR. QUINN:**  HE SAID HE'S WORKED ON SIMILAR MATTERS

14  WITH HIM AT LEAST 15 TIMES.

15          **THE COURT:**  RIGHT.                                     01:14

16          **MR. QUINN:**  HE'S RECOMMENDED CLIENTS USE HIM.  HE'S

17  READ HIS REPORTS.  HE'S SPOKEN WITH HIM.  HE'S COLLABORATED

18  WITH HIM.  He'd ALSO SAY THAT HE'S WORKED WITH HIM IN

19  PROFESSIONAL ORGANIZATIONS; SO THAT'S HOW HE KNOWS HE'S AN INK

20  EXPERT.                                                           01:14

21          **THE COURT:**  WE NOT ONLY DESIGNATE HIM AS a forensic

22  EXAMINER, WE DIDN'T GET INTO WHAT THAT WAS ABOUT.  LETS LAY

23  FOUNDATION FOR WHAT A forensic EXAMINER IS AS OPPOSED TO AN INK

24  EXPERT.  I SUSPECT THE JURY WOULDN'T KNOW THE DIFFERENCE RIGHT

25  NOW.                                                              01:14

1     **MR. QUINN:** I MAY HAVE BLOWN THROUGH THAT TOO

2  QUICKLY.

3     **THE COURT:** THERE WERE A FEW QUESTIONS ABOUT IT, BUT

4  IN TERMS OF EXPLAINING IT AS TO WHAT SPECIFICALLY IT MEANS --

5     **MR. QUINN:** OKAY.                                   01:14

6     **THE COURT:** IF THERE'S ANY FOUNDATION FOR

7  DISTINGUISHING BETWEEN SOMEONE WHO'S QUALIFIED AS AN INK EXPERT

8  AND SOMEONE -- THAT'S NOT THERE YET; SO RIGHT NOW I'LL SUSTAIN

9  THE OBJECTION ON FOUNDATION TO THIS QUESTION ON THAT BASIS.

10  ONCE WE GET BEYOND THAT, THERE IS THIS ISSUE OF WHETHER OR NOT   01:15

11  WE will CALL THIS EXPERT IN a REBUTTAL CASE. I SUPPOSE, IF

12  WE'RE DOING IT NOW --

13     **MR. SLOAN:** THE RELEVANT ISSUE IS WHETHER HIS OPINION

14  IS SUSTAINABLE. I THINK IT'S APPROPRIATE FROM A POINT TO USE

15  EVERYTHING IN HIS ARSENAL TO ATTACK MR. LYTER'S OPINION AS     01:15

16  THOUGH MR. LYTER -- BUT I DON'T THINK IT'S APPROPRIATE TO PUT

17  ON A WITNESS TO ATTACK ANOTHER WITNESS'S CREDENTIALS. THAT'S

18  WHY -- MR. QUINN WILL HAVE FULL OPPORTUNITY TO CROSS-EXAMINE

19  OUR WITNESS WITH DR. LYTER TO ASK HIM ABOUT HIS CREDENTIALS, TO

20  ASK HIM WHETHER THERE'S A BASIS FOR HIS OPINION. I DON'T THINK  01:15

21  HAVING ANOTHER EXPERT TESTIFY ABOUT SOME OTHER EXPERT'S

22  QUALIFICATIONS -- I DON'T THINK THAT'S APPROPRIATE TESTIMONY.

23     **THE COURT:** I APPRECIATE YOUR OPINION ON THAT.

24     LAY APPROPRIATE FOUNDATION, COUNSEL.

25     **MR. QUINN:** ALL RIGHT.                              01:16

1          **THE COURT:**  THANK YOU.

2          (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

3    **BY MR. QUINN:**

4    Q    MR. CUNNINGHAM, GO BACK TO THE CONCEPT OF THE FIELD OF

5    forensic DOCUMENT EXAMINATION.                                    01:16

6          CAN YOU EXPLAIN WHAT THAT IS.  AND I'M ASKING YOU TO

7    DISTINGUISH IT FROM INK ANALYSIS, IF YOU WILL.

8    A    YES.

9          IN MY PROFESSION, forensic DOCUMENT EXAMINATION, AS I

10   TESTIFIED PREVIOUSLY TO, I EXAMINE HANDWRITING, HANDPRINTING; I   01:16

11   DO PRELIMINARY EXAMINATIONS OF INK, PRELIMINARY EXAMINATIONS OF

12   PAPER FIBER; I EXAMINE COMPUTER PRINTING; I EXAMINE

13   TYPEWRITING, ALTHOUGH THERE'S NOT MUCH OF IT LEFT NOWADAYS; AND

14   I EXAMINE DOCUMENTS FOR ANY TYPES OF ALTERATIONS OR ADDITIONS

15   TO DOCUMENTS, ERASURES.  AND, FOR EXAMPLE, I WILL EXAMINE --     01:17

16   WHEN IT COMES TO ADDITIONS IN DOCUMENTS, SOMETIMES PEOPLE WILL

17   MAKE A "4" OUT OF A "1," AND THEY'LL MAKE A "9" OUT OF A "7,"

18   AND THEY'LL MAKE AN "8" OUT OF A "3."  AND I EXAMINE THE

19   STROKES OF THE PEN TO DETERMINE IF ADDITIONS HAVE BEEN MADE.

20         AN INK CHEMIST IS JUST WHAT IT SAYS:  A PERSON IS AN      01:17

21   INK CHEMIST.  THEY ANALYZE INK TO DETERMINE THE CHEMICAL

22   COMPONENTS OF THE INK; THEY ANALYZE INK TO DETERMINE WHO'S THE

23   MANUFACTURER, SUCH AS the BIC PEN COMPANY MANUFACTURES A

24   CERTAIN INK; AND WHAT TYPE OF PEN.  AND THEY ALSO TRY TO DATE

25   THE INK THAT'S ON A PAPER.  SO WHEN I HIRE AN INK CHEMIST,       01:18

1    THROUGH MY CLIENT, SUCH AS I HAVE DONE IN THE PAST WITH

2    DR. LYTER, I HIRE HIM AS AN INK CHEMIST TO DO THE INK WORK, NOT

3    TO BE A DOCUMENT EXAMINER.

4    Q    DO YOU EVER HOLD YOURSELF OUT AS AN INK EXPERT OR AS AN

5    INK CHEMIST?                                                      01:18

6    A    NOT AS AN INK CHEMIST, NO, SIR.

7    Q    WHEN YOU NEED THAT KIND OF HELP AS PART OF YOUR

8    EXAMINATION, I TAKE IT YOU HIRE OTHER PEOPLE.

9    A    YES.  I HIRE AN INK CHEMIST, WHO DOES INK CHEMISTRY.

10   Q    NOW, BASED ON YOUR FAMILIARITY WITH DR. LYTER, AS YOU'VE    01:18

11   DESCRIBED IT TO US, IS HE A forensic DOCUMENT EXAMINER?

12           MR. SLOAN:  OBJECTION.  LACK OF FOUNDATION,

13   YOUR HONOR.

14           THE COURT:  THIS IS BASED ON YOUR EARLIER TESTIMONY

15   ON YOUR RESUMÉ, ET CETERA?                                       01:18

16           THE WITNESS:  RESUME AND PERSONAL KNOWLEDGE,

17   YOUR HONOR.

18           THE COURT:  OVERRULED.

19           THE WITNESS:  NO.  DR. LYTER IS NOT A forensic

20   DOCUMENT EXAMINER.  IN FACT, IF HE WAS A DOCUMENT EXAMINER, HE   01:19

21   WOULD BE A MEMBER OF OUR ASSOCIATIONS AND BE ACCEPTED AS A

22   forensic DOCUMENT EXAMINER.  AND THAT JUST HAS NOT HAPPENED.

23   BY MR. QUINN:

24   Q    WHAT IS HIS AREA OF EXPERTISE?

25   A    HE'S AN INK CHEMIST.                                        01:19

```
 1              MR. QUINN:  THANK YOU, MR. CUNNINGHAM.

 2              THE COURT:  CROSS-EXAMINATION.

 3                          CROSS-EXAMINATION

 4     BY MR. SLOAN:

 5     Q    GOOD AFTERNOON, MR. CUNNINGHAM.                      01:20

 6          HOW ARE YOU?

 7     A    FINE.  THANK YOU.

 8     Q    WE'VE MET BEFORE; CORRECT?

 9     A    AT MY DEPOSITION, YES, SIR.

10     Q    AND I SAW YOU HERE LAST WEEK AS WELL; IS THAT CORRECT?   01:20

11     A    ON STANDBY, YES, SIR.

12     Q    AND YOU WERE HERE ON WEDNESDAY AS WELL?

13     A    I DON'T RECALL EVERY DAY, BUT I WAS HERE OFF AND ON FOR

14     THE PAST TWO WEEKS.

15     Q    SIR, YOU RECALL YOU WERE OUTSIDE IN THE HALLWAY TWO DAYS   01:20

16     AGO, DON'T YOU?

17     A    YES.

18     Q    YOU REMEMBER THAT?

19     A    I DO.

20     Q    HAVE YOU OBSERVED PART OF THIS TRIAL, OTHER THAN YOUR   01:20

21     TESTIMONY TODAY?

22     A    NO.

23     Q    YOU HAVEN'T OBSERVED ANY OF IT.

24     A    NO.

25     Q    YOU HAVEN'T OBSERVED ANY OF MR. BRYANT'S TESTIMONY.   01:20
```

```
 1   A     NO.

 2   Q     LET ME ASK YOU SOME QUESTIONS ABOUT DR. LYTER AND ABOUT

 3   YOUR OWN BACKGROUND.

 4         HOW LONG HAVE YOU KNOWN DR. LYTER?

 5   A     I CAN JUST GIVE YOU AN ESTIMATE.  I WOULD SAY AT LEAST      01:20

 6   25 YEARS.

 7   Q     AND HAVE YOU REVIEWED DR. LYTER'S RESUMÉ?

 8   A     I HAVE LOOKED AT HIS RESUMÉ, YES, SIR.

 9   Q     AND ARE YOU AWARE THAT HE HAS A PH.D. IN CHEMISTRY?

10   A     OF COURSE.                                                 01:21

11   Q     SIR, YOU DON'T EVEN HAVE A COLLEGE DEGREE, DO YOU, SIR?

12   A     NO, I DO NOT HAVE A COLLEGE DEGREE.

13   Q     AND YOU SPOKE ABOUT SOME OF THE CREDENTIALING

14   ORGANIZATIONS OF forensic DOCUMENTS; IS THAT CORRECT?

15   A     YES, SIR.                                                  01:21

16   Q     LET'S TALK ABOUT WHAT IT MEANS TO BE A forensic DOCUMENT

17   EXAMINER.

18         YOU MENTIONED THAT forensic DOCUMENT EXAMINERS

19   ANALYZE HANDWRITING; THEY LOOK AT ERASURES.

20         THEY DO, FOR INSTANCE, THE INDENTATION MATERIALIZER        01:21

21   THAT YOU DO; IS THAT CORRECT?

22   A     YES, SIR.

23   Q     THEY ALSO LOOK AT PAPER FIBER; CORRECT?

24   A     YES.

25   Q     YOU'RE AWARE, AREN'T YOU, THAT, IN FACT, DR. LYTER IS      01:22
```

1    REGULARLY RETAINED AND HAS REGULARLY TESTIFIED AS AN EXPERT ON

2    ALL OF THOSE SUBJECT MATTERS, EXCEPT FOR HANDWRITING ANALYSIS?

3    ARE YOU AWARE OF THAT?

4    A    NO, I'M NOT AWARE OF THAT.

5    Q    SO YOU'RE NOT AWARE OF ALL OF THE CASES IN WHICH DR. LYTER          01:22

6    TESTIFIES, ARE YOU?

7    A    OF COURSE NOT.

8    Q    HAVE YOU EXAMINED EACH AND EVERY MATTER IN WHICH HE'S BEEN

9    RETAINED?

10   A    NO.                                                                 01:22

11   Q    AND LET ME ASK YOU ABOUT SOME OF THE CREDENTIALING

12   ORGANIZATIONS.

13         THERE IS AN ORGANIZATION CALLED THE AMERICAN SOCIETY

14   OF forensic DOCUMENT EXAMINERS; CORRECT?

15   A    NO.                                                                 01:22

16   Q    DO I HAVE THAT WRONG?

17   A    YES.

18   Q    YOU PROBABLY KNOW THE CORRECT NAME.

19         IT'S THE AMERICAN BOARD OF forensic DOCUMENT

20   EXAMINERS?  IS THAT THE ONE I'M LOOKING FOR?                            01:23

21   A    I DON'T KNOW IF THAT'S WHAT YOU'RE LOOKING FOR, BUT THAT

22   IS AN ORGANIZATION, SIR.

23   Q    AND YOU THINK THAT IS ONE OF THE ORGANIZATIONS THAT

24   CREDENTIALS forensic DOCUMENT EXAMINERS; CORRECT?

25   A    YES.  IT'S A CERTIFYING BODY.                                      01:23

```
 1   Q    AND YOU'RE NOT CERTIFIED BY THAT BODY, ARE YOU, SIR?

 2   A    NO, I'M NOT.

 3   Q    NOW, THERE'S ANOTHER ORGANIZATION CALLED THE AMERICAN

 4   BOARD OF CRIMINALISTS.

 5        ISN'T THAT THE NAME OF THE ORGANIZATION I'M THINKING    01:23

 6   OF?

 7   A    I DON'T KNOW, BUT IT HAS NOTHING TO DO WITH forensic

 8   DOCUMENT EXAMINATION.

 9   Q    YOU'RE FAMILIAR WITH THE AMERICAN BOARD OF CRIMINALISTS;

10   RIGHT?                                                       01:23

11   A    NO.

12   Q    I'M SORRY.  I THINK I'M PRONOUNCING IT WRONG.

13        IT'S THE AMERICAN BOARD OF CRIMINALISTICS.

14        ARE YOU FAMILIAR WITH THAT ORGANIZATION?

15   A    NO.                                                     01:23

16   Q    ARE YOU FAMILIAR WITH THE FACT THAT DR. LYTER IS A MEMBER

17   OF THAT ORGANIZATION?

18   A    HE POSSIBLY COULD BE, BUT IT'S NOT A DOCUMENT EXAMINER'S

19   ASSOCIATION.

20   Q    YOU'RE NOT CERTIFIED BY THAT ORGANIZATION, ARE YOU, SIR? 01:24

21   A    I DON'T EVEN KNOW IF THEY HAVE A CERTIFICATION, AND I

22   WOULDN'T BE BECAUSE THEY'RE NOT A DOCUMENT EXAMINER'S

23   ASSOCIATION.

24   Q    I WANTED TO ASK YOU SOME QUESTIONS ABOUT THE NOTARY BOOK

25   THAT YOU SPOKE ABOUT EARLIER.                                01:24
```

1          **MR. SLOAN:**  CAN WE PUT UP EXHIBIT 60 ON THE SCREEN,

2    THE FIRST PAGE.

3    **BY MR. SLOAN:**

4    Q    THIS IS THE JOURNAL; CORRECT?

5    A    YES, THIS IS A NOTARY JOURNAL.                              01:25

6    Q    DO YOU HAVE THE ORIGINAL COPY IN FRONT OF YOU?

7    A    I DO, SIR.

8    Q    LET'S LOOK AT THE LINE THAT YOU CLAIM IS SUSPICIOUS; I

9    THINK IT'S ON PAGE 11 OF THE JOURNAL.

10   A    IT IS.                                                       01:25

11   Q    LET'S LOOK AT THAT FOR A SECOND, SIR.

12         NOW, YOU SAID THAT YOU BELIEVE THE FIFTH LINE HERE,

13   "FROM 1998 MISSOURI," IS SUSPICIOUS BECAUSE IT'S CROWDED AND

14   IT'S SLOWLY WRITTEN; CORRECT?

15   A    NO.  THERE WERE MANY OTHER ELEMENTS THAT WERE INCORPORATED   01:26

16   INTO THAT, JUST NOT THAT ONE ELEMENT.

17   Q    BUT THOSE ARE TWO OF THE ELEMENTS; CORRECT?

18   A    THAT'S CORRECT, SIR.

19   Q    AND YOU ALSO SAID THAT ONE OF THE ELEMENTS THAT CAUSED YOU

20   TO THINK IT WAS SUSPICIOUS IS THAT IT WAS SQUEEZED IN; IS THAT   01:26

21   CORRECT?

22   A    THAT'S ONE OF THE ELEMENTS, YES, SIR.

23   Q    NOW, AS PART OF YOUR EXAMINATION OF THE NOTARY BOOK, YOU

24   REVIEWED MS. JACQUELINE PRINCE'S TESTIMONY, HER DEPOSITION;

25   CORRECT?                                                         01:26

```
 1   A    NO.

 2   Q    YOU DIDN'T?

 3   A    NOT THAT I RECALL.

 4   Q    OKAY.

 5        WELL, SIR, DON'T YOU THINK IT WOULD HAVE BEEN                01:26

 6   RELEVANT TO YOUR EXAMINATION OF THE NOTARY BOOK TO HAVE

 7   REVIEWED MS. PRINCE'S DEPOSITION?

 8   A    ABSOLUTELY NOT.

 9   Q    SO YOU DON'T THINK THAT YOU SHOULD REVIEW THE TRANSCRIPT

10   OF SOMEONE WHO PREPARED A NOTARY BOOK THAT YOU'RE EXAMINING.     01:27

11   A    NO.  MY EXAMINATION SHOULD BE BASED ON THE EVIDENCE, NOT

12   HEARSAY OR ANOTHER PERSON'S TESTIMONY.

13   Q    AND, IN FACT, YOU THINK IT WOULD HAVE BEEN INAPPROPRIATE

14   FOR YOU TO HAVE REVIEWED MS. PRINCE'S DEPOSITION TESTIMONY,

15   DON'T YOU, SIR?                                                  01:27

16   A    YES.

17   Q    OKAY.

18        SIR, COULD I HAVE YOU -- ARE YOU SURE, AS YOU SIT

19   HERE TODAY -- YOU'VE TAKEN AN OATH; CORRECT?

20   A    YES.                                                        01:27

21   Q    SO YOU'RE ANSWERING UNDER PENALTY OF PERJURY; IS THAT

22   CORRECT?

23   A    ABSOLUTELY.

24   Q    AND ARE YOU ABSOLUTELY SURE THAT YOU DID NOT REVIEW

25   MS. PRINCE'S DEPOSITION TESTIMONY BEFORE PREPARING YOUR REPORT?  01:27
```

```
 1   A    AS I PREVIOUSLY TESTIFIED, I DON'T RECALL IF I DID OR NOT.

 2   Q    SIR, I THINK YOU SAID THAT YOU DIDN'T REVIEW IT.

 3        DIDN'T YOU SAY THAT YOU DIDN'T REVIEW IT?

 4   A    NO, I DIDN'T SAY I DIDN'T REVIEW IT.

 5        MY BEST RECOLLECTION IS, MY ANSWER IS THAT I DON'T          01:27

 6   RECALL IF I READ IT IN ITS ENTIRETY OR PART OF IT OR IF I

 7   DIDN'T READ IT AT ALL.

 8   Q    BUT, SIR, I THOUGHT -- MAYBE I'M MISTAKEN, BUT I THOUGHT

 9   YOU HAD JUST SAID THAT IT WOULD HAVE BEEN INAPPROPRIATE FOR YOU

10   TO HAVE READ IT.                                               01:28

11   A    IT WOULD HAVE BEEN INAPPROPRIATE FOR ME TO BASE MY

12   FINDINGS AND CONCLUSIONS ON WHAT IS SAID IN THE DEPOSITION.

13   Q    SIR, ARE YOU CERTAIN, AS YOU SIT HERE TODAY, THAT YOU

14   DIDN'T SAY IT WOULD BE INAPPROPRIATE FOR YOU TO HAVE READ HER

15   TESTIMONY?                                                     01:28

16   A    IT WOULD BE INAPPROPRIATE TO READ THE DEPOSITION TESTIMONY

17   IF IT CAUSED ME TO CONCLUDE CERTAIN INFORMATION OUTSIDE THE

18   SCOPE OF MY EXAMINATION.

19   Q    SO YOU'RE SAYING YOU DON'T THINK IT WOULD BE RELEVANT TO

20   KNOW WHETHER THERE WERE PARTICULAR CIRCUMSTANCES WHICH MAY HAVE  01:28

21   CAUSED THAT HANDWRITING TO HAVE BEEN SQUEEZED IN?  THAT

22   WOULDN'T HAVE BEEN SIGNIFICANT TO YOU?

23   A    NO.

24   Q    BUT YOU DID THINK THAT IT WAS ALL RIGHT TO SPEAK TO

25   MS. HUTNYAN, MATTEL'S COUNSEL, WHO TOLD YOU, APPARENTLY, ALL    01:29
```

```
 1    KINDS OF INFORMATION ABOUT CARTER BRYANT; CORRECT?

 2    A    SHE DID.

 3    Q    SO YOU THOUGHT THAT WAS APPROPRIATE, BUT IT WAS

 4    INAPPROPRIATE FOR YOU TO LOOK AT OR CONSIDER MS. PRINCE'S

 5    DEPOSITION TESTIMONY.                                        01:29

 6         THAT'S WHAT YOU'RE TESTIFYING TODAY; CORRECT?

 7    A    NO.  IT ALL DEPENDS WHEN I RECEIVED THE INFORMATION FROM

 8    MS. HUTNYAN, AND IT ALL DEPENDS WHEN A PERSON READS A

 9    DEPOSITION TRANSCRIPT.

10    Q    SIR, BUT YOU RECEIVED THE INFORMATION FROM MS. HUTNYAN   01:29

11    BEFORE YOU EXAMINED THE NOTARY BOOK; CORRECT?

12    A    THE ONLY INFORMATION I RECEIVED FROM MS. HUTNYAN BEFORE I

13    EXAMINED THE NOTARY BOOK WAS THAT SHE THOUGHT THAT THIS WAS A

14    SUSPICIOUS ENTRY AND SHE WANTED ME TO EXAMINE ALL OF THE

15    WRITING IN THE "DOCUMENT KIND OR TYPE" SECTION IN THE NOTARY  01:29

16    BOOK.

17    Q    SO MATTEL'S ATTORNEY TOLD YOU THAT SHE THOUGHT IT WAS

18    SUSPICIOUS, AND THEN YOU LOOKED AT IT AND YOU DETERMINED THAT

19    IT WAS, IN FACT, SUSPICIOUS.

20         IS THAT WHAT HAPPENED?                                  01:30

21    A    THAT'S CORRECT.

22    Q    BY THE WAY, YOU PREPARED A REPORT IN CONNECTION WITH THIS

23    CASE, DIDN'T YOU?

24    A    YES.

25    Q    AND WOULD IT REFRESH YOUR RECOLLECTION AS TO WHETHER OR  01:30
```

1    NOT YOU EVER REVIEWED MS. PRINCE'S DEPOSITION FOR YOU TO LOOK

2    AT YOUR EXPERT REPORT?

3    A    YES, IT WOULD CLARIFY IT.

4    Q    COULD YOU TAKE A LOOK AT 4623.  IT'S IN THE WHITE BINDER

5    THAT'S IN FRONT OF YOU, ALTHOUGH I SUSPECT IT MAY ALSO BE IN          01:30

6    THE BLACK BINDER.  IF YOU COULD LOOK AT THE LAST PAGE OF THAT.

7    IT'S PAGE 11, EXHIBIT 4623-11.  IF YOU COULD LOOK AT THE SECOND

8    PARAGRAPH.

9         DO YOU HAVE THAT, SIR?

10   A    I'M LOOKING FOR IT.                                             01:30

11        WHICH NUMBER IS IT, AGAIN?

12   Q    IT'S EXHIBIT 4623, AND IT'S THE ELEVENTH PAGE OF THAT

13   EXHIBIT, THE VERY FIRST SENTENCE IN THE SECOND PARAGRAPH, THAT

14   I'D LIKE YOU TO LOOK AT.

15   A    I HAVE IT.                                                      01:31

16   Q    LOOK AT THE SECOND PARAGRAPH OF THAT, THE FIRST LINE.

17        LET ME ASK YOU, DOES THAT REFRESH YOUR RECOLLECTION

18   THAT YOU REVIEWED THE DEPOSITION TESTIMONY TRANSCRIPT OF

19   MS. PRINCE?

20   A    WHAT PAGE IS THAT, AGAIN, SIR?                                  01:31

21   Q    IT'S THE LAST PAGE, SIR.  IT'S PAGE 11.

22        DOES THAT REFRESH YOUR RECOLLECTION THAT YOU DID, IN

23   FACT, READ THE DEPOSITION TRANSCRIPT OF MS. PRINCE?

24   A    YES.  THAT'S AFTER I CONDUCTED MY EXAMINATION.

25   Q    SIR, IT DOESN'T SAY THAT YOU ONLY REVIEWED HER DEPOSITION      01:32

1    TRANSCRIPT AFTER YOU CONDUCTED THE EXAMINATION, DOES IT?

2    A    NO.  BUT THAT'S WHAT HAPPENED.

3    Q    WHEN YOU SAY YOU REVIEWED IT AFTER YOU CONDUCTED YOUR

4    EXAMINATION, THAT MEANS AFTER YOU LOOKED AT THE NOTARY BOOK;

5    CORRECT?                                                      01:32

6    A    AFTER I EXAMINED THE ENTRY IN THE NOTARY BOOK, THE

7    ORIGINAL NOTARY BOOK, AND AFTER I REVIEWED COPIES OF THE

8    MATERIALS, I WAS GIVEN MS. PRINCE'S DEPOSITION TRANSCRIPT, AND

9    IN IT, IT WAS NOT IN HER CUSTODY AT ALL TIMES.

10         **MR. SLOAN:**  YOUR HONOR, MOVE TO STRIKE THE LAST PART   01:32

11   OF HIS ANSWER.

12         **THE COURT:**  IT'S STRICKEN.

13   **BY MR. SLOAN:**

14   Q    SIR, YOU DID REVIEW HER DEPOSITION; RIGHT?

15   A    I DON'T THINK I READ THE WHOLE THING, SIR.              01:33

16   Q    BUT YOU REVIEWED PARTS THAT YOU THOUGHT WERE IMPORTANT;

17   CORRECT?

18   A    NO.  I REVIEWED PARTS THAT I WAS ASKED TO REVIEW.

19   Q    THESE WERE PARTS THAT YOU WERE ASKED TO REVIEW BY MATTEL'S

20   COUNSEL; CORRECT?                                            01:33

21   A    CORRECT.

22   Q    AND I ASSUME THAT THEY ASKED YOU TO REVIEW THE PART IN

23   WHICH MS. PRINCE SAYS THAT THE REASON SHE HAD TO SQUEEZE IN THE

24   DEPOSITION TESTIMONY IS BECAUSE THERE WAS SO MUCH TEXT.

25         DID YOU REVIEW THAT PART, SIR?                         01:33

```
 1   A    I DON'T RECALL -- AS STATED IN MY REPORT, THE REASON I
 2   REVIEWED AND I WAS DIRECTED TO REVIEW IT WAS BECAUSE SHE SAID
 3   SHE WAS NOT IN THE POSSESSION OF THE NOTARY JOURNAL AT ALL
 4   TIMES.
 5          MR. SLOAN:  MOVE TO STRIKE THE LAST PART OF HIS        01:33
 6   ANSWER.
 7          THE COURT:  THE PROBLEM IS, IT WAS A COMPOUND
 8   QUESTION.
 9          OVERRULED AT THIS POINT.
10   BY MR. SLOAN:                                                 01:34
11   Q    SIR, ARE YOU AWARE THAT MS. PRINCE TESTIFIED THAT SHE HAD
12   TO SQUEEZE IN THE LAST LINE BECAUSE THERE WAS SO MUCH TEXT?
13          MR. QUINN:  ASSUMES FACTS NOT IN EVIDENCE,
14   YOUR HONOR.
15          THE COURT:  HE PUT IT IN EVIDENCE, COUNSEL, IN THE     01:34
16   LAST QUESTION.  IF I GRANT THE MOTION TO STRIKE, IT'S NO LONGER
17   IN EVIDENCE.  IF I OVERRULE, IT IS IN EVIDENCE.
18          MR. QUINN:  WITHDRAWN, YOUR HONOR.
19          THE COURT:  THANK YOU.
20          NEXT QUESTION, COUNSEL.                                01:34
21   BY MR. SLOAN:
22   Q    MR. CUNNINGHAM, ARE YOU AWARE THAT MS. PRINCE HAD
23   TESTIFIED THAT SHE WROTE ALL OF THE ENTRIES IN THIS PARTICULAR
24   BOX AT THE SAME TIME?
25   A    NO.                                                      01:35
```

```
 1   Q    YOU DIDN'T READ THAT PART OF HER TESTIMONY?

 2   A    NOT THAT I RECALL, SIR.

 3   Q    SO MATTEL DID NOT SHOW YOU THAT PART OF HER TESTIMONY; IS

 4   THAT CORRECT?

 5   A    I DON'T RECALL.                                          01:35

 6   Q    BUT YOU DO RECALL NOW THAT YOU, IN FACT, DID REVIEW

 7   PORTIONS OF MS. PRINCE'S TESTIMONY; CORRECT?

 8   A    THE PORTION WHERE SHE STATED THAT THE BOOK WAS NOT IN HER

 9   POSSESSION AT ALL TIMES.

10   Q    THAT'S THE ONLY PORTION YOU SAY YOU READ?               01:35

11   A    THAT'S THE ONLY PORTION I REMEMBER, AND THAT'S WHAT'S

12   REFLECTED IN MY REPORT.

13   Q    NOW, MR. CUNNINGHAM, YOU WOULD AGREE THAT IT'S MORE LIKELY

14   THAT YOU'RE GOING TO HAVE SQUEEZED-IN LINES IF YOU HAVE MORE

15   TEXT IN A BOX; RIGHT?  THE MORE TEXT THAT'S IN A BOX, THE MORE   01:36

16   LIKELY THAT SOME OF THE WRITING IS GOING TO BE SQUEEZED IN?

17   WOULD YOU SAY THAT'S FAIR?

18   A    IT ALL DEPENDS HOW A PERSON FORMATS AND ANTICIPATES HOW

19   MUCH INFORMATION IS GOING INTO THE BLOCK.

20   Q    MR. CUNNINGHAM, THIS PARTICULAR ENTRY HAS FIVE LINES OF    01:36

21   TEXT; IS THAT CORRECT?

22   A    IT DOES.

23   Q    OKAY.

24        AND HAVE YOU REVIEWED THE ENTIRE NOTARY BOOK?

25   A    I REVIEWED MOST OF THE ENTRIES IN THE NOTARY BOOK THAT ARE  01:36
```

```
 1   NOT RELATED TO THE BRYANT ENTRY.

 2   Q    OKAY.

 3        AND YOU'RE AWARE, AREN'T YOU, THAT, IN FACT, THIS IS

 4   THE ONLY BLOCK OF TEXT LIKE THIS THAT HAS FIVE LINES?  YOU'RE

 5   AWARE OF THAT, AREN'T YOU, SIR?                                01:37

 6   A    I AM.

 7   Q    OKAY.

 8        IN FACT, THERE'S NOT ANOTHER ENTRY IN THIS ENTIRE

 9   NOTARY BOOK WHERE THERE'S EVEN FOUR LINES IN A BOX; ISN'T THAT

10   RIGHT?                                                        01:37

11   A    THAT'S CORRECT.

12   Q    AND GIVEN THAT, ISN'T IT NATURAL THAT THE TEXT IN THIS BOX

13   WOULD BE MORE SQUEEZED IN THAN OTHER BOXES WHERE THERE ARE ONLY

14   THREE LINES OF TEXT?

15   A    OF COURSE.                                               01:37

16   Q    LET'S LOOK AT SOME OF THOSE OTHER ENTRIES.

17        BEFORE WE DO, THOUGH, LET ME ASK YOU, DID YOU NOTE

18   ANYWHERE IN YOUR REPORT THAT THIS WAS THE ONLY BOX THAT HAD

19   FIVE LINES OF TEXT?

20   A    NO.                                                      01:37

21   Q    YOU DIDN'T THINK THAT WAS SIGNIFICANT?

22   A    NO.  BECAUSE I WAS BASING IT ON THE FIVE LINES OF TEXT IN

23   THAT BOX.

24   Q    LET'S LOOK BRIEFLY AT PAGE 1 OF THE NOTARY BOOK.

25        THE COURT:  WHAT EXHIBIT, COUNSEL?                       01:38
```

