1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                 EASTERN DIVISION

4                    - - -

5       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                    - - -

7   MATTEL, INC.,                    )
                                     )
8                    Plaintiff,      )
                                     )
9           vs.                      )   No. CV 04-09049
                                     )
10  MGA ENTERTAINMENT, inc., et. Al., )
                                     )
11                   Defendants.     )   TRIAL DAY 18
    _____ )   MORNING SESSION
12  AND CONSOLIDATED ACTIONS,        )   pages 3690-3821
    _____ )

13

14

15       REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                Riverside, California

17              Tuesday, July 1st, 2008

18                   8:44 A.M.

19

20

21

22

23            THERESA A. LANZA, RPR, CSR
              Federal Official Court Reporter
24            3470 12th Street, Rm. 134
              Riverside, California  92501
25                  951-274-0844
              WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2

     On behalf of MATTEL, INC.:
 3
                           QUINN EMANUEL
 4                         By:  JOHN QUINN
                                JON COREY
 5                              MICHAEL T. ZELLER
                                HARRY OLIVAR
 6                              TIMOTHY ALGER
                           865 S. FIGUEROA STREET,
 7                         10TH FLOOR
                           LOS ANGELES, California  90017
 8

 9

10   ON BEHALF OF MGA ENTERTAINMENT:

11                         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                           BY:  THOMAS J. NOLAN
12                              JASON RUSSELL
                                RAOUL SLOAN
13                              LAUREN AGUIAR
                                CARL ROTH
14                         300 SOUTH GRAND AVENUE
                           LOS ANGELES, CALIFORNIA  90071-3144
15                         213-687-5000

16

17

18

19

20

21

22

23

24

25
```

TUESDAY, JULY 1, 2008                    TRIAL DAY 18, MORNING SESSION

```
 1                            I N D E X

 2                                                        Page

 3   Defense CASE (continued)......................... 3705

 4   Plaintiff Case (INTERRUPTED)..................... 3770

 5

 6

 7   DEFENSE
     WITNESS           DIRECT      CROSS      REDIRECT      RECROSS
 8   JANET LENORE BRYANT  (VIA VIDEO DEPOSITION)

 9   BY MR. ZELLER    3705

10

11   Plaintiff
     WITNESS           DIRECT      CROSS      REDIRECT      RECROSS
12   FARHAD LARIAN

13   BY MR. QUINN     3770                     3798, 3816
     BY MR. NOLAN                  3790                        3809
14

15

16

17        EXHIBITS           RECEIVED

18           734               3768
             736               3768
19           744               3768
             754               3768
20           767               3768
             774               3768
21           778               3768
             779               3768
22           781               3768
             783               3768
23           795               3768
           18569               3811
24

25
```

TUESDAY, JULY 1, 2008                    TRIAL DAY 18, MORNING SESSION

```
 1        RIVERSIDE, CALIFORNIA; TUESDAY, JULY 1ST, 2008;8:44 A.M.

 2                              -oOo-

 3        THE COURT:  Good morning, counsel.

 4        THE CLERK:  CALLING CASE NUMBER CV04-09049-SGL,

 5    MATTEL, INC., V. MGA, INC., ET AL.                          00:03

 6        MAY WE HAVE COUNSEL PLEASE STATE YOUR APPEARANCES FOR

 7    THE RECORD.

 8        MR. QUINN:  JOHN QUINN, BILL PRICE, MIKE ZELLER FOR

 9    MATTEL.

10        MR. NOLAN:  TOM NOLAN, LAUREN AGUIAR, AND CARL ROTH      00:03

11    ON BEHALF OF MGA.

12        THE COURT:  SO YOU'RE ALL STILL HERE?

13        MS. AGUIAR:  SORRY.

14        MR. NOLAN:  WE THOUGHT WE'D SURPRISE YOU THIS

15    MORNING.  WELCOME BACK.  I TRUST your trip WAS SUCCESSFUL.   00:03

16        THE COURT:  IT WAS.

17        MR. NOLAN:  I MEANT THE FISHING.

18        THE COURT:  I WON'T TALK ABOUT FISHING STORIES.

19        I UNDERSTAND THERE ARE A FEW ISSUES WE NEED TO TAKE

20    UP.                                                         00:03

21        MR. NOLAN:  YES, YOUR HONOR.

22        ONE IMMEDIATE AND TWO LONG-TERM, AND I'VE RAISED THEM

23    WITH MR. PRICE AND MR. QUINN, THIS ISSUE, THIS MORNING.

24        MATTEL INTENDS TO ATTEMPT TO INTRODUCE A DOCUMENT

25    WHICH IS A PLEADING THAT WAS FILED IN AN ACTION IN THE UNITED  00:04
```

1    KINGDOM; IT'S EXHIBIT 10175.  IT WILL NOT COME IN TODAY.  WE

2    EXPECT THEY WILL ATTEMPT TO GET IT IN IN THE TESTIMONY OF OUR

3    CUSTODIAN OF RECORDS.

4            THIS IS A PLEADING THAT WAS FILED IN THE UK.  THE

5    PLEADING WAS SUPERVISED BY AN ATTORNEY NAMED RAYMOND DAVID                00:04

6    BLACK, WHO IS A SOLICITOR AND HEAD OF THE INTELLECTUAL PROPERTY

7    DEPARTMENT OF SJ BERWIN UNLIMITED, LLP, IN THE UK.

8            WE HAVE PRESENTED TO MATTEL A DECLARATION FROM

9    MR. BLACK WHEREIN HE LAYS OUT TWO IMPORTANT FACTS; ONE IS THAT

10   THE DOCUMENT WHICH HAS A REFERENCE TO IT THAT THE CONCEPTION OF           00:04

11   BRATZ WAS IN 1999.  HIS DECLARATION, WHICH WE WILL ALSO SUBMIT

12   TO THE COURT, YOUR HONOR, DURING THE NEXT BREAK, STATES THAT

13   THE 1999 REFERENCE IN THE PLEADING WAS NOT RELEVANT TO ANY

14   CLAIM THAT WAS BEING ASSERTED AGAINST A THIRD-PARTY COMPANY IN

15   THE UK; THAT IT WAS MORE FOR BACKGROUND AS A REFERENCE.  IN               00:05

16   OTHER WORDS, TO SAY THAT IT WAS NOT A JURISDICTIONAL ASSERTION

17   ON THE PART OF MGA.  BUT MOST IMPORTANTLY, MR. BLACK SAYS IN

18   HIS EXHIBIT AFFIDAVIT THAT THE REFERENCE IN 1999 WAS A CLEAR

19   TYPOGRAPHICAL ERROR; THAT HE HAD UNDERSTOOD THAT THE CREATION

20   WAS IN 1998 AND THAT HE SIMPLY DID NOT CATCH IT WHEN IT WAS               00:05

21   FILED WITH THE COURT.

22           THE THIRD IMPORTANT POINT THAT IS ESTABLISHED IN HIS

23   DECLARATION IS THAT, ALTHOUGH HE'S DOING WELL, THREE WEEKS AGO

24   HE HAD TRIPLE BYPASS SURGERY; BUT HE'S DOING WELL AND QUITE

25   ENERGETIC FOR SOMEONE IN HIS CONDITION.                                   00:06

1        ON FRIDAY, YOUR HONOR, I TOOK THE LEAVE OF -- I FIRST

2   CALLED MR. HOLMES AND LEFT A VOICE MAIL ON THURSDAY, AND I THEN

3   CALLED THE CLERK'S OFFICE, GOT A RETURN PHONE CALL, ABOUT THE

4   POSSIBILITY THAT IF THIS DOCUMENT IS ADMITTED INTO EVIDENCE,

5   THAT WE WOULD BE ALLOWED LEAVE TO TAKE THE TESTIMONY OF          00:06

6   MR. BLACK VIA VIDEO FROM LONDON.  I RECALL A FEW YEARS AGO

7   PARTICIPATING IN A CONFERENCE WITH THE CLERK'S OFFICE IN

8   LOS ANGELES REGARDING THE NEW TECHNOLOGY AND HOW THE COURTS ARE

9   TRYING TO COME INTO THE NEXT GENERATION AND AFFORD THESE

10  OPPORTUNITIES.                                                   00:07

11       WHAT WE WOULD LIKE, YOUR HONOR, IS TO VIGOROUSLY

12  ARGUE THAT THIS DOCUMENT DOES NOT CONSTITUTE AN ADMISSION BY

13  MGA.  IT WAS NOT AUTHORIZED.  WE CLEARLY ARE NOT AUTHORIZING

14  LAWYERS TO FILE DOCUMENTS IN FOREIGN JURISDICTIONS WHICH

15  INCLUDE A TYPOGRAPHICAL ERROR.                                   00:07

16       NEVERTHELESS, IF THE COURT WERE TO ACCEPT THAT -- AND

17  THE OBJECTION WOULD BE A 403-TYPE OBJECTION, AND, MORE

18  IMPORTANTLY, THAT IT DOES NOT CONSTITUTE A JUDICIAL ADMISSION,

19  IF YOU WOULD, THAT WOULD BE BINDING, BECAUSE IT'S NOT

20  AUTHORIZED.  IT WASN'T A POSITION THAT THE PARTY, MGA,           00:07

21  KNOWINGLY WAS TAKING OVER IN LONDON.  BUT ASSUMING THAT I COME

22  IN SECOND PLACE ON THOSE ARGUMENTS, I WANTED TO AT LEAST ALERT

23  THE COURT -- I'VE ALERTED MR. QUINN AND MR. PRICE THIS

24  MORNING -- THAT WE HAVE DONE A DRY RUN ON FRIDAY.  THE COURT

25  WAS DARK ON FRIDAY, AND THE CLERK'S OFFICE, I THINK WITH         00:07

1   PERMISSION, CAME INTO THE COURTROOM AND DID A TEST RUN, AND THE

2   VIDEO FEED FROM LONDON TO HERE IS QUITE ADEQUATE AND CLEAR.

3   AND WHAT WE WOULD LIKE TO DO, IF NECESSARY, IS TO, ON THURSDAY,

4   TAKE THE TESTIMONY OF RAYMOND BLACK BY VIDEO, IF NECESSARY.  I

5   JUST WANTED TO ALERT THE COURT SO THAT THIS DIDN'T CATCH YOU OR     00:08

6   THE STAFF OR MATTEL BY SURPRISE.

7          **THE COURT:**  ARE YOU REPRESENTING TO THE COURT THAT

8   FOR HEALTH REASONS, MR. BLACK SHOULD NOT TRAVEL AT THIS TIME?

9          **MR. NOLAN:**  I AM, YOUR HONOR.  AND THAT IS ALSO SET

10  FORTH IN HIS -- HIS MEDICAL SITUATION IS SET FORTH IN HIS --        00:08

11  WELL, I CAN REPRESENT TO YOU, YOUR HONOR, THAT I HAVE SPOKEN TO

12  MR. BLACK AND THAT HE, THREE WEEKS AGO, HAD TRIPLE BYPASS

13  SURGERY.

14         **THE COURT:**  VERY WELL.

15         LET ME HEAR FROM MR. QUINN.                                  00:08

16         **MR. QUINN:**  YOUR HONOR, WE WERE ALERTED TO THIS THIS

17  MORNING AND RECEIVED THE AFFIDAVIT OF MR. BLACK.  WE'D LIKE A

18  CHANCE TO TAKE A LOOK AT IT, AND WE'LL CONFER WITH MR. NOLAN.

19         **THE COURT:**  VERY WELL.  THANK YOU, COUNSEL.

20         ANY OTHER ISSUES WE NEED TO TAKE UP AT THIS TIME?            00:08

21         **MR. NOLAN:**  YES, YOUR HONOR.

22         WITH RESPECT TO THE FIRST WITNESS THIS MORNING,

23  FARHAD LARIAN, JUST A COUPLE OF PRELIMINARY MATTERS.

24         I'VE GONE THROUGH THE NOTEBOOK THAT THEY EXPECT TO GO

25  THROUGH WITH MR. LARIAN.                                           00:09

```
 1            THERE ARE A NUMBER OF DOCUMENTS THERE, INCLUDING THE

 2    COMPLAINT THAT WAS FILED THAT LED TO THE ARBITRATION BETWEEN

 3    MR. LARIAN AND HIS BROTHER.  I JUST WANTED TO, MORE OR LESS,

 4    PUT OURSELVES BACK WHERE WE WERE WHEN THIS ISSUE FIRST AROSE

 5    AND WAS DISCUSSED WITH THE COURT.  WE HAD FILED A MOTION              00:09

 6    IN LIMINE ON THIS.  THE COURT RULED, AND you had INDICATED THAT

 7    YOU WERE GOING TO BE VERY MINDFUL, THAT THIS IS NOT THE PROPER

 8    FORUM TO BRING IN A SPAT BETWEEN TWO BROTHERS.  WE NOTE IN

 9    THERE THAT THERE'S AN EXHIBIT THAT REFERS TO AN ALLEGED

10    SPOLIATION EVIDENCE ISSUE IN AN UNRELATED CASE, AND I THINK THE      00:09

11    REPRESENTATION WAS MADE THAT THERE WAS, BY INFERENCE THEN, A

12    RELEVANCE TO THIS CASE BECAUSE OF ALLEGATIONS WHICH HAVE NOT

13    BEEN PROVEN WITH RESPECT TO ISAAC LARIAN OR MGA WITH RESPECT TO

14    SPOLIATION.  WE'RE GOING TO OBJECT TO THAT.

15            BUT THE ONE THING I WANTED TO POINT OUT IS THAT IN           00:10

16    THE EXHIBIT COPY THAT I HAVE, YOU HAD INDICATED THAT THE FIRST

17    LINE -- EVEN IF THIS DOCUMENT WOULD COME IN on THE OFF

18    CHANCE -- THAT SOMETHING ABOUT 'SWEARING ON THE HEADS OF YOUR

19    CHILDREN...'

20            I DON'T RECALL IF YOU RECALL THAT.                           00:10

21            THE COURT:  RIGHT.

22            THE COURT'S TAKE ON THIS IS NOT THAT JUST BECAUSE

23    IT'S A SPAT BETWEEN BROTHERS, IT'S EXCLUDED.  I THINK I

24    INDICATED ON THE RECORD -- I MEAN, SPATS BETWEEN BROTHERS ARE

25    AS OLD AS CAIN AND ABEL.  BUT THE ISSUE SHOULD NOT BE THE SPAT       00:10
```

1    ITSELF, BUT RATHER, WHETHER OR NOT THERE'S ANY RELEVANT

2    EVIDENCE, ANY STATEMENTS MADE, THAT IS RELEVANT TO THIS CASE

3    THAT CAN BE ATTRIBUTED TO A PARTY OPPONENT OR WHAT HAVE YOU

4    THAT'S RELEVANT TO A CLAIM.

5            I DO WANT TO AVOID -- THERE WAS SOME LANGUAGE USED IN      00:10

6    SOME OF THESE DOCUMENTS -- AND I THINK I'VE ALREADY INDICATED

7    THIS IN A NUMBER OF CONTEXTS -- THAT ARE PREJUDICIAL AND HAVE

8    NOTHING TO DO WITH ANYTHING AND ARE QUITE PERSONAL AND PRIVATE

9    IN NATURE, AND I'D LIKE TO SEE THESE REDACTED; SO I TRUST

10   COUNSEL WILL BE MINDFUL OF THE COURT'S EARLIER REMARKS AND WILL   00:11

11   PROCEED WITH CAUTION ON THIS.

12           **MR. NOLAN:**  RIGHT.

13           WE MADE THE MOTION *IN LIMINE*.  WE MADE THE ARGUMENT

14   WITH RESPECT TO 403.  I'M NOT GOING TO BEAT A DEAD HORSE WITH

15   RESPECT TO THAT.                                                  00:11

16           I WILL OBJECT ACCORDINGLY.

17           **THE COURT:**  I INDICATED THAT YOU PRESERVE ALL OF YOUR

18   OBJECTIONS.

19           **MR. NOLAN:**  THAT'S MY POINT.

20           THE LAST POINT I WANT TO RAISE, YOUR HONOR, WE HAVE        00:11

21   LODGED WITH THE COURT, WHICH I BELIEVE IS GOING TO BE THE LAST

22   VIDEO TRANSCRIPT THAT NEEDS TO BE REVIEWED -- AND THAT'S

23   MR. PALMER.  IF I COULD JUST GIVE YOU SOME REAL QUICK

24   BACKGROUND ON THIS, BECAUSE WE MAY COME UP TO IT THIS AFTERNOON

25   IF WE RUN OUT OF TIME, BUT CERTAINLY TOMORROW.                    00:11

1          MR. PALMER WAS A 30(B)(6) WITNESS DESIGNATED BY

2    MATTEL WITH RESPECT TO PHONE RECORDS, AND IN PARTICULAR, THE

3    PHONE CALLS FROM MR. CARTER BRYANT'S EXTENSION WHILE AT MATTEL.

4    AND THE COURT WILL RECALL THAT THERE WAS EXTENSIVE QUESTIONING

5    OF CARTER BRYANT WITH RESPECT TO THE VOLUME OF PHONE CALLS MADE          00:12

6    DURING SEPTEMBER.

7          THE COURT MAY RECALL THAT DURING THE COURSE OF THE

8    HEARING CONDUCTED, I BELIEVE, IN FEBRUARY OF 2007, THE ISSUE OR

9    THE FACT THAT MATTEL CANNOT LOCATE THE OCTOBER PHONE RECORDS OF

10   CARTER BRYANT WAS RAISED.                                                00:12

11         **THE COURT:**  I RECALL THAT.

12         **MR. NOLAN:**  IN ANY EVENT, YOUR HONOR, WE BELIEVE THAT

13   MR. PALMER'S VIDEO DEPOSITION TAKES ALL OF ABOUT SEVEN OR TEN

14   MINUTES TO SET UP THE RELEVANCE OF THE TWO DOCUMENTS.

15         WE RECEIVED THE OBJECTIONS BY MATTEL TO THIS                       00:12

16   TRANSCRIPT LAST EVENING.  AND I WILL WAIT UNTIL THE COURT GETS

17   A CHANCE TO REVIEW IT, BUT IT'S MOSTLY FOUNDATIONAL RELEVANCY

18   WITH RESPECT TO THEIR OWN 30(B)(6) WITNESS, WHICH I THOUGHT WAS

19   A LITTLE BIT CURIOUS.

20         MR. QUINN AND I HAD EXCHANGED AN E-MAIL REGARDING WHO              00:13

21   WAS GOING TO ARGUE THAT PARTICULAR POINT FOR HIM.  BUT HERE'S

22   THE BOTTOM LINE.  I WAS ADVISED FOR THE FIRST TIME LAST NIGHT

23   THAT MR. PALMER IS ON THE EAST COAST ON VACATION.  AND WE WOULD

24   VERY MUCH LIKE TO HAVE THIS AS PART OF OUR CASE NOW, AND THAT'S

25   WHY WE WOULD ASK THE COURT AT SOME POINT IN TIME TO TAKE A LOOK         00:13

