1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                 EASTERN DIVISION

4                    - - -

5       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                    - - -

7    MATTEL, INC.,                    )
                                      )
8                    Plaintiff,       )
                                      )
9           vs.                       )  No. CV 04-09049
                                      )
10   MGA ENTERTAINMENT, Inc., Et. Al.,  )
                                      )
11                   Defendants.      )  TRIAL DAY 19
     _____)  MORNING SESSION
12   AND CONSOLIDATED ACTIONS,        )  Pages 3881-4021
     _____)

13

14

15       REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                Riverside, California

17              Wednesday, July 2, 2008

18                   8:48 A.M.

19

20

21

22

23            THERESA A. LANZA, RPR, CSR
              Federal Official Court Reporter
24            3470 12th Street, Rm. 134
              Riverside, California  92501
25                 951-274-0844
               WWW.THERESALANZA.COM

```
 1    APPEARANCES:

 2
      On behalf of MATTEL, INC.:
 3
                          QUINN EMANUEL
 4                        By:  JOHN QUINN
                               JON COREY
 5                             MICHAEL T. ZELLER
                               HARRY OLIVAR
 6                             TIMOTHY ALGER
                          865 S. FIGUEROA STREET,
 7                        10TH FLOOR
                          LOS ANGELES, California  90017
 8

 9

10    ON BEHALF OF MGA ENTERTAINMENT:

11                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                          BY:  THOMAS J. NOLAN
12                             JASON RUSSELL
                               RAOUL KENNEDY
13                             LAUREN AGUIAR
                               CARL ROTH
14                        300 SOUTH GRAND AVENUE
                          LOS ANGELES, CALIFORNIA  90071-3144
15                        213-687-5000

16
      On behalf of third-party defendant peter marlow:
17
                          Law offices of steven m. Goldsobel
18                        By:  Steven m. Goldsobel
                          1900 avenue of the stars
19                        Suite 1800
                          Los angeles, ca  90067
20                        310-552-4848

21

22

23

24

25
```

Wednesday, July 2, 2008                    Trial Day 19, Morning Session

```
 1                         I N D E X

 2                                                    Page

 3   Plaintiff witness.................................  3920

 4   Defense Case (continued)..........................  3967

 5

 6   PLAINTIFF
     WITNESS            DIRECT      CROSS     REDIRECT      RECROSS
 7   Peter Marlow (continued)

 8   BY MR. ZELLER      3920                  3958
     BY MS. AGUIAR                3950
 9

10   DEFENSE
     WITNESS            DIRECT      CROSS     REDIRECT      RECROSS
11   Robert Eckert (continued)

12   BY MR. Nolan       3967

13

14

15

16          EXHIBITS           RECEIVED

17          5723               3919
            10034              3920
18          18562-A            3970
            18481              3977
19

20

21

22

23

24

25
```

1      RIVERSIDE, CALIFORNIA; WEDNESDAY, JULY 2nd, 2008; 8:48 A.M.

2                              -oOo-

3           **THE CLERK:**  CALLING CASE NUMBER CV04-09049-SGL,

4      MATTEL, INC., V. MGA, INC., ET AL.

5           MAY WE HAVE COUNSEL PLEASE STATE YOUR APPEARANCES FOR

6      THE RECORD.

7           **MR. QUINN:**  JOHN QUINN, BILL PRICE, MIKE ZELLER FOR

8      MATTEL.

9           **MR. NOLAN:**  TOM NOLAN, LAUREN AGUIAR, JASON RUSSELL,

10     AND CARL ROTH.                                                    08:48

11          **THE COURT:**  GOOD MORNING, COUNSEL.

12          THERE'S TWO MATTERS THE COURT WANTED TO TAKE UP

13     BEFORE WE STARTED WITH TESTIMONY THIS MORNING.  ONE IS THE

14     EXPERT WITNESS, MR. ROBERT TONNER, AND THE MOTION *IN LIMINE*

15     THAT THE COURT DEFERRED ON THAT, AS WELL AS MATTEL'S MOTION FOR  08:49

16     WAIVER.  THE COURT IS PREPARED TO ADDRESS BOTH OF THOSE.

17          LET ME BEGIN WITH THE MOTION *IN LIMINE*, AND LET ME

18     HEAR FROM MGA ON THAT.

19          **MS. AGUIAR:**  YES, YOUR HONOR.

20          **THE COURT:**  THERE'S A LOT OF -- I GUESS THE WAY I'VE     08:49

21     DIVIDED THIS IS, THERE'S TESTIMONY FROM THE EXPERT THAT I COULD

22     SEE MIGHT VERY WELL BE RELEVANT TO 1-B ISSUES.

23          **MS. AGUIAR:**  ABSOLUTELY, IF I MAY.

24          **THE COURT:**  THANK YOU.

25          **MS. AGUIAR:**  AND I ANTICIPATED THAT.  AND MR. COREY      08:49

1    AND I HAD A VERY CONGENIAL CONVERSATION LAST NIGHT.  CAN YOU

2    BELIEVE THAT?  AND WE ELIMINATED PORTIONS OF THE MOTION THAT

3    PERTAINED TO 1-B SO THAT WE COULD FOCUS -- I BELIEVE WHAT I'M

4    REPRESENTING IS WHAT HE AND I AGREED LAST NIGHT, BUT HE CAN

5    JUMP IN IF ANYTHING DOESN'T SOUND RIGHT.                        08:50

6          **THE COURT:**  VERY GOOD.  EXCELLENT.

7          **MS. AGUIAR:**  I'LL REFER TO THE ROMAN NUMERAL PORTIONS

8    OF THE MOTION, IF THAT WOULD BE OKAY.

9          **THE COURT:**  THAT WOULD BE GREAT.

10         **MS. AGUIAR:**  THE PORTIONS THAT ARE STILL IN PLAY ARE    08:50

11   ROMAN III --

12         **THE COURT:**  YES.

13         **MS. AGUIAR:**  -- A, B, AND D, AND ROMAN VI.  AND OTHER

14   THAN THAT, THE ISSUES ARE EITHER 1-B ISSUES OR ISSUES THAT

15   PERTAIN TO OTHER WITNESSES.                                    08:50

16         **THE COURT:**  I'M SORRY.  I WAS LOOKING AT YOUR

17   OPPOSITION.

18               III...

19         **MS. AGUIAR:**  III, A, B, AND D; AND ROMAN VI.

20         **THE COURT:**  RIGHT.                                   08:50

21         **MS. AGUIAR:**  AND ALL OTHER ISSUES ARE EITHER 1-B

22   ISSUES OR PERTAIN TO THE TWO OTHER EXPERTS THAT ARE REFERENCED

23   IN MOTION *IN LIMINE* NUMBER 13.

24         **THE COURT:**  TO HAVE SOMEONE EXPLAIN THE DESIGN

25   PROCESS OF THE DOLL, OF A DOLL -- AND HE CERTAINLY SOUNDS       08:51

```
 1   QUALIFIED IN THAT REGARD.  I COULD CERTAINLY SEE THE RELEVANCE
 2   TO 1-B. I CAN SEE SOME RELEVANCE, I SUPPOSE, IN MORE GENERAL
 3   TERMS, IN 1-A ABOUT HOW A DESIGNER MIGHT BE INSPIRED.  THE
 4   PROBLEM THAT I'M HAVING IS HIS OPINION TESTIMONY THAT A
 5   PARTICULAR SOURCE, WHETHER IT BE SEVENTEEN MAGAZINE OR AN
 6   ADVERTISEMENT IN SEVENTEEN MAGAZINE OR SOMETHING ELSE, DID OR
 7   DID NOT, IN FACT, INSPIRE CARTER BRYANT, AS OPPOSED TO ANY
 8   NUMBER OF THINGS THAT COULD HAVE INSPIRED CARTER BRYANT.
 9        BOTH SIDES SEEM TO BE USING THESE -- I'LL CALL THEM
10   EXTERNALITIES IN THE SAME WAY.  YOU'RE USING SEVENTEEN MAGAZINE
11   AND THE KIDS AT KICKAPOO HIGH SCHOOL.  MATTEL IS USING TOON
12   TEENS AND OTHER DESIGN WORKS AT MATTEL TO SUGGEST THAT AN
13   ARTIST, IN THIS CASE THE ARTIST CARTER BRYANT, WAS INSPIRED AND
14   THAT SOMEHOW ESTABLISHES THE TIMING OF HIS INSPIRATION.  AND
15   I'VE GIVEN BOTH SIDES FREE REIGN TO INTRODUCE THAT.
16        I CAN ALSO SEE AN EXPERT COMING IN AND SAYING, 'YEAH,
17   THAT'S WHAT HAPPENS; PEOPLE ARE INSPIRED.'
18        IT SEEMS KIND OF SELF-EVIDENT.  I DON'T THINK THAT IS
19   SOMETHING THAT REALLY IS A CHALLENGING CONCEPT FOR A JURY TO
20   GET THEIR MIND AROUND.
21        BUT TO GO ONE STEP FURTHER AND HAVE AN EXPERT SAY
22   THAT IT'S PLAUSIBLE THAT THIS PARTICULAR THEORY IS CORRECT,
23   WHEN I DON'T DETECT ANY SCIENTIFIC BASIS OF THAT EXPERT
24   REJECTING THE PLAUSIBILITY OF SOME OTHER THEORY, I THINK RUNS
25   INTO CONFUSING PRINCIPLES UNDER DAUBERT.  BUT THAT'S JUST MY
```

08:51
08:51
08:52
08:52
08:52
08:53

1    INITIAL REACTION OF THE TESTIMONY.

2              **MS. AGUIAR:**  ABSOLUTELY.  AND I THINK THAT IS REALLY

3    THE CRUX OF THE ISSUE HERE.  THERE ARE A FEW OTHER THINGS IN

4    THE MOTION *IN LIMINE*, LIKE WHETHER OR NOT WE SHOULD BE ABLE TO

5    BRING OUT AS PART OF HIS CREDENTIALS WHETHER HE DOES CHARITY         08:53

6    WORK; BUT LET ME PUT THAT ASIDE, BECAUSE YOU'VE CLEARLY PUT

7    YOUR FINGER ON THE KEY ISSUE.

8              FIRST OF ALL, I AGREE WITH YOU THAT ONE OF THE

9    AREAS -- AND MR. TONNER'S TESTIMONY WILL BE -- AND I THINK THE

10   WAY YOU PUT IT WAS, THE INSPIRATION PROCESS; AND THAT IS THE        08:53

11   WAY, AS AN ARTISTIC PERSON AND AS A PERSON WHO HAS DESIGNED

12   DOLLS HIMSELF, CAN TESTIFY THAT THE ARTISTIC INSPIRATION

13   PROCESS DOES HAPPEN THAT WAY.

14             NOW, THAT MAY BE SELF-EVIDENT; IT MAY NOT.  I MEAN,

15   WE KNOW A LITTLE BIT ABOUT THE JURY.  WE KNOW WE HAVE ONE DOLL      08:53

16   COLLECTOR ON THE JURY.  BUT OTHER THAN HER, WE HAVE FOLKS WHO

17   HAVE AT LEAST NOT INDICATED ANY PROPENSITY FOR ARTISTIC ABILITY

18   OR ANY EXPERIENCE IN THEIR OWN LIVES DEALING WITH ARTISTS AND

19   HOW THAT HAPPENS; SO I THINK THAT YOU'RE ABSOLUTELY RIGHT WHEN

20   YOU SAY THAT IT'S NOT SCIENTIFIC.  BUT I THINK EXPERTS COME IN      08:54

21   IN ALL ASPECTS OF ANY KIND OF INFORMATION THAT ASSISTS A JURY

22   IN UNDERSTANDING THE KEY ISSUE IN THIS CASE.

23             SO JUST BECAUSE HE'S NOT A SCIENTIST, I THINK THAT,

24   IN AND OF ITSELF --

25             **THE COURT:**  MY REFERENCE TO SCIENCE WAS NOT SO MUCH    08:54

```
 1   IN DESCRIBING THE CREATIVE PROCESS; IT WAS A SCIENTIFIC BASIS.

 2   AND HERE WHERE I USED SCIENCE, NOT IN ITS PROPER SENSE OF

 3   CHEMISTRY, BIOLOGY, PHYSICS, BUT IN TERMS OF A SCIENTIFIC

 4   METHOD TYPE, THE PRINCIPAL REASON FOR DISTINGUISHING ONE SOURCE

 5   OF INSPIRATION, I.E. THE SOURCE BEING SUGGESTED BY MGA, AS        08:54

 6   OPPOSED TO ANOTHER SOURCE OF INSPIRATION, THE SOURCE BEING

 7   PRESSED BY MATTEL.

 8            MS. AGUIAR:   RIGHT.  AND LET ME ADDRESS THAT.

 9            I THINK WHAT MR. TONNER WILL DO IS SAY THAT AS

10   SOMEONE WHO IS A DESIGNER, WHO HAS SKETCHED HIMSELF, WHO WENT     08:55

11   TO DESIGN SCHOOL, WHO WORKS WITH DESIGNERS WHO PRESENT IDEAS TO

12   HIM AND IS STEEPED IN REVIEWING THESE KINDS OF IMAGES AND

13   SEEING WHAT INFLUENCES FROM ONE IMAGE ARE REFLECTED IN

14   ANOTHER -- THIS IS TESTIMONY THAT HAS BEEN BROUGHT OUT BY LAY

15   WITNESSES IN THIS CASE.  BUT HE WAS ALSO QUESTIONED AT HIS        08:55

16   DEPOSITION ON, FOR EXAMPLE, TOON TEENS VERSUS BRATZ.  AND WE'VE

17   ALL HEARD ABOUT THAT.  MATTEL HAS ITS OWN EXPERT.  WHETHER OR

18   NOT IT CHOOSES TO CALL THAT EXPERT, I DON'T KNOW; BUT THEY HAVE

19   THEIR OWN EXPERT, HE'S AN ART EXPERT, AND HE LOOKS AT THE

20   THINGS AND HE SAYS, 'WELL, LET ME TELL YOU, FROM AN ARTISTIC      08:55

21   PERSPECTIVE AND AS A DESIGNER AND AS A SKETCHER, WHAT I SEE AS

22   THE DIFFERENCES AND THE SIMILARITIES...'

23            I CAN REPRESENT TO YOU THAT MR. TONNER WILL NOT SAY,

24   'I BELIEVE WHAT CARTER BRYANT IS SAYING.'  HE WILL NOT SAY, 'I

25   BELIEVE THAT WHAT HE SAYS IS TRUE.'  HE WILL BE SAYING, 'I AM     08:56
```

1  OBSERVING THE STYLISTIC ELEMENTS IN THIS DRAWING AND COMPARING

2  THEM TO THE OTHER ONE,' WHICH IS, I THINK, A FAIR BASIS FOR HIM

3  TO BE TESTIFYING.

4       HE ADDRESSED IT IN HIS REPORT.  THEY INQUIRED AT HIS

5  DEPOSITION ABOUT IT.  AND THIS IS WHAT HE DOES; THIS IS WHAT HE       08:56

6  DOES FOR A LIVING.

7       **THE COURT:**  TO SAY THAT THERE ARE STYLISTIC

8  ELEMENTS -- AGAIN, THERE'S A CERTAIN DEGREE OF -- I WANT TO BE

9  CAREFUL HOW I PHRASE THIS, BUT LET'S BE FRANK, EVERYONE WHO SAW

10  THE AD, THE PARIS BLUES AD, FOR EXAMPLE, CAN SEE THE       08:57

11  SIMILARITIES BETWEEN -- CERTAIN STYLISTIC ELEMENTS IN THE PARIS

12  BLUES AD AND A DRAWING OF A BRATZ DOLL.  AND TO HAVE AN EXPERT

13  COME UP AND STATE THE OBVIOUS -- BEYOND HAVING HIM EXPLAIN THE

14  PROCESS THAT A DESIGN ARTIST GOES THROUGH TO POINTING OUT THESE

15  COMPARATIVE FEATURES, WHICH EITHER YOU OR MR. NOLAN CAN       08:57

16  ADEQUATELY DO, I REALLY DON'T KNOW WHAT THAT GAINS.  AND THE

17  CONCERN I HAVE IS, THEN, YES, IT DOES TO A CERTAIN EXTENT, IN

18  REBUTTAL, OPEN THE FLOOD GATES TO HAVE NOW SOMEBODY ELSE COME

19  UP AND POINT OUT SIMILARITIES TO SOME OTHER DOLL.  AND I DON'T

20  KNOW IF THAT -- I'M QUESTIONING HOW BENEFICIAL THAT ASPECT OF       08:57

21  THE TESTIMONY IS.

22       BUT IT ALSO CAUSES ME TO QUESTION ON A MORE

23  FUNDAMENTAL LEVEL -- AGAIN, I'M TRYING TO SAY THIS ARTFULLY,

24  BECAUSE I CERTAINLY DON'T WANT TO -- I'M NOT IN A POSITION AT

25  THIS POINT TO QUESTION MR. TONNER'S TESTIMONY, BUT IS HE ABLE       08:58

1    TO ARTICULATE A SCIENTIFIC BASIS -- AND I USE THAT TERM BROADLY

2    TO INCLUDE THE ARTS, I SUPPOSE, IN THIS CASE -- TO EXCLUDE

3    OTHER INSPIRATIONAL POINTS AND TO DEFINITIVELY SAY THAT THIS

4    WAS THE INSPIRATION, I.E. THE PARIS BLUES AD, OR SOMETHING

5    ELSE, AS OPPOSED TO SOMETHING ELSE BEING THE INSPIRATION?  OR          08:58

6    COULD WE WILLY NILLY SIT DOWN AND GO THROUGH ANY NUMBER OF

7    MAGAZINES FROM 1990 TO 2002 AND POINT OUT ANY NUMBER OF THINGS

8    THAT COULD HAVE BEEN THE INSPIRATION?

9         **MS. AGUIAR:**  UNDERSTOOD.

10            FIRST OFF, IT'S CLEARLY AN ISSUE IN THIS CASE THAT          08:58

11   THE JURY HAS HEARD ABOUT AT LENGTH.  THEY'VE HEARD ABOUT IT

12   FROM LAY WITNESSES.  I THINK THAT IS ONE OF THE PURPOSES THAT

13   EXPERTS SERVE IN A CASE.  AND WE HAPPEN TO HAVE FOUND AN EXPERT

14   THAT IS AT THE TOP OF HIS FIELD, WHO HAS YEARS AND YEARS OF

15   EXPERIENCE DOING THIS AND OF JUDGING THESE THINGS AND OF SEEING          08:59

16   THEM AND EXPLAINING THEM TO PEOPLE.  AND SO I THINK IT'S FAIR

17   FOR US TO BE ABLE TO OFFER AN EXPERT TO COMMENT ON THE

18   TESTIMONY THAT'S BEEN GIVEN BY THE LAY WITNESSES.

19            AND TO ADDRESS YOUR SPECIFIC QUESTION, I DON'T KNOW

20   WHETHER HE WOULD CALL IT SCIENTIFIC.  I CAN TELL YOU THAT HE          08:59

21   WOULD SAY, 'I'M LOOKING AT THIS ONE, AND THESE ARE THE

22   SIMILARITIES I SEE, AND THIS IS WHY IT'S CONSISTENT WITH WHAT I

23   SEE.'

24            AND, SURE, THAT TO ME, GOES TO THE WEIGHT.  THE JURY

25   CAN SAY, 'OH, WELL, YEAH, THIS GUY' -- THEY CAN JUDGE HIS          08:59

1    CREDIBILITY AND WEIGH WHAT THEY WANT, AND THEN MATTEL CAN CROSS

2    HIM ON THAT AND SAY, 'WELL, DOESN'T IT LOOK LIKE THIS OTHER

3    THING?'

4         HE WILL ALSO SAY THAT HE WAS NOT THERE IN 1998.  SO

5    HE'S NOT HERE TO SAY FOR SURE WHAT INSPIRED HIM.  BUT HE IS          09:00

6    HERE TO SAY, AS A DOLL DESIGNER AND AS AN ARTIST, WHY THESE

7    DESIGN INSPIRATIONS ARE CONSISTENT WITH WHAT HE SEES.  AND I

8    THINK THAT IT IS SUCH AN ISSUE IN THIS CASE THAT IT'S FAIR FOR

9    US TO BE ABLE TO OFFER A QUALIFIED EXPERT ON THIS SUBJECT.

10   FRANKLY, I CAN'T THINK OF ANYONE WHO'S MUCH MORE QUALIFIED.         09:00

11        I UNDERSTAND WHY MATTEL DOESN'T WANT MR. TONNER ON

12   THE STAND, BECAUSE THERE'S NOT MANY PEOPLE LIKE HIM IN THIS

13   COUNTRY.  THERE'S NOT MANY PEOPLE WHO OWN THEIR OWN DOLL

14   COMPANY, WHO HAVE BEEN IN FASHION DESIGN, WHO HAVE DESIGNED

15   DOLLS FOR THE MASS MARKET AND FOR THE COLLECTIBLE MARKET, AND       09:00

16   WHO ARE SCULPTORS AND ARTISTS THEMSELVES.  THEY'RE SORT OF A

17   RARE BREED.

18        **THE COURT:**  VERY WELL.

19        **MS. AGUIAR:**  AND I THINK HE BRINGS SOMETHING,

20   BASICALLY, TO ONE OF THE CORE ISSUES IN 1-A.                       09:01

21        **THE COURT:**  THANK YOU, COUNSEL.

22        I'LL HEAR FROM MATTEL.

23        **MR. COREY:**  THANK YOU, YOUR HONOR.

24        I THINK THAT IT WOULD HELP US TO GO BACK TO FIRST

25   PRINCIPALS A LITTLE BIT.                                           09:01

```
 1            UNDER 702 IN DAUBERT, THERE HAS TO BE AN EMPIRICAL

 2    BASIS FOR THESE WITNESSES TO COME IN AND TESTIFY.  AND WHAT YOU

 3    HAVE MR. TONNER DOING, WHAT HE'S BEING OFFERED FOR, IS TO COME

 4    IN AND SAY, 'I HEARD CARTER BRYANT'S STORY RELATED TO ME BY AN

 5    ATTORNEY FROM O'MELVENY & MYERS, AND IT SOUNDED PRETTY GOOD TO    09:01

 6    ME, SO, JURY, I THINK YOU SHOULD BELIEVE MR. BRYANT'S ACCOUNT.'

 7            THE COURT:  BUT LET'S ACCEPT COUNSEL'S REPRESENTATION

 8    THAT THAT'S NOT GOING TO BE -- I'M NOT GOING TO PERMIT THAT

 9    KIND OF TESTIMONY IN THIS COURTROOM.  THAT'S NOT HAPPENING.  IF

10    THAT'S ATTEMPTED TO BE ELICITED -- WHOEVER IS TRYING TO ELICIT    09:01

11    THAT WILL BE EMBARRASSED, BECAUSE THE COURT WILL STOP THAT AND

12    INSTRUCT THE JURY TO DISREGARD IT.  SO THAT'S NOT GOING TO

13    HAPPEN.

14            THE ONLY EXTENT THAT I'M CONSIDERING ALLOWING THIS TO

15    GO FORWARD WOULD BE DESCRIBING THE CREATIVE PROCESS ITSELF AND    09:02

16    THE EXTENT TO WHICH EXTERNAL CULTURAL INFLUENCES PLAY A ROLE IN

17    THAT CREATIVE PROCESS.  THIS IS SOMETHING WHICH HAS BEEN

18    ADVOCATED BY BOTH SIDES.  BOTH SIDES HAVE PRESSED THIS FROM DAY

19    ONE.  AND TO HAVE AN EXPERT, SOMEONE WELL EXPERIENCED OR WELL

20    VERSED IN THE DESIGN PROCESS AS MR. TONNER APPEARS TO BE, TO      09:02

21    SPEAK TO THAT, I CAN SEE SOME VALUE IN THAT.

22            MY TROUBLE IS, AS I EXPRESSED, THOUGH, IS GOING

23    BEYOND THAT, AND IN WHAT THIS PARTICULAR EXPERT DID IN TERMS OF

24    IDENTIFYING PARTICULAR FEATURES AND PARTICULAR CULTURAL

25    INFLUENCES, NAMELY THESE ADS OR THE MAGAZINES OR THE KIDS AT      09:02
```

```
 1   KICKAPOO OR THE TOON TEENS, AND MAKING JUDGMENTS ABOUT WHICH OF
 2   THESE ACTUALLY, IN FACT, AFFECTED CARTER BRYANT.  AND THAT'S
 3   WHERE I'M HAVING THE BIGGEST TROUBLE.
 4        IF YOU THINK THE COURT IS MISTAKEN ON THE FIRST
 5   POINT, ABOUT JUST HAVING SOMEONE WITH THESE KINDS OF                09:03
 6   CREDENTIALS EXPLAIN THE CREATIVE PROCESS, I'D LIKE TO HEAR FROM
 7   YOU ON THAT.  BUT I'M TENTATIVELY SOLD ON THAT.  WHAT I'M NOT
 8   SOLD ON IS THIS KIND OF SECOND PART.  WE'RE DEFINITELY NOT
 9   GOING TO HAVE TESTIMONY ABOUT -- YOU KNOW, HAVE AN EXPERT STAND
10   UP AND SAY, 'I BELIEVE THIS SIDE; I DON'T BELIEVE THAT SIDE.'       09:03
11   THAT'S THE JUROR'S PROVINCE.
12        MR. COREY:  I DO THINK THE COURT IS MISTAKEN ON THE
13   FIRST PART, AND LET ME KIND OF START BACK.
14        WHAT MS. AGUIAR ARTICULATED THAT MR. TONNER WAS GOING
15   TO TESTIFY ABOUT IS NOT IN HIS REPORT.  THE SOLE BASIS FOR HIS      09:03
16   REPORT WAS OPINING ABOUT THE PLAUSIBILITY, THE ARTISTIC
17   PLAUSIBILITY, OF CARTER BRYANT'S CREATION STORY.
18        NOW, WHAT THE JURY HAS HEARD -- MR. TONNER MAY BE THE
19   MOST QUALIFIED EXPERT IN THE WORLD AS FAR AS HIS CREATIVE
20   PROCESS -- WHAT THE JURY HAS HEARD FOR A NUMBER OF DAYS IS THE      09:04
21   CREATIVE PROCESS THAT CARTER BRYANT CLAIMS TO HAVE BEEN THROUGH
22   IN CREATING THESE PARTICULAR BRATZ DOLLS.  AND IT'S UP TO THE
23   JURY TO DECIDE WHETHER THEY BELIEVE THAT OR NOT.
24        NOW, PUTTING ON TOP OF THAT AN EXPERT SAYING, 'WELL,
25   AS AN ABSTRACT, THIS IS WHAT THE CREATIVE PROCESS IS,' WHILE        09:04
```

1    MR. TONNER DOESN'T EVEN HAVE THE BENEFIT OF KNOWING WHAT

2    CARTER BRYANT TESTIFIED TO, SEEMS TO ME TO BE A LITTLE FAR

3    AFIELD, REGARDLESS OF HOW QUALIFIED HE MAY BE IN HIS OWN

4    EXPERIENCE.  AND HIS OWN EXPERIENCE, ACTUALLY, IS MORE IN BEING

5    A SCULPTOR THAN A SKETCHER, LIKE MR. BRYANT.                    09:04

6          SO I DO THINK THE COURT IS MISTAKEN ON THAT POINT,

7    WHICH BRINGS ME BACK TO WHAT WE WERE TALKING ABOUT BEFORE.

8    THERE'S NOTHING IN HIS REPORT OR HIS DEPOSITION THAT SHOWS THAT

9    THERE IS KIND OF THIS KNOWLEDGE REQUIREMENT THAT WE HAVE TO

10   HAVE UNDER 702 TO SHOW THAT THERE'S SOME RIGOR APPLIED TO WHAT  09:04

11   THIS CREATIVE PROCESS MAY BE.  I THINK, AS A THRESHOLD MATTER,

12   THAT'S WHAT DAUBERT REQUIRES, AND I HAVEN'T HEARD THAT FROM

13   MS. AGUIAR, AND I HAVEN'T SEEN THAT IN HIS REPORT OR HIS

14   DEPOSITION.  I THINK HE'S JUST GOING TO GET UP AND MUSE AND

15   SAY, 'WHEN I CREATE THINGS, THIS IS WHAT I DO AND THIS IS WHAT  09:05

16   I LOOK AT.'

17         NOW, TO THE EXTENT THE COURT WANTS TO GO BEYOND THAT

18   AND HAVE MR. TONNER TALK ABOUT EXTRINSIC INFLUENCES BEYOND WHAT

19   MR. BRYANT HAS IDENTIFIED -- THAT WAS ONE OF THE CONCERNS THAT

20   MS. AGUIAR AND I TALKED ABOUT YESTERDAY; AND SHE'LL CORRECT ME  09:05

21   IF I'M WRONG, BUT I THINK THE REPRESENTATION IS THAT IF

22   MR. TONNER MAKES IT ON THE STAND, HE'S GOING TO BE LIMITED

23   TO -- THEY'RE NOT GOING TO ELICIT ANYTHING FROM HIM IN THE FORM

24   OF AN OPINION THAT RELATES TO ANY INFLUENCE OTHER THAN WHAT

25   MR. BRYANT HAS IDENTIFIED.                                      09:05

```
 1            THE COURT:  IS THAT CORRECT?

 2            MS. AGUIAR:  THE SHORT ANSWER IS YES.

 3            THE COURT:  OKAY.  I'LL TAKE THE SHORT ANSWER.

 4            I DO WANT TO TAKE UP AND HEAR SOME ARGUMENT ON THIS

 5   OTHER MATTER.  I THINK IT WOULD HELP THE COURT -- YOU DON'T     09:06

 6   PLAN ON CALLING MR. TONNER THIS MORNING, DO YOU?

 7            MS. AGUIAR:  NO.

 8            THE COURT:  I DON'T HAVE ANYTHING AT LUNCH TODAY,

 9   EXCEPT LUNCH.  WHAT I'D LIKE TO DO IS HEAR FROM MR. TONNER.

10   AND I WANT TO GIVE MR. COREY AND MS. AGUIAR AN OPPORTUNITY TO   09:06

11   EXPLORE EXACTLY -- I'D LIKE TO HAVE A BETTER SENSE DIRECTLY

12   FROM HIM THE BASIS FOR BOTH OF THESE AREAS.  AND THE ONLY TWO

13   AREAS THAT I'M CONSIDERING ARE THIS CREATIVE PROCESS -- AND I'M

14   MINDFUL OF THE CRITIQUE THAT MR. COREY HAS ADVANCED THAT

15   THERE'S NO BASIS TO IMPUTE, ESSENTIALLY, HIS CREATIVE PROCESS,  09:06

16   OR HIS UNDERSTANDING OF THE CREATIVE PROCESS, ON MR. BRYANT.

17   SO I'LL BE INTERESTED IN THE FOUNDATION FOR THAT.

18            BUT THEN, SECONDLY, THE OTHER AREA WHICH THE COURT

19   HAS EXPRESSED CONCERN IN IS HOW IT IS THAT HE CAN FURTHER

20   IMPUTE, BEYOND POINTING OUT SIMILARITIES -- THE POINTING OUT OF 09:07

21   SIMILARITIES BETWEEN THE AD AND THE DRAWING, HOW THAT REQUIRES

22   AN EXPERT AND WHAT ADDED DIMENSION HE BRINGS.  AND I THINK WE

23   SHOULD EXPLORE THAT THROUGH A HEARING OUTSIDE THE PRESENCE OF

24   THE JURY BEFORE THE COURT IS SATISFIED THAT THIS CAN PROCEED.

25            MR. COREY:  IF HE'S JUST GOING TO REPEAT WHAT THE      09:07
```

```
 1    JURY HAS HEARD, THEN THERE'S NO ASSISTANCE TO THE JURY.

 2            THE COURT:  MS. AGUIAR SUGGESTS IT'S BEYOND THAT, AND

 3    I THINK MGA HAS A RIGHT TO HAVE THE COURT AT LEAST CONSIDER THE

 4    TESTIMONY ITSELF.

 5            MR. COREY:  OF COURSE.                                    09:07

 6            THE COURT:  VERY WELL.

 7            MS. AGUIAR:  JUST BRIEFLY, YOUR HONOR, BECAUSE I DID

 8    WANT TO MAKE SURE THAT I'M CLEAR, THERE ARE OTHER ASPECTS OF

 9    HIS TESTIMONY THAT ARE COVERED IN HIS REPORT, ARE WITHIN THE

10    SCOPE OF HIS REPORT, AND THAT WE WOULD ELICIT TESTIMONY FROM    09:08

11    HIM ON.  FOR EXAMPLE, THE COLORIZATION.  WE ALL KNOW AND WE'VE

12    HEARD TESTIMONY THAT THE ORIGINAL CONCEPT DRAWINGS WERE DONE IN

13    BLACK AND WHITE; COLOR WAS ADDED LATER.  THAT'S IN HIS REPORT.

14    HE WAS ASKED AT HIS DEPOSITION ABOUT IT.  AND THAT ABSOLUTELY

15    IS A SUBJECT THAT WE WOULD --                                   09:08

16            THE COURT:  WHAT EXACTLY IS HE GOING TO SAY TO THAT

17    EFFECT?

18            MS. AGUIAR:  HIS TESTIMONY ON THAT IS GOING TO BE

19    FROM THE PERSPECTIVE OF, AGAIN, SOMEONE WHO NOT ONLY DOES THIS

20    HIMSELF --                                                      09:08

21            THE COURT:  RIGHT.  BUT WHAT DOES HE SAY ABOUT THAT?

22            MS. AGUIAR:  HE'S TALKING ABOUT WHETHER OR NOT THE

23    ADDING OF COLOR DOES ANYTHING TO THE DRAWING.

24            THE COURT:  WHAT IS HE GOING TO SAY?

25            MS. AGUIAR:  HE'S GOING TO SAY THAT FROM HIS            09:08
```

```
 1   EXPERIENCE, HIS OWN PERSONAL EXPERIENCE, AND HAVING PITCHES

 2   MADE TO HIM, THAT HE DOES NOT BELIEVE THAT THE ADDING OF THE

 3   COLOR CHANGED THE CONCEPT OF THE DRAWING.  AND HE WILL EXPLAIN

 4   WHY HE ADDS COLOR WHEN HE GOES TO DO PITCHES.  AND I THINK

 5   THAT'S CLEARLY IN HIS REPORT.  HE WAS ASKED ABOUT IT AT HIS       09:09

 6   DEPOSITION.

 7            AND IN A SIMILAR VEIN, WE'VE HEARD ABOUT HOW, FOR THE

 8   PITCH, MR. BRYANT DREW SOME ADDITIONAL FASHIONS ONTO THE DOLL.

 9   SO I WOULD SORT OF PUT THE COLOR AND THE FASHION IN THE SAME

10   CATEGORY IN TERMS OF WHAT IT ADDS WHEN SOMEONE IS DESIGNING A    09:09

11   DOLL IDEA.  AND THAT IS WHAT MR. TONNER DOES.  HE DESIGNS DOLLS

12   HIMSELF, AND HE WORKS WITH PEOPLE WHO DESIGN THEM FOR HIM; AND

13   THAT'S HIS INDUSTRY.

14            THE COURT:  ANYTHING ELSE?

15            MS. AGUIAR:  I JUST WANT TO MAKE SURE THAT WHEN          09:09

16   YOU --

17            THE COURT:  I WANT TO HAVE AN EXHAUSTIVE LIST.

18            MS. AGUIAR:  I APPRECIATE THAT.  THAT'S WHY I STOOD

19   UP.

20            YOU SAID CREATIVE PROCESS, AND I JUST WANT TO MAKE       09:09

21   SURE THAT I UNDERSTAND WHAT IS ENCOMPASSED WITHIN THE CREATIVE

22   PROCESS.

23            THE COURT:  I'M BASING MINE ON THE BRIEFS, WHAT I

24   READ LAST NIGHT.  TO THE EXTENT THAT THERE'S STUFF THAT WAS NOT

25   DISCUSSED OR ADDRESSED IN THE BRIEFS, THAT'S WHAT YOU NEED TO    09:10
```

1    ADDRESS NOW.

2            MS. AGUIAR:  THE CREATIVE PROCESS, HE WOULD ADDRESS;

3    BASICALLY, THE DOLL DESIGN PROCESS; BUT NOT BEYOND THE POINT

4    WHERE WE'VE GOTTEN IN 1-A.  IN OTHER WORDS, HE WOULD NOT TALK

5    ABOUT WHEN YOU'RE ACTUALLY MANUFACTURING A DOLL.                09:10

6            THE COURT:  RIGHT.  AND HOLD THE PERCENTAGE ISSUE,

7    THE 10 TO 15 PERCENT IS THE DESIGNER --

8            MS. AGUIAR:  ABSOLUTELY NOT.  BUT HE WOULD TALK ABOUT

9    THE DESIGN PROCESS AS IT RELATES TO EVERYTHING THAT HAS BEEN

10   TALKED ABOUT IN 1-A; NAMELY, WHEN YOU TAKE IT FROM AN IDEA TO A  09:10

11   DRAWING AND YOU PUT PEN TO PAPER AND THEN YOU WANT TO PITCH IT

12   AND YOU MAYBE ADD COLOR AND YOU PERHAPS GIVE THEM A COUPLE OF

13   OTHER OUTFITS.

14           THE COURT:  THE DRAWINGS, RIGHT; THE CREATIVE PROCESS

15   OF THE DRAWINGS IS PROBABLY THE BEST WAY TO SAY THAT.            09:10

16           MS. AGUIAR:  HE'S ALSO A SCULPTOR.  AND IN HIS

17   REPORT, HE HAS INFORMATION ABOUT SCULPTING.  AND THEY ASKED HIM

18   EXTENSIVE QUESTIONS AT HIS DEPOSITION ABOUT SCULPTING.

19           NOW, I WILL NOT ELICIT TESTIMONY FROM HIM REGARDING

20   ANYTHING BEYOND WHAT WE'VE TALKED ABOUT, BUT THIS JURY HAS       09:11

21   HEARD ABOUT SCULPTING.  ONE OF THE WITNESSES ON MATTEL'S LIST

22   IS MARGARET LEAHY.  SHE WAS A SCULPTOR FOR BRATZ.  THERE'S AT

23   LEAST ONE TANGIBLE SCULPT THAT'S IN EVIDENCE.

24           THE COURT:  WHAT IS HE GOING TO SPEAK TO ABOUT

25   SCULPTING?                                                      09:11

1      **MS. AGUIAR:**  HE WOULD SPEAK TO THE IMPORTANCE OF THE

2  SCULPTOR IN THE PROCESS AND SPEAK TO THE DRAWINGS AND WHETHER

3  OR NOT THOSE DRAWINGS, IN HIS EXPERIENCE AS AN ARTIST AND AS

4  SOMEONE WHO SCULPTS FROM DRAWINGS, WHETHER THOSE DRAWINGS HAVE

5  ENOUGH INFORMATION IN IT THAT -- MERELY FROM MR. BRYANT'S            09:11

6  DRAWING, WHETHER A PARTICULAR SCULPT WOULD NECESSARILY EMERGE

7  FROM THAT DRAWING.

8      BECAUSE AN ARGUMENT HAS BEEN MADE -- AND IF YOU LOOK

9  AT THE VERDICT FORM, BY THE WAY -- IF YOU LOOK AT MATTEL'S

10  VERDICT FORM, IT SAYS, 'WHICH OF THESE THREE DIMENSIONAL            09:11

11  SCULPTS OR OTHER WORKS BASICALLY DID MR. BRYANT CREATE.'

12      WELL, THAT'S AN ISSUE.  AND IT'S GOING TO BE AN

13  ISSUE.  IT'S BEEN AN ISSUE THAT TESTIMONY HAS BEEN ELICITED ON,

14  AND THE JURY IS GOING TO BE ASKED THAT QUESTION.  MR. TONNER IS

15  A SCULPTOR AND MR. TONNER HAS WORKED ON THESE TYPES OF THINGS.     09:12

16      **THE COURT:**  VERY WELL.

