1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3             EASTERN DIVISION

4                  - - -

5     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                  - - -

7   MATTEL, INC.,                    )
                                     )
8                    Plaintiff,      )
                                     )
9           vs.                      )  No. CV 04-09049
                                     )
10  MGA ENTERTAINMENT, inc., et. Al.,  )
                                     )
11                   Defendants.     )  TRIAL DAY 20
    _____)  MORNING SESSION
12  AND CONSOLIDATED ACTIONS,        )  Pages 4202-4331
    _____)

13

14

15      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                Riverside, California

17               Thursday, July 3, 2008

18                    8:19 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
              Federal Official Court Reporter
24              3470 12th Street, Rm. 134
                Riverside, California  92501
25                   951-274-0844
                  WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2
     On behalf of MATTEL, INC.:
 3
                           QUINN EMANUEL
 4                         By:  JOHN QUINN
                                JON COREY
 5                              MICHAEL T. ZELLER
                                HARRY OLIVAR
 6                              TIMOTHY ALGER
                           865 S. FIGUEROA STREET,
 7                         10TH FLOOR
                           LOS ANGELES, California  90017
 8

 9

10   ON BEHALF OF MGA ENTERTAINMENT:

11                         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                           BY:  THOMAS J. NOLAN
12                              JASON RUSSELL
                                RAOUL SLOAN
13                              LAUREN AGUIAR
                                CARL ROTH
14                         300 SOUTH GRAND AVENUE
                           LOS ANGELES, CALIFORNIA  90071-3144
15                         213-687-5000

16

17

18

19

20

21

22

23

24

25
```

THURSDAY, JULY 3, 2008                    TRIAL DAY 20, MORNING SESSION

```
1                    I N D E X

2                                           Page

3   Defense Case (continued)........................ 4248

4

5   DEFENSE
    WITNESS            DIRECT      CROSS      REDIRECT      RECROSS
6   Margaret Ann Leahy (continued)

7   BY MR. NOLAN       4248
    BY MR. PRICE                   4292
8

9

10

11          EXHIBITS            RECEIVED

12          17821               4251
            1139                4261
13          1140, a-d           4285
            538                 4304
14          1125                4314
            1128                4318
15

16

17

18

19

20

21

22

23

24

25
```

```
 1        RIVERSIDE, CALIFORNIA; THURSDAY, JULY 3, 2008; 8:19 A.M.

 2                              -oOo-

 3        THE COURT:  CALLING CASE NUMBER CV04-09049-SGL,

 4   MATTEL, INC., V. MGA, INC., ET AL.

 5        MAY WE HAVE COUNSEL PLEASE STATE YOUR APPEARANCES FOR

 6   THE RECORD.

 7        MR. QUINN:  JOHN QUINN, BILL PRICE, MIKE ZELLER FOR

 8   MATTEL.

 9        MR. NOLAN:  TOM NOLAN, LAUREN AGUIAR, JASON RUSSELL,

10   AND CARL ROTH.

11        THE COURT:  GOOD MORNING, COUNSEL.

12        WE HAD SEVERAL MATTERS WE WANTED TO TAKE UP THIS

13   MORNING.  I HAD ASKED COUNSEL TO MEET AND CONFER ON A COUPLE OF

14   THINGS LAST NIGHT, SO WHY DON'T WE START WITH THAT.

15        LET'S BEGIN WITH THE ISSUE OF THE CUSTODIAN OF           08:19

16   RECORDS AND THE VARIOUS DOCUMENTS THAT MGA WANTED TO INTRODUCE

17   THROUGH A CUSTODIAN.

18        MS. AGUIAR:  BRIEFLY, YOUR HONOR, THE STATUS OF THAT

19   IS, WE EXCHANGED E-MAILS LAST NIGHT.  WE SENT THEM A NARROWED

20   DOWN LIST OF DOCUMENTS.  THEY SAID THEY WERE ABLE TO STIPULATE   08:19

21   TO THE ADMISSIBILITY OF ONE OR TWO OF THEM.  WITH REGARD TO

22   ANOTHER SEVERAL, THEY CHALLENGED AUTHENTICITY.  AND THEN WITH

23   REGARD TO THE REST, THEY STIPULATED TO AUTHENTICITY BUT

24   RESERVED ON ADMISSIBILITY.

25        THE COURT:  HOW MANY DOCUMENTS TOTAL ARE WE TALKING       08:19
```

```
 1   ABOUT, APPROXIMATELY?
 2          MS. AGUIAR:  APPROXIMATELY A DOZEN OR SO.  I DIDN'T
 3   COUNT THEM.
 4          THE COURT:  THAT'S OKAY.  WE'RE NOT TALKING ABOUT
 5   30 PLUS?                                                      08:20
 6          MS. AGUIAR:  NO.  ABOUT A DOZEN.
 7          THE COURT:  OKAY.  AND TWO ARE FULLY STIPULATED, SO
 8   THOSE ARE OFF.
 9          HOW MANY ARE STIPULATED AS TO AUTHENTICITY?
10          MS. AGUIAR:  I WANT TO SAY MOST OF THESE IN THIS LIST  08:20
11   ARE STIPULATED TO AUTHENTICITY, SO I THINK WITH REGARD TO --
12   PRETTY MUCH WHAT WE'RE GOING TO BE DOING IS DEALING WITH ISSUES
13   OF, IS THIS ADMISSIBLE -- WHATEVER OBJECTIONS -- IF I'M
14   MISSTATING, TELL ME; BUT I THINK IT'S GOING TO BE A QUESTION OF
15   WHETHER THEY HAVE OBJECTIONS BASED ON VARIOUS ADMISSIBILITY     08:20
16   GROUNDS.
17          THE COURT:  AND HOW MANY ARE CHALLENGED ON
18   AUTHENTICITY?
19          MS. AGUIAR:  TWO.
20          THE COURT:  TWO.                                        08:20
21          I'LL ASK YOU FIRST, AND THEN I'LL ASK MATTEL, HOW DO
22   YOU PROPOSE PROCEEDING AT THIS POINT?
23          MS. AGUIAR:  I WAS WONDERING WHETHER -- THIS
24   CUSTODIAN OF RECORD PROCESS IS NEW TO ME, SO I WAS WONDERING,
25   DOES IT MAKE SENSE -- AND OBVIOUSLY, YOU CAN CHARGE THE TIME    08:21
```

1    AGAINST US, BUT I'M WONDERING IF THIS IS SOMETHING WE NEED TO

2    DO IN FRONT OF THE JURY.  WE CERTAINLY CAN.  IF IT'S A QUESTION

3    OF US JUST DISCUSSING THE ADMISSIBILITY OF A DOCUMENT, PERHAPS

4    WE CAN JUST DO IT WITH YOU ON A BREAK AND JUST ARGUE THE ISSUES

5    TO YOU; BECAUSE, OTHERWISE, IT WILL BE KIND OF A STRANGE                08:21

6    PROCESS.

7         **THE COURT:**  I DON'T KNOW IF I'VE EXPLAINED IT, BUT MY

8    RATIONALE FOR HAVING THIS CUSTODIAN OF RECORD PROCESS -- AND I

9    KNOW BOTH SIDES SOMEWHAT OBJECTED TO IT -- WHAT I DID NOT WANT

10   TO HAVE, AND I THINK HAS BEEN AVOIDED NOW -- BUT, YOU KNOW,           08:21

11   JUST YESTERDAY, YOU WERE TALKING ABOUT 30-SOME DOCUMENTS, AND

12   WHAT I DID NOT WANT TO HAVE IS TO GET TO THE END OF THIS TRIAL

13   AND HAVE HUNDREDS OR THOUSANDS OR EVEN SCORES OF DOCUMENTS JUST

14   BEING DUMPED ON THIS JURY AND SENT BACK INTO THE JURY ROOM.

15   GIVEN THE NATURE OF THE CASE, GIVEN THE NATURE OF THE                 08:21

16   DISCOVERY, GIVEN THE AMOUNT OF EXHIBITS IN PLAY HERE, THAT'S

17   WHAT I WAS TRYING TO AVOID.

18        I WANTED THE JURY TO HAVE SEEN THE DOCUMENT THROUGH A

19   WITNESS, IN OPEN COURT, BEFORE IT WAS JUST DUMPED ON THEM, SO

20   THEY'RE NOT HEARING IN CLOSING ARGUMENT, 'OH, BY THE WAY,            08:22

21   THERE'S 28 DOCUMENTS THAT GO TO THIS POINT; YOU HAVE NOT SEEN

22   THEM, BUT HERE THEY ARE; WE'RE GOING TO FLASH THEM UP FOR THE

23   FIRST TIME IN CLOSING.'

24        THAT'S WHAT I WAS TRYING TO AVOID.

25        I NORMALLY DON'T DO THIS, BECAUSE NORMALLY, IT'S A              08:22

```
 1   HANDFUL OF DOCUMENTS; BUT IT DOES NOW SOUND THAT WE'RE DOWN TO
 2   THOSE FEW DOCUMENTS.
 3           I STILL WOULD LIKE TO HAVE, JUST TO KEEP THINGS FAIR
 4   TO BOTH SIDES -- JUST HAVE SOMEBODY UP THERE.  I'LL CERTAINLY
 5   ENTERTAIN THE ARGUMENTS IN ADVANCE, AND YOU CAN GET MY SENSE OF      08:22
 6   HOW THEY'RE GOING TO GO SO THAT IT MOVES QUICKLY.
 7           MS. AGUIAR:  THAT'S FINE.
 8           THE COURT:  I JUST WANT THE JURY TO SEE THE DOCUMENT.
 9           MS. AGUIAR:  THAT MAKES SENSE.
10           SO MORNING BREAK, LUNCH BREAK, IF YOU WANT TO MAYBE         08:22
11   GO OVER THIS SO IT'S NOT, YOU KNOW, A PRIMER FOR THE JURY ON
12   EVIDENTIARY OBJECTIONS FOR 20 OR 25 MINUTES, IF MR. ZELLER IS
13   AMENABLE TO THAT, WE CAN GIVE YOU AN IDEA OF WHAT'S GOING ON.
14           THE COURT:  LET ME HEAR FROM MR. ZELLER IN TERMS OF
15   WHAT THE OBJECTIONS REALLY ARE.                                    08:23
16           WHAT IS THE NATURE OF YOUR OBJECTIONS, SPECIFICALLY
17   TO THE ONES WHERE YOU'VE STIPULATED TO AUTHENTICITY BUT THAT
18   ARE STILL OTHERWISE OBJECTED?  ARE THESE RELEVANCY OBJECTIONS,
19   OR ARE THESE -- I GUESS WHAT I DON'T WANT TO HEAR ARE
20   FOUNDATIONAL OBJECTIONS, THAT WHATEVER WITNESS THEY'RE TRYING      08:23
21   TO GET THEM IN THROUGH ISN'T FAMILIAR WITH THE DOCUMENT,
22   BECAUSE THAT'S BEEN THE CASE FOR A NUMBER OF DOCUMENTS.
23           MR. ZELLER:  I CAN'T GUARANTEE THAT THERE ARE NONE
24   WHERE WE DO NOT HAVE A FOUND ADDITIONAL ISSUE.  IN THE MAIN,
25   THE DOCUMENTS THAT WE AGREE ARE AUTHENTIC BUT WE HAVE OTHER       08:23
```

1    OBJECTIONS TO FALL UNDER 402, 403.  MAYBE THERE'S SOME HEARSAY

2    OBJECTIONS FOR PARTICULAR DOCUMENTS, BUT IN THE MAIN, IT IS

3    RELEVANCE, OR JUST CUMULATIVE, UNFAIR PREJUDICE, WASTE OF TIME,

4    AND SO ON.

5           NOW, I'M A LITTLE BIT CONFLICTED IN TERMS OF THE                08:23

6    REQUESTED PROCEDURE, BECAUSE THE COURT WILL RECALL THAT I MORE

7    THAN ONCE STOOD UP HERE AND ASKED THE COURT TO DO EXACTLY THIS.

8           **THE COURT:**  GIVEN YOUR ANSWER TO THAT, WHAT I'M

9    INCLINED TO DO IS JUST HAVE YOU DO THE EXACT SAME THING I HAD

10   MGA DO.  PUT UP A CUSTODIAN; PUT UP SOMEONE FROM THE COMPANY;        08:24

11   PICK WHOEVER YOU WANT; AND LET'S GET THESE DOCUMENTS IN THROUGH

12   THAT PERSON.  THE ONE OBJECTION I'LL OVERRULE IN ADVANCE IS

13   THAT THE WITNESS IS NOT FAMILIAR WITH THE DOCUMENT, BECAUSE

14   YOU'RE PICKING.  IT'S KIND OF A 30(B)6 TYPE WITNESS, BASICALLY,

15   ON THE STAND.                                                        08:24

16          LET'S GET THE DOCUMENTS IN.  YOU CAN MAKE YOUR

17   RELEVANCY OBJECTIONS, AND THE COURT WILL RULE ON THEM, AND THE

18   DOCUMENTS WILL COME IN OR THEY WON'T.  THAT TAKES CARE OF THE

19   STIPULATED DOCUMENTS AND THE ONES THAT THERE'S AN AUTHENTICITY

20   STIPULATION TO.  SO LET'S DO THAT SOMETIME TODAY OR TUESDAY AND      08:24

21   BE DONE WITH IT.

22          THAT LEAVES, APPARENTLY, TWO WHERE YOU CHALLENGED THE

23   AUTHENTICITY.

24          WHAT IS THE ISSUE THERE?

25          **MR. ZELLER:**  THE ONE THAT I HAVE MOST FIRMLY IN MIND      08:24

| | |
|---|---|
| 1 | IS A PHOTOGRAPH THAT THEY HAVE BEEN ATTEMPTING TO ADMIT THROUGH |
| 2 | A COUPLE OF WITNESSES, OR AT LEAST ONE THAT I CAN REMEMBER, |
| 3 | THROUGH CASSIDY PARK.  ACTUALLY, RIGHT NOW, I RECALL THAT THERE |
| 4 | WAS AT LEAST TWO.  NONE OF THE WITNESSES COULD AUTHENTICATE IT. |
| 5 | IT APPEARS TO BE SOMETHING THAT WAS AMONG MATTEL'S FILES.  IT'S |
| 6 | CLEARLY WRONG, WHATEVER THIS DOCUMENT IS.  IT'S A PHOTOGRAPH |
| 7 | WITH A DATE ON IT THAT'S IMPRINTED IN 1998, BUT THE DOLL THAT |
| 8 | MGA KNOWS WELL DIDN'T EVEN EXIST IN 1998.  SO THAT IS THE |
| 9 | PHOTOGRAPH.  WE DON'T KNOW WHERE IT CAME FROM. |
| 10 | **THE COURT:**  YOU DON'T KNOW WHERE IT CAME FROM? |
| 11 | **MR. ZELLER:**  WE DO NOT. |
| 12 | **THE COURT:**  I SEE THE PROBLEM. |
| 13 | **MR. NOLAN:**  MAY I HAND UP THE PICTURES? |
| 14 | **THE COURT:**  YES.  LET ME TAKE A LOOK AT IT. |
| 15 | **MR. NOLAN:**  OBVIOUSLY, WITH RESPECT TO THE COMMENT |
| 16 | THAT MGA WELL KNOWS IT DIDN'T EXIST, WE DISAGREE WITH THAT |
| 17 | SINCE THIS IS A DOCUMENT THAT WAS PRODUCED BY MATTEL IN THIS |
| 18 | PRODUCTION. |
| 19 | **THE COURT:**  YOU WOULD BE THE FIRST TO CONCEDE THAT |
| 20 | SOMETIMES DATES ARE WRONG; THAT'S BEEN YOUR ARGUMENT THROUGHOUT |
| 21 | THIS TRIAL. |
| 22 | **MR. NOLAN:**  IF WE COULD ALL STIPULATE TO THAT, |
| 23 | YOUR HONOR. |
| 24 | **THE COURT:**  I THINK WE ALL KNOW THAT MISTAKES HAPPEN. |
| 25 | **MR. NOLAN:**  THIS DOESN'T LOOK LIKE A MISTAKE, THE WAY |

08:25 (lines 5)
08:25 (line 10)
08:25 (line 15)
08:26 (line 20)
08:26 (line 25)

```
 1    IT'S RECORDED.

 2           THE COURT:  BECAUSE IT'S TYPED?

 3           MR. NOLAN:  THEN THEY SHOULD COME UP AND SAY IT'S A

 4    MISTAKE.

 5           THAT'S MY ONLY POINT, YOUR HONOR.                        08:26

 6           THE COURT OFTENTIMES AT SIDE-BARS POINTED OUT TO ME

 7    GRAPHICALLY, IN DESCRIPTIVE WORDS, ABOUT, 'WHAT'S HAPPENING

 8    HERE, MR. NOLAN; THIS IS A DOCUMENT; WHY CAN'T YOU RECOGNIZE

 9    THIS DOCUMENT?'

10           THE COURT:  RIGHT.                                       08:26

11           MR. NOLAN:  AND YET, THIS IS A DOCUMENT THAT IS A

12    JEWEL BARBIE.  MATTEL HAS IT IN ITS RECORDS WITH THESE

13    NOTATIONS ON IT.  IF THEY WANT TO COME IN AND EXPLAIN THAT IT

14    WAS A TYPO, LIKE WE'VE HAD TO DO, SO BE IT; BUT THIS WAS A

15    DOCUMENT THAT WAS PRODUCED.                                     08:27

16           THE COURT:  I SEE.

17           IS THERE ANY QUESTION THAT EMERALD-JEWEL BARBIE CAME

18    OUT IN 1999?

19           MR. ZELLER:  THERE WERE FOUR DOLLS; ONE CAME OUT IN

20    1999, THE OTHER THREE CAME OUT IN 2000.  IT IS SOMETHING THAT   08:27

21    SHOULD NOT BE DISPUTED.  WE HAVE PRODUCED PLANNING DOCUMENTS

22    THAT SHOW THAT THE PROJECT DID NOT EVEN START UNTIL 1999.

23           SO, I MEAN, THERE'S ABSOLUTELY NO EVIDENCE

24    WHATSOEVER, WHETHER TESTIMONIAL, WHETHER IN DOCUMENTS, OR

25    ANYTHING ELSE, THAT THAT DOLL THAT'S DEPICTED THERE WAS EVEN IN 08:27
```

1    EXISTENCE IN 1998.  IN FACT, THE PROJECT DIDN'T EVEN START

2    UNTIL AFTER 1998.

3            THIS IS AMONG A STACK OF PHOTOGRAPHS.  THEY ALL HAVE

4    THE SAME DATE ON THEM.  WE DON'T KNOW WHERE THEY CAME FROM.

5    IT'S CLEARLY SOME ERROR OF SOME KIND.  BUT SAYING THAT WE HAVE          08:27

6    TO PRODUCE SOMEONE TO SAY IT'S A TYPO, WE DON'T EVEN KNOW WHERE

7    THESE THINGS CAME FROM.  IT APPEARS TO BE SOME SORT OF

8    COMPUTER-GENERATED LEGEND ON THESE PHOTOGRAPHS, AND SO WE DO

9    DISPUTE THE AUTHENTICITY OF IT.

10           **THE COURT:**  BUT, YOU KNOW, I'M TRYING TO THINK THIS          08:28

11   OUT.  I'M THINKING OUT LOUD, BECAUSE THIS IS JUST BEFORE ME

12   NOW.  A DISCOVERY REQUEST IS MADE.  THIS IS RESPONSIVE TO THE

13   DISCOVERY REQUEST.  THERE'S NO QUESTION THAT THIS IS AUTHENTIC

14   IN THE SENSE THAT THIS WAS A PHOTOGRAPH OF A JEWEL BARBIE THAT

15   WAS IN THE POSSESSION OF MATTEL AND THAT SOMEBODY AT MATTEL          08:28

16   DESIGNATED IT AS HAVING A COPYRIGHT OF 1998.

17           IS THAT CORRECT?

18           **MR. ZELLER:**  THAT IS AN ASSUMPTION THAT I DON'T THINK

19   WE CAN SHARE.  IT WAS CERTAINLY A DOCUMENT THAT WAS IN THE

20   POSSESSION OF SOMEBODY AT MATTEL.  WHETHER IT CAME FROM AN          08:28

21   OUTSIDE VENDOR, AS MANY OF MATTEL DOCUMENTS DO, AND ENDED UP IN

22   PEOPLE'S FILES -- PEOPLE SEND THINGS TO MATTEL.  OUTSIDE

23   VENDORS SENT PROPOSALS, LETTERS, ALL MANNER OF THINGS, IN

24   TRYING TO GET BUSINESS, OR ON A PROJECT, OR WHATEVER.

25           I MEAN, I CERTAINLY WOULD NOT DISPUTE THAT IT IS          08:29

1   SOMETHING THAT WE FOUND AT MATTEL SOMEWHERE.  BUT I DON'T THINK

2   THAT THE OTHER -- I THINK THE REST OF IT IS AN ASSUMPTION.

3           **THE COURT:**  THE PROBLEM THAT I'M HAVING, MR. NOLAN,

4   WITH THIS IS THE 403 ISSUE, CONFUSING THE JURY.

5           IF THERE'S NO DISPUTE, IF THERE'S NOT A SCINTILLA OF      08:29

6   EVIDENCE, THAT THIS JEWEL BARBIE WAS, IN FACT, COPYRIGHTED OR

7   MANUFACTURED IN 1998 AND THIS IS CLEARLY A MISTAKE, TO

8   INTRODUCE THAT FOR THE SOLE PURPOSE OF FORCING MATTEL TO GET UP

9   AND EXPLAIN THAT THIS IS WRONG, WHEN THERE IS NO EVIDENCE ALSO

10  OF WHO PRODUCED THIS, I THINK THAT DOES HAVE A 403 PROBLEM.  I   08:29

11  THINK THAT'S DIFFERENT THAN ANYTHING ELSE THAT WE'VE HAD IN

12  THIS TRIAL.

13          FOR EXAMPLE, OTHER MISTAKES WERE MADE.  AND, YOU

14  KNOW, WHAT'S COMING TO MIND IS THE WALL STREET JOURNAL ARTICLE,

15  WHERE MR. LARIAN SAID 1999 AND NOW HAS CORRECTED THAT AND SAYS   08:30

16  THAT HE WAS MISTAKEN.  THERE'S NO QUESTION THAT THE REPORTER

17  THOUGHT HE SAID 1999.  THERE IS A SCINTILLA OF EVIDENCE, AT

18  LEAST, THAT THAT MAY VERY WELL BE THE CASE; AND YOU'VE

19  CERTAINLY BEEN ABLE TO REBUT THAT, AND THAT'S BEEN FLUSHED OUT

20  BEFORE THE JURY.                                                08:30

21          ACCEPTING FOR A MOMENT MR. ZELLER'S PROFFER -- AND I

22  WOULD CERTAINLY ENTERTAIN ANY EVIDENCE WHATSOEVER THAT SUGGESTS

23  THAT THERE WAS A SCINTILLA OF EVIDENCE THAT THIS MIGHT ACTUALLY

24  BE CORRECT -- I MAY LOOK AT THIS DIFFERENTLY; BUT IF THERE

25  REALLY IS NO DOUBT THAT THIS IS FULLY MISTAKEN, I THINK TO       08:30

1    PERMIT THIS TO COME IN, PARTICULARLY SINCE WE DON'T HAVE A

2    WITNESS WHO HAS BEEN IDENTIFIED AS CREATING THIS, I THINK

3    THERE'S A 403 PROBLEM THERE.

4         **MR. NOLAN:**  LET ME TRY TO ADDRESS IT IN ADDRESSING

5    WHETHER OR NOT THERE'S A SCINTILLA OF EVIDENCE.                08:31

6         **THE COURT:**  YES.

7         **MR. NOLAN:**  THE COURT WILL RECALL, OF COURSE, THAT

8    CARTER BRYANT, IN ONE OF HIS DRAWINGS IN THE NOTEBOOK, HAS

9    TESTIFIED THAT HE DID WORK ON JEWEL BARBIE IN 1998 AS WELL AS

10   WHEN HE RETURNED TO MATTEL.                                   08:31

11        **THE COURT:**  RIGHT.

12        **MR. NOLAN:**  HE HAS TWO DISTINCT MEMORIES -- HE HAS

13   MEMORY OF TWO DISTINCT TIMES WHEN HE WORKED ON A JEWEL BARBIE.

14        MATTEL COUNTERED THAT EVIDENCE BY SUGGESTING, THROUGH

15   CASSIDY PARK, THAT THE JEWEL BARBIE WAS MANUFACTURED IN        08:31

16   MAINLINE BARBIE; AND WE HAD THE GRAPHIC DESCRIPTION OF THE

17   INDENTED BELLY BUTTON --

18        **THE COURT:**  RIGHT.

19        **MR. NOLAN:**  -- BUT THAT THERE WAS NO SUCH PROJECT IN

20   1998.  SO I DISAGREE THAT THERE ISN'T ANY EVIDENCE THAT THERE  08:32

21   WAS WORK BEING DONE ON JEWEL BARBIE IN 1998.

22        **THE COURT:**  THAT'S NOT WHAT I SAID.

23        **MR. NOLAN:**  RIGHT.

24        **THE COURT:**  THERE IS NO EVIDENCE THAT JEWEL BARBIE

25   WAS PRODUCED -- THAT WE HAD THIS IN 1998.                     08:32

```
 1          THERE'S NO QUESTION -- AND THAT'S WHY CASSIDY PARK'S
 2   TESTIMONY ONLY GOES SO FAR TO SAY THAT JEWEL BARBIE WAS NOT
 3   DONE UNTIL 1999.  IT DOES NOT IN ANY WAY SUGGEST THAT WORK WAS
 4   NOT BEING DONE ON IT IN 1998, OR PERHAPS 1997 FOR THAT MATTER.
 5   WE ALL KNOW AND IT'S BEEN WELL ESTABLISHED, I THINK -- AND THE     08:32
 6   COURT WILL CERTAINLY ENTERTAIN FURTHER EVIDENCE OF THIS,
 7   BECAUSE I THINK IT WOULD BE RELEVANT TO THIS VERY POINT -- THAT
 8   IT TAKES TIME FOR THESE PROJECTS TO DEVELOP.  JUST BECAUSE THE
 9   DOLL COMES OUT IN -- THAT THE DOLL IN THIS FORM -- THIS APPEARS
10   TO BE A FINISHED FORM OF A DOLL; THAT'S WHAT IT APPEARS TO THE     08:32
11   COURT, ANYWAY -- COMES OUT IN 1999, CERTAINLY DOES NOT SUGGEST
12   THAT BASIC SKETCHES OF THE DOLL WERE NOT BEING COMMISSIONED AND
13   COMPLETED IN 1998.
14          MR. NOLAN:  CORRECT.
15          THE COURT:  SO MR. BRYANT'S EXPLANATION IS WHOLLY          08:33
16   CONSISTENT WITH THAT TESTIMONY.
17          MY CONCERN WITH THIS IS -- AND THE SCINTILLA OF
18   EVIDENCE THAT I'M LOOKING FOR IS THE SCINTILLA OF EVIDENCE THAT
19   THE FINISHED PRODUCT, THE DOLL, WAS ACTUALLY COPYRIGHTED; THAT
20   THIS WAS COPYRIGHTED, THAT THIS IS ACCURATE.  THAT'S WHAT I'M     08:33
21   LOOKING FOR.
22          MR. NOLAN:  I'LL TAKE ONE OF YOUR COMMENTS WHEN I
23   THOUGHT YOU WERE KIND OF LEANING --
24          THE COURT:  I'M GOING BACK AND FORTH.  I DID INDICATE
25   THAT I WAS THINKING OUT LOUD.                                     08:33
```

1       **MR. NOLAN:**  BUT YOU WERE LEANING BECAUSE OF AN

2  IMPORTANT ISSUE, AND THAT IS, THINK OF THE DISCOVERY PROCESS.

3  WE PROPOUND DISCOVERY.

4       **THE COURT:**  RIGHT.

5       **MR. NOLAN:**  WE HAVE NO IDEA WHAT DOCUMENTS ARE GOING      08:33

6  TO BE RESPONSIVE.  THAT'S SOLELY IN THE MIND OF MATTEL IN WHAT

7  IS RESPONSIVE TO A DOCUMENT REQUEST THAT WE SERVE.

8       MATTEL, ON ITS OWN, WITHOUT ANY CONSULTATION WITH US,

9  WITHOUT ANY MOTIONS TO COMPEL, WITHOUT ANY ARGUMENTS, PRODUCES,

10  IN RESPONSE TO A SPECIFIC DISCOVERY RESPONSE, THIS DOCUMENT.      08:34

11       **THE COURT:**  I FOUND MR. ZELLER'S RESPONSE ACTUALLY

12  PERSUASIVE.  YOU CAN ADDRESS THAT, BECAUSE I WAS THINKING,

13  NARROWLY, I SUPPOSE, THAT ANYTHING THAT MATTEL PRODUCES MUST BE

14  WHAT THEY CREATED.  BUT AS MR. ZELLER POINTS OUT, THEY ARE

15  OBLIGATED TO PRODUCE, AND I WOULD EXPECT THEM TO PRODUCE, AS      08:34

16  WOULD YOU, ANYTHING IN THEIR POSSESSION, CUSTODY, OR CONTROL.

17  IT COULD BE THAT SOMETHING IS CREATED BY SOMEBODY OUTSIDE OF

18  MATTEL, PROVIDED TO MATTEL; THEY HAVE IT IN THEIR POSSESSION,

19  AND THEY ARE OBLIGATED TO PRODUCE IT.  THAT DOESN'T NECESSARILY

20  MEAN THAT MATTEL CREATED WHAT THEY PRODUCED.  THAT WAS AN      08:34

21  ASSUMPTION THAT I WAS INITIALLY MAKING, BUT I THINK MR. ZELLER

22  CORRECTED THE COURT, IN SO MANY WORDS, AND I THINK HE'S

23  PROBABLY RIGHT, UNLESS I'M MISSING SOMETHING.

24       **MR. NOLAN:**  BUT, YOUR HONOR, WITH RESPECT TO WHETHER

25  OR NOT THIS RAISES A 403 ISSUE, I THINK WHAT IT RAISES IS      08:34

```
 1    SIMPLY THE FOLLOWING:  THE COURT MADE THE COMMENT THAT THERE
 2    HAVE BEEN MISTAKES ON DOCUMENTS, ON COPYRIGHT APPLICATIONS.  WE
 3    HAVE IN THE RECORD, AND THEY HAVE ARGUED EXTENSIVELY THROUGH
 4    OUR COUNSEL, THAT THE COPYRIGHT APPLICATIONS THAT HAD DATES ON
 5    IT THAT WERE WRONG WERE THERE INTENTIONALLY AND THAT THEY WERE    08:35
 6    REALLY TRUTHFUL.  WE HAD TO PRODUCE --
 7         THE COURT:  BUT THERE WAS NO QUESTION WHO CREATED
 8    THOSE DECLARATIONS, AND THERE IS A CLEAR INFERENCE THAT CAN BE
 9    DRAWN GIVEN THE BENEFIT TO BE OBTAINED BY THE DATING OF THEM IN
10    THE MANNER THAT THEY WERE MISTAKENLY DATED; SO THERE, I HAVE      08:35
11    THAT BASIS.
12         I DON'T HAVE ANY BASIS IN THIS ONE.  THIS JUST
13    APPEARS TO BE A CLEAR UNDISPUTED MISTAKE CREATED BY SOMEBODY,
14    AND WE DON'T KNOW WHO THAT IS.  THERE IS JUST SIMPLY NO
15    FOUNDATION, THAT I CAN SEE -- AND LET ME KNOW IF THERE IS,       08:35
16    BECAUSE I CERTAINLY WANT TO --
17         MR. NOLAN:  BUT I DON'T KNOW WHY --
18         THE COURT:  IT'S NOT THAT I WANT THE EVIDENCE IN.  IF
19    IT'S LEGITIMATE, I WANT BOTH SIDES TO HAVE ALL OF THE EVIDENCE
20    IN THAT'S LEGITIMATE.                                           08:36
21         MR. NOLAN:  WHY IS THERE A PRESUMPTION THAT IT'S
22    UNDISPUTED THAT THIS IS A MISTAKE?
23         THE COURT:  I NEED EVIDENCE TO -- THERE'S BEEN A
24    PROFFER THAT IT'S UNDISPUTED.
25         MR. NOLAN:  THAT'S FINE, BUT MY PROFFER, YOUR HONOR,       08:36
```

1    IS THAT WE HAVE A WITNESS WHO SAID THAT HE WAS WORKING ON A

2    PROJECT FOR JEWEL BARBIE -- OKAY, JUST STOP FOR A SECOND.  THE

3    COURT MADE THE COMMENT -- AND IT'S THE RIGHT COMMENT; WE ALL

4    KNOW IT NOW -- THAT IT MAY HAVE BEEN THAT IT CAME OUT LATER,

5    BUT THE WORK STARTED IN 1998.  AND THAT'S WHEN YOU GO AND YOU        08:36

6    PROTECT IT BY COPYRIGHT.

7          SO WHAT I'M SAYING IS THAT I DON'T THINK IT'S

8    UNDISPUTED.  IF THIS WAS A MISTAKE, HAVE THEM COME IN AND

9    EXPLAIN THAT IT WAS MISTAKEN.

10         **THE COURT:**  I'M ACCEPTING BOTH YOUR PROFFERS.  IT'S        08:36

11   NOT THAT I'M ACCEPTING HIS AND NOT ACCEPTING YOURS.  I'M

12   ACCEPTING BOTH.  THEY'RE NOT IN CONFLICT AT ALL.

13         **MR. NOLAN:**  THEN, YOUR HONOR, WE HAVE A SERIES OF

14   EXHIBITS --

15         **THE COURT:**  JUST TO FOLLOW UP ON YOUR LAST COMMENT,        08:37

16   YOU'RE NOT SUGGESTING THAT THE COPYRIGHT DATE FOR THE FINISHED

17   PRODUCT GOES BACK TO WHEN THE DRAWING WAS DONE?  BECAUSE I

18   SUSPECT I'LL BE HEARING A MUCH DIFFERENT POSITION IN 1-B.

19         **MR. NOLAN:**  NO, YOUR HONOR.  I'M NOT TRYING TO TAKE

20   BOTH SIDES.  I'M JUST TRYING TO SAY THAT THE RULES OF           08:37

21   ENGAGEMENT HERE, AS I UNDERSTOOD IT, WAS THAT THE DOCUMENT ON

22   ITS FACE SHOWS THAT THERE WAS A JEWEL BARBIE THAT APPEARS IN

23   THE RECORDS OF MATTEL THAT BEARS A COPYRIGHT DATE OF 1998.

24   THAT'S ALL I CAN TELL YOU.  THAT'S ALL I CAN REPRESENT.

25         **THE COURT:**  AND I HAVE BEFORE ME AN OBJECTION ON          08:37

