1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                  EASTERN DIVISION

4                    - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                    - - -

7   Carter Bryant, Et. Al.,          )
                                     )
8                    Plaintiffs,     )
                                     )
9            vs.                     )   No. ED CV 04-09049
                                     )   (LEAD LOW NUMBER)
10  Mattel, Inc., Et. Al.,           )
                                     )
11                   Defendants.     )   HEARING
    _____)
12  AND CONSOLIDATED ACTIONS,        )
    _____)
13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                Riverside, California

17              Monday, April 7th, 2008

18                   11:34 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
              Federal Official Court Reporter
24              3470 12th Street, Rm. 134
              Riverside, California  92501
25                 951-274-0844
               WWW.THERESALANZA.COM

```
 1  APPEARANCES:

 2

    On behalf of Carter Bryant:
 3                          KEKER & VAN NEST
                            BY:  CHRISTA ANDERSON
 4                          710 SANSOME STREET
                            SAN FRANCISCO, California  94111-1704
 5                          415-391-5400

 6

 7  on behalf of Mattel:

 8                          QUINN EMANUEL
                            By:  JOHN QUINN
 9                          BY:  MICHAEL T. ZELLER
                            865 S. FIGUEROA STREET,
10                          10TH FLOOR
                            LOS ANGELES, California  90017
11                          213-624-7707

12

13  ON BEHALF OF MGA ENTERTAINMENT AND ISAAC LARIAN:

14                          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                            BY:  THOMAS J. NOLAN
15                          BY:  CARL ALAN ROTH
                            BY:  KENNETH PLEVAN
16                          300 SOUTH GRAND AVENUE
                            LOS ANGELES, CALIFORNIA  90071-3144
17                          213-687-5000

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                                              Page

3    HEARING....................................   4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          RIVERSIDE, CALIFORNIA; MONDAY, APRIL 7, 2008; 11:34 A.M.

 2                              -oOo-

 3          THE CLERK:  CALLING CALENDAR ITEM NUMBER TEN,

 4   CARTER BRYANT VERSUS MATTEL, INC., CASE NUMBER CV 04-9049-SGL,

 5   AND RELATED CASE NUMBERS CV 04-9059 AND CV-05-2727.            11:31

 6          MAY WE HAVE COUNSEL PLEASE STATE YOUR APPEARANCES FOR

 7   THE RECORD.

 8          MR. QUINN:  JOHN QUINN AND MIKE ZELLER FOR MATTEL.

 9          MR. NOLAN:  TOM NOLAN, SKADDEN ARPS, FOR MGA AND

10   LARIAN.                                                        11:34

11          MR. ROTH:  CARL ROTH FROM SKADDEN ARPS, YOUR HONOR.

12          MR. PLEVAN:  KENNETH PLEVAN, YOUR HONOR.

13          MS. ANDERSON:  CHRISTA ANDERSON FOR CARTER BRYANT.

14          THE COURT:  GOOD MORNING TO YOU ALL.

15          WE'RE ON CALENDAR THIS MORNING FOR MATTEL'S MOTION TO   11:34

16   DISQUALIFY SKADDEN ARPS AND THE EXPERT WITNESS, MS. TOMIYAMA.

17          I ALSO HAVE RECEIVED AND REVIEWED MGA'S EX-PARTE

18   APPLICATION CONCERNING THE EXHIBITS THAT WERE FILED, THE

19   EXHIBIT LIST; AND I ALSO HAVE MATTEL'S EX-PARTE APPLICATION TO

20   COMPEL CERTAIN DEPOSITIONS.                                    11:35

21          I PLAN TO, TIME PERMITTING, ADDRESS THOSE TWO

22   ADDITIONAL EX PARTES AT THIS HEARING AS WELL.

23          BUT I FIRST WANT TO TAKE ON AND ADDRESS THE PRIMARY

24   MOTION BEFORE THE COURT TODAY, AND THAT'S THIS MOTION TO

25   DISQUALIFY SKADDEN ARPS AND THE EXPERT.                        11:35
```

```
 1              I'M GOING TO APPROACH THIS A LITTLE DIFFERENTLY.
 2              THE COURT HAS SPENT A SUBSTANTIAL AMOUNT OF TIME THIS
 3   PAST WEEK REVIEWING THIS.  I HAVE MY CHRONOLOGY HERE; I HAVE MY
 4   NOTES; I EVEN HAVE A TENTATIVE SET OF FINDINGS AND CONCLUSIONS
 5   OF LAW, WHICH, AFTER A SERIES OF QUESTIONS BY THE COURT, I'M     11:35
 6   GOING TO READ AND THEN INVITE COUNSEL TO RESPOND TO THE
 7   TENTATIVE.  BUT I FIRST HAVE SOME QUESTIONS FOR SKADDEN ARPS,
 8   FOR THE DEFENSE.
 9              MR. NOLAN, I UNDERSTAND FROM OUR LAST HEARING THAT
10   YOU INDICATED THAT YOU WOULD BE SPEAKING FOR SKADDEN ARPS.      11:36
11              MR. NOLAN:  THAT'S CORRECT, YOUR HONOR.
12              THE COURT:  WITH RESPECT TO THE TWO ATTORNEYS,
13   MR. PLEVAN AND MS. CAMPAGNA, ARE THEY PRESENT TODAY?
14              MR. NOLAN:  MR. PLEVAN IS, YOUR HONOR.
15              THE COURT:  MR. PLEVAN IS.
16              WHAT ABOUT MS. CAMPAGNA?
17              MR. NOLAN:  SHE'S NOT PRESENT.
18              THE COURT:  AM I PRONOUNCING THAT CORRECTLY?
19              MR. NOLAN:  YOU ARE, YOUR HONOR.
20              SHE'S AN ASSOCIATE IN THE NEW YORK OFFICE.           11:36
21              THE COURT:  VERY GOOD.
22              MR. NOLAN:  MR. PLEVAN IS A PARTNER IN THE NEW YORK
23   OFFICE.  BOTH HAVE BEEN ADMITTED PRO HAC VICE.
24              THE COURT:  I GUESS ONE OF THE QUESTIONS THAT I HAD
25   TO BEGIN WITH -- BECAUSE I WANTED TO GET A SENSE OF             11:36
```

1  MR. PLEVAN'S AND MS. CAMPAGNA'S INVOLVEMENT IN OTHER ASPECTS OF

2  THE CASE BEYOND THEIR WORK WITH THE EXPERT WITNESS.

3          AND, PERHAPS, I DON'T EVEN NEED TO QUESTION THEM

4  ABOUT THAT.  PERHAPS, YOU COULD LET THE COURT KNOW WHAT THAT

5  INVOLVEMENT IS.                                                    11:37

6          **MR. NOLAN:**  WHATEVER THE COURT WISHES, I'M HAPPY TO

7  ADDRESS THAT.

8          LIKE MOST COMPLICATED CASES AS COMPLEX AND AS BROAD

9  RANGING IN ISSUES, WE HAVE DIVIDED THE CASE IN TERMS OF TEAMS.

10  MR. PLEVAN, FROM THE OUTSET OF THE CASE, HAS BEEN ASSIGNED TO    11:37

11  WHAT I CALL THE IP PORTION OF THE CASE, THE COPYRIGHT ISSUES,

12  AND DEALING WITH AND PREPARING AND DEFENDING DEPOSITIONS WITH

13  RESPECT TO THE EXPERT WITNESSES THAT HE'S BEEN PARTICULARLY

14  ASSIGNED TO.  MICHELLE CAMPAGNA HAS BEEN SPECIFICALLY ASSIGNED

15  TO MR. PLEVAN; AND THEY GENERALLY WORK AS A TEAM.                11:37

16          WE DO NOT NECESSARILY INTEGRATE THE TEAMS WITH

17  RESPECT TO CROSSOVERS.  IN OTHER WORDS, MR. PLEVAN IS NOT

18  INVOLVED, NECESSARILY, TO THE GREATEST DEGREE IN THE FACTUAL

19  DEVELOPMENT OF, LET'S SAY, CARTER BRYANT'S DRAWINGS, ALTHOUGH

20  CERTAINLY WE WORK AS A TEAM.  I DON'T WANT TO, IN ANY WAY, DENY  11:37

21  THAT POINT, YOUR HONOR.  MR. PLEVAN HAS BEEN INVOLVED IN EVERY

22  SIGNIFICANT MEETING THAT WE'VE HAD DISCUSSING A WIDE-RANGING

23  NUMBER OF ISSUES IN THE CASE.

24          NOT SO TRUE WITH RESPECT TO MICHELLE CAMPAGNA.  HER

25  ROLE HAS BEEN FAIRLY DISCRETE.                                   11:38

1    **THE COURT:**  I DON'T WANT TO LEAVE THAT 'NOT

2  NECESSARILY INVOLVED.'

3    COULD YOU BE MORE SPECIFIC, SPECIFICALLY IN TERMS OF

4  INFORMATION OBTAINED FROM THIS EXPERT; HOW HAS THAT BEEN

5  INTEGRATED INTO THE OVERALL TEAM OR THE OVERALL REPRESENTATION?   11:38

6    **MR. NOLAN:**  ACTUALLY, YOUR HONOR, THE INVOLVEMENT OF

7  MS. TOMIYAMA IN THE OVERALL DEVELOPMENT OF THE FACTUAL

8  PRESENTATION THAT WE EXPECT AT TRIAL AND HOW IT RELATES TO THE

9  LEGAL ISSUES ARE RATHER LIMITED IN SCOPE AND IN NATURE.

10    **THE COURT:**  IN WHAT WAY?   11:38

11    **MR. NOLAN:**  IN THE SENSE THAT MS. TOMIYAMA'S

12  TESTIMONY RELATES TO A VERY DISCRETE AREA OF THE CASE, AND THAT

13  IS THE COMPARISON OF THE FACE PAINTING AND THE PAINTING OF

14  EYES.  THERE ARE OTHER WITNESSES THAT DEAL WITH THAT ISSUE.

15  GLENN VILPPU IS ONE, AND WE HAVE A NUMBER OF OTHER WITNESSES   11:39

16  THAT DEAL WITH OTHER ASPECTS OF THE CASE.

17    IN THAT REGARD, MR. PLEVAN AND MS. CAMPAGNA HAVE BEEN

18  SOLELY RESPONSIBLE FOR THE INTERACTION WITH MS. TOMIYAMA IN THE

19  CASE.  THEY WERE RESPONSIBLE FOR THE INITIAL INTERVIEWS AND THE

20  DEVELOPMENT AND PRESENTATION OF THE EXPERT REPORT.  AND   11:39

21  MR. PLEVAN WAS PRESENT AT HER DEPOSITION.

22    **THE COURT:**  WHAT ABOUT MR. HOLDEN?  MR. HOLDEN IS THE

23  IN-HOUSE COUNSEL.  THE COURT JUST GOT THE IMPRESSION FROM

24  PREVIOUS MOTIONS THAT HE'S BEEN VERY MUCH INVOLVED IN ALL

25  ASPECTS OF THIS CASE.  HE SEEMS TO BE A VERY HANDS-ON IN-HOUSE   11:40

```
 1   COUNSEL.

 2          IS THAT CORRECT?

 3          MR. NOLAN:  HE'S VERY EFFECTIVE IN-HOUSE COUNSEL, IN

 4   THE SENSE HE'S HERE, SO I NEED TO SAY THAT.

 5          NO.  I KNOW THIS IS A VERY SERIOUS MATTER, AND I        11:40

 6   APOLOGIZE.

 7          THE COURT:  THAT'S ALL RIGHT.

 8          MR. NOLAN:  I TOLD MYSELF I WASN'T GOING TO RESORT TO

 9   ANY HUMOR THIS MORNING, BUT IT'S DIFFICULT FOR ME.

10          MR. HOLDEN PLAYED A CRITICAL ROLE IN THE TRANSITION    11:40

11   OF THIS CASE FROM O'MELVENY & MYERS TO THE SKADDEN ARPS FIRM,

12   IN TERMS OF PROVIDING INFORMATION AND COORDINATING SINCE THEN.

13   HOWEVER, BECAUSE OF THE NUMEROUS AEO DESIGNATIONS IN THIS CASE,

14   MR. HOLDEN HAS, IN EFFECT, BEEN REMOVED FROM A SIGNIFICANT

15   PORTION OF THIS CASE AND HASN'T SEEN IT.  I THINK THAT THE ONLY  11:40

16   INTERACTION THAT MR. HOLDEN HAD WAS THE FIRST INITIAL MEETING,

17   WHERE MR. HOLDEN WAS PRESENT AND COUNSEL FOR O'MELVENY WAS ALSO

18   PRESENT.  THEREAFTER, I THINK THAT MR. HOLDEN, IN HIS

19   DECLARATION, SAYS THAT HE SAW MS. TOMIYAMA IN OUR OFFICE.

20          THE COURT:  YOU'RE TALKING ABOUT HIS INTERACTION WITH    11:41

21   MS. TOMIYAMA.

22          MR. NOLAN:  YES.

23          THE COURT:  I'M ASKING ABOUT HIS INTERACTION WITH

24   THE...

25          MR. NOLAN:  THE ENTIRE TEAM?                            11:41
```

1          **THE COURT:**  YES.

2          **MR. NOLAN:**  I'M SORRY.

3          VERY INVOLVED IN THAT SENSE.

4          **THE COURT:**  THAT'S MY SENSE.

5          **MR. NOLAN:**  UP UNTIL RECENTLY, WHEN JEANINE PISONI         11:41

6    WAS HIRED AS THE GENERAL COUNSEL -- AND SHE IS PRESENT FOR MGA

7    THIS MORNING -- MR. HOLDEN WAS THE PRIMARY LAWYER WITHIN MGA

8    THAT WE WOULD DEAL WITH IF WE NEEDED TO GET INFORMATION.

9          **THE COURT:**  VERY GOOD.

