1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                    EASTERN DIVISION

4                        - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                        - - -

7    Carter Bryant, Et. Al.,          )
                                       )
8                     Plaintiffs,  )
                                       )
9            vs.                   )   No. ED CV 04-09049
                                       )   (LEAD LOW NUMBER)
10   Mattel, Inc., Et. Al.,            )
                                       )
11                    Defendants.  )
     _____)   HEARING
12   AND RELATED ACTIONS,             )
     _____)

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 Riverside, California

17                 Monday, April 14, 2008

18                    10:14 A.M.

19

20

21

22

23               THERESA A. LANZA, RPR, CSR
                Federal Official Court Reporter
24               3470 12th Street, Rm. 134
                Riverside, California  92501
25                  (951) 274-0844
                 Www.theresalanza.com

```
1   APPEARANCES:

2

3   On behalf of MATTEL, INC.:

4
                        QUINN EMANUEL
5                       By:  Timothy l. Alger
                        865 S. FIGUEROA STREET,
6                       10TH FLOOR
                        LOS ANGELES, California  90017
7                       (213) 624-7707

8

9   on behalf of moving party, mattel, inc.:

                        stroock & stroock & lavan, llp
10                      by:  Michael j. Niborski
                        2029 century park east
11                      los angeles, ca 90067-3086
                        310-556-5800
12

13

14  on behalf of non-party christopher palmeri:

                        davis wright tremaine llp
15                      BY:  Alonzo wickers iv
                        865 south figueroa street,
16                      suite 2400
                        Los angeles, California  90017-2566
17                      213-633-6865

18

19  ON BEHALF OF MGA ENTERTAINMENT:

20                      skadden, arps, slate, meagher & flom llp
                        BY:  Robert james herrington
21                      300 SOUTH grand avenue
                        LOS ANGELES, CALIFORNIA 90071-3144
22                      213-687-5000

23

24

25
```

I N D E X

Motion........................................   4   Page

JULY 24, 2006                    ED CV 04-09049

1      RIVERSIDE, CALIFORNIA; MONDAY, APRIL 14, 2008; 10:14 A.M.

2                                -oOo-

3           **THE COURT:**  COUNSEL, WHY DON'T YOU GO AHEAD AND MAKE

4      YOUR APPEARANCES WHILE WE'RE WAITING.

5           **MR. ALGER:**  TIMOTHY ALGER FROM QUINN EMANUEL ON          10:14

6      BEHALF OF MATTEL.  AND WITH ME TODAY IS MICHAEL NIBORSKI, WHO'S

7      CO-COUNSELING WITH US ON THIS MOTION.

8           **THE COURT:**  VERY WELL.

9           **MR. HERRINGTON:**  ROBERT HERRINGTON FROM SKADDEN ARPS

10     ON BEHALF OF MGA AND MR. LARIAN.                                 10:15

11          **MR. WICKERS:**  AL WICKERS, DAVIS WRIGHT & TREMAINE, ON

12     BEHALF OF NONPARTY REPORTER, CHRIS PALMERI.

13          **THE COURT:**  GOOD MORNING, COUNSEL.

14          THERE ARE ACTUALLY THREE MATTERS THE COURT IS GOING

15     TO TAKE UP THIS MORNING.                                         10:15

16          THE FIRST ONE, JUST FOR THE RECORD, THE COURT DID

17     RECEIVE THE STIPULATION FROM THE PARTIES CONCERNING THE

18     SCREENING OF THE JURY PANEL.  WE'RE GOING TO SCREEN PRIOR TO

19     THE VOIR DIRE PROCESS FOR TWO-MONTH AVAILABILITY, JUST SO THAT

20     WE'RE NOT DEALING WITH THAT DURING THE COURSE OF THE SELECTION   10:15

21     OF THE JURY ITSELF.  THE COURT IS SHOOTING TO HAVE ABOUT 60 TO

22     75 INDIVIDUALS IN OUR PANEL, IN OUR VENIRE PANEL, THAT ARE ABLE

23     TO SIT FOR APPROXIMATELY A TWO-MONTH TRIAL.

24          THE SECOND MATTER IS, I HAVE AN EX-PARTE APPLICATION

25     BROUGHT BY MATTEL, REQUESTING, ESSENTIALLY, A SURREBUTTAL        10:16

1    REPORT TO SUPPLEMENT THEIR PREVIOUSLY-SUBMITTED EXPERT REPORTS

2    BY WILLIAM TWINN AND LLOYD CUNNINGHAM REGARDING CERTAIN BRYANT

3    ORIGINALS.  THE COURT RECEIVED THAT AND THE OPPOSITION LATE

4    LAST WEEK.  I HAVE SOME QUESTIONS CONCERNING THAT.

5         AND THEN I HAVE A MOTION, ALSO ON CALENDAR,                10:16

6    CONSIDERING THE APPEAL OF THE DISCOVERY MASTER'S FEBRUARY 26,

7    2008 ORDER DENYING MATTEL'S MOTION TO COMPEL THE DEPOSITION OF

8    MR. CHRISTOPHER PALMERI.  WE DO HAVE COUNSEL FOR

9    CHRISTOPHER PALMERI HERE.

10        I MADE REFERENCE TO THE FIRST MATTER, AND THAT IS THE      10:17

11   JURY ISSUE.  I APPRECIATE THE PROMPT ATTENTION TO THAT

12   STIPULATION SO THAT WE CAN START SENDING OUT, AS OF TODAY,

13   SUMMONS AND LETTERS TO POTENTIAL JURY MEMBERS.

14        LET ME TAKE UP THE MOTION SECOND, AND THAT IS THE

15   MOTION INVOLVING CHRISTOPHER PALMERI.  LET ME BEGIN WITH       10:17

16   MATTEL.  I WANT TO GET A BETTER SENSE OF EXACTLY WHAT IT IS

17   THAT YOU NEED THE DEPOSITION FOR.  AS I UNDERSTAND IT, NUMBER

18   ONE, YOU NEED IT FOR YOUR STATUTE OF LIMITATIONS ARGUMENT WHICH

19   YOU HAVE RAISED IN THE MOTION FOR SUMMARY JUDGMENT AND IN

20   OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT; THAT IS ONE     10:17

21   PURPOSE.

22        IT ALSO GOES TO A CONCEALMENT ISSUE IN PHASE TWO, A

23   FRAUDULENT CONCEALMENT ISSUE.

24        WHAT ELSE DOES IT GO TO?

25        **MR. NIBORSKI:**  I THINK IT GOES ALSO, YOUR HONOR, TO    10:18

1   THE LATCHES DEFENSE RAISED BY MGA.

2           **THE COURT:**  EXPLAIN.

3           **MR. NIBORSKI:**  THERE'S A LOT OF OVERLAP BETWEEN THESE

4   ISSUES.

5           ESSENTIALLY, WHAT YOU HAVE HERE IS, YOU HAVE, IN THE          10:18

6   SUMMER OF 2003, TWO INTERVIEWS BEING GIVEN TO ARGUABLY THE TWO

7   MOST IMPORTANT BUSINESS JOURNALS IN THE COUNTRY.  ONE OF THE

8   REASONS THAT WE'RE HERE IS BECAUSE WE'RE DEALING WITH

9   BUSINESSWEEK MAGAZINE.  WE'RE NOT DEALING WITH A SMALL

10  PUBLICATION.  WE'RE DEALING WITH THE WALL STREET JOURNAL, AND       10:18

11  WE'RE DEALING WITH BUSINESSWEEK.  AND THE FACT THAT MR. LARIAN

12  CHOSE TO GIVE AN INTERVIEW TO BUSINESSWEEK AND TO MAKE AN

13  AFFIRMATIVE STATEMENT ABOUT THE ORIGIN OF BRATZ, WHILE THEN

14  SUBSEQUENTLY IN THIS LITIGATION, MAKING A VERY BIG POINT ABOUT

15  THE FACT THAT WHAT WAS IN THE WALL STREET JOURNAL ARTICLE PUT       10:19

16  US ON NOTICE OF CERTAIN FACTS AND THAT OUR FAILURE TO PROSECUTE

17  THE CASE EARLIER SUBJECTS US TO A LATCHES DEFENSE.

18          OUR PURPOSE HERE IS IN NO WAY TO IMPINGE ON THE

19  NEWS-GATHERING PROCESS.  IF WE WERE DEALING WITH UNPUBLISHED

20  INFORMATION --                                                     10:19

21          **THE COURT:**  LET ME STOP YOU THERE.

