1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                 EASTERN DIVISION

4                    - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                    - - -

7   Carter Bryant, Et. Al.,          )
                                      )
8                    Plaintiffs,  )
                                      )
9            vs.                  )  No. ED CV 04-09049
                                  )  (LEAD LOW NUMBER)
10  Mattel, Inc., Et. Al.,            )
                                      )
11                   Defendants.  )  Motions for Partial
    _____)  Summary Judgement
12  AND CONSOLIDATED ACTIONS,         )
    _____)

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             Riverside, California

17            Tuesday, April 22, 2008

18                 10:07 A.M.

19
                    **VOLUME I**
20                **PAGES 1-213**

21

22

23           THERESA A. LANZA, RPR, CSR
           Federal Official Court Reporter
24           3470 12th Street, Rm. 134
           Riverside, California  92501
25                951-274-0844
              WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2   On behalf of Carter Bryant:

 3                        KEKER & VAN NEST
                          BY:   CHRISTA M. ANDERSON
 4                        BY:   MATTHEW M. WERDEGAR
                          710 SANSOME STREET
 5                        SAN FRANCISCO, California  94111-1704
                          415-391-5400
 6

 7   on behalf of Mattel:

 8                        QUINN EMANUEL
                          By:   JOHN B. QUINN
 9                        BY:   B. DYLAN PROCTOR
                          BY:   MICHAEL T. ZELLER
10                        865 S. FIGUEROA STREET,
                          10TH FLOOR
11                        LOS ANGELES, California  90017
                          213-624-7707
12

13   ON BEHALF OF MGA ENTERTAINMENT:

14                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                          BY:   THOMAS J. NOLAN
15                        BY:   CARL ALAN ROTH
                          BY:   JASON RUSSELL
16                        300 SOUTH GRAND AVENUE
                          LOS ANGELES, CALIFORNIA  90071-3144
17                        213-687-5000

18
     ALSO PRESENT:        AMBASSADOR ROBERT-PIERRE PROSPER,
19                        DAVID BRISTOW, ESQ.

20

21

22

23

24

25
```

1                          I N D E X

2                                                    Page

3     MOTIONS........................................    5

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    RIVERSIDE, CALIFORNIA; TUESDAY, APRIL 22, 2008; 10:07 A.M.

2                              -oOo-

3         **THE CLERK:**  CALLING THE MATTER OF CARTER BRYANT

4    VERSUS MATTEL, CASE NUMBER CV 04-9049, AND RELATED ACTIONS.

5         MAY WE HAVE COUNSEL PLEASE COME FORWARD AND STATE

6    YOUR APPEARANCES FOR THE RECORD.

7         **MR. QUINN:**  JOHN QUINN, MIKE ZELLER, DYLAN PROCTOR

8    FOR MATTEL.

9         **MR. NOLAN:**  TOM NOLAN, JASON RUSSELL, ON BEHALF OF

10   MGA AND ISAAC LARIAN.                                      10:07

11        **MS. ANDERSON:**  CHRISTA ANDERSON, MATTHEW WERDEGAR,

12   AND AUDREY WALTON-HADLOCK ON BEHALF OF CARTER BRYANT.

13        **THE COURT:**  GOOD MORNING TO YOU ALL.

14        COUNSEL, WE'RE ON CALENDAR THIS MORNING, OF COURSE,

15   FOR THE VARIOUS MOTIONS FOR PARTIAL SUMMARY JUDGMENT.  THE   10:07

16   COURT HAS RECEIVED AND REVIEWED THE EXTENSIVE FILINGS MADE ON

17   BOTH SIDES, AND I LOOK FORWARD TO DEDICATING TODAY TO HEARING

18   ORAL ARGUMENT ON THESE MOTIONS.

19        WHAT I'D LIKE TO DO IS BEGIN NOW AND GO THROUGH THE

20   LUNCH HOUR.  WE WILL THEN RESUME AT 1:30 AND GO THROUGH 4:30;  10:08

21   SO THAT'S THE TIME I'M SETTING ASIDE.  USE YOUR TIME WISELY.

22        I HAVE SEVERAL QUESTIONS THAT I WILL HAVE THROUGHOUT

23   THE DAY ON THE VARIOUS MOTIONS, AND I TRUST THAT YOU ALL WILL

24   HAVE A FEW POINTS TO MAKE OR EMPHASIZE AS WELL.  I'LL CERTAINLY

25   ALLOW YOU TO USE YOUR TIME AS YOU THINK IT'S BEST TO USE IT.   10:08

1          I'LL BEGIN WITH PLAINTIFFS, MATTEL, AND GO THROUGH

2    THEIR MOTIONS THIS MORNING.  WE'LL THEN PICK UP WITH MGA AND

3    CARTER BRYANT, UNLESS THERE'S A STRONG REASON TO USE SOME OTHER

4    ORDER.

5          WITH RESPECT TO MATTEL, IF YOU WANT TO BEGIN, YOU          10:08

6    MAY.

7          **MR. QUINN:**  THANK YOU, YOUR HONOR.

8          IF IT'S ACCEPTABLE TO THE COURT, WE HAD DIVIDED UP

9    THE ARGUMENT BETWEEN MR. ZELLER AND MYSELF ON MATTEL'S MOTIONS.

10         **THE COURT:**  VERY WELL.                                 10:09

11         **MR. QUINN:**  I WILL ADDRESS THE MOTION DIRECTED TO

12   MATTEL'S CLAIMS AGAINST THE COUNTER DEFENDANTS, I GUESS IS THE

13   APPROPRIATE POSTURE; AND MR. ZELLER WILL ADDRESS THE MOTIONS

14   DIRECTED TO THE COUNTER DEFENDANT'S AFFIRMATIVE DEFENSES.

15         **THE COURT:**  SO I'LL BEGIN WITH YOU, THEN.             10:09

16         I'LL CHOOSE MY WORDS CAREFULLY HERE.

17         AS YOU WOULD UNDERSTAND IT, IT'S THE INVENTIONS

18   AGREEMENT.  AS THE DEFENSE WOULD UNDERSTAND IT, IT'S THE

19   EMPLOYMENT AGREEMENT.  I'M JUST GOING TO REFER TO IT AS "THE

20   AGREEMENT," SO AS TO NOT INDICATE THAT I FIND FOR ANY ONE       10:09

21   SIDE'S UNDERSTANDING.

22         **MR. QUINN:**  THE AGREEMENT, WHICH, DEPENDENT UPON

23   WHO'S TALKING, MAY OR MAY NOT INCLUDE A QUESTIONNAIRE.

24         **THE COURT:**  IT'S ALL RELATIVE, I SUPPOSE, AT THIS

25   POINT.

1     BUT ANYWAY, WE'LL BEGIN WITH THE ENFORCEABILITY OF

2 THE AGREEMENT AND THEN WHETHER, UNDER THE AGREEMENT, THE COURT

3 IS IN A POSITION, AS A MATTER OF LAW, TO FIND ANY OF THE

4 BREACHES, ET CETERA, THAT YOU SUGGEST.

5     **MR. QUINN:**  YES, YOUR HONOR.                                    10:10

6     I BEGIN WITH WHAT I TAKE IS AN UNDISPUTED PROPOSITION

7 THAT THE CONSTRUCTION OF A WRITTEN AGREEMENT IS A QUESTION OF

8 LAW FOR THE COURT.  SO I SUBMIT, YOUR HONOR, THAT WE ARE

9 PROPERLY BEFORE THE COURT, ASKING THE COURT TO CONSTRUE THE

10 INVENTIONS AGREEMENT TO INCLUDE THESE BRATZ-RELATED MATERIALS      10:10

11 THAT WERE CREATED DURING THE COURSE OF MR. BRYANT'S EMPLOYMENT.

12     NOW, THE DEFENSE POSITION ON THIS HAS TO BE, AND IS,

13 THAT EVEN THOUGH THE INVENTIONS AGREEMENT USES WORDS LIKE -- IT

14 INCLUDES PATENTABLE AND UNPATENTABLE INVENTIONS; IT

15 SPECIFICALLY REFERS TO THE TERM "DESIGNS"; REFERS TWICE TO THE     10:10

16 CONCEPT OF COPYRIGHTS AND COOPERATION IN SECURING COPYRIGHTS --

17 THE DEFENSE POSITION HAS TO BE THAT THE INVENTIONS AGREEMENT

18 ONLY COVERS SORT OF TECHNICAL PATENTABLE-TYPE MATERIALS.

19     I SUBMIT THAT GIVEN THE PLAIN LANGUAGE OF THE

20 AGREEMENT THAT I JUST REFERRED TO, YOUR HONOR, THAT'S A VERY       10:11

21 SURPRISING CONCLUSION AND A VERY, VERY DIFFICULT CONCLUSION TO

22 REACH IN THE TEETH OF THE EXPLICIT REFERENCES TO PATENTABLE,

23 UNPATENTABLE COPYRIGHTS AND DESIGNS.

24     **THE COURT:**  ALONG THOSE LINES, COULD YOU POINT TO ANY

25 SPECIFIC REFERENCES THAT ARE NOT MADE IN THE CONTEXT OF PATENT     10:11

1    OR PATENT LAW?

2         **MR. QUINN:**  WELL, I WOULD SAY, YOUR HONOR, THAT THE

3    REFERENCE TO COPYRIGHTS -- AND COPYRIGHTS ARE, BY DEFINITION,

4    SOMETHING THAT'S COPYRIGHTABLE; IT'S NOT PATENTABLE.  THERE'S A

5    SPECIFIC REFERENCE TO DESIGNS.  I SUPPOSE DESIGNS, IN SOME          10:11

6    SENSE, UNDER SOME CIRCUMSTANCES, COULD BE CONSTRUED TO INCLUDE

7    MATERIAL THAT MIGHT BE PATENTABLE.

8         BUT I THINK A MORE COMMON MEANING THERE, SORT OF

9    EVERYDAY MEANING OF IT, IS THE DESIGN IS MORE EASILY FIT INTO

10   THE CONTEXT OF COPYRIGHT.                                           10:12

11        **THE COURT:**  THAT'S THE QUESTION THAT I HAVE.

12        SHOULD I BE USING THE EVERYDAY MEANING OF DESIGN OR

13   THE MEANING OF DESIGN IN THE CONTEXT OF PATENT LAW?

14        **MR. QUINN:**  I THINK THE ORDINARY MEANING, I THINK,

15   YOUR HONOR, WOULD BE THE APPROPRIATE MEANING TO BE LOOKING AT       10:12

16   HERE.  THIS IS AN AGREEMENT NOT TO BE SIGNED BY A PATENT AGENT,

17   AND IT DOESN'T REQUIRE THAT WE RESORT TO TECHNICAL, SPECIALIZED

18   TYPES OF MEANINGS IN ORDER TO UNDERSTAND THE AGREEMENT.

19        THIS IS AN INDIVIDUAL, MR. BRYANT, WHO, I THINK

20   EVERYONE AGREES, WAS NEVER INVOLVED, WAS NOT INTENDED TO BE         10:12

21   INVOLVED, AND, IN FACT, NEVER WAS INVOLVED IN INVENTING, IF YOU

22   WILL, ANYTHING OF A TECHNICAL NATURE OR SOMETHING THAT WOULD BE

23   PATENTABLE OR SUBMITTED FOR PATENT PROTECTION.  I MEAN, HE WAS

24   HIRED AND ENTERED INTO THIS AGREEMENT WITH THE EXPECTATION THAT

25   HE WOULD BE WORKING ON DOLL DESIGNS, WHICH WE ALL KNOW IS           10:12

1   EXACTLY WHAT HE DID; SO IT WOULD BE SURPRISING IF THE

2   OBLIGATIONS THAT HE UNDERTOOK PURSUANT TO THE AGREEMENT, THAT

3   HE WAS REQUESTED TO SIGN OR REQUIRED TO SIGN AT THE TIME THAT

4   HE STARTED HIS EMPLOYMENT WITH MATTEL, COVERED THINGS THAT

5   NOBODY EVER EXPECTED THAT HE WOULD BE DOING, AND, IN FACT,                     10:13

6   THINGS THAT HE NEVER DID.

7           MOREOVER, YOUR HONOR, INVENTION IS A WORD THAT'S USED

8   IN THE CONTEXT OF COPYRIGHT LAW, ALSO TO REFER TO COPYRIGHTABLE

9   MATERIAL.  AND WE'VE CITED THE COURT TO SOME AUTHORITIES FOR

10  THAT AT PAGE 5 OF OUR MOVING PAPER.                                           10:13

11          THE DEFENSE IS FORCED TO TAKE THE POSITION THAT

12  SECTION 2870, WHICH IS EMBRACED BY -- THERE'S THE LANGUAGE OF

13  2870 THE CARVE OUT, WHICH IS EXPLICITLY TRACKED AND EMBRACED BY

14  THE OPINION -- THE DEFENSE IS FORCED TO ULTIMATELY TAKE THE

15  POSITION THAT 2870 PROVIDES NO PROTECTION FOR EMPLOYEES WHO                   10:14

16  CREATE COPYRIGHTABLE INVENTIONS, OR CREATE COPYRIGHTABLE

17  MATERIAL, WHICH I THINK IS SORT OF A SURPRISING RESULT TO THINK

18  THAT THE LEGISLATURE PROTECTED EMPLOYEES WHO CREATED THINGS

19  WHICH ARE PATENTABLE, BUT CREATED NO PROTECTION FOR MATERIAL

20  WHICH CAN BE COPYRIGHTED.                                                     10:14

21          AND, IN FACT, IT'S ONE COURT THAT ADDRESSED THAT; THE

22  ICONIX COURT REACHED JUST THAT OPPOSITE CONCLUSION; AND, IN

23  FACT, IT COVERS COPYRIGHTED MATERIAL.

24          THE LANGUAGE OF THE AGREEMENT SAYS THAT "ALL SUCH

25  INVENTIONS ARE ASSIGNED TO THE FULLEST EXTENT OF THE LAW, ALL                 10:14

1  RIGHTS, INCLUDING BUT NOT LIMITED TO..."

2          SO THAT, I SUBMIT, YOUR HONOR, INCLUDES EVERYTHING.

3  WE HAVE THE DECISION OF THE COURT IN THE CADENCE CASE THAT SAYS

4  THAT WHEN YOU HAVE THAT KIND OF LANGUAGE, THEN EVERY TYPE OF

5  INVENTION, CREATION IS COVERED BY THE AGREEMENT TO THE FULLEST      10:14

6  EXTENT OF THE LAW.

7          **THE COURT:**  WHAT EXACTLY DID CARTER BRYANT CREATE,

8  THEN, FROM YOUR PERSPECTIVE?

9          **MR. QUINN:**  CARTER BRYANT CREATED SOME DRAWINGS; HE

10  CREATED SOME PROTOTYPES.  THESE CAN ALSO BE CHARACTERIZED AS       10:15

11  DESIGNS.  I THINK IN OUR MOTION, WE ASKED FOR THE COURT TO

12  ADJUDICATE THINGS THAT HE CREATED DURING HIS EMPLOYMENT OF THAT

13  NATURE, WITHIN THE COURSE AND SCOPE OF HIS WORK, ARE SUBJECT TO

14  THE AGREEMENT.  WE CALL OUT SOME SPECIFIC THINGS, SPECIFIC

15  EXHIBITS, WHICH I TAKE FROM THE BRIEFING.  THERE IS NO DISPUTE     10:15

16  THAT HE DID CREATE THOSE DURING THE TIME HE WAS EMPLOYED BY

17  MATTEL.  SO THOSE ARE SOME VERY SPECIFIC THINGS.  I BELIEVE

18  THAT THERE ARE FOUR OR FIVE OR SIX OF THOSE EXHIBITS.

19          WE FULLY ACKNOWLEDGE THAT THERE ARE DISPUTED ISSUES

20  AS TO OTHER MATTERS; AND THOSE CAN'T BE RESOLVED TODAY.  BUT       10:15

21  THERE ARE SOME SPECIFIC THINGS THAT I DON'T THINK THERE'S ANY

22  DISPUTE THAT HE CREATED.

23          I WOULD POINT OUT, THOUGH, THAT IF IT'S CORRECT THAT

24  SECTION 2870 DID NOT COVER COPYRIGHTS, THEN THE RESULT WOULD BE

25  THAT MATTEL WOULD OWN IT.  SINCE IT COVERS EVERYTHING,            10:16

```
1    INCLUDING BUT NOT LIMITED TO THE FULLEST EXTENT OF THE LAW, I
2    THINK THE DEFENSE KIND OF RUNS INTO THEMSELVES COMING IN THE
3    OTHER DIRECTION THERE, BECAUSE NECESSARILY, THE COPYRIGHTS
4    WOULD BE COVERED IF THEY'RE NOT PICKED UP BY THE STATUTE.
5              SO FOR THESE REASONS, YOUR HONOR, I DON'T BELIEVE THE    10:16
6    COURT HAS ANY NEED IN CONSTRUING THIS WRITTEN AGREEMENT.  I DO
7    NOT BELIEVE THE COURT HAS ANY NEED TO RESORT TO EXTRINSIC
8    EVIDENCE.  THE BASIC RULE OF CONTRACT CONSTRUCTION IS, IF A
9    CONTRACT CAN REASONABLY BE INTERPRETED ACCORDING TO THE PLAIN,
10   ORDINARY MEANING OF ITS TERMS, THEN IT SHOULD BE SO    10:16
11   INTERPRETED.
12             I WOULD SUBMIT, YOUR HONOR, THAT UNDER THE PLAIN,
13   ORDINARY MEANING OF THESE TERMS, THESE MATERIALS THAT
14   MR. BRYANT CREATED DURING THE COURSE OF HIS EMPLOYMENT WOULD BE
15   OWNED BY MATTEL AND THEY'RE NOT LIMITED TO TECHNICAL TYPE,    10:17
16   PATENTABLE INVENTIONS.
17             BUT IF WE LOOK AT THE EXTRINSIC EVIDENCE, WHAT DOES
18   IT SHOW US?
19             WE HAVE THE TESTIMONY OF MR. BRYANT'S MOTHER, ABOUT A
20   CONVERSATION THAT SHE HAD WITH MR. BRYANT WHERE MR. BRYANT WAS    10:17
21   SAYING HE WAS SHORT ON MONEY, AND SHE SAID TO HIM, 'WELL, WHY
22   DON'T YOU JUST SELL SOME OF YOUR DRAWINGS, CARTER,' AND HIS
23   RESPONSE WAS, 'I CAN'T.  THAT WOULD BE IN VIOLATION OF MY
24   AGREEMENT WITH MATTEL.'
25             THE DEFENSE MAKES MUCH OF THE SUGGESTION THAT THIS IS    10:17
```

```
 1   A HIGHLY TECHNICAL, DENSE AGREEMENT; THAT AN EMPLOYEE COULDN'T

 2   BE EXPECTED TO UNDERSTAND IT.  THE EVIDENCE ON THIS, FROM

 3   MR. BRYANT'S MOTHER, IS THAT HE UNDERSTOOD IT AND HE EXPLAINED

 4   IT TO HIS MOM.  AND, YOU KNOW, THAT'S NOT REALLY SURPRISING,

 5   BECAUSE THIS IS NOT AN EMPLOYEE.  WE'RE NOT TALKING ABOUT              10:18

 6   THINGS THAT ARE FOREIGN TO WHAT HE DOES, LIKE A JANITOR OR A

 7   HUMAN RESOURCES PERSON OR SOMEONE ELSE.

 8           BY THE WAY, MATTEL DOES NOT REQUIRE ALL EMPLOYEES TO

 9   SIGN THIS AGREEMENT.  WE'RE TALKING ABOUT A DESIGNER, AN

10   ARTIST, SOMEBODY WHO WORKS IN A DESIGN CENTER, A HIGHLY SECURE        10:18

11   FACILITY, WHO HAS UNDERTAKEN CERTAIN OBLIGATIONS WITH THE

12   COMPANY.  HE UNDERSTANDS THAT WHEN HE GOES TO WORK FOR A

13   COMPANY AND HE CREATES DESIGNS IN THAT COMPANY'S LINE OF WORK,

14   HE UNDERSTANDS WHAT THAT MEANS.  SO I DON'T THINK WE SHOULD GET

15   CARRIED AWAY BY THE IDEA THAT THIS IS A HIGHLY DENSE,                  10:18

16   COMPLICATED AGREEMENT THAT NOBODY COULD BE EXPECTED TO

17   UNDERSTAND.  BECAUSE, IN FACT, HE DID UNDERSTAND IT.

18           THE COURT:  ONE PHRASE THAT I CONTINUE TO STRUGGLE

19   WITH IS THE PHRASE "CONCEIVED OR REDUCED TO PRACTICE."

20           WHAT DOES THAT MEAN?                                          10:18

21           MR. QUINN:  "CONCEIVED," I SUBMIT, YOUR HONOR, MEANS

22   THE IDEA.  THE IDEA.

23           THE COURT:  AND THERE'S CERTAINLY SOME DISPUTE AS TO

24   WHEN HE HAD THE IDEA.

25           MR. QUINN:  THERE IS A DISPUTE ABOUT THAT.                    10:19
```

1        "REDUCED TO PRACTICE," IT DEPENDS ON WHAT WE'RE

2    TALKING ABOUT.  IN THE CASE OF SOMETHING THAT'S COPYRIGHTABLE,

3    LIKE A DRAWING OR A DESIGN, I WOULD SAY IT'S WHEN HE CREATES

4    IT; WHEN HE PUTS IT DOWN.  IT'S THE TWO-DIMENSIONAL IMAGE THAT

5    THEN EXISTS, OR THE THREE-DIMENSIONAL IMAGE THAT THEN EXISTS;          10:19

6    SO I THINK THAT'S WHAT "REDUCED TO PRACTICE" MEANS IN THAT

7    CONTEXT.

8        OBVIOUSLY, IT'S A BROADER TERM, BUT IT ALSO HAS OTHER

9    MEANINGS IN OTHER CONTEXTS.

10       SO I SUBMIT, YOUR HONOR, THAT THERE IS NO NEED FOR US          10:19

11   TO GET TO THE TIE-BREAKING RULES OF CONTRA PROFERENTEM,

12   CONSTRUING AN AGREEMENT AGAINST THE DRAFTER, OR WHETHER THIS IS

13   A CONTRACT OF ADHESION -- THERE'S A DEBATE ABOUT THAT --

14   WHETHER SOME EMPLOYEES -- THERE IS EVIDENCE THAT SOME EMPLOYEES

15   HAD NEGOTIATED CHANGES TO THEIR AGREEMENTS.  I THINK THE RIGHT          10:19

16   OF THOSE WERE HIGH-LEVEL EMPLOYEES.

17       **THE COURT:**  I DON'T HAVE A PROBLEM FINDING

18   PROCEDURALLY THAT THIS IS AN ADHESION CONTRACT, BUT I THINK

19   SUBSEQUENTLY, AS I'VE PREVIOUSLY INDICATED, IT MAY BE DIFFICULT

20   TO ESTABLISH THAT.          10:20

21       **MR. QUINN:**  I THINK, YOUR HONOR, THAT'S NOT AN ISSUE

22   THAT THE COURT NEEDS TO GET TO, BECAUSE THOSE ARE SORT OF

23   TIE-BREAKING RULES, WHEN IT'S HARD TO CONSTRUE AN AGREEMENT AND

24   IT CAN BE CONSTRUED EQUALLY REASONABLY TWO DIFFERENT WAYS.  AND

25   WE DON'T THINK THAT IS THE CASE HERE.          10:20

1    **THE COURT:**  LET ME HEAR FROM -- BEFORE WE GET ON TO

2  THE BREACH ISSUES, I'D LIKE TO KEEP THIS ORDER AND INVITE

3  MR. NOLAN, AND THEN --

4    **MR. NOLAN:**  YOUR HONOR, I THINK THAT CHRISTA ANDERSON

5  MIGHT GO FIRST.                                               10:20

6    **THE COURT:**  WHOEVER WISHES TO SPEAK CAN BEGIN.  IT

7  SOUNDS LIKE THERE'S A NUMBER OF OPTIONS WE HAVE OUT HERE.

8    **MS. ANDERSON:**  THAT WOULD BE GREAT, YOUR HONOR.

9    **MR. NOLAN:**  I MAY ADD MORE COMMENTS, DEPENDING ON --

10    **THE COURT:**  IT WOULDN'T SURPRISE ME.                   10:20

11    **MS. ANDERSON:**  THANK YOU, YOUR HONOR.

12    CHRISTA ANDERSON FOR CARTER BRYANT.

13    YOUR HONOR, BEFORE I ADDRESS THESE SPECIFIC MATTERS,

14  IN PARTICULAR THE INTERPRETATION OF THE CONTRACT, I'D LIKE TO

15  PULL BACK FOR JUST ONE MOMENT TO TALK ABOUT THE CONTEXT IN    10:21

16  WHICH WE'RE CONSIDERING THIS, BECAUSE IT'S DIRECTLY RELEVANT TO

17  RESOLVING THE INTERPRETATION QUESTION.

18    AS YOUR HONOR IS UNDOUBTEDLY AWARE, MATTEL IS A

19  WORLD-RENOWNED TOY COMPANY.  IT MAKES A WIDE VARIETY OF TOYS,

20  RANGING FROM SOFT STUFFED ANIMALS TO HARD PLASTIC DEVICES LIKE  10:21

21  THE ORIGINAL DIVA STARZ THAT HAD SOME ELECTRONIC NOISE-MAKING

22  THINGS IN THE BOTTOM OF THE FEET.  ALL SORTS OF TOYS.  IT

23  EMPLOYS TENS OF THOUSANDS OF EMPLOYEES.  THOUSANDS OF THOSE

24  EMPLOYEES WORK IN EL SEGUNDO.  AND OVER THE YEARS, THOUSANDS OF

25  THOSE EMPLOYEES, AND ALL OF THE ONES WORKING IN THAT CENTER,   10:21

 1   WERE REQUIRED TO SIGN A CONTRACT.  IT'S A FORM CONTRACT.  IT'S

 2   A FORM CONTRACT DRAFTED BY MATTEL'S LAWYERS.

 3            THAT SINGULAR FORM CONTRACT WAS IMPOSED ON ALL OF THE

 4   EMPLOYEES -- THIS IS UNDISPUTED -- WHETHER THEY WERE

 5   SEAMSTRESSES, WHO, BY MATTEL'S OWN ADMISSION, DID NO CREATIVE          10:22

 6   WORK WHATSOEVER; WHETHER THEY WERE ARTISTS; WHETHER THEY WERE

 7   THE SECURITY PERSONNEL; WHETHER THEY WERE JANITORS.  ALL OF

 8   THEM.

 9            THIS FORM CONTRACT IS REALLY AT THE CORE OF WHAT

10   WE'RE TALKING ABOUT HERE TODAY.  IT LIES AT THE CORE OF THE          10:22

11   BREACH OF CONTRACT CLAIM.  AND IT LIES AT THE CORE OF THIS

12   CASE.

13            SO WHEN YOU CONSIDER THE CIRCUMSTANCES THAT

14   CARTER BRYANT ENTERED INTO, HIS EMPLOYEE RELATIONSHIP WITH

15   MATTEL, THAT NEEDS TO BE UNDERSTOOD.  HE, LIKE ALL THE OTHER         10:22

16   THOUSANDS OF PEOPLE THAT EVER WENT TO WORK THERE, SAT DOWN IN A

17   ROOM ON BOARDING DAY AND WERE HANDED A STACK OF PAPERS AND

18   SIGNED THEM.

19            IN ALL OF THE HISTORY OF MATTEL, MATTEL'S LAWYERS

20   COULD ONLY COME UP WITH TWO EXAMPLES WHERE ANYONE HAD DONE           10:23

21   ANYTHING TO EFFECT ANY KIND OF MODIFICATION TO THAT FORM

22   CONTRACT; THEY WERE SENIOR EXECUTIVES, AND ALL THEY WERE ABLE

23   TO DO WAS PUT A LITTLE ASTERISK INDICATING SOME KIND OF

24   EXCLUSION THAT THEY HAD SOMEHOW NEGOTIATED AS A RESULT OF THEIR

25   SENIOR STATUS.                                                       10:23

1          THERE ISN'T A SHRED OF EVIDENCE IN THE RECORD THAT

2     MATTEL WOULD HAVE EVER AGREED TO ANY MODIFICATION OF

3     MR. BRYANT'S CONTRACT.

4          **THE COURT:**  I'M WILLING TO GIVE YOU THE PROCEDURAL

5     ADHESIVENESS OF THIS CONTRACT, AT LEAST FOR THE SAKE OF THIS          10:23

6     DISCUSSION.

7          HOW WERE ANY OF THESE TERMS OPPRESSIVE IN ANY SENSE?

8          **MS. ANDERSON:**  WELL, YOUR HONOR, I THINK IT'S

9     IMPORTANT TO DISTINGUISH THE QUESTION THAT YOU WERE FACED WITH

10    WHEN YOU WERE HEARING MOTIONS TO DISMISS SOME TIME AGO IN THIS          10:24

11    CASE AND YOU WERE ASKED TO CONSIDER WHETHER OR NOT THE FORM

12    CONTRACT, STANDING ALL ALONE, NO EXTRINSIC EVIDENCE, WAS

13    UNCONSCIONABLE.

14         **THE COURT:**  WHAT'S CHANGED?  TELL ME WHAT'S CHANGED

15    BETWEEN NOW AND THEN.          10:24

16         **MS. ANDERSON:**  YES.

17         WE ARE NOT HERE TODAY -- AND NOWHERE IN OUR MOVING

18    PAPERS HAVE WE ASSERTED THAT THIS CONTRACT, IN ITS ENTIRETY, IS

19    UNCONSCIONABLE.  WE ARE NOT.  WHAT WE HAVE PRESENTED TO YOUR

20    HONOR IS ARGUMENT, AND MATTEL HAS NOT REBUTTED IT, THAT EVERY          10:24

21    ELEMENT OF A CONTRACT OF ADHESION IS PRESENT HERE.  AND IF I

22    MAY, YOUR HONOR, I'D LIKE TO SHOW A SLIDE THAT SETS FORTH THE

23    ELEMENTS OF A CONTRACT OF ADHESION.

24         SLIDE 23, IF I MAY.

25         I APOLOGIZE.          10:25

```
 1            IN ANY EVENT, YOUR HONOR, IN THE CONTRACT OF

 2    ADHESION, WE HAVE A SITUATION -- AND IT'S SET FORTH IN OUR

 3    PAPERS -- THAT THE LAW REQUIRES THAT WHERE TWO PARTIES ARE

 4    BROUGHT TOGETHER, AND ARE BROUGHT TOGETHER UNDER A CONTRACT,

 5    AND ONE PARTY IS NOT IN A POSITION OF BARGAINING, WHERE IT'S A      10:26

 6    TAKE-IT-OR-LEAVE-IT CONTRACT -- THAT'S THE LANGUAGE YOU SEE IN

 7    THOSE CASES WE'VE CITED IN OUR BRIEFS, YOUR HONOR -- IF IT'S A

 8    TAKE-IT-OR-LEAVE-IT CONTRACT, BY DEFINITION, WITHOUT QUESTION,

 9    IT IS A CONTRACT OF ADHESION.  AND MATTEL HAS ADMITTED IT.

10    THIS IS AN UNDISPUTED FACT.  THEY ADMITTED THAT IN THE             10:26

11    STATEMENT OF UNDISPUTED FACTS, YOUR HONOR -- IF YOU TAKE A LOOK

12    AT THIS -- THEY ADMITTED THAT MR. BRYANT'S CHOICE, WHEN FACED

13    WITH THIS CONTRACT, WAS TO EITHER SIGN IT OR NOT WORK THERE.

14            THE COURT:  BUT THAT BY ITSELF IS NOT SUFFICIENT TO

15    SUPPRESS THE CONTRACT.                                             10:27

16            MS. ANDERSON:  WE ARE NOT HERE, YOUR HONOR, ARGUING

17    THAT THE CONTRACT IS INVALID, UNCONSCIONABLE OR SHOULDN'T BE

18    ADMITTED OR IS NOT EVIDENCE.  WHAT WE ARE SAYING, YOUR HONOR,

19    IS THAT IT IS A CONTRACT OF ADHESION, AND BECAUSE OF THAT,

20    THERE ARE RULES THAT GOVERN ITS CONSTRUCTION; SO WE'RE NOT         10:27

21    HERE, YOUR HONOR, SAYING, 'THROW THE CONTRACT OUT THE WINDOW.'

22            WHAT WE'RE SAYING IS, THE RULES THAT GOVERN

23    CONSTRUCTION ARE VERY SPECIFICALLY TAILORED WHEN YOU'RE FACED

24    WITH A SITUATION OF A CONTRACT OF ADHESION.  AND THERE'S A

25    REASON FOR IT.  AND IT IS NOT A TIEBREAKER.                        10:27
```

1      THE CASE LAW EXPLICITLY SAYS -- IF I COULD HAVE SLIDE

2  24 NOW, AARON, PLEASE -- THE CASE LAW EXPLICITLY SAYS THAT THE

3  POLICIES GOVERNING CONSTRUCTION OF A CONTRACT OF ADHESION, IT'S

4  NOT A MERE TIEBREAKER.  THAT'S DISPARAGING THIS CANON OF

5  CONSTRUCTION.  WHAT IT IS IS TO RECOGNIZE THE STRONG POLICY          10:27

6  THAT FAVORS -- UNDERSTANDING WHEN THERE'S A PARTICULAR DRAFTER

7  IN THE SITUATION, YOU'VE GOT THE DOCTRINE OF CONTRA

8  PROFERENTEM; THAT DOCTRINE SAYS ONE OF THE CANONS OF

9  CONSTRUCTION IS, YOU CONSTRUE AGAINST THE DRAFTER.

10      **THE COURT:**  I THINK WHAT MR. QUINN WAS SAYING IS THAT        10:28

11  IT'S A TIEBREAKER IN THE SENSE THAT IF IT'S AMBIGUOUS, THEN YOU

12  GO TO, PERHAPS, SOME OF THESE OTHER PRINCIPLES OF CONTRACT

13  INTERPRETATION.  BUT I THINK THE POINT THAT MATTEL IS MAKING IS

14  THAT THERE'S REALLY NOTHING AMBIGUOUS ABOUT THIS CONTRACT.

15      FOCUS ON THIS AMBIGUITY.  FOCUS ON WHAT GETS ME INTO          10:28

16  THIS -- USING THESE VARIOUS RULES.  WHETHER YOU CALL THEM

17  TIE-BREAKING RULES OR WHATEVER, THEY'RE THE RULES THAT ARE

18  EMPLOYED WHEN YOU HAVE AN AMBIGUOUS CONTRACT AND --

19      **MS. ANDERSON:**  I WOULD BE HAPPY TO DO THAT,

20  YOUR HONOR.                                                      10:28

21      AARON, MAY I HAVE SLIDE 11, PLEASE.

22      THE LANGUAGE THAT WE'RE TALKING ABOUT -- AND THE COPY

23  OF THE CONTRACT THAT EXISTS IN THIS CASE IS VERY DIFFICULT TO

24  READ, AND SO WHAT I'VE DONE --

25      **THE COURT:**  YOU DON'T NEED TO TELL ME THAT.             10:29

```
 1          MS. ANDERSON:  WHAT I'VE DONE IS TAKEN THE LIBERTY OF

 2   REPRODUCING IT HERE ON TWO SLIDES.

 3          SLIDE 11 IS PARAGRAPH 2-A WHICH TALKS ABOUT THE

 4   ASSIGNMENT UNDER THIS CONTRACT OF INVENTIONS THAT HAVE BEEN,

 5   QUOTE, UNQUOTE, "CONCEIVED OR REDUCED TO PRACTICE," QUOTE,        10:29

 6   UNQUOTE, DURING MY EMPLOYMENT.

 7          AND THE NEXT PARAGRAPH, 2-B, WHICH IS ON THE NEXT

 8   SLIDE, TALKS ABOUT INVENTIONS, INCLUDING BUT NOT BEING LIMITED

 9   TO DISCOVERIES, IMPROVEMENTS, PROCESSES, DEVELOPMENTS, DESIGNS,

10   ET CETERA; DATA COMPUTER PROGRAMS FORMULATED, WHETHER           10:29

11   PATENTABLE OR UNPATENTABLE.  THAT'S THE CORE OF THE LANGUAGE

12   THAT WE'RE ADDRESSING IN THIS CONSTRUCTION ISSUE IN

13   INTERPRETING THIS CONTRACT.

14          THE CANONS OF CONSTRUCTION CALL FOR THE COURT TO TRY

15   TO GIVE EFFECT TO THE MUTUAL INTENTION OF THE PARTIES AT THE    10:29

16   TIME OF THE CONTRACT.

17          SLIDE 14, PLEASE.

18          THAT'S SORT OF THE OVER-ARCHING JOB THAT WE'RE FACED

19   WITH IN INTERPRETING A CONTRACT.

20          NEXT SLIDE, PLEASE.                                      10:30

21          TO TRY TO GIVE EFFECT OF MUTUAL INTENTION,

22   YOUR HONOR, YOU HAVE TO TRY TO DETERMINE, BASED ON OBJECTIVE

23   MANIFESTATIONS, WHAT THE PARTY'S INTENT WAS.  AND THERE ARE TWO

24   PLACES YOUR HONOR NEEDS TO LOOK.  YOU NEED TO LOOK IN THE WORDS

25   OF THE CONTRACT, AND YOU NEED TO LOOK AT EXTRINSIC EVIDENCE;    10:30
```

```
 1   BOTH OF THOSE AREAS.

 2           EXTRINSIC EVIDENCE INCLUDES SURROUNDING

 3   CIRCUMSTANCES; IT INCLUDES THE OBJECT, NATURE AND SUBJECT

 4   MATTER OF A CONTRACT; AND IT INCLUDES SUBSEQUENT CONDUCT.

 5           IF I COULD HAVE THE NEXT SLIDE, PLEASE, 16.          10:30

 6           WHAT'S REALLY IMPORTANT FOR US ALL TO REMEMBER HERE

 7   IS THAT IN CALIFORNIA, SIMPLY LOOKING AT THE LANGUAGE OF THE

 8   CONTRACT AND SAYING, 'I'M LOOKING AT IT.  I THINK IT'S CLEAR.

 9   DONE' --

10           THE COURT:  BUT THAT'S WHEN THE LANGUAGE IS DISPUTED  10:31

11   OR IT'S AMBIGUOUS.  THAT'S WHY I'M TRYING TO PRESS YOU ON WHAT

12   EXACTLY IS DISPUTED ABOUT THE TERMS.

13           MS. ANDERSON:  IT'S HOTLY DISPUTED, YOUR HONOR.

14           THE COURT:  I KNOW THAT.

15           MS. ANDERSON:  IF YOU TAKE A LOOK, YOUR HONOR, AT THE  10:31

16   LANGUAGE THAT MATTEL'S LAWYERS CHOSE TO USE IN TALKING ABOUT

17   WHAT AN INVENTION IS -- SLIDE 26, PLEASE -- THIS IS THE

18   LANGUAGE THEY CHOSE.  THEY CHOSE LANGUAGE THAT TALKS ABOUT THE

19   SIGNING INVENTIONS CONCEIVED OR REDUCED TO PRACTICE DURING

20   EMPLOYMENT.  AND THOSE INVENTIONS ARE INCLUDING BUT NOT LIMITED  10:31

21   TO ALL OF THESE TECHNICAL, TECHNOLOGICAL KINDS OF TERMS.

22   MATTEL'S LAWYERS SPECIFICALLY CHOSE TO DEFINE THIS FOR

23   EMPLOYEES WHO WERE LOOKING AT THIS FORM CONTRACT.

24           THE COURT:  WHAT'S SO COMPLICATED ABOUT THESE WORDS?

25   "KNOW-HOW," "DESIGN," "DEVELOPMENT," THOSE DON'T STRIKE ME AS  10:31
```

 1   PARTICULARLY TECHNICAL...

 2           **MS. ANDERSON:**  NEXT SLIDE, PLEASE, YOUR HONOR.

 3           THE LAWYERS THAT DRAFTED THIS CONTRACT WERE WELL

 4   AWARE OF THE IMPORT OF THE KINDS OF WORDS THAT THEY SELECTED

 5   HERE, BECAUSE THEY ARE DRAWN DIRECTLY FROM PATENT LAW.                10:32

 6           I'M GOING TO START WITH THE MIDDLE BULLET POINT AND

 7   GO OUT OF ORDER HERE, YOUR HONOR, BECAUSE THIS IS THE POINT

 8   THAT MATTEL NEVER ADDRESSES.

 9           **THE COURT:**  NOW YOU'RE MAKING THIS MORE TECHNICAL.

10   JUST LOOKING AT THE CONTRACT OF TERMS, AS MR. BRYANT WOULD LOOK      10:32

11   AT IT, WHAT IS SO COMPLICATED ABOUT A WORD LIKE "DISCOVERIES"

12   OR "DEVELOPMENTS"?  THESE ARE WORDS THAT ARE ON MY SIXTH-GRADE

13   DAUGHTER'S VOCABULARY TEST.

14           **MS. ANDERSON:**  BECAUSE, YOUR HONOR, WHEN YOU ARE

15   LOOKING AT A CONTRACT, ONE OF THE CANONS OF INTERPRETATION IS,       10:32

16   YOU DO GIVE ORDINARY WORDS THEIR ORDINARY MEANING; BUT WHEN A

17   LAWYER WHO DRAFTS THE CONTRACT -- AND THAT'S THE SITUATION

18   WE'RE FACED WITH HERE -- INVOKES TECHNICAL TERMS.  AND

19   "CONCEPTION AND REDUCTION TO PRACTICE" IS ABSOLUTELY A TERM OF

20   ART IN PATENT LAW; THAT IS A QUINTESSENTIAL TERM OF ART.  WHEN       10:33

21   THE LAWYERS WHO DRAFTED THIS CONTRACT SAID, 'HEY, THIS

22   ASSIGNMENT WE'RE GOING TO HAVE, IT'S GOING TO BE FOR INVENTIONS

23   CONCEIVED AND REDUCED TO PRACTICE,' THEY SPECIFICALLY TARGETED

24   THE KINDS OF THINGS THAT ARE SUBJECT TO PATENT LAW.  THEY CHOSE

25   IT.                                                                  10:33

```
 1          IF THEY WANTED TO SAY 'ANY OLD THING YOU EVER THOUGHT

 2   OF OR CAME UP WITH,' THEY COULD HAVE SAID IT.  THEY DIDN'T SAY

 3   IT.  THEY DID SAY IT LATER, YOUR HONOR, LATER, IMMEDIATELY

 4   BEFORE SUING MY CLIENT.  THEY DECIDED THAT THEY WOULD GO AND

 5   TAKE A LOOK AT THIS CONTRACT, AND THEY SUBSTANTIALLY BROADENED    10:33

 6   THE LANGUAGE.  THEY ADDED IN WORDS THAT WOULD BRING IN THE

 7   SCOPE OF THINGS THAT ARE PURELY SUBJECT TO COPYRIGHT LAW,

 8   THINGS THAT ARE JUST GENERAL IDEAS.  THEY ADDED IN THAT

 9   LANGUAGE, YOUR HONOR.  I CAN SHOW YOU THE SLIDE IN A SECOND.

10          THE COURT:  WHAT WORD WOULD YOU USE TO SUBSTITUTE FOR     10:33

11   "CONCEIVING AN IDEA"?

12          MS. ANDERSON:  YOUR HONOR --

13          THE COURT:  YOU, NOT THEM.

14          MS. ANDERSON:  ME, PERSONALLY?

15          THE COURT:  COME UP WITH ANOTHER WORD FOR "CONCEIVING     10:34

16   AN IDEA."

17          MS. ANDERSON:  ORDINARY LANGUAGE THAT --

18          THE COURT:  YES.  GIVE ME A SYNONYM THAT YOU

19   THINK ACCURATELY --

20          MS. ANDERSON:  "AN IDEA THAT YOU COME UP WITH."          10:34

21          THEY DON'T HAVE THAT IN THAT CONTRACT.  THEY DIDN'T

22   USE ORDINARY ENGLISH LANGUAGE.  THEY USED TECHNICAL PATENT LAW

23   TERMS.  THEY SPECIFICALLY CHOSE THEM.

24          AND, YOUR HONOR, THIS IS WHERE THE DOCTRINE OF CONTRA

25   PROFERENTEM, WHICH IS STRONGLY APPLIED WHEN THE DRAFTER'S A      10:34
```

```
 1   LAWYER AND IT'S A CONTRACT OF ADHESION -- THAT'S WHERE THIS

 2   COMES INTO PLAY.

 3          THEY HAVE TO BEAR THE BURDEN OF WHAT THEY CHOSE.

 4   THEY CHOSE TECHNICAL LANGUAGE.  IT IS NOT A BURDEN THAT'S

 5   PLACED ON THE PERSON THAT IS IN AN INFERIOR BARGAINING        10:34

 6   POSITION.  IN THIS CASE, NO POSITION TO BARGAIN.  THEY CHOSE

 7   THE LANGUAGE.  THEY PICKED THE WORDS.  AND EVERY SINGLE TERM IN

 8   THIS CONTRACT TURNS ON THAT PHRASE:  "INVENTIONS CONCEIVED OR

 9   REDUCED TO PRACTICE DURING MY EMPLOYMENT."

10          NOTHING ELSE WAS ASSIGNED.  AND ALL THE OTHER WORDS     10:35

11   THAT THEY TALK ABOUT, WORDS WHERE THEY TALK ABOUT COPYRIGHT,

12   YOUR HONOR, THEY CITE TO THE FACT THAT THERE'S SOME USAGE OF

13   THE WORD 'COPYRIGHT' IN THE LANGUAGE OF PARAGRAPH 2-A.

14          WHY DON'T WE TAKE A QUICK LOOK AT THAT.

15          IT'S SLIDE 11.                                          10:35

16          WE'RE BACK HERE AT SLIDE 11 AND THE SAME PLACE YOU

17   SEE THE 'INVENTIONS CONCEIVED OR REDUCED TO PRACTICE,' YOUR

18   HONOR.  SO THAT'S WHERE WE HAVE THIS LANGUAGE.  IT'S IN THE

19   FOLLOWING SENTENCE THAT YOU SEE THE WORD "COPYRIGHT."

20          BUT NOTE, WHEN THE MATTEL LAWYERS DRAFTED THIS         10:35

21   CONTRACT, THEY SAID, 'YOU, EMPLOYEE, YOU'RE ASSIGNING ALL THESE

22   INVENTIONS CONCEIVED OR REDUCED TO PRACTICE.'  AND THEN IN THE

23   NEXT SENTENCE, THEY SAY, 'BY THE WAY, IN ASSIGNING ALL MY

24   RIGHT, TITLE, AND INTEREST IN SUCH INVENTIONS, I'M ALSO

25   ASSIGNING ANY INTEREST IN ANY PATENT COPYRIGHT, PATENT        10:36
```

1  APPLICATION, OR COPYRIGHT APPLICATION BASED THEREON.'

2  THOSE LAWYERS WHO DRAFTED THIS CONTRACT KNOW THAT

3  THERE ARE CIRCUMSTANCES -- AND THIS IS EXACTLY THE KIND OF

4  LANGUAGE YOU SEE WHEN YOU HAVE EMPLOYEES WHO ARE WORKING IN THE

5  COMPUTER FIELD AND THEY MIGHT BE DOING TECHNICAL THINGS WHICH        10:36

6  ARE -- FOR EXAMPLE, A SOURCE CODE FOR A WEBSITE, WHERE IT'S A

7  TECHNICAL INVENTION, IT IS SUBJECT TO PATENT, BUT THERE ARE

8  ALSO SOME COPYRIGHT ASPECTS TO IT.  THIS LANGUAGE SAYS, 'TO THE

9  EXTENT THERE ARE ANY COPYRIGHTS THAT MIGHT BE ALSO APPLICABLE

10  TO THIS INVENTION THAT YOU CONCEIVED AND REDUCED TO                 10:36

11  PRACTICE' --

12  THE COURT:  THIS STRUCK ME AS VERY INTERESTING WHEN I

13  READ THIS -- MAYBE NOT THE FIRST TIME I READ IT, BUT, LIKE,

14  MAYBE THE EIGHTEENTH TIME I READ IT -- THAT SENTENCE

15  DISTINGUISHES BETWEEN RIGHTS OR INTERESTS OR TITLE THAT ARE         10:36

16  BASED ON PATENT COPYRIGHT, PATENT APPLICATIONS, ET CETERA, AND

17  TITLE OR INTEREST IN SUCH INVENTIONS, AS IF THERE CAN BE

18  INVENTIONS THAT AREN'T GOING TO BE PATENT, COPYRIGHT OR LEAD TO

19  PATENT APPLICATIONS.  IT DISTINGUISHES THE TWO.

20  IF THEY WERE ALL ONE AND THE SAME, AS YOU'RE URGING               10:37

21  THIS COURT TO CONSIDER, THEN THERE WOULD BE NO REASON FOR THE

22  REDUNDANCY.

23  MS. ANDERSON:  ACTUALLY, THERE IS, YOUR HONOR.

24  THE COURT:  EXPLAIN.  WHAT'S THE REASON FOR THE

25  REDUNDANCY?                                                        10:37

```
 1          MS. ANDERSON:  FOR EXAMPLE, THE ICONIX CASE IS A
 2   GREAT EXAMPLE.  MATTEL CITED IT IN THEIR BRIEF.  THEY CLAIM
 3   THAT THIS IS AN EXAMPLE OF HOW THE WORD "INVENTIONS" IS USED TO
 4   DESCRIBE A COPYRIGHT.  I THINK THAT WAS ONE OF THE REASONS THEY
 5   CITED IT.  MAYBE ON THE LABOR CODE 2870 PURPOSE.            10:37
 6          BUT IN ICONIX, YOU'VE GOT A WEBSITE, A SOURCE CODE
 7   THAT WAS DEVELOPED.  CLEARLY, THIS IS THE KIND OF THING THAT
 8   LAWYERS KNOW.  YOU DEVELOP THIS TECHNOLOGICAL ADVANCEMENT; IT'S
 9   A WEBSITE; IT'S GOT A SOURCE CODE; YOU'RE GOING TO GET A PATENT
10   ON IT; BUT YOU KNOW YOU ALSO MIGHT BE ABLE TO GET A COPYRIGHT   10:37
11   ON IT.  THEY DRAFTED THIS LANGUAGE.  THEY USED THE WORD "BASED
12   THEREON" BECAUSE THEY WANT TO MAKE CLEAR, IF YOU DO AN
13   INVENTION THAT'S CONCEIVED OR REDUCED TO PRACTICE, THEN THAT
14   IMMEDIATELY PUTS YOU IN THE WORLD OF THINGS THAT SURROUND
15   PATENT LAW, THOSE KIND OF TECHNICAL DISCOVERIES.  IF YOU DO   10:38
16   THAT AND WE FIGURE OUT THAT BASED THEREON I CAN ALSO MAYBE HAVE
17   A COPYRIGHT BECAUSE IT'S A SOURCE CODE KIND OF SITUATION, THEN
18   WE GET THAT TOO.
19          BUT WHAT THEY NEVER SAY -- THEY DON'T SAY,
20   'SEPARATELY, WE ALSO TELL YOU THAT YOU'VE ASSIGNED TO US ALL   10:38
21   COPYRIGHTS AND ALL OTHER THINGS.'  THEY DON'T SAY THAT.  THEY
22   SAY "BASED THEREON."  BASED THEREON HARKENS BACK TO INVENTIONS.
23          THIS WHOLE INTERPRETATION MUST ACCOUNT FOR THE
24   LAWYER'S CHOICE TO SAY THAT WHAT IS ASSIGNED IS THIS INVENTION
25   THAT WAS CONCEIVED OR REDUCED TO PRACTICE, BUT BECAUSE CHOOSING   10:38
```

```
1    TECHNICAL TERMS OF ART UNDER THE CANONS OF CONSTRUCTION

2    REQUIRES AN INTERPRETATION CONSISTENT WITH THAT CHOICE.

3    BECAUSE THEY CHOSE TECHNICAL WORDS.  THEY'RE LAWYERS.  THEY

4    KNEW EXACTLY WHAT THEY WERE DOING.

5              AND IT'S VERY IMPORTANT THAT WHEN WE REVIEW THESE      10:39

6    KINDS OF CHOICES OF WORDS MADE BY LAWYERS THAT WE INTERPRET IT

7    GIVEN WHAT WE KNOW.  AND WHAT WE KNOW IS, THOSE LAWYERS KNEW

8    WHAT THEY WERE DOING.

9              IN CONSIDERING THE INTERPRETATION ISSUES THAT

10   SURROUND THIS, YOUR HONOR, THE BOTTOM LINE IS, THE CANONS OF     10:39

11   CONSTRUCTION DRAW US THROUGH VARIOUS STEPS THAT TALK ABOUT --

12   WHEN WE'RE LOOKING AT EXTRINSIC EVIDENCE, WHICH WE'RE REQUIRED

13   TO DO -- AT LEAST IN A FIRST INSTANCE WE'RE REQUIRED TO LOOK AT

14   IT, BECAUSE SOMETIMES EXTRINSIC EVIDENCE CAN REVEAL A LATENT

15   AMBIGUITY.                                                       10:39

16        THE COURT:  I AGREE WITH YOU THAT THERE'S NO QUESTION

17   THAT MATTEL'S LAWYERS WANTED TO CAPTURE, BY THIS AGREEMENT,

18   ANYTHING THAT WOULD BE PATENTABLE, COPYRIGHTABLE.  AND THEY

19   TOOK GREAT PAINS TO MAKE SURE THAT WAS COVERED.

20             BUT HOW DO THEY LIMIT IT TO THAT?                      10:40

21             I MEAN, YOU WANT ME TO LIMIT IT JUST TO THAT.  THEY

22   USE PHRASES "DISCOVERIES," "IMPROVEMENTS," "PROCESSES."  YOU

23   HAD THE AMERICAN HERITAGE DICTIONARY UP THERE A FEW MOMENTS

24   AGO; AND WEBSTER'S IS ACTUALLY PRETTY CLOSE TO THAT.  IT TALKS

25   ABOUT "DEVICES," "METHODS," AND "PROCESSES," WHICH IS ONE OF     10:40
```

```
 1   THE WORDS THAT IS USED IN THE AGREEMENT ITSELF.  I MEAN,

 2   WHENEVER YOU'RE GOING TO DEFINE INVENTIONS, YOU'RE GOING TO USE

 3   TERMS LIKE THAT.

 4           I GUESS I DON'T SEE "KNOW-HOW" AS A PARTICULARLY

 5   TECHNICAL TERM.  THAT'S THE KIND OF PHRASE, ALMOST LIKE YOUR      10:40

 6   SUGGESTION OF "COME UP WITH," "THE KNOW-HOW," "THE STUFF THAT

 7   YOU DO."

 8           MS. ANDERSON:  IT MAY BE HELPFUL, YOUR HONOR, TO TAKE

 9   A LOOK AT WHAT MATTEL'S LAWYERS DID WHEN THEY DECIDED,

10   APPARENTLY, THAT THEIR AGREEMENT WAS TOO NARROW AND THEY          10:40

11   DECIDED THEY WANTED TO BROADEN IT.

12           IF WE COULD HAVE SLIDE 29, PLEASE.

13           EVIDENCE OF SUBSEQUENT REVISION OF A FORM CONTRACT IN

14   A CASE LIKE THIS IS DIRECTLY RELEVANT, YOUR HONOR, BECAUSE THE

15   LAWYERS THAT DRAFTED THE ORIGINAL CONTRACT APPARENTLY WENT BACK   10:41

16   AND DECIDED RIGHT BEFORE THEY SUED MY CLIENT THAT THEY WANTED

17   TO MAKE THEIR AGREEMENT BROADER.

18           AND LOOK AT THE LANGUAGE THAT THEY KNEW THEY HAD TO

19   USE.

20           THE COURT:  THE FIRST FOUR OR FIVE, THEY'RE ALL           10:41

21   PATENT, INTELLECTUAL PROPERTY PHRASES; MASS WORKS, COPYRIGHTS,

22   OTHER INTELLECTUAL PROPERTY RIGHTS.

23           MS. ANDERSON:  THESE ARE ACTUALLY WORDS, YOUR HONOR,

24   ORIGINAL WORKS OF AUTHORSHIP, THOSE KINDS OF IDEAS, IDEAS

25   CREATED BY ITS EMPLOYEES --  THIS IS AN ATTEMPT BY THE LAWYERS    10:41
```

1   TO SAY, 'WE WANT TO OPEN UP THE SCOPE OF THIS AGREEMENT.'

2        **THE COURT:** "WORK MADE FOR HIRE," "PROTECTABLE BY

3   COPYRIGHT," THOSE ARE ALL TERMS OF ART IN INTELLECTUAL

4   PROPERTY.

5        **MS. ANDERSON:** IN COPYRIGHT, YOUR HONOR. "WORKS MADE          10:42

6   FOR HIRE" IS A COPYRIGHT (UNINTELLIGIBLE).

7        **THE COURT:** I UNDERSTAND.

8        **MS. ANDERSON:** AND "PROTECTABLE BY COPYRIGHT,"

9   OBVIOUSLY, DIRECTLY REFERENCES COPYRIGHT.

10        LOOK WHAT THEY DID TO THE "WHETHER PATENTABLE OR               10:42

11   UNPATENTABLE" LANGUAGE.

12        THEY KNEW THAT IF THEY WANTED TO MAKE THIS BE CLEAR,

13   THEY NEEDED TO ADD MORE LANGUAGE. BECAUSE THE WAY THEY HAD IT

14   BEFORE, THEY INTENTIONALLY SELECTED WORDS FROM PATENT LAW.

15   THEY NEEDED TO EXPAND. AND SO WHAT THEY DID WAS TO TRY TO MAKE      10:42

16   IT CLEAR THAT THEY WERE CAUSING AN ASSIGNMENT OF ANY IDEAS

17   CREATED BY ITS EMPLOYEES.

18        THERE WAS NOTHING PREVENTING THEM FROM USING THAT

19   LANGUAGE IN THAT FIRST CONTRACT. THEY JUST DIDN'T. AND UNDER

20   THE RULES OF CONTRACT CONSTRUCTION, AND WHEN YOU HAVE A           10:42

21   CONTRACT OF ADHESION, AND WHEN MATTEL WAS THE DRAFTER, AND WHEN

22   IT WAS A LAWYER FROM MATTEL THAT DRAFTED THE CONTRACT, IT MUST

23   BE CONSTRUED AGAINST THE DRAFTER. UNDER THE LAW, IT MUST BE.

24        AND THERE IS NOT A SINGLE CASE CITED BY MATTEL IN ANY

25   OF ITS BRIEFS AND NOT A SINGLE ARGUMENT MADE BY MATTEL IN ANY     10:43

```
1    OF ITS BRIEFS THAT DENIES THE FACT THAT THIS WAS A

2    TAKE-IT-OR-LEAVE-IT CONTRACT.  AND BY DEFINITION, THAT'S A

3    CONTRACT OF ADHESION.

4         ALL OF THE QUESTIONS YOUR HONOR IS RAISING, 'ISN'T IT

5    TRUE IT COULD ALSO MEAN THAT,' 'ISN'T IT TRUE IT COULD ALSO        10:43

6    MEAN THAT' ARE INDICATORS, AT MINIMUM, OF AMBIGUITY.  YOUR

7    HONOR, THE QUESTIONS YOU'RE ASKING, AT MINIMUM, INDICATE THE

8    EXISTENCE OF AN AMBIGUITY.  BY DEFINITION, YOU MUST CONSTRUE IT

9    AGAINST THE DRAFTER.  THEY PICKED THE WORDS "CONCEIVED AND

10   REDUCED TO PRACTICE."  THEY PICKED THE WORD "INVENTION."  THEY     10:43

11   TALKED ABOUT FORMULAE AND COMPUTERS.  THEY PICKED THOSE WORDS

12   FOR A REASON.

13        AND WE, CARTER BRYANT, EMPLOYEES WHO SIGN THAT, ARE

14   NOT THE PARTY TO BEAR THE BURDEN OF THEIR CHOICE.

15        THE COURT:  VERY WELL.  THANK YOU, COUNSEL.                   10:43

16        MS. ANDERSON:  THANK YOU.

17        THE COURT:  MR. NOLAN?

18        MR. NOLAN:  JUST BRIEFLY.

19        I WANT TO STAY WITH THAT LAST CHART.

20        YOU KNOW, TO A CERTAIN EXTENT, YOUR HONOR, MGA HAS A          10:44

21   SIGNIFICANT INTEREST IN THE OUTCOME OF THIS DETERMINATION,

22   BECAUSE OF THE IMPACT ON US.

23        HOWEVER, WE DID NOT BRING THIS MOTION, AND WE ARE NOT

24   PARTIES TO IT.  WE WEREN'T AWARE OF IT; SO MY ARGUMENT TODAY

25   DOES NOT SUGGEST THAT I WANT TO PUT US IN THAT ROLE.  I JUST       10:44
```

```
 1   WANT TO MAKE SOME INTERESTING OBSERVATIONS FROM WHAT WE'VE BEEN

 2   LOOKING AT IN THIS CASE.

 3        I THOUGHT IT WAS VERY STRIKING, TWO THINGS -- AND YOU

 4   REFERRED TO YOUR DAUGHTER AND HER UNDERSTANDING OF TERMS.  I DO

 5   THE SAME THING WITH MY DAUGHTERS, AND I'VE DONE FOCUS GROUPS          10:44

 6   WITH THEM WITH RESPECT TO OTHER ISSUES.  AND WHAT'S VERY

 7   INTERESTING ABOUT THIS, YOUR HONOR, BECAUSE I THINK IT'S VERY

 8   TELLING -- WHAT OUR FIRST IMPRESSION OF THESE WORDS REALLY TAKE

 9   US INTO DISTRACTION, IN THE SENSE THAT WE WANT TO APPLY THE

10   ORDINARY MEANING TO THE TERMS.  BUT I THINK THE LAW REQUIRES US       10:45

11   TO LOOK AT IT THROUGH THE EYES OF A POTENTIAL EMPLOYEE APPLYING

12   FOR WORK AT MATTEL.

13        SO THAT TAKES IT OUT OF MY DAUGHTER'S INTERPRETATION

14   OR ANY OTHER LAYMAN'S INTERPRETATION, IN THIS INSTANCE, YOUR

15   HONOR, BECAUSE WHAT IS MISSING IN THE FIRST FORM OF THE               10:45

16   CONTRACT IS THE TERM, THE WORD, "IDEA."

17        NOT A RATHER UNIQUE CONCEPT WHEN YOU THINK ABOUT

18   THIS, JUDGE, BECAUSE AT THE END OF THE DAY, WITH -- AND I

19   SHOULD HAVE STARTED OFF BY APOLOGIZING.  SOMEONE TOLD ME THAT

20   WE HAVE SUBMITTED, BOTH SIDES, OR ALL THREE, OVER 10,000 PAGES        10:45

21   IN CONNECTION WITH THESE MOTIONS.  IT GOES TO SHOW YOU THE

22   COMPLEXITIES OF THE ISSUE.  AND I THINK THE ONLY ADVANTAGE YOU

23   HAVE IS THAT YOU STARTED OFF WITH THE ANSWER SHEET, WE DON'T,

24   AS TO HOW THIS TEST WILL COME OUT.

25        BUT THE POINT IS, IF MATTEL WANTS THE IDEA, WHY DON'T            10:46
```

1    THEY JUST SIMPLY PUT IT THERE AND ALERT THE MATTEL EMPLOYEE

2    SITTING IN THE ROOM, WHERE ONE OF THEIR EXPERTS, MR. STEIN, HAS

3    DESCRIBED IT AS THE FIRST DAY, IT'S AN ASSAULT ON YOUR SENSES.

4    THERE'S SO MUCH STUFF.  YOU'VE GOT TO FIGURE OUT WHETHER OR NOT

5    YOU'RE GOING TO TAKE DENTAL; AND THEN, ARE YOU GOING TO BE PART      10:46

6    OF THE HMO PROGRAM; ARE YOU GOING TO TAKE MEDICAL; WHAT'S YOUR

7    401(K) BENEFITS?  AND THEY HAVE THIS AGREEMENT IN THERE THAT'S,

8    IN TURN, A CONFIDENTIAL AGREEMENT.  AND YOU'RE SITTING THERE

9    TRYING TO THINK, 'ALL RIGHT, WHAT' -- 'I'M COMING HERE; I'M

10   GOING TO BE A DESIGNER; I'VE GOT THAT; I UNDERSTAND THAT.'  I        10:46

11   LOOK AT THE CONTRACT.

12         AND YOU AND I BOTH CAN AGREE THAT THOSE TERMS SEEM

13   EMINENTLY REASONABLE AND EMINENTLY CLEAR, EXCEPT AS I'M SITTING

14   THERE AND I'M CARTER BRYANT, AND MY WHOLE LIFE, SINCE I'VE BEEN

15   EIGHT YEARS OLD, I'VE BEEN INTERESTED IN FASHION, NOT               10:47

16   BASKETBALL, NOT FOOTBALL, NOTHING LIKE THAT, BUT IDEAS, OF A

17   DREAM.

18         NOWHERE DOES MATTEL SAY THAT BY AFFIXING YOUR

19   SIGNATURE TO THIS CONTRACT, YOU'RE GOING TO CONTRACT AWAY --

20   OH, INVENTIONS AND ALL THAT, I KIND OF GET THAT, BUT NO ONE          10:47

21   TELLS CARTER BRYANT THAT IT'S GOING TO BE HIS IDEAS AND HIS

22   DREAMS.

23         **THE COURT:**  LET ME STOP YOU THERE, BECAUSE YOU RAISE

24   AN INTERESTING POINT.  BUT, WOW, IF I WAS THE CARTER BRYANT YOU

25   JUST DESCRIBED AND SOMEONE WAS TELLING ME TO SIGN A CONTRACT         10:47

```
 1   SAYING THAT THEY HAVE RIGHTS NOW TO MY IDEAS, MY THOUGHTS -- I
 2   DON'T THINK THAT'S WHAT ANYONE IS CLAIMING OR ANYONE WOULD
 3   CLAIM.  IT'S NOT THE IDEA IN THE HEAD; IT'S WHEN YOU TAKE THAT
 4   IDEA AND YOU MAKE SOMETHING OF IT.  THAT'S WHAT HE'S BEING
 5   HIRED BY MATTEL TO DO, AND THAT'S WHAT ONE READING OF THIS       10:47
 6   AGREEMENT WOULD BE, IS THAT MATTEL IS SAYING, 'WHEN YOU TAKE
 7   THAT FROM AN IDEA AND MAKE SOMETHING OUT OF IT, THEN IT BECOMES
 8   A DISCOVERY, AN IMPROVEMENT, A PROCESS, A DEVELOPMENT, A
 9   DESIGN, ET CETERA, ET CETERA.  THAT'S WHEN IT BECOMES OURS.'
10           I DON'T THINK ANYONE WOULD WANT TO TURN TO AN ARTIST     10:48
11   OF ANY TYPE AND SAY, 'WE NOW OWN YOUR IDEAS.'  THAT SEEMS TO BE
12   A LITTLE MUCH.
13           MR. NOLAN:  DOESN'T IT?  IT DOES.  I AGREE.
14           CAN I HAVE THE CHART UP, THOUGH, ON THE CONTRACTS
15   HERE.                                                           10:48
16           WHAT'S INTERESTING ABOUT IT IS -- I WANT YOU TO TAKE
17   A LOOK AT THREE FORM CONTRACTS USED BY MATTEL AT THREE
18   DIFFERENT STAGES.  THE FIRST CONTRACT THAT I'M GOING TO SHOW
19   YOU IS FROM THE EARLY 1990'S.  THE SECOND ONE WE'RE GOING TO
20   SHOW YOU, IN THE MIDDLE, IS THE ACTUAL ONE THAT CARTER SIGNED.  10:48
21   AND THEN THE THIRD ONE IS THE 2004 CONTRACT, WHICH IS THE
22   CONTRACT VERSION THAT MS. ANDERSON HAD UP AFTERWARDS.
23           THE FIRST ONE, YOUR HONOR, HAS MATTEL SAYING -- AND
24   WE HAVE TAKEN THESE OUT; THESE ARE ALL PART OF THE RECORD --
25   'MY INTEREST IN' -- AND THIS IS, OF COURSE, THE INVENTIONS      10:49
```

1    AGREEMENT AND WHAT YOU'RE SIGNING IS PART OF THE EMPLOYMENT

2    AGREEMENT.  WHAT I'VE TRIED TO DO IS REPLICATE THE THREE OUT

3    WITH PARAGRAPHS.  'MY INTEREST IN ANY AND ALL INVENTIONS,

4    IMPROVEMENTS, AND IDEAS,' WHETHER OR NOT PATENTABLE.

5         SO NOW LET'S GO TO CARTER BRYANT'S CONTRACT THAT HE        10:49

6    SIGNS.  AGAIN, THAT'S THE MIDDLE ONE, YOUR HONOR.  AND I KNOW

7    THE PRINT IS SMALL.  BUT NOW THEY'VE DROPPED OUT THE WORD

8    "IDEAS" FROM CARTER BRYANT.

9         NOW GO BACK TO THE NEXT VERSION OF THIS CONTRACT, IN

10   MARCH OF 2004.  LET ME SET THE STAGE.  IN MARCH OF 2004,        10:50

11   MATT BOUSQUETTE, A GENTLEMAN WHO WE'VE YET BEEN ABLE TO DEPOSE,

12   DESPITE ALL OF THE MOTIONS AND ALL OF THE EFFORTS TO DO SO --

13   MATT BOUSQUETTE SUMMONS ALMOST ALL OF THE EMPLOYEES INTO A

14   LARGE CONFERENCE ROOM AT MATTEL'S HEADQUARTERS, AND HE ASKS ALL

15   OF THE EMPLOYEES, INCLUDING THOSE THAT ARE STILL THERE FROM      10:50

16   CARTER BRYANT'S ERA, AND SAYS, 'WE HAVE A NEW AGREEMENT; WE

17   WANT YOU TO SIGN IT; AND HERE IT IS.'

18        AND IT'S ALMOST LIKE A HIGH SCHOOL ASSEMBLY IN A

19   SENSE.  AND THEY ALL SIGN IT.

20        NOW LOOK WHAT'S IN THIS VERSION:  "I WILL PROMPTLY          10:50

21   DISCLOSE IN CONFIDENCE TO MATTEL ALL INVENTIONS, DISCOVERIES,

22   IMPROVEMENTS, DEVELOPMENTS, DESIGN WORKS, ORIGINAL WORKS OF

23   AUTHORSHIP, IDEAS."

24        **THE COURT:**  IT'S PRETTY REMARKABLE.

25        BUT I'M NOT BEING CALLED UPON IN THIS CASE TO PASS          10:50

```
1   UPON THIS PARTICULAR CONTRACT.  BUT THE NOTION OF REQUIRING

2   SOMEONE TO DISCLOSE ALL THEIR IDEAS, THAT'S --

3           MR. NOLAN:  IT'S BREATHTAKING.

4           THE COURT:  THAT IS BREATHTAKING, FROM MY VIEW.

5           MR. NOLAN:  SO JUST BEAR WITH ME FOR A MOMENT.          10:51

6           THAT, IN ESSENCE, YOUR HONOR, IS WHAT THEY'RE

7   CLAIMING HERE.

8           DESPITE THE ARGUMENT THIS MORNING THAT MR. --

9           THE COURT:  WAIT A SECOND.

10          HOW ARE THEY ASKING FOR IT?                            10:51

11          THEY SEEM TO BE LIMITING IT TO PRECISELY WHEN WE

12  REDUCE THOSE THINGS TO A DRAWING OR CREATE A MODEL.

13          MR. NOLAN:  RIGHT.

14          HERE IS WHAT'S HAPPENING, YOUR HONOR, IS THAT THE

15  IDEA THAT CARTER BRYANT HAS IS NOT TO DRAW FOUR HIP           10:51

16  MULTI-ETHNIC GIRLS WITH ATTITUDE.  HIS IDEA IS TO DEVELOP A

17  FASHION DOLL.  IT'S THE IDEA OF A FASHION DOLL.

18          THE COURT:  AND WE DON'T KNOW WHEN THAT IDEA WAS

19  CONCEIVED BY HIM.  MR. QUINN ADMITTED AS MUCH.

20          MR. NOLAN:  THAT'S ONE OF THE ISSUES.  BUT MY          10:52

21  QUESTION -- AND I THINK WHAT'S REALLY POSED IN THIS MOTION --

22  ACTUALLY, IT'S POSED IN THE AFFIRMATIVE MOTION BROUGHT BY

23  CARTER BRYANT -- IS THAT EVEN MATTEL CAN'T OWN MY DREAMS OR MY

24  IDEAS.

25          RIGHT?                                                 10:52
```

1      **THE COURT:**  UNTIL YOU ACTUALLY REDUCE THEM TO WRITING

2    IN THE COURSE OF YOUR EMPLOYMENT.

3      **MR. NOLAN:**  NO.  NO.  I DON'T THINK SO, YOUR HONOR.

4    ONLY IF IN THE COURSE OF YOUR EMPLOYMENT -- AND WE COULD GO

5    THROUGH SOME OF THOSE OTHER TERMS --                          10:52

6      **THE COURT:**  I KNOW.

7      **MR. NOLAN:**  SO THERE'S AN AMBIGUITY RIGHT THERE,

8    BECAUSE THERE IS NO DISPUTE THAT CARTER BRYANT IS AN

9    ILLUSTRATOR.  HE'S AN ILLUSTRATOR.  WHAT HE DOES LATER IS

10   CONTRIBUTE TO, BY GIVING AN EXPRESSION AND AN IDEA TO MGA, AND   10:52

11   THEY REDUCE TO PRACTICE THE ACTUAL DOLL.  CARTER'S DRAWINGS ARE

12   MERELY AN EXPRESSION OF AN IDEA THAT HE HAS.

13       NOW, MATTEL WANTS YOU TO BELIEVE THAT THIS CASE IS

14   REALLY ABOUT AN IDEA FOR A DRAWING, A REDUCTION TO PRACTICE IS

15   THE DRAWING ITSELF, AND THAT'S WHAT THEY WANT.  THAT'S NOT      10:53

16   TRUE.  WE KNOW THAT'S NOT THE CASE, BECAUSE WE KNOW THE

17   EVIDENCE WILL LATER SHOW THAT THE DRAWINGS ARE ACTUALLY SET

18   ASIDE BY THE SCULPTORS AT SOME POINT IN TIME IN THE PROCESS AND

19   THEY DEVELOP BRATZ.

20       THE IDEA THAT CARTER BRYANT HAD WAS FOR A FASHION       10:53

21   DOLL.  IT'S THE SAME IDEA THAT ISAAC LARIAN HAD AND

22   PAULA GARCIA HAD.  IT ALL CAME TOGETHER THAT THEY MADE A

23   FASHION DOLL.  THAT WAS THE IDEA.  THAT'S NOT PROTECTED.

24       NOW, THE LAST POINT I WANT TO MAKE, YOUR HONOR, IS --

25   AND LET ME JUST ROUND THIS ONE OFF -- THAT HAD MATTEL WANTED TO   10:53

1  PROTECT CARTER BRYANT'S IDEAS, THEY COULD HAVE CLEARLY SAID SO.

2  AND THEY SAID IT BEFORE AND AFTER.  BUT FOR WHATEVER REASON,

3  WHICH THIS COURT DOES NOT KNOW, WE DON'T KNOW, THEY DID NOT

4  INCLUDE "IDEAS" IN WHAT CARTER BRYANT DID.

5        NOW, I THINK THE COURT IS OF THE IMPRESSION THAT            10:54

6  MOST -- AT LEAST FROM THE QUESTIONS THAT YOU'RE ASKING -- MOST

7  OF THESE TERMS ARE PRETTY COMMONPLACE.  "INVENTIONS," EVERYBODY

8  KIND OF UNDERSTANDS IT.  YOU HAVE RECORD EVIDENCE IN FRONT OF

9  YOU, YOUR HONOR.

10        I TOOK THE DEPOSITION OF BOB ECKERT, CHAIRMAN OF THE       10:54

11  BOARD OF MATTEL.  I THOUGHT, YOU KNOW, HE'D BE A PRETTY COOL

12  PERSON TO ASK WHAT AN INVENTION IS; WHY DON'T WE ASK HIM WHAT

13  HIS EMPLOYEES' IDEAS MIGHT COVER, WHETHER OR NOT THEY'RE

14  COVERED UNDER THE PROGRAM.  AND I USED AS AN EXAMPLE

15  TIM KILPIN.  THIS IS IN THE RECORD TOO, JUST TO SET THE STAGE.   10:54

16  I'VE GOT THE CEO OF MATTEL, AND THEN I'VE GOT TIM KILPIN.  NOW,

17  TIM KILPIN, YOUR HONOR, IS A GENTLEMAN WHO'S HIRED AWAY FROM

18  DISNEY, COMES BACK TO MATTEL IN ABOUT OCTOBER OF 2003 TO TAKE

19  OVER AND REINVIGORATE, IF YOU WOULD, THE DOLL LINE, THE GIRLS

20  DIVISION.                                                       10:54

21        TIM KILPIN -- PRIOR TO HIS DEPOSITION, WE DID A

22  GOOGLE SEARCH, AND WE FOUND OUT THAT TIM KILPIN PLAYS FOR A

23  BAND CALLED "THE TOYS."  AND HE, NOT WANTING TO BE A FASHION

24  DOLL DESIGNER ALL OF HIS LIFE, ACTUALLY WANTED TO PLAY -- I

25  THINK IT WAS THE BASS GUITAR.  A LITTLE BIT INTERESTING IN THE   10:55

```
 1   SENSE THAT IT'S NOT THE PERFECT ANALOGY, BUT IF YOU LOOK AT THE
 2   PARALLEL TRACKS, YOU'VE GOT TIM KILPIN, WHO WANTS TO BE A
 3   MUSICIAN; CARTER BRYANT, FROM THE DAYS OUT IN THE PLAYGROUNDS
 4   IN CALIFORNIA, WHO WANTS TO BE A FASHION DESIGNER.  TIM KILPIN
 5   AND CARTER BRYANT BOTH COME TO MATTEL.  TIM KILPIN CONTINUES          10:55
 6   HIS DREAM.  HE CONTINUES TO WRITE SONGS AT NIGHT WHEN HE'S AT
 7   HOME.  HE PLAYS AT VARIOUS FUNCTIONS.  IN FACT, I THINK HE EVEN
 8   ADMITTED THAT THE BAND IS NOT THAT GOOD AND THE ONLY GIG HE
 9   GETS IS AT A MATTEL CONCERT OR PICNIC OR WHATEVER.
10           BUT THEN I ASK HIM THE MONEY SHOT; I ASK HIM, 'DO YOU         10:55
11   WRITE SONGS?'
12               'YEAH, I DO.'
13               'WHO OWNS THEM?'
14               'I DO.'
15               'WHY DOESN'T MATTEL?'                                     10:56
16               'WHY WOULD MATTEL OWN THEM?  I DO THEM AT HOME.'
17           I THOUGHT THAT WAS KIND OF INTERESTING, BECAUSE HE'S
18   THE HEAD OF THE DIVISION.  HE DOESN'T BELIEVE THAT HIS SONGS
19   ARE COVERED BY THE EMPLOYMENT AGREEMENT THAT HE SIGNED, THE
20   SAME AGREEMENT THAT CARTER BRYANT HAD SIGNED.                         10:56
21           SO I ASKED BOB ECKERT, 'MR. ECKERT, DID YOU KNOW THAT
22   ONE OF YOUR KEY EXECUTIVES HERE IN THE COMPANY WRITES SONGS?
23               MATTEL SELLS SONGS, DON'T THEY.'
24               'YES.'
25               'DO YOU OWN HIS SONGS?'                                   10:56
```

```
 1              'I THINK WE MIGHT.'

 2              ALL I'M SAYING IS, THIS IDEA OF AMBIGUITY, YOUR

 3    HONOR --

 4         THE COURT:  2870 WOULD HAVE SOMETHING TOO.

 5         MR. NOLAN:  INTERESTING -- OKAY, UNDER 2870, THE LAST    10:56

 6    POINT I WANT TO MAKE, PART OF THE PROBLEM IN THIS BRIEFING IS

 7    THAT BECAUSE OF THE -- AND IT'S OUR OWN DOING, YOU KNOW, THAT

 8    WE ASKED FOR AN EXTENSION AND EVERYTHING GOT CONDENSED; BUT

 9    THERE'S DISCOVERY THAT'S GOING ON.

10              YOU MIGHT BE INTERESTED IN KNOWING THAT --           10:57

11         THE COURT:  I SUSPECT THERE WILL BE DISCOVERY GOING

12    ON IN THIS CASE WHEN THESE TRIALS ARE OVER, COUNSEL.

13         MR. NOLAN:  MY DAUGHTER IS ENTERING COLLEGE NEXT

14    YEAR.  GOD FORBID, SHE'LL EVER BE A LAWYER.  BUT I THINK SHE'S

15    GOING TO TAKE A DEPOSITION IN THIS CASE AT SOME POINT IN TIME.  10:57

16              (LAUGHTER.)

17         MR. NOLAN:  HERE'S THE POINT I WANTED TO MAKE, YOUR

18    HONOR:

19              THEIR OWN EXPERT, MR. GOMEZ, PRACTITIONER FOR A

20    NUMBER OF YEARS, IN HIS DEPOSITION COULD NOT OFFER A DEFINITION  10:57

21    OF THE TERM "INVENTION" AS IT'S USED IN THAT STATUTE.

22              SO ALL I'M SAYING IS THAT I RESPECTFULLY, YOUR HONOR,

23    SUBMIT THAT THE AMBIGUITY IS IN THE EYE OF THE BEHOLDER.  AND

24    THE EYE OF THE BEHOLDER IS SOMEONE WHO'S APPLYING.  AND I WOULD

25    ASK THE COURT TO KEEP IN MIND THE TWO PARALLEL TRACKS OF TWO    10:57
```

EMPLOYEES, ONE WHO CERTAINLY GETS PAID A LOT MORE; BUT
CARTER BRYANT AND TIM KILPIN, COMING TO WORK, AND THEY WANT TO
KNOW WHETHER OR NOT THEIR IDEAS AND DREAMS ARE GOING TO BE
COVERED.

        THE OTHER THING I WOULD SAY, YOUR HONOR, IS THAT THE
WHOLE IDEA HERE IS THAT HE'S BEEN DESCRIBED -- AND WHAT THEY'RE
GOING AFTER AND WHAT THEY'RE ALLEGING AS THE CORE OF THIS CASE
IS THAT HE CONCEIVED OF THE IDEA OF A FASHION DOLL, NOT OF A
DRAWING, OF A FASHION DOLL LINE.  AND THAT'S NOT COVERED IN
THIS.  IT MIGHT HAVE BEEN, YOUR HONOR, COVERED IN THE 2004
AGREEMENT.  I WOULD TELL YOU THAT I WOULDN'T MAKE THESE
COMMENTS IF WE WERE DEALING WITH THE 2004 AGREEMENT.  BUT I
WILL SAY THIS:  WHEN MATTEL WANTED TO COVER IDEAS, THEY KNEW
HOW TO PUT IT IN THERE.

        I WILL COME BACK TO THIS POINT VERY BRIEFLY IN THE
STATUTE OF LIMITATIONS ARGUMENT.  YOU MIGHT THINK, 'HOW IN THE
WORLD IS HE GOING TO PULL THIS IN ON THIS ONE?'  IN THE STATUTE
OF LIMITATIONS ARGUMENT, YOUR HONOR, I WILL SHOW YOU AN E-MAIL
THAT'S BEEN REDACTED BECAUSE OF THE ATTORNEY-CLIENT PRIVILEGE,
WHICH WE -- I RESPECTFULLY BELIEVE -- AND THE MATTER IS BEFORE
JUDGE INFANTE NOW ON WHETHER OR NOT THEY WAIVED THE
ATTORNEY-CLIENT PRIVILEGE ON USING IT BOTH AS A SWORD AND A
SHIELD -- WE BELIEVE THAT THE INVESTIGATION THAT WAS CONDUCTED
IN 2002 DECIDED NOT TO BRING A CHARGE FOR THAT SIMPLE REASON;
THAT ACCORDING -- IT SAYS, ACCORDING TO OUTSIDE COUNSEL, THEY

```
1    COULDN'T BRING THIS ACTION.

2          THEY COULDN'T BRING THE ACTION BECAUSE THE 2004

3    CONTRACT DOES NOT INCLUDE IDEAS; AND THAT'S WHY THEY PUT IT IN

4    THE 2004 VERSION OF THE NEW CONTRACT.

5          THANK YOU VERY MUCH.                                    10:59

6          THE COURT:  THANK YOU, COUNSEL.

7          THE COURT HAS HEARD FROM ALL OF YOU ON THE

8    ENFORCEABILITY.

9          MR. QUINN, I'D LIKE TO MOVE IN TO THE NEXT PHASE OF

10   THIS, ASSUMING THERE IS AN ENFORCEABLE AGREEMENT, WHETHER UNDER  10:59

11   THE AGREEMENT THERE'S ANY CONSEQUENCES OR ANY LEGAL CONCLUSIONS

12   THE COURT CAN REACH NOW ABOUT BREACH, ET CETERA.

13         IF YOU WANT TO BRIEFLY RESPOND TO ANY OF THE POINTS

14   MADE, YOU MAY DO SO; BUT LET'S TRY TO MOVE FORWARD NOW INTO THE

15   NEXT MOVEMENT HERE, IF WE COULD.                              10:59

16         MR. QUINN:  JUST A COUPLE OF BRIEF RESPONSES,

17   YOUR HONOR.

18         I DON'T THINK THAT BY PROFFERING AN UNREASONABLE

19   INTERPRETATION, ONE CAN CREATE AMBIGUITY.  AND WE SUBMIT THAT

20   THE ONLY REASONABLE INTERPRETATION IS NOT THE ONE THAT'S BEEN   11:00

21   ADVANCED THAT IT ONLY COVERS PATENTS.

22         THERE'S NO MYSTERY ABOUT WHERE THE LANGUAGE OF THIS

23   CONTRACT CAME FROM.  WHOEVER WROTE THIS -- I'M ASSUMING --

24   LET'S ASSUME --

25         THE COURT:  I'M SORRY.  MAYBE I'M NOT UNDERSTANDING      11:00
```

```
 1   WHAT YOU'RE SAYING THERE, SO LET ME ASK.

 2          WOULD YOU CONCEDE THAT IF THERE ARE TWO REASONABLE

 3   INTERPRETATIONS, TWO DIFFERENT REASONABLE INTERPRETATIONS WHICH

 4   LED TO TWO DIFFERENT CONCLUSIONS, THEN THERE WOULD BE

 5   AMBIGUITY?                                                       11:00

 6          MR. QUINN:  I WOULD AGREE WITH THAT --

 7          THE COURT:  OKAY.

 8          MR. QUINN:  -- IF THERE ARE TWO EQUALLY REASONABLE

 9   INTERPRETATIONS.

10          THE COURT:  SO IF YOUR INTERPRETATION IS REASONABLE     11:00

11   AND CARTER BRYANT'S INTERPRETATION IS REASONABLE, THEN I HAVE

12   AN AMBIGUOUS CONTRACT.

13          MR. QUINN:  I WOULD SAY IF THEY'RE BOTH EQUALLY

14   REASONABLE.

15          YOUR HONOR, THE REASON MAY BE A CONTINUUM.               11:00

16   OBVIOUSLY, THESE ARE REASONABLE LAWYERS SITTING OVER HERE TO MY

17   LEFT, AND INVENTIVE LAWYERS, IF I MAY USE THE TERM, AND THEY'VE

18   COME UP WITH AN ARGUMENT WITH -- I SUBMIT, THERE'S SOME GAPS IN

19   THE LOGIC, BUT I'M NOT PREPARED TO SAY THERE'S NO REASON

20   WHATSOEVER TO THE ARGUMENT.                                     11:01

21          BUT I DO NOT THINK THAT THE PROFFERED INTERPRETATION

22   THAT THIS CONTRACT ONLY COVERS PATENTABLE MATERIAL IS A

23   REASONABLE INTERPRETATION, OR IS AT LEAST AS REASONABLE AS THE

24   ONE THAT WE'VE ADVANCED THAT IT ALSO COVERS COPYRIGHTABLE

25   MATERIAL.                                                       11:01
```

1          I DON'T KNOW IF I'VE MADE MYSELF CLEAR ON THAT POINT,

2    YOUR HONOR.

3          **THE COURT:**  WELL, YOU SEEM TO BE MAKING TWO DIFFERENT

4    POINTS.  THE FORMER PART OF THAT POINT IS THAT YOU DON'T THINK

5    THAT THEIR INTERPRETATION IS REASONABLE TO LIMIT IT SIMPLY TO      11:01

6    PATENTABLE.

7          **MR. QUINN:**  RIGHT.

8          **THE COURT:**  BUT IF YOU'RE SUGGESTING THAT, PERHAPS,

9    THAT IS A REASONABLE INTERPRETATION, BUT THAT YOURS IS SIMPLY

10   MORE REASONABLE, I DON'T KNOW IF THE LAW REQUIRES THE COURT TO     11:02

11   JUST TRY TO FIGURE OUT THE MOST REASONABLE INTERPRETATION OF A

12   CONTRACT, IF THE COURT DOES, IN FACT, HAVE TWO INTERPRETATIONS

13   THAT CROSS THE THRESHOLD OF REASONABLENESS.

14         **MR. QUINN:**  RIGHT.

15         **THE COURT:**  I HOPE YOU UNDERSTAND WHAT I'M SAYING.       11:02

16         **MR. QUINN:**  I THINK THEIR INTERPRETATION CAN BE

17   ARTICULATED IN A REASONABLE SOUNDING WAY.  THAT'S WHAT I MEANT

18   TO SAY.  I BELIEVE THERE ARE LOGICAL GAPS IN IT.  BECAUSE,

19   AMONG OTHER THINGS, IT LEADS TO THE CONCLUSION -- AND THIS IS

20   THE POINT I'M ABOUT TO MAKE, YOUR HONOR:  THERE'S NO MYSTERY       11:02

21   WHERE THIS LANGUAGE CAME FROM.  WHOEVER WROTE THIS -- AND I

22   ASSUME IT WAS A LAWYER -- HAD OPEN BEFORE THEM THE LANGUAGE OF

23   SECTION 2870, WHERE ALL OF THIS LANGUAGE APPEARS, INCLUDING

24   "REDUCED TO PRACTICE."  IT APPEARS IN THE LANGUAGE OF THE

25   STATUTE.  AND WHOEVER WAS WRITING THIS WAS CLEARLY TRYING TO       11:02

1    WRITE AN AGREEMENT THAT WOULD BE ENFORCEABLE UNDER THAT

2    SECTION.

3            WE HAVE THE ICONIX CASE, WHICH SAYS THAT PROTECTS

4    PEOPLE WHO WRITE COPYRIGHTABLE MATERIALS.

5            ON THE EXTRINSIC EVIDENCE, THERE REALLY ISN'T -- NO     11:03

6    EXTRINSIC EVIDENCE HAS EVER BEEN OFFERED THAT MR. BRYANT, AT

7    ANY TIME, UNDERSTOOD THIS TO ONLY REFER TO PATENTABLE

8    MATERIALS.  THE ONLY EVIDENCE ON THAT IS THAT HE KNEW IT

9    COVERED HIS DESIGNS; HIS RESPONSE TO HIS MOTHER.

10           WITH RESPECT TO LATER CHANGES TO THE AGREEMENT, OR      11:03

11   EARLIER AGREEMENTS, WE'RE NOT TALKING ABOUT THOSE AGREEMENTS.

12   AND THERE'S A CASE THAT WE'VE CITED, YOUR HONOR, BAMERY V.

13   GREIF, 949 F. SUPP. 523, WHICH SAYS THAT IT'S NOT APPROPRIATE

14   TO LOOK AT THOSE OTHER VERSIONS OF AN AGREEMENT.

15           THE SUBSEQUENT AGREEMENT THAT WAS ENTERED INTO, THIS    11:03

16   WAS NOT JUST A MINOR TWEAKING OF SOME LANGUAGE.  THAT GREW TO

17   BECOME A FIVE-PAGE AGREEMENT INSTEAD OF A ONE-PAGE AGREEMENT.

18           SO I THINK IT'S NOT APPROPRIATE TO SORT OF ISOLATE

19   ONE LANGUAGE -- YOU KNOW, ONE TERM IN THERE, AND SAY, 'WELL,

20   THIS IS' -- 'OBVIOUSLY, THEY MUST HAVE RECOGNIZED SOMETHING WAS  11:04

21   WRONG.'

22           **THE COURT:**  LET'S PUT THAT ASIDE.  FAIR ENOUGH.

23   BECAUSE YOU ARE CORRECT IN THE CASE YOU CITE.

24           BUT WHAT ABOUT THE SUBSTANCE OF MR. NOLAN'S ARGUMENT

25   THAT THIS CONCEPT OF AN IDEA WAS LACKING; AND WHETHER IT CAME    11:04

```
1    IN IN ANOTHER AGREEMENT OR NOT, PERHAPS THAT MIGHT BE

2    IRRELEVANT.  BUT THAT PHRASE, OR THAT CONCEPT, HOWEVER YOU WANT

3    TO DEFINE IT, HE ARGUES, IS NOT PRESENT.

4         MR. QUINN:  WELL, IT SAYS "CONCEIVED OF," OR "REDUCED

5    TO PRACTICE."  AND THAT'S ALSO THE LANGUAGE IN THE STATUTE.        11:04

6    AND I SUBMIT, "CONCEIVED OF" PICKS UP IDEAS.  SO IF YOU COME UP

7    WITH AN IDEA RELATING TO A TOY WHILE YOU WORK FOR US, YES, WE

8    OWN THAT, TO THE EXTENT THE LAW PERMITS THAT.

9         THE COURT:  LET'S MOVE ON TO, ASSUMING THERE IS AN

10   AGREEMENT HERE THAT'S ENFORCEABLE, THE CONSEQUENCES THEREOF.       11:04

11        MR. NOLAN:  YOUR HONOR, MAY I JUST GIVE A CITE ON

12   THIS POINT.

13        I'M JUST POINTING OUT THAT THE DISTINCTION WE WERE

14   MAKING BETWEEN DRAWINGS AND DESIGNS AND IDEAS AND THAT THEY'RE

15   ONLY CLAIMING IT'S THE DRAWING, I WANTED TO CITE TO MATTEL'S       11:05

16   CORRECTED OPPOSITION TO THE MGA PARTIES IN CARTER BRYANT'S

17   MOTION FOR PARTIAL SUMMARY JUDGMENT AT PAGE 71, AND I'M QUOTING

18   FROM LINE 21.  IT SAYS, "AS EXPLAINED IN MATTEL'S MOTION AT

19   PAGES 6 TO 10, MATTEL OWNS THE INTANGIBLE BRATZ IDEAS AND

20   CONCEPTS PURSUANT TO THE INVENTIONS AGREEMENT.  ACCORDING TO       11:05

21   THE INVENTIONS AGREEMENT, IT CREATES A PROTECTED PROPERTY

22   INTEREST IN THE IDEAS AND CONCEPTS BRYANT CREATED OR CONCEIVED

23   WHILE EMPLOYED AT MATTEL."

24        THANK YOU.

25        THE COURT:  THANK YOU, COUNSEL.                               11:05
```

```
 1           MR. QUINN?

 2           MR. QUINN:  YOUR HONOR, TURNING NOW TO THE BREACH OF

 3  CONTRACT CLAIM -- AND I DON'T KNOW WHETHER THE COURT, AT THE

 4  SAME TIME, WOULD LIKE ME TO ADDRESS THE BREACH OF FIDUCIARY

 5  DUTY.                                                            11:06

 6           THE COURT:  LET'S HOLD OFF ON FIDUCIARY DUTY.  I KNOW

 7  THAT'S RELATED TO THE -- LET'S SEPARATE THAT OUT, BECAUSE THAT

 8  PLAYS A ROLE IN SEVERAL OF THE OTHER MOTIONS AS WELL, AND SOME

 9  OTHER ISSUES; SO LET'S SEPARATE OUT WHETHER AND TO WHAT EXTENT

10  THE AGREEMENT CREATES THAT FIDUCIARY DUTY.                       11:06

11           LET'S FOCUS ON, ASSUMING THERE'S AN ENFORCEABLE

12  AGREEMENT, WHAT INVENTIONS ARE BEING COVERED, ET CETERA.

13           MR. QUINN:  ALL RIGHT.

14           YOUR HONOR, THIS IS POINT NUMBER FOUR IN OUR NOTICE

15  OF MOTION THAT WE'RE TALKING ABOUT NOW, AND WE EXPRESSLY CARVED  11:06

16  OUT THAT WE DID NOT ASK THE COURT, OBVIOUSLY, TO RULE ON

17  DAMAGES OR THE FULL SCOPE OF THE BREACH.  WE MERELY ASKED FOR

18  AN ADJUDICATION FROM THE COURT THAT MR. BRYANT IS LIABLE FOR

19  BREACH OF BOTH THE INVENTIONS AGREEMENT AND THE CONFLICT OF

20  INTEREST QUESTIONNAIRE.                                          11:06

21           I WOULD SUBMIT, YOUR HONOR, THAT THIS IS AN AGREEMENT

22  WHICH INCLUDES UNDERTAKINGS, CLEAR PROMISSORY UNDERTAKINGS, BY

23  THE EMPLOYEE TO COMMUNICATE TO MATTEL ALL INVENTIONS THAT HE

24  COMES UP WITH; TO ASSIGN THEM TO MATTEL.  IT EXPRESSLY

25  PROHIBITS HIM FROM ENGAGING IN BUSINESS FOR A COMPETITOR OR IN   11:07
```

1    ASSISTING A COMPETITIVE BUSINESS.  AND IN THE QUESTIONNAIRE,

2    THERE IS PROMISSORY LANGUAGE -- I KNOW IT'S ENTITLED A

3    QUESTIONNAIRE, AND THE DEFENSE ARGUES THAT MEANS IT CAN'T BE AN

4    AGREEMENT; BUT IT RECITES IN IT, 'I AGREE' -- THOSE WORDS

5    ACTUALLY APPEAR -- HE AGREES TO NOTIFY MATTEL IF HE GETS                11:07

6    ENGAGED IN ANY BUSINESS VENTURE DURING HIS EMPLOYMENT, WHETHER

7    IT BE A CONFLICT OF INTEREST OR WHETHER THERE WOULD BE ANY

8    CHANGE IN THE VARIOUS -- HE HAS TO CHECK VARIOUS BOXES -- ANY

9    CHANGE IN HIS CIRCUMSTANCES RELATING TO HIS INVOLVEMENT WITH A

10   COMPETITIVE BUSINESS, OR ANYTHING LIKE THAT.                            11:08

11         THE UNDISPUTED EVIDENCE IS THAT MR. BRYANT DID, WHILE

12   EMPLOYED BY MATTEL, DEVELOP A MODEL FOR A DOLL FOR THE

13   EXPRESSED PURPOSE OF TRYING TO SELL IT TO MGA; THAT HE ENGAGED

14   THE SERVICES OF MATTEL EMPLOYEES; THAT HE PAID A MATTEL

15   EMPLOYEE TO HELP HIM PUT THIS DOLL TOGETHER; THAT HE ACTUALLY           11:08

16   DID WORK ON DRAWINGS; THAT HE WORKED FOUR HOURS PER DAY,

17   ACCORDING TO AN MGA DOCUMENT, FOR MGA WHILE EMPLOYED BY MATTEL;

18   THAT HE COMMUNICATED WITH VENDORS IN HONG KONG, HAIR SUPPLIERS;

19   THAT HE COMMUNICATED AND SAID, 'THE COMPANY I'M WORKING WITH IS

20   MGA'; THAT HE ACTUALLY DID A PROJECT, THE ANGEL DOLL PROJECT,           11:08

21   WHICH HE COMPLETED, DREW, CREATED A DESIGN, AND WAS PAID FOR

22   THAT.

23         I THINK ALL OF THESE THINGS ARE NOT DISPUTED.

24         WHAT THE DEFENSE DOES IS ATTEMPT TO TRIVIALIZE IT,

25   SAYS IT'S ONLY $150 THAT HE WAS PAID FOR THE ANGEL DOLL                 11:09

1    PROJECT; THAT HE ONLY PAID A SMALL AMOUNT OF MONEY TO THE

2    MATTEL EMPLOYEE; THAT THE IDENTITY OF THE HAIR SUPPLY VENDOR IN

3    HONG KONG, MATTEL DOES NOT CLAIM WAS A TRADE SECRET.  THE

4    SUGGESTION IS THAT NONE OF THESE THINGS ADD UP TO ANYTHING.

5           I SUBMIT, YOUR HONOR, IT SIMPLY CANNOT BE THE CASE          11:09

6    THAT IT'S PERFECTLY OKAY FOR AN EMPLOYEE, WHILE HE'S UNDER SUCH

7    AN AGREEMENT AS MR. BRYANT WAS -- THAT IT'S PERFECTLY OKAY FOR

8    HIM TO DO THESE THINGS.

9           THIS WAS SQUARELY ASSISTING A COMPETITOR.

10          **THE COURT:**  IT'S PERFECTLY NOT OKAY TO DO IT IF IT       11:09

11   VIOLATES AN AGREEMENT.  SO IT DOES MATTER WHETHER OR NOT THEY

12   ADD UP TO A VIOLATION OR A BREACH OF THE AGREEMENT.

13          **MR. QUINN:**  SURE.

14          AND I SUBMIT, IT DOES BREACH THOSE TERMS.

15          HE WAS ASSISTING A COMPETITOR.  HE DID FAIL TO NOTIFY       11:10

16   MATTEL THAT HE HAD DEVELOPED AN INVENTION.  HE DID USE MATTEL

17   RESOURCES AND EMPLOYEES TO DO THESE VARIOUS THINGS.  HE DID

18   VIOLATE THE TERMS OF HIS AGREEMENT.

19          AGAIN, THE SCOPE OF THAT AND THE CONSEQUENCES OF IT

20   ARE NOT ADDRESSED BY OUR MOTION; BUT I THINK THE CONCLUSION IS    11:10

21   INESCAPABLE THAT HE DID BREACH HIS AGREEMENT.

22          **THE COURT:**  WOULD IT NOT BE BETTER FOR THE COURT,

23   SINCE THE SCOPE OF THE ALLEGED BREACH, ASSUMING THAT THERE IS A

24   MINIMAL BREACH -- AND I'M CERTAINLY NOT FINDING THAT AT THIS

25   POINT -- BUT YOU CONCEDE THAT IT'S NOT -- BASED ON THE EVIDENCE   11:10

```
 1   BEFORE THE COURT RIGHT NOW, I CAN'T FIND THE EXTENT OR THE

 2   SCOPE OF THE ALLEGED BREACH; CORRECT?

 3          MR. QUINN:  YOU CANNOT FIND THE FULL -- THERE ARE

 4   DISPUTED ISSUES ABOUT VERY IMPORTANT THINGS CONCERNING WHAT HE

 5   WAS DOING.                                                     11:11

 6          THE COURT:  WOULD IT NOT BE BETTER, THEN, TO ALLOW A

 7   JURY TO CONSIDER ALL OF THIS EVIDENCE AND DETERMINE BOTH

 8   WHETHER AND THE EXTENT OF ANY SUCH BREACH?

 9          MR. QUINN:  WELL, I THINK, YOUR HONOR, IF THE COURT

10   IS CONVINCED THAT THERE WAS A BREACH HERE, WE'RE ENTITLED TO   11:11

11   THAT INSTRUCTION TO THE JURY.

12          THE COURT:  BUT IF I'M UNABLE TO DETERMINE THE EXTENT

13   OR THE SCOPE --

14          MR. QUINN:  TO SOME DEGREE, I SUBMIT THE COURT IS

15   ENTITLED, CAN DO THAT; AND I WOULD SUBMIT, MUST DO THAT.       11:11

16   BECAUSE IT IS CLEARLY A BREACH, AND THERE'S NO POINT IN OUR

17   ARGUING ABOUT THAT WITH A JURY AS TO WHETHER OR NOT THERE WAS A

18   BREACH.  THERE WAS A BREACH.  WE'VE PROVED THERE WAS A BREACH.

19   THE UNDISPUTED FACTS ESTABLISH THERE WAS A BREACH.  AND WE

20   SHOULDN'T HAVE TO SPEND THE TIME AT TRIAL TO ESTABLISH THAT.   11:11

21   THE TRIAL SHOULD FOCUS ON THE ISSUE OF THESE DRAWINGS, WHEN

22   THEY WERE CREATED AND WHO OWNS THEM.

23          THE COURT:  ANYTHING FURTHER ON THIS POINT?

24          MR. QUINN:  NO, YOUR HONOR.

25          THE COURT:  VERY WELL.                                 11:12
```

1          **MS. ANDERSON:**  THANK YOU, YOUR HONOR.

2          THERE ABSOLUTELY ARE DISPUTED ISSUES OF FACT WITH

3   RESPECT TO THE QUESTION OF WHETHER OR NOT THERE WAS A BREACH.

4   CLEARLY, YOUR HONOR, THE FIRST QUESTION WE HAD TO ADDRESS TODAY

5   IS, HOW SHOULD THE COURT INTERPRET THE LANGUAGE OF THE          11:12

6   CONTRACT?

7          THAT'S THE SUBJECT OF OUR MOTION.  THAT'S THE SUBJECT

8   OF INQUIRY.  BUT ONCE THAT IS DETERMINED, THE JURY WILL DECIDE,

9   AND NEEDS TO DECIDE, WHETHER THERE HAS BEEN A BREACH AND TO

10  WHAT EXTENT.  AND THERE ARE SERIOUS FACTUAL DISPUTES THAT MUST   11:12

11  BE RESOLVED HERE.  IT'S ABSOLUTELY NOT THE CASE THAT THERE ARE

12  UNDISPUTED FACTS SUPPORTING A FINDING OF BREACH.

13         MAY I HAVE SLIDE 37, PLEASE.

14         I'D LIKE TO TALK VERY BRIEFLY, JUST TO CLARIFY ONE

15  ISSUE THAT DIDN'T REALLY COME UP DURING THE DISCUSSIONS OF       11:13

16  INTERPRETATION.  BUT I THINK IT'S IMPORTANT TO ASSESS.  AND

17  THAT IS THE FOLLOWING:  WE SUBMIT, YOUR HONOR, THAT UNDER THE

18  CANONS OF CONSTRUCTION, THIS COURT MUST CONSTRUE THE CONTRACT

19  THE WAY BRYANT HAS SUBMITTED IN ITS PAPERS BECAUSE OF THE

20  DOCTRINES OF CONTRA PROFERENTEM AND THE FACT THAT IT'S A         11:13

21  CONTRACT OF ADHESION.

22         BUT WERE THE COURT TO DECLINE TO DO SO FOR SOME

23  REASON, THAT WOULD LEAVE FACTUAL DISPUTES AS TO INTERPRETATIONS

24  THAT SHOULD BE RESOLVED BY THE JURY.  BECAUSE MATTEL IS THE

25  DRAFTER, DRAFTED BY LAWYERS, CONTRACT OF ADHESION, THERE'S NO    11:13

1    PRESUMPTION THAT CAN RESOLVE AMBIGUITIES IN MATTEL'S FAVOR.

2           THEREFORE, WERE THE COURT NOT TO ADOPT BRYANT'S

3    CONSTRUCTION, WE SUBMIT IT WOULD HAVE TO GO TO THE JURY ON THAT

4    QUESTION; SO THERE'S ONE FACTUAL DISPUTE THAT MAY OR MAY NOT

5    EXIST, DEPENDING ON THE COURT'S OUTCOME.                         11:14

6           SECOND, EVEN IF YOU ARE TO ASSUME APPLICATION OF

7    MATTEL'S IMPROPER CONSTRUCTION, THERE ARE SERIOUS FACTUAL

8    DISPUTES HERE ABOUT WHETHER ANYTHING WAS CONCEIVED OR REDUCED

9    TO PRACTICE DURING HIS EMPLOYMENT THAT THE JURY MUST HEAR; MUCH

10   BACK AND FORTH ABOUT WHEN THINGS WERE DONE AND WHAT CONSTITUTES  11:14

11   A CONCEPTION AND WHAT CONSTITUTES A REDUCTION TO PRACTICE,

12   BASED ON THE ARGUMENTS THAT MATTEL ITSELF HAS MADE.

13          **THE COURT:**  WHAT ABOUT THOSE DRAWINGS, THE DRAWINGS

14   THEMSELVES, THE EXHIBITS THAT ARE REFERRED TO BY MATTEL?

15          **MS. ANDERSON:**  WELL, YOUR HONOR --                    11:14

16          **THE COURT:**  ASSUMING THAT THE COURT WERE TO FIND THAT

17   THE CONTRACT WAS ENFORCEABLE, OR IF THE JURY FOUND THAT THE

18   CONTRACT WAS ENFORCEABLE, ASSUMING WE GOT THAT OUT OF THE WAY,

19   A DRAWING OF THE TYPE IN THE EXHIBITS THAT ARE SUBMITTED THERE,

20   THE 17 DRAWINGS OR WHATEVER, THOSE WERE CERTAINLY CONCEIVED TO   11:15

21   REDUCED TO WRITING OR DRAWING OR WHATEVER DURING THE PERIOD OF

22   EMPLOYMENT.

23          **MS. ANDERSON:**  HOWEVER, YOUR HONOR, AS MR. NOLAN JUST

24   POINTED OUT, THE IDEA THAT'S BEING CONSIDERED HERE IS AN IDEA

25   FOR A DOLL LINE.                                                 11:15

1           **THE COURT:**  NOW PUT ASIDE THE IDEA, THE ACTUAL --

2    WHAT WAS REDUCED TO WRITING.  IT'S NO LONGER AN IDEA.

3           I HAVE QUESTIONS ABOUT JUST THE WHOLE NOTION OF

4    GRABBING SOMEONE'S IDEAS THAT HAVEN'T COME OUT.  BUT ONCE THEY

5    COME OUT AND THEY'RE ON PAPER AND YOU HAVE THINGS THAT -- IT'S         11:15

6    NOT DISPUTED THEY WERE ACTUALLY DRAWN DURING THE COURSE OF

7    EMPLOYMENT.

8           **MS. ANDERSON:**  THE JURY IS GOING TO NEED TO ASSESS

9    WHETHER THAT DRAWING IS SUFFICIENT TO BE A CONCEPTION OF A DOLL

10   LINE.  BECAUSE, YOUR HONOR, THE DEFINITION IN PATENT LAW              11:15

11   REQUIRES SUFFICIENT DEFINITENESS.  IT'S A QUESTION OF FACT.

12   AND THERE ARE EXPERTS IN THIS CASE THAT ARE GOING TO DISCUSS,

13   AMONG OTHER THINGS, THE MANY THINGS THAT WERE NOT PRESENT TO

14   ENABLE THE CREATION OF A DOLL LINE FROM THAT SKETCH.  THOSE ARE

15   ALL THINGS THE JURY IS ENTITLED TO HEAR AND ASSESS.                  11:16

16          SO WE'VE GOT ONE ISSUE THERE, JUST ON REDUCTION TO

17   PRACTICE AND CONCEPTION, JUST THERE, JUST ONE FACTUAL ISSUE

18   THERE.

19          ON TOP OF THAT, YOUR HONOR, ALL OF THE OTHER

20   SO-CALLED EVIDENCE THAT MATTEL HAS SUBMITTED TO SUPPORT THEIR        11:16

21   FINDING OF BREACH, ALL OF IT IS DISPUTED AS TO WHETHER OR NOT

22   IT WAS IMPROPER.  THERE'S A DOCTRINE OF PREPARATION TO COMPETE

23   IN CALIFORNIA WHICH ABSOLUTELY LET'S EMPLOYEES GET READY TO GO

24   AND WORK FOR ANOTHER EMPLOYER OR DO OTHER KINDS OF COMPETING

25   BUSINESS.  AND THERE'S NO CONSTRUCTION OF THE CONTRACT THAT          11:16

```
 1   WOULD ALLOW A FINDING THAT MR. BRYANT IS BARRED FROM DOING

 2   THINGS TO GET READY TO GO OFF AND DO HIS OWN JOB.  AND THE JURY

 3   NEEDS TO ASSESS THAT.  BECAUSE QUESTIONS ABOUT WHETHER

 4   SOMETHING IS PERMISSIBLE, PREPARATION TO COMPETE, INVOLVES

 5   IMPORTANT CONSIDERATIONS OF INTENT, YOUR HONOR.                11:17

 6          THE COURT:  SO YOU WOULD CAPTURE ALL OF THESE

 7   DRAWINGS AS PART OF PREPARATION TO COMPETE?

 8          MS. ANDERSON:  NO.  THE ACTIONS TO WHICH MATTEL IS

 9   POINTING ARE EVIDENCE OF BREACH.  THEY ARE ALL ACTIONS THAT

10   THEY CLAIM MR. BRYANT TOOK DURING THE PERIOD OF TIME          11:17

11   ENCOMPASSING HIS EMPLOYMENT, AND THEY'RE SAYING THOSE ACTS ARE

12   IMPROPER; THEY'RE IN VIOLATION OF THE CONTRACT; THEY'RE BREACH

13   OF THIS DUTY, BREACH OF THAT DUTY.

14          WE'RE SAYING THEY ARE WELL WITHIN PERMISSIBLE

15   ACTIVITY IN CALIFORNIA, AND THE CONTRACT CAN'T BE CONSTRUED TO 11:17

16   BAR MR. BRYANT FROM BEING ABLE TO PREPARE TO COMPETE.  AND THE

17   JURY NEEDS TO ASSESS QUESTIONS OF INTENT ON THAT SUBJECT.

18          BEYOND THAT, THERE ARE MANY DISPUTES ABOUT THE EXTENT

19   TO WHICH THE EVIDENCE THEY POINT TO REALLY SAYS WHAT THEY'RE

20   SAYING.  THEY NEED TO ARGUE THAT TO THE JURY.  THE QUESTION OF 11:17

21   WHETHER THERE'S ACTUALLY AN ACT THAT VIOLATED THIS CONTRACT,

22   THAT'S SOMETHING THE JURY NEEDS TO ASSESS, AND NEEDS TO ASSESS

23   AS A WHOLE, NOT PIECEMEAL.

24          FINALLY, AS TO THE QUESTIONNAIRE, WHICH WE STATED IS

25   ABSOLUTELY NOT A CONTRACT, BESIDES THE CLEARLY MISLEADING      11:18
```

```
 1   FASHION IN WHICH IT HAS BEEN DRAFTED, IF YOU WERE TO SUGGEST IT
 2   WERE A CONTRACT, WE HAVE THE ISSUE OF AN INTEGRATION CLAUSE.
 3   AND THERE IS A VERY CLEAR INTEGRATION CLAUSE IN THE AGREEMENT
 4   ITSELF WHICH WOULD BAR THIS FROM BEING AN ACTUAL CONTRACT.
 5           BUT WERE THE COURT TO CONSIDER THAT TO BE A CONTRACT,     11:18
 6   THAT JURY SHOULD BE ABLE TO ASSESS WHETHER THERE WAS A BREACH
 7   WHEN BRYANT, AS SOON AS HE SIGNED THE CONTRACT, GAVE NOTICE.
 8   THOSE ARE ALL QUESTIONS THE JURY NEEDS TO HEAR AS A WHOLE.
 9   BEAKING THIS CASE UP PIECEMEAL WILL MISLEAD THEM AND CONFUSE
10   THEM.                                                            11:18
11           THE COURT:  THANK YOU, COUNSEL.
12           MS. ANDERSON:  THANK YOU.
13           MR. NOLAN:  YOUR HONOR, VERY BRIEFLY.
14           I'D LIKE TO TAKE THE COURT BACK TO ONE OF THE
15   QUESTIONS THAT YOU ASKED MR. QUINN ABOUT.                       11:19
16           WOULD IT BE FAIR TO INSTRUCT THE JURY ON THE BREACH
17   WHEN YOU DON'T UNDERSTAND THE SCOPE AND BREADTH OF THAT BREACH
18   AND THE POTENTIAL IMPACT?
19           AND I RESPECTFULLY SUBMIT THAT WE WOULD BE HORRIBLY
20   PREJUDICED BY A FINDING OF BREACH WITHOUT SOME APPRECIATION FOR  11:19
21   THE BREADTH AND THE SCOPE.  WE HAVE GREAT RESPECT FOR
22   QUINN EMANUEL, AND I ASSUME THEY HAVE THE SAME RESPECT, DESPITE
23   THE HOTEL DISPUTE THAT WE'RE INVOLVED IN RIGHT NOW.  AND WE'RE
24   NOT GOING TO GO THERE, YOUR HONOR.  BUT HERE'S MY POINT --
25           THE COURT:  THE COURT WILL TOUCH UPON THAT BEFORE THE    11:19
```

1    END OF THE DAY.

2            **MR. NOLAN:**  AND THAT'S WHY I THOUGHT I WOULD RAISE IT

3    FIRST.

4            WE HAVE A WORD CHECK AT OUR OFFICE THAT ANYTIME IT'S

5    SAID IN A BRIEF THAT IT'S NOT DISPUTED, WE GO IMMEDIATELY TO        11:19

6    THAT AND THEN WE DISPUTE IT, BECAUSE IT'S CLEARLY THE CASE.

7    THERE'S NOTHING THAT'S NOT DISPUTED IN THIS CASE.  MR. QUINN

8    SAID THERE WERE A LOT OF FACTORS THAT ARE NOT DISPUTED.

9            WHAT THIS ISSUE NOW IMPACTS, YOUR HONOR, IS A WHOLE

10   OTHER ISSUE THAT'S OF INTEREST; AND THAT IS, EVEN IF YOU ASSUME     11:20

11   THAT CARTER WAS COVERED BY THE CONTRACT, DID HE BREACH IT?

12           THERE'S A CLAUSE IN THE CONTRACT THAT SAYS YOU HAVE

13   TO DO IT DURING THE COURSE OF YOUR EMPLOYMENT.

14           AARON, COULD I HAVE THAT VERSION UP.

15           REMEMBER, YOUR HONOR, I SHOWED YOU THREE VERSIONS OF        11:20

16   THE CONTRACT:  THE EARLY 1990'S, THE ONE THAT CARTER SIGNED,

17   AND THEN THE 2004 ONE THAT CLARIFIES THE AMBIGUITY.

18           THIS ISSUE NOW COMES INTO QUESTION OF WHAT WAS

19   ALLOWED AT MATTEL WITH RESPECT TO MOONLIGHTING.

20           IF YOU ACCEPT, AS DOES CALIFORNIA, THAT AN EMPLOYEE         11:20

21   HAS A RIGHT TO PREPARE TO COMPETE -- YOU TALKED ABOUT 17

22   DRAWINGS.  I HOPE THAT THE COURT MISSPOKE, BECAUSE I THINK ONLY

23   MATTEL TAKES THE POSITION THAT THERE WERE SIX DRAWINGS OR

24   IMPROVEMENTS THAT WERE DONE.  BECAUSE THERE WAS CERTAINLY AN

25   ISSUE WITH RESPECT TO THE OTHER DRAWINGS, AS TO WHEN THEY WERE      11:20

1    DONE, WHETHER OR NOT THEY WERE 1998 OR 1999.

2         **THE COURT:**  YOU'RE RIGHT.

3         **MR. NOLAN:**  AND AT TRIAL, WE'RE GOING TO HAVE A CSI

4    PRODUCTION WITH RESPECT TO INK TESTING.

5         **THE COURT:**  RIGHT.  AND THEN THERE'S A QUESTION OF          11:21

6    WHETHER THEY'RE SUBSTANTIALLY SIMILAR AND ALL.  AND I

7    UNDERSTAND THAT.

8         **MR. NOLAN:**  SO I WANT TO MOVE THAT ASIDE.

9         AND ALSO, WHETHER OR NOT THEY WERE ACTUALLY DONE IN

10   1998.

11        BUT HERE'S THE POINT I WANT TO MAKE, IS THAT IF YOU

12   GO NOW TO THE MIDDLE -- OR, I'M SORRY, I GUESS IT'S THE TOP

13   PART -- THIS, OF COURSE, IS WHAT CARTER SIGNS.  AND IT TALKS

14   ABOUT THE INVENTIONS, SO IT'S INCORPORATING FROM THE PREVIOUS

15   PARAGRAPH.  AND NOW IT SAYS, 'KNOW-HOW, DATA COMPUTER          11:21

16   PROGRAMS' -- WHERE IT SAYS, 'DURING THE COURSE OF MY

17   EMPLOYMENT.'

18        NOW, IF YOU GO TO THE '04 AGREEMENT, TO SHOW AND

19   DEMONSTRATE THE AMBIGUITY THAT EXISTED, THEY'VE NOW ADDED,

20   'DURING MY PERIOD OF EMPLOYMENT WITH MATTEL, WHETHER OR NOT IN  11:21

21   THE COURSE OF MY EMPLOYMENT AT MATTEL,' A VERY FINE POINT, NOT

22   NUANCED AT ALL, BECAUSE WHAT THE JURY WILL HEAR -- AND YOU'VE

23   SEEN SOME REFERENCES, I THINK, TO THE RECORD -- IS THAT THERE

24   IS A LOT OF EVIDENCE THAT MATTEL EMPLOYEES ARE ALLOWED TO

25   MOONLIGHT.                                                      11:22

```
1        IN ONE INSTANCE, YOUR HONOR, IF YOU JUST WANT TO

2   FOCUS ON ONE PERSON, RICHARD DE ANDA, THE VICE PRESIDENT AND

3   HEAD MUCKY-MUCK OF --

4        THE COURT:  I UNDERSTAND THE IRONIC SITUATION WITH

5   HIM.                                                              11:22

6        MR. NOLAN:  -- OF GLOBAL SECURITY -- HE KEPT

7   REMINDING ME THAT HE WAS IN CHARGE OF GLOBAL SECURITY -- I

8   HAPPENED TO GOOGLE HIM AND FOUND OUT THAT HE WAS APPEARING AS

9   AN EXPERT WITNESS.  AND, AGAIN, MUCH LIKE KILPIN, HE MADE THE

10  POINT, 'BUT, MR. NOLAN, I WOULD VISIT THE OFFICES OF THE       11:22

11  LAWYERS I WAS WORKING WITH AFTER I LEFT THE EMPLOYMENT OF

12  MATTEL, ON MY WAY HOME.'

13       NOW, IF THE EVIDENCE HERE IS THAT CARTER BRYANT WAS

14  DOING THESE DRAWINGS, THESE SIX DRAWINGS, AT NIGHT, IN THE BACK

15  COTTAGE, USING HIS OWN LIGHT BOX, DOES THAT CONSTITUTE          11:23

16  MOONLIGHTING?  DOES THAT ALLOW HIM TO BE ABLE TO PREPARE TO

17  COMPETE?  IS IT A LOT LIKE MARGARET LEAHY'S TESTIMONY, THE

18  SCULPTOR, FORMER MATTEL EMPLOYEE, WHO, AFTER ADOPTING A CHILD,

19  NEEDS ADDITIONAL WORK, GOES TO HER SUPERVISOR AT MATTEL AND IS

20  TOLD A LIST OF VENDORS THAT SHE SHOULD CONTACT ABOUT DOING      11:23

21  MOONLIGHTING?

22       IT ALSO IMPLICATES, AGAIN, THE POLICIES AT MATTEL.

23       MR. ECKERT ADMITTED IN HIS DEPOSITION TO ME THAT WHEN

24  HIS OWN DAUGHTER GOT MARRIED, HE ASKED ONE OF THE SEAMSTRESSES

25  TO REPLICATE HER WEDDING DRESS, MINIATURIZE IT FOR THE WEDDING  11:23
```

```
 1   CAKE.  IS THAT MOONLIGHTING?

 2             THERE IS A TECHNICAL TERM AT MATTEL -- THEY'RE CALLED

 3   "G JOBS."  I THINK THE "G" STANDS FOR GIFT JOBS -- AND WHAT YOU

 4   WILL FIND IN THIS RECORD IS THAT THERE'S A PRACTICE WHEREBY

 5   EMPLOYEES CAN ACTUALLY COME IN AND HAVE OTHER EMPLOYEES HELP      11:24

 6   THEM ON GIFTS.  AND WHAT WE'RE SAYING HERE, YOUR HONOR, IS THAT

 7   IT'S NOT THAT CLEAR.

 8             EVEN IF YOU FIND THAT THEY OWN HIS IDEAS, DID HE DO

 9   IT IN THE COURSE OF HIS EMPLOYMENT?  DOES THAT MEAN, WHILE HE'S

10   AT MATTEL -- BECAUSE THERE'S NO EVIDENCE THAT THEY SENT CARTER    11:24

11   HOME AND SAID, YOU KNOW, 'I WANT YOU TO DO SOME ADDITIONAL

12   DRAWINGS FOR US AT NIGHT.'

13             THE OTHER POINT I'D MAKE, YOUR HONOR, IS THAT IT IS

14   UNDISPUTED THAT DESPITE ALL OF THE VERSIONS OF BARBIES THAT ARE

15   OUT THERE -- I THINK WE HAVE A NASCAR DRIVER; I THINK WE HAVE A   11:24

16   PRESIDENTIAL CANDIDATE -- WE DO NOT HAVE ANY BARBIES THAT ARE

17   APPEARING AS MULTI-ETHNIC WITH FOUR FRIENDS.  CARTER BRYANT WAS

18   PAID TO DRAW ELEGANT FASHION DRAWINGS FOR BARBIE COLLECTIBLES.

19   IT WAS NOT HIS JOB, IT WASN'T IN THE COURSE OF HIS EMPLOYMENT,

20   TO BE DRAWING MULTI-ETHNIC TYPE OF THINGS.  HE WAS NEVER ASKED    11:25

21   TO DESIGN A DOLL OTHER THAN DOING FASHIONS FOR BARBIE.

22             SO WHEN YOU LOOK AT THE AMBIGUITIES HERE ON THE TERMS

23   OF BREACH, AND YOU NOW GO HERE AND SAY -- AND YOU'RE

24   CARTER BRYANT, AND YOU'RE AN HONEST GUY -- YOU'RE TRYING TO SAY

25   TO YOURSELF, 'ALL RIGHT,' MUCH LIKE DE ANDA, 'WHEN I'M AT HOME    11:25
```

1    AND I'M DOING MY EXPERT REPORTS, THAT'S NOT COVERED BY MY

2    EMPLOYMENT AGREEMENT.  IF I'M GOING HOME AND DOING DRAWINGS AT

3    NIGHT ON MY OWN TIME, IS THAT PART OF MY EMPLOYMENT AGREEMENT,

4    WHEN I KNOW THAT OTHER PEOPLE ARE MOONLIGHTING?'

5         SEE, I THINK THAT THERE'S NOT A SUFFICIENT RECORD FOR    11:25

6    YOU TO MAKE A DETERMINATION.  I DO SAY, YOUR HONOR, WHEN YOU GO

7    BACK TO THE ORIGINAL IDEA OF THIS WHOLE CONCEPT OF WHETHER OR

8    NOT THE CONTRACT COVERED WHAT WAS DONE, THE SECOND STEP YOU

9    HAVE TO MAKE, AFTER YOU GET OVER THIS ISSUE OF IDEAS, IS THIS

10   CURVE THAT WE THROW AT YOU NOW AS TO WHETHER OR NOT, IF HE'S    11:26

11   DOING THIS AT HOME -- WHICH IS THE EVIDENCE; THERE'S NO

12   EVIDENCE THAT ANYBODY SAW HIM DOING THIS -- WAS IT IN THE

13   COURSE OF HIS EMPLOYMENT?  WE RESPECTFULLY SUBMIT NOT.  THAT'S

14   ANOTHER AMBIGUITY.  AND IS OUR INTERPRETATION REASONABLE?  OF

15   COURSE, IT IS.  AND IT'S REASONABLE BECAUSE OTHER EMPLOYEES AT    11:26

16   MATTEL BELIEVED IT TO BE REASONABLE.

17        PRESUMABLY, MR. ECKERT THOUGHT IT WAS APPROPRIATE TO

18   ASK SOMEBODY IN OFF-HOURS TO MAKE A MINIATURIZED WEDDING DRESS

19   FOR HIS DAUGHTER.  I DON'T KNOW, AND I DON'T EXPECT, THAT HE

20   HAD TO GIVE THE DRESS BACK TO MATTEL.    11:26

21        EMPLOYEES WERE ALLOWED TO DO THIS OFF-HOURS, AND IT

22   WASN'T IN THE COURSE OF EMPLOYMENT.

23        **THE COURT:**  TO USE THAT EXAMPLE, COUNSEL, THAT

24   WEDDING DRESS, MINIATURIZED WEDDING DRESS, ARGUABLY WOULD BE

25   THE PROPERTY OF MATTEL, WOULD IT NOT?    11:27

1    **MR. NOLAN:**  I DON'T KNOW.  BUT I ASSUME THAT IT'S IN

2    THE HOUSE OF MR. ECKERT'S DAUGHTER RIGHT NOW.  AND I DON'T

3    THINK THEY'VE ASKED HER TO RETURN IT.  AT LEAST THERE'S NO

4    EVIDENCE.

5            I'M BEING SARCASTIC ON THAT.  I APOLOGIZE.            11:27

6        **THE COURT:**  I MEAN, I UNDERSTAND IT'S KIND OF,

7    PERHAPS, A BIT OF A RED HERRING; BUT IF THAT WEDDING DRESS

8    SOMEHOW CAUGHT ON AND IT WAS AS WILDLY POPULAR AS THESE FOUR

9    DOLLS, I SUSPECT MATTEL WOULD SAY THAT WAS DONE BY THEIR

10   SEAMSTRESS WHILE EMPLOYED BY MATTEL, AND THAT WOULD PROBABLY BE   11:27

11   COPYRIGHTABLE BY MATTEL.

12           NO?

13       **MR. NOLAN:**  NOT FASHIONS.  FASHIONS AREN'T

14   COPYRIGHTABLE.  WE'LL GET TO THAT A LITTLE BIT LATER ON,

15   YOUR HONOR.                                                  11:27

16           **THE COURT:**  OKAY.  FAIR ENOUGH.

17           **MR. NOLAN:**  I WOULD SUBMIT THAT IT'S NOT.

18           IT'S A SIMILAR MIND STATE OF KILPIN WRITING HIS MUSIC

19   IN THE BACKYARD.  AND I THINK THAT WE HAVE TO KEEP ALL OF THESE

20   DIFFERENT IDEAS IN PLACE, YOUR HONOR.                        11:28

21           "IDEAS" IS A BAD TERM.  IT'S A PUN, I GUESS, I'M

22   USING HERE.  BUT I'M JUST SAYING THAT THIS -- I JUST THINK THAT

23   ANYBODY HAS TO STRUGGLE WITH THE INTERPRETATION OF CARTER'S

24   CONTRACT WHEN YOU LOOK AT 2004, WHERE IT'S CLEARLY SPELLED OUT,

25   'WHETHER OR NOT IN THE COURSE OF MY EMPLOYMENT'; SO IN THE   11:28

```
 1   CLARIFICATION, 'DURING MY PERIOD OF EMPLOYMENT,' WHICH IS WHAT
 2   CARTER SIGNED, MATTEL'S LAWYERS BELIEVED THAT THEY HAD TO
 3   CLARIFY WHAT MIGHT HAVE APPEARED TO YOU TO BE A RATHER
 4   STRAIGHTFORWARD TERM, TO MAKE IT ABSOLUTELY CLEAR WHETHER OR
 5   NOT, 'IN THE COURSE OF MY EMPLOYMENT.'                          11:28
 6           THANK YOU.
 7           THE COURT:  THANK YOU, COUNSEL.
 8           MR. QUINN:  YOUR HONOR, WE'RE GOING TO HEAR ABOUT
 9   MOONLIGHTING, AND I WON'T PUT A STAKE IN THE HEART OF IT TODAY,
10   I KNOW; BUT IT REALLY IS SUCH A NON ISSUE.  THE DOCUMENT SAYS   11:28
11   YOU CAN DO THINGS WITH CONSENT.  YOU'RE BEING TOLD A LOT OF
12   THINGS WITHOUT CITATIONS TO THE RECORD AND WITHOUT THE FULL
13   STORY AT THIS POINT.
14           DE ANDA, THE HEAD OF SECURITY, HAS A WRITTEN
15   AGREEMENT THAT PERMITS HIM TO DO A SIDE BUSINESS.  LEAHY        11:29
16   ADMITTED IT WAS WRONG IN HER DEPOSITION FOR HER TO DO WHAT THEY
17   CHARACTERIZE AS MOONLIGHTING.  MR. ECKERT, THE DOLL FOR THE
18   WEDDING CAKE, YOUR HONOR, FULLY DISCLOSED; EVERYBODY KNEW WHAT
19   IT WAS; AND THEY MADE IT.  IT'S FULL DISCLOSURE.
20           HOW ABOUT CARTER BRYANT?                                11:29
21           WE TAKE CARTER BRYANT'S TESTIMONY -- AND THIS IS FROM
22   PAGE 788, HIS TESTIMONY ON JANUARY 23, 2008; AND I ASKED HIM,
23   'DO YOU HAVE ANY BASIS TO BELIEVE THAT IT WAS PERFECTLY FINE
24   FOR YOU TO DO WORKS FOR ANOTHER TOY COMPANY WHILE YOU WERE
25   EMPLOYED BY MATTEL?'                                            11:29
```

```
 1              ANSWER:  'NO.'

 2         HIS TESTIMONY IS, HE NEVER TOLD ANYBODY.  HE NEVER

 3    HAD ANY CONSENT FOR WHAT THEY NOW CHARACTERIZE AS MOONLIGHTING.

 4              THERE REALLY CANNOT BE ANY KIND OF, I SUBMIT, SERIOUS

 5    ISSUE ABOUT WHETHER IF YOU'RE A DOLL DESIGNER, IT'S OKAY FOR      11:30

 6    YOU TO DESIGN DOLLS FOR A COMPETITOR.  IT JUST FLIES IN THE

 7    TEETH OF HIS AGREEMENT.

 8              THE CALIFORNIA LEGISLATURES ENACTED A STATUTE THAT

 9    SAYS YOU CAN PROHIBIT EMPLOYEES FROM DOING THAT.  AND THAT'S

10    EXACTLY WHAT HAPPENED HERE.                                      11:30

11         THE COURT:  COUNSEL, IF WE CAN, UNLESS YOU HAVE

12    ANYTHING FURTHER ON THAT, LET'S MOVE ON PAST THE INVENTIONS

13    AGREEMENT BREACH ISSUES AND GET INTO THE DUTY OF LOYALTY AND

14    THE FIDUCIARY DUTY ISSUES.

15         MR. QUINN:  OKAY.  I'M GOING TO RESPOND ON THE             11:30

16    PREPARATIONS TO COMPETE.

17         THE COURT:  VERY WELL.

18         MR. QUINN:  YOUR HONOR, THIS IS NOT PREPARATION TO

19    COMPETE, TO CREATE -- IF YOU'RE A DOLL DESIGNER, TO CREATE DOLL

20    DESIGNS.  THAT'S NOT JUST SIMPLY PREPARATIONS TO COMPETE.        11:30

21              THE LAW IS CLEAR THAT -- AND THIS IS THE BANKCROFT

22    CASE -- THAT THE TYPE OF PREPARATION THAT'S OKAY DEPENDS ON THE

23    SPECIFIC CIRCUMSTANCES AND WHAT EXACTLY YOU'RE DOING.

24              THE HUONG QUE CASE SAYS THAT IN ANY EVENT, LAWFUL

25    PREPARATIONS TO COMPETE CANNOT INCLUDE ASSISTING A COMPETITOR.   11:31
```

1        AND I'D REFER YOUR HONOR, ALSO, TO THE DANIEL ORIFICE

2   CASE AND THE SEQUOIA CASE, BOTH OF WHICH INDICATE THAT YOU

3   SHOULD GIVE NOTICE IF YOU ARE GOING TO ENGAGE IN PREPARATIONS

4   TO COMPETE.

5        THE COURT:  BUT SOMETIMES THAT'S SIMPLY NOT POSSIBLE.    11:31

6        MR. QUINN:  SOMETIMES IT'S NOT POSSIBLE.  BUT I

7   SUBMIT, IF THEY'RE TRYING TO CRAM MR. BRYANT'S ACTIVITIES INTO

8   THE CUBBYHOLE OF PREPARATIONS TO COMPETE, AND HE'S GOT AN

9   AGREEMENT THAT SAYS HE CAN'T CREATE DESIGNS FOR A COMPETITOR,

10  HE SHOULD GIVE NOTICE OF THAT.                                11:31

11       THE COURT:  THESE CASES THAT YOU CITE, THEY DO REFER

12  TO EVALUATING THE TOTALITY OF CIRCUMSTANCES AND WHETHER OR NOT

13  IT'S REASONABLE PREPARATIONS TO COMPETE OR NOT; AND THAT'S

14  EXACTLY, I THINK, WHAT MR. NOLAN IS EMBRACING WHEN HE SUGGESTS

15  THAT THAT'S WHY THIS IS AN ISSUE FOR THE JURY.                11:32

16       HOW CAN I DECIDE, AS A MATTER OF LAW, WHETHER OR NOT

17  THESE ARE, IN FACT, PREPARATIONS TO COMPETE, AS OPPOSED TO

18  AIDING AND ASSISTING THE COMPETITOR?

19       MR. QUINN:  WELL, I THINK THE FACTS ANSWER THAT FOR

20  US.  HE'S ACTUALLY CREATING DOLL DESIGNS.  HE'S ACTUALLY TAKING  11:32

21  STEPS TO CREATE A PRODUCT FOR A COMPETITOR.  THAT CROSSES THE

22  LINE.

23       THE HUONG QUE CASE SAYS YOU CAN'T -- WHATEVER

24  "PREPARATIONS TO COMPETE" MAY MEAN, YOU CAN'T ASSIST A

25  COMPETITOR.  AND HE HAD AN AGREEMENT, YOUR HONOR, THAT          11:32

```
 1   SPECIFICALLY PROVIDED THAT HE WOULD DISCLOSE IF HE WAS ENGAGED

 2   IN ANY COMPETITIVE ACTIVITY.  WHATEVER THE RIGHTS, IF YOU WILL,

 3   OF PREPARING TO COMPETE IS, IT DOESN'T MEAN THAT YOU CAN BREACH

 4   AN AGREEMENT THAT SAYS, 'IF YOU'RE GOING TO ENGAGE IN

 5   COMPETITIVE ACTIVITY AND ASSIST A COMPETITOR, YOU DON'T HAVE TO     11:32

 6   DISCLOSE IT, NOTWITHSTANDING THE TERMS OF YOUR CONTRACT.'

 7           THE COURT HEARD ARGUMENT ABOUT, 'THIS IS AN ISSUE OF

 8   INTENT,' IF YOU'LL RECALL THAT; 'THIS IS REALLY INTENT; THE

 9   COURT CAN'T DECIDE THAT NOW.'  THERE'S NO ELEMENT OF INTENT IN

10   A BREACH OF CONTRACT CLAIM.  WE DON'T LOOK INTO THE INTENT OF A     11:33

11   BREACHING PARTY.  INTENT IS SIMPLY IRRELEVANT.

12           THE INTEGRATION CLAUSE -- THE INVENTIONS AGREEMENT

13   SPECIFICALLY REFERS TO THE CONFLICT OF INTEREST POLICY PURSUANT

14   TO WHICH THE QUESTIONNAIRE IS ISSUED; SO I DON'T THINK THERE'S

15   AN INTEGRATION ISSUE THERE.                                        11:33

16           THE COURT:  THAT'S PARAGRAPH 3-A.

17           MR. QUINN:  YES.

18           AND THEN, FINALLY, YOUR HONOR, THOSE DRAWINGS -- THE

19   SPECIFIC DRAWINGS AND EXHIBITS THAT ARE REFERENCED IN OUR

20   NOTICE OF MOTION, I REALLY -- MAYBE I MISSED IT, BUT I DIDN'T       11:33

21   SEE IN THE OPPOSITION ANY DISPUTE THAT THOSE PARTICULAR

22   DRAWINGS AND EXHIBITS WERE CREATED DURING THE COURSE OF HIS

23   MATTEL EMPLOYMENT.  I SUBMIT THERE IS NO ISSUE ON THOSE.

24           THE COURT:  YOU HEARD MR. NOLAN SAY THAT HE RAN A

25   WORD SEARCH AND THEY DISPUTE EVERYTHING.                           11:33
```

```
 1              MR. QUINN:  I UNDERSTAND.

 2              MR. NOLAN:  SO STIPULATED.

 3              MR. QUINN:  OTHER THAN THE USUAL GLOBAL DISPUTATIONS.

 4           THE COURT:  I ASSUME MR. NOLAN SAYS THAT HE DISPUTES

 5   IT ASSUMING THAT THERE'S A GOOD FAITH BASIS TO DISPUTE IT.       11:34

 6              MR. QUINN:  RIGHT.

 7           THE COURT:  THAT'S IMPLIED IN HIS STATEMENT, I

 8   ASSUME.

 9              ALL RIGHT.  LET'S TALK ABOUT FIDUCIARY DUTY.

10              MR. QUINN:  BREACH OF FIDUCIARY DUTY.               11:34

11           WE KNOW FROM THE GAB BUSINESS SERVICES CASE, YOUR

12   HONOR, THAT THERE CAN BE TWO TYPES OF CIRCUMSTANCES IN WHICH A

13   FIDUCIARY RELATIONSHIP CAN BE CREATED WITH AN EMPLOYEE; ONE WAS

14   WHERE THERE'S AN EXPRESSED UNDERTAKING IN TRUST; AND, SECOND,

15   WHERE THERE IS THE RECEIPT OF CONFIDENTIAL INFORMATION.  WE      11:34

16   HAVE THAT EXPRESSED UNDERTAKING IN THE AGREEMENT THAT

17   MR. BRYANT SIGNED.

18              ALL YOU HAVE TO DO IS LOOK AT THE LANGUAGE.  IT SAYS,

19   AND I QUOTE NOW, 'THE COMPANY DEPENDS ON ME TO MAINTAIN THAT

20   CONFIDENTIALITY, AND I ACCEPT THAT POSITION OF TRUST.'          11:35

21              IT PROVIDES THAT HE MUST MAINTAIN PROPRIETARY

22   INFORMATION IN STRICTEST CONFIDENCE.  AND THAT POINT IS

23   REPEATEDLY DROVE HOME; THAT HE WILL MAINTAIN THE

24   CONFIDENTIALITY OF TRADE SECRET INFORMATION.

25              I WOULDN'T GO SO FAR AS TO ARGUE THAT THIS CREATED A    11:35
```

```
 1   FIDUCIARY OBLIGATION RUNNING TO EVERY SUBJECT MATTER,
 2   CERTAINLY, OF MR. BRYANT'S INTERFACE WITH MATTEL AND
 3   INFORMATION THAT HE MAY HAVE ACCESS TO; BUT CLEARLY AS TO WHAT
 4   HE WAS DOING, THE PROPRIETARY INFORMATION, THE CONFIDENTIAL
 5   INFORMATION, INFORMATION CONCERNING NEW PRODUCTS, HE'S RIGHT AT    11:35
 6   THE HEART OF THE MATTER.  I MEAN, HE HAS THE KEYS TO THE
 7   KINGDOM.  HE PARTICIPATES IN WEEKLY STAFF MEETINGS IN THE
 8   DESIGN CENTER, WHERE THE LIFEBLOOD OF MATTEL'S BUSINESS IS --
 9   THE BUSINESS IS CREATION, IT'S INVENTION, AND HE PARTICIPATES
10   IN WEEKLY MEETINGS THAT HE ATTENDS, WHERE NEW IDEAS ARE VETTED.   11:36
11   THERE'S DISCUSSION ABOUT NEW PRODUCTS AND WHERE THEY STAND AND
12   WHAT'S GOING TO BE COMING UP IN THE NEXT QUARTER OR THE NEXT
13   YEAR.
14        THE COURT:  I'M GOING TO PUSH YOU ALONG HERE, AND
15   I'LL CERTAINLY ENTERTAIN ARGUMENT FROM THE OTHER SIDE.  BUT       11:36
16   BASED ON WHAT'S BEEN SUBMITTED, I DON'T HAVE SO MUCH OF A
17   PROBLEM WITH THE EXISTENCE OF A DUTY AS I DO WITH WHETHER OR
18   NOT THERE'S A FACTUAL ISSUE RELATED TO THE BREACH, AND
19   PARTICULARLY, THE AIDING AND ABETTING THEORIES AS THEY RELATE
20   TO MGA AND MR. LARIAN.  SO I WOULD APPRECIATE YOUR THOUGHTS ON    11:36
21   THAT.
22        MR. QUINN:  ALL RIGHT.
23        YOUR HONOR, SO HE'S A FIDUCIARY WITH RESPECT TO THE
24   COMPANY'S INTELLECTUAL PROPERTY; THE DESIGNS HE CREATES, THE
25   DESIGNS HE HEARS ABOUT, THE LIFEBLOOD OF THE COMPANY'S           11:37
```

1    BUSINESS.  HE BREACHED THAT.  HE DISCLOSED DESIGNS THAT HE

2    CREATED WHILE HE WORKED THERE TO MGA.

3         **THE COURT:**  DOESN'T THIS STILL GO BACK TO THE

4    PREVIOUS ARGUMENTS OF WHAT WAS DESIGN, WHAT ACTUALLY IS OR IS

5    NOT CAPTURED BY THIS?                                          11:37

6         **MR. QUINN:**  A FIDUCIARY WHO'S INVOLVED IN CREATING

7    NEW PRODUCTS, I SUBMIT, IF THAT'S THE SCOPE OF YOUR FIDUCIARY

8    OBLIGATIONS, IT'S A BREACH OF THAT OBLIGATION TO BE CREATING

9    NEW PRODUCTS FOR ANOTHER COMPANY.  I MEAN, QUITE SIMPLY PUT, IF

10   HE'S A FIDUCIARY, AND I SUBMIT HE IS, WITH RESPECT TO NEW       11:37

11   PRODUCT INFORMATION, INTELLECTUAL PROPERTY, HOW COULD YOU

12   BREACH THAT MORE CLEARLY THAN BY CREATING NEW PRODUCTS FOR A

13   COMPETITOR?

14        I MEAN, HE KNOWS, YOUR HONOR, WHAT MATTEL DOES, WHAT

15   MATTEL DOESN'T DO, WHAT'S COMING DOWN THE PIKE, WHAT WILL       11:38

16   APPEAL.  HE HAS ACCESS TO ALL OF THAT KIND OF INFORMATION.

17   KNOWING WHAT HE KNOWS, SITTING IN THE MEETINGS THAT HE SITS IN,

18   PARTICIPATING IN THE DESIGN-MAKING PROCESS, AS HE DOES.  HE

19   TAKES A PRODUCT AND TAKES IT TO A COMPETITOR.  IF WE'RE OVER

20   THE FIRST HUMP, THAT HE'S A FIDUCIARY WITH RESPECT TO THAT TYPE 11:38

21   OF INFORMATION, IT'S GOT TO BE A BREACH.

22        **THE COURT:**  DOES MATTEL EVEN KNOW THAT IT'S A PRODUCT

23   AT THAT POINT IN TIME?

24        **MR. QUINN:**  MATTEL NEVER KNEW ABOUT BRATZ WHILE HE

25   WAS THERE.  MATTEL NEVER KNEW.  BUT I DON'T THINK THAT'S        11:38

1    NECESSARY FOR A FINDING THAT HE BREACHED HIS DUTY.  HAVING

2    ACCESS TO THE INFORMATION HE HAD, HAVING THE POSITION OF TRUST

3    THAT HE HAD -- I MEAN, WE CAN SEE THE THOUGHT PROCESS.  AND I

4    THINK WE'RE GOING TO HEAR IT.  WE ALREADY HAVE HEARD, 'MATTEL

5    WOULD NEVER EXPLOIT BRATZ.  THIS IS SOMETHING I CAN TAKE ACROSS    11:39

6    THE STREET.  BARBIE IS VULNERABLE HERE.'

7            THAT IS A BREACH OF FIDUCIARY DUTY.  THERE'S NO

8    DISPUTE THAT HE DID THOSE THINGS.

9            **THE COURT:**  AND THE AIDING AND ABETTING?

10           **MR. QUINN:**  THE AIDING AND ABETTING, TWO ELEMENTS,    11:39

11   YOUR HONOR:  KNOWLEDGE AND SUBSTANTIAL ASSISTANCE.

12           AND WE KNOW THAT FROM THE SONY CASE -- I BELIEVE

13   THAT'S BY JUDGE MANELLA, WHO AT ONE TIME HAD THIS CASE, IN THE

14   CENTRAL DISTRICT --

15           **THE COURT:**  YES.  YOUR MISFORTUNE.    11:39

16           **MR. QUINN:**  THAT WILLFUL BLINDNESS CAN CONSTITUTE

17   AIDING AND ABETTING.  IT'S NOT -- YOU CAN'T JUST 'HEAR NO EVIL,

18   SEE NO EVIL,' AND ESCAPE LIABILITY FOR AIDING AND ABETTING.

19           THIS IS NOT A WILLFUL BLINDNESS CASE.  THEY KNEW.

20   MGA KNEW THAT MR. BRYANT HAD ONE OF THESE AGREEMENTS.    11:40

21           **THE COURT:**  NOW, THEY DIDN'T HAVE THE AGREEMENT

22   ITSELF.  IN FACT, MR. BRYANT DIDN'T THINK IT WAS APPROPRIATE TO

23   ASK FOR THE AGREEMENT.

24           **MR. QUINN:**  HE THOUGHT IT WOULD BE SUSPICIOUS IF HE'D

25   ASKED FOR IT.    11:40

1        THEY ASKED TO SEE IT.  THEY THOUGHT IT WOULD BE

2   SUSPICIOUS.  AND THEN SOMEBODY, I SUBMIT, TRYING TO SET UP A

3   RELIANCE OF COUNSEL, A DEFENSE -- SOMETHING ABOUT WHICH, I

4   THINK, WE NEED TO EXPLORE SOME MORE AT ANOTHER DATE -- ENGAGES

5   A LAWYER BY THE NAME OF ROSENBAUM TO CALL MR. BRYANT'S LAWYER,      11:40

6   AND SAY, 'DOES MR. BRYANT REALLY OWN THIS?'

7        THE CONVERSATION TAKES FIVE MINUTES, MR. ROSENBAUM'S

8   TESTIMONY IS; AND HE SAID THAT THE PORTION OF THAT CONVERSATION

9   THAT CONCERNED WHETHER MR. BRYANT ACTUALLY OWNED THIS WAS ABOUT

10  HALF OF THE FIVE-MINUTE CONVERSATION.                               11:40

11       AND WHAT WAS HE TOLD?  WHAT WAS THE FULL EXTENT OF

12  HIS INVESTIGATION?  WHAT WAS HE TOLD BY MR. BRYANT'S LAWYER?

13       'YES, MR. BRYANT OWNS THIS.'

14       THAT'S IT.

15       EXCEPT ROSENBAUM, MGA'S LAWYER AND AGENT AT THE TIME,          11:41

16  TESTIFIES IN DEPOSITION THAT HE KNEW THAT THE EXISTENCE OF THAT

17  AGREEMENT, WHICH MR. BRYANT TOLD HIM WOULD BE TOO SUSPICIOUS TO

18  ASK FOR, PROBABLY MEANT THAT MATTEL -- HE KNEW IT MEANT THAT

19  MATTEL PROBABLY OWNED ANYTHING MR. BRYANT HAD CREATED DURING

20  HIS EMPLOYMENT WITH MATTEL, WAS HIS TESTIMONY.  HE KNOWS THAT       11:41

21  BECAUSE HE WORKED IN THIS AREA.  THAT PRACTICE IS UNIVERSAL.

22  BY THE WAY, IT HAPPENS AT MGA, TOO.  THEIR EMPLOYEES SIGN AN

23  AGREEMENT HAVING THOSE TERMS AS WELL.  THEY KNEW THIS.

24       HOW ALSO DID THEY KNOW THIS?

25       MGA WAS STAFFED THEN, IS STAFFED NOW, TO A LARGE              11:41

1   EXTENT, BY FORMER MATTEL EMPLOYEES WHO HAVE BEEN RECRUITED

2   AWAY, INCLUDING THE VERY PEOPLE WHO WERE KEY IN DEVELOPING THE

3   BRATZ PRODUCT.  PAULA GARCIA, THEN PAULA TREANTAFELLES, WHO WAS

4   THE PROJECT MANAGER FOR BRATZ, AND WAS THE FIRST PERSON OTHER

5   THAN VICTORIA MARLOW TO MEET WITH MR. BRYANT, WAS A PREVIOUS,      11:42

6   IN VERY RECENT PAST, MATTEL EMPLOYEE WHO HAD ONE OF THESE

7   INVENTIONS AGREEMENTS.  SHE KNEW THE TERMS OF THE MATTEL

8   AGREEMENT.

9           VERONICA MARLOW IS THE ONE WHO BROUGHT THEM TOGETHER

10  AND MADE A SEVEN-FIGURE AMOUNT OF MONEY AS A FINDER'S FEE, ALSO    11:42

11  A FORMER MATTEL EMPLOYEE WHO HAD ONE OF THESE AGREEMENTS.

12          AND MARGARET LEAHY, THE SCULPTOR OF THE BRATZ DOLL,

13  ALSO A FORMER MATTEL EMPLOYEE, WHO HAD ONE OF THESE AGREEMENTS

14  WITH MATTEL.

15          THESE ARE THE PRINCIPAL PEOPLE AT MGA WHO ARE             11:42

16  INVOLVED IN TAKING THIS PROJECT ON BOARD.  THEY ALL HAD THESE

17  AGREEMENTS.  THEY KNEW THESE EMPLOYEES HAD THESE AGREEMENTS.

18  THEY'RE CHARGEABLE WITH THAT NOTICE.

19          I THINK THE COURT HAS TO LAYER THIS AND TAKE INTO

20  ACCOUNT MGA'S CONCEALMENT AND CHANGING STORIES ABOUT THE ORIGIN   11:43

21  OF BRATZ.  MR. LARIAN IS ON RECORD, IN THE PUBLIC RECORD, WITH

22  CHANGING STORIES ABOUT WHERE BRATZ CAME FROM.  IT WAS HIS

23  DAUGHTER; IT WAS HIM; IT WAS THE DOLL CONTEST; DIFFERENT

24  STORIES.  THE CONCEALMENT OF THEIR INVOLVEMENT WITH MR. BRYANT.

25  'DON'T ASK WHEN HE STARTED WORKING FOR MGA' IN THEIR DOCUMENTS.   11:43

1    I THINK IT'S CLEAR, YOUR HONOR, THAT MGA KNEW WHAT IT WAS

2    DOING, AIDED AND ABETTED MR. BRYANT IN HIS BREACH OF HIS DUTIES

3    TO MATTEL.

4            **THE COURT:**  THANK YOU, COUNSEL.

5            I WANT TO GIVE MGA AND MR. BRYANT THE LAST 15 MINUTES    11:44

6    BEFORE LUNCH TO RESPOND JUST ON THIS POINT, SO WE CAN WRAP THIS

7    SECTION UP; AND THEN AFTER LUNCH, WE'LL RESUME WITH THE

8    AFFIRMATIVE DEFENSES.

9            **MS. ANDERSON:**  THANK YOU, YOUR HONOR.

10           IF I MAY, YOUR HONOR, I'D LIKE TO START WITH THE    11:44

11   QUESTION OF THE EXISTENCE OF A DUTY FIRST, BECAUSE I THINK IT

12   HELPS TO WALK THROUGH THIS IN THAT ORDER.

13           I'D ALSO PREFACE THIS WITH THE STATEMENT, AS WE SAID

14   IN OUR PAPERS, WE'RE NOT MOVING ON THE ABSENCE OF A DUTY OF

15   LOYALTY.  THAT IS NOT A BASIS OF OUR PAPERS.  WE ARE OBVIOUSLY    11:44

16   OPPOSING MATTEL'S CLAIM THAT THERE IS NO DISPUTE AND WE

17   BREACHED IT.

18           **THE COURT:**  I APPRECIATE YOU FOCUSING ON THIS,

19   BECAUSE, AS I INDICATED, JUST FROM THE PAPERS ITSELF, I TEND TO

20   SEE THE DUTY THAT THEY'RE DESCRIBING; SO I WOULD APPRECIATE YOU    11:44

21   FOCUSING ON THAT.

22           **MS. ANDERSON:**  THE QUESTION HERE IS WHETHER THERE IS

23   ANY FIDUCIARY DUTY IMPOSED BY AGREEMENT, AND THERE IS NOT, YOUR

24   HONOR.

25           YOUR HONOR, IF MATTEL'S CONSTRUCTION OF THE LAW WERE    11:45

```
 1    CORRECT, VIRTUALLY EVERY EMPLOYEE IN THE STATE WOULD OWE A

 2    FIDUCIARY DUTY.

 3            FORTUNATELY FOR THEM, THAT IS NOT THE LAW.  FIDUCIARY

 4    DUTIES ARE AN ONEROUS DUTY, AND THE LAW ONLY IMPOSES THEM IN

 5    CERTAIN CIRCUMSTANCES.                                          11:45

 6            THE GAB CASE, WHICH BOTH MATTEL AND MR. BRYANT HAVE

 7    CITED IN THEIR PAPERS, IS THE CORE CASE ON THIS QUESTION.  GAB

 8    RECOGNIZES THERE ARE TWO KINDS OF FIDUCIARY DUTIES, THOSE

 9    IMPOSED BY LAW, NOT AT ISSUE HERE, AND THOSE THAT ARE

10    UNDERTAKEN BY AGREEMENT.                                        11:45

11            THE ONLY EVIDENCE, THE ONLY ARGUMENT, TO WHICH MATTEL

12    POINTS ON THIS ISSUE IS THE NOTION THAT UNDER THIS AGREEMENT --

13    THIS CONTRACT WE'VE BEEN TALKING ABOUT -- AND BY NATURE OF HIS

14    JOB, TRUST AND CONFIDENCE WAS REPOSED IN MR. BRYANT.  THAT IS

15    THEIR ARGUMENT.                                                 11:46

16            HOWEVER, UNDER THE LAW, YOUR HONOR, THAT IS

17    ABSOLUTELY INSUFFICIENT TO IMPOSE A FIDUCIARY DUTY.

18            IF I COULD HAVE SLIDE 5, PLEASE.

19            THE CITY SOLUTIONS CASE, WHICH CITES WORLD VISION, A

20    2002 CASE HERE, MADE VERY CLEAR, "THE MERE FACT THAT IN THE     11:46

21    COURSE OF BUSINESS RELATIONSHIPS, THE PARTIES' REPOSED TRUST

22    AND CONFIDENCE IN EACH OTHER DOES NOT IMPOSE ANY CORRESPONDING

23    FIDUCIARY DUTIES."

24            THE COURT:  FAIR ENOUGH.

25            MS. ANDERSON:  SO THAT IS NOT ENOUGH.                    11:46
```

1          WHAT THEY MUST SHOW, YOUR HONOR, ARE FOUR ELEMENTS TO

2     IMPOSE SUCH A DUTY BY AGREEMENT.

3          IF I COULD HAVE THE NEXT SLIDE, PLEASE.

4          **THE COURT:**  THERE NEEDS TO BE A VOLUNTARY ACCEPTANCE

5     OR THE ASSUMPTION OF THAT FIDUCIARY DUTY.                        11:46

6          **MS. ANDERSON:**  EXACTLY, YOUR HONOR.

7          THERE MUST BE VOLUNTARILY ACCEPTANCE.  IN A KNOWING

8     AGREEMENT, TO ACT AS A FIDUCIARY, THAT AGREEMENT HAS TO MAKE

9     ABSOLUTELY CLEAR THAT YOU OWE A FIDUCIARY DUTY.  YOU'RE NOT

10    JUST BEING REPOSED WITH TRUST AND CONVERSATION.  YOU OWE A       11:47

11    FIDUCIARY DUTY.

12         THIRD, THERE MUST BE A SEPARATE ACT THAT CREATES A

13    FIDUCIARY RELATION KNOWN TO LAW.

14         **THE COURT:**  BUT THE CONTRACT WOULD DO THAT, THOUGH;

15    RIGHT?                                                          11:47

16         **MS. ANDERSON:**  WELL, YOUR HONOR, WHEN IT'S AN

17    EMPLOYER-EMPLOYEE CIRCUMSTANCE, YOU HAVE TO HAVE VERY SPECIFIC

18    REQUIREMENTS MET, WHICH ARE NOT MET HERE.  EMPLOYER-EMPLOYEE

19    RELATIONSHIPS ARE NOT A FIDUCIARY RELATION KNOWN TO LAW.

20         **THE COURT:**  BY ITSELF, THAT'S CORRECT.  IT HAS TO BE    11:47

21    SOMETHING ELSE.

22         **MS. ANDERSON:**  THERE HAS TO BE SOMETHING MORE, SOME

23    SEPARATE ACT, YOUR HONOR, WHICH JUST DOES NOT EXIST IN THIS

24    CASE.

25         AND, FINALLY -- AND THIS IS AN ELEMENT -- AND,            11:47

1    FRANKLY, THE THIRD ELEMENT AS WELL, MATTEL DOESN'T EVEN TRY TO

2    ADDRESS -- THIS LAST ELEMENT REQUIRES THAT THE FIDUCIARY IS NOT

3    ON EQUAL TERMS WITH THE DEPENDENT PARTY, BUT INSTEAD IS IN A

4    SUPERIOR POSITION TO EXERT UNIQUE INFLUENCE OVER THE DEPENDENT

5    PARTY.

6            THERE IS NOT A SHRED OF EVIDENCE, THERE IS NO

7    ARGUMENT MADE BY MATTEL, THAT MR. BRYANT WAS EVER IN A SUPERIOR

8    POSITION WITH RESPECT TO ANYTHING AT MATTEL.  IF ANYTHING, IT

9    WAS THE REVERSE.  HE SIGNED A CONTRACT OF ADHESION, A CONTRACT

10   THAT HAS TO BE RESOLVED AGAINST MATTEL.  AND THIS IS THE        11:48

11   CONTRACT THEY'RE RELYING UPON AS SOMETHING THAT DISCLOSED THE

12   IMPOSITION OF A FIDUCIARY DUTY.

13         **THE COURT:**  YOU'RE LOOKING AT IT IN THE GENERAL

14   SENSE.  BUT IN A PARTICULAR SENSE, WHEN YOU HAVE ACCESS TO OR

15   YOU HAVE YOUR COMPANY'S SECRETS -- LET'S ASSUME FOR A MOMENT    11:48

16   ARGUENDO THAT THEY ARE -- THEN YOU'RE IN A POSITION TO DO

17   SOMETHING WITH THOSE SECRETS AND THE COMPANY REALLY CAN'T --

18   WHAT CAN THE COMPANY DO TO STOP YOU, UNLESS THEY RELY ON YOUR

19   TRUSTWORTHINESS?

20         **MS. ANDERSON:**  THE GAB CASE, YOUR HONOR, MAKES CLEAR   11:48

21   THAT IN CALIFORNIA, MERE ENTRUSTMENT OF TRUST AND CONFIDENCE,

22   MERE REPOSE OF TRUST AND CONFIDENCE, IS NOT ENOUGH.  THAT IS

23   NOT ENOUGH.

24         **THE COURT:**  I UNDERSTAND THAT.

25         **MS. ANDERSON:**  IT DOESN'T MATTER HOW SPECIAL THOSE     11:49

```
 1   SECRETS ARE.  IT DOESN'T MATTER HOW WONDERFUL THOSE SECRETS

 2   ARE.  IF THAT'S ALL YOU'VE GOT, IT'S NOT ENOUGH.

 3         NOW, CASES WHERE YOU DO SEE A FIDUCIARY RELATION

 4   IMPOSED, THERE IS A LOT MORE.  FOR EXAMPLE, THE STEVENS CASE,

 5   ON WHICH MATTEL RELIES -- IT'S A 1957 CASE -- A FIDUCIARY         11:49

 6   RELATIONSHIP IS IMPOSED THERE BECAUSE AN INVENTOR TRANSFERRED

 7   HIS PATENTED IDEA OVER TO A PARTICULAR INDIVIDUAL, ENTRUSTED

 8   HIM WITH ALL OF THE RESPONSIBILITIES OF BOOKKEEPING AND

 9   MANUFACTURING AND SELLING AND LICENSING.  AND THE PARTY THAT

10   TRANSFERRED THAT INVENTION OVER HAD TO RELY ON ALL OF THE GOOD    11:49

11   FAITH; THEY HAD NO CONTROL WHATSOEVER, AND THEY SAT THERE AND

12   WAITED FOR ROYALTIES TO BE PAID.

13         IT'S MUCH, MUCH MORE.  AND CALIFORNIA REQUIRES MUCH,

14   MUCH MORE BECAUSE IT DOES NOT WANT TO IMPOSE SUCH AN ONEROUS

15   DUTY WITHOUT THESE FOUR REQUIREMENTS BEING MET, YOUR HONOR.       11:50

16   THERE'S NOT A SINGLE WORD IN MATTEL'S PAPERS OR IN THEIR

17   ARGUMENT THAT HAS EVER ADDRESSED ALL FOUR OF THESE ELEMENTS.

18   AND THEY ARE MANDATORY.

19         THERE IS A DUTY OF LOYALTY, AND THAT IS THE SUBJECT

20   MATTER OF THIS CASE.  AND WE SUBMIT THAT DUTY OF LOYALTY CLAIM    11:50

21   DOES NEED TO GO TO THE JURY.  BUT THIS IS OVERREACHING IN EVERY

22   WAY.

23         SOME OF THE CASES, YOUR HONOR, THAT ADDRESS DUTY OF

24   LOYALTY REALLY DRIVE HOME THE KIND OF CIRCUMSTANCES WHERE YOU

25   HAVE BREACH.                                                     11:50
```

```
 1            AND IF I COULD MOVE ON TO BREACH, YOUR HONOR.

 2            THE COURT:  PLEASE DO.

 3            MS. ANDERSON:  AT BOTTOM, TO ASSESS WHETHER OR NOT

 4    THERE'S BEEN A BREACH OF THE DUTY OF LOYALTY, AS WELL AS BREACH

 5    OF FIDUCIARY DUTY -- BUT WE SUBMIT THERE IS NONE -- YOU HAVE A    11:50

 6    CIRCUMSTANCE WHERE AN EMPLOYEE IS NOT ENGAGED IN MERE

 7    PREPARATIONS TO COMPETE.  THAT EMPLOYEE HAS DECIDED TO

 8    UNDERTAKE ACTS OF DIRECT COMPETITION WITH THE EMPLOYER WHILE

 9    EMPLOYED.

10            I MEAN, A GOOD EXAMPLE ARE CASES WHERE YOU HAVE THE      11:51

11    PRESIDENT WHO DECIDES TO RAID AN ENTIRE DEPARTMENT OF EMPLOYEES

12    AND RECOMMEND TO THEIR HR DEPARTMENT THAT THEY NOT GIVE THOSE

13    EMPLOYEES BIG RAISES, TO MAKE IT EASIER ON HIM TO RAID THE

14    ENTIRE DEPARTMENT.

15            OTHER CIRCUMSTANCES WHERE AN EMPLOYEE DECIDES TO         11:51

16    ACTUALLY SELL PRODUCTS, DIVERT SALES AWAY FROM THE EMPLOYER

17    WHILE STILL EMPLOYED.  THEY'RE ACTS OF DIRECT COMPETITION THAT

18    TAKE PLACE DURING THE EMPLOYMENT.

19            THERE IS NO BREACH OF THE DUTY OF LOYALTY WHERE THE

20    ACTS TAKEN BY THE EMPLOYEE ARE TAKEN IN PREPARATION TO COMPETE.  11:51

21    AND THE KINDS OF THINGS THAT COURTS HAVE SAID ARE PERMISSIBLE

22    PREPARATIONS TO COMPETE THAT ARE NOT BARRED BY LAW ARE JUST THE

23    KINDS OF THINGS TO WHICH MATTEL IS POINTING IN THIS CASE.

24            I HAVE A SLIDE THAT CAN BE OF SOME HELP HERE.

25            IF I COULD HAVE SLIDE 36, PLEASE.                        11:52
```

```
 1            THESE ARE SOME EXAMPLES.  AND THE CASES ARE CITED IN

 2   PAGES 26 TO 27 OF OUR OPPOSITION.  TO SAVE SOME SPACE, I'VE

 3   BULLETPOINTED THEM HERE FOR YOUR HONOR.

 4            ACTS THAT ARE PERMISSIBLE:  PREPARATIONS TO COMPETE

 5   INCLUDE SETTING UP CORPORATIONS; CONTACTING INVESTORS FOR THE     11:52

 6   NEW COMPETING ENTERPRISE; APPLYING FOR LOANS; SIGNING

 7   AGREEMENTS; USING EMPLOYER RESOURCES; USING TIME DURING WORK

 8   HOURS, INCLUDING TAKING SICK TIME TO ATTEND A MEETING; USING,

 9   AS LONG AS IT'S NOT TRADE SECRET, MARKETING PLANS, CUSTOMER

10   LISTS, AND OTHER INFORMATION.  ALL OF THIS KIND OF ACTIVITY IS    11:52

11   ABSOLUTELY PERMISSIBLE UNDER CALIFORNIA LAW.  AND THE JURY

12   NEEDS TO DECIDE WHETHER THERE WAS ANY BREACH, GIVEN THE NATURE

13   OF ALLEGATIONS OF BREACH THAT WE HAVE BEFORE US.

14            AND I THINK IT'S REALLY IMPORTANT TO STRESS -- IF I

15   COULD HAVE SLIDE 34, PLEASE -- MATTEL'S COUNSEL HAS SAID         11:53

16   REPEATEDLY IN THEIR PAPERS, AND SAID AGAIN DURING ORAL

17   ARGUMENT, THAT THERE IS A REQUIREMENT THAT MR. BRYANT DISCLOSE

18   HIS ACTIVITIES TO MATTEL.

19            NOT TRUE.

20            THE BANKCROFT CASE, AND ALL ITS PROGENY, EXPLAIN        11:53

21   THERE IS NO REQUIREMENT THAT AN OFFICER DISCLOSE HIS

22   PREPARATIONS TO COMPETE WITH THE CORPORATION IN EVERY CASE.

23            THERE'S NONE.

24            THE ONLY CIRCUMSTANCES WHERE IT MAY BE REQUIRED ARE

25   CIRCUMSTANCES WHERE NONDISCLOSURE CAN BE HARMFUL TO THE          11:53
```

```
 1    CORPORATION.  THEY REQUIRE SPECIFIC SHOWING OF HARM.  NO SUCH

 2    EVIDENCE HAS BEEN PRESENTED HERE.  THE KIND OF HARM THEY'RE

 3    TALKING ABOUT IS COMPETITION, STEALING EMPLOYEES, BIDDING

 4    AGAINST YOUR EMPLOYER.  I MEAN, IT'S VERY SPECIFIC, TANGIBLE

 5    HARM.  THERE'S NO REQUIREMENT FOR MR. BRYANT TO HAVE DISCLOSED      11:54

 6    HIS DECISION TO TAKE STEPS TO GET READY TO LEAVE AND GO WORK ON

 7    HIS OWN WITH MGA.  NONE.

 8                THANK YOU, YOUR HONOR.

 9           THE COURT:  THANK YOU, COUNSEL.

10           MR. NOLAN:  A COUPLE OF POINTS I WANTED TO GO BACK           11:54

11    TO.

12                FIRST OF ALL, LET ME GIVE YOU A CITATION.  MR. QUINN

13    ARGUES ON AIDING AND ABETTING THE BREACH OF FIDUCIARY DUTY.

14    OBVIOUSLY, THIS IS A DERIVATIVE ARGUMENT IF THERE'S NO BREACH.

15    BUT I WANT TO POINT OUT SOMETHING:  MR. QUINN IS FLAT WRONG         11:54

16    WITH RESPECT TO THE STATE OF LAW.  WILLFUL BLINDNESS IS NOT

17    SUFFICIENT.  AND I CITE TO, YOUR HONOR, THE CASES THAT WE CITED

18    IN OUR PAPERS; BUT IN PARTICULAR, I'LL GIVE YOU THE CASE OF

19    UNITED STATES V. UNION BANK -- I'M SORRY -- NEILSON V. UNION

20    BANK OF CALIFORNIA, CITING TO RESOLUTION TRUST CORPORATION V.       11:55

21    ROWE.  AND THE CITE THERE WAS AT 1993 WEST LAW 183512.  BUT

22    THEN IT GOES ON, QUOTE, "UNDER CALIFORNIA LAW, ACTUAL KNOWLEDGE

23    AND INTENT ARE REQUIRED TO IMPOSE AIDING AND ABETTING

24    LIABILITY," CITING TO THE GARAMENDI CASE, AS WELL, AND A FEW

25    OTHER STRING CITATIONS THERE.                                      11:55
```

```
 1        I DO WANT TO GO BACK, THOUGH, TO MAKE A COUPLE OF

 2   OBSERVATIONS ABOUT THIS WHOLE IDEA OF BREACH.  AND I'D ASK THE

 3   COURT TO AT LEAST KEEP IN MIND THE BREADTH AND THE SCOPE OF

 4   MR. QUINN'S RECENT DESCRIPTION AS TO WHAT CARTER BRYANT HAD

 5   ACCESS TO WHEN I START ARGUING STATUTE OF LIMITATIONS, BECAUSE    11:56

 6   I'LL GET TO THAT LATER.  BUT I JUST REALLY WANT THE RECORD

 7   FOCUSED ON THAT PARTICULAR DESCRIPTION OF WHAT THEY KNEW AND

 8   EXPECTED CARTER BRYANT TO HAVE HAD ACCESS TO WHILE HE WAS AN

 9   EMPLOYEE.

10        OF COURSE, WE THINK THE RECORD EVIDENCE IS QUITE          11:56

11   CLEAR -- AND I THINK THIS IS A DISPUTED FACT AND WILL GO TO THE

12   JURY, YOUR HONOR -- IS THAT ALL OF THE EXPERT TESTIMONY IN THIS

13   CASE WILL SHOW AND DEMONSTRATE UNEQUIVOCALLY THAT TO MAKE A 3-D

14   DOLL FROM A 2-D DRAWING IS VIRTUALLY IMPOSSIBLE, BASED ON THE

15   HERO SHOT THAT CARTER MADE AND THE OTHER 2-D DIMENSIONS.  SO     11:56

16   THEIR ARGUMENT THAT SOMEHOW CARTER TOOK THE IDEA -- AND NOW

17   WE'RE AGAIN BACK TO THIS IDEA OF A DOLL, OR A DRAWING -- AND

18   BROUGHT IT OVER -- OUR EXPERT, GLENN VILPPU, ONE OF THE LEADING

19   EXPERTS IN THE WORLD, AN EXPERT THAT IS SO RENOWNED THAT IN ONE

20   OF THE MOTIONS *IN LIMINE*, THEY'RE ACTUALLY ASKING YOU TO STRIKE  11:57

21   HIM BECAUSE HE'S TOO FAMOUS -- I'M NOT MAKING THIS UP -- TO

22   TESTIFY IN FRONT OF A JURY.

23        **THE COURT:**  I HAVEN'T LOOKED AT THE MOTIONS *IN LIMINE*

24   YET.  THEY'RE IN A PILE.

25        (LAUGHTER).                                                11:57
```

1        **MR. NOLAN:**  I RESPECTFULLY SUBMIT TO YOUR HONOR THAT

2    IS ONE OF THE ARGUMENTS.  THEIR EXPERT, MR. LUTZ, IDENTIFIES

3    MR. VILPPU AS BEING THE TEACHER, THE MASTER ARTIST, FROM WHICH

4    SHE LEARNED.  WE SAT AROUND AND SAID 'THAT'S PRETTY COOL.  I

5    WONDER WHERE MR. VILPPU IS.'  WE CONTACTED HIM.  MR. VILPPU IS        11:57

6    OUR EXPERT AND WILL SAY THAT THEY'RE WRONG.

7            THE POINT HERE IS, THIS IDEA THAT MR. BRYANT TOOK

8    SOME IDEA FROM MATTEL AND THAT TURNED OUT TO BE BRATZ, THAT'S A

9    FACTUAL DISPUTE.  THERE'S GOING TO BE A LOT OF EVIDENCE ON

10   THAT.  AND IF THAT'S THE BASIS FOR THE BREACH OF FIDUCIARY        11:58

11   DUTY, YOUR HONOR, IT'S JUST NOT CORRECT.

12           CARTER BRYANT SAID HE DIDN'T CREATE BRATZ.  MGA

13   CREATED BRATZ.  MGA BROUGHT IT TO THE MARKET.  THEY TRANSFORMED

14   A 2-DIMENSIONAL DRAWING INTO A 3-D DOLL.

15       **THE COURT:**  DO YOU HAVE ANY THOUGHTS YOURSELF ON THE        11:58

16   FIDUCIARY DUTY ITSELF?

17       **MR. NOLAN:**  THAT'S AN INTERESTING POINT, YOUR HONOR,

18   EXCEPT I AGREE WITH MS. ANDERSON'S ARGUMENT ABOUT THE RELATIVE

19   POSITION OF THE TWO WITHIN THE COMPANY.  WE DO NOT BELIEVE THAT

20   CARTER HAD A FIDUCIARY RELATIONSHIP TO MATTEL.  AND I POINT TO        11:58

21   THIS, AND SOMETIMES I THINK MORE PRACTICAL EVIDENCE

22   DEMONSTRATES WHY THAT IS THE CASE.

23           MR. QUINN SAYS THAT, 'GEE, CARTER BRYANT NEVER ASKED

24   MATTEL FOR A COPY OF HIS EMPLOYMENT AGREEMENT, AND HE SHOULD

25   HAVE GIVEN IT TO US.'  AND THAT'S PART OF THE AIDING AND        11:59

1   ABETTING CONCEPT, AND I THINK YOUR HONOR REMEMBERS THE

2   TESTIMONY THAT CARTER DIDN'T WANT TO DO THAT BECAUSE IT WAS

3   SUSPICIOUS TO DO THAT.

4          **THE COURT:** RIGHT.

5          **MR. NOLAN:** FIRST OF ALL, IN ANSWERING YOUR QUESTION,     11:59

6   IS IT SUSPICIOUS?  AND THE ANSWER IS, FRANKLY, NO.  THE

7   EVIDENCE IS UNDISPUTED.

8              EMPLOYEES, INTERESTINGLY, DO NOT GET A COPY OF THE

9   EMPLOYMENT AGREEMENT WHEN THEY SIGN IT.  INTERESTING.  THE HR

10  DEPARTMENT -- THE TESTIMONY IN THIS CASE IS THAT DOCUMENT IS     11:59

11  PROPRIETARY; IT'S A PROPRIETARY DOCUMENT.

12             HOW CAN CARTER TURN THAT OVER TO MGA, IN THE FIRST

13  INSTANCE?

14             BUT SETTING THAT ASIDE.

15             THE TESTIMONY IS GOING TO BE -- WE'LL HAVE TESTIMONY   11:59

16  FROM THEIR OWN EXPERT, MR. STEIN, WHO ADMITS THAT EVERY MORNING

17  CARTER BRYANT IS COMING TO MATTEL TO WORK, HE WAS SUBJECT TO

18  BEING LAID OFF.

19             YOU KNOW, I ASKED MR. ECKERT, 'DURING THIS RELATIVE

20  PERIOD OF TIME, HOW MANY EMPLOYEES DID YOU LAY OFF.'  HE SAID,   12:00

21  'I DON'T KNOW FOR SURE, BUT I KNOW IT WAS HUNDREDS.'

22             SO LET'S THINK ABOUT THE STANDARD THAT MR. QUINN IS

23  IMPOSING ON A YOUNG GENTLEMAN WHO'S A FASHION DESIGNER.  HE'S

24  NOT DESIGNING ANY DOLLS AT MATTEL, YOUR HONOR.  HE'S A FASHION

25  DESIGNER.  THAT'S WHAT HE WAS EMPLOYED TO DO.  THAT IN THAT      12:00

```
 1   KIND OF ENVIRONMENT, HE'S SUPPOSED TO CALL THE HR DEPARTMENT

 2   AND ASK FOR ACCESS TO A DOCUMENT THAT THEY CONSIDER

 3   PROPRIETARY?

 4           I THINK, IF YOU ADD UP ALL OF THOSE FACTS, IT SHOWS

 5   THAT CARTER BRYANT WAS NOT A FIDUCIARY AND DID NOT HAVE A        12:00

 6   FIDUCIARY OBLIGATION TO MATTEL.

 7           THE COURT:  THANK YOU, COUNSEL.

 8           MR. NOLAN:  AND AT BEST, YOUR HONOR, IT IS CERTAINLY

 9   DISPUTED AND SHOULD GO TO THE JURY.

10           THE COURT:  WE'RE GOING TO TAKE OUR LUNCH BREAK AT       12:00

11   THIS TIME.  WE'LL RESUME AT 1:30.  I'LL SEE COUNSEL AT THAT

12   POINT.  WE'LL START UP WITH THE AFFIRMATIVE DEFENSES; THAT WILL

13   GIVE MR. QUINN A CHANCE TO RESPOND; AND THEN BE PREPARED TO GO

14   ON TO THE AFFIRMATIVE DEFENSES.

15           COURT IS IN RECESS.                                     12:01

16           (LUNCH RECESS TAKEN.)

17           THE CLERK:  RECALLING THE MATTER OF CARTER BRYANT

18   VERSUS MATTEL AND ASSOCIATED CASES, CASE NUMBER CV 04-9049.

19           MAY WE HAVE COUNSEL PLEASE RESTATE YOUR APPEARANCES

20   FOR THE RECORD.                                                 01:44

21           MR. QUINN:  JOHN QUINN, MIKE ZELLER, AND

22   DYLAN PROCTOR FOR MATTEL.

23           MR. NOLAN:  TOM NOLAN AND JASON RUSSELL FOR MGA

24   PARTIES AND ISAAC LARIAN.

25           MS. ANDERSON:  CHRISTA ANDERSON, MATTHEW WERDEGAR,       01:44
```

1   AND AUDREY WALTON-HADLOCK FOR CARTER BRYANT.

2         **THE COURT:**  GOOD AFTERNOON.

3         I HAD INDICATED THAT AFTER LUNCH WE WOULD GET RIGHT

4   TO THE AFFIRMATIVE DEFENSES, BUT THERE'S TWO ADDITIONAL MATTERS

5   THAT I WANT TO TAKE UP BEFORE WE GET BACK TO OUR ORAL ARGUMENT      01:44

6   ON THE MOTIONS FOR SUMMARY JUDGMENT, MORE SO TO ACCOMMODATE

7   OTHER PEOPLE'S SCHEDULES.

8         IT WAS BROUGHT TO MY ATTENTION BY MATTEL AT THE LAST

9   HEARING, AND WAS REFERENCED BY MR. NOLAN EARLIER TODAY, THIS

10  DISPUTE THAT HAS ARISEN OVER THE HOTEL ACCOMMODATIONS HERE IN       01:45

11  RIVERSIDE.  WHEN IT WAS FIRST BROUGHT TO MY ATTENTION BY

12  MATTEL, I CONTACTED MR. DAVID BRISTOW.  HE'S AN ATTORNEY IN

13  TOWN HERE WITH REID & HELLYER, AND HE IS THE ATTORNEY TO DUANE

14  AND KELLY ROBERTS, WHO OWN THE MISSION INN.  AND I ASKED HIM,

15  ON BEHALF OF THE COURT, TO LOOK INTO THIS MATTER AND CONTACT        01:45

16  THE PARTIES AND SEE IF SOME ARRANGEMENT COULD BE WORKED OUT

17  THAT WOULD BE ACCEPTABLE TO EVERYBODY.

18        MR. BRISTOW HAS A FEW MOMENTS EARLY THIS AFTERNOON;

19  AND I WOULD LIKE FOR YOU TO PLACE ON THE RECORD, IF YOU WOULD,

20  MR. BRISTOW, WHERE THIS ALL STANDS AND WHAT INFORMATION YOU         01:45

21  HAVE.

22        FIRST LET ME THANK YOU FOR TAKING THE TIME AND THE

23  ENERGY TO GET INVOLVED IN THIS MATTER.

24        **MR. BRISTOW:**  THE PLEASURE IS MINE, YOUR HONOR.

25        AS YOU MENTIONED, THE COURT INQUIRED AND ASKED ME TO          01:45

1   FIND OUT WHAT THE STATUS OF THE SITUATION WAS.  I CONTACTED

2   BOTH THE SKADDEN FIRM AS WELL AS THE QUINN EMANUEL FIRM.  MY

3   UNDERSTANDING OF THE FACTS IS THAT THE SKADDEN FIRM, OR THEIR

4   PREDECESSOR, CONTRACTED WITH THE MISSION INN FOR A BLOCK OF

5   ROOMS, AS WELL AS WAR ROOM CAPABILITY, FOR THE TERM OF THE            01:46

6   ANTICIPATED TERM OF THIS TRIAL.

7          SUBSEQUENT TO THAT TIME, AN ATTORNEY FROM THE

8   QUINN EMANUEL FIRM CONTACTED THE MISSION INN AND INQUIRED AS TO

9   THE AVAILABILITY OF ROOMS.  MY UNDERSTANDING IS, THAT INITIAL

10  CONTACT OCCURRED IN DECEMBER OF 2007.                                01:46

11         AT THAT TIME, THEY WERE ADVISED THAT THE SKADDEN

12  FIRM OR THAT MGA HAD MADE THE RESERVATION, AND THEY WERE

13  ADVISED AT THAT TIME THAT THERE WAS A LACK OF AVAILABILITY OF

14  ROOMS DURING THE PERIOD REQUESTED IN THE MONTH OF JUNE DUE TO

15  THE HEIGHTENED USE OF THE MISSION INN DURING THE MONTH OF JUNE,      01:47

16  BOTH IN TERMS OF GRADUATIONS AND WEDDINGS.

17         AT THAT TIME, THEY WERE ADVISED THAT WHILE THERE WAS

18  AVAILABILITY, THEY COULD NOT GUARANTEE AVAILABILITY THROUGH THE

19  ENTIRE PERIOD, AND THAT THERE WAS AN EXCLUSIVITY PROVISION WITH

20  REGARD TO THE PREVIOUS COMMITMENT MADE BY MGA.                       01:47

21         DURING THAT CONVERSATION, THE SALES REPRESENTATIVE

22  FROM THE MISSION INN ADVISED THEM OF THE MARRIOTT, GAVE THEM

23  THE CONTACT INFORMATION FOR THE MARRIOTT; AND THERE WAS

24  DISCUSSION AS TO, IF THERE WAS AVAILABILITY, WHAT WOULD THE

25  RATE BE, ET CETERA.  THAT INFORMATION WAS CONVEYED TO THE            01:47

1    ATTORNEY AT QUINN EMANUEL.

2         AS IT STANDS RIGHT NOW, THE SKADDEN FIRM HAS INFORMED

3    ME THAT THEY DESIRE TO ENFORCE THE EXCLUSIVITY PROVISION WITHIN

4    THEIR CONTRACT FOR MGA AT THE MISSION INN; THAT TERM DOES NOT

5    PROHIBIT ANY OPPOSING COUNSEL FROM BOOKING ROOMS AT THE                    01:48

6    MISSION INN; HOWEVER, THAT CAN ONLY OCCUR THROUGH THE INTERNET

7    OR A TRAVEL AGENT, WHICH WOULD MEAN THEY WOULD NOT BE ENTITLED

8    TO THE BEST RATE.

9         WHEN I SPOKE WITH MR. NOLAN WITH REGARD TO THIS

10   ISSUE, HE INDICATED THAT HE WANTED TO ENFORCE THE TERM FOR             01:48

11   SECURITY PURPOSES, DUE TO THE NATURE OF THIS LITIGATION AND THE

12   FACT THAT HE WANTED TO AVOID ANY POSSIBLE SECURITY BREACHES IN

13   TERMS OF FAXES BEING MISDIRECTED TO THE WRONG ROOM BY HOTEL

14   PERSONNEL.

15        I BELIEVE THAT IF THE PARTIES WERE DESIROUS TO              01:48

16   RESOLVE THAT ISSUE, THEY COULD RESOLVE THAT ISSUE IN A FAR MORE

17   EFFICIENT MANNER, SINCE THE CURRENT SITUATION DOES NOT AND

18   PROBABLY CANNOT EXCLUDE ANYONE FROM GOING INTO THE PUBLIC ROOMS

19   AT THE MISSION INN AND FROM BOOKING ROOMS AT THE MISSION INN.

20        IT'S MY UNDERSTANDING THAT THE WAR ROOM SPACE WITHIN         01:48

21   THE MISSION INN, THAT THE SKADDEN FIRM HAS CONTRACTED FOR, IS

22   IN AN AREA OF THE MISSION INN KNOWN AS THE ROTUNDA.  I THINK,

23   TO THE DEGREE THE PARTIES CAN COOPERATE TOGETHER, WE COULD COME

24   UP WITH AN AGREEMENT THAT EACH FIRM WOULD BE RESTRICTED TO

25   CERTAIN AREAS OF THE MISSION INN, AND THEY WOULD AGREE NOT TO       01:49

1   GO IN THE OTHER AREAS OF THE MISSION INN WHERE THEIR

2   COMPETITORS WERE.

3        THE ONLY PROVISO IS, THERE IS AVAILABILITY, JUST NOT

4   FOR -- I BELIEVE IT'S FIVE NIGHTS IN JUNE AT THE MISSION INN;

5   SO TO THE DEGREE ANYBODY FROM MATTEL OR THEIR COUNSEL WAS          01:49

6   STAYING AT THE MISSION INN, THEY WOULD HAVE TO RELOCATE TO THE

7   MARRIOTT ON THOSE FIVE NIGHTS.  WITH THAT PROVISO, MY CLIENT

8   CONTINUES TO BE WILLING TO WORK WITH THEM, BOTH IN TERMS OF

9   BOOKING AVAILABLE ROOMS AND ON THE PRICES PREVIOUSLY PROVIDED

10  FOR A SPECIFIC STRATA OF ROOMS.                                   01:49

11       **THE COURT:**  SO, AS I UNDERSTAND IT, IF THE PARTIES

12  WERE AMENABLE TO THIS, WE COULD -- THE MISSION INN WOULD

13  ACCOMMODATE BOTH SIDES, OR ALL THREE SIDES, AS THE CASE MIGHT

14  BE, AND THEY COULD BE KEPT SEPARATE, IN SEPARATE WINGS -- IT'S

15  A VERY LARGE HOTEL -- THEY COULD BE KEPT IN SEPARATE WINGS.       01:50

16  THERE COULD BE AN AGREEMENT NOT TO ENTER INTO AREAS SUCH AS THE

17  ROTUNDA, WHICH IS DESIGNATED AS WAR ROOMS.  AND FROM YOUR

18  PERSPECTIVE, THAT WOULD BE A MORE EFFECTIVE WAY TO ACHIEVE

19  MR. NOLAN'S STATED GOAL OF ENSURING SECURITY, THAN THE STATUS

20  QUO, WHICH SIMPLY KEEPS OPPOSING FIRM FROM GETTING A BLOCK OF     01:50

21  ROOMS; THAT WOULD NOT STOP ANY INDIVIDUAL LAWYER FROM RENTING A

22  ROOM ADJACENT TO ANY ONE OF THE SKADDEN ROOMS.

23       **MR. BRISTOW:**  THAT'S CORRECT.  THAT'S MY

24  UNDERSTANDING OF THAT, YOUR HONOR.

25       **THE COURT:**  VERY GOOD.

1          WELL, THANK YOU.

2          LET ME ASK COUNSEL.

3          IS THAT SOMETHING THAT YOU COULD LIVE WITH?  OR IF

4    YOU HAVE ANY QUESTIONS, PERHAPS MR. BRISTOW -- BECAUSE I WOULD

5    LIKE TO GET THIS RESOLVED.  I DON'T WANT THIS TO TURN INTO A          01:50

6    BIGGER ISSUE THAN IT ALREADY IS.

7          **MR. NOLAN:**  YOUR HONOR, I DID TALK TO COUNSEL.  I

8    EXPLAINED THE SITUATION AND THE JUSTIFICATIONS WHICH WERE

9    PROVIDED TO ME WHEN I TOOK OVER THE CASE.  I PERSONALLY WENT TO

10   THE MISSION INN.  I MET WITH THEIR MANAGEMENT.  I HAD A TOUR.          01:51

11   ROOMS HAD ALREADY BEEN BLOCKED OUT.  WE DO HAVE WAR ROOMS

12   THERE.  I ASKED SEVERAL QUESTIONS WITH RESPECT TO T-1 LINES

13   COMING IN AND THE USE OF THE T-1 LINES; WOULD WE HAVE TO GET

14   OUR OWN T-1 LINES?

15         IT'S MORE TECHNICAL THAN WE NEED TO GET INTO, BUT MY          01:51

16   EXPERIENCE IN THE PAST HAS BEEN THAT WHEN YOU'RE USING HOTEL

17   LINES, THE DRAIN ON THE VOLUME OF THE T-1 CAN BE AFFECTED BY

18   THE GUESTS THAT ARE IN THEIR ROOMS, IF YOU'RE EVER IN A HOTEL

19   AND YOU'RE GOING WIRELESS OR WHATEVER.  THAT WAS A CONCERN OF

20   OURS WITH RESPECT TO HAVING BOTH ROOMS IN THERE.          01:51

21         BUT I'LL BE VERY HONEST WITH YOU, I'VE TRIED A NUMBER

22   OF CASES OUTSIDE OF LOS ANGELES; IT IS NOT UNCOMMON FOR THESE

23   ARRANGEMENTS TO BE ENTERED INTO FOR SECURITY PURPOSES.

24         IN THIS CASE, IN PARTICULAR, YOUR HONOR -- AND I

25   THINK IT'S STRIKING THAT IN A CASE WHERE UP UNTIL YOU ENTER AN          01:51

```
 1   ORDER TODAY, PRESUMABLY BASED ON A REPORT THAT ALL COUNSEL HAS

 2   SUBMITTED TO YOU, I HAVE NOT BEEN ALLOWED TO SHOW MY CLIENTS

 3   PARTICULAR DOCUMENTS, UNLESS -- AND THIS WAS JUST VERY

 4   RECENTLY -- I WAS ALSO PRESENT WITH THOSE CLIENTS.  THAT'S THE

 5   KIND OF CONFIDENTIALITY THAT HAS BEEN PLACED ON THESE            01:52

 6   DOCUMENTS.

 7        GIVEN THE FACT THAT THE COURT CALLED THE HOTEL -- AND

 8   I HEARD ABOUT THE COURT'S CONCERN; I WASN'T HERE AT THAT

 9   HEARING -- I TOOK IT UPON MYSELF TO DETERMINE, WELL, IS THIS A

10   QUESTION OF ROOMS?  I MEAN, IF THERE AREN'T ENOUGH ROOMS,       01:52

11   THAT'S FINE.  BUT I CHECKED, AND IT WAS CONFIRMED THAT THE

12   QUINN EMANUEL FIRM HAD ALREADY BOOKED OUT A BLOCK OF ROOMS AT

13   THE MARRIOTT, WHICH IS GENERALLY THE CASE.  YOU KNOW, COKE

14   STAYS AT ONE HOTEL; PEPSI STAYS AT THE OTHER HOTEL.  THIS IS A

15   LITTLE BIT LIKE THAT, IS WHAT'S GOING ON IN THIS CASE.          01:52

16        BUT EVEN TO THE NEXT STEP, JOHN QUINN AND I TALKED

17   YESTERDAY AFTERNOON ABOUT THIS, AND JOHN EXPLAINED TO ME THAT

18   IT REALLY WASN'T A QUESTION OF THE WAR ROOMS OR ANYTHING ELSE

19   LIKE THAT.  FRANKLY, SOME OF THE TEAM WANTED TO SLEEP AT THE

20   MISSION INN.                                                    01:53

21        YOUR HONOR, MY POINT IS THAT IN A TRIAL OF THIS SIZE,

22   WE DON'T KNOW WHERE ANYBODY ELSE IS GOING TO BE STAYING IN THE

23   HOTEL.  IT'S A LITTLE BIT LIKE BEING IN THE ELEVATOR WITH

24   JURORS.  YOU DON'T KNOW WHAT YOU'RE SAYING TO WHOM.  AND WE

25   WANTED THE SECURITY OF KNOWING THAT WHEN WE WERE IN THE ROOM    01:53
```

```
 1    AREAS -- OKAY, I KNOW THAT I CAN'T KEEP THEM OUT OF THE BAR; I

 2    HOPE I CAN SEE THEM IN THE BAR OCCASIONALLY.  BUT I CAN KEEP

 3    THEM OUT OF THE ROOMS WHERE MR. LARIAN AND HIS FAMILY MIGHT BE

 4    STAYING.

 5           THE COURT:  THAT'S THE POINT.  I DON'T MEAN TO              01:53

 6    INTERRUPT, MR. NOLAN; BUT THE WAY IT STANDS CURRENTLY, AS

 7    MR. BRISTOW HAS EXPLAINED TO ME BOTH BEFORE THIS HEARING AND, I

 8    THINK, AS HE'S PUT ON THE RECORD -- AS IT STANDS RIGHT NOW, YOU

 9    HAVE YOUR 11 ROOMS, OR WHATEVER IT IS, IN THE HOTEL.  THERE'S

10    ABSOLUTELY NOTHING, INCLUDING THE EXCLUSIVITY CLAUSE, WHICH      01:54

11    WOULD STOP ANYONE FROM QUINN EMANUEL OR MATTEL FROM BOOKING A

12    ROOM AND BEING LOCATED IN A ROOM RIGHT NEXT TO MR. LARIAN.

13    NOTHING COULD STOP THAT.

14           WHAT COULD STOP THAT WOULD BE, PERHAPS, AN AGREEMENT

15    ON BOTH SIDES THAT THE NORTHEAST WING IS WHERE SKADDEN ARPS IS   01:54

16    GOING TO BE AND THE SOUTHWEST WING IS WHERE QUINN EMANUEL IS

17    GOING TO BE; AND THEN YOU'LL KNOW WHERE EACH OTHER IS AND YOU

18    CAN BE ASSURED THAT THERE'S THAT DISTANCE.

19           BUT THAT COULD ONLY OCCUR IF THE PARTIES WERE WILLING

20    TO AGREE.  AS IT STANDS RIGHT NOW, ALL THAT'S BEING ACHIEVED,    01:54

21    ESSENTIALLY, IS THAT QUINN EMANUEL CAN'T GET A BLOCK OF ROOMS

22    AT THE REDUCED RATE BECAUSE YOU DO HAVE THE ABILITY TO ENFORCE

23    YOUR EXCLUSIVITY CLAUSE.  I DON'T THINK THERE'S ANYTHING

24    ILLEGAL ABOUT THOSE CLAUSES.  THEY'RE A COMMON THING THAT

25    HAPPENS.  BUT IT REALLY DOESN'T ADDRESS THE CONCERN THAT YOU'RE  01:54
```

```
 1    STATING HERE.

 2            I THINK AN AGREEMENT ALONG THE LINES THAT I'M

 3    SUGGESTING, OR THAT MR. BRISTOW HAS PROPOSED, ACTUALLY

 4    ADDRESSES THE SECURITY CONCERNS BY KEEPING YOU SEPARATED.

 5            MR. NOLAN:  YOUR HONOR, I RESPECTFULLY DISAGREE, AND      01:55

 6    LET ME EXPLAIN WHY.

 7            THE COURT:  PLEASE.

 8            MR. NOLAN:  WE HAVE A BLOCK OF ROOMS THAT ARE STREWN

 9    THROUGHOUT THE HOTEL.  WE'RE NOT IN THE EAST WING OR THE WEST

10    WING OR WHATEVER.  THE ROOMS WERE CHOSEN BASED ON              01:55

11    REPRESENTATIONS BY MANAGEMENT AT THE HOTEL.  WE WENT BY -- AND

12    KEKER GOT ALL THE GOOD ROOMS, FIRST OF ALL; I WANTED TO MAKE

13    CERTAIN THAT THAT'S CLEAR.  I MEAN, I'M GOING TO RAISE THAT THE

14    NEXT TIME.

15            (LAUGHTER.)

16            THE COURT:  YOU'RE GOING TO HAVE TO TAKE THAT UP WITH

17    MR. KEKER.

18            MR. NOLAN:  IN ALL SERIOUSNESS, YOUR HONOR, THE HOTEL

19    IS A BEAUTIFUL HOTEL, BUT THERE ARE CERTAIN ROOMS THAT ARE FAR

20    MORE ACCOMMODATING FOR A TWO-MONTH STAY.  THOSE ROOMS ARE WHAT   01:55

21    WE CONTRACTED FOR; WE PAID A PRICE FOR THAT.

22            NOW, I CAN TELL YOU THAT JOHN KEKER IS STAYING IN A

23    PART OF THE HOTEL THAT I'M NOT STAYING IN.  NOT BY DESIGN; IT'S

24    JUST THAT THAT'S THE WAY WE'VE SET IT UP.  SO NOW, FOR US TO

25    HAVE TO RESHUFFLE -- IT REMINDS ME -- AND THIS WAS MY            01:56
```

1  COLLEAGUE'S COMMENT THIS MORNING -- IF YOU REMEMBER THE WAR OF

2  THE ROSES, THE MOVIE --

3       **THE COURT:**  I DO.  BUT I HOPE --

4       **MR. NOLAN:**  BUT WHAT I DON'T WANT ANYBODY TO HAVE TO

5  DO IS PAINT A LINE DOWN THE MISSION INN HOTEL.  BUT, YOUR                01:56

6  HONOR, IN EFFECT, WHAT YOU'RE GOING TO ASK US TO DO BY THIS

7  ACCOMMODATION -- AND IT'S TRUE, THEY CAN BOOK A ROOM TONIGHT

8  AND STAY, AND MAYBE ONE NIGHT THEY'LL BE STAYING NEXT TO ME.

9  THAT'S FINE.  BUT THIS IDEA OF AN ALLOCATION OF A BLOCK OF

10  ROOMS AT THE MISSION INN HOTEL -- WE WOULD HAVE TO REDO OUR              01:56

11  CONTRACT BECAUSE WE HAVE SPECIFIC ROOMS ASSIGNED ON EACH FLOOR.

12  THAT'S THE POINT, YOUR HONOR.

13       **THE COURT:**  I SEE.

14       **MR. NOLAN:**  I'M NOT TRYING TO BE DIFFICULT.  I

15  ACTUALLY THINK WE'VE TRIED TO BE VERY REASONABLE.  I TRIED TO           01:56

16  TALK TO MR. QUINN ABOUT IT.  I EXPLAINED CANDIDLY TO HIM, AS

17  WELL AS COUNSEL FOR THE MISSION INN WHEN THEY CALLED US, THIS

18  ISN'T AN EFFORT TO TRY TO MAKE JOHN QUINN STAY AT A HOTEL

19  THAT'S LESSER THAN THE MISSION INN.

20       **THE COURT:**  AND I DON'T MEAN TO DISPARAGE THE                  01:57

21  MARRIOTT HOTEL.  IT'S A FINE, FINE HOTEL.

22       **MR. NOLAN:**  NO.  IT'S A VERY FINE -- AND THEY'RE NOT

23  EVEN REPRESENTED HERE TODAY.

24       **THE COURT:**  COUNSEL, I REALLY THINK WE HAVE ENOUGH

25  ATTORNEYS IN THE ROOM.                                                  01:57

```
 1                    (LAUGHTER.)

 2            MR. NOLAN:  BUT, YOUR HONOR, I DO WANT TO MAKE A

 3    POINT:  THERE IS AN ADVANTAGE AT THE MARRIOTT:  YOU GET REWARD

 4    POINTS.  WE DON'T GET REWARD POINTS.

 5            I'LL SUBMIT ON THAT.  THANK YOU.                    01:57

 6            (MORE LAUGHTER.)

 7            THE COURT:  MR. QUINN, ANY THOUGHTS?

 8            MR. QUINN:  THE ONE THING I'VE LEARNED IS THAT WE CAN

 9    BOOK ROOMS.  I DIDN'T KNOW THAT.

10            THE COURT:  THANK YOU.                              01:57

11            VERY WELL.

12            MR. BRISTOW, I APPRECIATE YOUR EFFORTS IN THIS

13    REGARD.

14            MR. BRISTOW:  THANK YOU, YOUR HONOR.

15            AND I DIDN'T MEAN TO EX-PARTE THE MARRIOTT, BY THE   01:57

16    WAY.

17            THE COURT:  OF COURSE NOT.  I APPRECIATE THAT.

18            THANK YOU FOR ALL YOUR EFFORTS IN THIS REGARD.

19            SEEING HOW LITTLE PROGRESS WE MADE ON THE SETTLEMENT

20    OF THE HOTEL DISPUTE, I ALMOST AM AFRAID TO RAISE THE NEXT   01:57

21    ISSUE THAT I WANTED TO RAISE; AND THAT'S THE SETTLEMENT OF THE

22    CASE ITSELF.

23            I DID INVITE AMBASSADOR PROSPER TO JOIN US TODAY, AND

24    I WOULD LIKE TO BEGIN BY ASKING FOR AN UPDATE ON YOUR SENSE OF

25    SETTLEMENT EFFORTS, AS TO WHERE WE ARE, THE PROCESS; OF COURSE, 01:58
```

```
 1   WITHOUT GETTING INTO THE SUBSTANCE OF ANY CONVERSATIONS THAT

 2   YOU MIGHT HAVE HAD WITH ANY INDIVIDUAL COUNSEL.  IF YOU COULD

 3   BRING THE COURT UP TO SPEED IN TERMS OF WHERE WE ARE ON YOUR

 4   SETTLEMENT EFFORTS.

 5        AMBASSADOR PROSPER:  FOR THE PAST SEVERAL MONTHS, I            01:58

 6   HAVE HAD THE OPPORTUNITY TO MEET WITH THE RESPECTIVE COUNSEL ON

 7   THIS CASE, AS WELL AS THE LEADERSHIP BOTH AT MGA WITH

 8   MR. ISAAC LARIAN AND BOB ECKERT AT MATTEL.  DURING THOSE

 9   DISCUSSIONS, I'VE HAD THE OPPORTUNITY TO REALLY GET A GOOD

10   SENSE OF WHERE THE PARTIES ARE COMING FROM, AND WE'VE TRIED TO     01:58

11   NARROW THE ISSUES, WHICH, AS YOU CAN IMAGINE, HAS BEEN A BIT OF

12   A CHALLENGE.

13        WHERE WE ARE TODAY IS, I'VE RECEIVED A PROPOSAL FROM

14   ONE SIDE, WHICH I'VE COMMUNICATED TO THE OTHER PARTY, AND I'M

15   WAITING FOR NOT ONLY A FORMAL REACTION, BUT ALSO A COUNTER        01:58

16   PROPOSAL.  I BELIEVE THE DOCUMENT HAS BEEN PREPARED.  I SHOULD

17   HAVE RECEIVED IT LAST NIGHT, BUT HOPEFULLY, WE'LL GET IT TODAY

18   SO THAT WE CAN LOOK AT IT AND THEN EFFECTIVELY EVALUATE HOW

19   CLOSE OR HOW FAR APART THE PARTIES ARE.

20        RIGHT NOW, I'M NOT IN THE POSITION MYSELF TO REALLY          01:59

21   ASSESS WHETHER OR NOT WE'LL BE ABLE TO SETTLE THIS CASE OR HOW

22   LIKELY IT WILL BE.  THERE IS A LOT MORE WORK THAT IS REQUIRED.

23   WE'RE SCHEDULED TO HAVE A FORMAL SETTLEMENT CONFERENCE ON

24   MONDAY, THE 28TH.  I'M NOT SURE IF, IN FACT, WE'LL BE READY FOR

25   THAT DAY.  I NEED TO SEE THE DOCUMENT FROM ONE OF THE PARTIES,    01:59
```

```
 1    AND FROM THERE WE'LL BE ABLE TO REALLY HAVE A MORE CLEAR VISION

 2    OF NOT ONLY WHAT IS IN STORE, WHAT WORK REMAINS, BUT WHETHER OR

 3    NOT THE PROCESS SHOULD, IN FACT, EVEN CONTINUE.

 4              THE COURT:  THANK YOU.

 5              AMBASSADOR PROSPER:  THANK YOU.                          01:59

 6              THE COURT:  MR. QUINN, WHAT, FROM YOUR PERSPECTIVE,

 7    ARE THE PROSPECTS FOR RESOLUTION OF THIS CASE?

 8              MR. QUINN:  I DON'T REALLY KNOW, YOUR HONOR.

 9              I'M NOT AWARE -- I DON'T HAVE INFORMATION ABOUT -- I

10    KNOW MY CLIENT'S VIEWS.  I DON'T KNOW THE DEFENDANTS' VIEWS,      02:00

11    CANDIDLY.  WE HAVEN'T GOTTEN THAT INFORMATION.

12              WE HAVE ALL DAY SET ASIDE NEXT MONDAY, WHERE WE'LL BE

13    AT AMBASSADOR PROSPER'S OFFICES AND EVERYBODY WILL BE PRESENT;

14    AND PRESUMABLY, THERE WILL BE BACK AND FORTH AND EXCHANGE OF

15    PROPOSALS.  BUT AT THIS POINT, I DON'T KNOW WHERE THE OTHER       02:00

16    SIDE IS.

17              THE COURT:  WHERE IS YOUR SIDE?

18              MR. QUINN:  WHERE IS OUR SIDE?

19              THE COURT:  YES.

20              I WOULDN'T EXPECT YOU TO KNOW WHERE --                  02:00

21              MR. QUINN:  THERE ARE SOME VERY SPECIFIC TERMS WHICH

22    MATTEL HAS SIGNED OFF ON, AND THEY ARE IN WRITING; AND IF THEY

23    HAVE NOT ALREADY BEEN GIVEN TO AMBASSADOR PROSPER TODAY, HE

24    WILL HAVE THEM BEFORE WE LEAVE THIS BUILDING TODAY.

25              THE COURT:  VERY WELL.  OKAY.                           02:01
```

```
 1              SO HE WILL HAVE A CLEAR SENSE OF WHERE YOU ARE AT?

 2         MR. QUINN:  YES.

 3         THE COURT:  ALL RIGHT.

 4         MR. NOLAN?

 5         MR. NOLAN:  YOUR HONOR, BRIEFLY, I THINK ALL OF US        02:01

 6   CAN COMPLIMENT AMBASSADOR PROSPER FOR THE AMOUNT OF TIME AND

 7   ENERGY HE HAS PUT INTO THIS CASE.  I HAVE NEVER HAD AN

 8   EXPERIENCE WITH A MEDIATOR WHO HAS GOTTEN INVOLVED IN THE CASE

 9   AS MUCH AS AMBASSADOR PROSPER HAS.

10              WE HAVE MET WITH HIM ON SEVERAL OCCASIONS.  WE HAVE   02:01

11   MET, BOTH AS A LAW FIRM, IN THE SENSE OF THE TRIAL TEAM SITTING

12   DOWN AND MAKING OURSELVES AVAILABLE AND RESPONDING TO

13   QUESTIONS.  WE HAVE PROVIDED INFORMATION REGARDING OUR CASE;

14   EXPERT REPORTS, THAT TYPE OF THING, SUMMARY JUDGMENT.  ALSO,

15   YOUR HONOR, I HAVE MET WITH THE AMBASSADOR, TOGETHER WITH       02:01

16   ISAAC LARIAN.  I THINK WE'VE DONE THAT ON TWO OCCASIONS.  AND

17   ACTUALLY, ISAAC AND THE AMBASSADOR HAVE MET ALONE IN NEW YORK

18   AND HAD A RECENT DISCUSSION LAST WEEK.

19              WE HAVE PLEDGED THAT WE ARE PRUDENT BUSINESSMEN, BUT

20   WE HAVE NO IDEA WHERE MATTEL IS AT.  AND THAT'S THE STATE OF     02:02

21   AFFAIRS.  I'M HAPPY WITH THE LEVEL OF COOPERATION THAT WE'VE

22   MADE IN THIS CASE.  WE STAND READY.

23              I ACTUALLY MISUNDERSTOOD.  I THOUGHT THAT YOU HAD

24   MENTIONED, OR MAYBE THE AMBASSADOR DID, THAT IT WOULD BE WISE

25   TO HAVE THE GENERAL COUNSELS, OR THE CHIEF PEOPLE, HERE, THE     02:02
```

```
 1   DECISION-MAKERS; AND WE HAVE THE GENERAL COUNSEL, ASSOCIATE

 2   GENERAL COUNSEL, OF MGA, AS WELL AS ISAAC LARIAN IN THE

 3   COURTROOM TODAY, SO THAT THEY HAVE THE ABILITY THEMSELVES, NOT

 4   FILTERED BY LAWYERS, EITHER THROUGH ANALYTICAL DISSECTION OR

 5   ABSTRACT FILTRATION; THEY HAVE IT, FROM WHAT THE ARGUMENTS ARE       02:02

 6   HERE.

 7            I DON'T THINK MATTEL HAS HAD THAT LEVEL OF

 8   COMMITMENT, TODAY AT LEAST; BUT I'M HOPING THAT ON MONDAY, IT

 9   WILL BE A FRUITFUL DAY.

10            THE COURT:  VERY WELL.                                       02:03

11            ON THAT POINT, I'VE CERTAINLY DEFERRED STRUCTURING

12   SETTLEMENT PROCEDURES TO THE AMBASSADOR, ALTHOUGH I THINK I'VE

13   MADE IT CLEAR ON THE RECORD, AND I MADE IT CLEAR TO THE

14   AMBASSADOR AS WELL, THAT IF HE NEEDS THE COURT TO BECOME

15   INVOLVED IN REQUIRING ANYONE TO SHOW UP OR TO COOPERATE IN THE        02:03

16   SETTLEMENT PROCEDURE, THAT HE SHOULD FEEL FREE TO LET ME KNOW.

17   HE HAS NOT ASKED FOR ANY SUCH ORDER UP TO THIS POINT.  I WOULD

18   HOPE SUCH AN ORDER WOULD BE UNNECESSARY.  I DON'T PLAN ON

19   GETTING INVOLVED IN THE HOTEL DISPUTE, BUT I DO VIEW THIS AS AN

20   EXTRAORDINARILY SERIOUS MATTER; AND I EXPECT EVERYONE TO BE           02:03

21   FULLY COOPERATING WITH AMBASSADOR PROSPER.

22            MR. QUINN:  YES, YOUR HONOR.

23            I REALLY DON'T THINK THE SUGGESTION THAT MATTEL

24   HASN'T DONE THAT IS FAIR.  THE CHAIRMAN AND CEO, MR. ECKERT,

25   HAS MET WITH AMBASSADOR PROSPER.  HE'S MADE HIMSELF AVAILABLE.        02:03
```

1   HE'S INDICATED TO AMBASSADOR PROSPER THAT HE'LL BE AVAILABLE

2   FURTHER AFTER THE MEETING.  SITTING HERE ARE HOUSE COUNSEL AT

3   MATTEL, INCLUDING THE ASSOCIATE GENERAL COUNSEL IN CHARGE OF

4   LITIGATION.  THE GENERAL COUNSEL OF MATTEL IS A SECURITIES

5   LAWYER, NOT A LITIGATOR.  HE LOOKS TO MS. THOMAS.  MR. ECKERT         02:04

6   ISN'T EVEN A LAWYER.

7            SO ANY SUGGESTION THAT THERE'S SOME -- THE FACT THAT

8   THOSE FOLKS AREN'T HERE INDICATES THAT MATTEL HASN'T

9   PARTICIPATED AS MUCH OR HASN'T SHOWN AS MUCH COMMITMENT, I

10  REALLY DON'T THINK THAT IS FAIR.                                     02:04

11          **THE COURT:**  VERY WELL, COUNSEL.

12          LET ME HEAR FROM COUNSEL FOR CARTER BRYANT.

13          **MS. ANDERSON:**  THANK YOU, YOUR HONOR.

14          I DON'T HAVE MUCH TO SAY ON THIS SUBJECT, BECAUSE AS

15  MR. KEKER SAID IN EARLIER HEARINGS, I BELIEVE BEFORE YOUR            02:04

16  HONOR, WE ARE NOT THE PARTY WHO CAN REALLY PUT AN END TO THIS

17  LITIGATION BY A SETTLEMENT.  BUT WE ARE FULLY SUPPORTIVE OF THE

18  PROCESS, AND WE WANT TO COOPERATE AND PARTICIPATE FULLY IN IT.

19          BUT GIVEN THE NATURE OF THE CASE AND THE KIND OF

20  CLAIMS THAT HAVE BEEN ASSERTED AND THE EXTENT OF DAMAGES, WE'RE      02:05

21  SORT OF NOT THE PARTY IN A POSITION TO FULLY RESOLVE IT.

22          **THE COURT:**  VERY WELL.

23          **MS. ANDERSON:**  THANK YOU, YOUR HONOR.

24          **THE COURT:**  THANK YOU, COUNSEL.

25          THE COURT HAS PREVIOUSLY INDICATED, THE TRIAL WILL GO        02:05

```
 1    FORWARD, WILL COMMENCE, ON MAY 27TH.

 2            THE PARTIES HAVE ALSO STIPULATED, PURSUANT TO THE

 3    COURT'S REQUEST, TO HAVE A PRE-SCREENED JURY PANEL.  THE

 4    SCREENING IS ONLY RELATED TO THE ISSUE OF BEING ABLE TO SIT FOR

 5    A TWO-MONTH TRIAL.                                              02:05

 6            THAT JURY PANEL WILL BE ASSEMBLED ON MAY 20TH, ONE

 7    WEEK BEFORE THE TRIAL.  THE VOIR DIRE WILL PROCEED ON MAY 20TH,

 8    AT 9:00.  I PLAN TO PICK THE JURY THAT WEEK, SO THAT ON

 9    MAY 27TH, WE CAN BEGIN WITH OPENING STATEMENTS AND THE

10    PLAINTIFF CAN BEGIN PRESENTING ITS CASE.                        02:06

11            WE HAVE SEVERAL MOTIONS IN LIMINE THAT ARE PENDING,

12    AS I UNDERSTAND IT.  WHAT I PLAN TO DO IS TAKE THOSE MOTIONS

13    IN LIMINE UP AFTER WE HAVE SELECTED THE JURY.  SO I'M PUTTING

14    ASIDE THE ENTIRE WEEK OF MAY 20TH THROUGH MAY 23RD, TUESDAY

15    THROUGH FRIDAY, FOR THIS CASE.  I ANTICIPATE IT'S GOING TO TAKE  02:06

16    US A DAY, DAY AND A HALF, MAYBE EVEN TWO DAYS, TO PICK A JURY

17    IN THIS MATTER.  AND THEN WHATEVER REMAINS OF THAT WEEK WILL BE

18    DEVOTED TO THE MOTIONS IN LIMINE.  YOU WILL THEN HAVE THE

19    WEEKEND, KNOWING THE COURT'S RULINGS ON THE MOTIONS IN LIMINE,

20    TO PREPARE FOR YOUR OPENING STATEMENTS TO THE JURY.  ACTUALLY,  02:06

21    IT'S A THREE-DAY WEEKEND; MEMORIAL DAY FALLS IN THERE.  THEN

22    TUESDAY MORNING, WE'LL START WITH THE TRIAL.

23            I THINK I PREVIOUSLY INDICATED TO YOU THE TIME LIMITS

24    THAT I'M GOING TO IMPOSE ON THE TRIAL, SO YOU'LL HAVE YOUR

25    TIME; USE IT AS YOU SEE FIT; AND WE'LL GO FROM THERE.           02:06
```

1      **MR. NOLAN:**  YOUR HONOR, MAY I MAKE ONE NOTE ON THE

2  SCHEDULE JUST FOR A SECOND?

3      **THE COURT:**  PLEASE.

4      **MR. NOLAN:**  I JUST WANTED TO, OUT OF AN ABUNDANCE OF

5  CAUTION, JUST ALERT COUNSEL FOR MATTEL, AS WELL AS THE COURT,          02:07

6  THAT ISAAC LARIAN, WHO IS UNDER A TRIAL SUBPOENA, HAS BEEN

7  NOMINATED AS A REPRESENTATIVE OF THE UNITED STATES DEPARTMENT

8  OF STATE FOR AN AWARD THAT WILL BE ANNOUNCED IN MONACO ON THE

9  EVENING, I THINK -- NICE QUARTERS, BUT STILL -- HE'S

10  REPRESENTING THE UNITED STATES FOR ENTREPRENEUR OF THE YEAR.          02:07

11  AND HE'S BEEN ASKED BY THE STATE DEPARTMENT TO MAKE HIMSELF

12  AVAILABLE.  HE'S KNOWN ABOUT THIS TRIAL, AND HE WILL ONLY GO

13  OVER THERE FOR PURPOSES OF THE AWARD CEREMONY AND THEN COME

14  RIGHT BACK.  IT MIGHT BE THAT HE WILL BE IN TRANSIT A COUPLE OF

15  DAYS, AND I WANTED IT TO BE ON THE RECORD EARLY SO THEY DON'T          02:08

16  SAY, 'OH, WELL, YOU KNOW, WE DIDN'T KNOW MR. LARIAN WAS GOING

17  TO BE OUT OF THE COUNTRY FOR THAT PERIOD OF TIME.'

18      I ASK FOR LEAVE OF THE COURT TO ALLOW HIM TO DO THAT.

19  IT'S A PERSONAL AWARD FOR HIM, BUT HE'S ALSO REPRESENTING THE

20  UNITED STATES OF AMERICA.          02:08

21      **THE COURT:**  DO YOU KNOW THE DATE OF THE AWARD

22  CEREMONY?

23      **MR. NOLAN:**  THE AWARD IS MAY 28TH ITSELF, YOUR HONOR.

24      **THE COURT:**  I SEE.  SO IT WOULD JUST BE AT THE

25  BEGINNING, MAY 28TH?  OKAY.  VERY WELL.          02:08

1          **MR. NOLAN:**  RIGHT.

2          **THE COURT:**  ALL RIGHT.  I CERTAINLY APPRECIATE THAT.

3          I ASSUME THAT WE CAN ACCOMMODATE HIM AS A WITNESS IN

4    THIS MATTER.  HE WILL HAVE TO FOREGO, OF COURSE, OBSERVING THE

5    TRIAL DURING THAT PERIOD.                                        02:08

6          YOU'RE NOT ASKING TO CONTINUE THE TRIAL BASED ON

7    THAT, ARE YOU?

8          **MR. NOLAN:**  NO, YOUR HONOR.  BUT I DID WANT TO

9    EXPLAIN THAT TO THE COURT AS EARLY AS POSSIBLE, ESPECIALLY NOW

10   THAT WE WERE PICKING THE JURY JUST PRIOR TO THAT PERIOD OF       02:09

11   TIME.

12         **THE COURT:**  RIGHT.

13         WE'LL BE PICKING IT THAT PREVIOUS WEEK, AND THEN

14   WE'LL BE STARTING RIGHT IN.

15         ONE OF THE CONCERNS THAT THE COURT HAS IN TERMS OF --      02:09

16   AND WHY I WILL BE ENFORCING THE TRIAL SCHEDULE, IS THAT THE

17   HOURS AND THE DAYS PERMIT THE COURT TO HAVE THIS TRIAL

18   COMPLETED; THEN I HAVE A CRIMINAL -- IT'S A MANSLAUGHTER CASE

19   INVOLVING A FORMER AMERICAN SERVICEMAN OVER IN IRAQ.  THAT'S

20   BEING PUSHED BY THE SPEEDY TRIAL, IN LATER JULY, AND THAT NEEDS  02:09

21   TO START UP; SO I'M REALLY NOT IN A POSITION TO MOVE THIS CASE

22   EVEN ONE WEEK FORWARD, SO...

23         **MR. NOLAN:**  I UNDERSTAND THAT, YOUR HONOR.

24         MY UNDERSTANDING FROM THE TRAVEL ARRANGEMENTS IS THAT

25   MR. LARIAN WILL BE BACK ON THE 2ND, WHICH IS THE MONDAY         02:09

```
 1   FOLLOWING THAT WEEKEND.  BUT I WANTED TO ALERT THE COURT OF

 2   THAT.

 3        THE COURT:  I APPRECIATE THAT.

 4        ALL RIGHT.  VERY WELL.

 5        LET'S RESUME WITH OUR ORAL ARGUMENT ON THE MOTIONS        02:09

 6   FOR PARTIAL SUMMARY JUDGMENT.  I WANTED TO PICK UP ON THE

 7   AFFIRMATIVE DEFENSES, ALTHOUGH I DID INDICATE, I THINK, AT THE

 8   END OF THE LAST BREAK THAT I WOULD GIVE MR. QUINN LEAVE TO MAKE

 9   ANY REBUTTAL THAT HE WANTS TO THOSE FINAL ARGUMENTS RELATED TO

10   THE BREACH, THE FIDUCIARY DUTY.                               02:10

11        MR. QUINN:  YOUR HONOR, ALSO, BEFORE WE GET TO THE

12   AFFIRMATIVE DEFENSES, DID THE COURT WANT TO ADDRESS THE

13   COPYRIGHT ISSUES?

14        THE COURT:  I CAN TAKE THOSE UP AGAIN AT A LATER --

15   LET'S HOLD OFF ON THAT.                                       02:10

16        MR. QUINN:  ALL RIGHT.

17        THE COURT:  WHEN YOU SAY THE COPYRIGHT ISSUES, YOU'RE

18   REFERRING TO --

19        MR. QUINN:  ORIGINALITY; PROTECTABILITY, WHAT'S

20   PROTECTABLE, WHICH WE THINK IS A QUESTION OF LAW FROM YOUR     02:10

21   HONOR; AND THEN SUBSTANTIAL SIMILARITY.

22        THE COURT:  I WILL TAKE THOSE UP ON THE CARTER BRYANT

23   MOTION.  I'LL GIVE YOU A CHANCE TO DO THAT.  SOME OF THESE ARE,

24   OBVIOUSLY, IN SEVERAL DIFFERENT PLACES.

25        MR. QUINN:  THEY OVERLAP.  I APPRECIATE THAT.            02:10
```

```
 1            THEN JUST A COUPLE OF REMARKS, YOUR HONOR, FINISHING

 2   UP ON BREACH OF FIDUCIARY DUTY.

 3            THE COURT:  PLEASE.

 4            MR. QUINN:  I TRIED TO SEE IF I COULD TRACK DOWN THE

 5   CITY SOLUTIONS CASE THAT HAD THOSE FOUR OR FIVE ELEMENTS          02:11

 6   THAT --

 7            THE COURT:  I HAVE A COPY RIGHT HERE, IF YOU WOULD

 8   LIKE TO TAKE A LOOK.

 9            MR. QUINN:  WELL, I WON'T IMPOSE IT ON EVERYBODY FOR

10   ME TO READ IT IN REALTIME; SO I WASN'T ABLE TO REFRESH MYSELF     02:11

11   WITH WHAT THE FACTUAL SITUATION WAS.  BUT JUST JUDGING BY THOSE

12   ELEMENTS, IF THOSE ARE THE ELEMENTS, AND IF THAT'S APPLICABLE,

13   I THINK THOSE ARE ALL SATISFIED HERE.

14            THE COURT:  WELL, FOCUS ON THE LAST ONE.

15            MR. QUINN:  IF THE COURT COULD REMIND ME WHICH ONE       02:11

16   THAT IS.

17            THE COURT:  POSITION OF SUPERIORITY WITH RESPECT TO

18   THE ISSUE AT HAND.

19            MR. QUINN:  AS TO BRATZ, MR. BRYANT WAS TOTALLY

20   SUPERIOR.  I MEAN, WE WERE COMPLETELY INFERIOR.  WE KNEW          02:11

21   NOTHING; HE KNEW EVERYTHING, I THINK.

22            NOW, I DON'T KNOW WHETHER SUPERIORITY AROSE IN THAT

23   CASE IN THE CONTEXT OF EMPLOYEE VERSUS EMPLOYER.  I THINK I GET

24   THE IDEA, AS TO THIS PARTICULAR PROPERTY WHICH WAS THE SUBJECT

25   OF CONFIDENCE, HE WAS IN A SUPERIOR POSITION.  IN TERMS OF A      02:12
```

1    VOLUNTARY ACCEPTANCE OF A POSITION OF TRUST, WE SHOULDN'T LOSE

2    SIGHT OF THE FACT THAT THE INVENTIONS AGREEMENT, THE VERY LAST

3    WORDS ABOVE HIS SIGNATURE, IN SOLID CAPS, "THIS AGREEMENT

4    CREATES IMPORTANT OBLIGATIONS OF TRUST."

5            I DON'T KNOW HOW YOU EXPRESS A VOLUNTARY ACCEPTANCE          02:12

6    ANY BETTER THAN THAT.

7            THAT'S ALL I HAVE ON THE FIDUCIARY DUTY, YOUR HONOR.

8            **THE COURT:**  VERY WELL.

9            DO YOU WANT TO PICK UP WITH THE AFFIRMATIVE DEFENSES?

10           **MR. QUINN:**  MR. ZELLER WILL BE ADDRESSING THAT.          02:12

11           **THE COURT:**  MR. ZELLER, YOU'RE WELCOME TO THE STAGE.

12           AND LET ME ASK YOU FIRST -- AND I'M SURE YOU HAVE

13   LOTS TO SAY TO THE COURT -- BUT SEVERAL OF THESE AFFIRMATIVE

14   DEFENSES -- AND I'M GOING TO ASK THE SAME QUESTION OF -- MAYBE

15   I'LL START OFF BY ASKING THE OTHER SIDE AS WELL, MGA AND          02:13

16   CARTER BRYANT.  I'D LIKE TO HEAR FROM ALL COUNSEL ON THIS

17   QUESTION.

18           ACQUIESCENCE WAIVER AND CONSENT, ABANDONMENT,

19   LATCHES, UNCLEAN HANDS... THESE STRIKE THE COURT AS EQUITABLE

20   DEFENSES.  ALTHOUGH IN YOUR PAPERS, AT VARIOUS TIMES, YOU MAKE     02:13

21   MENTION OF WHETHER OR NOT A JURY COULD FIND EVIDENCE TO RESOLVE

22   A DISPUTED FACT THAT MIGHT RELATE TO THESE.

23           IS IT YOUR UNDERSTANDING THAT THESE ARE DEFENSES THAT

24   THE COURT WILL CONSIDER AFTER THE TRIAL, OR, FROM YOUR

25   PERSPECTIVE, ARE THESE DEFENSES THAT ARE ACTUALLY ARGUED TO THE    02:13

```
 1    JURY?

 2          MR. ZELLER:  I THINK IN THE MAIN, YOUR HONOR, WE

 3    BELIEVE THAT THOSE ARE DEFENSES THAT ARE TRIED TO THE COURT.

 4          THE COURT:  OKAY.

 5          MR. ZELLER:  AND IT SHOULD BE SUITABLY TAKEN UP      02:13

 6    AFTER --

 7          THE COURT:  ALL OF THE EVIDENCE IS HEARD.

 8          MR. ZELLER:  EXACTLY.

 9          IN PARTICULAR, DEFENSES LIKE LATCHES, TRADITIONALLY

10    CONSIDERED TO BE AN EQUITABLE DEFENSE.  IN PRIOR LITIGATION  02:14

11    THAT I'VE BEEN INVOLVED IN, INTELLECTUAL PROPERTY DISPUTES,

12    THOSE ARE DETERMINATIONS MADE BY THE COURT AFTER THE JURY

13    VERDICT.

14          THERE MAY BE A COUPLE OF AFFIRMATIVE DEFENSES,

15    PROBABLY, FOR EXAMPLE, THE SECTION 205 DEFENSE.           02:14

16          THE COURT:  I UNDERSTAND THAT.

17          MR. ZELLER:  BUT I DO AGREE IN THE MAIN WITH THE ONES

18    THAT THE COURT HAS IDENTIFIED.  AND WE PROBABLY HAD USED THE

19    PHRASEOLOGY THAT THE COURT HAS REFERRED TO, BUT I THINK AT THE

20    VERY BEGINNING OF A LOT OF THIS, IN TERMS OF OUR DISCUSSION IN  02:14

21    THE BRIEFS, WE DID TAKE THE POSITION VERY CLEARLY THAT WE

22    THOUGHT THESE WERE EQUITABLE DEFENSES, SHOULDN'T BE GOING TO

23    THE JURY AT ALL UNDER ANY CIRCUMSTANCES.

24          BUT CERTAINLY, IN THE ALTERNATIVE, IF THEY WERE TO BE

25    DETERMINED TO BE LEGAL DEFENSES RATHER THAN EQUITABLE ONES  02:14
```

```
 1   TRIED TO THE JURY, THERE'S NO DISPUTE, THERE'S NO FACTUAL
 2   DISPUTE THAT WOULD WARRANT THEM USING UP THE TIME OF THE JURY;
 3   AND THE COURT, FOR THAT MATTER.
 4        THE COURT:  OKAY.  VERY WELL.  I'M GOING TO GIVE YOU
 5   YOUR FULL ALLOTTED TIME.                                         02:15
 6        MR. NOLAN, DO YOU AGREE WITH THAT?
 7        MR. RUSSELL:  JASON RUSSELL FOR THE MGA PARTIES.
 8        YOUR HONOR, THIS IS AN ISSUE THAT HAS BEEN RAISED NOT
 9   IN SUMMARY JUDGMENT MOTIONS, BUT RATHER IN MOTIONS IN LIMINE BY
10   MATTEL.  AND CERTAINLY, WE'RE GOING TO BE PREPARED TO ADDRESS    02:15
11   AND FULLY RESPOND TO THOSE ARGUMENTS ON THE MOTIONS IN LIMINE.
12   BUT LET ME JUST SAY, AS A THRESHOLD ARGUMENT, WE DISAGREE.
13        CERTAINLY, FOR MANY OF THESE DEFENSES, LATCHES IN
14   PARTICULAR, I THINK THOSE ARE ISSUES THAT GO TO THE JURY.  WE
15   CITED, YOUR HONOR, TO SOME CASES IN THE SUMMARY JUDGMENT         02:15
16   MOTIONS, THOUGH THAT WASN'T THE POINT OF THE ARGUMENTS MADE BY
17   MATTEL, AND IT WASN'T THE POINT OF THE ARGUMENTS IN OUR
18   RESPONSE.  BUT THOSE ARE ISSUES THAT CERTAINLY COULD BE TRIED
19   TO THE JURY.
20        AND IF YOUR HONOR WERE TO DISAGREE, THERE'S NO REASON       02:15
21   THAT THE EVIDENCE COULDN'T BE PRESENTED AT THE SAME TIME AND
22   YOUR HONOR COULD RULE AT THE END.  IT REALLY WOULD MAKE NO
23   SENSE TO HAVE DUAL TRIALS.  AND, AGAIN, THIS IS REALLY AN
24   EVIDENTIARY POINT, MUCH MORE THAN A LEGAL ARGUMENT FOR SUMMARY
25   JUDGMENT.                                                        02:15
```

```
 1          BUT IN ANY EVENT, WE BELIEVE THAT LATCHES,

 2   ACQUIESCENCE, CONSENT, AND PROBABLY WAIVER, AT THE MINIMUM,

 3   COULD BE ARGUED TO THE JURY AS A MATTER OF LEGAL QUESTIONS.

 4          CERTAINLY, THERE ARE MIXED CLAIMS HERE.  YOU'VE GOT

 5   CLAIMS THAT ARE QUASI EQUITABLE; THE UNFAIR COMPETITION AND THE       02:16

 6   LIKE.  IT'S VERY UNCLEAR WHERE TO DRAW THE LINE IN THIS CASE.

 7   AND I THINK THAT'S THE REASON WHY THIS MAKES SENSE TO DEFER

 8   THIS ISSUE UNTIL WE'VE HAD A CHANCE TO FULLY BRIEF IT FOR YOUR

 9   HONOR ON THE MOTIONS IN LIMINE.

10          THE COURT:  THANK YOU, COUNSEL.                                02:16

11          ANYTHING FROM CARTER BRYANT, JUST ON THIS POINT?

12          MS. ANDERSON:  WE CONCUR, YOUR HONOR, WITH MGA

13   COUNSEL.

14          THE COURT:  VERY WELL.

15          MR. ZELLER, BACK TO YOU.  YOU MAY NOW GO THROUGH THEM          02:16

16   IN WHATEVER ORDER YOU SEE FIT.

17          MR. ZELLER:  I THINK STARTING WITH SECTION 205 WOULD

18   BE APPROPRIATE.

19          THE COURT:  IT'S THE FIRST ON MY LIST.

20          MR. ZELLER:  THERE'S NOT REALLY ANY DISPUTE HERE,             02:16

21   YOUR HONOR, THAT THERE WAS NO RECORDATION OF ANY ASSIGNMENT.

22   THAT IS THE BEGINNING AND END OF ANY 205 DEFENSE.  I COULD

23   CERTAINLY ELABORATE FURTHER, BUT IT'S RIGHT THERE IN THE

24   STATUTE; IT'S IN THE CASE THAT WE CITED.

25          THE COURT:  THEY RESPONDED THEY DID REGISTER.                  02:17
```

1      **MR. ZELLER:**  WELL, REGISTRATION IS NOT RECORDATION.

2  THAT'S WHAT THE CASE SAYS.  THE STATUTE ITSELF TREATS

3  REGISTRATION AS A SEPARATE ISSUE OF RECORDATION.  IT'S RIGHT

4  THERE IN THE TERMS OF IT; SO TO TREAT REGISTRATION AS THE SAME

5  AS RECORDATION JUST SIMPLY MAKES THE TERMS OF THE STATUTE                02:17

6  COMPLETELY SUPERFLUOUS.

7      **THE COURT:**  I DO HAVE SOME QUESTIONS FOR MGA ON THAT

8  POINT, BUT I UNDERSTAND YOUR ARGUMENT.

9      **MR. ZELLER:**  I THINK IN TERMS OF THE OTHER -- WHAT

10  WE'LL CALL GOOD FAITH DEFENSES, FRANKLY, I THINK THAT MGA               02:17

11  CONCEDES HERE THAT THESE ARE NOT REALLY TRULY AFFIRMATIVE

12  DEFENSES, BUT, RATHER, ATTEMPTS TO NEGATE CERTAIN ELEMENTS

13  OF --

14      **THE COURT:**  INTENT ELEMENTS.

15      **MR. ZELLER:**  -- MATTEL CLAIMS.

16      CORRECT, YOUR HONOR.

17      AND I THINK THAT THEY WERE AT LEAST MORE OR LESS

18  CANDID ON THE POINT WHEN THEY SAY THAT PRIOR COUNSEL HAD

19  ASSERTED THEM OUT OF AN ABUNDANCE OF CAUTION.  BUT THERE'S

20  ABSOLUTELY NO REASON FOR THEM TO CLUTTER THE RECORD, CAUSE              02:18

21  CONFUSION AT TRIAL; AND WE THINK THAT THEY'RE APPROPRIATE FOR

22  SUMMARY JUDGMENT, JUST AS A MATTER OF LAW, FOR THAT VERY

23  REASON.

24      WE ALSO, OF COURSE, THINK THAT THERE'S NO FACTUAL

25  BASIS FOR THOSE DEFENSES.  BUT NEVERTHELESS, AT BEST, THEY JUST         02:18

```
 1   SIMPLY NEGATE AN ELEMENT.  AND WE THINK THAT REALLY THE TAKING

 2   OUT THE 205 DEFENSE, TAKING OUT THE SO-CALLED GOOD FAITH

 3   DEFENSES, WILL CERTAINLY STREAMLINE THE TRIAL, AND SUMMARY

 4   JUDGMENT IS WARRANTED ON THOSE.

 5           HEARING NO FURTHER RESPONSE FROM MGA...                  02:18

 6           I DON'T KNOW IF ANY OF THESE ARE SERIOUSLY DISPUTED

 7   AT THIS POINT.

 8           THE COURT:  WHAT ABOUT ACQUIESCENCE, WAIVER, AND

 9   CONSENT?

10           MR. ZELLER:  WELL, I THINK, FRANKLY, THAT ON WAIVER      02:19

11   AND CONSENT, THE DEFENDANTS IGNORE THAT THE PLAIN LANGUAGE OF

12   THE INVENTIONS AGREEMENT ABSOLUTELY PRECLUDES THESE DEFENSES.

13   AND IN PARTICULAR, THE AGREEMENT MAKES VERY CLEAR THAT -- AND

14   THIS IS IN PARAGRAPH 4-A -- "MY OBLIGATION UNDER THIS AGREEMENT

15   MAY NOT BE MODIFIED OR TERMINATED, IN WHOLE OR IN PART, EXCEPT   02:19

16   IN WRITING SIGNED BY A VICE PRESIDENT OF THE COMPANY.  ANY

17   WAIVER BY THE COMPANY OF A BREACH ON ANY PROVISION OF THIS

18   AGREEMENT WILL NOT OPERATE OR BE CONSTRUED AS A WAIVER OF ANY

19   SUBSEQUENT BREACH."

20           SO AT THE VERY THRESHOLD, YOUR HONOR, IN OUR VIEW,       02:19

21   THESE DEFENSES FAIL.  AND THERE'S JUST NO RESPONSE TO THIS.

22   THERE'S NO DISPUTED ISSUE OF FACT AS TO THOSE ISSUES.

23           THERE HAS BEEN NO MODIFICATION OF THESE PROVISIONS,

24   THESE OBLIGATIONS UNDER THE AGREEMENT, WITH RESPECT TO

25   MR. BRYANT.  AND IF IT'S THE CASE THAT EVEN A WAIVER OF A        02:20
```

1    BREACH BY -- OR THERE CAN BE NO WAIVER OF A BREACH BY

2    MR. BRYANT, OR IF THERE IS AN INSTANCE OF BREACH BY MR. BRYANT,

3    THAT THAT'S NOT A WAIVER.

4         CERTAINLY, IT CAN'T APPLY IF THERE'S SUPPOSEDLY A

5    NONENFORCEMENT AS TO OTHER EMPLOYEES, WHICH IS REALLY THE          02:20

6    PREDICATE FOR A LOT OF THESE OTHER AFFIRMATIVE DEFENSES THAT

7    THEY'RE RAISING DEALING WITH SO-CALLED MOONLIGHTING AND CONDUCT

8    OF OTHER EMPLOYEES, ALLEGEDLY.

9         **THE COURT:**  ABANDONMENT.

10        **MR. QUINN:**  I THINK THESE REALLY FAIL FOR THE SAME        02:20

11   REASON AS A LOT OF THESE.  I MEAN, NOT TO PUT IT UNKINDLY, BUT

12   A LOT OF THESE DEFENSES SEEM TO BE JUST SIMPLY KIND OF

13   REPACKAGED ARGUMENTS; THE SAME ARGUMENTS THAT THE DEFENDANTS

14   TRY TO PUT FORTH IN VARIOUS WAYS, I GUESS TO BETTER THEIR ODDS

15   THAT SOMEHOW ONE OF THESE WILL BE ACCEPTED BY A JURY.             02:21

16        **THE COURT:**  A LOT OF THEM DO SEEM TO TOUCH UPON THE

17   STATUTE OF LIMITATIONS ARGUMENT, AND THAT'S ONE THAT THE COURT

18   DOES HAVE A NUMBER OF QUESTIONS ON, IN TERMS OF WHETHER THIS

19   WAS BROUGHT IN A TIMELY FASHION, WHETHER MATTEL EXERCISED THEIR

20   RIGHTS PROPERLY AND PURSUED A REMEDY APPROPRIATELY.               02:21

21        **MR. ZELLER:**  RIGHT.

22        AND IT DOES SEEM TO BE, IN MANY RESPECTS, A WAY OF

23   REPACKAGING; IN PARTICULAR, AS THE COURT IS POINTING OUT, THE

24   STATUTE OF LIMITATIONS DEFENSE.  IT'S BASICALLY, THERE WAS A

25   DELAY; MATTEL KNEW THAT CARTER BRYANT HAD ENGAGED IN THIS         02:21

```
 1    MISCONDUCT AND SAT ON ITS RIGHTS AND SO ON.

 2              AND IN OUR VIEW -- AND WE'VE, OF COURSE, GONE THROUGH

 3    THESE METHODICALLY IN OUR PAPERS, LOOKING AT THE VARIOUS

 4    ELEMENTS FOR EACH OF THESE DEFENSES AND HOW THAT ATTEMPT TO

 5    REPACKAGE THE VERY SAME DEFENSE JUST DOESN'T WASH AS TO THE      02:21

 6    REQUIRED ELEMENTS FOR THESE.

 7              I MEAN, ABANDONMENT, FOR EXAMPLE, IN THE COPYRIGHT

 8    CONTEXT, IS ACTUALLY AN EXTRAORDINARILY DIFFICULT BURDEN TO

 9    MEET FOR A DEFENDANT.  IT REALLY REQUIRES RATHER CLEAR

10    REPUDIATION BY THE COPYRIGHT HOLDER OF SAYING THAT, 'I'M         02:22

11    ABANDONING MY COPYRIGHT.'  THERE ARE CASES THAT GO SO FAR AS TO

12    SAY THAT IT HAS TO BE EXPLICIT AND PUBLIC BEFORE THAT HAPPENS.

13    AND THERE IS NOT ANY KIND OF OVERT ACT WITH RESPECT TO

14    MR. BRYANT, IN PARTICULAR, THAT THE DEFENDANTS CAN POINT TO AS

15    SOMEHOW CONSTITUTING AN ABANDONMENT, AN ESTOPPEL, A WAIVER, OR   02:22

16    ANY OF THESE OTHER WAYS THAT THEY TRY AND REPACKAGE THE SAME,

17    KIND OF, YOU KNOW, SUPPOSED DELAY ARGUMENT.

18              THE COURT:  THIS ALL GOES TO THAT ISSUE THAT WE'RE

19    GOING TO EXPLORE IN SOME DETAIL IN THE STATUTE OF LIMITATIONS

20    ARGUMENT; THAT MATTEL WAS ON NOTICE, THAT CARTER BRYANT WAS UP   02:22

21    TO THIS AND DIDN'T RESPOND, DIDN'T RESPOND WITH A LAWSUIT,

22    DIDN'T DO ANYTHING IN RESPONSE TO THAT INFORMATION.

23              MR. ZELLER:  WELL, CERTAINLY, THESE DEFENSES WOULD

24    FAIL FOR THE SAME REASON THAT THE STATUTE OF LIMITATIONS KINDS

25    OF ARGUMENTS AND THE DEFENSE ITSELF FAILS.  BUT STILL, IT'S THE  02:23
```

```
 1    ATTEMPT TO REPACKAGE THESE THAT DOESN'T REALLY WASH.

 2            MOST OF THESE KINDS OF DEFENSES, ESTOPPEL,

 3    ABANDONMENT, I MEAN, THEY REQUIRE SOME KIND OF AFFIRMATIVE

 4    ACTION BY MATTEL THAT WOULD GIVE COMFORT TO A DEFENDANT THAT

 5    THERE WOULD BE NO SUIT OR THAT THERE ARE NO RIGHTS THAT ARE        02:23

 6    BEING ASSERTED TO A PARTICULAR COPYRIGHT.  THE CASES ARE VERY

 7    CLEAR, AND WE'VE CITED THEM THROUGHOUT OUR BRIEFS, THAT MERE

 8    INACTION, MERE DELAY, THE VERY KINDS OF THINGS THAT THEY POINT

 9    TO AS BEING THE ALLEGED BASES FOR THESE DEFENSES, SIMPLY ARE

10    NOT SUFFICIENT.                                                   02:23

11            THE COURT:  THE ACTS AND OMISSIONS OF OTHERS.

12            THAT WAS LISTED IN YOUR NOTICE, BUT I DIDN'T SEE

13    ANYTHING IN THE PAPERS THEMSELVES ON THAT.

14            MR. ZELLER:  I THOUGHT WE DID ADDRESS IT IN THE

15    PAPERS ITSELF.  I THOUGHT WE SAID BASICALLY THAT THERE WAS        02:23

16    SUFFICIENT EVIDENCE ON THE MERITS AS TO THE PARTICIPATION OF

17    MGA AND ISAAC LARIAN TO SHOW THAT DEFENSE COULD NOT PREVAIL.

18    I'M PRETTY CONFIDENT THAT WAS IN THE BRIEF ITSELF.

19            MR. RUSSELL:  IF I MIGHT ADD, YOUR HONOR, THAT WAS

20    ADDRESSED WITH RESPECT TO THEIR AIDING AND ABETTING ARGUMENT.     02:24

21    THEY HAVE A SINGLE SENTENCE AT THE END OF THEIR AIDING AND

22    ABETTING ARGUMENT WHERE THEY ADDRESS IT.  IT MIGHT BE IN A

23    FOOTNOTE.  I APOLOGIZE.

24            THE COURT:  I MUST HAVE MISSED THAT.

25            MR. ZELLER:  IT WAS PROBABLY A LONG SENTENCE; BUT IN      02:24
```

```
 1  ANY EVENT...

 2          IT WAS MORE THAN JUST A LINE.

 3          THE COURT:  VERY WELL.

 4          MR. ZELLER:  BUT I KNOW THAT THERE WAS ANOTHER

 5  CONTEXT IN WHICH WE HAD RAISED, FOR EXAMPLE, A DI MINIMUS       02:24

 6  COPYRIGHT DEFENSE; BUT WHERE, OF COURSE, BY OUR VIEWPOINT,

 7  ESTABLISHING THAT THERE WAS SUBSTANTIAL SIMILARITY IN ITSELF

 8  NECESSARILY NEGATES THIS CONCEPT OF DI MINIMUS USE.  SO THERE

 9  CERTAINLY WERE OTHER CONTEXTS IN WHICH WE DISPOSE OF OR ADDRESS

10  THESE PARTICULAR KINDS OF DEFENSES.                            02:24

11          AND IN FAIRNESS, YOUR HONOR, I THINK MANY OF THESE

12  DEFENSES ARE THE KINDS OF DEFENSES THAT VERY CAUTIOUS LAWYERS

13  TYPICALLY WILL ASSERT AT THE BEGINNING OF A CASE, BECAUSE THEY

14  OBVIOUSLY DON'T WANT TO BE IN A POSITION OF WAIVING SOME KIND

15  OF ARGUMENT OR SOME KIND OF DEFENSE.  BUT THIS IS REALLY THE    02:25

16  DAY, I THINK, FOR A LOT OF THESE DEFENSES TO BE WEEDED OUT.

17          THE COURT:  I'VE PUT STATUTE OF LIMITATIONS ASIDE

18  BECAUSE I WANT TO SPEND SOME TIME ON THAT AS A SEPARATE ISSUE;

19  IT'S RAISED IN DIFFERENT PLACES BY DIFFERENT INDIVIDUALS.  BUT

20  THERE'S ONE OF THESE AFFIRMATIVE DEFENSES, ONE SUB THEORY UNDER 02:25

21  IT, THAT KIND OF INTRIGUED ME A BIT; AND THAT WAS THE UNCLEAN

22  HANDS.  THAT'S THE ARGUMENT, ESSENTIALLY, THAT MATTEL WAS LYING

23  IN WAIT; THAT THEY KNEW ABOUT WHAT WAS GOING ON; THEY HAD THIS

24  TOLERANCE OF MOONLIGHTING; THEY KIND OF LULLED CARTER BRYANT

25  INTO COMPLICITY, BASICALLY, AND THEN SEIZED THE DAY, AS IT      02:25
```

1    WERE.

2          **MR. ZELLER:**  AND I THINK THAT THERE'S A COUPLE OF

3    THINGS TO BE SAID ABOUT THE UNCLEAN HANDS DEFENSE.

4          NUMBER ONE, MGA HAS WITHDRAWN IT.  THERE'S NO

5    ASSERTION OF AN UNCLEAN HANDS DEFENSE BY MGA IN PHASE ONE OF          02:26

6    THIS CASE.  IT IS GONE.

7          CARTER BRYANT DOES CONTINUE TO ASSERT AN UNCLEAN

8    HANDS DEFENSE OF A SORT.  YOU RECALL THAT THE PORTION OF THE

9    BRIEF THAT ADDRESSES UNCLEAN HANDS COULD ONLY BE CALLED

10   SOMEWHAT ATMOSPHERIC.  IT'S BASICALLY THE SENSE OF, 'WELL, WE        02:26

11   CAN'T REALLY NECESSARILY ARTICULATE THE NUANCES AND SUBTLETIES

12   OF THE INEQUITABLE CONDUCT BY MATTEL IN THIS CASE.'

13         BUT, OF COURSE, THIS IS SUMMARY JUDGMENT.  IT'S NOT

14   ENOUGH TO JUST SIMPLY SAY, 'WELL, THE JURY MIGHT FIND SOME

15   REASON TO FIND IN MY FAVOR.'                                        02:26

16         **THE COURT:**  WELL, THEY ARTICULATED IT MORE THAN JUST

17   ATMOSPHERIC.  THEY HAVE A THEORY HERE.

18         **MR. ZELLER:**  RIGHT.

19         AND I THINK THAT THE COURT HAS POINTED OUT THAT ONE

20   BASIS, I SUPPOSE, THAT THEY ARE TRYING TO ASSERT IS THE             02:26

21   SO-CALLED MOONLIGHTING, WHICH THEY REALLY USE AS KIND OF AN

22   OVERWORKED TERM TO DESCRIBE MANY, MANY DIFFERENT THINGS THAT GO

23   ON.  AND IT'S DONE REALLY TO OBSCURE ONE BASIC FACT:  THAT

24   THERE IS ABSOLUTELY NO EVIDENCE IN THIS CASE THAT MATTEL EVER

25   ALLOWED, KNOWINGLY, ANY DESIGNER TO WORK FOR A COMPETITIVE DOLL     02:27

1    COMPANY WORKING ON DOLL DESIGNS.  THERE'S JUST NO EVIDENCE OF

2    THAT OCCURRING.

3            AND SO WHAT THE DEFENDANTS DO IN THIS CASE IS THEY

4    CONFLATE VARIOUS OTHER KINDS OF SITUATIONS.  MATTEL'S POLICY

5    NEVER PROHIBITS ANYONE FROM HAVING ANY KIND OF OUTSIDE JOB.        02:27

6    WHAT IT DID REQUIRE WAS DISCLOSURE AND PERMISSION.  THAT IS

7    WHAT CARTER BRYANT DID NOT DO.  SO TO EVEN TALK ABOUT MOST OF

8    THESE OTHER SITUATIONS, RIGHT THEN AND THERE IS COMPLETELY

9    MISLEADING.

10           RICH DE ANDA, FOR EXAMPLE, HE SOUGHT AND OBTAINED THE      02:27

11   COMPANY'S PERMISSION TO DO THAT KIND OF WORK.  AND IT'S NOT

12   COMPETITIVE WORK.  SO TO SORT OF PRETEND THAT RICH DE ANDA,

13   ACTING AS AN EXPERT WITNESS, IS COMPARABLE TO A DOLL DESIGNER

14   LIKE CARTER BRYANT, DESIGNING A COMPETITIVE DOLL IN SECRET,

15   USING MATTEL RESOURCES, AND THEN SELLING IT TO A COMPETITOR,       02:28

16   YOU KNOW, IS REALLY NOT AN ANALOGY, I THINK, THAT HOLDS UP AT

17   ALL.

18           THEN TO THE POINT ABOUT MOONLIGHTING.  IN PARTICULAR,

19   THE COURT WILL RECALL THAT CARTER BRYANT WAS ASKED THIS

20   QUESTION:  "DO YOU HAVE ANY BASIS TO BELIEVE THAT IT WAS           02:28

21   PERFECTLY FINE FOR YOU TO DO WORK FOR ANOTHER TOY COMPANY WHILE

22   YOU WERE EMPLOYED BY MATTEL?"

23           ANSWER:  "NO."

24           SO THAT ITSELF REALLY, I THINK, TAKES OUT THIS NOTION

25   OF UNCLEAN HANDS ALTOGETHER.  IT'S SUPPOSED TO AFFECT THE          02:28

```
 1   EQUITIES OF THE PARTIES; NOT JUST SIMPLY CARTER BRYANT'S BELIEF
 2   THAT SOMEHOW MATTEL IS BEING UNFAIR AS TO HIM AFTER THE FACT.
 3   IT'S GOT TO AFFECT HIM.  AND THAT IS WHAT'S MISSING HERE.
 4           THE COURT:  VERY GOOD.
 5           COUNSEL, I'M GOING TO INVITE YOU BACK TO SPEAK ON      02:29
 6   STATUTE OF LIMITATIONS; BUT WITH RESPECT TO THESE OTHER
 7   AFFIRMATIVE DEFENSES, LET ME INVITE SOMEONE FROM THE DEFENSE.
 8           MR. RUSSELL:  YOUR HONOR, IF I MIGHT BRIEFLY RESPOND
 9   TO SOME OF THE POINTS THAT WERE MADE BY MY ESTEEMED COLLEAGUE.
10           THE COURT:  LET'S START WITH SECTION 205, BECAUSE I    02:29
11   HAVEN'T REALLY HAD ANY RESPONSE TO IT.  BECAUSE THAT WAS MY
12   READING OF THE STATUTE AS WELL, IS THAT IT REQUIRES NOT JUST
13   REGISTRATION, BUT A RECORDATION CONSISTENT WITH THE
14   REQUIREMENTS IN THE ACT ITSELF.  IT'S CONSISTENT WITH THE
15   STATUTE HERE -- WITH 205(C), WHICH PROVIDES THE RECORDATION AS  02:29
16   CONSTRUCTIVE NOTICE.  AND IT'S NOT CLEAR AT ALL IN THE RECORD
17   -- I DON'T SEE THE EVIDENCE OF THAT BEING DONE.
18           MR. RUSSELL:  FAIR ENOUGH.
19           I MEAN, YOUR HONOR, I THINK WE ARE TAKING A SOMEWHAT
20   AGGRESSIVE POSITION HERE.  THERE IS NO DOUBT THAT AS A MATTER   02:29
21   OF FORMAL RECORDATION, THAT DIDN'T HAPPEN.  THERE IS, IN OUR
22   STANDPOINT.  BUT OUR POINT IS -- AND WE THINK THIS IS A FAIR
23   CONSTRUCTION OF THE DEFENSE -- THIS IS A BONA FIDE PURCHASER
24   FOR VALUE THAT TYPICAL CONSTRUCT IS YOU TAKE IN GOOD FAITH FOR
25   VALUE WITHOUT KNOWLEDGE OF SOMEONE ELSE OWNING IT.             02:30
```

1          CERTAINLY, AS TO THE FORMER ASPECTS OF IT, THERE'S NO

2   DISPUTE THAT MGA DIDN'T KNOW -- WELL, I TAKE THAT BACK.  THERE

3   ARE DISPUTES.

4          **THE COURT:**  ABOUT WHAT THEY KNEW.

5          **MR. RUSSELL:**  THERE ARE DISPUTES.  BUT CERTAINLY, MGA          02:30

6   CAN PUT FORTH A DEFENSE TO SHOW THAT IT RECEIVED

7   REPRESENTATIONS FROM MR. BRYANT, FROM MR. BRYANT'S ATTORNEY,

8   AND THROUGH ITS COPYRIGHT COUNSEL, ASSURANCES THAT MATTEL

9   DIDN'T HAVE RIGHTS TO THE BRATZ CONCEPT.

10          AT THE SAME TIME, THE RECORD WILL SHOW THAT AT THE          02:30

11   TIME THAT --

12          **THE COURT:**  BUT THAT'S JUST NOT ENOUGH UNDER LAW.

13          **MR. RUSSELL:**  LET ME FINISH THE --

14          **THE COURT:**  OKAY.  I'M SORRY.

15          **MR. RUSSELL:**  THE FIRST PART OF IT -- WE CAN          02:30

16   ESTABLISH THE FIRST PART.  THE SECOND PART IS, AT THE TIME THAT

17   MGA REGISTERED AND PLACED INTO THE PUBLIC RECORDS THAT IT HAD

18   RECEIVED OWNERSHIP OVER THE BRATZ BY VIRTUE OF AN ASSIGNMENT

19   FROM MR. BRYANT, ESSENTIALLY, CONTEMPORANEOUSLY, MATTEL CAME

20   INTO POSSESSION OF THE VERY CONTRACT UNDERLYING IT.          02:31

21          SO AS A MATTER OF CONSTRUCTIVE KNOWLEDGE, THEY'VE GOT

22   A PUBLIC REGISTRATION SAYING ASSIGNMENT AND THEY HAVE THE

23   CONTRACT.  SO IT WOULD BE OUR POSITION THAT IT IS FAIR FOR THE

24   JURY TO HEAR THAT DEFENSE AND DECIDE WHETHER OR NOT THAT IS

25   CONSTRUCTIVE KNOWLEDGE, TO PUT TWO AND TWO TOGETHER.  BECAUSE,          02:31

1    BEAR IN MIND, MGA REGISTERED THESE THINGS IN 2003, DESPITE THE

2    FACT -- AND THIS IS UNDISPUTED -- MATTEL HAD THE CONTRACT FOR

3    OVER THREE YEARS AND DIDN'T REGISTER ITS ALLEGED COPYRIGHT

4    INTEREST IN THE BRATZ DRAWINGS, WHEN IT ADMITS IT WAS ON NOTICE

5    AS OF NOVEMBER OF 2003.  AND THAT'S WHEN MGA WAS REGISTERING          02:31

6    THE COPYRIGHT.  THAT'S WHEN MGA TURNED OVER TO MATTEL,

7    VOLUNTARILY, THE CONTRACT BETWEEN MGA AND MR. BRYANT.

8              SO WHY SHOULD THE JURY NOT HEAR AND DECIDE FOR ITSELF

9    IF MGA TOOK IN GOOD FAITH AS A BONA FIDE PURCHASER FOR VALUE?

10             IT SEEMS REASONABLE UNDER THOSE CIRCUMSTANCES.           02:31

11             WE WEREN'T AWARE OF ANY CASE THAT DEALT WITH THIS.

12   AS I SAY, AS A TECHNICAL MATTER, WE DON'T MEET THE RECORDATION

13   STANDARDS, BUT AS A MATTER OF CONSTRUCTIVE KNOWLEDGE -- AND WE

14   THINK NIMMER CAN BE READ TO SUPPORT US -- CERTAINLY,

15   CONSTRUCTIVELY, THERE CAN BE NO ARGUMENT BUT THAT MATTEL, IN       02:32

16   FACT, KNEW ABOUT THE TRANSFER AND HOW IT CAME TO BE AT THE TIME

17   OF THE REGISTRATION.

18             SO THAT'S OUR ARGUMENT.

19             **THE COURT:**  VERY WELL, COUNSEL.

20             A NUMBER OF THESE DEFENSES -- AND THEY REALLY ARE, TO    02:32

21   MY THINKING, EQUITABLE DEFENSES -- THE COURT WILL CONSIDER, AS

22   YOU URGE, AFTER THE COURT HEARS THE TRIAL EVIDENCE.

23             PUTTING ASIDE THE STATUTE OF LIMITATIONS, ARE THERE

24   ANY OF THESE OTHER DEFENSES THAT YOU WISH TO ADDRESS AT THIS

25   TIME?                                                             02:32

1      **MR. RUSSELL:**  WELL, YOUR HONOR, FIRST, I THINK YOU

2   MADE MENTION TO THE UNCLEAN HANDS DEFENSE AND THE THEORY THAT

3   WAS ARTICULATED.  I THINK THE MGA PARTIES RETAINED THE LATCHES

4   DEFENSE, AND IT'S THROUGH THAT VEHICLE THAT THE MGA PARTIES

5   WILL PUT FORTH BEFORE YOUR HONOR THE EXACT SAME THEORY THAT THE          02:32

6   UNCLEAN HANDS DEFENSE WOULD PUT BEFORE YOU.  THAT IS TO SAY,

7   MATTEL SAT THERE LYING IN WAIT, SPECULATING ON THE SUCCESS OF

8   THE BRATZ DOLLS, KNOWING FULL WELL THESE THINGS TOOK ENORMOUS

9   INVESTMENT, AND THEY WAITED UNTIL IT WAS SUCCESSFUL, AND THAT'S

10  WHEN THEY CHOSE TO SUE.                                                  02:33

11      AND WE PUT FORTH BEFORE THE COURT THE QUOTATIONS FROM

12  MR. BRAUR INDICATING THAT IT WAS ONLY AFTER THE DOLLS WERE

13  LOSING MARKET SHARE AT MATTEL, THE HOUSE WAS ON FIRE, ET

14  CETERA, THAT THERE WAS A DECISION MADE INTERNALLY AT MATTEL TO

15  LITIGATE MGA TO DEATH.  AND IT'S OUR POSITION THAT WAS AN               02:33

16  UNREASONABLE DELAY BY MATTEL AND THAT IT CAUSED PREJUDICE TO

17  THE MGA PARTIES.

18      SO CERTAINLY, AS TO THE LATCHES DEFENSE, THAT

19  CERTAINLY IS AN ISSUE THAT WE THINK NOT ONLY SHOULD SURVIVE,

20  BUT ALSO THAT SHOULD GO TO THE JURY.  WE CITE YOUR HONOR TO THE          02:33

21  LEO H. FEIST CASE, WHICH IS A 1916 CASE BY JUDGE LEARNED HAND,

22  WHICH ESTABLISHES THAT THIS IS A PROPER LEGAL DEFENSE TO A

23  COPYRIGHT CLAIM.

24      SO WE DON'T THINK THIS IS AN ISSUE THAT YOU SHOULD

25  DECIDE.  WE THINK THIS IS AN ISSUE THAT THE JURY SHOULD DECIDE,          02:33

1   TO THE EXTENT THAT YOUR HONOR OR THE JURY REJECTS THE STATUTE

2   OF LIMITATIONS ARGUMENT.  AND I DON'T WANT TO BELABOR THE

3   STATUTE OF LIMITATIONS ARGUMENTS; THAT WILL BE SOMETHING

4   MR. NOLAN WILL EXPOUND ON.

5            SUFFICE IT TO SAY, THE LATCHES DEFENSE CAN BE                    02:34

6   MAINTAINED, EVEN IF YOU FIND THE STATUTE OF LIMITATIONS DEFENSE

7   DOESN'T WORK.

8            **THE COURT:**  GENERALLY, THAT'S ONLY THE CASE IF

9   THERE'S REALLY SOMETHING EXTRAORDINARY.

10           **MR. RUSSELL:**  CORRECT.  AND WE THINK THERE IS HERE,         02:34

11  YOUR HONOR.  WE THINK THAT THIS IS THE MOST EXTRAORDINARY CASE

12  YOU CAN EVER HAVE.  MATTEL SAT THERE, KNOWINGLY.  THERE'S NO

13  DISPUTE THEY KNEW IN 2003.  THEY ADMIT THEY KNEW IN 2003 ALL OF

14  THE FACTS THEY NEEDED TO ASSERT A CLAIM; AND THEY DID NOT

15  ASSERT A COPYRIGHT CLAIM FOR THREE YEARS.  WE CAN ARGUE ABOUT          02:34

16  RELATION BACK; WE CAN ARGUE ABOUT TOLLING; BUT WHAT WE CAN'T

17  ARGUE ABOUT IS, FOR THREE YEARS MATTEL SPECULATED AT THE

18  EXPENSE OF THE MGA PARTIES.

19           THAT'S SOMETHING THE JURY SHOULD HEAR.

20           NOW, DID THAT CAUSE PREJUDICE?  ABSOLUTELY.  WE KNOW          02:34

21  FOR A FACT, BECAUSE MATTEL LOST PHONE RECORDS, INCLUDING THE

22  CRITICAL MONTH OF OCTOBER OF 2000.  WE KNOW THAT THEY DID NOT

23  MAINTAIN THEIR E-MAILS, BECAUSE OF THIS PURPORTED AUTO-DELETE

24  FUNCTION; SO WE HAVE NO IDEA WHAT THE INTERNAL COMMUNICATIONS

25  ARE.  WE KNOW THAT THERE ARE WITNESSES, INCLUDING MR. DE ANDA,        02:35

```
 1   WHO REPEATEDLY RESPONDED, 'WELL, IT'S BEEN TOO LONG.  I CAN'T

 2   RECALL.'

 3          SO WE HAVE CERTAINLY MADE OUT A PRIMA FACIE CASE,

 4   MORE THAN ENOUGH TO CREATE A DISPUTED ISSUE OF FACT ON THE

 5   LATCHES DEFENSE.                                              02:35

 6          NOW, THESE SAME FACTS, I SUBMIT TO YOU, WOULD

 7   CERTAINLY APPLY WITH RESPECT TO WAIVER, ACQUIESCENCE, AND

 8   CONSENT; AND WITH DEFERENCE TO MR. ZELLER, I UNDERSTAND HIS

 9   ARGUMENT THAT THIS IS JUST REPACKAGING.  THE LAW ALLOWS US TO

10   ASSERT, UNDER DIFFERENT LEGAL THEORIES, DEFENSES.  WE HAVE    02:35

11   CHOSEN TO DO THAT.  THE DEFENSES RELY IN LARGE MEASURE BOTH ON

12   THE MOONLIGHTING, BUT ALSO ON THE SAME FACTS THAT SUPPORT OUR

13   LATCHES AND STATUTE OF LIMITATIONS DEFENSES.  THEY'VE CITED YOU

14   NO CASES TO SUGGEST YOU CAN RULE AS A MATTER OF LAW GIVEN THIS

15   DISPUTED RECORD.                                              02:35

16          NOW, I KNOW MR. ZELLER MAKES THE POINT, THE CONTRACT

17   ON ITS FACE PROHIBITS WAIVER; AND MAYBE THAT'S AN ARGUMENT THAT

18   THE KEKER FIRM WOULD CHOOSE TO ADDRESS, BUT THAT'S NOT

19   APPLICABLE TO THE MGA PARTIES.  THEY HAVE SEPARATE LEGAL

20   ARGUMENTS.  THEY'RE NOT BOUND BY THAT CONTRACT.  AND THERE'S NO  02:36

21   CASE CITED BY MR. ZELLER.  AND I THINK IT INTERESTING THAT THEY

22   COULDN'T -- THEY HAD THE CHANCE TO -- THAT SAYS, 'WE'RE BOUND

23   BY THAT PROVISION.'

24          THE COURT:  ARE YOU SUGGESTING THAT MGA WAS AWARE OF

25   THE MOONLIGHTING?                                             02:36
```

1           **MR. RUSSELL:**  WELL, I THINK THAT THE ARGUMENT COULD

2     BE, CERTAINLY ONCE MR. BRYANT CAME OVER, THEY WERE AWARE OF

3     MOONLIGHTING, AND THEY RELIED ON THE FACT -- IN INVESTING MONEY

4     INTO THE PRODUCT, MARKETING, PACKAGING, ET CETERA -- THE FACT

5     THAT MATTEL ISN'T SUING.  EVERYTHING THEY'RE DOING IS                  02:36

6     CONSISTENT WITH AND REINFORCING THE NOTION THAT EVEN IF THEY

7     THOUGHT THEY OWNED IT, THEY'RE INTENTIONALLY NOT PROCEEDING.

8           SO THERE'S AT LEAST A DISPUTED ISSUE OF FACT, BECAUSE

9     CERTAINLY, WE CAN ARGUE WE KNEW THE MOONLIGHTING POLICIES AFTER

10    MR. BRYANT CAME OVER.  AND WE'RE ENTITLED TO RELY UPON THOSE,        02:36

11    JUST AS WE'RE ENTITLED TO RELY UPON THE ABSENCE OF A SUIT BY

12    MATTEL.

13          WE'RE TALKING ABOUT, AFTER ALL, THE NUMBER ONE

14    INFRINGEMENT PLAINTIFF IN THE TOY INDUSTRY.  AND WE CITED YOUR

15    HONOR TO THE CASES WHERE COURTS HAVE NOTED, 'IF YOU ENTER THE       02:36

16    FASHION LINE MARKET, YOU MIGHT AS WELL PAINT A TARGET ON YOUR

17    BACK, BECAUSE THAT'S WHAT THEY DO.  YOU ENTER THE MARKET; IF

18    YOU HAVE ANY POWER AT ALL IN THE MARKET, THEY SUE YOU.'

19          WELL, THEY DIDN'T SUE; AND THEY DIDN'T SUE FOR NEARLY

20    FIVE YEARS, FIVE AND A HALF YEARS.  CERTAINLY, THAT CREATES A       02:37

21    QUESTION FOR THE JURY AS TO WHETHER OR NOT THAT WAS AN

22    INTENTIONAL DECISION.

23          AND AS MR. NOLAN IS GOING TO POINT OUT IN A FEW

24    MOMENTS, WE THINK WE HAVE COMPELLING EVIDENCE TO SHOW THAT THIS

25    WAS, INDEED, AN INTENTIONAL DECISION, WITH FULL KNOWLEDGE BY         02:37

1   MATTEL; THAT THEY KNEW THEIR AGREEMENTS DIDN'T COVER IT, BUT

2   ONCE THEY STARTED TO LOSE MARKET SHARE, THEY HAD NO CHOICE BUT

3   TO COMMENCE LITIGATION.  SO, ACCORDINGLY, THERE ARE DISPUTED

4   ISSUES THERE TOO.  THOSE FACTUAL PREDICATES, YOUR HONOR, WE

5   SUBMIT, WOULD JUSTIFY RETAINING ALL OF OUR AFFIRMATIVE                02:37

6   DEFENSES.

7           AND, AGAIN, I DO NOT SUBMIT THAT THOSE ARE EQUITABLE.

8   WE'D LIKE TO ARGUE THAT ON THE MOTION *IN LIMINE*; BUT AT A

9   MINIMUM, THEY SHOULD SURVIVE SUMMARY JUDGMENT, PARTICULARLY

10  GIVEN WHAT WE THINK IS THE FLIMSY ARGUMENT MADE -- WITH               02:37

11  RESPECT, THE ARGUMENTS THAT WERE MADE BY MATTEL WERE BASICALLY

12  A PARAGRAPH PER DEFENSE.  IT WAS AT THE END OF THE MOTION;

13  NOBODY HAD A LOT OF TIME.

14          **THE COURT:**  I AM NEVER GOING TO CRITICIZE BREVITY,

15  COUNSEL.                                                             02:38

16          **MR. RUSSELL:**  SINCE I WROTE MOST OF IT, I GUESS I

17  TAKE THE BLAME AS WELL.  BUT IN ANY EVENT, WE'LL STAND ON THAT.

18          **THE COURT:**  THANK YOU, COUNSEL.

19          **MS. ANDERSON:**  BRIEFLY, YOUR HONOR?

20          **THE COURT:**  ABSOLUTELY.                                  02:38

21          **MS. ANDERSON:**  I'M NOT GOING TO REHASH ANY ARGUMENTS.

22  I'D JUST LIKE TO TOUCH ON ONE OF THE DEFENSES, BECAUSE IT'S THE

23  DEFENSE OF UNCLEAN HANDS; THAT MR. BRYANT DOES HAVE AND THE MGA

24  DEFENDANTS HAVE NOT ASSERTED FOR THIS PHASE.

25          AS THE COURT IS AWARE, THIS DEFENSE CAN BE                   02:38

1   ESTABLISHED BY SHOWING UNCONSCIENTIOUS CONDUCT BY THE PLAINTIFF

2   CONNECTED TO THE CONTROVERSY.

3           AS YOUR HONOR HAS OBSERVED, WE HAVE IDENTIFIED FACTS,

4   PUT THEM IN THE RECORD, TO SUPPORT OUR CONTENTION THAT MATTEL'S

5   HANDS WERE UNCLEAN; THAT THEY SAT ON THEIR HANDS, WATCHING AND       02:38

6   LETTING MGA DEVELOP AND SELL THIS DOLL FOR YEARS; THAT ALONE

7   WILL ESTABLISH THE UNCLEAN HANDS DEFENSE.

8           BUT MR. BRYANT IS IN A SPECIAL POSITION, BECAUSE IN

9   ADDITION TO THAT, MR. BRYANT ASSERTS THAT MATTEL WAITED BEFORE

10  SUING MR. BRYANT BECAUSE MATTEL WANTED TO HAVE MR. BRYANT'S         02:39

11  COOPERATION IN ANOTHER LAWSUIT, WHICH IS YET ANOTHER FACT IN

12  SUPPORT OF THIS CLAIM.

13          ADDITIONALLY, ALTHOUGH MATTEL DOESN'T RELY ON THE

14  CHECKOUT FORM THAT MR. BRYANT WAS REQUIRED TO SIGN WHEN HE

15  DEPARTED MATTEL AS A BASIS FOR THEIR CONTRACT CLAIM, THEY DO       02:39

16  POINT TO IT AS SUPPORT FOR THEIR ARGUMENT THAT THE AGREEMENT

17  THAT MR. BRYANT SIGNED COVERED EVERY SINGLE THING HE EVER

18  THOUGHT OF.  AND BY POINTING TO THAT CHECKOUT FORM, THEY ARE

19  POINTING TO A DOCUMENT THAT WE CONTEND IS ENTIRELY DECEPTIVE

20  AND IS INTENDED TO COERCE EMPLOYEES WHO ARE LEAVING TO SIGN THE    02:39

21  DOCUMENT THAT SAYS THEY AGREED TO SOMETHING THEY NEVER AGREED

22  TO.

23          ALL OF THESE FACTS ARE FACTS THE JURY NEEDS TO HEAR.

24  NONE OF THE FACTS THAT HAVE BEEN OFFERED IN SUPPORT OF MATTEL'S

25  MOTION ON THIS PARTICULAR AFFIRMATIVE DEFENSE ARE UNDISPUTED.      02:40

1   THEY ARE IN DISPUTE.  AND THE JURY AND YOUR HONOR SHOULD HEAR

2   THEM, DEPENDING ON WHAT YOUR HONOR DECIDES IS THE APPROPRIATE

3   WAY FOR IT TO BE COVERED.

4           **THE COURT:**  THANK YOU, COUNSEL.

5           **MS. ANDERSON:**  THANK YOU, YOUR HONOR.

6           **THE COURT:**  I'D LIKE TO HEAR ON STATUTE OF

7   LIMITATIONS.

8           MR. ZELLER, I WILL GIVE YOU A CHANCE TO REBUT

9   BRIEFLY, IF YOU WISH; BUT THEN LET'S MOVE ON TO THE STATUTE OF

10  LIMITATIONS.                                                    02:40

11          **MR. ZELLER:**  THERE'S SORT OF A BIT OF BANDYING GOING

12  ON HERE.

13          ON THE ONE HAND, WE HAVE BRYANT BASICALLY SAYING,

14  'WELL, THERE WAS DELAY.'  BRYANT IS THE ONLY ONE NOW ASSERTING

15  THAT DEFENSE AT THIS POINT AND IS CLAIMING DELAY.               02:40

16          BUT HOW WAS THERE ANY DELAY AS TO CARTER BRYANT?

17          I MEAN, THE DELAY THAT THEY ARE CLAIMING ABOUT FOR

18  MGA IS THAT THEY'RE CLAIMING, 'WELL, MATTEL WAITED FIVE YEARS

19  TO SUE MGA.'  BUT THE COURT WILL RECALL, WE, OF COURSE, SUED

20  CARTER BRYANT IN APRIL OF 2004.  THERE'S NO QUESTION THAT WAS   02:41

21  TIMELY.

22          THERE'S, IN FACT, NEVER BEEN ANY SERIOUS DISPUTE THAT

23  OUR CLAIMS AGAINST CARTER BRYANT WERE TIMELY.  THEY TOOK ISSUE,

24  OF COURSE, WITH HOW LONG WE WAITED TO AMEND.  BUT THAT WAS AN

25  ISSUE THAT WAS AIRED EXTENSIVELY IN FRONT OF YOUR HONOR; AND    02:41

```
 1   YOUR HONOR REJECTED IT.

 2           IS THAT REALLY SERIOUSLY SUPPOSED TO BE A JURY ISSUE

 3   AT THIS POINT?  THEY CLEARLY SEEM TO WANT TO DRAG IN THROUGH

 4   THIS DEFENSE, BASICALLY, LITIGATION CONDUCT.  AND IN SOME WAYS,

 5   FROM OUR PERSPECTIVE, WE WANT TO SAY, 'BRING IT ON,' BECAUSE IF    02:41

 6   THEY WANT TO TRY AND EXPLAIN TO THE JURY WHY -- OR WE WANT TO

 7   EXPLAIN TO THE JURY WHY IT TOOK US SO LONG TO BE ABLE TO ASSERT

 8   CLAIMS, WELL, WE CAN TALK ENDLESSLY ABOUT THE OBSTRUCTIONISM

 9   THAT WE FACED.

10           CARTER BRYANT HAD TO BE ORDERED TWICE, TWO DIFFERENT       02:41

11   COURT ORDERS, BEFORE HE SAT FOR DEPOSITION, SEVERAL MONTHS

12   AFTER THIS LAWSUIT WAS BROUGHT.  NOVEMBER OF 2004.  AND THEN

13   FOR THEM TO COME IN HERE AND BASICALLY FAULT MATTEL AND SAY

14   'AFTER ALL THAT MOTION PRACTICE THAT IT TOOK JUST SIMPLY TO GET

15   CARTER BRYANT IN THE CHAIR, THEN THERE WAS A YEAR IN WHICH THE     02:42

16   CASE WAS STAYED.'  THEN WE HAD TO FIGHT WITH ISAAC LARIAN TO

17   GET HIM IN THE CHAIR.  AND IT TOOK TWO COURT ORDERS TO GET HIM

18   IN THE CHAIR AS WELL.  AND THAT WASN'T UNTIL THE SUMMER OF

19   2006.

20           SO, I MEAN, CERTAINLY, THE PROGRESSION THAT WE CAN         02:42

21   SEE HERE, IF THAT'S WHAT THIS TRIAL IS GOING TO BE ABOUT, WITH

22   RESPECT TO UNCLEAN HANDS, WELL, THAT'S THE KIND OF INFORMATION

23   THAT IS GOING TO HAVE TO COME IN IN FRONT OF THE JURY.

24           THE COURT:  SO YOU'RE AGREEING, THEN, THAT IT'S

25   CERTAINLY SOMETHING THAT WE CAN'T RESOLVE HERE IN SUMMARY          02:42
```

1  JUDGMENT.

2       **MR. ZELLER:**  I ACTUALLY THINK THAT IT CAN BE RESOLVED

3  IN SUMMARY JUDGMENT BECAUSE -- BUT MY POINT IS, YOUR HONOR,

4  THAT THIS IS NOT SUITABLE AS UNCLEAN HANDS; THAT'S

5  FUNDAMENTALLY THE POINT I'M TRYING TO MAKE.                    02:42

6       **THE COURT:**  MGA HAS TAKEN THE POSITION THAT ACTUALLY

7  COMES IN UNDER THEIR LATCHES DEFENSE.

8       **MR. ZELLER:**  SURE.

9       BUT MY FUNDAMENTAL POINT IS, YOUR HONOR, IS THAT'S

10  NOT UNCLEAN HANDS.  THAT IS NOT SOMETHING THAT THEY CAN ASSERT   02:42

11  AS UNCLEAN HANDS.  THERE'S BEEN NO DELAY AS TO SUING CARTER

12  BRYANT.

13       **THE COURT:**  AS YOU POINTED OUT, MGA IS NOT ASSERTING

14  UNCLEAN HANDS.

15       **MR. ZELLER:**  RIGHT.  EXACTLY.  MGA ITSELF -- THAT'S     02:43

16  WHAT I'M SAYING, IS THAT THERE'S -- WE HAVE CARTER BRYANT

17  BASICALLY TRYING TO ASSERT PREJUDICE TO MGA.  AND MGA,

18  MEANWHILE, HASN'T EVEN ASSERTED THIS DEFENSE.  THERE'S BEEN NO

19  DELAY, AND NEVER HAS BEEN ANY ARGUMENT OF DELAY, ABOUT SUING

20  CARTER BRYANT.  THAT'S MY FUNDAMENTAL POINT.  THAT'S WHY I'M     02:43

21  SAYING THAT THERE'S THIS DISCONNECT BETWEEN MGA BASICALLY

22  TRYING TO STAND AT MGA'S SHOES TO ASSERT THIS UNCLEAN HANDS

23  DEFENSE.

24       BECAUSE ULTIMATELY, WHEN WE HEAR THINGS LIKE

25  CARTER BRYANT'S COUNSEL SAYING THAT MATTEL SAT ON ITS HANDS,    02:43

```
 1   HOW DID IT SIT ON ITS HANDS AS TO CARTER BRYANT?

 2           THERE'S JUST NO EVIDENCE OF THAT.  THERE'S NO REAL

 3   ARGUMENT THAT THAT'S WHAT OCCURRED.

 4           AND THIS PROBABLY SEGUES, IN MANY RESPECTS, INTO

 5   STATUTE OF LIMITATIONS, BECAUSE, OF COURSE, FIRST AND FOREMOST,   02:43

 6   YOUR HONOR, A NUMBER OF THE ARGUMENTS THAT THEY MAKE REALLY

 7   ALREADY FLY IN THE FACE OF WHAT THE COURT RULED ON IN RELATION

 8   BACK.

 9           MR. NOLAN:  YOUR HONOR, I APOLOGIZE TO INTERRUPT.

10           THE COURT:  I'M SORRY.

11           MR. NOLAN:  IF WE'RE GOING TO MOVE INTO STATUTE OF

12   LIMITATIONS, I DO THINK THAT THIS SIDE WAS GOING TO MAKE ONE

13   COMMENT IN RESPONSE TO WHETHER OR NOT CARTER BRYANT WAS

14   ACTUALLY INTENDING THAT THERE WAS INJURY FROM THIS DELAY.

15           THE COURT:  FAIR ENOUGH.  TO KEEP THIS CLEAN, WHY       02:44

16   DON'T WE HOLD OFF.  LET ME HEAR THE ONE RESPONSE TO THIS, AND

17   THEN WE'LL WRAP UP THE LAST OF THE AFFIRMATIVE DEFENSES.

18           AND THEN, MR. ZELLER, I'LL INVITE YOU TO SPEAK TO THE

19   STATUTE OF LIMITATIONS.

20           MS. ANDERSON:  THANK YOU, YOUR HONOR.                   02:44

21           YOUR HONOR, WE JUST HEARD MR. RUSSELL LIST A NUMBER

22   OF FORMS OF PREJUDICE FROM DELAY.  MATTEL, WE CONTEND, KNEW IN

23   2001 THE FACTS THAT WERE BASES FOR SUING, AND THEY SAT ON THEIR

24   HANDS AND DIDN'T SUE MY CLIENT UNTIL 2004.  AND DURING THAT

25   PERIOD OF TIME, EVIDENCE, WE BELIEVE, WAS LOST; MEMORIES FADED.  02:44
```

1    THAT IS PREJUDICE.

2         WE MAY NOT HAVE BEEN THE PARTY THAT ACTUALLY

3    MANUFACTURED AND SOLD THESE PRODUCTS, BUT ABSOLUTELY, WE SUFFER

4    FROM PREJUDICE, AND THESE ARE FACTS THAT THE JURY NEEDS TO

5    HEAR.                                                              02:45

6         IN ADDITION, YOUR HONOR, I THINK IT'S IMPORTANT TO

7    CLARIFY, WHEN WE MET AND CONFERRED WITH MATTEL'S COUNSEL ABOUT

8    THE UNCLEAN HANDS DEFENSE, MATTEL'S COUNSEL ACKNOWLEDGED THAT

9    CARTER BRYANT IS IN A DISTINCT POSITION WITH RESPECT TO

10   ASSERTING THIS DEFENSE, THAT IS MGA, WHICH IS WHY WE RETAINED     02:45

11   THE DEFENSE AND WHY THE DEFENSE WAS ULTIMATELY WITHDRAWN FOR

12   PHASE ONE BY MGA.

13        IT'S NOT A CONCESSION OF THE INVALIDITY OF

14   MR. BRYANT'S UNCLEAN HANDS DEFENSE.  IT'S THE FACT THAT

15   MR. BRYANT, BEING A FORMER EMPLOYEE, WHO RELIED IN OTHER WAYS,    02:45

16   WAS SUBJECTED TO THIS MISLEADING CHECKOUT FORM, WHY HE

17   PARTICIPATED IN LITIGATION TO ASSIST MATTEL WHO WAS SITTING

18   THERE, WAITING TO SUE HIM.  ALL OF THOSE FACTS ARE PARTICULAR

19   TO MR. BRYANT, WHICH IS WHY WE RETAIN IT.

20        THANK YOU, YOUR HONOR.                                       02:45

21        **THE COURT:**  I UNDERSTAND YOUR POSITION.

22        THANK YOU, COUNSEL.

23        IF THERE'S NOTHING FURTHER ON THOSE, LET'S HEAR ON

24   THE STATUTE OF LIMITATIONS.

25        **MR. ZELLER:**  I THINK THE LOGICAL STARTING POINT HERE,    02:46

```
 1    ALTHOUGH THERE ARE MANY ISSUES, POTENTIALLY, THAT ONE COULD
 2    ADDRESS WITH STATUTE OF LIMITATIONS, IS THE DEFENDANTS'
 3    ARGUMENT THAT RELATION BACK TO MATTEL'S APRIL 2004 COMPLAINT
 4    DOES NOT APPLY TO MATTEL'S AMENDED CLAIMS.  THE COURT REJECTED
 5    THAT.  INDEED, THE COURT FOUND THAT BASED ON DEFENDANTS' OWN    02:46
 6    ADMISSIONS, THOSE CLAIMS RELATED BACK FOR BOTH THE COPYRIGHT
 7    INFRINGEMENT CLAIMS AND THE CONTRACT INTERFERENCE CLAIMS.
 8              AS THE COURT FOUND ON THE SUBSTITUTION OF LARIAN AND
 9    MGA HONG KONG AS DOES, THAT WAS PROPER AS WELL; AND THAT WAS
10    THE COURT ORDER, I'M SURE, THAT THE COURT WILL RECALL AS WELL,  02:46
11    WHERE WE LITIGATED THAT VERY ISSUE ON THE AMENDMENT.
12              THERE'S NOT REALLY ANY NEW EVIDENCE THAT THESE
13    DEFENDANTS SUBMIT THAT WOULD OTHERWISE CHANGE THE RELATION BACK
14    EQUATION.  THERE'S JUST NOTHING THAT THEY RAISE FACTUALLY.  IN
15    FACT, THE ONLY THING THEY REALLY DO IS REHASH A LEGAL ARGUMENT  02:47
16    THAT THE COURT'S ALREADY REJECTED, WHICH IS NAMELY THAT THERE
17    CAN BE NO DOE SUBSTITUTION, UNLESS YOU DIDN'T KNOW THE ACTUAL
18    NAME OF THE DEFENDANT.  AND THAT'S JUST NOT THE LAW OF
19    CALIFORNIA, AND THAT'S NOT THE LAW OF CALIFORNIA AS THIS COURT
20    HAS ALREADY FOUND IT.                                          02:47
21         THE COURT:  LET'S GET TO THE BIGGER ISSUE; AND THAT'S
22    WHETHER OR NOT THE COURT SHOULD GO WITH THIS NOVEMBER 24, 2003
23    DATE.
24         MR. ZELLER:  RIGHT.  AND WE DO THINK THAT, OF COURSE,
25    IS THE PROPER DATE.                                            02:47
```

1          **THE COURT:**  I UNDERSTAND THAT.

2          BY ASKING THE QUESTION, I'M NOT AGREEING WITH YOU.

3          **MR. ZELLER:**  SURE.  I UNDERSTAND.

4          I MEAN, I THINK THE WAY THAT THIS IS SET UP IS THAT

5    MGA SUGGESTS THAT ANY SIMILARITY BETWEEN THE BRATZ DOLLS AND          02:47

6    ANY MATTEL PRODUCT PUTS MATTEL ON NOTICE OF POTENTIAL

7    WRONGDOING.  AND THAT'S WHAT, AT LEAST IN PART, BEGINS THE

8    STATUTE.

9          AND, IN PARTICULAR, OF COURSE, THE COURT IS AWARE

10   THAT THEIR POSITION IS SO EXTREME IN SOME RESPECTS THAT THEY          02:48

11   CLAIM THAT WE SHOULD HAVE SUED CARTER BRYANT IN OCTOBER OF

12   2000.

13         I JUST DON'T SEE HOW THAT'S REALLY A REASONABLE

14   INTERPRETATION OF ANY STATUTE OF LIMITATIONS, PARTICULARLY

15   GIVEN THE FACT, AS THIS COURT HAS POINTED OUT PREVIOUSLY IN           02:48

16   CONNECTION WITH STATUTE OF LIMITATIONS -- WE HAVE RULE 11

17   OBLIGATIONS, COUNSEL DOES, AND TO SUGGEST, AS MGA DOES

18   THROUGHOUT ITS BRIEFS, THAT MATTEL WAS REQUIRED TO SUE WHENEVER

19   IT HEARD A RUMOR, HEARD INNUENDO, SOMEONE SUGGESTED SOME RUMOR

20   TO SOMEBODY ELSE, THAT THAT WAS A BASIS FOR RUNNING INTO             02:48

21   FEDERAL COURT, I THINK THE COURT CAN SEE READILY WHAT KIND OF

22   MISCHIEF THAT KIND OF STANDARD WOULD MEAN FOR LITIGANTS.  THIS

23   COURT WOULD BE FLOODED WITH ALL MANNER OF SUITS BROUGHT JUST

24   FOR PEOPLE TO PROTECT THEMSELVES.

25         AND I THINK THAT IN TERMS OF WHAT IS THE APPROPRIATE           02:48

```
 1   NOTICE STANDARD, I THINK THAT'S REALLY, IN MANY RESPECTS, ONE

 2   OF THE KEY ISSUES HERE, REALLY, ON STATUTE OF LIMITATIONS.  AND

 3   THE FOX CASE, THE WESTINGHOUSE CIRCUIT BREAKER CASE, THE HOBSON

 4   CASE, ALL MAKE CLEAR THAT INQUIRY NOTICE IS NOT SUSPICION OF

 5   ANY WRONG, BUT RATHER, YOU MUST BE AWARE OF THE FACTS          02:49

 6   UNDERLYING THE GENERIC ELEMENTS OF THE CLAIM THAT IS ASSERTED

 7   IN THE CASE; NAMELY, THAT'S THE ACTS, THE CAUSATION, AND

 8   DAMAGES.

 9        IN THIS CASE, THE INJURY HERE WAS INFRINGEMENT OF

10   MATTEL'S RIGHTS IN BRATZ.  IN FACT, THE COPYRIGHT CASES, SUCH  02:49

11   AS THE POLAR BEAR CASE, SAY, QUITE EXPLICITLY, THAT IT IS THE

12   ALLEGED INFRINGEMENT THAT MATTERS FOR STATUTE OF LIMITATIONS

13   PURPOSES.

14        HERE, THE ALLEGED INFRINGEMENT IS NOT OF TOON TEENS;

15   IT'S NOT OF DIVA STARZ; IT'S NOT OF BARBIE; IT'S NOT OF ANY    02:49

16   NUMBER OF OTHER PRODUCTS THAT THEY TRY AND POINT TO AS SOMEHOW

17   PEOPLE THOUGHT THAT THERE MIGHT BE SOME SIMILARITY, AND,

18   THEREFORE, I GUESS, REALLY REQUIRED MATTEL TO RUN OFF TO COURT

19   AND SUE.

20        THE ALLEGED INFRINGEMENT IN THIS CASE, QUITE CLEARLY,     02:50

21   IS BRATZ, OR THE BRATZ DRAWINGS THAT CARTER BRYANT CREATED

22   DURING HIS MATTEL TENURE AND THE OTHER TANGIBLE ITEMS THAT HE

23   CREATED DURING HIS MATTEL EMPLOYMENT THAT RELATED TO BRATZ.

24   THAT IS WHAT IS ASSERTED AS INFRINGEMENT IN THIS CASE.

25        THE COURT:  YOU'RE ASSERTING INFRINGEMENT BACK,           02:50
```

1   ESSENTIALLY, IN 2002, WHEN MATTEL WRITES TO MR. LARIAN,

2   THREATENING TO SUE ON THE DIVA STARZ LINE, THE CONNECTION

3   BETWEEN DIVA STARZ AND BRATZ.

4        **MR. ZELLER:**  I DON'T THINK THAT THAT'S WHAT IT SAYS,

5   YOUR HONOR.                                                    02:50

6        THE INFRINGEMENT CLAIM THAT WAS BEING RAISED, THE

7   CEASE AND DESIST LETTER THAT WAS BEING SENT, RELATED TO CERTAIN

8   KINDS OF STATEMENTS THAT WERE BEING MADE ON A WEBSITE.  IT

9   DIDN'T INVOLVE COPYRIGHT INFRINGEMENT OF MATTEL'S RIGHTS IN

10  BRATZ.  THAT IS AS CLEAR AS DAY THAT WAS NOT THE BASIS FOR THAT  02:51

11  CLAIM OR FOR THAT CEASE AND DESIST LETTER.  IT'S A DIFFERENT

12  ISSUE ALTOGETHER.

13       AND I ACTUALLY WOULD LIKE TO TALK ABOUT THAT LETTER A

14  LITTLE BIT MORE IN A BIT, BECAUSE THEY, IN MANY RESPECTS, TRY

15  AND USE IT AS THEIR EXCUSE FOR LYING TO THE WORLD ABOUT WHERE    02:51

16  BRATZ CAME FROM.  BUT FUNDAMENTALLY, EVEN IF THAT LETTER, OR

17  EVEN IF IT'S THE CASE THAT SOMEHOW SOME PEOPLE THOUGHT THAT

18  BRATZ WAS AN INFRINGEMENT OF DIVA STARZ, THAT STILL DOESN'T

19  START THE STATUTE OF LIMITATIONS RUNNING.  IT'S OUR RIGHTS IN

20  BRATZ THAT ARE AT ISSUE IN THIS CASE.  THAT IS THE BASIS OF THE  02:51

21  INFRINGEMENT CLAIM.

22       AND THERE IS NO DISPUTE, ABSOLUTELY NO DISPUTE HERE,

23  THAT MATTEL DID NOT KNOW OF ITS OWNERSHIP CLAIM IN THOSE BRATZ

24  DRAWINGS UNTIL, AT A BARE MINIMUM, IT RECEIVED THE DRAWINGS.

25  NOT ONLY IS THAT TRUE AS A FACTUAL MATTER, BUT IT DOESN'T MAKE   02:51

1    ANY SENSE TO ARGUE OTHERWISE.  WE COULDN'T POSSIBLY HAVE

2    COMPARED -- MATTEL COULD NOT HAVE POSSIBLY COMPARED THE BRATZ

3    DOLLS TO THE BRATZ DRAWINGS UNTIL IT HAD THE DRAWINGS.  AND

4    THERE'S NO DISPUTE THAT THOSE DRAWINGS WERE NOT PROVIDED TO

5    MATTEL, THAT MATTEL DID NOT HAVE THEM, UNTIL NOVEMBER OF 2003.        02:52

6         SUBSTANTIAL SIMILARITY REQUIRES TWO THINGS TO

7    COMPARE.  FIRST OF ALL, WE DON'T KNOW AT THAT TIME THAT THERE

8    IS A BASIS FOR AN OWNERSHIP CLAIM IN BRATZ ITSELF, OR EVEN IN

9    THE DRAWINGS.  AND NUMBER TWO, WE DIDN'T HAVE THE UNDERLYING

10   WORKS THAT WE POTENTIALLY HAD RIGHTS IN, MOST NOTABLY BECAUSE        02:52

11   MR. BRYANT TOOK THEM WITH HIM AND SOLD THEM TO MGA.

12        SO IN MANY RESPECTS, YOUR HONOR, THESE ISSUES ABOUT

13   KNOWING WHEN BRATZ CAME OUT; KNOWING CARTER BRYANT MIGHT HAVE

14   HAD SOME INVOLVEMENT IN IT; THINKING THAT, PERHAPS, THERE WERE

15   SOME SIMILARITIES BETWEEN OTHER MATTEL PRODUCTS, THOSE ARE ALL       02:52

16   RED HERRINGS; COMPLETELY RED HERRINGS.  THOSE ARE NOT THE BASES

17   FOR THE INFRINGEMENT CLAIM THAT WE ARE MAKING IN THIS CASE AND

18   THAT ALL OF OUR CLAIMS ARE PREDICATED ON.

19        **THE COURT:**  THANK YOU, COUNSEL.

20        MR. NOLAN.        02:53

21        **MR. NOLAN:**  THANK YOU.

22        **MR. ZELLER:**  ALSO, I DO HAVE SOME POINTS, YOUR HONOR,

23   TO MAKE AT SOME POINT ABOUT, REALLY, THE FACTUAL ERRORS THAT

24   ARE RAISED IN THIS WHOLE LITANY OF THE CHRONOLOGY THAT'S

25   RAISED, ABOUT WHEN MATTEL SUPPOSEDLY KNEW ABOUT CERTAIN FACTS        02:53

```
 1   AND EVERYTHING ELSE.  THERE ARE A NUMBER OF VERY SERIOUS ERRORS

 2   IN THE FACTUAL RECORD THAT ARE ASSERTED IN MGA'S CHRONOLOGY

 3   HERE ABOUT WHAT MATTEL SUPPOSEDLY KNEW.  AND SOME OF THOSE

 4   LINCHPIN FACTS THAT THEY BASICALLY SAY, 'THIS WAS IT.  THIS IS

 5   THE SMOKING GUN.  IT PROVES THAT MATTEL KNEW,' IN FACT, ARE        02:53

 6   MISREPRESENTATIONS OF THE FACTUAL RECORD.

 7         THE COURT:  I'LL GIVE YOU A CHANCE TO REBUT THOSE IN

 8   A MOMENT, COUNSEL.

 9         MR. NOLAN.

10         MR. NOLAN:  THANK YOU, YOUR HONOR.                           02:54

11         I, TOO, WANT TO GO TO WHAT I THINK IS THE CORE ISSUE

12   HERE; AND WE'LL GET TO RELATION BACK A LITTLE BIT LATER.

13   ACTUALLY, I THINK WE'VE COVERED THAT IN THE BRIEFS.

14         THE COURT:  YOU HAVE COVERED IT IN THE BRIEFS, AND

15   THE COURT HAS PREVIOUSLY TOUCHED ON THAT.  I'M MORE               02:54

16   CONCERNED -- WHERE I'M STRUGGLING THE MOST IS ON THE ACTUAL

17   DATE AND THESE FACTS, ACTUALLY, THAT MR. ZELLER JUST MADE

18   REFERENCE TO; SO LET ME HEAR YOUR THOUGHTS ON THAT.

19         MR. NOLAN:  I UNDERSTAND.

20         THERE ARE A COUPLE OF TRUISMS THAT MATTEL JUST CANNOT       02:54

21   DENY; AND ONE IS THAT THE POSITION THAT THEY'VE ALWAYS

22   ARTICULATED IN THIS LITIGATION IS THAT IT TAKES ABOUT NINE

23   MONTHS TO BRING A DOLL TO MARKET.  WE CANNOT FORGET THAT AS

24   ALWAYS THE STARTING POINT OF THE FRAMEWORK WITHIN WHICH MATTEL

25   EVALUATES THIS CASE.                                             02:55
```

1     I'M STRUCK BY A COMMENT THAT IS NOW BEING MADE TO

2  YOUR HONOR, AND THAT IS THAT ALL THEY ARE INTERESTED IN AND ALL

3  THEY'RE ASSERTING IS THIS INFRINGEMENT OF THE BRATZ DRAWINGS.

4     IF I MIGHT, IF I COULD GO TO THEIR SUPPLEMENTAL

5  INTERROGATORY, THEIR MOST RECENT ONE; AND I WANT TO GIVE YOU        02:55

6  THE BREADTH OF WHAT THEY'RE ACTUALLY CLAIMING IN THE

7  PROCEDURES, NOT THAT THEY'RE RETREATING FROM IT NOW.

8     THIS IS MATTEL'S SUPPLEMENTAL RESPONSES TO THE SECOND

9  SET OF INTERROGATORIES PROPOUNDED BY CARTER BRYANT; AND THEY

10  WERE FILED ON MARCH 4, 2008, VERY RECENTLY.                        02:55

11     HERE, THE ALLEGATION IS -- AND WHAT I'VE DONE HERE IS

12  JUST TAKEN OUT OF THEIR RATHER LONG ANSWER SOME OF THE CLIPS

13  THAT I THINK ARE MOST APPROPRIATE.

14     "BRYANT USED HIS EMPLOYMENT WITH MATTEL TO DEVELOP

15  BRATZ FOR MGA.  EVIDENCE THAT MATTEL HAS THUS FAR OBTAINED          02:55

16  ESTABLISHES THAT BRYANT CONCEIVED AND DEVELOPED BRATZ AS A

17  MATTEL EMPLOYEE.  IN SO DOING, HE RELIED ON THE BENEFITS OF HIS

18  YEARLY SALARY PAID BY MATTEL.  HE ALSO RELIED ON HIS TRAINING

19  AND EXPERIENCE AS A DOLL DESIGNER, WHICH WAS PROVIDED BY

20  MATTEL, AND RESOURCES PROVIDED BY MATTEL TO AID AND ASSIST ITS      02:56

21  DESIGNERS."

22     SO THE CONTENTION THAT ALL THEY'RE INTERESTED IN IS

23  THE DRAWINGS THEMSELVES, OKAY, IS FRANKLY TOO NARROW, BECAUSE

24  WHAT THEY ARE CONTENDING IN THIS LAWSUIT IS THAT CARTER BRYANT

25  USED THE RESOURCES OF MATTEL IN ORDER TO DEVELOP BRATZ.            02:56

1        AND I WANT TO HARKEN BACK TO THE ARGUMENT THAT I

2   ASKED THE COURT TO REMEMBER FROM MR. QUINN'S ARGUMENT IN

3   SUPPORT OF THEIR POSITION WITH RESPECT TO THE FIDUCIARY DUTY.

4   THE WAY MATTEL DESCRIBES CARTER BRYANT'S ACCESS TO A LOT OF

5   CONFIDENTIAL INFORMATION IS THAT HE WAS ATTENDING WEEKLY            02:56

6   MEETINGS; THAT HE HAD ACCESS TO ALL OF THEIR NEW PRODUCT LINES.

7   PRESUMABLY -- AND THIS IS VERY IMPORTANT -- THAT WOULD INCLUDE

8   TOON TEENS.

9        NOW, TOON TEENS, YOUR HONOR, IS GOING TO BE A VERY

10  CENTRAL FOCUS AS I DEVELOP THIS FACTUAL BACKGROUND, WHICH I        02:57

11  BELIEVE IS THE TRUE STATE OF MATTEL'S KNOWLEDGE.

12       TO GO TO THE END, I AGREE WITH MR. RUSSELL THAT THIS

13  IS A UNIQUE CASE IN THE SENSE THAT WE DO NOT BELIEVE THAT THERE

14  ARE STRONGER FACTS OUT THERE SUPPORTING THAT MATTEL ORIGINALLY

15  CONCLUDED THAT BRATZ WAS A FAD; BARBIE WAS INVULNERABLE, NEVER     02:57

16  HAD BEEN TESTED IN 40 YEARS OF ITS EXISTENCE.  THEY NEEDED

17  CARTER BRYANT AS A WITNESS IN A CASE, AND THEY DON'T MOVE OUT

18  AGGRESSIVELY.

19       NOW, LET'S TEST THAT.  LET'S SEE WHAT WE KNOW.

20       IN OCTOBER OF 2000, WHEN CARTER BRYANT LEAVES, THERE          02:58

21  IS ALREADY AT MATTEL, BY THEIR OWN EVIDENCE IN THIS CASE, BY

22  THEIR ACCOUNT, A HIGH DEGREE OF SUSPICION OF CARTER BRYANT THAT

23  CARTER BRYANT HAS LIED TO THEM WITH RESPECT TO HIS EXIT FROM

24  THE COMPANY AND THAT HIS DIRECT SUPERVISORS DO NOT EVEN BELIEVE

25  THE STORY THAT HE IS GIVEN WHEN HE IS IN THE EXIT INTERVIEW.       02:58

1       AND HERE, I WANT TO SHOW THE FIRST VIDEO CLAIM, WHICH

2    IS FROM JILL NORDQUIST; AND MS. NORDQUIST, OF COURSE, IS IN THE

3    DESIGN CENTER; SHE WORKS IN CLOSE PROXIMITY WITH CARTER BRYANT.

4    AND I WANT YOU TO KNOW WHAT SHE'S TESTIFIED IN HER DEPOSITION

5    AS TO WHAT SHE KNEW AS OF, NOW, OCTOBER OF 2000.                02:59

6            (VIDEOTAPE DEPOSITION PLAYS.)

7        **MR. NOLAN:**  YOUR HONOR, THE PROPRIETARY INFORMATION

8    CHECKOUT FORM, WHICH IS THE ANDERSON DECLARATION, EXHIBIT

9    NUMBER 27, CHRISTA ANDERSON'S DECLARATION, NUMBER 27, HAS THE

10   CHECKOUT FORM WHICH IS AT OR ABOUT THE SAME TIME.              03:02

11       AND I WANT TO GO TO THE SECTION, AARON, IF I COULD,

12   WHERE HE IS MARKED AS "INELIGIBLE FOR REHIRE."

13       IN ANY EVENT, YOUR HONOR -- AND I'LL GET THE CITE IN

14   JUST A MOMENT IF SOMEONE CAN GIVE IT TO ME -- WHEN

15   CARTER BRYANT LEAVES, HE'S INTERVIEWED; AND NOTWITHSTANDING THE   03:03

16   FACT THAT HE HAS PROVIDED TWO WEEKS NOTICE AND DESPITE THE FACT

17   THAT HE HAS BEEN A LOYAL EMPLOYEE, MATTEL, ON ITS OWN, WITHOUT

18   DISCLOSING TO CARTER BRYANT THAT HE IS GOING TO BE DEEMED NOW

19   INELIGIBLE FOR REHIRE.

20       **THE COURT:**  COUNSEL, I JUST HEARD FROM A WITNESS WHO       03:03

21   SUGGESTS THAT HE WAS NOT EXACTLY A MODEL, LOYAL EMPLOYEE.

22       **MR. NOLAN:**  BUT THEY'RE GOING TO TAKE A DIFFERENT

23   POSITION IN THIS CASE.

24       **THE COURT:**  I DON'T CARE WHAT POSITION THEY TAKE.

25   THE FACTS ARE THE FACTS.                                        03:03

```
 1          MR. NOLAN:  WELL, YOUR HONOR, THEN I LIKE THOSE FACTS

 2   TOO, BECAUSE IF HE'S NOT A MODEL EMPLOYEE, HE'S LYING TO

 3   THEM -- AND I'M JUST SAYING THAT THIS IS THEIR ACCOUNT; THAT

 4   HE'S NOT A MODEL EMPLOYEE; HE'S LYING TO THEM AS TO WHERE HE'S

 5   GOING; HE'S NOT DISCLOSING WHERE HE'S GOING.  THEY'RE ON          03:04

 6   REASONABLE SUSPICION TO DO A COUPLE OF THINGS, ONE IS -- AND

 7   THAT'S THE ONLY POINT --

 8          THE COURT:  I GIVE YOU THAT.  I CERTAINLY THINK

 9   THERE'S GROUNDS FOR REASONABLE SUSPICION HERE.

10          MR. NOLAN:  NOW, LET'S TALK ABOUT REASONABLE             03:04

11   SUSPICION AND WHAT THAT LEADS YOU TO, YOUR HONOR, BECAUSE YOU

12   KNOW THAT WE HAVE CITED AS THE LEADING CASES ON THIS BOTH THE

13   SOLIMAN CASE AND JOLLY, WHICH TALKS ABOUT REASONABLE

14   INVESTIGATION.

15          WE KNOW NOW, THROUGH THE PALMER DECLARATION, THAT        03:04

16   MATTEL HAD AVAILABLE TO IT AT THE TIME -- I'VE NOW PUT ON THE

17   SCREEN THE CHECKOUT FORM.  IT'S EXHIBIT NUMBER 29, PAGE 389.

18   IT'S THE RUSSELL DECLARATION, YOUR HONOR.

19          THE COURT:  YES.

20          MR. NOLAN:  THANK YOU.                                  03:04

21          MATTEL HAS AVAILABLE, AND THEY KNOW IT AT THE TIME,

22   ACCESS TO ALL OF CARTER'S PHONE RECORDS.  HAD THEY AT THAT TIME

23   TAKEN A REASONABLE INVESTIGATION TO DETERMINE IF HE WAS GOING

24   TO WORK AT A COMPETITOR, WHAT THEY WOULD HAVE LEARNED AT THAT

25   TIME IS THAT CARTER WAS MAKING PHONE CALLS IN SEPTEMBER OF 2000   03:05
```

```
 1   TO MGA.  THERE ARE, IN SEPTEMBER ALONE, AT LEAST 18 PHONE
 2   CALLS.  I'VE HIGHLIGHTED THEM HERE, AND FOR THE COURT'S
 3   BENEFIT -- I SHOULD KNOW IT; THEY CALL ME ALL OF THE TIME --
 4   THE TELEPHONE NUMBER AT MGA IS -- IT'S OUT IN SEPULVEDA --
 5   (818) 894-2525.  IF YOU LOOK AT THIS, THERE'S 18 PHONE CALLS.    03:05
 6   JILL NORDQUIST OR ANYBODY COULD HAVE WALKED OVER AND SAID, 'YOU
 7   KNOW WHAT, SOMEBODY IS LYING TO US.  WE DON'T WANT TO REHIRE
 8   THEM.  WE HAVE THE IN-HOUSE CAPABILITY OF KNOWING WHO HE'S BEEN
 9   CALLING.  LET'S JUST LOOK TO SEE.'  IT'S A PUBLISHED NUMBER.
10   THEY WOULD HAVE SEEN THAT HE WAS CALLING MGA.  THEY WOULD HAVE    03:05
11   ALSO LEARNED THAT THE OTHER NUMBER UP HERE FOR GRANADA HILLS IS
12   VERONICA MARLOW.  THEY COULD HAVE STARTED PIECING THINGS
13   TOGETHER.  THEY WOULD HAVE BEEN AT LEAST ON INQUIRY NOTICE THAT
14   IT'S SUSPICIOUS.
15        NOW, WITH THAT SUSPICION, I'M NOT SAYING THAT THEY          03:06
16   HAD TO RUN TO COURT IN OCTOBER.
17        THE COURT:  I WOULD CERTAINLY HOPE NOT.
18        MR. NOLAN:  OF COURSE NOT.
19        BUT NOW I NEED TO BUILD ON THIS KNOWLEDGE, YOUR
20   HONOR, BECAUSE THAT'S REALLY WHERE I THINK THIS REALLY --        03:06
21        THE COURT:  FAIR ENOUGH.
22        MR. NOLAN:  NOW, LET'S GO TO THE NEXT STEP IN THIS
23   CASE, WHICH IS THE TOY FAIR.
24        YOU KNOW THAT THERE ARE A SERIES OF TOY FAIRS WHERE
25   BRATZ IS FIRST SHOWN.  NOW, DESPITE MATTEL CLAIMING THAT THEY    03:06
```

```
1   REALLY HAVE EITHER NO INTEREST OR THEY'RE NOT AWARE OF BRATZ
2   AND IT'S NOT A CONCERN FOR THEM, THERE IS EVIDENCE THAT THEY GO
3   OUT AND THEY ACTUALLY FILM THE BRATZ DISPLAY.
4           AND HERE, I'D LIKE TO HAVE THE VIDEO THAT'S BEEN
5   PRODUCED RECENTLY, VERY RECENTLY; AND THIS IS OF THE TOKYO TOY    03:07
6   FAIR, WHICH IS IN FEBRUARY OF 2001.  THIS IS VERY SHORT, BRIEF;
7   THE CD IS WITH THE RECORD.  I'LL JUST SHOW IT, YOUR HONOR.  IT
8   TAKES A LITTLE WHILE.  IT'S A LITTLE BIT GRAINY.  I DON'T KNOW
9   WHETHER OR NOT THIS WAS DONE UNDERCOVER OR WHETHER OR NOT THE
10  CAMERA IS IN A PURSE.                                            03:07
11          THE COURT:  LET'S NOT SPECULATE, THEN.
12          MR. NOLAN:  NO, NO, NO.  WE DON'T NEED TO SPECULATE,
13  BUT I'M JUST SAYING THAT IT'S NOT CNN QUALITY.
14          THE COURT:  I APPRECIATE THAT.
15          (VIDEOTAPE PLAYS.)                                       03:07
16          MR. NOLAN:  THE FIRST PART IS NOT BRATZ.  THIS IS
17  JUST ANOTHER BOOTH OVER IN TOKYO.
18          NOW YOU GET TO BRATZ.
19          NOW, SUBSEQUENT TO THIS -- AND BY THE WAY, LET'S
20  FOCUS FOR JUST A MOMENT -- YOU HAVE THE DRAWINGS RIGHT THERE.    03:08
21  THEY'RE LOOKING AT BRATZ.  THEY'RE LOOKING AT THE DRAWINGS.
22  THEY KNOW THAT CARTER BRYANT IS AN ILLUSTRATOR.  THEY KNOW
23  THAT -- AND WE'RE GOING TO SHOW YOU HOW THE SUSPICION CONTINUES
24  TO GROW -- THEY KNOW THAT IN ORDER FOR THESE DOLLS, BY THEIR
25  VIEW, TO HAVE BEEN PERCOLATING ALONG, THEY WOULD HAVE HAD TO     03:08
```

1    START MANY MONTHS BEFORE THE TOY FAIRS, WHICH BRINGS IT BACK

2    INTO, CLEARLY, THE TIME THAT HE WAS EMPLOYED AT MATTEL.

3            **THE COURT:**  THE TOY FAIR, REFRESH MY RECOLLECTION,

4    WHEN IS THAT?

5            **MR. NOLAN:**  FEBRUARY OF 2001.                      03:08

6            **THE COURT:**  ALL RIGHT.

7            **MR. NOLAN:**  AND THEY'RE STARTING TO MONITOR AT THE

8    TOY FAIR.

9            **THE COURT:**  RIGHT.

10           **MR. NOLAN:**  NOW, WE ALSO NOTE, YOUR HONOR, FROM THE   03:08

11   DECLARATION THAT WAS SUBMITTED BY MATTEL -- AND THIS IS THE

12   MATEO ROMANO DECLARATION; HE WAS AN EMPLOYEE OF MATTEL LATIN

13   AMERICA.

14           **THE COURT:**  RIGHT.

15           **MR. NOLAN:**  HE IS THE GENTLEMAN THAT ADMITS IN HIS   03:09

16   DECLARATION UNDER OATH THAT IN JANUARY AND FEBRUARY OF 2001, HE

17   ATTENDED THE HONG KONG AND NEW YORK TOY FAIRS ON BEHALF OF

18   MATTEL LATIN AMERICA, THAT HE MET WITH ISAAC LARIAN AND OTHERS,

19   AND THAT HE WAS SHOWN SEVERAL OF THE PRODUCTS FOR POTENTIAL

20   DISTRIBUTION IN LATIN AMERICA.                               03:09

21           WE APPROACHED MATTEL TO SEE WHETHER OR NOT THEY

22   WANTED TO DISTRIBUTE BRATZ.  I MEAN, WHEN YOU THINK ABOUT THE

23   CONCEALMENT HERE THAT THEY'RE ALLEGING NOW, WE ACTUALLY SUGGEST

24   TO MATTEL, 'WOULD YOU BE OUR DISTRIBUTOR?'

25           HE TAKES INFORMATION FROM US, AND IN HIS              03:09

```
 1    DECLARATION -- AGAIN, YOUR HONOR, I'M READING IT -- HE SAYS, "I
 2    SUBSEQUENTLY SUBMITTED A LIST TO MATTEL OF POTENTIAL ITEMS FOR
 3    MATTEL'S LATIN AMERICAN SUBSIDIARIES," AND HE SAYS THAT HE
 4    HONORS THE CONFIDENTIALITY REQUIREMENT OF ISAAC LARIAN BECAUSE
 5    HE DOESN'T SEND BACK TO MATTEL ANYTHING BUT PRODUCT LINE            03:09
 6    NUMBERS AND THINGS LIKE THAT; AND THAT'S AT THE SECOND PAGE OF
 7    HIS DECLARATION.
 8            THE COURT:  THERE WAS NOTHING IN THAT DECLARATION
 9    WHICH SUGGESTED THAT HE HAD INFORMATION THAT CARTER BRYANT WAS
10    INVOLVED IN THIS.                                                   03:10
11            MR. NOLAN:  HE DIDN'T.  THAT'S CORRECT, YOUR HONOR.
12            THE COURT:  RIGHT.
13            MR. NOLAN:  HE SAID, "I DID NOT SHOW OR PROVIDE
14    PICTURES, PROTOTYPES, OR SAMPLES OF THE BRATZ DOLLS TO ANYONE
15    AT MATTEL, INC."                                                    03:10
16            MY ONLY POINT ON THAT, YOUR HONOR, IS THAT THIS
17    GENTLEMAN WORKING FOR MATTEL RECOGNIZES THAT THERE'S A
18    CONFIDENTIAL NATURE ABOUT THAT INFORMATION THAT HE'S BEEN
19    PROVIDED.  YET I'VE JUST NOW SHOWN YOU VIDEOS THAT SOMEBODY
20    ELSE WITHIN MATTEL IS TAKING OF BRATZ AND THEIR INTEREST IN         03:10
21    BRATZ AND TRYING TO FIGURE OUT WHAT'S THE SOURCE OF BRATZ.
22            THEY'RE STILL ON REASONABLE SUSPICION.  THERE'S
23    SOMETHING GOING ON HERE.  WE'RE GOING TO PERCOLATE ALONG HERE.
24    I WANT TO MAKE CERTAIN THAT I SHOW YOU THE PICTURES THAT COME
25    OUT OF THE TOY FAIR.  WHEN ROMANO SAYS IN HIS DECLARATION HE        03:10
```

1   WASN'T SENDING ANYTHING BACK, CERTAINLY THEY WERE GETTING

2   PICTURES, BECAUSE HERE, AS PART OF THE EXHIBITS THAT WE

3   SUBMITTED, IS AN E-MAIL; AND HERE IS AN ACTUAL SHOT.  AND THIS,

4   AGAIN, YOUR HONOR, IS IN THE FEBRUARY/MARCH OF 2001 TIME PERIOD

5   THAT IT'S BRATZ THAT THEY'RE FOCUSED ON; AND THEY'RE SENDING IT          03:11

6   BACK TO MATTEL.

7            QUERY:  WHY?

8            WE'RE GOING TO HAVE TO CONTINUE TO SPECULATE FOR JUST

9   A MOMENT.

10           BUT NOW LET'S GET TO JUNE 2001.  NOW I'M IN JUNE OF            03:11

11  2001.  WHAT'S HAPPENING IN JUNE OF 2001?  BRATZ HAS HIT THE

12  MARKET IN SPAIN.

13           IS CARTER BRYANT CONNECTED TO BRATZ?  AND WHEN DOES

14  THAT HAPPEN?

15           THEY WANT YOU TO BELIEVE, FROM THEIR OWN PAPERS, THAT          03:11

16  IT'S NOT SO MUCH LATER.

17           LET ME PLAY YOU THE TESTIMONY AGAIN OF

18  JILL NORDQUIST, AND THEN I'LL GO RIGHT ON TO ELISE CLOONAN,

19  BOTH OF WHOM WORKED IN THE BARBIE MAINLINE WHERE THEY WERE

20  HEARING RUMORS THAT CARTER BRYANT WAS INVOLVED WITH BRATZ.             03:11

21           FIRST START WITH JILL NORDQUIST, PLEASE.

22           (VIDEOTAPED DEPOSITION PLAYS.)

23           **MR. NOLAN:**  NOW ELISE CLOONAN.

24           (VIDEOTAPED DEPOSITION PLAYS.)

25           **MR. NOLAN:**  SO NOW WE'RE IN THE SUMMER OF 2001.  YOU       03:14

```
 1   HAVE -- THAT LAST TAG LINE IS POWERFUL, OF VP CASSIDY PARK.  WE

 2   NEED TO REMEMBER THAT NAME.  SHE KNEW AS WELL.  IT WAS WIDELY

 3   KNOWN THAT CARTER WAS CONNECTED TO BRATZ.

 4          BUT HERE'S THE OTHER POINT, YOUR HONOR:  WHEN I WAS

 5   TALKING ABOUT THE TOY FAIR SHOWS, WHAT I FORGOT TO MENTION,      03:14

 6   WHICH IS CRITICAL, IS THAT THERE WERE TRADE PRESS ARTICLES

 7   COMING OUT.  THEY CITED TO MY DECLARATION IN SUPPORT OF THE

 8   SUMMARY JUDGMENT, NOTING BRATZ.  THE FIRST ONE, I BELIEVE, YOUR

 9   HONOR, IS -- ONE OF BRATZ'S DRAWINGS THAT WERE EXHIBITED AT THE

10   NEW YORK TOY FAIR WAS PUBLISHED IN DSN RETAILING, WHICH IS A     03:15

11   TOY TRADE JOURNAL, ON MARCH 5, 2001; THAT'S EXHIBIT 113 TO MY

12   DECLARATION.

13          MOREOVER, YOUR HONOR, THERE WERE -- AND WE'VE CITED

14   THIS IN OUR PAPERS, THAT THE BUSINESS WIRE ARTICLE -- THIS IS

15   EXHIBIT NUMBER 47 TO RUSSELL'S DECLARATION -- IT WAS A BUSINESS  03:15

16   WIRE ARTICLE, FEBRUARY 8, 2001, IDENTIFYING LARIAN AS CONNECTED

17   WITH BRATZ.

18          WE HAVE PUBLICATIONS AT THIS POINT IN TIME WHERE IT'S

19   BEING DESCRIBED AS A KNOCKOFF OF DIVA STARZ.  THAT CITATION,

20   YOUR HONOR, LET ME GO ON TO THAT.  THE ALLEGED SIMILARITIES      03:16

21   WERE APPARENT TO MATTEL EXECUTIVES AS SOON AS THEY SAW THE

22   BRATZ.  THAT IS UNDISPUTED.

23          LET'S GO TO THE RUSSELL DECLARATION, EXHIBIT 8.  AND

24   THIS IS FONTANELLA.  WE WON'T PLAY FONTANELLA.  BUT THIS IS AT

25   PAGE 93 THROUGH 13, 94 THROUGH 22.  THIS IS HER QUOTE:  "I       03:16
```

```
 1   REMEMBER MY REACTION WAS 'THIS LOOKS JUST LIKE DIVA STARZ'."

 2          SO, AGAIN, PROPRIETARY -- WELL, DIVA STARZ WAS OUT IN

 3   THE PUBLIC.

 4          THE COURT:  AS COUNSEL POINTED OUT, THAT'S NOT THE

 5   BASIS FOR THE COMPLAINT IN APRIL OF 2004.  IT'S WHETHER OR NOT    03:16

 6   CARTER BRYANT HAD DEVELOPED BRATZ.

 7          MR. NOLAN:  ACTUALLY, YOUR HONOR, WHEN I SHOWED YOU

 8   THE SUPPLEMENTAL RESPONSE TO THE INTERROGATORY, THAT'S NOT

 9   TRUE.

10          WHAT THEY CLAIM IS THAT CARTER HAD ACCESS TO VARIOUS       03:16

11   PRODUCTS OF MATTEL, INCLUDING ACCESS TO DIVA STARZ.  AND WE'RE

12   GOING TO SEE HERE IN JUST A MINUTE TOON TEENS.  IN OTHER WORDS,

13   WHEN WE CITED IN OUR PAPERS, YOUR HONOR, THE WOOD DECISION,

14   WHICH IS THE CASE WHERE THE COURT SAID THAT, 'LISTEN, IF YOU

15   HAVE REASONABLE SUSPICION TO BELIEVE THAT SOME OF YOUR           03:17

16   PROPRIETARY INFORMATION IS BEING COMPROMISED, THAT PUTS YOU ON

17   NOTICE, REASONABLE INQUIRY, TO DO AN INVESTIGATION.'

18          NOW, ALL I'M SAYING, YOUR HONOR, IS, KEEP IT BUILDING

19   AND KEEP IT ROLLING.  WHAT DO THEY KNOW?  WHEN DO THEY KNOW IT?

20   WHAT DID THEY DO WITH IT?  AND THAT'S THE POINT OF THESE         03:17

21   PUBLICATIONS.  THE FACT NOW THAT THEY ALL KNOW IN THE SUMMER OF

22   2001 -- IT IS UNDISPUTABLE -- IN THE SUMMER OF 2001, WIDESPREAD

23   RUMOR, INCLUDING UP TO A VP IN DESIGN, THAT CARTER IS BEHIND

24   BRATZ.  YOU HAVE NEWSPAPER COVERAGE, TRADE JOURNALS, SAYING

25   THAT BRATZ RESEMBLES MATTEL PRODUCT.  YOU HAVE MATTEL KNOWING    03:17
```

1  THE LAUNCH DATE OF BRATZ IN JANUARY, BECAUSE THEY'RE AT THE TOY

2  SHOW AND THEY'RE THROWING THE VIDEOS BACK.  THEY KNOW IN THEIR

3  HEAD THAT BECAUSE IT TAKES SO LONG, 'X' MONTHS, TO PRODUCE

4  BRATZ -- THAT PUTS IT SQUARELY IN THE POSITION OF KNOWING THAT

5  CARTER BRYANT WAS EMPLOYED AT MATTEL WHEN BRATZ CAME OUT.  03:18

6       DOES IT GIVE THEM PERFECT KNOWLEDGE?

7       NO.  I'M NOT SAYING THAT, YOUR HONOR.  BUT IT GIVES

8  YOU, UNDER SOLIMAN AND JOLLY, ENOUGH TO ACT; AND THAT'S WHEN

9  THEY COULD HAVE TAKEN STEPS.  WE TALKED ABOUT IT IN TERMS OF

10  LATCHES AND EVERYTHING ELSE.  THEY COULD HAVE MADE SOME  03:18

11  INQUIRIES.

12       WHAT DID THEY DO?  THEY DO CONDUCT AN INVESTIGATION.

13  WE KNOW THAT.  WE'RE GOING TO GET TO THAT IN JUST A MOMENT.

14  BUT I WANT TO MAKE ABSOLUTELY CLEAR, BEFORE I LEAVE THE SUMMER

15  OF 2001, THAT THEY ARE WELL AWARE THAT A FORMER EMPLOYEE WHO  03:18

16  THEY DIDN'T BELIEVE WHEN THEY WERE LEAVING, WHO THEY KNEW HAD

17  LIED, WHO THEY HAD ACCESS TO HIS TELEPHONE RECORDS AND HAD GONE

18  TO A COMPETITOR, AND THAT COMPETITOR WAS LAUNCHING A DOLL

19  THAT'S ALLEGED TO HAVE BEEN SIMILAR TO DIVA STARZ, THE BELLS

20  ARE STARTING TO GO OFF AT MATTEL.  03:19

21       **THE COURT:**  SO THEY START THEIR INVESTIGATION.

22       **MR. NOLAN:**  NO, NOT YET.

23       AT LEAST WE DON'T THINK SO.

24       THEY DON'T START THEIR INVESTIGATION, NOW, UNTIL

25  MARCH -- LET ME MOVE ON.  LET ME MOVE VERY QUICKLY NOW TO  03:19

1    FEBRUARY OF 2002.

2             IT'S BEEN IN THE MARKETPLACE FOR A PERIOD OF TIME;

3    AND, AGAIN, I GO BACK -- YOU CAN LOOK IN THE PAPERS; YOUR STAFF

4    CAN LOOK IN THE PAPERS.  THERE'S A NUMBER OF TIMES THAT MATTEL

5    HAS TOLD YOU THAT THEY DIDN'T KNOW ABOUT CARTER BRYANT.          03:19

6             THE EVIDENCE IS THAT THEY WERE MONITORING OUR

7    WEBSITE, OUR FAN WEBSITE.  AND ON THE WEBSITE, A VENDOR

8    DISCLOSES, FOR THE FIRST TIME PUBLICLY, THAT CARTER BRYANT WAS

9    BEHIND BRATZ.

10            NOW, THAT COMES OUT IN FEBRUARY.                         03:20

11            DO YOU HAVE THAT, AARON?  DO YOU HAVE THE WEB SITE?

12            THANK YOU.

13            THIS IS AN E-MAIL, YOUR HONOR.  THIS IS EXHIBIT 95.

14   AND THIS IS ACTUALLY A DOWNLOAD FROM A LETTER THAT'S POSTED ON

15   A FAN SITE.  AND THIS GENTLEMAN IS REFERRING TO IT, AND HE       03:20

16   SAYS, "HI, CHRISTIAN," AND HE'S GIVING YOU ALL THE BACKGROUND

17   AND SAYS, "HOWEVER, I CAN'T TAKE CREDIT FOR CREATING THE BRATZ

18   DOLLS, OR EVEN THE FIRST BRATZ ILLUSTRATIONS, FOR THAT HONOR

19   WOULD GO TO A FELLOW NAMED CARTER BRYANT."

20            NOW, HOW DO WE KNOW THAT MATTEL IS AWARE OF THIS?        03:20

21            YOUR HONOR, WE KNOW THAT BECAUSE THIS IS IN FEBRUARY.

22   THEY ARE MONITORING.  THIS IS THE SAME FAN SITE THAT CAUSES

23   THEM, IN FEBRUARY 2002, TO SEND A CEASE AND DESIST LETTER TO

24   MGA AND ISAAC LARIAN ABOUT MAKING NO REFERENCE TO DIVA STARZ.

25            NOW WE'RE IN FEBRUARY OF 2002.  THIS IS SIGNIFICANT      03:21

1   ENOUGH THAT THEY NOW WRITE A LETTER TO ISAAC LARIAN.  THEY HAVE

2   HIS ADDRESS.  THEY KNOW HE'S AFFILIATED WITH MGA ENTERTAINMENT.

3   TRADEMARK INFRINGEMENT.  AND THEY TALK ABOUT DIVA STARZ

4   TRADEMARKS ON THE WEBSITE IN CONNECTION WITH BRATZ.

5           NOW, WE WOULD SUBMIT, YOUR HONOR, AT THIS POINT IN          03:21

6   TIME, THEY ARE ALSO ON NOTICE, BECAUSE ON THE FAN SITE, IT'S

7   BEEN DISCLOSED THAT IT'S CARTER BRYANT.

8           WHAT HAPPENS AFTER THIS LETTER IS VERY INTERESTING,

9   BECAUSE YOU'LL SEE A LOT OF ALLEGED CONCEALMENT GOING ON WITHIN

10  MGA.  THEY SAY THERE WERE EFFORTS TO CONCEAL THE TRUE NATURE OF    03:21

11  BRATZ AND CARTER BRYANT.  ACTUALLY, YOUR HONOR, ALL OF THOSE

12  STEPS ARE TAKEN IN RESPONSE BY ISAAC LARIAN RECEIVING THIS

13  THREATENING LETTER FROM, AS JASON RUSSELL SAYS, THE TOY

14  INFRINGER PLAINTIFF.  HE KNOWS HE'S GOT A TARGET ON HIS BACK.

15  HE'S TELLING EVERYBODY, 'I DON'T WANT TO BE SUED BY MATTEL.        03:22

16  PLEASE TAKE THIS DOWN.  WE DIDN'T STEAL THIS FROM MATTEL.  WE

17  MADE IT."

18          SO WHAT HAPPENS NEXT IS MOST INTERESTING, AND MOST

19  TROUBLING AT THE SAME TIME.  LET'S NOW GO TO MARCH OF 2002.

20  AND I THINK YOU SAW THIS IN CONNECTION WITH THE TERMINATION       03:22

21  SANCTIONS MOTION, AND THAT IS THE INVESTIGATIVE FILE.

22          NOW, YOUR HONOR, JUST SO THAT WE KNOW, THIS IS AN

23  INVESTIGATIVE FILE, MARCH OF 2002.  AND REMEMBER, THEY'VE TAKEN

24  THIS POSITION THAT THEY'RE NOT ON NOTICE OR ANYTHING UNTIL MUCH

25  LATER.  BUT LET'S LOOK AT THIS -- LET'S GO TO THE OPENING PAGE.    03:23

```
 1   THIS IS DONE BY -- I KNOW YOU'RE A FORMER ASSISTANT U.S.

 2   ATTORNEY.  I AM AS WELL.  THIS IS TYPICAL.  MR. DE ANDA AND

 3   MR. SIMONEAU ARE BOTH FORMER LA PD'S, SO THEY WRITE IT UP.

 4   IT'S KIND OF A POLICE REPORT; WHAT WE WOULD HAVE SEEN, OR A

 5   CASE AGENT REPORT THAT WOULD HAVE BEEN SENT TO US.  CATEGORY:      03:23

 6   THEFT.  SUBCATEGORY:  PROPRIETARY INFORMATION.  CURRENT DATE:

 7   MARCH 15, 2002.  REPORT IS TAKEN BY BOB SIMONEAU.  INCIDENT

 8   NARRATIVE:  INFORMATION RECEIVED FROM DESIGN CENTER STAFF,

 9   EVELYN VIOLA AND IVY ROSS, THAT MGA ENTERTAINMENT, HEADED BY A

10   PERSON KNOWN AS ISAAC LARIAN, HAS RECENTLY HIRED A NUMBER OF     03:23

11   FORMER MATTEL EMPLOYEES AND IS MANUFACTURING PRODUCTS THAT

12   APPEAR TO BE MATTEL DESIGNS.

13          NOW, THAT IS SUFFICIENT TO HAVE THEM OPEN UP AND

14   LAUNCH AN INVESTIGATION.  AND WHAT'S INTERESTING ABOUT THIS,

15   YOUR HONOR, IS THAT, IF YOU LOOK AT THE LOG SHEET -- LET'S GO    03:23

16   TO THE LOG PAGE FOR JUST A MOMENT -- WHAT HAPPENS IS THAT

17   MR. SIMONEAU CONDUCTS AN INTERVIEW ON MARCH 28TH OF 2002.  THIS

18   IS EXHIBIT NUMBER 29, AND I THINK IT'S PAGE 444.  THESE ARE THE

19   HANDWRITTEN LOGS, CHRONOLOGICAL RECORDS; AND YOU'LL SEE THE

20   FIRST ONE IS 3-15-02:  RECEIVED CASE INFORMATION.  AND THEN     03:24

21   MARCH 28TH, THE ENTRY HERE IS FASCINATING:  MET WITH

22   CASSIDY PARK.

23          CASSIDY PARK IS THE VP THAT WE JUST HEARD MENTIONED

24   THAT KNOWS ABOUT THIS IN THE SUMMER OF 2001.  CASSIDY PARK.  HE

25   MEETS WITH CASSIDY PARK TO GET MORE INFORMATION ON AN MGA       03:24
```

1    ISSUE.

2          WE DON'T KNOW WHAT THE ISSUE IS, ALTHOUGH IT'S THEFT

3    AND PROPRIETARY INFORMATION, SIMILAR TO WHAT THEY'RE SAYING IN

4    THEIR INTERROGATORY; THAT WE HAD ACCESS TO PROPRIETARY

5    INFORMATION, PRODUCTS, RESOURCES, THAT TYPE THING.                03:25

6          AND THEN HE GOES ON:  SHE SUGGESTS CARTER BRYANT AS

7    ILLUSTRATOR/FORMER EMPLOYEE WHO MAY HAVE PLAGIARIZED DESIGNS OF

8    LILY MARTINEZ AND CREATED BRATZ DOLLS FOR MGA.

9          SO THEY HAVE CASSIDY PARK, WHO'S A VICE PRESIDENT IN

10   2002, TELLING THEM, 'CARTER BRYANT CREATED BRATZ, AND YOU         03:25

11   SHOULD INVESTIGATE HIM FOR PLAGIARIZING MATTEL'S DESIGNS.'

12         NOW, THEN WHAT THEY DO NEXT IS, THEY GO AND THEY

13   CHECK SCHOENBORN FOR LEADS.  NEGATIVE.

14         AND WE TOOK THE DEPOSITION OF MR. SIMONEAU.  WHAT

15   THAT MEANS, YOUR HONOR, IS THAT ON THOSE DATES, BASED ON THAT     03:25

16   INFORMATION, THEY START SURVEILLING MGA, GOING TO THE PHYSICAL

17   PLANT, I THINK, PRESUMABLY TO SEE IF CARTER BRYANT IS THERE.

18   BECAUSE RIGHT ABOVE THAT, THEY'VE ASKED, AT 3:00 IN THE

19   AFTERNOON:  "CHECKED WITH HR FOR BRYANT'S FILE.  TERMINATION

20   DATE IS OCTOBER 20TH."                                           03:26

21         SO THEY KNOW IMMEDIATELY TO GET THE INTERNAL FILES OF

22   CARTER BRYANT AND GET THEM HERE.

23         NOW, AGAIN, YOUR HONOR, THIS INFORMATION IS ALL

24   BUILDING CARTER TO BRATZ.  AND I STARTED OFF WITH THIS ARGUMENT

25   BECAUSE IT'S VERY CRITICAL:  HOW LONG DOES IT TAKE TO BRING A     03:26

```
 1   DOLL TO THE MARKET?  MATTEL'S VIEW IS THAT IT WAS MONTHS

 2   BEFORE.  THEY CLEARLY KNOW THAT HE WAS WORKING AT MATTEL.  THE

 3   ALLEGATIONS ARE THAT HE HAD ACCESS TO PROPRIETARY INFORMATION

 4   AND THAT HE USED IT.

 5        NOW, THEY'RE GOING TO GET AROUND THIS, YOUR HONOR, BY     03:26

 6   MAKING A BOLD STATEMENT TO YOU, AND TO US; AND THAT IS, 'JUDGE,

 7   ALL WE INVESTIGATED HERE WAS DIVA STARZ AND TOON TEENS, AND WE

 8   CONCLUDED THAT THERE WAS NO COPYRIGHT INFRINGEMENT.'

 9        BUT THAT MISSES THE MARK, BECAUSE WHAT THEY WERE ON

10   NOTICE OF IS THAT EVEN THE PUBLIC, THE PRESS, WERE COMMENTING   03:27

11   ABOUT ALLEGED SIMILARITIES WITH DIVA STARZ.  THEY KNOW,

12   INTERNALLY, ENOUGH, FROM THEIR VICE PRESIDENT, THAT TOON TEENS,

13   A PRODUCT THAT IS COMPLETELY PROPRIETARY, NEVER SOLD IN THE

14   MARKETPLACE, IS ALLEGED TO HAVE BEEN THE INFLUENCE OR THE

15   SOURCE OF SOME OF CARTER'S DRAWINGS.  THAT IS A VIOLATION OF    03:27

16   THEIR INVENTIONS AGREEMENT, AS THEY CONTEND.  THAT'S WHY I

17   ASKED YOU TO REMEMBER HOW THEY WERE DESCRIBING HIS ACCESS TO

18   INFORMATION.  NOW WE HAVE AN INVESTIGATION.

19        AARON, IF YOU COULD DO JUST THESE NEXT PAGES.

20        YOU SEE WHERE IT SAYS "REDACTED."  EVERY PAGE             03:27

21   THEREAFTER:  REDACTED, REDACTED, REDACTED, REDACTED, REDACTED,

22   REDACTED -- KEEP GOING.  ALL OF THIS IS NOT AVAILABLE TO US,

23   BUT YET --

24        THE COURT:  COUNSEL, YOUR TIMELINE THAT YOU'RE LAYING

25   OUT HERE, IN GOOD DETAIL, IS VERY CONSISTENT WITH THE          03:28
```

1    CHRONOLOGY THAT I'VE WRITTEN UP, GOING THROUGH THEIR BRIEFS.

2         **MR. NOLAN:**  RIGHT.

3         **THE COURT:**  THEY'RE PLACED ON NOTICE.  THEY HAVE

4    REASONABLE SUSPICION.  THEY ENGAGE COUNSEL.  THEY LAUNCH AN

5    INVESTIGATION.  WE'RE NOW INTO THE SUMMER OF 2002.                03:28

6         LESS THAN TWO YEARS LATER, THEY FILED THEIR LAWSUIT.

7         **MR. NOLAN:**  SUMMER OF 2002, THEY FILED THE LAWSUIT

8    AGAINST CARTER BRYANT.  I'M MAKING A MOTION WITH RESPECT TO

9    MGA.

10        **THE COURT:**  I UNDERSTAND.  AND THAT GOES BACK TO THIS    03:28

11   WHOLE RELATION BACK PERIOD --

12        **MR. NOLAN:**  BUT I THINK AT THE TIME YOU MADE THE

13   RULING, I DON'T THINK A LOT OF THIS DISCOVERY WAS AVAILABLE TO

14   US.  AND I ALSO THINK, YOUR HONOR, WHAT'S ABSOLUTELY CRITICAL

15   HERE IS, YOU KNOW, WE'VE CITED CASES TO YOU THAT IT IS UNFAIR   03:29

16   -- IF A PARTY IS USING THE ATTORNEY-CLIENT PRIVILEGE BOTH AS A

17   SHIELD AND AS A SWORD; THAT'S NOT FAIR.

18        THEY'RE ASKING YOU TO ACCEPT, AT FACE VALUE, THAT THE

19   ONLY THING THAT THEY INVESTIGATED WAS DIVA STARZ AND

20   TOON TEENS.  MY POINT IS THAT -- AND THIS MATTER IS BEFORE      03:29

21   JUDGE INFANTE; WE ARGUED IT TEN DAYS AGO; WE HAVE A 56(F)

22   MOTION IN FRONT OF YOU FOR THE SAME INFORMATION, YOUR HONOR; I

23   THINK THIS IS GOING TO BE VERY TELLING -- THEY HAD REASONABLE

24   SUSPICION TO START DRAWING ALL OF THE DOTS TOGETHER AND

25   CONCLUDE THAT CARTER BRYANT VIOLATED HIS INVENTIONS AGREEMENT;  03:29

1    THAT HE DREW BRATZ, CREATED BRATZ, WHILE AT MATTEL.

2          NOW, YOU MIGHT SAY, 'OKAY.  WELL, THEY DIDN'T FIND

3    IT.  THEY HAD GOOD COUNSEL.'

4          WELL, YOUR HONOR, I DON'T KNOW WHAT HAPPENED.  I

5    MEAN, I KNOW THAT MIKE ZELLER WAS ASSIGNED TO IT, AND I KNOW          03:30

6    THAT MR. ZELLER IS A VERY GOOD LAWYER; BUT LOOK AT WHAT HE

7    MISSED.  ALL HE NEEDED TO DO WAS TO TAKE THE ALLEGATIONS THAT

8    MR. SIMONEAU HAD ABOUT THE THEFT OF PROPRIETARY INFORMATION; HE

9    COULD HAVE RUN TELEPHONE RECORDS EVEN AT THAT POINT IN TIME; HE

10   COULD HAVE DETERMINED THAT IT WAS COMMON KNOWLEDGE THAT             03:30

11   CARTER BRYANT WAS BEHIND BRATZ.  HE COULD HAVE SEEN, AND MUST

12   HAVE SEEN, TOON TEENS, BECAUSE THE 30(B)(6) WITNESS WE TOOK

13   REPORTED THAT APPARENTLY MR. ZELLER OPINED THAT THEY DIDN'T

14   HAVE A COPYRIGHT ACTION AGAINST TOON TEENS.  BUT THAT MISSES

15   THE WHOLE POINT OF THEIR ARGUMENT AND THE THRUST OF THEIR CASE      03:30

16   HERE; AND THAT IS THAT CARTER VIOLATED HIS EMPLOYMENT AGREEMENT

17   BECAUSE HE HAD ACCESS TO PROPRIETARY INFORMATION.

18          IT'S A LITTLE BIT LIKE THE WOOD CASE.

19          **THE COURT:**  VERY GOOD.

20          SO MAYBE I SHOULD PRESS YOU TO GO AHEAD TO YOUR             03:30

21   RELATION BACK ARGUMENT, BECAUSE AS I INDICATE, WITHIN TWO YEARS

22   OF THIS, THE LAWSUIT IS FILED.  AND THE SHORTEST STATUTE OF

23   LIMITATIONS THAT WE'RE TALKING ABOUT HERE IS A TWO-YEAR

24   STATUTE; CORRECT?

25          **MR. NOLAN:**  WELL, ON SOME OF THE CLAIMS.  YOU'RE        03:31

1  RIGHT, THERE ARE CLAIMS THERE FOR TWO YEARS.

2          **THE COURT:**  SOME ARE THREE.

3          **MR. NOLAN:**  BUT, YOUR HONOR, I WOULD SAY THAT THEY

4  WERE ON INQUIRY NOTICE IN 2001, SUMMER OF 2001.

5          **THE COURT:**  THEY DON'T START THEIR INVESTIGATION --          03:31

6  CERTAINLY --

7          **MR. NOLAN:**  THEN WHY DO WE NEED TO --

8          **THE COURT:** -- EXPECT A COMPANY TO HAVE -- TO DO THEIR

9  INVESTIGATION --

10          **MR. NOLAN:**  YOUR HONOR, WITH ALL DUE RESPECT, WHY DO          03:31

11  WE GIVE SUCH CREDIT?  WHY DO WE GIVE SUCH DISCRETION TO MATTEL

12  TO ACCEPT THE DATE THAT THEY STARTED THE INVESTIGATION?

13          THEY HAVE ESTABLISHED, IN THIS CASE, A FILE, A CODE

14  NAME; THEY ASSIGNED A CODE NAME TO THE FILE.  THAT'S ALSO GOING

15  TO BE BROUGHT TO YOU.  I THINK THERE'S AN APPEAL FROM          03:31

16  JUDGE INFANTE.  THEY CODE IT A SPECIAL WAY.  IT'S CUTE.  THEY

17  DO THE ACRONYM OF -- THEY ADDED A LETTER, MGA; SO IT COMES OUT

18  TO N-H-B; IT'S THE 'NHB' FILE.

19          **THE COURT:**  KIND OF LIKE THE --

20          **MR. NOLAN:**  YEAH, A LITTLE BIT LIKE THAT.  I MEAN,          03:32

21  IT'S PRETTY EASY TO BREAK THE CODE.

22          BUT THEY HAVE ENOUGH TO DO THIS.

23          **THE COURT:**  THIS ISN'T THE NAVAJO CODE YOU'RE TALKING

24  ABOUT THERE.

25          (LAUGHTER.)

1      **MR. NOLAN:**  NO.  NO.  NO.  APPARENTLY NOT.

2          BUT, YOUR HONOR, MY POINT IS, WHAT <u>JOLLY</u> AND <u>SOLIMAN</u>

3  TELL YOU IS TO START DOING A REASONABLE INVESTIGATION.  HAD

4  THEY DONE A REASONABLE INVESTIGATION WHEN THE DESIGN CENTER

5  KNEW THAT CARTER WAS BEHIND BRATZ, THEY WOULD HAVE KNOWN THAT        03:32

6  BRATZ WAS DONE AND CREATED WHILE HE WAS AN EMPLOYEE OF MATTEL.

7  IT'S THAT SIMPLE.  IT IS THAT SIMPLE, YOUR HONOR.  AND THEY

8  WANT TO IGNORE IT BY SAYING, 'WE DIDN'T OPEN UP A FORMAL

9  INVESTIGATION UNTIL MARCH OF 2002.'

10         BUT, YOUR HONOR, THAT'S THEIR OWN CHOOSING.  THE FACT        03:32

11 THEY CHOSE TO WAIT THAT LONG WAS REALLY A MARKET RESPONSE TO,

12 FRANKLY, WHAT WAS GOING ON IN THE MARKETPLACE.

13     **THE COURT:**  SHOULDN'T THE COURT ASSUME, THOUGH, THAT

14 THEY WOULD OPEN UP THEIR INVESTIGATION?  WOULDN'T THEY HAVE

15 EVERY INTEREST -- THIS IS AN INTERNAL INVESTIGATION -- WOULDN'T     03:33

16 THEY HAVE EVERY INTEREST TO START THEIR INVESTIGATION AS SOON

17 AS THEY REASONABLY BELIEVED THAT THERE WAS A PROBLEM?

18         **MR. NOLAN:**  BUT, YOUR HONOR --

19     **THE COURT:**  WHAT WOULD THEIR INTEREST BE IN DELAYING

20 THEIR OWN INTERNAL INVESTIGATION?                                    03:33

21         I UNDERSTAND YOUR ALLEGATIONS CONCERNING MARKET

22 REASONS, WHY THEY MIGHT WANT TO DELAY ACTUALLY BRINGING THE

23 LAWSUIT, TO SEE IF BRATZ IS ACTUALLY A SUCCESS AND WHETHER THIS

24 LAWSUIT IS WORTH IT.  BUT IN TERMS OF THE ACTUAL INVESTIGATION

25 ITSELF --                                                            03:33

```
 1          MR. NOLAN:  WELL, YOUR HONOR, MAYBE AT THE END OF

 2   THIS, IT'S -- I DON'T KNOW IF I HAVE TO HAVE AN ANSWER, NOR DO

 3   I THINK YOU DO, FOR PURPOSES OF THE ANALYSIS UNDER SOLIMAN AND

 4   JOLLY.  I DON'T UNDERSTAND WHY THEY DIDN'T START THE

 5   INVESTIGATION EARLIER.  THE VICE PRESIDENT KNOWS.  THE VICE        03:33

 6   PRESIDENT KNOWS THAT HE TOOK THE DESIGNS.

 7          BUT I WILL GIVE YOU ONE ANSWER THAT I BELIEVE IS THE

 8   RIGHT ANSWER; AND THAT IS, BECAUSE CASSIDY PARK, VICE

 9   PRESIDENT, KNEW THAT CARTER WORKED AT MATTEL; DID NOT PREVENT

10   HIM FROM HAVING THIS SUCCESS.  IT'S NOT COVERED BY THE           03:34

11   CONFIDENTIAL EMPLOYEE INVENTIONS AGREEMENT.

12          THERE'S THAT POSSIBILITY, YOUR HONOR, THAT THEY TOOK

13   THAT KIND OF INTERPRETATION OF THEIR AGREEMENT AT THAT TIME,

14   BEFORE THE HOUSE WAS ON FIRE, THE BRAND WAS IN CRISIS.  THEY

15   WERE LOSING AFTERBITS IN EVERY SCORE.  AND TO PROVE THAT POINT,  03:34

16   YOUR HONOR, LET ME JUST CONTINUE, AND I'LL GET OUT OF THIS

17   TIMELINE.  I'VE GOT ONE MORE THING I WANT TO HIT WITH YOU, IF

18   YOU DON'T MIND; AND THAT IS SOMETHING THAT YOU FOCUSED ON IN

19   THE TERMINATION SANCTIONS MOTION, AND RIGHTFULLY SO, AND THAT

20   WAS THE ANONYMOUS LETTER.                                        03:34

21          IF I COULD HAVE THE ANONYMOUS LETTER UP FOR JUST A

22   MOMENT.

23          THIS IS IN AUGUST OF 2002.

24          NOW, REMEMBER, WHAT I'VE BUILT -- WHICH I DON'T

25   BELIEVE WAS BUILT FOR YOU IN THE TERMINATION SANCTIONS, BECAUSE  03:35
```

1  WE JUST DIDN'T HAVE ALL OF THE EVIDENCE, YOUR HONOR, AT THAT

2  TIME BECAUSE OF DISCOVERY.  HERE YOU HAVE AN ANONYMOUS LETTER

3  TO ECKERT, CEO OF MATTEL -- THIS IS ECKERT'S HANDWRITING; IT'S

4  BEEN CONFIRMED IN HIS DEPOSITION -- TO ALAN KAYE:  "WORTH

5  HAVING RICHARD EXPLORE?"  AND THAT'S RICHARD DE ANDA.          03:35

6  RICHARD DE ANDA IS THE ONE IN MARCH THAT HAD OPENED UP THE

7  FILE.  AND THEN YOU HAVE ALAN KAYE'S NOTE, "RICHARD, I GUESS

8  START WITH IVY TO SEE IF THIS MAKES ANY SENSE."

9          OF COURSE IT MAKES SENSE, BECAUSE THEY'VE KNOWN ABOUT

10  THIS FOR SOME TIME.  BUT LOOK HOW SPECIFIC THIS INFORMATION IS  03:35

11  AT THIS POINT IN TIME.

12          YOU GO TO THE NEXT E-MAIL, THOUGH, FROM

13  MR. DE ANDA -- AND THIS IS VERY TELLING HERE, YOUR HONOR; THIS

14  IS -- IT'S NOT DATED, BECAUSE, LIKE MOST E-MAILS, WHEN YOU

15  PRINT IT OUT, IT DOESN'T PRINT OUT THE DATE.  BUT I REPRESENT   03:36

16  TO YOU THAT THE RECORD EVIDENCE, DE ANDA ADMITS TO ME THAT THIS

17  WAS SENT IMMEDIATELY AFTER GETTING THE ANONYMOUS LETTER FROM

18  THE CEO.  AND HE'S WRITING NOW TO ALAN KAYE.  AND, AGAIN,

19  ALAN KAYE IS THE HR PERSON.

20          "ALAN, I'VE RECEIVED YOUR ANONYMOUS LETTER ORIGINALLY   03:36

21  SENT TO BOB ECKERT REGARDING CARTER BRYANT AND BRATZ.  I'M

22  AWARE OF THIS SITUATION AND HAVE BEEN WORKING ON IT FOR SEVERAL

23  MONTHS.  MY FRUSTRATION IN THIS MATTER WAS THAT GENESIS OF" --

24  BLANK -- "AND THAT IS NOW IN THE HANDS OF ROBERT NORMILE," THE

25  GENERAL COUNSEL OF MATTEL.                                     03:36

1          THAT WAS A PARENTHETICAL STATEMENT, BY THE WAY.

2          "THE TRUTH OF THE MATTER IS THAT CARTER BRYANT DID

3    WORK FOR MATTEL; HOWEVER" -- REDACTION -- "ACCORDING TO OUTSIDE

4    ATTORNEYS, McSHANE HAS BEEN" -- AND MICHELLE McSHANE IS SOMEONE

5    WITHIN THE LEGAL DEPARTMENT, YOUR HONOR, THAT HAD ORIGINALLY          03:37

6    MET WITH IVY ROSS AND CASSIDY PARK AND RICHARD DE ANDA IN MARCH

7    OF 2002.  AND THAT'S WHEN IT WAS DECIDED THAT IT WOULD BE

8    INVESTIGATED AS A LEGAL MATTER, AS OPPOSED TO AN INVESTIGATIVE

9    MATTER.

10         AND THEN IT GOES ON TO THE BOTTOM PARAGRAPH; IT SAYS,          03:37

11   "WE ONLY FOUND OUT DURING OUR LAST TRIP TO MEXICO THAT MATTEL

12   HAS A RELATIONSHIP WITH MGA.  WE HAVE MGA'S PRODUCT IN OUR

13   MEXICO WAREHOUSE.  EVIDENTLY, MATTEL LATIN AMERICA HAS AN

14   AGREEMENT WITH MGA TO SELL THE PRODUCT.  THIS IS A GOOD EXAMPLE

15   THAT THE RIGHT HAND DOESN'T KNOW WHAT THE LEFT HAND IS DOING.          03:37

16   LET ME KNOW IF YOU WOULD LIKE ME TO RESPOND TO MR. BOB."

17         **THE COURT:**  SO I TAKE IT THAT YOU FEEL THAT YOU CAN

18   PARAPHRASE WHAT HAS BEEN REDACTED?

19         **MR. NOLAN:**  NO.  I DON'T THINK WE SHOULD PARAPHRASE.

20   YOU KNOW WHAT?  I DON'T THINK IT'S FAIR -- YOU KNOW, SERIOUSLY,          03:37

21   YOUR HONOR, I DON'T THINK IT'S FAIR, IN THIS SERIOUS OF A

22   SITUATION, WHEN THEY MOVED ON SUMMARY JUDGMENT ON STATUTE OF

23   LIMITATIONS, FOR THEM NOW TO BE STANDING BEHIND THE PRIVILEGE.

24         WHAT DID OUTSIDE COUNSEL SAY?  WHAT IF OUTSIDE

25   COUNSEL SAID, 'CARTER BRYANT WAS EMPLOYED AT MATTEL; HOWEVER,          03:38

```
1   THE VERSION OF THE EMPLOYMENT AGREEMENT THAT HE SIGNED DID NOT

2   COVER IDEAS,' OR 'THE WORK THAT HE DID WAS NOT IN THE COURSE OF

3   HIS EMPLOYMENT,' CHANGES THAT WERE LATER MADE TO EMPLOYMENT

4   AGREEMENTS.

5           I DON'T KNOW.  IT'S NOT FAIR.  IT'S PURELY                    03:38

6   SPECULATIVE ON MY END.

7           MR. ZELLER:  I APOLOGIZE FOR INTERRUPTING, YOUR

8   HONOR, BECAUSE THIS IS THE SECOND TIME NOW MR. NOLAN HAS DONE

9   THIS, WHICH IS BASICALLY AN ATTEMPT TO COMMENT ON THE

10  IMPLICATION OF A PRIVILEGE.                                           03:38

11          THIS E-MAIL IN PARTICULAR WAS IN FRONT OF

12  JUDGE INFANTE.  WE PROVIDED IT TO HIM IN-CAMERA.  HE REJECTED

13  THEIR MOTION; SO FOR MR. NOLAN TO STAND HERE AND SPECULATE AND

14  BASICALLY -- WHILE MEANWHILE, OF COURSE, NOT COINCIDENTALLY,

15  TRYING TO TAR OUTSIDE COUNSEL DOING IT, IS REALLY QUITE              03:39

16  IMPROPER.

17          AND YOU WOULD THINK THAT, FRANKLY, AFTER THE --

18          THE COURT:  I MISUNDERSTOOD THIS.

19          DIDN'T YOU, MR. NOLAN, SAY THAT THIS IS PENDING

20  BEFORE JUDGE INFANTE?                                                03:39

21          MR. NOLAN:  YES.

22          MR. ZELLER:  THEY RENEWED A DIFFERENT MOTION TO TRY

23  AND GET TO THE SAME E-MAIL.  AS WE POINTED OUT, OF COURSE, TO

24  JUDGE INFANTE, THIS IS AT LEAST THE SECOND TIME THAT IT'S NOW

25  IN FRONT OF YOU.  THEY SPECIFICALLY RAISED THESE REDACTIONS         03:39
```

1    MONTHS AGO WITH JUDGE INFANTE -- I'LL PROVIDE THE ORDER TO THE

2    COURT -- THEY RAISED THIS EXACT E-MAIL, THESE EXACT REDACTIONS.

3              **THE COURT:**  IN THIS CONTEXT?

4              **MR. ZELLER:**  YES.  IN THIS CONTEXT, ARGUED THAT THEY

5    WERE ENTITLED TO THAT, AS WELL AS THE OTHER REDACTIONS IN THE          03:39

6    INVESTIGATION FILE.  JUDGE INFANTE REJECTED IT.

7              NOW, MONTHS LATER, JUST BEFORE SUMMARY JUDGMENT,

8    UNDOUBTEDLY SO HE COULD STAND UP HERE AND MAKE THIS ARGUMENT,

9    THEY HAVE MADE A DIFFERENT ARGUMENT TO THE JUDGE AS TO WHY THIS

10   AND SOME OF THE OTHER MATERIALS OUGHT TO BE PRODUCED, OR FORCED      03:40

11   TO BE PRODUCED.  BUT JUDGE INFANTE HAS SEEN THIS DOCUMENT IN

12   UNREDACTED FORM.  HE REJECTED THEIR ATTACK ON IT.

13             **MR. NOLAN:**  YOUR HONOR, FIRST OF ALL, I WANT TO MAKE

14   CLEAR, I WAS NOT TARRING ANY LAWYER, PERSONALLY OR NOT.  BUT

15   MR. ZELLER KNOWS BETTER THAN WHAT HE JUST SAID, AND I WILL TAR      03:40

16   HIM ON THAT.

17             HERE'S WHAT HAPPENED, YOUR HONOR:

18             THIS MOTION WAS BROUGHT IN FRONT OF JUDGE INFANTE ON

19   THIS E-MAIL.  HE LOOKED AT IT IN-CAMERA AND RULED THAT IT

20   CONTAINS PRIVILEGED INFORMATION.  WE THEN WENT BACK TO             03:40

21   JUDGE INFANTE AFTER WE HAD ALL OF THE DISCOVERY IN THIS CASE

22   AND ARGUED TO JUDGE INFANTE, UNDER PROPER NINTH CIRCUIT LAW,

23   INCLUDING THE PENZOIL CASE, THAT MATTEL, NOW THAT WE UNDERSTOOD

24   THEIR POSITION, CAN'T HAVE IT BOTH WAYS.  THEY SIMPLY CANNOT BE

25   NOW MOVING ON SUMMARY JUDGMENT ON STATUTE OF LIMITATIONS; THEY      03:41

1   CAN'T BE REPRESENTING TO US AND TO THE RECORD THAT ALL THEY

2   LOOKED AT WAS DIVA STARZ AND TOON TEENS, AND THEN ALSO ASSERT

3   THE ATTORNEY-CLIENT PRIVILEGE.

4           IN FACT, YOUR HONOR, MR. ZELLER DOESN'T TELL YOU THE

5   WHOLE STORY; AND THAT IS THAT JUDGE INFANTE, IN RESPONSE TO          03:41

6   THAT MOTION, ORDERED THAT A 30(B)(6) DEPONENT BE PRESENTED AND

7   THAT THE PRIVILEGE NOT BE ASSERTED DURING THAT DEPOSITION.  I

8   TOOK THAT DEPOSITION ON THE 30(B)(6) ON STATUTE OF LIMITATIONS.

9   THEY DID NOT SHOW HER THE LEGAL FILE, AND THEY DID NOT SHOW HER

10  OR GIVE HER ACCESS TO MICHELLE McSHANE, WHO HAD BEEN CONDUCTING      03:41

11  THE FACTUAL INVESTIGATION.

12          SO WITH ALL DUE RESPECT, YOUR HONOR, WE'VE EXERCISED

13  OUR RIGHTS.  IT'S A LEGITIMATE MOTION.  IT WAS HEAVILY ARGUED,

14  BY THE WAY, IN FRONT OF JUDGE INFANTE; SO IT WAS RAISED IN A

15  TOTALLY DIFFERENT CONTEXT, NOW THAT THEY'RE MOVING                   03:42

16  AFFIRMATIVELY FOR SUMMARY JUDGMENT.  AND WE'VE CITED THAT IN

17  OUR 56(F) PAPERS.

18          **THE COURT:**  I KNOW YOU HAVE.

19          VERY WELL.

20          IS THERE ANYTHING FURTHER, COUNSEL, BECAUSE I WANT TO        03:42

21  GIVE MR. ZELLER AN OPPORTUNITY.

22          **MR. NOLAN:**  YOUR HONOR, IF I MIGHT JUST WITH RESPECT

23  TO THE RELATION BACK ARGUMENT --

24          **THE COURT:**  BRIEFLY.  BECAUSE I HAVE A PRETTY GOOD

25  SENSE OF YOUR ARGUMENT ON THIS.                                      03:42

1     **MR. NOLAN:**  YOU KNOW WHAT, YOUR HONOR?  LET ME SUBMIT

2  ON THAT, BECAUSE IT'S COVERED IN THE BRIEFS; SO I'LL ADDRESS

3  WHATEVER MR. ZELLER SAYS.

4          **THE COURT:**  THANK YOU.

5          **MR. ZELLER:**  AS TO THE POINT OF MGA'S ATTEMPTING TO      03:42

6  BASICALLY REARGUE AN ISSUE THAT WAS ALREADY DECIDED BY

7  JUDGE INFANTE AND REJECTED, NOW THAT THEY'VE BROUGHT ANOTHER

8  MOTION IN FRONT OF HIM, I DON'T SEE HOW THAT EXACTLY ALLOWS

9  THEM TO ARGUE THAT, FIRST OF ALL, THE PRIOR DECISION SHOULD BE

10  DISREGARDED, AND, SECOND, THAT SOMEHOW THEIR ASSERTION OF A      03:42

11  STATUTE OF LIMITATIONS DEFENSE, THEIR ASSERTION OF IT, WHERE

12  THEY BEAR THE BURDEN OF PROOF, MEANS THAT MATTEL'S PRIVILEGE IS

13  PIERCED OR SOMEHOW SHOULD BE DEEMED WAIVED.

14          THEY, IN FACT, HAVE HAD COPIOUS TESTIMONY AND

15  DOCUMENTS IN THIS CASE ESTABLISHING, WITHOUT ANY DOUBT, THAT      03:43

16  THAT E-MAIL, THE 2002 INVESTIGATION, AND THE OTHER THINGS THEY

17  ARGUE ABOUT AS MATTEL BELIEVING, THAT THERE WERE SIMILARITIES

18  BETWEEN MATTEL PRODUCT AND BRATZ, RELATED TO, NUMBER ONE,

19  TOON TEENS, AND, NUMBER TWO, DIVA STARZ.

20          THERE IS ABSOLUTELY NOTHING NEW ABOUT THIS ARGUMENT.      03:43

21  THEY FLUSH IT OUT IN MORE DETAIL, BUT THE COURT WILL RECALL,

22  SINCE THE VERY FIRST DAY WE HAVE BEEN IN THIS COURTROOM, AND

23  EVEN BACK IN THE FIRST DAY WHEN WE WERE IN THE COURTROOM WITH

24  JUDGE MANELLA, THAT WAS THEIR ARGUMENT.

25          THIS IS REALLY A CASE IN WHICH MATTEL IS SUING FOR      03:43

```
 1   INFRINGEMENT OF DIVA STARZ.  THAT HAS BEEN THE REFRAIN FROM DAY

 2   ONE, WAS THE REFRAIN ON REMOVAL, THE REFRAIN WHEN WE ATTEMPTED

 3   TO AMEND, AND ON AND ON.  AND WE HAVE MADE IT VERY CLEAR -- MR.

 4   QUINN STOOD UP QUITE SOME TIME AGO AND SAID, 'WE ARE NOT

 5   ASSERTING AN INFRINGEMENT CLAIM BASED ON TOON TEENS.'  IT'S     03:44

 6   PURE AND SIMPLE.

 7         TOON TEENS CERTAINLY HAS RELEVANCE, LIKE SOME ASPECTS

 8   OF DIVA STARZ, BECAUSE IT SHOWS CHRONOLOGY.  MANY THINGS,

 9   ACCORDING TO MR. BRYANT, INSPIRED HIM.  AND WE'RE CERTAINLY

10   ENTITLED TO COMMENT ON THOSE THINGS.  BUT WE HAVE NOT SUED IN   03:44

11   THIS CASE FOR COPYRIGHT INFRINGEMENT OF TOON TEENS.  WE HAVE

12   NOT SUED FOR COPYRIGHT INFRINGEMENT OF DIVA STARZ.

13         AT THE END OF THE DAY, EVERYTHING THAT MR. NOLAN

14   POINTS TO SIMPLY DOESN'T ADD UP, NOT EVEN CLOSE, TO A CLAIM

15   THAT MATTEL OWNS BRATZ.  IT'S THINGS LIKE, 'WELL, MAYBE        03:44

16   CARTER BRYANT WENT TO MGA.  MAYBE HE HAD SOME INVOLVEMENT WITH

17   BRATZ.'

18         AND THERE ARE, IN FACT, A NUMBER OF FACTUAL

19   MISSTATEMENTS THAT I CAN CERTAINLY GO INTO IN TERMS OF WHAT IS

20   BEING SAID HERE.  BUT THE COURT CAN ACTUALLY SEE THE DISCONNECT 03:44

21   BETWEEN THE EVIDENCE THAT'S BEING CITED AND THEIR ARGUMENTS

22   BASED ON IT.  JILL NORDQUIST, FOR EXAMPLE; SHE WAS NOT

23   CARTER BRYANT'S SUPERVISOR, AS THE BRIEFS SAY, AS MR. NOLAN HAS

24   SAID.  SHE WAS A CO-WORKER.  SHE HAD NO SUPERVISORY POWER OVER

25   HIM.  SHE WAS SUSPICIOUS, AND HE LIED TO HER.  THAT IS HER     03:45
```

1    TESTIMONY.  IT'S ESTABLISHED AS FRAUDULENT CONCEALMENT.

2         IF YOU CAN IMAGINE A SITUATION WHERE A PERSON LIKE

3    JILL NORDQUIST COMES TO LEGAL COUNSEL; ARE THEY SUPPOSED TO

4    SAY, 'WELL, BECAUSE YOU JUST CAN'T BELIEVE THAT CARTER BRYANT

5    WOULD BE DOING SOMETHING OTHER THAN DOLL DESIGN, WE BETTER        03:45

6    BRING A LAWSUIT.'

7         THIS IS THE LEVEL AT WHICH THEY'RE TRYING TO

8    BASICALLY SAY, 'IF WE KNIT TOGETHER 30, 40, 50 PIECES OF

9    WHATEVER IT IS OF THESE VARIOUS SUSPICIONS, INNUENDOES, AND SO

10   FORTH, FROM JAPAN, SOUTH AMERICA, HONG KONG, PARTS OF THE        03:45

11   UNITED STATES, IF WE BRING ALL OF THOSE THINGS TOGETHER, THEN

12   THERE'S A SUSPICION THAT SOMEHOW WE OWN BRATZ.'  AND IT JUST

13   DOESN'T ADD UP TO THAT AT ALL.

14        BUT I THINK THAT THERE'S ANOTHER POINT TO BE MADE IN

15   ALL OF THIS, WHICH IS THE THING THAT MGA NEVER ESTABLISHES IN    03:46

16   ANY OF THIS, IS THAT EVEN IF THAT WAS TRUE, EVEN IF IT RESULTED

17   OR SHOULD HAVE BEEN SUSPICIOUS TO MATTEL, IT WOULD HAVE AVAILED

18   MATTEL OF NOTHING.  THE FACT IS, THERE WAS NO INVESTIGATION

19   THAT COULD HAVE RESULTED IN OBTAINING THE DRAWINGS THAT MATTEL

20   HAS SUED ON, UNTIL IT HAD RECEIVED THEM IN NOVEMBER OF 2003      03:46

21   FROM CITY WORLD.  I MEAN, THERE'S JUST NO SHOWING WHATSOEVER

22   THAT THE MOST DILIGENT PLAINTIFF ON THE FACE OF THE EARTH COULD

23   HAVE OBTAINED THOSE DRAWINGS, BECAUSE CARTER BRYANT TOOK THEM,

24   HE DELIVERED THEM TO MGA, AND THEY ARE NOT PUBLIC.

25        NOW, ONE THING THAT MGA SAYS IS REALLY A KEYSTONE IN        03:46

THIS WHOLE ARGUMENT ABOUT 'MATTEL KNEW OR SHOULD HAVE KNOWN' IS

THAT MATTEL BELIEVED IT WAS IMPOSSIBLE TO DEVELOP A DOLL IN A

TIME FRAME OF LESS THAN NINE MONTHS, OR THREE MONTHS, OR

WHATEVER THE CASE MAY BE.  BASICALLY, THEY SAY IT'S IMPOSSIBLE

FOR THE DOLL TO HAVE BEEN DEVELOPED BETWEEN BRYANT'S DEPARTURE          03:47

IN OCTOBER OF 2000 AND THE HONG KONG TOY FAIR IN JANUARY OF

2001.

        THE EVIDENCE THAT THEY CITE TO IS THE DEPOSITION OF

HOI HOFFMAN; AND THIS IS THE PASSAGE THAT THEY RELY UPON FOR

THIS PROPOSITION, THIS KEYSTONE PROPOSITION IN THEIR ENTIRE             03:47

CHRONOLOGY.  AND SHE'S, BY THE WAY, SOMEONE WHO WORKED WITH

CARTER BRYANT.

        "QUESTION:  AND THEN THE DESIGNER CREATES A

PRELIMINARY SKETCH OF THE FASHION?

        ANSWER:  NO.  OF THE DOLL.                                      03:47

        QUESTION:  OF THE DOLL?

        ANSWER:  YES.

        QUESTION:  OKAY.  SO THE DESIGNER CREATES A

PRELIMINARY SKETCH OF THE DOLL?

        ANSWER:  YES."                                                  03:47

        **MR. ZELLER:**  THAT IS THE TESTIMONY THAT THEY'RE

RELYING UPON FOR THAT CRITICAL PROPOSITION.

        IT CLEARLY DOES NOT ESTABLISH THAT SOMEHOW MATTEL

CATEGORICALLY BELIEVED THAT IT WAS IMPOSSIBLE TO DO A DOLL IN

LESS THAN NINE MONTHS.  AND THAT IS ABSOLUTELY INDISPENSABLE TO         03:48

1    THEIR ENTIRE NOTICE ARGUMENT.

2          MEANWHILE, THEY HAVE AN EXPERT --

3          THE COURT:   COUNSEL, LET ME CUT TO THE CHASE ON A

4    PARTICULAR ALLEGATION THAT MGA HAS MADE:

5          IS IT YOUR REPRESENTATION TO THE COURT THAT THERE IS          03:48

6    NO EVIDENCE THAT MATTEL DID NOT PURSUE CARTER BRYANT IN THE

7    SUMMER OF 2001 BECAUSE IT WAS UNAWARE OF CARTER BRYANT'S ROLE

8    IN DEVELOPING BRATZ OR BECAUSE THEY THOUGHT THEY WERE SOMEHOW

9    LEGALLY FORECLOSED BY THE CONTRACT THAT THEY HAD HAD WITH

10   CARTER BRYANT?                                                      03:48

11         MR. ZELLER:   WELL, THAT SEEMS TO BE MORE THAN ONE

12   QUESTION.

13         THE COURT:   TAKE YOUR TIME.

14         MR. ZELLER:   WITH RESPECT TO CARTER BRYANT, THERE IS

15   NO EVIDENCE, AND I'M AWARE OF NOTHING, THAT WOULD SUGGEST THAT      03:48

16   CARTER BRYANT WAS BEING CONSIDERED THE SUBJECT OF A LEGAL CLAIM

17   IN 2001.   THERE'S JUST NO EVIDENCE OF THAT EITHER.

18         AND THIS KIND OF GOES TO THE POINT OF HOW --

19         THE COURT:   WHY?

20         MR. ZELLER:   I'M SORRY?

21         THE COURT:   THE QUESTION IS WHY HE WAS NOT BEING

22   CONSIDERED.   IS IT BECAUSE THEY DID NOT HAVE ANY EVIDENCE OR

23   KNOWLEDGE, OR BECAUSE MATTEL THOUGHT THAT THEY WERE SOMEHOW

24   UNABLE TO ON LEGAL GROUNDS, BECAUSE OF THE CONTRACT, THE

25   EMPLOYMENT CONTRACT, THE INVENTIONS AGREEMENT, WHATEVER YOU         03:49

```
1    WANT TO CALL IT?

2              I THINK YOU UNDERSTAND THE QUESTION I'M ASKING.

3         MR. ZELLER:  I THINK I DO, BUT IT'S SOMEWHAT

4    DIFFICULT TO ESTABLISH A NEGATIVE IN THAT SENSE.

5              I CAN CERTAINLY SAY THAT THERE IS ABSOLUTELY NO      03:49

6    EVIDENCE THAT IN 2001, MATTEL CONSIDERED A LEGAL CLAIM AND

7    DECIDED NOT TO BRING IT AGAINST CARTER BRYANT FOR ANYTHING --

8    FOR ANY REASON AT ALL.

9              THE EVIDENCE SHOWS THAT THE FIRST TIME THERE WAS A

10   CLAIM THAT WAS CONSIDERED AGAINST CARTER BRYANT WAS THE RESULT  03:49

11   OF THAT 2002 SO-CALLED INVESTIGATION THAT MR. NOLAN WAS

12   REFERRING TO.  AND WE'VE TALKED ABOUT THAT VERY INVESTIGATION

13   ON MORE THAN ONE OCCASION IN THIS COURTROOM.

14        THE COURT:  LET ME ASK THE QUESTION, THEN, ABOUT THE

15   SUMMER OF 2002.  SAME QUESTION:  IS THERE ANY LEGAL REASON WHY  03:50

16   MATTEL DID NOT PURSUE CARTER BRYANT, OR WAS IT A MATTER THAT

17   THEY DID NOT KNOW THAT CARTER BRYANT WAS INVOLVED IN BRATZ?

18        MR. ZELLER:  MATTEL CONSIDERED BRINGING A CLAIM

19   AGAINST CARTER BRYANT BASED UPON COPYRIGHT INFRINGEMENT OF

20   TOON TEENS, THE TOON TEENS PLAGIARISM, THAT'S WHAT IT IS BEING  03:50

21   REFERRED TO.  THAT WAS CONSIDERED.  MATTEL DECIDED NOT TO

22   PURSUE THAT CLAIM.  THAT IS NOT A CLAIM THAT IS BEING MADE IN

23   THIS CASE EITHER.

24              I THINK WE MADE THAT POINT PREVIOUSLY TO THE COURT;

25   AND THAT IS WHEN YOU SEE, FOR EXAMPLE, THE PHRASES IN THOSE     03:50
```

1  DOCUMENTS TALKING ABOUT THE PLAGIARISM OF LILY MARTINEZ'S

2  DESIGNS.  LILY MARTINEZ WAS THE CREATOR OF TOON TEENS.  THAT'S

3  WHAT IT'S TALKING ABOUT.  AND, AGAIN, FOR MR. NOLAN TO SUGGEST

4  THAT SOMEHOW ALL OF THE STUFF ABOUT TOON TEENS IS ONLY NEW,

5  THAT HAS JUST BEEN REPEATEDLY ERRED BY MGA IN THE COURSE OF        03:51

6  THIS CASE.

7          **THE COURT:**  I GUESS THE CONCERN I HAVE THERE IS THAT

8  THEY CONSIDERED -- WHAT YOU'RE TELLING ME IS THAT THEY

9  CONSIDERED BRINGING THE CLAIM AGAINST CARTER BRYANT BASED ON

10  PLAGIARISM OF TOON TEENS.                                         03:51

11          ARE YOU ALSO TELLING ME THAT THERE'S NO EVIDENCE --

12  AND THAT'S THE STANDARD HERE -- THAT MATTEL DID NOT BRING A

13  CLAIM FOR VIOLATION OF THE INVENTIONS AGREEMENT BECAUSE THEY

14  DID NOT THINK THEY COULD BRING SUCH A CLAIM?

15          **MR. ZELLER:**  AT NO TIME, UP UNTIL WE GET INTO THE        03:51

16  TIME IN 2003 WHEN, OF COURSE, THERE WAS THE CITY WORLD MEETING

17  WHERE THAT INFORMATION WAS OBTAINED --

18          **THE COURT:**  IN NOVEMBER OF 2003.

19          **MR. ZELLER:**  -- AT NO TIME OTHER THAN THAT TIME

20  FRAME, STARTING IN THAT TIME FRAME, DID MATTEL THINK OR           03:51

21  CONSIDER A CONTRACT CLAIM AGAINST CARTER BRYANT.

22          IN OTHER WORDS, AT NO TIME DID MATTEL --

23          **THE COURT:**  A CLAIM BASED ON THE INVENTIONS

24  AGREEMENT.

25          **MR. ZELLER:**  CORRECT; RIGHT; OVER THE INVENTIONS        03:52

```
 1   AGREEMENT.

 2         AT NO TIME DID MATTEL THINK THAT CONTRACT PREVENTED

 3   ANY CLAIM.  THE CLAIM THAT WAS CONSIDERED -- AND THE RECORD IS

 4   CRYSTAL CLEAR ON THIS -- I MEAN, IN TERMS OF MR. NOLAN SAYING

 5   THAT SOMEHOW PRIVILEGE HAS BEEN ASSERTED TO DENY THEM FACTS,      03:52

 6   OUR 30(B)(6) WITNESS TESTIFIED ABOUT THAT 2002 INVESTIGATION --

 7         THE COURT:  YOU'RE TELLING THE COURT THAT AT NO TIME

 8   DID MATTEL COME TO THE CONCLUSION THAT THE CONTRACT CLAIM

 9   FAILED TO PROVIDE A BASIS TO BRING A CLAIM?

10         MR. ZELLER:  RIGHT.  RIGHT.                                 03:52

11         AND JUST IN TERMS OF THE FACTS, SO IT'S VERY CLEAR IN

12   THIS REGARD -- AND BY THE WAY, THE PLAGIARISM THAT WAS BEING

13   DISCUSSED -- AND THIS IS ALSO CLEAR FROM THE RECORD, AND THERE

14   IS NO EVIDENCE TO THE CONTRARY -- THE PLAGIARISM THAT WAS BEING

15   CONSIDERED WITH RESPECT TO CARTER BRYANT IN 2002 WAS PLAGIARISM   03:52

16   AFTER HE LEFT.  THERE'S JUST NOTHING TO SUGGEST THAT PEOPLE

17   WERE INVESTIGATING AT THAT TIME, OR EVER CAME TO A CONCLUSION

18   THAT SOMEHOW THERE WASN'T A CLAIM BASED ON THE FACT THAT

19   CARTER BRYANT WAS WORKING ON BRATZ WHEN HE WAS EMPLOYED BY

20   MATTEL.  THAT WAS NOT SOMETHING THAT, FRANKLY, OCCURRED TO        03:53

21   ANYBODY.  THERE'S NO EVIDENCE THAT IT EVER OCCURRED TO ANYBODY.

22   YOU HAVE THE ANONYMOUS LETTER, WHICH THEY'VE, OF COURSE, RELIED

23   UPON.

24         BUT THE FACT IS, AS THIS COURT HAS POINTED OUT, WHERE

25   DO YOU GO WITH THAT?  I MEAN, OUR WITNESSES EVEN TESTIFIED,       03:53
```

```
 1   'YOU GET AN ANONYMOUS LETTER; THERE'S NOTHING YOU CAN DO WITH
 2   IT.'  IT STATES ALLEGATIONS; MAYBE IT'S RUMORS, MAYBE ITS
 3   VALID.  BUT THE CASES, ALSO, THAT WE'VE CITED IN OUR BRIEF MAKE
 4   VERY CLEAR THAT UNTIL THERE'S SOME BASIS FOR VALIDATING IT, IT
 5   IS NOT NOTICE, AND IT JUST REALLY CAN'T BE.                    03:53
 6        BUT WHAT I WOULD LIKE TO POINT OUT, IN TERMS OF THE
 7   FACTS THAT HAVE BEEN MADE AVAILABLE TO MGA, JUST TO REFUTE THIS
 8   IDEA THAT SOMEHOW SUMMARY JUDGMENT IS NOT PROPER ON THIS
 9   SUBJECT, MATTEL'S PROVIDED A 30(B)6 WITNESS WHO TESTIFIED ABOUT
10   THE FACTS RELATING TO STATUTE OF LIMITATIONS.  THEY DEPOSED     03:54
11   RICH DE ANDA.  THEY DEPOSED BOB SIMONEAU.  AND THOSE WERE THE
12   GENTLEMEN, OF COURSE, WHO WERE INVOLVED IN THE 2002
13   INVESTIGATION THAT THEY RELY UPON SO HEAVILY.  THEY DEPOSED
14   CASSIDY PARK.  THEY DEPOSED IVY ROSS.  THEY DEPOSED EVERY
15   SINGLE PARTICIPANT IN THAT INVESTIGATION.                      03:54
16        THE COURT:  I UNDERSTAND THAT, COUNSEL.
17        MR. ZELLER:  SO THERE IS NO QUESTION THAT THEY HAVE
18   NOT BEEN DEPRIVED OF ANYTHING OTHER THAN OUR PRIVILEGED
19   COMMUNICATIONS, WHICH THEY'RE NOT ENTITLED TO.
20        THE COURT:  WE'RE GOING TO TAKE A TEN-MINUTE BREAK         03:54
21   FOR THE COURT REPORTER, SHE'S BEEN GOING STEADY SINCE WE
22   RESUMED THIS AFTERNOON, AND THEN WE'LL CONTINUE.  I'LL HEAR
23   VERY BRIEFLY FROM MGA ON THE STATUTE OF LIMITATIONS, AND THEN I
24   WANT TO MOVE ON TO PREEMPTION.
25        (WHEREUPON, A BRIEF RECESS WAS HELD.)                     04:13
```

1          **THE COURT:**  COUNSEL, YOU MAY CONTINUE.

2          **MR. ZELLER:**  THE POINT I WAS MAKING BEFORE THE BREAK

3    WAS IN RESPONSE TO MGA'S CLAIM, THIS LINCHPIN CLAIM, THAT

4    MATTEL WAS ON NOTICE OR HAD TO HAVE KNOWN THAT CARTER BRYANT

5    WAS WORKING ON BRATZ WHILE EMPLOYED BY MATTEL BECAUSE OF THE          04:13

6    SHORT DEVELOPMENT TIME FRAME WITH RESPECT TO BRATZ AND ITS

7    SHOWING AT THE HONG KONG TOY FAIR IN JANUARY OF 2001.

8          AS I NOTED, THE EVIDENCE THAT THEY SUPPORT,

9    SUPPOSEDLY FROM MATTEL, DOES NOT SUPPORT.  CONVERSELY, THEIR

10   OWN EXPERT -- AND IF WE COULD BRING UP PAGE 16 OF THE TONNER          04:13

11   REPORT; THIS IS THEIR EXPERT, RICHARD TONNER -- ROBERT TONNER,

12   RATHER; HE'S A DOLL EXPERT THEY HAD PUT FORTH AS AN EXPERT IN

13   THIS CASE.  AND YOU'LL SEE IN THE BRACKETED PART:

14          "I UNDERSTAND THAT IN THIS CASE, THERE'S SOME

15   QUESTION ABOUT MGA BEING ABLE TO DEVELOP A NEW DOLL IN A SHORT        04:14

16   AMOUNT OF TIME --

17          **THE COURT:**  COUNSEL, SLOW DOWN.

18          **MR. ZELLER:**  I'M SORRY.

19          **THE COURT:**  SHE'S FAST, BUT...

20          **MR. ZELLER:**  I WAS DOING GOOD THERE FOR A WHILE.

21          "IN THE SHORT AMOUNT OF TIME, FROM EARLY OCTOBER

22   2000, AND HAVE IT READY TO SHOW AT THE HONG KONG TOY FAIR IN

23   JANUARY OF 2001.  WAS IT POSSIBLE?  THE ANSWER IS ABSOLUTELY

24   YES."

25          AND THEN YOU'LL DROP DOWN A LITTLE BIT FURTHER THERE,          04:14

1 AND YOU'LL SEE THAT IT SAYS, "WITH TALENTED, PROFESSIONAL

2 PEOPLE,' WHICH MGA CERTAINLY HAD, 'A NEW PRODUCT PROTOTYPE CAN

3 COME TOGETHER PRETTY QUICKLY, AND CERTAINLY WITHIN THREE TO

4 FOUR MONTHS.  IT WOULD BE A TIGHT SCHEDULE, BUT ABSOLUTELY

5 DOABLE.'

6          SO THIS VERY CRITICAL CLAIM THAT THEY MAKE THAT

7 SOMEHOW MATTEL SHOULD HAVE INFERRED OR SHOULD HAVE KNOWN FROM

8 THE DEVELOPMENT CHRONOLOGY ITSELF, JUST FROM WHEN CARTER BRYANT

9 LEFT TO THE HONG KONG TOY FAIR, DOES NOT WITHSTAND SCRUTINY.

10 IT'S NOT SUPPORTED BY THE EVIDENCE.                            04:14

11          MOREOVER, YOU'LL NOTICE THAT WHEN THEY PLAYED THE

12 CLIP FROM JILL NORDQUIST, HER TESTIMONY WAS ACTUALLY VERY

13 SPECIFIC.  SHE DIDN'T SAY, 'I THOUGHT HE WAS THE CREATOR,' OR

14 'I HEARD HE WAS THE CREATOR OF BRATZ.'  SHE HEARD HE HAD SOME

15 INVOLVEMENT.                                                  04:15

16          THAT IS NOT, OF COURSE, EXCLUSIVE OF THE IDEA THAT

17 SOMEONE LEAVES A COMPANY LIKE MATTEL AND GOES AND WORKS

18 SOMEWHERE ELSE EVENTUALLY.  THAT DOES NOT ADD UP TO A CLAIM.

19 IN FACT, THEY'VE ARGUED THROUGHOUT TODAY, AND IN THEIR BRIEFS,

20 THAT THAT KIND OF THING IS COMPLETELY NOT ACTIONABLE; SO       04:15

21 THERE'S NOTHING REMARKABLE ABOUT THIS FACT THAT CARTER BRYANT

22 EVENTUALLY -- PEOPLE BELIEVE, OR THERE'S RUMOR OR SUSPICION,

23 THAT HE HAS SOMETHING TO DO WITH BRATZ.

24          THERE IS NO EVIDENCE WHATSOEVER THAT ANYONE AT

25 MATTEL, IN THAT TIME FRAME, OR EVEN LATER, AS I'LL GET INTO     04:15

1    HERE IN MINUTE, KNEW FOR A FACT THAT CARTER BRYANT -- OR EVEN

2    REALLY STRONGLY SUSPECTED, THAT CARTER BRYANT WAS, QUOTE, "THE

3    CREATOR OF BRATZ."

4             AND THAT'S ANOTHER INDISPENSABLE FACT, REALLY, HERE

5    IN THEIR CHRONOLOGY THAT YOU WOULD HAVE TO KNOW IN ORDER TO          04:16

6    SORT OF ADD ALL OF THESE 16 THINGS TOGETHER TO SAY, 'WELL,

7    PERHAPS YOU SHOULD HAVE KNOWN.'

8             WHAT I'D LIKE TO DO, THEN, IS TALK IN PARTICULAR

9    ABOUT MGA'S ARGUMENT, THEIR ASSERTION, THAT IT WAS PUBLICLY

10   KNOWN THAT CARTER BRYANT WAS THE CREATOR OF BRATZ AS EARLY AS        04:16

11   2002.  AND THAT WAS EXHIBIT 95 THAT THEY PUT UP ON THE SCREEN.

12   THAT IS THE DAVID DEES E-MAIL.

13            FIRST OF ALL, THAT IS AN E-MAIL.  IT'S NOT A WEBSITE.

14   THERE IS NO EVIDENCE THAT E-MAIL WAS EVER POSTED ON THE WEBSITE

15   THAT WAS THE SUBJECT OF THE CEASE AND DESIST LETTER THAT MATTEL      04:16

16   SENT.  THAT'S JUST PURE SPECULATION THAT IT, IN FACT, SHOWED UP

17   ON THERE.  AND, IN FACT, WHAT THIS E-MAIL ESTABLISHES IS

18   FRAUDULENT CONCEALMENT BY MGA.

19            ISAAC LARIAN'S RESPONSE TO THIS WAS THERE SHOULD BE

20   NO MENTION OF BRYANT.  THERE SHOULD BE NO MENTION, NOT JUST          04:17

21   SIMPLY OF MATTEL OR DIVA STARZ OR ANY OF THE THINGS THAT THEY

22   TRY AND ARGUE WAS SOMEHOW THE SUBJECT OF MATTEL'S LETTER.  IT

23   IS ABOUT BRYANT, AND CONCEALING BRYANT.

24            THERE'S OTHER, OF COURSE, EVIDENCE IN THE CASE THAT

25   THE COURT IS AWARE OF.  THERE'S AN E-MAIL FROM AN MGA EMPLOYEE       04:17

1  TO ISAAC LARIAN SAYING, 'I KNOW WE HAVE TO KEEP CARTER BRYANT

2  UNDER WRAPS.'  THERE'S THE DOCUMENT THAT MR. QUINN HAS

3  MENTIONED PREVIOUSLY, WHICH IS DATES OF MATTEL EMPLOYMENT;

4  DON'T ASK -- I'M SORRY, FOR MGA.

5      NOW, ALSO, OF COURSE, THIS WHOLE NOTION THAT SOMEHOW  04:17

6  IT WAS A PUBLIC FACT AS OF 2002 THAT CARTER BRYANT WAS THE

7  CREATOR OF BRATZ.  THAT IS ACTUALLY CONTRADICTED BY THEIR OWN

8  RFA RESPONSES IN THIS CASE.  IN FACT, THEY ACCUSE US, IN THEIR

9  BRIEFS, OF MISREPRESENTING TO THE COURT THEIR ANSWERS TO THESE

10  RFA'S.  04:18

11      I THINK IT'S WORTH QUOTING HERE, ON PAGE 8 OF THEIR

12  REPLY, THAT, QUOTE, "AND NEITHER DOES MATTEL'S OUTRIGHT

13  DECEPTION THAT MGA PURPORTEDLY ADMITTED THAT NO PUBLIC

14  STATEMENT, EVEN RECOGNIZING BRYANT AS BRATZ'S CREATOR, WAS

15  ISSUED UNTIL JULY 18, 2003 WHEN THE WALL STREET JOURNAL  04:18

16  PUBLISHED AN ARTICLE WITH THAT INFORMATION.  ONE LOOK AT MGA'S

17  RESPONSES, CITED IN SUPPORT OF THIS ASSERTION, CONFIRMS THAT

18  THE REQUESTS FOR ADMISSION IN QUESTION WERE ACTUALLY DENIED,"

19  END QUOTE.

20      NOW, IF WE CAN PULL UP THEIR RFA RESPONSES.  04:18

21      REQUEST FOR ADMISSION 183, "ADMIT THAT PRIOR TO

22  JULY 1, 2003, MGA HAD NOT ISSUED ANY PRESS RELEASE THAT

23  IDENTIFIED BRYANT AS THE CREATOR OF BRATZ."

24      YOU'LL SEE, THEN, DOWN BELOW, THERE ARE SOME

25  OBJECTIONS, GENERAL OBJECTIONS, AND IT SAYS, "MGA ADMITS THE  04:19

```
 1   REQUEST."

 2          FURTHER DOWN, 184, "ADMIT THAT MGA IS NOT AWARE OF

 3   ANY PRESS REPORT OR PUBLICATION THAT IDENTIFIED BRYANT AS THE

 4   CREATOR OF BRATZ PRIOR TO JULY 15, 2003."

 5          THE RESPONSE HERE IS, AFTER THE OBJECTIONS, "MGA          04:19

 6   ADMITS THE REQUEST."

 7          REQUEST FOR ADMISSION 185, "ADMIT THAT THE FIRST

 8   PRESS REPORT OR PUBLICATION THAT IDENTIFIED BRYANT AS THE

 9   CREATOR OF BRATZ WAS THE WALL STREET JOURNAL ARTICLE ENTITLED

10   'DOLLED UP TO LURE OLDER GIRLS, MATTEL BRINGS IN HIP-HOP         04:19

11   CROWD,' AND PUBLISHED ON JULY 18, 2003."

12          AFTER THE OBJECTIONS, "MGA ADMITS THE REQUEST."

13          SO THIS NOTION, TOO, THAT IN PIECING TOGETHER THEIR

14   CHRONOLOGY, THAT SOMEHOW IT WAS PUBLICLY CONFIRMED, PUBLICLY

15   KNOWN, AND SOMEHOW DISCLOSED BY MGA THAT CARTER BRYANT WAS THE   04:20

16   CREATOR OF BRATZ, IS CONTRADICTED BY THE RECORD.

17          NOW, ALL OF THIS IS IMPORTANT, TOO, FOR PURPOSES OF

18   THE FRAUDULENT CONCEALMENT.  THE FACT IS THAT THEY HAVE

19   ATTEMPTED TO EXCUSE ISAAC LARIAN'S STATEMENTS TO THE PRESS; TO

20   THE COURT'S; TO THE TRADEMARK OFFICE, THE PATENT OFFICE, BY      04:20

21   THIS IDEA THAT SOMEHOW IT WAS ALL THE RESULT OF RECEIVING A

22   CEASE AND DESIST LETTER FROM MATTEL ABOUT DIVA STARZ AND THAT,

23   OBVIOUSLY, THIS DOES NOT ACCOUNT FOR ANYTHING.

24          THERE'S NO EVIDENCE OF THAT; AND CHRONOLOGICALLY, IT

25   MAKES NO SENSE.                                                 04:20
```

 1          RACHEL HARRIS, WHO WAS AN MGA EMPLOYEE IN 2000,

 2    TESTIFIED QUITE SPECIFICALLY AND REPEATEDLY THAT THE

 3    INSTRUCTION BY MR. LARIAN TO CONCEAL MR. BRYANT'S ROLE AND THAT

 4    HE HIMSELF, MR. LARIAN, WOULD BE FALSELY TAKING CREDIT FOR THE

 5    CREATION OF BRATZ STARTED IN 2000, TWO YEARS BEFORE THE CEASE          04:21

 6    AND DESIST LETTER THAT THEY NOW TRY AND RELY UPON AS SOMEHOW

 7    BEING EVIDENCE OF -- OR REALLY AN EXCUSE FOR THOSE STATEMENTS

 8    THAT MR. LARIAN HAD MADE OVER AND OVER OVER THE YEARS.

 9          AND IT, OBVIOUSLY, JUST DOES NOT ACCOUNT IN ANY WAY

10    AS TO WHY MR. LARIAN WOULD BE TAKING CREDIT -- INCORRECTLY,           04:21

11    FALSELY, AS HE HAD TO HAVE KNOWN -- FOR THE CREATION OF BRATZ

12    TO BUSINESSWEEK IN JULY OF 2003, RIGHT AROUND THE SAME TIME AS

13    THAT WALL STREET JOURNAL ARTICLE CAME OUT.

14          **THE COURT:**  VERY GOOD, COUNSEL.  I THINK I HAVE A

15    PRETTY GOOD UNDERSTANDING OF YOUR POSITION ON THIS.                   04:21

16          I DO WANT TO MOVE ALONG.  IT'S 4:20, SO WE DO NEED TO

17    MOVE ALONG.

18          ARE THERE ANY OTHER CRITICAL POINTS THAT YOU NEED TO

19    ADDRESS?

20          **MR. ZELLER:**  THERE ARE CERTAINLY OTHER STATEMENTS I         04:21

21    COULD CORRECT, BUT I'LL LEAVE IT FOR NOW, YOUR HONOR.

22          **THE COURT:**  VERY WELL.

23          MR. NOLAN, VERY BRIEFLY.

24          **MR. NOLAN:**  I KNOW.  BUT....

25          YES, I UNDERSTAND.                                             04:22

1          YOUR HONOR, MR. ZELLER COMMENTED ABOUT MY SPECULATION

2    ON THE PRIVILEGE ISSUE, IF YOU'LL RECALL THAT.  MR. ZELLER, IN

3    HIS ARGUMENT, JUST QUOTED FROM AN E-MAIL, A PORTION OF AN

4    E-MAIL, THAT IS THE SUBJECT OF A MOTION BEFORE YOU ON CLAWBACK.

5    IT IS A COMMUNICATION BY ISAAC LARIAN TO HIS ATTORNEY.                  04:22

6    MR. ZELLER KNOWS THAT.  WE'VE ASKED THEM, UNDER THE PROTECTIVE

7    ORDER, TO RETURN IT TO US.  THEY'VE REFUSED.  WE ASKED THEM TO

8    REDACT IT OUT OF THEIR BRIEF.  THEY REFUSED.  WE HAD TO FILE A

9    MOTION IN FRONT OF YOU; AND NEVERTHELESS, HE GOES THROUGH THE

10   STOP SIGN.                                                             04:22

11         THE RULES HAVE TO APPLY BOTH WAYS EQUALLY.

12         ALSO, REAL QUICKLY, YOUR HONOR, THEY GO TO,

13   INTERESTINGLY, OUR EXPERT, TONNER, TO GO TO THIS CORE ISSUE

14   THAT THEY IDENTIFY AS BEING THE TIME TO DELIVER A FASHION DOLL

15   TO THE MARKET.  IT'S NOT TONNER'S IMPRESSION OF THAT THAT             04:22

16   COUNTS.  WE DIDN'T HIRE HIM UNTIL 2008.

17         A ONE-MINUTE CLIP, I'D LIKE TO PLAY; KEVIN FARR,

18   MATTEL'S CFO, ON THE VERY ISSUE; AND IT'S HIS STATE OF MIND AT

19   MATTEL THAT COUNTS FOR YOU.  THIS IS KEVIN FARR.

20         (VIDEOTAPE DEPOSITION PLAYS.)                                    04:23

21         **MR. NOLAN:**  YOUR HONOR, MR. ZELLER SAID THIS WHOLE

22   THING ABOUT STATUTE OF LIMITATIONS.  I GOT TO TAKE THE

23   DEPOSITIONS OF CASSIDY PARK AND RICHARD DE ANDA.  I WANT TO

24   PLAY THIS QUICK CLIP FROM CASSIDY PARK.

25         REMEMBER, CASSIDY PARK WAS THE ONE THAT WAS THE VICE            04:23

1    PRESIDENT AND KNEW IN 2001, AND ALSO WAS INTERVIEWED BY

2    MR. DE ANDA.  THIS IS WHY THE STATUTE OF LIMITATIONS IS

3    IMPORTANT.

4            PLEASE PLAY CASSIDY PARK.

5            THIS IS AT PAGE 107.  AND WE'LL SUBMIT THESE, YOUR          04:23

6    HONOR, AS PART OF THE RECORD, SO THE COURT REPORTER DOESN'T

7    HAVE TO DO IT.

8             CASSIDY PARK.

9            (VIDEOTAPED DEPOSITION PLAYS.)

10           **MR. NOLAN:**  SHE'S EITHER FORGETFUL -- BUT WE SURE        04:24

11   WISH THIS LAWSUIT HAD BEEN FILED EARLIER, AND WE WOULD HAVE

12   BEEN ASKING THOSE QUESTIONS EARLIER, BECAUSE SHE'S FORGOTTEN

13   IT.  BUT I'VE, APPARENTLY, HAD COMPLETE ACCESS TO CASSIDY PARK.

14           RICHARD DE ANDA, WE TOOK HIS DEPOSITION.  YOU'RE

15   ABSOLUTELY RIGHT, I DID.  MR. DE ANDA ANSWERED, FOR A TOTAL OF      04:24

16   213 TIMES, THAT HE COULD NOT RECALL, INCLUDING COULD NOT RECALL

17   WITH SPECIFICITY WHAT SHE TOLD HIM.

18           YOUR HONOR, THE POINT IN THIS CASE -- AND WE

19   SUBMITTED ON FRIDAY AFTERNOON A SUPPLEMENTAL CITATION TO THE

20   APRIL 15TH DECISION.                                               04:25

21           **THE COURT:**  THERE WERE SEVERAL SUPPLEMENTAL DOCUMENTS

22   THAT CAME IN ON FRIDAY AFTERNOON.

23           **MR. NOLAN:**  YEAH.  THIS ONE WAS REALLY GOOD, THOUGH.

24           **THE COURT:**  I WON'T MAKE ANY FURTHER EDITORIAL

25   COMMENTS; BUT GO AHEAD, COUNSEL.                                   04:25

```
 1              (LAUGHTER.)

 2         MR. NOLAN:  I'LL TAKE THAT AS A CONCURRENCE,

 3   YOUR HONOR.  THANK YOU.

 4         THE COURT:  TAKE THAT HOWEVER YOU WANT, COUNSEL.

 5         MR. NOLAN:  I'M SORRY.  I APOLOGIZE.  I KNOW THIS IS     04:25

 6   SERIOUS, AND IT'S LATE IN THE DAY.

 7         IT'S PLATT ELECTRIC SUPPLY, INC. V. EOFF.  IT IS

 8   CITED -- THE WEST LAW CITATION, 2008, WEST LAW 1722882; AND IT

 9   SAYS, "PLAINTIFF NEED NOT BE AWARE OF THE SPECIFIC FACTS

10   NECESSARY TO ESTABLISH A CLAIM, SINCE THEY CAN BE DEVELOPED IN   04:25

11   PRETRIAL DISCOVERY.  WRONG AND WRONGDOING IN THIS CONTEXT ARE

12   UNDERSTOOD AND THEY'RE LAY AND NOT LEGAL SENSES."

13         MY POINT, YOUR HONOR, IS THAT CASSIDY PARK, THE

14   DESIGN CENTER, ALL KNEW THAT CARTER BRYANT WAS BEHIND BRATZ IN

15   THE SUMMER OF 2001; AND WHETHER OR NOT THE LEGAL DEPARTMENT     04:26

16   INITIATED AN INVESTIGATION IS NOT NECESSARY, BECAUSE HAD THEY

17   CONDUCTED A REASONABLE INVESTIGATION, THEY WOULD HAVE FOUND

18   THAT THERE WAS A BREACH OF THE EMPLOYMENT AGREEMENT.

19   ALLEGEDLY, AS THE WAY THEY INTERPRETED IT, YOU WOULD LOSE THE

20   BREACH OF CONTRACT, THE FIDUCIARY DUTY, THE AIDING AND         04:26

21   ABETTING, THE INTENTIONAL INTERFERENCE; THAT ALL GOES BY THE

22   WAYSIDE.

23         THIS IS MY LAST POINT:

24         MR. ZELLER CONTINUES TO SAY TO YOU THAT HE

25   INVESTIGATED -- AND IT IS HE.  I MEAN, I DO PERSONALLY TAKE    04:26
```

```
 1    ISSUE WITH THE QUESTION THAT WAS POSED TO MR. ZELLER, 'I KNOW

 2    WHY YOU DO IT.'  BUT IN A CASE WHERE THEY'RE SEEKING A BILLION

 3    DOLLARS FROM MY CLIENT, I DON'T KNOW WHETHER OR NOT I HAVE TO

 4    RELY ON A REPRESENTATION THAT IS NOT TESTED BY LOOKING AT HIS

 5    INVESTIGATIVE FILES.  HE SAYS THAT TOON TEENS -- HE LOOKED AT      04:27

 6    IT; IT'S NOT PART OF THE CASE; THEY'RE SUING ON BRATZ.

 7         I'M GOING TO END ON ONE THING, YOUR HONOR.  I'D LIKE

 8    TO GO TO THE INTERROGATORY RESPONSES, THE PORTION THAT I DID

 9    NOT SHOW YOU.  THIS IS THE RESPONSE THAT WAS FILED IN MARCH OF

10    2008.                                                             04:27

11         "BRYANT BORROWED FROM MATTEL INTELLECTUAL PROPERTY TO

12    DEVELOP BRATZ."

13         THIS IS WHAT THEIR CLAIM IS IN THIS CASE.

14         "OTHER EVIDENCE ADDUCED TO DATE ALSO SHOWS THAT

15    BRYANT BORROWED SOME OF HIS IDEAS FOR BRATZ FROM PREEXISTING       04:27

16    MATTEL PROJECTS.  BRATZ HAS CERTAIN ATTRIBUTES, TOO MANY TO BE

17    COINCIDENTAL, THAT ARE SIMILAR TO PRODUCTS THAT WERE UNDER

18    DEVELOPMENT WHILE BRYANT AND OTHER MATTEL EMPLOYEES WHO WORKED

19    WITH MGA ON BRATZ WORKED AT MATTEL.  FOR EXAMPLE, E-MAILS AND

20    OTHER DOCUMENTS SHOW THAT BRYANT RELIED ON THE BODY OF MATTEL'S    04:27

21    SKIPPER DOLL FOR HIS DESIGN OF THE BRATZ DOLL BODY.

22         "MOREOVER, THE EVIDENCE SHOWS THAT BRYANT BORROWED

23    FROM A MATTEL PROJECT CALLED TOON TEENS IN FORMULATING HIS

24    IDEAS FOR BRATZ.  LILY MARTINEZ, THE DESIGNER FOR TOON TEENS,

25    HAD HER SKETCHES POSTED IN HER CUBICLE IN 1999.  BRYANT           04:28
```

1   COMMENTED THAT HE LIKED MS. MARTINEZ'S TOON TEEN SKETCHES AND

2   HAD NEVER SEEN ANYTHING LIKE THEM.  BRYANT'S EXPOSURE TO

3   TOON TEENS DESIGNS AND THE SIMILARITIES BETWEEN THE TOON TEENS

4   DRAWINGS AND BRYANT'S BRATZ DRAWINGS TENDS TO ESTABLISH NOT

5   ONLY THAT BRYANT CREATED BRATZ WHILE EMPLOYED BY MATTEL, BUT          04:28

6   ALSO THAT BRYANT BORROWED SOME OF HIS IDEAS FOR BRATZ FROM

7   MATTEL'S INTELLECTUAL PROPERTY."

8           THEN THE VERY LAST CITATION, YOUR HONOR, I WANT TO

9   SHOW YOU IS AN E-MAIL FROM ELISE CLOONAN TO LILLY MARTINEZ IN

10  THE SUMMER OF 2001.  AND THIS IS IN OUR PAPERS, AND I'LL GET         04:29

11  YOU THE CITATION IN JUST A MOMENT TO SHOW YOU HOW WIDESPREAD

12  THIS WAS KNOWN AT MATTEL.

13          THIS IS FROM ELISE CLOONAN, DESIGN CENTER AT

14  MATTEL -- THAT'S WHO SHE WORKS FOR -- TO LILLY MARTINEZ; AND IT

15  SAYS, "ALSO, DID YOU SEE THE DOLLS BY MGA CALLED BRATZ?  THEY       04:29

16  LOOK REALLY CLOSE TO LILYPAD'S TOON TEENS.  I MEAN REALLY

17  CLOSE.  THE FACE PAINT, EYES, ESPECIALLY, LOOK LIKE LILLY

18  PAINTED THEM HERSELF.  THEY EVEN HAVE THE SAME BIG FEET THAT

19  SOMEHOW BOTHERED MATTEL EXECUTIVES.  AND THEY DON'T EVEN HAVE A

20  FEATURE; SOMETHING THAT MATTEL EXECS ALSO WERE ON OUR BACKS         04:29

21  ABOUT.  IF YOU HAVEN'T BOUGHT THEM ALREADY, YOU SHOULD.  THEY

22  REALLY LOOK GREAT.  TELL CARTER THANKS FOR HELPING ME GET THE

23  SCOOP ON TARMICHAEL.  I'M LOOKING FORWARD TO SEEING YOU."

24          THEY WERE WELL ON NOTICE, YOUR HONOR.  THE FACT THAT

25  THEY BLEW IT AND DIDN'T CONDUCT THE REASONABLE INVESTIGATION        04:30

```
 1   THAT PLATT AND SOLIMAN AND THE JOLLY CASES SAY THEY SHOULD HAVE

 2   DOESN'T EXCUSE THEM.

 3           I'LL SUBMIT.

 4           THANK YOU VERY MUCH FOR YOUR PATIENCE.

 5       THE COURT:  THANK YOU, COUNSEL.                            04:30

 6       MR. ZELLER:  JUST ONE QUICK POINT, YOUR HONOR --

 7       THE COURT:  VERY QUICKLY.

 8       MR. ZELLER:  -- BECAUSE THIS REALLY KIND OF

 9   ILLUSTRATES THE FACT HOW THIS IS COBBLED TOGETHER, IN A WAY

10   THAT REALLY IS NOT A CORRECT REPRESENTATION OF THE FACTS.      04:30

11           THAT LAST E-MAIL THAT WAS JUST PUT UP INVOLVED

12   ELISE CLOONAN.  ELISE CLOONAN WAS CARTER BRYANT'S ROOMMATE, HIS

13   FRIEND, A FELLOW DESIGNER THERE AT MATTEL.  SHE WAS DEPOSED IN

14   THIS CASE.  SHE WAS ASKED DID SHE KNOW THAT CARTER BRYANT DID

15   THIS WHEN HE WAS EMPLOYED BY MATTEL.  SHE SAID SHE HAD NO IDEA. 04:30

16           SHE DID NOT EVEN KNOW THAT CARTER BRYANT WAS

17   INVOLVED -- OR WAS THE CREATOR OF BRATZ, I SHOULD SAY, UNTIL

18   AFTER SHE HAD LEFT MATTEL AND SHE WAS ON A CROSS-COUNTRY TRIP,

19   STOPPED IN MISSOURI IN NOVEMBER OF 2002, AND ASKED CARTER

20   POINT-BLANK, IN WHICH HE SAID, 'YEAH, I DID DO IT.'            04:31

21           'WELL, WHY DIDN'T YOU TELL ME CARTER?  I DIDN'T

22   KNOW.'

23           'WELL, BECAUSE I WANTED TO PROTECT YOU.'

24           THIS IS EVIDENCE OF FRAUDULENT CONCEALMENT.  THIS IS

25   NOT EVIDENCE OF MATTEL'S KNOWLEDGE OR NOTICE TO MATTEL.  THIS   04:31
```

```
 1   IS EVIDENCE OF FRAUDULENT CONCEALMENT.  AND THE VERY FACT

 2   THAT --

 3           THE COURT:  THERE'S CLEARLY SUSPICION, COUNSEL.

 4           MR. ZELLER:  WELL, I WOULD AGREE WITH THAT.  BUT

 5   SUSPICIONS OF WHAT?  THAT CARTER BRYANT HAD SOMETHING TO DO      04:31

 6   WITH BRATZ?  THAT IS NOT ACTIONABLE.

 7           AND THEN HE COPIED TOON TEENS, WHICH I DON'T THINK

 8   ANYONE SAID DIFFERENTLY ON THAT.  BUT THAT IS NOT THE

 9   INFRINGEMENT CLAIM THAT WE HAVE BROUGHT, AND IT'S NOT THE CLAIM

10   WE BROUGHT IN THIS CASE.                                        04:31

11           THE COURT:  I UNDERSTAND THAT.

12           MR. ZELLER:  IT'S EVIDENCE, BUT IT'S NOT THE CLAIM.

13           THE COURT:  VERY GOOD.

14           DON'T GO ANYWHERE, COUNSEL, UNLESS -- MR. QUINN, ARE

15   YOU COMING BACK FOR PREEMPTION?                                 04:32

16           MR. QUINN:  NOT ME, YOUR HONOR.

17           THE COURT:  ALL RIGHT.

18           MS. ANDERSON:  YOUR HONOR, I JUST HAD A FEW QUICK

19   POINTS, I HAVE A COUPLE OF MINUTES, BUT THEY WOULD WRAP UP

20   EVERYTHING; SO IF YOUR HONOR IS GOING ON TO THE NEXT ARGUMENT,  04:32

21   THAT'S FINE.

22           THE COURT:  ARE YOU SURE?

23           MS. ANDERSON:  YES.  THAT'S FINE.  THANK YOU.

24           THE COURT:  ALL RIGHT.  I'LL ACCEPT THE INVITATION.

25           MS. ANDERSON:  SOME OF THE STATUTE OF LIMITATIONS       04:32
```

```
1   ARGUMENTS IN OUR PAPERS.  WE JOIN IN THEM.  SAME NOTICE FACTS

2   PUTS THEM ON NOTICE OF CLAIMS AGAINST MR. BRYANT AS WELL.

3           THE COURT:  VERY GOOD.  THANK YOU, COUNSEL.

4           TURNING TO MGA'S MOTION, THE FIRST ISSUE IS THE

5   STATUTE OF LIMITATIONS.  WE'VE ADDRESSED THAT.            04:32

6           LET'S MOVE ON TO PREEMPTION.

7           MR. RUSSELL:  YES, YOUR HONOR.  I THINK I CAN DO THIS

8   QUICKLY.

9           THE TEST FOR PREEMPTION IS WELL ESTABLISHED.

10          THE COURT:  IT IS.  AND I'VE READ IT SEVERAL TIMES.   04:32

11          MR. RUSSELL:  GREAT.  SO LET'S JUST GO THROUGH THE

12   CLAIMS QUICKLY.

13          ON THE CLAIM FOR CONVERSION, I'M JUST GOING TO FOCUS

14   ON THEIR ARGUMENTS, WHICH I THINK ARE SOMEWHAT UNUSUAL.  IF YOU

15   READ THEIR BRIEF, MATTEL DISSECTS THEIR CONVERSION CLAIM INTO   04:32

16   TWO PIECES.  THEY CLAIM FOR CONVERSION OF IDEAS, WHICH THEY

17   ACKNOWLEDGE IS NOT PERMISSIBLE UNDER A CLAIM FOR CONVERSION; SO

18   I DON'T KNOW WHAT MORE THERE IS TO SAY THERE, OTHER THAN THE

19   FACT THAT MELCHIOR, DIELSI, IDEMA, AND SELBY, AS THEY NOTE IN

20   THEIR OWN BRIEF, ALL HOLD THAT CONVERSION CANNOT BE ALLOWED FOR  04:33

21   CONVERSION OF INTANGIBLE IDEAS.

22          THEY THEN ATTEMPT TO MOVE ON -- LET ME JUST ADDRESS

23   TWO.  THEY CITE TWO CASES, NEITHER WHICH APPLY.  FIRST,

24   CAVALIER V. JIM HENSON, WHICH IS A STATE LAW CLAIM FOR THEFT OF

25   IDEAS.  IF THEY HAD PLED THAT CLAIM, I SUPPOSE WE COULD ARGUE   04:33
```

```
 1   ABOUT IT; THOUGH EVEN IN THAT CASE, AND IN SUBSEQUENT CASES,
 2   CALIFORNIA LAW HAS CALLED INTO QUESTION WHETHER OR NOT THAT
 3   CLAIM WOULD EVEN BE VIABLE.  BUT CERTAINLY WITH RESPECT TO A
 4   CLAIM FOR CONVERSION, THERE CAN BE NO CONVERSION OF AN
 5   INTANGIBLE IDEA.  THEY ADMIT IT.  IT'S CLEAR LAW.  SO THAT PART      04:33
 6   OF THE CLAIM, BY EVERY MEASURE, IS PREEMPTED.
 7          THE COURT:  I AGREE.  OR AT LEAST IT'S -- IT'S NOT
 8   NECESSARILY PREEMPTED.  IT'S JUST NOT --
 9          MR. RUSSELL:  IT'S JUST NOT A CLAIM.
10          THE COURT:  THE TORT OF CONVERSION DOES NOT APPLY TO          04:33
11   AN IDEA.
12          MR. RUSSELL:  CORRECT.
13          NOW, THE SECOND PIECE, THEY TRY TO PARSE OUT THE
14   TANGIBLE PROPERTY THAT THEY'RE SEEKING RECOVERY OF.
15          NOW, YOU'LL NOTE -- YOU CAN READ THE BRIEF --                04:34
16          THE COURT:  AND THAT SEEMS TO BE AN ADDITIONAL
17   ELEMENT THAT WOULD BE NOT BE COVERED BY COPYRIGHT.
18          MR. RUSSELL:  IT CERTAINLY WOULD BE IF THEY PUT ANY
19   EVIDENCE IN OF WHAT IT WAS THEY WERE SEEKING.
20          NOW, WE PUT EVIDENCE IN OUR OPENING BRIEF SHOWING            04:34
21   THAT WHAT WE COULD GLEAN FROM THEIR DISCOVERY WAS A DISCARDED
22   DOLL HEAD.  AND THAT'S UNDISPUTED.  MR. BRYANT FOUND A DOLL
23   HEAD IN THE TRASH AT MATTEL AND USED IT.  AND UNDER THE ANANDA
24   CASE, TRASH CANNOT BE THE BASIS FOR A CLAIM FOR CONVERSION; SO
25   WE CAN JUST TAKE THE DOLL HEAD, PUT IT OUT.                         04:34
```

1        WE ALSO CITED, YOUR HONOR, TO CASES SAYING THAT

2   DE MINIMIS VALUE CANNOT SUPPORT A CLAIM FOR CONVERSION.  THAT

3   WOULD, OF COURSE, RELATE TO THE PHONE CALLS AND THE LIKE.  BUT

4   IF YOU READ THEIR BRIEF -- AND I'LL DIRECT YOU TO IT -- THEY

5   CITE TO THEIR COMPLAINT.  THAT'S IT.  PAGE 73 OF THEIR BRIEF,        04:34

6   THEY CITE THEIR COMPLAINT, PARAGRAPH 157, PARAGRAPH 158.  NOT

7   EVIDENCE.  THE COMPLAINT.

8        YOU DON'T HAVE TO RELY ON THAT, AND NOR DO WE.

9   THEY'VE NEVER IDENTIFIED WHAT IT IS THAT WAS ALLEGEDLY

10  CONVERTED BECAUSE THEY DON'T HAVE ANYTHING THAT WAS CONVERTED.     04:35

11  THE TRUTH IS, THEY NEVER POSSESSED THE DRAWINGS.  THEY'RE NOT

12  EVEN ARGUING THAT THE DRAWINGS WERE CONVERTED.  THEY DON'T PUT

13  EVIDENCE IN THAT THAT'S WHAT'S CONVERTED.  SO THERE IS NO

14  TANGIBLE PROPERTY THAT COULD BE CONVERTED.  SO THAT PART OF THE

15  CLAIM SIMPLY FAILS FOR A LACK OF EVIDENCE AS WELL.                 04:35

16       SO THE CONVERSION CLAIM SHOULD SIMPLY DISAPPEAR.

17       WITH RESPECT TO THE CLAIM FOR INTERFERENCE WITH

18  CONTRACT, WE'VE CITED YOUR HONOR TO LEGIONS OF DECISIONS THAT

19  HOLD THAT THE ADDITIONAL ELEMENTS OF INTENT AND AWARENESS AND

20  THE LIKE ARE NOT SUFFICIENT UNDER THE COPYRIGHT ACT TO ESCAPE     04:35

21  PREEMPTION.  AND WE HAVE MORE CASES THAN I CARE TO RELY UPON;

22  BUT SUFFICE IT TO SAY, WE HAVE MANY.  THEY ESSENTIALLY HAVE ONE

23  OR TWO CASES IN RESPONSE, WHICH ARE VERY DISTINCT FROM THIS

24  CASE.  THEY HAVE THE ALTERA CASE, WHICH IS A PERMITTED USER,

25  CONDITIONAL USER CASE, IN WHICH THE PROTECTED EXTRA ELEMENT IS    04:35

```
 1   A CONTRACT BETWEEN THE PLAINTIFF AND CONSUMERS.

 2            NOW, WE DON'T HAVE THAT HERE.  I MEAN, THE CONTRACT

 3   WE'RE TALKING ABOUT, OF COURSE, IS THE CONTRACT WITH

 4   CARTER BRYANT, THE CONTRACT THAT, ACCORDING TO THEM, MR. BRYANT

 5   CHOSE TO BREACH; SO THERE IS NO ADDITIONAL ELEMENT.  THE VERY        04:36

 6   THING THAT THEY'RE ALLEGING WAS BREACHED WAS THE OBLIGATION TO

 7   TURN OVER THE PROPERTY, THE INTANGIBLE PROPERTY THAT THEY THEN

 8   WISHED TO EXPLOIT.

 9            THE COURT:  I TEND TO AGREE, COUNSEL.

10            MR. RUSSELL:  OKAY.  I WON'T BELABOR IT, THEN.           04:36

11            LASTLY, WITH RESPECT TO UNFAIR COMPETITION, AGAIN, WE

12   ARE SQUARELY WITHIN -- THIS IS THE SMITH & HAWKEN CASE.  IT

13   COULDN'T BE MORE CLEAR WHAT WE'RE TALKING ABOUT HERE.  THE

14   ALLEGED ACTS THAT WE'RE TALKING ABOUT ARE ACTS IN WHICH MGA AND

15   CARTER BRYANT ARE ALLEGED TO HAVE TAKEN AWAY FROM MATTEL THE        04:36

16   RIGHT TO EXPLOIT INTANGIBLE PROPERTY FIXED AND IMMEDIATE.  THIS

17   IS EXACTLY WHAT THE COPYRIGHT ACT COVERS, SQUARELY PREEMPTED.

18   AND THEY DON'T HOLD ANYTHING DIFFERENT.  THE ONLY ARGUMENT THAT

19   THEY CAN COME UP WITH, FOR AN ADDITIONAL ELEMENT, FOR THEIR

20   UNFAIR COMPETITION CLAIM, IS THE ELEMENT OF BRIBERY.  THEY          04:37

21   POINT TO THAT.  THEY ALSO POINT TO TRADE SECRETS.  TRADE

22   SECRETS, OF COURSE, ISN'T FAIR GAME FOR PHASE ONE.

23            THE COURT:  THE INTENTIONAL INTERFERENCE WITH

24   CONTRACTUAL --

25            MR. RUSSELL:  WHICH FAILS, FOR THE REASONS WE JUST        04:37
```

```
 1   SAID.  YOU CAN'T BASE A CLAIM FOR UNFAIR COMPETITION TO ESCAPE

 2   PREEMPTION BY RELYING ON A PREEMPTED CLAIM.  AND THEY DON'T

 3   CITE --

 4          THE COURT:  SO THAT LEAVES COMMERCIAL BRIBERY.

 5          MR. RUSSELL:  CORRECT.                                   04:37

 6          AND THE COMMERCIAL BRIBERY THAT WE'RE TALKING ABOUT

 7   HERE IS, ALLEGEDLY, MR. BRYANT WAS BRIBED TO TURN OVER THE

 8   INTELLECTUAL PROPERTY.  IT IS PART AND PARCEL IF YOU FOLLOW THE

 9   DEL MADERA CASE.  FIRST OF ALL, WE DISPUTE THE BRIBERY AT EVERY

10   LEVEL AND CONTEND THAT THERE'S NO EVIDENCE.                     04:37

11          THE COURT:  I UNDERSTAND.

12          MR. RUSSELL:  ACCEPTING THAT, EVEN IF YOU ACCEPT

13   THAT, WHAT WAS IT THAT HE WAS ALLEGEDLY BRIBED TO DO?

14          YOU SAW FROM MR. NOLAN THE INTERROGATORY RESPONSES.

15   WHAT MR. BRYANT WAS ALLEGEDLY BRIBED TO DO WAS TO MISUSE HIS    04:37

16   POSITION TO TURN OVER TO MGA INTELLECTUAL PROPERTY THAT MATTEL

17   WISHED TO EXPLOIT.  THIS IS, UNDER DEL MADERA AND ITS PROGENY,

18   AND SMITH & HAWKEN, DIRECTLY WITHIN THE AMBIT OF THE COPYRIGHT

19   ACT, AND HENCE PREEMPTED.  THERE'S NO ADDITIONAL ELEMENT.

20          AND WE'RE NOT TALKING ABOUT BRIBERY SEPARATE AND         04:38

21   APART FROM INTELLECTUAL PROPERTY.  IT'S THE VERY REASON FOR THE

22   BRIBERY, ALLEGEDLY.  THEY BRIBED HIM TO GET THE PROPERTY.  SO

23   THERE IS NO ADDITIONAL ELEMENT.  IT'S EXACTLY WHAT THEY'RE

24   SEEKING TO EXPLOIT.  IT'S EXACTLY WHAT THE COPYRIGHT ACT WOULD

25   GIVE THEM RIGHTS TO EXPLOIT, IF THEY, IN FACT, HAD SUCH RIGHTS. 04:38
```

1        SO, AGAIN, I THINK THAT, WE WOULD SUBMIT, IS CLEARLY

2   PREEMPTED.

3        AND UNLESS YOUR HONOR HAS QUESTIONS, I'LL DEFER TO MY

4   COLLEAGUES.

5        **THE COURT:**  VERY WELL.                                04:38

6        BEFORE I HEAR FROM MATTEL, DOES CARTER BRYANT WISH TO

7   JOIN IN ON ANY OF THIS?

8        **MS. ANDERSON:**  WE CONCUR WITH THE ARGUMENTS OF MGA

9   COUNSEL.  THANK YOU.

10        **THE COURT:**  VERY WELL.

11        ALL RIGHT.  MR. ZELLER.

12        **MR. ZELLER:**  I DO THINK THAT IT'S ACTUALLY QUITE

13   CLEAR THAT THE INTENTIONAL INTERFERENCE WITH CONTRACT CLAIM IS

14   NOT PREEMPTED.  IT REQUIRES ADDITIONAL ELEMENTS, NOT THE LEAST

15   OF WHICH IS A CONTRACT.  THERE'S NOT JUST SIMPLY INDUCEMENT.    04:39

16   THAT SEEMS TO BE WHAT THEY WERE PRINCIPALLY FOCUSING ON IN THE

17   ISSUES OF INTENT.  BUT THE EXTRA ELEMENT IN THIS CLAIM IS,

18   WITHOUT QUESTION, THE ESTABLISHMENT OF A CONTRACT.

19        WE DO NOT HAVE TO ESTABLISH A CONTRACT AS A

20   PREREQUISITE TO ANY COPYRIGHT INFRINGEMENT CLAIM.  AND WHAT I   04:39

21   WOULD REFER THE COURT TO, IN TERMS OF NINTH CIRCUIT AUTHORITY,

22   IS THE ALTERA COURT CASE, WHICH REJECTED THE CLAIM THAT

23   INTERFERENCE WITH A SOFTWARE LICENSE AGREEMENT BY COPYING

24   SOFTWARE FILES TO ATTRACT NEW CUSTOMERS WAS PREEMPTED.

25        THERE'S THE SUMMIT MACHINE CASE, ALSO THE NINTH           04:39

1    CIRCUIT, WHICH MADE QUITE CLEAR THAT AN INTERFERENCE CLAIM

2    THERE WAS NOT PREEMPTED BECAUSE IT HAS THIS EXTRA ELEMENT.  AND

3    AS THEY SAY, THE MOST GLARINGLY OBVIOUS EXTRA ELEMENT IS THE

4    CONTRACT ITSELF.

5            THAT IS NOT AN ELEMENT OF A COPYRIGHT INFRINGEMENT       04:39

6    CLAIM, SO IT JUST SIMPLY CANNOT BE PREEMPTED.

7            NOW, IN TERMS OF THE UNFAIR COMPETITION CLAIM, ONE

8    ISSUE THAT HAS CERTAINLY COME UP IS, TO WHAT DEGREE IS A CLAIM

9    OF COMMERCIAL BRIBERY PREEMPTED?  THAT SEEMS TO BE WHERE THINGS

10   HAVE BOILED DOWN TO.  BECAUSE, FRANKLY, IF A PORTION OF THIS IS   04:40

11   GOING TO TRIAL -- I MEAN, THE COMMERCIAL BRIBERY IS NOT

12   PREEMPTED, THEN THAT CLAIM, OBVIOUSLY, SURVIVES AS BEING A

13   PREDICATE FOR THAT CLAIM.

14           COMMERCIAL BRIBERY, LIKEWISE, IS ABSOLUTELY NOT AN

15   ELEMENT OF A COPYRIGHT INFRINGEMENT CLAIM.  I MEAN, THAT'S        04:40

16   REALLY THE BASIS THAT YOU CAN USE AS A TEST TO DETERMINE

17   WHETHER OR NOT A PARTICULAR CLAIM IS PREEMPTED.  THOSE RIGHTS

18   ARE SIMPLY NOT EQUIVALENT, AND THEY ALSO ARE NOT NECESSARY.  WE

19   OBVIOUSLY, TO ESTABLISH COPYRIGHT INFRINGEMENT, DON'T HAVE TO

20   SHOW ANY KIND OF PAYMENT, ANY KIND OF COMMERCIAL BRIBERY,        04:40

21   WITHIN THE PENAL CODE, AS WE WILL DO FOR THE UNFAIR COMPETITION

22   CLAIM.

23           AND I WILL NOTE THAT THE CHARACTERIZATION OF OUR

24   CLAIM IS A LITTLE BIT, I THINK, TOO NARROW.  THE FACT IS THAT

25   THERE WAS COMMERCIAL BRIBERY NOT ONLY BECAUSE MGA PAID           04:41

1    CARTER BRYANT, CARTER BRYANT PAID OTHERS.  AND WE ALSO BELIEVE

2    THAT, WHEN DISCOVERY IS FINISHED ON PEOPLE LIKE CABRERRA,

3    MORALES, AND SO ON, THAT THERE WILL BE MORE EVIDENCE OF

4    COMMERCIAL BRIBERY AND UNFAIR COMPETITION RUNNING TO BOTH MGA

5    AND CARTER BRYANT.                                              04:41

6          **THE COURT:**  COUNSEL, I TEND TO AGREE THAT THE

7    COMMERCIAL BRIBERY PROBABLY SURVIVES PREEMPTION.  I'M NOT SO

8    SURE ABOUT THE OTHER UNFAIR COMPETITION THEORIES ADVANCED, OR

9    CLAIMS ADVANCED.

10         **MR. ZELLER:**  I DO THINK THAT THERE IS AN ISSUE -- AND  04:41

11   I WILL PROBABLY SOUND SOMEWHAT WAFFLING ON IT -- CONCERNING

12   TRADE SECRET.  WE HAVE RAISED THAT IN THE BRIEF.  PART OF OUR

13   CONCERN IS -- AND WE DO HAVE A MOTION *IN LIMINE* ON THIS -- IS

14   THAT MGA, THROUGHOUT ITS EXPERT REPORTS, HAS RAISED ALL MANNER

15   OF -- WE'LL SAY KIND OF POST-BRYANT ISSUES, INCLUDING ABOUT     04:41

16   THEIR MARKETING, THEIR ALLEGEDLY BRILLIANT INNOVATION, A WHOLE

17   VARIETY OF THINGS, THAT MISAPPROPRIATE FOR MATTEL, AND ARE

18   SPECIFICALLY ALLEGED -- IN FACT, WE HAVE EVIDENCE -- THAT THEY

19   WERE MISAPPROPRIATED FOR MATTEL.

20         NOW, WE DON'T THINK THAT THOSE MATTERS WILL PROBABLY       04:42

21   BE PART OF PHASE ONE, BUT SINCE WE'RE NOT EVEN SURE WHAT THE

22   SCOPE OF IT IS AT THIS POINT, THAT IS ONE REASON WHY IT WAS

23   RAISED.

24         ALSO, WE OBVIOUSLY, AT THE END OF THE DAY, WHETHER

25   IT'S PHASE ONE OR PHASE TWO, TRADE SECRET AND THOSE KIND OF     04:42

```
 1   MISAPPROPRIATION AND MISAPPROPRIATION OF MATTEL'S INFORMATION,

 2   THAT IS SIMPLY NOT PREEMPTED.  THAT, AGAIN, HAS THE EXTRA

 3   ELEMENTS, NOT THE LEAST OF WHICH IS THE CONFIDENTIAL

 4   RELATIONSHIP; POTENTIALLY, WE BELIEVE, THE FIDUCIARY

 5   RELATIONSHIP THAT CARTER BRYANT OWED, AS WELL AS THE CONTRACT.      04:42

 6   SO THERE ARE ACTUALLY MULTIPLE ADDITIONAL ELEMENTS THAT WOULD

 7   HAVE TO BE ESTABLISHED THAT TAKE THAT KIND OF UNFAIR

 8   COMPETITION CLAIM OUT OF PREEMPTION BY THE COPYRIGHT ACT.

 9        THE OTHER ISSUE REALLY PERTAINS, THEN, TO PREEMPTION

10   OF THE CONVERSION CLAIM, THEIR ALLEGATION OF THAT.               04:43

11        THERE ARE TWO THINGS GOING ON HERE.  NUMBER ONE --

12   AND I THINK THE EASY CASE ON THAT ARGUMENT PERTAINS TO THE

13   TANGIBLE ITEMS.  I DON'T THINK THERE'S A SERIOUS ARGUMENT HERE

14   BY MGA THAT THE CONVERSION OF TANGIBLE ITEMS IS PREEMPTED BY

15   THE COPYRIGHT ACT.  I MEAN, OTTO V. REESE, A NINTH CIRCUIT       04:43

16   CASE, IS EXPLICIT ABOUT THAT POINT.  THEY BASICALLY CLAIM THAT

17   SOME TRASH WAS TAKEN FROM MATTEL.

18        THE COURT:  WHAT TANGIBLE OBJECTS ARE WE TALKING

19   ABOUT?  ARE WE TALKING ABOUT THE DOLL HEAD AND SOME OTHER --

20        MR. ZELLER:  IT'S THE DRAWINGS.  IT'S THE DRAWINGS         04:43

21   AND THE SCULPTS THAT WERE MADE.  THEY MAY WANT TO MAKE SOME

22   ARGUMENT ABOUT WHETHER OR NOT TRASH THAT HE CLAIMS HE TOOK

23   SOMEHOW IS REALLY THE BASIS FOR OUR CONVERSION CLAIM; BUT IT'S,

24   NUMBER ONE, THE ACTUAL DRAWINGS OF BRATZ.  AND THERE'S NO

25   QUESTION THAT ACTUALLY PHYSICALLY TAKING THOSE PIECES OF PAPER   04:44
```

1    AND SELLING THEM TO MGA, PUTTING THEM INTO THEIR POSSESSION,

2    THAT DOES NOT PREEMPT IT.  AND THAT IS A CONVERSION CLAIM.

3    THAT'S VERY WELL RECOGNIZED.

4            SECOND, THERE ARE SCULPTS THAT WE BELIEVE WE HAVE

5    OWNERSHIP RIGHTS TO.  THESE ARE SCULPTS THAT WERE MADE DURING          04:44

6    THE COURSE OF CARTER BRYANT'S EMPLOYMENT.  HE PROVIDED DESIGN

7    DRAWINGS FOR THESE SCULPTS TO BE MADE.  HE GAVE DIRECTION AND

8    GAVE SUGGESTIONS, HOWEVER YOU WANT TO CHARACTERIZE IT; BUT HE

9    BASICALLY DIRECTED HOW THAT SCULPT WOULD LOOK.  THAT WAS TAKEN

10   FROM MATTEL AS WELL.                                                   04:44

11           AND THAT WAS SOMETHING THAT MATTEL HAS OWNERSHIP

12   RIGHTS IN.  THESE ARE TANGIBLE THREE-DIMENSIONAL,

13   TWO-DIMENSIONAL ITEMS; AND THESE ARE JUST NOT PREEMPTED.  SO

14   THE WHOLE NOTION OF THE CARTER BRYANT STORY ABOUT HAVING TAKEN

15   THE MATERIALS OUT OF THE TRASH CAN FOR A SO-CALLED DUMMY, IT'S        04:44

16   JUST REALLY A RED HERRING.  THAT'S OBVIOUSLY NOT THE BASIS FOR

17   THAT CLAIM.

18           THE OTHER ASPECT ON THE CONVERSION CLAIM OR THE OTHER

19   ISSUE PERTAINS TO IDEAS AND CONCEPTS.  AND, IN FACT, IT IS OUR

20   POSITION, YOUR HONOR, THAT IDEAS CAN BE CONVERTED.  THERE IS         04:45

21   AUTHORITY, CALIFORNIA AUTHORITY -- ADMITTEDLY, IT'S OLD -- BUT

22   NEVERTHELESS, THERE'S AN OLDER CALIFORNIA STATE DECISION THAT

23   TALKS ABOUT HOW IDEAS THEMSELVES CAN BE THE SUBJECT OF

24   CONVERSION.

25           THE COURT:  MORE RECENT AUTHORITY WOULD SUGGEST             04:45

```
 1   OTHERWISE.

 2          MR. ZELLER:  I DON'T KNOW IF THAT'S NECESSARILY THE

 3   CASE.

 4          THERE'S THE DESNY CASE; THERE'S THE ROKOS CASE;

 5   THERE'S THE OTHER THINGS THAT REALLY COME WITHIN THE BROAD         04:45

 6   UMBRELLA OF IDEA THEFT.  AND THAT IS A RECOGNIZED CLAIM.  NOW,

 7   IT'S CONTRACTUALLY BASED.  AND FROM OUR PERSPECTIVE, BECAUSE IT

 8   IS CONTRACTUALLY BASED IN THAT WAY, IT IS NOT PREEMPTED, FOR

 9   THAT REASON.  I MEAN, THERE IS, AGAIN, AN ESTABLISHMENT OF A

10   RELATIONSHIP.

11          IN FACT, BY DEFINITION, UNDER THESE KINDS OF IDEA

12   THEFT CLAIMS, UNDER CALIFORNIA LAW, THE IDEA IS, OF COURSE, IF

13   THERE'S NO RELATIONSHIP BETWEEN THE PARTIES, THEN IDEAS ARE

14   FREE FOR THE TAKING, BECAUSE THEY'RE OUT THERE IN THE PUBLIC

15   DOMAIN; THEY'RE NOT PROTECTED BY COPYRIGHT.                       04:46

16          BUT IF THERE IS THAT RELATIONSHIP, THERE IS NO

17   QUESTION THAT THE LAW WILL ENFORCE THE PROTECTION OF AN

18   ABSTRACT IDEA.  AND THAT'S, IN FACT, EXACTLY WHAT THE DESNY V.

19   WILDER CASE HOLDS, WHERE IT SAYS, 'THE POLICY THAT PRECLUDES

20   PROTECTION OF AN ABSTRACT IDEA, BY COPYRIGHT, DOES NOT PREVENT    04:46

21   ITS PROTECTION BY CONTRACT.'

22          SO THAT IS THE REASON WHY WE DO THINK THAT THERE IS A

23   CONVERSION CLAIM THAT CAN RELY UPON THE NOTION OF AN IDEA BEING

24   TAKEN OR BEING CONVERTED.

25          NOW, THAT THEN LEADS TO THE ISSUE OF, WELL, WITH SUCH      04:47
```

1    A CLAIM, IS IT PREEMPTED BY THE COPYRIGHT ACT?

2         AND THERE IS A CASE THAT HAS ADDRESSED THIS; AND

3    THAT'S THE LADDIE CASE THAT WE CITE IN OUR BRIEF.  AND IT SAYS,

4    QUOTE, "SECTION 102(B) EXPRESSLY PRECLUDES THE EXTENSION OF

5    COPYRIGHT PROTECTION FOR AN ORIGINAL WORK OF AUTHORSHIP TO AN         04:47

6    IDEA.  THUS, IDEAS DO NOT COME UNDER THE SUBJECT MATTER OF

7    COPYRIGHT, AND CLAIMS BASED UPON THEM ARE NOT PREEMPTED BY

8    FEDERAL COPYRIGHT LAW," END QUOTE.

9         SO THAT, AT ITS HEART, YOUR HONOR, IS OUR ARGUMENT ON

10   WHY THAT IS A VIABLE CLAIM AND WHY IT IS ALSO NOT PREEMPTED.          04:47

11   BECAUSE IT JUST DOESN'T EVEN MEET THAT THRESHOLD ISSUE, OR THAT

12   THRESHOLD REQUIREMENT, FOR PREEMPTION, WHICH IS THAT IT HAS TO

13   COME WITHIN THE SUBJECT MATTER OF COPYRIGHT.

14        AND, IN ADDITION, WE WOULD SAY, THERE'S AN EXTRA

15   ELEMENT PRESENT, AND, THEREFORE, IT IS NOT PREEMPTED FOR A            04:48

16   SECOND REASON, BECAUSE IT REQUIRES A RELATIONSHIP, IT REQUIRES

17   A CONTRACT, THAT IS NOT REQUIRED AS A PREREQUISITE TO A

18   COPYRIGHT INFRINGEMENT CLAIM.

19        **THE COURT:**  THANK YOU, COUNSEL.

20        **MR. RUSSELL:**  YOUR HONOR, FIRST, I'D JUST LIKE TO            04:48

21   START OFF WITH THE OBVIOUS PROPOSITION THAT MATTEL DIDN'T PLEAD

22   THE CLAIMS THAT IT NOW SAYS COULD PROTECT IDEAS.  THEY HAVEN'T

23   PLED THEM.  NO ONE IN THIS COURTROOM WAS ALIVE WHEN CALIFORNIA

24   HELD AS THE LAW OF THE LAND THAT YOU COULD CONVERT AN IDEA.

25   THE CASES ARE LEGION.  WE CITE DOZENS OF THEM; DIELSI, IDEMA,        04:48

1    WORTHE, ON AND ON.  THEY ADMIT THEIR OWN AUTHORITIES; SELBY.

2          YOU CANNOT CONVERT AN IDEA.  IF THEY WANTED TO HAVE A

3    CLAIM FOR PROTECTION OF AN IDEA, THERE ARE MANY LEGAL THEORIES

4    TO DO SO.

5          **THE COURT:**  WHAT ABOUT THESE DRAWINGS, COUNSEL?          04:48

6          **MR. RUSSELL:**  FIRST OF ALL, I'D LIKE TO POINT OUT

7    THAT THERE IS NO EVIDENCE IN THIS RECORD -- AND THEY SAY THAT

8    WE DON'T SERIOUSLY CONTEST IT.  WE DO -- THERE'S NO EVIDENCE IN

9    THIS RECORD THAT THEY'RE CONTENDING THAT THE DRAWINGS ARE WHAT

10   ARE CONVERTED.  THIS IS AN ARGUMENT THEY'RE MAKING TODAY.       04:49

11   WE'VE BEEN ASKING THEM REPEATEDLY, WHAT HAS BEEN CONVERTED?

12         BUT THAT'S OKAY; LET'S ASSUME THAT THEY HAD.  NOT A

13   PROBLEM.

14         THE CASE LAW THAT WE CITED, YOUR HONOR, WHERE THE

15   GRAVAMEN OF THE CLAIM IS NOT FOR THE TANGIBLE PROPERTY -- WE'RE  04:49

16   NOT TALKING HERE ABOUT THE VALUE OF THE PAPER AND THE INK ON

17   WHICH THE DRAWINGS WERE MADE.  AND IF YOU LOOK AT THE WORTHE

18   CASE AND YOU LOOK AT HARPER ROW PUBLICATIONS V. NATIONAL

19   ENTERPRISES, A SECOND CIRCUIT DECISION, THEY EXPLICITLY DEAL

20   WITH THIS SITUATION.  WHERE THE GRAVAMEN OF THE CLAIM IS NOT     04:49

21   FOR THE VALUE OF THE ACTUAL PHYSICAL PROPERTY BUT FOR THE

22   CONTENT THEREIN, THAT CLAIM IS PREEMPTED.  AND IT'S

23   SELF-EVIDENT.

24         IF YOU LOOK AT THEIR COMPLAINT HERE, IF YOU LOOK AT

25   PARAGRAPHS 157 AND 160 OF THEIR CONVERSION CLAIM, YOU'LL SEE     04:49

```
 1    THEY'RE NOT ASKING FOR THE VALUE OF THE PAPER.  AND THEY EVEN

 2    ADMIT IT.  I'LL READ IT, PARAGRAPH 160.

 3           "MATTEL IS ENTITLED TO DAMAGE IN AN AMOUNT SUFFICIENT

 4    TO INDEMNIFY MATTEL FOR THE LOSS SUFFERED, WHICH IS NOT

 5    MEASURED BY THE VALUE OF THE PROPERTY MISAPPROPRIATED."          04:50

 6           SO WE'VE GOT THAT ADMISSION.  NOW WE'RE SQUARELY

 7    WITHIN WORTHE, SQUARELY WITHIN HARPER, AND SQUARELY WITHIN

 8    IDEMA.

 9           WHAT THEY ARE SEEKING:  "BUT INCLUDES THE LOST

10    PROFITS THAT MATTEL SUFFERED AS A RESULT OF THE CONVERSION."    04:50

11           PROFITS FROM WHAT?

12           IT CERTAINLY WASN'T PROFITS FROM CONVERTING THE

13    PHYSICAL PIECE OF PAPER.  IT'S FROM CONVERTING THE TANGIBLE

14    EXPRESSION OF AN IDEA.  THIS FALLS SQUARELY WITHIN THE AMBIT OF

15    THE COPYRIGHT ACT.                                             04:50

16           NOW, MR. ZELLER MADE AN ARGUMENT TO YOU THAT BECAUSE

17    IDEAS ARE NOT PROTECTED UNDER THE COPYRIGHT ACT, THEREFORE THEY

18    CAN PROCEED.  HIS OWN BRIEF ADMITS -- AND THERE ARE MANY, MANY

19    CASES THAT DEAL WITH THIS -- THE FACT THAT THE COPYRIGHT ACT

20    DOESN'T EXTEND PROTECTION TO IDEAS DOES NOT MEAN THE CLAIM       04:50

21    ISN'T PREEMPTED.

22           AS THEY ACKNOWLEDGE, PAGE 72, FOOTNOTE 242, CITING

23    SELBY, "IDEAS EMBODIED IN A WORK COVERED BY THE COPYRIGHT ACT

24    ARE, NEVERTHELESS, WITHIN THE SUBJECT MATTER OF COPYRIGHT FOR

25    PURPOSES OF PREEMPTION BECAUSE SCOPE AND PROTECTION ARE NOT      04:51
```

```
 1   SYNONYMOUS."

 2            I COULD GO ON AND ON.

 3            THE COURT:  I UNDERSTAND.

 4            MR. RUSSELL:  SO THE CONVERSION CLAIM SHOULD BE OUT.

 5            WHETHER OR NOT YOU ACCEPT THEIR ARGUMENT ABOUT THE          04:51

 6   DRAWINGS, THE ONLY THING WE'RE HERE TO QUARREL ABOUT IS, ARE

 7   THEY ACTUALLY SEEKING THE VALUE OF THE TANGIBLE ITEMS OF

 8   ANYTHING?

 9            AND OTHER THAN THE DRAWINGS, FOR WHICH THEY ADMIT IN

10   THEIR OWN PLEADING THEY'RE NOT SEEKING THE TANGIBLE VALUE, THE     04:51

11   ONLY THING WE COULD IDENTIFY FROM DISCOVERY WAS THE DOLL HEAD.

12   AND, YES, WE SERIOUSLY CONSIDER THAT IS A FRIVOLOUS CLAIM.  YOU

13   CAN'T BASE A CLAIM ON TRASH.  AND THERE IS NO EVIDENCE TO

14   REFUTE THAT THE DOLL HEAD THAT WAS USED WAS TRASH.  AND THEY

15   DON'T SUBMIT ANY.  AND I DIDN'T HEAR MR. ZELLER RESPOND TO MY      04:51

16   CHALLENGE TO POINT TO THE RECORD AND SHOW YOU ANY, BECAUSE HE

17   CAN'T.  THERE ISN'T ANY.  WE'RE TALKING ABOUT TRASH, AND WE'RE

18   TALKING ABOUT FIXED EXPRESSION, IN A TANGIBLE MEDIUM, WHICH

19   FALLS SQUARELY WITHIN THE SCOPE OF COPYRIGHT ACT.  SO THEIR

20   CONVERSION CLAIM IS OUT.

21            SO THEN WE GO BACK TO -- I'LL JUST WORK IT BACK

22   THROUGH THE OTHER CLAIMS -- THE INTENTIONAL INTERFERENCE.  WE

23   CITED YOUR HONOR TO MANY CASES.

24            THE COURT:  COUNSEL, UNLESS YOU HAVE SOMETHING NEW TO

25   ADD AT THIS POINT...                                              04:52
```

```
 1              MR. RUSSELL:  THAT'S IT.

 2              THE COURT:  VERY GOOD.

 3         ANYTHING FURTHER FROM CARTER BRYANT?

 4              MS. ANDERSON:  NOT ON THE PREEMPTION, YOUR HONOR.

 5              THE COURT:  VERY WELL.                               04:52

 6         WE'VE COVERED MORE THAN PREEMPTION AT THIS POINT.

 7         ANYTHING FURTHER ON ANYTHING THAT'S BEEN DISCUSSED

 8    HERE?

 9              MS. ANDERSON:  AT ALL?

10         I DO HAVE A FEW CLOSING POINTS I'D LIKE TO RAISE,         04:52

11    YOUR HONOR.

12              THE COURT:  WHY DON'T YOU DO THAT.

13         LET'S GIVE CARTER BRYANT A CHANCE.

14         THEN, MR. ZELLER, I'LL ALLOW YOU TO RESPOND TO THE

15    ENTIRE...                                                     04:52

16         I'VE EXTENDED THIS A HALF HOUR PAST 4:30 BECAUSE I

17    DID HAVE THOSE MATTERS I TOOK IN AFTER LUNCH; BUT WE ARE

18    GETTING CLOSE TO THE END OF THE DAY HERE.

19              MS. ANDERSON:  THANK YOU, YOUR HONOR.  I'M GOING TO

20    MAKE IT VERY, VERY BRIEF.                                     04:53

21         FIRST, BECAUSE OF THE LENGTH OF THIS HEARING, THERE'S

22    OBVIOUSLY NO TIME OR OPPORTUNITY TO ADDRESS EVIDENTIARY

23    OBJECTIONS.  WE JUST WANT TO STATE FOR THE RECORD WE DID ASSERT

24    THEM.  WE REASSERT THEM DURING THE HEARING AND REQUEST A RULING

25    ON THEM, TO THE EXTENT RELEVANT TO YOUR HONOR'S RULINGS, AND   04:53
```

 1   ADDRESS THEM FOR THE RECORD.

 2          AND BECAUSE OF THE TIME LIMITATIONS, YOUR HONOR,

 3   OBVIOUSLY, WE'RE NOT IN A POSITION TO ADDRESS EVERY SINGLE

 4   POINT THAT HAS BEEN RAISED OR REFUTE EVERY FACTUAL ASSERTION

 5   THAT HAS BEEN MADE BY MATTEL'S COUNSEL.                        04:53

 6          **THE COURT:**  COUNSEL, YOU HAVE HAD SUFFICIENT TIME TO

 7   RAISE ALL OF THESE ISSUES IN THE EXTENSIVE BRIEFINGS.

 8          **MS. ANDERSON:**  IN THE BRIEFINGS, YES.  THAT'S WHAT I

 9   WANTED TO SAY, YOUR HONOR.  MEANING, DURING THE HEARING, I

10   DIDN'T WANT TO INTERRUPT THE FLOW OF THE DAY.  BUT THERE'S BEEN  04:53

11   STATEMENTS MADE ABOUT THINGS THAT SOME WITNESSES HAVE SAID MY

12   CLIENT HAS SAID AND ASSERTIONS THAT MY CLIENT IS A LIAR.  HE IS

13   NOT.  HE TESTIFIED TRUTHFULLY IN DEPOSITION AND TESTIFIED THAT

14   HE TOLD MATTEL WHEN HE LEFT HE WAS GOING TO WORK ON A NEW DOLL

15   LINE; STILL GIVES THE SAME NOTICE TO MATTEL ON THE STATUTE       04:53

16   ISSUES.  BUT I JUST WANTED TO MAKE THAT CLARITY FOR THE RECORD.

17          SECOND, FOR THE ARGUMENTS THAT MR. BRYANT RAISED IN

18   HIS AFFIRMATIVE SUMMARY JUDGMENT MOTION THAT WERE ADDRESSED IN

19   FULL IN OUR BRIEFS, WE ALSO RELIED ON MGA'S COUNSEL FOR SOME OF

20   THEIR ARGUMENTS AS WELL, BUT ON OUR ARGUMENTS, WE NOTE THAT      04:54

21   MATTEL'S COUNSEL HAS SUBMITTED A 56(F) DECLARATION.

22          FOR THE ARGUMENTS THAT WE MADE IN OUR BRIEF, THERE IS

23   NO BASIS FOR 56(F) RELIEF.  THERE ARE NO FURTHER FACTS REQUIRED

24   TO ENTER SUMMARY JUDGMENT IN MR. BRYANT'S FAVOR ON THE

25   ARGUMENTS THAT WE ADDRESSED AT LENGTH IN OUR BRIEF.             04:54

1        LASTLY, I JUST WANT TO CLARIFY FOR THE COURT, TO MAKE

2   SURE THERE'S NO CONFUSION ON THE ISSUE, WE HAVE NOT MOVED ON

3   THE QUESTION OF ENFORCEABILITY OF THIS CONTRACT; SO THE WHOLE

4   INQUIRY ABOUT WHETHER THE CONTRACT IS, AS A WHOLE,

5   UNENFORCEABLE OR UNCONSCIONABLE, THAT'S NOT WHAT WE'RE HERE          04:54

6   ASKING THE COURT --

7        **THE COURT:**  I UNDERSTAND.  YOUR ISSUES ARE ON THE

8   INFRINGEMENT CLAIM, FIDUCIARY DUTY, WHICH WE'VE DISCUSSED AT

9   LENGTH, THE BREACH OF CONTRACT; NOT THE ENFORCEABILITY, BUT THE

10  BREACH ASPECT OF IT.                                                 04:55

11       **MS. ANDERSON:**  AND ON OUR MOTION, MOST IMPORTANTLY,

12  THE PROPER INTERPRETATION OF THAT CONTRACT.

13       **THE COURT:**  RIGHT.

14       **MS. ANDERSON:**  BECAUSE WE SAY THOSE TERMS, AT BEST,

15  ARE AMBIGUOUS.  AND EVEN MATTEL'S COUNSEL CONCEDES THAT THE          04:55

16  TERMS ARE REASONABLY SUSCEPTIBLE TO THE DEFINITIONS WE HAVE

17  PROVIDED IN OUR BRIEF.  AND UNDER THE WOLF CASE, THAT MEANS

18  THEY'RE AMBIGUOUS.  BECAUSE IT'S AN UNDISPUTED CONTRACT OF

19  ADHESION, THAT AMBIGUITY MUST BE RESOLVED IN MR. BRYANT'S

20  FAVOR.                                                               04:55

21       **THE COURT:**  YOU ALSO RAISE UNJUST ENRICHMENT,

22  CONVERSION, AND UNFAIR COMPETITION.

23       WE'VE COVERED THOSE -- THE LAST CLAIM -- THE LAST

24  GROUND YOU MOVED ON WAS ON THE DECLARATORY RELIEF.

25       IS THERE ANYTHING FURTHER YOU WANT TO ELABORATE ON              04:55

1   THAT?

2           MS. ANDERSON:  I THINK IT'S BEEN COVERED ADEQUATELY

3   IN THE BRIEF.

4           THE COURT:  VERY WELL.

5           MS. ANDERSON:  AND WE JOINED IN MANY ARGUMENTS OF        04:55

6   MGA'S COUNSEL AS WELL.

7           THE COURT:  VERY GOOD.

8           THANK YOU VERY MUCH, COUNSEL.

9           MR. ZELLER.

10          MR. ZELLER:  WITH RESPECT TO THE ALLEGED PREEMPTION      04:56

11  OF THE CONVERSION CLAIM, THERE CONTINUES TO BE THIS ASSERTION

12  THAT WHAT MR. BRYANT TOOK, EVEN OUT OF MATTEL, WITH RESPECT TO

13  THE SO-CALLED DUMMY, WAS NOTHING BUT TRASH.

14          BUT, NUMBER ONE, HE HAD ANOTHER MATTEL EMPLOYEE MAKE

15  UP THE HAIR FOR IT; ANOTHER MATTEL EMPLOYEE PUT FACE PAINT ON    04:56

16  IT.  HE PAID THEM MONEY TO DO THIS.  SO THE IDEA THAT HE JUST

17  TOOK SOME SCRAP OUT OF THE TRASH, OUT OF MATTEL, IS JUST SIMPLY

18  NOT EVEN A FAIR CHARACTERIZATION OF MR. BRYANT'S OWN TESTIMONY.

19          AND, OF COURSE, I HEARD THAT I NEEDED TO RISE TO THE

20  CHALLENGE TO REFUTE THIS.  THE FACT IS, THE RECORD,             04:56

21  MR. BRYANT'S OWN TESTIMONY, DOESN'T SUPPORT THE IDEA THAT IT

22  WAS NOTHING BUT A NAKED HEAD THAT WAS A PIECE OF TRASH THAT HE

23  TOOK AWAY FROM MATTEL.

24          THE COURT:  WHAT ABOUT THIS ARGUMENT THAT THE

25  DRAWINGS ARE NOTHING MORE THAN BASICALLY AN EXPRESSION OR A     04:57

1    MEMORIALIZATION OF THE IDEA?

2         **MR. ZELLER:**  WELL, I'M NOT REALLY SURE WHAT THE

3    SIGNIFICANCE OF THAT ARGUMENT REALLY WOULD BE, BECAUSE THE FACT

4    IS THAT IT'S TANGIBLE PROPERTY AS WELL.

5         I MEAN, CERTAINLY, IT HAS SOMETHING THAT IT CAN BE          04:57

6    PROTECTED, AND IS PROTECTED, FROM OUR VIEWPOINT, BY COPYRIGHT,

7    BECAUSE IT'S EXPRESSION; RIGHT; SO IT CERTAINLY HAS THAT

8    INTANGIBLE PROTECTION THAT IS PROVIDED TO IT UNDER THE

9    COPYRIGHT ACT.

10        BUT IT'S ALSO A TWO-DIMENSIONAL TANGIBLE ITEM THAT          04:57

11   BELONGS TO MATTEL.  REALLY, THE ARGUMENT THAT MGA MAKES FROM

12   THAT POINT IS ONLY, REALLY, A DAMAGES ONE; IT ISN'T ONE ABOUT

13   PREEMPTION.  IT'S REALLY SAYING, 'WELL, OKAY, MATTEL ISN'T

14   REALLY SUING BECAUSE IT WANTS THE INK AND PAPER ON THE

15   DRAWINGS.'

16        BUT THE FACT IS, THOSE ARE THREE-DIMENSIONAL AND

17   TWO-DIMENSIONAL ITEMS THAT BELONG TO MATTEL.  IT IS A

18   CONVERSION CLAIM.  IT IS A WELL-RECOGNIZED CONVERSION CLAIM.

19   AND IT IS NOT PREEMPTED UNDER, QUITE CLEARLY, NINTH CIRCUIT

20   LAW.                                                            04:58

21        MOREOVER, THIS IDEA THAT SOMEHOW THIS WASN'T RAISED,

22   IT'S A LITTLE UNCLEAR TO ME HOW THAT COULD BE, GIVEN THAT MGA'S

23   COUNSEL READ DISCOVERY RESPONSES SPECIFICALLY DESCRIBING THAT

24   CLAIM, AND THEN HE USED THEM TO ATTACK US, BY BASICALLY SAYING,

25   'WELL, MATTEL IS SEEKING LOST PROFITS AS A RESULT OF THIS       04:58

1    CONVERSION.'

2           IN FACT, THE REMEDY THAT WE'VE SOUGHT -- AND WE SAID

3    THIS IN THE BRIEF -- IS A DISGORGEMENT REMEDY; AND THAT IS

4    SOMETHING THAT'S ALLOWED.

5           NOW, ULTIMATELY, AT THE END OF THE DAY, THAT DOESN'T        04:58

6    REALLY HAVE ANYTHING TO DO WITH THE SUMMARY JUDGMENT MOTION

7    THAT'S NOW PENDING IN FRONT OF THE COURT.  THE ISSUES OF WHAT

8    MATTEL'S DAMAGE IS FROM THAT CONVERSION, WHAT ARE THE PROPER

9    REMEDIES, AND THAT SORT OF THING, THAT IS FOR ANOTHER DAY.

10   THIS IS AN ISSUE OF, IS IT PREEMPTED?  AND THE LAW IS QUITE        04:58

11   CLEAR THAT YOU DON'T LOOK JUST AT THE REMEDY AND SAY, 'WELL,

12   THE REMEDY LOOKS THE SAME; THEREFORE, IT'S PREEMPTED.'

13          YOU LOOK TO A WELL-ESTABLISHED TEST --

14          **THE COURT:**  RELEVANCE.

15          **MR. ZELLER:**  -- THAT MAKES THAT DETERMINATION; SO        04:59

16   IT'S GETTING AHEAD OF OURSELVES, AND I DON'T THINK IT'S A BASIS

17   THAT WOULD ALLOW MGA TO OBTAIN SUMMARY JUDGMENT ON PREEMPTION

18   GROUNDS.

19          **THE COURT:**  THANK YOU, COUNSEL.

20          IS THERE ANYTHING FURTHER YOU WANT TO ADDRESS?             04:59

21          **MR. QUINN:**  YOUR HONOR, THERE IS STILL THOSE

22   COPYRIGHT ISSUES.

23          **MR. NOLAN:**  BEFORE WE GET TO THAT, CAN I JUST MAKE

24   ONE COMMENT, YOUR HONOR?

25          **THE COURT:**  I'M GOING TO GIVE EACH OF YOU FIVE          04:59

1    MINUTES AT THIS POINT.

2             MR. NOLAN, YOU HAVE FIVE MINUTES.

3             MR. QUINN, YOU'LL HAVE FIVE MINUTES, IF YOU WANT TO

4    ADDRESS THESE COPYRIGHT ISSUES.

5             AND I'LL CERTAINLY GIVE CARTER BRYANT --                04:59

6             **MS. ANDERSON:** (INAUDIBLE).

7             **THE COURT:**  ALL RIGHT.  I'M NOT GOING TO INSIST.

8             I'LL GIVE BOTH OF YOU FIVE MINUTES.  IT'S 5:00 NOW.

9             **MR. NOLAN:**  YOUR HONOR, I JUST WANT TO SUBMIT AS PART

10   OF THE RECORD HERE, IF I COULD, OUR PHASE ONE CLAIM EXPIRATION      04:59

11   CHART.  I WAS GOING TO USE IT DURING THE PRESENTATION.  THEY

12   HAVE ONE AT THE END OF THEIR BRIEF.  I WOULD JUST ASK THAT I

13   COULD LODGE THIS WITH THE COURT.  I'LL GIVE A COPY TO

14   MR. QUINN.

15            THE SECOND POINT THAT I WANT TO MAKE WITH RESPECT TO      05:00

16   THE COPYRIGHT IS THAT I WANT TO MAKE ABSOLUTELY CLEAR THAT

17   ALTHOUGH WE'VE BEEN TALKING THROUGHOUT THE DAY ABOUT SO-CALLED

18   DRAWINGS THAT WERE DONE DURING 1999, THIS IS A LARGELY DISPUTED

19   FACT, AS TO WHETHER OR NOT ANY, IN FACT, DRAWINGS WERE DONE IN

20   1999 THAT WOULD EVEN TRIGGER ANY OF THIS ANALYSIS.  I JUST WANT    05:00

21   TO BE ABSOLUTELY CLEAR ABOUT THAT.  WE WERE TALKING ABOUT SIX,

22   17.  THE RECORD EVIDENCE FROM OUR EXPERTS IS THAT, IF THERE WAS

23   ANYTHING DONE IN 1999, ADDING COLOR HAD NOTHING TO DO AND DID

24   NOT HELP WITH RESPECT TO THE DEVELOPMENT OF THE BRATZ.  AND

25   THAT'S FROM GLENN VILPPU; AND I THINK THAT THAT'S PART OF OUR      05:00

1    RECORD.

2           AND THEN I'LL JUST RESPOND TO WHATEVER MR. QUINN SAYS

3    ON THE COPYRIGHT ISSUE.

4           **THE COURT:**  VERY WELL.

5           **MR. QUINN:**  YOUR HONOR, THIS IS ITEM 3 FROM OUR          05:01

6    NOTICE OF MOTION THAT THE FIRST GENERATION BRATZ DOLLS,

7    RELEASED TO THE PUBLIC IN THE SUMMER OF 2001, WITH THE LISTED

8    COPYRIGHT REGISTRATION NUMBERS, ARE SUBSTANTIALLY SIMILAR TO

9    17 DRAWINGS.

10          **THE COURT:**  YES.  THAT WAS YOUR THIRD; RIGHT?          05:01

11          **MR. QUINN:**  YES, YOUR HONOR.

12          **THE COURT:**  I SKIPPED OVER THAT.  I'M SORRY.

13          **MR. QUINN:**  YOUR HONOR, REALLY, THERE ARE TWO ISSUES

14   HERE; AND THAT IS, FIRST, WHAT'S PROTECTABLE; AND THE SECOND

15   ISSUE IS SUBSTANTIAL SIMILARITY.          05:01

16          AND THE FIRST ISSUE, WHAT'S PROTECTABLE AND WHETHER

17   THE DRAWINGS HAVE SUFFICIENT ORIGINALITY, IS A QUESTION OF LAW

18   FOR THE COURT.  THAT'S FOR YOUR HONOR.  THAT'S THE NEWMAN CASE.

19   AND I'M SORRY, I EARLIER REFERRED TO A DECISION BY

20   JUDGE MANELLA.  I WAS THINKING OF THIS ONE, ACTUALLY.  THIS IS          05:01

21   THE DECISION BY JUDGE MANELLA.  IN OUR PAPERS, WE CITE SEVERAL

22   OTHER CASES, HOLDING THAT THAT'S THE COURT'S RESPONSIBILITY AS

23   WELL.

24          VERY BRIEFLY, JUDICIAL ESTOPPEL:  THEY SUED PEOPLE,

25   SAYING THESE ARE ORIGINAL WORKS.  THEY REGISTERED THEM, WHICH          05:02

1   CREATES A PRESUMPTION OF ORIGINALITY.  THAT'S ALL STUFF THEY

2   DID.  IN THEIR PAPERS, THEY REALLY DIDN'T HAVE A RESPONSE TO

3   THAT.

4          WE'RE ENTITLED TO PROTECTION FOR THE CREATIVE

5   VARIATION AS WELL AS THE CREATIVE COMPILATION THAT'S                05:02

6   REPRESENTED IN THE WORKS.  AND THEY APPLY THIS FILTRATION

7   ANALYSIS, WHICH IS KIND OF INTERESTING, YOUR HONOR.

8          MR. MENELL'S OPINION -- I DON'T KNOW IF THE COURT

9   WADED THAT DEEPLY INTO THE PAPERS -- BUT HE GOES BACK AND --

10  YOU KNOW, IT'S LIKE ECCLESIASTES:  THERE'S NOTHING NEW UNDER       05:02

11  THE SUN.  "ALLY MCBEAL WAS ALMOST A LIVE FASHION DOLL, THAT

12  COULD APPEAL TO YOUNG GIRLS ALIKE.  SHE WAS ALSO CLOSELY

13  ASSOCIATED WITH SASSY FEMALE SUPPORTING ACTRESSES.  SEX IN THE

14  CITY BROUGHT THE FEMALE BOND TO A NEW LEVEL.  IT ALSO REVEALED

15  ASSERTIVENESS AND SEXUALITY NEVER BEFORE SEEN IN TELEVISION.       05:02

16  IN THE MUSIC FIELD, THE SPICE GIRLS WERE A MAJOR NEW INFLUENCE.

17  THEY BROUGHT THE MULTI-RACIAL --

18          **THE COURT:**  COUNSEL, SLOW DOWN.

19          **MR. QUINN:**  I'M SORRY.

20          I'LL SUBMIT WHAT I JUST READ IN WRITING.  IT SAYS THE       05:03

21  STEVE MADDEN, MADDEN ADVERTISEMENT, CAPTURES THE ATTITUDE,

22  LARGE FEET, AND OUT-THRUST HIPS.

23          AND THEN THESE ARE THE THINGS THAT HE FINDS SINCE

24  SUMERIA THAT'S OUT THERE IN POPULAR CULTURE.  THEN HE RUNS IT

25  THROUGH HIS COLATER, TO THE FILTRATION ANALYSIS, AND OUT COMES    05:03

```
 1    THE IDEA OF A GIRL GROUP; OUT COMES THE IDEA OF A MULTI-RACIAL
 2    GROUP; OUT COMES THE IDEA OF LARGE FEET; OUT COMES THE IDEA OF
 3    A LARGE HEAD.  THIS IS NOT A FILTER; IT'S A PLUG, OR A STOPPER.
 4    NOTHING GETS THROUGH THIS COLATER.  THERE'S NOTHING THAT HASN'T
 5    EXISTED BEFORE.                                                    05:04
 6           WE'RE ENTITLED TO PROTECTION ON THESE DRAWINGS OF THE
 7    PARTICULAR EXPRESSIONS REPRESENTED IN THESE DRAWINGS.  I'D
 8    REFER THE COURT TO THAT WELL-KNOWN CASE OF MATTEL V.
 9    GOLDBERGER, WHICH IS QUOTED IN THE PAPERS, WHERE THE COURT
10    SAID, 'LOOK, THERE'S A LOT OF DIFFERENT WAYS OF MAKING           05:04
11    UP-TURNED NOSES, BOWED LIPS, AND WIDELY-SPACED EYES.
12           JUST THE IDEA OF BOWED LIPS OR WIDELY-SPACED EYES, OR
13    LARGE FEET, OR LARGE HEADS, THAT'S NOT WHAT'S PROTECTABLE.
14    THAT'S THE PROBLEM WITH THE FILTRATION ANALYSIS HERE.  THE
15    VARIATIONS OF EACH OF THOSE ARE WHAT'S PROTECTABLE.              05:04
16           THE COURT:  THERE IS AN ISSUE WITH RESPECT TO
17    TRANSLATING THE TWO-DIMENSIONAL DRAWING, THOUGH, INTO A
18    THREE-DIMENSIONAL DOLL.
19           MR. QUINN:  I DON'T THINK THERE IS, YOUR HONOR.  YOU
20    GET, THEN, TO SUBSTANTIAL SIMILARITY, WHICH IS THE SECOND HALF   05:04
21    OF IT.
22           I WOULD JUST SAY, BEFORE I LEAVE PROTECTION,
23    MR. BRYANT HAS SUBMITTED A DECLARATION.  HE NEVER SAYS HE
24    COPIED ANYTHING.  HE HAS ALWAYS CLAIMED THAT THESE WERE
25    ORIGINAL DRAWINGS IN THE THINGS THAT HE SIGNED.  AND THEY        05:05
```

1    HAVEN'T IDENTIFIED ANYTHING THAT PREEXISTED THESE DRAWINGS

2    THAT'S IDENTICAL.  I MEAN, SPICE GIRLS, THE STEVE MADDEN AD,

3    ALL THE REST OF IT, THERE'S NOTHING IDENTICAL THERE;

4    I.E., DIFFERENT FORMS OF -- THIS IS JUST LIKE DIFFERENT FORMS

5    OF BOWED LIPS, DIFFERENT FORMS OF WIDELY-SPACED EYES.  THESE        05:05

6    ARE ORIGINAL CREATIONS.  THEY HAVEN'T IDENTIFIED ANYTHING TO

7    THE COURT THAT INDICATES THAT THEY ARE.

8              AS TO SUBSTANTIAL SIMILARITY, IF WE COULD PUT UP

9    PAGE 16, FROM OUR BRIEF, WE PUT UP, SIDE-BY-SIDE, A BRATZ DOLL

10   AND ONE OF CARTER BRYANT'S DRAWINGS.  YOUR HONOR, THIS ALSO --     05:05

11   I'M REALLY OF TWO MINDS ABOUT WHETHER I WANT TO WIN ON THIS

12   PART OF THE MOTION, BECAUSE I ALMOST THINK IF THEY WANT TO GET

13   UP AND TELL THE JURY THAT THESE AREN'T -- IT'S LIKE A CLINT

14   EASTWOOD MOMENT.

15        **THE COURT:**  I'VE GOT TO LAUGH.  AND I DON'T WANT TO       05:06

16   BETRAY ANY SECRETS FROM CHAMBERS, COUNSEL, BUT I HAD THE SAME

17   REACTION.

18        **MR. QUINN:**  THERE WE HAVE TWO THINGS WE HAVE TO DO.

19   THE EXTRINSIC ANALYSIS, YOUR HONOR -- I'M SORRY, THAT ONE IS

20   FOR YOU ALSO.  THAT'S FOR THE COURT, WHERE YOU LOOK AT AN          05:06

21   OBJECTIVE COMPARISON OF THE ELEMENTS, 2-D VERSUS 3-D.

22              I DON'T THINK IT'S A PROBLEM HERE.

23              INTRINSIC.  TOUGHER TO WIN ON SUMMARY JUDGMENT.  IF

24   YOU GET TO THE LEVEL THAT NO REASONABLE JUROR COULD CONCLUDE

25   THAT INTRINSICALLY, THE OVERALL LOOK AND FEEL, WHICH IS THE        05:06

```
 1   TEST, IS THE SAME, I THINK WE'RE THERE, YOUR HONOR.  I MEAN, WE

 2   DID THAT SURVEY WE SUBMITTED.  92 PERCENT OF, LIKE,

 3   EIGHT-YEAR-OLDS IN GALLERIAS SHOWN THIS DRAWING SAY "BRATZ."

 4            THANK YOU, YOUR HONOR.

 5            THE COURT:  IT IS A PRETTY COMPELLING -- THESE SERIES    05:06

 6   OF PICTURES ARE PRETTY COMPELLING, COUNSEL.

 7            MR. NOLAN:  YOUR HONOR, IF THAT WAS THE TEST, I MIGHT

 8   AGREE WITH YOU.  BUT THAT'S NOT NINTH CIRCUIT LAW; THAT'S NOT

 9   HOW YOU ARE, I RESPECTFULLY SUBMIT, TO LOOK AT THIS.

10            THE COURT:  BUT HOW IS A JURY TO LOOK AT IT?           05:07

11            MR. NOLAN:  WELL, YOUR HONOR, I THINK WHAT MATTEL HAS

12   DONE, CLEVERLY ON FRIDAY, IS TO SUBMIT A SUPPLEMENTAL

13   PRESENTATION TO YOU, SAYING 'NOW IT'S YOUR DECISION TO MAKE,'

14   AND THEY SUGGEST THAT THERE'S ENOUGH RECORD EVIDENCE.

15            THIS HAS ABSOLUTELY NO ANALYTICAL DISSECTION OF        05:07

16   WHAT'S PROTECTABLE.  THAT'S THE FIRST ANALYSIS, YOUR HONOR.

17            THE COURT:  THERE WAS SOME ANALYTICAL -- WHAT DO YOU

18   MEAN BY "ANALYTICAL DISSECTION"?

19            MR. NOLAN:  LET'S TAKE A LOOK AT THIS.

20            THE COURT:  I DID REVIEW THE EXHIBITS AND THE REPORT    05:07

21   THAT HAD THE COMPARISONS BY LINES.

22            MR. NOLAN:  YOUR HONOR, IF I COULD HAVE THAT UP REAL

23   QUICK JUST FOR A MOMENT, I'LL SHOW YOU SOMETHING; AND I'LL COME

24   BACK TO THIS.

25            THE COURT:  THAT'S PROBABLY MORE THAN I WANTED TO       05:08
```

1    SEE.

2              MR. NOLAN:  I APOLOGIZE.

3              THE COURT:  THAT'S QUITE ALL RIGHT.

4              MR. NOLAN:  YOUR HONOR, WHAT'S INTERESTING ABOUT THIS

5    IS THAT THE DRAWING ON THE LEFT IS NOT THE CARTER BRYANT/BRATZ          05:08

6    DRAWING.  THE EVIDENCE IN THIS CASE IS THAT THE DRAWING ON THE

7    LEFT SIDE IS FROM -- I BELIEVE IT'S THE THIRD VERSION OF THE

8    SCULPT ITSELF.  MARGARET LEAHY HAS TESTIFIED THAT IS

9    SIGNIFICANTLY DIFFERENT THAN CARTER'S DRAWINGS; SO HAVE EXPERTS

10   SUCH AS ROBERT TONNER, GLENN VILPPU.  AND IF YOU HAD A                  05:08

11   COMPARISON UP THERE, YOU WOULD BE ABLE TO SEE IT.  THERE WERE A

12   LOT OF CHANGES THAT WERE MADE.

13            NOW, WE'RE TALKING ABOUT A DOLL; SO WHAT YOU AND I

14   MIGHT, TO THE NAKED EYE, THINK MAY NOT BE A SIGNIFICANT CHANGE,

15   TO THE DESIGNER, TO THE SCULPTOR, THEY ARE HUGE.  BUT YOU KNOW          05:08

16   WHAT WAS INTERESTING, YOUR HONOR?  MR. LUTZ, IN HIS DEPOSITION,

17   WAS TOLD, 'BY THE WAY, DID YOU KNOW THAT THE DRAWING ON THE

18   LEFT IS NOT CARTER'S DRAWING; THAT HE ACTUALLY COPIED IT FROM

19   THE SCULPT?'  MR. LUTZ DIDN'T KNOW THAT.

20            REMARKABLY, WHAT THEY'RE SAYING HERE FOR YOUR HONOR            05:09

21   IS THAT THERE ARE SUBSTANTIAL SIMILARITIES BETWEEN THESE TWO;

22   AND I WOULD SUBMIT, THERE PROBABLY IS, BECAUSE IT'S TAKEN FROM

23   A SCULPT RATHER THAN THE DRAWING ITSELF, FROM THE 3-D DOLL.

24            THE COURT:  LET'S GO BACK TO THE PREVIOUS --

25            MR. NOLAN:  ALL RIGHT.  NOW, LET'S GO BACK TO THIS

```
 1    ONE, BECAUSE I UNDERSTAND THIS.

 2              WHAT'S INTERESTING ABOUT THIS COMMENT THAT MR. QUINN

 3    MADE ABOUT THE EXPERT REPORT, ABOUT THE SURVEY THAT THEY PUT

 4    IN, THEY WERE COMPARING THESE DRAWINGS NOT TO DOLLS SUCH AS

 5    MY SCENE AND THINGS LIKE THAT, THEY WERE REFERRING THEM TO A      05:09

 6    CABBAGE PATCH DOLL, TO CHERRY MUFFIN DOLLS AND STUFF LIKE THAT.

 7    WE HAVE A MOTION, A DAUBERT MOTION, TO STRIKE THAT SURVEY.

 8              BUT TO COME BACK TO THIS PICTURE, YOUR HONOR, WHAT I

 9    BELIEVE THE LAW REQUIRES YOU TO DO IN THE FIRST INSTANCE IS TO

10    SAY, 'ALL RIGHT, I HAVE TO TAKE OUT OF THIS WHAT IS NOT SUBJECT   05:10

11    TO PROTECTION.  WHAT AM I GOING TO ANALYTICALLY DISSECT OUT OF

12    IT?'

13              AND I'LL GIVE YOU A COUPLE OF EXAMPLES:  BIG FEET,

14    BIG HEADS, SNOW CAPS; THE FASHIONS.  THE FASHIONS AREN'T

15    PROTECTABLE.  SO I THINK WHAT MR. QUINN IS FAILING TO DO, AND     05:10

16    IS MAYBE HOPING THAT YOU WILL OVERLOOK THIS IMPORTANT STEP,

17    BUT --

18              THE COURT:  WHAT WOULD YOU SAY IS PROTECTABLE?

19              MR. NOLAN:  OH, VERY LITTLE.  AND I'LL TELL YOU WHY.

20              THE BACKPACKS, FOR INSTANCE; THE FASHION --            05:10

21              DID YOU ASK ME WHAT'S PROTECTABLE?

22              THE COURT:  WHAT IS PROTECTABLE?

23              MR. NOLAN:  VERY, VERY, VERY LITTLE HERE.

24              THE COURT:  WHAT?

25              MR. NOLAN:  MAYBE THE EYES.  MAYBE THE EYES.  MAYBE     05:11
```

```
 1   THE EYES ARE SIGNIFICANT AND STYLISH AND SUCH THAT THEY MAY BE

 2   ABLE TO -- BUT A HAT?  A FASHION HAT?  NO.  THE HAIR?  NO.

 3          COPYRIGHT OFFICE SAYS YOU CAN'T PROTECT THAT KIND OF

 4   STUFF.  THAT HAS TO BE TAKEN OUT.  THIS IS WHAT MENELL TALKS

 5   ABOUT; THIS IS WHAT VILPPU TALKS ABOUT:  THE FASHION SWEATER,     05:11

 6   CROPPED TOP.

 7          MR. LUTZ, WITH RESPECT TO THE FASHION IN THESE LOOKS,

 8   TESTIFIED AT HIS DEPOSITION -- AND PART OF OUR PROBLEM IS, YOUR

 9   HONOR -- YOU KNOW, THIS RECORD EVIDENCE NEEDS TO BE, I GUESS,

10   SUPPLEMENTED.  AND THAT'S WHY WE DON'T THINK IT'S SUBJECT TO      05:11

11   SUMMARY JUDGMENT -- MR. LUTZ, THEIR OWN EXPERT, LOOKING AT

12   THIS, SAID, 'YOU KNOW WHAT?  JUST GO OUTSIDE STAPLES CENTER.

13   YOU'LL SEE PEOPLE LIKE THIS ALL OVER.'

14          THE COURT:  WE HAD A YOUNG LADY FROM BLYTHE WHO CAME

15   IN HERE AT THE BEGINNING OF THE CASE.  YOU WEREN'T INVOLVED IN    05:12

16   THE CASE AT THAT TIME, I DON'T THINK; BUT THERE WAS AN

17   INTERVENER THAT TRIED TO COME IN THAT CLAIMED THAT THE WHOLE

18   THING WAS HER IDEA.  SHE DRESSED THE PART WHEN SHE CAME INTO

19   COURT.

20          MR. NOLAN:  WELL, MAYBE SHE WAS ON HER WAY TO THE          05:12

21   LAKER GAME.

22          THE COURT:  AS LONG AS SHE'S NOT ON THE JURY, WE'RE

23   FINE.

24          MR. NOLAN:  BUT, YOUR HONOR, HERE'S THE POINT:  YOU

25   DON'T HAVE ANY EVIDENCE FROM THEM BY WHICH YOU NEED TO           05:12
```

```
 1  ANALYTICALLY DISSECT THESE DRAWINGS TO THEN MAKE AN APPROPRIATE

 2  COMPARISON.  WHAT THEY'RE HOPING YOU'LL DO IS EXACTLY THAT.

 3  EXACTLY THAT.  AND THERE WILL BE EXPERT TESTIMONY WITH RESPECT

 4  TO THAT.  AND MR. VILPPU GOES THROUGH IT IN GREAT DETAIL, YOUR

 5  HONOR.  BUT THAT'S NOT THE TEST IN THE NINTH CIRCUIT.          05:12

 6       YOU HAVE TO ANALYTICALLY DISSECT OUT WHAT'S

 7  PROTECTABLE AND WHAT'S NOT PROTECTABLE; AND THEN BASED ON THAT,

 8  MAKE A DETERMINATION AS TO WHETHER OR NOT THERE IS A BROAD OR A

 9  THIN PROTECTION.  AND THEN IF IT'S BROAD OR THIN, DEPENDING ON

10  HOW YOU COME OUT ON THAT, IT HAS TO BE VIRTUALLY IDENTICAL OR   05:13

11  SUBSTANTIALLY SIMILAR.  OUR EXPERTS GO THROUGH THIS IN GREAT

12  DETAIL.

13       BUT, YOUR HONOR, WHAT'S INTERESTING AND WHAT WAS SO

14  STRIKING ABOUT THIS ARGUMENT, THE SUBMISSION THAT WAS MADE ON

15  FRIDAY -- THAT, FRANKLY, CHANGED THE COURSE OF HISTORY; AND I   05:13

16  RESPECTFULLY SUBMIT IT WAS AN 180-DEGREE CHANGE IN THEIR VIEW

17  -- WAS THEIR ASKING YOU NOW TO MAKE THIS ANALYSIS, BECAUSE

18  THEIR OWN EXPERTS OVERLOOKED THAT STEP.  YOU HAVE NO EVIDENCE

19  BEFORE YOU FROM THEM WHERE THEY'VE IDENTIFIED THE ELEMENTS THAT

20  THEY BELIEVE ARE SUBJECT TO PROTECTION.  AND THAT'S A CRITICAL  05:13

21  STEP.

22            (BRIEF RECESS TAKEN TO SWITCH COURT REPORTERS.)

23            (THIS CONCLUDES VOLUME I OF 4-22-08)

24  / / /

25  / / /
```

1                               CERTIFICATE

2

3       I hereby certify that pursuant to section 753, title 28, United
        States code, the foregoing is a true and correct transcript of
4       the stenographically recorded proceedings held in the above-
        entitled matter and that the transcript page format is in
5       conformance with the regulations of the judicial conference of
        the United States.

6

7       _____           _____
        THERESA A. LANZA, CSR, RPR                       Date
8       Federal Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25