1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                 EASTERN DIVISION

4                     - - -

5       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                     - - -

7   Carter Bryant, Et. Al.,          )
                                      )
8                      Plaintiffs,    )
                                      )
9            vs.                      )   No. ED CV 04-09049
                                      )   (LEAD LOW NUMBER)
10  Mattel, Inc., Et. Al.,            )
                                      )
11                     Defendants.    )   HEARING
    _____)
12  AND CONSOLIDATED ACTIONS,         )
    _____)
13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               Los Angeles, California

17               Monday, May 12, 2008

18                  10:02 A.M.

19

20

21

22

23            THERESA A. LANZA, RPR, CSR
            Federal Official Court Reporter
24            3470 12th Street, Rm. 134
            Riverside, California  92501
25                951-274-0844
              WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2   On behalf of Carter Bryant:

 3                        KEKER & VAN NEST
                          BY:  MATTHEW M. WERDEGAR
 4                        710 SANSOME STREET
                          SAN FRANCISCO, California  94111-1704
 5                        415-391-5400

 6
     on behalf of Mattel:
 7
                          QUINN EMANUEL
 8                        By:  TIMOTHY L. ALGER
                          BY:  HARRY A. OLIVAR, JR.
 9                        BY:  JON COREY
                          BY:  DIANE CAFFERATA HUTNYAN
10                        865 S. FIGUEROA STREET,
                          10TH FLOOR
11                        LOS ANGELES, California  90017
                          213-624-7707
12

13   On Behalf of Mga Entertainment:

14                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                          BY:  THOMAS J. NOLAN
15                        BY:  RAOUL D. KENNEDY
                          300 SOUTH GRAND AVENUE
16                        LOS ANGELES, CALIFORNIA  90071-3144
                          213-687-5000
17

18   ON BEHALF OF THIRD-PARTY MATTHEW BOUSQUETTE:

19                        CALDWELL LESLIE & PROCTOR, PC
                          BY:  SANDRA L. THOLEN
20                        1000 WILSHIRE BOULEVARD,
                          SUITE 600
21                        LOS ANGELES, CALIFORNIA  90017
                          213-629-9040
22

23

24   /  /  /

25   /  /  /
```

```
 1   APPEARANCES (CONTINUED):

 2


 3
     ON BEHALF OF THIRD PARTIES MARLOW, HATCH-LEAHY, AND CLOONAN:
 4
                         KEATS McFARLAND & WILSON LLP
 5                       BY:  CHRISTIAN C. DOWELL
                         BY:  CHRIS HARRIS
 6                       9720 WILSHIRE BOULEVARD,
                         PENTHOUSE SUITE
 7                       BEVERLY HILLS, CALIFORNIA  90212
                         310-777-3749
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MAY 12, 2008                                    BRYANT v MATTEL

1                              I N D E X

2                                                          Page

3     HEARING........................................   5

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

     MAY 12, 2008                        BRYANT v MATTEL

1      LOS ANGELES, CALIFORNIA; MONDAY, MAY 12, 2008; 10:02 A.M.

2                              -oOo-

3           **THE COURT:**  I KNOW YOU WERE ALL DISAPPOINTED NOT TO

4    BE ABLE TO MAKE ANOTHER TRIP OUT TO RIVERSIDE THIS MORNING, BUT

5    AS IT TURNS OUT, THE COURT HAS A NOONTIME MEETING IN LOS                10:02

6    ANGELES TODAY.  IN FACT, I NEED TO LEAVE HERE AT 11:30; SO WE

7    HAVE AN HOUR AND A HALF TO GET THROUGH THESE MOTIONS.  LET'S

8    USE OUR TIME AS WISELY AS WE CAN.

9           MY BINDER HERE HAS THE 12 MOTIONS; INITIALLY, 11, BUT

10   12 DID FILTER IN.  I'M JUST GOING TO GO THROUGH THE ORDER.             10:03

11   THEY REALLY WEREN'T PUT IN ANY PARTICULAR ORDER, OTHER THAN THE

12   ORDER THAT WE DUG THEM OUT AND PUT THEM IN HERE.

13          LET'S BEGIN WITH APPEARANCES ON THE RECORD.

14          **MR. ALGER:**  TIMOTHY ALGER FOR MATTEL, FROM

15   QUINN EMANUEL.                                                          10:03

16          **MR. OLIVAR:**  HARRY OLIVAR, QUINN EMANUEL, FOR MATTEL.

17          **MS. HUTNYAN:**  DIANE HUTNYAN, QUINN EMANUEL, FOR

18   MATTEL.

19          **MR. COREY:**  JON COREY ON BEHALF OF MATTEL,

20   YOUR HONOR.                                                             10:03

21          **MS. THOLEN:**  SANDRA THOLEN, CALDWELL, LESLIE &

22   PROCTOR, FOR THIRD-PARTY WITNESS MATTHEW BOUSQUETTE.

23          **MR. DOWELL:**  CHRISTIAN DOWELL FOR THIRD-PARTY

24   WITNESSES MS. CLOONAN, MS. MARLOW, AND MS. LEAHY, FROM KEATS,

25   McFARLAND & WILSON.                                                     10:04

1          **MR. WERDEGAR:**  MATT WERDEGAR ON BEHALF OF

2     CARTER BRYANT.

3          **MR. KENNEDY:**  RAOUL KENNEDY ON BEHALF OF THE MGA

4     PARTIES.

5          **MR. NOLAN:**  TOM NOLAN ON BEHALF OF MGA PARTIES.              10:04

6          I MIGHT POINT OUT THAT THIS IS THE FIRST TIME RAOUL

7     HAS BEEN BEFORE US IN THIS CASE, ALTHOUGH HE'S BEEN LABORING IN

8     SAN FRANCISCO IN FRONT OF JUDGE INFANTE AND HAS PROBABLY ARGUED

9     ABOUT 81 OR 82 OF THESE MOTIONS.  WE'VE LOST COUNT.

10          **THE COURT:**  VERY GOOD.

11          WELCOME, MR. KENNEDY.

12          **MR. KENNEDY:**  GLAD TO BE FINALLY CALLED UP TO THE

13     MAJORS.

14          **THE COURT:**  THE FIRST MOTION THAT I HAVE IS MGA'S

15     NOTICE AND MOTION OBJECTING TO THE DISCOVERY MASTER'S APRIL 26,    10:04

16     2008 ORDER GRANTING MATTHEW BOUSQUETTE'S MOTION TO QUASH

17     SUBPOENA.

18          I SUPPOSE I'LL HEAR FROM, OF COURSE, MGA ON THAT

19     POINT, AND THEN MR. DOWELL, YOU'RE REPRESENTING...

20          **MS. THOLEN:**  I AM.                                        10:05

21          **THE COURT:**  OF COURSE.

22          THEN MS. THOLEN.

23          YOU'RE HERE ON BEHALF OF MR. CALDWELL?

24          **MS. THOLEN:**  I AM.

25          **THE COURT:**  VERY GOOD.

```
 1              THIS IS MGA'S MOTION.  IS THERE ANYTHING FURTHER AT
 2    THIS TIME?
 3              MR. NOLAN:  YOUR HONOR, THANK YOU.  I'LL TRY TO BE
 4    BRIEF AND NOT REPEAT A LOT OF HISTORY BECAUSE I THINK IT'S WELL
 5    SET FORTH IN OUR PAPERS.  CLEARLY, WE BELIEVE THAT                10:05
 6    JUDGE INFANTE APPLIED THE WRONG STANDARD AND THE WRONG ANALYSIS
 7    AND THAT IT'S CLEARLY ERRONEOUS AND CONTRARY TO LAW.
 8              I WANT TO GO IMMEDIATELY TO A SUMMARY OF WHAT I
 9    BELIEVE SETS FORTH THE FACTUAL POSTURE IN THIS CASE.  THERE, IN
10    EFFECT, HAVE BEEN THREE DEPOSITION SUBPOENAS SERVED IN THIS      10:05
11    MATTER.  TWO WERE SERVED ON MR. BOUSQUETTE'S COUNSEL,
12    QUINN EMANUEL.  THE FIRST ONE, NOVEMBER 2006, WAS IN EXISTENCE
13    FOR 14 MONTHS, UNTIL FEBRUARY 25, 2008, WHEN WE WERE TOLD FOR
14    THE FIRST TIME THAT QUINN EMANUEL DID NOT REPRESENT
15    MR. BOUSQUETTE, NOTWITHSTANDING THE FACT THAT DURING THOSE       10:06
16    14 MONTHS, THERE WERE APPEARANCES BEFORE JUDGE INFANTE,
17    NUMEROUS CORRESPONDENCE, WITH BOTH O'MELVENY AND LATER
18    SKADDEN ARPS, ACTUALLY SETTING DATES.  WE FINALLY AGREED TO A
19    DEPOSITION DATE PURSUANT TO THAT SUBPOENA, AND THAT DEPOSITION
20    WAS UNILATERALLY CANCELLED; NOT BY MR. BOUSQUETTE; NOT BY HIS    10:06
21    NOW PERSONAL COUNSEL, CHRIS CALDWELL; BUT RATHER BY
22    QUINN EMANUEL.
23              YOUR HONOR, BEFORE THAT DEPOSITION, WHICH WAS TO BE
24    SCHEDULED IN CHICAGO, THE FEBRUARY 15TH ONE, AS WE WERE RACING
25    TO FINISH DISCOVERY, YOU HAD ASKED THAT EVERYTHING TRY TO BE     10:06
```

```
 1   FINISHED BY JANUARY 28TH.  THERE WOULD BE SOME OVERFLOW.

 2         WE HAD CONVERSATIONS WITH MR. COREY, MR. ZELLER;

 3   AGAIN, LETTERS WRITTEN BACK SAYING, 'WE REPRESENT

 4   MR. BOUSQUETTE.  HE WILL BE AVAILABLE.'

 5         OUT OF AN ABUNDANCE OF CAUTION, WE SERVED A SECOND      10:07

 6   SUBPOENA ON THE QUINN EMANUEL FIRM, THIS ONE ISSUED OUT OF THE

 7   NORTHERN DISTRICT OF ILLINOIS, ASKING FOR THE SAME INFORMATION

 8   AND MEMORIALIZING OUR UNDERSTANDING OF FEBRUARY 15TH.  AGAIN,

 9   UPON RECEIPT OF THAT, NO LETTER INDICATING THAT THEY WERE NOT

10   AUTHORIZED TO ACCEPT.                                        10:07

11         THE THIRD SUBPOENA, OF COURSE, IS THE ONE THAT IS THE

12   SUBJECT OF THE MOTION THAT WAS BEFORE JUDGE INFANTE.  WE HAD

13   COME TO YOU AFTER THE UNILATERAL CANCELLATION OF THE DEPOSITION

14   IN CHICAGO, WHERE THE COURT WILL RECALL THERE WAS AN EXCHANGE

15   ON THE RECORD WITH MR. COREY.  YOUR INSTRUCTION AT THE END TO   10:07

16   MR. COREY WAS, 'BE CAREFUL; BE CAREFUL, MR. COREY.'  THIS WAS

17   IN RESPONSE TO QUESTIONS BACK AND FORTH AS TO, 'IF YOU DON'T

18   REPRESENT BOUSQUETTE, WHY DID YOU UNILATERALLY CANCEL IT?'

19         WE HAD TO GO BACK BEFORE INFANTE.  THE COURT PROPERLY

20   ISSUED AN ORDER SAYING IT WAS A DISCOVERY MATTER.  WE WENT BACK   10:08

21   TO INFANTE, AGAIN TOLD, YOUR HONOR, THAT NOW HE'S A RESIDENT OF

22   CHICAGO; THAT TERM IS BEING USED.  WE IMMEDIATELY GO BACK TO

23   CHRIS CALDWELL.  I ASKED MR. CALDWELL TO ACKNOWLEDGE THAT HE

24   WILL ACCEPT SERVICE AND TRY TO ARRANGE SOMETHING.  NO PHONE

25   CALL BACK.                                                   10:08
```

1      WE UNDERTAKE A SEARCH OF CHICAGO.  THERE IS NO

2  LOCATION FOR MATT BOUSQUETTE IN CHICAGO.  AND I THOUGHT IT WAS

3  VERY INTERESTING, THAT IN THE OPPOSITION FILED, IT GIVES YOU A

4  GOOGLE SEARCH OF THE LOCATION OF HIS EMPLOYMENT.  WE CHECKED

5  HIS EMPLOYMENT.  HE WAS NOT THERE.  NO INDICATIONS OF ANY          10:08

6  RESIDENCY IN ILLINOIS.  WE LOOKED FOR DRIVER'S LICENSES,

7  EVERYTHING.  NO CONTACTS WITH THE STATE OF ILLINOIS.

8      SURPRISINGLY TO US, IN LIGHT OF THE QUALITY OF

9  COUNSEL IN THIS CASE AND THE INTEGRITY OF THE LAWYERS INVOLVED

10  HERE, WE NOW LEARN THAT DESPITE REPRESENTATIONS TO YOUR HONOR,    10:09

11  JUDGE INFANTE, MR. BOUSQUETTE WAS A RESIDENT OF CHICAGO,

12  ILLINOIS.

13      THE TRUTH OF THE MATTER IS, THAT FOR NINTH CIRCUIT

14  PURPOSES AND INTERPRETING THE RESIDENCY STANDARD UNDER 45, HE,

15  IN FACT, IS A RESIDENT OF CALIFORNIA.  HE OWNS HOMES; HE OWNS     10:09

16  BUSINESSES; HE OWNS COMMERCIAL PROPERTIES; HE'S REGISTERED TO

17  VOTE HERE.  HE WAS PHYSICALLY LOCATED HERE AND SERVED WITH

18  ANOTHER SUBPOENA; THAT WAS THE THIRD SUBPOENA.  HE RECENTLY

19  REGISTERED CARS.  HE RECENTLY RENEWED HIS CALIFORNIA DRIVER'S

20  LICENSE.  HIS RESIDENCE, YOUR HONOR, IN PALM SPRINGS IS LISTED    10:09

21  UNDER THE TAX RULES OF CALIFORNIA AS HIS PRINCIPAL PLACE OF

22  RESIDENCY, TO TAKE CARE OF THAT TAX EXEMPTION.

23      YOUR HONOR, HE MAY BE LIVING IN A HOTEL IN CHICAGO.

24  I DON'T KNOW.  HE TRAVELS AN AWFUL LOT.  THE BETTER TEST, AS WE

25  CITED IN THE CASES IN CALIFORNIA UNDER THE NINTH CIRCUIT          10:10

```
 1    STANDARD, IS THAT RESIDENCY, YOUR HONOR, DOES NOT MEAN

 2    DOMICILE.  WE BELIEVE THAT JUDGE INFANTE APPLIED THE WRONG

 3    RULE.

 4          I WILL ASK THIS, YOUR HONOR:  AT THE END OF THE DAY,

 5    THESE PROCEEDINGS MUST BE FREE OF GAME-PLAYING.  A TEST OF        10:10

 6    FAIRNESS SHOULD ALSO BE APPLIED HERE.

 7          WE HAVE SPENT TENS OF THOUSANDS OF DOLLARS TO GET

 8    MR. BOUSQUETTE, WHO IS A CRITICAL WITNESS IN THIS CASE, UNDER

 9    DEPOSITION, AS EARLY AS NOVEMBER OF 2006.  I THINK HE WAS

10    ACTUALLY THE FIRST PERSON THAT I WANTED TO TAKE THE DEPOSITION    10:10

11    OF WHEN WE TOOK OVER THIS MATTER.  THE EXCUSE THAT WAS GIVEN TO

12    YOU FOR THE UNILATERAL CANCELLING WAS THAT HE WAS NOT A

13    PHASE-ONE WITNESS.

14          AND PROBABLY TO PUT THE BEST EXCLAMATION MARK ON THIS

15    MOTION, YOUR HONOR, IS THAT ON APRIL 1ST, MATTEL SUBMITTED ITS    10:11

16    WITNESS LIST AND LISTED MATT BOUSQUETTE ON ITS WITNESS LIST FOR

17    THE PHASE-ONE TRIAL.

18          I IMPLORE THE COURT TO STOP THE GAMES, TO ALLOW US TO

19    TAKE THIS DEPOSITION.  IT DEFIES MY SENSIBILITIES AS TO HOW WE

20    CAN SPEND AS MUCH TIME AS WE DID TRYING TO FIGURE OUT IF WE       10:11

21    COULD TAKE THE DEPOSITION OF CHRIS PALMERI, A WRITER FOR

22    BUSINESSWEEK, WHO ATTRIBUTED ONE PARAGRAPH TO A STORY WHERE HE

23    QUOTES MR. LARIAN -- AND WE'RE BACK AND FORTH BETWEEN HERE.  WE

24    HAVE HAD THESE KIND OF GAMES PLAYED IN FRONT OF MR. BOUSQUETTE.

25    I NOTED, YOUR HONOR, IN THE PAPERS THAT THIS WAS THE FIRST TIME   10:11
```

1  IN THIS CASE THAT I EVER AUTHORIZED SKADDEN ARPS TO SEEK

2  SANCTIONS AGAINST COUNSEL IN THIS CASE.

3       WHAT HAS HAPPENED IN THIS CASE, I RESPECTFULLY

4  SUBMIT, HAS JUST BEEN DEPLORABLE AND IS NOT IN THE BEST

5  INTEREST OF THE PRACTICE OF LAW IN THE CENTRAL DISTRICT OF                 10:12

6  CALIFORNIA.

7       BUT I WILL ADD THAT IF THIS IS ALLOWED TO ESCAPE AND

8  MR. BOUSQUETTE, WHO IS A CRITICAL WITNESS, ESCAPES BY PLAYING

9  THESE KIND OF MATTERS THROUGH VERY COMPETENT LAWYERS, WE HAVE

10 SET A VERY LOW STANDARD FOR LAWYERS PRACTICING IN THIS                     10:12

11 DISTRICT.

12       I'LL SIT ON THAT.

13       **THE COURT:**  THANK YOU, COUNSEL.

