# EXHIBIT 19



CALENDARED
RECEIVED

MAY 13 2009

1   Byron Z. Moldo (SBN 109652)
      bmoldo@ecjlaw.com
2   David Seror (SBN 67488)
      dseror@ecjlaw.com
3   Peter A. Davidson (SBN 76194)
      pdavidson@ecjlaw.com
4   **ERVIN COHEN & JESSUP LLP**
    9401 Wilshire Boulevard, Ninth Floor
5   Beverly Hills, California 90212-2974
    Telephone (310) 273-6333
6   Facsimile (310) 859-2325

7   Attorneys for Patrick A. Fraioli, Jr., Temporary Receiver

8

9                **UNITED STATES DISTRICT COURT**

10               **CENTRAL DISTRICT OF CALIFORNIA**

11               **EASTERN DIVISION (RIVERSIDE)**

12

13   CARTER BRYANT, an individual,        )   CASE NO. CV 04-9049 SGL (RNBx)
                                          )
14                      Plaintiff,         )   Consolidated with Case No. 04-9059
                                          )   and Case No. 05-2727
15        v.                               )
                                          )   [Judge Stephen G. Larson]
16   MATTEL, INC., a Delaware corporation,)
                                          )
17                      Defendant.         )   **PRELIMINARY REPORT AND**
                                          )   **RECOMMENDATIONS OF**
18                                         )   **PATRICK A. FRAIOLI, JR.,**
                                          )   **TEMPORARY RECEIVER**
19                                         )
                                          )   **DATE: May 18, 2009**
20                                         )   **TIME: 2:00 p.m.**
                                          )   **CTRM:**
21   _____ )

22        TO THE HONORABLE STEPHEN G. LARSON, UNITED STATES

23   DISTRICT COURT JUDGE;

24        Patrick A. Fraioli, Jr., Temporary Receiver ("Receiver"), herewith submits his

25   Preliminary Report and Recommendations in accordance with the Court's April 27,

26   2009 Order Re Appointment of Temporary Receiver Pending Hearing on

27   Appointment of Permanent Receiver ("Order"), and states as follows:

28

IDOCS:13569.1.884241.6                     1        5-13-09

ERVIN COHEN & JESSUP LLP

EXHIBIT 19
PAGE 374

1      1.     Patrick A. Fraioli, Jr. is the duly appointed and qualified Temporary

2    Receiver for the MGA entities, having been appointed Temporary Receiver on April

3    27, 2009. The Receiver has been charged to manage, supervise and oversee the assets

4    of the MGA entities and the Bratz Brand and all Bratz Assets, as those terms are

5    defined in the Order.

6      2.     The Order directed the Receiver at paragraph 10.m. to prepare and

7    provide to this Court a report setting forth preliminary conclusions, findings and

8    recommendations. In addition, paragraph 13 of the Order directed the Receiver to file

9    a report and recommendation concerning all actions taken, as well as

10   recommendations for further action by May 11, 2009. The Court extended the date

11   for submission of the Receiver's preliminary report to May 12, 2009.

12     3.     Since the time of his appointment, the Receiver has taken the following

13   actions to further the purposes of the Receivership:

14           a.     Financial Controls and Safeguards.

15     At the time the Receiver was appointed, MGA Entertainment, Inc. ("MGAE")

16   required approval from two authorized individuals for all payments exceeding

17   $25,000. The following six individuals were authorized to approve such payments:

18   Isaac Larian, Jahangir Makabi, Shirin Makabi, Brian Wing, Lisa Tonnu and Didier

19   Pietri. As a means of supervising cash disbursements, the Receiver instituted a new

20   cash disbursement policy. Under this policy, the approval of the Receiver is required

21   for any payment exceeding $25,000, including checks, wire transfers and other

22   disbursements. In an effort to maintain routine operations, payments of $25,000 or

23   less that are in the ordinary course of business and not made to a related party may be

24   processed without the approval of the Receiver.

25           Investigation of MGAE financial records and interviews with

26   management revealed a number of payments to MGAE related parties and affiliated

27   entities, including Shirin Makabi, Mr. Larian's sister-in-law, MGAE's Hong Kong

28   subsidiary and related entities that own real property leased to MGAE. The cash

IDOCS:13569.1:884241.6                    2

ERVIN COHEN & JESSUP LLP

1   disbursement policy implemented by the Receiver restricts disbursements to related

2   parties in order to better preserve MGAE's cash position. Pursuant to the

3   disbursement policy, no payments can be made to related parties or affiliated entities

4   (including MGAE subsidiaries) without the approval of the Receiver. Related parties

5   include Isaac Larian, Jahangir and Shirin Makabi, other relatives of Mr. Larian and

6   16300 Roscoe Boulevard, LLC and MGA North LLC, owners of MGAE leased

7   properties.

8        Mr. Larian, Mr. Larian's sister and Mr. Makabi's wife are employees of

9   MGAE. The Receiver authorized the continued payment of salary to these individuals

10  for periods to and including May 18, 2009. The Receiver also authorized

11  reimbursement of travel expenses in the approximate amount of $50,000, and the

12  payment by MGAE of certain legal fees for Mr. Larian. Finally, the Temporary

13  Receiver authorized a payment of $168,000 to 16300 Roscoe Boulevard, LLC in

14  partial payment of amounts due for May rent. MGAE leases its Van Nuys corporate

15  headquarters from 16300 Roscoe Boulevard, LLC, a Larian related party. The amount

16  of the payment is in the amount of the corresponding mortgage payments required to

17  be paid by the owner of the property.

18       The Receiver also prohibited payments to Omni 808 LLC and Wachovia Bank

19  without his prior authorization. On or about May 1, 2009, the Receiver authorized a

20  payment in the amount of $94,000 to Wachovia Bank. The next payment to

21  Wachovia Bank is due in June 2009.

22            The Receiver and/or his advisors participated in discussions with MGAE

23  officers in Europe and Hong Kong regarding finance and operations. During these

24  discussions, he discovered the European offices in Poland, Spain, France, Germany,

25  the Netherlands and the United Kingdom and the office in Hong Kong use a different

26  system for reporting weekly cash flow projections than the system used in the United

27  States. In order to standardize the system for reporting weekly cash flow projections,

28  the Receiver instructed the European and Hong Kong offices to immediately switch to

IDOCS:13569.1:884241.6                    3

ERVIN COHEN & JESSUP LLP

1 the reporting system utilized by the United States. At the direction of the Receiver,

2 the MGAE Corporate Treasury instituted a weekly cash forecast requirement in which

3 each MGAE entity, both within and outside the United States, was required to submit

4 a Cash Flow Forecast with actual current week details and updates for future cash

5 flows, using a uniform template, by the close of business every Friday.

6                 b.    MGAE (Mexico).

7        Upon review of MGAE's operations at its Mexican facility, the Receiver

8 discovered that the current monthly cost to operate the facility was approximately

9 $500,000 and that the continued operation of the facility was not necessary given

10 MGAE's current level of operations. Based on these findings and following

11 discussions with members of MGAE management, the Receiver concluded that it was

12 in the best interests of MGAE to cease operations at the Mexican facility as soon as

13 possible, consistent with minimizing the overall cost to MGAE of closing the facility.

14 Accordingly, the Receiver instructed MGAE management, under the direction of

15 Diane Goveia-Gordon, President of Canada, Mexico and Latin America, to prepare a

16 plan for the orderly closure of the Mexican facility. Management's initial plan was

17 delivered to the Receiver on May 5, 2009 and provides for a period of approximately

18 four months to complete the closure. Ms. Goveia-Gordon advised the Receiver that,

19 given various logistical, contractual and regulatory considerations, it was not feasible

20 to complete the closure prior to September 1, 2009. The plan includes, among other

21 matters, a procedure to dispose of the approximately $4,000,000 worth of inventory

22 remaining at the facility and to collect outstanding accounts receivable, which are

23 primarily due from Wal-Mart.

24        At the time the Receiver was appointed, the Mexican facility had 22 employees.

25 In order to reduce unnecessary costs, the Receiver agreed with management's

26 suggestion to reduce staffing levels, and, accordingly, ten of the employees were

27 terminated effective April 30, 2009. The Receiver will continue to investigate means

28 of reducing the costs to operate the facility and expedite the closing schedule.

ERVIN COHEN & JESSUP LLP

IDOCS:13569.1:884241.6     4

c.   Communication with Retailers.

A preliminary investigation of MGAE's sales, including interviews with management, showed that the following four retailers account for approximately 75% of MGAE's sales worldwide: (1) Target; (2) Wal-Mart; (3) Toys "R" Us; and (4) K-Mart. Given the significance of these retailers to the well-being of MGAE, the Receiver, with the help of Larry Falcon, Vice-President of Sales at MGAE, contacted all four major retailers in an effort to discuss the current situation and, if nothing else, to open a line of communication between MGAE and the retailers with regards to the current situation. During preliminary conversations, the general concern communicated to the Receiver was twofold: (i) whether MGAE can fulfill previously-placed orders and deliver product as promised; and (ii) whether MGAE will be able to reimburse the retailers for the return of any remaining product as of January 10, 2010, as required by the terms of the permanent injunction. At this time, subject to the Court's continuance of the Receivership, the Receiver has scheduled follow-up meetings with each of the retailers to occur after the May 18, 2009 hearing, so as to better address their concerns by providing up-to-date information on the existing circumstances.

d.   Meetings and Other Communications with the MGA Entities, Mattel and Other Interested Parties.

The Receiver, directly and through his advisors, has established a regular course of meetings and other communications with the MGA entities, Mattel and other interested parties, including:

- Regular meetings and conversations with MGAE management, including establishing a regular dialogue with MGAE management to discuss the implications of the receivership;

- Frequent meetings and conversations with Isaac Larian;

5

- Meetings with MGAE's in-house and outside counsel, as well as Mattel's in-house and outside counsel, to discuss the current litigation and each party's respective positions;

- Meetings with OMNI 808 LLC's counsel, Todd Gordinier of Bingham McCutchen LLP, to clarify the elements and nature of the transaction with Wachovia Bank;

- Visits to various MGAE facilities for purposes of investigation and observation, including the Chatsworth showroom and the Redlands warehouse/ distribution center;

- Participation in weekly cash management meetings with MGAE executives;

- Telephonic conferences with representatives from MGAE's European and Asian operations, including Ron Brawer, President of MGAE Europe, and Eric Groenwald, European Finance Director; and

- Responding on a daily basis to numerous inquiries from vendors, creditors and licensees.

    e.    <u>Miscellaneous Actions.</u>

The Receiver, directly and through his advisors, also has taken the following actions:

- The Receiver was added as an additional insured on all relevant MGAE insurance policies;

- On May 5, 2009, pursuant to Section 4(g) of the Court's Order, the Receiver opened a bank account at Torrey Pines Bank in the name of Patrick A. Fraioli Jr., Temporary Receiver, for use in connection with the administration of the receivership estate; and

- The Receiver's advisors conducted a UCC search on "MGA Entertainment," as Debtor, and obtained copies of all UCC financing statements of record as of April 21, 2009.

4.    Immediately upon his appointment the Receiver assembled the following team of professionals to assist in his efforts and in order to prepare a preliminary report:

    a.    <u>Kibel Green, Inc. ("Kibel") – Financial Consultants to Receiver;</u>

ERVIN COHEN & JESSUP LLP

b.   Reinventures LLC ("Reinventures") – Management Consultant to Receiver;

c.   Crowe Horwath LLP ("Crowe") – Forensic Accountants to Receiver;

d.   Ervin Cohen & Jessup LLP ("ECJ") – Attorneys for Receiver; and

e.   Interco Management Corp. ("Interco") – Field Agent to Receiver.

Summary information regarding each of the advisors engaged by the Receiver is attached hereto as Exhibit "A".

5.   Each of the professionals retained by the Receiver, with the exception of Interco, has prepared a preliminary report of their actions taken and preliminary conclusions, findings and recommendations, which reports are attached hereto as set forth in paragraphs a through d below.  Given the limited amount of time that has elapsed since their engagement and the scope of the business of the MGA entities, the preliminary conclusions, findings and recommendations set forth in the referenced reports are subject to further review, analysis and investigation.

a.   Kibel – Exhibit "B";

b.   Reinventures – Exhibit "C";

c.   Crowe – Exhibit "D"; and

d.   ECJ – Exhibit "E".

6.   The Receiver requests instructions from the Court on the following matters:

a.   Issues Arising From the Court's December 3, 2008 Preliminary Injunction; January 7, 2009 Stay; April 27, 2009 Order Lifting the Stay; and the Temporary Receiver's Order of Appointment.

