1    106.   Answering paragraph 106 of the Complaint, Mattel denies the
2    truth of the allegations set forth therein.

3    107.   Answering paragraph 107 of the Complaint, Mattel denies the
4    truth of the allegations set forth therein.

5    108.   Answering paragraph 108 of the Complaint, Mattel denies the
6    truth of the allegations set forth therein and specifically denies that plaintiff is
7    entitled to injunctive relief.

8    109.   Answering paragraph 109 of the Complaint, Mattel repeats its
9    responses contained in paragraphs 1 through 108 of this Third Amended Answer
10   and incorporates them by reference as though fully and completely set forth herein.

11   110.   Answering paragraph 110 of the Complaint, Mattel denies the
12   truth of the allegations set forth therein.

13   111.   Answering paragraph 111 of the Complaint, Mattel denies the
14   truth of the allegations set forth therein.

15   112.   Answering paragraph 112 of the Complaint, Mattel denies the
16   truth of the allegations set forth therein.

17   113.   Answering paragraph 113 of the Complaint, Mattel denies the
18   truth of the allegations set forth therein.

19   114.   Answering paragraph 114 of the Complaint, Mattel denies the
20   truth of the allegations set forth therein.

21   115.   Answering paragraph 115 of the Complaint, Mattel denies the
22   truth of the allegations set forth therein.

23   116.   Answering paragraph 116 of the Complaint, Mattel denies the
24   truth of the allegations set forth therein.

25   117.   Answering paragraph 117 of the Complaint, Mattel denies the
26   truth of the allegations set forth therein and specifically denies that plaintiff is
27   entitled to injunctive relief.

28

-22-
THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _/S_
PAGE _241_

1    118.   Answering paragraph 118 of the Complaint, Mattel denies the
2  truth of the allegations set forth therein.

3    119.   Answering paragraph 119 of the Complaint, Mattel repeats its
4  responses contained in paragraphs 1 through 118 of this Third Amended Answer
5  and incorporates them by reference as though fully and completely set forth herein.

6    120.   Answering paragraph 120 of the Complaint, Mattel denies the
7  truth of the allegations set forth therein.

8    121.   Answering paragraph 121 of the Complaint, Mattel denies the
9  truth of the allegations set forth therein.

10    122.   Answering paragraph 122 of the Complaint, Mattel denies the
11  truth of the allegations set forth therein.

12    123.   Answering paragraph 123 of the Complaint, Mattel denies the
13  truth of the allegations set forth therein and specifically denies that plaintiff is
14  entitled to injunctive relief.

15    124.   Answering paragraph 124 of the Complaint, Mattel repeats its
16  responses contained in paragraphs 1 through 123 of this Third Amended Answer
17  and incorporates them by reference as though fully and completely set forth herein.

18    125.   Answering paragraph 125 of the Complaint, Mattel denies the
19  truth of the allegations set forth therein.

20

21                              General Denial

22    Unless specifically admitted herein, Mattel denies the truth of each and
23  every allegation set forth in plaintiff's Complaint and specifically denies that
24  plaintiff is entitled to any relief against Mattel.

25

26

27

28

00505.07209/2875224.1

-23-
EXHIBIT _15_

PAGE _242_

## Affirmative Defenses

By alleging the Affirmative Defenses set forth below, Mattel does not agree or concede that it bears the burden of proof or the burden of persuasion on any of these issues, whether in whole or in part.

### First Affirmative Defense

Plaintiff's Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

Plaintiff has no valid, enforceable or protectible rights or interest in the alleged trade dress or other matters asserted, including without limitation in that plaintiff has failed to establish that its alleged trade dress is distinctive as to plaintiff.

### Third Affirmative Defense

Plaintiff's claims, including without limitation plaintiff's claims based upon alleged extra-territorial acts, are barred in whole or in part by lack of subject matter jurisdiction.

### Fourth Affirmative Defense

Plaintiff's claims are barred in whole or in part by plaintiff's unclean hands.

### Fifth Affirmative Defense

Plaintiff's claims are barred in whole or in part by virtue of Mattel's prior-creation of the elements and other matters asserted in the Complaint.

| | |
|---|---|
| 1 | <p style="text-align:center">Sixth Affirmative Defense</p> |
| 2 | Plaintiff's claims are barred in whole or in part by its lack of standing. |
| 3 | |
| 4 | <p style="text-align:center">Seventh Affirmative Defense</p> |
| 5 | Plaintiff's claims are barred in whole or in part by the applicable |
| 6 | statutes of limitation and the doctrine of laches. |
| 7 | |
| 8 | <p style="text-align:center">Eighth Affirmative Defense</p> |
| 9 | Plaintiff's claims are barred in whole or in part by the doctrines of |
| 10 | waiver, estoppel, acquiescence, and abandonment. |
| 11 | |
| 12 | <p style="text-align:center">Ninth Affirmative Defense</p> |
| 13 | Plaintiff's claims are barred in whole or in part by Mattel's |
| 14 | constitutional rights of free speech, petitioning and association, including without |
| 15 | limitation by the litigation privilege as protected by and/or codified in *inter alia* |
| 16 | Section 47(b) of the California Civil Code, the *Noerr-Pennington* doctrine, the |
| 17 | common interest privilege and by other privileges. |
| 18 | |
| 19 | <p style="text-align:center">Tenth Affirmative Defense</p> |
| 20 | Plaintiff's claims are barred in whole or in part by Mattel's federal and |
| 21 | state constitutional rights of free speech, including without limitation under the First |
| 22 | Amendment of the United States Constitution. |
| 23 | |
| 24 | <p style="text-align:center">Eleventh Affirmative Defense</p> |
| 25 | Plaintiff's claims are barred in whole or in part by the competitor |
| 26 | privilege. |
| 27 | |
| 28 | |

00505.07209/2875224.1

-25-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _15_
PAGE _244_

1                             Twelfth Affirmative Defense

2             Plaintiff's claims are in whole or in part preempted by the Copyright

3 Act and barred by the *Sears-Compco* doctrine.

4

5                             Thirteenth Affirmative Defense

6             Plaintiff's requested relief, including plaintiff's requests for punitive

7 and/or enhanced damages, are barred in whole or in part because all of Mattel's

8 actions were in good faith.

9

10                             Fourteenth Affirmative Defense

11             Plaintiff's damages, if any, were not caused by Mattel and are not

12 attributable to the acts or omissions of Mattel.

13

14                             Fifteenth Affirmative Defense

15             Plaintiff has failed to mitigate its damages, if any.

16

17                             Additional Defenses

18             Mattel has insufficient knowledge or information upon which to form a

19 belief as to whether additional defenses are available. Mattel reserves the right to

20 amend this Third Amended Answer to add, delete, or modify additional defenses

21 based on legal theories which may or will be divulged through clarification of the

22 Complaint, through discovery, through change or clarification of the governing law

23 or through further legal analysis of plaintiff's positions in this litigation.

24

25                             Prayer for Relief

26

27             WHEREFORE, Mattel prays for relief as follows:

28

THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _15_

PAGE _245_

1         1.     That the Complaint be dismissed with prejudice;

2         2.     That plaintiff take nothing by reason of the Complaint against

3 Mattel and that judgment be entered in Mattel's favor;

4         3.     That Mattel recover its costs and attorneys' fees; and

5         4.     That this Court award such other and further relief as it deems

6 just and proper.

7                              **COUNTERCLAIMS**

8         Pursuant to the Court's Orders of, inter alia, January 12, 2007, June 27,

9 2007, and May 21, 2009, and incorporating its [Proposed] Amended Complaint

10 dated November 19, 2006, Mattel, Inc. alleges as follows:

11                           **Preliminary Statement**

12         1.     For years MGA Entertainment, Inc. has engaged in a pattern of

13 stealing and using Mattel, Inc.'s property and trade secrets. MGA's use of the

14 stolen property and trade secrets caused and continues to cause significant harm to

15 Mattel. MGA first stole "Bratz," a fashion doll, from Mattel, and then continued

16 stealing Mattel's confidential and proprietary information to fuel MGA's growth.

17 Even after Mattel originally filed this suit, MGA, Isaac Larian and their co-

18 conspirators continued this pattern of wrongdoing, engaging in additional acts of

19 commercial bribery, destruction of evidence, evidence tampering and perjury, and

20 in fraudulent conveyances and bankruptcy fraud. Indeed, MGA, Larian and their

21 co-conspirators carried out several of these wrongs while the Phase 1 trial was on-

22 going and shortly after it concluded, and continue to engage in further misconduct

23 up to and beyond the present, for the specific purpose of thwarting the findings of

24 the jury in Mattel's favor, obstructing the judicial process, and damaging Mattel

25 and its rights.

26         2.     Carter Bryant conceived, created and developed Bratz designs

27 while he was employed by Mattel as a doll designer. He concealed his Bratz work

28 from Mattel and wrongfully sold Bratz to MGA while he was a Mattel employee.

THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _15_

PAGE _246_

1    As MGA knows, Mattel owns the Bratz designs that Bryant made. As the rightful
2    owner of those Bratz designs, Mattel has registered copyrights for them and seeks
3    damages arising from MGA's repeated infringement of those copyrights.

4         3.    In 2008, the jury in the Phase 1 trial in this action found that
5    Carter Bryant conceived of and created Bratz, including without limitation Bratz
6    sculpts and prototypes, the Bratz name, the Bratz characters, and more than 70
7    Bratz design drawings, while working for Mattel and that MGA and Isaac Larian
8    unlawfully aided and abetted that wrongdoing and profited from their wrongful
9    acts. Specifically, the jury found that MGA and Larian unlawfully infringed
10   Mattel's copyrights in Bratz works created by Bryant while a Mattel employee and
11   owned by Mattel, converted Bratz drawings from Mattel, tortiously interfered with
12   Bryant's contract with Mattel, aided and abetted Bryant's breach of his duty of
13   loyalty to Mattel, and aided and abetted Bryant's breach of his fiduciary duty to
14   Mattel. The jury further found that MGA had fraudulently concealed its wrongful
15   conduct from Mattel. Yet MGA's wrongful conduct has not ceased. Undeterred by
16   the jury's findings, MGA continues to infringe even to this day, and threatens to
17   infringe in the future, Mattel's rights in Bratz.

18        4.    MGA's illegal conduct in stealing Bratz was also just the
19   beginning. Emboldened by the success of its earlier illegal conduct, MGA has
20   repeated—and even expanded through this day—its pattern of theft, bribery,
21   evidence destruction and tampering, perjury, obstruction, financial manipulations
22   and other illegal conduct. For example, in or about 2004, MGA decided to expand
23   into Mexico. To do so, and operating from its Southern California offices, MGA
24   hired away three key Mattel employees in Mexico, who, on their way out, stole
25   virtually every category of Mattel's sensitive and trade secret business plans and
26   information for the Mexican market, as well as a significant quantity of sensitive
27   and trade secret information for Mattel's U.S. and worldwide businesses, and took
28   them to MGA. Armed with Mattel's confidential business plans and methods,

EXHIBIT _15_

PAGE _247_

1  MGA claimed to have increased its market share in Mexico alone by 90% in a
2  single year.

3     5.    In 2005, MGA needed help in Canada. So MGA, again
4  operating from its Southern California headquarters, hired Janine Brisbois from
5  Mattel. At that time, Ms. Brisbois was responsible for Mattel's account with Toys
6  'R Us ("TRU") and Wal-Mart. MGA gave her responsibility for those same
7  accounts, and she took from Mattel documents containing proprietary advertising,
8  project, sales, customer and strategy information for not only Canada, but for the
9  United States. Eliminating any doubt that MGA then proceeded to use those stolen
10  materials, Brisbois subsequently accessed and modified certain of those Mattel
11  documents while employed by MGA.

12     6.    Starting no later than 2000, and continuing until at least 2005,
13  MGA bribed Mattel employees in addition to Bryant to work on Bratz and other
14  products for MGA's benefit. In the face of Court Orders compelling MGA to
15  disclose such evidence, MGA falsely denied under oath that there were such other
16  Mattel employees. In December 2007, however, the truth came to light—MGA
17  agents had bribed at least three more Mattel employees over a five-year span,
18  including even during times after this suit was filed. MGA's agents acted to
19  conceal the bribery, including by paying Mattel employees in cash and using false
20  names and false social security numbers.

21     7.    These are not the only instances of such misconduct which MGA
22  orchestrated and carried out from its headquarters in this District. Counter-
23  defendants have engaged in an ongoing, widespread pattern of illegal acts that
24  continues to this day and that threatens to continue into the future. Those acts
25  include, without limitation, inducing Mattel employees to steal Mattel's
26  confidential information or other property and take it with them to MGA to further
27  MGA's business interests and to harm Mattel. They also include, without
28  limitation, continued acts of copyright infringement, evidence destruction and

00505.07209/2875224.1

-29-
THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT __15__
PAGE __248__

1 perjury. They also include, without limitation, Larian's and MGA's illegal transfer,
2 transport and laundering of their ill-gotten profits, including through their use of
3 sham single-purpose entities created during or immediately after the Phase 1 trial,
4 for the purpose of thwarting the jury's Phase 1 verdict against them, continuing
5 with their acts of infringement, manipulating their financial condition and
6 defrauding Mattel.

### Jurisdiction

8     8.     This Court has federal question jurisdiction over this action
9 pursuant to 28 U.S.C. §§ 1331, 17 U.S.C. §§ 101 *et seq.*, and 18 U.S.C. § 1964(c).
10 This Court has supplemental jurisdiction over Mattel's state law claims pursuant to
11 28 U.S.C. § 1367.

### Venue

13     9.     Venue is proper in this District pursuant to 28 U.S.C.
14 §§ 1391(b)-(d), 1391(f) and 1400(a) and 18 U.S.C. § 1965.

### Parties

16     10.     Mattel is a corporation organized and existing under the laws of
17 the State of Delaware, with its principal place of business in El Segundo,
18 California.

19     11.     Counter-defendant MGA Entertainment, Inc. ("MGA") is a
20 corporation organized and existing under the laws of the State of California, with
21 its principal place of business in Van Nuys, California. Mattel is informed and
22 believes, and on that basis alleges, that ABC International Traders, Inc. is a
23 predecessor corporation to MGA and that until September 16, 2002, MGA was
24 incorporated and known as ABC International Traders, Inc. Upon the filing of the
25 Complaint, Mattel, being ignorant of the nature, extent and scope of MGA
26 Entertainment, Inc.'s involvement and complicity in the conduct alleged therein and
27 having designated MGA Entertainment, Inc. in the Complaint as Doe 1 and having
28 discovered its involvement and complicity, Mattel previously amended its

-30-
THIRD AMENDED ANSWER AND COUNTERCLAIMS
00505.07209/2875224.1

EXHIBIT 15
PAGE 249

1   Complaint by substituting MGA Entertainment, Inc. for the fictitious Doe name
2   Doe 1.

3          12.    Counter-defendant Carter Bryant ("Bryant") is an individual who
4   formerly was employed by Mattel and has worked for and continues to work as a
5   contractor for MGA. Mr. Bryant currently resides in the State of Missouri.

6          13.    Counter-defendant MGA Entertainment (HK) Limited is a
7   business entity organized and existing under the laws of the Hong Kong Special
8   Administrative Region, with its principal place of business in Hong Kong. Upon
9   the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope
10  of involvement and complicity of MGA Entertainment (HK) Limited in the conduct
11  alleged therein and having designated MGA Entertainment (HK) Limited in the
12  Complaint as Doe 2 and having discovered its involvement and complicity, Mattel
13  previously amended its Complaint by substituting MGA Entertainment (HK)
14  Limited for the fictitious Doe name Doe 2.

15         14.    Counter-defendant MGAE de Mexico, S.R.L. de C.V. ("MGA
16  de Mexico") is a business entity organized and existing under the laws of Mexico,
17  with its principal place of business in Mexico City, Mexico.

18         15.    Mattel is informed and believes, and on that basis alleges, that
19  Counter-defendant Larian is the President and CEO of MGA and an individual
20  residing in the County of Los Angeles. Upon the filing of the Complaint, Mattel,
21  being ignorant of the nature, extent and scope of involvement and complicity of
22  Larian in the conduct alleged therein and having designated Larian in the
23  Complaint as Doe 3 and having discovered his involvement and complicity, Mattel
24  previously amended its Complaint by substituting Larian for the fictitious Doe
25  name Doe 3.

26         16.    Mattel is informed and believes, and on that basis alleges, that
27  Counter-defendant Larian is directly or indirectly principal, owner, member and/or
28  controlling shareholder and alter-ego of IGWT Group, LLC ("IGWT Group") and

00505.07209/2875224.1

-31-

1   IGWT 826 Investments, LLC ("IGWT 826 Investments"). On information and

2   belief, the financial affairs of Larian and these limited liability companies—which

3   were formed during and subsequent to the Phase 1 trial—are significantly

4   intermingled and interconnected, the companies being mere shells which Larian

5   used as conduits for his own business dealings, created and operated pursuant to an

6   unlawful scheme as alleged herein.

