Patricia L. Glaser, State Bar No. 055668
  pglaser@glaserweil.com
Joel N. Klevens, State Bar No. 045446
  jklevens@glaserweil.com
GLASER, WEIL, FINK, JACOBS,
  HOWARD & SHAPIRO, LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone:  310-553-3000
Facsimile:  310-556-2920

Attorneys for the MGA Parties for Phase 2

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>  Plaintiff,<br><br>v.<br><br>MATTEL, INC., a Delaware Corporation<br><br>  Defendant.<br><br>AND CONSOLIDATED ACTIONS | Case No. CV 04-9049 SGL (RNBx)<br><br>Consolidated with: Case No. CV 04-9059 and Case No. CV 05-2727<br><br>**Hon. Stephen J. Larson**<br><br>**[PUBLIC REDACTED] MGA PARTIES' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO EX PARTE MOTION OF TEMPORARY RECEIVER FOR ORDER (1) APPROVING FINAL ACCOUNT AND REPORT; (2) APPROVING FINAL COMPENSATION TO TEMPORARY RECEIVER AND PROFESSIONALS; (3) DISCHARGING RECEIVER**<br><br>**Phase 2**<br>Discovery Cut-off:  December 11, 2009<br>Pre-Trial Conference:  March 1, 2010<br>Trial Date:  March 23, 2010 |

680631

# TABLE OF CONTENTS

**Page**

I. Introduction ..................................................................................................................... i

II. Background ..................................................................................................................... 2

    A. Procedural Posture ............................................................................................... 2

        1. Mattel Seeks, and the Court Grants, a Temporary Receivership that is Exclusively for Mattel's Benefit .............................................................. 2

        2. The Court Terminates the Receivership ................................................ 4

    B. MGA's Financial Condition ................................................................................. 6

    C. The Final Account And Report ............................................................................ 7

III. Argument ......................................................................................................................... 8

    A. Applicable Legal Standard For Cost Allocation .................................................. 8

    B. Under The *Pioche Mines* And *Frankwell Bullion* Factors, The Court Should Allocate The Total Expenses Of The Temporary Receivership To Mattel As The Party That Procured And Benefited From It .................................................. 11

IV. Conclusion ..................................................................................................................... 13

# TABLE OF AUTHORITIES

**Page**

### CASES

*Commodity Future Trading Commission v. Frankwell Bullion Ltd.*,
 99 F.3d 299 (9th Cir. 1996) ............................................................................ 1, 8, 9, 11

*Pioche Mines Consolidated, Inc. v. Dolman*,
 333 F.2d 257 (9th Cir. 1964) .......................................................................... 1, 8, 9, 11

*United States v. Guess*,
 2005 U.S. Dist. LEXIS 14237, 96 A.F.T.R.2d (RIA) 5193 (S.D. Cal. 2005) .... 8, 9, 10, 11, 12

*United States v. Ianniello*,
 824 F.2d 203 (2d Cir. 1987) ........................................................................................ 10

### STATUTES

18 U.S.C. § 1964 .............................................................................................. 10, 11

Cal. Bus. & Prof. Code § 17200 ................................................................................ 2

## I. Introduction

The MGA Parties[1] oppose the Ex Parte Motion of Temporary Receiver for Order (1) Approving Final Account and Report; (2) Approving Final Compensation to Temporary Receiver; (3) Discharging Receiver and respond to the attached Receiver's Final Account and Report[2] as follows.  As a preliminary matter, (1) the MGA Parties do not oppose the Temporary Receiver's request to be discharged, (2) the MGA Parties have not been provided with sufficient data to evaluate the legitimacy or the amount of the specific fees claimed, and, for that reason, they reserve the right to contest any specific fee on the basis it is not legitimate, reasonable or within the scope of the appointment, and (3) the MGA Parties continue to contend that <u>all</u> of the fees and expenses associated with the receivership are improper in that there was not a sufficient basis for the appointment of a temporary receiver.

