# Exhibit 8

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3112**

WRITER'S INTERNET ADDRESS
**dylanproctor@quinnemanuel.com**

January 3, 2008

**VIA FACSIMILE AND U.S. MAIL**

Michael H. Page, Esq.
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111

Thomas J. Nolan, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071

Re:   <u>Mattel, Inc. v. Bryant, et al.</u>

Dear Counsel:

We are in receipt of your latest sets of Interrogatories to Mattel -- MGA's Second Set of Interrogatories to Mattel, Inc. and Carter Bryant's Second Set of Interrogatories to Mattel, Inc. Pursuant to the Order for the Appointment of a Discovery Master, we write to request a meet and confer regarding these discovery requests.

As you are aware, both sides in this case are limited to a total of fifty interrogatories. *See* Minute Order of February 27, 2007. Additionally, discrete, unrelated issues addressed within an interrogatory count as their own, separate interrogatories. *Order Granting Joint Motion for Protective Order Regarding Mattel's Interrogatories; Denying Mattel's Motion to Compel Interrogatory Responses*, dated September 5, 2007. MGA and Carter Bryant have exceeded the limits on the number of interrogatories they may serve.

To date, Mr. Bryant has served at least twenty numbered interrogatories, and MGA has served at least thirty-one. However, many of the interrogatories are compound and therefore actually constitute multiple interrogatories. For example, MGA's interrogatory number 28 reads: "Describe in detail the complete factual basis for YOUR COUNTERCLAIMS, including, without limitation all facts, DOCUMENTS, and witnesses that REFER OR RELATE TO YOUR

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100

07975/2339545.1

Exhibit 8 Page 69

COUNTERCLAIMS." Because Mattel has brought a number of counterclaims, this discovery request actually constitutes a number of interrogatories. Thus, although Defendants have not sought leave of Court to exceed the 50 interrogatory limit, they clearly have. MGA's Second Set of Interrogatories to Mattel, Inc. and Carter Bryant's Second Set of Interrogatories to Mattel, Inc. are therefore improper.

Please let us know when you are available to meet and confer regarding these issues. If we cannot come to a resolution, Mattel intends to move for a protective order providing that it need not respond to some or all of these Interrogatories.

I look forward to hearing from you.

Very truly yours,

*Dylan Proctor (by Heidi Keahn)*

B. Dylan Proctor

Exhibit 8  Page **70**

# Exhibit 9

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3112**

WRITER'S INTERNET ADDRESS
dylanproctor@quinnemanuel.com

January 17, 2008

<u>VIA FACSIMILE AND U.S. MAIL</u>

Robert J. Herrington, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, CA 90071-3144

Re:    <u>Mattel v. Bryant et al.</u>

Dear Rob:

I write further to our conference of counsel of yesterday, January 16, 2008.

First, I will send you a revised stipulation regarding the production of redacted documents for your consideration, as we discussed. We expect that Bryant and other defendants will be parties to this stipulation. I note that, even within the past few days, we continue to receive redacted documents from Carter Bryant, for example.

With respect to MGA's Third Set of Requests for Admission, you stated that you had identified approximately 100 requests that can be withdrawn. You said that you would e-mail the relevant request numbers for our review. We will respond with Mattel's final position once we receive this information.

As to MGA's Second Sets of Interrogatories, I have explained Mattel's view that Bryant's and MGA's First Sets of Interrogatories consist of at least 43 separate interrogatories, and that Defendants therefore have 7 interrogatories remaining. You agreed to identify the 7 interrogatories in the Second Sets which Defendants want Mattel to answer. Mattel will then begin the process of providing supplemental responses to those 7 interrogatories. As to the

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 335 Madison Avenue, 17th Floor, New York, New York 10017 | TEL 212-702-8100 FAX 212-702-8200
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94104 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
PALM SPRINGS | 45-025 Manitou Drive, Suite 10, Indian Wells, California 92210 | TEL 760-345-4757 FAX 760-345-2414
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3107 FAX 858-812-3336

Exhibit 9 Page 71

remaining interrogatories which have been served, either Mattel will move for a protective order on the grounds that Defendants have exceeded the 50 interrogatory limit set by the Court, or Defendants will seek leave to serve additional interrogatories.

Finally, we discussed MGA's requests for admission regarding whether Mattel seeks lost profits as damages in connection with the <u>Mattel v. Bryant</u> complaint.  You agreed that following your conversation with my partner, Tim Alger, MGA's request for a meet and confer on this issue is moot.

I look forward to hearing from you soon.

Very truly yours,

*B. Dylan Proctor /sw*

B. Dylan Proctor

Exhibit 9  Page **72**

# Exhibit 10

Ce 3

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 90378)
2    Michael T. Zeller (Bar No. 196417)
   865 South Figueroa Street, 10th Floor
3  Los Angeles, California  90017-2543
   Telephone:  (213) 443-3000
4  Facsimile:  (213) 443-3100

5  Attorneys for Plaintiff
   Mattel, Inc.

6

7

8                    UNITED STATES DISTRICT COURT

9           FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11 MATTEL, INC., a Delaware          )   Case No. CV 04-3431 NM (RNBx)
   corporation,                      )
12                                   )
               Plaintiff,            )   PLAINTIFF MATTEL, INC.'S
13                                   )   OBJECTIONS AND RESPONSES
        v.                           )   TO DEFENDANT'S FIRST SET OF
14                                   )   INTERROGATORIES
   CARTER BRYANT, an individual; and )
15 DOES 1 through 10, inclusive,     )
                                     )
16             Defendants.           )

17

18

19

20

21

22

23

24

25

26

27

28

07209/594726.1

Preliminary Statement

Mattel has not yet completed its investigation of the facts relating to this action, has not yet reviewed all documents relating to this action, has not yet interviewed all witnesses in this action, and has yet to receive discovery from defendant or any third parties with regard to this action.  Consequently, Mattel reserves the right to amend and/or supplement its responses if and when additional facts or documents are discovered.  Additionally, because Mattel's responses are based on facts and documents that Mattel has identified to date, they do not preclude Mattel from later relying on facts or documents discovered or generated pursuant to subsequent investigation or discovery.  Mattel's partial response to any of Defendant's First Set of Interrogatories (the "Interrogatories") is not to be construed as a waiver of any of its objections or its right to object to any other Interrogatory or discovery request.

General Objections

Mattel generally objects to each of the Interrogatories on each and every one of the following grounds, which are incorporated into and made a part of Mattel's response to each and every individual Interrogatory:

1.      Mattel objects to the Interrogatories on the grounds that they seek to impose obligations upon Mattel beyond those imposed by the Federal Rules of Civil Procedure.

2.      Mattel objects to the Interrogatories on the grounds that they call for the disclosure of information subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege, including the privilege against disclosure of the identities and work product of consulting experts.  Such information and documents will not be produced.

3.      Mattel objects to the Interrogatories on the grounds that they call for production or disclosure of confidential, proprietary and/or private

-2-

RESPONSE TO INTERROGATORIES

Exhibit 10  Page 74

1   information.  Such information and documents will not be disclosed or produced

2   except pursuant to and in reliance upon a suitable protective order.  Mattel

3   provided defendant with a draft protective order on June 17, 2004 and is currently

4   working with defendant to finalize a protective order.

5           4.      Mattel objects to the Interrogatories on the grounds that they

6   seek the disclosure of information or documents that are in the possession, custody

7   and control of independent parties over whom Mattel has no control, including

8   without limitation to defendant and MGA Entertainment Inc. ("MGA"), and seek

9   the disclosure of information or documents that are in the possession, custody and

10  control of defendant or are publicly available and hence equally available to all

11  parties to this litigation.

12          5.      Mattel objects to the Interrogatories on the grounds that they

13  call for information that is not relevant to the subject matter of the pending action,

14  nor reasonably calculated to lead to the discovery of admissible evidence.

15          6.      Mattel objects to the Interrogatories on the grounds that they

16  are unduly burdensome and oppressive.  To the extent the Interrogatories call for

17  the identification of, or Mattel's responses state that Mattel will produce, any

18  documents or tangible items, Mattel will make available for inspection and

19  copying those documents and tangible items that it is able to locate after a

20  reasonable, good-faith search for and review of non-privileged files that are

21  reasonably likely to contain responsive documents and tangible things.

22          7.      Mattel objects to the Interrogatories on the grounds that they

23  seek the disclosure of information or documents in violation of the terms of

24  agreements or protective orders entered into with third parties, or in violation of

25  the privacy, contractual, or other rights of third parties.

26          8.      Mattel objects to the Interrogatories on the grounds that the

27  definition of "Mattel" is overbroad, vague and ambiguous and unduly burdensome.

28

07209/594726.1                                              -3-

RESPONSE TO INTERROGATORIES

Exhibit 10 Page 75

1    A statement by Mattel that it will produce documents in response to

2 an Interrogatory is not intended to suggest, nor should it be construed to mean,

3 that any such documents exist, or that they are in Mattel's possession, custody or

4 control.

5

6                        Specific and General Responses

7    Each of the following objections and responses to the Interrogatories

8 is expressly made subject to the above Preliminary Statement and General

9 Objections, all of which are incorporated in each of the following objections and

10 responses to specific Interrogatories.

11

12 INTERROGATORY NO. 1:

13    State all facts supporting YOUR contention, if YOU so contend, that

14 Bryant performed services or did any work for a third party or for himself while in

15 the employ of MATTEL.

16

17 RESPONSE TO INTERROGATORY NO. 1:

18    In addition to the general objections stated above, Mattel specifically

19 objects to this Interrogatory on the grounds that it calls for the disclosure of

20 information subject to the attorney-client privilege, the attorney work-product

21 doctrine and other applicable privileges.  Mattel further objects to this

22 Interrogatory on the ground that it calls for the disclosure of confidential and/or

23 proprietary information, which Mattel will disclose only subject to and in reliance

24 upon a suitable protective order.  Mattel further objects to this Interrogatory as

25 unreasonably burdensome and overbroad in that it purports to require Mattel to

26 summarize all facts on this subject, including without limitation facts that are

27 known to or in the possession, custody and control of defendant and nonparties,

28 including nonparties associated with defendant.  Mattel further objects to this

-4-

1 | Interrogatory on the grounds that it is premature in that it purports to seek to all

2 | facts relating to this subject at the outset of discovery in this action and also seeks

3 | to circumvent the expert disclosure provisions of the <u>Federal</u> and <u>Local Rules</u>.

4 |      Subject to and without waiving the foregoing general and specific

5 | objections, Mattel responds as follows:

6 |      On January 4, 1999, upon starting his second term of Mattel

7 | employment, and as a condition of and in consideration for his employment,

8 | defendant entered into an Employee Confidential Information and Inventions

9 | Agreement (the "Employee Agreement"). Among other things, defendant agreed

10 | that he would not, without Mattel's express written consent, "engage in any

11 | employment or business other than for [Mattel], or invest in or assist (in any

12 | manner) any business competitive with the business or future business plans of

13 | [Mattel]." Defendant further acknowledged that he held a position of trust with

14 | Mattel. In addition, defendant assigned to Mattel all right, title and interest in

15 | "inventions," including without limitation "designs," that he created, conceived or

16 | reduced to practice, whether alone or jointly with others, during his employment

17 | by Mattel under the terms set forth in his Employee Agreement. A copy of

18 | defendant's Employee Agreement with Mattel, dated January 4, 1999, is attached

19 | to the Complaint as Exhibit A and is hereby incorporated into this response by this

20 | reference.

21 |      Furthermore, on January 4, 1999, defendant executed a Conflict of

22 | Interest Questionnaire (the "Conflict Questionnaire"). Among other things,

23 | defendant certified in the Conflict Questionnaire that, other than as disclosed, he

24 | had not worked for any competitor of Mattel in the prior twelve months and had

25 | not engaged in any business venture or transaction involving a Mattel competitor

26 | that could be construed as a conflict of interest. Defendant specifically agreed that

27 | he would immediately notify his supervisor of any change in his situation that

28 | would cause him to change any of the foregoing certifications. The only conflict

07209/594726.1

-5-

RESPONSE TO INTERROGATORIES

Exhibit 10 Page 77

1 disclosure that defendant made on the Conflict Questionnaire (or at any time
2 subsequently) concerned what defendant stated was "freelance" work that is
3 unrelated to the conduct alleged herein. A copy of the Conflict Questionnaire
4 executed by Bryant is attached as Exhibit B to the Complaint and is hereby
5 incorporated into this response by this reference.

6         In late November 2003, Mattel obtained a copy of a contract
7 evidencing that defendant had secretly aided, assisted and worked as a designer for
8 MGA, a Mattel competitor, while defendant was employed by Mattel and was
9 being paid by Mattel for his exclusive services as a designer. Defendant's
10 agreement with MGA obligated defendant to provide design services to MGA on a
11 "top priority" basis. In addition, defendant's agreement with MGA purported to
12 assign MGA rights to preexisting works by defendant and to deem work and
13 services furnished by defendant to MGA under the agreement as "works for hire."
14 Furthermore, defendant's agreement with MGA provided that defendant would be
15 paid for such services and receive royalties and other consideration for products
16 on which defendant provided aid or assistance. A copy of defendant's agreement
17 with MGA, in the form obtained by Mattel, is attached to the Declaration of
18 Michael T. Zeller in Support of Motion for Remand as Exhibit 2 and is hereby
19 incorporated into this response by this reference. Defendant, while he was
20 employed by Mattel, also secretly used Mattel resources, as well as defendant's
21 time on the job, to aid and assist MGA and to further his own personal interests
22 over the interests of Mattel. During the time that defendant was employed by
23 Mattel and thereafter, defendant concealed these actions from Mattel, including
24 without limitation by failing to notify his supervisor of his conflict of interest
25 regarding MGA and by making affirmative misrepresentations to Mattel
26 management upon his departure from Mattel.

27         By way of further answer, pursuant to Federal Rule of Civil Procedure
28 33(d), Mattel will produce responsive, non-privileged documents and tangible

07209/594726.1

-6-

1 | items in its possession, custody or control from which the answer to this
2 | Interrogatory may be derived.

3 | By way of further answer, Mattel currently has not yet received
4 | discovery from defendant or MGA, has not yet obtained any deposition testimony
5 | and has not yet had the opportunity to obtain information from other third parties
6 | who may possess relevant information.  Mattel therefore reserves the right to
7 | supplement this response after Mattel receives more information about defendant's
8 | activities.  By way of further answer, this topic may be the subject of expert
9 | testimony, which will be disclosed in the manner, and at the time, required for
10 | expert disclosures pursuant to the <u>Federal</u> and <u>Local Rules</u>.

11 |

12 | <u>INTERROGATORY NO. 2</u>:

13 | State all facts supporting YOUR contention, if YOU so contend, that
14 | Bryant for his own gain, or the gain of any third party, at any time converted,
15 | improperly used, sold, assigned or otherwise transferred any work product of his
16 | creation which YOU believe was owned by MATTEL.

17 |

18 | <u>RESPONSE TO INTERROGATORY NO. 2</u>:

19 | In addition to the general objections stated above, Mattel specifically
20 | objects to this Interrogatory on the grounds that it calls for the disclosure of
21 | information subject to the attorney-client privilege, the attorney work-product
22 | doctrine and other applicable privileges.  Mattel further objects to this
23 | Interrogatory on the ground that it calls for the disclosure of confidential and/or
24 | proprietary information, which Mattel will disclose only subject to and in reliance
25 | upon a suitable protective order.  Mattel further objects to this Interrogatory as
26 | unreasonably burdensome and overbroad in that it purports to require Mattel to
27 | summarize all facts on this subject, including without limitation facts that are
28 | known to or in the possession, custody and control of defendant and nonparties,

07209/594726.1

-7-

1  including nonparties associated with defendant. Mattel further objects to this

2  Interrogatory on the grounds that it is premature in that it purports to seek to all

3  facts relating to this subject at the outset of discovery in this action and also seeks

4  to circumvent the expert disclosure provisions of the <u>Federal</u> and <u>Local</u> <u>Rules</u>.

5       Subject to and without waiving the foregoing general and specific

6  objections, Mattel responds as follows:

7       On January 4, 1999, upon starting his second term of employment

8  with Mattel, and as a condition of and in consideration for his employment,

9  defendant entered into an Employee Agreement. Among other things, defendant

10  agreed that he would not, without Mattel's express written consent, "engage in any

11  employment or business other than for [Mattel], or invest in or assist (in any

12  manner) any business competitive with the business or future business plans of

13  [Mattel]." Defendant further acknowledged that he held a position of trust with

14  Mattel. In addition, defendant assigned to Mattel all rights, title and interest in

15  "inventions," including without limitation "designs," that he conceived, created or

16  reduced to practice, whether alone or jointly with others, during his employment

17  by Mattel under the terms set forth in his Employee Agreement. A copy of

18  defendant's Employee Agreement with Mattel, dated January 4, 1999, is attached

19  to the Complaint as Exhibit A and is hereby incorporated into this response by this

20  reference.

21       Furthermore, on January 4, 1999, defendant executed a Conflict

22  Questionnaire. Among other things, defendant certified in the Conflict

23  Questionnaire that, other than as disclosed, he had not worked for any competitor

24  of Mattel in the prior twelve months and had not engaged in any business venture

25  or transaction involving a Mattel competitor that could be construed as a conflict

26  of interest. Defendant specifically agreed that he would immediately notify his

27  supervisor of any change in his situation that would cause him to change any of

28  the foregoing certifications. The only conflict disclosure that defendant made on

1  the Conflict Questionnaire (or at any time subsequently) concerned what

2  defendant stated was "freelance" work that is unrelated to the conduct alleged

3  herein. A copy of the Conflict Questionnaire executed by Bryant is attached as

4  Exhibit B to the Complaint and is hereby incorporated into this response by this

5  reference.

6          In late November 2003, Mattel obtained a copy of a contract

7  evidencing that defendant had secretly aided, assisted and worked as a designer for

8  MGA, a Mattel competitor, while defendant was employed by Mattel and was

9  being paid by Mattel for his exclusive services as a designer. Defendant's

10  agreement with MGA obligated defendant to provide design services to MGA on a

11  "top priority" basis. In addition, defendant's agreement with MGA purported to

12  assign MGA rights to preexisting works by defendant and to deem work and

13  services furnished by defendant to MGA under the agreement as "works for hire."

14  Furthermore, defendant's agreement with MGA provided that defendant would be

15  paid for such services and receive royalties and other consideration for products

16  on which defendant provided aid or assistance. A copy of defendant's agreement

17  with MGA, in the form obtained by Mattel, is attached to the Declaration of

18  Michael T. Zeller in Support of Motion for Remand as Exhibit 2 and is hereby

19  incorporated into this response by this reference. Defendant, while he was

20  employed by Mattel, also secretly used Mattel resources, as well as defendant's

21  time on the job, to aid and assist MGA and to further his own personal interests

22  over the interests of Mattel. During the time that defendant was employed by

23  Mattel and thereafter, defendant concealed these actions from Mattel, including

24  without limitation by failing to notify his supervisor of his conflict of interest

25  regarding MGA and by making affirmative misrepresentations to Mattel

26  management upon his departure from Mattel.

27          Mattel was entitled to, *inter alia*, defendant's exclusive services and

28  the exclusive ownership of his inventions as defined in and set forth in his

RESPONSE TO INTERROGATORIES

Exhibit 10  Page __8__

1 Employee Agreement and pursuant to law, while he was employed by Mattel and
2 being paid by Mattel for his exclusive services as a designer. However, defendant
3 provided such services, and aided and assisted a Mattel competitor, including
4 without limitation by purporting to confer convey rights to MGA, during the time
5 of his Mattel employment. All inventions, including without limitation ideas,
6 concepts, designs, proprietary information, and other property conceived, created
7 or reduced to practice by defendant (whether alone or jointly with others) while
8 employed by Mattel, and all work product, proceeds and benefits derived
9 therefrom, were and are owned by Mattel as set forth in his Employee Agreement
10 and pursuant to law.

11 By way of further answer, pursuant to <u>Federal Rule of Civil Procedure</u>
12 33(d), Mattel will produce responsive, non-privileged documents and tangible
13 items in its possession, custody or control from which the answer to this
14 Interrogatory may be derived.

15 By way of further answer, Mattel currently has not yet received
16 discovery from defendant or MGA, has not yet obtained any deposition testimony
17 and has not yet had the opportunity to obtain information from other third parties
18 who may possess relevant information. Mattel therefore reserves the right to
19 supplement this response after Mattel receives more information about defendant's
20 activities. By way of further answer, this topic may be the subject of expert
21 testimony, which will be disclosed in the manner, and at the time, required for
22 expert disclosures pursuant to the <u>Federal</u> and <u>Local Rules</u>.

23

24 <u>INTERROGATORY NO. 3</u>:

25 State all facts supporting YOUR contention, if YOU so contend, that
26 Bryant for his own gain, or the gain of any third party, at any time converted, used,
27 sold, assigned or otherwise transferred any MATTEL work product owned at any
28 time by MATTEL or created by any MATTEL employee other than Bryant, or by

07209/594726.1

-10-

1  any independent contractor, during the time that such PERSON was working for
2  MATTEL.

3

4  RESPONSE TO INTERROGATORY NO. 3:

5          In addition to the general objections stated above, Mattel specifically
6  objects to this Interrogatory on the grounds that it calls for the disclosure of
7  information subject to the attorney-client privilege, the attorney work-product
8  doctrine and other applicable privileges.  Mattel further objects to this
9  Interrogatory as unreasonably burdensome and overbroad in it purports to require
10 Mattel to summarize all facts on this subject, including without limitation facts
11 that are known to or in the possession, custody and control of defendant and
12 nonparties, including nonparties associated with defendant, and purports to require
13 Mattel to identify and investigate facts relating to its numerous employees and
14 independent contractors around the world.  Mattel further objects to this
15 Interrogatory on the grounds that it is premature in that it purports to seek to all
16 facts relating to this subject at the outset of discovery in this action and also seeks
17 to circumvent the expert disclosure provisions of the Federal and Local Rules.
18         Subject to and without waiving the foregoing general and specific
19 objections, Mattel responds as follows:
20         The facts necessary to answer this Interrogatory are known to
21 defendant as well as MGA and other third parties, but not to Mattel at this
22 juncture.  Mattel currently has outstanding discovery requests to defendant and to
23 MGA, and reserves the right to supplement this response after Mattel receives
24 more information about defendant's activities.

25

26

27

28

RESPONSE TO INTERROGATORIES

Exhibit 10 Page 83

1  INTERROGATORY NO. 4:

2          State all facts supporting YOUR contention, if YOU so contend, that

3  any product sold by MGA Entertainment, Inc. ("MGA") under the trade name

4  "Bratz" originated from, is derived from, is based on, copies, incorporates, or is

5  substantially or confusingly similar to any design or work product created or

6  worked on by Bryant while employed by MATTEL.

