Page 200

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

---

```
MATTEL, INC.,                 :  PAGES 200 - 239
                              :
          PLAINTIFF,          :
                              :
     VS.                      :  NO. ED CV04-09049-SGL
                              :  [CONSOLIDATED WITH
MGA ENTERTAINMENT, INC.,      :  CV04-9059 & CV05-2727]
ET AL.,                       :
                              :
          DEFENDANTS.         :
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

WEDNESDAY, MAY 21, 2008

AFTERNOON SESSION

MARK SCHWEITZER, CSR, RPR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
181-H ROYBAL FEDERAL BUILDING
255 EAST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012
(213) 663-3494

Page 201

1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4         Quinn Emanuel
          By John B. Quinn, Esq.
5         By B. Dylan Proctor, Esq.
          By Michael T. Zeller, Esq.
6         855 South Figueroa Street
          10th Floor
7         Los Angeles, CA 90017
          (213) 624-7707

8

9    On Behalf of MGA Entertainment:

10        Skadden, Arps, Slate, Meagher & Flom LLP
          By Thomas J. Nolan, Esq.
11        By Carl Alan Roth, Esq.
          By Jason Russell, Esq.
12        300 South Grand Avenue
          Los Angeles, CA 90071-3144
13        (213) 687-5000

14

15

16

17

18

19

20

21

22

23

24

25

Page 202

1        I N D E X

2

3        MATTER:   MOTIONS IN LIMINE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

299476b4-81a6-43d1-8904-224d037aeb48

1          Riverside, California; Wednesday, May 21, 2008

2                          3:03 P.M.

3          THE COURT:  Okay.  We're back on the record.  I'll

4   hear from Mattel on Motion in Limine No. 6.

5          MR. QUINN:  Your Honor, we did have reciprocal

6   motions here.  MGA's Motion in Limine No. 6, Mattel's Motion

7   in Limine No. 3.  At the top level, they are both in complete

8   agreement, that only Phase 1 information should be in Phase

9   1, and Phase 2 information should be in Phase 2.

10          But it's -- you have to get to the details to get

11   beyond that sort of general agreement.

12          THE COURT:  Right.

13          MR. QUINN:  And what I would propose to do, your

14   Honor, is look at the six categories of information which are

15   in MGA's Notice of Motion and just to walk through those if I

16   could, your Honor.

17          THE COURT:  Sure.

18          MR. QUINN:  The first one is that they want to keep

19   out any contention that MGA stole Mattel employees.

20          As we understand it, there's no reason in --

21          THE COURT:  Or hired Mattel employees.

22          MR. QUINN:  Stole or hired, you know.  It shouldn't

23   be an employee raiding case in Phase 1.  The fact that lots

24   of employees had gone over there, whether after they were

25   laid off or whether because they were offered a multiple of

1    their salaries at Mattel to go to MGA.  It shouldn't be a

2    raiding case in Phase 1.  Unless somehow, particularly in

3    Phase 1-A, unless apportionment comes in, and then we do have

4    to be able to respond, it seems to me, that that wasn't your

5    great packaging.  That wasn't your great -- those weren't

6    your great ideas.  Those were things you got from our people.

7    And that's something that's teed up in some other motions.

8              THE COURT:  Yes.

9              MR. QUINN:  But Phase 1-A, pristine, should not be

10   about employee rating and wholesale movement of employees.

11             But the fact that at the time they hired or they

12   entered into the contract with Mr. Bryant, there were

13   numerous former Mattel employees at MGA who knew what

14   Mattel's contracts were, knew exactly what they were.  That's

15   real important.  We have to prove knowledge of the contract.

16   There is direct knowledge.

17             Specifically, your Honor, a woman by the name of

18   now Paula Garcia, then Paula Treantafelles, now head of the

19   girls division, who was the MGA project director for Bratz,

20   she's the first person at MGA who Mr. Bryant meets with.  And

21   she's a former Mattel employee.  She had the same contract

22   that Mr. Bryant had.

23             There is direct knowledge by a key person who's

24   right in the middle of this.

25             THE COURT:  Let's go to the next one, the -- I have

1   a lot more problem with the evidence that MGA borrowed Mattel

2   ideas to create MGA products coming in in Phase 1-A.

3           MR. QUINN:  You know, the only thing that I can

4   think of that should come in, and this, I think, is crucial,

5   has to come in, is Toon Teens, and Diva Starz.  And that's

6   because they are important as to the timing as to when Carter

7   Bryant did this.  Why, your Honor?  We're not -- I've stood

8   up here and said two years ago or whenever it was, we're not

9   making a copyright infringement claim as to Toon Teens.  That

10  was looked at, and there was no such claim.

11          But clearly there are common elements -- and we've

12  maintained this throughout the case -- that Toon Teens was

13  part of the inspiration for Bratz.  If you look at them, I

14  think any reasonable viewer will conclude that.  And there's

15  testimony, your Honor, that Mr. Bryant, when he saw Toon

16  Teens, here's the testimony, that he said Mattel is going to

17  be sorry they didn't do this someday.  Because Toon Teens was

18  never released.

19          So Toon Teens did not exist at the time he went off

20  to Missouri.  Toon Teens was created after that.

21          And if the jury believes that Toon Teens was part

22  of the inspiration for Bratz, then that helps nail down the

23  timing, because if they believe that, then it could not have

24  been done --

25          THE COURT:  How is this anything other than kind of

1    a back-door way to get in a copyright infringement off of

2    Toon Teens?

3           MR. QUINN:  We are not suing for copyright

4    infringement, your Honor, but they are close -- they are

5    close enough, and they have very common elements, and we have

6    this testimony that Mr. Bryant saw and said they are going to

7    be sorry they didn't do that.  And I think anybody who looks

8    at it will see these are, you know, if it's not copyright

9    infringement, these are very, very close.

