UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

---

| | | |
|---|---|---|
| MATTEL, INC., | : | PAGES 1- 76 |
| | : | |
| PLAINTIFF, | : | |
| | : | |
| VS. | : | NO. ED CV04-09049-SGL |
| | : | [CONSOLIDATED WITH |
| MGA ENTERTAINMENT, INC., | : | CV04-9059 & CV05-2727] |
| ET AL., | : | |
| | : | |
| DEFENDANTS. | : | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

THURSDAY, MAY 22, 2008

MORNING SESSION

MARK SCHWEITZER, CSR, RPR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
181-H ROYBAL FEDERAL BUILDING
255 EAST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012
(213) 663-3494

1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4        Quinn Emanuel
         By John B. Quinn, Esq.
5            B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
6            Harry Olivar, Esq.
             John Corey, Esq.
7            Diane Hutnyan, Esq.
         855 South Figueroa Street
8        10th Floor
         Los Angeles, CA 90017
9        (213) 624-7707

10

11   On Behalf of MGA Entertainment:

12       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
13           Carl Alan Roth, Esq.
             Jason Russell, Esq.
14           Lauren Aguiar, Esq.
             David Hansen, Esq.
15           Matthew Sloan, Esq.
         300 South Grand Avenue
16       Los Angeles, CA 90071-3144
         (213) 687-5000

17

18

19

20

21

22

23

24

25

1                                      I N D E X

2

3                        MATTER:    MOTIONS IN LIMINE.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Riverside, California; Thursday, May 22, 2008

2                          9:47 A.M.

3          WHEREUPON THE CASE HAVING BEEN CALLED AND

4          APPEARANCES GIVEN, THE FOLLOWING PROCEEDINGS

5          WERE HELD:

6          THE COURT:  Good morning, Counsel.

7          MR. QUINN:  Your Honor, could I just address a --

8    something we received overnight and one loose end from

9    yesterday?

10         THE COURT:  Okay.

11         MR. QUINN:  Thank you, your Honor.  We received a

12   reply memorandum in further support of the supplemental

13   declaration of Marina Bogorad, apparently filed overnight.

14   This relates to the issue about whether Mattel received the

15   drawings in September rather than October.  At some point

16   we'd like to discuss that.  There is a statement or a

17   suggestion -- actually more than a suggestion -- that a fax

18   was doctored by us or Mattel.  At some point, when the Court

19   considers it appropriate, we'd like a chance to respond to

20   that.

21         THE COURT:  Well, one thing that I want to mention

22   to both parties in that regard, the Court did see that when I

23   arrived this morning.  When I give leave to one party to file

24   something, a response, that should not be taken to imply to

25   the other party that they then have leave to file a

1  supplemental response to that response.  We've got to stop

2  the madness at some point in time.  I'm trying to restore

3  balance as best I can to a situation.  You undo the balance

4  when you submit another reply.  And this is as good an

5  illustration of that as any.

6          MR. NOLAN:  Your Honor, it was -- I think this may

7  be the first and maybe last time that this happened, and I

8  will tell you, I made the call myself.  When we got the

9  papers, I had asked for them during the day.  Although it was

10 E-filed, we checked and didn't get a copy until we got home

11 last night.

12          I looked at it.  I knew the Court was working on an

13 order.  I thought that some of the issues that had been

14 raised were important enough, and I know that you said that

15 we needed to ask for leave to do that, but I didn't

16 realize -- I didn't know whether or not the Court would be

17 issuing the order before --

18          THE COURT:  I haven't issued the order this

19 morning, but on the statute of limitations, I finished ruling

20 everything on the motions for summary judgment and the motion

21 for reconsideration except the statute of limitations, which

22 I have deferred further.  And I'm -- let's talk about this

23 now.  While the thoughts are still fresh in my mind from

24 about three o'clock this morning, let me address these.

25          One of the issues I'm really struggling with right

1  now on the statute of limitations is the interplay between

2  the evidence that Mattel wants to introduce with respect to

3  Toon Teens.  And I understand the argument that Mr. Quinn to

4  be making how Toon Teens is probative to the timing of the

5  issue on the breach of contract and when it was that Carter

6  Bryant came up with the idea for Bratz.

7          I understand your argument, sitting next to Lily

8  Martinez and seeing the Toon Teens, and that might be

9  probative of that he was inspired by those Toon Teens, given

10  his comment, certainly not dispositive on the point, but I

11  understand your argument on that.

12          MR. QUINN:  Your Honor, we --

13          THE COURT:  But that then plays into the statute of

14  limitations argument.  I can see the relevance to that in

15  terms of the timing on the breach issues.  What I'm

16  struggling with now is that to the extent that that is true,

17  that also plays into the timing issues on the statute of

18  limitations.  And I don't know if you can have it both ways.

19          I mean, to a certain extent, when I was doing my

20  statute of limitations analysis, I was kind of excluding the

21  Toon Teens.  Now that it's coming back in, and I'm starting

22  to be open to your rationale in terms of admitting that

23  evidence for purposes of timing on breach, that's playing

24  into the Court's analysis now in terms of timing on the

25  statute of limitations.

1          So I want to hear from both sides on that.

2          MR. QUINN:  Sure.  I understand the dynamic there,

3   your Honor.

4          THE COURT:  Particularly with Ms. Martinez.  The

5   point is underscored by her presence as your representative.

6          MR. QUINN:  Right.  And I understand the point that

7   the Court is making.  And there is no claim made, never has

8   been a claim made that Toon Teens was copied.

9          THE COURT:  And I understand that.

10          MR. QUINN:  And, in fact, you know, to avoid jury

11   confusion, I think the jury can be instructed that there is

12   no claim made by Mattel that Mr. Bryant did anything wrongful

13   in copying Toon Teens and that you are to hear that evidence

14   solely for the purpose, that it's only relevant to the issue

15   of timing.

16          So I think we can deal with that jury confusion

17   issue.  The claim here has always been that while he was

18   working at Mattel, he created something that we owned.  And

19   we had no basis for believing until we saw those Hong Kong --

20   until we saw the contract for thinking he had created

21   something that we owned while he was at Mattel.

22          The theory always was, or the concern always was

23   here Carter Bryant is gone.  The Bratz drawing is introduced,

24   or doll is introduced into the world, and people start

25   thinking that looks like Toon Teens.  Maybe after he left he

1   copied Toon Teens.  People saw similarities.  That's one

2   claim that was investigated.  People looked at it and decided

3   we're not going to pursue that.

4           There was never an inkling, and I don't think

5   there's any suggestion in the record, no evidence that I'm

6   aware of has been pointed to that anybody thought that he had

7   created something which Mattel owned by virtue of his

8   contract while he was there.

9           THE COURT:  But for the very reason that you

10  believe this evidence is probative, that you believe that a

11  jury should be able to say oh, well -- that a reasonable

12  person should be able to say that oh, well, he was working

13  next to Ms. Martinez.  He saw the Toon Teens.  That's when he

14  came up with the idea.  That's when he did the drawings.  And

15  you want a reasonable jury to infer that.  Certainly the

16  reasonable folks at Mattel, in their investigative

17  department, should have had the same idea and started

18  investigating that from the get-go or as soon as they saw the

19  introduction of the Bratz doll.  No?

20          MR. QUINN:  What basis would they have had to think

21  they did it while he was at Mattel?

22          THE COURT:  The same basis that you want this jury

23  to infer.

24          MR. QUINN:  Suspicion, sure.  What we want the jury

25  to infer is the inspiration from seeing the common elements.

1  That's a different question as to whether Mattel has a basis

2  to bring a lawsuit based on the contract claim.  It's

3  entirely consistent for him to have left Mattel.  He's seen

4  Toon Teens.  He creates something.  It appears in the world

5  after that.  That's what folks looked into.  But there is

6  simply no evidence to think that there was a contract claim.

7  That's utter speculation.

8          Why should they have gone to court to bring a

9  contract claim?  What made them think -- let's say he's

10  sitting next to Lilly.  He wasn't sitting next to Lilly, but

11  close to Lilly.  What would make anybody think that he

12  necessarily -- or there was reason to bring a lawsuit that he

13  had created that while he was still working there?  There's

14  just no evidence that he created it while he was still

15  working there.  And that would be the contract claim.  That's

16  the claim we're suing on.  That's what we have to focus on.

17          THE COURT:  I understand that.  I understand, and

18  the Court is attempting to come up with the accrual for the

19  actual claim in the lawsuit, not some other claim.

20          MR. QUINN:  Your Honor, last night, yesterday,

21  there was some suggestion that perhaps the idea that Toon

22  Teens in any fashion was in this case was a surprise.

23          We assembled from the record, your Honor, last

24  night, and we'd like to file with the Court a declaration

25  showing consistently throughout this case where we have said

b53971f5-200a-4937-84db-4424603b6038

Page 10

1   in the record, and they have pursued discovery on this, that

2   Toon Teens was relevant to timing, that we weren't pursuing

3   the copyright claim or a copying claim, but it was relevant

4   to the determination of timing.  So there's been no

5   sandbagging here, and I'd like permission to file --

6            THE COURT:  Let's hold off on that for now.  We'll

7   come back to that.

8            Mr. Nolan?

9            MR. NOLAN:  Your Honor, a couple of points.

10  Because I think that your Honor has put its thumb and

11  attention on this case which Mattel would prefer to analyze

12  as though they were sandbagged or deal with by saying we're

13  not suing on Toon Teens, and I'm just of the mind that that's

14  not relevant to the inquiry that I think you have to struggle

15  with in this case.  And what I go back to is the long line of

16  cases that talk about what is reasonable suspicion.

17           A couple things interesting.  We almost have

18  everybody conceding that there was suspicion, even Mr. Quinn.

19  If you work on that, and remember that Toon Teens was never

20  published anywhere.  It was proprietary information within

21  Mattel.  Shortly after -- and I'm not going to repeat all the

22  evidence of the -- you know, that Nordquist thought he was

23  lying about where he was going to go to work and stuff like

24  that.  But I will ask the Court to remember the Ivy Ross

25  testimony, that as early as the summer of '01, everybody knew

1   that Carter was the creator.  In fact, we showed yesterday in

2   the argument the My Scene 360 where Lily Martinez says Carter

3   was the creator.

4           This case, especially in Phase 1 on ownership, and

5   even with the Court's ruling this morning about breach of

6   fiduciary duty, duty of loyalty, that type of thing, in

7   essence Mattel's claim at its gut level is that Carter Bryant

8   breached his contract by taking something from Mattel that he

9   wasn't entitled to.  It's not so much if he took it after he

10  left or not.  I mean, that's maybe what the jury sorts out.

11          But in the statute of limitations analysis, your

12  Honor, I think this is what Jolly teaches us, and this is

13  what Solomon teaches us.  And interestingly, although both of

14  them are product liability cases, one of them deals with a

15  smoker's situation, and the smoker is saying there is enough

16  information out there to let you know that there was a

17  problem with nicotine and cigarettes.  I think it's the

18  Solomon case.

19          Here, as soon as Bratz comes out, they know that

20  Carter is working at Mattel.  There is suspicion at that

21  point in time.  This is what Mr. Quinn has already --

22          THE COURT:  Let me stop you just right there.

23  What's the undisputed evidence that MGA knew that Carter was

24  working at Mattel?

