Page 200

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

---

| | | |
|---|---|---|
| MATTEL, INC., | : | PAGES 200 - 339 |
| | : | |
| PLAINTIFF, | : | |
| | : | |
| VS. | : | NO. ED CV04-09049-SGL |
| | : | [CONSOLIDATED WITH |
| MGA ENTERTAINMENT, INC., | : | CV04-9059 & CV05-2727] |
| ET AL., | : | |
| | : | |
| DEFENDANTS. | : | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

TUESDAY, MAY 27, 2008

JURY TRIAL - DAY 2

AFTERNOON SESSION

MARK SCHWEITZER, CSR, RPR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
181-H ROYBAL FEDERAL BUILDING
255 EAST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012
(213) 663-3494

1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4         Quinn Emanuel
          By John B. Quinn, Esq.
5             B. Dylan Proctor, Esq.
              Michael T. Zeller, Esq.
6             Harry Olivar, Esq.
              John Corey, Esq.
7             Diane Hutnyan, Esq.
          855 South Figueroa Street
8         10th Floor
          Los Angeles, CA 90017
9         (213) 624-7707

10

     On Behalf of MGA Entertainment:
11

          Skadden, Arps, Slate, Meagher & Flom LLP
12        By Thomas J. Nolan, Esq.
              Carl Alan Roth, Esq.
13            Jason Russell, Esq.
              Lauren Aguiar, Esq.
14            David Hansen, Esq.
              Matthew Sloan, Esq.
15        300 South Grand Avenue
          Los Angeles, CA 90071-3144
16        (213) 687-5000

17

18

19

20

21

22

23

24

25

Page 202

1                          I N D E X

2

3    OPENING STATEMENT BY COUNSEL FOR THE DEFENSE............ 214

4    IVY ROSS, SWORN....................................... 276

5    DIRECT EXAMINATION BY MR. QUINN:...................... 276

6    CROSS-EXAMINATION BY MR. NOLAN:  ..................... 324

7

8                        E X H I B I T S

9    (Exhibit 13541-1 received.)........................... 288

10   (Exhibit 293 received.)............................... 289

11   (Exhibit 13535-13540 received.)....................... 292

12   (Exhibit 432 received.)............................... 301

13   (Exhibit 316 received.)............................... 305

14   (Exhibit 314 received.)............................... 307

15   (Exhibit 257 received.)............................... 309

16   (Exhibit 257-4 and 257-6 received.)................... 311

17   (Exhibit 258-1 and 258-6 received.)................... 312

18   (Exhibit 259-1 and 259-5 received.)................... 313

19   (Exhibit 48-11 received.)............................. 316

20   (Exhibit 48-1 received.).............................. 320

21   (Exhibit 48-2 received.).............................. 321

22   (Exhibit 48-008 received.)............................ 336

23
                            1
24

25

1     Riverside, California; Tuesday, May 27, 2008

2          1:00 P.M.

3     (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

4          THE COURT:   Mr. Nolan, you indicated you wanted to

5     take up a few matters before your opening.

6          MR. NOLAN:   Thank you, your Honor.   The Court will

7     recall that all last week we went through, I think, about 30

8     motions in limine, with the Court giving us guidance with

9     respect to what would be in Phase 1-A, what would be in 1-B.

10    The Court, however, reserved review of the topics and issues

11    that I could get into after Mr. Quinn had completed his

12    opening statement.

13         We believe, your Honor, that Mr. Quinn in his

14    opening statement has broken down any notion or any barrier

15    that had been attempted to be established as to the status of

16    the Barbie line at Mattel.   Mr. Quinn specifically addressed

17    this jury and told them that the Barbie was the first fashion

18    doll, that it's been a wonderful success, a leading fashion

19    doll for decades, that it is -- that its success is the

20    result of millions of dollars that are spent in development

21    in developing the toy.   They are dreamed up by highly

22    talented, skilled artists.

23         And then he goes on to say in contrast, that MGA

24    never really built anything so that the only way it could

25    have been a success with Bratz is because we stole

1  everything.  And we stole Carter Bryant, which, of course, is

2  not the truth.

3        But specifically, your Honor, he talks and he

4  describes to the jury that we were limited to an electronics

5  company with some limited Hong Kong capability.  He goes into

6  great length and goes all the way out to nearly the filing of

7  this lawsuit as to statements that Mr. Larian has made to the

8  press.  He distinguishes -- I'm sorry.  He draws no

9  differentiation at all between the concept drawings of Carter

10 Bryant and the doll itself, Bratz.

11       And so when Mr. Larian is interviewed about Bratz,

12 the interviews go to the doll itself.  There is never going

13 to be an article that will be shown to this jury, and

14 Mr. Quinn knows this, which says by the way, who did the

15 preliminary concept drawings in Bratz?  That's never asked.

16       Yet, without drawing the distinction between the

17 drawings and the doll, Mr. Quinn intentionally blurred that

18 distinction.

19       We know as of October 19th, at least that was the

20 Court's indication on Friday, that I would do a full stop on

21 October 19th, 2000, with respect to the development of the

22 status of Bratz, again, your Honor, knowing full well what

23 the restrictions were and knowing full well that you would

24 revisit this issue after opening statement.

25       Mr. Quinn went straight through all the way to

1   Hong Kong in 2004 and later talking about the doll, not the

2   drawings.

3          We should be allowed, your Honor, not only in my

4   opening statement, but clearly in 1-A, to now give the

5   development of the doll itself separate and apart, because

6   Mr. Quinn has intentionally blurred the two.

7          With respect to the --

8          THE COURT:  Explain what you mean in terms of the

9   development of the doll.  What does that go to?

10          MR. NOLAN:  It simply goes to the fact that there

11   is -- there are concept drawings, and then there's the

12   doll itself.

13          THE COURT:  I understand the need to put any

14   quotations attributed to Mr. Larian in context, and any

15   reference to the Hong Kong litigation in context.  And I will

16   certainly -- well, I want to hear from Mr. Quinn, but I'll be

17   inclined to give you leave to do that.  If you're going to

18   turn this into a full-flung development of the doll trial,

19   that seems to be far afield.

20          MR. NOLAN:  No, your Honor.  It will be limited.  I

21   will just talk about the efforts and energy of MGA in

22   developing the sculpt apart from October 19th and that it was

23   then sent over to Hong Kong with the changes that were made

24   by MGA, Paula Garcia, that type of thing.

25          Your Honor, he invited it by specifically making

Page 206

1    this argument to the jury.  It's not of my own doing.

2              THE COURT:  Let me hear Mr. Quinn's response.

3              MR. NOLAN:  Your Honor, very briefly on one more

4    thing?

5              THE COURT:  One more thing.

6              MR. NOLAN:  On Toon Teens, your Honor, I think

7    it's -- and Toon Teens and Hong Kong.  Can I do two things?

8    Toon Teens, he starts talking about similarities, that type

9    of thing.  That coupled with the fact that they say the most

10   astonishing news was over in Hong Kong in November of 2003,

11   they got the contract, your Honor, and that nobody knew

12   anything at that time.

13             We believe now we should be allowed to show the

14   documents that demonstrate internally, including Lily

15   Martinez, the designer of Toon Teens, who well knew about

16   Carter Bryant as the illustrator and creator of Bratz in --

17             THE COURT:  For what purpose?

18             MR. NOLAN:  Your Honor, to take out this idea that

19   Mattel is claiming that they had no idea and we were

20   concealing it from the world.  We weren't.  At a My Scene

21   meeting in 2002, your Honor, Lily Martinez --

22             THE COURT:  Let me stop you there.  Internal

23   efforts or investigations by Mattel wouldn't necessarily

24   undercut that you were -- the allegation that you're

25   concealing.

8f7f8ad3-b8c6-4a9b-b4bd-5b0487575e86

Page 207

1       MR. NOLAN:  No, your Honor, but it goes to the

2  whole motive behind this case.  And the investigation that

3  Mattel has conducted, your Honor, starting in 2002.

4       THE COURT:  I've already ruled that motive is not

5  coming in in this broad sense, Counsel.

6       MR. NOLAN:  But your Honor, in 2002, Mattel has

7  been told their internal investigative department opened up a

8  file and conducted an investigation in 2002.  Mr. Quinn told

9  this jury it wasn't until after they went to Hong Kong that

10  they conducted an investigation.

11       THE COURT:  Well, there's a difference between what

12  they knew and when they knew it and when they started an

13  investigation.

14       MR. NOLAN:  We all know that because of the statute

15  of limitations argument, your Honor.  But this jury has been

16  led to believe that the Toon Teens is the source of these --

17       THE COURT:  You are certainly entitled to respond

18  to these in the context of placing whatever evidence -- the

19  purpose of opening statement is to explain to the jury what

20  you expect the evidence to show.  And in responding or laying

21  out your own case, you can certainly indicate and place these

22  quotations from interviews, from litigation, claims being

23  made, counterclaims being made in context.

24       MR. NOLAN:  And I would submit, your Honor,

25  together with the status of Barbie, since Mr. Quinn has said

1   that Barbie has been successfully the leading fashion doll.

2   He even mentioned the fact that MGA files a lot of lawsuits.

3   He made that statement to this jury, your Honor.  And yet --

4   and so I think I should be able to get into the fact that

5   Mattel is equal to the challenge in terms of filing lawsuits.

6          So it's the condition of Barbie, what was really

7   happening at Mattel.  I will not talk about the motives.  I

8   will not attribute that's the reason for the lawsuit.  But I

9   do believe I should be entitled to show what the condition of

10  Barbie was at Mattel.  It was not innovative, your Honor.  He

11  told this jury that Mattel is well known in the fashion

12  design area and Mattel itself for innovative fashion

13  development.  We know the internal record shows that they

14  weren't, that they were complacent.

15         THE COURT:  Okay, Counsel.  I'll hear from

16  Mr. Quinn.

17         MR. QUINN:  I think it's important to bear in mind

18  what Mr. Nolan wants to do now.  Based on my statement that

19  Mattel -- or that Barbie was the first fashion doll, that it

20  was successful for decades, that Mattel is innovative, some

21  sort of generalized positive remarks about Barbie which, by

22  the way, I don't think are news to anybody in this courtroom.

23         He then wants to use that as the thin end of the

24  wedge to then get into what was happening to Barbie in the

25  last several years, very specific, house on fire, kill Bratz,

1    this litany of things that at every opportunity MGA has tried

2    to inject in this case.

3          THE COURT:  Well, let me stop you Mr. Quinn.  If

4    you can stand up and say the evidence will show, and it's not

5    really clear to me what the relevance of that was anyway.

6    But there was no objection.  You were making the statement.

7    Barbie is a great doll.  Why shouldn't I allow Mr. Nolan to

8    say no, it wasn't at this particular time.

9          MR. QUINN:  Well, I think in view of what he wants

10   to do, it's like gross overcompensation.  To then get into

11   slippage in market share.  I didn't bring this up today.  I

12   didn't say that today Barbie still reigns.  I didn't get into

13   any market share issues.  I didn't get into any dollars and

14   cents.  And believe me, that's exactly what he wants to do.

15         THE COURT:  I agree there should be no gross

16   overcompensation.

17         MR. QUINN:  And, your Honor, let's bear in mind, I

18   think my comments were sort of general stage setting.  They

19   came very early on in my opening statement.  This case still

20   is about what -- this phase still is about what Carter Bryant

21   created while he was at Mattel.

22         THE COURT:  What about the concerns or the issues

23   of what was going on in terms of the investigation, what

24   Mattel knew, and when?  You did indicate that it wasn't until

25   basically 2003 before this all came to light.  And that's

 1   fair enough, and that position, I understand your evidence

 2   for that.  Counsel has evidence that suggests perhaps an

 3   earlier date.

 4         MR. QUINN:  Well, your Honor, he quoted me as

 5   saying that there was no investigation until after -- he

 6   mystery numbers that.  I didn't say that.

 7         Your Honor, I didn't say anything that is

 8   inconsistent with the theory of this case, that while at

 9   Mattel, he created these drawings.

10         THE COURT:  I understand that.

11         MR. QUINN:  And I didn't say anything inconsistent

12   with the notion that we didn't know that until, you know, we

13   had no concrete proof of that.

14         THE COURT:  Right, but Mr. Nolan is not limited to

15   presenting evidence that's consistent with your case.

16         MR. QUINN:  But he's now -- it would be a lot

17   easier if he were, your Honor.  But, you know, he's now --

18   the thin end of this particular wedge is then wanting to talk

19   about the fact that there were rumors that Carter Bryant was

20   involved.  There may have been something after he left.  And

21   then the issue here is very narrow as to what we knew about

22   while he was at Mattel.

23         THE COURT:  Very good.  Thank you, Counsel.

24         All right.  Mr. Nolan, you need to be careful on

25   this.  I mean, certainly in the same way in the same manner

Page 211

1    that Mr. Quinn got into some irrelevant information about

2    Barbie and its success, I will allow you in that same manner

3    to talk about your response to that.

4             MR. NOLAN:  Thank you.

5             THE COURT:  But really, no gross overcompensations.

6    This is not about Barbie or how successful or nonsuccessful

7    Barbie was or wasn't.  The Court has ruled on the motion in

8    limine.  Keep that ruling in mind.  The last thing you want

9    is the Court having to intervene in your opening statement.

10            Certainly with respect to what was happening at

11   Mattel, and what evidence is going to be introduced to call

12   into dispute the statements of when they found out about this

13   and what not, limit yourself to the evidence in terms of what

14   was happening at Mattel.  The door is not open for

15   apportionment in 1-A.  So we're not getting into the full

16   description of the doll, of what happened -- the focus of 1-A

17   is simply who, what, if anything, did Carter Bryant do while

18   he was an employee of Mattel.  You're going to have -- if we

19   get to 1-B in this case, you will have your opportunity to

20   get into all of this other stuff.

21            MR. NOLAN:  Your Honor, can I at least throw out --

22            THE COURT:  Don't infect 1-A.  Don't infect 1-A

23   with stuff that's truly irrelevant.  And I will sustain a

24   relevancy objection if you get too far into that.

25            MR. NOLAN:  Your Honor, I do want to, at least some

1    point in time, point out that we're talking about doll and

2    drawings.  This phase is about a drawing.

3              THE COURT:  Placing the statements of Mr. Larian

4    into some kind of context is appropriate, given the manner in

5    which those statements were used by Mr. Quinn in his opening

6    statement.  That is fair game.  Going beyond that, I think

7    that would only confuse the jury and confuse the issues that

8    are being presented to this jury in 1-A.

9              Do you understand?

10             MR. NOLAN:  We're not going to be talking about

11   analytical dissection.  No, I'm sorry.  I completely accept

12   the Court's order.

13             THE COURT:  You're going to get an instruction from

14   the Court in the middle of the opening statement a lot sooner

15   before you get to analytical dissection.

16             MR. NOLAN:  I'm sorry.  Your Honor, I wonder if

17   I -- so I understand that I can at least say this is a doll.

18   These are the drawings.  And then I can also talk and address

19   the Barbie success issue?

20             THE COURT:  Briefly, Counsel.  In the same manner

21   that Mr. Quinn.  Quite frankly, I think it's all irrelevant,

22   and I probably would have sustained an objection by you if

23   you had objected to him getting into Barbie.  I thought we

24   covered this in the motions in limine.  Frankly, it's not

25   relevant whether Barbie is successful or not successful.

1   It's not an issue in this case.

2           MR. QUINN:  Your Honor, I'm been handed an inch and

3   a half thick stack of documents that MGA says they want to

4   use in their opening.  I object to use of any of these

5   documents.  They weren't exchanged.  We had an agreement

6   before court this morning that anything anybody might want to

7   use you'd exchange.  We object to all of these.  Many of them

8   are not coming into evidence in any event.

9           THE COURT:  I've said this several weeks ago at the

10  outset, that the Court's standard in terms of using any

11  evidence in the opening statement is whether or not there is

12  an evidentiary objection to it.  If it's stipulated that it's

13  coming in at trial, it may be used.  If there's an

14  evidentiary objection to it, it is not used.  That was my

15  statement I made several weeks ago.  I reaffirmed it before

16  the opening statements this morning.  And that continues to

17  be the Court's position.

18          MR. RIGHT:  Your Honor, I believe the Court has

19  ruled that some of these documents are relevant in this case

20  already.  That was the subject of the motions in limine.

21          THE COURT:  That doesn't establish admissibility.

22  The Court has maintained a consistent position on this.  So

23  is the jury ready?

24          THE CLERK:  Yes.

25          THE COURT:  Let's bring them in.

Page 214

1          (WHEREUPON THE JURY ENTERS.)

2          THE COURT:  We're back on the record in the

3   presence of the jury.  Mr. Nolan, you may proceed with your

4   opening statement.

5          OPENING STATEMENT BY COUNSEL FOR THE DEFENSE

6          MR. NOLAN:  May it please the Court, good

7   afternoon, ladies and gentlemen.

8          Like Mr. Quinn, I probably should start off by

9   introducing some members of the audience here.  First of all,

10  from the proceedings that we had last Tuesday, Isaac Larian,

11  the chief executive officer of MGA, is present, along with

12  his wife Angela.  His daughter Jasmine is here, too.

13          Jasmine, you will hear in the opening statement,

14  when she was 12 years old, was the daughter that looked at

15  the drawings of Carter Bryant, and although Isaac believed

16  that they were weird, Jasmine liked them, and Bratz has

17  become a success.

18          I was going to introduce my wife and both of my

19  daughters, but as usual, they are late.

20          So if you see two girls coming in with a mother,

21  those are my daughters.

22          I wanted to -- you know, you look around, and

23  opening statements are an exciting day of a trial.  Because

24  we start to talk about the evidence.  And one of the ways

25  that I like to explain my role in this case, because I'll

1    always go second, is that there was, and there still is, a

2    news broadcaster by the name of Paul Harvey.  I don't know if

3    you remember Paul Harvey, but it was always interesting, I'd

4    be listening to him driving home, and then I'd hear one part

5    of the story.  And then there was a commercial break, and

6    then he would come back, and then he would say the rest of

7    the story.  And it ends quite differently.

8          Life is that way, and trials are that way, and

9    frankly, opening statements are that way.

10         So here's the rest of the story.  I will deny right

11   now that Carter Bryant did the Bratz drawings while at

12   Mattel.

13         I will deny that MGA stole the Bratz idea.  This

14   case and this evidence will establish that Mattel through

15   capable lawyers are trying to get an idea that they did not

16   create and a doll that they did not make.

17         Mr. Quinn talked about peeling back an onion.  And

18   although this is not the way I thought I would start off

19   today, I want to read a question and answer, and then I want

20   to show you the yearbook from Kickapoo High School.  And

21   let's put that up, please.

22         In his opening statement, Mr. Quinn told you that

23   Carter Bryant testified that this is his inspiration for

24   Bratz, hip-hop, urban.  And I looked at it, and I'm sensitive

25   because my daughter is graduating from high school Sunday,

Page 216

1    and I see their dressed up photographs, and I've seen them at

2    the house.  And a lot of times those photographs don't line

3    up.

4            But that wasn't Carter Bryant's inspiration.

5    Actually, this is the testimony that you will hear in this

6    trial.

7            Question by Mr. Quinn and answer by Carter Bryant:

8            "QUESTION:  Can you tell me, as best you can

9        recall, when it was you created the Bratz?

10           "ANSWER:  Yes.  Let's see.  I was driving by a

11       high school.  I believe it was on my way home from

12       work -- and there were -- the kids were getting out

13       of school, and I was just kind of struck by the way

14       they looked.  They were wearing kind of, you know,

15       oversized clothes, big, baggy jeans.  They had on

16       backpacks and -- I don't know.  There was just

17       something very interesting and exciting about their

18       energy andjust got me to kind of thinking, you

19       know, wouldn't it be cool if there were some

20       characters that kind of accurately represented

21       today's teenager.

22           "And so when I went home, I started doing a

23       little bit of sketching and sketched some

24       characters fairly quickly.  I had also kind of been

25       looking at magazines and things like that.  There

1        were some advertising things that were going on at

2        the same time that kind of all melded together and

3        kind of gave me the idea.  There was a Paris Blues

4        ad.

5              "There was -- 17 magazine had a Steve Madden

6        ad.  There was an ad from a Dixie Chicks' album,

7        and it said, "Chicks with Attitude" on it, and it

8        all just came together, and it all just really kind

9        of struck me when I drove by that high school.

10             "QUESTION:  Can you place this in a month in

11       1998?

12             "ANSWER:  It was in late August.

13             "QUESTION:  And do you recall the high school?

14             "ANSWER:  I believe it was Kickapoo High."

15             Mr. Bryant didn't testify that these were hip-hop

16       kids, multi-ethnic with attitudes.

17             What he actually testified to was that he saw the

18       teenagers' energy and their baggy clothes, and then he looked

19       at magazines, and you weren't shown the magazine that

20       Mr. Quinn asked Mr. Bryant about.

21             Can we have Seventeen magazine up.  This, ladies

22       and gentlemen, is Seventeen magazine.  It's dated August

23       1998.  It's received July 2nd, 1998.  I got this from the

24       Glendale library.  It's in publication.  They have a

25       subscription.  This is the magazine that Carter Bryant said

Page 218

1   was his inspiration for Bratz.  And if we could just turn to

2   some of the pages in here.  If we could turn to Mr. Bryant

3   testifying.

