Page 1550

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

---

```
MATTEL, INC.,                  :  PAGES 1550 - 1668
                               :
         PLAINTIFF,            :
                               :
    VS.                        :  NO. ED CV04-09049-SGL
                               :  [CONSOLIDATED WITH
MGA ENTERTAINMENT, INC.,       :  CV04-9059 & CV05-2727]
ET AL.,                        :
                               :
         DEFENDANTS.           :
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

THURSDAY, JUNE 5, 2008

JURY TRIAL - DAY 8

AFTERNOON SESSION

MARK SCHWEITZER, CSR, RPR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
181-H ROYBAL FEDERAL BUILDING
255 EAST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012
(213) 663-3494

Page 1551

1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4        Quinn Emanuel
         By John B. Quinn, Esq.
5            B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
6            Harry Olivar, Esq.
             John Corey, Esq.
7            Diane Hutnyan, Esq.
             William Price, Esq.
8        855 South Figueroa Street
         10th Floor
9        Los Angeles, CA 90017
         (213) 624-7707

10

11

12   On Behalf of MGA Entertainment:

13       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
         300 South Grand Avenue
17       Los Angeles, CA 90071-3144
         (213) 687-5000

18

19

20

21

22

23

24

25

Page 1552

1                               I N D E X

2

3    MAUREEN TKACIC, VIA VIDEOTAPED DEPOSITION.............. 1559

4    ISAAC LARIAN, SWORN................................... 1572

5    DIRECT EXAMINATION BY MR. PRICE:...................... 1573

6

7

8                            E X H I B I T S

9    (Exhibit 1-A received.)............................... 1559

10   (Exhibit 11856 received.)............................. 1588

11   (Exhibit 5713 received.).............................. 1591

12   (Exhibit 5715 received.).............................. 1592

13   (Exhibit 13619 received.)............................. 1594

14   (Exhibit 8 received.)................................. 1609

15   (Exhibit 13382 received.)............................. 1618

16   (Exhibit 13620 received.)............................. 1624

17   (Exhibit 11907 received.)............................. 1648

18   (Exhibit 12842 received.)............................. 1651

19   (Exhibit 11248 received.)............................. 1655

20

21

22

23

24

25

Page 1553

1      Riverside, California; Thursday, June 5, 2008

2                         1:30 P.M.

3       (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

4            THE COURT:  Back on the record.  A couple of

5    issues.  Have we figured out the dates yet with respect to

6    the filing of the lawsuit?  It shouldn't be complicated.

7            MR. QUINN:  It shouldn't be, your Honor, but I

8    think we have to say, since MGA actually intervened because

9    they took the position that Carter Bryant couldn't adequately

10   protect their interests in the original Matter versus Carter

11   Bryant case, it's not just a simple one day.  I think we have

12   to say a case was filed on such and such a date.  MGA became

13   a party to that case on such and such a date, and then on

14   such and such a date claims were asserted against MGA.

15           MR. NOLAN:  My point is that the issue -- the issue

16   is when did Matter file a copyright claim against MGA.  It is

17   true that MGA intervened in the Carter Bryant action, but the

18   Court will recall that Matter was steadfastly taking the

19   position that that was not a copyright case and did not

20   involve Bratz.

21           So, your Honor, I guess to cut through the chase, I

22   am prepared to say it would be okay for the jury to be told

23   that MGA intervened in the Carter Bryant lawsuit in December

24   of 2004.  Mattel filed its copyright claim against MGA on

25   July 12th of 2007.

4a7976b7-80f1-4fdf-aea0-ab993789aba7

1          MR. QUINN:  I don't think --

2          THE COURT:  Hold on.  Stop.  MGA intervened on what

3     date?

4          MR. NOLAN:  December 7th of 2004.

5          THE COURT:  And Matter filed its initial complaint

6     against Carter Bryant on what date?  That's the date we've

7     already stipulated to.

8          MR. NOLAN:  That was April 24th of 2004.

9          THE COURT:  Okay.  I really don't want to get into

10    particular claims, copyright claims or this claim that I

11    think will be very confusing to the jury.  We've made a

12    distinct effort -- the point here is just to indicate when

13    parties may or may not have been on notice that there was a

14    lawsuit.  All of these claims, as we have all recognized, as

15    the Court recognized by consolidating these cases, are

16    inextricably intertwined.

17         MR. NOLAN:  Your Honor, with respect, I do believe

18    that with respect to the instruction or the stipulation to be

19    given to the jury, in light of the way that Mr. Zeller chose

20    to cross-examine the witness about the copyright applications

21    being filed and the corrective actions taken on the

22    copyright, the jury must be told when the copyright action

23    was filed.  Without telling them that, Judge, then the jury

24    is left to believe that in the filing of the lawsuit against

25    Carter Bryant and at the time of the intervention, you know,

1    his drawings were in issue and everything else.  Matter has

2    taken the opposite position, as the Court knows, on the

3    removal petitions, and all I would ask is that the jury

4    simply be told what I explained and then say that the

5    copyright application by Mattel against MGA was filed on the

6    date.  I respectfully think we need to say the copyright

7    because of the cross-examination that Mr. Zeller elicited.

8              THE COURT:  How would you want me to characterize

9    what Mattel filed against Carter Bryant then?

10             MR. NOLAN:  A breach of contract claim, which it

11   was.

12             MR. QUINN:  Your Honor, the problem with that is

13   that both MGA and Carter Bryant took a position from the

14   beginning that that underlying initial case was really a

15   copyright case.  And that went up to the Ninth Circuit on

16   that.  I mean, they have always characterized it as a

17   disguised copyright case.  So I think the Court's instincts

18   are right.  There really is no point in getting into what

19   causes of action were filed when.  I think that's going to be

20   more confusing.  What the jury needs to know was when was MGA

21   on notice that there was some claim relating to Bratz, and

22   they intervened and took the position in filings with this

23   court that they needed to intervene to protect their property

24   interests in Bratz.  And they characterized it as a copyright

25   claim from the beginning.

Page 1556

1          MR. NOLAN:  But your Honor, Mattel disavowed that

2     position.

3          THE COURT:  I understand that, but you didn't

4     disavow that position.  You, being MGA.

5          MR. NOLAN:  But, your Honor, after --

6          THE COURT:  MGA took that position that it was a

7     copyright claim.

8          MR. NOLAN:  Your Honor, MGA took the position, and

9     Judge Manella agreed with Mattel and took their

10    representation that it wasn't.

11         THE COURT:  And then it went to the Ninth Circuit.

12         MR. NOLAN:  It went to the Ninth Circuit, and

13    that's when the copyright action, once it came back to the

14    District Court --

15         THE COURT:  I just think that this is -- we've got

16    a stipulation on the right.  If counsel wants me to give the

17    additional dates, I will, but I'm not going to get into the

18    claims.  If you don't want me to give you the additional

19    dates, I won't.

20         MR. NOLAN:  May we revisit it later?

21         THE COURT:  Yes.  What I'm proposing to say, if you

22    want, there's a stipulation now.  I don't need to do anything

23    further.  If you want, I will do the following.  You heard a

24    stipulation that Mattel filed a complaint against Carter

25    Bryant on April 24th, 2004.  MGA intervened in that complaint

Page 1557

1    on December 7, 2004.  Mattel filed a complaint against MGA on

2    December 12th, 2007.  I will state that if you want me to.

3    If you don't, I don't.

4              MR. QUINN:  The date of the initial complaint

5    filing is actually April 27th.

6              THE COURT:  Is that correct?

7              MR. NOLAN:  Yes, your Honor.

8              THE COURT:  I also received an under seal lodging

9    from Mr. Nolan this morning.  I'd like to take this up at

10   this time, Mr. Nolan.  I won't disclose it.  Why don't you

11   disclose it to the extent that you want too.

12             MR. NOLAN:  First of all, your Honor, I don't

13   believe it was filed under seal.

14             THE COURT:  It was not filed.  It was just given to

15   the Court in a sealed envelope.

16             MR. QUINN:  Your Honor, could we do this at sidebar

17   because this is actually something that we had asked to take

18   up, and I thought it was going to come up at the recess.

19             THE COURT:  Very well.  This is a recess.  You mean

20   the recess earlier?

21             MR. QUINN:  The next recess.

22             THE CLERK:  I had mentioned to counsel the next

23   recess.

24             THE COURT:  Very good.  I certainly don't want to

25   interfere with Mr. Holmes's running the courtroom.

Page 1558

1          THE CLERK:  Your Honor, the clerk would defer to

2   the Court on the issue.

3          THE COURT:  That's fine.  We can take it up at the

4   next recess.

5          Very well.  Anything further before we bring the

6   jury?

7          MR. QUINN:  No, your Honor.

8          MR. NOLAN:  No, your Honor.

9          THE COURT:  All right.

10         (WHEREUPON THE JURY ENTERS.)

11         THE COURT:  Good afternoon, members of the jury.

12  I'm going do elaborate on a stipulation that was entered into

13  between the parties concerning the date of the filing of the

14  lawsuit in this matter.  The parties previously stipulated

15  that Mattel filed a complaint against Carter Bryant on April

16  27th of 2004.  The parties have also stipulated that MGA

17  intervened in that complaint, became a party to that

18  complaint, on December 7th, 2004.  And then Mattel filed a

19  complaint against MGA on December 12th, 2007.  I previously

20  instructed that you are to basically disregard the complaint

21  that was previously filed against Carter Bryant for purposes

22  of evaluating this trial.  But at least for knowing the times

23  of when those and the dates when those complaints were filed,

24  the parties have stipulated as I just indicated.

25         Counsel, you may call your next witness.

Page 1559

1      MR. QUINN:  Yes.  Mattel calls Maureen Tkacik.  And

2  this will be a videotape.

3      THE COURT:  Good.  Are there any exhibits to be

4  introduced in advance of the tape?

5      MR. QUINN:  There is an agreement to Exhibit 1-A,

6  the redacted document.

7      THE COURT:  Exhibit 1-A is admitted subject to the

8  redactions we discussed previously.

9      MR. NOLAN:  Yes, your Honor.

10     THE COURT:  Very well.

11     (Exhibit 1-A received.)

12     THE COURT:  You may proceed.

13     WHEREUPON THE VIDEOTAPED DEPOSITION

14     EXCERPTS OF MAUREEN TKACIK, AS PROVIDED

15     BY COUNSEL, WERE PLAYED AND ARE INCORPORATED

16     HEREIN BELOW AS FOLLOWS:

17     MAUREEN TKACIK, VIA VIDEOTAPED DEPOSITION

18  Q.  Good morning, Miss Tkacik.

19  A.  Good morning.

20  Q.  Could you tell us where you are currently employed?

21  A.  I am currently employed by Gawker Media.

22  Q.  And is that here in New York?

23  A.  Yes.

24  Q.  And were you previously employed by the Wall Street

25  Journal?

Page 1560

1   A.   I was.

2   Q.   And approximately what time period were you employed by

3   the Journal?

4   A.   May 2001 through August or September of 2003.

5   Q.   And following your time at the Journal, did you then go

6   to Gawker Media?

7   A.   I worked at Philadelphia Magazine in between, and

8   free-lanced for several publications.

9   Q.   And where did you work prior to the Wall Street Journal

10  as a reporter, if anything?

11  A.   I worked for Time Magazine in Asia, in Hong Kong.  I

12  worked at the Philadelphia Daily News in Philadelphia and I

13  worked at the Washington Times in Washington, D.C. and I

14  worked for a web company called Asia Wise in Hong Kong.

15  Q.   Can you just give us a brief background about your

16  education?

17  A.   I went to University of Pennsylvania for two years.

18  I dropped out.  I took some graduate classes at George

19  Mason's -- at George Mason University School of Public

20  Policy, and that's the extent.

21  Q.   And what was your job title while you worked at the The

22  Wall Street Journal?

23  A.   My specific job title was reporting assistant or

24  assistant reporter, something like that.

25  Q.   And could you describe your job duties while you were

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1561

1    there?

2    A.    I had to cover, it was somewhat -- and I had a few

3    companies that I had to cover.  I had to cover, generally,

4    youth oriented consumer products firms.  So, that would be

5    toy companies like Mattel and footwear, the footwear

6    companies, some youth retailers.  There was a crop of

7    companies that I had to keep track of.

8    Q.    Thank you.  I am going to show you what we are going to

9    mark as Exhibit 1.  This is a July 18, 2003 article from The

10   Wall Street Journal.  I have copies for the witness and

11   counsel.

12              (Whereupon, the aforementioned article was marked

13   as Plaintiff's Exhibit 1 for identification as of this date

14   by the Reporter.)

15   BY MR. NIBORSKI:

16   Q.    Miss Tkacik, could I have you take a look at what's been

17   marked as Exhibit 1?

18   A.    Yes.

19   Q.    Do you recognize this?

20   A.    I do.

21   Q.    And what is it?

22   A.    It is a story that I wrote, that I think is why I am

23   here.

24   Q.    And just for the record, this is a Wall Street Journal

25   article dated July 18, 2003 entitled, "To Lure Older Girls,

1    Mattel Brings in Hip-Hop Crowd."

2    A.    Correct.

3    Q.    And this is an article that you wrote?

4    A.    Yes.

5    Q.    And if I could have you turn to the second page, you

6    will see a highlighted paragraph.  Do you see that?

7    A.    Yes.

8    Q.    Could I have you read that out loud, please?

9    A.    "Isaac Larian, chief executive of MGA, says he had never

10   heard of a project similar to the Bratz at Mattel.  He says

11   he chose Mr. Bryant's idea for the Bratz over several others

12   after holding a sort of fashion-doll design contest in late

13   1999."

14   Q.    And did you interview Isaac Larian in preparation for

15   writing this article?

16   A.    Yes.

17   Q.    And you would agree, wouldn't you, that the article

18   attributes certain statements to Mr. Larian?

19   A.    I am not sure what -- that statement that is

20   highlighted, I would say that that is attributed to Isaac

21   Larian.

22   Q.    The second sentence reads, "He says he chose Mr.

23   Bryant's idea for the Bratz over several others after holding

24   a sort of fashion-doll contest in late 1999."  Did I read

25   that correctly.

Page 1563

1   A.   You missed the word design.  It's fashion-doll design

2   contest.

3   Q.   Fair enough.  Let me repeat it.  He says he chose Mr.

4   Bryant's idea for the Bratz over several others after holding

5   a sort of fashion-doll design contest in late 1999; is that

6   correct?

7   A.   Yes.

8   Q.   And did Mr. Larian tell you that statement during your

9   interview?

10  A.   Yes.

11  Q.   Following the publication of your article, did anybody

12  from MGA ever contact you and ask for a correction or

13  retraction or anything from the article?

14  A.   No.

15  Q.   Did Mr. Larian ever contact you and asked for a

16  correction or retraction or anything from the article?

17  A.   No.

18  Q.   Did you ever learn that anyone contacted The Wall Street

19  Journal and asked for a correction or retraction or anything

20  in the article?

21  A.   No.

22  Q.   You say that you left University of Pennsylvania, when

23  was that?

24  A.   1998.

25  Q.   And did you begin work in journalism after you left

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1564

1   Pennsylvania?

2   A.   Directly following that.

3   Q.   And the job that you mentioned that you had prior to

4   working for The Wall Street Journal, were they full-time jobs

5   or free-lance jobs?

6   A.   Full time.  They were all full-time jobs.

7   Q.   When you were working for The Wall Street Journal from

8   May 2001 to August/September 2003, where were you living?

9   A.   I was living in Los Angeles.

10  Q.   Is it true that Mattel contacted you to get you

11  interested in writing the article that became Exhibit 1?

12  A.   No.  No.

13  Q.   Do you know a Julie Jensen at Mattel?

14  A.   There was a PR person there by that name, but I thought

15  her name was Julia.

16  Q.   Did Julia Jensen contact you to encourage you to write

17  an article about Flavas for Mattel, about Mattel's launch of

18  the Flavas product?

19  A.   No.  There was a -- generally, the initial genesis of

20  this was they have a sort of toy fair at Mattel where they

21  show new lines, new products to retailers, and so I had gone

22  to that and seen the Flavas.  But the story itself -- and I

23  was thinking about writing about the Flavas.  But it was

24  only -- but I thought, you know, it was only when I learned

25  about a more interesting story that I, you know, this became

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1565

1    a story in the journal.

2    Q.   When you say you learned about a more interesting story,

3    what do you mean?

4    A.   When I learned about the more interesting angle of the

5    companies, I think I would say corporate culture, I don't

6    remember the story that specifically, but I would describe it

7    more as a story about a corporate culture that, you know,

8    was, had been very Barbie centric rather corporate, a

9    business model that was dependent on this one kind of brand

10   and how it was changing.  And I didn't, Mattel had not

11   provided me with any of that information nor did they, you

12   know, did they, did Julia Jensen or anybody else there seek

13   to.

14   Q.   Let's turn to the third paragraph of the article, where

15   is says, "Mattel Inc. hopes that the dolls are hip enough to

16   take on the Bratz."  You see that?

