Page 1753

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

---

MATTEL, INC.,                    :   PAGES 1753 - 1888
                                 :
          PLAINTIFF,             :
                                 :
     VS.                         :   NO. ED CV04-09049-SGL
                                 :   [CONSOLIDATED WITH
MGA ENTERTAINMENT, INC.,         :   CV04-9059 & CV05-2727]
ET AL.,                          :
                                 :
          DEFENDANTS.            :


REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

FRIDAY, JUNE 6, 2008

JURY TRIAL - DAY 9

AFTERNOON SESSION


MARK SCHWEITZER, CSR, RPR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
181-H ROYBAL FEDERAL BUILDING
255 EAST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012
(213) 663-3494

Page 1754

1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4        Quinn Emanuel
         By John B. Quinn, Esq.
5            B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
6            Harry Olivar, Esq.
             John Corey, Esq.
7            Diane Hutnyan, Esq.
             William Price, Esq.
8        855 South Figueroa Street
         10th Floor
9        Los Angeles, CA 90017
         (213) 624-7707

10

11

12   On Behalf of MGA Entertainment:

13       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
         300 South Grand Avenue
17       Los Angeles, CA 90071-3144
         (213) 687-5000

18

19

20

21

22

23

24

25

Page 1755

1                        I N D E X

2    ISAAC LARIAN, PREVIOUSLY SWORN....................... 1764

3    DIRECT EXAMINATION (CONTINUED) BY MR. PRICE:......... 1764

4                      E X H I B I T S

5    (Exhibit 593, Pages 2 and 3, received.)............... 1773

6    (Exhibit 16789 received.)............................ 1782

7    (Exhibit 1762 received.)............................. 1785

8    (Exhibit 11276 received.)............................ 1786

9    (Exhibit 11277 received.)............................ 1789

10   (Exhibit 11245 received.)............................ 1795

11   (Exhibit 12 received.)............................... 1798

12   (Exhibit 10, Page 1, received.)...................... 1802

13   (Exhibit 11336 received.)............................ 1813

14   (Exhibit 11203 received.)............................ 1823

15   (Exhibit 13223, Page 2, last paragraph, received.).....1834

16   (Exhibit 13223, Page 3, paragraphs 2 and 6 received.)..1836

17   (Exhibit 633 received.).............................. 1850

18   (Exhibit 4941 received.)............................. 1852

19   (Exhibit 947, paragraph 8, received.).................1862

20

21

22

23

24

25

Page 1756

1        Riverside, California; Friday, June 6, 2008

2                        1:35 P.M.

3        (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

4              THE COURT:  There's a matter to be taken up outside

5    the presence of the jury?

6              MR. PROCTOR:  Two matters.  First, I believe the

7    Court has received a letter from a third party witness whose

8    name is Andreas Koch.  He is someone who was deposed in this

9    case.  We subpoenaed him to testify.  We intended to have him

10   testify in week one.  He was here for one full day, was not

11   able to get on the stand when Ms. Garcia's testimony went

12   longer than expected.

13             He is now saying or stating that he is unavailable

14   basically until after Mattel is to have rested this case.

15   He's out of town all this week, and then he's got, I believe

16   it's trade shows, for the next two full weeks.  He's

17   available on Monday, but, of course, the court is dark on

18   Monday.

19             We have agreed -- the letter is dated June 3rd.  It

20   was submitted to the Court, a copy to myself and Mr. Nolan.

21             THE COURT:  I don't know if I have that, but I'll

22   ask Mr. Holmes when he gets back in here.  It doesn't sound

23   familiar.

24             MR. PROCTOR:  Okay.  He was deposed.  Mattel has no

25   problem presenting his testimony by video.  I believe

1    Mr. Nolan does object to that.  So we're looking for guidance

2    from the Court.

3              THE COURT:  You have legally sufficiently

4    subpoenaed him to testify?

5              MR. PROCTOR:  We have.

6              THE COURT:  And how long do you anticipate his

7    testimony to be?

8              MR. PROCTOR:  Our direct would be fairly brief,

9    probably less than half an hour.

10             THE COURT:  Mr. Nolan?

11             MR. NOLAN:  Your Honor, he is under lawful

12   subpoena.  He lives in Manhattan Beach.  I know he's been

13   inconvenienced.  A lot of our people have been

14   inconvenienced.  That's how it is.  Your Honor, I point out

15   that he is represented by counsel that we understand he

16   admitted at his deposition is being paid for by Mattel.

17   We'll work on this issue if there's a way around it.  This

18   was the issue that Mr. Zeller brought up about how far he may

19   want to go in and talk about the style of the work at MGA and

20   those type of things.

21             If all of that is out, there's just a very discrete

22   portion of the video deposition that, know, could be played

23   in its substitution, but we need to work that out with them.

24   If that's what they intend to put him on for, we would have

25   an objection because all they want to do is blast MGA, and

1    the life-style there, I guess.  That's what I understand.

2            And from Mr. Zeller's comments, he was saying he

3    was still reserving.  So maybe we could work this out.  I

4    think he's under subpoena, your Honor.  I think we'd be

5    willing to interrupt a witness if he's only going to be 15 or

6    20 minutes or a half hour.  We can make those kind of

7    accommodations, but we're having these kinds of problems with

8    other witnesses, too.

9            THE COURT:  I certainly am reluctant -- not

10   reluctant.  I would certainly prefer to use the U.S. Marshals

11   only when necessary.  So I would appreciate every effort be

12   made to accommodate the witness and the witness accommodate

13   the court; however, if he's under legal process and is

14   failing to appear, as directed by counsel, the Court will

15   take appropriate steps.  But it sounds like you have not

16   exhausted the efforts to work out either an arrangement with

17   yourselves or with the witness.  Is the Court's perception

18   correct?

19           MR. PROCTOR:  I don't believe that's right.  I

20   proposed -- I spoke to his counsel.  I said that Mattel would

21   be willing to present his testimony by video.  We would

22   discuss it with the other side.  I did that.  Mr. Nolan told

23   me unequivocally no, we want him here live.  If the Court

24   orders that he must appear live, I can pass that information

25   on to his counsel, and I'm sure -- I believe that coercion

Page 1759

1    will not be necessary at that stage.  I did want to attempt

2    to present this testimony by video if Mr. Nolan were to agree

3    to do that.

4         THE COURT:  If you are calling for an order, the

5    Court would provide such an order.  I would want a date and

6    time certain, however, for appearance.  What would your

7    suggestion be, Counsel?

8         MR. ZELLER:  If we may, your Honor, let's consult

9    with his counsel.  And he says he is going to be gone,

10   apparently.  I'm not sure how far.  We have the letter.  And

11   just in response to Mr. Nolan's comment about Mattel paying

12   fees, that is correct for this lawyer.  But the reason is

13   because Skadden at his deposition adjourned the deposition,

14   insisting that he get a letter.  And so --

15        THE COURT:  Whatever.  It sounds like the Court's

16   perception was correct, that you have not exhausted -- you

17   are either asking for an order or not.  Are you asking for an

18   order?

19        MR. ZELLER:  I think that we are asking for a court

20   order.

21        THE COURT:  What time and date are you asking for?

22        MR. ZELLER:  That's what I don't know.  And that's

23   the point at which I would ask the Court that perhaps the

24   next break, we can reconvene and see if there's something

25   that can potentially be done.  We would like him here on

Page 1760

1    Tuesday.  But I don't necessarily want to just simply,

2    without addressing it with his counsel, seeing if he's going

3    to be out of the country or something on Tuesday.  That

4    would --

5              THE COURT:  Why don't you address it with his

6    counsel and get back to the Court later today.

7              MR. ZELLER:  So I think just to be clear, we would

8    like an order.  We just don't know the time.

9              THE COURT:  Very well.

10             MR. ZELLER:  Thank you, Judge.

11             THE COURT:  Mr. Nolan, anything further on this

12   point?

13             MR. NOLAN:  Your Honor, my only point is if they

14   would submit to us a designated video of what they would

15   intend to play, then maybe we'd have a better shot as trying

16   to work out something where we wouldn't have to ask the Court

17   to intervene.

18             THE COURT:  I'll leave that up to you, Counsel.

19             MR. ZELLER:  Another administrative matter, your

20   Honor, is that we would like leave to file a motion -- a

21   motion for leave for some expert reports concerning the

22   electronic media that the Court had recently ordered produced

23   and that our experts have been analyzing.

24             These relate to the Elise Cloonan media as well as

25   Isaac Larian's hard drives.

Page 1761

1          THE COURT:  So you want your experts to be able to

2     take a look at these?

3          MR. ZELLER:  They already have, your Honor.

4          THE COURT:  What are you seeking specifically?

5          MR. ZELLER:  We would like to be able to file a

6     motion.  Of course, at the Court's direction, we cannot file

7     motions without prior leave.  This would be a motion for

8     leave to serve their expert reports and to add them to our

9     witness list.

10          THE COURT:  I mean, this is the difficulty of

11     having discovery going on in the course of the trial.

12     Without resolving the issue of whether the Court will grant

13     such leave for the filing of a report or the reports, I will

14     give you leave to file a brief motion not to exceed five

15     pages, and, of course, Mr. Nolan, you may respond.

16          MR. NOLAN:  Thank you.

17          MR. ZELLER:  Thank you.

18          THE COURT:  There's not much point, obviously, in

19     ordering discovery produced if the discovery cannot be used.

20          MR. ZELLER:  That would be our viewpoint, your

21     Honor, and we will expect making a showing as to why we're

22     entitled to present this evidence.

23          THE COURT:  See if you can't talk to Mr. Nolan

24     about coming up with a way of dealing with this short of --

25     because then, if you're going to be asking to submit expert

Page 1762

1   reports, I suspect the next thing I'll be hearing is a

2   request to submit rebuttal expert reports.

3            MR. ZELLER:  I would imagine.

4            THE COURT:  So see if there may be some way, given

5   the posture of this case at this particular time, that this

6   can be short-circuited.

7            MR. ZELLER:  Certainly we'll talk to them further,

8   your Honor, but the Court may recall that a couple of days

9   ago we actually did raise this issue.  We have tried to at

10  least with respect to some of it that was already -- we

11  provided the report.

12           THE COURT:  Well, now you and Mr. Nolan have the

13  benefit of the Court's comments.

14           MR. ZELLER:  Correct.

15           THE COURT:  Very good, Counsel.

16           Anything else to be taken up before we bring the

17  jury in?

18           Very well.  One last thing, and perhaps, Mr. Quinn,

19  you can help the Court with this.  I want to get this order

20  out the door.  What was the date of the settlement agreement

21  with Carter Bryant?

22           MR. ZELLER:  I do not know that offhand.  I can get

23  that fairly quickly.

24           THE COURT:  Could you, please.

25           MR. ZELLER:  I will.

Page 1763

1          THE COURT:  Thank you.

2          MR. NOLAN:  The last point for us is that

3    apparently they have indicated to us that they want to bring

4    in a witness on Tuesday, Bryan Armstrong, who is a paralegal

5    handling copyright applications, for the sole purpose of

6    introducing copyright applications.  And I think that in the

7    context of one of the video depositions that were played, I

8    think you sustained certain objections with respect to that,

9    the filing of the copyright applications, that this was just

10   Phase 1 issues.  And we just wanted to maybe reserve the

11   opportunity, whether or not today or before Mr. Armstrong is

12   called, to raise this issue outside the presence of the jury

13   with you.

14         THE COURT:  You did introduce a number of copyright

15   applications yesterday.

16         MR. NOLAN:  That was with respect to Lucy Arant

17   with respect to her credibility, since she had personally

18   signed those applications, and they were impugning her --

19         THE COURT:  Let me take this up in the context of

20   the witness.

21         Let's move on with Mr. Larian's testimony.

22         MR. QUINN:  Settlement agreement, May 18th.

23         THE COURT:  May 18th.  Thank you, Counsel.

24         MR. PRICE:  And, your Honor, could you give us the

25   time allocations today?

Page 1764

1    THE COURT:  Total time used at this point?

2    MR. PRICE:  Yes.

3    THE COURT:  Right now 12 plus 8, so 20 hours and 40

4  minutes by Mattel and approximately 12 hours and 5 minutes by

5  MGA.  Approximately.

6    MR. PRICE:  Thank you.

7    (WHEREUPON THE JURY ENTERS.)

8    THE COURT:  Counsel, you may proceed.

9    ISAAC LARIAN, PREVIOUSLY SWORN.

10    DIRECT EXAMINATION (CONTINUED)

11  BY MR. PRICE:

12  Q.   Good afternoon, Mr. Larian.

13  A.   Good afternoon.

14  Q.   I want to go back in the time frame now to September of

15  2000, when you had a meeting with Mr. Bryant.  That month, of

16  course, it was your understanding that entire month he was

17  working for Mattel?

18  A.   Yes.

19  Q.   So that month after this meeting did you have further

20  communications with Mr. Bryant after this September 1st

21  introduction?

22  A.   Personally, I think the only one I recall is that I made

23  a phone call to him at home sometime in October, to the best

24  of my recollection, to negotiate the terms of the contract.

25  Q.   You said October.  I'm referring to September, when you

Page 1765

1   knew he was a Mattel employee.  Did you have -- after the

2   September 1st meeting, did you have conversations with

3   Mr. Carter about anything in the month of September?

4   A.   I don't recall one way or another.  I might have; I

5   might not have.  I don't recall.

6   Q.   What kind of conversations would you have been having

7   with him?

8   A.   Again, if I don't recall it, I don't know what type of

9   conversations.

10  Q.   All right.  To clarify, I mean, you don't recall any

11  conversations with Mr. Bryant after September 1st, from

12  September 1st to October?

13  A.   From September 1st to October?

14  Q.   Yes.

15  A.   I don't recall.  It could be, but I don't recall.

16  Q.   It's fair to say you agree that he should not be working

17  for MGA in any way in that time frame?

18  A.   That's correct.

19  Q.   MGA at that time had a -- what was its general phone

20  number?  If you just wanted to call MGA, do you recall what

21  that extension was?

22  A.   Yes, I do.

23  Q.   What was that?

24  A.   The general number at MGA is (818) 894-2525.

25  Q.   Is there some way to go directly to your phone?

Page 1766

1    A.    Yes.

2    Q.    How would you do that?

3    A.    My direct phone number is (818) 894-3150.

4    Q.    So if someone called that 3150 extension, would that

5    ring directly to your office?

6    A.    My secretary's office.  It would ring my secretary's

7    office.

8    Q.    Would it also ring in your office?  It just had to be

9    picked up by the woman who is your secretary?

10   A.    My secretary picks it up.  And usually my secretary

11   picks it up and checks who the person is before she sends it

12   to me.

13   Q.    And so that phone number, to clarify, (818) 894-3150;

14   correct?

15   A.    That's correct.

16   Q.    And again, during the entire month of September, you

17   knew that Mr. Bryant worked at Mattel during the day;

18   correct?

19   A.    I did.

20   Q.    So, for example, if you got direct calls to your direct

21   line in the afternoon, say, at 3:00 P.M., or 4:00 P.M., you

22   would understand that Mr. Bryant was calling you from his

23   work at Mattel?

24   A.    Not necessarily.  Could have been on vacation.  He could

25   have been out sick.  I have no idea if he was calling me from

Page 1767

1    Mattel or not.  There's no way to know if he was calling me

2    from Mattel or not.

3    Q.   If he were calling you in the middle of the day and you

4    had the understanding that he shouldn't be doing any work for

5    MGA during the month of September, certainly you would ask

6    him, it's the middle of the day, aren't you at work?

7    A.   I did not ask that kind of question.

8    Q.   Certainly you can't deny that Mr. Bryant called you

9    during the month of September from his office at Mattel to

10   your direct line at MGA?

11   A.   I cannot deny or not deny.  He might have.  I just don't

12   know.

13   Q.   If you look at Exhibit 30, which I believe is already in

14   evidence -- this is already in evidence.  It's Exhibit 30.

15   It's dated September 18, 2000, from Mr. Bryant to a

16   Mr. Kinuyo?

17   A.   That's what it says.

18   Q.   Have you found it?

19   A.   Yes.

20   Q.   And my first question is prior to this trial, had you

21   ever seen this letter before?

22   A.   No, I have seen it during this trial.

23   Q.   Did Mr. Bryant call you at your office just a couple

24   days after this letter?

25   A.   I have no idea.

Page 1768

1    Q.   In the letter, it says:   "The company I am working with

2    is called MGA Entertainment, and we are located in

3    Los Angeles, California"?

4    A.   I do see that.

5    Q.   You'll agree that it would have been inappropriate for

6    Mr. Carter to contact vendors in September of 2000 saying

7    that he was working with MGA Entertainment?

8    A.   Yes, it would be inappropriate.

9    Q.   And you see this is regarding ordering a supply of

10   Hollow Saran Hair fiber.

11           Do you see that?

12   A.   Yes.

13   Q.   By the way, do you know if in fact MGA paid for the

14   Hollow Saran Hair fiber which Mr. Bryant ordered in

15   September?

16           MR. NOLAN:   Objection, your Honor.   Lack of

17   foundation.   Misstates the document.

18           THE COURT:   Lay a foundation.

19   Q.   BY MR. PRICE:   You know whether or not there actually

20   was Hollow Saran Hair fiber ordered by Mr. Bryant on behalf

21   of MGA in September of 2000?

22   A.   I have no idea.

23   Q.   Did you approve the invoices that were paid by MGA?

24   A.   When?

25   Q.   In -- I'm sorry.   Good question.   In the September,

Page 1769

1    October time frame?

2    A.   Not necessarily.  Over certain amount.

3    Q.   You see here where September 2000, Mr. Bryant says MGA

4    Entertainment, attention Carter Bryant, and there's an

5    address there in Gardena, California.

6            Do you see that?

7    A.   I do.  That's not MGA's address.

8    Q.   That was going to be my next question.  That's not MGA's

9    address; right?

10   A.   It is not.

11   Q.   And you agree that it would have been inappropriate for

12   Mr. Carter to be representing that the address of MGA

13   Entertainment was 1319 West 160th street, Gardena,

14   California?

15   A.   Yes.

16   Q.   Now, you have an understanding that Mr. Bryant in this

17   August/September time frame was also asked by

18   Ms. Treantafelles to draw some angel heads to be used to try

19   to come up with the head of a doll?

20   A.   I have no understanding of that.  I have no idea if she

21   did ask him or not.

22   Q.   You would agree that that also would be inappropriate,

23   that is, for Ms. Garcia to ask a Mattel employee to provide

24   her with drawings that might be used for a doll for MGA?

25   A.   If she knew that he was working at Mattel and she did

1  that, it would be inappropriate.  I would not have approved

2  that.

3  Q.   And, of course, it's your understanding that, at least

4  as of September 1st, she knew he worked at Mattel.

5  A.   I knew that -- I knew on September 1st that he worked at

6  Mattel.  He told me that.

7  Q.   Well, he told you that in your office.

8  A.   That's correct.

9  Q.   And Ms. Garcia was there.

10  A.   I believe she was.

11  Q.   And, in fact, you've told us he not only told you he was

12  working for Mattel, he talked about when he created the

13  drawings.

14  A.   That's correct.  When I asked him.

15  Q.   So how long would the conversation that you had about

16  his employment at Mattel and whether he created the drawings

17  at Mattel, how long did you discuss that in this meeting

18  September 1st?

19  A.   I don't recall exactly how many minutes.  30 to 45

20  minutes we spent on that.  Again, I recall that the whole

21  meeting took maybe half an hour to 45 minutes maximum, to the

22  best of my recollection.