1          **MR. SLOAN:**  IT'S EXHIBIT 60-A.  AND THE DOCUMENT PAGE

2    NUMBER IS ACTUALLY PAGE 9, ALTHOUGH THE PAGE OF THE NOTARY BOOK

3    ITSELF IS PAGE 1.

4    **BY MR. SLOAN:**

5    Q    THIS IS A REPRESENTATIVE SAMPLE OF THE NOTARY BOOK; IS          01:38

6    THAT CORRECT, MR. CUNNINGHAM?

7    A    YES.

8    Q    AND YOU NOTE THAT A BUNCH OF THE BOXES ON THE RIGHT-HAND

9    SIDE THAT HAVE INDIVIDUALS' ADDRESSES HAVE THREE LINES OF TEXT;

10   IS THAT CORRECT?                                                    01:38

11   A    THAT'S CORRECT.

12   Q    YOU DON'T SEE ANYTHING THAT HAS FOUR LINES OF TEXT, DO

13   YOU?

14   A    NO.

15   Q    NOTHING THAT HAS FIVE LINES.                                   01:38

16   A    NO.

17   Q    YOU INDICATED THAT ONE OF THE THINGS YOU FOUND SUSPICIOUS

18   IN THE ENTRY THAT YOU WERE TALKING ABOUT ON PAGE 11 -- YOU SAID

19   ONE OF THE THINGS YOU FOUND SUSPICIOUS HERE IS THAT THE WRITER

20   BEGAN WRITING THE FIRST LINE OF TEXT ON THE FIRST PREPRINTED       01:39

21   LINE; CORRECT?

22   A    NO.  THE FIRST LINE IS NOT SUSPICIOUS.  I JUST NOTED HOW

23   THE FIRST LINE WAS WRITTEN.

24          THE SECOND LINE IS A CONTRIBUTOR TO THE SUSPICIOUS

25   ENTRY ON THE FIFTH LINE BY BEING RAISED ABOVE THE SECOND          01:39

```
 1   MACHINE-PRINTED LINE.

 2   Q    THAT'S NOT THE QUESTION I ASKED YOU.

 3        THE QUESTION I ASKED IS, YOU NOTED THAT THE FIRST

 4   LINE OF TEXT IS FLUSH, OR RELATIVELY FLUSH, TO THAT FIRST

 5   PREPRINTED LINE, DIDN'T YOU?                                    01:40

 6   A    YES.  THAT'S A DIFFERENT QUESTION YOU JUST ASKED; BUT,

 7   YES, I AGREE.

 8   Q    YOU DID NOTE THAT?

 9   A    YES.

10   Q    AND YOU SAID THAT CONTRIBUTED TO WHAT YOU THOUGHT WAS      01:40

11   SUSPICIOUS ABOUT THIS, BECAUSE IF, IN FACT, THE WRITER KNEW AT

12   THE VERY SECOND THEY STARTED TO WRITE THIS THAT THEY WERE GOING

13   TO USE FIVE LINES, YOU THINK THEY WOULDN'T HAVE BEGUN ON THE

14   FIRST FLUSH LINE; CORRECT?

15   A    NO, THAT'S NOT MY TESTIMONY.                               01:40

16   Q    WELL, YOU DID STATE THAT IT WAS SIGNIFICANT TO YOU THAT

17   THE FIRST LINE WAS NOT FLUSH TO THAT FIRST HASH MARK; CORRECT?

18   A    NO.  MY SIGNIFICANCE WAS THE SECOND LINE, NOT THE FIRST

19   LINE.

20   Q    SO YOU DON'T THINK THERE'S ANYTHING SUSPICIOUS ABOUT THE   01:40

21   FIRST LINE.

22   A    NO.

23   Q    SIR, WOULD YOU AGREE -- LOOK THROUGH THE NOTARY BOOK --

24   ACTUALLY, LET'S GO BACK TO PAGE 1 THAT WE WERE LOOKING AT JUST

25   A MOMENT AGO.                                                   01:41
```

```
 1            WHY DON'T YOU LOOK AT THAT AND TELL ME WHETHER YOU
 2   WOULD AGREE THAT THE PERSON WHO WROTE THIS NOTARY BOOK,
 3   ASSUMING THAT IT'S ALL THE SAME AUTHOR -- AND YOU TESTIFIED
 4   EARLIER THAT YOU HAVE NO REASON TO BELIEVE, EXCEPT FOR POSSIBLY
 5   THAT LAST LINE -- YOU HAVE NO REASON TO BELIEVE THIS ISN'T ALL      01:41
 6   BY THE SAME AUTHOR; IS THAT CORRECT?
 7   A    THAT'S CORRECT.  THE BULK OF IT, AT LEAST, YES.
 8   Q    WOULD YOU AGREE THAT THE AUTHOR HAS A TENDENCY TO WRITE
 9   THE FIRST LINE OF TEXT FLUSH TO THE FIRST HORIZONTAL LINE IN
10   THE BOX?                                                           01:41
11   A    I WOULD PHRASE IT DIFFERENTLY, BUT I'LL TRY TO ANSWER IT.
12            THE FIRST LINE IS GENERALLY WRITTEN ON THE FIRST
13   MACHINE-PRINTED LINE.
14   Q    OKAY.  THAT'S MUCH MORE ELEGANT THAN I SAID, SO I
15   APPRECIATE IT.
16            BUT YOU WOULD AGREE THAT THAT IS, IN FACT, A COMMON
17   CHARACTERISTIC OF ALL OF THE WRITING IN THIS NOTARY BOOK,
18   WOULDN'T YOU?
19   A    YES.
20   Q    IN FACT, THAT'S ALSO COMMON TO THE ENTRY THAT YOU CLAIM IS    01:42
21   SUSPICIOUS; CORRECT?
22   A    YES.
23   Q    NOW, ANOTHER COMMON CHARACTERISTIC OF ALL OF THESE ENTRIES
24   IS THAT THE AUTHOR TRIES TO KEEP EVERYTHING AS MUCH AS POSSIBLE
25   WITHIN THE BOX, IN OTHER WORDS AT OR ABOVE THE BOTTOM              01:42
```

```
 1   PREPRINTED LINE.

 2           WOULD YOU AGREE THAT THAT'S TRUE?

 3   A    YES.  BUT THAT DOESN'T REPRESENT ALL OF THE ENTRIES.

 4   THERE ARE SOME DIFFERENCES PRESENT IN ENTRIES OTHER THAN WHAT

 5   IS OBSERVED ON THIS PAGE ONE.                                    01:43

 6   Q    OKAY.  DO YOU SEE ANY INSTANCE ON THIS PAGE, PAGE 1, WHERE

 7   THE AUTHOR GOES BELOW THE DARK PREPRINTED LINE AT THE BOTTOM OF

 8   THE BOX?

 9   A    YES.  IN FACT, THERE ARE SOME SMALLER COMMAS THAT THE

10   PERSON MAKES IN THIS SECTION YOU'RE REFERRING TO; AND SOME OF    01:43

11   THE SMALLER COMMAS PROTRUDE BELOW THE BOTTOM MACHINE-PRINTED

12   LINE.

13   Q    SO YOU'RE SAYING, SOMETIMES WHEN A PERSON WRITES A COMMA,

14   THEY ACTUALLY GO DOWN BELOW THE PREPRINTED LINE.

15   A    YES.  EITHER IF THEY WRITE A LARGE OR IF THEY WRITE A       01:43

16   SMALL COMMA, IT EXTENDS, AT TIMES, BELOW THE BOTTOM

17   MACHINE-PRINTED LINE.

18   Q    OTHER THAN THAT, WOULD YOU AGREE THAT THE AUTHOR OF THIS

19   NOTARY BOOK GENERALLY WRITES THE LAST LINE, THE THIRD LINE,

20   RIGHT ON THAT LAST LINE IN THE BOX, THE DARK LINE IN THE BOX?    01:44

21   A    YES.  FOR THE MOST PART, EXCEPT IN ONE INSTANCE, THE THIRD

22   BOX DOWN UNDER "NAME AND ADDRESS," THE PERSON HAS FLOATED THE

23   LAST LINE OF TEXT ABOVE THE BOTTOM PREPRINTED LINE; AND THERE

24   ARE A COUPLE OF INSTANCES, SUCH AS THE LAST BOX IN THE BOTTOM

25   OF THAT COLUMN, WHERE THE NUMERAL ONE ALSO PROTRUDES BELOW THE   01:44
```

1    LAST MACHINE-PRINTED LINE.

2    Q    WE NOTED THAT THE LAST LINE ON THIS PAGE -- THIS IS PAGE 1

3    OF THE NOTARY BOOK, WHICH IS PAGE 9 OF EXHIBIT 60-A -- IN ALL

4    OF THOSE CASES, THE LAST LINE IS BASICALLY RESTING ON THE

5    BOTTOM PREPRINTED LINE; CORRECT?                                    01:45

6    A    NO.  THERE ARE MANY INSTANCES THAT I CAN SEE IN THESE

7    BOXES -- FOR EXAMPLE, THE LAST BOX IN THE BOTTOM, FOR

8    LEWIS JOHNSON, THE ADDRESS AND THE STREET ARE RESTING ON THE

9    PRINTED LINE, BUT THE TOWN OF GARDENA IS FLOATING ABOVE THE

10   PRINTED LINE.  THE BOX ABOVE THE WORD "HALLDALE AVENUE," THE       01:45

11   CITY AND STATE, AND ESPECIALLY THE ZIP CODE, ARE FLOATING WAY

12   ABOVE THE BOTTOM PREPRINTED LINE.  BUT THEY'RE NOT ALL RESTING,

13   AS YOU SAY, RIGHT ON THE BOTTOM MACHINE-PRINTED LINE.

14   Q    SIR, LET'S LOOK AT THIS.

15        LET'S TURN BACK JUST FOR A MOMENT TO PAGE 11, THE ONE         01:45

16   YOU CLAIM IS THE SUSPICIOUS ENTRY.

17        AGAIN, SIR, YOU'RE CLAIMING THERE THAT ONE OF THE

18   THINGS THAT WAS SUSPICIOUS IS THAT THIS FOURTH LINE IS FLOATING

19   ABOVE THE LAST LINE; IS THAT CORRECT?

20   A    IT IS FLOATING ABOVE THE LAST LINE; HOWEVER, THAT LAST        01:46

21   SPACE BETWEEN THAT AND THE LINE IS REALLY OCCUPIED BY THOSE

22   COMMAS.

23   Q    SIR, THAT'S NOT THE QUESTION I ASKED.

24        THE QUESTION I ASKED IS, YOU CLAIM THAT ONE OF THE

25   REASONS THIS IS SUSPICIOUS IS BECAUSE THE FOURTH LINE IS           01:46

1  FLOATING ABOVE THE BOTTOM LINE; CORRECT?

2          **MR. QUINN:**  OBJECTION.  ASKED AND ANSWERED.

3          **THE COURT:**  OVERRULED.

4          **THE WITNESS:**  AS I MENTIONED, THE COMMAS ARE PART OF

5  THE FOURTH LINE AND THE COMMAS ARE NOT FLOATING ABOVE THE LINE.        01:47

6  **BY MR. SLOAN:**

7  Q    SIR --

8          **MR. QUINN:**  I AM AFRAID THE WITNESS DIDN'T GET A

9  CHANCE TO FINISH.

10         **THE COURT:**  WERE YOU FINISHED?        01:47

11         **THE WITNESS:**  YES, YOUR HONOR.

12         **THE COURT:**  VERY WELL.

13  **BY MR. SLOAN:**

14  Q    SIR, EXCLUDING THE COMMAS, WOULD YOU AGREE THAT THE FOURTH

15  LINE HERE IS FLOATING SIGNIFICANTLY ABOVE THE BOTTOM LINE OF        01:47

16  THIS BOX?

17  A    I HAVE TO ASK YOU, SIR, WHAT DO YOU MEAN BY

18  "SIGNIFICANTLY"?  I DON'T UNDERSTAND.

19  Q    WELL, IS IT FLOATING FAR ENOUGH ABOVE THE BOTTOM LINE THAT

20  SOMEONE COULD WRITE IN "FROM 1998 MISSOURI" UNDER IT?        01:47

21  A    THAT SOMEONE COULD SQUEEZE IT IN.

22  Q    SO, IN FACT, THERE IS ENOUGH ROOM TO WRITE ANOTHER LINE OF

23  TEXT; CORRECT?

24  A    IT'S OBVIOUS; ANOTHER LINE OF TEXT IS PRESENT THERE.

25  Q    SO LET'S GO BACK TO PAGE 1, AGAIN, SIR.  LET'S GO BACK TO        01:48

PAGE 1, WHICH IS PAGE 9 OF THE EXHIBIT.

      **MR. SLOAN:**  CAN WE BLOW UP THE RIGHT-HAND COLUMN AND START WITH THE TOP LINE, WHERE THE NAMES AND ADDRESSES ARE.

**BY MR. SLOAN:**

Q   SIR, AS YOU LOOK AT THAT, DO YOU THINK THERE'S ANYPLACE THAT ANYONE COULD HAVE WRITTEN ANYTHING UNDER THAT LINE?

A   NO.

Q   LET'S LOOK AT THE NEXT LINE.

      THIS IS MR. LOEFF'S ADDRESS; 14009 HALLDALE AVENUE, GARDENA, CALIFORNIA.

      DO YOU THINK ANYONE COULD HAVE WRITTEN ANY TEXT UNDER THAT LINE?

A   NO.

Q   LET'S GO DOWN TO THE NEXT LINE.

      DO YOU THINK ANYONE COULD HAVE WRITTEN ANY TEXT UNDER THIS LINE?

A   IF THEY ATTEMPTED TO SQUEEZE IT IN AND REDUCE THEIR SIZE OF WRITING, THEY PROBABLY COULD HAVE FIT SOMETHING IN THERE.

Q   YOU WOULD AGREE, THOUGH, SIR, THAT THERE'S A LOT MORE SPACE UNDER "LUPE, HALLIDAE, JADE, AND TWO MALES" IN THE QUESTIONED AREA THAN THERE IS UNDER 1005 WEST 190TH STREET, WOULDN'T YOU, SIR?

A   I WOULDN'T CATEGORIZE IT AS A LOT MORE SPACE.  I WOULD SAY THERE'S A LITTLE MORE SPACE.

Q   LET'S GO DOWN TO THE NEXT LINE, "CURT WESTON."

01:48

01:49

01:49

01:49

```
 1              WOULD YOU AGREE HERE, SIR, THAT THERE'S NO SPACE FOR

 2   ANYONE TO WRITE ANYTHING UNLESS THEY HAD MICROSCOPIC

 3   HANDWRITING?

 4   A    THAT'S TRUE, SIR.

 5   Q    LET'S LOOK AT THE NEXT LINE, SIR.                      01:49

 6              WOULD YOU AGREE THAT IT WOULD BE IMPOSSIBLE FOR

 7   ANYONE TO WRITE ANY TEXT IN HERE UNLESS THEY HAD MICROSCOPIC

 8   HANDWRITING?

 9   A    NOT EVEN WITH MICROSCOPIC HANDWRITING, SIR.

10   Q    LET'S GO DOWN TO THE NEXT LINE.                        01:49

11              SIR, WOULD YOU AGREE THAT IT WOULD BE IMPOSSIBLE TO

12   WRITE ANY TEXT IN THERE WITHOUT MICROSCOPIC HANDWRITING?

13   A    THAT'S CORRECT, SIR.

14   Q    SIR, IF YOU LOOK THROUGH ALL OF THE PAGES OF TEXT IN THIS

15   NOTARY BOOK, WOULD YOU SAY THAT IT'S FAIR THAT IN ALMOST ALL  01:50

16   CASES, IF NOT ALL CASES, EXCEPT FOR THE QUESTIONED ENTRY, WHERE

17   THERE'S THREE LINES OF TEXT -- AND THERE'S NEVER MORE THAN

18   THREE LINES OF TEXT -- THAT IT WOULD BE VIRTUALLY IMPOSSIBLE

19   FOR SOMEONE TO WRITE ANYTHING BELOW THAT BOTTOM LINE?

20   A    ABSOLUTELY NOT, SIR.  ON PAGE 7, THERE ARE TWO ENTRIES.  01:50

21   THE FIRST ENTRY AND THE SECOND ENTRY, ESPECIALLY THE SECOND

22   ENTRY, UNDER "NAME AND ADDRESS OF SIGNER," "EL SEGUNDO,

23   CALIFORNIA," IS WRITTEN WITH A SIMILAR SPACE; IN OTHER WORDS,

24   SIMILARLY FLOATED ABOVE THE MACHINE-PRINTED LINE.

25   Q    SO WHAT YOU'RE SAYING IS THAT YOU BELIEVE THAT THERE'S   01:50
```

1   ENOUGH SPACE FOR SOMEONE TO HAVE SQUEEZED IN ANOTHER LINE OF

2   TEXT, LIKE "FROM 1998 MISSOURI," ON THE BOTTOM OF THE FIRST

3   LINE, UNDER "EL SEGUNDO, CALIFORNIA 90245"?  THAT'S YOUR

4   TESTIMONY?

5   A    NO.  IT'S THE OTHER "EL SEGUNDO" BELOW THAT.            01:51

6   Q    UNDER THIS "EL SEGUNDO"?

7   A    YES.  THERE'S ENOUGH ROOM FOR A PERSON TO SQUEEZE IN

8   INFORMATION SIMILARLY AS "FROM 1998 MISSOURI."

9   Q    SIR, ARE YOU TALKING ABOUT TO THE RIGHT OF "EL SEGUNDO,

10  CALIFORNIA" OR UNDER "EL SEGUNDO, CALIFORNIA"?              01:51

11  A    UNDER.

12  Q    SO IS THAT THE ONLY PLACE WHERE YOU THINK THERE'S SPACE

13  WHERE SOMEONE WROTE -- WHERE THE AUTHOR WROTE THREE MORE LINES

14  WHERE THEY COULD FIT IN SOME TEXT?

15  A    THERE'S A LITTLE SPACE IN THE "EL SEGUNDO" ABOVE AS WELL.  01:51

16  NOT AS MUCH, BUT ENOUGH IF YOU WANTED TO SQUEEZE IT IN.

17          AND I WOULD HAVE TO GO THROUGH ALL THE PAGES, IF YOU

18  ALLOW ME THE TIME, TO LOOK AND SEE IF THERE ARE ANY OTHERS.

19  Q    SIR, LET ME JUST ASK YOU THIS, BECAUSE THE JURY WILL HAVE

20  THE OPPORTUNITY TO EXAMINE THIS THEMSELVES, AND I THINK THEY    01:52

21  CAN USE THEIR COMMON SENSE:  WOULD YOU SAY THAT --

22          **MR. QUINN:**  YOUR HONOR, I OBJECT.  IT'S

23  ARGUMENTATIVE.

24          **THE COURT:**  SUSTAINED.

25          NEXT QUESTION, COUNSEL.                              01:52

1    **BY MR. SLOAN:**

2    Q    SIR, LET ME ASK YOU THIS, BECAUSE THE JURY WILL HAVE THE

3    OPPORTUNITY TO REVIEW THIS ON THEIR OWN:  WOULD YOU SAY --

4            **MR. QUINN:**  SAME OBJECTION.

5            **THE COURT:**  COUNSEL, I'VE INSTRUCTED COUNSEL ON BOTH          01:52

6    SIDES NOT TO DO THAT.

7            **MR. SLOAN:**  I'M SORRY.  YOUR HONOR, I THOUGHT YOU

8    WERE OBJECTING TO THE OTHER PART.  I APOLOGIZE.

9            **THE COURT:**  JUST ASK A QUESTION.  DON'T MAKE A

10   STATEMENT.

11   **BY MR. SLOAN:**

12   Q    MR. CUNNINGHAM, WOULD YOU SAY THAT IT'S FAIR THAT IN THE

13   GREAT MAJORITY OF CASES, THE AUTHOR, WHEN WRITING THREE LINES

14   OR MORE, DOES NOT LEAVE ENOUGH SPACE TO WRITE AN ADDITIONAL

15   LINE BENEATH THE THIRD LINE?  WOULD YOU AGREE WITH THAT?          01:52

16   A    PROBABLY IN THE MAJORITY OF CASES.  BUT JUST THUMBING

17   THROUGH THE PAGE NOW, I FOUND ANOTHER AREA WHERE THERE'S A

18   FAIRLY GOOD AMOUNT OF SPACE.  THE PERSON TENDS TO FLOAT OFF

19   THAT BOTTOM LINE OCCASIONALLY, BUT I WOULD SAY THAT THE PERSON

20   WRITES ON THE LINE MORE OFTEN.          01:53

21   Q    THEY WRITE ON THE BOTTOM LINE MORE OFTEN, YOU'RE SAYING?

22   A    THAN FLOATING ABOVE IT, YES.

23   Q    IN FACT, IN THE GREAT MAJORITY OF CASES, THEY WRITE ON THE

24   BOTTOM LINE; CORRECT?

25   A    I WOULD HAVE TO GO THROUGH EVERY ENTRY TO GIVE YOU AN          01:53

1    AFFIRMATIVE ANSWER ON THAT, SIR.

2    Q    YOU HAVE EXAMINED DOZENS OF NOTARY BOOKS DURING YOUR

3    CAREER; IS THAT CORRECT?

4    A    YES, I'D SAY, AT A MINIMUM.

5    Q    AND IN YOUR EXPERIENCE, DO NOTARIES GENERALLY TRY TO KEEP    01:53

6    THE ENTIRE TEXT OF AN ENTRY IN A SINGLE BOX?

7    A    THEY DO.

8    Q    SO IF THERE WAS A LOT OF TEXT, THEY MAY HAVE TO TRY TO

9    SQUEEZE IT ALL IN; IS THAT CORRECT?

10   A    THAT'S CORRECT.                                              01:54

11        **THE COURT:**  COUNSEL, IF YOU'RE MOVING ON TO A

12   DIFFERENT AREA, WE'RE GOING TO TAKE OUR AFTERNOON BREAK.

13        (WHEREUPON, JURORS DEPART COURTROOM.)

14        (WHEREUPON, A BRIEF RECESS WAS HELD.)

15        **THE COURT:**  WE'RE BACK ON THE RECORD.                    02:45

16        JUST TO PUT ON THE RECORD, THE COURT HAD AN IN-CAMERA

17   MEETING WITH COUNSEL FOR BOTH MATTEL AND MGA THAT WAS OFF THE

18   RECORD IN WHICH THE COURT DISCUSSED ITS IN-CAMERA REVIEW OF THE

19   DOCUMENTS FOR WHICH MGA CLAIMS ATTORNEY-CLIENT PRIVILEGE.

20        THE COURT HAS REVIEWED THE DOCUMENTS IN LIGHT OF ALL        02:46

21   OF THE ARGUMENT AND THE EVIDENCE AND LEGAL ANALYSIS SUBMITTED

22   TO IT, AND FINDS THAT ALL BUT ONE OF THE DOCUMENTS ARE

23   PRIVILEGED.  AND I BELIEVE THAT, JUST FOR THE RECORD, MGA

24   RECOGNIZES THAT THE E-MAIL FROM ISAAC LARIAN TO...

25        **MS. AGUIAR:**  YOUR HONOR, IF IT WOULD BE HELPFUL, WE     02:46

```
1   KNOW WHICH DOCUMENT YOU ARE REFERRING TO.  I SAW WHICH ONE YOU

2   REFERRED TO, AND WE HAVE AN UNDERSTANDING.

3           THE COURT:  YOU KNOW WHICH ONE I'M REFERRING TO?

4       MS. AGUIAR:  YES.

5           THE COURT:  EXCEPT FOR THAT ONE DOCUMENT.  I MUST     02:47

6   HAVE LEFT IT INSIDE.

7           MS. AGUIAR:  IT'S AN E-MAIL BETWEEN MR. BRYANT AND

8   MR. LARIAN.

9           THE COURT:  YES.  IT WAS AN E-MAIL BETWEEN MR. LARIAN

10  AND MR. BRYANT.                                              02:47

11          MS. AGUIAR:  CORRECT.

12          THE COURT:  AND YOU WILL TURN THAT OVER TODAY.

13          MS. AGUIAR:  WE WILL.

14          THE COURT:  OTHERWISE, ALL OF THE DOCUMENTS,

15  INCLUDING THE CLAWBACK DOCUMENT, WHICH WAS KS-07831, ARE     02:47

16  PRIVILEGED, AND THE CLIENT FRAUD EXCEPTION DOES NOT APPLY.  AND

17  I'LL NOT VICIATE THAT PRIVILEGE IN THIS CASE AT THIS POINT; SO

18  THAT TAKES CARE OF THAT MOTION.  THE COURT WILL INDICATE THAT

19  IN A MINUTE ORDER AS WELL.

20          HERE IT IS.  I FOUND IT.                             02:47

21          THIS IS THE E-MAIL FROM ISAAC LARIAN TO

22  VICTORIA O'CONNOR, WHICH WAS FORWARDING AN E-MAIL FROM

23  CARTER BRYANT TO ISAAC LARIAN.  AND THIS WILL BE ATTACHED TO

24  THE MINUTE ORDER AND TURNED OVER TO MATTEL.

25          WE'RE BACK ON THE RECORD.  LET'S BRING THE JURY IN.  02:48
```

```
 1            YES, COUNSEL?
 2        MS. MORGENTHALER:  I'M ALISA MORGENTHALER,
 3  CHRISTENSEN GLASER, COUNSEL FOR NONPARTY FARHAD LARIAN.
 4            COUNSEL FOR MATTEL DEMANDED THAT MR. LARIAN BE HERE
 5  AT 1:15 TODAY.  HE'S BEEN WAITING SINCE THAT TIME.  AND HE IS      02:48
 6  NOT REALLY AVAILABLE TO ATTEND ON ANOTHER DAY.  COUNSEL'S
 7  INDICATING THEY'RE GOING TO TAKE A LATER SCHEDULED WITNESS
 8  BEFORE HIM, AND WE'D LIKE TO HAVE THE COURT TAKE MR. LARIAN,
 9  WHO'S SCHEDULED NEXT AFTER THE EXPERT, SO THAT HE CAN HAVE HIS
10  TESTIMONY TODAY, AS SCHEDULED.                                    02:48
11        THE COURT:  THANK YOU, COUNSEL.
12            CAN WE ACCOMMODATE, MR. QUINN?
13        MR. QUINN:  THE OTHER WITNESS IS PETER MARLOW, WHO'S
14  REPRESENTED BY THE GENTLEMAN IN THE AISLE, WHO'S FAMILIAR TO US
15  ALL.                                                              02:49
16        THE COURT:  YES.
17        MR. GOLDSOBEL:  GOOD AFTERNOON, YOUR HONOR.
18        MR. QUINN:  AND WE HAVE TOLD THEM THAT IT SEEMS
19  UNLIKELY THAT WE WILL GET TO BOTH OF THEIR CLIENTS.
20            WE WOULD DO EITHER ONE.                                 02:49
21        THE COURT:  WELL, LET'S DO THIS:  I'LL ASK THE JURY
22  IF THEY'RE WILLING TO STAY A LITTLE LATER TONIGHT AND we'll SEE
23  IF WE CAN'T STAY UNTIL 5:30.  LET'S RESUME HERE AND GET THROUGH
24  THESE WITNESSES AS QUICKLY AS WE CAN.
25            THANK YOU, COUNSEL.                                     02:49
```

```
 1                  (WHEREUPON, JURORS ENTER COURTROOM.)

 2          THE COURT:  MEMBERS OF THE JURY, I KNOW THIS IS A

 3   BURDEN TO ASK OF ANYBODY ON A FRIDAY AFTERNOON, BUT IS THERE

 4   ANYONE WHO ABSOLUTELY CANNOT STAY UNTIL 5:30?  WE HAVE SOME

 5   WITNESSES WE WERE GOING TO TRY AND SQUEEZE IN, JUST BECAUSE       02:51

 6   THEY HAVE BEEN WAITING.

 7          JUROR:  I'VE GOT CLASS THAT STARTS AT 5:00.  I'M LATE

 8   ANYWAY, BUT I CAN BE A LITTLE LATER.

 9          THE COURT:  IS THAT OKAY?

10          JUROR:  YEAH.                                             02:51

11          THE COURT:  DO YOU HAVE SOMEONE WHO CAN TAKE NOTES

12   FOR YOU?

13          JUROR:  YES.

14          THE COURT:  COUNSEL, LET'S PROCEED.

15          MR. SLOAN:  COULD WE HAVE UP PAGE 11 OF THE NOTARY        02:51

16   BOOK, EXHIBIT 60-A-019.  LET'S LOOK AT THIS ONE MORE TIME.

17               CROSS-EXAMINATION (continued)

18   BY MR. SLOAN:

19   Q    MR. CUNNINGHAM, IF WE LOOK AT THE NEXT BOX OVER, THE BOX

20   THAT SAYS "CARTER BRYANT" RIGHT THERE, WOULD YOU AGREE THAT ON   02:51

21   THAT BOX, AS WELL, THERE'S NO SPACE BELOW THAT TO ENTER ANY

22   ADDITIONAL TEXT?

23   A    NOT AVAILABLE SPACE FOR ADDITIONAL TEXT, THAT'S CORRECT,

24   SIR.

25   Q    IT'S YOUR BELIEF THAT, IN FACT, THE AUTHOR, MS. PRINCE,     02:52
```

```
 1   WROTE THAT AT THE SAME TIME AS AT LEAST THE FIRST FOUR LINES IN
 2   THAT BOX; IS THAT CORRECT?
 3   A   I HAVEN'T EXAMINED IT FOR THAT PURPOSE, SIR, SO I DON'T
 4   KNOW.
 5   Q   LET ME HAVE YOU LOOK AT PAGE 12 OF THIS EXHIBIT, THE BOX    02:52
 6   THAT SAYS "13 DRAWINGS."  AGAIN, IT'S PAGE 12 IN THE NOTARY
 7   BOOK, PAGE 20 OF EXHIBIT 60-A.
 8           WOULD YOU AGREE THERE, ALSO, THERE'S NO ROOM TO WRITE
 9   ANY ADDITIONAL TEXT?
10   A   POSSIBLY UNDER THE LAST FIVE WORDS, SOMEONE COULD SQUEEZE   02:53
11   SOMETHING IN, BUT OBVIOUSLY, NOT UNDER THE AMPERSAND OR THE
12   WORD "SIGNED."  BUT IT SHOWS HOW THE PERSON DOES FLOAT OFF THE
13   PREPRINTED LINE.
14   Q   AND, SIR, YOU INDICATED THAT ONE OF THE OTHER THINGS THAT
15   YOU FOUND SUSPICIOUS WAS THAT THE WRITER -- IF WE COULD GO BACK  02:53
16   TO THIS BOX HERE, the ORIGINAL SKETCHES -- THAT THE WRITER HAD
17   GONE OUTSIDE OF THE BOX, THE VERTICAL LINE, TO THE RIGHT.
18           DIDN'T YOU SAY THAT?
19   A   YES.  PLUS THE FACT THAT A PERIOD IS THERE, AND VERY
20   RARELY, IF EVER, THE PERSON WRITES A PERIOD AT THE END OF       02:53
21   ENTRIES.
22   Q   IF WE LOOK AT THIS ENTRY ON THE FOLLOWING PAGE, DIDN'T THE
23   AUTHOR DO THE VERY SAME THING, WHICH IS CROSS THE RIGHT HASH
24   MARK?
25   A   THAT'S PRECISELY WHAT WOULD HAPPEN IF YOU DON'T HAVE ROOM   02:54
```