```
 1   AT THIS TRANSCRIPT.  I THINK IT'S THE LAST ONE THAT WE'RE GOING

 2   TO ASK YOU, AT LEAST FOR OUR CASE, TO REVIEW SO WE CAN LOOK AT

 3   THE OBJECTIONS; THEN WE KNOW WHERE WE STAND WITH RESPECT TO

 4   PALMER.

 5            THE COURT:  VERY WELL.                                    00:13

 6            MR. COREY?

 7            MR. COREY:  THANK YOU, YOUR HONOR.  I WILL FOLLOW UP

 8   ON THAT VERY BRIEFLY.

 9            WITH RESPECT TO MR. PALMER, MATTEL DOES NOT HAVE AN

10   OBJECTION TO THE DOCUMENT RECORDING MR. BRYANT'S PHONE RECORDS    00:13

11   COMING INTO EVIDENCE.  WE'LL STIPULATE TO THAT.

12            BUT TO THE EXTENT THE DESIGNATION EXCEEDS THAT SCOPE

13   AND STARTS TALKING ABOUT QUESTIONS ABOUT WHERE THESE OCTOBER

14   2000 TAPES -- THE OCTOBER 2000 INFORMATION COMES FROM, THAT'S

15   OUT OF BOUNDS.  THE COURT HAS --                                  00:14

16            THE COURT:  WHAT'S YOUR CONCERN THERE?

17            I HAVEN'T LOOKED AT IT.

18            MR. COREY:  THE CONCERN IS THAT THEY ARE GOING TO SAY

19   THAT THIS IS EQUIVALENT TO EVIDENCE ELIMINATOR; PEOPLE LOSE

20   THINGS ALL OF THE TIME.  WE'VE BEEN THE ROUNDS WITH RESPECT TO    00:14

21   EVIDENCE ELIMINATOR, AND FOR THEM TO COME IN AND SAY "MATTEL

22   HAS MISSING INFORMATION TOO; YOU SHOULD DRAW AN ADVERSE

23   INFERENCE AGAINST THEM BECAUSE OF THAT."

24            THAT'S THE BASIS FOR THE OBJECTIONS.

25            WITH RESPECT TO THE RECORD ABOUT MR. BRYANT'S PHONE       00:14
```

```
 1   COMMUNICATIONS WITH MGA, THERE'S NOT AN ISSUE THERE.  THAT CAN

 2   COME IN.  WE'LL STIPULATE TO THAT.

 3          THE COURT:  WHY EXACTLY SHOULDN'T MGA BE ABLE TO

 4   ARGUE THAT THERE'S MISSING PHONE RECORDS AND MAKE WHATEVER

 5   ARGUMENT THEY WANT FROM THAT EVIDENCE?                          00:14

 6          MR. COREY:  WHAT'S IT RELEVANT TO?

 7          THE COURT:  I ASSUME THAT'S A RHETORICAL QUESTION.

 8          MR. COREY:  IT IS A RHETORICAL QUESTION.

 9          WHAT CLAIM OR DEFENSE DOES MISSING PHONE RECORDS HAVE

10   TO DO -- WHAT DO MISSING PHONE RECORDS HAVE TO DO WITH ANY      00:15

11   CLAIM OR DEFENSE IN THIS ACTION?  I MEAN, I'M SITTING HERE AND

12   I CAN'T THINK OF ONE.  THAT'S THE BASIS FOR THE OBJECTION, AND

13   THE COURT CAN LOOK AT THE OBJECTION.

14          THE COURT:  I THINK MR. NOLAN JUST GOT AN IDEA.

15          MR. NOLAN:  I'LL BE BRIEF ON THE RELEVANCE OBJECTION,    00:15

16   YOUR HONOR.

17          WE THINK IT IS PROBATIVE FOR THE JURY TO UNDERSTAND

18   THAT IN SEPTEMBER, WHICH IT'S OUR CONTENTION THAT MR. BRYANT

19   WAS IN COMMUNICATION WITH MGA WITH RESPECT TO THE POTENTIAL FOR

20   EMPLOYMENT, THAT THERE ARE SOME -- I FORGET -- NUMEROUS PHONE   00:15

21   CALLS.  IT'S BEEN CHARACTERIZED FOR THE JURY THAT HE WAS

22   CALLING EVERY DAY, CONSTANT.

23          I BELIEVE THE EVIDENCE IS GOING TO SHOW THAT THE

24   MONTH OF SEPTEMBER THERE WAS NO MORE THAN 45 MINUTES OF PHONE

25   CALLS OVER THE ENTIRE MONTH.  THE LONGEST TELEPHONE CALL, I     00:15
```

```
 1   BELIEVE, IS ABOUT 90 SECONDS.  BUT HERE'S THE RELEVANCE, YOUR

 2   HONOR.

 3           THEY CLAIM THAT DURING THE CRITICAL PERIOD OF TIME OF

 4   OCTOBER 4TH THROUGH OCTOBER 20TH, MR. BRYANT WAS SERVING TWO

 5   MASTERS, AND THAT ONE OF THE INDICATORS OF WHAT HE WAS DOING        00:16

 6   AND HOW MANY CONTACTS HE HAD WITH MATTEL DURING THAT RELEVANT

 7   PERIOD OF TIME IS NOT AVAILABLE TO US.

 8           WE THINK THAT THAT'S VERY CURIOUS, AND WE THINK THAT

 9   THE JURY, AS A TRIER OF FACT, SHOULD BE ABLE TO KNOW THAT

10   ALTHOUGH MATTEL KEEPS THESE PHONE RECORDS AS PART OF THEIR          00:16

11   BUSINESS RECORDS DURING A VERY CRITICAL PERIOD OF TIME RELEVANT

12   TO THIS CASE AS TO WHAT CARTER BRYANT WAS DOING DURING

13   PARTICULAR TIMES, THE PHONE RECORDS BECOME MYSTERIOUSLY

14   MISSING.

15           THIS WAS RAISED --                                         00:16

16       THE COURT:  I KNOW WHEN IT WAS RAISED.

17           SO YOU WANT TO BE ABLE TO MAKE THE ARGUMENT, THEN,

18   THAT SOMEHOW THIS WAS A DELIBERATE SUPPRESSION OF EVIDENCE OR

19   AN INTENTIONAL LOSS OF EVIDENCE?

20       MR. NOLAN:  YOUR HONOR, I DON'T KNOW YET.  WE'RE              00:16

21   GOING TO SEE HOW THE EVIDENCE COMES IN ON THIS.

22       THE COURT:  WHEN YOU DECIDE, LET THE COURT KNOW,

23   BECAUSE I THINK THAT'S IMPORTANT TO THIS ISSUE.  AND IF IT IS,

24   THEN THERE'S A CERTAIN THRESHOLD, AS YOU APTLY POINTED OUT IN

25   YOUR OPPOSITION TO EVIDENCE ELIMINATOR AND OTHER THINGS.  I'VE    00:17
```

```
 1   GOT TO KNOW WHAT POSITION YOU'RE GOING TO TAKE BEFORE I CAN

 2   RULE ON THESE OBJECTIONS.

 3           MR. NOLAN:  IF I MIGHT, YOUR HONOR -- AND I'M NOT

 4   ASKING YOU TO DO BUSY WORK.  THE TESTIMONY IS RATHER SHORT.  I

 5   DO BELIEVE THAT BASED ON THE TESTIMONY THAT IS PRESENT IN THAT        00:17

 6   TRANSCRIPT AND HOW MR. PALMER TESTIFIES AS A 30(B)(6) AND THE

 7   HANDLING OF THE OCTOBER PHONE RECORDS, THAT THERE IS A

 8   SIGNIFICANT ISSUE IN QUESTION THAT THE DOCUMENT MAY HAVE BEEN

 9   IN EXISTENCE BEFORE IT WAS SENT TO THE LEGAL DEPARTMENT.

10           THE COURT:  YOU NEED TO ANSWER THE COURT'S QUESTION.        00:17

11   I'M NOT SAYING RIGHT NOW.  YOU CAN TAKE THIS UP AGAIN AT THE

12   BREAK.  BUT THE COURT WENT THROUGH AN EXTENSIVE HEARING and

13   CONSIDERED TESTIMONY BEFORE IT MADE ITS DECISION ON EVIDENCE

14   ELIMINATOR, IN ALLOWING THAT TO PROCEED.  AND I NEED TO IMPOSE,

15   UPON YOUR URGING, THE SAME STANDARDS, OF COURSE, IF THAT IS        00:17

16   WHAT YOU'RE SUGGESTING NOW.

17           THE COURT IS GOING TO GO THROUGH THE SAME PROCESS.

18   HOW I'M GOING TO COME OUT, I DON'T KNOW.  I HAVEN'T LOOKED AT

19   THE EVIDENCE.  BUT IT WOULD BE HELPFUL TO THE COURT TO KNOW

20   EXACTLY WHAT IT IS THAT YOU'RE SEEKING, HOW FAR YOU WANT TO GO        00:18

21   WITH THIS.

22           MR. NOLAN:  RIGHT.

23           I WILL SAY RIGHT NOW, AND THEN WE CAN TAKE THIS UP

24   LATER SO WE DON'T KEEP THE JURY WAITING, I BELIEVE THE TRIER OF

25   FACT IS GOING TO BE CURIOUS AS TO WHY THERE'S NO REFERENCE TO        00:18
```

1   OCTOBER TELEPHONE RECORDS.

2        **THE COURT:**   CURIOSITY, I THINK YOU OR MS. AGUIAR HAS

3   POINTED OUT, IS NOT A SUFFICIENT BASIS TO ADMIT EVIDENCE.   IT'S

4   GOT TO BE MORE THAN SIMPLY SATISFYING CURIOSITY.   THERE ARE

5   CERTAIN THRESHOLDS THAT NEED TO BE MET.   AND YOU MAY VERY WELL          00:18

6   BE ABLE TO MEET THEM.   I'LL CONSIDER THIS EVIDENCE WITH THAT IN

7   MIND.   BUT I WOULD LIKE TO KNOW -- AND WHY DON'T WE TAKE THIS

8   UP AT THE BREAK, BECAUSE WE'LL HAVE -- GREG IS CHECKING ON THE

9   JURY RIGHT NOW -- EXACTLY WHAT IT IS THAT YOU WANT TO ARGUE.

10       AND THEN I'LL HEAR, MR. COREY, FROM YOU FURTHER.                    00:18

11       **MR. NOLAN:**   ALL RIGHT.

12       **THE COURT:**   LET'S TAKE A BRIEF RECESS BEFORE WE BRING

13   IN THE JURY.

14       **THE CLERK:**   COURT STANDS IN RECESS.

15       (WHEREUPON, A BRIEF RECESS WAS HELD.)                              00:24

16       (WHEREUPON, JURORS ENTER COURTROOM.)

17       **THE COURT:**   GOOD MORNING, MEMBERS OF THE JURY.

18   WELCOME BACK.

19       WITH THE EXCEPTION OF THE FOURTH OF JULY NOW, WE

20   SHOULD BE IN CONSTANT SESSION, TUESDAY THROUGH FRIDAY.   OF           00:24

21   COURSE, WE DO HAVE THIS FRIDAY OFF FOR THE FOURTH.   SO WE'LL

22   HAVE TRIAL ALL DAY TODAY, ALL DAY TOMORROW, AND ALL DAY

23   THURSDAY.

24       AT THIS TIME, ONE OF THE WITNESSES THAT MATTEL WAS

25   UNABLE TO CALL DURING THEIR CASE-IN-CHIEF BECAUSE HE WAS             00:24

1   UNAVAILABLE IS NOW AVAILABLE; SO I BELIEVE MATTEL IS GOING TO

2   CALL A WITNESS.

3           **MR. QUINN:**  WE WERE, BUT HE HAS NOT ARRIVED YET.  SO

4   WE'RE GOING TO DO SOMETHING ELSE.

5           **THE COURT:**  SO TELL US, WHAT ARE WE GOING TO DO,          00:25

6   MR. NOLAN?

7           **MR. NOLAN:**  GOOD MORNING.

8           I'VE BEEN TOLD THAT THE TRAFFIC -- HE'S ABOUT TEN

9   MINUTES AWAY.  BUT RATHER THAN TAKING ANY TIME, WHAT I'D LIKE

10  TO DO, I'D LIKE TO GO BACK INTO OUR CASE AND PRESENT OUR NEXT   00:25

11  WITNESS BY VIDEO, IF I MIGHT.  AND I HAVE ADVISED MR. QUINN AND

12  MR. PRICE OF THIS FACT.

13          WE WOULD NOW PLAY THE DEPOSITION OF JANET BRYANT THAT

14  WAS CONDUCTED SEPTEMBER 25, 2007, IN SPRINGFIELD, MISSOURI, BY

15  MR. ZELLER.  THE TAPE IS ONE HOUR AND 21 MINUTES.  AND AFTER    00:25

16  THAT, YOUR HONOR, WE WOULD THEN CALL THE NEXT WITNESS.

17          **THE COURT:**  VERY WELL.

18          YOU MAY PROCEED.

19          (WHEREUPON, THE VIDEO OF JANET LENORE BRYANT

20          IS PLAYED; EXCERPTS PROVIDED BY COUNSEL                      00:26

21          AS FOLLOWS: )

22          Q:  If you can please tell us your full name for the

23           Record.

24          A:   Janet Lenore Bryant.

25          Q:   Is that L-E-N-O-R-E?

```
 1              A:   Yes.

 2              Q:   Where do you currently reside?

 3              A:   Springfield, Missouri.

 4              Q:   How long did you live on Sycamore Drive in

 5               Kimberling City?

 6              A:   I believe from 1997 through 1999 or 2000. I'm

 7               Not absolutely sure about that.

 8              Q:   If you could please tell me briefly your

 9               Employment history?

10              A:   I've been a homemaker most of my life.

11              Q:   For about how long?

12              A:   Well, we've been married for 44 years. I think

13               In that length of time I have worked maybe three

14               Years out of that entire time.

15              Q:   When was the last time that you had a work --

16               And I don't want to suggest that being a

17               Homemaker is not work, but when was the last

18               Time you had outside employment?

19              A:   I believe it was 1988, '87, '88.

20              Q:   And what did you do?

21              A:   I worked in a party supply store in Placentia,

22               California as a manager.

23              Q:   And about how long did you have that job?

24              A:   One year.

25              Q:   What was the name of the store?
```

```
 1            A:   I think it was called Party Supply. I don't
 2             Remember that.
 3            Q:   And your husband is Tom Bryant; is that correct?
 4            A:   Yes.
 5            Q:   And so you mentioned that you moved to
 6             Washington State in about 1972, and you were
 7             There about three years so that was
 8             Approximately 1975?
 9            A:   Yes.
10            Q:   And where did you go from there?
11            A:   Kirkland, Washington.
12            Q:   And about how long were you in Kirkland?
13            A:   I'm guessing two to three years.
14            Q:   And where did you live after Kirkland?
15            A:   We moved to Alaska.
16            Q:   Where in Alaska? It's a big place.
17            A:   Soldotna.
18            Q:   If you could spell that for us please.
19            A:   S-O-L-D-O-T-N-A.
20            Q:   And how long were you there in that city or
21             Town?
22            A:   I would say approximately four years.
23            Q:   So that would be somewhere in the 1978 through
24             1982 time period?
25            A:   Probably, yes.
```

TUESDAY, JULY 1, 2008                    TRIAL DAY 18, MORNING SESSION

1      Q:   And where did you go after that town in Alaska?

2      A:   Back to California.

3      Q:   And where did you live in California at that

4       Time?

5      A:   Apple Valley.

6      Q:   Did you move back to California in approximately

7       1982?

8      A:   I think it would be closer to '83, '84. I don't

9       Remember exactly.

10     Q:   It's your best estimation or recollection?

11     A:   Yes.

12     Q:   How long did you live in Apple Valley?

13     A:   Probably three years.

14     Q:   So until approximately the 1987 time period?

15     A:   Yes.

16     Q:   And then where did you live after that?

17     A:   San Diego, California.

18     Q:   And how long were you in San Diego?

19     A:   A short time. About five months.

20     Q:   Where did you go after San Diego, California?

21     A:   Trying to remember. I think we went to Idaho.

22     Q:   That's when you went to Idaho Falls?

23     A:   Yes, about '88 I believe.

24     Q:   And that's where you went to live on Park Road

25      In Idaho Falls, Idaho you told me about earlier?

```
 1          A:   Yes.

 2          Q:   You're Carter Bryant's mother; is that true?

 3          A:   Yes.

 4          Q:   And you mentioned that your oldest son is Wade.

 5           Do you have any other children?

 6          A:   Yes.

 7          Q:   Who else?

 8          A:   We have a daughter Amber and a younger daughter

 9           Anjanette.

10          Q:   I'm sorry, the name again?

11          A:   Anjanette. A-N-J-A-N-E-T-T-E.

12          Q:   So two sons, two daughters?

13          A:   Right.

14          Q:   Do any of your children still live with you?

15          A:   No.

16          Q:   I take it you reside in your current home with

17           Your husband Tom; is that right?

18          A:   Yes.

19          Q:   Does anyone else live there?

20          A:   Our dog.

21          Q:   You have, of course, told me so far about

22           Various places where you have lived over the

23           Years. I take it during some of those times

24           Your son Carter lived with you; is that true?

25          A:   Yes.
```

1    Q:   It's fair to say that he lived with you in those

2         Locations you had mentioned from the time he was

3         Born up until the time that you were at the --

4         Lived in Apple Valley, California; is that

5         Right?

6    A:   Yes.

7    Q:   And then he graduated from high school there; is

8         That right?

9    A:   Yes.

10   Q:   Starting with that point, were there other times

11        After that that Carter lived with you?

12   A:   Yes.

13   Q:   What other times or locations?

14   A:   He lived with us in Idaho Falls and in

15        Kimberling City. Can I interrupt for just one

16        Moment. I forgot two places that he lived.

17   Q:   Okay, sure.

18   A:   Do you need those in there?

19   Q:   Yeah, please.

20   A:   We have moved a lot. When we left Idaho the

21        Second time, we moved to Virginia. I am

22        Thinking that's '90, '91. Then from Virginia we

23        Spent some time in Saudi Arabia, then back to

24        Idaho.

25   Q:   What time period did Carter live with you in

```
 1              Kimberling City, Missouri?
 2         A:    I believe it was 1997 through '98.
 3         Q:    So it was a continuous block of time that Carter
 4          Was living with you during that 1997 and 1998
 5          Time period in Kimberling City?
 6         A:    Yes.
 7         Q:    Back during that time period when Carter was
 8          Living with you in Kimberling City, Missouri,
 9          Did anyone else live in the house?
10         A:    My husband and Carter's two dogs.
11         Q:    I'm sorry. His dogs.
12         A:    Yeah.
13         Q:    So the people that were there in the house were
14          You, your husband, Tom, and Carter; is that
15          Correct?
16         A:    Yes.
17         Q:    Was anyone -- were there any other people living
18          In the house?
19         A:    No.
20         Q:    I take it that back in that time period when
21          Carter was living with you in Kimberling City,
22          Missouri you had understood that he had worked
23          At Mattel; is that right?
24         A:    Yes.
25         Q:    During the time that Carter was living with you
```

1      There in Kimberling City, Missouri, did you talk

2      With him about any kinds of illustrations or

3      Drawings that he made when he was living there?

4      A:   Yes.

5      Q:   And was that something you routinely did with

6      Him, or was that something that was unusual?

7      A:   I would express interest in whatever he was

8      Drawing if he chose to show it to me.

9      Q:   Is that something that Carter -- if you

10      Expressed interest, it was something that Carter

11      Typically did was he'd show them to you, or was

12      It just sometimes?

13      A:   Sometimes.

14      Q:   And did he frequently show you illustrations or

15      Drawings that he made during that time period?

16      A:   Sometimes.

17      Q:   (By Mr. Zeller) I'm just trying to get a

18      General sense here of how common or unusual it

19      Was during this time period for Carter to show

20      You something that he had drawn or had

21      Illustrated.

22      A:   Okay. If he was excited about something -- he

23      Was very excited about his greeting cards that

24      He was designing.

25      Q:   You had mentioned that Carter, during this time

```
 1          Period when he was living with you in Kimberling
 2          City, was excited about the illustrations and
 3          The work he was doing on greeting cards?
 4     A:   Yes.
 5     Q:   And what do you remember about that work or
 6          Those illustrations he showed you?
 7     A:   What do I remember about them? You mean, did I
 8          Like them?
 9     Q:   Well, I guess, I was thinking of something a
10          Little bit more particular. I mean, do you
11          Remember what they looked like?
12     A:   Yes, some of them. Probably not all.
13     Q:   Please tell me the ones you can remember.
14     A:   He did a witch Halloween card. He did some
15          Little people on a Valentine card. Those two I
16          Recall right now. I can't remember. I think
17          There were more than two, but I remember those
18          Specifically.
19     Q:   And these illustrations that you saw, were
20          They -- I take it they were actual drawings of
21          Some kind --
22     A:   Yes.
23     Q:   -- that Carter showed you? And were they in
24          Color? Were they black and white sketches?
25     A:   In color.
```

```
1        Q:   Did you yourself show Tom any drawings that
2         Carter did back during that time period when
3         Carter was living with you in Kimberling City?
4        A:   To Tom?
5        Q:   Yes.
6        A:   Oh, yes.
7        Q:   And what did you show Tom?
8        A:   Probably I showed him the cards I'm sure. I
9         Showed him whatever I was allowed to show him.
10       Q:   Well, is there anything else that you can
11        Remember showing Tom that Carter had done --
12        Well, I'm sorry. I'll rephrase it.
13        During the time that Carter lived with you
14        In Kimberling City, Missouri, do you recall
15        Showing Tom any drawings that Carter had done
16        Other than the greeting card drawings?
17       A:   Yes.
18       Q:   And what other ones do you remember showing?
19       A:   The Bratz, the birth of them.
20       Q:   And what did you show Tom Bryant in connection
21        With the Bratz?
22       A:   The sketches he had done, I believe they were in
23        Pencil, of the concept of the big head and the
24        Big feet and the little bodies.
25       Q:   And you were the one who showed those to Tom?
```

```
 1          A:   Yes.
 2          Q:   Try and find a way of putting this question, but
 3           I'm curious why is it that you were showing the
 4           Drawings to Tom as opposed to Carter? What is
 5           Your understanding as to that?
 6          A:   Well, Tom was gone during the week, and there
 7           Wasn't as much opportunity for him to see
 8           Anything that was going on except on the
 9           Weekend, and I specifically remember being so
10           Excited about how cute they were that I wanted
11           Tom to see them.
12          Q:   And how was it you had the drawings to show Tom?
13          A:   He was living in the house, and he had shown
14           Them to me. So I didn't feel like it would be
15           The wrong thing to do to show my husband.
16           Did Carter give you the drawings to show
17           Tom, or did you go and you found them and you
18           Showed them to Tom?
19          A:   I don't recall. Probably I was excited and I
20           Picked them up and took them in the family room
21           And said look what Carter did.
22          Q:   So my question is: How did you know where the
23           Bratz drawings were specifically to get them and
24           Show them to Tom?
25          A:   They were probably obvious -- in an obvious
```

```
 1          Place like the easel.  I don't know.
 2     Q:   When you say 'probably,' you don't have a
 3          Specific recollection of that; is that true?
 4     A:   Right. I don't know whether they were lying on
 5          The table or on the easel.
 6     Q:   So it's fair to say that you do not recall and
 7          You don't know how it is that you found the
 8          Bratz drawings among the many other drawings
 9          That were in Carter's room at that time; is that
10          True?
11     A:   Correct.
12     Q:   And when you showed these to Tom, what was his
13          Reaction?
14     A:   He said those are really cute.
15     Q:   And when you showed them to Tom, did you
16          Describe what they were in any way?
17     A:   Yes.
18     Q:   What did you say that they were?
19     A:   Look at these this idea the big head and the big
20          Feet. Aren't they cute.
21     Q:   And then that's when he said that they're really
22          Cute?
23     A:   Really cute.
24     Q:   I'm sorry. That's a yes?
25     A:   Yes.
```

```
1        Q:   It was your understanding by the time you showed
2         These drawings to Tom that these were drawings
3         For dolls?
4        A:   Yes.
5        Q:   (By Mr. Zeller) The drawings that you showed to
6         Tom of the Bratz that we've been talking about,
7         Were those pencil sketches of the entire doll or
8         Character and mainly had the face and the head
9         Together with the body and the fashions and
10        Everything else?
11       A:   No.
12       Q:   So they were on separate pieces of paper?
13       A:   Yes.
14       Q:   Where you had the faces on one piece of paper
15        And the bodies along with fashions without the
16        Faces on separate pieces of paper; right?
17       A:   Yes.
18       Q:   And about how many drawings did you show Tom of
19        The Bratz?
20       A:   I don't recall.
21       Q:   Was it more than one?
22       A:   I don't recall. It may have been just one
23        Initially.
24       Q:   Well, maybe I should ask this at this point
25        Then. Did you show Tom Bratz drawings on more
```

1        Than one occasion during the time period when

2        Carter was living with you in Kimberling City?

3        A:    Probably, yes.

4        Q:    You say probably. Do you recall doing that on

5         More than one occasion?

6        A:    I recall the initial occasion of showing Tom the

7         Idea because I was so excited. I don't recall

8         Specific instances showing him later drawings.

9         There may have been.

10       Q:    You can't be sure one way or another?

11       A:    No.

12       Q:    I take it that prior to the time that you showed

13        Tom one or potentially more drawings of Bratz

14        For the first time during this time period when

15        Carter was living with you in Kimberling City, I

16        Take it that Carter showed you the drawings for

17        The first time; is that right?

18       A:    Yes.

19       Q:    And about how much in advance was that, the time

20        When you showed the drawing or drawings to Tom

21        On that initial occasion?

22       A:    I'm not sure, but probably as soon as he came

23        Home.

24       Q:    So it's your expectation it was a very short

25        Period of time?

| | |
|---|---|
| 1 | A:   Yes. |
| 2 | Q:   Do you think it might have been on the same day |
| 3 | When Carter first showed you the drawings that |
| 4 | You then showed them to Tom? |
| 5 | A:   I don't believe it was the same day. |
| 6 | Q:   Please tell us what you can recall about the |
| 7 | Occasion in which Carter first showed you any |
| 8 | Bratz drawings of any kind? |
| 9 | A:   He knocked on my bedroom door and said mom, I |
| 10 | Want to show you something. What do you think |
| 11 | Of this idea? What do you think of these? |
| 12 | Q:   (By Mr. Zeller) Did you know that the |
| 13 | Drawings -- well, let me ask this first. |
| 14 | Do you remember how many drawings he showed |
| 15 | You on that occasion? Was it one? More than |
| 16 | One? |
| 17 | A:   You mean pieces of paper? |
| 18 | Q:   Yeah. |
| 19 | A:   I believe it was one. |
| 20 | Q:   It was one? |
| 21 | A:   I believe it was. |
| 22 | Q:   Do you remember what kind of paper it was on? |
| 23 | A:   No. |
| 24 | Q:   So you're not sure if it was like a regular |
| 25 | Plain piece of white paper or like a yellow |

```
 1              Legal pad like I have here or transparency type
 2              Paper, tissue paper, butcher paper?  You
 3              Wouldn't be able to tell me what kind it was on?
 4         A:   Not with certainty.
 5         Q:   Well, when you say with certainty, do you have
 6              Any recollection at all?
 7         A:   It was white is all I know.
 8         Q:   Was it translucent paper of any kind?
 9         A:   I don't remember.
10         Q:   (By Mr. Zeller) Is it fair to say that during
11              The time -- you don't have a specific
12              Recollection that Carter called them Bratz
13              During the time he was living with you there in
14              Kimberling City; is that correct?
15         A:   That's correct.
16         Q:   Then to make sure that I have your testimony on
17              This, did Carter at that time when he showed you
18              The drawing, did he tell you what the source or
19              Inspiration was either the drawing or this idea
20              That he had for dolls?
21         A:   I don't recall that.
22         Q:   You don't remember him talking about that; is
23              That true?
24         A:   Correct.
25         Q:   Now, at any time have you ever discussed that
```

1        With Carter, what the source was or the

2        Inspiration was for the Bratz dolls?

3     A:   I don't recall that. I recall him saying I have

4        Been thinking about it. I have been thinking

5        About this idea.

6     Q:   During the time when Carter was living with you

7        There in Kimberling City, did Carter ever tell

8        You what the source was or the inspiration was

9        Behind Bratz?

10    A:   Not that I recall.

11    Q:   Do you have any knowledge or information as to

12       What it is that inspired Carter to come up with

13       The Bratz?

14    A:   No. Goodness.

15    Q:   Did Carter ever tell you that he was inspired to

16       Come up with Bratz by seeing kids at Kickapoo

17       High School?

18    A:   I don't recall him ever telling me that. He may

19       Have and I may have forgotten it, but I don't

20       Recall it.

21    Q:   You don't have a recollection of that occurring;

22       Is that true?

23    A:   Right, correct.

24    Q:   Has he ever said -- ever given you a reason as

25       To why he didn't present the Bratz to Mattel

```
 1              Instead of MGA?
 2              A:   Yes. He told me that it was his idea and he
 3              Wanted royalties.
 4              Q:   Did he give any other reason?
 5              A:   No.
 6              Q:   Has Carter ever said to you in words or
 7              Substance that he ever did show Bratz to anyone
 8              At Mattel when he was working at Mattel.
 9              A:   No.
10              Q:   And what other conversations or communications
11              Have you had with Carter about his contract?
12              A:   When he was not employed and he was trying to
13              Figure out a way to earn money, I suggested
14              Maybe doing some sketches and selling them, and
15              He just said that would interfere with my
16              Contract and I don't want to do that. I
17              Wouldn't ever -- he was very conscientious about
18              That.
19              Q:   What was it that Carter said in connection with
20              His Mattel contract that would be considered
21              Unethical?
22              A:   Doing any work while he was employed by them.
23              Q:   (By Mr. Zeller) Any work for a Mattel
24              Competitor?
25              A:   Yes.
```

TUESDAY, JULY 1, 2008                    TRIAL DAY 18, MORNING SESSION

```
 1          So at one point you suggested to Carter

 2          That he figure out a way to sell sketches that

 3          He had made?

 4     A:   Yeah.

 5     Q:   And he said, well, I can't do that because it

 6          Would interfere with my contract with Mattel?

 7     A:   Right.

 8     Q:   And it's fair to say that when you had this

 9          Conversation with Carter, it was your

10          Understanding that he was still employed by

11          Mattel?

12     A:   Yes. Exactly when it was, I don't remember.

13     Q:   And do you have an estimation as to the number

14          Of drawings that he showed you when he was there

15          In Kimberling City?

16     A:   No.

17     Q:   So you're not sure if it was 10, less than 10,

18          More than 10?

19     A:   No.

20     Q:   When was it that Carter showed you that first

21          Drawing of the dolls?

22     A:   I don't remember.

23     Q:   You're sure it was when you were living in

24          Kimberling City?

25     A:   Yes.
```

```
 1          Q:   So but you're not sure during that time period
 2           When Carter was living with you when he first
 3           Showed you that drawing?
 4          A:   No.
 5          Q:   Or any Bratz drawing?
 6          A:   No, I am not.
 7          Q:   Well, that's my next question. I assume you
 8           Didn't create any documents or any documentation
 9           As to when you first saw these or saw any of
10           Those Bratz drawings; is that correct?
11          A:   No.
12          Q:   I'm sorry, it's correct?
13          A:   It's correct what you said.
14          Q:   During this time period when Carter was living
15           In Kimberling City with you, did you show those
16           Drawings to anyone else?
17          A:   Yes.
18          Q:   Who else did you show them to?
19          A:   My friend Jeanne.
20          Q:   And is that J-E-A-N?
21          A:   J-E-A-N-N-E Galvano, G-A-L-V-A-N-O.
22          Q:  G-A-L-V-A-N-O?
23          A:   Yes.
24          Q:   And you had mentioned she's a friend of yours?
25          A:   Yes.
```

```
1        Q:    Was she living in Kimberling City at the time?