17      ANYTHING ELSE?

18      **MS. AGUIAR:**  IN TERMS OF DESIGN INSPIRATION, ARE YOU

19  INCLUDING COMPARISONS -- I THINK THIS IS PRETTY CLEAR -- BUT

20  COMPARISONS OF OTHER THINGS LIKE TOON TEENS, NOT JUST ADS?          09:12

21      **THE COURT:**  RIGHT.

22      **MS. AGUIAR:**  BECAUSE I THINK THE JURY SHOULDN'T BE

23  LEFT TO ONLY HEAR TESTIMONY FROM IVY ROSS AND LILY MARTINEZ ON

24  TOON TEENS, BECAUSE THEY WERE THE FIRST TWO WITNESSES IN THIS

25  CASE, AND THEY BOTH ADDRESSED IT, AND THEY BOTH ADDRESSED WHAT      09:12

```
 1   THAT POSE LOOKS LIKE, AND I THINK THAT WE SHOULD BE ABLE TO --
 2        THE COURT:  AND HE'S GOING TO SAY THAT BRATZ DOESN'T
 3   LOOK LIKE TOON TEENS?
 4        MS. AGUIAR:  HE'S GOING TO GIVE HIS REASONS WHY HE
 5   THINKS THERE ARE MAJOR DIFFERENCES FROM A DESIGN PERSPECTIVE    09:12
 6   BETWEEN THE TOON TEENS SKETCHES AND THE BRATZ SKETCHES.
 7        THE COURT:  IS HE GOING TO SAY THAT THERE ARE MAJOR
 8   DIFFERENCES BETWEEN THE PARIS BLUES AD AND THE DESIGN SKETCHES?
 9        MS. AGUIAR:  MAJOR DIFFERENCES OR SIMILARITIES?
10        THE COURT:  MAJOR DIFFERENCES.                            09:13
11        MS. AGUIAR:  I THINK HIS TESTIMONY IS THAT HE SEES
12   MANY MORE SIMILARITIES THAN DIFFERENCES, AND IT SEEMS LIKE HE'S
13   GOING TO SAY, 'THESE ARE THE ELEMENTS THAT I SEE IN THIS AD, IN
14   THE BRATZ SKETCHES.'
15        THE COURT:  I THINK I NEED TO HEAR THIS TESTIMONY         09:13
16   BEFORE IT'S GIVEN TO THE JURY.
17        MS. AGUIAR:  OKAY.
18        AND OBVIOUSLY, THE TOON TEENS THING INCLUDES THE
19   WHOLE IDEA OF THE POSES, WHICH GOES BACK TO THE OPENING
20   STATEMENTS, YOUR HONOR.                                       09:13
21        THE COURT:  I KNOW.
22        MS. AGUIAR:  THANK YOU.
23        THE COURT:  VERY GOOD.
24        MR. COREY:  JUST VERY BRIEFLY, YOUR HONOR.
25        I WANT TO BE CLEAR, THE SCOPE OF THE MOTION, TO THE       09:13
```

1    EXTENT THAT THINGS AREN'T EXCLUDED UNDER 1-B, IS THAT

2    MR. TONNER SHOULDN'T BE TESTIFYING AT ALL.  WE DO HAVE SOME --

3    WITH RESPECT TO SOME OF THE THINGS THAT MS. AGUIAR ARTICULATED,

4    THE COLORIZATION OF THE DRAWINGS GOES TO THE SCOPE OF THE

5    PROTECTABILITY, WHICH IS UNDER THE COPYRIGHT ACT; THAT'S A 1-B        09:13

6    ISSUE.

7            TO THE EXTENT THEY WANT HIM TO TALK ABOUT THE

8    SCULPTS, WHAT THAT REALLY -- THAT IMPLICATES OUR MOTION,

9    MATTEL'S MOTION, WITH RESPECT TO THE TRANSLATION OF 2-D TO 3-D.

10   I THINK THAT ALL COMES IN IN 1-B ANYWAY, BUT WE DO HAVE A         09:14

11   MOTION PENDING BEFORE THE COURT ON THE TRANSLATION OF 2-D TO

12   3-D.  I THINK, BEFORE WE CROSS THAT BRIDGE WITH MR. TONNER, THE

13   COURT MAY NEED TO REVISIT THAT.

14           **THE COURT:**  I KNOW.  I'M MINDFUL OF THAT.

15           WE'LL TAKE THAT UP.  AND I'LL HEAR FROM MR. TONNER         09:14

16   DURING LUNCHTIME.

17           **MS. AGUIAR:**  WHAT TIME WOULD YOU LIKE HIM HERE,

18   YOUR HONOR?  DO YOU WANT TO DO IT AT THE BEGINNING OR THE END

19   OF THE BREAK?

20           **THE COURT:**  LET'S HAVE HIM HERE FROM 12:30 TO 1:30.    09:14

21           HOW LONG WOULD YOU ANTICIPATE -- SKIPPING THROUGH

22   CREDENTIALS AND STUFF -- THE COURT HAS THE BENEFIT OF THAT FROM

23   HIS REPORT -- THE SUBSTANCE OF THE TESTIMONY ITSELF, HOW LONG

24   WOULD YOU ANTICIPATE?

25           **MS. AGUIAR:**  I WANT TO UNDERSTAND WHAT YOU ENVISION    09:15

1    HAPPENING.

2              **THE COURT:**  I WANT TO HEAR HIS TESTIMONY.

3              **MS. AGUIAR:**  AS IF WE'RE DOING, FOR LACK OF A BETTER

4    WORD, A DRY RUN?

5              **THE COURT:**  YES.

6              **MS. AGUIAR:**  LIKE, JUST GO THROUGH IT AND 'WHAT WOULD

7    YOU SAY,' RATHER THAN MORE OF LIKE A VOIR DIRE, LIKE 'WHAT

8    WOULD YOU SAY, WHAT DO YOU THINK ABOUT THIS' --

9              **THE COURT:**  WHAT I MAY DO, FOR THE COURT'S

10   CONVENIENCE, IS BREAK IT DOWN INTO THE FOUR CATEGORIES THAT          09:15

11   YOU'VE SUGGESTED HERE.  WE'VE COME UP WITH THE CREATIVE DESIGN

12   PROCESS FOR THE DRAWINGS; THE COMPARATIVE INFLUENCE PROCESS;

13   THE COLORIZATION, WHICH ADDS BOTH THE COLORIZATION OF THE

14   DRAWINGS AND THE FASHION DRAWINGS; AND THE SCULPTING.  AND IN

15   EACH OF THOSE FOUR AREAS, I'D LIKE TO HEAR HIS TESTIMONY AS          09:15

16   ELICITED FROM YOU, AND I'D LIKE TO HEAR THE CROSS-EXAMINATION;

17   AND THEN THE COURT WILL ASSESS WHETHER OR NOT THIS EXPERT IS

18   REALLY QUALIFIED, AND THE COURT WILL PERFORM ITS GATEKEEPING

19   FUNCTION.

20             **MS. AGUIAR:**  OKAY.  THEN WE MAY NEED THE BETTER PART     09:15

21   OF 12:30 TO 1:30.

22             **THE COURT:**  ALL RIGHT.  THEN LET'S START AT 12:15;

23   HAVE HIM READY TO GO AT 12:15.

24             **MS. AGUIAR:**  I WILL.

25             **THE COURT:**  VERY WELL.

```
 1              THE WAIVER ISSUE.  I'LL TELL YOU WHERE I AM ON THIS
 2     AT THIS POINT.
 3              I THINK IT'S PRETTY CLEAR TO THE COURT THAT THE
 4     ROSENBAUM E-MAIL WAS A PRIVILEGED COMMUNICATION.  THERE IS NO
 5     QUESTION THAT IT CONTAINED ADVICE FROM AN ATTORNEY TO A CLIENT.   09:17
 6     IT MADE A RECOMMENDATION.  IT DID SET FORTH FACTUAL STATEMENTS.
 7     THE FACTUAL STATEMENTS WERE IN THE CONTEXT OF THE E-MAIL, THE
 8     PREDICATE FOR THE RECOMMENDATION; SO I THINK THE FACTUAL
 9     STATEMENT IS INEXTRICABLY INTERTWINED WITH THE ADVICE.
10              THE ADVICE-OF-COUNSEL DEFENSE HAS NOT BEEN ASSERTED,    09:17
11     OR HAS BEEN OTHERWISE DEALT WITH.  BUT I THINK THAT'S A BIT OF
12     A RED HERRING IN THIS CASE, BECAUSE I DON'T THINK IT'S
13     NECESSARY TO ASSERT AN ADVICE-OF-COUNSEL DEFENSE TO WAIVE
14     ATTORNEY-CLIENT PRIVILEGE BY PRODUCTION OF A PRIVILEGED
15     COMMUNICATION.                                                    09:17
16              BUT WHERE I THINK MGA HAS A FAIRLY CONVINCING
17     ARGUMENT GOES TO THE SCOPE OF THE WAIVER, AND PARTICULARLY THIS
18     IN RE: SEAGATE TECH CASE THAT THEY CITE ON PAGE 19 OF THEIR
19     OPPOSITION, WHICH I DON'T REALLY HAVE A CLEAR RESPONSE FROM
20     MATTEL.  SO I WANT TO BEGIN THIS BY GIVING MATTEL AN            09:18
21     OPPORTUNITY TO RESPOND TO BOTH THE ANALYSIS AND THE CONCLUSION
22     OF THE SEAGATE CASE.  AND SEPARATE AND APART FROM THE MERITS OF
23     THIS ISSUE, THE COURT IS SOMEWHAT CONCERNED ABOUT THE TIMING OF
24     THE MOTION SEEKING THE WAIVER.  I'D LIKE THAT ISSUE ADDRESSED
25     AS WELL.                                                         09:18
```

```
 1              SO I'M GOING TO INVITE MATTEL TO PROCEED FIRST ON
 2   THIS.  I GUESS THE FIRST TWO ISSUES ARE NOT NECESSARY TO
 3   ADDRESS, BECAUSE I DO THINK THAT THIS WAS A PRIVILEGED
 4   COMMUNICATION; BUT I DO SEE THE COURT'S DISTINCTION IN SEAGATE,
 5   THE FEDERAL CIRCUIT'S DISTINCTION, AND I SEE HOW IT MIGHT APPLY     09:18
 6   TO THIS PARTICULAR COMMUNICATION.  AND I'M ALSO CONCERNED ABOUT
 7   THE TIMING.
 8              WHO FROM MATTEL -- I DON'T SEE ANYONE JUMPING UP.
 9         MR. PROCTOR:  I'M TRYING TO REFRESH MYSELF ON THE
10   SEAGATE CASE, YOUR HONOR.                                          09:19
11         THE COURT:  I'LL READ THE QUOTE FROM SEAGATE THAT MGA
12   RELIES UPON.  "WHEREAS OPINION COUNSEL SERVES TO PROVIDE AN
13   OBJECTIVE ASSESSMENT FOR MAKING INFORMED BUSINESS DECISIONS,
14   TRIAL COUNSEL FOCUSES ON LITIGATION STRATEGY AND EVALUATES THE
15   MOST SUCCESSFUL MANNER IN PRESENTING A CASE TO A JUDICIAL          09:19
16   DECISION MAKER AND TRIAL COUNSEL ENGAGED IN AN ADVERSARIAL
17   PROCESS."
18              THE COURT DISTINGUISHES BETWEEN, ESSENTIALLY, THE
19   ADVICE BEING OFFERED IN A BUSINESS CONTEXT.
20              HERE, THE ADVICE BEING OFFERED IS CLEARLY RELATED TO     09:19
21   TIME LIMITATIONS ON PATENT LAWS.  AND I DON'T BUY THIS
22   DISTINCTION THAT -- THIS DISSECTION THAT MGA TRIES TO SAY,
23   'WELL, THE LINE BEFORE THAT IS UNRELATED FACTUAL ASSERTION FROM
24   THE ADVICE THAT'S GIVEN.'  IT'S CLEARLY GIVEN -- THE ADVICE IS
25   GIVEN RELYING ON THAT FACTUAL OR CONCLUSION OF FACT THAT THE        09:20
```

1    LAWYER IS REACHING, AND THEN GIVING A RECOMMENDATION.  BUT THE

2    RECOMMENDATION, AT LEAST WITH RESPECT TO THIS PARTICULAR

3    E-MAIL, AS OPPOSED TO OTHER E-MAILS THAT HAVE NOT BEEN

4    PROVIDED, FOCUSES ON TIME LIMITATIONS ON THE PATENT LAWS.  SO I

5    THINK WHAT SEAGATE STANDS FOR IS THIS NOTION THAT --                    09:20

6            I FEEL I NEED TO UP MY TEMPO, NOW THAT --

7            (LAUGHTER.)

8            **MR. NOLAN:**  WE HAD TO RULE AGAINST DOUBLE-TEAMING,

9    BUT UPGRADING IS JUST -- IT'S NOT FAIR TO MR. PROCTOR.  THAT'S

10   ALL I'M SAYING.                                                         09:20

11           **MR. PROCTOR:**  I JUST DO WHAT I'M TOLD.

12           **THE COURT:**  I'LL BE BRIEFER THE NEXT TIME, SO YOU CAN

13   HOPEFULLY HOLD THE LINE THERE.

14           APPARENTLY, YOU DO UNDERSTAND WHERE I'M GOING WITH

15   THIS, SO I'M GOING TO STOP TALKING AND LET YOU TALK.                    09:21

16           **MR. QUINN:**  I THINK I DO, YOUR HONOR.

17           THERE IS THIS WHOLE LINE OF CASES IN THE PATENT LAW

18   AREA WHERE THE DEFENDANT, ALLEGED INFRINGER, ASSERTS IN DEFENSE

19   OF A WILLFUL INFRINGEMENT CLAIM -- ASSERTS A DEFENSE OF

20   RELIANCE ON ADVICE OF COUNSEL.  AND THERE IS THIS WHOLE LINE OF         09:21

21   CASES WHERE COURTS TRY TO DRAW THE LINE, 'OKAY, YOU'VE RELIED

22   ON THE ADVICE OF COUNSEL; THEREFORE, ANY LEGAL INPUT THAT YOU

23   HAD IS FAIR GAME.  ANYTHING ANY LAWYER TOLD YOU ABOUT WHETHER

24   YOUR PATENT INFRINGED OR DIDN'T INFRINGE OR WHETHER THEIR

25   PATENT WAS VALID IS FAIR GAME FOR DISCOVERY.'                           09:21

Wednesday, July 2, 2008                    Trial Day 19, Morning Session

```
 1            AND THERE'S THIS WHOLE LINE OF CASES WHERE COURTS

 2   HAVE HAD TO DRAW THE LINE.  WELL, DOES THAT RELATE -- ONCE

 3   YOU'VE GOT LITIGATION COUNSEL AND THERE'S A LAWSUIT PENDING,

 4   DOES THE LITIGATOR, THE ACTUAL LAWYERS DEFENDING THE CASE --

 5   DOES THEIR ADVICE -- IS THAT IMPLICATED, AND IS THAT FAIR GAME    09:22

 6   FOR DISCOVERY, WHEN YOU HAVE AN ADVICE-OF-COUNSEL DEFENSE

 7   ASSERTED IN RESPONSE TO A WILLFUL INFRINGEMENT CLAIM?

 8            I THINK THAT'S WHAT THIS IS TALKING ABOUT HERE.

 9            AND YOU SEE CASES GOING BOTH WAYS.

10        THE COURT:  WHY DOESN'T THAT DISTINCTION APPLY HERE          09:22

11   BETWEEN THE ROSENBAUM E-MAILS THAT ARE ALL WRAPPED UP IN THIS

12   TRANSACTION AS OPPOSED TO OTHER ATTORNEYS THAT ARE COMING ON

13   BOARD TO DEFEND AGAINST POTENTIAL LITIGATION FROM MATTEL AND

14   THEIR ADVICE CONCERNING POTENTIAL LITIGATION PREPARATION, OR IN

15   ANTICIPATION OF A LITIGATION?  WHY SHOULDN'T THE SAME            09:22

16   DISTINCTION APPLY IN THIS CASE?

17        MR. QUINN:  BECAUSE, QUITE LITERALLY, IN THE PATENT

18   AREA, WHEN YOU'RE DEALING WITH A CLAIM OF WILLFUL INFRINGEMENT,

19   THE COURT'S CONCERN -- AND IT'S THE CONCERN IN THE SEAGATE

20   CASE -- IS WHETHER TRIAL COUNSEL, WHERE YOU ACTUALLY HAVE A      09:22

21   LITIGATION PENDING, SOMEONE'S NOW BEEN ENGAGED TO DEFEND THE

22   CLAIM OF WILLFUL INFRINGEMENT -- WHETHER THE PLAINTIFF CAN GET

23   ACCESS TO TRIAL COUNSEL'S ADVICE AND RECOMMENDATIONS.  THAT'S,

24   I SUBMIT, A DIFFERENT CIRCUMSTANCE.  THAT'S THE FOCUS --

25        THE COURT:  WHY?                                            09:23
```

1          YOU'RE SAYING IT'S DIFFICULT.  WHY?

2          WHY IS IT DIFFERENT IN THIS CASE, GIVING THE ADVICE

3     OF MR. ROSENBAUM ON THE ACTUAL -- IN THIS CASE, A PATENT --

4     TIMING OF SUBMITTING A PATENT APPLICATION, PRESUMABLY, VERSUS

5     SEEKING PATTY GLASER'S ADVICE IN TERMS OF PREPARING FOR AN          09:23

6     ONSLAUGHT OF LITIGATION FROM MATTEL?

7          **MR. QUINN:**  MOST OBVIOUSLY, THERE IS NO LITIGATION

8     PENDING AT THAT POINT.

9          **THE COURT:**  NOT PENDING.  BUT IS THAT A MATERIAL

10    DISTINCTION?.                                                       09:23

11         **MR. QUINN:**  YES.  IN THE WORLD WHERE SEAGATE COMES

12    FROM, DEFENDING WILLFUL INFRINGEMENT CLAIMS, YES, THAT MATTERS.

13    WHAT THAT REALLY FOCUSES ON IS HAMSTRINGING TRIAL COUNSEL'S

14    EFFORTS TO DEFEND A THEN-PENDING CLAIM.

15         **THE COURT:**  MR. LARIAN HAS ALREADY TESTIFIED THAT HE       09:24

16    WAS SCARED OF LITIGATION FROM MATTEL FROM DAY ONE.  AND THAT'S

17    REFLECTED IN -- IT'S REFLECTED.

18         **MR. QUINN:**  IT'S REFLECTED.

19         BUT, YOUR HONOR, WHAT WE HAVE HERE IS MR. LARIAN'S

20    COMMUNICATION TO THE LAWYER, WHAT WE'RE TALKING ABOUT HERE, AT      09:24

21    LEAST TO THE EXTENT THAT WE'VE SEEN THEM.  IT DOESN'T IMPLICATE

22    A LITIGATOR, A POTENTIAL LITIGATOR, WHO MIGHT BE ENGAGED TO

23    DEFEND SOME HYPOTHETICAL CASE, THEIR ADVICE COMING BACK.  THESE

24    ARE STATEMENTS BY MR. LARIAN.

25         **THE COURT:**  THE COMMUNICATION IS PROTECTED EITHER          09:24

```
 1    WAY.  AGAIN, YOU'RE MAKING A DISTINCTION -- I DON'T KNOW -- IS

 2    THERE LEGAL SUPPORT FOR THAT?  FOR EXAMPLE, EVEN IN THE PATENT

 3    CONTEXT, IS IT ONLY THE COMMUNICATIONS FROM THE LAWYER?

 4         MR. QUINN:  NO, I DON'T THINK SO.

 5         IF WE'RE TALKING ABOUT THE POTENTIAL INVASION OF THE          09:25

 6    ATTORNEY'S THOUGHT PROCESSES AND THE ATTORNEY'S WORK PRODUCT

 7    AND ADVICE TO THE CLIENT, THAT'S NOT IMPLICATED BY AN INITIAL

 8    COMMUNICATION BY MR. LARIAN TO THE LAWYER, ON THE VERY SAME

 9    SUBJECT MATTER AS TO WHICH THEY'VE ALREADY WAIVED THE

10    PRIVILEGE.  THAT DOESN'T OPEN EVEN THE POTENTIAL LITIGATION       09:25

11    DEFENSE FILES.  IT'S ON THE VERY SAME SUBJECT MATTER, I.E. THE

12    CHRONOLOGY OF WHEN THIS WAS DONE.

13         SO WHAT WE'RE CONFRONTED WITH HERE, YOUR HONOR, IS AN

14    EFFORT -- THIS IS THE -- I'M NOT GOING TO SAY IT'S CLASSIC,

15    BECAUSE IT'S ACTUALLY KIND OF UNUSUAL, I THINK.  BUT IT'S A       09:25

16    SELECTIVE WAIVER.  THEY GAVE US THE ONE DOCUMENT ON THE SUBJECT

17    PRIVILEGED COMMUNICATION, ON THE CHRONOLOGY, THE KEY

18    CHRONOLOGY; AND THEY WANT TO WITHHOLD ANOTHER ONE.

19         THE COURT:  TO A LARGE EXTENT, IT COMES DOWN TO HOW I

20    CHARACTERIZE ULTIMATELY WHAT THE COMMUNICATION IS ABOUT.  IF IT   09:26

21    IS, AS YOU SUGGEST, IF THE COMMUNICATION IS ABOUT THE SUBJECT

22    MATTER OF THE TIMING.

23         MR. QUINN:  AGREED.

24         THE COURT:  HOWEVER, IF I CHARACTERIZE ONE SUBSET OF

25    COMMUNICATIONS AS RELATED TO PATENT APPLICATIONS AND CERTAIN      09:26
```

```
 1   TRANSACTIONS AND ANOTHER SET OF COMMUNICATIONS RELATED TO
 2   PREPARATION FOR ANTICIPATED LITIGATION, THEN IT'S WHERE TO DRAW
 3   THAT LINE.  IT'S NOT AN EASY ONE TO DRAW.
 4        MR. QUINN:  I AGREE, YOUR HONOR.  IT DOES DEAL
 5   WITH -- THE COURT'S RIGHT.  IT IS THE SAME SUBJECT MATTER.       09:26
 6        THE COURT:  AND THAT LEADS ME INTO THE EQUITABLE
 7   CONSIDERATION OF THE TIMING OF THIS.
 8        MR. QUINN:  YES, YOUR HONOR.
 9        FROM THE VERY BEGINNING, WHEN WE RAISED THIS -- AND I
10   THINK IT'S TRUE, IF YOU GO BACK TO THE INITIAL BRIEF THAT WE     09:26
11   FILED A WEEK OR TEN DAYS AFTER MS. GLASER'S DEPOSITION WAS
12   TAKEN -- AND WE THOUGHT WE HAD A BASIS FOR A CRIME FRAUD
13   MOTION -- IF YOU GO BACK AND LOOK AT THAT BRIEF, WE ALSO ARGUE
14   WAIVER.  EVERY TIME WE'VE BROUGHT THIS UP, WE'VE ALSO MENTIONED
15   WAIVER.  THE COURT HASN'T RULED ON THAT.  IT WASN'T UNTIL THE    09:27
16   COURT DEALT WITH THE CRIME FRAUD THAT WE PROMPTLY SAID, 'AND
17   THERE'S THIS OTHER BASIS FOR REQUIRING THE PRODUCTION OF THIS
18   DOCUMENT THAT HAS NOT BEEN ADDRESSED.'  BUT WE HAVE AT EVERY
19   STAGE PRESERVED THAT, YOUR HONOR, AND ADVANCED THE ARGUMENT
20   THAT, 'WAIT A SECOND.  THEY GAVE US THIS; IT'S A WAIVER.'        09:27
21        THE COURT:  THANK YOU, COUNSEL.
22        MR. RUSSELL?
23        MR. RUSSELL:  YOUR HONOR, IF I CAN START WITH THE
24   TIMING, BECAUSE I THINK THAT'S IMPORTANT.  AND I WANT TO, IF I
25   COULD, TAKE YOU BACK TO A KEY POINT, WHICH IS, IF YOU LOOK AT    09:27
```

1   OUR BRIEF, AND ON THIS SPECIFIC COMMUNICATION WE'RE TALKING

2   ABOUT, MR. QUINN ELICITED TESTIMONY ABOUT THIS E-MAIL IN

3   MR. LARIAN'S DEPOSITION AND REPRESENTED THAT WOULD NOT BE A

4   WAIVER.  THAT WAS DONE.  WE CITE THAT IN THE PAPERS, EXHIBIT 22

5   TO NOLAN.  SO EVEN IF WE DIDN'T AGREE WITH YOU, AND WE DON'T                    09:28

6   AGREE WITH YOU, THAT IT'S A WAIVER TO RELAY THESE FACTS, WE'VE

7   GOT MR. QUINN ASKING MR. LARIAN ABOUT THIS VERY UNREDACTED

8   PORTION AND SAYING, 'I WILL NOT TREAT THAT AS A WAIVER.'

9         HOW CAN WE NOT RELY UPON THAT?  HE ELICITED THAT

10  TESTIMONY FROM THE WITNESS.  THE WITNESS THEN TESTIFIED, IN                    09:28

11  DEPOSITION, IN TRIAL, AND IT WAS BASED UPON THAT AGREEMENT THAT

12  OTHER WITNESSES WERE ALLOWED TO TESTIFY, INCLUDING

13  MR. ROSENBAUM AND OTHERS.

14        **THE COURT:**  REFRESH MY RECOLLECTION ON THE TIMELINE.

15  WAS THAT BEFORE OR AFTER YOU HAD TURNED OVER THE E-MAIL?                       09:28

16        **MR. RUSSELL:**  WELL BEFORE.

17        **THE COURT:**  RIGHT.  SO THERE WAS THAT INTERVENING

18  ACT, AND THAT'S WHAT THE COURT IS RELYING ON IN FINDING A

19  WAIVER.

20        I AGREED WITH YOU UP TO THAT POINT.  YOU CAN RELY ON                     09:28

21  MR. QUINN'S ASSERTION THAT IT'S NOT A WAIVER.  THEN YOU TOOK

22  THE AFFIRMATIVE STEP OF TURNING OVER IT, AND THAT'S WHERE I

23  FIND THE WAIVER ON THIS COMMUNICATION.

24        I'M WITH YOU TENTATIVELY OF THE SCOPE, BUT THAT IS A

25  SIGNIFICANT EVENT POST WHATEVER REPRESENTATION WAS MADE DURING                09:29

```
 1   THE DEPOSITION IS WHEN YOU -- AND IF YOU NEVER WOULD HAVE
 2   TURNED OVER THAT, IF YOU WOULD HAVE KEPT THAT DOCUMENT ON YOUR
 3   PRIVILEGED LOG AND CONTINUED TO TREAT IT AS PRIVILEGED, THAT
 4   WOULD HAVE BEEN A DIFFERENT SCENARIO.  ONCE YOU TURNED IT
 5   OVER --                                                       09:29
 6            MR. RUSSELL:  IF I MIGHT JUST GO BACK TO THAT,
 7   YOUR HONOR.  UNDERSTAND, THE KEY CHANGING ACT HERE IS THAT
 8   SKADDEN ARPS REPLACED O'MELVENY.  WE WENT BACK, BECAUSE, IN
 9   LARGE PART, YOUR HONOR, YOU RULED ON MOTION IN LIMINE NUMBER 7.
10   AND I STOOD HERE WITH YOU, YOUR HONOR, WHEN YOU TOLD US TO     09:29
11   REREVIEW OUR PRIVILEGED LOG.  AND BASED UPON A REVIEW OF
12   MR. LARIAN'S TRANSCRIPT AND WHAT MR. QUINN SAID, IT SEEMED TO
13   ME INESCAPABLE THAT THAT COULD NOT BE A WAIVER TO TURN OVER THE
14   VERY COMMUNICATION.  WE'RE TALKING ABOUT THE EXACT LANGUAGE
15   THAT MR. LARIAN WAS ASKED TO TESTIFY ABOUT.                   09:29
16            HE WAS ASKED, 'I HAVE AN E-MAIL FROM MY LAWYER THAT
17   TALKS ABOUT THE TIMING,' AND MR. QUINN SAID, 'WELL, I DON'T
18   REGARD IT AS A WAIVER.  IF THAT'S THE ISSUE, YOU CAN TELL ME
19   ABOUT THIS.  IF THERE'S SOMETHING YOU'RE CONCERNED ABOUT, YOU
20   CAN TELL ME ABOUT IT.  I AGREE, IT'S NOT A WAIVER.'           09:30
21            THEN HE WENT ON AND HE SAID, 'WELL, IF MR. ROSENBAUM
22   IS MERELY RELAYING WHAT MR. BRYANT'S LAWYERS TOLD HIM, THAT IS
23   A FACT.  THAT IS NOT A WAIVER.'
24            THAT'S WHAT HE SAID.  AND BASED UPON THAT STATEMENT,
25   MR. LARIAN THEN TESTIFIED TO THE SUBSTANCE OF THE E-MAIL; SO TO  09:30
```

1   TURN OVER THE ACTUAL SUBSTANCE TO PROVE THAT IS AN ACCURATE

2   STATEMENT, I DON'T SEE HOW THAT CAN BE A WAIVER.  IF IT'S NOT A

3   WAIVER TO TESTIFY VERBATIM TO THE CONTENTS OF THE E-MAIL, HOW

4   IS TURNING OVER THE E-MAIL A WAIVER?

5        IT DOESN'T SEEM FAIR.                                    09:30

6        **THE COURT:**  WELL, IT'S NOT SO MUCH THAT IT WASN'T A

7   WAIVER INITIALLY, I SUPPOSE.  IT WAS THAT MR. QUINN INDICATED

8   THAT BASED ON THAT, HE WAS STIPULATING AND WOULD BE JUDICIALLY

9   ESTOPPED FROM ASSERTING THE WAIVER BASED ON THAT.  IT'S JUST

10  THAT WE HAVE THIS FURTHER ACT OF DISCLOSING IT.               09:31

11       AGAIN, WOW, IT'S HARD TO IMAGINE HOW YOU CAN CLAIM

12  WAIVER AT THIS POINT, OR NO WAIVER AT THIS POINT, AND CLAIM THE

13  PRIVILEGE ON A DOCUMENT THAT YOU'VE TURNED OVER.

14       **MR. RUSSELL:**  WE'RE NOT CLAIMING PRIVILEGE ON IT.

15       **THE COURT:**  SO IF YOU DON'T CLAIM, THE PRIVILEGE IS    09:31

16  WAIVED; RIGHT?  I THINK WE'RE ALL IN AGREEMENT ON THAT.

17       LET'S MOVE ON TO THE SCOPE ISSUE, WHICH, I THINK, IS

18  THE CRITICAL QUESTION.

19       NO ONE IS SUGGESTING AT THIS POINT THAT A PRIVILEGE

20  ATTACHES TO THIS DOCUMENT.                                    09:31

21       **MR. RUSSELL:**  CORRECT.

22       **THE COURT:**  WE'RE IN AGREEMENT ON THAT; SO LET'S NOW

23  MOVE ON TO SCOPE.

24       **MR. RUSSELL:**  YOUR HONOR, I DON'T SEE THE DISTINCTION

25  THAT MR. QUINN IS TRYING TO ARTICULATE FOR YOU.              09:31

1       SEAGATE ON ITS FACE DOESN'T LIMIT ITSELF TO THE

2   PATENT CONTEXT.  BUT EVEN IF IT DID, THIS IS HAND AND GLOVE.

3   IT IS PATENT ADVICE ON THE ONE HAND, AND ON THE OTHER, A YEAR

4   LATER, MR. LARIAN REACHING OUT TO NOT JUST ANY COUNSEL, BUT

5   PATTY GLASER, WHO WAS, FOR A TIME, TRIAL COUNSEL.                09:32

6            **THE COURT:**  WHAT WAS SHE AT THE TIME THAT HE MADE THE

7   COMMUNICATION WITH HER?

8            **MR. RUSSELL:**  WELL, THERE WASN'T LITIGATION PENDING,

9   BUT HE SOUGHT HER AND RETAINED HER WHEN LITIGATION WAS FILED.

10  SO I DON'T THINK --                                             09:32

11           **THE COURT:**  GO BACK TO THE COURT'S QUESTION.

12           WHEN HE MADE THE COMMUNICATIONS, WHAT ROLE --

13           I GUESS I'M MAKING THE ASSUMPTION THAT SHE WAS

14  CONSULTING HIM AT THAT TIME, IN ANTICIPATION OF LITIGATION.

15           **MR. RUSSELL:**  THERE'S ABSOLUTELY NO DOUBT,          09:32

16  YOUR HONOR.  SHE HAD REPRESENTED MR. LARIAN AND MGA FOR YEARS

17  AS HIS LITIGATION COUNSEL.

18           **THE COURT:**  NOT AS HIS PATENT ATTORNEY?

19           **MR. RUSSELL:**  ABSOLUTELY NOT.

20           **THE COURT:**  I'M SURE MS. GLASER COULD --            09:32

21           **MR. RUSSELL:**  SHE COULD CORRECT ME, I'M SURE; BUT IN

22  THIS CONTEXT -- AND I THINK YOU'VE SEEN, YOUR HONOR, IN

23  CHAMBERS, THE VERY E-MAIL.

24           **THE COURT:**  I HAVE.

25           **MR. RUSSELL:**  YOU KNOW THAT THE CONTEXT IS CLEAR;   09:32

1    MR. LARIAN WAS CONCERNED ABOUT ACTUAL LITIGATION.  NOT PATENT

2    LITIGATION.

3         **THE COURT:**  OKAY.