```
 1   AUTHENTICITY AND FOUNDATION, AND I'M BENDING OVER BACKWARDS,
 2   QUITE FRANKLY, MR. NOLAN, TO TRY TO SEE IF THERE'S SOME WAY --
 3   AND I'M DOING THIS NOT TO BE UNFAIR TO MATTEL, BUT I'M DOING
 4   THIS BECAUSE MATTEL PRODUCED IT.  I THINK IT'S FAIR FOR THE
 5   COURT TO TAKE A HIGHER SCRUTINY OF THIS DOCUMENT.  NORMALLY, I      08:37
 6   WOULD JUST SAY, 'STOP THE CONVERSATION; GET YOUR WITNESS UP
 7   HERE.'  I'M BENDING OVER BACKWARDS FOR MGA PRECISELY BECAUSE
 8   THIS WAS PRODUCED IN DISCOVERY BY MATTEL.  BUT THERE'S NO
 9   FOUNDATION OR AUTHENTICITY FOR THIS DOCUMENT, SHORT OF THE FACT
10   OF PRODUCTION.  AND EVEN THOUGH I STARTED DOWN THAT ROAD, I        08:38
11   DON'T HAVE A COGENT RESPONSE TO MR. ZELLER'S POINT THAT SIMPLY
12   BECAUSE IT WAS PRODUCED IN DISCOVERY DOES NOT MEAN THAT IT
13   REALLY WAS CREATED BY MATTEL.
14           AND NOT THAT THE DOLL WASN'T CREATED BY MATTEL, BUT I
15   JUST HAVE NO IDEA WHO TYPED THIS THING, "COPYRIGHT MATTEL          08:38
16   1998," AS OPPOSED TO THE DECLARATION THAT CAME IN EARLIER,
17   WHERE IT WASN'T DISPUTED WHO CREATED THAT DECLARATION; THAT IT
18   WAS CARTER BRYANT AND THE ATTORNEY FOR MGA.  AND ANY OF THE
19   OTHER EXAMPLES.  THE WALL STREET JOURNAL ARTICLE, FOR EXAMPLE,
20   IT WAS UNDISPUTED THAT IT WAS ISAAC LARIAN WHO HAD THE            08:38
21   INTERVIEW WITH THE WALL STREET JOURNAL REPORTER.  THAT'S WHAT
22   I'M TALKING ABOUT.  I HOPE THAT MAKES SENSE.
23           MR. NOLAN:  IT DOES, YOUR HONOR, AND I THINK MY
24   PROFFER WOULD JUST END WITH THE FOLLOWING COMMENT:  I THINK
25   WITH RESPECT TO -- PARTIES ARE PUT IN CERTAIN POSITIONS WITH      08:38
```

1    RESPECT TO THE DISCOVERY THAT IS PROPOUNDED.  THEY PROPOUNDED

2    THIS DISCOVERY TO US.  I HAVE NO ABILITY OTHER THAN TO ASK FOR

3    THE PERSON MOST KNOWLEDGEABLE --

4           **THE COURT:**  30(B)(6), RIGHT.

5           **MR. NOLAN:**  -- TO TELL ME ABOUT THIS PARTICULAR                08:39

6    DOCUMENT.  AND THAT'S WHAT WE'VE DONE DURING THE COURSE OF

7    THIS, BECAUSE, FRANKLY, CASSIDY PARK, WHEN I SHOWED IT TO HER,

8    SAID, 'I DON'T RECOGNIZE THIS.  I HAVE NOT SEEN IT.'  THAT'S

9    WHEN WE DID --

10          **THE COURT:**  AND I WILL GIVE YOU LEAVE TO BRING IN             08:39

11   ANYBODY YOU WANT.  YOU CAN PUT MR. ECKERT BACK ON THE STAND, IF

12   YOU WANT.  BUT IF THEY CAN'T IDENTIFY THIS, AND I'M GETTING A

13   PROFFER FROM MR. ZELLER THAT THEY CAN'T, THE DOCUMENT IS NOT

14   GOING TO COME IN.  SO UNLESS THERE'S SOMEBODY AT MATTEL -- AND

15   I'LL GIVE YOU LEAVE TO CALL FROM THE CEO DOWN TO THE                    08:39

16   MAINTENANCE ENGINEER -- - IF THERE'S NOBODY THERE, I DON'T HAVE

17   A BASIS, COUNSEL, TO ALLOW THIS IN.

18          I UNDERSTAND THE FRUSTRATION.

19          **MR. NOLAN:**  I'LL JUST END ON THIS POINT, YOUR HONOR:

20   IF I KNEW OF THE 27,000 EMPLOYEES AT MATTEL THAT WOULD BE ABLE          08:40

21   TO GIVE US TESTIMONY ON THAT, OBVIOUSLY I'D CALL THEM.  BUT

22   I'LL TELL YOU, THE ONE GROUP HERE THAT COULD ANSWER THIS

23   QUESTION AS TO, A, WHETHER OR NOT IT WAS A MISTAKE, WHY IT WAS

24   PRODUCED, AND WHERE IT WAS FOUND, IT'S MATTEL.  THEY PRODUCED

25   IT.                                                                     08:40

1          **THE COURT:**  WAS THERE A 30(B)(6) QUESTION DIRECTED

2     TOWARDS THIS EXHIBIT?

3          **MR. NOLAN:**  NOT ON THIS PARTICULAR EXHIBIT,

4     YOUR HONOR.

5          **THE COURT:**  I REALLY THINK THAT WOULD HAVE BEEN          08:40

6     THE -- LORD KNOWS THERE WAS ENOUGH -- I'M NOT FAULTING ANYONE

7     FOR NOT ASKING ANOTHER QUESTION IN DISCOVERY, BUT I SUPPOSE

8     THAT'S PROBABLY THE ANSWER TO THIS.

9          THERE WAS A SECOND DOCUMENT CHALLENGED FOR

10    AUTHENTICITY?                                                   08:40

11         **MR. NOLAN:**  YES, YOUR HONOR.

12         THE SECOND DOCUMENT IS ANOTHER DOCUMENT PRODUCED BY

13    MATTEL.

14         DO WE HAVE ANOTHER COPY SO WE CAN HAND THIS UP TO THE

15    COURT?                                                          08:40

16         THIS IS A DOCUMENT THAT BEARS MATTEL PRODUCTION

17    NUMBER M-0794346, AND IT IS A COMPILATION OF PAYMENTS MADE TO

18    VENDORS.  IN HERE, IT LISTS OUTSIDE PAYMENTS MADE TO VENDORS.

19    AND FOR FACE, ANNA RHEE, THAT HAS A PURCHASE NUMBER OF 292107

20    SHOWS THAT SHE WAS PAID $200,000 FOR FACE PAINTING BY MATTEL.   08:41

21    THIS WAS PRODUCED IN RESPONSE TO A DISCOVERY REQUEST THAT WE

22    PROPOUNDED.

23         WE ASSUMED, DURING THE COURSE OF THIS TRIAL, THAT

24    THESE STATEMENTS THAT WERE MADE HERE REPRESENTED TRUTHFUL

25    STATEMENTS AS TO THE AMOUNTS OF MONEY PAID BY ANNA RHEE, AND WE  08:42

1    WANT TO PUT THIS INTO EVIDENCE, AND NOW WE'RE TOLD THIS IS NOT

2    AN AUTHENTIC DOCUMENT.

3           **THE COURT:**  MR. ZELLER?

4           **MR. ZELLER:**  THIS DOCUMENT, WE HAVE JUST BEEN UNABLE

5    TO CONFIRM WHERE IT COME FROM, WHO GENERATED IT.                08:42

6           I WILL CERTAINLY POINT OUT TO THE COURT, WE DON'T

7    TAKE THESE THINGS LIGHTLY.  I MEAN, THERE ARE ONLY TWO

8    DOCUMENTS THAT FALL INTO THIS CATEGORY.

9           **THE COURT:**  IS THIS A MATTEL -- YOU CAN PROBABLY TELL

10   FROM THE LOOK OF THE STRUCTURE OF THIS.                        08:42

11          **MR. ZELLER:**  WE CAN'T TELL THAT, YOUR HONOR.

12          PART OF THE ISSUE HERE IS THAT, OBVIOUSLY, WE WERE

13   NOT GIVEN A LOT OF NOTICE ABOUT ANY OF THESE DOCUMENTS; AND IN

14   PARTICULAR, THIS ONE, WE HAVE JUST HAD DIFFICULTY TRYING TO

15   ASCERTAIN WHAT IT IS AND TRACKING IT DOWN.                     08:42

16          SO FAR, THERE'S DOESN'T HAVE INDICIA TO US OF WHAT

17   GROUP IT CAME OUT OF, WHO GENERATED IT.  THERE'S NO IDENTIFYING

18   INFORMATION ON IT.  THAT'S PART OF THE PROBLEM.  SO WE DON'T

19   KNOW ABOUT THE BONA FIDES OF THIS DOCUMENT.  IT MAY BE THAT

20   COME TUESDAY WE CAN SAY, IT'S ACCURATE IT'S INACCURATE,        08:43

21   WHATEVER THIS THING IS.  BUT AT LEAST GIVEN THE AMOUNT OF TIME

22   THAT WE HAVE HAD, THIS PARTICULAR DOCUMENT, WE'RE JUST UNABLE

23   TO ASCERTAIN WHAT IT IS, WHETHER IT'S GENUINE.

24          AND I'LL ALSO POINT OUT, YOUR HONOR, FOR THE PURPOSE

25   FOR WHICH THIS IS BEING OFFERED, THIS IS SOMEWHAT CUMULATIVE.  08:43

```
 1   THERE WAS BOAT LOADS OF EVIDENCE PRODUCED, INCLUDING BY
 2   ANNA RHEE, IN RESPONSE TO A SUBPOENA, ABOUT WHAT SHE WAS PAID.
 3   THERE ARE OTHER DOCUMENTS IN THERE, AND THERE IS OTHER EVIDENCE
 4   THAT PERTAINS TO THIS; AND THAT'S WHY IT'S A LITTLE STRANGE TO
 5   US THAT THIS IS THE DOCUMENT THAT IS BEING PROPOSED.          08:43
 6          THE COURT:  IS THERE ANY QUESTION THAT ANNA RHEE,
 7   IN 2000 -- 2002 WAS PAID $200,000?
 8          MR. ZELLER:  I BELIEVE THERE IS, YOUR HONOR.  THAT'S
 9   PART OF THE PROBLEM.  FROM WHAT WE CAN SEE FROM OTHER
10   DOCUMENTS, IT WOULD NOT BE THIS ROUND NUMBER.  IT IS NOT A --  08:43
11          THE COURT:  WHAT IS IT, APPROXIMATELY?
12          MR. ZELLER:  I WOULD HAVE TO GET THE NUMBER.  IT IS
13   CONSIDERABLE, THERE'S NO DOUBT, BUT I DON'T THINK IT REACHED
14   $200,000.  BUT THE ACTUAL AMOUNTS ARE SOMETHING THAT ARE
15   DOCUMENTED IN OTHER RECORDS.  YOU'LL NOTICE THAT ALL OF THESE   08:44
16   THINGS ARE JUST THESE ROUND NUMBERS.
17          BY THE WAY, THIS SAYS "BUDGET."  IT DOESN'T SAY THIS
18   IS WHAT PEOPLE HAVE BEEN PAID.  THESE ARE ALLOCATED AMOUNTS.
19          THE COURT:  WELL, ACTUALLY, THE FIRST TWO PAGES
20   APPEAR -- WELL, THE SECOND PAGE IS BLANK, BUT THE FIRST PAGE   08:44
21   DOES APPEAR TO BE A BUDGET.  AND I CAN'T IMAGINE, UNLESS IT WAS
22   REALLY AMAZING AND THE STARS AND PLANETS WERE LINED UP -- THE
23   FIRST PAGE WAS A BUDGET, BUT THE THIRD PAGE APPEARS TO BE
24   ACTUAL AMOUNTS SPENT.
25          MR. ZELLER:  CORRECT.                                  08:44
```

1      THE COURT:  YOU LINE THESE UP IN A SPREADSHEET FORM,

2  AND IT APPEARS THAT ANNA RHEE, OF THE BUDGET OF $200,000,

3  YEAR-TO-DATE AS OF -- WELL, 2001 ACTUAL SPENT WAS $163,692, AND

4  IT APPEARS THAT SOMEONE WAS BUDGETING TO PAY HER $200,000 IN

5  2002.                                                            08:45

6      UNLIKE THE PICTURE, I'M ACCEPTING YOUR PROFFER THAT

7  THERE'S OTHER DOCUMENTS WHICH SUBSTANTIATE THIS.  THIS IS NOT

8  SOMETHING WHICH APPEARS TO BE A MISTAKE.  YOU JUST DON'T KNOW

9  WHO DID THIS.

10      IS THAT CORRECT?                                            08:45

11      MR. ZELLER:  WELL, I ACTUALLY -- CERTAINLY, THE

12  SECOND PART IS CORRECT.

13      THE COURT:  ARE YOU IN A POSITION TO DISPUTE THAT AS

14  OF 2001, $163,692.20 WAS ACTUALLY PAID TO HER?  AS OF MAY 7,

15  2002, IT APPEARS THAT $35,330 WAS PAID; AND THE BALANCE AS OF   08:45

16  THAT DATE, ON THE BUDGET, WAS $164,669.23, AND THE TOTAL

17  BUDGETED AMOUNT WAS $200,000.

18      IS THERE ANY REASON TO DISPUTE THOSE NUMBERS?

19      MR. ZELLER:  GIVEN THE AMOUNT OF TIME WE'VE HAD, I

20  CAN'T SAY ONE WAY OR THE OTHER, JUDGE.                          08:46

21      THE COURT:  I THINK, GIVEN THIS CASE, THAT I'M GOING

22  TO IMPOSE AN OBLIGATION ON MATTEL TO FIND OUT.

23      MR. ZELLER:  WE WILL LOOK INTO IT, YOUR HONOR; BUT

24  THIS RAISES THE SECOND ISSUE.  THIS COMES UNDER THE

25  FAIR-IS-FAIR HEADING.                                           08:46

1          THE COURT SAID AT LEAST A COUPLE OF TIMES -- AND THIS

2     IS THE RULE THAT WAS APPLIED TO US -- IF AUTHENTICITY IS NOT

3     STIPULATED TO, IT DOES NOT COME IN THROUGH THE CUSTODIAN OF

4     RECORDS.  THEY HAVE TO HAVE AN AUTHENTICATING WITNESS.  THAT IS

5     SOMETHING THE COURT HAS SAID; THAT WAS THE POSITION THAT MGA          08:46

6     TOOK; AND THAT'S THE RULE THAT NEEDS TO APPLY TO THIS DOCUMENT.

7          I HEAR WHAT THE COURT IS SAYING, AND WE CERTAINLY

8     DON'T TAKE THIS LIGHTLY.  AND IF COME TUESDAY, WE CAN CONFIRM

9     WHAT THIS IS, WE KNOW WHERE IT CAME FROM, THAT IT'S A MATTEL

10    DOCUMENT, WE WILL STIPULATE TO ITS AUTHENTICITY.  THAT'S NOT AN       08:46

11    ISSUE.  BUT GIVEN, OBVIOUSLY, THE USE THAT THEY WANT TO MAKE OF

12    THIS DOCUMENT, OUR LACK OF KNOWLEDGE OF IT, GIVEN THE TIME

13    PERIOD THAT WE HAVE, WE ARE STANDING ON THAT OBJECTION RIGHT

14    NOW.

15          **THE COURT:**  VERY WELL.                                      08:47

16          I TRUST THERE'S NO PREJUDICE IF WE WAIT UNTIL

17    TUESDAY.  I TRUST WE'LL HAVE THIS RESOLVED BY THEN.  IF NOT,

18    THE COURT WILL RESERVE ITS RIGHT TO IMPOSE WHATEVER REMEDIES IT

19    FEELS IS APPROPRIATE AT THAT TIME.

20          **MR. NOLAN:**  THANK YOU.                                      08:47

21          **THE COURT:**  MR. ZELLER, YOU'LL REPORT BACK TO THE

22    COURT, THEN, ON WHAT YOU FIND OUT ABOUT THIS DOCUMENT.

23          THE OTHER DOCUMENT, THOUGH, THE COURT IS GOING TO

24    SUSTAIN MATTEL'S OBJECTION.

25          AND THE REMAINDER OF THE DOCUMENTS WHICH HAVE BEEN              08:47

1    STIPULATED TO AUTHENTICITY, MATTEL WILL PROVIDE A CUSTODIAN OF

2    RECORDS ON THAT.  THE TWO STIPULATED DOCUMENTS, I'LL LEAVE THAT

3    TO MGA TO INTRODUCE THOSE WHEN THEY WISH.

4            LET'S TAKE UP THE ISSUE OF MR. KILPIN.

5        **MR. NOLAN:**  YOUR HONOR, VERY BRIEFLY --                08:47

6        **THE COURT:**  I'M EMBARRASSED TO SAY I LEFT MY E-MAIL

7    AT HOME.

8            DOES SOMEONE HAVE ANOTHER COPY OF THAT E-MAIL?

9        **MR. NOLAN:**  YES, WE DO.

10       (DOCUMENT PROVIDED TO THE COURT.)                         08:48

11       **THE COURT:**  VERY WELL.  YES.

12       **MR. NOLAN:**  NOT TO REPEAT, BUT JUST TO PUT THIS IN

13   CONTEXT, AND I JUST WANTED TO MAKE ONE FINAL POINT ON WHY I

14   BELIEVE THAT MR. KILPIN SHOULD BE REQUIRED TO TAKE THE STAND

15   AND TESTIFY AS TO SEVERAL CONTENTS THAT ARE CONTAINED IN        08:48

16   VARIOUS MARKETING REPORTS THAT HE PREPARED AND CIRCULATED AS

17   HEAD OF -- OR EITHER HE PREPARED OR WAS PREPARED UNDER HIS

18   SUPERVISION AND THAT HE REVIEWED AND THAT HE AUTHORIZED THE

19   DISTRIBUTION OF.  AND THEY GO TO QUESTIONS THAT INCLUDE -- AND

20   I'LL GET TO THIS E-MAIL IN JUST A MOMENT -- THE 'HOUSE ON       08:49

21   FIRE'; BARBIE IS A 'BRAND IN CRISIS.'  AND THE REASON WHY I

22   WANT TO RAISE THIS AGAIN IS THAT, ALTHOUGH YOU LIMITED ME TO --

23   I DON'T MEAN THAT IN A BAD WAY, BUT THE TESTIMONY WITH

24   MR. ECKERT WAS LIMITED WITH RESPECT TO HIS IMPRESSION AT THE

25   TIME THAT HE GOT TO MATTEL.                                     08:49

```
 1              THE COURT:  I DID LIMIT YOU.  I RULED ON A MOTION
 2   IN LIMINE BEFORE TRIAL, AND THE COURT HAS NOT CHANGED ITS
 3   POSITION ON THAT.
 4              MR. NOLAN:  I DIDN'T MEAN THAT IN A NEGATIVE WAY.
 5              THE COURT:  NOT TAKEN AS SUCH.                        08:49
 6              MR. NOLAN:  WE TALKED EXTENSIVELY, THOUGH, ABOUT,
 7   'THAT'S MATTEL, AND THAT WAS MATTEL-BASHING'; THAT'S HOW IT WAS
 8   DESCRIBED.
 9              THE COURT:  YES.  I DON'T WANT MGA-BASHING, AND I
10   DON'T WANT MATTEL-BASHING.                                      08:50
11              MR. NOLAN:  IN ANY EVENT, I THINK BOTH COUNSEL WOULD
12   CONSIDER THAT THE EVIDENCE THAT CAME IN WAS SLIGHTLY OF THAT
13   NATURE.
14              THE COURT:  THERE HAS BEEN SOME SLIGHT EVIDENCE TO
15   THAT NATURE.  I'VE TRIED TO KEEP IT TO A MINIMUM.  THAT'S WHERE  08:50
16   I'M AT.
17              MR. NOLAN:  THE EVIDENCE, THOUGH, IN THIS CASE,
18   STARTING WITH THE WAY THAT MR. QUINN SET THE STAGE IN HIS
19   OPENING STATEMENT AND THEN CONFIRMED THROUGH THE TESTIMONY OF
20   IVY ROSS AND CASSIDY PARK, WAS THAT THE BARBIE DOLL, THE BARBIE  08:50
21   ITSELF, NOT LIMITED TO 2000, WAS A DOLL THAT WAS HUGELY
22   SUCCESSFUL, WITH INNOVATIONS YEAR AFTER YEAR AFTER YEAR;
23   MILLIONS OF DOLLARS SPENT ON IT BY A CREATIVE AND INNOVATIVE
24   TEAM.  THE CONTRAST TO MGA WAS THAT WE COULDN'T DO ANYTHING; WE
25   WERE THE GANG THAT COULDN'T SHOOT STRAIGHT, AND THAT WE HAD TO   08:50
```

1    STEAL THE DESIGN.

2           IVY ROSS WAS ASKED AT PAGE 283 BY MR. QUINN:

3           QUESTION:  "WAS BARBIE SOMETHING THAT JUST EVERY YEAR

4    YOU CRANKED OUT A NEW VERSION OF THE SAME THING?  DID BARBIE

5    EVOLVE?"

6           NO TIME LIMITATION WAS PUT ON THIS.

7           AT PAGE 283, ON MAY 27TH, MR. QUINN ASKED IVY ROSS

8    WHETHER OR NOT MATTEL CAME OUT WITH NEW DOLLS EVERY YEAR, AND

9    SHE IDENTIFIED THAT, IN FACT, THEY DID.  SHE IDENTIFIED

10   MY SCENE AS BEING A DOLL THAT THEY CREATED IN TERMS OF HOW THE    08:51

11   BARBIE BRAND EVOLVED.

12          AGAIN, NO TIME LIMITATION.

13          WE KNOW THAT ONCE THEY GO IN AND THAT THEY HAVE

14   INTRODUCED MY SCENE INTO THE MARKETPLACE, WE'RE INTO THE 2003

15   TIME PERIOD.  IT WAS THE TESTIMONY OF IVY ROSS THAT THAT WAS AN   08:51

16   EXAMPLE OF THE CONSTANT INTERVENTION OF BARBIE.

17          THEN AT PAGE 285, HE ASKED IVY ROSS WHETHER OR NOT

18   MATTEL MADE DOLLS OTHER THAN BARBIE AND TO PROVIDE EXAMPLES AND

19   WHETHER OR NOT THEY WERE TIED TO A PARTICULAR AGE GROUP.

20          THEN AT PAGE 403, WE HAD DISCUSSIONS, EXTENSIVE           08:52

21   DISCUSSIONS, REGARDING, AGAIN, THE INTRODUCTION OF DOLLS

22   THROUGH IVY ROSS, AND IVY ROSS WAS TESTIFYING ABOUT HOW

23   COLLABORATIVE IT WAS, WHAT A SUCCESSFUL OPERATION IT WAS.  AND

24   SHE TESTIFIED AT PAGE 412 AND 413 THAT COLLABORATION WITHIN

25   MATTEL IS HUGE AND HAS BEEN SINCE ROSS STARTED WORKING AT        08:52

1    MATTEL.

2            NOT LIMITED TO 2000.

3            AT PAGE 294, AGAIN, MR. QUINN ASKED ROSS WHETHER OR

4    NOT IT WAS PART OF HER JOB TO PROMOTE CREATIVITY IN THE DESIGN

5    CENTER.                                                              08:53

6            AGAIN, NO TIME LIMITATION.

7            THERE WAS TESTIMONY AT PAGE 295, ASKED ABOUT WHETHER

8    MATTEL DEVELOPED ANY PARTICULAR PROGRAMS OR APPROACHES IN ORDER

9    TO PROMOTE NEW IDEAS.

10           AGAIN, NO TIME LIMITATION.                                   08:53

11           PAGE 285, TESTIMONY WITH RESPECT TO BLUE SKY SLOTS.

12   THE COURT MAY RECALL THE REFERENCE TO BLUE SKY SLOTS.  AGAIN,

13   ROSS TESTIFIED AS TO VARIOUS WAYS SHE AND MATTEL ALLOWED

14   DESIGNERS TO COME IN AND OPEN THEIR OWN IDEAS.

15           NO LIMITATION PUT ON THAT.                                   08:53

16           DURING THE CROSS-EXAMINATION OF IVY ROSS, I ASKED HER

17   SPECIFIC QUESTIONS ABOUT TIM KILPIN, WHO WAS HER BOSS.  "DID

18   TIM KILPIN EVER TELL YOU THAT THE BRAND WAS IN CRISIS?"

19           I ADMIT THAT I DIDN'T ASK WHETHER OR NOT IT WAS

20   DESCRIBED AS 'HOUSE ON FIRE,' BUT I DID ASK ABOUT 'BRAND IN         08:53

21   CRISIS.'

22           AN OBJECTION WAS ASSERTED.  IT WAS OVERRULED.  AT

23   THAT POINT, THE COURT SAID TO COUNSEL AT SIDE-BAR, BECAUSE

24   THERE WAS A CONFERENCE -- MR. QUINN WAS COMPLAINING.  AND AT

25   PAGE 349, YOU SAY -- WE'RE TALKING ABOUT HOW FAR IVY ROSS          08:54

1    OPENED THE DOOR, AND I SAID WORDS TO THE EFFECT, AT LINE 7,

2    "THIS SEEMS TO ME TO BE REALLY PUSHING THE ENVELOPE.  I DON'T

3    THINK IT'S FAIR FOR ME TO HAVE TO BE OBJECTING IF MR. QUINN IS

4    PUSHING THE ENVELOPE TO AN AREA WHERE WE HAD WANTED THAT

5    EVIDENCE IN BUT IT WAS RULED OUT.  I WANTED TO HAVE AN                    08:54

6    OPPORTUNITY TO DEVELOP IT.  IT SEEMS TO ME THAT COUNSEL KNOWS

7    THE BRIGHT LINE TEST THAT THE COURTS HAVE APPROVED IN THIS CASE

8    THROUGH THE MOTIONS *IN LIMINE*."

9         AND THE COURT RESPONDED, "COUNSEL, YOU CAN CERTAINLY

10   REBUT ANY EVIDENCE THAT MR. QUINN OFFERS."                                08:54

11        THEN IT GOES ON.  AGAIN, NOW AT PAGE 350, THERE'S A

12   COLLOQUY AT SIDE-BAR, AND THE COURT SAYS, "I DON'T KNOW WHAT

13   WE'RE GOING TO HEAR AND WHAT WE'RE NOT.  IT IS A MOVING TARGET

14   IN A CERTAIN SENSE, AND YOU BASICALLY DEFINE HOW FAR THAT

15   GOES."

16        THAT COMMENT WAS DIRECTED TO MR. QUINN.

17        "TO THE EXTENT THAT YOU INTRODUCE EVIDENCE ABOUT

18   BARBIE AND THE BARBIE LINE AND ABOUT WHAT WAS GOING ON IN

19   INNOVATIONS, MR. NOLAN CAN RESPOND TO THAT.  IT'S KIND OF IN

20   YOUR HANDS AT THIS POINT.  YOU HAVE THE COURT'S INITIAL RULING          08:55

21   ABOUT MOTIVE AND THE COURT'S INITIAL RULING ABOUT BARBIE BEING

22   IRRELEVANT, BUT TO THE EXTENT YOU PUSH THAT OUT, MR. NOLAN CAN

23   COME IN AND FILL IT BACK IN."

24        SO THE QUESTIONS TO IVY WERE ON MAY 28TH, PAGE 406.

25   I ASKED HER, "DID MR. KILPIN EVER TELL YOU THAT HE THOUGHT THE          08:55

1    BARBIE BRAND WAS A BRAND IN CRISIS?"

2        THAT'S AT LINES 6 THROUGH 8.

3        AND HER ANSWER WAS, "I DON'T REMEMBER HIM EVER SAYING

4    THAT."

5        AND THEN AT 406 -- AND THIS IS THE ONE THAT YOU                    08:55

6    OVERRULED THE RELEVANCE OBJECTION BECAUSE -- AND THIS IS BACK

7    ON MAY 28TH.  I DON'T EVEN REMEMBER MAY 28TH.  IT SEEMS SO FAR

8    BEHIND, YOUR HONOR.

9        **THE COURT:**  IT DOES SEEM A LONG TIME AGO.

10       **MR. NOLAN:**  BUT IT'S INTERESTING, AT THE END OF THE           08:56

11   CASE, THINGS SEEM TO BE SOMETIMES MORE NARROWER THAN THEY WERE

12   WHEN THEY OPENED UP.

13       BUT I THINK IT'S HELPFUL TO GO BACK.

14       QUESTION:  "DID MR. KILPIN EVER TELL YOU THAT HE

15   THOUGHT THAT MATTEL HAD BEEN OUT THOUGHT AND OUT EXECUTED?"          08:56

16       MR. QUINN OBJECTED.

17       THE COURT OVERRULED.  "YOU MAY ANSWER."

18       AND SHE ANSWERS, "NO, I DON'T REMEMBER HIM EVER

19   TELLING ME THAT."

20       BUT NEVERTHELESS, IVY ROSS WAS WORKING FOR                       08:56

21   MR. KILPIN; AND, IN FACT, THAT WAS MR. KILPIN'S STATEMENT IN

22   MARKETING REPORTS THAT HE OFFERED.

23       **THE COURT:**  VERY GOOD.

24       I'M TRYING TO HOLD THE LINE, AND I WOULD HAVE

25   PREFERRED IF MR. QUINN HAD NOT GOTTEN INTO ANY OF THIS.  I          08:57

```
 1   SUSPECT THE BASIS TO DO SO IS, IN PART, ATTRIBUTABLE TO YOUR
 2   OPENING STATEMENT AND THE STRATEGY THAT MGA HAS TAKEN, AT
 3   LEAST.  AND THERE'S BEEN SOME EVIDENCE TO THE EFFECT OF
 4   SOMETHING ELSE THAT I DON'T THINK IS NECESSARILY ALL THAT
 5   RELEVANT; AND THAT'S THIS ISSUE OF WHETHER OR NOT CARTER BRYANT    08:57
 6   COULD EVER HAVE GOTTEN MATTEL TO BUY HIS IDEA AND THAT SOMEHOW
 7   THAT'S A RATIONALIZATION OR A JUSTIFICATION FOR BREACHING HIS
 8   DUTY OF LOYALTY OR HIS FIDUCIARY RELATIONSHIP OR HIS CONTRACT.
 9   ALL OF THIS SHOULD STAY OUT.  AND I KNOW IT HOVERS IN THE
10   BACKGROUND OF ALL OF THIS, AND I AM TRYING TO KEEP IT ALL OUT.    08:57
11        BUT WHAT DID CLEARLY COME IN FROM A SERIES OF
12   QUESTIONS FROM MR. QUINN, BOTH IN HIS OPENING STATEMENT AND HIS
13   QUESTIONS TO IVY ROSS, IS JUST, AS YOU POINT OUT, KIND OF THE
14   CREATIVE PROCESS INVOLVING BARBIE.  DID BARBIE EVOLVE?  DID
15   MATTEL COME OUT WITH NEW DOLLS?  THE COLLABORATIVE ENVIRONMENT;   08:58
16   THE NEW APPROACHES; OPEN TO NEW IDEAS.  THAT DOOR WAS CLEARLY
17   OPENED.  I THINK MR. QUINN WOULD HAVE TO ACKNOWLEDGE THAT.
18   I'LL HEAR FROM HIM IN A MOMENT.  AND I DID INDICATE AT
19   SIDE-BAR, AND I'LL REINDICATE NOW, THAT YOU CAN CERTAINLY REBUT
20   THAT.  AND I BELIEVE THAT I'VE GIVEN YOU SOME LATITUDE IN        08:58
21   REBUTTING THAT.
22        ARGUABLY, I THINK, I'VE PROBABLY GIVEN YOU TOO MUCH
23   LATITUDE, BECAUSE I'VE ALLOWED TO GET IN THE QUESTION ABOUT A
24   'BRAND IN CRISIS' AND THE 'OUT THOUGHT AND OUT EXECUTED',
25   ALTHOUGH I THINK IT'S FAIR ENOUGH.  THAT DOES RELATE TO THE      08:58
```