10         WELL, THOSE WERE SOME PRELIMINARY QUESTIONS.                   11:41

11         AS I INDICATED, WHAT I WANTED TO DO WAS GIVE YOU MY

12   SENSE, HAVING GONE THROUGH THE EXPERT REPORT, THE DECLARATIONS

13   THAT HAVE BEEN SUBMITTED, BOTH ON THE RECORD, BY BOTH SIDES, AS

14   WELL AS THE DECLARATIONS SUBMITTED IN-CAMERA --

15         YOU KNOW, I SHOULD SAY AT THE OUTSET, I UNDERSTAND            11:42

16   THAT IT'S A VERY AWKWARD SITUATION WHEN THE COURT MUST CONSIDER

17   A DECLARATION THAT'S SUBMITTED IN-CAMERA, BECAUSE IT DOES NOT

18   HAVE THE ABILITY TO HAVE THAT DECLARATION TESTED, OF COURSE, BY

19   THE OTHER SIDE AND THROUGH THE ADVERSARIAL PROCESS; SO TO A

20   CERTAIN EXTENT, THE COURT HAS TO ENGAGE IN ITS OWN TESTING,        11:42

21   VIS-À-VIS THE OTHER DEPOSITIONS THAT HAVE BEEN SUBMITTED AND

22   THE OTHER KNOWN PUBLIC -- OR AT LEAST WITHIN THE CONTEXT OF THE

23   PROCEEDINGS, WHAT IS KNOWN TO THE ATTORNEYS.  AND I HAVE TO DO

24   THAT WEIGHING MYSELF.  IT'S NOT AN EASY PROCESS, AND THE COURT

25   DOES NOT TAKE THAT RESPONSIBILITY LIGHTLY AT ALL.                  11:42

1       I ALSO SHOULD NOTE THAT I'VE KIND OF BROKEN THIS DOWN

2   INTO TWO MOTIONS.  I'M CONSIDERING THE MOTION TO DISQUALIFY THE

3   EXPERT, AND THEN THE MOTION TO DISQUALIFY COUNSEL, IN KIND OF A

4   SEPARATE ANALYSIS ON BOTH.

5       LET ME BEGIN WITH THE FINDINGS OF FACT THAT THE COURT      11:43

6   IS TENTATIVELY MAKING.  AND THIS IS TENTATIVE SUBJECT TO

7   ARGUMENTATION.  WE'RE APPROACHING THE NOON LUNCH HOUR.  I DO

8   INTEND TO TAKE A BREAK FOR LUNCH AND RESUME THIS IN THE

9   AFTERNOON.  I DO NOT WANT THIS RUSHED.  AS MR. NOLAN JUST

10  ALLUDED TO A MOMENT AGO, OBVIOUSLY THIS IS A SERIOUS MATTER      11:43

11  THAT THE COURT TAKES SERIOUSLY.  I DON'T WANT ANYONE TO BE

12  RUSHED.  I WANT EVERYONE TO HAVE AN OPPORTUNITY TO SAY WHAT

13  THEY NEED TO SAY.  BUT PERHAPS I COULD BEGIN BY GIVING THIS

14  TENTATIVE, AND THEN WE CAN TAKE A BREAK AND RESUME WITH

15  ARGUMENT AT THAT TIME.      11:43

16      BASED ON THE EVIDENCE AVAILABLE TO ALL OF THE

17  PARTIES, THOUGH -- THIS IS NOT CONSIDERING AT ALL THE

18  IN-CAMERA -- THIS IS WHAT I THINK IS UNCONTROVERTED:

19      FIRST OF ALL, IT IS UNCONTROVERTED THAT MGA

20  UNDERSTOOD THAT MS. TOMIYAMA, A FORMER EMPLOYEE, WHO HAD BEEN      11:44

21  MATTEL'S EMPLOYEE FOR 15 YEARS, HAD BEEN CONSULTED, WHILE SO

22  EMPLOYED BY MATTEL'S LEGAL COUNSEL, TO COMPARE MATTEL'S DOLLS

23  WITH OTHER COMPANIES' DOLLS AND PROVIDE TO COUNSEL AN ANALYSIS

24  OF HER COMPARISON FOR THE PURPOSE OF ASSISTING COUNSEL TO

25  ADVISE MATTEL ON LEGAL ISSUES REGARDING THE DOLLS.      11:44

1          IT IS UNCONTROVERTED THAT SHE WAS ENGAGED BY

2    SKADDEN ARPS ON BEHALF OF MGA TO PERFORM THE SAME TYPE OF

3    ANALYSIS AND THAT SHE DID, IN FACT, PROVIDE SUCH AN ANALYSIS.

4    THIS IS THE ANALYSIS RELATED TO THE COMPARISONS OF THE FACE

5    PAINTINGS.                                                      11:44

6          IT IS UNCONTROVERTED THAT SHE WAS EMPLOYED BY MATTEL

7    DURING THE TIME PERIOD THAT MGA FILED ITS COMPLAINT AGAINST

8    MATTEL IN THE CASE PENDING BEFORE THIS COURT; THAT'S

9    CV-05-2727.

10         IT IS NOT DISPUTED THAT SHE WAS SHOWN THE COMPLAINT     11:45

11   IN THAT CASE BY MATTEL ATTORNEYS AND DISCUSSED THE CONTENTS, AT

12   LEAST IN PASSING, ON THAT COMPLAINT.

13         IT IS NOT CONTROVERTED THAT MS. TOMIYAMA WAS SUBJECT

14   TO A SEPARATION AGREEMENT THAT REQUIRED HER TO GIVE NOTICE TO

15   MATTEL BEFORE PROVIDING SERVICES TO A COMPETITOR, AND THAT BY  11:45

16   THE TERMS OF THAT AGREEMENT, THAT REQUIREMENT CONTINUES TO THIS

17   DAY.

18         IT'S NOT DISPUTED THAT MS. TOMIYAMA DID NOT GIVE SUCH

19   NOTICE, NOR IS IT DISPUTED THAT MS. TOMIYAMA SHOWED A COPY OF

20   THE AGREEMENT TO AND WAS ADVISED BY A SKADDEN ARPS ATTORNEY    11:45

21   THAT SHE WAS UNDER NO OBLIGATION TO COMPLY WITH IT, DESPITE THE

22   LANGUAGE SET FORTH IN THE AGREEMENT.

23         IT IS NOT CONTROVERTED THAT MS. TOMIYAMA IS UNABLE TO

24   DISTINGUISH BETWEEN PRIVILEGED AND UNPRIVILEGED DOCUMENTS.

25   THIS WAS CLEAR TO THE COURT IN REVIEWING HER ANSWERS TO HER    11:45

1  DEPOSITION.  SHE ADMITTED AS MUCH IN HER DEPOSITION, AND

2  THERE'S A NUMBER OF EXAMPLES IN HER DEPOSITION WHICH

3  DEMONSTRATE THAT INABILITY TO DISTINGUISH BETWEEN PRIVILEGED

4  AND UNPRIVILEGED COMMUNICATIONS.

5          IT IS NOT DISPUTED, AS SET FORTH IN HER EXPERT                11:46

6  REPORT, EXPRESSLY IN HER REPORT, THAT SHE'S UNABLE TO

7  DISTINGUISH BETWEEN FACT TESTIMONY AND EXPERT TESTIMONY.  SHE

8  STATES AS MUCH.

9          SO THOSE ARE KIND OF A LIST OF FACTS THAT I THINK ARE

10  NOT DISPUTED, JUST BASED ON MY READING OF THE DEPOSITIONS AND     11:46

11  TRANSCRIPTS AND DECLARATIONS THAT ARE SET FORTH ON THE RECORD.

12          I THEN HAVE THE IN-CAMERA FILING MADE BY MATTEL.  AND

13  AS I INDICATED, I NEED TO TEMPER MY OBSERVATIONS REGARDING THE

14  ENGAGEMENT OF MS. TOMIYAMA AS AN EXPERT, WITH THE UNDERSTANDING

15  THAT NEITHER MGA NOR THE ATTORNEYS OF SKADDEN ARPS HAVE BEEN      11:46

16  ABLE TO REVIEW THE IN-CAMERA MATERIAL THAT PURPORTEDLY REVEALS

17  THE EXTENT OF MS. TOMIYAMA'S INVOLVEMENT ON BEHALF OF MATTEL IN

18  THESE CONSOLIDATED CASES.

19          I HAVE NO REASON NOT TO ACCEPT THOSE REPRESENTATIONS,

20  BUT I AM MINDFUL OF THE FACT THAT THEY ARE BEING SUBMITTED        11:47

21  IN-CAMERA.

22          BUT WHEN I COMPARE THE IN-CAMERA DECLARATION TO

23  MS. TOMIYAMA'S DEPOSITION, SPECIFICALLY HERE, I HAVE IN MY

24  NOTES, PAGES 262 TO 263 -- WHEREIN SHE CANNOT MERELY NOT RECALL

25  BUT CANNOT DENY ANALYZING BRATZ DOLLS FOR MATTEL'S LAWYERS.  IT   11:47

1   IS ALSO UNCONTROVERTED THAT MS. TOMIYAMA WAS EXTENSIVELY

2   INVOLVED IN ISSUES REGARDING THE CLAIMS AND DEFENSES IMPLICATED

3   BY MGA'S COMPLAINT AGAINST MATTEL IN CASE 05-2727 BEFORE THIS

4   COURT.  SHE WAS PRIVY TO COUNSEL'S ANALYSIS, THOUGHTS, AND

5   IMPRESSIONS RELATING TO COMPARISONS OF THE "MY SCENE" DOLLS AND        11:47

6   THE BRATZ DOLLS.

7           ALSO COMPARING THE IN-CAMERA DECLARATIONS TO

8   MS. TOMIYAMA'S DEPOSITION AT PAGES 266 TO 268, WHERE, AGAIN,

9   SHE MERELY CANNOT RECALL BUT DOES NOT DENY ASSISTING COUNSEL'S

10  INVESTIGATION OF CARTER BRYANT'S ACTIVITIES AT MATTEL.  IT IS         11:48

11  UNCONTROVERTED THAT MS. TOMIYAMA WAS DEEPLY INVOLVED IN

12  MATTEL'S INVESTIGATIONS OF CARTER BRYANT'S ACTIVITIES AND WAS

13  PRIVY TO COUNSEL'S ANALYSIS, THOUGHTS, AND IMPRESSIONS ABOUT

14  ISSUES DIRECTLY RELATED TO PHASE ONE OF THIS TRIAL.

15          IT'S SOMEWHAT DISTURBING, THE SERIES OF 'I DON'T               11:48

16  RECALLS,' 'I DON'T RECALLS' FROM MS. TOMIYAMA, BUT IT'S

17  SIGNIFICANT THAT SHE DOES NOT DENY THAT ANALYSIS; AND WHEN

18  COMBINED WITH THE INFORMATION SET FORTH IN THE IN-CAMERA

19  DECLARATION, THE COURT MAKES THE FINDINGS THAT IT DOES.

20          THE THIRD COMPARISON I WOULD DO IS MAKING THE                 11:48

21  COMPARISON BETWEEN THE IN-CAMERA DECLARATIONS TO MS. TOMIYAMA'S

22  DEPOSITION AT PAGES 246 TO 248, WHERE SHE DISCUSSES THE

23  DOCUMENT ATTACHED AS EXHIBIT A TO HER EXPERT REPORT, THE SIMBA

24  VERSUS BARBIE PHOTO MONTAGE.  THE COURT CONCLUDES THAT THE

25  DOCUMENT IS BOTH ATTORNEY WORK-PRODUCT AND PROTECTED BY THE           11:48

 1   ATTORNEY-CLIENT PRIVILEGE.

 2        WITH THIS RECORD IN MIND, I'LL SET FORTH THE COURT'S

 3   LEGAL ANALYSIS.  I BEGIN BY LOOKING TO STENCEL V. FAIRCHILD

 4   CORPORATION, 174 F. SUPP. 2D 1080, A CENTRAL DISTRICT CASE.

 5   THE COURT MUST CONSIDER THREE FACTORS, AND DOES SO AS FOLLOWS,        11:49

 6   AT LEAST TENTATIVELY:

 7        THE FIRST IS THAT MATTEL MUST PROVE THAT IT WAS

 8   OBJECTIVELY REASONABLE TO BELIEVE THAT A CONFIDENTIAL

 9   RELATIONSHIP EXISTED BETWEEN MS. TOMIYAMA AND MATTEL.  AT THIS

10   POINT, IT'S UNQUESTIONABLE THAT BASED ON THE IN-CAMERA              11:49

11   DECLARATIONS, AS WELL AS THE DEPOSITION TESTIMONY OF

12   MS. TOMIYAMA AND THE EXPERT REPORT, THAT MATTEL HAS ESTABLISHED

13   A CONFIDENTIAL RELATIONSHIP WITH MS. TOMIYAMA.

14        ACCORDING TO HER OWN TESTIMONY DURING THE LAST TWO

15   YEARS OF HER EMPLOYMENT, MATTEL'S LEGAL DEPARTMENT CONSULTED        11:49

16   WITH HER REGULARLY, ABOUT ONCE PER MONTH, REGARDING LITIGATION

17   ISSUES INVOLVING COMPARISONS OF MATTEL'S PRODUCTS WITH

18   COMPETITORS' PRODUCTS.  THE IN-CAMERA DECLARATIONS GO ON TO

19   PROVIDE A MORE IN-DEPTH DETAILED ANALYSIS OF THESE

20   CONSULTATIONS; BUT, AGAIN, FROM HER OWN TESTIMONY ITSELF, IT'S      11:50

21   QUITE CLEAR THAT SHE HAD THOSE TYPES OF CONSULTATIONS AT LEAST

22   ONCE A MONTH.

23        THE SECOND FACTOR IS THAT MATTEL MUST ESTABLISH THAT

24   IT IN FACT DISCLOSED CONFIDENTIAL INFORMATION TO THE EXPERT.

25   THE COURT TENTATIVELY FINDS THIS HAS BEEN MET BY VIRTUE OF THE      11:50

1    IN-CAMERA DECLARATIONS.

2         A THIRD INQUIRY MADE BY THE STENCEL CASE INVOLVES

3    POLICY CONSIDERATIONS.  IT CAUTIONS STRONGLY AGAINST THE

4    TACTICAL USE OF MOTIONS TO DISQUALIFY EXPERTS, CONSIDERS THE

5    ABILITY OF EXPERTS TO PURSUE THEIR TRADE, AND WEIGHS THE          11:50

6    IMPORTANCE OF ALLOWING PARTIES TO SELECT THEIR OWN EXPERTS.

7    THESE CONSIDERATIONS ARE WEIGHED AGAINST POTENTIAL PREJUDICE TO

8    THE MOVING PARTY IF THE EXPERT IS NOT DISQUALIFIED.

9         THE COURT HAS CAREFULLY CONSIDERED EACH ONE OF THESE

10   THREE ISSUES.  FROM MY REVIEW OF THE RECORD, THE PRESENT MOTION    11:51

11   DOES NOT STRIKE ME AS ONE THAT'S BEING BROUGHT FOR TACTICAL

12   REASONS, NOTWITHSTANDING COUNSEL'S ARGUMENT TO THE CONTRARY.

13   MGA DOES TAKE ISSUE WITH MATTEL'S TIMING, BUT THE COURT

14   DISCERNS NO DELAY IN THE BRINGING OF THE PRESENT MOTION.

15        THE COURT DRAFTED UP A CHRONOLOGY, AND GIVEN THE             11:51

16   DISCLOSURE OF THE EXPERT REPORT, MATTEL, TWO DAYS LATER, SERVES

17   A SUBPOENA ON MS. TOMIYAMA, RECOGNIZING HER STATUS AS A

18   DESIGNATED EXPERT; THAT'S ON FEBRUARY 17TH.  THE DEPOSITION

19   GOES FORWARD ON MARCH 22ND, AND THEN SOMETIME IN THE VERY EARLY

20   PART OF MARCH, A FEW DAYS LATER, MATTEL CONTACTS BOTH            11:51

21   SKADDEN ARPS AND CARTER BRYANT'S ATTORNEYS REGARDING THE

22   DISCLOSURE OF PRIVILEGED INFORMATION, AND THEN THE PRESENT

23   MOTION IS FILED, I BELIEVE, ON MARCH 18TH.  SO THERE DOESN'T

24   SEEM TO BE A TACTICAL DELAY.  THIS ISN'T A SITUATION WHERE THE

25   EXPERT DEPOSITION TOOK PLACE MONTHS AGO AND THERE WAS A BIG      11:52

1    DELAY IN BRINGING THIS MOTION TO DISQUALIFY HER.  NOR IS THERE

2    A QUESTION THAT DISQUALIFICATION WOULD IMPAIR MS. TOMIYAMA'S

3    ABILITY TO PURSUE HER TRADE.  AS NOTED IN HER EXPERT REPORT, I

4    BELIEVE, THIS IS HER FIRST ATTEMPT AT BEING AN EXPERT, OR

5    PROVIDING EXPERT TESTIMONY.                                    11:52

6          MGA HAS NOTED IN ITS OPPOSITION THAT EXPERTS IN THE

7    FIELD OF FASHION DOLL FACE PAINTING ARE IN SHORT SUPPLY; AND

8    EVEN THOUGH IT HAS NOT SUBMITTED EVIDENCE IN SUPPORT OF THAT

9    STATEMENT, THE COURT HAS NO REASON NOT TO ACCEPT THAT

10   REPRESENTATION; THAT, ALONG WITH THE FACT THAT THE EXPERT      11:52

11   DESIGNATION DATE IN THIS ACTION HAS PASSED, IMPACTS GREATLY

12   UPON MGA'S ABILITY TO SELECT ITS OWN EXPERTS.

13         NONETHELESS, THE CONSIDERATION MUST BE WEIGHED

14   AGAINST THE POTENTIAL PREJUDICE TO MATTEL ABSENT

15   DISQUALIFICATION, WHICH THE COURT FINDS TENTATIVELY IS QUITE   11:52

16   SUBSTANTIAL.  EVEN ABSENT ANY FINDING OF BAD FAITH ON THE PART

17   OF COUNSEL, MGA HAD THE BENEFIT OF CONSULTING WITH A LONG-TERM

18   EMPLOYEE OF MATTEL, WHOSE EXPERTISE IN APPLYING HER ANALYSIS TO

19   LEGAL CLAIMS AND DEFENSES WAS DEVELOPED UNDER THE DIRECTION OF

20   MATTEL'S ATTORNEYS, AND WHO WAS EXPOSED TO THE THOUGHTS,       11:53

21   THEORIES, ANALYSIS, AND IMPRESSIONS OF THOSE VARIOUS SAME

22   ATTORNEYS IN THE YEARS LEADING UP TO THIS CASE AND INVOLVING

23   THIS PARTICULAR CASE.

24         THIS SAME EXPERT HAS ADMITTED TO AND DEMONSTRATED

25   REPEATEDLY A WHOLESALE INABILITY TO DISTINGUISH BETWEEN        11:53

1   PRIVILEGED AND NONPRIVILEGED INFORMATION OR COMMUNICATIONS,

2   WHICH FURTHER UNDERSCORES THE PROBLEM THAT WE HAVE BEFORE US.

3          IN ITS DECISION TO DISQUALIFY AN EXPERT, THE COURT

4   NEED NOT CONCLUDE WHETHER OR NOT COUNSEL FOR MGA ADMONISHED

5   MS. TOMIYAMA REGARDING THE DISCLOSURE OF PRIVILEGED                    11:53

6   COMMUNICATIONS OR ATTORNEY WORK PRODUCT.  INDEED, IT IS CLEAR

7   THAT WHETHER THEY DID OR DID NOT IS IRRELEVANT ON THIS ISSUE,

8   BECAUSE GIVEN HER INABILITY TO DISTINGUISH BETWEEN THE TWO, IT

9   WOULD HAVE HAD LITTLE OR NO EFFECT.

10         MOREOVER, THIS COURT IS STRUCK BY THE REASONING OF           11:54

11  THE CALIFORNIA COURT OF APPEAL IN SHADOW TRAFFIC, WHERE THE

12  COURT CONCLUDED THAT WHERE AN EXPERT WAS EXPOSED TO AN

13  ADVERSARY'S CONFIDENTIAL INFORMATION ON A GIVEN TOPIC, EVEN IN

14  THE ABSENCE OF DISCLOSURE OF THAT INFORMATION, THE ADVERSARY,

15  QUOTE, "COULD STILL OBTAIN THE BENEFIT OF THE INFORMATION,            11:54

16  BECAUSE THE DATA, CONSCIOUSLY OR UNCONSCIOUSLY, COULD SHAPE OR

17  AFFECT THE ANALYSIS AND ADVICE," CLOSED QUOTE, OFFERED BY THE

18  EXPERT.

19         SO TOO IS THE CASE HERE.

20         MS. TOMIYAMA'S INVOLVEMENT FOR MATTEL IN THE PRESENT         11:54

21  LITIGATION CANNOT BE UNDERSTATED, NOR HER ABILITY TO

22  COMPARTMENTALIZE INFORMATION UPON WHICH SHE MAY NOT RELY IN HER

23  COMMUNICATIONS WITH MGA AND IN THE PREPARATION OF HER EXPERT

24  REPORT.  FOR THIS REASON, SHE CARRIES WITH HER A TAINT.  AND

25  BASED ON EVERYTHING THAT I HAVE SET FORTH, IT IS THE COURT'S         11:55

```
 1    TENTATIVE DECISION ON THIS MOTION TO DISQUALIFY HER AS AN

 2    EXPERT.  THAT IS MY TENTATIVE DECISION WITH RESPECT TO THAT

 3    PART.

 4            AS I INDICATED, THE COURT IS TREATING SEPARATELY THE

 5    ISSUE OF DISQUALIFICATION OF COUNSEL.  INITIALLY, I KNOW THERE      11:55

 6    WAS A DISPUTE BETWEEN THE PARTIES HERE ON THE BURDEN OF PROOF

 7    IN TERMS OF DISQUALIFICATION OF COUNSEL.  MATTEL ASKED THE

 8    COURT TO APPLY A TEST THAT PRESUMES CERTAIN DISCLOSURES HAVE

 9    BEEN MADE TO THE ADVERSARIES.  THEY CITE SHADOW TRAFFIC, IN RE:

10    COMPLEX ASBESTOS LITIGATION, BOTH CASES COMING OUT OF THE          11:55

11    CALIFORNIA COURT OF APPEAL.  UPON THESE, MATTEL CONTENDS THAT

12    'ONCE A PARTY SEEKING DISQUALIFICATION SHOWS THAT THE FORMER

13    EMPLOYEE OR EXPERT POSSESSES CONFIDENTIAL ATTORNEY-CLIENT

14    INFORMATION RELATED TO THE PROCEEDINGS BEFORE THE COURT,' AS

15    MATTEL HAS DONE HERE, 'A REBUTTABLE PRESUMPTION ARISES THAT THE     11:56

16    INFORMATION HAS BEEN USED OR DISCLOSED IN THE CURRENT

17    EMPLOYMENT.'  THIS IS THE RULE OF NECESSITY, BASED ON THE

18    NOTION THAT THE PARTIES SEEKING DISQUALIFICATION ARE NOT IN A

19    POSITION TO BASICALLY FERRET OUT OR DETERMINE WHAT IS KNOWN BY

20    THE ADVERSARY'S ATTORNEYS.                                         11:56

21            MGA ARGUES AGAINST APPLICATION OF THIS RULE, RELYING

22    ON AN UNPUBLISHED CASE, IN RE: EXDS, INCORPORATED.  IN THIS

23    UNPUBLISHED CALIFORNIA DISTRICT COURT CASE, ACTUALLY, THAT

24    APPLIES CALIFORNIA LAW, IT NOTES THAT THIS PRESUMPTION IS

25    MISPLACED, QUOTE, "IN SITUATIONS INVOLVING COUNSEL'S EX-PARTE      11:56
```

1    CONTACT WITH AN ADVERSE PARTY'S FORMER EMPLOYEE," CLOSED QUOTE,

2    THE RATIONALE BEING THAT CONTACT RELATES TO COUNSEL'S ABILITY

3    TO INVESTIGATE THE FACTS RELEVANT TO THE CASE.

4          THE PROBLEM THAT I HAVE WITH THIS CASE HERE IS THAT

5    MS. TOMIYAMA IS NOT MERELY A FORMER MATTEL EMPLOYEE WHO WAS      11:57

6    CONSULTED AS A POTENTIAL FACT WITNESS, BUT RATHER, SHE WAS A

7    FORMER EMPLOYEE WHO, BASED ON THE EVIDENCE BEFORE THE COURT,

8    ACTED ESSENTIALLY AS AN EXPERT WITNESS FOR MATTEL'S EMPLOYEES

9    WHILE SHE WAS EMPLOYED AT MATTEL.  SHE WAS CONSULTED AS A FACT

10   WITNESS, BUT SHE WAS ALSO CONSULTED AS AN EXPERT WITNESS.  AND   11:57

11   AS THE IN-CAMERA DECLARATIONS REVEAL, HER ROLE AT MATTEL IN

12   PRACTICE WAS SOMETHING AKIN TO AN IN-HOUSE EXPERT ON THIS

13   PARTICULAR ISSUE OF THE FACE-PAINTING COMPARISONS.

14         THEREFORE, I THINK IT'S MORE APPROPRIATE TO APPLY

15   THOSE PUBLISHED CALIFORNIA COURT OF APPEAL CASES AND APPLY A     11:57

16   PRESUMPTION THAT THE INFORMATION HAS BEEN USED OR DISCLOSED IN

17   HER CURRENT EMPLOYMENT AS AN EXPERT FOR MGA.

18         NOW, THERE'S NO EVIDENCE FOR THIS, SO I'M UNWILLING

19   TO INFER THAT ATTORNEYS HAVE ENGAGED IN ANY MISCONDUCT MERELY

20   BECAUSE THEY'VE HAD THE OPPORTUNITY TO DO SO, EVEN AN AMPLE      11:58

21   OPPORTUNITY TO DO SO.  AND I WANT TO MAKE CLEAR ON THE RECORD

22   THAT THE COURT IS NOT DOING THAT, AND I'M NOT SUGGESTING

23   ANYTHING ALONG THOSE LINES.  I'M NOT INCLINED TO CONCLUDE THAT

24   MGA ATTORNEYS HAVE HAD ANY INVOLVEMENT IN INDUCING THE

25   DISCLOSURE OF ANY PRIVILEGED WORK OR ANY PRIVILEGED MATERIAL.    11:58

```
 1   I WANT THAT TO BE CLEAR AS PART OF THIS ANALYSIS GOES FORWARD.

 2           HAVING SAID THAT, I AM STRUGGLING WITH THE RATHER

 3   CONCLUSORY NATURE OF MGA'S COUNSEL'S DECLARATION.  THIS WAS THE

 4   POINT, MR. NOLAN, I WAS PRESSING WITH YOU EARLIER, WHEN WE TALK

 5   ABOUT WHAT'S NECESSARILY SO OR NOT NECESSARILY SO.  AND I        11:58

 6   UNDERSTAND THE DIFFICULTY THAT COUNSEL IS IN, NOT ONLY

 7   MR. NOLAN IN ARGUING THIS, BUT MR. PLEVAN AS WELL IN PREPARING

 8   THESE DECLARATIONS, BECAUSE IT IS UNQUESTIONABLY DIFFICULT TO

 9   PROVE A NEGATIVE, OR DISPROVE A NEGATIVE, AS THE CASE MAY BE.

10   THERE ARE TWO PROBLEMS WITH THE DECLARATIONS, THOUGH, THAT I     11:59

11   WANT TO ARTICULATE FOR THE RECORD; AND I WILL BE PARTICULARLY

12   INVITING A RESPONSE TO THESE TWO CONCERNS.

13           THE FIRST IS THAT IT IS NOT UNLIKELY THAT COUNSEL FOR

14   MGA IS NOT IN A POSITION -- I SUPPOSE I SHOULDN'T USE A DOUBLE

15   NEGATIVE THERE -- BECAUSE OF THE LACK OF INFORMATION AND         11:59

16   BECAUSE OF MS. TOMIYAMA'S LIMITATIONS TO IDENTIFY MATTEL'S

17   PRIVILEGED INFORMATION OR ATTORNEY WORK PRODUCT.  I'M PRECISELY

18   CONCERNED THAT THEY ARE IN A POSITION TO IDENTIFY SUCH

19   MATERIAL.  NOT THAT THEY HAVE, BUT THAT THEY'RE IN A POSITION

20   TO DO SO.                                                        11:59

21           SECOND, FROM THE COURT'S PERSPECTIVE, CONCLUSORY

22   DECLARATIONS LEAVE MUCH ROOM FOR MISCHIEF, EVEN WHEN PREPARED

23   BY THE MOST ETHICAL OF COUNSEL.  AND, AGAIN, I'M NOT REACHING

24   ANY CONCLUSIONS CONCERNING ANYONE'S ETHICS AT THIS POINT.

25           LET ME GIVE YOU A FEW EXAMPLES.                          12:00
```

1          THE STATEMENTS OF COUNSEL THAT MS. TOMIYAMA DID NOT

2    DISCLOSE CONFIDENTIAL INFORMATION TO THEM PRESUPPOSES THAT SHE

3    WOULD RECOGNIZE WHAT IS CONFIDENTIAL INFORMATION.  AND AS BORNE

4    OUT IN THE DEPOSITIONS, SHE DOESN'T SEEM TO GET WHAT IS

5    CONFIDENTIAL AND WHAT IS NOT CONFIDENTIAL.  SO TO SAY IN A          12:00

6    DECLARATION THAT SHE HAS NOT SAID THAT SHE HAS DISCLOSED

7    ANYTHING THAT IS CONFIDENTIAL, THE COURT DOESN'T HAVE ANY BASIS

8    TO RELY UPON THAT -- AND I DON'T THINK COUNSEL HAS A BASIS TO

9    RELY UPON THAT -- AS ASSURING THAT CONFIDENTIAL INFORMATION HAS

10   NOT BEEN DISCLOSED.                                                 12:00

11         ADDITIONALLY, COUNSEL STATES IN HIS DECLARATION THAT

12   MS. TOMIYAMA'S SEPARATION AGREEMENT EXPIRED ON APRIL 13TH OF

13   LAST YEAR, DESPITE EXPLICIT LANGUAGE TO THE CONTRARY IN A

14   CLAUSE REGARDING MS. TOMIYAMA'S RESPONSIBILITY TO NOTIFY MATTEL

15   IF SHE PROVIDED SERVICES TO A COMPETITOR, WHICH CERTAINLY GOES      12:01

16   BEYOND THAT DATE.

17         THERE IS A CONTINUING OBLIGATION HERE.

18         IN SUM, WE HAVE AN EXPERT RETAINED BY MGA WHO WAS

19   TAINTED BY HER EXPOSURE TO MATTEL'S ATTORNEY-CLIENT PRIVILEGED

20   COMMUNICATIONS AND ATTORNEY WORK PRODUCT.  SHE IS UNABLE TO         12:01

21   DISTINGUISH BETWEEN THESE AND INNOCUOUS COMMUNICATIONS AND

22   MATERIALS.  MGA'S COUNSEL HAS PROVEN SIMILARLY UNABLE TO

23   IDENTIFY MATTEL'S ATTORNEY-CLIENT PRIVILEGED COMMUNICATIONS AND

24   ATTORNEY WORK PRODUCT WHEN PRESENTED WITH IT, ALBEIT NOT FROM A

25   LACK OF ABILITY, BUT FROM A LACK OF INFORMATION.                    12:01

1      IT APPEARS TO THE COURT, THEN, THAT ITS DUTIES NOW

2  REQUIRE IT TO ATTEND TO THE TASK OF DETERMINING THE EXTENT OF

3  MS. TOMIYAMA'S TAINT.

4      THAT IS WHAT PROMPTED THOSE INITIAL QUESTIONS TO THE

5  COURT, THAT THE COURT ASKED TO COUNSEL.  AND THAT'S WHERE I'M        12:01

6  LEFT.  I HAVE NOT REACHED EVEN A TENTATIVE CONCLUSION REGARDING

7  THE MOTION TO DISQUALIFY COUNSEL.  THERE ARE SEVERAL LEVELS OF

8  THIS.  THERE'S THE POSSIBILITY OF CABINING OFF THOSE COUNSEL

9  WHO HAVE WORKED DIRECTLY WITH MS. TOMIYAMA; THAT WOULD BE

10  MR. PLEVAN AND MS. CAMPAGNA BACK IN NEW YORK.                       12:02

11      THE COSTS TO THE COURT, THE COSTS TO MGA, THE COSTS

12  TO THIS WHOLE PROCESS OF DISQUALIFYING THE ENTIRE FIRM OF

13  SKADDEN ARPS ARE ENORMOUS.  THE BURDEN THAT PLACES ON THE

14  ENTIRE SYSTEM WOULD BE DRAMATIC.  AND IT'S NOT AT ALL CLEAR TO

15  THE COURT THAT SUCH A DRASTIC REMEDY, AS BEING URGED BY            12:02

16  PLAINTIFF'S COUNSEL, IS NECESSARY.  BUT CLEARLY, SOMETHING

17  NEEDS TO BE DONE.

18      AS I INDICATED, I'M FAIRLY COMFORTABLE, BASED ON THE

19  RECORD BEFORE ME -- AND I CERTAINLY WANT TO HEAR COUNSELS'

20  RESPONSES TO THE COURT'S FINDINGS -- BUT BASED ON THE FINDINGS     12:03

21  -- AND THE COURT HAS TRIED TO THOROUGHLY REVIEW EVERYTHING

22  THAT'S BEEN SUBMITTED IN THE LAST SEVERAL WEEKS ON THIS -- IT'S

23  PRETTY CLEAR THAT MS. TOMIYAMA HAS GOT TO BE DISQUALIFIED.

24      YOU KNOW, SOMETHING THAT JUST KEEPS COMING BACK TO ME

25  THIS PAST WEEK IS, WHY, WHEN THAT EXPERT REPORT CAME OUT AND       12:03

1    THOSE STATEMENTS WERE IN THERE, RED FLAGS DID NOT GO UP; THAT

2    THERE WASN'T THIS 'WAIT-A-SECOND' MOMENT, GIVEN WHAT WAS IN

3    THAT REPORT.  NOW WE'VE PUSHED FORWARD TO THE DEPOSITION.

4         THIS MOTION HAS WEIGHED VERY HEAVILY ON THE COURT,

5    SINCE IT WAS FILED AND CERTAINLY SINCE I STARTED READING THE          12:03

6    PAPERS.

7         BUT THAT'S WHERE I'M AT.

8         THIS BRINGS US UP TO THE NOON HOUR.  I WANT COUNSEL

9    TO HAVE A CHANCE TO DIGEST WHAT THE COURT HAS PLACED FORTH ON

10   THE RECORD.  I WANT TO GIVE COUNSEL EVERY OPPORTUNITY TO             12:04

11   ADDRESS THE COURT WHEN WE RETURN.  IT'S FIVE AFTER 12:00 NOW.

12   LET'S RETURN AT 1:00, AND I WILL TURN THIS OVER TO COUNSEL TO

13   ADDRESS THE COURT.

14        PERHAPS I'M MISSING SOMETHING ENTIRELY HERE.

15        PLEASE BE ASSURED ON BOTH SIDES THAT I'VE THOROUGHLY           12:04

16   READ YOUR PAPERS AND YOUR DECLARATIONS; SOME OF THE PAPERS

17   SEVERAL TIMES OVER.  BUT I DO WANT YOU TO READDRESS SOMETHING I

18   MAY HAVE MISSED IN YOUR ARGUMENTS, IN LIGHT OF THE COURT'S

19   CONCERN, PARTICULARLY ON THIS MOTION TO DISQUALIFY COUNSEL.  I

20   FEEL FAIRLY COMMITTED ON THE FIRST MOTION, ALTHOUGH I'LL            12:04

21   CERTAINLY ENTERTAIN WHATEVER ARGUMENT YOU WANT TO OFFER.  BUT I

22   CERTAINLY LOOK TO YOUR COMMENTS ON THE SECOND ONE.

23        SO WITH THAT, I'M GOING TO TAKE A RECESS FOR

24   55 MINUTES.  WE'LL RESUME AT 1:00.

25        **THE CLERK:**  THE COURT STANDS IN RECESS.                        12:05

APRIL 7TH, 2008                    BRYANT V. MATTEL

```
 1              (LUNCH RECESS TAKEN.)

 2         THE CLERK:  RECALLING ITEM TEN, THE CASE OF

 3   CARTER BRYANT VERSUS MATTEL, INC., CASE NUMBER CV 04-9049.

 4         THE COURT:  WE'RE BACK ON THE RECORD.

 5         AT THIS TIME, THE COURT WILL ENTERTAIN INDIVIDUAL      01:05

 6   ORAL ARGUMENT FROM COUNSEL.  I'LL PERMIT MGA TO PROCEED FIRST.

 7         MR. NOLAN:  THANK YOU, YOUR HONOR.

 8         YOUR HONOR, I WOULD BE REMISS IF I DIDN'T START THIS

 9   ARGUMENT BY APOLOGIZING THAT WE'VE HAD TO TAKE UP THE COURT'S

10   VERY BUSY TIME.  IT WASN'T LOST ON ME THE SUBSTANTIAL MOTION  01:05

11   FOR SUMMARY JUDGMENT THAT WAS ARGUED THIS MORNING.  FOR THIS TO

12   HAVE TO BE VISITED BY YOUR HONOR AND YOUR STAFF IS NOT

13   SOMETHING THAT I'M HAPPY ABOUT, AND I APOLOGIZE FOR THAT.

14         THE COURT:  UNDERSTOOD.

15         MR. NOLAN:  HOWEVER, IT DOESN'T IN ANY WAY EXPLAIN     01:05

16   OR, FRANKLY, PROPERLY PUT INTO CONTEXT, I THINK, THE CHALLENGE

17   THAT THIS COURT HAS.

18         I WANT TO GO BACK VERY BRIEFLY AND JUST ADDRESS, IF I

19   MIGHT, THE FINDINGS OF FACT WITH RESPECT TO MS. TOMIYAMA,

20   BECAUSE IN A CERTAIN WAY, I DO THINK THAT THEY FRAME, EVEN     01:06

21   UNDER THE SHADOW-OF-DOUBT ANALYSIS, WHAT THE APPROPRIATE REMEDY

22   MIGHT BE, TO ENSURE THE INTEGRITY OF THE PROCESS GOING FORWARD,

23   WHICH IS ULTIMATELY THE TEST THAT WE'RE GOING TO HAVE TO APPLY.

24         I WANT YOU, JUST FOR A MOMENT, TO LOOK AT THE FACTUAL

25   RECORD IN A DIFFERENT PERSPECTIVE.                            01:06
```

```
 1          CALIFORNIA ALLOWS EX-PARTE CONTACT WITH FORMER
 2   EMPLOYEES OF AN ADVERSARY WITHOUT THE REQUIREMENT OF PROVIDING
 3   ANY NOTICE WHATSOEVER.  MS. TOMIYAMA, UNLIKE MR. THOMPSON IN
 4   THE SHADOW TRAFFIC CASE, HE BEING THE EMPLOYEE OF DELOITTE, DID
 5   NOT MAKE A LIVING HOLDING HERSELF OUT AS AN EXPERT WITNESS OR     01:07
 6   PREPARING DAMAGE ANALYSIS OR ACTING AS A CONSULTANT.  RATHER,
 7   MS. TOMIYAMA, OVER HER 16-YEAR HISTORY AT MATTEL, WAS A
 8   DEDICATED FACE PAINTER, WHO OVER THE LAST PORTION OF HER CAREER
 9   AT MATTEL WAS CONSULTED FROM TIME TO TIME AND ASKED TO MAKE,
10   APPARENTLY, A COMPARISON -- AT LEAST THIS IS WHAT WE KNOW AND     01:07
11   WHAT THE RECORD SHOWS, YOUR HONOR -- A COMPARISON BETWEEN
12   OFFENDING PRODUCT ON THE ONE HAND, MOSTLY ALLEGED KNOCK-OFFS
13   FROM THE FAR EAST, TO BARBIE DOLLS --
14          THE COURT:  LET ME JUST STOP YOU THERE FOR ONE
15   SECOND.  I WANT THE RECORD TO BE CLEAR HERE.  I'M READING FROM    01:08
16   HER EXPERT REPORT AT PAGE 9.  SHE SAID, "I WAS ASKED ABOUT ONCE
17   A MONTH TO ASSIST MATTEL'S PRODUCT LEGAL DEPARTMENT TO
18   DETERMINE IF, IN MY OPINION, CERTAIN COMPETITORS' DOLLS WERE
19   KNOCK-OFFS OF BARBIE OR MY SCENE."
20          SO IT'S NOT JUST SPORADICALLY.  I MEAN, THIS IS BY         01:08
21   HER OWN STATEMENT, IT WAS ONCE A MONTH, IT WAS BY THE LEGAL
22   DEPARTMENT, AND IT WAS FOR THE ASSESSMENT OF BEING A KNOCK-OFF,
23   WHICH WE ALL -- MY POINT ON THAT IS THAT WE ALL UNDERSTAND WHAT
24   SHE WAS SAYING THERE.  WE SHOULD UNDERSTAND WHAT SHE WAS SAYING
25   THERE AND WHAT SHE WAS DOING.                                    01:08
```

1          **MR. NOLAN:**  I UNDERSTAND.

2          BUT THE QUESTION, I THINK, THAT IS PRESENTED BY THAT

3    IS, DOES MERE CONTACT WITH AN EMPLOYEE TURN THOSE

4    COMMUNICATIONS INTO CONFIDENTIAL COMMUNICATION?

5          AND IN CERTAIN INSTANCES, I'M SURE THEY DO.  I WILL          01:08

6    ADMIT THAT, YOUR HONOR.  I AM SURE THAT THERE MUST BE CASES SHE

7    WAS CONSULTED ON WHERE THE COMMUNICATIONS MAY HAVE BEEN

8    PRIVILEGED.  I DON'T KNOW.

9          AND I DON'T KNOW.  I DON'T KNOW.

10          THIS IS ONE OF OUR PROBLEMS IN THIS CASE, IS THAT          01:09

11    GIVEN THE EXTENSIVE BRIEFING IN THIS CASE AND ALL OF THE

12    PRODUCTIONS -- DO YOU KNOW THAT AT NO TIME DID MATTEL EVER LIST

13    ON A PRIVILEGED LOG ANY DOCUMENT ATTRIBUTED TO MS. TOMIYAMA,

14    EXCEPT IN THE FOLLOWING INSTANCE, YOUR HONOR:  AT SOME POINT IN

15    TIME ON A PRIVILEGE LOG, THEY LISTED AN E-MAIL TO MS. TOMIYAMA          01:09

16    AS BEING PRIVILEGED.  SUBSEQUENTLY, THEY REMOVED THAT E-MAIL

17    FROM THE PRIVILEGE LOG.

18          RECENTLY, AND ONLY AFTER THIS HEARING WAS NOTICED, ON

19    MARCH 20TH OF 2008, DID THEY FILE A SUPPLEMENTAL PRIVILEGE LOG;

20    AND ON THAT PRIVILEGE LOG, FOR THE FIRST TIME, IS A          01:10

21    COMMUNICATION, AN E-MAIL, DATED -- I BELIEVE IT'S MAY 1ST OF

22    THE YEAR 2000.

23          NOW, LET ME PUT THIS IN PERSPECTIVE.

24          WE HAVE, I BELIEVE, A MULTI-PAGE PRIVILEGE LOG FROM

25    MATTEL.  ONLY ONE ENTRY FOR THIS ALLEGED -- I'M SORRY; I DON'T          01:10

1   MEAN IT THAT WAY, BECAUSE I KNOW THE COURT'S FINDINGS -- OF

2   THIS SO-CALLED IN-HOUSE EXPERT THAT THEY USED AND RELIED ON FOR

3   ALL OF THEIR ANALYSIS AND THAT TYPE OF THING; AND THAT ONE

4   E-MAIL IS AT A POINT IN TIME THAT HAS, WE BELIEVE, ABSOLUTELY

5   NO RELEVANCE TO THIS CASE, THAT I CAN TELL, BECAUSE MAY OF 2000      01:11

6   IS THREE MONTHS BEFORE CARTER BRYANT IS EVEN CONTACTED IN THE

7   CASE.

8           **THE COURT:**  LET ME ASK YOU ABOUT YOUR HESITATION

9   RIGHT THERE.  THESE FINDINGS ARE TENTATIVE.  I REALLY WANT TO

10  HEAR FROM YOU, MR. NOLAN, OR FROM MR. PLEVAN, IF I'M MISTAKEN      01:11

11  ON THIS.  I'M TAKING HER WORDS TO TAKE IT THAT MATTEL'S LEGAL

12  PEOPLE ASKED FOR HER EXPERT -- I MEAN, THEY TREATED HER AS AN

13  EXPERT; THEY WANTED HER TO PROVIDE HER OPINION.  AND SHE'S THE

14  ONE WHO USES THE WORD "OPINION."

15          AND I'M NOT SURE IF SHE'S REALLY SMART OR IF SHE'S        01:11

16  REALLY JUST OUT OF IT OR WHAT.  I REALLY DON'T KNOW WHAT TO

17  THINK OF MS. TOMIYAMA.  I DON'T KNOW IF SHE'S SMART -- I REALLY

18  DON'T.  BECAUSE THERE'S SOME THINGS THAT SHE WRITES IN HER

19  EXPERT REPORT WHICH SEEM TO INDICATE THAT SHE REALLY DOES GET

20  IT, AND THERE ARE OTHER THINGS THAT SHE SAYS IN HER DEPOSITION    01:12

21  WHICH SUGGEST THAT SHE DOESN'T; SO I REALLY DON'T KNOW -- I

22  DON'T KNOW WHAT TO MAKE OF HER.

23          BUT I'M NOT MAKING A CONCLUSION THAT, I DON'T THINK,

24  IS CONTRADICTED BY ANYTHING.  MATTEL'S LEGAL PEOPLE USED HER AS

25  AN EXPERT IN THIS DOLL FACE-PAINTING AREA FOR PURPOSES OF         01:12

Case 2:04-cv-09049-DOC-RNB  Document 5686  Filed 06/04/09  Page 28 of 105  Page ID #:183766

28

1  DETERMINING WHETHER THERE WERE KNOCK-OFFS OR NOT.

2          IS THERE A DISPUTE ON THAT?  I THINK THAT'S BEYOND

3  THE ALLEGED.

4          **MR. PLEVAN:**  YES, YOUR HONOR.

5          KENNETH PLEVAN, YOUR HONOR.                          01:12

6          **THE COURT:**  PLEASE.

7          **MR. PLEVAN:**  AND, YOUR HONOR, I'M HERE TO ANSWER

8  WHATEVER QUESTIONS YOUR HONOR HAS, BECAUSE I HEARD THE

9  COMMENTS.

10         I CAN JUST ADDRESS THAT.                             01:12

11         AS I STATED IN MY DECLARATION, WE TREATED THAT AS

12 CREDENTIALS.  WE TOLD HER, IN NO UNCERTAIN TERMS, WE DIDN'T

13 WANT TO KNOW ANY OF THE FACTS, THE CLIENTS, WHAT SHE SAID TO

14 THE LAWYERS, WHAT THE LAWYERS SAID TO HER.  AND WE DID IT IN

15 NONTECHNICAL TERMS.  WE SAID, 'WE DON'T WANT ANY COMMUNICATIONS  01:12

16 WITH THE LAWYERS.'  AND SHE WAS ADAMANT, I BELIEVE IN HER

17 DEPOSITION AS WELL, BUT CERTAINLY WITH ME, WHENEVER WE ASKED.

18 ON TWO OCCASIONS, THE FIRST MEETING, AND THEN THE SECOND ONE,

19 WHEN WE PREPARED HER FOR HER DEPOSITION, I SAID, 'DID THEY EVER

20 TALK TO YOU ABOUT CARTER BRYANT?'                            01:13

21         SHE SAID, 'ABSOLUTELY NOT.'

22         IT WAS LIKE A WALL FELL DOWN.  IT WAS CLEAR THAT

23 THERE WAS NO DISCUSSION THERE.

24         'WHAT ABOUT THE MY SCENE LINE?'