22          IF THAT'S YOUR UNDERSTANDING OF LATCHES, THEN IT HAS

23  THE SAME RESPONSE AS THE STATUTE OF LIMITATIONS.

24          IF IT'S ABOUT PUTTING YOU ON NOTICE, ALL THAT WOULD

25  HAVE PUT YOU ON NOTICE -- I'M NOT SAYING IT'S NOT SIGNIFICANT,      10:19

```
 1   BECAUSE IT MAY VERY WELL BE SIGNIFICANT; IT MAY VERY WELL BE

 2   DISPOSITIVE -- BUT WHATEVER PUTS YOU ON NOTICE WAS THIS ARTICLE

 3   AS IT APPEARED BACK IN 2003.

 4        MR. NIBORSKI:  YES.

 5        THE COURT:  YOU CERTAINLY DIDN'T HAVE, IN 2003,          10:19

 6   ACCESS TO THE REPORTER OR THE REPORTER'S SOURCES OR ADDITIONAL

 7   NOTES OF THE REPORTER THAT WERE NOT PUT INTO THE ARTICLE.  ALL

 8   YOU WOULD HAVE, ALL THAT'S OUT THERE IN THE PUBLIC, ALL THAT

 9   WOULD HAVE TOLLED THE STATUTE OF LIMITATIONS, ALL THAT WOULD

10   HAVE COME INTO PLAY IN TERMS OF WHAT WAS GOING ON PUBLICLY, IS  10:20

11   WHAT IS IN THE ARTICLE.  AND ASSUMING THAT THE ARTICLE COMES IN

12   FOR SUMMARY JUDGMENT PURPOSES, AS I THINK IT DOES AS A

13   SELF-AUTHENTICATING DOCUMENT FOR PURPOSES OF SUMMARY

14   JUDGMENT -- NOT NECESSARILY FOR TRIAL, BUT I THINK THESE ISSUES

15   COME UP AT THE SUMMARY JUDGMENT STAGE -- I DON'T SEE WHAT MORE  10:20

16   YOU GET BY GETTING TO THE REPORTER AND HOW THAT'S REALLY

17   RELEVANT TO A LATCHES.

18        NOW, I COULD SEE HOW, PERHAPS, THE REPORTER MAY HAVE

19   EVIDENCE RELATING TO THE FRAUDULENT CONCEALMENT, BUT THAT WOULD

20   BE A PHASE TWO ISSUE AND I DON'T THINK I NEED TO GET TO THAT AT  10:20

21   THIS POINT.

22        MR. NIBORSKI:  WELL, THAT'S EXACTLY RIGHT, YOUR

23   HONOR.

24        THE FRAUDULENT CONCEALMENT ISSUE -- I MEAN, OUR POINT

25   IS THAT IF IT'S RELEVANT TO BOTH THE FRAUDULENT CONCEALMENT    10:20
```

```
 1   ISSUE, AS WELL AS THE STATUTE OF LIMITATIONS AND LATCHES
 2   DEFENSES -- AND WHAT WE'RE ESSENTIALLY SEEKING IS TESTIMONY TO
 3   CONFIRM A PUBLISHED STATEMENT IN AN ARTICLE IN A, PERHAPS, 20-
 4   TO 30-MINUTE DEPOSITION -- IT MAKES PERFECT SENSE TO DO THAT
 5   ALL AT ONCE.                                                     10:21
 6           THE COURT:  BUT DO YOU UNDERSTAND THE COURT'S POINT,
 7   THOUGH, ABOUT WHY -- FOR PURPOSES OF THE STATUTE OF LIMITATIONS
 8   AND THOSE ARGUMENTS, WHAT YOU'RE GOING TO BE RELYING UPON IS
 9   WHAT WAS ACTUALLY PUBLISHED IN THE ARTICLE, NOT WHAT'S BENEATH
10   IT?                                                              10:21
11           MR. NIBORSKI:  CORRECT.
12           THE COURT:  I MEAN, YOU ALLUDE TO VERIFICATION HERE.
13   THIS IS NOT A QUOTE.  UNLIKE THE SENTENCE BEFORE IT, WHERE
14   THERE'S A QUOTE, THIS WAS JUST A STATEMENT.
15           I WOULD CONCEDE THAT IT IS LOGICAL TO ASSUME THAT THE    10:21
16   SOURCE OF THAT INFORMATION WAS PROBABLY MR. LARIAN.  BUT IT MAY
17   NOT HAVE BEEN.  I MEAN, THE REPORTER MAY HAVE GOTTEN THAT FROM
18   SOMEPLACE ELSE; AND THAT'S WHY IT RAISES THE WHOLE ISSUE THAT
19   YOU'RE REALLY TRYING TO GET TO THE SOURCE, A CONFIDENTIAL
20   SOURCE IN THE SENSE THAT IT WASN'T DISCLOSED IN THE ARTICLE,     10:21
21   AND NOT SIMPLY A VERIFICATION OF A QUOTE.
22           I MEAN, IF THIS WAS SIMPLY A VERIFICATION OF A QUOTE,
23   THE JOURNALIST'S PRIVILEGE ANALYSIS MIGHT BE DIFFERENT,
24   ALTHOUGH THERE'S DISPUTE IN THE CASES THAT I WAS READING THIS
25   WEEKEND.  SOME SUGGEST THAT THEY'RE TREATED THE SAME; SOME       10:22
```

 1    SUGGEST THEY'RE TREATED DIFFERENTLY.  BUT I DON'T THINK WE EVEN

 2    REALLY NEED TO ADDRESS THAT BECAUSE THIS ISN'T A QUOTE.

 3    THERE'S NO QUESTION THAT THIS IS A STATEMENT.

 4         **MR. NIBORSKI:**  I THINK THAT'S A FAIR POINT, YOUR

 5    HONOR.  BUT I THINK THAT WE ARE AS CLOSE AS HUMANLY POSSIBLE TO      10:22

 6    A QUOTE, WITHOUT THE LITTLE ACTUAL MARKINGS AND A 'LARIAN SAID'

 7    ON EITHER SIDE OF THE STATEMENT.

 8         PRESUMABLY, IF MR. LARIAN WAS NOT THE SOURCE OF THE

 9    STATEMENT, WHEN WE BEGAN MEETING AND CONFERRING WITH COUNSEL,

10    YOU KNOW, NINE MONTHS AGO, A STATEMENT TO THAT EFFECT WOULD         10:22

11    HAVE BEEN TAKEN ON FACE VALUE, AND WE WOULD HAVE LET THE ISSUE

12    LIE.

13         **THE COURT:**  BUT INSTEAD, MR. LARIAN DOESN'T REALLY

14    REMEMBER WHAT HAPPENED OR WHAT HE SAID.

15         **MR. NIBORSKI:**  RIGHT.                                      10:22

16         AND JUST TO SEGUE INTO ONE OF THE OTHER ISSUES IN

17    THIS MOTION, YOU KNOW, JUDGE INFANTE DID NOT HAVE THE BENEFIT,

18    WHEN THIS WAS FIRST BRIEFED BEFORE HIM, OF THE SECOND SESSION

19    OF MR. LARIAN'S DEPOSITION, WHICH, AS YOUR HONOR KNOWS, WE HAD

20    TO GO THROUGH SOME HOOPS TO GET TO.  AND IT WAS PRETTY CLEAR        10:23

21    MR. LARIAN HAD THE SUFFICIENT LACK OF RECOLLECTION TO MAKE HIM

22    A VIABLE ALTERNATIVE SOURCE.

23         AND WE ALSO CORROBORATED THE FACT THAT THERE REALLY

24    ARE ONLY TWO PEOPLE ON THE FACE OF THE EARTH WITH THIS

25    INFORMATION:  MR. LARIAN AND MR. PALMERI.                          10:23

```
 1              TO CIRCLE BACK TO THE CONCEALMENT ISSUE, ONE OF OUR
 2    POINTS IS THAT THIS IS NOT JUST THAT MR. LARIAN TOLD A FRIEND
 3    OR A COLLEAGUE, 'HERE'S WHERE I GOT THE IDEA FOR BRATZ.'  THE
 4    FACT THAT HE ACTIVELY CHOSE TO PUT THIS INFORMATION OUT TO THE
 5    LARGEST BUSINESS MAGAZINE IN THE WORLD, AND SUBSEQUENT TO THAT,   10:23
 6    RECEIVED AN E-MAIL TO CONFIRM THOSE TYPES OF FACTS AND THE
 7    ARTICLE WENT TO PRINT, TO US THAT'S A VERY, VERY SIGNIFICANT
 8    POINT.
 9              THE COURT:  I TRUST THERE WAS NO RESPONSE.  THAT
10    E-MAIL WAS RATHER INTERESTING, BECAUSE IT DID LAY IT OUT.  IN    10:23
11    THE E-MAIL, THERE WAS -- I DIDN'T SEE A RESPONSE.
12              MR. NIBORSKI:  AS FAR AS I KNOW, THERE WAS NO
13    RESPONSIVE DOCUMENT ANYWHERE IN THE PRODUCTION THAT WE
14    RECEIVED.  I DON'T KNOW WHETHER THERE WAS.  MR. LARIAN, AS YOU
15    MAY HAVE READ FROM THE DEPOSITION, DIDN'T RECALL THE SUBSTANCE   10:24
16    OF THAT INFORMATION.
17              THE COURT:  OKAY.  LET ME HEAR FROM THE DEFENSE, FROM
18    COUNSEL FOR THE REPORTER.
19              MR. WICKERS:  THANK YOU, YOUR HONOR.
20              ADDRESSING BRIEFLY A COUPLE OF POINTS THAT COUNSEL     10:24
21    TALKED ABOUT.
22              WE WOULD AGREE WITH THE COURT, FIRST OF ALL, THAT AS
23    TO LATCHES AND STATUTE OF LIMITATIONS ISSUES, THE PUBLICATION
24    OF THE ARTICLE IS MORE THAN ADEQUATE TO SERVE THE PURPOSES THAT
25    MATTEL SEEKS MR. PALMERI'S DEPOSITION.                           10:24
```