14       MS. THOLEN?

15       **MS. THOLEN:**  YOUR HONOR, MR. NOLAN CLAIMS THAT THERE             10:12

16 HAVE BEEN THREE SUBPOENAS SERVED ON MR. BOUSQUETTE.  AND I

17 UNDERSTAND THAT THERE IS BACK AND FORTH BETWEEN MATTEL AND MGA

18 WITH RESPECT TO MR. BOUSQUETTE'S DEPOSITION.

19       THAT SAID, BOTH MR. CALDWELL AND MR. BOUSQUETTE HAVE

20 SUBMITTED SWORN DECLARATIONS THAT QUINN WAS NOT AUTHORIZED TO              10:12

21 ACCEPT A DEPOSITION SUBPOENA ON BEHALF OF MR. BOUSQUETTE AND

22 THAT THEY HAD NEVER AUTHORIZED QUINN TO ACCEPT A DEPOSITION

23 SUBPOENA.

24       THAT SAID, THE ONLY DEPOSITION, AT LEAST IN OUR VIEW,

25 THAT'S REALLY AT ISSUE -- AND I CAN'T SPEAK TO WHAT WENT ON                10:12

1   BETWEEN MGA AND MATTEL WITH RESPECT TO THOSE DEPOSITIONS -- IN

2   OUR VIEW, THE ONLY DEPOSITION SUBPOENA THAT'S AT ISSUE IS THE

3   ONE THAT WAS SERVED ON MR. BOUSQUETTE IN PALM SPRINGS THAT

4   REQUIRED HIS DEPOSITION TO BE TAKEN 11 DAYS LATER.

5          MR. NOLAN MENTIONED A CONVERSATION THAT HE HAD WITH        10:13

6   MR. CALDWELL WITH RESPECT TO WHETHER OR NOT OUR FIRM WOULD

7   ACCEPT SERVICE OF THE SUBPOENA ON BEHALF OF MR. BOUSQUETTE, AND

8   THERE'S A PIECE THAT'S MISSING FROM THAT STORY, WHICH IS THAT

9   WHEN MR. NOLAN SPOKE TO MR. CALDWELL -- AND THIS IS IN

10  MR. CALDWELL'S DECLARATION -- MR. CALDWELL SAID, 'I WILL TALK    10:13

11  TO MY CLIENT, BUT I NEED TO SEE A COPY OF THE COURT'S ORDER SO

12  THAT I CAN PROPERLY ADVISE MY CLIENT.'

13         MR. NOLAN DID NOT PROVIDE A COPY OF THAT ORDER.

14  INSTEAD, THEY FRANTICALLY WENT AHEAD AND SERVED MR. BOUSQUETTE

15  IN PALM SPRINGS; SO THERE'S A PIECE MISSING IN TERMS OF THAT     10:13

16  CHRONOLOGY.

17         THAT SAID, MR. NOLAN ALSO ARGUES THAT THERE'S ALL

18  KINDS OF CIRCUMSTANTIAL EVIDENCE WHICH SUGGESTS THAT

19  MR. BOUSQUETTE IS A RESIDENT OF CALIFORNIA.  I THINK IF YOU

20  LOOK AT THE EVIDENCE, WHAT WE HAVE IS, WE HAVE A SWORN          10:14

21  DECLARATION FROM MR. BOUSQUETTE SAYING, 'I LIVE IN ITASCA,

22  ILLINOIS; MY PLACE OF EMPLOYMENT IS IN ITASCA, ILLINOIS; AND I

23  DO NOT CONDUCT BUSINESS ON A REGULAR BASIS IN PERSON IN

24  CALIFORNIA.'

25         YOU LOOK AT THAT EVIDENCE AND YOU BALANCE IT AGAINST      10:14

```
 1   THE EVIDENCE THAT MR. NOLAN IS RELYING ON, WHICH IS A

 2   DECLARATION OF ITS PRIVATE INVESTIGATOR, WHICH, AGAIN, IF YOU

 3   LOOK AT THAT DECLARATION, AS WE POINTED OUT, IT'S FILLED WITH

 4   HEARSAY, DOUBLE HEARSAY --

 5           THE COURT:  LET'S PUT ALL OF THE HEARSAY ASIDE.        10:14

 6           DOES HE OWN A RESIDENCE IN PALM SPRINGS?

 7           MS. THOLEN:  HE DOES OWN A HOME IN PALM SPRINGS.

 8           THE COURT:  AND HE'S FILED A HOMEOWNER'S EXEMPTION

 9   WITH THE STATE OF CALIFORNIA, THE FRANCHISE BOARD?

10           MS. THOLEN:  YOUR HONOR, I DON'T KNOW THAT.           10:14

11           THE COURT:  OKAY.  YOU DON'T KNOW THAT.

12           IS HE A REGISTERED VOTER IN THE COUNTY OF RIVERSIDE?

13           MS. THOLEN:  HE WAS REGISTERED TO VOTE IN CALIFORNIA.

14           THE COURT:  IS HE A REGISTERED VOTER IN CALIFORNIA?

15           MS. THOLEN:  MY UNDERSTANDING IS -- I HONESTLY DON'T   10:14

16   KNOW AT THIS POINT.

17           THE COURT:  THAT'S FINE.  AND I'M NOT GOING TO PRESS

18   YOU IF YOU DON'T KNOW.

19           DO YOU KNOW WHETHER HE HAS A CALIFORNIA DRIVER'S

20   LICENSE?                                                      10:15

21           MS. THOLEN:  I DO NOT KNOW, YOUR HONOR.

22           THE COURT:  AND DO YOU KNOW IF HE HAS NUMEROUS

23   VEHICLES REGISTERED IN THE STATE OF CALIFORNIA?

24           MS. THOLEN:  I DO NOT KNOW, YOUR HONOR.

25           THE COURT:  WHAT ABOUT THIS MCP PROPERTIES, LLC, THAT  10:15
```

```
 1    IS REGISTERED, ALLEGEDLY, IN PALM SPRINGS, OR IN CALIFORNIA?

 2            DO YOU KNOW ANYTHING ABOUT THAT COMPANY?

 3            MS. THOLEN:  I ONLY KNOW WHAT MR. NOLAN'S

 4    INVESTIGATOR PUT IN THE DECLARATION.

 5            THE COURT:  DO YOU HAVE ANY REASON TO DISPUTE           10:15

 6    ANYTHING THAT WAS SET FORTH IN THAT?

 7            MS. THOLEN:  NO.

 8            BUT I WOULD ALSO ARGUE, YOUR HONOR, THAT IT'S NOT

 9    SIMPLY ENOUGH THAT HE HAS A BUSINESS THAT HAPPENS TO BE BASED

10    IN PALM SPRINGS.                                              10:15

11            THE COURT:  I'M SIMPLY ASKING A QUESTION, COUNSEL.

12            MS. THOLEN:  OKAY.

13            THE COURT:  SO YOU HAVE NO REASON TO DISPUTE ANY OF

14    THAT INFORMATION?

15            MS. THOLEN:  NO.                                       10:15

16            BUT, YOUR HONOR, I WOULD POINT TO THE DECLARATION

17    FROM MR. SHERMAN, WHICH NEVER SAYS FOR SURE THAT HE HAS A

18    HOMEOWNER'S EXEMPTION ON THIS PROPERTY IN PALM SPRINGS.  THE

19    LANGUAGE HE USES IS THAT IT'S CURRENTLY APPEARING TO CLAIM A

20    HOMEOWNER'S EXEMPTION.  AND ALL OF THAT EVIDENCE IS SUSPECT IN 10:16

21    THAT RESPECT.

22            JUDGE INFANTE LOOKED AT BOTH THE EVIDENCE WE

23    SUBMITTED AND THE EVIDENCE THAT MGA SUBMITTED, AND MADE A

24    FACTUAL DETERMINATION, BASED ON THAT EVIDENCE, THAT

25    MR. BOUSQUETTE WAS NOT A RESIDENT OF CALIFORNIA; HE DID NOT    10:16
```

```
 1   WORK IN CALIFORNIA AND DID NOT CONDUCT BUSINESS IN PERSON ON A

 2   REGULAR BASIS IN CALIFORNIA.  I DON'T THINK THAT YOU CAN ARGUE

 3   THAT THAT'S CONTRARY TO THE EVIDENCE OR THAT IT'S CLEARLY

 4   ERRONEOUS.

 5            THEY MAKE AN ARGUMENT THAT JUDGE INFANTE DECIDED THIS    10:16

 6   BASED ON DOMICILE.  JUDGE INFANTE NEVER SAYS THAT.  HE

 7   BASICALLY RECITES THE EVIDENCE FROM BOTH SIDES, AND THEN HE

 8   REACHES A CONCLUSION.  AND, IN FACT, HE SEEMS TO CREDIT THE

 9   DECLARATION OF MR. SHERMAN.  BUT HE CONCLUDES THAT BASED ON

10   THAT, UNDER RULE 45, THE SUBPOENA HAS TO BE QUASHED.             10:16

11            THE COURT:  VERY GOOD.

12            ANYTHING FURTHER, MS. THOLEN?

13            MS. THOLEN:  NO, YOUR HONOR.

14            THE COURT:  DOES ANYONE ELSE WISH TO BE HEARD ON

15   THIS?

16            MR. COREY?

17            MR. COREY:  YES.  LET ME TRY TO BE VERY BRIEF,

18   BECAUSE IT SOUNDS TO ME LIKE THE COURT IS FOCUSING ON THE

19   CURRENT SUBPOENA.

20            I'M SITTING HERE FEELING A LITTLE BLIND, BASED ON       10:17

21   MR. NOLAN'S COMMENTS.  AND WHAT I WANT TO MAKE VERY CLEAR IS

22   THAT THE COURT SHOULDN'T INTERPRET QUINN EMANUEL'S COOPERATION

23   IN SCHEDULING MR. BOUSQUETTE'S DEPOSITION INTO SOMETHING THAT

24   IT'S NOT.  IT'S NOT A REPRESENTATION.  THERE WAS NEVER ANY

25   AGREEMENT TO ACCEPT SERVICE OF ANY OF THE PRIOR SUBPOENAS.       10:17
```

```
 1          I DO NEED TO ADDRESS VERY BRIEFLY -- THE REASON WHY

 2   MR. BOUSQUETTE IS ON MATTEL'S PHASE ONE WITNESS LIST IS

 3   BECAUSE, AS THE COURT IS VERY WELL AWARE, THERE IS A

 4   DISAGREEMENT BETWEEN THE PARTIES AS TO WHAT IS AND WHAT IS NOT

 5   IN PHASE ONE.  THAT'S THE SUBJECT OF A NUMBER OF MOTIONS IN        10:17

 6   LIMINE.

 7          IF, IN FACT, MGA IS SUCCESSFUL IN BRINGING INTO PHASE

 8   ONE THE ISSUES THAT MATTEL PERCEIVES TO BE PHASE TWO, THEN, AS

 9   A PROPHYLACTIC MEASURE, IF THERE ARE ISSUES THAT MR. BOUSQUETTE

10   NEEDS TO ADDRESS, HE NEEDS TO BE ON A WITNESS LIST.  AND HE WAS    10:18

11   ON OUR WITNESS LIST AS A 'MAY CALL' JUST FOR THAT REASON.

12          MATTEL ABSOLUTELY DISAGREES THAT HE HAS ANY KNOWLEDGE

13   ABOUT PHASE ONE.  AND I BELIEVE, IN LIGHT OF THE SUMMARY

14   JUDGMENT RULING, THE ONLY ARTICULATED BASIS FOR

15   MR. BOUSQUETTE'S KNOWLEDGE OF PHASE ONE, AS I RECALL -- AS I       10:18

16   RECALL, MR. NOLAN ARTICULATED THAT HE WAS INVOLVED IN A

17   REWRITING OF THE INVENTIONS AGREEMENT IN 2004.  I THINK THAT

18   MAY HAVE GONE BY THE WAYSIDE.

19          UNLESS THE COURT HAS ANY OTHER QUESTIONS...

20      THE COURT:  ANYONE ELSE?                                       10:18

21      MR. NOLAN:  YOUR HONOR, MAY I JUST BRIEFLY RESPOND,

22   SO THE RECORD IS CLEAR?

23      THE COURT:  I DON'T KNOW IF THAT'S NECESSARY,

24   MR. NOLAN, BECAUSE -- AND IT MAY HAVE BEEN IMPROVIDENT FOR THE

25   COURT TO CHOOSE THIS AS THE FIRST MOTION, BUT I'M INCLINED TO      10:18
```

1    GRANT THE MOTION.

2         I DO SO VERY RELUCTANTLY, BECAUSE AS I'VE

3    DEMONSTRATED, I THINK, IN PREVIOUS RULINGS, I'VE GIVEN A

4    TREMENDOUS AMOUNT OF DISCRETION OR DEFERENCE TO THE FINDINGS OF

5    JUDGE INFANTE, AS I THINK THE STANDARD REQUIRES THE COURT TO DO    10:19

6    SO.  BUT RESPECTFULLY, I THINK JUDGE INFANTE IS CLEARLY

7    ERRONEOUS IN HIS FINDING THAT MR. BOUSQUETTE IS NOT A RESIDENT

8    OF CALIFORNIA.  I BELIEVE THE THIRD SUBPOENA WAS PROPERLY

9    SERVED, AND WE NEED TO HAVE A DEPOSITION.  I HAD INDICATED, I

10   THINK IN FEBRUARY, THE COURT'S SUGGESTION WAS THAT THIS BE    10:19

11   RESOLVED; AND IT HASN'T BEEN.  BUT IT'S GOING TO BE RESOLVED

12   NOW.

13        I REVIEWED THE SCHEDULE FOR MR. CALDWELL.  I KNOW HE

14   WANTS TO SIT IN ON THIS DEPOSITION.  UNFORTUNATELY, THE ONE

15   WEEKDAY, THE ONLY WEEKDAY, THAT MR. BOUSQUETTE IS AVAILABLE IS    10:19

16   THE DAY THAT MR. CALDWELL HAS SOMETHING; SO ASSUMING YOU WANT

17   TO GO WITH THAT, I'M GOING TO HAVE TO DO THE EXTRAORDINARILY

18   UNUSUAL THING OF REQUIRING SOMETHING TO TAKE PLACE ON A

19   WEEKEND.  I DON'T LIKE DOING THAT AT ALL, BUT I DO UNDERSTAND

20   FROM THE LETTER, IF I'M INTERPRETING IT CORRECTLY, THAT HE'LL    10:19

21   BE HERE IN PALM SPRINGS ON THE WEEKENDS OVER THE NEXT SEVERAL

22   WEEKENDS.

23        SO I GUESS MY FIRST QUESTION IS, MS. THOLEN, DOES

24   MR. BOUSQUETTE OBSERVE THE SABBATH ON SATURDAY OR SUNDAY?

25        **MS. THOLEN:**  YOUR HONOR, I'M SORRY.  I HONESTLY DON'T    10:20

```
 1   KNOW.  I'M NEW TO ALL OF THIS.

 2        THE COURT:  I REALLY DID WANT TO HAVE SOMEBODY AT

 3   THIS HEARING THAT COULD SPEAK COMPETENTLY ON BEHALF OF YOUR

 4   CLIENT, SO YOU MAY WANT TO MAKE A PHONE CALL AND FIND THAT OUT,

 5   BECAUSE I'M GOING TO SET AND ORDER A DEPOSITION TO TAKE PLACE    10:20

 6   ON A DATE CERTAIN, AND I WOULD CERTAINLY NOT WANT TO INTERFERE

 7   WITH ANYBODY'S RELIGIOUS OBSERVANCE.

 8        MR. CALDWELL COULDN'T BE HERE.  HE NEEDED TO HAVE

 9   SOMEBODY HERE WHO COULD SPEAK COMPETENTLY ON BEHALF OF HIS

10   CLIENT.  I THOUGHT I KIND OF GAVE A CLUE LAST WEEK, WHEN I       10:20

11   ASKED FOR A SCHEDULING, THAT I WANTED TO HAVE INFORMATION ABOUT

12   SCHEDULING.

13        MS. THOLEN:  YOUR HONOR, IS IT POSSIBLE TO GIVE US,

14   LIKE, A WEEK'S RANGE TO WORK WITH?

15        THE COURT:  NO.  NOT AT THIS POINT.  IT'S TOO LATE          10:20

16   FOR THAT.

17        MS. THOLEN:  SO YOU'D LIKE TO KNOW WHETHER SATURDAY

18   OR SUNDAY IS OUT FOR MR. BOUSQUETTE?

19        THE COURT:  FOR RELIGIOUS PURPOSES, YES.

20        MS. THOLEN:  I'LL GO MAKE THE CALL, YOUR HONOR.             10:20

21        THE COURT:  LET'S TAKE THIS BACK UP WHEN COUNSEL

22   RETURNS.

23        LET'S MOVE ON TO THE SECOND MOTION, AND THAT IS

24   RELATED TO THE -- IT'S ENTITLED IN MATTEL'S MOTION "OBJECTING

25   TO THE DISCOVERY MASTER'S APRIL 14, 2008 ORDER REGARDING         10:21
```

```
 1   MATTEL'S MOTION TO COMPEL COMMUNICATIONS REGARDING THIS

 2   ACTION."

 3            I'VE GOT A COUPLE OF QUESTIONS HERE, I GUESS.

 4            I SUPPOSE I SHOULD DIRECT THESE AT MGA.

 5            THE DIFFICULTY THAT I'M HAVING WITH THE DISCOVERY        10:21

 6   MASTER'S ORDER ON THIS IS THIS DISTINCTION BETWEEN

 7   NONPRIVILEGED COMMUNICATIONS WITH EMPLOYEES, WITH CERTAIN

 8   EMPLOYEES ANYWAY, BEING OKAY, BUT NONPRIVILEGED COMMUNICATIONS

 9   WITH COUNSEL, OR IN-HOUSE COUNSEL, NOT BEING OKAY.  I MEAN, IF

10   IT'S BE NONPRIVILEGED -- I GUESS I'M PARTLY HAVING TROUBLE       10:21

11   WRAPPING MY MIND AROUND HOW NONPRIVILEGED COMMUNICATION BETWEEN

12   COUNSEL IS NONPRIVILEGED, BUT I SUPPOSE THERE ARE CERTAIN

13   THINGS THAT IT COULD BE.  BUT THE DISTINCTION THAT HE DRAWS

14   THERE IS ONE THAT I'M NOT FOLLOWING.

15            I HOPE THE QUESTION MAKES SENSE.                        10:22

16       MR. KENNEDY:  LET ME TRY TO SPEAK TO THAT.

17            I THINK THE UNDERLYING RATIONALE IS, EVEN WHEN WE'RE

18   TALKING ABOUT KEY MGA EMPLOYEES, THEY DON'T SPEND THEIR DAYS

19   LITIGATING THE CASE.  WITH REGARD TO THE THREE LAW FIRMS AND

20   THE FIVE IN-HOUSE COUNSEL, THESE ARE PEOPLE WHO OVER THE LAST    10:22

21   FOUR YEARS HAVE SPENT, YOUR HONOR KNOWS AS WELL AS I, JUST AN

22   INCREDIBLE AMOUNT OF TIME ON THIS CASE.  SO FOR EACH OF THEM TO

23   UNDERTAKE THE BURDEN OF DISTINGUISHING PRIVILEGED FROM

24   NONPRIVILEGED COMMUNICATIONS, WHEN A LOT OF TIME THAT'S ALL

25   THEY'VE DONE.  PARTICULARLY, REMEMBER THE 'REFER OR RELATE'      10:22
```

```
 1   DEFINITION HERE IS, ANYTHING --

 2           THE COURT:  MR. KENNEDY, LET ME JUST STOP YOU THERE.

 3           WOULDN'T THAT SAME BURDEN EXIST FOR THE

 4   COMMUNICATIONS BETWEEN COUNSEL AND EMPLOYEES?

 5           MR. KENNEDY:  I DON'T THINK SO, YOUR HONOR.                10:23

 6           FIRST, TO THE EXTENT YOUR HONOR SAYS WE SHOULD HAVE

 7   APPEALED THE PORTION THAT WENT TO THE SIX EMPLOYEES, PERHAPS WE

 8   COULD HAVE DONE THAT, BECAUSE UNDER THAT DEFINITION, I THINK WE

 9   COULD HAVE CONJURED SOMETHING UP.

10           BUT HERE'S THE DIFFERENCE:  I CAME DOWN HERE LAST         10:23

11   NIGHT AND GOT IN A CAB.  I'VE BEEN IN THE HABIT OF SAVING

12   RECEIPTS UP UNTIL NOW SO I CAN GET REIMBURSED.  SINCE I'VE

13   STARTED WORKING ON THIS MOTION, I REALIZE I HAVE TO POTENTIALLY

14   SAVE THEM FOR TWO PURPOSES.  THIS IS A DOCUMENT THAT PERTAINS,

15   RELATES, REFERS, ET CETERA, TO THIS LAWSUIT, AS DOES VIRTUALLY   10:23

16   EVERYTHING THAT I'VE BEEN DOING.

17           TO RESPOND, WE'D LITERALLY HAVE TO GO THROUGH AND

18   SEPARATE OUT THE CAB RECEIPTS FROM EVERYTHING ELSE THAT'S

19   INVOLVED.  I THINK THAT'S REPRESENTED BY -- MATTEL MAKES NO

20   ATTEMPT TO SAY, 'HERE'S WHY WE NEED EVERY ONE OF THESE PIECES    10:24

21   OF PAPER.'

22           THE COURT:  WELL, THAT GOES TO THE ISSUE OF BURDEN.

23   I CERTAINLY WANT TO ASK MATTEL ABOUT BURDEN, BUT I'D LIKE TO

24   GET BACK TO THIS LEGAL DISTINCTION.  OR IS THIS JUST BASICALLY

25   HOW, FROM YOUR PERSPECTIVE, THE DISCOVERY MASTER LESSENED THE    10:24
```

```
 1   BURDEN, BASICALLY, BY SEPARATING OUT -- I'M HAVING TROUBLE

 2   COMING UP WITH A PRINCIPAL DISTINCTION BETWEEN COMMUNICATIONS

 3   WITH EMPLOYEES VERSUS COMMUNICATIONS WITH COUNSEL, IF THEY'RE

 4   NONPRIVILEGED.

 5            MR. KENNEDY:  I APOLOGIZE, YOUR HONOR.  I DON'T THINK   10:24

 6   I UNDERSTOOD THE FULL IMPORT OF THE QUESTION THE FIRST TIME.

 7            I'M NOT SURE THERE IS A CONCEPTIONAL DIFFERENCE

 8   THERE.  I THINK WE ARE TALKING SOLELY ABOUT THE BURDEN AND JUST

 9   THE SHEER VOLUME OF POTENTIALLY PRIVILEGED MATERIALS THAT ARE

10   GOING TO BE INVOLVED.                                          10:24

11            THE COURT:  FAIR ENOUGH.

12            WELL, LET ME ASK MATTEL.

13            WHO WOULD LIKE TO SPEAK TO THIS?

14            MR. ALGER:  THIS IS MINE, YOUR HONOR.

15            OBVIOUSLY, IT'S OUR VIEW -- I THINK THE PAPERS        10:24

16   ARTICULATE IT WELL -- THAT THE DISCOVERY MASTER ENGAGES IN

17   ARBITRARY LIMITATION.  THE DISCOVERY MASTER HAS EXCLUDED SOME

18   OF THE MOST IMPORTANT NONPRIVILEGED COMMUNICATIONS HERE.

19            AS THE COURT IS VERY FAMILIAR WITH THIS CASE, WE'VE

20   ALREADY HAD EVIDENCE IN THE RECORD AS TO QUESTIONS ABOUT       10:25

21   WHETHER THERE'S BEEN SPOLIATION OF EVIDENCE; WE'VE HAD

22   QUESTIONS PRESENTED TO THE COURT REGARDING WITNESSES'

23   PROSPECTIVE TESTIMONY AND COUNSEL FOR MGA'S COMMUNICATIONS WITH

24   WITNESSES, SUCH AS MS. TOMIYAMA; WE'VE HAD, ALSO, MATTERS

25   PRESENTED TO THIS COURT AND THE DISCOVERY MASTER REGARDING      10:25
```