The Receiver was appointed as receiver over the MGAE entities, and the Bratz Brand and the Bratz Assets, and directed to manage, preserve and maximize the profits of each.  The Receiver has received numerous inquires regarding apparent uncertainties and/or conflicts arising under and between the Court's December 3, 2008

PRELIMINARY REPORT AND RECOMMENDATIONS
OF PATRICK A. FRAIOLI JR. TEMPORARY RECEIVER

ERVIN COHEN & JESSUP LLP

1 Preliminary Injunction, the Court's January 7, 2009 Stay, the Court's April 27, 2009

2 Order Lifting the Stay and the mandate of the Receiver under his Order of

3 Appointment. The inquires have raised questions regarding exactly which Bratz

4 products can be sold by MGAE and what, if anything, at the present time should be

5 done with the Bratz Assets and Bratz-related products that are not considered part of

6 the spring and fall 2009 lines. The Receiver is also concerned that certain portions of

7 the Preliminary Injunction, now technically in effect, may not have been intended by

8 the Court to be currently applicable and thus may unintentionally impact the

9 Receiver's charge to manage, preserve and maximize the profits of both the MGA

10 entities and the Bratz Brand and Bratz Assets. Specific examples are set forth below.

11 The Court's Preliminary Injunction, among other things, enjoined the

12 manufacturing, distributing, marketing, shipping and selling of various Bratz-related

13 items, including but not limited to products incorporating the "core Bratz fashion doll

14 production sculpt", "the Bratz movie sculpt", certain listed dolls except for younger

15 versions of certain dolls, any doll embodying or incorporating any of the Jade, Chloe,

16 Yasmin and Sasha Bratz characters, and any doll, product or advertising substantially

17 similar to Mattel's copyright protected head and body sculpts, including, without

18 limitation, the Bratz fashion dolls set forth in paragraph 1(h) of the Preliminary

19 Injunction.

20 The Court's January 7, 2009 Order stayed the Injunction, thereby freeing

21 MGAE to continue to sell all Bratz-related products, and in particular allowed

22 "retailers and distributors…to purchase the spring and fall 2009 lines of Bratz and

23 Bratz-related products from MGA and MGA licensees, up to and including December

24 31, 2009."

25 The Court's April 27, 2009 lifting of the Stay vacated the January 7, 2009 Stay,

26 thereby re-imposing the Permanent Injunction, but specifically left undisturbed the

27 more limited Stay set forth in the Court's January 7, 2009 Stay Order relating "to the

28 purchase of Bratz products by retailers and distributors up to and including December

ERVIN COHEN & JESSUP LLP

IDOCS:13569.1:884241.6

1    31, 2009", as supplemented in the Court's April 27, 2009 Order.

2         Based on the Court's rulings, the Receiver is not sure whether MGAE is now

3    limited to only selling the spring and fall 2009 lines of Bratz and Bratz-related

4    products. Can MGAE sell or deliver non-spring and fall 2009 lines of Bratz and

5    Bratz-related products (i.e., prior year's products which are still in inventory or are

6    still on the shelves of retailers)? If these products cannot be sold, are they to be

7    delivered to Mattel's counsel for impoundment as required by Paragraph 3 of the

8    Injunction? The same holds true for not just dolls, but all the items set forth in

9    Paragraph 3 of the Preliminary Injunction. Based on available information, if these

10   products cannot be sold by MGAE, this will have an immediate material adverse

11   effect on both MGAE and its retailers.

12        Paragraph 9 of the Order Appointing Receiver further addresses this issue,

13   indicating that the January 7, 2009 Order is left undisturbed, but supplemented to

14   apparently allow Bratz products to be sold, so long as the Receiver has authorized the

15   sale, and the Receiver is paid for such products. The Receiver, therefore, believes

16   instructions are necessary, if he is confirmed as Permanent Receiver or the term of the

17   temporary receivership is extended, as to whether any Bratz-related products other

18   than the spring and fall 2009 lines of Bratz and Bratz-related products can be sold, or

19   whether only the spring and fall 2009 lines of Bratz products can be sold, and all other

20   Bratz-related products, packaging, signs, advertisements, etc. must be recalled and

21   turned over Mattel's counsel. The Receiver at present does not know the scope of

22   such a recall or the cost to MGAE; however the Receiver believes the cost in both

23   time and actual out-of-pocket costs will be significant. If an immediate turnover and

24   recall is required and the Receiver is to remain in place, the Receiver requests that he

25   be given 20 days to present a plan to the Court setting forth how the turnover and

26   recall can be implemented and the costs associated therewith.

27        Paragraph 6 of the Preliminary Injunction requires the defendants (MGAE and

28   Mr. Larian) to make written contact with each distributor, retailer, wholesaler,

IDOCS:13569.1:884241.6                              9

1   exporter, customer and licensee, and to provide them with a copy of the Preliminary

2   Injunction and the notice to be published as set forth in Paragraph 6.  The notice does

3   not take into account the modification of the Stay allowing sales of the spring and fall

4   2009 lines, nor the authority granted to the Receiver in Paragraph 9.  Further, mailing

5   of the notice and publication of the notice would be severely detrimental to the

6   Receiver's charge to maximize the assets of MGAE and the Bratz Assets.  It is unclear

7   to the Receiver, therefore, whether the Court intended Paragraph 6 of the Preliminary

8   Injunction to be enforced and implemented now, or whether it is to be held in

9   abeyance until after the sales permitted up to and including December 31, 2009 are

10  completed, or whether it needs to be modified.  The same holds true with Paragraph 7

11  of the Preliminary Injunction, requiring that the same notice be placed on MGAE's

12  website.

13          The Receiver is unclear whether compliance with Paragraph 4 of the Permanent

14  Injunction is intended to occur immediately, or whether it is intended to take effect

15  after the permitted sales of the spring and fall 2009 lines up to and including

16  December 31, 2009 are completed.  Paragraph 4 requires the defendants to procure the

17  return, withdrawal and recall of the Bratz products and to refund "all monies paid by

18  each entity or person," including associated shipping charges.  Such a requirement at

19  this time could have a serious negative financial impact on MGAE, although the

20  Receiver has not had sufficient time to quantify the impact if compliance with

21  Paragraph 4 must occur immediately.

22          The Receiver is similarly unclear as to whether Paragraph 5 of the Preliminary

23  Injunction must take effect immediately, especially given the Receiver's authority to

24  sell the spring and fall 2009 lines and the apparent authority of the Receiver to

25  authorize the sale of prior years' product lines.

26          The Receiver also is unclear as to the Court's intention in Paragraphs 10(b) and

27  10(e) of his Order of Appointment.  Paragraph 10(b) provides that the Receiver shall

28  maintain and not disperse any Receivership funds and/or "proceeds" earned from the

PRELIMINARY REPORT AND RECOMMENDATIONS
OF PATRICK A. FRAIOLI, JR., TEMPORARY RECEIVER

1 exploitation of Bratz-branded dolls, except to satisfy the reasonable and ordinary costs

2 and expenses incurred by the Receivership. It is unclear what the Court intended by

3 the use of the term "proceeds." The Receiver believes the Court meant "profits," and

4 not simply "revenue". The Receiver believes the Court used the term "Bratz-branded

5 dolls" to mean the same as the Bratz Assets as defined in the order of appointment,

6 but it is unclear. This issue may not be significant as the Receiver interpreted

7 Paragraph 10(b) as allowing the Receiver, in any event, to use the receipts from the

8 sales of Bratz-branded dolls to pay the ordinary costs and expenses incurred by the

9 Receivership, which would mean the costs and expenses of operating MGAE.

10 Paragraph 10(e), however, may conflict with Paragraph 10(b). Paragraph 10(e)

11 provides that all revenue relating to MGAE and Bratz is to be turned over to the

12 Receiver, but then provides "these revenues shall not be released pending further

13 order of the Court." The Receiver believes, but is not certain, that the Court intended

14 that the Receiver can use these revenues to pay the reasonable and ordinary costs and

15 expenses of operating MGAE, and that any excess funds are not to be released

16 pending further order of the Court. The Receiver needs confirmation that his belief

17 and understanding is correct.

18             b.    Effect of the Appointment of the Receiver on MGAE Litigation.

19        By appointing the Receiver, the officers and directors of MGAE were divested

20 of any powers to govern MGAE and manage its litigation, except as otherwise ordered

21 by the Court. This is a result of the powers and authority vested in the receiver by

22 general receivership law, as well as the Court's specific order. The appointment of a

23 receiver for a corporation vests the receiver with the sole power, absent some specific

24 order of the Court, to manage the corporation's litigation. First Federal Savings &

25 Loan Association, 531 F.Supp. 251, 255(D.) Haw. (1981) ["When a receiver is

26 appointed for a corporation, the corporation's management loses the power to run its

27 affairs and the receiver obtains all the corporation's powers and assets."] SEC v.

28 Spence & Green, 612 F.2d 896, 903 (5th Cir., 1980), cert. denied, 449 U.S. 1082

ERVIN COHEN & JESSUP LLP

IDOCS 13569.1:884241.6       11

1    (1981) ["As a general rule a receiver standing in the shoes of management holds the

2    sole right – absent some sort of shareholder derivative action – to direct the litigation

3    of the corporation whose care he is entrusted."]  For the same reason, the attorney-

4    client privilege on behalf of the corporation passed to the receiver upon his

5    appointment.  U.S. v. Plache, 913 F.2d 1375, 1381 (9th Cir. 1990) ["Because the

6    privilege was held by the corporation, any right to assert the attorney-client privilege

7    on behalf of the corporation passed when the receiver of ELMAS/ROBL and its

8    affiliates and subsidiaries, was appointed by the court."]

9        MGAE is involved in numerous pieces of litigation throughout the world.

10   While the Receiver now has the authority to direct MGAE's handling of that

11   litigation, the Receiver believes the Court should consider and provide the Receiver

12   with some guidance as to what the Court desires the Receiver's involvement to be in

13   this litigation.  Based on the above authority, as a general rule the Receiver is vested

14   with total authority to govern and direct MGAE's involvement in litigation, even the

15   litigation in which the receiver was appointed.  For example, in SEC v. Spence &

16   Green, the receiver settled with the SEC on behalf of the defendant Spence & Green

17   over which he was appointed receiver at the SEC's request.

18       This Court's order appointing the Receiver makes clear that MGAE, and

19   presumably its officers and directors since MGAE can only act through them, can

20   appeal the order granting the preliminary injunction and the order appointing the

21   Receiver and related orders, and that the Receiver is not to take a position in this

22   litigation, except insofar as the Court orders or invites him to do so.  See ¶4.r

23   ["notwithstanding the foregoing, the MGAE parties shall have all the requisite

24   authority to assert all rights in this ongoing litigation between Mattel and the MGAE

25   parties in this action and the Receiver shall not assert a position in such litigation,

26   except insofar as the Court orders or invites the Receiver to do so.]"

27       The Receiver intends to abide by the Court's order assuming he is made

28   Permanent Receiver or the term of the temporary receivership is extended.  The

ERVIN COHEN & JESSUP LLP

1   Receiver, however, requests instruction as to whether the Receiver should be involved

2   in attempting to resolve the existing dispute between the parties, as any resolution will

3   directly affect not only the Bratz Assets over which the Receiver has control, but also

4   his obligation to maximize the value of the MGAE assets.  The Receiver's

5   involvement can take various forms, including acting as an intermediary in an attempt

6   to broker a resolution, participating in the ongoing mediation or, if the Court directs,

7   simply staying out of the dispute.

8       7.    Based on the preliminary reports of  Kibel, Reinventures, Crowe and

9   ECJ, and the Receiver's investigations and observations to date, the Receiver makes

10  the recommendations set forth in Exhibit "F".  The portion of the recommendations

11  that the Receiver recommends be served on the parties and their counsel are separately

12  set forth in Exhibit "G".

13

14  DATED: May 12, 2009

15                                 Patrick A. Fraioli, Jr.,
                                   Temporary Receiver

16

17

18

19

20

21

22

23

24

25

26

27

28

ERVIN COHEN & JESSUP LLP

PRELIMINARY REPORT AND RECOMMENDATIONS
OF PATRICK A. FRAIOLI, JR., TEMPORARY RECEIVER

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California; I am over the age of 18 years and am not a party to the within action. My business address: 9401 Wilshire Blvd., 9th Floor, Beverly Hills, CA 90212-2974.

On **May 12, 2009**, I served the document(s) described as: **PRELIMINARY REPORT AND RECOMMENDATIONS OF PATRICK A. FRAIOLI, JR., TEMPORARY RECEIVER; EXHIBIT G; and ORDER DIRECTING IN CAMERA AND UNDER SEAL FILING BY CLERK AND ORDERING LIMITED SERVICE BY RECEIVER OF RECEIVER'S REPORT AND RECOMMENDATIONS**, on the interested parties in said action by enclosing the document(s) in a sealed envelope addressed as follows:

### SEE ATTACHED SERVICE LIST

☐ **BY MAIL:** I caused such envelope(s) with postage thereon, fully prepaid, to be placed in the United States mail. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.