7          17.   Mattel is informed and believes, and on that basis alleges, that

8   Counter-defendant Larian is directly or indirectly trustee, principal, owner, and/or

9   controlling participant and alter-ego of several trusts devised by or on behalf of

10   Larian for the purpose of manipulating MGA's and Larian's finances, including

11   without limitation The Makabi Living Trust, The Larian Living Trust, The Angela

12   Larian Qualified Annuity Trust, The Isaac E. Larian Qualified Annuity Trust, The

13   Jahangir Eli Makabi Qualified Annuity Trust, as well as other trusts and similar

14   vehicles presently unknown to Mattel because of their concealment by Larian,

15   MGA and their co-conspirators.

16          18.   Mattel is informed and believes, and on that basis alleges, that

17   Counter-defendant Larian is directly or indirectly principal, owner, member and/or

18   controlling participant and alter-ego of several other sham entities devised by or on

19   behalf of Larian for the purpose of manipulating MGA's and Larian's finances,

20   including without limitation Omni 808 Investors, LLC, Vision Capital, LLC and

21   Lexington Financial Limited (collectively, the "Omni Parties") as well as other

22   entities currently unknown by name to Mattel because of their concealment by

23   Larian, MGA, the Omni Parties and their co-conspirators.

24          19.   Mattel is informed and believes, and on that basis alleges, that

25   Counter-defendant Larian has employed, directly or indirectly, other co-

26   conspirators to directly and indirectly carry out his intentional wrongdoing,

27   including in order to conceal and manipulate his and MGA's finances and to

28   conduct other fraudulent and illegal conduct, including without limitation Neil

EXHIBIT /S
PAGE 257

1  Kadisha, Leon Neman, Fred Mashian, Jahangir Eli Makabi, Shirin Makabi, Farhad

2  Larian, Angela Larian, Veronica Marlow and Peter Marlow, as well as other

3  persons presently unknown to Mattel because of their concealment by Larian,

4  MGA, the Omni Parties and their co-conspirators.

5      20.  Mattel is informed and believes, and on that basis alleges, that at

6  all relevant times mentioned herein such individuals, trusts, Larian, the Omni

7  Parties, IGWT Group and IGWT 826 Investments, together with their employees,

8  officers, putative owners, members and principals, agents, representatives and

9  attorneys, were acting in concert and in active participation with each other in

10  committing the wrongful acts alleged herein, and were the agents of each other and

11  were acting within the scope and authority of that agency and with the knowledge,

12  consent and approval of each other.

13      21.  Counter-defendant Carlos Gustavo Machado Gomez is an

14  individual who is employed by Counter-defendant MGA and who resided in this

15  District at the time he was named and served as a Counter-defendant in the Second

16  Amended Answer and Counterclaims and, on information and belief, currently

17  resides in Mexico.

18      22.  The true names and capacities of Counter-defendants sued herein

19  as DOES 4 through 10, inclusive, are unknown to Mattel, which therefore sues said

20  Counter-defendants by such fictitious names. Mattel will amend its pleadings to

21  allege their true names and capacities when the same are ascertained.

22                    **Factual Background**

23  **I.   MATTEL**

24      23.  Mattel manufactures and markets toys, games, dolls and other

25  consumer products. Harold Mattson and Elliot and Ruth Handler founded Mattel in

26  1945. The name of the company was created by incorporating the names of two of

27  its founders, "MATT-son" and "EL-liot." Originating from the Handlers' garage in

28  Southern California, the company greatly expanded its operations following World

1  War II.  During the next several decades, Mattel became famous for producing

2  high-quality products at reasonable prices.

3        24.    Critical to Mattel's success is its ability to design and develop

4  new products.  Mattel invests millions of dollars in product design and

5  development and introduces hundreds of new products each year.  Mattel maintains

6  a 180,000 square-foot design center in El Segundo, California, that houses

7  hundreds of designers, sculptors, painters and other artists, who work exclusively to

8  create the products on which Mattel's business depends.

9        25.    Mattel also has invested substantial amounts over many years to

10  develop its business methods and practices, including, without limitation, its

11  marketing and advertising research, plans, methods and processes; its business

12  research and forecasts; its costs, budgets, pricing, credit terms, deal terms and

13  finances; its manufacturing, distribution, and sales methods and processes; and its

14  inventory methods and processes.  These represent a material part of the intellectual

15  infrastructure of Mattel and are highly valuable.

16  **II.    MGA ENTERTAINMENT**

17        26.    MGA is also a toy manufacturer.  MGA began as a consumer

18  electronics business, but expanded into the toy business with licenses to sell

19  handheld electronic games.  By approximately late 1999 or early 2000, MGA

20  developed a strategy to expand its business and compete directly with Mattel by

21  launching a fashion doll line, so it stole a fashion doll that was owned by Mattel—

22  "Bratz."

23        27.    MGA intentionally stole not just specific Mattel property, such

24  as Bratz designs, prototypes and related materials, but also a vast array of trade

25  secrets and other confidential information that comprise Mattel's intellectual

26  infrastructure.  MGA's rapid growth was not organic, but rather was based upon its

27  theft of Bratz.  As a result, MGA lacked an appropriate intellectual infrastructure

28  for a company of its size and it became increasingly difficult to manage.  To deal

-34-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT ___15___

PAGE ___253___

1   with these problems, as detailed below, time and time again MGA simply stole

2   Mattel's proprietary business methods, practices and information.  This not only

3   allowed MGA to avoid expending the time, money and effort necessary to build a

4   legitimate business, but also allowed MGA to unfairly compete against Mattel by

5   taking Mattel's playbook.

6   **III.  MGA STEALS A NEW LINE OF FASHION DOLLS FROM MATTEL**

7       28.    Carter Bryant is a former Mattel employee.  Bryant joined Mattel

8   in September 1995, where he worked in Mattel's Design Center as a BARBIE

9   product designer.  In or about April 1998, Bryant resigned his position with Mattel

10  and moved to Missouri to live with his parents.  Late in 1998, Bryant applied to

11  Mattel to be rehired.  On January 4, 1999, he began working at Mattel in Mattel's

12  Design Center, again as a product designer, for Mattel's BARBIE collectibles line.

13      29.    Upon his return to Mattel in January 1999, Bryant executed an

14  Employee Confidential Information and Inventions Agreement (the "Employment

15  Agreement"), a true and correct copy of which is attached hereto as Exhibit A.

16      30.    Pursuant to his Employment Agreement and as a condition of

17  and in consideration for his employment, Bryant agreed, among other things, that

18  he held a position of trust with Mattel, that the designs and inventions he created

19  during his Mattel employment (with certain exceptions not relevant here) were

20  owned by Mattel, and that he would be loyal to the company by agreeing not to

21  assist or work for any competitor of Mattel while he was employed by Mattel.

22      31.    On January 4, 1999, Bryant also executed Mattel's Conflict of

23  Interest Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant

24  certified in the Conflict Questionnaire that, other than as disclosed, he had not

25  worked for any competitor of Mattel in the prior twelve months and had not

26  engaged in any business venture or transaction involving a Mattel competitor that

27  could be construed as a conflict of interest.  Bryant understood what the Conflict

28  Questionnaire required because, among other things, he disclosed on it the

00505.07209/2875224.1

-35-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT __15__

PAGE __254__

1   freelance work he had performed while in Missouri for Ashton-Drake, which is

2   unrelated to the conduct alleged herein.  A true and correct copy of the Conflict

3   Questionnaire executed by Bryant is attached hereto as Exhibit B.

4        32.   Pursuant to the Conflict Questionnaire, Bryant also agreed that

5   he would immediately notify his supervisor of any change in his situation that

6   would cause him to change any of the foregoing certifications.  Despite this

7   obligation, at no time did Bryant disclose to Mattel that he was engaging in any

8   business venture or transaction with MGA or any other Mattel competitor.

9        33.   More specifically, while Bryant was employed by Mattel, Bryant

10  and other Counter-defendants misappropriated and misused Mattel property and

11  Mattel resources for the benefit of Bryant and MGA.  Such acts included, but are

12  not limited to, the following:

13        a.   using his exposure to Mattel development programs to

14  create the concept, design and name of Bratz;

15        b.   using Mattel resources, and while employed by Mattel,

16  Bryant worked by himself and with other Mattel employees and contractors to

17  design and develop Bratz, including without limitation by creating drawings and

18  three-dimensional models of Bratz dolls, and fashion designs for the dolls'

19  associated clothing and accessories; and

20        c.   using Mattel resources, and while employed by Mattel,

21  Bryant took steps to assist MGA to produce Bratz dolls.

22        34.   During the time that he was employed by Mattel and thereafter,

23  Bryant concealed these actions from Mattel, including by failing to notify his

24  supervisor of the conflict of interest he created when he began working on MGA's

25  behalf and when he began receiving payments from MGA.  Bryant additionally

26  enlisted other Mattel employees to perform work on Bratz during the time he was

27  employed by Mattel and, by all indications, in at least some cases led them to

28  believe that they were performing work on a project for Mattel.

00505.07209/2875224.1

-36-

EXHIBIT  15

PAGE  255

1       35.   Bryant also made affirmative misrepresentations to Mattel

2  management and employees immediately before his departure from Mattel on

3  October 20, 2000. For example, during his last few weeks at Mattel, Bryant told

4  his co-workers and supervisors that he was going to leave Mattel for "non-

5  competitive" pursuits. Bryant's representations to his supervisors and his co-

6  workers were false. Bryant knew at the time that those representations were false

7  and made those false statements to conceal from Mattel the fact that he was already

8  working with MGA and that he had contracted with MGA to assign Bratz works to

9  MGA and to provide design and development services to MGA, a Mattel

10  competitor.

11       36.   As a result of the efforts of Bryant and other Mattel employees

12  working on Bratz (which were done without Mattel's knowledge), the Bratz dolls

13  had been designed and were far along in development during the time that Bryant

14  was employed by Mattel and prior to the time that Bryant left Mattel on

15  October 20, 2000. Not only did Bryant create and develop designs for the dolls as

16  well as other aspects of the products such as their fashion accessories during the

17  time he was employed by Mattel, but MGA showed Bratz prototypes and/or

18  product to both focus groups and retailers by November 2000, less than three

19  weeks after Bryant left Mattel. Bryant, Larian and others at MGA arranged these

20  meetings while Bryant was still employed by Mattel.

21       37.   Bryant and MGA employees also repeatedly and continuously

22  communicated with employees of MGA Entertainment (HK) Limited on subjects

23  such as design and manufacturing of Bratz. On information and belief, at all

24  material times, MGA Entertainment (HK) Limited has maintained regular and

25  continuous contacts with persons in the County of Los Angeles; it regularly has

26  shipped products that it manufactures, or that are manufactured for it, to the County

27  of Los Angeles; and such products have been distributed to retailers and sold to

28  consumers in the County of Los Angeles.

-37-
THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT ___/>

PAGE __256

1         38.  Bratz also were shown to retailers at the Hong Kong Toy Fair in
2 January 2001. By early 2001, only a few months after Bryant resigned from
3 Mattel, MGA began having the Bratz fashion doll line and accessories
4 manufactured and then, shortly thereafter, began selling them at retail.

5         39.  Since 2001, MGA has distributed and sold Bratz and Bratz-
6 related products throughout the world. Mattel is informed and believes that MGA
7 also licenses Bratz to third parties. Mattel is also informed and believes that MGA
8 during certain time periods has derived annual revenue from its sales and licenses
9 of Bratz in excess of $500 million. Mattel is further informed and believes that
10 MGA and Bryant claim current ownership of Bratz, and all copyrights and
11 copyright registrations attendant thereto. MGA continues to market, sell and,
12 license Bratz and has expressed an intention to continue to do so.

13         40.  Mattel is informed and believes that MGA and Larian
14 encouraged, aided and financed Bryant to develop Bratz, knowing full well that
15 Bryant was still employed by Mattel at the time and that by performing such work,
16 including design-related work, for his own benefit and/or the benefit of MGA,
17 Bryant would be, and was, in breach of his contractual, statutory and common law
18 duties to Mattel. Mattel is also informed and believes that MGA proceeded to aid
19 and encourage Bryant to develop Bratz with the goal of obtaining a valuable
20 fashion doll line that would be commercially successful in the competitive, multi-
21 billion dollar market for fashion dolls.

22         41.  Pursuant to Bryant's contract with Mattel, among other things,
23 Mattel is the true owner of Bratz designs and works, including those specifically
24 that were conceived, created or reduced to practice during Bryant's Mattel
25 employment as well as all designs and works that are or have been derived
26 therefrom. Counter-defendants' continued use, sale, distribution and licensing of
27 Bratz thus infringes upon Mattel's rights, injures Mattel and unlawfully enriches the
28 Counter-defendants.

-38-
THIRD AMENDED ANSWER AND COUNTERCLAIMS
EXHIBIT __15__
PAGE __257__

1        42.    Bryant and MGA deliberately and intentionally concealed facts

2  sufficient for Mattel to suspect or to know that it was the true owner of Bratz.

3  Their acts of concealment include, but are not limited to, concealing the fact that

4  Bryant conceived, created, designed and developed Bratz while employed by

5  Mattel, including by tampering with, altering and defacing documents which

6  showed that, in fact, Bryant was a Mattel employee while he was working for and

7  with MGA; concealing the fact that Bryant worked with and assisted MGA during

8  the time Bryant was employed by Mattel and was compensated for that assistance;

9  concealing that Bryant was providing consulting services to MGA; concealing

10  Bryant's role in Bratz by falsely claiming that Larian and others were the creators

11  of Bratz; and concealing the fact that Mattel was the true owner of Bratz by, among

12  other things, filing fraudulent registrations and/or amendments to registrations with

13  the United States Copyright Office claiming MGA as the author of Bratz as a work

14  for hire and mis-dating or altering relevant dates on such documents to further

15  obscure the true facts of when the works were created.

16        43.    Because of Bryant's and MGA's acts of concealment and Bryant's

17  misrepresentations to Mattel, Mattel had no reason to suspect that Bryant had

18  worked with MGA, or assisted MGA, while he still employed by Mattel until

19  approximately November 24, 2003, when Mattel received, through an unrelated

20  legal action, a copy of Bryant's agreement with MGA which showed that the date

21  of Bryant's agreement with MGA predated Bryant's departure from Mattel. It was

22  then, as a result, that Mattel learned for the first time that Bryant had secretly aided,

23  assisted and worked for and with MGA while employed at Mattel and in violation

24  of his Mattel Employment Agreement. Specifically, Bryant's agreement with

25  MGA obligated Bryant to provide product design services to MGA on a "top

26  priority" basis. Bryant's agreement with MGA also provided that Bryant would

27  receive royalties and other consideration for sales of products on which Bryant

28  provided aid or assistance; that all works and services furnished by Bryant under

00505.07209/2875224.1

-39-

EXHIBIT _15_

PAGE _258_

1  the agreement, including those he purportedly provided while still a Mattel
2  employee, purportedly would be considered "works for hire" of MGA; and that all
3  intellectual property rights to preexisting works by Bryant, including Bratz designs,
4  purportedly were assigned to MGA.

5  **IV. MGA STEALS MATTEL TRADE SECRETS IN MEXICO**

6          44.   On information and belief, in or about late 2003 or early 2004,
7  MGA decided to open business operations in Mexico. Faced with the difficult task
8  of developing an overall strategy for expanding into a market in which it had only a
9  nominal presence and no operations, MGA elected to steal Mattel's plans, strategy
10 and business information for the Mexican market and materials related to Mattel's
11 worldwide business strategies. As detailed below, MGA and Larian approached
12 three employees of Mattel's Mexican subsidiary ("Mattel Mexico"), enticed them to
13 steal Mattel's most sensitive business planning materials, and then hired them to
14 assist in establishing and running MGA's new Mexican subsidiary.

15         A.    **MGA Hires Three Senior Mattel Employees in Mexico**

16         45.   Carlos Gustavo Machado Gomez ("Machado") was the Senior
17 Marketing Manager, Boys Division, for Mattel Mexico, a position of trust and
18 confidence. He was employed at Mattel Mexico from April 1, 1997 until April 19,
19 2004. His duties included short, medium and long-term marketing planning,
20 generating product sales projections, and assisting in creation of the media plan. In
21 his position, Machado had access to highly confidential and sensitive marketing
22 and product development information. Machado had an employment agreement
23 with Mattel in which he agreed to maintain the confidentiality of Mattel's protected
24 information. Mattel's policies also required Machado to protect Mattel's
25 proprietary information and not to disclose it to competitors.

26         46.   Mariana Trueba Almada ("Trueba") was the Senior Marketing
27 Manager, Girls Division, for Mattel Mexico, a position of trust and confidence.
28 She was employed at Mattel Mexico from November 3, 1997 until April 19, 2004.

00S05.07209/2875224.1

-40-

1  Like Machado, her duties included short, medium and long-term marketing
2  planning, generating product sales projections, and assisting in creation of the
3  media plan. In her position, Trueba had access to highly confidential and sensitive
4  marketing and product development information. Trueba had an employment
5  agreement with Mattel in which she agreed to maintain the confidentiality of
6  Mattel's protected information. Mattel's policies also required Trueba to protect
7  Mattel's proprietary information and not to disclose it to competitors.

8      47.   Pablo Vargas San Jose ("Vargas") was a Senior Trade Marketing
9  Manager with Mattel Mexico, a position of trust and confidence. He was employed
10  at Mattel Mexico from March 29, 2001 until April 19, 2004. Vargas was
11  responsible for ensuring that point-of-sale promotions were carried out, analyzing
12  the results of such promotions, negotiating promotion budgets, and generally
13  managing promotional activities. Vargas also had access to highly confidential and
14  sensitive marketing and product development information. Vargas had an
15  employment agreement with Mattel in which he agreed to maintain the
16  confidentiality of Mattel's protected information. Mattel's policies also required
17  Vargas to protect Mattel's proprietary information and not to disclose it to
18  competitors.

19      48.   Beginning in late 2003 or early 2004, Machado, Trueba and
20  Vargas began planning to leave Mattel Mexico to join MGA. In connection with
21  that plan, and with the encouragement of Larian and other MGA officers operating
22  in the United States, they began accessing, copying and collecting proprietary
23  Mattel documents to take with them. On April 19, 2004, Machado, Trueba and
24  Vargas each resigned their positions with Mattel, effective immediately. They
25  stated that they had been hired by a Mattel competitor, but refused to identify that
26  competitor. In fact, they had been offered and accepted employment by MGA to
27  establish and run MGA's new operation in Mexico.