This brief addresses who should pay the costs of the temporary receivership in the first instance.  The receivership procured by Mattel was terminated as inequitable in scope and manner.  The purpose of the receivership was (1) to protect Mattel, Inc.'s ("Mattel") Bratz-related interests and expectations and (2) to allow Mattel and the Court to investigate Mattel's allegations that the MGA Parties had violated the Court's previous orders, which allegations also served as putative predicate felonies under Mattel's civil RICO action against the MGA Parties in the Phase 2 litigation.

Neither the purposes of the improper receivership nor its results conferred any benefit upon the MGA Parties.  All of the fees and expenses claimed by the

---

[1]   "MGA Parties" refers collectively to MGA Entertainment, Inc. ("MGA"), MGA Entertainment (HK) Limited ("MGA HK") and Isaac Larian ("Larian").  MGA and MGA HK are jointly referred to as the "MGA Entities."

[2]   Hereinafter, the "Final Account and Report" refers to the whole, or any specific part, of the *Ex Parte* Motion of Temporary Receiver for Order (1) Approving Final Account and Report; (2) Approving Final Compensation to Temporary Receiver; (3) Discharging Receiver the *Ex Parte* Motion of Temporary Receiver for Order (1) Approving Final Account and Report; (2) Approving Final Compensation to Temporary Receiver; (3) Discharging Receiver; Receiver's Final Account and Report (Dkt 5747).

680631

**1**

Temporary Receiver were incurred solely as a result of the receivership and would not have arisen but for the appointment. On these facts, applicable Ninth Circuit precedent directs the Court to allocate the total expenses of the temporary receivership to Mattel, at least until such time that it is established (which it cannot be) that the MGA Entities benefited from the receivership.

## II. Background

### A. Procedural Posture

#### 1. Mattel Seeks, and the Court Grants, a Temporary Receivership that is Exclusively for Mattel's Benefit

On December 29, 2008, Mattel filed an unnoticed *ex parte* application for the appointment of a receiver for MGA grounded in Mattel's concern that MGA's poor financial condition posed an imminent threat to Mattel's property interests in Bratz resulting from the Court's December 3 Orders.[3] (Mattel, Inc.'s *Ex Parte* Application for Appointment of Receiver for MGA or for Alternate Relief ("Application") (Dkt 4540) 14-15.) Mattel asserted in its Application that "MGA cannot be trusted to accurately report its financial condition, . . . preserve Bratz assets, pay Mattel the damages that Mattel has been awarded or protect Mattel's interests in the Bratz intellectual property." (Application 1.) Mattel sought to have the receiver appointed "to preserve the value of Bratz, oversee and control all financial and business aspects of Bratz, including the revenues generated by it, and ensure that assets are not dissipated." (*Id*.)

---

[3] The December 3 Orders are the Order Granting Mattel, Inc.'s Motion for Permanent Injunction ("Permanent Injunction Order") (Dkt 4443), the Order Granting Mattel, Inc.'s Motion for Declaratory Judgment ("Declaratory Judgment Order") (Dkt 4442), and the Order Granting Mattel, Inc.'s Motion for Constructive Trust and Injunctive Relief Pursuant to Cal. Bus. & Prof. Code § 17200 ("Constructive Trust Order"), as supported by the Court's Order Finding in Favor of Mattel as to the MGA Parties' Affirmative Defenses etc. ("1/23 Omnibus Order") (Dkt 4439), and modified by the Court's Order Denying Mattel's Motion for Judgment as a Matter of Law etc. ("4/27/09 Order") (Dkt 5273).

680631

1. On January 7, 2009—following an initial hearing on December 30, 2008, and a sealed hearing on January 5, 2009—the Court issued its Order Appointing Forensic Auditor (Dkt 4657) in which it held in abeyance Mattel's Application pending a forensic audit of the MGA Parties by Court-appointed auditor Ronald L. Durkin. The Court appointed Mr. Durkin to evaluate certain of the allegations made by Mattel in its Application, including in regard to MGA's transactions with Omni 808, LLC ("Omni 808") and IGWT 826 Investments, LLC ("IGWT").