7

8  RESPONSE TO INTERROGATORY NO. 4:

9          In addition to the general objections stated above, Mattel specifically

10  objects to this Interrogatory on the grounds that it calls for the disclosure of

11  information subject to the attorney-client privilege, the attorney work-product

12  doctrine and other applicable privileges.  Mattel further objects to this

13  Interrogatory on the ground that it calls for the disclosure of confidential and/or

14  proprietary information, which Mattel will disclose only subject to and in reliance

15  upon a suitable protective order.  Mattel further objects to this Interrogatory as

16  unreasonably burdensome and overbroad in that it purports to require Mattel to

17  summarize all facts on this subject, including without limitation facts that are

18  known to or in the possession, custody and control of defendant and nonparties,

19  including nonparties associated with defendant, and purports to require Mattel to

20  identify all such Bratz products that may be derived from, is based on, copies,

21  incorporates, or is substantially or confusingly similar to any design or work

22  product created or worked on by defendant while employed by Mattel.  Mattel

23  further objects to this Interrogatory on the grounds that it is premature in that it

24  purports to seek to all facts relating to this subject at the outset of discovery in this

25  action and also seeks to circumvent the expert disclosure provisions of the Federal

26  and Local Rules.

27          Subject to and without waiving the foregoing general and specific

28  objections, Mattel responds as follows:

-12-

RESPONSE TO INTERROGATORIES

Exhibit 10  Page **84**

1    The facts necessary to answer this Interrogatory are known to

2  defendant as well as MGA and other third parties, but not to Mattel at this

3  juncture. Mattel currently has outstanding discovery requests to defendant and to

4  MGA, and reserves the right to supplement this response after Mattel receives

5  more information about defendant's activities.

6

7  INTERROGATORY NO. 5:

8    State all facts supporting YOUR contention, if YOU so contend, that

9  any product sold at any time by MGA under the trade name "Bratz" originated

10  from, is derived from, is based on, copies, incorporates, or is substantially or

11  confusingly similar to any design or work product owned at any time by MATTEL

12  or created by any MATTEL employee other than Bryant or by any independent

13  contractor during the time that such PERSON was working for MATTEL.

14

15  RESPONSE TO INTERROGATORY NO. 5:

16    In addition to the general objections stated above, Mattel specifically

17  objects to this Interrogatory on the grounds that it calls for the disclosure of

18  information subject to the attorney-client privilege, the attorney work-product

19  doctrine and other applicable privileges. Mattel further objects to this

20  Interrogatory on the ground that it calls for the disclosure of confidential and/or

21  proprietary information, which Mattel will disclose only subject to and in reliance

22  upon a suitable protective order. Mattel further objects to this Interrogatory as

23  unreasonably burdensome and overbroad in that it purports to require Mattel to

24  summarize all facts on this subject, including without limitation facts that are

25  known to or in the possession, custody and control of defendant and nonparties,

26  including nonparties associated with defendant; purports to require Mattel to

27  identify and investigate facts relating to its numerous current and former

28  employees and independent contractors around the world; and purports to require

RESPONSE TO INTERROGATORIES

Exhibit 10  Page 85

1   Mattel to identify all Bratz products that originated from, are derived from, are

2   based on, copy, incorporate, or are substantially or confusingly similar to any

3   design or work product owned at any time by Mattel or created by any of Mattel's

4   many current and former employees and independent contractors.  Mattel further

5   objects to this Interrogatory on the grounds that it is premature in that it purports

6   to seek to all facts relating to this subject at the outset of discovery in this action

7   and also seeks to circumvent the expert disclosure provisions of the Federal and

8   Local Rules.

9           Subject to and without waiving the foregoing general and specific

10  objections, Mattel responds as follows:

11          The facts necessary to answer this Interrogatory are known to

12  defendant as well as MGA and other third parties, but not to Mattel at this

13  juncture.  Mattel currently has outstanding discovery requests to defendant and to

14  MGA, and reserves the right to supplement this response after Mattel receives

15  more information about defendant's activities.

16

17  INTERROGATORY NO. 6:

18          State all facts supporting YOUR claim that YOU have been damaged

19  by any act or omission of Bryant.

20

21  RESPONSE TO INTERROGATORY NO. 6:

22          In addition to the general objections stated above, Mattel specifically

23  objects to this Interrogatory on the grounds that it calls for the disclosure of

24  information subject to the attorney-client privilege, the attorney work-product

25  doctrine and other applicable privileges.  Mattel further objects to this

26  Interrogatory on the ground that it calls for the disclosure of confidential and/or

27  proprietary information, which Mattel will disclose only subject to and in reliance

28  upon a suitable protective order.  Mattel further objects to this Interrogatory as

RESPONSE TO INTERROGATORIES

Exhibit 10  Page 86

1  unreasonably burdensome and overbroad in that it purports to require Mattel to
2  summarize all facts on this subject, including without limitation facts that are
3  known to or in the possession, custody and control of defendant and nonparties,
4  including nonparties associated with defendant.  Mattel further objects to this
5  Interrogatory on the grounds that it is premature in that it purports to seek to all
6  facts relating to this subject at the outset of discovery in this action and also seeks
7  to circumvent the expert disclosure provisions of the <u>Federal</u> and <u>Local</u> <u>Rules</u>.

8            Subject to and without waiving the foregoing general and specific
9  objections, Mattel responds as follows:

10            Mattel has not yet computed damages because no discovery has yet
11  been obtained, including in particular discovery necessary to compute damages
12  that is uniquely in the possession of defendant and third parties.  At a minimum,
13  Mattel's damages computation will include without limitation the following:
14  monies paid to defendant by any Mattel competitor, including without limitation
15  MGA, during his period of disloyalty and/or as a result of defendant's misconduct;
16  disgorgement of any other benefit, or its value, or its proceeds, derived or obtained
17  by defendant as a result of his disloyalty, his breach of contract and other
18  misconduct and/or as a result of work that he performed for any Mattel competitor,
19  including without limitation MGA, during his Mattel employment; any profits and
20  the value of any other benefits that defendant's co-conspirators' derived or
21  obtained as a result of defendant's disloyalty and other misconduct; the value of
22  Mattel assets, resources, opportunities and/or property, including intellectual
23  property, that defendant and his co-conspirators converted, diverted from Mattel
24  and/or otherwise improperly used or usurped; the value of information and
25  intellectual property owned by Mattel which defendant provided to any Mattel
26  competitor in violation of his obligations to Mattel; compensation paid by Mattel
27  to defendant during defendant's period of disloyalty; and all other damages and
28  relief sought in Mattel's Complaint.

                                            -15-

1    By way of further answer, pursuant to <u>Federal Rule of Civil</u>

2  <u>Procedure</u> 33(d), Mattel will produce responsive, non-privileged documents and

3  tangible items in its possession, custody or control from which the answer to this

4  Interrogatory may be derived.

5    By way of further answer, this topic may be the subject of expert

6  testimony, which will be disclosed in the manner, and at the time, required for

7  expert disclosures pursuant to the <u>Federal</u> and <u>Local</u> <u>Rules</u>.

8    By way of further answer, Mattel currently has outstanding discovery

9  requests to defendant and to MGA, and reserves the right to supplement this

10  response after Mattel receives more information about defendant's activities.

11

12  <u>INTERROGATORY NO. 7</u>:

13    IDENTIFY all PERSONS YOU believe have knowledge of facts

14  supporting YOUR contention, if YOU so contend, that any product sold by MGA

15  under the trade name "Bratz" originated from, is derived from, is based on, copies,

16  incorporates, is substantially similar to any design, or elements thereof, created or

17  worked on by Bryant while employed by MATTEL.

18

19  <u>RESPONSE TO INTERROGATORY NO. 7</u>:

20    In addition to the general objections stated above, Mattel specifically

21  objects to this Interrogatory as being overbroad and unduly burdensome on the

22  grounds that it seeks to identify <u>all</u> persons having knowledge of Bratz products

23  that may be similar to any designs or elements that defendant worked on while

24  employed at Mattel; such a request potentially includes a large number of MGA

25  products and employees, vendors and contractors not currently known to Mattel

26  and is also information known to defendant.  Mattel further objects to this

27  Interrogatory on the grounds that it is premature in that it purports to seek to all

28  facts relating to this subject at the outset of discovery in this action and also seeks

07209/594726.1

RESPONSE TO INTERROGATORIES

Exhibit 10 Page 88

1   to circumvent the expert disclosure provisions of the <u>Federal</u> and <u>Local</u> <u>Rules</u>.

2   Mattel further objects to this Interrogatory on the grounds that it purports to

3   require Mattel to disclose the identity of consulting experts.  The identity of any

4   such experts will not be disclosed.

5          Subject to and without waiving the foregoing general and specific

6   objections, Mattel responds as follows:

7          The identity of any such persons is known to defendant as well as

8   MGA and other third parties, but not to Mattel at this juncture.  Mattel currently

9   has outstanding discovery requests to defendant and to MGA, and reserves the

10  right to supplement this response after Mattel receives more information about

11  defendant's activities.

12

13  INTERROGATORY NO. 8:

14         IDENTIFY all PERSONS YOU believe have knowledge of facts

15  supporting YOUR contention, if YOU so contend, that any product sold by MGA

16  under the trade name "Bratz" originated from, is derived from, is based on, copies,

17  incorporates, or is substantially or confusingly similar to any design or work

18  product owned at any time by MATTEL or created by any MATTEL employee

19  other than Bryant or by any independent contractor during the time that such

20  PERSON was working for MATTEL.

21

22  RESPONSE TO INTERROGATORY NO. 8:

23         In addition to the general objections stated above, Mattel objects to

24  this Interrogatory as being overbroad and unduly burdensome on the grounds that

25  it seeks to identify <u>all</u> persons having knowledge of such products that originated

26  from, are derived from, are based on, copy, incorporate, or are substantially or

27  confusingly similar to any design or work product owned at any time by Mattel or

28  created by any of Mattel's current and former employees and independent

1  contractors.  Such a request potentially includes a large number of current and
2  former Mattel employees and independent contractors, as well as MGA products
3  and employees not currently known to Mattel.

4        Subject to and without waiving the foregoing general and specific
5  objections, Mattel responds as follows:

6        The identity of any such persons is known to defendant as well as
7  MGA and other third parties, but not to Mattel at this juncture.  Mattel currently
8  has outstanding discovery requests to defendant and to MGA, and reserves the
9  right to supplement this response after Mattel receives more information about
10  defendant's activities.

11

12  INTERROGATORY NO. 9:

13        State all facts supporting YOUR contention that MATTEL first
14  became aware of the alleged wrongful conduct of Bryant in November 2003, as set
15  forth in Paragraph 12 of the Complaint.

16

17  RESPONSE TO INTERROGATORY NO. 9:

18        In addition to the general objections stated above, Mattel specifically
19  objects to this Interrogatory on the grounds that it calls for the disclosure of
20  information subject to the attorney-client privilege, the attorney work-product
21  doctrine and other applicable privileges.  Mattel further objects to this
22  Interrogatory on the ground that it calls for the disclosure of confidential and/or
23  proprietary information, which Mattel will disclose only subject to and in reliance
24  upon a suitable protective order.  Mattel further objects to this Interrogatory as
25  unreasonably burdensome and overbroad in that it purports to require Mattel to
26  summarize all facts on this subject.  Mattel further objects to this Interrogatory on
27  the grounds that it is premature in that it purports to seek to all facts relating to this
28  subject at the outset of discovery in this action.

Exhibit 10 Page 90

1    Subject to and without waiving the foregoing general and specific
2  objections, Mattel responds as follows:
3    Pursuant to <u>Federal Rule of Civil Procedure</u> 33(d), Mattel will
4  produce responsive, non-privileged documents and tangible items in its
5  possession, custody or control from which the answer to this Interrogatory may be
6  derived.
7
8  <u>INTERROGATORY NO. 10</u>:
9    State all facts supporting YOUR contention that Bryant failed to meet
10 his obligations under the MATTEL "Employee Confidential Information and
11 Inventions Agreement" attached to the Complaint as Exhibit "A".
12
13 <u>RESPONSE TO INTERROGATORY NO. 10</u>:
14    In addition to the general objections stated above, Mattel specifically
15 objects to this Interrogatory on the grounds that it calls for the disclosure of
16 information subject to the attorney-client privilege, the attorney work-product
17 doctrine and other applicable privileges.  Mattel further objects to this
18 Interrogatory on the ground that it calls for the disclosure of confidential and/or
19 proprietary information, which Mattel will disclose only subject to and in reliance
20 upon a suitable protective order.  Mattel further objects to this Interrogatory as
21 unreasonably burdensome and overbroad in that it purports to require Mattel to
22 summarize all facts on this subject, including without limitation facts that are
23 known to or in the possession, custody and control of defendant and nonparties,
24 including nonparties associated with defendant.  Mattel further objects to this
25 Interrogatory on the grounds that it is premature in that it purports to seek to all
26 facts relating to this subject at the outset of discovery in this action and also seeks
27 to circumvent the expert disclosure provisions of the <u>Federal</u> and <u>Local Rules</u>.
28

07209/594726.1

RESPONSE TO INTERROGATORIES

Exhibit 10  Page *91*

1        Subject to and without waiving the foregoing general and specific

2  objections, Mattel responds as follows:

3        Please see Response to Interrogatory No. 1.

4        By way of further answer, pursuant to <u>Federal Rule of Civil</u>

5  <u>Procedure</u> 33(d), Mattel will produce responsive, non-privileged documents and

6  tangible items in its possession, custody or control from which the answer to this

7  Interrogatory may be derived.

8        By way of further answer, this topic may be the subject of expert

9  testimony, which will be disclosed in the manner, and at the time, required for

10  expert disclosures pursuant to the <u>Federal</u> and <u>Local</u> <u>Rules</u>.

11        By way of further answer, Mattel currently has outstanding discovery

12  requests to defendant and to MGA, and reserves the right to supplement this

13  response after Mattel receives more information about defendant's activities.

14

15  <u>INTERROGATORY NO. 11</u>:

16        State all facts supporting YOUR contention that Bryant failed to meet

17  his obligations under the MATTEL Conflict of Interest Questionnaire," attached to

18  the Complaint as Exhibit "B".

19

20  <u>RESPONSE TO INTERROGATORY NO. 11</u>:

21        In addition to the general objections stated above, Mattel specifically

22  objects to this Interrogatory on the grounds that it calls for the disclosure of

23  information subject to the attorney-client privilege, the attorney work-product

24  doctrine and other applicable privileges.  Mattel further objects to this

25  Interrogatory on the ground that it calls for the disclosure of confidential and/or

26  proprietary information, which Mattel will disclose only once a suitable protective

27  order is entered.  Mattel further objects to this Interrogatory as unreasonably

28  burdensome and overbroad on the grounds that it purports to require Mattel to

-20-

RESPONSE TO INTERROGATORIES

Exhibit 10 Page 92

1    RESPONSE TO INTERROGATORY NO. 12:

2              In addition to the general objections stated above, Mattel specifically

3    objects to this Interrogatory on the grounds that it calls for the disclosure of

4    information subject to the attorney-client privilege, the attorney work-product

5    doctrine and other applicable privileges.  Mattel further objects to this

6    Interrogatory as unreasonably burdensome and overbroad in that it purports to

7    require Mattel to summarize all facts on this subject, including without limitation

8    facts that are known to or in the possession, custody and control of defendant and

9    nonparties, including nonparties associated with defendant.  Mattel further objects

10   to this Interrogatory on the grounds that it is premature in that it purports to seek

11   to all facts relating to this subject at the outset of discovery in this action and also

12   seeks to circumvent the expert disclosure provisions of the Federal and Local

13   Rules.

14             Subject to and without waiving the foregoing general and specific

15   objections, Mattel responds as follows:

16             The facts necessary to answer this Interrogatory are known to

17   defendant as well as MGA and other third parties, but not to Mattel at this

18   juncture.  Mattel currently has outstanding discovery requests to defendant and to

19   MGA, and reserves the right to supplement this response after Mattel receives

20   more information about defendant's activities.

21

22   INTERROGATORY NO. 13:

23             State all facts supporting YOUR contention that Bryant was in a

24   fiduciary relationship with MATTEL.

25

26

27

28

07209/594726.1                              -22-

RESPONSE TO INTERROGATORY NO. 13:

        In addition to the general objections stated above, Mattel specifically objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the attorney work-product doctrine and other applicable privileges. Mattel further objects to this Interrogatory on the ground that it calls for the disclosure of confidential and/or proprietary information, which Mattel will disclose only subject to and in reliance upon a suitable protective order. Mattel further objects to this Interrogatory as unreasonably burdensome and overbroad on the grounds that it purports to require Mattel to summarize all facts on this subject. Mattel further objects to this Interrogatory on the grounds that it is premature in that it purports to seek to all facts relating to this subject at the outset of discovery in this action.

        Subject to and without waiving the foregoing general and specific objections, Mattel responds as follows:

        Defendant agreed that he held a fiduciary relationship in his agreements with Mattel, including without limitation in his January 4, 1999 Employee Agreement in which he acknowledged that he held a position of trust with Mattel. A copy of defendant's Employee Agreement with Mattel is attached to the Complaint as Exhibit A and is hereby incorporated into this response by this reference. Moreover, in his position as a designer, Bryant had access to and was entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of his job assignments and duties. In his position, Bryant also represented Mattel in its dealings with third parties and, in his actions in the course and scope of his employment with Mattel, was an agent of Mattel.

        By way of further answer, pursuant to Federal Rule of Civil Procedure 33(d), Mattel will produce responsive, non-privileged documents and tangible

07209/594726.1

-23-

RESPONSE TO INTERROGATORIES

Exhibit 10 Page 95

1  items in its possession, custody or control that relate to this subject of defendant's
2  fiduciary relationship with Mattel.

3          By way of further answer, Mattel currently has outstanding discovery
4  requests to defendant and to MGA, and reserves the right to supplement this
5  response after Mattel receives more information about defendant's activities.

6

7  INTERROGATORY NO. 14:

8          If YOU contend that prior to October 20, 2000, MATTEL had any toy
9  concept or project which had not yet been offered for sale to the public, including
10  without limitation, any toy concept or project in the pre-production or
11  development phase, that Bryant improperly copied, replicated, borrowed or
12  otherwise used in whole, or in any part, during or after Bryant's employment with
13  MATTEL, IDENTIFY that toy concept or project.

14

15  RESPONSE TO INTERROGATORY NO. 14:

16          In addition to the general objections stated above, Mattel objects to
17  this Interrogatory on the grounds that it calls for the disclosure of information
18  subject to the attorney-client privilege, the attorney work-product doctrine and
19  other applicable privileges.  Mattel further objects to this Interrogatory as
20  unreasonably burdensome and overbroad on the grounds that it purports to require
21  Mattel to identify facts that are known to or in the possession, custody and control
22  of defendant and nonparties, including nonparties associated with defendant.
23  Mattel further objects to this Interrogatory on the grounds that it is premature in
24  that it purports to seek to all facts relating to this subject at the outset of discovery
25  in this action and also seeks to circumvent the expert disclosure provisions of the
26  Federal and Local Rules.

27          Subject to and without waiving the foregoing general and specific
28  objections, Mattel responds as follows:

07209/594726.1

-24-

1    The facts necessary to answer this Interrogatory are known to

2 defendant as well as MGA and other third parties, but not to Mattel at this

3 juncture. Mattel currently has outstanding discovery requests to defendant and to

4 MGA, and reserves the right to supplement this response after Mattel receives

5 more information about defendant's activities.

6

7 INTERROGATORY NO. 15:

8    IDENTIFY each and every MATTEL employee who supervised work

9 performed by Bryant throughout the period or periods of Bryant's employment

10 with MATTEL.

11

12 RESPONSE TO INTERROGATORY NO. 15:

13    In addition to the general objections stated above, Mattel objects to

14 this Interrogatory as vague, ambiguous and overbroad with respect to the phrase

15 "MATTEL employee who supervised work performed by Bryant." Mattel further

16 objects to this Interrogatory on the grounds that this information is equally

17 available to defendant, as defendant necessarily possesses superior firsthand

18 knowledge of the people with whom he personally interacted at Mattel.

19    Subject to and without waiving the foregoing general and specific

20 objections, Mattel responds as follows:

21    Mattel employees who directly supervised Carter Bryant during his

22 employment at Mattel included:

23    1.    Anne Driskill, c/o Mattel, Inc., 333 Continental Blvd., El

24 Segundo, California.

25    2.    Cassidy Beal-Park, c/o Mattel, Inc., 333 Continental Blvd., El

26 Segundo, California.

27    3.    Ivy Ross, c/o Mattel, Inc., 333 Continental Blvd., El Segundo,

28 California.

RESPONSE TO INTERROGATORIES

Exhibit 10 Page **97**

1          4.    Ronald Longsdorf, c/o Mattel, Inc., 333 Continental Blvd., El

2 Segundo, California.

3          The above witnesses who are employed by Mattel, Inc. or identified

4 c/o Mattel, Inc. may be contacted through Mattel's counsel, Quinn Emanuel

5 Urquhart Oliver & Hedges, LLP.

6          By way of further answer, pursuant to <u>Federal Rule of Civil Procedure</u>

7 <u>33(d)</u>, Mattel will produce will produce responsive, non-privileged documents and

8 tangible items in its possession, custody or control from which the answer to this

9 Interrogatory may be derived.

10

11 <u>INTERROGATORY NO. 16</u>:

12          IDENTIFY each and every MATTEL employee or independent

13 contractor that worked with Bryant on any project he worked on for MATTEL,

14 from 1996 to October 2000.

15

16 <u>RESPONSE TO INTERROGATORY NO. 16</u>:

17          In addition to the general objections stated above, Mattel objects to

18 this Interrogatory as overbroad and unduly burdensome on the grounds that it

19 seeks the identification of <u>all</u> employees or independent contractors who worked

20 with Bryant on "any project he worked on for MATTEL" for a period of several

21 years. For the same reasons, Mattel further objects to this Interrogatory on the

22 grounds that it seeks information that is not relevant to this action or reasonably

23 calculated to lead to the discovery of admissible evidence. Mattel further objects

24 to this Interrogatory on the grounds that this information is equally available to

25 defendant, as defendant necessarily possesses superior firsthand knowledge of the

26 people with whom he personally interacted at Mattel.

27          Subject to and without waiving the foregoing general and specific

28 objections, Mattel responds as follows:

-26-

RESPONSE TO INTERROGATORIES

Exhibit 10 Page 98

1           Please see response to Interrogatory No. 15, which identifies Mattel

2    personnel who directly supervised Carter Bryant during his employment at Mattel.

3

4    INTERROGATORY NO. 17:

5           IDENTIFY each and every employee against whom YOU have filed,

6    or threaten to file, a lawsuit pertaining in whole, or in any part, to an alleged

7    violation of the MATTEL "Employee Confidential Information and Inventions

8    Agreement," the form of which is attached to the Complaint as Exhibit "A".

9

10   RESPONSE TO INTERROGATORY NO. 17:

11          In addition to the general objections stated above, Mattel objects to

12   this Request as overbroad and unduly burdensome on the grounds that it seeks the

13   identification of <u>all</u> litigation related to such Mattel employment agreements,

14   including any such litigation relating to provisions or terms that are not at issue in

15   this lawsuit and relating to conduct that is not at issue in this action.  Mattel

16   further objects to this Interrogatory on the grounds that it is unduly burdensome

17   and harassing in that it is not limited as to time, and thus purports to require Mattel

18   to identify each employee against which it has ever "filed or threatened to file" a

19   lawsuit pertaining in whole, or in any part, to an alleged violation of Mattel's

20   employee agreements.  Mattel further objects to this Interrogatory on the grounds

21   that it seeks information that is not relevant or reasonably calculated to lead to the

22   discovery of admissible evidence.  Mattel further objects to this Interrogatory as

23   vague and ambiguous with respect to the terms "the form of which" and "threaten

24   to file."  Mattel further objects to this Interrogatory on the grounds that it is unduly

25   burdensome and harassing in that it purports to require Mattel to produce to

26   defendant information that is publicly available and hence equally available to

27   defendant.  Defendant is equally well situated to obtain or derive any such non-

28   confidential information from the public record.