10          Your Honor, there's nothing that says that we have

11   to bring every conceivable claim.

12          THE COURT:  Doesn't this create a trial within a

13   trial in terms of whether or not Toon Teens is or is not

14   closely related to an --

15          MR. QUINN:  No.

16          THE COURT:  Otherwise, what relevance --

17          MR. QUINN:  No, it wouldn't.  The testimony was he

18   thought it was great and that they looked similar.  And

19   that's it, your Honor.  And the importance of it is the

20   timing.  Because it didn't exist until after he came back.

21   If the jury believes --

22          THE COURT:  But that doesn't prove -- let's say he

23   developed Bratz in 1998.  He saw it.  Ah, it looks great,

24   they'll regret that they are not going to do it.  Or he saw

25   it and then was inspired by it.  There's really no evidence

299476b4-81a6-43d1-8904-224d037aeb48

1    suggesting that it has any bearing on when Carter Bryant

2    developed --

3            MR. QUINN:  Well, they maintain that it was -- that

4    he was inspired by an August 1998 Seventeen magazine, and he

5    saw that, and that was the interests operation.

6            THE COURT:  But nothing that you just proffered to

7    the Court suggests that he was inspired by it.  He may have

8    admired it, but that wasn't necessarily an inspiring --

9            MR. QUINN:  The fact that he's working in a room a

10   few cubicles away from a person who has done a doll, a

11   drawing which looks very much like this, your Honor, and that

12   I can tell you a lot of people have seen and, you know, had

13   the similar kind of reaction.  I mean, let him get up here.

14           His account is he saw a figure in Seventeen

15   magazine, you know, and that was part of his inspiration.

16   The fact that this existed at the time, he saw it, he admired

17   it, I submit that is something that the jury can consider.

18           THE COURT:  Okay.  All right.  Let's move on.

19           MR. QUINN:  We don't have it before your Honor, and

20   I don't know if it's in the record before the Court right

21   now.  I'm sure it's in the record.  Everything is in the

22   record.

23           THE COURT:  I've seen Toon Teens at some point in

24   time.  I didn't pay a whole lot of attention to it based on

25   your representation.

1    MR. QUINN:  Your Honor, my representation was that

2    we weren't suing for copyright infringement.  And I've stood

3    by that representation.  We abandoned that claim, but in all

4    our discovery responses, we have consistently said this is

5    relevant to timing.  And in Responses to Interrogatories, we

6    have consistently said that Toon Teens -- we haven't hid the

7    ball on this.  And there's been a lot of discovery about --

8    Lily Martinez is the one who designed Toon Teens, and she's

9    been deposed and questioned about it, and there's been a lot

10   of discovery on it.  And, in fact, as part of their statute

11   of limitations story is this whole question of the

12   investigation, was it Toon Teens, was it not Toon Teens.  Did

13   that put us on notice.  That's going to come in in any event.

14        So I know of no other Mattel ideas --

15        THE COURT:  It's going to come in, assuming that

16   statute of limitations goes to trial.

17        MR. QUINN:  Yes.  Assuming that.

18        THE COURT:  Yes.  The third one is evidence that

19   MGA used Mattel company information for marketing and

20   branding.

21        MR. QUINN:  Well, that's --

22        THE COURT:  That all turns on apportionment.

23        MR. QUINN:  Exactly.  That's it.  Do we get to do

24   battle by responding at that point.  If they are going to

25   come in and say --

Page 209

1        THE COURT:  That's only apportionment.  You

2   recognize that that only plays out --

3        MR. QUINN:  Those two are linked.

4        THE COURT:  We got to be careful not to speak over

5   each other.  The poor court reporter doesn't even tape.  He

6   just plays it straight up.  So we got to be careful.

7        MR. QUINN:  Number 4, we disclaimed any intent to

8   offer the evidence identified in item No. 4.

9        THE COURT:  As well as No. 6; correct?

10        MR. QUINN:  Number 6, I guess we didn't even

11   address it, I don't think.  Because we weren't sure what they

12   were talking about.  But I don't see how it comes in.

13        THE COURT:  No, I don't either.

14        MR. QUINN:  So that leaves No. 5.

15        THE COURT:  That's the evidence that MGA induced

16   Mattel employees to work off hours for MGA, the moonlighting.

17        MR. QUINN:  Yes, your Honor.  And the evidence on

18   that, your Honor, this has been late coming, because the

19   Court knows the history of how that came out in December and

20   then there was -- there were motions before Judge Infante,

21   and depositions finally got taken within a matter of, you

22   know, within the last two weeks.  Documents have been

23   produced, and a lot of evidence has been gathered on this

24   since these briefs were filed.

25        There is evidence, your Honor, that MGA knew this

1   was going on.  And just for context, these women began

2   working on Bratz back in 2000 at the same time that Mr. --

3   they enter into the contract with Mr. Bryant, or shortly

4   thereafter.

5           And they -- there's direct evidence, Peter Marlow,

6   who is in the middle of this, with his wife Veronica Marlow,

7   writes a letter, and this was just produced to us a few days

8   ago, wrote a letter to MGA, to Mr. Larian, saying that he was

9   concerned that if Mattel found out what these women were

10  doing, that they would be fired.

11          Ms. Salazar, one of the three seamstresses,

12  actually makes an employment application -- this is later

13  on -- to work at MGA.  She gives her Mattel dates of

14  employment on it.  She says she's been working on Bratz and

15  says she's been working with Marlow.  If you look at the four

16  corners of the application, you can put it together.

17          Veronica Marlow is paid hundreds of thousands of

18  dollars -- we don't know the exact amount -- by MGA for her

19  work in coordinating this.  She is paid millions by

20  Mr. Bryant for bringing them together.  Bringing him together

21  with MGA.