25          MR. NOLAN:  I'm sorry?

b53971f5-200a-4937-84db-4424603b6038

Page 12

1          THE COURT:  You said they knew that Carter was

2     working at --

3          MR. NOLAN:  I think the reversal.  When did Mattel

4     know that Carter was working at MGA?

5          THE COURT:  Okay.  I'm sorry.  Very well.  That's

6     just another issue I was thinking about earlier, is whether

7     or not there is clear evidence that when did Mattel know

8     that -- MGA know that Carter was working at Mattel before he

9     came over?  I don't know if that makes sense.  There's an

10    issue we'll get back to.

11         MR. NOLAN:  Okay.  I think that although we say

12    that they were on notice, if you would, of an issue regarding

13    employee misrepresenting, if you would, during the course of

14    an exit interview, where they were going to go to work,

15    Nordquist, and we've cited to Nordquist.

16         THE COURT:  Fair enough.  I grant you there's clear

17    evidence that --

18         MR. NOLAN:  But here's the point I wanted to make.

19    And this is in the summary judgment.  I don't know whether or

20    not we emphasized this.  Mattel marks on his employment exit

21    interview that Carter is not eligible for rehire.  And the

22    evidence in the case is that -- I mean, he complied, as far

23    as Mattel knew, you know, he gave two weeks' notice.

24    Typically, if you were walking out and you were going to work

25    for a competitor, those would be the circumstances where you

Page 13

1   would be marked as ineligible for rehire.

2           So that was right at October when he walks out the

3   door.  They tag him as not being eligible for rehire.  His

4   supervisor believes he's lying, and she says, it's the quote

5   that we played, that the only thing he could do is go and

6   design a doll.

7           Now, just stop for a moment, and then you put in

8   there that by the summer of '01, everybody knows that Carter

9   is behind Bratz, and Bratz is issued by MGA.  There's no

10  doubt about that because the marketplace, you'll recall,

11  reacted readily at the toy fair, which is in --

12          THE COURT:  I'm comfortable with that, Counsel.

13  I'm comfortable with the fact that it was understood that

14  Carter was associated and connected with Bratz.  I don't

15  think Mattel is going to dispute that.

16          MR. NOLAN:  Let me continue on this one, your

17  Honor.  Then you have the e-mail from Lisa Cloonan, when she

18  sees Bratz, that says oh, my gosh, it looks so similar to

19  Toon Teens.  It has Lilly's eyes and has this and this and

20  has that.

21          At that point in time, what I believe Mattel is

22  urging you to adopt is a standard that no court has adopted

23  in analyzing statute of limitations, and that you then switch

24  over to a Rule 11 analysis as to whether or not they could go

25  and file a claim.  That's not what we're saying.

Page 14

1          THE COURT:  But let me stop you.  Okay.  Let's

2    assume that they at that point have a reasonable basis to

3    bring a claim that Bratz infringes on Toon Teens.  Fair

4    enough.  If that was the case that was before me right now,

5    this motion would be a lot easier to resolve.  That's not the

6    case that's before me.

7          MR. NOLAN:  But I think it is in this respect, your

8    Honor.  I know they say it doesn't infringe.  But, you know,

9    we have two -- and I'm just doing this in my own mind.  I

10   apologize.

11         THE COURT:  Don't apologize because I've been doing

12   that for the last 16 hours now in my mind.

13         MR. NOLAN:  There's actually two cases that we're

14   trying.  One is the ownership of Bratz, but, you know, in a

15   way, that's a disguised way of describing the contract terms

16   and the breach of the contract terms.  The breach of the

17   contract terms includes the notion that Carter borrowed from

18   Toon Teens, that he converted product.  He took, we contend

19   trash, the skull, the dummy doll, and all of that while he

20   was employed at Mattel.  No issue about drawings just yet.

21         THE COURT:  All right.  I've come across the same

22   thought myself, and I'll tell you the problem that I'm having

23   with it so you can respond.

24         MR. NOLAN:  Okay.

25         THE COURT:  Is it's one thing to say that Mattel

1   had enough evidence to say, in this time period that we're

2   talking about here, that this Bratz doll looks enough like

3   Toon Teens that you can go into Federal Court and make the

4   argument that Bratz is copying Toon Teens.

5           But it's another thing to say that he actually came

6   up with Bratz while he was at Mattel.  Because the contract

7   ends once he leaves Mattel, and then it becomes purely a

8   copyright infringement case.  The only way you get to the

9   contract case is if he did something while he was at Mattel.

10  Just having the idea, as we all agree, is not the copyright.

11  It's that he had to have done something while at Mattel.  He

12  had to draw something.  He had to reduce the design -- reduce

13  it to a design or to something on paper.

14          And for this case, the question seems to be is when

15  does Mattel know that.  I'm sorry to interrupt, but I want

16  you to respond to where I'm at.

17          MR. NOLAN:  No, I understand.  And what I'd like

18  you to do just for a moment is to move the drawings aside for

19  just a second.

20          THE COURT:  Okay.

21          MR. NOLAN:  Okay.  Because with all due respect, I

22  think that we're hung up on the drawings.

23          THE COURT:  Perhaps.

24          MR. NOLAN:  So this is what I want you to focus on

25  for just a moment.  I want to go back to Mattel, its

Page 16

1    confidential agreement.  I want to go to the exit interview

2    process, and, of course, the documents are part of the

3    summary judgment motion.  As part of the exit interview,

4    Carter signs a document.

5              At no time, at no time, even today, could Carter

6    use proprietary information that he learned while he was at

7    Mattel.

8              THE COURT:  Okay.

9              MR. NOLAN:  The contract that he signed and his

10   exit interview, where he signs another document where he more

11   or less transfers anything over that he made while he was

12   working at Mattel, and we have a lot of testimony that that

13   contract was misleading and et cetera, but I don't think

14   that's going to be even an issue now with Carter out of the

15   case.  But in any event --

16             THE COURT:  But is that the claim that's being

17   brought in this case?

18             MR. NOLAN:  Oh, yes, your Honor.

19             THE COURT:  That contract?

20             MR. NOLAN:  Well, they rely on it.  They say that

21   he took proprietary -- you know, I guess what I'm saying in

22   an inarticulate way is that if you say he borrowed from Toon

23   Teens, even if he borrowed it while he was at MGA, that is a

24   violation of the confidentiality agreement that he had signed

25   at Mattel.

Page 17

1          THE COURT:  At his exit interview.

2          MR. NOLAN:  At his exit interview and also, your

3    Honor, when he started his employment, because at all times

4    while he was under employment, he contracted to keep

5    confidential the proprietary information that he had access

6    to at Mattel.

7          That obligation did not -- was never released, and

8    so when they say that he borrowed from Toon Teens, that's a

9    breach of his contract.  And what we're saying, your Honor,

10   is that the moment they suspected that it was Toon Teens that

11   he had borrowed from, they were under reasonable suspicion to

12   then initiate an investigation.  And I'm not commenting on it

13   because I don't want Mr. Zeller to stand up and accuse me of

14   this.  We don't know what they investigated.

15         But, your Honor, this case and this argument and

16   the mini opening statement that Mr. Quinn made was to the

17   point that Carter stole stuff from Mattel.  That's part of

18   this case.

19         And, your Honor, what we're saying is that with

20   Toon Teens, with Toon Teens, that's the fact that puts them

21   on reasonable suspicion to do an investigation.  And this is

22   what the investigation would have done.  They would have gone

23   in, and they would have said does everybody agree with the

24   press, that this looks like Diva Starz and Toon Teens.

25         I'm not talking about a copyright violation.  I'm

b53971f5-200a-4937-84db-4424603b6038

1    not talking about a copyright violation.  I'm just talking

2    about, darn it, he must have taken something from us because

3    of the big eyes and the similarities.  Maybe it doesn't

4    equate to a copyright violation, but it at a minimum

5    constitutes a violation of our employment agreement.

6            Now, we lost the summary judgment motion on the

7    enforceability of the contract in that it was not ambiguous.

8    But I think the Court will recall that Carter Bryant's

9    lawyers, and we were trying to make the better argument, to

10   be frank with you.

11           What we were trying to do is put into context to

12   say well, wait a minute, if this contract is so clear on its

13   face and unambiguous, then the minute that they saw the

14   similarities, Mr. Quinn described it yesterday as being very

15   close.  Today he said suspicion for sure, that they were on

16   notice at that point in time, suspicion, to conduct an

17   interview.  They would have learned from Lily Martinez that

18   Lily Martinez, Cassidy Park, believed that he had plagiarized

19   things from Toon Teens.  We know that from the investigative

20   file.  That's the March 28, 2002, entry that says Carter

21   Bryant, illustrator of Bratz, plagiarized Lily Martinez.

22           Your Honor, that's what we're talking about here

23   today that he borrowed from.  Now, plagiarized and borrowing

24   maybe legally have different connotations, but from a

25   reasonable suspicion point of view, we say, your Honor, and

b53971f5-200a-4937-84db-4424603b6038

Page 19

1    we feel really strong about this issue, that now that they

2    have taken the position that Toon Teens is in the case, and I

3    see that Mr. Quinn wants to submit this on the record about

4    that we weren't sandbagged, your Honor, it's not a question

5    of being sandbagged.

6           That's not what we're arguing, but, your Honor, it

7    says here in their counterclaim in this case, your Honor,

8    paragraph 26 says, more specifically, while Bryant was

9    employed by Mattel, Bryant and other counterdefendants

10   misappropriated and misused Mattel property and Mattel

11   resources for the benefit of Bryant and MGA.  Such acts

12   included but are not limited to the following:  A, using his

13   exposure to Mattel development programs to create the

14   concept, design, and name of Bratz.

15          We heard that yesterday or the day before.  I

16   think -- I forget even what day it is this week.  I don't

17   know how the Court has kept up with this, but I think it was

18   on Monday summary judgment, Mr. Zeller was arguing about the

19   name Bratz, that they were contemplating.  So that's one

20   issue.

21          The minute they see Bratz, forget the design, all

22   of a sudden they see something out there called Bratz, and we

23   were looking at that and considering it, and that's their

24   testimony, that would have put them on notice immediately

25   when they saw it come out in the press.

b53971f5-200a-4937-84db-4424603b6038

1          B, using Mattel resources and while employed by

2    Mattel, Bryant worked by himself and with other Mattel

3    employees and contractors to design and develop Bratz,

4    including without limitation by creating drawings and three

5    dimensional models of Bratz dolls and fashion designs of the

6    dolls' associated clothing and accessories.

7          THE COURT:  Slow down on reading, please.

8          MR. NOLAN:  But the key is using his exposure to

9    Mattel development programs.

10          I referred you in the earlier argument to the

11   expert report of Loetz, where Loetz is opining as to the

12   similarities with Toon Teens.

13          But this is my Clint Eastwood moment, to use

14   Mr. Quinn's argument before.  I think it's very interesting

15   that lawyers in Hong Kong that are not connected with Mattel,

16   that are defending an infringement case against -- brought

17   against them by MGA, this is in November of 2003, merely upon

18   reading The Wall Street Journal article that came out, said

19   we understand that Carter Bryant took material from

20   proprietary information, and on that basis alone, without

21   having any of the other knowledge, they asked Mattel to

22   assist them, to go to Tokyo with Toon Teens because they want

23   to assert Toon Teens as the artistic work upon which Bratz

24   was based.  And, in fact, they ultimately do.