4          You'll see in a minute, when I show you the Bratz

5   and drawings, you'll see the eyes, the big head.  Notice the

6   big feet, the slim waste, the fashions, the midriff.

7          Now, nothing about this trial should be an

8   acknowledgment by Mr. Quinn, the father of five girls, or me,

9   the father of two girls, that we necessarily all agree with

10  this style of dress for teenagers.  But the truth of the

11  matter is there was a marketing opportunity out there at that

12  time that was not being served by the consumers of Barbie.

13         Let's move on to some of the other ads that Carter

14  Bryant will explain was some of his inspiration.

15         Carter Bryant had never designed a doll in his

16  life.  He, in essence, was a fashion designer.  I'm going to

17  go through it painstakingly to show you the type of art that

18  Mr. Bryant went through.

19         Let's go through some more ads here.  Multi-ethnic,

20  friends, getting along.

21         Here's the Steve Madden ad.  No doubt, ladies and

22  gentlemen, that this appeared in the August 1998 edition of

23  Seventeen magazine.  Not one part of our case, ladies and

24  gentlemen, is that that character was going to Kickapoo High

25  School.  That's not -- that wasn't the inspiration.

Page 219

1          All right.  In so many ways, even though he's not a

2    party to this action, this case is all about Carter Bryant,

3    and it's all about when he did the drawings, not when the

4    doll was manufactured.

5          These are the Bratz dolls, a sampling of them.

6    These are not what's at issue in this case from a design

7    point of view.

8          They want Bratz.  This case is about the idea for

9    Bratz and when it came up.

10         Let me introduce you to the concept of the Bratz as

11   Carter Bryant described them in 1998.  This is trial

12   Exhibit 5-CB at page 43.

13         It's the handwritten note that Carter Bryant will

14   tell you he made in 1998 in August, where he's describing

15   them, meet the Bratz.  Group of cool girls from your school.

16   Four best friends with totally transformable looks.  Simply

17   pop off their hair and shoes and trade for a new look.  Jade

18   doll comes with two pop-off wigs and two bears.  Meet Zoe.

19   And then he says meet Hallidae, meet Jade.  This is the

20   concept of Bratz.

21         This is Carter Bryant's idea.  This was born in

22   August of 1998, while Carter Bryant was not an employee of

23   Mattel.  This case is not about anyone walking away from

24   Carter Bryant's employment agreement and confidentiality

25   agreement at Mattel.  That's not the issue.

1          The issue is whether or not Carter Bryant's idea

2     and concept for the Bratz for multi-ethnic, hip-hop, urban

3     fashion-focused young characters was conceived in August or

4     September and October of 1998 before he returns to Mattel.

5          Let's go to the time line position for just a

6     moment.  The dates and the periods of time are moving dates,

7     and they can be confusing.  Trust me, this is your first

8     experience to it.

9          We've lived with this.  We know the evidence, but I

10    think sometimes looking at it graphically to decide what

11    we're talking about, fundamentally the structure of my

12    opening statement is going to be that I will be dealing with

13    primarily three very important time periods.

14         Carter Bryant was employed by Mattel between

15    November 1995 and January of 1998.  He leaves in 1998, and

16    I'll explain the circumstances behind that for a moment in a

17    little bit.

18         He goes back to Missouri to live with his parents.

19    He is still employed at Mattel when he goes back to Missouri

20    up through April 15th.  You see up in the upper left-hand

21    corner, I've noted that Carter Bryant began his free-lance

22    work in Missouri, and he was part time for Mattel.  I'm going

23    to explain that to you in just a little bit.  I'll show you

24    those documents.

25         April 15th, 1998, he resigns from Mattel.  He sends

1    a formal letter to Mattel resigning his obligations, which

2    free him from his employment agreement from 1995.

3           We will show you evidence that through 1998, Carter

4    was pursuing his design, his dreams, his ideas.  He was

5    pitching new fashions, new ideas.  He was going out on

6    interviews and doing holiday cards.  He was doing Bratz.  He

7    was doing another doll called Sabrina.  I'll show you that in

8    just a minute.

9           And then at the very end of 1998, we'll talk about

10   witnesses and the trips of the people who saw Bratz in 1998.

11   And then the next date where Mattel has a claim to ideas

12   would be January 4th of the year 1999 through October 19th of

13   2000.  That's the second period of employment.

14           So when Mr. Quinn expressed to you that how

15   convenient it was that there was this eight-month period of

16   time, a gap, if you would, of this time of employment with

17   Mattel, that's not exactly the case here.  There are two

18   distinct periods of employment that Carter had.

19           The evidence in this case and all fact witnesses

20   that will come in here will testify that Carter Bryant did

21   his drawings in 1998, while not employed by Mattel.

22           And, you know, one of them is his mother.  And I

23   guess if you say that mothers are biased and they can never

24   be truthful, then you'll discount her testimony.  But she

25   will testify, and she will confirm that she saw Carter

8f7f8ad3-b8c6-4a9b-b4bd-5b0487575e86

Page 222

1    Bryant's drawings of Bratz in 1998, while he was not an

2    employee of Mattel.

3            We'll also bring in other witnesses who will

4    testify to the exact same thing.

5            Mattel will not bring in one single witness who

6    will say that they saw Carter Bryant do his drawings of Bratz

7    in 1999 or 2000.  The evidence that he refers to is that in

8    1999 and again in 2000, there is color added to the original

9    master drawings and eveningwear gowns, which I will get to.

10           Those, ladies and gentlemen, at the end of the

11   case, whatever color value that might have, and the

12   eveningwear, because they were never used, they might be

13   owned by Mattel, if that's what you find, but that was not

14   the Bratz concept.

15           Let's start where most stories start, and that's

16   the beginning.  It's not the soft side of Carter Bryant,

17   because that's not what this case is about.  These are

18   competitive companies.  He had an obligation under his

19   employment agreement the first time he worked and the second

20   time he worked at Mattel.  And we will prove to you, ladies

21   and gentlemen, that at all times Carter Bryant abided by his

22   obligations in that contract.

23           But what we will also tell you is Mattel's

24   employment agreement was not a lifetime sentence.  An

25   employee who signs his agreement with Mattel is allowed to

Page 223

1   leave Mattel and pursue a better life, to get a better job,

2   to grab an opportunity that was not available to him within

3   Mattel.  Their contract does not prevent someone from

4   improving themselves.  Likewise, that contract, as hard as

5   they want to, does not allow Mattel, as innovative as they

6   think they are, as the largest toy company in the world, does

7   not allow them to grab back before you even start working at

8   Mattel your ideas and concepts.  There is no dispute about

9   that.

10          January 4th, the year 2000, Carter Bryant, when he

11  signed that agreement, agrees that any idea or design concept

12  that he comes up with during that period of employment is

13  Mattel's.  He nowhere says and nowhere does he transfer, and

14  there will be no witness, expert or otherwise, that will say

15  that by signing that agreement, Carter Bryant agreed to

16  disclose any other idea that he had on his own time.

17          Carter from day one was born and blessed to be an

18  artist.  When he testifies, if there's time, we'll ask him to

19  illustrate some things for you.  But at the age of 13, just

20  to show you the breadth of his talent, at the age of 13, he

21  applied for a national contest, a competition, to draw

22  characters for a comic book series, which used to be one of

23  my favorites, Archy.  He won that contest.  This is a Carter

24  Bryant sampling.

25          And by the way, it is Aaron Shorr who will be

Page 224

1   running the technology for me.  This is Veronica's outfit by

2   Carter Bryant.  He was living in Alaska at the time at the

3   age of 13.

4          Carter attended high school in Napa Valley and

5   moved about eight different places.  He applied to Parsons

6   School of Design in New York.  He was talented.  He was

7   accepted.  Carter didn't have the money to attend Parsons

8   School of Design in New York.  He went to a design center

9   school in Los Angeles, Otis, a very nice, very competent,

10  well respected art -- not Parsons, but nevertheless, Carter

11  went there as a child.  Carter was always into drawing,

12  always into fashion.

13         In 1995 he starts his first work at Mattel.  He

14  sends his resume and portfolio to Mattel.  He goes through

15  three interviews.  This is in 1995.  This is before Bratz.

16  He's given a test project.  He's asked to draw for an

17  interview a design of a super power comic for one of the

18  characters at Mattel.

19         May I have trial Exhibit No. 250 up and 15, 455.

20         This is the interview drawing that Carter did for

21  Mattel in 1995.  He gets paid a total of $810 even though

22  he's not employed.  9/15/95.  They like his work.  He's hired

23  as a temporary employee at $15 per hour, and he works 40

24  hours a week.

25         By November of 1995, he had become a full-time

Page 225

1    employee at Mattel.  He believed by going to Mattel there was

2    going to be great opportunity for him.  He worked on what was

3    called Main Line Barbie.

4            He decides to leave after a few years because

5    frankly, although Mr. Quinn in his opening statement

6    described Mattel as being creative and innovative, the

7    leading toy designer in the world, Match Box and Hot Wheels,

8    which I told you the case wasn't about, but with Barbie,

9    where Carter Bryant was assigned, it was a bureaucracy.  It

10   was a market-driven brand where Carter will describe to you,

11   and others will, too, that it was do this, but not do that.

12           So Carter, with all of his talent, was assigned to

13   basically be drawing different colors of hair that would be

14   used on dolls.

15           Carter didn't disrespect Mattel.  He enjoyed

16   working there.  He certainly recognized the opportunity.  But

17   Carter's soul was restless.  He wanted to design more things

18   on his own.  He went to a woman by the name of Cassidy Park.

19   I believe she'll be a witness here.  She was more or less one

20   of his supervisors, an employee at Mattel.  And he tells her,

21   you know, I want to go back.  I want to live closer to my

22   family.

23           By then his parents had moved to Kimberling City in

24   Missouri.

25           He said, "I want to do some free-lancing."  He had

1   been doing free-lancing while he was at Mattel.  I want to

2   show you a couple of the ideas.  If I could show

3   Exhibit 15471.  This is a letter to his parents, 7/18/95.

4   He's still an employee at Mattel.

5          He goes, "Well, here are the prototypes for my

6   Christmas cards.  I've doing one more in this series in

7   English and then a special, quote, surprise, one.  What do

8   you think?  I'm pretty tickled with them.  Let me know if you

9   want to order any for Christmas, okay?  Got my portfolio and

10  resume sent off today.  Cross your fingers for me.  I miss

11  you both so much.  Can't wait until we can all be nearby

12  again.  Love always, Carter."

13         Just to show a couple of the Christmas cards he was

14  doing.  He started a website at the time, while at Mattel

15  this first time.  So when Mr. Quinn in his opening

16  statement -- and frankly, he described Carter's talent as

17  being much more like Barbie, the flowery gowns, and that's

18  all consistent, and how could this young, talented artist

19  come up with Bratz.

20         Here's an example that Carter drew.  Let me give

21  you -- go to another one.  Here's another one that Carter's

22  doing in the night, at his house, off hours from Mattel.

23         Is there one more?  And here's another one.  So

24  Carter moves on January 5th, 1998, to Kimberling City.  He

25  moves in with his parents, his mom and dad.  He works with

Page 227

1    Mattel from January to April of 1998 on a reduced schedule,

2    and he does various drawings for them in Missouri as a

3    free-lance artist pursuant to this reduced work schedule.

4            Let's show the January 1998 drawing.  This is an

5    example of the work that they were sending to Carter, and

6    they asked Carter to come up with some fashions, not the

7    doll, the fashions for the doll.

8            Mattel's assignments included Barbie fashion

9    dresses, and here's the one that probably pushed Carter off

10   the edge a little bit because he ultimately resigned shortly

11   after this.  But here's something that Mattel sends to him

12   while he's back there.  This is the hand-held stapler.

13   Actually, when I saw this I thought it was a stapler, but

14   it's actually a fashion press.

15           Now, he doesn't do the drawings, what I call the

16   stapler.  I apologize.  It sure looks like a stapler to me.

17   Someone at Mattel drew it.  They sent it to Carter in

18   Missouri and said Carter, make this look good.

19           But that's not Carter Bryant's talent.  That really

20   wasn't what he wanted to be doing.  But Carter did what he

21   was supposed to do.  He made some notes.  And in any event,

22   at this time Carter's realizing that he really wants to

23   pursue free-lance.  He doesn't want to be restricted.  He

24   meets a mom by the name of Elaine Rosenthal, who gives Carter

25   her card.  She's an artist's representative.  Says she'll

1    keep an eye out for you.  See if she can get him a job.

2    Couldn't.

3              He also signs a contract with another artist's

4    representative, which then causes him to resign from Mattel.

5    On April 15, 1998, Carter submits a resignation letter to

6    Mattel.  And we have this as Trial Exhibit 15609.

7              It says April 15, 1998.  It's from Carter Bryant.

8    That's his parents' address in Kimberling City.

9              "Dearest Cassidy, Cynthia, and others concerned,

10   please accept this written notice of my resignation,

11   effective two weeks after the date above, April 29, 1998.

12   I've decided to stay in Missouri and pursue other interests.

13   I just want to say thank you both so much for everything

14   you've done for me while I've been at Mattel.  My time and

15   experience there has been extremely valuable.  I will still

16   be available for free-lancing projects in the future, should

17   you decide you want to work with me on a project."

18             So thereafter, Carter starts submitting independent

19   ideas that he has, and one of them that he sends to is Ashton

20   Drake.  Ashton Drake is a company, I believe, located in

21   Chicago, and it does collectible dolls.  Carter is not

22   employed at Mattel.  And so he's doing these designs.  And

23   just to give you an example of Carter's drawings during this

24   period of time, this is an example.  This is Exhibit

25   No. 15062, which shows you the heads, the forms.

1          And what Carter will testify to is how do you draw?

2      I have a hard time with stickmen.  But what Carter will

3      explain to you is that you don't keep drawing over and over

4      the same design, the same idea, the same doll.  What you do

5      is you work on a pose first.  So you establish a pose.  And

6      what he was taught in art school also is listen, draw the

7      head separate.  Draw the faces separate so you can move them

8      around, and you don't have to keep redrawing everything.

9          But this is an example, and Carter will explain how

10     he did it and who he sent it to.  He sent it to Ashton Drake.

11         Why don't we go to 15060 and 15064, Aaron.

12         Here's another example of Carter's talent.  He

13     sends this also to Ashton Drake.

14         Now, Carter also submits his resume to Lego,

15     Hasbro, Hallmark.  He doesn't get any takers.

16         We'll show you the art that he submits to them.  He

17     even applies for a management position at Barnes and Noble

18     bookstore trying to get a job.  He ultimately takes a job at

19     the Old Navy clothing store.  You heard about the Old Navy

20     store job because they are going to contend that there was no

21     way that Carter Bryant could be driving around Kickapoo High

22     School.  I guess that was the purpose of that graphic.

23         I read the testimony.  Carter Bryant said he

24     believed he may have been coming home from work, but if

25     that's the scientific evidence that Mattel is going to rely

1   on that the drawings weren't done in 1998, I'll have

2   something to say about that in closing argument.

3        He also in 1998 comes up with the drawing concept

4   of a doll called Sabrina.  And let's turn to Sabrina for a

5   moment.  Let's go to the theme first.

6        You recall, when I first opened up my opening

7   statement, I introduced you to Bratz, a handwritten

8   description by Carter Bryant describing them as multi-ethnic,

9   friends, transformable fashions amongst themselves.  This is

10  Carter's style.  This is what he does.  He writes out a

11  script in handwriting and then does drawings.  This is

12  another sample of ideas and concepts that Carter had while he

13  was back in Missouri in 1998.  This was before Bratz.  It

14  talks about his idea for a doll line called Sabrina.

15  Interestingly, this one is now pitched for the 1950's.

16       But let's go to examples of Sabrina, because this

17  will be critical.  Mattel has no evidence to prove that he

18  was not doing Sabrina in 1998.  Here's an example of Sabrina.

19  Sabrina has, and these are Carter Bryant's drawings, a

20  concept that frankly I had not seen or thought about,

21  frankly, and that is having detachable hair so you can move

22  them amongst dolls and dolls have different hairstyles.  You

23  will see later on that that exact idea, the concept of

24  removing doll hair and placing it on another one, was

25  Sabrina, August of 1998.  That's the same time he was doing

Page 231

1    the concept of Bratz.

2           I've shown you and we talked about, because I took

3    it out of order, Kickapoo High School and the Seventeen

4    magazine.  I want to go back, if I could just go to the Coke

5    ad.  Because I don't believe that we showed the Coke ad.

6           You will recall that one of the points made in

7    opening statement was that Carter Bryant drew and copied Lily

8    Martinez's Toon Teens.  And one of the proofs that was made

9    that the evidence that Mattel will offer to you is that the

10   original idea and the original drawing by Carter Bryant of

11   the Bratz concept was that the heads were in proportion to

12   the body -- I think you'll recall that reference -- and that

13   he got the idea for big heads, big feet, big lips from Lily

14   Martinez.

15          Now, with all due respect to the design talents of

16   Lily Martinez, I don't know where Lily Martinez got her idea

17   for big heads and big feet in these ads, but Carter Bryant

18   will testify, and you cannot deny the date on this Seventeen

19   magazine, that you look at the Coke ad.  It's big head, big

20   feet, big lips.

21          If you go to the Paris Blue ad again just for a

22   moment, big head, big feet.

23          And the Steve Madden ad.  Body out of proportion,

24   big feet.  But girls with attitude, the poses.  Rebellious,

25   maybe.  Attitude, certainly.  That's Steve Madden.  That's in

1  every magazine.  He's still selling shoes.  They are still

2  bigger than usual.  That's the idea.  But you see, Mattel

3  will tell you that it was Lily Martinez's idea that Carter

4  Bryant ripped off, and they do that because they have to put

5  Carter in 1999.  And then one of the questions, I guess, for

6  you will be why didn't they show you the Seventeen magazine.

7          So his idea for the Bratz empowered young girls

8  with attitudes, multi-ethnic groups of girls, bodies out of

9  proportion, big eyes, full lips.  Remember this idea of body

10  out of proportion because when I talk about Paula Garcia,

11  I'll talk a little bit more about the development of Bratz.

12          And, of course, the last idea of hip urban fashion.

13  Again, it was shown in the magazine of Seventeen, and you

14  will have that magazine back later on.  His script for meet

15  the Bratz, very similar to his style for bringing up his

16  script regarding Sabrina.

17          Carter draws his master drawings of Bratz in August

18  and September of 1998.  I want to show you and introduce you

19  to what's known as Zoe.  This is going to be Trial

20  Exhibit 05-CB.

21          Now, Carter will testify that this was done in

22  1998.  He will go and explain to you the process that he uses

23  in drawing.  There's not a face.  It's not that Carter didn't

24  have an idea for a face.  I'll show you the head drawings on

25  a separate page.  Remember, Carter will testify that at his

Page 233

1   school of design, he was told you can move the faces.  Draw

2   the head separately so that -- and this is important -- so

3   that once you have the concept down and once you draw the

4   doll or the fashion idea, you do not have to keep repeating

5   it.  You simply will put it on a light box.  You can trace

6   it.

7            Technology permitting and time permitting, and with

8   the Court's permission, we'll have a light box here.  And

9   Mr. Bryant will testify how, after doing the drawings, you

10  can put the drawings on the light box.  It's a pretty simple

11  concept.  It's a box that has light that shines up through a

12  rather translucent plastic, which allows you to be able to

13  put a heavier piece of paper on your master drawing, such as

14  trace paper.  And then you can slowly trace, and then you're

15  not having to repeat it all the time.

16           So this is Zoe, another character you remember from

17  the pitch book, the concept of Lupe, I think, was the next in

18  order.  This is Lupe.  This was his idea for Lupe.  And then

19  he had another character.  This was Hallidae.  Hallidae's

20  name gets changed later on.  It's sold today as Sasha, and

21  then we have Jade.  Again, drawing in 1998.

22           This will become important because basically what

23  happens is that these drawings and concepts are finished in

24  1998.  He's got Bratz, he's got an idea.  But he's been shut

25  down by Ashton Drake, Lego, Hasbro.  He didn't send these to

1   them.  His other drawings didn't go anywhere.  This drawing

2   later becomes the master drawing from which Carter in the

3   year 1999 draws and traces it and adds color.  Later I'll

4   show you the color.

5            That's what he added while he was at Mattel.  He

6   did not redraw the character.  He didn't change the concept

7   of it.  He made it into, I think, a blue dress.  I have to

8   confess I'm color bind, and I'm going to get all of these

9   colors wrong.  But I do believe it's blue or some kind of a

10   dress.  But that's what he did.  He traced it.  He traced it

11   for the master drawings in 1998.

12            The first step in Carter's drawings is to draw a

13   faceless form to give the right proportions and poses.  And

14   he does this on tracing paper.  Let's talk about the focus on

15   the poses.  Let's go to -- these are early stages of Carter's

16   development of Bratz.  But let's stop for just a moment.