17   A.   Uh-huh.

18   Q.   It says, "The Flavas (pronounced Flay-vuhs like flavors)

19   is a set of six dolls brought from design to production in

20   just three months, represent a striking gamble for the giant

21   toy company."

22   Do you see that?

23   A.   Yes.

24   Q.   Did people at Mattel identified in this article tell you

25   that the Flavas was developed in just three months?

Page 1566

1   A.    Yes.

2   Q.    Do you recall them saying to you that it was possible to

3   develop a new doll line in a short period of time if one

4   wanted to?

5   A.    I don't remember specifically that.

6   Q.    But that was the gist of what they were telling you?

7   A.    That has to be assumed.  "Barbie began as a great girl

8   who was simply a reflection of popular culture, but in the

9   past few years, we had sort of put her on a pedestal," says

10  Matt Bousquette, president of the newly created Mattel Brands

11  unit."

12  Do you see that?

13  A.    Yes.

14  Q.    Is that an accurate quote of what he said?

15  A.    Yes.  I remember that conversation.

16  Q.    Now, in here it says, you wrote, "He says he chose Mr.

17  Bryant's idea for the Bratz after several others about

18  holding a sort of fashion-doll contest."

19  Do you see that?

20  A.    Yes.

21  Q.    Did you ask him what he meant?  Or do you have any

22  understanding of what was meant by this sort of fashion-doll

23  contest?

24  A.    Right now no, I don't remember.  I remember talking to

25  him, and, I believe he was overseas at the time.  And he

Page 1567

1  explained it to me.  But, there probably just was a rumor

2  story too.

3  Q.   So you don't know anything about the nature of this sort

4  of contest; is that right?

5  A.   No.

6  Q.   And you say that Mr. Larian was overseas when you spoke

7  to him; is that right?

8  A.   I vaguely recall him being overseas.

9  Q.   Do you remember if he was in Asia?

10  A.   I think I remember, because I used to live in Hong Kong

11  and I think I had a conversation with him at the time, Oh,

12  where are you staying, you know, check out this restaurant.

13  Q.    Now, when you set up the interview with Mr. Larian, did

14  you tell him in advance you wanted to talk about the origins

15  of Bratz?

16  A.   I don't remember.

17  Q.   What do you recall saying to MGA as to why you wanted to

18  speak to them?

19  A.   I don't remember.

20  Q.   Do you know whether Mr. Larian had his calendar in front

21  of him or had done any research in preparation for speaking

22  to you?

23  A.   I have no idea.

24  Q.   And did you receive any e-mails from MGA in connection

25  with this article?

Page 1568

1    A.    I don't remember.

2    Q.    Mark as Exhibit 8 an e-mail exchange, the bottom of

3    which is an e-mail from Mr. Larian to Miss Tkacik dated July

4    14, 2003.

5    Q.    Miss Tkacik, do you recognize the oldest e-mail in the

6    chain, the last e-mail on the page as an e-mail you received

7    on or about July 14, 2003 from Mr. Larian to you?

8    A.    I believe that -- I don't remember it specifically, but

9    I do remember him being -- I remember him specifically saying

10   to me at some point, something about Formal Funk and how

11   Mattel had copied it, but I don't recognize the e-mail.  I

12   think it was one of the talking points.

13   Q.    And there is nothing in this e-mail that talks about a

14   Bratz doll contest or when it occurred; is that right?

15   A.    Yes.

16   Q.    And you are not aware of any written communication of

17   any kind from MGA on that point, correct?

18   A.    I don't know.

19   Q.    And the e-mail also says, "Please e-mail me a copy of

20   the article when it's out as I am in the orient."

21   Do you see that?

22   A.    Yes.

23   Q.    And does that refresh your recollection that he was,

24   whether he mentioned to you he was in Asia when he was

25   speaking to you?

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1569

1    A.    Yes, it does refresh.

2    Q.    Now, when you spoke to Mr. Larian, did you notice that

3    he had a heavy accent?

4    A.    I remember him, he does have an accent.  It certainly

5    didn't make him unintelligible.

6    Q.    Was it your impression that English was not his first

7    language?

8    A.    I didn't really think about it.  He spoke it very well.

9    Q.    Do you understand that he came from Iran?

10   A.    I understood that he was Persian, but I didn't know -- I

11   don't remember.  I think that at one point I probably talked

12   to him about, you know, when he had come over or what have

13   you, but I have no recollection of that now.

14   Q.    You say in your article after the highlighted paragraph,

15   "Mr. Larian, who emigrated to the U.S. from Iran found his

16   company in the late 1970."

17         Do you see that?  It's on Page 2.

18   A.    Okay.

19   Q.    Does that refresh your recollection that you understood

20   that he had been born in Iran and only later came to the

21   United States?

22   A.    Yes.

23   Q.    How long was your conversation with Mr. Larian in

24   relation to this article?

25   A.    I don't know.

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1570

1    Q.    Is it fair to say it was a brief conversation?

2    A.    No.  I don't think so.

3    Q.    And someone who covers or had covered the consumer

4    products industry for youth, was it your impression that

5    Mattel did not like to introduce products that it felt

6    competed with Barbie?

7    A.    Yes.

8    Q.    You go on to say, "Mr. Bousquette says he told designers

9    to make the dolls as authentic as possible as quickly as

10   possible."

11   A.    Then I would presume that I did.

12   Q.    So you were accurately quoting Mr. Bousquette there?

13   A.    I have no reason to believe I am not.

14   Q.    And does that refresh your recollection as to whether

15   Mr. Bousquette and Miss Ross told you that they instructed

16   their subordinates at Mattel to rush production of Flavas in

17   three months?

18   A.    It does.  I am fairly certain now reading this over

19   again that I discussed the timing with Mr. Bousquette.

20   Q.    And you understood from your discussions with him that

21   he had instructed the Mattel team to rush Flavas into

22   production in three months; isn't that true?

23   A.    Yes.

24            CONCLUSION OF VIDEOTAPED DEPOSITION EXCERPTS

25            MR. NOLAN:  Your Honor, I'm sorry.  This is

Page 1571

1   probably my mistake.  I thought that Exhibit 8 was going to

2   be introduced.  And it's not to be displayed.

3               THE COURT:  Counsel?

4               MR. ZELLER:  It's not in evidence.

5               THE COURT:  Very well.  Is there an objection?

6               MR. NOLAN:  There is, your Honor.  I thought that

7   Exhibit 8 was going to be coming in.  Now I understand

8   there's an issue.  We'll talk about it later.

9               THE COURT:  Very well.  Let's continue.

10              (Videotaped deposition excerpt playing continued.)

11              MR. NOLAN:  Your Honor, MGA would move in Exhibit 8

12  as testified to in that deposition.

13              THE COURT:  Any objection?

14              MR. QUINN:  I don't have a copy of it, your Honor.

15              MR. ZELLER:  The Court will recall that this is --

16              THE COURT:  What's the objection?

17              MR. ZELLER:  Lacks foundation, and it wasn't

18  stipulated to, and it's hearsay.

19              THE COURT:  Why don't we take this up during the

20  recess.

21              Let's move on to the next witness.

22              MR. PRICE:  Your Honor, at this time I'd like to

23  read a couple of requests for admission and the answer.

24              THE COURT:  Very well.  Let me instruct the jury

25  briefly.

Page 1572

1         These are requests for admissions that were made

2    during the course of discovery in this case.  These were

3    propounded by Mattel, and the responses were made by

4    defendant MGA.

5         And you may consider them as evidence in this case.

6    It's entirely up to you to give whatever weight you feel is

7    appropriate to these admissions.

8         Counsel.

9         MR. PRICE:  Admit that MGA is not aware of any

10   press report or publication that identified Bryant as the

11   creator of Bratz prior to July 15, 2003.  Response, MGA

12   admits the request.

13        Request for admission.  Admit that the first press

14   report for publication that identified Bryant as the creator

15   of Bratz was The Wall Street Journal article entitled, quote,

16   Dolled Up to Lure Older Girls, Mattel brings in hip-hop

17   crowd, close quote, and published on July 18, 2003.

18        Response to request for admission, MGA admits the

19   request.

20        With that, your Honor, we'd now call Isaac Larian

21   to the stand.

22        THE COURT:  Very well.

23        THE CLERK:  Please raise your right hand.

24                  ISAAC LARIAN, SWORN.

25        THE CLERK:  Thank you, sir.  Please be seated.

Page 1573

1    Please state your full name for the record, and

2  spell your last name.

3         THE WITNESS:  Isaac Larian, L-A-R-I-A-N.

4         THE CLERK:  Thank you.

5               DIRECT EXAMINATION

6  BY MR. PRICE:

7  Q.   Good afternoon, Mr. Larian.

8  A.   Good afternoon.

9  Q.   You are the CEO of MGA Entertainment?

10  A.   I am.

11  Q.   And how long have you been the CEO of MGA Entertainment?

12  A.   I founded the company since the beginning, 1982.

13  Q.   And I believe currently you own about 81 percent of the

14  company; is that right?

15  A.   Little bit more than that, 81.8 percent.

16  Q.   And it's fair to say -- I don't want to get into any

17  numbers at this point -- that the Bratz line and Bratz

18  merchandise has been profitable for MGA Entertainment?

19  A.   It has.

20  Q.   And that you personally, as a result of that, have

21  profited from the Bratz sales?

22         MR. NOLAN:  Objection, your Honor.  Relevance as to

23  point in time.

24         THE COURT:  Overruled.

25         THE WITNESS:  Yes.

Page 1574

1    Q.   BY MR. PRICE:  I want to ask you a few questions --

2    well, let me step back.  When I say "you," that would include

3    members of your family as well; is that correct?  That

4    members of your family also have profited as a result of

5    sales of Bratz.

6    A.   My wife doesn't work, but I'm sure she has.

7    Q.   Well, certainly some of the profits have been

8    distributed to your wife?

9            MR. NOLAN:  Your Honor, again I'm going to object

10   based on 403 and relevance.

11           THE COURT:  Overruled as to his wife.

12   Q.   BY MR. PRICE:  Let me ask the question again.  Have

13   profits been distributed as a result of Bratz sales to other

14   members of your family?

15   A.   Yes.

16   Q.   Would those include your sister?

17   A.   I have three sisters.

18   Q.   Okay.  Forgive me if I mispronounce the names.  Is it

19   Shereen (phonetic)?

20   A.   She's one of my sisters.

21   Q.   And profits have been distributed to her?

22   A.   Yes.

23   Q.   And to your brother-in-law, Jahanger (phonetic)?

24   Profits have been distributed to him?

25   A.   Yes.

1    Q.   And your father, is it Aghdas, A-G-H-D-A-S?

2    A.   No, that's not my father.

3    Q.   Who is that?

4    A.   That's my mother.

5    Q.   Ah.  Totally my fault.  And profits have been

6    distributed to your mother?

7    A.   I don't know.

8    Q.   Is that the kind of thing you would know?

9    A.   Yes, my father has passed away.

10   Q.   Do you know whether or not checks have been issued from

11   MGA Entertainment profits to Aghdas Larian?

12   A.   Yes.

13   Q.   How about Elias Larian?  Who is that?

14   A.   He's my cousin.

15   Q.   And have profits been distributed to Elias Larian as

16   well?

17   A.   I'm not sure profit.  He's a consultant for the company,

18   and he gets a salary.

19   Q.   And Shorea Larian, who is that?

20   A.   She's my sister.  We're a family-owned company, and my

21   sister Shorea (phonetic) also works at the company.

22   Q.   And have profits been distributed to her as well?

23   A.   She gets a salary.  So I don't know if that's profit.

24   She gets a salary as an employee of MGA.

25   Q.   Is any of that tied to the results of the MGA sales?

Page 1576

1    Any of that salary?  Is it bonuses, or is it all salary?

2    A.   Yes.  Well --

3    Q.   Let me ask it again.

4    A.   Excuse me.  I have to finish.  I was not finished.

5          THE COURT:  You may finish your question, sir.

6          THE WITNESS:  When you asked about -- you confused

7    because my sister and my brother-in-law Elias and Shereen,

8    who are here, they are part owners of the company.  My mother

9    is not.  My sister Shorea is not.  They are employees of the

10   company.  My cousin Elias is not employee of the company.

11   Q.   Now, I want to ask you quickly some questions about the

12   video deposition we just saw, and it's Ms. Tkacik.  You sat

13   here and saw the testimony?

14   A.   I did.

15   Q.   And you in fact spoke with her?

16   A.   I don't recall, but I'm sure I've spoken to her.

17   Q.   And you recall there were questions in there about

18   whether or not you had an accent.

19          Do you recall that?

20   A.   Unfortunately, I have lived here for 37 years, but I

21   still have the accent.

22   Q.   But even though you have that accent, it's correct that

23   she didn't mishear you when you said there was sort of a

24   fashion doll design contest for Bratz or for a fashion doll?

25   A.   I don't think she misheard me.  But I'm not --

Page 1577

1    Q.   You believe that that is in fact what you told her,

2    which is that there was a -- sort of the fashion doll contest

3    that resulted in Bratz being selected?

4    A.   It's possible I said that, yes.

5    Q.   And the reason you think it's possible that you said

6    that is that you said under oath that there in fact was a

7    sort of fashion doll design contest that resulted in Bratz

8    being selected as a fashion doll; correct?

9    A.   Yes.

10   Q.   Is that right?

11   A.   Yes, yes.

12   Q.   And we'll get back to the details of that contest later.

13   Right now I want to ask you about another witness's testimony

14   that I think you were here for.  You recall a couple days ago

15   when Jennifer Maurus took the stand?

16   A.   I do.

17   Q.   And you were here for that; correct?

18   A.   I do.

19   Q.   And I want to show you an exhibit which she was shown

20   and Mr. Nolan asked her some questions about.

21            It's in evidence, your Honor, and it's

22   Exhibit 13532.

23            THE COURT:  You may publish.

24            MR. PRICE:  If we can put that up.

25            THE WITNESS:  What was the exhibit number again?

Page 1578

1          MR. PRICE:  It's 13352.  It's going to be toward

2     the end of that single large binder I gave you.  I'm sorry.

3     13532.

4          THE WITNESS:  Can I open this and take this out?

5     It's hard to see it.

6          MR. PRICE:  I don't think it's a good idea to take

7     it out.

8          THE COURT:  Mr. Holmes.

9     Q.   BY MR. PRICE:  So that doesn't spill out, if you

10    unlatched the two ends, you might want to push that back

11    together so it doesn't actually open.

12          And do you see Exhibit 13532?

13    A.   May I have a moment to read it?

14    Q.   Sure.

15    A.   Would you like me to read the whole thing here?

16    Q.   I'll ask you some questions.  If you think you need to

17    read the whole thing, you can tell me.  Why don't we start by

18    me asking you some questions.

19    A.   Well, if you're going to ask questions about this

20    document, I'd like to have a chance to read it.

21          MR. PRICE:  Your Honor, I think to save time, I can

22    ask questions, and if he says he needs to read the whole

23    thing, he can ask me at that point.

24          THE COURT:  Counsel, why don't you ask your next

25    question.

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1579

1          Mr. Larian, if at any point in time you need to

2     stop and read the document, you may do so.

3          Counsel, your next question.

4     Q.   BY MR. PRICE:  You recall that Mr. Nolan was asking

5     Ms. Maurus about whether or not she signed this

6     confidentiality agreement.

7          Do you recall that?

8     A.   I don't recall if he asked that question or not.

9     Q.   Okay.  And --

10    A.   Yeah, I think he did, and she said no, she hadn't signed

11    it.

12    Q.   In fact, do you recall that she said that -- testified

13    that there was somewhat of an uproar about this?

14    A.   I believe she said that.

15    Q.   And that's true, is it not?  That there was in fact an

16    uproar when this was sent to the company's employees?

17    A.   I don't recall that.  It's 2000, eight years ago.  I do

18    not recall.

19    Q.   Perhaps you can tell me, who at that time is Michelle

20    Thompson?

21    A.   I see the name.  I don't recall her.

22    Q.   You don't recall what her position was at MGA?

23    A.   No, I don't.  That was eight years ago.

24    Q.   Well, if we look at the document itself, then, if you

25    need to read the whole thing, tell me, but I'd like to call

Page 1580

1    your attention to a couple of sections, if I may, of this

2    proposed agreement that was sent around August 10, 2000.

3    A.   Excuse me.  If you're going to ask me questions about

4    this document, I'd like to be able to read it to put it all

5    into context.

6    Q.   Let me ask you a question.  If you need to do that,

7    we'll take the time.  Could you look at page 3, please.  It

8    says Exhibit 13532-0003 at the bottom.