23  Q.   I want to show you what we've marked as Exhibit 393.

24  A.   In this book I'm not finding it.

25  Q.   I'm going to bring it up to you.  It's a separate

Page 1771

1    document.

2    A.    Okay.

3            MR. PRICE:   Your Honor, may I approach?

4            THE COURT:   Yes, you may.

5    Q.    BY MR. PRICE:   You've had a chance to look at

6    Exhibit 393?

7    A.    I have.

8    Q.    Have you ever seen 393 before?

9    A.    I have not.

10   Q.    Let me show you what we'll mark as Exhibit 593 for

11   identification.

12           Do you see Exhibit 593?

13   A.    I do.

14   Q.    And do you recognize this as being an invoice?

15   A.    It says on the top.

16   Q.    And look at the second page.   Do you see something which

17   purports to be a purchase order?

18   A.    It does.

19   Q.    And if you look at this purchase order, is that the

20   format of purchase orders at MGA Entertainment?

21   A.    I have no idea.

22   Q.    You've never seen purchase orders at MGA Entertainment?

23   A.    I have seen different versions.   But I don't recall

24   this.

25   Q.    The purchase orders that you've seen, have they been in

Page 1772

1    a format that you see on the second page of Exhibit 593?

2    A.   I don't recall.  I remember what we have now.  I don't

3    recall at that time.

4    Q.   Can you tell me, if you look at the third page,

5    something which purports to say requisition.  Does this

6    appear to be a requisition form that MGA used in the

7    August/September 2000 time frame?

8    A.   I don't know one way or another.  It doesn't say MGA on

9    it.

10   Q.   Well, do you know who a Klegg, K-L-E-G-G, is?  You see

11   that name on the requisition, page 3?

12   A.   I have no idea.  I don't know anybody by the name of

13   Klegg.

14   Q.   Okay.  Well, look at the first page.  Paula

15   Treantafelles, you knew her.

16   A.   Yes.

17   Q.   Did you know a Kerri Brode?

18   A.   I do know a Kerri Brode.

19   Q.   And was her name before she got married Kerri Legg?

20   A.   I wouldn't know.

21          MR. PRICE:  Do you know -- I'll go ahead and move

22   Exhibit 593 in evidence.

23          MR. NOLAN:  Your Honor, lack of foundation.

24          THE COURT:  Lay a further foundation, Counsel.

25          I'm sorry?

Page 1773

1    MR. NOLAN:  If the first page was removed from it,

2    we would not object to the second two pages coming in as a

3    business record of MGA.

4    THE COURT:  You can lay further foundation for the

5    first page, Counsel, if you wish.

6    MR. PRICE:  I will try.  At this point I would move

7    in pages 2 and 3.

8    THE COURT:  No objection to that?

9    MR. NOLAN:  No objection.

10   THE COURT:  They are admitted.

11   (Exhibit 593, Pages 2 and 3, received.)

12   Q.   BY MR. PRICE:  So first let's then look at the second

13   page.  Do you see the date on the second page, September

14   28th, 2000?

15   A.   I do.

16   Q.   And perhaps could you tell us what is a purchase order?

17   A.   Purchase order is the purchase order.

18   Q.   When you're buying something from someone?

19   A.   That's correct.

20   Q.   And your company MGA is, at this time at least, was

21   actually ABC International Traders, Inc., doing business as

22   MGA Entertainment; correct?

23   A.   That's correct, to the best of my recollection, yes.

24   Q.   And you had an L.A. main warehouse on Schoenborn Street?

25   A.   We did.

Page 1774

1   Q.   And you see there's a section here which talks about

2   date requested, quantity ordered.

3            Do you see that?

4   A.   I do.

5   Q.   And there was a total bill here of about $162?

6   A.   And 38 cents.  It's 36 or 38.  I can't see.

7   Q.   And you see the name here, Carter Bryant?

8   A.   I do.

9   Q.   You'll agree that Mr. Bryant's name should not be in a

10  purchase order from MGA in the September time frame?

11  A.   If he was working at Mattel, no, he should not have been

12  doing any work for MGA.

13  Q.   And you knew he was working for Mattel in September.

14  A.   On September 1, 2000, I did.

15  Q.   In fact, you knew throughout the month of September he

16  was working for Mattel.

17  A.   That's correct.

18  Q.   It's your understanding everybody at that meeting with

19  you on September 1st knew he was working at Mattel.

20  A.   To the best of my recollection, yes.  I knew for sure.

21  Q.   And if we look at the third page in evidence here, could

22  you tell the jury what a requisition is?

23  A.   I have no idea.

24  Q.   Perhaps -- well, if you have no idea, we'll go ahead and

25  skip this.

1           Did you yourself in phone conversations that you

2     had -- strike that.

3           In conversations you had with Mr. Bryant in

4     September talk to him about doing sketches for other MGA

5     dolls other than Bratz?

6     A.   I did not.

7           MR. PRICE:  Your Honor, at this time I would like

8     to read into the record, and I'll show to Mr. Nolan, an

9     Interrogatory.

10          THE COURT:  Any objection?  Why don't you state for

11    the record what the Interrogatory is, Mr. Price.

12          MR. NOLAN:  We have no objection, your Honor, both

13    to the Interrogatory and to the response.

14          THE COURT:  Very well.  You may do so.  Clearly

15    state what it is.

16          MR. PRICE:  It's a Supplemental Interrogatory.

17    Your Honor, it's been pointed out to me this is the first

18    time we've used an Interrogatory in response to an answer.

19    So I'm wondering if you might explain to the jury what it is.

20          THE COURT:  Very well.  As part of the discovery

21    process, the parties are afforded leave to submit

22    Interrogatories, which is essentially questions to the other

23    side.  The other side is obliged to respond to the question.

24    That question has been certified as accurate, and it, once

25    introduced without objection into the record, it can be

Page 1776

1   treated by you as evidence.  It is entirely up to you as to

2   how much weight to give to that evidence as it is with any

3   evidence that you hear.

4        Counsel.

5        MR. PRICE:  Thank you, your Honor.  First, with

6   Mr. Nolan's agreement, I'm going to read a definition of a

7   term in the Interrogatory.  The term test project.  Test

8   project means any design, project, assignment, or other work

9   of any kind created, developed, improved upon, or performed

10  by any candidates, interviewee, applicant, or prospective or

11  potential employee or independent contractor in advance of,

12  in consideration of, or otherwise as part of or in connection

13  with any interview or interviewing process for employment or

14  contracting or potential employment or contracting of any

15  kind.

16       That's the definition of test project.

17       The Interrogatory to MGA is:  "Identify fully and

18  completely each and every test project that you caused, had,

19  requested, asked, or solicited any person to perform during

20  the time period January 1, 1998, through December 31, 2004,

21  inclusive.  And identify all persons with knowledge thereof

22  and all documents that refer or relate to such test project."

23       MGA's response:  "MGA does not contend that it

24  caused, had, requested, asked, or solicited Bryant to perform

25  a test project."

Page 1777

1   Q.   So again, talking about what was going on in September,

2   if you'd look at Exhibit 305.

3           And this is already in evidence, your Honor.

4           THE COURT:  Very well.

5   Q.   BY MR. PRICE:  Have you found 305, sir?

6   A.   I'm sorry.  I don't find it in here.  Maybe I can just

7   look.

8   Q.   Sure.  If you can view that and it's easier for you.

9   A.   Request you blow that up, please?

10  Q.   Which part would you like blown up?

11  A.   I cannot see -- if I could find it in here, that would

12  be even better.  All right.  I'm sorry.  I have it.

13  Q.   Let's first go to the top here.  You say -- this is an

14  e-mail that you sent to Victoria O'Connor and Dennis Medici;

15  is that right?

16  A.   Yes.

17  Q.   Regarding Carter compensation?

18  A.   Yes.

19  Q.   And you see Paula Treantafelles has stated here:  "I

20  would say that Carter has worked an average of about four

21  hours a day, and we began working on this line the first part

22  of September."

23           Do you see that?

24  A.   I do.

25  Q.   And then Ms. O'Connor asked you:  "Do you want to start

Page 1778

1   his salary for the month of October since he began in

2   September?  Please advise."

3              Do you see that?

4   A.    I do.

5   Q.    And you say from the day he signed the contract.

6   A.    That's correct.

7   Q.    Actually, under this contract, Mr. Carter wasn't paid by

8   the hour, was he?

9   A.    No, he was not.  The contract that he had with MGA.

10  Q.    Let me clarify.  Under the contract he had with MGA, he

11  wasn't paid by the hour.

12  A.    That's correct, he was not.

13  Q.    And, in fact, under the contract he had with MGA, he

14  wasn't paid a salary.

15  A.    No, he was paid -- because he was not an employee.  He

16  was paid, I believe, $5,000 a month per the contract for the

17  first -- I don't remember the exact term.

18  Q.    Let's help you out.  If you look at Exhibit 15, and this

19  is the contract between Mr. Bryant and MGA dated as of

20  September 18, 2000.  We can go to the second page, where it

21  refers to paragraph 4.  Compensation and costs?

22  A.    I see that.

23  Q.    What Mr. Carter was to be paid was not a salary but an

24  advance; is that right?  You see for the first six months of

25  the term of this agreement:  "MGA shall pay Bryant for his

Page 1779

1    services at the rate of $5,500 per month.  For the next three

2    months of the term, MGA shall pay Bryant for his services at

3    the rate of $5,000 per month."

4    A.   I see that.

5    Q.   "All sums paid to Bryant as monthly feels shall be

6    deemed to be nonrefundable, fully recoupable advances against

7    any royalties that may be payable to Bryant pursuant to

8    paragraph 4-B below."

9         Do you see that?

10   A.   I do.

11   Q.   So it didn't matter in terms of how much money

12   Mr. Bryant was going to receive from MGA.  It didn't at least

13   matter directly how many hours he worked.

14   A.   I'm sorry.  I don't think I understand your question.

15   Q.   It wasn't that clear.

16        In terms of what Mr. Bryant was to be paid, it

17   doesn't matter how many hours he worked.

18   A.   As of October 4, when he signed the contract?

19   Q.   As of the time he was under a contractual relationship

20   with MGA.

21   A.   As of October 4, my feeling was, understanding, whether

22   he's going to work full time on the Bratz project.

23   Q.   But my question, sir, is the compensation, the amount of

24   hours he worked did not affect the advance that he received;

25   correct?

Page 1780

1    A.    I'm sorry.  I still don't understand the question.

2    Q.    This advance that you are giving him, the advance

3    against his royalty.

4    A.    That's correct.

5    Q.    He gets that advance if he works 40 hours a week or 30

6    hours a week or whatever; correct?

7    A.    That's correct, as a free-lancer, yes, definitely yes.

8    Q.    And paragraph B:  "MGA shall pay to Bryant a royalty of

9    3 percent."

10           Do you see that?

11   A.    That's correct.

12   Q.    And the way this would work, then, was if, for example,

13   that 3 percent came to 35 million and you already paid him

14   5,000, you would only have to pay him 29,995,000?

15   A.    Your math is better.  I don't think 35 million less

16   $5,000 counts to 29 million.  So maybe it's your math which

17   is mistaken.

18   Q.    I could be off.  But you'd subtract $5,000 from

19   whatever he's owed in his royalty?

20   A.    It comes out, that's correct.

21   Q.    If we could go to the first page of the contract.

22           If you look at this paragraph here, the first

23   paragraph, retention as consultant/services.

24           Did you have a provision in here that it is

25   understood and agreed that Bryant shall provide his services

Page 1781

1    on a top priority basis as his services pertain to other

2    clients of Bryant?

3              Do you see that?

4    A.    I do.

5    Q.    So that if he's working as a consultant with other

6    people, his top priority is to be MGA.

7    A.    Absolutely.

8    Q.    So if we can go back to 305, then.  It's correct to say,

9    sir, that however many hours Mr. Bryant worked -- whether it

10   be September, October, or whatever -- had nothing to do with

11   what he would get in terms of an advance; correct?

12   A.    Against the contract, no.  And if he was working in

13   September, in my opinion, if he was doing any work in

14   September for Bratz or MGA, he should not have been doing it.

15   It's a bad judgment on his side.

16   Q.    Well, or on MGA's side by asking -- if they asked him to

17   work.

18   A.    Or on Paula's side, yes.  If Paula asked him to do that,

19   she was wrong.

20   Q.    And then in October, if you could look at Exhibit 16789.

21   A.    Yes, sir.

22   Q.    Do you recognize Exhibit 16789 as an e-mail between

23   you -- well, the top e-mail is between you and Ms. O'Connor

24   and Ms. Treantafelles?

25   A.    Yes.

Page 1782

1    Q.   And you see at the bottom there's an e-mail between you

2    and also Ms. Treantafelles and Victoria O'Connor.

3         Do you see that?

4    A.   Yes, I do.

5         MR. PRICE:  Your Honor, move 16789 into evidence.

6         MR. NOLAN:  No objection.

7         THE COURT:  It's admitted.

8         (Exhibit 16789 received.)

9    Q.   BY MR. PRICE:  And let's again look at this section

10   here.  Now, you see this appears to be to Paula and Victoria

11   about Bratz.

12   A.   Yes.

13   Q.   And the importance is high.

14        Do you see that?

15   A.   Yes.

16   Q.   So October 5th, you were referring to this project as

17   Bratz?

18   A.   October 5th.

19   Q.   Let me rephrase.  As of October 5th, 2000, you were

20   referring to this project as Bratz.

21   A.   We were.

22   Q.   And you see it says Carter here.  It doesn't look like

23   it's sent to Carter, that you expected this to get to him in

24   some way?

25   A.   I think it was sent to Carter.

Page 1783

1  Q.   Oh, here we go.  This is your -- I skipped this here.

2  So this goes to him at his home?

3  A.   I have no idea.

4  Q.   Okay.  And as of October 5th, you're talking about him

5  and Paula focusing 200 percent.  Do you see that?

6  A.   I do.

7  Q.   And you remind him about all of the royalty he's going

8  to make.

9  A.   That's correct.

10 Q.   As you know, he's going to be pretty happy about that?

11 A.   I'm sorry?

12 Q.   Withdraw the question.

13       And down here, you say, "Now it is up to you."

14       And you're talking about Mr. Bryant.

15 A.   I do.

16 Q.   And you say, in your belief, he needs to put 16 hours a

17 day starting now on this and nothing else; correct?

18 A.   Yes.

19 Q.   So your expectation, and I'm going to focus on a time

20 frame between the date of this e-mail and October 19th, okay?

21 Your expectation during that time frame is that he'd be

22 working for MGA or on MGA's behalf hopefully 16 hours a day;

23 correct?

24 A.   Absolutely.

25 Q.   And then if you'd look at Exhibit -- by the way, at this

Page 1784

1   time you were already telling Mr. Bryant to think and design

2   the accessories; correct?

3   A.   I do.

4   Q.   And you already had in mind you wanted him to think

5   about a commercial?

6   A.   I do.

7   Q.   And about a New York showroom presentation?

8   A.   I did.

9   Q.   And your expectation is that he'd be working on all of

10  this beginning immediately.

11  A.   Beginning October 5th.

12  Q.   And it's your belief he was working on those things

13  between October 5th and October 19th?

14  A.   I hope he was.  He was getting paid.

15  Q.   Well, he was getting an advance.

16  A.   Well, you can call it advance.  Paid.  He was getting

17  money from MGA.

18  Q.   And it's fair to say that the royalties have been a

19  little larger than the advances?

20  A.   When?  As of October 5?

21  Q.   Let's say as of two years later.

22  A.   Yes.

23  Q.   Now, if you look at Exhibit 1762.  Do you recognize the

24  top part of this e-mail to be an e-mail from you to Carter

25  Bryant?

Page 1785

1    A.   Yes, sir.

2              MR. PRICE:  Your Honor, move Exhibit 1762 into

3    evidence.

4              MR. NOLAN:  No objection.

5              THE COURT:  It's admitted.

6              (Exhibit 1762 received.)

7              THE COURT:  You may publish.

8    Q.   BY MR. PRICE:  You see this is dated October 6, 2000?

9    A.   Yes, that's correct.

10   Q.   And this is where you tell Mr. Bryant that, quote, you

11   are very creative, and I believe this line, if done with

12   focus and strategic thought, will be huge.

13   A.   I do.

14   Q.   And you are requesting him to meet with Paula ASAP and

15   work on this full time.

16             Do you see that?

17   A.   I do.

18   Q.   So it was your expectation, then, from October 6th --

19   well, between October 6th and October 19th, that Mr. Bryant

20   would be working on this full time?

21   A.   Yes, that's right.

22   Q.   By the way, you say "Mercedeh," is that how it's

23   pronounced?

24   A.   Your pronunciation is better than mine.  Mercedeh will

25   be starting at MGA next Tuesday.

Page 1786

1   Q.   What is Mercedeh's position to be with respect to Bratz?

2   A.   She was, to the best of my recollection, an engineer

3   that we hired to work on all products that we had, dolls,

4   including Bratz.

5   Q.   And she was someone who was also a former Mattel

6   employee?

7   A.   She was.

8   Q.   Now, around this time frame or October 5th, your

9   direction was that there was to be a full line extension with

10  respect to Bratz?

11  A.   I'm sorry?  I don't understand your question.

12  Q.   Let me try to make it easier for you.  If you look at

13  Exhibit 11276.

14  A.   That's correct.

15  Q.   You recognize this as e-mail communications between you

16  and among others Paula Treantafelles, now known as Paula

17  Garcia?

18  A.   Yes.

19          MR. PRICE:  Your Honor, move Exhibit 11276 into

20  evidence.

21          MR. NOLAN:  No objection.

22          THE COURT:  Admitted.

23          (Exhibit 11276 received.)

24  Q.   BY MR. PRICE:  And let's go to the bottom e-mail first.

25  This is an e-mail from you to all in product development,

Page 1787

1    about developing a 2002 line.

2              Do you see that?

3    A.   That's correct, yes.  I'm sorry.  It's spring 2002.

4    Q.   Spring 2002.

5              And if we go to the e-mail that you get in response

6    to this, you see you got an e-mail from Ms. Garcia, then

7    known as Ms. Treantafelles, what about the line extension to

8    Bratz?

9              Do you see that?

10   A.   I do.

11   Q.   Did she normally send you e-mails with everything in

12   bold?

13   A.   I don't know.

14   Q.   Did you read this as she was sort of saying what about

15   the line extension to Bratz, that it was important?

16   A.   No.  I know from my own practice I type two fingers at a

17   time, and it gets locks.  And I don't always look at the

18   screen, and I don't want to go back and change.  So...

19   Q.   Let's look at your response.  Your response to

20   Ms. Treantafelles on October 16th was "yes," in small case.

21   And then everything, all in caps.

22   A.   Yes.

23   Q.   Correct?

24   A.   Yes.

25   Q.   And that wasn't a mistake.  That was you meant to

Page 1788

1   emphasize everything; correct?

2   A.   I don't know if I meant to emphasize everything or I

3   got -- I put the E and it got locked.  But I did type that.

4   Q.   So by mid-October, you were talking about everything, a

5   line extension for Bratz; correct?

6   A.   To design.  To start designing line extension for Bratz.

7   Q.   What's a line extension?

8   A.   Other products that we would bring in later on.  We

9   designed about six to nine month in advance usually.

10  Q.   But when you say a line extension to Bratz, does that

11  mean there would be a Bratz line and then there would be

12  extensions to that line?