1  TO WRITE ON THE NEXT LINE.  I AGREE FULLY.

2  Q    NOW, SIR, YOU TESTIFIED THAT YOU'RE NOT AN INK CHEMIST.

3  A    CORRECT.

4  Q    BUT YOU MADE SOME EFFORT TO DETERMINE, THROUGH OFFICIAL

5  AND MICROSCOPIC EXAMINATION, WHETHER THE INK USED TO WRITE          02:54

6  "FROM 1998 MISSOURI" WAS DIFFERENT FROM THE INK IN THE FIRST

7  FOUR LINES OF THIS ENTRY, DIDN'T YOU?

8  A    THAT'S ONLY PARTIALLY TRUE, SIR.

9  Q    SIR, YOU CONDUCTED A MICROSCOPIC EXAMINATION OF THE TEXT

10 IN THIS BOX, DIDN'T YOU?                                           02:54

11 A    I CERTAINLY DID.

12 Q    AND YOU ALSO CONDUCTED AN EXAMINATION WITH REFLECTED

13 INFRARED LIGHT; IS THAT CORRECT?

14 A    THAT'S ONE OF THE ELEMENTS I USED, YES, SIR.

15 Q    AND THE MICROSCOPE CAN BE A VERY POWERFUL INSTRUMENT IN        02:55

16 DETERMINING THE DIFFERENCE -- IF YOU HAVE DIFFERENT INKS, IT

17 CAN OFTEN HELP YOU DISTINGUISH BETWEEN DIFFERENT INKS, CAN'T

18 IT, SIR?

19 A    NOT AS READILY AS OTHER EXAMINATIONS I PERFORMED.

20 Q    YOU ALSO PERFORMED AN EXAMINATION WITH REFLECTED INFRARED      02:55

21 LIGHT; CORRECT?

22 A    RADIATION, YES.

23 Q    AND THAT IS ANOTHER POWERFUL DEVICE THAT WILL SOMETIMES

24 ALLOW YOU TO DISTINGUISH BETWEEN DIFFERENT INKS, IF, IN FACT,

25 DIFFERENT INKS ARE USED IN THE SAME ENTRY; IS THAT CORRECT?        02:55

```
 1   A     YES, SIR.

 2   Q     AND YOU ALSO USED INFRARED LUMINESCENCE TO TRY TO

 3   DISTINGUISH OR DETERMINE WHETHER, IN FACT, THE INK USED TO

 4   CREATE THE ENTRY "FROM 1998 MISSOURI" WAS DIFFERENT FROM THE

 5   OTHER FOUR LINES OF INK IN THAT ENTRY; IS THAT CORRECT?         02:55

 6   A     YES, SIR.

 7   Q     AND, SIR, YOU DETERMINED THAT YOU WERE UNABLE TO DETERMINE

 8   WHETHER THE INK ON THE FOURTH LINE, THE INK USED TO WRITE THE

 9   FOURTH -- OR THE FIFTH LINE, RATHER -- WAS DIFFERENT FROM ANY

10   OF THOSE OTHER INKS, DIDN'T YOU?                                02:56

11   A     I COULD NOT DIFFERENTIATE BETWEEN THE INK USED FOR THE

12   FIRST FOUR LINES AND THE INK USED FOR THE FIFTH LINE.

13   Q     THAT WAS USING MICROSCOPIC EXAMINATION; CORRECT?

14   A     CORRECT.

15   Q     YOU COULDN'T DISTINGUISH WITH REFLECTED INFRARED LIGHT?   02:56

16   A     CORRECT.

17   Q     YOU COULDN'T DISTINGUISH USING INFRARED LUMINESCENCE?

18   A     CORRECT.

19   Q     AND YOU ALSO USED UV LIGHT, DIDN'T YOU, SIR?

20   A     A UV LIGHT AND A DICHROIC FILTER.                         02:56

21   Q     AND THOSE ARE ALL VERY POWERFUL DEVICES TO TRY TO

22   DISTINGUISH BETWEEN THE INKS IN DIFFERENT QUESTIONED ENTRIES;

23   CORRECT?

24   A     I DON'T USE THE TERM "POWERFUL," BUT THEY'RE SCIENTIFIC

25   INSTRUMENTATION THAT I USED.                                    02:56
```

FRIDAY, JUNE 20, 2008                    TRIAL DAY 16, AFTERNOON SESSION

```
 1   Q    YOU USED THEM BECAUSE YOU THOUGHT IT MIGHT BE HELPFUL TO
 2   DISTINGUISH BETWEEN THE INKS; CORRECT, SIR?
 3   A    YES, SIR.
 4   Q    AND YOU WEREN'T ABLE TO DISTINGUISH ANY DIFFERENCE BETWEEN
 5   THE INKS?                                                        02:57
 6   A    I WAS NOT.
 7   Q    THANK YOU.
 8        YOU TESTIFIED THAT ONE OF YOUR EXPERTISE IS
 9   HANDWRITING; CORRECT?
10   A    YES, SIR.                                                   02:57
11   Q    AND YOU SAID THAT YOU EXAMINED THE HANDPRINTING IN THE
12   LINE "FROM 1998 MISSOURI"; CORRECT?
13   A    YES.
14   Q    IN FACT, YOU DETERMINED THAT THERE WERE NUMEROUS
15   HANDPRINTING CHARACTERISTICS IN COMMON BETWEEN "FROM 1998        02:57
16   MISSOURI" AND THE REST OF THIS ENTRY, DIDN'T YOU, SIR?
17   A    YES, THERE WERE SOME HANDWRITING FEATURES IN COMMON.
18   THAT'S CORRECT.
19   Q    IN FACT, YOU DON'T SEE ANY INDICATION IN THE "FROM 1998
20   MISSOURI" WHICH WOULD CAUSE YOU TO BELIEVE THAT WAS ENTERED BY   02:57
21   A DIFFERENT AUTHOR THAN THE FIRST FOUR LINES OF THIS TEXT, DO
22   YOU, SIR?
23   A    NO.  JUST THE CONTRARY.  I DO.
24   Q    ALL RIGHT.
25        AND YOUR CONCLUSION IS MERELY THAT BECAUSE THIS WAS         02:58
```

```
 1   SO SLOWLY WRITTEN AND DELIBERATELY WRITTEN, IT DIDN'T PROVIDE A
 2   SUFFICIENT BASIS FOR YOU TO BE ABLE TO DETERMINE WHETHER THE
 3   AUTHOR WAS DIFFERENT; CORRECT?
 4   A    NOT ALONE, SIR, NO.  THERE ARE OTHER ELEMENTS THAT I
 5   CONSIDERED AS WELL.                                              02:58
 6   Q    YOU DON'T SEE ANY INDICATION THAT IT WAS WRITTEN BY
 7   ANOTHER AUTHOR; IS THAT CORRECT?
 8   A    THERE ARE SOME DIFFERENCES AS WELL AS SOME AGREEMENT.  THE
 9   DIFFERENCES COULD LEAN TOWARDS ANOTHER AUTHOR; THE AGREEMENT
10   CAN LEAN TOWARDS THE PERSON WHO WROTE THE FIRST FOUR LINES.      02:58
11   Q    SIR, DIDN'T YOU TESTIFY THAT THE REASON THAT YOU COULDN'T
12   REACH A DEFINITIVE CONCLUSION WAS BECAUSE THIS WAS VERY SLOWLY
13   WRITTEN?
14   A    I DID.
15   Q    AND WOULDN'T YOU EXPECT THAT IF AN AUTHOR HAD A LIMITED     02:59
16   AMOUNT OF SPACE AND HAD TO SQUEEZE IN AN ENTRY THAT, IN FACT,
17   THEY WOULD HAVE TO WRITE VERY SLOWLY AND DELIBERATELY?
18   A    THAT COULD OCCUR.  THAT'S WHAT I had PREVIOUSLY TESTIFIED
19   TO.
20   Q    AND YOU DON'T THINK THAT WOULD BE UNUSUAL AT ALL, DO YOU,   02:59
21   SIR?
22   A    NO.
23   Q    AND YOU DON'T THINK, IN FACT, THAT IT WOULD BE SUSPICIOUS
24   THAT IF SOMEONE HAD A SMALL AMOUNT OF SPACE, THEY WOULD WRITE
25   THAT ENTRY VERY SLOWLY, DO YOU?                                 02:59
```

1    A    NO.

2    Q    SIR, DO YOU KNOW WHEN MS. PRINCE WROTE THIS ENTRY IN HERE?

3         YOU DON'T EVEN KNOW WHETHER MS. PRINCE WROTE IT.

4    THAT'S WHAT YOU WERE GOING TO SAY; CORRECT?

5    A    NO.                                                        03:00

6    Q    LET'S TALK ABOUT THE AUTHOR, WHEN THE AUTHOR WROTE THIS.

7         DO YOU KNOW WHETHER THEY HAD ALL OF THE TEXT IN MIND

8    WHEN THEY STARTED THE FIRST WORD?

9    A    I BELIEVE THAT THEY -- WELL, WITH THE FIRST WORD, NO, I

10   DON'T BELIEVE THEY HAD ALL OF THE TEXT, WHICH INCLUDES FIVE      03:00

11   LINES, IN MIND.  I THINK THAT THEY HAD IN MIND TO WRITE FOUR

12   LINES, THE SPACING, ET CETERA, AND THE PERIOD.  AND OTHER

13   INFORMATION HAS CONVINCED ME OF THAT.

14   Q    SIR, THE PERSON WRITING THIS COULD HAVE BEEN COMPOSING IT

15   AS THEY WERE WRITING IT; CORRECT?                               03:00

16   A    GENERALLY, WHEN A NOTARY WRITES INFORMATION IN THE

17   "DOCUMENT KIND OR TYPE," THEY ARE EITHER RECEIVING THE

18   INFORMATION FROM A CLIENT OR THEY ARE LOOKING AT THE PARTICULAR

19   DOCUMENTS THAT THEY ARE GOING TO ENTER AND THEY HAVE THEM IN

20   FRONT OF THEM; SO I THINK IT WOULDN'T REALLY BE COMPOSING AS     03:01

21   THEY WRITE.

22   Q    WELL, SIR, YOU NEVER INTERVIEWED MS. PRINCE TO ASK HER THE

23   DETAILS ABOUT HOW SHE MADE THIS ENTRY, DID YOU, SIR?

24   A    NO, SIR.

25   Q    SO YOU HAVE NO IDEA HOW MUCH INFORMATION SHE HAD OR WHAT    03:01

1  SHE PLANNED TO WRITE WHEN SHE FIRST STARTED TO WRITE THIS, DO

2  YOU, SIR?

3  A    THAT'S CORRECT.

4  Q    NOW, YOU MENTIONed EARLIER THAT MS. HUTNYAN, ONE OF

5  MATTEL'S ATTORNEYS, TOLD YOU THAT SHE THOUGHT THAT LINE WAS          03:01

6  SUSPICIOUS; CORRECT?

7  A    YES.

8  Q    AND AFTER SHE SAID THAT SHE THOUGHT IT WAS SUSPICIOUS, YOU

9  FOUND THAT IT WAS SUSPICIOUS; CORRECT?

10 A    YES.                                                           03:02

11 Q    SIR, HOW MUCH DO YOU GET PAID BY MATTEL PER HOUR?

12 A    $200 AN HOUR.

13 Q    BY THE WAY, I WANTED TO ASK YOU ONE OTHER QUESTION ABOUT

14 JACQUELINE PRINCE'S DEPOSITION.

15        YOU SAID YOU ONLY READ A PORTION OF THAT.                    03:02

16 A    TO THE BEST OF MY RECOLLECTION, I JUST READ A PORTION OF

17 IT REGARDING THAT SHE DIDN'T HAVE THE NOTARY BOOK IN HER

18 POSSESSION AT ALL TIMES.  I WAS ASKED TO READ THAT PORTION

19 BECAUSE APPARENTLY MATTEL THOUGHT THAT WAS AN IMPORTANT ISSUE.

20 Q    WELL, SIR, IN YOUR REPORT, YOU DIDN'T SAY THAT YOU HAD        03:02

21 ONLY READ AN EXCERPT OF HER DEPOSITION, DID YOU?

22 A    NO.  BUT IT RELATES TO WHAT I WAS REFERRING TO IN MY

23 REPORT, THAT SHE WASN'T IN THE POSSESSION OF THE NOTARY JOURNAL

24 AT ALL TIMES.

25 Q    SIR, YOUR REPORT SAYS THAT YOU REVIEWED THE WHOLE             03:02

1    DEPOSITION, DOESN'T IT?

2    A    I'D HAVE TO LOOK AT IT AGAIN.

3    Q    IT SAID, "I REVIEWED THE DEPOSITION TESTIMONY TRANSCRIPT

4    OF JACQUELINE PRINCE"; CORRECT?

5            MR. QUINN:  PAGE NUMBER?                              03:03

6            MR. SLOAN:  EXHIBIT 4623, PAGE 11.

7            THE WITNESS:  NO, IT DOESN'T SAY THAT I REVIEWED THE

8    WHOLE TESTIMONY TRANSCRIPT OF JACQUELINE PRINCE.  IT JUST SAID

9    that I REVIEWED THE DEPOSITION TESTIMONY AND FOUND THAT HER

10   NOTARY JOURNAL WAS NOT IN HER CUSTODY AT ALL TIMES.          03:03

11          I DO RECALL THAT'S WHAT I WAS DIRECTED TO READ, AND I

12   DOUBT IF I READ ANYTHING ELSE IN HER DEPOSITION TESTIMONY.

13   BY MR. SLOAN:

14   Q    SIR, MR. QUINN ASKED YOU, AT THE BEGINNING OF YOUR

15   TESTIMONY THIS MORNING, I GUESS IT WAS, ABOUT THE DOCUMENTS YOU   03:03

16   HAD REVIEWED, AND MR. QUINN SUGGESTED THAT YOU HAD RECEIVED

17   FROM MATTEL THE NOTARY BOOK, THE BLACK NOTEBOOK, AND A COUPLE

18   OF SHEETS OF PAPER.

19          DO YOU RECALL THAT TESTIMONY?

20   A    I DO, SIR.                                              03:04

21   Q    IN FACT, YOU REVIEWED A LOT MORE MATERIAL THAN THAT,

22   DIDN'T YOU, SIR?

23   A    OH, DEFINITELY, SIR.

24   Q    IN FACT, MATTEL SENT EIGHT OR NINE BOXES OF MATERIALS;

25   CORRECT?                                                    03:04

```
 1   A     YES, SIR.

 2   Q     AND YOU SPENT AN ENORMOUS AMOUNT OF TIME REVIEWING THEM,

 3   DIDN'T YOU?

 4   A     YES.

 5   Q     DOZENS OF HOURS; IS THAT FAIR?                              03:04

 6   A     YES.

 7   Q     AND YOU RECEIVED THOSE DOCUMENTS IN SEPTEMBER OF 2007;

 8   CORRECT?

 9   A     I BELIEVE SO.

10   Q     IN FACT, YOU SPENT OVER 80 HOURS REVIEWING THEM IN         03:04

11   SEPTEMBER 2007; CORRECT?

12   A     I BELIEVE THAT'S CORRECT.

13   Q     AND YOU REVIEWED ALL OF THOSE DOCUMENTS IN ALL OF THOSE

14   BOXES; CORRECT?

15   A     "REVIEW" IS A GOOD WORD TO USE, BECAUSE I DIDN'T EXAMINE   03:04

16   THEM ALL IN DETAIL.

17   Q     NOW, AFTER THAT INITIAL 80 HOURS, YOU SPENT AN ADDITIONAL

18   30 HOURS, OVER 30 HOURS, IN JANUARY AND FEBRUARY OF 2008,

19   PERFORMING ADDITIONAL EXAMINATIONS AND PREPARING YOUR EXPERT

20   REPORT, DIDN'T YOU?                                              03:05

21   A     YES SIR.

22   Q     YOU SPENT SUBSTANTIALLY MORE TIME PREPARING FOR YOUR

23   DEPOSITION IN MARCH, DIDN'T YOU, SIR?

24   A     YES, SIR.

25   Q     AND I ASSUME THAT YOU SPENT A SUBSTANTIAL AMOUNT OF TIME   03:05
```

```
 1   PREPARING FOR YOUR TESTIMONY TODAY, DIDN'T YOU, SIR?

 2   A    YES, SIR.

 3   Q    SO IN ALL, YOU SPENT WELL IN EXCESS OF 120 HOURS ON THIS

 4   CASE; WOULD YOU SAY THAT'S FAIR?

 5   A    I WOULD SAY IT MAY BE FAIR, BUT I WOULD HAVE TO DO AN          03:05

 6   ACCURATE COUNT TO GET INTO THE BALLPARK OF HOW MANY HOURS.

 7   Q    YOU SAID YOU SPENT MORE THAN 80 HOURS REVIEWING THE

 8   DOCUMENTS IN SEPTEMBER; CORRECT?

 9   A    YES.

10   Q    AND YOU SPENT MORE THAN 30 HOURS REVIEWING THEM AND           03:05

11   PREPARING YOUR REPORT; CORRECT?

12   A    YES.

13   Q    SO DON'T YOU THINK YOU'VE SPENT MORE THAN AN ADDITIONAL

14   TEN HOURS PREPARING FOR DEPOSITION, PREPARING FOR YOUR

15   TESTIMONY TODAY?                                                   03:06

16   A    YES.

17   Q    DURING THAT TIME, YOU'VE BEEN PAID HANDSOMELY FOR YOUR

18   SERVICES, HAVEN'T YOU, SIR?

19   A    WELL, I DON'T KNOW IF THE TERM "HANDSOMELY" APPROPRIATELY

20   FITS, BUT I'VE BEEN PAID FOR MY SERVICES.                         03:06

21   Q    OVER $20,000?

22   A    I WOULD SAY IT WOULD BE CLOSE TO THAT.

23   Q    OVER $30,000?

24   A    I DON'T KNOW.  I'VE BEEN WORKING ON THE CASE FOR FOUR

25   YEARS.                                                            03:06
```

1  Q    IN THE COURSE OF PREPARING YOUR REPORT, YOU ALSO REVIEWED

2  THE DEPOSITION TESTIMONY OF CARTER BRYANT THAT WAS TAKEN IN

3  NOVEMBER 2004, DIDN'T YOU, SIR?

4  A    I REVIEWED A PORTION OF THAT AS WELL, YES, SIR.

5  Q    YOU'RE SURE YOU ONLY REVIEWED PORTIONS?                      03:06

6  A    I DON'T RECALL.  IT'S BEEN SO LONG AGO.  IN FACT, I DON'T

7  EVEN REMEMBER THE CONTENT OF HIS DEPOSITION.

8  Q    WOULD IT REFRESH YOUR RECOLLECTION TO LOOK AT YOUR REPORT?

9  A    CERTAINLY.

10 Q    WHY DON'T WE LOOK AT THE SAME PAGE, EXHIBIT 4623, AT         03:07

11 PAGE 11.  LOOK AT THE MIDDLE OF THE FIRST PARAGRAPH.

12      DOES THAT REFRESH YOUR RECOLLECTION THAT YOU REVIEWED

13 THE FIRST THREE VOLUMES OF MR. BRYANT'S TESTIMONY TAKEN ON

14 NOVEMBER 4, 5, AND 8, 2004?

15 A    IF YOU WOULD GIVE ME A MOMENT, SIR, TO READ THIS.            03:07

16      YES.  THERE'S NOTHING IN THERE THAT STATES I REVIEWED

17 THEM IN TOTAL, AND I DO RECALL THAT I DIDN'T READ THREE VOLUMES

18 OF HIS DEPOSITION TESTIMONY.

19 Q    BUT IT DOESN'T SAY THAT YOU JUST REVIEWED EXCERPTS OF IT,

20 DOES IT?                                                         03:08

21 A    NO.

22 Q    NOW, SIR, LET ME ASK YOU SOME QUESTIONS ABOUT YOUR ROLE AS

23 AN EXPERT.

24      YOU WERE HIRED AND PAID BY MATTEL; CORRECT?

25 A    YES.                                                        03:08

1    Q    BUT YOU HAVE A DUTY TO BE OBJECTIVE; CORRECT?

2    A    YES.

3    Q    SO YOU WOULDN'T SHADE OR COLOR THE TRUTH JUST TO ASSIST

4    YOUR CLIENT, WOULD YOU, SIR?

5    A    ABSOLUTELY NOT.                                          03:08

6    Q    IN FACT, I THINK YOU SAID EARLIER THAT WHETHER YOU'RE

7    HIRED BY PLAINTIFF OR DEFENDANT, THEY ALL GET THE SAME ANSWER.

8         IS THAT YOUR VIEW OF THE PROFESSION?

9    A    THAT'S CORRECT, SIR.

10   Q    SO YOU HAVE A DUTY TO GIVE THE FULL STORY TO THE JURY;     03:08

11   CORRECT?

12   A    THE FULL STORY THAT'S ASKED OF ME WHILE I'M ON THE WITNESS

13   STAND.

14   Q    SO IF YOU FOUND SOMETHING IN YOUR EXAMINATION THAT WOULD

15   POTENTIALLY CONTRADICT YOUR CLIENT'S THEORY, YOU'D BE OBLIGATED  03:09

16   TO PUT THAT IN YOUR REPORT, WOULDN'T YOU, SIR?

17   A    YES.

18   Q    AND YOU WOULD BE OBLIGATED TO TELL THE JURY ABOUT IT,

19   WOULDN'T YOU, SIR?

20   A    YES.                                                       03:09

21   Q    I WANT TO ASK YOU SOME QUESTIONS ABOUT THE BLACK NOTEBOOK.

22        YOU FOCUSED ON CERTAIN DOCUMENTS IN THAT NOTEBOOK,

23   AND I'M GOING TO USE SLIGHTLY DIFFERENT EXHIBIT NUMBERS, BUT

24   THEY ARE THE SAME DOCUMENTS.

25        LET'S FIRST LOOK AT YOUR (unintelligible) IMPRESSION       03:09

```
 1    OF -- I'M SORRY -- THE IMPRESSION THAT YOU CREATED OF PAGE 61
 2    OF THE NOTARY BOOK.  AND I THINK THAT'S EXHIBIT 13634.
 3    A    THAT'S CORRECT.
 4    Q    THAT IS YOUR IMPRESSION THAT YOU DEVELOPED, YOU SAID, WITH
 5    THE INDENTATION MATERIALIZER OF PAGE 61 OF THE BLACK NOTEBOOK;      03:10
 6    CORRECT?
 7    A    YES, ON PAGE 61.
 8    Q    AND NOW CAN I PUT, ON THE SIDE OF THAT, YOUR DEMONSTRATIVE
 9    C-2.
10         YOU INDICATED THAT C-2, WHICH IS ON THE RIGHT SIDE OF        03:10
11    THE SCREEN, WHICH IS THE DEMONSTRATIVE OF 13634, WAS ENHANCED
12    IN SOME WAY; CORRECT?
13    A    YES.
14    Q    CAN YOU TELL US HOW IT WAS ENHANCED.
15    A    IT WAS ENHANCED BY A GRAPHIC ARTIST WHO WAS WORKING FOR       03:10
16    MATTEL.  I ASKED THE GRAPHIC ARTIST TO SCAN IT AND TO MAKE THE
17    LINES SOMEWHAT BOLDER SO IT WOULD BE MORE VISIBLE FOR THE
18    JURORS TO SEE.
19    Q    AND DID YOU ASK THE GRAPHIC ARTIST JUST TO MAKE SOME OF
20    THE LINES BOLDER?                                                  03:11
21    A    THE ONES THAT I WANTED TO DEMONSTRATE IN FRONT OF THE JURY
22    TODAY, YES.
23    Q    AND THOSE LINES ARE THE LINES WHICH ARE, YOU CLAIM, THE
24    IMPRESSION OF BRYANT 179, WHICH IS EXHIBIT 523; IS THAT
25    CORRECT?                                                           03:11
```

```
 1  A    NO.  THE EXHIBIT NUMBER I HAVE FOR THE DOLL THAT MADE THE
 2  IMPRESSIONS ONTO -- THAT I DEVELOPED FROM 13634 ARE FROM
 3  EXHIBIT 542.
 4  Q    OKAY.  SO LET'S USE THAT NUMBER, 542.
 5       LET'S PUT YOUR EXHIBIT 13634 NEXT TO THAT.                03:11
 6       SO YOU'RE SAYING THAT YOU HAD THE GRAPHIC ARTIST TRY
 7  TO HIGHLIGHT THE LINES FROM THIS, OR ENHANCE THEM, SO THEY
 8  WOULD BE EASIER FOR THE JURY TO SEE; CORRECT?
 9  A    CORRECT.
10  Q    NOW, SIR, THE REASON THAT YOU THOUGHT THIS IMPRESSION WAS  03:12
11  IMPORTANT IS THAT, IN YOUR MIND, IT WOULD SHOW THAT THIS
12  EXHIBIT, EXHIBIT 5-42, WAS IMPRESSED INTO THE BLACK NOTEBOOK;
13  CORRECT?
14  A    IT WAS MY OPINION THAT THE BALL-POINT INK LINES FROM
15  EXHIBIT 542 WERE INDENTED INTO PAGE 61 OF THE BLACK NOTEBOOK.  03:12
16  Q    AND, SIR, YOU THOUGHT THIS WAS IMPORTANT BECAUSE MATTEL,
17  OR MATTEL'S ATTORNEYS, TOLD YOU THAT IT MIGHT TELL YOU
18  SOMETHING ABOUT THE TIMING OF WHEN EXHIBIT 542 WAS PREPARED;
19  CORRECT?
20  A    NO.                                                       03:13
21  Q    THEY DIDN'T TELL YOU THAT?
22  A    NO.  THEY MENTIONED IT AFTER MY EXAMINATION.
23  Q    THEY TOLD YOU THAT AFTER THE EXAMINATION, AND YOU THEN
24  UNDERSTOOD THAT IT WAS IMPORTANT TO THEM BECAUSE IT MIGHT TELL
25  THEM WHEN EXHIBIT 542 WAS CREATED; CORRECT?                    03:13
```

```
 1   A    YES.  THAT'S THE EVIDENCE THAT THEY WERE CONSIDERING AT

 2   THAT TIME.

 3   Q    SO SIR, I ASSUME IT WOULD ALSO BE IMPORTANT, IF YOU FOUND

 4   OTHER IMAGES DEVELOPED IN EXHIBIT 13634 THAT WERE ALSO CREATED

 5   BY MR. BRYANT -- WOULDN'T IT BE IMPORTANT IF YOU SAW OTHER       03:14

 6   IMAGES THAT WERE ALSO IMPRESSED INTO THAT DOCUMENT?

 7   A    I DID SEE OTHER IMAGES, AND I PREVIOUSLY TESTIFIED ABOUT

 8   THE OTHER IMAGES.  HOWEVER, APPARENTLY, MATTEL DIDN'T THINK

 9   THEY WERE AS IMPORTANT AS THE IMAGE OF THE DOLL.

10   Q    OKAY.                                                        03:14

11   A    IT'S NOT UP TO ME TO DETERMINE WHICH IS THE MOST

12   IMPORTANT.

13   Q    SIR, THE IMAGE YOU'RE TALKING ABOUT IS -- YOU SAID THERE

14   WAS A LITTLE BOY IN A RAIN HAT; CORRECT?

15   A    And AN UMBRELLA.  IT APPEARED THAT THE LITTLE BOY WAS        03:14

16   FISHING, AND IT LOOKED LIKE A RAIN HAT; THAT'S CORRECT.

17   Q    IF I COULD JUST TRACE THIS OUT.

18        YOU'RE TALKING ABOUT THIS RIGHT HERE, THIS LITTLE BOY

19   AND THE HAT; AND THERE'S A RAIN HAT THERE.

20   A    YES.  THAT'S WHAT I PREVIOUSLY TESTIFIED ABOUT.             03:14

21   Q    OKAY.  SO LET'S JUST TRACE THIS OUT.

22        AND DO YOU SEE HE'S GOT A FACE THERE?

23   A    YES.

24   Q    LET'S TRACE OUT THE FACE.

25        AND HE APPEARS TO BE HOLDING A FISHING ROD.                 03:15
```

```
 1   A     YES.

 2   Q     DO YOU SEE THAT FISHING ROD?

 3   A     YES.

 4   Q     THERE APPEARS TO BE A CLOUD THERE.

 5         DO YOU SEE THAT, SIR?                              03:15

 6   A     YES.

 7   Q     NOW, WHEN YOU SAW THAT IMPRESSION, DID YOU MAKE ANY

 8   ATTEMPT TO DETERMINE WHAT THAT IMPRESSION MAY HAVE BEEN CREATED

 9   FROM?

10   A    NOT AT THAT TIME, SIR.                             03:15

11   Q    SIR, I'D LIKE YOU TO TAKE A LOOK AT SOMETHING WHICH HAS

12   ALREADY BEEN ADMITTED INTO EVIDENCE.  AND IT'S EXHIBIT 15393.

13         MR. SLOAN:  AND, YOUR HONOR, IF I COULD APPROACH, I'M

14   GOING TO HAND THIS TO THE WITNESS.

15         THE COURT:  YOU MAY.                              03:16

16         MR. SLOAN:  YOUR HONOR, THIS HAS BEEN ADMITTED.

17         COULD I HAVE IT SHOWN ON THE SCREEN, PLEASE.

18         THE COURT:  VERY WELL.

19   BY MR. SLOAN:

20   Q    SIR, EXHIBIT 15393, WHICH YOU HAVE THE ORIGINAL OF AND IS  03:16

21   ON THE SCREEN NOW, THAT'S ONE OF THE DOCUMENTS THAT MATTEL

22   PROVIDED TO YOU BACK IN SEPTEMBER OF 2007 TO REVIEW AND

23   EXAMINE, ISN'T IT, SIR?

24   A    IT IS.

25   Q    OKAY.                                              03:16
```

1          AND IT'S A PICTURE OF A CHILD IN A RAIN COAT, WITH AN

2    UMBRELLA AND A FISHING POLE; CORRECT?

3    A    YES, IT IS.

4    Q    AND IF WE COULD GO BACK, ACTUALLY, TO YOUR IMPRESSION ON

5    EXHIBIT 13634.                                                  03:17

6          AS YOU SAID, YOU CAN SEE THE UMBRELLA THERE; CORRECT?

7    A    YES, I CAN.

8    Q    LET'S TRACE THAT OUT.

9          I THINK IT GOES LIKE THAT, AND THEN THERE'S A POLE UP

10   HERE.                                                          03:17

11         DO YOU SEE ANY OTHER DETAILS OF THAT IMAGE IMPRESSED

12   INTO EXHIBIT 13634?

13   A    NO.  NOT AT THIS TIME, I DON'T SEE ANY.

14   Q    AND WOULD YOU AGREE THAT, IN FACT, EXHIBIT 15393 IS

15   IMPRESSED IN REVERSE ONTO THIS PAGE, WHICH IS PAGE 61 OF THE   03:17

16   BLACK NOTEBOOK?

17   A    YES.  ABSOLUTELY.

18   Q    SO YOU'VE EXAMINED IT, AND YOU THINK THAT'S A POSITIVE

19   MATCH.

20   A    YES.                                                      03:18

21   Q    AND, SIR, WERE YOU AWARE THAT MR. BRYANT TESTIFIED EARLIER

22   THIS WEEK, IN FACT JUST THIS MORNING, THAT THIS IMAGE HERE,

23   EXHIBIT 15393, WAS, IN FACT, A GREETING CARD THAT HE CREATED IN

24   1998?