2        A:    No.

3        Q:    Where did she live?

4        A:    Alaska.

5        Q:    The state of Alaska I assume?

6        A:    Yes.

7        Q:    Was she down here visiting?

8        A:    Yes.

9        Q:    And she was visiting you?

10       A:    Yes.

11       Q:    And staying in your home?

12       A:    Yes.

13       Q:    And is she someone you are still in touch with?

14       A:    Yes.

15       Q:    I take it you met her when you lived up in

16             Alaska?

17       A:    Yes.

18       Q:    And you've kept in touch with her since then?

19       A:    Yes.

20       Q:    How did you meet her?

21       A:    Her husband installed the carpet in our home,

22             And after he had been there a few days, he said,

23             Would you be willing to go visit my wife. She's

24             Depressed. We just moved here.

25       Q:    'Here' being Alaska?
```

```
 1          A:   Yes. And I said yes.
 2          Q:   I see. And so this was when you were living in
 3           Alaska that this happened?
 4          A:   Yes.
 5          Q:   Got it now. And then so you struck up a
 6           Friendship with her and you've been friends ever
 7           Since?
 8          A:   Exactly, yes.
 9          Q:   Was that the first time during this time when
10           Carter was living with you in Kimberling City
11           That Ms. Galvano came and visited you?
12          A:   She used to try and come and visit us every year
13           Wherever we were living. Sometimes she could,
14           Sometimes she couldn't.
15          Q:   So other than Tom, your husband, and
16           Ms. Galvano, did you show those drawings to
17           Anyone else back in the time period when Carter
18           Was living with you in Kimberling City?
19          A:   Not that I recall, no.
20          Q:   And did you show Ms. Galvano those drawings
21           There when she was actually in your home?
22          A:   Yes.
23          Q:   And did Ms. Galvano give you any reaction to the
24           Drawings?
25          A:   She thought they were cute. She thought
```

1          Everything he drew was cute, you know, friends.

2     Q:   Do you recall what her reaction was?

3     A:   She liked them.

4     Q:   The drawings that you showed Ms. Galvano, were

5          Those the drawings that had the heads and the

6          Faces separate from the rest of the body and the

7          Fashions?

8     A:   I don't recall.

9     Q:   So you're not sure which ones you showed her?

10    A:   No.

11    Q:   Earlier today you were telling me about an

12         Occasion in which you showed Bratz drawings to

13         Ms. Galvano?

14    A:   Yes.

15    Q:   And do you remember how many of those you showed

16         To her?

17    A:   No.

18    Q:   (By Mr. Zeller) Do you recognize Exhibit 701?

19    A:   Yes.

20    Q:   Is this a drawing that you saw when Carter was

21         Living with you in Kimberling City?

22    A:   I'm not certain.

23    Q:   Is this perhaps I need to ask a more particular

24         Question with some of these. I assume you

25         Recognize this as a Carter drawing?

TUESDAY, JULY 1, 2008                    TRIAL DAY 18, MORNING SESSION

```
 1          A:   Yes.

 2          Q:   Have you ever seen this particular Carter

 3          Drawing before?

 4          A:   I wish I could tell you, yes, definitely for

 5          Certain. I have seen so many. It looks like I

 6          Have seen it.

 7          Q:   But it's fair to say you can't tell us from any

 8          Recollection that you have that you saw this

 9          Drawing, Exhibit 701, during the time that

10          Carter was living with you in Kimberling City;

11          Is that correct?

12          A:   I can't say absolutely, no.

13          Q:   You couldn't swear to it?

14          A:   No.

15          MR. ZELLER:  Would you please mark as

16          Exhibit 703 a one-page document bearing Bates

17          Number Bryant 177.

18          Q:   (By Mr. Zeller) You've had a chance to take a

19          Look at Exhibit 703?

20          A:   Yes.

21          Q:   Do you recognize this as a drawing that you saw

22          When Carter was living with you in Kimberling

23          City?

24          A:   I don't know that I saw it when he was living

25          With us in Kimberling City.
```

```
1          Q:   Have you ever seen this particular drawing that
2           We've marked as Exhibit 703?
3          A:   I don't recall.
4          Q:   So it's fair to say --
5          A:   Specifically.
6          Q:   I'm sorry?
7          A:   I don't recall specifically.
8          Q:   So is it fair to say you don't have any
9           Knowledge or information about when this drawing
10          That we've marked as Exhibit 703 was created?
11         A:   No.
12         Q:   It's fair to say you don't?
13         A:   No.
14         Q:   I'm correct?
15         A:   You are correct.
16         Q:   Okay, thank you.
17         A:   It just, yeah, brings back a lot of memories.
18         MR. ZELLER:  Would you please mark as
19          Exhibit 704 a one-page document bearing Bates
20          Number Bryant 189.
21          (Exhibit 704 marked.)
22         Q:   Oh, okay. Is Exhibit 704 a drawing that Carter
23          Showed you or that you otherwise saw during the
24          Time period that Carter was living with you in
25          Kimberling City?
```

TUESDAY, JULY 1, 2008                      TRIAL DAY 18, MORNING SESSION

```
 1          A:   I would say, yes.

 2          Q:   So this is one of the drawings you do remember

 3           Seeing?

 4          A:   I would say yes. I remember the clogs.

 5          Q:   And when you say 'the clogs,' what particular

 6           Portion are you referring to?

 7          A:   The shoes.

 8          Q:   Well, the problem is that there is more than one

 9           Shoe on Exhibit 704. Is it all of them or is it

10           A particular one?

11          A:   All three -- well, she's got shoes on underneath

12           The pants, but I don't know that they're clogs.

13           It just that looks a lot like Jade.

14          Q:   And was this drawing that we marked as

15           Exhibit 704 the first one that Carter showed

16           You?

17          A:   I don't believe so. I'm not certain.

18          Q:   Do you think this is one of the ones that Carter

19           Showed you in the days or weeks or even months

20           Following when he showed you the first Bratz

21           Drawing during this time period that he was

22           Living with you in Kimberling City?

23          A:   I think so, yes.

24          MR. ZELLER:  Let's please mark as

25           Exhibit 705 a one-page document bearing Bates
```

```
 1              Number Bryant 190.
 2              (Exhibit 705 marked.)
 3         Q:   (By Mr. Zeller) Have you had a chance to look
 4          At Exhibit 705?
 5         A:   Yes.
 6         Q:   Is this a drawing that you saw during the time
 7          When Carter was living with you in Kimberling
 8          City?
 9         A:   I can't say for certain. It looks like it.
10         Q:   Well, maybe I need to clarify that.
11         A:   There was so many. Sorry.
12         Q:   No, that's quite all right. Let me start it
13          This way. Do you have an actual recollection of
14          Seeing Exhibit 705 during the time period Carter
15          Was living with you in Kimberling City?
16         A:   No.
17         MR. ZELLER:  Let's please mark as
18          Exhibit 706 a one-page document bearing Bates
19          Number Bryant 216.
20              (Exhibit 706 marked.)
21         Q:   (By Mr. Zeller) Have you had a chance to take a
22          Look at Exhibit 706?
23         A:   Yes.
24         Q:   Is this a drawing that you saw during the time
25          Period when Carter was living with you in
```

```
 1              Kimberling City?
 2        A:    Probably, but that's not a definite yes or no.
 3        Q:    So you're not sure one way or another; is that
 4         Correct?
 5    MR. PAGE:  Misstates her prior.
 6        A:    The little goloshes look very familiar.
 7        Q:    (By Mr. Zeller) And when you say 'the
 8         Goloshes,' you are talking about these boots
 9         Here in the middle?
10        A:    Yeah.
11        Q:    For the record maybe one way of dealing with
12         That is maybe if you have a pen over there,
13         Maybe you could just circle them, the ones that
14         You do recognize.
15        A:    Do you want me to circle them?
16        Q:    Yes, please. Then so I understand your
17         Testimony on this anyway make sure. You
18         Recognize these boots; right?
19        A:    Yes.
20        Q:    Do you recognize them as a drawing that you saw
21         Back in the time period when Carter was living
22         With you in Kimberling City?
23        A:    Yes.
24        Q:    So this portion of it anyway, the one that you
25         Circled of the boots, that's a drawing that
```

```
 1              Carter showed you at some point?

 2         A:   Yes.

 3         Q:   When he was living in Kimberling City?

 4         A:   Yes. Can I assert something here?

 5         Q:   Yeah, absolutely.

 6         A:   He did.

 7         MR. ZELLER:  Directing your attention to

 8          Exhibit 706, we talked about the boots, and you

 9          Do have a recollection of seeing a drawing of

10          The boots back when Carter was living with you

11          In Kimberling City. How about the other

12          Portions of this Exhibit 706?

13         A:   They all look familiar to me.

14         Q:   You're not sure about whether those parts were

15          Something you saw back when Carter was living

16          With you in Kimberling City; is that true?

17         A:   That's true. He used to draw hundreds of shoes.

18         MR. ZELLER:  Let's please mark as Exhibit

19          707 a one-page document bearing Bates number

20          Bryant 217.

21          (Exhibit 707 marked.)

22         MR. ZELLER:  Please let us know when you've

23          Had a chance to take a look at 707.

24         A:   Okay.

25         Q:   (By Mr. Zeller) Is this a drawing that you saw
```

```
1              During the time period when Carter was living

2              With you in Kimberling City?

3         A:    I think, yes.

4         Q:    And was it your understanding that this was a

5              Drawing that Carter had created in connection

6              With the doll that you later on came to know as

7              Bratz?

8         A:    Yes.

9         Q:    Did you discuss this particular drawing with

10             Carter?

11        A:    I can't say for certain. Probably. Because I

12             Remember loving the rooted kinky hair.

13        Q:    And when you were talking about earlier that you

14             Loved the kinky hair, you are talking about this

15             Portion near the top where it has the words

16             Rooted hair next to it?

17        A:    Yes.

18        Q:    But it's fair to say that you have never had any

19             Discussion with Carter or don't have any

20             Information about the rest of Exhibit 707

21             Insofar as it is describing some way of removing

22             Hair or doing something with hair; is that

23             Correct?

24        A:    If we talk about the kinky hair, we probably

25             Talked about everything. That's all I can say.
```

```
 1              Q:   (By Mr. Zeller) But you're not sure whether you
 2               Talked about any of that?
 3              A:   No. I'm not certain.
 4               Did you talk to Carter about this idea or
 5               Concept of having removable feet for the dolls?
 6              A:   Yes.
 7              Q:   And that was during the time period when Carter
 8               Was living with you in Kimberling City,
 9               Missouri; is that correct?
10              A:   Yes.
11              Q:   And what is it that Carter said along those
12               Lines?
13              A:   When he showed me the drawing, I said I love the
14               Feet. He said I want to make the whole foot and
15               Shoe removable so they don't have to fool around
16               With losing shoes. They can just snap them on
17               And off and find them in the carpet.
18              Q:   During this time period when Carter was living
19               With you in Kimberling City, did he show you any
20               Drawings of this concept?
21              A:   Yes.
22              Q:   He did. And what is it that you recall him
23               Showing you that had the concept of removable
24               Feet?
25              A:   Shoes, feet.
```

1      Q:   They depicted the fact that the shoes and the

2       Feet could be removed?

3      A:   Yes.

4      **MR. ZELLER:**   Please mark as Exhibit 708 a

5       One-page document bearing Bates number Bryant

6       300.

7       (Exhibit 708 marked.)

8      Q:   (By Mr. Zeller) Have you had a chance to take a

9       Look at Exhibit 708? Do you need to take

10      Another minute?

11     A:   No. I'm okay. Go ahead.

12     Q:   Are you sure?

13     A:   Yeah.

14     Q:   Have you seen -- you've had a chance to take a

15      Look at Exhibit 708?

16     A:   Yes.

17     Q:   And is this a drawing that Carter Bryant has

18      Ever shown you?

19     A:   Yes.

20     Q:   And when did Carter show you this drawing?

21     A:   When he had lived with us in Kimberling City. I

22      Don't remember the exact day.

23     Q:   Now, you'll see that there are four names that

24      Are listed here?

25     A:   Yes.

```
1          Q:   Jade, Lupe, Zoe and Hallyday, H-A-L-L-Y-D-A-Y?

2          A:   Yes.

3          Q:   Were those names on this drawing at the time

4           That you saw it back when Carter was living in

5           Kimberling City?

6          A:   Yes.

7          Q:   Was this the first drawing that Carter showed

8           You in connection with Bratz?

9          A:   I don't believe it was the first one, no.

10         Q:   So this was one of the later ones then?

11         A:   Yes.

12    MR. ZELLER:   Please mark as --

13         Q:   And by the way with Exhibit 708, you recognize

14          Exhibit 708 a design drawings for the heads of

15          The Bratz dolls; is that correct?

16         A:   Yes.

17    MR. ZELLER:   Let me show you what was

18          Previously marked as Bryant 183 which we'll mark

19          As Exhibit 709.

20          (Exhibit 709 marked.)

21         Q:    (By Mr. Zeller) Please let me know when you've

22          Had a chance to take a look at Exhibit 709.

23         A:   Okay.

24         Q:   Have you seen Exhibit 709 before?

25         A:   Yes.
```

```
 1          Q:   Is this something that Carter showed you at some

 2           Point?

 3          A:   Yes, at some point.

 4          Q:   When did he show this to you?

 5          A:   I can't say.

 6          Q:   So you're not --

 7          A:   I believe it was when he was still coming up

 8           With the original concept.

 9          Q:   So you're going to have to help me out a little

10           Bit here. So are you saying that you do recall

11           This as something that you saw when Carter was

12           Living in Kimberling City for sure or you're not

13           Sure?

14          A:   I'm going to say yes in Kimberling City because

15           I just remember writing little stories.

16          Q:   Well, he may have been writing the stories, but

17           I'm trying to find out did he write this little

18           Particular story by your recollection during

19           That time when he was in Kimberling City?

20          A:   I can't say absolutely.

21          Q:   You'll notice that in the first paragraph the

22           Text, the actual text we'll say for Exhibit 709

23           Where it starts off 'four best friends with

24           Totally transformable looks.' And then goes on

25           It references, quote, two pop-off wigs, end
```

TUESDAY, JULY 1, 2008                    TRIAL DAY 18, MORNING SESSION

```
 1          Quote.  Do you see that?
 2          A:   Yes, right at the top, yes.
 3          MR. ZELLER:  Please mark as Exhibit 710 a
 4          One-page document bearing Bates number Bryant
 5          186.
 6          (Exhibit 710 marked.)
 7          Q:   (By Mr. Zeller) Please let me know when you've
 8          Had a chance to take a look at Exhibit 710?
 9          A:   Yes.
10          Q:   Is this a drawing that you saw when Carter was
11          Living with you in Kimberling City?
12          A:   I can't say for certain this is the one, but
13          This is what they looked like originally when
14          They were born, kind of like in cocoon.
15          Q:   Well, I'll try and clarify that statement a
16          Second, but let me just find out on this
17          Specific drawing that we marked as Exhibit 710,
18          Do you remember whether you saw this during the
19          Time period, this particular drawing when Carter
20          Was living with you in Kimberling City?
21          A:   I can't say for certain, no.
22          Q:   Then to go back to the original answer that you
23          Gave when you said that it looks somewhat like
24          They did when they were I think in cocoon you
25          Said?
```

```
1         A:   Yeah.

2         Q:   When you say that, are you saying that this

3          Drawing that we've marked as Exhibit 710 looks

4          Like that first drawing that you saw, the very

5          First one?

6         A:   Yes.

7         Q:   And was it the same as Exhibit 710 in the sense

8          That it didn't have facial features on it?

9         A:   Yes.

10        Q:   But you're not sure if this particular drawing

11         We marked as Exhibit 710 is that same drawing?

12        A:   No.

13        Q:   (By Mr. Zeller) Do you recognize what we've

14         Marked as Exhibit 712?

15        A:   Yes.

16        Q:   Is this a drawing that Carter showed you when he

17         Was living in Kimberling City, Missouri?

18        A:   Yes.

19        Q:   And so you remember this drawing specifically as

20         One that Carter showed you?

21        A:   Yes.

22        Q:   (By Mr. Zeller) Have you had a chance to take a

23         Look at Exhibit 713?

24        A:   Yes.

25        Q:   Is this a drawing that you saw while Carter was
```

```
 1              Living with you there in Kimberling City?
 2         A:   I can't say for certain. I believe so.
 3         Q:   (By Mr. Zeller) Is Exhibit 733 a drawing that
 4         You saw when Carter was living with you in
 5         Kimberling City?
 6         A:   I would say, yes.
 7         Q:   It's your recollection you saw this one; is that
 8         True?
 9         A:   It's my recollection.
10         Q:   And this is a drawing that Carter showed you?
11         A:   If I saw it, he would have shown it to me, yes.
12         Q:   Well, just to be clear, you had mentioned that
13         On some occasions he showed them to you -- well,
14         I'm sorry, strike that.
15         It's fair to say that in each instance in
16         Which you saw one of these Bratz drawings back
17         In that time period when Carter was living with
18         You in Kimberling City, that at some point
19         Carter actually showed it to you?
20         A:   Yes.
21         Q:   And that's true of Exhibit 733?
22         A:   That's my best recollection, I saw this one.
23         Q:   Was this the first drawing that Carter showed
24         You?
25         A:   No.
```

1      Q:   Because this one has a face?

2      A:   I'm sorry.

3      Q:   This one has a face and fashions. So you know

4       It wasn't the first one?

5      A:   No.

6      Q:   Did you have any discussion with Carter about

7       This particular drawing we've marked as

8       Exhibit 733?

9      A:   Probably, yes.

10      Q:   What do you remember discussing with him on

11       That?

12      A:   I can't say for sure, you know, a mom. That's

13       Beautiful, that's wonderful, she's so cute.

14      Q:   Anything else you can remember?

15      A:   No.

16      **MR. ZELLER:**  Let's please mark as

17       Exhibit 734 a photograph of Exhibit 733.

18       (Exhibit 734 marked.)

19      Q:   (By Mr. Zeller) If I asked you the same

20       Questions about Exhibit 734 that I asked you

21       About 733, would your answers be the same?

22      A:   Yes. I don't know whether or not I saw it in

23       Color though.

24      Q:   So it's your best recollection that you saw this

25       Drawing that we've marked as Exhibit 734 in some

TUESDAY, JULY 1, 2008                    TRIAL DAY 18, MORNING SESSION

```
 1              Form.  You're not sure whether it was in color
 2              At that time or it was in black and white when
 3              Carter was living with you in Kimberling City?
 4         A:    Right.
 5         Q:    And you're just not sure one way or the other?
 6         A:    I'm really not.
 7         Q:    Going back for a moment to one of the prior
 8              Exhibits, Exhibit 726. It's the one that had
 9              That typed text.
10         A:    Okay.
11         Q:    Back in the time period when you were -- well,
12              Strike that.
13              Back in the time period when Carter was
14              Living with you in Kimberling City, did you see
15              Any Bratz drawings that had that kind of typed
16              Text on it or any kind of typed text?
17         A:    No.
18         Q:    (By Mr. Zeller) Is Exhibit 735 a drawing that
19              You saw when Carter was living with you in
20              Kimberling City?
21         A:    I would say, yes.
22         Q:    You recall seeing this drawing?
23         A:    Yes.
24         Q:    And I take it this was not the first one you
25              Saw. Is that true?
```

```
1            A:    That's true.

2            Q:    The first Bratz one?

3            A:    Right, that's true. You are going to keep

4             Asking me that same clarification.

5            Q:    Well, we may eventually run into it. That's why

6             I continue to ask.

7            A:    Okay.

8            Q:    So this is one of the ones that you saw back

9             When Carter was living with you in Kimberling

10            City, but it was after the first one you saw?

11            A:    Yes.

12            Q:    Did you have a particular discussion with Carter

13            About this drawing that we've marked as

14            Exhibit 735 back in that time period?

15            A:    I loved her fuzzy little sweater and her hair.

16            Q:    Did you mention that to Carter?

17            A:    Of course.

18            Q:    And this was back when Carter was living with

19            You in Kimberling City?

20            A:    Yes.

21            Would you please mark as Exhibit 736 a

22            Photograph of Exhibit 735.

23            (Exhibit 736 marked.)

24            Q:    (By Mr. Zeller) If I ask you

25            About Exhibit 736 as I asked you about 735,
```

```
 1              Would you give me the same answers?