4         **MR. RUSSELL:**  AND I JUST WANT TO MAKE ONE OTHER POINT

5    ON THIS TIMING ISSUE, BECAUSE I DON'T WANT TO LEAVE IT            09:33

6    UNADDRESSED; AND THAT IS, THIS HAS BEEN SOMETHING THAT THEY SAT

7    ON THEIR HANDS FOR THREE WEEKS AS WITNESSES HAVE COME UP AND

8    DOWN.  WHY DID WE NOT HEAR FROM THEM?

9         THE POSITION NOW IS, ON JUNE 4TH, THE CHANGING ACT

10   HAPPENED, AND 20 DAYS HAVE PASSED, 20 DAYS WHILE WITNESSES WHO    09:33

11   AUTHORED AND RECEIVED E-MAILS TESTIFIED.  NOT A PEEP.  AND I

12   DON'T UNDERSTAND WHY THAT, IN AND OF ITSELF, SHOULDN'T BE A

13   BASIS TO DENY THEIR MOTION.  I DIDN'T HEAR ANYTHING FROM

14   MR. QUINN, AND THE BRIEFS ARE DEAD SILENT ON THAT POINT.

15        **THE COURT:**  VERY GOOD.                                   09:33

16        MR. QUINN?

17        **MR. QUINN:**  I DON'T KNOW IF THE COURT IS INTERESTED

18   IN WHAT TRANSPIRED AT THE DEPOSITION AND WHAT I AGREED TO OR

19   NOT.  IF THAT'S SOMETHING THAT --

20        **THE COURT:**  AT THIS POINT, I THINK IT'S WATER UNDER      09:33

21   THE BRIDGE.  I THINK BOTH SIDES ARE AGREED, AND I THINK THE

22   COURT IS FINDING, THAT THE PRIVILEGE IS WAIVED WITH RESPECT TO

23   THE DOCUMENT, THIS DOCUMENT; THAT'S DONE.

24        **MR. QUINN:**  RIGHT.

25        **THE COURT:**  WHAT I'M STRUGGLING WITH IS THE SCOPE OF     09:34

```
 1    THAT WAIVER.

 2            MR. QUINN:  RIGHT.

 3            IS THE COURT STILL CONCERNED -- I GATHER THE COURT IS

 4    ALSO STILL CONCERNED ABOUT MS. GLASER'S ROLE AND THE POTENTIAL

 5    IMPLICATION OF --                                          09:34

 6            THE COURT:  THAT DOES HAVE --

 7            MR. QUINN:  -- LITIGATION COUNSEL.

 8            THE COURT:  RIGHT.

 9            MR. QUINN:  HOWEVER WE DESCRIBE THAT, IN THE PATENT

10    CONTEXT OR OUTSIDE OF THE PATENT CONTEXT -- AND I SUBMIT THIS  09:34

11    IS REALLY AN ISSUE THAT ARISES IN SEAGATE AND OTHER PATENT

12    CASES IN THE CIRCUMSTANCES I'VE DESCRIBED, WHERE THE PLAINTIFF

13    IS TRYING TO GET INTO LITIGATION COUNSEL'S FILES TO SEE WHAT

14    IT --

15            THE COURT:  THIS IS PATENT ADVICE THAT OSTENSIBLY IS  09:34

16    BEING COMMUNICATED HERE; CORRECT?

17            MR. QUINN:  NO.

18            THE COURT:  HOW DO YOU READ THAT, AT LEAST ON ITS

19    FACE?

20            MR. QUINN:  ON SEAGATE?                              09:34

21            THE COURT:  NO.  IN THE ROSENBAUM E-MAIL.

22            THE ADVICE GIVEN -- TO THE EXTENT THERE IS ADVICE

23    GIVEN BY THIS E-MAIL, IS, 'I RECOMMEND THAT YOUR PATENT

24    ATTORNEYS REVIEW THIS PROJECT AS SOON AS POSSIBLE TO AVOID ANY

25    TIME LIMITATIONS IN THE PATENT LAWS.'                        09:35
```

```
 1            MR. QUINN:  THERE IS PATENT ADVICE, SURE, YOUR HONOR;

 2   BUT GOING FORWARD TO MS. GLASER'S E-MAIL --

 3            THE COURT:  THAT'S THE ONLY ADVICE, THAT I CAN SEE,

 4   IN THIS E-MAIL.  I DON'T SEE ANY OTHER ADVICE.

 5            MR. QUINN:  BUT, YOUR HONOR, THE POINT IS THAT THE       09:35

 6   QUESTION OF THE ALLEGED PRIVILEGED DOCUMENT THAT WE'RE SAYING

 7   THAT COMES WITHIN THE SCOPE OF THIS HAS NOTHING TO DO WITH

 8   PATENT ADVICE.

 9            THE COURT:  IT DOESN'T.

10            MR. QUINN:  THERE'S NO CLAIM OF WILLFULNESS.  THERE'S    09:35

11   NO EFFORT TO -- I GUESS THIS WOULD BE MY MAIN POINT,

12   YOUR HONOR, AND I THINK THIS IS THE IMPORTANT THING TO GRASP:

13   WHATEVER OUR CONCERN IS ABOUT PROTECTING TRIAL COUNSEL, OR EVEN

14   PRELITIGATION, POTENTIAL TRIAL COUNSEL'S ADVICE AND ROLE, IT

15   CAN'T APPLY TO THAT INITIAL COMMUNICATION FROM THE CLIENT        09:35

16   BEFORE HE'S EVER GOTTEN ANY ADVICE FROM THE LITIGATOR.  IF

17   THAT'S ON THE SAME SUBJECT MATTER -- AND THIS REALLY IS OUR

18   ARGUMENT, YOUR HONOR -- IF THE CLIENT MAKES A COMMUNICATION TO

19   A LAWYER THAT'S ON THE SAME SUBJECT AS TO WHICH THE PRIVILEGE

20   HAS ALREADY BEEN WAIVED, THEN IT'S WAIVED THERE, AND THAT        09:36

21   INITIAL COMMUNICATION CAN'T IMPLICATE THE TRIAL LAWYER'S ROLE,

22   WHETHER IT'S FAIR OR UNFAIR, TO GET INTO THE TRIAL LAWYER'S

23   FILE.  THAT'S WHAT SEAGATE IS CONCERNED WITH.

24            THE COURT:  IT'S AN INTERESTING QUESTION.  I THINK I

25   UNDERSTAND YOUR ARGUMENT.  YOUR POINT IS THAT ADVICE AND         09:36
```

 1   INFORMATION IS GIVEN CONCERNING THE TIMING ISSUE, AT LEAST IN

 2   THIS E-MAIL AS IT RELATES TO PATENT LAW.  MR. LARIAN THEN TURNS

 3   AROUND AND GIVES INFORMATION TO MS. GLASER.  BUT IF THAT

 4   INFORMATION IS BEING GIVEN FOR A DIFFERENT PURPOSE --

 5           **MR. QUINN:**  YES, IT IS, YOUR HONOR.                    09:36

 6           **THE COURT:**  -- THAN SEEKING PATENT ADVICE, IS IT NOT

 7   SEPARATE FROM THE WAIVER THAT WAS OBTAINED BY VIRTUE OF THE

 8   PRODUCTION OF THE EARLIER E-MAIL?

 9           **MR. QUINN:**  I WOULD THINK NOT IF IT'S THE SAME

10   SUBJECT.  A DIFFERENT PURPOSE IN THAT WE'RE TALKING ABOUT A       09:37

11   DIFFERENT BODY OF LAW.  WE'RE NOT NECESSARILY TALKING ABOUT THE

12   FIELD OF PATENT LAW.  BUT THE SUBJECT MATTER, THE CHRONOLOGY,

13   WHAT HE KNEW, HIS STATE OF MIND, THAT'S WHAT WE'RE TALKING

14   ABOUT; MR. LARIAN'S STATE OF MIND; WHAT HE KNEW WHEN HE REACHES

15   OUT TO POTENTIAL LITIGATION COUNSEL.  IF IT'S THE SAME SUBJECT,   09:37

16   I.E. WHEN WAS THIS CREATED, IT'S BEEN WAIVED.

17           **THE COURT:**  I'M GOING TO THINK ABOUT THIS.  I'LL

18   ANNOUNCE A DECISION DURING THE NOON HOUR.

19           THANK YOU, COUNSEL.

20           MR. GOLDSOBEL?                                            09:37

21           **MR. GOLDSOBEL:**  STEVE GOLDSOBEL ON BEHALF OF

22   MR. MARLOW, WHO IS HERE AGAIN TODAY.

23           I UNDERSTAND MR. MARLOW IS GOING TO BE CALLED FIRST

24   THING.  I JUST WANTED TO REMIND THE COURT THAT MR. ZELLER MADE

25   A REPRESENTATION WHEN WE ADJOURNED HIS TESTIMONY LAST TIME THAT   09:37

1   HE WAS GOING TO LIMIT THE TESTIMONY TO TEN MINUTES.  IT'S

2   CERTAINLY OUR HOPE AND EXPECTATION THAT THE COURT WILL LIMIT

3   HIM SO MR. MARLOW CAN MOVE ON.

4           **THE COURT:**  I APPRECIATE THAT.  AND I WILL KEEP IT

5   CLOSE TO TEN MINUTES.  THE COURT IS MINDFUL THAT WHEN THERE'S          09:38

6   OBJECTIONS MADE OR WHEN THERE'S -- BASED ON THE WITNESS'S

7   ANSWERS, THAT SOMETIMES WHAT IS TEN MINUTES, ASSUMING STEADFAST

8   READILY-MADE ANSWERS WITHOUT OBJECTIONS, AND SOMETIMES IT TAKES

9   A LITTLE LONGER THAN THAT.

10          **MR. GOLDSOBEL:**  I JUST WANTED TO REMIND THE COURT OF       09:38

11  THAT CONVERSATION.

12          **THE COURT:**  VERY WELL.

13          **MR. NOLAN:**  SO WE WILL INTERRUPT MR. ECKERT AND PUT

14  MR. MARLOW BACK UP.

15          **THE COURT:**  YOU HAVE NO OBJECTION TO DOING THAT?          09:38

16          **MR. NOLAN:**  THAT WAS UNDERSTOOD, AND I CAN'T CHANGE

17  THE RULES RIGHT NOW.  IT WOULDN'T BE FAIR.

18          **THE COURT:**  ALL RIGHT.  THEN LET'S NOT BE UNFAIR.

19          WE'RE GOING TO TAKE A THREE-MINUTE RECESS WHILE WE

20  GET THE JURY.                                                        09:38

21          (WHEREUPON, A BRIEF RECESS WAS HELD.)

22          (WHEREUPON, JURORS ENTER COURTROOM.)

23          **THE COURT:**  GOOD MORNING, MEMBERS OF THE JURY.  WE'RE

24  GOING TO INTERRUPT THE EXAMINATION AND COMPLETE PETER MARLOW'S

25  EXAMINATION, WHICH WE DIDN'T QUITE FINISH LAST WEEK.  HE WAS          09:47

```
 1    UNAVAILABLE YESTERDAY, BUT HE IS AVAILABLE THIS MORNING.

 2              IS THAT RIGHT, MR. ZELLER?

 3         MR. ZELLER:  YES.

 4         THE COURT:  VERY GOOD.

 5         MR. ZELLER:  YES.                                        09:47

 6              MATTEL CALLS PETER MARLOW FOR THE CONCLUSION OF HIS

 7    TESTIMONY.

 8         THE COURT:  VERY WELL.

 9         MR. ZELLER:  IF I MAY MOVE INTO EVIDENCE THE REST OF

10    EXHIBIT 5723, WHICH WERE THOSE TIME SHEETS.  THE COURT HAD    09:47

11    ALLOWED THE INTRODUCTION OF THE FIRST TWO PAGES, AND THERE WERE

12    SOME ADDITIONAL PAGES.

13         THE COURT:  VERY WELL.

14              ANY OBJECTION?

15         MS. AGUIAR:  I STILL HAVE AN OBJECTION ON RELEVANCE      09:47

16    AND 403, YOUR HONOR.

17         THE COURT:  VERY WELL.

18              THAT IS OVERRULED, AND THE EXHIBIT IS ADMITTED.

19              (EXHIBIT 5723 RECEIVED.)

20         MR. ZELLER:  THANK YOU.                                 09:47

21              AND THEN THERE WAS ALSO EXHIBIT 10034, WHICH IS THE

22    APPLICATION OF MARIA SALAZAR TO MGA.  THE COURT HAD

23    CONDITIONALLY ADMITTED IT THROUGH THE CUSTODIAN OF RECORDS,

24    CONTINGENT ON IT BEING CONNECTED UP WITH RELEVANCE; AND I THINK

25    THAT'S NOW BEEN ESTABLISHED.                                 09:48
```

1    **THE COURT:**  THAT RELEVANCY OBJECTION IS OVERRULED, OR

2  AT LEAST THE CONDITIONAL ADMITTANCE IS MADE UNCONDITIONALLY.

3  IT IS ADMITTED, AND IT MAY BE PUBLISHED.

4    (EXHIBIT 10034 RECEIVED.)

5    **MR. ZELLER:**  THANK YOU, YOUR HONOR.                    09:48

6    **THE COURT:**  VERY WELL.

7    MR. MARLOW, WELCOME BACK.

8    COUNSEL, YOU MAY PROCEED.

9    **FURTHER DIRECT EXAMINATION**

10  **BY MR. ZELLER:**

11  Q    GOOD MORNING, MR. MARLOW.

12  A    GOOD MORNING.

13  Q    WHEN YOU TESTIFIED HERE IN COURT LAST WEEK, YOU TOLD US

14  THAT THERE WERE THREE MATTEL EMPLOYEES WHO SECRETLY WORKED FOR

15  YEARS ON BRATZ FASHIONS WHILE THEY WERE EMPLOYED BY MATTEL.    09:48

16    DO YOU REMEMBER THAT?

17  A    I REMEMBER THE QUESTION.

18  Q    AND THESE THREE ARE NAMED MARIA SALAZAR, ANA CABRERA, AND

19  BEATRIZ MORALES, AS WE TALKED ABOUT; RIGHT?

20  A    UH-HUH.  YES.                                           09:48

21  Q    AND WHEN YOU TESTIFIED LAST WEEK BEFORE THE JURY IN

22  RESPONSE TO MGA'S COUNSEL'S QUESTIONS, YOU TESTIFIED THAT AS

23  FAR AS YOU KNEW, AND AS FAR AS YOU KNOW, NO ONE AT MGA WAS EVER

24  AWARE THAT ANY OF THESE THREE MATTEL EMPLOYEES WERE WORKING ON

25  BRATZ WHILE THEY WERE EMPLOYED BY MATTEL.                    09:49

```
 1              DO YOU RECALL THAT?

 2    A    YES.

 3    Q    AND YOU SPECIFICALLY SAID ISAAC LARIAN NEVER KNEW; RIGHT?

 4    A    YES.

 5    Q    IT'S YOUR RECOLLECTION?                                    09:49

 6    A    YES.

 7    Q    AND YOU SAID PAULA GARCIA AND CARTER BRYANT DIDN'T KNOW

 8    EITHER, IN RESPONSE TO MGA'S COUNSEL'S QUESTIONS.

 9              DO YOU RECALL THAT?

10    A    VAGUELY.                                                   09:49

11    Q    NOW, IN FACT, YOU UNDERSTOOD YEARS AGO THAT MGA KNEW

12    MATTEL EMPLOYEES HAD BEEN SECRETLY WORKING ON BRATZ FASHIONS;

13    ISN'T THAT TRUE?

14         MS. AGUIAR:  OBJECTION.  LACKS FOUNDATION.

15    MISCHARACTERIZES HIS TESTIMONY.                                 09:49

16         THE COURT:  SUSTAINED ON FOUNDATION.

17    BY MR. ZELLER:

18    Q    MS. SALAZAR JOINED MGA AS AN EMPLOYEE IN 2003; CORRECT?

19    A    I DON'T KNOW.  I BELIEVE SO.

20    Q    AND SHE CERTAINLY KNEW SHE HAD WORKED ON BRATZ SECRETLY    09:49

21    WHILE A MATTEL EMPLOYEE; RIGHT?

22    A    YES.

23    Q    AND SO ONE REASON YOU UNDERSTOOD THAT MGA KNEW NO LATER

24    THAN 2003 THAT MATTEL EMPLOYEES WERE SECRETLY WORKING ON BRATZ

25    FASHIONS WAS BECAUSE, AS WE JUST DISCUSSED, MS. SALAZAR        09:50
```

```
 1    ACTUALLY JOINED MGA AS AN EMPLOYEE; CORRECT?
 2              MS. AGUIAR:  OBJECTION.  LACKS FOUNDATION; CALLS FOR
 3    SPECULATION; AND THE QUESTION IS VAGUE.  HE SAYS MGA KNEW.
 4              THE COURT:  REPHRASE THAT QUESTION, COUNSEL.
 5    BY MR. ZELLER:
 6    Q    SO AS WE TALKED ABOUT, ONE REASON YOU DO KNOW THAT NO
 7    LATER THAN 2003 THAT MGA WAS AWARE OF THESE MATTEL EMPLOYEES
 8    SECRETLY WORKING ON BRATZ WAS BECAUSE MS. SALAZAR HERSELF, WHO
 9    KNEW, WAS OVER THERE AT MGA; RIGHT?
10              MS. AGUIAR:  SAME OBJECTION.  LACKS FOUNDATION; CALLS      09:50
11    FOR SPECULATION.
12              THE COURT:  YOU'RE ASKING HIM THE BASIS FOR HIS
13    KNOWLEDGE IN A LEADING FASHION?
14              MR. ZELLER:  CORRECT.
15              THE COURT:  OVERRULED.                                    09:51
16              YOU MAY ANSWER.
17              THE WITNESS:  I WOULDN'T --
18              MS. AGUIAR:  I'M SORRY, YOUR HONOR.
19              IT ASSUMES FACTS NOT IN EVIDENCE.  HE SAYS ONE REASON
20    YOU KNEW THAT MGA KNEW.  THAT'S NOT BEEN ESTABLISHED.  IN FACT,     09:51
21    THE OPPOSITE.
22              THE COURT:  HE ALSO ANSWERED THAT QUESTION IN THE
23    AFFIRMATIVE, AND THERE WAS NO OBJECTION THAT HE DID KNOW.
24              ONE SECOND, COUNSEL.  LET ME MAKE SURE I'M CORRECT ON
25    THIS, BECAUSE THIS IS AN IMPORTANT POINT.                          09:51
```

1          THERE WAS A QUESTION ASKED, "AND SHE CERTAINLY KNEW

2    SHE HAD WORKED ON BRATZ SECRETLY WHILE A MATTEL EMPLOYEE;

3    RIGHT?"

4          NO OBJECTION.

5          ANSWER:  "YES."                                    09:51

6          **MS. AGUIAR:**  SHE KNEW.  BUT THAT'S NOT WHAT HE'S

7    ASKING HIM.  HE'S ASKING HIM WHETHER HE KNEW THAT MGA KNEW.

8    MS. SALAZAR IS NOT MGA.  MS. SALAZAR IS AN HOURLY-PAID

9    SEAMSTRESS.

10          **THE COURT:**  THANK YOU, COUNSEL.              09:52

11          SUSTAINED ON FOUNDATION.

12          **MR. ZELLER:**  I'M IMPEACHING HIS PRIOR STATEMENT.

13          **THE COURT:**  LET'S GO TO SIDE-BAR.  WE'LL HAVE THIS

14    DISCUSSION AT SIDE-BAR.

15          THANK YOU, COUNSEL.                              09:52

16          (SIDE-BAR PROCEEDINGS HELD AS FOLLOWS:)

17          **THE COURT:**  YOU'RE IMPEACHING HIS STATEMENT FROM THE

18    OTHER DAY?

19          **MR. ZELLER:**  CORRECT.  HE'S ALREADY SAID --

20          **THE COURT:**  THAT'S WHAT I NEED REFRESHING ON.    09:52

21          **MR. ZELLER:**  -- MGA NEVER KNEW.  ISAAC LARIAN NEVER

22    KNEW.  CARTER BRYANT, PAULA GARCIA, NO ONE OVER THERE EVER

23    KNEW.  HE SAID MGA NEVER KNEW; THAT WAS IN RESPONSE TO A

24    QUESTION.

25          **THE COURT:**  MGA NEVER KNEW.                  09:53

1          **MR. ZELLER:**  CORRECT.

2          **MS. AGUIAR:**  I ASKED HIM WHETHER SPECIFIC PEOPLE --

3    WHETHER HE TOLD -- I ASKED HIM WHETHER HE EVER TOLD

4    ISAAC LARIAN OR PAULA GARCIA OR CARTER BRYANT OR WHETHER HE

5    EVER TOLD ANYONE ELSE AT MGA.                                    09:53

6          WHAT MR. ZELLER IS TRYING TO DO IS TO EQUATE MARIA

7    SALAZAR WITH MGA; AND THAT'S A MASSIVE STRETCH.

8          **THE COURT:**  THAT'S A FOUNDATIONAL ISSUE THAT NEEDS TO

9    BE LAID.  I AGREE WITH COUNSEL.

10         **MR. ZELLER:**  I GUESS I'M NOT UNDERSTANDING THIS          09:53

11   DISTINCTION THAT SHE'S EMPLOYED THERE.  THAT'S BEEN

12   ESTABLISHED.

13

14         **THE COURT:**  RIGHT.  BUT ESSENTIALLY WHAT MGA IS

15   TAKING THE POSITION, IF I UNDERSTAND MGA CORRECTLY, IS THEY ARE   09:53

16   NOT TAKING ISSUE WITH WHAT MARIA SALAZAR KNOWS.  SHE'S, IN

17   CROSS-EXAMINATION, ESTABLISHED THE POINT THAT WHILE MARIA

18   SALAZAR MAY HAVE KNOWN THIS, THERE'S NO EVIDENCE THAT WAS

19   COMMUNICATED TO ANYONE HIGHER UP AT MGA.

20         WHAT YOU'RE TRYING TO DO NOW IS GET HIM TO SAY THAT         09:54

21   MGA KNEW, I ASSUME ISAAC LARIAN KNEW, OR ANY OF THE HIGHER-UP

22   PEOPLE, AND THAT'S THE FOUNDATION THAT'S MISSING.  HOW COULD

23   THIS WITNESS TESTIFY AS TO WHAT MGA KNEW?  UNLESS IT'S ANYTHING

24   MORE, AND MAYBE ALL IT IS IS AN ASSUMPTION -- DID HE GIVE THAT

25   ANSWER IN THE DEPOSITION, THAT BECAUSE SALAZAR WORKED FOR MGA    09:54

1    THAT HE ASSUMED THAT MGA KNEW.  BUT THAT'S SPECULATION.  AND I

2    THINK THE FOUNDATIONAL OBJECTION IS WELL TAKEN.

3          **MR. QUINN:**  THIS GETS US INTO THE IMPEACHMENT POINT.

4    HE GOT UP THERE AND HE SAID, NO, I NEVER BELIEVED; I DON'T

5    BELIEVE; I HAVE NO UNDERSTANDING THAT MGA EVER KNEW.  WHEN HE          09:54

6    SAID THE OPPOSITE IN HIS DEPOSITION, REGARDLESS OF WHAT THE

7    BASIS WAS FOR THE --

8          **THE COURT:**  I WILL GIVE YOU LEAVE TO EXPLORE THAT.

9    BUT AS PHRASED, THE QUESTIONS THAT YOU ARE ASKING ARE, I THINK,

10   CONFLATING SALAZAR AND MGA, THE KNOWLEDGE OF THOSE TWO, WITHOUT       09:55

11   PROPER FOUNDATION.  BUT I WILL GIVE YOU LEAVE TO EXPLORE HIS

12   ANSWER IN HIS DEPOSITION.  THAT'S ONE OF THE REASONS WHY I'M

13   ALLOWING YOU TO HAVE -- BUT YOU'VE GOT TO FOCUS ON THAT ANSWER

14   AND EXPLORE HIS REASONS FOR DOING THAT.

15         I'M GOING TO SUSTAIN THE FOUNDATIONAL OBJECTION.               09:55

16         **MS. AGUIAR:**  CAN I JUST ASK FOR CLARITY ON WHAT

17   ANSWER IN HIS DEPOSITION WE'RE TALKING ABOUT?

18         **THE COURT:**  THE ANSWER WHERE HE SAYS, YES, THAT MGA

19   KNEW.

20         AND I THINK THAT YOU'RE PROBABLY RIGHT, THAT THAT IS          09:55

21   ALL PREDICATED ON SALAZAR.  AND YOU CAN SURELY BRING THAT OUT

22   IN CROSS-EXAMINATION.  AND IF YOU THINK THERE'S SOME OTHER

23   BASIS FOR HIM BESIDES SALAZAR, YOU CAN EXPLORE THAT AND ASK HIM

24   THAT.  BUT I'M NOT GOING TO ALLOW -- THERE'S GOING TO HAVE TO

25   BE FOUNDATION FOR THAT.  BECAUSE AS I'M SEEING THE EVIDENCE         09:55

```
 1   RIGHT NOW, THAT IS THE ONLY BASIS, IS THE SALAZAR EMPLOYMENT.

 2          MS. AGUIAR:  AND I WILL MAKE A PROFFER TO YOU THAT

 3   MS. SALAZAR TESTIFIED IN HER DEPOSITION UNDER OATH THAT WHEN

 4   SHE WAS AN EMPLOYEE OF MGA, SHE NEVER TOLD THEM.

 5          THE COURT:  AND THAT'S FINE.                          09:56

 6          MS. AGUIAR:  I THINK THAT'S IMPORTANT.

 7          THE COURT:  IT IS.  I WILL ALLOW YOU TO EXPLORE THIS,

 8   BECAUSE I DON'T KNOW FOR A FACT THAT IS THE ONLY BASIS THAT HE

 9   HAS.

10          MR. ZELLER:  THERE IS ANOTHER ONE, AND I'LL GET TO     09:56

11   THAT.

12          THE COURT:  GET TO IT.

13          MS. AGUIAR:  BUT IF THE OTHER ONE IS THE E-MAIL...

14   WHAT'S THE OTHER ONE?

15          MR. ZELLER:  IT'S IMPEACHMENT; THAT'S A FACT.          09:56

16          MS. AGUIAR:  BUT IF WE'RE BACK TO THE SAME --

17          THE COURT:  IF HE TESTIFIED TO IT, I'LL ALLOW YOU TO

18   EXPLORE IT.  THE E-MAIL HAS ALREADY BEEN INTRODUCED.

19          MS. AGUIAR:  THE E-MAIL HAS BEEN INTRODUCED TO

20   MR. LARIAN.  WE HAD SEVERAL SIDEBARS WHEN MR. MARLOW TESTIFIED 09:56

21   LAST TUESDAY AND YOU HELD THE LINE AND YOU SAID THE JURY HAS

22   HEARD ENOUGH ABOUT THAT E-MAIL, YOU'RE NOT GOING INTO THAT

23   E-MAIL.

24          THE COURT:  I DID, COUNSEL.

25          MS. AGUIAR:  SO IF THAT'S THE ONLY OTHER REASON --      09:56
```

1      **THE COURT:**  I HELD THE LINE GOING DIRECTLY TO THE

2  E-MAIL.  BUT YOU CAN LAY FOUNDATION FOR THAT.  BUT WE'RE NOT

3  GOING TO THE THROW E-MAIL OUT AND SAY "IS IT THIS?"  BECAUSE TO

4  ME, THAT E-MAIL IS NOT THAT CLEAR.

5      **MR. ZELLER:**  HERE'S WHAT I INTEND TO DO, YOUR HONOR.      09:57

6  AND THIS IS STRAIGHTFORWARD IMPEACHMENT.  THAT'S THE WAY I CAN

7  BEST ARTICULATE IT.

8      HE SAID MGA NEVER KNEW.  THE FACT IS I CAN SAY

9  MR. MARLOW, PREVIOUSLY YOU SAID YOU, IN FACT, BELIEVED THAT MGA

10  KNEW; AND THE REASON YOU BELIEVED THAT WAS, NUMBER ONE,      09:57

11  MARIA SALAZAR; NUMBER TWO, BECAUSE OF THE 2005 E-MAIL.

12      THAT'S IN HIS DEPOSITION.

13      **THE COURT:**  THE 2005 E-MAIL IS NOT A REASON TO

14  BELIEVE IT.  IF YOU WANT TO EXPLORE THAT YOU PERCEIVE TO BE THE

15  REASON OF THAT E-MAIL, I WILL PERMIT YOU TO GO THERE.  BUT THE      09:57

16  2005 E-MAIL IS NOT A REASON TO BELIEVE.

17      MR. ZELLER, YOU'VE GOT TO LAY FOUNDATION OF HOW HE

18  KNOWS ABOUT THIS BEYOND MS. SALAZAR.  THAT'S WHAT'S MISSING.

19      THE OBJECTION IS SUSTAINED.  LET'S CONTINUE.

20      **MR. ZELLER:**  IF I MAY GET CLARIFICATION.      09:57

21      I'M HAVING SOME DIFFICULTY UNDERSTANDING EXACTLY

22  WHERE WE ARE.

23      WHAT I'M PROPOSING IS SIMPLY TO IMPEACH MR. MARLOW

24  WITH PRIOR INCONSISTENT STATEMENTS FROM HIS DEPOSITION ABOUT

25  HIS OWN BELIEFS.      09:58

```
 1              THE COURT:  I'M ALLOWING THAT.

 2              MR. ZELLER:  PART OF THAT IS HIS OWN ANSWER IN THE

 3   DEPOSITION.  HE FIRST SAID IT WAS BECAUSE OF THE MARIA SALAZAR

 4   SITUATION.  HE LATER SAID IT WAS BECAUSE OF THE 2005 E-MAIL.

 5   THAT WAS HIS LINK.  I CAN GET THE TRANSCRIPT.            09:58

 6              THE COURT:  DO YOU KNOW WHERE IT IS?

 7              MR. ZELLER:  YES, YOUR HONOR.

 8              PAGE 259, LINE 13, THROUGH PAGE 260, LINE SEVEN.

 9              THE COURT:  WHERE DOES THIS IMPUTE ANY KNOWLEDGE TO

10   MGA?                                                    09:59

11              MR. ZELLER:  HE SAYS "WE HAD AT ONE POINT TRIED TO

12   HIRE SOME THIRD-PARTY HELPERS, AND THEY MAY HAVE BEEN EMPLOYEES

13   AT MATTEL."

14              MS. AGUIAR:  THAT'S NOT WHAT THE E-MAIL SAYS.

15              THE COURT:  I UNDERSTAND THAT.                10:00

16              WHAT COUNSEL IS GETTING AT IS THAT WAS HIS

17   UNDERSTANDING OF THE E-MAIL.

18              BUT, OF COURSE, TO IMPUTE THE KNOWLEDGE TO MGA, IT'S

19   NOT RELEVANT WHAT HIS UNDERSTANDING OF THE E-MAIL IS; IT'S WHAT

20   THE RECIPIENT'S UNDERSTANDING.  AND THAT'S BEEN EXPLORED IN   10:00

21   THIS TRIAL.

22              MS. AGUIAR:  WITH MR. LARIAN.

23              THE COURT:  AGAIN, YOU CAN EXPLORE THIS WITH HIM.

24   BUT I DON'T THINK THE 2005 E-MAIL IS A REASON FOR HIM -- OTHER

25   THAN --                                                 10:00
```

1        **MR. ZELLER:**  CREDIBILITY.

2        **THE COURT:**  YOU CAN ASK HIM -- AGAIN, IT GETS BACK TO

3  FOUNDATION.  IF YOU CAN ELICIT FROM HIM THAT HE SENT AN

4  E-MAIL -- THAT HE COMMUNICATED TO MGA THAT MATTEL EMPLOYEES

5  WERE THERE --                                                    10:01

6        **MS. AGUIAR:**  THEN WE'RE GOING BACK TO THE DEPOSITION,

7  PAGE 262, "WHEN YOU E-MAILED MR. LARIAN, WHAT DID YOU TELL

8  HIM?"  I DIDN'T INFORM HIM OF MATTEL EMPLOYEES.  I MENTIONED TO

9  HIM THAT VERONICA HAS HELPERS."  AND THERE'S MORE TESTIMONY IN

10 HIS SECOND DAY WHERE HE SAYS, IN FACT, IT WAS THE OPPOSITE;      10:01

11 THAT HE DIDN'T WANT HIM TO KNOW WHO THESE PEOPLE WERE.

12        YOUR HONOR, THIS WHOLE --

13        **THE COURT:**  I'M GOING TO SUSTAIN THE OBJECTION,

14 COUNSEL.  THANK YOU, MR. ZELLER.

15        (SIDE-BAR PROCEEDINGS CONCLUDED.)                         10:02

16        **THE COURT:**  YOU MAY PROCEED, COUNSEL.

17        **MR. ZELLER:**  THANK YOU, YOUR HONOR.

18 **BY MR. ZELLER:**

19 Q    IT WAS YOUR BELIEF, BY 2003 AT THE LATEST, THAT MGA WAS,

20 IN FACT, AWARE THAT THERE WERE MATTEL EMPLOYEES SECRETLY         10:02

21 WORKING ON BRATZ FASHIONS WHILE EMPLOYED BY MATTEL; CORRECT?

22        **MS. AGUIAR:**  OBJECTION.  LACKS FOUNDATION; ASSUMES

23 FACTS NOT IN EVIDENCE; AND MISSTATES HIS PRIOR TESTIMONY.

24        **THE COURT:**  OVERRULED.

25        **THE WITNESS:**  IT WAS NOT.                             10:02

3930

```
 1   BY MR. ZELLER:
 2   Q    IF WE COULD PLEASE TAKE A LOOK AT YOUR DEPOSITION
 3   TRANSCRIPT; THIS IS VOLUME I, PAGE 102, LINES 11 THROUGH 23.
 4   A    OKAY.
 5             MR. ZELLER:  I'D LIKE TO PUBLISH IT, YOUR HONOR.      10:02
 6             THE COURT:  ANY OBJECTION?
 7             MS. AGUIAR:  THAT'S FINE, YOUR HONOR.
 8             THE COURT:  VERY WELL.  YOU MAY PLAY IT.
 9             MR. ZELLER:  IF WE CAN PULL THE TRANSCRIPT.
10   BY MR. ZELLER:
11   Q    YOU'LL SEE THAT THIS QUESTION HERE IS:  "DID YOU AND YOUR
12   WIFE EVER INFORM MGA OF THE IDENTITY OF THIRD PARTIES WHO YOU
13   USED TO WORK ON BRATZ DOLLS?"
14             ANSWER:  "YES."
15             QUESTION:  "HOW DID YOU DO THAT?"                     10:03
16             ANSWER:  "I DIDN'T DO THAT.  MY WIFE DID."
17             QUESTION:  "HOW WAS THAT ACHIEVED?"
18             ANSWER:  "SHE HELPED A FRIEND GET A JOB THERE."
19             QUESTION:  "WHO WAS THAT?"
20             ANSWER:  "MARIA ELENA SALAZAR."                       10:04
21             QUESTION:  "WHERE DID MARIA SALAZAR GET A JOB AT?"
22             ANSWER:  "AT MGA."
23   BY MR. ZELLER:
24   Q    THAT'S THE QUESTIONS YOU WERE ASKED AND THE TESTIMONY YOU
25   GAVE JUST LAST MONTH; ISN'T THAT TRUE?                         10:04
```

Wednesday, July 2, 2008                          Trial Day 19, Morning Session

1   A    YES.  BUT YOU'LL SEE ON THE NEXT PAGE, YOU ASKED THE SAME

2   QUESTION, AND I CORRECT MY ANSWER, AND I LET YOU KNOW THAT, IN

3   FACT, I WAS SPECULATING WHEN I SAID THAT.

4   Q    SO WHEN YOU TESTIFIED, YOU WERE TESTIFYING UNTRUTHFULLY

5   THERE TO THESE QUESTIONS AND ANSWERS?                          10:04

6   A    I WAS MISTAKEN.

7   Q    THIS GOES BACK TO MY QUESTION, SIR.  YOU TOLD THE JURY

8   THAT IT WAS YOUR UNDERSTANDING, YOUR BELIEF, THAT MGA NEVER

9   KNEW; RIGHT?

10  A    YES.                                                      10:04

11  Q    IN FACT, AS YOU SIT HERE TODAY, YOU KNOW MGA KNOWS NOW;

12  RIGHT?

13  A    YES.

14          MS. AGUIAR:  OBJECTION.  VAGUE.  KNOWS WHAT?

15          THE COURT:  SUSTAINED.                                 10:05

16  BY MR. ZELLER:

17  Q    YOU KNOW THAT MGA AT SOME POINT LEARNED, BY YOUR

18  UNDERSTANDING, THAT MATTEL EMPLOYEES WERE SECRETLY WORKING ON

19  BRATZ FASHIONS WHILE EMPLOYED BY MATTEL; CORRECT?

20          MS. AGUIAR:  OBJECTION.  LACKS FOUNDATION; ASSUMES      10:05

21  FACT NOT IN EVIDENCE.

22          THE COURT:  SUSTAINED.

23          MS. AGUIAR:  THAT'S NOT WHAT HE SAID.

24  BY MR. ZELLER:

25  Q    SO WHEN YOU TESTIFIED AT YOUR DEPOSITION, ISN'T IT TRUE    10:05

1    THAT AT ONE POINT YOU STATED THAT YOU HAD A BELIEF -- CALL IT

2    SPECULATION, CALL IT WHAT YOU WANT -- BUT YOU HAD A BELIEF THAT

3    NO LATER THAN 2003, MGA KNEW?

4    A    NO LATER THAN 2003?

5          AS I SAID, I WAS MISTAKEN.  I DIDN'T HAVE THAT                  10:05

6    BELIEF.  I ASSUMED THINGS THAT WERE NOT TRUE, AND I MADE A

7    MISTAKE.  BUT I QUICKLY CORRECTED IT THE NEXT TIME YOU ASKED

8    THAT SAME QUESTION.

9    Q    WELL, IT IS YOUR UNDERSTANDING THAT YOUR WIFE AND BUSINESS

10   PARTNER VERONICA MARLOW HELPED MS. SALAZAR GET THE JOB AT MGA.      10:06

11          **MS. AGUIAR:**  OBJECTION.  ASSUMES FACT NOT IN

12   EVIDENCE.

13          **THE COURT:**  OVERRULED.