```
 1   WHOLE NATURE OF, IS SPECIFICALLY THE BARBIE DOLL EVOLVING?  IS

 2   IT SOMETHING WHICH IS OPEN TO NEW IDEAS?

 3         TO GO BEYOND THAT, THOUGH, AND WHAT I OBJECTED TO

 4   YESTERDAY AND WHAT I THINK GOES BACK TO THE HEART OF THE MOTION

 5   IN LIMINE ARE THE MORE -- AND THIS IS -- I'VE SHORTENED IT BY      08:59

 6   SAYING ATTACKS ON MATTEL -- THE MORE BROAD-BASED 'HOUSE ON

 7   FIRE,' 'MATTEL'S IN CRISIS' -- I MEAN, THIS, AS WE'VE HEARD

 8   FROM MR. ECKERT -- I MEAN, THERE ARE A NUMBER OF THINGS GOING

 9   ON AT MATTEL ENTIRELY UNRELATED TO THE TOY BUSINESS THAT MAY OR

10   MAY NOT ACCOUNT FOR CONCLUSIONS THAT INVESTORS AND OTHERS ARE     08:59

11   REACHING ABOUT MATTEL.  AND THAT IS THE BROAD BRUSH UPON WHICH

12   I'M GOING TO CONTINUE TO INSIST THAT DOES NOT COME IN.

13         THERE'S PARTICULAR OPENINGS THAT HAVE BEEN MADE HERE.

14   THE COURT HAS GIVEN YOU LEAVE TO ASK CERTAIN QUESTIONS, WHICH

15   YOU HAVE ASKED; BUT I'M NOT GOING TO ALLOW THE LEAVE THAT I       08:59

16   HAVE GIVEN YOU TO BASICALLY JUSTIFY A FURTHER OPENING OF THE

17   DOOR.

18         NOW, TO CIRCLE BACK AROUND AND TO IMPEACH IVY ROSS

19   WITH THE 'BRAND IN CRISIS' AND THE 'OUT THOUGHT AND OUT

20   EXECUTED' QUESTIONS WHICH HAVE ALREADY COME IN IS PROBABLY FAIR   09:00

21   GAME.  I DO WANT TO GIVE MATTEL A CHANCE TO RESPOND TO THAT.

22         BEYOND THAT, NO.

23       MR. NOLAN:  I UNDERSTAND THAT, YOUR HONOR.

24       THE COURT:  IS THAT UNDERSTOOD?

25       MR. NOLAN:  COMPLETELY.                                       09:00
```

1        **THE COURT:**  VERY GOOD.

2        **MR. NOLAN:**  WITH RESPECT TO THIS ONE LAST POINT, ALL

3   OF THESE QUESTIONS TO MR. KILPIN ARE NOT DIRECTED TO MATTEL AS

4   A WHOLE.  MR. KILPIN'S RESPONSIBILITY WAS LIMITED SIMPLY TO THE

5   BARBIE DOLL LINE.                                          09:00

6        **THE COURT:**  RIGHT.  BUT THAT'S WHY THIS E-MAIL IS NOT

7   COMING IN, BECAUSE THIS GOES TO -- FIRST OF ALL, IT'S 2004;

8   IT'S TALKING ABOUT THAT BARBIE IS DOWN 39 PERCENT, BRATZ IS UP

9   180 PERCENT.  I MEAN, THIS MAY BE RELEVANT TO THINGS IN THE 1-B

10  AND PHASE 2 OF THE TRIAL, BUT THIS IS NOT RELEVANT TO WHAT     09:00

11  CARTER BRYANT DID WHILE HE WAS WORKING AT MATTEL.

12        THE ISSUE OF WHAT HE WAS ABLE TO DO WHILE WORKING AT

13  MATTEL, VIS-À-VIS THE BARBIE LINE, HAS BEEN MADE RELEVANT

14  LARGELY BY QUESTIONS THAT MR. QUINN HAS BEEN OPEN TO.  BUT ONCE

15  WE GET WAY BEYOND THAT, THAT'S JUST NOT RELEVANT, COUNSEL.  AND   09:01

16  I UNDERSTAND WHY YOU WANT TO GET THIS IN, BUT I CAN'T SEE ANY

17  LEGITIMATE BASIS TO GET THESE LATE THINGS IN, THESE ISSUES OF

18  THESE MARKETING PLANS, TO THE EXTENT THEY GO BEYOND BARBIE AT

19  OR BEFORE THE RELEVANT TIME PERIOD.

20        **MR. NOLAN:**  BUT I ASKED MS. ROSS WHETHER OR NOT      09:01

21  MR. KILPIN EVER TOLD HER THAT THE BRAND WAS IN CRISIS, AND SHE

22  DENIED THAT.

23        **THE COURT:**  RIGHT.

24        **MR. NOLAN:**  IN FACT, MR. KILPIN'S IMPRESSION WAS THAT

25  THE BRAND WAS IN CRISIS.  I WON'T SHOW THE MARKETING REPORTS.   09:01

```
 1              COULD I ASK MR. KILPIN, "ISN'T IT TRUE THAT YOU
 2   BELIEVED THAT THE BARBIE BRAND WAS IN A STATE OF CRISIS?"
 3         THE COURT:  WHEN?
 4         MR. NOLAN:  WHILE HE WAS IN CHARGE OF THE DIVISION,
 5   FROM THE PERIOD STARTING FROM THE TIME HE CAME OVER FROM DISNEY    09:01
 6   IN 2003 TO THE TIME THAT HE WAS MOVED OVER TO THE BOYS'
 7   DIVISION.
 8         THE COURT:  I LET THAT QUESTION -- WHY IS IT RELEVANT
 9   IF THE BRAND WAS IN CRISIS IN 2003 AND 2004?
10              I DID LET THAT IN.  AND I'M STARTING TO THINK I MADE    09:02
11   A BIG MISTAKE WHEN I DID THAT.  NOT A BIG MISTAKE, FOR
12   APPELLATE PURPOSES, BUT JUST FOR -- AND THAT'S NOT AN ABUSE OF
13   DISCRETION, BUT --
14         MR. NOLAN:  WITH ALL DUE RESPECT, YOUR HONOR, I THINK
15   YOU WERE REACTING TO --                                           09:02
16         THE COURT:  I WAS.  I WAS TRYING TO RIGHT THE TABLE.
17         MR. NOLAN:  AND IT'S MY CASE NOW.  THE FACT THAT IT
18   TOOK SO LONG TO GET TO MY CASE IS NOT MY FAULT.
19         THE COURT:  THAT'S NOT EVEN AN ISSUE AT THIS POINT.
20         MR. NOLAN:  BUT I SHOULD BE ABLE TO GO BACK AND REBUT    09:02
21   THE EVIDENCE THAT WAS INTRODUCED BY MR. QUINN.
22         THE COURT:  YES.  YOU CAN REBUT THE EVIDENCE THAT WAS
23   INTRODUCED BY MR. QUINN.  BUT YOU CAN'T BOLSTER THE EVIDENCE
24   THAT WAS INTRODUCED; YOU CAN'T USE YOUR OWN QUESTIONS TO
25   FURTHER OPEN THE DOOR.  AND IF THE 'BRAND IN CRISIS' QUESTION    09:02
```

```
 1   -- WHICH, AT THE TIME I HEARD THE QUESTION, I DON'T THINK THERE
 2   WAS AN OBJECTION ON TIME FRAME GROUNDS -- I WOULD HAVE TO
 3   CHECK; I'M SURE SOMEONE HAS THE TRANSCRIPT SOMEPLACE -- BUT I
 4   WAS NOT FOCUSED ON THE FACT THAT WAS A QUESTION RELATED TO
 5   2003, 2004.  I WAS ASSUMING THAT WAS RELATED TO THE RELEVANT        09:03
 6   TIME FRAME WHEN I PERMITTED THAT IN, TO TRY TO RIGHT THE BOAT
 7   ON THESE OTHER QUESTIONS.  BUT IF THIS IS CLEARLY BASED ON
 8   2003, 2004, HOW IS THAT RELEVANT?
 9        MR. NOLAN:  I'M BEATING A DRUM, AND I APOLOGIZE,
10   YOUR HONOR.                                                        09:03
11        THE COURT:  I DO WANT TO HEAR.  IS THERE A REASON WHY
12   THAT WOULD BE RELEVANT, 2003 OR 2004 WOULD BE RELEVANT?
13        MR. NOLAN:  IT IS, BECAUSE I NEED TO ADDRESS THE
14   EVIDENCE THAT THEY HAVE INTRODUCED INTO THIS CASE SHOWING THAT
15   BARBIE WAS IN A CONSTANT EVOLUTION, INNOVATIVE PROCESS, EVEN       09:03
16   THROUGH 2003, EVEN THROUGH 2004, WITHOUT ANY TIME LIMITATION.
17        THERE WAS NO TIME LIMITATION IMPOSED EITHER IN THE
18   OPENING STATEMENT OR IN ANY OF MR. QUINN'S QUESTIONS.
19        THE COURT:  THAT DOESN'T ANSWER THE QUESTION AT ALL,
20   MR. NOLAN, AS TO HOW ANY OF THE INFORMATION, ANY OF THE           09:04
21   EVIDENCE -- AND I'LL INSTRUCT THE JURY, IF BOTH SIDES WANT ME
22   TO, THAT WHAT YOU HAVE HEARD ABOUT WHAT WAS GOING ON AT MATTEL
23   IN 2003 AND 2004 IS COMPLETELY IRRELEVANT TO THIS PHASE OF THE
24   TRIAL.  I'LL INCLUDE 2002 AND 2008 IN THAT INSTRUCTION AS WELL.
25   BUT I'M NOT GOING TO SIT HERE NOW AND OPEN THE DOOR FOR           09:04
```

1  EVIDENCE RELATED TO A TIME FRAME THAT HAS NOTHING TO DO WITH

2  IT.

3            I UNDERSTAND THAT EVERY QUESTION THAT'S ASKED DOES

4  NOT NECESSARILY SPECIFY THE TIME FRAME.  IF WE DID THAT, WE

5  WOULD PROBABLY DOUBLE THE LENGTH OF THIS TRIAL.  THE COURT WAS        09:04

6  ASSUMING, WHEN THESE QUESTIONS WERE BEING ASKED BY YOU AND

7  MR. QUINN, THAT WE WERE FOCUSING ON THE RELEVANT TIME PERIOD IN

8  QUESTION.  AND I RELIED ON YOU, COUNSEL, AS YOU DID MANY TIMES,

9  AND AS MR. QUINN DID MANY TIMES, TO OBJECT WHEN YOU THOUGHT THE

10  TIME FRAME WAS INAPPROPRIATE.  AND I SUSTAINED A WHOLE BUNCH OF       09:04

11  THOSE OBJECTIONS AND FORCED YOU AND FORCED MR. QUINN AND

12  MR. PRICE TO REPHRASE THE QUESTION WITH THE APPROPRIATE TIME

13  FRAME.

14            NOW, IF SOME QUESTIONS WENT UNDETECTED BY YOU OR

15  UNDETECTED BY MR. QUINN AND MR. PRICE THAT DID NOT HAVE AN           09:05

16  APPROPRIATE TIME FRAME ON IT, YOU'VE WAIVED THOSE OBJECTIONS,

17  BOTH SIDES --  NOW I'M SAFE FOR PURPOSES OF APPEAL --  AND I'M

18  NOT GOING TO USE THAT WAIVER AT THIS POINT TO OPEN THE DOOR FOR

19  INFORMATION AND EVIDENCE FROM 2003 AND 2004.  IT IS JUST NOT

20  RELEVANT.                                                           09:05

21            **MR. NOLAN:**  I'VE MADE MY PROFFER, YOUR HONOR.  I

22  APPRECIATE THE COURT'S COMMENTS.

23            **THE COURT:**  I MADE MY RULING.

24            **MR. NOLAN:**  I APPRECIATE THE TIME THAT YOU'VE ALLOWED

25  FOR ME.

```
 1            I WILL REPRESENT THAT MR. KILPIN DID NOT GO TO WORK

 2    AT MATTEL UNTIL -- I BELIEVE IT WAS LATE 2003, SO HE CLEARLY

 3    FALLS, AS I UNDERSTAND, BEYOND THE TIME PERIOD THAT YOU --

 4            THE COURT:  AND STRICTLY FOR PURPOSES OF IMPEACHMENT,

 5    I WILL ALLOW YOU TO ASK THE QUESTIONS, 'DID YOU EVER TELL

 6    IVY ROSS THAT IT WAS A BRAND IN CRISIS' AND THE 'OUT THOUGHT

 7    AND OUT EXECUTED,' BUT WE'RE NOT GOING ANY FURTHER BEYOND THAT.

 8    AND THAT'S SOLELY FOR IMPEACHMENT PURPOSES.  WE'RE NOT GOING TO

 9    GET INTO THE UNDERLYING DOCUMENTS TO PROVE THAT UP BECAUSE OF

10    THE COURT'S RULING ON RELEVANCE.

11            MR. NOLAN:  THANK YOU.

12            THE COURT:  VERY WELL.

13            MR. QUINN, I'VE MADE A RULING WITHOUT HEARING FROM

14    YOU AT ALL.

15            MR. QUINN:  MOVE FOR RECONSIDERATION.

16            YOUR HONOR, MR. NOLAN CAN'T CREATE HIS OWN

17    CIRCUMSTANCE FOR IMPEACHMENT.  THAT'S WHAT HE'S DOING HERE.  HE

18    ASKED A QUESTION ON A COLLATERAL, IRRELEVANT MATTER OF

19    MS. ROSS; AND SHE SAYS, 'I DON'T REMEMBER,' OR 'I NEVER HEARD

20    THAT,' AND NOW HE WANTS TO IMPEACH THAT.

21            THE COURT:  I AM FINDING THAT ULTIMATELY IT'S NOT

22    RELEVANT.

23            MR. QUINN:  BUT, YOUR HONOR, I THINK MR. NOLAN HAS

24    DONE HIS BEST NOW TO SCOUR THE RECORD AND CITE TO YOU GLOSSES

25    OF WHAT HE RECALLS THE TESTIMONY WAS SEVERAL WEEKS AGO, AND
```

09:05
09:06
09:06
09:06
09:06
09:06

```
 1   SUGGEST THAT I ELICITED SOME TESTIMONY SPECIFICALLY ABOUT

 2   BARBIE'S RESULTS OR ACHIEVEMENTS IN THESE YEARS.

 3            I SUBMIT THE RECORD DOES NOT SUPPORT THAT.

 4            THERE WAS TESTIMONY -- WHAT THEY'RE PIECING TOGETHER

 5   ARE LITTLE PIECES, LIKE 'CREATIVITY IS IMPORTANT,'             09:07

 6   'COLLABORATION IS IMPORTANT,' 'BARBIE HAS FOR DECADES BEEN THE

 7   LEADING FASHION DOLL.'

 8            THE COURT:  THAT WAS FROM YOUR OPENING STATEMENT.

 9            MR. QUINN:  IT WAS FROM MY OPENING STATEMENT.

10            THE COURT:  AND THAT'S WHY I THINK, OUT OF FAIRNESS,   09:07

11   JUST TO PUT THAT IN PERSPECTIVE, THE 'BRAND IN CRISIS'

12   STATEMENT IS PROBABLY -- I DO THINK YOU PUSHED OUTSIDE THE

13   ENVELOPE ON THAT IN YOUR OPENING STATEMENT.

14            LET ME ASK YOU THE SAME QUESTION:  HOW IS IT

15   RELEVANT?  HOW IS THAT STATEMENT THAT YOU --                   09:07

16            MR. QUINN:  IT WAS OPENING STATEMENT.  YOU TOLD THE

17   JURY --

18            THE COURT:  HOW IS THAT STATEMENT RELEVANT?

19            MR. QUINN:  I'M TRYING TO REMEMBER THE CIRCUMSTANCES

20   IN -- I THINK IT WAS --                                        09:08

21            THE COURT:  IT'S NOT.

22            MR. QUINN:  IT'S RELEVANT TO INTRODUCE MY CLIENT,

23   YOUR HONOR.  I THINK THE CONTEXT IN WHICH I SAID IT WAS, YOU

24   KNOW, 'MATTEL, LEADING BRAND, BARBIE, THE LEADING FASHION DOLL

25   FOR DECADES.'  AND IT WASN'T SOMETHING THAT I DWELLED ON OR     09:08
```

1    SAID ANYTHING MORE ABOUT.

2              IT'S LIKE, 'THIS IS MY CLIENT.  HERE'S THESE

3    PRODUCTS.  YOU'VE HEARD OF THEM.  OBVIOUSLY, THIS HAS BEEN THE

4    LEADING FASHION DOLL FOR A LONG TIME.'

5              **THE COURT:**  I THINK THERE'S MORE -- I THINK THAT          09:08

6    CARRIES MORE WEIGHT THAN A SIMPLE INTRODUCTION, AND I THINK

7    IT'S FAIR GAME FOR THAT WEIGHT TO BE COUNTERED, AS IT HAS BEEN,

8    AND NO MORE.

9              **MR. QUINN:**  YOUR HONOR, I THINK WE'RE RUNNING AFOUL

10   OF A BASIC RULE OF EVIDENCE HERE; THAT YOU CAN'T USE EXTRINSIC      09:08

11   EVIDENCE TO IMPEACH ON SOMETHING THAT'S MERELY COLLATERAL.

12             **THE COURT:**  I'M NOT PERMITTING THE EXTRINSIC

13   EVIDENCE -- WELL --

14             **MR. QUINN:**  IT IS EXTRINSIC, YOUR HONOR.

15             AND MS. ROSS IS ON THE STAND.  IT'S A COLLATERAL          09:09

16   ISSUE.  'DID HE EVER TELL YOU IT'S A BRAND IN CRISIS,' OR 'DID

17   HE EVER TELL YOU THEY WERE OUT THOUGHT OR OUT EXECUTED?'  SHE

18   SAYS, 'I DON'T KNOW,' OR 'I DIDN'T.'

19             AND NOW THEY WANT TO CALL HIM, A MAN WHO DIDN'T JOIN

20   UNTIL 2003, AND IMPEACH ON A COLLATERAL MATTER BECAUSE I SAID      09:09

21   IN OPENING STATEMENT THAT BARBIE HAS BEEN FOR DECADES THE

22   LEADING FASHION DOLL?

23             **THE COURT:**  IT'S MORE THAN THAT, AND YOU DID GET

24   INTO, AS MR. NOLAN POINTS OUT, 'DID BARBIE EVOLVE,' 'DID MATTEL

25   COME OUT WITH NEW DOLLS?'  YOU DISCUSSED MY SCENE, WHICH CAME      09:09

```
 1   OUT IN WHAT YEAR?

 2            WHAT YEAR DID MY SCENE COME OUT?

 3            MR. QUINN:  A LITTLE HELP ON THIS...

 4            MR. NOLAN:  2002, YOUR HONOR.

 5            MR. QUINN:  DID I DISCUSS MY SCENE?  I DON'T THINK I      09:09

 6   DID.  THEY TRIED TO BRING IT UP.  WE DON'T TALK ABOUT MY SCENE.

 7            THE COURT:  MR. NOLAN, I'M RELYING ON YOUR PROFFER.

 8            I'VE GOT TO BE ABLE TO RELY ON YOUR PROFFER, COUNSEL.

 9            MR. NOLAN:  YOUR HONOR, THEY INTRODUCED EVIDENCE WITH

10   RESPECT TO COMING OUT WITH NEW BRANDS AND EVOLVING --              09:10

11            THE COURT:  I TOOK NOTES WHEN YOU WERE SPEAKING,

12   COUNSEL, SO PLEASE DON'T TELL ME THAT I CAN'T RELY ON THAT.

13            MR. QUINN:  WHILE HE'S LOOKING FOR THAT, MAY I

14   ADDRESS --

15            THE COURT:  GIVE HIM A SECOND.                            09:10

16            AFTER THIS POINT, WE'RE GOING TO BRING THE JURY IN,

17   AND WE'LL CONTINUE THIS DISCUSSION LATER.

18            (BRIEF PAUSE.)

19            MR. NOLAN:  YOUR HONOR, AT PAGE 283, JOHN QUINN ASKED

20   ROSS WHETHER MATTEL CAME OUT WITH NEW DOLLS EVERY YEAR WHILE       09:11

21   SHE WAS EMPLOYED AT MATTEL.  SHE TESTIFIED THAT THEY CAME OUT

22   WITH NEW DOLLS FOR MANY OF THE YEARS SHE WAS THERE.

23            AT PAGE 295, 22, TO 296, PAGE 4, AGAIN, QUESTION OF

24   MR. QUINN; QUINN ASKED ROSS WHETHER OR NOT MATTEL FOCUSED ON

25   DOLLS ONLY OF A CERTAIN AGE.  AND THEN IVY ROSS TESTIFIED THAT     09:11
```

1    'THEY CREATED MY SCENE IN TERMS OF HOW WE EVOLVED THE BARBIE

2    BRANDS FOR THE OLDER GIRL.'

3              THAT'S IT.

4              AND MY LAST POINT, YOUR HONOR, IS THAT I ENJOY THIS

5    ARGUMENT IMMENSELY ABOUT EXTRINSIC EVIDENCE BEING BROUGHT IN          09:11

6    FOR IMPEACHMENT PURPOSES; BUT I STOOD HERE AND LISTENED TO AN

7    ARGUMENT THAT THEY WANTED TO BRING FARHAD LARIAN IN ABOUT

8    SO-CALLED DESTRUCTION OF DOCUMENTS IN ANOTHER CASE; AND YOU

9    TEASED ME AND ASKED ME IF I HAD EVER DONE THAT IN A CASE FOR

10   PURPOSES OF IMPEACHMENT.  AND IN THAT SITUATION, YOUR HONOR,         09:12

11   THERE'S NO SCINTILLA OF EVIDENCE IN THIS CASE THAT ISAAC LARIAN

12   HAD EVER SPOLIATED EVIDENCE IN THIS CASE.  THERE'S BEEN NOT A

13   SHRED OF DOCUMENTS.  BUT YET, MR. LARIAN WAS ALLOWED TO COME ON

14   THE STAND AND TESTIFY ABOUT AN E-MAIL IN ANOTHER CASE.

15             SO USING EXTRINSIC EVIDENCE --                             09:12

16        **THE COURT:**  MR. QUINN?

17        **MR. QUINN:**  YOUR HONOR, WHAT HE'S JUST READ IS, I

18   ASKED QUESTIONS, 'DOES MATTEL INTRODUCE NEW DOLLS?'

19             'YES, THEY DO INTRODUCE NEW DOLLS.'

20             'FOR DIFFERENT AGE GROUPS?'                                09:12

21             'YES.'

22             AND SHE CITED SOME OF THE DOLLS, AND APPARENTLY

23   REFERRED TO MY SCENE AS BEING ONE OF THE NEW DOLLS.

24             BECAUSE OF THAT -- WE TALKED ABOUT HAVING SOME

25   BALANCE HERE.                                                        09:12

THURSDAY, JULY 3, 2008                  TRIAL DAY 20, MORNING SESSION

1          **THE COURT:**  THAT'S WHAT I'M TRYING TO ACHIEVE,

2     COUNSEL.

3          **MR. QUINN:**  I DON'T THINK THAT TESTIMONY -- I ASSUME

4     THAT'S AS GOOD AS MGA CAN DO, WHAT YOU JUST NOW HEARD,

5     YOUR HONOR.  THAT IS NOT SUFFICIENT AND JUSTIFICATION FOR THEM,          09:13

6     BY WAY OF REBUTTAL OR IMPEACHMENT, TO START TALKING ABOUT

7     'BRAND IN CRISIS,' 'OUT THOUGHT,' 'OUT EXECUTED.'  I MEAN, WE

8     WEREN'T BRAGGING ABOUT OUR RESULTS.

9          **THE COURT:**  WHAT ABOUT THIS LAST POINT THAT MR. NOLAN

10    RAISED WITH REGARD TO FARHAD LARIAN'S TESTIMONY AS EXTRINSIC          09:13

11    EVIDENCE OF IMPEACHMENT?

12         **MR. QUINN:**  IT WAS EXTRINSIC EVIDENCE.  I ASKED HIM A

13    QUESTION WHETHER HE HAD EVER BEEN -- I DON'T REMEMBER WHETHER

14    HE DENIED OR NOT, OR FUDGED ON THAT.  A LOT OF HIS ANSWERS WERE

15    SORT OF 'TIT-FOR-TAT; I LIED.'          09:13

16         **THE COURT:**  THE INITIAL RESPONSE, AS THE COURT

17    RECALLS, WAS NOT REALLY RESPONSIVE ON THAT POINT.

18         **MR. QUINN:**  ALL RIGHT.

19         SO I FRANKLY CAN'T RECALL WHETHER THERE WAS A FLAT

20    DENIAL.          09:14

21         **THE COURT:**  LET'S ASSUME IT WAS A FLAT DENIAL; IT WAS

22    EXTRINSIC EVIDENCE.

23         **MR. QUINN:**  IF IT WAS A FLAT DENIAL, THEN IT WAS

24    IMPEACHMENT WITH EXTRINSIC EVIDENCE.  BUT I DON'T KNOW THAT WE

25    HEARD THAT PARTICULAR OBJECTION AT THAT POINT, YOUR HONOR.          09:14

THURSDAY, JULY 3, 2008                    TRIAL DAY 20, MORNING SESSION

1          **THE COURT:**  VERY WELL.

2          MR. NOLAN?

3          **MR. NOLAN:**  ONE OTHER REPRESENTATION THAT I WOULD

4    MAKE AT PAGE 428 OF THE TRANSCRIPT.  IN QUESTIONING BY

5    MR. QUINN OF LILY MARTINEZ, STARTING AT "CAN YOU TELL US A        09:14

6    LITTLE BIT ABOUT WHO THESE FOLKS ARE AND WHAT THEIR TALENTS ARE

7    AND BACKGROUNDS ARE ON YOUR TEAM.'

8          AND THEN LILY MARTINEZ GOES ON, AND SHE'S THE ONE

9    THAT INTRODUCES THAT SHE WORKS ON THE MY SCENE BRAND; SO SHE

10   ALSO BROUGHT IN THE FACT THAT SHE WAS WORKING ON MY SCENE.        09:14

11         **THE COURT:**  MR. NOLAN, BESIDES THE TWO POINTS, THE

12   IMPEACHMENT OF IVY ROSS, IS THERE ANY OTHER -- AND GIVEN THE

13   COURT'S RULINGS, WE'RE NOT GOING TO GET INTO MARKETING ISSUES

14   FROM 2003 AND 2004 -- IS THERE ANYTHING ELSE THAT MR. KILPIN IS

15   GOING TO ADDRESS?                                                 09:15

16         **MR. NOLAN:**  YES, YOUR HONOR.

17         THERE IS AN EXCHANGE THAT MR. KILPIN HAS WITH

18   MR. LARIAN AT THE NEW YORK TOY FAIR WHEN BRATZ COMES OUT.

19         **THE COURT:**  WHEN IS THIS?

20         **MR. NOLAN:**  2001.                                       09:15

21         **THE COURT:**  OKAY.

22         **MR. NOLAN:**  AND THERE'S BEEN A LOT OF TESTIMONY ABOUT

23   THE TOY FAIR, AND BRATZ WAS SHOWN AT THAT POINT IN TIME.  THERE

24   WAS AN EXCHANGE AT THAT POINT IN TIME WHERE MR. KILPIN

25   CONGRATULATES MR. LARIAN ABOUT THE FRESH PRODUCT AND SAYS --      09:15

```
 1   ABOUT BRATZ, AND BEATING BARBIE AND CONGRATULATING MR. LARIAN

 2   ON THE SUCCESS AT THE TOY FAIR IN 2001.

 3           I ALSO WANT TO GET INTO EVIDENCE --

 4        THE COURT:  HOW DOES THAT BEAR ON THE HEARSAY ISSUE?

 5   UNLESS IT'S GOING TO BE WAIVED.                              09:15

 6           I ASSUME THERE'S A HEARSAY OBJECTION.

 7        MR. QUINN:  YES, YOUR HONOR.

 8        THE COURT:  HOW IS THAT NOT HEARSAY?

 9        MR. NOLAN:  THAT HE ISSUED AN E-MAIL TO MR. LARIAN.

10   HE'S HERE AND IS AVAILABLE FOR CROSS-EXAMINATION.  MR. KILPIN 09:16

11   IS THE AUTHOR OF THE E-MAIL.  HE'S HERE FOR PURPOSES OF

12   CROSS-EXAMINATION, TO TEST THE ACCURACY OF HIS PERCEPTIONS AT

13   THAT TIME AND WHAT HE KNEW ABOUT BRATZ AT THAT TIME AND WHAT

14   HIS IMPRESSION WAS OF BRATZ.

15        THE COURT:  WELL, IF IT'S OFFERED FOR HIS IMPRESSIONS  09:16

16   OR PERCEPTIONS, HOW IS THAT RELEVANT?

17           HE'S NOT WORKING AT MATTEL AT THIS POINT; CORRECT?

18        MR. NOLAN:  NO.  BUT HE HAD BEEN WORKING AT MATTEL

19   FOR A NUMBER OF YEARS BEFORE THAT.

20        THE COURT:  IT'S NOT A STATEMENT BY A PARTY OPPONENT   09:16

21   AT THE TIME THAT HE MAKES THE STATEMENT.

22        MR. NOLAN:  THAT'S CORRECT, YOUR HONOR.  THAT'S

23   CORRECT.  BUT HE DOES SAY THAT IT'S FRESH; IT'S SOMETHING THAT

24   HE HAD NEVER SEEN BEFORE IN THE MARKETPLACE.  AND AS A RESULT

25   OF THAT -- I MEAN, THEIR WHOLE ARGUMENT HERE --             09:16
```

1      **THE COURT:**  WHAT IS THAT RELEVANT TO, ASSUMING WE GET

2  BY THE HEARSAY OBJECTION?

3      **MR. NOLAN:**  TOON TEENS AT MATTEL.  THEY ARE CLAIMING

4  THAT MATTEL -- I MEAN, THAT WE BORROWED EXTENSIVELY FROM

5  TOON TEENS.  AND WHAT I WANT TO ESTABLISH IS THAT MR. KILPIN          09:17

6  THOUGHT, WHEN HE SAW BRATZ -- AND HERE'S A GENTLEMAN THAT WAS

7  IN THE TOY INDUSTRY --

8      **THE COURT:**  AND HE DIDN'T THINK IT LOOKED LIKE

9  TOON TEENS?

10      **MR. NOLAN:**  NO.  OR ANYTHING ELSE THAT HE HAD EVER

11  SEEN WHILE HE HAD BEEN PREVIOUSLY WORKING AT MATTEL.

12      THEN THE OTHER CATEGORY, YOUR HONOR, IS THAT

13  MR. KILPIN -- OF COURSE, WE HAD TESTIMONY FROM MR. ECKERT ON

14  THIS POINT.  I WANT TO ESTABLISH THAT MR. KILPIN MOVED FROM

15  MATTEL TO DISNEY, AND THAT WHILE AT DISNEY, HE HAD SECRET          09:17

16  MEETINGS WITH MATTEL IN ORDER TO GET ANOTHER JOB.  HE

17  INTERVIEWED AT MATTEL WHILE HE WAS STILL EMPLOYED AT DISNEY,

18  JUST TO GO TO THAT WHOLE POINT AND CLOSE THE LOOP THAT THAT IS

19  APPROPRIATE.

20      THEN I ALSO WANT TO ASK SOME QUESTIONS ABOUT WHETHER          09:17

21  OR NOT, WHEN HE DEALT WITH INVENTORS, CREATORS THAT CAME IN

22  WITH NEW IDEAS -- WHETHER OR NOT HE HIMSELF HANDLED THE

23  INVESTIGATION OR DID HE LEAVE THAT TO THE LEGAL DEPARTMENT TO

24  HANDLE.

25      THERE WAS A WHOLE LINE OF QUESTIONS ABOUT, 'GEE,          09:18

1   MR. LARIAN, DIDN'T YOU THINK THAT YOU SHOULD HAVE CONDUCTED AN

2   INVESTIGATION FURTHER INTO WHAT CARTER BRYANT HAD DONE?'

3          AND I WANT TO ESTABLISH THAT, IN FACT, IS NOT THE

4   CASE AND THAT IT WAS ENTIRELY REASONABLE FOR MR. LARIAN TO RELY

5   ON LAWYERS TO DO THE WARRANTIES.                              09:18

6          **THE COURT:**  VERY WELL.

7          **MR. NOLAN:**  THAT'S THE SAME ISSUE WITH CASSIDY PARK.

8          CAN I ADDRESS THE CASSIDY PARK ISSUE REAL QUICK?

9          **THE COURT:**  WE HAVE A JURY WAITING, COUNSEL.  WE'LL

10  CONTINUE THIS CONVERSATION AT THE NEXT BREAK.                 09:18

11         MR. QUINN?

12         **MR. QUINN:**  THE SECRET MEETINGS -- IRRELEVANT.

13         **THE COURT:**  YOU'RE PRESERVING ALL YOUR OBJECTIONS.

14  YOU CAN MAKE THEM DURING THE TESTIMONY.  THE COURT WILL

15  CONSIDER THEM.                                                09:18

16         **MR. QUINN:**  WHAT COUNSEL JUST SAID, THE CONVERSATION

17  WITH MR. KILPIN, TOY OF THE YEAR, THAT'S 2002.

18         **THE COURT:**  I UNDERSTAND.

19         **MR. QUINN:**  HE HAD NEVER SEEN TOON TEENS.

20         **THE COURT:**  HE SAID IT WAS 2001.                   09:18

21         **MR. QUINN:**  HE SAID 2001, BUT IT WAS 2002; THAT'S

22  WHEN HE GOT THE TOY OF THE YEAR.

23         **MR. NOLAN:**  NO.  I'M NOT TALKING ABOUT THE TOY OF THE

24  YEAR.  I'M TALKING ABOUT THE TOY FAIR IN NEW YORK.

25         **MR. QUINN:**  HE'S NOT EVEN EMPLOYED BY MATTEL AT THAT  09:19