25         'ABSOLUTELY NOT.'                                    01:13

1          SO, JUDGE, I DON'T WANT TO SIT HERE AND SAY, OKAY,

2   COULD IT HAVE BEEN --

3          **THE COURT:**  WHAT DID YOU THINK, THEN, WHEN YOU SAW

4   THIS REPORT COME OUT, WHERE SHE TALKS ABOUT BEING USED IN THAT

5   CAPACITY AND USING THAT -- AND THIS IS HER CREDENTIALS, THEN,          01:13

6   FOR MAKING OPINIONS.

7          I MEAN, PUT YOURSELF IN THE OPPOSING PARTY'S SHOES.

8   COULD YOU IMAGINE IF THE OTHER SIDE CAME OUT WITH AN EXPERT

9   THAT WAS A FORMER MGA EXPERT FOR YOUR LEGAL TEAM, IN THE

10  IN-HOUSE LEGAL TEAM, AND AS A PREDICATE FOR THEIR EXPERT          01:14

11  OPINION, THEY WERE BASING THAT, IN PART, ON CONSULTATIONS WITH

12  YOUR IN-HOUSE PEOPLE.

13         **MR. PLEVAN:**  YOUR HONOR, NOT ON THIS CASE.

14         THOSE INSTANCES WERE ALL, AS SHE RELATED TO US -- AND

15  I BELIEVE IT'S IN HER DEPOSITION TESTIMONY -- ALL RELATED TO          01:14

16  SOME OTHER COMPANY, SOME OTHER COMMENTS.

17         **THE COURT:**  THAT'S NOT SO CLEAR.  SHE SAYS THAT SHE

18  WAS ASKED TO --

19         **MR. PLEVAN:**  WELL, YOUR HONOR, AGAIN, IT WAS

20  ABSOLUTELY CLEAR TO US.  AND I CAN'T -- I'VE RELUCTANTLY TRIED          01:14

21  TO STAY AWAY FROM THE DEPOSITION, AGAIN BECAUSE OF THE PENDING

22  MOTION.

23         **THE COURT:**  I APPRECIATE THAT.

24         **MR. PLEVAN:**  BUT IT WAS CLEAR TO US, AND I BELIEVE

25  IT'S CLEAR FROM HER TESTIMONY; AND THAT'S WHY SHE REPEATED TEN          01:14

1    TIMES SHE DIDN'T REMEMBER TALKING ABOUT CARTER BRYANT.  THOSE

2    INSTANCES WERE NOT INSTANCES WHERE SHE WAS TALKING ABOUT THIS

3    CASE.  SHE NEVER SAID AT HER DEPOSITION SHE HAD ANY

4    RECOLLECTION.  SHE SAID, YES, SHE WAS CONSULTED FROM TIME TO

5    TIME BY THE LEGAL DEPARTMENT; THEY CAME TO HER.  SHE TOLD US,     01:15

6    SHE SAID IN HER REPORT, THAT NO ONE TOLD HER WHAT TO DO OR HOW

7    TO DO IT.  SHE DID AN ANALYSIS BASED ON HER EXPERIENCE AND

8    TRAINING IN THE FIELD, 30 OR 40 YEARS.  SHE WOULD THEN MAKE A

9    REPORT AND NEVER HEAR ANOTHER WORD ABOUT IT.  A MONTH OR SO

10   LATER, SOMEONE WOULD COME BACK AND SAY, 'HERE'S ANOTHER DOLL.    01:15

11   TAKE A LOOK AT THIS ONE.'  SHE WOULD DO THAT AND REPORT BACK.

12          IN HER DEPOSITION -- AND, AGAIN, IT'S IN OUR BRIEF --

13   SHE REPEATEDLY SAID SHE HAD NO RECOLLECTION OF TALKING ABOUT

14   THIS CASE, ABOUT CARTER BRYANT, ABOUT MGA; AND SHE TOLD ME, IN

15   NO UNCERTAIN TERMS, THAT CLEARLY, THIS WAS -- IT WAS LIKE A      01:15

16   WALL OF SILENCE.

17          WHEN WE SHOWED HER THE COMPLAINT, THE PLEADINGS IN

18   THE CASE, SHE SAID, 'YOU KNOW, I'VE SEEN ONE OF THESE BEFORE.'

19   I SAID, 'HOW DID YOU SEE IT?'  SHE SAYS, 'WELL, ONE OF THE

20   LAWYERS CAME BY IN ONE OF THOSE SITUATIONS WHERE THEY WERE       01:15

21   TALKING TO ME, AND ONE OF THESE OTHER THINGS, AND MADE A JOKE

22   ABOUT MR. LARIAN.'

23          **THE COURT:**  BUT YOU DO UNDERSTAND THE POSITION THE

24   COURT IS IN, COUNSEL.  I HAVE DECLARATIONS FROM OPPOSING

25   COUNSEL SAYING, 'YES, WE DID TALK TO HER ABOUT IT,' AND THEN WE  01:16

```
 1   HAVE HER SAYING -- NOT THAT SHE DENIES IT.  AS I SAID, SHE

 2   SAYS, 'I DON'T RECALL.  I DON'T RECALL.  I DON'T RECALL.'

 3           AND THAT'S PART OF THE STRUGGLE THAT I HAVE WITH

 4   THE --

 5           MR. PLEVAN:  I UNDERSTAND, YOUR HONOR.               01:16

 6           I'M NOT GOING AWAY, I'M GOING TO BE RIGHT HERE.

 7           THE COURT:  I UNDERSTAND.

 8           MR. PLEVAN:  FOR ANY OTHER QUESTIONS YOUR HONOR HAS,

 9   BUT I HAVE TO DEFER TO MR. NOLAN.

10           THE COURT:  FAIR ENOUGH.                            01:16

11           MR. NOLAN?

12           MR. NOLAN:  YOUR HONOR, THIS MAY BE INTERRUPTED FROM

13   TIME TO TIME; BUT GIVEN THE IMPORTANCE, I KNOW THAT YOU

14   APPRECIATE THIS.

15           THE COURT:  AND I HOPE YOU UNDERSTAND THAT I'LL BE   01:16

16   INTERRUPTING YOU FROM TIME TO TIME, JUST BECAUSE --

17           MR. NOLAN:  OF COURSE.  OF COURSE.

18           THE COURT:  I DON'T MEAN TO BE RUDE.

19           MR. NOLAN:  NO, NO, NO.  NOT AT ALL.

20           IN A SENSE, YOU ARE IN A POSITION FAR BETTER THAN    01:16

21   WE'VE EVER BEEN IN THIS CASE, IN TERMS OF THE DECLARATIONS THAT

22   ARE SUBMITTED TO YOU UNDER SEAL.

23           THE COURT:  AND I RECOGNIZE THAT.

24           MR. NOLAN:  I WAS STRUCK BY -- AND NOT HOLDING THE

25   COURT TO THIS, BUT AT THE LAST MONDAY APPEARANCE THAT WE HAD  01:17
```

```
 1   BEFORE YOU, YOU HAD INDICATED TO COUNSEL THAT YOU WANTED, AND
 2   YOU INVITED, THE EX-PARTE SUBMISSIONS.  AND YOU ASKED THE
 3   PRECISE QUESTION THAT'S RELEVANT HERE:  'PLEASE IDENTIFY,
 4   PLEASE IDENTIFY FOR ME, WHAT IS THE WORK PRODUCT THAT YOU
 5   CONTEND WAS SHARED WITH SKADDEN ARPS.'  AND I THINK THE QUOTE     01:17
 6   WAS, 'I'VE REVIEWED THE MOVING PAPERS, AND I'M NOT CERTAIN WHAT
 7   YOU'RE CONTENDING.'
 8            SO WE'RE AT A DISTINCT DISADVANTAGE, NOT LOOKING AT
 9   IT.  BUT THAT'S THE RULES OF THE GAME, AND I COMPLETELY
10   UNDERSTAND IT.                                                    01:17
11            THE COURT:  I KNOW IT'S FRUSTRATING.
12            MR. NOLAN:  IT'S, FRANKLY, NOT FRUSTRATING.  LET ME
13   DEAL WITH IT THIS WAY:
14            YOU KNOW ALL TOO WELL, HAVING LIVED THROUGH THIS
15   CASE, HOW CONTENTIOUS THIS LITIGATION IS.  YOU ALSO KNOW THAT     01:18
16   IN TWO WEEKS, THE MOTION FOR SUMMARY JUDGMENT IS SCHEDULED TO
17   BE HEARD.  A VERY SIGNIFICANT ISSUE IN THE SUMMARY JUDGMENT IS
18   THE STATUTE OF LIMITATIONS.
19            THE COURT:  IT IS.  IT IS NOTED IN BOTH YOUR MOVING
20   PAPERS AND IN CARTER BRYANT'S MOVING PAPERS.  YES.  CORRECT.      01:18
21   AND ANTICIPATED IN MATTEL'S MOVING PAPERS; SO, YES.
22            MR. NOLAN:  RIGHT.
23            SO AS THE TRIER OF FACT --
24            THE COURT:  I'M ONLY GOING TO RULE ONCE ON IT, BY THE
25   WAY, DESPITE THE FACT THAT IT'S RAISED IN ALL THREE MOVING        01:18
```

```
 1    PAPERS.

 2            MR. NOLAN:  UNFORTUNATELY, YOU DON'T GET PAID MORE

 3    FOR RULING THREE TIMES.  I UNDERSTAND.

 4            THE COURT:  I DON'T WANT TO GET INTO JUDGE'S PAY AT

 5    THIS TIME, COUNSEL.                                           01:18

 6            MR. NOLAN:  I'LL SUPPORT ANYTHING, YOUR HONOR.

 7            HERE'S THE ISSUE:

 8            WE POLITELY SAID IN OUR MOVING PAPERS THAT ANY

 9    SUBMISSION AT THIS STAGE SHOULD BE TAKEN WITH A STRONG GRAIN OF

10    SALT.  AND IF I COULD PUT UP MY TIMELINE FOR JUST A MOMENT.  I 01:19

11    KNOW THAT YOU HAVE A TIMELINE.  VERY BRIEF.  I WANT TO GO TO

12    SOMETHING THAT I THINK PUTS SQUARELY IN ISSUE THE CREDIBILITY

13    OF WHATEVER HAS BEEN SUBMITTED TO YOU.

14            THE FIRST POINT I'VE MADE TO YOU ALREADY IS THAT ON A

15    PRIVILEGE LOG, WHERE THERE'S BEEN A LOT OF MOTIONS BACK AND    01:19

16    FORTH IN TERMS OF THE DISCOVERY MASTER ABOUT MAKING THE

17    COMPLETE PRIVILEGE LOGS, ONLY ONE E-MAIL FROM MAY OF 2000 --

18            PRESUMABLY, IF THEY HAD SUCH EXTENSIVE CONTACT WITH

19    MS. TOMIYAMA -- AND I DON'T KNOW WHETHER OR NOT ALL OF THE

20    E-MAILS ARE SUBMITTED TO YOU.  IF THEY ARE, I'M KIND OF CURIOUS 01:19

21    AS TO WHY THEY WEREN'T LISTED ON A PRIVILEGE LOG, NUMBER ONE;

22    BUT MORE IMPORTANTLY, IF I COULD JUST GO TO THE TIMELINE.

23            YOU SPECIFICALLY FIND THAT THERE WAS NO DELAY.  AND,

24    YOUR HONOR, PLEASE KEEP IN CONTEXT HOW I'M TRYING TO PRESENT

25    THIS ISSUE IN TERMS OF, WHAT DOES SKADDEN KNOW AND WHAT SHOULD 01:20
```

```
1   IT HAVE KNOWN IN TERMS OF WHAT INFORMATION WAS BEING PROVIDED?

2            WHAT WE DO KNOW, WHICH IS UNCONTROVERTED, IS THAT IN

3   FEBRUARY OF 2006, MS. TOMIYAMA WAS FIRED BY MATTEL.  AS PART OF

4   THIS, SHE SIGNS AN AGREEMENT, A SEPARATION CONSULTING

5   AGREEMENT.  ALL I'M ASKING NOW IS TO WEIGH ALL OF THIS IN LIGHT    01:20

6   OF THE CONTENTION NOW THAT SHE WAS AN INTEGRAL PART OF THE TEAM

7   AND THAT THEY RELIED ON HER, AND EVERYTHING ELSE LIKE THAT.

8   BECAUSE THE LAW IS CLEAR, YOUR HONOR, MERELY HAVING

9   COMMUNICATIONS WITH YOUR COUNSEL DOESN'T MAKE THEM PRIVILEGED.

10           THE COURT:  I DO UNDERSTAND THAT POINT.  THE ISSUE         01:20

11  HERE IS WHETHER OR NOT SHE WAS BEYOND THAT.

12           MR. NOLAN:  I UNDERSTAND THAT, YOUR HONOR.

13           BUT IN PARTICULAR, THE FINDING WITH RESPECT TO THE

14  SIMBA EXHIBIT, THE FACE MONTAGE -- YOUR HONOR, TO THIS DAY, THE

15  FACE MONTAGE IS NOT LISTED ON ANY PRIVILEGE LOG,                   01:21

16  NOTWITHSTANDING THE FACT THAT THEY HAVE PRODUCED DOCUMENTS FROM

17  THE SIMBA LITIGATION AND HAVE LISTED SOME ON THE PRIVILEGE LOG;

18  SO THAT'S NOT ON THE LIST.

19           PRESUMABLY, IN THEIR DECLARATIONS, THEY'VE SAID TO

20  YOU THAT IT WAS.  BUT I WOULD POINT, YOUR HONOR, TO THE IN RE:     01:21

21  SYNCOR ERISA LITIGATION MATTER AND THE UNITED STATES V.

22  ROCKWELL CASES CITED IN OUR MOVING PAPERS THAT SAYS, IN EFFECT,

23  WHEN A PERSON IS ASKED TO CREATE A DOCUMENT WITH THE INTENT

24  THAT DOCUMENT IS GOING TO BE SENT OVER TO A THIRD PARTY,

25  WHETHER OR NOT IT WAS SENT OVER OR NOT DOES NOT MAKE IT            01:21
```

```
 1    ATTORNEY WORK-PRODUCT PRIVILEGE.

 2           THE DOCUMENT, WHEN YOU LOOK AT IT, HAS NOT -- THERE

 3    ARE NO COMMUNICATIONS ON IT; IT'S NOT MARKED CONFIDENTIAL; IT'S

 4    NOT MARKED ANYTHING; AND IT WAS NEVER LISTED IN THIS CASE AS

 5    BEING PRIVILEGED.                                              01:22

 6           BUT LET'S GO BACK TO THE TIMELINE FOR A MOMENT.

 7           SO IN FEBRUARY OF 2006, SHE LEAVES; SHE'S A

 8    CONSULTANT; SHE WAS THE CONSULTANT FOR 14 MONTHS.

 9           MY QUESTION, YOUR HONOR, WHICH I CANNOT ANSWER, IS,

10    IN THE EX-PARTE SUBMISSIONS, DO THEY REPRESENT THAT THEY       01:22

11    CONSULTED WITH HER AT ANY TIME DURING THAT 14-MONTH PERIOD

12    REGARDING THIS LITIGATION?  BECAUSE IF THEY DIDN'T, YOUR HONOR,

13    I SUGGEST THAT MR. PLEVAN HAS A BETTER ARGUMENT; AND THAT IS

14    THAT SHE WASN'T CONSULTED ABOUT THIS PIECE OF LITIGATION.

15    BECAUSE HAD SHE AND SHE WAS A CONSULTANT, YOU WOULD HAVE       01:22

16    EXPECTED THERE TO BE MORE CONTACT WITH HER.

17           IF SHE WAS SO CRITICAL -- 'TINA, CAN YOU HELP US ON

18    THIS PARTICULAR POINT REGARDING THIS CASE?'

19           I'VE NOT SEEN ANY E-MAILS; NOTHING IS ON THE

20    PRIVILEGE LOG; AND CERTAINLY, MS. TOMIYAMA DOESN'T RECALL SUCH 01:23

21    CONTACT; THEY WOULD HAVE COME OUT DURING THE DEPOSITION.

22           LET'S JUST TURN FOR JUST A MOMENT TO THE CONSULTING

23    AGREEMENT, IF I MIGHT.

24           THIS DOCUMENT, YOUR HONOR, I SAW IT FOR THE FIRST

25    TIME LAST NIGHT.  IT WAS FOR THE LIMITED PURPOSES OF JUST      01:23
```

```
1    TRYING TO FRAME THIS ISSUE FOR THE COURT.  THIS IS THE

2    SEPARATION AGREEMENT AND GENERAL RELEASE AGREEMENT.  IT'S

3    INTERESTING BECAUSE IT, IN FACT, WAS A SETTLEMENT WITH HER TO

4    AVOID AGE DISCRIMINATION ISSUES AND STUFF LIKE THAT.

5              IF WE MIGHT, LET'S GO TO THE CONSULTING...                01:23

6              COMPANY PROPERTY.  LET'S JUST TALK ABOUT COMPANY

7    PROPERTY FOR A MINUTE.  I WOULD EXPECT IN THE EX-PARTE

8    SUBMISSIONS THAT THEY WOULD HAVE AN EXPLANATION FOR THIS.

9              IF MS. TOMIYAMA WAS SO CRITICAL OR AN INTEGRAL MEMBER

10   OF THE TEAM AND HAD KNOWLEDGE DIRECTED TO THIS LITIGATION,       01:24

11   WHICH, OF COURSE, IS THE PROPER ANALYSIS UNDER SHADOW TRAFFIC

12   AND IN RE: COMPLEX ASBESTOS LITIGATION, IT'S THE NATURE OF THE

13   RELATIONSHIP WITH MATTEL IN THE FIRST INSTANCE THAT WE HAVE TO

14   ANALYZE.

15             IN RE: COMPLEX ASBESTOS LITIGATION, IT WAS A           01:24

16   PARALEGAL AT BROBECK, MR. MICHAEL VOGEL, WHO THEN SWITCHES OVER

17   TO THE OTHER FIRM, WHO HAS CONFIDENTIAL INFORMATION; HE HAD

18   WORKED ON THE CASE ALL OF THE TIME.  IT'S UNDISPUTED THAT HE

19   HAD ACCESS.

20             IN SHADOW TRAFFIC, NO DISPUTE THAT THE ONLY REASON     01:24

21   FOR GOING TO DELOITTE TOUCHE WAS TO PROVIDE THEM INFORMATION

22   SUCH THAT THERE COULD BE A DETERMINATION AS TO WHETHER OR NOT

23   THEY'RE GOING TO BE AN EXPERT.

24             HERE, YOU HAVE A TOTALLY DIFFERENT BACKGROUND WITH

25   RESPECT TO THE RELATIONSHIP OF MS. TOMIYAMA.                     01:24
```

1           NEVERTHELESS, LET'S JUST ACCEPT WHAT MATTEL HAS EVER

2    TOLD YOU IN THIS CASE.

3           YOU WOULD EXPECT IN THIS AGREEMENT TO FIND THAT THERE

4    IS SOME REFERENCE TO THE LEGAL WORK THAT SHE DID FOR MATTEL IN

5    ANALYZING ALL OF THIS AND THAT SHE WOULD MAKE HERSELF AVAILABLE     01:25

6    FOR CONSULTING PURPOSES ON FILES AND IN CONTINUING LITIGATION.

7           **THE COURT:**  BUT IT'S NOT SO MUCH THAT SHE'S PROVIDED

8    LEGAL OPINION.  SHE'S USING HER EXPERTISE ON FACE PAINTING IN A

9    WAY, AS DIRECTED, APPARENTLY, BY LEGAL COUNSEL, TO ASSIST WITH

10   LEGAL COUNSEL'S FORMULATION OF A LEGAL OPINION; NAMELY, WHETHER     01:25

11   OR NOT THERE'S A COPYRIGHT INFRINGEMENT, OR SOMETHING OF THAT

12   NATURE.

13          IT'S VERY DISCRETE, AND I DO RECOGNIZE THAT.

14          THE CONCERN THE COURT HAS IS IN THE CONTEXT OF THOSE

15   DISCUSSIONS, WHICH COULD JUST AS WELL BE ORAL AS WRITTEN AND        01:25

16   THEREFORE NOT HAVE A PAPER TRAIL OR AN E-MAIL TRAIL.  THE

17   IMPRESSIONS AND THOUGHTS OF COUNSEL IN CONSULTING WITH THEIR

18   EXPERT, MS. TOMIYAMA, ARE REVEALED; AND THAT'S THE PROBLEM.

19          **MR. NOLAN:**  SO LET'S LOOK AT THAT FOR JUST A MOMENT,

20   IF I MIGHT.                                                        01:26

21          **THE COURT:**  PLEASE.

22          **MR. NOLAN:**  THE TESTIMONY THAT SHE HAS -- AND I CAN

23   PLAY YOU A VIDEO CLIP FROM THE DEPOSITION -- IT'S QUITE CLEAR,

24   THIS IDEA THAT SHE IS GETTING IMPRESSIONS AND WHAT HAVE YOU

25   FROM MATTEL.  SHE'S NOT BEING TOLD WHAT ANALYSIS TO DO; SHE'S      01:26

```
1    BEING ASKED TO DO SOMETHING THAT IN HER EVERYDAY BUSINESS,
2    SHE'S INVOLVED WITH.  SHE'S A FACT WITNESS.  SHE LOOKS AT THE
3    COMPLEXION PAINT ON DOLLS, AND SHE GOES AROUND AND TRAVELS
4    AROUND THE WORLD AND TEACHES, FOR MATTEL, ALL OF THE FACE
5    PAINTERS.  AND IF YOU HAVE A LICENSE WITH MATTEL, YOU HAVE THE      01:26
6    PLEASURE OF SITTING DOWN WITH MS. TOMIYAMA AND SHE'LL TEACH YOU
7    HOW TO PAINT A BARBIE DOLL.
8            WHEN THE LEGAL TEAM COMES TO HER, THERE IS NOTHING IN
9    HER BACKGROUND THAT GUIDES THEM IN DOING THE LEGAL ANALYSIS.
10   THEY ARE GOING TO HER FOR FACTUAL ABSORPTION; 'TELL ME THIS,'      01:27
11   'TELL ME THAT.'  UNDOUBTEDLY, IN HER DEPOSITION, SHE SAID IT
12   ONCE, SHE SAID IT SEVERAL TIMES:  'THIS WAS NOT THE LEGAL
13   DEPARTMENT'S METHODOLOGY.  NOBODY TOLD ME HOW TO DO IT.  I MADE
14   THAT DETERMINATION MYSELF.'
15           SHE'S A FACT WITNESS IN THAT REGARD.  BUT HERE, YOUR       01:27
16   HONOR, NO DESCRIPTION OF THE KIND OF LEGAL WORK THAT SHE DOES.
17           AND LET'S GO TO THE ADDITIONAL SERVICES.  AND SHE'S
18   GOING TO BE PAID NOW AS A CONSULTANT, AND SHE AGREES THAT SHE'S
19   GOING TO PROVIDE CONSULTING SERVICES.  '...WILL PRIMARILY
20   CONSIST OF MAKING MYSELF AVAILABLE TO SUPPLY AND/OR VERIFY         01:27
21   FACTUAL AND HISTORICAL INFORMATION IN CONNECTION WITH VARIOUS
22   MATTERS ON WHICH I WORKED WHILE EMPLOYED BY THE COMPANY AND
23   ASSISTING WITH THE TRANSITION OF ASSIGNMENTS, PROJECTS, AND
24   DUTIES FOR WHICH I WAS RESPONSIBLE WHILE EMPLOYED BY THE
25   COMPANY, THE CONSULTING SERVICES.'                                 01:28
```

```
 1          NOW, IN YOUR FINDINGS, YOU MAKE THE POINT THAT WHILE

 2   SHE WAS EMPLOYED AT MATTEL, THE LAWSUIT WAS FILED.  IF MATTEL,

 3   AT THAT POINT IN TIME, CONSIDERED HER TO BE PART OF THE TEAM,

 4   OR NECESSARY TO IT, QUERY, WHY, THEN, DIDN'T THEY PUT THIS IN

 5   THE CONSULTING AGREEMENT AND REPLY TO HER AS PART OF THE          01:28

 6   CONSULTING SERVICES TO MAKE HERSELF AVAILABLE TO THE LEGAL

 7   DEPARTMENT AT WHICH -- I'M JUST SAYING IT'S NOT THERE.

 8          NOW, IS THIS CONFIRMATORY OF ANYTHING?

 9          NO.  BUT I WONDER WHAT'S BEEN SUBMITTED TO YOU.

10   BECAUSE IF THE SUBMISSION WAS, 'I MET WITH HER SO OFTEN AND I     01:28

11   CONSULTED WITH HER AND I SHARED OUR LEGAL DEFENSES AND THEORIES

12   WITH HER,' THEN, IF I WAS IN FRONT OF A JURY -- AND IN A SENSE

13   YOU ARE BECAUSE YOU'RE THE FACT FINDER -- I'M ASKING MYSELF,

14   WHY DOES MATTEL'S LEGAL DEPARTMENT HAVE TO ASK A FACE PAINTER

15   OR SHARE WITH A FACE PAINTER THEIR LEGAL THEORIES IN THE CASE?    01:29

16          ALL SHE DID, YOUR HONOR, WAS PROVIDE FACTUAL ANALYSIS

17   WHICH COULD BE USED, AND WAS INTENDED TO USE, INTENDED TO USE,

18   WITH THIRD PARTIES IN TERMS OF NEGOTIATION.  THAT WAS THE

19   INTENT BEHIND, APPARENTLY, THE PREPARATION OF THE MONTAGE FOR

20   THE FACE.                                                        01:29

21          AND WHAT'S INTERESTING ABOUT THAT EXCHANGE,

22   YOUR HONOR -- AND THIS IS UNCONTROVERTED, UNLESS IT'S IN YOUR

23   SUBMISSION -- THE LEGAL TEAM DOESN'T EVEN GO TO HER TO ASK HER

24   TO DO THE FACE MONTAGE.  CASSIDY PARK GOES TO HER AND SAYS

25   WORDS TO THE EFFECT -- THIS IS THE TESTIMONY FROM THE            01:29
```

1    DEPOSITION -- 'WE HAVE RESOLVED THE SIMBA LITIGATION.  THEY

2    WANT FACES THAT WOULD BE ACCEPTABLE FOR SIMBA TO BE DEALING

3    WITH.  CAN YOU DO THE FACE MONTAGE?'

4            SHE DOES IT.  SHE DOESN'T RECALL ANY INTERFACE WITH

5    MR. MOORE ON THAT POINT.                                          01:30

6            MAYBE IN THE DECLARATIONS, MR. MOORE AND MR. ZELLER

7    SAY, 'NO, THERE WAS PLENTY MORE TO IT.'  AND IF THAT'S THE

8    CASE, YOUR HONOR, THEN I THINK WHEN WE GET TO THE REBUTTAL

9    PRESUMPTION, WHETHER OR NOT WE'RE ABLE TO REBUT THE

10   PRESUMPTION, I THINK MY ARGUMENT IS PRETTY STRONG THERE THAT IF   01:30

11   THE WITNESS IS NOT RECALLING ANY OF THAT, WHETHER OR NOT SHE'S

12   SUBCONSCIOUSLY DOING IT OR NOT, WE DIDN'T ASK HER THOSE KIND OF

13   QUESTIONS; IT WASN'T RELEVANT TO WHAT WE WERE DOING.

14           INTERESTINGLY, WHAT SHE'S TASKED TO DO IN THIS CASE,

15   YOUR HONOR, IS SOMETHING BY HER OWN ADMISSION, BY HER OWN         01:30

16   ADMISSION, SHE DIDN'T DO FOR MATTEL.  SEE, IN OUR CASE, WHAT

17   SHE IS DOING IS MAKING A COMPARISON FROM THE CARTER BRYANT'S

18   2-D DRAWINGS TO A 3-D OBJECT, THE BRATZ DOLL, AND ASKED WHETHER

19   OR NOT THEY'RE SUBSTANTIALLY SIMILAR.

20           IN HER REPORT AND IN THE DEPOSITION TESTIMONY, SHE        01:31

21   SAYS THAT SHE WAS NEVER ASKED TO DO THAT FOR MATTEL.  THAT'S

22   NOT THE METHODOLOGY SHE USED.

23           SO WHATEVER THIS SO-CALLED PRIVILEGED METHODOLOGY WAS

24   THAT SHE USED FOR MATTEL -- WHICH WE'RE NOT INTERESTED IN AND

25   WE NEVER ASKED HER FOR AND SHE NEVER DISCLOSED IT TO US --        01:31

1    SHE'S NOT USING THAT METHODOLOGY IN THIS CASE.

2         **THE COURT:**  LET ME PICK UP ON SOMETHING YOU SAID

3    THERE, BECAUSE I CERTAINLY DO NOT BELIEVE THAT MR. PLEVAN OR

4    YOU OR ANYBODY ELSE ON THE SKADDEN TEAM ASKED HER TO DISCLOSE

5    ATTORNEY-CLIENT INFORMATION OR ATTORNEY WORK PRODUCT OR                    01:31

6    ANYTHING OF THE SORT.

7         MY CONCERN IS, AS REFLECTED IN THOSE DEPOSITIONS --

8    AND I THINK I MENTIONED THIS SEVERAL TIMES BEFORE THE BREAK --

9    IS THAT SHE INDICATES NOT ONLY THAT SHE DOESN'T RECALL WHAT

10   WENT ON, MAKING HER A PRETTY UNRELIABLE WITNESS AS TO WHAT DID            01:31

11   OR DID NOT HAPPEN, BUT SHE DOESN'T UNDERSTAND THE DIFFERENCE

12   BETWEEN PRIVILEGED AND UNPRIVILEGED INFORMATION.

13        YOU'VE PUT UP INFORMATION THERE, YOU KNOW, THIS

14   CONSULTING AGREEMENT, THAT TALKS ABOUT CONFIDENTIALITY AND THE

15   REST.  I GATHER SHE'S NOT HERE TODAY, BUT BASED ON WHAT I HAVE           01:32

16   BEFORE ME OF HER, SHE DOESN'T REALLY HOLD A LOT OF CREDIBILITY

17   WITH THE COURT IN TERMS OF HER ABILITY -- I'M SURE SHE'S A

18   FABULOUS DOLL FACE PAINTER AND SHE'S AN EXPERT IN THAT, BUT IN

19   TERMS OF HER ABILITY TO UNDERSTAND THE CONFIDENCE AND

20   UNDERSTAND WHAT IS OR IS NOT ATTORNEY-CLIENT PRODUCT OR WORK             01:32

21   PRODUCT OR COMMUNICATION, IT APPEARS THAT SHE DOESN'T HAVE THAT

22   UNDERSTANDING.

23        **MR. NOLAN:**  RIGHT.