1           WITH RESPECT TO THE OTHER ISSUE THAT THE COURT

2    RAISED, HOWEVER, I WANTED TO START AT THE VERY BEGINNING WITH,

3    WE ARE DEALING WITH A DISCOVERY MASTER'S RULING THAT IS

4    ENTITLED TO SUBSTANTIAL DEFERENCE HERE AND SHOULD BE REVERSED

5    ONLY IF IT'S CLEARLY ERRONEOUS OR CONTRARY TO LAW.  I WOULD          10:25

6    RATHER NOT GO DOWN THE LENGTHY DISCUSSION OF THE PUBLISHED

7    VERSUS UNPUBLISHED DISTINCTIONS, BECAUSE CANDIDLY, I DON'T

8    BELIEVE IT MATTERS HERE; IT'S KIND OF A RED HERRING ARGUMENT.

9           THERE WERE 11 CASES CITED BETWEEN THE VARIOUS PARTIES

10   DEALING WITH WHAT MIGHT BE TERMED "AUTHENTICATION."  TEN OF          10:25

11   THEM WENT THROUGH A PRIVILEGE ANALYSIS.  SIX OF THEM RULED IN

12   FAVOR OF THE REPORTER; FOUR RULED AGAINST THE REPORTER.  BUT I

13   DON'T THINK THAT'S REALLY THE RELEVANT DISTINCTION HERE.

14           I THINK WHAT IS MOST IMPORTANT IS THAT THE DISCOVERY

15   MASTER FOUND ON ALL THREE POINTS -- RELEVANCE, CUMULATIVENESS,       10:25

16   AND EXHAUSTION -- THAT MATTEL HAD FAILED TO MEET ITS BURDEN.

17   SO TO REVERSE JUDGE INFANTE'S DECISION, THIS COURT WOULD HAVE

18   TO FIND THAT JUDGE INFANTE'S RULING WAS CLEARLY ERRONEOUS OR

19   CONTRARY TO LAW ON ALL THREE OF THOSE ISSUES.  AND WE DON'T

20   BELIEVE THAT MATTEL CAN DO THAT.                                     10:25

21           SKIPPING OVER THE STATUTE OF LIMITATIONS, LATCHES,

22   AND IMPEACHMENT ARGUMENTS THAT WERE RAISED BY MATTEL IN ITS

23   BRIEFING BEFORE JUDGE INFANTE, AND MOVING DIRECTLY TO THE

24   GUILTY MIND THEORY, TO CALL IT THAT, I THINK IT IS INACCURATE

25   TO SUGGEST THAT JUDGE INFANTE DID NOT CONSIDER THAT ARGUMENT.        10:26

1   IT'S CLEAR FROM HIS ORDER, IN FACT, THAT HE DID.  TWICE HE

2   MENTIONS THIS GUILTY KNOWLEDGE OR GUILTY MIND ARGUMENT THAT WAS

3   RAISED BY MATTEL WITH RESPECT TO THE CLEAR RELEVANCE ISSUE, AND

4   HE CLEARLY FOUND THAT IT DID NOT RISE TO THAT LEVEL.

5           I THINK THERE'S A TELLING FACT.  MR. LARIAN HAD BEEN     10:26

6   DEPOSED BEFORE THIS MOTION PRACTICE OVER THE DEPOSITION

7   SUBPOENA TO MR. PALMERI, AND MR. LARIAN WAS QUESTIONED BRIEFLY

8   BY MATTEL'S LAWYERS ABOUT HIS STATEMENTS TO REPORTERS.

9           **THE COURT:**  HE WAS.

10          YOU KNOW, PART OF WHAT JUDGE INFANTE FOUND WAS, AND     10:26

11  KIND OF THE BOTTOM LINE WAS -- I THINK THE PHRASE HE USED WAS

12  THAT MATTEL HAD NOT 'PLUMBED THE DEPTHS.'  AND TO THINK THAT

13  ANYBODY HAS NOT PLUMBED THE DEPTHS IN THIS CASE IS SOMEWHAT --

14  CAUSES ONE TO PAUSE.

15          BUT, FAIR ENOUGH, THEY HAD NOT PLUMBED THE DEPTHS AT     10:27

16  THAT POINT.  AND I THINK THAT MAY HAVE BEEN A VALID CONTENTION

17  OR FINDING BY JUDGE INFANTE IN FEBRUARY.  BUT WE DO HAVE

18  SUBSEQUENT INFORMATION, SUBSEQUENT EFFORTS, BY MATTEL.

19          I DON'T KNOW WHAT MORE THEY CAN DO TO TRY TO

20  ASCERTAIN THE PARTICULAR INFORMATION RELATED TO THE INTENTIONAL   10:27

21  CONCEALMENT ISSUE.  AS I INDICATED, I FEEL FAIRLY CONFIDENT

22  THAT MATTEL CAN PROCEED IN THEIR MOTION FOR SUMMARY JUDGMENT

23  WITH THIS ARTICLE AND USE IT FOR WHATEVER EFFECT THEY WANT TO

24  USE IT FOR IN THAT MOTION.  I DON'T THINK THERE'S ANYTHING MORE

25  TO BE GAINED, BECAUSE ANYTHING ELSE WOULD HAVE NOT BEEN PUBLIC;   10:27

1  THEY WOULD NOT HAVE KNOWN ABOUT IT BACK IN 2003; SO IT PROBABLY

2  WOULD NOT BE RELEVANT.

3          BUT THE INTENTIONAL CONCEALMENT ARGUMENT, I CAN SEE

4  THE RELEVANCE THERE, PERHAPS, ALTHOUGH IT'S A PHASE-TWO ISSUE

5  AND IT MAY NOT BE A BRIDGE THAT WE NEED TO CROSS AT THIS POINT.   10:28

6  IT MAY BE PREMATURE TO BE ADDRESSING THIS, PARTICULARLY GIVEN

7  THE FACT THAT EVERYONE, I'M SURE, HAS OTHER THINGS THAT THEY

8  NEED TO BE PAYING ATTENTION TO RIGHT NOW.

9          BUT IN TERMS OF THE ACTUAL CORRECTNESS OF

10  JUDGE INFANTE'S ORDER -- AND THIS IS THE POINT I'D LIKE YOU TO   10:28

11  ADDRESS IS -- YOU CALLED UPON MATTEL TO PLUMB THE DEPTHS.  THEY

12  SEEMED TO HAVE DONE THAT, OR AT LEAST THAT'S PART OF THEIR

13  ARGUMENT.

14          WHAT MORE, FROM YOUR PERSPECTIVE, COULD THEY DO,

15  SHORT OF THE DEPOSITION OF YOUR CLIENT?   10:28

16          **MR. WICKERS:**  WELL, I THINK THAT ACTUALLY TOUCHES ON

17  ALL THREE PRONGS OF THE TEST; AND I'LL TAKE THEM IN REVERSE

18  ORDER, SO TO SPEAK.

19          ON EXHAUSTION FIRST, THERE ARE OTHERS WHO MATTEL

20  COULD DEPOSE ABOUT WHETHER OR NOT MR. LARIAN SUPPOSEDLY MADE   10:28

21  INCONSISTENT STATEMENTS OR VARYING STATEMENTS ABOUT THE ORIGINS

22  OF BRATZ AND HOW THEY WERE CREATED AND WHO WAS INVOLVED IN THE

23  CREATION.

24          **THE COURT:**  WHO?