1  OFFERS AND AGREEMENTS TO PAY FEES FOR WITNESSES IN THIS CASE.

2  WE'VE SHOWN IN OUR PAPERS HOW COUNSEL, IN-HOUSE COUNSEL, FOR

3  MGA HAD COMMUNICATIONS WITH JACQUELINE PRINCE, WHO CREATED THE

4  NOTARY BOOK, WHERE THERE'S NOW EVIDENCE THAT IT'S BEEN

5  FABRICATED.  WE HAVE EVIDENCE OF COMMUNICATIONS BETWEEN MGA'S          10:25

6  COUNSEL AND MR. FARHAD LARIAN, WHO'S ACKNOWLEDGED DESTROYING

7  EVIDENCE.

8           FOR THE DISCOVERY MASTER TO EXEMPT MGA'S IN-HOUSE

9  COUNSEL AND OUTSIDE COUNSEL REGARDING COMMUNICATIONS WITH THIRD

10  PARTIES IS JUST -- THERE'S NO DISTINCTION.  THERE'S NO            10:26

11  JUSTIFIABLE DISTINCTION.

12           **THE COURT:**  AS THIS DISCUSSION REVEALS, I THINK THERE

13  MAY BE DIFFICULTY TO DISTINGUISH IT ON A LEGAL BASIS, SHORT OF

14  SIMPLY -- I SUPPOSE THE ONLY EXPLANATION THAT I CAN SEE IS THAT

15  IT MUST BE DONE ON SOME KIND OF BURDEN BASIS; THAT THE REQUEST        10:26

16  IS SO BROAD, AS MR. KENNEDY ARGUES IN HIS PAPERS, THAT THIS IS

17  WHERE THE DISCOVERY MASTER CAME DOWN IN TRYING TO STRIKE THAT

18  BALANCE.

19           I'M NOT SUGGESTING THAT I WOULD HAVE STRICKEN THE

20  SAME BALANCE, BUT IS IT SO PATENTLY UNREASONABLE THAT IT NEEDS        10:26

21  TO BE OVERTURNED, I GUESS, IS THE QUESTION.

22           **MR. ALGER:**  IT IS PATENTLY UNREASONABLE, BECAUSE AS

23  ATTORNEYS, WE HAVE TO MAKE EVALUATIONS ALL THE TIME ABOUT

24  DOCUMENTS AND WHETHER THEY'RE PRIVILEGED OR NONPRIVILEGED.

25  THERE'S BEEN QUITE A BIT OF DISPUTE THROUGHOUT THE COURSE OF          10:26

```
 1   THIS LITIGATION AS TO WHAT DOCUMENTS ARE PRIVILEGED AND

 2   NONPRIVILEGED.  BOTH SIDES HAVE HIRED DOZENS OF LAWYERS TO

 3   REVIEW DOCUMENTS AND EVALUATE DOCUMENTS AS TO THEIR CONTENTS

 4   AND WHETHER THEY'RE PRIVILEGED OR NOT.  AND WE ALSO HAVE

 5   PROVISIONS THAT PROTECT THE INADVERTENT DISCLOSURE OF              10:27

 6   PRIVILEGED DOCUMENTS; SO WE'VE GOT MEASURES THAT PROTECT

 7   PARTIES ON PRIVILEGED COMMUNICATIONS.

 8          BOTH SIDES HAVE THE RESOURCES AND HAVE INVESTED THE

 9   RESOURCES IN REVIEWING DOCUMENTS IN THIS CASE.  TO SAY, 'OKAY,

10   WELL, WE'RE JUST GOING TO GIVE THEM COMMUNICATIONS BY            10:27

11   MR. LARIAN AND SO FORTH, BUT NOT THE ATTORNEYS WHO ARE ACTUALLY

12   CARRYING OUT THE WORK OF MGA AND COMMUNICATING WITH THIRD

13   PARTIES ABOUT THIS CASE,' TO ME, AGAIN, THERE'S NO LEGITIMATE

14   LEGAL DISTINCTION, AND IT DOESN'T MAKE SENSE ON A BURDEN SIDE

15   EITHER.

16          BOTH SIDES HAVE BEEN FULLY EQUIPPED AND INVESTED --

17   AS MGA HAS POINTED OUT, THEY'VE SPENT HUNDREDS OF THOUSANDS OF

18   DOLLARS GOING THROUGH DOCUMENTS.  AND MATTEL HAS DONE THE SAME.

19   WE'VE BOTH BEEN PUT IN A POSITION WHERE WE'VE HAD TO PREPARE

20   PRIVILEGED LOGS.  AND THERE'S BEEN DISPUTES OVER THE SCOPE OF   10:28

21   THE PRIVILEGED LOGS.  THESE ARE ALL MATTERS THAT BOTH SIDES ARE

22   FULLY PREPARED TO DEAL WITH.  AND IT'S OUR VIEW THAT THERE'S

23   NOT A SERIOUS OVERBREADTH PROBLEM HERE; THERE'S NOT A SERIOUS

24   OVERBREADTH ARGUMENT.

25          ON THAT, WE'D SUBMIT, YOUR HONOR.                        10:28
```

1          **THE COURT:**  ANYTHING FURTHER, MR. KENNEDY?

2          **MR. KENNEDY:**  YES.  VERY BRIEFLY, YOUR HONOR.

3          WE'RE TALKING ABOUT ASKING UP TO A HUNDRED OUTSIDE

4    LAWYERS TO HAVE TO COMB THROUGH EVERYTHING, DOWN TO AND

5    INCLUDING TODAY, FOR WHAT'S PRIVILEGED AND NONPRIVILEGED.          10:28

6          AS MR. ALGER JUST POINTED OUT, MATTEL CAN WRITE,

7    APPARENTLY, A LASERED REQUEST WHEN THEY WANT.  THEY COULD HAVE

8    SAID, 'COMMUNICATIONS BETWEEN MR. CENDALI AND MS. PRINCE.'

9    THEY COULD HAVE VERY EASILY HAVE DONE THAT.

10          THAT ISN'T WHAT THEY DID.          10:29

11          WITH THAT, I SUBMIT WE DO NOT HAVE ANYTHING

12    APPROACHING CLEAR ERROR WITH REGARD TO BURDEN.

13          UNLESS YOUR HONOR HAS ANY QUESTIONS, I'M PREPARED TO

14    SUBMIT.

15          **THE COURT:**  VERY WELL.

16          ANYONE ELSE ON THIS MOTION?

17          I'LL CIRCLE BACK TO THIS.

18          THE THIRD MOTION, THE MOTION FOR AN ORDER GRANTING

19    THE ADVERSE INFERENCE JURY INSTRUCTION, WAS STRICKEN PURSUANT

20    TO THE COURT'S ORDER ISSUED EARLIER.          10:29

21          THE FOURTH MOTION IS MATTEL'S MOTION OBJECTING TO THE

22    DISCOVERY MASTER'S DENIAL OF A MOTION TO COMPEL PRODUCTION OF

23    THE DOCUMENT MGA 3,801,819-22.  THE COURT HAS RECEIVED,

24    IN-CAMERA, THE DOCUMENT.

25          THIS WAS A CLAWBACK SITUATION.  I'M TRYING TO THINK          10:29

1    HOW TO DISCUSS THIS WITHOUT GIVING THE IN-CAMERA STATUS OF IT.

2            AS I UNDERSTAND IT, IT'S JUST TWO LINES THAT WERE

3    REDACTED; IS THAT CORRECT?

4            **MR. KENNEDY:**  THERE'S A FEW MORE THAN THAT,

5    YOUR HONOR.  IT'S, PERHAPS, 12 LINES.                           10:30

6            **THE COURT:**  DOES SOMEBODY HAVE A COPY OF THE REDACTED

7    ONE?  I HAVE A COPY OF THE UNREDACTED RIGHT IN FRONT OF ME.

8    DOES SOMEONE HAVE A COPY OF THE REDACTED VERSION THAT WAS

9    ACTUALLY PRODUCED IN DISCOVERY?

10           **MR. ALGER:**  YOUR HONOR, I DO NOT; BUT IT IS TWO LINES   10:30

11   THAT WERE REDACTED.

12           **THE COURT:**  AS I UNDERSTAND IT, AT LEAST AS IT'S

13   DESCRIBED IN THE PAPERS, IT'S TWO LINES IN THE MARCH 12, 2002

14   E-MAIL FROM ISAAC LARIAN TO VICTORIA O'CONNER, ET AL.

15           **MR. KENNEDY:**  THAT'S CORRECT.                        10:30

16           I'M SORRY; I MISUNDERSTOOD.

17           **THE COURT:**  ALL RIGHT.

18           THE PROBLEM I'M HAVING IS ACTUALLY -- I KNOW BOTH

19   LINES WERE REDACTED.  I CAN SEE MORE CLEARLY HOW THE FIRST OF

20   THOSE TWO LINES IS PROPERLY REDACTED.  NOT SO MUCH THE SECOND.  10:30

21   NOT TO SPLIT HAIRS, BUT I GUESS I'M SPLITTING SENTENCES HERE.

22   I'M TRYING TO THINK HOW WE'RE GOING TO HAVE A DISCUSSION OF

23   THIS, GIVEN THAT THE LINES THEMSELVES AT THIS POINT ARE

24   ATTORNEYS' EYES ONLY.

25           ANY SUGGESTION FROM MR. KENNEDY OR MR. NOLAN AS TO       10:31

```
 1   HOW TO PROCEED?

 2        MR. KENNEDY:  OTHER THAN GOING INTO AN IN-CAMERA

 3   PROCEEDING OR SOMEHOW DOING IT OFF THE RECORD WITH EVERYBODY

 4   EXCEPT ATTORNEYS PRESENT, I'M NOT SURE HOW WE COULD PROCEED.

 5        THE COURT:  I ASSUME THAT THE RELEVANT PARTIES                10:31

 6   UNDERSTAND WHAT THE TWO LINES ARE.  IT'S BASICALLY THAT FIRST

 7   LINE THAT THE COURT CAN MORE READILY SEE AS BEING AN

 8   ATTORNEY-CLIENT COMMUNICATION.

 9        THE SECOND ONE, WHICH IS MORE OF A DECLARATORY

10   STATEMENT, DOES NOT APPEAR TO BE SO MUCH IN THE WAY OF A CLIENT    10:31

11   SEEKING ADVICE OR A CLIENT SEEKING DIRECTION FROM, IN THIS

12   CASE, HIS ATTORNEY.

13        MR. NOLAN:  YOUR HONOR, IF I MIGHT.

14        MAYBE ONE OF THE WAYS THAT WE COULD ADDRESS THIS

15   WITHOUT HAVING TO GO IN-CAMERA WITH YOU IS TO VIEW IT AS A        10:32

16   COMMUNICATION BASED ON ADVICE PROVIDED BY OUTSIDE COUNSEL AS TO

17   WHAT STEPS NEED TO BE TAKEN TO BE CONSISTENT WITH THAT ADVICE

18   THAT WAS PROVIDED TO THE CLIENT.

19        THE COURT:  ARE YOU SUGGESTING THAT THE SUBSEQUENT

20   ACTION OF A CEO IMPLEMENTING ADVICE PREVIOUSLY GIVEN IS          10:32

21   PROTECTED UNDER THE PRIVILEGE?

22        MR. NOLAN:  I'M NOT FOR PURPOSES OF THIS DISCUSSION.

23   BUT I DON'T THINK I HAVE TO EVEN GO THERE, YOUR HONOR.  I THINK

24   THE WAY THAT LAWYERS COMMUNICATE WITH CLIENTS, ESPECIALLY

25   COMPANY CLIENTS, CORPORATE CLIENTS, WOULD BE TO SAY, 'THESE ARE  10:32
```

1  THE STEPS THAT YOU MUST TAKE,' AND THEN TO EXPLAIN TO EMPLOYEES

2  WHY THOSE STEPS ARE BEING TAKEN, TO PUT THEM INTO THE

3  PERSPECTIVE OF SOMETHING MORE THAN, 'HEY, YOU KNOW, I THINK

4  THIS IS A GOOD IDEA FROM A BUSINESS PERSPECTIVE.'

5  **THE COURT:**  I CAN SEE THAT IF IT WAS REVERSED, THAT          10:33

6  WOULD BE THE CASE.  IF THE ATTORNEY WAS TELLING THE CLIENT, 'DO

7  THIS,' THAT WOULD CLEARLY BE ADVICE OF COUNSEL.

8  **MR. NOLAN:**  BUT I THINK WITH RESPECT TO THE

9  DECLARATION THAT WAS SUBMITTED, ALONG WITH THIS DOCUMENT FROM

10  MR. LARIAN, THAT, IN FACT, IS EXACTLY WHAT OCCURRED IN THIS      10:33

11  CASE; THAT ADVICE --

12  **THE COURT:**  WAS GIVEN.

13  **MR. NOLAN:**  THE CEASE AND DESIST LETTER COMES IN;

14  'WE'RE GOING TO SUE YOU; WE'RE GOING TO DO BAD THINGS TO YOU.'

15  OUTSIDE COUNSEL IS SOUGHT; DISCUSSIONS HAD; INSTRUCTIONS        10:33

16  PROVIDED; RESPONSE GIVEN TO MATTEL; THEN OUTSIDE COUNSEL GIVES

17  INSTRUCTIONS TO THE CLIENT THROUGH WHATEVER ORDINARY LINE OF

18  COMMUNICATION IS ESTABLISHED.  MAYBE AT MATTEL, THEY HAVE A

19  DIFFERENT WAY OF COMMUNICATING.  MAYBE IT'S THROUGH MS. THOMAS,

20  BECAUSE OF THE LEGAL DEPARTMENT.                                10:34

21  **THE COURT:**  AND THAT'S ALL FINE, AND I GIVE YOU

22  EVERYTHING UP TO THAT POINT AS BEING PROTECTED BY

23  ATTORNEY-CLIENT PRIVILEGE.  IT'S WHEN THE CLIENT, NAMELY

24  MR. LARIAN IN THIS CASE, THEN ACTS ON THAT ADVICE AND GIVES

25  DIRECTION.                                                      10:34

1    **MR. NOLAN:**  BECAUSE WHEN HE CONVEYS THE REASON FOR

2  THAT DIRECTION, AND THE ADDED IMPORTANCE OF IT, IS BECAUSE

3  THERE IS A THREATENED LEGAL ACTION AGAINST US AND WE MUST TAKE

4  THE FOLLOWING STEPS.

5         THE ONLY WAY HE CAN DO THAT, YOUR HONOR, IS EITHER TO    10:34

6  GO TO HIS LAWYERS AND SAY, WITHIN THE LEGAL DEPARTMENT -- AND

7  THAT'S WHAT HE DOES -- TWO OF THE PEOPLE --

8         **THE COURT:**  TWO OF THE THREE ARE LAWYERS, RIGHT.

9         **MR. NOLAN:**  'I WANT TO BE ASSURED THAT MY COMPANY IS

10  COMPLYING WITH THE LEGAL ADVICE THAT THEY ALL HAVE TO HAVE NOW    10:34

11  IN ORDER TO POLICE AS THEY LOOK AT THIS OUTSIDE WEBSITE.'

12         SO I DON'T THINK IT'S FAIR TO PARSE IT AS FINELY AS

13  THAT.  I DO THINK, IN THIS SITUATION, THE ONLY WAY TO

14  EFFECTIVELY CLOSE THE LOOP, IF YOU WOULD, ON THE LEGAL ADVICE

15  THAT WAS BEING PROVIDED TO MGA WAS TO COMMUNICATE IN THIS    10:35

16  FASHION.  AND THAT'S CONSISTENT.

17         **THE COURT:**  LET ME HEAR FROM MATTEL ON THAT.

18         DO YOU UNDERSTAND WHAT I'M SAYING?

19         I HOPE YOU UNDERSTAND WHERE I'M AT.

20         **MR. ALGER:**  I HAVEN'T SEEN THE E-MAIL IN A LONG TIME,    10:35

21  SO I'M AT SOME DISADVANTAGE HERE, BUT I DO WANT TO MAKE MY

22  ARGUMENT.

23         **THE COURT:**  ALL RIGHT.

24         **MR. ALGER:**  SO BEAR WITH ME IF IT'S NOT AS FINELY

25  TUNED AS YOU WISH, BECAUSE I DON'T HAVE THE DOCUMENT IN FRONT    10:35

1    OF ME.

2             **THE COURT:**  FAIR ENOUGH.