☒ **BY FEDERAL EXPRESS/OVERNITE EXPRESS MAIL:** I caused said document(s) to be sent via Federal Express / Overnite Express Mail for next business day delivery.

☐ **BY FACSIMILE:** I caused said document(s) to be sent via facsimile.

☒ **BY EMAIL:** I caused said document(s) to be sent via email.

☐ **ELECTRONICALLY MAILED:** Said document(s) were electronically served on the person(s) as indicated on the attached Notice of Electronic Filing.

☐ **BY TELEPHONIC COMMUNICATION:** I telephoned the interested parties and gave notice as indicated in my declaration.

☐ **BY PERSONAL SERVICE:** I caused said document(s) to be delivered to the addressees listed on the attached Service List.

☐ **[State]** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒ **[Federal]** I declare that I am employed in the offices of a member of the State Bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **May 12, 2009**, at Los Angeles, California.

_____
TRISH MELENDEZ

IDOCS:13569.1:883209.1

| | |
|---|---|
| 1 | **SERVICE LIST** |
| 2 | Thomas J. Nolan, Esq. | Counsel for Defendants/Counter- |
| | Jason D. Russell, Esq. | Defendants/Appellants, MGA Entertainment, |
| 3 | Skadden Arps Slate Meagher & Flom LLP | Inc., MGA Entertainment (HK) Limited, and |
| | 300 S. Grand Avenue, Suite 3400 | Isaac Larian |
| 4 | Los Angeles, CA 90071-3144 | |
| | T: 213/687-5000 | |
| 5 | F: 213/687-5600 | **BY OVERNITE EXPRESS** |
| | E: tnolan@skadden.com; jrussell@skadden.com | |
| 6 | | |
| 7 | Mark E. Haddad, Esq. | Counsel for Defendants/Counter- |
| | Robert A. Holland, Esq. | Defendants/Appellants, MGA Entertainment, |
| 8 | Alycia A. Degen, Esq. | Inc., MGA Entertainment (HK) Limited, and |
| | Sidley Austin LLP | Isaac Larian |
| 9 | 555 West Fifth Street, Suite 4000 | |
| | Los Angeles, CA 90013-1010 | |
| 10 | T: 213/896-6000 | **BY OVERNITE EXPRESS** |
| | F: 213/896-6600 | |
| 11 | E: mhaddad@sidley.com; | |
| 12 | rholland@sidley.com; adegen@sidley.com | |
| 13 | | |
| | John B. Quinn, Esq. | Counsel for Defendant/Appellee, Mattel, Inc. |
| 14 | Michael T. Zeller, Esq. | |
| | Jon D. Corey, Esq. | |
| 15 | Brett Dylan Proctor, Esq. | **BY OVERNITE EXPRESS** |
| | Quinn Emanuel Urquhart Oliver & Hedges LLP | |
| 16 | 865 S. Figueroa Street, 10th Floor | |
| | Los Angeles, CA 90017-2543 | |
| 17 | T: 213/443-3000 | |
| 18 | F: 213/443-3100 | |
| | E: johnquinn@quinnemanuel.com; | |
| 19 | michaelzeller@quinnemanuel.com; | |
| | joncorey@quinnemanuel.com; | |
| 20 | dylanproctor@quinnemanuel.com | |
| 21 | | |
| | Sanford I. Weisburst, Esq. | Counsel for Defendant/Appellee, Mattel, Inc. |
| 22 | Quinn Emanuel Urquhart Oliver & Hedges LLP | |
| 23 | 51 Madison Avenue, 22nd Floor | |
| | New York, NY 10010 | **BY EMAIL AND FEDERAL EXPRESS** |
| 24 | T: 212/849-7170 | |
| | F: 212/849-7100 | |
| 25 | E: sandyweisburst@quinnemanuel.com | |
| 26 | | |
| 27 | | |
| 28 | | |

IDOCS:13569.1:883209.1

EXHIBIT _____ 19

PAGE _____ 388

Patricia L. Glaser, Esq.
Glaser Weil Fink Jacobs and Shapiro
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
T: 310/553-3000
F: 310/556-2920
E: pglaser@glaserweil.com

Counsel for Counter-Defendant, MGAE De Mexico SRL De Cv

*BY OVERNITE EXPRESS*

Russell J. Frackman, Esq.
Mitchell Silberberg & Knupp
11377 W. Olympic Blvd.
Los Angeles, CA 90064-1683
T: 310/312-3132
F: 310/312-3788
E: rjf@msk.com

Counsel for Counter-Defendant, MGAE De Mexico SRL De Cv

*BY OVERNITE EXPRESS*

Peter H. Bonis, Esq.
Peter H. Bonis Law Offices
1990 N. California Blvd., 8th Floor
Walnut Creek, CA 94596
T: 925/287-6428

Counsel for Plaintiff, Carter Bryant

*BY OVERNITE EXPRESS*

Alexander H. Cote, Esq.
Mark E. Overland, Esq.
David C. Scheper, Esq.
Overland Borenstein Scheper & Kim
601 West Fifth Street, 12th Floor
Los Angeles, CA 90071-2025
T: 213/613-4655
F: 213/613-4656
E: acote@obsklaw.com;
moverland@obsklaw.com;
dscheper@obsklaw.com

Counsel for Counter-Defendant, Carlos Gustavo Machado Gomez

*BY OVERNITE EXPRESS*

Leah Chava Gershon, Esq.
James W. Spertus Law Offices
12100 Wilshire Blvd., Suite 620
Los Angeles, CA 90025
T: 310/826-4700
E: leah@spertuslaw.com

Counsel for Counter-Defendant, Carlos Gustavo Machado Gomez

*BY OVERNITE EXPRESS*

IDOCS:13569.1:883209.1

EXHIBIT _____ 19
PAGE _____ 389

1

2   Linda M. Burrow, Esq.                          Counsel for Third Party Defendant, Anne Wang
    Caldwell Leslie and Proctor PC
3   1000 Wilshire Blvd., Suite 600
    Los Angeles, CA 90017
4   T: 213/629-9040                                *BY OVERNITE EXPRESS*
    F: 213/629-9022
5   E: burrow@caldwell-leslie.com

6
    Todd E. Gordinier, Esq.                        Counsel for Limited Intervenor, Omni 808
7   Bingham McCutchen                              Investors LLC
    600 Anton Blvd., 18th Floor
8   Costa Mesa, CA 92626
    T: 714/830-0600                                *BY OVERNITE EXPRESS*
9   F: 714/830-0700
10  E: todd.gordinier@bingham.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                    EXHIBIT        19

28                                    PAGE          390
    IDOCS:13569.1:883209.1

# EXHIBIT G

**EXHIBIT G**

EXHIBIT ____ 19

PAGE ____ 391

**Receiver's Recommendations:**

The Receiver has identified three different scenarios to accomplish the goals of the receivership, as follows:

**1.      Implement the Court Order Requiring Turnover of Bratz Assets, January, 2010.** It is contemplated that this option provides for an orderly transition of the Bratz Assets to Mattel; allows the Receiver to remain in place in some capacity, perhaps to continue with efforts to meet and negotiate a potential settlement with Mattel; and gives MGAE time to meet with its licensees and satisfy commitments for Fall 2009. However, on balance, the Receiver does not support this option because MGAE is experiencing a severe cash flow problem, and it appears unlikely under this option that MGAE will have sufficient cash to continue operations beyond approximately July, 2009. The Receiver believes this option will lead to a bankruptcy filing.

**2.      Immediate Turnover of Bratz Assets to Mattel.** Under this scenario, it is anticipated that the Receiver (or a Monitor) will remain in place to monitor and coordinate the immediate turnover of the Bratz Assets to Mattel, and his role will be reduced and limited to that function, thus limiting the duration, cost and intrusiveness. This scenario provides some immediate benefit to MGAE in that the costs of producing Bratz products for Fall 2009 have been eliminated; it allows MGAE to internally reorganize by downsizing its Hong Kong and European operations; it allows MGAE to concentrate on its remaining products, and attempt to obtain new financing; and it allows MGAE to deal with its business priorities out from under the potential cloud of the receivership. The Receiver recognizes the effect this option will have on retailers who have allocated shelf space for the Fall 2009 Bratz product lines and that litigation may result with Bratz licensees. In order to aid retailers, the Receiver suggests that there be no recall of Bratz products already delivered and that Mattel bear the "transaction costs" of the abrupt transfer, although the parties will no doubt disagree over the extent thereof. Mattel would be able to immediately take action as it sees fit to produce a Spring 2010 product line. A bankruptcy may be required to deal with the licensee issue and real property lessors.

**3.      Orderly Transition and Realignment of Incentives.** This scenario provides a combination of scenarios 1 and 2. Under this option, MGAE will continue manufacturing, marketing and selling the Bratz Assets through December 31, 2009. All revenues derived from these activities will remain with MGAE. Commencing January 1, 2010, Mattel will be able to manufacture, market, and sell Bratz assets. This option works to the benefit of both MGAE and Mattel. MGAE benefits because it will derive a profit from these activities (assuming MGAE can raise sufficient operating capital to actually produce, market and sell the Bratz dolls) and preserves the value of the Bratz brand, which can be exploited by Mattel for the Spring 2010 selling cycle and provides momentum to Mattel. In addition, under this scenario Mattel will be allowed to produce drawings and preliminary marketing plans so that it does not have to start fresh on January 1, 2010, and will be given immunity from suit for infringement in the interim if the jury verdict is ultimately reversed. In addition, the Receiver believes a stay of the Phase 2 litigation is required, based on the assumption that borrowing funds will be difficult with the specter of litigation and the concern that borrowed funds will be used to fund litigation and pay attorneys, instead of focusing all efforts and funds on product design and delivery.

In evaluating these options, the Receiver concludes that scenario 2 (Immediate Turnover of Bratz Assets to Mattel) is the most appropriate and recommends its adoption by the Court. On balance, it achieves the short term result of increasing anticipated cash by not expending funds for the production of the Fall 2009 product cycle, and allows MGAE to downsize portions of its Hong Kong and European operations, as it deems appropriate. In the long term, it provides MGAE with the opportunity to become a leaner and more efficient organization. It also allows MGAE to determine its own destiny by taking those steps it deems best. It is anticipated that under these circumstances, MGAE may· have a greater opportunity to seek and obtain new financing and removes the uncertainty occasioned by Phase 1 of the Mattel litigation. The Receiver recognizes that potential litigation may result from licensees; however, the Receiver concludes they may look to Mattel as the new producer of the Bratz Assets and notes that he has been advised by MGAE management that the license agreements generally are assignable. Mattel may also press on with Phase 2 or other litigation and this may impact MGAE after the receivership has been terminated. Thus, a stay of Phase 2 for approximately 90 days would allow the parties to focus on the transition and ensuring the success of the fall 2009 season. A bankruptcy filing by MGAE, if necessary, may resolve issues dealing with the downsizing of its operations. If this scenario is adopted, the Court should obtain assurances from Mattel that it will fulfill commitments MGAE has made for the Fall 2009 line pursuant to prior Court Orders.

Other Recommendations:

     1.     Mattel has advised the Receiver that it will not sell Bratz Assets that were not produced under its supervision. Accordingly, the Receiver recommends that, with timing dependent upon which scenario the Court approves, all Bratz Assets remaining as of a date certain consistent with the Court's Order following the hearing on May 18ᵗ 2009, be picked up by Mattel and destroyed at its expense.

     2.     The Court should order at least a temporary Stay of Phase 2 of the Mattel – MGAE litigation. MGAE is suffering under the strain of legal fees, largely from this litigation. Though defense costs should be reimbursed by MGAE's insurers, there is delay and uncertainty associated with reimbursement. A stay would allow the company time to reorganize itself, depending upon which scenario was implemented, and would allow it time to focus on obtaining funding for future operations. A stay may be beneficial to Mattel as well, since it will allow it to focus on the transition of the Bratz line rather than the litigation, at least for the short term. Finally, the Court might be able to assist Ambassador Prosper during this period in his ongoing attempts to negotiate a settlement between the parties. The Receiver would suggest a 90 day Stay for this purpose, and would ask that the Court, in consultation with Ambassador Prosper, determine whether Judge Larson should personally be involved in such negotiations.