28

00505.07209/2875224.1

-41-

EXHIBIT _15_
PAGE _260_

**B.    Machado, Trueba and Vargas Stole Dozens of Confidential Trade
Secret Marketing and Sales Documents for MGA's Benefit**

49.    Following these resignations, Mattel discovered that Machado,
Trueba and Vargas had been in frequent telephonic and e-mail contact with MGA
personnel, including Larian, for over three months prior to their resignations. The
primary vehicle for these communications in furtherance of their "plot" was an
America Online e-mail account with the address <plot04@aol.com>. On
information and belief, during this time, Machado, Trueba and Vargas supplied
Larian with certain Mattel confidential and proprietary information in order to
prove their value to MGA and to improve their negotiating position vis-à-vis their
respective employment contracts with MGA.

50.    In March 2004, Machado, Trueba and Vargas were making plans
to travel from Mexico to Los Angeles to meet with MGA personnel in person prior
to resigning their positions at Mattel. Also, by at least March 3, 2004, Machado,
Trueba and Vargas were discussing with MGA personnel, including Larian,
specific details regarding setting up MGA offices in Mexico City. On information
and belief, prior to their resignations, Larian and others at MGA directed Machado,
Trueba and Vargas to steal virtually all Mattel confidential and proprietary
information that they could access and bring it with them to MGA. This was
reflected in, among things, e-mail messages that Mattel had discovered after
Machado, Trueba and Vargas had resigned. For example, on March 22, 2006,
approximately one month before they resigned, Machado, Trueba and Vargas wrote
an e-mail message from the <plot04@aol.com> e-mail account addressed to
Larian, MGA's General Manager Susan Kuemmerle and another MGA officer
Thomas Park. In that e-mail message, Machado, Trueba and Vargas sought to
prove their value in this endeavor to MGA by writing: "Attached you will find our
analysis for future discussion. We will be available during the nights of the week
after 16:30 Los Angeles time . . . ." In another e-mail message, showing that the

THIRD AMENDED ANSWER AND COUNTERCLAIMS



EXHIBIT _15_
PAGE _261_

1   participants intentionally sought to maximize the damage to Mattel from their

2   conduct, Kuemmerle wrote to Larian and Park: "Gustavo, Mariana and Pablo want

3   to resign (all at the same time, and you can believe my smile!) next Wednesday."

4           51.    Beginning on April 12, 2004, a week before his resignation and

5   after numerous communications and meetings with Larian and other MGA

6   personnel, Machado began transferring additional Mattel confidential and

7   proprietary information to a portable USB storage device (also know as a "thumb

8   drive") that he connected to his Mattel computer.  On Friday, April 16, 2004, the

9   last business day before he gave notice, Machado copied at least 70 sensitive

10  documents to the portable USB storage device.

11          52.    Starting on April 12, 2004, Vargas also copied a host of

12  confidential and proprietary materials to a portable USB storage device, including

13  sales plans, sales projections and customer profiles.

14          53.    On April 16, 2004, Trueba also copied Mattel confidential and

15  proprietary information to a portable USB storage device connected to her Mattel

16  computer.

17          54.    With full knowledge that she was going to leave Mattel for a

18  competitor, Trueba also took steps to increase further her access to Mattel's

19  confidential information shortly before her resignation.  For example, just four days

20  before leaving, Trueba went out of her way to seek to attend a meeting at which

21  Mattel personnel analyzed BARBIE programs for the United States, Canada and

22  South America.  Two days before her resignation, she contacted both a Mattel

23  employee located in El Segundo, California and Mattel's advertising agency to

24  request updated confidential information about advertising plans for BARBIE.  On

25  information and belief, Trueba acted at the direction of MGA and Larian and did so

26  in order to obtain further information that would allow MGA to obtain unfair

27  competitive advantage over Mattel.

28

-43-

THIRD AMENDED ANSWER AND COUNTERCLAIMS
EXHIBIT _18_
PAGE _262_

1           55.   Machado, Trueba and Vargas stole virtually every type of

2   document a competitor would need to enter the Mexican market and to unlawfully

3   compete with Mattel in Mexico, in the United States, and elsewhere. They stole

4   global internal future line lists that detailed anticipated future products; production

5   and shipping costs for Mattel products; daily sales data for Mattel products;

6   customer data; sales estimates and projections; marketing projections; documents

7   analyzing changes in sales performance from 2003 to 2004; budgets for advertising

8   and promotional expenses; strategic research reflecting consumer responses to

9   products in development; media plans; consumer comments regarding existing

10   Mattel products; customer discounts and terms of sale; customer inventory level

11   data; assessments of promotional campaign success; market size historical data and

12   projections; marketing plans and strategies; merchandising plans; retail pricing and

13   marketing strategies; and other similar materials.

14          56.   The stolen data was not limited to the Mexican market. The

15   information stolen would, and did, give MGA an unfair competitive advantage in

16   the United States and around the world. Further, the stolen information was not

17   located exclusively in Mexico, but included confidential and proprietary

18   information that resided on Mattel computers in Phoenix, Arizona and El Segundo,

19   California, and/or documents which were originally created by personnel in El

20   Segundo. Included among these stolen documents was one of Mattel's earliest

21   internal global line lists, which included information for BARBIE products for the

22   upcoming year and included, for each product, the expected profit margin,

23   advertising expenditures, expected volume and marketing strategy. On information

24   and belief, Machado, Trueba or Vargas delivered that internal line list to Larian or

25   another MGA officer during their negotiations with MGA.

26          57.   MGA has used the information taken from Mattel to obtain an

27   unfair advantage over Mattel, including in both the United States and Mexico. In

28   fact, MGA later publicized its claim that, in 2005, it had increased its Mexican

1  market share by 90 percent over the prior year. This increase came at the expense
2  of Mattel, which lost market share during 2004 in Mexico and was forced to
3  increase its advertising and promotional spending to offset further losses.

4       58.  Machado, Trueba and Vargas attempted to conceal their
5  widespread theft of Mattel's proprietary information. For example, Machado ran a
6  software program on his Mattel personal computer in an attempt to erase
7  information, including information that would reveal the addresses to which he had
8  sent, or from which he had received, e-mail messages. On information and belief,
9  for the same purpose Machado also damaged the hard drive of the personal
10  computer that he used at Mattel.

11       59.  On information and belief, on April 19, 2004, immediately after
12  Machado, Trueba and Vargas simultaneously resigned, they traveled from Mexico
13  to Los Angeles to meet with MGA personnel, including Larian, in person.

14       60.  Mattel notified Mexican authorities about the theft of its trade
15  secret and confidential information. On October 27, 2005, the Mexican Attorney
16  General Office obtained a search warrant from the Mexican Federal Criminal
17  Courts for MGA's facilities in Mexico City. In that search, the Mexican authorities
18  found and seized from MGA's offices both electronic and paper copies of a large
19  number of documents containing Mattel trade secrets, including those that Mattel
20  discovered through its forensic investigations, plus many others that Mattel had not
21  known had been stolen.

22       61.  Based on Machado's "performance" in Mexico, Isaac Larian
23  subsequently promoted Machado, and he was transferred to MGA's main office in
24  Van Nuys, California. When deposed in connection with this case, Machado
25  refused to answer questions about his misconduct and instead invoked the Fifth
26  Amendment over 100 times. On information and belief, Machado has resided at
27  times relevant hereto in the County of Los Angeles, California, and on information
28  and belief, currently resides in Mexico.

-45-

EXHIBIT ___15___

PAGE ___264___

1 V. MGA HIRES MATTEL'S SENIOR VICE PRESIDENT AND
2   GENERAL MANAGER TO FACILITATE ITS THEFT AND USE OF
3   MATTEL'S HIGHLY VALUABLE BUSINESS METHODS AND
4   PRACTICES

5      62.   On October 1, 2004, Mattel's Senior Vice President and General
6   Manager, Ron Brawer, left Mattel and joined MGA. Tyco Toys, Inc. ("Tyco"), a
7   predecessor to Mattel, had hired Brawer on April 22, 1996. The same day, Brawer
8   entered into an Employee Invention & Trade Secret Agreement with Tyco. On
9   April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel,
10  New Jersey, and remained bound by his Employee Invention & Trade Secret
11  Agreement.

12     63.   In January 2003, while Brawer held a position of trust and
13  confidence at Mattel, Mattel's "Code of Conduct" was circulated to all Mattel
14  employees worldwide. Included in the Code of Conduct were statements that:

15         Employees and Directors have an obligation to protect the
16         confidentiality of Mattel's proprietary information. Proprietary
17         information is any information not generally known to the public
18         that is useful to Mattel, that would be useful to its competitors or
19         other third parties or that would be harmful to Mattel or its
20         customers if disclosed. Proprietary information includes trade
21         secrets, revenue and profit information and projections, new
22         product information, marketing plans, design and development
23         efforts, manufacturing processes and any information regarding
24         potential acquisitions, divestitures and investments.
25         We can protect the security of Mattel's proprietary information
26         by limiting access to it. Confidential information should not be
27         discussed with those who are not obligated to maintain the
28         information in confidence and in public places where the

00505.07209/2875224.1

-46-

1      information is not likely to be kept secret, such as planes,

2      restaurants and elevators. The obligation to preserve confidential

3      information continues even after employment ends.

4  The Code of Conduct applied to Brawer and required that he meet his obligations

5  under the Code of Conduct.

6      64.   By 2003, Brawer had advanced within Mattel to a Senior Vice

7  President position over customer marketing, a position of trust and confidence. In

8  his executive position, Brawer was provided access to information that was both

9  sensitive and confidential, including, but not limited to, detailed information related

10  to development, manufacture, marketing, pricing, shipping, and performance of

11  Mattel's then-current and anticipated future product lines, and other confidential

12  business plans between Mattel and its most significant retail customers.

13      65.   In December 2003, Alan Kaye, Mattel's Senior Vice President of

14  Human Resources, asked Brawer whether he was discussing potential employment

15  with MGA. Brawer denied that he had been in contact with MGA and represented

16  that he would not talk to MGA. Throughout 2004, Mattel reminded and stressed to

17  its employees, including Brawer, the importance of protecting Mattel's confidential

18  and proprietary materials and information.

19      66.   On March 18, 2004, in response to a survey from the President of

20  Mattel Brands, Matt Bousquette, confirming compliance with Mattel's Code of

21  Conduct, Brawer wrote back that he "applaud[ed] the company's vigorous

22  protection of it's [sic] intellectual property," reflecting Brawer's clear

23  understanding that Mattel required its proprietary information to be kept

24  confidential.

25      67.   In April 2004, Mattel promoted Brawer to Senior Vice

26  President/General Manager. The General Manager position also is an executive

27  position of trust and confidence. The role of a General Manager is to lead a cross-

28  functional "Customer Business Team." Each General Manager is accountable for a

-47-

1    strategic partnership with a key Mattel retailer, covering all aspects of the business,
2    including both traditional toy sales and retail development of licensed products.

3          68.    In or about late May 2004, Brawer began performing General
4    Manager duties, working with one of Mattel's major retail customer accounts.
5    Thereafter, Brawer began receiving information related not only to the Senior Vice
6    President, Customer Marketing position that he still formally held, but also began
7    receiving detailed information related to his role as General Manager. Brawer
8    began requesting and analyzing detailed information related to Mattel and its four
9    key retail accounts.

10         69.    On September 15, 2004, Brawer left work at noon for observance
11   of Rosh Hashanah. As Brawer left, he carried a large cardboard box with binders
12   and other materials. Several hours after his departure, Brawer instructed his
13   assistant to print Mattel's 2004 Sales Plan for one of Mattel's significant customers
14   and to provide it to him, falsely claiming he needed it for a meeting

15         70.    On September 17, 2004, Brawer returned to Mattel and
16   immediately informed his supervisor that he was leaving Mattel, effective October
17   1, 2004, to work for competitor MGA.

18         71.    On September 20, 2004, Mattel hand-delivered a letter to Brawer
19   reminding him of his continuing obligation to preserve the confidentiality of
20   Mattel's proprietary information and trade secrets not only through October 1,
21   2004, but continuing beyond the termination of his employment.

22         72.    At his exit interview on September 29, 2004, Mattel reminded
23   Brawer that he had ongoing duties of confidentiality to Mattel, even after the
24   termination of his employment. Brawer was given a copy of his Original
25   Confidentiality Agreement, which he had signed on April 22, 1996, and another
26   copy of the Code of Conduct. During the exit interview, however, Brawer noted
27   that he had not signed the Code of Conduct, which he intended and Mattel
28   understood to mean that Brawer believed he was not bound by Mattel's policy

EXHIBIT __15__
PAGE __247__

1  because he had not signed it. Brawer was unwilling to complete or sign the form

2  that sought to confirm that Brawer understood his ongoing obligations under the

3  Code of Conduct, which included the obligation to preserve the confidentiality of

4  Mattel's proprietary and trade secret information.

5         73.   On October 1, 2004, Brawer's final day of employment with

6  Mattel, Mattel hand-delivered to Brawer a letter that, among other things, reminded

7  Brawer of his confidentiality obligations to Mattel under the Code of Conduct.

8         74.   Upon joining MGA, Brawer became its Executive Vice-

9  President of Sales and Marketing. In that role he was responsible for MGA's sales

10  worldwide. As part of those responsibilities, Brawer had and continues to have

11  responsibility for MGA's accounts with the same retailers that he worked with

12  while at Mattel.

13         75.   Brawer represented during his Mattel exit interview that he had

14  returned all proprietary information to Mattel. That representation was false. On

15  information and belief, Brawer removed proprietary and trade secret information

16  from Mattel that he did not return. Mattel is informed and believes that Brawer did

17  not return to Mattel, for example, the information contained in his contacts file.

18  The contacts file included contact information for Mattel customers, most notably

19  TRU, and extensive contact information for Mattel employees, including titles, e-

20  mail addresses and telephone numbers.

21         76.   Brawer has used that contact information on a regular basis.

22  Since leaving Mattel, Brawer has had contacts with Mattel employees, both by

23  telephone and by electronic mail. Based on his knowledge of Mattel's operations

24  and the roles of certain Mattel employees, he has targeted certain Mattel employees

25  who have broad access to Mattel proprietary information in an effort to induce and

26  encourage them to join MGA and to steal or otherwise wrongfully misappropriate

27  Mattel confidential information and trade secrets. Brawer has done so by

28  promising these Mattel employees salaries 25 percent or more higher than they earn

00505.07209/2875224.1

-49-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT ___15___

PAGE ___268___

1  at Mattel and stating to them that they should not be concerned by legal action

2  taken by Mattel to protect its trade secrets and its rights because such claims are

3  hard to prove and easy to defeat.

4  **VI.  MGA HIRES OTHER KEY PERSONNEL FROM MATTEL IN**

5  **ORDER TO OBTAIN TRADE SECRET AND HIGHLY**

6  **CONFIDENTIAL INFORMATION REGARDING MATTEL'S**

7  **FORECASTING & INVENTORY MANAGEMENT SYSTEMS**

8  77.  On March 13, 2006, MGA recruited Jorge Castilla, Mattel's

9  Planning Specialist for Operations, Planning & Finance.  Before he left Mattel,

10  Castilla stole on behalf of counter-defendants significant Mattel trade secrets and

11  proprietary information.

12  78.  Castilla joined Mattel in November 1999 and, in positions both

13  in Europe and the U.S., played a role in Mattel's development of highly proprietary

14  processes and systems for forecasting and inventory management in which Mattel

15  invested heavily.  In Mattel's European operations, Mr. Castilla was involved in

16  Mattel's development of a pilot program to improve sales forecasting in the United

17  Kingdom, and later, with the potential application of the pilot program to Mattel's

18  world-wide sales forecasting.

19  79.  In late 2004, Castilla worked with the International Planning

20  group at Mattel's headquarters in El Segundo, California, where he was responsible

21  for establishing Mattel's Electronic Data Warehouse system, a proprietary database

22  containing highly confidential business information, such as sales, future/pending

23  orders, product availability and sales forecasts at the stock keeping unit level.

24  Additionally, he was responsible for implementing Mattel's customized sales

25  forecasting system and preparing information for senior financial officers regarding

26  inventory levels, sales demands and related topics.

27  80.  Throughout his tenure at Mattel, Castilla became privy to some

28  of Mattel's most confidential and valuable information.  Castilla acknowledged his

-50-

EXHIBIT __15__

PAGE __269__

1 position of trust confidence and agreed that he would preserve and would not.
2 disclose or misuse Mattel's proprietary or confidential information on numerous
3 occasions. For example, in Castilla's Employee Confidential Information and
4 Inventions Agreement, which he signed on October 29, 1999, he acknowledged
5 that he would develop and have access to Mattel proprietary information. Castilla
6 further agreed not to "disclose or use at any time either during or after my
7 employment with [Mattel], any Proprietary Information," and to "cooperate with
8 the Company and use [his] best efforts to prevent the unauthorized disclosure, use
9 or reproduction of all Proprietary Information." He also agreed that when he left
10 Mattel's employ, he would deliver to Mattel "all tangible, written, graphical,
11 machine readable and other materials (including all copies in [his] possession or
12 under [his] control containing or disclosing Proprietary Information."