On April 27, 2009, the Court issued the above-referenced 4/27/09 Order, which included its Order Re Appointment of Receiver Pending Hearing on Appointment of Permanent Receiver. Pursuant to *L.R.* 66, the Court appointed Patrick A. Fraioli, Jr., as Temporary Receiver for the MGA Entities to manage, supervise and oversee all assets of the MGA Entities, including, but not limited to, the Bratz Brand and Bratz Assets (as defined in the 4/27/09 Order) which the Court reiterated "are and have been the property of Mattel." (4/27/09 Order 16-17, 20-22.)

The scope of the temporary receivership was all-embracing. Not only was the Temporary Receiver appointed to control, manage, preserve and maximize the profits of the Bratz Brand and Bratz Assets, but also to exercise complete control over the MGA Entities and their finances unrelated to the Bratz Brand and Bratz Assets. (*Id*. at 17.) The Temporary Receiver was further directed to conduct a complete investigation of all financial affairs of the MGA Entities with special emphasis on all transfers and transactions made by the MGA Entities from and after July 17, 2008. (*Id*.) The Court granted the Temporary Receiver absolute and broad, sweeping powers to effectuate the foregoing purposes. (*Id*. at 17-20.)

In regard to the costs of the temporary receivership, the Court ordered the MGA Parties, commencing with the date of the Order, to turn over all revenue to the Temporary Receiver, not limited to revenue derived from the exploitation of property the Court had found to be Mattel's property (i.e., Bratz Brand and Bratz Assets). (*Id*. at 23-24 ¶ 10.e.) To the extent the revenues received by the MGA Parties relating to

the MGA Entities were insufficient to fund the costs of the receivership, then the MGA Entities were ordered to provide funding from sources other than revenue. (*Id.* ¶ 10.f.) To the further extent these funds (i.e., all funds in the receivership estate) were insufficient to fully compensate the Temporary Receiver and his professionals, the Court retained jurisdiction to allocate the costs against Mattel, as the party who procured the temporary receivership, and/or Larian, as the principal owner and beneficiary of the MGA Entities. (*Id.* at 20 ¶ 5.)

### 2.     The Court Terminates the Receivership

The Court ordered all interested parties to appear on May 18, 2009, "to show cause, if there be any, why a permanent receiver should not be appointed in the same scope and manner as the Court's appointment of the Temporary Receiver." (*Id.* at 25 ¶ 11.) However, by May 18, 2009, even Mattel conceded that cause was lacking to appoint a permanent receiver "in the same scope and manner" as the temporary receivership. As the Court explained at the hearing:

> I don't even think Mattel at this point is seeking the full-blown receivership. What Mattel essentially proposed in its papers is a receivership over the Bratz assets, as they define them, refer to them. As the Court defines them in the Court's orders, the assets that the Court has ruled, based on the jury's findings and its own substantial similarity analysis, are the intellectual property of Mattel.

(5/18/09 Rep.'s Tr. 39:8-14.) And even to that end, the Court explained its view that a receivership was not a "workable solution" and "[i]t's clear to the Court that MGA needs to be run by Isaac Larian." (*Id.* at 39:15-18.) The Court went further, recognizing that continuation of the temporary receivership could not only harm MGA, but could contribute to its demise:

> What I'm speaking to is in terms of managing a toy company. I have tremendous respect for the receiver, Mr. Fraioli, but that is not his specialty. The toy aspect, the creative aspect, is something which if there

1  is going to be an MGA toy company, an entertainment company, that
2  Mr. Larian is the first to run that; that makes the most creative sense; it
3  makes the most economic sense.
4      The last thing the Court wants to do -- and this is with respect to
5  any company that appears before this Court -- is in any way contribute to
6  its demise.
7      At the same time, of course, I must do all I can to effective[ly]
8  preserve rights, preserve property, of those who have had their rights
9  compromised. And it's in striking that balance that the Court thinks that
10  at this point, after the 20-day temporary receiver, that a monitor is more
11  important.