07209/594726.1

-27-

1  INTERROGATORY NO. 18:

2  IDENTIFY each and every employee against whom YOU have filed,

3  or threaten to file, a lawsuit pertaining in whole, or in any part, to an alleged

4  violation of the MATTEL "Conflict of Interest Questionnaire," the form of which

5  attached to the Complaint as Exhibit "B".

6

7  RESPONSE TO INTERROGATORY NO. 18:

8  In addition to the general objections stated above, Mattel objects to

9  this Request as overbroad and unduly burdensome on the grounds that it seeks the

10  identification of all litigation related to such Mattel employment agreements,

11  including any such litigation relating to provisions or terms that are not at issue in

12  this lawsuit and relating to conduct that is not at issue in this action. Mattel

13  further objects to this Interrogatory on the grounds that it is unduly burdensome

14  and harassing in that it is not limited as to time, and thus purports to require Mattel

15  to identify each employee against which it has ever "filed or threatened to file" a

16  lawsuit pertaining in whole, or in any part, to an alleged violation of Mattel's

17  employee agreements. Mattel further objects to this Interrogatory on the grounds

18  that it seeks information that is not relevant or reasonably calculated to lead to the

19  discovery of admissible evidence. Mattel further objects to this Interrogatory as

20  vague and ambiguous with respect to the terms "the form of which" and "threaten

21  to file." Mattel further objects to this Interrogatory on the grounds that it is unduly

22  burdensome and harassing in that it purports to require Mattel to produce to

23  defendant information that is publicly available and hence equally available to

24  defendant. Defendant is equally well situated to obtain or derive any such non-

25  confidential information from the public record.

26

27

28

07209/594726.1

-28-

1  INTERROGATORY NO. 19:

2          IDENTIFY all measures taken by MATTEL to achieve compliance

3  with the MATTEL "Employee Confidential Information and Inventions

4  Agreement," the form of which is attached to the Complaint as Exhibit "A," and

5  the MATTEL "Conflict of Interest Questionnaire," the form of which attached to

6  the Complaint as Exhibit "B".

7

8  RESPONSE TO INTERROGATORY NO. 19:

9          Mattel further objects to this Interrogatory on the grounds that it calls

10  for the disclosure of information subject to the attorney-client privilege, the

11  attorney work-product doctrine and other applicable privileges. Mattel further

12  objects to this Interrogatory on the ground that it calls for the disclosure of

13  confidential and/or proprietary information, which Mattel will disclose only

14  subject to and in reliance upon a suitable protective order. Mattel further objects

15  to this Interrogatory as being vague and ambiguous with respect to the term

16  "measures taken by MATTEL to achieve compliance." Mattel further objects to

17  this Interrogatory as being overbroad and unduly burdensome on the grounds that

18  it is not limited as to time, and because it seeks information relating to all such

19  measures taken by Mattel with regard to its agreements with innumerable

20  employees, including with respect to agreements, contractual terms and other

21  matters that are not at issue in this lawsuit. Mattel further objects to this

22  Interrogatory on the grounds that it seeks information and documents that is not

23  relevant to this action or reasonably calculated to lead to the discovery of

24  admissible evidence.

25

26

27

28

07209/594726.1

RESPONSE TO INTERROGATORIES

Exhibit 10, Page 101

1  DATED:  July 16, 2004

2                                    QUINN EMANUEL URQUHART
                                     OLIVER & HEDGES, LLP
3

4                                    By
                                        Michael T. Zeller
5                                       Attorneys for Plaintiff
                                        Mattel, Inc.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RESPONSE TO INTERROGATORIES

Exhibit 10  Page 102

1

**PROOF OF SERVICE**
1013A(3) CCP Revised 5/1/88

2  STATE OF CALIFORNIA )
   COUNTY OF LOS ANGELES )

3

4       I am employed in the county of Los Angeles State of California. I am over the age of 18
and not a party to the within action; my business address is: 865 South Figueroa Street, 10th Floor,
Los Angeles, CA 90012.

5       On July 16, 2004, I served the foregoing document described as **PLAINTIFF MATTEL,
INC.'S OBJECTIONS AND RESPONSES TO DEFENDANT'S FIRST SET OF
6  INTERROGATORIES** on all interested parties in this action.

7                    **Robert F. Millman, Esq.**
                     **Douglas A. Wickham, Esq.**
8                    **Littler Mendelson**
                     **A Professional Corporation**
9                    2049 Century Park East, 5th Floor
                     Los Angeles, California 90067-3107
10                   Phone: 310-553-0308
                     **Fax: 310-553-5583**

11 [ ]  By placing [ ] the original [X] true copies thereof enclosed in sealed envelopes addressed
12      as follows:

13 [X]  **BY MAIL**

14 [ ]  I deposited such envelope in the mail at Los Angeles, California. The envelope was mailed
        with postage thereon fully prepaid.

15 [ ]  As follows: I am "readily familiar" with the firm's practice of collection and processing
        correspondence for mailing. Under that practice it would be deposited with U.S. postal
16      service on that same day with postage thereon fully prepaid at Los Angeles, California in the
        ordinary course of business. I am aware that on motion of the party served, service is
17      presumed invalid if postal cancellation date or postage meter date is more than one day after
        date of deposit for mailing in affidavit.

18 [ ]  **BY OVERNIGHT COURIER** I caused each envelope with postage prepaid to be sent
19      by Federal Express.

20 [ ]  **BY TELECOPIER** By transmitting the above listed document(s) to the fax number(s)
        set forth above on this date.

21 [ ]  **BY PERSONAL SERVICE** I delivered such envelope by hand to the addressee.

22 Executed on July 16, 2004, at Los Angeles, California.

23 [ ]  (State) I declare under penalty of perjury under the laws of the State of California that the
        above is true and correct.

24

25 [X]  (Federal) I declare that I am employed in the office of a member of the bar of this court at
        whose direction the service was made.

26 Maria Albert
   Print Name                        Signature

27

28

# Exhibit 11

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 90378)
2     Michael T. Zeller (Bar No. 196417)
      Jon D. Corey (Bar No. 185066)
3   865 South Figueroa Street, 10th Floor
    Los Angeles, California 90017-2543
4   Telephone: (213) 443-3000
    Facsimile:   (213) 443-3100
5
    Attorneys for Plaintiff
6   Mattel, Inc.

7

8                 UNITED STATES DISTRICT COURT

9          FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11   MATTEL, INC., a Delaware            )   CASE NO. CV 04-9059 NM (RNBx)
     corporation,                        )
12                    Plaintiff,         )
                                         )
13          v.                           )   PLAINTIFF MATTEL, INC.'S
                                         )   OBJECTIONS AND
14   CARTER BRYANT, an individual, and   )   SUPPLEMENTAL RESPONSES TO
     DOES 1 through 10, inclusive,       )   DEFENDANT'S FIRST SET OF
15                    Defendants.        )   INTERROGATORIES
                                         )   (INTERROGATORY NOS. 1-3, 6,
16   ────────────────────────────────    )   10-13 AND 16)
                                         )
17   CARTER BRYANT, on behalf of         )
     himself, all present and former     )
18   employees of Mattel, Inc., and the  )
     general public,                     )
19                                       )
                    Counter-Claimant,    )
20                                       )
            v.                           )
21                                       )
     MATTEL, INC., a Delaware            )
22   corporation,                        )
                                         )
23                  Counter-Defendant.   )
     ────────────────────────────────    )

24

25

26

27

28

07209/655298.1

Exhibit 11  Page *104*

<u>Preliminary Statement</u>

       Mattel has not yet completed its investigation of the facts relating to this action, has not yet reviewed all documents relating to this action, has not yet interviewed all witnesses in this action, and has not completed discovery from defendants Carter Bryant or MGA Entertainment, Inc. or any third parties with regard to this action. Consequently, Mattel reserves the right to amend and/or supplement these responses if and when additional facts or documents are discovered. Additionally, because Mattel's responses are based on facts and documents that Mattel has identified to date, they do not preclude Mattel from later relying on facts or documents discovered or generated pursuant to subsequent investigation or discovery. Mattel's partial supplemental response to any of Defendant's First Set of Interrogatories (the "Interrogatories") is not to be construed as a waiver of any of its objections or its right to object to any other discovery request.

<u>General Objections</u>

       Mattel generally objects to each of the Interrogatories on each and every one of the following grounds, which are incorporated into and made a part of Mattel's response to each and every individual Interrogatory:

       1.    Mattel objects to the Interrogatories on the grounds that they seek to impose obligations upon Mattel beyond those imposed by the <u>Federal Rules of Civil Procedure</u>.

       2.    Mattel objects to the Interrogatories on the grounds that they call for the disclosure of information subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege, including the privilege against disclosure of the identities and work product of consulting experts. Such information and documents will not be produced.

1         3.     Mattel objects to the Interrogatories on the grounds that they

2  call for production or disclosure of confidential, proprietary and/or private

3  information.  Such information and documents will not be disclosed or produced

4  except pursuant to and in reliance upon the operative protective order.

5         4.     Mattel objects to the Interrogatories on the grounds that they

6  seek the disclosure of information or documents that are in the possession, custody

7  and control of independent parties over whom Mattel has no control, and seek the

8  disclosure of information or documents that are in the possession, custody and

9  control of defendant Bryant or are publicly available and hence equally available

10  to all parties to this litigation.

11         5.     Mattel objects to the Interrogatories on the grounds that they

12  call for information that is neither relevant to the claims or defenses in the pending

13  action nor reasonably calculated to lead to the discovery of admissible evidence.

14         6.     Mattel objects to the Interrogatories on the grounds that they

15  are unduly burdensome and oppressive.  To the extent the Interrogatories call for

16  the identification of, or Mattel's responses state that Mattel will produce, any

17  documents or tangible items, at a mutually convenient time and place Mattel will

18  make available for inspection and copying those documents or tangible items that

19  it is able to locate after a reasonable, good-faith search for and review of non-

20  privileged files that are reasonably likely to contain responsive documents and

21  tangible things.

22         7.     Mattel objects to the Interrogatories on the grounds that they

23  seek the disclosure of information or documents in violation of the terms of

24  agreements or protective orders entered into with third parties, or in violation of

25  the privacy, contractual, or other rights of third parties.

26         8.     Mattel objects to the Interrogatories on the grounds that the

27  definition of "Mattel" is overbroad, vague and ambiguous and unduly burdensome.

28

1   A statement by Mattel that it will produce documents in response to
2  an Interrogatory is not intended to suggest, nor should it be construed to mean,
3  that any such documents exist, or that they are in Mattel's possession, custody or
4  control.
5
6              Specific and General Responses
7          Each of the following objections and responses to the Interrogatories
8  is expressly made subject to the above Preliminary Statement and General
9  Objections, all of which are incorporated in each of the following objections and
10 responses to specific Interrogatories.
11
12 INTERROGATORY NO. 1:
13          State all facts supporting YOUR contention, if YOU so contend, that
14 Bryant performed services or did any work for a third party or for himself while in
15 the employ of MATTEL.
16
17 SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:
18          In addition to the general objections stated above, Mattel specifically
19 objects to this Interrogatory on the grounds that it calls for the disclosure of
20 information subject to the attorney-client privilege, the attorney work-product
21 doctrine and other applicable privileges.  Mattel further objects to this
22 Interrogatory on the ground that it calls for the disclosure of confidential and/or
23 proprietary information, which Mattel will disclose only subject to and in reliance
24 upon a suitable protective order.  Mattel further objects to this Interrogatory as
25 unreasonably burdensome and overbroad in that it purports to require Mattel to
26 summarize all facts on this subject, including without limitation, facts that are
27 known to or in the possession, custody and control of defendant Bryant,
28 defendant-in-intervention MGA Entertainment, Inc. and nonparties, including

07209/655298.1

1  nonparties associated with Bryant and/or MGA.  Mattel only undertakes to make a

2  good-faith, reasonable effort to summarize facts currently known to it in

3  responding to this Interrogatory.  Mattel further objects to this Interrogatory on the

4  grounds that it is premature in that it purports to seek to all facts relating to this

5  subject at the outset of discovery in this action and also seeks to circumvent the

6  expert disclosure provisions of the Federal Rules of Civil Procedure and the Local

7  Rules.

8          Subject to and without waiving the foregoing general and specific

9  objections, Mattel responds as follows:

10         On January 4, 1999, upon starting his second term of Mattel

11  employment, and as a condition of and in consideration for his employment,

12  defendant Bryant entered into an Employee Confidential Information and

13  Inventions Agreement (the "Employee Agreement").  Among other things, Bryant

14  agreed that he would not, without Mattel's express written consent, "engage in any

15  employment or business other than for [Mattel], or invest in or assist (in any

16  manner) any business competitive with the business or future business plans of

17  [Mattel]."  Bryant further acknowledged that he held a position of trust with

18  Mattel.  In addition, Bryant assigned to Mattel all right, title and interest in

19  "inventions," including without limitation "designs," that he created, conceived or

20  reduced to practice, whether alone or jointly with others, during his employment

21  by Mattel under the terms set forth in his Employee Agreement.  A copy of

22  defendant's Employee Agreement with Mattel, dated January 4, 1999, is attached

23  to the Complaint as Exhibit A and is hereby incorporated into this response by this

24  reference.  Before his departure from Mattel, Bryant confirmed his obligations in a

25  Proprietary Information Checkout form, which Bryant agreed to and signed.  A

26  copy of this additional agreement has been produced in this action and is hereby

27  incorporated into this response by this reference.

28

07209/655298.1

-5-

1    Also on January 4, 1999, Bryant executed a Conflict of Interest
2  Questionnaire (the "Conflict Questionnaire"). Among other things, Bryant
3  certified in the Conflict Questionnaire that, other than as disclosed, he had not
4  worked for any competitor of Mattel in the prior twelve months and had not
5  engaged in any business venture or transaction involving a Mattel competitor that
6  could be construed as a conflict of interest. Bryant specifically agreed that he
7  would immediately notify his supervisor of any change in his situation that would
8  cause him to change any of the foregoing certifications. The only conflict
9  disclosure that Bryant made on the Conflict Questionnaire concerned what
10  defendant stated was "freelance" work for Ashton-Drake that is unrelated to the
11  conduct alleged herein. At no time did Bryant disclose to Mattel that he was
12  working with MGA, a known competitor, while employed by Mattel, or that he
13  was paid by MGA for services rendered to MGA while he was a Mattel employee.
14  A copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B
15  to the Complaint and is hereby incorporated into this response by this reference.

16    In late November 2003, Mattel obtained a copy of a contract
17  evidencing that Bryant had aided and assisted, and worked as a designer with,
18  MGA, a Mattel competitor, while he was employed by Mattel and was being paid
19  by Mattel for his exclusive services as a designer. Bryant's agreement with MGA
20  obligated him to provide design services to MGA on a "top priority" basis. In
21  addition, his agreement with MGA purported to assign to MGA rights to
22  preexisting works by Bryant and to deem work and services furnished by Bryant to
23  MGA under the agreement as "works for hire." Furthermore, Bryant's agreement
24  with MGA provided that he would be paid for such services and receive royalties
25  and other consideration for products on which he provided aid or assistance. A
26  copy of defendant's agreement with MGA, in the form obtained by Mattel, has
27  been produced in this case and is hereby incorporated into this response by this
28  reference.

07209/655298.1

-6-

Exhibit 11 Page 109

1          Although discovery and Mattel's investigation are on-going,

2  additional documents, testimony and other evidence thus far obtained have

3  confirmed that Bryant worked with and aided MGA, and advanced his own

4  personal interests over Mattel's, during the term of his Mattel employment without

5  Mattel's express written permission.  First, Bryant admitted at deposition that he

6  did so, although he sought to minimize and conceal the time period and extent of

7  his aid to and work with MGA.  Among other things, Bryant testified that (1) he

8  made pitches to MGA concerning the Bratz project during the term of his

9  employment; (2) he used Mattel personnel and other Mattel resources to assist him

10  in such pitches, including without limitation by using Mattel personnel and

11  resources to make what he called a "dummy" and others have called a three-

12  dimensional prototype; (3) he used Mattel personnel and other Mattel resources to

13  work on the Bratz project during his Mattel employment, including without

14  limitation by (a) obtaining information about a Mattel hair vendor, which Bryant

15  then contacted for his own and MGA's benefit and which Bryant told he was

16  working with MGA; and (b) identifying others who Bryant knew as a consequence

17  of his Mattel employment to work on the project and enlisting them to work on the

18  Bratz project during the term of his Mattel employment; (4) he worked on what

19  Bryant characterized as a "test project" to aid and assist MGA and benefit himself,

20  at Mattel's expense, during the term of his Mattel employment;  (5) he entered into

21  his agreement with MGA during the term of his Mattel employment and used

22  Mattel resources in connection with the negotiation and execution of that

23  agreement; and (6) he received monetary payments and other benefits from MGA

24  during the term of his Mattel employment, and both Bryant and MGA benefitted

25  further as a consequence of his aid and assistance to and work with MGA during

26  the term of his Mattel employment.

27          Second, MGA and those associated with MGA have made statements,

28  including under oath, that confirm Bryant assisted and worked with MGA during

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11  Page *110*

his Mattel employment.  Among his many statements to the press, for example, MGA's CEO, Isaac Larian, told the *Wall Street Journal* that "he chose Mr. Bryant's idea for the Bratz over several others after holding a sort of fashion-doll design contest in late 1999"--a time when Bryant was employed by Mattel.  In a sworn affidavit filed in a Hong Kong lawsuit brought by MGA, Isaac Larian stated that "[t]he Bratz dolls were first exhibited in the USA in November 2000," which further confirms that Bryant was working with and aiding MGA on the project prior to his departure from Mattel on or about October 20, 2000.  Additionally, Isaac Larian has been sued for fraud and other claims by his brother and one-time partner in MGA, Farhad Larian.  Farhad Larian's verified Complaint alleges, among other things, that "in or about late 1999 and early 2000, Isaac became aware of a potential new product line that had tremendous potential for [MGA].  The new product line involved the 'Bratz' dolls and related products." The verified Complaint further alleges:  "In or about early 2000, Isaac called a meeting to discuss the new Bratz product line with selected individuals" at MGA, and took affirmative steps "to conceal" from Farhad Larian MGA's "plans for the Bratz line" in February, March and May 2000.  Bryant was working for Mattel during each of these time periods.

Third, although discovery is still in its early stages, other witnesses who have testified thus far in the case have provided testimony revealing that Bryant aided and worked with MGA during his Mattel employment.  Bryant testified that he pitched the Bratz project to MGA in late August and September 2000.  Bryant also testified that he had no contact with MGA until August 2000 and had never even heard of MGA before July 2000. Bryant claims that he discussed the Bratz project with Anna Rhee--and introduced Ms. Rhee to MGA-- only after he stopped working for Mattel in late October 2000.  After Bryant introduced Ms. Rhee to MGA (which is undisputed--Bryant and Ms. Rhee agree

-8-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11 Page *41*

1   that she had no involvement with MGA prior to Bryant's introduction), Ms. Rhee

2   painted Bratz doll heads.

3            During the six months from August 2004 (when MGA made its initial

4   document production in this case) to January 2005, MGA produced a mere eight

5   pages of payment records relating to work that Ms. Rhee performed on Bryant-

6   related projects in the year 2000.  These pages relate exclusively to work that

7   Ms. Rhee did on Bryant-related projects in December 2000, after Bryant left

8   Mattel, which would be consistent with Bryant's testimony.

9            After Bryant testified and after MGA made its initial production of

10  Anna Rhee documents, however, Anna Rhee produced documents pursuant to

11  subpoena in mid-January 2005.  Included in Ms. Rhee's production were

12  approximately twenty invoices for work that she performed on Bryant-related

13  MGA projects in the year 2000, none of which MGA or Bryant had disclosed.

14  These invoices also revealed that Ms. Rhee performed work with Bryant and

15  MGA on at least seven separate occasions before Bryant's departure from Mattel--

16  including one invoice that dates to June 12, 2000, when Bryant purportedly had

17  never even heard of MGA.

18           After Ms. Rhee produced these documents, MGA then made a

19  supplemental production of certain internal documents relating to work performed

20  by Ms. Rhee during the June-October 2000 time period.  These belatedly produced

21  MGA records purport to show that Ms. Rhee's work during that time period

22  related to a project known as "Angel" and/or "Prayer Angels."

23           At her deposition, however, Ms. Rhee testified that her work during

24  that time period was for Bratz and that "Angel" was MGA's and Bryant's code

25  name for Bratz.  Thus, Ms. Rhee testified that her June 12, 2000 work was for face

26  painting on two Bratz doll heads; her late August 2000 work was for face painting

27  on four Bratz doll heads; and her work as of September 8, 2000 was for face

28

-9-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11  Page 112

1   painting on additional Bratz doll heads. All of these are times when Bryant was
2   employed by Mattel.

3          At the deposition, defendants' counsel repeatedly tried--and failed--to
4   persuade Ms. Rhee to agree with their claim that "Angel" and/or "Prayer Angels"
5   was a different doll project than Bratz and that she worked on that project in the
6   June 2000, not Bratz. For example, defendants' counsel asked whether the
7   June 12, 2000 invoice--which Ms. Rhee had testified was for work on Bratz--
8   "could" instead relate to the doll "that ultimately came to market as Prayer
9   Angels." Ms. Rhee responded: "There's no way."

10          Ms. Rhee further testified that during a time when Bryant was
11   necessarily employed by Mattel, he had contacted her about the "big" and "secret"
12   project that he was working on. Bryant instructed Anna Rhee not to tell anyone
13   about the "secret" project, including Mattel employees. He discussed this project
14   with Ms. Rhee while she was visiting the Mattel Design Center where Bryant was
15   working and informed her that he had engaged a "corporate attorney" to help him
16   with the "secret" project.

17          Fourth, while working for Mattel, Bryant concealed and affirmatively
18   misrepresented his aid and assistance to MGA in other ways. In particular, despite
19   his obligations to do so, Bryant failed to notify his Mattel supervisor of his
20   conflict of interest in working with MGA. Prior to and upon his departure, Bryant
21   further misrepresented to Mattel, including to Ivy Ross and Sandy Yamamoto, his
22   future plans by stating that he was not going to work with a competitor.