22          Mr. Nolan said that there was only invocations of

23  the Fifth Amendment with respect to certain tax issues.  I

24  think he's mistaken on that.  The Fifth Amendment was invoked

25  hundreds of times for things.  For example, were there

1   efforts to conceal this to hide it from Mattel.  Fifth

2   Amendment invoked.

3           Mr. Marlow was squarely asked at his deposition did

4   MGA know about this, and he answers, "Yes, they did."

5           And then his answer goes on.  He takes it back.

6   But his first response to that is yes, they did.

7           You know, there is a pattern here of concealment

8   from which I think a jury could infer that MGA knew what was

9   going on.  The use of the false Social Security numbers and

10  false names and tax identification information.

11          If you add all of this together, your Honor, there

12  just isn't a basis at this stage to say this can't come into

13  evidence.  A jury would be entitled to infer that MGA knew,

14  given all the money that's going back and forth, given the

15  testimony, given the invocation of the Fifth Amendment, the

16  employment application, Marlow's letter, the timing, the fact

17  that this starts shortly after Carter Bryant signs his

18  contract.

19          THE COURT:  I understand your position, Counsel.

20  Thank you.

21          Let me hear briefly from Mr. Nolan on this.

22          MR. NOLAN:  Your Honor, let me start off by saying

23  I'm getting tired of this.  I would like Mr. Quinn to produce

24  right now the letter from Peter Marlow to MGA, Mr. Larian

25  saying that Mattel would know.

Page 212

1          THE COURT:  I note your objection, Counsel.

2          MR. NOLAN:  Your Honor, it does not say that.  It

3     talks about their employer.  We have no idea who that

4     employer was.  This is a town blessed with a lot of garment

5     companies.  All these poor Hispanic women were sewing our

6     doll designs.  Okay?  We did not know.  Veronica Marlow has

7     her own business.  And, in fact, when we wanted to hire

8     Veronica Marlow, she was concerned that we may go and try to

9     find out who her people were, and we'd hire them directly.

10          This is just an overstatement, your Honor.  And I

11     think that if we have to get in front of the jury -- and I've

12     thought about this a lot.  I can't tell whether or not I want

13     those workers on the stand, because I think in many ways

14     their view of what the obligations were under the employment

15     agreement that Carter Bryant signed will be very interesting

16     with respect to whether or not Mattel was enforcing any of

17     this information.  Oh, yes, we all know what happens to these

18     poor women once this lawsuit is filed.

19          I'll move on from there, your Honor.  Let me go to

20     something else.

21          Breathtakingly, in this case now, once we are on

22     the eve of trial, we have a jury, they come out, and they are

23     clearly now telling you about Toon Teens, Diva Starz, sitting

24     right next to the cubicle.

25          I don't know where Dale Cendali is at this moment,

1   the former attorney standing behind the same lectern making

2   an argument to you in January of 2007, or making arguments to

3   Judge Manella saying, "Oh, this case is not part of any

4   copyright claim," and now they are trying to draw a

5   distinction.

6           But if they are, your Honor, what's so interesting

7   is Mr. Quinn's eloquence about why it's relevant now.

8   Applying the standards for statute of limitations of what

9   they knew.  They had reasonable suspicion.  And if in fact

10  Carter Bryant was sitting next to the cubicle of Lily

11  Martinez, and we all know and we're submitting something

12  electrically today that Lily Martinez -- we were surprised

13  yesterday to see her in court, as the corporate

14  representative.  She was the designer --

15          THE COURT:  Apparently Mr. Larian was as well, from

16  the e-mail.

17          MR. NOLAN:  Yes.  Well, because, your Honor, I

18  think everybody in the courtroom was because we were told

19  that this was not involving Toon Teens.

20          I hope that the Court reflects on that with respect

21  to the statute of limitations.

22          And by the way, your Honor, the submission we were

23  making today is prompted by Lily Martinez being here, as

24  there is what's known as My Scene 360 review, and I'm going

25  to segue into this motion in just a minute.  This document is

Page 214

1   being submitted today.  It's dated October 24, 2002.  This is

2   Lily Martinez.  And we're talking about My Scene brand

3   update.  And it says product Nolee approved worldwide.

4   Interestingly, Mattel made a My Scene doll and named it

5   Bryant.

6           Okay?  Now, you know, there are coincidences.  You

7   know, Goldberg on the East Coast, this case on the West

8   Coast.  I don't know any Bryants.  I don't think it's a very

9   common name.  But Lily pointed out that the former Mattel

10  designee who is the creator of Bratz was named Bryant.

11          This is submitted because we were actually doing

12  stuff on what would happen if Lily Martinez testified.  We

13  didn't think she was going to be relevant because she's Toon

14  Teens.  Now we kind of understand.

15          Your Honor, where does this all end?  How

16  reasonable of a suspicion do you have to be in to do an

17  investigation to determine --

18          THE COURT:  There's little question that they

19  figured out at some point in time that Bryant was the one who

20  created Bratz.  The question is when did he do it.

21          MR. NOLAN:  No, no, no.  Yes, I know that's the

22  copyright.  That's 1-A.  That's 1-A.  I understand that, your

23  Honor.  But there are contract claims in this case of

24  borrowing of impressions --

25          THE COURT:  You mean that's 1-B.  Copyright

1    infringement is 1-B.

2           MR. NOLAN:  I apologize.  What he meant was the

3    ownership issue in 1-A.  But also, your Honor, you made

4    reference to this.  And I don't know how the summary judgment

5    motions will come out on statute of limitations, but, your

6    Honor, their claim in this case, and there's motions in

7    limine going to this issue of borrowings, you know, that

8    we're trying to exclude this evidence.

9           If -- and they are including this in their claim in

10   this case, that one of the breaches of contract that Carter

11   had was that he borrowed from proprietary information that he

12   had at Mattel.  You heard Mr. Quinn make that very, very

13   point.  He made that very, very point.