25          And I guess my point is this, your Honor, is if

Page 21

1   counsel across the world in reading a newspaper article can

2   put two and two together about Toon Teens, why didn't Mattel

3   do that immediately in October of 2000, or certainly at the

4   New York toy fair, or certainly the moment that someone said

5   there's a new doll that's coming out, and it's Bratz.  Carter

6   Bryant went over to Mattel.

7          Your Honor, I think at that point in time, the

8   evidence is overwhelming that Mattel could have conducted an

9   investigation.

10          Now, could they have discovered exactly what they

11   are now claiming in this case?  I don't know that, but I

12   respectfully submit, your Honor, that you don't have to go

13   there because that's not what the standard is.  They had a

14   standard to conduct the investigation.  They could have sued

15   based on enough information that they had.

16          Lily Martinez, the next cubicle over.  If they had

17   talked to Lily Martinez, if they had just simply talked to

18   Lily Martinez, the testimony is going to be that Carter

19   Bryant said I really like your stuff.  It's really cute.

20   Mattel would be stupid not to do that.  They want to put that

21   evidence in front of the jury.

22          They could have found that out in a heartbeat.

23   They could have then looked at the phone records, because

24   they do it, and there's 18 phone calls to MGA right at that

25   period of time.  And that's in October.  Then the toy fair

Page 22

1    comes out, and they know about Bratz, and everybody is

2    commenting about the similarities between Diva Starz.

3             So what I guess the bottom line, your Honor,

4    repeating myself as I often do in this case, and I apologize.

5    The bottom line is that it's not that they were on notice of

6    the copyright violation.  And we'll never know what standard

7    they applied in making that determination.

8             But, your Honor, respectfully, you don't have to go

9    to the drawings.  They knew at that point in time sufficient

10   information that someone had breached the confidentiality

11   agreement because they had borrowed proprietary information

12   and design information, and it influenced work that was done

13   after Carter left.

14            Thank you.

15            THE COURT:  Before you sit down, Mr. Nolan, I want

16   to ask you this question, and I'll be asking Mr. Zeller this

17   question.

18            The Court would like to be able to resolve the

19   statute of limitations argument before the trial begins, one

20   way or the other.  It's certainly not for lack of time spent

21   on this issue because I probably spent more time on this

22   issue than any other issue.  But I suppose one decision the

23   Court could make is simply to let this evidence play out at

24   trial and let the jury make findings with respect to who knew

25   what and when.  I understand the Court must ultimately make

Page 23

1    the -- determine what the accrual date for purposes of

2    statute of limitations, but there may very well be a value to

3    having findings by the jury.

4           Your thoughts.  And I'll be asking Mr. Zeller the

5    same thing, but let Mr. Nolan respond first.

6           MR. NOLAN:  The answer, your Honor, and I'll be --

7    I've actually thought about this.  I believe this is an

8    incredibly strong motion for summary judgment under the

9    Ninth Circuit standards.  Especially now with the recent

10   developments of the argument of Toon Teens.  I could

11   certainly appreciate the difficulty that the Court is faced

12   with, with, you know, all of the issues that we have to

13   expose.  I would urge the Court that there is no way

14   respectfully that on this record to grant summary judgment in

15   favor of Mattel.  I think we have the right argument.  At a

16   minimum, I think this case should go to the jury on the

17   statute of limitations issue.  But if I can go one other step

18   here, your Honor.

19          I also -- in most cases as a trial lawyer, you

20   think of a position that you'll have in the Ninth Circuit.  I

21   mean, you try cases, and then you think okay, what does the

22   record look like on appeal here.

23          Here's my problem, to be very candid.  And I think

24   we've made this point before.  This is a unique case in many

25   respects.  I don't know if we'll survive to take this case to

1    the Ninth Circuit.  A public company against a private

2    company.  This is a tough battle.  This is really a tough and

3    very expensive battle.

4            That's why we would urge very, very hard, your

5    Honor.  It's one -- you know, in some cases you can say okay,

6    if you lose, we'll take it up -- you call the client that we

7    lost, but we got a heck of appeal.  Here that phone call is

8    not going to take place because MGA will probably go under as

9    a result of this with financial pressures on it and

10   injunctions and all of that kind of stuff.

11           I guess what I would urge, your Honor, I'm not

12   backing off from the strength of my conviction, the absolute

13   strength of my conviction that Mattel has chosen -- and we

14   all do it in cases -- they have chosen a course of pleading

15   in this case which started back in deciding when they first

16   fought to file against Carter.  They fought against taking it

17   to Federal Court.  They brought it back.  Don't have to get

18   into the motives of why they did that.  That's not an issue

19   here for you.

20           But, your Honor, when they made a representation to

21   get around certain barriers at that point in time that they

22   were not going to pursue Toon Teens, and they are not making

23   a claim on Toon Teens, but in effect they are through the

24   back door.  And, your Honor, you said this yesterday.

25           Isn't that a back door to the copyright.

Page 25

1   Respectfully, I think that's the second back door.  What they

2   are actually doing is using it as a back door on the contract

3   violation and the terms because they are talking about

4   borrowings of resources.

5         They were on notice.  The world was on notice of

6   the similarities.  Those similarities gave rise to a breach

7   of or to a reasonable suspicion that they should have

8   investigated and concluded that although we may not have

9   enough for copyright violation, if they truly believe their

10  contract was enforceable, they could have filed a lawsuit at

11  that point in time.

12        No Rule 11 issue, Judge.  No issue in State Court.

13  And they have taken discovery, and that discovery would have

14  led to other issues.  And they are speculating as to what

15  would have been objected to and whatever and all that have

16  kind of stuff.  But that's not the way this analysis works

17  out.

18        Your Honor, I'll end on this.  This is a tough

19  analysis.  It's even tougher given this case and given the

20  enormity of this case.  And I'm not suggesting in any way

21  that the Court would shy away from making a tough argument.

22  Statute of limitations are rare.  But this case is one of

23  those cases where I believe the record evidence back in no

24  later than the summer of '01, and we say now with the

25  acknowledgment of Bratz and now trying to get the trademark,

Page 26

1    that they knew that then and there and could have sued then.

2              The amendment to the pretrial conference is also

3    very informative.  They have said that the trademark has

4    always been in this case.  That's more or less the point when

5    we get to the pretrial conference amendment.  And I'm not

6    taking you down a red herring here or anything else or

7    another rabbit hole.

8              All I'm saying is the overwhelming evidence now as

9    we get closer to trial, we now understand what we've always

10   believed, and that is this case, they had everything in front

11   of them that they needed, save except for the drawing.  But

12   the drawing, your Honor, is irrelevant because they are now

13   saying that we borrowed from Toon Teens, and that's a breach

14   of the confidentiality agreement.  Thank you.

15             THE COURT:  Thank you, Counsel.

16             Mr. Zeller.

17             MR. ZELLER:  Thank you, your Honor.  We sat here

18   patiently listening to his argument for about 15 minutes.

19   And not once did Mr. Nolan or anyone else for MGA identify

20   what fact they claim gave Mattel notice at any time that was

21   relevant prior to the limitations period, that Carter Bryant

22   created Bratz while at Mattel.  That is the salient fact.

23   That is the underpinning, the generic element that runs

24   through all of our claims.

25             Even now all we hear is about Toon Teens, and

1    Mattel could have sued over something else.  And also, of

2    course, that Mr. Nolan resorts yet again to David and

3    Goliath.  Really, I think it illustrates that he's not

4    talking about record facts.  He's asking the Court to

5    basically throw it to a jury because he wants to argue

6    sympathy for supposedly the little guy.

7         THE COURT:  Well, let me stop you there,

8    Mr. Zeller.  I suppose the argument is not made that

9    he actually created Bratz completely at Mattel.  What

10   Mr. Nolan is saying is that he violated the contract and

11   breached the contract and then -- ran afoul of the various

12   claims that you have made.

13        Whether Bratz was actually created right after

14   leaving, completely created afterwards or before, I think

15   Mr. Nolan is suggesting is not necessarily dispositive of

16   this issue if there is sufficient understanding that he got

17   the design, got the idea, started reducing it, whatever he

18   did.  That's not -- that's certainly not clear on the record,

19   but I think you may be talking past each other.

20        MR. ZELLER:  No, I understand.  I just wanted to

21   make those preliminary remarks because I don't think he ever

22   addressed the Court's actual question.  I'm going to respond

23   specifically to what Mr. Nolan said, but he never answered

24   the Court's question.  He's never answered the question that

25   has been raised from the beginning of this.  What facts,

1    record facts, are they pointing to to show that Mattel was

2    aware that Carter Bryant had created Bratz while he was

3    employed by Mattel or even suspected that.

4           There is no record evidence of that.  All we hear

5    is speculation pointing to redactions of privileged

6    information saying it could be.  And that's sort of the

7    lead-off point.

8           Now, let me, however, your Honor, respond

9    specifically to Mr. Nolan's argument.  And also let me say,

10   as a prefatory matter, none of this is in their Interrogatory

11   Responses.  The Court will recall, of course, that the Court

12   had to order MGA to respond to an Interrogatory to fully

13   disclose their affirmative defenses in their case and the

14   facts that they are relying on.

15          This was not in it.  It's not in a prior briefing.

16   We've obviously been going through this for weeks now, where

17   they are not making this argument, where the Toon Teens issue

18   was separately a breach of contract.

19          Setting all of that aside, however, the problem

20   with their argument is that it is absolutely factually

21   baseless.  The Toon Teens drawings were in fact published in

22   1999.  They were not solely internal at that point.  They

23   were actually used because Lily Martinez initially did those

24   drawings as the decals for a T-shirt on these dolls.  And so

25   that fashion was public.  It was public before Carter Bryant

1    even left Mattel.

2            So this notion that people automatically assumed

3    that Carter Bryant must have already breached his contract

4    because he, you know, to use their phrase, borrowed, which is

5    an inaccurate term, Toon Teens, does not lead to that

6    conclusion.

7            Mr. Nolan's entire factual predicate is wrong and

8    unsupported by the evidence.

9            Number two, even if that's the case, even if Mattel

10   were to have suspected that it somehow had a claim because

11   Carter Bryant had taken internal Mattel information, that's

12   still a different suit.  That is still a different claim.

13   That does not speak to did Carter Bryant create Bratz while

14   he was employed by Mattel.  And that is the suit that brings

15   us here today.

16           I mean literally understood, Mr. Nolan's argument

17   would basically say that if Mattel knew for a fact that

18   Carter Bryant walked out of Mattel with a box of pencils,

19   which would have technically been a breach of his contract,

20   that Mattel was at that point obligated to sue him for

21   everything.

22           THE COURT:  I think this is a lot more related to

23   the creation of Bratz than a box of pencils would be.

24           MR. ZELLER:  I understand there is some potential

25   connection, but one could always make that argument.

b53971f5-200a-4937-84db-4424603b6038

Page 30

 1          THE COURT:  And you're right.  Someone could always

 2    make that argument.  And part of the -- part of what I'm

 3    struggling with is where that line of demarcation is.  How

 4    much of the claim has to be apparent.

 5          MR. ZELLER:  Well, I would put it this way, your

 6    Honor.  If there was no dispute as to when Carter Bryant

 7    created Bratz, that they have raised, then Toon Teens would

 8    not be in the case.  Bear in mind how we got here.  We got

 9    here in talking about Toon Teens and its relevance because

10    Carter Bryant and MGA have represented to the Court that

11    Carter Bryant was inspired by a whole host of other things,

12    and he created in 1998 during a time period he was not

13    employed by Mattel.