17   Even on this, even as rudimentary as these drawings are, you

18   know that they have attitude.  You know they are rebellious.

19   You know that they have got that pose.  You know, the locked

20   knees, the hip cocked.  This was Carter's impression of what

21   was out there in 1998 before he ever met Lily Martinez.

22            Next, here they are.  This is the Bratz.  This will

23   later, I'll show you, become the hero shot.

24            But you can tell right now from the hand that's

25   gestured out there.  Do you see that?  You see, this is

1   Carter's drawing in August of 1998.  You see the pose?  It's

2   like this.

3            And, Aaron, can you take me back to the Seventeen

4   magazine that has the same pose.  With the fist forward.

5            We've got one other example from the August 1998

6   ad.  Pose, out like that.  August 1998.  No denial.  Nobody

7   is going to say that Carter Bryant came in here, came into

8   Mattel in 1999 and thought wow, I never thought of anything

9   like this.  I've never seen anything like Toon Teens, I've

10  never seen anything like Lily Martinez does.

11           The evidence is going to be, and you can't shake

12  it, is that it's 1998 that he does these drawings.

13           Now let's also talk about the removable hair,

14  because this is interesting.  Remember I told you that

15  Sabrina had removable hair from 1998.  Let's go to the master

16  drawing for Carter with removable hair.  Let's go to more

17  pictures of drawings for the Bratz dolls.  These are all done

18  in 1998.  Carter will be here and can be cross-examined.

19  These are some of the other examples.

20           I'll show you during the trial, and I'm not going

21  to do it right now, but I'll show that you that hair due for

22  Lupe on the right is right out of the magazine from August of

23  1998 Seventeen.  And I'll also show you that Lily Martinez

24  cannot come in here with any drawings that has hair like

25  that.

1          We have at least three witnesses that will come in

2     with respect to having seen these drawings.  And I want to

3     spend a little time with them.  I talked to you about Jena's

4     (phonetic) mother.  I think the evidence is going to be that

5     mothers can tell the truth as to what they saw in 1998.  But

6     Jean Galvano is a friend.  Not denying that either.  But Jean

7     Galvano is an interesting witness because Jean Galvano will

8     testify in this case, did testify, that she traveled from

9     Anchorage, Alaska, to visit her friend Janet Bryant in

10    Kimberling City, Missouri, and that she was shown the

11    drawings.

12          Now, at this point in time, I think the evidence

13    will show that when your son is a fashion designer, and I

14    think the testimony from the mother will be that he actually

15    raced to get the fashion magazines to beat her to them --

16    maybe you don't show it all around town, okay?  But to her

17    close friend who had lived with them, lived close by, they

18    used to be neighbors, who was always fascinated and enjoyed

19    Carter's drawings.

20          Jean Galvano doesn't really have a dog in this

21    fight.  She doesn't have a financial interest.  And try as

22    they might, Mattel tried to get Jean Galvano to testify that

23    she wasn't sure it was 1998 or 1999 that she saw Carter's

24    drawings of Bratz in 1998.  Jean Galvano, however, kept a

25    calendar, and we have her calendar, and we can show to you

Page  237

1    exactly when she went to spring -- to Kimberling City,

2    Missouri.  It's August of 1998.  This is Jean Galvano.

3    She'll testify probably by video.  This will be in evidence.

4    This wasn't doctored or forged.  But this wasn't pointed out

5    to you.  On this day, there is an A.A. number, Alaskan

6    Airlines, the toll free number for reservations.  And right

7    above it will be the -- over here, there's the number.

8    48,288 and 45,456.

9              Those, ladies and gentlemen, the number of miles on

10   Alaskan Airlines that it takes to fly from Anchorage, Alaska,

11   to Harrisburg, Pennsylvania.  Jean Galvano was going to pay a

12   visit to her sick mother and on her way back, she was

13   stopping in at Kimberling, Missouri.  We will prove to you

14   that Jean Galvano was in Kimberling City, Missouri, in August

15   of 1998 and that she saw the Bratz drawings, the concept for

16   Bratz.

17             Let me, if I may, move over to September of 1998

18   because this is also important.  Carter is trying to get a

19   job.  He's working at Old Navy.  He's still talented, doing a

20   little bit of free-lance work for Ashton Drake on some of his

21   drawings, but he gets an opportunity for an interview at

22   Ashton Drake.  He wants to work on a line of dolls called the

23   Jean doll.  There was the Jean doll founded by a gentleman,

24   created by a gentleman named Mel Odem, O-D-E-M.

25             Carter has two telephone interviews with Ashton

Page 238

1    Drake first.  And in one of the conversations that he has, he

2    asks the woman -- and Carter will testify to this -- how did

3    Mel Odem ever get his idea presented to Ashton Drake?  And

4    they said there was a company in New York called Alaska Mama.

5    Not very many mysteries in this case, but one of the

6    mysteries I will always try to figure out is how does a

7    business named Alaska Mama end up in New York.

8            He goes to Chicago and has an interview for Ashton

9    Drake.  He wants to work on the Jean doll.  Carter gets

10   rejected again.  So he's been rejected by Ashton Drake, Lego,

11   Hasbro.  He is approaching 30 years old, and he wants to move

12   on from Old Navy.  He decides to reapply to Mattel.  And in

13   October and November of the year 1998, he applies to come

14   back to Mattel, and during this period of time, he starts to

15   prepare a portfolio for Mattel.

16           If I could turn to 15058, the flower hat lady.

17   This is also Carter Bryant.

18           15072.  Pirate lady.  And, of course, 15073, cook

19   lady.  More drawings done in 1998, done for preparation for

20   an interview he's going to have with Barbie, Mattel.  He

21   doesn't want to go to Main Line Barbie.  He wants to go to

22   collectibles where they have the more elaborate dresses.

23   That's why he does these dresses.  It's not as was suggested,

24   that he's more akin to doing these flowery dresses.  He goes,

25   he interviews, they hire him and make him an offer.

1          He drives from Missouri to Los Angeles.  He arrives

2     November 1st, 1999 -- I'm sorry, January 1, 1999, in the

3     afternoon.  He pulls up to Richard Irmen's house.  Richard

4     Irmen was Carter Bryant's partner before he left Mattel.  He

5     is his partner today.  He will testify in this case.

6          At that meeting Richard, catching up with Carter,

7     said, "What have you been doing?  Show me some of the

8     things."  And Carter shows the portfolio and shows Richard

9     Irmen on January 1st of the year 1999, before he starts to

10    work at Mattel, the concept of Bratz.  He shows him the

11    drawings.  Richard Irmen will testify that he did see them on

12    January 1st, 1999.  Carter goes to work at Mattel January

13    4th, 1999.  Let's have the confidentiality agreement up for a

14    moment.  This is shown in a graphic.  It's not that I can't

15    do graphics.  It's just that I want to show the documents.

16    Let's go to the inventions agreement.

17         Ladies and gentlemen, this is the employee

18    confidential information agreement that Mattel will contend

19    gives them the right to Bratz.  The ownership of invention.

20    It says:  "I agree to communicate to the company as properly

21    and fully as practicable all inventions as defined below

22    conceived or reduced to practice by me or by others at any

23    time during my employment by the company."

24         And inventions includes discoveries, improvements,

25    processes, developments, designs.  It also includes ideas.

1    But as I said before, ladies and gentlemen, by

2    signing this contract, Carter Bryant did not give to Mattel

3    anything more than the commitment to work on Mattel projects

4    eight hours a day, or whatever time they wanted, but he

5    didn't give them his ideas, and he didn't give them his soul

6    before he got to Mattel.  That is what this case is about.

7    The scientific evidence that Mr. Quinn spent so

8    much time on will not support the conclusion that those

9    drawings that I just showed you, that Carter's parents saw,

10   that Jean Galvano saw, that Richard Irmen saw in 1998,

11   nothing can transform through this agreement and move them

12   over to 1999.

13   Can I show the graphic of the pictures.

14   The real issue in this case, ladies and gentlemen,

15   these are the drawings that Carter did in 1998 while not

16   employed at Mattel.  He will testify he did these all.

17   Can I highlight for them the Bratz.

18   The highlighted version are the ones that you will

19   see.  They are the concept.  They are the idea.  They are the

20   expression, and they are the reduction to drawing of the

21   Bratz idea.  This issue in this case for you will be whether

22   or not Mattel can move these drawings from 1998 over the line

23   to that point while he was employed by Mattel, the scientific

24   evidence will not allow it.  The evidence will be to the

25   contrary.  The scientific evidence in this case will be that

1   they were done in 1998.

2          Now, you'll say wait a minute.  Mr. Quinn in his

3   opening statement told me that he will have an expert who

4   will testify that the color drawings were actually copied --

5   I'm sorry, that the stick drawings that I showed you were

6   copied from the color drawings.  The testimony, however,

7   ladies and gentlemen, will be that that doesn't make any

8   sense.  The experts will talk about the fact that the color

9   drawing was traced.

10         Now, Mr. Quinn made reference to the fact that

11  there was -- their expert can tell because the lines were oh,

12  so slow being drawn, and that's why they believe that the

13  color drawing was done first.

14         I think our experts and the evidence will raise the

15  following question.  How many color books do you buy that are

16  fully colored first?  The evidence will establish that it was

17  the Bratz concept drawings that were the focus of the

18  drawings and that Carter Bryant, at Mattel, simply traced, at

19  night, in his studio in back of his house the master drawings

20  and added the color to it.

21         All right.  To Carter Bryant, January 4, 1999, he's

22  an employee of Mattel.  But although he's an employee of

23  Mattel, that agreement does not give him -- I'm sorry -- does

24  not give Mattel his ideas if you find that they were done in

25  1998.

Page 242

1          And this goes to the conspiracy, the so-called

2     cover-up Mr. Quinn was describing to you in many ways.  He

3     talks to you about a notary book.  Let me tell you a little

4     bit about this story.  According to the opening statement,

5     Mattel will contend that Carter Bryant in 1999 went to a --

6     went to get his drawings copyrighted.  And that's why in

7     evidence you will see that the master drawings have a

8     copyright -- I'm sorry, a notary public stamp that says 1999.

9          Carter Bryant, and think about this just for a

10    moment.  It's rather breathtaking.  Carter Bryant, you

11    understand the over arching theme here is that my client,

12    Isaac Larian, kicked Carter out and both of them concealed

13    the fact that Carter Bryant was behind the drawings.

14          Carter Bryant ultimately goes to a woman at Mattel

15    who was working for the vice-president of administration at

16    Mattel.  She happens to be a notary.  She does not know

17    Carter.  There is no social relationship.  It's just a

18    passing relationship, and someone said you know what?  This

19    person has a notary.  Carter Bryant, not hiding anything,

20    goes to the notary's house, Jacqueline Prince, and says to

21    her, "I want to send out my idea.  I'm going to send it to

22    Alaska Mama."  He had gotten the name of Alaska Mama in 1998

23    in his interview with Ashton Drake over the telephone.  He

24    wants to send his drawings out.

25          He wants to make certain, however, that he can

1   prove that they are his drawings.  He gets them copyrighted

2   in 1999.  Jacqueline Prince will testify by video.  She

3   doesn't have a dog in this fight either.  Jacqueline Prince

4   will testify.  And let's put up the notary book.  This is her

5   notary book.  She's sworn to keep it accurate.  Her testimony

6   is -- and this is interesting because the graphic that you

7   were shown only showed this part.  I want to show just for a

8   moment the full page of it.

9            Jacqueline Prince will testify that Carter Bryant

10  came to her apartment, that Carter showed her the drawings.

11  He asked her to notarize the drawings.  She put them in the

12  book.  She notarized them, and she used the description as it

13  is here.

14           Now, when the graphic was shown to you in

15  Mr. Quinn's opening statement, he only showed you the first

16  entry.  But look for a minute at the second entry.  The

17  second entry is written on the top line.  It's a letter, do

18  you see that?  Mattel is going to contend that last line from

19  1998 Missouri was added later.  The graphic, remember this.

20  The graphic said forged notary book.  Jacqueline Prince under

21  oath testifies that she put in all of those words at the same

22  time, and I guess common sense will ask you if it was put in

23  later, if from 1998 Missouri was added to this later,

24  sometime later as part of the conspiracy, why, when she

25  originally did this entry, did she just coincidentally leave

1   a quarter of an inch above the bottom line.

2          The evidence in this case will be only one

3   interpretation.  And that is that she's testifying

4   truthfully.  She's not biased.  She wrote that whole

5   description.  Original sketches of doll idea, characters, six

6   total, names are Zoe, Jade, Lupe, Hallidae, and there was, I

7   think, two males.  From 1998 Missouri.

8          But Mattel told you in the opening statement, wait.

9   They are going to have an ink expert who is going to tell you

10  that from 1998 Missouri is different ink.

11         The evidence in this case will be that Mattel's

12  expert did four tests on that line.  The first three tests

13  showed nothing.  Same ink, same time.  In fact, all of the

14  experts will say you can't age this ink to tell whether or

15  not it was done later on.

16         But they are all in agreement with respect to this.

17  Three tests, all same ink.  He applies a different test, and

18  he finds traces of menthol in the ink.  And on that he

19  concludes that it was added later, forged I think was the

20  term that you were told, with a different pen.  Both experts

21  will testify that in their collective years of nearly 60

22  years testifying as experts, they have never come across ink

23  that has menthol in it.

24         Our expert will say that he replicated the test,

25  and he could find no evidence of menthol in the ink and

Page 245

1    doesn't say that it's made up.  It just simply that when he

2    tested it, same page, same ink, he does not find through his

3    sensitive instruments any menthol, and he concludes that it's

4    possible either in the lab that Mattel used for their fourth

5    test there was contamination of menthol, or possibly, if

6    there was in fact menthol actually in the ink, that it came

7    from possibly having a cigarette that had menthol in it next

8    to the notary public at some point in time.

9            But it's just trace elements, and you will know

10   that, and there will be no doubt about that three of the four

11   tests that Mattel even conducted themselves were negative.

12   It's all the same ink.  And so you'll have to question

13   yourself.

14           All right.  Alaska Mama, although it was

15   instrumental in placing the Jean doll at Ashton Drakes,

16   returns Carter Bryant's drawings to him about Bratz.  They

17   didn't do the toy line.  They did the Jean doll set back in

18   the Hollywood studio days.  Carter remains working in 1999

19   and 2000 at Mattel.

20           In the year 2000 Carter meets a woman by the name

21   of Veronica Marlow.  You've heard about Veronica Marlow.  She

22   was then an employee at Mattel but was leaving to become an

23   individual consultant.  Had not even seen Carter for a while

24   and had not realized that he had come back to Mattel.  And

25   she sees Carter Bryant, and Carter says, "Oh, I was back in

1    Missouri.  I came up with some ideas for drawings.  I'd love

2    to show you.  They are kind of like a hip funky fashion

3    doll."

4            Veronica said, "I'd love to see them sometime."

5    Carter forgets about the conversation, and Veronica says,

6    "I'd like to see them."  So Carter shows Veronica his ideas

7    for the Bratz.  She really likes them.  It's different.  And

8    later she leaves Mattel's employment.  And she is an

9    individual consultant.  And she is helping MGA out on a doll.

10   It was a doll called Prayer Angels.

11           So let me talk to you a little bit about MGA and

12   introduce you to MGA now in the story.  Carter is employed at

13   Mattel.  You heard Mr. Quinn say that the theory of Mattel is

14   that MGA had never done anything about a fashion doll or

15   never made a doll, didn't have the capabilities.  In fact,

16   it's not true.  That's not true.

17           MGA was started some time ago in the mid-80's by

18   Isaac Larian.  And yes, he is the American dream.  He'll miss

19   a couple days.  He'll be out tomorrow, Thursday, and Friday.

20   He's going to Europe to be a representative of the United

21   States in an entrepreneur of the year award.

22           Paula Garcia, who is also present today, will be

23   here in his absence as our corporate representative.

24   Mr. Larian will return and be available next week.

25           He will testify in this case.

1        Mr. Larian and his brother did have a dispute.  I

2   want to talk about that just for a moment.  Because there was

3   an allegation regarding concealment here and that his brother

4   in a lawsuit contended that Mr. Larian had started working in

5   1999 on Bratz.  That's simply not true.  It is simply not

6   true.

7        Mr. Larian's brother did sue him.  Families have

8   disputes.  It's been reconciled.  And after filing the

9   lawsuit -- this was not told to you -- his brother dropped

10  the lawsuit, admitted it was baseless.  They settled.

11  Mr. Larian was awarded attorney fees.  Stuff happens.

12       But the other idea and other contention that was

13  made is that Mr. Larian took his family's wealth to start

14  MGA.  The fact of the matter is that his father ran a textile

15  shop in Iran.  He had three employees.  Himself, his wife,

16  and a salesclerk.  Isaac went back to Iran in the revolution

17  and brought them to the United States.  This idea of wealthy

18  backgrounds of MGA is defied by the facts.

19       In truth, MGA is a dream of Isaac.  He starts off

20  making electronic products, but it morphed into other

21  different things.  But they did make some dolls.  Not mini

22  fashion dolls like Bratz, but they had made a doll called

23  Hippity Hoppity Bouncy, I think it was.

24       And Prayer Angels was another one.  With all due

25  respect to the toy industry, the fact that all of us lawyers

1    are talking about dolls all the time and playing with dolls,

2    I go home every night and my daughters can't believe that

3    that's what I do, play with dolls, and what have you, the

4    truth of the matter is that's what this case is about.

5             Hippity Hoppity Bouncy Baby was a doll.  Prayer

6    Angels was not so successful.  In fact, it was taken out of

7    the market.  But this is the line of dolls which will be the

8    subject of evidence.

9             Mr. Quinn says that Carter Bryant was using a face

10   painter as early as June of 2000 to paint faces on Bratz and

11   that they were working on Bratz.

12            She'll be here.  She did testify that she got an

13   assignment from Carter.  We will show through invoices that

14   she's wrong on her dates.  I think she's simply confused.  In

15   truth, what she was working on was a project called Prayer

16   Angels.

17            Veronica Marlow was also working as an independent

18   consultant.  And in August of 1999 -- I'm sorry -- August of

19   2000 -- August of 2000, Veronica Marlow and Paula Garcia are

20   working at MGA, and they are doing a photo shoot.  And Paula

21   Garcia is walking back from the photo shoot with Veronica and

22   is talking about an idea that she wanted to create about a

23   new doll, a more relevant doll, that Barbie was losing out

24   significant market share because although it was iconic --

25   and I'm not taking anything away from Barbie -- that the

1  evidence was showing that Barbie was not appealing to the

2  older generation of girls, the ones that Carter Bryant had

3  identified in Bratz.

4          Paula Garcia, who I said is sitting next to

5  Mr. Larian, Paula Garcia has an interesting background.  She

6  graduates from the University of Southern California.  She

7  goes to an advertising agency, well-known advertising agency

8  upon graduation, and part of her account is the Mattel

9  account.  She likes Mattel.  She's interested in going to

10 work there.  She applies.  She wants to go in the marketing

11 department.  Paula will tell that you she got accepted but

12 not in the marketing department.

13         Paula Garcia was assigned word operations.  Paula

14 Garcia did not fit into the Barbie marketing group.  She did

15 not have the right look that she felt was needed to be on the

16 Barbie line.  Try as she might, it just wasn't working out.

17 She'll describe Mattel a little bit like Carter was in terms

18 of being restricted, do this, do that.  Paula was frustrated

19 that Mattel was not going after what she thought was a market

20 cap out there for what they call the tweens age, 8 to 12,

21 these younger more hip kids who, frankly, were moving on in

22 their lives, who were more operational for fashions and that

23 type of thing.

24         But in any event, Paula Garcia was walking back

25 with Veronica Marlow after the photo shoot and said, "I have

1    this idea.  There's a hole in the market.  I see this market

2    opportunity.  I've talked to Isaac about it, and I'd like to

3    do a fashion doll that can appeal to older kids."

4            And Veronica Marlow tells Paula, "Wow, I just saw

5    something that you may like.  It's by a designer."  They said

6    to you in opening statement that Paula Garcia knows Carter

7    Bryant.  Ladies and gentlemen, in this courtroom, under oath,

8    Paula Garcia and Carter Bryant will testify that at no time

9    did they know each other at Mattel.  At no time did they talk

10   to each other, and that the first time they met, the first

11   time they met was at the pitch meeting at MGA for Carter's

12   design.

13           Now, you were told that we reached out and stole a

14   Mattel designer because we couldn't design something, and we

15   wanted what they had.

16           In truth, the evidence is that Carter Bryant

17   himself, consistent with what he was doing in 1998, 1999, and

18   consistent with why he left Mattel in the first place, wanted

19   something bigger.

20           He was working on Barbie.  It was a narrow brand.

21   It was driven by the marketing.  Whatever was good for Barbie

22   was good for Mattel.  They wouldn't be innovative.  I will

23   have evidence that will say that despite what we're being

24   told here, that they were innovative, creative, design, that

25   the marketing president described it as being complacent,

1   that they were out bought and they were out executed.  That's

2   the condition within the design center.