9            Have you found that page?

10   A.   That says page 2 at the bottom.

11   Q.   I'd ask you to look at 13532-0003.

12   A.   Yes, I have that.

13   Q.   You have that?

14   A.   Yes.

15   Q.   And you're right.  It says page 2 right here.

16           Do you see that?

17   A.   That's correct.

18   Q.   And I want to call your attention to this paragraph

19   here, which says:  "Employee further agrees that during

20   his/her employment and for a period of 12 months after

21   termination, employee will not solicit the purchase of any

22   products or services from any supplier or vendor who supplies

23   products or services to the company."

24           Can you read that?

25   A.   I read that.

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1581

1  Q.   Now, it's true, is it not, that MGA had employees from

2  other companies who were in fact soliciting vendors who had

3  worked for those prior companies?

4  A.   I don't recall in 2000, yes, we had employees, and I'm

5  sure we bought from other companies, but I don't recall the

6  specifics.

7  Q.   For example, it's true, is it not, that there were some

8  vendors who were well known in the industry and usually by

9  numerous toy companies?

10 A.   I can't answer that.  At that time in 2000 I don't know

11 what other toy companies bought from who.

12 Q.   Well, for example, Steve Linker, who we've heard about

13 here, you knew that he did products for Mattel, and he was

14 asked to do projects for MGA.

15 A.   The first time I saw Steve Linker is in his video

16 deposition here.  I've never known or met Mr. Steve Linker.

17 Q.   How about Anna Rhee?  You understood that she was a

18 vendor who worked for numerous toy companies such as Mattel

19 and MGA and other toy companies; correct?

20 A.   No.  The first time I met Anna Rhee was when she was on

21 the stand here.  I had no idea who Anna Rhee is until I saw

22 her in court yesterday or whenever she was here.

23 Q.   How about Veronica Marlow?  She was a vendor for MGA.

24 Is it your understanding she worked for other toy companies

25 as well?

Page 1582

1  A.   I know she did work for us.  I don't know if she had

2  worked for other companies or not.  I have no idea.

3  Q.   Isn't it fair to say that, in August of 2000, it was

4  commonplace for vendors to provide services to more than one

5  toy company?

6  A.   I couldn't tell you that one way or another.

7  Q.   Did you have a belief that this paragraph here, that if

8  an employee leaves MGA and works for someone else, they can't

9  use one of these vendors for 12 months, do you think this

10 might deter people from leaving MGA?

11 A.    No, this contract, now that I have seen it, I don't

12 think it was a fair contract, I think we withdrew it.  I had

13 nothing to do with putting this contract together except my

14 signature on the last page.

15 Q.   But as of 2000, how long had you been in the toy

16 business?

17 A.   Since 1987.

18 Q.   So I'm trying to do my addition here.  So that's about

19 13 years?

20 A.   That's correct.

21 Q.   So you're saying your 13 years of experience in the toy

22 industry, you didn't have any knowledge that it was

23 commonplace for various vendors to work for more than one toy

24 company?

25 A.   I am sure people work for other toy companies, but I

Page 1583

1    have no specific knowledge of that.

2    Q.   Well, let me, if you look at this --

3    A.   I'm talking about free-lancers, again, or vendors for

4    material.

5    Q.   Well, let's look at -- if you look at MA 0006, have you

6    found that page?

7    A.   Yes, I have.

8    Q.   And I want to call your attention to the second

9    paragraph here, protection of proprietary position

10   information.  And you see the last part here:  "Accordingly,

11   for a period of one year following the termination of

12   employee's employment with the company for any reason,

13   employee shall not directly or indirectly become employed by

14   or provide any services to or for any company or business

15   that is engaged in the business throughout the United

16   States."

17              Do you see that?

18   A.   Well, it goes on.

19   Q.   It goes on.  "Unless the employee demonstrates to the

20   company's reasonable satisfaction that such employment or

21   service will not result in the unauthorized use or disclosure

22   of proprietary information."

23              Do you see that?

24   A.   I do.

25   Q.   Okay.  And you see up here, the business is the business

Page 1584

1    of the invention, design, development, and manufacture of

2    toys.

3              Do you see that?

4    A.    I do.

5    Q.    So in sending out this proposed contract, you understood

6    one of the provisions was if an employee left your company,

7    it was solely up to MGA as to whether or not that employee

8    could work at any other toy company in the world.

9    A.    Well, I did not, as I mentioned earlier, I did not send

10   this out.  And we withdrew this agreement because this

11   agreement is not a fair agreement and could not -- and should

12   not have been sent out and signed.

13   Q.    So now you do recall this being sent out?

14   A.    I saw the first date that it was -- it says it was sent

15   out to all MGA employees.  I assume it was sent out.

16   Q.    So do you now recall that when this was sent out, that

17   there was in fact, as Ms. Maurus said, an uproar, and the

18   people refused to sign it?

19   A.    I do not recall an uproar.

20   Q.    Well, is it your testimony that this proposed contract

21   was sent to all employees without your prior approval?

22   A.    Yes.

23   Q.    And who did that?  Who sent this out to all the

24   employees without your prior approval?

25   A.    Well, if you go to page --

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1585

1   Q.   First page?

2   A.   First page.  It says Michelle Thompson.  And at that

3   time the Human Resources of the company reported to my

4   brother, Fred Larian.

5   Q.   And so are you saying your brother knew about this?

6   A.   I have no idea.

7   Q.   When did you decide to withdraw this?  You told us there

8   was no uproar.  So when was it that you decided to withdraw

9   this?

10  A.   I don't recall the date.

11  Q.   Is there any document, any e-mail to employees or

12  something saying I didn't mean to try to impose this

13  agreement on you?

14  A.   I do not know.

15  Q.   You certainly haven't seen any such e-mail, have you?

16  A.   I have not looked for it, no.

17  Q.   Certainly it's true that at the time, August 10, 2000,

18  that this was sent out, where you were -- where this proposal

19  was being made by your company, that MGA had under its employ

20  former Mattel employees who had left Mattel and joined MGA?

21  A.    I'm not sure if they had left Mattel or Mattel had fired

22  them or Mattel had laid them off, to come to work for MGA.

23  So I don't know.  I don't remember that far back.  But Mattel

24  does fire a lot of people, lays off a lot of people.  So they

25  have a right to go get jobs elsewhere.

Page 1586

1   Q.   But your business plan at this time was not to hire

2   Mattel employees who might happen to be laid off.  Your

3   business plan was actually to use contacts within MGA to hire

4   people who were not being laid off by Mattel.  Isn't that

5   right?

6   A.   We didn't have a business plan.  We were a small company

7   at the time, and I don't recall in 2000 -- in the year this

8   was done, if there was such a thing.  We were a small company

9   at that time.

10  Q.   I understand your testimony that you are a small

11  company.  My question is a bit different.

12          Say August 2000, you know -- November '99 through

13  August 2000, isn't it correct that one of your strategies was

14  not to hire people that had been laid off, but actually hire

15  people who then worked at Mattel and that you learned about

16  through people working for you?

17          MR. NOLAN:  Objection, your Honor.  Relevance.

18  Also motion in limine.

19          THE COURT:  Overruled.  You may answer.

20          THE WITNESS:  We did not have a business plan, as

21  you mentioned, or a policy that I recall that says let's go

22  ahead and only hire employees of Mattel who have not been

23  laid off or fired.  Mattel fires and lays off a lot of

24  employees often.

25  Q.   BY MR. PRICE:  Well, if you'd look at Exhibit 11856.

1    A.    I'm sorry?  85?

2    Q.    It's 11856.

3    A.    May I have a moment to read this, please?

4    Q.    Certainly.  Mr. Larian, my question, by the way --

5    A.    Excuse me, sir.  If you're going to ask me a question

6    about it, you have to give me time to read it.

7    Q.    Well, this appears to be an e-mail from you to Mary

8    Claire Tiffany dated November 20, 1999, which then attaches

9    other e-mails in a string.

10            Do you see that?

11   A.    I see my name on there.  And I see Mary Claire Tiffany's

12   name on there.

13   Q.    And you -- you see it also has a sent date and a

14   received date, and a subject, weekly update.  Do you see

15   that?

16   A.    I do.

17   Q.    And you have no reason to believe that this is not in

18   fact an e-mail which you sent to Mary Claire Tiffany on or

19   around November 20, 1999?

20   A.    I don't.

21            MR. PRICE:  Your Honor, move 11856 into evidence.

22            MR. NOLAN:  No objection, subject to the earlier

23   objection.

24            THE COURT:  No objection?

25            MR. NOLAN:  Based on the earlier objection that was

Page 1588

1   overruled.

2         THE COURT:  Very well.  I'll come back to that

3   during the recess.

4         THE WITNESS:  Can I continue -- finish reading

5   this?

6         MR. PRICE:  Your Honor, may I publish now?

7         THE COURT:  You may.

8         (Exhibit 11856 received.)

9   Q.   BY MR. PRICE:  Mr. Larian, it starts with a please see

10  my comments.

11        Do you see that?

12  A.   I do.

13  Q.   That's referring to comments that you make in an e-mail

14  that's attached.

15        Do you see that?

16  A.   I don't know.  I haven't had a chance to read it.

17  Q.   Okay.  Let's see if we can help you on that.  We go

18  here -- you see there are things such as "I passed on to Kami

19  a resume for a senior product manager," et cetera, and then

20  it says, "Let me see the resume.  Isaac."

21        Do you see that?

22  A.   That's correct.

23  Q.   One of your practices, when you got e-mails, is you

24  would go through them and put in your responses in the text

25  you received; correct?

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1589

1    A.    Yes.

2    Q.    Next page, it says:  "Kami doesn't think Mattel will

3    have any more layoffs until February."

4             Do you see that?

5    A.    Yes.

6    Q.    And Kami refers to who?

7    A.    Kami Gillmour, who was laid off by Mattel.

8    Q.    She was a former Mattel employee who he said was laid

9    off?

10   A.    Yes, Mattel laid her off.  And she came to work at MGA.

11   Q.    This is your response, isn't it?  "Why are we waiting

12   for a layoff?  They don't layoff their stars.  We should

13   aggressively recruit from inside Mattel.  People are looking

14   to move out.  Isaac."

15            Did you in fact write that?

16   A.    I believe I did.

17   Q.    Now, if you'd also look at Exhibit -- I think it's 5713.

18   You see that appears to be an e-mail from you to Mary Claire

19   Tiffany and Kami Gillmour, dated --

20   A.    Hold on.  I don't have it in front of me.

21   Q.    It's 5713.  Is this an e-mail you sent to Mary Claire

22   Tiffany and Kami Gillmour around October 1, 1999, regarding

23   hires for the marketing department?

24            MR. NOLAN:  Is the exhibit that's being published

25   the exhibit you're pointing to?

Page 1590

1          MR. PRICE:  No.

2          MR. NOLAN:  I don't know why it's on the screen.

3          THE COURT:  This is in evidence.

4          MR. PRICE:  It's in evidence.

5          MR. NOLAN:  It's not what he's being questioned

6     about.

7          THE COURT:  Is this not in evidence?

8          MR. PRICE:  This is in evidence.

9          THE COURT:  I'm sorry.  The --

10         MR. PRICE:  What he's looking at now is not this.

11         THE COURT:  Very well.  We shouldn't be referring

12    to the substance, Counsel.

13         MR. PRICE:  I'm not referring to the substance at

14    all.  I'm just asking whether this appears to be the e-mail.

15         THE WITNESS:  Go ahead.

16    Q.  BY MR. PRICE:  Does this appear to be an e-mail from you

17    to Mary Claire Tiffany and Kami Gillmour around October 1,

18    1999?

19    A.  Yes.

20         THE COURT:  Why don't we take this off now.  It may

21    be confusing.

22         THE WITNESS:  It is.

23         MR. QUINN:  I move 5713 in evidence.

24         MR. NOLAN:  No objection.

25         THE COURT:  It's admitted.  You may publish this

Page 1591

1    one now.

2              (Exhibit 5713 received.)

3    Q.    BY MR. PRICE:   You see, Mr. Larian, this is October of

4    '99, where you need hires for marketing department.   You need

5    an associate product manager or product manager.   You need a

6    director.

7              Do you see that?

8    A.    I do.

9    Q.    And let's go to the second part of this.   And one of the

10   things you say in this is we need these positions filled

11   urgently.

12             Do you see that?

13   A.    Yes.

14   Q.    And then you told Mary Claire Tiffany:   "Please run an

15   ad and recruit from Mattel."

16             Do you see that?

17   A.    Yes.

18   Q.    By the way, who is Mary Claire Tiffany?

19   A.    I believe she's in Human Resources.

20   Q.    And if you look at Exhibit 5715, that's the very next

21   one.   Is that an e-mail dated August 11, '99, sent from you

22   to Ms. Tiffany?

23   A.    There are two e-mails in here.   There are actually a few

24   e-mails in here with different dates.

25   Q.    It's a string of e-mails which begins with Isaac Larian

Page 1592

1    to Mary Claire Tiffany, 8/11/99.

2              Do you see that?

3    A.   It's a little confusing because this exhibit has other

4    e-mails.  Second page with August 10 date on it.

5    Q.   And if you look at that, sir, don't you recognize that

6    as a string of e-mails beginning with an e-mail on August

7    10th, and then there's your reply, and then there's a reply

8    from Ms. Tiffany, and then there's your reply, et cetera?

9    A.   Yes, go ahead.

10   Q.   You recognize this as an e-mail string between you and

11   Ms. Tiffany in the August '99 time frame?

12   A.   Yes, and other people.

13             MR. PRICE:  Move Exhibit 5715 in evidence.

14             THE COURT:  Any objection?

15             MR. NOLAN:  Still a continuing objection, but based

16   on that ruling, your Honor, we have no objection --

17             THE COURT:  Counsel, I understand your objection.

18   Please don't keep repeating that.

19             MR. NOLAN:  No objection.

20             THE COURT:  Very well.  It's admitted.

21             (Exhibit 5715 received.)

22   Q.   BY MR. PRICE:  You see, actually, sir, this begins -- go

23   to the second page, with an e-mail from C.P. Bui to you and

24   Kami Gillmour, mechanical toys engineer.

25             You want to put an ad in the paper for mechanical

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1593

1    toys engineer.

2              Do you see that?

3    A.    I do.

4    Q.    And if we go to the next page here, there's this message

5    here.  And there's a response to engineer applicants we have

6    are for electrical engineering.

7              Do you see that?

8    A.    I do.

9    Q.    And this August 10th is your response to Ms. Tiffany's

10   e-mail here; correct?

11   A.    That's correct.

12   Q.    And your response is:  "Please ask Traci and Kami if

13   they know good people out of Mattel."

14             Do you see that?

15   A.    Yes.

16   Q.    And by Traci, you are referring to Traci Feldman?

17   A.    I assume so.  I don't recall.

18   Q.    And who is Ms. Feldman?

19   A.    I have no recollection of her or he.  I don't know if

20   it's a he or she.

21   Q.    And the last e-mail I want you to look at in this vein

22   is Exhibit 13619.  Do you recognize that as a string of

23   e-mails between you and --

24   A.    I'm sorry.  I don't have that in front of me.  Hold on

25   one second.

1   Q.   Mr. Larian, my question is is this a string of e-mails

2   between you and Kami Gillmour dated around December of 1999?

3   A.   They don't start like that.  If you look at page

4   13619-003, or MGA 0183309, it's an e-mail, looks like --

5   yeah, I apologize.  It starts with somebody else.  I am on

6   these e-mails, yes.

7         MR. PRICE:  Your Honor, I would move Exhibit 13619

8   into evidence.

9         MR. NOLAN:  No objection, your Honor.

10        THE COURT:  It's admitted.  You may publish.

11        (Exhibit 13619 received.)

12  Q.   BY MR. PRICE:  And you see, sir, that this is your --

13  the final e-mail in the string, your December 17, 1999,

14  e-mail.

15        Do you see that?

16  A.   I do.

17  Q.   Which ends with:  "I like Traci, and if she can be

18  guided to a clear direction, she will be fine."

19        Do you see that?

20  A.   Yeah, but I see I sent an e-mail from myself to myself.

21  So that doesn't make sense.

22  Q.   Is that how it works when you've blind copied folks?

23  A.   No.  If you look at one, two, three, four rows down, can

24  you highlight that?  BCC?  That's blind copy.  That's the

25  blind copy.  I'm sending an e-mail from myself to myself.  I

Page 1595

1    don't know why that is.

2    Q.   I understand.  When you send an e-mail to a group that

3    you are blind copying and to yourself, when it shows up in

4    your e-mail box, it just has it to you; is that right?

5    Because the rest are blind copied?

6    A.   No, I don't think so, I don't know.

7    Q.   In any event, here, Traci here is talking about -- Traci

8    Feldman, you're discussing her performance; is that right?

9    A.   I need to read this.  If you're going to ask me about

10   this e-mail, I need to read it.