13  A.   Both together.  Bratz and line extension.

14  Q.   So what --

15  A.   And you're talking about Bratz the toy; right?  You're

16  not talking about the drawings.

17  Q.   My question is what do you mean when you distinguish

18  Bratz from an extension of Bratz?  That is, on October 16th,

19  what were you looking at as an extension to Bratz?  What

20  sorts of things?

21  A.   When you mean Bratz, do you mean the drawings or the

22  dolls?

23  Q.   Well, I'm trying to find out what this meant here.  The

24  line extension to Bratz.  So when you read Ms. Treantafelles

25  saying Bratz here, what did you read her to mean?

Page 1789

1    A.    Bratz toy line.

2    Q.    So what kind of extension were you saying you wanted to

3    do as of mid-October 2000 to the Bratz toy line?

4    A.    Again, for spring 2002, to design other products.  For

5    example, another character, fashions, accessories, et cetera.

6    Q.    If we could look at Exhibit 11277.

7    A.    Go ahead.

8    Q.    And do you recognize that as e-mail communication

9    between you and a Franki Tsang and Stephen Lee?

10   A.    That's correct.

11            MR. PRICE:  Your Honor, I move 11277 into evidence.

12            MR. NOLAN:  No objection.

13            THE COURT:  Admitted.  You may publish.

14            (Exhibit 11277 received.)

15   Q.    BY MR. PRICE:  First, I want to make sure we're not

16   confused, Mr. Larian.  Earlier today, you recall, we played a

17   section of a deposition transcript where you were asked if

18   you regarded Bratz as a fashion doll, when it was introduced,

19   and you said, "No, I think we considered it a small doll."

20   A.    Mini doll.

21   Q.    Do you recall you used the word "small"?

22   A.    Maybe.  Small or mini doll are probably the same.

23   Q.    So let's look at your e-mail in October of 2000.  And

24   first, can you tell me who Frank I. Tsang is?

25   A.    He was head of our product development in Hong Kong.

Page 1790

1    Q.    And Stephen Lee?

2    A.    He was the managing director of MGA Hong Kong.

3    Q.    And again, you have some things in bold and some things

4    aren't.  That appears to be intentional on this e-mail.

5    Would you agree?

6    A.    I don't remember.

7    Q.    You say please listen to me carefully.  This is in all

8    caps, a fashion doll.

9    A.    I do.

10   Q.    So in October of 2000, you considered Bratz to be a

11   fashion doll?

12   A.    Fashion doll or mini doll, yes.

13   Q.    And by the end of October, you considered that what you

14   projected in terms of sales was 25 million?

15   A.    I'm sorry.  By October?  No.  I was projecting

16   $25 million for sales of Bratz for the year 2001.

17   Q.    To be clear, then, you expected that within the next

18   year, the next fiscal year, that Bratz dolls would sell

19   somewhere in the neighborhood of $25 million.

20   A.    In the year of 2001, yes.

21   Q.    And you are referring to a woman named Cecelia.  Who is

22   she?

23   A.    I don't recall her, unfortunately.

24   Q.    Do you remember Cecelia Kwok?

25   A.    Yes, I believe she was a product manager in Hong Kong.

Page 1791

1  Q.   And if we could go down to the attached e-mail.  Do you

2  see this is from Mercedeh Ward?  That's the former Mattel

3  employee who began in October?

4  A.   By October 30th she was an MGA employee.

5  Q.   And you were copied on this?

6  A.   I am.

7  Q.   And you see Cecelia Kwok here.  Does that refresh your

8  memory that that's who you were referring to?

9  A.   Yes.

10  Q.   And by this time, by the end of October, MGA had sent to

11  Hong Kong sort of a doll to use or to look at to see how MGA

12  wanted the Bratz doll to be manufactured; correct?

13  A.   I don't recall what was sent to Hong Kong.

14  Q.   Well, let's go to the next page here and see if this

15  helps remind you.  If you go up in this area here, it says

16  doll has a movable head like the Skipper doll.

17  A.   What page are you on?  Yes, I see that.

18  Q.   And the Skipper doll refers to Skippy, Barbie's little

19  sister.

20  A.   I have no idea if she has a sister.

21  Q.   You are familiar with your competitors' products?

22  A.   I'm familiar with Barbie.

23  Q.   And her playmates?

24  A.   I only know Barbie and Ken.

25  Q.   I understand you probably don't play with dolls

Page 1792

1  yourself, but around this time, did you have daughters who

2  played with dolls?

3  A.    Don't be so sure.  Maybe I did play with them.

4  Q.    I'm giving you the benefit of the doubt.

5  A.    I have one daughter.

6  Q.    How old was she in 2000?  You better get this right.

7  A.    I think it's -- she's 12.  My wife is looking at me.  So

8  it's very scary.

9  Q.    She looks very pleasant.  I don't know what you're

10  talking about.

11        Do you know, then, what they are referring to when

12  they say the Skipper doll?

13  A.    I have no idea.  I have never seen a Skipper doll.  To

14  date I have not.

15  Q.    Isn't it true that in October, Paula and Mercedeh were

16  sent to Hong Kong a Skipper doll made by Mattel, Barbie's

17  little sister, so they could model the body off of Mattel's

18  Skipper doll?

19  A.    I have no idea what they sent and what they bought at

20  Toys-R-Us to send to Hong Kong.  I have no idea.

21  Q.    One way or the other?

22  A.    No.

23  Q.    And where it says the arms will move like the Skipper

24  doll, and hip joints are just like the Skipper doll, the knee

25  will bend like the Skipper doll, all of that, you don't know

Page 1793

1   which Skipper doll that's referring to?

2   A.   I have no idea.   I've never seen a Skipper doll.   I

3   promise.

4   Q.   Do you know whether or not it was part of the

5   responsibilities of your subordinates, though, such as Paula

6   Garcia and Mercedeh Ward, to be familiar with competitors'

7   dolls?

8   A.   I hope they were familiar with the competitors' dolls.

9   Q.   Would you have thought there was anything wrong if MGA

10  was copying the body of a Mattel doll to use for Bratz?

11  A.   Well, if they were -- if they went to Toys-R-Us and

12  bought a Skipper doll and said to use this as a reference, I

13  don't think there's anything wrong about that.

14  Q.   Now, on September 1st, when Mr. Bryant had his meeting

15  with you, I think we mentioned he had a prototype.

16  A.   He had a dummy.   He had something that to me looked like

17  an alien.   He had something.

18  Q.   Well, you heard Ms. O'Connor testify about the head, the

19  face?

20  A.   Yes, I heard her testimony.

21  Q.   Do you agree that the face was beautifully painted?

22  A.   I don't recall.   I think to me it was very ugly.   It was

23  like an alien.   I didn't pay attention.   My focus was on the

24  drawings.

25  Q.   Well, did you agree with what Ms. O'Connor said, that

Page 1794

1   that face that Mr. Bryant presented in early September looked

2   similar to what became the Bratz dolls' faces?

3   A.   I don't remember.  Frankly, I don't remember that rough

4   dummy.  I don't know.

5   Q.   Let's see if this helps refresh your recollection.  If

6   you look at Exhibit 11245.  And by the way, Mr. Larian, your

7   conversation with Mr. Bryant in September, did he mention to

8   you that he worked on the Skipper doll while he was at

9   Mattel?

10  A.   Not that I recall.

11  Q.   Did he provide you with a resume at the time?

12  A.   I'm sorry?

13  Q.   Did he provide you with a resume at the time?

14  A.   He did have not a resume.  To the best of my

15  recollection, he did not have a resume.

16  Q.   So prior to agreeing to pay him advances of 5,500 or

17  5,000 a month and 3 percent royalties on what you thought

18  would be a huge line, prior to that, you didn't ask him

19  exactly what his experience was at Mattel?

20  A.   I did.  He said he's a fashion designer.

21  Q.   If you have it in front of you, it's 11245.

22  A.   I do.

23  Q.   And you recognize that as e-mail traffic between you and

24  Mercedeh Ward and Paula Treantafelles, also known as Paula

25  Garcia?

Page 1795

1    A.   It is an e-mail going back and forth.  My name is on it.

2              MR. PRICE:  I move Exhibit 11245 into evidence.

3              MR. NOLAN:  No objection.

4              THE COURT:  Admitted.  You may publish.

5              (Exhibit 11245 received.)

6    Q.   BY MR. PRICE:  And if we look at the very short thing at

7    the top, it says please print and see me on this.  And that's

8    between you and Ms. Ward and Ms. Garcia.

9    A.   Yes.

10   Q.   And if we look to the -- so you actually wanted this

11   e-mail string printed out.

12   A.   I did.

13   Q.   And one of the things that was being discussed was the

14   movement of the Bratz doll.

15   A.   No.  I don't recall that.  I recall that this was -- if

16   you look at it, it's such a long, long e-mail.  And I didn't

17   want to sit down and read every line of this.  So I told them

18   to print it and come see me.

19   Q.   So let's look at this paragraph here, then.  There's

20   discussions about whether Hong Kong can make the armatures

21   according to the sculpture of the Bratz.

22             Do you see that?

23   A.   Yes.

24   Q.   And the next paragraph talks about right now.  Next

25   paragraph, if we can.

d9029057-99ba-4336-b075-1e3ce6b015b5

Page 1796

1    "We have already clear about the movement.  Head,

2  arms, legs, and hips."

3  A.   I see that.

4  Q.   Do you know who Samuel Wong is?

5  A.   He was head of product investigate in Hong Kong.

6  Q.   And then if we look at the next page, and again, here,

7  going down, I guess, to the bottom.  This e-mail that you

8  asked to be printed out, do you see it says noted the

9  construction of the doll movable head will be same as the

10  Skipper doll.  Answer, yes.

11  A.   I see that.

12  Q.   Talks about Skipper doll, et cetera.  Do you see that?

13  A.   I do.

14  Q.   Since you were hoping this would be such a huge line,

15  you wanted to have some idea as to what the doll looked like

16  when it would be manufactured; right?

17  A.   I definitely wanted the dolls to look good when they

18  were manufactured.

19  Q.   So certainly you would have asked in this time frame

20  toward the end of October --

21  A.   This is November --

22  Q.   What do you mean by -- what do you mean by Skipper?

23  A.   No, I wouldn't.  I would not get involved in that

24  detail.  And this is, by the way, November, not October.

25  Q.   Actually, sir, go on up to see this particular e-mail,

Page 1797

1    although it's right on the cusp, it's October 31?

2    A.   Right.

3    Q.   I want to focus on what was done prior to October 19th

4    during that month of October, you are getting ready, MGA is

5    getting ready for a presentation in early November to

6    retailers to tell them about Bratz; correct?

7    A.   And the rest of the MGA line.  Usually it's called

8    pretoy fair, when you go and see retailers with your

9    preliminary design, boards, drawings, et cetera.

10   Q.   And obviously, if you're going to be presenting --

11   A.   I'm sorry.  Not to all the retailers.  What we call top

12   four or five.  Kmart, Wal-Mart, Toys-R-Us, Target.

13   Q.   And obviously to do that, you have to do work in

14   preparation for that?

15   A.   Yes, I hope so.

16   Q.   And it's your view that when you had this meeting

17   with -- was it Kmart?

18   A.   That's one of them.  I said the top five customers.

19   Q.   When you had this meeting with the top five in early

20   November, it's your -- the way you would characterize this is

21   that that was the first exhibition of Bratz?

22   A.   The drawings, the concepts, yes.  The drawings were

23   presented to retailers in November, I believe.

24   Q.   Was it just the drawings in November?

25   A.   That's correct.  To the best of my recollection.

Page 1798

1   Q.   And if you look at Exhibit 12 in your binder, sir.

2   A.   I have it, yes.

3   Q.   Do you recognize this as an affidavit which you executed

4   in connection with litigation in Hong Kong?

5   A.   I believe it is.

6   Q.   And it was an affidavit which you signed under penalty

7   of perjury?

8   A.   Well, I'm not sure in Hong Kong if they said under

9   penalty of perjury or not.  But I always try to tell the

10  truth when I sign something.

11          MR. PRICE:  Your Honor, I'd like to move Exhibit 12

12  into evidence.

13          THE COURT:  Any objection?

14          MR. NOLAN:  No objection, your Honor.

15          THE COURT:  It's admitted, and you may publish.

16          (Exhibit 12 received.)

17  Q.   BY MR. PRICE:  And you see, this was a case in Hong Kong

18  concerning MGA's position that someone in Hong Kong was

19  infringing MGA's rights with respect to the Bratz dolls;

20  correct?

21  A.   Yes, in 2002.

22  Q.   And it starts out with "I, Isaac Larian," and gives your

23  address, "do make oath and say as follows."

24          Do you see that?

25  A.   Yes, it does.

Page 1799

1    Q.    And if we can skip ahead to page 4.  Do you know whose

2    handwriting -- underlining this is by the way?

3    A.    I have no idea.

4    Q.    Do you know if it was yours?

5    A.    No.  I have no idea.  It's not like handwriting.  It's

6    just underlining.

7    Q.    It's kind of hard to recognize anybody's underlining,

8    isn't it?  Could be anybody.

9             So it says:  "I am advised by my legal advisors

10   that copyright law does not protect concepts or ideas per se,

11   but the expression of an idea in a material form.  And in

12   this case, it is the 17 design drawings exhibited as LSC-3."

13            Do you see that?

14   A.    I do.

15   Q.    And that referred to an exhibit attached to somebody

16   else's affidavit that had drawings.

17   A.    I have no idea.  My attorney in Hong Kong prepared this,

18   and I believe, to the best of my recollection, under

19   Hong Kong law, that's what you have to do.

20   Q.    But you are referring here to something called LSC-3; is

21   that right?

22   A.    Yes.

23   Q.    At the time you knew what that meant?

24   A.    I had no idea.  I still don't know what LSC-3 means.

25   Q.    At the time you said, under penalty of perjury, that in

Page 1800

1  this case it's the 17 design drawings exhibited as LSC-3.  At

2  the time you wrote that and swore under oath that it was

3  true, at that time you knew what was being talked about;

4  right?

5  A.   If you're asking me what LSC-3 means, I don't know what

6  it means at that time, nor do I now.  Do you know what it

7  means?

8  Q.   Yes.

9          So you're telling us that you would make a

10 statement under oath for which you had no basis whatsoever?

11 A.   This was a matter of litigation in Hong Kong in 2002,

12 and our attorneys had prepared a lawsuit, and they had given

13 me an affidavit to sign, and I relied on my attorney that

14 what they put in there is correct, and I signed it.  I

15 usually rely on my attorneys.

16 Q.   But you understand that your attorneys aren't swearing

17 under oath that what you're saying is true.

18 A.   That's correct.

19 Q.   I mean, they are not that dumb.  They are not going to

20 swear under oath to that; right?

21 A.   I am not going to -- I'm not going to characterize

22 attorneys dumb or smart.

23 Q.   I half appreciate that.

24          But if you look, you're the one telling the Court,

25 under penalty of perjury, that what you're referring to here

Page 1801

1  as the 17 design drawings as LSC-3, you're telling the Court

2  that's what you're talking about; right?

3  A.   This is what the document says.

4  Q.   I'm just trying to say at the time you said that under

5  oath, certainly you believed it to be true.

6  A.   Yes.

7  Q.   And to believe it to be true, of course, you'd have to

8  know what LSC-3 is; right?

9  A.   I'm telling the truth, sir.  I don't know what LSC-3

10  means now or then.

11  Q.   Let's see if I can refresh your memory.  If you'd look

12  at Exhibit 10.  And I'm going to ask you to look at a page

13  which is not yet in evidence, which is the first page.  Have

14  you found that?

15  A.   Yes, I have.

16  Q.   And does that refresh your memory that what you are

17  referring to when you say LSC-3 is the exhibit marked LSC-3

18  referred to in the affirmation of Lee Shiu Cheung?

19  A.   Yes, I can see that.

20  Q.   So that kind of takes you back to the time when you were

21  looking at all of these documents; right?

22  A.   No, just looking at it right now, I think LSC probably

23  stands for the first three -- what do you call it, the

24  letters of Lee Shiu Cheung.

25          MR. PRICE:  Your Honor, I would move the first page

Page 1802

1    of Exhibit 10 in evidence, and I think the prior page is

2    already admitted.

3              MR. NOLAN:  No objection.

4              THE COURT:  It's admitted.  You may publish.

5              (Exhibit 10, Page 1, received.)

6    Q.   BY MR. PRICE:  So look at this all the way down, Ken.

7    So on the affidavit that you executed, when you are saying

8    that you are talking about two dimensional drawings that are

9    referred to as LSC-3, it's these 17 drawings which are part

10   of an exhibit marked LSC-3; right?

11   A.   Now I see the relation, yes.

12   Q.   And these drawings here are what you are referring to

13   when you are referring to LSC-3 in your affidavit; correct?

14   A.   Apparently I am referring to Lee Shiu Cheung's

15   affidavit.  I am referring to what is here, LSC-3.

16   Q.   But you referred to the 17 drawings in LSC-3, and those

17   are the drawings that followed; correct?

18   A.   I believe so.  I don't recall my state of mind, but I

19   believe so, yes.

20   Q.   And so this is the first one.  So you see here at the

21   bottom here?

22   A.   Yes, I do.

23   Q.   This is your signature?

24   A.   It is.

25   Q.   And is your signature, as best you can tell, at least on

Page 1803

1    the first, oh, 14 pages of this exhibit?

2    A.   Yes, it is.

3    Q.   And you signed this in June of 2000?

4    A.   No.  June 2002.

5    Q.   I'm sorry.  That's a 2 there?

6    A.   Yes, it is.

7    Q.   That makes sense.  Thanks for correcting me on that.

8    A.   You're welcome.

9    Q.   And then the exhibit that was then presented to the

10   Court in Hong Kong, you see it says contract date, September

11   18, 2000?

12   A.   I do.  I don't know whose handwriting this is.  I have

13   no idea what that is.

14   Q.   Well, at the time you signed this, June of 2002, the

15   contract date was put on there at the same time?

16   A.   I don't know.  That's not my handwriting, I don't know

17   who put that there, whether it was before or after.  I have

18   no idea.

19   Q.   By the way, if you look at the -- let me ask it this

20   way.  It's true that, however, if we look at your affidavit,

21   which is Exhibit 12, and go again to page 4, you had

22   obviously seen those 17 design drawings that were attached to

23   the affidavit; correct?  When you said under penalty of

24   perjury, and in this case, it is the 17 design drawings

25   exhibited as LSC-3.

Page 1804

1    A.    I had seen these drawings.  I don't know if they were

2    only 17 or not.  I don't recall at this time.  It's possible

3    that I had seen all the 17 drawings.

4    Q.    In fact, you saw Exhibit LSC-3, which has written on it

5    the contract date of September 18, 2000?

6    A.    I'm sorry?

7    Q.    You saw those design drawings, some of which have

8    written on them the contract date of September 18, 2000.

9    A.    You showed me one.

10   Q.    Just the first 13, 14 pages.

11         Let's make it simple.  When you signed your

12   affidavit under penalty of perjury --

13   A.    Excuse me for one second.  Because not all of this

14   contract date September 18.  If you look at the next page, it

15   look like 9/5 to me.

16   Q.    The page after this one?

17   A.    M 001490.  So again, I don't know who wrote this.  I

18   have no idea what these are.

19   Q.    The point is they were written on there before you told

20   the Court in Hong Kong that this is what you were suing on?

21   A.    Not correct.  I don't know if they were written before

22   or after.