25   A    I WAS NOT AWARE OF WHAT HE TESTIFIED TO TODAY, BUT I WAS   03:18

```
 1   TOLD BY MATTEL COUNSEL THAT IT WAS PROBABLY AN IMAGE FOR A

 2   GREETING CARD; BUT I WASN'T GIVEN THE DATE.

 3   Q    BASED ON THE FACT THAT IT'S IMPRESSED IN REVERSE, DOES

 4   THAT MEAN THAT WHOEVER AUTHORED THIS, WHOEVER DREW THIS

 5   PICTURE, 15393 -- OR RATHER THAT THE PICTURE WAS SOMEWHERE      03:19

 6   BEHIND THE BLACK NOTEBOOK -- I'M SORRY -- SOMEWHERE BEHIND THIS

 7   PAGE, PAGE 61 OF THE BLACK NOTEBOOK?

 8   A    YES.

 9   Q    BY THE WAY, WHAT ELSE DID MATTEL TELL YOU, OR MATTEL'S

10   COUNSEL TELL YOU, ABOUT THIS IMAGE, EXHIBIT 15393?              03:19

11   A    THEY TOLD ME THAT DR. LYTER MADE A STATEMENT IN HIS

12   REPORT, WHICH I ALSO READ, THAT BECAUSE THE BOY WITH THE

13   UMBRELLA AND FISHING POLE'S IMAGE APPEARED TO BE MUCH BOLDER ON

14   THE INDENTED WRITING LIFT, THAT IT WAS CLOSER TO PAGE 61 THAN

15   THE IMAGE OF THE DOLLS.                                        03:19

16   Q    AND DO YOU AGREE WITH THAT, SIR?

17   A    ABSOLUTELY NOT.

18   Q    BUT YOU DO AGREE THAT THIS SHOWS POSITIVELY THAT

19   EXHIBIT 15393, THIS RAINY DAY RASCALS GREETING CARD, WAS

20   WRITTEN IN THE BLACK NOTEBOOK; CORRECT?                        03:20

21   A    YES.

22   Q    AND IT LEFT AN IMPRESSION ON PAGE 61 OF THE BLACK

23   NOTEBOOK; CORRECT?

24   A    IT DID, SIR.

25   Q    THAT'S THE SAME PAGE IN WHICH YOU SAY THAT EXHIBIT 542 WAS 03:20
```

1    IMPRESSED; CORRECT?

2    A    YES.

3    Q    NOW, ASSUMING THAT MR. BRYANT'S TESTIMONY THAT HE DREW

4    THIS RAINY DAY RASCALS GREETING CARD IN 1998, IN MISSOURI, IS

5    TRUE, ASSUMING THAT, THAT WOULD MEAN THAT THIS DRAWING WAS ALSO          03:20

6    MADE IN 1998; CORRECT?

7              MR. QUINN:  OBJECTION.  ARGUMENTATIVE.  IT'S ALSO

8    BEYOND HIS EXPERTISE IN TERMS OF THE DATING.

9              THE COURT:  IT'S MORE A FOUNDATIONAL CONCERN I HAVE

10   WITH HIS ABILITY TO ANSWER THE QUESTION, COUNSEL.                        03:21

11             EITHER REPHRASE OR LAY A FOUNDATION FOR YOUR

12   QUESTION.

13   BY MR. SLOAN:

14   Q    SIR, IT'S YOUR OPINION THAT THE FACT THAT THE IMPRESSION

15   OF THIS RAINY DAY RASCALS GREETING CARD, 15393, IS IMPRESSED           03:21

16   INTO PAGE 61 MEANS THAT GREETING CARD WAS WRITTEN IN THE BLACK

17   NOTEBOOK; CORRECT?

18   A    IT WAS WRITTEN IN THE BLACK NOTEBOOK.  IT WAS DRAWN IN THE

19   BLACK NOTEBOOK, YES.

20   Q    AND YOUR TESTIMONY IS THAT EXHIBIT 542 WAS ON TOP OF THIS         03:21

21   PAGE 61 OF THE BLACK NOTEBOOK; CORRECT?

22   A    CORRECT.

23   Q    AND IS IT YOUR TESTIMONY THAT THIS RAINY DAY RASCALS

24   GREETING CARD WAS ACTUALLY BEHIND PAGE 61?

25   A    POSSIBLY.                                                         03:22

1  Q    WELL, IT'S THE REVERSE OF IT THAT IT'S IMPRESSED INTO

2  THAT; CORRECT?

3  A    BUT A PAGE COULD HAVE BEEN TORN OUT AND THEN PLACED ON TOP

4  OF PAGE 61 AND DRAWN RIGHT SIDE UP; SO I DON'T KNOW HOW THE

5  DRAWING WAS DRAWN, WHETHER ATTACHED IN THE NOTEBOOK OR TORN OUT    03:22

6  AND THEN PLACED ON THE FRONT OF PAGE 61.

7  Q    BUT, SIR, YOU WOULD AGREE THAT THE FACT THAT THIS RAINY

8  DAY RASCALS GREETING CARD WAS IMPRESSED INTO THIS PAGE WOULD BE

9  SIGNIFICANT, ESPECIALLY IF THIS CARD WERE DRAWN IN 1998; IS

10  THAT CORRECT, SIR?                                                 03:22

11  A    I DON'T KNOW IF IT'S DRAWN IN 1998, SIR.

12  Q    SIR, ASSUMING THAT THIS CARD WAS DRAWN IN 1998, IT WOULD

13  SHOW THAT IT LEFT AN IMPRESSION ON THIS PAGE, PAGE 61 --

14  A    YES.

15  Q    -- IN 1998; CORRECT?                                          03:23

16  A    IF IT WAS DRAWN IN 1998, YES, THAT'S CORRECT.

17  Q    AND THE FACT THAT EXHIBIT 542 WAS IMPRESSED UPON THE SAME

18  PAGE WOULD TEND TO SHOW THAT EXHIBIT 542 WAS ALSO CREATED IN

19  1998.

20  A    NO, THAT'S NOT LOGICALLY CORRECT.                             03:23

21       PAGE 5-42 COULD HAVE BEEN DRAWN MONTHS LATER IN THE

22  SAME NOTEBOOK, IF THE PERSON JUST PUT THE NOTEBOOK ASIDE AND

23  DECIDED TO DRAW LATER.

24  Q    SIR, LET ME ASK YOU THIS:  YOU HAD ONE OF MATTEL'S GRAPHIC

25  ARTISTS SKETCH OUT THE OUTLINE OF EXHIBIT 542 ON -- I BELIEVE     03:23

1    IT WAS ONE OF THE EARLIER GRAPHICS YOU SHOWED US.

2             DO YOU REMEMBER THAT GRAPHIC?

3    A    NO.  YOU'LL HAVE TO SHOW IT TO ME, SIR.

4    Q    YOU DON'T REMEMBER SEEING THE GRAPHIC EARLIER?

5    A    I PRESENTED MANY GRAPHICS EARLIER, SIR.                    03:24

6    Q    I WAS WRONG.  I THINK THIS IS GRAPHIC C-3.

7             YOU HAD ONE OF MATTEL'S GRAPHIC ARTISTS SKETCH OUT

8    THE OUTLINES OF EXHIBIT 542 IN THIS GRAPHIC, DIDN'T YOU?

9    A    NOT SKETCH.  SCAN.

10   Q    OKAY.  THEY SCANNED.                                        03:24

11            BUT THEN SOMEONE HIGHLIGHTED THE OUTLINE OF

12   EXHIBIT 542; CORRECT?

13   A    THAT'S CORRECT.

14   Q    HOW COME THEY DIDN'T HIGHLIGHT THE IMPRESSION OF THE

15   GREETING CARD?                                                  03:24

16   A    BECAUSE MATTEL, AT THAT PARTICULAR MOMENT, WAS NOT

17   CONCERNED ABOUT THE GREETING CARD; THEY WERE CONCERNED ABOUT

18   THE DOLL IMAGE.

19   Q    SO YOU TESTIFIED EARLIER THAT IT WAS YOUR OBLIGATION AS AN

20   EXPERT TO PUT EVERYTHING IN THE REPORT THAT MIGHT BE PERTINENT  03:25

21   TO THE JURY; CORRECT?

22            **MR. QUINN:**  MISSTATES HIS TESTIMONY.

23            **THE COURT:**  SUSTAINED.

24   **BY MR. SLOAN:**

25   Q    SIR, YOU TESTIFIED THAT IF THERE WERE A FACT THAT WOULD    03:25

1   CONTRADICT YOUR CLIENT'S CASE, OR THEIR THEORY OF THE CASE,

2   THAT YOU WOULD BE OBLIGED, AS AN EXPERT, TO PUT THAT IN YOUR

3   REPORT; CORRECT?

4   A    DEFINITELY.

5   Q    AND DID YOU NOTICE THE IMPRESSION OF THIS RAINY DAY          03:25

6   RASCALS GREETING CARD IN PAGE 61 OF THE BLACK NOTEBOOK WHEN YOU

7   INITIALLY EXAMINED YOUR IMPRESSION?

8   A    I DID.

9   Q    YOU DID?

10  A    YES.                                                         03:26

11  Q    DIDN'T YOU FEEL THAT IT WAS YOUR OBLIGATION AS AN EXPERT

12  TO DETERMINE WHETHER OR NOT THAT IMPRESSION COULD TELL YOU

13  SOMETHING ABOUT WHEN THIS DOCUMENT WAS CREATED?

14  A    NO.  AS YOU MENTIONED, OF IMPORTANCE AT THAT POINT, I

15  DIDN'T KNOW, I DIDN'T HAVE A CLUE, THAT THAT BOY WAS OF          03:26

16  IMPORTANCE.  AND IT'S UP TO MATTEL TO DETERMINE WHAT IS OF

17  IMPORTANCE TO THEIR CASE.  IT'S NOT UP TO ME TO DETERMINE THAT.

18  Q    SO YOU'RE SAYING THAT MATTEL DIDN'T TELL YOU THAT THE FACT

19  THAT THERE WAS A RAINY DAY RASCALS GREETING CARD IMPRESSED INTO

20  THAT PAGE -- THEY DIDN'T TELL YOU THAT WAS IMPORTANT?           03:26

21  A    THAT'S CORRECT.

22  Q    AND YOU DIDN'T FEEL ANY INDEPENDENT PROFESSIONAL

23  OBLIGATION TO LOOK INTO THE SOURCE OF THIS IMPRESSION.

24         IS THAT WHAT YOU'RE SAYING?

25  A    THAT'S CORRECT.  AT THAT PARTICULAR TIME, THERE WAS NO      03:26

1    NEED FOR ME TO DO THAT.

2    Q    EVEN THOUGH YOU HAD SPENT, WE'VE NOW ESTABLISHED, WELL

3    OVER 100 HOURS IN EXAMINING THE DOCUMENTS AND PREPARING FOR

4    THIS CASE.

5    A    THAT'S CORRECT.                                          03:27

6    Q    AND YOU DIDN'T POINT THIS OUT TO THE JURY, OTHER THAN SORT

7    OF MENTIONING IT BRIEFLY IN YOUR TESTIMONY, BECAUSE MATTEL TOLD

8    YOU NOT TO MENTION IT; CORRECT?

9    A    ABSOLUTELY NOT.  I MENTIONED IT IN MY PREVIOUS TESTIMONY,

10   AND IT WASN'T BRIEFLY.                                       03:27

11   Q    SIR, BEFORE YOU PREPARED YOUR REPORT IN THIS CASE, YOU HAD

12   READ MR. BRYANT'S TESTIMONY IN HIS DEPOSITION; CORRECT?

13   A    NOT THE ENTIRE DEPOSITION TESTIMONY.  AND AS YOU

14   PREVIOUSLY MENTIONED, THERE WERE THREE VOLUMES, AND I KNOW FOR

15   A FACT I DIDN'T READ THREE VOLUMES.                          03:27

16   Q    BUT WERE YOU AWARE THAT MR. BRYANT TESTIFIED, IN HIS

17   DEPOSITION ON NOVEMBER 4, 2004, THAT HE HAD, IN FACT, BEEN

18   CREATING GREETING CARDS WHEN HE WAS LIVING WITH HIS PARENTS IN

19   MISSOURI IN 1998?

20   A    I HAVE NO RECOLLECTION OF THAT.                         03:28

21   Q    WOULD IT POSSIBLY REFRESH YOUR RECOLLECTION IF YOU LOOKED

22   AT MR. BRYANT'S DEPOSITION TRANSCRIPT?

23   A    NO, IT WOULDN'T.

24   Q    IT WOULDN'T REFRESH YOUR RECOLLECTION?

25   A    NO.  BECAUSE I DON'T REMEMBER THAT.                     03:28

```
 1   Q    WELL, SIR, IF YOU LOOKED AT IT, AS YOU'RE SAYING, HOW DO

 2   YOU KNOW IT WOULDN'T REFRESH YOUR RECOLLECTION?

 3   A    BECAUSE YOU VERBALLY JUST TOLD ME ABOUT IT, AND I DON'T

 4   REMEMBER IT; AND IF I DON'T REMEMBER IT WHEN YOU TELL ME ABOUT

 5   IT, READING IT WOULDN'T ASSIST.                                 03:28

 6   Q    BUT YOU DON'T DISPUTE THAT THAT'S IN HIS DEPOSITION.

 7   A    ABSOLUTELY NOT.

 8   Q    LET'S MOVE ON TO EXHIBIT 13635.

 9        THAT IS THE IMPRESSION FILM THAT YOU DEVELOPED FROM,

10   I BELIEVE YOU SAID PAGE 63 OF THE BLACK NOTEBOOK; IS THAT       03:29

11   CORRECT?

12   A    YES, IT IS.

13   Q    ACTUALLY, BEFORE I DO THAT, YOU HAVE THE ORIGINAL OF

14   EXHIBIT 15393 IN FRONT OF YOU, DON'T YOU?

15   A    15393?                                                     03:29

16   Q    THAT'S THE RAINY DAY RASCALS GREETING CARD WE WERE JUST

17   LOOKING AT.

18   A    YES.  IT WAS JUST HANDED TO ME.  I HAVE IT.

19   Q    CAN YOU TAKE THAT OUT AND HOLD IT UP IN FRONT OF JURY, THE

20   ORIGINAL.                                                       03:29

21   A    YES.

22   Q    IS THAT ON NOTEBOOK PAPER THAT APPEARS TO BE IDENTICAL TO

23   THE NOTEBOOK PAPER FROM THE BLACK NOTEBOOK, WHICH IS

24   EXHIBIT 1155-C?

25   A    BASED UPON MY OBSERVATION OF IT RIGHT NOW, IT LOOKS        03:29
```

```
 1   SIMILAR, BUT I CAN'T SAY IDENTICAL AT THIS POINT.

 2   Q    AND BY THE WAY, YOU SAID YOU DID NOTICE THE IMPRESSION OF

 3   THAT GREETING CARD IN YOUR INITIAL EXAMINATION OF THE FILM FROM

 4   PAGE 61; CORRECT?

 5   A    WOULD YOU REPEAT THAT, PLEASE.                          03:30

 6   Q    YOU SAID THAT WHEN YOU INITIALLY DEVELOPED THE FILM FROM

 7   PAGE 61, YOU NOTICED THE IMPRESSION OF THAT GREETING CARD; IS

 8   THAT CORRECT?

 9   A    I SAW IT.

10   Q    YOU DIDN'T PUT THAT IN YOUR REPORT, DID YOU, SIR?       03:30

11   A    NO.

12   Q    THAT'S BECAUSE MATTEL TOLD YOU NOT TO PUT IT IN THE

13   REPORT.

14   A    NO.

15   Q    BECAUSE MATTEL TOLD YOU THAT IT WASN'T IMPORTANT.       03:30

16   A    NO.

17   Q    DON'T YOU THINK THAT IT'S SIGNIFICANT THAT IF THERE'S A

18   KEY PIECE OF EVIDENCE AND YOU FIND AN IMPRESSION, THAT YOU

19   WOULD TELL THE RECIPIENT OF THE REPORT ABOUT OTHER IMPRESSIONS

20   THAT YOU HAD FOUND IN THE SAME FILM?                         03:30

21           MR. QUINN:  OBJECTION.  ARGUMENTATIVE.

22           THE COURT:  SUSTAINED.

23   BY MR. SLOAN:

24   Q    YOU THOUGHT THAT THIS FILM WAS A KEY PIECE OF EVIDENCE,

25   DIDN'T YOU, SIR?                                             03:31
```

1    A    NO.

2    Q    YOU didn't THINK IT WAS IMPORTANT?

3    A    NO.

4    Q    BUT YOU DECIDED TO PUT IT INTO YOUR REPORT.

5    A    I WAS ASKED TO INCLUDE IT IN MY REPORT.                03:31

6    Q    IS IT YOUR TESTIMONY THAT YOU ONLY PUT THINGS IN YOUR

7    REPORT THAT YOU'RE ASKED TO PUT IN YOUR REPORT?

8    A    IF THAT'S THE EVIDENCE THAT'S GOING TO BE SUBMITTED TO THE

9    COURT, YES.

10   Q    SO IF THERE'S SOME EVIDENCE THAT MIGHT BE UNFAVORABLE TO   03:31

11   YOUR CLIENT AND YOUR CLIENT TELLS YOU NOT TO SUBMIT IT TO THE

12   COURT, YOU WOULDN'T PUT IT IN THE REPORT?  IS THAT YOUR

13   TESTIMONY?

14   A    I WOULD FIRST HAVE TO KNOW IT'S UNFAVORABLE.

15   Q    WELL, WHEN YOU SAW THIS IMPRESSION IN THE FILM, HOW DID   03:31

16   YOU KNOW IT WASN'T IMPORTANT?

17   A    I DIDN'T KNOW IT WAS IMPORTANT.  I DIDN'T KNOW IT WAS

18   UNFAVORABLE.  IT'S JUST AN IMAGE THAT I DEVELOPED WHICH I HAVE

19   NO COMMENT ON ABOUT THE STRENGTH OF IT ONE WAY OR ANOTHER.

20   Q    SO IF YOU FOUND AN IMAGE OF SOMETHING ELSE, WOULDN'T IT BE   03:32

21   IMPORTANT TO SAY THAT YOU ALSO FOUND ANOTHER IMAGE IN THE SAME

22   DOCUMENT?

23   A    I DID TELL them THAT.

24   Q    YOU TOLD MATTEL THAT?

25   A    SURE.  AND THEY COULD SEE IT THEMSELVES AS WELL.        03:32

1    Q    AND MATTEL TOLD YOU NOT TO PUT IT IN THE REPORT.

2    A    THEY DIDN'T TELL ME NOT TO PUT IT IN THE REPORT.  THEY

3    TOLD ME WHAT THEY WANTED IN THE REPORT REGARDING THE DRAWN

4    IMAGES OF THE DOLLS.

5    Q    SO THEY TOLD YOU WHAT THEY WANTED IN THE REPORT WAS THAT          03:32

6    THERE WAS AN IMPRESSION OF ONE OF THE BRATZ DRAWINGS IN THAT

7    PAGE; CORRECT?

8    A    THAT'S CORRECT.

9    Q    AND THEY MUST HAVE ALSO TOLD YOU, 'WE DON'T WANT YOU TO

10   MENTION ANYTHING ELSE YOU FOUND'; CORRECT?                            03:32

11   A    THEY DIDN'T SAY IT IN THOSE WORDS.  THEY JUST MENTIONED TO

12   ME, 'THIS IS THE EVIDENCE WE ARE GOING TO SUBMIT AT TRIAL, AND

13   THIS IS THE EVIDENCE WE WANT YOU TO PREPARE IN YOUR RULE 26

14   REPORT.'

15   Q    WELL, DID YOU ASK THEM WHETHER THIS OTHER IMPRESSION WAS         03:33

16   IMPORTANT?

17   A    I DON'T RECALL.

18   Q    DID YOU TELL THEM THAT YOU FOUND THIS OTHER IMPRESSION?

19   A    YES, I DID.

20   Q    AND THEY SAID, 'JUST PUT IN THE IMPRESSION OF THE DOLL.          03:33

21   DON'T PUT IN THE IMPRESSION OF THE RAINY DAY RASCALS GREETING

22   CARD'?

23   A    THEY DIDN'T PHRASE IT THAT WAY, SIR.

24   Q    WELL, THEY SAID, 'PUT IN THAT YOU FOUND THE IMPRESSION OF

25   THE DOLL, BUT DON'T PUT IN THAT YOU FOUND THE IMPRESSION OF THE       03:33

1    LITTLE CHILD WITH THE RAIN COAT'?  IS THAT WHAT THEY SAID?

2    A    NO.  THEY JUST SAID TO ME, 'INCLUDE IN YOUR REPORT THE

3    EVIDENCE OF THE IMPRESSION OF THE DOLLS THAT YOU DEVELOPED IN

4    PAGE 61 AND 63 OF THE NOTEBOOK.'

5            I DON'T THINK THAT THEY WERE MARKED AS 61 AND 63 AT        03:33

6    THAT TIME, BUT I'M USING THAT AS A REFERENCE HERE.

7    Q    WHICH ATTORNEY TOLD YOU THAT THEY ONLY WANTED YOU TO

8    MENTION THAT THERE WAS AN IMAGE OF THE DOLL ON THIS PAGE?

9    A    ATTORNEY DIANE HUTNYAN.

10   Q    SO SHE TOLD YOU ONLY TO MENTION THAT YOU FOUND THE IMAGE      03:34

11   OF THE DOLL ON THE PAGE.

12   A    YES.  AND SHE SAID, 'THAT'S THE EVIDENCE WE'RE GOING TO

13   PRODUCE IN COURT,' AND THAT I WILL TESTIFY ABOUT.

14   Q    AND YOU REALIZEd THAT WAS EVIDENCE THAT WOULD BE FAVORABLE

15   TO MATTEL; RIGHT?                                                  03:34

16   A    AT THAT TIME, I DIDN'T KNOW.

17   Q    SO DIANE HUTNYAN IS THE SAME WOMAN WHO TOLD YOU THAT SHE

18   FELT THE NOTARY BOOK WAS SUSPICIOUS; RIGHT?

19   A    THAT'S CORRECT.

20   Q    AND DID SHE TELL YOU THAT IT WAS IMPORTANT THAT YOU FIND      03:34

21   THE IMAGE OF THIS DOLL IN THIS PAGE?

22   A    NO.

23   Q    SIR, LET'S MOVE ON TO EXHIBIT 13635.

24          THIS IS YOUR IMPRESSION, THE IMPRESSION THAT YOU

25   DEVELOPED, OF PAGE 63 OF THE BLACK NOTEBOOK; CORRECT?             03:35

3408

```
 1    A     CORRECT.

 2    Q     AND YOU HIGHLIGHTED IN ONE OF YOUR GRAPHICS THESE EYES,

 3    AND THERE'S AN ARCHED EYEBROW, AND I THINK THERE'S AN EYEBROW

 4    ON THE OTHER SIDE; CORRECT?

 5    A     THAT'S CORRECT.                                              03:35

 6    Q     AND YOU SAY THAT YOU BELIEVE THAT'S A POSITIVE IMPRESSION

 7    FROM THE DOCUMENT THAT WAS MARKED BRYANT 179, WHICH I THINK IS

 8    EXHIBIT 5-39; IS THAT CORRECT?

 9    A     YES; THE BALLPOINT INK IMAGE FROM THAT DOCUMENT.

10    Q     NOW, SIR, ONE OF THE IMPORTANT TRAITS OF BEING A FORENSIC   03:35

11    DOCUMENT EXAMINER IS PATTERN RECOGNITION; IS THAT CORRECT?

12    A     THAT'S CORRECT.

13    Q     AND THAT IS THE ABILITY TO RECOGNIZE PATTERNS IN FILMS YOU

14    DEVELOP OR OTHER THINGS; IS THAT CORRECT?

15    A     YES, IT, IS.                                                03:36

16    Q     AND, SIR, DID YOU NOTICE ANOTHER IMPRESSION THAT WAS ALSO

17    IN THIS DOCUMENT, EXHIBIT 13635?

18    A     YES; A COUPLE OF OTHER THINGS.

19    Q     DID YOU NOTICE, FOR INSTANCE, THE WORD "WHENEVER" HERE?

20    A     YES, I DID.                                                 03:36

21    Q     DID YOU NOTICE ANYTHING ELSE OF SIGNIFICANCE IN THIS

22    DOCUMENT?

23    A     YES.   THERE'S AN IMPRESSION OF A LITTLE DOG DOWN TOWARDS

24    THE CENTER OF THE PAGE.

25    Q     DID YOU NOTICE, NEAR THE BOTTOM, THE WORD "YOU"?           03:37
```

```
 1            DO YOU SEE THAT ANYWHERE?
 2   A   I SEE SOME ILLEGIBLE LETTER FORMS, WHICH I CAN'T MAKE OUT
 3   EXACTLY WHAT THEY ARE; BUT, NO, I CAN'T MAKE THOSE OUT.
 4   Q   DID YOU NOTICE THOSE THINGS WHEN YOU ORIGINALLY EXAMINED
 5   THIS FILM?                                                        03:37
 6   A   I DID.
 7   Q   AND DID YOU MAKE ANY EFFORT TO DETERMINE THE SOURCE OF
 8   THOSE IMPRESSIONS?
 9   A   I THINK I DID.
10   Q   DID YOU DETERMINE THE SOURCE OF THOSE IMPRESSIONS?           03:37
11   A   YES.  I DON'T RECALL WHAT THE ACTUAL SOURCE WAS, BUT I DO
12   RECALL FINDING THE FACE OF THE DOG WITH THE LONG EARS, AND I DO
13   RECALL FINDING THE WORD "WHENEVER"; BUT I DON'T RECALL ON WHICH
14   DOCUMENTS THEY WERE ON.
15   Q   SIR, COULD I HAVE YOU LOOK AT EXHIBIT 15333, WHICH I THINK   03:38
16   YOU HAVE IN FRONT OF YOU.
17   A   YES, I HAVE IT IN FRONT OF ME.
18   Q   AND YOU'RE HOLDING UP THE ORIGINAL FOR THE JURY?
19   A   YES.
20   Q   DOES THAT APPEAR TO BE ON THE SAME NOTEBOOK PAPER AS THE     03:38
21   BLACK NOTEBOOK?
22   A   IT DOES.  VERY SIMILAR PAPER.
23   Q   AND DO YOU SEE, IN THE TOP LEFT-HAND CORNER OF THAT
24   DOCUMENT, WHERE IT SAYS "WHENEVER"?
25   A   YES.  THAT'S THE SOURCE -- I DO RECALL THAT IS THE SOURCE    03:38
```