 2         A:   Yes.

 3         Q:   Now, is it the case that this drawing that we've

 4          Photographed as Exhibit 736 is the drawing as

 5          You saw it back in Kimberling City; namely, it

 6          Was in color?

 7         A:   I don't remember whether or not it was in color.

 8         Q:   But it was in this form and this level of detail

 9          Whether it was in black and white or in color?

10         A:   To the best of my memory, yes, it was -- I don't

11          Know whether it was in black and white or in

12          Color.

13         Q:   But it was this drawing, Exhibit 736?

14         A:   To the best of my memory, yes.

15         Q:   Did it have that backpack there that says little

16          Star on it?

17         A:   I don't recall.

18         Q:   Do you remember if any of the drawings that you

19          Saw back when Carter was living with you in

20          Kimberling City had any accessories like that

21          With it? Backpacks or any other kind of

22          Accessory?

23         A:   Yes.

24         MR. ZELLER:  Let's mark as Exhibit 737 a

25          Document bearing Bates number Bryant 313.
```

1          Q:    (By Mr. Zeller) Directing your attention to

2          Exhibit 737.

3          Is this a drawing that you saw back when

4          Carter was living with you back in Kimberling

5          City, Missouri?

6          A:    I think so, but I can't be absolutely sure.

7          Q:    Is it your best recollection that you did?

8          A:    Yes.

9          Q:    And the drawing that you saw was in this form,

10          In other words, it had the face and the fashions

11          And the like all together as one figure?

12          A:    Yes.

13          **MR. ZELLER:**  Let's please mark as

14          Exhibit 738 a photograph of Exhibit 737.

15          (Exhibit 738 marked.)

16          Q:    (By Mr. Zeller) By the way with Exhibit 737

17          That drawing, did you ever have any discussions

18          With Carter about it?

19          A:    Probably. I don't recall what they were.

20          Q:    So you generally recall having a discussion or a

21          Conversation of some kind. You just aren't sure

22          What was said?

23          A:    Yes. If we saw them together, I'm sure I made

24          Comments or he made comments.

25          Q:    Directing your attention to Exhibit 738, which

1          Is a photograph of Exhibit 737.  Do you see

2          That?

3     A:   Yes.

4     Q:   If I asked you the same questions about

5          Exhibit 738 that I asked you about 737, would

6          Your answers be the same?

7     A:   Yes.

8     Q:   Now, did you, in fact, see Exhibit 737 and 738

9          This particular drawing in color back when

10         Carter was living with you in Missouri in

11         Kimberling City?

12    A:   I don't recall whether it was in color.

13    Q:   And so the record is clear then as to the

14         Exhibits we've marked and discussed thus far

15         Exhibits 701 through 739, you don't recall

16         Showing your husband, Tom, any of these drawings

17         Back in the time period when Carter was living

18         With you in Kimberling City; is that correct?

19    A:   I don't recall for certainty.

20    Q:   You don't recall for certainty showing him any

21         Of them?

22    A:   Not of these.

23    Q:   Now, with respect to these exhibits that we've

24         Marked so far Exhibit 701 through 739, did you

25         Show any of these to Ms. Galvano?

1     A:   I don't believe so. I believe the ones I showed

2      Her were the same ones I showed Tom.

3     Q:   Do you recall seeing any pencil drawings of any

4      Of the Bratz dolls or anything relating to Bratz

5      That was on this translucent type paper that

6      We've photographed here and shown in

7      Exhibit 740?

8     A:   I don't recall seeing them on transparency.

9      Very well could have been. I don't recall.

10     Q:   Let me show you what was previously marked as

11      Exhibit -- or excuse me I'm going to mark as

12      Exhibit 742 a one-page document which is a

13      Photograph of Exhibit 741.

14      (Exhibit 742 marked.)

15     Q:   Did you see Exhibit 742 at the time when Carter

16      Was living with you in Kimberling City?

17     A:   I could have. I don't recall.

18     Q:   (By Mr. Zeller) Is Exhibit 743 a drawing that

19      You saw back in the time period when Carter was

20      Living with you in Kimberling City?

21     A:   It looks like it.

22     Q:   And when you say it looks like it, is it your

23      Recollection you did see this drawing,

24      Exhibit 743, in that time period?

25     A:   It's my recollection. I can't be certain I'm

1          Right, but --

2          Q:    (By Mr. Zeller) Is Exhibit 744 a drawing that

3          You saw back when Carter was living with you in

4          Kimberling City?

5          A:    It looks the same as 743 in color.

6          Q:    Well, it is a photograph of it to be clear.

7          A:    I'm going to say yes to the best of my

8          Recollection.

9          Q:    And have you ever had a conversation with Carter

10         As to whether or not the actual

11         Three-dimensional Bratz dolls that were created

12         Were created from his drawings?

13         A:    Yeah.

14         Q:    (By Mr. Zeller) And what did you and Carter

15         Discuss in that regard?

16         A:    As far as how much they looked like his

17         Drawings, how much they were going to look like

18         His drawings, is that what you're asking me?

19         Q:    Yes, that's part of it.

20         A:    He told me that when the prototype came out, he

21         Was very pleased because they did look so much

22         Like his drawing and they did.

23         **MR. ZELLER:**  Please mark as Exhibit 753 a

24         One-page document bearing Bates number Bryant

25         180. And while we're at it, let's please mark

TUESDAY, JULY 1, 2008                    TRIAL DAY 18, MORNING SESSION

1        As Exhibit 754 a photograph of Exhibit 753.

2        (Exhibit 753-754 marked.)

3        Q:   (By Mr. Zeller) Did you see the drawing that's

4        Depicted here in Exhibit 753 and 754 --

5        A:   Yes.

6        Q:   -- back at the time when Carter was living with

7        You in Kimberling City?

8        A:   Yes, they look so familiar to me.

9        Q:   So you believe you did see them back then?

10       A:   I do believe I did see them, to the best of my

11       Recollection.

12       Q:   (By Mr. Zeller) Is the drawing that we've

13       Marked as Exhibit 756 a drawing that you saw

14       Back in the time that Carter was living with you

15       In Kimberling City?

16       A:   Yes.

17       Q:   And you remember this one?

18       A:   I remember this one.

19       Q:   Is this one that you talked with Carter about?

20       A:   I'm sure we did.

21       **MR. ZELLER:**  Please mark as Exhibit 757 a

22       One-page document bearing Bates number Bryant

23       175.

24       (Exhibit 757 marked.)

25       Q:   (By Mr. Zeller) Is Exhibit 757 a drawing that

1          You saw back in the time period when Carter was

2          Living with you in Kimberling City?

3     A:    I would say yes.

4     Q:    And you recall when you saw this drawing back in

5          That time period this drawing we marked as

6          Exhibit 757 that you recall seeing the

7          Handwriting on there and that description about

8          Hallidae?

9     A:    Yes. I don't remember the name 'Hallidae'

10         Specifically, but the drawing and the other

11         Narrative there, yes.

12    Q:    And you saw drawings for other characters other

13         Than Hallidae that we've marked here as

14         Exhibit 757 such as with Chloe where it had the

15         Same description about their likes and their

16         Pets and that sort of thing?

17    A:    Uh-huh, yes.

18    Q:    Directing your attention to the second page of

19         Exhibit 35.

20    A:    Yes.

21    Q:    Is this a drawing that -- and again let's set

22         Aside the handwriting so that doesn't get

23         Distracting.

24         Do you recognize the drawing that's here on

25         The second page of Exhibit 35 as being a drawing

TUESDAY, JULY 1, 2008                          TRIAL DAY 18, MORNING SESSION

```
 1          That Carter showed you back in the time period
 2          He was living with you in Kimberling City?
 3     A:   I can't say with an absolute certainty that that
 4          Is the drawing, but I saw many like that with
 5          That pose, a little less curvy initially.
 6     Q:   Is it your best recollection that you saw the
 7          Drawing portion that's here on the second page
 8          Of Exhibit 35 as a drawing that you saw back in
 9          The time period when Carter was living with you
10          In Kimberling City?
11     A:   I would say, yes. So close.
12     Q:   Well, it's your best recollection you saw this
13          Actual drawing; is that true?
14     A:   I would say yes.
15     Q:   So it's your best recollection that you showed
16          Tom this drawing that has the number Bryant 278
17          On it back in this time period when Carter was
18          Living with you in Kimberling City?
19     A:   Yes.
20     MR. ZELLER:  What number are we up to?
21          Please mark as Exhibit 758 a one-page drawing
22          Bearing Bates number Bryant 203.
23          (Exhibit 758 marked.)
24     Q:   (By Mr. Zeller) Do you recognize what we've
25          Marked as Exhibit 758?
```

TUESDAY, JULY 1, 2008                    TRIAL DAY 18, MORNING SESSION

```
 1          A:   Yes.
 2          Q:   Is this a drawing that you saw back in the time
 3           Period when Carter was living with you in
 4           Kimberling City?
 5          A:   Yes.
 6          Q:   Was this the first Bratz drawing he showed you?
 7          A:   I believe this was the first one.
 8          Q:   So this was the drawing that you had that
 9           Conversation with Carter about that you had
10           Described previously in your deposition when he
11           Came and knocked on your bedroom door and then
12           Showed you what we've marked as Exhibit 758; is
13           That correct?
14          A:   Yes.
15           (Exhibit 761 marked.)
16          Q:   (By Mr. Zeller) Is Exhibit 761 a drawing that
17           You saw back in the time when Carter Bryant was
18           Living with you in Kimberling City?
19          A:   I don't remember this one specifically like I do
20           The one of the four.
21          Q:   So you're not sure about Exhibit 761; is that
22           Correct?
23          A:   I'm not sure if I saw it, is that what you're
24           Asking me?
25          Q:   Yes, back in at that time period.
```

1    A:   This particular one, no. I know I saw one of

2     The four.

3    Q:   The one that we talked about previously that

4     We've marked as Exhibit 758, 759 and 760?

5    A:   Yes.

6    **MR. ZELLER:**  Please mark as Exhibit 767 a

7     One-page document bearing Bates number Bryant

8     202.

9     (Exhibit 767 marked.)

10    Q:   (By Mr. Zeller) Is this drawing that we've

11     Marked as Exhibit 767 a drawing that you saw

12     Back in the time period when Carter was living

13     With you in Kimberling City?

14    A:   It looks like it is. I can't say absolutely.

15    Q:   So you're not sure?

16    A:   I'm not sure.

17    **MR. ZELLER:**  Please mark as Exhibit 774 a

18     One-page document bearing Bates number Bryant

19     194.

20     (Exhibit 774 marked.)

21    Q:   (By Mr. Zeller) Directing your attention to

22     Exhibit 774. Is this a drawing that you saw

23     Back at the time when Carter was living with you

24     In Kimberling City?

25    A:   Yes.

1      Q:   And you specifically recall that; is that

2       Correct?

3      A:   Yes.

4      Q:   Just so the record is clear then, it's fair to

5       Say you don't have a recollection as to whether

6       Or not the word 'Bratz' was on this drawing back

7       When you saw it during that time period when

8       Carter was living with you in Kimberling City;

9       Is that correct?

10     A:   That's correct.

11     **MR. ZELLER:**   Let's mark as Exhibit 778 a

12      One-page document which is a photograph of a

13      Group Bratz drawing.

14      (Exhibit 778 marked.)

15     Q:   (By Mr. Zeller) Have you ever seen the drawing

16      That's photographed here in Exhibit 778?

17     A:   I have seen the drawing, yes.

18     Q:   And did you see it in this form colored in?

19     A:   I can't recall that I saw it in color.

20     Q:   So is it fair to say that you're not sure that

21      When you saw -- well, I'm sorry. Let's back up

22      For a second.

23      Is it fair to say that whether you saw it

24      In color or not, you saw this exact drawing

25      That's depicted here in Exhibit 778 back in the

```
 1          Time period when Carter was living with you in
 2          Kimberling City?
 3     A:    Yes.
 4     Q:    And you have a recollection of that; is that
 5          True?
 6     A:    Yes, I remember this little drawing of the four
 7          Of them.
 8     Q:    From that time period?
 9     A:    Yes.
10     Q:    But you're not sure whether you saw it colored
11          In or in black and white?
12     A:    I'm not sure. I probably did, but I'm not sure.
13     Q:    So let me see if I have an understanding of your
14          Testimony. So you're sure that you saw this
15          Drawing that we've marked as Exhibit 778 back in
16          That time period when Carter was living with you
17          In Kimberling City; right?
18     A:    Yes.
19     Q:    You're not sure one way or another whether or
20          Not the drawing you saw was in color or in black
21          And white?
22     A:    Right.
23     Q:    Now, you said that you at some point you said
24          Something along the lines of that you probably
25          Did. So now I'm just trying to understand what
```

```
1              You mean by that.  Is it your best recollection
2              That when you saw this drawing 778 that it was
3              In color or it was in black and white?
4         A:   When I first saw it, my best recollection is it
5              Was black and white.
6         Q:   And do you have a recollection of prior to the
7              Time that Carter left that you saw this drawing
8              In color?
9         A:   Not with certainty.
10        Q:   So that part you're not sure about?
11        A:   Right.
12        Q:   (By Mr. Zeller) Do you recognize Exhibit 779 as
13             A drawing that you saw back in the time period
14             When Carter was living with you in Kimberling
15             City?
16        A:   Yes.
17        Q:   You'll see that on this one there is a
18             Handwritten date, the lower right-hand corner
19             8/1998?
20        A:   Yes.
21        Q:   Was that handwritten date on the drawing when
22             You saw it?
23        A:   I don't recall that.
24        Q:   It's your best recollection that there were no
25             Dates on those drawings; is that true?
```

```
 1           A:   If there were, I wasn't looking at them.
 2           Q:   It's fair to say at least you don't have any
 3            Recollection of seeing any dates on those
 4            Drawings that Carter showed you back in the time
 5            Period when he was in Kimberling City?
 6           A:   No.
 7           Q:   That's fair to say?
 8           A:   That's fair to say.
 9           MR. ZELLER:   Please mark as Exhibit 781 a
10            One-page document bearing Bates number Bryant
11            208.
12            (Exhibit 781 marked.)
13           Q:   (By Mr. Zeller) Is Exhibit 781 a drawing that
14            You saw back in the time period when Carter was
15            Living with you in Kimberling City?
16           A:   Yes.
17           Q:   Back in the time period when you saw this and he
18            Was living with you in Kimberling City, did it
19            Have this notary stamp with the signatures on
20            It?
21           A:   No, I didn't see it.
22           Q:   Do you know for certain whether or not that
23            Notary stamp with the signatures was on the
24            Drawing at the time that you first saw it?
25           A:   I don't recall seeing the stamp on the drawing.
```

1    Q:   Let's please mark as Exhibit 783 a one-page

2         Photograph of a drawing depicting a -- a boy

3         Body.

4         (Deposition Exhibit No. 783 was marked

5         For identification.)

6    Q:   So then what I'm asking is a broader question.

7         Do you recall seeing any boy drawings that Carter

8         Did during the time period that Carter was living

9         With you in Kimberling City?

10   A:   Yes.

11   Q:   So you do remember at least seeing some, you're

12        Not --

13   A:   Boys, yes.

14   Q:   Right, some of the boy drawings?

15   A:   Boy stuff, yeah.

16   Q:   And has Carter ever said to you directly that he

17        Was the one who came up with the BRATZ boys?

18   A:   He didn't have to say it, I saw them.

19   Q:   And -- and when you say you saw them, what do

20        You mean?

21   A:   The drawings.

22   Q:   Back in 1998 or so?

23   A:   Yes, or so, I'm not sure exactly the month.

24   Q:   Well, are -- are you sure about the year?

25   A:   I would say, yes, '98.

```
 1              Q:   But you can't tell me when in 1998?

 2              A:   No. I cannot.

 3              Q:   So the record is clear then, the -- the first

 4               Time that you saw a drawing of any BRATZ boy

 5               Doll, was after you saw that first initial BRATZ

 6               Drawing that Carter had shown you in your

 7               Bedroom?

 8              A:   That's correct.

 9              Q:   For the reasons that you already talked about --

10              A:   Yes.

11              Q:   -- which was that he showed you boy drawings.

12               Back in the time period when he was living with you.

13               In Kimberling City?

14              A:   Yes.

15              Q:   And you recall having conversations with Carter

16               About the name Jade --

17              A:   Yes.

18              Q:   -- back when he was living with you in

19               Kimberling City?

20              A:   Yes.

21              Q:   Did you see that name written down on a drawing

22               Or some other kind of documents back in that time

23               Period?

24              A:   Yes.

25              Q:   So then with respect to that name, it was both
```

```
 1              Conversations you had with Carter and then you
 2              Saw it on -- on some kind of document?
 3         A:   Yes.
 4         Q:   Do you remember what kind of document you saw it
 5              On, whether it was a drawing or something else?
 6         A:   No. No.
 7         Q:   (By Mr. Zeller) Is Exhibit 789 a drawing that
 8              You saw back in that time period when Carter was
 9              Living with you in Kimberling City?
10         A:   I think so, but I would be guessing, it -- the
11              Hair looks so much like what he did.
12         Q:   (By Mr. Zeller) So you're not sure one way or
13              Another whether you saw Exhibit 789, this drawing
14              Here that we've marked, back in that time period
15              When Carter was living with you in
16              Kimberling City?
17         A:   There are things about it that look so familiar
18              To me as far as what I saw then, but to say that
19              The outfit is exactly that way and her hair and
20              The shoes, I can't say for certain.
21         Q:   So if I -- if I understand you correctly, tell
22              Me if I'm wrong --
23         A:   Okay.
24         MR. PAGE:  We will.
25         Q:   (By Mr. Zeller) -- there are some elements of it
```

```
 1          You think that you recognize from that time
 2          Period, but you're not sure as to whether you saw
 3          This particular drawing?
 4          A:   That's correct.
 5          MR. ZELLER:  No. Mark as -- yeah,
 6          Exhibit 790 a photograph of an original
 7          Carter Bryant drawing for Zoe, Z-O-E.
 8          (Deposition Exhibit No. 790 was marked
 9          For identification.)
10          Q:   (By Mr. Zeller) You'll see Exhibit 790 is a Zoe
11          Drawing?
12          A:   Yes.
13          Q:   And you'll see -- in the lower left-hand corner
14          Of this photograph, you'll see that there's the
15          Notary stamp and the signature lines?
16          A:   Yes.
17          Q:   Did you ever see a Zoe drawing that had that
18          Notary stamp and the -- the signature lines on it
19          Back in this time period when Carter was living
20          With you in Kimberling City?
21          A:   I don't recall having seen it.
22          Q:   (By Mr. Zeller) Is Exhibit 791 a drawing that
23          You saw back in the time period when Carter was
24          Living with you in Kimberling City?
25          A:   Yes, I believe it -- it is, yes.
```

1          Q:   And you saw it in this finished form with the

2           Details filled in and the backpack and as it's

3           Depicted here in Exhibit 791?

4          A:   I cannot say I saw it in its totally finished

5           Form with the backpack, but the little girl and

6           The outfit, I think that's Jade or Zoe.

7          Q:   Do you remember seeing the drawing of the -- the

8           Doll as is depicted here in Exhibit 791?

9          A:   Yes.

10          Q:   (By Mr. Zeller) Is Exhibit 792 a drawing that

11           You saw back in that time period when Carter was

12           Living with you in Kimberling City?

13          A:   As well as I can remember, I believe this was

14           Zoe, I'm not certain.

15          Q:   And -- and one thing to be clear about, I guess,

16           With -- with Exhibit 791 and 792 is, that you saw

17           These drawings of these two characters that we're

18           Talking about here, these drawings, when they

19           Were put together, where they had the head

20           Together with the body and the fashions and

21           Everything else complete --

22          A:   Yes.

23          Q:   (By Mr. Zeller) Do you recognize Exhibit 793 as

24           A drawing that you saw back in the time period when

25           Carter was living with you in Kimberling City?

```
 1              A:   I would say, yes, that looks like Cloe.

 2              Q:   And you remember seeing this drawing in this

 3               Form with these -- these fashions and the -- the

 4               Hairstyle and the shoes and everything else

 5               That's depicted here?

 6              A:   I can't be certain on every detail, but, like I

 7               Said, I saw so many fashions that were similar,

 8               I'm going to say yes.

 9              Q:   Is it the case that with respect to the drawing

10               That we've marked here as Exhibit 793, that you

11               Saw this drawing in -- in the same finished form?

12              A:   To my best recollection.

13              Q:   Please mark as Exhibit 794 a one-page document

14               Bearing Bates No. Bryant 206.

15               (Deposition Exhibit No. 794 was marked

16               For identification.)

17              MR. ZELLER:   I'm sorry, this is 794; right?

18              MS. BUCHAKJIAN:   Uh-huh.

19              MR. PAGE:   Yes.

20              Q:   (By Mr. Zeller) Okay. All right. Do you

21               Recognize Exhibit 794 as the drawing that you saw

22               Back in the time period when Carter was living

23               With you in Kimberling City?

24              A:   Yes. I remember the name Lupe as well.

25              Q:   So you remember the name Lupe?
```

```
 1          A:   Yes.
 2          Q:   L-U-P-E?
 3          A:   Yes.
 4          Q:   And -- and you remember it being on this
 5           Particular drawing as well, 794?
 6          A:   I don't remember if it was on there when -- I
 7           Remember the name, I don't remember if it was on
 8           The drawing when I saw the drawing, I remember
 9           The -- the drawing.
10          Q:   Let me try it this way then. It's fair to say
11           That you recall seeing Lupe written down on at
12           Least a drawing --
13          A:   Yes.
14          Q:   -- you're just not sure if it was this one?
15          A:   Yes.
16          Q:   Would you please mark as Exhibit 795 a one-page
17           Document bearing Bates No. Bryant 204?
18           (Deposition Exhibit No. 795 was marked
19           For identification.)
20          Q:   (By Mr. Zeller) Do you recognize Exhibit 795 as
21           A drawing that you saw back in the time period when
22           Carter was living with you in Kimberling City?
23          A:   Yes.
24          Q:   When you saw it, did it have that notary stamp
25           And the two signature lines on it?
```

```
1       A:   No.

2       Q:   It did not have it?

3       A:   No.

4       Q:   Would you please mark as Exhibit 796 a one-page

5        Document bearing Bates No. Bryant 201?

6        (Deposition Exhibit No. 796 was marked

7        For identification.)

8       Q:   (By Mr. Zeller) Have you had a chance to

9        Exhibit 796?

10      A:   Yes.

11      Q:   Is this a drawing that you saw back in the time

12       Period when Carter was living with you in

13       Kimberling City?

14      A:   Probably.

15      Q:   Well, you say probably. That's not really --

16      A:   I can't say --

17      Q:   -- an answer we can accept in a deposition;

18       Sorry.

19      A:   Sorry.

20      MR. PAGE:  Yeah, you can, it's a perfectly

21       Good answer.

22      Q:   (By Mr. Zeller) It's fair to say you don't --

23       You don't know for sure?

24      A:   Not for -- with certainty.

25      Q:   And you can't swear one way or another whether
```

```
 1              You saw this document --
 2         A:   That's correct.
 3         Q:   -- back in that time period?
 4         A:   But...
 5         Q:   I'm sorry, that's correct?
 6         A:   That's correct.
 7         Q:   And, so, it's fair to say that with respect to
 8              All the -- the documents that -- that we've
 9              Marked as exhibits and that we've shown you here
10              During the course of this, none of that's
11              Refreshed your recollection as to any particular
12              Drawings that you showed Ms. Galvano when she
13              Visited you there in Kimberling City?
14         A:   That's correct. I don't remember.
15         Q:   (By Mr. Zeller) I assume that since Carter
16              Started working with MGA you -- you have received
17              Money from Carter; is that right?
18         A:   Yes.
19         Q:   And -- and your husband, Tom, has as well?
20         A:   Yes.
21         Q:   And then so I guess overall -- and tell me if
22              I'm wrong -- it sounds like you would say that of.
23              The money and the things of value that Carter's
24              Given you since -- since working on BRATZ has been
25              About half a million?
```

1           A:   Yes.

2           Q:   And has that been to -- to you and Tom jointly

3            Or have there been separate?

4           A:   Jointly.

5           (EXCERPTS CONCLUDED.)                                    01:46
            **MR. NOLAN:**  YOUR HONOR, THAT CONCLUDES THE

6    PRESENTATION OF MGA'S WITNESS JANET BRYANT.

7           WE WOULD AT THIS TIME MOVE INTO EVIDENCE EXHIBITS

8    THAT ARE REFERENCED IN MS. BRYANT'S TESTIMONY THAT HAVE NOT

9    BEEN PREVIOUSLY OFFERED.

10           FOR THE COURT'S CONVENIENCE AND THE JURY'S            01:47

11   CONVENIENCE, CAN WE JUST HAVE THEM FLASHED ON THE SCreen SO

12   THAT WE KNOW WHAT WE'RE TALKING ABOUT, OR DO YOU WANT ME TO

13   JUST READ THE NUMBERS?

14           **THE COURT:**  WHY DON'T YOU READ THE NUMBERS.  THAT'S

15   WHAT WE'VE BEEN DOING UP TO THIS POINT.                       01:47

16           **MR. NOLAN:**  IT'S 734, 736, 744, 754, 767, 774, 778,

17   779, 781, 783, 795.

18           **THE COURT:**  VERY WELL.

19           THAT'S STIPULATED TO, COUNSEL?

20           **MR. ZELLER:**  NO OBJECTION.                         01:47

21           **THE COURT:**  VERY WELL.  THEY'RE ALL ADMITTED.

22           (EXHIBITS 734, 736, 744, 754, 767, 774, 778,

23            779, 781, 783, 795 RECEIVED.)

24           LET'S TAKE OUR MORNING BREAK AND YOU CAN CALL YOUR

25   NEXT WITNESS AFTER THE BREAK.                                 01:47

```
 1            MR. NOLAN:  THAT WILL BE A MATTEL WITNESS.  WE'VE

 2    AGREED THAT THEY CAN INTERRUPT OUR PRESENTATION OF THE

 3    EVIDENCE.

 4            THE COURT:  VERY WELL.

 5            (WHEREUPON, JURORS DEPART COURTROOM.)              02:16

 6            (WHEREUPON, A BRIEF RECESS WAS HELD.)

 7            (WHEREUPON, JURORS ENTER COURTROOM.)

 8            THE COURT:  MR. QUINN?

 9            MR. QUINN:  YES, YOUR HONOR.  MATTEL CALLS

10    FARHAD LARIAN.                                            02:16

11            THE CLERK:  DO YOU SOLEMNLY STATE THAT THE TESTIMONY

12    YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL

13    BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO

14    HELP YOU GOD?

15            THE WITNESS:  I DO.                                02:16

16            THE COURT:  HOLD ON ONE SECOND, MR. HOLMES.

17            COUNSEL, MAKE YOUR APPEARANCE FOR THE RECORD.

18            MS. MORGENTHALER:  ALISA MORGENTHALER OF CHRISTENSEN

19    GLASER, COUNSEL FOR NONPARTY FARHAD LARIAN.

20            ALSO, YOUR HONOR, IF I CAN JUST REMIND HIS HONOR OF  02:17

21    THE AGREEMENT LAST WEEK THAT MR. LARIAN'S TESTIMONY ON DIRECT

22    WOULD BE LIMITED TO 20 MINUTES.

23            THE COURT:  YES.  THAT WAS MY UNDERSTANDING.

24            RIGHT, MR. QUINN?

25            MR. QUINN:  THANK YOU, YOUR HONOR.                 02:17
```

```
 1              THE COURT:  MR. HOLMES, YOU MAY PROCEED.