14          **THE WITNESS:**  I WAS MISTAKEN.  I MADE AN ASSUMPTION

15   THAT WAS NOT TRUE; AND LATER I FOUND THAT OUT.                      10:06

16   **BY MR. ZELLER:**

17   Q    YOU TESTIFIED THAT'S WHAT OCCURRED AT YOUR DEPOSITION,

18   CORRECT, AS WE JUST SAW?

19   A    I WAS SPECULATING AND I DIDN'T KNOW; AND AFTERWARDS, I

20   ASKED MY WIFE ABOUT THAT BECAUSE I WANTED TO KNOW, AND SHE TOLD     10:06

21   ME WHAT ACTUALLY HAPPENED, AND I REALIZED THAT I WAS

22   SPECULATING AND I WAS WAY OUT OF BOUNDS AND I SAID THINGS THAT

23   I DIDN'T KNOW.

24   Q    WERE YOU SPECULATING A LOT AT YOUR DEPOSITION?

25   A    NO.                                                           10:06

1    Q    IN FACT, YOU KNEW FULL WELL FROM THE BEGINNING OF YOUR

2    DEPOSITION, BECAUSE MATTEL'S LAWYERS TOLD YOU, YOUR OWN LAWYER

3    TOLD YOU, EVEN AT THE START OF IT, THAT YOU SHOULDN'T

4    SPECULATE; CORRECT?

5    A    I UNDERSTAND.                                              10:07

6    Q    THAT'S A CORRECT?  THAT'S A YES?

7    A    YES.

8    Q    YOU UNDERSTOOD THAT?

9    A    YES.

10   Q    BY THE WAY, YOU DIDN'T CHANGE THIS TESTIMONY WHEN YOU HAD   10:07

11   THE OPPORTUNITY TO DO THAT AFTER THE TRANSCRIPT HAD BEEN SENT

12   TO YOU; RIGHT?

13        **MS. AGUIAR:**  OBJECTION, YOUR HONOR.  IT'S

14   ARGUMENTATIVE.  HE'S ALREADY SAID HE ACTUALLY CHANGED IT THE

15   VERY NEXT PAGE.                                                 10:07

16        **THE COURT:**  SUSTAINED.

17   **BY MR. ZELLER:**

18   Q    IF WE COULD LOOK AT PAGE 259, LINE 13, THROUGH PAGE 260,

19   LINE 7, OF YOUR DEPOSITION TRANSCRIPT, VOLUME I.

20        **MR. ZELLER:**  I'D ALSO LIKE TO PUBLISH THIS,            10:07

21   YOUR HONOR.

22        **MS. AGUIAR:**  OBJECTION.  THIS IS BASED ON YOUR RULING

23   AT SIDE-BAR.

24        **THE COURT:**  I BELIEVE WE ADDRESSED THIS AT SIDE-BAR,

25   COUNSEL.                                                        10:08

| | |
|---|---|
| 1 | **MR. ZELLER:**  IT'S IMPEACHMENT, YOUR HONOR.  HE'S UP |
| 2 | HERE NOW SAYING AGAIN, AND I ASKED HIM ABOUT HIS BELIEF. |
| 3 | **THE COURT:**  YOU'RE NOW IMPEACHING WHAT HE JUST |
| 4 | TESTIFIED TO? |
| 5 | **MR. ZELLER:**  CORRECT. |
| 6 | **MS. AGUIAR:**  HIS TESTIMONY -- |
| 7 | **THE COURT:**  I'LL CONSIDER THAT IN LIGHT OF THAT. |
| 8 | I THINK THE BEST WAY TO HANDLE THIS IS, COUNSEL, |
| 9 | THERE'S ADDITIONAL DEPOSITION TESTIMONY THAT YOU HAD INDICATED |
| 10 | THAT I THINK COMPLETES THIS. |
| 11 | WHAT PAGE AND LINES WAS THAT? |
| 12 | **MS. AGUIAR:**  I BELIEVE THAT THE TESTIMONY COMPLETING |
| 13 | THAT WAS PAGE 262, LINE 14, THROUGH 263, LINE 5, AT LEAST; AND |
| 14 | THERE ARE OTHER PLACES. |
| 15 | **THE COURT:**  I'LL GIVE YOU LEAVE TO PURSUE THAT IN |
| 16 | YOUR EXAMINATION. |
| 17 | COUNSEL, I'LL PERMIT IT IN TO IMPEACH THE MOST RECENT |
| 18 | TESTIMONY.  HOWEVER, I THINK YOU NEED TO INCLUDE THE LANGUAGE |
| 19 | THAT HAS JUST BEEN IDENTIFIED BY MS. AGUIAR. |
| 20 | **MR. ZELLER:**  INCLUDE IT NOW? |
| 21 | **THE COURT:**  YES.  AND THEN I'LL GIVE COUNSEL LEAVE |
| 22 | FOR ANY ADDITIONAL DEPOSITION TESTIMONY SHE WANTS TO IDENTIFY |
| 23 | AT THAT TIME. |
| 24 | **MR. ZELLER:**  IF WE COULD PLEASE PUT UP 259, LINE 13, |
| 25 | THROUGH PAGE 260, LINE 7. |

10:08
10:08
10:09
10:09
10:09

```
 1            THE COURT:  AND...

 2            MR. ZELLER:  WITH THE COURT'S PERMISSION, ONE SCREEN

 3   AT A TIME, PERHAPS.

 4            THE COURT:  VERY WELL.

 5   BY MR. ZELLER:

 6   Q    YOU SEE THAT THIS IS FROM YOUR DEPOSITION; RIGHT?

 7   A    YES.

 8   Q    QUESTION:  "DID VERONICA MARLOW MAKE ANY SUGGESTION TO ANY

 9   MATTEL EMPLOYEE IN 2004 THAT THEY MIGHT BE ABLE TO GET

10   EMPLOYMENT AT MGA?"                                          10:10

11            ANSWER:  "IT'S POSSIBLE.  I DON'T HAVE -- IT

12   SOUNDS -- IT SOUNDS RIGHT."

13            QUESTION:  "WHAT SOUNDS RIGHT ABOUT THAT TO YOU?"

14            ANSWER:  "THAT" --

15            THEN THERE'S AN OBJECTION.                          10:10

16            THE DEPONENT:  "WELL, I DON'T RECALL.  YES."

17            QUESTION:  "WHAT DO YOU RECALL?"

18            ANSWER:  "I RECALL THAT I SENT AN E-MAIL TO PAULA AND

19   ISAAC TELLING THEM THAT WE HAD AT ONE POINT TRIED TO HIRE

20   THEM -- HIRE SOME THIRD-PARTY HELPERS, AND THEY MAY HAVE BEEN 10:10

21   EMPLOYEES AT MATTEL."

22            QUESTION:  "WHEN DID YOU SEND THAT E-MAIL?"

23            ANSWER:  "WE LOOKED AT THAT E-MAIL.  I THINK IT WAS

24   IN 2005.  "

25            MR. ZELLER:  AND THEN THE OTHER PORTIONS.           10:10
```

1          **MS. AGUIAR:**  PAGE 262, LINE 14, THROUGH 263, LINE

2     FIVE.

3          **MR. ZELLER:**  IF WE COULD PLEASE PULL THOSE UP.

4     **BY MR. ZELLER:**

5     Q    QUESTION:  "WHEN YOU E-MAILED MR. LARIAN REGARDING THE          10:11

6     MATTEL EMPLOYEES WHO HAD BEEN HELPING YOU ON BRATZ, DID YOU

7     INFORM THEM THAT THEY HAD DONE A GOOD JOB FOR YOU" --

8               IT CONTINUES ON OVER THE OBJECTION.

9               -- "ON BRATZ?"

10              ANSWER:  "I DIDN'T INFORM HIM OF MATTEL EMPLOYEES.  I          10:11

11    MENTIONED TO HIM THAT VERONICA HAS HELPERS, AND I TOLD HIM THAT

12    THEY WORK VERY GOOD TOGETHER AS A TEAM, VERONICA AND HER

13    HELPERS."

14              QUESTION:  "WHAT WAS YOUR INTENTION WHEN YOU SENT

15    THAT E-MAIL TO MR. LARIAN?"          10:11

16              ANSWER:  "IT WAS MY INTENT TO GET HIM TO VALUE THE

17    CONTRIBUTION OF MY WIFE TOWARD THE COMPANY."

18    **BY MR. ZELLER:**

19    Q    NOW, IN THE INITIAL PASSAGE WE READ FROM, THE ISAAC YOU'RE

20    REFERRING TO IS ISAAC LARIAN.          10:11

21    A    RIGHT.

22    Q    AND THE PAULA YOU'RE REFERRING TO IS PAULA GARCIA; IS THAT

23    CORRECT?

24    A    YES.

25    Q    NOW, IF YOU COULD PLEASE LOOK AT EXHIBIT 13223 IN          10:11

1    EVIDENCE.

2            **MS. AGUIAR:**  YOUR HONOR, OBJECTION.

3            **MR. ZELLER:**  I'M JUST GOING TO ASK HIM IF THAT'S THE

4    E-MAIL THAT HE'S REFERRING TO IN HIS DEPOSITION.

5            **THE COURT:**  COUNSEL, LET'S NOT GET TO THE E-MAIL                    10:12

6    QUITE YET.  LET'S ASK HIM ABOUT THE BENEFIT OF THE E-MAIL.

7    **BY MR. ZELLER:**

8    Q    DO YOU HAVE THAT EXHIBIT IN FRONT OF YOU, SIR?  IT'S

9    EXHIBIT 13223.

10   A    YES.                                                                      10:12

11   Q    AND YOU RECOGNIZE THAT AS AN E-MAIL YOU SENT TO

12   ISAAC LARIAN, PAULA GARCIA, AND CARTER BRYANT, IN 2005; IS THAT

13   CORRECT?

14   A    YES.

15   Q    THIS IS THE E-MAIL YOU WERE TALKING ABOUT IN THE                          10:12

16   DEPOSITION PASSAGE THAT WE QUOTED; IS THAT CORRECT?

17   A    I BELIEVE IT WAS, YES.

18   Q    NOW, YOU UNDERSTOOD WHEN YOU SENT THIS E-MAIL, THIS

19   COMMUNICATION THAT YOU WERE TALKING ABOUT IN YOUR DEPOSITION,

20   TO ISAAC LARIAN, PAULA GARCIA, AND CARTER BRYANT -- YOU                        10:13

21   UNDERSTOOD THAT YOU WERE AT LEAST TELLING THEM THAT THESE

22   HELPERS, THE PEOPLE WORKING ON THE BRATZ FASHIONS, WORKED FOR

23   AN MGA COMPETITOR; IS THAT TRUE?

24            **MS. AGUIAR:**  OBJECTION, YOUR HONOR.

25            CAN WE DO THIS AT SIDE-BAR?  WE WEREN'T GOING TO GO                    10:13

```
 1   OVER THIS E-MAIL.  YOU HAD MADE A RULING.

 2          THE COURT:  LET'S TAKE OUR MORNING RECESS.

 3          (WHEREUPON, JURORS DEPART COURTROOM.)

 4          THE COURT:  MS. AGUIAR, YOU ASKED FOR A SIDE-BAR.

 5   YOU HAVE THE COURT'S UNDIVIDED ATTENTION.                    10:15

 6          MS. AGUIAR:  WITH RESPECT, YOUR HONOR, WE HAVE BEEN

 7   DOWN THIS ROAD NOW FIVE OR SIX TIMES ON THIS E-MAIL.  AND WHILE

 8   I APPRECIATE MR. ZELLER'S BEING A ZEALOUS ADVOCATE, YOU HAVE

 9   RULED REPEATEDLY THAT THIS E-MAIL IS OFF LIMITS.  HE KEEPS

10   COMING BACK TO IT.  WE HAVE AN ADDITIONAL SIDE-BAR.  YOU       10:15

11   REINFORCE THAT IT'S OFF LIMITS.

12          MR. MARLOW HAS NOT GIVEN ANY TESTIMONY THAT IS

13   INCONSISTENT WITH THE FACT THAT THIS E-MAIL DIDN'T CONVEY THAT

14   THEY WERE MATTEL EMPLOYEES.  HE THREW UP A PORTION OF HIS

15   TESTIMONY.  THERE WAS A SECTION TWO PAGES LATER WHERE HE MAKES  10:15

16   IT CRYSTAL CLEAR THAT HE DOESN'T SAY MATTEL.  THE E-MAIL ON ITS

17   FACE DOES NOT MENTION MATTEL.  HE HAS GIVEN TESTIMONY UNDER

18   OATH TWO DIFFERENT DAYS OF HIS DEPOSITION THAT HE DIDN'T SAY

19   MATTEL; AND, IN FACT, THAT HE SPECIFICALLY DID NOT WANT THEM TO

20   KNOW THAT THEY WORKED AT MATTEL, BECAUSE HE DIDN'T WANT THEM TO  10:16

21   KNOW WHO THEY WERE, BECAUSE IT WAS IN MR. MARLOW'S INTEREST NOT

22   TO HAVE THESE PEOPLE HIRED AWAY.

23          AND I WILL MAKE A PROFFER, YOUR HONOR, THAT EVERY

24   OTHER PERSON WHO HAS TESTIFIED ABOUT THIS E-MAIL IS TESTIFYING

25   IN A MANNER COMPLETELY CONSISTENT WITH MR. MARLOW; SO          10:16
```

1    MR. ZELLER CAN HAVE AS HIS MANTRA OF 'IMPEACHMENT' UNTIL THE

2    END OF THE DAY, BUT IN THE END, IT'S NOT IMPEACHMENT BECAUSE

3    THIS WITNESS HAS NOT TESTIFIED INCONSISTENTLY WITH THE FACT

4    THAT THIS E-MAIL DOES NOT MENTION MATTEL; HE DIDN'T MEAN FOR IT

5    TO MENTION MATTEL; MR. LARIAN TESTIFIED THAT HE DIDN'T          10:16

6    UNDERSTAND THAT IT WAS MATTEL AND THAT HE NEVER KNEW THAT THEY

7    WERE MATTEL EMPLOYEES.

8         **THE COURT:**  THANK YOU, COUNSEL.

9         JUST TO BE CLEAR, WHAT THE COURT HAS RULED AT

10   SIDE-BAR REPEATEDLY IS THAT THERE IS INSUFFICIENT FOUNDATION.   10:17

11   THAT IS WHAT I'VE BEEN SUSTAINING TIME AND TIME AGAIN.  I

12   PERMITTED THE DEPOSITION AFTER I BELIEVED THAT FOUNDATION HAD

13   BEEN ELICITED BASED ON THE TESTIMONY.  NOW THERE'S A SEPARATE

14   QUESTION AS TO WHETHER OR NOT THE LAST SERIES OF ANSWERS

15   FURTHER LAYS A FOUNDATION NOW FOR THE REFERENCE TO AN EXHIBIT   10:17

16   THAT HAS ALREADY BEEN ADMITTED INTO EVIDENCE.  THAT'S THE

17   QUESTION NOW THAT'S BEFORE YOU, MR. ZELLER.

18        **MR. ZELLER:**  AND I THINK THE COURT HAS PUT THE

19   QUESTION EXACTLY RIGHT.  IT SEEMS TO ME TO BE AN ANSWER THAT'S

20   STARING US IN THE FACE THAT THIS IS PROPER.                    10:17

21        THIS E-MAIL IS ALREADY IN EVIDENCE.  THIS GOES TO HIS

22   CREDIBILITY.  I'VE BEEN PHRASING THE QUESTIONS IN TERMS OF 'YOU

23   UNDERSTOOD,' 'YOU KNEW,' 'YOU BELIEVED.'

24        AND THE REASON, OF COURSE, I'M DOING THAT IS, THERE'S

25   NO QUESTION THERE'S FOUNDATION FOR THAT.                       10:18

```
 1            AND THE JURY IS CERTAINLY ENTITLED TO ASSESS HIS
 2   CREDIBILITY WHEN HE SAYS IN HIS DEPOSITION -- AND I'M NOT GOING
 3   TO ARGUE WITH EVERYTHING THAT MGA'S COUNSEL SAYS ABOUT THE
 4   DEPOSITIONS AND THE CHARACTERIZATIONS, BUT THE COURT HAS
 5   ALREADY SEEN, AT LEAST AT TWO PLACES, HE SUGGESTS IN HIS         10:18
 6   ANSWERS THAT MGA KNEW, OR AT LEAST HIS UNDERSTANDING WAS THAT
 7   MGA KNEW.  THAT IS CONTRARY TO HIS DEPOSITION.
 8            AND HE, OF COURSE, COMPOUNDED THE ISSUE WHEN I USED
 9   THE FIRST PASSAGE AND HE SAID, 'OH, I WAS JUST SPECULATING.'
10            THE COURT:  BUT AT THE END OF THE DAY, I THINK,        10:18
11   MS. AGUIAR, YOU'RE ABSOLUTELY CORRECT, THAT THE OVERWHELMING
12   EVIDENCE ON THIS POINT IS IN YOUR FAVOR.  I HAVE GREAT
13   DIFFICULTY READING THE PORTIONS OF THE E-MAIL TO SUGGEST THAT
14   IT WAS A COMMUNICATION TO MR. LARIAN INFORMING HIM THAT THESE
15   WERE MATTEL EMPLOYEES.  IT DOES NOT MENTION MATTEL.            10:19
16            I THINK IT'S A BIT OF A LEAP.
17            THE ONLY THING THAT WE HAVE THAT WOULD SUGGEST A
18   CONNECTION TO THIS WITNESS WAS THIS WITNESS'S INITIAL, LATER
19   RECANTED, REFERENCE TO THIS AS A BASIS FOR HIM HAVING SOME
20   SPECULATIVE UNDERSTANDING THAT MGA KNEW.                       10:19
21            IS THAT A PROPER BASIS FOR IMPEACHMENT?
22            I DON'T KNOW.
23            I FAIL TO SEE IF THIS WAS -- I GUESS I'M STRUGGLING,
24   MS. AGUIAR, TO SEE THE HARM AT THIS POINT.
25            COUNSEL, DON'T ROLL YOUR EYES.  THAT REALLY IS        10:20
```

1    UNBECOMING TO THE COURT.

2         **MS. AGUIAR:**  I'M --

3         **THE COURT:**  I'M SORRY THAT I'M BELABORING THIS ISSUE,

4    BUT I THINK IT'S AN IMPORTANT ONE.  IT SEEMS TO BE IMPORTANT TO

5    YOU AND YOUR CLIENT, AND I WANT TO TREAT IT AS SUCH.                    10:20

6         **MS. AGUIAR:**  IT'S INCREDIBLY IMPORTANT, YOUR HONOR.

7    I WAS REFERENCING SOMETHING ELSE.

8         IF YOU LOOK AT HIS QUESTION AND ANSWER -- AND NO ONE

9    TAKES THIS MORE SERIOUSLY THAN I DO, AND I HAVE BEEN TRYING TO

10   BE FORTHRIGHT WITH THE COURT ABOUT THIS PROCESS AND WHY EXACTLY     10:20

11   I THINK THAT WE'RE GOING DOWN A ROAD HERE THAT IS, AS YOU PUT

12   IT, AN EXTREMELY THIN READ; THAT IS THE WAY YOU PUT IT THE WEEK

13   BEFORE LAST.

14        **THE COURT:**  IT IS.

15        **MS. AGUIAR:**  AND WE'VE MOVED FROM A VERY THIN READ       10:20

16   ALL OF THE WAY INTO NOW MR. MARLOW BEING HERE FOR A FOURTH DAY,

17   COMING UP ON THE STAND A SECOND TIME, AND GOING INTO AREAS

18   WHERE, FRANKLY, THE ONLY THING THAT HAS HAPPENED SINCE HE'S

19   TAKEN THE STAND IS THAT HE HAS REINFORCED THE FACT THAT HE

20   DIDN'T TELL MGA AND MGA DIDN'T KNOW.                                10:21

21        SO FOR MR. ZELLER TO SAY THAT IT'S IMPEACHMENT, I

22   THINK IT IS DISINGENUOUS.  THIS WITNESS DOESN'T NEED TO BE

23   IMPEACHED ON SOMETHING WHERE HIS DEPOSITION TESTIMONY IS CLEAR

24   THAT HE DID NOT TELL.

25        **THE COURT:**  WHAT IS THE PREJUDICE TO MGA?  ANSWER THE    10:21

```
 1   COURT'S QUESTION.

 2        I TEND TO AGREE THAT YOU'RE RIGHT.  I DON'T FIND THIS

 3   VERY PERSUASIVE AT ALL, AND I THINK IT'S PROVIDING YOU AN

 4   OPPORTUNITY TO DEMONSTRATE THAT.  I DON'T UNDERSTAND WHY THIS

 5   POINT IS BEING DRIVEN HOME, BECAUSE IT REALLY IS A SLENDER     10:21

 6   READ.  IT'S A READ, NONETHELESS.

 7        I THINK PERHAPS TOO MUCH IS BEING MADE OUT OF THIS,

 8   GIVEN WHAT'S THERE.  THERE'S NOT A WHOLE LOT OF 'THERE' THERE.

 9   THE JURY HAS SEEN IT.  THE JURY IS GOING TO HAVE THIS.  COUNSEL

10   IS GOING TO BE ABLE TO ARGUE THIS THING.  IF THEY WANT TO       10:21

11   DEVOTE THREE QUARTERS OF THEIR CLOSING ARGUMENT TO THESE

12   SEEMINGLY INNOCUOUS PARAGRAPHS, AS YOU DESCRIBE IT, LET THEM DO

13   IT.

14            MS. AGUIAR:  I APPRECIATE THAT, YOUR HONOR.

15            THE COURT:  AND YOU COME BACK WITH, OR MR. NOLAN WILL   10:22

16   COME BACK WITH HIS LITANY OF WITNESSES WHO DISPUTE IT.  THE

17   EXPLANATIONS THAT YOU WILL ELICIT ON CROSS-EXAMINATION -- I

18   DON'T GET THE BIG DEAL AT THIS POINT, AND I THINK THAT THERE

19   MAY BE -- I DON'T KNOW.  I'M STARTING TO THINK I'M MISSING

20   SOMETHING.                                                      10:22

21            MS. AGUIAR:  I DON'T THINK YOU'RE MISSING ANYTHING AT

22   ALL.  BUT LET ME EXPLAIN TO YOU WHY I'M DOING THIS, BECAUSE I

23   THINK IT IS PREJUDICIAL, AND I THINK AT THIS POINT --

24            THE COURT:  WHAT'S THE PREJUDICE?  THAT WAS MY

25   QUESTION.                                                       10:22
```

1    **MS. AGUIAR:**  WE'RE TALKING ABOUT A CASE WHERE A JURY

2    PASSED YOU A NOTE YESTERDAY SAYING, 'WHAT IS GOING ON WITH THIS

3    CASE?  WHAT CAN WE EXPECT IN TERMS OF TIMING AND SCHEDULE?'

4         **THE COURT:**  THAT'S PREJUDICE TO MATTEL.  THEY'RE THE

5    ONES WASTING TIME.                                              10:22

6         **MS. AGUIAR:**  I UNDERSTAND THAT.

7         **THE COURT:**  FROM THE JURY'S PERSPECTIVE.  YOU KNOW

8    WHAT I MEAN.

9         **MS. AGUIAR:**  BUT IF MR. ZELLER IS ALLOWED, ON SUCH A

10   THIN READ, WHICH, WITH RESPECT, HAS GOTTEN THINNER SINCE        10:23

11   MR. MARLOW TOOK THE STAND -- AND THEN WE, MGA, HAVE TO CHASE

12   DOWN -- YOU SAID, YEAH, WE CAN BRING IN THREE WITNESSES SAYING

13   THAT WHAT MR. MARLOW SAID IS CONSISTENT.  BUT YOU KNOW WHAT,

14   YOUR HONOR?  WE'RE ACTUALLY TRYING TO LITIGATE THIS CASE IN AS

15   AN EFFICIENT MANNER AS WE CAN.                                  10:23

16        WE'VE USED 31 HOURS.  WE WANT TO GET THIS CASE TO THE

17   JURY.  WE WANT TO REST OUR CASE BY THE END OF TOMORROW.  AND I

18   DON'T WANT TO BRING IN WITNESSES THAT HAVE TO PROVE THAT

19   MR. ZELLER'S READ IS NOT ONLY THIN; IT'S NONEXISTENT.  AND I

20   DON'T WANT TO HAVE TO BRING IN WITNESSES WHO ARE GOING TO SAY   10:23

21   THAT WHAT MR. MARLOW SAID IS TRUE.  I DON'T WANT TO HAVE TO

22   RECALL MR. LARIAN.  I DON'T WANT TO HAVE TO BRING BACK

23   PAULA GARCIA.  I DON'T WANT TO HAVE TO PUT THE SEAMSTRESSES ON

24   THE STAND WHOSE SECOND LANGUAGE IS ENGLISH AND HAVE THEM

25   EXPLAIN WHY THEY NEVER TOLD MGA.

```
 1          SO IN ANSWER TO YOUR QUESTION, 'WHY IS THIS
 2   PREJUDICIAL,' IT'S BECAUSE WE WANT TO GET THIS CASE TO THE
 3   JURY.  THEY'RE READY FOR IT, AND WE WANT TO REST OUR CASE
 4   TOMORROW.  I DON'T WANT TO HAVE TO CALL ADDITIONAL WITNESSES.
 5          THE COURT:  THANK YOU, COUNSEL.                           10:24
 6          MR. ZELLER:  THE REPRESENTATIONS THERE AT THE END ARE
 7   A LITTLE SURPRISING TO ME, CONSIDERING THAT MGA, IN ADDING A
 8   NUMBER OF THINGS, PRIOR DAYS, TO EXHIBIT LISTS, CALLING
 9   ADDITIONAL WITNESSES, IS ALL ABOUT THIS; SO IT'S A LITTLE BIT
10   HARD TO UNDERSTAND.                                              10:24
11          THEY WANT TO CALL MR. DEANDA, FOR EXAMPLE, FOR THE
12   EXPRESSED PURPOSE OF TALKING ABOUT MATTEL'S INVESTIGATION OF
13   THESE CIRCUMSTANCES.  THERE ARE THE TRANSCRIPTS OF THEIR
14   INTERVIEWS THAT THEY WANT TO MOVE INTO EVIDENCE.  WE'VE ALREADY
15   GONE DOWN THIS ROAD WITH MGA, SO IT'S PRECLUDING ME FROM        10:24
16   ESTABLISHING THAT MR. MARLOW AND HIS DENIALS ARE NOT CREDIBLE
17   AND ARE INCONSISTENT WITH EVEN A PLAIN READING OF THIS E-MAIL.
18          AND THE PUNCH LINE TO US, YOUR HONOR, IS --
19          THE COURT:  WHAT IS IT IN THIS E-MAIL THAT YOU
20   BELIEVE LINKS THIS TO MATTEL SO CLEARLY?                        10:24
21          MR. ZELLER:  HUNDREDS OF HOURS OF DOLL-MAKING
22   EXPERIENCE.
23          WHERE ELSE DOES SOMEONE GET THAT IN SOUTHERN
24   CALIFORNIA?
25          THE COURT:  MAYBE THEY WORKED FOR MR. TONNER.  I         10:25
```

1   DON'T KNOW.

2          **MR. ZELLER:**  HE'S NOT IN SOUTHERN CALIFORNIA.

3          **THE COURT:**  OH.

4          **MR. ZELLER:**  THE FACT IS -- MAYBE MR. MARLOW CAN GIVE

5   US A LITANY OF SUCH COMPANIES; THAT WOULD BE HIS TESTIMONY, I          10:25

6   SUPPOSE.  THE JURY CAN DECIDE WHETHER OR NOT IT'S CREDIBLE; AND

7   THAT IN THE FACE OF THAT, THAT KIND OF STATEMENT IN HIS OWN

8   E-MAIL, IN HIS UNDERSTANDING OF THAT E-MAIL -- I MEAN, THIS IS

9   NOT ABOUT WHAT DOES MGA KNOW OR NOT KNOW?  THIS IS

10  STRAIGHTFORWARD IMPEACHMENT CREDIBILITY:  'YOU WROTE THIS          10:25

11  E-MAIL; YOU UNDERSTOOD.'

12         **THE COURT:**  COUNSEL, WE'VE GONE WELL BEYOND THE TEN

13  MINUTES THAT YOU HAD INDICATED.

14         HOW MUCH LONGER DO YOU HAVE WITH THIS WITNESS?

15         **MR. ZELLER:**  WELL, I INTENDED TO ASK THAT QUESTION          10:26

16  ABOUT THE E-MAIL THAT WE JUST DISCUSSED, AND THEN I HAVE

17  QUESTIONS, BASICALLY, ABOUT HIS AGREEMENT TO CONCEAL THIS

18  STARTING IN 2000.

19         **THE COURT:**  THIS GOES WELL BEYOND THE TEN MINUTES

20  THAT YOU HAD REPRESENTED.          10:26

21         **MR. ZELLER:**  WELL, YOUR HONOR, THERE WERE, OBVIOUSLY,

22  A NUMBER OF OBJECTIONS; WE'VE HAD SIDE BARS.

23         **THE COURT:**  I UNDERSTAND THAT.  THAT'S WHY I HAVEN'T

24  HELD IT TO AN ACTUAL TEN MINUTES.  BUT I THINK EVEN DISCOUNTING

25  ALL OF THE SIDE-BARS AND ALL OF THE OBJECTIONS, I THINK WE'RE          10:26

1   WELL BEYOND TEN MINUTES OF PURE TESTIMONY TIME.

2           **MR. ZELLER:**  I'M AT A LOSS FOR A RESPONSE,

3   YOUR HONOR.  OTHERWISE, ATTORNEYS CAN SIMPLY DICTATE HOW LONG

4   THE EXAMINATION TAKES AND ESSENTIALLY STYMY IT.

5           **THE COURT:**  THIS WASN'T A DICTATE.  I ASKED YOU HOW        10:27

6   MUCH TIME WHEN WE ADJOURNED AND AGREED TO HAVE MR. MARLOW COME

7   BACK AND MAKE THE APPEARANCE.  NO ONE ELSE DICTATED TEN

8   MINUTES.  IT WAS YOUR OFFER OF TEN MINUTES, COUNSEL.

9           **MR. ZELLER:**  I UNDERSTAND.  THAT'S NOT WHAT I'M

10  TALKING ABOUT.  I'M SAYING -- MY OWN PERCEPTION -- AND I        10:27

11  HAVEN'T BEEN TIMING IT, OF COURSE, DOWN TO THE SECOND -- BUT MY

12  PERCEPTION ISN'T THAT I'VE ASKED HIM TEN MINUTES OF ACTUAL

13  QUESTIONS.  RIGHT OR WRONG, THAT JUST HASN'T BEEN MY

14  PERCEPTION.

15          **THE COURT:**  FAIR ENOUGH.  THAT MEANS YOUR TEN MINUTES    10:27

16  ARE UP BY YOUR OWN PERCEPTION.

17          **MR. ZELLER:**  AS THE COURT RECOGNIZED, TOO, AT THE

18  BEGINNING OF ALL OF THIS, HE DID CHANGE HIS TESTIMONY ON THE

19  STAND.  I HAD TO GO INTO A COUPLE OF AREAS THAT -- AND, OF

20  COURSE, I ALSO HAD TO READ ADDITIONAL TESTIMONY AT COUNSEL'S    10:27

21  INSISTENCE.  HE THREW AN ANSWER IN, 'WELL, I WAS JUST

22  SPECULATING.'  SOME OF THOSE THINGS WOULD HAVE BEEN DONE ON

23  REDIRECT.

24          **THE COURT:**  FAIR ENOUGH.

25          I'M GOING TO GIVE YOU A VERY LIMITED AMOUNT OF TIME       10:28

1    TO WRAP THIS UP, COUNSEL.

2         THE EXHIBIT IN QUESTION, THE E-MAIL IN QUESTION, IS

3    IN EVIDENCE.  I DON'T SEE THE PREJUDICE.  I DO THINK THE

4    ANSWERS THAT ARE GIVEN AND WHAT HAS BEEN ELICITED PROVIDES A

5    BARE LEVEL OF FOUNDATION TO ASK HIM A QUESTION OR TWO ABOUT          10:28

6    THIS.  BUT, COUNSEL, YOU HAVE TO MOVE THIS ALONG AND PARE THIS

7    DOWN.  WE'RE GOING TO HAVE THIS WITNESS OFF THE STAND IN THE

8    NEXT FEW MINUTES.

9         **MR. ZELLER:**  FAIR ENOUGH, YOUR HONOR.  I WILL

10   ABSOLUTELY DO THAT.                                                   10:28

11        **THE COURT:**  THE COURT IS GOING TO TAKE A BRIEF

12   RECESS, AND THEN WE'LL BRING THE JURY BACK IN.

13             (WHEREUPON, A BRIEF RECESS WAS HELD.)

14             (JURORS ENTER COURTROOM.)

15        **THE COURT:**  COUNSEL, YOU MAY RESUME.                          10:36

16        **MR. ZELLER:**  THANK YOU, YOUR HONOR.