```
 1    POINT.  HE NEVER COULD HAVE SEEN TOON TEENS.
 2            THE COURT:  COUNSEL, I'M SURE YOU'LL MAKE THE
 3    OBJECTIONS WHEN THE TIME COMES.  THE COURT WILL BE CAREFULLY
 4    LISTENING FOR FOUNDATION LEADING UP TO ALL OF THESE AREAS.
 5            LET'S BRING THE JURY IN.                              09:19
 6            MS. AGUIAR:  YOUR HONOR, AT THE MORNING BREAK, CAN WE
 7    ADDRESS THE RODNEY PALMER VIDEO, BECAUSE WE'LL PROBABLY BE
 8    NEEDING TO PLAY THAT.
 9            THE COURT:  YES.  WE'LL START WITH THAT AT THE BREAK.
10            (WHEREUPON, JURORS ENTER COURTROOM.)
11                 DIRECT EXAMINATION (continued)
12    BY MR. NOLAN:
13    Q    GOOD MORNING, MS. LEAHY.
14    A    GOOD MORNING.
15    Q    I WANT TO GO BACK TO THE MOLDS THAT ARE IN FRONT OF YOU, 09:23
16    TRIAL EXHIBITS 1040-A THROUGH -D, AND I BELIEVE THE D IS THE
17    ONE FARTHEST ON YOUR LEFT; IS THAT CORRECT?
18    A    D, LIKE DOG?
19    Q    YES.
20    A    THAT'S THIS ONE.                                         09:23
21    Q    WHICH IS THE MOLD UP THERE THAT HAD THE MOLD FOR THE BRATZ
22    SCULPT?
23    A    WELL, THEY ALL HAVE BODY PARTS.
24    Q    WHICH IS THE PART THAT HAS TO DO WITH THE SCULPT?
25    A    OH.  THE HEAD?                                           09:23
```

1   Q     YES.

2   A     THAT'S THIS ONE.

3   Q     YOU'RE HOLDING --

4   A     IT'S 1140-D.

5   Q     NOW, THAT PARTICULAR SCULPT OF THE HEAD WAS PREPARED ON        09:24

6   WHAT DATE?  WHAT DATE WAS IT COMPLETED?

7   A     THIS ONE OR THIS ONE?

8   Q     THE D, OF THE SCULPT.

9   A     THIS IS A LATER VERSION OF THIS HEAD AFTER I WENT TO WAX

10  AND STARTED CLEANING IT UP AND MAKING CHANGES.                       09:24

11  Q     YOU'RE POINTING TO THE ACTUAL CLAY SCULPT OR THE SCULPT

12  THAT'S THERE WHEN YOU SAY IT'S DIFFERENT FROM THE ONE THAT YOU

13  DID; CORRECT?

14  A     RIGHT.  THIS IS THE FIRST SCULPT I DID.

15  Q     SO TURNING TO THE FIRST SCULPT -- AND I WANT TO FOCUS ON        09:24

16  THAT FOR A MOMENT -- YOU DID DO A SCULPT OF A BRATZ HEAD

17  SOMETIME EARLIER THAN OCTOBER; CORRECT?  OCTOBER 23RD?

18  A     THIS ONE WAS DONE EARLIER THAN THE 23RD.  THIS WAS IN-

19  BETWEEN THE 11TH AND THE 23RD.

20  Q     AND THE SCULPT FOR THE SKULL THAT IS ON THE FIGURINE THAT       09:25

21  IS IN FRONT OF YOUR WITNESS BOX THERE, CAN YOU GIVE US THE DATE

22  WHEN THAT WAS DONE?

23  A     THIS WOULD HAVE BEEN FINISHED ON THE 6TH.

24  Q     NOW, PRIOR TO THE SCULPT OF THE HEAD ON OCTOBER 6TH, ARE

25  YOU AWARE OF ANY OTHER SCULPT OF A FIGURINE THAT YOU WERE            09:25

1   WORKING ON ON THE BRATZ PROJECT?

2   A    PRIOR TO THIS?

3   Q    YES.

4   A    NO.  THERE'S NOTHING OTHER THAN THIS.

5   Q    OKAY.                                                    09:25

6             NOW, THIS IS THE ONE THAT YOU'RE TALKING ABOUT THAT

7   IS ON THE FIGURINE.

8   A    THE VERY FIRST ONE.

9   Q    DID YOU GIVE THAT VERY FIRST FIGURINE SCULPT OF THE SKULL

10  TO ANNA RHEE?                                                 09:25

11  A    THIS ONE?

12  Q    YES.

13  A    NO, I DID NOT.

14  Q    AND TO YOUR KNOWLEDGE, IS IT TRUE THAT ANNA RHEE DID NOT

15  HAVE A SCULPT TO CAST AND TO FACE PAINT FOR A BRATZ FIGURINE   09:26

16  UNTIL DECEMBER OF 2000?

17            **MR. PRICE:**  OBJECTION.  LACKS FOUNDATION.

18            **MR. NOLAN:**  IT WAS A BAD QUESTION.

19            **THE COURT:**  WITHDRAWN?

20            **MR. NOLAN:**  I'LL LAY A FOUNDATION.              09:26

21            **THE COURT:**  ALL RIGHT.  THANK YOU.

22            **MR. NOLAN:**  IT WASN'T THAT BAD OF A QUESTION, I DON'T

23  THINK.  I'LL RETRACT THAT.  I JUST NEED TO ESTABLISH A

24  FOUNDATION.  YOU WOULD THINK AFTER SEVEN WEEKS, I'D KNOW THAT.

25  / / /                                                         09:26

THURSDAY, JULY 3, 2008            TRIAL DAY 20, MORNING SESSION

```
 1   BY MR. NOLAN:
 2   Q    HOW IS IT THAT YOU KNOW ONE WAY OR THE OTHER WHETHER OR
 3   NOT ANNA RHEE WAS EVER PROVIDED A HEAD SCULPT OF BRATZ TO
 4   PAINT?
 5   A    BECAUSE SHE PAINTED THE FINAL SCULPT AND I MADE THE MOLD    09:27
 6   OF THAT MYSELF.
 7   Q    AND AT WHAT POINT IN TIME DID YOU PROVIDE ANNA RHEE THE
 8   FINAL SCULPT TO PAINT?
 9   A    IT WOULD HAVE BEEN IN DECEMBER, BUT I'M PRETTY SURE
10   MERCEDEH GAVE IT TO HER.  I DIDN'T GIVE IT TO HER PERSONALLY.    09:27
11   Q    WAS THAT DECEMBER OF 2000?
12   A    YES.
13   Q    IF YOU'LL TURN IN THE NOTEBOOK TO TRIAL EXHIBIT 17821.
14        DO YOU RECOGNIZE THIS DOCUMENT?
15   A    YEAH.  IT'S A QUOTE.                                       09:28
16   Q    A QUOTE FOR WHAT?
17   A    SO I CAN GET A PURCHASE ORDER, TO GET PAID, FOR WHEN I
18   SUBMIT AN INVOICE.
19   Q    DID YOU PREPARE THE DOCUMENT THAT HAS BEEN MARKED AS
20   17821?                                                          09:28
21   A    YES.
22        MR. NOLAN:  YOUR HONOR, WE'D OFFER 17821.
23        MR. PRICE:  NO OBJECTION.
24        THE COURT:  IT'S ADMITTED.
25        (EXHIBIT 17821 RECEIVED.)                                  09:28
```

THURSDAY, JULY 3, 2008                    TRIAL DAY 20, MORNING SESSION

1              **THE COURT:**  YOU MAY PUBLISH.

2    **BY MR. NOLAN:**

3    Q    SO THIS IS A QUOTE; CORRECT?

4    A    CORRECT.

5    Q    YOU PREPARED IT; AND THE DATE OF THIS IS OCTOBER 12, 2000;    09:28

6    CORRECT?

7    A    CORRECT.

8    Q    AND IT IS ON "LEAHY 3-D DESIGN."

9              AND THAT'S THE BUSINESS THAT YOU HAD ESTABLISHED;

10   CORRECT?                                                          09:28

11   A    CORRECT.

12   Q    IT SAYS THE NAME OF CLIENT, "MGA ENTERTAINMENT."

13             DO YOU SEE THAT?

14   A    YES.

15   Q    AND PAULA TREANTAFELLES AND CARTER BRYANT; CORRECT?          09:29

16   A    CORRECT.

17   Q    THEN I WANT TO GO TO THE DESCRIPTION HERE.

18             THESE ARE THE QUOTES FOR THE WORK THAT YOU WERE DOING

19   ON THE SCULPTING.

20   A    CORRECT; THE WORK THAT I WAS GOING TO DO.                    09:29

21   Q    IT SAYS, "ROUGH BODY, ONE HEAD, TWO ARMS, ONE TORSO WITH

22   LEGS ATTACHED, QUANTITY: ONE," AND THE RATE WAS $5,500;

23   CORRECT?

24   A    CORRECT.

25   Q    AND THIS IS A QUOTE; CORRECT?                                09:29

```
 1   A    CORRECT.

 2   Q    IS THIS AN INVOICE REFLECTING WORK THAT HAD ALREADY BEEN

 3   DONE?

 4   A    IT'S NOT AN INVOICE.  IT'S A QUOTE.

 5   Q    THE NEXT SAYS, "FINAL BODY, ONE HEAD, TWO ARMS WITH BALL        09:29

 6   JOINTS, ONE TORSO, TWO LEGS WITH BALL JOINTS'; AND THIS IS

 7   GOING TO BE $6,500, QUANTITY; CORRECT?

 8   A    CORRECT.

 9   Q    AND THEN YOU HAVE THE EXTRA HEAD, DIFFERENT FACIAL

10   EXPRESSION.

11         AND IS THAT FREE?

12   A    THAT WAS FREE.

13   Q    I WANT TO FOCUS ON THE FINAL BODY QUOTE.

14         DID YOU, IN FACT, HAVE A FINAL BODY SCULPTED BY

15   OCTOBER 12TH?                                                        09:30

16   A    NO, I DIDN'T.  I KNEW I WAS GOING TO DO IT, SO PAULA SAID

17   'JUST GET THE QUOTE IN SO YOU CAN GET PAID,' BECAUSE IT TAKES

18   AWHILE WHEN YOU'RE A NEW VENDOR TO GET PAID BY A NEW COMPANY.

19   Q    AS OF OCTOBER 19, 2000, HAD YOU SCULPTED WHAT YOU

20   CONSIDERED TO BE THE FINAL SCULPT FOR BRATZ?                         09:30

21         MR. PRICE:  OBJECTION.  IRRELEVANT.

22         THE COURT:  SUSTAINED.

23   BY MR. NOLAN:

24   Q    AS OF OCTOBER 19, 2000, HAD CARTER BRYANT DIRECTED YOU TO

25   FINISH A FINAL SCULPT OF WHAT WOULD TURN OUT TO BE THE BRATZ         09:31
```

```
 1    DOLL?

 2    A    NOT AS OF OCTOBER 19TH, NO.

 3    Q    DO YOU HAVE EXHIBIT NUMBER 323-032 IN YOUR BOOK?

 4          I'M GOING TO GO BACK TO ONE EXHIBIT.  I JUST WANT TO

 5    GO BACK SINCE WE HAVE THIS INVOICE UP ON THE SCREEN.  I HAVE A      09:32

 6    NOTE THAT I NEEDED TO FOLLOW UP ON.

 7          THE COURT:  WHAT EXHIBIT IS THIS, COUNSEL?

 8          MR. NOLAN:  THIS EXHIBIT IS 17821-001.

 9          THE COURT:  VERY WELL.

10    BY MR. NOLAN:

11    Q    IF YOU'LL LOOK AT THE DESCRIPTION OF THE FINAL BODY WITH

12    BALL JOINTS.

13          DO YOU SEE THAT?

14    A    YES.

15    Q    IN FACT, AS OF THIS TIME, BEFORE OCTOBER 19, 2002, HAD        09:32

16    CARTER BRYANT EVER DIRECTED YOU, INSTRUCTED YOU, ON A FINAL

17    SCULPT INCLUDING BALL JOINTS FOR A BRATZ SCULPT?

18    A    NO, HE HAD NOT.

19    Q    NOW, GOING TO THIS EXHIBIT, AND I APOLOGIZE FOR JUMPING

20    BACK ON THAT.                                                      09:32

21          DO YOU HAVE NOW IN FRONT OF YOU EXHIBIT 323-032?

22    A    YES.

23          MR. NOLAN:  YOUR HONOR, THIS IS ADMITTED.

24          CAN WE PUBLISH THIS?

25          THE COURT:  YES.                                             09:33
```

THURSDAY, JULY 3, 2008                    TRIAL DAY 20, MORNING SESSION

1          **MR. NOLAN:**  THANK YOU.

2   **BY MR. NOLAN:**

3   Q    DO YOU RECOGNIZE THIS DOCUMENT?

4   A    I DO.

5   Q    HOW DO YOU RECOGNIZE IT?                                    09:33

6   A    IT'S A DRAWING CARTER CAME UP WITH AFTER THE OCTOBER 25TH

7   MEETING WITH MERCEDEH AND PAULA.

8   Q    HOW DO YOU KNOW CARTER DID THIS DRAWING?

9   A    I KNOW HE DID IT BECAUSE HE GAVE IT TO ME LATER.  HE HAD

10  KIND OF BASED IT ON WHAT PROGRESS I WAS MAKING AT THE TIME.      09:33

11  AND, I DON'T KNOW, I GUESS HE THOUGHT IT WOULD BE HELPFUL.

12  Q    AND WHAT DATE DID HE PROVIDE THIS TO YOU?

13  A    I DON'T KNOW THE DATE, BUT IT WOULD HAVE BEEN AFTER THE

14  OCTOBER 25TH MEETING.

15  Q    DID YOU USE THIS DRAWING IN ANY MANNER OR FASHION IN        09:34

16  SCULPTING THE VARIOUS ITERATIONS UP THROUGH OCTOBER 19TH?

17  A    NO, I HAD NOT.  I DIDN'T HAVE THE DRAWING THEN, SO...

18  Q    THIS DRAWING, 323-032, THAT'S ON THE SCREEN, MS. LEAHY,

19  DID THIS DRAWING IN ANY WAY GUIDE YOU IN YOUR SCULPTING OF

20  ITERATIONS OF SCULPTS THAT ULTIMATELY TURNED INTO A FINAL       09:34

21  SCULPT FOR BRATZ?

22  A    WELL, NO, IT DIDN'T, BECAUSE HE BASED THIS DRAWING ON MY

23  PROGRESS THAT I HAD DONE SO FAR; SO IT'S NOT -- IT'S ANOTHER

24  ONE OF CARTER'S DRAWINGS.  IT JUST DOESN'T HAVE PRACTICAL

25  APPLICATIONS.                                                   09:35

1    Q    WHAT DO YOU MEAN BY "PRACTICAL APPLICATIONS"?

2    A    IT'S A FRONT VIEW.

3    Q    WHY IS THAT SIGNIFICANCE, FOR YOU AS A SCULPTOR?

4    A    AS A SCULPTOR, IT'S EASIER TO SCULPT FROM A FRONT VIEW.  A

5    LOT OF TIMES YOU GET -- YOU KNOW, IN THE TURNAROUNDS, YOU GET          09:35

6    THREE-QUARTER VIEWS, BECAUSE IT'S EASIER FOR ARTISTS TO DRAW IN

7    THREE-QUARTERS.  SO THIS WOULD HAVE BEEN GOOD HAD I HAD IT IN

8    THE BEGINNING; BUT I DIDN'T HAVE ANYTHING LIKE THIS IN THE

9    BEGINNING.  I JUST HAD THAT THREE-QUARTER VIEW.

10   Q    WHEN YOU SAY "IN THE BEGINNING," WHAT TIME PERIOD ARE YOU          09:35

11   REFERRING TO?  BACK TO THE FIRST MEETING WITH CARTER BRYANT?

12   A    THE FIRST MEETING WITH CARTER.

13   Q    AND EXHIBIT 323-032, IN YOUR VIEW, IN YOUR EXPERIENCE,

14   WOULD THAT BE DESCRIBED AS AN ENGINEERING DRAWING?

15   A    NO, NOT AT ALL.                                                    09:35

16   Q    WAS EXHIBIT 323-032 IN THE ORIGINAL BINDER OF CONCEPT

17   DRAWINGS THAT MR. BRYANT PROVIDED TO YOU IN LATE SEPTEMBER OF

18   2000?

19   A    NO, IT WASN'T.

20   Q    YESTERDAY I WAS ASKING YOU A SERIES OF QUESTIONS AS TO THE         09:36

21   USE OF THE CONCEPT DRAWINGS FROM CARTER BRYANT IN YOUR

22   SCULPTING PROCESS.  I JUST WANT TO GO BACK THERE.

23        CAN YOU ESTIMATE FOR US, FROM THE TIME THAT YOU FIRST

24   RECEIVED THE PHONE CALL FROM MR. BRYANT THROUGH OCTOBER 19TH OF

25   2000 -- SO YOU'RE FAMILIAR WITH THAT TIME PERIOD?  SOMEWHERE           09:36

1    BETWEEN SEPTEMBER 18TH, 20TH, WHEN YOU FIRST GOT THE PHONE CALL

2    FROM MR. BRYANT, THROUGH THE PERIOD OF OCTOBER 19TH.

3            DO YOU HAVE THAT TIME FRAME IN MIND?

4    A    YES.

5    Q    DURING THAT PERIOD OF TIME, CAN YOU ESTIMATE FOR THE JURY        09:36

6    HOW MUCH TIME YOU YOURSELF SPENT ON SCULPTING.

7    A    PROBABLY ABOUT 40 HOURS.

8    Q    AND DURING THAT SAME PERIOD OF TIME -- WE REVIEWED THIS

9    YESTERDAY, JUST TO PUT IT IN CONTEXT -- YOU HAD HOW MANY

10   MEETINGS IN SEPTEMBER WITH MR. BRYANT?  WAS IT TWO?                  09:37

11   A    CAN YOU REPEAT THE DATES.

12   Q    SURE.  I JUST WANT TO BREAK THIS DOWN IN SEPTEMBER.

13   A    OH, SEPTEMBER.

14   Q    YES.

15   A    I JUST HAD THE ONE MEETING -- NO, THE TWO MEETINGS,            09:37

16   BECAUSE HE BROUGHT ME THE DRAWINGS, AND THEN HE LOOKED AT THE

17   SCULPT; SO TWO.

18   Q    SO ONE MEETING HE BROUGHT YOU THE DRAWINGS?

19   A    RIGHT.

20   Q    AND YOU DIDN'T HAVE A SCULPT AT THAT TIME?                     09:38

21   A    NO, I DIDN'T.

22   Q    AND THAT MEETING WE SET AT ABOUT SEPTEMBER 20 --

23   A    THE FIRST ONE?

24   Q    YES.

25   A    WE SAID THE 27TH; RIGHT?                                       09:38

THURSDAY, JULY 3, 2008                    TRIAL DAY 20, MORNING SESSION

1   Q    APPROXIMATELY.

2        NOW, AT THIS FIRST MEETING, DID YOU HAVE ANY CLAY AND

3   DID YOU DO ANYTHING TO TRY TO SHOW CARTER BRYANT WHAT YOU WOULD

4   DO WITH RESPECT TO A SCULPT?

5        **MR. PRICE:**  OBJECTION.  ASKED AND ANSWERED YESTERDAY.   09:38

6        **THE COURT:**  IT HAS BEEN, COUNSEL.

7   **BY MR. NOLAN:**

8   Q    SO THERE WERE TWO MEETINGS THAT YOU HAD WITH MR. BRYANT IN

9   SEPTEMBER; YES?

10  A    CORRECT.                                                   09:38

11  Q    BUT ONLY ONE OF THOSE MEETINGS DEALT WITH A SCULPT;

12  CORRECT?

13  A    CORRECT.

14  Q    AND THAT MEETING THAT YOU HAD WHERE THE SCULPT WAS

15  PRESENT, YOUR TESTIMONY YESTERDAY WAS THAT LASTED APPROXIMATELY  09:38

16  20 MINUTES.

17  A    CORRECT.

18  Q    NOW, THAT'S THE TIME PERIOD FOR SEPTEMBER.

19       WERE THERE ANY OTHER MEETINGS IN SEPTEMBER THAT YOU

20  HAD WITH MR. BRYANT?                                            09:39

21  A    NO.

22  Q    SO WOULD IT BE FAIR TO SUMMARIZE THAT IN SEPTEMBER, YOU

23  HAD A DISCUSSION WITH MR. BRYANT THAT LASTED APPROXIMATELY

24  20 MINUTES WITH RESPECT TO THE SCULPT PROJECT THAT YOU WERE

25  WORKING ON?                                                     09:39

THURSDAY, JULY 3, 2008              TRIAL DAY 20, MORNING SESSION

1   A   CAN YOU REPEAT THE TIME, BECAUSE WE HAD THE TWO MEETINGS,

2   SO I'M JUST GUESSING THEY WERE AROUND --

3   Q   I'M JUST TALKING ABOUT THE FIRST MEETING IN SEPTEMBER,

4   WHERE YOU HAD YOUR FIRST ITERATION OF THE SCULPT.

5   A   OH, YEAH; ABOUT 20 MINUTES.                                    09:39

6   Q   OKAY.

7           NOW, WE'RE OUT OF SEPTEMBER.  I WANT TO MOVE TO

8   OCTOBER FOR A MOMENT.

9           BETWEEN THE PERIOD OF OCTOBER 1ST AND OCTOBER 19TH,

10  MY RECOLLECTION IS THAT YOU HAD A MEETING WITH MR. BRYANT ON      09:39

11  OCTOBER 6TH; CORRECT?

12  A   CORRECT.

13          MR. PRICE:  OBJECTION.  LEADING; ASKED AND ANSWERED.

14          THE COURT:  IT HAS BEEN.

15          MR. NOLAN:  IT'S JUST FOUNDATIONAL FOR THIS NEXT          09:39

16  QUESTION.

17          THE COURT:  REPHRASE, COUNSEL.  MAKE IT CLEAR IT'S A

18  FOUNDATIONAL QUESTION.

19  BY MR. NOLAN:

20  Q   HOW MANY MEETINGS DO YOU RECALL HAVING WITH CARTER BRYANT     09:40

21  FROM OCTOBER 1ST THROUGH OCTOBER 19TH?

22  A   JUST ONE.

23  Q   WHAT WAS THE DATE OF THAT MEETING?

24  A   THAT WOULD HAVE BEEN THE OCTOBER 6TH MEETING.

25  Q   AGAIN, HOW LONG DID THAT MEETING TAKE PLACE?                  09:40

1    A    ABOUT ANOTHER 20 MINUTES.

2    Q    FROM OCTOBER 6TH THROUGH OCTOBER 19, 2000, DO YOU RECALL

3    HAVING ANY OTHER MEETINGS OR TELEPHONE CONVERSATIONS WITH

4    CARTER BRYANT?

5    A    NO.  AT THAT POINT, THEY HAD ALL MADE AS MANY COMMENTS AS        09:40

6    THEY COULD.  THEY DIDN'T REALLY KNOW WHAT WENT INTO MAKING A

7    DOLL.  I THINK THEY LIKED THE LOOK OF THIS, SO I WENT IN AND

8    STARTED CUTTING IT UP AND MAKING IT SMALLER AND MAKING IT INTO

9    A MORE WORKABLE DOLL, LIKE I WAS TALKING ABOUT YESTERDAY.

10   Q    I'D LIKE YOU TO LOOK AT EXHIBIT 1139, PLEASE.                    09:41

11        DO YOU RECOGNIZE 1139?

12   A    I DO.

13   Q    WHAT IS IT?

14   A    IT'S A DRAWING OF FOUR HEADS, AND THEN IT HAS SOME OF MY

15   LITTLE DRAWINGS FOR SIZING.                                          09:41

16   Q    DO YOU RECOGNIZE YOUR HANDWRITING ON THIS DOCUMENT?

17   A    YES, I DO.

18   Q    WHEN DID YOU FIRST RECEIVE THIS DOCUMENT?

19   A    I DON'T REMEMBER WHEN I GOT THIS DOCUMENT.

20   Q    IN ANY EVENT, WAS THIS A DOCUMENT THAT YOU HAD IN YOUR           09:41

21   POSSESSION BEFORE OCTOBER 19TH OF 2000?

22   A    I DON'T KNOW IF I HAD IT BEFORE OCTOBER 19TH OR NOT.

23   Q    WITH RESPECT TO THE CONTENTS OF THE DRAWING AND THE FOUR

24   HEADS, DID YOU DRAW THE FOUR HEADS?

25   A    NO, I DIDN'T.                                                    09:42

1   Q     DO YOU KNOW WHO DID?

2   A     IT WAS CARTER.

3         **MR. NOLAN:**  YOUR HONOR, WE'D OFFER EXHIBIT 1139.

4         **THE COURT:**  ANY OBJECTION?

5         **MR. PRICE:**  NO OBJECTION.                          09:42

6         **THE COURT:**  IT'S ADMITTED.

7         (EXHIBIT 1139 RECEIVED.)

8   **BY MR. NOLAN:**

9   Q     CAN YOU IDENTIFY FOR THE JURY WHERE YOUR DOODLES ARE.

10  A     THEY ARE THE ONES ON THE RIGHT.                        09:42

11        I'M NOT KNOWN FOR MY 2-D ABILITY.

12  Q     AND DO YOU RECALL WHY YOU MADE THESE DOODLES ON THIS

13  DRAWING?

14  A     WELL, IT ALL HAS TO DO WITH THE ROTOCASTING PROCESS.

15  THAT'S WHEN YOU MAKE THE SQUISHY HEADS FOR THE DOLLS.  THEY   09:42

16  MAKE A COPPER MOLD AROUND IT.

17        TRY TO STICK WITH ME; IT'S KIND OF COMPLICATED.

18        THEY MAKE A COPPER MOLD AROUND THE HEAD, AND THEN

19  THEY MELT THE WAX HEAD OUT.  THEN AFTER THAT, THEY TAKE A

20  LIQUID VINYL AND INJECT IT INTO THE MOLD, AND THEN THE MOLD   09:43

21  ROTATES; THAT'S WHY IT'S CALLED ROTOCASTING.  THEY HAVE TO DO

22  THIS PROCESS THREE TIMES, AND EACH TIME IT SHRINKS 2 PERCENT,

23  WHICH IS WHERE YOU GET THE 6-PERCENT SHRINK.  THEY MAKE A MOLD

24  ONCE, POUR THE VINYL IN THERE, AND THEN IT CURES; AND THEN THEY

25  PULL IT OUT WITH PLIERS, AND YOU HAVE A LITTLE HEAD.  AND THEN  09:43

THURSDAY, JULY 3, 2008                TRIAL DAY 20, MORNING SESSION

```
 1   THEY HAVE TO DO IT THREE MORE TIMES -- OR TWO MORE TIMES AFTER
 2   THAT.
 3          SO IN THIS DRAWING, I'M TAKING THE 6 PERCENT AND
 4   CALCULATING DOWN OF WHAT THE PRODUCT SIZE WILL BE OF THE HEAD.
 5   IT'S KIND OF A TRICKY PROCESS, GETTING THE SIZING RIGHT.       09:43
 6   Q   IN LOOKING AT CARTER'S CONCEPT DRAWINGS OF THE FOUR HEADS,
 7   DO YOU RECALL ONE WAY OR THE OTHER WHETHER OR NOT YOU EVER HAD
 8   A DISCUSSION WITH HIM ABOUT A NOSE?
 9   A   CARTER DIDN'T REALLY PUT MUCH OF A NOSE IN THE DRAWINGS,
10   AND THERE ARE CERTAIN FOUNDATIONAL THINGS YOU NEED WHEN YOU    09:44
11   SCULPT A HEAD.
12          MR. PRICE:  OBJECTION, YOUR HONOR.  IT'S BEYOND THE
13   SCOPE OF THE QUESTION; NONRESPONSIVE.
14          THE COURT:  REPHRASE.
15   BY MR. NOLAN:
16   Q   SO YOU DO RECALL A CONVERSATION WITH MR. BRYANT ABOUT A
17   NOSE IN CONNECTION WITH THE SCULPT THAT YOU WERE WORKING ON.
18   A   RIGHT.  HE DIDN'T WANT A NOSE.
19   Q   HOLD ON.  LET ME JUST ASK THE NEXT QUESTION.
20          WHAT WAS THAT CONVERSATION?                             09:44
21   A   THE CONVERSATION WAS THAT HE DIDN'T REALLY WANT A NOSE; HE
22   BARELY WANTED ANY NOSE AT ALL.  AND, YOU KNOW, AS A SCULPTOR, I
23   KNOW YOU HAVE TO HAVE A NOSE ON THE FACE OR THE BONE STRUCTURE
24   JUST DOESN'T MAKE ANY SENSE.
25   Q   SO DID YOU PUT A NOSE ON THE SCULPT YOU DID?               09:44
```

1    A    YEAH.  I DID A BIGGER NOSE THAN THAT LITTLE TEENY DOT THAT

2    HE DREW.

3    Q    DO YOU RECALL, LOOKING AT THIS EXHIBIT, WHEN YOU PUT THOSE

4    DOODLES ON THE DRAWING?

5    A    I DON'T RECALL.  IT WOULD HAVE BEEN WHEN I HAD A LATER          09:44

6    VERSION OF THE HEAD, BECAUSE AT THIS POINT, WE WEREN'T GETTING

7    INTO THE TECHNICAL PART OF IT.

8    Q    MS. LEAHY, AS OF OCTOBER 19, 2000, CAN YOU DESCRIBE FOR US

9    WHAT THE STATUS WAS OF YOUR SCULPTING ASSIGNMENT FOR BRATZ.

10   A    WELL, AFTER OCTOBER -- THIS WAS MOLDED BY OCTOBER 11TH          09:45

11   AND --

12   Q    YOU'RE TALKING NOW ABOUT THE FIGURINE.

13   A    THE FIGURINE.

14        AND I HAD A WAX POURED.  AND THEN THAT'S WHEN I

15   STARTED GOING IN AND CUTTING IT UP AND CLEANING IT UP AND           09:45

16   PUTTING THE JOINTS IN AND THINGS LIKE THAT.

17   Q    IS THAT FIGURINE THE BRATZ SCULPT, MS. LEAHY?

18        **MR. PRICE:**  OBJECTION.  IRRELEVANT; OUTSIDE THE TIME

19   FRAME.

20        **THE COURT:**  SUSTAINED.                                     09:45

21   **BY MR. NOLAN:**

22   Q    THE FIGURINE THAT YOU HAVE IN FRONT OF YOU, MS. LEAHY,

23   WHAT DATE WAS THAT COMPLETED?

24   A    THAT WAS COMPLETED ON OCTOBER 6TH.

25        **THE COURT:**  OF 2000?                                       09:46

1            **THE WITNESS:**  OF 2000.

2    **BY MR. NOLAN:**

3    Q    WAS THAT FIGURINE THAT YOU SCULPTED ON OCTOBER 6, 2000,

4    THE FINAL BRATZ SCULPT?

5            **MR. PRICE:**  OBJECTION.  IRRELEVANT.                     09:46

6            **THE COURT:**  SUSTAINED.

7    **BY MR. NOLAN:**

8    Q    NOW, WE TALKED ABOUT THE FACT THAT YOUR HUSBAND WORKS AT

9    MATTEL; CORRECT?

10   A    CORRECT.                                                       09:46

11   Q    YOU'RE REPRESENTED BY COUNSEL IN THIS CASE, AREN'T YOU?

12   A    YES.

13   Q    WHAT'S THE NAME OF YOUR COUNSEL?

14   A    LARRY MCFARLAND.

15   Q    AT SOME POINT IN TIME AFTER YOU DID THE SCULPTING ON          09:46

16   BRATZ, DID YOU BECOME AN EMPLOYEE OF MGA?

17   A    YES.

18   Q    WHAT PERIOD OF TIME WERE YOU EMPLOYED BY MGA?

19   A    IT WAS APRIL OF 2005 TO MARCH OF 2007.

20   Q    WHERE DID YOU GO TO WORK AFTER MGA?                           09:47

21   A    I WENT TO THE DISNEY STORE.

22   Q    DID YOU RESIGN FROM MGA BEFORE YOU STARTED TO WORK AT

23   MATTEL?

24   A    AT THE DISNEY STORE?

25   Q    AT THE DISNEY STORE.  I'M SORRY.                              09:47