24        SO GOING FORWARD, THAT MIGHT PRESENT AN ISSUE BECAUSE

25   OF THE SUBCONSCIOUS CONCERN ABOUT TURNING OVER INFORMATION.             01:32

```
1            BUT WHAT IS CLEAR IN THIS CASE --
2            THE COURT:  IT SORT OF HANGS OVER ALL THE
3    PROCEEDINGS.
4            MR. PLEVAN:  YOUR HONOR, IF I MAY RESPOND TO THAT
5    LAST QUESTION.                                            01:32
6            THE COURT:  YES, MR. PLEVAN.
7            MR. PLEVAN:  WHAT MS. TOMIYAMA TESTIFIED AT HER
8    DEPOSITION, WHAT SHE TOLD US, AND WHAT I SAY IN MY DECLARATION
9    IS THAT SHE SAID, 'WHEN I WAS ASKED TO DO THINGS FOR THE LEGAL
10   DEPARTMENT' -- AND, AGAIN, SHE SAID, 'NEVER WITH RESPECT TO    01:33
11   CARTER BRYANT' -- AGAIN, THAT'S WHAT I BELIEVE SHE TESTIFIED
12   TO, AND SHE SAID IT TO US.  'IT WAS NEVER WITH RESPECT TO THIS
13   CASE, WITH RESPECT TO CARTER BRYANT.'
14           WHEN I SHOWED HER THE CARTER BRYANT DRAWINGS, SHE
15   SAID SHE'D NEVER SEEN THEM BEFORE.  WHAT SHE SAID WAS, SHE    01:33
16   COMPARED THEM THE WAY SHE WOULD DO IT BECAUSE SHE WAS A FACE
17   PAINTER.  BUT NO ONE FROM MATTEL'S LEGAL DEPARTMENT EVER TOLD
18   HER HOW TO DO IT.  SHE WOULD MAKE A COMPARISON, AND THEN REPORT
19   BACK.  SO, IN THAT SENSE, WE DID TALK TO HER, OBVIOUSLY, ABOUT
20   A FACE PAINT COMPARISON.  BUT WHAT SHE TOLD US WAS, 'THIS WAS  01:33
21   BASED ON MY EXPERIENCE.'  SO WE MADE IT ABSOLUTELY CLEAR TO
22   HER --
23           AND I UNDERSTAND YOUR HONOR'S CONCERN ABOUT THE
24   ATTORNEY-CLIENT PRIVILEGE.  I DIDN'T TALK TO HER IN TERMS OF
25   TECHNICAL LANGUAGE.  I SAID, 'I DON'T WANT TO HEAR WHAT THE    01:33
```

```
 1   LAWYERS TALKED TO YOU ABOUT, AND I DON'T WANT TO HEAR WHAT YOU

 2   TOLD THE LAWYERS ON ANY OF THOSE OTHER SITUATIONS.'

 3        I ASKED HER, 'DID YOU EVER CONSULT IN THIS CASE?'

 4   SHE SAID, 'NO.'

 5        THE COURT:  SO IT WAS CLEAR TO YOU, WHEN YOU MET WITH    01:34

 6   HER, THEN, THAT SHE HAD BEEN IN CONSULTATION WITH THE LAWYERS?

 7        MR. PLEVAN:  YES, YOUR HONOR.  SHE TOLD US THAT, AND

 8   THAT'S WHY IT'S IN THE REPORT.

 9        I VIEWED THAT AS A CREDENTIAL, THAT SHE HAD BEEN

10   ASKED TO DO THIS.  BUT I TOLD HER RIGHT AT THE BEGINNING, 'I DO    01:34

11   NOT WANT TO KNOW THE PARTIES, THE NAMES, WHAT YOU SAID, OR

12   ANYTHING ELSE.'

13        WHAT WE'RE INTERESTED IN, SIMPLY, IS THIS AS A

14   CREDENTIAL; IF, AS AN EXPERT, THIS WAS SOMETHING SHE HAD DONE

15   FOR SOMEBODY ELSE.  BUT WITHOUT TELLING US.                    01:34

16        IT'S LIKE GOING TO AN EXPERT AND GETTING A LIST OF

17   THE PRIOR --

18        THE COURT:  DID IT GIVE YOU ANY PAUSE THAT SHE WAS

19   SERVING AS AN EXPERT, DOING FACE PAINTING COMPARISONS, OVER

20   DOLLS THAT WERE THE SUBJECT OF LITIGATION THAT YOUR CLIENT HAD    01:34

21   FILED, AT THE TIME THAT YOUR CLIENT HAD FILED THAT LITIGATION?

22        THE ONE CASE HAD ALREADY BEEN FILED WHILE SHE WAS

23   STILL THERE.

24        MR. PLEVAN:  RIGHT.

25        YOUR HONOR, AGAIN, I BELIEVE THIS IS IN HER              01:35
```

```
 1   DEPOSITION AND I BELIEVE IT'S IN HER REPORT.  SHE WAS
 2   ABSOLUTELY ADAMANT -- I DON'T MEAN HER REPORT, I MEAN HER
 3   DEPOSITION -- SHE TOLD US SHE HAD NEVER BEEN CONSULTED ON
 4   ANYTHING RELATING TO THIS LAWSUIT.  I SPECIFICALLY SAID, 'WHAT
 5   ABOUT MY SCENE?'  SHE SAID, 'NO.'                              01:35
 6         IT WAS LIKE A WALL OF SILENCE.
 7         'THESE LAWYERS DID TALK TO ME ON THESE OTHER MATTERS,
 8   BUT NEVER ONCE RAISED THIS ISSUE.'
 9         THEN LATER, SHE SAID SOMETHING ABOUT HOW ONE OF THE
10   IN-HOUSE LAWYERS HAD GIVEN HER THE COMPLAINT IN THE COURSE OF  01:35
11   TALKING TO HER ABOUT ONE OF THESE OTHER THINGS AND MADE A JOKE
12   ABOUT MR. LARIAN.  SO THEN I FOLLOWED UP AGAIN; I SAID, 'WELL,
13   DID THEY TALK TO YOU ABOUT THE SUBSTANCE?'
14         'NO.  NEVER.  DID NOT COME BACK TO ME.  NEVER ASKED
15   ME ABOUT IT.'  'FRANKLY,' SHE SAID, 'I WOULD HAVE BEEN VERY    01:35
16   UNCOMFORTABLE.  I KNEW CARTER BRYANT.  I WOULD NOT HAVE WANTED
17   TO GET INVOLVED IN THAT, AND I DID NOT.'
18         THE COURT:  SHE ACTUALLY HAS SOME STRONG FEELINGS
19   ABOUT CARTER BRYANT AND HIS RELATIONSHIP WITH MATTEL.
20         MR. PLEVAN:  YES, YOUR HONOR.  ABSOLUTELY.  AND I        01:36
21   BELIEVE THAT --
22         THE COURT:  DOESN'T THAT REFLECT THAT SHE HAD AN
23   AWARENESS OF --
24         MR. PLEVAN:  WHAT IT MEANT TO ME, YOUR HONOR, WAS
25   THAT THERE WASN'T ANY CASUAL CONVERSATIONS, BECAUSE SHE        01:36
```

1   REMEMBERED THE JOKE AND SHE WAS VERY CLEAR TO US --

2          AND, AGAIN, I KNOW IN HER DEPOSITION SHE SAYS, 'I

3   DON'T REMEMBER,' BUT THERE ARE OTHER TIMES WHERE SHE DENIES IT

4   AS WELL.  SHE SAID, 'THEY NEVER TALKED TO ME ABOUT' -- THERE

5   WAS EVEN ONE INCIDENT WHERE MR. ZELLER, WHO ASKED THE QUESTIONS          01:36

6   AT HER DEPOSITION, SAID, 'DON'T YOU REMEMBER A PARALEGAL FROM

7   THE LEGAL DEPARTMENT COMING TO YOU?'  AND SHE THOUGHT ABOUT IT

8   FOR A MINUTE AND SAID, 'WASN'T THAT ABOUT THIS CASE?'  SHE SAID

9   -- AND THIS IS IN HER DEPOSITION TESTIMONY -- 'THE PARALEGAL

10  CAME TO ME AND ASKED ME TO GIVE HER OUR HISTORIC FILES.  SHE          01:36

11  WAS GOING TO TAKE THEM TO THE LEGAL DEPARTMENT AND GET THEM

12  COPIED.  AND I REMEMBER THIS BECAUSE I FELT SORRY FOR HER

13  BECAUSE SHE HAD TO CARRY THESE HUGE BINDERS.  AND I JUST

14  ASSUMED THAT THE LEGAL DEPARTMENT WANTED THE FILES THEMSELVES.

15  IT WAS NOTHING INVOLVED IN THIS CASE.  SHE SIMPLY TOOK MY FILES          01:37

16  AWAY AND HAD THEM COPIED.  AND LATER THEY WERE BROUGHT BACK.'

17         SO TO ME -- AGAIN, YOUR HONOR, I UNDERSTAND -- I'VE

18  HEARD YOUR HONOR'S VIEWS, BUT IN TERMS OF, DID THIS COME

19  THROUGH AS RINGING TRUE, SHE WASN'T, LIKE -- SHE WAS TELLING

20  SPECIFIC FACTS.          01:37

21         **THE COURT:**  YOU'VE DEALT WITH HER FAR MORE THAN I

22  HAVE, COUNSEL.

23         **MR. PLEVAN:**  YES, YOUR HONOR.  I UNDERSTAND.

24         DID YOUR HONOR HAVE -- I KNOW YOUR HONOR MAY HAVE --

25  WELL, I DON'T HAVE TO DO IT NOW, BUT YOUR HONOR HAS, I BELIEVE,          01:37

1    OTHER QUESTIONS FOR ME.

2              **THE COURT:**  I MIGHT, COUNSEL.  LET'S PROCEED.

3         **MR. PLEVAN:**  THANK YOU.

4         **MR. NOLAN:**  YOUR HONOR, IF I MIGHT GO BACK TO THE

5    TIMELINE FOR JUST A MOMENT AND MAKE A POINT.                    01:37

6              AGAIN, I'M ACCEPTING WHAT THE COURT'S FINDINGS ARE

7    BUT QUESTIONING THE CREDIBILITY OF THE SUBMISSIONS, TO BE VERY

8    FRANK WITH YOU.

9              ON APRIL 13TH, HER SEPARATION AGREEMENT EXPIRES.

10   THERE'S NO ISSUE THAT WE CONTACTED HER BEFORE THE SEPARATION    01:38

11   AGREEMENT EXPIRES.

12             **THE COURT:**  THE ONLY THING I'D ADD TO THAT, COUNSEL,

13   IS, IT'S CLEAR THAT EVEN THOUGH THE SEPARATION AGREEMENT

14   EXPIRES AND SHE STOPS WORKING FOR MATTEL, THE REQUIREMENT THAT

15   SHE NOTIFY MATTEL IF SHE'S CONTACTED CONTINUES.                 01:38

16             CORRECT?

17        **MR. NOLAN:**  YES.  I AGREE WITH THAT, YOUR HONOR.

18             BUT MUCH LIKE EVERYTHING IN THIS CASE, I THINK

19   THERE'S ANOTHER SIDE TO THE STORY.

20             **THE COURT:**  LET ME HEAR IT.                       01:38

21        **MR. NOLAN:**  OKAY.

22             I BELIEVE THAT THE QUESTION OF WHETHER OR NOT MATTEL

23   IS NOTIFIED UNDER THE AGREEMENT THAT SHE IS EMPLOYED AND DOING

24   SOME KIND OF SERVICES -- MAYBE THEY TAKE ISSUE WITH IT -- THE

25   VERY SERVICES THAT THEY TAKE ISSUE WITH, THEY'RE NOTIFIED ON    01:38

```
 1   JANUARY 7, 2008, OF THE INTENT TO USE HER AS A FACTUAL WITNESS

 2   IN OUR SUPPLEMENTAL INTERROGATORIES.

 3           AT THAT POINT IN TIME --

 4       THE COURT:  YOU HAVE JANUARY 7TH.  I HAVE JANUARY 5TH

 5   ON MY CHRONOLOGY, BUT PERHAPS IT'S NOT --                        01:39

 6       MR. NOLAN:  I WOULD LIKE TO SAY WE ROUND OFF, BUT MY

 7   RECOLLECTION IS IT'S JANUARY 7TH; BUT I CAN GO WITH THE 5TH.

 8       THE COURT:  I'M GIVING YOU THE BENEFIT OF TWO DAYS;

 9   BUT ANYWAY, JANUARY 5TH OR JANUARY 7TH.

10       MR. NOLAN:  OKAY.

11           NOW, HERE, ASSUMING EVERYTHING IS CORRECT THAT MATTEL

12   HAS BEEN TELLING US AND TELLING YOU, YOUR HONOR, RIGHT THEN AND

13   THERE, THEY ARE ON NOTICE THAT SOME TYPE OF SERVICE IS BEING

14   PROVIDED TO AN ATTORNEY FOR MGA.  WHETHER OR NOT THE SERVICE IS

15   FOR MGA OR FOR SKADDEN ARPS, I'M NOT GOING TO TRY TO DRAW THAT   01:39

16   DISTINCTION OR CUT IT FINE FOR YOUR HONOR.  THAT'S NOT WHAT I'M

17   RELYING ON.  WHAT I'M RELYING ON NOW IS THAT AS OF THAT DATE,

18   THEY KNOW THAT A FORMER CONSULTANT THAT THEY BELIEVE POSSESSES

19   PRIVILEGED INFORMATION IS NOW WORKING FOR THE OTHER SIDE AS

20   EITHER A FACT WITNESS -- WELL, CLEARLY AS A FACT WITNESS,        01:39

21   BECAUSE WE LIST HER IN SEVERAL PLACES.

22       THE COURT:  ALL RIGHT.

23       MR. NOLAN:  CLEARLY, NO RED FLAGS FOR US.

24           SAY WHAT ONE MIGHT ABOUT US, BUT WE'RE NOT FOOLISH IN

25   THIS CASE AND WE'RE NOT RUBBING ANYBODY'S NOSE IN THIS.  WE      01:40
```

```
 1   WERE FLYING BLIND ON THIS.  AND WE DIDN'T HIDE HER; WE
 2   DISCLOSED HER IN THE SUPPLEMENTAL INTERROGATORY.  IF WE THOUGHT
 3   THERE WAS AN ISSUE OR THERE WAS ANYTHING INAPPROPRIATE ABOUT
 4   THIS, WHERE THE RED FLAGS WERE UP -- ANOTHER LAW FIRM MAY NOT
 5   HAVE LISTED HER.  WE LISTED HER.  THEY DON'T RESPOND.  THEY          01:40
 6   DON'T TAKE AN ISSUE WITH THIS AT ALL.
 7         SO THE QUESTION THEN BECOMES, ALL RIGHT, UNDER THEIR
 8   INTERPRETATION OF WHATEVER THEY SUBMITTED TO YOU, IN TERMS OF
 9   THE NUMEROUS CONTACTS THAT THEY HAD WITH HER -- AND I ASSUME
10   THAT THEY'RE TAKING THE POSITION THAT SUBCONSCIOUSLY SHE CAN'T      01:40
11   SEPARATE OUT LEGAL FROM FACT -- THEN MY QUESTION IS WITH YOUR
12   FINDING THAT THERE WAS NO DELAY BY MATTEL.  I RESPECTFULLY
13   SUBMIT THAT WAS WHEN THEY WERE ON NOTICE AND COULD HAVE CALLED
14   AND SAID, 'HEY, THERE'S AN ISSUE,' WHETHER FORMALLY OR PICK UP
15   THE PHONE.                                                          01:41
16         THE COURT:  DOESN'T THIS GET TO YOUR POINT, THOUGH,
17   THAT THERE'S NOTHING WRONG UNDER CALIFORNIA LAW ABOUT
18   CONTACTING A FORMER EMPLOYEE, BUT THERE IS A PROBLEM ONCE SHE
19   GETS INTO THE AREA OF POTENTIALLY DISCLOSING TO MATTEL AREAS OF
20   ATTORNEY WORK PRODUCT OR ATTORNEY-CLIENT COMMUNICATIONS.           01:41
21         AND IF IT'S LOST ON YOU, IT'S LOST ON MATTEL UNTIL
22   THEY RECEIVE THIS EXPERT REPORT, WHICH SHE, AS THE BASIS FOR
23   HER OPINION, MAKES REFERENCE TO THIS.
24         I ALSO WAS GOING TO ASK YOU ABOUT -- YOU SAY NO RED
25   FLAGS FOR YOU UP TO THIS POINT.  THESE MEETINGS THAT TAKE          01:41
```

```
 1   PLACE, THE FIRST ONE IS ON NOVEMBER 1, 2007, BACK IN

 2   NEW YORK -- I DON'T KNOW IF IT'S BACK IN NEW YORK, BUT IT'S

 3   WITH MR. PLEVAN.

 4            MR. PLEVAN:  IN LOS ANGELES, YOUR HONOR.

 5            THE COURT:  AND, OF COURSE, MR. HOLDEN MEETS WITH HER    01:42

 6   EVEN BEFORE THAT, WHEN O'MELVENY & MYERS IS REPRESENTING.

 7            MR. NOLAN:  BUT AT THAT POINT IN TIME, YOUR HONOR --

 8            THE COURT:  I DON'T KNOW WHAT HAPPENED IN THOSE

 9   CONVERSATIONS, BUT --

10            MR. NOLAN:  LET'S ALSO UNDERSTAND WHAT WE'RE TALKING     01:42

11   ABOUT HERE WITH RESPECT TO HER SO-CALLED EXPERTISE.  OKAY?

12            I ALWAYS THOUGHT, RATHER THAN THE MOTION FOR

13   DISQUALIFICATION -- I'LL BE VERY HONEST WITH YOU -- NEVER

14   THOUGHT OF THAT IN A MOMENT.  BUT AFTERWARDS, UPON REFLECTING

15   ON IT, MAYBE IT'S THEIR MOTION THAT SHE WASN'T AN EXPERT.       01:42

16   SHE'S REALLY A FACT WITNESS.  THAT'S WHAT SHE'S REALLY DOING,

17   BASED ON HER 16 YEARS OF EXPERIENCE.  THIS IS NOT LIKE

18   MR. THOMPSON IN DELOITTE WHOSE SOLE PROFESSION IS BEING AN

19   EXPERT WITNESS ON DAMAGES AND STUFF LIKE THAT.  SHE'S REALLY

20   APPLYING A FACTUAL SCENARIO.                                     01:42

21            BUT I GO BACK TO THIS POINT, YOUR HONOR:  IF THEY'RE

22   CONTENDING NOW THAT SHE CAN'T TELL THE DIFFERENCE BETWEEN

23   PRIVILEGED INFORMATION AND NON PRIVILEGED INFORMATION.

24            THE COURT:  THAT'S HER POSITION.

25            MR. NOLAN:  THAT'S HER POSITION?                        01:43
```

```
 1          WELL, THEY'RE SAYING THAT SHE COULDN'T TELL -- THAT

 2   THERE'S NO WAY -- MATTEL'S POSITION IN THIS CASE MUST BE THAT

 3   THERE WAS A WAY TO DISCERN BETWEEN PRIVILEGED INFORMATION AND

 4   FACTUAL.  AND ALL I'M SAYING, YOUR HONOR, IS, AT THAT POINT IN

 5   TIME, MATTEL WAS IN A FAR BETTER POSITION TO REACT TO THE          01:43

 6   NOTICE THAT WAS PROVIDED IN JANUARY; AND THEY DON'T DO SO.

 7          THE COURT:  ALL RIGHT.

 8          MR. NOLAN:  THEN, YOUR HONOR, YOU MOVE ALONG HERE AND

 9   YOU RECEIVE -- WE SERVE MS. TOMIYAMA'S EXPERT REPORT

10   FEBRUARY 11TH.                                                     01:43

11          WHAT'S INTERESTING IS, IN SHADOW TRAFFIC, WHEN THE

12   EXPERT DISCLOSURES ARE EXCHANGED, THERE IS AN IMMEDIATE PHONE

13   CALL BETWEEN THE LAWYER FROM LATHAM AND THE LAWYER AT

14   ANDREWS KURTH, WHERE THE LATHAM LAWYER SAYS, 'I KNEW YOU WERE

15   GOING TO HAVE A PROBLEM WITH THIS,' 'I THOUGHT YOU HAD A           01:44

16   PROBLEM WITH THIS,' OR 'WE ANTICIPATED THAT THERE WOULD BE AN

17   ISSUE HERE.'

18          HERE, IT'S RADIO SILENCE.  WE'RE NOT EVEN, LIKE,

19   WAITING UNTIL THE END OF THE DAY AND GOING, 'OH, NOBODY CALLED.

20   THAT'S GREAT.'  THERE WAS NO CONTACT.                             01:44

21          IN FACT, YOUR HONOR, I RESPECTFULLY SUBMIT THAT IF

22   SHE IS AS INVOLVED IN THE DEFENSES AS THEY CLAIM, MATTEL WAS IN

23   A FAR BETTER POSITION TO GIVE US A RING AND SAY, 'TOM,' OR

24   WHOEVER, 'WE'VE GOT A PROBLEM.  CAN WE DISCUSS IT?'

25          THEY DON'T REACH OUT FOR US.                                01:44
```

1      WHAT THEY DO, YOUR HONOR, IS, THEY ENGAGE IN MEET AND

2   CONFERS WITH RESPECT TO THE DISCOVERY THAT'S GOING TO TAKE

3   PLACE WITH THE EXPERTS.  AND WE SIGN AN EXPERT STIPULATION --

4   I'M SORRY; IT'S NOT ON THIS ONE -- FEBRUARY 25TH.  WE SIGNED A

5   STIPULATION, LODGED IT WITH THE COURT, WITH RESPECT TO THE                01:45

6   AMOUNT OF DISCOVERY THAT WILL BE OBTAINED BETWEEN THE EXPERTS.

7      THERE IS NO SHOWING, THERE CANNOT BE ANY SHOWING,

8   THAT EVEN DURING THESE DISCUSSIONS, MATTEL DOES NOT SAY TO US,

9   'BY THE WAY, TOMIYAMA WAS A CONSULTING EXPERT FOR US.  THERE'S

10  GOING TO BE A PROBLEM HERE.'                                             01:45

11      THEY DON'T SAY A WORD ABOUT IT.

12      WE THEN GO TO THE DEPOSITION.  THE DEPOSITION TAKES

13  PLACE ON FEBRUARY 27TH.  AND THEN SATURDAY, MARCH 1ST, ABOUT

14  1:00 IN THE AFTERNOON, A SATURDAY, NOT IMMEDIATELY AFTER THE

15  DEPOSITION -- I DON'T GET A PHONE CALL; NOBODY GETS ANYTHING.            01:45

16  BUT A FEW DAYS LATER, A SATURDAY AFTERNOON AT 1:00, I GET AN

17  E-MAIL SAYING THAT THEY'RE GOING TO HAVE A MEET AND CONFER TO

18  DISQUALIFY US.  AND I'LL NEVER FORGET WHERE I WAS THEN.  I WAS

19  AT MY DAUGHTER'S VOLLEYBALL TOURNAMENT, AND IT RUINED THE REST

20  OF THE TOURNAMENT.                                                      01:46

21      BUT NEVERTHELESS, AFTER THAT, WE GO INTO MEET AND

22  CONFERS.  BUT THE NEXT THING WE DO -- BECAUSE NOW, YOUR HONOR,

23  I THINK OUR CONDUCT IS BEING REVIEWED -- MARCH 3RD, WHICH IS

24  THE MONDAY, I ORDER, WITHIN SKADDEN, A CLAW BACK OF NOT ONLY

25  THE ALLEGED OFFENDING PRODUCT, THE SIMBA DOCUMENT, I INSTRUCT           01:46

```
 1   THE I.T. DEPARTMENT TO WITHDRAW ALL COPIES OF THE EXPERT

 2   REPORT; RECEIVE IT BACK FROM ANYBODY AND EVERYBODY WHO MAY HAVE

 3   HAD IT.  BECAUSE, YOU KNOW, THEY'RE IN THE FILES.  NOT

 4   EVERYBODY IS READING THIS; OTHERWISE, WE WOULD NEVER GET

 5   EVERYTHING DONE.  THERE'S 28 EXPERTS IN THIS CASE.  I TOOK          01:46

 6   THOSE PRECAUTIONS.  I WENT SO FAR AS TO SAY THAT THE ROUGH

 7   TRANSCRIPT THAT COMES IN EVERY NIGHT -- BOTH SIDES GET ROUGH

 8   DEPOSITION TRANSCRIPTS -- I ORDERED THAT THE ROUGH TRANSCRIPT

 9   BE REMOVED AND BROUGHT BACK.

10           I DO THAT, YOUR HONOR, NOT IN A SENSE OF GUILT, BUT         01:47

11   RATHER, BECAUSE AT THAT POINT IN TIME, MY ETHICAL

12   RESPONSIBILITY, I THOUGHT, WAS -- AND I STILL BELIEVE I DID THE

13   RIGHT THING -- NOW FACED FOR THE FIRST TIME WITH THEM

14   CONTENDING THAT I WAS IN POSSESSION OF PRIVILEGED INFORMATION,

15   WE TOOK THE NECESSARY STEPS TO WIPE THAT FROM THE SYSTEM; WE        01:47

16   DELETED IT FROM THE SYSTEM.  I ORDERED THAT A LEGAL ASSISTANT

17   IN THE LOS ANGELES OFFICE TAKE THE ORIGINAL REPORT, THE ONLY

18   COPY OF THE REPORT, AND THE ROUGH TRANSCRIPT, TOGETHER WITH THE

19   ACTUAL FINAL TRANSCRIPT WHEN IT CAME IN, TO BE LOCKED UNDER

20   SEAL, HAVING NO ACCESS TO ANYBODY.                                 01:47

21           THE COURT:  ALL OF THOSE STEPS ARE VERY COMMENDABLE,

22   COUNSEL, AND I MEAN THAT SINCERELY.  BUT GETTING BACK TO THE

23   TIMELINE, MARCH 1ST -- THIS IS GOING BACK TO THE EXPERT

24   REPORT -- PART OF THE PROBLEM IS, I DON'T HAVE, AND MATTEL

25   DOESN'T HAVE -- JUST LIKE YOU DON'T HAVE THE IN-CAMERA, THEY        01:48
```

1    DON'T HAVE THE VERBATIM OF THE DISCUSSIONS THAT TOOK PLACE

2    BEFORE.  WE HAVE THIS EXPERT REPORT, THOUGH.  AND I PLACE A LOT

3    OF STOCK IN THAT BECAUSE IT'S IN HER OWN WORDS, AND THERE'S NO

4    GETTING AROUND THAT.  AND YOU HAVE REFERRED SEVERAL TIMES TO

5    HER INVOLVEMENT WITH MATTEL LEGAL AS BEING A CREDENTIAL, BUT          01:48

6    THAT ALL SHE DID WAS FACE PAINT.

7            THE REPORT LEADS ME TO CONCLUDE THAT THERE WAS MORE

8    THAN THAT.  I'LL READ ONE LINE, AND I WOULD LIKE TO HEAR YOUR

9    RESPONSE TO THAT.  THIS IS ON PAGE 2 OF THE REPORT.  IT'S UNDER

10   THE SECTION OF HER QUALIFICATIONS:  SHE WRITES, "RESPONDING TO        01:48

11   A REQUEST FROM MATTEL'S PRODUCT LEGAL GROUP IN MID 2004, I

12   WORKED WITH MY STAFF TO PAINT AND PHOTOGRAPH FACE PAINT

13   VARIATIONS THAT ANOTHER DOLL COMPANY COULD USE WITHOUT

14   OBJECTION FROM MATTEL."  THAT'S EXHIBIT A.

15           "FROM MID 2004" -- THIS IS GOING FORWARD -- "I WAS            01:49

16   REGULARLY CONSULTED BY MATTEL'S PRODUCT LEGAL GROUP, WHO

17   BROUGHT ME DOLLS FROM OTHER MANUFACTURERS AND ASKED IF I

18   BELIEVED THEY INFRINGED ON MATTEL'S TRADE DRESS, THE TERM

19   MATTEL LAWYERS USE."

20           PUTTING ASIDE ANYTHING I'VE LEARNED FROM THE                  01:49

21   IN-CAMERA, IF LAWYERS ASK AN EXPERT TO SAY, 'I WANT YOUR

22   OPINION AS TO WHETHER THIS VIOLATES A TRADE DRESS,' TO A

23   NONLAWYER, OBVIOUSLY AN EXPLANATION AS TO WHAT A TRADE DRESS

24   VIOLATION IS, OR MORE IMPORTANTLY, WHAT THEY PERCEIVE TO BE A

25   TRADE DRESS VIOLATION -- THOSE ARE THE THOUGHTS AND IMPRESSIONS      01:49

```
 1    THAT I WAS REFERRING TO IN MY FINDINGS.  THOSE HAD TO HAVE BEEN

 2    COMMUNICATED, BASED ON WHAT SHE TELLS ME HERE, BECAUSE GIVEN

 3    WHAT SHE COMES ACROSS WITH IN HER DEPOSITION, SHE DOESN'T KNOW

 4    TRADE DRESS FROM ANYTHING ELSE, RIGHT?  SHE HAS NO

 5    UNDERSTANDING OF THESE LEGAL CONCEPTS.  BUT SHE STATES IN HER        01:50

 6    REPORT THAT SHE WAS TOLD TO OFFER AN OPINION ABOUT TRADE DRESS

 7    VIOLATIONS.

 8              WELL, HOW ELSE COULD SHE HAVE DONE THAT REGULAR TASK

 9    THAT SHE DESCRIBES WITHOUT HAVING RECEIVED MATTEL'S IMPRESSIONS

10    OF WHAT CONSTITUTES A TRADE DRESS VIOLATION?                        01:50

11         MR. NOLAN:  YOUR HONOR, IF I MIGHT, THERE'S A LOT

12    THAT I'VE DONE FOR PREPARATION OF THIS ARGUMENT.  BUT THERE WAS

13    A DIFFICULT CHOICE TO MAKE AS TO WHO SHOULD MAKE THIS ARGUMENT.

14    AS I TOLD YOU LAST WEEK, I CAME INTO THIS CASE; I ACCEPTED THE

15    RESPONSIBILITY; AND I'M GOING TO STAND HERE AND I'M GOING TO        01:50

16    DEFEND SKADDEN ARPS.

17              HOWEVER, I DID NOT READ MS. TOMIYAMA'S FINAL REPORT,

18    AND I HAVE NOT YET.  WHAT I WOULD ASK --

19         THE COURT:  OKAY.

20         MR. NOLAN:  AND I WILL JUST SAY THAT.                         01:50

21         THE COURT:  VERY WELL.

22         MR. NOLAN:  EARLIER VARIATIONS MAYBE CROSSED MY WAY,

23    BUT SHE'S NOT ON MY RADAR SCREEN.

24              WHAT I WOULD ASK IN THIS SPECIFIC REGARD, WITHOUT IT

25    BEING PERCEIVED AS A PUNT FROM ME, IS TO HAVE MR. PLEVAN           01:51
```

1  RESPOND TO THAT PARTICULAR POINT, BECAUSE IT'S SOMETHING THAT I

2  WOULD NEVER HAVE FOCUSED ON.

3        **THE COURT:**  ALL RIGHT.