25          **MR. WICKERS:**  TOY INDUSTRY ANALYSTS, INVESTORS,   10:29

1   PUBLICISTS.

2          IF THERE WERE SOME KIND OF CONSPIRACY OR SOME KIND OF

3   GRAND SCHEME TO CONCEAL THIS, PRESUMABLY HE MIGHT HAVE SPOKEN

4   TO THOSE PEOPLE AS WELL.

5          THERE'S BEEN NO SHOWING THAT MATTEL ATTEMPTED TO          10:29

6   DEPOSE ANYBODY BESIDES THE INDIVIDUALS WHO ARRANGED FOR THIS

7   INTERVIEW, I THINK THE MGA PUBLICIST AND A RULE 30(B)(6)

8   DEPONENT; AND THEY FINALLY ASKED MR. LARIAN THIS QUESTION IN

9   HIS SUBSEQUENT DEPOSITION.

10         **THE COURT:**  BESIDES THOSE THREE, THE PUBLICIST, THE   10:29

11  30(B)(6), AND MR. LARIAN, WHO ELSE FROM MGA WOULD HAVE THIS

12  INFORMATION?

13         **MR. WICKERS:**  IT'S NOT LIMITED SOLELY TO MGA.  THAT'S

14  WHAT, I THINK, JUDGE INFANTE CORRECTLY POINTED OUT.

15         THE ISSUE IS NOT SIMPLY WHETHER THEY'VE TALKED TO        10:29

16  EVERYBODY WHO MAY HAVE BEEN PRESENT FOR THAT CONVERSATION.  THE

17  QUESTION IS WHETHER THEY'VE EXHAUSTED ALTERNATIVE SOURCES OF

18  THE INFORMATION ABOUT THE SUBJECT MATTER THAT THEY PROFESS TO

19  WANT TO COVER WITH MR. PALMERI; AND THAT IS, SUPPOSEDLY,

20  VARYING AND INCONSISTENT STATEMENTS THAT MR. LARIAN MADE TO    10:30

21  OUTSIDERS OR OTHERS ABOUT THE CREATION OF THE BRATZ DOLLS.

22         AND BECAUSE THE NINTH CIRCUIT HAS MADE CLEAR THAT

23  REPORTERS ARE SUPPOSED TO BE THE PLACE OF LAST RESORT FOR CIVIL

24  LITIGANTS UNDER THESE KIND OF CIRCUMSTANCES.  AND IF ONE WE'RE

25  ALWAYS TO SAY THAT IF THE INTERVIEWED SUBJECT, ASSUMING THAT HE  10:30

1   WAS THE SOURCE OF THIS INFORMATION, WHICH IT'S NOT REVEALED IN

2   THE STORY, BUT EVEN IF YOU ASSUME THAT FOR PURPOSES OF ARGUMENT

3   TODAY, IF ALL YOU HAD TO DO WAS ASK THE SUBJECT AND THE SUBJECT

4   SAID, 'I DON'T RECALL,' OR 'NO, I DIDN'T SAY THAT,' THEN YOU

5   COULD ALWAYS GET TO THE REPORTER; AND THAT WOULD RENDER          10:30

6   EXHAUSTION A RELATIVELY MEANINGLESS STANDARD.

7           WE DON'T SUGGEST, AS MATTEL PUT WORDS IN OUR MOUTH IN

8   THEIR REPLY BRIEF, THAT THEY MUST DEPOSE 60 PEOPLE.  WE CITED

9   THAT CASE THAT SAID IT MIGHT NOT BE UNREASONABLE TO REQUIRE

10  THAT MANY SIMPLY TO SHOW THAT THIS IS AN ONEROUS BURDEN AND      10:31

11  MATTEL CAN'T SIMPLY TURN TO MR. PALMERI BECAUSE HE MAY BE A

12  MORE CONVENIENT WITNESS FOR THIS TYPE OF INFORMATION.

13          BUT THE SAME ISSUE ALSO TOUCHES ON CUMULATIVENESS AND

14  ON RELEVANCE; AND WE WOULD SUBMIT THAT IF THIS ISSUE OF

15  MR. LARIAN'S STATEMENTS TO MR. PALMERI WERE, IN FACT, VITAL TO   10:31

16  MATTEL'S CASE, AS MATTEL SETS FORTH IN ITS PAPERS, THEN

17  MATTEL'S COUNSEL WOULD HAVE SPECIFICALLY ASKED MR. LARIAN ABOUT

18  THOSE STATEMENTS IN HIS FIRST ROUND OF DEPOSITIONS.  AND THEY

19  DIDN'T.  THEY ASKED KIND OF VERY GENERAL QUESTIONS ABOUT HIS

20  STATEMENTS TO REPORTERS.  HE MADE SOME STATEMENT ABOUT          10:31

21  'REPORTERS DON'T ALWAYS ACCURATELY REFLECT WHAT IT IS I SAY TO

22  THEM.'

23          **THE COURT:**  I AGREE THAT THE FIRST ROUND WAS

24  INADEQUATE, AND I THINK JUDGE INFANTE RIGHTLY NOTED THAT.

25          THE QUESTION IS, SINCE THAT TIME, THOUGH...            10:32

1      **MR. WICKERS:**  THAT'S ON THE EXHAUSTION ISSUE.  BUT

2   ACTUALLY, I THINK ALSO THAT WHAT WAS COVERED IN HIS FIRST

3   DEPOSITION, I ALSO BELIEVE, IS RELEVANT, YOUR HONOR, TO THE

4   RELEVANCE QUESTION.  BECAUSE IF, IN FACT, THIS COMMUNICATION,

5   ALLEGED COMMUNICATION, BETWEEN MR. LARIAN AND MR. PALMERI WERE     10:32

6   AS VITAL TO MATTEL'S CASE AS MATTEL REPRESENTS IN ITS BRIEFS, I

7   BELIEVE MATTEL'S LAWYERS WOULD HAVE ASKED MR. PALMERI THOSE

8   QUESTIONS IN HIS FIRST ROUND OF DEPOSITIONS.  IF IT IS SO

9   IMPORTANT --

10      **THE COURT:**  THAT'S INTERESTING.                              10:32

11      RELEVANCY IS NOT GOING TO BE DETERMINED BY THE VIGOR

12   OR ZEALOUSNESS WHICH COUNSEL PURSUES AN ISSUE, BECAUSE

13   SOMETIMES COUNSEL WILL PURSUE ISSUES VIGOROUSLY THAT ARE NOT

14   RELEVANT.  THAT CAN'T BE THE STANDARD.

15      **MR. WICKERS:**  NO.                                            10:32

16      HOWEVER, YOUR HONOR, I WOULD SUBMIT THAT IN THIS

17   CASE, WITH SUCH ABLE COUNSEL ON ALL SIDES, IF AN ISSUE WERE, IN

18   FACT, SO HIGHLY RELEVANT, IT WOULD HAVE BEEN COVERED.

19      IT ALSO GOES TO THE CUMULATIVENESS PRONG OF THE TEST,

20   BECAUSE AS MATTEL ADMITS, AND AS JUDGE INFANTE POINTED OUT IN     10:32

21   HIS ORDER, THEY HAVE HAD VOLUNTARY DEPOSITION TESTIMONY FROM

22   TWO REPORTERS ALREADY WHO HAVE TESTIFIED ABOUT VARYING

23   STATEMENTS THAT MR. LARIAN SUPPOSEDLY MADE TO THEM ABOUT THE

24   ORIGINS OF THE BRATZ DOLLS.  THAT WAS A CHICAGO SUN TIMES

25   REPORTER AND A FORMER WALL STREET JOURNAL REPORTER.  AND I       10:33

```
 1   INFORMED THAT SINCE OUR LAST ROUND OF BRIEFING BEFORE THE
 2   DISCOVERY MASTER, THAT MATTEL DEPOSED ANOTHER REPORTER WHO
 3   VOLUNTARILY TESTIFIED.  I BELIEVE MR. NIBORSKI TOLD ME THAT THE
 4   REPORTER HAD BEEN WITH THE SAN FERNANDO BUSINESS JOURNAL AND
 5   THAT THESE ISSUES WERE COVERED THERE.                            10:33
 6          SO WE WOULD SUBMIT THAT IF, AS JUDGE INFANTE FOUND,
 7   HAVING TESTIMONY FROM TWO REPORTERS ON THAT ISSUE WERE
 8   CUMULATIVE, IT'S ONLY MORE CUMULATIVE NOW THAT THEY HAVE
 9   TESTIMONY FROM THREE REPORTERS ON THIS TOPIC.
10          THE COURT:  THANK YOU, COUNSEL.                           10:33
11          MR. WICKERS:  THANK YOU, YOUR HONOR.
12          THE COURT:  I'LL CERTAINLY GIVE THE MOVING PARTY THE
13   LAST OPPORTUNITY, BUT IS THERE ANYTHING FROM MGA BEFORE I HEAR
14   BACK FROM THE PLAINTIFFS?
15          MR. HERRINGTON:  VERY BRIEFLY, YOUR HONOR.               10:34
16          THE COURT'S QUESTION, I THINK, WAS A GOOD ONE, AND I
17   JUST WANTED TO POINT OUT THAT SINCE THAT TIME, AS THE COURT'S
18   AWARE, MR. LARIAN HAS, INDEED, BEEN DEPOSED AGAIN REGARDING
19   THIS EXACT STATEMENT AND THIS EXACT ARTICLE.  I THINK THERE'S
20   BEEN CHARACTERIZATIONS OF MR. LARIAN'S KNOWLEDGE REGARDING THIS  10:34
21   ARTICLE.  BUT AT BOTTOM, HE DOES NOT DENY THAT THE STATEMENT
22   WAS MADE; IT MAY HAVE BEEN HIM.
23          HE SAYS, 'SO YOU'RE NOT SURE ONE WAY OR THE OTHER.'
24          HE SAYS, 'I DON'T RECALL.  I MIGHT HAVE SAID IT.'
25          HE SAYS, 'YOU'RE NOT DENYING IT?'                        10:34
```

1          'NO.'

2          AND THEN THEY GO ON TO ASK HIM, 'IS THE STATEMENT

3     TRUE?'

4          AND HE SAYS, 'IT'S PARTIALLY TRUE.'  AND THEN HE

5     EXPLAINS THE BASIS FOR THE STATEMENT: 'BECAUSE THAT'S WHAT MY          10:34

6     KIDS WERE WEARING AT THAT TIME.  THEY WERE YOUNG; THEY WERE

7     WEARING CLOTHES LIKE THAT; AND THE BRATZ CONCEPT THAT WE SAW,

8     THAT'S WHAT WE HAD IN MIND.'

9          AND THEN THEY GO ON TO ASK MR. LARIAN, 'WHEN?  WHEN

10    DID YOU HAVE THAT?'  HE SAYS, 'DID YOU HAVE THIS IDEA FOR DOLLS          10:35

11    THAT HAD THAT TYPE OF CLOTHING BEFORE OR AFTER YOU FIRST MET

12    CARTER BRYANT?'

13          'AFTER.'

14          'CAN YOU PUT THE TIME PERIOD APPROXIMATELY WHEN YOU

15    HAD THAT IDEA?'          10:35

16          'I CAN'T.'

17          SO BOTTOM LINE, YOUR HONOR, HE --

18          **THE COURT:**  HE USES THE ROYAL 'WE,' THOUGH.

19          **MR. HERRINGTON:**  SAY THAT ONE MORE TIME.

20          **THE COURT:**  HE USES THE ROYAL 'WE.'  'WE HAD THAT.'          10:35

21          **MR. HERRINGTON:**  HE DOES.  HE DOES USE THAT PHRASE.

22          **THE COURT:**  WHO'S HE TALKING ABOUT?  HIMSELF?

23          WHO'S THE 'WE'?

24          **MR. HERRINGTON:**  I DO NOT KNOW, YOUR HONOR.

25          **THE COURT:**  OKAY.          10:35

1          **MR. HERRINGTON:**  ALTHOUGH, THAT QUESTION, CERTAINLY

2   MATTEL HAD THE OPPORTUNITY TO ASK THEM TO POINT OUT THAT

3   AMBIGUITY.

4          **THE COURT:**  I KNOW.

5          **MR. ALGER:**  YOUR HONOR, TIM ALGER AGAIN.                    10:35

6          AND I WANT TO TAKE THE COURT'S TIME BECAUSE I HAVE

7   GREATER DEPTH OF KNOWLEDGE ABOUT THE CASE THAN MR. NIBORSKI.

8          THE COURT MENTIONED THAT THIS MIGHT BE A PHASE-TWO

9   ISSUE.  I DON'T THINK IT'S A PHASE-TWO ISSUE AT ALL.  I THINK

10  IT'S A PHASE-ONE ISSUE.                                          10:35

11         **THE COURT:**  EXPLAIN.