3          **MR. ALGER:**  THERE'S NO LEGAL ADVICE SOUGHT IN THE

4    COMMUNICATION.  THERE'S A DIRECTION, A BUSINESS DIRECTION,

5    THAT'S DIRECTED TO THE COO OF THE COMPANY, ONE LAWYER, AND A          10:35

6    PARALEGAL.  THE FACT THAT IT WAS DIRECTED AT THREE PEOPLE, ONE

7    OF WHICH HAPPENED TO BE A LAWYER, DOESN'T MAKE IT A

8    COMMUNICATION FOR THE PURPOSES OF OBTAINING LEGAL ADVICE.  I

9    THINK THAT'S CRYSTAL CLEAR.

10            THERE WERE NINE RECIPIENTS OF THE E-MAIL, A TOTAL OF          10:35

11    NINE.  THERE IS NO MARKING ON IT IDENTIFYING IT AS

12    CONFIDENTIAL.  AND, IN FACT, EIGHT OF THOSE NINE RECIPIENTS

13    WERE NOT LAWYERS.  MR. LARIAN DIDN'T INDICATE ANYTHING ABOUT IT

14    BEING CONFIDENTIAL.  WE HAD EXTENSIVE TESTIMONY BY

15    RACHEL HARRIS, WHO IS AWARE OF THIS COMMUNICATION, WHO WAS          10:36

16    AWARE OF THE FALLOUT FROM THIS COMMUNICATION AND THE FACT THAT

17    MR. DEES GOT FIRED AFTER DOING COMPETENT, QUALITY WORK FOR MGA

18    FOR A NUMBER OF MONTHS SIMPLY BECAUSE HE DISCLOSED TO A FAN

19    WEBSITE THAT MR. CARTER INVENTED BRATZ.

20            THE FACT OF THE MATTER IS THAT -- AND WITH RESPECT TO          10:36

21    MR. NOLAN'S ARGUMENT -- AND I'VE READ HIS ARGUMENT AT SUMMARY

22    JUDGMENT -- THERE'S NO MENTION IN THAT CEASE AND DESIST LETTER

23    FROM MR. QUINTO ABOUT MATTEL OR ABOUT BRYANT.  NONE.

24            BUT THE E-MAIL COMMUNICATION WITH THIS ALLEGED

25    INSTRUCTION MAKES REFERENCE TO MATTEL AND IT MAKES REFERENCE TO          10:36

```
 1   MR. BRYANT.

 2        SO THE STORY THAT MGA HAS NOW DEVELOPED, AND IS

 3   PRESSING ON YOUR HONOR IN THE CONTEXT OF THE SUMMARY JUDGMENT

 4   MOTION AND IS EXPECTED TO ARGUE TO THE JURY, IS THAT THERE WAS

 5   CONCEALMENT GOING ON HERE SOLELY BECAUSE OF THE CEASE AND           10:37

 6   DESIST LETTER ABOUT, QUOTE, "BARBIE," UNQUOTE, AND "DIVA

 7   STARZ," UNQUOTE.

 8        THE FACT OF THE MATTER IS, THIS E-MAIL WAS PART OF A

 9   COVER-UP RELATED TO BRYANT AND RELATED TO THE DEVELOPMENT OF

10   BRATZ.                                                              10:37

11        THE COURT:  I UNDERSTAND YOUR ARGUMENT, COUNSEL.

12        MR. ALGER:  SO WHAT'S HAPPENED IS, THE REDACTION

13   ALLOWS MGA, NOT ONLY TO HIDE THE CONCEALMENT ARGUMENT THAT

14   MATTEL IS GOING TO PRESENT TO THE JURY, BUT ALSO TO PRESENT A

15   FALSE AND MISLEADING STORY ABOUT THAT THIS IS A REACTION TO A       10:37

16   CEASE AND DESIST LETTER.

17        THE COURT:  LET ME ASK YOU THAT, BECAUSE THAT'S KIND

18   OF A REPEATED REFRAIN THAT PEPPERS YOUR MOTION, THAT SOMEHOW IT

19   DESTROYS THE CONTEXT OF THE E-MAIL.

20        I UNDERSTAND YOUR THEORY OF THE CASE.  AND I'M NOT             10:37

21   SAYING IT'S RIGHT OR WRONG, BUT YOUR THEORY OF WHAT THIS E-MAIL

22   STANDS FOR IS PART OF ITS COVER-UP.

23        BUT CERTAINLY, DON'T YOU GET THAT SAME SENSE FROM THE

24   FIRST THREE LINES OF THE E-MAIL?

25        I MEAN, I UNDERSTAND THE FOURTH AND FIFTH LINES ADD           10:38
```

```
1    MORE UMPH TO IT, IF YOU WOULD, TO USE THE LEGAL PHRASE, BUT THE

2    FIRST THREE LINES CERTAINLY CONVEY THAT SAME THOUGHT; THAT

3    MR. LARIAN IS REACTING TO THIS INFORMATION BEING OUT THERE ON

4    THE WEBSITE, ET CETERA.

5           MR. ALGER:  RIGHT.  THE E-MAIL DOES GET US PARTWAY       10:38

6    THERE, BUT IT REALLY DOESN'T GET US ALL OF THE WAY THERE.  AND

7    THAT IS THAT THERE WAS AN ATTEMPT TO COVER UP MR. BRYANT'S

8    INVOLVEMENT IN THE CREATION OF BRATZ THAT'S GOING ON HERE.  AND

9    THAT'S WHAT'S IMPORTANT HERE; THAT THERE WAS A DEMAND BY

10   MR. LARIAN --                                                  10:38

11          THE COURT:  THE INFO THAT DAVID DEES PROVIDED WAS

12   BRYANT; CORRECT?

13          MR. ALGER:  YES.

14          THE COURT:  SO THAT IS OUT THERE.

15          MR. ALGER:  YES.                                        10:38

16          THE COURT:  WHEN ISAAC LARIAN SAYS IN THE UNREDACTED

17   VERSION, 'VICTORIA, DAVE, WHO GAVE DAVID DEES INFO AND WHAT HE

18   DOES FOR US TO THIS YAHOO LADY AND WHY,' HE'S TALKING ABOUT THE

19   INFORMATION THAT DAVID DEES RELATED CONCERNING CARTER BRYANT;

20   CORRECT?                                                       10:39

21          MR. ALGER:  WELL, WE DON'T KNOW THAT, BECAUSE MGA IS

22   GOING TO ARGUE THAT IT WAS ALL BECAUSE OF DAVID QUINTO'S LETTER

23   ABOUT MAKING SURE DIVA STARZ IS DOWN OFF THE WEBSITE.  SO THE

24   REDACTION OPENS THE DOOR TO MGA TO MAKE ANOTHER STORY UP ABOUT

25   THIS PARTICULAR E-MAIL AND SAY, 'OH, WELL, WE'RE JUST POLICING  10:39
```

1    THE WEBSITE,' WHICH, BY THE WAY, THEY'VE SAID, 'WE DON'T HAVE

2    ANY INVOLVEMENT WITH IT.'  MS. GLASER WROTE BACK TO US AND

3    SAID, 'WE DON'T HAVE ANY CONTROL OVER THE WEBSITE.'

4        **THE COURT:**  WE HAVE THE DAVID DEES E-MAIL ATTACHED

5    HERE.  I MEAN, IT GOES ON --                                    10:39

6        **MR. ALGER:**  RIGHT.

7        **THE COURT: --** YOU CAN KIND OF SPELL IT OUT.

8        ALL RIGHT.  I UNDERSTAND YOUR ARGUMENT.

9        MS. THOLEN, DO WE HAVE AN ANSWER TO THE QUESTION?

10       **MS. THOLEN:**  SATURDAY IS PREFERABLE.                     10:39

11       **THE COURT:**  SATURDAY IS PREFERABLE.

12       ALL RIGHT.  VERY GOOD.

13       **MR. NOLAN:**  WHICH SATURDAY?

14       **THE COURT:**  I TRUST WE HAVE ENOUGH LAWYERS FROM THE

15   FIRMS THAT SOMEBODY COULD SEND SOMEBODY OUT ON A SATURDAY TO     10:40

16   COVER A DEPOSITION?

17       **MR. NOLAN:**  I THINK SO.

18       **THE COURT:**  THE ONLY DATE THAT SEEMS TO WORK IN

19   ADVANCE OF THE TRIAL IS EITHER MAY 17TH OR MAY 24TH.

20       **MS. THOLEN:**  MAY 24TH IS MEMORIAL WEEKEND, IF THAT       10:40

21   PLAYS IN.

22       **THE COURT:**  SPEAK UP, COUNSEL, PLEASE.

23       **MS. THOLEN:**  THE 24TH IS THE BEGINNING OF THE

24   MEMORIAL DAY WEEKEND.

25       **THE COURT:**  IT IS.                                       10:40

1      **MR. NOLAN:**  YOUR HONOR, WE WOULD PREFER THE 17TH.

2      **THE COURT:**  OKAY.  LET'S DO IT.

3      **MR. NOLAN:**  THAT WOULD BE THIS SATURDAY.

4      **MS. THOLEN:**  I WOULD SAY THE 24TH, YOUR HONOR, JUST

5  BECAUSE IT GIVES US MORE TIME.      10:40

6      **MR. NOLAN:**  YOUR HONOR, I JUST WANT TO CONTRAST THOSE

7  TWO DATES.

8      THE 17TH IS THE SATURDAY BEFORE WE GO DOWN FOR THE

9  SUMMARY JUDGMENT ARGUMENTS --

10      **THE COURT:**  THAT'S WHAT I'M THINKING AS WELL.      10:40

11      I'M GOING TO ORDER MAY 17TH, FOR THE COURT'S BENEFIT,

12  BECAUSE THIS IS WRAPPED UP IN THE 56(F) AFFIDAVIT AND I WANT TO

13  GET AS MANY OF THE EVIDENTIARY ISSUES PINNED DOWN AS POSSIBLE

14  BEFORE WE HAVE OUR HEARING ON THE 19TH.  I MAY NOT BE ABLE TO

15  GET THEM ALL PINNED DOWN, AND THAT MAY BE A COMPLICATING FACTOR  10:41

16  FOR THE COURT TO RULE ON ALL OF THE MOTIONS FOR PARTIAL SUMMARY

17  JUDGMENT THAT ARE OUTSTANDING, BUT I DO WANT TO GET AS MANY

18  PINNED DOWN AS POSSIBLE.  SO I'M GOING TO ORDER THAT THE

19  DEPOSITION PROCEED ON MAY 17TH IN PALM SPRINGS.  THAT WAY,

20  NOBODY HAS THE COST OF GOING BACK TO CHICAGO.      10:41

21      I AM GOING TO DENY THE REQUEST FOR SANCTIONS IN THIS

22  CASE, BUT I AM GOING TO ORDER THAT THE DEPOSITION GO FORWARD.

23  AND I WANT TO MAKE IT CLEAR -- AND I'LL MAKE THIS CLEAR IN THE

24  ORDER -- THAT I'M NOT IMPLYING, BY ORDERING THE DEPOSITION TO

25  GO FORWARD, THAT MR. BOUSQUETTE IS NECESSARILY A PHASE-ONE  10:41

1    WITNESS.  I KNOW THERE ARE ISSUES TO BE TAKEN UP IN THE MOTIONS

2    *IN LIMINE* THAT WE'RE GOING TO BE DISCUSSING NEXT WEEK.  THERE'S

3    NOTHING ABOUT THIS ORDER WHICH IS -- THAT'S NOT THE BASIS FOR

4    IT.  I RESPECTFULLY BELIEVE THAT JUDGE INFANTE WAS ERRONEOUS

5    WITH RESPECT TO HIS FINDING ON RESIDENCY.                          10:42

6         **MR. NOLAN:**  YOUR HONOR, ASSUMING THAT THIS IS EVEN

7    POSSIBLE, IF IT TURNS OUT THAT IT'S MORE CONVENIENT FOR THE

8    PARTIES TO DO THE DEPOSITION IN LOS ANGELES ON SATURDAY -- AND

9    I DON'T KNOW IF IT IS -- WOULD THAT BE OKAY, AS LONG AS IT'S

10   AGREED TO BY ALL OF THE PARTIES?                                   10:42

11        **THE COURT:**  GIVEN THE HISTORY IN THIS CASE, THE

12   PARTIES MAY SUBMIT A STIPULATION AND A PROPOSED ORDER TO THE

13   COURT MODIFYING THE COURT'S ORDER.  BUT THE ORDER THAT I'M

14   GOING TO ISSUE -- I'M LEAVING FOR BOSTON TONIGHT, SO I PROBABLY

15   WON'T GET THIS ORDER OUT UNTIL WEDNESDAY -- BUT THE ORDER THAT     10:42

16   WILL GO OUT ON WEDNESDAY WILL BE ORDERING THAT IT TAKE PLACE IN

17   PALM SPRINGS.  IF YOU WANT TO MODIFY THAT BY STIPULATION, THE

18   COURT HAS BEEN GENERALLY RECEPTIVE TO STIPULATIONS.

19        **MR. NOLAN:**  I HEAR IT'S NICE THIS TIME OF YEAR THERE.

20        **THE COURT:**  I JUST DON'T WANT TO GET THIS OFF ORDER.      10:42

21        **MR. COREY:**  THANK YOU, YOUR HONOR.

22        **MR. NOLAN:**  THANK YOU, YOUR HONOR.

23        **THE COURT:**  LET'S LOOK AT MOTION NUMBER FIVE.

24        THIS IS A MOTION OBJECTING TO PORTIONS OF THE

25   DISCOVERY MASTER'S APRIL 14, 2008 ORDER DENYING THE MOTION TO      10:43

1    COMPEL PRODUCTION IN RESPONSE TO MATTEL'S FIFTH SET OF REQUESTS

2    FOR PRODUCTION.

3             I WANT TO START WITH MATTEL ON THIS, BECAUSE THIS

4    ISSUE ACTUALLY PERVADES A FEW OF THESE MOTIONS, AND IT AFFECTS

5    HOW THE COURT IS REVIEWING THESE DECISIONS BY THE DISCOVERY          10:43

6    MASTER.

7             AS I'M SEEING IT RIGHT NOW, THE ISSUE IS WHAT WAS

8    BEFORE THE DISCOVERY MASTER AT THE TIME THE DISCOVERY MASTER

9    RULED AND WHETHER OR NOT HE FOUND THAT THERE WAS AN OVERBURDEN

10   OR CUMULATIVE OR WHATEVER; NOT AS MODIFIED OR PROPOSED TO BE        10:43

11   MODIFIED BY MATTEL.  A NUMBER OF TIMES, THIS ARGUMENT -- IT'S

12   LIKE, A REQUEST IS MADE; MATTEL DOESN'T PRODUCE; THERE'S A

13   MEET-AND-CONFER IN ANTICIPATION OF THE DISCOVERY MASTER'S

14   ORDER; DIFFERENT LIMITATIONS ARE PROPOSED; NOTHING COMES OF IT;

15   BUT WHAT JUDGE INFANTE ULTIMATELY DECIDES UPON IS THE ACTUAL        10:44

16   REQUEST AS ORIGINALLY MADE.

17            AND I'M ASKED TO REVIEW THAT DECISION.  NOT SOMETHING

18   ELSE THAT COULD HAVE BEEN BEFORE HIM BUT WASN'T; NAMELY, SOME

19   KIND OF AN AGREEMENT TO NARROW THE SCOPE OF THE DISCOVERY.

20            I DON'T KNOW, MR. ALGER, IF THIS IS FOR YOU TO             10:44

21   ADDRESS, BUT DO YOU UNDERSTAND THE QUESTION I'M ASKING?

22            **MR. ALGER:**  YES, I DO.  AND IT IS ON MY PLATE.

23            **THE COURT:**  ALL RIGHT.  WELL, THEN, HAVE AT IT.

24            **MR. ALGER:**  I THINK THIS MOTION IS DISTINCTIVE IN A

25   MAJOR RESPECT; AND THAT IS THAT MGA DID NOT TELL THE TRUTH TO       10:44

```
 1    JUDGE INFANTE ABOUT WHAT THEY --

 2         THE COURT:  PERHAPS YOU MAY HAVE THOUGHT THEY

 3    MISCHARACTERIZED IT.

 4         LET'S TRY TO AVOID PHRASES LIKE 'DIDN'T TELL THE

 5    TRUTH,' 'LIED'...                                        10:44

 6         MR. ALGER:  WELL, THAT'S PART OF THE PROBLEM HERE, ON

 7    THIS PARTICULAR ONE.

 8         THE COURT:  WHAT HAPPENED HERE?

 9         MR. ALGER:  WHAT HAPPENED WAS, WE WERE BURIED BY

10    MGA -- AND I GUESS IT WAS A STRATEGIC CALL -- IN ABOUT THREE  10:45

11    AND A HALF MILLION PAGES OF DOCUMENTS LATE IN THE YEAR AND THE

12    BEGINNING OF THIS YEAR; ABOUT A HALF A MILLION WERE PRODUCED

13    DURING THE LAST WEEK OR SO OF JANUARY AND INTO FEBRUARY THAT WE

14    HAD TO DIG THROUGH.  THE MOTION PRACTICE ON THIS COMMENCED ON

15    THE 28TH OF JANUARY, SO THE BRIEFING SCHEDULE WAS SUCH THAT WE  10:45

16    WERE NOT ABLE TO GIVE THE KIND OF RESPONSE THAT WOULD HAVE BEEN

17    PREFERRED BEFORE JUDGE INFANTE HEARD THE MATTER.

18         IN RESPONSE, MGA MADE CONCLUSORY STATEMENTS, WHICH

19    ARE REPEATED TO THIS COURT, ABOUT WHAT THEY HAVE DONE IN

20    RESPONSE TO THESE REQUESTS; ACTUALLY IN RESPONSE TO OTHER  10:45

21    REQUESTS, BUT THEY SAID THAT THAT FULFILLED THEIR OBLIGATIONS

22    UNDER THIS REQUEST.  WE PRESENTED TO JUDGE INFANTE PROOF THAT

23    THEY HAD NOT DONE WHAT THEY HAD SAID.  THAT WAS NOT SERIOUSLY

24    REVIEWED BY JUDGE INFANTE.  AND THAT'S THE BIG ISSUE HERE.

25         SO WHAT HAPPENED IS, WE BELIEVE JUDGE INFANTE ERRED.  10:45
```

1        WE SPOKE FURTHER WITH MGA AND SAID, 'WELL, LISTEN, TO

2   RESOLVE THIS MATTER AND AVOID THE NECESSITY OF GOING TO

3   JUDGE LARSON, WE'RE PREPARED TO NARROW THIS EVEN FURTHER, AND

4   THESE ARE THE SPECIFIC DOCUMENTS WE NEED.'  AND THAT WAS

5   REJECTED AS WELL.                                              10:46

6        AND WHAT HAPPENS IS, IF THE COURT IS NOT INCLINED TO

7   CONSIDER REVISIONS OR FURTHER EFFORTS TO MEET AND CONFER AND

8   COMPROMISE, THEN WHAT IT DOES IS, IT RUNS CONTRARY TO THE WHOLE

9   GOAL OF THE MEET-AND-CONFER PROCESS UNDER THE FRCP.

10        I THINK THE PARTIES SHOULD CONTINUE TO DISCUSS IN THE       10:46

11   HOPES OF NARROWING AND AVOIDING MOTION PRACTICE IN FRONT OF THE

12   DISTRICT COURT.  I DON'T SEE ANYTHING IN THE LAW THAT SAYS THAT

13   ONCE IT'S SUBMITTED TO THE DISCOVERY MASTER, THAT'S THE END OF

14   THE ROAD.

15        **THE COURT:**  I DID READ FOOTNOTE 17, WHERE YOU HAVE      10:46

16   THIS EXPLANATION OF WHAT YOU DID.  BUT WHAT WE DON'T WANT TO

17   ENCOURAGE ALSO IS THIS NOTION OF OBJECTING; GOING TO THE

18   DISCOVERY MASTER; 'LET'S THROW THE DICE; LET'S SEE IF WE WIN;

19   OH, OKAY, WE LOST; WELL, NOW WE'LL DISCUSS A NARROWING.'

20        THE PROBLEM THAT I'M HAVING IS MORE THAT THE               10:47

21   DISCUSSION ABOUT THE NARROWING TOOK PLACE POST- AS OPPOSED TO

22   PRE-.  AND I UNDERSTAND THAT YOU WERE PRESSED FOR TIME, BUT

23   THAT'S SOMETHING WHICH IS ENDEMIC AROUND HERE; WE'RE ALL

24   PRESSED FOR TIME.  IF YOU WANT TO TALK ABOUT SOMEONE WHO'S

25   PRESSED FOR TIME RIGHT NOW, YOU'RE LOOKING AT HIM.  THINGS ARE  10:47

1    NOT AN IDEAL SITUATION IN TERMS OF TIME.

2          BUT YOU'RE RIGHT, FAR BE IT FROM THIS COURT TO EVER

3    SUGGEST THAT WE SHOULD NOT MEET AND CONFER.  BUT AT THE SAME

4    TIME, I'M SOMEWHAT SYMPATHETIC TO THE POSITION, AS WELL, THAT

5    THE MEET AND CONFERRING CAME POST GOING FOR THE WHOLE BAG.          10:47

6          **MR. ALGER:**  YOUR HONOR, WE DID MEET AND CONFER BEFORE

7    THE MATTER WAS DECIDED BY JUDGE INFANTE.  WE ATTEMPTED TO MEET

8    AND CONFER BEFORE THE FILING.  THERE WAS ALSO A MEET-AND-CONFER

9    AFTER.  ON FEBRUARY 21ST, JUDGE INFANTE TOLD THE PARTIES TO

10   MEET AND CONFER ON ALL OF THE PENDING MOTIONS.  WE MET AND        10:47

11   CONFERRED AT THAT POINT; I BELIEVE IT WAS IN MID FEBRUARY.  MGA

12   JUST DUG IN ITS HEELS AT THAT POINT.

13         AND I THINK THE FLIP SIDE -- I UNDERSTAND YOUR

14   HONOR'S POINT, BUT THERE'S A FLIP SIDE; AND THAT IS, THE

15   RESPONDING PARTY CAN TAKE ADVANTAGE OF THIS AND SAY, 'WELL,        10:48

16   YOUR REQUESTS ARE OVERBROAD.  WE'RE NOT GOING TO BUDGE AT ALL.

17   GO TO BAT.'  AND YOU'RE STUCK WITH THESE VERY BROAD REQUESTS.

18   PERIOD.

19         SO THEN THEY GET THE ADVANTAGE OF SAYING, 'WELL, WE

20   MET AND CONFERRED.'  BUT THE REALITY IS, THERE WASN'T ANY GOOD     10:48

21   FAITH MEET-AND-CONFER.

22         **THE COURT:**  YOU'RE RIGHT.  BUT WHAT THAT DOES

23   ULTIMATELY IS, IT FORCES BOTH SIDES IN CRAFTING THEIR REQUEST,

24   TO BEGIN WITH, TO BE NARROW AND PRECISE AND NOT BE

25   OVERREACHING.                                                      10:48

1          **MR. ALGER:**  UNDERSTOOD, YOUR HONOR.  WE ENDEAVORED

2    NOT ONLY TO MAKE THEM COMPREHENSIVE, BUT ALSO TO GET THE

3    INFORMATION --

4          **THE COURT:**  I UNDERSTAND.

5          **MR. ALGER:**  AND WE ATTEMPTED TO MEET AND CONFER ON          10:48

6    THIS.

7          **THE COURT:**  MR. KENNEDY?