EXHIBIT "G" RECEIVER'S RECOMMENDATIONS

EXHIBIT ...... \9

PAGE ........ 393

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.   CV 04-09049 SGL(RNBx)                              Date: May 12, 2009
Title:     MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
================================================================================

PRESENT: HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

        Cindy Sasse                         None Present
        Courtroom Deputy                    Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:     ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                          None Present

**PROCEEDINGS:   ORDER DIRECTING IN CAMERA AND UNDER SEAL FILING BY CLERK
                 AND ORDERING LIMITED SERVICE BY RECEIVER OF RECEIVER'S
                 REPORT AND RECOMMENDATIONS**

        The Court is in receipt of the Preliminary Report and Recommendations of Patrick A. Fraioli,
Jr., Temporary Receiver, filed on this day. The Court directs the Clerk to maintain the Report and
all its exhibits in camera, except as set forth below.

        The Receiver is ORDERED to immediately serve the Report and Exhibit G, but not Exhibits
A through F, on all counsel of record. The Clerk is directed to file a copy of the Report and Exhibit
G under seal.

        **IT IS SO ORDERED.**

MINUTES FORM 90                                    Initials of Deputy Clerk __cls_____
CIVIL -- GEN                              1

EXHIBIT ____19____

PAGE ____394____

# EXHIBIT 20

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 21

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 22

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 23

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 24

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 25

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 26

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 27

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.    CV 04-09049 SGL(RNBx)                          Date: January 7, 2009

Title:     MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
====================================================================

PRESENT:   HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

           Jim Holmes                        None Present
           Courtroom Deputy                  Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:      ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                           None Present

PROCEEDINGS:   ORDER MODIFYING STAY OF PERMANENT INJUNCTION

               ORDER APPOINTING FORENSIC AUDITOR

After an initial hearing on December 30, 2008, and a sealed hearing on January 5, 2009, and after consideration of the parties' papers relating to the MGA parties' motion for stay pending appeal (which specific relief the Court denied for the reasons stated on the record), and after consideration of the parties' papers relating to Mattel's ex parte application to appoint a receiver, the Court issues the following Order modifying the stay set forth in the Court's December 3, 2008, Order, and appointing a forensic auditor.

MODIFYING STAY OF PERMANENT INJUNCTION

Notwithstanding any previous Order of the Court, the December 3, 2008, Order Granting Mattel, Inc.'s Motion for Permanent Injunction (docket #4439), shall remain **STAYED**, ineffective and non-final, until further order of the Court. Specifically, retailers and distributors will be permitted to purchase the Spring and Fall 2009 lines of Bratz and Bratz-related products from MGA and MGA licensees, up to and including December 31, 2009.

In the event that the Court awards control over the rights to the Bratz products referenced in the Court's December 3, 2008, Order and the January 7, 2009 Stipulation and Order (regarding

MINUTES FORM 90                                    Initials of Deputy Clerk __jh_____
CIVIL -- GEN                          1

EXHIBIT ____27____

PAGE ____521____

the Spring and Fall 2009 lines) to a Court-appointed receiver or to Mattel, Inc., that award will be
subject to a requirement that retailers and distributors be permitted to purchase the Spring and
Fall 2009 lines up to and including December 31, 2009.

## APPOINTMENT OF FORENSIC AUDITOR

As discussed on the record, the Court **HOLDS IN ABEYANCE** Mattel's ex parte application
for appointment of a receiver pending a forensic audit of MGA Entertainment, Inc., Isaac Larian,
and MGA Entertainment Hong Kong.

For good cause shown, the Court hereby **APPOINTS** Ronald L. Durkin to serve as the
Court's forensic auditor (hereinafter referred to as "the Auditor"). Mr. Durkin's qualifications appear
in an attachment to this Order. The Court has provided the Auditor with the parties' attorneys'
contact information. The Auditor shall direct his initial communications to counsel.

Defendants MGA Entertainment, Inc., Isaac Larian, and MGA Entertainment Hong Kong,
shall provide the Auditor with access to any and all MGA records, regardless of the medium or
media of the maintenance of those records, **including but not limited to the
"Document/Information Request List" attached to this Order,** that the Auditor deems
necessary to enable him to provide the Court with a report, in camera, regarding MGA's finances
sufficient to enable the Court to determine whether or not appointment of a receiver is warranted.
The audit shall extend to any and all related entities as the Auditor deems necessary. Defendants
shall also make available for interview individuals identified to them by the Auditor. Defendants
shall make its computer systems, physical premises, and offices, available to the Auditor upon his
reasonable request during normal business hours. Defendants shall permit the Auditor's
reasonable use of its office machines, such as copiers and fax machines, as may be necessary to
complete the audit.

The Auditor shall have the authority to seek the services of fellow professionals (as well as
para-professionals and support staff) necessary to accomplish the Court-appointed audit. The
provisions of this Order extend to the Auditor's delegatees as he so directs. The Auditor and his
delegatees shall be compensated at their reasonable customary hourly rates.

The expense of the forensic audit shall be borne, in the first instance, by Mattel. After the
Court considers the Auditor's report[s], the Court will consider whether the audit expenses should
be shared with, or shifted completely to, defendants, based on the equities. The Auditor and his
team shall submit periodic billing statements to Mattel to an address specified by Mattel's counsel.

All parties (and individuals and entities under their control) shall cooperate with the Auditor
so that he may report to the Court in an expeditious manner.

**IT IS SO ORDERED.**

MINUTES FORM 90                                          Initials of Deputy Clerk __jh_____
CIVIL -- GEN                          2

EXHIBIT _____27_____

PAGE _____522_____

## FORENSIC AUDITOR
## DOCUMENT/INFORMATION REQUEST LIST
### January 7, 2009

1.    Audited financial statements for the last three years. If audited financial statements are not available, then the most current draft of financial statements for the last three years.

2.    Quarterly financial statements for the last three years.

3.    Detailed electronic monthly general ledgers and trial balances for the last three years. If electronic files are not available, then please produce in hard copies.

4.    Detailed electronic revenue or sales subsidiary ledgers for the last three years. If electronic files are not available, then please produce the request in hard copies.

5.    Detailed electronic receipts or cash subsidiary ledgers for the last three years. If electronic files are not available, then please produce in hard copies.

6.    Detailed electronic accounts payables and disbursements subsidiary ledgers for the last three years. Details should include, but should not be limited to, vendor/payee ID, vendor/payee name, check/payment number, payment date (Standard Mask, i.e. MM/DD/YY, MM/DD/YYYY; not Jan 1, 2005), payment amount, currency indicator (if other than US dollars), foreign exchange rate (if other than US dollars), invoice number, invoice date (Standard Mask, i.e. MM/DD/YY, MM/DD/YYYY; not Jan 1, 2005), invoice amount, comment or description, and any other information contained in the file. If electronic files are not available, then please produce in hard copies.

7.    Detailed electronic vendor master files of all active and inactive vendors for the last three years. Details should include, but should not be limited to, vendor ID, vendor name, status (active/inactive), vendor address (including City, State, Zip, Country), date created, created by user ID. If electronic files are not available, then please produce in hard copies.

8.    Detailed electronic payroll files for the last three years. Details should include, but not be limited to, employee ID, employee name, payment date, payment number, deductions (e.g. tax, contributions, etc.), gross payment amount, net payment amount, and any other information contained in the file. If electronic files are not available, then please produce in hard copies.

9.    Any and all records that substantiate transfers of assets to other entities, individuals, and/or parties, within the US and outside of the US.

10.   Copies of all bank statements, canceled checks, wire instructions, and all other information and notices sent with bank statements for the last three years.

MINUTES FORM 90                                      Initials of Deputy Clerk __jh_____
CIVIL -- GEN                           3

EXHIBIT _____27_____

PAGE _____523_____

i

11.    Federal and state tax returns for the last three years.

12.    A summary of all contributions, loans and any sources of funding during the last twelve months.  Copies of agreements and/or contracts supporting these transactions.

13.    A summary of all related party transactions detailing any compensation, loans, advances, payments, fees or any other form of consideration paid to Isaac Larian, family members, or affiliates, or any other related party.

14.    Detail of all loan facilities with an indication of creditor and relevant terms.

15.    Copies of any notices from federal or state tax authorities regarding audits or audit adjustments during the last 3 years.

16.    All detailed corporate credit card statements for the last three years.  If electronic files are not available, then please produce in hard copies.

17.    Information and documents regarding expense reimbursement of owners, officers, employees, family members, or affiliates.

18.    Detailed human resources files (electronic) of all employee information (for all current and terminated employees to date) including but not limited to employee name, employee number, address, phone number, start date, termination date, status, position, social security number, and any other information contained in the files.  If electronic files are not available, then please produce in hard copies.

19.    Electronic files of all emails including attachments to the emails from the network server and from backup tapes (please identify dates of backup tapes in order for selection of time period).

20.    Forensic images of personal computer hard drives and PDAs of selected individuals.

MINUTES FORM 90                                     Initials of Deputy Clerk __jh_____
CIVIL -- GEN                          4

EXHIBIT _____27_____

PAGE _____524_____





Ronald L. Durkin
CPA/CFF, CFE, CIRA

### Senior Managing Director

619 481 5201

rdurkin@durkinforensic.com

701 B Street Suite 1310
San Diego, CA 92101

Ronald L. Durkin is a CPA with over 30 years combined experience in public accounting and as a Special Agent with the FBI. He has testified in accounting, financial, and bankruptcy matters in U.S. District Court, U.S. Bankruptcy Court, U.S. Tax Court and in various State courts. During his tenure with the FBI, Ron was responsible for investigations involving white collar crime, political and public corruption, money laundering, organized crime, labor racketeering, racketeer-influenced and corrupt organization statute (RICO) violations, and narcotics matters. Since leaving the FBI, he has assisted clients in matters involving fraud prevention, detection, and internal investigations. He has worked on cases involving Foreign Corrupt Practices Act, employee embezzlement, management fraud, financial statement fraud, conflict-of-interest, check kiting, bankruptcy fraud, money laundering, and Ponzi schemes.

In 2008 Ron retired from KPMG. While at KPMG, Ron was the National Partner in Charge of the Fraud and Misconduct Investigations practice and served as the Western Region's forensic practice leader as well as the office coordinating partner for the Los Angeles office's forensic practice.

EXHIBIT _____ 27 _____

PAGE _____ 525 _____



**Service Lines**

Fraud & Misconduct Investigations
Fraud Risk Management
Forensic in the Audit/Shadow Procedures

**Education and Certifications**

Bachelor of Science, Accounting,
California State University, Sacramento

Masters of Business Administration
(Emphasis in Accounting), California
State University, Sacramento

Certified Public Accountant,
licensed in California, Arizona,
Nevada, and Washington

Certified in Financial Forensics

Certified Fraud Examiner

Certified Insolvency and
Restructuring Advisor

He is a frequent speaker at the FBI Academy and at the AIC-
PA National Fraud Conference, California and other State CPA
Societies, and he has made presentations to the IRS Criminal
Investigative Division and the U.S. Postal Inspectors CPA semi-
nars. He is a member of the AICPA National Accreditation Com-
mission and a former member of the Business Valuation and
Forensic Litigation Services Executive Committee. He is the
former chair of the AICPA Anti-Fraud Programs and Controls
Task Force and past chair of the AICPA Litigation and Dispute
Resolution Services Subcommittee. Ron is also the Chair of the
California Society of CPA's Litigation Services Steering Commit-
tee and the past Chair of the California Society of CPAs Fraud
Section.

Ron was a 2003 AICPA Volunteer of the Year. Ron was also hon-
ored with the Distinguished Achievement Award by the AICPA
in 2006 for his long time commitment to the AICPA. In 2007, Ron
was awarded the first-ever FLS Lifetime Achievement Award by
the AICPA.

EXHIBIT ___27___

PAGE ___526___

i



## Professional Associations

American Institute of Certified Public
Accountants (Immediate Past Chair of
Litigation & Dispute Resolution Services
Subcommittee) – member since 1995

California Society of Certified Public
Accountants (member of Steering Com-
mittee for statewide Litigation Services
Sections and Chair of Fraud Section)

Association of Certified Fraud Examiners
(Member of Faculty since 1995)

Association of Insolvency and
Restructuring Advisors

Society of Former Special Agents
of the FBI

Institute of Internal Auditors

## Investigative and
## Integrity Advisory Experience

On an International level, he has worked on a number of mat-
ters involving alleged Foreign Corrupt Practices Act (FCPA)
violations. Working on behalf of U.S. based companies, Ron in-
vestigated allegations that members of management of foreign
subsidiaries were involved in either bribing foreign officials, di-
verting corporate opportunities and funds, or conspiring with
others to defraud U.S. based victims.

Conducted an investigation of certain allegations of political
and public corruption surrounding an international sporting
event that was to be held in the US. The allegations involved
FCPA, bribery, and public corruption.