13        81.   Castilla had agreed to the terms in Mattel's Code of Conduct to
14 preserve Mattel's confidential and proprietary information and was specifically
15 warned that "the unauthorized use or disclosure of [Mattel's] confidential,
16 proprietary or trade secret information" may result in the termination of his
17 employment. He further agreed:

18        Employees have an obligation to protect the Company's
19        confidential and proprietary information. Confidential and
20        proprietary information is any information which is not
21        generally known to the public that is useful to the
22        Company and that would either be useful to the
23        Company's competitors or third parties or harmful to the
24        Company or its customers, if disclosed. Confidential and
25        proprietary information includes, but is not limited to,
26        trade secrets, revenue and profit information and
27        projections, new product information, sales and marketing
28        plans, design and development plans, manufacturing

1          processes, confidential personnel information and

2          information regarding potential acquisitions, divestitures

3          and/or investments.

4        82.   On Monday, March 13, 2006, Castilla informed Mattel that he

5  was resigning to take a position with MGA, as a Manager of Global Sales Planning,

6  with responsibilities that substantially paralleled those that he had at Mattel.

7        83.   During Castilla's exit interview on March 13, 2006, he was

8  provided with a document reminding him of his obligations to preserve Mattel's

9  confidential and proprietary information, including his obligations under Mattel's

10  Employee Confidential Information and Inventions Agreement, including but not

11  limited to "inventions, marketing plans, product plans, business strategies, forecasts

12  and personnel information." Further, Castilla filled out an exit interview checkout

13  form, in which he acknowledged receiving not only the reminder, but also the

14  Mattel Code of Conduct. Castilla also acknowledged that, during the course of his

15  employment at Mattel, he had received materials containing confidential and

16  proprietary information, and affirmed that he did not copy or disclose any of the

17  listed documents or the information that they contained to anyone outside of

18  Mattel, and denied having possession of any of the listed documents. He also

19  affirmed that he returned to Mattel all of its confidential and proprietary documents

20  by representing that he "brought them in on March 12, 2006, filed them and put

21  together a summary of ongoing projects for supervisor, Brenda [Ray-Martin]."

22        84.   Despite his affirmations to the contrary, as of Friday, March 10,

23  2006, Castilla had created a folder on his Mattel network share drive that he labeled

24  "To Take." The folder contained approximately 56 megabytes of information. The

25  bulk of that information was made up of documents containing Mattel trade secrets

26  and confidential information, including documents related to inventory

27  management and forecasting for Mattel, as well as a highly confidential document

28  prepared by Mattel's senior executives that laid out Mattel's future international

-52-

THIRD AMENDED ANSWER AND COUNTERCLAIMS



EXHIBIT __15__

PAGE __211__

1  business strategies and marketing priorities not only up to today, but also for the
2  coming years.

3       85.    Just prior to his resignation, Castilla entered Mattel's
4  headquarters building at approximately 9:30 a.m. on Sunday, March 12, 2006 and
5  departed at approximately 2:00 p.m.  By Monday, March 13, 2006, Castilla had
6  deleted the "To Take" folder and its contents from his network share drive.  Castilla
7  had transferred the information in the "To Take" folder and potentially the folder
8  itself to an e-mail account <hoclau04@gmail.com>, <hoclau04@yahoo.com>
9  and/or to a personal digital assistant device.

10      86.    When he was later interviewed by the FBI about his theft, on
11 information and belief Castilla turned over to the FBI agents the storage media
12 from his personal digital device which contained Mattel trade secrets.  When
13 deposed in connection with this case, Castilla refused to answer questions about his
14 misconduct and instead invoked the Fifth Amendment nearly 500 times.

15      87.    Much of the Mattel trade secrets and confidential information
16 that Castilla took from Mattel related to the successful processes for efficient and
17 cost-effective management of inventory and the use of sophisticated forecasting
18 techniques that Mattel, through significant investment, developed to obtain a
19 competitive advantage in the toy industry with its unique order, manufacture and
20 delivery cycles.  The former Mattel employees working at MGA recognized the
21 value of Castilla's knowledge.  MGA was in dire need of improved inventory
22 management and forecasting, and to remedy this problem MGA targeted Castilla—
23 and the Mattel-specific knowledge that he possessed—and lured him to MGA.
24 With the benefit of the information that he brought with him, on information and
25 belief, MGA, including through Castilla, has used that proprietary and confidential
26 information to improve MGA's sales forecasting and inventory planning, thus
27 saving MGA many millions of dollars, and providing it with other advantages.
28

-53-

EXHIBIT __15__
PAGE __212__

## VII. MGA STEALS MATTEL TRADE SECRETS IN CANADA

88. In an effort to increase its market share and sales in Canada and elsewhere, MGA stole Mattel trade secrets regarding Mattel's customers, sales, projects, advertising and strategy, not only for Canada, but the United States and the rest of the world.

89. Janine Brisbois was a Director of Sales for the Girls Division in Canada. Mattel hired her as a National Account Manager in August 1999. When she was hired as a Mattel employee, Brisbois agreed that she would preserve and would not disclose Mattel's proprietary or confidential information. For example, Brisbois agreed:

> You must keep Mattel's Proprietary Information confidential,
> and you may only use or disclose such information as necessary
> to perform your job responsibilities in accordance with Mattel
> policies. Your obligation to keep Mattel's Proprietary
> Information confidential will continue even after any termination
> of your employment with your employer.
>
> . . .
>
> Mattel takes steps to maintain the secrecy and confidential nature
> of Mattel's Proprietary Information and, if a competitor
> discovered Mattel's Proprietary Information, it could
> significantly damage Mattel and your Employer.

90. While with Mattel, Brisbois had responsibility for Mattel's account with TRU and later had responsibility for Mattel's Wal-Mart account. In her capacity as Sales Director-Wal-Mart/CTC/Girls Team, Brisbois had access to Mattel confidential and proprietary information regarding Mattel's future product lines, advertising and promotional campaigns and product profitability.

91. On September 26, 2005, Brisbois resigned from Mattel to take a position as Vice President of Sales at MGA. Mattel is informed and believes that

1  in that position Brisbois has responsibility for MGA's accounts with both TRU and

2  Wal-Mart.  During Brisbois' exit interview she was specifically asked whether she

3  was "taking anything."  Brisbois responded, "No."  Both during and after her exit

4  interview, Brisbois was advised by Mattel of her obligations to preserve Mattel's

5  confidential and proprietary information.

6         92.   Mattel is informed and believes that Brisbois spoke with Isaac

7  Larian, MGA's CEO, on September 22, 2005 at approximately 8:30 p.m., when he

8  called Ms. Brisbois at her home.  Mattel subsequently learned that on the same day

9  that she spoke with Mr. Larian and four days before she resigned, Brisbois copied

10  approximately 45 Mattel documents on to a USB or "thumb" drive with the volume

11  label "BACKPACK."  On information and belief, Brisbois removed the thumb

12  drive from Mattel Canada's office by concealing it in her backpack or gym bag the

13  last time that she left that office.  These documents contained Mattel trade secret

14  and proprietary information, and included:

15        &bull;  a document containing the price, cost, sales plan and quantity of every

16          Mattel product ordered by every Mattel customer in 2005 and 2006;

17        &bull;  the BARBIE television advertising strategy and information concerning

18          sales increases generated by television advertisements;

19        &bull;  competitive analysis of Mattel vis-à-vis its competitors in Canada;

20        &bull;  an analysis of Mattel's girls business sales beginning in 2003 and

21          forecasts through 2006;

22        &bull;  profit and loss reviews for Mattel's products being sold in Wal-Mart,

23          including margins and profit in not only Canada, but in the United

24          States and Mexico; and

25        &bull;  a document containing the product launch dates and related advertising

26          for all Mattel new products between Fall 2005 and Spring 2006.

27         93.   After Mattel discovered that Brisbois had copied these sensitive

28  documents to a thumb drive, Mattel notified Canadian law enforcement authorities.

1   Canadian law enforcement authorities recovered from Brisbois a thumb drive with
2   the volume label "BACKPACK" containing the documents that Brisbois had
3   copied from Mattel's computer system. Mattel later learned that while she was
4   working as a Vice President of Sales at MGA, Brisbois accessed and modified
5   documents on that thumb drive.

6       94.   After joining MGA, Brisbois repeatedly traveled to MGA's
7   offices in Van Nuys, California and met with Larian and Brawer. In February,
8   2006, knowing that Mattel trade secrets had been seized from MGA's Mexico City
9   offices and that at least three MGA employees were under criminal investigation,
10  MGA nonetheless issued a press release trumpeting its 2005 performance, with
11  Larian himself concluding, "Our international teams in Mexico and Canada have
12  done a fantastic job."

13  **VIII. AT MGA'S DIRECTION, MATTEL EMPLOYEES IN ADDITION TO**
14  **BRYANT SECRETLY WORK ON BRATZ FOR YEARS**

15      95.   MGA also knowingly bribed and secretly used Mattel employees
16  in addition to Bryant to work on MGA products such as Bratz while they were
17  Mattel employees and, furthermore, fraudulently concealed such activity. On
18  December 28, 2007, MGA vendor and agent Veronica Marlow revealed at her
19  deposition that, beginning in 2000 and continuing over a time period spanning at
20  least five years, at least three Mattel employees in addition to Bryant worked on
21  Bratz while employed by Mattel: Ana Isabel Cabrera, Beatriz Morales and Maria
22  Elena Salazar. Like Bryant, these Mattel employees all signed agreements
23  assigning Mattel all rights to intellectual property they created while employed by
24  Mattel. Each of the three Mattel employees worked for MGA through Marlow, to
25  whom MGA and Bryant have paid millions of dollars since 2000.

26      96.   Following Marlow's December 2007 deposition, Ms. Cabrera
27  and Ms. Morales, who were still Mattel employees, admitted to being paid for and
28  working on Bratz while Mattel employees and to knowing that such conduct was

1 wrong. Both specifically acknowledged that they continued to work on Bratz even
2 after Mattel had made them aware of this litigation involving Bryant's secret, illegal
3 work with MGA and had reiterated the need to protect Mattel's intellectual
4 property. Both admitted that they tried to conceal their work for MGA.

5       97.   MGA and Larian knew that their bribery and use of Mattel
6 employees was wrongful and took steps to conceal that misconduct. Among other
7 things: (a) MGA and Larian, by and through their agents Peter Marlow and
8 Veronica Marlow, used devices such as paying the Mattel employees in cash and
9 using false names and false social security numbers in tax and other business
10 records; (b) MGA and Larian continued their acts of bribery and other misconduct
11 after this litigation was filed; (c) MGA and Larian failed to disclose their payments
12 to these Mattel employees despite Court Orders compelling them to disclose any
13 such instances; and (d) MGA and Larian hired Maria Elena Salazar after she left
14 Mattel, even though she specifically touted in her employment application to MGA
15 that she worked on the "first patterns for [the] Bratz doll and release;" and (e) in an
16 email from Peter Marlow to Larian and Paula Garcia of MGA dated June 20, 2005,
17 Marlow informed MGA that the pattern and sample makers "have secure day jobs
18 with an outlook of many more years of stability," they "moonlight" to work on
19 Bratz and "[t]hey have more than 100 years total of doll-making experience
20 between them."

21 **IX. MGA PERSUADES OTHER EMPLOYEES LEAVING MATTEL TO**
22      **JOIN MGA TO MISAPPROPRIATE MATTEL TRADE SECRETS**
23      **FOR THE BENEFIT OF MGA**

24       98.   In the past few years, MGA has hired directly over 100 Mattel
25 employees, ranging from Senior Vice-President level to lower level employees. On
26 information and belief, many of these employees were specifically targeted and
27 recruited by MGA, including by Larian and Brawer, based on the Mattel
28 confidential and proprietary information they could access. Many of these

1   employees had access to proprietary and confidential Mattel information. Mattel

2   believes that some of those former Mattel employees may be observing their

3   obligations not to misappropriate, disclose or use Mattel's confidential and

4   proprietary information. Mattel is informed and believes, however, that certain

5   additional employees accessed, copied and took from Mattel confidential and

6   proprietary information, including Mattel's strategic plans; business operations,

7   methods and systems; marketing and advertising strategies and plans; future

8   product lines; product profit margins; and customer requirements. The

9   misappropriated confidential and proprietary information included information that

10  these Mattel employees were not authorized to access. On information and belief,

11  the misappropriated confidential and proprietary information taken from Mattel is

12  being disclosed to and used by MGA for the benefit of MGA and to the detriment

13  of Mattel.

14  **X.   LARIAN MAKES MISREPRESENTATIONS TO RETAILERS ABOUT**

15  **MATTEL'S PRODUCTS**

16          99.   Counter-defendants have engaged in other illegal practices in

17  their efforts to compete unfairly with Mattel. Larian has a practice of sending e-

18  mail messages to a "Bratz News" distribution list that Larian created or that was

19  created for him. Mattel is informed and believes that the recipients of e-mail

20  messages sent to the "Bratz News" distribution list include members of the media

21  as well as representatives of many of Mattel's most significant customers.

22          100.  On May 12, 2006, Larian sent an e-mail message to the "Bratz

23  News" distribution list that included a reference to Mattel's updated MY SCENE

24  MY BLING BLING product with real gems. Mattel had not publicly announced

25  this product at the time that Larian sent his May 12, 2006 e-mail. In fact, Mattel

26  had guarded the identification of this particular product.

27          101.  Shortly thereafter, Larian engaged in a campaign of calling

28  Mattel's most significant customers, including but not limited to Target and TRU,

00505.07209/2875224.1

-58-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT ___15___

PAGE ___277___

1 | regarding the MY SCENE MY BLING BLING product with real gems. In an
2 | effort to dissuade these retailers from purchasing Mattel's MY SCENE MY BLING
3 | BLING product with real gems, Larian knowingly made false factual statements
4 | about that product to each retailer. As of the writing of this Third Amended
5 | Answer and Counterclaims, Mattel is aware that Larian represented to each retailer
6 | that each was the only retailer to purchase the product and that Mattel would not be
7 | supporting the product with television advertising. At the time that Larian made
8 | these statements, he knew them to be false. As a result of Larian's
9 | misrepresentations, at least one retailer cancelled its order for 75,000 units of the
10 | MY SCENE MY BLING BLING product with real gems. Only after Mattel
11 | learned of Larian's misrepresentations and was able to correct them was Mattel able
12 | to assure the retailer that Larian's representations were false and to persuade the
13 | retailer to reinstate the order.

14 |           102. Such conduct is not an isolated incident. MGA and Larian, in an
15 | effort to gain an unfair competitive advantage, repeatedly issued false and
16 | misleading press releases and spread false rumors in the marketplace. In these
17 | press releases and in their other statements made in marketplace, MGA and Larian
18 | have deliberately misrepresented Bratz's sales, Bratz's market share, Bratz's
19 | position vis-à-vis Mattel's BARBIE products, sales of Mattel's BARBIE products
20 | and the market share of Mattel's BARBIE products.

21 | **XI. LARIAN AND MGA DESTROY DOCUMENTS, ENGAGE IN**
22 |     **PERJURY, CONSPIRACY TO COMMIT PERJURY AND**
23 |     **OBSTRUCTION OF JUSTICE**

24 |           103. On information and belief, Larian and MGA have themselves,
25 | and through their agents and co-conspirators, destroyed, altered, fabricated and
26 | back-dated documents and engaged in other acts of spoliation to conceal the
27 | existence, nature and breadth of their wrongful conduct. For example, and without
28 | limitation, Farhad Larian, a former MGA executive and director and Isaac Larian's

EXHIBIT _____ /5

PAGE __278__

1  brother, deliberately destroyed several boxes of documents relevant to Mattel's
2  claims against Bryant and MGA to keep them from Mattel. Farhad Larian did so
3  while still on MGA's payroll.

4         104. On information and belief, Larian and MGA have also conspired
5  to commit perjury and engaged in acts of perjury and other acts of obstruction in
6  connection with MGA's theft of Mattel's property and Mattel's claims relating
7  thereto. These actions include, among others, MGA's submission of false
8  information in sworn applications to the U.S. Copyright Office; Larian's repeated
9  sworn testimony during Phase 1 that Bryant told him, and that Larian believed, that
10 Bryant had not created Bratz while employed by Mattel; MGA's and Larian's
11 submission of false statements regarding MGA's ability to receive outside funding
12 in court pleadings and false statements regarding its financial condition in this
13 action.

14 **XII. MGA AND LARIAN LAUNDER MONEY, ENGAGE IN**
15      **FRAUDULENT TRANSFERS AND ATTEMPT TO OBTAIN SHAM**
16      **PRIORITY OVER MATTEL'S CLAIMS**

17        105. MGA and Larian, on information and belief, have engaged in
18 and continue to engage in a complex scheme to transfer, launder or otherwise hide
19 the ill-gotten funds they have obtained by virtue of their unlawful conduct and have
20 gone to extensive lengths to cover up and obscure such activities. On information
21 and belief, this scheme was orchestrated and/or commenced no later than 2007, but
22 accelerated during the pendency of trial, especially after the Jury's Phase 1A
23 verdict in Mattel's favor. This scheme continues to and beyond this day and
24 threatens to continue into the future.

25       106. On information and belief, in concert with various co-
26 conspirators and shell companies controlled by them, acting on their behalf or in
27 which they have an interest, MGA and Larian have transferred or transported, or
28 caused to be transferred or transported, funds obtained through their unlawful

-60-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT __/5__
PAGE __279__

1    conduct in interstate commerce, including without limitation out of the United
2    States. At least some of these funds, on information and belief, were later returned
3    to the United States through shell entities that attempt to disguise not only the true
4    owners of the companies, but the origin and source of the funds as well.