(*Id*. at 89:9-24.)

On May 21, 2009, the Court issued its written ruling rejecting Mattel's request for a permanent receiver, confirming the expiration of the temporary receivership, ordering the filing of an accounting of the temporary receivership and appointing an MGA Monitor to effectuate the December 3 Orders. (5/21/09 Order Re Expiration of Temporary Receivership and Order Appointing MGA Monitor ("5/21/09 Order") (Dkt 5565).) The ruling resulted from the Court's consideration of oral arguments at the May 18 hearing and the following documents: (1) The Report and Recommendations of Patrick A. Fraioli, Jr., Temporary Receiver (the "Temporary Receiver Report"); (2) the Responsive Report of Court-appointed Forensic Auditor Ronald Durkin (the "Forensic Auditor Report"); (3) the parties' briefs; and (4) the Statement of Position filed by Omni 808. (5/21/09 Order 8.) While the Monitor was granted the power and authority to monitor the financial affairs and operations of the MGA Entities, the centerpiece of the monitorship is the Monitor's supervisory and oversight responsibilities over the Bratz Assets (as again defined in the 5/21/09 Order), the exploitation of the Bratz Assets and the resulting profits. (*See id*. at 9-13.) In regard to such profits, the Court ordered that the Monitor shall collect from MGA,

on a monthly basis, the amount of net profits derived by MGA from exploitation of the Bratz Assets during the preceding month, as well as an accounting setting forth the basis for the calculation of the net profits and the supporting documentation establishing such basis. (*Id.* at 11 ¶ B.1.g & n.8; *id.* at 13 ¶ B.2.) Significantly, the Court ordered that the expenses of the monitorship were to be borne by Mattel. (*Id.* at 13 ¶ B.5.)

In essence, the temporary receivership, which gave absolute possession and control of <u>all</u> of the MGA Entities' assets to the Temporary Receiver, was converted to a monitorship, which gives to the Monitor possession, to be held in escrow, of only the net profits derived by MGA from exploitation of the Bratz Assets (the "Bratz Profits"). (*Id.*) Also, in the 5/21/09 Order (re Ex Parte Application to Stay Pending Appeal), the Court ordered the parties to submit statements on what is the proper scope and calculation of the Bratz Profits that must be turned over by MGA. (*Id.* at 7-8.) That matter was heard on June 15. On June 18, 2009, the Court ordered that the MGA Parties must account for and turn over Bratz Profits for the period of December 3, 2008, through January 21, 2010, deducting both direct and indirect costs, as well as taxes, associated with the production of the products. (6/18/09 Order After June 15, 2009, Hearing on Accounting Issues ("6/18/09 Order") (Dkt 5740).)

### B.     MGA's Financial Condition

While the Forensic Auditor Report and the Temporary Receiver Report ████████████████████████████████████████████████████████████████████████████████████████████████████████. The Forensic Auditor Report discussed ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Indeed, the Forensic Auditor ████████████████████████████████████████████████████████████████

1  ███████████████████████████████ The Temporary Receiver Report likewise
2  highlighted ████████████████████████████████████████████████████████
3  ████████████████████████████████████████ (*Id.*, Ex. G.)

### C. The Final Account And Report

The total expenses of the temporary receivership amount to $1,052,504.03 -- 12 percent of which is attributable to the Temporary Receiver and the remainder to his professionals as follows: 44 percent to his law partnership; 16 percent to his financial consultants; 8 percent to his forensic accountants; 16 percent to his management consultant; and 3 percent to his field agent. [4, 5] As the Final Account and Report notes, the exhibits have been filed under seal and have not been served on the MGA Parties. (Final Account and Report 7 n.1.) Consequently, aside from the invoices that were attached to the Temporary Receiver's first notice of intention to pay interim compensation, the MGA Parties have not been provided with <u>any</u> detail about the time entries and task descriptions of the Temporary Receiver or of his professionals.