23          Finally, both Bryant and MGA have spoliated evidence relating to the
24   timing and extent of Bryant's aid to and work with MGA during his Mattel
25   employment. One example was revealed by the testimony of Victoria O'Connor, a
26   former MGA executive. According to Ms. O'Connor, Bryant faxed a signed copy
27   of a Bryant/MGA contract to MGA from Mattel. Upon receipt, each page of the
28   contract included a fax header that read "Barbie Collectibles" and bore the number

07209/655298.1                                      -10-

Exhibit 11  Page 113

1  of the Mattel fax machine that it came from, revealing that it came from Mattel's
2  Designer Center where Bryant worked. When Ms. O'Connor brought this to the
3  attention of Isaac Larian, Mr. Larian instructed her to "white-out" the fax header
4  information on all pages of the contract and send the contract, as altered, to an
5  outside MGA attorney. At Mr. Larian's direction, Ms. O'Connor proceeded to
6  alter each page of the contract in order to conceal, as Ms. O'Connor testified, the
7  fact that Bryant "was still employed at Mattel at the time the contract [between
8  MGA and Bryant] was executed."

9          As further examples, Bryant has produced documents that appear to
10 have been altered to conceal information. These include, most notably, a fax of
11 Bratz drawings that has a fax header date of April 10, 2000--six months before
12 Bryant left Mattel's employ. Although the fax header information on the page
13 produced by Bryant states that it was the third page of a fax transmission, neither
14 preceding nor subsequent pages, nor any cover sheet, has been produced. Further,
15 even though the fax header on the produced page has fields for both the sender's
16 name and the sender's telephone number, neither the name of the sender nor the
17 sender's telephone number appears in the fax header.

18         Both MGA and Bryant also have failed and refused to provide Mattel
19 with access to original documents, despite the fact that one or both apparently
20 have already performed destructive ink chemistry analyses on Bryant's original
21 drawings and despite their agreement to provide those originals. Bryant's counsel
22 agreed to produce all of Bryant's original Bratz drawings at his deposition.
23 Despite these promises, Bryant brought only a few of his original drawings to the
24 deposition. Some of these drawings--including the originals of documents
25 BRYANT 192 and BRYANT 210--had holes in them, indicating that samples had
26 been extracted for ink chemical dating analysis. Bryant testified that his drawings
27 did not have holes in them when he turned them over to defendants' counsel and
28 that he was unaware of the origin of the holes. Appearances notwithstanding,

1  defendants' counsel has denied that anyone engaged in destructive sampling or

2  analysis of Bryant's original drawings.  Defendants have not, however, explained

3  the origin of the holes in the original drawings.

4        Ramona Prince, a third-party witness, has raised other questions

5  about the integrity of Bryant's documents.  According to both Ms. Prince and

6  Bryant, Bryant showed Ms. Prince his Bratz drawings in August 1999, when he

7  was employed by Mattel.  Ms. Prince, however, has testified that markings which

8  now appear on the copy of a Bratz drawing produced by defendants did *not* appear

9  on the original drawing that Bryant showed her in 1999.  This conflicts with

10  Bryant's testimony about the drawing.  He claims that he created the drawing in its

11  entirety in August 1998, before he showed it to Ms. Prince.

12        By way of further answer, pursuant to Federal Rule of Civil

13  Procedure 33(d), Mattel will produce responsive, non-privileged documents and

14  tangible items in its possession, custody or control from which the answer to this

15  Interrogatory may be derived.

16        By way of further answer, Mattel currently has not yet received

17  discovery from defendant or MGA, has not yet obtained any deposition testimony

18  and has not yet had the opportunity to obtain information from other third parties

19  who may possess relevant information.  Mattel therefore reserves the right to

20  supplement this response after Mattel receives more information about defendant's

21  activities.  By way of further answer, this topic may be the subject of expert

22  testimony, which will be disclosed in the manner, and at the time, required for

23  expert disclosures pursuant to the Federal and Local Rules.

24

25  INTERROGATORY NO. 2:

26        State all facts supporting YOUR contention, if YOU so contend, that

27  Bryant for his own gain, or the gain of any third party, at any time converted,

28

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11  Page *115*

1   improperly used, sold, assigned or otherwise transferred any work product of his
2   creation which YOU believe was owned by MATTEL.
3
4   SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:
5           In addition to the general objections stated above, Mattel specifically
6   objects to this Interrogatory on the grounds that it calls for the disclosure of
7   information subject to the attorney-client privilege, the attorney work-product
8   doctrine and other applicable privileges. Mattel further objects to this
9   Interrogatory on the ground that it calls for the disclosure of confidential and/or
10  proprietary information, which Mattel will disclose only subject to and in reliance
11  upon a suitable protective order. Mattel further objects to this Interrogatory as
12  unreasonably burdensome and overbroad in that it purports to require Mattel to
13  summarize all facts on this subject, including without limitation, facts that are
14  known to or in the possession, custody and control of defendant Bryant,
15  defendant-in-intervention MGA Entertainment, Inc. and nonparties, including
16  nonparties associated with Bryant and/or MGA. Mattel only undertakes to make a
17  good-faith, reasonable effort to summarize facts currently known to it in
18  responding to this Interrogatory. Mattel further objects to this Interrogatory on the
19  grounds that it is premature in that it purports to seek to all facts relating to this
20  subject at the outset of discovery in this action and also seeks to circumvent the
21  expert disclosure provisions of the Federal Rules of Civil Procedure and the Local
22  Rules.
23          Subject to and without waiving the foregoing general and specific
24  objections, Mattel responds as follows:
25          On January 4, 1999, upon starting his second term of Mattel
26  employment, and as a condition of and in consideration for his employment,
27  defendant Bryant entered into an Employee Confidential Information and
28  Inventions Agreement (the "Employee Agreement"). Among other things, Bryant

1   agreed that he would not, without Mattel's express written consent, "engage in any
2   employment or business other than for [Mattel], or invest in or assist (in any
3   manner) any business competitive with the business or future business plans of
4   [Mattel]." Bryant further acknowledged that he held a position of trust with
5   Mattel. In addition, Bryant assigned to Mattel all right, title and interest in
6   "inventions," including without limitation "designs," that he created, conceived or
7   reduced to practice, whether alone or jointly with others, during his employment
8   by Mattel under the terms set forth in his Employee Agreement. A copy of
9   defendant's Employee Agreement with Mattel, dated January 4, 1999, is attached
10  to the Complaint as Exhibit A and is hereby incorporated into this response by this
11  reference. Before his departure from Mattel, Bryant confirmed his obligations in a
12  Proprietary Information Checkout form, which Bryant agreed to and signed. A
13  copy of this additional agreement has been produced in this action and is hereby
14  incorporated into this response by this reference.

15          Also on January 4, 1999, Bryant executed a Conflict of Interest
16  Questionnaire (the "Conflict Questionnaire"). Among other things, Bryant
17  certified in the Conflict Questionnaire that, other than as disclosed, he had not
18  worked for any competitor of Mattel in the prior twelve months and had not
19  engaged in any business venture or transaction involving a Mattel competitor that
20  could be construed as a conflict of interest. Bryant specifically agreed that he
21  would immediately notify his supervisor of any change in his situation that would
22  cause him to change any of the foregoing certifications. The only conflict
23  disclosure that Bryant made on the Conflict Questionnaire concerned what
24  defendant stated was "freelance" work for Ashton-Drake that is unrelated to the
25  conduct alleged herein. At no time did Bryant disclose to Mattel that he was
26  working with MGA, a known competitor, while employed by Mattel, or that he
27  was paid by MGA for services rendered to MGA while he was a Mattel employee.
28

-14-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11   Page _117_

1 | A copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B
2 | to the Complaint and is hereby incorporated into this response by this reference.
3 | In late November 2003, Mattel obtained a copy of a contract
4 | evidencing that Bryant had aided and assisted, and worked as a designer with,
5 | MGA, a Mattel competitor, while he was employed by Mattel and was being paid
6 | by Mattel for his exclusive services as a designer. Bryant's agreement with MGA
7 | obligated him to provide design services to MGA on a "top priority" basis. In
8 | addition, his agreement with MGA purported to assign to MGA rights to
9 | preexisting works by Bryant and to deem work and services furnished by Bryant to
10 | MGA under the agreement as "works for hire." Furthermore, Bryant's agreement
11 | with MGA provided that he would be paid for such services and receive royalties
12 | and other consideration for products on which he provided aid or assistance. A
13 | copy of defendant's agreement with MGA, in the form obtained by Mattel, has
14 | been produced in this case and is hereby incorporated into this response by this
15 | reference.
16 | Although discovery and Mattel's investigation are on-going,
17 | additional documents, testimony and other evidence thus far obtained have
18 | confirmed that Bryant worked with and aided MGA, and advanced his own
19 | personal interests over Mattel's, during the term of his Mattel employment without
20 | Mattel's express written permission. First, Bryant admitted at deposition that he
21 | did so, although he sought to minimize and conceal the time period and extent of
22 | his aid to and work with MGA. Among other things, Bryant testified that (1) he
23 | made pitches to MGA concerning the Bratz project during the term of his
24 | employment; (2) he used Mattel personnel and other Mattel resources to assist him
25 | in such pitches, including without limitation by using Mattel personnel and
26 | resources to make what he called a "dummy" and others have called a three-
27 | dimensional prototype; (3) he used Mattel personnel and other Mattel resources to
28 | work on the Bratz project during his Mattel employment, including without

-15-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11  Page 118

1   limitation by (a) obtaining information about a Mattel hair vendor, which Bryant
2   then contacted for his own and MGA's benefit and which Bryant told he was
3   working with MGA; and (b) identifying others who Bryant knew as a consequence
4   of his Mattel employment to work on the project and enlisting them to work on the
5   Bratz project during the term of his Mattel employment; (4) he worked on what
6   Bryant characterized as a "test project" to aid and assist MGA and benefit himself,
7   at Mattel's expense, during the term of his Mattel employment;  (5) he entered into
8   his agreement with MGA during the term of his Mattel employment and used
9   Mattel resources in connection with the negotiation and execution of that
10  agreement; and (6) he received monetary payments and other benefits from MGA
11  during the term of his Mattel employment, and both Bryant and MGA benefitted
12  further as a consequence of his aid and assistance to and work with MGA during
13  the term of his Mattel employment.

14          Second, MGA and those associated with MGA have made statements,
15  including under oath, that confirm Bryant assisted and worked with MGA during
16  his Mattel employment.  Among his many statements to the press, for example,
17  MGA's CEO, Isaac Larian, told the *Wall Street Journal* that "he chose
18  Mr. Bryant's idea for the Bratz over several others after holding a sort of
19  fashion-doll design contest in late 1999"--a time when Bryant was employed by
20  Mattel.  In a sworn affidavit filed in a Hong Kong lawsuit brought by MGA,
21  Isaac Larian stated that "[t]he Bratz dolls were first exhibited in the USA in
22  November 2000," which further confirms that Bryant was working with and aiding
23  MGA on the project prior to his departure from Mattel on or about October 20,
24  2000.  Additionally, Isaac Larian has been sued for fraud and other claims by his
25  brother and one-time partner in MGA, Farhad Larian.  Farhad Larian's verified
26  Complaint alleges, among other things, that "in or about late 1999 and early 2000,
27  Isaac became aware of a potential new product line that had tremendous potential
28  for [MGA].  The new product line involved the 'Bratz' dolls and related products."

07209/655298.1

-16-
SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11   Page *119*

1   The verified Complaint further alleges: "In or about early 2000, Isaac called a

2   meeting to discuss the new Bratz product line with selected individuals" at MGA,

3   and took affirmative steps "to conceal" from Farhad Larian MGA's "plans for the

4   Bratz line" in February, March and May 2000.  Bryant was working for Mattel

5   during each of these time periods.

6           Third, although discovery is still in its early stages, other witnesses

7   who have testified thus far in the case have provided testimony revealing that

8   Bryant aided and worked with MGA during his Mattel employment.  Bryant

9   testified that he pitched the Bratz project to MGA in late August and September

10  2000.  Bryant also testified that he had no contact with MGA until August 2000

11  and had never even heard of MGA before July 2000. Bryant claims that he

12  discussed the Bratz project with Anna Rhee--and introduced Ms. Rhee to MGA--

13  only after he stopped working for Mattel in late October 2000.  After Bryant

14  introduced Ms. Rhee to MGA (which is undisputed--Bryant and Ms. Rhee agree

15  that she had no involvement with MGA prior to Bryant's introduction), Ms. Rhee

16  painted Bratz doll heads.

17          During the six months from August 2004 (when MGA made its initial

18  document production in this case) to January 2005, MGA produced a mere eight

19  pages of payment records relating to work that Ms. Rhee performed on Bryant-

20  related projects in the year 2000.  These pages relate exclusively to work that

21  Ms. Rhee did on Bryant-related projects in December 2000, after Bryant left

22  Mattel, which would be consistent with Bryant's testimony.

23          After Bryant testified and after MGA made its initial production of

24  Anna Rhee documents, however, Anna Rhee produced documents pursuant to

25  subpoena in mid-January 2005.  Included in Ms. Rhee's production were

26  approximately twenty invoices for work that she performed on Bryant-related

27  MGA projects in the year 2000, none of which MGA or Bryant had disclosed.

28  These invoices also revealed that Ms. Rhee performed work with Bryant and

07209/655298.1

-17-

Exhibit 11 Page 128

1  MGA on at least seven separate occasions before Bryant's departure from Mattel--

2  including one invoice that dates to June 12, 2000, when Bryant purportedly had

3  never even heard of MGA.

4          After Ms. Rhee produced these documents, MGA then made a

5  supplemental production of certain internal documents relating to work performed

6  by Ms. Rhee during the June-October 2000 time period.  These belatedly produced

7  MGA records purport to show that Ms. Rhee's work during that time period

8  related to a project known as "Angel" and/or "Prayer Angels."

9          At her deposition, however, Ms. Rhee testified that her work during

10 that time period was for Bratz and that "Angel" was MGA's and Bryant's code

11 name for Bratz.  Thus, Ms. Rhee testified that her June 12, 2000 work was for face

12 painting on two Bratz doll heads; her late August 2000 work was for face painting

13 on four Bratz doll heads; and her work as of September 8, 2000 was for face

14 painting on additional Bratz doll heads.  All of these are times when Bryant was

15 employed by Mattel.

16         At the deposition, defendants' counsel repeatedly tried--and failed--to

17 persuade Ms. Rhee to agree with their claim that "Angel" and/or "Prayer Angels"

18 was a different doll project than Bratz and that she worked on that project in the

19 June 2000, not Bratz.  For example, defendants' counsel asked whether the

20 June 12, 2000 invoice--which Ms. Rhee had testified was for work on Bratz--

21 "could" instead relate to the doll "that ultimately came to market as Prayer

22 Angels."  Ms. Rhee responded:  "There's no way."

23         Ms. Rhee further testified that during a time when Bryant was

24 necessarily employed by Mattel, he had contacted her about the "big" and "secret"

25 project that he was working on.  Bryant instructed Anna Rhee not to tell anyone

26 about the "secret" project, including Mattel employees.  He discussed this project

27 with Ms. Rhee while she was visiting the Mattel Design Center where Bryant was

28

-18-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11  Page 121

1  working and informed her that he had engaged a "corporate attorney" to help him
2  with the "secret" project.

3         Fourth, while working for Mattel, Bryant concealed and affirmatively
4  misrepresented his aid and assistance to MGA in other ways. In particular, despite
5  his obligations to do so, Bryant failed to notify his Mattel supervisor of his
6  conflict of interest in working with MGA. Prior to and upon his departure, Bryant
7  further misrepresented to Mattel, including to Ivy Ross and Sandy Yamamoto, his
8  future plans by stating that he was not going to work with a competitor.

9         Finally, both Bryant and MGA have spoliated evidence relating to the
10 timing and extent of Bryant's aid to and work with MGA during his Mattel
11 employment. One example was revealed by the testimony of Victoria O'Connor, a
12 former MGA executive. According to Ms. O'Connor, Bryant faxed a signed copy
13 of a Bryant/MGA contract to MGA from Mattel. Upon receipt, each page of the
14 contract included a fax header that read "Barbie Collectibles" and bore the number
15 of the Mattel fax machine that it came from, revealing that it came from Mattel's
16 Designer Center where Bryant worked. When Ms. O'Connor brought this to the
17 attention of Isaac Larian, Mr. Larian instructed her to "white-out" the fax header
18 information on all pages of the contract and send the contract, as altered, to an
19 outside MGA attorney. At Mr. Larian's direction, Ms. O'Connor proceeded to
20 alter each page of the contract in order to conceal, as Ms. O'Connor testified, the
21 fact that Bryant "was still employed at Mattel at the time the contract [between
22 MGA and Bryant] was executed."

23        As further examples, Bryant has produced documents that appear to
24 have been altered to conceal information. These include, most notably, a fax of
25 Bratz drawings that has a fax header date of April 10, 2000--six months before
26 Bryant left Mattel's employ. Although the fax header information on the page
27 produced by Bryant states that it was the third page of a fax transmission, neither
28 preceding nor subsequent pages, nor any cover sheet, has been produced. Further,

-19-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11 Page 122

1  even though the fax header on the produced page has fields for both the sender's

2  name and the sender's telephone number, neither the name of the sender nor the

3  sender's telephone number appears in the fax header.

4          Both MGA and Bryant also have failed and refused to provide Mattel

5  with access to original documents, despite the fact that one or both apparently

6  have already performed destructive ink chemistry analyses on Bryant's original

7  drawings and despite their agreement to provide those originals. Bryant's counsel

8  agreed to produce all of Bryant's original Bratz drawings at his deposition.

9  Despite these promises, Bryant brought only a few of his original drawings to the

10  deposition. Some of these drawings--including the originals of documents

11  BRYANT 192 and BRYANT 210--had holes in them, indicating that samples had

12  been extracted for ink chemical dating analysis. Bryant testified that his drawings

13  did not have holes in them when he turned them over to defendants' counsel and

14  that he was unaware of the origin of the holes. Appearances notwithstanding,

15  defendants' counsel has denied that anyone engaged in destructive sampling or

16  analysis of Bryant's original drawings. Defendants have not, however, explained

17  the origin of the holes in the original drawings.

18          Ramona Prince, a third-party witness, has raised other questions

19  about the integrity of Bryant's documents. According to both Ms. Prince and

20  Bryant, Bryant showed Ms. Prince his Bratz drawings in August 1999, when he

21  was employed by Mattel. Ms. Prince, however, has testified that markings which

22  now appear on the copy of a Bratz drawing produced by defendants did *not* appear

23  on the original drawing that Bryant showed her in 1999. This conflicts with

24  Bryant's testimony about the drawing. He claims that he created the drawing in its

25  entirety in August 1998, before he showed it to Ms. Prince.

26          By way of further answer, pursuant to <u>Federal Rule of Civil</u>

27  <u>Procedure</u> 33(d), Mattel will produce responsive, non-privileged documents and

28

-20-

Exhibit 11 Page 123

1   tangible items in its possession, custody or control from which the answer to this

2   Interrogatory may be derived.

3           By way of further answer, Mattel currently has not yet received

4   discovery from defendant or MGA, has not yet obtained any deposition testimony

5   and has not yet had the opportunity to obtain information from other third parties

6   who may possess relevant information. Mattel therefore reserves the right to

7   supplement this response after Mattel receives more information about defendant's

8   activities. By way of further answer, this topic may be the subject of expert

9   testimony, which will be disclosed in the manner, and at the time, required for

10  expert disclosures pursuant to the Federal and Local Rules.

11

12  INTERROGATORY NO. 3:

13          State all facts supporting YOUR contention, if YOU so contend, that

14  Bryant for his own gain, or the gain of any third party, at any time converted, used,

15  sold, assigned or otherwise transferred any MATTEL work product owned at any

16  time by MATTEL or created by any MATTEL employee other than Bryant, or by

17  any independent contractor, during the time that such PERSON was working for

18  MATTEL.

19

20  SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:

21          In addition to the general objections stated above, Mattel specifically

22  objects to this Interrogatory on the grounds that it calls for the disclosure of

23  information subject to the attorney-client privilege, the attorney work-product

24  doctrine and other applicable privileges. Mattel further objects to this

25  Interrogatory on the ground that it calls for the disclosure of confidential and/or

26  proprietary information, which Mattel will disclose only subject to and in reliance

27  upon a suitable protective order. Mattel further objects to this Interrogatory as

28  unreasonably burdensome and overbroad in that it purports to require Mattel to

07209/655298.1

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11 Page 124

1  summarize all facts on this subject, including without limitation, facts that are

2  known to or in the possession, custody and control of defendant Bryant,

3  defendant-in-intervention MGA Entertainment, Inc. and nonparties, including

4  nonparties associated with Bryant and/or MGA.  Mattel only undertakes to make a

5  good-faith, reasonable effort to summarize facts currently known to it in

6  responding to this Interrogatory.  Mattel further objects to this Interrogatory on the

7  grounds that it is premature in that it purports to seek to all facts relating to this

8  subject at the outset of discovery in this action and also seeks to circumvent the

9  expert disclosure provisions of the Federal Rules of Civil Procedure and the Local

10  Rules.

11          Subject to and without waiving the foregoing general and specific

12  objections, Mattel responds as follows:

13          On January 4, 1999, upon starting his second term of Mattel

14  employment, and as a condition of and in consideration for his employment,

15  defendant Bryant entered into an Employee Confidential Information and

16  Inventions Agreement (the "Employee Agreement").  Among other things, Bryant

17  agreed that he would not, without Mattel's express written consent, "engage in any

18  employment or business other than for [Mattel], or invest in or assist (in any

19  manner) any business competitive with the business or future business plans of

20  [Mattel]."  Bryant further acknowledged that he held a position of trust with

21  Mattel.  In addition, Bryant assigned to Mattel all right, title and interest in

22  "inventions," including without limitation "designs," that he created, conceived or

23  reduced to practice, whether alone or jointly with others, during his employment

24  by Mattel under the terms set forth in his Employee Agreement.  A copy of

25  defendant's Employee Agreement with Mattel, dated January 4, 1999, is attached

26  to the Complaint as Exhibit A and is hereby incorporated into this response by this

27  reference. Before his departure from Mattel, Bryant confirmed his obligations in a

28  Proprietary Information Checkout form, which Bryant agreed to and signed.  A

-22-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11  Page 125

1  copy of this additional agreement has been produced in this action and is hereby

2  incorporated into this response by this reference.

3          Also on January 4, 1999, Bryant executed a Conflict of Interest

4  Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant

5  certified in the Conflict Questionnaire that, other than as disclosed, he had not

6  worked for any competitor of Mattel in the prior twelve months and had not

7  engaged in any business venture or transaction involving a Mattel competitor that

8  could be construed as a conflict of interest.  Bryant specifically agreed that he

9  would immediately notify his supervisor of any change in his situation that would

10  cause him to change any of the foregoing certifications.  The only conflict

11  disclosure that Bryant made on the Conflict Questionnaire concerned what

12  defendant stated was "freelance" work for Ashton-Drake that is unrelated to the

13  conduct alleged herein.  At no time did Bryant disclose to Mattel that he was

14  working with MGA, a known competitor, while employed by Mattel, or that he

15  was paid by MGA for services rendered to MGA while he was a Mattel employee.

16  A copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B

17  to the Complaint and is hereby incorporated into this response by this reference.