14          Now, clearly, your Honor, I will set aside whether

15   or not they should have known about the drawings for a

16   moment.  We've had that argument.  I'm not going to go back

17   there.  But certainly, your Honor, reasonable suspicion to

18   investigate --

19          THE COURT:  Let's get back to the motion in limine.

20          MR. NOLAN:  Okay.  So now let's go to the motion in

21   limine just for a moment, your Honor.  On this apportionment

22   issue and why I think My Scene is also relevant.  And I

23   apologize for that detour, but it's relevant to this motion.

24          On the apportionment argument, on damages, what in

25   effect Mattel wants is two bites of the apple in front of a

Page 216

1    jury.  We've made that seven agent amendment issue in our

2    papers, your Honor.

3              We have Phase 2.  There are trade dress issue

4    claims.  There are breaches of trade secret claims.  There's

5    RICO claims, and, you know -- you know more about Phase 2

6    than I do, unfortunately.  But, your Honor, all of that is

7    part of Phase 2.  If that evidence contaminates in my view

8    our 1-B, here's what will open the door.

9              In our case in Phase 2, we contend that My Scene

10   was copycatting the Bratz packaging, the Bratz play themes.

11   That's what our Phase 2 claim is against Mattel.  You know,

12   there are two competing claims.

13             What we claim in this case, your Honor, is that

14   under apportionment of damages, which is recognizable under

15   the copyright statute, and that's what we're trying in that

16   phase of the case, we should be allowed to have the expert

17   testimony testify as to, you know, the value of the packaging

18   and do the proportionality.

19             In another trial, in Phase 2, Mattel has every

20   right and every opportunity to present whatever evidence they

21   want that whatever success we had in the --

22             THE COURT:  Finish your thought.  What is your

23   expert going to testify to under apportionment in, you say,

24   Phase 1-B?

25             MR. NOLAN:  Sure.  Well, it's that what you would

1  assume by the term apportionment, that a value is affixed to

2  the doll itself.  It's how I describe it to my daughters when

3  I go home.  I can't believe I'm playing with naked dolls all

4  day.  And I say that too many times, and I'm embarrassed by

5  it, but I'm going to keep saying it.  And then you have --

6  and I don't have it here, your Honor -- but then you have the

7  packaging.  You have the accessories.

8           THE COURT:  I understand that.  I do understand

9  that to be your argument for apportionment, but then why

10 wouldn't Mattel be able to say if you are claiming an

11 apportioned, severable value to the accessories, their

12 argument is well, you stole those accessories from us.  I'm

13 not saying that's true or not.  That's their allegation.  If

14 MGA did do that, that would offset that damage; right?

15 Assuming.

16           MR. NOLAN:  Assuming that happened, your Honor,

17 assuming that happened, they would have a right to try to

18 prove that up against us.  But I will be able --

19           THE COURT:  In Phase 1.

20           MR. NOLAN:  No.

21           THE COURT:  Why not?

22           MR. NOLAN:  Well, then, bring in all of the copycat

23 packaging that they did of our product to show that most of

24 the stuff is available at retail.  They could have gotten it

25 from retail.  You are blowing the distinction, your Honor,

Page 218

1   with all due respect, between Phase 2 and Phase 1 because

2   they can't have it both ways.  You know, the project manager

3   from My Scene, your Honor, used to work at MGA.

4            We can go on and on about the similarity.  What the

5   statute allows in 1-B is for a determination to be made on

6   the Bratz branding.

7            What is available in Phase 2, if they can prove it,

8   after all of the discovery has been had, because we haven't

9   had a chance to depose everybody relating to Phase 2, is they

10  will have that opportunity in Phase 2 to get back whatever

11  they believe.  The other thing, your Honor, is frankly, if

12  they put that evidence in in Phase 1-B, there's going to be a

13  huge Seventh Amendment issue with respect to Phase 2.

14           THE COURT:  I see the problems.  And I understand

15  what you're saying about the Seventh Amendment issue and all

16  of that.  My concern is that the chain reaction begins when

17  the apportionment argument is made.  If you argue -- let's

18  say the jury has found that Mattel owns Bratz.  And now the

19  damages phase, you're going to say well, wait, time out.  You

20  only own this part of Bratz.  There's other parts of Bratz

21  that we've added to it.  Doesn't Mattel have a right to say

22  no, you didn't add that?

23           MR. NOLAN:  No.  Well, they --

24           THE COURT:  They just kind of accept that?

25           MR. NOLAN:  Well, no, your Honor.  I think actually

1    their position is --

2            THE COURT:  That is kind of their position.  Their

3    position is that they want to be able to respond by saying

4    no, you didn't add that value.  You took that value from us.

5            MR. NOLAN:  Well, your Honor, then I will say that

6    we've been prejudiced by the stay in Phase 2 discovery

7    because we haven't been able to launch Phase 2.  We never

8    took the discovery in Phase 2 to be able to counterbalance

9    that.  You know, we --

10           THE COURT:  I understand your concern.  I'm just

11    trying to see how this plays out.

12           MR. NOLAN:  Your Honor, to put this more succinctly

13    from the person who actually wrote this brief, is that the

14    issue in 1-B from apportionality, is what are the damages

15    flowing from the alleged infringement.  Not damages flowing

16    from, you know, copycatting or stealing away -- allegations

17    of stealing away employees or they did the packaging or they

18    copied the packaging.  The --

19           THE COURT:  Those damages will be addressed in

20    Phase 2.

21           MR. NOLAN:  That's it, your Honor.  And I

22    respectfully submit that if that is allowed to come in in

23    this case and --

24           THE COURT:  That unravels the phasing.  I

25    understand your argument.  Thank you very much, Counsel.

Page 220

1          MR. NOLAN:   Thank you very much.

2          THE COURT:   Mr. Quinn, if you'd just address that

3     last point.