14          Fundamentally Toon Teens is there to refute that.

15    I mean, it seems perverse in some way for a defendant

16    basically to say well, because I've interjected issues in the

17    case, that means you are time barred.  You can't respond

18    otherwise.

19          And that's why I think that there is some -- that

20    is why the cases are quite clear that look, you can't just

21    sort of look at could you have sued.  Was there some

22    generalized wrongdoing, but rather when were you on notice of

23    the claim that you asserted.  Because otherwise, we would

24    always have these kinds of arguments.

25          But also let me address the Court's point about why

1    not just send this to the jury.  I think that would be

2    problematic, and I think that the Court would really be

3    potentially creating this kind of prejudice to Mattel.  We

4    think we're entitled to it.  The undisputed facts,

5    notwithstanding Mr. Nolan's extended speculation of all

6    manner of kinds are that Mattel's claims are not time barred.

7              What I think the Court can hear from Mr. Nolan's

8    argument and see from their papers that the kinds of

9    arguments they are going to make to this jury, in addition to

10   David and Goliath and a bunch of other kinds of improper

11   arguments, are the kinds that the Court sees in the paper

12   that they filed without authorization, which literally

13   accuses of having doctored and manipulated evidence without

14   any factual basis.

15             And that's the sort of thing they are going to say

16   in front of the jury.

17             THE COURT:  Well, we've already heard in

18   Mr. Quinn's opening statement that Carter Bryant doctored

19   evidence.

20             MR. ZELLER:  But unlike that, we have experts who

21   have done scientific testing to establish that.

22             THE COURT:  Just so you know, we're going to be

23   getting to this later this morning or this afternoon on these

24   motions in limine, both sides have a lot of damming evidence,

25   and that's why we have a jury.  We're going to trial.  This

1    is not going to be a pleasant trial for either company.  So

2    both sides are going to have a lot of evidence saying a lot

3    of bad things about the other side.  And that's, you know, if

4    you want to avoid that, then let's call up the ambassador.

5            MR. ZELLER:  I understand, your Honor.  But I -- I

6    hear you.  And there's no question about that.  That is going

7    to be.  But what is different about this is that number one,

8    they use this as a vehicle for attacking the lawyers.  And in

9    particular, the outside lawyers.  I mean, I don't know if the

10   Court's ever had a trial where the issue that defendant tried

11   to make was basically about the outside lawyers.

12           THE COURT:  This is unique in the Court's

13   experience in several respects, Counsel.

14           MR. ZELLER:  And I think it's for good reason that

15   the Court hasn't seen that.

16           But also, what is the logical implication of all of

17   these arguments that they make, which is basically that trial

18   counsel ought to get up there and testify to at least deny

19   their spurious and speculative accusations.  Fundamentally

20   while this case is unique, the law does govern here, and

21   that's why I don't think Mr. Nolan's appeal to sympathy or

22   his arguments about we should be allowed to speculate freely

23   because the stakes are so high, the law doesn't change for

24   that.  The law is supposed to be equal for everybody.  And

25   it's supposed to be equal regardless of the relative size of

b53971f5-200a-4937-84db-4424603b6038

Page 33

1    the companies.

2           It's particularly absurd that Mr. Nolan would stand

3    up here and yet again make his David and Goliath argument

4    after winning yesterday a motion in limine that doesn't allow

5    us to tell the jury that in fact Mr. Larian purports to be a

6    billionaire.  You'll see that obviously this is not creating

7    a level playing field with these kinds of arguments.  And the

8    law is very clear, and in fact there are jury instructions

9    that the jury is supposed to disregard that sort of thing.

10          Yet Mr. Nolan resorts to it in every single

11   argument he makes.

12          But what I would like to do, your Honor, is to the

13   extent that the Court has any issue or any question about

14   this argument about the Toon Teens information being

15   internally proprietary.  And that should have given rise to a

16   claim, we'll be happy to put in, and I've already had them --

17   asked to have them brought over here.  I'll show you the

18   dolls.  They were out in 1999.  They are the Toon Teens

19   drawings.

20          THE COURT:  Thank you, Counsel.

21          MR. ZELLER:  Thank you.

22          MR. NOLAN:  May I very briefly?

23          THE COURT:  Very briefly, Counsel.  I think I have

24   a pretty good sense at this point.

25          MR. NOLAN:  Thank you, your Honor.  I would just

Page 34

1    like to direct the Court's attention to our opposition to

2    Mattel's corrected separate statement of uncontested facts,

3    at page 138.  And it's No. 152.  And the MGA party's

4    additional material facts reads as follows:  "The Toon Teens

5    line had never been released and remained within Mattel's

6    exclusive possession at all times."

7         The citation to that, your Honor, is Exhibit 89,

8    which is Lily Martinez's deposition at page 125, line 16,

9    through page 126, line 8.  Page 182, line 11, through 183,

10   line 14.  Citing to Exhibit 99.

11        So Lily Martinez's testimony here in the record is

12   contrary to the assertion that was just made.

13        The other thing is just simply -- listen, if I said

14   David and Goliath, I did not mean to.  I'm not playing on

15   your sympathies.  That's not what this is about.  I want to

16   cite two cases, your Honor.  This is the Solomon versus

17   Phillip Morris case that I referred to.  And I'm reading

18   from -- I think it's the WESTLAW 311 at 966.

19        It says:  "But under California law, a plaintiff

20   need not be aware of the specific facts necessary to

21   establish a claim in order for a cause of action to accrue.

22   His claim accrues when simply put, he at least suspects that

23   someone has done something wrong to him."

24        And we would argue, your Honor, that when they saw

25   Bratz and they thought that that was a proprietary name, that

Page 35

1    in and of itself is a new development.  And certainly the

2    similarities between Toon Teens and Diva Starz that even the

3    public was commenting on.

4           And then the last quote I'd like, your Honor,

5    because it is the law, this is from the California Supreme

6    Court case in Jolly.  And if I might just read from Jolly at

7    44 Cal.App. 3rd 1103 at page 6 of this opinion, it says:

8           "As we said in Sanchez, and reiterated in

9    Gutierrez, the limitations period begins once the plaintiff,

10   quote, has notice or information of circumstances to put a

11   reasonable person on inquiry.  A plaintiff need not be aware

12   of the specific, quote, facts necessary to establish a claim.

13   That is a process contemplated by pretrial discovery.

14          "Once the plaintiff has suspicion of wrongdoing and

15   therefore an incentive to sue, she must decide whether to

16   file suit or sit on her rights.  So long as the suspicious --

17   suspicion exists, it is clear that the plaintiff must go find

18   the facts.  She cannot wait for the facts to find her."

19          And our point, your Honor, is that Mattel has

20   asserted to this Court that their confidentiality and

21   inventions agreement was clear and unambiguous.  We accept

22   the Court's ruling.  You granted summary judgment on that.

23          If that's true, then they knew that the

24   similarities between Toon Teens, the name and the use of

25   Bratz, put them under reasonable suspicion.  Had they

Page 36

1   conducted investigation, they would have come upon enough

2   basis of the breach of the confidentiality agreement, the

3   breach of fiduciary duty claim, all of which we're filing

4   under 1-A, and I suspect in pretrial discovery, they would

5   have also discovered the drawings, and perhaps they would

6   have amended for a copyright infringement claim.  It was all

7   there.

8              THE COURT:  Thank you, Counsel.

9              MR. QUINN:  Has the Court heard all it wants to

10  hear on this?  Would the Court be interested in hearing about

11  the decal that Mr. Zeller was referring to rather than the

12  doll?  What Mr. Nolan just read, the doll was not published,

13  the three-dimensional doll was not published, but the

14  two-dimensional image of the Toon Teen doll had been.

15             THE COURT:  I understand the distinction.  Thank

16  you.

17             I'm going to take a brief recess here.  I need to

18  get my motion in limine notes.  Let's take a 15-minute

19  recess.

20             (Recess taken.)

21             THE COURT:  Back on the record.  Okay.  I promise

22  to move off the statute of limitations issue shortly.  But,

23  Mr. Zeller, I did want to follow up with you on one thing

24  that you didn't mention, and then Mr. Nolan, I'll give you a

25  chance to respond.

b53971f5-200a-4937-84db-4424603b6038

1          One last piece of the statute of limitations puzzle

2     the Court needs to factor into its analysis is the allegation

3     concerning fraudulent concealment and the extent to which

4     that arguably tolls the accrual date.  The problem there, and

5     I know the Court probably contributed to this problem, given

6     its ruling yesterday on the motion concerning the deposition

7     of Mr. Palmeri, but I believe I was compelled to do so based

8     on the standard of law, there's certainly some dispute in

9     terms of the evidence on the fraudulent -- or the alleged

10    fraudulent concealment.  I'd like to hear argument on that.

11          To what extent can the Court, from your

12    perspective, should the Court factor in the allegation of

13    fraudulent concealment to its statute of limitations analysis

14    in terms of a sort of tolling at the summary judgment stage

15    as opposed to allowing this to go out through trial.  One of

16    the things you suggested is the Court should not allow this

17    to go to trial.  One of the benefits is I could also have the

18    jury's ruling on fraudulent concealment if, based on the

19    evidence, there is any such thing.

20          That's a little more difficult for me to factor in

21    at this stage, I think.

22          But I'd like to hear from you on that.  And I said

23    Mr. Zeller.  It doesn't have to be Mr. Zeller.  It could be

24    Mr. Corey or whoever.

25          MR. ZELLER:  I think that the short answer is, your

1   Honor, that it really depends on whether you're looking at

2   our motion versus their motion.

3            THE COURT:  I'm looking at both, but that is part

4   of the problem.  I mean, they are both moving for it, and I'm

5   trying to work out what standard.

6            MR. ZELLER:  I think that it's fair to say that on

7   our motion, fraudulent concealment doesn't make any

8   difference.  Because from our point of view, whether there

9   was fraudulent concealment or not, there was no accrual until

10  really a period of time where nothing would be time barred,

11  and the issue is then something that the Court does not even

12  need to reach or doesn't even have to get into fraudulent

13  concealment on our motion.

14           However, we had raised fraudulent concealment in

15  opposition to their motion that Mattel's claims, or any of

16  them, are time barred.  And we've certainly made a number of

17  legal arguments as to why that is, some of which overlap with

18  our motion and some which do not.

19           But fundamentally, we've said that you certainly

20  could not, the Court certainly should not grant their motion

21  for summary judgment on statute of limitations because there

22  is a factual dispute about the fraudulent concealment.

23           There is a dispute that the parties have as to the

24  legal effect of fraudulent concealment.  But I don't think

25  that -- and maybe Mr. Nolan can tell me their perspective is

1    different, but I didn't read their arguments to mean that

2    there was a serious dispute, that there is a factual dispute

3    on fraudulent concealment.

4              I mean, the record evidence on that, I would

5    respectfully submit, really does show that at a bare minimum,

6    if we get into fraudulent concealment, whether there was

7    fraudulent concealment is a factual dispute that can't be

8    resolved on summary judgment.