3            Carter wanted a different idea.  He wanted a

4   chance.  Veronica Marlow -- he calls Veronica Marlow and says

5   listen, can you give me an idea of who I might contact to get

6   my idea out there.  And Veronica says I know a company by the

7   name of MGA.  I'm doing consulting work.  They want to do a

8   doll.  Carter says great.  Carter then goes home, and there's

9   no dispute about this.  As part of his portfolio, he adds to

10  his original master drawing concept evening wear.  This is a

11  picture that he has colored in, and he's added fashionwear.

12  He did this.  Mattel can own these dresses.  That's all they

13  get in this case.  That long gown, that was done at night in

14  the back of his house, presumably Mattel, if you find so, can

15  have the dress, but that is the original master drawing, and

16  it was traced from the master drawings, and Carter will

17  testify to it.

18           In any event, he brings these in a portfolio.  He

19  does a couple other things in anticipation of the pitch

20  meeting, unbeknownst to us, and we did not encourage this.

21  Carter did a dummy doll.  That's what it's called.  It's a

22  mockup.  Sometimes it's called a Frankenstein doll.  And what

23  he wanted to do is he had these concept drawings that had

24  been done in 1998.  Now he wanted to pitch the doll.  And

25  admittedly, we didn't know this at this time.  I know it now.

1        He goes into a trash barrel at Mattel, and he pulls

2   out a blank head.  Not this one.  But it was just blank.  And

3   he puts it onto a body that's right, parts that he either got

4   from his house, but they are the same type of things that are

5   offered at sale for retail.

6        I think he used Ken's feet, Ken and Barbie.  To use

7   proportions.  I think he showed a Barbie torso, and he put

8   some legs on.  That dummy doll together with his portfolio,

9   he goes to what he thought was going to be an interview job.

10  That's what he was doing.  He wanted to be a free-lancer.  He

11  wanted to sell his idea that was not owned by Mattel.  He

12  goes to the meeting September 1st, meeting at MGA.  At that

13  meeting, Paula, Isaac, and Isaac's 12-year-old daughter

14  Jasmine.  Carter shows the drawings, the characters.

15       They look at these drawings.  Paula likes it

16  immediately.  It's the concept.  It's the idea that she was

17  thinking of that could be more appealing to that unserved

18  market area, market opportunity.

19       Isaac was a little bit more doubtful about it.

20  First of all, he didn't know if it could be made into a doll.

21  I think his testimony was actually, no offense, Isaac, but

22  you thought maybe the drawings were a little bit weird.

23       But Jasmine, who was out of school that day and was

24  at MGA because Isaac would bring his kids in, was sitting in

25  the outer office.  She had just had lunch with her dad.  He

1   came out, and he showed it to Jasmine.  Jasmine actually is

2   the first focus group of Bratz.  Jasmine liked it.  She said,

3   "I think it's cool."  Meeting ends, but more importantly,

4   during that meeting Isaac asked Carter Bryant this question.

5   Is this concept, is this something that's being done at

6   Mattel?  And Carter Bryant tells Isaac at that time, "No.

7   This is my own idea.  I did it outside the employment of

8   Mattel."

9            Isaac said, "Let me think about it.  I'll get back

10  to you."  And the testimony will be from Mr. Larian that he

11  did think about it.  He thought about it for about six days,

12  seven days.  He weighed the fact that this was going to take

13  millions of dollars of commitment.  It was going to take

14  resources.

15           Doll lines fail.  A lot of new toys are introduced,

16  and they are flops.  But Isaac took the risk and said, "I'm

17  going to do this.  I'm going to commit the resources of MGA,

18  and we're going to get this job done."

19           He calls Carter up, and he offers Carter a job,

20  full-time employment at MGA, and Carter says, "No.  I don't

21  want to work for another company.  I'll be a consultant.  I

22  want to be able to do free-lancing.  I do not want to go to

23  work for MGA."

24           They work out an arrangement whereby Carter signs

25  an agreement.  Carter had some negotiations back and forth.

1    Isaac says to Victoria O'Connor get this done.  And she sends

2    it out to David Rosenbaum, who will testify.  He's MGA's

3    lawyer.

4           Veronica Marlow, who is now serving as the

5    representative of Carter Bryant, Veronica Marlow is now just

6    a consultant.  She couldn't be working for Mattel because

7    Mattel had a policy that, after you quit, you could not be a

8    consultant for six months with them.  So she was working for

9    MGA, no dispute, no issue there.

10          She refers Carter Bryant to a well-respected IP,

11   intellectual property copyright boutique in Los Angeles by

12   the name of Pretty Schroeder.  Carter will testify that he

13   met with Pretty.  He was introduced to a woman named Anna

14   Wang, who will also be a witness.

15          Two lawyers, one representing Carter Bryant, one

16   representing MGA.  They enter into a consulting agreement,

17   and you will hear that the representations that were made

18   during that due diligence discussion was that Carter Bryant

19   said, "I did this in 1998, not while employed at Mattel.

20   These are my ideas.  They are not Mattel's ideas."

21          One issue is that Anna Wang says to him did you

22   sign any agreements at Mattel.  He sends to her his

23   employment agreement that he signed at Mattel.  But

24   interestingly, he does not have a copy of his confidentiality

25   agreement that he signed from January of 1999.  Why?  Because

1    Mattel does not give the employees a copy of that agreement.

2              You'll hear testimony that they believe that that

3    document is proprietary.  Carter Bryant tells I think David

4    Rosenbaum or Anna Wang, I don't want to go to HR and ask them

5    for a copy of that agreement.  It's going to raise suspicion.

6              We, ladies and gentlemen, did not encourage him to

7    say that.  That was Carter's decision.  He did not want to

8    call himself out to the HR department.  I guess anybody using

9    common sense, if someone from the HR department is told an

10   employee wants to take a look at an agreement, they might

11   think he's going to be leaving.

12             In any event, Carter goes, is represented by

13   counsel, David Rosenbaum is representing us.  We enter into

14   an agreement with Carter Bryant.  There's negotiations back

15   and forth.  Carter is ably represented.  We're ably

16   represented.  Carter wants royalties on everything for Bratz.

17   Isaac says no, you're not going to get royalties on

18   everything.  I'll give you royalties on what you contribute

19   to the Bratz fashions.

20             Let's show the agreement between Carter Bryant and

21   MGA.  This, ladies and gentlemen, is a contract.  It's dated

22   September 18th, date as of September 18, 2000.  It's Carter

23   Bryant.  It's dated as of September 18, 2000, but it's not

24   signed on that day.  That will be the day that David

25   Rosenbaum first gets the assignment.  He will tell you that.

1        The actual date of this document is October 4.  We

2   know that from the fax line that indicates it was faxed over,

3   the signature line and both parties signed it on October 4th.

4   But I want to spend a few moments on this contract.

5        This is our contract with Carter Bryant.  And if

6   you could turn to the reps and warranties section.  I think

7   it's paragraph 5.  Warranties and indemnity.  Bryant

8   represents and warrants and agrees to that.

9        So in this document, Carter Bryant tells G.B.A.

10  that he has the right and is free to execute this agreement

11  to grant the rights granted by him to MGA hereunder and to

12  perform each and every term and provision thereof.

13       B, he affirmatively states neither the execution

14  and delivery of this agreement nor the performance by Bryant

15  of any of his obligations hereunder will constitute a

16  violation, breach, or default under any agreement,

17  arrangement, or understanding, or any other restriction of

18  any kind, to which Bryant is a party or by which Bryant is

19  bound.

20       And the third one here is the Bryant work product

21  shall be free of all liens -- now we're talking about the

22  drawings, the concept of Bratz.  Carter Bryant warrants to

23  MGA that Bryant work product shall be free of all liens,

24  encumbrances, and there will be no claims, demands, or

25  actions pending or threatened with respect thereto, and that

Page 257

1    Bryant work product is original and no part thereof infringes

2    or shall infringe upon any common law or statutory rights or

3    intellectual property rights of any third party including

4    without limitation, contractual rights, patents, copyrights,

5    marks, work rights, trade secrets, rights of privacy, and

6    other intellectual property rights.

7              And then let's go to the indemnification paragraph.

8    This is drawn by lawyers, not by Isaac Larian and not by

9    Carter Bryant.  These are separate lawyers, competent

10   lawyers.  And they will both testify.  And in this contract,

11   Carter Bryant goes out, and he says -- he shall indemnify and

12   hold MGA harmless from and against any and all claims,

13   losses, costs, judgments, settlements, damages, and expenses,

14   including reasonable counsel fees arising from any breach by

15   him of any of the warranties, representations, and agreements

16   made by him hereunder.

17             We wanted that representation.  We wanted that

18   statement from Carter Bryant.  He gave it to us in the

19   contract.  This contract was signed October 4th.  We told him

20   to resign immediately at Mattel.  Carter Bryant gave his

21   notice to Mattel on October 4th.  He gave them two weeks'

22   notice.  Because that's what he understood was the right

23   thing to do.

24             He will testify that he did not want to leave

25   Mattel's projects hanging that he was working on.  There will

Page 258

1    not be one shred of evidence, not one person will come into

2    this courtroom and say that Bryant during that two-week

3    period of time took anything from Mattel, took any

4    confidential information from Mattel or proprietary

5    information from Mattel.  He did his job and finished his

6    work.

7          Now, they will make the contention that well, they

8    didn't know where Carter Bryant was going to work.  They

9    didn't know he was going to work for a competitor.

10         Remember that his contract at Mattel says nothing

11   about you can't go to work for a competitor.  Carter Bryant

12   could walk out that day and go to work at another competitor.

13   Just like MGA.  The restriction was that he couldn't take

14   proprietary information.  The evidence in this case will be

15   that he took no proprietary information from Mattel.

16         The trash sculpt for the dummy doll, the dummy doll

17   was tossed aside because Carter Bryant, Isaac Larian, and

18   everybody else will tell you that it was ugly.  They didn't

19   know what that was, and they all focused on the drawings.

20   The dummy doll is not here.  But what's interesting is what

21   is not here is you heard a lot about what Carter Bryant was

22   doing in September of 1999 while he was at Mattel.

23         Mr. Quinn said that in September the phone records,

24   because Mattel keeps phone records on all of the extensions,

25   so this grand conspiracy where we're concealing everything,

1   you'll see Carter Bryant's September records.  Carter Bryant

2   was making phone calls from his extension at Mattel to MGA.

3   He makes 18 phone calls in September to MGA.  If he was

4   trying to hide what he was doing, if this was so secretive,

5   why is he making the phone calls in September?

6          So in October, after he signs the agreement, a

7   really interesting question is okay, what he is doing between

8   October 4th and October 19th, the day he leaves.  Those would

9   be interesting telephone records to see.  Of all the months

10  that are missing, Carter Bryant's telephone records from

11  October at Mattel can't be found.

12         October 19 -- let me back up.  September 1st, after

13  the pitch meeting, and after the phone call is made, and

14  after the contract negotiations go on, another person enters

15  the stage, and her name is Margaret Leahy, and she's going to

16  be a very important witness.

17         Margaret Leahy is a free-lance sculptor.  Carter

18  Bryant's drawings are provided to Margaret Leahy as the

19  sculptor to build the Bratz doll.  Her testimony will be that

20  Carter Bryant gave his concept drawings to Margaret Leahy at

21  her house and said here's my idea.  Do your magic.

22         And Margaret Leahy will testify that she worked on

23  the sculpt which will eventually over a course of months turn

24  into Bratz, but we're going to focus only on the work through

25  October 19th because that's the last day that Carter was

Page 260

1  working at Mattel.

2          During this period of time, Carter will testify

3  that he did relatively little with respect to the actual

4  sculpt itself.  Margaret Leahy will say that she attended a

5  meeting with Carter, that Paula was there.  The first sculpt

6  that Margaret Leahy did was shown to Paula Garcia, and Paula

7  had an interesting reaction to it.  And this explains a

8  little bit about why Paula actually was so intrigued by

9  Carter's drawings.

10         See, Paula will explain to you that not only did

11  she not feel she fit in at Mattel, she'll also tell you that

12  growing up, she didn't aspire to be Barbie.  She wasn't

13  blessed with some of the attributes that a Barbie doll has.

14  She was, frankly, more regular and more normal.  She didn't

15  aspire to the body proportions.  What she was into was

16  creating a doll that girls could play with that could grab

17  onto their fashions, not to their bodies or body styles.

18         So when she first saw the sculpt that she saw, I

19  think it was sometime in September, she looked at it, and she

20  cut it back, and she said no, it's way too sexualized, the

21  concept is too old.  I want to take out -- and Paula will

22  testify to this.  I wanted to take out the va-va-voom in it.

23  She narrows the waist a little bit, narrows the hips, cuts a

24  little bit out of the thigh, doesn't make it as voluptuous.

25         Paula is driving this.  Paula wants a doll that

Page 261

1    girls are going to be attracted to --

2              MR. QUINN:  This is not relevant.

3              THE COURT:  Sustained.  Move along, Counsel.

4              MR. NOLAN:  Paula will testify that there were a

5    couple of meetings with Margaret Leahy, and Margaret Leahy

6    will tell you the work she was doing from September 1st

7    through October 19th.  And interestingly, Carter Bryant gives

8    Margaret Leahy the concept drawings that he had done, and he

9    gives her one other thing.  He gives her a copy of the Steve

10   Madden ad.  This one is the current ad that's running in

11   around 2000.

12             It is a doll that has horns on it, and Margaret

13   Leahy will testify during this period of time that she's

14   getting inspiration from the concept drawings for Bratz, but

15   also from Steve Madden, and she's putting in her own --

16             MR. QUINN:  Your Honor, I object.  This is not

17   relevant.

18             THE COURT:  Sustained again.

19             Counsel, let's move along.

20             MR. NOLAN:  Carter Bryant, during this period of

21   time, makes a phone call.  You heard about that in opening

22   statement.  He does call a hair supplier called Universal.

23   It's located in the Far East.  It is a well-known, well-known

24   supplier of doll hair.  Mr. Quinn said that he'll show you

25   evidence that he ordered large amounts of it.  He simply

Page 262

1   asked for samples of the kind of doll hair because that's the

2   doll hair that he was thinking about for his Bratz dolls.  He

3   gets the number from Mattel.  I don't dispute that.  We don't

4   know this.  But nevertheless, I just want to point this out.

5           Universal Hair Supply is well known in the

6   industry.  Anybody, including MGA, knew about Universal.  And

7   that's the source of Saran hair.  They are the largest

8   producer of Saran hair.  It's the hair used on the Bratz

9   doll.  Carter Bryant made that phone call while he was still

10  employed at Mattel.  We don't deny that.  It will be left up

11  to you as to whether or not that violated a duty.  But we

12  didn't ask him to do it; we didn't know about it.  We knew

13  about it as a result of this litigation.

14          That's basically the story through the contract

15  signing of the arrangement between Mattel -- I'm sorry.

16  Between MGA and Carter Bryant.

17          Your Honor, I didn't know if this was a good time

18  for a break, or did you want me to keep going because I was

19  going to switch to a different topic.

20          THE COURT:  You may proceed, Counsel.

21          MR. NOLAN:  Mr. Quinn spent a lot of time about the

22  coverup and the concealment as evidence that we stole this

23  idea from Mattel.  And I want to spend some time talking you

24  through this so-called concealment evidence because I think

25  it's important.  It's relevant.

1           In doing so, I want to make certain that we draw a

2    distinction between two things.  One is the drawings, and one

3    is the Bratz doll itself.  Mattel will never bring in a

4    newspaper article, an interview, or a conversation where

5    someone asks Isaac Larian who did the drawings for Bratz.

6    All of the references that you saw, always was directed to

7    the doll.

8           And so in the Business Week article, if I could,

9    this is the massive conspiracy that we wanted to hide Carter

10   Bryant from the world because if the world knew, and this

11   Business Week article -- let's just turn to it for a moment.

12   It's not the best copy, and I apologize.  This is to really

13   be a player at Mattel.  This is an article actually about

14   meat.  And you'll be able to read the whole article.  To

15   really be a player, Mattel needs hotter toys.

16           In the bottom of it is Mr. Larian's quote.  "Mattel

17   won't live or die on every new toy it develops, but it can't

18   just rely on Barbies either.  Like they say in business

19   school, no risk, no reward."

20           Mr. Larian said that.  Without risks, there's no

21   reward.  And then it goes on:  "Isaac Larian, CEO of

22   privately healed MGA, he should know, he got the idea for

23   Bratz after seeing his own kids run around in navel-baring

24   tops and hip huggers.  And as Eckert is finding out,

25   sometimes the best ideas are right in front of you."

1          They say that Isaac Larian is concealing Carter

2     Bryant as the designer of Bratz.  This is consistent with

3     Mr. Larian's testimony.  In fact, as I explained to you, it

4     was Jasmine who, when looking at the drawings, the drawings.

5          You'll hear testimony that during those 10 days or

6     so, when Mr. Larian was considering whether or not he would

7     take the risk for the reward and coming out with the doll, he

8     was reflecting that the drawings look a lot like the kids

9     that are coming over to my house.  They make it out as though

10    this is concealment.

11         Let me go to a couple of other examples.  They talk

12    about -- let's go to Trial Exhibit 4900.

13         This is a document that is issued by Isaac right

14    after the launch of Bratz.  And he's being told by the

15    outside that this is an e-mail that's being sent to his

16    internal people.  MGA has full, free, and clear rights to

17    Bratz, and Bratz follows, I've been advised that Mattel is

18    spreading rumors that there are legal issues regarding Bratz.

19    This is untrue.  We are and will deliver our full capacity of

20    Bratz products with no delays.  If you or your customers have

21    any questions, please call me directly.

22         See, Isaac Larian, once he knew that he launched

23    Bratz, he knew that he was going to waken the sleeping giant

24    Mattel.  In an e-mail that he receives October 11th, '01,

25    this is from Isaac Larian to Mr. Block, Hasbro.  Isaac Larian

Page 265

1    says it is hard for a baby sheep to fight off a --

2            MR. QUINN:  I object, your Honor.  This is just not

3    relevant.

4            THE COURT:  Was this stipulated to as admissible?

5            MR. NOLAN:  Yes, your Honor.  This was shown this

6    morning.

7            MR. QUINN:  We agree it can be shown to the jury

8    subject to the Court's rulings.

9            THE COURT:  This was shown this morning?

10           MR. QUINN:  It was, your Honor, but it's not

11   relevant.

12           THE COURT:  If it was shown this morning,

13   overruled.

14           MR. NOLAN:  Okay.  It is hard for a baby sheep to

15   fight off a lion.

16           There's another document, your Honor, that I want

17   to -- with respect to the massive conspiracy and that Carter

18   Bryant was kept in concealment, I want to show a couple

19   things.

20           Think about it, if this is so secret and this is so

21   much of a concern to everybody, of all the notaries that

22   Carter Bryant could go to, why does he go to a Mattel notary

23   who is the administrative assistant to a vice-president of

24   Mattel and show her and ask her to notarize his drawings?  I

25   suppose he could have gone to Kinko's, and nobody would have

Page 266

1   known about it --

2           MR. QUINN:  Your Honor, this is argument.

3           THE COURT:  It is.  Move along.

4           MR. NOLAN:  Okay.  He did not go to Kinko's.  He

5   went to a notary public at the time.

6           THE COURT:  Counsel, please.  When I sustain an

7   objection, stop and move on.

8           MR. NOLAN:  You heard evidence that he was told

9   that he used resources, that he had friends of his paint the

10  dummy with the eyes.  Show Trial Exhibit 1310.  This is a

11  check dated August 25th, 2000.  This is pay to the Mattel

12  co-worker.  We didn't know about this.  We didn't ask him to

13  do this.  And Carter Bryant's not here anymore.  But clearly,

14  if you are involved in a conspiracy and you are trying to

15  hide it so much --

16          MR. QUINN:  Your Honor, this is more argument.

17          THE COURT:  Counsel, it is argumentative.

18          MR. NOLAN:  I'm sorry.  I apologize, your Honor.

19          You will see that this check is written out on

20  Carter Bryant's check stock, made out in the amount of $150.

21  No effort to conceal it.

22          Again, we talked about the Mattel hair vendor,

23  Universal.

24          Let's have this exhibit up here.  Exhibit No. 0030.

25  This is the letter regarding Saran hair that Carter Bryant

Page  267

1    issued on September 18th.  This is the time that he's meeting

2    with his lawyer.  And he says:  "Dear Kinuyo, I enjoyed

3    speaking with you on the phone today about possibly ordering

4    a supply of your 408 hollow Saran hair fiber."  He talks

5    about:  "The company I am working with is called MGA

6    Entertainment, we are located in Los Angeles.  You can e-mail

7    me at."

8              Go down to the bottom and look at the telephone

9    number.

10             Phone number, again, is (310) 538-3615.

11             Carter Bryant is not concealing anything from

12   anybody in this regard.  On the day he leaves his employment,

13   now knowing that he has signed a contract and now knowing

14   that his idea was accepted, he has an exit interview and

15   tells the exit interview person at Mattel that "an

16   opportunity arose, and I had to take it."  This is from his

17   exit interview, Trial Exhibit 00050.  And then Trial Exhibit

18   01195 at page 11 of the document.  This is interesting.  Even

19   though he gave two weeks' notice, Mattel was well aware that

20   he was going to work for a competitor because they mark on

21   his exit interview sheet ineligible for rehire.  Do you have

22   that, Aaron?