11   Q.   Okay.  Let me help you, if I can.  This might move

12   things along.  If you look at the second page here, do you

13   see there's an e-mail from Ms. Gillmour to you dated

14   September 16?  I'm going to highlight this part here.

15        MR. NOLAN:  Your Honor, my only point is that if

16   Mr. Price is going to take the e-mail starting with "can be

17   measured," it's only fair that Mr. Larian look at the first

18   part of this phrase.

19        THE COURT:  Fair enough.

20        MR. PRICE:  Sure.

21        THE WITNESS:  That's why I'd really like to have a

22   chance to read these e-mails.

23        MR. PRICE:  Let's go back --

24        THE WITNESS:  Excuse me.

25        THE COURT:  Very well.  Mr. Larian would like a

Page 1596

1    moment to review the document.  You may do so, sir.

2              THE WITNESS:  Thank you.  Go ahead.

3    Q.   BY MR. PRICE:  These are discussions about Traci Feldman

4    and her performance?

5    A.   It doesn't say about her performance, and I don't recall

6    who Traci Feldman is.

7    Q.   If you look at this page here, this is a portion of

8    Ms. Gillmour's e-mail to you.  You see this where it says:

9    "We recruited her from Mattel because of her experience and

10   qualifications.  I would say the same thing about Andy or any

11   other high-level people we recruited."

12             Do you see that?

13   A.   I do.

14   Q.   And it's true that Ms. Feldman was in fact recruited

15   from Mattel because of her experience and qualifications?

16   A.   This is Kami Gillmour's e-mail.  I do not recall these

17   conversations for Traci Feldman.

18   Q.   And here it says:  "As you know, it's been a highly

19   volatile, chaotic, and fragile time, and now is not the time

20   to be on attack mode.  We need bodies to make this happen and

21   bring MGA to the next level."

22             Do you see that?

23   A.   I do.

24   Q.   And in your response, you did not disagree with that

25   assessment of the situation in December of 1999, that is,

Page 1597

1  that MGA was in a volatile, chaotic, and fragile time, and it

2  wasn't the time to be in attack mode?

3  A.   I don't know if I responded that portion of the e-mail

4  or not, no.

5  Q.   Well, is it true that because MGA was in this volatile,

6  chaotic, and fragile time, that MGA had this pattern of

7  directing people -- you had a pattern of directing people,

8  when there were vacancies, to go and recruit out of Mattel?

9  A.   That is not correct.  I don't recall MGA being in a

10  volatile -- whatever the words that Kami Gillmour used in her

11  e-mail.  And I do not agree with her characterization.  Nor

12  do I agree with yours.

13  Q.   Well, if we look at the first page of 13619, it's

14  certainly fair to say that in your response to Ms. Gillmour,

15  that you did not say you disagreed with her assessment that

16  MGA was in a highly volatile, chaotic, and fragile time and

17  now is not the time to be on attack mode?

18  A.   I did not.

19  Q.   So getting back, then, to this agreement that we were

20  looking at that was sent out, that Ms. Maurus testified to,

21  which is 13532 --

22  A.   You want me to go back --

23  Q.   Fortunately, it's very close in the book there.  13532.

24  It appears you agree that --

25  A.   Hold on one second, sir.

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1598

1   Q.   Oh, sure.

2   A.   Go ahead.

3   Q.   It appears you agree that it was wise for Ms. Maurus to

4   refuse to sign this proposed contract.

5   A.   I have no idea what Jennifer Maurus was thinking or why

6   she wanted to sign or not sign the agreement.

7   Q.   Didn't you say a few minutes ago that you looked at this

8   contract and you thought it was unfair?

9   A.   I believe it was unfair, yes.  I -- looking at it, it's

10  unfair.

11  Q.   And that you had really nothing to do with this at all?

12  A.   To the best of my recollection, I did not.

13           MR. NOLAN:  Your Honor, asked and answered.

14           THE COURT:  Sustained.  Move along, Counsel.

15  Q.   BY MR. PRICE:  Let's look, if we could, at the last page

16  of this document, which is 13532-0010, the last page of this

17  unfair contract that was being sent out.

18           MR. NOLAN:  Your Honor, I'm going to object to the

19  characterization of counsel in the questions.

20           MR. PRICE:  I can rephrase.

21           THE COURT:  Rephrase.  Thank you, Counsel.

22  Q.   BY MR. PRICE:  You see the last page of this contract?

23  A.   I do.

24  Q.   And this is the last page of a contract which you say is

25  unfair.

Page 1599

1    A.    This is a contract, yes, it's unfair.

2    Q.    If we look at the last page of the contract, which you

3    say is unfair, we see a signature here dated July 25, 2000.

4          Do you see that?

5    A.    I do.

6    Q.    And if you note, that is a couple weeks before this

7    contract was actually sent out to the employees on August

8    10th; correct?

9    A.    It's 7/25 -- August 10.  Yes.  I really don't recall

10   this contract or the dates.  So I'm not sure if they were

11   together or separate.  I just don't -- I cannot say one way

12   or another.

13   Q.    Well, it's correct to say that the signature on this

14   contract, which you've characterized as unfair, is yours?

15   A.    It is my signature.

16   Q.    And so let me ask you again, having seen all of this,

17   there was an uproar when this was sent around?

18   A.    I don't recall an uproar, sir.

19   Q.    Do you recall anybody complaining?

20   A.    I don't recall one way or another.

21   Q.    It's your understanding that under this proposed

22   contract, that if someone left MGA, like, say, if Paula

23   Garcia left MGA or Kami Gillmour left MGA, that they could

24   not then try to recruit people from MGA to come to their new

25   company.

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1600

1    A.    This is a hypothetical question you're asking me.   As I

2    mentioned to you, we withdrew -- my recollection is that we

3    withdrew this contract.   This contract is not enforceable.

4    Q.    Personally, you agree the contract is not enforceable.

5    A.    I do.

6    Q.    Because some of these provisions are just illegal.   You

7    understand that?

8          MR. NOLAN:   Objection.   Your Honor, calls for a

9    legal conclusion.

10          THE COURT:   Sustained.

11   Q.   BY MR. PRICE:   Your understanding, you thought that some

12   of the provisions of this contract were not enforceable, to

13   your understanding.

14   A.    I think people can go and freely work for other

15   companies in the United States.   That's my understanding.

16   Q.    And I'm not talking about hypothetical.   I'm asking

17   about this contract which was sent around.   Your

18   understanding is that under this contract which was sent

19   around, that one of the provisions was that if an employee

20   like Kami Gillmour or Paula Garcia left MGA, they could not

21   then recruit people from MGA to their new company.

22   A.    You just asked me a hypothetical question, but you told

23   me it's not hypothetical.   So I don't know how to answer

24   that.

25   Q.    Let me help you out.   Look at page 13532-0007.

1    A.    Yes.

2    Q.    Do you see where it says nonsolicitation of personnel?

3    A.    I do.

4    Q.    "During employee's employment with the company and for

5    one year thereafter, employee shall not, directly or

6    indirectly, solicit, induce, or attempt to solicit or induce,

7    any person known to employee to be an employee of the company

8    who, directly or indirectly, engages in the business on

9    behalf of the company, to terminate his or her employment or

10   other relationship with the company for the purpose of

11   associating with any entity that engages in the business of

12   which employee is or becomes an officer, et cetera, or any

13   competitor of the company in the business."

14          Do you see that?

15   A.    I see the paragraph.

16   Q.    All right.  So it's not a hypothetical.  You understood

17   in this contract that you signed that one of the provisions

18   was that MGA could not -- MGA personnel could not do what you

19   were doing to Mattel.  That is, you couldn't have someone

20   leave MGA and then seek to hire MGA's employees?

21          MR. NOLAN:  Objection, your Honor.

22          THE COURT:  What's the objection?

23          MR. NOLAN:  Foundation.  This contract was not

24   entered into.  It was not enforced.  He didn't write it.

25   There's no foundation for Mr. Larian --

Page 1602

1      THE COURT:  Sustained.  Foundation.

2   Q.  BY MR. PRICE:  Let me rephrase, then.  We've looked at,

3   at least on a few occasions, you directed former Mattel

4   employees to contact people they knew at Mattel to try to

5   fill job vacancies at MGA; correct?

6   A.   Former Mattel employees who were laid off or we hired to

7   work at MGA?  Is that what you're referring to?

8   Q.   I'm saying former Mattel employees who were working at

9   MGA no matter how they got there, you asked those former

10  Mattel employees to contact folks currently working at Mattel

11  to see if they wanted to come work for MGA?

12  A.   I did.

13  Q.   And you understood that when this contract went

14  around -- this draft contract which you signed, that it had a

15  provision which would have prohibited an MGA employee from

16  doing that if MGA left MGA --

17      MR. NOLAN:  Objection, your Honor.  Foundation,

18  your Honor.

19      THE COURT:  Sustained.

20  Q.  BY MR. PRICE:  Well, before you signed this contract,

21  which was sent to all employees, did you read the paragraphs

22  of the contract?

23      MR. NOLAN:  Objection, your Honor.  Foundation.

24  Misstates his testimony.

25      THE COURT:  Let's go ahead and take our afternoon

Page 1603

1    break here.

2               (WHEREUPON THE JURY WITHDRAWS.)

3               THE COURT:  Please be seated.  Let me start with

4    the last thing first, Counsel.  What is your foundational

5    objection to the last question?

6               MR. NOLAN:  Your Honor, oh, you mean the earlier

7    ones?

8               THE COURT:  Just the last one.

9               MR. NOLAN:  The last one, the record evidence is

10   that Mr. Larian -- I don't think there's any evidence that

11   this was transmitted to all the employees at MGA --

12              THE COURT:  Very good.  I'll sustain it on that

13   foundational basis.

14              MR. NOLAN:  Number two is the contract was never

15   put in place at MGA.  There's not any evidence that any

16   employee ever signed this agreement or that MGA tried to

17   enforce it.  Yet Mr. Price continues to build on this saying

18   it would be a violation of your contract, and there's no

19   foundation.

20              THE COURT:  I have been sustaining the foundational

21   objection.  I do need to say you've got to stop the speaking

22   objections, and I'm going to start overruling them when I

23   start hearing a speaking objection.

24              MR. NOLAN:  Okay.  Your Honor, I apologize.

25              THE COURT:  I said this at the beginning of trial.

Page 1604

1    I'm directing this to both sides, all attorneys, state your

2    legal objection and be done with it.  I'll ask, if I need

3    further clarification.  I've been fairly liberal at granting

4    sidebars if you believe the Court is not getting it.

5           Now, going back to a few other objections.  As far

6    as the family investment in the business, this all goes to

7    bias.  I thought I made a very clear ruling on the motion in

8    limine that Mr. Larian's wealth in general is not coming in,

9    but his, and by extension his family's interest in the

10   outcome of this case directly goes to issues of credibility.

11   And that's all coming in before the jury.  So those

12   objections on relevancy grounds were overruled.

13          And with respect to the series of questions that

14   you had the continuing objection on regarding MGA's practices

15   regarding Mattel employees and the 1999, 2000 time period,

16   that goes directly to the contention of intentional -- aiding

17   and abetting and the intentional interference with

18   contractual relations.  That is not precluded by any motion

19   in limine.

20          MR. NOLAN:  I understand.  My confusion, your

21   Honor, was that there is a motion in limine with respect to

22   stealing employees from Mattel, which is part of Phase 2, and

23   that was the basis of the motion in limine, and that's what I

24   was trying to get to.  It seemed to me that's what we were

25   really getting into, and that's why I was making that

Page 1605

1   objection.  We're not waiving that -- because I thought the

2   Court ruled in our favor.

3            THE COURT:  You're not waiving that as well.  This

4   is not -- Mr. Price has carefully limited this in terms of

5   time to this particular area, and the Court overrules the

6   objection on that ground.

7            A few other issues to take up here during this

8   break.

9            Let's go back to the Tkacik deposition.  The

10  objection came in from Mattel concerning an e-mail, and the

11  pages in the transcript that relate to that are pages 34

12  through 37.  And what's remarkable about this is that this is

13  a Mattel designation.  There was a -- I'm sorry.  This was an

14  MGA designation.  Mattel made the objection.  The Court

15  sustained it as to lines 17 through 22 of page 34.  There's

16  no objection to the portion that you are now objecting to.

17           MR. ZELLER:  I'm not sure it was -- I apologize if

18  this wasn't clear.  What we were objecting to was the

19  exhibit.

20           THE COURT:  I understand that.  But I made it

21  clear, at the beginning of this trial, that if there's

22  testimony about an exhibit and testimony about an exhibit

23  does not come in unless the exhibit is in, when you've waived

24  any objection to the exhibit in the deposition, the Court

25  assumed that you waived any objection to the exhibit itself.

Page 1606

1  If you had an objection to the exhibit, the time to have made

2  it was when the substance of the exhibit was discussed in the

3  transcript.

4        MR. ZELLER:  I apologize if we misunderstood.  Part

5  of the confusion, if the Court will recall, when the Linker

6  video was played, we had a comparable situation, and,

7  Mr. Nolan, that was Exhibit 10, and there was in fact

8  copious testimony on that particular document.  During the

9  course of when that video was played, the Court will recall

10 that MGA insisted that it be taken down because it was not

11 an agreed-upon exhibit.  And so that's how -- that's where

12 perhaps the confusion arose, because there was no agreement

13 that that exhibit came in.

14       THE COURT:  Wait a second.  I've already put

15 that -- oh, here it is.  I'm sorry.  On the Linker

16 deposition, where are you referring to?

17       MR. ZELLER:  That was Exhibit 10.  I can get

18 potentially the lines of the testimony.

19       THE COURT:  That would be helpful.

20       MR. NOLAN:  Your Honor, that's the Hong Kong

21 document that there was no foundation.  And actually, no

22 testimony.

23       THE COURT:  What are you referring to now?

24       MR. NOLAN:  Exhibit No. 10 in Linker's deposition.

25 I think they are two different issues.

1    THE COURT:  Well, we've got to get this straight

2    right now.  If you have an objection to an exhibit in these

3    videotaped depositions, you have got to make it.  If you

4    don't make it, and the exhibit comes in in the course of the

5    videotaped description, then it's coming in.  But I want to

6    make sure this is consistently applied, and if the Court made

7    an error with respect to the Linker deposition, I want to go

8    back and correct that.

9         So if you can identify for me where this Exhibit 10

10   is, I appreciate your doing so.

11        MR. ZELLER:  We're getting the line designations

12   right now.  But I do apologize.  That may have interjected

13   some confusion --

14        THE COURT:  There's nothing to apologize for.  I

15   just want to make sure we're doing this consistently for both

16   sides.

17        MR. ZELLER:  And I am told -- and perhaps this did

18   not follow the Court's intended protocol -- but I do

19   understand we have objections to Exhibit 8 that was played --

20   that was part of the Tkacik video.  So it may be that --

21        THE COURT:  Where are the objections to Exhibit 8?

22   I have it right in front of me.

23        MR. PROCTOR:  In the front of the binder, where it

24   states objections --

25        THE COURT:  That's the other thing.  I've tried to

Page 1608

1    make clear, the exception has to be interlineated on the

2    document itself.  That's what I'm going off of.  If it's not

3    there, it's waived.  If it's not interlineated, I'm not going

4    to rule on it.  And if I don't rule on it, it's implicitly

5    overruled.  So those are the ground rules for both sides.

6    You can't be putting objections in different places.

7              MR. NOLAN:  Your Honor, I'll get the --

8              THE COURT:  Mr. Proctor, where are you referring

9    to?  Objections at the beginning?

10             MR. PROCTOR:  Unless I'm mistaken, unless there is

11   a mistake, at the very front of the binder, there should be a

12   pleading which states our objections to Exhibit 8.  And this

13   is our fault.  We misunderstood where the Court wanted the

14   objections to the documentary exhibits.

15             THE COURT:  I have the pleading here.  I do not see

16   any objections.  There's three pages.  There's a cover sheet.

17   There is a please take notice of designations.  And then

18   there is the designations.

19             MR. PROCTOR:  It must have been inadvertently left

20   out.  I apologize for that.

21             THE COURT:  I don't have it.  Very well.  So the

22   objection is overruled on the Tkacik.  And Exhibit 8 is

23   admitted.

24             MR. NOLAN:  Can that exhibit be admitted in front

25   of the jury so that they know?

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1609

1          THE COURT:  We're not going to go back to that,

2     Counsel.  It's admitted.  We're going to use it in closing

3     argument.  The substance was revealed in front of the jury,

4     and the objection is now overruled.

5          (Exhibit 8 received.)

6          MR. ZELLER:  May we have a comparable ruling, then,

7     on Exhibit 10?

8          THE COURT:  If I can find it.

9          MR. ZELLER:  And we're getting the line

10    designations at this moment.

11         THE COURT:  I'm not going to rule without looking

12    at it.

13         MR. ZELLER:  Understood.  The designation began --

14    this is clip 63 is what we have.  Page 131-/9 to 131/11.

15         THE COURT:  131/9 to 131/11, and that's the

16    beginning of the designation.  So this is where it starts to

17    talk about Exhibit 10.