23   Q.    Let me put it this way:  You have no reason to believe

24   that Exhibit 10 -- go to the first page, which says this is

25   the exhibit marked LSC-3.

Page 1805

1          Do you see that?

2     A.    I do.

3     Q.    You have no reason to believe that you were referring to

4     anything other than this exhibit when you signed your

5     affirmation under oath to the Hong Kong court?

6     A.    I have no -- no, I don't.  I agree with you.  I'm

7     getting tired.

8     Q.    If we look at Exhibit 12, you remember I was asking you

9     whether or not Bratz was first exhibited in November of 2000?

10          Do you recall me asking you about that?

11    A.    Yes.

12    Q.    And if you would look at the fifth page, you see

13    paragraph 13?

14    A.    Yes.

15    Q.    And you were stating under oath to the Hong Kong court

16    that the Bratz dolls were first exhibited in the USA in

17    November 2000; correct?

18    A.    That is an error.  There were no Bratz dolls in November

19    2000.  There were no Bratz dolls until 2001.  That's an

20    error.

21    Q.    Did you ever do anything to correct the statement to the

22    Hong Kong court?

23    A.    I don't believe I did, no.

24    Q.    And you were making these statements to the Hong Kong

25    court so the Hong Kong court would take action; correct?

Page 1806

1    A.   I was not -- I was in USA.  I sign these for my

2    attorneys in Hong Kong to take action against a company who

3    was knocking off Bratz.

4    Q.   Well, let me ask you this:  Let's go to the second --

5    they were further exhibited in Hong Kong in January 2001.

6         Do you see that?

7    A.   I do.

8    Q.   Is that a true statement?

9    A.   We had four knockoffs of Bratz dolls in January 2001,

10   Hong Kong toy show.

11   Q.   In any event, in order to exhibit anything to these

12   retailers, it was your expectation that Carter Bryant for the

13   month of October was working full time, in your view, 16

14   hours a day to make that possible?

15   A.   Yes, from October 5th.

16   Q.   And can you tell the jury what he was doing for 16 hours

17   a day between October 5th and October 19th to make the

18   exhibition of drawings or whatever it is of Bratz possible?

19   A.   He did not -- he did not have anything to do with the

20   exhibition.  I hope he was working with our people to design

21   the Bratz fashions and accessories so we can make the doll.

22   Q.   Well, actually, one of the things exhibited in November

23   were drawings with fashions on two-dimensional Bratz dolls;

24   right?

25   A.   I'm sorry.  Can you repeat that for me?

Page 1807

1   Q.   Let me try it again.

2          One of the things exhibited in November of 2000, at

3   the very least, were drawings of Bratz characters wearing

4   clothes, having pocketbooks, and things like that; right?

5          MR. NOLAN:   Objection.   Temporal foundation.

6          THE COURT:   Overruled.

7          THE WITNESS:   There were Bratz drawings,

8   two-dimensional Bratz drawings with -- if you can show

9   the picture, that's what it was.

10         THE COURT:   Why don't we go ahead and take our

11  break right now.

12         (Recess taken.)

13         THE COURT:   Counsel, you may continue.

14  Q.   BY MR. PRICE:   Mr. Larian, I want you to focus again on

15  Exhibit 12, your sworn affidavit.

16  A.   Go ahead.

17  Q.   I want to understand your testimony.   It's your

18  testimony, sir, that when you sign a sworn affidavit to a

19  court, you don't have to know what's in it is true?

20         MR. NOLAN:   Your Honor, objection, argumentative,

21  lack of foundation.

22         THE COURT:   Sustained.   Rephrase your question,

23  Counsel.

24  Q.   BY MR. PRICE:   Let me rephrase and get some background.

25         This affidavit was filed to support MGA's position

Page 1808

1    in a legal matter in Hong Kong; right?

2    A.   I believe so, yes.

3    Q.   Wherein MGA was contending that an entity was infringing

4    MGA's rights; correct?

5    A.   Yes, sir, I believe so.

6    Q.   The idea was to put a halt to that?

7    A.   Yes, sir.

8    Q.   And to be compensated for that in damages?

9    A.   I don't know about the compensation, but put a halt to

10   it.

11   Q.   And in connection with trying to win that case, you

12   signed under oath Exhibit 12; correct?

13   A.   I believe I did, yes, sir.

14   Q.   And your practice in signing such an important document

15   was sometimes you'd read it, sometimes you wouldn't?

16   A.   That's correct.  If my attorneys prepared it, I would

17   not necessarily read everything.  That's correct.

18   Q.   So if the attorney said you've got to sign this to win

19   the case, and you're signing it under oath, you would be

20   willing to sign a document without even reading it; is that

21   right?

22   A.   That has not happened, and I hope the legal profession

23   is more ethical than what you're suggesting.

24   Q.   Well, I thought you said that that might happen, that in

25   that time frame, at least, your practice was even if it's a

Page 1809

1    statement under oath to a court, sometimes I'd read it,

2    sometimes I wouldn't.

3    A.    That's what I said, yes.

4    Q.    And you knew that -- I take it, then, that means there

5    were occasions, obviously, where you have signed statements

6    under oath in an attempt to win a case where you didn't even

7    read the statement you were signing?

8    A.    I don't recall that one way or another.

9    Q.    Well, I thought you said sometimes you did, sometimes

10   you didn't.

11   A.    I did say sometimes I do and sometimes I don't.  I trust

12   my attorneys, and I hope they are ethical and they are not

13   doing anything illegal when they ask me to sign an affidavit.

14   Q.    I want to focus on the "sometimes I don't."  There are

15   times when you will sign sworn statements under penalty of

16   perjury when you don't read those statements, so you don't

17   personally know if what you are saying is in fact true; is

18   that correct?

19   A.    No, that's not the fact.  That's not correct.

20   Q.    It's true, sir, that the attorney who drafts your

21   affidavits doesn't always have firsthand knowledge of the

22   facts you know; correct?

23   A.    No, gets it from me and other people.

24   Q.    But the person who has firsthand knowledge who can say

25   under oath whether it's true or not is you, not your

Page 1810

1    attorney; correct?

2    A.    That's correct.

3    Q.    So I just want to focus on the times where you said

4    sometimes I don't.  Could you please tell us the times where

5    you have made sworn statements under penalty of perjury to a

6    court where you haven't bothered to even read the statement

7    to see if it's true?

8    A.    I cannot.

9    Q.    Has that happened in this case?

10   A.    I don't know.

11   Q.    You understand that the oath you take in signing an

12   affidavit is it has the same impact, is just as serious as

13   the oath you took when you got to that stand and took an

14   oath?

15   A.    Yes, sir.

16   Q.    Let's go back to November of 2000.  You remember you

17   said there was this meeting with Kmart?

18   A.    Yes.

19   Q.    One quick question.  Is Larry McFarland one of your

20   attorneys, one of MGA's attorneys?

21   A.    I think he has represented us.  I don't know if he

22   represents us now or not.

23   Q.    At some point in time, Mr. McFarland represented MGA?

24   A.    I believe so, yes.

25   Q.    And do you give the oath that you took, when you took

Page 1811

1   the witness stand, the same solemnity, the same seriousness

2   of the oath that you have taken when you have signed

3   affidavits that you have not read?

4   A.   I think I answered that.  And the answer is yes, sir.

5   Q.   So focusing now on November 2000, we were talking about

6   what Mr. Bryant was doing 16 hours a day during the month of

7   October.  And I want to focus you on November 2000.  I don't

8   have this exhibit for you.

9            It's in evidence, your Honor, and these are

10  drawings.  If I could show Exhibit 1107?

11           THE COURT:  Let me strike everything up to showing

12  Exhibit 1107.

13           MR. NOLAN:  I think my objection is --

14           THE COURT:  It's stricken.  Exhibit 1107.

15  Q.   BY MR. PRICE:  Let me set the stage.  Your understanding

16  was in the month of October, Mr. Bryant's working full time,

17  16 hours a day.

18  A.   No.

19           My understanding was he was supposed to work for

20  MGA after he signed his contract.  I have no idea what he was

21  doing.  I wasn't watching to see what he was doing or not

22  doing.

23  Q.   Well, let's look at Exhibit 1107.  We can show this.

24  This is a drawing.  I'll represent to you there's testimony

25  this was one of the drawings presented to Kmart in November

Page 1812

1    of 2000.  It's your understanding, sir, is it not --

2    A.   I'm sorry.  Can you get the --

3    Q.   It's not in your book.  It's the color drawing here.

4    Isn't it your understanding that one of the things Mr. Bryant

5    was supposed to be working on in the month of October were

6    the drawings this were presented to Kmart?

7    A.   I have no idea what he was doing.

8    Q.   Who else was doing this?

9    A.   I have no idea.  Maybe Paula, maybe other people.  I

10   have no -- my guess is as good as yours.

11   Q.   You believe that someone other than Mr. Bryant did this

12   drawing and these designs?

13   A.   I have no idea one way or another.

14   Q.   If I showed you another one, such as 1108, I'll

15   represent to you that there's testimony this was presented to

16   Kmart.  It's your understanding someone other than Carter

17   Bryant did this?

18   A.   I have no idea.

19   Q.   Well, Paula Garcia was not a designer, was she?

20   A.   No, but we had other designers at MGA.  So I have no

21   idea who was working on what.  I have no idea.

22   Q.   Well, what was your expectation that Mr. Bryant would be

23   doing from October 5th forward working full time, 16 hours a

24   day?

25   A.   Well, I was expecting that he would help in the product

Page 1813

1    we develop in the Bratz dolls.

2    Q.    And the first big event that was this presentation to

3    Kmart; correct?

4    A.    I have no idea if that was the first or the last.   I

5    could not tell you one way or another.

6    Q.    The only fashion doll that MGA had at the time that

7    Carter Bryant was to be working on was Bratz; right?

8    A.    Yes.

9    Q.    I'll show you what we'll mark for identification as

10   Exhibit 11336.   I'll bring that up to you.

11            And do you recognize Exhibit 11336 as an e-mail

12   with an attachment between you and Rachel Harris?

13   A.    Give me a moment to look at it, please.

14   Q.    Certainly.

15   A.    It has my name on the first page.

16   Q.    This appears to be one of your e-mails attaching another

17   e-mail; correct?

18   A.    Forwarding another e-mail.

19            MR. PRICE:   Your Honor, I move 11336 into evidence.

20            MR. NOLAN:   No objection.

21            THE COURT:   It's admitted.   You may publish.

22            (Exhibit 11336 received.)

23   Q.    BY MR. PRICE:   And what's happening here is you're

24   receiving an e-mail and forwarding it on to Rachel Harris;

25   correct?

Page 1814

1   A.   Yes.

2   Q.   And the e-mail you're receiving is from Jennifer Maurus;

3   correct?

4   A.   Yes, sir.

5   Q.   And she writes about a road show.  Items we need for our

6   road show.

7        Do you see that?

8   A.   Yes, I do.

9   Q.   And that included this meeting you were going to have

10  with Kmart; right?

11  A.   I don't recall that.  It could be.  I don't recall it.

12  Q.   It says:  "Our list comes from the meeting Isaac chaired

13  a couple of weeks ago."

14       Do you see that?

15  A.   Yes.

16  Q.   And that's a couple weeks prior to November 1st.

17  A.   Yes, I assume so.

18  Q.   Sometime in mid-October.

19  A.   That's what Jennifer said, yes.

20  Q.   And it says:  "The attached recap list was prepared by

21  Helene and sent to Kerri on October 20th."

22       Do you see that?

23  A.   Yes.

24  Q.   So you understand that the work done for that list had

25  to have been done prior to October 20th?

Page 1815

1   A.   I have no idea what work was done or anything else.

2   It's a recap.  It says recap list.  So I have no idea what

3   it's referring to.

4   Q.   Well, if you look at "attached are lists."

5           Do you see that?  Look at the second page.

6   A.   I do see that.

7   Q.   "Sample list for November road show, J.C. Penney,

8   Kmart."

9           Do you see that?

10  A.   Yes.

11  Q.   And it says:  "Pull from fall 2001 price list dated

12  October 18."

13          Do you see that?

14  A.   I do.  On the bottom, yes.

15  Q.   And if you would go to the last page, 11336-008.

16  A.   Yes, sir.

17  Q.   You see there's a section that says TV small dolls?

18  A.   I do.

19  Q.   And you said that at this time you would sometimes refer

20  to these Bratz dolls as small dolls?

21  A.   Yes, sir.

22  Q.   And you see here it's talking about Zoe, Jade, Hallidae,

23  Lupe.

24          Do you see that?

25  A.   I do.

Page 1816

1    Q.   At this time these were the names for the Bratz dolls;

2    correct?

3    A.   Most likely, yes.   That's the names we were considering.

4    Q.   And if we look at the categories here.   Down at the

5    bottom it says:   "Pulled from fall 2001 price list dated

6    October 18th."

7              Do you see that?

8    A.   I see that.

9    Q.   And you see here these columns, FOB L.A.?   What's that

10   stand for?

11   A.   Means free on board our Los Angeles warehouse.

12   Q.   And what would that mean to someone who doesn't know

13   anything about the toy industry?

14   A.   Means I have no idea.   Ask Mattel.

15   Q.   I think you -- they aren't on the stand yet.   You could

16   explain to the jury what free on board means.

17   A.   Means what I just said, for example, you have

18   merchandise in warehouse.   You have warehouse in Rialto.   And

19   Wal-Mart comes to pick up merchandise.   When they order, they

20   bring a truck to pick up the merchandise.   They bring their

21   own truck.   And we give them the merchandise in their truck.

22   That means FOB, basically from that moment on, it's their

23   product.

24   Q.   So --

25   A.   They own it.   I don't know if I explained it right.

Page 1817

1   Q.   So as of October 18th, you have a price list that's what

2   Wal-Mart or Kmart will pay when they come to you for the Zoe

3   doll, the Jade doll, Hallidae, and Lupe; correct?

4   A.   We have a suggested price, yes.  We have the preliminary

5   price list.

6   Q.   And obviously this is what you presented to Kmart?

7   A.   I have no idea what was presented to Kmart.

8   Q.   And to prepare to present this to Kmart, obviously you

9   have to do some work to try to figure out what the price

10   should be.

11   A.   Not necessarily.  We can just guess and put prices.

12   Prices change.

13   Q.   Well, you did something, some calculations, some

14   estimates of cost to come up with 9.69?

15   A.   I have, probably.  But I cannot say for sure.

16   Q.   And the workout dress pack and the prom dress pack at

17   3.69, those were dress packs associated with the Bratz dolls?

18   A.   I believe they were -- I don't remember exactly, but I

19   believe they were what we call fashion packs or accessory

20   packs.

21   Q.   And those had been priced out by October 18th.

22   A.   We had a suggested FOB L.A. price at that time,

23   preliminary selling price.

24   Q.   And you also had hair pack TV, carrying case TV.  What

25   does that refer to?

Page 1818

1   A.   Means that we were planning to put the hair pack,

2   preliminary again, and the carrying case on TV, to a TV

3   commercial.

4   Q.   And that's why it says TV small dolls?

5   A.   That's correct.

6   Q.   You preliminary priced those as well; correct?

7   A.   Yes.

8   Q.   And you also had calculated an available Hong Kong date;

9   correct?

10   A.   That's, again, we were hoping that this should be the

11   available Hong Kong date; that's correct, in 2001.

12   Q.   Now, with respect to these prices, when you're

13   presenting prices to retailers, it's not your practice just

14   to come up with a wild guess, is it?

15   A.   It is.

16   Q.   Your testimony is that -- your assumption is that there

17   was something else behind this besides a wild guess?

18   A.   I've been in the toy business for so many years.  You

19   look at the competition, and you back it out.  For example,

20   the retail price of this doll going to be 14.99.  The

21   retailer is going to make 35 percent.  And it's going to cost

22   them this much to take it to the warehouse.

23        So you back it out, and you come up with an

24   estimated price that you want to sell it to them at, and we

25   wanted these dolls to have a retail price of 14.99.

Page 1819

1   Q.   Case pack.  What are those numbers representing?

2   A.   How many we hope to come to a carton, a case pack of six

3   dolls, for instance.

4   Q.   In order to make estimates for how many would come, you

5   have to do some work on packaging, obviously.

6   A.   No.

7   Q.   Perhaps not obvious.

8        In this time frame, October 18th, your view was

9   that Bratz was going to be a huge part of your business.

10  A.   Yes, I did.

11  Q.   Your expectation --

12  A.   For 2001.  I expected it to be a huge product by

13  Christmas for 2001.  If you look at it, it says fall 2001.  I

14  just didn't want to mix the dates.

15  Q.   And your understanding was that Mr. Bryant was working

16  hard at this time from October 5th, 2000, through October

17  18th to make that happen?

18  A.   I have no idea what Carter Bryant was doing.  I hope he

19  was working hard, but I have no idea what he was doing, if he

20  was doing anything.

21  Q.   I showed you 1236, which is already in evidence.

22       May I approach, your Honor?

23       THE COURT:  You may.

24  Q.   BY MR. PRICE:  You see this is an e-mail, the first part

25  of it from you to Paula Treantafelles -- Paula Garcia -- and

Page 1820

1    others.

2              Do you see that?

3    A.   Yes, I do.

4    Q.   It's Re:  Bratz detail information -- urgent.

5              Do you see that?

6    A.   Yes, I do.

7    Q.   And it discusses --

8    A.   Well, it's forwarding an e-mail behind it; right?

9    Q.   And you are concerned with increasing the -- or needing

10   to increase the target cost to 2.75 for the dolls.

11             Do you see that?

12   A.   Yes.

13   Q.   Let's go to what's attached here.  So this is in

14   response to an e-mail that Paula Garcia sent to others,

15   including you, on October 24th.

16             Do you see that?

17   A.   Yes, sir.

18   Q.   And when you read this, I assume you thought that

19   Ms. Garcia was giving you accurate information?

20   A.   Which product are you talking about?

21   Q.   Well, when she sends you information on which you are to

22   base your decisions, it's your expectation that she tries to

23   give you accurate information?

24   A.   In general, yes, but Paula Garcia, there's a joke at MGA

25   that she's not very good with numbers.  So I would not.

Page 1821

1    Q.   So other than the numbers, you do rely on Paula Garcia

2    to give you accurate information?

3    A.   Yes, I do.

4    Q.   You're better at numbers than she is?

5    A.   I am not a genius; maybe I am a little better, yes.

6    Q.   But the things that you could count on her for, perhaps

7    not numbers, but when she writes to you and says we have

8    finalized the fashion designs, and I am releasing the

9    following final design packages to you on our Friday, when

10   she makes a statement like that, you rely on that statement

11   to be accurate and true; correct?

12   A.   I hope that it's accurate and true.

13   Q.   Have you seen that phrase before, that there are

14   finalized fashion designs, and there are final design

15   packages?

16   A.   That I do not recall.  It's possible that -- I see that

17   she has said that, but...

18   Q.   My question might not have been clear.  As someone

19   working in the toy industry at this time, about 13 years or

20   so, had you heard the phrase "finalized fashion designs" and

21   "final design packages" prior to October 24, 2000, when you

22   received this e-mail?

23   A.   I don't recall having heard that or not heard that.  I

24   don't recall at that time.

25   Q.   At the time you received this October 24, 2000, e-mail,

Page 1822

1   where your subordinate Paula Garcia was telling you we have

2   finalized the fashion designs and I am releasing the

3   following final design packages, did you know what she was

4   talking about?

5   A.   I have no idea.  I don't recall.  I don't recall this

6   e-mail or the state of mind at that time.  I don't recall.