1   OF THE "WHENEVER" THAT I DEVELOPED AS INDENTED WRITING.

2   Q    SO YOU BELIEVE THAT THERE'S A POSITIVE IMPRESSION OF THIS

3   DOCUMENT, 15333, THAT IS IMPRESSED INTO PAGE 63 OF THE

4   NOTEBOOK; IS THAT CORRECT?

5   A    YES, THAT'S CORRECT.                                          03:39

6   Q    IS IT YOUR PROFESSIONAL OPINION AS AN EXPERT THAT MEANS

7   THAT THIS DOCUMENT, 15333, WAS DRAWN ON TOP OF PAGE 63 OF THAT

8   BLACK NOTEBOOK?

9   A    YES.

10  Q    AND, SIR, ARE YOU AWARE THAT 15333 IS A DOCUMENT WHICH      03:39

11  MR. BRYANT HAS TESTIFIED IN THIS COURT WAS ONE OF THE RAINY DAY

12  RASCALS GREETING CARDS HE CREATED IN 1998 WHEN HE WAS LIVING IN

13  MISSOURI?

14  A    NO, I'M NOT AWARE OF THAT.

15  Q    YOU WEREN'T AWARE OF THAT?                                   03:39

16  A    NO.

17  Q    NO ONE AT MATTEL TOLD YOU THAT?

18  A    NO.

19  Q    NOW, YOU SAID THAT YOU NOTICED THIS IMPRESSION IN

20  EXHIBIT 13635 IN YOUR FILM WHEN YOU DID THE INITIAL              03:39

21  EXAMINATION; CORRECT?

22  A    YES.

23  Q    BUT YOU DIDN'T PUT THAT IN YOUR REPORT, DID YOU, SIR?

24  A    NO, I DIDN'T.

25  Q    AND IS THE REASON YOU DIDN'T PUT THAT IN THE REPORT         03:40

1   BECAUSE SOMEONE AT MATTEL TOLD YOU NOT TO PUT IT IN YOUR

2   REPORT?

3   A    IT WASN'T WORDED THAT WAY.  IT'S THAT THEY WERE MORE

4   INTERESTED IN THE EYES AND THE EYEBROWS OF EXHIBIT 5-39, AND

5   THAT WAS THE EVIDENCE THAT THEY WERE GOING TO SUBMIT TO THE          03:40

6   COURT.

7   Q    BUT AS AN EXPERT, SIR, YOU'RE AWARE THAT IF THERE ARE

8   IMPRESSIONS OF OTHER DOCUMENTS WHICH ARE IMPRESSED INTO ONE OF

9   YOUR FILMS, THAT MIGHT BE SIGNIFICANT IN TERMS OF BEING ABLE TO

10  DETERMINE THE DATE IN WHICH SOMETHING WAS CREATED; IS THAT          03:40

11  CORRECT?

12  A    THAT COULD BE, BUT I WOULD HAVE TO BE AWARE AND NOTIFIED

13  OF THE SIGNIFICANCE.

14  Q    SO NO ONE NOTIFIED YOU OF THE SIGNIFICANCE OF THIS

15  DRAWING.                                                            03:40

16  A    IF YOU'RE REFERRING TO THE DOG FACE -- AND ACTUALLY, I DO

17  SEE THE WORD "YOU" ON MY LIFT AS WELL, AND THE WORD "WHENEVER"

18  I DON'T KNOW WHAT THE SIGNIFICANCE OF THOSE INDENTATIONS ARE.

19  Q    BUT SOMEONE AT MATTEL TOLD YOU JUST TO MENTION THAT YOU

20  SAW THE EYES OF EXHIBIT 539 IN THIS DOCUMENT; CORRECT?              03:41

21  A    YES.  THEY TOLD ME THAT WAS THE EVIDENCE THEY WERE GOING

22  TO PRODUCE IN COURT AND WANTED ME TO TESTIFY ABOUT.

23  Q    AND WHO TOLD YOU TO DO THAT?

24  A    ATTORNEY DIANE HUTNYAN.

25  Q    SIR, WOULD YOU AGREE THAT THE IMPRESSION FROM THIS RAINY       03:41

1   DAY RASCALS GREETING CARD IS STRONG, AS STRONG, AS THE

2   IMPRESSION OF THESE EYES FROM EXHIBIT 539?

3   A    IT COULD BE PLACED IN A SIMILAR CATEGORY, BUT TO SAY "AS

4   STRONG" FOR ONE OR THE OTHER, THAT WOULD BE VERY DIFFICULT TO

5   DO.                                                                    03:42

6   Q    AFTER YOU FOUND THIS IMPRESSION, DID YOU ASK ANYONE AT

7   MATTEL THE SIGNIFICANCE OF THIS GREETING CARD?

8   A    NO.

9   Q    YOU JUST DECIDED NOT TO PUT IT IN THERE BECAUSE THEY TOLD

10  YOU NOT TO PUT IT IN THERE.                                           03:42

11  A    NO.  THAT'S PHRASING IT INCORRECTLY.

12          I PUT IT IN MY REPORT BECAUSE THEY MENTIONED TO ME

13  THAT THAT'S THE EVIDENCE THAT THEY WERE GOING TO PRODUCE IN

14  COURT AND THAT'S WHAT I WAS TO TESTIFY ABOUT.

15  Q    SO THEY TOLD YOU THAT THEY WANTED YOU TO TESTIFY THAT YOU        03:42

16  FOUND THE IMPRESSION OF EXHIBIT 539 IN PAGE 63; CORRECT?

17  A    CORRECT.

18  Q    WHAT I'M ASKING YOU IS, WHY DIDN'T YOU ALSO PUT IN YOUR

19  REPORT THAT YOU FOUND THIS DOCUMENT, EXHIBIT 15333?

20  A    BECAUSE APPARENTLY MY CLIENT DIDN'T PLACE THAT MUCH              03:43

21  SIGNIFICANCE ON IT.

22  Q    AND IS MS. HUTNYAN IN COURT TODAY?

23  A    I DON'T SEE HER HERE.

24  Q    SIR, LET ME ASK YOU SOME OTHER QUESTIONS ABOUT THAT BLACK

25  NOTEBOOK YOU HAVE IN FRONT OF YOU.                                    03:43

```
 1              YOU SAID THAT YOU BELIEVED THAT THE NOTEBOOK HAS 120

 2    PAGES, OR ORIGINALLY HAD 120 PAGES; CORRECT?

 3    A    IF THE '120' ON THE FRONT OF THE NOTEBOOK ACTUALLY

 4    REFLECTS THE NUMBER OF PAGES THAT ARE SUPPOSED TO BE CONTAINED

 5    IN IT, YES.                                                        03:44

 6    Q    AND, AGAIN, THIS IS EXHIBIT 1155-C; CORRECT?

 7    A    IT IS.

 8    Q    IN FACT, YOU PUT IN YOUR REPORT THAT THERE WERE 66 PAGES

 9    OF THIS NOTEBOOK THAT HAD BEEN REMOVED; CORRECT?

10    A    BASED ON THE INFORMATION ON THE FRONT OF THE NOTEBOOK,        03:44

11    WHICH READS '120,' IF THAT IS, IN FACT, CORRECT.

12    Q    SO MORE THAN HALF OF THE PAGES HAVE BEEN TORN OUT;

13    CORRECT?

14    A    YES.

15    Q    AND OF THE REMAINING PAGES, THERE ARE MANY BLANK PAGES;       03:44

16    CORRECT?

17    A    YES, THERE ARE.

18    Q    DO YOU KNOW WHERE ANY OF THE BLANK PAGES ARE BESIDES THE

19    FOUR PAGES THAT YOU HAVE TESTIFIED ABOUT, EXHIBIT 539,

20    EXHIBIT 5-42, AND THE TWO RAINY DAY RASCALS GREETING CARDS THAT    03:44

21    WE SPOKE ABOUT TODAY?

22    A    I COULD LOOK FOR THEM FOR YOU, IF YOU WOULD LIKE.  THE

23    MAJORITY OF THESE PAGES DO HAVE DRAWINGS ON THEM, HOWEVER.

24    Q    SIR, I THINK YOU misUNDERSTOOD MY QUESTION.

25    A    OH, I'M SORRY.
```

1    Q    YOU SAID THAT THERE ARE 66 PAGES THAT HAVE BEEN TORN OUT,

2    ASSUMING THAT IT STARTED WITH 120 PAGES; CORRECT?

3    A    YES.

4    Q    AND THE ONLY PAGES THAT YOU'RE AWARE OF, OF THE ONES THAT

5    HAVE BEEN TORN OUT, ARE THE FOUR PAGES I JUST MENTIONED;          03:45

6    CORRECT?

7    A    NO.  THERE ARE TWO OTHER PAGES, I BELIEVE, OF EXHIBITS 540

8    AND 541; THOSE ARE TWO OTHER PAGES.

9    Q    SIR, YOU DON'T HAVE ANY KNOWLEDGE AS TO WHEN THE PAGES,

10   EXHIBIT 542 AND EXHIBIT 539, WERE TORN OUT, DO YOU?               03:45

11   A    NO, I DON'T.

12   Q    AND YOU HAVE NO KNOWLEDGE OF WHEN THE RAINY DAY RASCALS

13   GREETING CARDS THAT WE SPOKE ABOUT, EXHIBITS 15333 AND

14   EXHIBIT 15393 -- YOU DON'T KNOW WHEN THOSE WERE TORN OUT

15   EITHER, DO YOU?                                                   03:46

16   A    NO, I DON'T, SIR.

17   Q    AND THEY COULD HAVE BEEN TORN OUT IN 1997; CORRECT?

18   A    I DON'T KNOW.  I DON'T KNOW THE DATE OF WHEN THIS NOTEBOOK

19   WAS ISSUED, SO I DON'T KNOW IF THEY WERE TORN OUT IN 1997.

20   Q    AND THEY COULD HAVE BEEN TORN OUT IN 1998; CORRECT, SIR?     03:46

21   A    I GUESS THEY COULD HAVE BEEN.  SURE.

22   Q    SIR, BASED ON YOUR 28 YEARS OF EXPERIENCE AS AN EXPERT,

23   YOU CAN'T DETERMINE, TO A SCIENTIFIC CERTAINTY, WHEN THOSE

24   RAINY DAY RASCALS GREETING CARDS WERE CREATED, CAN YOU?

25   A    NO.                                                          03:47

```
 1   Q    AND IF I ASKED YOU THE SAME QUESTION ABOUT EXHIBITS 5-42

 2   AND 5-39, WOULD YOU HAVE THE SAME ANSWER, THAT YOU CAN'T

 3   DETERMINE, WITH ANY SCIENTIFIC PRECISION, WHEN THOSE DRAWINGS

 4   WERE CREATED?

 5   A    I CAN'T.                                                    03:47

 6         MR. SLOAN:  NO FURTHER QUESTIONS, YOUR HONOR.

 7         THE COURT:  VERY WELL.

 8         MR. QUINN?

 9         MR. QUINN:  THANK YOU, YOUR HONOR.

10                   REDIRECT EXAMINATION                            03:47

11   BY MR. QUINN:

12   Q    MR. CUNNINGHAM, MGA COUNSEL KEPT ASKING YOU IF YOU WERE

13   AWARE THAT MR. BRYANT TESTIFIED IN THIS TRIAL THAT HE CREATED

14   THOSE RAINY DAY RASCALS GREETING CARDS IN 1998.

15         DO YOU RECALL BEING ASKED THOSE QUESTIONS?               03:48

16   A    I DO.

17   Q    DO YOU KNOW WHETHER MR. BRYANT FIRST MADE THE CLAIM, IN

18   THIS TRIAL, AFTER YOUR REPORT WAS DONE, THAT HE CREATED THOSE

19   GREETING CARDS IN 1998?

20         MR. SLOAN:  OBJECTION.  FOUNDATION; MISSTATES THE         03:48

21   EVIDENCE.

22         THE COURT:  OVERRULED.

23   BY MR. QUINN:

24   Q    MR. CUNNINGHAM, DO YOU KNOW WHETHER MR. BRYANT, FOR THE

25   VERY FIRST TIME, MADE THE CLAIM, WHEN HE WAS ON THE WITNESS     03:48
```

| | |
|---|---|
| 1 | STAND IN THIS TRIAL, THAT HE CREATED THOSE RAINY DAY RASCALS |
| 2 | GREETING CARDS IN 1998?  DO YOU KNOW WHETHER THAT'S TRUE OR |
| 3 | NOT? |
| 4 | **MR. SLOAN:**  OBJECTION.  FOUNDATION; MISSTATES THE |
| 5 | EVIDENCE. |
| 6 | **THE COURT:**  OVERRULED. |
| 7 | **THE WITNESS:**  NO.  I HAVE NO IDEA OF THAT, SIR. |
| 8 | **BY MR. QUINN:** |
| 9 | Q    AFTER YOUR INDENTATION ANALYSIS WAS DONE. |
| 10 | A    IF IT WAS STATED AFTER MY INDENTATION ANALYSIS WAS |
| 11 | COMPLETED, I DON'T KNOW WHAT HIS TESTIMONY WAS IN COURT. |
| 12 | Q    AFTER FIVE DAYS OF DEPOSITION, WHEN HE NEVER SAID IN HIS |
| 13 | DEPOSITION THAT THOSE RAINY DAY RASCALS GREETING CARDS WERE |
| 14 | CREATED IN 1998 -- DO YOU KNOW WHETHER THAT'S TRUE? |
| 15 | **MR. SLOAN:**  OBJECTION.  IT'S ARGUMENTATIVE, AND IT |
| 16 | ALSO MISSTATES THE DEPOSITION TESTIMONY. |
| 17 | **THE COURT:**  SUSTAINED. |
| 18 | **BY MR. QUINN:** |
| 19 | Q    COUNSEL WOULD HAVE THAT DEPOSITION TESTIMONY, THEN, TO |
| 20 | PRESENT IF THERE WERE SUCH DEPOSITION TESTIMONY, WOULDN'T HE? |
| 21 | A    I WOULD THINK SO, SIR. |
| 22 | **THE COURT:**  IT WAS ARGUMENTATIVE, BUT I'LL LET IT |
| 23 | STAND. |
| 24 | **BY MR. QUINN:** |
| 25 | Q    ARE YOU AWARE OF ANY EVIDENCE AT ALL THAT THOSE RAINY DAY |

03:48

03:48

03:49

03:49

03:49

FRIDAY, JUNE 20, 2008                    TRIAL DAY 16, AFTERNOON SESSION

```
1   RASCALS GREETING CARDS WERE CREATED IN 1998, OTHER THAN WHAT
2   COUNSEL HAS TOLD YOU WAS MR. BRYANT'S TESTIMONY?
3   A    NO.  I HAVE NO KNOWLEDGE OF THE DATE WHEN THEY WERE
4   PREPARED.
5   Q    IF MR. BRYANT HADN'T MADE THAT CLAIM UNTIL THIS WEEK WHEN    03:49
6   HE WAS IN TRIAL, YOU COULD NOT KNOW WHETHER THERE WAS ANY
7   SIGNIFICANCE TO WHEN THE RAINY DAY RASCAL GREETING CARDS WERE
8   CREATED; CORRECT?
9         MR. SLOAN:  OBJECTION. ARGUMENTATIVE; LACK OF
10  FOUNDATION.                                                       03:50
11        THE COURT:  THE WORD "IF" STAYS IN.
12        OVERRULED.
13        THE WITNESS:  COULD YOU REPEAT THE QUESTION.
14  BY MR. QUINN:
15  Q    IF MR. BRYANT HADN'T MADE THAT CLAIM THAT THE RAINY DAY      03:50
16  RASCALS GREETING CARDS WERE CREATED IN 1998, IF HE HADN'T FIRST
17  MADE THAT CLAIM UNTIL THIS WEEK WHEN HE WAS ON THE WITNESS
18  STAND, YOU WOULDN'T HAVE ANY BASIS TO KNOW THAT THE DATING OF
19  THOSE HAD ANY SIGNIFICANCE, WOULD YOU?
20  A    NO.                                                          03:50
21        MR. SLOAN:  OBJECTION, YOUR HONOR.  ARGUMENTATIVE.
22        THE COURT:  OVERRULED.
23        THE WITNESS:  NO, I WOULDN'T KNOW IF THEY WERE
24  SUSPICIOUS IN NATURE, AND I WOULDN'T KNOW IF THEY HAD ANY
25  SIGNIFICANCE WHATSOEVER DURING MY PREVIOUS EXAMINATION OF IT.     03:50
```

**BY MR. QUINN:**

Q    SO BASED ON WHAT YOU KNOW, JUST AT THIS POINT IN TIME, TO

CONCLUDE THAT, IN FACT, THESE RAINY DAY RASCALS GREETING CARDS

WERE CREATED IN 1998, THE ONLY THING YOU WOULD HAVE TO GO ON IS

WHAT COUNSEL HAS REPRESENTED TO YOU THAT MR. BRYANT TESTIFIED                03:51

TO; CORRECT?

A    THAT'S CORRECT, SIR.

Q    IS THERE ALSO SOME OBJECTIVE EVIDENCE IN THAT BLACK

NOTEBOOK AS TO WHEN THINGS WERE CREATED, SUCH AS BANK

STATEMENTS AND THINGS LIKE THAT?                                            03:51

        **MR. SLOAN:**  OBJECTION, YOUR HONOR.  FOUNDATION; CALLS

FOR SPECULATION.

        **THE COURT:**  IT DOES SEEM OUTSIDE THE SCOPE, COUNSEL.

        THIS IS A forensic DOCUMENT EXAMINER.

        LET'S MOVE ALONG.                                                   03:51

        **MR. QUINN:**  VERY WELL, YOUR HONOR.

**BY MR. QUINN:**

Q    DID ANYBODY TELL YOU THAT MR. BRYANT TESTIFIED THAT HE

CONTINUED TO CREATE GREETING CARDS IN 1998, INCLUDING RIGHT UP

TO THE PRESENT, THAT HE TESTIFIED TO THAT THIS VERY DAY, IN                 03:51

THAT CHAIR?

A    NO, I HAVEN'T BEEN ADVISED OF THAT.

        **MR. SLOAN:**  OBJECTION, YOUR HONOR.  MISSTATES THE

TESTIMONY OF MR. BRYANT, AS TO THE DAY, YOUR HONOR.

        **THE COURT:**  VERY GOOD.                                         03:52

```
 1          REPHRASE.

 2          MR. QUINN:  I THOUGHT IT WAS TODAY.

 3   BY MR. QUINN:

 4   Q    WERE YOU AWARE THAT MR. BRYANT TESTIFIED ON THE WITNESS

 5   STAND IN THIS TRIAL THAT HE CONTINUED TO MAKE GREETING CARDS UP      03:52

 6   TO THIS DATE, UP TO THIS YEAR THAT WE'RE NOW IN?

 7   A    I HAVE NO KNOWLEDGE OF THAT, SIR.

 8   Q    DID IT SURPRISE YOU THAT THERE WERE OTHER IMAGES THAT YOU

 9   WERE ABLE TO DEVELOP ON THOSE PAGES AS WELL?

10   A    NO; IT DIDN'T SURPRISE ME, AS I PREVIOUSLY TESTIFIED TO.       03:52

11          QUITE OFTEN, WE DEVELOP MULTIPLE IMAGES FROM OTHER

12   PAGES.

13   Q    AND WHY DOES THAT HAPPEN SOMETIMES?

14   A    BECAUSE, AS I MENTIONED PREVIOUSLY, THE PERSON CAN WRITE

15   ON TWO PAGES ABOVE THE IMAGE WITH HEAVY PEN PRESSURE, A PERSON      03:52

16   CAN WRITE ON THREE PAGES ABOVE THE DOCUMENT WHICH IS THE

17   SUBJECT MATTER WITH HEAVY PEN PRESSURE, AND THE INDENT WRITING

18   FROM BOTH OF THOSE PAGES CAN INDENT INTO ONE PAGE.

19   Q    WAS IT YOUR INTENTION TO HIDE THAT FACT FROM THE JURY,

20   THAT THERE WERE IMPRESSIONS OF OTHER IMAGES?                        03:53

21   A    NO.  IT'S RIGHT IN MY DEMONSTRATIVE AND ON MY INDENTED

22   WRITING FILM SO THE JURY WOULD BE ABLE TO SEE THAT.  THERE'S

23   NOTHING FOR ME TO HIDE.

24   Q    DID YOU MENTION THAT WHEN I WAS FIRST ASKING YOU

25   QUESTIONS?                                                         03:53
```

```
 1   A    YES.  I DID MENTION THAT THERE WAS AN IMAGE OF A BOY WITH
 2   A FISHING POLE AND AN UMBRELLA.
 3   Q    BUT TO GET BACK TO YOUR CONCLUSIONS ABOUT THE PLACEMENT OF
 4   THOSE DOLL IMAGES IN THIS BOOK, DOES THE PRESENCE OF OTHER
 5   IMAGES, WHETHER GREETING CARDS OR ANYTHING ELSE, DOES THAT        03:53
 6   AFFECT YOUR ANALYSIS CONCERNING YOUR CONCLUSIONS REGARDING
 7   WHETHER THOSE PARTICULAR DOLL IMAGES, THOSE EXHIBITS, CAME FROM
 8   THAT BLACK NOTEBOOK?
 9   A    NO.  THAT WAS MY ASSIGNMENT, AND THAT'S WHAT I WAS ASKED
10   TO TESTIFY TO.                                                    03:53
11   Q    IF WE COULD GO TO THE NOTARY BOOK.
12        YOU WERE ASKED SOME QUESTIONS ABOUT WHETHER THE
13   WRITER HAD LEFT ROOM FOR A FIFTH LINE THERE, AND YOU WERE ASKED
14   IF THERE IS ROOM THERE EXCLUDING THE COMMAS.
15        DO YOU RECALL BEING ASKED THAT QUESTION?                    03:54
16   A    YES.
17   Q    WHAT IS THE SIGNIFICANCE OF THE COMMAS, FROM YOUR POINT OF
18   VIEW AS A FORENSIC DOCUMENT EXAMINER?
19   A    WELL, IT'S VERY CLEAR, EXAMINING OTHER ENTRIES IN THIS
20   NOTARY JOURNAL THAT AREN'T RELATED TO THE CARTER BRYANT ENTRY,    03:54
21   ESPECIALLY ON THE FIRST PAGE THAT OPPOSING COUNSEL WAS
22   CONCENTRATING ON, WHERE THIS INDIVIDUAL MAKES SHORT COMMAS --
23   AND IF A PERSON HAS THE CAPABILITY OF MAKING SHORT COMMAS, AND
24   IF THAT PERSON HAD AN INTENTION OF WRITING A FIFTH LINE OF
25   WRITING, IT'S NOT LIKELY THE PERSON IS GOING TO MAKE THESE HUGE   03:55
```

1  COMMAS THAT PROTRUDE OR EXTEND ALL OF THE WAY DOWN TO THE

2  BOTTOM PRINTED LINE.  THEY JUST SERVE AS OBSTRUCTIONS IF YOU

3  WANT TO WRITE SOMETHING ON THAT FIFTH LINE.

4  Q    LET'S LOOK AT THE DEMONSTRATIVE WHERE THAT FIFTH LINE IS

5  TAKEN OUT.  JUST SHOW THE COMMAS.                              03:55

6  A    YES.  THAT'S A VERY GOOD EXAMPLE.

7          WHEN THE PERSON DOES HAVE THE CAPABILITY OF WRITING

8  SMALLER COMMAS, IT'S NOT LIKELY THAT THEY'RE GOING TO MAKE

9  THOSE HUGE COMMAS TO OBSTRUCT THE FIFTH LINE OF WRITING.

10 Q    COUNSEL ASKED YOU IF YOU FOUND IT SUSPICIOUS THAT THE     03:55

11 FIRST LINE WAS WRITTEN ON THE FIRST MACHINE-PRINTED LINE; AND

12 YOU SAID, NO, WHAT WAS SIGNIFICANT TO YOU WAS THE FACT THAT THE

13 SECOND LINE WAS IN BETWEEN THE MACHINE-PRINTED LINES.

14         COULD YOU EXPLAIN THAT.

15 A    YES.                                                      03:55

16         IT'S NOT JUST THAT THE SECOND LINE IS IN-BETWEEN THE

17 FIRST AND SECOND PRINTED LINES.  IT'S THE FACT, IN MY OPINION,

18 THAT THE PERSON, WHEN WRITING THAT SECOND LINE, ANTICIPATED

19 INCLUDING MORE HANDWRITTEN INFORMATION IN THAT BLOCK THAN THE

20 THREE PRINTED LINES COULD ACCOMMODATE.  THE PERSON GAVE        03:56

21 GENEROUS SPACING BETWEEN THE FIRST AND SECOND LINE, THE SECOND

22 AND THIRD LINE, AND THE THIRD AND FOURTH LINE, WHICH YOU ALSO

23 HAVE A PERIOD AFTER "MALES," AND "MALES" DOES PROTRUDE INTO THE

24 NEXT BLOCK; AND IF THE PERSON DID INTEND TO WRITE FIVE LINES,

25 IT WOULD HAVE BEEN VERY EASY, SINCE THEY DID SUCH A GOOD JOB OF  03:56

1    SPACING THE FOUR LINES -- THEY COULD HAVE TIGHTENED UP ON THOSE

2    FOUR LINES A LITTLE, WHICH WOULD HAVE AFFORDED THEM EXTRA SPACE

3    FOR THE FIFTH LINE OF WRITING.

4    Q    AT ONE POINT YOU WERE ASKED A QUESTION, AND YOU SAID THAT

5    IT DEPENDED ON WHEN YOU RECEIVED THE EVIDENCE, IN TERMS OF          03:56

6    WHETHER IT'S APPROPRIATE TO CONSIDER DEPOSITIONS OR DOCUMENTS;

7    IT DEPENDS ON WHEN YOU GET IT, WHEN YOU DO YOUR WORK.

8         DO YOU RECALL THAT ANSWER?

9    A    I DO, SIR.

10   Q    COULD YOU EXPLAIN THAT, PLEASE.                                03:57

11   A    YES.

12        IF I CONDUCT AN EXAMINATION FIRST, AND THEN I RECEIVE

13   INFORMATION ABOUT THE QUESTIONABILITY OF THE ENTRY LATER, THEN

14   I FIND NO PROBLEM WITH THAT.

15        IT DEPENDS ON IF YOU READ A DEPOSITION TRANSCRIPT IN           03:57

16   ITS ENTIRETY OR IF YOU JUST READ SEGMENTS OF A DEPOSITION

17   TRANSCRIPT; AND IT'S WHEN YOU READ THEM, BEFORE OR AFTER YOUR

18   EXAMINATION.  SUCH AS IN JACQUELINE PRINCE'S DEPOSITION

19   TESTIMONY, I WAS ONLY DIRECTED TO ONE AREA THAT I CAN RECALL.

20   Q    WHAT IS THE SIGNIFICANCE?  WHY DOES IT MATTER WHEN YOU         03:57

21   READ IT, IN TERMS OF YOUR GOAL AS A QUESTIONED DOCUMENT

22   EXAMINER?

23   A    I DON'T LIKE TO BE PROVIDED WITH TOO MUCH INFORMATION

24   ABOUT THE CASE PRIOR TO MY EXAMINATION.  SUCH AS THE FIVE LINES

25   OF WRITING.  EVEN THOUGH I WAS DIRECTED TO "FROM 1998              03:58

1   MISSOURI," BECAUSE ANYONE CAN SEE THAT IT'S SQUEEZED INTO THAT

2   POSITION, I LIKE TO JUST EXAMINE THE EVIDENCE BEFORE ME AND

3   REACH MY CONCLUSIONS BASED UPON THAT.

4   Q    NOW, YOU SAID IN RESPONSE TO ONE OF COUNSEL'S QUESTIONS

5   THAT YOU DON'T HAVE A COLLEGE DEGREE.                          03:58

6   A    THAT'S CORRECT, SIR.

7   Q    AND YOU'RE NOT A MEMBER OF THE AMERICAN BOARD OF FORENSIC

8   DOCUMENT EXAMINERS; IS THAT TRUE?

9   A    I'M NOT CERTIFIED BY THEM, SIR.

10  Q    AND WHY AREN'T YOU CERTIFIED BY THEM?                     03:58

11  A    WELL, I HAVE ALL OF THE EDUCATIONAL BACKGROUND AS A

12  FORENSIC DOCUMENT EXAMINER, BUT ONE OF THEIR REQUIREMENTS IS

13  THAT I HAVE TO HAVE A BACHELOR'S DEGREE IN ANY SUBJECT IN

14  ADDITION TO MY EDUCATION IN THE FIELD OF DOCUMENT EXAMINATION.

15  AND I FULLY SUPPORT THEM FOR MAKING IT MANDATORY FOR THE       03:58

16  BACHELOR'S DEGREE, WHICH I DON'T HAVE.

17  Q    BUT DO YOU DO ANY WORK WITH THE AMERICAN BOARD OF FORENSIC

18  DOCUMENT EXAMINERS?  EVEN THOUGH YOU CAN'T BE CERTIFIED BECAUSE

19  YOU DON'T HAVE A COLLEGE DEGREE, DO YOU DO ANY WORK WITH THEM?

20  A    YES.  IN FACT, THEY BEGAN PUTTING ON ADVANCED HANDWRITING  03:59

21  PROGRAMS FOR THEIR CERTIFIED MEMBERS IN 1997, AND THE FIRST

22  ADVANCED HANDWRITING PROGRAM THEY PUT ON FOR THEIR CERTIFIED

23  MEMBERS, WHICH WAS A THREE-DAY WORKSHOP, THEY CALLED ME UP AND

24  ASKED ME TO TEACH ALL OF THEIR MEMBERS FOR THREE DAYS.  SO EVEN

25  THOUGH I'M NOT CERTIFIED, I APPRECIATED THAT THEY ACKNOWLEDGED  03:59

1    MY EXPERTISE AND ASKED ME TO PUT ON A PROGRAM FOR THE CERTIFIED

2    MEMBERS.

3    Q    SO DOES THE FACT THAT YOU DON'T HAVE A COLLEGE DEGREE MEAN

4    THAT YOU'RE NOT COMPETENT AS A DOCUMENT EXAMINER?

5    A    NO.  NOT AT ALL.                                              03:59

6    Q    WAS IT A PROBLEM WHEN YOU APPLIED TO GET INTO THE SECRET

7    SERVICE SCHOOL FOR QUESTIONED DOCUMENTS, THE FACT THAT YOU

8    DIDN'T HAVE A COLLEGE DEGREE?

9    A    NO.

10   Q    WHEN YOU GOT INTO THAT PROGRAM WITH THE UNITED STATES        04:00

11   POSTAL SERVICE CRIME LAB, DID THEY HAVE A PROBLEM WITH THE FACT

12   THAT YOU DIDN'T HAVE A COLLEGE DEGREE?

13   A    NO, SIR.

14   Q    WHEN YOU WENT THROUGH THAT FBI QUESTIONED DOCUMENTS

15   COURSE, WAS THAT AN ISSUE FOR THEM?                               04:00

16   A    ABSOLUTELY NOT.

17   Q    WHEN THAT FBI-FUNDED ORGANIZATION CHOSE YOU AS ONE OF TWO

18   PEOPLE FROM THE CIVIL FIELD IN THE COUNTRY TO ESTABLISH

19   NATIONAL STANDARDS FOR QUESTIONED DOCUMENTS EXAMINATION, WAS IT

20   A PROBLEM THAT YOU DIDN'T HAVE A COLLEGE DEGREE?                  04:00

21   A    NO.  NOT AT ALL.

22   Q    SO TO GO BACK TO THE NOTARY BOOK AND THE CONCEPT OF WHAT

23   IS SUSPICIOUS AND UNUSUAL, WOULD IT BE SUSPICIOUS TO YOU IF THE

24   FIRST TIME THAT CARTER BRYANT TESTIFIED THAT HE DID THESE

25   GREETING CARDS IN 1998 WAS AFTER YOU HAD DELIVERED YOUR REPORT?   04:00

1        **MR. SLOAN:**  OBJECTION, YOUR HONOR.  FOUNDATION.

2        **MR. QUINN:**  I'M SORRY.  THE RAINY DAY GREETING CARDS,

3   THE RAINY DAY RASCALS GREETING CARDS.

4        **THE COURT:**  THANK YOU.

5   **BY MR. QUINN:**                                              04:01

6   Q    WOULD IT BE SUSPICIOUS TO YOU IF HE FIRST TESTIFIED THAT

7   THOSE WERE DONE IN 1998 AFTER YOU HAD DELIVERED YOUR REPORT

8   IDENTIFYING THE INDENTATIONS THAT YOU SAW?

9        **MR. SLOAN:**  OBJECTION.  LACKS FOUNDATION; CALLS FOR

10  SPECULATION; BEYOND THE SCOPE OF HIS EXPERTISE.               04:01

11       **THE COURT:**  REPHRASE YOUR QUESTION, COUNSEL.

12  **BY MR. QUINN:**

13  Q    WOULD IT BE SUSPICIOUS TO YOU IF MR. BRYANT TESTIFIED FOR

14  THE FIRST TIME THAT THESE RAINY DAY RASCALS GREETING CARDS WERE

15  DONE BACK IN 1998 AFTER YOU HAD DONE YOUR ANALYSIS AND         04:01

16  DELIVERED YOUR REPORT?

17       **MR. SLOAN:**  SAME OBJECTION, YOUR HONOR.  LACK OF

18  FOUNDATION; CALLS FOR SPECULATION; BEYOND THE SCOPE OF HIS

19  EXPERTISE.

20       **THE COURT:**  OVERRULED.                               04:02

21       **THE WITNESS:**  WELL, IF HE HAD THE OPPORTUNITY TO READ

22  MY REPORT FIRST AND THEN MADE THAT STATEMENT LATER, THAT COULD

23  ALSO BE CONSIDERED AS A SELF-SERVING STATEMENT.

24       **THE COURT:**  I'M SORRY.  SUSTAIN THE OBJECTION.