 2              THE CLERK:  PLEASE STATE YOUR NAME FOR THE RECORD,

 3    SIR.

 4              THE WITNESS:  FARHAD LARIAN, A/K/A FRED.

 5                      DIRECT EXAMINATION                        02:17

 6    BY MR. QUINN:

 7    Q    GOOD MORNING, MR. LARIAN.  MY NAME IS JOHN QUINN, AND I

 8    REPRESENT MATTEL.

 9              YOU FOUNDED MGA WITH YOUR BROTHER ISAAC; CORRECT?

10    A    YES, I DID.                                           02:17

11    Q    AND YOU FOUNDED THAT COMPANY WITH SEED MONEY THAT HAD BEEN

12    PROVIDED BY YOUR PARENTS; IS THAT CORRECT?

13    A    I'M NOT SURE ABOUT THAT.  I THINK MY PARENTS LOANED THE

14    MONEY TO US, ACTUALLY.

15    Q    THEY PROVIDED SEED CAPITAL?  DO YOU RECALL THAT?        02:17

16              MR. NOLAN:  OBJECTION, YOUR HONOR.  VAGUE AND

17    AMBIGUOUS.

18              THE COURT:  SUSTAINED.

19              GO AHEAD.  CLARIFY, MR. QUINN.

20    BY MR. QUINN:                                               02:17

21    Q    DO YOU RECALL THAT YOUR PARENTS PROVIDED SEED CAPITAL TO

22    START THE COMPANY NOW KNOWN AS MGA?

23              THE COURT:  THAT WAS THE SAME QUESTION, COUNSEL.

24              WHAT DO YOU MEAN BY "SEED CAPITAL"?

25    BY MR. QUINN:                                               02:18
```

```
 1   Q    DO YOU RECALL THAT THEY PROVIDED SOME FUNDS TO START UP

 2   THE BUSINESS?

 3   A    I KNOW THEY HELPED US FINANCIALLY WITH THE BUSINESS.

 4   HAVING RECENTLY LOOKED AT SOME DOCUMENTS, I KNOW THEY gave US

 5   THE LOAN GUARANTEES; THEY PROVIDED -- THEY PUT UP THEIR CD AS A      02:18

 6   LOAN GUARANTEE AND WITHDRAW AGAINST IT TO GROW OUR BUSINESS.

 7   Q    AND THAT WAS THE MONEY THAT WAS USED TO START UP THE

 8   BUSINESS.

 9   A    I AM NOT SURE ABOUT THAT NOW.

10   Q    IF YOU COULD TAKE A LOOK AT YOUR DEPOSITION, PLEASE, SIR.      02:18

11   YOU'LL FIND IT OVER THERE TO YOUR RIGHT.  PAGE 204.  IT'S

12   PROBABLY IN THE FIRST VOLUME.  PAGE 204, LINES 12 TO 19.

13          MR. QUINN:  I'D REQUEST PERMISSION TO READ THAT,

14   YOUR HONOR.

15          THE COURT:  ANY OBJECTION?                                   02:19

16          MR. NOLAN:  NO OBJECTION.

17   BY MR. QUINN:

18   Q    QUESTION:  "IT'S YOUR RECOLLECTION THAT THE SEED MONEY,

19   THE CAPITAL, THAT WAS USED TO START UP MGA WAS MONEY THAT YOUR

20   PARENTS PROVIDED; RIGHT?"                                           02:19

21          ANSWER:  "MY BELIEF IS THAT THE -- OUR PARENTS' MONEY

22   IS WHAT STARTED THIS."

23   BY MR. QUINN:

24   Q    AND IT WAS ABOUT A SUM OF $100,000 THAT YOUR PARENTS

25   PROVIDED.                                                           02:19
```

```
 1   A    I DON'T REMEMBER THE EXACT AMOUNT.  AS I SAID, HAVING

 2   RECENTLY LOOKED AT SOME DOCUMENTS, I KNOW THEY GAVE US LOAN

 3   GUARANTEES, NOT ACTUAL CASH.

 4   Q    THE $100,000 NUMBER, HAVE YOU EVER TOLD ANYONE THAT YOUR

 5   PARENTS PROVIDED $100,000 TO START THE BUSINESS?                02:20

 6           MR. NOLAN:  OBJECTION.  RELEVANCY.  CALLS FOR

 7   HEARSAY.

 8           THE COURT:  OVERRULED.

 9           THE WITNESS:  I DON'T BELIEVE I SAID $100,000, NO.

10   BY MR. QUINN:                                                   02:20

11   Q    SIR, COULD YOU PLEASE LOOK AT -- THERE'S A TAB, 11669.

12   LET ME FIRST JUST ASK, DO YOU RECALL PARTICIPATING IN A

13   CONVERSATION WITH YOUR BROTHER ISAAC LARIAN AND AN INDIVIDUAL

14   NAMED MORAD ZARABI, A CONVERSATION THAT WAS RECORDED IN JANUARY

15   OF 2003?  DO YOU RECALL THAT, SIR?                              02:20

16   A    I DO.

17   Q    ALL RIGHT.

18           AND HAVE YOU SEEN THE TRANSCRIPT OF THAT

19   CONVERSATION?

20   A    NO, I HAVE NOT.                                            02:21

21   Q    IF YOU WOULD TAKE A LOOK AT THIS, YOU'LL SEE THAT IN THIS

22   EXHIBIT 11669 -- THE FIRST HALF OF IT IS IN -- I ASSUME THAT'S

23   THE FARSI LANGUAGE; IS THAT CORRECT?

24   A    I SEE FARSI AND ENGLISH MIXED.

25   Q    AND THEN BEHIND THAT, BEGINNING AT PAGE -- YOU'LL SEE DOWN  02:21
```

```
 1    IN THE LOWER RIGHT, MR. LARIAN, THERE ARE EXHIBIT NUMBERS, AND
 2    AT THE PAGE 11669-41, 0041, THERE BEGINS AN ENGLISH
 3    TRANSLATION.
 4          MR. NOLAN:  OBJECTION, YOUR HONOR.  LACK OF
 5    FOUNDATION.                                                      02:21
 6          THE COURT:  IT'S A QUESTION.
 7          YOU MAY ANSWER.
 8    BY MR. QUINN:
 9    Q    DO YOU SEE THAT, SIR?
10    A    I SEE PAGE 41, YES.                                         02:21
11    Q    AND DOES THIS APPEAR TO YOU TO BE A TRANSCRIPT OF THAT
12    RECORDED CONVERSATION THAT WE REFERRED TO EARLIER?
13    A    THAT'S YOUR REPRESENTATION.  IT'S THE FIRST TIME I'M
14    SEEING IT.
15          MR. QUINN:  YOUR HONOR, THIS IS A DOCUMENT AS TO          02:22
16    WHICH THERE'S NO DISPUTE ABOUT AUTHENTICITY.
17          THE COURT:  COUNSEL?
18          MR. NOLAN:  YOUR HONOR, WITH RESPECT TO AUTHENTICITY,
19    THE CORRECTION OF IT AND THE ADMISSIBILITY OF IT, WE'VE
20    RESERVED ALL OF THE OBJECTIONS, ESPECIALLY the LACK OF          02:22
21    FOUNDATION.
22          THE COURT:  WITH RESPECT TO AUTHENTICITY --
23          WHAT ARE YOU PROPOSING THIS TO BE, COUNSEL?
24          MR. QUINN:  THE TRANSCRIPT OF THE RECORDING OF A
25    CONVERSATION BETWEEN THOSE INDIVIDUALS AND THE ENGLISH         02:22
```

```
 1   TRANSLATION OF IT.  IT WAS PRODUCED BY MGA.

 2              THE COURT:  COUNSEL?

 3          MR. NOLAN:  THERE IS AN AGREEMENT THAT THIS

 4   REPRESENTS A TRANSLATION.  THERE'S NO AGREEMENT THAT THIS IS AN

 5   ACCURATE TRANSLATION OF THE ENTIRE CONVERSATION OF THE            02:22

 6   DOCUMENT.  AND IT ISN'T, YOUR HONOR.

 7              THE COURT:  That DOESN'T SOUND LIKE A STIPULATION.

 8          MR. QUINN:  BEYOND AUTHENTICITY, IT DOESN'T SOUND

 9   LIKE IT, YOUR HONOR.

10              THE COURT:  It DOESN'T EVEN SOUND LIKE WE HAVE AN      02:23

11   AUTHENTICITY.

12          MR. NOLAN:  I APOLOGIZE.  I BELIEVE THAT THIS IS A

13   DOCUMENT THAT WAS IN THE FILES OF MGA, BUT WHAT WE'RE SAYING IS

14   THAT THERE IS NO AGREEMENT THAT IT IS AN ACCURATE TRANSCRIPTION

15   OF THE ENTIRE CONVERSATION.  AND ON 403 GROUNDS, YOUR HONOR, WE   02:23

16   WOULD HAVE TO GO INTO HOW THIS DOCUMENT WAS PREPARED AND WHY

17   IT'S NOT A VERBATIM TRANSCRIPT OF THE ACTUAL RECORDING.

18              THE COURT:  VERY WELL.

19              THE FOUNDATIONAL OBJECTION IS SUSTAINED AT THIS

20   POINT.                                                           02:23

21   BY MR. QUINN:

22   Q    MR. LARIAN, DO YOU RECALL, IN THE COURSE OF THIS

23   CONVERSATION WITH YOUR BROTHER AND MR. ZARABI, MAKING THE

24   STATEMENT THAT YOUR PARENTS HAD PROVIDED $100,000 TO START THE

25   BUSINESS THAT'S NOW KNOWN AS MGA?  DO YOU RECALL THAT?           02:23
```

1          **MR. NOLAN:**  OBJECTION.  HEARSAY, YOUR HONOR.

2          **THE COURT:**  OVERRULED.

3          **THE WITNESS:**  I DON'T RECALL.

4   **BY MR. QUINN:**

5   Q    ONE WAY OR THE OTHER?                                    02:23

6   A    IT'S FIVE, SIX YEARS AGO; SOME PERIOD OF MY LIFE THAT I

7   WANT TO FORGET ABOUT.  AND I HAVE FORGOTTEN ABOUT MOST OF IT.

8   Q    YOU JUST DON'T RECALL.

9   A    I DON'T RECALL.

10  Q    YOU MIGHT HAVE SAID IT, YOU MIGHT NOT HAVE SAID IT, YOU   02:24

11  JUST DON'T REMEMBER.

12  A    I DON'T REMEMBER.

13  Q    TAKE A LOOK, THEN, AT PAGE 105, WITHIN EXHIBIT 11669-105.

14  A    OKAY.

15  Q    DIRECTING YOUR ATTENTION TO A PARAGRAPH IN THE BEGINNING  02:24

16  OF THE PAGE -- DON'T READ IT OUT LOUD, BUT THERE'S A PARAGRAPH

17  THAT BEGINS "YES."

18          DO YOU SEE THAT?

19  A    YES.

20  Q    IF YOU WOULD JUST TAKE A MOMENT TO READ THAT PARAGRAPH TO  02:24

21  YOURSELF.

22  A    OKAY.

23  Q    HAVING READ THAT, DO YOU NOW RECALL THAT YOU MADE A

24  STATEMENT THAT YOUR PARENTS HAD PROVIDED $100,000 TO START UP

25  THE BUSINESS?                                                 02:25

```
 1   A     NO, I DON'T.  AND THIS DOCUMENT DOESN'T SAY WHO SAID WHAT.

 2   Q     SO YOU'RE JUST NOT SURE IF THAT'S SOMETHING YOU SAID.

 3   A     IT'S VERY POSSIBLE MORAD SAID IT.

 4   Q     BUT IN ANY EVENT, YOU WERE ONE OF THE CO-FOUNDERS OF THE

 5   BUSINESS NOW KNOWN AS MGA; CORRECT?                          02:25

 6   A     YES.

 7   Q     AND YOU WERE A 50-PERCENT OWNER OF THE COMPANY; YOU OWNED

 8   HALF OF THE COMPANY UNTIL SOMETIME IN THE 1985 TO 1986 TIME

 9   FRAME.

10   A     YES, I WAS.                                            02:25

11   Q     AND AT THAT POINT, YOU BECAME A 45-PERCENT OWNER BECAUSE

12   SOMEONE ELSE BOUGHT AN INTEREST IN THE COMPANY; IS THAT TRUE?

13   A     THAT'S TRUE.

14   Q     AND YOU CONTINUED TO BE A 45-PERCENT OWNER OF MGA UNTIL

15   DECEMBER OF 2000; IS THAT CORRECT?                           02:26

16   A     THAT'S CORRECT.

17   Q     AND AS I UNDERSTAND IT, DURING THAT TIME PERIOD, YOU WERE

18   ALSO A DIRECTOR; YOU WERE ON THE BOARD OF DIRECTORS OF MGA.

19   A     YES, I WAS.

20   Q     AND YOU WERE ALSO AN OFFICER OF THE COMPANY.  I THINK YOU   02:26

21   WERE THE TREASURER AND AN EXECUTIVE VICE PRESIDENT; CORRECT?

22   A     MAYBE NOT AT THE SAME TIME, BUT I HAD DIFFERENT TITLES

23   THROUGHOUT THE HISTORY OF THE COMPANY.

24   Q     RIGHT.

25         BUT THEN IN DECEMBER OF 2000, YOU SOLD YOUR STOCK,      02:26
```

```
 1   YOUR 45-PERCENT INTEREST IN THE COMPANY, TO YOUR BROTHER; IS
 2   THAT CORRECT?
 3   A    CORRECT.
 4   Q    AND YOU SOLD IT FOR, LIKE, $8.7 MILLION, $8.8 MILLION,
 5   SOMETHING LIKE THAT; CORRECT?                                    02:26
 6   A    CORRECT.
 7   Q    AND THEN AFTER THAT, YOU BECAME A PAID CONSULTANT FOR MGA;
 8   CORRECT?
 9   A    THE CONSULTANCY WAS PART OF THE AGREEMENT.  IT WAS A WAY
10   FOR MY UNCLE TO PAY ME SOME EXTRA MONEY AND ALSO TO HELP THEM    02:27
11   OUT FOR A FEW MONTHS.
12   Q    YOU RECEIVED $7,500 A MONTH UNTIL SOMETHING LIKE DECEMBER
13   OF 2005 AS A CONSULTANT.
14   A    CORRECT.
15   Q    AND AS A CONSULTANT, YOUR DUTIES INCLUDED ADDRESSING        02:27
16   TRADEMARK ISSUES, SHIPPING ISSUES, AND LITIGATION SUPPORT;
17   CORRECT?
18   A    EARLY ON FOR THE FIRST YEAR AND A HALF, I WOULD SAY.
19   Q    THOSE WERE YOUR DUTIES AS A CONSULTANT; CORRECT?
20   A    YES.                                                        02:27
21   Q    AND THEN IN 2005, YOU ACTUALLY BROUGHT A CLAIM, A LAWSUIT,
22   AGAINST YOUR BROTHER RELATING TO THE STOCK SALE, ALLEGING THAT
23   HE HAD DEFRAUDED YOU; CORRECT?
24           MR. NOLAN:  OBJECTION, YOUR HONOR.  RELEVANCE; 403.
25           THE WITNESS:  NOT CORRECT.                               02:27
```

```
 1              THE COURT:  WAIT ONE SECOND.

 2              PERMIT IT AS FOUNDATION, COUNSEL.

 3              OVERRULED.

 4    BY MR. QUINN:

 5    Q    YOU BROUGHT A CLAIM AGAINST YOUR BROTHER, ALLEGING THAT HE    02:28

 6    HAD CONCEALED CERTAIN FACTS FROM YOU IN CONNECTION WITH THE

 7    STOCK SALE; ISN'T THAT RIGHT?

 8    A    YOUR LAST QUESTION SAID IN 2005.  IN 2005, I DIDN'T MAKE A

 9    CLAIM.

10    Q    I GOT THE DATE WRONG.                                        02:28

11              WHEN WAS IT THAT YOU BROUGHT THIS CLAIM AGAINST YOUR

12    BROTHER?

13    A    2003.

14    Q    AND THE CLAIM WAS, AMONG OTHER THINGS, THAT HE HAD

15    CONCEALED IMPORTANT FACTS FROM YOU WHEN HE BOUGHT YOUR STOCK;     02:28

16    CORRECT?

17    A    THAT'S WHAT I BELIEVE.

18    Q    AND ONE OF THE THINGS THAT YOU BELIEVE HE HAD CONCEALED

19    FROM YOU IN DECEMBER OF 2000 IS THE FACT THAT HE HAD BEEN

20    DEVELOPING THIS BRATZ DOLL; CORRECT?                              02:28

21    A    THAT WAS THE BASIS OF MY LAWSUIT, YES.

22    Q    RIGHT.

23              AND YOU THOUGHT HE HAD BEEN DEVELOPING THIS FOR SOME

24    PERIOD OF TIME SECRETLY, AND HE HAD KEPT THIS FROM YOU;

25    CORRECT?                                                          02:28
```

```
 1   A    I THINK THE BETTER ANSWER IS, I WAS -- I HAD TAKEN MYSELF

 2   OUT OF THE LOOP; SO SECRETLY I DON'T THINK IT WAS A SECRET IN

 3   THE COMPANY, SO...

 4   Q    NOT MY QUESTION, SIR.

 5        I'M FOCUSING ON THE CLAIM THAT YOU BROUGHT AGAINST          02:29

 6   YOUR BROTHER.

 7        AND THE CLAIM THAT YOU BROUGHT WAS, HE HAD KEPT FROM

 8   YOU INFORMATION ABOUT DEVELOPMENT OF THIS BRATZ DOLL AT THE

 9   TIME OF THE STOCK SALE IN DECEMBER OF 2000; RIGHT?

10   A    THAT'S WHAT I ALLEGED.                                      02:29

11   Q    THAT HE KEPT THAT SECRET FROM YOU?

12   A    THAT'S WHAT I ALLEGED, YES.

13   Q    AND YOU HAD COLLECTED EVIDENCE RELATING TO YOUR CLAIMS

14   AGAINST YOUR BROTHER; CORRECT?

15        MR. NOLAN:  OBJECTION, YOUR HONOR.  LACK OF                 02:29

16   FOUNDATION; ALSO VAGUE AND AMBIGUOUS.

17        THE COURT:  REPHRASE YOUR QUESTION.

18   BY MR. QUINN:

19   Q    DURING THE TIME THAT YOU WERE A CONSULTANT, YOU HAD

20   DOWNLOADED E-MAILS FROM THE MGA SERVER ONTO A UBS [SIC] DEVICE.  02:29

21   A    NO.

22   Q    YOU HAD A UBS [SIC] DEVICE WHICH HAD SOME E-MAILS ON IT.

23   A    YOU MEAN A USB DEVICE?  I DID, YES.

24   Q    SO YOU HAD COLLECTED SOME E-MAILS; CORRECT?

25   A    I HAD E-MAILS IN THE COURSE OF MY WORK AT MGA AND DURING    02:30
```

```
 1   THE CONSULTANCY PERIOD.

 2   Q    AND YOU ALSO HAD COLLECTED SOME DECLARATIONS AND SOME

 3   DRAFT DECLARATIONS; CORRECT?

 4   A    TIME PERIOD, PLEASE.

 5   Q    PRIOR TO BRINGING THIS CLAIM AGAINST YOUR BROTHER, YOU HAD        02:30

 6   COLLECTED SOME DECLARATIONS AND DRAFT DECLARATIONS.

 7   A    NO.

 8   Q    WHEN DID YOU DO THOSE?  WHEN DID YOU GET THE DECLARATIONS

 9   AND THE DRAFT DECLARATIONS?

10   A    AFTER I BROUGHT THE LAWSUIT, SO...                               02:30

11   Q    SO YOU WENT AROUND AND COLLECTED THOSE FROM PEOPLE.

12   A    I THINK 2005.

13   Q    OKAY.

14        AND YOU ALSO HAD SOME INFORMATION YOU HAD COLLECTED

15   ABOUT BRATZ ROYALTIES; YOU HAD SOME SPREADSHEETS.                     02:30

16   A    I WAS DOING ROYALTIES WHILE I WAS A CONSULTANT FOR MGA.

17   Q    YOU HAD THAT INFORMATION AS WELL.

18   A    I DID, YES.

19   Q    AND YOU HAD SOME DOCUMENTS ABOUT TRADEMARKS AND THINGS

20   CONCERNING BRATZ WHICH YOU HAD ALSO COLLECTED AS PART OF YOUR         02:31

21   INVESTIGATION.

22   A    NO.  AGAIN, I WAS -- LET ME THINK -- I WAS DOING THE

23   TRADEMARKING FOR MGA BEFORE I BROUGHT THE LAWSUIT.

24   Q    RIGHT.

25        BUT YOU HAD INFORMATION ABOUT BRATZ TRADEMARKS;                  02:31
```

```
 1   CORRECT?

 2   A    I DID.  AS I SAID, I WAS DOING THE TRADEMARKING.

 3   Q    FOR WHATEVER REASON, YOU HAD THAT -- CONCERNING ROYALTIES

 4   AND OTHER E-MAILS RELATING TO BRATZ AS WELL; CORRECT?

 5   A    CORRECT.                                                  02:31

 6   Q    IN TOTAL, I THINK YOU HAD SOME TEN TO 15 BOXES OF

 7   INFORMATION THAT YOU HAD GIVEN YOUR ATTORNEYS; CORRECT?

 8   A    I THINK TEN TO 15 BOXES INCLUDED PLEADINGS, AND I THINK BY

 9   THE TIME YOU'RE REFERRING TO, 2005 -- BY THE TIME THAT I

10   DROPPED THE LAWSUIT, THERE MAY HAVE BEEN TEN TO 15 BOXES.       02:31

11   Q    THAT WAS THE VOLUME OF INFORMATION THAT YOU HAD; CORRECT?

12   A    SOUNDS RIGHT.  AS I SAID, MULTIPLE COPIES OF SOME

13   PLEADINGS, MAYBE, AND OTHER THINGS.

14   Q    OKAY.

15         AND THEN YOU ULTIMATELY DISMISSED YOUR CLAIMS AGAINST     02:32

16   ISAAC LARIAN; CORRECT?

17   A    YES, I DID.

18   Q    AND YOU DID THAT IN ORDER TO -- YOU HOPED TO FACILITATE

19   FAMILY HARMONY?

20   A    THAT WAS ONE OF THE REASONS.                              02:32

21   Q    A FEW DAYS AFTER DROPPING THAT LITIGATION, YOU GOT RID OF

22   ALL OF THOSE DOCUMENTS YOU HAD COLLECTED IN CONNECTION WITH

23   YOUR CASE; CORRECT?

24   A    NOT CORRECT.

25   Q    WELL, YOU HAD THIS -- WHAT DO YOU CALL IT? -- USB DEVICE?  02:32
```

```
 1   A     YES.

 2   Q     YOU ERASED THAT; CORRECT?

 3   A     I PROBABLY ERASED IT.  I USED THE USB DEVICE IN THE COURSE

 4   OF BUSINESS.  SO AFTER I HAD GIVEN IT TO MY ATTORNEY AND THEY

 5   HAD MADE THEIR OWN COPY, WHEN I GOT IT BACK, if I NEEDED TO PUT      02:33

 6   OTHER THINGS ON THE USB DEVICE, I WOULD.

 7   Q     AND THESE VARIOUS DOCUMENTS YOU HAD COLLECTED, E-MAILS AND

 8   THINGS RELATED TO BRATZ, YOU DESTROYED THOSE?

 9   A     SOME OF THEM.  NOT ALL OF THEM.

10   Q     THIS TEN TO 12 BOXES OF DOCUMENTS, YOU DON'T HAVE THOSE        02:33

11   ANYMORE.  THEY DON'T EXIST.

12   A     THAT'S NOT TRUE.

13   Q     YOU HAVE THEM?

14   A     I HAVE A LOT OF THEM.  I DO HAVE A LOT OF THEM.

15   Q     SO YOU'RE SAYING THE INFORMATION THAT YOU HAD COLLECTED       02:33

16   RELATED TO BRATZ FOR YOUR CASE, YOU STILL HAVE THAT.

17   A     WHATEVER I HAVE HAD, WHATEVER I HAD, I GAVE TO MY

18   ATTORNEY, AND I KNOW THEY GAVE YOU 12,000 PAGES OF DOCUMENTS.

19   TO SAY I DON'T HAVE IT, IT'S A MISCHARACTERIZATION.

20   Q     SIR, YOU ERASED WHATEVER WAS ON THE USB DEVICE; CORRECT?      02:33

21   A     AS I SAID, IN THE COURSE OF BUSINESS, I USE A USB DEVICE

22   FOR MY WORK, FOR MY KIDS' HOMEWORK, AND WE OVERWROTE

23   INFORMATION ON IT.  IF I DIDN'T NEED THE INFORMATION ON THE USB

24   DEVICE, OF COURSE, I ERASED IT.

25   Q     BUT YOU INDICATED THAT YOU GOT RID OF INFORMATION BECAUSE     02:34
```

```
 1   YOU DIDN'T WANT TO BE DEPOSED.