17   **BY MR. ZELLER:**

18   Q    BEFORE THE BREAK, MR. MARLOW, WE WERE TALKING ABOUT THAT

19   E-MAIL FROM 2005, EXHIBIT 13223.

20             IF WE COULD PLEASE PULL THAT UP ON THE SCREEN.              10:36

21             NOW, IN THIS E-MAIL, YOU UNDERSTOOD THAT YOU WERE

22   TELLING ISAAC LARIAN, PAULA GARCIA, AND CARTER BRYANT THAT THE

23   EMPLOYEES WORKING ON BRATZ FASHIONS WORKED FOR AN MGA

24   COMPETITOR; IS THAT TRUE?

25   A    I DON'T SEE WHERE I USED THOSE WORDS.                            10:36

1    Q    WELL, IN SUBSTANCE, THAT'S WHAT YOU SAID, ISN'T IT?

2    A    I DON'T THINK SO.

3    Q    WELL, LET'S LOOK AT THE SECOND PAGE OF YOUR E-MAIL.

4         DO YOU SEE HERE WHERE IT TALKS ABOUT 'IF VERONICA

5    GOES TO WORK FOR MGA, SHE WILL NO LONGER BE ABLE TO WORK WITH          10:37

6    HER TEAM OF PATTERN AND SAMPLE MAKERS.'

7         DO YOU SEE THAT?

8    A    YES.

9    Q    SAMPLE MAKERS ARE PEOPLE WHO MAKE DOLL CLOTHING; RIGHT?

10   A    RIGHT.                                                            10:37

11   Q    AND THEN THE NEXT PAGE, IT SAYS 'THEY ONLY MOONLIGHT FOR

12   VERONICA.'

13   A    UH-HUH.

14   Q    NOW FURTHER ON, YOU, IN FACT, DO TELL THEM THAT THESE

15   EMPLOYEES WORKED FOR ANOTHER TOY COMPANY; CORRECT?                     10:37

16   A    PLEASE ALLOW ME TO REVIEW THIS CAREFULLY.

17   Q    THAT WAS YOUR UNDERSTANDING WHAT YOU WERE COMMUNICATING IN

18   THIS E-MAIL.

19         THE COURT:  WAIT A SECOND, COUNSEL THERE'S A QUESTION

20   PENDING.  THE WITNESS ASKED TO REVIEW THE EXHIBIT.                     10:37

21         THE WITNESS:  WHAT WAS THE QUESTION AGAIN?

22   BY MR. ZELLER:

23   Q    THE QUESTION IS THAT IN THIS E-MAIL, YOU SAID IT WAS YOUR

24   UNDERSTANDING THAT -- YOU SAID THAT THESE EMPLOYEES WERE IN

25   FACT WORKING FOR ANOTHER TOY COMPANY OTHER THAN MGA.                   10:38

1   A    I DIDN'T SAY TOY COMPANY.  SAMPLE MAKERS CAN APPLY TO

2   PEOPLE WHO MAKE ACTUAL HUMAN CLOTHES AS WELL.

3   Q    YOU TOLD THEM THAT IT WAS A DOLL COMPANY THAT THEY WORKED

4   FOR; CORRECT?

5   A    I DIDN'T SEE THAT ANYWHERE.                                10:38

6        IT WASN'T MY INTENT TO SAY THAT.

7   Q    IT WAS NOT YOUR INTENT?

8   A    DID I SAY DOLL COMPANY?  I DIDN'T SAY THAT.

9   Q    DIRECTING YOUR ATTENTION TO THIS SENTENCE HERE, DO YOU SEE

10  WHERE IT STARTS OFF, 'SO HOW DO THEY GET ANY WORK DONE LIKE     10:38

11  THIS.'

12       DO YOU SEE THAT PARAGRAPH?

13  A    UH-HUH.

14  Q    DO YOU SEE WHERE IT SAYS 'THEY HAVE MORE THAN 100 YEARS

15  TOTAL OF DOLL MAKING EXPERIENCE BETWEEN THEM'?                  10:39

16       DO YOU SEE THAT?

17  A    RIGHT.

18  Q    NOW, IT DOESN'T MENTION MATTEL BY NAME; RIGHT?

19  A    RIGHT.

20  Q    MATTEL IS THE LARGEST DOLL MAKER IN THIS AREA BY FAR, AND  10:39

21  CERTAINLY WAS AS OF 2005; CORRECT?

22       **MS. AGUIAR:**  OBJECTION.  FOUNDATION; 403.

23       **THE COURT:**  SUSTAINED.

24  **BY MR. ZELLER:**

25  Q    IT WAS YOUR UNDERSTANDING BACK IN THE 2005 TIME PERIOD     10:39

1    THAT MATTEL WAS THE LARGEST DOLL COMPANY IN THE AREA; CORRECT?

2           **MS. AGUIAR:**  OBJECTION.  LACKS FOUNDATION.

3           **THE COURT:**  AS PHRASED, IT'S OKAY.

4           OVERRULED.

5           **THE WITNESS:**  YOU KNOW, JUST BECAUSE THEY ARE MAKING          10:39

6    DOLLS DOESN'T MEAN THEY ARE WORKING FOR A TOY COMPANY.

7           WE HAVE A VERY GOOD FRIEND WHO IS A DOLL MAKER WHO

8    DOESN'T WORK FOR A TOY COMPANY.

9           **MR. ZELLER:**  MOVE TO STRIKE, YOUR HONOR.

10          **THE COURT:**  IT'S NONRESPONSIVE.                              10:39

11          THE QUESTION IS WHETHER OR NOT, YOUr UNDERSTANDING

12   ABOUT MATTEL, WAS IT THE LARGEST TOY COMPANY.

13          **THE WITNESS:**  YES.

14          **MR. ZELLER:**  I HAVE NOTHING FURTHER, YOUR HONOR.

15          **THE COURT:**  VERY WELL.                                       10:39

16          CROSS-EXAMINATION?

17                            **CROSS-EXAMINATION**

18   **By MS. AGUIAR:**

19   Q    LET'S STICK WITH THIS E-MAIL.

20          GIVE THE JURY A LITTLE BIT OF CONTEXT, IF YOU WOULD.            10:40

21          DID YOU HAVE A MEETING WITH MGA IN 2005 THAT LED YOU

22   TO SEND THIS E-MAIL TO PAULA GARCIA AND THE OTHERS AT MGA?

23   A    I DID.  MY WIFE AND I MET WITH MEL WOODS WHO WAS PRESIDENT

24   OF MGA AT THE TIME, AND HE WANTED TO KNOW MORE ABOUT OUR

25   EXPENSES AND OUR COSTS; HE WAS ON A COST-CUTTING MISSION FOR          10:40

1    MGA.  HE ASKED US ABOUT OUR HELPERS, HOW MUCH WE WERE PAYING

2    THEM, WHO THEY WERE, AND WE REFUSED TO ANSWER ANY QUESTIONS

3    ABOUT OUR HELPERS.  AND AS A RESULT, THE MEETING QUICKLY TURNED

4    SOUR AND WE ESSENTIALLY WALKED AWAY FROM A $300,000 A YEAR

5    INCOME IN ORDER NOT TO REVEAL THE NAMES AND ANY MORE                10:41

6    INFORMATION ABOUT THESE HELPERS.

7    Q    SO DID YOU TELL MR. WOODS IN ADVANCE OF THE MEETING THE

8    IDENTITY OF THE SEAMSTRESSES THAT WERE WORKING FOR YOU AND YOUR

9    WIFE?

10   A    NO.                                                           10:41

11   Q    DID YOU TELL MR. WOODS, OR ANYONE ELSE AT MGA IN ADVANCE

12   OF THAT MEETING, THAT THE SEAMSTRESSES WHO WERE WORKING FOR YOU

13   WERE EMPLOYEES OF MATTEL?

14   A    NO.

15   Q    DURING THE MEETING ITSELF, DID YOU TELL ANYONE IN            10:41

16   ATTENDANCE AT THE MEETING WHO WAS AN MGA PERSON THE IDENTITIES

17   OF THE SEAMSTRESSES WHO WORKED FOR YOU AND YOUR WIFE?

18   A    NO.

19   Q    DID YOU TELL THEM DURING THE COURSE OF THE MEETING THAT

20   THE FOLKS WHO WERE WORKING FOR YOU WERE MOONLIGHTING, WORKING     10:41

21   SECOND JOBS, FROM MATTEL?

22   A    NO.

23   Q    WAS THE PURPOSE OF THE MEETING TO DISCUSS THE FACT THAT

24   YOU HAD MATTEL EMPLOYEES WORKING FOR YOU?

25   A    NO.  IT WAS A COST-CUTTING MEETING.                          10:42

1  Q    WAS IT YOUR INTENT IN SENDING THIS E-MAIL TO THE FOLKS AT

2  MGA TO CONVEY TO THEM THAT THE PEOPLE WHO WERE WORKING FOR YOU

3  AND YOUR WIFE WERE MATTEL EMPLOYEES WHO WERE MOONLIGHTING?

4  A    NO.  WHAT HAPPENED WAS DURING THE MEETING, IT CAME OUT

5  THAT SHE HAD HELPERS, AND THOSE HELPERS WERE DISCUSSED AND WE         10:42

6  WOULDN'T TALK ABOUT THEM.  SO WE WALKED OUT.

7        AND I KNEW THAT IT WAS PRETTY MUCH FINISHED BETWEEN

8  US AND MGA.  AND I FELT BAD ABOUT THAT, SO I SENT THIS E-MAIL

9  TO ISAAC AND PAULA AND CARTER, TRYING TO SALVAGE THE

10 RELATIONSHIP BETWEEN US, MY WIFE AND I, AND MGA.  AND EVEN           10:43

11 THEN, I WOULDN'T REVEAL TO THEM ANY MORE INFORMATION ABOUT OUR

12 HELPERS.  IT WAS ONLY MY INTENT TO LET THEM KNOW THAT MY WIFE

13 WORKED VERY HARD AND THAT SHE HAD PUT A LOT INTO DOING THE

14 FASHIONS FOR THE BRATZ DOLLS, AND I TRIED TO IMPRESS ON THEM,

15 YOU KNOW, JUST HOW IMPORTANT THAT WAS.                               10:43

16 Q    AND I BELIEVE MR. ZELLER ASKED YOU THIS QUESTION, BUT JUST

17 TO CONFIRM.  DO YOU MENTION MATTEL IN THE PORTION OF THE E-MAIL

18 THAT'S IN EVIDENCE?

19 A    NO.

20 Q    BASED ON THE INFORMATION THAT YOU GAVE TO THESE MGA             10:43

21 REPRESENTATIVES IN THIS E-MAIL, DID YOU HAVE AN UNDERSTANDING

22 THAT THEY WOULD KNOW BY WHAT YOU DID SAY IN THE E-MAIL THAT IT

23 HAD TO HAVE BEEN MATTEL THAT THESE PEOPLE WERE WORKING FOR?

24 A    ABSOLUTELY NOT.

25 Q    ARE THERE OTHER COMPANIES IN -- LET'S KEEP IT TO SOUTHERN       10:43

```
 1   CALIFORNIA; LET'S PRESUME THESE FOLKS WORKED IN THE SOUTHERN
 2   CALIFORNIA AREA -- ARE THERE OTHER COMPANIES IN SOUTHERN
 3   CALIFORNIA THAT YOU COULD HAVE BEEN REFERRING TO OTHER THAN
 4   MATTEL?
 5   A    MANY.  WE WERE -- MY WIFE AND I WERE IN THE TOY BUSINESS.   10:44
 6   WE WERE AWARE OF MANY COMPANIES IN SOUTHERN CALIFORNIA THAT
 7   MAKE TOYS.
 8   Q    GIVE US A FEW OF THOSE EXAMPLES THAT YOU CAN RECALL, AS
 9   YOU SIT HERE.
10   A    SURE.  JAKKS PACIFIC, APPLAUSE, MALIBU TOYS, BANDAI,      10:44
11   DISNEY.
12   Q    WAS IT IN YOUR INTEREST, IN YOUR BUSINESS INTEREST OR IN
13   YOUR PERSONAL SELF INTEREST, TO TELL MGA THAT YOU HAD MATTEL
14   EMPLOYEES WORKING FOR YOU WHO WERE WORKING SECOND JOBS AT
15   NIGHT?                                                         10:44
16   A    NO.
17   Q    DO YOU KNOW WHETHER THE FOLKS AT MGA WHO RECEIVED THE
18   E-MAIL READ THE E-MAIL?
19   A    I NEVER GOT ANY REPLY.  I DON'T KNOW.
20   Q    TO THE BEST OF YOUR RECOLLECTION, YOU SAID YOU DIDN'T GET  10:45
21   A REPLY.  DID YOU GET REPLY FROM ANY OF THE PEOPLE WHO WERE THE
22   RECIPIENTS OF THIS E-MAIL?
23   A    NO.
24   Q    LET'S TALK ABOUT MARIA SALAZAR.
25            MR. ZELLER SUGGESTED TO YOU THROUGH HIS QUESTIONING   10:45
```

1   THAT BECAUSE MARIA SALAZAR WORKED FOR MGA STARTING IN 2003,

2   THAT THEREFORE, MGA AS A COMPANY KNEW THAT SHE HAD, FOR A SHORT

3   PERIOD OF TIME, MOONLIGHTED.  IS THAT YOUR UNDERSTANDING?

4           **MR. ZELLER:**  THE QUESTION IS ARGUMENTATIVE.

5           **THE COURT:**  REPHRASE IT.                                    10:45

6   **BY MS. AGUIAR:**

7   Q   DO YOU HAVE AN UNDERSTANDING OF THE REASON YOU WERE BEING

8   ASKED QUESTIONS ABOUT MARIA SALAZAR IS THAT MATTEL IS TRYING TO

9   ESTABLISH THAT MGA KNEW?

10          **THE COURT:**  SUSTAINED.                                      10:46

11          **MR. ZELLER:**  SAME OBJECTION.

12          **MS. AGUIAR:**  I'LL JUST GO TO THE QUESTION THEN.

13  **BY MS. AGUIAR:**

14  Q   DO YOU HAVE AN UNDERSTANDING OF HOW MARIA SALAZAR WAS

15  REFERRED TO MGA IN THE FIRST PLACE?                               10:46

16  A   YES.

17  Q   WHAT IS THAT UNDERSTANDING?

18          **MR. ZELLER:**  FOUNDATION.

19  **BY MS. AGUIAR:**

20  Q   WHAT'S YOUR UNDERSTANDING BASED ON?                          10:46

21          **THE COURT:**  THE OBJECTION IS FOUNDATION?

22          **MR. ZELLER:**  YES, FOUNDATION.

23          **THE COURT:**  REPHRASE.

24  **BY MS. AGUIAR:**

25  Q   WHAT'S YOUR UNDERSTANDING BASED ON?                          10:46

1    A    A RECENT CONVERSATION WITH MY WIFE.

2    Q    WHAT IS YOUR UNDERSTANDING AS TO HOW MS. SALAZAR CAME TO

3    BE REFERRED TO MGA?

4            **MR. ZELLER:**  OBJECTION.  HEARSAY.

5            **MS. AGUIAR:**  GOES TO STATE OF MIND, YOUR HONOR.          10:46

6            **THE COURT:**  IT DOES.  OVERRULED.

7            THIS IS NOT BEING CONSIDERED FOR THE TRUTH OF THE

8    STATEMENT, THE OUT-OF-COURT STATEMENT, BUT RATHER, THE EFFECT

9    IT HAS ON THE WITNESS'S STATE OF MIND.

10            **THE WITNESS:**  AFTER MY DEPOSITION I ASKED MY WIFE       10:46

11   ABOUT THAT, BECAUSE I WANTED TO KNOW MORE.  I KNOW I HAD

12   SPECULATED WHEN I ANSWERED, WHEN I WAS ASKED THAT QUESTION THE

13   FIRST TIME IN THAT DEPOSITION.  SO I ASKED MY WIFE TO FILL ME

14   IN ON THE DETAILS TO LET ME KNOW WHAT ACTUALLY HAPPENED.  AND

15   SHE TOLD ME THAT WHILE SHE WAS IN BRAZIL VISITING HER MOTHER,   10:47

16   SHE RECEIVED A PHONE CALL FROM MARIA ELENA TELLING HER THAT

17   MARIA ELENA --

18            **MR. ZELLER:**  THIS IS NOW DOUBLE HEARSAY.

19            **THE COURT:**  IT'S STILL GOING TO STATE OF MIND.

20            IT'S OVERRULED.                                          10:47

21            **THE WITNESS:**  THAT SHE HAD RECEIVED A PHONE CALL FROM

22   MARIA ELENA TELLING HER, THROUGH ANOTHER FRIEND, SHE WAS

23   REFERRED TO MGA WHILE SHE HAD BEEN DOING WORK ON AND OFF FOR MY

24   WIFE LONG AFTER SHE HAD LEFT MATTEL AND JUST WANTED TO KNOW

25   WHAT MY WIFE THOUGHT OF HER GETTING A JOB AT MGA, IF IT WOULD    10:48

```
 1   BE A PROBLEM FOR HER; THAT SHE WOULDN'T BE ABLE TO HELP HER

 2   ANYMORE WITH THE FASHIONS -- WOULD RATHER BE WORKING DIRECTLY

 3   FOR MGA.  AND MY WIFE SAID THAT -- TOLD ME THAT SHE RECALLED

 4   TELLING HER THAT IT WOULD BE OKAY.  SHE DIDN'T HAVE A PROBLEM;

 5   TO GO FOR IT; TO DO WHAT SHE THOUGHT WAS BEST FOR HER AND HER        10:48

 6   FAMILY.

 7   BY MS. AGUIAR:

 8   Q   IS IT YOUR UNDERSTANDING YOUR WIFE WAS NOT THE ONE WHO

 9   REFERRED MARIA ELENA SALAZAR TO MGA; IT WAS SOMEONE ELSE?

10   A   YES.                                                            10:48

11   Q   IS THAT CORRECT?

12   A   YES.

13   Q   DO YOU HAVE ANY INFORMATION THAT AFTER MARIA ELENA SALAZAR

14   WENT TO WORK AT MGA, THAT SHE TOLD MGA THAT FOR A SHORT PERIOD

15   OF TIME IN 2000 SHE HAD WORKED A SECOND JOB AT NIGHT WHILE          10:48

16   WORKING AT MATTEL?

17   A   I HAVE NO INFORMATION ON THAT.

18   Q   DID MS. SALAZAR EVER TELL YOU THAT WHEN SHE STARTED

19   WORKING FOR MGA AS A SEAMSTRESS THAT SHE BLABBED ON TO PEOPLE

20   AT MGA ABOUT HOW SHE HAD ONCE MOONLIGHTED BACK IN 2000 WHILE        10:49

21   SHE WAS WORKING AT MATTEL?

22   A   NO.

23   Q   DO YOU HAVE ANY REASON TO BELIEVE THAT MS. SALAZAR, WHO

24   HAD ACTUALLY JUST SECURED A JOB WITH HEALTH BENEFITS, THAT SHE

25   WOULD TELL HER EMPLOYER THAT SHE HAD ONCE MOONLIGHTED FOR           10:49
```

1    ANOTHER COMPANY?

2              **MR. ZELLER:**  ASSUMES FACTS; ARGUMENTATIVE.

3              **THE COURT:**  REPHRASE.

4    BY **MS. AGUIAR:**

5    Q    DO YOU HAVE ANY REASON TO BELIEVE MS. SALAZAR WOULD HAVE          10:49

6    TOLD HER CURRENT EMPLOYER THAT INFORMATION?

7              **MR. ZELLER:**  SAME OBJECTIONS.

8              **THE COURT:**  OVERRULED.

9              **THE WITNESS:**  I HAVE NO REASON TO BELIEVE SHE WOULD

10   HAVE TOLD.                                                            10:50

11   BY **MS. AGUIAR:**

12   Q    JUST TO BE CLEAR, MR. ZELLER WALKED YOU THROUGH THREE

13   DIFFERENT WOMEN WHO HAD WORKED SECOND JOBS FOR YOU AND YOUR

14   WIFE.  MS. SALAZAR WENT AT ONE POINT TO WORK FOR MGA; CORRECT?

15   A    YES.                                                             10:50

16   Q    SHE WAS ONE OF THE THREE WOMEN.

17   A    YES.

18   Q    DID MS. SALAZAR TELL YOU -- DID YOU HAVE AN UNDERSTANDING

19   THAT ONE OF THE REASONS SHE WENT TO WORK FOR MGA WAS THAT SHE

20   NEEDED HEALTH BENEFITS FOR HER FAMILY?                                10:50

21             **MR. ZELLER:**  OBJECTION, YOUR HONOR.  THIS IS FAR

22   OUTSIDE OF THE BOUNDS OF 402, 403; IT'S STILL HEARSAY.

23             **THE COURT:**  SUSTAIN THE OBJECTION.

24   BY **MS. AGUIAR:**

25   Q    DID YOU HAVE A CONVERSATION WITH MS. SALAZAR REGARDING THE       10:50

```
 1    REASON WHY SHE WENT TO WORK FOR MGA RATHER THAN JUST STICKING
 2    WORKING WITH YOU AND YOUR WIFE?
 3    A    I CAN'T RECALL THAT CONVERSATION.
 4    Q    SO MS. SALAZAR WORKED FOR MGA.  DID THE OTHER TWO WOMEN,
 5    MS. CABRERA AND MS. MORALES, DID THEY EVER WORK FOR MGA AT ANY      10:51
 6    POINT?
 7    A    NO.
 8    Q    TO YOUR KNOWLEDGE, DID THOSE WOMEN HAVE DIRECT CONTACT
 9    WITH MGA?
10         MR. ZELLER:  FOUNDATION.                                      10:51
11         THE COURT:  SUSTAINED.
12    BY MS. AGUIAR:
13    Q    DID YOU EVER INTRODUCE EITHER MS. CABRERA OR MS. MORALES
14    TO ANYONE AT MGA?
15    A    NO.                                                           10:51
16    Q    DID YOU EVER BRING THEM TO MGA'S OFFICES WHILE THEY WERE
17    WORKING FOR YOU?
18    A    NO.
19         MS. AGUIAR:  NOTHING FURTHER.  THANK YOU.
20         THE COURT:  ANYTHING FURTHER, MR. ZELLER?                     10:51
21         MR. ZELLER:  JUST A FEW QUESTIONS, YOUR HONOR.
22         THE COURT:  VERY WELL.
23                    REDIRECT EXAMINATION
24    BY MR. ZELLER:
25    Q    MR. MARLOW, YOU'VE HAD TWO OR THREE LAWYERS AT LEAST          10:52
```

```
 1   WORKING FOR YOU ON THIS CASE; IS THAT TRUE?

 2           MS. AGUIAR:  OBJECTION.  IT GOES BEYOND THE SCOPE OF

 3   THE CROSS.

 4           THE COURT:  IT GOES TO IMPEACHMENT.  OVERRULED.

 5           THE WITNESS:  YES.                                    10:52

 6   BY MR. ZELLER:

 7   Q   AND YOU THEN DESCRIBED AT SOME LENGTH HERE IN RESPONSE TO

 8   QUESTIONS FROM MGA'S COUNSEL ABOUT HOW YOU LEARNED ABOUT THE

 9   TRUE CIRCUMSTANCES OF MS. SALAZAR GOING AND WORKING AT MGA.

10           DO YOU RECALL THAT?                                   10:52

11   A   YES.

12   Q   AND YOU SAID THAT THIS HAPPENED AFTER YOUR DEPOSITION;

13   RIGHT?

14   A   YES.

15   Q   NOW, JUST SO THE CHRONOLOGY IS CLEAR, BACK IN 2003 IS WHEN 10:52

16   MARIA SALAZAR WENT AND WORKED AT MGA; CORRECT?

17   A   RIGHT.

18   Q   AND THEN YOUR DEPOSITION WAS TAKEN JUST LAST MONTH; IS

19   THAT RIGHT?

20   A   RIGHT.                                                    10:52

21   Q   SO FOR ABOUT FIVE YEARS YOU HAD THE IMPRESSION AND THE

22   BELIEF THAT MS. SALAZAR GOT THE JOB AT MGA THROUGH YOUR WIFE;

23   CORRECT?

24           MS. AGUIAR:  OBJECTION.  ASSUMES FACTS NOT AT ISSUE.

25           THE COURT:  SUSTAINED.                                10:52
```

1   **BY MR. ZELLER:**

2   Q   WHAT WAS YOUR BELIEF DURING THE TIME PERIOD FROM 2003 UP

3   UNTIL THE TIME YOUR DEPOSITION WAS TAKEN IN MAY OF 2008 OF THIS

4   YEAR?

5           **MS. AGUIAR:**  OBJECTION.  RELEVANCE.                    10:53

6           **THE COURT:**  OVERRULED.

7           YOU MAY ANSWER.

8           **THE WITNESS:**  I DIDN'T GIVE IT ANY THOUGHT.

9   **BY MR. ZELLER:**

10  Q   WELL, AT SOME POINT, YOU CERTAINLY HAD A BELIEF, AN        10:53

11  UNDERSTANDING, THAT YOUR WIFE GOT THE JOB FOR MS. SALAZAR WITH

12  MGA; RIGHT?  THAT SHE WAS A PARTICIPANT IN THAT PROCESS?

13          **MS. AGUIAR:**  OBJECTION.  MISSTATES TESTIMONY.

14          **THE COURT:**  OVERRULED.

15          **THE WITNESS:**  I DIDN'T HAVE THAT BELIEF.            10:53

16  **BY MR. ZELLER:**

17  Q   NEVER?

18  A   NO.

19  Q   NOW, CERTAINLY YOU HAD CONVERSATIONS WITH YOUR LAWYERS

20  PRIOR TO COMING HERE TODAY TO GIVE THIS TESTIMONY; IS THAT     10:53

21  RIGHT?

22          **MR. GOLDSOBEL:**  OBJECTION.  PRIVILEGE.

23          **THE COURT:**  SUSTAINED.

24          **MR. ZELLER:**  YOUR HONOR, I'M NOT ASKING ABOUT THE

25  COMMUNICATIONS.  I'M ASKING DID HE HAVE CONVERSATIONS?        10:53

```
1          THE COURT:  IF THERE WAS A CONVERSATION?

2          OVERRULED.

3          MR. GOLDSOBEL:  COULD WE HAVE A SIDE-BAR?

4          THE COURT:  YES.

5          (SIDE-BAR PROCEEDINGS AS FOLLOWS:)                     10:54

6          THE COURT:  COUNSEL?

7          MR. GOLDSOBEL:  ISN'T MR. ZELLER'S QUESTION A LOADED

8   QUESTION?  IN THE QUESTION, HE'S ASKING ABOUT WHETHER OR NOT

9   THERE'S CONVERSATIONS.  YOU SUGGESTED THE SUBJECT MATTER OF

10  THOSE CONVERSATIONS; THEREBY, THE ANSWER OF THE QUESTION       10:54

11  CONVEYS PRIVILEGED INFORMATION.

12         THE COURT:  THE QUESTION WAS SIMPLY WHETHER THERE WAS

13  A CONVERSATION.

14         MR. GOLDSOBEL:  ABOUT A PARTICULAR SUBJECT MATTER.

15         MR. ZELLER:  I ASKED IF HE TALKED TO HIS LAWYERS        10:54

16  BEFORE COMING --

17         THE COURT:  REPHRASE THE QUESTION, JUST TO MAKE SURE.

18         I DON'T THINK YOU SAID WHAT IT WAS ABOUT, BUT YOU CAN

19  CERTAINLY ASK THE QUESTION.

20         MR. ZELLER:  BUT I'D ALSO REMIND THE COURT THAT MGA     10:54

21  HAS EXTENSIVELY QUESTIONED WITNESSES ABOUT PREPARATION FOR

22  TESTIMONY.

23         THE COURT:  I'M AWARE OF THAT, AND I PERMIT QUESTIONS

24  ABOUT WHETHER OR NOT CONVERSATIONS OR MEETINGS TOOK PLACE.  WE

25  DO NOT GET INTO THE SUBJECT MATTER OF THOSE CONVERSATIONS,     10:55
```

```
 1  BECAUSE THAT IS PRIVILEGED.  THAT'S THE STANDARD.

 2          MR. ZELLER:  THAT'S ALL I ASKED.

 3          THE COURT:  VERY WELL.

 4          (SIDE-BAR PROCEEDINGS CONCLUDED.)

 5  BY MR. ZELLER:

 6  Q   SO MR. MARLOW, MY QUESTION IS THAT CERTAINLY BEFORE YOU

 7  CAME HERE TO TESTIFY, YOU HAD CONVERSATIONS WITH YOUR LAWYERS;

 8  IS THAT TRUE?

 9  A   YES.

10  Q   AND YOU HAD CONVERSATIONS WITH YOUR LAWYERS IN ORDER TO     10:55

11  COME HERE AND GIVE ANSWERS IN RESPONSE TO THE QUESTIONS YOU'RE

12  ASKED TODAY; IS THAT TRUE?

13          MR. GOLDSOBEL:  OBJECTION.  PRIVILEGE.

14          THE COURT:  LET'S MOVE ALONG.

15          SUSTAIN THE OBJECTION.  REPHRASE IT, COUNSEL.         10:56

16  BY MR. ZELLER:

17  Q   TO PREPARE FOR YOUR TESTIMONY HERE TODAY, YOU TALKED TO

18  LAWYERS; CORRECT?

19          MR. GOLDSOBEL:  OBJECTION.  PRIVILEGE.

20          THE COURT:  OVERRULED.                                10:56

21          THE WITNESS:  PREPARED IN WHAT WAY?

22  BY MR. ZELLER:

23  Q   YOU KNEW YOU WERE GOING TO COME HERE AND TESTIFY.

24  A   RIGHT.

25  Q   YOU TALKED WITH LAWYERS ABOUT THE FACT YOU WERE GOING TO   10:56
```

1    COME AND TESTIFY; CORRECT?

2            MR. GOLDSOBEL:  OBJECTION.  PRIVILEGE.

3            THE COURT:  JUST THE FACT THAT YOU WERE GOING TO

4    TESTIFY.  RIGHT.  WE'RE DEALING WITH GENERAL SUBJECT MATTER.

5    NOT CONTENT.                                                    10:56

6            MR. ZELLER:  CORRECT.

7            THE COURT:  VERY WELL.  OVERRULED.

8            THE WITNESS:  ASK THE QUESTION AGAIN.

9    BY MR. ZELLER:

10   Q    YOU HAD CONVERSATIONS WITH YOUR LAWYERS ABOUT THE FACT YOU   10:56

11   WERE GOING TO COME HERE AND TESTIFY; RIGHT?

12   A    YES.

13   Q    AND YOU HAD CONVERSATIONS WITH THEM IN WHICH SUBJECTS OF

14   YOUR POTENTIAL TESTIMONY HERE TODAY WERE DISCUSSED WITH THOSE

15   LAWYERS; RIGHT?                                                  10:56

16           MR. GOLDSOBEL:  OBJECTION.  PRIVILEGED.

17           THE COURT:  OVERRULED.

18           THE WITNESS:  REPEAT THE QUESTION.

19   BY MR. ZELLER:

20   Q    YOU HAD CONVERSATIONS WITH YOUR LAWYERS PRIOR TO COMING     10:57

21   HERE TODAY IN WHICH YOU DISCUSSED WITH THE LAWYERS THE

22   SUBJECTS, THE LIKELY SUBJECTS THAT YOU WERE GOING TO TESTIFY

23   ABOUT HERE; CORRECT?

24   A    I DON'T RECALL THAT.

25   Q    I'M SORRY?                                                  10:57

1    A    I DON'T RECALL THAT.

2    Q    WELL, WHEN DID YOU LAST MEET WITH YOUR LAWYERS?

3    A    ABOUT FIVE MINUTES AGO.

4    Q    AND YOU DON'T REMEMBER WHETHER YOU DISCUSSED SUBJECTS OF

5    POTENTIAL TESTIMONY; IS THAT RIGHT?                              10:57

6    A    NO.

7    Q    YOU DO REMEMBER OR YOU DON'T?

8    A    I REMEMBER THAT WE DID NOT.

9    Q    AND SO YOU CAN'T TELL ME -- WHEN WAS THE TIME YOU MET WITH

10   THEM BEFORE THAT?                                               10:57

11   A    ABOUT AN HOUR AND A HALF AGO.

12   Q    AND DID YOU TALK ABOUT POTENTIAL SUBJECTS OF TESTIMONY

13   THEN?

14   A    WE DID NOT.

15   Q    AND WHAT ABOUT THE TIME BEFORE THAT?                       10:57

16   A    IT WAS -- YEAH.  YES.

17   Q    AND YOU TALKED ABOUT SUBJECTS OF YOUR TESTIMONY AT THAT

18   TIME; CORRECT?

19   A    YES.

20   Q    SO YOU NOW DO REMEMBER.                                    10:58

21   A    YES.

22   Q    AND YOU UNDERSTAND, GENERALLY SPEAKING, AS YOU SIT HERE

23   NOW, THAT IT WOULD BE BAD FOR MGA IF YOU WERE TO COME IN HERE

24   AND TESTIFY THAT MGA KNEW THAT THESE THREE EMPLOYEES WERE

25   WORKING SECRETLY ON BRATZ WHILE MATTEL EMPLOYEES; CORRECT?      10:58

1          **MS. AGUIAR:**  YOUR HONOR.  ARGUMENTATIVE; 403; ASSUMES

2     FACTS.

3          **THE COURT:**  SUSTAINED AS PHRASED.

4     **BY MR. ZELLER:**

5     Q    IT'S YOUR CLAIM HERE, YOUR TESTIMONY, THAT MGA HAD NO          10:58

6     KNOWLEDGE ABOUT WHO WORKED FOR YEARS ON THE BRATZ FASHIONS; IS

7     THAT CORRECT?

8     A    IT'S A PLAIN FACT THAT MGA HAD NO KNOWLEDGE ABOUT WHO

9     WORKED ON THE BRATZ FASHIONS.

10    Q    WELL, THEY CERTAINLY KNEW THERE WERE SAMPLE MAKERS WORKING    10:59

11    ON THE BRATZ FASHIONS EVEN PRIOR TO OCTOBER 20, 2000; CORRECT?

12         **MS. AGUIAR:**  CUMULATIVE, YOUR HONOR.

13         **THE COURT:**  IT'S STARTING TO GET CUMULATIVE, COUNSEL.

14         MOVE ALONG.

15    **BY MR. ZELLER:**                                                 10:59

16    Q    YOU HAD MENTIONED THIS MEETING THAT YOU HAD WITH MEL WOODS

17    BACK IN 2005 AND YOU TALK ABOUT THAT IN THE CONTEXT OF THE

18    E-MAIL THAT YOU SENT; RIGHT?

19    A    YES.

20    Q    BEFORE THAT, HOWEVER, IN FACT FOR YEARS BEFORE THAT, YOU      10:59

21    HAD COMMUNICATIONS WITH PEOPLE AT MGA ABOUT THE BILLS AND THE

22    INVOICES AND THE LIKE THAT PERTAIN TO THE SAMPLE MAKING;

23    CORRECT?

24    A    YES.

25    Q    IN FACT, THOSE STARTED AS EARLY AS 2000; IS THAT TRUE?       10:59

1    A    YES.

2    Q    THOSE COMMUNICATIONS THAT YOU HAD ABOUT THE BILLS,

3    INCLUDING FOR THE SAMPLE MAKERS' WORK, WAS WITH ISAAC LARIAN;

4    IS THAT TRUE?

5    A    I DON'T RECALL HAVING SUCH COMMUNICATION WITH          11:00

6    ISAAC LARIAN.

7    Q    WHO DID YOU DISCUSS IT WITH AT MGA?

8    A    I DIDN'T DISCUSS IT ALL.  WHAT I DID WAS TURN IN INVOICES

9    FOR A FEW MONTHS WHERE THE CONTRIBUTIONS OF VERONICA'S THIRD

10   PARTY HELPERS -- THERE WAS A FEW MONTHS WHERE THE CONTRIBUTION     11:00

11   OF VERONICA'S HELPERS WAS DISCRIMINATED AS A LINE ITEM ON THE

12   INVOICES THAT I HAD SENT MGA.

13   Q    MY QUESTION IS DIFFERENT, SIR.  MY QUESTION IS SIMPLY,

14   ISN'T IT TRUE THAT YOU HAD REGULAR COMMUNICATIONS WITH PEOPLE

15   AT MGA ABOUT THOSE BILLS, THE BILLS THAT YOU SENT THEM OVER THE    11:00

16   YEARS?

17   A    YES.

18   Q    IN FACT, MGA PAID LATE; ISN'T THAT TRUE?

19   A    I'M SORRY?

20   Q    PERIODICALLY, MGA PAID THOSE BILLS LATE.              11:00

21   A    NOT PERIODICALLY.  ONCE IN A WHILE THERE WAS A

22   MISUNDERSTANDING.

23   Q    YOU HAD COMMUNICATIONS WITH MGA ABOUT THAT; CORRECT?

24        **MS. AGUIAR:**  OBJECTION, YOUR HONOR.  RELEVANCE.

25        **THE COURT:**  FOUNDATIONAL.  OVERRULED.          11:01

1    **BY MR. ZELLER:**

2    Q    ALL I'M TRYING IS REALLY TO FIND OUT A SIMPLE POINT,

3    MR. MARLOW.  ISN'T IT TRUE YOU HAD REGULAR CONTACTS WITH MGA

4    FROM THE VERY START, FROM THE 2000 TIME PERIOD TO THE 2005 TIME

5    PERIOD, WELL BEFORE THIS MEETING WITH MEL WOODS.                11:01

6    A    YES.

7    Q    THANK YOU.

8         **MS. AGUIAR:**  NOTHING FURTHER, YOUR HONOR.  THANK YOU.

9         **THE COURT:**  VERY WELL.

10        YOU'RE EXCUSED, SIR, THANK YOU.                            11:01

11        **MR. NOLAN:**  YOUR HONOR, WE WILL NOW RESUME WITH OUR

12   WITNESS, BOB ECKERT.

13        **THE CLERK:**  PLEASE RESTATE YOUR NAME FOR THE RECORD.

14        **THE WITNESS:**  ROBERT ECKERT.