```
 1   A    YEAH.  I RESIGNED FROM THEM BEFORE I STARTED EMPLOYMENT

 2   WITH THEM AS A FULL-TIME EMPLOYEE.

 3   Q    WERE YOU RECRUITED FROM MGA?

 4   A    YES, I WAS.

 5   Q    WHO RECRUITED YOU?                                        09:47

 6   A    A GUY NAMED -- HIS NAME WAS DAVID -- AND I'M DRAWING A

 7   BLANK ON HIS LAST NAME.  OH, DAVID HARRISON.

 8   Q    WAS IVY ROSS EMPLOYED AT THE DISNEY STORES AT THE TIME YOU

 9   WENT TO WORK THERE?

10   A    YES, SHE WAS.  I INTERVIEWED WITH HER.                    09:47

11   Q    DID YOU INTERVIEW WITH MS. ROSS AT THE DISNEY STORE WHILE

12   YOU WERE STILL EMPLOYED AT MGA?

13   A    YES, I DID.

14   Q    DID YOU INTERVIEW AT THE DISNEY STORE WITH THE PERMISSION

15   OF ANYBODY AT MGA?                                             09:48

16   A    NO.

17   Q    YOUR LAWYER, LARRY MCFARLAND, REPRESENTS YOU; CORRECT?

18   A    CORRECT.

19   Q    AND YOUR LEGAL FEES ARE BEING PAID BY MGA; CORRECT?

20   A    CORRECT.                                                  09:48

21   Q    DID YOU BELIEVE THAT THERE WAS ANYTHING INAPPROPRIATE

22   ABOUT THAT?

23           MR. PRICE:  OBJECTION.  IRRELEVANT.

24           WE'RE NOT CLAIMING THERE IS.

25           THE COURT:  AS PHRASED, SUSTAINED.                     09:48
```

1    BY MR. NOLAN:

2    Q    IN ANY EVENT, DID YOU EVER RECEIVE A PHONE CALL FROM A

3    REPRESENTATIVE OF THE MATTEL LEGAL DEPARTMENT?

4         MR. PRICE:  OBJECTION.  IRRELEVANT.

5         SIDE-BAR, YOUR HONOR?                                    09:48

6         THE COURT:  YES.

7         (WHEREUPON, THE FOLLOWING PROCEEDINGS

8         WERE HELD AT SIDE-BAR:)

9         THE COURT:  WHERE IS THIS GOING?

10        MR. NOLAN:  MICHAEL MOORE, IN-HOUSE COUNSEL, CONTACTS   09:49

11   MS. LEAHY, PUTS IN A PRETEXT PHONE CALL, SAYING THAT HE'S

12   CALLING FOR MATTEL ABOUT WORK.  SHE'S AN OUTSIDE VENDOR.  HE

13   THEN ASKS HER A SERIES OF QUESTIONS ABOUT OFFERING COUNSEL FOR

14   HER.  WHEN SHE SAYS NO, THAT SHE IS ALREADY REPRESENTED BY

15   COUNSEL, THEY GO TO HER HUSBAND AT MATTEL.  THEY HAVE A MEETING 09:49

16   WITH HER HUSBAND -- I BELIEVE IT'S ON TWO OCCASIONS, BUT

17   CERTAINLY ON ONE -- WHERE THEY SAY THEY BELIEVE MS. LEAHY IS

18   NOT BEING REPRESENTED PROPERLY AND THEY WOULD LIKE HER TO

19   CHANGE COUNSEL.

20        THE COURT:  THEY SAY THIS TO HER HUSBAND?             09:50

21        MR. NOLAN:  YES.

22        AND THEN THIS LETTER IS WRITTEN THAT I'M NOW OFFERING

23   -- THERE'S AN EXHIBIT NUMBER, I DON'T HAVE IT HERE, BUT I

24   REPRESENT IT'S JANUARY 5, 2000, TO QUINN EMANUEL FROM THE LAW

25   FIRM OF SIDLEY AUSTIN WHICH THEY DIRECT TO MR. QUINN'S FIRM    09:50

1    SAYING --

2            **THE COURT:**  LET ME HEAR FROM MATTEL NOW.

3            **MR. PRICE:**  FOR MY LEGAL POINT OF VIEW, FIRST, THE

4    CALL TO HER ASKING WHETHER OR NOT SHE WANTS TO BE REPRESENTED

5    BY COUNSEL IS IRRELEVANT.                                        09:50

6            SECOND, ANY INFORMATION ABOUT WHAT WAS SAID TO HER

7    HUSBAND HAS GOT TO BE HEARSAY.  WHEN WE ASKED HER AT HER

8    DEPOSITION ABOUT COMMUNICATIONS WITH HER HUSBAND, I BELIEVE SHE

9    ASSERTED THE MARITAL PRIVILEGE.

10           **THE COURT:**  STOP RIGHT THERE.                         09:50

11           THE FIRST QUESTION IS NOT IRRELEVANT, BECAUSE I'VE

12   ALLOWED BOTH SIDES TO GET INTO WHAT GOES TO BIAS AND

13   IMPEACHMENT, AND THAT'S ALL COME OUT IN THE WASH.  THE

14   OBJECTION IS OVERRULED TO HIS QUESTION.

15           HAS THE MARITAL PRIVILEGE BEEN ASSERTED AT THE           09:51

16   DEPOSITION?

17           **MR. ZELLER:**  IT WAS, YOUR HONOR.

18           **THE COURT:**  THEN THAT STOPS THAT.

19           **MR. NOLAN:**  BUT, YOUR HONOR, WHAT ABOUT THIS LETTER?

20   BECAUSE SHE IS COPIED ON THIS LETTER.                           09:51

21           **THE COURT:**  HOW IS THIS NOT HEARSAY?  SHE'S JUST

22   COPIED ON IT.  HOW IS IT NOT HEARSAY?

23           THINK ABOUT THAT ONE.  YOU ASKED THE QUESTION.

24           **MS. AGUIAR:**  THERE MAY BE A DISTINCTION -- I'M

25   THINKING ON THE FLY HERE -- BUT THE LETTER CAME IN YESTERDAY    09:51

1   FROM ONE LAW FIRM TO ANOTHER REGARDING MR. MARLOW'S LEGAL FEES.

2   IS THAT DIFFERENT?

3          THE COURT:  I'M SORRY?

4          MS. AGUIAR:  A LETTER CAME IN YESTERDAY --

5          THE COURT:  I DON'T KNOW IF AN OBJECTION WAS MADE ON          09:51

6   THAT.

7          MS. AGUIAR:  IT WAS.  MR. ROTH MADE AN OBJECTION ON A

8   NUMBER OF GROUNDS.  THAT LETTER IS IN EVIDENCE.

9          THE COURT:  I'M GOING TO HAVE TO GO BACK TO THAT.  I

10  KNOW THE LETTER YOU'RE TALKING ABOUT.                               09:52

11         MR. PRICE:  THAT'S FROM AN AGENT AT MGA.  THEIR

12  OUTSIDE COUNSEL IS OFFERING LEGAL FEES; SO THAT LETTER IS

13  IRRELEVANT.

14         THE COURT:  THIS IS THE ONE WHERE THE COUNSEL IS

15  IDENTIFIED AS THE PERSON TO WHOM THE INVOICES ARE TO GO THROUGH     09:52

16  THE BILLING?

17         MR. PRICE:  YES.

18         THE COURT:  THAT'S A PARTY OPPONENT.

19         MR. PRICE:  THIS IS HEARSAY.

20         THE COURT:  UNLESS THE OFFICER IS SOMEHOW                     09:52

21  REPRESENTING MGA AT THIS POINT -- MATTEL AT THIS POINT; THAT

22  WOULD HAVE TO BE MATTEL; AND THEY ARE NOT.

23         MR. NOLAN:  BUT I AM --

24         THE COURT:  WHO ARE THEY REPRESENTING?

25         MR. NOLAN:  MARGARET LEAHY; AND THEY ARE WRITING A            09:52

```
 1   LETTER TO MATTEL ASKING --

 2        THE COURT:  WHO IS SIDLEY AUSTIN HIRED BY?  WHO'S

 3   PAYING SIDLEY AUSTIN'S BILLS?

 4        MR. NOLAN:  MGA.

 5        THE COURT:  SO THIS WAS A LETTER FROM MGA; SO THAT'S    09:52

 6   NOT A PARTY OPPONENT.

 7        MR. NOLAN:  BUT THIS LETTER HERE IS TALKING ABOUT --

 8   THIS IS A CEASE AND DESIST LETTER ABOUT THIS REGARDING -- WE

 9   ARE TROUBLED TO LEARN MICHAEL MOORE, IN-HOUSE COUNSEL, HAS HAD

10   CONTACT WITH OUR -- EVEN THOUGH --                          09:53

11        THE COURT:  THIS IS TROUBLING, AND I GUESS THAT'S THE

12   BIGGER ISSUE.  IT'S HEARSAY.  BUT THIS IS SOMEWHAT TROUBLING ON

13   AN ETHICAL LEVEL, COUNSEL.

14        MR. ZELLER:  I WOULD LIKE TO ADDRESS THAT, BECAUSE WE

15   DO FEEL VERY STRONGLY ABOUT THIS.  IT IS NOT PROOF.  IT IS,    09:53

16   FROM OUR PERSPECTIVE, FACTUALLY BASELESS.  IT WAS BEING SENT AS

17   REALLY INTERFERENCE WITH MR. MOORE, AND WE CAN CERTAINLY SHOW

18   THAT.

19        BUT WHERE THAT LEAVES US, YOUR HONOR, IS THAT IT ALSO

20   SHOWS THE 403 PROBLEM HERE TOO.  TO THE EXTENT THEY REALLY     09:53

21   THOUGHT THERE WAS AN ETHICAL VIOLATION, THEY SHOULD HAVE

22   BROUGHT IT TO THE COURT'S ATTENTION.  THAT'S A LEGAL ISSUE FOR

23   THE COURT TO RULE ON.

24        THE COURT:  THE COURT IS GOING TO RAISE ITS OWN

25   ETHICAL CONCERNS WHEN IT SEES THEM, AND I'M SEEING THIS RIGHT  09:54
```

THURSDAY, JULY 3, 2008          TRIAL DAY 20, MORNING SESSION

4270

1    NOW.

2            ASK YOUR QUESTION.  WE'RE NOT GOING TO GET INTO THIS

3    NOW, BUT THE COURT IS GOING TO TAKE THIS UP.

4        **MR. PRICE:**  ON THAT QUESTION, YOU SAID IT'S RELEVANT

5    TO SHOW BIAS.  IT SHOWS BIAS TO HER IF SHE IS GOING -- TO SAY       09:54

6    HE PLACED A CALL TO HER.

7        **THE COURT:**  WE'RE NOT GOING TO GET INTO THE PRETEXT

8    CALL.

9            THE QUESTION THAT WAS JUST ASKED -- I CAN LOOK IT UP,

10   BUT THE QUESTION THAT WAS JUST ASKED WAS --                         09:54

11       **MR. NOLAN:**  DID YOU RECEIVE A PHONE CALL?  DO YOU

12   KNOW MICHAEL MOORE?  DID YOU RECEIVE A PHONE CALL FROM HIM?

13       **THE COURT:**  'DID MATTEL OFFER TO REPRESENT YOU?'

14           I THINK THAT'S A QUESTION THAT CAN BE ANSWERED.  BUT

15   WE'RE NOT GOING TO GET INTO -- YOU DIDN'T SAY ANYTHING ABOUT        09:54

16   PRETEXT IN THERE; THAT REQUIRES HEARSAY AND THERE'S NO

17   FOUNDATION FOR THAT AT THIS POINT.

18           YOU CAN CERTAINLY ASK ABOUT DID MICHAEL MOORE -- THE

19   ANSWER IS GOING TO BE 'YES.'  'WHAT DID MICHAEL MOORE ASK YOU?'

20           AND THAT'S IT.  AND THEN WE'LL TAKE THIS OTHER ISSUE        09:55

21   UP; SO WE MAY BE CALLING MARGARET LEAHY BACK.

22       **MS. AGUIAR:**  CAN WE ASK THE FOLLOWUP, WHICH IS IF SHE

23   ENDED UP HAVING A LAWYER BY MATTEL AT ANY POINT?

24       **THE COURT:**  YES.  THAT'S FINE; THAT MAKES SENSE.

25           (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)           09:55

THURSDAY, JULY 3, 2008              TRIAL DAY 20, MORNING SESSION

4271

```
 1            THE COURT:  YOU MAY PROCEED, COUNSEL.

 2            AND LET'S HAVE THE QUESTION REREAD, BECAUSE I'M

 3    OVERRULING THE OBJECTION.

 4            (WHEREUPON, THE LAST QUESTION WAS READ

 5            BACK BY THE COURT REPORTER.)                      09:56

 6            THE WITNESS:  YEAH, I DID.

 7    BY MR. NOLAN:

 8    Q    DO YOU RECALL WHEN?

 9    A    IT WAS EITHER RIGHT BEFORE OR RIGHT AFTER I HAD THE BABY;

10    I CAN'T REMEMBER; SO THAT WOULD HAVE BEEN IN JUNE OF 2004.    09:56

11    Q    AND WHO WAS IT FROM MATTEL'S LEGAL DEPARTMENT THAT CALLED

12    YOU?

13    A    IT WAS A MAN NAMED MICHAEL MOORE.

14    Q    AT THE TIME THAT YOU RECEIVED THE PHONE CALL FROM

15    MR. MOORE, WERE YOU REPRESENTED BY COUNSEL?                 09:56

16    A    NO, I WASN'T.

17    Q    AT SOME POINT IN TIME, DID YOU RETURN THE PHONE CALL?

18    A    YEAH, I DID, BECAUSE HE LEFT A MESSAGE SAYING --

19    Q    JUST ANSWER THE QUESTION.

20            THE COURT:  COUNSEL, I THINK WE WENT OVER THESE      09:57

21    QUESTIONS AT SIDE-BAR.

22    BY MR. NOLAN:

23    Q    AT SOME POINT IN TIME, DID MATTEL OFFER TO RETAIN COUNSEL

24    TO REPRESENT YOU IN THIS MATTER?

25    A    HE WANTED ME TO COME IN AND TALK TO HIM.                09:57
```

THURSDAY, JULY 3, 2008                    TRIAL DAY 20, MORNING SESSION

```
 1            MR. PRICE:  OBJECTION.  MOVE TO STRIKE AS

 2   NONRESPONSIVE.

 3            THE COURT:  SUSTAINED.

 4   BY MR. NOLAN:

 5   Q    DID YOU EVER MEET WITH HIM?                        09:57

 6   A    NO, I DIDN'T.

 7            MR. PRICE:  CAN WE GET AN ANSWER TO THE QUESTION,

 8   YOUR HONOR?

 9            THE COURT:  THE QUESTION THAT WAS ASKED WAS, "AT SOME

10   POINT IN TIME, DID MATTEL OFFER TO RETAIN COUNSEL TO REPRESENT   09:57

11   YOU IN THIS MATTER?"

12            THAT WAS A YES OR NO QUESTION.

13            THE WITNESS:  I DON'T THINK THEY MADE AN OFFICIAL

14   OFFER, IF THAT WORKS.

15   BY MR. NOLAN:

16   Q    DID THEY MAKE AN UNOFFICIAL OFFER?

17   A    I GOT THAT FEELING.

18            MR. PRICE:  OBJECTION.  MOVE TO STRIKE AS

19   SPECULATION.

20            THE COURT:  LAY A FOUNDATION.                   09:58

21   BY MR. NOLAN:

22   Q    WHAT WAS THE BASIS FOR YOUR FEELING THAT MATTEL WAS

23   OFFERING YOU COUNSEL?

24   A    I FELT -- I DON'T KNOW HOW TO SAY THIS, BECAUSE I KEEP

25   GETTING OBJECTED.                                        09:58
```

THURSDAY, JULY 3, 2008              TRIAL DAY 20, MORNING SESSION

1      **MR. PRICE:**  HE'S GOT TO ASK THE RIGHT QUESTION.

2          **THE COURT:**  ANSWER THE QUESTION AS BEST YOU CAN,

3   MA'AM.

4          **THE WITNESS:**  CAN YOU ASK IT AGAIN.

5   **BY MR. NOLAN:**

6   Q    SURE.

7          WHAT WAS THE BASIS FOR YOUR FEELING THAT THEY WERE

8   UNOFFICIALLY ASKING YOU OR OFFERING TO PROVIDE COUNSEL FOR YOU

9   IN CONNECTION WITH THIS LITIGATION?

10  A    WELL, THAT FIRST MESSAGE FROM HIM SOUNDED LIKE HE SAID,      09:58

11  'I'M CALLING ABOUT SOME WORK'; SO I THOUGHT, 'GREAT, I GET

12  ANOTHER PERSON TO DO WORK FOR.'  SO I CALLED HIM BACK, AND THEN

13  FOUND OUT HE WAS A MATTEL LAWYER.  AND HE KEPT TALKING TO ME.

14  I'M LIKE, 'I DON'T KNOW, I DON'T KNOW, I DON'T KNOW WHAT TO SAY

15  TO YOU,' SO I HUNG UP AND THEN CALLED DAPHNE GRONICH FROM MGA.   09:59

16  Q    AND, THEREAFTER, DID MGA PROVIDE COUNSEL FOR YOU?

17  A    CORRECT.

18  Q    IF I COULD GO BACK TO EXHIBIT 1234.

19         **MR. NOLAN:**  MAY I HAVE A MOMENT TO TALK TO COUNSEL

20  ABOUT SOMETHING, YOUR HONOR?                                    09:59

21         **THE COURT:**  YOU MAY.

22         (BRIEF PAUSE.)

23  **BY MR. NOLAN:**

24  Q    DO YOU HAVE EXHIBIT 1234 IN FRONT OF YOU?

25  A    YES.                                                       10:00

1      **MR. NOLAN:**  YOUR HONOR, WE'RE ASKING MR. PRICE TO

2  CHECK A FACT FIRST BEFORE WE GO FORWARD WITH THIS.

3          (BRIEF PAUSE.)

4      **MR. NOLAN:**  YOUR HONOR, IF I MIGHT -- AND I APOLOGIZE

5  FOR THE UNORTHODOX WAY THIS COMES UP -- WE HAVE A STIPULATION          10:01

6  THAT IF I WERE TO ASK MS. LEAHY QUESTIONS CONCERNING ITERATIONS

7  ON SCULPTS THAT SHE DID AFTER OCTOBER 19TH, MATTEL WOULD OBJECT

8  THAT IT GOES BEYOND THE TIME FRAME COVERED IN THIS LAWSUIT, AND

9  THEY WOULD OBJECT TO THE RELEVANCY OF THAT PERIOD.  THAT'S THE

10  STIPULATION.          10:02

11      **MR. PRICE:**  PRETTY OBVIOUS.  YES.

12      **THE COURT:**  YOU'RE STIPULATING THAT THEY'RE GOING TO

13  OBJECT?

14      **MR. NOLAN:**  AND, YOUR HONOR, I GUESS, WE'LL FORECAST

15  THAT THE COURT'S RULING WILL BE THAT AREA IS NOT RELEVANT TO          10:02

16  1-A.

17      **THE COURT:**  AND YOU'RE STIPULATING TO THAT?

18      **MR. NOLAN:**  AND THEY'RE STIPULATING TO THAT.

19      **THE COURT:**  AND YOU'RE STIPULATING TO THAT?

20      **MR. NOLAN:**  NO.  I'M JUST SAYING THAT --          10:02

21      CAN WE APPROACH SIDE-BAR?  I APOLOGIZE.

22      **THE COURT:**  YES.

23      (WHEREUPON, THE FOLLOWING PROCEEDINGS

24      WERE HELD AT SIDE-BAR:)

25      **THE COURT:**  COUNSEL?          10:03

1      **MR. NOLAN:**  WE WOULD LIKE TO GET INTO EVIDENCE THE

2   MOLDS THAT WERE DONE AFTER --

3      **THE COURT:**  RIGHT.  AND I HAVE SUSTAINED A NUMBER OF

4   OBJECTIONS FOR ANYTHING ABOUT THIS FINAL SCULPT, BECAUSE WHAT'S

5   RELEVANT IS WHAT CARTER BRYANT DID IN THE SEPTEMBER/OCTOBER      10:03

6   TIME PERIOD AND BEFORE THAT.  NOT WHAT HAPPENED TO THE DOLL

7   AFTER THAT, WHICH IS RESERVED FOR 1-B; SO THAT PROGNOSTICATION

8   IS ACCURATE.  UNLESS I'M MISSING SOMETHING.

9      IS THERE A REASON WHY THIS IS RELEVANT?

10      **MR. NOLAN:**  YES.                                          10:03

11      **THE COURT:**  OKAY.

12      **MR. NOLAN:**  AND WE'RE TALKING ABOUT THE VERDICT

13   FORMS -- I'M NOT PREDICTING HOW IT'S GOING TO COME OUT, BUT I

14   HAVE TO SAY THAT THEY HAVE ON THEIR VERDICT FORM EXHIBIT NUMBER

15   1234 AND 1234-A AS A SCULPT THEY WANT TO ASK THE JURY TO AWARD   10:03

16   TO MATTEL.

17      **THE COURT:**  THAT'S THE ONE SITTING UP THERE?

18      **MS. AGUIAR:**  NO.  THIS IS AT ANOTHER ONE.

19      EXHIBIT 1234 IS A SCULPT OR A CAST THAT POST-DATES

20   OCTOBER 19TH.  EVEN THOUGH IT POST-DATES OCTOBER 19TH, IT IS A   10:04

21   SCULPT THAT IS CURRENTLY ON MATTEL'S VERDICT FORM.

22      **THE COURT:**  YOU'RE GOING TO NEED TO EXPLAIN THAT.

23      I SEE YOUR POINT.

24      **MR. NOLAN:**  NOW ALL THINGS BECOME CLEAR.

25      **MR. PRICE:**  SO I ASKED MIKE, IS THAT A MISTAKE ABOUT     10:04

```
1    BEING ON THE VERDICT FORM, BECAUSE, OBVIOUSLY, THE RESPONSE IS
2    'RIGHT NOW, WE CAN'T TELL.'
3              SO MY SUGGESTION, THE STIPULATION WAS GOING TO BE
4    THAT IF I HAD THAT OUT AND IF IT'S ON THE VERDICT FORM, THAT WE
5    WILL STILL -- HER TESTIMONY WOULD BE THAT IT WAS AFTER          10:04
6    OCTOBER 19TH.  THE ONLY REASON IT WOULD BE ON THE FORM IS IF
7    THERE'S SOME DISPUTE.  I DON'T KNOW IF THERE IS.
8              THE COURT:  WAIT A SECOND.  I CAN DECIDE THIS RIGHT
9    NOW.  WAS THIS MOLD DONE AFTER OCTOBER 19TH?
10             MR. ZELLER:  THAT'S WHAT I'M SAYING.  I DON'T KNOW IF 10:05
11   THERE'S OTHER TESTIMONY FROM THE OTHER SIDE.  MR. NOLAN
12   PROFFERS SHE WAS SAYING IT WAS DONE AFTER OCTOBER 19TH.  I
13   CAN'T REMEMBER WHETHER MS. GARCIA OR MR. CARTER TESTIFIED ONE
14   WAY OR THE OTHER.
15             THE COURT:  NOW IS THE TIME TO LET THE COURT KNOW.    10:05
16             MR. NOLAN:  I'LL LAY THE FOUNDATION WITH HER,
17   YOUR HONOR, AND I'LL ASK HER WHETHER OR NOT SHE DID THE SCULPT
18   AFTER OCTOBER 19TH.
19             MR. PRICE:  THAT'S WHY I SAID WE'LL STIP TO THAT IF
20   THERE'S OTHER TESTIMONY AS WELL.                                10:05
21             MS. AGUIAR:  BUT LET ME JUST SAY --
22             THE COURT:  BUT IF THAT'S THE CASE, HE WANTS TO ASK
23   QUESTIONS OF HER AND HE SHOULD BE ABLE TO, IF YOU'RE
24   INSISTING ON -- COUNSEL, YOU NEED TO KNOW AT THIS POINT IN TIME
25   WHAT IS OR IS NOT THE SUBJECT OF YOUR PROPOSED VERDICT FORM.    10:05
```

1    **MS. AGUIAR:**  I CAN TELL YOU, I LOOKED AT THE VERDICT

2  FORM, WROTE DOWN THE EXHIBIT NUMBERS AND THIS EXHIBIT NUMBER IS

3  ON IT.

4         **THE COURT:**  I'M GOING TO STOP THIS RIGHT HERE.

5         YOU MAY OBJECT.  IF YOU OBJECT ON TIMELINESS, THEN                    10:05

6  IT'S NOT GOING TO BE ON THE VERDICT FORM.  IF YOU DON'T, AND IT

7  COMES IN, IT MAY OR MAY NOT BE ON THE VERDICT FORM.

8         **MR. PRICE:**  I'LL JUST OBJECT ON TIMELINESS, BECAUSE

9  HE'S RECOVERED --

10        **THE COURT:**  SUSTAIN THE OBJECTION.  IT'S OFF THE                   10:06

11  VERDICT FORM.

12        **MR. NOLAN:**  SINCE WE WENT BACK TO THE SIDEBAR, AFTER

13  I SUGGESTED THERE WAS A STIPULATION, I DON'T WANT IT TO APPEAR

14  AS THOUGH THERE WASN'T A STIPULATION.

15        **THE COURT:**  I'LL CLARIFY IT TO THE JURY.                          10:06

16        **MR. PRICE:**  YOU PROFFERED; I OBJECTED; YOU SUSTAINED

17  IT.

18        **THE COURT:**  I'LL TAKE CARE OF THIS, COUNSEL.

19        THANK YOU.

20        (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

21        **THE COURT:**  THE JURY IS INSTRUCTED TO DISREGARD THAT

22  ENTIRE LAST INCIDENT AS IF IT NEVER HAPPENED AT ALL.

23        COUNSEL, YOUR NEXT QUESTION.

24        **MR. NOLAN:**  BUT NOBODY GOT IN TROUBLE.

25        **THE COURT:**  NOBODY GOT IN TROUBLE.                                10:07

```
 1              LET'S JUST MOVE ALONG.
 2    BY MR. NOLAN:
 3    Q    MS. LEAHY, AT ANY TIME, WERE YOU INSTRUCTED BY MGA TO
 4    CONCEAL CARTER BRYANT'S INVOLVEMENTS IN THE BRATZ PROJECT?
 5    A    NO.                                                        10:07
 6    Q    AFTER YOU HAD FINISHED SCULPTING THE FINAL BRATZ SCULPT
 7    AND THE BRATZ DOLL WAS OFFERED FOR RETAIL, DID ANYBODY FROM MGA
 8    EVER COME BACK TO YOU AND SAY YOU HAD TO KEEP CARTER BRYANT
 9    UNDER WRAPS?
10    A    NO.  NEVER.                                                10:08
11    Q    DO YOU RECALL ANY CONVERSATION WITH ANYBODY AFTER YOU DID
12    THE FINAL BRATZ PROJECT WHERE YOU DISCUSSED CARTER BRYANT?
13    A    WELL, YEAH.  I TALKED TO VARIOUS FRIENDS ABOUT IT.  IT WAS
14    KIND OF EXCITING THAT IT CAME OUT.  IT WAS THE FIRST DOLL I
15    EVER DID.                                                      10:08
16    Q    DID YOU TALK TO ANYBODY EMPLOYED AT MATTEL?
17    A    YES.
18    Q    AND WHO WAS THAT?
19    A    WELL, THERE WAS MY GOOD FRIEND ROXANNA POWELL.  I TALKED
20    TO MY OLD BOSSES.                                              10:09
21              MR. PRICE:  OBJECTION.  THIS IS IRRELEVANT TO THIS.
22              THE COURT:  OVERRULED.
23              IT'S A FOUNDATIONAL QUESTION, WHO SHE TALKED TO.
24              JUST IDENTIFY THE PEOPLE.
25              THE WITNESS:  MICHAEL HEBDEN, WHO WAS MY SUPERVISOR;  10:09
```

```
 1   ABBO, WHO WAS MY MENTOR THERE.
 2   BY MR. NOLAN:
 3   Q    THESE LAST THREE PEOPLE ARE PEOPLE THAT WERE EMPLOYED AT
 4   MATTEL?
 5   A    YES.                                                      10:09
 6   Q    WHEN DID YOU HAVE CONVERSATIONS WITH THEM?
 7   A    IT WOULD HAVE BEEN AFTER IT CAME OUT, WHEN EVERYBODY KNEW
 8   ABOUT IT.
 9   Q    APPROXIMATELY WHAT TIME PERIOD?
10   A    2001, LATE 2001; FALL, PROBABLY.                          10:09
11   Q    ANY OTHER MATTEL EMPLOYEES THAT YOU DISCLOSED CARTER'S
12   INVOLVEMENT WITH BRATZ, OTHER THAN THE THREE YOU'VE IDENTIFIED
13   FOR THE JURY?
14   A    NOT THAT I REMEMBER SPECIFICALLY.  EVERYBODY KNEW ABOUT
15   CARTER AND THE BRATZ AT THE TIME.                              10:10
16        MR. PRICE:  MOVE TO STRIKE THE LAST PART AS
17   NONRESPONSIVE.
18        THE COURT:  IT IS.
19        EVERYTHING AFTER "NOT THAT I REMEMBER SPECIFICALLY"
20   IS STRICKEN.                                                   10:10
21   BY MR. NOLAN:
22   Q    WHAT DID YOU TELL THESE THREE INDIVIDUALS ABOUT YOUR WORK
23   ON BRATZ, THESE MATTEL EMPLOYEES?
24        MR. PRICE:  OBJECTION.  COMPOUND.
25        THE COURT:  IT IS.                                        10:10
```

1           LET ME SEE YOU AT SIDE-BAR, COUNSEL.

2           ACTUALLY, LET'S TAKE OUR MORNING RECESS AT THIS TIME.

3           (WHEREUPON, JURORS DEPART COURTROOM.)

4       **THE COURT:**  COUNSEL, WHAT I WANT TO DISCUSS,

5   ACTUALLY -- I ASSUME WHERE THIS IS GOING TOWARDS IS REBUTTING          10:11

6   THE ALLEGATION OF A REQUIRED CLOAK OF SECRECY CONCERNING THIS.

7           **MR. NOLAN:**  THAT'S RIGHT.

8       **THE COURT:**  VERY GOOD.  I JUST WANTED TO MAKE SURE

9   THAT I UNDERSTOOD EXACTLY WHERE THIS IS GOING.

10          AND THE COMPOUND OBJECTION IS SUSTAINED.  JUST          10:11

11  REPHRASE YOUR QUESTION WHEN WE COME BACK.

12          **MR. NOLAN:**  I WILL, YOUR HONOR.

13      **THE COURT:**  I WAS JUST CONFUSED THERE FOR A SECOND.

14          THE COURT IS GOING TO HAVE TO TAKE A BIT OF A BREAK.

15  AND I KNOW YOU ASKED FOR THE PALMER RULINGS.          10:11

16          DO WE HAVE ENOUGH TO GET THROUGH TO LUNCHTIME, OR IS

17  THAT SOMETHING THAT YOU REALLY NEED IN THE NEXT HOUR AND A

18  HALF?

19          **MR. NOLAN:**  NO.  I THINK WE HAVE ENOUGH.

20      **THE COURT:**  TO GET THROUGH TO LUNCH?          10:12

21      **MR. NOLAN:**  RIGHT.  YES.

22      **THE COURT:**  BECAUSE I'VE MADE MY RULINGS ON PALMER

23  SUBJECT TO SOME ARGUMENT THAT I WANT TO HEAR, BUT I WANT TO

24  ADDRESS THIS.

25          **MR. NOLAN:**  WE CLEARLY CAN MAKE IT TO LUNCH, BECAUSE          10:12

```
 1  WE HAVE OTHER VIDEOS.