4        **MR. PLEVAN:**  YOUR HONOR, AGAIN, AS SHE TESTIFIED AT

5  HER DEPOSITION, SHE SAID SHE WAS NOT ASKED, NOT TOLD WHAT          01:51

6  METHODOLOGY TO USE; SHE WAS ASKED TO COMPARE THE TWO HEADS AND

7  REPORT BACK.

8        **THE COURT:**  I'VE GOT TO STOP YOU THERE, BECAUSE IN

9  HER REPORT, THIS IS HER LANGUAGE.

10        **MR. PLEVAN:**  YES, YOUR HONOR.  ABSOLUTELY.

11        **THE COURT:**  SHE SAID, 'I WAS ASKED IF I BELIEVED THEY

12  INFRINGED ON MATTEL'S TRADE DRESS.'

13        **MR. PLEVAN:**  YES, YOUR HONOR.

14        I ASKED HER; I REMEMBER THE CONVERSATION WITH HER

15  ABOUT THAT.  I SAID, 'WERE YOU ASKED TO DO A COPYRIGHT          01:51

16  ANALYSIS?'

17        SHE SAID, 'I DON'T REMEMBER THAT WORD.  I THINK THEY

18  SAID TRADE DRESS.'

19        I SAID, 'WHAT DID YOU DO?'

20        SHE SAID, 'I MADE A COMPARISON.  I MADE A COMPARISON      01:51

21  BASED ON MY EXPERIENCE, AND I REPORTED BACK WHAT I SAW LOOKED

22  LIKE WHETHER IT WAS COPIED OR NOT COPIED, WHAT THE SIMILARITIES

23  AND DIFFERENCES WERE.'

24        **THE COURT:**  YOU UNDERSTAND MY CONCERN?  THE WORD

25  "TRADE DRESS" IS SOMETHING THAT WE MAY ALL UNDERSTAND, OR THINK   01:52

```
 1   WE UNDERSTAND.  I DON'T WANT TO ASSUME FACTS NOT IN EVIDENCE,
 2   BUT...
 3         MR. PLEVAN:  I THOUGHT IT WAS STRANGE MYSELF,
 4   YOUR HONOR, BUT SHE ABSOLUTELY --
 5         THE COURT:  YEAH, YOU SHOULD THINK IT WAS STRANGE.        01:52
 6         MR. PLEVAN:  IT WAS AS SHE DESCRIBED HER METHODOLOGY.
 7   SHE WENT THROUGH, COMPARED IT, AND MADE A REPORT ON WHAT SHE
 8   FOUND WERE THE SIMILARITIES AND THE DIFFERENCES.
 9         THE COURT:  BUT HOW WOULD SHE EVEN KNOW THAT TRADE
10   DRESS INVOLVES SIMILARITIES AND DIFFERENCES, COUNSEL?           01:52
11         MR. PLEVAN:  I DON'T THINK SHE DID KNOW.  I THINK SHE
12   ASSUMED THAT SHE WAS BEING ASKED TO MAKE A COMPARISON AS SHE
13   WOULD AS A PROFESSIONAL, IN TERMS OF WHAT SHE VIEWED AS LOOKING
14   LIKE IT WAS A SIMILARITY OR A DIFFERENCE.
15         I DON'T THINK SHE EVEN REMEMBERED THE WORD CORRECTLY.     01:52
16   I THINK IT WAS PROBABLY A COPYRIGHT ANALYSIS THAT WAS BEING
17   DONE AND NOT A TRADE DRESS ANALYSIS.
18         SO THAT'S THE REASON I TOLD HER -- WHEN SHE SAID
19   THAT, WHEN SHE WROTE THAT, I SAID, 'I THINK YOU SHOULD PUT THAT
20   IN QUOTES.'                                                     01:52
21         THE COURT:  SO YOU SUGGESTED THAT SHE PUT IT IN
22   QUOTES?
23         MR. PLEVAN:  I BELIEVE I TOLD HER TO PUT IT IN
24   QUOTES.  I SAID, 'IS THAT A WORD THAT YOU REMEMBER?'
25         SHE SAID, 'YES.'  AGAIN, SHE SAID -- BECAUSE WE          01:52
```

```
 1   REPEATED THIS -- AS SHE SAYS IN HER REPORT, OR CERTAINLY AT HER
 2   DEPOSITION, SHE WAS NEVER GIVEN GUIDANCE; SHE WAS NEVER ASKED;
 3   SHE WAS SIMPLY TOLD TO MAKE A COMPARISON AND REPORT BACK.  SHE
 4   SAID SHE REPORTED BACK ORALLY AND THEN THAT WAS IT; SHE NEVER
 5   HEARD AGAIN.  NOBODY EVER TOLD HER WHETHER HER FINDINGS WERE       01:53
 6   RIGHT OR WRONG OR IT WAS JUST --
 7         THE COURT:  WELL, I'M STRUGGLING WITH THAT,
 8   MR. PLEVAN.  IF THAT'S THE TERM SHE REMEMBERS THE LAWYERS
 9   USING, I'VE JUST GOT TO BELIEVE THAT SHE WOULD HAVE SAID, 'WHAT
10   DO YOU MEAN BY TRADE DRESS?  YOU WANT AN OPINION ON TRADE         01:53
11   DRESS?  WHAT ARE YOU TALKING ABOUT?'
12         MR. NOLAN:  WELL, YOUR HONOR -- AND MR. PLEVAN CAN
13   RESPOND TO THIS, BECAUSE THIS IS THE ARGUMENT:  WHETHER OR NOT
14   THAT'S WHAT'S IN HER REPORT, WE NEVER INQUIRED INTO THOSE
15   MATTERS.                                                          01:53
16         THE COURT:  AND THAT'S A SEPARATE ISSUE.  I'M NOT
17   SUGGESTING THAT YOU DID.
18         MR. PLEVAN:  WE INTENTIONALLY DID NOT WANT ANYTHING
19   OTHER THAN THE TOPIC OF THE CONVERSATION.
20         THE COURT:  I UNDERSTAND.                                   01:53
21         PLEASE UNDERSTAND WHERE I'M DRAWING THE LINES HERE.
22         MR. NOLAN:  I UNDERSTAND.
23         WHAT'S THE OLD SAYING?  THAT HE WHO REPRESENTS
24   HIMSELF HAS A FOOL FOR A LAWYER; THAT MAY BE APPLICABLE TODAY.
25   BUT IN TERMS OF TRYING TO COVER BOTH ISSUES, FACTUALLY, I THINK   01:54
```

1    THE BACKGROUND APPLIES IN BOTH.  AND WHERE THERE'S A DIVERSION,

2    WE NEED TO POINT IT OUT.

3         YOUR HONOR, I'M JUST GETTING BACK TO THE FACTUAL

4    FINDINGS.  I DO THINK THAT IT'S CURIOUS THAT IT TAKES AWHILE

5    AFTER TAKING THE DEPOSITION TO CONTACT US WITH RESPECT TO THE     01:54

6    MEET AND CONFER.

7         **THE COURT:**  WAIT A SECOND.  I HAVE HERE THAT THE

8    DEPOSITION TOOK PLACE ON FEBRUARY 26TH, AND YOU SAID YOU'RE AT

9    THE VOLLEYBALL GAME ON MARCH 1ST; SO THIS --

10        **MR. NOLAN:**  MARCH 1ST IS A SATURDAY.                       01:54

11        **THE COURT:**  THIS IS A LEAP YEAR, SO THERE WAS NOT --

12   THERE WERE ONLY A COUPLE OF DAYS THERE; RIGHT?

13        **MR. NOLAN:**  THE DEPOSITION WAS TAKEN ON WHAT DATE,

14   KEN?

15        **MR. PLEVAN:**  IT WAS THREE DAYS LATER.                      01:54

16        **MR. NOLAN:**  THREE DAYS LATER, WE GET THE PHONE CALL.

17        **THE COURT:**  OKAY.

18        **MR. NOLAN:**  YOUR HONOR, INTERESTINGLY, IN

19   SHADOW TRAFFIC, IN THREE DAYS, THEY HAD SOUGHT PROTECTIVE

20   ORDERS FROM THE COURT IMMEDIATELY.  NOW, I'M NOT PUTTING OUR      01:55

21   DEFENSE COMPLETELY ON THAT, ALTHOUGH IT'S A FACTOR THAT A TRIER

22   OF FACT SHOULD WEIGH.

23        **THE COURT:**  IT'S ONE OF THE FACTORS.

24        **MR. NOLAN:**  I'LL TELL YOU THIS, YOUR HONOR; HERE'S

25   WHAT HAPPENED ABOUT THE COMMUNICATIONS IN THIS CASE:              01:55

1          WE FILE A SUMMARY JUDGMENT MOTION IN THIS CASE ON A

2    FRIDAY, MARCH 7TH.

3          **THE COURT:**  YES.

4          **MR. NOLAN:**  I THINK IT'S MARCH 8TH OR MARCH 9TH,

5    EITHER SATURDAY OR SUNDAY, I'M IN THE OFFICE AND I GET NOTICE                01:55

6    OF AN EX PARTE THAT NEVER GOT TO YOU, TELLING ME THAT THEY WERE

7    GOING TO COME IN AND STRIKE THE MOTION FOR SUMMARY JUDGMENT

8    BECAUSE WE DID NOT DOUBLE SPACE THE QUOTES AND THEREBY HAD TEN

9    MORE PAGES LEFT, OR WE GOT TEN MORE PAGES, OR SOMETHING ELSE

10   LIKE THAT.  AND I JUST SAY TO MYSELF, IF IT TAKES LESS TIME TO               01:56

11   CALL ME ABOUT THE FONTS AND THE SPACING ON SUCH AN IMPORTANT

12   MATTER, WHY ISN'T THE PHONE CALL IMMEDIATE?

13         NEVERTHELESS, YOUR HONOR, I STILL GO BACK TO WHAT WE

14   DID FOLLOWING IT.  BUT HERE'S THE KEY I WANT TO POINT OUT:  ON

15   MARCH 7TH, WE FILED OUR MOTIONS FOR SUMMARY JUDGMENT.                        01:56

16         WHY IS THAT CRITICAL, YOUR HONOR?

17         I GO BACK TO THIS BECAUSE I WANT TO TIE THIS UP.

18         ONE OF THE CRITICAL ISSUES IN THE SUMMARY JUDGMENT IS

19   WHETHER OR NOT THIS WHOLE THING HAS BEEN SNOOKERED, TO COIN A

20   PHRASE.  WE BELIEVE THAT THE RECORD EVIDENCE SHOWS THAT MATTEL               01:56

21   KNEW, FROM AS EARLY AS FEBRUARY OF 2001, ABOUT WHAT WAS GOING

22   ON; AND WE THINK THAT THE EVIDENCE -- AND I'LL ARGUE THE

23   SUMMARY JUDGMENT LATER -- BUT THE CRITICAL PLAYERS INVOLVED IN

24   THE STATE OF KNOWLEDGE FOR MATTEL ARE MIKE ZELLER AND

25   MR. MOORE.  AND AS A TRIER OF FACT IN WEIGHING THE SUBMISSIONS              01:57

```
 1   THAT YOU HAVE BEFORE YOU, YOUR HONOR, I POINT THAT OUT.  I
 2   WOULD BE REMISS IF I DIDN'T SAY THAT ON BEHALF OF MY CLIENT.
 3          AND I CAN'T SEE WHAT THEY'RE SAYING.
 4          ALL I'M ASKING IS, IF WHAT THEY'RE TELLING YOU UNDER
 5   SEAL IS SO POWERFUL TO SUPPORT THE FINDINGS THAT YOU'VE          01:57
 6   ANNOUNCED, I'M KIND OF CURIOUS AS TO WHY IT ISN'T UNTIL
 7   MARCH 20TH THAT WE HAVE A PRIVILEGE LOG THAT CONTAINS ONLY ONE
 8   E-MAIL FROM HER; AND WHY WE DON'T SEE IN HER CONSULTING
 9   AGREEMENT ANY REFERENCE TO HER INVOLVEMENT WITH THE LEGAL
10   DEPARTMENT; AND WHY, IN THE FOURTEEN MONTHS AFTER SHE LEAVES     01:57
11   THE EMPLOYMENT OF MATTEL, THERE'S NOBODY REACHING OUT TO HER
12   AND SAYING, 'HEY, BECAUSE WE RELY ON YOU ALL OF THE TIME AND
13   YOU'RE SO INTEGRAL, WE NEED YOU ON THIS CASE; THE LITIGATION IS
14   GOING FORWARD.'
15          YOUR HONOR DOES NOT STAY PHASE TWO.  THIS IS REALLY A     01:58
16   PHASE TWO ISSUE, THE MY SCENE COMPARISON AND TRADE DRESS.  I
17   KNOW THAT YOU SAY THAT WHATEVER THEY'VE PUT BEFORE YOU IS
18   CRITICAL TO PHASE ONE.  I CAN ONLY GUESS, BECAUSE I DON'T HAVE
19   IT ANYWHERE IN THE PRIVILEGE LOG, BUT, YOU KNOW, THE MY SCENE
20   ISSUE IS A PHASE-TWO ISSUE.  BUT NEVERTHELESS, THERE'S NO        01:58
21   INDICATION THAT WE EVER INQUIRE.
22          THEN YOU GET TO THE DEPOSITION AND SHE'S ASKED FOR
23   SEVEN HOURS ABOUT HER STATE OF KNOWLEDGE, AND WHAT HAVE YOU.
24   AND I THINK IT'S FAIR, YOUR HONOR, FOR YOU TO SEE THREE CLIPS,
25   VERY SHORT, IF I MIGHT, FROM THE VIDEO DEPOSITION OF            01:58
```

```
 1   CHRISTINA TOMIYAMA.  THE FIRST ONE DEALS WITH DISCUSSIONS

 2   REGARDING THE MGA COMPLAINT, BECAUSE, OF COURSE, THAT'S THE

 3   CONTROVERSY HERE.  I'M ASSUMING THAT THEY'VE SUBMITTED

 4   DECLARATIONS TO YOU SAYING THAT, YOU KNOW, THEY DISCUSSED THIS

 5   CASE WITH HER AND BRATZ AND STUFF LIKE THAT.  ALL I'M SAYING        01:58

 6   IS, I THINK WE'RE ENTITLED, AND I THINK MS. TOMIYAMA IS

 7   ENTITLED, TO WATCH THE TESTIMONY.  IT'S VERY BRIEF.  AND I CAN

 8   GIVE THIS TO MS. LANZA AFTERWARDS; AND I'LL GIVE A COPY TO

 9   COUNSEL.  THIS IS FROM PAGE 252, LINE 17, THROUGH 252, LINE 22;

10   AND THEN WE'RE GOING TO CONTINUE IT AND RUN IT ALL OF THE WAY       01:59

11   TO PAGE 254, LINE 3.

12           THE COURT:  COUNSEL, BEFORE YOU START ON THAT, I'M

13   GOING TO DIRECT THE COURT REPORTER NOT TO RECORD THE DEPOSITION

14   TESTIMONY AND DIRECT COUNSEL TO LODGE THE WRITTEN TESTIMONY

15   WITH THE COURT FOR PURPOSES OF THE RECORD.                         01:59

16           (WHEREUPON, VIDEOTAPE PLAYS.)

17           MR. NOLAN:  SO LET'S FIND OUT WHAT THE CONVERSATION

18   WAS.

19           (WHEREUPON, VIDEOTAPE PLAYS AGAIN.)

20           MR. NOLAN:  SO THAT, YOUR HONOR, IS WHAT WAS QUOTED        02:01

21   TO YOU IN THE MOVING PAPERS.  THE VERY NEXT QUESTION AND ANSWER

22   IS NOT CITED TO YOU.

23           NOW LET'S PLAY THE FOLLOW-UP.

24           (WHEREUPON, VIDEOTAPE PLAYS AGAIN.)

25           MR. NOLAN:  THEN THE LAST SEGMENT.  THIS IS LATER ON       02:01
```

1    AT PAGE 255, LINES 24, THROUGH 256, LINE 25.  MR. ZELLER IS

2    REPEATEDLY PRESSING HER ON THIS POINT OF WHAT WAS THE EXTENT OF

3    CONVERSATIONS REGARDING THIS COMPLAINT.

4              THIS IS MS. TOMIYAMA'S ANSWER.

5              (VIDEOTAPE PLAYS AGAIN.)                                   02:02

6              **MR. NOLAN:**  YOUR HONOR, IF SHE'S WRONG, IF SHE WAS

7    WRONG -- AND THEY'VE NOW SUBMITTED TO YOU INFORMATION THAT

8    CONFIRMS THAT THOSE COMMUNICATIONS WERE HAD, BECAUSE AT THE

9    DEPOSITION, MR. ZELLER SAID, 'IF I SHOWED YOU E-MAILS, WOULD

10   THAT REFRESH YOUR RECOLLECTION?"  AND THAT'S WHEN SHE STOPPED     02:03

11   DENYING -- I MEAN, SHE COULDN'T DENY; SHE'S BEING HONEST; SHE

12   SAID, 'LISTEN, IF YOU CAN PROVE SOMETHING TO ME, I'LL TAKE A

13   LOOK AT IT.  I DON'T HAVE A PRESENT RECOLLECTION OF IT AT ALL.'

14             NOW, IF THEY'VE SUBMITTED SOMETHING IN-CAMERA TO YOU,

15   YOUR HONOR, IN THE FORM OF AN E-MAIL COMMUNICATION, ALL OF THIS   02:03

16   IS FOR NAUGHT IN TERMS OF MY ARGUMENT.  BUT IF THEY HAVEN'T, OR

17   IF THEY HAVE, WHY ISN'T IT ON THEIR PRIVILEGE LOGS ANYWHERE?

18             AND THIS IS ANOTHER POINT, YOUR HONOR, WHERE I'M ALSO

19   STRADDLING BOTH ISSUES HERE, BECAUSE MR. PLEVAN IS AT THE

20   DEPOSITION; NOBODY ELSE IS THERE FROM SKADDEN ARPS; AND, OF       02:04

21   COURSE, WE SHUT THIS DOWN ON MARCH 3RD; WHEN WE HEAR THAT

22   THERE'S AN ALLEGATION, WE CORNER EVERYTHING OFF; MR. PLEVAN

23   DOESN'T TALK TO ANYBODY ABOUT THIS ISSUE.  I GO SO FAR AS TO

24   HAVE THE PAPERS PREPARED BY ANOTHER OFFICE IN WASHINGTON, D.C;

25   THAT'S WHY YOU WERE FLOODED WITH PRO HAC VICES FROM AMY SABRIN,   02:04

1    DAVID FOSTER, AND MICHAEL KELLY.  AND ONLY THOSE HAD ACCESS TO

2    THE, QUOTE, "ALLEGED PRIVILEGED INFORMATION," IF YOU WOULD,

3    THAT WAS INADVERTENTLY DISCLOSED.

4            I CHOSE TO RECAPTURE ALL OF THIS INFORMATION PURSUANT

5    TO A PROTECTIVE ORDER THAT'S BEEN IN PLACE IN THIS CASE.              02:04

6    PURSUANT TO THAT PROTECTIVE ORDER -- AND THAT'S IN THE PAPERS

7    HERE -- AS ALWAYS IS THE CASE, THERE ARE INADVERTENT

8    DISCLOSURES QUITE OFTEN.  I THINK ON NINE SEPARATE OCCASIONS,

9    WE GOT TRUE PRIVILEGED INFORMATION.  AND WE WOULDN'T HAVE SEEN

10   IT IN THE PRODUCTION.  THEY BROUGHT IT TO OUR ATTENTION.  WE        02:05

11   IMMEDIATELY TOOK CARE OF IT, JUST LIKE THEY'VE RESPONDED EVERY

12   TIME THAT WE'VE DONE IT.  IT HAPPENS IN THIS CASE.

13           I JUST KEEP COMING BACK TO THE POINT:  WHEN BALANCING

14   THE INTERESTS OF THE INCREDIBLE PREJUDICE THAT'S GOING TO BE

15   SUFFERED BY MGA WITH RESPECT TO THE ABSENCE OF THIS EXPERT, WHY     02:05

16   DIDN'T THEY JUST CONTACT US, AS, IN SHADOW TRAFFIC, IT

17   OCCURRED?

18           SHADOW TRAFFIC RESPONDED, YOUR HONOR, IN THREE DAYS

19   WITH A PROTECTIVE ORDER.  IT WAS 54 DAYS FROM THE LISTING OF

20   MS. TOMIYAMA'S NAME IN THE INTERROGATORY TO THE DATE I RECEIVED     02:05

21   THE MEET AND CONFER NOTICE; 54 DAYS TRANSPIRED, WHILE THEY KNEW

22   THAT MS. TOMIYAMA WAS GOING TO BE WORKING -- BEING A WITNESS IN

23   THIS CASE.  AND I GO BACK TO THE FACT THAT I DON'T -- I

24   RESPECTFULLY DON'T BELIEVE THAT THEY GET ANY COMFORT FROM

25   SAYING, 'GEE, WE THOUGHT SHE WAS ONLY GOING TO BE A FACT            02:06

```
1    WITNESS,' BECAUSE BASED ON THE PRESENTATION THAT THEY'RE MAKING
2    HERE, YOUR HONOR, WE KNOW SHE'S A FACT WITNESS; 99 PERCENT OF
3    THE TIME, THAT'S WHAT SHE'S DOING.  THE ONLY TIME THE LEGAL
4    DEPARTMENT EVER CONSULTED WITH HER WAS IN HER CAPACITY AS A
5    FACTUAL WITNESS, AS A FACE PAINTER.  THEY DIDN'T GO TO HER AND   02:06
6    SAY, 'WHAT DO YOU THINK ABOUT TRADE DRESS?'
7            THE COURT:  WELL, THAT'S WHAT SHE SAYS THEY DID.
8            MR. NOLAN:  THEY USED THAT TERM.
9            LET THEM EXPLAIN THAT, YOUR HONOR.  LET THEM EXPLAIN
10   IT IN THEIR SUBMISSIONS.                                        02:06
11           THE COURT:  I UNDERSTAND YOUR ARGUMENT, COUNSEL.
12           MR. NOLAN:  BUT I MAKE THIS ARGUMENT IN LIGHT OF THE
13   ENORMOUS PREJUDICE THAT'S NOW GOING TO OCCUR TO MGA, INCLUDING
14   THE DISQUALIFICATION OF THIS LAW FIRM --
15           THE COURT:  I'M MINDFUL OF ALL OF THAT.                  02:06
16           MR. NOLAN:  AND BECAUSE THE SHADOW TRAFFIC FRAMEWORK
17   IS ONE I'M WORKING WITH IN TERMS OF THE --
18           THE COURT:  SO IS THE COURT.
19           MR. NOLAN:  I UNDERSTAND THAT, YOUR HONOR.
20           BUT I WOULD BE REMISS IF I SAID I DON'T BELIEVE THE      02:07
21   SHADOW TRAFFIC FRAMEWORK IS THE APPROPRIATE FRAMEWORK.  AND
22   EXDS, TO THE EXTENT THAT IT'S UNPUBLISHED, I APOLOGIZE.  THAT'S
23   NOT WHAT WE'RE REALLY RELYING ON.  OUR KEY RELIANCE HERE IS ON
24   THOSE LINE OF CASES THAT COME OUT OF THE STATE OF CALIFORNIA.
25   I THINK YOU REFERRED TO SOME OF THEM ALREADY.  ONE IS THE --     02:07
```

```
 1   NO, YOU HAVEN'T -- IS THE NALIAN TRUCK LINES CASE, AND OTHER
 2   CASES THAT FOLLOW SUIT FROM THAT, WHERE THERE YOU HAVE
 3   EXECUTIVES WHO ARE CLEARLY IDENTIFIED AS CRITICAL PARTS OF THE
 4   TEAM, NO ISSUE ABOUT IT, AND THEY BECOME FACTUAL WITNESSES AND
 5   SUPPORT ALL OF THAT INFORMATION AND GIVE IT TO COUNSEL.          02:07
 6            AND, YOUR HONOR, I RESPECTFULLY SUBMIT THAT
 7   MS. TOMIYAMA IS A LOT CLOSER TO MR. HARRISON IN THE NALIAN
 8   TRUCKING -- MUCH CLOSER TO THAT SITUATION THAN THE EXPERT FROM
 9   DELOITTE IN THE SHADOW TRAFFIC CASE, BECAUSE IN SHADOW TRAFFIC
10   AND IN RE: COMPLEX ASBESTOS LITIGATION, THE ONLY POTENTIAL      02:08
11   SOURCE OF KNOWLEDGE IN THAT RELATIONSHIP WAS PRIVILEGED
12   COMMUNICATION, UNEQUIVOCALLY.  YOU HAD DELOITTE.  EVERYBODY
13   KNOWS THAT WHEN YOU'RE MEETING WITH AN EXPERT, IT'S
14   CONFIDENTIAL.
15            IN RE: COMPLEX ASBESTOS LITIGATION, IT'S THE          02:08
16   PARALEGAL SWITCHING SIDES.  HERE, YOU HAVE A FACE PAINTER, WHO
17   99 PERCENT OF THE TIME, IS DEALING WITH FACE PAINTS.  SO,
18   FACTUALLY, I THINK THAT RELATIONSHIP, OR THE CONTEXT OF THAT
19   RELATIONSHIP, REALLY PUTS YOU, RESPECTFULLY, AS WE ARGUE, MORE
20   IN THE ANALYSIS THAT WE'VE ALLEGED HERE.  THE FRAMEWORK SHOULD  02:09
21   BE UNDER THE NALIAN TRUCKING CASES, BECAUSE HERE'S WHAT ALL OF
22   THE COURTS TRY OUT FOR -- AND SHADOW TRAFFIC IS THE SAME WAY:
23   THERE'S GOT TO BE A BRIGHT LINE FOR ATTORNEYS TO KNOW.  BECAUSE
24   IN CALIFORNIA, YOU CAN CONTACT SOMEONE WHO IS A FORMER
25   EMPLOYEE.  RESPECTFULLY, IF WE'RE ALL OFF THIS CASE, THEN I     02:09
```

```
 1   THINK THAT IT CHILLS ANY POSSIBILITY THAT A LAWYER WOULD EVER

 2   CONTACT -- IT COULD -- A FORMER EMPLOYEE FOR FEAR THAT

 3   SUBCONSCIOUSLY, SUBCONSCIOUSLY, YOUR HONOR, THAT PERSON MIGHT,

 4   IN THE RECESSES OF THEIR MIND, NOT REMEMBER PRIVILEGED

 5   COMMUNICATIONS.

 6        SO THE PROTECTION, I WOULD SUBMIT, FOR LAWYERS FACED

 7   WITH THAT WOULD BE, 'ALL RIGHT, LET'S SEE IF MS. TOMIYAMA IS ON

 8   A PRIVILEGE LOG; WHEN LISTED AS A WITNESS, DO WE GET A PHONE

 9   CALL SIMILAR TO THE ONE I GOT ABOUT THE FONT SIZE?'

10        RADIO SILENCE FOR 54 DAYS.                              02:10

11        WHY DOES THE DEPOSITION EVEN GO FORWARD IN THIS CASE

12   OF MS. TOMIYAMA?  AS FAR AS I UNDERSTAND THE REPRESENTATIONS

13   THAT HAVE BEEN MADE TO YOU IN-CAMERA, THERE IS NO REASON TO GO

14   FORWARD WITH THE DEPOSITION, CANDIDLY, EXCEPT TO MAKE

15   CERTAIN -- AND MAYBE AS A POISON PILL -- TO ASK MS. TOMIYAMA    02:10

16   CERTAIN QUESTIONS THAT ARE DESIGNED TO IMPREGNATE KEN PLEVAN

17   SITTING AT A DEPOSITION, WHO IS CLUELESS RIGHT NOW THAT THERE'S

18   ANY CONTENTION THAT THERE'S ANY PRIVILEGED INFORMATION.

19        WHERE'S THE BRIGHT LINE THAT WARNS LAWYERS IN THESE

20   KINDS OF SITUATIONS, YOUR HONOR?                             02:11

21        AND THAT'S WHY I RESPECTFULLY UNDERSTAND SHADOW

22   TRAFFIC.  AND I'VE READ IT CONSIDERABLY, BUT I DON'T THINK IT

23   APPLIES TO THESE CIRCUMSTANCES.  IT'S A FAIR APPLICATION.  BUT

24   I THINK THE BETTER LEGAL FRAMEWORK TO JUDGE THE CONDUCT OF

25   MS. TOMIYAMA AND FOR SKADDEN LAWYERS IS MORE ON THE NALIAN    02:11
```