12         **MR. ALGER:**  THERE'S A CLAIM OF OWNERSHIP MADE BY

13  MR. LARIAN TO THE WORLD HERE.  900,000 COPIES OF <u>BUSINESSWEEK</u>

14  ARE CIRCULATED EACH WEEK.  I CAN'T THINK OF A MORE EFFECTIVE

15  WAY FOR MR. LARIAN TO GET OUT TO THE BUSINESS COMMUNITY AND THE   10:36

16  WORLD THAT HE WAS CLAIMING TO OWN BRATZ; AND THIS WAS PART OF A

17  CONSISTENT DISSEMINATION OF INFORMATION BY MGA OVER THE COURSE

18  OF YEARS, WHICH WILL BE ESTABLISHED AT TRIAL.

19         **THE COURT:**  HOLD ON A SECOND.

20         HOW IS THAT EVIDENCE THAT YOU WOULD WANT TO BE             10:36

21  RELYING UPON IN YOUR PHASE-ONE CLAIMS?

22         **MR. ALGER:**  BECAUSE, YOUR HONOR, IT SHOWS GUILTY

23  KNOWLEDGE AND THAT MR. LARIAN WAS HIDING --

24         **THE COURT:**  GUILTY KNOWLEDGE OF WHAT?

25         **MR. ALGER:**  THAT MATTEL TRULY OWNED THESE DRAWINGS.    10:36

1          **THE COURT:**  BECAUSE MR. LARIAN IS CLAIMING OWNERSHIP

2    FOR THE DOLL, THAT SHOWS THAT MATTEL OWNS THE DOLL?

3          **MR. ALGER:**  THERE WILL BE ESTABLISHED AT TRIAL --

4    THERE'S A CONSISTENT COURSE OF CONDUCT BY MGA, INCLUDING

5    INTERNAL COMMUNICATIONS, INCLUDING PUBLIC STATEMENTS, ABOUT          10:36

6    BRATZ AND ALWAYS ATTRIBUTING THE SOURCE OF BRATZ TO SOMETHING

7    ELSE OTHER THAN CARTER BRYANT.  AND IT'S ACKNOWLEDGED IN THE

8    DISCOVERY BY MGA THAT THEY NEVER -- IT WAS NEVER PUBLISHED

9    PRIOR TO THE JULY 2003 ARTICLE IN THE WALL STREET JOURNAL THAT

10   BRYANT WAS THE CREATOR OF BRATZ.          10:37

11         THIS IS ALMOST THREE YEARS LATER.

12         MGA DID ITS BEST TO COVER UP THE TRUE ORIGINS OF

13   BRATZ THROUGHOUT THAT PERIOD OF TIME, AND MR. LARIAN WAS

14   CONTINUING TO DO THAT RIGHT UP AND THROUGH THE SUMMER OF 2003

15   WHEN HE TALKED TO MR. PALMERI.          10:37

16         **THE COURT:**  I UNDERSTAND THOSE ALLEGATIONS, AND I

17   UNDERSTAND HOW THOSE ALLEGATIONS FIGURE PROMINENTLY IN WHAT WE

18   CALL THE PHASE-TWO COMPLAINT.  I GUESS YOU'RE GOING TO HAVE TO

19   EXPLAIN TO ME HOW THEY PLAY INTO THE NARROW ISSUES THAT THE

20   COURT HAS SPECIFIED FOR PHASE ONE.          10:37

21         **MR. ALGER:**  YOUR HONOR, MR. LARIAN'S CONDUCT, HIS

22   STATEMENTS, WERE MADE FOR THE PURPOSE OF COVERING UP THE TRUE

23   OWNERSHIP OF THESE DRAWINGS.

24         HE KNEW THAT MATTEL OWNED THE DRAWINGS.  HE KNEW THAT

25   THERE WAS A PROBLEM RELATED TO MR. BRYANT'S DEVELOPMENT OF THE          10:37

```
 1   DRAWINGS WHILE HE WAS EMPLOYED BY MATTEL.  HE WENT OUT OF HIS
 2   WAY TO MAKE SURE THAT IT WAS NOT DISSEMINATED THAT MR. BRYANT
 3   WAS THE INVENTOR OF BRATZ.  THAT'S GUILTY KNOWLEDGE, AND IT'S
 4   VERY PERSUASIVE TO THE JURY.  IT'S GOING TO BE A CRITICAL PART
 5   OF THE PHASE-ONE TRIAL HERE, YOUR HONOR.  I DON'T WANT THERE TO    10:38
 6   BE ANY MISUNDERSTANDING ABOUT THAT.  MATTEL'S VIEW IS THAT THIS
 7   IS VITAL TO THE PHASE-ONE CASE.  AND MR. LARIAN'S CONDUCT IN
 8   COVERING UP THE TRUE ORIGINS OF BRATZ AND MR. BRYANT'S
 9   INVOLVEMENT IN BRATZ, PARTICULARLY DURING THE PERIOD OF TIME
10   WHEN HE WAS EMPLOYED BY MATTEL, GOES DIRECTLY TO THE ISSUE OF      10:38
11   WHETHER MGA KNEW THAT THEY WERE PURCHASING, FROM MR. BRYANT,
12   PROPERTY THAT BELONGED TO MATTEL.  IT'S CRITICAL TO PHASE ONE,
13   AND I DON'T WANT THERE TO BE ANY MISUNDERSTANDING ABOUT THAT.
14         SO WHAT WE HAVE HERE IS A COURSE OF CONDUCT.  THIS
15   STATEMENT TO MR. PALMERI, IT'S NOT CUMULATIVE BECAUSE IT'S PART    10:38
16   OF A COURSE OF CONDUCT.  IT'S ALSO UNIQUE IN THAT IT WAS MADE
17   TO THE WORLD.  IT WASN'T JUST MADE TO SOMEONE OVER LUNCH.
18         THE COURT:  I'M SORRY, I DON'T UNDERSTAND WHAT YOU
19   JUST SAID THERE.
20         IT'S NOT CUMULATIVE BECAUSE IT WAS PART OF THE COURSE        10:38
21   OF CONDUCT?
22         MR. ALGER:  IT'S NOT CUMULATIVE FOR TWO MAJOR
23   REASONS, YOUR HONOR; AND THIS IS WHERE, I THINK --
24         THE COURT:  WELL, YOU SAID BECAUSE OF THE COURSE OF
25   CONDUCT.  I DON'T UNDERSTAND THE --                               10:39
```

```
 1              MR. ALGER:  I THINK THERE'S --

 2              THE COURT:  DON'T SPEAK OVER ME.

 3              THERE'S NOBODY ELSE IN THE COURTROOM.  WE'VE GOT ALL

 4   MORNING.  SLOW DOWN.

 5              MR. ALGER:  YOUR HONOR, I THINK THERE'S TWO THINGS          10:39

 6   THAT WILL MAKE THIS DIFFERENT THAN THE SITUATION THAT

 7   MR. WICKERS HAS DESCRIBED.

 8              ONE, THE STATEMENTS THAT MR. LARIAN MADE TO PALMERI

 9   ARE UNIQUE IN THAT THEY WERE MADE TO A REPORTER THAT WAS GOING

10   TO SEND THIS OUT TO THE WORLD.  THAT DISTINGUISHES IT FROM          10:39

11   MR. LARIAN TALKING TO SOMEONE IN THE OFFICE, TALKING TO SOMEONE

12   OVER LUNCH, OR EVEN TALKING TO SOMEONE ON THE STREET CORNER AND

13   SHOUTING IT FROM THE CORNER OF FIGUEROA AND EIGHTH IN DOWNTOWN

14   LOS ANGELES.  HE WAS SENDING IT OUT TO THE WORLD, TO A

15   BUSINESSWEEK REPORTER WHO WAS FAMILIAR WITH THE TOY INDUSTRY,          10:39

16   WHO HAD BEEN WRITING AND CONTINUES TO WRITE ABOUT THE TOY

17   INDUSTRY THAT'S FOLLOWED ON WALL STREET.  HE WAS SENDING OUT

18   THE INFORMATION.  SO THAT MAKES IT UNIQUE RIGHT THERE.

19              EVEN IF MR. LARIAN HAD SAID THE EXACT SAME WORDS TO

20   SOMEONE ELSE, IT DOESN'T MAKE THIS CUMULATIVE.  IT'S UNIQUE          10:40

21   BECAUSE IT WAS SENT OUT PURPOSELY AND INTENTIONALLY TO THE

22   WORLD.

23              SECOND, IT'S NOT CUMULATIVE, BECAUSE IT'S PART OF A

24   COURSE OF CONDUCT.  IT SHOWS THAT THERE WAS INTENTIONALITY ON

25   THE PART OF MGA.  IT SHOWS THAT THIS WAS NOT JUST A MISTAKE, A          10:40
```

```
 1   REPORTER MISSTATING SOMETHING, MISQUOTING SOMETHING, SOMETHING

 2   BEING MISUNDERSTOOD.  IT SHOWS, OVER THE COURSE OF THREE TO

 3   FOUR YEARS, MGA CONSISTENTLY SENDING OUT DIFFERENT STORIES,

 4   OTHER THAN BRYANT'S INVOLVEMENT, TO THE WORLD.  AND WHETHER HE

 5   SAID IT TO THIS PERSON ON DAY ONE AND ANOTHER PERSON ON DAY        10:40

 6   TWO, ANOTHER PERSON ON DAY THREE, IT'S ALL PART OF THE COURSE

 7   OF CONDUCT AND INTENTIONALITY.

 8          AND ALSO, BECAUSE AGAIN, BECAUSE I HAVE A GREATER

 9   DEPTH OF KNOWLEDGE ON THIS, I WANTED TO POINT OUT THAT IN THE

10   CASE OF THE WALL STREET JOURNAL REPORTER, MGA CHALLENGED THAT      10:40

11   REPORTER'S RECOLLECTION OF THE COMMUNICATIONS WITH MR. LARIAN.

12   AND, FOR EXAMPLE, MGA'S COUNSEL SAID TO MAUREEN TKACIK, THE

13   WALL STREET JOURNAL REPORTER, THEY SAID 'WELL, MR. LARIAN, YOU

14   KNOW THAT ENGLISH IS HIS SECOND LANGUAGE, RIGHT?  DID YOU

15   REALLY UNDERSTAND HIM?'                                            10:41

16          AND MAUREEN TKACIK SAID, 'I UNDERSTOOD HIM VERY WELL.

17   I DIDN'T HAVE A PROBLEM.'

18          THEN THEY SAID, 'WELL, YOU KNOW MR. LARIAN WAS ON A

19   CELL PHONE WHEN HE TALKED TO YOU, MS. TKACIK.  DIDN'T IT CUT

20   OUT?  DIDN'T YOU HAVE PROBLEMS WITH THE CONNECTION?'               10:41

21          AND MS. TKACIK SAID, 'THERE WASN'T A PROBLEM.  IT WAS

22   QUITE CLEAR WHEN I TALKED TO MR. LARIAN, WHEN HE TOLD ME THAT

23   THERE WAS A DOLL DESIGN CONTEST IN 1999.'

24          SO MGA IS GOING TO BE HEARD TO ARGUE TO THIS JURY IN

25   A COUPLE OF MONTHS THAT THE REPORTERS HEARD IT WRONG; THAT         10:41
```

```
 1    THERE WAS SOME AMBIGUITY.  AND WITH ALL DUE RESPECT TO

 2    MR. HERRINGTON, WHEN HE TALKS ABOUT MR. LARIAN AT THE SECOND

 3    DEPOSITION SAYING, 'OH, I'M NOT DENYING IT,' THE FACT OF THE

 4    MATTER IS, THEY WANT -- MGA AND BRYANT WANT TO CREATE AMBIGUITY

 5    ABOUT THIS.  AND MATTEL IS ENTITLED TO GET THE EVIDENCE          10:42

 6    NECESSARY TO PRESENT TO THE JURY THAT THERE'S NO QUESTION ABOUT

 7    THIS; THAT IT WAS AN INTENTIONAL, DELIBERATE, CONSISTENT COURSE

 8    OF CONDUCT BY MGA TO COVER UP THE TRUE ORIGINS OF BRATZ AND

 9    MR. BRYANT'S INVOLVEMENT, BECAUSE THEY KNEW IT AND THEY KNEW

10    THAT MATTEL OWNED THAT PROPERTY.                                 10:42

11          THIS IS ALL VERY CRITICAL TO PHASE ONE.  IT'S AN

12    IMPORTANT PART OF THE CASE.  AND THAT NEEDS TO BE CONSIDERED,

13    YOUR HONOR.

14          THE COURT:  THANK YOU, COUNSEL.

15          MR. ALGER:  THANK YOU.                                     10:42

16          THE COURT:  ANYTHING FURTHER?

17          MR. HERRINGTON:  BRIEFLY, YOUR HONOR.

18          THE COURT:  YOU MAY.

19          MR. HERRINGTON:  JUST FOR THE RECORD AND THAT IT'S

20    CLEAR, MGA AND MR. LARIAN OBVIOUSLY CHALLENGE THE STATEMENTS     10:42

21    THAT WERE JUST RENDERED BY MATTEL'S COUNSEL REGARDING NOT ONLY

22    THE RELEVANCE, BUT THE STATE OF MIND AND INTENTIONALITY SOME

23    SEEK TO COVER UP.

24          I THINK THE RECORD THAT YOUR HONOR HAS IN FRONT OF

25    HIM ON SUMMARY JUDGMENT WILL REFLECT THAT THERE WERE OTHER       10:42
```