8          **MR. KENNEDY:**  UNLESS THE COURT HAS QUESTIONS, I THINK

9    YOU STATED OUR POSITION BETTER THAN WE HAVE.

10         **THE COURT:**  VERY WELL.                                      10:48

11         HERE'S ONE THAT I WANT TO SPEND SOME TIME ON, BECAUSE

12   THIS ONE I HAVE --

13         **MS. THOLEN:**  YOUR HONOR, DO YOU NEED ME ANY LONGER?

14         **THE COURT:**  NO.  YOU'RE FINE.  UNLESS YOU WANT TO SIT

15   HERE FOR -- YOU'RE FREE.  HAVE A NICE DAY.  THANK YOU, COUNSEL.       10:49

16         **MS. THOLEN:**  THANK YOU.

17         (WHEREUPON, MS. THOLEN EXITS CONFERENCE ROOM.)

18         **THE COURT:**  NUMBER SIX IS THE MOTION TO COMPEL

19   DISCOVERY ON ISSUES AS TO WHICH MATTEL HAS WAIVED THE

20   ATTORNEY-CLIENT AND WORK-PRODUCT PRIVILEGES CLAIM ASSERTION.         10:49

21         THIS IS MGA'S NOTICE.

22         THIS IS ALL WRAPPED UP IN WHETHER OR NOT THE

23   PRIVILEGED DOCUMENTS SHOULD BE PRODUCED WITH RESPECT TO THE

24   INVESTIGATION THAT TOOK PLACE.

25         ESSENTIALLY, AS I UNDERSTAND IT, THIS HAS GONE BEFORE          10:49

1   THE DISCOVERY MASTER ON TWO DIFFERENT OCCASIONS.  IT FIRST

2   WENT, AND BASICALLY, THE DISCOVERY MASTER SENT IT BACK FOR

3   FURTHER DISCOVERY; AND THEN AGAIN, WHEN THE DISCOVERY WAS

4   COMPLETED, OR WE THOUGHT IT WAS COMPLETED, THERE WAS A RENEWED

5   MOTION, BASICALLY, ALLEGING THAT THE INFORMATION WAS STILL NOT      10:50

6   PROVIDED.

7          THIS TURNS ON THIS HEARN CASE.  I GUESS BOTH SIDES

8   AGREE, EVERYONE'S IN AGREEMENT, THAT IS THE STANDARD.  THERE'S

9   THE THREE ELEMENTS.  EVERYONE FEELS GOOD THAT THE FIRST

10  ELEMENT, THE ASSERTION OF PRIVILEGE WAS A RESULT OF THE          10:50

11  ASSERTING PARTY, IS MET.

12         THE QUESTION IS ON THE LAST TWO, AND SPECIFICALLY

13  WHETHER OR NOT SOME RELIANCE BY THE ASSERTING PRIVILEGE MUST BE

14  MADE.  THERE'S OBVIOUSLY A DEBATE IN TERMS OF WHAT THE LAW

15  REQUIRES OR DOESN'T REQUIRE.                                     10:50

16         I THINK A FAIR READING OF THE DISCOVERY MASTER'S

17  ORDER SUBMITTED BY MATTEL IN THIS MATTER IS THAT THE DISCOVERY

18  MASTER VIEWED THAT MGA HAD RECEIVED SUFFICIENT EVIDENCE RELATED

19  TO THIS INVESTIGATION FROM ALTERNATIVE SOURCES WITHOUT HAVING

20  THE PRIVILEGED DOCUMENTS, THE PRIVILEGED INFORMATION, ITSELF.    10:51

21         AND, OF COURSE, MGA DISPUTES THAT.

22         I AM SOMEWHAT UNSETTLED, SO I GUESS I'LL START WITH

23  MATTEL ON THAT POINT, WITH RESPECT TO THE 30(B) WITNESS,

24  MS. SIMPSON-TAYLOR.

25         SHE WAS SUBMITTED TO COVER A PRETTY BROAD RANGE OF        10:51

```
 1   TOPICS, AND I HAVE SOME QUESTION, THEN, AS TO HOW WELL PREPARED

 2   SHE WAS TO RESPOND TO THE PARTICULAR TOPICS THAT ARE AT ISSUE

 3   HERE AND WHETHER OR NOT MGA AND CARTER BRYANT HAD A FAIR

 4   OPPORTUNITY TO KNOW THAT.

 5        I'M GRAPPLING WITH THE STATUTE OF LIMITATIONS ISSUE       10:51

 6   AS IT STANDS RIGHT NOW.  AND I REALLY HAVE A QUESTION AS TO

 7   WHETHER OR NOT I CAN ISSUE A RULING ON THAT.  I'D LIKE TO BE

 8   ABLE TO RULE ON THAT AFTER THE HEARINGS ON MONDAY ONE WAY OR

 9   THE OTHER, BUT, BOY, IT REALLY TURNS ON THIS INVESTIGATION; AND

10   IT SEEMS THAT THERE'S A LOT OF INFORMATION ABOUT THIS           10:52

11   INVESTIGATION THAT WE DON'T HAVE.

12        COUNSEL?

13        MR. OLIVAR:  YOUR HONOR, I WANT TO MAKE CLEAR, OUR

14   POSITION IS THAT ALL OF THE FACTS, AS THEY CAME INTO MATTEL --

15   AND WE THINK THAT'S ALL THAT'S RELEVANT TO THE QUESTION HERE --  10:52

16   THERE'S A CLAIM THAT STATUTE OF LIMITATIONS APPLIES.  MATTEL'S

17   POSITION IS THAT MATTEL DIDN'T KNOW CERTAIN FACTS UNTIL CERTAIN

18   POINTS IN TIME.

19        THE COURT:  RIGHT.  AND YOU RELY ON DECLARATIONS FROM

20   VARIOUS PEOPLE SAYING, 'WE DIDN'T KNOW ANYTHING.'               10:52

21        WELL, CERTAINLY, MGA AND CARTER BRYANT HAVE THE RIGHT

22   TO TEST THAT.

23        MR. OLIVAR:  ABSOLUTELY.  AND THEY ABSOLUTELY HAVE

24   THE RIGHT TO LEARN WHEN MATTEL LEARNED OF CERTAIN --

25        THE COURT:  WHAT MATTEL KNEW AND WHEN, RIGHT.              10:52
```

1     **MR. OLIVAR:**  BUT THEY DO NOT HAVE THE RIGHT -- AND AS

2     THE DISCOVERY MASTER FOUND, THIS POINT IS CLEARLY

3     DISPOSITIVE -- THEY DON'T HAVE THE RIGHT TO KNOW -- AND IT'S

4     NOT VITAL FOR THEM TO KNOW -- WHAT THE ATTORNEYS THOUGHT ABOUT

5     THE FACTS OR COMMUNICATED --                                  10:52

6          **THE COURT:**  AND THAT'S FAIR ENOUGH, PROVIDED -- AND I

7     THINK THIS ASSUMPTION IS IMPLICIT IN BOTH OF JUDGE INFANTE'S

8     RULINGS -- THAT IS FAIR ENOUGH, PROVIDED THAT THEY DO, IN FACT,

9     KNOW WHAT MATTEL KNEW AND WHEN.  AND I HAVEN'T READ THE ENTIRE

10    SIMPSON-TAYLOR DEPOSITION, SO I'M HAVING THE DIFFERENT          10:53

11    CHARACTERIZATIONS OF WHAT TOOK PLACE THERE, BUT MGA HAS RAISED

12    ENOUGH FOR ME TO BE CONCERNED ABOUT WHETHER OR NOT SHE REALLY

13    WAS WELL PREPARED OR THE BEST PERSON TO ACTUALLY GIVE AN

14    EXPLANATION IN TERMS OF WHAT MATTEL KNEW AND WHEN.

15         **MR. OLIVAR:**  TWO POINTS THERE, YOUR HONOR.            10:53

16         FIRST OF ALL, THE ONLY COMPLAINT I'VE SEEN IN MGA'S

17    PAPERS ABOUT THE DEPOSITION IS -- WELL, THE PRIMARY COMPLAINT

18    IS THAT SHE DIDN'T REVIEW THE PRIVILEGED MATERIALS; SHE DIDN'T

19    REVIEW THE REDACTED LEGAL FILES; SHE DIDN'T REVIEW WHAT THE

20    LAWYERS WERE THINKING.  AND THAT'S, AS WE PUT IN OUR PAPERS,   10:53

21    ABOUT AS CIRCULAR AS IT COMES.

22         SHE WAS ABLE TO TESTIFY AS TO NONPRIVILEGED FACTS,

23    WHEN MATTEL LEARNED OF THE FACTS, ALL THEY'RE ENTITLED TO KNOW.

24    HAD SHE GONE INTO THE LEGAL DEPARTMENT'S RUMINATIONS ABOUT THE

25    FACTS, THEN WE WOULD BE HEARING A DIFFERENT KIND OF WAIVER     10:54

```
 1   MOTION.  OBVIOUSLY, YOU'RE NOT GOING TO PREPARE A 30(B)(6)
 2   WITNESS ON PRIVILEGED MATERIAL.  THEN THEY DO HAVE A GOOD
 3   WAIVER MOTION.  HERE, THEY DON'T.  SHE DIDN'T LOOK INTO
 4   PRIVILEGED MATERIAL.
 5          BUT WE HAVE THE THREE INTERROGATORY RESPONSES.  AND     10:54
 6   THOSE ARE SET FORTH IN THE ORDER IN THE MOTION, THROUGH OTHER
 7   PEOPLE'S DEPOSITIONS, THROUGH DOCUMENTS.  AND WE HAVE GIVEN ALL
 8   NONPRIVILEGED INFORMATION ABOUT WHEN FACTS CAME TO THE
 9   ATTENTION OF MATTEL.  AND WHAT THE LAWYERS THOUGHT ABOUT THEM
10   IS CERTAINLY NOT VITAL, AS JUDGE INFANTE FOUND.             10:54
11          THE SECOND POINT IS -- AND I APPRECIATE YOUR HONOR'S
12   EFFORT IN GOING THROUGH DEPOSITIONS, BUT EVEN AS THEIR BANNER
13   CASE RAMBUS ACKNOWLEDGES, THIS IS NOT A DE NOVO REVIEW ON THE
14   DISCOVERY MASTER'S DETERMINATION AS TO WHAT OCCURRED AT THE
15   DEPOSITION AND WHAT'S VITAL IN THIS CASE.  IN THE RAMBUS COURT,  10:54
16   IT WAS THE OTHER WAY AROUND.  DISCOVERY MASTER THERE, SPECIAL
17   MASTER AMBLER, HAD DETERMINED THAT THE INFORMATION WAS VITAL,
18   AND THE COURT SAID, 'WELL, YOU'RE MAKING ARGUMENTS LIKE I
19   SHOULD REVIEW THAT MYSELF AND DECIDE IN THE FIRST INSTANCE
20   WHETHER THE INFORMATION WAS VITAL.  NO, THAT'S ENTITLED TO     10:55
21   DEFERENCE.'
22          SO THAT'S THE STANDARD HERE.
23          I DON'T THINK THE COURT -- AND I EXPECT YOUR HONOR
24   DOESN'T HAVE TIME FOR THIS EITHER -- IS REQUIRED TO TAKE A FULL
25   REVIEW OF THE DEPOSITION AND REACH AN INDEPENDENT DE NOVO      10:55
```

```
 1    CONCLUSION AS TO WHETHER THE WITNESS DID A GOOD JOB.  THE

 2    DISCOVERY MASTER'S FINDING ON THAT SCORE IS NOT CLEARLY

 3    ERRONEOUS, FOR SURE.

 4            THE COURT:  I DIDN'T GET A RESPONSE TO THIS ALOVERA

 5    CASE.

 6            YOU'VE TAKEN A LOOK AT THAT?

 7            MR. OLIVAR:  YES, YOUR HONOR.

 8            IN THAT CASE -- THAT'S OUT OF THE DISTRICT OF

 9    ARIZONA, ALSO UNPUBLISHED -- IN THAT CASE --

10            THE COURT:  IT IS AN UNPUBLISHED DISTRICT CASE.      10:55

11            MR. OLIVAR:  IT'S PAGES 6 TO 7 OF THE ORDER.  AS THE

12    DISCOVERY MASTER POINTED OUT, THAT'S A CASE WHERE THE

13    PLAINTIFFS ALLEGED IT WAS THE ATTORNEY INVOLVEMENT IN

14    DISCOVERING THE FACTS THAT WAS CRITICAL TO THEIR EQUITABLE

15    TOLLING CLAIM.  AND THERE, THE ATTORNEY WAS FRONT AND CENTER IN  10:55

16    LEARNING THE FACTS, SO THE ATTORNEY HAD TO TESTIFY ABOUT THAT.

17            HERE, WE'RE NOT SAYING THAT THE LEGAL DEPARTMENT IS

18    CENTRAL IN DISCOVERY.  AND WHEN THE LAWYERS HAVE LEARNED FACTS,

19    SUCH AS MR. MOORE IN HIS DECLARATION, WE REVEALED THAT.  WE'RE

20    NOT CLAIMING PRIVILEGE AS TO WHEN MR. MOORE LEARNED OF BRYANT'S  10:56

21    CONTRACT.  HE PUT IN A DECLARATION TO THAT POINT; THAT HE

22    LEARNED OF THE CONTRACT ON NOVEMBER 24, 2003, WHEN HE RECEIVED

23    IT FROM A THIRD PARTY.  SIMPLY, THERE'S A FACTUAL DISTINCTION

24    THERE.

25            THE COURT:  VERY GOOD.
```

1          COUNSEL?

2          **MR. NOLAN:**  LET ME BACK UP JUST FOR A MOMENT AND SET

3    THE STAGE.

4          WE DID GO TO JUDGE INFANTE ON TWO OCCASIONS.  I THINK

5    THE FIRST ONE IS VERY IMPORTANT TO UNDERSTAND THE SECOND ONE,          10:56

6    WHICH LEADS, WE BELIEVE, TO WHAT HAS OCCURRED NOW, WHICH IS

7    VERY UNFAIR.

8          JUDGE INFANTE, IN ADDRESSING THIS MOTION, ALMOST MADE

9    THE SAME OBSERVATIONS YOU DID.  HE SAID THAT THIS IS A VERY

10   DIFFICULT ISSUE, BECAUSE AT THE END OF THE DAY, IT'S A QUESTION       10:56

11   OF FAIRNESS.

12         HE MADE THE TWO FINDINGS UNDER RAMBUS AND SAID, 'THE

13   ONE THING THAT I AM HUNG UP ON' -- THAT'S NOT THE LEGAL TERM HE

14   USED -- 'IS WHETHER OR NOT THE INFORMATION IS VITAL TO.'  AND I

15   SEE IN MATTEL'S PAPERS THAT MATTEL IS TAKING THE POSITION THAT       10:57

16   THEY WILL NOT ASSERT THE ATTORNEY-CLIENT PRIVILEGE AT THE

17   30(B)(6) DEPOSITION.  AND THEN WE'VE QUOTED THIS IN OUR PAPERS:

18   'COUNSEL, BE VERY CAREFUL.  MATTEL, BE VERY, VERY CAREFUL ABOUT

19   HOW YOU HANDLE THIS DEPOSITION, AND, LIKEWISE, MGA.'

20         I TOOK THE DEPOSITION OF THE 30(B)(6) WITNESS, AND I           10:57

21   LATER ARGUED THE MATTER IN FRONT OF JUDGE INFANTE.

22   EFFECTIVELY, WHAT MATTEL DID WAS NOT ASSERT THE ATTORNEY-CLIENT

23   PRIVILEGE, BECAUSE THEY DID NOT ALLOW THE 30(B)(6) WITNESS TO

24   DISCUSS THE INVESTIGATION, NOT THE THOUGHTS AND PROCESSES OF

25   THE LAWYERS, BECAUSE WE WERE CLEAR TO DISTINGUISH BETWEEN,           10:57

1  'I DON'T WANT YOUR LEGAL THEORIES.  I WANT TO KNOW THE FACTS

2  THAT YOU LEARNED OF IN THE COURSE OF THE INVESTIGATION.'

3          MATTEL CHOSE TO CONDUCT THE INVESTIGATION,

4  YOUR HONOR.  AND THIS IS NOT CONTROVERTED AT ALL.  WHEN THE

5  ALLEGATION COMES IN IN MARCH OF 2002, AND THEY OPENED UP THE          10:58

6  INVESTIGATIVE FILE, MR. DEANDA, HEAD OF SECURITY, MEETS AND

7  TAKES AN INTERVIEW.  THERE'S A DECISION AS TO WHO'S GOING TO

8  TAKE OVER THE INVESTIGATION.  A WOMAN BY THE NAME OF MICHELLE

9  McSHANE FROM THE LEGAL DEPARTMENT IS PRESENT AT THAT INITIAL

10  MEETING.  IT'S SUBSEQUENTLY DECIDED AT THAT MEETING, OR THAT          10:58

11  EVENING, THAT THE LEGAL DEPARTMENT WOULD THEN TAKE OVER THE

12  FACTUAL INVESTIGATION.  THEY HIRE MICHAEL ZELLER.  THEY CONDUCT

13  AN INVESTIGATION.

14          YOU HAVE HAD REPRESENTED TO YOU -- WE SEE IT IN THE

15  PAPERS -- WHAT THAT INVESTIGATION ENCOMPASSED, THAT IT WAS ONLY          10:58

16  TOON TEENS; THAT IT WAS ONLY ABOUT WHETHER OR NOT THERE WAS A

17  COMPARISON BETWEEN BRATZ AND TOON TEENS.  AT THE DEPOSITION OF

18  THE 30(B)(6) WITNESS, SHE WAS NOT PROVIDED ANY OPPORTUNITY TO

19  INTERVIEW MICHELLE McSHANE AS TO WHAT FACTS HAD BEEN LEARNED IN

20  THE INVESTIGATION; NOT SEEKING LEGAL COMMUNICATIONS, BUT WHAT          10:59

21  FACTS HAD BEEN LEARNED.  SHE MEETS WITH MR. NORMILE, THE

22  GENERAL COUNSEL, YET DOES NOT ASK MR. NORMILE FACTUAL QUESTIONS

23  ABOUT WHAT HE KNEW, WHAT THEY FOUND, WHAT'S CONSISTENT IN THAT

24  FILE.

25          IS THIS TROUBLESOME?  IS IT A QUESTION OF FAIRNESS?          10:59

```
 1   YOUR HONOR, I BELIEVE THE COURT NOW HAS -- BECAUSE IT CAME OUT

 2   ON THURSDAY OR FRIDAY -- JUDGE INFANTE RECENTLY RULED ON A

 3   RELATED ISSUE.  I JUST NEED TO BRING THIS IN FOR JUST A SECOND.

 4   JUDGE INFANTE HAD BEFORE HIM THE DEANDA E-MAIL THAT'S REDACTED,

 5   FOLLOWING THE RECEIPT OF THE ANONYMOUS LETTER IN AUGUST OF         11:00

 6   2002.  I USED IT DURING THE SUMMARY JUDGMENT ARGUMENT.  IT

 7   CAUSED YOUR HONOR -- NOT CAUSED, I APOLOGIZE -- IT ALLOWED

 8   YOUR HONOR TO INQUIRE OF MR. ZELLER, WAS THERE ANY REASON OTHER

 9   THAN TOON TEENS, OTHER THAN THAT, FOR YOU TO CONCLUDE THAT

10   THERE WAS SOMETHING WRONG WITH THE CONTRACT?                       11:00

11        I BUTCHERED YOUR QUESTION, BUT THAT'S THE IMPORT OF

12   WHAT IT SAID.

13        MR. ZELLER, AFTER BEING ASKED THE QUESTION TWICE,

14   SAID, 'NO.  THAT WAS IT.'

15        INTERESTINGLY, JUDGE INFANTE HAS UPHELD THE PRIVILEGE        11:00

16   OF THE REDACTION.  THE ARGUMENT THAT WE WERE MAKING BEFORE

17   JUDGE INFANTE WAS THAT DURING MY DEPOSITION TO MR. DEANDA, THAT

18   HE HAD WAIVED THE SUBSTANCE OF THE E-MAIL, BECAUSE HE HAD GIVEN

19   US COMMUNICATIONS BETWEEN MICHELLE McSHANE ABOUT THE E-MAIL.

20   HE HAD TALKED ABOUT THE E-MAIL.                                   11:01

21        JUDGE INFANTE REVIEWED IT IN-CAMERA AND SAID IT IS

22   NOT RESPONSIVE AND IT WAS NOT WAIVED BY THE SUBSTANTIVE

23   DISCUSSION AND THE ANSWER BECAUSE IT DIDN'T DEAL WITH

24   TOON TEENS.

25        SO NOW, AS OF THURSDAY, WE NOW KNOW THAT E-MAIL DOES         11:01
```