Conducted an investigation of an alleged kickback scheme on the
part of a purchasing manager of a global technology company.

Conducted an internal investigation with a multi-national corpo-
ration regarding corruption involving a former manager in the
accounts receivable department. The case was referred to the
United States Attorney's Office and the FBI for prosecution.

EXHIBIT _____ 27

PAGE _____ 527



Conducted an internal investigation, on behalf of a publicly traded company, regarding alleged diversion of funds with the accounts payable department. The case was referred to the United States Attorney's Office and the FBI for prosecution.

Investigated allegations of fraud in the real estate industry, including new construction projects, as well as management and operation of office buildings, apartment buildings and shopping centers.

Investigated allegations of corruption by certain members of a County Board of Supervisors who were indicted by a Federal Grand Jury.

Served as an undercover agent in a case involving 35 State Court Judges who were indicted and convicted of public corruption.

Conducted a number of investigations of cases involving Pyramid and Ponzi schemes. He also has testified in U.S. District Court, State Court, and Bankruptcy Court in several of these cases.

During career with the FBI and as a bankruptcy trustee, investigated allegations of fraud, corruption and organized crime within the solid waste industry.

EXHIBIT _____ 27

PAGE _____ 528

i



As the Chapter 11 Trustee of two failed insurance agencies,
he conducted investigations into allegations of fraud and mis-
management on the part of senior management.

As a Chapter 7 Trustee, Chapter 11 Trustee, and Examiner in
bankruptcy matters, has conducted hundreds of investigations
where allegations of fraud have been alleged.

Served as a "keeper" for the Department of Corporations,
investigated a State securities fraud matter.

Served as trustee of the parent of one of the largest financial
institutions in California where securities fraud and other ac-
tions were alleged against senior management.

EXHIBIT _____ 27 _____

PAGE _____ 529 _____

i



## Publications

One of the principal authors of the AICPA Practice Aid 07-1 – "Forensic Accounting – Fraud Investigations" (2007)

Chair of the AICPA Forensic Procedures Task Force responsible for the writing of the "Forensic Procedures and Specialists: Useful Tools and Techniques" – AICPA Special Report, 2006

Chair of the AICPA Antifraud Programs and Controls Task Force responsible for the writing of "Management Override of Internal Controls: The Achilles' Heel of Fraud Prevention" – AICPA Practice Aid, 2005

Principal author – AICPA Technical Consulting Practice Aid 97-1 "Fraud Investigations in Litigation and Dispute Resolution Services"

Co-author – California Society of CPA "The Witness Chair" – SAS 99 – Is It Enough To Help Close the Expectation Chasm? (2003)

Author – "A Systematic Approach to Fraud Investigation" – The CPA Expert, Spring 2000 (AICPA Newsletter for providers of Business Valuation and Litigation Services)

Co-author – "Defining the Practice of Forensic Accounting" The CPA Expert, 1999 Special Issue (AICPA Newsletter for providers of Business Valuation and Litigation Services)

Contributing and Reviewing author to Guide to Fraud Investigations published by Practitioners Publishing Company

Contributing author to Handbook of Litigation Services for John Wiley and Sons. The chapter written by Mr. Durkin is entitled "Criminal Cases and the Investigative Accountant."

Book review of Investigating White Collar Crime: Embezzlement and Financial Fraud for "CPA Management Consultant".

EXHIBIT ___27___

PAGE ___530___

i

# EXHIBIT 28

California Business Search                                               Page 1 of 1



**California Business Portal**
Secretary of State DEBRA BOWEN

**DISCLAIMER:** The information displayed here is current as of Jan 30, 2009 and is updated weekly. It is
not a complete or certified record of the Limited Partnership or Limited Liability Company.

| LP/LLC | | |
|---|---|---|
| IGWT 826 INVESTMENTS, LLC | | |
| Number: 200824110196 | Date Filed: 8/27/2008 | Status: active |
| Jurisdiction: CALIFORNIA | | |
| Address | | |
| 156 COPLEY PL | | |
| BEVERLY HILLS, CA 90210 | | |
| Agent for Service of Process | | |
| NATIONAL CORPORATE RESEARCH, LTD. (C2003899) | | |

Blank fields indicate the information is not contained in the computer file.

If the agent for service of process is a corporation, the address of the agent may be requested by ordering a
status report. Fees and instructions for ordering a status report are included on the Business Entities Records
Order Form.

EXHIBIT _____ 29 _____

PAGE _____ 531 _____

# EXHIBIT 29

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 30

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 31

1

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                   EASTERN DIVISION

 4                      - - -

 5       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 6                      - - -

 7   MATTEL, INC.,                    )
                                      )      COPY
 8                       Plaintiff,   )
                                      )
 9            vs.                     )   No. CV 04-09049
                                      )
10   MGA ENTERTAINMENT, INC., ET. AL.,)
                                      )
11                       Defendants.  )
     _____)   Motions
12   AND CONSOLIDATED ACTIONS,        )
     _____)

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                Riverside, California

17             Wednesday, February 11, 2009

18                   10:03 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
                Federal Official Court Reporter
24              3470 12th Street, Rm. 134
                Riverside, California  92501
25                   951-274-0844
                WWW.THERESALANZA.COM
```

dnesday, February 11, 2009      EXHIBIT ____31____      Mattel vs. MGA Entertainme:

PAGE ____552____

```
 1   APPEARANCES:

 2   ON BEHALF OF MATTEL, INC.:

 3                       QUINN EMANUEL
                         By:  JOHN QUINN
 4                            DYLAN PROCTOR
                              MICHAEL T. ZELLER
 5                       865 S. FIGUEROA STREET,
                         10TH FLOOR
 6                       LOS ANGELES, California  90017
                         213-624-7707
 7

 8   ON BEHALF OF MGA ENTERTAINMENT/ISAAC LARIAN:
     (Outgoing)
 9                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         BY:  THOMAS J. NOLAN
10                            JASON RUSSELL
                         300 SOUTH GRAND AVENUE
11                       LOS ANGELES, CALIFORNIA  90071-3144
                         213-687-5000
12

13   ON BEHALF OF MGA ENTERTAINMENT/ISAAC LARIAN:
     (Incoming)
14                       GLASER, WEIL, FINK, JACOBS & SHAPIRO, LLP
                         BY:  JOEL KLEVENS
15                       10250 Constellation Boulevard
                         Los Angeles, California  90067
16                       310-553-3000

17                       MITCHELL, SILBERBERG & KNUPP LLP
                         BY:  RUSSELL J. FRACKMAN
18                       11377 West Olympic Boulevard,
                         Los Angeles, California  90064-1683
19                       310-312-2000

20
     ON BEHALF OF DEFENDANT GUSTAVO MACHADO:
21
                         OVERLAND BORENSTEIN SCHEPER & KIM LLP
22                       BY:  ALEXANDER H. COTE
                         601 West Fifth Street,
23                       12th Floor
                         Los Angeles, California  90071
24                       213-613-4660

25   /  /  /
```

:dnesday, February 11, 2009   EXHIBIT _____ 31 _____   Mattel vs. MGA Entertainmen

PAGE _____ 553

```
 1                    I N D E X  (Continued)

 2

 3    APPEARANCES (continued):

 4
      On behalf of OMNI 808:
 5

 6                        BINGHAM McCUTCHEN LLP
                          BY:   Todd E. Gordinier
 7                        600 Anton Boulevard
                          Costa Mesa, CA  92626-1924
 8                        714-830-0622

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

:dnesday, February 11, 2009       EXHIBIT ____31____        Mattel vs. MGA Entertainmei

PAGE _____554_____

1                                I N D E X

2                                                          Page

3     Motions.......................................        4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Wednesday, February 11, 2009      EXHIBIT    31        Mattel vs. MGA Entertainmen

                                  PAGE        555

70

1   follow the logical reason, their full amount of damages, based

2   on the instructions that they were provided and the evidence

3   that they were given, comes out to a consistent verdict.

4            THE COURT:   I do understand your argument.   Thank

5   you, Counsel.

6            MR. ZELLER:   Your Honor --

7            THE COURT:   No.   I've allowed the moving party to

8   speak first and last, and let's stick to that.   You have well

9   briefed these things.

10           I next want to take up Omni 808's ex-parte                      01:34

11  application to intervene for limited purposes.

12           Mr. Gordinier.

13           MR. GORDINIER:   Thank you for offering me the

14  opportunity to address the Court.

15           We've set out in our papers, really, what we're              01:34

16  looking for here.   The transaction by which Omni 808 acquired

17  its interest and stepped into the shoes of Wachovia was

18  straightforward and it was at arm's length.   And I, frankly,

19  although naively, believed that if we would get stipulated to

20  be a party to the proceeding going forward, to the extent the         01:35

21  Court --

22           THE COURT:   Where do those funds come from?

23           MR. GORDINIER:   Mr. Kadisha, Your Honor, is a very

24  substantial individual.   Mr. Kadisha, Neil Kadisha, who is the

25  president and CEO of Omni 808, was one of the founders of             01:35

EXHIBIT ___3___          Mattel vs. MGA Entertainme:

PAGE ___555·|___

1    Qualcomm.  With everything that's gone on in the market in the

2    last six or seven months, I don't want to make any

3    representations, but Mr. Kadisha has from time to time appeared

4    on the Forbes 400 list.  I don't know what his net worth is.

5            What happened, Your Honor, is, Wachovia called the          01:35

6    note.  I don't know why.  I've been involved in these cases

7    where everybody feels like the world revolves around what's

8    happening in this courtroom.  As the Court knows, Wachovia had

9    other issues.

10           Wachovia and its syndicate wanted it off its balance         01:35

11   sheet, and MGA needed relief from the immediate need to pay

12   money they did not have.  And my client was approached and put

13   together people and bought the indebtedness and assumed the

14   debt at a discount, at a substantial discount; and he expects

15   to make money.                                                       01:36

16           THE COURT:  You're representing to the Court, though,

17   that this was not MGA's money; that this was -- from wherever

18   it came from, it came from someplace else.

19           MR. GORDINIER:  Your Honor, two things.  I've never

20   met Mr. Larian, and I know less about MGA than almost everybody      01:36

21   else.

22           THE COURT:  I'm not asking about what you know from

23   MGA but of what you know from your client.

24           MR. GORDINIER:  What I know from my client is, he put

25   in many millions of dollars.  He had a couple of investors with      01:36

:dnesday, February 11, 2009      EXHIBIT ____3l____      Mattel vs. MGA Entertainme:

PAGE ____555.2____

1   him to put in many millions of dollars.

2         THE COURT:   Those investors and that money did not

3   come from MGA?

4         MR. GORDINIER:   That's the best of my understanding,

5   Your Honor.   That's true.                                    01:36

6         And the best way to resolve that is what the Court

7   has already done.   The Court did exactly the right thing and

8   set up Mr. Durkin, who's very accomplished, to look at MGA's

9   books.   Step number one, he can tell the Court what their

10  balance sheet is, what their income statement is, and also the   01:37

11  sources and uses of cash.

12        And if there are any issues -- and, by the way, I'm

13  happy to talk to Mr. Durkin or have Mr. Durkin talk to my

14  client.   This is not intended to be -- this wasn't a fraudulent

15  transaction, Your Honor.   We negotiated -- we -- I didn't do   01:37

16  it -- Omni 808 negotiated with Davis Polk on behalf of Wachovia

17  and bought at a discount; and Omni 808 expects to and would

18  like to make money on its investment, and will not be able to

19  do so, obviously, if MGA goes out of business.   So our interest

20  here is in protecting Omni 808's investment.   And part of that   01:38

21  is wanting a say in how MGA's business on this receiver issue

22  is dealt with.

23        THE COURT:   The interest to intervene is focused, as

24  you indicate in your papers, on the receivership issue?

25        MR. GORDINIER:   That's correct, Your Honor.   That's   01:38

EXHIBIT _____ 31 _____   Mattel vs. MGA Entertainmer

PAGE _____ 555.3 _____

1    correct.

2              THE COURT:  Very well.

3         Does anyone wish to be heard in opposition to the

4    ex-parte application?

5              MR. ZELLER:  Yes, Your Honor.                           01:38

6         I don't know that we've been -- and maybe the Court

7    heard it differently, but I still do not hear anything that

8    certainly approaches evidence that this was, in fact, an arm's

9    length transaction.

10             THE COURT:  I have a representation from respected      01:38

11   counsel.

12             MR. ZELLER:  Well, he said -- Your Honor, the

13   Court -- all he said was to the best of his knowledge.  He

14   didn't say it didn't come from it.