5          107. These entities have, on information and belief, funded further
6    wrongdoing by MGA and Larian, including the purported purchase, at a substantial
7    discount, of notes held by MGA's then-largest creditor, Wachovia, and other
8    members of a bank syndicate. By this scheme, Larian and his co-conspirators
9    sought to disguise their identities and to obtain purported priority as an alleged
10   secure creditor (rather than as a shareholder) over Mattel's claims against MGA
11   and MGA's assets, including without limitation Bratz assets. On information and
12   belief, MGA and Larian conducted and participated in this scheme with the purpose
13   of concealing and manipulating their assets and liabilities and the appearance of
14   their financial condition in anticipation of their liability to Mattel, and for the
15   purpose of minimizing any exposure due to that liability. The scheme has directly
16   assisted MGA and Larian in committing the other wrongs against Mattel identified
17   herein.

18      **A.    Larian and MGA Create Various Shell and Off-Shore Entities**

19         108. On information and belief, Larian and MGA, and those acting in
20   concert with them, have created, affiliated with, employed or purchased one or
21   more shell entities to either transfer or assist in the transfer of proceeds generated
22   by their unlawful conduct and the criminal enterprises. These include, but are not
23   limited to, the following entities and transactions:

24      • Lexington Financial Limited ("Lexington"), a company purportedly
25        based in the Caribbean island nation of Nevis that is notorious for its
26        secrecy laws. Lexington, whose purported London business address
27        listed in filings with the State of California is nothing more than a
28        virtual office provided by a London company for a few dollars a month,

00505.07209/2875224.1

-61-

EXHIBIT ___15___
PAGE ___280___

1    appears to be a non-operating shell corporation. Lexington was
2    registered on March 3, 2006 by persons who, on information and belief,
3    were acting on behalf of or in concert with Larian, and Larian and his
4    co-conspirators used and continue to use Lexington to conceal, receive,
5    hold and transfer funds generated by the wrongful conduct alleged
6    herein.

7    •   Vision Capital, LLC, a Delaware limited liability company ("Vision
8        Capital"), which, on information and belief, was created by persons at
9        the direction or on behalf of Larian on August 19, 2008, just after the
10       Phase 1A verdict in Mattel's favor. On information and belief, Larian
11       and his co-conspirators used and continue to use Vision Capital to
12       conceal, receive, hold and transfer funds generated by their wrongful
13       conduct alleged herein.

14   •   Omni 808 Investors, LLC, a California limited liability corporation
15       ("Omni 808"), which, on information and belief, was created at the
16       direction or on behalf of Larian on August 12, 2008, just after the Phase
17       1A verdict in Mattel's favor. On information and belief, Larian and his
18       co-conspirators used and continue to use Omni 808 to conceal, receive,
19       hold and transfer funds generated by their wrongful conduct alleged
20       herein. In 2006, Neil Kadisha, the alleged CEO of Omni 808 and a
21       Larian co-conspirator, was found by a court after trial to be "no more
22       than a common thief" and was held liable for stealing millions of
23       dollars as part of a decade-long pattern of fraudulent conduct that
24       included perjury, subornation of perjury, fabrication of financial
25       records, sham transactions, preparation of back-dated documents,
26       fraudulent accountings, acts of looting, embezzlement and other
27       misappropriations of funds, breaches of fiduciary duty, conflicts of
28       interest and illegal self-dealing.

-62-

1    109. Lexington claims a purported security interest in the assets of
2    Vision Capital. Vision Capital claims a purported security interest in the assets of
3    Omni 808.

4    110. MGA and Larian, and their co-conspirators, have, on information
5    and belief, used these entities to transfer their ill-gotten funds from the United
6    States and/or to move laundered funds back into the United States, including
7    without limitation in an attempt to obtain purported priority as an alleged secured
8    creditor over Mattel's claims and to deprive Mattel of assets to which it has a
9    legitimate claim.

10    111. On information and belief, Lexington, Vision Capital and Omni
11    808 are alter-egos of each other, the companies being mere shells created and
12    operated pursuant to a fraudulent scheme as alleged herein, and with their financial
13    affairs being significantly intermingled and interconnected.

14    112. On information and belief, Larian, either alone or with other co-
15    conspirators, formed or caused to be formed the alter-ego entity IGWT Group on
16    June 26, 2008—during the Phase 1 trial—and registered its place of business as
17    Larian's home address. On information and belief, Larian, either alone or with
18    other co-conspirators, also formed or caused to be formed an affiliate alter-ego
19    entity called IGWT 826 Investments on August 27, 2008—the day after the Phase 1
20    trial ended. IGWT 826 Investments is registered at the home address of Shirin
21    Makabi and Jahangir Eli Makabi. Shirin Makabi is Isaac Larian's sister, Jahangir
22    Eli Makabi is Isaac Larian's brother-in-law, and both are shareholders or beneficial
23    shareholders of MGA through various trusts.

24    **B.    The Purported Acquisition of the Wachovia Debt**

25    113. After the Phase 1A verdict, MGA and Larian represented on
26    multiple occasions to both this Court and the Ninth Circuit that MGA was in dire
27    financial straits and might file imminently for bankruptcy. MGA and Larian    .
28    represented to the Court that MGA had not obtained and could not obtain funding

00505.07209/2875224.1

-63-
THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT ___15___
PAGE ___282___

1   (a representation that MGA later was forced to retract as false).  At the same time
2   MGA's largest lender, Wachovia, accelerated over $313 million dollars worth of
3   debt that MGA owed it and triggered the lock-box provision of its loan agreements
4   with MGA, which required the transfer to Wachovia of all, or substantially all, of
5   the revenue that MGA received.

6        114.  On information and belief, Larian and MGA, and their co-
7   conspirators, in order to maintain control over MGA's revenue and to frustrate the
8   jury's verdicts in Mattel's favor, determined to purchase the Wachovia note
9   through various entities affiliated with Larian or with MGA.  On information and
10  belief, Larian intended to use Lexington, Vision Capital, Omni 808, the IGWT
11  entities and other vehicles currently unknown to Mattel (because of the efforts by
12  MGA, Larian, Omni 808 and their co-conspirators to conceal them) to distance
13  himself from the transaction and thereby conceal the true source of the funds used
14  to purportedly purchase the Wachovia note and to conceal that Larian in fact
15  participated in or controlled the acquisition of the debt, directly or indirectly.  On
16  information and belief, at Larian's urging and acting in concert with Larian, Omni
17  808 purportedly acquired the bulk of that debt at a massive discount.

18       115.  Omni 808 has represented to the Court that its claimed
19  acquisition of the Wachovia note was an arms-length business deal.  Omni 808 has
20  also represented to the Court that the funds used for the purported acquisition did
21  not originate from MGA or Larian.  Wachovia and others, however, recently
22  produced documents that undermine these claims and representations.  For
23  example, a July 29, 2008 offer letter to Wachovia states that Larian would have a
24  non-voting limited interest in the loan acquisition.  As another example, a Senior
25  Promissory Note between MGA and Wachovia, dated September 3, 2008,
26  specifically identifies Omni 808 as an affiliate of MGA.

27       116.  Moreover, Vision Capital, which claims it holds a purported
28  security interest in Omni 808, is also affiliated with MGA.  Vision Capital has

-64-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT ___/5__

PAGE __283__

1    listed its address as 1525 South Broadway, Los Angeles, California. Mattel has not
2    been able to identify an active business named Vision Capital located there. Mattel
3    did identify this as the location of Neman Brothers & Associates, a business owned
4    by Leon Neman, Larian's brother-in-law who has served as an MGA director.
5    After Mattel uncovered these facts, Mr. Neman claimed to be an alleged principal
6    of Vision Capital.

7            117. On information and belief, the funds Omni 808 used to
8    purportedly purchase the Wachovia note were, in whole or in part, generated by
9    Larian's and MGA's wrongful conduct directed towards Mattel. On information
10   and belief, Larian has used, at least in part, IGWT Group, IGWT 826 Investments,
11   Lexington, Vision Capital and other shell and alter-ego companies as conduits to
12   transfer funds to Omni 808 and others and to conceal the source of such funds.

13           118. MGA and Larian have now also admitted that Omni 808
14   provided additional funds to MGA beyond the Wachovia debt purchase, though
15   MGA first denied that was the case. MGA and Omni 808 entered into a Secured
16   Delayed Draw Demand Note on October 16, 2008. Pursuant to the terms of that
17   Note, Omni 808 would make available up to $40 million of additional purported
18   credit to MGA. Pursuant to a written request submitted by MGA on October 17,
19   2008, Omni 808 loaned MGA an additional $6 million under that Note. On
20   information and belief, those funds also were, in whole or in part, generated by
21   Larian's and MGA's wrongful conduct towards Mattel and transferred through
22   Larian-controlled conduits to conceal the true source of the funds. In fact, the
23   Secured Delayed Draw Demand Note between MGA and Omni 808 states that
24   Omni 808's funding came, at least in part, from IGWT 826 Investments.

25           119. On information and belief, Omni 808's claimed acquisition of
26   the Wachovia note was not an "arms-length" transaction by an independent
27   investor or investors. Instead it was, on information and belief, an insider
28   transaction facilitated by Larian and MGA through the use of nominally

                                         THIRD AMENDED ANSWER AND COUNTERCLAIMS
                                         EXHIBIT ___/5___
                                         PAGE __284__

1 │ independent but affiliated entities, for wrongful purposes that include without
2 │ limitation maintaining substantial control over MGA's revenues in the near term,
3 │ continuing with their wrongful activities despite the jury's verdict against them and
4 │ establishing purported priority as a secured creditor over Mattel's claims in any
5 │ eventual bankruptcy. On information and belief, Larian participated and was
6 │ involved in the purported acquisition of MGA's debt, though the claimed
7 │ acquisition was structured to conceal it from Mattel.

8 │        120. While the precise mechanisms by which Larian transferred funds
9 │ and manipulated MGA's and Larian's finances through these conduits is not yet
10 │ known to Mattel because such information is in the exclusive possession and
11 │ control of MGA, Larian and their co-conspirators, and they have refused to disclose
12 │ or misrepresented even basic information such as the alleged owners of the entities,
13 │ on information and belief Larian and his affiliates have created shell entities for the
14 │ purpose of obscuring and concealing the true ownership of assets held and origin of
15 │ funds transferred, while Larian and his family members and affiliates further have
16 │ made massive distributions and other payments totaling hundreds of millions of
17 │ dollars from MGA to themselves and engaged in a series of related-party
18 │ transactions as part of a scheme to convert at least tens of millions of dollars in
19 │ MGA equity into debt.

20 │        121. For example, according to an MGA Lender Update dated
21 │ November 1, 2007, in approximately August 2007, MGA made purported loans in
22 │ the amount of 2.5 million euros for investments in another toy company, called
23 │ Zapf, purportedly on behalf of Larian and his family. Another 12 million euros
24 │ were due in November 2007, for which MGA was liable if Larian did not
25 │ contribute. As shown in a Master Assignment and Exchange Agreement between
26 │ Omni 808, MGA, and MGA de Mexico and Wachovia and dated September 3,
27 │ 2008, soon after the Phase 1A verdict and during the Phase 1B trial Larian and his
28 │ family members (including, without limitation, Jahangir Eli Makabi and Shirin

-66-
THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT __15__
PAGE __285__

1    Larian Makabi as Co-Trustees of the Makabi Living Trust, Isaac Larian and Angela

2    Larian as Trustees of the Larian Living Trust, the Angela Larian Qualified Annuity

3    Trust, the Isaac E. Larian Qualified Annuity Trust, the Jahangir Eli Makabi

4    Qualified Annuity Trust, Jahangir Eli Makabi, and the Shirin Larian Makabi

5    Qualified Annuity Trust) executed a series of twenty-two separate transactions (on

6    August 4, 5, 8, 19, 25, 2008) which purported to transfer as loans by shareholders

7    over $13.3 million from U.S. based trust accounts to MGA Entertainment (HK)

8    Limited.  Another series of twenty-two transfers (also on August 4, 5, 8, 19, 25,

9    2008) show that Larian and these same family members, MGA shareholders, have

10   also purported to loan nearly $6 million in funds to MGA.

11        C.    **Larian Loots MGA's Assets by Selling MGA Inventory to Himself**

12              **at Fire Sale Prices**

13              122.  On information and belief, Larian and MGA have transferred and

14   are continuing to transfer assets from MGA by coordinating the sale of significant

15   MGA inventory, at substantial discounts, to companies affiliated with Larian.

16   These transactions have had the effect of denuding MGA of its most valuable

17   inventory, sold to Larian's own companies for pennies on the dollar, while

18   permitting Larian to substantially benefit by reselling MGA's inventory, and while

19   further infringing Mattel's intellectual property.

20              123.  On information and belief, Larian, through the Larian-controlled

21   IGWT entities, is purchasing Bratz products that infringe Mattel's rights and other

22   MGA products for steep discounts and reselling, distributing and offering for sale

23   such products.  MGA has admitted that it sold tens of millions of dollars in Bratz

24   inventory to IGWT entities at a "substantial discount."  Documents show that the

25   discount on this self-dealing transaction was in fact massive.

26              124.  In May of 2008, when MGA was undergoing cash-flow

27   problems for reasons that included Larian's on-going de facto liquidation of MGA

28   assets, Larian arranged to have MGA purportedly sell vast amounts of MGA

EXHIBIT ___15___

PAGE ___286___

1    inventory, including infringing Bratz products, to himself through the IGWT
2    Group. As shown by an Inventory Purchase Agreement between MGA and IGWT
3    Group, dated July 7, 2008, MGA purportedly agreed to sell hundreds of thousands
4    of inventory items to Larian's IGWT Group. This agreement was signed by Larian
5    on behalf of both MGA and IGWT Group. Through this transaction, MGA sold
6    inventory with a retail value of more than $65 million for just $5.3 million.

7         125. MGA and Larian have claimed that the arrangement was to
8    MGA's benefit because the deal involved obsolete and overstock inventory.
9    However, as the Bill of Sale accompanying the agreement (which shows the SKUs
10   of the products IGWT Group purchased) shows, inventory MGA sold to IGWT
11   Group included current inventory, including current Bratz products.

12        126. The full extent of this and other transactions by which Larian has
13   arranged the substantially discounted sale of MGA assets to IGWT Group or other
14   Larian-controlled entities or affiliates is not yet known to Mattel because such
15   information is in the exclusive possession and control of MGA, Larian, the IGWT
16   entities and their co-conspirators, and they have refused to disclose information to
17   Mattel. On information and belief, by arranging this type of transaction with
18   IGWT Group and other similar insider transactions yet unknown to Mattel, Larian
19   has siphoned significant MGA assets for his own personal benefit. On information
20   and belief, the purported transaction with IGWT Group is only the most recent in a
21   series of insider arrangement facilitated by Larian, which, by May 16, 2008, led
22   Wachovia to conclude that Larian had engaged in a de-facto liquidation of MGA's
23   assets over the course of 2008 and other times.

24
25
26
27
28

## CLAIMS FOR RELIEF

### First Counterclaim

#### Copyright Infringement

#### (Against MGA, MGA Entertainment (HK) Limited,

#### Larian, Bryant and Does 4 through 10)

127. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 126, above, as though fully set forth at length.

128. Mattel is the owner of copyrights in works that are fixed in tangible media of expression and that are the subject of valid, and subsisting, copyright registrations owned by Mattel. These include, without limitation, the works that are the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-378-650, VA 1-378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-378-655, VA 1-378-656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-378-660, VAu 715-270, VAu 715-271 and VAu 715-273. These also include, without limitation, the works that are the subject of Registrations VAu 960-439, VAu 964-304, VAu 964-306, VAu 964-308, VAu 964-309, VAu 964-310, VAu 964-311, VAu 964-315, VAu 964-318, VAu 964-319, VAu 964-320 and VAu 964-321.

129. Counter-defendants have reproduced, created derivative works from and otherwise infringed upon the exclusive rights of Mattel in its protected works without Mattel's authorization. Counter-defendants' acts violate Mattel's exclusive rights under the Copyright Act, including without limitation Mattel's exclusive rights to reproduce its copyrighted works and to create derivative works from its copyrighted works, as set forth in 17 U.S.C. §§ 106 and 501.

130. Counter-defendants' infringement (and substantial contributions to the infringement) of Mattel's copyrighted works is and has been knowingly made without Mattel's consent and for commercial purposes and the direct financial benefit of Counter-defendants. Counter-defendants, moreover, have deliberately

EXHIBIT _15_

PAGE _288_

1  failed to exercise their right and ability to supervise the infringing activities of
2  others within their control to refrain from infringing Mattel's copyrighted works
3  and have failed to do so in order to deliberately further their significant financial
4  interest in the infringement of Mattel's copyrighted works. Accordingly, Counter-
5  defendants have engaged in direct, contributory and vicarious infringement of
6  Mattel's copyrighted works.

7        131. By virtue of Counter-defendants' infringing acts, Mattel is
8  entitled to recover Mattel's actual damages plus Counter-defendants' profits,
9  Mattel's costs of suit and attorneys' fees, and all other relief permitted under the
10  Copyright Act.

11        132. Counter-defendants' actions described above have caused and
12  will continue to cause irreparable damage to Mattel, for which Mattel has no
13  remedy at law. Unless Counter-defendants are restrained by this Court from
14  continuing their infringement of Mattel's copyrights, these injuries will continue to
15  occur in the future. Mattel is accordingly entitled to injunctive relief restraining
16  Counter-defendants from further infringement.

17                    **Second Counterclaim**
18     **Violation of the Racketeer Influenced and Corrupt Organizations Act**
19                  **18 U.S.C. §§ 1962(c) and 1964(c)**
20                  **(Against All Counter-defendants)**

21        133. Mattel repeats and realleges each and every allegation set forth in
22  paragraphs 1 through 132, above, as though fully set forth at length.