From what may be gleaned from (1) the Final Account and Report, (2) the invoices that were attached as Exhibits A-F to the first notice of intention to pay interim compensation, (3) the Temporary Receiver Report and (4) the Temporary Receiver's oral accounts of his activities at case hearings, it is clear that the Temporary Receiver and his professionals spent nearly all of their time during the receivership period familiarizing themselves with the MGA Entities' operations (much of which consisted of internal conferences and "get up to speed" meetings), establishing limits on cash disbursements and certain payments, establishing cash

---

[4]  *See* chart, *infra*, Appendix A, for numeric breakdown.
[5]  *See., e.g.,* 5/6/09 Notice of Intention to Pay Interim Compensation to Receiver, Professionals and Agent (No.1) (Dkt 5361). The Temporary Receiver's law firm, Ervin Cohen & Jessup LLP, served as counsel; Kibel Green, Inc. served as "Financial Consultants to Receiver;" Crow Horwath LLP served as "Forensic Accounts to Receiver;" Reinventures served as "Management Consultant to Receiver;" and Interco Management Corp. served as "Field Agent to Receiver." *Id*.

reporting requirements for the MGA Entities' foreign operations, and investigating Mattel's allegations concerning Omni 808, IGWT and alleged violations of the December 3 Orders. While the Temporary Receiver spent some time communicating with the MGA Entities' retailers, that was only to educate them about the fact and effect of the receivership and to attempt to allay the retailers' concerns in relation thereto.

The Final Account and Report does not state that any of the costs associated with the activities of the Temporary Receiver and his professionals would have had to be incurred had there been no receivership. Nor does the Final Account and Report allow the inference, let alone state as a conclusion, that these "services" conferred a genuine benefit upon the MGA Entities.

## III. Argument

### A. Applicable Legal Standard For Cost Allocation

On an application of a temporary receiver for approval of fees and expenses upon the expiration of a temporary receivership and termination of the appointment, the district courts in the Ninth Circuit apply the following test for allocating the costs between the parties:

> [T]hose costs of the receivership that would not have arisen but for the appointment should be charged against the party invoking the receivership . . . . On the other hand, expenses that the corporation would have had to incur had there been no receiver, and expenses that confer a genuine benefit upon the corporation, should be charged to it.

*Pioche Mines Consol., Inc. v. Dolman*, 333 F.2d 257, 276 (9th Cir. 1964); *Commodity Future Trading Comm'n v. Frankwell Bullion Ltd.*, 99 F.3d 299, 306 (9th Cir. 1996) ("*Frankwell Bullion*"). In *United States v. Guess*, 2005 U.S. Dist. LEXIS 14237, 96 A.F.T.R.2d (RIA) 5193 (S.D. Cal. 2005), Judge Burns applied this test in a highly analogous procedural and factual context.

In *Guess*, the United States filed an unnoticed *ex parte* application for a TRO

and appointment of a temporary receiver with powers to engage accountants and attorneys. The United States alleged that the defendants controlled more than $500 million in assets derived from their fraudulent tax avoidance schemes, all of which, according to the government, was in danger of dissipation. The Court granted the government's proposed TRO, appointed a temporary receiver and set an OSC hearing regarding whether a preliminary injunction should issue and whether a permanent receiver should be appointed. After a lengthy hearing on the OSC, the Court dissolved the TRO, denied entry of the preliminary injunction and terminated the temporary receiver's appointment. *Id.* at *5-*7. On the temporary receiver's application for approval of fees and expenses, no party contested the legitimacy or amount of the claimed fees and expenses. The parties disputed only who should pay the receivership costs. *Id.* at *3.