18          In late November 2003, Mattel obtained a copy of a contract

19  evidencing that Bryant had aided and assisted, and worked as a designer with,

20  MGA, a Mattel competitor, while he was employed by Mattel and was being paid

21  by Mattel for his exclusive services as a designer.  Bryant's agreement with MGA

22  obligated him to provide design services to MGA on a "top priority" basis.  In

23  addition, his agreement with MGA purported to assign to MGA rights to

24  preexisting works by Bryant and to deem work and services furnished by Bryant to

25  MGA under the agreement as "works for hire."  Furthermore, Bryant's agreement

26  with MGA provided that he would be paid for such services and receive royalties

27  and other consideration for products on which he provided aid or assistance.  A

28  copy of defendant's agreement with MGA, in the form obtained by Mattel, has

07209/655298.1

-23-

Exhibit 11  Page 126

1  been produced in this case and is hereby incorporated into this response by this

2  reference.

3             Although discovery and Mattel's investigation are on-going,

4  additional documents, testimony and other evidence thus far obtained have

5  confirmed that Bryant worked with and aided MGA, and advanced his own

6  personal interests over Mattel's, during the term of his Mattel employment without

7  Mattel's express written permission.  First, Bryant admitted at deposition that he

8  did so, although he sought to minimize and conceal the time period and extent of

9  his aid to and work with MGA.  Among other things, Bryant testified that (1) he

10  made pitches to MGA concerning the Bratz project during the term of his

11  employment; (2) he used Mattel personnel and other Mattel resources to assist him

12  in such pitches, including without limitation by using Mattel personnel and

13  resources to make what he called a "dummy" and others have called a three-

14  dimensional prototype; (3) he used Mattel personnel and other Mattel resources to

15  work on the Bratz project during his Mattel employment, including without

16  limitation by (a) obtaining information about a Mattel hair vendor, which Bryant

17  then contacted for his own and MGA's benefit and which Bryant told he was

18  working with MGA; and (b) identifying others who Bryant knew as a consequence

19  of his Mattel employment to work on the project and enlisting them to work on the

20  Bratz project during the term of his Mattel employment; (4) he worked on what

21  Bryant characterized as a "test project" to aid and assist MGA and benefit himself,

22  at Mattel's expense, during the term of his Mattel employment;  (5) he entered into

23  his agreement with MGA during the term of his Mattel employment and used

24  Mattel resources in connection with the negotiation and execution of that

25  agreement; and (6) he received monetary payments and other benefits from MGA

26  during the term of his Mattel employment, and both Bryant and MGA benefitted

27  further as a consequence of his aid and assistance to and work with MGA during

28  the term of his Mattel employment.

-24-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11  Page 127

1    Second, MGA and those associated with MGA have made statements,

2 including under oath, that confirm Bryant assisted and worked with MGA during

3 his Mattel employment.  Among his many statements to the press, for example,

4 MGA's CEO, Isaac Larian, told the *Wall Street Journal* that "he chose

5 Mr. Bryant's idea for the Bratz over several others after holding a sort of

6 fashion-doll design contest in late 1999"--a time when Bryant was employed by

7 Mattel.  In a sworn affidavit filed in a Hong Kong lawsuit brought by MGA,

8 Isaac Larian stated that "[t]he Bratz dolls were first exhibited in the USA in

9 November 2000," which further confirms that Bryant was working with and aiding

10 MGA on the project prior to his departure from Mattel on or about October 20,

11 2000.  Additionally, Isaac Larian has been sued for fraud and other claims by his

12 brother and one-time partner in MGA, Farhad Larian.  Farhad Larian's verified

13 Complaint alleges, among other things, that "in or about late 1999 and early 2000,

14 Isaac became aware of a potential new product line that had tremendous potential

15 for [MGA].  The new product line involved the 'Bratz' dolls and related products."

16 The verified Complaint further alleges: "In or about early 2000, Isaac called a

17 meeting to discuss the new Bratz product line with selected individuals" at MGA,

18 and took affirmative steps "to conceal" from Farhad Larian MGA's "plans for the

19 Bratz line" in February, March and May 2000.  Bryant was working for Mattel

20 during each of these time periods.

21    Third, although discovery is still in its early stages, other witnesses

22 who have testified thus far in the case have provided testimony revealing that

23 Bryant aided and worked with MGA during his Mattel employment.  Bryant

24 testified that he pitched the Bratz project to MGA in late August and September

25 2000.  Bryant also testified that he had no contact with MGA until August 2000

26 and had never even heard of MGA before July 2000.  Bryant claims that he

27 discussed the Bratz project with Anna Rhee--and introduced Ms. Rhee to MGA--

28 only after he stopped working for Mattel in late October 2000.  After Bryant

07209/655298.1

-25-

1   introduced Ms. Rhee to MGA (which is undisputed--Bryant and Ms. Rhee agree

2   that she had no involvement with MGA prior to Bryant's introduction), Ms. Rhee

3   painted Bratz doll heads.

4          During the six months from August 2004 (when MGA made its initial

5   document production in this case) to January 2005, MGA produced a mere eight

6   pages of payment records relating to work that Ms. Rhee performed on Bryant-

7   related projects in the year 2000.  These pages relate exclusively to work that

8   Ms. Rhee did on Bryant-related projects in December 2000, after Bryant left

9   Mattel, which would be consistent with Bryant's testimony.

10         After Bryant testified and after MGA made its initial production of

11  Anna Rhee documents, however, Anna Rhee produced documents pursuant to

12  subpoena in mid-January 2005.  Included in Ms. Rhee's production were

13  approximately twenty invoices for work that she performed on Bryant-related

14  MGA projects in the year 2000, none of which MGA or Bryant had disclosed.

15  These invoices also revealed that Ms. Rhee performed work with Bryant and

16  MGA on at least seven separate occasions before Bryant's departure from Mattel--

17  including one invoice that dates to June 12, 2000, when Bryant purportedly had

18  never even heard of MGA.

19         After Ms. Rhee produced these documents, MGA then made a

20  supplemental production of certain internal documents relating to work performed

21  by Ms. Rhee during the June-October 2000 time period.  These belatedly produced

22  MGA records purport to show that Ms. Rhee's work during that time period

23  related to a project known as "Angel" and/or "Prayer Angels."

24         At her deposition, however, Ms. Rhee testified that her work during

25  that time period was for Bratz and that "Angel" was MGA's and Bryant's code

26  name for Bratz.  Thus, Ms. Rhee testified that her June 12, 2000 work was for face

27  painting on two Bratz doll heads; her late August 2000 work was for face painting

28  on four Bratz doll heads; and her work as of September 8, 2000 was for face

-26-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11  Page 129

1 | painting on additional Bratz doll heads. All of these are times when Bryant was
2 | employed by Mattel.

3 | At the deposition, defendants' counsel repeatedly tried--and failed--to
4 | persuade Ms. Rhee to agree with their claim that "Angel" and/or "Prayer Angels"
5 | was a different doll project than Bratz and that she worked on that project in the
6 | June 2000, not Bratz. For example, defendants' counsel asked whether the
7 | June 12, 2000 invoice--which Ms. Rhee had testified was for work on Bratz--
8 | "could" instead relate to the doll "that ultimately came to market as Prayer
9 | Angels." Ms. Rhee responded: "There's no way."

10 | Ms. Rhee further testified that during a time when Bryant was
11 | necessarily employed by Mattel, he had contacted her about the "big" and "secret"
12 | project that he was working on. Bryant instructed Anna Rhee not to tell anyone
13 | about the "secret" project, including Mattel employees. He discussed this project
14 | with Ms. Rhee while she was visiting the Mattel Design Center where Bryant was
15 | working and informed her that he had engaged a "corporate attorney" to help him
16 | with the "secret" project.

17 | Fourth, while working for Mattel, Bryant concealed and affirmatively
18 | misrepresented his aid and assistance to MGA in other ways. In particular, despite
19 | his obligations to do so, Bryant failed to notify his Mattel supervisor of his
20 | conflict of interest in working with MGA. Prior to and upon his departure, Bryant
21 | further misrepresented to Mattel, including to Ivy Ross and Sandy Yamamoto, his
22 | future plans by stating that he was not going to work with a competitor.

23 | Finally, both Bryant and MGA have spoliated evidence relating to the
24 | timing and extent of Bryant's aid to and work with MGA during his Mattel
25 | employment. One example was revealed by the testimony of Victoria O'Connor, a
26 | former MGA executive. According to Ms. O'Connor, Bryant faxed a signed copy
27 | of a Bryant/MGA contract to MGA from Mattel. Upon receipt, each page of the
28 | contract included a fax header that read "Barbie Collectibles" and bore the number

-27-

Exhibit 11 Page 130

1    of the Mattel fax machine that it came from, revealing that it came from Mattel's
2    Designer Center where Bryant worked.  When Ms. O'Connor brought this to the
3    attention of Isaac Larian, Mr. Larian instructed her to "white-out" the fax header
4    information on all pages of the contract and send the contract, as altered, to an
5    outside MGA attorney.  At Mr. Larian's direction, Ms. O'Connor proceeded to
6    alter each page of the contract in order to conceal, as Ms. O'Connor testified, the
7    fact that Bryant "was still employed at Mattel at the time the contract [between
8    MGA and Bryant] was executed."

9            As further examples, Bryant has produced documents that appear to
10   have been altered to conceal information.  These include, most notably, a fax of
11   Bratz drawings that has a fax header date of April 10, 2000--six months before
12   Bryant left Mattel's employ.  Although the fax header information on the page
13   produced by Bryant states that it was the third page of a fax transmission, neither
14   preceding nor subsequent pages, nor any cover sheet, has been produced.  Further,
15   even though the fax header on the produced page has fields for both the sender's
16   name and the sender's telephone number, neither the name of the sender nor the
17   sender's telephone number appears in the fax header.

18           Both MGA and Bryant also have failed and refused to provide Mattel
19   with access to original documents, despite the fact that one or both apparently
20   have already performed destructive ink chemistry analyses on Bryant's original
21   drawings and despite their agreement to provide those originals.  Bryant's counsel
22   agreed to produce all of Bryant's original Bratz drawings at his deposition.
23   Despite these promises, Bryant brought only a few of his original drawings to the
24   deposition.  Some of these drawings--including the originals of documents
25   BRYANT 192 and BRYANT 210--had holes in them, indicating that samples had
26   been extracted for ink chemical dating analysis.  Bryant testified that his drawings
27   did not have holes in them when he turned them over to defendants' counsel and
28   that he was unaware of the origin of the holes.  Appearances notwithstanding,

1  defendants' counsel has denied that anyone engaged in destructive sampling or

2  analysis of Bryant's original drawings.  Defendants have not, however, explained

3  the origin of the holes in the original drawings.

4          Ramona Prince, a third-party witness, has raised other questions

5  about the integrity of Bryant's documents.  According to both Ms. Prince and

6  Bryant, Bryant showed Ms. Prince his Bratz drawings in August 1999, when he

7  was employed by Mattel.  Ms. Prince, however, has testified that markings which

8  now appear on the copy of a Bratz drawing produced by defendants did *not* appear

9  on the original drawing that Bryant showed her in 1999.  This conflicts with

10 Bryant's testimony about the drawing.  He claims that he created the drawing in its

11 entirety in August 1998, before he showed it to Ms. Prince.

12         By way of further answer, pursuant to Federal Rule of Civil

13 Procedure 33(d), Mattel will produce responsive, non-privileged documents and

14 tangible items in its possession, custody or control from which the answer to this

15 Interrogatory may be derived.

16         By way of further answer, Mattel currently has not yet received

17 discovery from defendant or MGA, has not yet obtained any deposition testimony

18 and has not yet had the opportunity to obtain information from other third parties

19 who may possess relevant information.  Mattel therefore reserves the right to

20 supplement this response after Mattel receives more information about defendant's

21 activities.  By way of further answer, this topic may be the subject of expert

22 testimony, which will be disclosed in the manner, and at the time, required for

23 expert disclosures pursuant to the Federal and Local Rules.

24

25 INTERROGATORY NO. 6:

26         State all facts supporting YOUR claim that YOU have been damaged

27 by any act or omission of Bryant.

28

1  <u>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6</u>:

2         In addition to the general objections stated above, Mattel specifically

3  objects to this Interrogatory on the grounds that it calls for the disclosure of

4  information subject to the attorney-client privilege, the attorney work-product

5  doctrine and other applicable privileges.  Mattel further objects to this

6  Interrogatory on the ground that it calls for the disclosure of confidential and/or

7  proprietary information, which Mattel will disclose only subject to and in reliance

8  upon a suitable protective order.  Mattel further objects to this Interrogatory as

9  unreasonably burdensome and overbroad in that it purports to require Mattel to

10 summarize all facts on this subject, including without limitation, facts that are

11 known to or in the possession, custody and control of defendant Bryant,

12 defendant-in-intervention MGA Entertainment, Inc. and nonparties, including

13 nonparties associated with Bryant and/or MGA.  Mattel only undertakes to make a

14 good-faith, reasonable effort to summarize facts currently known to it in

15 responding to this Interrogatory.  Mattel further objects to this Interrogatory on the

16 grounds that it is premature in that it purports to seek to all facts relating to this

17 subject at the outset of discovery in this action and also seeks to circumvent the

18 expert disclosure provisions of the <u>Federal Rules of Civil Procedure</u> and the <u>Local</u>

19 <u>Rules</u>.

20        Subject to and without waiving the foregoing general and specific

21 objections, Mattel responds as follows:

22        On January 4, 1999, upon starting his second term of Mattel

23 employment, and as a condition of and in consideration for his employment,

24 defendant Bryant entered into an Employee Confidential Information and

25 Inventions Agreement (the "Employee Agreement").  Among other things, Bryant

26 agreed that he would not, without Mattel's express written consent, "engage in any

27 employment or business other than for [Mattel], or invest in or assist (in any

28 manner) any business competitive with the business or future business plans of

07209/655298.1

1   [Mattel]." Bryant further acknowledged that he held a position of trust with

2   Mattel. In addition, Bryant assigned to Mattel all right, title and interest in

3   "inventions," including without limitation "designs," that he created, conceived or

4   reduced to practice, whether alone or jointly with others, during his employment

5   by Mattel under the terms set forth in his Employee Agreement. A copy of

6   defendant's Employee Agreement with Mattel, dated January 4, 1999, is attached

7   to the Complaint as Exhibit A and is hereby incorporated into this response by this

8   reference. Before his departure from Mattel, Bryant confirmed his obligations in a

9   Proprietary Information Checkout form, which Bryant agreed to and signed. A

10  copy of this additional agreement has been produced in this action and is hereby

11  incorporated into this response by this reference.

12          Also on January 4, 1999, Bryant executed a Conflict of Interest

13  Questionnaire (the "Conflict Questionnaire"). Among other things, Bryant

14  certified in the Conflict Questionnaire that, other than as disclosed, he had not

15  worked for any competitor of Mattel in the prior twelve months and had not

16  engaged in any business venture or transaction involving a Mattel competitor that

17  could be construed as a conflict of interest. Bryant specifically agreed that he

18  would immediately notify his supervisor of any change in his situation that would

19  cause him to change any of the foregoing certifications. The only conflict

20  disclosure that Bryant made on the Conflict Questionnaire concerned what

21  defendant stated was "freelance" work for Ashton-Drake that is unrelated to the

22  conduct alleged herein. At no time did Bryant disclose to Mattel that he was

23  working with MGA, a known competitor, while employed by Mattel, or that he

24  was paid by MGA for services rendered to MGA while he was a Mattel employee.

25  A copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B

26  to the Complaint and is hereby incorporated into this response by this reference.

27          In late November 2003, Mattel obtained a copy of a contract

28  evidencing that Bryant had aided and assisted, and worked as a designer with,

-31-
                                       SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11 Page 134

1 | MGA, a Mattel competitor, while he was employed by Mattel and was being paid
2 | by Mattel for his exclusive services as a designer.  Bryant's agreement with MGA
3 | obligated him to provide design services to MGA on a "top priority" basis.  In
4 | addition, his agreement with MGA purported to assign to MGA rights to
5 | preexisting works by Bryant and to deem work and services furnished by Bryant to
6 | MGA under the agreement as "works for hire."  Furthermore, Bryant's agreement
7 | with MGA provided that he would be paid for such services and receive royalties
8 | and other consideration for products on which he provided aid or assistance.  A
9 | copy of defendant's agreement with MGA, in the form obtained by Mattel, has
10 | been produced in this case and is hereby incorporated into this response by this
11 | reference.

12 | Although discovery and Mattel's investigation are on-going,
13 | additional documents, testimony and other evidence thus far obtained have
14 | confirmed that Bryant worked with and aided MGA, and advanced his own
15 | personal interests over Mattel's, during the term of his Mattel employment without
16 | Mattel's express written permission.  First, Bryant admitted at deposition that he
17 | did so, although he sought to minimize and conceal the time period and extent of
18 | his aid to and work with MGA.  Among other things, Bryant testified that (1) he
19 | made pitches to MGA concerning the Bratz project during the term of his
20 | employment; (2) he used Mattel personnel and other Mattel resources to assist him
21 | in such pitches, including without limitation by using Mattel personnel and
22 | resources to make what he called a "dummy" and others have called a three-
23 | dimensional prototype; (3) he used Mattel personnel and other Mattel resources to
24 | work on the Bratz project during his Mattel employment, including without
25 | limitation by (a) obtaining information about a Mattel hair vendor, which Bryant
26 | then contacted for his own and MGA's benefit and which Bryant told he was
27 | working with MGA; and (b) identifying others who Bryant knew as a consequence
28 | of his Mattel employment to work on the project and enlisting them to work on the

07209/655298.1

-32-
SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11 Page 135

1  Bratz project during the term of his Mattel employment; (4) he worked on what

2  Bryant characterized as a "test project" to aid and assist MGA and benefit himself,

3  at Mattel's expense, during the term of his Mattel employment;  (5) he entered into

4  his agreement with MGA during the term of his Mattel employment and used

5  Mattel resources in connection with the negotiation and execution of that

6  agreement; and (6) he received monetary payments and other benefits from MGA

7  during the term of his Mattel employment, and both Bryant and MGA benefitted

8  further as a consequence of his aid and assistance to and work with MGA during

9  the term of his Mattel employment.

10          Second, MGA and those associated with MGA have made statements,

11  including under oath, that confirm Bryant assisted and worked with MGA during

12  his Mattel employment.  Among his many statements to the press, for example,

13  MGA's CEO, Isaac Larian, told the *Wall Street Journal* that "he chose

14  Mr. Bryant's idea for the Bratz over several others after holding a sort of

15  fashion-doll design contest in late 1999"--a time when Bryant was employed by

16  Mattel.  In a sworn affidavit filed in a Hong Kong lawsuit brought by MGA,

17  Isaac Larian stated that "[t]he Bratz dolls were first exhibited in the USA in

18  November 2000," which further confirms that Bryant was working with and aiding

19  MGA on the project prior to his departure from Mattel on or about October 20,

20  2000.  Additionally, Isaac Larian has been sued for fraud and other claims by his

21  brother and one-time partner in MGA, Farhad Larian.  Farhad Larian's verified

22  Complaint alleges, among other things, that "in or about late 1999 and early 2000,

23  Isaac became aware of a potential new product line that had tremendous potential

24  for [MGA].  The new product line involved the 'Bratz' dolls and related products."

25  The verified Complaint further alleges: "In or about early 2000, Isaac called a

26  meeting to discuss the new Bratz product line with selected individuals" at MGA,

27  and took affirmative steps "to conceal" from Farhad Larian MGA's "plans for the

28

-33-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11 Page 136

1  Bratz line" in February, March and May 2000. Bryant was working for Mattel
2  during each of these time periods.

3          Third, although discovery is still in its early stages, other witnesses
4  who have testified thus far in the case have provided testimony revealing that
5  Bryant aided and worked with MGA during his Mattel employment. Bryant
6  testified that he pitched the Bratz project to MGA in late August and September
7  2000. Bryant also testified that he had no contact with MGA until August 2000
8  and had never even heard of MGA before July 2000. Bryant claims that he
9  discussed the Bratz project with Anna Rhee--and introduced Ms. Rhee to MGA--
10 only after he stopped working for Mattel in late October 2000. After Bryant
11 introduced Ms. Rhee to MGA (which is undisputed--Bryant and Ms. Rhee agree
12 that she had no involvement with MGA prior to Bryant's introduction), Ms. Rhee
13 painted Bratz doll heads.

14          During the six months from August 2004 (when MGA made its initial
15 document production in this case) to January 2005, MGA produced a mere eight
16 pages of payment records relating to work that Ms. Rhee performed on Bryant-
17 related projects in the year 2000. These pages relate exclusively to work that
18 Ms. Rhee did on Bryant-related projects in December 2000, after Bryant left
19 Mattel, which would be consistent with Bryant's testimony.

20          After Bryant testified and after MGA made its initial production of
21 Anna Rhee documents, however, Anna Rhee produced documents pursuant to
22 subpoena in mid-January 2005. Included in Ms. Rhee's production were
23 approximately twenty invoices for work that she performed on Bryant-related
24 MGA projects in the year 2000, none of which MGA or Bryant had disclosed.
25 These invoices also revealed that Ms. Rhee performed work with Bryant and
26 MGA on at least seven separate occasions before Bryant's departure from Mattel--
27 including one invoice that dates to June 12, 2000, when Bryant purportedly had
28 never even heard of MGA.

-34-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11 Page 137

1         After Ms. Rhee produced these documents, MGA then made a

2   supplemental production of certain internal documents relating to work performed

3   by Ms. Rhee during the June-October 2000 time period.  These belatedly produced

4   MGA records purport to show that Ms. Rhee's work during that time period

5   related to a project known as "Angel" and/or "Prayer Angels."

6         At her deposition, however, Ms. Rhee testified that her work during

7   that time period was for Bratz and that "Angel" was MGA's and Bryant's code

8   name for Bratz.  Thus, Ms. Rhee testified that her June 12, 2000 work was for face

9   painting on two Bratz doll heads; her late August 2000 work was for face painting

10  on four Bratz doll heads; and her work as of September 8, 2000 was for face

11  painting on additional Bratz doll heads.  All of these are times when Bryant was

12  employed by Mattel.

13        At the deposition, defendants' counsel repeatedly tried--and failed--to

14  persuade Ms. Rhee to agree with their claim that "Angel" and/or "Prayer Angels"

15  was a different doll project than Bratz and that she worked on that project in the

16  June 2000, not Bratz.  For example, defendants' counsel asked whether the

17  June 12, 2000 invoice--which Ms. Rhee had testified was for work on Bratz--

18  "could" instead relate to the doll "that ultimately came to market as Prayer

19  Angels."  Ms. Rhee responded:  "There's no way."

20        Ms. Rhee further testified that during a time when Bryant was

21  necessarily employed by Mattel, he had contacted her about the "big" and "secret"

22  project that he was working on.  Bryant instructed Anna Rhee not to tell anyone

23  about the "secret" project, including Mattel employees.  He discussed this project

24  with Ms. Rhee while she was visiting the Mattel Design Center where Bryant was

25  working and informed her that he had engaged a "corporate attorney" to help him

26  with the "secret" project.