4          MR. QUINN:   Your Honor, what would happen, we'd be

5     telling a false story to the jury.  They would be talking

6     about their innovations and apportioning the revenue and

7     profits to what they tell the jury are their innovations

8     where they are not their innovations.  They are our

9     innovations.  And the situation we're in with the discovery

10    stay, Mr. Nolan saying they would be prejudiced by that,

11    that's something they asked for.  I mean, that is something

12    that MGA asked for, a stay on Phase 2 discovery.  I think

13    that's in January or February where we were here, and that

14    was stayed.  And we saw this problem coming.  Because we

15    wouldn't be able to, you know, that's why we've asked in the

16    alternative for some expedited discovery on these Phase 2

17    issues.

18          So I acknowledge it's a conundrum, but once you get

19    into -- now, maybe we don't have to address it until 1-B.  It

20    leaks into 1-A, though, if they want to say as part of --

21    we're going to get to motion in limine on affirmative

22    defense, that, for example, for laches purposes they have to

23    show some detriment that time went by, you know, that they

24    were investing.  Our concern is they want to leak that into

25    1-A and start talking about all their innovation and

1    everything that they did to support their laches defense.

2           And that's where it could come up in 1-A.  And we

3    don't think that's right.  I mean, we have no dispute, and

4    we'd stipulate they spent millions of dollars developing

5    Bratz.  There's no problem with that.

6           But what we don't want to do is get into talking

7    about all their innovative things, all the things they did,

8    any kind of detail at all under the guise of we're proving up

9    our laches defense to show that we were prejudiced by the

10   passage of time.

11          That still leaves the problem for Phase 1-B about

12   when you get to apportionment, whether they can talk about

13   their innovations without the jury being told we say where

14   the innovations really came from.  And, you know, it's a

15   problem.

16          But you know, your Honor, on Toon Teens, some broad

17   statements have been made about how we've assured everybody

18   all along that that was out of the case.

19          We've assured everyone all along that that's in the

20   case.  We told the Ninth Circuit about that.  We brought it

21   up in Answers to Interrogatories.  I was very careful about

22   that because I was alert to that issue.  I didn't want to be

23   told or hear at some point that we disclaimed any relevance

24   of Toon Teens.  We never made any secret about the fact that

25   people did an investigation because they noticed the fact

1   that there was similarity between Toon Teens and Bratz.  And

2   sure, you know, if that goes to the jury, they have got an

3   argument, then, that, you know, they can use for their -- for

4   statute of limitations purposes.

5          Our sole reason for wanting to bring that up is --

6   relates to proving the timing, your Honor.

7          And our expert, Professor Loetz, you know, they

8   claim that he's inspired by Seventeen magazine.  We have an

9   expert who is going to say Toon Teens is much closer to Bratz

10  than the figure in the Steve Madden ad in Seventeen magazine.

11         So that expert testimony -- apparently they are

12  moving to exclude that also.

13         There really is no -- there's been no secret about

14  the importance of Toon Teens in this case, your Honor.

15         THE COURT:  All right, Counsel.  Thank you.

16         MR. NOLAN:  May I just respond very briefly, your

17  Honor?

18         THE COURT:  Very briefly, Counsel.  I think I

19  understand your position.

20         MR. QUINN:  I'm sorry.  May I say one last thing?

21  There is a series of My Scene dolls on Brainstorming Norm

22  localities.  One was Madison Avenue.  One was Bryant Park.

23         MR. NOLAN:  Maybe the next one will be Tom Nolan.

24  But, your Honor, on this one, infringement 1-B does not go to

25  what MGA put into it.  It goes to what is in -- what's caused

1   by the infringement.  It's the infringement analysis

2   copyright.  That's all that's in.  They want to bring in all

3   of this Phase 2 stuff.  There was a reason for the

4   distinction between 2 and 1-A and 1-B.  Phase 2 and Phase 1-A

5   and 1-B.  We're going to blur all of it, your Honor, if you

6   do that.

7          The other thing on Toon Teens, and I'll end on Toon

8   Teens.  Your Honor, the representations that were made with

9   respect to Toon Teens not only had to do with the amendment

10  of the complaint but statements made by Mr. Quinn in

11  connection with -- I guess it was a motion for sanctions for

12  spoilation of evidence with respect to not retaining

13  documents because they weren't on notice, and we talked about

14  Rule 11.

15         I think if I recall correctly from that January

16  transcript, you were talking about, all right, well, counsel,

17  they didn't know about the drawings.  And artfully, Mr. Quinn

18  at that point said your Honor, Toon Teens were not -- we're

19  not pursuing Toon Teens.

20         And then another thing is that in all of the

21  arguments that we've had with respect to the waiver of the

22  attorney-client privilege, we were always told, in those

23  arguments from Mr. Zeller, that the reason why the

24  investigation is irrelevant is because they were looking into

25  Toon Teens, and if Mr. Quinn is right about the comparison

Page 224

1    being so close, it's his terms, so close, so similar, their

2    representations, they can't have it both ways, your Honor.

3    At some point in time --

4              THE COURT:  I understand your argument, Counsel.

5              MR. QUINN:  Your Honor, again, it's the issue of

6    was he creating it while he was employed, or did he leave and

7    then copy Toon Teens.  That's the distinction.

8              And if your Honor's considering excluding the

9    evidence regarding Cabrera, et al., we'd like a chance to put

10   on the record and make an offer of proof.  There's a lot of

11   additional information that's come in just within the last 10

12   days.

13             THE COURT:  I'm sorry?

14             MR. QUINN:  Regarding Mr. Marlow's testimony, the

15   letter that Mr. Marlow wrote, the other things that I

16   referred to, we'd like a chance to supplement the record.