9              Now, we've certainly said and we believe that the

10   law is that if there is evidence of fraudulent concealment,

11   that that changes the notice standard, and it changes it to

12   basically a mere knowledge kind of standard, and we've talked

13   about that legal issue in the briefs.  So that's the inner

14   play or therefore between the two motions insofar as they

15   relate or do not relate, better phrased, between our motion

16   and their motion.

17             THE COURT:  That's helpful, Counsel.  Thank you.

18             Mr. Nolan?

19             MR. NOLAN:  I think that Mr. Zeller overlooks an

20   important position well staked out in the court, decisions

21   we've cited to the Court.

22             Your Honor, two cases that I'd like you to focus on

23   for a moment, and it stands for the proposition that there's

24   no tolling based on fraudulent concealment in this case.

25             First is the Snapp and Associates insurance case,

1    which is under California law.  Suspicion of wrongdoing

2    coupled with the knowledge and the harm that it's caused is

3    sufficient to end tolling based on fraudulent concealment.

4    And also fraudulent concealment doctrine does not toll the

5    statute of limitations no matter what the defendant has done

6    to conceal his wrongs if a plaintiff has a suspicion of

7    wrongdoing and knowledge of the harm that it's caused.  And

8    that's citing to the Heinz semiconductor case.

9            So the point here, your Honor, is it doesn't change

10   the dynamic of what we were talking about this morning.  I'm

11   off of the drawings for a moment.  I'm focused for --

12           THE COURT:  Right.

13           MR. NOLAN:  So when you add up all of the factors

14   of knowledge of similarities of Toon Teens, knowledge of the

15   use of the name Bratz, the public knowledge that Carter is

16   over at MGA.  I mean, one of the points that I would make to

17   the jury, if this went to the jury, on fraudulent concealment

18   is there is no worse example of fraudulent concealment or

19   unsuccessful fraudulent concealment if that was the intent,

20   which it clearly wasn't, your Honor, and I think the facts

21   will support it while at trial.

22           Nevertheless, Mattel still had the suspicion on its

23   own.  The other thing that's complicated by this, your Honor,

24   is that I don't quarrel with the ruling and the position that

25   they have taken with respect to the attorney-client

1    privilege.  But in particular, in a case like this, where

2    they are asserting a privilege, we know they took an

3    investigation, and we do know that in 2000 they suspect that

4    he's going to be a doll designer.  We know Bratz.  But when

5    you go to the investigative file that's public -- I mean,

6    it's not asserted, you know, and no privilege on this.

7           They were told by Cassidy Park, that's the March

8    28th entry on the log itself, when you go into the document

9    and go back to the investigative file.  A lot of it is

10   redacted.  So you have to go back into the file pretty

11   carefully to look at the log sheet.  Here it is, your Honor.

12          You know, you have the notation here by Cassidy

13   Park, and I believe her title is head designer.  If not,

14   she's a very senior designer with Carter Bryant, illustrator

15   plagiarized.

16          So if we're concealing any of this, your Honor,

17   these cases that I cited to you, Snapp and Heinz

18   semiconductor indicate that there's no tolling, if that's the

19   way the Court posed the question to me.  It shouldn't be a

20   factor in the analysis of the statute of limitations, based

21   on these two cases and based on the suspicion level that was

22   available there.

23          THE COURT:  Very good.  All right.  Well, I'm going

24   to try to get an order out on statute of limitations if I

25   can.  I will get an order out, and I will either be resolving

Page 42

1    it, or we'll be teeing it up for trial.

2           I want to go back to the motions in limine.  Let's

3    get through those.  I'd like to start with revisiting one

4    that we discussed yesterday, which led to Mr. Quinn's apt

5    description of the conundrum that had been created.  This is

6    with respect to Motion in Limine No. 6 by MGA and the role of

7    the Phase 2 evidence in Phase 1.

8           I tend to agree, after looking at this again, that

9    if apportionment comes into play in Phase 1-B, certainly

10   Mattel has to be in a position to respond to that.  I don't

11   know if it's necessary for them to respond with this Phase 2

12   evidence, namely, the, I know, bringing in the depositions of

13   the various Mattel employees that MGA hired from Mattel's

14   perspective, stole, MGA's perspective, hired.

15          There's kind of an alternative suggestion by Mattel

16   in their opposition, and this is at page 12, that Mattel must

17   at least have the opportunity to present testimony that MGA's

18   profits are not a result of its innovative development

19   strategies but are indeed the result of the doll.  This is

20   the analysis that has been offered by Mattel's damages

21   expert.

22          So it sounds to the Court like Mattel does have an

23   ability to respond to the apportionment argument, just not

24   necessarily using or relying upon this Phase 2 evidence.  And

25   that's basically the tentative view that the Court is likely

Page 43

1    to take, but I'd like to hear from both sides before I go

2    down the road.

3              MR. QUINN:  I think there is agreement on this,

4    actually, that to whatever extent profits are attributable to

5    intrinsic qualities of the doll, to what extent they are

6    attributable to packaging, marketing, and all the various

7    things that MGA says it has done, both sides agree that that

8    type of analysis has to be undertaken.

9              So we surely are going to be arguing, and we have

10   experts whose expert testimony on this is saying the real

11   appeal of this and success of this doll is because of the

12   aesthetic qualities of the doll.  It is what it is, and

13   that's the value.

14             They have experts that say well, that has some

15   value to be sure, but a much larger percentage of the profits

16   are really attributable to the innovative marketing.  And we

17   have competing experts on that as to the relative

18   proportions.

19             That doesn't address the problem.  We have to

20   battle the part of that that relates to their innovations,

21   their marketing, their inventory --

22             THE COURT:  I understand that you can also battle

23   that with some of the expert analysis that you've already

24   submitted or proffered.

25             MR. QUINN:  Well, we will do that anyway, your

b53971f5-200a-4937-84db-4424603b6038

1    Honor.  For sure.  We will do that anyway.  But that's only

2    half the argument.  The other half of the argument that we

3    would be deprived of is what they claim as their innovations,

4    which really account for the values that were stolen from us.

5    That's where the Phase 2 stuff comes in.

6           So the battle about the relative contribution of

7    the intrinsic qualities of the doll versus marketing,

8    et cetera, that's a battle that's going to happen anyway, and

9    that's really not what we're -- we're not concerned about

10   that.  I think everybody is in agreement that that relative

11   contest as -- the contest as to the relative contributions,

12   the profits of those, that's going to happen.

13          What we're concerned about is should they be able

14   to lay off a lot of the value on innovations which we contend

15   were taken from Mattel.  And that's the Phase 2 problem.

16          It seems that if they are going to say, for

17   example, and I'm going to make this up, because I don't have

18   a specific example to hand.  We have this really innovative

19   package that was attractive that people liked.  And they are

20   going to tell the jury that that's really part of the value

21   and why the dolls flew off the shelves.

22          If that package was stolen from us and represents a

23   Mattel trade secret, we ought to able to tell that to the

24   jury.

25          THE COURT:  I guess the best way to do this is to

Page 45

1    instruct you not to make any reference to this in your

2    opening statement.  We'll have to wait until and if we

3    actually reach Phase 1-B and see what MGA does and what they

4    introduce and perhaps, as with anything else, they may open

5    the door to evidence that otherwise would not be admissible

6    under the trial.

7            I'm not going to rule at this point that it is

8    admissible.  In fact, I'm going to rule, for purposes of the

9    opening statement, that you are not to do it, and we'll just

10   have to wait and see.  I think that's really the only way we

11   can resolve this conundrum.

12           MR. QUINN:  In fact, in my opening statement I

13   wasn't intending to address any 1-B issue.  I thought 1-B --

14           THE COURT:  And you're right.  And there is going

15   to be a separate opening statement for that.  But just --

16           MR. QUINN:  I regard this as a 1-B conundrum.  In

17   my opening statement, I wasn't going to address it or any

18   other 1-B subject.

19           THE COURT:  Very well.  So that takes care of that

20   problem, and I'll set this forth in my ruling on this motion

21   in limine.  I do think my initial reaction is to uphold the

22   phasing.  In fact, it was Mattel that submitted the proposed

23   phasing, and I largely adopted what was submitted by Mattel.

24           So I don't think there's an issue that needs to be

25   addressed at this point.  We'll have to wait and see what MGA

b53971f5-200a-4937-84db-4424603b6038

Page 46

1    does, assuming that we would get to a 1-B phase of the trial.

2              Mr. Nolan?

3              MR. NOLAN:  Yes.

4              THE COURT:  All right.

5              MR. NOLAN:  That's what my handlers have told me.

6              THE COURT:  All right.  That's great.  Very good.

7              I had skipped over -- I hadn't had a chance to read

8    before yesterday the Motions in Limine 13, 14, and 15.

9    Because I wasn't sure on the joinder that's been made clear.

10   So let's take those up at this time.

11             Motion in Limine 13 is the motion in limine to

12   exclude evidence regarding alleged spoilation of evidence by

13   Bryant.

14             14 is the motion to exclude evidence and argument

15   regarding Bryant's alleged borrowing of ideas or concepts

16   from preexisting Mattel projects, including Toon Teens, Diva

17   Starz, the Swan line, and Skipper.  We've already touched

18   upon that this morning to a certain extent.

19             And No. 15 is to exclude evidence and argument

20   regarding any of defendants' affirmative defenses or claims

21   that have been either dismissed or voluntarily withdrawn.

22             Starting with the easy one first, I trust with

23   respect to No. 15 at this point, to the extent that a claim

24   or defense has been withdrawn, that's not going to be an

25   issue.

b53971f5-200a-4937-84db-4424603b6038

Page  47

1          MR.  QUINN:   There's a stipulation on that, your

2     Honor.

3          THE COURT:  Right.

4          MR.  QUINN:   That's fine.

5          THE COURT:  Then that's out.  13 and 14 may not be

6     so easily resolved.  But I'll hear from MGA, who is now

7     standing in the place of Carter Bryant on this.

8          MR. NOLAN:  Your Honor, both because numerically

9     13 comes before 14 and I also think that we spent a lot of

10    time talking about the borrowing issue.  Let me first go to

11    No. 13, which is sometimes referred to as the Evidence

12    Eliminator issue.

13         At the outset, the Court has framed this issue that

14    we stand in the shoes of Carter Bryant in terms of joining in

15    it.  We respectfully submit that if Carter Bryant were still

16    in this case, this is a very strong motion, as we believe

17    that the record evidence that has been presented to your

18    Honor clearly demonstrates, that the use of a software

19    package that was downloaded that has the unfortunate but

20    maybe effective marketing name of Evidence Eliminator is not

21    an Evidence Eliminator.

22         The testimony is that it assists in cleaning up

23    cookies that are left after you visit various sites and then

24    allows your machine to run a little bit quicker.

25         I will submit, and I'm not testifying on this

b53971f5-200a-4937-84db-4424603b6038

1    point, but, your Honor, I don't know whether or not the

2    courts have a system where if you need to, you can, from

3    home, remotely access into your computer network.  I don't

4    know if judges are allowed to have that ability.  Law firms

5    do.  And I cannot sometimes connect to our New York database,

6    and I will call up the tech people, and they will ask me to

7    go in, because the kids have been on the computer, and my

8    wife has been on the computer, and ask me to delete all --

9    you know, go off of the standard configuration and delete all

10   of the history of wherever they have visited.  And then I can

11   dial up and make the connection.