23             This is the interview form.  It's internal to

24   Mattel.  We get it as part of the litigation here.  And it

25   marks that Carter Bryant is ineligible for rehire.

Page 268

1           This wasn't concealed.  They knew, they suspected

2     that he was going to work for a competitor.  He wasn't

3     prohibited to go work for a competitor.  Jill Nordquist will

4     testify in this case she was one of the supervisors in the

5     design center, and she will testify that she knew at that

6     time that Carter Bryant was going to work at a competitor.

7           But at the same day that he was leaving and gave

8     notice, Carter Bryant told two of his co-workers that he was

9     going to launch his own doll line.  That's Mira Mirkazemi

10    and Susan Bryant.

11          Carter Bryant will testify, ladies and gentlemen,

12    that he was never told by MGA to keep his involvement secret,

13    to hide it.  Isaac Larian will explain why he did make

14    efforts at some times to conceal who the designer was on

15    Bratz for very good reason.  Isaac Larian will explain to you

16    this is a very, very competitive market.  He did not want the

17    identity of Carter Bryant or any of his employees out there.

18    Paula Treantafelles Garcia is actually the person who really

19    does all of the work in trying to develop this.

20          But let's see some of the other things that show

21    that MGA was not trying to hide as a consultant.  MGA showed

22    Carter Bryant's artwork in toy fairs and allowed Mattel to

23    participate.  Trial Exhibit 0919.  This is the -- you know,

24    they have the doll shows in Hong Kong, New York, and Tokyo

25    each year.  And it was during this period of time that Mattel

Page 269

1    came in, saw Bratz.  In fact, at trial I'll introduce to you

2    a video camera that was taken of the Bratz project by Mattel

3    and then sent back to Mattel.  They were well aware of it.

4            In fact, in this conspiracy of concealment, let's

5    turn to Trial Exhibit No. 17281.  This is an important

6    document.  This is a document that's dated -- the dates on

7    the e-mails after a while in this case, you'll understand the

8    middle number 12 is actually the month.  I apologize.

9    There's no 14 months in a year.  So this is December 14, year

10   2000 is the send date sent out on behalf of Eric Yip, and

11   this is a pitch book sent to Wal-Mart.

12           Look at the J-peg we send out to Wal-Mart.  We're

13   not hiding anything.  We're sending out Carter's concept

14   drawings.  Carter's name is on the bottom of it.  Where is

15   the concealment?

16           I want to go to one other thing because I think

17   Mr. Quinn was saying that it was not until much later that

18   they realized that Carter Bryant was the designer of Mattel,

19   of the Bratz doll.  I want to go to the 360 review, if I

20   might.  I apologize, your Honor.

21           We will show you evidence that, and witnesses from

22   Mattel will testify that it was common knowledge at Mattel,

23   common knowledge at Mattel in the design center, as of the

24   summer of '01, that Carter Bryant was the illustrator and

25   creator of Bratz.

1           This wasn't being concealed from anybody.  And in

2    fact, Mr. Quinn mentioned to you about an e-mail that we sent

3    around, Isaac sent around, don't tell anybody about Mattel.

4    Don't tell anybody about Barbie.  Don't say anything about

5    Carter Bryant or Carter Bryant -- I'm sorry, the Carter

6    Bryant artwork.

7           If I could go to the Yahoo fan site posting,

8    please.  Do you have that?

9           Some of you may be aware of this, especially in

10   this decade of -- I'm dating myself, of the Internet.  There

11   are fan sites that are hosted.  Yahoo had a hosted fan site

12   for Bratz.  Bratz is, as Mr. Quinn told you, was an enormous

13   success around the world.  And on one of the postings, it

14   said words to the effect, Hi, Christian.  It's a posting on

15   the website, and the third paragraph:  "I'm swamped right now

16   with colorizing lots of new whacky funky styles, and there

17   are new hats and boas and tops that I got a kick out of.

18   However, I can't take credit for creating the Bratz dolls or

19   even the first Bratz illustrations, for that honor would go

20   to a fellow named Carter Bryant."

21           Now, it is true that after this posting, we did

22   send out an e-mail and ask Yahoo to take it down.  We did

23   send an e-mail out to our employees telling them do not make

24   reference in the public domain to Barbie or Mattel, Carter

25   Bryant, or the Bratz dolls.

Page 271

1        But what you will see is that it was a response to,

2   and I have the cease-and-desist letter, Mattel, the same

3   lawyers in this case sitting at this table, in February of

4   2002, wrote a letter to Isaac Larian advising Mr. Larian, we

5   are counsel to Mattel.  We are writing to request that MGA

6   Entertainment immediately and permanently cease infringing

7   Mattel's Barbie and Diva Starz trademarks.  The marks are

8   being infringed by the Bratz Yahoo discussion group.  The

9   courts have not hesitated to enjoin the use of a competitor's

10  mark.

11        In response to this, it is true that Isaac Larian

12  instructed people do not make reference to Mattel or do not

13  make reference to any of these trademarks.  We don't want to

14  be sued.  Mattel is already sending us a cease-and-desist

15  letter.

16        That is why we sent the internal e-mails.

17        The evidence will also show that far from being in

18  a concern about conspiracy or hiding the involvement of

19  Bratz, that at the New York toy fair that was held in 2001,

20  in the year 2001, we invited Mattel in, and Mattel looked at

21  Bratz.  We even approached them.  There was a suggestion that

22  Mattel would license Bratz.  Clearly, the evidence will ask,

23  if you are in a conspiracy and you are trying to conceal, why

24  do you go to Mattel and ask them to be your licensee of this

25  product.

Page  272

1            I want to turn to one other document, and this has

2      to do with the Wall Street Journal article that they pointed

3      out to you, which was published in 2003.  And I think it was

4      July or August of 2003.  It is true that in that article,

5      Mr. Larian says that he had conducted a doll design contest

6      in 1999.  Mr. Larian will explain that interview.  Mr. Larian

7      does not believe he said 1999.  He was mistaken.  But at all

8      times, ladies and gentlemen, the evidence will show that the

9      first pitch meeting for Bratz was in 2000.  And we can show

10     you all the activity that followed.  The idea that this was

11     done in June of 2000 by Mattel will not be sustained by the

12     evidence.

13            Mr. Quinn showed you a document filed in Hong Kong.

14     This is a document in Hong Kong which, and I guess because it

15     was said that it was so secret over there, nobody would know

16     about it.  We had a claim on the face of it a reference to

17     1999.  This is a document that you'll see in evidence.

18            What's interesting about it is that, and I'll point

19     this out to you.  This is the case that we filed against an

20     infringer in Hong Kong.  And it's from this that they quoted

21     the 1999 date, the drawings were done in 1998.  But what

22     you'll see at trial, and can we go to the exhibits of the

23     drawings.  The drawings themselves that are attached here

24     bear the dates on it.  Some of them are dated in 1998.  Why

25     would -- some are dated in 2001.  Some are dated -- these are

Page  273

1    later ones done by Carter.  Here's some of the basic shots

2    done in 1998.  This bears the date of August 1998.  It's

3    obvious that we're not trying to conceal anything.  We're

4    putting in the dates when they were actually done.  So they

5    go to one phrase in this claim that says it was 1999.

6              They also showed you trademark applications where

7    there was an issue of first use.  Whether or not it was June

8    of 2000 or -- I think it was June, that -- I think the

9    representation was made that we filed trademark applications

10   showing first use in June of 2000.  The lawyer will testify

11   she does approximately 2000 applications each year.  The June

12   2000 date is off by a year.  We launched in June of 2001 and

13   offered it for retail.  We believe the evidence will show

14   that it's simply a typo.

15             So throughout this case there are going to be

16   mistakes that were made with respect to a typo.  The first

17   time, however, that it was offered for retail was June of

18   2001.  There's no dispute about that.  There's no evidence

19   that it was available for being used in commerce in June of

20   2000.

21             I think the evidence will be that it was simply a

22   typo and somebody didn't catch it.

23             One of the other documents that Mr. Quinn went to

24   as evidence of the conspiracy, the concealment of Carter

25   Bryant, was a list of employees from Mattel.

Page 274

1        Can I have that up, Aaron.

2        This was the document that Mr. Quinn referred to in

3    his opening statement.  I wanted to focus on something, if I

4    could.  This is the document, as it's being pulled up, list

5    of employees, dates of hire, and then for Carter Bryant --

6    this is this document.  Kind of an odd document, but we'll

7    lay the foundation for it.

8        Look at the date, April 20 of '06.  Litigation has

9    already started between the parties.  The issue of Carter

10   Bryant and when he did his drawings are part of the

11   litigation.  MGA, you'll hear, had intervened in the lawsuit

12   between Carter Bryant and Mattel.  This document -- and let's

13   go to where it says don't ask.  You'll see what Mr. Quinn

14   showed you, it says Mattel dates, right after -- do you see

15   that?

16       We will bring in Daphne Gronich, the former general

17   counsel of MGA, who was counsel at this time.  And she'll say

18   that this document, she'll explain to you that this document

19   was prepared for this litigation in trying to do a survey,

20   because we had to respond to Interrogatories and what have

21   you.  The "don't ask Carter Bryant," and "don't ask" was put

22   there because Carter Bryant was represented by his own

23   counsel.

24       So was Anna Rhee, counsel for Anna Rhee.  Carter

25   Bryant, when he was in the lawsuit, was represented by

8f7f8ad3-b8c6-4a9b-b4bd-5b0487575e86

1    another law firm.  The general counsel will explain that

2    these notations that don't ask, don't ask simply refers to do

3    not ask Carter Bryant direct information since he's

4    represented by counsel.  That's it.  But more importantly,

5    using this as concealment when it's dated 4/20/06 and the

6    lawsuit had been going on for some time -- I'll have more to

7    say about that in closing argument.

8            A lot of information.  I appreciate the time and

9    attention.  In conclusion, I want to say this.  This case is

10   about an idea and a concept that Carter Bryant created in

11   1998.  His agreement with Mattel does not provide them the

12   right to claim that idea and make claim to it themselves.

13   Nothing in the agreement contains a provision that he has to

14   transfer to them all of his thoughts and ideas before he came

15   to work at Mattel.

16           The experts in this case will prove to you not that

17   they were done in 1999 but rather that they were done in

18   1998.  Mattel will not be able to meet its burden to move

19   Carter Bryant's drawings from 1998 over into the column of

20   1999.  They simply will not do it.

21           Carter Bryant is entitled do his idea.  He's

22   entitled to his dream, and at the end I will tell you that

23   MGA was the one that took the risk and brought Bratz into the

24   retail market, and Mattel is not entitled to what they didn't

25   think of or what they didn't manufacture.

Page 276

1          Thank you very much.

2          THE COURT:  Thank you, Counsel.  We're going to go

3   ahead and take our afternoon recess at this time for about 15

4   minutes.  Counsel, be prepared to call your first witness

5   when we return.

6          (Recess taken.)

7          THE COURT:  Counsel may call your first witness.

8          MR. QUINN:  Mattel calls Ivy Ross.

9          THE COURT:  Please stand next to the court reporter

10  and raise your right hand.

11                      IVY ROSS, SWORN.

12          THE COURT:  Please have a seat.  State your full

13  name for the record, and spell your last name.

14          THE WITNESS:  Ivy Ross, R-O-S-S.

15          THE COURT:  You may proceed, Counsel.

16          MR. QUINN:  Thank you, your Honor.

17                      DIRECT EXAMINATION

18  BY MR. QUINN:

19  Q.   Good afternoon, Ms. Ross.

20  A.   Good afternoon.

21  Q.   By whom are you employed?

22  A.   Currently I'm in between jobs.  I'll be starting a new

23  one Monday, June 2nd, with the Gap.

24  Q.   So you're joining the Gap?

25  A.   Correct.

Page 277

1    Q.   In what type of position?

2    A.   I'll be executive vice-president of marketing for the

3    Gap brand.

4    Q.   And what is the position that you are leaving or in the

5    process of leaving?

6    A.   Chief creative officer of the Disney stores, North

7    America.

8    Q.   As chief creative officer, what were your job duties at

9    the Disney store?

10   A.   I was responsible for the design and development of all

11   the product in the stores as well as the creative advertising

12   and the store's design.

13   Q.   Did you tell us how long you worked producing?

14   A.   A year and a half.

15   Q.   Prior to that -- what is it that you'll be doing at the

16   Gap?

17   A.   I will be in charge of advertising, store design,

18   packaging, everything but the product.

19   Q.   Not the Levi's?

20   A.   No.

21   Q.   During your career, has your -- can you tell us whether

22   or not your career has focused on things like design,

23   packaging, marketing?

24   A.   For 35 years it's been pretty much product design and

25   development in a number of categories of design.

Page 278

1    Q.    Now, did you work for Mattel for a period of time?

2    A.    Yes, for approximately seven years.

3    Q.    And can you give us those inclusive dates just to orient

4    us all?

5    A.    I started '96 or '97 and ended the end of '03, early

6    '04.

7    Q.    '96 or '97 and ended?

8    A.    It was the very end of '03.  I think right after -- I'm

9    not sure whether I gave my resignation prior to Christmas,

10   but I don't know the exact final date.  It was either the

11   very end of '03 or beginning of '04.

12   Q.    Can you give us the idea -- an idea of other jobs you've

13   held in your 35 years in marketing and design?

14   A.    Let's see, I was president of Calvin Klein men's

15   accessories.  I was senior vice-president of design

16   development for Coach handbags and leather goods.  I was

17   executive vice-president for Old Navy product design,

18   development.  I had my own company when I was 20.  And I

19   worked for Swatch watch, I was a senior designer there.

20   Q.    And what was -- when you first started at Mattel in, I

21   think you said, '96 or '97, what position did you have?

22   A.    I was senior vice-president of design development for

23   Barbie.  And then after that, I was promoted to take on all

24   of girls design, so not just Barbie, but large and small

25   dolls.  And then I was also given extra responsibility to be

8f7f8ad3-b8c6-4a9b-b4bd-5b0487575e86

Page 279

1    in charge of packaging as well.

2    Q.   So when you first started out in the position relating

3    to Barbie, could you please tell the jury what your job

4    duties were?

5    A.   I was responsible for the design and development of the

6    Barbie doll line.  Everything from working with what we call

7    the preliminary designers who would do the drawings and dot

8    concept all the way through -- not manufacture, but handing

9    it off to the engineers to get it ready for development, for

10   manufacturing.

11   Q.   And in that job can you tell us how many people reported

12   to you?

13   A.   Probably a little bit over 200, somewhere in there.

14   Q.   And then at some point you had some responsibility for

15   all of girls?

16   A.   Correct.

17   Q.   What does that mean, all of girls?

18   A.   So all the other girl brands, such as Polypocket, Little

19   Mommy.  There was a brand called What's Her Face, Diva Starz.

20   It was over time.  So I was in charge of all the toys we made

21   for the girls' division.  It was divided between the girls'

22   division and the boys' division.

23   Q.   When was it you assumed responsibility for the entire

24   girls' division?

25   A.   I don't remember.  May have been approximately two years

Page 280

1    after I began.  I'm not entirely sure.

2    Q.   If that were correct, would that place it somewhere

3    around 1999?

4    A.   Correct.

5    Q.   Or 2000, somewhere in that range?

6    A.   That feels about right.  It may be more like '99.

7    Q.   Okay.  And as head of girls, they call it girls' toys?

8    Is that --

9    A.   Yeah, I think we called it the girls' division.

10   Q.   As head of the girls' division, how many people did you

11   have reporting to you directly or indirectly in total would

12   you estimate?

13   A.   I think there was -- it varied from seven to nine direct

14   reports and a total of maybe from 200 to 280 in total.

15   Q.   Okay.

16   A.   Approximately.

17   Q.   And who are these people that reported to you?  What are

18   their backgrounds?  What kind of jobs did they have?

19   A.   My direct reports?

20   Q.   Yes?

21   A.   Most were vice-presidents.  There may have been some

22   senior directors, but they were all professionals, having

23   been in the industry for many years, whereas some of the

24   designers we had were starting straight out of school.  But

25   direct reports for the most part had been professionals in

1    the design industry for many years.

2    Q.    How about the work force, the designers and other

3    people?

4    A.    It ranged from interns, just, you know, who were still

5    in school or getting out of school all the way through

6    industrial designers, engineers, ex-hairdressers, they were

7    all professionals that either came out of the fashion

8    industry or product design, engineering, industrial design.

9    Q.    Did these people have different kinds of skill sets?

10   A.    Yeah.  Depending on the -- on what their function was.

11   Q.    Can you give some examples of the different skill sets

12   that these designers had?

13   A.    Well, so for example, the hair department, that team,

14   most of them were real hairdressers that used to work on real

15   people and now were doing it in miniature for dolls.  Fashion

16   designers who used to work for Seventh Avenue, fashion

17   designers again miniaturizing their skills for jobs.

18   Industrial designers who would come up with the mechanisms

19   for the dolls, how the doll could move or roller skate.

20           So they were more industrial design background.

21   Engineers who would figure out how, once the industrial

22   designers made the doll roller blade, the engineer would

23   figure out how to re-engineer it for production.  Face

24   painters, who some of them were makeup artists, some were

25   painters as background.  Yeah, I think that -- sculptors,

1    many of them -- the head of our sculpting department was from

2    Italy and did fine art sculpting.

3              So it was a joy to work there.

4    Q.   We've heard the term fashion doll.  Can you explain to

5    us what a fashion doll is?

6    A.   A fashion doll to me is a play pattern that usually --

7    Q.   Can I stop you there?  When you say play pattern --

8    A.   It's a way -- to me fashion doll -- a play pattern is a

9    way in which you -- a child tends to play with the object.

10   So usually things are categorized in play pattern.  So the

11   play pattern of the fashion doll is one where there's hair

12   play and fashion play.  Fashion play, meaning you're able to

13   take the fashions on and off the doll.  And brush the hair or

14   make hairdos.  It used to be that, you know, I think it was

15   only 10-inch dolls were considered fashion dolls.  And now

16   the category has broadened, and fashion dolls also takes in

17   some large dolls and small dolls.

18   Q.   Is that term fashion doll something which in your

19   experience is actually recognized in the toy industry?

20   A.   Yes.

21   Q.   Barbie, I'm going to ask you a really stupid question,

22   probably not the last one.  What is Barbie?

23   A.   Well, Barbie is a brand that has a variety of products

24   within it.  You know, from home videos to clothing for girls,

25   accessories, things for their room, a doll, accessory for the

1  doll, yeah, quite a range of products.

2  Q.   And when you say Barbie as a brand, do you mean that as

3  distinction from Barbie as a doll?

4  A.   Correct.   I mean, the Barbie doll is one piece of the

5  Barbie brand.

6  Q.   And when you were there, did Mattel come out with new

7  Barbie dolls every year?

8  A.   Yes, many of them.

9  Q.   Can you tell us how -- when you were there, were there

10  teams of people who were assigned to work on Barbie?

11  A.   Yes.   Under me I had some teams -- a team that was

12  assigned to the collector of Barbies, and then I think it was

13  three or four teams on the main line Barbie business.   And

14  they were given parameters or slots of the kind of Barbie

15  dolls we needed, and then they were given some blue sky slots

16  where they could present whatever ideas they had for a Barbie

17  doll.

18  Q.   But in your experience, was Barbie something that just

19  every year you cranked out a new version of the same thing?

20  Did Barbie evolve?

21  A.   Oh, yeah, we changed her whole body type based on the

22  times and the -- you know, her body was originally designed

23  to show off the fashions of the 50's, so while I was there,

24  we redesigned her body entirely because the fashions changed

25  in the late 90's.   So we not only resculpted her body, we

Page 284

1   changed at times her skin color, and then we were always

2   inventing new play patterns with her, new ways to play plus

3   new fashions, plus new friends.

4   Q.   Okay.  Besides Ken?

5   A.   Yes.  Well, until recently Ken was the only man.

6   Q.   Whatever happened to Ken?  Never mind.

7          You made reference to Barbie main line and Barbie

8   collectibles.  Can you explain what the difference -- what

9   you mean by those?

10  A.   Barbie collectibles was a division where most of those

11  dolls were made not to be played with but for adults who

12  collected Barbie.  There were a few dolls that were young

13  collector.  So where a grandmother would buy her first doll

14  for her grandchild, but these dolls were basically not meant

15  to play with.  They were meant to display.

16  Q.   So that's collectibles?

17  A.   Yes.  Whereas Barbie main line was broken into groups,

18  there were older girl Barbie groups that were focused on

19  doing the more 8 to 12 year old focus for Barbie, and then

20  there were younger girl Barbie design groups.  We broke the

21  teams up mostly by age, and then at one point we broke it up

22  by fantasy versus reality play.  So we were dividing the

23  groups with specialties, both by age because Barbie -- we

24  were doing product that appealed to from 3 to 5 all the way

25  up 8 to 10.