18         THE COURT:  Mr. Nolan?

19         MR. NOLAN:  Your Honor --

20         THE COURT:  There does not appear to be an

21    objection here at all.

22         MR. NOLAN:  Your Honor, there are objections.  They

23    have been lodged and have been part of the pretrial

24    conference.  We have this --

25         THE COURT:  We're not going back to pretrial.

Page 1610

1  That's why I tried to make this clear.  I need to have the

2  objection in front of me.  If it's not in front of me, it is

3  waived.

4         MR. NOLAN:  But, your Honor, may I just be heard

5  for just a moment?  This is apples and oranges, what they are

6  trying to do here.  I don't mind having -- and I think I've

7  demonstrated this, to be fair on both sides.

8         THE COURT:  Explain to me how it's apples and

9  oranges.

10        MR. NOLAN:  Exhibit 8 is an exhibit that was sent

11  to the deponent who is testifying.  She testified that she

12  received that from Isaac Larian.  And she used that as part

13  of her story.  It refreshed her recollection that he was in

14  Asia.

15        Exhibit No. 10 is a document that Mr. Linker never

16  saw.  It is a document that's filed in Hong Kong.  All they

17  asked him was were the photos attached to that, similar to

18  those photos that he saw at a meeting.  The first part of

19  Exhibit 10 is from a Hong Kong filing.  That's what they want

20  to get in, your Honor.  And that's why it's apples and

21  oranges.

22        THE COURT:  I don't think that's the case.  You

23  just want to get the drawings in; correct?

24        MR. ZELLER:  That is correct.

25        THE COURT:  Just the drawings that Mr. Linker

Page 1611

1    referred to.

2              Do you have an objection to that?

3              MR. NOLAN:  No, your Honor.

4              THE COURT:  Then there's no objection.  Very good.

5    So it was just the drawings.

6              MR. ZELLER:  Yes.  Exhibit 10 consists of the

7    drawings, and he was asked questions not about the drawings

8    per se, but rather -- because he saw drawings, those same

9    drawings, but whether or not the initial information, such as

10   the handwritten date, was on the version that he had seen.

11             THE COURT:  Very well.  What I want you to do is

12   sit down between you and see if you can't stipulate to the

13   pages from Exhibit 10 that are being admitted and only those

14   pages will be.  If you can't agree, come to me.  But I've got

15   to have the objection.

16             Don't be relying on -- first of all, the pretrial

17   conference order is much different than it was when it was

18   submitted to me.  And that's been issued now.  And you can't

19   be relying on some separate pleading someplace else.  I want

20   the objections stated, interlineated on the actual

21   transcripts themselves.  I'll rule on them.  Ig I don't rule

22   on them, you have waived them.  Understood?

23             MR. ZELLER:  Understood.

24             THE COURT:  Understood, Mr. Nolan?

25             MR. NOLAN:  I completely understand.  The last

Page 1612

1  protocol, your Honor, is if they are playing an exhibit, if

2  an exhibit from our designation is in and stipulated to, I

3  want the protocol to be that that exhibit gets pulled up like

4  they are pulling up their exhibits.

5         THE COURT:  Any exhibit that is in can be pulled

6  up.  What I'm asking you to do at the beginning of these

7  videotaped depositions is actually submit to the Court -- and

8  you both have to bear the responsibility of doing this -- of

9  going through the transcript and identifying on the record

10  the exhibits that have been stipulated to as being

11  admissible.

12         And we don't show anything.  We don't play anything

13  that has not been admitted.

14         All right.  That takes care of that issue.  I've

15  indicated to both sides to stop the speaking objections and

16  watch your facial reactions.

17         And the last issue is this letter.

18         Mr. Nolan, you submitted -- I'm sorry.

19         Mr. Zeller, was there something else?

20         MR. ZELLER:  This is something we would like to

21  have heard at sidebar, your Honor.  We do not want to be

22  discussing this letter in open court.

23         THE COURT:  You are familiar with the letter?

24         MR. ZELLER:  I am, your Honor.  We received it this

25  morning as part of a notice.

Page 1613

1           THE COURT:  Very well.  We'll begin the discussion

2    at sidebar.

3           (SIDEBAR CONFERENCE HELD AND PLACED

4           UNDER SEAL AND IS NOT TRANSCRIBED HEREIN.)

5           (Recess taken.)

6           THE COURT:  We're back on the record outside the

7    presence of the jury.  The Court just wanted to place on the

8    record that the letter submitted by Mr. Nolan on behalf of

9    MGA has been received by the Court.  It has been placed under

10   seal.  It has not been admitted in evidence, and it will

11   remain under seal pending further order of the court, counsel

12   having given direction in terms of motions and filings

13   related to that letter, and we'll leave it at that.

14          Let's bring in the jury.

15          (WHEREUPON THE JURY ENTERS.)

16          THE COURT:  Mr. Price, you may continue.

17          MR. PRICE:  Thank you, your Honor.

18   Q.   Mr. Larian, I think we talked about Exhibit 13532.  And

19   is it correct, sir, that the decisions of MGA in this time

20   frame, '99, 2000 time frame, the actions all had to be

21   sanctioned by you?

22   A.   I am the CEO of the company.  At the end of the day, the

23   buck stops with me, yes.

24   Q.   Not just about, but before anything like this memo could

25   go out, August of 2000, before that could go out, that had to

Page 1614

1   be sanctioned by you; correct?

2   A.   I don't recall at that time.  My brother was 45 percent

3   owner of the company.  So I think he had as much authority as

4   I did.

5   Q.   Well, when did you become 81 percent owner of the

6   company?

7   A.   After I bought my shares from my brother.

8   Q.   When was that in a time frame?

9   A.   I believe it was either 2000 or 2001.

10  Q.   Wasn't the management style in late '99, early 2000,

11  that every decision had to be run by you?

12  A.   No, not necessarily.

13  Q.   Didn't your management team actually convene a meeting

14  with you to complain about that, that nothing could get done

15  unless you had your input?

16  A.   I don't recall that being so.

17  Q.   Do you know a gentleman at this time named Martin Hitch?

18  A.   At what time?

19  Q.   '99, 2000?

20  A.   I don't know if it was '99 or 2000 or 2001.  But we had

21  someone named Martin Hitch working for us.

22  Q.   He was V.P. of international?

23  A.   He was V.P. of international sales, yes.

24  Q.   And Pat Williams, who was he at this time frame?

25  A.   He was head of -- excuse me.  I apologize.  Again, I

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1615

1    don't know the exact date.

2    Q.   Hitch was head of international sales, and Mr. Williams

3    was head of domestic sales?

4    A.   My recollection is that Pat Williams was head of overall

5    sales.

6    Q.   And then Mr. Hitch worked under him as head of

7    international sales?

8    A.   That's to the best of my memory, yes.

9    Q.   And they were fairly important members of your

10   management team?

11   A.   Yes.

12   Q.   And didn't they convene a meeting with you to talk about

13   your management style and that you had to approve everything?

14   A.   It's possible.  I don't recall the meeting, but it's

15   possible.

16   Q.   Let me show you what we've marked as Exhibit 13626 for

17   identification.

18        Have you had time to look over Exhibit 13626 for

19   identification?

20   A.   I have, yes.

21   Q.   You see it is on the letterhead of MGA Entertainment?

22   A.   Yes.

23   Q.   And it is a meeting agenda between you and Mr. Williams

24   and Mr. Hitch?

25   A.   It says on the top "meeting," and my name is on it.

Page 1616

1          MR. NOLAN:  Your Honor, we're going to object to

2     the relevance of this document.

3          THE COURT:  You may proceed, Counsel.  It's not

4     been introduced yet.

5          MR. PRICE:  That's correct.

6          THE COURT:  Very well.

7     Q.   BY MR. PRICE:  And you said you see it's your name on

8     it, Mr. Williams and Mr. Hitch.  And you also see it says

9     agenda?

10    A.   That's correct, yes, I do.

11    Q.   And there was in fact a meeting with you three to talk

12    about management issues?

13    A.   I don't recall the meeting.

14    Q.   Do you have any reason to believe that this is not in

15    fact a document which reflects an agenda of a meeting with

16    you, Mr. Williams, and Mr. Hitch around February 2001?

17    A.   That's what the paper says, but I don't recall the

18    meeting.

19    Q.   I'm asking do you have any reason to think this is not

20    what it appears to be?

21    A.   I have no recollection of it.

22    Q.   Is it true, sir, that those individuals met with you and

23    talked about how the culture in MGA was autocratic and that

24    you had to approve everything?

25          MR. NOLAN:  Objection, your Honor.  Relevance, lack

Page 1617

1   of foundation, and hearsay.

2          THE COURT:  Overruled hearsay as admission of party

3   opponent.  Overrule the relevance.  Objection is overruled.

4          But, Counsel, we're not getting into the substance

5   of this.

6          MR. PRICE:  Very well.

7          THE WITNESS:  Go ahead and ask the question.

8   Q.  BY MR. PRICE:  Isn't it correct that you had a -- you

9   had meetings with Mr. Williams and Mr. Hitch where your sales

10  folks complained that there was this autocratic culture where

11  every decision had to be sanctioned by you?

12  A.  I don't recall in 2001 the meetings that I had.

13  Q.  Actually, sir, wasn't one of the things they complained

14  about was that you would take the position that if you didn't

15  put it in writing, you were going to deny it?

16  A.  I don't recall that.

17  Q.  Didn't you send an e-mail around saying -- in a joking

18  fashion, I have Alzheimer's.  So if it's not in writing, I

19  didn't say it.

20  A.  It's possible.  I have a sense of humor.

21  Q.  You meant it.  You meant that if it wasn't in writing,

22  you were going to deny that happened?

23  A.  Meant what?  That I have Alzheimer's?  I don't have

24  Alzheimer's.

25  Q.  I'm not accusing you of that yet.  What I'm saying is

4a7976b7-80f1-4fdf-aea0-ab993789aba7

1   you meant, when you told your employees that if they didn't

2   have it from you in writing, you were going to deny that it

3   happened?

4   A.   I might have.  I don't recall.

5   Q.   Because that was your position at the time, that if you

6   don't have it in writing from me, I'm going to say it didn't

7   happen.

8   A.   It's possible.  I don't remember.

9   Q.   Let's see if we can refresh your memory on that.  If

10  you'll look at 13382.

11          Have you found it?

12  A.   Yes, I have.

13  Q.   And you recognize that as an e-mail you sent around

14  January 31, 2001?

15  A.   That looks like it, yes.

16  Q.   And with an Importance of "high."

17  A.   Yes.

18          MR. PRICE:  Your Honor, move Exhibit 13382 in

19  evidence.

20          MR. NOLAN:  Objection.  Relevance.

21          THE COURT:  Overruled.

22          (Exhibit 13382 received.)

23          THE COURT:  You may publish.

24  Q.   BY MR. PRICE:  And this is an e-mail that you sent out

25  to everybody in marketing, everybody in sales.

Page 1619

1          Do you see that?

2    A.   Yes, I do.

3    Q.   And here's your sense of humor here.  It says:  "My

4    Alzheimer's Disease."

5    A.   Yes.

6    Q.   Was this your sense of humor, too, where it says "high"

7    under Importance?

8    A.   I don't recall that.

9    Q.   Is that because of the Alzheimer's?

10          Let me ask again.

11          MR. NOLAN:  We'll stipulate that Mr. Price

12    apparently has a sense of humor as well.

13          THE COURT:  Very well.

14    Q.   BY MR. PRICE:  Usually, when you put "high" on

15    Importance on an e-mail, you mean that it was in fact

16    important?

17    A.   I hope so.

18    Q.   And here we have the first line:  "Please note that I

19    have been diagnosed with having Alzheimer's, and I don't

20    remember anything anymore."

21          Do you see that?

22    A.   I see that.

23    Q.   That was a joke?

24    A.   It was a joke.

25    Q.   How about the second thing?  "So, if it is not in

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1620

1    writing, I did not approve it.  I did not say it.  Whatever."

2              Do you see that?

3    A.    Yes.

4    Q.    That, you meant.

5    A.    I did.

6    Q.    And in fact, that precipitated this meeting where one of

7    the complaints that you got from Mr. Williams and Mr. Hitch

8    was that you had an approach of denying everything if it

9    wasn't in writing.

10   A.    I don't remember that meeting.

11   Q.    Let me ask it this way.  Can you deny such a meeting

12   where you told your sales folks that, you know, "I'm going to

13   deny everything unless it's in writing"?

14   A.    I can't -- I don't recall it.  So I cannot agree to it

15   or deny it.

16   Q.    Did you have a meeting with Mr. Williams and Mr. Hitch

17   where one of the issues that they brought to your attention

18   was that there was a confrontational environment?

19   A.    Again, you're going back eight, nine years.  I have had

20   many meetings.  I don't recall every meeting I have had.

21   Q.    Do the documents sometimes help you refresh your memory

22   as to what happened?

23   A.    Yes.

24   Q.    Well, if you could look at Exhibit 13626.  Does that

25   refresh your memory?  It's the one that I handed up to you

Page 1621

1    separately.  Thank you.

2    A.   It is not.

3    Q.   Does that refresh your memory that one of the complaints

4    of your management was that -- was that there was a

5    confrontational environment among management?

6    A.   I don't recall this meeting or this memo.  So I don't

7    remember.

8    Q.   Now, in doing that, are you saying that because -- I'll

9    step back.

10          Well, is your current practice to deny it if it's

11   not in writing approach?

12   A.   No.

13   Q.   Wouldn't you remember a meeting with your top management

14   where they were bringing up such issues that there was a

15   confrontational environment and that everything had to be

16   sanctioned by you and that you would deny everything if it

17   wasn't in writing?  Isn't that the kind of thing you'd

18   remember?

19   A.   Eight years ago, no.

20   Q.   Well, is that still your management style?

21   A.   What's my management style?

22   Q.   To be confrontational, every decision has to be

23   sanctioned by you, that you'll deny something if it's not in

24   writing?

25          MR. NOLAN:  Your Honor, objection.  Relevance.

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1622

1   Time period.

2          MR. PRICE:  I'll lay a foundation.

3          THE COURT:  Why don't you lay a foundation,

4   Counsel.

5   Q.   BY MR. PRICE:  Has your management style changed since

6   1999, 2000, 2001 time frame?

7          THE COURT:  I'm going to sustain the relevancy on

8   that.  Let's move along.  The only time frame that's relevant

9   is that period.

10         MR. PRICE:  The only reason, if it's the same, then

11  he could testify to it.

12         THE COURT:  I understand.  Let's move along.

13         MR. PRICE:  Your Honor, I would move Exhibit 13626

14  into evidence.

15         MR. NOLAN:  Lack of foundation, your Honor.

16         THE COURT:  Let's lay a foundation.

17         MR. NOLAN:  That's the exhibit we just went

18  through.

19         THE COURT:  What's the exhibit number?

20         MR. PRICE:  13626.  That's the one I handed up

21  separately.

22         THE COURT:  Very well.  Sustain the objection.

23  Q.   BY MR. PRICE:  Mr. Larian, let me focus now on

24  agreements that -- where you know employees didn't sign the

25  agreement.  And I'd like you to look at Exhibit 1117.

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1623

1    A.    I'm sorry.  I can't find this in here.

2    Q.    There are only four digits.  It's 1117.

3    A.    I got it.

4    Q.    And 1117 is in evidence.

5    A.    Yes, go ahead.

6    Q.    If we look at the last page of Exhibit 1117, which is

7    page 8, look at the bottom here.

8    A.    Yes.  Okay.

9    Q.    Could you tell me whose signature this is on behalf of

10   MGA?

11   A.    Looks like Eve Johnson, who was -- it looks like Eve

12   Johnson-Ford, who was head of Human Resources at the time.

13   Q.    So at this time -- this is April 2000.  Do you see that?

14   A.    I do.

15   Q.    So at this time there was contracts which were signed by

16   MGA employees; correct?

17   A.    Confidentiality agreements, yes.

18   Q.    And agreements concerning inventions as well?

19   A.    Yes.  Confidentiality agreements.

20   Q.    Did every employee have to sign such agreements?

21   A.    To the best of my recollection, I couldn't say.  Most

22   likely.  Well, no, I'm not sure.

23   Q.    Let me ask you to also look at Exhibit 13620.

24   A.    I'm sorry?

25   Q.    Exhibit 13620.

Page 1624

1    A.    Go ahead.

2    Q.    Look at the last page of Exhibit 13620.  Is that your

3    signature?

4    A.    It is.

5    Q.    This is dated sometime in 1999; is that right?

6    A.    Yes.

7    Q.    And you recognize this as an agreement with Kami

8    Gillmour?

9    A.    I do.

10          MR. PRICE:  Your Honor, move Exhibit 13620 into

11   evidence.

12          MR. NOLAN:  No objection.

13          THE COURT:  It's admitted.  You may publish.

14          (Exhibit 13620 received.)