7   It's possible that's what she was talking about.  I can see

8   that's what she is saying, but I don't recall.

9   Q.   When you say you can see that's what she's saying, tell

10  us what your understanding she is saying when she says we

11  have finalized the fashion designs?

12  A.   She wrote this e-mail.  She is a better witness to tell

13  what you that means.  I cannot guess what she was thinking.

14  Q.   So is it your testimony that at the time you got this

15  idea, you had no idea what Paula Garcia was saying when she

16  said we have finalized the fashion designs and I am releasing

17  the final design packages?

18  A.   I do not recall that, no.

19  Q.   I'm going to show you what we'll mark as Exhibit 11203

20  for identification.

21  A.   Excuse me for one second.  I want to go back to this for

22  a second.

23          THE COURT:  Wait a second.  Your attorney will have

24  a chance to follow up.

25          THE WITNESS:  But you know, I just recall

Page 1823

1    something --

2              THE COURT:  Mr. Larian, thank you.

3    Q.   BY MR. PRICE:  Do you see Exhibit 11203, Mr. Larian?

4    A.   I do.

5    Q.   Do you recognize that as an e-mail string which begins

6    from an e-mail from you to Eric Yip dated November 30, 2000?

7    A.   No, this starts as an e-mail from Jennifer Maurus, not

8    from me.

9    Q.   Fair enough.  The first e-mail on the first page is from

10   you to Eric Yip, and then it contains other e-mails; correct?

11   A.   Which one are you talking about?  I don't want to get

12   confused here.

13   Q.   First page, where it says Isaac Larian --

14   A.   Yes, that's correct.

15             MR. PRICE:  Your Honor, move Exhibit 11203 into

16   evidence.

17             MR. NOLAN:  Your Honor, we have no objection.

18             THE COURT:  Very well.  It's admitted.  You may

19   publish.

20             (Exhibit 11203 received.)

21   Q.   BY MR. PRICE:  Quick question.  Here, where you say we

22   need Ron Stover for sure for Bratz, which is a huge part of

23   our business, who is Ron Stover?

24   A.   Ron Stover was the buyer for dolls at Wal-Mart at one

25   time.  He's no longer there.

Page 1824

1    Q.   Again, let's focus on who is working on Bratz at the

2    September/October time frame.  In your first meeting you met

3    Veronica Marlow; correct?

4    A.   September 1, yes, I did meet her.

5    Q.   And it's your understanding that she was a friend of

6    Mr. Bryant's?

7    A.   I have no understanding how do they know each other, if

8    they were friends or not.  I met them both, to the best of my

9    recollection, I don't know if I met Veronica yet before.

10   Anyway, I met Veronica and Carter together.

11   Q.   Veronica and who?

12   A.   Carter.  At that meeting.

13   Q.   And was it your understanding that she was friends with

14   Paula Garcia?

15   A.   Who was?

16   Q.   Fair question.  That Veronica Marlow was friends with

17   Paula Garcia?

18   A.   I have no idea if they were friends or not.  I have no

19   idea.

20   Q.   It's your understanding that Ms. Garcia was working with

21   Ms. Marlow prior to September 2000 on other dolls?

22   A.   I have learned to know that she was, yes.

23   Q.   And that in the months of September and October, that

24   Veronica Marlow worked over 160 hours on the Bratz project?

25   A.   I'm sorry.  Can you repeat that question?

Page 1825

1    Q.   Sure.  That in September or October, that Veronica

2    Marlow billed to MGA about 160 hours on Bratz.

3    A.   I don't know if she did or she didn't.  If she did, then

4    she did.

5    Q.   You certainly came to have an understanding that

6    Veronica Marlow was providing to MGA fashions for the Bratz

7    dolls.

8              MR. NOLAN:  Objection.  Foundation as to what point

9    in time.

10             THE COURT:  I'm sorry?

11             MR. NOLAN:  Foundation.  Temporal foundation.

12             THE COURT:  Sustained.

13   Q.   BY MR. PRICE:  Did you at some time have that

14   understanding?

15   A.   That what?

16   Q.   That Veronica Marlow was providing fashions for the

17   Bratz dolls?

18   A.   I think she was part of the fashion designs, yes.

19   Q.   And that was from day one; correct?

20   A.   No, I don't know when she had started, but I know that

21   she was part of the fashion designs.

22   Q.   When is your understanding that Veronica Marlow is part

23   of that?

24   A.   From the date we signed the contract, I assume.  I

25   assume again.  I don't know.

Page 1826

1    Q.    You would not -- strike that.

2            You would agree that it would have been wrong for

3    Veronica Marlow to use Mattel employees to sew fashions for

4    Bratz dolls?

5            MR. NOLAN:  Your Honor, I object to the relevance.

6            THE COURT:  Overruled.  You may answer.

7            THE WITNESS:  If she did, yes, she would be wrong.

8    Q.    BY MR. PRICE:  Is it correct that if you had discovered

9    that, you would have stopped her from working on any Bratz

10   dolls?

11   A.    I would have stopped her if I knew that she was working

12   on -- she was using Mattel employees to work on Bratz dolls,

13   I would definitely stop her, yes.

14   Q.    And that's because you know that that simply is

15   inappropriate activity.

16   A.    That's correct.

17   Q.    But isn't it true that you came to know that and did not

18   stop her from working on Bratz dolls?

19   A.    I came to know about it during the course of this

20   litigation just recently.

21   Q.    Didn't you know before that that --

22   A.    I did --

23   Q.    Wait.  Let me finish the question.  Didn't you know

24   before that that Veronica Marlow was using employees from

25   another doll company to work on the fashions for Bratz dolls?

Page 1827

1    A.    I did not.  Veronica Marlow was a free-lance contractor

2    for MGA, and I had no idea who she was using.

3    Q.    If she had told you that, you would have done something

4    about it; right?

5    A.    If she would have told me that, yes, I would not -- I

6    would stop her.

7    Q.    And her husband told you that in 2005, didn't he?

8              MR. NOLAN:  Your Honor, objection.  Relevancy with

9    respect to the time period.

10             THE COURT:  Overruled.  Goes to other issues.  You

11   may answer.

12             THE WITNESS:  I'm sorry.  Can you repeat?

13   Q.    BY MR. PRICE:  It's true that her husband told you that

14   in 2005, and you did nothing about it?

15   A.    I can't recall.  I'm sorry.

16   Q.    If you look in your binder, Exhibit 13223.

17             MR. NOLAN:  Would the Court entertain a quick

18   sidebar?

19             THE COURT:  Yes.

20             (SIDEBAR CONFERENCE HELD.)

21             MR. NOLAN:  Your Honor, I just wanted to make

22   certain, we're now into the year 2005, and Mattel is pushing

23   and pushing and pushing this date, this relevant date of what

24   work was being done on Bratz by people not involved or hired

25   by MGA with no knowledge.

1          Now, I don't know if he's going to go into this

2     now, but I'm saying I think they are intentionally blowing

3     through this time period that has been set up for 1-A, and

4     we're blurred.  And I've tried to be light on my objections.

5     I'm just -- when you said it related to other issues, I just

6     wanted some clarification so I know where not to object.

7               THE COURT:  It goes to issues, as I indicated,

8     other than what Carter Bryant did -- I'll let Mr. Price --

9               MR. PRICE:  We're not going into work that was done

10    on Bratz done in that time frame, after October 19, 2004.

11    What we're going into is this witness says, you know, it's

12    his practice he would not permit a Mattel employee to work on

13    Bratz, would not have permitted Carter Bryant to work on

14    Bratz.

15              THE COURT:  I chose my words as kind of a euphemism

16    for going to credibility.  I didn't want to say in front of a

17    jury, as I have, and I'm trying not to do that as an issue of

18    credibility.  That's what I meant when I said it goes to

19    another issue.

20              MR. NOLAN:  That's what I was getting at, your

21    Honor, because my only point is that what Isaac knew as of

22    October 19th or 20th is relevant with respect to the claims

23    that are being made to us.  There are no claims that have

24    been made against us or Veronica Marlow by Mattel regarding

25    work done by people other than Carter Bryant, and now we have

1    now gotten into, you know, work that Veronica Marlow is doing

2    in November, December, and now other work that is done by

3    her.

4              So I'm just seeing this as a slippery slope.  I

5    understand credibility issues.  But I want to make sure that

6    my objection -- that I was clear.

7              THE COURT:  You are clear.  And I'm glad that I had

8    the opportunity to make it clearer, not in front of the jury,

9    as to what I was ruling on.  It is credibility.  It's

10   limited.  Make your point and move on.  And then you, of

11   course, can respond in kind, absolutely.

12             MR. NOLAN:  Thank you.

13             MR. ZELLER:  If I may just for the record, because

14   that would seem to be sufficient for Mr. Larian, but

15   certainly down the road, we would also say that this goes

16   directly to elements that we have to prove for our claim.

17             THE COURT:  To your claim on the interference?

18             MR. ZELLER:  Right.

19             THE COURT:  I understand.

20             MR. NOLAN:  In 2005?

21             THE COURT:  Well, it's evidence relating back to --

22   you're shaking your head no, Counsel.

23             MS. AGUIAR:  It's not actually because Mr. Price's

24   question was didn't you at some point much later find out.

25   Well, even in his question, the wording of it is clear that

Page 1830

1   he's not even suggesting Mr. Larian knew in the relevant time

2   period, but he was just suggesting some time many years later

3   you found out.  So how does that go to the claim that they

4   have to prove regarding our behavior four years earlier?

5          THE COURT:  Counsel?

6          MR. ZELLER:  Again, Mr. Larian has already

7   testified that had he known, he would have done something

8   about it.  That relates back to any time.

9          THE COURT:  That's why I see this more as a

10  credibility issue as impeaching that position, that

11  Mr. Larian took.  And that was my thinking when I said it

12  relates to other issues.

13         MR. NOLAN:  Again, I just want to make a proffer

14  that the time period that they are now using is a document

15  from 2005.

16         THE COURT:  Let me get the document.  This is

17  Exhibit 13223.

18         MR. NOLAN:  Right.  This is going to be a time,

19  your Honor, where we are -- Mr. Larian is questioning the

20  costs that are being expended through Veronica Marlow in the

21  year 2005, 2004.  In response to that, Peter Marlow is

22  responding, saying the workers that we have, and he does not

23  identify them as Mattel workers, are very dedicated,

24  et cetera, et cetera, et cetera.

25         Isaac is only trying to deal with the cost issue.

Page 1831

1    There is no suggestion here that he's being told that it's a

2    Mattel employee.  But this door is going to open up that I'm

3    going to have, in order to refute this, is to start talking

4    about events in 2005, some five years later after the claim.

5    I understand the credibility issue, but the problem, your

6    Honor, is what they are doing is they are pushing this right

7    open, flinging the door wide open to try to bring in all the

8    seamstress issue that we don't believe is relevant in Phase

9    1-A.  It may be for credibility.  But it's a question of

10   balance.

11          THE COURT:  And I appreciate that, and I'm not

12   going to let this go far, but I do think they are entitled to

13   some leeway on the credibility.

14          MR. NOLAN:  I appreciate that.  I just wanted some

15   leeway here.  And the other point I want to make, your Honor,

16   is it is now ten to 4:00, and I'm assuming that they are by

17   now --

18          THE COURT:  4:10.

19          MR. NOLAN:  What did I say?

20          THE COURT:  Ten to 4:00.

21          MR. NOLAN:  They are so far into the hours in this

22   case --

23          THE COURT:  That's their problem.

24          MR. NOLAN:  I just wanted to make certain that you

25   are still --

Page 1832

1          THE COURT:  Don't worry.  Mr. Price and Mr. Quinn

2     can watch the clock.

3          MR. PRICE:  Whose time does this count against?

4          MR. NOLAN:  Me.

5          MR. PRICE:  For the record, Mr. Nolan did offer to

6     sell us hours for a million bucks an hour.

7          MS. AGUIAR:  Just to get closure, though, on one

8     thing, Mr. Zeller said that he thinks this information is

9     relevant not just to the credibility of this single witness,

10    but goes to the larger question of --

11         THE COURT:  You raise a good point on that,

12    Counsel, and I'm just allowing this for credibility.  No, you

13    did raise a good point, and I'll leave it at that.

14         MS. AGUIAR:  Thank you.

15         (CONCLUSION OF SIDEBAR CONFERENCE.)

16         THE COURT:  You may proceed.

17    Q.   BY MR. PRICE:  You have 13223 in front of you,

18    Mr. Larian?

19    A.   Yes, I do.

20    Q.   And you see it contains an e-mail from a Peter Marlow to

21    Paula Garcia, you, and M. Woods?

22    A.    I see that this is to Paula Garcia, and I'm copied, and

23    somebody named M. Woods is copied.

24         MR. PRICE:  Move Exhibit 13223 into evidence.

25         MR. NOLAN:  Objection.  Relevance, your Honor.

Page 1833

1          THE COURT:  I'm going to sustain the objection,

2     Counsel.  I don't know if the entire document is relevant.

3          Let's go to particular sections.

4          MR. PRICE:  Pardon?

5          THE COURT:  Let's lay foundation for the relevance

6     of the particular sections.

7          MR. PRICE:  Sure.

8     Q.   If you look at the second page of the document, and you

9     see, by the way, this is an e-mail from Peter Marlow,

10    Veronica Marlow's husband, concerning the services she has

11    been providing to MGA; correct?

12    A.   This is an e-mail that she's -- or he's sending to Paula

13    Garcia, and I see that I'm copied.  I don't know what is it

14    concerning.  If you'd like me to read it, I don't believe

15    I've seen this before.

16    Q.   Well, if you'd look at the second page.  There is a

17    paragraph at the end beginning with "if."

18          Do you see that?

19    A.   I do.

20    Q.   And the topic is Ms. Marlow talking about the people who

21    work for her.  Do you see that?

22          THE COURT:  Counsel, which paragraph in particular?

23    You're on page 2?

24          MR. PRICE:  Second page, and it's the last

25    paragraph.

Page 1834

1          THE COURT:  The last paragraph.  That spills over

2     to the next page?

3          MR. PRICE:  Yes.

4          THE COURT:  Very well.  You're moving to introduce

5     that particular paragraph?

6          MR. PRICE:  Pardon?

7          THE COURT:  Are you moving to introduce that

8     particular paragraph?

9          MR. PRICE:  Yes.

10          MR. NOLAN:  Objection with respect to foundation.

11     There's no foundation laid that he's seen this paragraph.

12          THE COURT:  Based on what's been established so

13     far, I'll overrule the foundational objection and the

14     relevancy objection to that paragraph alone.  That paragraph

15     alone may be published.

16          (Exhibit 13223, Page 2, last paragraph, received.)

17     Q.   BY MR. PRICE:  (Reading.)  "If Veronica goes to work for

18     MGA, she will no longer be able to work with her team of

19     pattern and sample makers.  They have secured day jobs with

20     an outlook of many more years of stability that they" --

21          THE COURT:  Just the first paragraph.

22          MR. PRICE:  "They only moonlight for Veronica.

23     About six months ago, we offered each of them full-time

24     employment at double their present salaries with a very

25     generous benefits package, but they all refused."

Page 1835

1          Do you see that?

2    A.   I do.

3    Q.   So this is communicating that whoever these people are,

4    they have a day job and they are moonlighting.

5    A.   That's what the paragraph says.  Your reading is as good

6    as mine.

7    Q.   And the paragraph right after that.

8              THE COURT:  One second, Counsel.

9              MR. PRICE:  And I request that that be moved into

10   evidence.

11             THE COURT:  Are there any other portions of this

12   e-mail that you are going to be seeking to introduce,

13   Counsel?

14             MR. PRICE:  It would just be the --

15             THE COURT:  Let's address this all at once.

16             MR. PRICE:  The sixth paragraph down there

17   beginning with "so."  It's really the third sentence

18   beginning with "they," which is important.

19             THE COURT:  Counsel, objections to these two

20   paragraphs, paragraphs 2 and 6 on page 3 of the exhibit,

21   Exhibit 13223.

22             MR. NOLAN:  Consistent with the prior ruling, we

23   have no objection.

24             THE COURT:  Very well.  So those two paragraphs can

25   come in.

Page 1836

1              (Exhibit 13223, Page 3, paragraphs 2 and 6

2              received.)

3    Q.   BY MR. PRICE:  Let's look at that first paragraph

4    beginning with these.  "These are older ladies, comfortable

5    with the way things are, and they don't want to change.  We

6    pay them very generously because they are risking their day

7    jobs, even a nice retirement, to work for us.  If they were

8    ever discovered, they'd certainly be painfully humiliated and

9    fired."

10             You see that?

11   A.   I do.

12   Q.   And so this e-mail informs you that Ms. Marlow has these

13   folks working for her who have secure day jobs, who are

14   moonlighting, and would certainly be fired if it was

15   discovered that they would be moonlighting.

16   A.   Yes.

17             MR. NOLAN:  Your Honor, I'm sorry.  In addition to

18   these paragraphs, could we just have the date of this e-mail?

19             THE COURT:  I was going to get to that, Counsel.

20   Let's make sure that we have a document that has the from,

21   sent, to, and subject line along with the three paragraphs

22   the Court has admitted on a singular piece of paper.  And why

23   don't we go ahead and put that up at this time.

24             MR. NOLAN:  Thank you very much, your Honor.

25             THE COURT:  The from, sent, to, and the subject

Page 1837

1    line.  Thank you, Counsel.

2          MR. PRICE:  We will put this in one document.  It's

3    from Peter Marlow, August 1, 2005, forward, Veronica Marlow.

4    And what we are looking at now is the e-mail from Peter

5    Marlow to Paula Garcia, Isaac Larian, two e-mails to Isaac

6    Larian, and M. Woods, dated June 20, 2005, subject, Veronica

7    Marlow.

8          THE COURT:  Very well, Counsel.  Leave it on the

9    screen.

10         MR. PRICE:  The only way digitally it can be done

11   is if it's in the background --

12         THE COURT:  Very well.  We've reached our technical

13   limits.

14         MR. PRICE:  All right.  If we can get back to the

15   these are older ladies.

16   Q.   At this point, reading this e-mail, you know these

17   ladies work for another toy company, don't you?

18   A.   No.

19   Q.   You know they have day jobs.  They are moonlighting, and

20   if it's discovered, they will be painfully humiliated and

21   fired.  You know that, don't you?

22   A.   That's what he said.

23   Q.   So that tells you they are working for another toy

24   company.

25   A.   No, it doesn't.

Page 1838

1   Q.   So this --

2   A.   I have no idea who they were working for.

3   Q.   So this would give you no concern whatsoever that the

4   women working and making the patterns for Bratz are working

5   for a competitor?

6   A.   I had no idea -- I have no idea even today who is he

7   talking about.  I don't even recall reading this e-mail.

8   It's a long e-mail sent to Paula, I was just copied on it.

9   So I have no idea.

10  Q.   Well, this was in the midst of a discussion that you

11  were having with Peter Marlow about how much Veronica Marlow

12  was charging; correct?

13  A.   I believe I had concerns how much money we were paying

14  to Veronica Marlow for the work she was doing, yes.

15  Q.   And you recall there are e-mails between you and Paula

16  and Veronica Marlow about her coming in house to work at MGA?

17  A.   Yes, I believe there are.

18  Q.   And this e-mail is part of that discussion where she's

19  saying I can't come in house and provide you the services.

20  A.   It's possible it is, yes.

21  Q.   So this is part of a conversation you were involved in

22  at this time frame, 2005.