25       I MISUNDERSTOOD THE QUESTION.                            04:02

```
 1          MR. SLOAN:  MOVE TO STRIKE.

 2          THE COURT:  THE ANSWER IS STRICKEN.

 3          THANK YOU, COUNSEL.

 4          I MISUNDERSTOOD THE QUESTION.

 5          MR. QUINN:  NOTHING FURTHER.  THANK YOU.        04:02

 6          THE COURT:  VERY WELL.

 7          ANYTHING FURTHER, MR. SLOAN?

 8          MR. SLOAN:  YES, YOUR HONOR.

 9                    RECROSS-EXAMINATION

10  BY MR. SLOAN:                                          04:02

11  Q    MR. CUNNINGHAM, YOU WERE DEALING WITH MS. HUTNYAN FROM

12  MATTEL'S LAW FIRM; CORRECT?

13  A    FOR THE MAJORITY OF THE TIME, SIR, YES.

14  Q    AND DID MS. HUTNYAN TELL YOU THAT MR. QUINN HAD, IN FACT,

15  QUESTIONED MR. BRYANT DURING HIS DEPOSITION IN NOVEMBER OF 2004  04:02

16  ABOUT WHETHER HE HAD BEEN DOING ANY DESIGN WORK WHILE HE WAS

17  LIVING WITH HIS PARENTS IN MISSOURI?

18  A    NO.

19          MR. SLOAN:  YOUR HONOR, I'D LIKE TO PLAY A PORTION OF

20  MR. BRYANT'S DEPOSITION TESTIMONY OF NOVEMBER 4, 2004;         04:03

21  PAGE 143, LINES 5 THROUGH 16 -- ACTUALLY, YOUR HONOR, PAGE 143,

22  LINES 6 THROUGH 16, AND ALSO PAGE 144, LINES 15, THROUGH

23  PAGE 145, LINE 4.

24          THE COURT:  WAIT A SECOND.

25          15 IS THE ANSWER.  I UNDERSTAND PAGE 143, LINES 6      04:04
```

```
 1   THROUGH 16.

 2            144, LINE 15, THAT STARTS WITH AN ANSWER.

 3            MR. SLOAN:  I'M SORRY.  LINE 16, YOUR HONOR, THROUGH

 4   145, LINE 4.

 5            AND, YOUR HONOR, THIS IS ONE OF THE DEPOSITION            04:04

 6   TRANSCRIPTS THAT MR. QUINN WAS JUST QUESTIONING MR. CUNNINGHAM

 7   ABOUT.

 8            THE COURT:  COUNSEL, LET'S NOT MAKE STATEMENTS LIKE

 9   THAT AGAIN.

10            MR. QUINN, IS THERE AN OBJECTION?                        04:04

11            MR. QUINN:  THE OBJECTION IS THAT IT'S IRRELEVANT;

12   IT'S NOT IMPEACHING OF ANYONE; IT DOESN'T REFER TO THE SUBJECT

13   MATTER THAT'S BEEN DISCUSSED.

14            IF WE COULD APPROACH SIDE-BAR.

15            (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

16   SIDE-BAR:)

17            THE COURT:  MAYBE IT'S the END OF THE DAY, but I

18   CAN'T REMEMBER IF THE ASHTON DRAKE GREETING CARDS WERE THE

19   RAINY DAY RASCALS CARDS.

20            WERE THEY?                                               04:06

21            MR. SLOAN:  I BELIEVE HE SAYS "GREETING CARDS FOR

22   HALLMARK."

23            THE COURT:  THE COURT JUST ASKED A QUESTION.

24            WERE THE ASHTON DRAKE GREETING CARDS THE RAINY DAY

25   RASCALS GREETING CARDS?  BECAUSE THAT IS WHAT'S AT ISSUE HERE,    04:06
```

```
 1   THE MAN WITH THE UMBRELLA AND THE HAT.

 2          MR. QUINN:  I THINK THE ANSWER IS NO, BUT I'D LIKE TO

 3   CONFIRM WITH MR. PRICE.

 4          THE COURT:  I JUST CAN'T REMEMBER.

 5          MR. SLOAN:  HE SAYS THE GREETING CARDS -- THE SECOND     04:06

 6   POINT -- HE SAYS HE WAS DOING THEM ON HIS OWN AND FOR HALLMARK.

 7   WHAT HE IS SAYING IS -- THE TESTIMONY IS CLEAR --

 8          THE COURT:  FOR THE BENEFIT OF MR. NOLAN AND

 9   MR. QUINN, MY QUESTION, IS:  ARE THE ASHTON DRAKE GREETING

10   CARDS, WHICH IS THE DEPOSITION TESTIMONY HERE, THE RAINY DAY     04:06

11   RASCAL GREETING CARDS THAT WERE THE SUBJECT OF THE EXAMINATION

12   OF THE EXPERT?

13          MR. SLOAN:  YOUR HONOR, I THINK HIS TESTIMONY HERE IS

14   THAT HE WAS DOING GREETING CARDS; AND ASHTON DRAKE, THEY ARE

15   SEPARATE THINGS; HE WAS DOING THEM FOR HALLMARK.               04:07

16          THE COURT:  THAT'S MY RECOLLECTION AS WELL, BUT I

17   WASN'T SURE.

18          MR. SLOAN:  AND OUR CONTENTION IS THAT THE GREETING

19   CARDS WE'RE TALKING ABOUT -- I THINK, IF YOU FOLLOWED HIS

20   TESTIMONY, HE DOESN'T EXPRESSLY SAY "RAINY DAY RASCALS" IN      04:07

21   HERE, BUT HE SAYS HE WAS DOING GREETING CARDS HERE.  AND THAT'S

22   CONSISTENT WITH WHAT HE TESTIFIED TO.

23          THE ONLY THING THAT'S DIFFERENT ABOUT WHAT HE

24   TESTIFIED TO IN COURT IS THAT HE DISCUSSED THE ACTUAL CARDS AND

25   THAT THEY WERE RAINY DAY RASCALS.                              04:07
```

1          BUT MR. QUINN HAS SUGGESTED NOW TO THE JURY THAT HE

2     MADE THIS WHOLE THING UP AFTER THE FACT BECAUSE OF THE EXPERT

3     REPORT, AND I THINK IT'S UNFAIR FOR THE JURY --

4          **THE COURT:**  I AGREE THAT THERE'S NO EVIDENCE THAT HE

5     MADE ANYTHING UP; IT'S ONLY AN INFERENCE THAT ANYONE MADE          04:07

6     ANYTHING UP.  THE QUESTION IS WHETHER OR NOT THERE'S EVIDENCE.

7          MR. QUINN IS TRYING TO GET OUT THAT, IS THERE ANY

8     EVIDENCE THAT -- AND AGAIN, WE'RE BACK TO CREDIBILITY.  WE'RE

9     NOT LOOKING FOR ABSTRACT TRUTHS HERE; WE'RE LOOKING FOR

10    CREDIBILITY.  THE EXAMINATION OF THE WITNESS BY YOU WAS THIS       04:08

11    RAINY DAY RASCAL CARD THAT APPEARS IN THE NOTEBOOK.  THE ONLY

12    RELEVANCE OF THAT TO IMPEACH THIS WITNESS IS IF THE RAINY DAY

13    RASCALS CARD WAS DONE IN 1998.

14          **MR. SLOAN:**  CORRECT.

15          **THE COURT:**  WE DON'T KNOW IF IT WAS OR IT WASN'T.          04:08

16          WE HAVE TESTIMONY FROM CARTER BRYANT THAT IT WAS;

17    THAT HE DID THE RAINY DAY RASCAL CARD IN 1998.  AND THE REASON

18    WHY YOU GOT INTO IT TODAY IS BECAUSE THAT'S WHAT HE SAID, AND

19    HE OBJECTED TO WHAT YOU SAID.

20          **MR. QUINN:**  HE REMEMBERS IT THE SAME WAY.                 04:08

21          **MR. PRICE:**  I ASKED HIM AGAIN THIS MORNING.

22          **THE COURT:**  IN ANY EVENT, MR. CARTER BRYANT TESTIFIED

23    TO NUMEROUS DIFFERENT GREETING CARDS THAT HE DID.

24          **MR. SLOAN:**  THE RAINY DAY RASCALS CARDS HE TESTIFIED

25    TO, I'M TALKING ABOUT IN COURT --                                 04:09

```
 1              THE COURT:  NO QUESTION.  WE ALL AGREE ON THAT.

 2              MR. SLOAN:  THEY WERE IN '98.

 3              THE COURT:  THE QUESTION OF WHETHER OR NOT HE

 4    TESTIFIED ABOUT THIS IN HIS DEPOSITION, I WILL ALLOW YOU TO GET

 5    THIS IN IF THIS IS TALKING ABOUT THE RAINY DAY RASCALS.      04:09

 6              MR. SLOAN:  FIRST OF ALL, MR. CUNNINGHAM HAS IN HIS

 7    REPORT -- HE'S NOW SAID THAT HE DID REVIEW THE SAME DEPOSITION

 8    TRANSCRIPT.

 9              THE COURT:  FINE.

10              MR. SLOAN:  AND HE'S TALKING ABOUT CREATING GREETING  04:09

11    CARDS HERE.

12              THE COURT:  THESE NEED TO BE THE RAINY DAY RASCALS

13    CARDS; OTHERWISE THIS IS NOT RELEVANT.

14              MR. SLOAN:  YOUR HONOR, IT'S OUR CONTENTION THESE ARE

15    THE RAINY DAY RASCALS.  THE FACT HE DIDN'T SPECIFICALLY MENTION 04:09

16    IT, I DON'T THINK IT'S SIGNIFICANT IF THOSE --

17              THE COURT:  THAT'S WHAT I WAS -- NOW WE'RE FULL

18    CIRCLE ALL OF THE WAY BACK TO MY FIRST QUESTION:  DID CARTER

19    BRYANT EVER INDICATE HE SUBMITTED RAINY DAY RASCAL CARDS TO

20    ASHTON DRAKE?                                                  04:09

21              MR. SLOAN:  I DON'T THINK SO.

22              THE COURT:  I DON'T THINK SO EITHER.

23              MR. SLOAN:  NO, NO, NO --

24              THE COURT:  THE GALL WITH THE HOLLOW JEANS AND THE

25    GET UP AND -- COUNSEL, YOU SAY NO, NO, NO.  BUT YOU'RE GOING TO 04:09
```

```
 1   HAVE TO PROVE IT.  IF YOU'RE WRONG AND YOU'RE MISSTATING

 2   THINGS, BE CAREFUL.

 3          MR. SLOAN:  WHAT I'M SAYING -- LET ME READ IT -- HE'S

 4   NOT SAYING HERE EITHER THAT HE DID THE GREETING CARD FOR

 5   ASHTON DRAKE.  IN FACT, HE SAYS HERE "YOU DID SOME GREETING        04:10

 6   CARDS; RIGHT?  AND THAT WAS FOR A PARTICULAR COMPANY."

 7          "NO, I WAS DOING THOSE ON MY OWN.  I WAS NOT GETTING

 8   PAID FOR THEM.  IT WAS JUST SOMETHING I WAS DOING."

 9          "DID YOU EVER SUBMIT THEM?"

10          "YES."                                                      04:10

11          "WHO DID YOU SUBMIT THEM TO?"

12          "I SUBMITTED THEM SOME TIME" --

13          I THINK HE SAYS HE SUBMITTED THEM TO HALLMARK.  BUT

14   RIGHT HERE THERE'S ANOTHER PORTION WHERE HE TALKED ABOUT

15   HALLMARK.                                                          04:10

16          HE'S NOT SAYING THESE ARE THE ASHTON DRAKE CARDS.

17   HE'S SAYING HE'S DOING THIS ON HIS OWN.  WHICH MY CONTENTION IS

18   THAT'S PERFECTLY CONSISTENT WITH THE TESTIMONY THAT HE GAVE IN

19   COURT.  THE ONLY THING THAT'S DIFFERENT IS HE DIDN'T

20   SPECIFICALLY IDENTIFY THOSE WERE THE RAINY DAY RASCALS GREETING    04:10

21   CARDS.

22          THE COURT:  THE LINES YOU IDENTIFIED, 6 THROUGH 16,

23   PAGE 143, AND LINES 16 ON PAGE 144 TO LINE 4, PAGE 145 APPEAR

24   TO BE THE ASHTON DRAKE CARDS.  I DON'T SEE ANY CONNECTION WITH

25   THEM TO THE RAINY DAY RASCALS, WHICH IS WHAT'S IN EVIDENCE.        04:11
```

```
 1          I WILL LET YOU GET IN ANYTHING FROM THE DEPOSITION
 2   SHOWING HE TALKED ABOUT THE RAINY DAY RASCAL CARDS THAT ARE THE
 3   SUBJECT OF THE IMPEACHMENT EFFORT.
 4          MR. SLOAN:  HE'S NOT SAYING THAT THESE ARE GREETING
 5   CARDS FOR ASHTON DRAKE.  HE'S SAYING HE WAS DOING DESIGN WORK     04:11
 6   FOR ASHTON DRAKE THAT HE GOT PAID FOR AND HE WAS ALSO DOING
 7   GREETING CARDS ON HIS OWN.
 8          THE COURT:  WHERE IS THAT?
 9          NOW YOU'RE JUST SAYING THINGS.  SHOW ME WHAT YOU'RE
10   TALKING ABOUT.                                                   04:11
11          MR. SLOAN:  "I HAVE DONE FREE-LANCE WORK FOR
12   ASHTON DRAKE, BUT THE GREETING CARDS IS THE ONLY" --
13          THE COURT:  "ASHTON DRAKE GALLERIES WERE THE ONLY
14   DESIGN THAT HE ACTUALLY GOT PAID FOR."
15          MR. SLOAN:  HE SAID THAT HE DIDN'T GET PAID FOR THE       04:11
16   GREETING CARDS.  "WAS THAT FOR A PARTICULAR COMPANY?"  NO, I
17   WAS JUST DOING THAT ON MY OWN, NOT GETTING PAID.  IT WAS JUST
18   MAINLY THAT'S MY INTEREST -- I DON'T HAVE THE FULL TRANSCRIPT
19   YOUR HONOR.  YOUR TRANSCRIPT, YOU SEE HE SUBMITTED THEM TO
20   HALLMARK.                                                        04:12
21          THE COURT:  MY TRANSCRIPT SHOWS "ARE YOU REFERRING TO
22   THE ASHTON DRAKE OR WHAT ARE YOU REFERRING TO?"
23   "ASHTON DRAKE."
24          THE QUESTIONS ARE BEING ASKED BY MR. QUINN; THEY ARE
25   ALL ASHTON DRAKE.                                                04:12
```

```
1              THIS IS THE FULL TRANSCRIPT.

2         MR. SLOAN:  "WAS THAT FOR A PARTICULAR COMPANY?"

3         "NO."

4         THE COURT:  THAT'S OUTSIDE, COUNSEL.

5         ANYWAY, IF YOU CAN ESTABLISH --                      04:12

6         MR. PRICE:  COUNSEL IS SAYING THE ISSUE HE BROUGHT UP

7  IS THAT THIS WITNESS, THIS EXPERT, BEHAVED IMPROPERLY BECAUSE

8  HE KNEW THAT -- SHOULD HAVE KNOWN THAT GREETING CARDS WAS DONE

9  IN 1998 THAT ASHTON DRAKE GREETING CARDS -- THERE'S NOTHING IN

10 HERE OF WHAT CARTER BRYANT SAYS HE DID ASHTON DRAKE GREETING   04:12

11 CARDS -- THAT HE DID RAINY DAY RASCALS IN 1998.

12        THE COURT:  THAT'S WHAT I'M ASKING FOR.

13        IF YOU HAVE ANY EVIDENCE OF THAT, I'LL LET IT IN.  IF

14 YOU NEED THE WEEKEND TO FIND IT, THAT'S FINE.

15        WE'RE OUT OF TIME.  IT'S 5:30.                        04:13

16        DO YOU HAVE ANY MORE QUESTIONS?

17        MR. QUINN:  NO.

18        MR. SLOAN:  NO, YOUR HONOR.

19        THE COURT:  NO FURTHER QUESTIONS?

20        MR. SLOAN:  OH, I'M SORRY.  YES.  I HAVE MORE         04:13

21 QUESTIONS.

22        THE COURT:  HOW MUCH MORE?

23        MR. SLOAN:  NOT MORE THAN TEN MINUTES.

24        THE COURT:  I TOLD THE JURY I'D KEEP THEM UNTIL 5:30.

25 YOU'RE GOING TO HAVE TO BRING THE WITNESS BACK ON MONDAY.     04:13
```

```
 1            UNIDENTIFIED SPEAKER:  HE'S GOT TWO TRIALS NEXT WEEK.

 2            THE COURT:  I UNDERSTAND THAT.  I HAVE A LOT OF ANGRY

 3    ATTORNEYS AND WITNESSES OUT HERE.

 4            THE CLERK:  JUROR NUMBER TWO, MS. APPLETON SAYS SHE

 5    CANNOT WORK BEYOND 5:30.                                      04:13

 6            (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

 7            THE COURT:  I'M SORRY, MEMBERS OF THE JURY.  IT LOOKS

 8    LIKE WE'RE GOING TO HAVE TO CONTINUE WITH THIS TESTIMONY ON

 9    TUESDAY.  WE'VE HAD TOO MANY ISSUES HERE THAT WE HAD TO RESOLVE

10    AS A MATTER OF LAW.  I KNOW YOU NEED TO GET HOME NOW.  I

11    APPRECIATE YOU STAYING FOR AS LONG AS YOU HAVE.  I APOLOGIZE

12    FOR THE LENGTHY DAY TODAY.  WE'LL START UP AT 9:00 ON TUESDAY,

13    AND I'LL HAVE YOU OUT OF HERE AT 5:00 ON TUESDAY.

14            HAVE A GREAT WEEKEND.  THANK YOU VERY MUCH.

15            (WHEREUPON, JURORS DEPART COURTROOM.)               04:14

16            THE COURT:  TO THE WITNESS, RETURN ON TUESDAY AT

17    9:00.

18            LET'S CONTINUE WITH THE DISCUSSION WE WERE HAVING AT

19    SIDE-BAR.

20            THE CREDIBILITY ISSUE, AS THE COURT UNDERSTANDS IT,   04:15

21    IS THAT ON THE SAME SHEETS OF PAPER, THERE WERE THE DOLL

22    DRAWINGS THAT MATTEL CLAIMS WERE PART OF THE BLACK NOTEBOOK.

23    THERE ALSO APPEARED DRAWINGS OF THE RAINY DAY RASCALS.  THERE

24    IS WHAT APPEARS TO BE, AND WHAT THE WITNESS HAS INDICATED IS, A

25    DRAWING OF A RAINY DAY RASCAL.                               04:15
```

1           NOW, THE IMPEACHMENT THAT MR. SLOAN IS ATTEMPTING TO

2    ACHIEVE BY THIS IS THAT THE WITNESS, THE EXPERT, DID NOT

3    DISCLOSE THAT IN HIS EXPERT REPORT BECAUSE HE KNEW THAT IT

4    MIGHT BE HELPFUL TO MGA -- OR WAS FOLLOWING DIRECTION FROM

5    MATTEL ONLY TO DISCLOSE THINGS THAT WERE HELPFUL TO MATTEL.  SO     04:16

6    THE CRITICAL LYNCHPIN TO THAT ARGUMENT, OF COURSE, IS THAT THE

7    WITNESS OR MATTEL OR SOMEBODY WOULD HAVE KNOWN THAT

8    CARTER BRYANT CLAIMED TO HAVE DONE, SPECIFICALLY, THE RAINY DAY

9    RASCALS GREETING CARD, THAT DRAWING, IN 1998.  BECAUSE IF HE

10   DID IT IN 1999, THAT WOULD SIMPLY CORROBORATE MATTEL'S             04:16

11   PERSPECTIVE; IT WOULD BE CUMULATIVE EVIDENCE; AND YOU WOULDN'T

12   EXPECT THE EXPERT TO HAVE INCLUDED IT, AND IT'S NOT IMPEACHMENT

13   AT ALL.  IT'S ONLY IMPEACHMENT, AS I UNDERSTAND IT -- AND I'M

14   ARTICULATING THIS NOT TO MAKE A FINDING; I'M ARTICULATING THIS

15   SO YOU UNDERSTAND MY THINKING.  AND IF I'M WRONG, YOU CAN TELL     04:17

16   ME HOW I'M WRONG.  BUT IT'S ONLY IMPEACHMENT IF, IN FACT, THE

17   WITNESS KNEW OR SHOULD HAVE KNOWN, BASED ON REVIEWING THE

18   DEPOSITIONS OR BASED ON WHAT MATTEL MIGHT HAVE TOLD THEM, THAT

19   THE RAINY DAY RASCALS DRAWING WAS DONE IN 1998.

20           AM I CORRECT ON THAT COUNSEL?                              04:17

21           **MR. SLOAN:**  YOU ARE, YOUR HONOR.

22           I THINK THE IMPORTANT POINT IS THAT THE DEPOSITION

23   TRANSCRIPT CLEARLY INDICATES --

24           **THE COURT:**  BEFORE WE GET TO THAT, I JUST WANT TO

25   MAKE SURE THAT I HAVE AN UNDERSTANDING OF THE CREDIBILITY         04:17

```
1   ARGUMENT YOU'RE MAKING.  SO AM I CORRECT ON THAT, THAT WE

2   NEED -- TO GET YOUR POINT, WE NEED TO ESTABLISH THAT THE RAINY

3   DAY RASCALS WAS IN 1998.  AND YOU'RE CORRECT THAT MR. BRYANT

4   TESTIFIED TO THAT THIS MORNING.

5            NOW, OF COURSE, THAT DOESN'T DO THE WITNESS, OR       04:17

6   FRANKLY, MATTEL, ANY GOOD, UNLESS THERE WAS KNOWLEDGE OF THAT,

7   AND I THINK -- AND THEY WEREN'T THE MOST ARTFUL QUESTIONS, BUT

8   THE COURT IS NOT BEING VERY ARTFUL RIGHT NOW -- THAT MR. QUINN

9   WAS ASKING -- HE WAS TRYING TO GET THE EXPERT TO SAY THAT IF HE

10  DIDN'T KNOW ABOUT THIS BEFORE NOW, THEN OBVIOUSLY, HE COULDN'T  04:18

11  HAVE KNOWN THAT IT WAS SIGNIFICANT OR KNOWN THAT THE RAINY DAY

12  RASCALS DRAWING THERE WAS SIGNIFICANT.

13           SO WHAT I'M SAYING IS, I WILL GIVE YOU FULL LEAVE AT

14  THIS POINT.  IF THERE IS ANYTHING IN THE DEPOSITIONS OR

15  ANYTHING IN THE MATERIAL THAT THIS EXPERT REVIEWED THAT        04:18

16  INDICATES THAT HE KNEW OR SHOULD HAVE KNOWN THAT THE RAINY DAY

17  RASCALS DRAWING THAT WAS CLEARLY SHOWN TO THE JURY THERE --

18  THAT EVEN IF THERE WAS A CLAIM THAT IT WAS DONE IN 1998 --

19  BECAUSE IT DOESN'T HAVE TO BE PROVEN -- IF THERE WAS A CLAIM,

20  FOR HIM TO BE A FAIR, EVEN-HANDED EXPERT, THAT IS WIDE OPEN FOR 04:18

21  IMPEACHMENT.  BUT IF THERE ISN'T EVIDENCE OF IT, THEN THE

22  ARGUMENT, QUITE FRANKLY, GOES NOWHERE.

23           MR. SLOAN:  YOUR HONOR, LET ME TRY TO EXTRICATE WHY I

24  THINK IT'S IMPORTANT.

25           FIRST OF ALL, THIS IS AN EXPERT -- THIS IS CLEARLY A  04:18
```

```
 1   KEY ISSUE FOR MGA.  IT ESTABLISHES, IN OUR MIND, THAT -- AND HE

 2   SAID SO HIMSELF -- THAT, IN FACT, THESE DRAWINGS THAT WERE DONE

 3   IN 1998 ARE IMPRESSED ON THE SAME PAGES AS THE DOCUMENTS THAT

 4   MATTEL IS CLAIMING WERE DONE IN 1999.

 5         THE COURT:  IF THEY WERE DONE IN 1998.  THAT'S THE       04:19

 6   CRITICAL POINT.

 7         MR. SLOAN:  CORRECT, YOUR HONOR.

 8         BUT IT'S A KEY POINT.  MR. BRYANT HAS TESTIFIED TO

 9   THAT.

10         THE COURT:  I UNDERSTAND WHY IT'S A KEY POINT.          04:19

11         MR. SLOAN:  THE FACT THAT HE DOESN'T KNOW WHAT

12   MR. BRYANT HAD SAID TODAY, WHICH IS CLEARLY -- OR WHAT HE SAID

13   BOTH IN TESTIMONY TODAY AND I BELIEVE ON WEDNESDAY -- WHICH IS

14   CLEARLY PERTINENT TO THE SIGNIFICANCE OF HIS FINDING, I THINK

15   THAT GOES TO HIS CREDIBILITY.  AND THE ISSUE THAT IN 1998,     04:19

16   MR. BRYANT SPECIFICALLY TESTIFIED THAT HE WAS DOING GREETING

17   CARDS.  AND THESE ARE GREETING CARDS.  I THINK WE SHOULD BE

18   ALLOWED TO PROBE HIS CREDIBILITY.  AND PART OF THAT IS

19   ASSESSING -- IF HE SAYS THAT HE HAD THE TRANSCRIPTS AND HE HAD

20   THEM AVAILABLE TO REVIEW, I THINK IT WOULD BE INCUMBENT UPON   04:19

21   HIM, AS AN OBJECTIVE EXPERT, TO LOOK AT THEM.

22         HE'S NOW TESTIFIED THAT HE SAW THESE IMPRESSIONS IN

23   THE DOCUMENTS.  I THINK WE SHOULD BE ALLOWED TO PROBE WHETHER

24   OR NOT HE UNDERSTOOD THAT, IN FACT, THOSE IMPRESSIONS WERE FROM

25   GREETING CARDS.  THEY LOOK VERY MUCH LIKE GREETING CARDS.      04:20
```

1          **THE COURT:**  THAT'S ALL IT IS, COUNSEL.  THAT'S WAY

2     TOO TENUOUS.  HE'S BEEN DOING GREETING CARDS FOR YEARS.  I'M

3     SURE MATTEL WILL STIPULATE THAT HE'S BEEN DOING GREETING CARDS

4     FOR YEARS.  HE'S BEEN DOING DRAWINGS OF DOLLS FOR YEARS.  IT'S

5     NOT A QUESTION OF JUST DOING DOLLS OR GREETING CARDS.  IT'S          04:20

6     WHICH DOLLS --

7          **MR. SLOAN:**  YOUR HONOR, I THINK THE ONLY

8     TESTIMONY -- I'M NOT SURE ABOUT THIS; I'LL CHECK -- BUT I THINK

9     THE ONLY TESTIMONY IN HIS DEPOSITION ABOUT GREETING CARDS IS

10    THAT HE WAS DOING THEM IN 1998.  AND THAT'S SIGNIFICANT.          04:20

11         THE OTHER POINT I WOULD MAKE, YOUR HONOR, IS THAT --

12         **THE COURT:**  IF YOU CAN POINT ME TO THAT IN A

13    DEPOSITION, I'LL LET THAT IN.

14         IF HE ONLY DID IT IN 1998, IF THAT WAS THE ONLY TIME

15    HE WAS DOING GREETING CARDS -- WHAT YOU JUST STATED THERE, IF    04:21

16    YOU CAN BACK IT UP --

17         **MR. SLOAN:**  YOUR HONOR, I'M SAYING THAT I THINK THAT

18    MAY BE IN THE DEPOSITIONS.  HE'S TESTIFIED -- I AGREE WITH

19    MR. PRICE, THAT HE'S TESTIFIED THAT HE WAS DOING GREETING

20    CARDS --                                                         04:21

21         **THE COURT:**  IF IT'S THERE, IT'S IN.

22         **MR. SLOAN:**  OKAY.

23         LET ME JUST MAKE THE ONE OTHER ARGUMENT, WHICH IS, I

24    THINK THAT MR. QUINN HAS REALLY PUT THIS IN ISSUE BY PUTTING

25    THESE QUESTIONS TO MR. CUNNINGHAM.  HE HAS CLEARLY SUGGESTED TO   04:21

```
 1   THE JURY THAT --

 2         THE COURT:  COUNSEL, YOU PUT IT IN ISSUE WHEN YOU

 3   RAISED IT HERE.  MR. QUINN IS RESPONDING TO THE ISSUE THAT YOU

 4   CREATED, AND I'M GIVING YOU FULL RANGE TO BRING IN AS MUCH

 5   EVIDENCE AS YOU WANT.  ALL I'M SAYING IS THAT YOUR EVIDENCE HAS      04:21

 6   TO SHOW THAT EITHER THE RAINY DAY RASCALS GREETING CARD ITSELF

 7   THAT WAS IN EVIDENCE HERE WAS DONE IN 1998 -- AND YOU DON'T

 8   HAVE TO PROVE IT; ALL YOU HAVE TO DO IS SHOW SOME EVIDENCE THAT

 9   WAS SOMETHING THAT HE SHOULD HAVE KNOWN BEFORE HE WALKED IN

10   TODAY TO TESTIFY, OR SPECIFICALLY BEFORE HE DID HIS REPORT.         04:21

11   BECAUSE YOUR ARGUMENT IS NOT THAT HIS TESTIMONY IS IMPEACHED;

12   YOU WERE USING THAT TO IMPEACH HIS REPORT, UPON WHICH HE'S

13   TESTIFIED TODAY.  BECAUSE YOU WERE CRITICIZING HIM FOR NOT

14   INCLUDING THAT IN HIS REPORT.

15         MR. SLOAN:  I WAS USING IT TO CRITICIZE BOTH HIS              04:22

16   REPORT AND HIS TESTIMONY.

17         THE COURT:  YOU CERTAINLY WOULDN'T EXPECT HIM TO HAVE

18   COME UP WITH DIFFERENT TESTIMONY FROM HIS REPORT BASED ON

19   TESTIMONY FROM THIS MORNING.

20         MR. SLOAN:  IF HE CAME INTO POSSESSION OF INFORMATION         04:22

21   AFTER HIS REPORT WAS RELEASED THAT WOULD UNDERMINE THE FINDINGS

22   OF HIS REPORT IN SOME WAY, WHICH WERE CLEARLY DIRECTED TO

23   PROVING THAT THESE IMPRESSIONS WERE LEFT IN 1999 -- OR THAT THE

24   DOLLS WERE CREATED IN 1999 --

25         THE COURT:  FAIR ENOUGH.  BUT ALL WE HAVE IS --               04:22
```

1          THIS CAME OUT THIS MORNING; RIGHT?

2          **MR. QUINN:**  FOR THE SECOND TIME.