 2   A    THAT WAS ONE OF MY CONCERNS, YES.

 3   Q    YOU DIDN'T WANT IT TO BE AVAILABLE TO MATTEL; CORRECT?

 4   A    THAT'S NOT WHAT I SAID.  I SIMPLY DID NOT WANT TO DEAL

 5   WITH THIS ANYMORE.                                              02:34

 6   Q    NOW, AT THE TIME THAT YOU DID WHAT YOU DID, THAT YOU GOT

 7   RID OF THE INFORMATION THAT YOU GOT RID OF, YOU KNEW THAT

 8   MATTEL HAD THIS DISPUTE WITH YOUR BROTHER; CORRECT?

 9   A    I KNEW THAT MATTEL HAD A DISPUTE SINCE 2004.

10   Q    SO YOU KNEW THIS CASE WAS PENDING AT THE TIME YOU GOT RID  02:34

11   OF THE INFORMATION THAT YOU GOT RID OF; CORRECT?

12   A    I KNEW THAT, AND I ALSO KNEW THAT I HAD NO LEGAL OR

13   CONTRACTUAL OBLIGATION TO MATTEL TO PRESERVE ANY DOCUMENTS.

14   Q    AND DID YOU GET SOME LEGAL ADVICE FROM SOMEBODY THAT EVEN

15   THOUGH THERE'S A CASE PENDING AND IT RELATES TO CLAIMS THAT ARE 02:35

16   SIMILAR TO THE CLAIMS THAT YOU BROUGHT, IT'S PERFECTLY OKAY FOR

17   YOU TO GET RID OF THAT INFORMATION?

18         MS. Morgenthaler:  OBJECTION.  ATTORNEY-CLIENT

19   PRIVILEGE.

20         THE COURT:  SUSTAINED AS PHRASED.                         02:35

21   BY MR. QUINN:

22   Q    DID YOU GET RID OF THIS INFORMATION THAT YOU HAD COLLECTED

23   IN CONNECTION WITH YOUR FRAUD CASE AGAINST YOUR BROTHER

24   RELATING TO BRATZ -- DID YOU GET RID OF THAT INFORMATION AT

25   YOUR BROTHER'S REQUEST?                                         02:35
```

1  A    NO, I DID NOT.

2  Q    IT'S TRUE, THOUGH, ISN'T IT, THAT YOUR BROTHER HAS TOLD

3  YOU PREVIOUSLY TO MAKE DOCUMENTS UNAVAILABLE IN LITIGATION?

4  ISN'T THAT TRUE?

5           **MR. NOLAN:**  OBJECTION, YOUR HONOR.  RELEVANCE; 403;    02:35

6  LACK OF FOUNDATION; AND ALSO HEARSAY.

7           **THE COURT:**  OVERRULED.

8  **BY MR. QUINN:**

9  Q    SIR, IT'S TRUE THAT IN CONNECTION WITH OTHER LITIGATION,

10 YOUR BROTHER HAS TOLD YOU TO MAKE DOCUMENTS UNAVAILABLE; ISN'T   02:36

11 THAT TRUE?

12 A    I WANT TO ANSWER, IF I CAN GO BACK FOR A SECOND.

13          I'VE PROVIDED YOU 12,000 PAGES OF DOCUMENTS.  SORRY,

14 I LOST TRACK OF MY...

15          IS IT TRUE?  I THINK I KNOW WHAT YOU'RE REFERRING TO.   02:36

16          IN 2000, ISAAC AND I WERE BICKERING AT EACH OTHER,

17 AND WE WERE PLAYING A TIT-FOR-TAT GAME, AND HE DIDN'T WANT ME

18 INVOLVED IN LITIGATION AT THE TIME BECAUSE I HAD SCREWED UP

19 SOME CASE IN TEXAS; SO HE SIMPLY DIDN'T WANT ME TO DEAL WITH

20 THE ATTORNEYS IN THAT CASE.                                     02:36

21 Q    THAT MAY BE THE ANSWER TO A DIFFERENT QUESTION, SIR.

22          MY QUESTION IS, IT'S TRUE THAT YOUR BROTHER HAS TOLD

23 YOU PREVIOUSLY TO MAKE DOCUMENTS UNAVAILABLE IN LITIGATION?

24 THAT'S HAPPENED BEFORE; TRUE?

25 A    WHAT HAPPENED WAS, IN THE FIREMAN'S FUND CASE, AS I SAID,   02:37

```
 1  WE WERE PLAYING TIT-FOR-TAT; WE WERE BICKERING AT EACH OTHER;

 2  AND HE DID NOT WANT ME INVOLVED IN THE CASE.  THERE WAS ONE

 3  DOCUMENT THAT WE HAD GIVEN COPIES OF TO THE ATTORNEYS, AND THE

 4  ORIGINAL WAS EXACTLY THE SAME AS THE COPY.  HE SIMPLY DIDN'T

 5  WANT ME INVOLVED IN THE CASE, AND THAT'S WHY HE TOLD ME NOT TO    02:37

 6  GIVE IT.

 7  Q    SO HE TOLD YOU IN THAT CASE NOT TO MAKE THE LEGIBLE

 8  ORIGINALS AVAILABLE TO FIREMEN'S FUND; CORRECT?  THAT'S WHAT HE

 9  TOLD YOU?

10  A    BECAUSE HE WAS GOING TO HANDLE IT HIMSELF.                   02:37

11  Q    YOU WROTE AN E-MAIL ABOUT THIS; CORRECT?

12  A    YES.

13  Q    YOU DIDN'T MAKE ANY MENTION OF THE FACT IN THE E-MAIL THAT

14  HE WAS GOING TO HANDLE IT HIMSELF, DID YOU?

15  A    AS I SAID, WE WERE PLAYING TIT-FOR-TAT, AND I WAS TRYING     02:38

16  TO SAY, 'I GOT YOU,' AND HE WAS TRYING TO SAY HE GOT ME; SO WE

17  HAD -- WE HAD A SIBLING RIVALRY.

18  Q    AND THE 'I GOT YOU' THAT YOU GAVE TO HIM WAS THAT YOU

19  REMINDED HIM THAT IN THIS FIREMAN'S FUND CASE, HE HAD

20  INSTRUCTED YOU NOT TO MAKE SOME ORIGINAL DOCUMENTS AVAILABLE,     02:38

21  AND YOU SAID, 'I DID IT ANYWAY.'

22        YOU SAID YOU DID IT ANYWAY; CORRECT?

23  A    THAT'S TRUE.

24  Q    NOW, AFTER YOU DISMISSED YOUR FRAUD CASE AGAINST

25  MR. LARIAN RELATING TO YOUR ALLEGATIONS OF CONCEALMENT OF        02:38
```

```
 1   BRATZ, HE WENT TO COURT AND GOT AN ATTORNEY'S FEES AWARD
 2   AGAINST YOU; CORRECT?
 3   A    YES, HE DID.
 4   Q    FOR $1 MILLION; CORRECT?
 5   A    YES, HE DID.                                            02:39
 6   Q    THAT'S STILL HANGING OVER YOU TO THIS DAY; ISN'T THAT
 7   TRUE?
 8   A    NO, IT'S NOT.
 9   Q    HAVE YOU PAID IT?
10   A    NO, I HAVE NOT.                                         02:39
11   Q    HAS ANYBODY TAKEN CARE OF THAT, THAT YOU'RE AWARE OF?
12   A    TAKEN CARE OF IT, MEANING WHAT?
13   Q    LET ME ASK IT THIS WAY:  IT'S TRUE, ISN'T IT, THAT YOUR
14   BROTHER COULD, TOMORROW, GO EXECUTE AND TRY TO COLLECT THAT
15   MILLION DOLLAR ATTORNEY'S FEES AWARD?                       02:39
16   A    ALL HE HAS TO DO IS GIVE ME A CALL AND I'LL WRITE HIM A
17   CHECK.
18   Q    HAS HE GIVEN YOU THAT CALL YET?
19   A    NO.
20   Q    HE COULD GIVE IT TO YOU TOMORROW.                      02:39
21   A    IF HE WANTS TO, HE CAN.  HE PROMISED ME HE WOULDN'T
22   COLLECT IT.  IF HE WANTs TO, he can.
23   Q    HAVE YOU EVER HEARD OF SOMETHING CALLED A SATISFACTION OF
24   JUDGMENT THAT SOMEBODY CAN FILE WITH THE COURT TO ABSOLUTELY
25   ELIMINATE THE CLAIM?  HAVE YOU EVER HEARD OF THAT?          02:39
```

1    A     NO, I HAVE NOT.

2    Q     SO HE COULD PLACE THAT CALL AS SOON AS YOU GET OFF THE

3    STAND HERE, AFTER YOUR TESTIMONY IS DONE.

4    A     HE COULD HAVE DONE IT YESTERDAY.  HE COULD DO IT -- I

5    DON'T KNOW WHAT THE TIME LIMIT IS FOR HIM TO DO IT.  AS I SAID,      02:39

6    HE CAN JUST CALL ME, AND I'LL PAY HIM.

7    Q     THE DOCUMENTS THAT YOU COLLECTED THAT RELATED TO BRATZ AND

8    WHICH YOU DESTROYED, THOSE INCLUDE DOCUMENTS FROM THE 2000 TIME

9    PERIOD; CORRECT?

10   A     I AM NOT SURE.  WHEN I DROPPED THE LAWSUIT, I THREW TWO OR      02:40

11   THREE OF THE BOXES AWAY.  THEN I GOT A LETTER FROM YOU ASKING

12   ME TO PRESERVE THEM.  I DIDN'T KNOW THE LETTER WAS NOT A LEGAL

13   OBLIGATION; IT WASN'T A SUBPOENA.  I PRESERVED THEM.  AND

14   THAT'S WHY YOU HAVE RECEIVED 12,000 PAGES OF DOCUMENTS.

15   Q     SIR, YOU DESTROYED DOCUMENTS RELATING TO BRATZ DATING FROM      02:40

16   THE 2000 TO 2001 TIME PERIOD; TRUE?

17   A     IT'S POSSIBLE.

18          **MR. QUINN:**  I'M SURE MY 20 MINUTES IS UP, YOUR HONOR.

19          **THE COURT:**  IT IS, COUNSEL.

20          **MS. MORGENTHALER:**  IT IS.                                  02:41

21          **THE COURT:**  THERE'S ONLY ONE JUDGE IN THIS COURTROOM,

22   SO I DON'T WANT ANSWERS GIVEN TO QUESTIONS DIRECTED TO THE

23   COURT BY ANY OTHER COUNSEL IN THIS COURTROOM.

24          THANK YOU.

25          **MR. QUINN:**  JUST THIS DEPOSITION PASSAGE, WITH THE         02:41

```
 1   COURT'S PERMISSION.

 2           THE COURT:  YOU MAY.

 3   BY MR. QUINN:

 4   Q    PAGE 54 OF YOUR DEPOSITION, SIR, LINES 1 TO 17.

 5           MR. QUINN:  REQUEST PERMISSION TO READ THAT,          02:41

 6   YOUR HONOR.

 7           THE COURT:  ANY OBJECTION, MR. NOLAN?

 8           MR. NOLAN:  IF I COULD, YOUR HONOR, REAL QUICKLY just

 9   READ IT.

10           THE WITNESS:  LINES 1 THROUGH...                      02:41

11           MR. QUINN:  1 THROUGH 17.

12           MR. NOLAN:  I'D LIKE TO HAVE IT CONTINUE TO PAGE 55,

13   FOR COMPLETENESS PURPOSES, LINE 14.

14           THE COURT:  VERY WELL.

15           ANY OBJECTION TO THAT, MR. QUINN?                     02:42

16           MR. QUINN:  JUST READING IT, YOUR HONOR.

17           THAT'S FINE, YOUR HONOR.

18           THE COURT:  VERY WELL.

19   BY MR. QUINN:

20   Q    QUESTION:  "THAT USB DEVICE HAD STORED ON IT E-MAILS FROM  02:42

21   MGA; CORRECT?"

22           ANSWER:  "YES."

23           QUESTION:  "AND THAT INCLUDED E-MAILS FROM THE 2000,

24   2001 TIME PERIOD?"

25           ANSWER:  "IT PROBABLY DID."                           02:42
```

1       QUESTION:  "THAT'S YOUR RECOLLECTION?"

2       ANSWER:  "YES."

3       QUESTION:  "SOME OF THOSE E-MAILS PERTAINED TO BRATZ;

4   CORRECT?"

5       ANSWER:  "I BELIEVE IT DID, YES."                          02:42

6       QUESTION:  "AND I TAKE IT AT SOME POINT THAT USB

7   DEVICE THAT YOU GAVE TO YOUR ATTORNEY -- I ASSUME IT WAS

8   BOB WILSON WHO GAVE YOU THE USB DEVICE."

9       ANSWER:  "I DON'T REMEMBER IF IT WAS BOB OR THE OTHER

10  ATTORNEY."                                                    02:42

11      QUESTION:  "IT WAS SOMEONE AT HIS FIRM?"

12      ANSWER:  "THERE WERE TWO FIRMS INVOLVED, SO COULD

13  HAVE BEEN RICH KELLNER."

14      QUESTION:  "OH, THEY WERE INVOLVED AT THE SAME TIME?"

15      ANSWER:  "YES."                                           02:43

16      QUESTION:  "SO THERE WAS BOB?"

17      ANSWER:  "NO, NO, NO.  AT ONE POINT, BOB QUIT, SO IT

18  WASN'T EXACTLY THE SAME TIME."

19      QUESTION:  "WELL, LET ME ASK IT THIS WAY:  YOU SAID

20  THAT TODAY THAT USB DEVICE IS AT YOUR HOME.  DID YOU GET IT    02:43

21  BACK FROM ONE OR MORE OF YOUR ATTORNEYS AT SOME POINT?"

22      ANSWER:  "YES, I DID."

23      QUESTION:  "AND ABOUT WHEN DID YOU DO THAT?"

24      ANSWER:  "AFTER I DROPPED THE LAWSUIT -- OR, NO,

25  MAYBE NOT.  SOMETIME; PROBABLY IN 2005."                      02:43

```
 1              THE COURT:  THANK YOU, COUNSEL.

 2              MR. QUINN:  THANK YOU, YOUR HONOR.

 3              THE COURT:  MR. NOLAN?

 4              MR. NOLAN:  THANK YOU.

 5                        CROSS-EXAMINATION                        02:43

 6  BY MR. NOLAN:

 7  Q    MR. LARIAN, JUST A COUPLE OF QUICK POINTS.

 8             WHEN YOU LEFT MGA AND RESIGNED AS A DIRECTOR, DID YOU

 9  STEAL ANY ORIGINAL DOCUMENTS FROM MGA?

10  A    I DON'T THINK SO.                                         02:44

11  Q    SO IS IT YOUR BEST BELIEF THAT ANY DOCUMENTS THAT YOU HAD

12  IN YOUR POSSESSION, WHETHER OR NOT IT WAS ON A USB OR IN BOXES,

13  WERE COPIES OF DOCUMENTS MAINTAINED AT MGA?

14  A    THEy WERE CERTAINLY THE COPIES.

15  Q    NOW, AFTER THE CONCLUSION OF THE ARBITRATION BETWEEN       02:44

16  YOURSELF AND ISAAC, IT'S TRUE THAT MGA ASKED YOU TO RETURN ALL

17  DOCUMENTS OF MGA ENTERTAINMENT IN YOUR POSSESSION; CORRECT?

18  A    YES, THEY DID.

19             MR. NOLAN:  YOUR HONOR, I'D LIKE TO APPROACH, IF I

20  MAY, WITH EXHIBIT 18569; AND I HAVE COPIES FOR THE COURT.       02:44

21  BY MR. NOLAN:

22  Q    I'D ASK YOU TO LOOK AT THE LETTER MARKED AS 18569, AND

23  NOTE THE DATE OF DECEMBER 30, 2005.

24             DO YOU SEE THAT?

25  A    YES, I DO.                                                 02:45
```

1            **MR. QUINN:**  I HAVE AN OBJECTION TO THE USE OF THIS

2     DOCUMENT.

3            **THE COURT:**  HE'S LAYING FOUNDATION AT THIS POINT.

4     HE'S NOT ASKING TO INTRODUCE IT.  I'M NOT REALLY SURE HOW HE

5     PLANS ON USING IT.                                          02:45

6            YOU MAY PROCEED, COUNSEL.

7     **BY MR. NOLAN:**

8     Q    DO YOU KNOW A PERSON NAMED RICHARD KELLNER?

9     A    YES, I DO.

10    Q    AND WHO'S RICHARD KELLNER?                             02:46

11    A    HE WAS MY ATTORNEY.

12    Q    DO YOU KNOW THE NAME OF A LAWYER BY THE NAME OF

13    ROBERT M. TURNER, FROM THE LAW FIRM OF KAYE SCHOLER?

14    A    YES, I DO.

15    Q    AND HOW DO YOU KNOW MR. TURNER?                        02:46

16    A    HE WAS ISAAC'S ATTORNEY.

17    Q    ISAAC'S ATTORNEY IN CONNECTION WITH WHAT MATTER?

18    A    MY LITIGATION WITH HIM.

19    Q    AND RICHARD KELLNER WAS YOUR LAWYER IN THE LITIGATION WITH

20    ISAAC.                                                      02:46

21    A    YES.

22            **MR. NOLAN:**  YOUR HONOR, WE'D OFFER 18569.

23            **MR. QUINN:**  OBJECTION.  IT WAS NOT PRODUCED.  IT'S

24    NOT PRODUCED IN DISCOVERY.

25            **THE COURT:**  COUNSEL?                            02:46

```
 1              MR. NOLAN:  LET ME GET A BATES NUMBER ON IT.

 2              I'LL MOVE OFF OF THIS AND COME BACK.

 3              THE COURT:  IF IT'S BEEN PRODUCED, YOU MAY USE IT;

 4   BUT IF NOT, you may not.

 5              MR. NOLAN:  I UNDERSTAND.                          02:46

 6   BY MR. NOLAN:

 7   Q    NOW, MR. LARIAN, YOU'VE NEVER BEEN A PARTY TO THE LAWSUIT

 8   WITH MATTEL; CORRECT?

 9   A    CORRECT.

10   Q    HAS ISAAC LARIAN EVER ASKED YOU TO DESTROY DOCUMENTS IN   02:47

11   CONNECTION WITH THIS LITIGATION?

12   A    NO.

13   Q    HAS ANYBODY FROM MGA EVER ASKED YOU TO DESTROY DOCUMENTS

14   RELATING TO THIS LITIGATION?

15   A    NEVER.                                                  02:47

16   Q    HAVE YOU EVER INTENTIONALLY DESTROYED DOCUMENTS RELATING

17   TO THIS LITIGATION?

18   A    I WANTED TO MOVE ON; AND, OBVIOUSLY, I DISCARDED

19   DOCUMENTS, SO...

20   Q    BEFORE YOU DESTROYED ANY OF THOSE TYPE OF DOCUMENTS, DID  02:47

21   YOU EVER ASK YOUR BROTHER FOR PERMISSION TO DO SO?

22   A    NEVER.

23   Q    DID YOU EVER ASK ANYBODY FROM MGA FOR PERMISSION TO DO

24   THAT?

25   A    NEVER.                                                  02:47
```

```
 1              THEY HAVE COPIES OF ALL OF THESE DOCUMENTS, SO...

 2              AND WHATEVER I HAD COLLECTED DURING THE LITIGATION,

 3    IF I HAD COLLECTED A FEW DECLARATIONS, THOSE WERE NOT MGA'S

 4    DOCUMENTS; THEY WERE MY DOCUMENTS.  AND I HAVE NO LEGAL

 5    OBLIGATION TO MATTEL TO PRESERVE ANY OF THOSE, OR TO MGA.      02:47

 6    Q    MR. LARIAN, MR. QUINN ASKED YOU ABOUT SOME OTHER

 7    LITIGATION INVOLVING FIREMEN'S FUND.

 8              DO YOU RECALL THAT QUESTION?

 9    A    I DO.

10    Q    SIR, DOES THAT LAWSUIT HAVE ANY CONNECTION AT ALL WITH   02:48

11    THIS LITIGATION?

12    A    NO, IT DOESN'T.

13    Q    IN THAT MATTER, YOU SAID THAT YOU WERE BICKERING WITH YOUR

14    BROTHER.

15    A    YES.                                                     02:48

16    Q    AND WITH RESPECT TO THE ORIGINAL OF A PARTICULAR DOCUMENT,

17    I WANT TO ASK YOU, WERE COPIES OF THE ORIGINAL PRESENTED IN

18    THAT LITIGATION?

19    A    YES, THEY WERE.  AND THOSE COPIES WERE, FOR THE MOST PART,

20    READABLE.                                                     02:48

21    Q    AND WAS THE NATURE OF THE DISPUTE IN THAT LITIGATION

22    BETWEEN YOU AND ISAAC -- WAS THAT SIMPLY ISAAC DID NOT WANT YOU

23    HANDLING IT BECAUSE HE THOUGHT YOU SCREWED IT UP AND HE DID NOT

24    WANT YOU PRODUCING DOCUMENTS; THAT HE WOULD PRODUCE DOCUMENTS?

25              **MR. QUINN:**  OBJECTION.  LEADING.                02:48
```

1          **THE COURT:**  SUSTAINED.

2          REPHRASE.

3          **MR. NOLAN:**  UNDER 611.

4          **THE COURT:**  FAIR ENOUGH.

5          OVERRULED.                                          02:49

6          **THE WITNESS:**  I KNEW I HAD SCREWED UP THE LITIGATION

7    IN TEXAS THAT LED TO THE COMPANY'S BANKRUPTCY, AND ISAAC WAS

8    VERY MAD AT ME.  HE DIDN'T WANT ME TO DO ANYTHING WITH THE

9    LITIGATION, SO...

10   **BY MR. NOLAN:**

11   Q    IN THAT LITIGATION, DID ISAAC EVER TELL YOU TO DESTROY THE

12   ORIGINAL?

13   A    NO.

14   Q    YOU FILED A LAWSUIT AGAINST ISAAC IN CONNECTION WITH YOUR

15   INVOLVEMENT AT MGA; CORRECT?                              02:49

16   A    THE SALE OF MY STOCKS.

17   Q    MR. QUINN ASKED YOU A SERIES OF QUESTIONS, AND ONE OF THE

18   ALLEGATIONS WAS THAT YOU CONTENDED THAT ISAAC LARIAN CONCEALED

19   FROM YOU THE DEVELOPMENT OF BRATZ WHILE YOU WERE WORKING AT

20   MGA; CORRECT?                                             02:49

21   A    YES.

22   Q    AND YOU FILED THAT LAWSUIT IN PUBLIC COURT; CORRECT?

23   A    YES.

24   Q    AND SUBSEQUENTLY, THE MATTER WENT TO ARBITRATION; CORRECT?

25   A    CORRECT.                                             02:50

1   Q    NOW, DURING THE COURSE OF THAT ARBITRATION, ISN'T IT

2   CORRECT THAT YOU DETERMINED, BASED ON EVIDENCE AND TESTIMONY OF

3   WITNESSES, THAT, IN FACT, BRATZ DEVELOPMENT WAS NOT CONCEALED

4   FROM YOU; CORRECT?

5   A    I LOOKED AT A FEW E-MAILS AND I DETERMINED THAT BRATZ --      02:50

6   THAT BASED ON THOSE E-MAILS, ISAAC DIDN'T THINK BRATZ WAS MUCH,

7   AND I GAVE HIM THE BENEFIT OF THE DOUBT AND I DROPPED THE

8   LAWSUIT.

9   Q    AND YOU DROPPED THE LAWSUIT VOLUNTARILY; CORRECT?

10  A    CORRECT.                                                      02:50

11  Q    AND YOU DROPPED THE LAWSUIT AFTER JENNIFER MAURUS

12  TESTIFIED IN THAT ARBITRATION; CORRECT?

13  A    CORRECT.

14  Q    AND SHE HAD BEEN A WITNESS FOR YOU IN THAT LITIGATION.

15  A    CORRECT.                                                      02:50

16  Q    YOU MENTIONED THAT AS A RESULT OF DROPPING THE LITIGATION,

17  ISAAC SOUGHT AND OBTAINED AN ORDER IMPOSING ATTORNEY'S FEES;

18  CORRECT?

19  A    CORRECT.

20  Q    AND YOU SAID THAT HE COULD CALL YOU AT ANY TIME AND YOU      02:51

21  WOULD WRITE HIM A CHECK TO PAY THAT; CORRECT?

22  A    CORRECT.

23  Q    WERE YOU AND ISAAC CLOSE TO YOUR FATHER?

24  A    VERY MUCH.

25  Q    TELL THE JURY WHEN YOUR FATHER DIED.                         02:51

```
1    A    JANUARY 20TH OF THIS YEAR.