15        **THE COURT:**  COUNSEL, YOU MAY PROCEED.                  11:02

16              **DIRECT EXAMINATION** (RESUMED)

17   **BY MR. NOLAN:**

18   Q    GOOD MORNING.

19   A    GOOD MORNING, MR. NOLAN.

20   Q    I THINK I SAW YOU RUNNING LAST NIGHT BY THE HOTEL.  DID    11:02

21   YOU TAKE A RUN LAST NIGHT?

22   A    I DID.

23   Q    I WASN'T FOLLOWING YOU.  I JUST SAW YOU RUNNING.

24   A    YOU WEREN'T SURVEILLING ME?

25   Q    I WAS JEALOUS.                                             11:03

1      OTHER THAN RUNNING, DID YOU GET A CHANCE TO MEET WITH

2  COUNSEL?

3  A    I DID MEET WITH MR. QUINN, MR. ZELLER, AND MR. ALGER LAST

4  NIGHT.

5  Q    DID YOU REVIEW YOUR TESTIMONY FROM YESTERDAY?                    11:03

6  A    NO, I DIDN'T.

7  Q    SO DID YOU HAPPEN TO HAVE A CHANCE TO REVIEW THE

8  TRANSCRIPT OF YOUR TESTIMONY?

9  A    NO.

10  Q    SO AS FAR AS YOU'RE CONCERNED, EVERYTHING YOU TESTIFIED TO       11:03

11  YESTERDAY WAS TRUTHFUL; CORRECT?

12  A    YES.

13  Q    I WANT TO DRAW YOU BACK.

14      I ASKED YOU YESTERDAY ABOUT WASN'T IT TRUE THAT IN

15  ADDITION TO WORKING -- THIS IS AT THE POINT IN TIME WHEN YOU          11:03

16  CAME TO MATTEL -- THAT ONE OF THE FINDINGS OR IMPRESSIONS THAT

17  YOU FORMED WERE THAT EMPLOYEES AT VARIOUS DIVISIONS WERE

18  WORKING IN SILOS.  DO YOU RECALL THAT?  AND YOU SAID YES?

19  A    YES.

20  Q    AND THEN I ASKED YOU THAT YOU ALSO FOUND THAT MATTEL'S          11:03

21  EMPLOYEES NEEDED TO FOCUS ON CREATIVITY, AND THEN I SAID ISN'T

22  THAT CORRECT, AND YOU ANSWERED MY QUESTION 'NO.'

23      I WANT TO ASK YOU, SIR, TO TAKE A LOOK, IF YOU WOULD,

24  TO WHAT'S IN YOUR EXHIBIT AS EXHIBIT 18562.

25      WHAT I'D LIKE TO DO IS ASK YOU TO TURN TO PAGE 045.              11:05

1       **MR. QUINN:**  YOUR HONOR, THIS IS AN EXHIBIT THAT WAS

2   SENT TO US, LIKE, 48 HOURS AGO.  IT'S NOT ON THE WITNESS LIST.

3       **MR. NOLAN:**  IT'S IMPEACHMENT.

4       **MR. QUINN:**  STILL...

5       **MR. NOLAN:**  IT WAS ON THE WITNESS LIST.                    11:05

6       **THE COURT:**  ONE SECOND.

7       OVERRULED.

8   **BY MR. NOLAN:**

9   Q   FIRST OF ALL, DO YOU RECOGNIZE THIS BOOK?

10      IT SAYS "YOU'RE IN CHARGE, NOW WHAT?  THE EIGHT-POINT        11:05

11  PLAN."  IT'S WRITTEN BY THOMAS JAY NEFF?

12      YOU'VE SEEN THIS BEFORE, HAVEN'T YOU?

13  A   YES.

14  Q   IN FACT, YOU WERE INTERVIEWED FOR THIS; CORRECT?

15  A   YES, I WAS.                                                  11:06

16  Q   IF I ASKED YOU TO TURN TO PAGE 18562-045, THE TOPIC OF

17  THAT IS 'DEVELOPING PEOPLE AT THE HOME OF BARBIE,' PAGE 153 OF

18  THE BOOK, IT SAYS 'BOB ECKERT.'  I WANT YOU TO LOOK AT THAT.

19      DO YOU RECALL, THERE'S QUOTES, THESE QUOTES ARE

20  ATTRIBUTED TO YOU; CORRECT?                                     11:06

21  A   YES, IT APPEARS THEY ARE.

22      **MR. NOLAN:**  YOUR HONOR, WE'D OFFER THE REDACTED

23  FORMAT OF 18562, WHICH IS IN THE NOTEBOOK MARKED AS

24  EXHIBIT 18562-A.

25      **MR. QUINN:**  NO OBJECTION TO THAT PAGE; I THINK THAT'S    11:06

```
 1    WHAT'S BEING OFFERED.

 2              MR. NOLAN:  IT'S THE FRONT PAGE, YOUR HONOR.

 3         THE COURT:  VERY WELL.

 4              MR. NOLAN:  IF I MAY PUBLISH?

 5         THE COURT:  YES.  IT'S ADMITTED.  YOU MAY PUBLISH.      11:06

 6              (EXHIBIT 18562-A IS RECEIVED.)

 7    BY MR. NOLAN:

 8    Q    THIS IS THE COVER PAGE; CORRECT?

 9    A    IT LOOKS LIKE THE COVER OF THE BOOK.

10    Q    SO YESTERDAY I ASKED YOU BEFORE THE JURY, WASN'T ONE OF    11:07

11    THE OTHER IMPRESSIONS THAT YOU HAD WAS THAT MATTEL HAD TO FOCUS

12    ON CREATIVITY, AND YOU SAID NO.

13              LET'S TURN TO PAGE 45 OF THIS INTERVIEW THAT YOU

14    PROVIDED IN THIS BOOK, AND I WANT YOU TO FOLLOW ALONG WITH ME.

15              THERE'S PORTIONS THAT ARE REDACTED.                 11:07

16              "MATTEL EVOLVES FROM A SMALL FAMILY-RUN COMPANY TO A

17    SUCCESSFUL FORTUNE 500 NUMBER-ONE-IN-OUR-CATEGORY COMPANY, TO A

18    COMPANY THAT HAD GOTTEN OFF TRACK FOR A FEW YEARS, HE SAYS."

19              I THINK THE 'HE SAYS' IS REFERRING TO BOB ECKERT;

20    CORRECT?                                                      11:07

21    A    IS THIS ON THE SAME PAGE?

22    Q    IT IS.

23    A    NOW I HAVE IT.

24    Q    WHERE IT SAYS "HE SAYS."

25    A    YES.                                                     11:08
```

 1    Q    AND THEN YOU GO ON "I SAW MY JOB AS AN OPPORTUNITY TO

 2    INFLUENCE THE CULTURE, TO GO BACK TO THE OLD DAYS AND EVEN

 3    MORE."

 4          FIRST OF ALL, WHAT DID YOU MEAN BY AN OPPORTUNITY TO

 5    INFLUENCE THE CULTURE, TO GO BACK TO THE OLD DAYS, AND EVEN          11:08

 6    MORE?  WHAT DID YOU MEAN BY THAT?

 7          **MR. QUINN:**  YOUR HONOR, THIS IS IRRELEVANT TO WHEN

 8    THE DRAWINGS WERE CREATED.

 9          **THE COURT:**  IT MAY BE.  I JUST DON'T KNOW WHAT HE

10    MEANS; SO LET'S FIND OUT WHAT HE MEANS.                             11:08

11          **MR. QUINN:**  I'M INTERESTED TOO.

12          **THE COURT:**  I AM TOO.

13          YOU MAY ANSWER.

14          **THE WITNESS:**  HOW ABOUT ME?

15          **THE COURT:**  YOU HOLD THE ANSWER.                          11:08

16          **THE WITNESS:**  SO THE QUESTION WAS WHAT DID I MEAN BY

17    THAT?

18          **MR. NOLAN:**  YES.

19          **THE WITNESS:**  WHAT I WAS TALKING ABOUT IS, AT THE

20    TIME I JOINED MATTEL, WE HAD JUST COME OUT OF A PERIOD WHERE WE      11:08

21    HAD MADE A SIGNIFICANT ACQUISITION, ROUGHLY THREE AND A HALF

22    BILLION DOLLARS ACQUISITION, A THING CALLED THE LEARNING

23    COMPANY, WHICH WAS A SOFTWARE BUSINESS, NOT PART OF MATTEL'S

24    TOY CORE BUSINESS.  AND THE SINGLE BIGGEST THING I SAW AT THE

25    TIME WAS THE OPPORTUNITY TO REFOCUS THE COMPANY BACK ON ITS         11:09

1    CORE TOY BUSINESS.

2    **BY MR. NOLAN:**

3    Q    OKAY.

4         SO THEN IT GOES ON, THE SECOND PARAGRAPH:  "LITERALLY

5    IN MY FIRST HOUR ON THE JOB, I TALKED ABOUT DEVELOPING PEOPLE."    11:09

6         WE TALKED ABOUT THAT YESTERDAY.

7    A    YES.

8    Q    "AND MATTEL HAS NOT BEEN SEEN AS A PEOPLE-DEVELOPING

9    MACHINE.  IT'S NOT GE.  WE REALLY DIDN'T HAVE HUMAN RESOURCES

10   101 WELL DEFINED AT MATTEL, AND WE HAD BEEN WORKING HARD TO DO    11:09

11   THAT.  I SPENT A LOT OF MY TIME ON MANAGEMENT EDUCATION, WHICH

12   DIDN'T REALLY EXIST WHEN I GOT HERE."

13        THEN, IF YOU CAN STROLL SCROLL DOWN, THERE'S MORE

14   REDACTION THAT DOESN'T RELATE TO THIS.  BUT THERE'S YOUR QUOTE:

15   "WE ALSO NEEDED TO FOCUS ON CREATIVITY"; CORRECT?    11:09

16   A    YES.

17   Q    AND THEN YESTERDAY, I --

18        **MR. QUINN:**  I'M NOT SURE IF THE WITNESS HAS SAID THAT

19   HE ACTUALLY SAID THAT.

20        **THE COURT:**  VERY WELL.    11:09

21   **BY MR. NOLAN:**

22   Q    IT'S IN A QUOTE.  DID YOU SAY THAT?

23   A    WELL, I THINK I DID SAY THAT, BUT I ALSO THINK THE

24   RELEVANT PORTION HERE IS THE PART YOU'VE REDACTED AFTER THAT.

25   IT TALKED ABOUT -- COULD WE GO BACK TO THE OTHER PAGE 45 -- I    11:10

```
 1    THINK THAT TALKED ABOUT THE IDEA OF CREATING SKUNK WORKS, AND

 2    THOSE SORTS OF THINGS.

 3              THE COURT:  COUNSEL, PUT UP THE ENTIRE PAGE 45.

 4              THE WITNESS:  I SAID "WE ALSO NEED TO FOCUS ON

 5    CREATIVITY.  WE DEVELOPED THE SKUNK WORKS TO TRAIN PEOPLE ON      11:10

 6    HOW TO BE MORE CREATIVE."

 7              THAT, TO ME, WAS THE CONTEXT I WAS DISCUSSING

 8    CREATIVITY IN.

 9    BY MR. NOLAN:

10    Q    IT GOES ON:  "IT COSTS ONLY A FEW THOUSAND DOLLARS AND THE   11:10

11    CLASS PROJECT TURNED OUT TO BE A NEW PRODUCT THAT'S BEEN VERY

12    SUCCESSFUL."

13    A    CORRECT.

14    Q    SO IT'S TRUE THAT WHEN YOU CAME TO MATTEL, YOU KNEW AND

15    FOUND THAT YOU NEEDED TO FOCUS ON CREATIVITY AT MATTEL;          11:11

16    CORRECT?

17    A    YES.

18    Q    THEN ANOTHER QUESTION THAT I ASKED YOU YESTERDAY HAD TO DO

19    WITH THE VARIOUS SURVEYS.

20              THE COURT:  LET ME STOP YOU, COUNSEL.                  11:11

21              JUST FOR THE JURY'S BENEFIT, I THINK MOST OF US ARE

22    FAMILIAR WITH LOCKHEED, BUT WHAT DO YOU MEAN BY SKUNK WORKS?

23              THE WITNESS:  THANK YOU.

24              I WOULDN'T HAVE RECALLED LOCKHEED.

25              I MEAN AN ENVIRONMENT, A SPECIAL PLACE -- WE TALKED    11:11
```

1   ABOUT THIS YESTERDAY, THIS PROJECT PLATYPUS -- WHERE WE CREATED

2   PHYSICALLY SPACE AND THE OPPORTUNITY FOR PEOPLE TO WORK IN THAT

3   SPACE ON THINGS TOTALLY UNRELATED TO THEIR REGULAR DAY-TO-DAY

4   JOB; SO WE TAKE PEOPLE OUT OF THEIR DAY-TO-DAY JOB FOR A

5   SPECIFIC PERIOD OF TIME, IN THIS CASE MAYBE FOUR, SIX WEEKS,                11:12

6   PUT THEM IN ANOTHER SPACE TO WORK ON A PROJECT TOTALLY

7   UNRELATED, A NEW IDEA.

8          I'M NOT SURE WHERE THE NAME SKUNK WORKS CAME FROM.

9          **MR. QUINN:**  LIL' ABNER, YOUR HONOR.  I HAPPEN TO KNOW

10  THAT.                                                                       11:12

11         **THE COURT:**  I KNOW YOU DO.

12         MOVE ALONG, COUNSEL.

13         **MR. NOLAN:**  WE APPRECIATE THE ASSISTANCE.

14  **BY MR. NOLAN:**

15  Q   MR. ECKERT, CONTINUE.  HAVE YOU FINISHED?                               11:12

16  A   I THINK SO.

17  Q   SO WE'VE PUT THAT WHOLE PAGE IN CONTEXT FOR YOU; RIGHT?

18  A   YES.

19  Q   SO ONE OF YOUR FOCUSES COMING IN WAS ON CREATIVITY.

20  A   YES.                                                                    11:12

21  Q   NOW, ANOTHER THING YESTERDAY WE TALKED ABOUT BEFORE THE

22  JURY WAS THAT YOU REVIEWED VARIOUS EMPLOYEE SURVEYS AND YOU

23  WERE IMPRESSED WITH THE POSITIVE IMAGERY THAT EMPLOYEES HAD

24  ABOUT THE COMPANY.

25         DO YOU RECALL THAT TESTIMONY?                                        11:12

1   A    YES.

2   Q    THEN THE OTHER COMPONENT OF THAT, I THINK, WAS THAT YOU

3   TESTIFIED THAT YOU WERE PLEASED WITH THE STRONG RESPONSE THAT

4   YOU HAD TO THE SURVEY; THAT IS, TO THE NUMBER OF THE EMPLOYEES

5   WHO HAD COMPLETED THE SURVEY.                                    11:13

6   A    YES.

7   Q    IT'S NOT TRUE, IS IT, SIR, THAT THE SURVEY RESULTS

8   DEMONSTRATED A POSITIVE IMAGERY AT MATTEL, DID IT?

9   A    MY RECOLLECTION OF THE SURVEY RESULTS IS -- AGAIN, I

10  WAS -- THERE WERE CERTAINLY MORAL ISSUES IN THE COMPANY, BUT I  11:13

11  WAS PLEASANTLY SURPRISED WITH NOT ONLY THE SURVEY RESULTS BUT

12  TALKING TO EMPLOYEES IN MY FIRST DAYS ON THE JOB WITH HOW THEY

13  FELT ABOUT THE COMPANY.

14  Q    I WANT TO ASK YOU, IF YOU COULD, TO TURN TO EXHIBIT 18481;

15  IT'S IN YOUR WHITE NOTEBOOK.                                     11:13

16        MR. ECKERT, DO YOU RECALL WRITING AN ARTICLE THAT WAS

17  PUBLISHED IN THE HARVARD BUSINESS JOURNAL IN NOVEMBER OF 2001?

18  A    YES; THE HARVARD BUSINESS REVIEW.

19  Q    I'M SORRY.

20        AND I'D ASK YOU TO LOOK AT 18481 AND IDENTIFY FOR US       11:14

21  WHETHER OR NOT THAT IS AN ACCURATE COPY OF THE ARTICLE THAT YOU

22  YOURSELF WROTE FOR THE HARVARD BUSINESS REVIEW.

23  A    YES, IT APPEARS TO BE.

24  Q    AND I JUST WANT TO -- IT MIGHT BE EASIER, BUT IF YOU WANT

25  TO GO BACK AT ANY TIME TO SEE THE ACTUAL FULL TEXT OF IT -- I    11:14

```
 1    JUST WANT TO ASK YOU TO TURN YOUR ATTENTION TO THE NEXT TAB

 2    OVER, WHICH IS EXHIBIT 18481-A, THE REDACTED VERSION, AND FOCUS

 3    ON A COUPLE OF THINGS.

 4    A    OKAY.

 5    Q    I'M RELATING BACK TO THE POSITIVE IMAGERY THAT YOU          11:15

 6    TESTIFIED YESTERDAY TO THE JURY.

 7              DO YOU SEE HERE, ON PAGE 2--

 8         MR. QUINN:  YOUR HONOR, I OBJECT TO THE PREAMBLE.  I

 9    THINK THAT INACCURATELY SUMMARIZES --

10         THE COURT:  VERY WELL.                                      11:15

11              I OBJECT TO THE SPEAKING OBJECTIONS, COUNSEL.

12              SUSTAINED.

13    BY MR. NOLAN:

14    Q    FOCUSING YOUR ATTENTION NOW TO PAGE 2 AND THE PRINTED

15    PORTION THAT'S CONTAINED HERE.                                   11:15

16    A    MR. NOLAN, PAGE 2 OF THE ARTICLE OR PAGE 2 OF THE EXHIBIT?

17    Q    PAGE 2 OF THE EXHIBIT.  AND FOR THE RECORD, IT'S PAGE 3 OF

18    9; CORRECT?

19    A    CORRECT.

20    Q    SO PAGE 2 OF THE EXHIBIT.                                   11:15

21              JUST READ TO YOURSELF, IF YOU WOULD, AND CONFIRM

22    THESE ARE YOUR OWN WORDS.

23    A    YES.

24         MR. NOLAN:  YOUR HONOR, I'D OFFER THE REDACTED

25    VERSION OF EXHIBIT 18481.                                        11:16
```

1          **THE COURT:**  ANY OBJECTION?

2          **MR. QUINN:**  IRRELEVANT.

3          **MR. NOLAN:**  IT'S FOR IMPEACHMENT.

4          **MR. QUINN:**  IT'S NOT IMPEACHING, YOUR HONOR.

5          **THE COURT:**  OVERRULED.                                    11:16

6          (EXHIBIT 18481 RECEIVED.)

7          **MR. NOLAN:**  CAN WE PUBLISH.

8          **THE COURT:**  YOU MAY.

9          **MR. NOLAN:**  THANK YOU.

10         AND JUST FOR THE FIRST PART, THIS IS THE FRONT PAGE     11:16

11    OF THE HARVARD BUSINESS REVIEW.

12    **BY MR. NOLAN:**

13    Q    IT SAYS "WHERE LEADERSHIP STARTS; ROBERT A. ECKERT."

14         THAT'S YOU, CORRECT, SIR?

15    A    YES.                                                    11:16

16    Q    LOOKING PAGE 2 OF MY EXHIBIT, PAGE 3 OF THE ACTUAL

17    ARTICLE.

18         ON THE TOP PART, IT SAYS -- AND AGAIN, WE'VE

19    CONFIRMED THIS IS YOUR WRITING; CORRECT?

20    A    YES.                                                    11:16

21    Q    THESE ARE YOUR WORDS.

22    A    YES, THESE ARE MY WORDS.

23    Q    THIS IS WHAT YOU WROTE IN NOVEMBER OF 2001 AND PUBLISHED

24    FOR THE HARVARD BUSINESS REVIEW; CORRECT?

25    A    I PROBABLY WROTE IT BEFORE THEN, BUT THAT'S WHEN IT WAS. 11:16

1  Q    "MATTEL HAD LOST ITS FOCUS.  IT WAS LOSING UP TO

2  $1 MILLION A DAY ON THE LEARNING COMPANY, A SOFTWARE FIRM

3  ACQUIRED DURING MY PREDECESSOR'S REIGN.  MATTEL WAS BORROWING

4  MONEY TO STAY AFLOAT, AND SEVERAL TOP MANAGERS, INCLUDING THE

5  CIO, HEAD OF OPERATIONS AND HEAD OF COMMUNICATIONS HAD LEFT.      11:17

6  THE COMPANY HAD BEEN WITHOUT A CEO FOR FIVE MONTHS.  MORAL WAS

7  AT AN ALL-TIME LOW AND THE STOCK PRICE WASN'T FAR BEHIND.

8  MATTEL NO LONGER KNEW WHAT IT WAS OR WHAT IT STOOD FOR.  IT WAS

9  TIME TO REFOCUS."

10         THEN YOU GO ON DOWN TO THE NEXT PARAGRAPH:  "LIKE ANY      11:17

11 NEW CEO WHO WALKS INTO A STRUGGLING COMPANY, I WAS FACING

12 UNREALISTIC EXPECTATIONS FROM ALL KINDS OF PEOPLE WHO HAD NEVER

13 MET ME.  NOT JUST WALL STREET ANALYSTS AND CUSTOMERS, BUT ALSO

14 MATTEL'S EMPLOYEES AROUND THE WORLD."

15         THAT'S HOW YOU FELT WHEN YOU TOOK THIS JOB; RIGHT?        11:17

16 A    YES.

17 Q    NOW, IT'S TRUE THAT YOU HAVE DONE GREAT THINGS AT MATTEL;

18 CORRECT?

19 A    I DON'T KNOW IF I WOULD GO THAT FAR.

20 Q    WELL YOUR FIRST YEARS, YOU TURNED AROUND THE PROFITABILITY   11:18

21 OF MATTEL.

22         **MR. QUINN:**  RELEVANCE.

23         **THE COURT:**  THIS GOES BEYOND THE IMPEACHMENT.

24         SUSTAINED.

25         **MR. NOLAN:**  I WAS GOING ON TO A DIFFERENT SUBJECT.     11:18

```
1            THE COURT:  I THINK SO.
2   BY MR. NOLAN:
3   Q    ISN'T IT TRUE, SIR, THAT IN YOUR FIRST YEAR AND DURING THE
4   PERIOD OF 1999, 2000, THAT MATTEL LAID OFF APPROXIMATELY
5   TEN PERCENT OF ITS WORK FORCE?                              11:18
6            MR. QUINN:  OBJECTION.  RELEVANCE.
7            THE COURT:  SUSTAINED.
8            MR. NOLAN:  IT GOES TO THE TIME PERIOD WHEN
9   RECRUITING WAS OCCURRING BY COMPETITOR COMPANIES FROM EMPLOYEES
10  OF MATTEL.                                                  11:18
11           THE COURT:  NARROW IT TO THAT FOCUS, THEN.
12  BY MR. NOLAN:
13  Q    ISN'T IT TRUE, SIR, THAT DURING THE PERIOD OF TIME OF 1999
14  -- LET'S STAY WITH YOU -- 2000, THAT EMPLOYEES AT MATTEL WERE
15  BEING RECRUITED TO COMPETITOR COMPANIES?                    11:18
16  A    I'M SORRY?
17           EMPLOYEES OF MATTEL'S WERE BEING RECRUITED INTO
18  COMPETITOR COMPANIES?
19  Q    BY COMPETITOR COMPANIES.
20  A    I THINK THERE'S ALWAYS RECRUITING GOING ON, SO I DON'T   11:19
21  KNOW IF THERE'S A SPECIFIC TIME PERIOD.  MATTEL EMPLOYEES ARE
22  RECRUITED I'M SURE, ALL OF THE TIME.
23  Q    LET ME PUT IT THIS WAY.  ISN'T IT TRUE THAT SHORTLY AFTER
24  YOU TOOK ON YOUR POSITION AT MATTEL, THAT A NUMBER OF EMPLOYEES
25  AT MATTEL WERE ASKED TO LEAVE THE WORK FORCE AT MATTEL?      11:19
```

1           **MR. QUINN:**  RELEVANCE, YOUR HONOR.

2           **MR. NOLAN:**  SAME ISSUE; LIMITED ONLY TO THAT TIME

3     PERIOD.

4           **THE COURT:**  AS PHRASED, COUNSEL, YOU'RE GOING TO HAVE

5     TO REPHRASE THE QUESTION.                                    11:19

6           I'M NOT SURE OF -- WERE ASKED TO LEAVE?

7           **MR. NOLAN:**  I'LL REPHRASE IT.

8     **BY MR. NOLAN:**

9     Q   IN 2000, IN ORDER TO RIGHT THE SHIP AND RETURN TO

10    PROFITABILITY, ISN'T IT CORRECT THAT YOU APPROVED THE LAYOFF OF   11:20

11    ABOUT TEN PERCENT OF THE WORK FORCE AT MATTEL?

12          **MR. QUINN:**  ASSUMES FACTS.

13          **THE COURT:**  SUSTAINED.

14    **BY MR. NOLAN:**

15    Q   DO YOU, AS THE HEAD MANAGER AT MATTEL, THE BIG GUY AT    11:20

16    MATTEL, KNOW WHETHER OR NOT IN 2000 THERE WERE ANY LAYOFFS?

17    A   YES, I DO.

18    Q   AND HOW DO YOU KNOW THAT, SIR?

19    A   BECAUSE I PARTICIPATED IN DISCUSSIONS AND DECISIONS ABOUT

20    LAYOFFS IN THE YEAR 2000.                                    11:20

21    Q   WERE THERE LAYOFFS AT MATTEL IN THE YEAR 2000?

22          **MR. QUINN:**  IRRELEVANT, YOUR HONOR.

23          **THE COURT:**  OVERRULED.

24          **THE WITNESS:**  YES, THERE WERE LAYOFFS IN THE YEAR

25    2000 AT MATTEL.                                              11:20

1    **BY MR. NOLAN:**

2    Q    ESTIMATE FOR US THE PERCENTAGE OF THE WORK FORCE AT MATTEL

3    LAID OFF.

4              **MR. QUINN:**  IRRELEVANT, YOUR HONOR.

5              **THE COURT:**  COUNSEL, WHERE IS THIS GOING?                11:20

6              **MR. NOLAN:**  YOUR HONOR, THERE WAS TESTIMONY FROM

7    ISAAC LARIAN --

8              **MR. QUINN:**  SIDE-BAR, PLEASE.

9              **THE COURT:**  YES.

10             (SIDE-BAR PROCEEDINGS AS FOLLOWS:)                           11:21

11             **THE COURT:**  COUNSEL, I WILL GIVE YOU SOME LEEWAY,

12   BECAUSE I KNOW MR. QUINN GOT INTO IT IN OPENING STATEMENT AND

13   WITH SOME OF THE WITNESSES.  BUT I THINK WE'RE GETTING TO THE

14   END OF THIS.

15             WHAT IS THE PARTICULAR --                                    11:21

16             **MR. NOLAN:**  HERE'S THE POINT.  WHEN MR. LARIAN WAS ON

17   THE STAND, MR. PRICE WAS GRILLING HIM ABOUT RECRUITING DURING

18   THAT RELEVANT PERIOD OF TIME.

19             **THE COURT:**  RIGHT.

20             **MR. NOLAN:**  AND MR. LARIAN TESTIFIED THAT IT WAS HIS      11:21

21   UNDERSTANDING THAT THERE WERE LAYOFFS AT MATTEL.  AND I WANT

22   TO --

23             **THE COURT:**  I'VE LET YOU HAVE TESTIMONY OUT THERE

24   THAT THERE HAVE BEEN LAYOFFS.  BUT IN TERMS OF THE NUMBERS OF

25   LAYOFFS, I THINK --                                                    11:22

```
 1            MR. NOLAN:  I SEE.

 2            THE COURT:  YOU'VE ASKED THAT TWICE NOW.

 3            MR. NOLAN:  SO IT'S THE AMOUNT.

 4            THE COURT:  IT'S TIME TO MOVE ON.

 5            MR. NOLAN:  GOOD.  I UNDERSTAND.                  11:22

 6            (SIDE-BAR PROCEEDINGS CONCLUDED.)

 7            THE COURT:  YOU MAY PROCEED, COUNSEL.

 8   BY MR. NOLAN:

 9   Q    MR. ECKERT, YESTERDAY WE WERE TALKING ABOUT SURVEYS, AND I

10   BELIEVE YOUR TESTIMONY WAS UNDER OATH THAT YOU HAVE READ THE  11:22

11   SURVEYS THAT HAVE BEEN CONDUCTED AT MATTEL; CORRECT?

12   A    EMPLOYEE SURVEYS?

13   Q    YES.

14   A    YES.

15   Q    DO YOU RECALL, SIR, IN 2002 THAT YOU ORDERED A MANAGEMENT  11:23

16   SURVEY TO BE CONDUCTED AT MATTEL?

17            MR. QUINN:  OBJECTION.  RELEVANCE; TIME PERIOD.

18            THE COURT:  IT'S FOUNDATIONAL.  OVERRULED.

19            THE WITNESS:  THERE MAY HAVE BEEN AN EMPLOYEE SURVEY

20   IN 2002.  I DON'T KNOW IF IT WOULD HAVE BEEN CONFINED TO JUST  11:23

21   MANAGEMENT IF THERE WAS ONE.

22   BY MR. NOLAN:

23   Q    PLEASE TAKE A LOOK AT EXHIBIT 16196.  PUT YOUR FINGER

24   THERE FOR A SECOND.  I WANT YOU NOW TO LOOK AT EXHIBIT 18561,

25   WHICH IS ALSO IN YOUR BOOK.                                11:24
```

1            **MR. QUINN:**  YOUR HONOR, OBJECT TO THE USE OF 18561.

2   IT WAS PROVIDED TO US ON JUNE 30TH.  IT IS NOT ON ANY EXHIBIT

3   LIST.

4            **THE COURT:**  LET ME SEE WHAT IT IS FIRST.

5            IS THIS IMPEACHMENT, COUNSEL?                        11:25

6            **MR. NOLAN:**  YES, IT IS, YOUR HONOR.

7            **THE COURT:**  18561?

8            **MR. NOLAN:**  YES.

9            ACTUALLY IMPEACHMENT.  BUT ALSO, MAYBE THE FIRST SHOT

10  WOULD BE TO REFRESH HIS RECOLLECTION.                         11:25

11           **THE COURT:**  IF YOU WANT TO DO THAT, YOU CAN PROCEED.

12  YOU HAVEN'T ESTABLISHED THE FOUNDATION.  SUSTAIN THE OBJECTION.

13           ASK HIM ANOTHER QUESTION.

14           **MR. NOLAN:**  I'LL COME BACK TO THAT IN CASE IT

15  DOESN'T.                                                     11:25

16  **BY MR. NOLAN:**

17  Q    LOOK AT 18561, SIR.

18  A    I HAVE IT.

19  Q    AND THE TITLE OF THIS IS A NEWS ARTICLE THAT APPEARED IN

20  WORK FORCE MANAGEMENT.                                       11:26

21           **MR. QUINN:**  YOUR HONOR, HE HASN'T ESTABLISHED HE HAS

22  EVER SEEN THIS BEFORE.

23           **THE COURT:**  SUSTAINED.

24           **MR. NOLAN:**  JUST LOOK AT THIS EXHIBIT.

25           **THE COURT:**  WHAT'S THIS GOING TO, COUNSEL?        11:26

1      **MR. NOLAN:**  IT'S GOING TO GO TO THE SURVEY, AND I

2   JUST WANTED TO ASK HIM WHETHER OR NOT IT REFRESHES HIS

3   RECOLLECTION THAT HE COMMISSIONED A SURVEY.

4           **THE COURT:**  VERY WELL.

5           **MR. QUINN:**  I DON'T THINK THERE'S BEEN TESTIMONY        11:26

6   ABOUT HE COMMISSIONED A SURVEY.

7           **THE COURT:**  THERE HAS BEEN SOME.  I'LL PERMIT IT.

8   **BY MR. NOLAN:**

9   Q    HAVE YOU EVER SEEN EXHIBIT 18561 BEFORE?

10  A    YES.  I BELIEVE, YES.  I KNOW I SAW IT LAST NIGHT.  I MAY        11:26

11  HAVE SEEN IT BEFORE THEN, BUT I KNOW I SAW THIS LAST NIGHT.

12  Q    AND THAT WAS LAST NIGHT WHEN YOU WERE MEETING WITH YOUR

13  ATTORNEYS?

14  A    YES.

15  Q    IN ANY EVENT, DO YOU RECALL LOOKING AT OR DO YOU RECALL        11:27

16  BEING INTERVIEWED ON JUNE 25, 2006?

17  A    NO.  I DON'T REMEMBER THE SPECIFIC DATE.  I MAY HAVE BEEN.

18  Q    SO LAST NIGHT DID YOU READ THIS ARTICLE?

19  A    NO.  I DIDN'T READ IT.  WE LEAFED THROUGH THE BOOK.

20  Q    DOES THIS REFRESH YOUR RECOLLECTION IN ANY WAY AFTER        11:27

21  REVIEWING THIS INTERVIEW, SIR, AS TO WHETHER OR NOT YOU HAD

22  ASKED FOR OR COMMISSIONED IN 2002 A GLOBAL MANAGEMENT SURVEY AT

23  MATTEL?

24          **MR. QUINN:**  I OBJECT TO THE CHARACTERIZATION OF

25  INTERVIEW.        11:27

1          **THE COURT:**  SUSTAINED.  REPHRASE.

2     **BY MR. NOLAN:**

3     Q    AFTER REVIEWING THIS DOCUMENT, DOES THIS REFRESH YOUR

4     RECOLLECTION THAT YOU COMMISSIONED IN 2002 A GLOBAL SURVEY

5     REGARDING A WORK FORCE MANAGEMENT STRATEGY?                      11:28

6     A    THAT'S WHAT THE ARTICLE SAYS.  IT ALSO SAYS "FIRST OF ITS

7     KIND," WHICH I DON'T BELIEVE THAT WOULD BE THE CASE.

8     Q    WHY?

9     A    I THOUGHT WE ALSO DID A SURVEY IN THE YEAR 2000 WAS THE

10    BEGINNING OF THIS, OF OUR EMPLOYEE SURVEYS.                      11:28

11    Q    THIS ONE GOES TO THE MANAGEMENT STRATEGY SURVEY; CORRECT?

12    A    NO.  THERE WASN'T A --

13         **MR. QUINN:**  VAGUE AND AMBIGUOUS, YOUR HONOR, AS TO

14    WHAT 'THIS ONE' IS, WHAT IT'S BEING REFERRED TO.

15         **THE COURT:**  COUNSEL?                                    11:28

16    **BY MR. NOLAN:**

17    Q    DO YOU RECALL COMMISSIONING A GLOBAL SURVEY OF MANAGEMENT

18    STRATEGY IN 2002?

19    A    I WOULDN'T PHRASE IT THAT WAY.  JUST THE WAY I READ THIS,

20    IT SAYS "ASPECTS OF THE WORK FORCE MANAGEMENT STRATEGY WERE      11:28

21    DESIGNED IN RESPONSE TO A GLOBAL SURVEY THAT HAD BEEN

22    COMMISSIONED."  SO THE SURVEY WASN'T A MANAGEMENT STRATEGY

23    SURVEY; IT WAS AN EMPLOYEE SURVEY.

24    Q    I UNDERSTAND.

25         SO YOU DO RECALL HAVING COMMISSIONED A GLOBAL SURVEY.       11:29

1    A    WE HAVE HAD GLOBAL EMPLOYEE SURVEYS.

2    Q    IN 2002?

3    A    IT'S POSSIBLE WE DID IN 2002.  WE'VE HAD SEVERAL EMPLOYEE

4    SURVEYS SINCE I'VE JOINED MATTEL.

5    Q    DO YOU STILL HAVE THIS OTHER EXHIBIT?                    11:29

6    A    YES.

7    Q    SO LET'S TURN BACK TO THAT ONE.  WHAT'S THE EXHIBIT

8    NUMBER?

9           MR. QUINN:  16196.

10          MR. NOLAN:  RIGHT.  IS THAT WHERE WE ARE?            11:29

11   BY MR. NOLAN:

12   Q    SO IT'S EXHIBIT 16196; CORRECT?

13   A    CORRECT.

14   Q    I JUST WANT TO ASK YOU, DO YOU RECOGNIZE THIS DOCUMENT AS

15   BEING A SURVEY REPORT OR THE REPORT OF A SURVEY THAT YOU       11:30

16   COMMISSIONED AT MATTEL?

17   A    I RECOGNIZE THIS DOCUMENT AS AN APPENDIX ABOUT BARBIE.  I

18   DON'T KNOW THAT IT'S AN EMPLOYEE SURVEY APPENDIX.  IT'S GOT A

19   BARBIE LOGO AND TALK ABOUT BARBIE FINAL RECOMMENDATIONS.  I

20   DON'T KNOW THAT THIS IS AN EMPLOYEE SURVEY REPORT.            11:30

21   Q    DO YOU RECALL WHETHER OR NOT YOU'VE EVER REVIEWED THE

22   AUGUST 5, 2002 BARBIE FINAL RECOMMENDATIONS?

23   A    I SAW THIS PAGE LAST NIGHT.

24   Q    OTHER THAN LAST NIGHT, DO YOU RECALL EVER SEEING THIS

25   DOCUMENT -- AND NOT LIMITED TO THE FIRST PAGE -- THE VARIOUS   11:30

1   FINDINGS AND RECOMMENDATIONS CONTAINED IN THIS DOCUMENT?

2           **MR. QUINN:**  I OBJECT TO GOING INTO THE CONTENT OF THE

3   DOCUMENT.

4           **THE COURT:**  SUSTAINED.