 2           THE COURT:  THAT'S RIGHT.

 3           MR. NOLAN:  YOUR HONOR, ONE LAST MINUTE.

 4           WE HAVE MR. DEANDA ON THE WITNESS STAND, AND I INTEND

 5  TO CALL HIM.                                                   10:12

 6           THE COURT:  YES.

 7           MR. NOLAN:  ONE OF THE AREAS THAT I WANT TO JUST

 8  CLEAN UP -- AND IT WILL BE VERY QUICK -- BECAUSE IT CAME UP IN

 9  THE TESTIMONY OF MR. MARLOW WITH RESPECT TO THE SEAMSTRESSES.

10           THE COURT:  YES.                                      10:12

11           MR. NOLAN:  I WANT TO ESTABLISH, THROUGH MR. DEANDA,

12  THAT THOSE SEAMSTRESSES WERE FIRED, AND I WANTED TO ALERT THE

13  COURT OF THAT AHEAD OF TIME, JUST AS AN OFFICER OF THE COURT.

14  WHAT I DIDN'T WANT TO HAVE IS A WHOLE BLOWUP --

15           THE COURT:  WHAT IS THE RELEVANCE OF THAT?            10:12

16           MR. NOLAN:  I THINK IT GOES TO THE WHOLE QUESTION OF

17  PETER MARLOW.  IN HIS TESTIMONY, THE COURT WILL RECALL THAT HE

18  DID CERTAIN THINGS WITHOUT MGA'S KNOWLEDGE CONCERNING HIDING OR

19  CONCEALING THEIR IDENTITY FROM MATTEL.  AND WE THINK THE FACT

20  THAT MATTEL, ONCE THEY LEARNED ABOUT THIS LATE-NIGHT, OFF-DUTY  10:13

21  WORK, FIRED THE MATTEL EMPLOYEES.  IT GIVES CREDENCE AS TO THE

22  EXPLANATION THAT PETER MARLOW WAS OFFERING UP WITH RESPECT TO

23  THE FEAR THAT THEY HAD THAT THERE WOULD BE SOME ACTION -- I'M

24  NOT GOING TO GO INTO DETAIL ON IT, BUT I THINK WE NEED TO

25  ESTABLISH ON THE RECORD THAT THEY WERE FIRED.                  10:13
```

```
 1              THE COURT:  LET ME HEAR FROM MATTEL ON THAT, BRIEFLY.

 2              MR. ZELLER:  IT'S NOT RELEVANT.  AND NUMBER TWO,

 3     MR. DEANDA -- AND I CAN MAKE THIS REPRESENTATION ON THE

 4     RECORD -- MR. DEANDA DOES NOT HAVE PERSONAL KNOWLEDGE AS TO

 5     WHAT HAPPENED WITH THE SAMPLE MAKERS, THESE DISLOYAL EMPLOYEES.   10:13

 6     HE WAS NOT PART OF THAT DECISION.

 7              SO HE IS NOT, IN ANY EVENT, THE PERSON TO COME IN AND

 8     TESTIFY, AND THERE'S NO BASIS FOR EVEN ASKING HIM.

 9              THE COURT:  WELL, IT SOUNDS LIKE A FOUNDATIONAL

10     OBJECTION.  WE'LL TAKE THEM UP IN THE COURSE OF THE WITNESS.      10:14

11              THE ISSUE I'M CONCERNED ABOUT IS THIS SIDLEY AUSTIN

12     LETTER THAT I SAW AT SIDE-BAR AND THE ETHICAL ISSUE RAISED BY

13     THAT COUNSEL.  I WANT TO GET TO THE BOTTOM OF THAT AS TO WHAT

14     HAPPENED WITH MICHAEL MOORE, OR ALLEGEDLY HAPPENED.

15              WHERE IS THAT AT?                                       10:14

16              MR. ZELLER:  IF I MAY, YOUR HONOR, JUST FOR THE

17     RECORD, ON THE LAST PART, WE WOULD HAVE A 403 OBJECTION, AS

18     WELL, TO THE WHOLE ISSUE.

19              THE COURT:  I'LL TAKE THOSE UP IN THE COURSE OF THE

20     TESTIMONY.                                                       10:14

21              MR. ZELLER:  WITH RESPECT TO THE MICHAEL MOORE

22     ALLEGATIONS, MR. MOORE DISPUTES THEM; THAT HE DID NOT CONTACT

23     THEM OR, YOU KNOW, TALKED TO MS. LEAHY AT THE TIME THAT HE KNEW

24     SHE WAS REPRESENTED.

25              IN FACT, THE TESTIMONY --                               10:14
```

1          **THE COURT:**  SHE TESTIFIED THAT SHE WASN'T

2     REPRESENTED.

3          **MR. ZELLER:**  RIGHT.

4          **THE COURT:**  CAN I SEE THAT LETTER AGAIN.

5          (DOCUMENT PROVIDED TO THE COURT.)                          10:15

6          **THE COURT:**  THERE'S NO QUESTION THAT HE DID CALL HER,

7     THOUGH; RIGHT?

8          **MR. ZELLER:**  I BELIEVE THAT'S CORRECT.

9          **MR. NOLAN:**  FOR THE RECORD, IT'S 18572, THE LETTER

10    THAT YOU'RE READING NOW.                                        10:15

11         **THE COURT:**  THANK YOU.

12         (BRIEF PAUSE.)

13         **THE COURT:**  MR. NOLAN, WE DID HEAR FROM THE WITNESS

14    THAT SHE INDICATED THAT SHE WAS NOT REPRESENTED AT THE TIME OF

15    THE PHONE CALL.  THE LETTER HERE SUGGESTS THAT NOTICE WAS       10:16

16    PROVIDED TO MR. MOORE THAT SHE WAS REPRESENTED.

17         DO YOU HAVE THAT NOTICE?

18         **MR. NOLAN:**  I DON'T.  AND WHAT I WAS GOING TO ASK IS

19    IF MR. MCFARLAND, WHO IS HERE -- I WAS NOT INVOLVED IN THE CASE

20    AT THIS TIME.  I DO THINK THAT MR. MCFARLAND MAY HAVE MORE      10:16

21    BACKGROUND ON THIS THAN I DO, SINCE HE REPRESENTS MS. LEAHY.

22    BUT MAYBE NOT.  THAT WAS THE INFORMATION THAT I HAD.

23         **THE COURT:**  MR. MCFARLAND, DO YOU HAVE THE NOTICE

24    THAT'S REFERENCED IN THIS LETTER FROM SIDLEY AUSTIN TO

25    QUINN EMANUEL?  AND THE REFERENCE I'M MAKING -- IT INDICATES    10:16

1   HERE THAT "WE ARE TROUBLED TO LEARN THAT MICHAEL MOORE,

2   IN-HOUSE COUNSEL FOR MATTEL, HAS HAD CONTACT WITH OUR CLIENT,

3   EVEN THOUGH HE HAD BEEN PREVIOUSLY ADVISED BY HER THAT SHE WAS

4   REPRESENTED BY COUNSEL."

5            WAS THERE ANY MEMORIALIZATION ON THAT?  BECAUSE THE          10:16

6   WITNESS JUST TESTIFIED THAT SHE WAS NOT REPRESENTED AT THE TIME

7   OF THE CONVERSATION.

8            **MR. MCFARLAND:**  HERE'S MY UNDERSTANDING:

9            I DIDN'T REPRESENT HER AT THE TIME.  AT THE TIME, THE

10  REPRESENTATION -- THE SIDLEY AUSTIN RETAINER LETTER IS DATED       10:17

11  DECEMBER 3RD OR 4TH.  THIS LETTER IS DATED JANUARY 5, 2005.  MY

12  UNDERSTANDING IS, THERE WAS MORE THAN ONE CONVERSATION WITH

13  MR. MOORE, AND WHAT YOU GOT INTO WAS THE FIRST CONVERSATION.

14           I THINK THAT THERE WAS SOME CONTINUING CONVERSATIONS,

15  EITHER DIRECTLY OR THROUGH THE HUSBAND, SOME OF WHICH FELL         10:17

16  DURING THIS REPRESENTATION PERIOD.

17           **THE COURT:**  THE COURT IS NOT GOING TO GET INTO THE

18  CONSERVATIONS WITH THE HUSBAND BECAUSE OF, AS DISCUSSED AT

19  SIDE-BAR, THE ASSERTION OF THE MARITAL PRIVILEGE; SO THAT'S

20  OFF, PURSUANT TO THIS WITNESS.                                     10:17

21           THE WITNESS ONLY INDICATED IN THE TESTIMONY THAT

22  THERE WAS THE ONE CONVERSATION DIRECTLY WITH HER AND SHE HAS

23  INDICATED THAT WAS PRIOR TO REPRESENTATION.

24           IS THERE ANY EVIDENCE TO THE CONTRARY THAT YOU WOULD

25  HAVE AT THIS POINT?                                                10:17

```
 1            AND I UNDERSTAND YOU DIDN'T REPRESENT HER AT THE
 2   TIME, BUT I'M JUST ASKING YOU --
 3            MR. MCFARLAND:  THERE'S NO WRITTEN EVIDENCE.
 4            THE COURT:  YOU DON'T HAVE ANYTHING?
 5            MR. MCFARLAND:  NO, WE DO NOT.
 6            THE COURT:  MR. NOLAN?
 7            MR. NOLAN:  WE DON'T HAVE IT HERE, BUT WE'LL DO A
 8   SEARCH RIGHT AWAY ON THE DATABASE TO SEE WHETHER OR NOT WE CAN
 9   BRING THIS TO CONCLUSION.
10            THE COURT:  IF YOU HAVE ANY EVIDENCE, BRING IT TO THE
11   COURT'S ATTENTION.  OTHERWISE, THE COURT IS GOING TO ACCEPT THE
12   REPRESENTATION OF THE WITNESS AT THIS TIME.
13            COURT IS IN RECESS.
14            (WHEREUPON A BRIEF RECESS WAS HELD.)
15            (JURORS ENTER COURTROOM.)
16            (WITNESS RESUMES STAND. )
17            MR. NOLAN:  YOUR HONOR, ONE ADMINISTRATIVE MATTER.
18        I'D MOVE INTO EVIDENCE 1140 A, B, C, AND D, THOSE MOLDS.
19            THE COURT:  THEY ARE ADMITTED.
20            (EXHIBITS 1140 A, B, C, and D are received.)
21   BY MR. NOLAN:
22   Q   JUST BEFORE THE BREAK, WE WERE TALKING ABOUT CONVERSATIONS
23   YOU HAD WITH THREE INDIVIDUALS IN THE SUMMER OF 2001.
24            DO YOU RECALL THAT?
25   A   YES.
```

10:18

10:18

10:37

10:37

10:38

1    Q    ONE OF THE NAMES WAS ROXANNA POWELL; CORRECT?

2         DO YOU KNOW, WAS ROXANNA POWELL EMPLOYED AT MATTEL

3    WHEN YOU HAD A CONVERSATION WITH HER?

4    A    YES, SHE WAS.

5    Q    DO YOU RECALL WHAT HER POSITION WAS?                    10:38

6    A    I DON'T KNOW HER TITLE, BUT SHE WAS A DESIGNER.

7    Q    AND WHAT DID YOU SAY TO MS. POWELL?

8    A    WELL, WE WERE DOING GYMNASTICS TOGETHER AT THE TIME AND WE

9    WOULD GO OUT AFTERWARDS AND TALK ABOUT STUFF; SO I WOULD TELL

10   HER ABOUT HOW IT WORKED AND WHAT I DID AND THINGS LIKE THAT.    10:38

11   WE TALKED A LOT, SO IT'S HARD TO REMEMBER VERBATIM.

12   Q    DID YOU DISCUSS WITH ROXANNA POWELL CARTER BRYANT'S

13   INVOLVEMENT WITH THE PROJECT?

14   A    YEAH, WE TALKED ABOUT CARTER.

15   Q    WHAT DID YOU SAY ABOUT CARTER?                           10:38

16   A    I REMEMBER ONE CONVERSATION WHERE SHE HAD ASKED, YOU KNOW,

17   WHAT PAULA'S ROLE WAS, WHAT CARTER'S ROLE WAS, ON THE DOLL.

18   Q    HOW DID YOU DESCRIBE PAULA'S ROLE WITH THE DOLL?

19   A    I WOULD DESCRIBE PAULA AS THE ONE THAT REALLY PUT IT

20   TOGETHER --                                                  10:39

21        MR. PRICE:  OBJECTION, YOUR HONOR.  IRRELEVANT;

22   HEARSAY.

23        THE COURT:  I THINK YOU NEED TO REPHRASE YOUR

24   QUESTION AND FOCUS ON A PARTICULAR TIME FRAME.

25   / / /                                                        10:39

THURSDAY, JULY 3, 2008                TRIAL DAY 20, MORNING SESSION

**BY MR. NOLAN:**

Q    IN THIS CONVERSATION WITH ROXANNA POWELL, DID YOU DESCRIBE
FOR HER PAULA TREANTAFELLES' ROLE DURING THE PERIOD OF THE
EARLIER CREATION IN THE BRATZ CONCEPT?

        **MR. PRICE:**  OBJECTION.                                    10:39

        **THE COURT:**  SUSTAINED.

**BY MR. NOLAN:**

Q    DURING THE CONVERSATION, DID YOU TELL ROXANNA POWELL ABOUT
CARTER BRYANT'S INVOLVEMENT IN THE EARLY CONCEPT OF THE BRATZ?

        **THE COURT:**  COUNSEL, THE PART I'M OVERRULING IS --    10:39
I'LL ALLOW YOU TO EXPLORE THE RELATIVE ROLES OF ANY INDIVIDUALS
AT THE MEETINGS WITH MR. BRYANT IN THE TIME PERIOD OF SEPTEMBER
AND OCTOBER OF 2000; NARROW THE QUESTION TO THAT.

**BY MR. NOLAN:**

Q    SO GOING BACK, IF I COULD, TO THE CONVERSATION THAT YOU    10:40
HAD WITH ROXANNA POWELL IN JUNE OF 2001, WERE YOU RELATING BACK
TO MS. POWELL WHAT THE EARLY DEVELOPMENT OF BRATZ WAS?

A    I DON'T KNOW IF WE TALKED ABOUT THE EARLY DEVELOPMENT
SPECIFICALLY; IT WAS THE OVERALL, YOU KNOW, PHENOMENON OF IT.

Q    WHAT DID YOU SAY, IF ANYTHING, TO HER WITH RESPECT TO WHAT    10:40
CARTER'S ROLE WAS IN THE BRATZ CONCEPTION?

A    WELL, THAT CARTER CAME UP WITH THE CONCEPT DRAWINGS.

Q    WHAT DID MS. POWELL SAY IN RESPONSE TO THAT?

        **MR. PRICE:**  OBJECTION.  HEARSAY.

        **THE COURT:**  SUSTAINED.                                  10:41

THURSDAY, JULY 3, 2008          TRIAL DAY 20, MORNING SESSION

```
 1   BY MR. NOLAN:
 2   Q    TURNING TO THE NEXT PERSON THAT YOU MENTIONED,
 3   MICHAEL HEBDEN.  IS THAT H-E-B-D-O-N?
 4   A    D-E-N.
 5   Q    AND WHO IS MICHAEL HEBDEN?                              10:41
 6   A    HE WAS MY SUPERVISOR AT MATTEL.
 7   Q    AND WHEN YOU HAD THIS CONVERSATION WITH MR. HEBDEN, WAS HE
 8   STILL EMPLOYED AT MATTEL?
 9   A    YES, HE WAS.
10   Q    DO YOU RECALL WHAT HIS ROLE WAS AT MATTEL AT THE TIME OF  10:41
11   THE CONVERSATION?
12        MR. PRICE:  OBJECTION.  FOUNDATION; AT THAT TIME.
13        THE COURT:  LAY FURTHER FOUNDATION.
14   BY MR. NOLAN:
15   Q    AT THE TIME YOU WERE HAVING THIS CONVERSATION WITH      10:41
16   MR. HEBDEN, WHAT TIME PERIOD ARE WE TALKING ABOUT?  WHEN DID
17   YOU HAVE THE CONVERSATION WITH MR. HEBDEN?
18   A    WELL, IT WOULD HAVE BEEN AFTER BRATZ CAME OUT AND AFTER
19   EVERYBODY KNEW ABOUT IT.
20   Q    DO YOU HAVE AN APPROXIMATION AS TO WHAT TIME THAT       10:41
21   CONVERSATION TOOK PLACE?
22   A    IT WOULD HAVE BEEN AROUND THE FALL OF 2001.
23   Q    AND WHAT DID YOU SAY TO MR. HEBDEN?
24   A    I THINK, YOU KNOW, WHEN I QUIT THE DEPARTMENT IT WAS A
25   HARD DECISION.  I REALLY FELT PROUD OF MYSELF BECAUSE I WAS  10:42
```

```
 1    SUCCESSFUL AND I HAD A CHANCE TO WORK ON A VERY SUCCESSFUL --

 2              MR. PRICE:  OBJECTION.  NONRESPONSIVE; AND TOO BROAD,

 3    GIVEN THE NARROW RELEVANCE.

 4              THE COURT:  JUST WHAT DID YOU SAY TO MR. HEBDEN?

 5              THE WITNESS:  I DON'T KNOW THE ACTUAL WORDS.  I JUST        10:42

 6    TALKED ABOUT DOING IT.

 7    BY MR. NOLAN:

 8    Q    CAN YOU RECALL IN SUBSTANCE WHAT YOU SAID TO MR. HEBDEN

 9    ABOUT CARTER BRYANT'S INVOLVEMENT IN BRATZ?

10    A    I CAN'T REMEMBER.                                               10:42

11    Q    DID MR. HEBDEN WORK AT THE DESIGN CENTER?

12    A    YES, HE DID.

13    Q    DID YOU TELL MR. HEBDEN THAT YOU HAD BEEN INVOLVED IN

14    SCULPTING THE BRATZ DOLL?

15    A    YES.                                                            10:42

16    Q    DID YOU TELL MR. HEBDEN THAT CARTER BRYANT HAD DONE THE

17    CONCEPT DRAWINGS?

18              MR. PRICE:  OBJECTION.  LEADING.

19              THE COURT:  SUSTAINED.

20    BY MR. NOLAN:

21    Q    DID YOU SAY ANYTHING TO MR. HEBDEN ABOUT CARTER BRYANT

22    DOING THE CONCEPT DRAWINGS?

23              MR. PRICE:  OBJECTION.  ASKED AND ANSWERED; SHE SAID

24    SHE COULDN'T REMEMBER.

25              THE COURT:  SUSTAINED.                                     10:43
```

**BY MR. NOLAN:**

2  Q    DO YOU RECALL IN YOUR CONVERSATION WITH MICHAEL HEBDEN

3  WHETHER OR NOT CARTER BRYANT'S NAME CAME UP?

4  A    I DON'T KNOW IF HIS NAME CAME UP WITH MICHAEL.

5  Q    THE THIRD PERSON IS ABBO.  IS THAT ABBO HUSSEIN?          10:43

6  A    IT'S HUSSEIN ABBO.

7  Q    WHO IS HE?

8  A    HE WAS MY MENTOR AT MATTEL.  HE WAS ALSO A MANAGER.  HE

9  WAS THE MAIN SCULPTOR ON MOST OF THE BARBIE PRODUCTS THERE.

10 Q    WHEN DID YOU HAVE A CONVERSATION WITH HIM CONCERNING THE   10:43

11 BRATZ PROJECT?

12 A    IT WOULD HAVE BEEN A LITTLE BIT LATER.

13 Q    CAN YOU GIVE US YOUR BEST ESTIMATE AS TO THE TIME?

14 A    I CAN TELL YOU THE PLACE BUT I DON'T REMEMBER THE TIME.

15 Q    WHAT'S THE PLACE?                                          10:44

16 A    IT WAS AT A JAPANESE RESTAURANT IN EL SEGUNDO.

17 Q    CAN YOU RECALL THE YEAR?

18 A    IT WOULD HAVE BEEN 2001.

19 Q    AND DURING THAT CONVERSATION, DID YOU MENTION

20 CARTER BRYANT'S NAME TO HIM?                                   10:44

21 A    YEAH.  WE TALKED ABOUT CARTER AND THE DESIGNING AND THE

22 SCULPTING AND PAULA AND THE PROCESS.

23 Q    WHAT DID YOU SAY TO HIM CONCERNING CARTER BRYANT'S

24 INVOLVEMENT IN THE BRATZ PROJECT?

25 A    WELL, I WAS TALKING TO HIM ABOUT HOW CARTER CAME UP WITH   10:44

```
 1   THE CONCEPT DRAWINGS AND HOW SOMEBODY FLEW THE NEST AT MATTEL,

 2   YOU KNOW; EVERYBODY TALKED ABOUT IT.

 3   Q    DID YOU SAY TO HIM ANYTHING ABOUT YOUR SCULPTING OF THE

 4   BRATZ DOLL?

 5           MR. PRICE:  OBJECTION.  HEARSAY, YOUR HONOR.              10:44

 6           THE COURT:  YES.  SUSTAINED.

 7   BY MR. NOLAN:

 8   Q    CAN YOU RECALL ANYBODY ELSE OTHER THAN THESE THREE PEOPLE

 9   THAT YOU HAD CONVERSATIONS WITH CONCERNING THE BRATZ

10   DEVELOPMENT, AND, IN PARTICULAR, CARTER BRYANT'S INVOLVEMENT?     10:45

11           MR. PRICE:  THAT MISSTATES THE EVIDENCE.

12           THE COURT:  REPHRASE, COUNSEL.

13   BY MR. NOLAN:

14   Q    WITH RESPECT TO CONVERSATIONS WITH ROXANNA POWELL AND

15   HUSSEIN ABBO, CAN YOU RECALL ANY OTHER PEOPLE THAT YOU SPOKE TO   10:45

16   WHERE YOU DISCUSSED THE FACT THAT CARTER BRYANT HAD DONE THE

17   CONCEPT DRAWINGS FOR BRATZ?

18   A    THAT'S ALL I REMEMBER.

19   Q    NOW, AT ANY TIME DID ANYBODY EVER COME TO YOU FROM MGA AND

20   TELL YOU, 'GEE, I WISH YOU HADN'T SAID ANYTHING ABOUT CARTER      10:45

21   BRYANT'?

22   A    NO.  NOT AT ALL.

23           MR. NOLAN:  THANK YOU.  NOTHING FURTHER.

24           THE COURT:  CROSS-EXAMINATION.

25   / / /
```

|    |                                                                              |        |
|----|------------------------------------------------------------------------------|--------|
| 1  | **CROSS-EXAMINATION**                                                        |        |
| 2  | **BY MR. PRICE:**                                                            |        |
| 3  | Q    CONCERNING THAT LAST TESTIMONY, DO YOU RECALL YOUR                       |        |
| 4  | DEPOSITION TAKEN IN THIS CASE?                                                |        |
| 5  | A    YES.                                                                     | 10:46  |
| 6  | Q    AND THAT WAS TAKEN DECEMBER 2007; CORRECT?                               |        |
| 7  | A    CORRECT.                                                                 |        |
| 8  | Q    AND DO YOU RECALL AT THAT TIME THAT YOU WERE ASKED WHETHER               |        |
| 9  | YOU HAD SPOKEN WITH ANYONE AT MATTEL ABOUT ANY LAWSUIT OR                     |        |
| 10 | LITIGATION WITH MGA OR ABOUT CARTER BRYANT?                                   | 10:46  |
| 11 | DO YOU RECALL THAT QUESTION?                                                  |        |
| 12 | A    I DON'T RECALL THE QUESTION SPECIFICALLY.                                |        |
| 13 | Q    SURE.                                                                    |        |
| 14 | **MR. PRICE:**  YOUR HONOR, IF WE COULD PLAY FROM                             |        |
| 15 | MS. LEAHY'S DEPOSITION TESTIMONY, PAGE 93, LINES FOUR THROUGH                 | 10:46  |
| 16 | NINE.                                                                         |        |
| 17 | **MR. NOLAN:**  YOUR HONOR, I JUST DON'T BELIEVE THAT IS                      |        |
| 18 | APPROPRIATE TO PLAY.                                                          |        |
| 19 | **THE COURT:**  THERE'S AN OBJECTION?                                         |        |
| 20 | **MR. NOLAN:**  YES.                                                          | 10:47  |
| 21 | **THE COURT:**  COUNSEL, THE PAGE AND LINES AGAIN.                            |        |
| 22 | **MR. PRICE:**  PAGE 93, LINES FOUR THROUGH NINE.                             |        |
| 23 | **MR. NOLAN:**  YOUR HONOR, THE QUESTION IS DIRECTED TO                       |        |
| 24 | DISCUSSING LITIGATION BETWEEN MGA AND CARTER BRYANT AND THAT                  |        |
| 25 | LITIGATION WAS NOT ONGOING IN 2001, THE TIME PERIOD SHE                       | 10:47  |

1    TESTIFIED TO.

2           MR. PRICE:   THAT'S NOT HOW SHE INTERPRETED THE

3    QUESTION, BECAUSE SHE LATER AMENDS HER ANSWER.

4           THE COURT:   LET'S ASK HER SOME QUESTIONS.

5           YOU'RE GOING TO HAVE TO LAY FOUNDATION BEFORE YOU GET    10:48

6    TO THIS.

7    BY MR. PRICE:

8    Q    MS. LEAHY, DO YOU RECALL AT YOUR DEPOSITION AT ONE POINT,

9    OR SOME POINTS THERE WERE BREAKS IN THE DEPOSITION TO GIVE YOU

10   A CHANCE TO CONSULT WITH YOUR ATTORNEY.  DO YOU RECALL THAT?    10:48

11   A    YES.

12   Q    AT ONE POINT YOU CAME BACK AND SAID YOU HAD AN ADDITION OR

13   SOME ADDITIONS TO MAKE TO YOUR TESTIMONY.  DO YOU RECALL THAT?

14   A    YES.

15   Q    AND ONE OF THE ADDITIONS THAT YOU MADE WAS YOU SAID THAT    10:48

16   YOU WANTED TO ADD THAT YOU HAD A CONVERSATION WITH I THINK IT

17   WAS ROXANNE POWELL.

18   A    ROXANNA.

19   Q    DO YOU RECALL THAT?

20   A    I RECALL SOMETHING LIKE THAT.    10:48

21   Q    AND IN DOING THAT, YOU WERE ADDING OR YOU WERE TRYING TO

22   MODIFY SOME TESTIMONY YOU HAD GIVEN EARLIER; CORRECT?

23          MR. NOLAN:   OBJECTION TO THE CHARACTERIZATION OF WHAT

24   SHE WAS TRYING TO DO, YOUR HONOR.

25          THE WITNESS:   CAN I READ IT?    10:49

```
 1              THE COURT:  OVERRULED.

 2              YOU MAY ANSWER.

 3              MR. PRICE:  LET ME REFRESH YOUR RECOLLECTION.  LOOK

 4   AT PAGE --

 5              THE COURT:  COUNSEL, LET HER ANSWER THE QUESTION.          10:49

 6   SHE HASN'T INDICATED SHE HAS FORGOTTEN.

 7              THE WITNESS:  CAN YOU ASK THE QUESTION AGAIN?

 8              MR. PRICE:  I KNOW YOU KIND OF POINTED, SO I THOUGHT

 9   YOU WERE POINTING TO YOUR DEPOSITION TRANSCRIPT.

10              THE COURT:  COUNSEL, ASK THE QUESTION AGAIN.             10:49

11   BY MR. PRICE:

12   Q    THE QUESTION IS:  DO YOU RECALL AT ONE POINT, AFTER

13   SPEAKING WITH YOUR COUNSEL, YOU CAME INTO THE ROOM AND SAID

14   THAT THERE WAS SOMETHING YOU WANTED TO ADD TO YOUR PRIOR

15   TESTIMONY?                                                         10:49

16   A    YEAH.  I REMEMBER THAT.

17   Q    AND YOU WANTED TO ADD A CONVERSATION WITH ROXANNA POWELL;

18   CORRECT?

19   A    THIS IS TALKING ABOUT WHICH QUESTION, THOUGH?

20   Q    WELL, IF YOU WOULD LOOK AT PAGE 204 OF YOUR DEPOSITION,       10:49

21   LINE 22, DO YOU RECALL THAT YOU WANTED TO ADD TO YOUR PRIOR --

22              THE COURT:  COUNSEL, LET HER READ THE DEPOSITION.

23              MR. PRICE:  PAGE 204, LINE 22, TO 205, LINE FOUR; YOU

24   CAN READ FURTHER IF YOU NEED TO REFRESH YOUR MEMORY.

25              THE WITNESS:  OKAY.  I REMEMBER IT NOW, LOOKING AT       10:50
```

1    IT.

2    **BY MR. PRICE:**

3    Q    DO YOU RECALL THAT YOU WANTED TO TALK ABOUT -- ADD

4    TESTIMONY ABOUT A CONVERSATION WITH ROXANNA POWELL THAT YOU HAD

5    NOT PREVIOUSLY SAID IN RESPONSE TO AN EARLIER QUESTION;          10:50

6    CORRECT?

7    A    BUT WHAT WAS THE PRIOR TESTIMONY?

8    Q    WELL, THAT'S GOING TO BE MY NEXT QUESTION.

9         DO YOU SEE, YOU WERE SAYING THAT YOU WANTED TO ADD TO

10   YOUR PRIOR TESTIMONY ABOUT TALKING ABOUT THE CASE?  DO YOU SEE   10:50

11   THAT?  THIS IS 204, LINES 22 THROUGH 25.

12   A    IT JUST SAYS "PRIOR TESTIMONY."

13        WHERE IS THE PRIOR TESTIMONY?

14        I'M JUST TRYING TO GET A REFERENCE.

15   Q    FIRST I'M GOING TO ASK YOU TO LOOK AT THIS WHERE YOU SAY    10:51

16   YOU WANT TO ADD TO YOUR PRIOR TESTIMONY ABOUT TALKING ABOUT THE

17   CASE.

18        DO YOU SEE THAT?

19   A    AND THE PRIOR TESTIMONY ABOUT TALKING ABOUT THE CASE IS

20   WHERE?  CAN I READ THAT?                                        10:51

21   Q    LOOK AT PAGE 93 AND LOOK AT LINES FOUR THROUGH NINE.

22   A    RIGHT.

23   Q    IS IT YOUR BEST RECOLLECTION THAT'S THE ANSWER YOU WANTED

24   TO ADD TO?

25   A    YEAH, THE PART ABOUT 'OR CARTER BRYANT.'                    10:51

```
 1          MR. PRICE:  AT THIS POINT, YOUR HONOR, IF I MAY PLAY
 2    93, LINES FOUR THROUGH NINE.
 3          THE COURT:  COUNSEL?
 4          MR. NOLAN:  STILL THE SAME OBJECTION.  LACK OF
 5    FOUNDATION, YOUR HONOR.  IT'S NOT PROPER IMPEACHMENT.          10:52
 6          THE COURT:  COUNSEL, JUST ASK THESE QUESTIONS, NOW
 7    THAT SHE'S REFRESHED HER RECOLLECTION WITH THE DEPOSITION.
 8    LET'S SEE IF YOU CAN'T PROCEED IN THAT MANNER.
 9    BY MR. PRICE:
10    Q    UP UNTIL THE TIME OF YOUR DEPOSITION, HAD YOU SPOKEN WITH  10:52
11    ANYONE AT MATTEL ABOUT ANY LAWSUIT OR LITIGATION WITH MGA OR
12    CARTER BRYANT?
13    A    WELL, I SPOKE ABOUT CARTER BRYANT BUT I DIDN'T SPEAK ABOUT
14    THE LAWSUITS OR THE LITIGATION.
15          I JUST UNDERSTAND THAT AS THEM ASKING IF I TALKED     10:52
16    ABOUT CARTER -- NOT ABOUT CARTER AND --
17    Q    YOU UNDERSTOOD THAT TO BEING ASKED WHETHER YOU TALKED WITH
18    HIM ABOUT CARTER BRYANT.
19          THE COURT:  THE PROBLEM IS IT'S COMPOUND, COUNSEL, AS
20    THE WITNESS HAS APTLY POINTED OUT; SO BREAK THE QUESTION DOWN  10:52
21    INTO SEPARATE --
22          MR. PRICE:  I THINK SHE SAID --
23    BY MR. PRICE:
24    Q    YOU UNDERSTOOD THAT QUESTION TO BE ASKING YOU NOT JUST
25    ABOUT THE CASE BUT WHETHER YOU HAD ANY CONVERSATIONS WITH     10:52
```