1    TRUCKING CASES THAT ALLOW, UNDER PROFESSIONAL RULE 2-100,

2    EX-PARTE CONTACT WITH FORMER EMPLOYEES.

3         WE WERE TAKING THE TASK -- AND I KNOW THAT I'M NOT

4    GOING TO TURN THIS ONE FINDING ASIDE; AND THAT IS THAT THIS WAS

5    NOT STRATEGICALLY BROUGHT FOR TACTICAL REASONS.  BUT ONE THING,    02:11

6    YOUR HONOR, THAT I THOUGHT WAS RICH IN IRONY AND STEEPED IN

7    HYPOCRISY IS THAT IN THE REPLY BRIEF THAT'S FILED, I'M TAKEN TO

8    TASK FOR NOT DISTINGUISHING THE MMR CASE.  IT'S A CASE OUT OF

9    CONNECTICUT.  AND SO, NOT WAIVING ALL PRIVILEGES HERE, ALTHOUGH

10   MAYBE IT DOESN'T MATTER AFTER TODAY, LAST NIGHT, WORKING FOR      02:12

11   THE ARGUMENT, I FIND OUT THAT QUINN EMANUEL WAS FACED WITH A

12   DISQUALIFICATION MOTION IN NEW YORK, IN A CASE CALLED -- I

13   THINK IT WAS BOB SIEBERT V. INTUIT, THE PEOPLE THAT DO ALL OF

14   THE QUICKEN PAPERS AND STUFF LIKE THAT.  THE TRIAL COURT FOUND

15   THAT THEY HAD USED A FORMER EXECUTIVE WHO SWITCHED SIDES; AND     02:12

16   THEY GET DISQUALIFIED ON APPEAL, AND THE TRIAL COURT ACTUALLY

17   APPLIED MMR.

18        ON APPEAL, QUINN EMANUEL ARGUES TO THE STATE COURT OF

19   APPEALS FOR NEW YORK THAT MMR HAS ABSOLUTELY NO APPLICATION IN

20   NEW YORK; IT'S ONLY APPLIED TO CONNECTICUT.                       02:13

21        AND I WAS SITTING THERE LAST NIGHT JUST THINKING,

22   'THIS IS REALLY RICH, WHEN I THINK ABOUT THIS.'  AND THIS IS

23   THE STANDARD THAT WE'RE DEALING WITH.  ON THE ONE HAND, YOU'RE

24   BEING ASKED TO LOOK AT THIS IN A VERY, VERY SERIOUS FASHION;

25   AND THEY'RE ARGUING WITH YOU THAT MY STANDARDS AND MY CONDUCT     02:13

1    AND SKADDEN ARPS SHOULD BE CALLED INTO QUESTION BECAUSE WE

2    FAILED TO DISTINGUISH MMR, WHERE THEY ARGUED THEMSELVES THAT IT

3    SHOULD NOT BE APPLIED IN A NEW YORK ACTION.

4           NOW, MY GEOGRAPHY IS NOT THE BEST, BUT EVEN IF YOU

5    WERE DOING IT KIND OF, LIKE, GEOGRAPHICALLY, CONNECTICUT IS FAR      02:13

6    CLOSER TO NEW YORK THAN IT IS TO CALIFORNIA; BUT NEVERTHELESS,

7    I LEFT LAST NIGHT, WHEN I WENT HOME, THINKING TO MYSELF, 'THIS

8    IS PRETTY SERIOUS STUFF, WHAT THEY'RE ASKING HERE, THE

9    PREJUDICE THAT'S GOING TO BE APPLIED BY THE COURT IF THEY GET

10   THEIR RELIEF,' AND YET, THEY'RE CALLING ME TO TASK BECAUSE I        02:13

11   DON'T DISTINGUISH A CASE FROM CONNECTICUT OR I DON'T

12   DISTINGUISH THE RICHARD CASE OUT OF VIRGINIA, I THINK IT IS.

13   IN THAT CASE, THE PARTY THAT WAS BEING DISQUALIFIED HAD A

14   THOUSAND E-MAILS IN THEIR PRESENCE THAT WERE CLEARLY MARKED.

15          SO I COME BACK TO THE BASIC FRAMEWORK, YOUR HONOR.          02:14

16   I'VE MADE MY POINT ABOUT SHADOW TRAFFIC.  I THINK THAT

17   SHADOW TRAFFIC IS NOT THE RIGHT ANALYSIS.  I THINK IT'S NALIAN

18   TRUCKING, GIVEN THE CIRCUMSTANCES THAT WE HAVE HERE.

19          I THINK THAT EVEN IF YOU LOOK AT SHADOW TRAFFIC, ONE

20   REMEDY WOULD BE IF THE COURT FOUND THAT THE ONLY EVIDENCE THAT      02:14

21   WAS CONVEYED TO US OF ARGUABLY A PRIVILEGED NATURE -- LET'S SAY

22   IT'S THE WORK-PRODUCT PRIVILEGE OF THE -- IT'S THE FACE

23   MONTAGE.  LET'S ASSUME THAT THEY'RE RIGHT ON THAT POINT.  I

24   HAVE TO TELL YOU, AS A PRACTITIONER, I WOULD NEVER HAVE THOUGHT

25   THAT A DOCUMENT THAT WAS PREPARED -- OR A FACE PAINTING THAT        02:14

```
 1   WAS PREPARED BY AN EMPLOYEE WITH THE INTENT THAT IT WAS GOING

 2   TO BE SENT OVER.  AND ALL WE HAVE IS THEIR REPRESENTATION THAT

 3   MONTAGE WAS NOT SENT OVER.  MAYBE IN YOUR SUBMISSION, YOU HAVE

 4   CLEAR EVIDENCE THAT NONE OF THE FACES WERE EVER SENT OVER.  IN

 5   OUR MEET AND CONFER, YOUR HONOR, THAT WAS ONE OF THE QUESTIONS.    02:15

 6   WE ACTUALLY NEVER GOT AN ANSWER TO THAT.  BUT I THINK THE

 7   EVIDENCE IS UNCONTROVERTED THAT WHEN SHE DOES IT, SHE BELIEVES

 8   IT'S GOING TO BE SENT OVER TO SIMBA.  AND I THINK UNDER THE IN

 9   RE:  SYNCOR ERISA LITIGATION, I DON'T THINK THAT CONSTITUTES

10   WORK PRODUCT.                                                      02:15

11          LET ME MOVE OVER, IF I CAN, BECAUSE I'VE TAKEN UP A

12   LOT OF TIME, AND I APOLOGIZE FOR THAT.  NOW LET ME GO TO THE

13   ANALYSIS WITH RESPECT TO SKADDEN ARPS, IF I MIGHT.

14          THE COURT:  YOU MAY.

15          MR. NOLAN:  IT'S UNDISPUTED THAT MOTIONS TO              02:15

16   DISQUALIFY ARE LEFT TO THE BROAD DISCRETION OF THE COURT, IN

17   TERMS OF FASHIONING WHAT RELIEF IS APPROPRIATE.  IT IS NOT

18   MEANT TO BE PUNITIVE.  SOME COURTS TALK ABOUT IT BEING

19   PROPHYLACTIC GOING FORWARD TO ENSURE THE INTEGRITY OF THE

20   PROCESS AND THE CONTAMINATION.                                     02:16

21          WE KNOW TODAY THE EXTENT OF THE ALLEGED

22   CONTAMINATION, FROM THE DEPOSITION AND FROM THE EXPERT REPORT,

23   JUST ASSUMING FOR A MOMENT THAT THEY DO CONTAIN INFORMATION.

24   IF IT DOES, ONE REMEDY THAT THE COURT HAS ALREADY INDICATED

25   LEANING TO DO IS TO TAKE MS. TOMIYAMA AWAY AS AN EXPERT.           02:16
```

1    THAT'S A POWERFUL, POWERFUL RULING.  IT'S, FRANKLY,

2    BREATHTAKING, IN A SENSE THAT IN AN AREA WHERE MATTEL TOOK

3    ABSOLUTELY NO STEPS TO IDENTIFY HER AS A CONSULTANT, NEVER

4    HIRED HER AS AN EXPERT, NEVER LISTED HER ON A PRIVILEGE LOG;

5    SOMEONE WHO IS NOT AN EXECUTIVE, NOT IN THE OLD ANALYSIS UNDER    02:17

6    UPJOHN AS TO CONTROL GROUP; NEVER MEETING WITH, AS FAR AS WE

7    CAN TELL, OTHER PEOPLE INVOLVED IN THE CASE, LIKE DAMAGE PEOPLE

8    ON OTHER LITIGATION.

9         IN A SITUATION WHERE SHE'S ASKED TO MAKE A COMPARISON

10   BETWEEN A 2-D DRAWING AND A 3-D OBJECT -- IT'S NOT DISPUTED;    02:17

11   SHE NEVER DID IT AT MATTEL -- IS SIMPLY BREATHTAKING TO ME.  IN

12   AN AREA SO FAR DOWN THE ROAD, SIX WEEKS AWAY FROM TRIAL, I

13   WOULD SAY TO THIS COURT, AND I WILL SAY TO A REVIEWING COURT,

14   THAT THE 'GOTCHA' WORKED BY MATTEL.  MATTEL WAS IN A BETTER

15   POSITION TO PREVENT THIS FROM HAPPENING, FRANKLY, THAN WE WERE,    02:18

16   YOUR HONOR.  BY SIMPLY HAVING IDENTIFIED HER, THEY COULD HAVE

17   RETAINED HER.  IF SHE WAS THAT IMPORTANT, THEY COULD HAVE

18   RETAINED HER; THEY COULD HAVE DISCLOSED HER AS A CONSULTANT;

19   THEY COULD HAVE CALLED US IN JANUARY.

20        BUT NOW LET'S MOVE OVER AND ASSUME THAT IS THE REMEDY    02:18

21   THAT'S BEING OFFERED.

22        THE CONTAMINATION.  KEN PLEVAN, MICHELLE CAMPAGNA

23   WORKED WITH HER.  I, FOR INSTANCE, HAD A PASSING EXCHANGE OF

24   GREETINGS WITH HER; IDENTIFIED MYSELF AS THE TRIAL LAWYER AND

25   MOVED ON TO A DIFFERENT SUBJECT.  NOT INVOLVED IN THE    02:19

```
 1   PREPARATION OF THE CASE.  AND THAT PART OF IT, MR. PLEVAN AND
 2   MS. CAMPAGNA DID ALL OF THAT.  THE MINUTE WE KNOW THAT THERE'S
 3   AN ISSUE, MUCH LIKE WHAT WE DO UNDER THE PROTECTIVE ORDER, YOUR
 4   HONOR, WHEN A DOCUMENT COMES OVER -- AND, IN FACT, YOUR HONOR,
 5   SOME OF THE DOCUMENTS THAT HAVE BEEN CLAWED BACK IN THIS CASE     02:19
 6   HAVE BEEN IN POSSESSION OF THE OTHER SIDE FOR SEVERAL MONTHS.
 7   BUT THE PROTECTIVE ORDER UNDERSTANDS THAT STUFF HAPPENS IN
 8   THESE KINDS OF CASES, AND SO THE MINUTE YOU REALIZE THAT IT'S
 9   PRIVILEGED, YOU FOUGHT BACK.
10        IT HAPPENED DURING THE DEPOSITION, I BELIEVE, OF           02:19
11   MARGARET LEAHY, OR ONE OF THE WITNESSES.  IN THE MIDDLE OF THE
12   DEPOSITION, MR. ZELLER WENT TO USE A PRIVILEGED DOCUMENT -- AND
13   I FORGET WHICH -- WAS IT MARGARET LEAHY OR VERONICA -- AND WE
14   SAID, 'WAIT A MINUTE.  THIS IS PRIVILEGED.'  YOU KNOW, THEY'VE
15   HAD IT FOR A LONG TIME, BUT WE DIDN'T MOVE TO DISQUALIFY IT.     02:19
16   WE JUST SAID, 'IT'S PRIVILEGED.  TURN IT OVER.'
17        IN THIS TYPE OF LITIGATION, THAT'S WHAT'S HAPPENED IN
18   THIS CASE, AND THAT'S HOW, I WOULD RESPECTFULLY SUBMIT,
19   YOUR HONOR, RELIEF COULD BE FASHIONED HERE.
20        I WOULD HATE TO THINK -- WELL, LET ME, FIRST OF ALL,       02:20
21   DEAL WITH CRAIG HOLDEN.
22        YOUR HONOR, THERE IS ABSOLUTELY NO EVIDENCE OF
23   MR. HOLDEN BEING SUBJECT TO ANY OF THIS; THE DRAFTING OF THE
24   EXPERT REPORT OR ANYTHING ELSE LIKE THAT.  THIS IS A
25   PRELIMINARY MEETING, JUST TO KIND OF INTRODUCE YOURSELF EARLY    02:20
```

```
 1   ON WITH O'MELVENY.  I WASN'T THERE, BUT MY UNDERSTANDING IS
 2   THAT MR. HOLDEN IS JUST IN A MEET-AND-GREET SITUATION, AND
 3   THEY'RE KIND OF JUST INTERVIEWING AS TO WHAT THE FACTUAL
 4   BACKGROUND OF HER EMPLOYMENT IS.  THERE'S NO EVIDENCE THAT ANY
 5   CONFIDENTIAL INFORMATION WAS EXPOSED DURING THAT MEETING.        02:20

 6          AND BECAUSE OF THE AEO DESIGNATIONS OF MOST OF THIS
 7   STUFF ANYWAY, MR. HOLDEN DOESN'T REALLY GET INVOLVED IN THE
 8   CASE FROM A FACTUAL POINT OF VIEW, EXCEPT TO THE EXTENT THAT
 9   IT'S ALL PUBLIC; YOU KNOW, WHEN IT GETS PUBLIC, THEN MR. HOLDEN
10   CAN REACT TO IT.                                                02:21

11          FOLLOWING ALONG IN THE SHADOW TRAFFIC ANALOGY, THERE
12   ARE MANY QUESTIONS ASKED OF THE LATHAM LAWYER, BOTH AT THE
13   TRIAL COURT AND AGAIN AT THE COURT OF APPEAL, ABOUT WHETHER OR
14   NOT THERE WAS SOMETHING THAT COULD BE FASHIONED LESS IN TERMS
15   OF A REMEDY, RECOGNIZING THE INCREDIBLE PREJUDICE THAT COULD     02:21
16   OCCUR HERE.

17          YOUR HONOR, I WANT TO ADDRESS THIS:
18          MY FIRST INSTINCT WOULD SAY, 'WELL, GEE, THROW KEN
19   AND MICHELLE UNDER THE BUS.'  I'M NOT ASKING YOUR HONOR THAT IT
20   HAS TO BE ALL OR NOTHING.  WHAT I AM ASKING THE COURT, IN YOUR   02:21
21   DISCRETION, IS TO WEIGH THE CONDUCT OF THE LAWYERS; THE
22   RATHER -- IT'S NOT GOING TO BE THE RIGHT TERM, BUT THE RATHER
23   INSIGNIFICANT ISSUE OF FACE PAINTING THAT PLAYS IN THIS CASE,
24   YOU KNOW, IN TERMS OF IN THE GRAND SCHEME OF THINGS, THIS IS
25   LIKE CARTER BRYANT SWITCHING SIDES AND THEN BEING AN EXPERT      02:22
```

1    AGAINST MGA.  THIS IS A SITUATION WHERE THE ISSUE IS VERY

2    DISCRETE ON THE NUMBER OF WITNESSES -- I KNOW WE HAVE 28

3    WITNESSES -- AND THE NUMBER OF ISSUES THAT WILL DECIDE THIS

4    CASE.  MS. TOMIYAMA'S ROLE HERE, ALTHOUGH WE BELIEVE SHE WOULD

5    BE ENORMOUSLY POWERFUL IN FRONT OF A JURY, ENORMOUSLY POWERFUL,    02:22

6    WHICH IS WHY MATTEL DOESN'T WANT HER TO TESTIFY, FRANKLY, YOUR

7    HONOR.  IF THEY WERE REALLY CONCERNED -- I MEAN, I'LL JUST GO

8    TO MY GRAVE BELIEVING IT, AND I HAVE SAY IT, I HAVE TO SAY IT,

9    GIVEN THE STAKES.  IF THEY REALLY BELIEVED --

10             **THE COURT:**  WHICH IS IT, COUNSEL?  IS SHE A POWERFUL    02:22

11   WITNESS, OR IS SHE A WITNESS ON AN INSIGNIFICANT DISCRETE

12   TOPIC?

13             **MR. NOLAN:**  ON THAT DISCRETE TOPIC, SHE'S EFFECTIVE.

14             **THE COURT:**  OKAY.

15             **MR. NOLAN:**  BUT YOU KNOW WHAT SHE'S ALSO EFFECTIVE    02:23

16   IN?  SHE'S A FORMER MATTEL EMPLOYEE.

17             **THE COURT:**  SHE'S NOT THE ONLY FORMER MATTEL EMPLOYEE

18   INVOLVED IN THIS CASE.

19             **MR. NOLAN:**  NO.  BUT SHE'S THE ONLY ONE THAT WOULD BE

20   TESTIFYING AGAINST MATTEL IN THIS CASE.  HENCE, THE REASON WHY    02:23

21   WE BELIEVE THERE'S A STRATEGIC REASON BROUGHT AND WHY I THINK

22   THE COURT -- AND I RESPECTFULLY ASK THE COURT TO REALLY TAKE

23   INTO CONSIDERATION -- I KNOW YOU PROBABLY HAVE ALREADY, BUT

24   JUST TO TAKE ONE MORE LOOK AT ALL OF THE VARYING INTERESTS THAT

25   ARE BEING REPRESENTED HERE.  AND I DON'T HAVE THE SUBMISSIONS,    02:23

```
 1   BUT I WILL ALWAYS WONDER, 'IF SHE WAS THAT INTEGRAL, WHY DIDN'T

 2   YOU CALL HER OUT, WHY DIDN'T YOU PICK UP THE PHONE, WHY DIDN'T

 3   YOU SEND ME AN E-MAIL WHEN YOU FIRST SAW HER NAME OR WHEN YOU

 4   FIRST SAW THE EXPERT REPORT, IF IT WAS THAT CLEAR, IF THE RED

 5   FLAGS WENT OUT?'                                                    02:23

 6          AND YOU KNOW WHAT?  ASSUME, JUDGE, THAT WE WERE

 7   ASLEEP AT THE SWITCH.  WITH 28 EXPERTS AND GOING OUT THERE, IT

 8   JUST DIDN'T REGISTER.  GIVEN WHERE WE'RE AT RIGHT NOW, WHY NOT

 9   THEN REACH OUT?

10          BUT IN ANY EVENT, YOUR HONOR --                             02:24

11      THE COURT:  COUNSEL, I THINK IT'S AN APPROPRIATE TIME

12   TO SUM UP.

13      MR. NOLAN:  YES.

14          WITH RESPECT TO SKADDEN ARPS, I TRULY BELIEVE AND

15   RESPECTFULLY SUBMIT, YOUR HONOR, THAT IN WEIGHING THE REMEDIES     02:24

16   HERE THAT ARE AVAILABLE TO THE COURT, A WHOLESALE

17   DISQUALIFICATION OF SKADDEN ARPS IN A CASE OF THIS SIZE, SO

18   SHORTLY BEFORE TRIAL, WOULD NOT ONLY BE A TREMENDOUS COST AND A

19   PREJUDICE TO THE COURT, FOR WHICH I AM DEEPLY APOLOGETIC THAT

20   IT EVER OCCURRED, BUT THE PREJUDICE TO MGA AND ITS RIGHT TO        02:24

21   HAVE ITS COUNSEL OF ITS CHOICE; I WOULD ASK THAT THE COURT TAKE

22   THAT INTO CONSIDERATION AND BELIEVE THAT THE SUBMISSIONS AND

23   THE COMMENTS MADE BY MR. PLEVAN AND THE OTHER SUBMISSIONS AND

24   ARGUMENTS THAT WE'VE MADE, THAT IF SHADOW TRAFFIC DOES APPLY

25   AND IT'S THE APPROPRIATE ANALYSIS, THAT THE REBUTTAL FOR           02:24
```

1    PRESUMPTION HAS BEEN MET.

2            AND MOREOVER, YOUR HONOR, I WOULD CITE TO THE -- I

3    DON'T KNOW HOW TO PRONOUNCE IT -- IT'S THE BAUGH CASE, WHICH

4    SAYS THAT ONLY WHERE THERE'S GOING TO BE A CONTINUING EFFECT ON

5    THE LITIGATION SHOULD THIS COURT EXERCISE THE KIND OF                02:25

6    DISCRETION THAT I THINK YOU WERE INDICATING WITH RESPECT TO

7    MS. TOMIYAMA.

8            IF MS. TOMIYAMA IS NOT AVAILABLE AS A WITNESS AND WE

9    DON'T WORK WITH HER AND SHE'S NOT INVOLVED IN ANYTHING, THERE

10   IS NO RISK FOR ANY FURTHER CONTAMINATION, YOUR HONOR.             02:25

11           **THE COURT:**  THANK YOU, YOUR HONOR.

12           **MR. NOLAN:**  THE CLAW BACK IS STILL IN EFFECT AT

13   SKADDEN.  IT'S BEEN VERY LIMITED.  AND I'M SORRY THAT I TOOK SO

14   LONG.

15           **THE COURT:**  IT'S QUITE ALL RIGHT.  I UNDERSTAND.        02:25

16           DOES COUNSEL FOR CARTER BRYANT WISH TO SAY ANYTHING

17   OR ADD ANYTHING TO MR. NOLAN'S PROPOSITION?

18           **MS. ANDERSON:**  NO, YOUR HONOR.

19           I JUST WANT TO MAKE A CLARIFICATION IN CASE IT DIDN'T

20   BECOME APPARENT IN THE RECORD.                                     02:25

21           THERE HAD BEEN AN ARGUMENT MADE IN MATTEL'S OPENING

22   PAPERS THAT BY CARTER BRYANT'S VOLUNTARILY DESTROYING ANY

23   COPIES IT HAD OF MS. TOMIYAMA'S REPORT, THAT WE WERE SOMEHOW

24   AGREEING WITH MATTEL THAT WE THOUGHT DISQUALIFICATION WAS

25   APPROPRIATE.  THAT WAS NOT THE REASON WE DID IT.  WE JUST DID      02:26

```
 1    IT IN AN ABUNDANCE OF CAUTION.

 2           THE COURT:  VERY GOOD.

 3           MS. ANDERSON:  I JUST WANTED TO MAKE THAT CLEAR.

 4           THANK YOU, YOUR HONOR.

 5           THE COURT:  THANK YOU, COUNSEL.                    02:26

 6           COUNSEL FOR MATTEL, MR. QUINN?

 7           MR. QUINN:  THANK YOU, YOUR HONOR.

 8           YOUR HONOR, I SUBMIT ON THE RECORD THAT EXISTS.

 9    THERE REALLY IS NOT ANY QUESTION THAT MS. TOMIYAMA HAD ACCESS

10    TO CONFIDENTIAL PRIVILEGED AND WORK-PRODUCT INFORMATION AT    02:26

11    MATTEL.  THE COURT HAS THE IN-CAMERA DECLARATIONS WHICH DISCUSS

12    THAT.

13           MR. NOLAN HAS RAISED A NUMBER OF ISSUES TO TRY TO

14    SUGGEST THAT WHAT'S IN THERE MAYBE, PERHAPS, SHOULD NOT BE

15    TAKEN AT FACE VALUE.  I WANT TO ADDRESS EACH OF THOSE THINGS.  02:26

16           BUT IF WE GO BACK TO HER DEPOSITION TESTIMONY,

17    YOUR HONOR, THE COURT WAS ABSOLUTELY RIGHT; THAT WHEN

18    MR. ZELLER ULTIMATELY ASKED HER, 'CAN YOU DENY THAT YOU

19    DISCUSSED THE CARTER BRYANT COMPLAINT?  CAN YOU DENY THAT YOU

20    DISCUSSED THE MGA COMPLAINT?'  IN EACH INSTANCE, SHE SAID SHE  02:27

21    WOULD NOT DENY IT.  AND THE PASSAGE FOLLOWING A PASSAGE THAT

22    WAS PLAYED TO THE COURT, THERE'S A PASSAGE AT PAGE 257, LINE

23    22, TO LINE 7.  SHE SAYS THAT SHE COULD NOT DENY THAT SHE

24    DISCUSSED THE MGA COMPLAINT BEYOND JUST DISCUSSING THE FLOWERY

25    LANGUAGE.                                                     02:27
```

```
 1            YOUR HONOR, THERE'S A SENTENCE OR TWO, BUT I THINK IT

 2   HAS SOME RELEVANCE HERE, IN THE SHADOW TRAFFIC DECISION ABOUT

 3   THOSE TYPES OF DENIALS, OR 'I DON'T RECALL,' ARE 'PREGNANT WITH

 4   AN ADMISSION, ARE PREGNANT WITH AN ADMISSION,' THE COURT OF

 5   APPEALS SAID, IN THE DISQUALIFICATION CONTEXT.                        02:27

 6            I THINK JUST SETTING ASIDE THE IN-CAMERA

 7   DECLARATIONS, WE HAVE TO SORT OF BE A LITTLE PRACTICAL AND

 8   COMMONSENSICAL HERE.  HERE IS SOMEONE WHO, EVERYONE AGREES BY

 9   THEIR OWN ACCOUNT, ONCE A MONTH, FOR A TWO-YEAR PERIOD, AT

10   LEAST, CONSULTED WITH MATTEL'S LAWYERS.  SHE ADMITS IN HER          02:28

11   REPORT THAT THEY BROUGHT HER THE MGA COMPLAINT.  SHE ADMITS

12   THAT AT PAGE 3 OF HER REPORT, THAT SHE WAS SHOWN IT.

13            DOES IT SEEM PLAUSIBLE THAT AN IN-HOUSE LAWYER AND A

14   PARTNER IN AN OUTSIDE FIRM WHO HAD USED THIS PERSON TO CONSULT

15   ON LEGAL MATTERS MET WITH HER AND SHOWED HER THE COMPLAINT         02:28

16   MERELY TO COMMENT ON THE FLOWERY LANGUAGE?

17            YOUR HONOR, I THINK THE ANSWER SPEAKS FOR ITSELF.

18            THERE REALLY CANNOT BE ANY QUESTION THAT THIS WOMAN

19   WAS INTIMATELY FAMILIAR WITH IMPORTANT CONFIDENTIAL AND

20   PRIVILEGED INFORMATION.                                             02:28

21            NOW, THE ISSUES THAT MR. NOLAN RAISES SUGGEST THAT

22   MAYBE THERE'S SOME REASON TO DOUBT THAT.  AND ONE THING HE

23   POINTS TO IS, WHY AREN'T THESE COMMUNICATIONS WITH HER ON A

24   PRIVILEGE LOG?

25            THE ANSWER TO THAT IS, SHE SAYS IN HER REPORT THAT        02:29
```

```
 1   SHE BEGAN DOING THIS WORK FOR THE LAW DEPARTMENT EVERY MONTH IN

 2   MID 2004.  THAT'S AT PAGE 2.  THAT'S AFTER THE LAWSUIT IS

 3   FILED.

 4           THE PARTIES IN THIS CASE HAVE AN AGREEMENT THAT

 5   COMMUNICATIONS AFTER THE LAWSUIT WAS FILED DO NOT HAVE TO BE       02:29

 6   LOGGED.  THAT'S THE ANSWER TO THAT.

 7           THERE WAS ONE OTHER COMMUNICATION THAT WAS FROM 2000;

 8   AND AS MR. NOLAN POINTS OUT, IT WAS RECENTLY ADDED TO A

 9   PRIVILEGE LOG.  WE CONTESTED THAT.  WE DIDN'T THINK THAT WAS

10   WITHIN THE SCOPE OF A REQUEST, WHATEVER WAS AT ISSUE THERE.  WE    02:29

11   LOST ON THAT.  WE WERE ORDERED TO PROVIDE A SUPPLEMENTAL

12   PRIVILEGE LOG, AND THAT'S WHY THAT ONE IS THERE.  THAT'S FROM

13   2000; THAT'S FROM OUTSIDE THE PERIOD AFTER THE LAWSUIT HAS BEEN

14   FILED.

15           MR. NOLAN RAISES A QUESTION ABOUT, 'OKAY, IF SHE WAS       02:30

16   SUCH AN INTEGRAL PART OF THE LEGAL TEAM' -- BY THE WAY, I

17   SUBMIT, YOUR HONOR, THAT'S NOT THE TEST, WHETHER SHE WAS A

18   LEGAL PART OF THE TEAM.

19           THE COURT:  I UNDERSTAND.

20           MR. QUINN:  BUT THE SUGGESTION WAS, IF SHE WAS SO          02:30

21   IMPORTANT, WHY WASN'T SOMETHING MEMORIALIZED IN OUR SEPARATION

22   AGREEMENT THAT SHE WOULD COOPERATE AND MAKE HERSELF AVAILABLE

23   TO RESPOND TO CLAIMS?

24           YOUR HONOR, THAT'S AT PAGE 7 OF THE SEPARATION

25   AGREEMENT.  THAT IS CLEARLY THERE.  SHE WAS LEGALLY OBLIGATED      02:30
```

```
 1   TO DO THAT.  AND THAT'S PART OF THAT SAME PARAGRAPH, WHERE SHE

 2   UNDERTOOK, IN PERPETUITY, TO GIVE NOTICE IF AN ADVERSE PARTY

 3   CONTACTED HER.

 4        THE COURT:  ADDRESS MR. NOLAN'S COMMENTS -- THE THIRD

 5   WAS THAT -- IN JANUARY, YOU'RE NOTIFIED THAT SHE'S A WITNESS.      02:30

 6        MR. QUINN:  YES; IT'S AN ANSWER TO AN INTERROGATORY.

 7        THE COURT:  AND THERE'S AN ARGUMENT THAT CERTAINLY

 8   RED FLAGS SHOULD HAVE GONE UP ON ONE SIDE.  BUT SHOULDN'T THAT

 9   HAVE GOTTEN YOUR ATTENTION?

10        MR. QUINN:  THERE'S AN ANSWER TO INTERROGATORY                02:31

11   LISTING A LOT OF PERSONS WITH KNOWLEDGE.  THAT INCLUDED

12   BOB NORMILE, THE GENERAL COUNSEL, THEY INCLUDED IN THAT LIST;

13   JUST LOTS AND LOTS OF FOLKS; A LOT OF PEOPLE WHO WE WOULDN'T

14   HAVE ANY REASON TO THINK THAT THEY HAD RETAINED AND WERE PAYING

15   AS A PAID EXPERT.                                                  02:31

16        AND I SUBMIT THAT MAKES A DIFFERENCE, YOUR HONOR,

17   WHETHER SOMEBODY IS RETAINED AND THEN HAS AN INCENTIVE TO TELL

18   EVERYTHING THAT YOU KNOW.

19        WE JUST HAVE A LIST IN THE ANSWER TO INTERROGATORY,

20   AND HER NAME IS AMONG MANY OTHERS.  AND YOU KNOW WHAT?            02:31

21   FRANKLY, SHE IS A PERCIPIENT WITNESS.  THAT WOULDN'T TIP US OFF

22   THAT THEY'RE ACTUALLY CONSULTING HER AND PAYING HER TO GIVE

23   LEGAL OPINIONS AND TO DO ANALYSES ABOUT INFRINGEMENT.  SHE IS A

24   PERCIPIENT WITNESS.  THERE'S NOTHING THERE THAT WOULD HAVE

25   TIPPED US OFF.                                                     02:31
```

1      **THE COURT:** THEY WOULD SAY THAT THEY'RE NOT PAYING

2  HER TO DO ANALYSIS ABOUT INFRINGEMENT, BUT RATHER, JUST TO DO

3  FACE PAINTING ANALYSIS.

4      **MR. QUINN:** WELL, I THINK THE REPORT SAYS WHAT IT

5  SAYS; HER TESTIMONY IS WHAT HER TESTIMONY IS.  AND I WANT TO                  02:32

6  GET INTO THAT AND TALK A LITTLE BIT ABOUT WHAT EXACTLY SHE SAYS

7  SHE'S DOING AND WHAT HER ROLE IS AND WHAT HER OPINIONS ARE,

8  BECAUSE I THINK THEY'RE SOMETHING QUITE DIFFERENT.

9      BUT IT WASN'T UNTIL WE GOT THROUGH THE ACTUAL EXPERT

10  REPORT THAT WE WERE ON NOTICE THAT THIS IS SOMEBODY WHO THEY          02:32

11  ACTUALLY HAD RETAINED TO GIVE OPINIONS IN THIS CASE.

12      WITHIN TWO DAYS, TWO DAYS OF THAT, YOUR HONOR, WE

13  SERVED HER WITH A SUBPOENA.  AND I'M NOT SURE WHETHER WE ARE

14  BEING FAULTED FOR TAKING HER DEPOSITION BEFORE MOVING TO

15  DISQUALIFY --                                                                 02:32

16      **THE COURT:** YES, YOU ARE.