1   PUBLISHED STATEMENTS THAT WERE ACTUALLY IN MATTEL'S POSSESSION

2   REGARDING CARTER BRYANT'S INVOLVEMENT, AT LEAST AS EARLY AS

3   2002, IF NOT EARLIER, INCLUDING STATEMENTS ON THE YAHOO!

4   WEBSITE THAT WERE PRESENTED --

5            THE COURT REPORTER:  I'M SORRY.  I CAN'T HEAR YOU

6   VERY WELL.

7            MR. HERRINGTON:  I'M SORRY.

8            I WAS JUST REFERENCING, YOUR HONOR, THE STATEMENTS

9   THAT ARE IN THE SUMMARY JUDGMENT RECORD REGARDING

10  CARTER BRYANT'S INVOLVEMENT THAT, I BELIEVE, ARE AT LEAST AS        10:43

11  EARLY AS EARLY 2002 IN CARTER BRYANT'S INVOLVEMENT IN BRATZ.

12           THE COURT:  WE'LL EXPLORE THIS MORE IN DETAIL NEXT

13  TUESDAY --

14           MR. HERRINGTON:  SURE.

15           THE COURT:  -- WHEN I HEAR ON THE MOTIONS FOR SUMMARY      10:43

16  JUDGMENT.  I MEAN, THERE'S NO QUESTION THAT THERE ARE

17  STATEMENTS, BUT THEN THERE'S OTHER STATEMENTS.  THE QUESTION IS

18  WHETHER OR NOT -- YOU KNOW, WHAT A REASONABLE PERSON MIGHT BE

19  ON NOTICE FOR AND WHEN THEY WERE ON NOTICE.  BUT WE'LL GET INTO

20  THAT NEXT.                                                         10:43

21           MR. HERRINGTON:  THAT WAS JUST THE ONE POINT I WANTED

22  TO...

23           THE COURT:  AND THERE'S NO QUESTION THAT, I THINK,

24  THIS BUSINESSWEEK ARTICLE FIGURES INTO THAT CALCULUS.  I'M NOT

25  EXACTLY SURE AT THIS POINT HOW IT DOES, AND I'LL HEAR ARGUMENT     10:43

```
 1   ON THAT NEXT TUESDAY.

 2            I KNOW YOU'RE OBJECTING TO THE RELEVANCE OF THIS

 3   GUILTY KNOWLEDGE ARGUMENT IN PHASE ONE.

 4            DO YOU CARE TO ELABORATE ON THAT, COUNSEL, AS TO WHY

 5   YOU VIEW THAT IT'S NOT VERY RELEVANT?                              10:44

 6       MR. HERRINGTON:  ACTUALLY, NO, YOUR HONOR, WE'RE NOT

 7   GOING TO ARGUE THAT IT'S NOT RELEVANT.  IT'S CLEARLY PART OF

 8   MATTEL'S CASE IN TERMS OF WHY THEY ARE ARGUING IN PHASE ONE

 9   THAT SOMEHOW THE STATUTE OF LIMITATIONS OR LATCHES DOESN'T

10   APPLY.  LATCHES IS AN EQUITABLE DEFENSE, SO I'M NOT --          10:44

11       THE COURT:  BEYOND THAT.  I THINK HE'S ARGUING THAT

12   IN ADDITION TO THE STATUTE OF LIMITATIONS AND LATCHES, THAT

13   THERE IS SOMETHING FURTHER -- WHAT I JUST HEARD WAS THAT

14   THERE'S A FURTHER RELEVANCY TO THE ACTUAL SUBSTANTIVE ISSUES IN

15   PHASE ONE.                                                       10:44

16       MR. HERRINGTON:  BEYOND THE LATCHES --

17       THE COURT:  THIS GOES TO THE EVIDENCE OF THE

18   OWNERSHIP OF THE BRATZ DOLLS.

19       MR. HERRINGTON:  THAT, WE DO NOT SEE, YOUR HONOR.

20   IT'S BEYOND LATCHES --                                           10:44

21       THE COURT:  I'M INVITING YOU TO ELABORATE ON --

22       MR. HERRINGTON:  NO.  ABSOLUTELY.

23            I MEAN, THE ISSUE BEFORE THE COURT IN TERMS OF THE

24   OWNERSHIP OF BRATZ WILL BE ONE OF CONTRACTUAL INTERPRETATION,

25   AND THEN LOOKING AT THE FACTS SURROUNDING THE DEVELOPMENT OF     10:45
```

1   BRATZ PRODUCTS AND THE DRAWINGS THAT BRYANT CREATED.

2          **THE COURT:**  COUNSEL JUST SAID THAT THIS IS PART OF

3   THE FACTS SURROUNDING THE DEVELOPMENT OF BRATZ.

4          **MR. HERRINGTON:**  UNDERSTOOD, YOUR HONOR.  AND I GUESS

5   I HAVE JUST A LITTLE BIT OF A HARD TIME BELIEVING THAT,                  10:45

6   CONSIDERING THAT THIS ARTICLE COMES OUT IN THE 2003 TIME FRAME

7   AND THE DEVELOPMENT OF BRATZ OCCURS BETWEEN LATE OCTOBER OF

8   2000 AND THEN IS FIRST RELEASED -- THE FIRST PRODUCTION START

9   DATE IS IN MAY OF 2001.

10         **THE COURT:**  RIGHT.  BUT THE STATEMENT IN 2003 IS          10:45

11  REFERENCING BACK IN TIME TO THIS PERIOD OF WHEN BRATZ WAS

12  DEVELOPED.  IT'S ISAAC LARIAN, ALLEGEDLY.  WE DON'T KNOW FOR

13  SURE BECAUSE WE DON'T KNOW EXACTLY WHAT THE SOURCE OF THE

14  REPORTER IS.  HE'S TALKING ABOUT THAT TIME PERIOD THAT YOU JUST

15  REFERENCED, WHEN BRATZ WAS CREATED.                                      10:45

16         **MR. HERRINGTON:**  ABSOLUTELY, YOUR HONOR.