1    NOT PERTAIN TO TOON TEENS.  AND YET, WHAT WE'RE TOLD,

2    YOUR HONOR, IS THAT THE ENTIRE INVESTIGATION WAS FOCUSED ON

3    TOON TEENS.  IT HAD NOTHING TO DO WITH THE CONTRACT

4    INTERPRETATION; IT NOTHING TO DO WITH ANY OF THIS OTHER STUFF.

5    SO I JUST POINT THAT OUT BECAUSE IT DOES CRY TO THE UNFAIRNESS.    11:01

6            WE BELIEVE THAT GOING INTO THIS, MATTEL MADE A

7    DECISION.  THEY MADE WHAT WE BELIEVE ARE AT LEAST THREE

8    CRITICAL DECISIONS.  RATHER THAN ALLOWING THEIR SECURITY

9    DEPARTMENT TO CONDUCT THE INVESTIGATION, THEY BROUGHT IT

10   IN-HOUSE, THEY BROUGHT IT IN WITH THEIR LAWYERS.  THE LAWYERS    11:01

11   DID THE INVESTIGATION.

12           NUMBER TWO, THEY CHOSE TO INSERT IN THE PLEADINGS IN

13   THIS CASE FRAUDULENT CONCEALMENT.  WE COULD NOT HAVE FOUND OUT

14   AND WE DID NOT FIND OUT UNTIL NOVEMBER 23, 2003.

15           BUT I WILL TELL YOU, YOUR HONOR -- AND IT'S MENTIONED    11:02

16   IN THE PAPERS, AS YOU NOW KNOW -- IS THAT THEY ARE ALLEGING

17   THAT THEY LEARNED ABOUT THE CONTRACT WHEN THEY WENT TO

18   HONG KONG AND WORKED WITH CITY WORLD AND GOT THAT ON

19   NOVEMBER 24, 2003.

20           THAT LAWSUIT, YOUR HONOR, WAS ORIGINALLY FILED IN      11:02

21   JUNE OF 2002 IN HONG KONG.  AND IN THAT LITIGATION, IN JUNE OF

22   2002, MR. BRYANT 'S CONTRACT HAD BEEN FILED, HAD BEEN

23   REFERENCED, AND THE DRAWINGS IN ISSUE WERE REFERENCED.

24           HERE ARE THE OTHER FACTS, YOUR HONOR:  IN JUNE OF

25   2001, IN HONG KONG, IN RELATED LITIGATION -- ESSENTIALLY, THEY   11:02

1    WERE SEEKING TO PREVENT INFRINGEMENT OF THE BRATZ PRODUCT -- IN

2    JUNE OF 2001, IN HONG KONG, IN COURT, THE DATE OF THE CONTRACT

3    AND THE DRAWINGS ARE DISCLOSED.

4            IT IS PATENTLY UNFAIR, YOUR HONOR, FOR MATTEL,

5    WRAPPING THIS ALL UP UNDER THE GUISE OF AN INVESTIGATION, TO          11:03

6    NOW COME IN AND SAY, 'NOT ONLY WERE WE DUPED AND WE COULDN'T

7    HAVE FOUND IT OUT,' BUT THEN THEY MOVE FOR SUMMARY JUDGMENT.

8            THEY ALSO, YOUR HONOR -- GOING BACK TO --

9        **THE COURT:**  LET ME ASK YOU THIS:  IF I ACCEPT THAT

10   SOME RELIEF IS NEEDED ON THIS AT THIS POINT, AND MINDFUL OF           11:03

11   YOUR EARLIER STATEMENT THAT WHAT YOU'RE NOT LOOKING FOR IS THE

12   INTERNAL THOUGHT PROCESSES OF THE IN-HOUSE COUNSEL --

13       **MR. NOLAN:**  I DON'T NEED THEM.

14       **THE COURT:**  -- OR THE ATTORNEYS OR MR. ZELLER OR

15   ANYBODY ELSE, WHAT WOULD YOU VIEW, AT THIS POINT -- AND I'LL          11:03

16   ASK THE SAME QUESTION OF MATTEL, ALTERNATIVELY -- ASSUMING THAT

17   THE COURT WERE TO ALTER THE DECISION BY JUDGE INFANTE, WHAT

18   WOULD BE THE MOST EFFECTIVE, EFFICIENT, AND LEAST

19   ATTORNEY-CLIENT INTRUSIVE MEANS OF OBTAINING THE INFORMATION

20   THAT YOU BELIEVE IS NECESSARY FOR PURPOSES OF THE STATUTE OF          11:04

21   LIMITATIONS DEFENSE?

22       **MR. NOLAN:**  THE INVESTIGATIVE FILE ITSELF CONTAINS

23   NUMEROUS, NUMEROUS PAGES OF REDACTION.  TO THE EXTENT THAT THEY

24   INCLUDE THE LEGAL IMPRESSIONS IS ONE THING, BUT I WILL SAY

25   THIS, YOUR HONOR:  THEY'VE ALREADY WAIVED, BY REPRESENTING TO         11:04

```
 1    THE COURT --

 2           THE COURT:  NOW YOU'RE GETTING OFF MY QUESTION.

 3           MR. NOLAN:  I APOLOGIZE.

 4           I WAS JUST GOING TO DESCRIBE WHETHER OR NOT I THINK

 5    THAT'S PRIVILEGED.                                            11:04

 6           THEY SHOULD BE ALLOWED TO REDACT OUT OF THE

 7    COMMUNICATIONS THAT THEY WERE HAVING THAT CONVEYED PRIVILEGED

 8    INFORMATION AMONGST THEMSELVES.  BUT IF, FOR INSTANCE, THERE

 9    WAS AN INTERVIEW CONDUCTED OF CASSIDY PARK OR LILLIE MARTINEZ

10    OR THE DESIGN CENTER PEOPLE, THAT CONFIRMED THAT THEY, IN FACT, 11:05

11    WERE WELL AWARE OF CARTER BRYANT, I WOULD ASSUME THE OBVIOUS

12    QUESTION WOULD BE, 'WELL, WHO DID YOU TELL AND WHAT FOLLOW-UP

13    WAS DONE ON THAT?'

14           THE COURT:  SO YOU'RE LOOKING FOR THE INVESTIGATIVE

15    FILE ITSELF OR A SUPPLEMENTAL 30(B) DEPOSITION?               11:05

16           MR. NOLAN:  NO, YOUR HONOR.  IT'S TOO SHORT.  THEY

17    HAD THEIR TIME TO AVOID THIS DISASTER FOR THEM, FRANKLY.

18           I THINK WE'RE ENTITLED TO THE FILE.  I THINK THAT

19    THEY SHOULD BE ALLOWED A REASONABLE PERIOD OF TIME, I WOULD

20    SAY, UNDER THE CIRCUMSTANCES, NO MORE THAN 48 HOURS, TO GO    11:05

21    THROUGH THEIR AND TO REDACT AND TO SUBMIT IN-CAMERA TO YOU,

22    YOUR HONOR, WHAT THEY BELIEVE IS REALLY ATTORNEY-CLIENT

23    PRIVILEGED.

24           WE ALREADY HAVE MR. ZELLER TELLING YOU, AND TELLING,

25    ACTUALLY, THE 30(B)(6) WITNESS, THAT HE MADE A DECISION THAT  11:05
```

```
 1   THERE WAS NO COPYRIGHT INFRINGEMENT BETWEEN TOON TEENS AND

 2   BRATZ.  WE KNOW THAT.  I THINK WHAT SHOULD BE INVOLVED IN THAT,

 3   SINCE IT'S BEEN COMMUNICATED, IS, WHAT WAS THE BASIS FOR THAT

 4   OPINION?

 5            THE COURT:  COUNSEL?                                11:06

 6            MR. OLIVAR:  YOUR HONOR, I DO NEED TO RESPOND,

 7   BECAUSE A LOT OF THIS HAS GONE WELL BEYOND THE RECORD OF WHAT

 8   THE DISCOVERY MASTER, WHAT YOUR HONOR POINTED OUT, AND WHAT

 9   WE'RE TALKING ABOUT TODAY, A LOT OF IT HAS GONE WELL BEYOND THE

10   PAPERS.

11            FIRST OF ALL, MS. McSHANE -- THE COMPLAINT THAT THE

12   WITNESS DID NOT INTERVIEW MICHELLE McSHANE -- MS. McSHANE WAS A

13   FORMER EMPLOYEE AT THE TIME, AND MATTEL HAD NO OBLIGATION TO

14   FIND AND INTERVIEW FORMER EMPLOYEES FOR DEPOSITION.

15            SECONDLY, THE WITNESS DID SPEAK TO MR. ZELLER AND     11:06

16   LEARNED FROM HIM THE FACTS THAT CAME UP IN THE COURSE OF THE

17   INVESTIGATION AND WAS PREPARED ON THAT POINT.  MR. ZELLER WAS

18   INTIMATELY INVOLVED IN THE INVESTIGATION; SO MGA HAS THE FACTS

19   AS THEY WERE LEARNED BY MATTEL, IN WHATEVER FORM, BY WHATEVER

20   PERSONNEL.  THEY'RE LOOKING FOR SOMETHING MORE.  AND THAT       11:07

21   SOMETHING MORE IS SOMETHING THEY'RE NOT ENTITLED TO EITHER,

22   UNDER THE SECOND PRONG OR THE THIRD PRONG OF THE HEARN TEST.

23            WITH RESPECT TO THE SUGGESTION THAT THEY NEED THE

24   INVESTIGATIVE FILES, A LOT OF THOSE DOCUMENTS HAVE BEEN

25   REVIEWED BY JUDGE INFANTE ALREADY, AND THE CLAIM OF PRIVILEGE   11:07
```

```
1    HAS BEEN UPHELD.  WE OBVIOUSLY OBJECT TO THAT.  IF THE

2    COMPLAINT IS ABOUT WITNESS PREPARATION, IF YOUR HONOR FINDS

3    THAT CLAIM WAS LEGITIMATE -- AND UNDER DEFERENTIAL STANDARD, I

4    DON'T SEE HOW YOUR HONOR COULD -- I THINK THE ONLY REMEDY WOULD

5    BE TO DIRECT THE WITNESS TO PREPARE IN WHATEVER AREAS REGARDING      11:07

6    THE FACTS KNOWN BY MATTEL THAT THE WITNESS WAS DEFICIENT.  BUT

7    WE DON'T THINK THE WITNESS WAS DEFICIENT IN ANY AREA REGARDING

8    FACTS AS THEY WERE (UNINTELLIGIBLE) BY MATTEL.

9            WITH THAT, I'LL SUBMIT, YOUR HONOR.

10           THE COURT:  I COULDN'T FIND -- BUT MAYBE IT WAS            11:07

11   SUBMITTED -- THIS DEPOSITION.

12           WAS THE DEPOSITION SUBMITTED?

13           MR. OLIVAR:  IT'S APPENDED TO THE DECLARATION OF

14   DYLAN PROCTOR, WHICH WE PUT IN WITH MY DECLARATION.  IN FACT, I

15   HAVE A COPY HERE, IF YOUR HONOR WOULD LIKE IT.                    11:08

16           THE COURT:  THIS IS THE SIMPSON-TAYLOR DEPOSITION?

17           MR. OLIVAR:  IT'S AN EXHIBIT TO THE OLIVAR

18   DECLARATION.

19           THE COURT:  IF IT WAS SUBMITTED, I DON'T NEED ANOTHER

20   COPY.                                                            11:08

21           MR. OLIVAR:  I'M FAIRLY CERTAIN IT'S THERE.

22           MS. McCRACKEN IS TELLING ME IT'S THERE.

23           THE COURT:  VERY WELL.

24           ALL RIGHT.  VERY GOOD.

25           MR. COREY:  YOUR HONOR, IF I MAY --
```

1      **THE COURT:**  YES, MR. COREY, BRIEFLY.

2      **MR. COREY:**  I THINK TWO MORE LITTLE PIECES OF

3  BACKGROUND WOULD BE HELPFUL TO THE COURT.

4      I CAN'T RECALL IF THIS WAS ORDERED OR NOT, BUT

5  COUNSEL FOR MGA MADE IT VERY CLEAR THAT THEY WANTED ONE WITNESS          11:08

6  WITH RESPECT TO ALL OF THE TOPICS, AND MATTEL DID ITS BEST TO

7  EDUCATE THAT ONE WITNESS.  SO WE'RE FEELING A LITTLE BIT

8  SANDBAGGED WHEN THEY COME IN AND SAY, WELL, THAT ONE WITNESS,

9  WHO THEY INSISTED ON, DIDN'T KNOW ENOUGH.  AND I THINK

10  JUDGE INFANTE TOOK THAT INTO ACCOUNT, AND THAT'S PART OF THE          11:09

11  BASIS FOR HIS OPINION.

12      I WANT TO ADDRESS VERY BRIEFLY THE E-MAIL THAT

13  MR. NOLAN TALKED ABOUT, BECAUSE HE'S ASKING THE COURT TO DRAW

14  AN INFERENCE FROM JUDGE INFANTE'S FINDING THAT THE LINES WERE

15  NOT RELEVANT OR RESPONSIVE, THAT THEY SOMEHOW RELATE TO THIS          11:09

16  CASE.

17      JUDGE INFANTE IS INTIMATELY FAMILIAR WITH WHAT

18  BELONGS IN THIS CASE AND WHAT DOES NOT BELONG IN THIS CASE.

19  AND IF HE HAD REACHED THE CONCLUSION THAT THOSE TWO LINES DO

20  BELONG IN THIS CASE, YOU CAN BE PRETTY SURE HE WOULD NOT HAVE          11:09

21  FOUND THEM TO BE IRRELEVANT.  AND WE'RE MORE THAN HAPPY TO

22  SUBMIT THAT E-MAIL, THAT SINGLE PAGE E-MAIL.

23      **THE COURT:**  I'M GOING TO TAKE YOU UP ON THAT OFFER,

24  MR. COREY.  I'D LIKE TO SEE AN UNREDACTED VERSION OF THAT

25  E-MAIL.

1       **MR. COREY:**  WE WOULD BE MORE THAN HAPPY TO SUBMIT

2   THAT.

3       **THE COURT:**  THERE'S BEEN A LOT OF INNUENDO BY THE

4   COURT ITSELF TRYING TO SPECULATE AS TO WHAT IT IS.  IT'S BEEN

5   DISPLAYED TO THE COURT.  IT'S COME UP NOW IN TWO DIFFERENT                11:09

6   HEARINGS.  I THINK IT WOULD BE OF BENEFIT TO THE COURT TO SEE

7   THAT IN-CAMERA.

8       **MR. COREY:**  ABSOLUTELY, YOUR HONOR.

9       **MR. NOLAN:**  YOUR HONOR, VERY BRIEFLY.

10      MR. WERDEGAR IS HERE, SO HE'LL CONFIRM THIS.  THERE                    11:10

11  WAS NO LIMITATION IMPOSED ON MATTEL OF ONLY ONE WITNESS FOR THE

12  NUMBER OF TOPICS.  THAT WAS THEIR CHOICE.  OUR ARGUMENT GOING

13  IN HAD BEEN THAT THEY HAD BEEN BANDYING WITNESSES.  THE COURT

14  WILL RECALL THAT.

15      **THE COURT:**  YOU SAID THAT BEFORE, RIGHT.                          11:10

16      MR. COREY, YOU DISAGREE WITH THAT?

17      **MR. COREY:**  THE PREMISE OF THE MOTION PURSUANT TO

18  WHICH MS. SIMPSON-TAYLOR WAS ORDERED WAS THAT MATTEL WAS

19  PROVIDING TOO MANY WITNESSES, AND THEY JUST WANTED A SINGLE

20  WITNESS TO PROVIDE THE INFORMATION.                                       11:10

21      **MR. NOLAN:**  JUDGE, YOUR MEMORY IS TOO GOOD IN THIS

22  CASE.  THAT'S JUST NOT FAIR.  THEY WERE PUTTING WITNESSES IN

23  THAT HAD PERSONAL KNOWLEDGE THAT HAD NO OTHER PREPARATION DONE.

24  SO WHAT THEY DO IS, THEY DO THE REVERSE:  THEY FIND ONE PERSON

25  WHO HAS NO KNOWLEDGE, AND THEN SHE DOESN'T DO AN INVESTIGATION.           11:10

1          **THE COURT:**  THAT'S WHY I WANT TO TAKE A LOOK AT THIS

2    DEPOSITION.  I'LL REVIEW THAT MYSELF.

3          **MR. NOLAN:**  I'M VERY COMFORTABLE WITH THAT.

4          YOUR HONOR, I'LL JUST SAY THIS:  THE TIME HAS COME,

5    AND COURTS RECOGNIZE THIS, THAT A PARTY JUST CANNOT HIDE BEHIND     11:11

6    IT.  THEY MADE THAT CHOICE.  THEY MADE THAT CHOICE.  IT IS OUT

7    OF FAIRNESS TO US IN THIS LITIGATION NOT TO ACCEPT THE

8    STATEMENT THAT THERE WAS NO POSSIBLE WAY THAT THEY COULD HAVE

9    LEARNED ABOUT BRATZ ANY EARLIER THAN MARCH OF 2003.  THERE'S

10   TOO MUCH WRITING ON THIS CASE.                                     11:11

11         THE FACT THAT JUDGE INFANTE HAS DONE ONE WHALE OF A

12   JOB IN THIS CASE, THERE'S ONE THING THAT DID NOT OCCUR IN FRONT

13   OF JUDGE INFANTE:  WE DID NOT FILE OUR SUMMARY JUDGMENT MOTION

14   IN FRONT OF JUDGE INFANTE, WHERE THIS ISSUE, I THINK, HAS BEEN

15   CRYSTALLY FOCUSED ON FOR THE COURT.  THE IMPORTANCE OF WHAT       11:11

16   THEY KNEW AND WHEN THEY KNEW IT IS ABSOLUTELY CRITICAL.

17         **THE COURT:**  IT IS.  AND I KEEP GOING BACK AND FORTH

18   IN MY OWN MIND ABOUT THIS WHOLE STATUTE OF LIMITATIONS ISSUE,

19   IN TERMS OF WHAT IS SUFFICIENT INFORMATION TO HAVE THE

20   REQUISITE BELIEF FORMED TO MAKE THE FILING.  THERE'S NO           11:12

21   QUESTION THAT THERE WAS A LOT OF SPECULATION, THERE WAS A LOT

22   OF SUSPICION.  THAT'S A GIVEN.

23         THE QUESTION IS, AT WHAT POINT IN TIME, FROM YOUR

24   PERSPECTIVE, BEFORE NOVEMBER OF 2003, WAS THERE A SUFFICIENT

25   UNIVERSE OF INFORMATION THAT WOULD WARRANT, WOULD SATISFY,        11:12

1   RULE 11 CONCERNS, ET CETERA?

2         **MR. NOLAN:**  BUT, YOUR HONOR, WE HAVE FOUND NO CASE,

3   AND THERE HAS BEEN NO CASE CITED TO YOU, WHERE A PARTY

4   SIMILARLY SITUATED TO MGA IN THIS CASE, FACING AN AFFIRMATIVE

5   SUMMARY JUDGMENT MOTION ON THE STATUTE OF LIMITATIONS, FACED          11:12

6   WITH THE INTERNAL INVESTIGATION CONDUCTED BY THE LEGAL

7   DEPARTMENT, NOT A FACTUAL SECURITY DEPARTMENT, IS NOW BEING

8   FORCED TO SAY, 'YOU STILL CAN'T LOOK BEHIND THAT CURTAIN.'

9         YOUR HONOR, THIS CASE SOME DAY MAY GET REVIEWED.

10        IN THE CHEVRON V. PENNZOIL CASE, ON A SUMMARY                    11:13

11  JUDGMENT MOTION, ON, WE THINK, MUCH LESS EGREGIOUS SITUATIONS,

12  THE NINTH CIRCUIT HAD NO TROUBLE SAYING, 'YOU KNOW WHAT,

13  EVERYBODY IN THIS LITIGATION' -- THE BEAUTY OF THIS LITIGATION

14  FOR YOU, YOUR HONOR, IS, EVERYBODY IS BIG AND EVERYBODY IS

15  GOOD.  AND THEY MADE THEIR CHOICES.  AND SOMETIMES CHOICES HAVE       11:13

16  CONSEQUENCES.

17        **THE COURT:**  THANK YOU, COUNSEL.