15        Second, the Court asked MGA; it didn't ask from            01:39

16   Larian, Larian's brother-in-law, his wife -- there are other

17   family members involved in this, and their fingerprints are on

18   this.  So, certainly, I want to be very clear, Your Honor, we

19   have not gone so far as to say, this is a fraud, this is a

20   sham, or so on.  The fact is that there are substantial          01:39

21   questions here as to the bona fides of this transaction and

22   whether or not this has been papered in a way to basically

23   create debt and credit, where, in fact, it would simply be

24   treated by the tax code, by the bankruptcy code, by the courts,

25   for every other purpose, as, in fact, being nothing but a loan,  01:39

:dnesday, February 11, 2009        EXHIBIT ___31___        Mattel vs. MGA Entertainme

PAGE___5554___

1    Because, otherwise, the Court is creating, I mean, truly very,

2    very pragmatic problems.  And that's just even on the

3    settlement front.  There are others I can talk about, in terms

4    of the complication of the proceedings.

5            If we now have yet another party, and particularly          01:44

6    one who we do not really know who it is, floating around in

7    this case, asserting rights -- and whatever it is that Omni 808

8    claims to have, namely this credit interest, can be fully

9    protected by Local Rule 66 procedures.

10           In fact, if that's all they're really trying to do,         01:44

11   to intervene on that basis, that's coextensive with Local Rule

12   66.  So there is nothing to be gained, and huge amounts to be

13   potentially lost, by allowing them in.

14           **THE COURT:**  Thank you, Counsel.

15           Mr. Gordinier, do you wish to respond?                       01:44

16           **MR. GORDINIER:**  Yes.  The last point first.

17           The last thing I want to do is sit at a settlement

18   table with these gentlemen, no offense to either of them, who I

19   know well.  We are entitled as a matter of right to intervene,

20   to protect our interests.  These unprovoked and unwarranted         01:44

21   personal attacks are just inappropriate.

22           I said as far as I know because I wasn't involved in

23   the actual funding of the deal.  But it's my understanding that

24   many millions of dollars went to Wachovia, for which Wachovia

25   transferred its interest in the debt.  And that was an arm's        01:45

:dnesday, February 11, 2009          EXHIBIT ___31___          Mattel vs. MGA Entertainmei

PAGE ___555.5___

78

```
 1    length deal, and it was a straightforward negotiation, and

 2    Davis Polk represented Wachovia.  There is no reason for the

 3    kind of repeated personal --

 4              THE COURT:  And who represented --

 5              MR. GORDINIER:  My partner in San Francisco, Bingham.   01:45

 6              THE COURT:  Bingham.

 7              MR. GORDINIER:  It's a fine firm, Your Honor.

 8              Bingham represented Omni 808 in this transaction.

 9              THE COURT:  Your representation, then, is that based

10    on your information and belief, the proceeds for that were not    01:45

11    proceeds -- I said MGA, but MGA, Isaac Larian, any other MGA

12    entity.

13              MR. GORDINIER:  As far as I know, Your Honor, this

14    was structured by Mr. Kadisha and the monies went to Wachovia.

15              THE COURT:  I know that part.  The question is where    01:46

16    the monies came from.

17              MR. GORDINIER:  I know at least $50 million came from

18    Mr. Kadisha and his immediate -- that's -- it's serious money,

19    Your Honor.  This was an arm's length transaction.

20              The focus of the receiver motion should be, and I       01:46

21    know is, from the Court's perspective, on MGA.  And Mr. Durkin,

22    when he finishes his process, or in the middle of his

23    process -- I'd be happy to talk to him about how this

24    transaction was structured.

25              THE COURT:  Very good.                                   01:46
```

:dnesday, February 11, 2009          EXHIBIT____31____   Mattel vs. MGA Entertainme:

PAGE____5556____

```
 1            MR. GORDINIER:  We are not intending to hold up or
 2    obstruct.  We've moved with the drift of this case as it's gone
 3    for the ten days I've been involved in it.  We're not going to
 4    hold the case up.  But we do believe we're entitled to be heard
 5    on the receiver issue.                                          01:47
 6            THE COURT:  Very good.
 7            We're going to take a very brief five-minute break
 8    for the court reporter.  I'll come back and rule on these
 9    matters, and then we'll proceed with the hearing.
10            (Whereupon, a brief recess was held.)                   01:47
11            THE COURT:  We're back on the record.
12            Regarding the receivership and everything, there's
13    actually three matters that are related.  First of all, there
14    is the ex-parte application for receivership which was being
15    held in abeyance by the Court; I have the ex-parte application  02:07
16    by Omni 808 for intervention for this limited purpose; and then
17    I have a request for a briefing schedule on the appointment of
18    a receiver.
19            For the record, the Court wishes to disclose that
20    last evening, or yesterday afternoon, the Court held a meeting  02:07
21    with the forensic auditor, Mr. Durkin, and his staff, as well
22    as certain judicial officers of the court and certain other
23    nonjudicial individuals assisting the Court.  All have been
24    expressly ordered not to disclose the contents of the interim
25    report pending further order of this Court, and the Court did   02:08
```

ednesday, February 11, 2009    EXHIBIT ____31____    Mattel vs. MGA Entertainmen

PAGE ____555.7____

1   discovery, let's let Mr. Durkin handle this. And that's what
2   he's talking about.

3          There may be other issues, but a major component --
4   and I would not want Your Honor to paint with too broad a
5   brush -- it is MGA's position as to Phase 1 receiver-related        02:38
6   issues, that Your Honor appropriately, at our request, took out
7   of discovery the financial discovery issues.

8          **THE COURT:** Mr. Durkin is acting at the Court's
9   direction to inform the Court of information. I may or may not
10  release any of the information that Mr. Durkin provides; so no      02:38
11  one, neither side, should be relying upon the information that
12  Mr. Durkin is gathering for purposes of litigating this case.
13  That's an entirely separate matter. And I have not stayed any
14  discovery, and there should be no reliance on that.

15         If that was misunderstood, it's clarified now.               02:39

16         **MR. RUSSELL:** Just so I can make sure I'm clear, Your
17  Honor, because I really, since we were the ones at the hearing
18  when this was discussed, and we asked Your Honor for this
19  precise relief, which is to say the financial discovery, the
20  allegations against Omni and IGWT and the like, and I thought I     02:39
21  heard Your Honor to say that it made sense for Mr. Durkin to
22  get to the base of it. And if, then, there were any merit to
23  it, we could allow this discovery to go forward.

24         **THE COURT:** Wait a second.

25         You're adding something in there. I didn't say               02:39

EXHIBIT ___31___  Mattel vs. MGA Entertainmer

PAGE ___556___

1    anything about discovery not going forth.  I have not ruled on
2    any discovery issues.  I ruled on the ex-parte application for
3    the appointment of the receiver that before I ruled on that,
4    that I wanted to have Mr. Durkin's report.  That's exactly what
5    I'm doing.  I took an interim report last night.  I'll await          02:39
6    the final report.  But that's for the Court's purposes.

7         Depending on how the receivership issue plays out, it
8    may or may not be released to some or all of the attorneys.  It
9    may very well be that at the end of the day, after my final
10   meeting with Mr. Durkin, that it never reaches the light of          02:40
11   day.

12        MR. RUSSELL:  Just so we're clear, Your Honor, Mattel
13   attached the very discovery they are now promulgating to other
14   parties to their receiver application and asked for leave to
15   serve it.  Your Honor did not grant that leave.  And then what       02:40
16   happened was they said, Well, we can't go down this avenue,
17   we'll launch a series of subpoenas.

18        THE COURT:  Then the question becomes -- and this is
19   a question for the Discovery Master, not for this Court --
20   whether or not the discovery is related to Phase 2.  If it is,       02:40
21   it is.  I'm not going to pass any judgment whatsoever.  I'm
22   going to leave that completely up to the Discovery Master.

23        MR. RUSSELL:  That's all we're asking for.  Rather
24   than painting with a broad brush, saying all discovery is
25   permitted, there's some discovery that does fall within the          02:40

:dnesday, February 11, 2009   EXHIBIT _____ 31 _____ Mattel vs. MGA Entertainmen

PAGE _____ 557

1   scope of what Your Honor refused to give them.  Let's let the

2   discovery master rule on it.  It can always come back to you.

3           THE COURT:  Okay.

4           But I guess, Mr. Russell, I'm not sure of the

5   characterization that you're making.                              02:41

6           I handled the receivership application and request

7   made thereunder in the way that I'm handling the receivership

8   application; that should not be taken one way or the other as a

9   discovery ruling.

10          MR. RUSSELL:  I guess, Your Honor, the question is if  02:41

11  there was, as part of that application, and there's an

12  assumption built in that we'd like to have the Discovery Master

13  resolve, is it just receiver discovery or is it Phase 2?  That

14  seems like a question that Mr. O'Bryan should answer.  But I

15  assume, since you don't have any of the briefs and you don't     02:41

16  have the discovery and this has just been dropped on you,

17  assume for the sake of this discussion, that it is solely

18  related to the receiver; that it is, as we pause it, identical

19  to the discovery submitted.

20          THE COURT:  I guess where I would distinguish,          02:41

21  counsel, is this notion of receiver discovery, or that phrase,

22  that's not a phrase the Court has used.  Not that I can recall

23  using.  If I did, I certainly did not intend to.  I'm not

24  designating that as a separate and severable part of the

25  discovery.                                                       02:42

:dnesday, February 11, 2009   EXHIBIT _____ 31      Mattel vs. MGA Entertainmei

PAGE_____ 558

1        The question for the discovery master will be whether

2   or not the disputed discovery request is related or relevant to

3   the trial that has now been scheduled for March or not.  I can

4   see tremendous overlap between, for example, discovery on

5   financial condition of the company as it relates to damages in        02:42

6   the Phase 2 and also issues that the receiver is looking at.

7   And without making a ruling on any of this, I would not suggest

8   for a moment that these are mutually exclusive categories.

9        MR. RUSSELL:  They may not be, Your Honor.  That's

10  the reason why Mr. O'Bryan in the first instance should deal        02:42

11  with it.  Because if you take it the way we take it, this might

12  not be Phase 2 discovery.

13       THE COURT:  You can make that argument to

14  Mr. O'Bryan.

15       MR. RUSSELL:  Thank you, Your Honor.        02:43

16       MR. ZELLER:  And just so it's clear, what Mr. Russell

17  is articulating is a basis as to why MGA has refused to give us

18  any financial --

19       THE COURT:  Mr. Zeller, I'm going to cut you off

20  here.  Take that up with the Discovery Master.  I don't mean to        02:43

21  cut you off, but I think I made my position as clear as I can

22  today that there is nothing from this Court which is precluding

23  any discovery that is properly sought for the trial that is

24  scheduled.

25       Whatever has happened has happened and we need to        02:43

ednesday, February 11, 2009   EXHIBIT _____ 31      Mattel vs. MGA Entertainmer

PAGE _____ 559

```
 1 | move forward.
 2 |           MR. ZELLER:  Thank you, Your Honor.
 3 |           THE COURT:  Thank you, counsel.
 4 |           MR. FRACKMAN:  I'm last, and I think I'll be the
 5 | shortest.  On the issue of streamlining discovery, I've read      02:43
 6 | the Court's prior orders concerning the number of depositions,
 7 | for example, and I confess, I'm a bit confused.
 8 |           We would request from the Court that there be a
 9 | reasonable limit placed on Phase 2 depositions.  I don't know
10 | whether that comes to Your Honor or whether that goes to the      02:44
11 | discover referee.
12 |           THE COURT:  In the first instance, that would go to
13 | the discovery referee.  The limits that were placed were limits
14 | that were placed on the earlier discovery phase.
15 |           To be clear again, I have placed no limits, no          02:44
16 | restrictions, other than what is set forth in the rules of
17 | civil procedure and in local rule 37 on discovery from this
18 | point until March 23rd.
19 |           If the parties wish to stipulate, they may.  If the
20 | parties think that the Court needs to be involved in this in      02:44
21 | the first instance, that needs to go to the Discovery Master.
22 |           MR. FRACKMAN:  I think we're prepared to follow the
23 | federal rules, Your Honor.  Thank you.
24 |           THE COURT:  Very good.
25 |           MR. ZELLER:  I feel like I'm being more difficult at    02:44
```

dnesday, February 11, 2009   EXHIBIT ____ 31 ____   Mattel vs. MGA Entertainmer

PAGE ____ 560 ____

1    we'll go from there.

2              **MR. ZELLER:**  Thank you.

3              **THE COURT:**  Anything further?

4              Thank you.  Good day.

5

6

7

8

9

10                        CERTIFICATE

11

12   I hereby certify that pursuant to section 753, title 28, United
     States Code, the foregoing is a true and correct transcript of
13   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
14   conformance with the regulations of the Judicial Conference of
     the United States.