23        134. Beginning at various times from approximately 1999 through the
24  filing of this Third Amended Answer and Counterclaims, in the Central District of
25  California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK)
26  Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and
27  Brawer, Trueba, Vargas, Castilla and Brisbois were employed by and associated-in-
28  fact with an enterprise engaging in, and the activities of which affect, interstate and

00505.07209/2875224.1

-70-

1  foreign commerce (the "MGA Criminal Enterprise"). The MGA Criminal

2  Enterprise is made up of the MGA Group (MGA, MGA Entertainment (HK)

3  Limited, MGA de Mexico, Larian, certain of the Doe Counter-defendants and

4  Brawer), the Bryant Group (Bryant and certain of the Doe Counter-defendants), the

5  Mexican Group (Machado, Trueba and Vargas) and the Canadian Group (Brisbois).

6       135. In addition, beginning at various times from approximately 1999

7  through the filing of this Third Amended Answer and Counterclaims, in the Central

8  District of California and elsewhere, Counter-defendants MGA, MGA

9  Entertainment (HK) Limited, Larian and Bryant, and certain of the Doe Counter-

10  defendants, were employed by and associated-in-fact with a second enterprise

11  engaging in, and the activities of which affect, interstate and foreign commerce (the

12  "Bratz Criminal Enterprise").

13       136. Further, beginning at least as early 2007, and through the filing

14  of this Third Amended Answer and Counterclaims, in the Central District of

15  California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK)

16  Limited and Larian, as well as IGWT Group, IGWT 826 Investments, Lexington,

17  Omni 808, Vision Capital, Leon Neman, Fred Mashian, Neil Kadisha, Jahangir Eli

18  Makabi, Shirin Larian Makabi, Angela Larian, The Makabi Living Trust, The

19  Larian Living Trust, The Angela Larian Qualified Annuity Trust, The Isaac E.

20  Larian Qualified Annuity Trust, The Jahangir Eli Makabi Qualified Annuity Trust,

21  The Shirin Larian Makabi Qualified Annuity Trust and certain of the Doe Counter-

22  defendants, and others acting in concert with or on behalf of the foregoing, were

23  employed by and associated-in-fact with another enterprise engaging in, and the

24  activities of which affect, interstate and foreign commerce (the "IGWT Criminal

25  Enterprise").

26       137. MGA, MGA Entertainment (HK) Limited, MGA de Mexico,

27  Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas,

28  Brisbois, Castilla and the Other Former Employees, and each of them, for the

THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT __15__

PAGE ___290___

1    purpose of executing and attempting to execute the scheme to improperly defraud
2    Mattel and steal its trade secret or otherwise confidential and proprietary
3    information and infringe Mattel's rights and conceal such misconduct, by means of
4    tortious, fraudulent and criminal conduct, did and do unlawfully, willfully and
5    knowingly conduct and participate, directly and indirectly, in the conduct of the
6    MGA Criminal Enterprise's affairs and, in the case of MGA, MGA Entertainment
7    (HK) Limited, Larian, Bryant, and certain of the Doe Counter-defendants, the Bratz
8    Criminal Enterprise's affairs, through a pattern of racketeering activity. Their
9    actions include multiple, related acts in violation of: 18 U.S.C. § 1341 (mail fraud),
10   18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1503 (influencing or injuring officer or
11   juror generally), 18 U.S.C. § 1512 (tampering with a witness victim, or informant),
12   18 U.S.C. § 1952 (interstate and foreign travel to aid racketeering), and 18 U.S.C. §
13   2319(a) and 17 U.S.C. § 506(a)(1)(A) (criminal copyright infringement).

14          138. In addition, MGA, MGA Entertainment (HK) Limited, Larian,
15   IGWT Group, IGWT 826 Investments, Lexington, Omni 808, Vision Capital, Leon
16   Neman, Fred Mashian, Neil Kadisha, Jahangir Eli Makabi, Shirin Larian Makabi,
17   Angela Larian, The Makabi Living Trust, The Larian Living Trust, The Angela
18   Larian Qualified Annuity Trust, The Isaac E. Larian Qualified Annuity Trust, The
19   Jahangir Eli Makabi Qualified Annuity Trust, The Shirin Larian Makabi Qualified
20   Annuity Trust and Does 4 through 10, and each of them, for the purpose of
21   executing and attempting to execute the scheme to infringe Mattel's rights and
22   transfer, transport or launder the ill-gotten gains from their infringements and the
23   MGA and Bratz Criminal Enterprises' thefts and infringements, and secret MGA
24   assets and purportedly obtain priority over Mattel, by means of tortious, fraudulent,
25   and criminal conduct, did and do unlawfully, willfully, and knowingly conduct and
26   participate, directly and indirectly, in the conduct of the IGWT Criminal
27   Enterprise's affairs through a pattern of racketeering activity. Their actions include
28   multiple, related acts in violation of: 18 U.S.C. § 1341 (mail fraud), 18 U.S.C.

00505.07209/2875224.1

1    § 1343 (wire fraud), 18 U.S.C. § 1952 (interstate and foreign travel to aid
2    racketeering), 18 U.S.C. § 152(7) (concealment of assets), 18 U.S.C. § 1956
3    (money laundering) and 18 U.S.C. § 1957 (use of unlawful funds) and 18 U.S.C. §
4    2319(a) and 17 U.S.C. § 506(a)(1)(A) (criminal copyright infringement).

5          139.  MGA, MGA Entertainment (HK) Limited, MGA de Mexico,
6    Larian, Bryant, Machado, Does 4 through 10, and the other members of the MGA
7    Criminal Enterprise, Bratz Criminal Enterprise and IGWT Criminal Enterprise, and
8    each of them, shared the common purpose of enabling MGA to defraud Mattel and
9    infringe its rights, and obtain confidential, proprietary and otherwise valuable
10   Mattel property through improper means, and conceal and transfer, transport or
11   launder the ill-gotten gains from such misconduct, and secret MGA assets and
12   purportedly obtain priority over Mattel, in order to assist MGA in illegally
13   competing with Mattel domestically and throughout the world.

14         140.  The MGA Criminal Enterprise, Bratz Criminal Enterprise and
15   IGWT Criminal Enterprise as described herein are and have been at all relevant
16   times continuing enterprises.  The conduct of each enterprise continues through the
17   date of this Third Amended Answer and Counterclaims and is ongoing, including
18   by virtue of MGA's continuing use and infringement of Mattel's information,
19   property and rights, and its use of ill-gotten gains from such thefts, all to the
20   detriment of Mattel.  Said enterprises furthermore threaten to continue such
21   conduct into the future, to the detriment of Mattel.

22         141.  The pattern of racketeering activity, as defined by 18 U.S.C.
23   §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat
24   of continuing criminal activity.  This activity consists of multiple acts of
25   racketeering by each member of the MGA Criminal Enterprise, Bratz Criminal
26   Enterprise and IGWT Criminal Enterprise, is interrelated, not isolated and is
27   perpetrated for the same or similar purposes by the same persons.  This activity
28   extends over a substantial period of time, up to and beyond the date of this Third

1 | Amended Answer and Counterclaims. These activities occurred after the effective
2 | date of 18 U.S.C. §§ 1961 *et seq.,* and the last such act occurred within 10 years
3 | after the commission of a prior act of racketeering activity. These racketeering
4 | activities included repeated acts of:

5 |      (a)   <u>Mail Fraud</u>: Counter-defendants MGA, MGA Entertainment
6 |             (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, and
7 |             Does 4 through 10, as well as some or all other members of the
8 |             MGA and IGWT Criminal Enterprises, aided and abetted by each
9 |             other, having devised a scheme or artifice to defraud Mattel of its
10 |             confidential trade secret information and property by conversion,
11 |             false representations, concealment and breaches of fiduciary duty,
12 |             and transfer, transport or launder the ill-gotten gains from such
13 |             thefts, and secret MGA assets and purportedly obtain priority
14 |             over Mattel, did for the purpose of furthering and executing such
15 |             a scheme or artifice to defraud, deposited or caused to be
16 |             deposited matters or things to be sent or delivered by the Postal
17 |             Service, or any private or commercial interstate carrier, or took or
18 |             received matters or things therefrom, or knowingly caused
19 |             matters or things to be delivered by mail or such carrier according
20 |             to the direction thereon, or at the place at which it is directed to
21 |             be delivered by the person to whom it is addressed, in violation of
22 |             18 U.S.C. § 1341 and 18 U.S.C. § 2, as alleged with greater
23 |             particularity in the foregoing paragraphs and as evidenced by,
24 |             among other acts of mail fraud, the true and correct copies of
25 |             communications and other evidence included in Exhibit C, D and
26 |             E;
27 |      (b)   <u>Wire Fraud</u>: C ounter-defendants MGA, MGA Entertainment
28 |             (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, and

-74-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _15_

PAGE _293_

Does 4 through 10, as well some or all other members of the MGA and IGWT Criminal Enterprises, aided and abetted by each other, having devised a scheme or artifice to defraud Mattel of its confidential and trade secret information and property by conversion, false representations, concealment and breaches of fiduciary duty, and transfer, transport or launder the ill-gotten gains from such thefts, and secret MGA assets and purportedly obtain priority over Mattel, did for the purpose of furthering and executing such a scheme or artifice to defraud, transmit and cause to be transmitted by means of wire communications in interstate or foreign commerce, writing, signs, signals, pictures or sound, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs and as evidenced by, among other acts of wire fraud, the true and correct copies of communications and other evidence included in Exhibit C, D and E;

(c) Tampering With a Witness, Victim or Informant: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, did corruptly alter, destroy, mutilate, or conceal more than one record, document, or other object, or attempted to do so, with the intent to impair the object's integrity or availability for use in an official proceeding, including this action, including without limitation by:

i. altering Bryant's contract with MGA relating to Bratz to conceal evidence that Bryant faxed the contract from the BARBIE COLLECTIBLES department of Mattel, using a fax

-75-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 15
PAGE 294

machine owned by Mattel and while Bryant was employed by Mattel;

      ii.    altering numerous original Bratz drawings created by Bryant by adding false and misleading date notations of "8/1998" and "© 8/1998" to the drawings even though the drawings were not created in August 1998; and

      iii.    destroying electronic and other evidence, including by destroying evidence previously contained on Carter Bryant's and Isaac Larian's computer hard drives, and destroying or causing to be destroyed evidence in possession of Farhad Larian;

      iv.    altering tax records and other business documents, including by use of false names and false social security numbers, to conceal the bribery of Mattel employees;

      Such actions are in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(d)    <u>Influencing or Injuring Officer or Juror Generally</u>:  Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, as well as some or all of the remaining members of the MGA Criminal Enterprise, aided and abetted by each other, did seek to corruptly impede, obstruct or influence the due administration of justice, including without limitation by:

      i.    Larian's and MGA's submission of false information in sworn applications to the U.S. Copyright Office and the U.S. Patent Office;

-76-
THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT *15*

PAGE **295**

ii. Larian repeatedly giving false testimony during the Phase 1 trial that Bryant told him (and that Larian believed) that Bryant had not created Bratz while employed by Mattel;

iii. Larian's and MGA's submission of false statements regarding MGA's ability to receive outside funding and numerous false statements regarding its financial condition in this action;

Such actions are in violation of 18 U.S.C. § 1503 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(e) Interstate and Foreign Travel in Aid of Racketeering Enterprises: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, as well as some or all of the remaining members of the MGA Criminal Enterprise and IGWT Criminal Enterprise, aided and abetted by each other, traveled in interstate and foreign commerce, or used the mail or any facility in interstate or foreign commerce, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity, *i.e.* bribery, in violation of the laws of the State of California, *Cal. Penal Code* § 641.3, all in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing and following paragraphs; money laundering in violation of 18 U.S.C. § 1956(a), as alleged with greater particularity in the foregoing and following paragraphs; and engaging in monetary transactions involving property derived from unlawful activities in violation of 18

-77-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _15_
PAGE _296_

1    U.S.C. § 1957(a), as alleged with greater particularity in the

2    foregoing and following paragraphs;

3    (f)    Money Laundering:  Counter-defendants MGA, MGA

4           Entertainment (HK) Limited and Larian and Does 4 through 10,

5           as well as some or all of the remaining members of the MGA and

6           IGWT Criminal Enterprises, aided and abetted by each other,

7           willfully engaged in financial transactions which were intended to

8           conceal or disguise the nature, the location, the source, the

9           ownership, or the control of the ill-gotten proceeds of their

10          criminal activities or were intended to further promote the

11          carrying on of their criminal activities, all in violation of 18

12          U.S.C. § 1956(a), as alleged with greater particularity in the

13          foregoing paragraphs;

14   (g)    Engaging in Monetary Transactions in Property Derived from

15          Unlawful Activity:  Counter-defendants MGA, MGA

16          Entertainment (HK) Limited, Larian, and Does 4 through 10, as

17          well as some or all of the remaining members of the MGA and

18          IGWT Criminal Enterprises, aided and abetted by each other,

19          willfully engaged in monetary transactions in criminally derived

20          property of a value greater than $10,000 derived from their

21          unlawful criminal activities, all in violation of 18 U.S.C. §

22          1957(a), as alleged with greater particularity in the foregoing

23          paragraphs;

24   (h)    Concealment of Assets:  Counter-defendants MGA, MGA

25          Entertainment (HK) Limited, Larian, and Does 4 through 10, as

26          well as some or all of the remaining members of the MGA and

27          IGWT Criminal Enterprises, aided and abetted by each other,

28          willfully sought to transfer or conceal property, and/or concealed,

EXHIBIT  15
PAGE  297

destroyed, mutilated, falsified or made false entries in recorded information relating to such property, in contemplation of a bankruptcy proceeding, all in violation of 18 U.S.C. § 152(7) & (8), as alleged with greater particularity in the foregoing paragraphs;

(i)     Criminal Copyright Infringement: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, as well as some or all other members of the MGA and IGWT Criminal Enterprises, aided and abetted by each other, willfully infringed and continue to willfully infringe Mattel's copyrights, including without limitation with respect to documents containing Mattel trade secret and confidential information and Bratz works created by Bryant and others while Mattel employees, for purposes of commercial advantage and private financial gain, all in violation of 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A), as alleged with greater particularity in the foregoing paragraphs.

142.    The persons alleged herein to have violated 18 U.S.C. § 1962(c) are separate from, though employed by or associated with, MGA, the MGA Group, the Bryant Group, the Mexican Group and the Canadian Group.

143.    MGA had a role in the racketeering activity that was distinct from the undertaking of those acting on its behalf. MGA also attempted to benefit, and did benefit, from the activity of its employees and agents alleged herein, and thus was not a passive victim of racketeering activity, but an active perpetrator.

144.    Mattel has been injured in its business or property as a direct and proximate result of the Counter-defendants' and the other enterprise members' violations of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

EXHIBIT __15__
PAGE __298__

1    145. As a result of the violations of 18 U.S.C. § 1962(c), by MGA,
2    MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado,
3    Does 4 through 10, Brawer, Trueba, Vargas, Brisbois, Castilla and the Other.
4    Former Employees, and IGWT Group, IGWT 826 Investments, Lexington, Omni
5    808, Vision Capital, Leon Neman, Fred Mashian, Neil Kadisha, Jahangir Eli
6    Makabi, Shirin Larian Makabi, The Makabi Living Trust, The Larian Living Trust,
7    The Angela Larian Qualified Annuity Trust, The Isaac E. Larian Qualified Annuity
8    Trust, The Jahangir Eli Makabi Qualified Annuity Trust and The Shirin Larian
9    Makabi Qualified Annuity Trust, Mattel has suffered substantial damages, in an
10   amount to be proved at trial. Pursuant to 18 U.S.C. § 1964(c), Mattel is entitled to
11   recover treble its general and special compensatory damages, plus interest, costs
12   and attorneys, fees, incurred by reason of Counter-defendants' violations of 18
13   U.S.C. § 1962(c).

<div align="center">

**Third Counterclaim**

**Conspiracy To Violate the Racketeer**

**Influenced And Corrupt Organizations Act**

**(18 U.S.C. §§ 1962(d) and 1964(c))**

**(Against All Counter-defendants)**

</div>

19   146. Mattel repeats and realleges each and every allegation set forth in
20   paragraphs 1 through 145, above, as though fully set forth at length.
21   147. Beginning at various times from approximately 1999 through the
22   filing of this Third Amended Answer and Counterclaims, in the Central District of
23   California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK)
24   Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and
25   Brawer, Trueba, Vargas, Brisbois, Castilla and the Other Former Employees
26   willfully, knowingly and unlawfully, did conspire, combine, confederate and agree
27   together to violate 18 U.S.C. § 1962(c).
28

1          148. These conspirators were employed by and associated-in-fact with

2  the MGA Criminal Enterprise engaging in, and the activities of which affect,

3  interstate and foreign commerce. Specifically, the MGA Group, the Bryant Group,

4  the Mexican Group and the Canadian Group, constituting a group of individuals

5  associated-in-fact, did unlawfully, willfully, and knowingly participate in and

6  conduct, directly and indirectly, the MGA Criminal Enterprise's affairs through a

7  pattern of racketeering activity. In addition, MGA, MGA Entertainment (HK)

8  Limited, Larian and Bryant, and certain of the Doe Counter-defendants,

9  constituting a group of individuals associated-in-fact, did unlawfully, willfully, and

10  knowingly participate in and conduct, directly and indirectly, the Bratz Criminal

11  Enterprise's affairs through a pattern of racketeering activity.

12          149. Beginning at least as early as 2007 through the filing of this

13  Third Amended Answer and Counterclaims, in the Central District of California

14  and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited,

15  MGA de Mexico, Larian, and Does 4 through 10, and IGWT Group, IGWT 826

16  Investments, Lexington, Omni 808, Vision Capital, Leon Neman, Fred Mashian,

17  Neil Kadisha, Angela Larian, Jahangir Eli Makabi, Shirin Larian Makabi, The

18  Makabi Living Trust, The Larian Living Trust, The Angela Larian Qualified

19  Annuity Trust, The Isaac E. Larian Qualified Annuity Trust, The Jahangir Eli

20  Makabi Qualified Annuity Trust and The Shirin Larian Makabi Qualified Annuity

21  Trust, willfully, knowingly and unlawfully, did conspire, combine, confederate and

22  agree together to violate 18 U.S.C. § 1962(c).