The government conceded that the question of who benefitted from the receivership controls under Ninth Circuit precedent *Pioche Mines* and *Frankwell Bullion*, but summarily contended that the temporary receiver performed tasks that the entities subject to the receivership would otherwise have had to perform, such as locating and freezing assets and putting their affairs and records in order. *Id.* at *14-*18. The defendants pointed out that the receiver's own account of the activities he and his professionals undertook demonstrated that they spent nearly all of their time familiarizing themselves with the defendants' operations, accounting for and freezing the defendants' assets and preparing the receiver's report; on the other hand, none of the receiver's invoices demonstrated that the fees and expenses were incurred actually operating the business and would have been incurred had no receiver been appointed. *Id.* at *19-*20. The defendants further called attention to the government's purpose in pursuing the appointment as merely gathering information to advance its criminal investigations. *Id.* at *18.

Applying the factors set forth in *Pioche Mines* and *Frankwell Bullion*, the Court found that it was appropriate to allocate the total expenses of the temporary

receivership to the United States. *Id*. at *22. The following considerations were most significant to the Court: "the absence of a demonstrated 'genuine benefit' to defendants from the freezing of all their assets, the costly and disruptive seizure of their records and property, their litigation expenses incurred to defend th[e] action and then to undo the interference, the government's objectives in seeking and obtaining the TRO" and the government's admission of value-received from the receiver's report and activities. *Id*. at *22.

Even in the case of receiverships for which the appointment has not terminated, the question of which party benefits from the appointment is determinative of who pays for the receivership costs, at least in the first instance. *See, e.g., United States v. Ianniello*, 824 F.2d 203, 203 (2d Cir. 1987). In *Ianniello*, the government initiated a civil RICO suit against the defendant restaurateurs and applied for and obtained a receiver *pendente lite* to manage the defendant restaurant. The defendants sought appellate review, challenging both the appointment of the receiver and the breadth of his powers. *Id*. at 207. The Second Circuit rejected both challenges, holding that the appointment and the breadth of receivership were proper under 18 U.S.C. § 1964. *Id*. at 208-209. Indeed, unlike in this case, a less intrusive oversight would have been ineffective to achieve the primary purpose. *Id*.

More pertinent here, on its cross-appeal, the government argued that it should not have been assessed the costs of the receivership "in the first instance" and "without prejudice to an application by the Government at the time of final judgment, should the Government prevail, to have [the costs] taxed against one or more of the defendants." *Id*. at 209 (citation and internal quotation marks omitted; alteration in original). The Court of Appeals rejected the government's contention. Given that the purpose of appointing the receiver was to prevent skimming from the restaurant's profits during the pendency of the litigation and thereby ensure that the true receipts were reflected on the books and, in turn, cause the payment of taxes to increase <u>for the benefit of the public</u>, it was appropriate at that stage to impose the costs of the

receivership on the government, "at least pending a resolution of its charges against the defendants. At appropriate time, if it is established that [the restaurant] as a corporate entity has benefited from the receivership, it might then be appropriate to reimburse the government for some, or perhaps all, of the expenses of the receiver." *Id*.

### B. Under The *Pioche Mines* And *Frankwell Bullion* Factors, The Court Should Allocate The Total Expenses Of The Temporary Receivership To Mattel As The Party That Procured And Benefited From It

As a threshold issue, the Court's allocation of the costs of the temporary receivership here should be guided by the fact that the receivership procured by Mattel was terminated for being inequitable, in that, at a minimum, it was overly broad and overly intrusive. This point is virtually inarguable in light of (1) Mattel's abandoning its request to continue the full-blown receivership over the MGA Entities (as observed by the Court at the May 18 hearing) and (2) the Court's correct recognition that continuing the receivership could well cause the MGA Entities' demise, while protecting Mattel's interest in the Bratz Assets and Bratz Profits could be accomplished by far less intrusive and costly means such as the monitorship settled upon by the Court.