27        Fourth, while working for Mattel, Bryant concealed and affirmatively

28  misrepresented his aid and assistance to MGA in other ways.  In particular, despite

1   his obligations to do so, Bryant failed to notify his Mattel supervisor of his

2   conflict of interest in working with MGA.  Prior to and upon his departure, Bryant

3   further misrepresented to Mattel, including to Ivy Ross and Sandy Yamamoto, his

4   future plans by stating that he was not going to work with a competitor.

5          Finally, both Bryant and MGA have spoliated evidence relating to the

6   timing and extent of Bryant's aid to and work with MGA during his Mattel

7   employment.  One example was revealed by the testimony of Victoria O'Connor, a

8   former MGA executive.  According to Ms. O'Connor, Bryant faxed a signed copy

9   of a Bryant/MGA contract to MGA from Mattel.  Upon receipt, each page of the

10  contract included a fax header that read "Barbie Collectibles" and bore the number

11  of the Mattel fax machine that it came from, revealing that it came from Mattel's

12  Designer Center where Bryant worked.  When Ms. O'Connor brought this to the

13  attention of Isaac Larian, Mr. Larian instructed her to "white-out" the fax header

14  information on all pages of the contract and send the contract, as altered, to an

15  outside MGA attorney.  At Mr. Larian's direction, Ms. O'Connor proceeded to

16  alter each page of the contract in order to conceal, as Ms. O'Connor testified, the

17  fact that Bryant "was still employed at Mattel at the time the contract [between

18  MGA and Bryant] was executed."

19         As further examples, Bryant has produced documents that appear to

20  have been altered to conceal information.  These include, most notably, a fax of

21  Bratz drawings that has a fax header date of April 10, 2000--six months before

22  Bryant left Mattel's employ.  Although the fax header information on the page

23  produced by Bryant states that it was the third page of a fax transmission, neither

24  preceding nor subsequent pages, nor any cover sheet, has been produced.  Further,

25  even though the fax header on the produced page has fields for both the sender's

26  name and the sender's telephone number, neither the name of the sender nor the

27  sender's telephone number appears in the fax header.

28

1            Both MGA and Bryant also have failed and refused to provide Mattel

2    with access to original documents, despite the fact that one or both apparently

3    have already performed destructive ink chemistry analyses on Bryant's original

4    drawings and despite their agreement to provide those originals.  Bryant's counsel

5    agreed to produce all of Bryant's original Bratz drawings at his deposition.

6    Despite these promises, Bryant brought only a few of his original drawings to the

7    deposition.  Some of these drawings--including the originals of documents

8    BRYANT 192 and BRYANT 210--had holes in them, indicating that samples had

9    been extracted for ink chemical dating analysis.  Bryant testified that his drawings

10   did not have holes in them when he turned them over to defendants' counsel and

11   that he was unaware of the origin of the holes.  Appearances notwithstanding,

12   defendants' counsel has denied that anyone engaged in destructive sampling or

13   analysis of Bryant's original drawings.  Defendants have not, however, explained

14   the origin of the holes in the original drawings.

15           Ramona Prince, a third-party witness, has raised other questions

16   about the integrity of Bryant's documents.  According to both Ms. Prince and

17   Bryant, Bryant showed Ms. Prince his Bratz drawings in August 1999, when he

18   was employed by Mattel.  Ms. Prince, however, has testified that markings which

19   now appear on the copy of a Bratz drawing produced by defendants did *not* appear

20   on the original drawing that Bryant showed her in 1999.  This conflicts with

21   Bryant's testimony about the drawing.  He claims that he created the drawing in its

22   entirety in August 1998, before he showed it to Ms. Prince.

23           Mattel has not yet computed damages because no discovery has yet

24   been obtained, including in particular discovery necessary to compute damages

25   that is uniquely in the possession of defendant and third parties.  At a minimum,

26   Mattel's damages computation will include without limitation the following:

27   monies paid to defendant by any Mattel competitor, including without limitation

28   MGA, during his period of disloyalty and/or as a result of defendant's misconduct;

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11  Page 140

1 | disgorgement of any other benefit, or its value, or its proceeds, derived or obtained
2 | by defendant as a result of his disloyalty, his breach of contract and other
3 | misconduct and/or as a result of work that he performed for any Mattel competitor,
4 | including without limitation MGA, during his Mattel employment; any profits and
5 | the value of any other benefits that defendant's co-conspirators' derived or
6 | obtained as a result of defendant's disloyalty and other misconduct; the value of
7 | Mattel assets, resources, opportunities and/or property, including intellectual
8 | property, that defendant and his co-conspirators converted, diverted from Mattel
9 | and/or otherwise improperly used or usurped; the value of information and
10 | intellectual property owned by Mattel which defendant provided to any Mattel
11 | competitor in violation of his obligations to Mattel; compensation paid by Mattel
12 | to defendant during defendant's period of disloyalty; and all other damages and
13 | relief sought in Mattel's Complaint.

14 |       By way of further answer, pursuant to <u>Federal Rule of Civil</u>
15 | <u>Procedure</u> 33(d), Mattel will produce responsive, non-privileged documents and
16 | tangible items in its possession, custody or control from which the answer to this
17 | Interrogatory may be derived.

18 |       By way of further answer, Mattel currently has not yet received
19 | discovery from defendant or MGA, has not yet obtained any deposition testimony
20 | and has not yet had the opportunity to obtain information from other third parties
21 | who may possess relevant information.  Mattel therefore reserves the right to
22 | supplement this response after Mattel receives more information about defendant's
23 | activities.  By way of further answer, this topic may be the subject of expert
24 | testimony, which will be disclosed in the manner, and at the time, required for
25 | expert disclosures pursuant to the <u>Federal</u> and <u>Local Rules</u>.
26 |
27 |
28 |

07209/655298.1

-38-

1   INTERROGATORY NO. 10:

2          State all facts supporting YOUR contention that Bryant failed to meet

3   his obligations under the MATTEL "Employee Confidential Information and

4   Inventions Agreement" attached to the Complaint as Exhibit "A".

5

6   SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:

7          In addition to the general objections stated above, Mattel specifically

8   objects to this Interrogatory on the grounds that it calls for the disclosure of

9   information subject to the attorney-client privilege, the attorney work-product

10  doctrine and other applicable privileges.  Mattel further objects to this

11  Interrogatory on the ground that it calls for the disclosure of confidential and/or

12  proprietary information, which Mattel will disclose only subject to and in reliance

13  upon a suitable protective order.  Mattel further objects to this Interrogatory as

14  unreasonably burdensome and overbroad in that it purports to require Mattel to

15  summarize all facts on this subject, including without limitation, facts that are

16  known to or in the possession, custody and control of defendant Bryant,

17  defendant-in-intervention MGA Entertainment, Inc. and nonparties, including

18  nonparties associated with Bryant and/or MGA.  Mattel only undertakes to make a

19  good-faith, reasonable effort to summarize facts currently known to it in

20  responding to this Interrogatory.  Mattel further objects to this Interrogatory on the

21  grounds that it is premature in that it purports to seek to all facts relating to this

22  subject at the outset of discovery in this action and also seeks to circumvent the

23  expert disclosure provisions of the Federal Rules of Civil Procedure and the Local

24  Rules.

25          Subject to and without waiving the foregoing general and specific

26  objections, Mattel responds as follows:

27          On January 4, 1999, upon starting his second term of Mattel

28  employment, and as a condition of and in consideration for his employment,

07209/655298.1

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11 Page 172

1   defendant Bryant entered into an Employee Confidential Information and

2   Inventions Agreement (the "Employee Agreement"). Among other things, Bryant

3   agreed that he would not, without Mattel's express written consent, "engage in any

4   employment or business other than for [Mattel], or invest in or assist (in any

5   manner) any business competitive with the business or future business plans of

6   [Mattel]." Bryant further acknowledged that he held a position of trust with

7   Mattel. In addition, Bryant assigned to Mattel all right, title and interest in

8   "inventions," including without limitation "designs," that he created, conceived or

9   reduced to practice, whether alone or jointly with others, during his employment

10  by Mattel under the terms set forth in his Employee Agreement. A copy of

11  defendant's Employee Agreement with Mattel, dated January 4, 1999, is attached

12  to the Complaint as Exhibit A and is hereby incorporated into this response by this

13  reference. Before his departure from Mattel, Bryant confirmed his obligations in a

14  Proprietary Information Checkout form, which Bryant agreed to and signed. A

15  copy of this additional agreement has been produced in this action and is hereby

16  incorporated into this response by this reference.

17          Also on January 4, 1999, Bryant executed a Conflict of Interest

18  Questionnaire (the "Conflict Questionnaire"). Among other things, Bryant

19  certified in the Conflict Questionnaire that, other than as disclosed, he had not

20  worked for any competitor of Mattel in the prior twelve months and had not

21  engaged in any business venture or transaction involving a Mattel competitor that

22  could be construed as a conflict of interest. Bryant specifically agreed that he

23  would immediately notify his supervisor of any change in his situation that would

24  cause him to change any of the foregoing certifications. The only conflict

25  disclosure that Bryant made on the Conflict Questionnaire concerned what

26  defendant stated was "freelance" work for Ashton-Drake that is unrelated to the

27  conduct alleged herein. At no time did Bryant disclose to Mattel that he was

28  working with MGA, a known competitor, while employed by Mattel, or that he

07209/655298.1

-40-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11   Page 143

1  was paid by MGA for services rendered to MGA while he was a Mattel employee.

2  A copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B

3  to the Complaint and is hereby incorporated into this response by this reference.

4              In late November 2003, Mattel obtained a copy of a contract

5  evidencing that Bryant had aided and assisted, and worked as a designer with,

6  MGA, a Mattel competitor, while he was employed by Mattel and was being paid

7  by Mattel for his exclusive services as a designer.  Bryant's agreement with MGA

8  obligated him to provide design services to MGA on a "top priority" basis.  In

9  addition, his agreement with MGA purported to assign to MGA rights to

10 preexisting works by Bryant and to deem work and services furnished by Bryant to

11 MGA under the agreement as "works for hire."  Furthermore, Bryant's agreement

12 with MGA provided that he would be paid for such services and receive royalties

13 and other consideration for products on which he provided aid or assistance.  A

14 copy of defendant's agreement with MGA, in the form obtained by Mattel, has

15 been produced in this case and is hereby incorporated into this response by this

16 reference.

17             Although discovery and Mattel's investigation are on-going,

18 additional documents, testimony and other evidence thus far obtained have

19 confirmed that Bryant worked with and aided MGA, and advanced his own

20 personal interests over Mattel's, during the term of his Mattel employment without

21 Mattel's express written permission.  First, Bryant admitted at deposition that he

22 did so, although he sought to minimize and conceal the time period and extent of

23 his aid to and work with MGA.  Among other things, Bryant testified that (1) he

24 made pitches to MGA concerning the Bratz project during the term of his

25 employment; (2) he used Mattel personnel and other Mattel resources to assist him

26 in such pitches, including without limitation by using Mattel personnel and

27 resources to make what he called a "dummy" and others have called a three-

28 dimensional prototype; (3) he used Mattel personnel and other Mattel resources to

07209/655298.1

-41-

1   work on the Bratz project during his Mattel employment, including without
2   limitation by (a) obtaining information about a Mattel hair vendor, which Bryant
3   then contacted for his own and MGA's benefit and which Bryant told he was
4   working with MGA; and (b) identifying others who Bryant knew as a consequence
5   of his Mattel employment to work on the project and enlisting them to work on the
6   Bratz project during the term of his Mattel employment; (4) he worked on what
7   Bryant characterized as a "test project" to aid and assist MGA and benefit himself,
8   at Mattel's expense, during the term of his Mattel employment;  (5) he entered into
9   his agreement with MGA during the term of his Mattel employment and used
10  Mattel resources in connection with the negotiation and execution of that
11  agreement; and (6) he received monetary payments and other benefits from MGA
12  during the term of his Mattel employment, and both Bryant and MGA benefitted
13  further as a consequence of his aid and assistance to and work with MGA during
14  the term of his Mattel employment.

15          Second, MGA and those associated with MGA have made statements,
16  including under oath, that confirm Bryant assisted and worked with MGA during
17  his Mattel employment.  Among his many statements to the press, for example,
18  MGA's CEO, Isaac Larian, told the *Wall Street Journal* that "he chose
19  Mr. Bryant's idea for the Bratz over several others after holding a sort of
20  fashion-doll design contest in late 1999"--a time when Bryant was employed by
21  Mattel.  In a sworn affidavit filed in a Hong Kong lawsuit brought by MGA,
22  Isaac Larian stated that "[t]he Bratz dolls were first exhibited in the USA in
23  November 2000," which further confirms that Bryant was working with and aiding
24  MGA on the project prior to his departure from Mattel on or about October 20,
25  2000.  Additionally, Isaac Larian has been sued for fraud and other claims by his
26  brother and one-time partner in MGA, Farhad Larian.  Farhad Larian's verified
27  Complaint alleges, among other things, that "in or about late 1999 and early 2000,
28  Isaac became aware of a potential new product line that had tremendous potential

07209/655298.1

-42-

1   for [MGA].  The new product line involved the 'Bratz' dolls and related products."
2   The verified Complaint further alleges:  "In or about early 2000, Isaac called a
3   meeting to discuss the new Bratz product line with selected individuals" at MGA,
4   and took affirmative steps "to conceal" from Farhad Larian MGA's "plans for the
5   Bratz line" in February, March and May 2000.  Bryant was working for Mattel
6   during each of these time periods.

7        Third, although discovery is still in its early stages, other witnesses
8   who have testified thus far in the case have provided testimony revealing that
9   Bryant aided and worked with MGA during his Mattel employment.  Bryant
10  testified that he pitched the Bratz project to MGA in late August and September
11  2000.  Bryant also testified that he had no contact with MGA until August 2000
12  and had never even heard of MGA before July 2000. Bryant claims that he
13  discussed the Bratz project with Anna Rhee--and introduced Ms. Rhee to MGA--
14  only after he stopped working for Mattel in late October 2000.  After Bryant
15  introduced Ms. Rhee to MGA (which is undisputed--Bryant and Ms. Rhee agree
16  that she had no involvement with MGA prior to Bryant's introduction), Ms. Rhee
17  painted Bratz doll heads.

18       During the six months from August 2004 (when MGA made its initial
19  document production in this case) to January 2005, MGA produced a mere eight
20  pages of payment records relating to work that Ms. Rhee performed on Bryant-
21  related projects in the year 2000.  These pages relate exclusively to work that
22  Ms. Rhee did on Bryant-related projects in December 2000, after Bryant left
23  Mattel, which would be consistent with Bryant's testimony.

24       After Bryant testified and after MGA made its initial production of
25  Anna Rhee documents, however, Anna Rhee produced documents pursuant to
26  subpoena in mid-January 2005.  Included in Ms. Rhee's production were
27  approximately twenty invoices for work that she performed on Bryant-related
28  MGA projects in the year 2000, none of which MGA or Bryant had disclosed.

1  These invoices also revealed that Ms. Rhee performed work with Bryant and

2  MGA on at least seven separate occasions before Bryant's departure from Mattel--

3  including one invoice that dates to June 12, 2000, when Bryant purportedly had

4  never even heard of MGA.

5          After Ms. Rhee produced these documents, MGA then made a

6  supplemental production of certain internal documents relating to work performed

7  by Ms. Rhee during the June-October 2000 time period. These belatedly produced

8  MGA records purport to show that Ms. Rhee's work during that time period

9  related to a project known as "Angel" and/or "Prayer Angels."

10         At her deposition, however, Ms. Rhee testified that her work during

11 that time period was for Bratz and that "Angel" was MGA's and Bryant's code

12 name for Bratz. Thus, Ms. Rhee testified that her June 12, 2000 work was for face

13 painting on two Bratz doll heads; her late August 2000 work was for face painting

14 on four Bratz doll heads; and her work as of September 8, 2000 was for face

15 painting on additional Bratz doll heads. All of these are times when Bryant was

16 employed by Mattel.

17         At the deposition, defendants' counsel repeatedly tried--and failed--to

18 persuade Ms. Rhee to agree with their claim that "Angel" and/or "Prayer Angels"

19 was a different doll project than Bratz and that she worked on that project in the

20 June 2000, not Bratz. For example, defendants' counsel asked whether the

21 June 12, 2000 invoice--which Ms. Rhee had testified was for work on Bratz--

22 "could" instead relate to the doll "that ultimately came to market as Prayer

23 Angels." Ms. Rhee responded: "There's no way."

24         Ms. Rhee further testified that during a time when Bryant was

25 necessarily employed by Mattel, he had contacted her about the "big" and "secret"

26 project that he was working on. Bryant instructed Anna Rhee not to tell anyone

27 about the "secret" project, including Mattel employees. He discussed this project

28 with Ms. Rhee while she was visiting the Mattel Design Center where Bryant was

07209/655298.1

-44-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11 Page 147

1   working and informed her that he had engaged a "corporate attorney" to help him
2   with the "secret" project.

3          Fourth, while working for Mattel, Bryant concealed and affirmatively
4   misrepresented his aid and assistance to MGA in other ways.  In particular, despite
5   his obligations to do so, Bryant failed to notify his Mattel supervisor of his
6   conflict of interest in working with MGA.  Prior to and upon his departure, Bryant
7   further misrepresented to Mattel, including to Ivy Ross and Sandy Yamamoto, his
8   future plans by stating that he was not going to work with a competitor.

9          Finally, both Bryant and MGA have spoliated evidence relating to the
10  timing and extent of Bryant's aid to and work with MGA during his Mattel
11  employment.  One example was revealed by the testimony of Victoria O'Connor, a
12  former MGA executive.  According to Ms. O'Connor, Bryant faxed a signed copy
13  of a Bryant/MGA contract to MGA from Mattel.  Upon receipt, each page of the
14  contract included a fax header that read "Barbie Collectibles" and bore the number
15  of the Mattel fax machine that it came from, revealing that it came from Mattel's
16  Designer Center where Bryant worked.  When Ms. O'Connor brought this to the
17  attention of Isaac Larian, Mr. Larian instructed her to "white-out" the fax header
18  information on all pages of the contract and send the contract, as altered, to an
19  outside MGA attorney.  At Mr. Larian's direction, Ms. O'Connor proceeded to
20  alter each page of the contract in order to conceal, as Ms. O'Connor testified, the
21  fact that Bryant "was still employed at Mattel at the time the contract [between
22  MGA and Bryant] was executed."

23         As further examples, Bryant has produced documents that appear to
24  have been altered to conceal information.  These include, most notably, a fax of
25  Bratz drawings that has a fax header date of April 10, 2000--six months before
26  Bryant left Mattel's employ.  Although the fax header information on the page
27  produced by Bryant states that it was the third page of a fax transmission, neither
28  preceding nor subsequent pages, nor any cover sheet, has been produced.  Further,

                                                -45-

1   even though the fax header on the produced page has fields for both the sender's

2   name and the sender's telephone number, neither the name of the sender nor the

3   sender's telephone number appears in the fax header.

4          Both MGA and Bryant also have failed and refused to provide Mattel

5   with access to original documents, despite the fact that one or both apparently

6   have already performed destructive ink chemistry analyses on Bryant's original

7   drawings and despite their agreement to provide those originals.  Bryant's counsel

8   agreed to produce all of Bryant's original Bratz drawings at his deposition.

9   Despite these promises, Bryant brought only a few of his original drawings to the

10  deposition.  Some of these drawings--including the originals of documents

11  BRYANT 192 and BRYANT 210--had holes in them, indicating that samples had

12  been extracted for ink chemical dating analysis.  Bryant testified that his drawings

13  did not have holes in them when he turned them over to defendants' counsel and

14  that he was unaware of the origin of the holes.  Appearances notwithstanding,

15  defendants' counsel has denied that anyone engaged in destructive sampling or

16  analysis of Bryant's original drawings.  Defendants have not, however, explained

17  the origin of the holes in the original drawings.

18         Ramona Prince, a third-party witness, has raised other questions

19  about the integrity of Bryant's documents.  According to both Ms. Prince and

20  Bryant, Bryant showed Ms. Prince his Bratz drawings in August 1999, when he

21  was employed by Mattel.  Ms. Prince, however, has testified that markings which

22  now appear on the copy of a Bratz drawing produced by defendants did *not* appear

23  on the original drawing that Bryant showed her in 1999.  This conflicts with

24  Bryant's testimony about the drawing.  He claims that he created the drawing in its

25  entirety in August 1998, before he showed it to Ms. Prince.

26         By way of further answer, pursuant to Federal Rule of Civil

27  Procedure 33(d), Mattel will produce responsive, non-privileged documents and

28

07209/655298.1

-46-

Exhibit 11  Page 149

1 tangible items in its possession, custody or control from which the answer to this
2 Interrogatory may be derived.

3       By way of further answer, Mattel currently has not yet received
4 discovery from defendant or MGA, has not yet obtained any deposition testimony
5 and has not yet had the opportunity to obtain information from other third parties
6 who may possess relevant information. Mattel therefore reserves the right to
7 supplement this response after Mattel receives more information about defendant's
8 activities. By way of further answer, this topic may be the subject of expert
9 testimony, which will be disclosed in the manner, and at the time, required for
10 expert disclosures pursuant to the <u>Federal</u> and <u>Local</u> <u>Rules</u>.

11

12 <u>INTERROGATORY NO. 11</u>:

13       State all facts supporting YOUR contention that Bryant failed to meet
14 his obligations under the MATTEL Conflict of Interest Questionnaire," attached to
15 the Complaint as Exhibit "B".

16

17 <u>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11</u>:

18       In addition to the general objections stated above, Mattel specifically
19 objects to this Interrogatory on the grounds that it calls for the disclosure of
20 information subject to the attorney-client privilege, the attorney work-product
21 doctrine and other applicable privileges. Mattel further objects to this
22 Interrogatory on the ground that it calls for the disclosure of confidential and/or
23 proprietary information, which Mattel will disclose only subject to and in reliance
24 upon a suitable protective order. Mattel further objects to this Interrogatory as
25 unreasonably burdensome and overbroad in that it purports to require Mattel to
26 summarize all facts on this subject, including without limitation, facts that are
27 known to or in the possession, custody and control of defendant Bryant,
28 defendant-in-intervention MGA Entertainment, Inc. and nonparties, including

07209/655298.1

1  nonparties associated with Bryant and/or MGA.  Mattel only undertakes to make a

2  good-faith, reasonable effort to summarize facts currently known to it in

3  responding to this Interrogatory.  Mattel further objects to this Interrogatory on the

4  grounds that it is premature in that it purports to seek to all facts relating to this

5  subject at the outset of discovery in this action and also seeks to circumvent the

6  expert disclosure provisions of the Federal Rules of Civil Procedure and the Local

7  Rules.

8          Subject to and without waiving the foregoing general and specific

9  objections, Mattel responds as follows:

10          On January 4, 1999, upon starting his second term of Mattel

11  employment, and as a condition of and in consideration for his employment,

12  defendant Bryant entered into an Employee Confidential Information and

13  Inventions Agreement (the "Employee Agreement").  Among other things, Bryant

14  agreed that he would not, without Mattel's express written consent, "engage in any

15  employment or business other than for [Mattel], or invest in or assist (in any

16  manner) any business competitive with the business or future business plans of

17  [Mattel]."  Bryant further acknowledged that he held a position of trust with

18  Mattel.  In addition, Bryant assigned to Mattel all right, title and interest in

19  "inventions," including without limitation "designs," that he created, conceived or

20  reduced to practice, whether alone or jointly with others, during his employment

21  by Mattel under the terms set forth in his Employee Agreement.  A copy of

22  defendant's Employee Agreement with Mattel, dated January 4, 1999, is attached

23  to the Complaint as Exhibit A and is hereby incorporated into this response by this

24  reference.  Before his departure from Mattel, Bryant confirmed his obligations in a

25  Proprietary Information Checkout form, which Bryant agreed to and signed.  A

26  copy of this additional agreement has been produced in this action and is hereby

27  incorporated into this response by this reference.