17             THE COURT:  On the off-work hours?

18             MR. QUINN:  Yes.

19             THE COURT:  Very well.

20             MR. QUINN:  And Toon Teens as well.  If the Court

21   is concerned about whether we've sandbagged on that in the

22   record, I'll be happy to provide the Court with more tape.

23             THE COURT:  All right.  And I'm dealing with 7, 8,

24   9, 10, 11, and 12 in a similar fashion.  Those are the

25   motions in limine to exclude expert witnesses, and expert

1    witnesses in quotation marks, indicating that the moving

2    party doesn't consider them experts.  This is Mike Wagner,

3    Kenneth Hollander, Ralph Oman, Carol Scott, Robert Lind, Lee

4    Loetz.

5              And, of course, the similar challenges are made by

6    Mattel in their motion No. 10 against Glenn Vilppu, No. 12,

7    Peter Menell, No. 13, Mary Bergstein, Robert Turner, and

8    Debora Middleton.  I'll deal with 15 separately.

9              But at least with respect to those individuals,

10   this is what the Court is considering doing with respect to

11   those motions in limine.  I know there's different issues

12   raised in each one of them, but they all go to challenges as

13   to whether or not those experts should be permitted to opine

14   as the proffer they are going to do or as the expert reports

15   indicate or the rebuttal reports indicate or whatever it

16   might be.

17             Mr. Quinn -- well, actually, Mr. Nolan requested a

18   week's notice or at least a notice on the week before of any

19   witnesses.  What I'm going to propose, actually, what I'm

20   going to order on that is a 48-hour kind of rolling notice.

21   Basically what I want at the end of a Tuesday, for example,

22   when Mr. Quinn is presenting his case or Mr. Tell is

23   presenting their case, to provide a list of witnesses for the

24   next two days.  Understanding, of course, that you may not

25   get through all of those witnesses in the next two days, and

Page 226

1   also understanding that you may get through them so quickly

2   that you have to pull something from the following day, but

3   as a general rule, covering the next two days' worth of

4   witnesses.  And then doing that every day so that there's at

5   least two days of notice given.

6          If we get to a Friday, I would expect the witnesses

7   for that Tuesday and Wednesday to be notified.  On Tuesday,

8   Wednesday, and Thursday.  For Wednesday, Thursday and Friday,

9   et cetera.

10          And that way there's not going to be any surprises.

11  And at the same time, nobody has to lay out their case a week

12  in advance or anything.  I think that's a reasonable

13  accommodation.

14          And we're going to be starting at 9:00.  And to the

15  extent that, in the course of the next 48 hours, one of these

16  witnesses is going to be called, one of these experts is

17  going to be called, what I'm going to do is hold essentially

18  a Daubert witness hearing at 8:30 in the morning.  And I will

19  decide whether or not that witness and to what extent that

20  witness can testify.

21          But by placing it into the trial itself, the Court

22  is going to have a better understanding of the context of

23  which that witness's evidence is going to play out and how

24  the other evidence is coming in.  The complication that that

25  creates, of course, is for your opening statements.  Not

Page 227

1   knowing what witnesses in advance are going to be -- or what

2   experts in advance are going to be admitted.

3           I am kind of going back and forth on this.  And in

4   a trial like this, there's no question that there's going to

5   be some evidence that's going to be referenced in the opening

6   statements that for whatever reason, whether it's because of

7   evidentiary objections or whatever, ultimately is not going

8   to come in and the opposing counsel is going to have the

9   opportunity in closing to say, you know, my opposing counsel

10  said that he would show you this evidence.  Obviously, it did

11  not come in.  And, you know, that's going to be back and

12  forth.

13          So I'm not partly concerned about any one piece of

14  evidence or even a handful of evidence coming in or being

15  referenced in opening statement that ultimately does not come

16  in.

17          And it also will impose on counsel the obligation

18  to think long and hard before they make representations to

19  the jury during their opening statement.

20          But as opposed to, as I went through and started

21  writing tentative rulings down or each one of these

22  witnesses, it's very dynamic and very fluid, and the

23  characterization that I'm receiving in the briefs is such, so

24  limited, and the context is so lacking that I'm finding it

25  difficult to making these rulings at this point.

1    So I think in combination with a notice of 48 hours

2    and providing counsel the opportunity, you know, for example,

3    on a Tuesday, if you say on Thursday I'm going to call

4    Kenneth Holland, you know, that Wednesday morning, we can

5    hold a hearing and based on the part that's been filed and

6    whatever additional argument you want to make, the Court can

7    decide then and there.

8    Now, it may be that there's a particular -- there's

9    a few particular motions that the Court really needs to

10   address before trial.  And if there are, I would entertain

11   your views.  But that's the general approach that I'm

12   thinking of proceeding.  So I'd like to hear counsel's

13   response.

14   MR. NOLAN:  Your Honor, I think that that might be

15   a good way to handle it.  One other proposal would have been

16   to -- although the Court -- you have motion calendars on

17   Mondays.  And rather than taking up the Mondays, we're off on

18   Mondays.  You're not in this case.

19   THE COURT:  Believe me, I've got plenty of work on

20   Mondays.

21   MR. NOLAN:  So I think this could work, and we'll

22   see on a rolling basis and maybe doing it that way.  One

23   thing, your Honor, I had understood from Mr. Quinn in our

24   last presentation, although I wanted to be told like the

25   following week all of the week so that everybody could adjust

1    and move and people have to come in from outside.  I mean, a

2    lot of the experts are not located here.