12          In effect, what Evidence Eliminator does, and

13   there's been a lot of testimony that you don't have to take

14   Tom Nolan and Maryann Nolan and the kids' experience in this

15   regard, or even our experience in connecting with Skadden,

16   the record evidence, and I think that it's not disputed by

17   Mattel, is that when Carter Bryant bought this package, he

18   never changed the standard configuration of the software

19   package.

20          And there is no evidence that anything has been

21   destroyed -- especially on one of his computers that he

22   ultimately gave away to his niece -- that there was no

23   evidence that it ever was used on that computer.

24          The second piece of evidence, your Honor, is that

25   with respect to the other computer in question, is that it

1    merely wrote over file names but did not delete anything from

2    this.  And so, you know, when you talk about evidence

3    spoilation, it is so potentially prejudicial to a jury and to

4    a trier of fact that the better cases cite to the need for

5    close scrutiny by a District Court judge, by the trial judge

6    to ensure that those claims are not wildly made in front of a

7    jury.

8            And I think the cases are well documented in the

9    motion.  In fact, if you look at it, what this is really

10   leading up to is they want to get -- give an adverse

11   inference to the jury, but as we cited in our papers, to

12   obtain the sanction, the party claiming spoilation must

13   demonstrate to the Court that one, the party with control of

14   the evidence had an obligation to preserve it at the time it

15   was destroyed, the party that destroyed the evidence had a

16   sufficiently colorable stated of mind, and some evidence

17   suggested that a document or documents are relevant to

18   substantiating the claim of the parties seeking sanctions

19   would have been included amongst the destroyed files, citing

20   to the housing rights case.

21           Your Honor, in each one of those elements, there is

22   absolutely no evidence to suggest that anything was

23   destroyed, number one, and number two, if it was eliminated,

24   that it was eliminated during the period of time when this

25   case was pending.

Page 50

1       THE COURT:  Well, there's no question that material

2   was deleted, and I assume the program worked as it was

3   intended to work.

4       MR. NOLAN:  Yes, your Honor, but the important

5   point is that there's no way to determine when that evidence

6   would have been eliminated.  It would be as though, you know,

7   in fact, this is another important point that comes out of

8   the testimony, which I don't think is refuted at all by

9   Mattel.  Even without Evidence Eliminator, the automatic

10  setup on a computer will eventually go in and wipe out

11  information on the computer for efficiency purposes so you

12  don't have these cookies.  Because every time you Google

13  something or whatever, it leaves an impression on the hard

14  drive of the computer.

15      The computer, any computer -- ours, mine, anything

16  here, you know, the one that I'm working on -- will

17  eventually, after 30 days or something, go in and wipe out

18  those cookies to clean it up.

19      So evidence is not necessarily deleted simply

20  because data on a computer is reflected to be deleted.  It

21  happens from the day you buy your computer in a store.

22      That's all that's going on in this case, your

23  Honor.  The burden is on Mattel to come in and show to you,

24  demonstrate to you, we suggest through an evidentiary hearing

25  with experts so you can make an independent assessment as to

b53971f5-200a-4937-84db-4424603b6038

1   whether or not there is evidence in the first instance to

2   even raise this possibility.  And that's what we would really

3   urge the Court to do if the Court finds that right now you

4   can't make that determination based on the record.

5         You know, you were talking about how we are going

6   to have to have some Daubert hearings.  But I would suspect

7   on this one, your Honor, we may not be able to do it at 8:30

8   in the morning.  We may need an hour or two to have the two

9   experts appear before your Honor on all of this, to

10  demonstrate that in fact there's nothing here.

11        Despite all of the use of Evidence Eliminator and

12  motions and everything else, there is no evidence that Carter

13  Bryant destroyed any data relating to this case.  Carter

14  Bryant has denied it.  The machine itself and the experts are

15  consistent on this.  The configuration of the Evidence

16  Eliminator software package was never changed, you know, to

17  allow it to, oh, today I'm going to eliminate this

18  information.

19        On top of that, your Honor, we join in this motion

20  for a reason that at the time, never in our wildest

21  imagination that we believed that we were going to be sitting

22  here alone in this case; all right?

23        Now, as MGA, there is no evidence, there is no

24  nexus, no suggestion that if Carter Bryant did delete

25  information, that he did so on our instruction or we had any

1   knowledge of it.  And so to have that infused in this case,

2   when a party who has been dismissed from the case with a full

3   release, as I understand it, from what Ambassador Prosper

4   represented to the Court, and I asked that to be confirmed,

5   and I did that for a specific reason, your Honor, and it was

6   because of this particular motion.

7            If all of the claims had been released against

8   Carter Bryant, it is, I think so prejudicial to now have this

9   jury told, as they were, in the mini opening statement, that

10  Carter Bryant --

11           THE COURT:  This is the motion in limine that

12  Mr. Quinn forgot about.

13           MR. QUINN:  It is.

14           MR. NOLAN:  It's also, your Honor, and I have to

15  tell you something.  I guess I could have tried to tackle

16  him.

17           THE COURT:  I don't want that going on.

18           MR. NOLAN:  Figuratively.  I was so struck --

19           THE COURT:  Because Mr. Quinn works out.  And I

20  wouldn't want to tackle him.

21           MR. NOLAN:  He could out bike me, but I think I

22  could get in a couple, three rounds.

23           But, your Honor, it was so prejudicial that I could

24  not at that very moment say time out.  It was only a

25  five-minute short.

Page 53

1          THE COURT:  The Court has already ruled on that.

2          MR. NOLAN:  And I reserved my rights on that.  But,

3    your Honor, this is so prejudicial, even if there was some

4    truth to it, because there's no nexus, but to overlay that

5    with the fact that Mattel has not demonstrated to you the

6    first step that they can identify that documents were deleted

7    related to this case, I think it's a nonstarter.  We would

8    ask the Court to grant this motion and not to allow any

9    evidence with respect to the use of Evidence Eliminator in

10   this case.

11         THE COURT:  What about the next motion, while

12   you're still up there, motion No. 14, which relates to the

13   evidence, references to borrowing from Mattel products.  This

14   basically goes back to the Toon Teens and all of that.

15         MR. NOLAN:  I don't know how to answer that

16   question in light of the statute of limitations argument that

17   we're making, because in a sense -- I don't think that they

18   should be allowed to make that claim with all of the claims

19   that they made that they were not going to assert Toon Teens

20   against Carter Bryant.

21          But I'm torn, your Honor, because now with the

22   borrowings claim, if I have to try the statute of limitations

23   case to the jury, if it's still alive in the case and the

24   Court's not granting Mattel's summary judgment motion, then I

25   guess, you know, I've got good arguments there.

1      But fundamentally, your Honor, this was not part of

2 the claims that were made.  And in the motion itself, Carter

3 Bryant's counsel went through many instances where they

4 pointed to instances where it was going to be -- it was

5 disavowed by Mattel that they were not going to make this

6 claim against Carter Bryant.

7      THE COURT:  Well, they are not making the claim,

8 though.  I mean, you haven't responded to their argument that

9 they are not making the claim and simply using this as

10 probative evidence of timing in terms of the breach.  I mean,

11 that's the argument that is not squarely addressed.  Let's

12 put aside -- well, there is no claim on copyright

13 infringement on Toon Teens or any of these other dolls.  This

14 is an argument that this evidence is probative of timing.

15      MR. NOLAN:  The timing of --

16      THE COURT:  Of the breach.  Of when Carter Bryant

17 developed the Bratz doll.  And your position is that he

18 developed it in 1998 beforehand.

19      MR. NOLAN:  Right.

20      THE COURT:  Their argument is he developed it right

21 in the middle of his time at Mattel, inspired in part by all

22 of this stuff.

23      MR. NOLAN:  Right.  I understand that, your Honor.

24 And I guess if I don't win the summary judgment motion on

25 that claim, because it's interesting, their opposition to

b53971f5-200a-4937-84db-4424603b6038

1  this motion, I actually contemplated filing, but we didn't, a

2  supplemental statement saying we're incorporating in our

3  summary judgment papers their opposition to the borrowings

4  claim where Carter Bryant was trying to exclude all of this

5  information.

6         And they come in, and they are asserting all of the

7  relevance of that information in the case and what they knew

8  and what he borrowed from, and that's really the touchstone

9  of the statute of limitations argument.

10         THE COURT:  I understand.  That's where I started

11  this morning.  Because I read this last night, and that's

12  what got me thinking about this whole thing.

13         MR. NOLAN:  So, your Honor, I guess what I'd like

14  to do is submit on the way that Carter Bryant briefed this

15  issue, that it's not in the case.  I understand now that the

16  issue has been put into the case, and the allegation has been

17  made, and so that's the best I can do.

18         THE COURT:  Very well.

19         Who wishes to address 13 and 14?

20         MR. QUINN:  This will be Mr. Proctor, your Honor.

21         THE COURT:  Mr. Quinn, if you were going to stand

22  up and address 13, then I really would have something to say.

23         MR. QUINN:  Justifiably so, your Honor.

24         MR. PROCTOR:  That was not a strategic allocation

25  of the motion.

Page 56

1          There are two very different issues presented by

2    motion 13, and defendants have tactically conflated them.

3    The first issue is whether evidence of -- Bryant's use of

4    Evidence Eliminator comes in.  The second issue is whether we

5    get an adverse inference instruction.  Those are two totally

6    separate issues, and I think they have to be analyzed

7    separately.

8          On the first issue, admissibility.  Defendants, to

9    Mr. Bryant really, who briefed this, raise a lot of smoke

10   about what the program does and what the program does not do.

11   But the core of this is undisputed, and your Honor touched on

12   this.  There's no dispute that Mr. Bryant purchased it,

13   installed it, ran it.  He admits he ran it multiple times and

14   that he deleted information.

15          THE COURT:  And that all took place two years

16   before the litigation in this case.

17          MR. PROCTOR:  Not correct, your Honor.  There's

18   also no dispute that Mr. Bryant ran Evidence Eliminator on

19   his laptop two days -- correction.  I want to clarify that.

20   Defendants may dispute whether Mr. Bryant ran it.  There's no

21   dispute that someone ran Evidence Eliminator on his laptop

22   after the lawsuit was filed two days before it was --

23          THE COURT:  Let me stop you here, because perhaps

24   we were conflating.  The Evidence Eliminator was purchased

25   and installed two years before the litigation.  That is

1   correct.

2           MR. PROCTOR:  Oh, that is correct.  I apologize.

3           THE COURT:  In terms of the running of the Evidence

4   Eliminator, what is the specific evidence which would

5   indicate that it was run -- I'm trying to find the right

6   adverb here -- unusually or out of its normal pattern?

7   Because Evidence Eliminator, I know it has a terrible name.

8   And the company should really think twice about the name, the

9   marketing.

10          But putting that aside.  It's the type of program,

11  quite frankly, that the Court has on its computer.  Yes, we

12  can access from home and all the same things that probably

13  most counsel has.  I'm not saying that all the judges take

14  advantage of that.  That's a separate issue.

15          But there's nothing unusual -- I suspect that you

16  may have a similar type of thing that clears e-mails, maybe

17  you don't.  But in any event, the Court does.  We have

18  something that clears out our e-mails after so many days.

19          MR. PROCTOR:  But Evidence Eliminator is not such a

20  program.  Evidence Eliminator is a totally different program.