Page 285

1    Q.   You used a phrase blue sky slots that you have for

2    Barbie designers.  What do you mean by that?

3    A.   Well, there were a couple ways that we allowed the

4    designers to come up with their own ideas with no boundaries

5    at all.  It was always their own ideas, but in some cases

6    there were boundaries based on price point and marketing

7    opportunities.  For example, wanting to do one anniversary

8    product that sold well the following year, and there were

9    times we said to the designers this is a blue sky slot,

10   meaning we're not going to tell you any parameters.  Just

11   come up with what you think is the right idea for Barbie for

12   this season.

13          Then there were in addition to blue sky slots, once

14   or twice a year, I would let the designers for about two

15   weeks work on brand new doll product lines that they

16   conceived of themselves.  I mean, in terms of if they were

17   head of a doll company, what kind of dolls would they want to

18   do.  So that was another way that the designers could come up

19   with absolutely not only ideas for Barbie and her friends but

20   new brands as well.

21   Q.   Now, when you were there, did Mattel make dolls other

22   than Barbie?

23   A.   Yes.

24   Q.   And can you give us some examples?

25   A.   Yeah, Diva Starz, What's Her Face, Polypocket, Little

Page 286

1    Mommy.   Those are the ones that come to mind.

2    Q.   Did you know a designer by the name of Carter Bryant

3    when you were at Mattel?

4    A.   Yes.   He was in the collector division.   That's what I

5    remember for the most of the time when I was there, he was in

6    collector.

7    Q.   All right.   Now, in the collector division, would his

8    work be limited only to working on fashions, or would he work

9    on other parts of the doll as well?

10   A.   No.   The designer was responsible for the entire

11   product, which included, you know, picking the skin tone for

12   Barbie, her pose, her hair.   They would work with a hair

13   designer and a makeup person, but they would do the design

14   work for the entire product, including the fashions.   We had

15   a separate division that only did Barbie fashions, which was

16   not the division that Carter was with.

17   Q.   All right.   Do the designers in collector, where

18   Mr. Bryant was, work only on collector dolls?

19   A.   Most of the time.   But we move designers around.   So

20   periodically, because, for example, when Carter was there the

21   first time at Mattel, he did work in main line, even once I

22   think there was Ann Olson who was in main line, we moved her

23   to director.   So we moved them, sometimes because they

24   expressed that they would like to try their hand at the other

25   division, sometimes because we felt it was a good

1  opportunity, and everyone was open to participating in these

2  new brand exercises.

3  Q.   Now, were all these talented people, the designers and

4  people who worked on dolls, did they work at a particular

5  location?

6  A.   Well, we all worked in the design center, both girls'

7  toys and boys' toys.

8  Q.   Where is the design center?

9  A.   I don't remember the exact address.

10  Q.   What city?

11  A.   El Segundo.

12  Q.   And how many people, roughly, worked there?

13  A.   I think about 500.

14  Q.   And can you describe for the jury who these people are

15  who work at the design center?

16  A.   Well, we had -- there were either designers -- it was

17  more than designers.  It's the kind of complement of team

18  that I described earlier:  Sculptors, face painters,

19  industrial designers, model shop, fashion designers, both

20  working the girls' division as well as the boys' division.

21  So there were certain areas that we shared, like the model

22  shop boys and girls shared.  But otherwise, pretty much the

23  boys' area and girls' area were separate all in this big huge

24  open airplane hanger.

25  Q.   Do you mean literally an airplane hanger?

Page 288

1    A.    I think it was an airplane hanger.

2    Q.    There's a binder in front of that you has some tabs, and

3    I'll ask you if you would, please, turn to tab 13541.

4          And my question to you, when you've found that, is

5    going to be whether you can identify that image there?

6    A.    Yes.  That's the entrance to the design center.

7    Q.    Is that a true and correct copy of what the entrance

8    looks like?

9    A.    Yep.

10         MR. QUINN:  I'd offer Exhibit 13541-1, your Honor.

11         THE COURT:  Any objection?

12         MR. NOLAN:  No objection.

13         THE COURT:  Admitted.

14         (Exhibit 13541-1 received.)

15         THE COURT:  You may publish.

16         MR. QUINN:  Thank you, your Honor.

17   Q.    That's the main entrance to the design center?

18   A.    Correct.

19   Q.    If you'd look at Exhibit 293, tab 293 rather, in your

20   book.  And my question for you is going to be whether you can

21   identify that.

22   A.    It appears to be one of our floor plans for the design

23   center.

24         MR. QUINN:  And I'd offer that as well.

25         MR. NOLAN:  No objection.

1       THE COURT:  Admitted.  You may publish.

2       (Exhibit 293 received.)

3  Q.   BY MR. QUINN:  So we see what looks like kind of a

4  rabbit warren of roofs.

5  A.   They were three-sided cubicles with one side open.  Some

6  of the designers would put a curtain that they would close

7  during lunch hour on one side.  But theoretically, they were

8  three-sided structures, and then, as you can see there, in

9  most of the design areas, they had a center worktable.  So

10 all of those three-sided cubicles had an open-ended side that

11 looked to this common rectangular table.  So the idea was

12 that everyone would put their work on that common table about

13 once a week, when I did my walk-throughs, for everyone to see

14 the work they had done.

15      MR. QUINN:  Your Honor, may I approach the witness

16 to give a laser pen?

17      THE COURT:  You may.

18 Q.   BY MR. QUINN:  Could you point out for the jury, please,

19 one of these common work areas that you're referring to?

20 A.   So this is a typical -- again, I can only speak for the

21 girls' design area, but that would be one team's work space

22 where the center table, you know, in each of these little

23 three-sided cubicle spaces would be a full complement of the

24 team, which would consist of someone who did the sewing, a

25 seamstress, who would do the sewing of the doll.  A doll

1    designer, an industrial engineer, the entire team that would

2    work on one focus of Barbie would be situated in this kind of

3    arrangement, and this common worktable is where they would

4    display their work for our design meetings.

5    Q.   Can you tell us whether within the design center itself,

6    and I'm not talking about the outside security.  We'll get to

7    that, but within the design center itself, can you tell us

8    whether or not it was an open situation where people could

9    walk by and see what other designers were working on?

10   A.   Oh, totally.  I mean, there was no barriers.  You could

11   come down.  There were aisles that you could walk through and

12   see, and often, when I would do my walk-throughs, everyone

13   knew what day you would put the work out, and it was a very

14   friendly, open atmosphere.  So friends would come by and look

15   at other people's work.  I really encouraged the

16   collaboration, collaborative environment.

17   Q.   Why did you consider that important, a collaboration?

18   A.   Because I think that's how you get the best ideas.  I

19   mean, sometimes it would be the design manager and myself

20   working with the designers to say would you, we really love

21   the feature of this doll, but we love the look of that doll.

22   So the idea was that everyone should be open to seeing each

23   other's work so we could all create the best product, which

24   was the goal.

25   Q.   We now have the full floor plan back up there.  Was your

Page 291

1   office in the design center?

2   A.   Yes, it's too small a print to read.

3   Q.   If we blow up the right area?

4   A.   I don't know.  I can't tell.  It's not in this area.

5   I'd have to look at a bigger blueprint to figure out --

6            MR. QUINN:  Could I approach the witness?

7            THE WITNESS:  Maybe I can show you where it is

8   here.

9   Q.   BY MR. QUINN:  Can you translate?

10  A.   I'll show you what part to zoom in.  Zoom in this area.

11  Oh, no, it's higher than that.  Hang on.  Let's go back.  See

12  if that might be it right there.  Yep.  There I am.

13  Q.   There's I. Ross.

14  A.   Yes.

15  Q.   So you're right in the thick of it there.

16  A.   Yes, I was right in the middle.

17  Q.   Would you turn, please, in the book to Exhibits 13535 to

18  -40.  That's 13535 to -40.  And if you could, just sort of

19  page through these -35 through -40, and my question is going

20  to be whether you can identify these.

21  A.   They appear to all be different views of the general

22  work areas of the design center.  I couldn't identify whose

23  specific office it was, but these are all for different

24  perspectives, areas of the floor plan.

25           MR. QUINN:  Your Honor, we'd offer Exhibits 13535

Page 292

1    through -40.

2              THE COURT:  Any objection?

3              MR. NOLAN:  No objection.

4              THE COURT:  Admitted.  You may publish.

5              (Exhibit 13535-13540 received.)

6    Q.   BY MR. QUINN:  I'll begin with -535.  This is one image

7    of the -- of what the cubicles looked like?

8    A.   Yes.

9    Q.   And then if we could turn to the next one, please.  This

10   is -37 -- or -36?  -36.  And then, please, -38 -- or -37.  It

11   doesn't come out so well on the screen, but it looks like

12   there's a lot of product and toys and --

13   A.   Oh, yes.  Well, first of all, we never had enough

14   storage space.  I have to be honest.  And things were always

15   a little messy.  And there was product lined out in the

16   halls.  The fire department didn't appreciate that.  But that

17   was the reality.  People decorate their own offices very

18   individually.  We encourage that.  So the walls were the

19   same, but everything else was pretty much individualized, and

20   there was product everywhere up on the cabinets.  We

21   displayed the dolls we were in the process of working on

22   these L-board shapes.  And that's what you can see on the

23   tops of the cabinets because there was not enough room.

24   Q.   Could you turn to -38, the next one.  More of the same?

25   A.   Yes, more of the same.

1   Q.   And -39.

2   A.   Yes.

3   Q.   And the last one, -40.  I can kind of see why the fire

4   department --

5   A.   Yeah, they were not happy with us.

6   Q.   So basically in your job were you -- would it be fair to

7   say that these people that worked in the design center, that

8   these are creative people?

9   A.   Oh, yes.

10  Q.   And your job was to manage creativity?

11  A.   I mean, my job was to work with the teams to create the

12  best product and the best solution.  So I had V.P.'s under me

13  that worked in different areas, like large dolls, small

14  dolls, collector, main line.  But I was very involved in once

15  a week walking around, looking at the work, approving what

16  went into these weekly design meetings.  So I was, yeah,

17  always seeing what was going on in the design center.

18  Q.   What were these weekly design meetings?

19  A.   There was two meetings a week.  One was where, up to a

20  certain level of management, got to look at the work in

21  progress.  And then we all agreed on what we thought was

22  ready to go into the executive level meeting.  So it was kind

23  of like a pre-meeting that myself and my equals on the

24  business side, because I was responsible for just the design

25  and creativity, and I had partners that were equal to me on

Page 294

1     the business side.

2           So together we would look at the designers' work

3     and agree on what we thought was ready to go into the final

4     executive meetings, which is where we would decide what would

5     go to the next step.

6     Q.   Did you regard it as part of your job to promote

7     creativity in the design center?

8     A.   Oh, yes.  I mean, I have --

9     Q.   My next question for you is how do you do that?  How do

10    you promote creativity?

11    A.   Well, I think some of the ways are you have to balance

12    the realities versus the possibilities.  The realities to me

13    are things that we had to make sure that we had, like a

14    number of dolls made at a certain price point, and then

15    there's the possibilities of what a designer may come up with

16    on their own that's unique and wonderful.

17    Q.   Were designers encouraged to come up with ideas on their

18    own?

19    A.   Absolutely.  Like I said, there was a certain amount

20    that they had to get done, and there was a certain amount of

21    blue sky slots and time allotted for something they wanted to

22    do on their own.  And a designer was always free to go to

23    their management and show them an idea that she had, and the

24    manager could say absolutely.  Go do it.  So they had the

25    ability to use Mattel's resources in terms of the sculptors,

1    hair and face paint, to take the idea to the next level and

2    then come show myself and the business partners.

3    Q.   Did you develop any particular programs or approaches in

4    order to promote new ideas?

5    A.   Well, I think this idea of letting people create their

6    own brands, I bring in inspirational speakers because I

7    believe you can't ask people for output until you give them

8    input.  So I'd bring in trend forecasters and psychologists

9    who would talk about how kids think and play to encourage

10   their minds and give them some time to take that information

11   and generate a new idea or a new play pattern.

12           There was something called project platypus, which

13   was a think tank also to help foster innovation and

14   creativity, which is where 12 people were taken out of the

15   design center, brought to another space across the street,

16   and really created new ideas and new brands.

17           So I was very much -- we were in the United States

18   the largest toy company, and it was crazy not to be creative.

19   That's why we were all in.  You have to balance that with

20   your business obligations, but the business gets the best of

21   the creativity when you're able to do both.

22   Q.   At Mattel, were you focused on toys or dolls only for

23   girls of a certain age?

24   A.   No.  I mean, we -- as Barbie started to trade down

25   younger and spread her wings, we needed to balance that with

Page 296

1   brands for the older girls.  So when I first came on, there

2   was Mystery Squad, and then we created Generation Girl and

3   then My Scene in terms of how we evolved the Barbie brand for

4   the older girl.

5   Q.   What is the role of a drawing, a two-dimensional drawing

6   in the process of creating a doll?

7   A.   I liken that to the blueprint for building a house.  I

8   mean, that's where it all starts.  That's the foundation, and

9   that drawing is given to the sculptor, the model maker.  The

10  designer, we call them the preliminary designers, they are

11  the ones that come up with the idea.  And they have that in

12  some way express their idea because what happens is other

13  team members do component parts.  So that drawing goes to the

14  sculpting, it then goes to face paint to do the face paint,

15  but without that initial drawing, it would be hard for all

16  those multiple people to be able to execute against it.  So

17  it's the blueprint in my mind.

18  Q.   Does the drawing include the artist's sort of vision for

19  what this doll might ultimately look like?

20  A.   Every artist has their own hand.  So if you're not doing

21  it on computer and you're sketching it, it tends to have a

22  certain style.  So I think everyone's drawing would show

23  their own personal style.  And that would be captured in the

24  execution of the sculpting or the face paint.

25  Q.   Now, while you were at Mattel, did the Mattel designers

1    who were employees, did they sign inventions agreements with

2    the company?

3    A.   I don't remember what it was called, but I remember it's

4    something.  For the 35 years I've been working at companies,

5    it's something you always sign.  Companies word it

6    differently, and I don't remember what Mattel's was worded.

7    But I know when I signed on, that I did sign something

8    that --

9    Q.   You signed one yourself?

10   A.   Yes.

11   Q.   And was that true of the other artistic people in the

12   design center?

13           MR. NOLAN:  Objection.  Your Honor.  Lacks

14   foundation.

15           THE COURT:  Sustained.  Lay a foundation, Counsel.

16   Q.   BY MR. QUINN:  Do you know whether or not Mattel had a

17   policy in the design center that folks who came to work

18   there, these artistic creative people, would enter into some

19   type of agreement with the company?

20   A.   Yes, my understanding was it wasn't just the artistic

21   people, but it was everyone in the design center.  The

22   engineers, everyone needed to sign that.

23   Q.   And can you tell us what your understanding was about

24   what that agreement provided in terms of ownership of what

25   was created?

Page 298

1      MR. NOLAN:  Your Honor, objection.  Lack of

2  foundation.  She doesn't recall signing the document.

3      THE COURT:  Sustained.  Lay a further foundation,

4  Counsel.

5  Q.   BY MR. QUINN:  Do you recall that you signed such a

6  document yourself?

7  A.   Yes, I definitely signed the document.

8  Q.   And did you have an understanding at the time as to what

9  you were agreeing to?

10 A.   Yes.

11 Q.   And what was it that you understood you were agreeing

12 to?

13 A.   That while I was employed by Mattel, any of the ideas

14 that I -- again, this may not be the words, but it's my

15 understanding.  Again, any of the ideas that I had, no matter

16 whether it was while I was home at night or out at a trade

17 fair, as long as it was within Mattel's range of products

18 that we created, that that was the property of Mattel.  So,

19 for example, if I came up with a car design, that wouldn't be

20 the property of Mattel.

21 Q.   Not Mattel's business.

22 A.   Right.  But anything that was within Mattel's range,

23 that they owned that idea.  It's been the same wherever I've

24 worked, whether it was -- wherever I worked.  So people word

25 it differently, but it's pretty standard.

1   Q.   Is it your experience that creative designers, people

2   who are creative and who have design jobs, who are also

3   employees in your experience in 35 years, can you tell us

4   whether or not it's customary that those types of agreements

5   are entered into?

6   A.   Yes, it is.

7   Q.   Do -- when you were there, did Mattel designers, were

8   they permitted to do some work at home rather than checking

9   into the design center?

10   A.   I remember sometimes we would allow that, yes.

11   Q.   And is that -- if folks worked at home on a toy, was it

12   the understanding that their creative contribution, even if

13   they did it at home relating to a toy, that that was owned by

14   the company?

15   A.   Absolutely.  As long as you were employed by Mattel, no

16   matter where you did it, if it was something that Mattel

17   could have been making, then they owned it.

18   Q.   All right.  Now, this design center that we looked at,

19   is that something that's open to the public?

20   A.   No.  It's a very, very tight security.

21   Q.   Can you describe that security for us, please?

22   A.   Well, there's a desk that you have to check in at, and

23   no cameras are allowed.  You have to ask -- you are asked who

24   you have come to see.  In fact, we have vendor rooms outside

25   the design center.  So often certain vendors we wouldn't even

1    let behind the scenes.  It's almost like Santa's workshop.

2    So we meet with people out in the lobby in these vendor

3    rooms, because it was very secretive.  It was like for toy

4    fair, you had to protect your ideas, again, not amongst

5    ourselves, that was a culture of sharing.  But in terms of

6    the outside world, we were very secretive.

7    Q.   You referred to a toy fair.  What is a toy fair?

8    A.   Toy fair is once a year, where the toys -- in February,

9    it was in New York, and then it got moved to Mattel's campus.

10   It's kind of the great reveal.  It's where you worked all

11   year to show your new line of toys, because in the toy

12   industry, the bulk of your money is made during the Christmas

13   season.  So yeah, it was the great reveal.  It's what we all

14   worked hard toward getting the latest and greatest toys ready

15   for toy fair.

16   Q.   And who would attend these toy fairs?

17   A.   The customers.  So the retailers, and some other toy

18   companies were there because they were exhibiting.  So toy

19   companies would get to see other toy companies' work, but it

20   was mostly for the buyers and retailers.

21   Q.   All right.  And you say that toy fair was originally in

22   New York.  Over time, were there toy fairs that took place in

23   other cities around the world, such as Hong Kong?

24   A.   I don't know if they called it the toy fair.  They have

25   their own toy fair, but the toy fair was the one --

1    Q.    Okay.   What is Diva Starz, S-T-A-R-Z?  Diva Starz?

2    A.    Diva Starz was a new brand for girls that was an

3    electronic doll that I think we launched in 2000.  Around

4    2000.  I'm not exactly sure.  But it was a doll that was able

5    to -- it had a big head because it had a lot of brains in

6    there, because it was able to recognize the clothing that you

7    put on the doll, and so it was pretty magical for a child who

8    could say, "That's my pink dress.  Find the shoes that go

9    with it."  And then magically the doll would read what items

10   you were putting on it and suggest certain hairdos doing with

11   it, et cetera.

12              So it was really the first electronic kind of

13   fashion doll.  I don't know whether we categorized it in the

14   fashion doll category at that time, but it did -- we should

15   have in retrospect.  It did have fashions.

16   Q.    Could you take a look at Exhibit 432.  And tell us

17   whether you can identify that document.

18   A.    Yes.

19   Q.    What is this?

20   A.    That's one of the Diva Starz, Alexa, in her package with

21   all of her accessories and molded clothing.

22              MR. QUINN:  I'd offer that, your Honor.

23              MR. NOLAN:  No objection.

24              THE COURT:  It's admitted.

25              (Exhibit 432 received.)

1    THE COURT:  You may publish.

2    MR. QUINN:  Thank you, your Honor.

3  Q.   This is a photocopy of the Diva Starz?

4  A.   It's a photocopy of the Diva Starz package with the

5  clothing and the doll accessories in the package, yes.

6  Q.   And in this photograph, we've managed to cut off the

7  S-T-A-R-Z.  It is spelled Z at the end, Starz?

8  A.   Correct.

9  Q.   Can you tell us whether or not the name Bratz, while you

10 were at Mattel, was ever considered as a name for a Diva

11 Star?

12 A.   Yes, when we were brainstorming what to call these

13 electronic dolls, I remember there was names like Chat Girls.

14 I think it was Brat Girls.  Wall Brats.

15      There was a couple of sassy themes, Chat Brat.

16 Because we thought of them, in fact, their tag line was, "We

17 know what's up."  They were kind of sassy and a little bratty

18 because they got what they wanted.  So brats, I don't

19 remember the way it was spelled, but I remember that brats

20 was something that we absolutely thought of and was not

21 available for some reason.  We have to find names that are

22 available across the entire world.  So it's really hard these

23 days to find those names.

24 Q.   Can you tell us when it was roughly when brats was being

25 considered as a name for Diva Starz with a Z?

1  A.   Well, it had to be -- I don't remember the exact date.

2  All I can say is if these came out in 2000, which I do

3  remember them coming out in around 2000, this had to be at

4  least the year before, because the name was something that we

5  needed it in time for the packaging and all of the printed

6  materials.