15   Q.    BY MR. PRICE:  Previously we were looking at Paula

16   Treantafelles, now Garcia's, agreement.  This is an agreement

17   with Kami Gillmour.

18          Do you see that?

19   A.    Yes, looks like it, yes.

20   Q.    Also concerning confidentiality and inventions

21   assignment?

22   A.    That's correct.

23   Q.    And there was a reason why you had employees sign these

24   agreements; correct?

25   A.    Yes, for them to keep things confidential.

Page 1625

1    Q.   And if we look at the specific provisions on these, you

2    see there's a section here, assignment of interest.

3              Do you see that?

4    A.   I do.

5    Q.   And it talks about that the employee agrees to assign

6    and does hereby assign to the company all interest which the

7    employee may have in all patentable and/or not patentable

8    ideas and/or inventions made or conceived by employee solely

9    or jointly with others during employee's employment with the

10   company.

11             Do you see that?

12   A.   I do.

13   Q.   And you were familiar with this provision; correct?

14   A.   I was not -- I'm still not familiar with the whole

15   contract, but I see that's written there, yes.

16   Q.   This is the same page that your signature is on.

17   A.   That's correct.

18   Q.   And it says:  "This assignment shall not apply to any

19   idea or invention developed by employee entirely on the

20   employee's own time without equipment, supplies, facilities,

21   or trade secret information of the company, unless such

22   invention or idea relates to the business of the company or

23   to the company's actual or anticipated research or

24   development."

25             Do you see that?

Page 1626

1    A.    I do.

2    Q.    And the business of MGA Entertainment at that time was

3    at least in part the toy business.

4    A.    That's correct.

5    Q.    And the reason that you have this sort of agreement with

6    your employees is if you are paying them a paycheck, and they

7    are a designer, for example, if they come up with a great

8    design idea, and they say they came up with it, you know, on

9    a Saturday night while take a shower, you don't want them to

10   be able to go across the street and give that to one of your

11   competitors; correct?

12   A.    If they were working at MGA and they would come and go

13   with product ideas or design ideas, yes, that meant that they

14   were doing it for MGA.

15   Q.    And if it related to your business, that's even if they

16   said to you hey, you know, Isaac, I did this during a lunch

17   break or on the weekend, that didn't matter.  If they were

18   employed by MGA and they come up with a great idea related to

19   your business, that belonged to you.

20   A.    My understanding has always been that if somebody's

21   doing something on their own, when they are not on our

22   payroll, whether if they are at -- on the weekends at their

23   home, my personal understanding is that what they do on their

24   own time belongs to them.  We don't own them.

25   Q.    If that idea relates to your business, the toy business,

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1627

1   your understanding here, you've got a designer whose job is

2   to make toys.  They are on your payroll; correct?

3   A.   Correct.

4   Q.   And you want them to come up with their best toy ideas

5   and give them to you; correct?

6   A.   Yes.

7   Q.   And if they claim they come up with their toy ideas on

8   their own time, say, at 5:30 instead of 5:00 P.M. -- you with

9   me so far?

10   A.   Yes, I see what's written there.

11   Q.   That still belongs to you because they are employed by

12   you and it relates to your business; right?

13   A.   Again, my own personal understanding is that if somebody

14   is working home on Saturday or Sunday, they are not getting

15   paid for Saturday and Sunday, this is my own personal

16   understanding regardless of this contract, that if they do

17   something on the weekends on their own time, that belongs to

18   them.  I don't own the people because they just work for me.

19   Q.   Now, you said regardless of the contract.  You

20   understand what your contract says is that if it relates to

21   your business, an employee -- an employee comes up with a

22   design, it still belongs to you even if they claim they did

23   it in the shower before they came to work.

24   A.   That's correct.  That's what the contract says.

25   Q.   And this contract was signed by -- by, to your

1    knowledge, all of MGA's employees in this '99, 2000 time

2    frame; correct?

3    A.   I'm not sure if everybody in the company signed it.

4    It's possible, but I don't know.  I don't think people who

5    work in the warehouse had to sign something like this, or

6    temps who came to work.  So I don't know.

7    Q.   But people like designers, people in management, those

8    sorts of folks would have to sign this sort of thing;

9    correct?

10   A.   Yes.

11   Q.   And having been in the toy business for some 17 years?

12   13 years?  '87.  Is that it?

13   A.   21 years now, I guess.

14   Q.   Okay.  As of 2000 -- 1999, 2000, had you been in the toy

15   business for 13 years?

16   A.   Yes.

17   Q.   So having been in the toy business for that long a

18   period of time, you recognize that it was standard practice

19   for toy companies to have such provisions in connection with

20   their designers, that is, where the company is going to own

21   their designs related to this company's business?

22   A.   That's not true.  There is no such standard.

23   Q.   So, for example, you thought that Mattel wouldn't have

24   such an agreement with its employees?

25   A.   I have no idea what Mattel had or not.  I wouldn't know.

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1629

1    Q.   So having been in the toy company business for 13 years

2    at this time, you didn't have an expectation that your

3    competitor would have in a contract, such as the one you have

4    with your employees, where you tell them that if you come up

5    with a design that relates to my business, it belongs to me?

6    A.   They could have.  But you said it's a standard.  I know

7    many companies.  I can name many companies that don't have

8    it.

9    Q.   Was it your expectation that Mattel didn't have this

10   sort of provision with its employees?

11   A.   I have in --

12          MR. NOLAN:   Objection, your Honor.  In terms of

13   what provision?

14          THE COURT:   The objection is what?

15          MR. NOLAN:   Vague and ambiguous.

16          THE COURT:   Sustained.

17   Q.   BY MR. PRICE:   Is it your expectation that Mattel did

18   not have contracts with its employees that provided that if

19   the employee came up with a design, while it worked for

20   Mattel and it related to Mattel's business, that it was a toy

21   design, that Mattel owned it, is it your testimony you didn't

22   expect that they had such a provision?

23   A.   I had no expectation one way or the other.  I didn't

24   know what Mattel had or not had at the time.

25   Q.   In fact, you previously testified you didn't even recall

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1630

1    whether MGA had contracts with its employees.

2    A.    I don't know what I testified to.   I know that at my

3    deposition, I said we have a confidentiality agreement.   To

4    me, that was the same agreement as we have here.

5              MR. PRICE:   Your Honor, if I could play from

6    Mr. Larian's deposition transcript, it's volume 1, the date

7    is July 18, 2006.   It's lines 15 through 22.

8              THE COURT:   I'm sorry.   What page?

9              MR. PRICE:   Page 36, lines 15 through 22.

10             THE COURT:   Any objection, Mr. Nolan?

11             MR. NOLAN:   One moment, your Honor.   No objection,

12   your Honor.

13             THE COURT:   You may play it.

14             DEPOSITION EXCERPTS PLAYED AS FOLLOWS:

15             "QUESTION:   Had MGA had contracts with its

16        employees as of September of 2000?

17             "ANSWER:   I don't recall.

18             "QUESTION:   You just don't know one way or

19        another?

20             "ANSWER:   I don't.

21             "QUESTION:   Had MGA ever entered into

22        contracts with any of its employees prior to

23        September of 2000?

24             "ANSWER:   It could have.   I don't recall

25        that."

Page 1631

1        MR. NOLAN:  I apologize.  For completeness, could

2   we just have it continue to run from line 22 -- I'm sorry --

3   line 23 on page 36, over to the next page, line 37, line 12

4   for completeness?

5        MR. PRICE:  You want to go from?

6        MR. NOLAN:  I just wanted to continue from line 23.

7   You stopped at line 23.  I want it from line 23 on page 36

8   through line 12 on page 37.

9        MR. PRICE:  I have no objection if we actually go

10  to line -- 37, line 24.

11       MR. NOLAN:  The ball is in my court.  Wait a

12  moment.

13       THE COURT:  He wants to go to 24.

14       MR. NOLAN:  That's fine, your Honor.

15       THE COURT:  Very well.  Play from page 36, line 15,

16  through page 37, line 24.  The objections contained therein

17  are overruled.

18       MR. PRICE:  We'll just continue playing from where

19  we stopped.

20       "QUESTION:  Did MGA have a practice of

21        entering into contracts with its employees as of

22        September of 2000?

23       "ANSWER:  No, I'm not aware of a practice like

24        that.

25       "QUESTION:  Does MGA have a -- that practice

Page 1632

1           now of entering into contracts with its employees?

2                "ANSWER:  I think some employees have

3           contracts with MGA, if that's what you're talking

4           about.

5                "QUESTION:  Well, let me be more specific.  As

6           of September 26, 2000, did MGA enter into

7           confidentiality or inventions agreements with its

8           employees?

9                "ANSWER:  I'm only aware that we had

10          confidentiality agreements.

11               "QUESTION:  Do you know what I mean by

12          inventions agreement?

13               "ANSWER:  I don't.

14               "QUESTION:  By inventions agreement, I mean an

15          agreement which includes a term which says that

16          things an employee invents, during the course of

17          the employee's employment with MGA, in certain

18          circumstances, will be owned by the company, by

19          MGA.  That's what I'm referring to.  Do you

20          understand what I'm saying?

21               "ANSWER:  I understand what you're saying."

22               MR. PRICE:  Your Honor, if I may now play from 44,

23     line 14, to line 20.  Actually, down to 45, line 7.

24               MR. NOLAN:  That's fine, your Honor.

25               THE COURT:  Very well.

Page 1633

1        DEPOSITION EXCERPT PLAYED.

2        "QUESTION:  All right.  How about inventions

3    agreements?  Was it your experience, Mr. Larian, as

4    of September of 2000, that companies in the toy

5    industry entered into inventions agreements with

6    their employees?

7        "ANSWER:  I'm not even sure what -- if I

8    understand what is an invention agreement.

9        "QUESTION:  It's what I was referring to

10    before.  That is to say, a type of agreement where

11    it says that if an employee creates something

12    relating to the employer's business during the

13    period of the employment, in some circumstances

14    that invention will be owned by the employer.

15    That's what I'm referring to.

16        "ANSWER:  That's a contract?

17        "QUESTION:  That -- that's what I'm referring

18    to when I say inventions agreement.

19        "ANSWER:  I don't have recollection of that

20    one way or another."

21    Q.   BY MR. PRICE:  Mr. Larian, if you'd go to the first page

22    of Exhibit 13620, which is in evidence.  The document you

23    signed was called confidentiality and inventions assignment

24    agreement?

25    A.   That's correct.

Page 1634

1    Q.   And as of September 2000, you had hired former employees

2    of Mattel; correct?

3    A.   Yes.

4    Q.   How many had you hired before September of 2000?

5    A.   I don't know.

6    Q.   More than five?

7    A.   I couldn't tell you.  I have no idea.

8    Q.   Well, we'll get to this in a second, but there's a

9    meeting around September of 2000 with Carter Bryant; correct?

10   A.   September 2000, yes, there is a meeting with Carter

11   Bryant.

12   Q.   And Paula Garcia was there.

13   A.   She was.

14   Q.   She was a former Mattel employee.

15   A.   She was.

16   Q.   And Kami Gillmour worked at MGA at the time; correct?

17   A.   She did.

18   Q.   She was a former Mattel employee.

19   A.   She did.

20   Q.   And --

21   A.   Excuse me for one second.  If you're talking September

22   1, 2000, I'm not sure if Kami Gillmour was working at MGA at

23   that time.  I'm sorry.  I apologize.

24   Q.   Is she the one who helped recruit Paula Garcia?

25   A.   I don't know how Paula Garcia came to MGA, no.

Page 1635

1    Q.   In any event, at some point Ms. Gillmour worked for MGA?

2    A.   She did.

3    Q.   And the woman Traci we were talking about earlier, Traci

4    Feldman, she had worked at Mattel.

5    A.   I have no idea.  I have no recollection of Traci

6    Feldman.

7    Q.   But it's fair to say that, when you met with Carter

8    Bryant for the first time, that MGA had hired employees that

9    had previously worked at Mattel?

10   A.   Yes.

11   Q.   And if we can talk about what happened in connection

12   with this meeting with Mr. Bryant.  First of all, as of

13   September of 2000, for that year financially, MGA ended up

14   losing money; correct?

15   A.   No, not as of September 2000.  For the year 200 (Sic),

16   we ended up losing money, but as of September 2000, we were

17   very profitable.  Actually, as of September 2000, we supposed

18   to be one of our most profitable years.

19   Q.   Well, let's put it this way.  You do financial

20   statements for the entire year; correct?

21   A.   That's correct.

22   Q.   And those financial statements for the entire year are

23   audited by some independent auditors?

24   A.   That's correct.

25   Q.   And if you look at Exhibit 10189.  Have you found that,

Page 1636

1    sir?

2    A.   Yes, I have.

3    Q.   And are those MGA Entertainment's balance sheets,

4    statements of operations, basically financial records for the

5    years 2000 and 2001?

6    A.   I don't know if they are or not.  I don't recall.

7    Q.   Pardon?

8    A.   I do not recall them.  I don't know if they are or not.

9    On the top it says MGA Entertainment.

10   Q.   Do you have any reason to think that these are not your

11   financial statements, yours, meaning MGA's, for 2000, 2001?

12   A.   I have no reason to believe or not to believe that they

13   are.

14   Q.   Let's me see if we can help you recollect if they are.

15   If we look at the second page, you see at the bottom some

16   figures there concerning --

17   A.   Can you tell me exactly what page?  There are figures on

18   every page.

19   Q.   Sure.  10189-002.  Do you see that?

20   A.   Yes, I do.

21   Q.   And if we look at the last figures on those pages, does

22   that remind you that these in fact are the financial

23   statements of MGA Entertainment for 2000 and 2001?

24   A.   I don't recall.

25   Q.   Well, do you recall that MGA Entertainment for 2000,

Page 1637

1    for the year 2000, the yearly results were a loss of over

2    $6 million?

3    A.   I know we had a loss.  I don't know the exact amount.

4    Q.   Does this refresh your recollection as to the exact

5    amount of the loss?

6    A.   It does not.

7    Q.   And I've been asking about 2000.  Back in 1997, I

8    believe, MGA had actually filed for bankruptcy; correct?

9    A.   We did.

10   Q.   Now, moving forward, then, to 2000, September of 2000,

11   you had your first meeting, you say, with Mr. Bryant;

12   correct?

13   A.   In September 1, 2000, was my first meeting with

14   Mr. Bryant.

15   Q.   And the reason you are fairly certain about the date is

16   because your secretary has a calendar; right?

17   A.   Of the calendar page that I have, yes.

18   Q.   And one of those calendar pages reflects that you had a

19   September 2000 meeting with Mr. Bryant.

20   A.   September 1, 2000, yes.

21   Q.   And your calendar also reflects that in weeks previous

22   to that, you were not in town.  You were somewhere, I think

23   it was Hong Kong.

24   A.   I think I was, but I don't have that in my mind.  I

25   don't have that date and where I was in my mind.  I know that

Page 1638

1    I was out of town before the meeting.

2    Q.   Sure.  Just to refresh your recollection, perhaps, look

3    at Exhibit 11210.

4    A.   11 --

5    Q.   11210.  Look at that to refresh your recollection as to

6    whether or not in the week of August 18, you were out of

7    town.

8    A.   Yes.

9    Q.   In fact, there was a time period from about the 21st

10   through the -- let me rephrase that.

11        I don't know if I'm reading this correctly.  From

12   the 14th to the 25th, when you were out of town; is that

13   right?

14   A.   No.  Because on the 15th there is something at 5:00 P.M.

15        Do you see that?

16   Q.   I do.  Could that have been a conference call?

17   A.   No.  P.D., weekly P.D. status call.

18   Q.   Well, tell me, looking at your calendar, what's your

19   understanding as to when in August you were out of town?

20   A.   Again, I don't recall, but according to this, I was out

21   of town from August 15 to August 27.

22   Q.   And when you had this meeting on September 1st, first of

23   all, that meeting, your understanding, was set up by

24   Ms. Garcia.

25   A.   I don't know if it was set up by Ms. Garcia or Victoria

Page 1639

1   O'Connor.  I don't recall.  Or my secretary.

2          MR. PRICE:  If we could play from Mr. Larian's

3   deposition transcript 26, line 22, to 27, line 6.  This is

4   volume 1.

5          THE COURT:  Any objection?

6          MR. NOLAN:  One moment, your Honor.

7          MR. NOLAN:  No objection.

8          THE COURT:  You may play it.

9          DEPOSITION EXCERPT PLAYED.

10         "QUESTION:  So the only one that responded was

11      Paula, and she came up with the concept for Bratz;

12      is that right?

13         "ANSWER:  She showed me something that became

14      the idea for Bratz.

15         "QUESTION:  What was it that she showed you?

16         "ANSWER:  She set up an appointment on my

17      calendar, and a gentleman by the name of Carter

18      Bryant was in that meeting, and he showed me some

19      drawings at that meeting, and that was -- that was

20      the idea that became Bratz later on."