23  A.   Which conversation?

24  Q.   About Veronica Marlow coming in house, about how much

25  she was costing; correct?

Page 1839

1  A.   I know that I was concerned with the amount of money we

2  were paying her to do free-lance contract work for us.

3  Q.   And this is Peter Marlow's response as to why Veronica

4  Marlow should not come in house; correct?

5  A.   I have no idea if that's his response.  Possibly, yes.

6  But I cannot say it for sure.

7  Q.   And reading those paragraphs, sitting here right now as

8  someone who has been in the toy industry for now a number of

9  years, '87 to 2008, 21 years, that's telling you these ladies

10  work at a competitor.

11  A.   No.  It says they are sample makers, and what's the

12  other word?  Pattern makers.  And in Southern California,

13  there are many, many companies in downtown L.A. in the

14  textile industry, in the clothing industry.  So they could be

15  from any of those companies.  I have no idea.

16  Q.   Not necessarily a doll making.

17  A.   That's correct.

18  Q.   So in that case, let's look at the next paragraph, the

19  paragraph that we talked about beginning with "so."

20         "So how do we get any work done like this?  Maybe

21  it's just that they are so talented.  They have more than 100

22  years total of doll-making experience between them."

23  A.   I see.

24  Q.   You see that?

25  A.   Yes.

Page 1840

1    Q.   So it's fair, Mr. Larian, that after reading this, that

2    these women have secure day jobs with stability, that they

3    are unwilling to leave, and that they moonlight, that if they

4    are discovered, they will be painfully humiliated and fired,

5    that they are talented doll makers, that they have more than

6    a hundred years of doll making experience between them.  All

7    of these certainly lead you to suspect that Veronica Marlow

8    is using a competitor's employees to make the fashions for

9    your Bratz dolls.

10   A.   I did not pay attention, as I told you, to this whole

11   long e-mail, nor did I read every line as you're doing right

12   now.

13   Q.   Well, it's certainly accurate to say that you did not do

14   anything in response to this e-mail to determine whether or

15   not the woman making fashions for Bratz was using competitors

16   of an employee.

17   A.   I did not do anything one way or another that I recall,

18   no.

19   Q.   And you didn't, for example, communicate with Mr. Marlow

20   or Veronica Marlow and say identify who these ladies are who

21   have a hundred years total doll-making experience and have

22   this secure employment and who are moonlighting and who would

23   be fired and humiliated if it was discovered.

24   A.   Again, as I testified, I did not read this long e-mail.

25   It was not sent to me.  It was sent to Paula.  I was copied

1    on it.  So I didn't recall even reading this whole e-mail.

2    Q.   Well, sitting here today, your business-making decision

3    would be I would do nothing if I received this.  I wouldn't

4    investigate it?

5    A.   I'm sorry?

6    Q.   I -- sitting here reading this today, your decision

7    still would be I wouldn't do anything about it, I wouldn't

8    investigate it?

9    A.   Paula was working with Veronica, and I hope she would

10   look into it.  I was not involved in that detail, no.

11   Q.   My question was different.  You said that you don't

12   recall reading this e-mail on which you are copied.

13   A.   That's correct.

14   Q.   My question is, sitting here today reading it, you still

15   wouldn't do anything about it?

16   A.   Probably I would not.

17           THE COURT:  Now, in recognition to the tech people,

18   they were able to get the date up there and the paragraph.

19           MR. PRICE:  He surprised himself.

20   Q.   And is that the same attitude you had when Mr. Bryant

21   came to you, as a Mattel employee, and showed you drawings?

22   That you didn't really care whether he had done those

23   drawings while he was at Mattel or not?

24   A.   I asked Carter Bryant specifically if he done those

25   drawings at Mattel, and he has told them he had done them in

Page 1842

1  1998 when he was not working for Mattel.

2  Q.   Do you have any reason to believe that the facts in this

3  e-mail about how Veronica Marlow's workers had secure

4  full-time jobs and were moonlighting and would be humiliated

5  and fired and had all of this doll-making experience, do you

6  have any reason to believe that Paula Garcia didn't know all

7  of this?

8  A.   I have no idea what she knew or not.  There are

9  statements in there like hundred years of doll making.  I

10  don't know if any of those are facts are not.  I have no

11  idea.  I didn't write this e-mail.

12  Q.   Well, the truth is you didn't want to know; right?

13  A.   That is not true, Mr. Price.  Your statement is not

14  true.

15  Q.   Then tell me everything you did after receiving this

16  e-mail to find out whether or not these women were working at

17  Mattel and working on the Bratz dolls at the same time.  Tell

18  me everything you did.

19  A.   I don't even know if they worked at Mattel or anywhere

20  else.  I told you I don't recall reading this e-mail.  This

21  long e-mail.  It was not addressed to me.

22  Q.   So it's your practice not to read e-mails that are --

23  let's see, three pages long?

24  A.   I get over 4- to 500 e-mails a day, and I cannot sit

25  down and read every one of them every line.  Yes, that's

Page 1843

1   true.

2   Q.   But this e-mail was in the middle of e-mail exchanges

3   between whether or not Ms. Marlow was going to join MGA;

4   correct?

5   A.   Probably, yes.

6   Q.   E-mails saying -- in which you were involved.

7   A.   I was concerned about the amount of money that Veronica

8   Marlow was charging, and I wanted to know if she can come and

9   work in house.  That's what I was focused on and concerned

10  with.

11  Q.   Well, Ms. Garcia, did she come to you and say Isaac,

12  Peter has put in this e-mail that the women working for

13  Veronica Marlow have secure day jobs, that they are

14  moonlighting, that they will be humiliated and fired if

15  anybody finds out, and that they have a hundred hours --

16  years of doll-making experience between them?  Did Paula

17  Garcia, to whom this was addressed, come to you and tell

18  you that?

19  A.   Not that I recall, no.

20  Q.   It's certainly something you would have expected her to

21  talk to you about if you didn't already know about it;

22  correct?

23  A.   Not necessarily, no.

24  Q.   Why wouldn't you expect your subordinate to tell you

25  that they had received an e-mail from a vendor which

Page 1844

1   confessed that they were using workers of another company who

2   would be fired if they -- if it was learned they were working

3   for you and who had a hundred years of doll-making experience

4   between them?  Why wouldn't you expect her to tell you that?

5   A.   We have over 1,000 employees.  If everyone came to tell

6   me about every e-mail they have, I would never get any work

7   done.  So I expect them to do their jobs.

8   Q.   Mr. Larian, I want to show you some documents to see if

9   you can identify them.  And I'll identify the first as

10  Exhibit 11665 for identification.

11          MR. NOLAN:  These are not on the exhibit list.

12          One moment, your Honor.

13          THE COURT:  You may.

14          MR. PRICE:  Can we go to sidebar on this?

15          THE COURT:  Sidebar.

16          (SIDEBAR CONFERENCE HELD.)

17          THE COURT:  Can I see the document?  Thanks.

18          MR. PRICE:  I don't want to examine Mr. Larian on

19   these documents.  They are three documents.  They are e-mails

20   from Mr. Gronich saying preserve your e-mails.  We want them

21   authenticated in case they become relevant.  Because he's the

22   one to authenticate them.  So I suggested that we agree that

23   they are authentic.  They are not admitted into evidence.

24   But the authenticity is stipulated to, and if they become

25   relevant.

Page 1845

1          THE COURT:   What's the objection?

2          MR. NOLAN:   We don't have an issue with respect to

3     the authenticity.  I was just handed this.  I'm assuming this

4     is the exact copy that was sent out.  I was just handed this.

5     This is in 2005.  This has nothing to do with Mr. Larian's

6     testimony right now, and I told Mr. Price that we could work

7     this out, and that Ms. Gronich is going to be a witness in

8     this case, and we're not going back on the basis of

9     authenticity, but it shouldn't be used with this witness in a

10    2005 document.

11         MS. AGUIAR:   And it also goes to basically what is

12    essentially discovery in this litigation.  And I don't want

13    to over-interpret the motion in limine, but we've been

14    objecting to each other's attempt to get into the discovery

15    in this case.  And so I also don't see how this even

16    conceivably could become relevant.

17         THE COURT:   Let me hear counsel.  I'm not really

18    sure.  I'm not finding what's relevant about these documents,

19    05, 06, and 07 regarding document retention as a result of

20    litigation.

21         MR. PRICE:   Two responses.  I'll let Mr. Zeller

22    respond to that particular question.

23         I don't plan to go into these with him.  So what

24    I'm saying --

25         THE COURT:   Let me hear from Mr. Zeller.

Page 1846

1      MR. ZELLER:  As the Court knows, there will be

2  spoliation issues.  Obviously, they may or may not come in.

3  But this would be a predicate in the event that these issues

4  of spoliation evidence come in, as we believe that they

5  should.

6      THE COURT:  I think this is premature at this point

7  in time.  Mr. Larian is not going anywhere.  The Court will

8  give you leave to recall him.

9      MR. NOLAN:  It's not going to be an issue.  Let's

10 move along.

11     (CONCLUSION OF SIDEBAR CONFERENCE.)

12     THE COURT:  You may proceed, Counsel.

13     MR. PRICE:  Thank you, your Honor.

14 Q.  By the way, so that we know what Ms. Garcia's position

15 was in 2005 when that e-mail, 13223, was sent to you and --

16 sent to her and copied to you, at that time she was a

17 vice-president of the company?

18 A.  Either director or vice-president.

19 Q.  Pardon?

20 A.  Either a director or vice-president.

21 Q.  And could you explain to the jury what a director of the

22 company is?

23 A.  It's basically she has people working for her

24 underneath.  She was promoted from a product manager to a

25 director.

Page 1847

1    Q.    And she reported directly to you?

2    A.    She did.

3    Q.    Switch topics now.

4          Did at any time MGA have a P.R. department?

5    A.    Yes, we do.

6    Q.    And for how long have you had a P.R. department?

7    A.    I believe since late 2000.

8    Q.    And one of your concerns back in, say --

9          THE COURT:  Counsel, identify the P.R. department.

10   Q.    BY MR. PRICE:  What does P.R. stand for?

11   A.    Public relations.

12   Q.    Thank you.  And one of your concerns, since the Bratz

13   dolls went on the market, was you wanted MGA to have a

14   consistent story about Bratz?

15         MR. NOLAN:  Objection as to the relevancy, when the

16   Bratz dolls come into the market.

17         THE COURT:  I'm going to sustain it.

18         Rephrase your question, counsel.  I'm not sure what

19   you mean by consistent story.

20   Q.    BY MR. PRICE:  Through your P.R. department, it was your

21   policy that no one talked to the press about Bratz unless

22   there was clearance in advance about what was to be said?

23         MR. NOLAN:  Objection.  Relevance.  Temporal

24   foundation.

25         THE COURT:  I'll sustain the temporal foundation.

Page 1848

1   Q.   BY MR. PRICE:  Beginning in 2001, 2002, there were press

2   reports about Bratz; correct?

3   A.   Yes.

4   Q.   And you were quoted in press reports saying certain

5   things about who was the inspiration for Bratz, how Bratz was

6   created, et cetera; correct?

7   A.   There were press reports about Bratz, sure.

8   Q.   And in those press reports, for example, we saw The Wall

9   Street Journal article, which talked about the sort of

10  fashion doll contest.

11          Do you recall that?

12  A.   I do.

13  Q.   And I just want to establish that in talking to the

14  press about those topics, it was important to you that there

15  would be agreement in advance as to what was going to be said

16  to the press.

17  A.   We have a company policy that I don't want other

18  people's names to be -- who worked for MGA to be in the

19  press, and the reason for that is I don't want headhunters to

20  be calling them.

21          MR. PRICE:  Move to strike as nonresponsive.

22          THE COURT:  I suppose it is, Counsel.  I'll strike.

23  The question is whether or not there was a -- an agreement,

24  not what the agreement was or why the agreement existed.

25  Sustained.  Stricken.

Page 1849

1    Q.    BY MR. PRICE:  Let me try to help move this along.  If

2    you look at Exhibit 633 for identification.  Have you found

3    that?

4    A.    Yes, go ahead.

5    Q.    Did you have a policy that no one was talking to the

6    press until they got clearance and they knew in advance what

7    was to be said?

8    A.    Yes.

9    Q.    And that policy is reflected in this e-mail; correct?

10   A.    No, that policy is not reflected in this e-mail.  But

11   that's the policy which I just explained to you, that I don't

12   want other people in the company to be talking to the press

13   or quoting to the press for the reason that I don't want

14   headhunters to be calling them.

15   Q.    There's nothing in this e-mail about headhunters, is

16   there?

17   A.    No, there's not.

18   Q.    And my question was this e-mail reflects your policy

19   that there be clearance and knowing in advance what people

20   are going to say so the same story comes out of everyone's

21   mouth.

22   A.    Yes, I can see that that's what's said in this.

23             MR. PRICE:  Your Honor, I move 633 into evidence.

24             MR. NOLAN:  No objection.

25             THE COURT:  It's admitted.  You may publish.

Page 1850

1          (Exhibit 633 received.)

2    Q.   BY MR. PRICE:  So this is June 19, 2001.  And perhaps

3    you can tell me there are some names we haven't seen.  Lon

4    Ross?

5    A.   I think he worked at MGA.  I don't know what position he

6    was in.

7    Q.   Dave Malacrida?

8    A.   He's our P.R. person, public relations person.

9    Q.   And in this e-mail, it attaches an article which you had

10   seen; correct?  Or that Mr. Malacrida, your public relations

11   person, had sent to you?

12   A.   Yes, I can see that.

13   Q.   And this is like some of your other e-mails where you

14   look at the e-mail and make your comments by writing things

15   in the attached e-mail.

16   A.   I do.

17   Q.   So for example, where it said the tween age is about 8

18   to 12, which is what Bratz is.

19          You have got your comment here about who said the

20   target is 8 to 12.

21   A.   I do.  I did that.  Those are my comments.

22   Q.   And this article quotes, for example, Mr. Ross; correct?

23   A.   Yes, I see his name there, yes.

24   Q.   And if we go to the next page, see up here, it quotes

25   Ms. O'Connor; correct?

Page 1851

1    A.    Yes.

2    Q.    And then you have your little comments here about more

3    like real girls.

4              Do you see that?

5    A.    Yes.

6    Q.    And in the next few pages, it also quotes either

7    Mr. Ross or Ms. O'Connor; correct?

8    A.    Yes, it does.  I can see a couple of them.

9    Q.    And certainly at this time you regarded Ms. O'Connor --

10   what was her position at this time?

11   A.    She was in charge of licensing, and I believe she was --

12   I believe public relations reported to her at the same time.

13   Q.    And licensing obviously was an important activity of

14   MGA.

15   A.    As of 2001, no, we hadn't started licensing yet.

16   Q.    So at that point you're planning to license, obviously.

17   A.    That's right.

18   Q.    You predicted that it would be a large profit area for

19   MGA.

20   A.    We wanted to start the licensing department, and she

21   started it.

22   Q.    So let's go to the first page again.  Your response

23   here.  You'll agree that nothing in here says I don't want

24   Victoria O'Connor or Mr. Ross to be quoted.

25   A.    It doesn't say that.  I'm sorry.  It says that no one

Page 1852

1    talks to the press.  I assume that means Victoria O'Connor

2    and Lon Ross.

3    Q.   What you say is we had a policy that no one talks to the

4    press until we get clearance and know in advance what we are

5    going to say; correct?

6    A.   Yes.

7    Q.   And your reason for saying you wanted to get clearance

8    and know what we're going to say is because we need to have

9    the same story come out of everyone's mouth.

10   A.   That's what it says.  That's what the paper says.

11   Q.   So you wanted the same story to come out of your mouth

12   that came out of Victoria O'Connor's mouth, that came out of

13   Mr. Ross's mouth; correct?

14   A.   We wanted to have consistency, yes.

15   Q.   Now, I'd like you to look at Exhibit 4941.

16   A.   Yes, go ahead.

17   Q.   And do you recognize 4941 as an e-mail which is Isaac

18   Larian to Isaac Larian, which includes an e-mail from a Chris

19   Palmeri to you?

20   A.   Yes.

21            MR. PRICE:  Move Exhibit 4941 into evidence, your

22   Honor.

23            MR. NOLAN:  No objection.

24            THE COURT:  It's admitted.  You may publish.

25            (Exhibit 4941 received.)

1    Q.   BY MR. PRICE:  Now, Chris Palmeri was a reporter at

2    Business Week; correct?

3    A.   Yes.  To the best of my recollection, he was, yes.

4    Q.   And these are your e-mail addresses?

5    A.   Yes.

6    Q.   And the subject of this is fact checking?

7    A.   Yes.

8    Q.   And what was going on here is Mr. Palmeri was sending

9    you an e-mail to fact check what he was going to put into his

10   article?

11   A.   That's correct.

12   Q.   And one thing he wanted to make sure is accurate, it

13   says:  "We describe you as a 49-year-old Iranian immigrant,

14   trained as a civil engineer, who modeled Bratz after your own

15   children, who wear midriff-baring shirts, low-rise jeans, and

16   baseball caps"; correct?

17   A.   I do see that, yes.

18   Q.   And actually the article was published which said the

19   Bratz were modeled, inspired by you seeing your own children

20   wearing these midriff-baring shirts?

21          MR. NOLAN:  Objection, your Honor.  Lack of

22   foundation.

23          THE COURT:  Sustained.

24   Q.   BY MR. PRICE:  Step back.  As we saw before, you were

25   concerned about the press that Bratz got; correct?

Page 1854

1  A.   I was not concerned about the -- I am sorry.  Say that

2  again.  I'm getting tired.  So I'm sorry.

3  Q.   It's Friday afternoon.  I don't blame you.

4       You wanted a consistent story about Bratz to come

5  out through the press.

6  A.   Yes.

7  Q.   And you would monitor to make sure that that consistent

8  story came out through the press.

9  A.   I did not monitor every piece of press that came out on

10 Bratz.  It's not possible to do that.

11 Q.   Well, did you monitor, when you have reporters contact

12 you for fact checking, would you then -- when reporters would

13 contact you to fact check an article, would you then read the

14 article?

15 A.   I have no idea whether I did or not.

16 Q.   Did you read the Business Week article that came out as

17 a result of this fact checking?

18 A.   I don't recall that.  I might have.  It's very possible.

19 Q.   You did read the e-mail, however, that you got from

20 Mr. Palmeri.

21 A.   Again, my name is on it.  So I assume I have read it.

22 Q.   And it was your understanding that what was going to be

23 published in the article was that you were a 49-year-old

24 Iranian immigrant, trained as a civil engineer, who modeled

25 Bratz after your own children, who wear midriff-baring

Page 1855

1   shirts, low-rise jeans, and baseball caps?

2   A.    What's your question?

3   Q.    It's your understanding that that information was the

4   information that was going to go into the article published

5   by Business Week?

6   A.    Probably, yes.

7   Q.    And that's why the fact checking, to make sure they

8   should say that; right?

9   A.    I hope so.  I don't know what was in his mind to send me

10   that e-mail.  You should ask him.

11   Q.    You don't understand he's trying to accurately make sure

12   he's going to say the right thing?

13   A.    His e-mail says fact checking.

14   Q.    So that's what you understood he was doing; right?  He

15   was saying hey, can I publish this and would it be accurate?

16   A.    Yes.

17   Q.    Okay.  Now, we're talking here about midriff-baring

18   shirts, low-rise jeans.  If you'd look at Exhibit 302.