3          **MR. SLOAN:**  IT CAME OUT ON WEDNESDAY, OR TUESDAY, AS

4    WELL.  I THINK IT WAS WEDNESDAY.  I'M NOT SURE.

5          BUT MR. BRYANT CLEARLY TESTIFIED ABOUT RAINY DAY          04:22

6    RASCALS BEFORE THIS MORNING.

7          **THE COURT:**  OKAY.  AND YOU'VE IMPEACHED HIM ON THAT

8    POINT.  THE JURY HEARD THAT.  THEY JURY KNOWS THAT.  YOU'VE

9    IMPEACHED HIM.  YOU'VE GOT THAT; THAT TESTIMONY WAS MADE AND HE

10   GAVE TESTIMONY TODAY THAT DIDN'T ACCOUNT FOR THAT.  YOU'RE      04:23

11   GOOD.

12         NOW WHAT YOU'RE GOING TO DO, YOU'RE GOING TO GO BACK

13   IN TIME -- MR. QUINN IS TRYING TO SAVE THE ATTACK ON THE REPORT

14   -- YOU WANT TO GO BACK IN TIME AND SHOW THAT, HEY, HE SHOULD

15   HAVE KNOWN THIS FROM BEFORE.  AND I'M SAYING THAT'S FINE; YOU   04:23

16   CAN DO THAT.  YOU JUST ARE GOING TO HAVE TO FIND SOMETHING

17   WHICH EITHER TIES IT TO RAINY DAY RASCALS IN 1998 OR THIS

18   GREETING CARD WAS JUST IN 1998.  BUT THERE'S GOT TO BE

19   SOMETHING.  OTHERWISE THERE'S NOT ENOUGH OF A CONNECTION THERE,

20   COUNSEL.                                                       04:23

21         **MR. SLOAN:**  SO YOU'RE SAYING THAT IF CARTER BRYANT'S

22   TESTIMONY, THE ONLY TESTIMONY IN HIS DEPOSITION --

23         **THE COURT:**  IF YOU CAN BACK UP ANYTHING THAT YOU'VE

24   REPRESENTED TO ME AT SIDE-BAR OR HERE, I'LL LET IT IN; BUT I

25   THINK YOU MAY BE SPEAKING A LITTLE BIT OUT OF TURN HERE,        04:24

```
 1    COUNSEL.

 2         MR. SLOAN:  YOUR HONOR, WHAT I SAID -- I SAID A

 3    COUPLE OF DIFFERENT THINGS -- WITH RESPECT TO THE DEPOSITION,

 4    THE ONLY PART OF THE DEPOSITION I KNOW ABOUT WHERE HE TALKS

 5    ABOUT GREETING CARDS, HE SAYS HE'S DOING IT IN 1998.  I'M NOT   04:24

 6    POSITIVE ABOUT THAT; I WILL CHECK.  THAT'S MY CURRENT BELIEF.

 7    BUT I DO NOT CLAIM TO HAVE AN ENCYCLOPEDIC KNOWLEDGE OF THE

 8    DEPOSITION.

 9         WITH RESPECT TO WHAT THE DEPOSITIONS SAY -- AND I

10    BELIEVE HE'S NOT TALKING ABOUT DOING ANYTHING FOR ASHTON DRAKE.  04:24

11    HE SAID HE WAS DOING IT ON HIS OWN; HE WAS TRYING TO SET UP HIS

12    OWN COMPANY; THEN HE SAID HE SUBMITTED IT TO HALLMARK.  IT DOES

13    NOT HAVE ANYTHING TO DO WITH ASHTON DRAKE.

14         THE COURT:  RIGHT.  AND I DON'T THINK THAT THE

15    EXPERT, READING THAT, ASSUMING THAT HE DID -- AND I'M GETTING   04:24

16    THE IMPRESSION THAT YOUR EXPERT KIND OF DID 'THIS' BUSINESS

17    (MAKING MOTIONS) WITH THE DEPOSITION, BUT THAT'S JUST MY OWN

18    SENSE.  YOU'RE PAYING THE EXPERT'S BILLS, NOT ME.  BUT I DON'T

19    GET THE IMPRESSION THAT THIS PARTICULAR EXPERT DID A WHOLE LOT

20    OF READING.  BUT LET'S ASSUME THAT HE DID.  IF HE DIDN'T, IT    04:24

21    WAS RECKLESS DISREGARD OF HIS DUTY TO DO SO.

22         LET'S ASSUME HE READ THAT ACTUAL PARAGRAPH THAT YOU

23    WANTED TO HAVE READ.  IN THE ABSENCE OF ANY DATE OR REFERENCE

24    TIME ON THAT, AND IN THE ABSENCE OF ANY CONNECTION TO THE RAINY

25    DAY RASCALS, I DON'T KNOW WHY THAT WOULD HAVE TRIGGERED FOR HIM  04:25
```

| | |
|---|---|
| 1 | AN 'AHA.'  THAT HIDDEN LITTLE RAINY DAY UMBRELLA THING, THAT |
| 2 | ACTUALLY HELPS MGA DATE THE NOTEBOOK BACK IN 1998. |
| 3 | **MR. SLOAN:**  YOUR HONOR, RESPECTFULLY, THERE IS A |
| 4 | CLEAR DATE REFERENCE IN THAT PASSAGE TOO.  HE'S DOING IT WHILE |
| 5 | HE WAS IN HIS INTERLUDE BETWEEN HIS TWO TIMES AT MATTEL. |
| 6 | **THE COURT:**  THAT'S THE GENERAL GREETING CARDS. |
| 7 | THERE'S NO CLEAR DATE PASSAGE TO THE RAINY DAY RASCALS OR -- |
| 8 | AND I KNOW YOU SAY THAT IT MIGHT BE THERE, BUT YOU'RE NOT SURE. |
| 9 | I NEED SOME INDICATION THAT THE ONLY TIME THAT HE DID GREETING |
| 10 | CARDS WAS IN '98.  EITHER OF THOSE PROVES YOUR POINT.  SO YOU |
| 11 | MAY BE RIGHT.  YOU JUST HAVE TO SHOW ME THE DEPOSITION |
| 12 | TRANSCRIPT YOU'RE REFERRING TO.  YOU DON'T EVEN HAVE TO SHOW IT |
| 13 | TO ME; JUST SHOW IT TO MR. QUINN. |
| 14 | **MR. NOLAN:**  MAY I MAKE ONE STATEMENT. |
| 15 | I PERSONALLY BELIEVE THAT THE ISSUE WE'RE TRYING TO |
| 16 | CONFRONT IS THAT MR. QUINN, IN HIS QUESTIONING OF THE EXPERT, |
| 17 | SAID, 'YOU WOULD FIND IT SUSPICIOUS' -- |
| 18 | **THE COURT:**  I DIDN'T LIKE THE WORD "SUSPICIOUS" |
| 19 | MYSELF. |
| 20 | **MR. NOLAN:**  -- 'IF MR. BRYANT DIDN'T TESTIFY TO THIS |
| 21 | UNTIL TODAY, OR THIS WEEK, AFTER YOUR REPORT WAS FILED.' |
| 22 | AND WHAT I JUST WANTED TO -- |
| 23 | **THE COURT:**  I THOUGHT I SUSTAINED AN OBJECTION WHEN |
| 24 | HE FIRST USED THE WORD "SUSPICIOUS." |
| 25 | **MR. NOLAN:**  THE CHRONOLOGY THAT I WANTED TO TELL |

04:25

04:25

04:26

04:26

04:26

```
 1    YOU -- IT CLEARLY -- AND THEN HE SAID, 'YOU WOULD EXPECT
 2    COUNSEL TO COME FORWARD WITH THAT TYPE OF TESTIMONY.'
 3            AND WHAT WOULD I SAY, YOUR HONOR, IS THAT THE
 4    CHRONOLOGY THAT OCCURS HERE IS -- EVEN IF WE'RE NOT GOOD ON
 5    THESE DEPOSITIONS -- AND WE'LL COMB THROUGH THEM, THE FIRST    04:26
 6    VOLUMES OVER THE WEEKEND; BUT I THINK WE'VE SHOWN YOU THE BEST
 7    WE HAVE RIGHT NOW.
 8            BUT HERE'S THE ISSUE:  THE WITNESS HAS CLEARLY
 9    TESTIFIED UNDER OATH THAT HE GOT THESE DOCUMENTS IN SEPTEMBER
10    OF 2007 AND SPENT 80 HOURS, AND NOTICED RAINY DAY RASCALS.    04:27
11    THEY TOOK CARTER BRYANT'S DEPOSITION TWO MORE TIMES IN MARCH.
12    NEVER ASKED HIM THE QUESTIONS OF RAINY DAY RASCALS.  AND I JUST
13    THINK IT'S INAPPROPRIATE FOR MR. QUINN -- BECAUSE WE DON'T HAVE
14    TO VOLUNTEER ANYTHING, OR MR. BRYANT DIDN'T HAVE TO VOLUNTEER
15    ANYTHING, IN HIS DEPOSITION.  THEY, KNOWING THAT THERE WAS AN    04:27
16    IMPRESSION OF THIS RAINY DAY RASCALS APPEARING ON THE FILM,
17    NEVERTHELESS TOOK CARTER BRYANT'S DEPOSITION AND NEVER ASKED
18    HIM THAT QUESTION.  AND NOW MR. QUINN --
19            THE COURT:  THIS IS A DIFFERENT ARGUMENT YOU'RE
20    MAKING NOW THAN THE ONE THAT MR. SLOAN --                      04:27
21            MR. NOLAN:  SO IT'S NOT TECHNICALLY A TAG TEAM.
22            THE COURT:  DIDN'T YOU OBJECT TO THAT EARLIER TODAY?
23            MR. NOLAN:  YES.  BUT YOU SAID THAT THE RULE MAY
24    CHANGE.
25            (LAUGHTER.)                                            04:28
```

```
 1              THE COURT:  ALL RIGHT.

 2              MR. NOLAN:  BUT IT IS A DIFFERENT ARGUMENT.  I WAS

 3    TRYING TO GIVE MR. SLOAN A NOTE ON THAT.  BUT THAT'S WHAT I WAS

 4    SEEING AS THE MOST --

 5              THE COURT:  THAT'S AN ENTIRELY DIFFERENT ARGUMENT,      04:28

 6    THOUGH, COUNSEL; AND IF YOU WANT TO MAKE --

 7              MR. NOLAN:  I GUESS THE WAY I -- IF I COULD PROPOSE

 8    SOMETHING, YOUR HONOR.  IF WE COULD ESTABLISH THAT HE SAW THE

 9    RAINY DAY RASCALS IN SEPTEMBER, WHENEVER HE DID.  AND NUMBER

10    TWO, 'DID YOU KNOW THAT MR. BRYANT'S DEPOSITION WAS TAKEN FOR    04:28

11    TWO ADDITIONAL DAYS IN MARCH?'  YES OR NO.  'DO YOU KNOW IF

12    MATTEL DID NOT ASK ANY QUESTIONS AT THAT POINT IN TIME?'

13              I MEAN, TO BE ABLE TO DO THAT --

14              THE COURT:  I DON'T THINK THE OBLIGATION IS ON THE

15    WITNESS TO DO THAT.                                             04:28

16              MR. NOLAN:  BUT, YOUR HONOR, MR. QUINN, WITH ALL DUE

17    RESPECT TO MR. QUINN, THE WAY HE ARGUED THAT IN THAT QUESTION,

18    THERE WAS AN OBJECTION TO IT; IT WAS OVERRULED, NOT ON THE USE

19    OF THE WORD 'SUSPICIOUS,' BUT I BELIEVE YOU ALLOWED IN --

20              THE COURT:  I'M LOOKING FOR THE QUESTION.             04:29

21              COULD THE COURT REPORTER FIND THAT QUESTION?

22              HERE IT IS.  I FOUND IT.

23              'WOULD IT BE SUSPICIOUS IF MR. BRYANT TESTIFIED FOR

24    THE FIRST TIME THAT THESE RAINY DAY GREETING CARDS WERE DONE

25    BACK IN 1998 AFTER YOU HAD DONE YOUR ANALYSIS AND DELIVERED     04:30
```

1    YOUR REPORT?'

2              THAT'S NOT WHAT YOU'RE REFERRING TO, THOUGH, IS IT?

3         **MR. NOLAN:**  I'LL LIVE WITH THAT ONE, YOUR HONOR,

4    BECAUSE I THINK FROM THAT, I CAN ARGUE THAT THERE WAS A TIME

5    WHERE HE SHOULD HAVE TESTIFIED TO THAT.  AND WE ALL KNOW THAT          04:31

6    IT WOULD ONLY HAVE BEEN IN THE DEPOSITION AND THAT MATTEL TOOK

7    THE DEPOSITION AND DID NOT ASK THAT QUESTION, WITH THE EVIDENCE

8    IN HAND THAT THEY DID FIND RAINY DAY RASCALS IMPRESSIONS.

9              SO WE'RE LEFT WITH THE IMPRESSION -- I MEAN, NOW, AS

10   COUNSEL, TRIAL COUNSEL, WE'VE BEEN CHALLENGED.  YOU WOULD            04:31

11   EXPECT US TO BRING THIS TESTIMONY BEFORE YOU.  THAT'S THE

12   DIFFICULTY THAT I SEE, YOUR HONOR.

13        **THE COURT:**  I SEE THAT ARGUMENT.  AND THIS IS

14   SEPARATE AND APART FROM THE ONE MR. SLOAN WAS MAKING.

15             SO LET ME HEAR A RESPONSE TO THIS ONE, MR. QUINN.          04:31

16        **MR. QUINN:**  THE ANSWER WASN'T STRICKEN?  I THOUGHT

17   THE ANSWER WAS STRICKEN.

18        **THE COURT:**  NO, IT WASN'T.

19             OH, IT WAS STRICKEN.  YOU'RE RIGHT.

20             I HAVEN'T COMPLETELY LOST IT.

21             I FIRST OVERRULED IT, AND THEN WHEN THE ANSWER

22   STARTED COMING OUT, I SAID, "I'M SORRY.  SUSTAIN THE OBJECTION.

23   I MISUNDERSTOOD THE QUESTION."

24        **MR. NOLAN:**  I APOLOGIZE.

25        **THE COURT:**  IT WAS STRICKEN.                                04:32

1          **MR. NOLAN:**  I WANT YOU TO END THIS DAY ON A GOOD

2    NOTE.

3          **THE COURT:**  BUT IT WAS A GOOD ARGUMENT.

4          (LAUGHTER.)

5          **THE COURT:**  BAD QUESTION, MR. QUINN.  IT'S GONE.          04:32

6    IT'S STRICKEN.

7          **MR. NOLAN:**  I JUST WANT TO MAKE CERTAIN THAT HE

8    DIDN'T REFORMAT IT AND ASK THE SAME QUESTION AGAIN.  AND I'LL

9    LOOK AT IT OVER THE WEEKEND, YOUR HONOR.

10          **THE COURT:**  VERY GOOD.                                   04:32

11          **MR. NOLAN:**  BUT IT'S A GOOD ARGUMENT, AND IT WAS A

12   GOOD RULING.

13          **THE COURT:**  I CAN SAVE YOU SOME TIME, BECAUSE HE

14   DIDN'T.  BECAUSE THEN I SAID, "THE ANSWER IS STRICKEN.  THANK

15   YOU, COUNSEL."

16          "MOVE TO STRIKE."

17          "I MISUNDERSTOOD THE QUESTION."

18          "NOTHING FURTHER."

19          "VERY WELL.  ANYTHING FURTHER, MR. SLOAN?"

20          "YES, YOUR HONOR."                                          04:32

21          THAT WAS IT.

22          **MR. NOLAN:**  OKAY.

23          **THE COURT:**  HE ENDED ON A BAD NOTE.  AND I UNDERSTAND

24   IT'S HIS BIRTHDAY AND EVERYTHING.

25          (LAUGHTER.)                                                 04:33

```
 1            MR. NOLAN:  IF I HAD KNOWN THAT, I WOULDN'T HAVE

 2   RAISED IT.

 3            THE COURT:  I JUST FOUND THAT OUT FROM THE COURT

 4   REPORTER.

 5            ANYTHING FURTHER?                                     04:33

 6            MR. NOLAN:  NO.

 7            THE COURT:  COUNSEL, IF I COULD GET TWO ATTORNEYS ON

 8   MONDAY, IN THE AFTERNOON, TO GO OVER THE OBJECTIONS, SO WE CAN

 9   HAVE THE VIDEO STUFF, JUST IN CASE, ON THE OFF SHOT MATTEL

10   WRAPS UP ON TUESDAY, SO THAT WE HAVE THOSE.  WHAT I'D LIKE TO   04:33

11   DO IS, AT 3:00 ON MONDAY AFTERNOON, IF I COULD JUST HAVE AN

12   ATTORNEY FROM EACH SIDE TO GO OVER THE PRINCE AND

13   JANET BRYANT AND --

14            MR. QUINN:  3:00 ON MONDAY, YOUR HONOR?

15            THE COURT:  3:00 ON MONDAY.                           04:33

16            MS. AGUIAR:  WE HAVE THE LAST VIDEO FOR YOU.

17            MR. NOLAN:  HOW DIFFICULT WOULD IT BE FOR THE COURT

18   TO CALCULATE THE CURRENT HOUR COUNT?  IS THAT TOO HARD FOR YOU

19   TO DO?

20            THE COURT:  YOUR TIME IS 26 HOURS, 15 MINUTES.        04:34

21            MR. NOLAN:  WHAT ABOUT MATTEL'S TIME?

22            THE COURT:  THEY JUST PASSED THE 40-HOUR MARK.

23            TWO-THIRDS OF THE WAY DONE, COUNSEL.

24            COUNSEL?

25            MR. GOLDSOBEL:  STEVE GOLDSOBEL ON BEHALF OF          04:34
```

1    MR. MARLOW.

2           UNFORTUNATELY, MR. MARLOW DIDN'T TESTIFY TODAY.

3           **THE COURT:**  I SEE THAT.  I KNOW.

4           **MR. GOLDSOBEL:**  AND THIS IS THE SECOND DAY THAT

5    MR. MARLOW HAS BEEN BROUGHT DOWN HERE FROM NORTHRIDGE TO SIT,          04:34

6    AND I THINK THIS IS MORE THAN SIMPLY JUST A BAD TIME-MANAGEMENT

7    SITUATION.

8           TODAY, MATTEL ALSO HAD ANOTHER NONPARTY COME DOWN TO

9    COURT.  AND I RESPECTFULLY THINK THERE'S JUST NO EXCUSE.

10          **THE COURT:**  WELL, LET ME ASK YOU THIS:  WAS THE          04:34

11   DEPOSITION ON MONDAY VIDEOTAPED?

12          **MR. GOLDSOBEL:**  YES, IT WAS.

13          **THE COURT:**  IS THERE ANY REASON WE SHOULDN'T USE

14   THAT, MR. ZELLER, GIVEN THESE CIRCUMSTANCES?

15          **MR. ZELLER:**  FOR ONE THING, IT WOULD BE LONGER.          04:35

16   THERE'S ALSO QUESTIONS THAT WE WANT TO ASK THAT AREN'T IN THE

17   TRANSCRIPT.  BUT FRANKLY, IT'S A 15-MINUTE EXAMINATION.  AND

18   IT'S ALSO -- PART OF THE PROBLEM IS THAT MR. MARLOW LOADED UP,

19   AS THE COURT HAS SEEN WITNESSES DO, ADDED EXTRANEOUS

20   INFORMATION INTO HIS ANSWERS.  I MEAN, THERE IS A LOT OF          04:35

21   PROBLEMS WITH THE TRANSCRIPT, INCLUDING INSTRUCTIONS NOT TO

22   ANSWER.  AND FRANKLY, THE BASE LINE FACTS ARE SOMETHING THAT

23   CAN BE GOTTEN OUT VERY QUICKLY.  AND THAT IS WHAT WE WANT TO DO

24   WITH HIM.

25          **MS. AGUIAR:**  THIS WAS RAISED THE OTHER DAY, AND I          04:35

```
 1    THINK THAT BECAUSE WE'VE RUN INTO THIS ISSUE NOW WITH

 2    MR. MARLOW, AND THE QUESTION IS, CAN HE COME UP?  HOW WILL THAT

 3    HAPPEN?

 4            WHENEVER YOU THINK IT'S APPROPRIATE TO TAKE UP, IF

 5    YOU WANT TO DO IT MONDAY OR TUESDAY MORNING -- I FRANKLY DO NOT    04:36

 6    BELIEVE -- AND I'M PREPARED TO MAKE AN ARGUMENT ON THIS --

 7            THE COURT:  THAT ANY OF THIS IS RELEVANT.

 8            MS. AGUIAR:  -- THAT THERE IS ANY RELEVANCE OF

 9    MR. MARLOW'S TESTIMONY TO THIS PHASE OF THIS TRIAL.

10            I KNOW IT MAY NOT BE AN ISSUE FOR RIGHT HERE AND          04:36

11    RIGHT NOW.

12            THE COURT:  MAYBE IT IS, BECAUSE WE'VE GOT COUNSEL

13    HERE.  IF IT'S NOT GOING TO BE RELEVANT, LET'S -- I DO WANT TO

14    SHOW SOME CONSIDERATION HERE, GIVEN THE FACT THIS IS NOW TWO

15    DAYS THAT MATTEL HAS HAD MR. MARLOW HERE AND HAS NOT CALLED       04:36

16    HIM.

17            WHERE ARE WE GOING WITH THIS?

18            IT'S ONLY 15 MINUTES, SO YOU CAN SUMMARIZE THAT IN 30

19    SECONDS.

20            MR. ZELLER:  YOUR HONOR, IT'S A VERY SIMPLE POINT,        04:36

21    WHICH IS ESTABLISHING THAT THERE WERE OTHER MATTEL EMPLOYEES

22    WORKING ON BRATZ DURING THE RELEVANT TIME PERIOD.  THAT IS

23    FIRST AND FOREMOST WHAT WE WANT FROM MR. MARLOW.  HE IS THE

24    PERCIPIENT WITNESS ON THAT.

25            THE COURT:  EXPLAIN YOUR THEORY ABOUT HOW IT RELATES      04:37
```

```
 1   TO THE CLAIMS IN PHASE 1-A.  THAT'S COUNSEL'S OBJECTION.

 2          MR. ZELLER:  IT GOES TO KNOWLEDGE, AND IT GOES TO

 3   INTENT.

 4          THE COURT:  WHOSE KNOWLEDGE?

 5          MR. ZELLER:  OF MGA.                                04:37

 6          BECAUSE THEY, OF COURSE, ARE SAYING -- AND THE COURT

 7   HAS HEARD THIS THEME MANY TIMES FROM MGA:  'WE DIDN'T KNOW.  WE

 8   DID NOT KNOW THAT CARTER BRYANT WAS DOING THESE THINGS WHILE

 9   EMPLOYED BY MATTEL.  WE, MGA, MADE EVERY EFFORT TO GET HIM OUT

10   OF THERE SO HE WOULDN'T BE DOING SUCH THINGS.'              04:37

11          INTENT, KNOWLEDGE; THOSE ARE THE THINGS THAT ARE

12   CRITICALLY IMPORTANT WITH RESPECT TO THOSE PARTICULAR CLAIMS

13   AGAINST MGA.

14          THE COURT:  I NEED A COUPLE OF NEXI, I GUESS IT IS.

15          FIRST, WHAT'S THE NEXUS BETWEEN WHAT PETER MARLOW     04:37

16   KNOWS AND WHAT MGA KNOWS?

17          MR. ZELLER:  IT FALLS UNDER THE HEADING OF PATTERN

18   EVIDENCE.  ARE THEY GOING TO SAY THAT THERE WERE FOUR PEOPLE

19   WHO DID THIS AND IT WAS ALL A TERRIBLE ACCIDENT?

20          I MEAN, THE JURY IS ENTITLED --                      04:38

21          THE COURT:  IS PETER MARLOW WORKING FOR MGA?

22          MR. ZELLER:  HE IS AN AGENT OF MGA.  VERONICA MARLOW

23   IS AN AGENT OF MGA.  AND THEY WERE WORKING ON BRATZ.

24          TO PUT A FINER POINT ON IT, YOUR HONOR, THE COURT

25   WILL RECALL THAT THERE WAS AN E-MAIL BETWEEN PETER MARLOW AND  04:38
```

```
1   ISAAC LARIAN, WHERE IT TALKS ABOUT THE 100 YEARS OF DOLL-MAKING

2   EXPERIENCE.  THOSE ARE THE OTHER FORMER MATTEL EMPLOYEES.

3           THE VERONICA MARLOW INVOICE THAT SPECIFICALLY TALKS

4   ABOUT SOMETHING IN THE VICINITY OF 81 HOURS OF WORK DONE ON THE

5   BRATZ FASHIONS WHILE BRYANT WAS STILL EMPLOYED BY MATTEL -- AND   04:38

6   THIS WAS ACTUALLY SPECIFICALLY DISCUSSED DURING OPENING -- IS

7   THAT AT LEAST ONE OF THOSE PEOPLE, AND IN FACT IT'S LIKELY THE

8   JURY WILL INFER THAT TWO OF THEM WERE AT THAT TIME MATTEL

9   EMPLOYEES, DOING THAT VERY WORK.

10          BY THE WAY, THIS IS ALSO AN ISSUE THEY MOVED *IN*         04:38

11  *LIMINE* ON, AND THAT HAS BEEN DISCUSSED, AND THE COURT DENIED

12  THEIR MOTION *IN LIMINE*.

13          **THE COURT:**  I RECALL.

14          **MR. GOLDSOBEL:**  YOUR HONOR, AT HIS DEPOSITION MOST

15  RECENTLY, HE TESTIFIED THAT HE NEVER TOLD MGA THAT MATTEL         04:39

16  EMPLOYEES WERE WORKING FOR HIM, NOR DID HE BELIEVE THAT MGA

17  BELIEVED THAT MATTEL EMPLOYEES WERE WORKING FOR HIM; SO THAT'S

18  HIS DEPOSITION TESTIMONY.  THAT'S ALREADY BEEN VIDEOTAPED.

19          **THE COURT:**  WAIT A SECOND, MR. ZELLER.  I'LL GIVE YOU

20  A FINAL CHANCE TO REPLY, BUT LET ME HEAR FROM MS. AGUIAR.        04:39

21          **MS. AGUIAR:**  THE PRIMARY REASON THEY WANT TO BRING

22  HIM IS TO SHOW OTHER MATTEL EMPLOYEES WERE WORKING ON BRATZ.

23  WE HAD A SIDE-BAR ON THIS, YOUR HONOR, ON JUNE 6TH; AND THEY

24  TRIED TO ARGUE WITH REGARD TO THE ISAAC LARIAN E-MAIL FROM

25  MR. MARLOW IN 2005.                                              04:39
```

1     YOU WERE VERY CLEAR AT THAT SIDE-BAR ON JUNE 6TH THAT

2  THIS WOULD ONLY COME IN FOR CREDIBILITY OF MR. LARIAN.  THAT

3  E-MAIL WAS HEAVILY REDACTED, AND IT CAME IN IN THAT

4  HEAVILY-REDACTED FORM SOLELY FOR PURPOSES OF CREDIBILITY,

5  BECAUSE MR. LARIAN -- THEY HAD ELICITED SOME TESTIMONY FROM        04:40

6  MR. LARIAN REGARDING MATTEL EMPLOYEES.

7         **THE COURT:**  RIGHT.

8         **MS. AGUIAR:**  MR. ZELLER, AT THAT SIDE-BAR, MADE AN

9  ARGUMENT TO YOUR HONOR, WHICH, MY INTERPRETATION OF THAT

10 SIDE-BAR TRANSCRIPT IS THAT YOU REJECTED THE ARGUMENT THAT THAT    04:40

11 RELATES TO THE CLAIMS THAT MATTEL HAS TO PROVE.

12        LET ME GIVE YOU THE SPECIFIC TESTIMONY FROM

13 MR. MARLOW IN BOTH OF HIS DEPOSITIONS THAT MGA, IN FACT, DID

14 NOT KNOW THAT ANYONE WAS WORKING FOR THEM AND WORKING FOR

15 MATTEL AT THE SAME TIME.                                          04:40

16        HIS MAY 2, 2008 TRANSCRIPT, AT PAGE 108, LINES 14

17 THROUGH 19:  "TO YOUR KNOWLEDGE, DID ANYBODY AT MGA

18 ENTERTAINMENT KNOW THAT YOU WERE USING MATTEL EMPLOYEES TO WORK

19 ON BRATZ?"

20        ANSWER:  "THEY NEVER KNEW.                                 04:40

21        QUESTION:  "AND WHAT DO YOU BASE THAT ANSWER ON?"

22        ANSWER:  "I NEVER TOLD THEM."

23        **MS. AGUIAR:**  AND THERE IS MORE TESTIMONY.  WE CAN

24 WATCH THE TRANSCRIPT WITH YOU, IF YOU WOULD LIKE.  THERE'S MORE

25 TESTIMONY ON PAGE 109.                                            04:41

```
1          IN HIS SECOND DEPOSITION, JUST THIS PAST MONDAY, AT
2   PAGE 542, HE WAS ASKED, WITH REGARD TO THAT E-MAIL THAT CAME
3   INTO EVIDENCE IN A REDACTED FORM, WHETHER HE EVER HAD AN
4   INTENTION TO COMMUNICATE TO MR. LARIAN THAT THERE WERE MATTEL
5   EMPLOYEES WORKING FOR THEM.                                     04:41
6          HE SAID, NO, HE NEVER HAD THAT INTENTION.
7          AND THE POINT THROUGHOUT HIS DEPOSITION -- BOTH
8   SESSIONS -- IS THAT HE, IN FACT, HAD AN AFFIRMATIVE REASON FOR
9   NOT WANTING MGA TO KNOW WHO HIS SUBCONTRACTORS WERE.  AND THAT
10  COMES OUT AS A THEME IN BOTH OF HIS TRANSCRIPTS.                04:41
11         THE COURT:  HOW DO WE EXPLAIN THE E-MAIL?
12         MS. AGUIAR:  THE E-MAIL DOES NOT REFER TO MATTEL.
13         AND HE WAS ASKED THE SPECIFIC QUESTION:  "DID YOU
14  MEAN TO CONVEY TO MR. LARIAN THAT THESE WERE MATTEL EMPLOYEES?"
15         AND HE SAID NO.                                          04:42
16         THE COURT:  VERY WELL.
17         MR. ZELLER, THIS GETS BACK TO THIS NEXUS QUESTION.
18         IN LIGHT OF THAT, HOW DO YOU RESPOND?  IS THERE ANY
19  EVIDENCE MAKING THIS CONNECTION BETWEEN --
20         MR. ZELLER:  ABSOLUTELY.
21         THE COURT:  -- THAT MGA -- BECAUSE THAT'S THE ONLY
22  WAY IT CAN BE RELEVANT, IS THAT MGA KNOWS THAT THEY HAVE MATTEL
23  EMPLOYEES WORKING ON BRATZ.  I COULD SEE THE RELEVANCE OF THAT.
24         WHAT IS THE EVIDENCE IN LIGHT OF THESE PROFFERS THAT
25  ARE BEING MADE?                                                 04:42
```

1          **MR. ZELLER:**  MARIE SALAZAR.  SHE WAS ONE OF THE

2    EMPLOYEES, THE MATTEL EMPLOYEES, WHO WAS SECRETLY WORKING ON

3    BRATZ.  MGA HIRED HER.  SHE SUBMITTED AN APPLICATION.  SHE WAS

4    RECOMMENDED BY VERONICA MARLOW AND CARTER BRYANT.  THIS IS

5    REFLECTED IN HER DOCUMENTS.                                          04:42

6          IN FACT, AT ANOTHER POINT IN HIS DEPOSITION,

7    MR. MARLOW WAS ASKED, DID MGA KNOW?

8          HE SAID YES.

9          THEN HE STARTED TO BACK OFF OF IT AFTER HE REALIZED

10   HE GAVE AN ANSWER THAT HE SHOULDN'T HAVE.                            04:43

11         **THE COURT:**  SO THERE IS DEPOSITION TESTIMONY IN WHICH

12   HE SAYS YES?

13         **MR. ZELLER:**  CORRECT.