2    Q    I'M SORRY.  JANUARY OF THIS YEAR?

3    A    JANUARY 20TH OF THIS YEAR.

4    Q    ISN'T IT TRUE THAT AFTER THESE PROCEEDINGS, ISAAC PROMISED

5    YOUR FATHER THAT HE WOULD NEVER COLLECT ON THAT AWARD?        02:51

6    A    HE PROMISED ME AND HE PROMISED MY FATHER -- AFTER THESE

7    PROCEEDINGS, HE PROMISED HE WOULD NEVER COLLECT THEM, SO...

8    Q    THERE WAS SOME TESTIMONY ABOUT SEED CAPITAL, AND I JUST

9    WANT TO GO BACK TO THAT.

10            WHEN DID YOU COME TO THE UNITED STATES?              02:52

11   A    1978.

12   Q    ARE YOU A CITIZEN?

13   A    YES, I AM.

14   Q    WHEN YOU CAME TO THE UNITED STATES, HOW OLD WERE YOU?

15   A    17.                                                      02:52

16   Q    WHO DID YOU LIVE WITH?

17   A    ISAAC.

18   Q    HOW LONG DID YOU LIVE WITH ISAAC?

19   A    UNTIL HE GOT MARRIED IN 1984.

20   Q    AND DURING THAT PERIOD OF TIME, YOU WERE WORKING, WEREN'T  02:52

21   YOU?

22   A    YES, I WAS.

23   Q    IN WHAT TYPE OF INDUSTRY?

24   A    I WAS A PIZZA DELIVERYMAN; I WAS A HANDYMAN, PAINTING

25   HOMES; AND I WAS A VALET PARKER.                             02:52
```

1    Q    YOU WORKED HARD FOR YOUR MONEY; RIGHT?

2    A    VERY MUCH.

3    Q    YOUR PARENTS WERE LIVING IN IRAN; CORRECT?

4    A    THEY CAME HERE IN THE EARLY '80S.

5    Q    BY U.S. STANDARDS, WERE THEY WEALTHY?                    02:53

6    A    NO.

7    Q    MR. LARIAN, IT'S TRUE THAT YOUR PARENTS PLEDGED A CD, A

8    CERTIFICATE OF DEPOSIT, AS COLLATERAL FOR A LOAN TO MGA AT SOME

9    POINT IN TIME; CORRECT?

10   A    THEY PLEDGED A CD, AND WE BORROWED AGAINST IT TO EXPAND   02:53

11   THE BUSINESS.

12   Q    DID YOU AND YOUR BROTHER REPAY THAT LOAN?

13   A    YES, WE DID.

14   Q    DID YOUR PARENTS EVER LOSE MONEY ON THE COLLATERAL THAT

15   THEY HAD POSTED?                                              02:53

16   A    NO.

17   Q    DO YOU LOVE YOUR BROTHER?

18   A    YES, I DO.

19   Q    THANK YOU.

20        **MR. NOLAN:**  NOTHING FURTHER.                         02:53

21        **THE COURT:**  ANYTHING FURTHER, MR. QUINN?

22        **MR. QUINN:**  YES, YOUR HONOR.

23   / / /

24   / / /

25   / / /

TUESDAY, JULY 1, 2008                    TRIAL DAY 18, MORNING SESSION

**REDIRECT EXAMINATION**

1

**BY MR. QUINN:**

2

3   Q   IN THIS FIREMAN'S FUND CASE, MR. LARIAN, YOUR BROTHER TOLD

4   YOU TO LIE AND SAY THAT THE ORIGINAL DOCUMENTS COULD NOT BE

5   FOUND; ISN'T THAT TRUE?                                          02:53

6   A   HE WANTED TO HANDLE THE CASE, AS I SAID.  I JUST WAS

7   PLAYING A GAME OF TIT-FOR-TAT, AND I WROTE HIM AN E-MAIL.  HE

8   DID NOT WRITE ME THE E-MAIL; I WROTE HIM THE E-MAIL.

9           **MR. QUINN:**  MOVE TO STRIKE THE ANSWER, YOUR HONOR.

10          **MR. NOLAN:**  IT WAS RESPONSIVE.                        02:54

11          **THE COURT:**  OVERRULED.

12          YOU MAY ASK ANOTHER QUESTION.  I'M NOT GOING TO

13  STRIKE IT.

14  **BY MR. QUINN:**

15  Q   IS IT TRUE THAT YOUR BROTHER TOLD YOU TO LIE AND SAY THE     02:54

16  ORIGINAL DOCUMENTS DID NOT EXIST?

17  A   IT'S TRUE THAT THAT'S WHAT I WROTE IN THE E-MAIL.  HE

18  WANTED TO HANDLE THE CASE BY HIMSELF.  HE WANTED ME OUT OF

19  LITIGATION.  ADMITTEDLY, I HAD CAUSED THE COMPANY TO HAVE TO

20  FILE FOR CHAPTER 11 BANKRUPTCY PROTECTION.  AND HE WANTED TO    02:54

21  HANDLE IT HIMSELF.

22          **MR. QUINN:**  MOVE TO STRIKE EVERYTHING AFTER THE FIRST

23  SENTENCE.

24          **THE COURT:**  IT DOES APPEAR TO BE NONRESPONSIVE AFTER

25  THE FIRST SENTENCE.                                             02:54

1          **MR. QUINN:**  I WOULD OFFER IN EVIDENCE, YOUR HONOR --

2     **BY MR. QUINN:**

3     Q    IF YOU TAKE A LOOK AT EXHIBIT -- IT SHOULD BE IN THE BOOK

4     THERE, MR. LARIAN -- EXHIBIT 13380.

5     A    OKAY.                                                              02:55

6     Q    THAT IS THE E-MAIL THAT YOU'RE REFERRING TO?

7     A    YES, IT IS.

8          **MR. QUINN:**  I'D OFFER THAT, YOUR HONOR, FOR

9     IMPEACHMENT.

10         **MR. NOLAN:**  OBJECTION.  IT'S NOT IMPEACHMENT; it's     02:55

11    HEARSAY AND IT CALLS FOR A LACK OF FOUNDATION; ALSO 403

12    GROUNDS.

13         **THE COURT:**  LAY A FURTHER FOUNDATION, COUNSEL.

14    **BY MR. QUINN:**

15    Q    SIR, THIS IS THE E-MAIL EXCHANGE THAT YOU'RE REFERRING TO   02:55

16    BETWEEN YOU AND YOUR BROTHER.

17    A    YES.

18    Q    THAT YOU HAVE TESTIFIED ABOUT.

19    A    YES, IT IS.

20    Q    AND THIS RELATES TO THIS FIREMAN'S FUND LITIGATION THAT     02:55

21    YOU ARE REFERRING TO.

22    A    YES.

23    Q    AND DO YOU RECALL THAT THERE WAS AN ISSUE ABOUT WHETHER

24    CERTAIN ORIGINAL DOCUMENTS THAT WERE NEEDED IN THE CASE COULD

25    BE FOUND BECAUSE THE COPIES THAT HAD BEEN PROVIDED TO THE OTHER  02:55

1    SIDE WERE NOT LEGIBLE?  DO YOU RECALL THAT?

2    A    LET ME READ IT, PLEASE.

3            WHAT'S YOUR QUESTION?

4    Q    DO YOU RECALL THAT THERE WAS AN ISSUE IN THE CASE THAT

5    SOME DOCUMENTS HAD BEEN PROVIDED TO FIREMAN'S FUND IN THAT          02:56

6    LITIGATION WHICH WERE NOT LEGIBLE AND THEY HAD ASKED FOR THE

7    ORIGINALS?

8    A    YES.

9    Q    AND THE ORIGINALS HAD, IN FACT, BEEN FOUND AT MGA, AND

10   YOUR BROTHER INSTRUCTED YOU TO TELL THEM THE ORIGINALS CANNOT       02:56

11   BE FOUND; ISN'T THAT TRUE?

12   A    I THINK I ADDED THAT FOR MYSELF; THAT WAS PLAYING

13   TIT-FOR-TAT.

14   Q    I'M SORRY?

15   A    I THINK I ADDED THAT MYSELF.  I THINK THAT WAS MY PART OF      02:56

16   PLAYING TIT-FOR-TAT.

17            **MR. QUINN:**  WELL, I'D OFFER THE EXHIBIT, YOUR HONOR.

18            **MR. NOLAN:**  SAME OBJECTIONS, YOUR HONOR.  RELEVANCY.

19   ALSO 403.

20            **THE COURT:**  THE COURT DOES HAVE 403 CONCERNS ABOUT       02:57

21   THIS.

22            I'M GOING TO ADMIT THE E-MAIL CORRESPONDENCE FROM

23   MR. LARIAN TO ISAAC LARIAN; THAT'S THE BOTTOM COMMUNICATION.

24            **MR. QUINN:**  YES.

25            **THE COURT:**  I'M GOING TO EXCLUDE BOTH RESPONSES ABOVE    02:57

```
 1    THAT ON 403 GROUNDS.

 2            MR. QUINN:  UNDERSTOOD, YOUR HONOR.

 3            MAY WE PUBLISH THAT?

 4        THE COURT:  JUST THE BOTTOM ONE.

 5        MR. NOLAN:  CAN I BE HEARD AT SIDE-BAR?            02:57

 6        THE COURT:  YES, YOU MAY.

 7            (WHEREUPON, THE FOLLOWING PROCEEDINGS

 8            WERE HELD AT SIDE-BAR:)

 9        THE COURT:  I SHOULD CHANGE THAT RESPONSE: 'UNLESS

10    YOU WANT TO DO IT THAT WAY," COUNSEL.  PERHAPS YOU MIGHT WANT   02:58

11    TO DO THAT.

12            MR. NOLAN:  "YOUR APPLICATION PROVES FALSE."

13        THE COURT:  CORRECT.

14        MR. QUINN:  WELL, THEN WE SHOULD HAVE THIS LINE HERE.

15        THE COURT:  LET'S INCLUDE THE RESPONSE.            02:58

16            MR. QUINN:  RIGHT.

17        THE COURT:  OUT OF COMPLETENESS, I'LL PERMIT THAT.

18        MR. QUINN:  RIGHT.  THEN WOULDN'T THE TOP LINE IN

19    RESPONSE TO THE RESPONSE --

20        THE COURT:  NO.  GET THAT OUT.  THAT'S THE PART --   02:58

21        MR. NOLAN:  JUST THAT --

22        THE COURT:  UNLESS THERE'S NO OBJECTION.

23        MR. NOLAN:  NO.  LET'S DO IT THIS WAY.  I THINK THIS

24    IS THE WAY.

25        THE COURT:  I AGREE.                            02:58
```

```
 1            THE COURT:  SO I'LL INCLUDE IN THE RECORD THE

 2   ORIGINAL MESSAGE, DATED MAY 24 AT 6:32 P.M., THE RESPONSE, MAY

 3   24, 2000 -- THE COURT IS EXCLUDING ON 403 GROUNDS THE NEXT

 4   DAY'S RESPONSE ON MAY 25, 12:49.

 5            And JUST SO YOU KNOW, IT'S BASICALLY BECAUSE OF THE      02:59

 6   ANSWERs, THE MUDDLED ANSWERS WE'RE GETTING.

 7            MR. NOLAN:  I UNDERSTAND THAT.

 8            THE COURT:  VERY GOOD.

 9            (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

10            THE COURT:  COUNSEL, AS I INDICATED, I'M ADMITTING      02:59

11   THE BOTTOM TWO MESSAGES.

12            MR. QUINN:  UNDERSTOOD, YOUR HONOR.

13            THE COURT:  YOU MAY PROCEED.

14            MR. QUINN:  IF WE MAY PUBLISH THAT, YOUR HONOR.

15   BY MR. QUINN:                                                   02:59

16   Q    THIS E-MAIL AT THE BOTTOM IS THE E-MAIL WE'VE BEEN

17   DISCUSSING.

18            DO YOU RECALL WHAT THIS FIREMAN'S FUND LAWSUIT WAS

19   ABOUT?

20   A    YES, I DO.                                                 03:00

21   Q    WHAT DID IT CONCERN, JUST IN GENERAL TERMS?

22   A    BAD FAITH CLAIM AGAINST INSURANCE COMPANY.

23   Q    MGA WAS BRINGING A CLAIM AGAINST ITS INSURANCE COMPANY; IS

24   THAT CORRECT?

25   A    YES.                                                       03:00
```

```
 1    Q    THERE WAS A QUESTION ABOUT -- WHO WAS MARTY KATZ?

 2    A    MGA'S ATTORNEY.

 3    Q    MGA'S ATTORNEY?

 4    A    AND MY ATTORNEY, YES.

 5    Q    THERE WAS AN ISSUE ABOUT WHETHER LEGIBLE COPIES EXISTED OF   03:00

 6    CERTAIN DOCUMENTS.

 7              DO YOU RECALL THAT?

 8    A    YES, I DO.

 9    Q    WHAT YOU WROTE TO YOUR BROTHER IS THAT "YOU INSTRUCTED ME

10    TO NOT PROVIDE THOSE TO MARTY AND TO TELL HIM WE COULD NOT FIND   03:00

11    THE ORIGINALS"; CORRECT?

12    A    THAT'S WHAT I WROTE THERE.

13    Q    BUT, IN FACT, WHAT YOU WROTE WAS, YOU FOUND THE ORIGINAL;

14    YOU HAD THE ORIGINALS; CORRECT?

15    A    THAT'S WHAT IT SAYS, YES.                                    03:01

16    Q    SO YOUR BROTHER HAD INSTRUCTED YOU -- WHAT YOU WROTE WAS,

17    YOUR BROTHER HAD INSTRUCTED YOU TO LIE TO THE ATTORNEY AND SAY

18    THAT THEY COULDN'T BE FOUND; CORRECT?

19    A    AS I SAID, THAT PART, I HAD ADDED MYSELF AS PART OF MY

20    TIT-FOR-TAT GAME WITH ISAAC.                                      03:01

21    Q    ARE YOU SAYING THAT YOU MADE THIS UP?

22    A    YES.

23    Q    WHAT YOU'RE TELLING US IS THAT YOU LIED IN THIS E-MAIL;

24    CORRECT?

25    A    I LIED IN THAT E-MAIL AS FAR AS HIM TELLING ME NOT TO GIVE   03:01
```

```
 1   THE ORIGINALS TO MARTY KATZ.

 2   Q    YOU INDICATED THAT ANY OF THE DOCUMENTS YOU HAD THAT YOU

 3   HAD COLLECTED IN CONNECTION WITH YOUR CASE CONCERNING BRATZ --

 4   IN RESPONSE TO MR. NOLAN'S QUESTION, YOU SAID THAT MGA WOULD

 5   HAVE COPIES OF ALL OF THOSE; CORRECT?                          03:01

 6   A    EXCEPT FOR DECLARATIONS AND THINGS THAT I GATHERED

 7   PERSONALLY; AND THOSE DID NOT BELONG TO MGA OR TO MATTEL.

 8   Q    THAT'S WHAT I WAS GOING TO ASK YOU ABOUT.

 9        THOSE DECLARATIONS, THOSE THINGS THAT YOU HAD

10   PERSONALLY COLLECTED, MGA WOULDN'T NECESSARILY HAVE; CORRECT?  03:02

11   A    THAT'S CORRECT.

12   Q    THOSE ARE GONE FOREVER.

13   A    UNLESS YOU GUYS GOT THEM FROM SOME PEOPLE.  AND I BELIEVE

14   YOU DID.

15   Q    WE GOT ALL OF THE DECLARATIONS THAT YOU HAD DRAFTED; IS   03:02

16   THAT YOUR UNDERSTANDING?

17   A    MY UNDERSTANDING IS, YOU GOT AT LEAST A FEW OF THEM.

18   Q    WE GOT ALL OF THE INFORMATION THAT YOU DESTROYED BEFORE

19   YOU DESTROYED IT.

20   A    AS I SAID, I HAVE NO OBLIGATION TO KEEP ANYTHING, SO I    03:02

21   DON'T KNOW WHAT YOU'RE TRYING TO INSINUATE HERE.

22        MAYBE YOUR HONOR CAN TELL ME IF I HAD ANY OBLIGATION

23   TO KEEP ANY OF THESE DOCUMENTS.

24   Q    AND THE REASON YOU DISMISSED YOUR CASE -- DO YOU RECALL

25   YOU FILED AN OPPOSITION TO YOUR BROTHER'S -- WHEN YOUR BROTHER 03:02
```

1    WENT TO COURT, AFTER YOU DISMISSED THE CASE, TO GET AN

2    ATTORNEY'S FEES AWARD AGAINST YOU, YOU FILED AN OPPOSITION TO

3    THAT; CORRECT?

4    A    YES, I DID.

5    Q    AND YOU DIDN'T SAY IN THAT OPPOSITION THAT 'I'VE REALIZED          03:03

6    MY CASE HAS NO MERIT; I REALIZE MY BROTHER NEVER CONCEALED

7    ANYTHING FROM ME ABOUT BRATZ.'  YOU DIDN'T SAY THAT, DID YOU?

8    A    WHAT I SAID WHEN I DROPPED THE LAWSUIT WAS THAT BASED ON

9    THE E-MAILS I HAD SEEN, I DIDN'T THINK ISAAC THOUGHT THAT MUCH

10   OF BRATZ WHEN I SOLD THE COMPANY.  AND I ALSO SAID THAT THE          03:03

11   APPRAISALS THAT MY UNCLE HAD DONE WERE NOT KOSHER.  AND THEN I

12   FILED THE OPPOSITION; AND IN IT, I MENTIONED THAT ONE OF THE

13   REASONS I DROPPED THE LAWSUIT WAS THE FACT THAT I HAD LOST MY

14   DAUGHTER FOR AN HOUR, OR HALF AN HOUR, AND THAT WAS ONE OF THE

15   THINGS THAT LED ME TO DROP THE LAWSUIT.                             03:03

16   Q    BUT WHEN YOU OPPOSED YOUR BROTHER'S REQUEST FOR ATTORNEY'S

17   FEES IN COURT, YOU DID NOT SAY THAT YOU HAD DECIDED YOUR CASE

18   NEVER HAD ANY MERIT?  WHAT YOU SAID WAS, 'I'M SIMPLY DISMISSING

19   THIS CASE IN ORDER TO PROMOTE FAMILY HARMONY'; CORRECT?

20   A    THAT WAS PART OF MY DECISION, YES.                             03:04

21   Q    THAT'S WHAT YOU SAID IN YOUR OPPOSITION.

22   A    I HAVEN'T READ IT IN THREE YEARS.

23   Q    TAKE A LOOK AT IT.  IT'S EXHIBIT 11567, 11567 IN THE BOOK

24   BEFORE YOU.

25   A    OKAY.  WHAT PAGE?                                              03:04

```
 1   Q    FOR EXAMPLE, ON THE FIRST PAGE, 0004.

 2   A    THIS IS MY ATTORNEY'S BRIEF.

 3   Q    RIGHT.

 4        YOUR ATTORNEY WAS FOLLOWING YOUR INSTRUCTIONS, I

 5   ASSUME.                                                    03:04

 6        MR. NOLAN:  OBJECTION.

 7        MS. MORGENTHALER:  OBJECTION.

 8        THE COURT:  SUSTAINED.

 9   BY MR. QUINN:

10   Q    DID YOU READ THIS BEFORE YOUR ATTORNEY SUBMITTED IT?  03:05

11   A    I DON'T REMEMBER.

12   Q    YOU DON'T REMEMBER ONE WAY OR THE OTHER?

13   A    NO.  I THINK I SIGNED THE DECLARATION IN RELATION TO THIS.

14   Q    YOU'RE RIGHT.  IF YOU LOOK AT THE BACK, PAGE 19, THERE'S A

15   DECLARATION, 11567-00019.  IT'S TWO PAGES.                 03:05

16        IS THAT YOUR DECLARATION, SIR?

17   A    YES, IT IS.

18   Q    AND WHAT YOU SAY THERE IS THAT YOU RELATE THIS INCIDENT

19   WHERE YOU LOST YOUR DAUGHTER AT THE BEACH FOR AN HOUR.

20   A    YES.                                                  03:05

21   Q    AND THAT CAUSED YOU TO REFLECT ABOUT THE IMPORTANCE OF

22   FAMILY.

23   A    IT WAS MORE THAN THAT.  MY WIFE, AND ALSO MYSELF, HAD MADE

24   A PLEDGE TO OURSELVES THAT IF WE FIND MY DAUGHTER, THAT WE WERE

25   GOING TO MAKE PEACE.                                       03:05
```

```
 1   Q    RIGHT.  AND I UNDERSTAND THAT SENTIMENT, MR. LARIAN.  BUT

 2   ANYWHERE IN THAT DECLARATION WHERE YOU'RE OPPOSING THIS REQUEST

 3   FOR ATTORNEY'S FEES, DO YOU SAY ANYTHING ABOUT, 'I'VE DROPPED

 4   THIS CASE BECAUSE I DECIDED MY CASE HAS NO MERIT'?

 5   A    I HAD SAID THAT ALREADY WHEN I DROPPED THE LAWSUIT.           03:06

 6        DOES IT SAY IT HERE?  DOES IT REPEAT IT HERE?  I

 7   DON'T KNOW.  YOU WANT ME TO REPEAT IT.

 8   Q    TAKE A LOOK AT IT.  THIS IS WHAT YOU FILED WITH THE COURT.

 9   A    WHAT'S YOUR QUESTION, AGAIN?

10   Q    IN HERE, YOU SAY -- AND I'M QUOTING NOW FROM THE SECOND      03:07

11   PAGE, THIRD LINE FROM THE TOP, "I MADE A DECISION TO ABANDON MY

12   CLAIMS IN THE ARBITRATION AND ISSUE A PUBLIC APOLOGY, HOPING,

13   PERHAPS IN VAIN, THAT ONE DAY MY BROTHER AND I COULD

14   RECONCILE."

15        DO YOU SEE THAT?                                             03:07

16   A    YES, I DO.

17   Q    THERE'S NOTHING IN HERE ANYWHERE WHERE YOU SAY, 'I DROPPED

18   THE CASE BECAUSE I DECIDED MY CLAIMS HAD NO MERIT, MY CLAIMS

19   ABOUT CONCEALMENT OF BRATZ.'

20        THAT'S NOT IN HERE, IS IT, SIR?                              03:08

21   A    IT ALSO DOESN'T SAY THAT I BROUGHT THE CASE BECAUSE IT HAD

22   MERIT.  IT DOESN'T SAY IT ONE WAY OR THE OTHER.

23   Q    IT DOESN'T SAY ANYTHING ABOUT YOU DROPPED IT BECAUSE --

24   ARE YOU TELLING US THAT YOU MIGHT HAVE BROUGHT THE CASE KNOWING

25   FROM THE BEGINNING IT HAD NO MERIT AT ALL?                        03:08
```

1   A    NO, THAT'S NOT WHAT I'M SAYING.  WHEN I DROPPED THE CASE,

2   I DID NOT SAY IT HAD NO MERIT.  I DID MENTION THAT THE

3   APPRAISALS THAT MY UNCLE HAD USED WERE NOT KOSHER.

4   Q    IN FACT, WHEN YOU FILED THAT CASE, YOU FILED A VERIFIED

5   COMPLAINT, WHICH YOU SIGNED UNDER PENALTY OF PERJURY, SAYING          03:08

6   THAT YOUR BROTHER HAD CONCEALED THE DEVELOPMENT OF BRATZ FROM

7   YOU; CORRECT?

8   A    THE LAWSUIT THAT I FILED HAS PORTIONS THAT ARE BASED ON

9   INFORMATION AND BELIEF, SO NOT ALL OF IT IS BASED ON A SWORN

10  DECLARATION.                                                         03:08

11  Q    BUT AT THE END, YOU SIGNED IT UNDER PENALTY OF PERJURY;

12  CORRECT?

13  A    AS I SAID, ONLY TO THE PORTIONS THAT I MENTIONED WHERE --

14  BASED ON KNOWLEDGE.  SOME OF IT WAS BASED ON INFORMATION AND

15  BELIEF.  AND ALSO, RECENTLY, LOOKING AT IT AGAIN, I SAW THAT          03:09

16  THERE'S ONE STATEMENT IN IT THAT SHOULD HAVE BEEN BASED ON

17  INFORMATION AND BELIEF, AND IT WASN'T.

18  Q    WHAT ONE WAS THAT?

19  A    IF I MAY HAVE THE --

20  Q    NEVER MIND.  WE'RE SHORT ON TIME.                               03:09

21  A    SOMETHING ABOUT 1999 BEING THE YEAR THAT BRATZ WAS

22  DEVELOPED AT MGA.  THAT WAS BASED ON AN ARTICLE FROM THE

23  NEW YORK TIMES -- SORRY -- WALL STREET JOURNAL ARTICLE.  THAT

24  WASN'T BASED ON ACTUAL KNOWLEDGE.

25  Q    THANK YOU VERY MUCH, SIR.                                       03:09

```
 1              THE COURT:  MR. NOLAN, ANYTHING FURTHER?