5   **BY MR. NOLAN:**

6   Q    DO YOU RECALL EVER SEEING THE CONTENTS OF THIS DOCUMENT

7   BEFORE?

8   A    NOT BEFORE LAST NIGHT.

9   Q    WHEN YOU REVIEWED IT LAST NIGHT, WERE ANY OF THE FINDINGS

10  THAT ARE CONTAINED IN THIS REPORT SURPRISING TO YOU --          11:31

11          **MR. QUINN:**  OBJECTION.  LACKS FOUNDATION.

12          **MR. NOLAN:**  I HADN'T FINISHED.

13          **THE COURT:**  FINISH THE QUESTION.

14  **BY MR. NOLAN:**

15  Q    -- THAT YOU FOUND SURPRISING OR INCONSISTENT WITH WHAT      11:31

16  YOUR UNDERSTANDING WAS OF THE STATUS REFLECTED IN THESE

17  RECOMMENDATIONS?

18          **MR. QUINN:**  ALSO ASSUMES FACTS NOT IN EVIDENCE.

19          **THE COURT:**  OVERRULED.

20          YOU MAY ANSWER.                                          11:31

21          **THE WITNESS:**  I DIDN'T READ THIS THOROUGHLY LAST

22  NIGHT, SO IT'S HARD FOR ME TO OPINE ON YOUR QUESTION.

23  **BY MR. NOLAN:**

24  Q    REGARDLESS OF LOOKING AT THIS DOCUMENT, WHAT I WANT TO ASK

25  YOU, SIR, IS, IN YOUR POSITION AT MATTEL, HAD IT EVER BEEN       11:32

1    REPORTED TO YOU THAT EMPLOYEES OR MANAGEMENT VIEWED MATTEL AS

2    BEING AN ORGANIZATION THAT WAS RISK ADVERSE?

3              **MR. QUINN:**  OBJECTION.  RELEVANCE.

4              **MR. NOLAN:**  AGAIN, IT GOES TO THE IMPEACHMENT OF IVY

5    ROSS.                                                                    11:32

6              **THE COURT:**  AS PHRASED, COUNSEL, I THINK THAT'S TOO

7    BROADLY STATED FOR THE COURT TO GET ANY RELEVANCE.

8              SUSTAIN THE OBJECTION.

9    **BY MR. NOLAN:**

10   Q    DO YOU RECALL EVER BEING ADVISED THAT AT MATTEL, THE            11:32

11   CRITICISM WAS THAT MATTEL DIDN'T DISTINGUISH BETWEEN

12   TWO-YEAR-OLDS AND 12-YEAR-OLDS?

13             **MR. QUINN:**  IRRELEVANT.

14             **THE COURT:**  COUNSEL?  WHERE IS THIS GOING?

15             **MR. NOLAN:**  AGAIN, YOUR HONOR --                          11:33

16             **MR. QUINN:**  COULD WE GO TO SIDE-BAR, YOUR HONOR?

17             **THE COURT:**  VERY WELL.

18             (SIDE-BAR PROCEEDINGS AS FOLLOWS:)

19             **THE COURT:**  COUNSEL, I'M VERY CONCERNED THAT WE'RE

20   GETTING INTO THE MATTEL BASHING THAT THE COURT SAID WAS NOT TO        11:33

21   HAPPEN UNDER THE MOTION *IN LIMINE*.  I REALLY DON'T SEE -- I'VE

22   GIVEN YOU A LOT OF LATITUDE OVER A NUMBER OF OBJECTIONS ON THIS

23   TO TRY TO ADDRESS PARTICULAR ISSUES THAT HAVE SLIPPED OUT.  BUT

24   WE SEEM TO BE GETTING INTO A 'LET'S BEAT UP ON MATTEL,' AND

25   I'VE RULED ALREADY ON THIS AND I'M NOT GOING TO REVISIT THAT.         11:34

1            **MR. NOLAN:**  I UNDERSTAND YOUR HONOR.

2            YOUR RULING, WITH ALL DUE RESPECT, WAS AT A TIME WHEN

3    THE RULES HAD BEEN SET DIFFERENTLY, IN THIS SENSE:  THEY WERE

4    BEFORE THE TRIAL; IT WAS BEFORE THE INTRODUCTION OF TESTIMONY.

5            AND IN VIEW OF THE RULING, MR. QUINN, IVY ROSS,                11:34

6    LILY MARTINEZ AND CASSIDY PARK, THREE WITNESSES FROM MATTEL,

7    HAVE CONSISTENTLY ENTERED INTO EVIDENCE BEFORE THIS JURY ABOUT

8    MATTEL, THE MOST SUCCESSFUL BARBIE FASHION, IT'S ALWAYS

9    SUCCESSFUL; THE ENVIRONMENT THAT IS COLLABORATIVE; EVERYTHING

10   WAS GREAT; TO CREATE THE IMPRESSION THAT CARTER BRYANT SHOULD          11:34

11   HAVE STAYED THERE AND SIMPLY PRESENTED HIS IDEA OF BRATZ TO

12   MATTEL.  THAT'S THE ISSUE THAT THEY HAVE TRIED TO CREATE HERE.

13           WE NEVER THOUGHT THEY WERE GOING TO DO THIS.

14   YOUR HONOR, I HAVE QUOTES FROM SIDE-BAR CONFERENCES AFTER THIS

15   TESTIMONY WHERE YOU TURNED TO MR. QUINN AND YOU SAID                   11:35

16   'MR. QUINN, THIS IS IN YOUR HANDS.  IF THIS EVIDENCE COMES IN,

17   I'M GOING TO ALLOW MR. NOLAN TO REBUT THIS.'

18           **THE COURT:**  I'M TRYING TO DO THAT.  BUT WHERE I'M

19   TRYING TO DRAW THE LINE IS REBUTTING EVIDENCE AND STATEMENTS

20   THAT ARE MADE WITHOUT GETTING INTO A FULL SCALE -- THESE              11:35

21   QUESTIONS NOW, RISK ADVERSE, IT'S SO BROAD.

22           I WILL GIVE YOU LATITUDE TO DEAL WITH THE PARTICULAR

23   TESTIMONY THAT'S BEEN INTRODUCED, ABSOLUTELY, OUT OF FAIRNESS,

24   NOTWITHSTANDING THE COURT'S RULING.  BUT THE QUESTIONS YOU'RE

25   ON NOW, WHERE MY RULINGS SUSTAINED THESE OBJECTIONS, ARE COMING       11:35

1    FROM, THEY ARE SO BROAD --

2         **MR. NOLAN:**  I ACCEPT THAT GUIDANCE.  THANK YOU.

3         **MR. QUINN:**  YOUR HONOR, MR. NOLAN, EVERY OTHER TIME

4    WE'RE UP HERE, MAKES THESE BROAD BRUSHED STATEMENTS ABOUT THE

5    TESTIMONY OF IVY ROSS AND MS. MARTINEZ AND OTHER PEOPLE.          11:36

6         **THE COURT:**  I UNDERSTAND THAT.  I THINK I HAVE THAT

7    IN MIND.  THAT'S WHAT I'M GOING TO BE CONTINUING TO BASE MY

8    RULINGS ON.

9         **MR. QUINN:**  THANK YOU, YOUR HONOR.

10        (SIDE-BAR PROCEEDINGS CONCLUDED.)                            11:36

11   **BY MR. NOLAN:**

12   Q    YESTERDAY WE WERE TALKING ABOUT TIM KILPIN.

13        DO YOU RECALL THAT LINE OF TESTIMONY?

14   A    I REALLY DON'T.

15   Q    OKAY.  LET'S JUST SET IT UP FOR YOU.                        11:36

16        YOU, OF COURSE, KNOW TIM KILPIN; YES?

17   A    YES.

18   Q    AND HE'S OVER IN THE BOYS' DIVISION RIGHT NOW.

19   A    YES.

20   Q    YOU RECRUITED HIM FROM DISNEY; CORRECT?                     11:36

21   A    I DIDN'T, BUT MATTEL DID.

22   Q    AND YOU INTERVIEWED HIM WHILE HE WAS STILL EMPLOYED AT

23   DISNEY FOR A POSITION AT MATTEL; CORRECT?

24   A    I BELIEVE I DID, YES.

25   Q    AND YOU APPROVED HIS HIRING AT MATTEL; CORRECT?             11:37

1    A    YES, I DID.

2    Q    AND DID HIS HIRING AT MATTEL REQUIRE A BUYOUT OF HIS

3    CONTRACT AT DISNEY, DO YOU RECALL?

4    A    I DON'T KNOW.

5    Q    IN ANY EVENT, YOU HIRED -- MATTEL HIRED TIM KILPIN TO HAVE        11:37

6    A POSITION WITHIN THE GIRLS' DIVISION; CORRECT?

7    A    I BELIEVE WE REHIRED TIM TO HAVE A POSITION IN THE GIRLS'

8    DIVISION.

9    Q    HE HAD PREVIOUSLY WORKED AT MATTEL BEFORE GOING TO DISNEY;

10   CORRECT?                                                              11:37

11   A    I THINK SO.

12   Q    AND HE HAD PREVIOUSLY WORKED AT TONKA TOYS; CORRECT?

13        DO YOU RECALL THAT, PREVIOUSLY?

14   A    I DON'T KNOW IF HE HAD.

15   Q    ANYWAY, WHEN YOU HIRED HIM, YOU HAD CONFIDENCE IN HIS            11:38

16   ABILITY; CORRECT?

17   A    YES.

18   Q    OTHERWISE YOU WOULDN'T HAVE HIRED HIM.

19   A    THAT'S RIGHT.

20   Q    AND MR. KILPIN'S RESPONSIBILITIES INCLUDED PREPARING            11:38

21   MARKETING PLANS; CORRECT?

22   A    I WOULD WORD IT DIFFERENTLY.  I WOULD SAY HE APPROVED

23   MARKETING PLANS AS A GENERAL MANAGER.  I DON'T KNOW THAT HE

24   WOULD BE RESPONSIBLE FOR PREPARING THEM.

25   Q    IN MY DEPOSITION OF YOU, YOU RECALL YOUR TESTIMONY WAS          11:38

```
 1    THAT YOU REVIEWED MARKETING PLANS; CORRECT?
 2             MR. QUINN:  YOUR HONOR, I OBJECT.
 3             THIS IS IRRELEVANT; TIME FRAME.
 4             THE COURT:  SUSTAINED.
 5             LET'S NARROW THE FOCUS, COUNSEL.                    11:38
 6             MR. NOLAN:  OKAY.
 7    BY MR. NOLAN:
 8    Q    YOU'RE AWARE, ARE YOU NOT, THAT DURING THE YEARS 2003,
 9    2004, AND 2005, THAT MR. KILPIN HAD RESPONSIBILITIES WITHIN THE
10    GIRLS' DIVISION; CORRECT?                                   11:39
11             MR. QUINN:  OBJECTION.  IRRELEVANT.
12             MR. NOLAN:  FOUNDATIONAL.
13             THE COURT:  OVERRULED.
14    BY MR. NOLAN:
15    Q    CORRECT?                                               11:39
16    A    LET ME JUST THINK.
17             GIVE ME JUST A MOMENT TO MAKE SURE I'M IN THE RIGHT
18    TIME FRAME.  2003, 2004, AND 2005?
19    Q    YES.
20    A    YES.  I BELIEVE THAT'S THE CASE.                       11:39
21    Q    AND DO YOU RECALL WHAT HIS POSITION WAS?
22    A    I DON'T RECALL THE SPECIFIC TITLE, BUT HE WAS GENERAL
23    MANAGER OF THE GIRLS' DIVISION.
24    Q    FROM TIME TO TIME, YOU WOULD MEET WITH MR. KILPIN AND HE
25    WOULD MAKE PRESENTATIONS TO YOU; CORRECT?                   11:39
```

```
 1            MR. QUINN:  OBJECTION.  RELEVANCE.

 2            THE COURT:  AGAIN, IT'S FOUNDATIONAL.  OVERRULED.

 3            THE WITNESS:  YES.  THAT'S TRUE.

 4   BY MR. NOLAN:

 5   Q   ISN'T IT TRUE THAT MR. KILPIN DESCRIBED MATTEL AS A HOUSE       11:40

 6   ON FIRE?

 7            MR. QUINN:  OBJECTION.  RELEVANCE; THAT VIOLATES THE

 8   MOTION IN LIMINE.

 9            THE COURT:  COUNSEL, I'LL SEE YOU AT SIDE-BAR.

10            (SIDE-BAR PROCEEDINGS AS FOLLOWS:)                         11:40

11            THE COURT:  MR. NOLAN, WHAT DID I JUST SAY?

12            MR. NOLAN:  YOUR HONOR, YOU TOLD ME TO LIMIT IT.

13   I'VE NOW NARROWED IT TO A VERY SPECIFIC QUESTION.  THIS IS THE

14   QUESTION THAT --

15            THE COURT:  THAT WAS A VERY BROAD -- THE WHOLE HOUSE       11:40

16   ON FIRE THING -- FIRST OF ALL, I DON'T KNOW WHAT IT MEANS,

17   OTHER THAN TO SAY THAT MATTEL HAS GOT A WHOLE HECK OF A LOT OF

18   PROBLEMS.  THIS IS AS BROAD A STATEMENT THAT YOU CAN POSSIBLY

19   MAKE, AND WE JUST HAD A SIDE-BAR WHERE I INDICATED YOU NEED TO

20   NARROW YOUR FOCUS.                                                 11:41

21            IN ADDITION TO WHICH, WE'VE GOT AMPLE HISTORY OF

22   MATTEL OBJECTING TO THIS PARTICULAR TESTIMONY AND THE COURT HAS

23   EXPRESSED ITS REAL CONCERN.  THIS WAS AT THE HEART OF THAT

24   MOTION *IN LIMINE*.

25            MR. QUINN:  AND WE'RE IN 2003; THE MAN DOES NOT EVEN      11:41
```

```
 1    KNOW --
 2             THE COURT:  MR. QUINN, I UNDERSTAND YOUR POSITION ON
 3    THIS.
 4             MR. NOLAN?
 5             MR. NOLAN:  I ASKED A SPECIFIC QUESTION.  I WAS          11:41
 6    ALLOWED TO ASK THESE QUESTIONS OF IVY ROSS, AND THE OBJECTION
 7    WAS OVERRULED.
 8             THE COURT:  ON THE HOUSE ON FIRE?
 9             MR. NOLAN:  YES, YOUR HONOR.  AND ALSO 'DID ANYBODY
10    TELL YOU THAT THE BRAND WAS IN CRISIS; THAT THEIR HOUSE WAS ON  11:41
11    FIRE; THAT YOU WERE OUT-EXECUTED?'  AND SHE SAID NO.  I SAID
12    DID MR. KILPIN EVER SAY THAT?
13             MR. KILPIN IS THE NEXT WITNESS; THAT'S THE REASON
14    WHY -- I WASN'T TRYING TO FLAUNT THE COURT'S RULING.
15             THIS CAME UP -- WE'RE ON OUR SIXTH WEEK, BUT THIS      11:42
16    GOES BACK TO TESTIMONY THEY ELICITED, YOUR HONOR.
17             MR. QUINN:  THAT'S NOT MY RECOLLECTION.
18             THERE WERE SOME QUESTIONS MR. NOLAN ASKED OF IVY ROSS
19    WHERE MY OBJECTIONS WERE OVERRULED AND THE COURT'S STATEMENT AT
20    THE TIME WAS WE HAD, TO SOME LIMITED EXTENT, WITH THAT WITNESS, 11:42
21    OPENED THE DOOR.
22             I OBJECT TO THE FOUNDATIONAL QUESTIONS, YOUR HONOR,
23    BECAUSE I KNOW WHAT'S COMING.  I KNEW HE WAS ABOUT TO BLURT
24    THAT OUT.  WE'RE IN 2003.  THIS HAS ABSOLUTELY NOTHING TO DO
25    WITH ISSUES THAT THE JURY HAS GOT TO DECIDE.  IT'S JUST AN      11:42
```

1    EFFORT TO SMEAR AND TAINT MATTEL.

2        **THE COURT:**  WE ARE TRYING TO DECIDE WHETHER OR NOT

3    MR. BRYANT DID SOME DRAWINGS.

4        **MR. NOLAN:**  I UNDERSTAND THAT.  AND WITH ALL DUE

5    RESPECT, YOUR HONOR, IF THOSE WERE THE RULES THAT WERE IMPOSED    11:43

6    IN THE BEGIN OF THE CASE WHEN MR. QUINN WAS, WITHOUT WARNING BY

7    YOU, HE GOES -- FOR INSTANCE, WHEN MS. ROSS WAS ON THE STAND, I

8    ASKED HER, AND THIS IS PAGE 406:  'DID MR. KILPIN EVER TELL YOU

9    HE THOUGHT THE BARBIE BRAND WAS A BRAND IN CRISIS?'

10       **THE COURT:**  I DON'T REMEMBER HIM SAYING THAT.              11:43

11       **MR. NOLAN:**  MY NOTES INDICATE THAT I ALSO ASKED 'DID

12   MR. KILPIN EVER TELL YOU HE THOUGHT THAT MATTEL HAD BEEN

13   OUTTHOUGHT AND OUTEXECUTED?

14       **MR. QUINN:**  I OBJECT.  THIS IS IRRELEVANT.

15       **MR. NOLAN:**  IT'S BEEN OPENED UP.                          11:43

16       BUT SHE DOES NOT ANSWER THE QUESTION.  THE FACT THAT

17   SHE CAN'T ANSWER --

18       **THE COURT:**  BUT THAT'S NOT THE HOUSE ON FIRE.

19       WHAT I'M TRYING TO AVOID IS THESE GENERALIZED,

20   BROAD-BASED ATTACKS ON MGA, OR MATTEL FOR THAT MATTER.  LET'S     11:43

21   FOCUS ON SPECIFIC -- THIS DOES NOT HELP THE JURY.  THERE ARE

22   403 REASONS TO KEEP THIS OUT.  THAT WAS THE BASIS FOR THE

23   MOTION IN LIMINE.  THIS DOES NOT MOVE THE BALL FORWARD.

24       YOU'VE GOT THE CEO OF MATTEL ON THE STAND.  ASK HIM

25   SPECIFIC QUESTIONS ADDRESSED TO ISSUES THAT WERE RAISED BY        11:44

1  MATTEL EMPLOYEES.  I'M NOT GOING TO PERMIT THESE BROAD-BASED

2  'HOUSE IS ON FIRE' QUESTIONS.  THIS IS NONSENSE.  THIS IS NOT

3  EVIDENCE OF ANYTHING.  THIS IS A BLUNDERBUSS ATTACK.

4       **MR. NOLAN:**  MAY I ASK THIS QUESTION, YOUR HONOR,

5  SINCE I WAS ALLOWED TO ASK IT OF IVY ROSS, BECAUSE AT THE TIME,  11:44

6  WHEN OUR MEMORIES WERE --

7       **THE COURT:**  ASK THAT QUESTION.

8       **MR. NOLAN:**  THE TWO QUESTIONS, JUST SO I CAN -- THE

9  ONLY TWO QUESTIONS I'LL ASK IS WHETHER OR NOT MR. KILPIN EVER

10  TOLD HIM IT WAS HIS VIEW THAT THE BARBIE BRAND WAS IN CRISIS,  11:44

11  NUMBER ONE, OR --

12       **THE COURT:**  WHY IS THAT RELEVANT TO THIS CASE?

13       **MR. NOLAN:**  WELL, YOUR HONOR, MR. QUINN --

14       **THE COURT:**  WHY IS THAT RELEVANT TO THIS CASE?

15       **MR. NOLAN:**  BECAUSE THEY MOVED THE BALL BY  11:44

16  INTRODUCING EVIDENCE IN HERE ABOUT HOW SUCCESSFUL BARBIE WAS.

17  AND YOUR HONOR SAID 'MR. QUINN, YOU'RE IN CHARGE HERE.  I WILL

18  ALLOW MR. NOLAN TO REBUT THIS TESTIMONY IF YOU PUT IT IN.'

19       AND WITH RESPECT, YOUR HONOR, THEY PUT IT IN.

20       THE TWO QUESTIONS I WANT ARE WERE YOU TOLD -- WAS HE  11:45

21  TOLD BY MR. KILPIN THAT IT WAS A BRAND IN CRISIS AND THAT HE

22  THOUGHT THAT MATTEL HAD BEEN OUTTHOUGHT AND OUTEXECUTED?

23       THOSE ARE THE TWO QUESTIONS I WAS ALLOWED TO ASK.

24       **THE COURT:**  I'LL ALLOW THAT SECOND ONE.

25       THE FIRST ONE, I SAID THAT THESE CONCLUSIONARY  11:45

```
 1    STATEMENTS ARE, I THINK, UNDULY PREJUDICIAL AND DON'T PROVE
 2    ANYTHING, SO THEY ARE NOT COMING IN FROM THIS WITNESS, THE NEXT
 3    WITNESS, OR ANYBODY ELSE.  THEY DON'T PROVE ANYTHING.  THEY ARE
 4    NOT EVIDENCE OF ANYTHING.  THEY ARE ATTACKS, AND ON 403 GROUNDS
 5    THE COURT WILL CONTINUE TO EXCLUDE THEM.                            11:45
 6          MR. QUINN:  YOUR HONOR, THE OUTTHOUGHT AND
 7    OUT-EXECUTED, I'M STILL AT A LOSS AS TO THE RELEVANCE OF THAT.
 8    THE COURT SAID THAT THE TIMING --
 9          THE COURT:  I'D LIKE TO SEE THE CONTEXT IN WHICH THAT
10    CAME UP.  I DON'T QUESTION THAT IT WAS OVERRULED, BUT I WOULD      11:46
11    HAVE TO SEE THE CONTEXT LEADING UP TO THAT.
12          MR. NOLAN:  HERE'S THE RELEVANCE ON THIS POINT,
13    YOUR HONOR, ON THE LAST ONE.
14          THEY HAVE PRESENTED A CASE HERE WHERE THERE'S NO WAY
15    -- MGA IS NOT SOPHISTICATED; THEY COULDN'T HAVE DEVELOPED A        11:46
16    FASHION DOLL; AND HERE'S MATTEL'S INTERNAL PEOPLE SAYING --
17          THE COURT:  AND I'VE ALLOWED THE EVIDENCE ON THAT
18    POINT TO COME IN, COUNSEL.
19          MR. NOLAN:  THIS IS MR. KILPIN'S E-MAIL WHERE HE
20    ACTUALLY USES THE WORDS 'OUTTHOUGHT AND OUTEXECUTED.'  AND WHAT    11:46
21    I WAS GOING TO DO WAS ASK MR. ECKERT WHETHER OR NOT HE RECALLS
22    EVER BEING TOLD THAT HE --
23          THE COURT:  THAT DOES COME BACK TO ME; THAT'S WHERE
24    IT GOES TO; IT GOES TO BOLSTER -- BOLSTER IS NOT THE RIGHT
25    WORD -- MGA'S ABILITY TO PULL THIS OFF.  THERE WAS A              11:46
```

```
 1    SUGGESTION, CERTAINLY IN OPENING STATEMENT, THAT MGA DIDN'T

 2    HAVE ANY DOLL EXPERIENCE, DOESN'T HAVE A HAND IN THIS MARKET.

 3    THAT DOES REFRESH MY RECOLLECTION OR MY THINKING, FOR RIGHT OR

 4    FOR WRONG, AT THE TIME THAT THIS WAS LEGITIMATELY REBUTTED WITH

 5    RESPECT TO THAT.  BECAUSE, FRANKLY, THAT STATEMENT, THE             11:47

 6    'OUTTHOUGHT,' IS MORE A REFERENCE TO MGA THAN IT IS TO BARBIE.

 7              MR. NOLAN:  YES.

 8              THE COURT:  I'M GOING TO CONTINUE TO HOLD THE

 9    POSITION THAT THERE ARE NOT TO BE -- MATTEL -- THAT THESE

10    BROAD-BASED ATTACKS ON MATTEL ARE NOT GOING TO BE PERMITTED.  I    11:47

11    WILL TELL THE JURY TO DISREGARD THAT LAST QUESTION.

12              MR. QUINN:  THE PROBLEM WITH -- I UNDERSTAND WHAT THE

13    COURT HAS SAID, BUT YOU'RE TALKING ABOUT COMPLETELY DIFFERENT

14    TIME FRAMES.  TIM KILPIN DOESN'T ARRIVE UNTIL 2003.

15              THE COURT:  THAT IS THE OTHER THING.  WE'VE GOT TO        11:47

16    GET BACK TO THE 2000 TIME FRAME, BECAUSE THAT IS WHERE THESE

17    WITNESSES AT THE BEGINNING OF THE CASE, THE LILY MARTINEZ AND

18    IVY ROSS WITNESSES, WERE TESTIFYING TO A PARTICULAR TIME FRAME.

19    WE'VE GOT TO NARROW THE FOCUS.

20              MR. QUINN:  SO KILPIN COULD NOT HAVE SAID IT IN 2003,     11:48

21    OBVIOUSLY.

22              THE COURT:  WE'RE GOING TO GET OFF OF THAT.

23              ALL RIGHT, MR. NOLAN?  DO YOU UNDERSTAND?

24              MR. NOLAN:  I DO, BUT I WANT TO MAKE CERTAIN.

25              THE COURT:  YOU DO GET THE POINT ABOUT MGA'S ABILITY      11:48
```

```
 1   TO COMPETE IN THIS AREA AND RELATIVELY, IN THAT CONTEXT, IT

 2   DOES MAKE SENSE TO BE GIVEN WHAT HAS BEEN INTRODUCED AND STATED

 3   IN OPENING STATEMENT.  BUT THAT DOESN'T JUSTIFY THE

 4   BLUNDERBUSS.

 5          MR. QUINN:  AND THAT CONTEXT INCLUDES THE TIME          11:48

 6   PERIOD, YOUR HONOR?

 7          THE COURT:  AND THE CONTEXT INCLUDES THE PERIOD OF

 8   TIME OF --

 9          MR. QUINN:  THE 2000?

10          THE COURT:  1999, 2000, RIGHT.                          11:48

11          MR. NOLAN:  WELL, AM I ALLOWED TO ASK HIM DID HE

12   BELIEVE THE BARBIE BRAND WAS IN CRISIS?

13          THE COURT:  AGAIN, 'BARBIE IN CRISIS' IS NOT RELEVANT

14   TO ANY ISSUE IN THIS PHASE.

15          MR. NOLAN:  I WANT TO AGREE WITH YOU, BUT AS A TRIAL    11:48

16   LAWYER, MATTEL HAS LAID THROUGH THEIR WITNESSES THAT BARBIE IS

17   INNOVATIVE EVERY YEAR; THIS IS WHAT IVY ROSS TESTIFIED.

18          MR. QUINN:  SHOW US THE TESTIMONY, YOUR HONOR.  I DO

19   NOT BELIEVE THAT TESTIMONY EXISTS; THAT IVY ROSS SAID BARBIE

20   WAS INNOVATIVE.                                                11:49

21          MR. NOLAN:  WELL, I'LL TELL YOU IN A MINUTE.

22          FIRST OF ALL, WE'LL GO TO MATTEL'S OPENING.

23          THE COURT:  IT WAS MORE IN THE OPENING THAN IT WAS

24   IVY ROSS.

25          MR. NOLAN:  "BARBIE HAD A WONDERFUL SUCCESS, LEADING    11:49
```

1   FASHION DOLL FOR DECADES."  NO LIMITATIONS THERE.  IT SAYS

2   "WITH CONSTANT INNOVATION, DUE TO" --

3           **THE COURT:**  I WILL GIVE YOU LIMITED LEEWAY, AS I

4   HAVE, BUT LET'S FOCUS IT ONLY ON THAT.  NOT 'BRAND IN CRISIS'

5   OR ANYTHING TO THAT EFFECT.                                      11:49

6           **MR. NOLAN:**  ALL RIGHT.

7           **THE COURT:**  LET'S MOVE ALONG.

8           (SIDE-BAR PROCEEDINGS CONCLUDED.)

9           **THE COURT:**  MR. NOLAN, YOU MAY ASK YOUR NEXT

10  QUESTION.  THE JURY IS TO DISREGARD THAT LAST QUESTION.          11:50

11  **BY MR. NOLAN:**

12  Q   MR. ECKERT, IN 2000 WHEN YOU ARRIVED AT MATTEL, IT'S TRUE

13  THAT YOUR IMPRESSION WAS THAT THE BARBIE BRAND WAS STRUGGLING;

14  CORRECT?

15          **MR. QUINN:**  OBJECTION TO THE RELEVANCE, YOUR HONOR.   11:50

16          **THE COURT:**  FIRST OF ALL, REPHRASE AS TO TIME FRAME,

17  AND THEN I'LL OVERRULE THE OBJECTION ON RELEVANCE.

18  **BY MR. NOLAN:**

19  Q    IN 2000 AND IN 2001, WAS IT YOUR IMPRESSION THAT THE

20  BARBIE BRAND AT MATTEL WAS STRUGGLING?                           11:51

21          **MR. QUINN:**  OBJECTION.  RELEVANCE.

22          **THE COURT:**  OVERRULED.

23          YOU MAY ANSWER.

24          **THE WITNESS:**  THANK YOU.

25          I DON'T KNOW IF I WOULD CHARACTERIZE IT AS THE BRAND     11:51

```
 1  WAS STRUGGLING.  I WOULD SAY THAT THE U.S. BARBIE DOLL SALES, I

 2  BELIEVE, WERE DECLINING THEN.  BUT I DON'T THINK I WOULD

 3  BROADEN THAT TO THE BRAND IS STRUGGLING EVERYWHERE IN THE

 4  WORLD.

 5  BY MR. NOLAN:

 6  Q   I DIDN'T MEAN TO SUGGEST AROUND THE WORLD.

 7          WHAT WAS YOUR IMPRESSION AS TO WHAT WAS CAUSING

 8  BARBIE TO STRUGGLING DURING THAT PERIOD OF TIME DOMESTICALLY?

 9  A   AGAIN, I DON'T KNOW THAT I WOULD USE THE WORD STRUGGLE TO

10  DESCRIBE THE BRAND.  I WOULD SAY --                         11:51

11  Q   SO YOU --

12          MR. QUINN:  THE WITNESS DIDN'T GET A CHANCE TO FINISH

13  HIS ANSWER.

14          THE COURT:  WERE YOU FINISHED, MR. ECKERT?

15          THE WITNESS:  OKAY.                                 11:52

16          THE COURT:  YOUR NEXT QUESTION, MR. NOLAN.

17          THE WITNESS:  WAS THAT A LEADING QUESTION?

18  BY MR. NOLAN:

19  Q   YOU SAID THAT YOU WOULDN'T AGREE WITH MY TERM STRUGGLE.

20          USE YOUR OWN WORDS TO DESCRIBE BARBIE BRAND IN 2000, 11:52

21  2001, WHEN YOU GET THERE.

22  A   I BELIEVE THAT BARBIE'S SALES WERE DECLINING IN THE U.S.

23  IN 2000 AND 2001.

24  Q   DID YOU HAVE AN IMPRESSION THAT BARBIE BRAND HAD BECOME

25  COMPLACENT AT MATTEL DURING THAT PERIOD OF TIME?           11:52
```

1          **MR. QUINN:**  OBJECTION.  VAGUE; RELEVANCE.

2          **THE COURT:**  SUSTAINED ON VAGUENESS.

3          REPHRASE, COUNSEL.

4    **BY MR. NOLAN:**

5    Q    DID YOU HAVE A VIEW AS TO WHETHER OR NOT COMPETITORS SUCH          11:52

6    AS BRATZ WAS OUTEXECUTING AND OUTTHINKING THE BARBIE TEAM?

7          **MR. QUINN:**  OBJECTION.  TIME FRAME.

8          **THE COURT:**  COUNSEL?

9          **MR. NOLAN:**  IN 2001.