```
 1   CARTER BRYANT.
 2   A    ABOUT CARTER BRYANT.  ABOUT.
 3          THE COURT:  COUNSEL, I'M GOING TO INTERJECT.
 4          IT'S A COMPOUND QUESTION.  BREAK THE QUESTION UP AND
 5   ASK THE WITNESS EACH COMPONENT SEPARATELY.                    10:53
 6          MR. PRICE:  MAY I HAVE A SIDE-BAR ON THIS?
 7          THE COURT:  YES.
 8          (SIDE-BAR PROCEEDINGS AS FOLLOWS:)
 9          THE COURT:  FIRST OF ALL, THIS IS A COMPOUND
10   QUESTION, AND THE WITNESS IS CLEARLY STRUGGLING BECAUSE SHE    10:53
11   WANTS TO ANSWER TO THE CARTER BRYANT PART BUT NOT TO THE MGA
12   PART.
13          MR. PRICE:  WHAT'S IMPORTANT, FIRST, THERE'S NO
14   OBJECTION IT WAS COMPOUND AT THIS TIME.
15          THE COURT:  I UNDERSTAND.  BUT IT'S A CONCERN WITH      10:53
16   THE CONFUSION HERE WITH THE WITNESS.  THE COURT IS TRYING TO
17   KEEP ORDER --
18          MR. PRICE:  LET ME CLARIFY.  WHAT SHE JUST SAID WAS
19   -- WHAT SHE UNDERSTOOD WAS RATHER THAN ASKING JUST ABOUT THE
20   CASE BUT ALSO ASKING ABOUT CARTER BRYANT.  SHE SAID NO, BUT    10:54
21   THEN SHE AMENDED HER ANSWER AND ADDED ONE PERSON.  NOT THREE.
22   SO THAT'S THE POINT.  SHE UNDERSTOOD THIS.  YOU CAN SEE BY THE
23   FACTS, SHE ADDED TO THE ANSWER.  SHE UNDERSTOOD THIS TO BE
24   ASKING WHETHER SHE HAD SPOKEN WITH ANYONE AT MATTEL ABOUT
25   CARTER BRYANT.  BECAUSE THEN SHE SAYS I HAD THIS CONVERSATION   10:54
```

1    WITH ROXANNA POWELL WHICH DIDN'T CONCERN THE CASE, IT JUST

2    CONCERNED CARTER BRYANT; SO THAT'S MY POINT.  HER UNDERSTANDING

3    IS IMPORTANT.

4           **THE COURT:**  I THINK THAT THIS IS STRUCTURED ON A

5    POORLY WORDED QUESTION AND I'M GOING TO SUSTAIN THE OBJECTION.    10:54

6    MOVE ALONG TO THE NEXT QUESTION.

7           (SIDE-BAR PROCEEDINGS CONCLUDED.)

8    **BY MR. PRICE:**

9    Q    MS. LEAHY, IN ANY EVENT, AT SOME POINT IN YOUR DEPOSITION,

10   YOU CAME BACK AND SAID YOU WANTED TO ADD SOME INFORMATION ABOUT   10:55

11   ROXANNA POWELL; CORRECT?

12   A    CORRECT.  THAT'S THIS ONE, RIGHT, ON 204?

13   Q    YES.  AND AT THAT TIME WHEN YOU WANTED TO ADD INFORMATION,

14   YOU TALKED ABOUT A CONVERSATION YOU HAD WITH ROXANNA POWELL

15   ABOUT CARTER BRYANT; CORRECT?                                    10:55

16   A    CORRECT.

17   Q    NOT ABOUT THE CASE BUT ABOUT CARTER BRYANT; RIGHT?

18   A    CORRECT.  THERE WASN'T A CASE.

19   Q    WHEN YOU CAME BACK TO SAY YOU WANTED TO ADD INFORMATION

20   ABOUT WHO YOU TALKED TO ABOUT CARTER BRYANT, YOU ONLY MENTIONED   10:55

21   ROXANNA POWELL; YOU DIDN'T MENTION MR. HEBDEN OR HUSSEIN ABBO;

22   CORRECT?

23   A    NOT IN THE DEPOSITION, NO.

24   Q    AND THE REASON YOU CAME BACK FROM THE BREAK WAS TO MAKE

25   SURE THE RECORD WAS ACCURATE; YOU WANTED TO ADD SOME             10:55

4299

1    INFORMATION; RIGHT?

2    A    YEAH, AS MUCH AS I COULD REMEMBER.

3    Q    AND IT'S TRUE THAT -- BY THE WAY, IN YOUR TESTIMONY, AT

4    THAT TIME YOU SAID YOU SPOKE WITH MS. POWELL, WAS IT AT A BAR

5    AFTER ONE OF YOUR WORKOUTS?                                        10:56

6    A    GYMNASTICS.

7    Q    AND THAT SHE WAS THE ONE TO INITIATE THE CONVERSATION.

8    A    CORRECT.

9    Q    AND YOU WERE ASKED BY MR. NOLAN WHETHER OR NOT, WHEN YOU

10   WERE WORKING ON BRATZ, WHETHER YOU WERE TOLD TO KEEP QUIET        10:56

11   ABOUT MR. BRYANT.  CLEARLY WHEN YOU WERE WORKING ON BRATZ AND

12   BEFORE THE DOLL BECAME PUBLIC, YOU KNEW THAT AS OF VENDOR YOU

13   WERE SUPPOSED TO KEEP INFORMATION ABOUT BRATZ CONFIDENTIAL;

14   CORRECT?

15   A    CORRECT.                                                     10:56

16   Q    NOW, AFTER BRATZ CAME OUT, YOU SAID YOU HAD THIS

17   CONVERSATION WITH MS. POWELL; RIGHT?

18   A    CORRECT.

19   Q    AND IT'S TRUE, IS IT NOT, MA'AM, THAT IN THIS CONVERSATION

20   WITH MS. POWELL, AT NO TIME DID YOU TELL HER THAT MR. BRYANT      10:56

21   WAS WORKING ON BRATZ WHEN HE WAS EMPLOYED BY MATTEL; IS THAT

22   CORRECT?

23   A    WE DIDN'T TALK ABOUT THAT.  NO.

24   Q    SO IN FACT, IT'S TRUE YOU NEVER TOLD ANYONE AT MATTEL THAT

25   MR. BRYANT WAS WORKING ON BRATZ WHILE HE WAS EMPLOYED AT          10:57

```
 1   MATTEL; RIGHT?

 2           LET ME ASK THAT SO IT'S NOT A DOUBLE NEGATIVE?

 3           THE COURT:  VERY WELL.  WITHDRAW THE QUESTION.

 4   BY MR. PRICE:

 5   Q    DID YOU EVER TELL ANYONE AT MATTEL THAT CARTER BRYANT WAS      10:57

 6   WORKING ON BRATZ WHILE HE WAS EMPLOYED AT MATTEL?

 7   A    IT DIDN'T COME UP IN ANY CONVERSATION, SO I DIDN'T THINK

 8   ABOUT IT.

 9   Q    SO THE ANSWER IS NO; CORRECT?

10   A    IT DIDN'T COME UP IN ANY CONVERSATION.                         10:57

11   Q    SO LET'S TALK, THEN, ABOUT YOUR INTERACTION WITH

12   CARTER BRYANT.  AND FIRST, ACTUALLY I WANT TO ASK YOU QUESTIONS

13   ABOUT THE CALL YOU GOT FROM MR. MOORE IN I THINK IT WAS JUNE OF

14   2004, YOU SAID; IS THAT RIGHT?

15   A    SOMEWHERE AROUND THERE, EITHER BEFORE OR AFTER I HAD THE       10:57

16   BABY.

17   Q    AND AT THAT TIME YOU WERE NOT REPRESENTED BY COUNSEL;

18   CORRECT?

19   A    CORRECT.

20   Q    AND IN FACT, EARLIER IN 2004, IN ABOUT APRIL OR MAY, YOU       10:57

21   HAD DONE SOME THIRD-PARTY VENDOR WORK WITH MATTEL; IS THAT

22   CORRECT?

23   A    I DID A HANDFUL OF WORK WITH MATTEL, BUT I CAN'T REMEMBER

24   THE DATES.  I'D HAVE TO GO THROUGH AND LOOK AT MY INVOICES AND

25   MY NOTES.                                                          10:58
```

1    Q    IF YOU WOULD LOOK, THERE'S A BLACK BINDER OF EXHIBITS, AND

2    LET'S SEE IF THIS REFRESHES YOUR RECOLLECTION.

3         IF YOU WOULD LOOK AT EXHIBIT 10022.  I BELIEVE THE

4    NAME OF YOUR COMPANY AT THAT TIME WAS 3-D DESIGNS, OR SOMETHING

5    LIKE THAT.                                                              10:59

6    A    YEAH.  3-D DESIGN.

7    Q    AND DO YOU RECALL THAT AROUND MAY OF 2004 THAT YOU WERE

8    APPROVED FOR A MATTEL PROJECT?  AND I'LL CALL YOUR ATTENTION TO

9    THE THIRD PAGE OF THIS DOCUMENT.

10   A    WHAT WAS YOUR QUESTION?                                           10:59

11   Q    THAT IT WAS AROUND MAY OF 2004 THAT YOU WERE APPROVED FOR

12   AN INDEPENDENT THIRD-PARTY PROJECT WITH MATTEL.

13   A    THIS WASN'T FOR A PROJECT.  THEY WOULD JUST OPEN UP, LIKE,

14   ALMOST LIKE ACCOUNTS SO, YOU KNOW, IF I DID DO A PROJECT WITH

15   THEM, THEY COULD PAY ME FROM THIS ALLOTTED MONEY; SO THIS ISN'T       11:00

16   ABOUT ANY SPECIFIC PROJECT.

17   Q    AND YOU HAD APPLIED FOR THAT ACCOUNT SOME TIME IN FEBRUARY

18   OF '94 WITH A BUSINESS VALIDATION APPLICATION; IS THAT RIGHT?

19   A COUPLE OF PAGES LATER, YOU'LL SEE IT, I THINK AT PAGE 4.

20   A    WHERE IS THE DATE ON HERE?                                        11:00

21   Q    I THINK THE DATE IS AT PAGE 6.

22   A    RIGHT.

23   Q    AND THEN THERE WAS -- DO YOU RECALL THERE WAS AN

24   ENGAGEMENT OF SERVICES FORM, IF YOU LOOK AT PAGE 7, DATED

25   JANUARY, 2004?                                                         11:00

```
 1   A    THIS IS A JUST-GETTING-ME-SET-UP-TYPE FORM.

 2   Q    DO YOU RECALL THERE WAS A SERVICES AGREEMENT --

 3   A    I'M ASKING, IS THAT WHAT THIS IS?

 4   Q    I'M ASKING YOU.

 5        THE COURT:  MA'AM, YOU NEED TO JUST ANSWER THE         11:01

 6   QUESTIONS?

 7        ANSWER THE NEXT QUESTION.

 8        THE WITNESS:  OKAY.

 9   BY MR. PRICE:

10   Q    IF YOU WOULD LOOK AT PAGE 10, DO YOU RECALL THERE BEING A   11:01

11   SERVICES AGREEMENT SIGNED SOME TIME IN 2004, AROUND APRIL OF

12   2004?

13   A    CORRECT.

14   Q    SO YOU HAD THESE INTERACTIONS WITH MATTEL IN THE APRIL OR

15   MAY 2004 TIME FRAME; CORRECT?                                 11:01

16   A    CORRECT.

17   Q    AND MR. MOORE CONTACTS YOU SOME TIME AROUND JUNE OF 2004;

18   CORRECT?

19   A    JUNE OR JULY.

20   Q    AND ONE OF THE THINGS YOU DO IN RESPONSE IS YOU CALLED UP   11:01

21   MS. GONRICH OF MGA; CORRECT?

22   A    GRONICH.

23   Q    IS THAT RIGHT?

24   A    CORRECT.

25   Q    SHE WAS THE ATTORNEY FOR MGA; CORRECT?                     11:02
```

1    A    CORRECT.

2    Q    AND THEN IT WAS IN FEBRUARY OF 2005 THAT YOU WERE ACTUALLY

3    HIRED FULL-TIME AT MGA; CORRECT?

4    A    CAN I ASK YOU TO REPEAT A QUESTION AGAIN?

5    Q    DO YOU WANT ME TO REPEAT THAT QUESTION?                    11:02

6    A    THE ONE ABOUT WHEN I CALLED DAPHNE GRONICH.

7    Q    DIDN'T YOU TESTIFY IN RESPONSE TO MR. NOLAN'S QUESTIONS

8    THAT AFTER MR. MOORE CALLED YOU, YOU CALLED MS. GRONICH, MGA'S

9    GENERAL COUNSEL?

10   A    HE CALLED ME AND LEFT A MESSAGE AND THEN I CALLED HIM      11:02

11   BACK.  THEN I CALLED DAPHNE GRONICH.

12   Q    AND MY NEXT QUESTION IS, IT WAS THEN SEVERAL MONTHS AFTER,

13   IN FEBRUARY OF 2005, THAT YOU BECAME A FULL TIME EMPLOYEE OF

14   MGA; CORRECT?

15   A    IT WAS APRIL.                                              11:02

16   Q    IF YOU WOULD LOOK AT EXHIBIT 538.

17        DO YOU HAVE THAT?

18   A    YES.

19   Q    DO YOU RECOGNIZE THAT AS AN AGREEMENT EXECUTED BETWEEN YOU

20   AND MGA ON OR ABOUT FEBRUARY -- THIS IS FEBRUARY OF 2004;       11:03

21   RIGHT?

22   A    I DON'T SEE A DATE.

23   Q    IF YOU WOULD LOOK AT -- LET'S GO TO PAGE 4.

24   A    OKAY.  BUT THAT SAYS -- OKAY.  SORRY.

25        **MR. PRICE:**  YOUR HONOR, MOVE EXHIBIT 538 INTO          11:03

1    EVIDENCE.

2             **MR. NOLAN:**  NO OBJECTION.

3             **THE COURT:**  IT'S ADMITTED.  YOU MAY PUBLISH.

4             (EXHIBIT 538 RECEIVED.)

5    **BY MR. PRICE:**

6    Q    IN ANY EVENT, IT'S ALSO TRUE THAT -- I THINK YOU SAID MGA

7    DID PROVIDE YOU WITH COUNSEL; CORRECT?

8    A    CORRECT.

9    Q    AND WHEN WAS THAT?

10   A    IT WOULD HAVE BEEN AFTER THE FIRST PHONE CALL WITH          11:04

11   MICHAEL MOORE.

12   Q    SO THE CHRONOLOGY IS MR. MOORE CALLED, AND YOU CALLED HIM

13   BACK; CORRECT?

14   A    CORRECT.

15   Q    HE DIDN'T OFFICIALLY OFFER TO GET YOU COUNSEL; CORRECT?    11:04

16   A    CORRECT.

17   Q    THEN YOU CALLED MS. GRONICH, THE GENERAL COUNSEL FOR MGA;

18   CORRECT?

19   A    CORRECT.

20   Q    THEN MGA PROVIDES YOU WITH COUNSEL; RIGHT?                 11:04

21   A    CORRECT.

22   Q    AND THIS IS BEFORE YOU'RE A FULL-TIME EMPLOYEE WITH MGA;

23   CORRECT?

24   A    YES.

25   Q    AND SO THEY ARE PAYING THE ATTORNEYS' FEES FOR YOUR        11:04

1    ATTORNEY; CORRECT?

2    A    FROM WHAT I ASSUMED.

3    Q    AND THAT WAS FROM SOMETIME IN 2004 TO THE PRESENT; RIGHT?

4    A    CORRECT.

5    Q    AND YOU HAVE ALSO EARNED FEES FROM MGA PERSONALLY; RIGHT?    11:04

6          **MR. NOLAN:**  OBJECTION.  VAGUE AND AMBIGUOUS.

7          **THE COURT:**  REPHRASE.

8    **BY MR. PRICE:**

9    Q    YOU MADE MONEY BECAUSE YOU WORKED FOR MGA; THEY MADE YOU

10   PAID YOU MONEY; CORRECT?    11:05

11   A    YEAH, THEY PAID ME MONEY.

12   Q    SOMEWHERE IN EXCESS OF HALF A MILLION DOLLARS SINCE THE

13   FIRST TIME YOU BEGAN WORKING FOR THEM; CORRECT?

14   A    YEAH.  WELL, I DON'T KNOW, I NEVER ADDED IT UP, BUT --

15   Q    DOES THAT SOUND ABOUT RIGHT, THAT IT'S SOMEWHERE IN EXCESS    11:05

16   OF HALF A MILLION DOLLARS?

17   A    WELL, I DIDN'T ADD IT UP; I'D HAVE STICKER SHOCK.

18   Q    YOU HAVE A GENERAL IDEA OF WHAT YOU MADE OVER THE YEARS

19   WITH MGA, THOUGH, DON'T YOU?

20   A    YEAH.  I'D HAVE TO GO THROUGH AND ADD UP ALL MY THINGS.    11:05

21   Q    OKAY.

22          NOW, LET ME SWITCH, THEN, TO YOUR CONTACTS WITH

23   MR. BRYANT IN SEPTEMBER.

24          YOU GOT A CALL FROM MR. BRYANT IN SEPTEMBER; CORRECT?

25   A    THIS IS GOING BACK TO 2000?    11:05

THURSDAY, JULY 3, 2008                TRIAL DAY 20, MORNING SESSION

```
 1   Q    YES.  YOU'RE RIGHT.  IN SEPTEMBER OF 2000, YOU GOT A CALL

 2   FROM MR. BRYANT; RIGHT?

 3   A    RIGHT.

 4   Q    AND PRIOR TO THAT, SIX YEARS PRIOR TO THAT, SEPTEMBER

 5   2000, YOU HAD WORKED FOR MATTEL; RIGHT?                        11:06

 6   A    YEAH; SOMEWHERE IN '95; IT WAS RIGHT AFTER I GOT MARRIED,

 7   SO SOMEWHERE LATE '94, EARLY '95.

 8   Q    AND BEFORE BRATZ, YOU HAD NEVER DONE A FASHION DOLL FROM

 9   START TO FINISH; CORRECT?

10   A    CORRECT.  I MAINLY DID THE HEADS.                         11:06

11   Q    SO MR. BRYANT CALLED YOU WHEN YOU WERE AT YOUR HOME;

12   RIGHT?

13   A    CORRECT.

14   Q    AND I BELIEVE YOU TESTIFIED TO THE JURY YESTERDAY THAT YOU

15   WERE EXCITED BECAUSE THIS PROJECT GAVE YOU ARTISTIC FREEDOM.    11:06

16        DO YOU RECALL THAT?

17   A    YES.  I REMEMBER.

18   Q    BUT IN YOUR DEPO, YOU SAID YOU WERE EXCITED BECAUSE IT WAS

19   THE FIRST JOB YOU GOT; RIGHT?

20   A    BOTH ARE TRUE.                                            11:06

21   Q    BUT YOU DIDN'T MENTION THE THING ABOUT ARTISTIC FREEDOM,

22   DID YOU?

23   A    I'D HAVE TO GO THROUGH AND READ MY DEPOSITION.

24   Q    LETS GO TO PAGE 131, LINES TWO THROUGH 11.

25        ACTUALLY, IT SHOULD BE LINES SIX THROUGH 11.              11:07
```

```
 1    A      OKAY.

 2              MR. PRICE:  YOUR HONOR, IF I MAY PLAY THAT.

 3              MR. NOLAN:  YOUR HONOR, FOR COMPLETENESS ON THIS

 4    SUBJECT, THE SUBJECT IS ADDRESSED AGAIN AT PAGE 152, LINES

 5    EIGHT THROUGH 11.                                          11:07

 6              MR. PRICE:  THAT'S IRRELEVANT AND NOT REQUIRED.

 7              THE COURT:  152, LINES 8 THROUGH 11 IS JUST --

 8              MR. PRICE:  HE PROBABLY MEANS SEVEN, YOUR HONOR.

 9    THERE'S A QUESTION ABOUT 'WHAT DO YOU MEAN BY INSPIRATION?'

10              THE COURT:  IT'S IRRELEVANT.                      11:08

11              MR. NOLAN:  IT'S 11; AND QUESTION NUMBER EIGHT --

12              MR. PRICE:  I DON'T THINK IT'S REQUIRED, YOUR HONOR.

13    IT'S NOT THE SAME QUESTION.

14              THE COURT:  COUNSEL, YOU'RE ON PAGE 152?

15              MR. NOLAN:  PAGE 152, QUESTION, LINE SEVEN, AND THE  11:08

16    ANSWER REFERS TO --

17              THE COURT:  IT REFERS TO INSPIRATION.  I JUST DON'T

18    SEE INSPIRATION ON PAGE 131.  I'LL LET YOU -- UNLESS I'M

19    MISSING SOMETHING.

20              MR. NOLAN:  IT'S THE FIRST SENTENCE THAT RELATES BACK  11:08

21    TO HER VIEW OF THE PROJECT.

22              THE COURT:  YOU MAY BRING THAT UP IN YOUR REDIRECT

23    EXAMINATION, COUNSEL.

24              OBJECTION.  OVERRULED.

25              (VIDEO DEPOSITION PLAYS; EXCERPTS PROVIDED         11:09
```

```
 1              AS FOLLOWS BY COUNSEL; PAGE 131:06 to 131:11:)

 2              Q   DID YOU TELL MR. BRYANT DURING THAT

 3         CONVERSATION WHETHER OR NOT YOU WOULD BE WILLING TO.

 4         DO THE WORK?

 5              A   I CAN'T REMEMBER VERBATIM.  I'M ASSUMING I

 6         SAID THAT.  I WAS VERY EXCITED BECAUSE IT WAS ONE OF.

 7         MY FIRST JOBS AS A VENDOR.

 8              (EXCERPTS CONCLUDED.)
```

 9  **BY MR. PRICE:**

10  Q    WHEN MR. BRYANT CALLED YOU IN THIS FIRST CALL, ONE OF THE     11:09

11  THINGS HE SAID WAS PAULA TREANTAFELLES WAS WORKING ON THIS

12  PROJECT; CORRECT?

13  A    CAN I LOOK AT MY NOTEBOOK?

14  Q    YOU MAY IF YOU LIKE.  I BELIEVE THAT'S 1137, PAGE 14, IS

15  WHERE YOU HAVE NOTES ABOUT SEPTEMBER 29TH.                         11:09

16  A    I DON'T REMEMBER TALKING TO HIM ABOUT PAULA IN THE FIRST

17  PHONE CALL.

18          **MR. PRICE:**  YOUR HONOR, I'D LIKE TO PLAY PAGE 129,

19  LINES NINE THROUGH 17.

20          **THE COURT:**  ANY OBJECTION?                             11:10

21          **MR. NOLAN:**  WE'D LIKE TO RUN IT TO 130, LINE 3.

22          **THE COURT:**  COUNSEL?

23          **MR. PRICE:**  IT'S NOT REQUIRED FOR THE POINT THAT'S

24  BEING MADE.

25          **THE COURT:**  I THINK IT MAKES IT COMPLETE; IT'S CLOSE   11:11

```
 1   ENOUGH; LET'S IMPROVE IT.
 2             MR. PRICE:  129, LINES 9 TO 30, TO 130, LINE 3.
 3             (VIDEO PLAYS; EXCERPTS PROVIDED BY
 4        COUNSEL AS FOLLOWS:
 5        Q   AND DURING THAT CONVERSATION IS WHEN CARTER
 6        BRYANT BROUGHT UP THE NAME M.G.A.; IS THAT CORRECT?
 7        A   YES.  I ASKED HIM WHO THE PROJECT WAS FOR.
 8        Q   IF YOU COULD, PLEASE, TELL ME WHAT YOU AND
 9        CARTER BRYANT DISCUSSED DURING THAT TELEPHONE
10        CONVERSATION?
11        A   FROM WHAT I REMEMBER, HE SAID HE HAD A
12        PROJECT, AND IT WAS FOR M.G.A. IN NORTH HILLS AND.
13        THAT PAULA TREANTAFELLES WAS WORKING ON IT AS WELL.
14        Q   DID HE SAY ANYTHING ELSE IN THAT CONVERSATION?
15        A   NOT THAT I REMEMBER.
16        Q   DID YOU HAVE AN UNDERSTANDING OR DID HE SAY
17        WHAT THE PROJECT FOR M.G.A. WAS?
18        A   NOT AT THAT TIME.
19        Q   THAT WAS SOMETHING YOU LEARNED SUBSEQUENTLY?
20        A   YES.
21        Q   AT THAT TIME, DID YOU UNDERSTAND THAT PAULA
22        TREANTAFELLES WAS AT M.G.A.?
23        A   THAT'S WHAT I ASSUMED BECAUSE I DIDN'T KNOW
24        HER NAME.
25        (EXCERPTS CONCLUDED.)                            11:12
```

```
 1    BY MR. PRICE:

 2    Q    AND YOU HAD, THEN, A FACE TO FACE MEETING WITH MR. BRYANT

 3    ABOUT A WEEK TO A WEEK AFTER THIS; CORRECT?

 4    A    CORRECT.

 5    Q    IF YOU LOOK AT EXHIBIT 1137, PAGE 14 -- I THINK YOU WERE        11:13

 6    LOOKING AT THAT TO REFRESH YOUR MEMORY -- AND THAT'S IN

 7    EVIDENCE, YOUR HONOR -- IF WE COULD BLOW UP THE TOP PART HERE.

 8             DO YOU SEE YOU HAVE THESE ENTRIES, "CARTER BRYANT,"

 9    "X 6099" AND THEN "310-538-3615"?  DO YOU SEE THAT?

10    A    YES.                                                           11:13

11    Q    AND THEN IT SAYS "DOLL PLAY FASHION, MGA ENTERTAINMENT."

12             DO YOU SEE THAT?

13    A    YES.

14    Q    DO YOU BELIEVE THOSE ARE YOUR NOTES FROM THIS FIRST

15    TELEPHONE CALL?                                                     11:13

16    A    YES.

17    Q    AND THIS "STAR 6099," YOU KNOW WHAT THAT REFERS TO;

18    CORRECT?

19    A    YES; THAT'S CARTER'S EXTENSION.

20    Q    YOU SAY HIS EXTENSION; THAT WAS HIS EXTENSION WHERE?           11:13

21    A    AT MATTEL.

22    Q    SO MR. BRYANT CALLS YOU, HE TELLS YOU -- HE GIVES YOU HIS

23    MATTEL EXTENSION; CORRECT?

24    A    CORRECT.

25    Q    HE SAYS THIS PROJECT IS FOR MGA; CORRECT?                      11:13
```

1   A    CORRECT.

2   Q    AND HE TELLS YOU THAT MS. TREANTAFELLES, WHOSE NAME YOU

3   HAD NEVER HEARD BEFORE, WAS ALSO INVOLVED WITH THIS; RIGHT?

4   A    WELL, I DON'T KNOW IF HE DID IT ON THE FIRST PHONE

5   CONVERSATION OR ONE OF THE SECOND CONVERSATION.  HER NAME IS AT    11:14

6   THE BOTTOM OF THAT PAGE BECAUSE I NEEDED TO SPELL IT; SO, YES,

7   HE COULD HAVE GONE OVER THAT ON THE FIRST CONVERSATION OR A

8   LATER ONE.

9   Q    BUT THE LATER ONE, YOU'RE TALKING ABOUT THE ONE YOU MIGHT

10  HAVE HAD A WEEK OR A WEEK AND A HALF LATER; RIGHT?    11:14

11  A    OR A LATER PHONE CONVERSATION.

12  Q    WELL, A WEEK OR A WEEK AND A HALF LATER, YOU DID HAVE A

13  FACE-TO-FACE MEETING WITH MR. BRYANT; CORRECT?

14  A    CORRECT.

15  Q    WHEN YOU HAD YOUR MEETING WITH HIM, HE DIDN'T GIVE YOU A    11:14

16  WRITTEN DESCRIPTION OF THE BRATZ DOLLS, DID HE?  THAT IS,

17  SOMETHING IN HANDWRITING DESCRIBING THEIR PERSONALITY AND

18  CHARACTERISTICS?

19  A    YOU MEAN WITH WORDS?

20  Q    YES.    11:15

21  A    NO.  IT WAS JUST THE DRAWINGS.

22  Q    AND HE DIDN'T SAY HE WANTED THESE DOLLS TO LOOK LIKE

23  BARBIE, DID HE?

24  A    NO.

25  Q    HE DIDN'T SAY HE WANTED THEM TO LOOK LIKE A CABBAGE PATCH    11:15

1    DOLL; RIGHT?

2    A    RIGHT.

3    Q    HE INSTEAD GAVE YOU SOME DRAWINGS TO SHOW YOU HIS CONCEPT

4    OF HOW THESE DOLLS SHOULD LOOK; CORRECT?

5    A    HE GAVE ME A BINDER WITH DRAWINGS IN THIS.                    11:15

6    Q    AND HE SAID 'THIS IS MY CONCEPT OF HOW I WANT THE DOLLS TO

7    LOOK'; RIGHT?

8    A    HE SAID NOT 'THIS IS HOW I WANTED THE DOLLS TO LOOK' BUT

9    'THIS IS MY IDEA, MY CONCEPT DRAWINGS, FOR THE DOLLS.'

10   Q    AND HE WANTED YOU TO DO A SCULPT; CORRECT?                    11:15

11   A    RIGHT; HE WANTED ME TO START SCULPTING.

12   Q    HE GAVE YOU -- I THINK YOU WERE SHOWN EXHIBIT 302, WHICH

13   WAS SOME BRATZ SKETCHES BY MR. BRYANT.  DO YOU RECALL THAT?

14   MR. NOLAN SHOWED YOU THAT?  THAT WAS IN THE WHITE BINDER?

15   A    YES.                                                          11:15

16   Q    IN FACT, IN THIS CASE, YOU PRODUCED TO US SKETCHES THAT

17   MR. BRYANT HAD DONE OF BRATZ DOLLS.  DO YOU RECALL THAT?  YOU

18   GAVE THEM TO YOUR ATTORNEY AND THEN THEY WERE HANDED OVER TO

19   US.

20   A    RIGHT.  I GAVE THEM THE BINDER.                               11:16

21   Q    AND IF YOU WOULD LOOK AT EXHIBIT 1125, IN THE BLACK

22   BINDER.  YOU RECOGNIZE THESE DRAWINGS AS THE DRAWINGS YOU

23   PROVIDED TO YOUR COUNSEL TO PROVIDE TO US; CORRECT?

24   A    WELL, I GAVE THE BINDER.  I DON'T WANT TO SAY I RECOGNIZE

25   EACH INDIVIDUAL DRAWING BECAUSE I DON'T REMEMBER WHICH ONES I     11:17

1    REMEMBER.  YOU KNOW WHAT I'M SAYING?

2              I JUST WANT TO MAKE SURE I'M BEING CLEAR THAT I DON'T

3    REMEMBER EACH SPECIFIC DRAWING BUT I REMEMBER THE BINDER FULL

4    OF DRAWINGS.

5    Q    AND YOU SEE THIS HAS THESE BATES ON IT "SABW-L."        11:17

6              DO YOU SEE THAT?

7    A    BATES?

8    Q    AT THE BOTTOM, IT HAS A NUMBER.

9    A    YEAH.

10   Q    DO YOU SEE THAT?        11:17

11   A    YES.

12   Q    AND YOUR COUNSEL WAS SIDLEY AUSTIN.

13             DO YOU RECOGNIZE THIS AS THE FILE YOU GAVE YOUR

14   COUNSEL?  DO YOU SEE THAT?

15   A    WHAT DO YOU MEAN, THE FILE?        11:17

16   Q    YOU SAID YOU GAVE A BINDER OF DOCUMENTS.  THIS IS THE

17   BINDER THAT YOU GAVE YOUR COUNSEL; CORRECT?

18   A    WELL, LIKE I SAID, I GAVE THEM A BINDER.  I CANNOT

19   HONESTLY IDENTIFY IF EACH WAS IN THERE OR NOT.

20   Q    DOES IT APPEAR TO BE CONSISTENT WITH WHAT YOU GAVE YOUR        11:18

21   COUNSEL?

22   A    YES.  IT APPEARS TO BE SIMILAR.

23             **MR. PRICE:**  YOUR HONOR, MOVE EXHIBIT 1125 INTO

24   EVIDENCE.

25             **MR. NOLAN:**  NO OBJECTION.        11:18

1          **THE COURT:**  ADMITTED.  YOU MAY PUBLISH.

2          (EXHIBIT 1125 RECEIVED.)

3    **BY MR. PRICE:**

4    Q    SO, FOR EXAMPLE, AMONG THE DRAWINGS YOU GOT IN THE FILE

5    WERE, SAY, THE DRAWING ON THE FIRST PAGE.  DO YOU SEE THAT?          11:18

6    A    YES.

7    Q    AND THE DRAWING ON THE SECOND PAGE.

8          LET ME JUST FLIP THROUGH THESE QUICKLY AND GET AN

9    IDEA OF WHAT'S IN HERE.

10         ONE OF THE OTHER DRAWINGS YOU GOT FROM MR. BRYANT WAS          11:18

11   ALREADY IN EVIDENCE, 1139; IF WE COULD SHOW THAT.

12   A    I DON'T KNOW IF THAT WAS IN THE BINDER, BUT I DID GET THEM

13   AT SOME POINT.

14   Q    FROM MR. BRYANT?

15   A    CORRECT.          11:19

16   Q    WHEN YOU MET AND HE GIVE YOU THESE DRAWINGS, DID HE ALSO

17   GAVE YOU AN AD BY STEVE MADDEN.  DO YOU RECALL THAT?

18   A    YES, I DO.

19   Q    AND I THINK YOU'VE ALREADY IDENTIFIED THAT AS 1127.

20         PERHAPS WE CAN SHOW THAT.          11:19

21         HE GAVE YOU THIS; CORRECT?

22   A    CORRECT.

23         **MR. PRICE:**  AND IF WE COULD SHOW YOU WHAT'S ALREADY

24   IN EVIDENCE, YOUR HONOR, IS EXHIBIT 10179-133; THAT'S A PAGE

25   FROM THE AUGUST 1999 <u>SEVENTEEN</u> MAGAZINE.  IF WE COULD PUT THAT          11:20

1     UP.

2               **THE COURT:**  YOU MAY.

3     **BY MR. PRICE:**

4     Q    DO YOU SEE EXHIBIT 10179-133 FROM THE AUGUST 1999

5     SEVENTEEN MAGAZINE; THAT'S THE SAME PHOTOGRAPH.                      11:20

6               DO YOU SEE THAT?

7     A    DO I NEED TO TURN TO THE PAGE?

8     Q    SURE.  OR YOU CAN LOOK AT THE MONITOR.

9     A    COMPARE THIS TO WHAT?

10    Q    THE PICTURE IN 10179-133, THE AUGUST '99 SEVENTEEN             11:20

11    MAGAZINE, IS THE SAME PHOTOGRAPH AS EXHIBIT 1127 THAT YOU SEE.

12              **THE COURT:**  COUNSEL, PUT WHAT YOU'RE ASKING THE

13    WITNESS TO COMPARE ON THE SCREEN.

14              **MR. PRICE:**  OKAY.

15    **BY MR. PRICE:**

16    Q    DO YOU SEE THAT NOW?

17    A    YES.

18    Q    YOU'LL AGREE THAT THE PHOTOGRAPH IS THE SAME PHOTOGRAPH

19    THAT WAS IN THE AUGUST '99 SEVENTEEN MAGAZINE AND WHAT

20    MR. BRYANT GAVE TO YOU IN SEPTEMBER.                                11:21

21    A    WELL, THERE'S DIFFERENT WORDS AT THE BOTTOM.

22    Q    RIGHT.  BUT I'M SAYING THE PHOTOGRAPHS ARE THE SAME;

23    CORRECT?

24              **MR. NOLAN:**  WELL, YOUR HONOR, I'M SORRY.

25              OBJECTION TO THE AMBIGUITY IN THE PHOTOGRAPH.             11:21

```
 1              THE COURT:  SUSTAINED.