17      **MR. QUINN:** YOUR HONOR, IF WE HAD IMMEDIATELY MOVED

18  TO DISQUALIFY, I SUSPECT WE MIGHT HAVE HEARD, 'WELL, THEY

19  HAVEN'T EVEN TAKEN HER DEPOSITION YET; IT'S PREMATURE.'

20      WE TOOK IT SERIOUSLY.  WHEN WE SAW THAT EXPERT               02:32

21  REPORT, DID WE THINK THAT THERE WAS A PROBLEM?  ABSOLUTELY WE

22  DID.  BUT I THINK WE DID THE PRUDENT THING, AND WE MOVED

23  QUICKLY.  WE DIDN'T SIT ON IT.  WE MOVED QUICKLY TO TAKE HER

24  DEPOSITION.

25      AT THE END OF THAT DEPOSITION, IF YOU LOOK AT THE END         02:33

1   OF IT, MR. ZELLER TELLS MR. PLEVAN, 'DO NOT CIRCULATE THIS

2   TRANSCRIPT.'  HE SAYS IT ON THE RECORD.  'THIS CONTAINS

3   PRIVILEGED INFORMATION.'  AND WE IMMEDIATELY PUT THEM ON

4   NOTICE.

5           I GUESS MY OTHER REACTION TO THAT, YOUR HONOR, IS,   02:33

6   WHAT DIFFERENCE DOES IT MAKE?  THE PROBLEM HERE WITH RETAINING

7   THIS PERSON AND DOING THE WORK THAT THEY DID WITH THIS PERSON

8   AND COMMUNICATING WITH HER, WAS THAT THEY HAD ACCESS TO,

9   PRESUMPTIVELY -- AND I SUBMIT, AND AS I'LL DISCUSS -- THEY

10  ACTUALLY DID RECEIVE CONFIDENTIAL PRIVILEGED INFORMATION.  THAT   02:33

11  WAS DONE.  THAT'S IN THE PAST.  AN EX-PARTE MOTION, A

12  PROTECTIVE ORDER, WHATEVER, WOULD NOT HAVE UNWOUND THAT.  THAT

13  HAD ALREADY HAPPENED.

14          **THE COURT:**  WHY DON'T YOU GET TO THAT, BECAUSE THAT'S

15  WHAT I'D LIKE TO HEAR MOST, IS WHAT YOU FEEL YOU CAN ELABORATE   02:34

16  ON AT THIS TIME IN TERMS OF THE DAMAGE, FROM YOUR PERSPECTIVE,

17  THAT HAS BEEN DONE.

18          **MR. QUINN:**  YES, YOUR HONOR.

19          AND THE THEME HERE IS, USING AS A CREDENTIAL, THE

20  FACT THAT SHE WORKED WITH THE MATTEL LAWYERS; USING IT AS A   02:34

21  CREDENTIAL.  I THINK THAT PHRASE THAT WE'VE HEARD SEVERAL TIMES

22  IS REALLY VERY REVEALING.

23          WHAT DOES SHE SAY IN HER REPORT AT PAGE 11,

24  YOUR HONOR?

25          AND THIS IS AFTER SHE'S RELATED HOW SHE'S CONSULTED   02:34

1    FOR THE MATTEL LEGAL DEPARTMENT.  SHE'S BEEN ASKED TO DO

2    THINGS; SHE'S BEEN ASKED TO MAKE DETERMINATIONS AND GIVE ADVICE

3    CONCERNING FEEDBACK.  SHE SAYS -- AND I THINK THIS IS KIND OF

4    CURIOUS -- 'NO ONE EVER ASKED ME TO COMPARE A TWO-DIMENSIONAL

5    IMAGE TO A THREE-DIMENSIONAL IMAGE.'                        02:34

6         WHY IS THAT IN THERE?

7         BY THE WAY, HER TESTIMONY IS THAT THE FOLKS AT

8    SKADDEN ARPS TOLD HER THE POINTS TO COVER IN HER REPORT.  SO I

9    THINK IT'S A FAIR QUESTION TO ASK OURSELVES, WHY IS SHE GOING

10   OUT OF THE WAY TO MAKE THIS CURIOUS STATEMENT THAT 'NO ONE AT   02:35

11   MATTEL EVER ASKED ME TO MAKE THAT COMPARISON, 2-D TO 3-D'?

12        BUT WHO ARE WE TALKING ABOUT HERE?  WE'RE TALKING

13   ABOUT MR. ZELLER AND MR. MOORE.

14        WHY DOES THAT MATTER?  BECAUSE THE DEFENSE THAT'S

15   MATERIALIZED IN THIS CASE SINCE THIS WOMAN GOT INVOLVED IS THAT  02:35

16   EVEN IF WE OWN THE TWO-DIMENSIONAL DRAWINGS, WE DON'T OWN THE

17   THREE-DIMENSIONAL BRATZ IMAGE; THAT IT'S IMPOSSIBLE TO MAKE

18   THAT KIND OF COMPARISON; IT'S NONSENSICAL; IT DOESN'T MATTER.

19        SKADDEN, MGA IS TRYING TO BUILD A FIRE WALL RIGHT

20   THERE.  THAT'S WHY THAT'S THERE; SO THEY CAN SAY, 'IT DIDN'T    02:35

21   EVEN MATTER TO MR. ZELLER AND MR. MOORE AND MATTEL.  THAT'S NOT

22   HOW THEY MAKE INFRINGEMENT DETERMINATIONS.  IT NEVER WOULD HAVE

23   OCCURRED TO THEM.  IT NEVER DID OCCUR TO THEM.  THEY ASKED ME

24   TO DO THIS TYPE OF INFRINGEMENT ANALYSIS, AND THEY NEVER ASKED

25   ME TO COMPARE TWO-DIMENSIONAL TO THREE-DIMENSIONAL.'          02:36

```
 1          WHAT'S THE IMPLICIT MESSAGE?  'THEY MUST NOT THINK
 2   THAT'S A WORTHWHILE, USEFUL, PLAUSIBLE DETERMINATION.'
 3          AND, INDEED, THAT'S HER OPINION THAT SHE GIVES.
 4          SO WHAT DO WE HAVE?  WE HAVE WITNESSES LIKE
 5   MARGARET LEAHY, REPRESENTED BY MR. PLEVAN AT DEPOSITION.       02:36
 6          WHO'S MARGARET LEAHY?  SHE'S THE PERSON WHO SCULPTS
 7   THE FIRST THREE-DIMENSIONAL BRATZ, ACTING UNDER BRYANT'S
 8   INSTRUCTIONS WHILE HE'S STILL EMPLOYED AT MATTEL.  HER
 9   TESTIMONY IS -- AND SHE SORT OF BLURTS IT OUT; IT'S NOT IN
10   RESPONSE TO A QUESTION, YOUR HONOR -- THAT 'IT WOULD MAKE NO   02:36
11   SENSE TO DO A COMPARISON OF A TWO-DIMENSIONAL IMAGE TO A
12   THREE-DIMENSIONAL SCULPT.  THAT MAKES NO SENSE AT ALL.'
13          VERONICA MARLOW, ALSO A KEY WITNESS, PAID BY
14   CARTER BRYANT OVER $1 MILLION; SHE BROUGHT THE TWO TOGETHER;
15   ALSO GIVES THE SAME OPINION; ALSO REPRESENTED BY MR. PLEVAN.   02:37
16          MR. PLEVAN HAS REPRESENTED OR DEPOSED OVER TEN
17   WITNESSES IN THIS CASE.
18          THIS IS JUST ONE POINT.  BUT THIS IS A KEY, KEY
19   ISSUE, YOUR HONOR.  THIS GOES TO THE HEART OF THE CASE HERE,
20   WHEN YOU GET BEYOND THE OWNERSHIP ISSUES.                     02:37
21          WHAT ELSE?  WHAT'S THE EVIDENCE?
22          I THINK MR. NOLAN IS IN AGREEMENT THAT IF
23   SHADOW TRAFFIC APPLIES, WE'RE ENTITLED TO THE BENEFIT OF A
24   PRESUMPTION.  BUT WHAT I'M SAYING, YOUR HONOR, IS, WE'RE WELL
25   PAST THAT.  WE HAVE THAT.                                     02:37
```

```
 1          WE ALSO HAVE EXHIBIT A ITSELF, THE VARIOUS WORKUP --
 2   BY THE WAY, THOSE ARE MY SCENE DRAWINGS; THOSE ARE DRAWINGS OF
 3   MY SCENE HEADS -- THEY ASSERT THE LEGAL PROPOSITION, IF
 4   SOMETHING IS CREATED WITH THE INTENTION OF PROVIDING IT TO A
 5   THIRD PARTY, THEN IT'S NOT PRIVILEGED.  I AGREE WITH THAT,        02:38
 6   YOUR HONOR; BUT THERE IS SIMPLY NO EVIDENCE THAT THAT'S WHY
 7   THAT WAS PREPARED.
 8          THE WITNESS SAID SHE THOUGHT THAT'S WHY IT WAS
 9   PREPARED.  SHE ALSO SAID SHE THOUGHT IT WAS GIVEN TO SIMBA.  IN
10   FACT, SHE WAS MISTAKEN.  SHE DIDN'T HAVE ANY FOUNDATION FOR      02:38
11   THAT OPINION.  THE UNDISPUTED EVIDENCE BEFORE THE COURT IS,
12   THAT WAS NEVER GIVEN TO A THIRD PARTY; AND YOU WOULDN'T, WITH
13   THE NAMES THERE OF THE INDIVIDUAL DESIGNERS WHO COME UP WITH
14   THOSE.
15          WHY IS THAT IMPORTANT?                                     02:38
16          THOSE ARE MY SCENE BARBIE HEADS.  THOSE ARE SHOWING
17   MATTEL'S OWN OPINIONS ABOUT WHAT FEATURES ARE PROTECTABLE AND
18   WHAT FEATURES ARE NOT PROTECTABLE.  THAT GOES TO THE HEART OF
19   BOTH PHASE TWO AND PHASE ONE IN THIS CASE.  BECAUSE WHAT ARE
20   THEY SAYING?  THEY'RE SAYING THAT THOSE TWO-DIMENSIONAL BRATZ    02:38
21   DRAWINGS ARE GENERIC; THEY'RE STOCK; THAT THE TWO-DIMENSIONAL
22   DRAWING BEARS NO RESEMBLANCE TO THE FIRST-WAVE BRATZ TOY AND
23   THAT THOSE ARE ALL STOCK FIGURES THAT CARTER BRYANT DREW AND
24   NONE OF THAT IS PROTECTABLE.
25          WELL, HERE THEY'VE GOT SOME EVIDENCE, THANKS TO THIS      02:39
```

1    WITNESS, ABOUT WHAT MATTEL THOUGHT WAS PROTECTABLE AND NOT

2    PROTECTABLE, WHAT IS STOCK, WHAT IS GENERIC, WHAT IS SCENE

3    AFFAIR.  THERE REALLY CAN BE NO QUESTION THAT IS A PRIVILEGED

4    DOCUMENT.

5            THE ANALYSIS REGARDING KNOCK-OFFS, PAGE 9 OF HER          02:39

6    REPORT, IMPLICIT IN THAT -- AND THEY WANT TO SAY SHE APPLIED

7    HER OWN METHODOLOGY IN DETERMINING AN INFRINGEMENT, OR

8    TRADE DRESS INFRINGEMENT, OR WHATEVER.  YOUR HONOR, THAT

9    SUGGESTS THAT THERE IS A SCIENCE OR ANALYSIS OR A SKILL,

10   SOMETHING OUTSIDE THE LEGAL REALM, A WAY OF THINKING, A        02:40

11   METHODOLOGY, REGARDING INFRINGEMENT THAT IS DETACHED FROM LEGAL

12   CONSIDERATIONS; THAT SHE HAD HER OWN METHOD OF DETERMINING

13   INFRINGEMENT THAT HAS NOTHING TO DO WITH THE LAW, HAS NOTHING

14   TO DO WITH LEGAL ADVICE OR DIRECTION THAT SHE WAS GIVEN.

15           IT MAKES NO SENSE ON THE FACE OF IT.                    02:40

16       **THE COURT:**  I CAN CERTAINLY SEE WITHIN A BUSINESS, AN

17   ARTISTIC COMMUNITY, IN ANY ARTISTIC COMMUNITY, CERTAINLY THE

18   NOTION OF SOMEONE COPYING SOMEBODY ELSE'S WORK.  THERE MAY VERY

19   WELL BE A FREESTANDING UNDERSTANDING OF WHAT IS A COPY AND WHAT

20   IS NOT.                                                        02:40

21           I DO RECOGNIZE THAT IN THIS EXPERT REPORT, THERE IS

22   REFERENCE TO DIRECTION IN THAT REGARD BEING TAKEN FROM THE

23   LAWYERS; AND I THINK THAT IS SIGNIFICANT.  SO I WOULDN'T FULLY

24   AGREE WITH YOUR ASSERTION.

25       **MR. QUINN:**  RIGHT.

1          **THE COURT:**  BUT I DO THINK THAT IN THIS CASE, THERE'S

2   EVIDENTIARY SUPPORT, EVEN NOT CONSIDERING WHAT IS SUBMITTED

3   IN-CAMERA FOR THE MOTION.

4          **MR. QUINN:**  WELL, WE CAN HYPOTHESIZE.  OKAY,

5   YOUR HONOR, I TAKE THE POINT; THAT LAY PERSONS OUT THERE          02:41

6   WORKING IN THE FIELD MAY HAVE SOME WORKING UNDERSTANDING OF

7   WHAT THEY THINK, FROM THEIR PROFESSIONAL STANDPOINT, LAY

8   PERSON'S STANDPOINT, CONSTITUTES COPYING.

9          BUT AS THE COURT POINTS OUT, THAT'S NOT WHAT SHE SAYS

10  IN HER REPORT.  SHE SAYS THAT MATTEL'S PRODUCT LEGAL GROUP --     02:41

11  I'M QUOTING NOW FROM PAGE 2 -- "BROUGHT ME DOLLS FROM OTHER

12  MANUFACTURERS AND ASKED IF I BELIEVED THEY INFRINGED ON

13  MATTEL'S TRADE DRESS, THE TERMS THAT MATTEL'S LAWYERS USE."

14         THIS IS SOMETHING VERY DIFFERENT.  SHE IS BEING

15  CONSULTED ON THESE VERY ISSUES.  AND IMPLICIT IN THAT IS, WHAT    02:41

16  IS PROTECTABLE AND WHAT ISN'T PROTECTABLE?  YOU DON'T HAVE TO

17  GO VERY FAR TO GET DOWN TO WHAT'S PROTECTABLE IN

18  CARTER BRYANT'S BRATZ DRAWINGS, WHICH MGA SAYS ARE ALL STOCK

19  AND UNPROTECTABLE.  BUT WHAT'S PROTECTABLE IN THE BARBIE

20  MY SCENE HEADS, WHICH THEY SPEND SIX PAGES IN THEIR COMPLAINT     02:42

21  SAYING THAT OUR FACE PAINTERS, OVER A PERIOD OF TIME, MADE

22  CLOSER AND CLOSER TO THEIRS.

23         **THE COURT:**  COUNSEL, I TEND TO AGREE WITH YOU.

24         YOU CAN ASSIST THE COURT IN FOCUSING ON REMEDIES.

25         **MR. QUINN:**  ALL RIGHT.

1        IN APPROACHING REMEDIES, YOUR HONOR, I THINK WE HAVE

2    TO APPROACH IT WITH A RECOGNITION THAT THESE ARE NOT SORT OF

3    COMPARTMENTALIZED, DISCRETE, OR PERIPHERAL ISSUES.  WE'RE

4    TALKING ABOUT COPYRIGHT AND INTELLECTUAL PROPERTY CLAIMS WHICH

5    GO TO THE HEART OF THAT PART OF THE CASE.                         02:43

6        NOW, THERE'S A WHOLE OTHER PART OF THE CASE THAT

7    RELATES TO CONTRACT ISSUES, YOUR HONOR.  HOW DO YOU CONSTRUE

8    THAT CONTRACT?  THEY RAISE ISSUES ABOUT THE ENFORCEABILITY OF

9    THE CONTRACT.  THE COURT HAS SEEN SOME OF THOSE ISSUES TEED UP

10   IN THE SUMMARY JUDGMENT MOTION.                                  02:43

11       **THE COURT:**  YES.

12       **MR. QUINN:**  BUT THE REST OF IT, WE'RE TALKING ABOUT

13   COPYRIGHT.  WE'RE TALKING ABOUT WHAT'S IN THE PUBLIC DOMAIN;

14   WHAT'S PROTECTABLE AND WHAT ISN'T PROTECTABLE.

15       WE'RE TALKING ABOUT ISSUES SUCH AS WHETHER YOU CAN         02:43

16   LOOK AT A TWO-DIMENSIONAL IMAGE AND MAKE JUDGMENTS ABOUT

17   WHETHER A THIRD-DIMENSIONAL IMAGE IS INFRINGING; PRECISELY THE

18   INFORMATION WHICH SHE SAID NOBODY IN MATTEL'S LEGAL DEPARTMENT

19   EVER ASKED HER TO DO; THAT VERY CURIOUS STATEMENT IN HER

20   OPINION.                                                        02:44

21       AT ONE POINT, MR. NOLAN SAYS THIS INVOLVES THE

22   INSIGNIFICANT ISSUES OF FACE PAINTING.

23       IT'S WELL BEYOND THAT, YOUR HONOR.  IT'S WHAT'S

24   PROTECTABLE, WHAT'S NOT, IN THE APPEARANCE OF A DOLL.

25       AND BY THE WAY, THEIR COMPLAINT AGAINST MATTEL IS SIX    02:44

1    PAGES WORTH OF FACE PAINTING ABOUT HOW JUST THE IMAGE, THE

2    FACIAL IMAGE OF THE DOLL, CHANGED OVER TIME TO LOOK, ACCORDING

3    TO THEM, MORE AND MORE LIKE BRATZ.

4         SO I THINK THESE ARE IMPORTANT ISSUES.  THEY'RE

5    CENTRAL ISSUES.  THEY'RE NOT PERIPHERAL ISSUES.                    02:44

6         AND I HAVE TO SAY, YOUR HONOR, THAT IN A SITUATION

7    LIKE THIS, WHERE LAWYERS HAVE HAD ACCESS TO OR EXPOSURE TO

8    PRIVILEGED INFORMATION CONCERNING THE SUBJECT IN SUIT, WE HAVE

9    NOT BEEN ABLE TO FIND ANY AUTHORITY AT ALL FOR THE IDEA THAT A

10   WALL CAN BE BUILT OR THAT LAWYERS CAN BE CORDONED OFF.             02:45

11        IN CALIFORNIA LAW, WE HAVE BEEN ABLE TO FIND NO

12   AUTHORITY FOR THAT, FOR THE EFFECTIVENESS IN THAT CIRCUMSTANCE

13   OF AN ETHICAL WALL.  AND I WOULD CITE THE COURT TO -- I'VE GOT

14   SEVERAL CASES -- HITACHI V. TATUNG, 419 F. SUPP. 2D 1158;

15   LARGO CONCRETE, NORTHERN DISTRICT OF CALIFORNIA, 2008, WEST        02:45

16   LAW, 53128; HENDRICKSON V. GREAT AMERICAN SAVINGS & LOAN,

17   11 CAL. APP. 4TH, 109.

18        LET ME GO BACK TO THE FIRST ONE.

19        IN HITACHI, THE COURT SAYS -- AND I QUOTE --

20   "ESTABLISHED RULE," CLOSED QUOTE, IN CALIFORNIA MANDATES THAT      02:45

21   IF AN INDIVIDUAL ATTORNEY IS DISQUALIFIED, THE DISQUALIFICATION

22   IS IMPUTED TO THE ENTIRE FIRM, QUOTE, "REGARDLESS OF EFFORTS TO

23   ERECT AN ETHICAL WALL," CLOSED QUOTE.

24        IN THE LARGO CONCRETE CASE, 2008 CASE FROM THE

25   NORTHERN DISTRICT OF CALIFORNIA, THE COURT SAID, "PLAINTIFFS DO    02:46

1    NOT CITE ANY CASE DECIDED SINCE HITACHI THAT CASTS DOUBT ON

2    THIS HOLDING.  TO THE CONTRARY, SINCE THE COURT'S OPINION,"

3    REFERRING TO THE HITACHI COURT, "THE CALIFORNIA SUPREME COURT

4    HAS AGAIN REJECTED AN ETHICAL WALL."

5         THE CALIFORNIA SUPREME COURT CASE THAT THE DISTRICT      02:46

6    COURT WAS REFERRING TO IS CITY OF SAN FRANCISCO V. COBRA

7    SOLUTIONS, CALIFORNIA SUPREME COURT CASE; IT DEALS WITH A CITY

8    ATTORNEY, SO THERE'S DIFFERENT CONSIDERATIONS.  BUT THE

9    CALIFORNIA SUPREME COURT AGAIN REITERATED THAT ETHICAL WALLS IN

10   CALIFORNIA SIMPLY DON'T WORK.  THERE ARE OTHER JURISDICTIONS    02:46

11   WHERE ETHICAL WALLS HAVE BEEN EXPLICITLY RECOGNIZED, BUT NOT IN

12   CALIFORNIA.

13        AND RECENTLY, IN A NORTHERN DISTRICT CASE, ACHTER V.

14   WEYERHAEUSER, THE NORTHERN DISTRICT OF CALIFORNIA SAID THAT

15   EVEN THOUGH THERE ARE SOME JURISDICTIONS IN THE COUNTRY WHICH   02:47

16   RECOGNIZE THE EFFECTIVENESS OF ETHICAL WALLS; NOT IN

17   CALIFORNIA.  SO CALIFORNIA LAW DOESN'T RECOGNIZE THEM.  SO WE,

18   THE DISTRICT COURT SITTING IN CALIFORNIA, COULD NOT RECOGNIZE

19   THE EFFECTIVENESS OF AN ETHICAL WALL.

20        OF COURSE, IN THE SHADOW TRAFFIC CASE, THE ENTIRE         02:47

21   FIRM OF LATHAM & WATKINS WAS DISQUALIFIED.

22        I THINK IT'S HARD FOR US TO IMAGINE HOW WE MIGHT

23   EFFECTIVELY TRY TO CABIN OR CORDON OFF THE LAWYERS ON THE

24   SKADDEN TEAM.

25        WOULD IT BE EVERYONE WHO READ THE REPORT?  WOULD THAT     02:47

APRIL 7TH, 2008                    BRYANT V. MATTEL

1    INCLUDE MR. NOLAN?

2         WELL, HE SAID HE READ A DRAFT; HE SAID HE HASN'T READ

3    THE FINAL ONE; THAT A DRAFT MAY HAVE CROSSED HIS DESK.

4         WHERE DO WE DRAW THAT LINE?

5         HOW ABOUT EVERYONE WHO MR. PLEVAN OR MS. CAMPAGNA          02:48

6    COMMUNICATED WITH OR REPORTED ON THE NATURE OF THEIR

7    CONVERSATIONS WITH THIS WITNESS?  WOULD THEY BE EXCLUDED OR

8    NOT?  HOW WOULD WE EVER KNOW --

9         **THE COURT:**  LET ME TRY TO ANSWER SOME OF THESE

10   QUESTIONS, ASSUMING THAT THEY'RE MORE THAN RHETORICAL, AND GET   02:48

11   YOUR RESPONSE TO THEM.

12        THE REPORT ITSELF HAS, IN THE COURT'S VIEW, BASED ON

13   MY PRELIMINARY FINDINGS, INFORMATION OR CONCLUSIONS THAT

14   INESCAPABLY, I THINK, ARE PREDICATED UPON ATTORNEY WORK

15   PRODUCT.  HOWEVER, PROVIDED THAT THE COURT EXCLUDES THIS         02:48

16   REPORT, EXCLUDES THE WITNESS, DISQUALIFIES THE EXPERT, IT IS

17   NOT CLEAR THAT SIMPLY HAVING READ THIS REPORT, PROVIDED THAT IT

18   COULD NOT BE USED IN ANY WAY, WOULD REALLY EMPOWER OPPOSING

19   COUNSEL WITH INFORMATION THAT WOULD BE TO YOUR DETRIMENT.

20        WHAT IS TO YOUR DETRIMENT, PERHAPS, IS CERTAINLY THE        02:49

21   INFORMATION THAT MS. TOMIYAMA RECEIVED FROM MR. MOORE, FROM

22   MR. ZELLER, FROM OTHER INDIVIDUALS.  BUT I HAVE COUNSELS'

23   REPRESENTATIONS, DECLARED UNDER PENALTY OF PERJURY, THAT THEY

24   HAVE NOT RECEIVED ANY INFORMATION THAT THEY WOULD CONSIDER TO

25   BE ATTORNEY-CLIENT PRIVILEGE.                                   02:49

```
 1            AND I UNDERSTAND THAT PUTS YOU IN A VERY AWKWARD
 2    POSITION.
 3            MR. QUINN:  ONE SHORT ANSWER TO THE LAST PART OF IT
 4    IS, HOW WOULD THEY KNOW?  THEY DIDN'T THINK EXHIBIT A WAS
 5    PRIVILEGED.  BUT I THINK THE REAL ANSWER TO THAT, YOUR HONOR,   02:49
 6    IS -- YOU SAY IT'S NOT CLEAR TO ME THERE WOULD BE ANY PREJUDICE
 7    TO MATTEL.
 8            I DON'T THINK THAT'S THE RIGHT -- THAT'S NOT THE
 9    QUESTION.  BECAUSE IN THIS COURTROOM, WHAT SHOULD BE CLEAR TO
10    MATTEL IS THAT THERE'S A LEVEL PLAYING FIELD.  AND THERE'S A    02:49
11    TAINT.  THERE'S A TAINT IN THIS PROCEEDING NOW.  WE DIDN'T PUT
12    IT THERE.  AND THE COURTS HAVE TALKED ABOUT IT IN EXACTLY THESE
13    TERMS, SAYING THAT SUSPICION, THAT MATTEL, LIKE ANY OTHER
14    LITIGANT, AND THE PUBLIC, AND EVERYBODY WHO RELIES ON THE
15    SYSTEM, ARE ENTITLED TO EXPECT THAT THOSE DOUBTS, THOSE NAGGING  02:50
16    DOUBTS, ABOUT WHETHER THERE WAS SOMETHING OUT THERE, WHETHER
17    THIS DIDN'T SHAPE PEOPLE'S FEELINGS AND THEIR THEORIES, HOW
18    THEY APPROACH THE EVIDENCE -- AS THE SHADOW TRAFFIC COURT SAID,
19    WE SHOULDN'T HAVE TO WORRY ABOUT THAT.
20            THERE'S SOME LANGUAGE IN THE MMR WALLACE CASE,          02:50
21    YOUR HONOR, QUOTING AN EARLIER DECISION, A TWA DECISION,
22    WILLIAMS V. TWA.  I'D LIKE TO READ IT TO THE COURT, BECAUSE IT
23    HAS SOME APPLICATION HERE, I THINK.  AND THIS IS FROM 764
24    F. SUPP. 712.
25            IT SAYS, "A REASONABLE MEMBER OF THE PUBLIC OR OF THE   02:50
```

```
 1   BAR WOULD SHARE WITH TWA" -- READ MATTEL -- "THE NAGGING
 2   SUSPICION THAT PLAINTIFF'S TRIAL PREPARATION" -- IN THIS CASE,
 3   DEFENDANTS -- "AND PRESENTATION OF THEIR CASE HAD BENEFITTED
 4   FROM CONFIDENTIAL INFORMATION OBTAINED FROM" -- AND THEN IT
 5   NAMES THE WITNESS.  "ALL FURTHER PROCEEDINGS IN THIS CASE,      02:51
 6   INCLUDING ANY TRIAL, WOULD BE TAINTED BY THIS REASONABLE
 7   SUSPICION."
 8            I THINK THERE'S A REASONABLE SUSPICION HERE.
 9            WHAT ARE WE TALKING ABOUT?
10            WE'RE TALKING ABOUT A PERSON WHO THEY KNEW --        02:51
11   APPARENTLY, SHE TOLD THEM UP FRONT -- MET WITH MATTEL'S LAWYERS
12   EVERY MONTH FOR TWO YEARS, AND THEY TOLD HER -- MATTEL'S
13   LAWYERS HAD SHOWN HER THE MGA COMPLAINT.
14            NOW WE HAVE A DISPUTE ABOUT WHETHER IT WAS A
15   DISCUSSION OF FLOWERY LANGUAGE OR THE SUBSTANCE.               02:51
16            YOUR HONOR, AT THAT POINT, BELLS AND WHISTLES SHOULD
17   HAVE BEEN GOING OFF.
18            THE ANSWER TO MR. NOLAN'S QUERY, 'IS ANYBODY SAFE
19   ANYMORE, IF THEY CAN BE DISQUALIFIED HERE,' I'D SAY, YEAH, IT'S
20   VERY IMPORTANT THAT THERE BE A RULE THAT YOU ACT AT YOUR PERIL  02:52
21   IF YOU'RE DEALING WITH A WITNESS WHO TELLS YOU THAT THEY HAVE
22   CONSULTED ON -- IF YOU'RE LITIGATING AN INTELLECTUAL PROPERTY
23   CASE AND THEY TELL YOU THEY'VE CONSULTED WITH MATTEL'S LAWYERS,
24   INSIDE AND OUTSIDE, EVERY MONTH FOR TWO YEARS, ON INTELLECTUAL
25   PROPERTY ISSUES, AND THAT, INDEED, THEY'VE BEEN SHOWN A         02:52
```

1    COMPLAINT IN THE CASE.

2         THIS ISN'T HARD.  AT THIS POINT, THIS IS -- YOU KNOW,

3    IF YOU PROCEED AT THAT POINT, YOU'RE ACTING AT YOUR PERIL.  AND

4    YES, I'M PERFECTLY AND TOTALLY AWARE OF THE COSTS TO THE SYSTEM

5    AND TO EVERYBODY INVOLVED IN THIS PROCEEDING ABOUT THE          02:52

6    DIRECTION WHERE I'M SUGGESTING THAT WE HAVE TO GO HERE.  AFTER

7    ALL, I REPRESENT THE PLAINTIFF, WE'VE GOT A TRIAL DATE, AND WE

8    WOULD LIKE NOT TO LOSE THAT TRIAL DATE.

9         BUT MY CLIENT IS ENTITLED NOT TO HAVE THIS NAGGING

10   SUSPICION THAT SOMEHOW THEIR THEORIES, THEIR APPROACH, WERE     02:53

11   SHAPED, AND THAT WHATEVER KIND OF BARRIERS THE COURT ATTEMPTS

12   TO CONSTRUCT, WON'T CAPTURE IT ALL, WON'T CAPTURE IT ALL.

13        THERE'S NO OTHER WAY TO MAKE THAT SUSPICION OF TAINT

14   GO AWAY.  AND I SUBMIT THAT SUSPICION OF TAINT IN THIS PROCESS

15   MUST GO AWAY IF THE PLAYING FIELD IN THIS COURTROOM IS GOING TO 02:53

16   BE FAIR AND LEVEL AND PROCEEDS.

17        **THE COURT:**  THANK YOU, COUNSEL.