17         AND, OBVIOUSLY -- AND MR. LARIAN WILL BE ON THE STAND

18  AND HE CAN TESTIFY EXACTLY WHAT HE INTENDED BY THAT STATEMENT

19  BEYOND --

20         **THE COURT:**  HE SAID HE DOESN'T RECALL IT.                    10:45

21         **MR. HERRINGTON:**  HE DOESN'T DENY MAKING IT.  HE WAS

22  ASKED IF THE STATEMENT WAS TRUE, AND HE SAYS, 'IT'S PARTIALLY

23  TRUE.'  HE SAYS, 'I SAW MY KIDS AROUND IN HIP-HUGGERS, AND THAT

24  WAS PART OF THE BASIS WHEN WE WERE DEVELOPING BRATZ; THAT WAS

25  PART OF WHAT WE LOOKED AT,' WHICH IS PERFECTLY CONSISTENT.              10:46

1        **THE COURT:**  HE WAS ASKED, QUOTE, 'DID YOU EVER SAY

2   THAT TO ANYBODY?'  HE WAS SHOWN THE ARTICLE; HE SAYS, ANSWER:

3   'IT'S POSSIBLE I DID.  I DON'T RECALL.'

4        **MR. HERRINGTON:**  AND THEN THE NEXT STATEMENT IS, 'ARE

5   YOU DENYING YOU SAID IT?'                                      10:46

6        AND HE SAYS, 'NO, I AM NOT.'

7        **THE COURT:**  WELL, NO.  THE NEXT STATEMENT IS,

8        QUESTION:  'SO YOU'RE NOT SURE ONE WAY OR THE OTHER.'

9        ANSWER:  'I DON'T RECALL IT.  I MIGHT HAVE SAID IT.'

10       QUESTION:  'YOU'RE NOT DENYING IT?'                        10:46

11       'NO.'

12       **MR. HERRINGTON:**  THAT'S RIGHT.  AND THEN HE'S ASKED

13   ABOUT THE TRUTH OF THE STATEMENT ON THE NEXT PAGE.

14       **THE COURT:**  AND THEN HE SAYS, 'PARTIALLY.'

15       **MR. HERRINGTON:**  THAT'S RIGHT.  AND THEN HE GOES ON    10:46

16   TO EXPLAIN WHAT HE MEANT.

17       **THE COURT:**  THAT'S WHEN HE USES THE ROYAL 'WE.'

18       OKAY.  ALL RIGHT.  I THINK I HAVE A PRETTY GOOD SENSE

19   OF COUNSELS' ARGUMENTS ON THIS, AND I'LL ISSUE A RULING ON THAT

20   SHORTLY.                                                      10:46

21       THE LAST ISSUE I WANTED TO TAKE UP, I RECEIVED LAST

22   WEEK THIS EX-PARTE APPLICATION TO FILE SUPPLEMENTAL EXPERT

23   REPORTS.  THIS WAS FILED BY MATTEL IN ANTICIPATION OF THE

24   ISSUE -- THE DISCOVERY ISSUE BEING RESOLVED BY JUDGE INFANTE AS

25   TO WHETHER OR NOT TO PERMIT FURTHER TESTING OF BRYANT DOCUMENTS  10:47

```
 1   AND THE CREATION OF, ESSENTIALLY, A SURREBUTTAL EXPERT REPORT.

 2   BUT SINCE WE'RE PAST THE EXPERT CUTOFF DATE OF MARCH 31ST, THEY

 3   WANTED TO GET LEAVE -- OR THEY'RE SEEKING LEAVE TO HAVE SEVEN

 4   DAYS AFTER THE DISCOVERY MASTER'S ORDER, ASSUMING THAT IT'S IN

 5   THEIR FAVOR, TO FILE A REPORT.                                    10:47

 6          IN READING THROUGH THIS, IT STRIKES THE COURT AS

 7   ESSENTIALLY SEEKING AN ADVISORY OPINION, BECAUSE WE CERTAINLY

 8   DON'T KNOW HOW THE DISCOVERY MASTER IS GOING TO RULE.  THE ONLY

 9   PROBLEM I HAVE WITH THAT -- AND THIS WAS NOTED IN A FOOTNOTE IN

10   THE MATTEL APPLICATION AND THEN EXPANDED UPON IN THE REPLY -- I  10:47

11   GAVE SIMILAR RELIEF TO MGA LAST MONTH WHEN THEY ASKED TO HAVE

12   AN EXTRA 14 DAYS AFTER THE DISCOVERY MASTER RULED ON CERTAIN

13   MATTERS.  I SUPPOSE THE ONLY DISTINCTION THAT I SEE IN MY MIND

14   IS AT LEAST WE WERE STILL WITHIN THE EXPERT DISCOVERY PERIOD.

15   THAT HAS NOW SINCE EXPIRED.  BUT I WANT TO MAKE SURE THAT I'M    10:48

16   TREATING BOTH SIDES FAIRLY IN THIS MATTER.

17          MGA REALLY DIDN'T RESPOND TO THIS MUCH AT ALL IN THE

18   COURSE OF THEIR OPPOSITION.  ADMITTEDLY, IT WAS ONLY RAISED IN

19   A FOOTNOTE IN THE INITIAL APPLICATION.  BUT I WANTED TO GIVE

20   MGA THE FIRST OPPORTUNITY THAT I HAD HERE TO RESPOND, IF THEY    10:48

21   WOULD.

22          MR. HERRINGTON:  JUST BRIEFLY, YOUR HONOR.

23          I THINK THERE'S A BIT OF A DISTINCTION BETWEEN THE

24   TWO SITUATIONS THAT ARE BEING IDENTIFIED HERE.  IN THE INSTANCE

25   OF MGA AND THE 14 DAYS THAT YOUR HONOR DID PROVIDE TO US, THAT   10:48
```

```
 1   WAS IN A SITUATION WHERE WE WERE -- FOR THE FIRST TIME, WE HAD
 2   RECEIVED AN EXPERT REPORT THAT HAD TESTED CERTAIN MATERIALS.
 3   WE HAD SOUGHT ACCESS TO THOSE MATERIALS FOR OUR TESTING.  AND
 4   THEN THAT WAS AN ISSUE THAT WAS BROUGHT BEFORE THE DISCOVERY
 5   MASTER, AND THEN WE CAME TO YOUR HONOR FOR AN EXTENSION OF TIME   10:49
 6   SO THAT ONCE THE DISCOVERY MASTER RULED, WE COULD THEN OBTAIN
 7   THOSE MATERIALS, ASSUMING IT'S ALLOWED, DO OUR TESTING, AND
 8   PREPARE THE REPORT.
 9        HERE WE HAVE A SITUATION WHERE -- IT'S ACTUALLY SORT
10   OF IRONIC -- WE HAVE -- MATTEL DID THE TESTING ALREADY ON THESE   10:49
11   MATERIALS.  MATTEL SUBMITTED THE EXPERT REPORT ON THOSE
12   MATERIALS.  WE THEN EXAMINED THOSE MATERIALS, OR OUR EXPERTS
13   DID; PROVIDED REBUTTAL REPORTS.  AND THOSE REBUTTAL REPORTS
14   SHOWED THAT MATTEL HAD MISTESTED AND MISSED SOME THINGS IN
15   DOING THE TESTING.                                                10:49
16        NOW WE HAVE A SITUATION WHERE MATTEL IS BASICALLY
17   SEEKING A DO-OVER ON THE EXPERT REPORTS.
18        THE COURT:  THAT SOUNDS LIKE A GOOD ARGUMENT,
19   PERHAPS, THAT YOU MIGHT WANT TO MAKE TO JUDGE INFANTE AS TO WHY
20   NOT TO ALLOW THEM TO DO THAT.  BUT IF JUDGE INFANTE DOES ALLOW    10:50
21   THEM TO DO THAT IN ADDRESSING THE MERITS OF THE DISCOVERY --
22   WHICH THIS COURT DOES NOT WANT TO OFFER ANY OPINION OR
23   INTERFERE; I'VE TRIED TO MAKE THAT CONSISTENTLY CLEAR THE LAST
24   THREE OR FOUR MONTHS, THAT ALL DISCOVERY MATTERS GO TO JUDGE
25   INFANTE AS A MATTER OF FIRST IMPRESSION.                          10:50
```

```
 1          WHY SHOULD I NOT, ASSUMING THAT HE DOES DECIDE WITH

 2   MATTEL, GIVE THEM LEAVE TO FILE A SURREBUTTAL REPORT, AS I DID

 3   IN YOUR CASE?

 4          MR. HERRINGTON:  YOUR HONOR, LET ME MAKE SURE I

 5   UNDERSTAND WHAT YOU'RE ASKING ME.                              10:50

 6          IT IS ASSUMING THAT ON THE MERITS, THE DISCOVERY

 7   MASTER AGREES WITH MATTEL'S POSITION THAT THEY SHOULD BE

 8   PERMITTED LEAVE TO FILE A SURREBUTTAL?

 9          THE COURT:  RIGHT.  THAT'S ALL THEY'RE BASICALLY

10   ASKING FOR, AT LEAST AS EXPLAINED IN THEIR REPLY.  THEY'RE     10:50

11   SIMPLY ASKING -- THEY DON'T WANT TO BE WASTING THEIR TIME

12   BEFORE JUDGE INFANTE.  AND IF JUDGE INFANTE RULES IN YOUR

13   FAVOR, FOR THE REASON THAT YOU JUST STATED OR FOR ANY OTHER

14   REASON, THEN THIS IS ALL A MOOT POINT AND NOTHING'S GETTING

15   FILED.  THEY JUST WANT TO KNOW THAT IF JUDGE INFANTE DOES FIND 10:51

16   IN THEIR FAVOR, THAT THEY SHOULD BE ABLE TO FILE A SURREBUTTAL.

17   THEY DON'T WANT TO HAVE THE COURT'S CASE MANAGEMENT CALENDAR

18   SOMEHOW PRECLUDING JUDGE INFANTE FROM RULING IN THEIR FAVOR.

19   THEY WANT A RULING ON THE MERITS, AS OPPOSED TO A PROCEDURAL

20   CONCERN THAT SOMEHOW EXPERT DISCOVERY IS CLOSED.               10:51

21          MR. HERRINGTON:  UNDERSTOOD, YOUR HONOR.

22          I GUESS I DID NOT UNDERSTAND YOUR QUESTION THE FIRST

23   TIME.

24          IN TERMS OF THAT SPECIFIC QUESTION, SHOULD MATTEL, IN

25   FAIRNESS, BE ALLOWED, ASSUMING THEY WIN BEFORE JUDGE INFANTE, I 10:51
```