18        **MR. NOLAN:**  I'LL SUBMIT ON THAT.

19        **THE COURT:**  VERY WELL.

20        I'M GOING TO SPEND SOME MORE TIME THINKING ABOUT THAT           11:13

21  PARTICULAR MOTION.

22        **MR. OLIVAR:**  YOUR HONOR CAN READ THE CHEVRON CASE.

23  IT HAS VERY DIFFERENT CIRCUMSTANCES.  IT SPECIFICALLY RELIED ON

24  COUNSEL'S ADVICE.

25        WITH THAT, I'LL SUBMIT.                                         11:13

```
 1            THE COURT:  I'M FAMILIAR WITH THE CHEVRON CASE.

 2       THANK YOU, COUNSEL.

 3       ALL RIGHT.  NUMBER SEVEN IS MATTEL'S MOTION OBJECTING

 4  TO PORTIONS OF THE DISCOVERY MASTER'S APRIL 14, 2008 ORDER

 5  GRANTING IN PART AND DENYING IN PART MATTEL'S MOTION TO COMPEL   11:13

 6  PRODUCTION OF DOCUMENTS AND THINGS BY MGA.

 7            THE COURT IS IN NO NEED OF FURTHER ARGUMENT ON THIS,

 8  UNLESS THERE'S ANYTHING THAT'S NOT SET FORTH IN THE BRIEFS IN

 9  THIS MATTER.

10            MR. COREY:  VERY, VERY BRIEFLY, BECAUSE I DO THINK   11:14

11  THAT THERE IS.  WE DID NOT GET THE OPPORTUNITY TO REPLY ON

12  THIS, AND THERE ARE A COUPLE OF POINTS THAT I WOULD LIKE TO

13  MAKE.

14            WE WENT THROUGH THE MEET-AND-CONFER PROCESS, AND THE

15  ISSUE THAT WAS IN FRONT OF JUDGE INFANTE WAS WHETHER, WITH    11:14

16  RESPECT TO THESE REQUESTS RELATING TO PRIOR REPRESENTATIONS

17  THAT MGA HAD MADE TO OTHER COURTS, OTHER TRIBUNALS, ABOUT

18  WHETHER COMPETITORS' DOLLS INFRINGED WITH BRATZ DRAWINGS THAT

19  MR. BRYANT CREATED.

20            THAT'S THE SCOPE OF WHAT WE WERE LOOKING FOR.       11:14

21            WE WENT IN FRONT OF JUDGE INFANTE AND ASKED THE OTHER

22  SIDE, BEFORE HE RULED ON THIS, AND SAID, 'LOOK, ALL YOU HAVE TO

23  DO IS IDENTIFY FOR US THE INFRINGEMENT CASES THAT YOU HAVE

24  FILED, AND WE WILL LOOK THROUGH THE PLEADING CLIP THAT HAS NO

25  NONPRIVILEGED INFORMATION.  THAT'S ALL THAT YOU HAVE TO DO.   11:15
```

1    AND WE WILL GO WHEREVER IN THE WORLD THESE ARE LOCATED TO FIND

2    THEM.'

3            AND JUDGE INFANTE FOUND THAT TO BE AN UNDUE BURDEN.

4            NOW, GIVEN THAT WE'VE ASSERTED IN THIS CASE JUDICIAL

5    ESTOPPEL, AND WE HAVE AN ARGUMENT FOR JUDICIAL ESTOPPEL, WE          11:15

6    HAVE INSTANCES, WHICH WE'VE PUT IN FRONT OF THE COURT, WHERE

7    MGA HAS TAKEN THIS POSITION IN PRIOR PROCEEDINGS.  FOR HIM TO

8    RULE THAT US GOING TO LOOK THROUGH CLEARLY NONPRIVILEGED

9    DOCUMENTS TO FIND OTHER EVIDENCE OF THAT, I THINK, IS CLEARLY

10   ERRONEOUS.                                                          11:15

11           THAT'S WHAT HE HAD IN FRONT OF HIM, AND THAT'S THE

12   DECISION THAT HE MADE.

13           NOW, THE OTHER TWO BASES THAT HE BASED HIS OPINION ON

14   WERE, IS THIS SOMETHING THAT'S CUMULATIVE?  IS THIS A REQUEST

15   THAT'S CUMULATIVE?                                                  11:16

16           AND YOU'LL SEE IN THE PAPERS, PARTICULARLY IN THE

17   OPPOSITION, THEY SAY, 'WELL, WE'VE PRODUCED DOCUMENTS RELATED

18   TO SOME OF THESE CASES.'  WHICH IS ABSOLUTELY TRUE, BECAUSE

19   JUDGE INFANTE ORDERED THEM TO PRODUCE SWORN AFFIDAVITS AND

20   DEPOSITION TESTIMONY, OR TRANSCRIPTS OF TESTIMONY, RELATED TO       11:16

21   THE CREATION OF BRATZ.

22           WHAT HASN'T BEEN PRODUCED, OR HAS BEEN PRODUCED ONLY

23   IN SNIPPETS, ARE THE COMPLAINTS, THE CLAIMS, THE LEGAL

24   POSITIONS TAKEN, THE RESPONSES TO CONTENTION INTERROGATORIES

25   THAT ARTICULATE THE LEGAL BASES BEING ASSERTED.  THOSE             11:16

```
 1   DOCUMENTS HAVE NOT BEEN PRODUCED.  AND SO THE WAY THAT WE HAD

 2   ARTICULATED WHAT WE WERE LOOKING FOR, THE REQUESTS ARE NOT, IN

 3   THIS INSTANT, CUMULATIVE.

 4        THE OTHER BASIS THAT HE HAD FOR RULING WAS THAT THE

 5   REQUESTS WERE NOT REASONABLY TAILORED, AND I THINK -- AND          11:17

 6   DURING THE MEET-AND-CONFER PROCESS, WHICH WE HAD ENGAGED IN

 7   BEFOREHAND AND PUT THIS PROPOSAL IN FRONT OF JUDGE INFANTE FOR

 8   HIM TO CONSIDER, WAS EXACTLY THAT.  WE TAILORED IT AND SOUGHT

 9   TO MINIMIZE THE BURDEN AS MUCH AS POSSIBLE.

10        THE COURT:  THIS DOES GET BACK TO THAT ISSUE THAT I           11:17

11   RAISED BEFORE, THOUGH.  WHAT JUDGE INFANTE RULED ON, AS I

12   UNDERSTAND HIS RULING, WAS WHAT WAS ACTUALLY REQUESTED.  NOT

13   WHAT WAS TAILORED OR PROPOSED TO BE TAILORED.

14        MR. COREY:  AND THAT'S ACTUALLY NOT RIGHT, BECAUSE

15   WHAT WE HAD DONE WAS, EACH SIDE HAD SUBMITTED LETTERS TO           11:17

16   JUDGE INFANTE.  AND IF THE COURT WOULD GIVE ME A MOMENT, I WILL

17   FIND THOSE LETTERS AND REFER THEM TO YOUR HONOR.  BECAUSE THE

18   ORDER TRACKS THE RELIEF SOUGHT OR THE AGREEMENTS REACHED FOR

19   THE NARROWING BY THE PARTIES DURING THAT MEET-AND-CONFER

20   PROCESS.  SO THAT WAS WHAT HE WAS CONSIDERING, WAS THE            11:17

21   NARROWING AS AGREED TO BY THE PARTIES; THE NARROWING AS AGREED

22   TO BY THE PARTIES.

23        THE COURT:  NOT AS ORIGINALLY PROPOUNDED.

24        MR. COREY:  EXACTLY.

25        THE COURT:  MR. KENNEDY, WOULD YOU ADDRESS THAT ONE          11:18
```

1    PARTICULAR POINT, BECAUSE THAT'S SOMETHING WHICH IS

2    INCONSISTENT WITH MY UNDERSTANDING FROM JUST READING THE

3    PAPERS.

4         **MR. KENNEDY:**  IT'S ALSO INCONSISTENT WITH MY

5    UNDERSTANDING OF WHAT'S BEFORE THE COURT RIGHT NOW, THAT          11:18

6    THEY'RE ASKING FOR YOU TO GIVE THEM WHAT IS SOUGHT IN NUMBER 6,

7    15, 23, AND 25.  AND I DON'T SEE THEIR PROPOSED FORM OF ORDER

8    AS CONTAINING ANY LIMITATION ON WHAT'S SUPPOSED TO BE THERE.

9    AND THOSE FOUR REQUESTS INCLUDE THOSE BROADER THAN ALL OUTDOORS

10   DEFINITIONS OF 'RELATE OR REFER TO.'                             11:18

11        IF MR. COREY HAS GOT SOME LETTERS OR SOMETHING ELSE,

12   I'D BE PLEASED TO TAKE A LOOK AT THEM, BUT I CAME HERE

13   UNDERSTANDING THAT IT WAS THOSE FOUR AND THE WAY THEY ASKED FOR

14   THEM.

15        **THE COURT:**  VERY WELL.  THANK YOU, COUNSEL.            11:18

16        THE EIGHTH MOTION IS THE MOTION BY MATTEL OBJECTING

17   TO THE PORTIONS OF THE DISCOVERY MASTER'S APRIL 11, 2008 ORDER

18   GRANTING IN PART MGA'S MOTION TO COMPEL MATTEL TO PRODUCE A

19   WITNESS PURSUANT TO 30(B)6.

20        I DID HAVE A QUESTION ON THIS, DIRECTED TOWARDS MGA,       11:19

21   CONCERNING THE -- MATTEL MAKES AN ARGUMENT IN THEIR MOTION, AND

22   AGAIN IN THEIR REPLY -- CONCERNING THE EFFECT OF THIS COURT'S

23   ORDER FOLLOWING THE MOTIONS FOR PARTIAL SUMMARY JUDGMENT AS

24   NEGATING A COUPLE OF THE TOPIC AREAS FOR THE 30(B)(6).

25        I'D LIKE TO GET YOUR RESPONSE TO THAT, IF YOU WOULD.       11:19

1       **MR. NOLAN:**  YES, YOUR HONOR.

2       **THE COURT:**  SPECIFICALLY, I'LL NEED SOME

3   CLARIFICATION FROM MATTEL ON THIS AS WELL, BECAUSE THEY ALSO

4   ARGUE THAT A NUMBER OF THE TOPICS RELATE TO PHASE TWO, AND THEY

5   REFER TO 8, 18, 30, AND 32.  I DON'T SEE 30 BEING SET FORTH          11:20

6   ANYWHERE IN THE PAPERS OR IN ARGUMENT SUGGESTING HOW 30 RELATES

7   TO PHASE TWO.

8           BUT THE ARGUMENT WITH RESPECT TO THE SUMMARY JUDGMENT

9   RULING RELATES TO TOPIC 26; THESE ARE THE MATTEL EMPLOYEES WHO

10  HAVE PREVIOUSLY SIGNED THE INVENTIONS AGREEMENT.  GIVEN THE          11:20

11  COURT'S RULING ON THE ENFORCEABILITY OF THE INVENTIONS

12  AGREEMENT, JUST ON THE ENFORCEABILITY OF THE INVENTIONS

13  AGREEMENT, THAT THIS IS NO LONGER RELEVANT.  AND THEN THE OTHER

14  TOPICS AS BEING RELATED TO PHASE TWO AND NOT TO PHASE ONE.

15      **MR. NOLAN:**  THIS IS ALWAYS A DIFFICULT POSITION TO BE          11:20

16  IN, BECAUSE YOU'RE INTERPRETING AN ORDER TO THE JUDGE THAT

17  ISSUED THE ORDER.  BUT I THINK THAT MATTEL IS MISLED IN TERMS

18  OF WHAT THEY BELIEVE WAS THE EXTENT AND BREADTH OF THE COURT'S

19  SUMMARY JUDGMENT RULING, AS WE UNDERSTAND IT.

20          I UNDERSTOOD FROM THE COURT'S RULING THAT YOU HAVE          11:21

21  FOUND THAT THE INVENTIONS AND CONFIDENTIALITY AGREEMENT IS AN

22  ENFORCEABLE CONTRACT.

23          HOWEVER, THE COURT WENT FURTHER AND SAID, 'HOWEVER,

24  THE AFFIRMATIVE DEFENSES THAT THE PARTIES HAVE RAISED IN

25  CONNECTION WITH THIS CASE, INCLUDING ACQUIESCENCE, WAIVER, AND          11:21

```
 1   THOSE TYPE OF DOCTRINES, ARE STILL AVAILABLE IN THIS CASE.'

 2        I HAD UNDERSTOOD, YOUR HONOR, MATTEL MAY HAVE AN

 3   ENFORCEABLE AGREEMENT.  HOWEVER, IF THEY CHOSE NOT TO ENFORCE

 4   THE AGREEMENT, EXCEPT ON EVERYBODY OTHER THAN CARTER BRYANT,

 5   AND ONLY AFTER THEY WERE GETTING BEAT IN THE MARKETPLACE BY      11:21

 6   BRATZ, THAT'S SOMETHING I THINK THIS JURY IS ENTITLED TO HEAR.

 7        THAT'S WHY I THINK THOSE TOPICS ARE PARTICULARLY

 8   RELEVANT STILL.

 9        WITH RESPECT TO SOME OF THE OTHER ONES, YOUR HONOR --

10        THE COURT:  THE PHASE-TWO STUFF, RIGHT.                    11:22

11        MR. NOLAN:  YES.

12        I CAN ASSURE YOU, YOUR HONOR, I'M NOT SPENDING A

13   NANOSECOND DEALING WITH PHASE-TWO STUFF RIGHT NOW.  WE'VE GOT

14   OUR HANDS FULL TRYING TO GET THIS THING READY FOR TRIAL.

15   THERE'S ALWAYS AN ISSUE.  THE DEVIL IS IN THE DETAILS AS TO     11:22

16   WHAT'S IN PHASE TWO.

17        THE COURT:  BUT THESE TOPICS THEY SPECIFY, THEY SEEM

18   TO BE, FOR EXAMPLE, INFORMATION REGARDING MATTEL'S EFFORTS TO

19   COMPETE WITH BRATZ; INFORMATION REGARDING A LARGE NUMBER OF

20   FORMER MATTEL EMPLOYEES WHO HAVE JOINED MGA.                    11:22

21        MR. NOLAN:  RIGHT; THOSE WOULD BE ALL PHASE TWO

22   TOPICS.

23        THE COURT:  THE NET WORTH OF BARBIE.

24        MR. NOLAN:  WE'RE NOT INTERESTED IN THE NET WORTH OF

25   BARBIE.  WE HAVE ENOUGH ISSUES IN OUR MOTION IN LIMINE NUMBER   11:22
```

```
1    13 DEALING WITH BARBIE'S HISTORY.  I THOUGHT WE SHOULD STAY

2    AWAY FROM HER NET WORTH; SO NO, YOUR HONOR, THOSE ARE NOT THE

3    ISSUES.

4             ONE OF THE ISSUES, THOUGH, THAT IS STILL AVAILABLE TO

5    US, GOES TO THIS WHOLE LATCHES AND STATUTE OF LIMITATIONS ISSUE       11:22

6    TOO.  THIS 30(B)(6) WITNESS APPEAL, CANDIDLY, YOUR HONOR, I

7    THINK WAS JUST A DELAYING EFFORT.  BUT WE SHOULD BE ENTITLED TO

8    HAVE THIS 30(B)(6) ORDER, AS JUDGE INFANTE HIMSELF FOUND.

9             THE COURT:  VERY WELL.

10            ANYTHING FURTHER FROM MATTEL ON THIS POINT?                   11:23

11            MR. COREY:  YES, YOUR HONOR.

12            IF I MAY GO BACK TO THE PRIOR MOTION, I CAN TELL THE

13   COURT WHERE THE LETTERS ARE.

14            THAT'S IN MY SUPPLEMENTAL DECLARATION SUBMITTED

15   BEFORE JUDGE INFANTE, EXHIBIT B IN CONNECTION WITH THIS              11:23

16   PROCEEDING, AND THAT'S DATED APRIL 9TH.

17            BUT I THINK IF THE COURT WILL LOOK PARTICULARLY AT

18   THE LATER PORTIONS OF THE ORDER THAT JUDGE INFANTE ACTUALLY

19   ISSUED DEALING WITH THE THINGS THAT THE PARTIES DID NOT APPEAL,

20   YOU CAN SEE VERY CLEARLY THAT JUDGE INFANTE IS TAKING INTO           11:23

21   ACCOUNT THE MEET AND CONFER PROCESS AND IS CONSIDERING THINGS

22   AS THE PARTIES HAVE NARROWED THEM DURING THE MEET AND CONFER

23   PROCESS.  A COPY OF THAT ORDER IS EXHIBIT 1 TO MY DECLARATION

24   SUBMITTED WITH THIS MOTION, WHICH WAS FILED ON APRIL 28TH.

25            THE COURT:  I'LL LOOK AT THAT.                              11:24
```

1        ADDRESSING NUMBER EIGHT, THOUGH.

2        **MR. COREY:**  I APOLOGIZE, YOUR HONOR.

3        LET ME START WITH PHASE TWO, THE TOPICS THAT WE

4   BELIEVE RELATE TO PHASE TWO; THAT'S TOPIC 8 AND TOPIC 18.

5   TOPIC 8 RELATES TO DAMAGES SUFFERED BY MATTEL.  MATTEL'S NOT          11:24

6   SEEKING DAMAGES FOR ITS OWN INJURY IN THIS CASE; THAT'S NOT A

7   THEORY THAT IS CONCERNED.

8        **THE COURT:**  I UNDERSTAND YOUR RATIONALE FOR 8 AND 18,

9   AND I UNDERSTAND YOUR RATIONALE FOR 32, BUT NOT 30.

10        WHAT'S 30?

11        **MR. COREY:**  THE NET WORTH OF THE BARBIE BRAND; THAT'S

12   WHAT I HAVE FOR 30.

13        **THE COURT:**  NO, THAT'S 18; AT LEAST ACCORDING TO

14   PAGE 11 OF YOUR REPLY.

15        **MR. COREY:**  THERE MAY BE A TYPO IN THE REPLY.          11:25

16        I'M NOT SURE WHICH ONE THE COURT IS TALKING ABOUT.

17        NUMBER 8 RELATES TO DAMAGES THAT MATTEL CLAIMS TO

18   HAVE SUFFERED IN THIS CASE.

19        FOR PHASE ONE:  NOTHING.

20        **THE COURT:**  ALL RIGHT.          11:25

21        **MR. COREY:**  NUMBER 18 RELATES TO EVERY SINGLE

22   EMPLOYEE WHO EVER LEFT MATTEL AND WHAT INTERVIEW PROCESS MATTEL

23   WENT THROUGH.  NUMBER 28:  ANY CONTENTION BY MATTEL REGARDING

24   SALES REVENUES AND PROJECTS IMPAIRED BY BRATZ.

25        **THE COURT:**  28, YOU SAY?          11:25

```
 1          MR. COREY:  NUMBER 28.

 2          NUMBER 29 IS VERY SIMILAR:  THE IMPACT OF BRATZ ON

 3    SALES AND REVENUE OF MATTEL'S PRODUCTS.

 4          NUMBER 30:  THE NET WORTH OF MATTEL'S BARBIE BRAND.

 5          NUMBER 32:  COMPETITIVE RESPONSE TO BRATZ.            11:25

 6          THE COURT:  WHERE CAN THE COURT TAKE A LOOK AT THESE

 7    TOPICS?  BECAUSE WHAT YOU'RE READING NOW IS NOT CONSISTENT WITH

 8    WHOEVER PREPARED THE REPLY BRIEF.

 9          MR. COREY:  IT IS NOT, AND I APOLOGIZE FOR THAT.

10          IF I MAY, I CAN HAND UP A COPY OF THE NOTICE.          11:26

11          MR. NOLAN:  JUDGE INFANTE'S ORDER THEN LINES UP WITH

12    THESE NUMBERS; RIGHT?

13          MR. COREY:  I'M NOT SURE WHAT THE QUESTION IS.

14          MR. NOLAN:  IN OTHER WORDS, JUDGE INFANTE ISSUED AN

15    ORDER WHERE HE GRANTED SOME AND NARROWED OTHERS.            11:27

16          MR. COREY:  CORRECT.

17          MR. NOLAN:  THAT'S ALL I'M SAYING.

18          MR. COREY:  I'M NOT EXCEEDING THE SCOPE OF

19    JUDGE INFANTE'S ORDER.

20          MR. NOLAN:  VERY WELL.                                11:27

21          THE COURT:  ALL RIGHT.  THE COURT WILL LOOK AT THIS.

22          I DO WANT TO GET TO A COUPLE OF OTHER MOTIONS BEFORE

23    WE RUN OF TIME HERE.

24          NUMBER 9, THE COURT IS ABLE TO RESOLVE ITSELF,

25    BECAUSE I DO KNOW WHAT I RULED BACK IN FEBRUARY.           11:27
```

1          THAT LEAVES 10, 11, AND 12; THAT'S WHERE WE BRING

2   INTO THE THIRD-PARTY ATTORNEYS THAT ARE PRESENT, AND YOU'LL BE

3   GIVEN AN OPPORTUNITY TO ADDRESS THESE.

4          10 AND 11 ARE BASICALLY FLIP SIDES OF THE SAME COIN.