15

16   _____        _2-13-09_
     THERESA A. LANZA, CSR, RPR                   Date
17   Federal Official Court Reporter

18

19

20

21

22

23

24

25

dnesday, February 11, 2009   EXHIBIT____31____  Mattel vs. MGA Entertainme

                             PAGE____561____

# EXHIBIT 32

1

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                     EASTERN DIVISION

 4                        - - -

 5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 6                        - - -

 7   MATTEL, INC.,                )
                                  )
 8                 Plaintiff,     )
                                  )
 9        vs.                     )   No. CV 04-09049
                                  )
10   MGA ENTERTAINMENT, INC., ET. Al.,  )
                                  )
11                 Defendants.    )   MOTIONS
                                  )
12   AND CONSOLIDATED ACTIONS,    )
                                  )
13   _____)

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 RIVERSIDE, CALIFORNIA

17                MONDAY, MAY 18, 2009

18                     1:52 P.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
                Federal Official Court Reporter
24                 3470 12th Street, Rm. 134
                Riverside, California  92501
25                     951-274-0844
                    www.theresalanza.com
```

Monday, May 18, 2009      EXHIBIT ____ 32      Mattel vs. MGA, et. Al.

PAGE ____ 562

2

```
 1   APPEARANCES:

 2
     On behalf of Mattel, Inc.:
 3
                         QUINN EMANUEL
 4                       By:   JOHN QUINN
                               MICHAEL T. ZELLER
 5                             DYLAN PROCTOR
                               SCOTT B. KIDMAN
 6                       865 S. FIGUEROA STREET,
                         10th Floor
 7                       Los Angeles, California   90017
                         213-624-7707
 8
                         KLEE, TUCHIN, BOGDANOFF & STERN LLP
 9                       BY:   DAVID M. STERN
                         1999 Avenue of the Stars
10                       Thirty-Ninth Floor
                         Los Angeles, CA   90067
11                       310-407-4025

12

13   On Behalf of MGA Entertainment/Isaac Larian:

14                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         BY:   THOMAS J. NOLAN
15                             JASON RUSSELL
                               CARL ROTH
16                       300 South Grand Avenue
                         Los Angeles, California   90071-3144
17                       213-687-5000

18                       GLASER, WEIL, FINK, JACOBS
                         HOWARD & SHAPIRO, LLP
19                       BY:   PATRICIA GLASER
                         BY:   JOEL N. KLEVENS
20                       10250 Constellation Blvd.
                         Los Angeles, CA   90067
21                       310-553-3000

22 .                     MITCHELL SILBERBERG & KNUPP LLP
                         BY:   RUSSELL J. FRACKMAN
23                       11377 West Olympic Blvd.
                         Los Angeles, CA   90064-1683
24                       310-312-2000

25   /  /  /
     /  /  /
```

Monday, May 18, 2009   **EXHIBIT** ___32___   Mattel vs. MGA, et. Al.

**PAGE** _____563_____

3

```
 1    APPEARANCES (cont'd):

 2
      On Behalf of MGA Entertainment/Isaac Larian:
 3
                         PACHULSKI STANG ZIEHL & JONES
 4                       BY:   JAMES I. STANG
                         BY:   RICHARD PACHULSKI
 5                       10100 Santa Monica Blvd.,
                         11th Floor
 6                       Los Angeles, CA   90067-4100
                         310-277-6910
 7

 8    On Behalf of Isaac Larian:

 9                       JEFFER MANGELS BUTLER & MARMARO LLP
                         BY:   JOSEPH A. EISENBERG
10                       1900 Avenue of the Stars
                         7th Floor
11                       Los Angeles, CA   90067-4308
                         310-203-8080
12

13    On Behalf of Defendants Omni 808:

14                       BINGHAM McCUTCHEN LLP
                         BY:   TODD E. GORDINIER
15                       BY:   PETER N. VILLAR
                         600 Anton Boulevard,
16                       18th Floor
                         Costa Mesa, CA   92626-1924
17                       714-830-0622

18
      On Behalf of Crum & Forster:
19
                         MUSICK, PEELER & GARRETT LLP
20                       BY:   JENNIFER M. KOKES
                         One Wilshire Boulevard
21                       Los Angeles, CA   90017
                         213-629-7618
22

23    ALSO PRESENT:      Patrick A. Fraioli, Jr.,
                         Ambassador Pierre Prosper
24                       Robert O'Bryan
                         Michael J. Bidart
25
```

Monday, May 18, 2009   EXHIBIT _____32_____ Mattel vs. MGA, et. Al.

PAGE _____564_____

4

| | |
|---|---|
| 1 | I N D E X |
| 2 | PAGE |
| 3 | MOTIONS.................................   5 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Monday, May 18, 2009   **EXHIBIT** ____32____ Mattel vs. MGA, et. Al.

**PAGE** ____565____

1          **MR. GORDINIER:**  Todd Gordinier for the Omni 808
2    parties.
3          Let me say, for my party's position, as you know,
4    from our submission, what you have just articulated is fine
5    with us.  That is something we are fine with.                    02:47
6          What I want to do today -- and you didn't address it,
7    and I hope I didn't cut you off -- but what I want to do today
8    is address the transactions that my client has been involved in
9    and make the record clear.
10         **THE COURT:**  You didn't cut me off, but let me cut you   02:47
11   off right now.
12         **MR. GORDINIER:**  Okay.
13         **THE COURT:**  Because I think this might be premature,
14   because, quite frankly, those transactions and the allegations
15   associated with them are the subject matter of the proposed      02:47
16   third amended answer and counterclaim.  And I'm not really sure
17   exactly where I'm going to go on that at this point.
18         They are also the subject matter of a supplemental
19   report that has just been received by the Court from the
20   forensic auditor, as of yesterday.  And, quite frankly, they're  02:47
21   not dispositive one way or the other of the issue of the
22   monitor or the receiver or where we're going on this; so I
23   don't know if this is something which needs to be addressed.
24         **MR. GORDINIER:**  I'm happy not to address it,
25   Your Honor.  I'm here today because you said one of the things   02:48

Monday, May 18, 2009   **EXHIBIT** _____ 32 _____ Mattel vs. MGA, et. Al.

                       **PAGE** _____ 566 _____

43

1   you wanted to address today is whether, as I represented to
2   you, this was a straightforward transaction or whether, as
3   Mattel has alleged, it was something else.

4          If the Court is still pondering that and wants to
5   come back at a different time and hear argument about that, I'm       02:48
6   fine with that.  But I don't want this issue festering anymore,
7   and --

8          **THE COURT:**  Well, let me say a few things to,
9   perhaps, address that festering aspect of it.

10         I've read the parties' extensive pleadings on this            02:48
11  particular issue.  I would hope that everybody concerned
12  understands what the Court is saying or is not saying.

13         The Court has never suggested, as I think maybe some
14  people have taken, that there is any criminal act with respect
15  to the transaction.  First of all, it's not a criminal case,       02:49
16  and the Court has not concluded in any sense that anything
17  criminally has taken place.  In fact, each and every one of the
18  individual transactions which make up what has come to be
19  referred to as the "Omni 808 transaction" may in itself be
20  completely legal.                                                    02:49

21         Whether or not a series of legal transactions can
22  have the effect of undermining or frustrating, or defeating
23  even, a court order, is an entirely separate matter from
24  whether or not any of those transactions are unlawful, or even
25  unethical.                                                           02:49

Monday, May 18, 2009  **EXHIBIT**_____32_____ Mattel vs. MGA, et. Al.

PAGE_____567_____

44

1          So it's important to keep in mind that, even though

2     the language used with respect to these allegations might be

3     quite broad, from the Court's perspective anyway, the concern

4     has been and remains only whether or not any of these financial

5     transactions are in any way obstructing or affecting the          02:50

6     Court's orders.  That's my only concern.

7          My only concern here, with respect to Mr. Larian,

8     with respect to Omni 808, with respect to any of these

9     entities, is whether or not what the Court has found and what

10    the Court has ordered can be effectively implemented.  If        02:50

11    something is frustrating that, the Court is of concern.  If

12    it's not frustrating that, that is for other entities and other

13    authorities to be concerned with.

14          Do you understand what I'm saying?

15          MR. GORDINIER:  I do understand what you're saying,        02:50

16    Your Honor.  But Mattel has called it unlawful, and the Court

17    has expressed a concern about whether something that Omni 808

18    was involved in was intended to or have the effect of

19    frustrating any of the Court's orders.  And I want to assure

20    the Court today that it did not.                                  02:50

21          And I'm prepared here to describe to the Court, in

22    however much detail the Court wants to hear, about how that

23    transaction was prepared, executed, and is operating today, to

24    satisfy yourself.

25          The short answer, Your Honor, is, it doesn't                02:51

Monday, May 18, 2009   **EXHIBIT** _____32_____ Mattel vs. MGA, et. Al.

**PAGE** _____568_____

1  implicate the IP at all.  And I don't think that's something

2  that's been made clear.

3          What happened was that Omni stepped into the shoes of

4  Wachovia.  It got nothing more and nothing less.  And that did

5  not include the IP; that did not include the intellectual          02:51

6  property.

7          THE COURT:  I think the concern is not so much -- I

8  don't think anybody disputes what you just said, other than --

9          MR. GORDINIER:  Actually, Mattel does.

10          THE COURT:  Well, the question, I think, that Mattel     02:51

11  raises is, first of all, who is Omni 808?

12          MR. GORDINIER:  They do raise that.

13          THE COURT:  Right.

14          And the second question is not so much that

15  directly -- that the IP, including part of their intellectual    02:51

16  property, is part and parcel of the security that has been

17  encumbered by that transaction.

18          MR. GORDINIER:  That's what I'm just telling you,

19  Your Honor.  It is not.  The security did not include the

20  intellectual property.                                           02:52

21          THE COURT:  Okay.  Well --

22          MR. GORDINIER:  I mean, that's -- so there was

23  nothing involved in that transaction that either was intended

24  to or had the effect of either trying to evade or alter or

25  obstruct any of the Court's orders.                              02:52

Monday, May 18, 2009  EXHIBIT _____ 32  Mattel vs. MGA, et. Al.

PAGE _____ 569

1           **MR. ZELLER:**  It offered to make a limited subset of
2    the materials available, number one, for us to look at the
3    dolls; we could not photograph them.  And, number two, we
4    couldn't even have copies of the documents; we could look at
5    them.  And also it was even then it was a subset of what we had    03:40
6    asked for.  So it wasn't even all of the dolls.  It was, you
7    know, whatever they picked as among the Moxie dolls.  So we
8    don't have that information.  And it has not been ordered.
9    They made these limited offers, but we don't have it.

10          And we, of course, pointed out in our papers, we need    03:40
11   copies of the documents; we need the order information; we
12   should be able to photograph the dolls so we can obviously
13   analyze them and show them to the Court.  I mean, these kinds
14   of restrictions on the information and even being able to
15   document it, there's really no basis for it.                      03:40

16          But what I would suggest, Your Honor, is that we deal
17   with that issue, we get the information, we can analyze it, we
18   come to the Court; and maybe in the context of seeking some new
19   injunction, motion, it may be in the context of enforcing the
20   prior one.  I can't prejudge exactly the procedural flavor this    03:41
21   would come in until we see what the information is.

22          But rest assured, Your Honor, if we get this
23   information, we can make a determination relatively quickly,
24   and think we would, to determine what it is that should happen
25   with this.                                                         03:41

Monday, May 18, 2009   **EXHIBIT** _____32_____  Mattel vs. MGA, et. Al.

                        **PAGE** _____570_____