23          150. These conspirators were employed by and associated-in-fact with

24  the IGWT Criminal Enterprise engaging in, and the activities of which affect,

25  interstate and foreign commerce. Specifically, MGA, MGA Entertainment (HK)

26  Limited, Larian, and IGWT Group, IGWT 826 Investments, Lexington, Omni 808,

27  Vision Capital, Leon Neman, Fred Mashian, Neil Kadisha, Jahangir Eli Makabi,

28  Shirin Larian Makabi, Angela Larian, The Makabi Living Trust, The Larian Living

-81-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _/5_

PAGE _300_

1   Trust, The Angela Larian Qualified Annuity Trust, The Isaac E. Larian Qualified

2   Annuity Trust, The Jahangir Eli Makabi Qualified Annuity Trust, The Shirin Larian

3   Makabi Qualified Annuity Trust and certain of the Doe Counter-defendants,

4   constituting a group of individuals associated-in-fact, did unlawfully, willfully, and

5   knowingly participate in and conduct, directly and indirectly, the IGWT Criminal

6   Enterprise's affairs through a pattern of racketeering activity.

7           151. The pattern of racketeering activity, as defined by 18 U.S.C.

8   §§ 1961(1) and (5), includes acts of mail fraud in violation of 18 U.S.C. § 1341 and

9   18 U.S.C. § 2; acts of wire fraud in violation of 18 U.S.C. § 1343 and 18 U.S.C.

10   § 2; conspiracy to commit perjury and acts of influencing or injuring officer or

11   juror generally in violation of 18 U.S.C. § 1503 and 18 U.S.C. § 2; acts of

12   tampering with witnesses, victims or informants in violation of 18 U.S.C. § 1512

13   and 18 U.S.C. § 2; acts of interstate and foreign travel in aid of racketeering

14   enterprises in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2; acts of unlawful

15   concealment of assets in violation of 18 U.S.C. § 152(7) & (8); acts of money

16   laundering in violation of 18 U.S.C. § 1956; acts of engaging in monetary

17   transactions in property derived from unlawful activities in violation of 18 U.S.C.

18   § 1957; and acts of criminal copyright infringement in violation of 18 U.S.C.

19   § 2319(a) and 17 U.S.C. § 506(a)(1)(A).

20           152. Counter-defendants and the other members of the MGA Criminal

21   Enterprise schemed to improperly defraud Mattel and steal its trade secret or

22   otherwise confidential and proprietary information and infringe Mattel's rights and

23   conceal such misconduct, as more fully set forth in the foregoing paragraphs.

24   Further, counter-defendants and the other members of the IGWT Criminal

25   Enterprise schemed to infringe Mattel's rights and transfer, transport or launder the

26   ill-gotten gains from their infringements and the MGA and Bratz Criminal

27   Enterprises' thefts and infringements, and secret MGA assets and purportedly

28   obtain priority over Mattel, as more fully set forth in the foregoing paragraphs.

EXHIBIT __15__
PAGE __301__

1         153.  In furtherance of this unlawful conspiracy, and to effect its

2  objectives, Counter-defendants and various co-conspirators committed numerous

3  overt acts, including but not limited to those set forth in the foregoing paragraphs.

4         154.  Mattel has been injured in its business or property as a direct and

5  proximate result of the Counter-defendants' and the other enterprise members'

6  violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts

7  constituting the pattern of racketeering activity.

8         155.  As a result of the conspiracies between and among all Counter-

9  defendants and the other conspirators to violate 18 U.S.C. § 1962(c), Mattel has

10  suffered substantial damages, in an amount to be proved at trial.  Pursuant to 18

11  U.S.C. § 1964(c), Mattel is entitled to recover treble its general and special

12  compensatory damages, plus interest, costs and attorneys, fees, incurred by reason

13  of Counter-defendants' violations of 18 U.S.C. § 1962(d).

<div align="center">

**Fourth Counterclaim**

**Misappropriation of Trade Secrets**

*(Cal. Civ. Code § 3426 et seq.)*

**(Against Counter-defendants MGA, MGA de Mexico,**

**Larian, Machado and Does 4 through 10)**

</div>

19         156.  Mattel repeats and realleges each and every allegation set forth in

20  paragraphs 1 through 155, above, as though fully set forth at length.

21         157.  As used herein, "Trade Secret Material" shall mean the

22  documents, materials and information stolen by Machado, Trueba, Vargas,

23  Brisbois, Castilla, the Other Former Employees, and other persons acting for, on

24  behalf of or at the direction of MGA and/or Larian.  Prior to their theft by Counter-

25  defendants, the Trade Secret Materials gave Mattel a significant competitive

26  advantage over its existing and would-be competitors, including MGA.  This

27  advantage, as to MGA, has now been compromised as a result of Counter-

28  defendants' unlawful activities.

-83-

1           158.  Mattel made reasonable efforts under the circumstances to
2  maintain the confidentiality of the Trade Secret Materials, including by having
3  employees and consultants who may have access the Trade Secret Materials sign
4  confidentiality agreements that oblige them not to disclose the Trade Secret
5  Materials or characteristics of the Trade Secret Materials; by limiting the
6  circulation of said materials within Mattel; by protecting and limiting access to
7  computers with log-in identifications and passwords; by limiting each employee's
8  access to electronic files to those that the particular employee needs to access; by
9  educating employees on the nature of Mattel's information that is confidential and
10  proprietary; and by reminding employees on a regular and periodic basis of their
11  obligation to protect and maintain Mattel's confidential and proprietary
12  information.

13          159.  Mattel's Trade Secret Materials derive independent economic
14  value from not being generally known to the public or to other persons who can
15  obtain economic benefit from their disclosure.

16          160.  Counter-defendants have illegally obtained the trade secret
17  materials, as set forth above, and through other means of which Mattel is presently
18  unaware.

19          161.  Counter-defendants have used and disclosed Mattel's Trade
20  Secret Materials without Mattel's consent and without regard to Mattel's rights, and
21  without compensation, permission, or licenses for the benefit of themselves and
22  others.

23          162.  Counter-defendants' conduct was, is, and remains willful and
24  wanton, and was taken with blatant disregard for Mattel's valid and enforceable
25  rights.

26          163.  Counter-defendants' wrongful conduct has caused and, unless
27  enjoined by this Court, will continue in the future to cause irreparable injury to
28  Mattel.  Mattel has no adequate remedy at law for such wrongs and injuries. Mattel

00505.07209/2875224.1

-84-

EXHIBIT __15__

PAGE __303__

1   is therefore entitled to a permanent injunction restraining and enjoining Counter-
2   defendants, and each of them, as well as their agents, servants, and employees, and
3   all persons acting thereunder, in concert with, or on their behalf, from further using
4   in any manner Mattel's trade secrets.
5           164. In addition, as a proximate result of Counter-defendants'
6   misconduct, Mattel has suffered actual damages, and Counter-defendants have been
7   unjustly enriched.
8           165. The aforementioned acts of the Counter-defendants were willful
9   and malicious, including in that Counter-defendants misappropriated Mattel's trade
10  secrets with the deliberate intent to injure Mattel's business and improve their own.
11  Mattel is therefore entitled to enhanced damages. Mattel is also entitled to
12  reasonable attorney's fees.

**Fifth Counterclaim**

**Breach of Contract**

**(Against Bryant)**

16          166. Mattel repeats and realleges each and every allegation set forth in
17  paragraphs 1 through 165, above, as though fully set forth at length.
18          167. Pursuant to his Employment Agreement, Bryant agreed that he
19  would not, without Mattel's express written consent, engage in any employment or
20  business other than for Mattel or assist in any manner any business competitive
21  with the business or future business plans of Mattel during his employment with
22  Mattel. Pursuant to his Mattel Employment Agreement, Bryant further assigned to
23  Mattel all right, title and interest in "inventions," including without limitation
24  "designs" and other works that he conceived, created or reduced to practice during
25  his employment by Mattel. In addition, pursuant to the Conflict Questionnaire,
26  Bryant certified that, other than as disclosed, he had not worked for any competitor
27  of Mattel and had not engaged in any business venture or transaction involving a
28  Mattel competitor that could be construed as a conflict of interest. Bryant further

THIRD AMENDED ANSWER AND COUNTERCLAIMS
EXHIBIT /8
PAGE 304

1    promised that he would notify his supervisor immediately of any change in his

2    situation that would cause him to change any of the foregoing certifications or

3    representations.

4              168. The Employment Agreement and the Conflict Questionnaire are

5    valid, enforceable contracts, and Mattel has performed each and every term and

6    condition of the Employment Agreement and Conflict Questionnaire required to be

7    performed by Mattel.

8              169. Bryant materially breached the foregoing contracts with Mattel,

9    in that, among other things, he secretly aided, assisted and worked for a Mattel

10   competitor during his employment with Mattel without the express written consent

11   of Mattel.

12             170. As a consequence of Bryant's breach, Mattel has suffered and

13   will, in the future, continue to suffer damages in an amount to be proven at trial.

14   Such damages include, without limitation, the amounts paid by the competitor to

15   Bryant during his Mattel employment; the amounts paid by MGA to Bryant during

16   his Mattel employment; the amount that Mattel paid Bryant during the time he

17   wrongfully worked with MGA; the value of information and intellectual property

18   owned by Mattel which Bryant provided to MGA; the value of the benefits that

19   MGA obtained from Bryant during the time he was employed by Mattel; and the

20   value of the benefits that MGA obtained from Bryant as a result of the work he

21   performed for or with MGA during his Mattel employment.

22             171. Bryant's conduct has caused, and unless enjoined will continue to

23   cause, irreparable injury to Mattel that cannot be adequately compensated by

24   money damages and for which Mattel has no adequate remedy at law.  Bryant

25   specifically acknowledged in his Employment Agreement that his breach of the

26   Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be

27   entitled to injunctive relief to enforce this Agreement, in addition to damages and

28   other available remedies."  Accordingly, Mattel is entitled to orders mandating

-86-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT ___/5___

PAGE __305__

1   Bryant's specific performance of his contracts with Mattel and restraining Bryant

2   from further breach.

3                         **Sixth Counterclaim**

4            **Intentional Interference with Contract**

5        **(Against MGA, Larian and Does 4 through 10)**

6         172. Mattel repeats and realleges each and every allegation set forth in

7   paragraphs 1 through 171, above, as though fully set forth at length.

8         173. Valid agreements existed between Mattel and the Mattel

9   employees who MGA induced to steal or was complicit in stealing Mattel trade

10   secrets and other proprietary and confidential information and who MGA bribed or

11   induced to work for or assist MGA while Mattel employees (collectively, the

12   "Mattel Employees"), including without limitation Bryant, Brawer, Machado,

13   Trueba, Vargas, Brisbois, Castilla, Cabrera, Morales, Salazar, and the Other Former

14   Employees.

15         174. At all times herein mentioned, MGA, Larian and Does 4 through

16   10 knew that the Mattel Employees had a duty under their agreements not to work

17   for or assist any competitor of Mattel, such as MGA. In addition, at all times

18   mentioned herein, MGA, Larian and Does 4 through 10 knew that Bryant had

19   assigned to Mattel, and was obligated to disclose to Mattel all inventions, including

20   designs and other works, created, conceived or reduced to practice during their

21   employment with Mattel.

22         175. Despite such knowledge, Counter-defendants MGA, Larian and

23   Does 4 through 10 intentionally and without justification solicited, induced and

24   encouraged the Mattel Employees to breach their contracts with Mattel.

25         176. As a direct and proximate result of Counter-defendants' efforts

26   and inducements, the Mattel Employees did breach their contracts with Mattel.

27

28

-87-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _15_

PAGE _306_

1   177. As a result of said breaches, Mattel has suffered damages and
2   will imminently suffer further damages, including the loss of its competitive
3   position and lost profits, in an amount to be proven at trial.

4   178. Counter-defendants performed the aforementioned conduct with
5   malice, fraud and oppression, and in conscious disregard of Mattel's rights.
6   Accordingly, Mattel is entitled to recover exemplary damages from Counter-
7   defendants in an amount to be determined at trial.

8                            **Seventh Counterclaim**
9                          **Breach of Fiduciary Duty**
10                       **(Against Bryant and Machado)**

11   179. Mattel repeats and realleges each and every allegation set forth in
12   paragraphs 1 through 178, above, as though fully set forth at length.

13   180. Bryant and Machado held positions of trust and confidence with
14   Mattel. In their positions, Bryant and Machado had access to and were entrusted
15   with Mattel's proprietary and confidential information, supervised the work of
16   others, exercised discretion and worked independently in many of their job
17   assignments and duties. In their positions, Bryant and Machado also represented
18   Mattel in its dealings with third parties and, in actions in the course and scope of
19   their employment with Mattel, were agents of Mattel. They confirmed their
20   relationship of trust with Mattel in respective employee agreements. Bryant and
21   Machado thus owed Mattel a fiduciary duty that included, but was not limited to,
22   an obligation not to take any action that would be contrary to Mattel's best interests
23   or that would deprive Mattel of any opportunities, profit or advantage which Bryant
24   or Machado might bring to Mattel.

25   181. Bryant breached his fiduciary duty to Mattel in that, while
26   employed by Mattel, he secretly aided and assisted a competitor of Mattel,
27   including without limitation by entering into an agreement with a Mattel
28   competitor. As alleged above, Bryant also breached the aforementioned duty by

-88-

EXHIBIT _____ /S
PAGE _____ 3o7

1    using Mattel property and resources for the benefit of, and to aid and assist, himself
2    personally and MGA.

3           182. Machado breached his fiduciary duty to Mattel, in that while
4    employed by Mattel, he secretly aided and assisted a competitor of Mattel by,
5    among other things, misappropriating Mattel trade secret and proprietary
6    information and providing said information to officers of MGA. Machado also
7    breached the aforementioned duty by using Mattel property and resources for the
8    benefit of, and to aid and assist, himself personally and MGA.

9           183. As a direct and proximate result of Counter-defendants' wrongful
10   conduct, Mattel has incurred damages in an amount to be determined at trial.

11          184. Counter-defendants acted with malice, fraud and oppression, and
12   in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an
13   award of exemplary damages against Counter-defendants in an amount to be
14   determined at trial.

15          185. Furthermore, Counter-defendants' conduct has caused, and unless
16   enjoined will continue to cause, irreparable injury to Mattel that cannot be
17   adequately compensated by money damages and for which Mattel has no adequate
18   remedy at law. Accordingly, Mattel is entitled to an order restraining further
19   breach of Bryant's fiduciary duty to Mattel and/or restraining Counter-defendants
20   from continuing to benefit from such breach.

21                              **Eighth Counterclaim**
22                   **Aiding and Abetting Breach of Fiduciary Duty**
23                   **(Against MGA, Larian and Does 4 through 10)**

24          186. Mattel repeats and realleges each and every allegation set forth in
25   paragraphs 1 through 185, above, as though fully set forth at length.

26          187. At all times herein mentioned, MGA, Larian and Does 4 through
27   10 knew that Bryant held a position of trust and confidence at Mattel. At all times
28   herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant owed a

00505.07209/2875224.1

1  fiduciary duty to Mattel not to take any action that would be contrary to Mattel's

2  best interests, including but not limited to secretly developing and designing Bratz

3  while employed by Mattel and by secretly assisting Larian and MGA .

4          188. At all times herein mentioned, MGA, Larian and Does 4 through

5  10 knew that the Mattel Employees (excluding Bryant) held positions of trust and

6  confidence at Mattel. At all times herein mentioned, MGA, Larian and Does 4

7  through 10 knew that the Mattel Employees (excluding Bryant) owed a fiduciary

8  duty to Mattel not to take any action that would be contrary to Mattel's best

9  interests, including but not limited to taking confidential trade secret information

10  from Mattel's premises and providing that information to a competitor.

11          189. Despite such knowledge, Counter-defendants MGA, Larian and

12  Does 4 through 10 intentionally and without justification solicited, encouraged,

13  aided and abetted and gave substantial assistance to the Mattel Employees to breach

14  their fiduciary duties to Mattel, knowing that their conduct would constitute

15  breaches of their fiduciary duties to Mattel.

16          190. As a direct and proximate result of Counter-defendants' efforts,

17  the Mattel Employees did breach their fiduciary duties to Mattel and Mattel has

18  incurred damages in an amount to be proven at trial. Mattel, therefore, is entitled to

19  recover compensatory damages in an amount to be determined at trial.

20          191. In taking the aforesaid actions, MGA, Larian and Does 4 through

21  10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

22  rights. Accordingly, Mattel is entitled to recover exemplary damages from

23  Counter-defendants in an amount to be determined at trial.

<div align="center">

### Ninth Counterclaim

### Breach of Duty of Loyalty

### (Against Bryant and Machado)

</div>

27         192. Mattel repeats and realleges each and every allegation set forth in

28  paragraphs 1 through 191, above, as though fully set forth at length.

00.505.07209/2875224.1

-90-



EXHIBIT 15

PAGE 309

1    193. As employees of Mattel, Bryant and Machado owed a duty of
2    undivided loyalty to Mattel. Pursuant to this duty, Bryant and Machado could not
3    compete with Mattel or assist a competitor of Mattel during their employment with
4    Mattel. Pursuant to this duty, Bryant and Machado were required to always give
5    preference to Mattel's business over their own, similar interests during the course of
6    their employment with Mattel.

7    194. Bryant and Machado breached their duty of loyalty to Mattel in
8    that, while employed by Mattel, they secretly aided, assisted and worked for a
9    competitor of Mattel, including without limitation by entering into agreements with
10   a Mattel competitor. As alleged above, they also breached the aforementioned duty
11   by using Mattel property and resources for the benefit of, and to aid and assist,
12   themselves personally and the competitor of Mattel.

13   195. As a direct and proximate result of Counter-defendants' wrongful
14   conduct, Mattel has incurred damages in an amount to be determined at trial.

15   196. Counter-defendants acted with malice, fraud and oppression, and
16   in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an
17   award of punitive damages against Counter-defendants in an amount to be
18   determined at trial.

19   197. Furthermore, Counter-defendants' conduct has caused, and unless
20   enjoined will continue to cause, irreparable injury to Mattel that cannot be
21   adequately compensated by money damages and for which Mattel has no adequate
22   remedy at law. Accordingly, Mattel is entitled to an order restraining further
23   breach of Counter-defendants' duty of loyalty to Mattel and/or restraining Counter-
24   defendants from continuing to benefit from such breach.

25   198. In breaching their duty of loyalty to Mattel, Bryant and Machado
26   acted with malice, fraud and oppression, and in conscious disregard of Mattel's
27   rights. Accordingly, Mattel is entitled to recover exemplary damages from
28   Counter-defendants in an amount to be determined at trial.

00505.07209/2875224.1

EXHIBIT _15_
PAGE _310_

1

**Tenth Counterclaim**

2

**Aiding and Abetting Breach of Duty of Loyalty**

3

**(Against MGA, Larian and Does 4 through 10)**

4           199.  Mattel repeats and realleges each and every allegation set forth in

5     paragraphs 1 through 198, above, as though fully set forth at length.

6           200.  MGA, Larian and Does 4 through 10 knew that Bryant, as an

7     employee of Mattel, owed a duty of loyalty to his employer.  MGA, Larian and

8     Does 4 through 10 knew that this duty included an obligation on the part of Bryant

9     not to compete with Mattel or assist a competitor of Mattel during the term of his

10    employment with Mattel.  MGA, Larian and Does 4 through 10 also knew that

11    Bryant was required to give preference to Mattel's business over his own, similar

12    interests or those of Mattel's competitors during the course of his employment with

13    Mattel.

14          201.  MGA, Larian and Does 4 through 10 knew that the Mattel

15    Employees (excluding Bryant) were employed by Mattel, and, as employees of

16    Mattel, that they owed duties of loyalty to Mattel.  MGA, Larian and Does 4

17    through 10 knew that these duties included an obligation on the part of the Mattel

18    Employees (excluding Bryant) not to compete with Mattel or assist a competitor of

19    Mattel during their Mattel employment.

20          202.  Despite such knowledge, Counter-defendants MGA, Larian and

21    Does 4 through 10 intentionally and without justification solicited, encouraged,

22    aided and abetted and gave substantial assistance to the Mattel Employees to

23    breach their duties of loyalty to Mattel, knowing that their conduct would constitute

24    breaches of their duties of loyalty to Mattel.

25          203.  As a further consequence of Counter-defendants' efforts, Mattel

26    has suffered injury and is entitled to compensatory damages in an amount to be

27    proven at trial.

28

00505.07209/2875224.1

-92-

EXHIBIT __15__

PAGE __311__

1    204. In taking the aforesaid actions, MGA, Larian and Does 4 through
2    10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's
3    rights. Accordingly, Mattel is entitled to recover exemplary damages from
4    Counter-defendants in an amount to be determined at trial.

5    ### Eleventh Counterclaim

6    ### Conversion

7    ### (Against All Counter-defendants)

8    205. Mattel repeats and realleges each and every allegation set forth in
9    paragraphs 1 through 204, above, as though fully set forth at length.

10   206. Counter-defendants wrongfully converted Mattel property and
11   resources by appropriating and using them for their own benefit and gain and for
12   the benefit and gain of others, without the permission of Mattel.

13   207. Mattel was entitled to, among other things, the exclusive right
14   and enjoyment in property and tangible materials owned by Mattel, including
15   without limitation such proper and materials that were created by Bryant while he
16   was a Mattel product designer. Such property was taken by Bryant from Mattel to
17   further his own interests and, in at least some instances, provided by Bryant to
18   Larian and MGA in furtherance of the interests of Bryant, Larian and MGA.

19   208. In addition, Counter-defendants wrongfully converted Mattel's
20   property by removing the Trade Secret Materials in electronic and paper form from
21   Mattel's offices. Counter-defendants did so without Mattel's permission and
22   continue to possess them.

23   209. As a direct and proximate result of Counter-defendants' wrongful
24   conversion of Mattel property, including those relating to Bratz and Mattel's Trade
25   Secret Materials, Mattel has incurred damages. Mattel, therefore, is entitled to
26   recover compensatory damages in an amount to be determined at trial.

27   210. As a result of Counter-defendants' acts of conversion, Mattel is
28   entitled to damages in an amount sufficient to indemnify Mattel for the loss

00505.07209/2875224.1

-93-

THIRD AMENDED ANSWER AND COUNTERCLAIMS



EXHIBIT _15_
PAGE _312_

1   suffered, which is not measured by the value of the property misappropriated, but

2   includes the lost profits that Mattel suffered as a result of the conversion or,

3   alternatively, the profits generated by the Counter-defendants that would not have

4   been generated but for the conversion.  Only such a measure of damages would

5   fully and fairly compensate Mattel for the injury it suffered due to Counter-

6   defendants' acts of conversion.

7        211.  Counter-defendants performed the aforementioned conduct with

8   malice, fraud and oppression, and in conscious disregard of Mattel's rights.

9   Accordingly, Mattel is entitled to recover exemplary damages from Counter-

10  defendants in an amount to be determined at trial.

11       212.  Furthermore, Counter-defendants' conduct has caused, and unless

12  enjoined will continue to cause, irreparable injury to Mattel that cannot be

13  adequately compensated by money damages and for which Mattel has no adequate

14  remedy at law.  Accordingly, Mattel is entitled to an order restraining Counter-

15  defendants from further conversion of Mattel property and resources and/or

16  restraining Counter-defendants from continuing to benefit from such conversion.

17                    **Twelfth Counterclaim**

18                      **Unfair Competition**

19          **(Common Law and *Cal. Bus. & Prof. Code* § 17200)**

20               **(Against All Counter-defendants)**

21       213.  Mattel repeats and realleges each and every allegation set forth in

22  paragraphs 1 through 212, above, as though fully set forth at length.

23       214.  Section 17200 of the California Business and Professions Code

24  prohibits unfair competition, including "any unlawful, unfair or fraudulent business

25  act or practice . . . ."

26       215.  By engaging in the foregoing conduct, Counter-defendants have,

27  individually and in combination, engaged in unlawful, unfair and/or fraudulent acts

28  of unfair competition in violation of both the common law of the state of California

00505.07209/2875224.1                    -94-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT __15__

PAGE __313__

1   and *Cal. Bus. & Prof. Code* § 17200 *et seq.* Such conduct included, without

2   limitation, MGA's commercial bribery of Bryant in violation of *Cal. Penal Code*

3   § 641.3 and misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a).

4   Such conduct also included, without limitation, MGA's and Larian's disparagement

5   of Mattel's products and misrepresentations as alleged above.

6          216. As a result of the aforementioned conduct, Mattel has suffered

7   damages and will imminently suffer further damages, including but not limited to

8   lost profits in an amount to be proven at trial. No adequate remedy at law exists for

9   the wrongs and injuries Mattel has suffered and will continue to suffer, and Mattel

10  is entitled to an injunction enjoining Counter-defendants' continued wrongful acts.

11  Mattel is also entitled to recover compensatory and exemplary damages pursuant to

12  the doctrine of common law unfair competition and *Cal. Civ. Code* § 3294.

13                      **Thirteenth Counterclaim**

14  **Avoidance of Intentional and Constructive Fraudulent Transfers Under**

15                  **Uniform Fraudulent Transfer Act**

16          **(Common Law and *Cal. Civil Code* §§ 3439 *et seq.*)**

17                      **(Against MGA and Larian)**

18          217. Mattel repeats and realleges each and every allegation set forth in

19  paragraphs 1 through 216, above, as though fully set forth at length.

20          218. Mattel is a creditor of MGA and Larian, and his alter-egos,

21  because Mattel has substantial claims against MGA and Larian, including but not

22  limited to claims that have already resulted in a jury verdict in this action in

23  Mattel's favor. *Cal. Civil Code* § 3439.01(b), (c).

24          219. After Mattel's claims had been asserted and continuing until the

25  Phase 1A verdict and dates thereafter, MGA and Larian engaged in fraudulent

26  transfers, *Cal. Civ. Code* § 3439.01(i), 3439.04, 3439.05, including, without

27  limitation, by transferring tens of millions of dollars of Bratz inventory from MGA

28  to the Larian-controlled IGWT Group. These transfers were at massive discounts,

EXHIBIT __/5__
PAGE __314__

1 | and on information and belief MGA did not receive reasonably equivalent value for
2 | the Bratz inventory that it transferred.

3 |       220. On information and belief, and based on the foregoing, these
4 | fraudulent transfers were made with actual intent to hinder, delay, and/or defraud
5 | MGA's and Larian's creditor, Mattel.

6 |       221. MGA has represented that it was on the verge of filing
7 | bankruptcy. If true, on information and belief at the time of the transfers MGA was
8 | unable to pay its debts as they became due and was engaged in a transaction, or was
9 | about to engage in a business, for which its remaining assets were unreasonably
10 | small, and MGA was insolvent. On information and belief, MGA intended to
11 | incur, or believed or reasonably should have believed it would incur, debts beyond
12 | its ability to pay as they became due.

13 |       222. By virtue of the foregoing, MGA's and Larian's fraudulent
14 | transfers, including without limitation the transfers of Bratz inventory to the IGWT
15 | Group, should be avoided, the transferred assets and their proceeds, including
16 | without limitation the Bratz inventory and/or and the proceeds of the sales of any
17 | Bratz inventory by IGWT Group, should be restored to MGA and attached, and
18 | injunctions should issue against any further fraudulent transfers and against any
19 | disposition of the transferred assets and/or their proceeds, pursuant to *Cal. Civil*
20 | *Code* § 3439.07.

21 | <center>**Fourteenth Counterclaim**</center>
22 | <center>**Declaratory Relief**</center>
23 | <center>**(Against All Counter-defendants)**</center>

24 |       223. Mattel repeats and realleges each and every allegation set forth in
25 | paragraphs 1 through 222, above, as though fully set forth at length.

26 |       224. As shown in the foregoing paragraphs above, an actual
27 | controversy exists between Mattel and Counter-defendants regarding Counter-
28 | defendants' lack of ownership interests in Bratz and Mattel's rights in the same.

00SOS.07209/2875224.1

THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT __15__

PAGE __315__

1     225. Accordingly, Mattel seeks a declaration of the Court that
2 Counter-defendants have no valid or protectable ownership rights or interests in
3 Bratz, and that Mattel is the true owner of the same, and further seeks an
4 accounting and imposition of a constructive trust over Bratz, including without
5 limitation registrations and applications for registrations relating thereto made or
6 filed by Counter-defendants and third parties, and over all revenues and other
7 monies or benefits derived or obtained from MGA's and Bryant's purported
8 ownership, use, sale, distribution and licensing of Bratz.

9     226. Mattel seeks a declaration of the Court that any and all
10 agreements between Bryant and/or any other individuals then-employed by Mattel,
11 on the one hand, and MGA, on the other hand, in which Bryant or any of them
12 purport to assign to MGA any right, title or interests in any work or properties that
13 they conceived, created or reduced to practice while Mattel employees, including
14 but not limited to the Bratz designs, is void and of no effect, including without
15 limitation because Bryant and/or any other such individuals had previously
16 assigned said right, title or interest to Mattel and because Mattel was otherwise the
17 owner of said right, title or interest.

### Prayer for Relief

19 WHEREFORE, Mattel respectfully requests judgment:

20    1.  For a declaration that Counter-defendants have no valid or
21 protectable ownership interests or rights in Bratz designs, works or properties
22 conceived, made, created or reduced to practice by Bryant during the term of his
23 Mattel employment and/or by any others then-employed by Mattel, as well as in all
24 derivatives prepared therefrom, and that Mattel is the true owner of the foregoing;

25    2.  For a declaration that any agreement between Bryant and/or by
26 any others then-employed by Mattel, on the one hand, and MGA or any person or
27 entity, on the other hand, in which Bryant or such others then-employed by Mattel
28 purported to assign any right, title or interests in any work or properties that they

EXHIBIT 15
PAGE 316

1   conceived, made, created or reduced to practice while employed by Mattel,

2   including but not limited to the Bratz designs, is void and of no effect;

3        3.   For an Order enjoining and restraining Counter-defendants, their

4   agents, servants and employees, and all persons in active concert or participation

5   with them, from further wrongful conduct, including without limitation from

6   imitating, copying, distributing, importing, displaying, preparing derivatives from

7   and otherwise infringing Mattel's copyright-protected works;

8        4.   For an Order, pursuant to 17 U.S.C. § 503(a) and other

9   applicable law, impounding all of Counter-defendants' products and materials that

10  infringe Mattel's copyrights, as well as all plates, molds, matrices and other articles

11  by which copies of the works embodied in Mattel's copyrights may be reproduced

12  or otherwise infringed;

13       5.   For an Order mandating that Counter-defendants return to Mattel

14  all tangible items, documents, designs, diagrams, sketches or any other

15  memorialization of inventions conceived, created, made or reduced to practice

16  during Bryant's employment with Mattel as well as all Mattel property converted

17  by Counter-defendants;

18       6.   For an Order mandating specific performance by Bryant to

19  comply with and satisfy Bryant's contractual obligations to Mattel;

20       7.   That Mattel be awarded, and Counter-defendants be ordered to

21  disgorge, all payments, revenues, profits, monies and royalties and any other

22  benefits derived or obtained as a result of the conduct alleged herein, including

23  without limitation of all revenues and profits attributable to Counter-defendants'

24  infringement of Mattel's copyrights under 17 U.S.C. § 504;

25       8.   For an accounting of all profits, monies and/or royalties from the

26  exercise of ownership, use, distribution, sales and licensing of Bratz;

27       9.   For the imposition of a constructive trust over Bratz, including

28  without limitation all rights and benefits relating thereto and registrations and

THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT ___/5

PAGE __3/7

1    applications for registrations relating thereto made or filed by Counter-defendants

2    and third parties, and all profits, monies, royalties and any other benefits derived or

3    obtained from Counter-defendant's exercise of ownership, use, sale, distribution

4    and licensing of Bratz;

5        10.    That Mattel recover its actual damages and lost profits;

6        11.    That Counter-defendants be ordered to pay exemplary damages

7    in a sum sufficient to punish and to make an example of them, and deter them and

8    others from similar wrongdoing;

9        12.    That Counter-defendants be ordered to pay treble its general and

10    special damages, plus interest, costs and attorney's fees incurred by reason of

11    Counter-defendants' violations of 18 U.S.C. §§ 1962(c)-(d).

12        13.    That Counter-defendants be ordered to pay double damages due

13    to their willful and malicious misappropriation of Mattel's trade secrets with

14    deliberate intent to injure Mattel's business and improve its own;

15        14.    That Counter-defendants pay to Mattel the full cost of this action

16    and Mattel's attorneys' and investigators' fees;

17        15.    For an Order that Larian is liable for all wrongs of his agents,

18    alter-egos or others committed on his behalf;

19        16.    That Counter-defendants' fraudulent transfers, including their

20    transfers of Bratz inventory, be avoided and set aside; the transferred assets and

21    their proceeds be restored to MGA and attached and/or subjected to a constructive

22    trust for Mattel's benefit; and Counter-defendants be enjoined against any further

23    fraudulent transfers and any disposition of the transferred assets and/or their

24    proceeds; and

25    //

26    //

27    //

28    //

EXHIBIT _/5_

PAGE _318_

1      17.   That Mattel have such other and further relief as the Court may

2   deem just and proper.

3

4   DATED:  May 22, 2009          QUINN EMANUEL URQUHART OLIVER &
                                   HEDGES, LLP
5

6                                  By /s/ John B. Quinn
                                       John B. Quinn
7                                      Attorneys for Defendant and Counter-
                                       claimant Mattel, Inc.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

00505.07209/2875224.1

-100-
THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT ___/5___
PAGE __319__

1

## DEMAND FOR JURY TRIAL

2

3        Mattel, Inc. respectfully requests a jury trial on all issues triable

4   thereby.

5

6   DATED:  May 22, 2009              QUINN EMANUEL URQUHART OLIVER &
                                       HEDGES, LLP
7

8                                     By /s/ John B. Quinn
                                         John B. Quinn
9                                        Attorneys for Defendant and Counter-
                                         claimant Mattel, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

00505.07209/2875224.1

                                    -101-
                              THIRD AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT __15__

PAGE __320__

# Exhibit 16
# Filed Under Seal Pursuant to Protective Order

# Exhibit 17
# Filed Under Seal Pursuant to
# Protective Order

# Exhibit 18
# Filed Under Seal Pursuant to
# Protective Order

# Exhibit 19
# Filed Under Seal Pursuant to
# Protective Order

# Exhibit 20
# Filed Under Seal Pursuant to Protective Order