The *Guess* opinion is directly on point. *See Guess*, 2005 U.S. Dist. LEXIS 14237. Accordingly, the Court should follow Judge Burns' well-reasoned application of the *Pioche Mines* and *Frankwell Bullion* factors to analogous facts. As in *Guess*, this matter involves a temporary receiver's application for approval of fees and expenses upon the expiration of the temporary receivership, after a determination that there was not good cause to appoint a permanent receiver.[6] As in *Guess*, the

---

[6] *Frankwell Bullion Ltd*., 99 F.3d 299, also bears procedural similarity. There, the plaintiff filed a motion seeking a TRO and appointment of a temporary receiver. *Id*. at 301. The district court granted the TRO and imposed a temporary receivership. *Id*. Thereafter, the district court denied the plaintiff's request for a preliminary

receivership here was for the benefit of the party that procured it (in part) to gather information in support of its underlying claims. As in *Guess*, none of the claimed fees and expenses would have been incurred if the Temporary Receiver had not been appointed. As in *Guess*, the Temporary Receiver's own reports, to the extent they include supporting documentation, show that nearly all of the time spent by the Temporary Receiver and his professionals was attributable to gaining familiarity with business operations of the entities that were subjected to the receivership and controlling their cash (again, for the benefit of the party that procured the receivership), as opposed to time spent performing business operations that would have had to be performed in the absence of the receivership. (*See also* Declaration of John Woolard in Opposition to Ex Parte Motion of Temporary Receiver for Order (1) Approving Final Account and Report; (2) Approving Final Compensation to Temporary Receiver; (3) Discharging Receiver ¶¶ 3-10 (same).)

As Judge Burns did in *Guess*, this Court should consider the foregoing facts and, in addition, "the absence of a demonstrated 'genuine benefit' to [the MGA Entities] from the freezing of all their assets, the costly and disruptive seizure of their records and property [and] their litigation expenses incurred to defend this action and then to undo the interference." *Id.* at *22. In sum, to compel the MGA Parties to pay for the temporary receivership imposed over their objection for the exclusive benefit of Mattel would be inequitable and violate Ninth Circuit precedent.

/ / / /
/ / / /
/ / / /
/ / / /
/ / / /

---

injunction, dissolved the receivership and later allocated costs of the receivership to the plaintiff based on the cost-splitting formula set forth in *Pioche Mines*. *Id*. The Court of Appeals affirmed the district court's allocation of costs to the plaintiff based on application of the formula. *Id*. at 306.

**680631**

**12**

**[PUBLIC REDACTED] MGA PARTIES' MEM. OF P. & A. IN OPP'N TO EX PARTE MOT. OF TEMP. REC'R FOR ORDER**

## IV. Conclusion

For the above reasons, the MGA Parties respectfully submit that the Court should reallocate the total expenses of the temporary receivership to Mattel and order Mattel to reimburse the MGA Entities for the $1,050,000.00 the Temporary Receiver paid to himself and his professionals from the MGA Entities' accounts in advancing, exclusively, the interests of Mattel.

Dated:  June 26, 2009

Patricia L. Glaser
Joel N. Klevens
GLASER, WEIL, FINK, JACOBS
 HOWARD & SHAPIRO, LLP


By:  ____/S/ — Joel N. Klevens__
     Attorneys for the MGA Parties
     for Phase 2

## Appendix A

|  | April 27, 2009, through May 14, 2009 | May 14, 2009, through May 18, 2009 | Final Account and Report and Hearing | Total |
|---|---|---|---|---|
| Receiver | $111,868.76 | $12,573.00 | $4,207.50 | $128,649.26 |
| Attorneys for Receiver | $414,541.71 | $38,049.82 | $8,050.00 | $460,641.53 |
| Financial Consultants to Receiver | $164,316.84 | $6,884.68 |  | $171,201.52 |
| Forensic Accountants to Receiver | $77,215.97 | $9,785.50 |  | $87,001.47 |
| Management Consultant to Receiver | $151,333.75 | $18,700.50 |  | $170,034.25 |
| Field Agent to Receiver | $33,336.00 | $1,640.00 |  | $34,976.00 |
| **Total** | **$952,613.03** | **$87,633.50** | **$12,257.50** | **$1,052,504.03** |

680631

14

[PUBLIC REDACTED] MGA PARTIES' MEM. OF P. & A. IN OPP'N TO
EX PARTE MOT. OF TEMP. REC'R FOR ORDER