28

07209/655298.1

-48-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11  Page 151

1        Also on January 4, 1999, Bryant executed a Conflict of Interest

2   Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant

3   certified in the Conflict Questionnaire that, other than as disclosed, he had not

4   worked for any competitor of Mattel in the prior twelve months and had not

5   engaged in any business venture or transaction involving a Mattel competitor that

6   could be construed as a conflict of interest.  Bryant specifically agreed that he

7   would immediately notify his supervisor of any change in his situation that would

8   cause him to change any of the foregoing certifications.  The only conflict

9   disclosure that Bryant made on the Conflict Questionnaire concerned what

10  defendant stated was "freelance" work for Ashton-Drake that is unrelated to the

11  conduct alleged herein.  At no time did Bryant disclose to Mattel that he was

12  working with MGA, a known competitor, while employed by Mattel, or that he

13  was paid by MGA for services rendered to MGA while he was a Mattel employee.

14  A copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B

15  to the Complaint and is hereby incorporated into this response by this reference.

16      In late November 2003, Mattel obtained a copy of a contract

17  evidencing that Bryant had aided and assisted, and worked as a designer with,

18  MGA, a Mattel competitor, while he was employed by Mattel and was being paid

19  by Mattel for his exclusive services as a designer.  Bryant's agreement with MGA

20  obligated him to provide design services to MGA on a "top priority" basis.  In

21  addition, his agreement with MGA purported to assign to MGA rights to

22  preexisting works by Bryant and to deem work and services furnished by Bryant to

23  MGA under the agreement as "works for hire."  Furthermore, Bryant's agreement

24  with MGA provided that he would be paid for such services and receive royalties

25  and other consideration for products on which he provided aid or assistance.  A

26  copy of defendant's agreement with MGA, in the form obtained by Mattel, has

27  been produced in this case and is hereby incorporated into this response by this

28  reference.

07209/655298.1

-49-

Exhibit 11  Page 152

1          Although discovery and Mattel's investigation are on-going,

2    additional documents, testimony and other evidence thus far obtained have

3    confirmed that Bryant worked with and aided MGA, and advanced his own

4    personal interests over Mattel's, during the term of his Mattel employment without

5    Mattel's express written permission.  First, Bryant admitted at deposition that he

6    did so, although he sought to minimize and conceal the time period and extent of

7    his aid to and work with MGA.  Among other things, Bryant testified that (1) he

8    made pitches to MGA concerning the Bratz project during the term of his

9    employment; (2) he used Mattel personnel and other Mattel resources to assist him

10   in such pitches, including without limitation by using Mattel personnel and

11   resources to make what he called a "dummy" and others have called a three-

12   dimensional prototype; (3) he used Mattel personnel and other Mattel resources to

13   work on the Bratz project during his Mattel employment, including without

14   limitation by (a) obtaining information about a Mattel hair vendor, which Bryant

15   then contacted for his own and MGA's benefit and which Bryant told he was

16   working with MGA; and (b) identifying others who Bryant knew as a consequence

17   of his Mattel employment to work on the project and enlisting them to work on the

18   Bratz project during the term of his Mattel employment; (4) he worked on what

19   Bryant characterized as a "test project" to aid and assist MGA and benefit himself,

20   at Mattel's expense, during the term of his Mattel employment;  (5) he entered into

21   his agreement with MGA during the term of his Mattel employment and used

22   Mattel resources in connection with the negotiation and execution of that

23   agreement; and (6) he received monetary payments and other benefits from MGA

24   during the term of his Mattel employment, and both Bryant and MGA benefitted

25   further as a consequence of his aid and assistance to and work with MGA during

26   the term of his Mattel employment.

27          Second, MGA and those associated with MGA have made statements,

28   including under oath, that confirm Bryant assisted and worked with MGA during

07209/655298.1

-50-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11  Page 153

1 | his Mattel employment. Among his many statements to the press, for example,
2 | MGA's CEO, Isaac Larian, told the *Wall Street Journal* that "he chose
3 | Mr. Bryant's idea for the Bratz over several others after holding a sort of
4 | fashion-doll design contest in late 1999"--a time when Bryant was employed by
5 | Mattel. In a sworn affidavit filed in a Hong Kong lawsuit brought by MGA,
6 | Isaac Larian stated that "[t]he Bratz dolls were first exhibited in the USA in
7 | November 2000," which further confirms that Bryant was working with and aiding
8 | MGA on the project prior to his departure from Mattel on or about October 20,
9 | 2000. Additionally, Isaac Larian has been sued for fraud and other claims by his
10 | brother and one-time partner in MGA, Farhad Larian. Farhad Larian's verified
11 | Complaint alleges, among other things, that "in or about late 1999 and early 2000,
12 | Isaac became aware of a potential new product line that had tremendous potential
13 | for [MGA]. The new product line involved the 'Bratz' dolls and related products."
14 | The verified Complaint further alleges: "In or about early 2000, Isaac called a
15 | meeting to discuss the new Bratz product line with selected individuals" at MGA,
16 | and took affirmative steps "to conceal" from Farhad Larian MGA's "plans for the
17 | Bratz line" in February, March and May 2000. Bryant was working for Mattel
18 | during each of these time periods.

19 |        Third, although discovery is still in its early stages, other witnesses
20 | who have testified thus far in the case have provided testimony revealing that
21 | Bryant aided and worked with MGA during his Mattel employment. Bryant
22 | testified that he pitched the Bratz project to MGA in late August and September
23 | 2000. Bryant also testified that he had no contact with MGA until August 2000
24 | and had never even heard of MGA before July 2000. Bryant claims that he
25 | discussed the Bratz project with Anna Rhee--and introduced Ms. Rhee to MGA--
26 | only after he stopped working for Mattel in late October 2000. After Bryant
27 | introduced Ms. Rhee to MGA (which is undisputed--Bryant and Ms. Rhee agree
28 |

-51-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11  Page 154

1   that she had no involvement with MGA prior to Bryant's introduction), Ms. Rhee

2   painted Bratz doll heads.

3          During the six months from August 2004 (when MGA made its initial

4   document production in this case) to January 2005, MGA produced a mere eight

5   pages of payment records relating to work that Ms. Rhee performed on Bryant-

6   related projects in the year 2000.  These pages relate exclusively to work that

7   Ms. Rhee did on Bryant-related projects in December 2000, after Bryant left

8   Mattel, which would be consistent with Bryant's testimony.

9          After Bryant testified and after MGA made its initial production of

10  Anna Rhee documents, however, Anna Rhee produced documents pursuant to

11  subpoena in mid-January 2005.  Included in Ms. Rhee's production were

12  approximately twenty invoices for work that she performed on Bryant-related

13  MGA projects in the year 2000, none of which MGA or Bryant had disclosed.

14  These invoices also revealed that Ms. Rhee performed work with Bryant and

15  MGA on at least seven separate occasions before Bryant's departure from Mattel--

16  including one invoice that dates to June 12, 2000, when Bryant purportedly had

17  never even heard of MGA.

18         After Ms. Rhee produced these documents, MGA then made a

19  supplemental production of certain internal documents relating to work performed

20  by Ms. Rhee during the June-October 2000 time period.  These belatedly produced

21  MGA records purport to show that Ms. Rhee's work during that time period

22  related to a project known as "Angel" and/or "Prayer Angels."

23         At her deposition, however, Ms. Rhee testified that her work during

24  that time period was for Bratz and that "Angel" was MGA's and Bryant's code

25  name for Bratz.  Thus, Ms. Rhee testified that her June 12, 2000 work was for face

26  painting on two Bratz doll heads; her late August 2000 work was for face painting

27  on four Bratz doll heads; and her work as of September 8, 2000 was for face

28

1 | painting on additional Bratz doll heads.  All of these are times when Bryant was
2 | employed by Mattel.

3 At the deposition, defendants' counsel repeatedly tried--and failed--to
4 | persuade Ms. Rhee to agree with their claim that "Angel" and/or "Prayer Angels"
5 | was a different doll project than Bratz and that she worked on that project in the
6 | June 2000, not Bratz.  For example, defendants' counsel asked whether the
7 | June 12, 2000 invoice--which Ms. Rhee had testified was for work on Bratz--
8 | "could" instead relate to the doll "that ultimately came to market as Prayer
9 | Angels." Ms. Rhee responded: "There's no way."

10 Ms. Rhee further testified that during a time when Bryant was
11 | necessarily employed by Mattel, he had contacted her about the "big" and "secret"
12 | project that he was working on.  Bryant instructed Anna Rhee not to tell anyone
13 | about the "secret" project, including Mattel employees.  He discussed this project
14 | with Ms. Rhee while she was visiting the Mattel Design Center where Bryant was
15 | working and informed her that he had engaged a "corporate attorney" to help him
16 | with the "secret" project.

17 Fourth, while working for Mattel, Bryant concealed and affirmatively
18 | misrepresented his aid and assistance to MGA in other ways.  In particular, despite
19 | his obligations to do so, Bryant failed to notify his Mattel supervisor of his
20 | conflict of interest in working with MGA.  Prior to and upon his departure, Bryant
21 | further misrepresented to Mattel, including to Ivy Ross and Sandy Yamamoto, his
22 | future plans by stating that he was not going to work with a competitor.

23 Finally, both Bryant and MGA have spoliated evidence relating to the
24 | timing and extent of Bryant's aid to and work with MGA during his Mattel
25 | employment.  One example was revealed by the testimony of Victoria O'Connor, a
26 | former MGA executive.  According to Ms. O'Connor, Bryant faxed a signed copy
27 | of a Bryant/MGA contract to MGA from Mattel.  Upon receipt, each page of the
28 | contract included a fax header that read "Barbie Collectibles" and bore the number

07209/655298.1

-53-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11  Page 156

1    of the Mattel fax machine that it came from, revealing that it came from Mattel's

2    Designer Center where Bryant worked. When Ms. O'Connor brought this to the

3    attention of Isaac Larian, Mr. Larian instructed her to "white-out" the fax header

4    information on all pages of the contract and send the contract, as altered, to an

5    outside MGA attorney. At Mr. Larian's direction, Ms. O'Connor proceeded to

6    alter each page of the contract in order to conceal, as Ms. O'Connor testified, the

7    fact that Bryant "was still employed at Mattel at the time the contract [between

8    MGA and Bryant] was executed."

9          As further examples, Bryant has produced documents that appear to

10   have been altered to conceal information. These include, most notably, a fax of

11   Bratz drawings that has a fax header date of April 10, 2000--six months before

12   Bryant left Mattel's employ. Although the fax header information on the page

13   produced by Bryant states that it was the third page of a fax transmission, neither

14   preceding nor subsequent pages, nor any cover sheet, has been produced. Further,

15   even though the fax header on the produced page has fields for both the sender's

16   name and the sender's telephone number, neither the name of the sender nor the

17   sender's telephone number appears in the fax header.

18          Both MGA and Bryant also have failed and refused to provide Mattel

19   with access to original documents, despite the fact that one or both apparently

20   have already performed destructive ink chemistry analyses on Bryant's original

21   drawings and despite their agreement to provide those originals. Bryant's counsel

22   agreed to produce all of Bryant's original Bratz drawings at his deposition.

23   Despite these promises, Bryant brought only a few of his original drawings to the

24   deposition. Some of these drawings--including the originals of documents

25   BRYANT 192 and BRYANT 210--had holes in them, indicating that samples had

26   been extracted for ink chemical dating analysis. Bryant testified that his drawings

27   did not have holes in them when he turned them over to defendants' counsel and

28   that he was unaware of the origin of the holes. Appearances notwithstanding,

-54-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11 Page 157

1  defendants' counsel has denied that anyone engaged in destructive sampling or

2  analysis of Bryant's original drawings.  Defendants have not, however, explained

3  the origin of the holes in the original drawings.

4       Ramona Prince, a third-party witness, has raised other questions

5  about the integrity of Bryant's documents.  According to both Ms. Prince and

6  Bryant, Bryant showed Ms. Prince his Bratz drawings in August 1999, when he

7  was employed by Mattel.  Ms. Prince, however, has testified that markings which

8  now appear on the copy of a Bratz drawing produced by defendants did *not* appear

9  on the original drawing that Bryant showed her in 1999.  This conflicts with

10 Bryant's testimony about the drawing.  He claims that he created the drawing in its

11 entirety in August 1998, before he showed it to Ms. Prince.

12       By way of further answer, pursuant to Federal Rule of Civil

13 Procedure 33(d), Mattel will produce responsive, non-privileged documents and

14 tangible items in its possession, custody or control from which the answer to this

15 Interrogatory may be derived.

16       By way of further answer, Mattel currently has not yet received

17 discovery from defendant or MGA, has not yet obtained any deposition testimony

18 and has not yet had the opportunity to obtain information from other third parties

19 who may possess relevant information.  Mattel therefore reserves the right to

20 supplement this response after Mattel receives more information about defendant's

21 activities.  By way of further answer, this topic may be the subject of expert

22 testimony, which will be disclosed in the manner, and at the time, required for

23 expert disclosures pursuant to the Federal and Local Rules.

24

25

26

27

28

-55-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11 Page 158

INTERROGATORY NO. 12:

State all facts supporting YOUR contention that Bryant misappropriated MATTEL property, including without limitation intellectual property, at any time.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12:

In addition to the general objections stated above, Mattel specifically objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the attorney work-product doctrine and other applicable privileges. Mattel further objects to this Interrogatory on the ground that it calls for the disclosure of confidential and/or proprietary information, which Mattel will disclose only subject to and in reliance upon a suitable protective order. Mattel further objects to this Interrogatory as unreasonably burdensome and overbroad in that it purports to require Mattel to summarize all facts on this subject, including without limitation, facts that are known to or in the possession, custody and control of defendant Bryant, defendant-in-intervention MGA Entertainment, Inc. and nonparties, including nonparties associated with Bryant and/or MGA. Mattel only undertakes to make a good-faith, reasonable effort to summarize facts currently known to it in responding to this Interrogatory. Mattel further objects to this Interrogatory on the grounds that it is premature in that it purports to seek to all facts relating to this subject at the outset of discovery in this action and also seeks to circumvent the expert disclosure provisions of the Federal Rules of Civil Procedure and the Local Rules.

Subject to and without waiving the foregoing general and specific objections, Mattel responds as follows:

On January 4, 1999, upon starting his second term of Mattel employment, and as a condition of and in consideration for his employment,

07209/655298.1

1  defendant Bryant entered into an Employee Confidential Information and
2  Inventions Agreement (the "Employee Agreement").  Among other things, Bryant
3  agreed that he would not, without Mattel's express written consent, "engage in any
4  employment or business other than for [Mattel], or invest in or assist (in any
5  manner) any business competitive with the business or future business plans of
6  [Mattel]."  Bryant further acknowledged that he held a position of trust with
7  Mattel.  In addition, Bryant assigned to Mattel all right, title and interest in
8  "inventions," including without limitation "designs," that he created, conceived or
9  reduced to practice, whether alone or jointly with others, during his employment
10 by Mattel under the terms set forth in his Employee Agreement.  A copy of
11 defendant's Employee Agreement with Mattel, dated January 4, 1999, is attached
12 to the Complaint as Exhibit A and is hereby incorporated into this response by this
13 reference.  Before his departure from Mattel, Bryant confirmed his obligations in a
14 Proprietary Information Checkout form, which Bryant agreed to and signed.  A
15 copy of this additional agreement has been produced in this action and is hereby
16 incorporated into this response by this reference.

17         Also on January 4, 1999, Bryant executed a Conflict of Interest
18 Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant
19 certified in the Conflict Questionnaire that, other than as disclosed, he had not
20 worked for any competitor of Mattel in the prior twelve months and had not
21 engaged in any business venture or transaction involving a Mattel competitor that
22 could be construed as a conflict of interest.  Bryant specifically agreed that he
23 would immediately notify his supervisor of any change in his situation that would
24 cause him to change any of the foregoing certifications.  The only conflict
25 disclosure that Bryant made on the Conflict Questionnaire concerned what
26 defendant stated was "freelance" work for Ashton-Drake that is unrelated to the
27 conduct alleged herein.  At no time did Bryant disclose to Mattel that he was
28 working with MGA, a known competitor, while employed by Mattel, or that he

-57-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11 Page 160

1   was paid by MGA for services rendered to MGA while he was a Mattel employee.

2   A copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B

3   to the Complaint and is hereby incorporated into this response by this reference.

4          In late November 2003, Mattel obtained a copy of a contract

5   evidencing that Bryant had aided and assisted, and worked as a designer with,

6   MGA, a Mattel competitor, while he was employed by Mattel and was being paid

7   by Mattel for his exclusive services as a designer.  Bryant's agreement with MGA

8   obligated him to provide design services to MGA on a "top priority" basis.  In

9   addition, his agreement with MGA purported to assign to MGA rights to

10  preexisting works by Bryant and to deem work and services furnished by Bryant to

11  MGA under the agreement as "works for hire."  Furthermore, Bryant's agreement

12  with MGA provided that he would be paid for such services and receive royalties

13  and other consideration for products on which he provided aid or assistance.  A

14  copy of defendant's agreement with MGA, in the form obtained by Mattel, has

15  been produced in this case and is hereby incorporated into this response by this

16  reference.

17         Although discovery and Mattel's investigation are on-going,

18  additional documents, testimony and other evidence thus far obtained have

19  confirmed that Bryant worked with and aided MGA, and advanced his own

20  personal interests over Mattel's, during the term of his Mattel employment without

21  Mattel's express written permission.  First, Bryant admitted at deposition that he

22  did so, although he sought to minimize and conceal the time period and extent of

23  his aid to and work with MGA.  Among other things, Bryant testified that (1) he

24  made pitches to MGA concerning the Bratz project during the term of his

25  employment; (2) he used Mattel personnel and other Mattel resources to assist him

26  in such pitches, including without limitation by using Mattel personnel and

27  resources to make what he called a "dummy" and others have called a three-

28  dimensional prototype; (3) he used Mattel personnel and other Mattel resources to

1   work on the Bratz project during his Mattel employment, including without
2   limitation by (a) obtaining information about a Mattel hair vendor, which Bryant
3   then contacted for his own and MGA's benefit and which Bryant told he was
4   working with MGA; and (b) identifying others who Bryant knew as a consequence
5   of his Mattel employment to work on the project and enlisting them to work on the
6   Bratz project during the term of his Mattel employment; (4) he worked on what
7   Bryant characterized as a "test project" to aid and assist MGA and benefit himself,
8   at Mattel's expense, during the term of his Mattel employment; (5) he entered into
9   his agreement with MGA during the term of his Mattel employment and used
10  Mattel resources in connection with the negotiation and execution of that
11  agreement; and (6) he received monetary payments and other benefits from MGA
12  during the term of his Mattel employment, and both Bryant and MGA benefitted
13  further as a consequence of his aid and assistance to and work with MGA during
14  the term of his Mattel employment.
15          Second, MGA and those associated with MGA have made statements,
16  including under oath, that confirm Bryant assisted and worked with MGA during
17  his Mattel employment.  Among his many statements to the press, for example,
18  MGA's CEO, Isaac Larian, told the *Wall Street Journal* that "he chose
19  Mr. Bryant's idea for the Bratz over several others after holding a sort of
20  fashion-doll design contest in late 1999"--a time when Bryant was employed by
21  Mattel.  In a sworn affidavit filed in a Hong Kong lawsuit brought by MGA,
22  Isaac Larian stated that "[t]he Bratz dolls were first exhibited in the USA in
23  November 2000," which further confirms that Bryant was working with and aiding
24  MGA on the project prior to his departure from Mattel on or about October 20,
25  2000.  Additionally, Isaac Larian has been sued for fraud and other claims by his
26  brother and one-time partner in MGA, Farhad Larian.  Farhad Larian's verified
27  Complaint alleges, among other things, that "in or about late 1999 and early 2000,
28  Isaac became aware of a potential new product line that had tremendous potential

-59-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11  Page 162

1  for [MGA]. The new product line involved the 'Bratz' dolls and related products."
2  The verified Complaint further alleges: "In or about early 2000, Isaac called a
3  meeting to discuss the new Bratz product line with selected individuals" at MGA,
4  and took affirmative steps "to conceal" from Farhad Larian MGA's "plans for the
5  Bratz line" in February, March and May 2000. Bryant was working for Mattel
6  during each of these time periods.

7          Third, although discovery is still in its early stages, other witnesses
8  who have testified thus far in the case have provided testimony revealing that
9  Bryant aided and worked with MGA during his Mattel employment. Bryant
10  testified that he pitched the Bratz project to MGA in late August and September
11  2000. Bryant also testified that he had no contact with MGA until August 2000
12  and had never even heard of MGA before July 2000. Bryant claims that he
13  discussed the Bratz project with Anna Rhee--and introduced Ms. Rhee to MGA--
14  only after he stopped working for Mattel in late October 2000. After Bryant
15  introduced Ms. Rhee to MGA (which is undisputed--Bryant and Ms. Rhee agree
16  that she had no involvement with MGA prior to Bryant's introduction), Ms. Rhee
17  painted Bratz doll heads.

18          During the six months from August 2004 (when MGA made its initial
19  document production in this case) to January 2005, MGA produced a mere eight
20  pages of payment records relating to work that Ms. Rhee performed on Bryant-
21  related projects in the year 2000. These pages relate exclusively to work that
22  Ms. Rhee did on Bryant-related projects in December 2000, after Bryant left
23  Mattel, which would be consistent with Bryant's testimony.

24          After Bryant testified and after MGA made its initial production of
25  Anna Rhee documents, however, Anna Rhee produced documents pursuant to
26  subpoena in mid-January 2005. Included in Ms. Rhee's production were
27  approximately twenty invoices for work that she performed on Bryant-related
28  MGA projects in the year 2000, none of which MGA or Bryant had disclosed.

1 │ These invoices also revealed that Ms. Rhee performed work with Bryant and
2 │ MGA on at least seven separate occasions before Bryant's departure from Mattel--
3 │ including one invoice that dates to June 12, 2000, when Bryant purportedly had
4 │ never even heard of MGA.

5 │         After Ms. Rhee produced these documents, MGA then made a
6 │ supplemental production of certain internal documents relating to work performed
7 │ by Ms. Rhee during the June-October 2000 time period. These belatedly produced
8 │ MGA records purport to show that Ms. Rhee's work during that time period
9 │ related to a project known as "Angel" and/or "Prayer Angels."

10 │         At her deposition, however, Ms. Rhee testified that her work during
11 │ that time period was for Bratz and that "Angel" was MGA's and Bryant's code
12 │ name for Bratz. Thus, Ms. Rhee testified that her June 12, 2000 work was for face
13 │ painting on two Bratz doll heads; her late August 2000 work was for face painting
14 │ on four Bratz doll heads; and her work as of September 8, 2000 was for face
15 │ painting on additional Bratz doll heads. All of these are times when Bryant was
16 │ employed by Mattel.

17 │         At the deposition, defendants' counsel repeatedly tried--and failed--to
18 │ persuade Ms. Rhee to agree with their claim that "Angel" and/or "Prayer Angels"
19 │ was a different doll project than Bratz and that she worked on that project in the
20 │ June 2000, not Bratz. For example, defendants' counsel asked whether the
21 │ June 12, 2000 invoice--which Ms. Rhee had testified was for work on Bratz--
22 │ "could" instead relate to the doll "that ultimately came to market as Prayer
23 │ Angels." Ms. Rhee responded: "There's no way."

24 │         Ms. Rhee further testified that during a time when Bryant was
25 │ necessarily employed by Mattel, he had contacted her about the "big" and "secret"
26 │ project that he was working on. Bryant instructed Anna Rhee not to tell anyone
27 │ about the "secret" project, including Mattel employees. He discussed this project
28 │ with Ms. Rhee while she was visiting the Mattel Design Center where Bryant was

-61-

Exhibit 11  Page *164*

1  working and informed her that he had engaged a "corporate attorney" to help him

2  with the "secret" project.

3          Fourth, while working for Mattel, Bryant concealed and affirmatively

4  misrepresented his aid and assistance to MGA in other ways. In particular, despite

5  his obligations to do so, Bryant failed to notify his Mattel supervisor of his

6  conflict of interest in working with MGA. Prior to and upon his departure, Bryant

7  further misrepresented to Mattel, including to Ivy Ross and Sandy Yamamoto, his

8  future plans by stating that he was not going to work with a competitor.

9          Finally, both Bryant and MGA have spoliated evidence relating to the

10 timing and extent of Bryant's aid to and work with MGA during his Mattel

11 employment. One example was revealed by the testimony of Victoria O'Connor, a

12 former MGA executive. According to Ms. O'Connor, Bryant faxed a signed copy

13 of a Bryant/MGA contract to MGA from Mattel. Upon receipt, each page of the

14 contract included a fax header that read "Barbie Collectibles" and bore the number

15 of the Mattel fax machine that it came from, revealing that it came from Mattel's

16 Designer Center where Bryant worked. When Ms. O'Connor brought this to the

17 attention of Isaac Larian, Mr. Larian instructed her to "white-out" the fax header

18 information on all pages of the contract and send the contract, as altered, to an

19 outside MGA attorney. At Mr. Larian's direction, Ms. O'Connor proceeded to

20 alter each page of the contract in order to conceal, as Ms. O'Connor testified, the

21 fact that Bryant "was still employed at Mattel at the time the contract [between

22 MGA and Bryant] was executed."

23          As further examples, Bryant has produced documents that appear to

24 have been altered to conceal information. These include, most notably, a fax of

25 Bratz drawings that has a fax header date of April 10, 2000--six months before

26 Bryant left Mattel's employ. Although the fax header information on the page

27 produced by Bryant states that it was the third page of a fax transmission, neither

28 preceding nor subsequent pages, nor any cover sheet, has been produced. Further,

07209/655298.1

-62-

1  even though the fax header on the produced page has fields for both the sender's

2  name and the sender's telephone number, neither the name of the sender nor the

3  sender's telephone number appears in the fax header.

4         Both MGA and Bryant also have failed and refused to provide Mattel

5  with access to original documents, despite the fact that one or both apparently

6  have already performed destructive ink chemistry analyses on Bryant's original

7  drawings and despite their agreement to provide those originals. Bryant's counsel

8  agreed to produce all of Bryant's original Bratz drawings at his deposition.

9  Despite these promises, Bryant brought only a few of his original drawings to the

10  deposition. Some of these drawings--including the originals of documents

11  BRYANT 192 and BRYANT 210--had holes in them, indicating that samples had

12  been extracted for ink chemical dating analysis. Bryant testified that his drawings

13  did not have holes in them when he turned them over to defendants' counsel and

14  that he was unaware of the origin of the holes. Appearances notwithstanding,

15  defendants' counsel has denied that anyone engaged in destructive sampling or

16  analysis of Bryant's original drawings. Defendants have not, however, explained

17  the origin of the holes in the original drawings.

18         Ramona Prince, a third-party witness, has raised other questions

19  about the integrity of Bryant's documents. According to both Ms. Prince and

20  Bryant, Bryant showed Ms. Prince his Bratz drawings in August 1999, when he

21  was employed by Mattel. Ms. Prince, however, has testified that markings which

22  now appear on the copy of a Bratz drawing produced by defendants did *not* appear

23  on the original drawing that Bryant showed her in 1999. This conflicts with

24  Bryant's testimony about the drawing. He claims that he created the drawing in its

25  entirety in August 1998, before he showed it to Ms. Prince.

26         By way of further answer, pursuant to Federal Rule of Civil

27  Procedure 33(d), Mattel will produce responsive, non-privileged documents and

28

07209/655298.1

-63-

SUPPLEMENTAL INTERROGATORY RESPONSES

Exhibit 11 Page *166*

1  tangible items in its possession, custody or control from which the answer to this
2  Interrogatory may be derived.

3          By way of further answer, Mattel currently has not yet received
4  discovery from defendant or MGA, has not yet obtained any deposition testimony
5  and has not yet had the opportunity to obtain information from other third parties
6  who may possess relevant information.  Mattel therefore reserves the right to
7  supplement this response after Mattel receives more information about defendant's
8  activities.  By way of further answer, this topic may be the subject of expert
9  testimony, which will be disclosed in the manner, and at the time, required for
10  expert disclosures pursuant to the Federal and Local Rules.

11

12  INTERROGATORY NO. 13:

13          State all facts supporting YOUR contention that Bryant was in a
14  fiduciary relationship with MATTEL.

15

16  SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:

17          In addition to the general objections stated above, Mattel specifically
18  objects to this Interrogatory on the grounds that it calls for the disclosure of
19  information subject to the attorney-client privilege, the attorney work-product
20  doctrine and other applicable privileges.  Mattel further objects to this
21  Interrogatory on the ground that it calls for the disclosure of confidential and/or
22  proprietary information, which Mattel will disclose only subject to and in reliance
23  upon a suitable protective order.  Mattel further objects to this Interrogatory as
24  unreasonably burdensome and overbroad in that it purports to require Mattel to
25  summarize all facts on this subject, including without limitation, facts that are
26  known to or in the possession, custody and control of defendant Bryant,
27  defendant-in-intervention MGA Entertainment, Inc. and nonparties, including
28  nonparties associated with Bryant and/or MGA.  Mattel only undertakes to make a

07209/655298.1

1 | good-faith, reasonable effort to summarize facts currently known to it in
2 | responding to this Interrogatory. Mattel further objects to this Interrogatory on the
3 | grounds that it is premature in that it purports to seek to all facts relating to this
4 | subject at the outset of discovery in this action and also seeks to circumvent the
5 | expert disclosure provisions of the <u>Federal Rules of Civil Procedure</u> and the <u>Local</u>
6 | <u>Rules</u>.
7 |       Subject to and without waiving the foregoing general and specific
8 | objections, Mattel responds as follows:
9 |       On January 4, 1999, upon starting his second term of Mattel
10 | employment, and as a condition of and in consideration for his employment,
11 | defendant Bryant entered into an Employee Confidential Information and
12 | Inventions Agreement (the "Employee Agreement"). Among other things, Bryant
13 | agreed that he would not, without Mattel's express written consent, "engage in any
14 | employment or business other than for [Mattel], or invest in or assist (in any
15 | manner) any business competitive with the business or future business plans of
16 | [Mattel]." Bryant further acknowledged that he held a position of trust with
17 | Mattel. In addition, Bryant assigned to Mattel all right, title and interest in
18 | "inventions," including without limitation "designs," that he created, conceived or
19 | reduced to practice, whether alone or jointly with others, during his employment
20 | by Mattel under the terms set forth in his Employee Agreement. A copy of
21 | defendant's Employee Agreement with Mattel, dated January 4, 1999, is attached
22 | to the Complaint as Exhibit A and is hereby incorporated into this response by this
23 | reference. Before his departure from Mattel, Bryant confirmed his obligations in a
24 | Proprietary Information Checkout form, which Bryant agreed to and signed. A
25 | copy of this additional agreement has been produced in this action and is hereby
26 | incorporated into this response by this reference.
27 |       Also on January 4, 1999, Bryant executed a Conflict of Interest
28 | Questionnaire (the "Conflict Questionnaire"). Among other things, Bryant

-65-

Mattel, Inc.'s Supplemental Responses to Bryant's First Set of Interrogatories

Exhibit 11  Page 168

1 | certified in the Conflict Questionnaire that, other than as disclosed, he had not
2 | worked for any competitor of Mattel in the prior twelve months and had not
3 | engaged in any business venture or transaction involving a Mattel competitor that
4 | could be construed as a conflict of interest.  Bryant specifically agreed that he
5 | would immediately notify his supervisor of any change in his situation that would
6 | cause him to change any of the foregoing certifications.  The only conflict
7 | disclosure that Bryant made on the Conflict Questionnaire concerned what
8 | defendant stated was "freelance" work for Ashton-Drake that is unrelated to the
9 | conduct alleged herein.  At no time did Bryant disclose to Mattel that he was
10 | working with MGA, a known competitor, while employed by Mattel, or that he
11 | was paid by MGA for services rendered to MGA while he was a Mattel employee.
12 | A copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B
13 | to the Complaint and is hereby incorporated into this response by this reference.
14 | In late November 2003, Mattel obtained a copy of a contract
15 | evidencing that Bryant had aided and assisted, and worked as a designer with,
16 | MGA, a Mattel competitor, while he was employed by Mattel and was being paid
17 | by Mattel for his exclusive services as a designer.  Bryant's agreement with MGA
18 | obligated him to provide design services to MGA on a "top priority" basis.  In
19 | addition, his agreement with MGA purported to assign to MGA rights to
20 | preexisting works by Bryant and to deem work and services furnished by Bryant to
21 | MGA under the agreement as "works for hire."  Furthermore, Bryant's agreement
22 | with MGA provided that he would be paid for such services and receive royalties
23 | and other consideration for products on which he provided aid or assistance.  A
24 | copy of defendant's agreement with MGA, in the form obtained by Mattel, has
25 | been produced in this case and is hereby incorporated into this response by this
26 | reference.
27 | Although discovery and Mattel's investigation are on-going,
28 | additional documents, testimony and other evidence thus far obtained have

07209/655298.1

Mattel, Inc.'s Supplemental Responses to Bryant's First Set of Interrogatories

Exhibit 11  Page *169*

1   confirmed that Bryant worked with and aided MGA, and advanced his own

2   personal interests over Mattel's, during the term of his Mattel employment without

3   Mattel's express written permission.  First, Bryant admitted at deposition that he

4   did so, although he sought to minimize and conceal the time period and extent of

5   his aid to and work with MGA.  Among other things, Bryant testified that (1) he

6   made pitches to MGA concerning the Bratz project during the term of his

7   employment; (2) he used Mattel personnel and other Mattel resources to assist him

8   in such pitches, including without limitation by using Mattel personnel and

9   resources to make what he called a "dummy" and others have called a three-

10  dimensional prototype; (3) he used Mattel personnel and other Mattel resources to

11  work on the Bratz project during his Mattel employment, including without

12  limitation by (a) obtaining information about a Mattel hair vendor, which Bryant

13  then contacted for his own and MGA's benefit and which Bryant told he was

14  working with MGA; and (b) identifying others who Bryant knew as a consequence

15  of his Mattel employment to work on the project and enlisting them to work on the

16  Bratz project during the term of his Mattel employment; (4) he worked on what

17  Bryant characterized as a "test project" to aid and assist MGA and benefit himself,

18  at Mattel's expense, during the term of his Mattel employment;  (5) he entered into

19  his agreement with MGA during the term of his Mattel employment and used

20  Mattel resources in connection with the negotiation and execution of that

21  agreement; and (6) he received monetary payments and other benefits from MGA

22  during the term of his Mattel employment, and both Bryant and MGA benefitted

23  further as a consequence of his aid and assistance to and work with MGA during

24  the term of his Mattel employment.

25          Second, MGA and those associated with MGA have made statements,

26  including under oath, that confirm Bryant assisted and worked with MGA during

27  his Mattel employment.  Among his many statements to the press, for example,

28  MGA's CEO, Isaac Larian, told the *Wall Street Journal* that "he chose

-67-

Exhibit 11  Page *176*

1   Mr. Bryant's idea for the Bratz over several others after holding a sort of

2   fashion-doll design contest in late 1999"--a time when Bryant was employed by

3   Mattel.  In a sworn affidavit filed in a Hong Kong lawsuit brought by MGA,

4   Isaac Larian stated that "[t]he Bratz dolls were first exhibited in the USA in

5   November 2000," which further confirms that Bryant was working with and aiding

6   MGA on the project prior to his departure from Mattel on or about October 20,

7   2000.  Additionally, Isaac Larian has been sued for fraud and other claims by his

8   brother and one-time partner in MGA, Farhad Larian.  Farhad Larian's verified

9   Complaint alleges, among other things, that "in or about late 1999 and early 2000,

10  Isaac became aware of a potential new product line that had tremendous potential

11  for [MGA].  The new product line involved the 'Bratz' dolls and related products."

12  The verified Complaint further alleges:  "In or about early 2000, Isaac called a

13  meeting to discuss the new Bratz product line with selected individuals" at MGA,

14  and took affirmative steps "to conceal" from Farhad Larian MGA's "plans for the

15  Bratz line" in February, March and May 2000.  Bryant was working for Mattel

16  during each of these time periods.

17          Third, although discovery is still in its early stages, other witnesses

18  who have testified thus far in the case have provided testimony revealing that

19  Bryant aided and worked with MGA during his Mattel employment.  Bryant

20  testified that he pitched the Bratz project to MGA in late August and September

21  2000.  Bryant also testified that he had no contact with MGA until August 2000

22  and had never even heard of MGA before July 2000. Bryant claims that he

23  discussed the Bratz project with Anna Rhee--and introduced Ms. Rhee to MGA--

24  only after he stopped working for Mattel in late October 2000.  After Bryant

25  introduced Ms. Rhee to MGA (which is undisputed--Bryant and Ms. Rhee agree

26  that she had no involvement with MGA prior to Bryant's introduction), Ms. Rhee

27  painted Bratz doll heads.

28

1        During the six months from August 2004 (when MGA made its initial

2    document production in this case) to January 2005, MGA produced a mere eight

3    pages of payment records relating to work that Ms. Rhee performed on Bryant-

4    related projects in the year 2000.  These pages relate exclusively to work that

5    Ms. Rhee did on Bryant-related projects in December 2000, after Bryant left

6    Mattel, which would be consistent with Bryant's testimony.

7        After Bryant testified and after MGA made its initial production of

8    Anna Rhee documents, however, Anna Rhee produced documents pursuant to

9    subpoena in mid-January 2005.  Included in Ms. Rhee's production were

10    approximately twenty invoices for work that she performed on Bryant-related

11    MGA projects in the year 2000, none of which MGA or Bryant had disclosed.

12    These invoices also revealed that Ms. Rhee performed work with Bryant and

13    MGA on at least seven separate occasions before Bryant's departure from Mattel--

14    including one invoice that dates to June 12, 2000, when Bryant purportedly had

15    never even heard of MGA.

16        After Ms. Rhee produced these documents, MGA then made a

17    supplemental production of certain internal documents relating to work performed

18    by Ms. Rhee during the June-October 2000 time period.  These belatedly produced

19    MGA records purport to show that Ms. Rhee's work during that time period

20    related to a project known as "Angel" and/or "Prayer Angels."

21        At her deposition, however, Ms. Rhee testified that her work during

22    that time period was for Bratz and that "Angel" was MGA's and Bryant's code

23    name for Bratz.  Thus, Ms. Rhee testified that her June 12, 2000 work was for face

24    painting on two Bratz doll heads; her late August 2000 work was for face painting

25    on four Bratz doll heads; and her work as of September 8, 2000 was for face

26    painting on additional Bratz doll heads.  All of these are times when Bryant was

27    employed by Mattel.

28

Exhibit 11 Page _172_

1    At the deposition, defendants' counsel repeatedly tried--and failed--to
2  persuade Ms. Rhee to agree with their claim that "Angel" and/or "Prayer Angels"
3  was a different doll project than Bratz and that she worked on that project in the
4  June 2000, not Bratz.  For example, defendants' counsel asked whether the
5  June 12, 2000 invoice--which Ms. Rhee had testified was for work on Bratz--
6  "could" instead relate to the doll "that ultimately came to market as Prayer
7  Angels."  Ms. Rhee responded:  "There's no way."
8    Ms. Rhee further testified that during a time when Bryant was
9  necessarily employed by Mattel, he had contacted her about the "big" and "secret"
10  project that he was working on.  Bryant instructed Anna Rhee not to tell anyone
11  about the "secret" project, including Mattel employees.  He discussed this project
12  with Ms. Rhee while she was visiting the Mattel Design Center where Bryant was
13  working and informed her that he had engaged a "corporate attorney" to help him
14  with the "secret" project.
15    Fourth, while working for Mattel, Bryant concealed and affirmatively
16  misrepresented his aid and assistance to MGA in other ways.  In particular, despite
17  his obligations to do so, Bryant failed to notify his Mattel supervisor of his
18  conflict of interest in working with MGA.  Prior to and upon his departure, Bryant
19  further misrepresented to Mattel, including to Ivy Ross and Sandy Yamamoto, his
20  future plans by stating that he was not going to work with a competitor.
21    Finally, both Bryant and MGA have spoliated evidence relating to the
22  timing and extent of Bryant's aid to and work with MGA during his Mattel
23  employment.  One example was revealed by the testimony of Victoria O'Connor, a
24  former MGA executive.  According to Ms. O'Connor, Bryant faxed a signed copy
25  of a Bryant/MGA contract to MGA from Mattel.  Upon receipt, each page of the
26  contract included a fax header that read "Barbie Collectibles" and bore the number
27  of the Mattel fax machine that it came from, revealing that it came from Mattel's
28  Designer Center where Bryant worked.  When Ms. O'Connor brought this to the

1  attention of Isaac Larian, Mr. Larian instructed her to "white-out" the fax header
2  information on all pages of the contract and send the contract, as altered, to an
3  outside MGA attorney.  At Mr. Larian's direction, Ms. O'Connor proceeded to
4  alter each page of the contract in order to conceal, as Ms. O'Connor testified, the
5  fact that Bryant "was still employed at Mattel at the time the contract [between
6  MGA and Bryant] was executed."
7          As further examples, Bryant has produced documents that appear to
8  have been altered to conceal information.  These include, most notably, a fax of
9  Bratz drawings that has a fax header date of April 10, 2000--six months before
10 Bryant left Mattel's employ. Although the fax header information on the page
11 produced by Bryant states that it was the third page of a fax transmission, neither
12 preceding nor subsequent pages, nor any cover sheet, has been produced.  Further,
13 even though the fax header on the produced page has fields for both the sender's
14 name and the sender's telephone number, neither the name of the sender nor the
15 sender's telephone number appears in the fax header.
16          Both MGA and Bryant also have failed and refused to provide Mattel
17 with access to original documents, despite the fact that one or both apparently
18 have already performed destructive ink chemistry analyses on Bryant's original
19 drawings and despite their agreement to provide those originals.  Bryant's counsel
20 agreed to produce all of Bryant's original Bratz drawings at his deposition.
21 Despite these promises, Bryant brought only a few of his original drawings to the
22 deposition.  Some of these drawings--including the originals of documents
23 BRYANT 192 and BRYANT 210--had holes in them, indicating that samples had
24 been extracted for ink chemical dating analysis.  Bryant testified that his drawings
25 did not have holes in them when he turned them over to defendants' counsel and
26 that he was unaware of the origin of the holes.  Appearances notwithstanding,
27 defendants' counsel has denied that anyone engaged in destructive sampling or
28

07209/655298.1

-71-

Exhibit 11  Page 174

1  analysis of Bryant's original drawings.  Defendants have not, however, explained
2  the origin of the holes in the original drawings.

3         Ramona Prince, a third-party witness, has raised other questions
4  about the integrity of Bryant's documents.  According to both Ms. Prince and
5  Bryant, Bryant showed Ms. Prince his Bratz drawings in August 1999, when he
6  was employed by Mattel.  Ms. Prince, however, has testified that markings which
7  now appear on the copy of a Bratz drawing produced by defendants did *not* appear
8  on the original drawing that Bryant showed her in 1999.  This conflicts with
9  Bryant's testimony about the drawing.  He claims that he created the drawing in its
10 entirety in August 1998, before he showed it to Ms. Prince.

11        By way of further answer, pursuant to <u>Federal Rule of Civil</u>
12 <u>Procedure</u> 33(d), Mattel will produce responsive, non-privileged documents and
13 tangible items in its possession, custody or control from which the answer to this
14 Interrogatory may be derived.

15        By way of further answer, Mattel currently has not yet received
16 discovery from defendant or MGA, has not yet obtained any deposition testimony
17 and has not yet had the opportunity to obtain information from other third parties
18 who may possess relevant information.  Mattel therefore reserves the right to
19 supplement this response after Mattel receives more information about defendant's
20 activities.  By way of further answer, this topic may be the subject of expert
21 testimony, which will be disclosed in the manner, and at the time, required for
22 expert disclosures pursuant to the <u>Federal</u> and <u>Local</u> <u>Rules</u>.

23

24 <u>INTERROGATORY NO. 16</u>:

25        IDENTIFY each and every MATTEL employee or independent
26 contractor that worked with Bryant on any project he worked on for MATTEL,
27 from 1996 to October 2000.

28

RESPONSE TO INTERROGATORY NO. 16:

In addition to the general objections stated above, Mattel objects to this Interrogatory as overbroad and unduly burdensome on the grounds that it seeks the identification of all employees or independent contractors who worked with Bryant on "any project he worked on for MATTEL" for a period of several years. For the same reasons, Mattel further objects to this Interrogatory on the grounds that it seeks information that is not relevant to this action or reasonably calculated to lead to the discovery of admissible evidence. Mattel further objects to this Interrogatory on the grounds that this information is equally available to defendant, as defendant necessarily possesses superior firsthand knowledge of the people with whom he personally interacted at Mattel.

Subject to and without waiving the foregoing general and specific objections, Mattel responds as follows:

Please see response to Interrogatory No. 15, which identifies Mattel personnel who directly supervised Carter Bryant during his employment at Mattel.

By way of further answer, pursuant to Federal Rule of Civil Procedure 33(d), Mattel will produce responsive, non-privileged documents and tangible items in its possession, custody or control from which the answer to this Interrogatory may be derived.

DATED: May 16, 2005

QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP

By _____
Jon D. Corey
Attorneys for Plaintiff
Mattel, Inc.

-73-

Exhibit 11  Page 176