3             You know, a lot of the witnesses are not located in

4    California.  48 hours' notice could get them travel

5    arrangements and getting them out here, I think, could be a

6    problem.  I had understood that Mr. Quinn had agreed for a

7    longer notice with respect to MGA employees.  And although

8    Mr. Quinn -- I just have to say this, your Honor.  Mr. Quinn

9    made a statement, and I was a little surprised when he said

10   I've never had to give that much notice.  I have to tell you,

11   your Honor, I have never tried a case in Federal Court

12   where -- and I'm not saying you should change your rules,

13   but --

14            THE COURT:  I understand, Counsel.

15            MR. NOLAN:  In this case, with all of the travel

16   commitments that people have, we do not have a single

17   witness, other than I think Mr. Lind, who lives in

18   Los Angeles.

19            THE COURT:  You've all tried a whole bunch of

20   cases.  None of you have tried a case before me.

21            MR. NOLAN:  That's true, and I understand that.

22   And I apologize, and we shouldn't be either bragging or

23   complaining that other people have imposed restrictions on

24   us.  That was not the point.  All I was trying to say, your

25   Honor, is that there are no surprises in this case.

 1          You know, we've sliced and diced and put it into a

 2   Vegematic, and everybody understands it's -- we're not

 3   looking for a competitive advantage, because I'll have to do

 4   the same thing.  All I'm saying is, for instance, 48 hours

 5   just this weekend, okay?  If we get notice Friday afternoon

 6   that people have to be here in court on Monday, or Tuesday,

 7   rather, we're working Memorial Day weekend.  But I don't know

 8   what everybody else's schedule is, and yet everybody will

 9   have to drop.

10          I'm just saying there isn't any game playing here.

11   It's just more of a convenience for the efficiency of

12   presentation of evidence.  And you know what?  It's also

13   going to apply to me with people putting on my case.  No one

14   is going to win this case on a "gotcha."  There's too many

15   lawyers here.  I'm more concerned about the witnesses that

16   are going to be called and their respective schedules.

17          So maybe a 72-hour notice might be a little bit

18   more helpful.  And really, your Honor, it's in complete

19   consideration of the third party witnesses.

20          THE COURT:  Very well.  This is the feedback I

21   wanted, Counsel.

22          Let me hear from Mr. Quinn.

23          MR. QUINN:  Your Honor, both of these companies are

24   local.  The MGA employee witnesses are all here.  This isn't

25   a concern about arranging their expert's schedule.  We're not

1  calling their experts.  We're going to call our experts.  And

2  we can give them 48 hours' notice of when our experts will be

3  here.  We're going to call some Mattel employees.  We will

4  give them 48 hours' notice.  That's longer than I would have

5  preferred.  We call MGA employees, they are local MGA

6  employees.  I think 48 hours' notice is ample.  Counsel's

7  arguments that there are no surprises here, it's all on the

8  table, he think cuts in favor of not giving some kind of

9  extraordinary extended notice.

10         THE COURT:  Very well.  I'll take your respective

11  positions on the amount of time.  But what about the thoughts

12  of proceeding and taking these witnesses as they come up in

13  the context of the trial as opposed to trying to figure out

14  and impose restrictions on both sides at this point?

15         MR. QUINN:  You mean the expert witnesses?

16         THE COURT:  The ones that are the subject of the

17  motions in limine.

18         MR. QUINN:  I -- we think that makes sense, your

19  Honor.

20         THE COURT:  Very good.

21         MR. ZELLER:  I'm not necessarily strongly

22  advocating this, but I do think there is one set of experts

23  that we might be able to deal with initially.  Without having

24  that hearing, which is really pertaining to professors Menell

25  and Lind.  You know, I think it's fair to say that our

1    position is fairly simple.  We designated Professor Lind

2    because they brought a copyright law professor in to come in

3    and talk about copyright law.  We don't think that's

4    appropriate.  Obviously, if Professor Menell is out,

5    Professor Lind has no further function in the case that I

6    could possibly think of.

7              THE COURT:  Well, and I don't.  I think I made some

8    comments earlier today about the whole idea of having

9    professors in and instruct the jury about the law.  I think

10   that's quite confusing.  We have our hands full if we have to

11   sit down and come up with jury instructions, but I want the

12   jury to be instructed once.  I don't want them to be

13   instructed by the Court having followed an instruction by

14   Professor Lind and an instruction by Professor Menell.

15             Now, I understand there may be some other issues

16   that the experts, some nonissues that they want to speak to,

17   and the Court would consider that.  But both sides can be

18   assured right now that neither of their legal experts are

19   going to be speaking on legal matters to the jury.

20             That's going to be the -- that's not going to be an

21   easy thing to do, and I'm not saying that there might not be

22   benefit if we all could agree on some legal expert to come in

23   here and give us all a tutorial.  But understanding that

24   that's not likely, we're going to have to go with our jury

25   instruction process.

1          MR. NOLAN:  And, your Honor, on behalf of MGA, we

2    accept that with respect to -- in fact, Mr. Zeller's offer

3    with respect to Mr. Lind, we accept it for Mr. Menell, with

4    the Court's one exception, and that is I just want to review

5    back and see whether or not there are any other factual

6    points that they can testify.  But I assure you, your Honor,

7    we understand and we accept the Court's ruling that Professor

8    Menell --

9          THE COURT:  With respect to those factual reports,

10   I know in the motion in limine brought by Mattel, there are

11   some objections, more the factual points are the foundation

12   on which you can make that factual testimony.  But that's the

13   type of testimony we can take up in the context of a Daubert

14   evidentiary hearing prior to starting the --

15         MR. NOLAN:  Your Honor, and I believe there's just

16   one other expert that we could address that goes to the

17   context.  And if I could have my partner Ms. Aguiar make that

18   point.  Maybe you'll disagree.

19         THE COURT:  Before we do that, Mr. Zeller, were you

20   finished?

21         MR. ZELLER:  Yes, I was, your Honor.

22         MS. AGUIAR:  Your Honor, I understand your point

23   about needing context for some of the expert witnesses.  I

24   think one discrete exception is Kenneth Hollander because we

25   make a specific argument, actually a series of arguments.  It

1   really doesn't go necessarily to his qualifications.  It goes

2   to whether the substance of his report, which is essentially

3   a survey that he's done, whether that is in and of itself

4   admissible in this case.

5          So I do think that's a discrete issue.  I know that

6   Mr. Quinn has at least once to my memory already mentioned to

7   you that hey, we have a survey that 90 percent of young girls

8   recognized the drawings purportedly as Bratz.

9          THE COURT:  Do we have Mr. Hollander here present?

10          MS. AGUIAR:  He's being offered by Mattel.  So I

11   certainly don't -- do we have him here?  I don't know.

12          MR. QUINN:  No, he's not here.

13          THE COURT:  So we wouldn't be able to proceed with

14   a Daubert hearing at this point.

15          MS. AGUIAR:  Well, I guess my point is that it's

16   really not a question of whether he is qualified.  It's --

17          THE COURT:  Well, you say -- in your paper you do

18   take issue actually with his scientific work.

19          MS. AGUIAR:  I take --

20          THE COURT:  If you want to waive that and rest

21   entirely on the legal argument, I'll consider that.  If you

22   want to waive all of the Daubert-related challenges.

23          MS. AGUIAR:  What I'd like to have your Honor

24   consider is our legal arguments, that the type of survey that

25   he's done is not admissible in a copyright case.  And I do

1    think there is a very strong argument based on the law that

2    it's not.  I don't know that I should have to be put in a

3    position to waive my arguments with regard to --

4              THE COURT:  You don't have to do anything, Counsel.

5              MS. AGUIAR:  I understand, but I think it's a

6    discrete issue that we could address today.

7              THE COURT:  No question we could.  There's a lot of

8    discrete issues that I suspect we could address.  But for the

9    sake of judicial economy, I'd like to address these together

10   and in context because I think also in your motion you also

11   suggest that other intrinsic evidence and experts should be

12   excluded as well, not just in this report.  So this is an

13   issue which is going to come up perhaps with other experts as

14   well; is that correct?

15             MS. AGUIAR:  We do say that, you're correct.

16             THE COURT:  All right.  So let's -- I'm afraid if I

17   go down creating an exception here, there's an argument on

18   each one of these for creating an exception.

19             MS. AGUIAR:  I understand.

20             MR. NOLAN:  On this one, though, with opening

21   statement, it's a very dangerous issue.  Because you have

22   warned us that we proceed at our own risk in the opening

23   statements, and I accept that, and I understand that.  I

24   suppose, though, allowing them to argue --

25             THE COURT:  They are not going to be allowed to

Page 236

1  argue in opening statement.

2              MR. NOLAN:  So we are going to change rules on

3  that?

4              I apologize for that last comment, your Honor.

5              With respect to the survey or talking about the

6  survey, there is a fundamental issue of whether or not those

7  surveys should even be mentioned or used at all in this case.

8  And for them to make a reference to that in opening statement

9  or show anything from the survey in opening statement --

10             THE COURT:  Mr. Quinn says he won't make any

11  reference to it in opening statement.

12             MR. NOLAN:  Perfect.  Thank you.

13             THE COURT:  All right.  That takes care of that.

14             MR. NOLAN:  Thank you.

15             THE COURT:  So we'll bring this up if and when

16  Mattel wants to call that witness.  We'll have our hearing.

17  We'll have the witness here.  We can go through it.  You can

18  fully explore all the of the issues, both the alleged

19  defectiveness of the survey as well as the legal arguments as

20  to why that survey should not be, or intrinsic evidence

21  should not be admitted, and we'll go from there.

22             I need to break a little early today because I want

23  to get the order for my Monday hearings out.  So we got

24  through the MGA motions except for the last three, which I

25  understand.  I haven't read those.  I'll read those tonight.

Page 237

1      We'll pick up with those in the morning, get

2 through the Mattel motions and the discovery motions, and

3 that's my goal for tomorrow.  I want to get this order out

4 this evening, though, concerning Monday's hearing.  And then

5 Friday is reserved for the pretrial conference order.

6      After we finish up tomorrow, I'm going to send you

7 all off, and we'll probably meet sometime on Friday once

8 you've had a chance to hopefully incorporate all of these

9 rulings into the pretrial conference order.

10      Mr. Olivar?

11      MR. OLIVAR:  Your Honor, I've spoken to my people

12 with the unsealing issue which we discussed earlier today,

13 and it's been pointed out to me that there hasn't been a

14 review and meet and confer on the parties regarding the

15 documents filed since May 16.  So I wanted to advise the

16 Court of that so if the Court issues an order unsealing the

17 file, other than documents that are identified in the joint

18 reports, we'd appreciate it if it be up to, say, the date

19 such as May 16th, and then we could do a later review

20 according to the Court's time line as to the subsequent

21 documents.

22      THE COURT:  Very good.  And I trust that since the

23 Court has issued an order that there's not going to be any

24 filings of motions without leave of Court once the trial

25 starts on the 27th, what we would be talking about is dealing

Page 238

1    with the 16th of May through the 27th of May.  And we'll deal

2    with that in a supplemental order, and then we'll be -- at

3    that point in time, we should stop the under seal filing.

4              MR. OLIVAR:  I can't promise anything about future

5    filings, but my understanding is there's a lot of things

6    about the motions in limine that are still under seal that we

7    need to go through.  So just -- I just want to make sure that

8    the order that the Court issues doesn't go after May 16th.

9              THE COURT:  Thank you, Counsel.

10             Anything else?

11             See you tomorrow morning at 9:30.

12

13             (Proceedings concluded at 4:55 P.M.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 239

C E R T I F I C A T E

     I hereby certify that pursuant to Title 28, Section 753 United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings in the above matter.

     Certified on May 21, 2008.


_____
MARK SCHWEITZER, CSR, RPR, CRR
Official Court Reporter
License No. 10514