21  The way this works, files -- when someone deletes their

22  files, the files are deleted, but they are still accessible.

23  Forensic people can access them.  There are programs that can

24  be used to access them.  The files go to unallocate the

25  space.  They are there.  From time to time, files in

Page 58

1    unallocated space can be normally overwritten.  Mr. Nolan was

2    referring to every 30 days.  That's not accurate.  Factually,

3    that's wrong.  But from time to time, they can be normally

4    overwritten.

5             What Evidence Eliminator does, it deletes

6    everything so that it cannot possibly be accessed by the

7    police.  And this is the advertisement.  This is the language

8    of it.

9             Who wants Evidence Eliminator banned?  Evidence

10   Eliminator 19, world's first hard drive cleaning program,

11   that is publicly advertised as designed, tested, and proven

12   to defeat the exact same forensic analysis equipment as used

13   by police and government agencies.

14            I don't think the Court has a program like that on

15   its computers.  That's my guess.  Someone who purchases

16   Evidence Eliminator is not purchasing it to speed it up.  And

17   someone who runs it two days -- this is undisputed -- runs it

18   two days before his computers are imaged by his attorneys

19   after he is sued --

20            THE COURT:  Let me stop you on that point because

21   my question there is was that an unusual running of it, or

22   was it something which goes automatically at certain times?

23            MR. PROCTOR:  Their expert admits this, that for

24   Mr. Bryant to run it in that fashion to delete those 9,400

25   file names must take steps to do so.  And that's on page 13

b53971f5-200a-4937-84db-4424603b6038

Page 59

1  of Mr. Bryant's expert report.

2           And there is no question.  I mean, this is

3  Mr. Funck's question.  If Evidence Eliminator had not been

4  run on July 12th, 2004, that's the two days before his

5  computers were imaged, could one recover the 9,400-plus file

6  names and folder names that were overwritten?  Answer, yes.

7  And the defense was raising smoke about this just being file

8  names.

9           Those file names are associated typically with

10 files in unallocated space.  Deleted information, which is

11 still accessible through programs like Encase, people that

12 forensic experts can access.  Programs that forensic experts

13 can use to access deleted information.  They are successful

14 until Evidence Eliminator is run.  And then they are not

15 accessible anymore.

16          So there's no dispute that evidence was eliminated.

17 There's no dispute that evidence was deleted.  And Mr. Bryant

18 admits that he ran it frequently.  There's no dispute about

19 that.

20          And that shows that, even what Mr. Nolan just said

21 shows that.  Mr. Nolan -- and I wrote it down because I

22 thought it was notable, and I saw this in the briefs, too.

23 Quote, no evidence Bryant deleted any data relating to this

24 case.  He deleted data.  He deleted data two days before his

25 programs were -- before his computers were imaged.  There's

b53971f5-200a-4937-84db-4424603b6038

Page 60

1  no evidence that it related to this case because it's gone.

2  We have no way of accessing it.  There's no dispute that he

3  ran it on his desktop, which was purchased the day he left

4  Mattel, because it's gone.  The information is gone.

5       And so on a relevance standard, there is no

6  question that this information is relevant.  It goes to a

7  number of issues, and it goes to a number of issues even with

8  Mr. Bryant out of the case.

9       Guilty knowledge, that's the primary one.  That's

10  the first one.  That's the clearest one.  The law is

11  absolutely clear that a party's destruction or a witness's

12  destruction of evidence is relevant to show guilty knowledge.

13       THE COURT:  You know, oftentimes when we have that

14  instruction, and the case law on that normally reflects an

15  understanding by the Court of what it was that was destroyed.

16  Specifically.  So that then you can craft an instruction that

17  would say that -- you could make a finding that the defendant

18  or the plaintiff has destroyed this particular piece of

19  evidence; therefore, ladies and gentlemen, you can infer a

20  particular fact or intention.

21       Here it would be pure speculation as to what it was

22  that was destroyed, to use your phrase, deleted to use the

23  defense phrase.  You're looking for basically just a broad

24  instruction that says well, he must be guilty.  He must have

25  a guilty mind set because he has this program, and it was run

b53971f5-200a-4937-84db-4424603b6038

Page 61

1   even though when you don't know, and I understand the kind of

2   Catch 22 that you're in, that you can't know because of the

3   nature of the program.

4           But really, one of the big concerns, not the only

5   one, but one of the big concerns I have with your position is

6   the breadth and what you can do with this particular

7   argument.

8           MR. PROCTOR:  Okay.  I have a couple responses.

9           THE COURT:  It's going to have to be really narrow

10  if you want to make any headway here is what I'm saying.

11          MR. PROCTOR:  Separate out the instruction and the

12  evidence.  Again, this was intentional.  This was tactical.

13  Defendants conflated the two things in their papers

14  consistently.  We tried to separate them out in our

15  opposition because they are two very different things.

16          Mr. Bryant -- let's focus on admissibility.  The

17  scope of the instruction, I'd like to address that, but if I

18  can, I'd like to deal with it at the end.

19          THE COURT:  That's fine.

20          MR. PROCTOR:  Mr. Bryant admitted that he used

21  these computers for his work on Bratz.  He purchased a

22  program.  It's not free.  He went out and purchased and ran a

23  program that is advertised as keeping evidence from being

24  uncovered to prevent you from going to jail.  That is classic

25  evidence.

1    This is a person who was making $75,000 at Mattel,

2    invents Bratz, to this date has made a very substantial

3    amount of money on Bratz.  The jury is entitled to infer --

4    especially when coupled with all the evidence of his lies,

5    the concealment of his work on Bratz from Mattel, the

6    conspiracy between Mr. Bryant and MGA, their joint

7    concealment of Mr. Bryant's work on Bratz from Mattel -- the

8    jury is entitled to infer that he purchased and ran Evidence

9    Eliminator to conceal evidence from Mattel.

10    When he did it, I mean, look, that he did it two

11    days before his computers were imaged so they could be turned

12    over to Mattel is probative, but it's not required.  When he

13    did it doesn't matter.  If he did it in 2002, which he did it

14    on the desktop computer in 2002, 2001 is when he purchased

15    it.  If he did it then, the jury is entitled do infer that he

16    was doing that to conceal evidence from Mattel.  And that's

17    relevant to show his guilty knowledge.

18    Now, Mr. Bryant is no longer a party to the case.

19    So MGA says oh, his guilty knowledge doesn't matter anymore.

20    That's not true.  Our claims against MGA are intentional

21    torts.  Aiding and abetting, for example.  An aiding and

22    abetting claim requires as an element proof of the underlying

23    claim against Mr. Bryant.  Proof for breach of duty of

24    loyalty, breach of fiduciary duty.  Those are intentional

25    torts.

1        So proving Mr. Bryant's intentionality is

2   absolutely fair game.  And coupled with the other evidence of

3   concealment, this is classic evidence which is admissible

4   under 404(b) to show his guilty mind, to show his intent.  It

5   is an action which the jury can infer was done to conceal

6   evidence from Mattel because he knew he was doing something

7   wrong.

8        And this is a quote from the Van Metre case,

9   spoliation evidence is generally admissible to show the

10  defendant's consciousness of guilt.  Aside from that, it goes

11  directly to the chronology.  Mr. Bryant's testimony is the

12  key testimony -- well, I don't want to overstate it.

13  Mr. Bryant's testimony, whether he's a witness or a party, is

14  some of the most important testimony that's going to be

15  offered in this case.

16       His story about creating Bratz in 1998 is an

17  important story.  The credibility of that story is important,

18  and people who are telling the truth generally don't destroy

19  evidence.  The jury is entitled to infer from his destruction

20  of evidence, his knowing purchase of a program which other

21  courts have found is so outrageous, that they grant

22  terminating sanctions based on it.

23       Actually, it's in very comparable circumstances.

24  If the Court looks at the Leon case, it's a Ninth Circuit

25  case.  It wasn't Evidence Eliminator, but the party, before

Page 64

1    his computers were going to be imaged, purchased a wiping

2    program, wiped his computers.  The Ninth Circuit affirmed

3    terminating sanctions based on it.

4           We're not seeking anything like that.  We're not

5    even beginning to overreach on this.  We're asking to

6    introduce it to the jury.

7           How can it be that Mr. Bryant can conceal evidence,

8    destroy it so that no one in the world can figure out what he

9    destroyed, and then have it so that we can't tell the jury he

10   did this?  It goes to his credibility, and it goes to any

11   absence of proof.

12          We've got some good evidence.  We would have more,

13   probably.  We don't know.  It's not there.  We would have

14   more probably if he hadn't destroyed it.

15          He can't destroy evidence and have us be precluded

16   from telling the jury why we don't have more evidence.

17   There's no question about any of this.  And all of this is

18   the case whether he's a witness or a party.  It makes no

19   difference.

20          THE COURT:  This again goes to the scope of what

21   you want to do with this.  What I don't want is -- I don't

22   necessarily think it's fair for you to be able to stand up

23   and say well, boy, there would be a lot more evidence of all

24   of this stuff.  Just let your imaginations run wild, jury,

25   because if you can think of it, it's probably been eliminated

Page 65

1    by the Evidence Eliminator.

2          That's the problem here.  We don't know what this

3    is.  And I understand it's difficult because you don't have

4    the evidence, and there's a Catch 22.  But that doesn't seem

5    to infer complete license just to allow the jury to wildly

6    speculate and be instructed by the Court that they should

7    infer this wrongful intent without any basis beyond what

8    you've already stated.

9          So I'd appreciate if you would get to the scope of

10   the instruction you're seeking and the like.

11         MR. PROCTOR:  Sure.  I mean, again, the instruction

12   is a -- and I know I'm repeating myself, but I think it's so

13   important that I'm going to do it.  The instruction is a

14   totally separate issue.  Right now we're just talking about

15   401, 403, 404(b).

16         THE COURT:  Yes.

17         MR. PROCTOR:  Under that standard, can we refer to

18   the fact that Mr. Bryant intentionally purchased, installed,

19   ran, and deleted information using a program that's designed

20   to conceal evidence from the police?  His testimony is he did

21   it to speed up his computer.  Mr. Nolan came up and argued

22   how, you know, he sometimes has to delete things to speed up

23   his computer as well.  The jury is entitled to decide whether

24   he did it to speed up his computer or did it for some other

25   reason.

Page 66

1        There's no way -- I mean, it would be completely

2   unfair to Mattel for us not to be able to mention his use of

3   Evidence Eliminator to the jury.  And the relevance is so

4   clear, and I promise I will guess to the instruction, but the

5   relevance is so clear --

6        THE COURT:  Please do.  I've read this other

7   argument, Counsel.  I'd appreciate it if you'd get to the

8   scope.

9        MR. PROCTOR:  Okay.  If I can make one more point

10  on the admissibility issue.

11       Mr. Bryant argues that relevance is not the

12  standard.  And Mr. Nolan actually argued that, too.  We cited

13  the Residential Funding case, which requires a showing that

14  the claims are probable and the Court knows these standards

15  very well from when MGA brought the motion against us.  It

16  requires a showing of willfulness before you get an adverse

17  inference instruction.

18       That's not what this is about.  There's no

19  heightened relevant standard to evidence of consciousness of

20  guilt.  It's just fewer 401, 403, 404(b).  There's no law

21  suggesting otherwise.  Mr. Bryant flagrantly misrepresents

22  that in his reply.

23       On the instruction, your Honor, first point is I

24  think it's premature.  This is a jury instruction.  There's

25  no reason to take up the issue of this jury instruction

1    without other jury instructions.  We requested a permissive

2    adverse inference jury instruction when we submitted jury

3    instructions pursuant to the Court's schedule.  That was a

4    timely request.  There is no need to consider whether we get

5    that jury instruction until the evidence comes in and the

6    Court can decide at that time whether it wants to offer it.

7         There's also no need to make a motion for a

8    permissive inference jury instruction.  We've cited

9    authorities on this, the one Beacon case, the Rogers case.

10   There's no real response on this.  There's not a single case

11   that holds that you have to make a motion to get an

12   instruction like this.  And the only instruction that we're

13   seeking is if you find the key satisfied requirements for the

14   spoliation instruction, which is different from destruction

15   of evidence, if you, the jury find that it satisfies the

16   requirements for this, you may infer that he did it to

17   conceal evidence from Mattel.

18        That's the only thing that we're seeking.  That's a

19   perfectly proper instruction to submit to the jury after the

20   evidence comes in if you believe that that instruction is

21   supported by the evidence.

22        But there's no need to make a motion in advance,

23   and there's no reason to decide that issue now.  And the

24   fact, the force of that argument is revealed by Mr. Bryant's

25   reply, actually.  And he argues, I quoted it.  He says

1  there's no -- he says the jury does not, quote, get to decide

2  whether evidence has been destroyed.  And that's how he tries

3  to distinguish these cases we've cited, saying you don't need

4  a motion for this permissive inference instruction.

5         There's no authority that says the jury doesn't

6  decide the factual question of whether evidence has been

7  destroyed.  And, in fact, that's an undisputed fact.  No one

8  disputes that evidence has been destroyed.  No one disputes

9  whether relevant evidence has been destroyed, which no one

10 can answer because of Mr. Bryant's actions.

11        THE COURT:  Thank you, Counsel.

12        Briefly, Mr. Nolan.

13        MR. QUINN:  We're prepared to submit on 14.  I

14 think the Court has probably heard all it needs to hear on

15 borrowing.

16        THE COURT:  Very well.

17        MR. QUINN:  But we would like to submit, your

18 Honor, what we collected last night, the history of the

19 pleadings in this case regarding Toon Teens always being an

20 issue.

21        THE COURT:  I suppose I haven't given you -- I did

22 have Mr. Nolan --

23        MR. QUINN:  Well, I think we said our piece on

24 this, your Honor.  And I would have a hard time not repeating

25 myself.

b53971f5-200a-4937-84db-4424603b6038

Page 69

1          THE COURT:  Very good.

2          MR. QUINN:  I just wanted to proffer again what we

3   had collected addressing the issue about whether there had

4   been sandbagging in the course of the case about whether Toon

5   Teens were still an issue.  And if it's acceptable, I would

6   like to file this.

7          THE COURT:  My concern about you filing this, which

8   is about an inch, would take about two inches for them to

9   respond to.

10          MR. QUINN:  It's all noncontroversial, your Honor.

11          MR. RUSSELL:  Inch and a half would be fine, your

12   Honor.

13          THE COURT:  Thank you, Mr. Quinn.

14          MR. QUINN:  Thank you.

15          THE COURT:  Mr. Nolan?  There's nothing to say on

16   14.

17          MR. NOLAN:  Right.  I just want to say --

18          THE COURT:  You know, on the Evidence Eliminator, I

19   tend to agree with you on the instruction.  And why should

20   not the Court basically allow both sides to introduce

21   evidence and testimony as to what it is all about and let the

22   jury figure it out?  If it's as harmless as you say it is and

23   as routine and as regular and as nonconsequential, then it's

24   of no moment.

25          If it is what the plaintiff purports it to be, then

1   it is consequential.  Why shouldn't the jury be able to

2   decide this fact along with all the other facts and all the

3   other allegations that are going to be flying around in this

4   trial?

5                MR. NOLAN:  For two reasons, your Honor.  Well, at

6   least two.  And as I'm talking, I'm sure I'm going to come up

7   with a couple more.

8                THE COURT:  That's your nature.

9                MR. NOLAN:  Start with the proposition that when

10  Carter Bryant settled out of this case, the Court, I think,

11  wisely cut back the hours that each of us are assigned to

12  deal with now.  And we each have, I think, 30 hours.  This

13  issue will become a red herring.  It is not simply Carter,

14  did you use Evidence Eliminator.  Kind of a smug look, you

15  sit down, and then I've got to cross-examine.  And then we're

16  going to call expert witnesses to talk about what Evidence

17  Eliminator does or does not do.

18               It is a trial within a trial.  Now, courts

19  recognize this.  And they say there's some evidence that

20  could go to the jury.  There is some evidence, however, that

21  is so potentially prejudicial that the Court in its

22  gatekeeper function should at least do the first analysis,

23  and the first analysis should be is there evidence of

24  spoilation such to warrant it allowing to go to the jury.

25               We cited your Honor to a Central District of

1    California decision, 2003.  Green versus Baca, which is

2    reported at 226 Federal Rules decision.  The Court conducted

3    a four-day hearing, a four-day hearing on whether or not

4    spoilation occurred by a current party to the case.  I go

5    back to the complication that this is Carter Bryant who is

6    released from this case, not a party to this case.

7              And now, you know, that evidence, if it comes in,

8    I'm going to be chasing Evidence Eliminator and bringing

9    in -- I think it's Menz on their part, and it's Funck on

10   our side -- where the fundamental issue that they cannot get

11   over, your Honor, is first of all, on the computer desktop,

12   there's no evidence that it was ever run.

13             It was purchased -- this was purchased years before

14   this litigation was ever contemplated by anybody.  And

15   where's the initial threshold issue of intent?  On the

16   running of the computer ram, so-called on July 12th, by their

17   own admission they can't even say who ran the program, number

18   one, two, used the desktop on that day, number one, nor can

19   they point to a single piece of evidence that was actually

20   deleted.

21             Your Honor, I'll cite you to the briefs in page 6

22   with respect to the -- of the motion itself, and I'm reading

23   from -- I think my page probably did this because he was

24   handling it.

25             Second, Evidence Eliminator did not delete any

1  files on July 12th.  Mattel's claim is based on a fundamental

2  misunderstanding of how EE works.  Instead, the most that can

3  be said is that EE automatically overwrote file names on that

4  date and that those file names corresponded to unknown files

5  that could have been deleted at any time in the history of

6  the file.

7            Now, you say, and it's interesting, and I don't

8  fault the Court's questioning of this.  Well, why don't you

9  just try this case in front of a jury.  And my only point,

10 and this is my last point, your Honor.  403 is there for a

11 reason.  The probative value of chasing this, based on the

12 current record, is so outweighed by the potential prejudice

13 and also the limited time that we have to try this case.  And

14 this is going to be a trial within a trial on a party that's

15 been released.

16           I would ask the Court, before you would do that, to

17 allow both experts to come in and have you be satisfied that

18 in fact there is even a basis to make the claim of

19 spoilation.  And I would ask your Honor -- we can't unring a

20 bell -- but I would ask the Court to direct counsel not to

21 make these allegations in the opening statement unless we can

22 have this hearing before the opening statements.  It is way

23 too prejudicial.

24           The best proof of that, your Honor, is the broad

25 brushes that you've heard in the arguments today from

Page 73

1    Mr. Proctor.  Articulate as they might be.  He never could

2    come back to the point that they could point to any evidence.

3    And oh --

4                THE COURT:  They can't, Counsel.  It's gone; right?

5                MR. NOLAN:  Your Honor, we produced e-mails.  We

6    produced e-mails between Carter Bryant and MGA.

7                THE COURT:  But you can't produce what's been

8    eliminated by definition.

9                MR. NOLAN:  By definition we cannot produce --

10   well, just overwrote file names, but what we can't prove and

11   nobody can prove is whether or not anything was deleted on

12   that day or was it deleted several years before.  Given

13   what's at stake in this case, non-party, this is, I think, a

14   classic case of 403, and we should be -- this should be

15   handled at the motion level now, but at a minimum before any

16   mention to the jury of this, again, we should be allowed to

17   have an evidentiary hearing where you can see and actually

18   focus on the expert reports, because they go to this very

19   issue.

20               THE COURT:  Very good.  Thank you, Counsel.

21               All right.  We're at the noon hour here.  What I'm

22   going to do is we're going to take a lunch break.  When we

23   come back, we'll go through the Mattel motions in limine.

24   The Court will then issue rulings with respect to all of

25   them.  I still have to issue a ruling on No. 4, No. 6, Nos.

1    13 and 14 here on MGA's.  I'll do that along with the Mattel

2    motions in limine.

3           There's a motion in limine of the Court's own that

4    I'd like to address and basically have the parties prepare to

5    discuss.  I have a real concern, based on what's happened in

6    the two days that followed the settlement of Mr. Bryant, as

7    to what to do with that in the trial.  And so I would like

8    the parties to speak to their intentions in terms of using --

9    how they wish to address that issue in the trial.

10          On one hand, I suppose the ideal situation would be

11   if there was no mention made of it.  But I don't know if

12   that's necessarily the right approach.

13          Anyway, without saying any more, I'd like to hear

14   from both parties in terms of what they intend to do and what

15   their justification is for doing what they intend to do.  And

16   I would like to take that issue up today rather than on the

17   morning of trial.  And I'll also rule on the last two, three

18   discovery motions as well today.

19          MR. NOLAN:  Your Honor, will we also have today a

20   report from Mattel with respect to the assignment that was

21   given them yesterday?

22          THE COURT:  Well, that kind of ties into the whole

23   settlement discussion.

24          MR. NOLAN:  And we will get to the discovery

25   motions today, because otherwise, I was going to send

Page 75

1    Mr. Sloan back to the office.  But if we are dealing with the

2    discovery motions today, he's going to be dealing with the

3    lighter motion -- it's not a lighter motion, it's the --

4              MR. QUINN:  You get the heavy ones.

5              MR. NOLAN:  As a former Assistant U.S. Attorney, he

6    can handle the heavy ones, too.  I would just say that's the

7    one he would be arguing.  And otherwise, I would send him

8    back to L.A.  That is the one that was brought with respect

9    to striking portions of the paper expert and ink experts.

10   But if the Court wants to deal with that tomorrow, that's

11   fine.

12             THE COURT:  To be honest, I'm hoping to get through

13   all of these motions today.  I can't guarantee that.  So --

14             MR. NOLAN:  I'm not asking you to guarantee.

15             THE COURT:  The only thing I'd like to do tomorrow,

16   quite frankly, is give you the morning to work on the

17   pretrial conference order, and then just get our pretrial

18   conference order together tomorrow afternoon, and let's go on

19   and enjoy Memorial Day weekend.

20             We're in recess.

21

22             (Lunch recess taken at 12:01 P.M.)

23

24

25

Page 76

1

2

3

4

5

6                          C E R T I F I C A T E

7

8

9           I hereby certify that pursuant to Title 28,

10    Section 753 United States Code, the foregoing is a true and

11    correct transcript of the stenographically reported

12    proceedings in the above matter.

13           Certified on May 22, 2008.

14

15

16    _____
      MARK SCHWEITZER, CSR, RPR, CRR
      Official Court Reporter
17    License No. 10514

18

19

20

21

22

23

24

25