7  Q.   Did the consideration of brats get to the point that

8  logos, brats logos for Diva Starz, or what became Diva Starz,

9  were actually developed?  Do you recall that?

10  A.   I remembered chat and brat were probably two of our

11  favorite names, and quite frankly, Diva Starz was our last

12  resort.  It was not our favorite.  Because it took a long

13  time for legal to clear in every country.  We'd often start

14  the logo department using a name we hoped would clear, and

15  then at the last minute, if it didn't clear, we would use

16  possibly the same type style but plug in the cleared name.

17  Q.   Could I ask you, please, to turn to Exhibit 316.  And

18  I'll ask you if you can identify this document.

19  A.   Yes.

20  Q.   And what is this document?  It's actually three pages.

21  A.   Okay.  Hang on.  Yes.  So these were some of the

22  preliminary logo designs by -- I think was Steve Linker, a

23  free-lancer we had hired to work on logo designs for the

24  brand.  Prior to us getting approval, you know, knowing

25  whether these names cleared.

1          MR. QUINN:  I would offer Exhibit 316, your Honor.

2          THE WITNESS:  And they also had, by the way, he was

3     also -- because we were getting ready to do the packaging.

4     So he was also doing illustrations of the Diva Starz getting

5     ready for the package art.

6          THE COURT:  Any objection?

7          MR. NOLAN:  Your Honor, could I have a further

8     foundation as to when she first saw this?

9          THE COURT:  Lay a further foundation, Counsel.

10         THE WITNESS:  I remember seeing --

11    Q.   BY MR. QUINN:  When did you first see Exhibit 316, these

12    three pages?  Could you tell us when you first saw it,

13    please?

14    A.   I remember seeing it in the brainstorming, the review,

15    the design review that we had.  I don't remember the exact

16    date.  And then I saw it again at the lawyer's office.

17    Q.   When you say design review, are you referring to the

18    design review back when you were at Mattel and thinking of

19    names for Diva Starz?

20    A.   Correct.  Because I had to be shown all the different

21    variations of the logo because it was my job to pick which of

22    these logo designs we would go with.  So I remember looking

23    at these in terms of trying to figure out what the right

24    style was.

25         MR. QUINN:  Offer 316, your Honor.

8f7f8ad3-b8c6-4a9b-b4bd-5b0487575e86

1        MR. NOLAN:  No objection, your Honor.

2        THE COURT:  It's admitted.

3        (Exhibit 316 received.)

4        THE COURT:  You may publish.

5   Q.   BY MR. QUINN:  If you look at the first page of

6   Exhibit 316, I see you're at the top there, on the right-hand

7   side, and if you could use the laser pen, we see Chat Brats.

8   A.   Yeah, so we would take a name that we were hoping to get

9   and then try live logo graphic treatments with that name

10  hoping it would clear.  So we tried Chat Girls, Chat Brats.

11  Q.   And turn to the next page, it's 316.  You see Brats up

12  there?  If you were considering using the name Brats without

13  that kind of logo as well?

14  A.   Yeah, we were looking at things.  We were looking at all

15  different combinations because sometimes a name would clear.

16  And if it didn't clear on its own, it might clear in

17  combination with something.  So we would try a whole lot of

18  variations if we really liked it.

19  Q.   And this is like if you had double vision here --

20  A.   I think that was just a graphic styling.  Again, playing

21  with the logo, if we were just to use the word Brats, how it

22  would be treated graphically.

23  Q.   And then the last page of Exhibit 316, the right-hand

24  side there's another version of Brats that was being

25  considered at the time?

Page 306

1   A.   Yep.  We were just thinking of using it by itself as

2   well.

3   Q.   If you look at -- please look at Exhibit 314.  Tell me

4   if you recognize this document?

5   A.   This is a document I remember seeing when I talked about

6   the brainstorms that we would have.

7           All the designers working on the project, and

8   sometimes we would throw in designers from other areas just

9   to get fresh ideas.  We would brainstorm a whole lot of

10  names, and sometimes the marketing people would go work with

11  legal because they had to pay for every name that was

12  cleared, and come back to us and let us know what was

13  cleared.  So these were some names that were submitted from

14  Steve Linker, the outside firm, these were their suggestions

15  for some of the names.

16  Q.   And you saw this at the time?

17  A.   Yeah, I remember getting a list.  I can't be sure if it

18  was this exact piece of paper, but I recognize a lot of these

19  names, and I remember that we were being submitted --

20  lists -- we invited many people to contribute ideas for this

21  brand.  So I know that -- I remember this list.

22           MR. QUINN:  I'd offer 314.

23           MR. NOLAN:  Objection.  Lack of foundation.  She

24  doesn't recall seeing this particular document.

25           THE COURT:  Overruled.  It's been testified to.

1          (Exhibit 314 received.)

2          THE COURT:  It's admitted, and you may publish.

3     Q.   BY MR. QUINN:  The date here at the top, this is January

4     of 2000?

5     A.   Yes.

6     Q.   There's the name Steve Linker that you have made

7     reference to?

8     A.   Yes.

9     Q.   And who is Liz Hogan?

10    A.   I think she worked with Steve, and Joni Pratte and Sue

11    Davis were my packaging designers.  So the urgency on the

12    name was we were starting to design the package, and

13    packaging would also submit names to get clearance.  So they

14    were submitting to packaging designers some of their ideas.

15    Q.   Could we look at the bottom two thirds of the document,

16    the list of names.  This is some of the list of names that

17    were proposed?

18    A.   Right.  And I would then get this list and sit down, and

19    we would as a team decide which ones were worth actually

20    spending money against in terms of which ones we liked enough

21    to -- we would spend the money searching it legally and

22    trying some of the graphic iterations.

23          So the previous exhibits that you saw some of the

24    logos came after we looked at lists like this, decided which

25    names we really liked, and then I would authorize that the

Page 308

1   work be done to play around with logo designs.

2   Q.   I see one of the names here that was considered is Mall

3   Brats.  Do you see that?

4   A.   Yes.

5   Q.   Do you know whether or not MGA has come out with a

6   product which is called Mall Brats ?

7              MR. NOLAN:  Objection, your Honor.  Foundation.

8              THE WITNESS:  No, I don't know that for sure.  I

9   know that at one point Bratz had a mall for their brat dolls,

10  but I don't remember what it was called.

11  Q.   BY MR. QUINN:  I'd like to change gears now and talk

12  about a different subject.

13             Have you heard of a project called Toon Teens?

14  A.   Yes.

15  Q.   What is Toon Teens?

16  A.   Toon Teens is one of the brand ideas that came out of

17  when I spoke earlier to the fact that I would -- I think it

18  was once a year, maybe sometimes twice a year invite the

19  designers to create new brand ideas on their own.  And we

20  would let them have some time to do that and use the

21  resources.  So Toon Teens was one of the brands that came out

22  of this exercise.

23             It was something that Lily Martinez had done based

24  on a -- her own illustration style that we had first seen in

25  a T-shirt that she had done for a previous Barbie doll that

1    was terrific, and we encouraged her.  I think it was her boss

2    actually encouraged her to make it into a whole brand.

3    Q.   When you say a T-shirt design she had done, was that --

4    A.   Previously.  And I don't remember when it was, but it

5    was pretty early in my tenure when I had come there.  We were

6    doing a roller-blading Barbie, which was done in Lily's

7    group.  I don't remember whether Lily actually did the doll.

8    I think was early in her career, too.  And I think she was an

9    assistant.  So often, as I explained, there's teams.  So she

10   may not have done the roller-blading doll but was doing the

11   illustration for what the roller-blading Barbie wore.

12   Q.   Could you tell whether it was a decal?

13   A.   It was a separate piece of art that she had done, but we

14   were going to put it on the shirt.  So it must have been a

15   decal format.

16   Q.   If you'd take a look at Exhibit 257-1.  And I'll ask you

17   also about 258-1.

18   A.   Yes.  That's the roller-blading doll I referred to.

19             MR. QUINN:  I'd offer that.  257-1.

20             THE COURT:  Any objection?

21             MR. NOLAN:  No objection.

22             THE COURT:  Admitted.  You may publish.

23             (Exhibit 257 received.)

24   Q.   BY MR. QUINN:  Is this the roller-skating Barbie --

25   A.   Yes, she actually skated.

1    Q.    On the T-shirt there, there's an image.

2    A.    This one right here.

3    Q.    Can you tell us whether that's the image that you were

4    referring to?

5    A.    Yes, that is.

6    Q.    And if you could look at 257-4.  257-4.

7    A.    Yes.

8    Q.    And 257-6.  If you'd look at those two.

9    A.    Yes.

10   Q.    And are those close-ups of the --

11   A.    Yes, close-ups of the same illustration.

12          MR. QUINN:  I'd offer 257-4 and 257-6.

13          MR. NOLAN:  Just the foundation as to when this was

14   offered for sale.

15          THE COURT:  Sustained.

16          THE WITNESS:  I just --

17          MR. QUINN:  I'm sorry?

18          THE COURT:  I sustained the objection.  Please lay

19   the foundation as to timing.

20   Q.    BY MR. QUINN:  Can you tell us when this was that the

21   Cool Skating Barbie was on the market -- introduced to the

22   market?

23   A.    I can only remember that it was early, like I say, I

24   came in maybe '96, '97, and it was probably sometime in the

25   first two years.  I don't remember the exact date.  It was

Page 311

1    pretty early in my tenure.

2              MR. QUINN:  Your Honor, we'd offer those two, 257-4

3    and -6.

4              MR. NOLAN:  Your Honor, there's still a lack of

5    foundation as to when it was offered or available to the

6    public.

7              THE COURT:  Overruled.  It's admitted.

8              (Exhibit 257-4 and 257-6 received.)

9    Q.   BY MR. QUINN:  And is this a close-up, again, showing

10   that decal?

11   A.   Yes, it is.

12   Q.   257-4 and 257-6?

13   A.   Correct.

14   Q.   Same thing?

15   A.   Yes.

16   Q.   And could you please turn to 258-1.  By the way, was

17   this Cool Skating Barbie doll, did this come in different

18   ethnicities?

19   A.   Yeah.  Not every Barbie doll, but many of them we

20   offered as black Barbie, Hispanic Barbie was really called

21   Theresa, which was her friend.  It wasn't really Hispanic

22   Barbie.  It was her friend Theresa.  So some Barbie dolls

23   were only white, blonde Barbie.  Others were offered in white

24   Barbie, black Barbie.  Or it was Barbie and some of her

25   friends, and Theresa was one of her friends.

1    Q.   If we could look at 258-1, please.  And I'll ask you if

2    you can identify 258-1.

3    A.   Yes.

4    Q.   And what is that?

5    A.   That's the same roller-blading doll but offered as

6    Theresa.

7    Q.   And was Theresa a certain ethnicity?

8    A.   Yes.  She was alluded to be Hispanic.

9            MR. QUINN:  All right.  I'll offer 258-1.

10           THE COURT:  Could you establish timing on this,

11   Counsel?

12   Q.   BY MR. QUINN:  Again, can you tell us, these Cool

13   Skating Barbies in the different versions, can you tell us

14   whether they came to market at the same time, different

15   times?

16   A.   Yeah, they were the exact same time, but again, was

17   probably within a year or two of my coming on board.

18           MR. QUINN:  I'd offer then, your Honor, 258-1 and

19   258-6.

20           THE COURT:  Any objection?

21           MR. NOLAN:  No objection.

22           THE COURT:  Admitted.

23           (Exhibit 258-1 and 258-6 received.)

24           THE COURT:  You may publish.

25           MR. QUINN:  Thank you, your Honor.

1    Q.    And did you say the name of this doll?

2    A.    Her friend Theresa.

3    Q.    And if we could look at 258-6.

4          And so did Lily do different decals for the

5    different --

6    A.    Yeah, for each of the -- I forget whether it was just

7    Theresa and Barbie or whether it was three or four, it may

8    have been black Barbie as well, but she would do different

9    decals for each of the different dolls.

10   Q.    If we could look at 259-1 and 259-5.  259-1 and 259-5,

11   and my question will be whether you can identify these.

12   A.    Yes.  So now I see we did offer Christy, which is her

13   African-American friend, and that's 259.

14   Q.    We'd offer 259-1 and 259-5, your Honor.

15         THE COURT:  Any objection?

16         MR. NOLAN:  Your Honor, I assume that this was

17   about the same time?

18         THE WITNESS:  Yes, they were all launched at the

19   same time.

20         MR. NOLAN:  Very well.  No objection.

21         THE COURT:  Admitted.

22         (Exhibit 259-1 and 259-5 received.)

23         MR. QUINN:  May I publish these?

24         THE COURT:  You may.

25   Q.    BY MR. QUINN:  This is the third version of the Cool

1    Skating Barbie?

2    A.    Correct.

3    Q.    Indicated that at the time -- do you know whether or

4    not, whether Lily Martinez came up with this design, whether

5    she was a full-time employee or an intern or what her status

6    was with the company?

7    A.    I don't remember.  I remember it was early on in her

8    employment.  She may have started as a -- often we would

9    start young designers as free-lance and make sure they were

10   great, and then offer them jobs.  So I can't remember whether

11   she was still a free-lancer or whether she was full time.

12   But -- or part time.  But either way she was a Mattel

13   employee.

14   Q.    Did you say that it's your recollection relatively --

15   A.    I remember it was early in her career because I remember

16   saying to Cassidy, if she's not full time, we should bring

17   her on.  Because we all thought they were really great

18   looking.

19   Q.    Could you look at 48-11, please.

20   A.    Yes.

21   Q.    Can you identify 48-11?

22   A.    These were some of Lily's variations of the decal that

23   was going on the T-shirt.  These were drawings that Lily did

24   that would be used as the decal on the doll's T-shirt.  The

25   designer had to do drawings that would go to a department

1   called visual design that would make them production ready.

2   So these were what she was submitting to visual design that

3   would make the production ready art.

4   Q.   So this was her drawing which ultimately became the

5   decal that we have looked at?

6   A.   Yes.

7           MR. QUINN:   I would offer Exhibit 48-11, your

8   Honor.

9           MR. NOLAN:   Your Honor, lack of personal

10  foundation.

11          THE COURT:   Sustained.

12  Q.   BY MR. QUINN:  What you told us about this exhibit, how

13  is it you know what that is?

14  A.   Because I recognized the drawings.  These are her

15  drawings.  And they are exactly the design of what we just

16  saw ended up on the dolls' T-shirt, and it's labeled visual

17  design, which means it was probably going to the visual

18  design department next.

19  Q.   Did you see this at the time?

20  A.   Yeah, well, I looked at most of the final packages.  In

21  the final walk-through, I see all the final components of

22  what is being given for production.

23  Q.   But in terms of these particular drawings?

24  A.   Yeah, I remember seeing these drawings.  I don't

25  remember everything on every product, but because these were

1    so cool looking, I specifically remember that we were all

2    very excited about them.

3            MR. QUINN:  I'd offer Exhibit 48-11.

4            MR. NOLAN:  Your Honor, speculation as to whether

5    or not it went to the design center.

6            MR. QUINN:  I can clear that up, your Honor.

7            THE COURT:  Yes.  In terms of the actual exhibit

8    itself, Counsel.

9            MR. NOLAN:  Yes, the actual exhibit itself.

10           THE COURT:  The exhibit is admitted subject to

11   clarifying the visual design center.

12           (Exhibit 48-11 received.)

13           MR. QUINN:  Do I have permission to publish the

14   exhibit?

15           THE COURT:  Yes, you do.

16   Q.   BY MR. QUINN:  Exhibit 48-11.  It says visual design

17   there.  Does that mean something to you?

18   A.   Visual designers were on my team as well.  They were --

19   we at one point had broken up the team into preliminary

20   designers and visual or development designers, and what it

21   meant is they were the designers that conceived of the idea

22   and did the original sketches, and then the visual designers

23   were the ones that actually did the mechanicals.  A lot more

24   left brain kind of designers.

25           So I didn't want to make the preliminary designers

8f7f8ad3-b8c6-4a9b-b4bd-5b0487575e86

1   have to do the entire process in terms of -- because there's

2   a process, when you send this off, that says now that you

3   have to get it ready for color separations, and it was much

4   more mechanical part.  So we had specialties.  So a

5   preliminary designer would do all the drawings, all the, you

6   know, the ideas, the concepts, and then instead of wasting,

7   you know, I'll use Lily as an example.  To have her spend two

8   days preparing this artwork for production, she would hand it

9   off to a team called visual design that actually were in the

10  same area that I showed you.

11          They were part of the team that made it happen.  So

12  they were in the design center as part of the team that Lily

13  worked on.

14  Q.   Do I understand correctly, from what you've told us,

15  that you do recognize these as Lily's drawings for that

16  decal?

17  A.   Absolutely.  Lily has a very distinct drawing style.

18  Q.   How so?  How would you describe it?

19  A.   Well, I mean, she's changed a bit over the years, but

20  the first thing is that it looks like her.  I remember the

21  first time I saw the drawings, and this was many years ago,

22  but I remember it was remarkable because it really was

23  distinctly the way she looked.  In those days she wore bright

24  red lipstick.  So we were kind of all -- that's why this so

25  stood out, because I remember all the designers gathered

Page 318

1  around and thought wow, she's really captured, and she even

2  dressed a little bit like that before she was pregnant.

3            So we all remember that it was the first time I had

4  seen someone come up with a doll that was truly a projection

5  of themselves.  So I will never forget.  Like I say, I can't

6  remember everyone's drawing style, but hers was distinctly a

7  projection of herself.

8  Q.   To get back to the issue that was raised, do you know

9  whether these drawings actually went on to the visual design

10 department?

11 A.   Yeah, because they ended up --

12 Q.   How do you know that?

13 A.   I know that because I've seen the end product and was

14 very involved.  I also approve, before things go into

15 production, the final proof.  So that this clearly is what

16 went on.

17 Q.   So we started talking about this decal because I asked

18 you about Toon Teens.  So what did this have to do with Toon

19 Teens?

20 A.   Well, because the next time, whenever the next time we

21 had one of these kinds of open time periods, where I invited

22 the designers to say we're looking for some new brands, so

23 you know, take the next two weeks, ane everyone, you know,

24 work on what you think would make a great doll brand, and I

25 remember Debbie and -- Cassidy was Debbie's boss -- and we

1   were all encouraging her that this would be a great look and

2   attitude to actually create a doll line.  So she did.

3          They had soft bodies and plastic heads, but she

4   called it Toon Teens, and they came with cars or some kind of

5   accessories.

6   Q.   And can you tell us how long after the decal was

7   created?  Do you remember?

8   A.   I don't remember.

9   Q.   Would you turn, please, to Exhibit 48-1.  And what would

10  be the first step?  If Lily is given the green light, why

11  don't you see if you can turn this into a doll, what would be

12  the first step?

13  A.   So she would do a drawing of exactly what she wanted

14  that doll to look like.  And if the doll -- and every

15  designer works slightly differently.  But, for example, she

16  would in this case because the doll I know, because I saw the

17  doll, have clothing.

18          So we would possibly give swatches of what she

19  wanted the clothing to be because this drawing, as explained

20  earlier, would become the blueprint that all of her team

21  members would follow to help her execute it.  So she had to

22  in the drawing create the doll's garment exactly the way she

23  wanted it to look, hand it off to the seamstress on her team

24  with fabric swatches to execute the clothing.  If it was a

25  hard body sculpted face, the drawing would be used to give to

1    the sculpting department to follow.

2              So the next step would be a drawing and anything

3    attached to it that her teammates needed like fabric or

4    details, face paint.

5    Q.    Would you take a look, please, at Exhibit 48-1.

6    A.    Yes.

7    Q.    And I'll ask you if you can identify that document.

8    A.    Yes, that's one of the drawings that was the initial

9    concept for Toon Teens.

10             MR. QUINN:   I'd offer that, your Honor.

11             THE COURT:   Any objection?

12             MR. NOLAN:   No objection.

13             THE COURT:   Admitted.

14             (Exhibit 48-1 received.).

15   Q.    BY MR. QUINN:   So is this a drawing that Lily

16   Martinez --

17   A.    Yes, and there are the fabric swatches, informing what

18   fabrics she wanted to use for the clothing.

19   Q.    And I notice that dolls in the drawing, the hands are

20   out to the side.

21   A.    Yes, because it came from her skating doll, but the doll

22   was balancing herself skating.  So it's interesting, she kept

23   that same look even though the dolls were no longer skating,

24   they had that same -- which actually works for the attitude,

25   but it came from the skating idea.

1    Q.    Would you look at Exhibit 48-2 and tell me if you can

2    identify that document.

3    A.    Yes, this is another one of the Toon Teen dolls.

4              MR. QUINN:  We'd offer that, your Honor.

5              MR. NOLAN:  No objection.

6              THE COURT:  Admitted.  You may publish.

7              (Exhibit 48-2 received.).

8    Q.    BY MR. QUINN:  Do you recall whether these Toon Teen

9    dolls that Lily Martinez created, whether they have different

10   ethnicities?

11   A.    Yes, I mean, they had different color skins.

12   Q.    Okay.  Let me change gears now and ask you some

13   questions on another subject.  You've already told us you

14   know Carter Bryant.

15   A.    Yes.

16   Q.    Do you know when he departed Mattel the second time?

17   A.    Yeah, because -- well, I only remember the time that he

18   departed.

19   Q.    Can you tell us roughly when that was, what year that

20   was?

21   A.    It was before I left.  So if I left in 2003, I don't

22   know.  It was a year or two prior to that maybe, or maybe a

23   year prior.  I don't remember the exact date.  But I was

24   there for it.

25   Q.    And did you speak to him about his leaving the company?

8f7f8ad3-b8c6-4a9b-b4bd-5b0487575e86

Page 322

1   A.   Yes, I did.  Because I was very upset.  His boss's boss,

2   Ron Longsdorf -- his immediate boss was Ann Driskill, and

3   Ann's boss was Ron Longsdorf, L-O-N-G-S-D-O-R-F, who was my

4   direct report.  And he came to me very upset that Carter had

5   resigned, and my first question was why.

6        He said that Carter was made this great offer that

7   really afforded him a life-style that he can't refuse, and I

8   remember him saying that he was able -- I remember this

9   picture of sitting in his home with his dog by his side and

10  being able to make a living out of his home.  And I

11  immediately asked, because what I usually ask when people

12  come and say so-and-so is resigning, my first question is

13  what's the problem.  Have we done anything wrong.  Is it

14  about money.  Is it about something that happened.  Because

15  my first predisposition is, if it's someone I want to keep,

16  is to find out why they are leaving.

17  Q.   Did you go talk to Carter Bryant?

18  A.   Yeah, well, so after Ron said to me it's a life-style

19  change, he -- and he says he won't tell me where he's going,

20  but he said it's not to competition.  I said let me talk to

21  him.  And I wanted to talk to him because I had hoped I could

22  talk him out of going because he was a very talented

23  designer.

24  Q.   So did you go talk to him?

25  A.   Yes, I did.

1    Q.   And what was said between the two of you?

2    A.   So I asked the same question.  I said, "I hear you're

3    leaving."  He said yes.  I said, "Why are you leaving?  Is

4    there anything I can do?  More money?"  He said absolutely

5    not.  He said, "I really need a life-style change.  This is

6    my second time here.  And I really have an opportunity where

7    I can work out of my house," and I think he said he was going

8    back to the midwest, and he said, "It's nothing you could

9    ever compete with.  It's just a life-style change."

10              I said is it -- "Are you going to competition?"

11   Because we had a policy that if you were going to

12   competition, you were asked to leave and not stay the two

13   weeks.  We prefer that you stay the two weeks, but if you

14   weren't going to competition, we wanted you to stay the two

15   weeks and finish your work.  But if you were going, it would

16   not be cool to stay.

17   Q.   You continued to pay them for the two weeks?

18   A.   Yes, that's pretty standard.  All the design companies I

19   worked with, that's standard.  Because if you go to

20   competition, we don't want you sitting there for two weeks.

21   Q.   What did he say when you asked him?

22   A.   He said, "Absolutely not.  I'm not going to anything

23   competitive."  So I let him stay the two weeks because I had

24   every reason to believe him and no reason to disbelieve him.

25   Q.   After he left Mattel, did Carter Bryant say anything to

8f7f8ad3-b8c6-4a9b-b4bd-5b0487575e86

Page 324

1    you about a new fashion doll idea that he had?

2    A.    No.

3    Q.    Did he ever mention to you the concept of a doll called

4    Bratz?

5    A.    No, absolutely not.

6              MR. QUINN:  Nothing further.

7              THE COURT:  Cross-examination.

8              MR. NOLAN:  Thank you, your Honor.

9                        CROSS-EXAMINATION

10   BY MR. NOLAN:

11   Q.    Good afternoon, Ms. Russell (Sic).  Let me just ask you

12   a couple of questions.

13             Just so it's clear in my notes, what is the exact

14   starting date for you at Mattel?

15   A.    As I said earlier, I don't remember the exact starting

16   date.

17   Q.    Can you give me the month?

18   A.    No.  I remember that I ended somewhere around the end of

19   '03, and I know I was there approximately seven years.  So I

20   either -- I remember during Christmastime knowing I was

21   resigning, but I don't remember whether I gave notice right

22   after Christmas or right before Christmas.  So it was either

23   December of '03 or early '04.  I know I was there for

24   approximately seven years.

25   Q.    I'm just curious, you can't recall your starting date at

1   Mattel, but you can recall the time that you saw a particular

2   decal?

3   A.   No, I was not able to recall, if you remember, the exact

4   time I saw the decal.  I just remember also in general terms

5   that it was somewhere early in my tenure, within a year or

6   two of my starting.  I could not remember the exact date.

7   Q.   When Carter Bryant left Mattel, do you know whether he

8   was marked as eligible for rehire?

9   A.   No.  The only thing that that may pertain to is we have

10  a policy where you could not rehire someone within six months

11  of them leaving.  So as you know, we brought him back.

12  There's no such thing in my mind, I was not aware of anything

13  about never being eligible for rehire.  We did have something

14  where you couldn't rehire someone until they had been gone

15  for six months if you wanted to use them free-lance, but I

16  never saw that document.

17  Q.   When did you first see the Bratz doll?

18  A.   I don't remember.  When it first came on the market, I

19  suppose.

20  Q.   Well, in relationship to, let's say, when you saw the

21  decal.

22  A.   Oh, it was much later, because I know that the only

23  thing I do know is that the Bratz doll came after Diva Starz.

24  And I do know that Diva Starz was 2000 because I thought that

25  they looked a little similar.  So I remember that's the only

1     chronological piece I can tell you, is it was after Diva

2     Starz, which I know was around 2000.

3     Q.   Did you consider at the time the consideration of the

4     name Bratz as being confidential or proprietary to Mattel?

5     A.   The consideration of it?

6     Q.   Yes.

7     A.   Yeah, I would consider that any of those internal

8     documents in terms of what we generated to be confidential.

9     Q.   Were you surprised, then, when you first heard of a new

10    doll that had been launched by MGA named Bratz?

11    A.   I thought it was a -- it was spelled differently.  So

12    the truth is you spell something differently -- I've been

13    through this enough in terms of clearing things legally that

14    just by spelling something differently, that you can have a

15    legal right to it.  So yeah, I thought oh, gee, we weren't

16    able to clear it that way, but they were able to clear it

17    this way.

18    Q.   Well, did you report that to anybody within Mattel, that

19    there was a former employee that had left Mattel and now

20    there was a doll line out with the name Bratz?

21    A.   No.  Because I didn't even think I knew where -- that

22    Carter was working at MGA at that point.  I don't remember

23    when exactly I found out.  But that would be -- yeah, that is

24    not anything that I would take note of.

25    Q.   When did you first learn that Carter Bryant was working

1   at MGA?

2   A.    I don't remember the exact date.

3   Q.    Do you recall when you learned that Carter Bryant was

4   one of the illustrators or designers of the doll Bratz?

5   A.    No, I don't remember.

6   Q.    No recollection?

7   A.    Of the exact date I found out, absolutely not.

8   Q.    Is it fair to say that in your position at Mattel, you

9   were part of management?

10  A.    Yes.

11  Q.    And it's true, as I understand it, that you felt that

12  one of your jobs was to create a collaborative environment at

13  Mattel; correct?

14  A.    That was my -- yes.  That was my methodology.  One of my

15  jobs is to create the best product I can.  And I think

16  collaboration is a means to get there in some cases.

17  Q.    Do you recall participating in a management survey at

18  Mattel?

19  A.    No, I do not.  I don't know what kind of survey you're

20  talking about.

21  Q.    Do you recall being interviewed as a representative of

22  senior management for a Barbie review, a survey regarding

23  how, you know, the design function works for Barbie?

24  A.    No.  I remember being part of a design and development

25  re-engineering process.  I don't know if that's what you're

1    referring to or not.

2    Q.   Do you have a white notebook right in front of you?  Do

3    you mind turning to Trial Exhibit 16196?

4    A.   Okay.

5    Q.   Do you see the front page Barbie, final recommendation,

6    dated August 5, 2002?

7    A.   Yes.

8    Q.   Revised August 6, 2002?

9    A.   Yes.

10   Q.   Turning to page 7 of the document, Trial

11   Exhibit 16196-009.

12            MR. QUINN:  Your Honor, I object to the witness

13   being questioned about a document that the witness -- there's

14   no foundation laid.

15            THE COURT:  It's not in yet.  Counsel, don't refer

16   to the substance of the document.

17   Q.   BY MR. NOLAN:  Could you look at page 9, and under

18   management interviews, do you see your name?

19   A.   Yes.

20   Q.   And do you see a title that is listed under your name?

21   A.   Yes.

22   Q.   And is that title correct?

23   A.   For that time I'm assuming it was.  Because my title

24   changed a number of times while I was there.

25   Q.   So does this refresh your recollection that you were

1   interviewed for a management survey with respect to the

2   Barbie final recommendations?

3   A.   No, it does not.   We did a lot of different projects.   I

4   mean, this particular survey, I don't have any recollection.

5   I mean, it's possible.

6   Q.   You testified on direct examination that Mattel was a

7   creative and innovative place to work; is that correct?

8   A.   I thought so, yes.

9   Q.   Do you recall any management survey results coming out

10  and making the finding that the organization was in fact risk

11  adverse or defensive, in a defensive mode?

12  A.   No, I do not.

13  Q.   Do you remember -- if I could ask you to turn to page 9.

14  Do you remember ever being told that the survey -- that a

15  survey was conducted and findings were that the organization

16  would --

17              MR. QUINN:   Your Honor, I object.

18              THE COURT:   Sustained.

19              MR. QUINN:   He's just reading the contents of the

20  document.

21              THE COURT:   Sustained.

22  Q.   BY MR. QUINN:   Ms. Ross, you've been shown a number of

23  documents by Mr. Quinn.   I was just wondering, do you recall

24  reading the recommendations that are set forth in this report

25  dated August 5, 2002?

Page 330

1    A.   Where are the recommendations?  What page?

2    Q.   Or any of the findings.  For instance, turn to page 010,

3    and it says management interview findings.  Do you see that?

4    A.   Page 10?

5    Q.   Yes.  Of the Exhibit itself.

6    A.   No.

7    Q.   You don't recall ever participating in any management

8    meetings where it was reported out --

9         MR. QUINN:  Your Honor, I object.  The witness has

10   said she hasn't seen the document.  Now he's using questions

11   to --

12        THE COURT:  Overruled.  Do not get into the

13   substance.

14   Q.   BY MR. NOLAN:  All right.  Separate and apart from this

15   report, do you recall participating in management meeting in

16   about August of 2002, where findings were presented to you

17   and other managers with respect to the results of other

18   managers, including yourself within the Barbie department?

19   A.   No, I do not remember this particular event.

20   Q.   We talked about Toon Teens for a moment.  You thought

21   that was a really cute idea?

22   A.   I thought it was great looking, yeah.

23   Q.   And based on your perception of the decal, you thought

24   it should be made into a doll?

25   A.   I thought it was great looking, and I thought it would

1   make a great doll.

2   Q.   Could you tell the jury whether or not Toon Teens was

3   ever made into a doll?

4   A.   No, it was not.

5   Q.   Why not?

6   A.   Because what we did was out of those exercises where we

7   took many different new brand ideas, they were brought to

8   focus groups, and there may have been, I think, six or seven,

9   and then after looking at the results of the focus groups and

10   looking at our portfolio of brands, it was decided which

11   brands we would go forward with, and I think we could only

12   take one or two new brands out of these exercises.

13          So it was What's Her Face, I think, was picked at

14   that time.  I don't remember the exact reason why What's Her

15   Face was picked over Toon Teens, but I just remember that

16   Toon Teens was not picked during that focus group session,

17   that it was entered into, and some other brand was.  And I

18   think it was What's Her Face.

19   Q.   Was it part of your responsibility to review the focus

20   group findings of potentially new products?

21   A.   Part of my responsibility, no.  I would come to some,

22   not all of them, depending on my time calendar, I would

23   attend some of the focus groups.  Usually the designer always

24   went.  I would come to some of them.  And in terms of the

25   reports that were issued, I can't say I read every single

8f7f8ad3-b8c6-4a9b-b4bd-5b0487575e86

Page 332

1    one.  I always tried to learn whatever I could from the

2    reports, but I can't be sure that I read every single one.  I

3    mean, I would hear.  The results were reported at a meeting

4    live.

5           So I didn't necessarily read it.  There was at the

6    next design meeting, people from research would be talking

7    about what their recommendations were.  So I can't say I read

8    all the reports, no.

9    Q.   Could I ask you to take a look at trial Exhibit No. 286

10   for a moment.

11   A.   Yes.

12   Q.   Do you have that in front of you?

13   A.   Yes.

14   Q.   It's titled Subject, Qualitative Research Flanker Dolls,

15   and it's got a number.  I just want to ask you a couple quick

16   questions.  First of all, are you familiar with the term

17   Flanker doll?

18   A.   Yes, it's a term that we used sometimes, the term

19   Flanker doll, to refer to a new brand.

20   Q.   Do you see that on November 17, 1999, there was a

21   qualitative research product or report distributed within

22   Mattel including feedback on Toon Teens?

23          MR. QUINN:  Excuse me, your Honor.  Again,

24   foundation.  Whether --

25          THE COURT:  Sustained.

1    Q.    BY MR. NOLAN:  Do you remember you testified earlier

2    that you attended a meeting where reports were given out

3    regarding various focus groups conducted involving Toon

4    Teens; correct?

5    A.    No.  What I testified is that sometimes -- you asked me

6    whether I had read all the reports.  And what I said is

7    sometimes I read them.  Sometimes I would go to the live

8    download from research.  So I can't honestly say in this

9    particular focus group whether I read it, whether I went to

10   the live report.  I don't remember.

11   Q.    Do you remember attending a meeting where a live report

12   was presented about Toon Teens?

13   A.    I don't remember the format in which I learned about

14   Toon Teens.  What I do remember is that it wasn't picked and

15   that I don't remember the reason why it wasn't picked.  But I

16   remember that something else was picked instead during that

17   time frame or that -- yeah.

18   Q.    Have you had a chance to look at Exhibit 286, which is

19   the qualitative research regarding Flanker dolls for Toon

20   Teens?  Do you remember seeing this document?

21   A.    I don't remember this particular document.

22   Q.    Do you remember seeing general reports similar to what's

23   stated here with respect to focus group results for Toon

24   Teens?

25   A.    I'm sorry.  Could you reword the question.

1  Q.   Do you recall receiving either live reports or written

2  documents where focus group feedback regarding Toon Teens was

3  reported?

4  A.   As I said earlier, sometimes the formats changed, and

5  sometimes I would receive them in writing and read them.  And

6  other times I would go to them live.  So I don't understand.

7  Are you asking me whether I remembered this -- I don't

8  remember this particular document, but that's what it appears

9  to be.

10  Q.   Is there any question in your mind that this document

11  was not available to you to review?

12       MR. QUINN:  Calls for speculation.

13       THE COURT:  Rephrase, Counsel.

14  Q.   BY MR. NOLAN:  Can you say categorically that you did

15  not review this document in your capacity at Mattel?

16  A.   I cannot say whether I did or did not.

17  Q.   Can you tell the jury other than you know that another

18  doll was chosen over Toon Teens, can you tell the jury what

19  you remember regarding what you had heard about focus groups'

20  reaction to Toon Teens?

21  A.   No, as I said to you earlier, I don't remember the

22  exact -- there was seven years of probably, God, 120 --

23  probably over 150 focus groups.  So I don't remember the

24  exact reasons.  What stuck in my mind was that it was not a

25  go forward brand and that we picked another brand, which I

1    think at the time was What's Her Face.

2    Q.   Can you describe to the jury why other than Mattel

3    picked out the doll -- why Toon Teens was never made into a

4    doll and offered for resale?

5    A.   No, like I said earlier, there's a number of reasons

6    why -- it has to do with our portfolio brands at the time,

7    where the opportunities lie on the shelf in terms of --

8    there's many complex reasons why a brand does or does not get

9    brought to market.  And I know this because my team would

10   constantly pump out new brands.  And I would say that there

11   were 15 to 20 different ideas a year would come up.

12           So I don't remember the exact rationale, but I

13   remember What's Her Face, which I liked as well.  So I wasn't

14   that disappointed.  I mean, What's Her Face got chosen

15   instead.

16   Q.   Do you recall ever being told that the focus groups

17   indicated the girls had a mixed reaction to Toon Teens?

18   A.   No, like I said, what I remember is that never for

19   whatever reasons, complicated reasons, it did not get picked,

20   and What's Her Face did get picked.

21   Q.   I want to go back to the drawing of Toon Teens, the

22   concept of Lily Martinez for just a moment.  I think it was

23   Exhibit No. 48-1.

24   A.   In the white book?

25   Q.   I'm sorry.  Turning back to the black book for a moment.

Page 336

1    A.    I'm sorry.  What was the number?

2    Q.    48.

3          THE COURT:  48-1.

4          THE WITNESS:  Got it.

5    Q.    BY MR. NOLAN:  To dash 0008.  Do you see that?

6    A.    Yes.

7    Q.    And you recognize this as some of the decals?

8    A.    Not the decals, these were the drawings for the Toon

9    Teens dolls.

10         MR. NOLAN:  Your Honor, we'd offer 48-008.

11         THE COURT:  Any objection?

12         MR. QUINN:  No objection.

13         THE COURT:  Admitted.

14         (Exhibit 48-008 received.)

15         THE COURT:  You may publish.

16         MR. NOLAN:  Thank you.

17   Q.    And just ask you to take a look at this for a moment.

18   Do you see the doll on the lower left?

19   A.    It's not a doll.  These are the drawings for the decals.

20   Q.    The drawing on the left, is that drawing on the left

21   done by Lily Martinez?

22   A.    Yes.

23   Q.    And is the drawing on the right the color version of

24   that drawing?

25   A.    It appears to be.

1  Q.   Do you know whether or not Lily Martinez drew those

2  dolls -- I'm sorry, those decals twice?

3  A.   Do I know if she drew them twice?  I don't know her

4  methodology, quite frankly.  Every designer works

5  differently.  So I recognize that as Lily's drawing style.  I

6  don't know whether she redrew it or she xeroxed it and pasted

7  it.  Everyone has their own method.

8  Q.   If we can go back to the full shot for a moment.

9  There's a lot of different drawings with different colors.

10  Do you see that?

11  A.   Yes.

12  Q.   Do you know whether or not Lily Martinez redrew each one

13  of those figures that appear here?

14  A.   As I said earlier, I don't know her particular

15  methodology, whether she redrew it or she could have xeroxed

16  it and pasted it down.

17  Q.   And in the middle of the drawing here, where you have on

18  the left-hand side Toon Teens drawings on skates, and on the

19  right-hand side Toon Teens on skates with color.  Do you see

20  that?

21  A.   By the way, these are not Toon Teens drawings on skates.

22  These are the decal drawings that were done for the

23  roller-blade Barbie prior to the invention of the Toon Teens

24  dolls.

25  Q.   I apologize.  In my year, roller blades and skates were

1   the same thing.  I apologize.

2        My question to you is would you say that the color

3   version of the hand drawing image on the left-hand side has

4   the same attitude as -- has the same attitude?

5   A.   Yeah, I would say to me it looks like the same drawing

6   but colored in.

7   Q.   Okay.  Before coming to Mattel --

8        THE COURT:  Counsel, I want to stop you here.  It's

9   the end of the day.  We'll resume at 9:00 tomorrow morning.

10  The jury is excused until 9:00.  Remember the admonition not

11  to discuss the case with anybody.  Be here, and we'll start

12  promptly at 9:00.  Have a good evening.

13        (WHEREUPON THE JURY WITHDRAWS.)

14        THE COURT:  Please be seated.  Mr. Quinn, who are

15  the witnesses you're calling for tomorrow?

16        MR. QUINN:  Tomorrow we'll be calling -- obviously

17  we'll finish up with Ms. Ross, Lily Martinez, Paula Garcia.

18        THE COURT:  Very good.  Let's be ready to go right

19  at 9:00.  I'd like to see counsel at 8:30.  And the only

20  comment, Mr. Nolan, when you're making objections, go ahead

21  and rise just for the court reporter, and it stops the

22  witness from speaking.  Not a problem.  If you're not

23  objecting, you may stay seated.  But if you are objecting, go

24  ahead and rise.

25        All right.  If there's nothing else, we'll see you

Page 339

1    tomorrow morning at 8:30.

2

3              (Proceedings concluded at 5:05 P.M.)

4

5

6

7

8

9

10

11

12                    C E R T I F I C A T E

13

14

15          I hereby certify that pursuant to Title 28,

16    Section 753 United States Code, the foregoing is a true and

17    correct transcript of the stenographically reported

18    proceedings in the above matter.

19              Certified on May 27, 2008.

20

21

22    _____
      MARK SCHWEITZER, CSR, RPR, CRR
      Official Court Reporter
23    License No. 10514

24

25