21   Q.  BY MR. PRICE:  And when you attended this meeting in

22   September, you assumed that Paula had previously met with

23   Mr. Bryant.

24   A.  I had no idea if she had met with Mr. Bryant before that

25   or not.

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1640

1  Q.   My question was different.   That was your assumption

2  based upon your business practice.

3  A.   No.

4          MR. PRICE:   If he we could play page 75, line 22,

5  to 76, line 1.

6          MR. NOLAN:   One moment, your Honor.   Your Honor,

7  for completeness, I'd like to play down to line 20.

8          THE COURT:   Any objection, Mr. Price?

9          MR. PRICE:   Let me read it, your Honor.

10          No objection.

11          THE COURT:   Very well.

12          DEPOSITION EXCERPT PLAYED.

13          "QUESTION:   So did you have the impression

14      that Paula and Victoria and Veronica had previously

15      met Mr. Bryant?

16          "ANSWER:   I don't recall.   Probably have.   I

17      think so, because they have -- I'm assuming.

18          "QUESTION:   All right.   I mean, do you

19      remember Paula or Victoria or Veronica expressing

20      to you that they were excited about this product or

21      idea or they thought it was a good one?

22          "ANSWER:   Yeah, I think Paula was very

23      excited.

24          "QUESTION:   Paula was real excited?

25          "ANSWER:   Right.

Page 1641

1        "QUESTION:  Did she indicate to you how much

2        time she had spent looking at this product or

3        talking to Carter before the meeting?

4        "ANSWER:  Not that I recall.

5        "QUESTION:  So somebody sort of introduces

6        you, here is Carter Bryant, and he's got this

7        product.  Then what happens?

8        "ANSWER:  They said let's see it, to the best

9        of my recollection.  You want to know what I

10       remember from the meeting?

11       "QUESTION:  Yeah."

12  Q.   BY MR. PRICE:  Now, Mr. Larian, the reason that probably

13  you were assuming that there was a meeting prior is because

14  you had expected your subordinates, your assistants, to have

15  met with Mr. Bryant before presenting him to you?

16       MR. NOLAN:  Objection, your Honor.  Assumes facts

17  not in evidence.

18       THE COURT:  Rephrase, Counsel.

19  Q.   BY MR. PRICE:  When you said -- when you were asked

20  whether you had the impression that Paula, Victoria, and

21  Veronica had previously met with Mr. Carter Bryant, you said,

22  "I don't recall, probably have, I think so.  I'm assuming."

23       Now, why do you assume that they met with

24  Mr. Bryant before this meeting with you?

25  A.   I just assumed that maybe they have seen.  As you saw in

Page 1642

1    my deposition, I said I don't recall.  And I still don't

2    recall if they have or not.  Before that.  My understanding

3    now being through this proceeding is for the first time, I

4    saw it on September 1, 2000.  I don't know if anybody else

5    has seen it before that or not.

6    Q.   Why in your deposition did you say that probably that

7    Ms. Garcia and Ms. O'Connor had met Mr. Bryant before?  Why

8    do you think that was probably the case?

9    A.   Again, I was just making assumption.

10   Q.   It wasn't based on anything, any prior experience, any

11   practice, or anything else?  Is that your testimony?

12   A.   That's my testimony.

13   Q.   Now, your testimony is that when you had this meeting on

14   September 1st, that when you came into it, you didn't even

15   know it was about a fashion doll.

16   A.   That's correct.  I thought they had brought somebody

17   to -- for an interview for a job for fashion designer.

18   Q.   So if Ms. Garcia testified -- has testified that, a

19   couple of days before September 1st, she had told you that

20   she was bringing a fashion doll idea to you, then would you

21   disagree with that?

22   A.   I don't.  I have no reason to agree or disagree with it.

23   My recollection was that he was coming in for a job

24   interview.  That's my recollection.  Again, going back seven

25   years.

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1643

1    Q.    Sure.  Now, at this meeting you had Ms. Garcia; correct?

2    A.    That's correct.

3    Q.    You had Victoria O'Connor?

4    A.    Yes.

5    Q.    You had a woman named Veronica Marlow?

6    A.    Yes.

7    Q.    And I believe your daughter was there?

8    A.    Yes, she was 12 at the time.

9    Q.    And when you got to this meeting, because you thought it

10   was for a job interview, one of the first things you asked

11   about is do you have a resume.

12   A.    I don't recall exactly.  I might have.  That's my

13   practice if someone is coming for a job interview, to ask to

14   see the resume.

15   Q.    Let me see if I can refresh your recollection.  If you

16   look at page -- you have your transcript in front of you?

17   A.    I do.  Which volume?

18   Q.    It's volume 1, page 77.

19   A.    I'm sorry.  The page?

20   Q.    Page 77.  And if you read to yourself, lines 17 through

21   19.

22   A.    Can you repeat the lines again?

23   Q.    77.  Just read to yourself 77, lines 17 through 19.

24   A.    Yes, go ahead.

25   Q.    Does that refresh your memory that because you thought

Page 1644

1   it was a job interview, that you said where are you working?

2   Do you have a resume?

3   A.   Well, can I read the whole thing to the jury?

4   Q.   I'm not asking you to read it to the jury.  I'm using

5   this to refresh your memory because you said you couldn't

6   recall.  Can you answer my question?  You can tell me yes,

7   no, or I don't recall.  At this meeting did you say where do

8   you work and do you have a resume?

9   A.   I think I have to read this whole thing to the jury so

10  they can get a context of my answer.

11  Q.   Well, my question is simple, and we can get to other

12  questions later.  How long did the meeting last?

13  A.   I don't recall.  Maybe half an hour, 45 minutes max.

14  Q.   Okay.  So let me talk to you about one aspect of the

15  meeting.  Did you ask Mr. Bryant where do you work and do you

16  have a resume?

17          THE COURT:  Answer the question the best you can.

18          THE WITNESS:  I believe I did.

19  Q.   BY MR. PRICE:  And he told you he worked at Mattel?

20  A.   He did.

21  Q.   And he said that in front of Ms. O'Connor and

22  Ms. Garcia?

23  A.   To the best of my recollection, yes, he did.

24  Q.   And he showed you at this meeting some drawings?

25  A.   Yes, he did.

1  Q.   And if you look at Exhibit 302, which is already in

2  evidence --

3  A.   302.  Yes.

4  Q.   -- is it your recollection that these were in fact the

5  drawings that Mr. Bryant showed in this meeting?

6  A.   Oh, you want to take a look at every page?  There are

7  many drawings in here.  Or just the one on the --

8  Q.   Just flip through the 15 pages, and your recollection

9  that this is what Mr. Bryant presented in September of 2000

10 to you.

11 A.   To the best of my recollection, yes, some of these were.

12 Some of them I remember.

13 Q.   And can you state that some weren't shown, or is it just

14 that you remember some and are not sure about others?

15 A.   The latter.

16 Q.   And looked at the second page.  It's correct, is it not,

17 that in this first presentation these dolls were called Bratz

18 with a Z?

19 A.   That's correct.

20 Q.   So in fact it was Carter Bryant who first came up with

21 the name Bratz?

22 A.   Yes.

23 Q.   And if we go to the next page, we look at

24 Exhibit 302-003.  He showed you drawings where at least one

25 of his characters was wearing hiphugger jeans and had a short

Page 1646

1    T-shirt; correct?

2    A.    That's what it says.

3    Q.    And you notice that if you look at the drawing, it's

4    kind of showing her midriff here?

5    A.    That's correct.

6    Q.    And let's go to the fifth page of the exhibit.   Another

7    drawing where he shows a character showing there a bare

8    midriff?

9    A.    Yes.

10   Q.    Same if you look at the next page.   Number 6.

11   A.    Yes.

12   Q.    Also have these hiphugger pants and a bare midriff?

13   A.    Yes.

14   Q.    So certainly these were sort of fashion statements that

15   were shown to you in September of 2000?

16   A.    These are drawings that were shown to me in September

17   2000.

18   Q.    And I believe you testified that according to you, I

19   guess, there was no one who worked on Bratz in September

20   because there was no contract?

21   A.    I'm sorry.   Can you repeat the question?

22   Q.    Is it true -- is it your testimony that after this

23   meeting, no one did work on Bratz in September because there

24   was no contract?

25            MR. NOLAN:   Objection, your Honor.   Vague and

Page 1647

1    ambiguous as to drawings for the doll.

2              THE COURT:  Rephrase, Counsel.

3    Q.   BY MR. PRICE:  In September 2000, was there any work at

4    all done on these drawings or on doll designs or anything

5    pertaining to Bratz after this meeting?

6              MR. NOLAN:  Compound, your Honor.

7              THE COURT:  Overruled.

8              THE WITNESS:  I don't know if there was or not.

9    It's possible that there was.

10   Q.   BY MR. PRICE:  It's your belief, however, that it's in

11   this month of September 2000 that, to use your words, Bratz

12   was born?

13   A.   In September of 2000 Bratz was born?  What do you mean

14   by Bratz?  Bratz drawings or Bratz dolls?  Bratz dolls did

15   not come to the market until 2001.

16   Q.   Well, if you look at Exhibit 11907.

17   A.   Exhibit?

18   Q.   11907.

19   A.   Yes, go ahead.

20   Q.   You recognize that as an e-mail that includes you and

21   Victoria O'Connor and Sandrine de Raspide?

22   A.   Your pronunciation is better than mine.

23   Q.   You recognize it as one of your e-mails?

24   A.   That's correct.

25             MR. PRICE:  Your Honor, move Exhibit 11907 into

Page 1648

1   evidence.

2          MR. NOLAN:  No objection, your Honor.

3          THE COURT:  It's admitted.

4          (Exhibit 11907 received.)

5   Q.   BY MR. PRICE:  This is one of those e-mails where

6   someone else has written you an e-mail and you're going

7   through and typing your comments or responses?

8   A.   That's correct.

9   Q.   So, for example, where it has this e-mail from Nathalie

10  Riesen to -- it says to ILarian at MGAE dot com.  Is that

11  you?

12  A.   That was my e-mail address at the time.

13  Q.   And you see it says:  "I have some questions about the

14  story of the Bratz.  I'd ask if you would" --

15  A.   I see that.

16  Q.   And one of the questions was date of birth of the Bratz,

17  time of development, first launch in the United States.

18          Do you see that?

19  A.   Yes.

20  Q.   And you've got -- what is typed here is your response;

21  correct?

22  A.   I'm sorry?  The one in capital is mine.

23  Q.   And your response is:  "Born September 2000.  Nine

24  months to develop, like a baby.  Launched in the USA in July

25  2001 and Spain June 2001, before USA."

Page 1649

1       Do you see that?

2  A.   I do.

3  Q.   And I take it that for this birth in September of 2000,

4  you're not taking credit for the paternity of that; right?

5  A.   I'm sorry?

6  Q.   That is, where it says born in September 2000, you are

7  not the one who bore it?

8  A.   I personally?

9  Q.   Yes.

10  A.   No, I have not given birth to anybody yet.

11  Q.   Notify me if you do.  We can make a lot of money.

12       So you're talking about born in September 2000, the

13  person who you're referring to who gave birth to Bratz in

14  September of 2000 was Carter Bryant?

15  A.   MGA Entertainment gave birth to Bratz dolls and Bratz

16  brand.  Carter Bryant came up with the drawings that became

17  the inspiration for Bratz.

18  Q.   My understanding is you weren't aware of anything being

19  done in September 2000 regarding Bratz except Mr. Carter

20  Bryant presented to you Exhibit 302.  Isn't that right?

21  A.   No.  My testimony was that there could have been some

22  work done on the Bratz to see if it could be done, could be

23  made to a doll or not in September or October.  I just don't

24  know the detail of that.

25  Q.   Well, you certainly would agree that the date that --

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1650

1    using your word here, Bratz, the date that Bratz was created

2    was in September of 2000.

3    A.   No.   You should refer back to the date of the e-mail.

4    That's October 31st, 2002.   And Bratz dolls were in the

5    market already for about a year when I wrote that e-mail.

6    Q.   Well, if you'd look at Exhibit 551.

7    A.   I'm sorry?

8    Q.   Look at Exhibit 551.

9    A.   Should I put this away?

10   Q.   Yes, we're going to 551 now, a different document.

11            And that's already in evidence, your Honor.

12            THE COURT:   Very well.

13   Q.   BY MR. PRICE:   Mr. Larian, you're aware of this e-mail

14   between Nana Ashong and Victoria O'Connor, Paula

15   Treantafelles, now known as Paula Garcia, and Martin Hitch?

16   A.   I'm not.

17   Q.   You've never seen this before this trial?

18   A.   Only through this trial I have.

19   Q.   Who is Nana Ashong?

20   A.   She was product manager, to the best of my recollection,

21   at MGA at one time.

22   Q.   And I think you said Martin Hitch, was he in charge of

23   sales?

24   A.   He was in charge of international sales.

25   Q.   And how about Jackie Bielke?

Page 1651

1    A.    I have no recollection of her.

2    Q.    Do you know why Ms. Ashong, in September of 2001, was

3    sending an e-mail saying that the date of creation for Bratz

4    was September 18, 2000?

5    A.    I have no idea.

6    Q.    Do you recall that you sent an e-mail saying for legal

7    purposes, let's say it's October of 2000?

8    A.    I don't recall that.  I might have.  I don't recall.

9    Q.    All right.  If you'd look at Exhibit 12842.

10   A.    I'm sorry.  Can you repeat the number?

11   Q.    12842.  Do you recognize this as an e-mail that you

12   wrote sometime around June 27, 2002?

13   A.    It's an e-mail that I wrote.  I don't remember the date.

14         MR. PRICE:  Move Exhibit 12842 into evidence.

15         MR. NOLAN:  No objection, your Honor.

16         THE COURT:  It's admitted, and you may publish.

17         (Exhibit 12842 received.)

18   Q.    BY MR. PRICE:  There's an e-mail from Caymohr,

19   C-A-Y-M-O-H-R, at AOL dot com.

20         Do you have any idea who that is?

21   A.    I have no idea.

22   Q.    The "To," that's your e-mail address; correct?

23   A.    It is.

24   Q.    Do you know whose e-mail addresses are in the CC?

25   A.    Ricardo Cruz, I think, is one of them, and the other one

1   was Fabienne, F-A-B-I-E-N-N-E, don't ask me to pronounce the

2   last name.

3   Q.   What was Ricardo Cruz's position?

4   A.   I think he was an assistant at the company.

5   Q.   Assistant to whom?

6   A.   I think to -- I don't remember who he was assistant to.

7   But he was an assistant.

8   Q.   And how about Fabienne, what was that person's position?

9   A.   I don't remember her position.

10  Q.   It begins:  "Hi, Isaac.  Here's the presentation for

11  Fox."

12       Who is that referring to?

13  A.   I assume it's presentation to 20th Century Fox.

14  Q.   And then:  "Isaac, I'm concerned you changed Bratz intro

15  date to October 200."  I assume that's wrong.

16  A.   For sure it's not done in the year 200.

17  Q.   Do you want to keep that or not?  Do you see that?

18  A.   Yes.

19  Q.   So apparently you understood this to mean October 2000.

20  A.   That's not my e-mail.  She wrote this.  I have no idea

21  what she meant, but if you want to see what I said, referring

22  to the top where I said October 2000 for legal purposes.

23  Q.   Okay.  That kind of gives you a hint of what you thought

24  she meant.

25  A.   I don't know what she meant there.  Bratz contract was

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1653

1   signed with Carter Bryant on October 4, 2000, and that's the

2   legal date that I had in mind.

3   Q.   And what date did you change it from?  Did you change it

4   from September of 2000?

5   A.   I barely recall this e-mail from October 200.  I don't

6   remember.  It's October 2000.

7   Q.   So for legal purposes, you wanted Fabienne to state that

8   the introduction of Bratz was in October of 2000; correct?

9   A.   The legal contract with Carter Bryant was signed on

10  October 4, 2000, and before that there was no such a thing as

11  Bratz.

12  Q.   And focusing on what Carter Bryant did in September and

13  October 2000, your view was that he was the inventor of

14  Bratz.

15  A.   I don't know --

16          MR. NOLAN:  Objection, your Honor.  Ambiguous with

17  respect to Bratz.

18          THE COURT:  Rephrase.

19  Q.   BY MR. PRICE:  You see the way you use Bratz in these

20  e-mails where you talked about the birth of Bratz and the

21  introduction of Bratz.  I'm using Bratz in the same way

22  you're using it in these e-mails.  So my question is in your

23  view in that time frame, Carter Bryant, this Mattel employee

24  who came to you and gave you these drawings, your view is he

25  was the inventor.

Page 1654

1   A.   Well, you got to look at the date of that e-mail.  If

2   you look at the date of the e-mail, it's in 2002.  So by 2002

3   there were dolls in the market.  There was a brand in the

4   market.  So that is to the reference to that when Carter

5   Bryant came to MGA on September 1, 2000, he showed us some

6   drawings that became the idea and the inspiration for Bratz.

7   Q.   I used a specific phrase, the inventor.  Is it your view

8   that using Bratz the same way you've been using it in these

9   e-mails, where you said it was born in September of 2000, it

10  was introduced October of 2000, using it in that same way, is

11  it your view that Carter Bryant was the inventor of Bratz?

12  A.   I think you can say that Carter Bryant was one of the

13  inventors of Bratz because the drawings that he did became

14  the inspiration for Bratz.

15  Q.   And, in fact, you've told him that in written

16  communications?

17  A.   It's possible.

18  Q.   In fact, you told him you wished you were the inventor.

19  A.   Of what?  I don't remember.

20  Q.   Look at, if you would, Exhibit 11248.

21  A.   Yes, go ahead.

22  Q.   Have you found it?

23  A.   I have.

24  Q.   Do you see this is an e-mail chain between and you

25  Mr. Bryant?

Page 1655

1    A.    Yes, it is.

2    Q.    Dated May 4, 2001?

3    A.    The last e-mail is dated May 4, 2001; correct.

4              MR. PRICE:  Your Honor, move Exhibit 11248 into

5    evidence.

6              MR. NOLAN:  No objection.

7              THE COURT:  It's admitted, and you may publish.

8              (Exhibit 11248 received.)

9    Q.    BY MR. PRICE:  If we go to the first e-mail on the

10   second page, this is a situation where Mr. Bryant had come up

11   with an idea called Sugar Planet.

12             Do you recall that?

13   A.    Yes, I do.

14   Q.    And he wanted royalties for that; correct?

15   A.    Yes, he did.

16   Q.    Now, his contract with MGA in October of 2000 or

17   September 2000 -- let me start over.

18             Your testimony is that that contract was in October

19   of 2000; correct?

20   A.    Yes.  October 4, 2000.

21   Q.    We'll get to looking at the contract in a second.  But

22   under that contract, whatever the date, he was to receive

23   royalties.

24   A.    That's correct.

25   Q.    And so here a few years -- here in May of 2001, he's

Page 1656

1  asking for royalties for another product?

2  A.   Yes.

3  Q.   And if we can go to the next page -- to the first page.

4  And let's look at your e-mail here.

5        I guess initially you're telling him he's asking

6  for too much.

7  A.   Yes, I think he was.

8  Q.   And you pointed out how 3 percent of numbers works.  You

9  talk 3 percent of 5 million is 150,000, et cetera.  3 percent

10 of zero is zero; right?

11 A.   Yes.

12 Q.   And then you write, "I wish I could be an inventor."

13 A.   In quotation mark.

14 Q.   "I mean it.  Starting in a couple of months, you will

15 have big fat checks coming to your house on Bratz, every

16 quarter.  No matter if MGA makes a profit or losses";

17 correct?

18 A.   That's correct.

19 Q.   And it's correct that, as the inventor, Mr. Bryant

20 actually received royalties on Bratz?

21 A.   As the person who had the contract with MGA who came up

22 with the drawings that became the ideas, the inspiration for

23 Bratz, yes, he did receive royalties.

24 Q.   And do you have an estimate as to Carter Bryant's

25 financial interest in Bratz?

Page 1657

1    A.    What do you mean by that?

2          MR. NOLAN:  Vague and ambiguous.

3          THE COURT:  Sustained.

4    Q.    BY MR. PRICE:  MGA has paid Carter Bryant royalties on

5    Bratz?

6    A.    Yes, they have.

7    Q.    Recognizing his contribution.

8    A.    Recognizing his contract with MGA.

9    Q.    Which recognizes his contribution; correct?

10   A.    He came up with the drawings, and later on, after the

11   contract was signed, yes, he came up with fashion designs and

12   accessory designs for the Bratz, and he received royalties on

13   the products that he had an input on.  Only on the product

14   that he had an input on did he receive royalties on.

15   Q.    And do you have some estimate on the amount of royalty

16   payments that Mr. Bryant has received?

17   A.    Yes.

18   Q.    And what's your estimate on Mr. Bryant's royalty

19   payments for his contribution?

20   A.    Over $30 million.

21   Q.    Now, let me go back to that September 1st meeting.

22   A.    I'm sorry.  Over $30 million from 2001 to now.

23   Q.    So let me go back to that September meeting.  You have

24   stated under oath that the way Mr. Bryant was brought forward

25   to you was because you instituted a sort of fashion doll

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1658

1   contest.

2   A.    I'm sorry?  Where do you say that I said that under

3   oath?  I was here when you played The Wall Street Journal,

4   and I think that's the only one I can recall.

5   Q.    Isn't it true that you have testified -- let me step

6   back.  Not only did you tell a Wall Street Journal reporter

7   that you had this sort of fashion doll contest that led to

8   Mr. Bryant being brought into MGA, you also said that under

9   penalty of perjury?

10  A.    If your question is did we had a fashion contest, yes,

11  we did have sort of fashion contests at MGA, which eventually

12  we settled on Carter Bryant's drawings that became the basis

13  of Bratz.

14  Q.    And let's be clear.  Prior to September 2000, there was

15  no fashion doll at MGA; correct?

16  A.    Well, if I adopt the definition that Ivy Ross gave to

17  fashion dolls, then yes, we did have a fashion doll.  Because

18  I remember her testifying that any doll that had hair and

19  clothing on it was a fashion doll.  But if you adopt the

20  definition which is in the industry, then no, we did not have

21  the fashion doll as of September 1, 2000.

22          MR. PRICE:  Just to be clear, your Honor, I'd like

23  to play from Mr. Larian's deposition page 24, line 14, to 25,

24  line 5.

25          THE COURT:  Any objection?

Page 1659

1          MR. NOLAN:  One moment.  Your Honor, I'd just like

2     to have it go through line 3 on page 26 for completeness.

3          MR. PRICE:  I believe 25, line 6, through 22 is

4     irrelevant to his answers and the questions that I was

5     asking.

6          THE COURT:  One second.  Let's play the entire

7     thing, 24, line 14, through 26, line 3.

8          DEPOSITION EXCERPT PLAYED.

9          "QUESTION:  At the time did MGA have a fashion

10         doll product?

11         "ANSWER:  I don't think we did.

12         "QUESTION:  Prior to your telling these folks

13         about this fashion doll contest, had MGA ever had a

14         fashion doll product?

15         "ANSWER:  I think I just answered that.  I

16         don't think we did.

17         "QUESTION:  I was asking about in the past.

18         Before I asked you at the time whether there was a

19         fashion doll.  This is a little bit different.  I'm

20         going backwards now.  At any time had MGA or its

21         predecessor company ever had a fashion doll

22         concept?

23         "ANSWER:  Not that I recall.

24         "QUESTION:  So would it be true to say -- I

25         take it Bratz is a fashion doll in your definition?

1      "ANSWER:  Some people call it a fashion doll.

2      Some people call it a small doll.

3      "QUESTION:  Did you regard it as a fashion

4      doll?

5      "ANSWER:  When?

6      "QUESTION:  When it was introduced.

7      "ANSWER:  No, I think we -- to the best of my

8      recollection, we considered it a small doll.

9      "QUESTION:  Okay.  So -- and to this day, you

10     don't regard it as a fashion doll, or you do?

11     "ANSWER:  It's a great doll.

12     "QUESTION:  Okay.  It's a great doll.  But do

13     you regard it as a fashion doll?

14     "ANSWER:  It can be a fashion doll.

15     "QUESTION:  Do you consider it such?

16     "ANSWER:  Right now, yes, I do.

17     "QUESTION:  Has Bratz ever had a fashion doll

18     product other than -- I'm sorry.  I'm going to do

19     that sort of thing.

20     "Has MGA ever had a fashion doll product at

21     any time other than Bratz?

22     "ANSWER:  Not that I recall."

23  Q.   BY MR. PRICE:  And so in September -- strike that.

24     So in 2000, not having a fashion doll product, your

25  testimony is that you started this sort of contest to tell

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1661

1    people to bring you the fashion doll concept?  That's your

2    testimony; correct?

3    A.   I did.  And again, we didn't have a fashion doll as of

4    September 1, 2000.  If you use the terminology that's really

5    used in the toy industry.  If you use what Ms. Ivy Ross

6    testified to, yes, I did.  Because we had dolls since 1997.

7    And I was sitting here, and I think Ms. Ivy Ross kind of put

8    all the dolls in the fashion doll category.

9            MR. PRICE:  I'll move to strike the last part of

10   the answer as nonresponsive.

11           THE COURT:  Stricken.

12   Q.   BY MR. PRICE:  And your testimony is, then, that you

13   specifically asked Paula Treantafelles and Kami Gillmour that

14   they were to go out and search for fashion doll ideas.

15   A.   And other people.

16   Q.   Those two in particular you recall asking; correct?

17   A.   To the best of my recollection, they were, designers

18   included, and Victoria O'Connor.

19   Q.   Those were the only two you specifically remember saying

20   we're going to have this sort of contest where you're going

21   to go out and bring in fashion doll ideas?

22   A.   Those were the two names that came to my mind when

23   Mr. John Quinn was taking my deposition, and those were the

24   names that I gave.

25   Q.   And by the way, you had an opportunity to read your

Page 1662

1  deposition transcript afterwards and make any corrections to

2  it?

3  A.   Yes, I did.

4  Q.   And, in fact, at the end of the deposition transcript,

5  there is a signature page where you say I've read this, and

6  everything in there is true except for where I've made

7  changes.

8  A.   I believe so.

9  Q.   And you didn't change those answers.  That is, that the

10 only people you recall, specifically recall telling about

11 this sort of fashion doll contest were Paula Treantafelles

12 and Kami Gillmour?

13 A.   There was no reason to change it.

14 Q.   And your testimony under oath was that this contest took

15 place somewhere between April and September of 2000?

16 A.   Yes.

17 Q.   And as a result of you telling Paula and Kami about this

18 contest to bring you fashion doll ideas, as a result of that,

19 that Paula brought you Bratz.

20 A.   No.

21 Q.   If we could look at page 26, lines 10 to 25.

22          Actually, your Honor, 26, line 10, to 27, line 6.

23          MR. NOLAN:  No objection, your Honor.

24          THE COURT:  To 27, line 6?

25          MR. PRICE:  Yes, your Honor.

Page 1663

1        THE COURT:  Very well.

2        DEPOSITION EXCERPT PLAYED.

3        "QUESTION:  After you talked to folks about

4    this sort of fashion doll contest, did Kami

5    Gillmour come back to you with any ideas?

6        "ANSWER:  Not that I recall.

7        "QUESTION:  Did Paula Treantafelles come back

8    to you with any ideas?

9        "ANSWER:  She brought Bratz, what was -- is

10   the idea that later on became Bratz.

11       "QUESTION:  Mr. Larian, did anyone else come

12   back to you with an idea for a fashion doll as a

13   result of your speaking to people about this sort

14   of contest?

15       "ANSWER:  Not that I recall.

16       "QUESTION:  So the only one who responded was

17   Paula, and she came up with the concept for Bratz;

18   is that right?

19       "ANSWER:  She showed me something that became

20   the idea for Bratz.

21       "QUESTION:  What was it that she showed you?

22       "ANSWER:  She set up an appointment on my

23   calendar, and a gentleman by the name of Carter

24   Bryant was in that meeting, and he showed me some

25   drawings at that meeting, and that was -- that was

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1664

1        the idea that became Bratz later on."

2   Q.   BY MR. PRICE:   Mr. Larian, you are aware that Ms. Garcia

3   has testified that she brought up the idea of a fashion doll

4   with you just days before September 1st?

5   A.   I'm not aware of her testimony.  My recollection and my

6   mind is very clear that I had asked people to come up with a

7   fashion doll idea.  And at the end, Bratz drawings that

8   Carter Bryant showed us in September 1, 2000, became the

9   basis, the inspiration for Bratz.

10  Q.   So if Ms. Garcia testified that she told you about this

11  fashion doll idea just days before September 1st, she would

12  be mistaken?

13  A.   Her recollection would be different than mine.

14  Q.   And if Ms. Garcia testified that there was no fashion

15  doll contest that she was aware of, again, she would be

16  mistaken?

17  A.   Her recollection would be different than mine.

18  Q.   And if Ms. Gillmour were to testify that there was no

19  fashion doll contest that she was aware of, then she would be

20  mistaken?

21  A.   Her recollection would be different than mine.

22  Q.   Sir, is it true that you made up this story under oath

23  about this fashion doll concept so you would get some credit

24  for the inspiration in the creation of Bratz?

25  A.   I did not make up any stories.

Page 1665

1   Q.   Well, you said there was this contest.  So what sort of

2   prize was there?  What did Ms. Garcia get for winning this

3   contest that you say that you created?

4   A.   There was no prize.

5   Q.   Well, for this contest that you created, is there

6   anything in writing, an e-mail, a note, a scrap of paper,

7   anything that supports your story that you were the one who

8   inspired your employees to go out and look for fashion dolls

9   to bring to MGA?

10  A.   Not that I recall.  Not that I know of.

11  Q.   Going back to the September 1st meeting, if we go to

12  Exhibit 1-A, which is in evidence, Isaac Larian says he chose

13  Mr. Bryant's idea for the Bratz over several others after

14  holding a sort of fashion doll design contest in late 1999.

15          Do you see that?

16  A.   I do.

17  Q.   And that's what you told the reporter.

18  A.   Well, you have been listening to the way I talk for the

19  past two, three hours.  That's not how I talk.  So she

20  probably paraphrased what I told her.  That's not exact

21  quotation what I said.

22  Q.   But it's the gist of what you said, that you chose

23  Mr. Bryant's idea over several others after holding a sort of

24  fashion doll contest in late 1999.  That was the substance of

25  what you said.

Page 1666

1  A.   I don't recall that conversation or that interview with

2  her.  I know that I had an interview with her.  I don't

3  recall the conversation.

4  Q.   Well, tell us about the several other fashion doll ideas

5  that resulted from this sort of contest.

6  A.   All I can tell you is that at the end, what we came up

7  with was the fashion doll with Bratz.  All the other ideas

8  that were being shown to us were kind of similar to Barbie,

9  and we didn't want to have anything to do with Barbie.

10  Q.   Well, no, I'm asking as a result of this sort of fashion

11  doll contest, can you tell me a single idea that came to you

12  as a result of your telling your employees, "I want this

13  fashion doll contest"?

14  A.   Not that I recall.  Apparently they were not good enough

15  for me to recall.

16  Q.   You realize, of course, that Ms. Garcia did not start at

17  MGA until April of 2000?

18  A.   That's correct.  She started April 2000.

19  Q.   Do you have somewhere in a file or something in writing

20  where there are these other submissions of these false dolls

21  as a result of your sort of contest?

22  A.   Not that I know of or I recall sitting here, no.

23  Q.   Do you have any explanation as to why the two people

24  that you specifically say you told about this contest say it

25  didn't happen?

4a7976b7-80f1-4fdf-aea0-ab993789aba7

Page 1667

1    A.    I have no idea.  The only reason I have is their

2    recollection is different than mine.  I heard Victoria

3    O'Connor say that I had asked her to go out and look for

4    fashion dolls.  And she was your witness.

5    Q.    Do you agree with the earlier e-mail you saw that if

6    it's not in writing, you didn't say it?

7    A.    I'm sorry?

8    Q.    Do you remember the earlier e-mail we saw?

9    A.    Yes.

10   Q.    Do you agree with that?  With the e-mail where you told

11   your employees if it's not in writing, you didn't say it, it

12   didn't happen?

13   A.    What I said in that e-mail?

14   Q.    Do you agree with that?  If it's not in writing, you

15   didn't say it, it didn't happen?

16   A.    That e-mail, the context of that e-mail was that people

17   were telling other people that I had approved for them to

18   spend money here, spend money here, make a product that I did

19   not approve for them to do.  And so I just wanted to, A, have

20   a sense of humor, and B, let them know that if you want my

21   approval on a product or expenditure, if I have not approved

22   it in writing, then I didn't approve it.  It had nothing to

23   do with this context here.  You are just connecting two

24   things that have no relationship to each other.

25              MR. PRICE:  I would like to move on to another

Page 1668

1    topic.

2           THE COURT:  Very well.  We'll adjourn for the day.

3    We'll have the jury back tomorrow at 9:00.

4

5           (Proceedings concluded at 4:55 P.M.)

6

7

8                  C E R T I F I C A T E

9

10

11          I hereby certify that pursuant to Title 28,

12   Section 753 United States Code, the foregoing is a true and

13   correct transcript of the stenographically reported

14   proceedings in the above Mattel.

15          Certified on June 5, 2008.

16

17

18                    _____
                      MARK SCHWEITZER, CSR, RPR, CRR
                      Official Court Reporter
19                    License No. 10514

20

21

22

23

24

25

4a7976b7-80f1-4fdf-aea0-ab993789aba7