19   A.    Yes, go ahead.

20   Q.    These are the drawings that Mr. Bryant gave you in

21   September of 2000; correct?

22   A.    I believe so, yes.

23   Q.    And if we look at 302-003, for example, the drawings

24   included hiphugger jeans; right?

25   A.    Yes.

Page 1856

1   Q.   Same as low-rise jeans?

2   A.   Yes, that's what my daughter wore.  That's what all the

3   other girls wore at that time.

4   Q.   Short T-shirt; right?

5   A.   Yes.

6   Q.   Midriff-baring?

7   A.   Yes.

8   Q.   In fact, a number of drawings in here like that.

9   A.   Yes, they are.

10  Q.   Where you have these hip hugging jeans and

11  midriff-baring shirt; right?

12  A.   Yes.

13  Q.   Mr. Bryant's drawings were the inspiration for Bratz.

14  A.   They were the inspiration for Bratz.

15  Q.   It's correct that -- if we can put up 4941 again.

16           Sitting here today, you consider that statement as

17  being partly true?

18           MR. NOLAN:  Objection, your Honor.  Foundation as

19  to what time.  2003?  Partly true of what?

20           THE COURT:  You are asking for foundation.

21  Sustained.

22  Q.   BY MR. PRICE:  Do you have an understanding as to

23  whether or not that statement is true or not?

24  A.   As of when?

25  Q.   Well, say, at the time of your deposition.

Page 1857

1   A.   Well, you know, this goes back to the 2000 -- September

2   2000.  And at that time my daughter Yasmin and her friends

3   were also wearing clothing that had midriff and -- I don't

4   even know how to say that.  I'm sorry.  Low-rise jeans,

5   et cetera.  And I put the two together.  That's what the kids

6   were wearing at that time.  And again, Carter Bryant's

7   drawings and -- look at my own kids -- was I put the two and

8   two together that I thought this kind of doll would be

9   successful.  That was one of the reasons we launched Bratz.

10  Q.   Were you trying to give the impression that you came up

11  with the Bratz look by just seeing the kind of clothes that

12  your daughter wore?

13  A.   No, I was not.

14  Q.   But you didn't tell Mr. Palmeri that the first time you

15  saw that look was associated with Bratz, was when Mr. Bryant

16  showed you these drawings?

17  A.    I did not.  Nor did I mention Paula Garcia or any other

18  designer who had worked on the Bratz.

19  Q.   Well, Ms. Garcia, are you saying she's the one who first

20  thought of these dolls having low-rise jeans, midriff-baring

21  shirts?

22  A.   No, she did not.  She was part of the whole design team

23  for the dolls.

24  Q.   It would be inaccurate to say that the Bratz dolls were

25  your son Jason's idea?

Page 1858

1   A.   Absolutely they were not my son Jason's idea.

2   Q.   But you did tell a reporter that.

3   A.   I did not.

4   Q.   If you look at Exhibit 12058.

5   A.   I'm not sure I can find this in this folder.

6   Q.   Do you have it in front of you?

7   A.   I do.

8   Q.   Have you ever seen this article before?

9   A.   I don't recall if I have or not.

10  Q.   And let me clarify.  Have you seen this article before

11  this litigation?

12  A.   Before this litigation?  No, I have seen it during this

13  litigation.

14  Q.   Before it, do you not recall one way or the other?

15  A.   I do not.

16  Q.   Did you talk with a reporter named Wes Weiss?

17  A.   I don't recall him, no.  I don't remember.  Maybe I

18  have.  I don't know.

19  Q.   Did you tell a reporter that your 17-year-old son Jason

20  came up with the idea for Bratz?

21  A.   I did not.  My son came up with a product called

22  Commandobot, but not Bratz.

23  Q.   If you look at Exhibit 11209.

24  A.   Yes, go ahead.

25  Q.   Have you seen the article that's Exhibit 11259?

Page 1859

1    A.    Only during the course of this litigation I have.

2    Q.    Did you ever tell a reporter that the idea for Bratz

3    came from when your daughter Yasmin and her cousins

4    complained that they were tired of Barbie?

5    A.    I don't recall -- I know that my daughter and her

6    friends were tired of Barbie.

7    Q.    The idea for Bratz came from Carter Bryant?

8    A.    It did.  The original idea for Bratz came from Carter

9    Bryant.

10   Q.    You weren't talking to your daughter, and then you came

11   up with the idea for Bratz.  That would be inaccurate;

12   correct?

13   A.    I did not come up with the idea for Bratz.  Bratz was

14   inspired by Carter Bryant's drawings.

15   Q.    So it would be false to say that you were the brain

16   child behind Bratz?

17   A.    For the Bratz drawings or Bratz dolls?

18   Q.    Say, for -- for however you use Bratz.

19   A.    No, I --

20   Q.    Let me finish.  It would be inaccurate to say that you

21   were the brain child behind Bratz?

22   A.    Absolutely.  I was the brain child behind the Bratz

23   dolls.  I created it.  I spent my money on it.  I put my

24   creative force into it.  I put my company's resources into it

25   to make it happen.  As far as the drawings were concerned

Page 1860

1    that became the basis for the Bratz, no, I have nothing to do

2    with that.

3    Q.   You have testified a number of times that Mr. Bryant was

4    the inspiration behind Bratz.

5              Do you recall that?

6    A.   His drawings were the inspiration for Bratz.

7    Q.   So it would be less than the complete truth if you

8    stated that you were the inspiration for Bratz.

9    A.   I don't even understand what less than completely true

10   means.  So can you rephrase that question?

11   Q.   You would not be telling the whole truth if you said

12   that you were the inspiration behind Bratz?

13             MR. NOLAN:  Objection.  Vague and ambiguous as to

14   the doll or the drawings --

15             THE COURT:  Fair enough.  Rephrase, Counsel.

16   Q.   BY MR. PRICE:  Let me do it this way.  If you'd look at

17   Exhibit 947.  It appears to be an affidavit.

18   A.   It's about 52 pages, yes.

19   Q.   Is this your affidavit in the case of MGA Entertainment

20   versus Thomas Christopher Joseph Metson?

21   A.   Yes.

22             MR. PRICE:  Your Honor, move Exhibit 947 in

23   evidence.

24             MR. NOLAN:  Your Honor, we have objection with

25   respect to relevance of most of this affidavit.  If Mr. Price

Page 1861

1    can point to it, it's a 52-page affidavit.

2              THE COURT:  You're not planning to complete the

3    examination this afternoon, are you?  Or is this your last

4    part?

5              MR. PRICE:  No, probably not.  I was going to

6    complete it on this topic.

7              THE COURT:  Very well.  Why don't we go ahead and

8    break for the day.

9              Ladies and gentlemen -- for the weekend, actually.

10   Well, this is your last document on this topic?

11             MR. PRICE:  The last document on this topic, yes.

12             THE COURT:  Let me see you at sidebar.

13             (SIDEBAR CONFERENCE HELD.)

14             THE COURT:  Mr. Nolan?

15             MR. NOLAN:  Your Honor, Exhibit No. 947, the

16   52-page document from Hong Kong, contains a lot of references

17   to stuff that is just totally irrelevant to 1-A and 1-B.  And

18   I think it raises a significant 403 --

19             THE COURT:  Can we identify particular paragraphs,

20   as we did with the last document?

21             MR. PRICE:  All I wanted to do is identify the

22   caption and identify that he swore under oath and identify --

23   it's actually just -- I think it's paragraph 14 at this

24   point.

25             THE COURT:  14?

1    MR. PRICE:  No, it's not 14.  If I had my copy me,

2    I could tell you.

3         8.  Paragraph 8.

4         MR. NOLAN:  That's the only one you want to use out

5    of the whole document?

6         MR. PRICE:  At this point.

7         MR. NOLAN:  Retract.

8         THE COURT:  Yes.  It's admitted except for that

9    paragraph and the front caption.

10        MR. PRICE:  And the statement under oath at the

11   end.

12        (Exhibit 947, paragraph 8, received.)

13        (CONCLUSION OF SIDEBAR CONFERENCE.)

14        THE COURT:  Counsel, you may proceed.

15        MR. PRICE:  Thank you, your Honor.

16   Q.   If you'd look at Exhibit 947, the caption, down to "I,

17   Isaac Larian, make oath and say as follows."

18        Mr. Larian, this is an affidavit you signed in this

19   case, in the case of MGA Entertainment and Thomas Christopher

20   Joseph Metson; correct?

21   A.   Yes.

22   Q.   And this was -- let me ask this:  Is this affidavit one

23   that you gave under oath?

24   A.   Yes.

25   Q.   Is this one of those affidavits you read before you

Page 1863

1   signed it under oath or one you did read before you signed it

2   under oath?

3   A.   For sure I didn't read this one.   It's 52 pages.   I

4   don't think I read it.   For sure I don't think I read it.   I

5   relied on my lawyers to prepare this.

6   Q.   What was MGA trying to accomplish by submitting under

7   oath to the court a 52-page affidavit signed by you?

8   A.   I don't remember the case.   I think it was about

9   somebody -- an infringement, I believe, in general.   In the

10  U.K.

11  Q.   And you didn't read any of these 52 pages to determine

12  whether what you were saying to the court under oath to get

13  legal relief was in fact accurate?

14  A.   I don't recall reading it, no.

15  Q.   Let's go to paragraph 8.

16       Before signing this affidavit under oath, did you

17  read this paragraph, saying, "I established the claimant and

18  was the inspiration behind the Bratz dolls"?

19  A.   Yes, I am absolutely the inspiration, the driving force

20  behind the Bratz dolls.   There's no question about it.   You

21  can ask anybody.   I think Victoria O'Connor even testified to

22  that.

23  Q.   My question was did you read this statement under oath

24  before you signed that affidavit?

25  A.   I don't recall if I read it or not, but that statement

Page 1864

1    is accurate.  I am the inspiration behind the Bratz dolls.

2    I'm the driving force behind the Bratz dolls.  And Victoria

3    O'Connor in this courthouse, your witness, testified to that.

4    Q.   Would you bet your case on that, that she said you were

5    the inspiration behind the Bratz dolls?

6            MR. NOLAN:  Objection, your Honor.  We're not

7    betting anything.

8            THE COURT:  Sustained.

9            Counsel, let's end for the day.  Ladies and

10   gentlemen, we're going to start Tuesday at 10:00.  We have

11   some matters to take up.  Remember, do not read about this

12   case in the paper.  Just a reminder.  And don't discuss it.

13           Enjoy your weekend, and we'll see you Tuesday

14   morning at 10:00.

15           (WHEREUPON THE JURY WITHDRAWS.)

16           THE COURT:  Counsel, please be seated.

17           Counsel, the Court is working on -- struggling with

18   trying to figure out what Judge Infante meant with his order

19   concerning the computer hard drives, and I need some

20   assistance from you in terms of some documents.  The

21   documents were filed with Judge Infante, and I'm referring to

22   the original motion before Judge Infante that triggered Judge

23   Infante's order.

24           I'm having trouble, and my law clerks are having

25   trouble retrieving for me those documents because the

Page 1865

1    documents that were going to Judge Infante, while we were

2    sealing them, that was basically the last that we dealt with

3    them.  And so this is specifically what I need.  I need --

4    and I know this is someplace in the exhibits, but I just

5    can't find it.  The discovery master's January 25th, 2007,

6    order itself compelling production of the Carter Bryant hard

7    drives.

8            Both sides refer to it, but I can't seem to find

9    the actual order itself.

10           The second thing is the underlying briefs that were

11   filed by both sides motions for, opposing the motion to get

12   the order to compel the production of the hard drives.  And

13   the only other thing that might be helpful to the Court, if

14   it's possibly available, is a transcript of the hearing

15   before Judge Infante, and just the portion dealing with this

16   particular order.

17           I'm trying to figure out what the actual order

18   covered and didn't cover.  And I don't know, Mr. Zeller or

19   Mr. Nolan, how long it would take to put this together.  The

20   sooner I get to this, the better.  But I understand this is

21   Friday at 5:05.

22           MR. ZELLER:  I believe we can pull that together

23   very quickly for your Honor.  Just if you let us know when

24   and where you would like it delivered, we can arrange for

25   that.

Page 1866

1        THE COURT:  When you say quickly, tomorrow?

2        MR. ZELLER:  Yes, absolutely, we can have it done

3   by tomorrow.

4        THE COURT:  If you can have it delivered to my

5   home, that would be fine.

6        MR. ZELLER:  Absolutely.  Is there a preferred

7   time?

8        THE COURT:  I wouldn't use the word preferred.

9        MR. ZELLER:  Is there an instructed time?

10       THE COURT:  That's probably better.  Well, I don't

11  want to impose unreasonable burdens on you.  When would be --

12  as long as I get it sometime before, say, three o'clock

13  tomorrow afternoon.

14       MR. ZELLER:  Sure, that's fine.  Just don't want to

15  unnecessarily disturb you.  Unnecessarily being the operative

16  word.

17       And one other point, your Honor.  Just so the Court

18  knows it's there.  Not trying to foist more material on the

19  Court to be sure, but there were additional motions filed in

20  the aftermath of the original order.  There were --

21       THE COURT:  Following the issuance of the order?

22       MR. ZELLER:  I'm sorry?

23       THE COURT:  Following the issuance of the order?

24       MR. ZELLER:  Correct.  There were motions to

25  enforce that were heard initially on the January 25th, 2007,

Page 1867

1   order where the -- there was some dispute about rarely the --

2   even two of the drives that were in our view compelled by

3   that order.

4           So there was at least two rounds of briefing on

5   that.

6           THE COURT:  Was there a subsequent order by Judge

7   Infante?

8           MR. ZELLER:  I would have to double-check on that.

9           THE COURT:  If there wasn't -- all I'm doing at

10  this point, what's before me is a motion to compel the

11  enforcement of the order, and what I'm having trouble doing

12  is deciding what that order required.  So what I want to know

13  is what was before Judge Infante when he issued the order.

14  Anything post, I'm not going to use that to base my decision

15  on.

16          MR. ZELLER:  I can double-check to make sure that

17  there were no actual orders.  It is possible --

18          THE COURT:  If there was.  Certainly if Judge

19  Infante clarified his order in any respect, I would certainly

20  want that as well, but I don't recall reading any reference

21  to that in your moving papers.

22          MR. ZELLER:  It's possible that it may have been

23  resolved by a stipulated order of some sort.  That's what I

24  cannot recall offhand.

25          THE COURT:  If that's the case, I'd like to see

Page 1868

1   that.  If not -- Mr. Corey didn't provide anything that

2   requires further elaboration?  A retraction, perhaps?

3          MR. ZELLER:  He just wanted to make sure it was

4   clear that the -- those initial motions to enforce dealt with

5   the two hard drives that have already been turned over.  He

6   just wanted to make sure of that.

7          THE COURT:  I am familiar that those hard drives.

8   The question is whether or not the order encompasses

9   something beyond those two additional hard drives.

10          MR. ZELLER:  Absolutely.  And I just wanted to

11   alert the Court that there were those subsequent issues.  I

12   will double-check and make sure there's no further orders on

13   that January 25th order.

14          THE COURT:  I hope to be able to resolve this on

15   Tuesday morning.  I'll see you here at 8:00 sharp.  Is there

16   anything else?

17          MS. AGUIAR:  We raised an issue with you before

18   regarding a witness that's on the list for Tuesday, and you

19   did indicate that we would wait to see how it came out with

20   his testimony.  My conversations with Mr. Zeller, though,

21   it's my understanding that that would be the sole area of

22   inquiry for this witness.  So I just wanted to get some

23   guidance, if we could, on the question of whether copyright

24   applications from subsequent years are in play at this point.

25   I think --

Page 1869

1      THE COURT:  Well, let me hear from Mr. Zeller,

2  first of all, as to why they would even be in play.  And I'll

3  give you a chance to respond so you don't have to anticipate

4  his argument.

5      Mr. Zeller, why would subsequent year copyright

6  applications have any relevance at this point?

7      MR. ZELLER:  I'm not sure that's really the

8  appropriate issue to determine with Mr. Armstrong.  Because I

9  assume that what she's referring to is to Mr. Armstrong's

10  testimony.

11     THE COURT:  Is that right, Ms. Aguiar?

12     MS. AGUIAR:  Yes.

13     THE COURT:  Very well.

14     MR. ZELLER:  Number one, Mr. Armstrong was a

15  designated 30(b)(6) witness on certain topics.  Some of those

16  topics in fact included the copyright registrations that the

17  Court will recall Mr. Nolan put in front of a witness

18  yesterday, Lucy Arant.  Those registrations, I mean, they are

19  clearly now in play.  They clearly relate to --

20     THE COURT:  Well, they are in play only to the

21  extent that they involve the date of creation and provide

22  evidence for that purpose.

23     MR. ZELLER:  Certainly I would agree --

24     THE COURT:  It doesn't open the door for -- I don't

25  think you want to get into copyright at this point.

Page 1870

1        MR. ZELLER:  That is correct, your Honor.  And I am

2   focused on those registrations, corrections made to them that

3   pertain to the dates.

4        THE COURT:  Okay.

5        MR. ZELLER:  I will say this, however, your Honor.

6   Obviously, both Mr. Larian and Ms. Garcia, not accusing

7   counsel of anything, but have certainly loaded their answers

8   with this wedge, this division between the dolls and the

9   drawings.  That is also addressed by these registrations.  So

10  I don't think it's fair to say that --

11       THE COURT:  Proffer for the Court in what way is

12  that addressed by these registrations?

13       MR. ZELLER:  Well, it is addressed by the

14  registrations, and we have expert testimony that can further

15  elaborate upon this in terms of copyright office procedure.

16  But the fact is what they obtained was a registration for the

17  doll.  They also have other registrations for those Bryant

18  drawings that list the dolls or make clear that the dolls are

19  derivatives of the drawings.

20       THE COURT:  Okay.  This is clearly 1-B, Counsel, on

21  this.

22       MR. ZELLER:  I don't necessarily disagree on one

23  level with the Court.

24       THE COURT:  I'm concerned.  I understand you want

25  to respond to what you perceive as this wedge, which I think

1   we addressed at sidebar on several occasions, and I believe

2   once we got past one particular witness, it seemed less and

3   less a problem.  If I allow you to then now use that wedge to

4   open up this entire issue and get into what's derivative and

5   what's not derivative, I've got to afford MGA the opportunity

6   to do the same thing.  And I think we'll just obliterate the

7   line between 1-A and 1-B.

8           MR. ZELLER:  I would put it this way, your Honor.

9   I think, you know, as we have -- as we've gone along, there

10  have been lines drawn.  You know, we have a 30(b)(6) witness

11  who has given testimony on this very issue about, you know,

12  about what the registrations cover and what was being

13  identified as being created at particular dates.

14          So, I mean, to some degree, these things are

15  intertwined.  We've heard Mr. Larian.  I mean, he was even

16  ending the day on this note of, well, absolutely I'm the

17  creator of the dolls.  Different somehow than the concept of

18  Bratz, different than the drawings.  I mean, they have been

19  consistently trying to draw this division.

20          THE COURT:  I think there is sufficient evidence

21  being presented just in what has been presented through a

22  number of witnesses, of the relationship between the drawings

23  and the dolls for purposes of 1-A.  Without going into a

24  legal discussion of copyright registrations, derivative

25  copyright registrations and the like.  I don't think you are

Page 1872

1    without evidentiary material to respond to whatever limited

2    incursions have taken place already of 1-B issues into 1-A.

3              I think to do what you're suggesting now might take

4    it to another level altogether that I don't think is

5    warranted at this time.  And I'm not saying that as we go

6    forward, if this continues to be at issue and Mr. Larian

7    starts relying on this distinction in the same way that

8    Ms. Garcia did, that perhaps that door might not be opened.

9              But given where we're at right now, my inclination

10   would be to limit your copyright information to the issue of

11   the dates and the correction of the dates, and let's leave it

12   at that.

13             MR. ZELLER:  And I understand the Court's ruling on

14   that.  And so certainly Mr. Armstrong can address the date

15   issue that I think we all agree is in play for purposes of

16   Phase 1-A.  Another issue that Mr. Armstrong can address, and

17   he was a designated 30(b)(6) witness on this, was the patent

18   application for interchangeable feet.  The one that

19   Mr. Larian was shown today.

20             There are declarations that Carter Bryant made in

21   support of that.  There are other factual issues that

22   underlie that application that he can and has testified

23   about, that from our perspective, we, of course, believe that

24   it was an untrue statement for Mr. Larian to be saying to the

25   Patent Office that he was the sole inventor of that -- of the

Page 1873

1    invention that was set forth in the application.

2         THE COURT:  This is strictly for impeachment

3    purposes?

4         MR. ZELLER:  I'm sorry?

5         THE COURT:  This is for impeachment purposes?

6         MR. ZELLER:  No, your Honor.  It is part of the

7    pattern of misstatements and concealment that was done in

8    terms of where Bratz came from.  This is part of the series

9    of statements that, of course, many of which have been

10   highlighted today in which Mr. Larian made false statements

11   to the press, to the U.S. government, to other people that he

12   was in fact the person who came up with Bratz, invented

13   Bratz, any number of variations on this idea.

14        So it actually goes to this concealment, and it's

15   also intent.

16        THE COURT:  I guess the concern I have is by using

17   the copyright papers to do that, you get into the very legal

18   issues which we've been trying to keep out, the copyright

19   legal issues that we're trying to keep out of 1-A.

20        MR. ZELLER:  Actually, that's the patent

21   application, your Honor.

22        THE COURT:  This is the patent application.

23        MR. ZELLER:  It's a patent application.  It's

24   Exhibit 500 that was shown to Mr. Larian today and is now in

25   evidence.  It is entitled, and I'm sure I won't get the words

Page 1874

1    exactly right.  But it's --

2              THE COURT:  Doll with aesthetic changeable foot

3    gear.

4              MR. ZELLER:  Correct.  And there is also a

5    declaration by Mr. Larian, which is in evidence today, in

6    which he swore to the Patent Office that he was the sole

7    inventor.

8              Mr. Armstrong was the Rule 30(b)(6) designee on

9    that application and on the statements that were played to

10   the Patent Office.  So he does have testimony on that

11   subject.  It also relates to the fact that Carter Bryant,

12   too, was involved in that application, and he made certain

13   statements to the Patent Office.

14             So from our perspective, it goes to part of this

15   series of statements that were made up until certainly the

16   time of the Wall Street Journal article, and even somewhat

17   beyond, in which Isaac Larian took the lion's share.

18             Carter Bryant isn't mentioned as being the

19   inventor, and that's not only the concealment point, but it

20   also goes to intent.  He obviously can't continue to say

21   well, everyone else in the world has misunderstood me.  When

22   we have this series of statements, particularly when they are

23   trying to make distinctions like the kind they are today,

24   which is well, I really meant the dolls, or I really meant

25   something else.

Page 1875

1          THE COURT:  Let me hear from Ms. Aguiar on this.

2          MR. ZELLER:  I thought those were the major issues

3     that Mr. Armstrong would address.

4          THE COURT:  Very good.

5          MS. AGUIAR:  With regard to the date, I guess if I

6     have clarification from Mr. Zeller that what he means is the

7     June -- I think this is correct -- June of 2000 date of

8     creation that was on the copyright application and then the

9     correction of that date, because obviously the applications

10    themselves have a lot of dates on them, can I get that --

11         THE COURT:  That's what the Court is referring to.

12    So whether Mr. Zeller is referring to it or not, that's

13    what's going to come in.

14         MS. AGUIAR:  And then with regard to the patent

15    application, Mr. Armstrong was asked questions about the

16    patent application.  He was a 30(b)(6) witness.  He's a legal

17    assistant at MGA.  I guess what I would say on that is that

18    Mr. Larian was asked questions, and they are going to be

19    continuing to ask Mr. Larian questions on that.

20         I know that doesn't mean they can't ask another

21    witness those same questions, but they do have the person who

22    is really the person with firsthand knowledge of those

23    documents, of the patent application.

24         THE COURT:  I understand.  What I'm thinking of

25    doing, Ms. Aguiar, is limiting -- and I want to hear your

Page 1876

1    response to this -- is limiting Mr. Armstrong as a 30(b)(6)

2    witness to covering exhibits and issues that have been

3    previously admitted.  To the extent that Exhibit 500 has been

4    admitted and Mr. Larian has discussed it, I think it's fair

5    game for them to bring up another witness to examine

6    Exhibit 500.  To the extent that the copyright applications

7    came in as rebuttal to basically your cross-examination or

8    Mr. Nolan's cross-examination of their witness, then it's

9    fair game for them to bring in this 30(b)(6) witness to

10   address those copyright applications.

11        What I'm going to limit, I think, is any foray into

12   any additional copyright material or intellectual property

13   material that I think gets us too far astray of the issues in

14   1-A, but I'll hear from both of you on that.  That's my

15   tentative thoughts in terms of how to proceed on this.

16        MR. PRICE:  Before I allow Mr. Zeller to speak, the

17   one exception I would like to that, your Honor, is Mr. Bryant

18   will be testifying, and there is, as Mr. Zeller referred to,

19   another document with respect to him and this patent

20   application.  And we know what his explanation is.  And the

21   30(b)(6) witness refutes that.  So with that, I believe we'll

22   be getting into evidence --

23        THE COURT:  I don't know if it will or it won't.

24   But the point I'm making is that by the time Mr. Armstrong

25   takes the stand, my thought will be to limit it to a

Page 1877

1    discussion of exhibits and issues that have already been

2    raised and not to use him as a means to go into further

3    copyright discussion absent a clear showing of relevance and

4    foundation.

5              MR. ZELLER:  If I may, first, just by way of

6    clarification, the June 2000 date is not from the copyright

7    applications.

8              THE COURT:  I understand.  It was from the

9    trademark application, but you're using this showing the

10   change of the trademark application -- on the copyright

11   application, the change there, that was their argument.  And

12   I understand that you disagree with that.

13             MR. ZELLER:  That was their argument.  But even

14   apart from that, we would still say that the fact that they

15   initially submitted copyright applications for the dolls

16   saying that they were done in the year 2000, and, of course,

17   we also have Nana Ashong's e-mail saying not only was it

18   2000, it was September 18, 2000, we would say that then for

19   them to go off and change after the litigation began,

20   changing that date, part of the concealment --

21             THE COURT:  That's further argument to be made.  I

22   understand.  But they are free to bring in evidence that the

23   change was made for innocent reasons or whatever.  And that's

24   part of why we're having a trial.

25             MR. ZELLER:  And part of what I would suspect that

Page 1878

1    Mr. Armstrong would be examined on would be the reasons for

2    the exchanges.  That was certainly part of the 30(b)(6)

3    testimony --

4                 THE COURT:  The reasons for the changes of the

5    dates.  It's all tied to the date testimony.

6                 MR. ZELLER:  Correct.

7                 THE COURT:  Yes, Counsel.

8                 MR. ZELLER:  Yes.  So the Court is certainly

9    correct that it is not our intention to get into a foray

10   about a bunch of other registrations, because there are many,

11   but I would ask the Court just somewhat to reserve judgment

12   as to what the full scope of this is.  We will know better,

13   of course, once Mr. Larian is done testifying.

14                 THE COURT:  And after we hear from Mr. Bryant, as

15   Mr. Price points out.  Just so you know, I'm still

16   formulating this, but my touchstone is going to be are these

17   issues that have been raised by MGA or have been admitted

18   through evidence from Mattel and limit it to that.

19                 MR. ZELLER:  It's certainly our intention not to go

20   broad.  It's to go narrow on these issues, and we understand

21   the Court's concern.

22                 THE COURT:  Ms. Aguiar, does that give you enough

23   guidance in terms of where I am right now?  Because

24   admittedly, I have to wait to hear the actual testimony

25   itself.

Page 1879

1          MS. AGUIAR:  I understand.  I appreciate it.

2          THE COURT:  That's a general orientation.

3          Okay.  While we're on the topic of witnesses, who

4    are we hearing from -- we're going to hear from Mr. Larian, I

5    presume.  Mr. Price, you have another --

6          MR. PRICE:  Fifteen minutes.

7          THE COURT:  -- five, ten minutes?

8          MR. PRICE:  That's actually accurate.

9          THE COURT:  Mr. Nolan, you have cross-examination?

10          MR. NOLAN:  I don't think it's going to be that

11    lengthy.  I'm hoping maybe an hour, hour and a half.

12          THE COURT:  Very well.  Who's next?

13          MR. QUINN:  Mr. Eckert.

14          THE COURT:  Okay.

15          MR. QUINN:  And then?

16          MR. ZELLER:  We have Rachel Harris, who we

17    anticipate testifying.  There's Andreas Koch, who we believe

18    we have something of a resolution, to which is that we will

19    play what we would expect to be agreed to or largely agreed

20    to portions of his videotaped deposition.  The general

21    concept is it will involve his testimony about an initial

22    meeting that he participated in with Mr. Bryant.

23          There are other issues that have been raised with

24    respect to Mr. Koch's testimony.  They go into other issues

25    about the workplace environment, treatment of employees there

Page 1880

1  at MGA, and a variety -- and without -- I understand the

2  Court's -- where the Court's going already on this.  But we

3  have decided to do, because contingent obviously on any door

4  opening issues and that sort of thing --

5          THE COURT:  Exactly.  And don't get me wrong.  I

6  think there's a degree of relevance to all of this with the

7  witnesses themselves for them to describe, you know, their

8  relationship with their employer, how they felt about working

9  there, whether they are disgruntled employees, whether they

10  are happy employees, I think there's a degree of that that's

11  relevant to the issue of witness credibility.  But to simply

12  bring in witnesses who are going to describe conditions at

13  Mattel or MGA, I think, I think whatever -- whatever

14  relevance that has is outweighed by the prejudice that would

15  be brought in through those types -- that type of testimony.

16          MR. ZELLER:  And what our intention was is that as

17  to those other issues, is that at this time we will not have

18  them as part of the videotaped deposition.  So that will

19  eliminate those issues.  Both sides are reserving their

20  rights.

21          Obviously, if we think it becomes relevant or

22  important to have the additional testimony in, you know, and

23  they are reserving their rights, of course, to oppose it, and

24  we would deal with it in that context.  The only thing that

25  would be waived is perhaps not the right word, but there's at

Page 1881

1  least agreement that people won't argue later on because

2  we've already had one segment played, that additional

3  segments can't be played again.

4         THE COURT:  Let me get through this list of

5  witnesses, and then I'll hear from Ms. Aguiar on any

6  particular objections they have.

7         So Mr. Eckert, Ms. Harris, Mr. Koch.  Who is next?

8         MR. ZELLER:  We have on the witness list for

9  Tuesday, whether we get to him beyond those witnesses, I

10 would say, is unlikely.  But Mr. Armstrong would potentially

11 be on that list.

12        THE COURT:  Okay.  And then where do we go from

13 there?

14        MR. ZELLER:  And then I think we're to Mr. Bryant.

15        THE COURT:  Okay.

16        MR. ZELLER:  There are maybe some additional things

17 that we would have in between.  There's the Kickapoo video,

18 which we're contemplating perhaps playing before.

19        THE COURT:  But nothing that's going to require --

20 the Court's inquiring more in terms of any hearings that I

21 need to hold, or morning hearings I need to hold relating to

22 motion in limine issues.  It sounds like the one we have on

23 Tuesday, which obviously goes to Carter Bryant in terms of

24 these hard drives and the Litler Mendleson (phonetic)

25 deposition and all of that, and Evidence Eliminator, that can

1   all be taken up on Tuesday morning.  There's nothing else

2   that needs to be addressed for any of your witnesses for

3   Tuesday or Wednesday; is that correct?

4          MR. ZELLER:  I'm not sure if this fully answers the

5   Court's question.  In general that's true.  The one thing I'm

6   not sure about is Mr. Menz.  He is one of the forensic

7   experts.  As a matter of timing, we were contemplating

8   calling him on Tuesday.  Again, I think at this point we're

9   into pretty theoretical territory, at least given the pace of

10  the past, that we would make it through all of these

11  witnesses, but we do have him on the list of people who

12  potentially would be called on Tuesday because it is our

13  intention after this sequence of witnesses, and maybe we

14  would shorten it up a bit, is then to have Mr. Bryant

15  testify.

16         THE COURT:  Well, Mr. Menz is something that we do

17  have to have a hearing for.  So if we find ourselves -- let

18  me take a look at my calendar and make sure I don't have

19  anything during the lunch hour.

20         I suppose if we have to, we'll know by noon, and

21  then we can do something during the lunch hour.

22         MR. ZELLER:  All right.  And we did have some

23  additional people on the Tuesday list.  Farhad Larian was

24  one.  I'm advised he's not really available next week.

25         THE COURT:  As long as you provide this to counsel.

Page 1883

1   I'm just really interested on anyone that would require a

2   hearing.

3         MR. ZELLER:  There is nobody else who -- well,

4   actually Farhad Larian would probably require a hearing, at

5   least in the sense of he had a U.S.B. device, and there were

6   spoliation issues that relate to Mr. Larian.  It does -- he

7   does start to get us into some of those issues.

8         THE COURT:  All right.  Very good.  Well, just keep

9   me posted on this.  Let me hear from Ms. Aguiar in terms of

10  any of the witnesses.

11        Is there anything else, Mr. Zeller?

12        MR. ZELLER:  One clarification of the materials

13  that the Court would like.  I know you would like the

14  underlying briefs related to the January 25th order.

15        THE COURT:  Well, not just the briefs, but anything

16  that was submitted.

17        MR. ZELLER:  That's what I was going to ask.  The

18  declarations as well.

19        THE COURT:  I'm afraid whenever I ask for that

20  stuff, but yeah, I need that as well.

21        MR. ZELLER:  Well --

22        THE COURT:  For whatever reason, we're having

23  trouble finding it.

24        MR. ZELLER:  To forewarn the Court that the January

25  25th, 2007, order covered an extremely broad range of

Page 1884

1    discovery issues.  I -- while I don't have a specific

2    recollection of the size of those declarations, I imagine

3    they are quite voluminous because that order covered an

4    entire range of discovery.

5             THE COURT:  Well, this might be a way, and

6    obviously I want both sides to look at what's being submitted

7    to me, and preferably you could run this also by the Keker

8    firm, Ms. Anderson.  You're going to need to do that before

9    you submit it because otherwise, it would be -- so you do

10   need to run this by them before you submit anything to the

11   Court.  But if you can go through there, and I will give you

12   an instruction -- submit the briefs in whole, but to the

13   extent that there are portions of the exhibits in the

14   declarations that are entirely irrelevant and you and counsel

15   for MGA and counsel for Carter Bryant can agree on it, I'd

16   just as soon not receive those.

17            MR. ZELLER:  We will do that, your Honor.

18            THE COURT:  Very well.  Anything further?

19            MR. ZELLER:  That was it for us.  Oh, actually, I

20   apologize.  Mr. Quinn handed me a note.  If we can get an

21   updated time count.

22            THE COURT:  I'll give that to you momentarily.

23            MR. NOLAN:  Could we charge the last half hour

24   against Mr. Zeller?

25            THE COURT:  Very good.  Give me a moment on this.

Page 1885

1   I have for the defense, I have approximately 12 hours and 15

2   minutes, and for the plaintiff, you've already gone around

3   the chess clock once, and now it's a total of 23 hours and 15

4   minutes.

5               MR. ZELLER:  I think that is it.  That's the last

6   note that was passed to me, and I think that is it.  Thank

7   you.

8               THE COURT:  Very well.

9               All right, Ms. Aguiar.  You've got complete control

10  of the floor now.

11              MS. AGUIAR:  With regard to Mr. Koch, I did say

12  that we would agree to the video and not require that he be

13  here live if it was limited in the way that Mr. Zeller just

14  described.  So we did reach that agreement, and so we were

15  able to work that out.

16              With regard to Mr. Menz, I am assuming that he

17  would obviously only be a witness if your Honor were to hold

18  that the Evidence Eliminator issues were relevant.

19              THE COURT:  So right.  That preliminary matter will

20  be decided Tuesday morning.

21              MS. AGUIAR:  Great.  And then the two nonparties

22  that were on their list for Tuesday were Farhad Larian, who I

23  understand he will not be on the table for Tuesday because

24  he's not available?

25              MR. ZELLER:  That's my understanding.

Page 1886

1          MS. AGUIAR:  And Elise Cloonan is also a nonparty.

2     And I'm guessing, based on what Mr. Zeller said, she's also

3     not on the table for Tuesday.

4          MR. ZELLER:  That's a little more difficult to say

5     for the moment.  But she is on our Tuesday list.  She's

6     represented by Larry McFarland.  We would expect her to

7     testify prior to the time that Carter Bryant starts.  It's a

8     little difficult, of course, to know how long Mr. Larian has

9     left on the stand.  And we obviously don't want to -- and

10    also whether or not --

11         THE COURT:  So she may be a Wednesday witness,

12    then?

13         MR. ZELLER:  Correct.

14         THE COURT:  So you are saying, though, that she

15    will be called before Carter Bryant?

16         MR. ZELLER:  That's our expectation.

17         MS. AGUIAR:  By my count, she would definitely be a

18    Wednesday witness.  And I think that's it.

19         THE COURT:  I think that's accurate, given that

20    we're going to have a late start on Tuesday.  We're not going

21    to start until 10:00.

22         MS. AGUIAR:  Right.  And they said they weren't

23    sure they were going to get to Armstrong.  And Cloonan would

24    be after him.

25         THE COURT:  Okay.  Anything further for MGA?

Page 1887

1          MR. NOLAN:  Your Honor, we start at 8:30 Tuesday

2    morning?

3          THE COURT:  8:00.  The order that I issued, I want

4    Carter Bryant's attorneys here at 8:00 as well, and I'm

5    planning to put us at 8:00 to 10:00 on the two motions

6    outstanding, the Evidence Eliminator, the hard drives, all of

7    this, and I hope to be well prepared myself to indicate my

8    tentative thoughts, and then I'll hear further argument.

9    I'll hear whatever witnesses that I need to hear, and make a

10   decision and go forward.

11         MR. NOLAN:  Your Honor, the last point was I wanted

12   to thank you on behalf of MGA for the manner which you

13   handled the order this morning.  That was very helpful.  And

14   two, we all wish we had the patience you have.

15         THE COURT:  The trial is not over yet.

16         Good evening.

17

18          (Proceedings concluded at 5:35 P.M.)

19

20

21

22

23

24

25

Page 1888

1

2

3

4

5

6                          C E R T I F I C A T E

7

8

9          I hereby certify that pursuant to Title 28,

10   Section 753 United States Code, the foregoing is a true and

11   correct transcript of the stenographically reported

12   proceedings in the above matter.

13          Certified on June 6, 2008.

14

15

                    _____
16                  MARK SCHWEITZER, CSR, RPR, CRR
                    Official Court Reporter
17                  License No. 10514

18

19

20

21

22

23

24

25