14         AND THEN HE STARTS TO BACK OFF OF IT, BUT IT'S

15   BECAUSE OF MARIE SALAZAR AND THE FACT THAT MGA HAD HIRED HER --      04:43

16   SHE WAS HIRED IN 2003, YOUR HONOR, TWO YEARS BEFORE THAT E-MAIL

17   THAT WAS SENT TO MR. LARIAN BY PETER MARLOW.

18         **THE COURT:**  COULD I SEE THAT DEPOSITION?

19         DOES SOMEONE HAVE THAT?

20         **MR. MCFARLAND:**  THAT'S JUST NOT ACCURATE.                  04:43

21         THERE'S BACK AND FORTH.  MARIE SALAZAR LEFT, I

22   BELIEVE, IN MARCH 2001 FROM MATTEL AND WORKED FOR THE MARLOWS

23   WHEN SHE WAS NOT AT MATTEL; WORKED FOR THE MARLOWS FOR A COUPLE

24   OF YEARS, AND THEN WENT TO MGA.  AND WHEN ASKED WHAT WAS SAID

25   TO WHO, WHEN, AND WHERE, MR. MARLOW HAS NO PERSONAL KNOWLEDGE        04:43

1    AT ALL.  AND THERE WAS SOME BACK AND FORTH HEARSAY AT VARIOUS

2    PLACES.  WE CAN LAY IT ALL OUT FOR YOU.  BUT THERE'S NO

3    PERSONAL KNOWLEDGE AT ALL FROM MR. MARLOW.  PERIOD.

4         NOW, THE OTHER THING THAT'S IMPORTANT IS TO LOOK AT

5    THIS QUESTION SPECIFICALLY WITH REGARD TO THAT E-MAIL.          04:44

6         "WITH REGARD TO THE E-MAIL THAT YOU SENT IN JUNE 2005

7    TO PAULA GARCIA, ISAAC LARIAN KNOW WHAT YOU HAVE IN MIND?"

8         "YES."

9         "DID YOU HAVE ANY INTENT TO COMMUNICATE TO MR. LARIAN

10   OR ANYONE ELSE AT MGA THAT THE OLDER WOMEN OR OLDER LADIES THAT  04:44

11   YOU WERE REFERRING TO WERE MATTEL EMPLOYEES?"

12        ANSWER:  "NO."

13        QUESTION:  "WHY NOT?"

14        ANSWER: "BECAUSE, FIRST OF ALL, I PROMISED THEM I

15   WOULD NOT REVEAL THEIR IDENTITY.  IT WAS IMPORTANT FOR ME TO     04:44

16   KEEP MY PROMISE TO THEM.  AND SECONDLY, I DID NOT WANT MGA

17   KNOWING WHO WAS HELPING VERONICA BECAUSE I THOUGHT THEY MIGHT

18   TRY TO HIRE THOSE PEOPLE AND THAT I WOULDN'T HAVE HELPERS OR

19   WOULD HAVE TO LOOK SOMEWHERE ELSE."

20        AND YOU ASKED AN EARLIER QUESTION.  I DO WANT TO PUT        04:44

21   IT IN CONTEXT.

22        WHAT IS THE CONTEXT OF THIS E-MAIL?

23        THE CONTEXT OF THIS E-MAIL IS A MEETING BETWEEN

24   MEL WOODS, WHO AT THAT TIME WAS PRESIDENT OF MGA, WITH THE

25   MARLOWS, AT WHICH MEETING HE SAID, 'I WANT YOU TO PUT YOUR       04:45

```
1   CARDS ON THE TABLE.  I WANT TO KNOW YOUR PRICES YOU'RE USING

2   AND EVERYTHING ELSE.'  VERONICA MARLOW WAS INSULTED.  PETER WAS

3   INSULTED.  THEY GOT UP, AND THEIR RELATIONSHIP, THEIR BUSINESS

4   RELATIONSHIP, ENDED.  THEY SAID, 'WE'RE DONE.'

5            AND THEN AFTER THAT, THIS IS PETER'S EFFORT TO          04:45

6   SALVAGE THE BUSINESS RELATIONSHIP.  BUT EVEN WHEN HE'S TRYING

7   TO SALVAGE IT, HE DOESN'T DISCLOSE EITHER THEIR IDENTITY OR THE

8   FACT THAT THEY WORKED FOR MATTEL.  AND THAT'S JUST CLEAR.

9            WE CAN PUT ALL OF THIS IN FRONT OF YOUR HONOR.  BUT

10  THIS IS CLEAR.                                                  04:45

11           THE COURT:  VERY WELL.

12           DID YOU FIND THE DEPOSITION, MR. ZELLER?

13           MR. ZELLER:  I'M NOT SURE UNDER WHAT RULE WE'RE

14  REQUIRED TO TAKE HIS BLANKET DENIALS.  THERE IS EVIDENCE THAT

15  WE'LL SUSTAIN, AN INFERENCE, THAT MGA KNEW.                     04:45

16           THE COURT:  I'M ASKING TO SEE THAT EVIDENCE, THOUGH.

17  BEFORE I ORDER THIS WITNESS BACK ON TUESDAY, I'D LIKE TO SEE

18  THAT EVIDENCE.

19           MR. ZELLER:  YOU'RE TALKING ABOUT THE 2005 E-MAIL?

20           THE COURT:  NO.  THE DEPOSITION WHERE HE SAID 'YES.'   04:45

21           MR. ZELLER:  RIGHT.

22           HE TALKS ABOUT -- IT'S ACTUALLY IN MORE THAN ONE

23  PLACE, YOUR HONOR.

24           THIS IS FROM VOLUME I, PAGE 102; THIS STARTS ON

25  LINE 11: "DID YOU OR YOUR WIFE EVER INFORM MGA OF THE IDENTITY  04:46
```

```
 1    OF THIRD PARTIES WHO USED TO WORK ON THE BRATZ DOLLS?"

 2           ANSWER:  "YES."

 3           THEN HE STARTS ASKING THE BASIS; AND IT'S BECAUSE OF

 4    MARIE SALAZAR GETTING A JOB THERE.

 5           SO, I MEAN, HE STARTS TO BACK OFF A BIT:  "DON'T GET    04:46

 6    ME WRONG..."  LATER ON, HE'S, LIKE, 'WELL, I'M JUST

 7    SPECULATING; I'M GUESSING.'

 8           BUT THE FACT IS, HE DID ADMIT IT AT FIRST.

 9           I THINK, IN LIGHT OF THOSE BLANKET DENIALS, WE SHOULD

10    BE ENTITLED TO SHOW, LOOK, HE HAS FINANCIAL TIES TO MGA; HE HAS   04:46

11    MOTIVATION TO GIVE THESE BLANKET DENIALS; AND ALSO --

12           THE COURT:  I'M GOING TO STOP YOU THERE, BECAUSE I

13    HAD A BUNCH OF HEADS SHAKING WHEN YOU WERE SAYING THAT BEFORE.

14    IN FACT, WHEN I WAS LOOKING AT YOU, MR. ZELLER, I SAW THREE

15    HEADS AT ONCE SHAKING BEHIND YOU THAT THERE WAS NO SUCH    04:46

16    DEPOSITION.

17           ARE WE ALL AGREED NOW THERE IS A DEPOSITION

18    TRANSCRIPT?  CAN WE TAKE A LOOK AT THIS?

19           DID HE SAY UNDER OATH THAT, YES, HE DID TELL MGA?

20           THIS IS A YES OR NO QUESTION.    04:47

21           MR. MCFARLAND:  IT'S NOT REALLY A YES OR NO QUESTION.

22           I THINK WHAT WE OUGHT TO DO IS READ BEFORE YOU --

23    IT'S SIX AND A HALF HOURS THE FIRST DAY, FIVE AND A HALF HOURS

24    THE SECOND DAY.

25           THE SALAZAR STORY WAS CONFUSING, BUT WHEN YOU READ    04:47
```

1   THE DEPOSITION -- WE CAN PULL ALL OF THE SECTIONS FOR YOU.

2   IT'S VERY CLEAR THAT THE SALAZAR STORY -- HE NEVER KNEW.  THEY

3   NEVER TOLD MGA.  THAT IS THE TESTIMONY.

4           **MS. AGUIAR:**  CAN I MAKE A SUGGESTION?

5           I KNOW YOU'RE BEING QUADRUPLED-TEAMED TODAY, BUT          04:47

6   WE'RE TRYING GET THE INFORMATION IN FRONT OF YOU.

7           THE QUESTION IS, FOR THIS PHASE, DID THEY KNOW IN THE

8   SEPTEMBER-OCTOBER TIME PERIOD THAT WE'RE TALKING ABOUT?  THAT'S

9   WHAT'S RELEVANT TO THIS PHASE.

10          EVEN IF YOU CREDIT THE INFERENCE THAT HE'S              04:47

11  SPECULATING ABOUT IN HIS DEPOSITION, THAT THEY GOT MS. SALAZAR

12  A JOB AT MGA, AND IN CONNECTION WITH DOING THAT, MGA MAY HAVE

13  FOUND OUT, MS. SALAZAR DID NOT START WORKING FOR MGA UNTIL

14  SEVERAL YEARS LATER; SO WE'RE NOT TALKING ABOUT AN INFERENCE OF

15  MGA'S KNOWLEDGE IN THE RELEVANT TIME PERIOD.                   04:48

16          SO I WOULD RESPECTFULLY SUBMIT THAT WE DO NOT NEED TO

17  BRIEF THIS ISSUE; THAT EVEN CREDITING THE DEPOSITION TESTIMONY

18  THAT MR. ZELLER IS REFERRING TO, WHICH STARTS ON PAGE 102,

19  MS. SALAZAR DIDN'T GET A JOB WITH MGA IN THE YEAR 2000.  IT WAS

20  SEVERAL YEARS LATER.                                          04:48

21          **THE COURT:**  LET ME JUST STOP THIS FOR A SECOND.

22          COUNSEL FOR MR. LARIAN HAS BEEN WAITING VERY

23  PATIENTLY IN THE BACK.

24          IS YOUR CLIENT NOT AVAILABLE ON TUESDAY?

25          **MS. MORGENTHALER:**  HE'S NOT AVAILABLE ON TUESDAY,   04:48

```
 1    YOUR HONOR.

 2              THE COURT:  WHERE IS HE ON TUESDAY?

 3              MS. MORGENTHALER:  HE'S OUT OF TOWN.

 4              THE COURT:  WHERE IS HE ON TUESDAY?

 5              MS. MORGENTHALER:  LAS VEGAS.                        04:48

 6              MONDAY, TUESDAY, AND WEDNESDAY, HE'S OUT OF TOWN.

 7              THE COURT:  IS THIS A VACATION?

 8              MS. MORGENTHALER:  I BELIEVE SO.

 9              THE COURT:  THIS IS WHAT I'M GOING TO DO:  I'M GOING

10    TO ORDER HIM TO APPEAR ON TUESDAY, BUT I'M GOING TO ORDER       04:49

11    MATTEL TO PAY THE COSTS OF INTERRUPTING HIS VACATION.  SO TO

12    THE EXTENT THAT HE HAS TO FLY DOWN FROM LAS VEGAS TO ONTARIO

13    AIRPORT, TAKE TRANSPORTATION OUT HERE, TESTIFY, AND THEN GO

14    BACK TO HIS VACATION, THAT COST IS GOING TO BE BORNE BY MATTEL.

15              MS. MORGENTHALER:  I WOULD ASK, THEN, THAT HE BE      04:49

16    SCHEDULED TO TESTIFY AT A PARTICULAR TIME, AND BE LIMITED TO

17    THAT PARTICULAR TIME --

18              THE COURT:  I'M GOING TO DO THAT AS WELL.

19              MS. MORGENTHALER:  -- BECAUSE OTHERWISE, HE'LL BE

20    HERE ALL DAY.                                                  04:49

21              THE COURT:  I UNDERSTAND, COUNSEL.

22              MR. ZELLER, HOW MUCH TIME IS IT GOING TO TAKE FOR

23    YOU, OR WHOEVER, TO EXAMINE MR. LARIAN?

24              MR. QUINN:  THAT'S ME, YOUR HONOR.  AND I THINK IT'S

25    A 20-MINUTE WITNESS.                                           04:50
```

```
 1            THE COURT:  VERY GOOD.

 2            WHAT WE'RE GOING TO DO IS FINISH UP -- I DON'T WANT

 3  TO INTERRUPT MGA'S EXAMINATION OF MR. CUNNINGHAM, BUT --

 4            I DIDN'T WANT TO DO THIS, BUT I REALLY THINK, OUT OF

 5  FAIRNESS, BECAUSE HE'S BEEN HERE A COUPLE OF DAYS, THAT THE        04:50

 6  COURT NEEDS TO INTERVENE AT THIS POINT.

 7            IS IT FRED OR FARHAD?

 8            MR. ZELLER:  HE GOES BY FRED.

 9            THE COURT:  FRED, MR. LARIAN, THE OTHER MR. LARIAN,

10  NOT THE ONE HERE, IS GOING TO APPEAR AS THE NEXT WITNESS AFTER     04:50

11  MR. CUNNINGHAM.  HE'LL BE LIMITED TO 20 MINUTES; AND MATTEL

12  WILL BEAR THE EXPENSE OF BRINGING HIM IN AND OUT; AND THAT WILL

13  TAKE CARE OF HIM BEING HERE.

14            I UNDERSTAND HE'S A FORMER MGA EMPLOYEE.  I

15  UNDERSTAND ALL OF THAT.                                            04:50

16            MS. MORGENTHALER:  WELL, THIS IS A PROBLEM, BECAUSE

17  HE'S ACTUALLY DRIVING FIVE KIDS TO LAS VEGAS; IT'S A TRIP FOR

18  CHILDREN.

19            MR. QUINN:  WOULD IT BE POSSIBLE FOR US TO REST,

20  SUBJECT TO OUR CALLING HIM NEXT WEEK AFTER HE GETS BACK?           04:51

21            THE COURT:  I SUPPOSE THAT'S WHAT WE'RE GOING TO HAVE

22  TO DO, IF HE'S NOT IN A POSITION TO LEAVE --

23            HE'S RESPONSIBLE FOR THESE CHILDREN?

24            MS. MORGENTHALER:  APPARENTLY, HE HAS RESPONSIBILITY

25  FOR THEM.                                                          04:51
```

```
 1              THE COURT:  HE'S BRINGING FIVE CHILDREN TO LAS VEGAS?

 2              MS. MORGENTHALER:  WHEN YOU DESCRIBED IT AS A

 3      VACATION, THAT WAS WHERE I WAS -- I'M NOT SURE HOW MUCH OF A

 4      VACATION THAT IS MYSELF, BUT...

 5              THE COURT:  HE'LL BE BACK THE WEEK AFTER NEXT?           04:51

 6              MS. MORGENTHALER:  YES.  AND I WOULD ASK THAT HE BE

 7      SCHEDULED FOR A PARTICULAR DATE AND TIME AND TIME PERIOD.

 8              THE COURT:  YES.  THAT'S WHAT WE'LL DO.  WE'LL BRING

 9      HIM IN.

10              IT'S GOING TO INTERVENE IN MGA'S CASE, BUT...          04:51

11              MR. NOLAN:  IN LIGHT OF THE INCONVENIENCE, WE

12      UNDERSTAND AND WE WILL MAKE THE ACCOMMODATION.

13              THE COURT:  EXCELLENT.  VERY WELL.

14              THEN LET'S WORK OUT A DATE ON THAT; JULY 2ND OR

15      JULY 3RD, WE'LL BRING IN MR. LARIAN.                          04:52

16              MS. MORGENTHALER:  SO JULY 2ND OR 3RD FOR A SCHEDULED

17      20-MINUTE INTERVAL?

18              THE COURT:  AND YOU'LL HAVE TO SCHEDULE THAT WITH

19      MGA.

20              MR. QUINN:  THE 20 MINUTES IS THE DIRECT; IT DOESN'T   04:52

21      INCLUDE ANY --

22              THE COURT:  RIGHT.

23              MR. NOLAN:  OURS IS GOING TO BE SHORT.

24              MS. MORGENTHALER:  THANK YOU, YOUR HONOR.

25              THE COURT:  BACK TO THIS OTHER ISSUE.                  04:52
```

1          LET ME TAKE A LOOK AT THIS DEPOSITION TRANSCRIPT.

2          MR. ZELLER:  YOU'D LIKE IT NOW, YOUR HONOR?

3          THE COURT:  YES.

4          MR. ZELLER:  I HAVE A MARKED-UP VERSION OF IT.

5          THE COURT:  DOES SOMEONE HAVE A CLEAN COPY?                04:52

6          MR. ZELLER:  YES, YOUR HONOR.

7          MS. AGUIAR:  YOU NEED TO HAVE THE SECOND DAY AS WELL,

8  YOUR HONOR.

9          THE COURT:  COUNSEL, THIS WAS CLEARLY LINKED TO

10  MS. SALAZAR GETTING A JOB.  AND THAT WAS NOT DURING THE TIME      04:53

11  PERIOD IN QUESTION HERE.  THAT WAS AFTER.

12          MR. ZELLER:  WELL, IT IS BEFORE THE TIME PERIOD WHEN

13  ISAAC LARIAN DENIES STILL KNOWING.  THE 2005 E-MAIL IS THE

14  ONE --

15          THE COURT:  THIS GOES TO IMPEACHMENT, THEN.              04:53

16          MR. ZELLER:  NO, I DON'T THINK SO, YOUR HONOR.  I

17  THINK IT ALSO GOES TO GUILTY KNOWLEDGE; IT GOES TO PATTERN, AND

18  IT GOES TO INTENT.  I MEAN, THE FACT THAT YOU HAVE A DEFENDANT

19  WHO'S DENYING KNOWING THAT CARTER BRYANT WAS DOING THESE THINGS

20  WHILE EMPLOYED BY MATTEL, WHEN THEY HAVE A CLOSE AGENT WHO HAS   04:53

21  BEEN PAID MILLIONS OF DOLLARS, WHO ALSO THEN HAS ANOTHER THREE

22  EMPLOYEES --

23          THE COURT:  THE COURT DID ADDRESS THIS IN THE MOTION

24  *IN LIMINE*.

25          MR. ZELLER:  AND IT WAS ALLOWED.                         04:53

```
 1              THE COURT:  VERY GOOD.

 2          WHAT I THINK WE NEED TO DO WITH RESPECT TO -- LET'S

 3   HAVE PETER MARLOW HERE ON TUESDAY.  BUT I'M GOING TO DO WITH

 4   HIM WHAT I WAS GOING TO DO WITH MR. LARIAN.  AND THAT IS

 5   REQUIRE MATTEL TO CALL HIM, IF THEY'RE GOING TO CALL HIM, AFTER      04:54

 6   WE FINISH WITH MR. CUNNINGHAM.

 7          AND YOU'VE ALREADY INDICATED THAT IT'S NO MORE THAN

 8   15 MINUTES OF DIRECT; SO I'LL IMPOSE BOTH OF THOSE

 9   REQUIREMENTS; SO THAT GIVES COUNSEL AN OPPORTUNITY TO PLAN.

10          AS TO HOW MUCH OF THAT 15 MINUTES YOU'RE ACTUALLY           04:54

11   GOING TO GET TO USE BASED ON THE OBJECTIONS, I'LL CONTINUE TO

12   WORK ON THIS AND THINK ABOUT THIS MYSELF OVER THE WEEKEND; AND

13   PERHAPS WE MAY DISCUSS THIS FURTHER ON MONDAY.

14              MR. ZELLER:  AGAIN, THE 15 MINUTES IS DIRECT.

15              THE COURT:  THE 15 MINUTES IS DIRECT.                    04:54

16          SO, COUNSEL, I'M GOING TO HAVE TO ORDER YOU BACK HERE

17   ON TUESDAY, AND YOU'RE WELCOME TO COME MONDAY AT 3:00 TO GET A

18   CLEAR ORDER FROM THE COURT IN TERMS OF -- BUT I'M NOT REQUIRING

19   YOU TO COME BACK OUT; IT'S ENTIRELY UP TO YOU, BECAUSE

20   APPARENTLY, THERE ARE SEVERAL ATTORNEYS WHO ARE WELL CAPABLE OF     04:54

21   ARGUING THIS PARTICULAR ISSUE.

22          BUT YOU AND MR. MCFARLAND AND MS. AGUIAR, YOU CAN ALL

23   COME IF YOU WANT.

24              MR. GOLDSOBEL:  FOR TUESDAY, I WANT TO BRING MY

25   SCHEDULE TO THE ATTENTION OF THE COURT.  I'LL BE BEFORE            04:55
```

```
 1    JUDGE KING FOR A HEARING ON TUESDAY AT 10:00, THAT I EXPECT
 2    COULD LAST UP TO TWO HOURS; SO I'M UNAVAILABLE IN THE MORNING,
 3    AND THROUGH NOON.  AND THEN FROM DOWNTOWN, IT WOULD TAKE ME
 4    TIME TO GET HERE.
 5            THE COURT:  SO I WON'T REQUIRE THAT IT GOES AFTER       04:55
 6    MR. CUNNINGHAM.
 7            AS SOON AS YOU GET HERE ON TUESDAY, I WANT YOU TO
 8    NOTIFY MR. HOLMES, AND THE NEXT CHANGE IN WITNESS, MR. MARLOW
 9    WILL GO, IF HE'S GOING.
10            MR. GOLDSOBEL:  AND IF HE DOESN'T GO ON TUESDAY, IS     04:55
11    HE GOING TO BE DISMISSED AT THAT POINT?
12            THE COURT:  YES.
13            MR. GOLDSOBEL:  BECAUSE THE NEXT SEVERAL DAYS, I WILL
14    BE OUT OF TOWN.
15            THE COURT:  WE DON'T HAVE MANY WITNESSES LEFT AT THIS   04:55
16    POINT.
17            MR. MCFARLAND:  JUST ONE QUICK THING.
18            ON WEDNESDAY, WHEN WE WERE HERE, YOUR HONOR, TALKING
19    ABOUT THE VARIOUS WITNESSES, AND I HAD MENTIONED THE THREE,
20    MS. LEAHY, MS. MARLOW, AND MS. CLOONAN, I BELIEVE MR. ZELLER   04:55
21    SAID THEY WERE, QUOTE, "MGA-AFFILIATED WITNESSES," AND THEN HE
22    WENT ON TO SAY THAT MGA WAS PAYING FOR THE ATTORNEYS' FEES.
23    AND THAT WASN'T THE FOCUS OF THAT DISCUSSION.  THE FOCUS WAS A
24    DISCUSSION ABOUT TIMING.
25            I DON'T WANT MY SILENCE TO BE INTERPRETED AS           04:56
```

1  AGREEMENT WITH THAT STATEMENT, BECAUSE HE KNOWS IT'S A MATTER

2  OF PUBLIC RECORD THAT THAT IS WRONG.

3          MR. MARLOW, MS. MARLOW, AND MS. CLOONAN ARE BEING

4  PAID FOR BY CARTER BRYANT, AND MS. LEAHY IS BEING PAID FOR BY

5  MGA.                                                          04:56

6          AND PURSUANT TO YOUR ORDER AND JUDGE INFANTE'S ORDER,

7  THAT INFORMATION WAS DISCLOSED IN DISCOVERY.

8          **THE COURT:**  VERY WELL.

9          **MR. MCFARLAND:**  SO I JUST WANT TO MAKE SURE MY

10 SILENCE IS NOT INTERPRETED AS AGREEMENT.                      04:56

11         MY LAST THING IS, THEY HAD ASKED MS. CLOONAN TO BE

12 HERE ON TUESDAY, AND MS. CLOONAN WAS UNABLE TO BE HERE -- I

13 MISSPOKE -- MS. LEAHY TO BE HERE ON TUESDAY.  SHE WAS

14 UNAVAILABLE ON FRIDAY.  I'M VERY CONCERNED.  AGAIN, SHE HAS

15 ARRANGED CHILD CARE FOR HER FOUR-YEAR-OLD FOR TUESDAY, BUT I'M  04:56

16 CONCERNED THAT SHE'S NOT GOING TO GET CALLED.

17         IS THERE ANY WAY WE CAN GET ANY KIND OF ASSURANCES

18 THAT IF SHE DOES GO TO THE TROUBLE TO COME HERE AND ARRANGE FOR

19 CHILD CARE, THAT THAT'S IT; YOU CALL HER OR --

20         **THE COURT:**  WITH RESPECT TO MR. MARLOW, WHO'S BEEN   04:57

21 OUT HERE SO MANY TIMES, I'M WILLING TO GIVE THAT ASSURANCE.  I

22 TRUST WE'LL GET TO MS. LEAHY AS WELL.

23         MR. ZELLER, DO YOU ANTICIPATE THAT BEING THE CASE?

24         **MR. ZELLER:**  YES, I DO, YOUR HONOR.

25         IT SOUNDS LIKE WHAT'S GOING TO HAPPEN -- AND WE HAVE    04:57

1    BEEN WORKING ON ALL OF THESE WITNESSES --

2              THE COURT:  I KNOW.  I KNOW.

3              MR. ZELLER:  WE THOUGHT THAT CERTAINLY THESE OTHER

4    TWO WOULD GO TODAY.  THERE WERE ISSUES, WITH CONFERENCES AND

5    EVERYTHING ELSE, THAT WERE UNANTICIPATED.  SO WE DO APOLOGIZE          04:57

6    TO THE PEOPLE INVOLVED.

7              THE COURT:  I KNOW.

8              MR. ZELLER:  NOW, THE ISSUE ABOUT MARGARET LEAHY

9    IS -- AND MR. PRICE IS GOING TO BE TAKING THAT EXAMINATION; IT

10   IS ALSO A 15-MINUTE --                                                04:57

11             MR. PRICE:  IT'S NOT MINE.  I WON'T BE HERE ON

12   TUESDAY, YOUR HONOR.

13             MR. ZELLER:  IN ANY EVENT, I THINK WE'RE PLANNING ON

14   THAT AS A 15-MINUTE EXAMINATION.

15             THE COURT:  YOU REALLY HAVE TO COME UP WITH ANOTHER          04:58

16   TIME PERIOD THAN 15 MINUTES.  AS MY PEOPLE WOULD SAY, IT TAKES

17   TEN MINUTES TO GET SOMEWHERE.

18             MR. PRICE:  I'M NOT DOING THE EXAMINATION, BUT I'VE

19   PREPARED IT.  IT'S ONE DOCUMENT.

20             THE COURT:  VERY WELL.                                      04:58

21             LET'S TRY TO GET THROUGH THESE AS QUICKLY AS WE CAN

22   ON TUESDAY.  AND I'LL REVIEW THE PETER MARLOW DEPOSITION OVER

23   THE WEEKEND.  BUT THE PARTIES SHOULD BE MINDFUL OF THE COURT'S

24   RULING ON THIS ISSUE, ON THE 404(B) ISSUES, AND THE MOTION

25   *IN LIMINE*.                                                          04:58

```
 1              ANYTHING ELSE, MR. ZELLER?

 2         MR. ZELLER:  THE ONE THING IS, I'M NOT SURE WHY IT

 3   WAS RAISED AS AN ISSUE ABOUT THE PAYMENT OF FEES.

 4         THE COURT:  IT'S NOT -- NOT NOW.

 5         THANK YOU, COUNSEL.                                    04:58

 6         MR. NOLAN:  YOUR HONOR, CAN WE HAVE AN UNDERSTANDING

 7   OF WHAT TUESDAY LOOKS LIKE?  ARE THEY GOING TO REST?  BECAUSE

 8   THIS IS THE FIRST TIME WE'VE RAISED THIS ISSUE.

 9         AL LYTER, WHO IS OUR EXPERT, AS YOU KNOW -- THAT

10   APPARENTLY IS NOT QUALIFIED TO TESTIFY, ACCORDING TO          04:59

11   MR. CUNNINGHAM -- IS ONLY AVAILABLE ON TUESDAY TO TESTIFY.  WE

12   THOUGHT WE WERE GOING TO BE IN OUR CASE ON TUESDAY.

13         ARE THEY GOING TO REST ON TUESDAY?

14         THE COURT:  I WOULD SAY YES.

15         THEY THOUGHT THEY WERE GOING TO REST TODAY, AND THEY    04:59

16   HAVE NOT ADDED ANY WITNESS.  IN FACT, THEY'VE ACTUALLY LOST A

17   WITNESS, BECAUSE MR. LARIAN IS GOING TO COME IN ON JULY 2ND OR

18   3RD.

19         MR. NOLAN:  SO IF THAT, FOR SOME REASON, GOES SOUTH

20   ON US, SINCE MR. LYTER IS THEN GOING TO BE GONE THE NEXT WEEK, 04:59

21   COULD WE SOMEHOW INTERRUPT OR GET A COMMITMENT FROM THEM THAT

22   THEY ARE GOING TO BE FINISHED AND RESTED AND WE'LL HAVE ENOUGH

23   TIME TO PUT MR. LYTER ON?

24         MR. QUINN:  ON TUESDAY?

25         MR. NOLAN:  YES.                                       04:59
```

1        ALL GOOD THINGS HAVE TO COME TO AN END AT SOME POINT

2   IN TIME.

3            **MR. QUINN:**  WE HAVE TO DO A CROSS-EXAMINATION TOO.

4            **MR. NOLAN:**  OF COURSE.

5            **MR. QUINN:**  WE BELIEVE IN GOOD FAITH THAT WE ARE DOWN        04:59

6   TO SOME WITNESSES WHO WILL BE PRETTY SHORT.  BUT I DON'T KNOW

7   THAT WE CAN DO THEM AND ALSO DO MR. LYTER.

8            **THE COURT:**  THE COURT IS CERTAINLY GOING TO BE AS

9   FLEXIBLE WITH MGA AS IT HAS BEEN WITH MATTEL.

10           **MR. NOLAN:**  I APPRECIATE THAT.        05:00

11           **THE COURT:**  VERY GOOD.

12           EVERYONE HAVE A GOOD WEEKEND.

13

14

15

16

17                        CERTIFICATE

18

19  I hereby certify that pursuant to section 753, title 28, united
    states code, the foregoing is a true and correct transcript of
20  the stenographically recorded proceedings held in the
    above-entitled matter and that the transcript page format is in
21  conformance with the regulations of the judicial conference of
    the united states.

22

23  _____        _____

24  THERESA A. LANZA, RPR, CSR                    Date
    Official COURT Reporter

25

FRIDAY, JUNE 20, 2008                    TRIAL DAY 16, AFTERNOON SESSION