 2              MR. NOLAN:  YES.

 3                        RECROSS-EXAMINATION

 4    BY MR. NOLAN:

 5    Q    LET'S GO BACK TO EXHIBIT 13380.                          03:09

 6              DO YOU REMEMBER FOCUSING ON THE E-MAIL EXCHANGE THAT

 7    YOU HAD WITH YOUR BROTHER ISAAC?

 8              MR. NOLAN:  THIS IS IN EVIDENCE, YOUR HONOR.

 9              THE COURT:  YES.

10    BY MR. NOLAN:

11    Q    MR. QUINN ASKED YOU TO LOOK AT YOUR MESSAGE TO ISAAC.

12              AND THAT'S ON THE BOTTOM; CORRECT?

13    A    YES.

14    Q    AND THIS IS THE PORTION THAT YOU SAY YOU MADE UP, IN TERMS

15    OF BEING TIT-FOR-TAT; IS THAT CORRECT?                        03:10

16    A    YES.

17    Q    THAT INFORMATION WAS FALSE; CORRECT?

18    A    YES.

19    Q    WELL, MR. QUINN DIDN'T SHOW YOU THE RESPONSE FROM

20    ISAAC LARIAN AT THE SAME TIME; RIGHT?                         03:10

21    A    CORRECT.

22    Q    SAME DATE.  YOU SENT THE E-MAIL AT 6:32 P.M., AND ISAAC,

23    YOUR BROTHER, RESPONDED AT 7:15 P.M.; RIGHT?

24    A    CORRECT.

25    Q    IF YOU WOULD READ FOR THE JURY THE FIRST LINE OF THE      03:10
```

```
 1   E-MAIL RESPONSE FROM ISAAC LARIAN TO YOU.

 2   A    "YOUR ALLEGATION STATED BELOW IS FALSE AND SELF-SERVING,

 3   AS USUAL."

 4   Q    AND YOU AGREED THAT ISAAC WAS RIGHT; IT WAS FALSE; RIGHT?

 5   A    YES, I DID.                                              03:10

 6          MR. NOLAN:  YOUR HONOR, EXHIBIT 18569 WAS PRODUCED.

 7   IT HAS BATES NUMBER KBK 012296 CK.  AND WITH PERMISSION, I'D

 8   LIKE TO PRESENT THIS TO MR. LARIAN.

 9          THE COURT:  VERY WELL.

10          IS THAT THE BATES-STAMPED COPY YOU HAVE HERE?          03:11

11   BY MR. NOLAN:

12   Q    THIS IS WHAT i WAS ASKING YOU IN DIRECT EXAMINATION.  JUST

13   GO BACK IN TIME, MR. LARIAN, IF YOU DON'T MIND.

14          JUST TO SET THIS UP, RICHARD KELLNER WAS YOUR LAWYER;

15   CORRECT?                                                      03:11

16   A    YES.

17   Q    AND ROBERT TURNER WAS COUNSEL FOR ISAAC AND MGA.

18   A    CORRECT.

19   Q    IN CONNECTION WITH THE LITIGATION THAT ENDED UP IN

20   ARBITRATION.                                                  03:11

21   A    YES.

22          MR. NOLAN:  YOUR HONOR, WE'D OFFER EXHIBIT 18569.

23          THE COURT:  ANY OBJECTION?

24          MR. QUINN:  NO OBJECTION.

25          THE COURT:  IT'S ADMITTED.                             03:11
```

```
 1              MR. NOLAN:  PERMISSION TO PUBLISH.

 2              THE COURT:  YES, YOU MAY PUBLISH.

 3              (EXHIBIT 18569 RECEIVED.)

 4   BY MR. NOLAN:

 5   Q    THIS IS A LETTER FROM MGA'S COUNSEL DATED DECEMBER 30,      03:12

 6   2005, RE: LARIAN V. LARIAN, ADRS CASE NUMBER -- THEN IT GIVES A

 7   NUMBER.  "DEAR RICHARD, PURSUANT TO THE DECEMBER 4, 2000 STOCK

 8   PURCHASE AGREEMENT, FARHAD LARIAN SHOULD IMMEDIATELY RETURN ALL

 9   DOCUMENTS OF MGA ENTERTAINMENT, INC., IN HIS POSSESSION."

10              DO YOU SEE THAT?                                      03:12

11   A    YES.

12   Q    IT'S CORRECT THAT YOU DID NOT RETURN THE DOCUMENTS AS

13   REQUESTED.

14   A    THAT'S CORRECT.  I STILL HAVE MOST OF THOSE DOCUMENTS.

15   Q    AND THOSE DOCUMENTS WERE PRODUCED IN THIS CASE; CORRECT?    03:12

16   A    I BELIEVE A LOT OF THEM WERE.  I GAVE ALL OF THEM TO MY

17   ATTORNEY.

18   Q    AND YOU'RE REPRESENTED TODAY IN COURT; CORRECT?

19   A    YES.

20   Q    AND THAT'S THE LAW FIRM THAT YOU GAVE THE DOCUMENTS TO;     03:12

21   CORRECT?

22   A    YES.

23   Q    MR. QUINN ASKED YOU ABOUT THE DECLARATION THAT YOU

24   SUBMITTED IN OPPOSITION TO THE ATTORNEY'S FEE PETITION.

25              DO YOU RECALL THAT?                                   03:13
```

1    A    YES.

2    Q    AND HE SAID THAT NOWHERE IN THERE WERE YOU SAYING WORDS TO

3    THE EFFECT THAT YOU HAD DISMISSED THE ARBITRATION PROCEEDING

4    BECAUSE YOU FOUND OUT AND DETERMINED THAT ISAAC HAD NOT

5    CONCEALED INFORMATION FROM YOU.                                    03:13

6         DO YOU RECALL THAT?

7    A    YES.

8    Q    I'D LIKE TO ASK YOU TO TURN TO TRIAL EXHIBIT NUMBER 12079.

9    LET ME ASK YOU, IN PARTICULAR, TO TURN TO PAGE 317.

10   A    BATES NUMBER 317, OR EXHIBIT NUMBER?                          03:14

11   Q    NO.  IT'S PAGE NUMBER -- IT'S ARBITRATION TRANSCRIPT 317;

12   145.

13   A    I'M HAVING A HARD TIME FINDING IT.

14   Q    CAN YOU TURN TO THE ARBITRATION TRANSCRIPT.  FORGET THE

15   BATES NUMBER FOR A MOMENT.  JUST GO TO THE ARBITRATION            03:14

16   TRANSCRIPT AND TURN TO PAGE 317.

17   A    OKAY.  FOUND IT.

18   Q    AND THIS IS THE TRANSCRIPT OF THE ACTUAL ARBITRATION

19   PROCEEDINGS; CORRECT?

20   A    YES.                                                          03:14

21   Q    AND ISN'T IT TRUE THAT FROM PAGE 317, LINE 2, TO 318,

22   LINE 19, THAT'S YOUR ANNOUNCEMENT THAT YOU WERE DROPPING THE

23   LAWSUIT; CORRECT?

24   A    YES.

25   Q    AND ISN'T IT TRUE THAT YOU SAY IN THE ARBITRATION, "WHEN     03:15

1   ISAAC FIRST LEARNED THAT I WAS COMPLAINING" --

2           **MR. QUINN:**  OBJECTION.  THIS IS HEARSAY.

3           **MR. NOLAN:**  WE OFFER THIS PORTION OF THE ARBITRATION

4   PROCEEDINGS.

5           **THE COURT:**  ANY OBJECTION?                           03:15

6           **MR. QUINN:**  HEARSAY.

7           **MR. NOLAN:**  IT'S A PRIOR CONSISTENT STATEMENT.

8           **THE COURT:**  MADE UNDER OATH, I PRESUME?

9           **MR. NOLAN:**  YES, YOUR HONOR.

10          **THE COURT:**  TO REBUT AN ALLEGATION OF a RECENT         03:15

11  FABRICATION?

12          **MR. NOLAN:**  YES, YOUR HONOR.

13          **MR. QUINN:**  ACTUALLY, HE'S NOT UNDER OATH AT THIS

14  POINT.

15          **THE COURT:**  THAT'S WHAT I DON'T KNOW.  THAT WAS THE    03:15

16  QUESTION.  I HAVEN'T SEEN THE ENTIRE DOCUMENT.

17          WAS IT MADE UNDER OATH?

18          **MR. QUINN:**  IT IS NOT UNDER OATH.

19  **BY MR. NOLAN:**

20  Q   LET ME BACK UP AND ASK YOU THIS QUESTION:  ISN'T IT TRUE     03:15

21  THAT AT THE ARBITRATION PROCEEDING, YOU SAID THAT ISAAC SHOWED

22  YOU DOCUMENTS AND IT SHOWS THAT HE DID NOT CONCEAL ANYTHING

23  FROM YOU; CORRECT?

24          **MR. QUINN:**  OBJECTION.  HEARSAY, YOUR HONOR.

25          **THE COURT:**  WE'RE RIGHT BACK WHERE WE WERE A MOMENT    03:16

```
 1    AGO, COUNSEL.

 2    BY MR. NOLAN:

 3    Q    ISN'T IT TRUE THAT AT THE ARBITRATION, YOU APOLOGIZED TO

 4    YOUR BROTHER?

 5    A    YES, I DID.                                                   03:16

 6    Q    AND YOU DROPPED THE LAWSUIT?

 7    A    YES, I DID.

 8    Q    ISN'T IT TRUE THAT ISAAC LENT YOUR PARENTS $6,000 AT THE

 9    END OF 1979 TO PAY THEIR DEBTS?

10    A    I AM NOT AWARE OF THAT.                                       03:16

11    Q    MR. LARIAN, ISN'T IT TRUE THAT NONE OF THE QUESTIONS THAT

12    MR. QUINN ASKED YOU TODAY GOES TO THE ULTIMATE QUESTION OF WHEN

13    CARTER BRYANT DID THE DRAWINGS FOR BRATZ?

14              MR. QUINN:  ARGUMENTATIVE, YOUR HONOR.

15              THE COURT:  LET ME SEE YOU AT SIDE-BAR FOR A SECOND.     03:17

16              (WHEREUPON, THE FOLLOWING PROCEEDINGS

17              WERE HELD AT SIDE-BAR:)

18              THE COURT:  I THINK I MADE A MISTAKE.  I SHOULD HAVE

19    these RULEs DOWN by NOW.  A PRIOR INCONSISTENT STATEMENT has to

20    be MADE UNDER oath.  THE PRIOR inCONSISTENT STATEMENT DOES NOT     03:17

21    HAVE TO BE MADE UNDER OATH TO REBUT THE RECENT ALLEGATION OF

22    LYING.

23              MR. QUINN:  YOU'RE AHEAD OF ME.

24              THE COURT:  I WANT TO MAKE SURE I'M RIGHT ON THIS.

25    (Reading:)  "A PRIOR STATEMENT BY a WITNESS TESTIFYING AT TRIAL    03:18
```

```
 1   SUBJECT TO CROSS-EXAMINATION CONCERNING a STATEMENT AND THE
 2   STATEMENT IS INCONSISTENT WITH THE DECLARANT'S TESTIMONY WAS
 3   GIVEN UNDER OATH SUBJECT TO PENALTY OF PERJURY IN A TRIAL OR
 4   CONSISTENT WITH THE DECLARANT'S TESTIMONY and IS OFFERED TO
 5   REBUT express or IMPLIED CHARGES AGAINST FABRICATION."          03:18
 6           I THINK THAT'S WHAT WE HAVE HERE; SO I THINK EVEN
 7   THOUGH IT WAS NOT MADE UNDER OATH, i think THAT IT CAN BE
 8   OFFERED now.
 9           NOW WE'RE OPENING A DOOR HERE, THOUGH, COUNSEL.
10       MR. NOLAN:  I KNOW.  I GOT WHAT I NEEDED.                   03:18
11       THE COURT:  BECAUSE IF THE TRANSCRIPT COMES IN, IT
12   ALl COMES IN.  AND THEN MR. QUINN STANDS UP --
13       MR. NOLAN:  I REALIZE THAT.  I CAN TAKE YOUR COURSE.
14       THE COURT:  VERY WELL.
15       (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)          03:19
16       MR. NOLAN:  YOUR HONOR, I BELIEVE I ASKED A QUESTION,
17   AND THERE WAS AN OBJECTION.  I WAS ASKING HIM -- LET ME REDO
18   IT.
19       THE COURT:  REPHRASE YOUR QUESTION.
20   BY MR. NOLAN:
21   Q   MR. LARIAN, ALL OF THIS STUFF, THESE QUESTIONS, THEY DON'T
22   GO TO THE QUESTION OF WHEN CARTER BRYANT DID THE BRATZ CONCEPT,
23   DO THEY?
24       MR. QUINN:  YOUR HONOR, THIS IS CLOSING ARGUMENT.
25       THE COURT:  LET'S MAKE A QUESTION, COUNSEL.  ASK A         03:19
```

```
 1   QUESTION, NOT A STATEMENT.
 2   BY MR. NOLAN:
 3   Q    DID ANY OF THE QUESTIONS THAT MR. QUINN ASKED YOU GO TO
 4   WHEN CARTER BRYANT CAME UP WITH THE CONCEPT FOR BRATZ?
 5            MR. QUINN:  SAME OBJECTION.                            03:19
 6            THE COURT:  IT'S RELEVANCE.
 7            SUSTAINED.
 8            MR. NOLAN:  NOTHING FURTHER.
 9            THE COURT:  MR. QUINN, WE'RE AT THE NOON HOUR HERE.
10            MAKE IT QUICK.                                        03:20
11                    REDIRECT EXAMINATION
12   BY MR. QUINN:
13   Q    YOU TOLD US YOU DESTROYED SOME E-MAILS FROM THE TIME
14   PERIOD BACK IN 2000 RELATING TO BRATZ; CORRECT?
15   A    I DISCARDED DOCUMENTS THAT I NO LONGER NEEDED.            03:20
16   Q    AND THOSE MIGHT HAVE HAD SOMETHING TO DO WITH THE ORIGIN
17   OF BRATZ; CORRECT?
18   A    AND MGA HAS THE ORIGINAL OF ALL OF THOSE E-MAILS.
19   Q    WELL, I KNOW YOU SAID THAT, BUT THIS FIREMAN'S FUND
20   EXHIBIT, FOR EXAMPLE, THAT'S EXHIBIT 13380, THAT'S ONE OF THE  03:20
21   DOCUMENTS THAT YOU DESTROYED; CORRECT?  YOU DIDN'T PRODUCE THIS
22   DOCUMENT IN RESPONSE TO A SUBPOENA?
23            MR. NOLAN:  OBJECTION.  MISCHARACTERIZES HIS
24   TESTIMONY.
25            THE COURT:  SUSTAINED AS PHRASED.                     03:20
```

```
 1   BY MR. QUINN:

 2   Q    ISN'T IT TRUE THAT THIS IS ONE OF THE DOCUMENTS THAT YOU

 3   DESTROYED?

 4   A    YOU'RE PROVING MY POINT THAT MGA HAD THE DOCUMENT, AND

 5   OBVIOUSLY, THEY GAVE IT TO YOU.                                03:20

 6   Q    WHAT MAKES YOU THINK THAT MGA PRODUCED THIS DOCUMENT, THAT

 7   WE GOT IT FROM MGA?

 8   A    BECAUSE I KNOW I DIDN'T.

 9   Q    BUT DO YOU SEE DOWN THERE "CG"?

10   A    YES, I DO.                                                03:21

11   Q    DO YOU KNOW WHETHER A SUBPOENA WAS SERVED ON THE

12   CHRISTENSEN GLASER FIRM AND WHETHER THEY PRODUCED THIS

13   DOCUMENT?

14   A    SAME THING.  SOMEBODY PRODUCED IT.

15   Q    RIGHT.                                                    03:21

16        YOU DON'T KNOW THAT MGA PRODUCED IT, ONE WAY OR THE

17   OTHER; CORRECT?

18   A    CG IS ALSO MGA'S ATTORNEY, OR WAS MGA'S ATTORNEY SO...

19   Q    THERE'S NO MGA -- ON THAT COPY THAT YOU'RE LOOKING AT,

20   THERE'S NO MGA PRODUCTION STAMP, IS THERE?                     03:21

21   A    THE ATTORNEY IS THE SAME AS -- THE ATTORNEY IS ACTING FOR

22   THE COMPANY.

23   Q    I UNDERSTAND WHAT YOU'RE SAYING.

24   A    I DON'T SEE A BATES STAMP.

25   Q    AND YOUR ATTORNEY HERE IS FROM THE CHRISTIANSEN FIRM.     03:21
```

```
 1   A     YES.

 2   Q     AND SHE'S BEING PAID BY MGA.

 3   A     YES.

 4         MR. QUINN:  AND, YOUR HONOR, NOW, I THINK, BECAUSE OF

 5   THE QUESTION MR. NOLAN ASKED ABOUT -- I THINK THE FIRST PART      03:21

 6   NOW COMES IN.

 7         THE COURT:  I AGREE.

 8         MR. QUINN:  SO IF WE COULD PUT THE WHOLE EXHIBIT UP.

 9         THE COURT:  NOT JUST THE QUESTION THAT WAS ASKED, BUT

10   THE ANSWER THAT WAS GIVEN.                                        03:22

11         MR. QUINN:  RIGHT.

12   BY MR. QUINN:

13   Q     MR. NOLAN ASKED YOU -- HE SAID THAT MR. QUINN DIDN'T ASK

14   YOU ABOUT YOUR BROTHER'S RESPONSE TO THIS E-MAIL WHERE YOU SAY

15   HE HAD INSTRUCTED YOU TO WITHHOLD DOCUMENTS.                      03:22

16         YOU RESPONDED TO THAT, DIDN'T YOU, SIR?

17   A     YES.

18   Q     AND WHAT YOU RESPONDED WAS, "YOUR DENIAL DOES NOT MAKE MY

19   ALLEGATION ANY LESS TRUE, AND TIME WILL PROVE WHAT THE REAL

20   TRUTH IS.  WHEN THE TIME COMES, WE'LL GO THROUGH BOTH OF OUR      03:22

21   TESTIMONIES AND PROVE WHO LIED ABOUT WHAT."

22         CORRECT?  THAT'S WHAT YOU WROTE AT THE TIME?

23   A     YES.

24   Q     BUT YOU'RE TELLING US THAT DOWN HERE IN THE ORIGINAL

25   E-MAIL, YOU WEREN'T TELLING THE TRUTH.                           03:22
```

```
 1   A    I ALREADY SAID THAT.

 2   Q    IS THAT SOMETHING THAT YOU MAKE A PRACTICE OF; THAT YOU

 3   LIE IN ORDER TO MAKE A POINT?

 4   A    AS I SAID, WE WERE PLAYING TIT-FOR-TAT; WE HAD SIBLING

 5   RIVALRIES; AND I PUT SOMETHING OUT THERE AND I DENIED IT.          03:23

 6   Q    AND YOU'RE NOW TELLING US IT WASN'T TRUE.

 7   A    YES.

 8   Q    THEN THIS EXHIBIT THAT CAME IN, EXHIBIT 18569, WHERE

 9   YOU'RE BEING TOLD THAT YOU SHOULD RETURN ALL DOCUMENTS OF MGA

10   IN YOUR POSSESSION -- IT'S DATED DECEMBER 30, 2005.                03:23

11            DO YOU HAVE THAT THERE, SIR?

12   A    I DO.

13   Q    BY THEN, THE ARBITRATION WAS OVER, RIGHT, HAD BEEN OVER

14   FOR SOME TIME?

15   A    CORRECT.                                                      03:23

16   Q    AND THE DOCUMENTS THAT YOU DESTROYED, YOU SAID YOU

17   DESTROYED JUST DAYS AFTER YOU DISMISSED THE ARBITRATION;

18   CORRECT?

19   A    CORRECT.

20   Q    SO THOSE DOCUMENTS WERE ALL GONE BY THE TIME THEY WROTE       03:23

21   YOU AND TOLD YOU TO RETURN EVERYTHING; CORRECT?

22   A    THEY HAD WRITTEN ME A LETTER PRIOR TO THIS ASKING FOR THE

23   DOCUMENTS AS WELL.

24   Q    BUT LONG BEFORE THIS DOCUMENT DATED DECEMBER 31, 2005, YOU

25   HAD DESTROYED THOSE DOCUMENTS BECAUSE YOU DESTROYED THEM WITHIN    03:23
```

1    DAYS AFTER YOU DISMISSED YOUR CASE; CORRECT?

2    A    I DISCARDED SOME OF THE DOCUMENTS AFTER I DISMISSED MY

3    CASE, AND THEN WHEN I GOT THE LETTER FROM YOUR FIRM, I KEPT THE

4    REST OF THE DOCUMENTS.  AND PRIOR TO THIS LETTER, MGA HAD

5    WRITTEN ME ANOTHER LETTER, I BELIEVE IN SEPTEMBER OR AUGUST OF          03:24

6    2005, ASKING ME TO RETURN DOCUMENTS.

7              THE COURT:  THANK YOU, MR. QUINN.

8              MR. QUINN:  THANK YOU.

9              THE COURT:  ANYTHING FURTHER, MR. NOLAN?

10             MR. NOLAN:  NO, YOUR HONOR.                                    03:24

11             THE COURT:  VERY WELL.

12             MR. LARIAN, YOU'RE EXCUSED.  I THANK YOU AND YOUR

13   COUNSEL FOR ACCOMMODATING THE COURT THIS MORNING.

14             LET'S TAKE OUR LUNCH BREAK.  I'LL SEE THE JURY AT

15   1:45.                                                                   03:24

16             (WHEREUPON, JURORS DEPART COURTROOM.)

17             THE COURT:  ARE THERE ANY MATTERS WE NEED TO TAKE UP

18   AT THIS MOMENT, BECAUSE THE COURT HAS TWO OTHER MATTERS

19   UNRELATED TO THIS THAT I NEED TO CALL.

20             IF NOT, I'LL SEE YOU AT 1:45.                                 03:25

21             ANYTHING FROM MATTEL?

22             MR. QUINN:  NOTHING URGENT.

23             WOULD WE HAVE SOME TIME BEFORE WE GO BACK INTO

24   SESSION?

25             THE COURT:  LET'S MEET AT 1:30.  THE JURY IS NOT              03:25

1    COMING BACK UNTIL 1:45.

2            ANYTHING FROM MGA?

3            **MR. NOLAN:**  NO.  WE'RE FINE.

4            (MORNING SESSION CONCLUDED.)

5

6

7

8

9

10

11

12

13                    CERTIFICATE

14

15   I hereby certify that pursuant to section 753, title 28, united
     states code, the foregoing is a true and correct transcript of
16   the stenographically recorded proceedings held in the
     above-entitled matter and that the transcript page format is in
17   conformance with the regulations of the judicial conference of
     the united states.

18

19

     _____          _____
20   THERESA A. LANZA, RPR, CSR                        Date
     Official COURT Reporter
21

22

23

24

25

TUESDAY, JULY 1, 2008                    TRIAL DAY 18, MORNING SESSION