10          **THE COURT:**  TAKE IT FROM THE TOP.          11:53

11    **BY MR. NOLAN:**

12    Q    BRATZ WAS ENTERED IN 2001; CORRECT?

13    A    IN SPAIN, YES.

14    Q    IT CAME TO YOUR ATTENTION THAT IN SPAIN, BRATZ WAS TAKING

15    MARKET SHARE AWAY FROM BARBIE; CORRECT?          11:53

16    A    IN 2001, YES.

17    Q    AND DID IT COME TO YOUR ATTENTION AT THAT TIME THAT THE

18    REASON WHY BRATZ WAS TAKING MARKET SHARE AWAY FROM BARBIE WAS

19    THAT THE BARBIE TEAM WAS BEING OUTTHOUGHT AND OUTEXECUTED BY

20    BRATZ?          11:53

21    A    IN SPAIN IN 2001?

22    Q    YES.

23    A    I DON'T REMEMBER REACHING THAT CONCLUSION.

24    Q    HAVE YOU EVER REACHED THAT CONCLUSION?

25          **MR. QUINN:**  EXCUSE ME.  TIME FRAME?          11:54

```
 1              THE COURT:  WITH RESPECT TO THAT PARTICULAR TIME

 2   FRAME?

 3              MR. NOLAN:  YES.

 4              THE WITNESS:  DID I EVER REACH THE CONCLUSION IN

 5   SPAIN IN 2001 THAT THE BARBIE TEAM WAS OUTEXECUTED OR -- NO, I        11:54

 6   DON'T RECALL.  I DON'T RECALL EVER REACHING THAT CONCLUSION.

 7   BY MR. NOLAN:

 8   Q    WELL, WE'VE TALKED ABOUT SPAIN.  NOW I WANT TO TALK

 9   DOMESTICALLY IN THE UNITED STATES.  YOU KNOW THAT BRATZ ENTERED

10   THE UNITED STATES IN APPROXIMATELY AUGUST OF 2001.  DO YOU         11:54

11   RECALL THAT?

12   A    NO, I DON'T.  I WOULD HAVE THOUGHT IT CAME TO THE U.S.

13   LATER.

14   Q    WHEN DO YOU BELIEVE THAT BRATZ CAME TO THE UNITED STATES?

15   A    I DON'T HAVE -- I DON'T REMEMBER A SPECIFIC TIME.          11:54

16   Q    WAS IT YEARS AFTER IT HAD BEEN INTRODUCED IN SPAIN?

17   A    I BELIEVE IT WAS AFTER IT WAS INTRODUCED IN SPAIN.  BUT I

18   DON'T THINK IT WAS YEARS AFTER, NO.

19   Q    WHEN IT WAS INTRODUCED IN THE UNITED STATES, WAS IT

20   BROUGHT TO YOUR ATTENTION THAT BRATZ WAS TAKING MARKET SHARE      11:55

21   AWAY FROM BARBIE IN SALES IN THE UNITED STATES?

22              MR. QUINN:  YOUR HONOR, OBJECTION, BECAUSE IT'S NOT

23   LIMITED TO THE TIME FRAME THAT WAS DISCUSSED.

24              MR. NOLAN:  2001, YOUR HONOR.

25              THE COURT:  VERY WELL.                                 11:55
```

```
 1              YOU MAY ANSWER.

 2              THE WITNESS:  IN 2001 IN THE UNITED STATES?

 3    BY MR. NOLAN:

 4    Q    YES.  IN 2001, IN THE UNITED STATES, ISN'T IT TRUE THAT

 5    BRATZ WAS TAKING MARKET SHARE AWAY FROM BARBIE?              11:55

 6              MR. QUINN:  ALSO IRRELEVANT, YOUR HONOR.

 7              THE COURT:  OVERRULED.

 8              YOU MAY ANSWER.

 9              THE WITNESS:  IT'S POSSIBLE IF BRATZ WERE INTRODUCED

10    IN THE UNITED STATES IN 2001.                                11:55

11    BY MR. NOLAN:

12    Q    WERE YOU AT THE NEW YORK TOY FAIR WHEN BRATZ WAS NAMED TOY

13    OF THE YEAR FOR 2001?

14              MR. QUINN:  ASSUMES FACTS NOT IN EVIDENCE.

15              THE COURT:  SUSTAINED AS PHRASED.               11:56

16              REPHRASE, COUNSEL.

17    BY MR. NOLAN:

18    Q    DO YOU KNOW, SIR, WHETHER OR NOT BRATZ, THE BRAND, THE

19    DOLL, WAS EVER NAMED TOY OF THE YEAR?

20    A    BY THE TOY INDUSTRY ASSOCIATION?                     11:56

21    Q    YES.

22    A    YES, I DO.

23    Q    AND DO YOU RECALL WHEN THAT OCCURRED?

24    A    NO, I DON'T.

25    Q    WERE YOU PRESENT AT THAT CEREMONY?                   11:56
```

```
 1    A    I'M SURE I WAS.

 2    Q    DO YOU RECALL, BY THE WAY, IF YOU WERE THERE, MR. LARIAN'S

 3  ACCEPTANCE SPEECH?

 4    A    NO, I DON'T.

 5          MR. QUINN:  MAY WE APPROACH, YOUR HONOR?              11:56

 6          WE DO HAVE AN OBJECTION TO THIS.

 7          THE COURT:  ALL RIGHT.

 8          (SIDE-BAR PROCEEDINGS AS FOLLOWS:)

 9          THE COURT:  COUNSEL?

10          MR. QUINN:  YOUR HONOR, THIS ISN'T EVEN PHASE 1-B.    11:57

11  THIS IS PHASE TWO.  THIS IS A MY SCENE DOLL.  HE WANTS TO GET

12  IT IN FRONT OF THE JURY TO SHOW THEM THE EYES.  THIS WAS AFTER

13  BRATZ.  IT'S IRRELEVANT.  THAT'S A WHOLE ANOTHER PHASE.

14          THE COURT:  WHEN DID MY SCENE COME OUT?

15          MR. ZELLER:  THEY LAUNCHED THIS IN OCTOBER OF 2002.   11:57

16          THE COURT:  COUNSEL?

17          MR. NOLAN:  THERE'S BEEN LOTS OF TESTIMONY ABOUT MY

18  SCENE.  FLAVAS IS IN EVIDENCE.  LAST NIGHT I WENT THROUGH MY

19  EXHIBITS AND I REALIZED THAT OF ALL OF THE DOLLS THAT ARE NOT

20  IN EVIDENCE IS A MY SCENE DOLL.                              11:58

21          WE'RE NOT GOING TO ARGUE OR MAKE ANY COMPARISONS.

22  IT'S JUST A CHECKLIST THAT FLAVAS IS IN.

23          THE COURT:  WHY IS IT RELEVANT?

24          MR. NOLAN:  BECAUSE THERE'S BEEN A LOT OF TESTIMONY

25  ABOUT THE DOLL 'MY SCENE,' AND THE JURY DOES NOT HAVE THE     11:58
```

```
 1   BENEFIT OF SEEING A 'MY SCENE' DOLL.
 2         THE COURT:  VERY WELL.
 3         IS THERE ANY DISPUTE THIS IS A 'MY SCENE' DOLL?
 4         MR. QUINN:  I TAKE IT, NO.
 5         THE COURT:  OKAY.                                    11:58
 6         I WILL CONSIDER THIS AFTER I'VE HAD A CHANCE TO -- I
 7   WANT TO KNOW EXACTLY THE CONTEXT OF THAT TESTIMONY AND WE CAN
 8   GET IT IN THROUGH STIPULATION.  THE CEO DOES NOT NEED TO
 9   TESTIFY --
10         MR. NOLAN:  HE DID TESTIFY THAT 'MY SCENE' CAME OUT   11:58
11   AFTER BRATZ.  IT WAS DURING MY DIRECT EXAMINATION OF THE --
12         THE COURT:  WHY IS THAT RELEVANT?
13         MR. NOLAN:  JUST TO GET HIM TO IDENTIFY SINCE HE WAS
14   UP HERE, JUST TRYING TO GET IT INTO EVIDENCE.
15         MR. QUINN:  WE STIPULATE THIS IS A 'MY SCENE' DOLL.   11:58
16         THE COURT:  THE ADMISSIBILITY THE COURT WILL
17   DETERMINE ONCE I TAKE A LOOK AT THIS TESTIMONY.
18         VERY WELL.
19         (SIDE-BAR PROCEEDINGS CONCLUDED.)
20         THE COURT:  COUNSEL, WE'LL DISCUSS THE STIPULATION   11:59
21   CONCERNING THAT DOLL.  YOU CAN MOVE ON TO THE NEXT QUESTION.
22   BY MR. NOLAN:
23   Q   MR. ECKERT, DO YOU KNOW WHETHER OR NOT MATTEL HAS A POLICY
24   AGAINST ALLOWING ITS EMPLOYEES TO MOONLIGHT?
25   A   BY 'MOONLIGHTING' YOU MEAN WORK A SECOND JOB?          11:59
```

1    Q    YES.

2    A    WE HAVE A POLICY ABOUT RECEIVING APPROVAL BEFORE ACCEPTING

3    A SECOND JOB.

4    Q    DO YOU KNOW AN INDIVIDUAL NAMED RICHARD DEANDA?

5    A    YES.                                                        11:59

6    Q    COULD YOU IDENTIFY RICHARD DEANDA AND HIS POSITION AT

7    MATTEL?

8    A    I DON'T KNOW HIS TITLE, BUT HE IS IN CHARGE OF OR HEADS UP

9    OUR GLOBAL SECURITY AT MATTEL.

10   Q    AT MY DEPOSITION I ASKED YOU WHETHER OR NOT YOU KNEW        12:00

11   THAT --

12           MR. QUINN:  YOUR HONOR, I OBJECT.  IT'S THE SUBJECT

13   OF A MOTION *IN LIMINE*.  IT'S IRRELEVANT.

14           THE COURT:  COUNSEL?

15           MR. NOLAN:  I DON'T KNOW WHAT MOTION *IN LIMINE* HE'S    12:00

16   REFERRING TO.

17           THE COURT:  THERE'S GOING TO NEED TO BE FURTHER

18   FOUNDATION LAID BEFORE WE GET INTO THE SUBSTANCE OF THIS,

19   PURSUANT TO THE COURT'S RULING.

20           MR. NOLAN:  THERE'S BEEN A LOT OF TESTIMONY IN THE       12:00

21   RECORD.

22           THE COURT:  FURTHER FOUNDATION IN TERMS OF THE

23   APPROPRIATE COMPARISON.

24           MR. NOLAN:  SO I SHOULDN'T PROCEED WITH HIM ON THIS

25   SUBJECT?                                                         12:00

```
 1              THE COURT:  IT DEPENDS ON IF THE FOUNDATION CAN BE

 2    LAID.

 3    BY MR. NOLAN:

 4    Q    DO YOU HAVE AN UNDERSTANDING OR KNOWLEDGE OF WHETHER OR

 5    NOT RICHARD DEANDA MOONLIGHTS ON A SECOND JOB?  JUST YES OR NO?   12:00

 6    A    I DO NOW HAVE AN UNDERSTANDING, SUBSEQUENT TO MY

 7    DEPOSITION, THAT HE DOES DO OTHER THINGS.

 8    Q    OTHER THAN HIS EMPLOYMENT AT MATTEL.

 9    A    YES, OTHER THAN HIS EMPLOYMENT AT MATTEL.

10              MR. NOLAN:  IT'S NOON.  SHOULD WE TAKE OUR BREAK.      12:01

11              THE COURT:  VERY WELL.

12              LET'S TAKE OUR LUNCH BREAK AT THIS TIME.

13              (WHEREUPON JURORS DEPART COURTROOM.)

14              THE COURT:  COUNSEL, WE'RE GOING TO START WITH THE

15    EXPERT WITNESS TESTIMONY AT 12:15.  LETS TAKE UP THIS LAST      12:01

16    ISSUE THAT IS STILL FRESH IN OUR MINDS, IN TERMS OF MR. DEANDA.

17              MR. QUINN:  CAN WE ADDRESS THAT LAST QUESTION AND

18    ANSWER?  THE COURT HAD RULED IN A MOTION IN LIMINE --

19              THE COURT:  THAT'S WHAT I'M TALKING ABOUT.

20              I'M GOING TO WAIT FOR THE WITNESS TO STEP OUTSIDE.     12:02

21              I'LL HEAR MATTEL'S OBJECTION, AND MR. NOLAN CAN

22    RESPOND.

23              MR. QUINN:  THE COURT RULED IT HAD TO BE AN

24    APPLES-TO-APPLES COMPARISON.  AND THE FACT THAT MR. DEANDA HAS

25    A SECOND JOB -- HE HAS NOT LAID THE PREDICATE THERE WAS ANY --   12:02
```

1    HE DIDN'T LAY THE PREDICATE THAT THERE WAS ANY APPLES-TO-APPLES

2    COMPARISON.

3              **THE COURT:**  THAT'S WHAT I ASSUMED YOUR OBJECTION WAS.

4    THAT'S WHAT I MEANT BY COMPARATIVE.  THERE NEEDS TO BE

5    FOUNDATION TO SUGGEST MR. DEANDA OR ANY OTHER EMPLOYEE HAS TO    12:02

6    BE SIMILARLY SITUATED TO MR. BRYANT; NOT IN TERMS OF THEIR

7    POSITION BUT IN TERMS OF THEIR CONTRACTUAL RELATIONSHIP AND

8    NOTIFICATION AND THE REST, BEFORE WE CAN GET INTO THIS.  THAT

9    WAS THE COURT'S RULING ON THE MOTION IN LIMINE.  THAT HAS NOT

10   CHANGED.

11             SO THAT'S WHY I SAY, IF YOU CAN LAY THAT FOUNDATION,

12   I'LL ALLOW YOU TO PROCEED WITH MR. DEANDA.  IF YOU CAN'T, THEN

13   -- THE COURT HAS ALREADY RULED ON THIS.

14             **MR. NOLAN:**  YOUR HONOR, AS I UNDERSTOOD THE QUESTION,

15   THE QUESTION, YOU SAID LAY THE FOUNDATION.  THE FIRST          12:03

16   PRELIMINARY QUESTION IS:  DOES HE KNOW THAT HE IS ENGAGED IN

17   ANOTHER JOB?  YES.

18             THEN THE SUBJECT OF THAT TYPE OF WORK, I DON'T KNOW

19   WHETHER OR NOT HE NOW KNOWS WHAT DEANDA DOES.

20             MR. DEANDA DOES SECURITY WORK ON THE SIDE.            12:03

21             **THE COURT:**  THE APPLES AND APPLES HAS NOT TO DO WITH

22   THE MOONLIGHTING OR THE NATURE OF THE WORK; IT HAS TO DO, AS I

23   UNDERSTAND MATTEL'S POSITION -- THE DISTINGUISHING FEATURE IS

24   WHETHER OR NOT A PERSON OBTAINS PERMISSION OR RECEIVES

25   PERMISSION.  THAT'S THE CRITICAL THING.                        12:03

```
 1              I THINK MATTEL CONCEDES THAT THERE ARE EMPLOYEES WHO

 2    MOONLIGHT.  BUT THE POSITION THEY ARE TAKING IS THAT THE

 3    DIFFERENCE BETWEEN THOSE EMPLOYEES AND CARTER BRYANT IS THAT

 4    CARTER BRYANT BREACHED HIS DUTY TO LOYALTY AND BREACHED HIS

 5    CONTRACT BY NOT OBTAINING PERMISSION TO DO IT.                    12:04

 6              WHETHER THAT'S TRUE OR NOT, I DON'T KNOW, BUT THAT'S

 7    -- AND THAT'S THE TEST THE COURT SET UP IN RULING ON THE MOTION

 8    IN LIMINE.

 9              THAT'S THE FOUNDATION THAT YOU NEED TO ESTABLISH.

10              IF YOU CAN ESTABLISH THAT MR. DEANDA DID NOT NOTIFY,    12:04

11    DID NOT RECEIVE PERMISSION FROM SOMEBODY AT MATTEL TO DO WHAT

12    HE'S DOING, THEN HE'S MORE SIMILARLY SITUATED TO MR. BRYANT.

13    AND PERHAPS IT'S EVIDENCE OF THE INTERPRETATION OF THE CONTRACT

14    OR LEAST MATTEL'S UNDERSTANDING OF THE CONTRACT THEY HAD, AND I

15    CAN SEE ITS ADMISSIBILITY THEN.                                  12:04

16              MR. NOLAN:  I'LL MAKE THIS PROFFER WITH RESPECT TO

17    MR. DEANDA'S, BECAUSE I TOOK HIS DEPOSITION.  I TOOK

18    MR. DEANDA'S DEPOSITION SEVEN HOURS; SOME PART OF IT WAS

19    DESIGNED OR LIMITED TO THIS WHOLE QUESTION OF MOONLIGHTING.  I

20    TOOK HIM THROUGH A LONG EXAMINATION ON IT.  HE ADMITTED TO       12:04

21    MOONLIGHTING.  AT THAT POINT IN TIME, HE SAID THAT HE HAD NOT

22    CLEARED IT WITH MANAGEMENT.  HE RECALLS THAT HE MAY HAVE HAD

23    ONE DISCUSSION WITH IT.

24              I ASKED HIM TO GO THROUGH THE HANDBOOK AND THE POLICY

25    AND LOOK FORWARD AND LOOK THROUGH IT, AND HE SAW THAT IT HAD     12:05
```

1    BEEN PROHIBITED UNLESS YOU HAD SUPERVISION, APPROVAL FROM A

2    SUPERVISOR.  I ASKED HIM THAT QUESTION.  HIS ANSWER WAS "I

3    DON'T THINK I DID IN THAT REGARD."

4         SUBSEQUENT TO THAT DEPOSITION, WE RECEIVE A COPY OF

5    THE EMPLOYMENT AGREEMENT WITH MATTEL AND MR. DEANDA.  AND          12:05

6    HANDWRITTEN IN ON THE SIDE HAS "PERMISSION TO DO EXPERT

7    WITNESSES."  BUT IT COMES AFTER THE DEPOSITION THAT MR. DEANDA,

8    WHEN ASKED THOSE QUESTIONS IN HIS DEPOSITION, DID NOT DISCLOSE

9    THAT HE HAD RECEIVED PERMISSION.  AND I THINK THAT'S A QUESTION

10   OF FACT, WHETHER OR NOT WE --                                     12:06

11        **THE COURT:**  IT SOUNDS LIKE A QUESTION OF FACT.

12   THAT'S THE FOUNDATIONAL WORK THAT NEEDS TO BE DONE, COUNSEL.

13        **MR. NOLAN:**  WITH HIM.

14        **THE COURT:**  WITH ANY WITNESS.

15        **MR. NOLAN:**  I UNDERSTAND.  AND MR. ECKERT MAY NOT         12:06

16   TAKE US TO THE NEXT ONE.  I JUST WANTED TO ESTABLISH THAT HE

17   WAS AWARE THAT MR. DEANDA DOES MOONLIGHTING.  AND THEN I'LL

18   HAVE TO LAY THE FOUNDATION WITH MR. DEANDA, BECAUSE I DON'T

19   THINK HE'S GOING TO BE ABLE TO DO IT.

20        **THE COURT:**  MR. QUINN?                                   12:06

21        **MR. QUINN:**  SOUNDS TO ME LIKE HE BROACHED THE SUBJECT

22   WITH MR. ECKERT, WHICH HE DIDN'T HAVE A GOOD FAITH BASIS FOR

23   BELIEVING HE COULD GET THE NECESSARY PREDICATE; SO HE WANTED TO

24   GET OUT IN FRONT OF JURY THE FACT THAT MR. DEANDA HAS A SECOND

25   JOB.                                                              12:06

1        I'M GOING TO REQUEST, WHEN WE GO BACK INTO SESSION,

2   THAT THE JURY BE TOLD THAT ANSWER IS STRIKEN.

3        **MR. NOLAN:**  I APOLOGIZE FOR INTERRUPTING.

4        THAT IS ABSOLUTELY INCORRECT.

5        AT HIS DEPOSITION, HE KNEW -- HE DID NOT KNOW ABOUT          12:06

6   DEANDA.  I ASSUME BY ASKING THIS QUESTION IN GOOD FAITH, AND HE

7   ADMITTED, THAT NOW AFTER THE DEPOSITION HE IS AWARE OF THAT

8   FACT.

9        WHAT I WANTED TO ASK HIM, AND WILL ASK HIM, IS

10  WHETHER OR NOT AFTER HIS DEPOSITION AND AFTER LEARNING THAT       12:07

11  MR. ECKERT IS MOONLIGHTING, DID HE DO ANYTHING TO CONFIRM THAT

12  MR. DEANDA WAS APPROVED TO DO THAT?

13       THAT'S THE QUESTION.

14       I WAS ASKING IN GOOD FAITH.

15       IF HE CAME BACK AND ANSWERED THAT QUESTION, YOU KNOW,        12:07

16  AFTER THE DEPOSITION, MR. NOLAN, I WENT BACK AND CONFIRMED THAT

17  MR. DEANDA, CONSISTENT WITH OUR POLICY, HAD THAT QUESTION --

18  BUT MR. QUINN'S SUGGESTION THAT I WAS ASKING THAT WITHOUT A

19  BASIS --

20       **THE COURT:**  THAT'S OF NO MOMENT.                          12:07

21       THE NEXT QUESTION MUST BE WHETHER OR NOT MR. DEANDA

22  OR MR. ECKERT -- OF MR. ECKERT, WHETHER OR NOT MR. DEANDA HAS

23  AUTHORITY.

24       **MR. NOLAN:**  RIGHT.  THAT'S GOING TO BE THE NEXT

25  QUESTION.                                                          12:08

1        **THE COURT:**  IF IT'S YES, YOU CAN EXPLORE THAT.  IF

2   IT'S NO, YOU CAN EXPLORE THAT.  IF IT'S I DON'T KNOW, WE'RE

3   GOING TO HAVE TO WAIT FOR MR. DEANDA.

4        **MR. NOLAN:**  RIGHT.

5        **THE COURT:**  AND THE JURY WILL BE TOLD THAT UNTIL AND          12:08

6   UNLESS FOUNDATION IS LAID BY MR. DEANDA, THAT THIS IS NOT AN

7   ISSUE BEFORE THEM.  AND IT WILL ONLY BECOME AN ISSUE IF THE

8   COURT FINDS ACCURATE FOUNDATION.

9        **MR. NOLAN:**  THANK YOU.

10        **MR. QUINN:**  WHY DOES IT MATTER WHETHER HE HAD          12:08

11   CONSENT?  WHAT'S THE POINT?  IT'S NOT AN APPLES-TO-APPLES

12   SITUATION.  THE TIME PERIOD IS DIFFERENT.

13        **THE COURT:**  I DON'T KNOW WHETHER IT IS OR NOT,

14   BECAUSE I DON'T HAVE THE FOUNDATION.  YOUR POINT IS WELL TAKEN,

15   MR. QUINN, THAT THE JURY -- IF THAT FOUNDATION IS NOT MET --          12:08

16   AND I THOUGHT MY RULING WAS FAIRLY CLEAR ON THE EXTENT TO WHICH

17   YOU CAN GET INTO THIS.  YOU ARE CORRECT, IF FOUNDATION HAS NOT

18   BEEN MET BETWEEN MR. ECKERT, MR. DEANDA AND WHOEVER ELSE, IT

19   MAY OR MAY NOT BE MET.  I DON'T KNOW.  I'M NOT GOING TO RULE IN

20   THE ABSTRACT AT THIS POINT.          12:09

21        I WILL ADVISE THE JURY THAT UNTIL AND UNLESS THE

22   COURT SAYS THAT THEY CAN CONSIDER IT, THEY CAN NOT CONSIDER IT.

23   WE'LL LEAVE IT AT THAT.

24        MR. ZELLER?

25        **MR. ZELLER:**  I UNDERSTAND THE COURT'S RELUCTANCE, NOT          12:09

1   ONLY JUST STATED, BUT PREVIOUSLY, TO TALK ABOUT SOME OF THESE

2   WITNESSES IN A MORE GLOBAL FASHION.  OBVIOUSLY, WITH SOME

3   WITNESSES WE'VE DONE THAT MORE THAN OTHERS.  MR. MARLOW WAS AN

4   EXAMPLE.

5           **THE COURT:**  RIGHT.                                    12:09

6           **MR. ZELLER:**  WE'VE BEEN RECENTLY NOTIFIED OF A LITANY

7   OF WITNESSES WHO FALL INTO THE SAME BOAT AS MR. ECKERT.

8   TIM KILPIN IS SOMEONE WHO HAS NOW BEEN SITTING AROUND FOR A DAY

9   AND A HALF WAITING TO BE CALLED.  WE HAVE MR. DEANDA WHO THEY

10  ALSO INTEND TO CALL.  PEOPLE WHO HAVE NO INFORMATION, AS FAR AS   12:09

11  WE'RE CONCERNED, THAT IS RELEVANT TO 1-A, AND THERE ARE A

12  NUMBER OF THESE NOW.

13          I AM CONCERNED THAT WE'RE GOING TO SEE A LITANY OF

14  WITNESSES WHO ARE VERY MUCH IN THE SAME VEIN AS MR. ECKERT,

15  WHICH WE'RE GETTING QUESTIONS THAT CERTAINLY ARE, FROM OUR       12:10

16  PERSPECTIVE, NOT PROPER.

17          **THE COURT:**  I STATED THE COURT'S VIEW AT SIDE-BAR

18  WHAT THEY ARE LIMITED TO.  IF IT BECOMES CLEAR IT'S A 403

19  ISSUE, THE COURT WILL RULE ACCORDINGLY.  I'M NOT GOING TO RULE

20  IN THE ABSTRACT RIGHT NOW.                                       12:10

21          **MR. ZELLER:**  I UNDERSTAND.

22          ONE ISSUE I THINK I'M ATTEMPTING TO FLAG HERE IS THAT

23  OBVIOUSLY PART OF THIS PUTS US IN SOMETHING OF A PREDICAMENT,

24  BECAUSE WE HAVE THESE WITNESSES PUT UP THERE, EXECUTIVES OF

25  MATTEL, WHO, OF COURSE, HAVE TO WAIT AROUND FOR A CONSIDERABLE    12:10

```
 1   PERIOD OF TIME JUST TO GET CALLED; SO THEY ARE GOING TO GET UP
 2   THERE.  AND THEN WE'RE GOING TO HAVE A CHOICE, WHICH IS EITHER
 3   TO ALLOW MR. NOLAN TO CONTINUE TO ASK THE SAME KINDS OF
 4   QUESTIONS, INCLUDING THINGS THAT THE COURT HAS ALREADY SAID
 5   QUITE CLEARLY, THROUGH PRIOR RULINGS, SHOULD NOT BE PART OF        12:10
 6   1-A.  AND AT THAT POINT WE'RE GOING TO HAVE A CHOICE.  WE'RE
 7   GOING TO END UP WASTING MORE TIME, HAVING TIME COUNTED AGAINST
 8   US.  I MEAN, THERE'S NO DOUBT WE HAVE TO ASK FOR
 9   THESE SIDEBARS.
10           THE COURT:  NOW YOU'RE TRACKING MS. AGUIAR'S SCRIPT.       12:10
11           MS. AGUIAR:  HE WAS JUST SO IMPRESSED WITH IT.
12           MR. ZELLER:  SHE CONVINCED ME, YOUR HONOR.  I THOUGHT
13   IT WAS --
14           THE COURT:  NEITHER OF YOU ARE CONVINCING ME ON THIS
15   POINT.  YOUR TIME IS YOUR TIME.  THIS WOULD BE A DIFFERENT        12:11
16   TRIAL IF THE COURT DID NOT HAVE YOU ON THE CLOCK.  AND IF I
17   MADE ONE GOOD DECISION IN THIS CASE, I THINK IT WAS TO ACTUALLY
18   IMPOSE THE CLOCK.  THE REST OF THE DECISIONS --
19           MR. ZELLER:  THERE IS ALSO THE PREJUDICIAL EFFECT IN
20   FRONT OF THE JURY; THEN WE LOOK LIKE WE'RE OBSTRUCTING.  AND      12:11
21   THIS IS SOMETHING THAT'S GOING TO BE --
22           THE COURT:  GIVE MORE FAITH TO THE JURY.  I THINK THE
23   JURY SEES AND UNDERSTANDS FAR MORE THAN WE LAWYERS GIVE THEM
24   CREDIT FOR.  THEY UNDERSTAND WHAT IS GOING ON HERE.  I THINK
25   THEY WILL UNDERSTAND WHAT THE ISSUES ARE.  I HOPE THEY WILL       12:11
```

1    MAKE A GOOD DECISION ALSO.  LET'S NOT WORRY ABOUT WHAT THE JURY

2    IS THINKING.

3         I APPRECIATE YOUR CONCERN.  I'M MINDFUL OF IT.

4    MR. NOLAN I THINK UNDERSTANDS THE PARAMETERS THE COURT HAS

5    PLACED ON HIM.                                              12:11

6         THE COURT DOES MAKE PRETRIAL RULINGS THE BEST THAT IT

7    CAN.  BUT JUST AS THE COURT HAS, BASED ON ANSWERS THAT CAME

8    FORWARD FROM MR. MARLOW, CIRCUMSTANCES CHANGE; SO DO

9    CIRCUMSTANCES CHANGE WHEN MR. ECKERT OR OTHERS TESTIFY, OR WHEN

10   MR. QUINN MADE HIS OPENING STATEMENT OR WHEN MR. QUINN AND     12:12

11   MR. PRICE ELICITED TESTIMONY THAT BROUGHT INTO ISSUE THINGS

12   THAT THE COURT DID NOT THINK WOULD BE AN ISSUE.  THIS IS NOT A

13   STATIC TRIAL.  THIS IS A DYNAMIC PROCESS, AND WHAT IS NOT

14   RELEVANT ONE MOMENT CAN BECOME RELEVANT REALLY QUICKLY; WHAT IS

15   NOT IMPEACHMENT CAN BECOME IMPEACHMENT BASED ON AN ANSWER TWO   12:12

16   SECONDS LATER, AS WE JUST SAW IN THE CASE OF MR. MARLOW.

17        I UNDERSTAND THE FRUSTRATION, AND IT WOULD BE NICE TO

18   BE ABLE TO SAY, OKAY, THESE ARE THE PRECISE RULES FOR THIS

19   TRIAL AND NOTHING THAT HAPPENS IS GOING TO CHANGE.  BUT THAT'S

20   NOT THE NATURE OF TRIAL.  WE ALL UNDERSTAND THAT.  I HOPE WE    12:13

21   ALL UNDERSTAND THAT.  AND I WILL CONTINUE TO MAKE THE BEST CALL

22   THAT I CAN, AND I UNDERSTAND THAT YOU BOTH WILL BE UPSET WITH

23   ME AT DIFFERENT TIMES, BUT THAT'S THE NATURE OF THE JOB.

24        **MR. ZELLER:**  I DIDN'T WANT THE COURT TO THINK I WAS

25   BEING CRITICAL AT ALL.  BECAUSE I ABSOLUTELY AGREE WITH THE     12:13

1    COURT, THAT ABSOLUTELY IT'S NOT A STATIC SITUATION.  HOWEVER, I

2    WILL POINT OUT THIS, IS THAT THE COURT WILL RECALL THAT BOTH

3    ISAAC LARIAN AND PAULA GARCIA SAID GLOWING THINGS ABOUT THE

4    WORK ENVIRONMENT AT MGA THAT WE KNOW WERE NOT TRUE.  WE WERE

5    NOT ALLOWED TO IMPEACH THEM ON THOSE SUBJECTS.                    12:13

6         NOW WE HAVE COLLATERAL WITNESSES UP TALKING ABOUT

7    MATTEL AT TIME PERIODS THAT ARE JUST NOT RELEVANT TO THIS CASE.

8         **THE COURT:**  I PERMITTED BOTH SIDES' PERCIPIENT

9    WITNESSES TO DESCRIBE THEIR WORK ENVIRONMENT TO A CERTAIN

10   EXTENT.  MATTEL EMPLOYEES DID THAT.  IVY ROSS DESCRIBED         12:13

11   CONDITIONS AT MATTEL, TO A CERTAIN EXTENT.

12        I DO THINK WE'RE GETTING FAR AFIELD WHEN WE HAVE A

13   SUBSTANTIAL AMOUNT OF IMPEACHMENT ON THAT.

14        YOU SAID YOU WERE PRECLUDED FROM ANY --

15        **MR. ZELLER:**  ON PAULA GARCIA.                            12:14

16        **THE COURT:**  REFRESH MY RECOLLECTION.

17        **MR. ZELLER:**  THE COURT CONSIDERED IT TO BE COLLATERAL

18   AND NOT RELEVANT.  SHE IS THE ONE WHO GOT UP AND SAID 'WHY IS

19   IT YOU WENT TO MGA?'  'IT WAS A FAMILY-FRIENDLY PLACE.'

20   MR. PRICE ASKED 'YOU KNOW, NOT EVERYBODY HOLDS THAT             12:14

21   PERCEPTION.'

22        **THE COURT:**  THERE'S A NUMBER OF PROBLEMS WITH THAT

23   QUESTION, AS OPPOSED TO -- THAT GOES TO WHAT OTHER PEOPLE,

24   THEIR MENTAL IMPRESSION --

25        **MR. ZELLER:**  SHE DESCRIBED IT MORE BROADLY.  I'M NOT    12:14

```
 1   TRYING TO ARTICULATE IT WORD FOR WORD.

 2          THE COURT:  I'LL LOOK AT THAT TRANSCRIPT, COUNSEL.

 3          IN ANY EVENT, MR. NOLAN, YOU UNDERSTAND YOU'RE ON A

 4   VERY TIGHT LEASH.

 5          MR. NOLAN:  RIGHT.                                    12:14

 6          THE COURT:  WE'RE NOT GOING TO BE TALKING ABOUT

 7   HOUSES ON FIRE OR BROAD BRUSH ATTACKS ON MATTEL; THAT IS NOT

 8   WHAT THIS IS ABOUT.  THAT'S BARRED ON 403 GROUNDS.  AND I THINK

 9   WE'VE PROBABLY COVERED ENOUGH OF THIS.  WE'VE HAD THE CEO.  YOU

10   CONTINUE TO HAVE THE CEO ON THE STAND.  IT'S GOING TO BE TIME   12:15

11   TO MOVE ON.

12          LET'S NOT FORGET WHAT THIS CASE OR WHAT THIS PHASE IS

13   ABOUT:  WHEN DID CARTER BRYANT DEVELOP THE DRAWINGS IN

14   QUESTION?  AND WHEN DID HE DO HIS WORK AND WHETHER OR NOT HE

15   BREACHED HIS DUTY OF LOYALTY AND FIDUCIARY DUTY; WHETHER THERE  12:15

16   WAS A CONTRACTUAL BREACH HERE.

17          THAT IS THE ISSUE.  WE'RE REALLY GETTING AFIELD.

18          MR. NOLAN:  I APPRECIATE THAT AND I ACCEPT THAT,

19   YOUR HONOR.

20          I THINK I'M THROUGH WITH MR. ECKERT; I'LL GO LOOK IN     12:15

21   MY OUTLINE AND PROBABLY CONFIRM THAT.

22          ONE PIECE OF FURTHER GUIDANCE THOUGH, YOUR HONOR,

23   WITH RESPECT TO MR. KILPIN.  I UNDERSTAND THE HOUSE ON FIRE,

24   BUT HE DOES HAVE THE ONE E-MAIL THAT I WAS ALLOWED TO QUESTION

25   IVY ROSS ON.  CASSIDY PARK IS A RECIPIENT OF THE E-MAIL.  IT IS  12:15
```

1    AN E-MAIL WHERE HE SAYS WE WERE OUTTHOUGHT AND OUTEXECUTED BY

2    BRATZ.  AND BASED ON THE SIDE-BAR, MY INTENT WOULD BE TO SIMPLY

3    CALL MR. KILPIN AND ASK HIM THE FOUNDATION TO PUT THAT E-MAIL

4    IN.

5              **THE COURT:**  IS THAT E-MAIL NOT IN EVIDENCE AT THIS          12:16

6    POINT?

7              **MR. NOLAN:**  IT'S NOT.

8              **THE COURT:**  LET ME LOOK AT THAT E-MAIL BEFORE I RULE.

9    IT'S A TANGENTIAL AREA TO BEGIN WITH, AND WE ALREADY HAVE

10   TESTIMONY ON IT.  I HAVE PERMITTED MATTEL TO CIRCLE BACK,          12:16

11   THOUGH, ON SOME OF THESE ISSUES, AND I'LL PROBABLY DO THE SAME

12   HERE.

13             **MR. NOLAN:**  THIS WAS THE ONE QUESTION, THE PRECISE

14   QUESTION, THAT I WAS ALLOWED TO ASK.

15             **THE COURT:**  LET ME LOOK AT IT.                             12:16

16             **MR. NOLAN:**  WE'LL BRING IT UP RIGHT NOW.

17             THANK YOU.

18             **THE COURT:**  MR. ZELLER?

19             **MR. ZELLER:**  THIS E-MAIL IS FROM 2003/2004.  HE'S

20   TALKING ABOUT A VERY SPECIFIC CONTEXT.                            12:16

21             WHAT I WOULD SAY TO THE COURT IS THAT IF THEY ARE

22   ALLOWED TO GET INTO THAT TIME PERIOD AND REALLY PUT IN FRONT OF

23   JURY THIS NOTION THAT MATTEL WAS OUTTHOUGHT AND OUTEXECUTED,

24   THAT DIRECTLY IMPLICATES THE TRADE SECRET.  WE NOW KNOW WHY IT

25   IS THAT PEOPLE HAVE THAT PERCEPTION WITHIN MATTEL, BECAUSE WE     12:17

```
 1   HAD EMPLOYEES BEING SOLICITED BY MGA TO STEAL MATTEL'S TRADE

 2   SECRETS.  THEY HAD THE PLAYBOOK.

 3          THE COURT:  WE'LL TAKE THIS UP AFTER I LOOK AT THE

 4   E-MAIL.

 5          I SAID AT 12:15 WE'D START.  IT'S NOW 12:17.              12:17

 6          WHY DON'T I MOVE THAT TO 12:30.  IF I DON'T GET

 7   SOMETHING TO EAT, I'M GOING TO GET GRUMPY.

 8          MS. AGUIAR:  YOUR HONOR, MIGHT YOU ENTERTAIN A SLIGHT

 9   VARIATION ON WHAT WE DO WITH THE EXPERT TO MOVE THINGS ALONG?

10   BECAUSE I APPRECIATE THAT YOU HAVE OTHER THINGS ON YOUR PLATE   12:17

11   AT LUNCH OTHER THAN A TUNA SANDWICH.  AND WE HAVE TO DEAL WITH

12   A BUNCH OF ISSUES.

13          WHAT ABOUT IF IN EACH OF THE FOUR AREAS, RATHER THAN

14   GO THROUGH THE FULL DIRECT AND FULL CROSS, WHAT IF HE TAKES THE

15   STAND AND WE SAY, IN EACH OF THE FOUR AREAS, ASK HIM TO EXPLAIN  12:18

16   TO YOU WHAT THE SUBSTANCE OF HIS TESTIMONY WOULD BE IN EACH OF

17   THOSE AREAS?  BECAUSE I THINK IT WOULD ACCOMPLISH THE SAME

18   THING, AND RATHER THAN GOING THROUGH QUESTIONS AND THEN

19   MR. COREY GETS UP AND GOES THROUGH HIS WHOLE CROSS, I FEEL WE

20   COULD DO IT MORE QUICKLY AND ACCOMPLISH THE SAME THING.         12:18

21          THE COURT:  THERE MAY BE VALUE TO THAT, PARTICULARLY

22   AT LEAST GETTING THE SUBSTANCE OF HIS TESTIMONY.  I STILL WOULD

23   INVITE COUNSEL TO ASK QUESTIONS THAT THEY FEEL ARE APPROPRIATE.

24   BECAUSE I WOULDN'T ASSUME THE COURT IS CAPABLE OF ASKING ALL OF

25   THE APPROPRIATE QUESTIONS.                                      12:18
```

1          **MS. AGUIAR:**   BUT THERE WOULD BE LESS THAN ASKING

2     EVERY SINGLE QUESTION, I WOULD JUST ASK HIM TO EXPLAIN TO YOU

3     HIS TESTIMONY, AND THEN MR. COREY WOULD BE ABLE TO FOLLOW UP ON

4     THAT.

5              **THE COURT:**   VERY WELL.                                    12:18

6              LET'S GET BACK TOGETHER IN ABOUT TEN OR 15 MINUTES.

7              (WHEREUPON A BRIEF RECESS WAS HELD.)

8              (MORNING SESSION CONCLUDED. )

9

10

11

12

13

14

15                            CERTIFICATE

16

17    I hereby certify that pursuant to section 753, title 28, United
      States code, the foregoing is a true and correct transcript of
18    the stenographically recorded proceedings held in the
      above-entitled matter and that the transcript page format is in
19    conformance with the regulations of the judicial conference of
      the United States.

20

21    _____          _____

22    THERESA A. LANZA, RPR, CSR                       Date
      Official COURT Reporter

23

24

25