 2    BY MR. PRICE:

 3    Q    DISREGARDING THE PRINT THAT'S ON IT, THE PHOTOGRAPHS OF

 4    THE TWO DOLLS, YOU'LL AGREE, ARE THE SAME.

 5    A    YEAH, FROM THE SCREEN, FAR AWAY.                          11:21

 6         I MEAN.  IF YOU WANT ME TO COMPARE THEM, LIKE, REALLY

 7    HARD, THEN -- BUT, YEAH, THEY APPEAR TO BE THE SAME.  THERE'S

 8    DIFFERENT THINGS ON THEM, BUT THE FIGURES APPEAR TO BE THE

 9    SAME.

10         IS THAT WHAT YOU ARE ASKING?                             11:21

11    Q    IN FACT, MY QUESTION IS, ON DIRECT, DID YOU TESTIFY THAT

12    THIS WAS WHAT CARTER BRYANT GAVE YOU?

13    A    WHICH ONE?

14    Q    THE 10179-0133.

15    A    THAT'S WHICH ONE?                                        11:22

16    Q    THE ONE ON THE LEFT.

17    A    SEEING THEM TOGETHER, I SEE THAT THERE'S DIFFERENT WORDS.

18    I DON'T REMEMBER WHAT YOU GUYS WERE SHOWING ME AT THE

19    DEPOSITION.

20    Q    I MEANT DURING YOUR EXAMINATION BY MR. NOLAN.            11:22

21    A    I'M CONFUSED.  I'M SORRY.

22    Q    I'LL MOVE ON.

23         YOU MENTIONED THAT YOU GOT A PHOTOGRAPH OF THESE

24    DOUBLE ANGEL PICTURES.  I'M GOING TO SHOW YOU SOMETHING ALREADY

25    MARKED IN EVIDENCE, IT'S EXHIBIT 17246-115.                   11:22
```

```
 1              THIS IS NOT SOMETHING MR. BRYANT GAVE YOU; CORRECT?
 2    A    CAN I LOOK IT UP IN HERE IN MY BOOK?
 3    Q    I'M NOT SURE IT'S THERE.  I MIGHT HAVE TO BRING THIS UP TO
 4    YOU.
 5              MR. PRICE:  IF I MAY, YOUR HONOR?                     11:23
 6              THE COURT:  YOU MAY.
 7    BY MR. PRICE:
 8    Q    THIS IS ALREADY IN EVIDENCE.  I'M JUST CONFIRMING.
 9              THIS IS NOT WHAT MR. BRYANT GAVE YOU IN SEPTEMBER;
10    RIGHT?                                                          11:23
11    A    NO, IT IS NOT.
12    Q    IF I COULD SHOW YOU 17246-126.  THIS ALSO IS NOT SOMETHING
13    THAT MR. BRYANT GAVE YOU IN SEPTEMBER OF 2000; CORRECT?
14    A    CORRECT.
15    Q    AND I'LL ASK YOU THE SAME QUESTIONS ABOUT 17246-127, AND   11:24
16    17246-193.  THIS SOMETHING MR. BRYANT GAVE YOU; CORRECT?
17    A    NO, IT IS NOT.
18    Q    AND IF YOU LOOK AT 17246-193, MR. BRYANT DIDN'T GIVE YOU
19    THIS EITHER; CORRECT?
20    A    NO, HE DID NOT.                                            11:24
21    Q    SO HE GAVE YOU WHAT APPEARS TO BE IN EXHIBIT 1125 AND THIS
22    STEVE MADDEN AD, EXHIBIT 1127; CORRECT?
23    A    WHAT'S THE 1125?
24    Q    THAT WAS THE BINDER, YOUR BINDER.
25              SO THOSE ARE THE THINGS HE GAVE YOU; CORRECT?          11:25
```

```
 1    A    CORRECT.

 2    Q    NOW, ONE OF THE OTHER DOCUMENTS HE GAVE YOU IS

 3    EXHIBIT 1128; CORRECT?  IF YOU WOULD LOOK AT THAT.

 4         AND I BELIEVE THAT WAS IN EVIDENCE AS WELL THROUGH

 5    MR. NOLAN'S EXAMINATION.                                    11:25

 6         MR. NOLAN:  I THINK THAT'S A MISSTATEMENT,

 7    YOUR HONOR.  I DON'T THINK I SHOWED THIS TO HER.

 8    BY MR. PRICE:

 9    Q    IF YOU LOOK AT EXHIBIT 1128, DO YOU SEE THAT?

10    A    UH-HUH.                                                11:25

11    Q    THAT'S ONE OF THE DRAWINGS MR. BRYANT GAVE YOU; IS THAT

12    CORRECT?

13    A    HE GAVE IT TO ME AT SOME POINT.  I'M NOT CLEAR IF IT WAS

14    IN THE BINDER OR NOT.

15         IS THAT WHAT YOU ARE ASKING?                           11:25

16    Q    SOME TIME IN SEPTEMBER OR OCTOBER, MR. BRYANT GAVE YOU

17    THIS DRAWING, 1128; CORRECT?

18    A    CORRECT.  I WOULD ASSUME.  I DON'T KNOW THE DATE.  I CAN'T

19    TELL YOU THE EXACT DATE.

20         MR. PRICE:  I'LL MOVE THAT INTO EVIDENCE, YOUR HONOR.   11:25

21         THE COURT:  IT'S ADMITTED.  YOU MAY NOW PUBLISH.

22         MR. NOLAN:  NO OBJECTION.

23         (EXHIBIT 1128 RECEIVED.)

24         MR. PRICE:  ACTUALLY, IF WE COULD PUT THAT UP, ALONG

25    WITH 1127 AND 1125-2.                                       11:26
```

THURSDAY, JULY 3, 2008                    TRIAL DAY 20, MORNING SESSION

1        THEY ARE ALL IN EVIDENCE, YOUR HONOR.  IT'S WHAT WE

2  JUST WENT THROUGH.

3        **THE COURT:**  VERY WELL.

4  **BY MR. PRICE:**

5  Q    SO SOME TIME IN SEPTEMBER AND OCTOBER 2000, YOU RECEIVED                11:26

6  FROM MR. BRYANT EACH OF THESE THREE DRAWINGS; CORRECT?

7        **MR. MCFARLAND:**  OBJECTION.  MISSTATES HER TESTIMONY.

8        **MR. NOLAN:**  I'LL JOIN IN THE OBJECTION.

9        **THE COURT:**  LET ME SEE ALL THREE COUNSEL AT SIDE-BAR

10  FOR A SECOND.                                                              11:26

11        (SIDE-BAR PROCEEDINGS AS FOLLOWS:)

12        **THE COURT:**  WE'RE HAVING ONE ATTORNEY ON THE

13  OBJECTIONS.  YOU CAN CERTAINLY MAKE OBJECTIONS ON

14  ATTORNEY-CLIENT PRIVILEGE AND ON PERSONAL OBJECTIONS, BUT IN

15  TERMS OF DEFENDING MGA'S CASE, THEY ARE IN THE GOOD HANDS OF         11:27

16  MR. NOLAN.

17        **MR. MCFARLAND:**  APOLOGIZE.

18        **THE COURT:**  MR. NOLAN, DO YOU JOIN?

19        **MR. NOLAN:**  I JOIN IN THE SAME ONE.

20        **THE COURT:**  STATE THE OBJECTION.                                 11:27

21        **MR. NOLAN:**  IT MISSTATES HER TESTIMONY, THE PREAMBLE.

22        **THE COURT:**  REPHRASE YOUR QUESTION.

23        **MR. MCFARLAND:**  SO FOR CLARIFICATION, IF IT'S

24  ATTORNEY-CLIENT, THAT'S FINE.

25        **THE COURT:**  RIGHT.  YOU'RE REPRESENTING HER IN HER             11:27

```
 1   PERSONAL CAPACITY.  I'M ONLY ALLOWING ONE ATTORNEY TO SPEAK FOR
 2   MGA IN TERMS OF THE MERITS OF THE CASE.
 3              MR. MCFARLAND:  VERY WELL.
 4              THE COURT:  VERY WELL.
 5          (SIDE-BAR PROCEEDINGS CONCLUDED.)                         11:27
 6   BY MR. PRICE:
 7   Q   THE GENTLEMAN WHO MADE THE OBJECTION, THAT'S YOUR ATTORNEY
 8   MR. MCFARLAND.
 9   A   WAS THAT YOU?
10          YES.                                                       11:28
11   Q   AND YOU UNDERSTOOD THAT HE ALSO REPRESENTS MGA.
12   A   I DIDN'T KNOW THAT UNTIL RECENTLY.
13   Q   BUT DO YOU KNOW NOW THAT HE ALSO REPRESENTS MGA?
14   A   RIGHT.
15              MR. NOLAN:  YOUR HONOR, OBJECTION TO THE               11:28
16   CHARACTERIZATION OF THAT IN THIS LITIGATION.
17              THE COURT:  YOU CAN FOLLOW UP, THEN, COUNSEL.
18   BY MR. PRICE:
19   Q   AND MY QUESTION WAS -- WE'VE ALREADY BEEN THROUGH THIS, I
20   BELIEVE, BUT LET'S TRY.                                          11:28
21          YOU RECEIVED A PHOTOGRAPH WHICH HAD THIS
22   DRAWING/PHOTOGRAPH FROM MR. BRYANT IN SEPTEMBER OR OCTOBER OF
23   2000; CORRECT?
24   A   YEAH.  IT HAD THE TWO FIGURES ON IT.
25   Q   AND IN THE BINDER THAT YOU GAVE YOUR COUNSEL, WHICH YOU       11:28
```

THURSDAY, JULY 3, 2008                    TRIAL DAY 20, MORNING SESSION

```
 1   RECEIVED FROM MR. BRYANT, WE HAVE THIS DRAWING; IT'S THE SECOND

 2   PAGE OF 1125; CORRECT?

 3   A    CORRECT.

 4   Q    AND YOU SAID YOU RECEIVED 1128 SOME TIME IN SEPTEMBER OR

 5   OCTOBER AS WELL; CORRECT?                                          11:29

 6   A    CORRECT.

 7   Q    SO YOU RECEIVED THESE THREE DRAWINGS FROM MR. BRYANT SOME

 8   TIME IN SEPTEMBER OR OCTOBER OF 2000; CORRECT?

 9   A    WELL, THE ONE ON THE LEFT ISN'T A DRAWING; IT'S AN AD.

10   Q    OKAY.  THIS DISTORTED PHOTOGRAPH?                             11:29

11   A    RIGHT.

12   Q    AND AFTER THIS INITIAL MEETING WHERE MR. BRYANT GAVE YOU

13   DRAWINGS AND GAVE YOU THIS STEVE MADDEN AD, YOU THEN WENT TO

14   WORK TO DO A SCULPT; CORRECT?

15   A    CORRECT.                                                      11:29

16   Q    AND MR. BRYANT DIDN'T LIVE AT YOUR HOUSE; RIGHT?

17   A    NO, HE DIDN'T.

18   Q    SO HE WASN'T THERE WHILE YOU WERE ACTUALLY DOING THE

19   SCULPT.

20   A    NO.                                                          11:29

21   Q    AND YOU WOULDN'T HAVE EXPECTED HIM TO BE; RIGHT?

22   A    RIGHT.

23   Q    THEN SOME TIME AROUND SEPTEMBER 29TH YOU HAD A MEETING

24   WITH MR. BRYANT.

25        MR. NOLAN:  YOUR HONOR, MY OBJECTION, IS THIS EXHIBIT        11:29
```

```
 1    BEING PUBLISHED TO THE JURY OR IS IT --
 2              MR. PRICE:  WE CAN TURN IT OFF NOW.
 3              THE COURT:  THANK YOU, COUNSEL.
 4    BY MR. PRICE:
 5    Q    THEN YOU HAVE YOUR SECOND MEETING WITH MR. BRYANT, WHICH      11:30
 6    IS SOMETIME AROUND SEPTEMBER 29TH; CORRECT?
 7    A    CORRECT.
 8    Q    AND AT THAT TIME, MS. TREANTAFELLES, MS. GARCIA, PAULA, IS
 9    NOT AT THAT MEETING; CORRECT?
10    A    THERE WAS SEVERAL MEETINGS, I HONESTLY CAN'T REMEMBER WHO     11:30
11    WAS AT WHICH MEETING.  THEY COULD HAVE BEEN AT THAT MEETING;
12    THEY COULD HAVE NOT BEEN AT THAT MEETING.
13              MR. PRICE:  IF WE COULD PLAY FROM MS. LEAHY'S
14    DEPOSITION TESTIMONY, 211, LINE 20, TO 212, LINE 7.
15              THE COURT:  ANY OBJECTION?                               11:30
16              MR. NOLAN:  NO OBJECTION, YOUR HONOR.
17              THE COURT:  YOU MAY PLAY IT.
18              (VIDEO PLAYS; EXCERPTS PROVIDED AS FOLLOWS: )
19              Q    WHEN IS IT THAT YOU HAD FIRST CONTACT WITH
20              ANYONE AT M.G.A. REGARDING THE BRATZ PROJECT?
21              A    WHEN PAULA CAME TO MY HOUSE.
22              Q    WHEN DID THAT OCCUR?
23              A    THE FIRST TIME I MET PAULA WAS OCTOBER 6TH.
24              Q    OF 2000?
25              A    YES.
```

THURSDAY, JULY 3, 2008                    TRIAL DAY 20, MORNING SESSION

```
 1              Q    YOU HAD MET PAULA TREANTAFELLES AT THAT TIME
 2         ON OCTOBER 6TH, 2000, AT YOUR HOUSE?
 3              A    YES.
 4              Q    DID YOU HAVE ANY SORT OF CONTACT WITH HER
 5         PRIOR TO THAT?
 6              A    NO.
 7              (EXCERPTS CONCLUDED.)
 8    BY MR. PRICE:
 9    Q    AND MS. LEAHY, IF YOU WOULD LOOK AT YOUR NOTES,
10    EXHIBIT 1137-14, IF WE CAN DISPLAY THAT, THAT'S IN EVIDENCE.        11:32
11    YOU'VE SEE YOU'VE GOT AN ENTRY DATED SEPTEMBER 29TH.
12              DO YOU SEE THAT?
13    A    RIGHT.
14    Q    AND YOU SEE YOU HAVE NOTED -- YOU PRESENTED YOUR SCULPT
15    THAT YOU HAD DONE; CORRECT?                                         11:32
16         MR. NOLAN:  OBJECTION TO TIME.
17    BY MR. PRICE:
18    Q    ON SEPTEMBER 29TH, YOU PRESENTED THE SCULPT THAT YOU HAD
19    DONE?
20    A    RIGHT; THE FIRST VERSION OF THIS ONE.                          11:32
21    Q    AND WHAT WE HAVE HERE IN YOUR NOTES ARE FIVE LINES WHERE
22    YOU WROTE DOWN COMMENTS THAT WERE MADE ABOUT THAT SCULPT;
23    CORRECT?
24    A    CORRECT.
25    Q    AND THESE WERE COMMENTS THAT WERE ALL MADE BY                  11:32
```

1   CARTER BRYANT; CORRECT?

2   A    WELL, WHAT I'M SAYING IS WHEN I LOOK AT THESE NOTES, THEY

3   COULD HAVE BEEN MADE BY PAULA AND VERONICA; THEY COULD HAVE

4   BEEN MADE BY CARTER.  I DON'T REMEMBER IF THEY WERE THERE AT

5   THAT MEETING OR NOT.                                        11:33

6   Q    WELL, AT YOUR DEPOSITION YOU HAD THESE NOTES IN FRONT OF

7   YOU; CORRECT?

8   A    CORRECT.

9   Q    AND AT YOUR DEPOSITION, LOOKING AT THESE NOTES, YOU SAID

10  IT WAS CARTER BRYANT WHO GAVE YOU EACH ONE OF THOSE CRITICISMS; 11:33

11  CORRECT?

12  A    DID I SAY THAT IN MY DEPOSITION?

13        MR. PRICE:  LET'S PLAY PAGE 161, LINES 5 THROUGH 17.

14        THE COURT:  ANY OBJECTION?

15        MR. NOLAN:  YES.  IT'S NOT IMPEACHMENT.  SHE DOES NOT 11:33

16  IDENTIFY THOSE COMMENTS BEING FROM CARTER BRYANT.

17        THE COURT:  IS 1137 THE SAME AS 1133 IN THE

18  DEPOSITION?

19        MR. PRICE:  YES; IT WAS A REDACTED VERSION.

20        THE COURT:  THE OBJECTION IS OVERRULED.            11:34

21        YOU MAY PLAY IT.

22        (VIDEO PLAYS; EXCERPTS PROVIDED BY

23        COUNSEL AS FOLLOWS: )

24        Q SO YOU SAID THAT YOU NEEDED TO LOOK AT YOUR

25        BOOK IN ORDER TO DETERMINE WHEN IT IS THAT YOU.

1          STARTED WORKING ON THAT FIRST SCULPT FOR BRATZ, SO,.

2          PLEASE, TELL ME NOW THAT YOU HAVE YOUR BOOK IN FRONT.

3          OF YOU MARKED AS 1132 AND 1133 WHEN THAT WAS?

4          A   IT SAYS SEPTEMBER 29 HERE WHERE CARTER IS

5          CRITIQUING THE SCULPT ON PAGE 00078.01.  IT'S THE.

6          FIRST PAGE AFTER THE FIRST PAGE.

7          Q   SO, PLEASE, TELL US WHAT THAT MEANS?

8          A   THAT MEANS HE WAS CRITIQUING MY SCULPT.  IT

9          TOOK ME TWO DAYS TO DO THE SCULPT, SO THAT WOULD HAVE

10         BEEN TWO OR THREE DAYS BEFORE SO THE 26TH OR THE.

11         27TH, SOMEWHERE AROUND THAT TIME.

12         (EXCERPTS CONCLUDED.)

13         **MR. PRICE:**  AND, YOUR HONOR, IF I COULD READ INTO

14  EVIDENCE AT THE SAME TIME PAGES 162, LINES 21 -- ACTUALLY, WE

15  CAN PLAY IT, LINES 21 THROUGH LINE 24.                            11:35

16         **THE COURT:**  ANY OBJECTION?

17         **MR. PRICE:**  162, LINE 21, TO 163, LINE 22.

18         **MR. NOLAN:**  NO OBJECTION, YOUR HONOR.

19         **THE COURT:**  VERY WELL.

20         (VIDEO PLAYS; EXCERPTS PROVIDED BY                          11:36

21         COUNSEL AS FOLLOWS:)

22         Q   THIS CRITIQUE THAT YOU MENTIONED THAT OCCURRED

23         ON OR ABOUT SEPTEMBER 29TH, 2000, OF THE FIRST BRATZ

24         SCULPT THAT YOU DID, MR. BRYANT WAS THAT?

25         A   YES.

```
 1          Q    YOU WERE THERE, OF COURSE?

 2          A    YES.

 3          Q    WAS ANYONE ELSE THERE?

 4          A    JUST MY DAUGHTER.

 5          Q    YOUR INFANT DAUGHTER?

 6          A    MY INFANT DAUGHTER AT THE TIME.

 7          Q    AND WHERE DID THIS TAKE PLACE?

 8          A    AT MY HOUSE.

 9          Q    MR. BRYANT GAVE YOU THE COMMENTS THAT ARE

10     REFLECTED HERE IN YOUR BOOK, THE SECOND PAGE OF.

11     EXHIBIT 1132?

12          A    CAN YOU SAY THAT AGAIN?

13          Q    SURE.  DIRECTING YOUR ATTENTION TO THE SECOND

14     PAGE OF EXHIBIT 1132, IT HAS THE ENTRY FOR SEPTEMBER

15     29TH, 2000.  IT HAS COMMENTS WHERE IT SAYS, "FIONA";

16     RIGHT?

17          A    YES.

18          Q    YOU MENTIONED THOSE WERE THE COMMENTS THAT

19     CARTER BRYANT GAVE YOU ON YOUR FIRST BRATZ SCULPT;

20     CORRECT?

21          A    CORRECT.

22          Q    DID HE GIVE YOU ANY OTHER COMMENTS?

23          A    NO.  THAT WAS IT.  I WROTE EVERYTHING DOWN.

24          (EXCERPTS CONCLUDED.)

25          MR. PRICE:  YOUR HONOR, THE SECOND PAGE, FOR THE     11:37
```

```
 1   RECORD, 1132 IS THE SAME AS WHAT WE'VE HAD ON THE BOARD, WHICH
 2   IS EXHIBIT 1137-14.
 3            THE COURT:  IS THAT STIPULATED TO?
 4            MR. NOLAN:  NO, YOUR HONOR.
 5            WELL, NOW, THIS VERSION IS THE SAME BECAUSE IT HASN'T    11:38
 6   BEEN REDACTED ON THE BOTTOM.  THE ONE SHOWN BEFORE, YOUR HONOR,
 7   HAD A REDACTION.
 8            MR. PRICE:  THAT'S TRUE.  THE ONE BEFORE HAD A
 9   REDACTION.  THEN THEY GAVE US A COPY BUT BOTH HAD THESE
10   CRITIQUES HERE.                                                  11:38
11            THE COURT:  IS THAT AGREED?
12            CAN SOMEONE HIGHLIGHT THE PORTION YOU'RE REFERRING
13   TO?
14            IS THAT THE SAME AS WHAT WAS BEING REFERRED TO IN
15   BOTH DEPOSITION TESTIMONY AND BEFORE THE JURY?                   11:38
16            MR. NOLAN:  YES, YOUR HONOR.  BUT THAT DEPOSITION
17   EXHIBIT SHOWN TO MS. LEAHY HAD THE BOTTOM PART OF IT NOT THERE,
18   WHICH HAS PAULA TREANTAFELLES' NAME UNDER THE DATE; THAT'S THE
19   POINT; SO WHEN IT'S REPRESENTED THAT THEY ARE THE SAME, IT'S
20   NOT THE SAME.                                                    11:38
21            THE COURT:  THE PORTION THAT'S HIGHLIGHTED IS THE
22   SAME; IS THAT CORRECT?
23            MR. NOLAN:  YES, YOUR HONOR.
24            THE COURT:  AND THE PORTION WITH THE NAME
25   "PAULA TREANTAFELLES" IS NOT THE SAME.                           11:38
```

1        **MR. NOLAN:**  CORRECT.

2        **THE COURT:**  THANK YOU.

3        **MR. NOLAN:**  THAT'S NOT ON THE EXHIBIT SHE WAS SHOWN

4   AT DEPOSITION.

5        **MR. PRICE:**  FOR THE RECORD, WE DID NOT REDACT THAT;      11:39

6   THAT WAS MGA'S REDACTION.

7        **MR. NOLAN:**  OBJECTION.  THAT'S NOT TRUE.  THAT WAS

8   NOT MGA'S REDACTION.

9        **THE COURT:**  WHO'S REDACTION WAS IT?

10        **MR. ZELLER:**  THEY WERE DONE BY MS. LEAHY'S COUNSEL AT    11:39

11  THE TIME, AND IT IS MY RECOLLECTION THAT AT THAT TIME, IT WAS

12  MR. MCFARLAND.

13        **MR. NOLAN:**  THAT WAS THE PRODUCT OF THE MEET AND

14  CONFER WE HAD WITH RESPECT TO DISCOVERY ISSUES INVOLVING THE

15  LAW FIRM OF QUINN EMANUEL THAT CERTAIN REDACTIONS WERE MADE.   11:39

16        **THE COURT:**  VERY WELL.

17        THE JURY IS TO AT THIS POINT DISREGARD THIS

18  DISCUSSION ABOUT THE REDACTION.  ALL THAT IS RELEVANT TO THE

19  CURRENT TESTIMONY IS THE HIGHLIGHTED AREA, AND BOTH PARTIES

20  STIPULATE THAT WAS THE SAME BEFORE THE WITNESS NOW AND AT THE  11:39

21  DEPOSITION.

22        IS THAT CORRECT, MR. PRICE?

23        **MR. PRICE:**  YES.

24        **THE COURT:**  MR. NOLAN?

25        **MR. NOLAN:**  YES.  EXCEPT FOR THE CHARACTERIZATION

1    THAT THE ONLY RELEVANCE IS THE TOP PART BECAUSE OF THE

2    INCLUSION OF THE NAME PAULA TREANTAFELLES UNDER THE DATE OF

3    SEPTEMBER 29TH.

4         **THE COURT:**  HOW IS THAT RELEVANT TO THE TESTIMONY WE

5    JUST HAD RIGHT NOW, COUNSEL?                                    11:40

6         **MR. NOLAN:**  YOUR HONOR, BECAUSE COUNSEL IS PLAYING A

7    REDACTED EXHIBIT OR SHOWING A REDACTED EXHIBIT THAT DID NOT

8    HAVE PAULA TREANTAFELLES' NAME.

9         **THE COURT:**  I UNDERSTAND THAT.  BUT HOW IS THAT

10   RELEVANT TO THE QUESTION THAT WAS POSED AND JUST PLAYED?        11:40

11        **MR. NOLAN:**  BECAUSE, YOUR HONOR, THEY ARE TRYING TO

12   IMPEACH MS. LEAHY WITH RESPECT TO HER RECOLLECTION ONE WAY OR

13   THE OTHER OF WHETHER OR NOT PAULA TREANTAFELLES WAS PRESENT.

14        **THE COURT:**  THAT WASN'T THE QUESTION THAT WAS JUST

15   POSED; THAT GOES TO AN EARLIER QUESTION.  AND THAT'S A POINT    11:40

16   THAT I'LL PERMIT YOU TO EXAMINE ON WHEN WE GET TO THAT.

17        FOR PURPOSES OF THE PENDING SERIES OF QUESTIONS, IS

18   THERE ANY OBJECTION?

19        IF THERE IS, THEN WE SHOULD JUST BRING BOTH EXHIBITS

20   IN.                                                            11:40

21        **MR. NOLAN:**  BOTH EXHIBITS ARE IN EVIDENCE, AND MY

22   OBJECTION IS --

23        **THE COURT:**  WHAT'S THE OTHER EXHIBIT?

24        **MR. NOLAN:**  1137.

25        **MR. PRICE:**  IT'S 1132 AND 1133.                       11:41

```
 1              WE'RE REFERRING NOW TO 1132-2 AND 1132-3 ARE THE SAME

 2     AS REDACTED VERSIONS OF 1137-14 AND 1137-15.

 3              THE COURT:  LET'S PUT THEM UP NEXT TO EACH OTHER.

 4              MR. NOLAN:  THANK YOU, YOUR HONOR.

 5              MR. PRICE:  IF WE COULD GO TO 1137-14.                    11:41

 6              THE COURT:  SO THE EXHIBIT ON THE LEFT IS WHAT

 7     WAS BEFORE THE WITNESS AT THE DEPOSITION; IS THAT CORRECT?

 8              MR. PRICE:  YES.

 9              MR. NOLAN:  CORRECT.

10              THE COURT:  THE EXHIBIT ON THE RIGHT IS WHAT IS          11:42

11     BEFORE THE WITNESS PRESENTLY; CORRECT?

12              MR. PRICE:  CORRECT.

13              THE COURT:  WHO DID THE REDACTION TO THE ONE ON THE

14     LEFT?

15              MR. ZELLER:  MY RECOLLECTION IS THAT THE REDACTED        11:42

16     VERSION ON THE LEFT IS WHAT WE WERE GIVEN IN ADVANCE OF

17     MS. LEAHY'S DEPOSITION, WHICH WAS PRODUCED BY HER COUNSEL,

18     MR. MCFARLAND'S LAW FIRM.

19              THE COURT:  MR. NOLAN, FROM YOUR PERSPECTIVE, WHO DID

20     THE REDACTION ON THE LEFT?                                       11:42

21              MR. NOLAN:  I APOLOGIZE.

22              MR. MCFARLAND.  BUT I WAS MISTAKEN.  THEY HAVE NOW

23     SHOWN 1132 --

24              THE COURT:  THEY BOTH SEEM TO HAVE

25     PAULA TREANTAFELLES' NAME ON THEM.                               11:42
```

1        **MR. NOLAN:**  NO.  THAT'S THE POINT.

2        IF I COULD HAVE EXHIBIT 1133 WHICH IS THE EXHIBIT

3   THAT WAS USED AT THE DEPOSITION, THAT PORTION HAS BEEN

4   REDACTED; SO 1132, MY UNDERSTANDING, IS NOT EXHIBIT.

5        **THE COURT:**  I'M GOING TO EXCUSE THE JURY AND WE'RE          11:42

6   GOING TO GET TO THE BOTTOM OF THIS.

7             (WHEREUPON JURORS DEPART COURTROOM.)

8        **THE COURT:**  COUNSEL, I'LL GIVE YOU A FEW CHANCES TO

9   TALK ABOUT THIS AMONGST YOURSELVES.

10            (WHEREUPON A LUNCH RECESS WAS HELD.)

11            (MORNING SESSION CONCLUDED.)

12

13

14

15

16

17                        CERTIFICATE

18

19  I hereby certify that pursuant to section 753, title 28, United
    States code, the foregoing is a true and correct transcript of
20  the stenographically recorded proceedings held in the
    above-entitled matter and that the transcript page format is in
21  conformance with the regulations of the judicial conference of
    the United States.

22

23

    _____                    _____
24  THERESA A. LANZA, RPR, CSR                         Date
    Official COURT Reporter

25                                                                      11:47

THURSDAY, JULY 3, 2008                    TRIAL DAY 20, MORNING SESSION