18        **MR. NOLAN:**  MAY I VERY BRIEFLY?

19        **THE COURT:**  VERY BRIEFLY, COUNSEL.

20        **MR. NOLAN:**  YOUR HONOR, JUST TO ADDRESS SOME FACTUAL    02:53

21   REPRESENTATIONS THAT MR. QUINN MADE THAT ARE INCORRECT.

22        FIRST OF ALL, MR. PLEVAN DOES NOT REPRESENT, NOR DOES

23   SKADDEN ARPS, MARGARET LEAHY OR VERONICA MARLOW.  THAT WAS

24   ALLEGEDLY A SIGNIFICANT PART, BECAUSE AT THOSE DEPOSITIONS,

25   THERE'S A DISCUSSION ABOUT 2-D VERSUS 3-D.                      02:54

```
 1              YOUR HONOR, IN TRUTH, SAM CHARE, A 30(B)(6) WITNESS

 2    FOR MGA, ACTUALLY TESTIFIED, BEFORE MS. TOMIYAMA WAS IDENTIFIED

 3    AND RETAINED AND CONSULTED WITH, THAT IT'S DIFFICULT TO COMPARE

 4    2-D DRAWINGS TO 3-D.  THAT WAS MR. CHARE'S ORIGINAL TESTIMONY,

 5    30(B)(6), NOT INFLUENCED BY MS. TOMIYAMA.                          02:54

 6              I'D ALSO POINT OUT, YOUR HONOR, THAT IT'S CURIOUS

 7    THAT MR. QUINN ARGUES THAT CONTAMINATION APPLIES.  YOUR HONOR,

 8    THEIR OWN EXPERT -- THIS GOES BACK TO THE RECEIPT OF THE

 9    TOMIYAMA EXPERT REPORT AND THAT THEY KNEW IMMEDIATELY -- YOUR

10    HONOR, MR. GOMEZ, I BELIEVE IS HIS NAME, IS ONE OF THEIR          02:55

11    REBUTTAL EXPERTS.  MR. GOMEZ, IN A FOOTNOTE TO HIS OPINION, A

12    PROFESSOR AT SOUTHWESTERN LAW, CITES TO CHRISTINA TOMIYAMA'S

13    EXPERT REPORT.  THEIR OWN EXPERT CITES TO CHRISTINA TOMIYAMA.

14              WITH RESPECT TO THE REMEDY -- AND, YOUR HONOR, I

15    DON'T KNOW IF THAT'S IN THE RECORD, AND I WILL SUBMIT THAT TO     02:55

16    THE COURT.

17              YOUR HONOR, WITH RESPECT TO THE REMEDY, LET ME JUST

18    ADDRESS THIS:

19              I RESPECT MR. QUINN IMMENSELY; HE'S A VERY TALENTED

20    LAWYER.  FOR MR. QUINN TO SAY THAT THIS ISSUE OF WHETHER OR NOT   02:55

21    YOU CAN GO FROM A 2-D DRAWING TO A 3-DEGREE OBJECT IS THE SOLE

22    PURPOSE FOR HAVING MS. TOMIYAMA APPEAR AS AN EXPERT IN THIS

23    CASE.

24              THE COURT:  I DON'T THINK HE WAS SUGGESTING IT'S HIS

25    SOLE PURPOSE, COUNSEL.                                            02:56
```

1        **MR. NOLAN:**  ONE OF THE PURPOSES.  AND IT'S A CRITICAL

2    POINT.

3            YOUR HONOR, THAT'S WHAT THIS CASE IS ALL ABOUT.

4            I CAN EASILY BE PREVENTED, THROUGH A PROTECTIVE ORDER

5    AND A DIRECTIVE FROM THE COURT, THAT NOT ONLY DO WE NOT USE          02:56

6    MS. TOMIYAMA, NOR ARE WE ALLOWED TO TELL THE JURY, 'AND, OH, BY

7    THE WAY, MATTEL DOESN'T DO THIS ANALYSIS THEMSELVES WHEN

8    THEY'RE LOOKING AT ADDITIONAL CASES.'

9            THAT CAN EASILY BE A SITUATION WHERE A BRIGHT LINE

10   COULD BE DRAWN, WHERE THEY DON'T HAVE TO WORRY ABOUT THE TAINT.      02:56

11   BECAUSE THE EVIDENCE, YOUR HONOR, I BELIEVE, HERE, IS QUITE

12   CLEAR THAT THROUGH THE TESTIMONY OF MR. PLEVAN, AMPLIFIED OR

13   SUPPLEMENTED TODAY, ALTHOUGH HER EXPERT REPORT DISCLOSES

14   CONFERENCES WITH LAWYERS, WE DID NOT INQUIRE INTO THOSE.  EVEN

15   THOUGH SHE IDENTIFIES THAT SHE WORKED ON OTHER CASES, HER OWN        02:57

16   TESTIMONY -- AND IT'S NOT CONVERTED HERE -- NEVER GAVE THAT

17   INFORMATION TO US.

18           GOING FORWARD, IF THERE'S A RISK THAT COULD COME OUT,

19   I ACCEPT THE COURT'S RATIONALE IN SAYING, 'ALL RIGHT, IF SHE

20   DOESN'T REALLY KNOW THE DIFFERENCE, SHE MAY BLURT IT OUT --         02:57

21   BECAUSE THE RECORD OF EVIDENCE IN FRONT OF YOU IS THAT WE NEVER

22   ASKED FOR IT.  AND YOU NOW KNOW WHAT WAS PROVIDED TO US,

23   YOUR HONOR.

24           AND I SUBMIT THAT IN WEIGHING THE BALANCE HERE OF,

25   YOU KNOW, THE HEAVY COSTS TO THE SYSTEM AND TO THE PREJUDICE OF     02:57

1    MGA, THE REMEDY OF NOT ALLOWING US TO TAKE THE CONCLUSIONS THAT

2    ARE CONTAINED IN THE REPORT, NOT USING HER AS A WITNESS, PUTS

3    US IN A POSITION WHERE MATTEL DOES NOT HAVE TO FEAR TAINT,

4    ESPECIALLY IF I'M NOT ALLOWED TO ARGUE -- WHICH I WOULDN'T

5    ANYWAY; I WOULDN'T ARGUE THAT MATTEL DOESN'T MAKE THIS          02:58

6    COMPARISON.

7         SHE TESTIFIES, YOUR HONOR, IN HER REPORT THAT THE

8    REASON WHY SHE PUT IT IN THERE WAS MORE OR LESS TO WEAKEN HER

9    OWN ANALYSIS, SAYING THAT WHAT MGA WAS ASKING HER TO DO IS

10   SOMETHING SHE NEVER DID FOR MATTEL.                            02:58

11        I WOULD RESPECTFULLY SUBMIT, YOUR HONOR, AND I'LL END

12   ON THIS NOTE, THAT WEIGHING ALL OF THE WEIGHTY ISSUES THAT YOU

13   MUST IN THIS CASE, THAT TO THE EXTENT THAT MS. TOMIYAMA'S

14   REPORT CONTAINS LEGAL COMMUNICATIONS IN THE FORM OF

15   COMMUNICATIONS THAT SHE HAD WITH COUNSEL, BY NOT BEING ABLE TO  02:58

16   USE THAT REPORT, NOT BEING ABLE TO USE HER AS A WITNESS,

17   FORBIDDING US FROM MAKING ANY REFERENCE TO THE METHODOLOGY

18   EMPLOYED BY MATTEL IN OTHER CASES, COMPARING FACE PAINT TO FACE

19   PAINT ON INFRINGING PRODUCT, IS A SIGNIFICANT IMPEDIMENT TO OUR

20   PRESENTATION OF THE CASE.  IT ENSURES THE INTEGRITY OF THE      02:59

21   PROCESS GOING FORWARD.  AND I THINK IT PROPERLY PUTS INTO

22   BALANCE THE NEED FOR ASSURANCE THAT COUNSEL ARE TRYING A CASE

23   WITHOUT A BENEFIT.

24        FOR THE LIFE OF ME, AS I STAND BEFORE YOU, AS THE

25   TRIAL ATTORNEY IN THIS CASE THAT WILL BE PRESENTING THE MGA     02:59

```
 1   CASE, OTHER THAN POSSIBLY THE REFERENCE TO MATTEL NOT USING
 2   THIS OR MATTEL'S OWN EMPLOYEE LIKES OUR CASE BETTER,
 3   MS. TOMIYAMA DOES NOT CONTAMINATE THE REST OF THE PRESENTATION
 4   OR CONTAMINATE THE LEGAL ISSUES THAT ARE GOING TO BE
 5   CONFRONTING THIS JURY.  AND I WOULD RESPECTFULLY SUBMIT, AS          03:00
 6   POINTED OUT IN THE SHADOW TRAFFIC CASE, TO DISQUALIFY AN ENTIRE
 7   FIRM BASED ON THIS RECORD, WHICH, FRANKLY, YOUR HONOR, IS NOT
 8   THE SHADOW TRAFFIC RECORD -- I RESPECTFULLY SUBMIT THAT A
 9   COMPARISON OF MR. THOMPSON AT DELOITTE AND WHAT INFORMATION HE
10   PROVIDED AND THE MANNER IN WHICH LATHAM & WATKINS DEALT WITH         03:00
11   THAT ISSUE IS 180 DEGREES DIFFERENT THAN THE WAY WE'VE DEALT
12   WITH THIS ISSUE AND THE FACTS THAT HAVE BEEN PRESENTED TO YOUR
13   HONOR.
14            THE COURT:  THANK YOU, COUNSEL.
15            MR. NOLAN:  AND I'LL SUBMIT ON THAT.
16            AND THANK YOU VERY MUCH, AND YOUR STAFF, FOR YOUR
17   TIME.
18            THE COURT:  THE COURT WILL TAKE THE MOTION TO
19   DISQUALIFY UNDER SUBMISSION, ALTHOUGH I DO ANTICIPATE ISSUING A
20   RULING VERY SHORTLY, WITHIN THE NEXT DAY OR TWO.  BUT THIS IS A      03:01
21   MATTER OF GREAT SIGNIFICANCE TO ALL PARTIES, AND I DO WANT TO
22   THINK ABOUT IT A LITTLE BIT MORE BEFORE I MAKE A FINAL
23   DECISION.
24            I'D INDICATED THAT I WANTED TO TAKE UP BOTH EX-PARTE
25   APPLICATIONS.  I THINK I'M GOING TO DEFER ON THE SECOND ONE,         03:01
```

1    THE DEPOSITIONS, JUST FOR A FEW DAYS, AND MAYBE NOT ISSUE AN

2    OPINION ON THAT JUST YET.

3          I DO WANT TO ADDRESS THE EX-PARTE APPLICATION BROUGHT

4    BY MGA CONCERNING THE EXHIBIT LIST, JUST BECAUSE, AS YOU

5    PREPARE FOR TRIAL BETWEEN NOW AND THE END OF MAY, WE NEED TO          03:01

6    GET A HANDLE ON THIS.  I THINK SOME GUIDANCE FROM THE COURT ON

7    THIS WOULD BE HELPFUL AT THIS POINT.

8          AS I UNDERSTAND IT, MATTEL HAS INDICATED THAT THERE

9    ARE GOING TO BE 21,000 EXHIBITS IN THE TRIAL, IN PHASE ONE.

10   THAT'S TOO MANY.  I UNDERSTAND MGA HAS COME UP WITH THEIR OWN          03:02

11   LIST OF 10,000 EXHIBITS, OR AT LEAST, I GUESS -- I TAKE THAT

12   BACK.  IT'S NOT QUITE THAT MANY.  BUT MATTEL CHARACTERIZES THAT

13   AS SUCH, BECAUSE, FROM MATTEL'S VIEW, THERE ARE MULTIPLE

14   EXHIBITS IN WHAT HAS BEEN DESIGNATED AS EACH EXHIBIT NUMBER.

15         **MR. NOLAN:**  IN TERMS OF THE COMPARISONS BEING MADE,          03:02

16   THERE ARE 21,000; THEN IT GETS EXPANDED TO ABOUT 35,000, IF

17   THERE WAS A FAIR COMPARISON.

18         **THE COURT:**  IN ANY EVENT, THERE ARE TOO MANY EXHIBITS

19   THAT HAVE BEEN PUT ON THE EXHIBIT LIST.

20         I HAVE NEVER DONE THIS BEFORE IN A TRIAL, BUT I'M          03:02

21   GOING TO DO THIS IN THIS CASE, I THINK IN THE INTEREST OF

22   EFFICIENT CASE MANAGEMENT.  I'M GOING TO PLACE LIMITS ON BOTH

23   THE NUMBER OF EXHIBITS AS WELL AS THE NUMBER OF HOURS THAT EACH

24   SIDE IS GOING TO HAVE.  THE COURT IS, FOR THE FIRST TIME --

25   I'VE NEVER DONE THIS -- I'M GOING TO USE A CHESS CLOCK.  AND          03:03

```
 1    THIS IS FOR PHASE ONE.  I AM GOING TO LIMIT THE TOTAL NUMBER OF
 2    EXHIBITS FOR EACH SIDE TO 4,500 EXHIBITS.  AND THESE ARE 4,500
 3    SINGULAR EXHIBITS; THAT IS TO SAY THAT EACH EXHIBIT IS TO
 4    REFLECT A SINGULAR DOCUMENT OR A SINGULAR PICTURE OR A SINGULAR
 5    THING.  NOT A SERIES OF THINGS OR A SERIES OF DOCUMENTS OR A          03:03
 6    SERIES OF PICTURES, BUT A SINGULAR THING.  AND I WILL DECIDE,
 7    IN MY DISCRETION, WHAT IS A SINGULAR THING, IF THERE IS A
 8    DISAGREEMENT ABOUT IT.  BUT OF THE 21,000 OR 35,000 OR 10,000,
 9    OR WHATEVER IT IS, PICK YOUR BEST 4,500 EXHIBITS, AND LET'S
10    IDENTIFY THOSE FOR THE OTHER SIDE.                                    03:03
11         I'M ALSO GOING TO LIMIT EACH SIDE TO 66 HOURS OF
12    EXAMINATION.  WHEN YOU ARE DIRECTLY EXAMINING A WITNESS, THAT
13    WILL COUNT TO YOUR SIDE.  WHEN YOU ARE CROSS-EXAMINING,
14    CROSS-EXAMINATION COUNTS TO THE OTHER SIDE.
15         AGAIN, CHOOSE WISELY.  IT'S ENTIRELY UP TO YOU HOW              03:04
16    MANY WITNESSES YOU WANT TO PUT FORWARD AND HOW MUCH TIME YOU
17    WANT TO SPEND WITH THEM.  BUT 66 HOURS ON EACH SIDE.
18         YES, COUNSEL?
19         MR. QUINN:  IS THAT JUST EXAMINATION?  IT'S NOT
20    OPENING OR CLOSING?                                                   03:04
21         THE COURT:  THAT'S NOT OPENING; THAT'S NOT JURY
22    SELECTION; THAT'S NOT CLOSING ARGUMENT.  THAT'S 66 HOURS WORTH
23    OF EXAMINATION.  SO THAT WILL BE A TOTAL OF 132 HOURS OF
24    EXAMINATION.  I AM HOPING THAT WE CAN AVERAGE ABOUT SIX HOURS
25    OF EXAMINATION A DAY, OR AT LEAST THAT'S MY HOPE, WHICH MEANS       03:04
```

```
1   THAT WILL BE ABOUT 22 TRIAL DAYS; SO, THAT'S ROUGHLY -- WE HAVE
2   FOUR TRIAL DAYS A WEEK -- THAT'S FIVE, SIX WEEKS.  BECAUSE
3   THERE'S GOING TO BE SOME DAYS THAT UNDOUBTEDLY THE COURT IS
4   GOING TO HAVE TO TURN ITS ATTENTION TO OTHER MATTERS.  BUT I
5   NEED TO BE ABLE TO BASICALLY GET THIS TRIAL IN BETWEEN ITS          03:05
6   START DATE AND THE NINTH CIRCUIT CONFERENCE, BECAUSE THE COURT
7   IS GOING TO BE BACKING UP TRIALS AND THERE MAY BE CRIMINAL
8   MATTERS THAT COME ON.  WE JUST HAVE TO GET THROUGH THIS WITHIN
9   A REASONABLE PERIOD OF TIME.
10           I UNDERSTAND THIS IS A VERY IMPORTANT CASE TO BOTH          03:05
11  YOUR CLIENTS, AND I'M NOT TRYING TO DIMINISH THAT IMPORTANCE AT
12  ALL.  BUT WE ARE DECIDING A COPYRIGHT ISSUE, NOT THE MEANING OF
13  LIFE; SO LET'S KIND OF KEEP THAT IN MIND.  AND I THINK WE CAN
14  PROBABLY GET THROUGH WITH THAT NUMBER OF EXHIBITS AND THAT
15  NUMBER OF HOURS.  WITH THE ENORMOUS SUPPLY OF TALENT THAT WE        03:05
16  HAVE IN TERMS OF THE TRIAL ATTORNEYS FOR THIS CASE, I TRUST YOU
17  CAN MAKE YOUR POINT.  AND, FRANKLY, ANYTHING BEYOND THAT, I
18  DON'T KNOW HOW ANY TRIER OF FACT COULD MAINTAIN IN THEIR MIND
19  MORE THAN THAT MANY EXHIBITS OR THAT MUCH TRIAL TESTIMONY.
20           MR. ZELLER:  ONE ISSUE I WANTED TO RAISE, YOUR HONOR,      03:06
21  AND I PERFECTLY UNDERSTAND THE 4,500 SINGLE-EXHIBIT DIRECTIVE.
22           ONE AREA WHERE THE PARTIES ARE NOT IN PARITY IS THAT
23  WE HAVE TO PUT ON FINANCIAL INFORMATION FOR MGA.  THE COURT MAY
24  RECALL THAT WE HAVE ASKED FOR DOCUMENTS, SIMPLE DOCUMENTS, LIKE
25  TAX RETURNS, IN ORDER TO COMPILE THEIR FINANCIAL INFORMATION.       03:06
```

```
 1    WE WERE DENIED.

 2             THAT MEANS THAT WE HAVE BEEN FORCED TO RECREATE THE

 3    WHEEL.  THAT IS LITERALLY THOUSANDS OF PAGES OF DOCUMENTS.  SO

 4    ONE THING I AM CONCERNED ABOUT IS THAT THEN THEY'RE GOING TO

 5    BASICALLY ARGUE, 'WELL, YOU DIDN'T PUT THE FINANCIAL DATA THAT    03:06

 6    YOU NEED TO BASICALLY HAVE YOUR EXPERTS TESTIFY ON THE EXHIBIT

 7    LIST.'  AND THAT WOULD DISADVANTAGE US.  SO IT SOMEHOW HAS PUT

 8    US TO THIS HOBSON'S CHOICE; THAT IF WE USE UP OUR 4,500

 9    EXHIBITS ON FINANCIAL DATA, OBVIOUSLY THAT'S GOING TO TAKE AWAY

10    FROM THE EXHIBITS WE'LL HAVE ON THE MERITS, AND VICE VERSA.      03:06

11             BUT THERE ARE UNDOUBTEDLY, JUST THE FINANCIAL

12    DOCUMENTS ALONE, THAT WE NEED TO BASICALLY CONSTRUCT THE

13    REVENUES AND EVERYTHING ELSE THAT WE NEED TO PUT ON AS PART OF

14    OUR CASE, THAT'S GOING TO EXCEED 4,500 RIGHT THERE.  AND THAT'S

15    NOT OUR DOING.  WE TRIED TO SIMPLIFY THE MATTER.                 03:07

16             THE COURT:  I WOULD IMAGINE THAT MOST OF THE

17    FINANCIAL RECORDS, YOU'RE GOING TO HAVE FINANCIAL EXPERTS WHO

18    ARE GOING TO BE TESTIFYING THROUGH THEIR FINANCIAL REPORTS

19    CONCERNING THESE DOCUMENTS, AND I WOULD ALSO ANTICIPATE, GIVEN

20    A LIMIT ON THE HOURS ON BOTH SIDES, THAT THERE ARE GOING TO BE   03:07

21    STIPULATIONS FORTHCOMING IN TERMS OF THE SUPPORTING

22    DOCUMENTATION THAT GO INTO THOSE FINANCIAL REPORTS.

23             AND IF YOU'RE NOT RECEIVING THAT COOPERATION, I TRUST

24    YOU'LL BRING THAT TO THE COURT'S ATTENTION.  AND THAT MIGHT BE

25    SOMETHING WE CAN REVISIT AT THE PRETRIAL CONFERENCE.  BUT I      03:07
```

1   WOULD IMAGINE, WITH THE TYPE OF MUTUAL STIPULATION WITH RESPECT

2   TO THOSE KINDS OF ROUTINE FINANCIAL DOCUMENTS THAT I BELIEVE

3   YOU'RE REFERRING TO, THAT THIS IS NOT GOING TO BE AN ISSUE,

4   COUNSEL.

5          **MR. ZELLER:**  THAT'S PRECISELY WHAT I WAS HOPING,          03:07

6   YOUR HONOR.  I JUST DIDN'T WANT THERE TO BE SOME INCENTIVE ON

7   THE OTHER SIDE TO BASICALLY SAY, 'WELL, WE'RE NOW NOT GOING TO

8   STIPULATE TO THE FINANCIAL DOCUMENTS,' TO FORCE US TO USE THE

9   4,500.

10          I'M NOT CASTING DISPERSIONS ON ANYONE.  I JUST WANTED       03:08

11  TO AVOID THAT.

12          **THE COURT:**  AND THE COURT WILL NOT, EITHER.  SO I

13  TRUST THAT WILL BE SOMETHING RESOLVED.

14          BUT TO ENFORCE THIS, WHAT I'M GOING TO DO IS REQUIRE

15  BOTH SIDES, AT THE PRETRIAL CONFERENCE, TO HAVE A WITNESS LIST    03:08

16  FOR THE COURT THAT ALLOCATES THESE 66 HOURS, AS BEST THEY CAN,

17  AND THAT ALSO CROSS-REFERENCES THE EXHIBITS THAT THEY INTEND

18  THOSE WITNESSES TO USE, SO THAT WE HAVE A SENSE OF

19  PROPORTIONALITY WITH THE WITNESSES AND THE HOURS AND THE

20  EXHIBITS.                                                         03:08

21          NOW, IF AT THE END OF 66 HOURS, IF EITHER SIDE HAS

22  USED THEIR 66 HOURS EFFICIENTLY, AND THERE IS SOME

23  EXTRAORDINARY REASON FOR REVISITING THIS ISSUE, THE COURT WOULD

24  CERTAINLY CONSIDER IT AGAIN, BUT ONLY AFTER THE 66 HOURS HAVE

25  BEEN USED AND THE 4,500 EXHIBITS HAVE BEEN USED.                  03:08

```
 1            I'M NOT SAYING THAT THERE IS NO CIRCUMSTANCE THAT I
 2    WOULD BUDGE FROM THAT.  THERE WOULD HAVE TO BE EXTRAORDINARY
 3    CAUSE.  BUT I WON'T MAKE THAT.  AND YOU RUN THE RISK HERE, THE
 4    PERIL, OF NOT HAVING THAT.  BUT I REALLY THINK THAT GIVEN THE
 5    ISSUES -- AND I'VE TRIED TO THINK ABOUT THIS AS BEST I CAN.  I    03:09
 6    DON'T HAVE ALL THAT MUCH EXPERIENCE IN THESE COPYRIGHT MATTERS,
 7    BUT WHAT I DO HAVE, I REALLY THINK THAT 66 HOURS AND 4,500
 8    EXHIBITS, ASSUMING THAT COUNSEL COOPERATE AND THEY ENTER INTO
 9    APPROPRIATE STIPULATIONS, THESE TYPES OF DOCUMENTS SHOULD BE
10    MORE THAN ENOUGH TO CONVEY TO A JURY WHO OWNS BRATZ.             03:09
11            MR. NOLAN:  YOUR HONOR, I THINK IT WAS ANTICIPATED BY
12    MR. ZELLER'S COMMENT.  THE LIMITS APPLY TO 1-A AND 1-B, BOTH,
13    COLLECTIVELY.
14            THE COURT:  I'M SORRY.  SAY THAT AGAIN.  I'M NOT
15    FOLLOWING YOU.                                                   03:09
16            MR. NOLAN:  I JUST WANT TO MAKE CERTAIN THAT WE ALL
17    AGREE THAT THE FIRST TRIAL IS GOING TO BE SET INTO PHASE 1-A
18    AND 1-B --
19            THE COURT:  RIGHT.
20            MR. NOLAN:  -- THAT THE LIMITS THAT YOU'VE IMPOSED
21    UPON US APPLY FOR THE WHOLE ENCHILADA.
22            THE COURT:  FOR ALL OF PHASE ONE, RIGHT.
23            MY INTENTION IS TO GET THROUGH PHASE ONE BEFORE THE
24    NINTH CIRCUIT CONFERENCE.
25            MR. NOLAN:  RIGHT.  THANK YOU.                           03:10
```

1          **MR. QUINN:**  AND, YOUR HONOR, THE 66 HOURS, THAT'S

2    PER SIDE, NOT PER PARTY?

3          **THE COURT:**  THAT'S CORRECT.

4          **MR. QUINN:**  AND THE EXHIBITS ARE PER SIDE?

5          **THE COURT:**  IT IS PER SIDE.                           03:10

6          I DOUBT CARTER BRYANT IS GOING TO NEED ANOTHER

7    66 HOURS TO FOLLOW UP ON WHATEVER MGA SAYS.  I TRUST THE

8    DEFENSE IS WORKING MORE OR LESS TOGETHER ON THIS.

9          **MS. ANDERSON:**  YES, YOUR HONOR.  WE'RE ATTEMPTING TO

10   DO SO AT EVERY JUNCTURE.  MY ONLY COMMENT, IF THE COURT WAS     03:10

11   OPEN TO ANY COMMENTS ON THIS, WE APPRECIATE THAT YOUR HONOR HAS

12   INSTITUTED SOME LIMITS, BECAUSE I THINK IT WILL HELP US

13   GREATLY.  AND IF ANYTHING, I THINK 66 HOURS IS EXTREMELY

14   GENEROUS.

15         I THINK IT WAS IN FEBRUARY OF 2007, MATTEL ITSELF         03:10

16   ESTIMATED THE TRIAL WOULDN'T TAKE MORE THAN FOUR WEEKS FOR THE

17   CARTER BRYANT ISSUES, FOCUSED ON THE CARTER BRYANT ISSUES, AND

18   THAT WOULD COME IN AT A NUMBER SOMEWHAT LOWER THAN 66 HOURS.

19         **THE COURT:**  THAT MAY BE THE CASE, AND I WOULD

20   CERTAINLY NOT OBJECT TO PARTIES TAKING LESS TIME TO TRY THIS    03:11

21   CASE.  I'M SIMPLY IMPOSING A MAXIMUM.

22         **MS. ANDERSON:**  THANK YOU, YOUR HONOR.

23         **THE COURT:**  MY APOLOGIES TO THE CRIMINAL BAR WHO'S

24   BEEN PATIENTLY WAITING BY FOR THE CRIMINAL CALENDAR.  IT WAS

25   SUPPOSED TO START AN HOUR AND TEN MINUTES AGO, BUT WE NEEDED TO 03:11

1    GET THROUGH THIS THIS AFTERNOON.  I WANTED TO MAKE SURE

2    EVERYONE HAD AN OPPORTUNITY TO ADDRESS THE COURT.

3          I WILL GET AN ORDER OUT ON THIS AS SOON AS POSSIBLE.

4    I'LL ALSO TAKE UP THAT DISCOVERY MATTER WITH THOSE DEPOSITIONS

5    WHICH SEEM TO BE GOING ON AND ON.  I'VE SEEN THOSE NAMES                03:11

6    BEFORE.  BUT I'LL TAKE A CLOSE LOOK AT THAT, AND WE'LL TRY TO

7    GET AN ORDER OUT.

8          **THE CLERK:**  COURT IS IN RECESS.

9

10

11

12

13

14

15

16                          CERTIFICATE

17

18   I hereby certify that pursuant to section 753, title 28, United
     States code, the foregoing is a true and correct transcript of
19   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
20   conformance with the regulations of the judicial conference of
     the United States.

21

22   _____          _____
     THERESA A. LANZA, CSR, RPR                      Date
23   FEDERAL Official COURT Reporter

24

25

APRIL 7TH, 2008                    BRYANT V. MATTEL