1    DON'T THINK WE'RE GOING TO OPPOSE THAT, THAT QUESTION.  THE

2    CONCERN, IN MY MIND, IS SIMPLY ONE OF TIMING AT THAT POINT, IF

3    WE GET TO THE POINT WHERE THE DISCOVERY MASTER HAS RULED THAT,

4    YES, A REBUTTAL REPORT CAN BE PREPARED AND FILED.

5         IN OTHER WORDS, THE DISCOVERY MASTER FINDS GOOD CAUSE      10:51

6    AND GRANTS THEM LEAVE.

7         THE COURT:  RIGHT.

8         MR. HERRINGTON:  AND WHERE ARE WE, THEN, IN THAT

9    SITUATION?

10        IF THAT HAPPENS QUICKLY, THEN WE PROBABLY HAVE NO        10:51

11   ISSUE.  IF THAT HAPPENS MUCH, MUCH CLOSER TO TRIAL, I HAVE SOME

12   CONCERNS; WE HAVE SOME CONCERNS; THE AMBIGUOUS 'WE'; MR. NOLAN

13   WILL HAVE SOME CONCERNS, JUST ABOUT THE TIMING OF THAT AND

14   MAKING SURE THAT WE AREN'T PREJUDICED IN OUR ABILITY TO RESPOND

15   TO THAT REBUTTAL.                                             10:52

16        THE COURT:  OKAY.  VERY WELL.  IF THAT'S YOUR

17   POSITION, THEN, IN LIGHT OF MY CONFIDENCE THAT JUDGE INFANTE

18   WILL ADDRESS THIS PROMPTLY, THE COURT WILL GRANT MATTEL'S

19   MOTION FOR THE --

20        YOU'RE ONLY ASKING FOR SEVEN DAYS, AS I UNDERSTAND       10:52

21   IT; CORRECT?

22        MR. ALGER:  THAT'S CORRECT, YOUR HONOR.  I HAVEN'T

23   REVIEWED THE PAPERS RECENTLY, BUT I BELIEVE THAT'S CORRECT.

24        THE COURT:  I'LL GRANT SEVEN DAYS FROM THE TIME THAT

25   JUDGE INFANTE RULES ON THAT MOTION.                          10:52

```
 1              I'M GOING TO MAKE IT CLEAR THAT THE COURT'S GRANTING

 2    OF THIS MOTION IN NO WAY SUGGESTS THAT THE MOTION BEFORE JUDGE

 3    INFANTE HAS OR DOES NOT HAVE ANY MERITS.  I'M SIMPLY

 4    SUGGESTING, AS A MATTER OF CASE MANAGEMENT, THAT SHOULD JUDGE

 5    INFANTE FIND GOOD CAUSE FOR WHAT MATTEL IS SEEKING, THAT I WILL   10:53

 6    AFFORD THEM THE OPPORTUNITY TO SUBMIT THE SURREBUTTAL REPORT.

 7              IF HE DOES NOT FIND GOOD CAUSE, THEN, OF COURSE,

 8    MATTEL HAS THE AVENUE TO APPEAL THAT MATTER TO THIS COURT.  BUT

 9    SHORT OF THAT, NOTHING IS HAPPENING.

10              COUNSEL?                                                10:53

11         MR. ALGER:  YOUR HONOR, COULD I ASK ONE HOUSEKEEPING

12    QUESTION?

13         THE COURT:  SURE.

14         MR. ALGER:  ONE OF MY AREAS OF RESPONSIBILITY IN THIS

15    CASE IS SOME OF THE LOGISTICAL ISSUES, INCLUDING HOUSING OUT      10:53

16    HERE IN RIVERSIDE DURING THE TWO-MONTH PERIOD WE'RE GOING TO BE

17    IN TRIAL.

18              WE'VE BEEN CHECKING AT THE HOTELS, AND WE LEARNED

19    LAST WEEK THAT THE MISSION INN HAS BEEN BOOKED BY OUR

20    OPPOSITION, AND THEY MADE MISSION INN PROMISE NOT TO MAKE ANY     10:53

21    ROOMS AVAILABLE TO MATTEL.

22         THE COURT:  THIS HAPPENS.  THIS IS THE SECOND TIME

23    THIS HAS HAPPENED THIS YEAR.

24         MR. ALGER:  WE DO THINK IT'S IMPROPER, AND THAT'S WHY

25    I WANTED TO BRING IT UP TO THE COURT.                            10:53
```

```
 1              THE COURT:  WOW.

 2              MR. ALGER:  ALTHOUGH THERE ARE OTHER HOTELS IN THE

 3    INLAND EMPIRE, IT CERTAINLY PUTS US AT A DISADVANTAGE; AND I

 4    JUST DON'T THINK IT'S A CIVIL WAY OF DEALING WITH THE

 5    SITUATION.                                                     10:54

 6              THE COURT:  I REALLY DON'T KNOW IF I HAVE

 7    JURISDICTION OVER THE MISSION INN'S RESERVATION POLICY.

 8              MR. ALGER:  BUT CERTAINLY, YOU COULD ADMONISH MGA TO

 9    CORRECT THE MISSION INN'S UNDERSTANDING OF WHO THEY CAN RENT

10    TO.                                                            10:54

11              MR. HERRINGTON:  MAY I?

12              THE COURT:  PLEASE, BY ALL MEANS.  THIS IS AN

13    INTERESTING ISSUE.

14              MR. HERRINGTON:  YOUR HONOR, ONE THING THAT I WOULD

15    EXPRESS SOMEWHAT SURPRISE AT IS, I DON'T BELIEVE WE'VE BEEN    10:54

16    CONTACTED BY COUNSEL FOR MATTEL TO DISCUSS THIS ISSUE PRIOR TO

17    THEM RAISING IT WITH YOUR HONOR.

18              THE COURT:  THEN WHY DON'T YOU DO THAT.  WHY DON'T

19    YOU HAVE A DISCUSSION AMONGST YOURSELVES.  I THINK THAT'S A

20    FAIR THING TO DO.                                              10:54

21              IT SOUNDS LIKE MGA IS OPEN TO DISCUSSING THIS ISSUE;

22    SO WHY DON'T YOU TAKE THAT INVITATION AND PROCEED ACCORDINGLY,

23    COUNSEL.

24              MR. ALGER:  BASED ON PREVIOUS DISCUSSIONS ABOUT MANY

25    THINGS IN THIS CASE, I DON'T HAVE A HIGH CONFIDENCE LEVEL.     10:54
```

1    THAT'S WHY I BRING IT UP.

2            **THE COURT:**  I APPRECIATE THAT, BUT I THINK THIS MIGHT

3    BE PRECISELY THE TYPE OF THING -- THE TYPE OF NONLEGAL ISSUE

4    THAT, PERHAPS, THERE CAN BE SOME ACCOMMODATION, SO TO SPEAK.

5            **MR. ALGER:**  THANK YOU, YOUR HONOR.                    10:55

6            **THE COURT:**  ALL RIGHT.  VERY WELL.

7            THE MISSION INN IS PROBABLY THE NICEST HOTEL WE HAVE

8    OUT HERE, SO I CAN UNDERSTAND WHY THERE'S A DESIRE.  IT'S A BIG

9    ENOUGH HOTEL THAT MAYBE SOMETHING COULD BE SET UP WHERE ONE

10   SIDE HAS ONE WING AND THE OTHER SIDE HAS A SEPARATE WING; AND   10:55

11   ONE WEEK SOMEONE COULD EAT AT DUANE'S AND THE NEXT

12   WEEK SOMEBODY ELSE COULD EAT AT DUANE'S.  I DON'T KNOW.  I

13   WOULD HOPE THAT YOU WOULD BE ABLE TO FIGURE THAT OUT.

14           BUT I'LL ISSUE AN ORDER ON THE REPORTER ISSUE.

15           AND I'VE RULED ON THE EX-PARTE APPLICATION.          10:55

16           I DON'T THINK THERE'S ANYTHING ELSE PENDING BEFORE

17   THE COURT UNTIL NEXT TUESDAY, SO I'LL SEE YOU ALL THEN.

18           **MR. ALGER:**  THANK YOU.

19           **MR. WICKERS:**  THANK YOU, YOUR HONOR.

20           **MR. HERRINGTON:**  THANK YOU.                       10:55

21

22

23

24   /  /  /

25   /  /  /

```
 1                              CERTIFICATE

 2

 3   I hereby certify that pursuant to section 753, title 28, united
     states code, the foregoing is a true and correct transcript of
 4   the stenographically recorded proceedings held in the
     above-entitled matter and that the transcript page format is in
 5   conformance with the regulations of the judicial conference of
     the united states.
 6

 7

     _____              _____
 8   THERESA A. LANZA, RPR, CSR                     Date
     Official Court Reporter
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

JULY 24, 2006                    ED CV 04-09049