5   IN NUMBER 10, MATTEL OBJECTS TO PORTIONS OF THE DISCOVER          11:27

6   MASTER'S APRIL 11, 2008 ORDER, GRANTING IN PART AND DENYING IN

7   PART MATTEL'S MOTION TO COMPEL PRODUCTION OF ELECTRONIC MEDIA

8   FROM THE THIRD PARTIES MS. CLOONAN, MS. HATCH-LEAHY, AND

9   MS. MARLOW.  THEN WE GET THE FLIP SIDE, ESSENTIALLY, FROM

10  MR. MCFARLAND, WHERE WE HAVE MS. CLOONAN'S OBJECTING TO          11:28

11  PORTIONS OF THAT SAME APRIL 11TH ORDER REGARDING A FURTHER

12  EXAMINATION OF MS. CLOONAN'S COMPUTER.  AND THEN OF COURSE WE

13  HAVE THE FINAL MOTION FOR RECONSIDERATION OF THE APRIL 22ND

14  ORDER DENYING THE MOTION TO COMPEL ADDITIONAL DEPOSITION OF

15  MS. MARLOW.                                                       11:28

16         THEY ARE ALL KIND OF WRAPPED WITH THESE THREE

17  WITNESSES, SO I WANT TO GIVE YOU FIVE MINUTES OR SO IF YOU WANT

18  TO ADDRESS THEM, IN WHATEVER ORDER YOU WANT.  I CERTAINLY HAVE

19  WHAT YOU HAVE ON PAPER.  THE COURT IS THINKING OF THESE THREE

20  MOTIONS TOGETHER, SO I'LL GIVE YOU AN OPPORTUNITY TO ADDRESS      11:28

21  THIS.

22         IN MY INITIAL THOUGHTS, HAVING READ THE MOTIONS, I

23  UNDERSTAND THERE WAS SOME BALANCING THAT WENT IN HERE.  AGAIN,

24  PERHAPS THIS COURT, FACED WITH A TASK SO AWESOME, MAY HAVE

25  APPROACHED IT SOMEWHAT DIFFERENTLY.  BUT I'VE GOT TO FIND THAT    11:29

1    THE APPROACH JUDGE INFANTE TOOK WAS CLEARLY ERRONEOUS OR

2    CONTRARY TO LAW BEFORE I DISTURB THIS.

3           YOU HAVE CONSISTENT POSITIONS, OF COURSE, BUT IT'S

4    JUST A MATTER OF FINDING FAULT WITH THE BALANCING THAT

5    JUDGE INFANTE EMPLOYED; SO COUNSEL?                          11:29

6           **MR. DOWELL:**  THIS IS MR. DOWELL.

7           JUST WITH REGARD TO OUR REQUEST TO REVIEW THE

8    DISCOVER MASTER'S ORDER WITH RESPECT TO MS. CLOONAN.  THE

9    DIFFERENCE, WE BELIEVE, WITH RESPECT TO THAT ORDER IS THAT TO

10   THE EXTENT THAT MATTEL IS ASSERTING THE DISCOVERY MASTER ORDER   11:29

11   AN UNFETTERED REVIEW OF MS. CLOONAN'S COMPUTER, WE BELIEVE THAT

12   TO THAT EXTENT, THE DISCOVERY MASTER'S ORDER IS CLEARLY

13   ERRONEOUS.  WE DO NOT BELIEVE THAT HE INTENDED IT TO COMPLETELY

14   VITIATE HER PRIVACY INTERESTS.

15          WE MET AND CONFERRED WITH MATTEL A COUPLE OF           11:30

16   DIFFERENT TIMES TRYING TO COME UP WITH A PROTOCOL THAT WOULD

17   ALLOW US TO AT LEAST REVIEW WITH REGARD TO HER PRIVATE AND

18   PRIVILEGED DOCUMENTS AND PHOTOGRAPHS THAT MIGHT COME UP ON THE

19   COMPUTERS, AND MATTEL TOOK THE UNREASONABLE POSITION THAT

20   JUDGE INFANTE HAD COMPLETELY VITIATED HER PRIVACY INTERESTS.   11:30

21   AND TO THAT EXTENT, WE THINK IT'S CLEARLY ERRONEOUS.

22          **THE COURT:**  IS THERE A REASON WHY WE WOULDN'T USE THE

23   SAME PROTOCOL THAT WE'RE USING?

24          **MR. OLIVAR:**  YES, YOUR HONOR.

25          THERE'S NO ARGUMENT ANYMORE THAT THERE'S NOT A STRONG   11:30

1    LIKELIHOOD THAT INFORMATION IS AVAILABLE ON THESE TWO THINGS;

2    THE BRATZ DISK AND THE COMPUTER.  WITH RESPECT TO THE PRIVACY

3    AND PRIVILEGE CLAIM, THERE'S NOTHING TO SUPPORT ANY PRIVACY OR

4    PRIVILEGE INTEREST.

5           MS. CLOONAN'S TESTIMONY WAS THAT THIS WAS A COMPUTER          11:31

6    THAT EVERYONE AND THEIR MOTHER -- THAT'S A QUOTE -- WOULD USE.

7    IT WAS VIRTUALLY A PUBLIC COMPUTER.  AND THE BRATZ DISK, SHE

8    SAYS SHE HAS NO IDEA WHAT THAT IS.  SHE JUST FOUND IT.  SHE

9    DOESN'T EVEN THINK IT'S HERS.  THERE'S BEEN TWO BRIEFS HERE.

10   NOT A SINGLE SUBMISSION FROM MS. CLOONAN, OTHER THAN COUNSEL'S        11:31

11   ARGUMENT ABOUT THESE PRIVACY AND PRIVILEGE INTERESTS.

12          AND GIVEN WHERE WE ARE IN TIME, GIVEN HOW CRITICAL

13   THIS INFORMATION IS, WE ABSOLUTELY OBJECT TO COUNSEL HAVING

14   ANOTHER ATTEMPT TO FILTER IT OR SCREEN IT.  THEY HAVE HAD IT

15   FOR TWO OR THREE YEARS NOW.  IF THEY HAVEN'T COME UP WITH            11:31

16   PRIVACY OR PRIVILEGE BY NOW IN REVIEWING IT, I THINK IT'S JUST

17   TOO LATE.  WE WOULD ASK FOR AN IMAGED COPY SO WE CAN DO OUR

18   REVIEW.

19          **MR. DOWELL:**  ONE MORE THING.

20          I JUST WANT TO POINT OUT THAT WE HAVE SUBMITTED A            11:31

21   DECLARATION FROM MS. CLOONAN STATING THAT THE DISK DID BELONG

22   TO HER AND SHE HAD A REGULAR PRACTICE OF REUSING THE ZIP DISKS

23   AND (UNINTELLIGIBLE) NO TELLING WHAT PRIVATE (UNINTELLIGIBLE)

24   AS FAR AS THE COMPUTER.

25          **THE COURT:**  HAVE YOU BEEN ABLE TO IDENTIFY THOSE          11:31

1  DOCUMENTS AND SUBMIT --

2      **MR. DOWELL:**  ACTUALLY, THE COMPUTER AND THE ZIP DISKS

3  ARE IN THE POSSESSION OF MATTEL'S EXPERTS, AND THEY HAVE BEEN

4  FOR MONTHS; SO WE HAVE NOT TOUCHED THEM AT ALL.

5      WITH REGARD TO WHETHER THE COMPUTER WAS PUBLIC, IT          11:32

6  WAS HER PERSONAL COMPUTER.  NOW, SHE DID HAVE PEOPLE THAT CAME

7  TO HER HOUSE -- SHE TESTIFIED DURING HER DEPOSITION.  THAT DOES

8  NOT MEAN SHE DID NOT USE IT HERSELF AND IT WAS STILL NOT HER

9  PERSONAL COMPUTER.

10      **MR. OLIVAR:**  YOUR HONOR, I HAVE MS. CLOONAN'S         11:32

11  DECLARATION IN THIS CASE HERE; IT'S A HALF A PAGE; ALL IT SAYS

12  IS "MY ZIP DISKS MAY CONTAIN, MAY CONTAIN, VARIOUS TYPES OF

13  FILES, INCLUDING FILES THAT ARE LIKELY TO CONTAIN PERSONAL

14  MATTERS."

15      WE'RE BEYOND THE 'MAY' STAGE.  IF THEY CAN'T MAKE A       11:32

16  SHOWING OF PRIVACY OR PRIVILEGE, THEN WE NEED TO GET THE IMAGES

17  OF THESE THINGS.

18      **THE COURT:**  IS THERE ANY PROTOCOL THAT YOU THINK

19  WOULD BE APPROPRIATE TO ADDRESS PERSONAL PRIVATE STUFF THAT

20  COMES UP?                                                    11:32

21      **MR. ALGER:**  WHILE WE'RE REVIEWING THE INFORMATION

22  FROM THE DISKS THAT WE WOULD TRY TO GET IN FAIRLY SHORT ORDER,

23  WE'D BE PLEASED TO HAVE MR. DOWELL STAND NEXT TO US AND SEE IF

24  THERE'S ANYTHING THAT COULD BE PRIVILEGED OR PRIVATE AND MAKE

25  THAT OBJECTION.  AND I'M SURE IF THERE'S PRIVILEGED MATERIAL,  11:33

1    WE'RE NOT GOING TO COME FIGHT FOR YOUR HONOR OR SOMEONE ELSE

2    ABOUT WHETHER IT NEEDS TO BE PRODUCED.

3            **THE COURT:**  ANYTHING FURTHER ON THESE LAST THREE

4    MOTIONS THAT IS NOT SET FORTH IN THE BRIEFS?

5            **MR. OLIVAR:**  IT'S ALL IN OUR BRIEFS.                    11:33

6            **MR. DOWELL:**  IT'S IN THE PAPERS, YOUR HONOR.

7            **THE COURT:**  VERY WELL.

8            AS I INDICATED, THE COURT WILL ISSUE AN ORDER ON

9    WEDNESDAY, MOST LIKELY TOWARDS THE END OF THE DAY.

10           I DID WANT TO GRANT, THOUGH, ON THE RECORD THE FIRST      11:33

11   MOTION, BECAUSE I WANT TO MAKE SURE THAT DEPOSITION GOES

12   FORWARD ON MAY 17.  THE REMAINING MOTIONS, I WILL TAKE UP AND

13   ISSUE AN ORDER ON WEDNESDAY.

14           JUST TO RECAP AS TO WHERE WE ARE, I KNOW I WENT

15   THROUGH THIS ON THE PHONE WHEN WE HAD OUR CONFERENCE LAST WEEK,   11:33

16   BUT THIS MONDAY WE'LL CONTINUE WITH THE MOTIONS FOR PARTIAL

17   SUMMARY JUDGMENT.  WE DO HAVE OUR PRETRIAL CONFERENCE.

18           ON TUESDAY, WE'RE GOING TO BEGIN THE SELECTION OF THE

19   JURY.  THE JURY THAT WE'RE GOING TO HAVE, THE COURT REQUESTED

20   60 MEMBERS OF THE PANEL, A 60-MEMBER PANEL, THAT HAVE ALL BEEN    11:34

21   SCREENED TO SIT FOR A TWO- TO THREE-MONTH JURY TRIAL; SO

22   ESSENTIALLY, THE ONLY QUESTION THAT WAS ASKED ON THE

23   QUESTIONNAIRE, AS I INDICATED EARLIER, IS 'ARE YOU AVAILABLE TO

24   SIT FOR THE TWO TO THREE MONTHS?'

25           **MR. NOLAN:**  THEY FOUND 60 PEOPLE?                    11:34

```
 1            THE COURT:  SO IN ANY EVENT, WE'LL PROCEED WITH THAT.

 2   ON TUESDAY MORNING, I ANTICIPATE WE'LL HAVE OUR JURY SELECTED

 3   SOME TIME ON WEDNESDAY.  AT THAT POINT THE COURT WILL TAKE UP

 4   ANY ADDITIONAL DISCOVERY MOTIONS, IF THEY EXIST.  I'M HOPING

 5   THAT THERE ARE NOT TOO MANY OF THOSE AT THIS POINT.  I DID GET      11:34

 6   A SUGGESTION FROM SOMEBODY, I THINK MR. NOLAN, THAT THERE MAY

 7   BE ANOTHER ONE DOWN THE PIKE, BUT WE'LL DEAL WITH THAT.  THEN

 8   WE'LL HAVE THE MOTIONS IN LIMINE.  I'VE RECEIVED THE REPLY

 9   BRIEFS ON THAT.  I PLAN TO WORK ON THAT THIS WEEKEND AND

10   HOPEFULLY BE READY BY NEXT WEDNESDAY, THURSDAY, TO WORK THOSE       11:34

11   OUT.  AND THAT WILL BRING US THROUGH FRIDAY.

12            THE COURT WILL BE PUTTING ASIDE ALL OF NEXT WEEK FOR

13   THIS CASE.  WE'LL HAVE MEMORIAL DAY WEEKEND, AND THEN WE'LL

14   START WITH OPENING STATEMENTS ON TUESDAY MORNING, THE 27TH OF

15   MAY.                                                               11:35

16            MR. NOLAN:  YOUR HONOR, NUMBER ONE, YOU ASKED US TO

17   AT LEAST RAISE THE ISSUE OF THE PRACTICALITY OF THE AEO

18   DESIGNATION STILL GOING FORWARD.

19            I HAVE A PROPOSAL I'M HOPING THAT'S ACCEPTABLE WITH

20   COUNSEL.                                                           11:35

21            THE COURT:  HAVE YOU DISCUSSED IT WITH OPPOSING

22   COUNSEL?

23            MR. ALGER:  NO.

24            THE COURT:  LETS TAKE THIS UP ON THE 19TH.  I REALLY

25   WANT THIS TO BE THOUGHT OUT WITH COUNSEL BEFORE IT GETS RAISED     11:35
```

1   TO THE COURT, I THINK OUT OF FAIRNESS TO THE OTHER SIDE.

2        **MR. NOLAN:**  I DON'T HAVE A PROPOSAL.

3        **THE COURT:**  YOU CAN RAISE THAT WITH COUNSEL.  WE'LL

4   TAKE THAT UP ON THE 19TH.

5        **MR. NOLAN:**  THE SECOND POINT, YOUR HONOR, IS THAT WE          11:35

6   WERE ADVISED, I WAS ADVISED, YESTERDAY, BY JOHN QUINN, THAT

7   MATTEL WAS THINKING OF USING A JURY QUESTIONNAIRE.

8        WE HAVEN'T GOTTEN A COPY OF THIS.

9        **THE COURT:**  THE COURT WILL BE CONDUCTING THE VOIR

10  DIRE IN THIS CASE.  I WILL BE AFFORDING COUNSEL AN OPPORTUNITY          11:35

11  TO DO SOME FOLLOW-UP QUESTIONS ORALLY.

12       **MR. NOLAN:**  BUT NOT ENTERTAINING A QUESTIONNAIRE FOR

13  THE JURY.

14       **THE COURT:**  I'LL ENTERTAIN ANYTHING.  BUT THE COURT'S

15  PRACTICE IS TO CONDUCT VOIR DIRE ITSELF AND ALLOW COUNSEL TO           11:36

16  SUPPLEMENT THAT WITH ORAL QUESTIONS.

17       IF THEY WANT TO HAVE THEM WRITTEN OUT IN A

18  QUESTIONNAIRE FORM FOR THEMSELVES, THAT'S FINE.

19       **MR. NOLAN:**  YOUR HONOR, DO YOU KNOW WHETHER OR NOT

20  THE PRE-SCREENING HAS INVOLVED THE DESCRIPTION OF THE CASE OR          11:36

21  THE TITLE OF THE CASE OR THE PARTIES?

22       WHEN THE JURY COMMISSIONER PRE-SCREENED, WAS THERE

23  ANY MENTION OF THE CASE?

24       **THE COURT:**  NO.  NO.

25       **MR. NOLAN:**  OKAY.  THAT HELPS.  SO WE HAVE THE CAUSE           11:36

```
 1   ISSUE.

 2            THE COURT:  I THINK I SENT A COPY OF THE

 3   QUESTIONNAIRE OUT ACCOMPANIED TO THE MINUTE ORDER WHEN I SENT

 4   OUT THE MINUTE ORDER; SO YOU SHOULD HAVE A COPY OF THAT.

 5            MR. NOLAN:  I'M SURE I DO.                          11:36

 6            THE LAST POINT, YOUR HONOR, THERE IS SOMETHING

 7   LURKING OUT THERE THAT IS GOING TO BE A HUGE ISSUE WHICH WILL

 8   COME BEFORE YOU ON AN EX-PARTE; IT'S MATTEL'S MOTION TO APPEAL

 9   FROM JUDGE INFANTE'S ORDER OF ABOUT TEN DAYS AGO, REQUESTING

10   THEM TO COMPLETE THEIR PRIVILEGE LOGS, THE ATTORNEY-CLIENT     11:36

11   PRIVILEGE.  AND WE HAVE BEEN TOLD -- WE HAD MEET AND CONFERS

12   OVER THE WEEKEND -- THAT MATTEL IS NOT COMPLYING WITH THE

13   ORDER; THEY BELIEVE IT'S A WASTE OF TIME.  THEY ARE GOING TO

14   APPEAL IT.

15            ALL WE ASKED WAS, WE'LL AGREE TO ACCELERATED TIME,    11:37

16   BUT WE WANTED MATTEL TO BE PREPARING, SO THAT IF THE MOTION IS

17   UPHELD, THAT THE WORK HAS ALREADY BEEN DONE.

18            THE COURT:  THE APPLICATION ISN'T BEFORE ME, SO I'M

19   NOT GOING TO GIVE ANY PRELIMINARY --

20            MR. ALGER:  YOUR HONOR, MR. NOLAN IS TRYING TO ARGUE   11:37

21   THE ISSUE OF --

22            THE COURT:  I'M ALREADY SIX MINUTES LATE FOR MY 11:30

23   MEETING.

24            WAS THERE SOMETHING URGENT, MR. COREY?

25            MR. COREY:  IT IS URGENT.                            11:37
```

```
 1                DOES THE COURT CONSIDER HAVING LIVE TESTIMONY AT THE

 2     CONTINUED HEARING ON THE MOTION FOR SUMMARY JUDGMENT?  BECAUSE

 3     I KNOW SOMETHING WAS DISCUSSED BACK AND FORTH FOR THE 19TH.

 4                THE COURT:  IT'S YOUR HEARING, COUNSEL.

 5                MR. COREY:  UNDERSTOOD.                                 11:37

 6                MR. ALGER:  I ALSO HAD ONE QUICK QUESTION.

 7                BEFORE THE COURT IS A JOINT REPORT REGARDING

 8     UNSEALING OF A MOTION FOR SUMMARY JUDGMENT DOCUMENTS.  AN ORDER

 9     HAS NOT BEEN ISSUED YET BY THE COURT.

10                THE COURT:  I'LL TAKE THAT UP ON THE 19TH, ALONG WITH  11:37

11     THE GENERAL ISSUE OF AEO AND WHATEVER PROPOSAL MR. NOLAN MIGHT

12     HAVE.

13                MR. ALGER:  THANK YOU.

14                MR. NOLAN:  THANK YOU, YOUR HONOR.

15                MR. COREY:  THANK YOU, YOUR HONOR.                     11:38

16

17

18                          CERTIFICATE

19

20     I hereby certify that pursuant to section 753, title 28, United
       States code, the foregoing is a true and correct transcript of
21     the stenographically recorded proceedings held in the above-
       entitled matter and that the transcript page format is in
22     conformance with the regulations of the judicial conference of
       the United States.

23

24     _____          _____
       THERESA A. LANZA, CSR, RPR                      Date
25     FEDERAL Official COURT Reporter
```