```
1          But even apart from the infringement aspect, this is
2   a company that has clearly shifted over to Moxiez.
3   Particularly the idea that somehow they should take the Bratz
4   revenues, such as they are, which the Court, of course, has
5   seen that they have plummeted, just even over the course of      03:41
6   last year versus now, that they should be able to take that
7   money and put it into Moxiez or something else.
8          THE COURT:  That would be the role of the monitor to
9   make sure that any revenues coming in on the Bratz 2009 line is
10  used to first and foremost take care of the expenses for        03:42
11  putting out the 2009 line, and then any profits would be held
12  in the constructive trust pending the turnover.
13         I don't disagree for a moment that ideally, again, an
14  immediate transition would be the best way to deal with the
15  situation.  And believe me, the Court has tried to explore the   03:42
16  idea of having some separate receivership set up to kind of
17  take it as a midwife, basically, between MGA and Mattel; that
18  does not seem to be practical either, in part, for many of the
19  same reasons almost in reverse as Mattel is concerned with.
20         So the default position, as I see it, is to leave it      03:42
21  with MGA, with an appropriate monitor, who, if your worse fears
22  are being realized, would be in a position to come back to the
23  Court and change the situation.
24         Right now, I'm being told by the receiver that at
25  least through July, perhaps through September, we have a         03:43
```

Monday, May 18, 2009  EXHIBIT ___32___ Mattel vs. MGA, et. Al.

PAGE ___571___

1  solvent institution, potentially solvent institution. Again, I

2  don't know; that is depending on a number of different

3  variables.

4        A lot of it has to do with this litigation. Probably

5  one of the biggest costs that MGA is facing is this continued      03:43

6  litigation. And I'm going to take up the issue of resolution

7  shortly. So I understand there's a lot of variables at play

8  here. The Court wants to adopt the least restrictive or least

9  burdensome path, which at the same time affords protection for

10 Mattel's intellectual property and maintains respect for MGA's     03:44

11 position as a company and their intellectual property.

12        As it stand right now, the Court has no basis to make

13 any decision with respect to Moxie.

14        MR. ZELLER: That's certainly true, Your Honor.

15        THE COURT: And I can see, either way, that being a        03:44

16 very important issue. An important issue to MGA's solvency,

17 for them to have a successful doll line that essentially

18 replaces Bratz, or, on the other hand, if it is infringing, as

19 you're alleging, obviously that's a critical issue to Mattel.

20 I just don't know right now. That's certainly one of the        03:44

21 variables involved. The continued litigation of Phase Two is

22 another variable. And then, of course, there are other

23 variables that I won't get into.

24        MR. ZELLER: And there are a few things I'd like to

25 circle back on. But if I could just mention something that we    03:44

Monday, May 18, 2009 EXHIBIT ___3 2___ Mattel vs. MGA, et. Al.

PAGE ___572___

1    do think is important for the preservation of the Bratz line,

2    which is the bankruptcy restrictions.

3          Clearly, as the Court has said, and apparently MGA

4    has agreed, any bankruptcy would have to be filed here in the

5    central district.                                              03:45

6          We also want it made very clear that the bankruptcy

7    estate should not include Mattel's rights to Bratz.

8          **THE COURT:**  Well, now we're getting way ahead of

9    ourselves.

10         That's an appropriate issue.  I've received            03:45

11   assurances from MGA today that that's not what they are seeking

12   at this point.  We will cross that bridge if and when we get to

13   it in terms of what is or what is not in the bankruptcy estate.

14         **MR. ZELLER:**  What I would ask, though, is that the

15   Court require at least a threshold showing as to these kinds of  03:45

16   bankruptcy issues.

17         MGA has already agreed that the reference should be

18   listed as to Mattel matters; so there's no question; they have

19   already conceded that.

20         This Court, having already invested years in this       03:45

21   case and, of course, three months of trial, should not allow

22   MGA to spend time and money and effort -- they claim they

23   critically need their money -- fighting about what should be in

24   the bankruptcy.

25         This doesn't strike us as efficient at all.  The        03:46

Monday, May 18, 2009    EXHIBIT    32    Mattel vs. MGA, et. Al.

PAGE    513

1     **MS. GLASER:** And we haven't had the benefit of that.

2  I think if we're paying -- at least temporarily, we at least

3  ought to see --

4     **THE COURT:** Part of what will occur at this point is

5  a complete accounting of all money spent during the 20-day     05:05

6  temporary receivership. You will be receiving that shortly

7  from Mr. Fraioli, which will account for all of the money

8  spent. And on a going-forward basis, the Court will specify

9  how future payments are to be made.

10     And as I indicated before, at the end of the day,     05:05

11  everyone will have the opportunity to revisit the issue of cost

12  sharing.

13     **MS. GLASER:** Thank you very much.

14     **THE COURT:** Is there anything further?

15     **MR. QUINN:** No, Your Honor.     05:06

16     **THE COURT:** Have a good evening.

17     (Court is adjourned.)

18                    CERTIFICATE

19

20  I hereby certify that pursuant to section 753, title 28, United
    States Code, the foregoing is a true and correct transcript of
21  the stenographically recorded proceedings held in the above-
    entitled matter and that the transcript page format is in
22  conformance with the regulations of the Judicial Conference of
    the United States.

23

24  _____        _May 29, 2009_
    THERESA A. LANZA, CSR, RPR                    Date
25  Federal Official Court Reporter


Monday, May 18, 2009                    Mattel vs. MGA, et. Al.

EXHIBIT  32

PAGE  514

# EXHIBIT 33

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 34

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an individual,

    Plaintiff,

    vs.

MATTEL, INC., a Delaware
corporation,

    Defendants.

No. CV 04-9049 SGL (RNBx)
Consolidated with
Nos. CV 04-9405 and
05-2727

**CERTIFIED
COPY**

_____

AND CONSOLIDATED ACTIONS.

_____

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Wednesday, March 4, 2009

Volume 1

Reported by:
CHERYL R. KAMALSKI
CSR No. 7113

Job No. 106479

EXHIBIT ___34___

PAGE ___636___



877.955.3855
www.sarnoffcourtreporters.com

IRVINE • LOS ANGELES • SAN FRANCISCO • LAS VEGAS • SAN DIEGO

**SARNOFF**
*Court Reporters and
Legal Technologies*

```
 1              UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA
 2                  EASTERN DIVISION

 3

 4   CARTER BRYANT, an individual,

 5        vs.                    No. CV 04-9049 SGL (RNBx)
                                 Consolidated with
 6   MATTEL, INC., a Delaware    Nos. CV 04-9405 and
     corporation,               05-2727
 7
            Defendants.
 8

 9

10

11   _____

12   AND CONSOLIDATED ACTIONS.
     _____
13

14

15

16        REPORTER'S TRANSCRIPT OF PROCEEDINGS, Volume 1,

17   taken at 555 West Fifth Street, 48th Floor, Los Angeles,

18   California, beginning at 10:08 a.m. and ending at

19   12:12 p.m. on Wednesday, March 4, 2009, before

20   CHERYL R. KAMALSKI, Certified Shorthand Reporter No. 7113.

21

22

23

24                          EXHIBIT ___34___

25                          PAGE ___637___
```

2

```
 1    APPEARANCES:
 2
 3    Discovery Master:
 4         ROBERT C. O'BRIEN
           Attorney at Law
 5         555 West Fifth Street, Suite 4800
           Los Angeles, California  90013-1065
 6         (213) 629-7400
 7    For Defendant Mattel, Inc.:
 8         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
           BY:  MICHAEL T. ZELLER
 9         BY:  JON COREY
           Attorneys at Law
10         865 South Figueroa Street, 10th Floor
           Los Angeles, California 90017
11         (213) 624-7707
12         MATTEL, INC.
           BY:  JILL E. THOMAS
13         Assistant General Counsel
           333 Continental Boulevard
14         El Segundo, California 90245-5012
           (310) 252-2000
15
16    For Defendants MGA and Isaac Larian:
17         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
           BY:  JASON D. RUSSELL
18         BY:  JENNIFER K. DEL CASTILLO
           Attorneys at Law
19         300 South Grand Avenue
           Los Angeles, California 90071
20         (213) 687-5000
21    For Defendant IGWT Group and IGWT 826 Investments:
22         VALLE & ASSOCIATES
           BY:  JEFFREY B. VALLE
23         BY:  ILAN WISNIA
           Attorneys at Law
24         11911 San Vicente Boulevard, Suite 324
           Los Angeles, California 90049
25         (310) 476-0300
```

EXHIBIT __34__

PAGE __638__

```
1    APPEARANCES (Continued):

2

3    For 808 Investors, LLC, Vision Capital, LLC, and OmniNet
     Capital, LLC:
4

5         BINGHAM McCUTCHEN LLP
          BY:   TODD E. GORDINIER
          BY:   PETER VILLAR
6         Attorneys at Law
          600 Anton Boulevard, 18th Floor
7         Costa Mesa, California 92626-1924
          (714) 830-0622
8

     Also Present:
9

          STEPHEN HAUSS
10        CRAIG HOLDEN

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 34
PAGE 639

4

1   compel is improper and should be denied for both serious

2   substantive and procedural reasons.  If we're going to

3   have these rules, they have a purpose, they have to be

4   followed.  And the Court's very order, the Court's

5   standing order says if this isn't done, it won't be

6   considered.  They now are walking away from these other

7   orders and they want to rely on the discovery stipulation

8   and order which, of course, I had no knowledge of when we

9   were having this discussion.  As you're well aware of,

10  they didn't even comply with that.  Perhaps if they had,

11  and set out, as they're required to do in writing, what it

12  is they want, why they want it, let's talk about it, let's

13  sit down and discuss it, we could, perhaps, have narrowed

14  it.  In fact, both I and my colleague told Mr. Corey we

15  were pretty sure we could satisfy himself with respect to

16  the bona fides of the transaction.  That was rejected.

17            MR. O'BRIEN:  Let me ask you this question.

18  You've said the discovery's overbroad.  What narrow

19  request could Mattel make that you believe would be proper

20  under the circumstances here?  In other words, what kind

21  of request do you think would be, as a third party?  I

22  mean, I understand you don't want to respond to anything,

23  it's a burden.  But assuming there's always a burden in

24  responding to discovery, what narrow request, based on

25  your understanding of the issues in phase 2, would be

EXHIBIT __34__

PAGE __640__                    50

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1  proper for your -- that you wouldn't come in here and file

2  a motion to quash?

3        MR. GORDINIER:  What documents do we have that

4  show that either Mr. Larian or MGA paid money into this to

5  purchase this debt?  I can tell you there are none.  This

6  is a ready, fire, aim situation.  The allegations that

7  were made and were made publicly are unconscionable and

8  can't be undone.

9        MR. O'BRIEN:  What other areas?  For example,

10  would the payment history with respect to the debt from

11  MGA to 808, assuming there is one, I don't know if this is

12  a balloon payment or that sort of thing --

13        MR. GORDINIER:  I assume that's in MGA's

14  financial statements, but -- I mean, I assume that they've

15  made payments.  I don't know the answer to that, that's

16  reflected on their financial statements, which I'm

17  assuming have been exchanged, but I don't know that.

18        MR. O'BRIEN:  Mr. Russell said that there was

19  discovery that was taken of Wachovia in phase 1.  I was

20  not involved in the case.  I don't know what discovery was

21  taken of Wachovia.  But, presumably -- but it sounds like,

22  and I'll let Mr. Zeller answer this and Mr. Russell

23  address it as well, but if there was discovery in phase 1

24  that was proper as to Wachovia in establishing the debt

25  and looking at the payment terms, and all that sort of

EXHIBIT ___34___

PAGE ___641___

**TRANSCRIPT OF PROCEEDINGS**                    03/04/09

1   thing, would that same sort of discovery be proper

2   vis-a-vis 808 --

3           MR. GORDINIER:  We absolutely offered -- we

4   offered, without knowing any of this, to give them the

5   deal documents.  Absolutely.  I don't know that it's

6   proper.  I think it's overbroad and I think it's

7   premature, but I'll just tell you, we offered to give them

8   the deal documents.  There's no secret there.  We did buy

9   the debt at a discount.  You've read the transcript.  I

10  told Judge Larson my client wants to make money at this,

11  and so he made a business decision that -- you know,

12  Wachovia has its own reasons for doing what it's doing

13  that we all can kind of guess -- but I don't know.  My

14  client had his own reasons for doing what he's doing.  The

15  only thing that seems to relate to all this is do they

16  have -- are there any documents that show the disgorgement

17  thing, or whatever he's trying to argue, and I'm not

18  familiar with the phase 2 -- but I have no problem

19  conceptually giving them the deal documents.  None at all.

20  But that doesn't entitle them to look at all records that

21  reflect all my nonparty entities, all documents detailing

22  or setting forth.  Read through them; they're overbroad

23  and they're improper.

24          MR. O'BRIEN:  What about performance, the

25  performance of the loan.

EXHIBIT ____**34**____

PAGE ____**642**____

52

1      I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3      That the foregoing proceedings were taken

4   before me at the time and place herein set forth; that

5   any witnesses in the foregoing proceedings, prior to

6   testifying, were duly sworn; that a record of the

7   proceedings was made by me using machine shorthand

8   which was thereafter transcribed under my direction;

9   that the foregoing transcript is a true record of the

10   testimony given.

11      Further, that if the foregoing pertains to

12   the original transcript of a deposition in a Federal

13   Case, before completion of the proceedings, review of

14   the transcript [  ] was [  ] was not requested.

15      I further certify I am neither financially

16   interested in the action nor a relative or employee

17   of any attorney or party to this action.

18      IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20

21   Dated:    MAR 0 9 2009

22

23      _Cheryl R. Kamalski_
        CHERYL R. KAMALSKI
24      CSR No.  7113

25
        EXHIBIT __34__

        PAGE ____643____

# EXHIBIT 35

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER