Page  2226

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

---

| | | |
|---|---|---|
| MATTEL, INC., | : | PAGES 2226 - 2352 |
| | : | |
| PLAINTIFF, | : | |
| | : | |
| VS. | : | NO. ED CV04-09049-SGL |
| | : | [CONSOLIDATED WITH |
| MGA ENTERTAINMENT, INC., | : | CV04-9059 & CV05-2727] |
| ET AL., | : | |
| | : | |
| DEFENDANTS. | : | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

WEDNESDAY, JUNE 11, 2008

JURY TRIAL - DAY 11

AFTERNOON SESSION

MARK SCHWEITZER, CSR, RPR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
181-H ROYBAL FEDERAL BUILDING
255 EAST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012
(213) 663-3494

1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4        Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
         By John B. Quinn, Esq.
5            B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
6            Harry Olivar, Esq.
             John Corey, Esq.
7            Diane Hutnyan, Esq.
             William Price, Esq.
8        855 South Figueroa Street
         10th Floor
9        Los Angeles, CA 90017
         (213) 624-7707

10

11

12   On Behalf of MGA Entertainment:

13       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
         300 South Grand Avenue
17       Los Angeles, CA 90071-3144
         (213) 687-5000

18

19   For Carter Bryant:
         Keker & Van Nest
20       By Christa Anderson, Esq.
             Michael H. Page, Esq.
21       710 Sansome Street
         San Francisco, California 94111-1704
22       (415) 391-5400

23

24

25

Page 2228

1                          I N D E X

2

3    ISAAC LARIAN, PREVIOUSLY SWORN........................ 2231

4    REDIRECT EXAMINATION (CONTINUED) BY MR. PRICE:........ 2231

5    BRYAN JOSEPH ARMSTRONG, SWORN........................ 2269

6    DIRECT EXAMINATION BY MR. ZELLER:.................... 2270

7    VIDEOTAPED DEPOSITION EXCERPTS OF SARAH ODOM.......... 2318

8    CARTER BRYANT, SWORN................................. 2329

9    DIRECT EXAMINATION BY MR. PRICE...................... 2329

10                        E X H I B I T S

11
     (Exhibits A-1, A-2, and A-3 received.)................ 2326
12
     (Exhibit 23 received.).............................. 2334
13
     (Exhibit 24 received.).............................. 2341
14
     (Exhibit 25 received.).............................. 2344
15
     (Exhibit 26 received.).............................. 2345
16

17

18

19

20

21

22

23

24

25

7dc8527b-b015-4d5e-b900-118ee9139575

Page 2229

1      Riverside, California; Wednesday, June 11, 2008

2                        1:40 P.M.)

3      (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

4          THE COURT:  Okay, we're back on the record outside

5      the presence of the jury.  I understand there's a matter you

6      wanted to take up?

7          MR. PRICE:  Quickly, your Honor.  In response to

8      Mr. Larian's statement regarding a target on the back and the

9      Federal Court finding that, I'm a little worried about that

10     just lying out there.  We're obviously researching it and

11     haven't completed our research over the noon hour.  But I

12     would just ask for leave at some point to recall him to the

13     stand, if our research isn't done, to challenge him just on

14     that, that one of those four cases a court said or made some

15     ruling about if you had a target on your back, if you do a

16     fashion doll.

17         THE COURT:  All right.  Well, as I indicated

18     previously, you're not asking for that.  So I won't go there.

19     The evidence is in.  Certainly the door has been opened to

20     that, and you may rebut that or respond to that as you see

21     fit.  As far as leave to recall him --

22         MR. PRICE:  He is a party representative.  He'll be

23     here.

24         THE COURT:  Let me hear from Mr. Nolan.  What are

25     your thoughts on that?

1        MR. NOLAN:  I'm generally against any witness being

2    recalled in this case.  I mean, Mr. Larian has testified.  I

3    understand Mr. Price's point.  Frankly, we've already

4    discussed this.  If he wants to go into it now, I guess he's

5    opened the door for it, your Honor.  I think we're going to

6    get into major issues with respect to 403.  I didn't object

7    because of what was said.  They went through a lot of

8    litigation that MGA filed.  I think it's kind of in balance

9    right now.  If they want to continue to go pursue this later

10   on, I'll have to deal with it at that time, your Honor.

11       THE COURT:  My concern is just, and this is not --

12   it was asked.  It was answered.  There was no objection made.

13   The idea of having something out there that a federal judge

14   has said, I just -- it's interjecting not this court, but

15   another court into the trial.  And I don't want there to be

16   any significance of that short of the effect that it might

17   have had on the witness's state of mind or on some arguably

18   relevant basis.  I just don't want there to be the jury

19   taking some kind of finding from that.

20       MR. NOLAN:  I understand.

21       THE COURT:  And that's the only concern I have from

22   a kind of fundamental fairness perspective, because the jury

23   has been instructed and will be instructed repeatedly that

24   it's the Court's province to instruct that the jury must

25   follow the instructions of the Court and having this

1   statement by another Federal Court out there, it is awkward.

2   But why don't we do this.  Why don't we proceed with the

3   examination, and let's see how this plays out.  Depending on

4   the circumstances, Mr. Price, I may or may not allow you to

5   recall the witness.  But it really depends how it plays out.

6            MR. PRICE:  Sure.  I don't intend to pursue that,

7   obviously, until -- I won't accuse Mr. Larian of totally

8   making it up until I've had the research done.

9            THE COURT:  I appreciate your putting it in that

10  order.  The allegations should follow the investigation.

11           MR. PRICE:  I agree.

12           THE COURT:  All right.  Let's bring the jury in.

13           (WHEREUPON THE JURY ENTERS.)

14           THE COURT:  Good afternoon, members of the jury.

15           Mr. Price, you may resume.

16           MR. PRICE:  Can we put up 4507.

17               ISAAC LARIAN, PREVIOUSLY SWORN.

18               REDIRECT EXAMINATION (CONTINUED)

19  BY MR. PRICE:

20  Q.   Mr. Larian, you recall during your examination with

21  Mr. Nolan, if we go to the second page of this, where we have

22  Mr. Dees saying that he couldn't take credit for Bratz, that

23  that honor would have to go to a fellow named Carter Bryant.

24           Do you recall being asked by Mr. Nolan that, if

25  there's a concealment, do you have any understanding as to

1  how David Dees would have known about Carter Bryant, and you

2  said, "I have no idea."

3          Do you recall that?

4  A.   Yes.

5  Q.   And do you have any idea how David Dees apparently had

6  Carter Bryant's e-mail address?  And you said, "I have no

7  idea."

8          Do you recall that?

9  A.   Yes, I do.

10  Q.   Well, you have an idea that Mr. Dees was an illustrator,

11  a vendor, who worked for MGA on Bratz.

12  A.    No, I have no idea.  I testified I have never met David

13  Dees.  I have no idea what he was doing.

14  Q.   Okay.  Reading this, you say they are asking him about

15  whether or not he can post pictures of Bratz, and he says I

16  work as a free-lance -- as an illustrator, have my own studio

17  at home.

18          Do you see that?

19  A.   I do.

20  Q.   All right.  MGA used vendors such as Ms. Leahy and

21  Ms. Rhee and others to assist with Bratz; correct?

22  A.   We did.

23  Q.   And you just don't know who all the vendors are.

24  A.   I don't know Mr. David --

25  Q.   David Dees.

Page 2233

1    A.    David Dees.

2    Q.    If we look at -- well, you see, it says, "I can't take

3    credit for creating the Bratz dolls."

4          Do you see that?

5    A.    I do.

6    Q.    That's because someone was complimenting his fashions

7    for Bratz; correct?

8    A.    I have no idea what he was saying.  I don't know who

9    this gentleman needs to be.  I don't know who he is.

10   Q.    Let's put it this way.  If Mr. Dees was a vendor who

11   worked as an illustrator on Bratz and worked with Carter

12   Bryant, he would know who Carter Bryant is.

13         MR. NOLAN:  Objection, your Honor.  Lack of

14   foundation.  Calls for speculation.

15         THE COURT:  Sustained.

16   Q.    BY MR. PRICE:  Well, your vendors again, such as Anna

17   Rhee and Ms. Leahy and Ms. Marlow, you have them sign

18   typically confidentiality agreements when they are working on

19   projects for MGA; correct?

20   A.    I believe so, again.  That's what I believe.

21   Q.    If we look at Exhibit 4942, which Mr. Nolan asked you

22   about.

23   A.    Yes.

24   Q.    And if we could blow up the bottom part of this.  This

25   was the e-mail from Dee Dee Valencia.  This was the e-mail to

Page 2234

1   you from Dee Dee Valencia about Bratz.

2           Do you recall Mr. Nolan asking you questions about

3   this?

4   A.   I did.

5   Q.   And he pointed out that she's talking here about doing a

6   limited edition collectible.

7           Do you recall that?

8   A.   Limited edition collectible.  Yes.

9   Q.   And then Mr. Nolan asked you can you tell the jury

10  whether or not you know who the designer for the doll My

11  Scene is.

12          You recall that question?

13  A.   I do.

14  Q.   And, of course, you don't know who designed My Scene.

15  You didn't know until recently.

16  A.   I didn't know until recently.

17  Q.   And he said after My Scene, Mattel released a doll

18  called Flavas.

19          You remember that?

20  A.   I do.

21  Q.   And you said you didn't really know who designed that;

22  correct?

23  A.   I still don't know who designed that.

24  Q.   But this e-mail isn't talking about mass market dolls,

25  is it?

1  A.   It's talking about -- no.  It's talking about -- it says

2  about limited edition collectibles.  And sometimes limited

3  edition collectibles are sold to mass markets, sometimes.

4  Q.   Well, whether or not you knew who the designer of My

5  Scene was or Flavas is sort of irrelevant to the question of

6  whether or not on limited edition collectibles, the designer

7  signs the package or something associated with the doll.

8         MR. NOLAN:  Objection, your Honor.  Argumentative.

9  Lack of foundation.

10        THE COURT:  Rephrase it, Counsel.

11        MR. PRICE:  Sure.

12  Q.   Let's ask it this way.  You know that Mattel has done

13  limited edition collectibles?

14  A.   I believe they have.

15  Q.   And, in fact, you've heard of a -- you keep track of the

16  competition sometimes; right?

17  A.   Sometimes.

18  Q.   You know about Grand Entrance Barbie?

19  A.   I'm sorry?

20  Q.   Grand Entrance Barbie, a limited edition collectible?

21  A.   I don't.  I'm sorry.  I don't know that one.

22  Q.   Well, you have seen Barbie collectibles signed by --

23  where the packaging is signed by the designer; right?

24  A.   I have seen a catalog where they give credit to

25  designers, a mail order catalog.

Page 2236

1    Q.   And some of these are also in stores; right?

2    A.   I'm sorry?

3    Q.   These are also in stores; correct?

4    A.   I don't know if they are or not.

5    Q.   Well, in any event, Mattel does limited edition

6    collectibles that are signed by designers; correct?

7    A.   Again, I have seen a mail order catalog from Barbie

8    collectible where they have given credit for some, not all,

9    some of the designers in that catalog to the best of my

10   recollection.

11   Q.   And, for example, Carter Bryant had his signature on a

12   Mattel doll; correct?

13   A.   I saw that, yes.

14   Q.   And also Robert Best?

15   A.   I don't know who Robert Best is.

16   Q.   Sharon Zuckerman?

17   A.   She applied for a job at MGA.

18   Q.   Good for her.  She also had her signature on a Mattel

19   limited edition doll; right?

20   A.   I have no idea.  I don't know.

21   Q.   In any event, what Ms. Valencia here is talking to you

22   about is whether or not the limited edition collectible

23   should be signed by question mark, I know we can't keep

24   Carter under wraps.

25            You understood she was talking about having a

1  designer sign not your mass market brands, but a limited

2  edition collectible.

3  A.   I have no idea what was on her mind when she wrote this

4  e-mail.  You should ask her to come and testify.

5  Q.   I'm just asking you as someone who read it.  You'll

6  agree that she's only talking about a signature in connection

7  with a limited edition collectible doll for Bratz.

8  A.   I believe reading that e-mail, yes, I believe that's

9  what she's asking.

10  Q.   And you understand that there's some thought why at

11  least some folks in the toy industry, that if you have the

12  designer sign the packaging, it might make it more

13  collectible.

14  A.   I believe the collectors like -- again, this is my

15  assumption.  I'm not a doll collector, but I believe the

16  collectors probably put more value on the dolls that are

17  signed.

18  Q.   Let me switch to a different topic.  You recall that in

19  your examination Mr. Nolan asked you did you hear Mr. Quinn

20  say that you were -- words to the effect, you used your

21  wealthy Iranian parents' money to start MGA.

22       Do you recall him asking that?

23  A.   I do.

24  Q.   And your answer was that I did hear that; correct?

25  A.   I did hear Mr. Quinn say that, yes.

1   Q.   And then you said basically that what Mr. Quinn said was

2   false.  In fact, absolutely not a true statement.

3   A.   Absolutely right, yes.

4   Q.   Now, when Mr. Nolan asked you did you hear Mr. Quinn say

5   that you were -- words to the effect you used your wealthy

6   Iranian parents' money to start MGA, when he asked you that

7   question, did you really remember what Mr. Quinn had said in

8   his opening?

9   A.   I remember he trying to intimate that I had wealthy

10  Iranian parents, and that's not the case.  I washed dishes,

11  bussed tables, waited tables, and put myself through college

12  in this country.

13  Q.   My question is do you recall what he said.  You're

14  accusing him of making a false statement.  Do you remember

15  what he said in making that accusation -- that he made a

16  false statement?

17  A.   I am not going to accuse him of making a false

18  statement.  He knows the statement he make.

19  Q.   You told the jury that Mr. Quinn lied to them.

20  A.   I said to the jury, and I say that to them again right

21  now, I came to this country at the age of 17.  I had $750 in

22  my pocket, a one-way ticket, which meant I cannot go back.  I

23  washed dishes.  That was my first job, at Spires coffee shop.

24  Lawndale from 11:00 to 7:00 in the morning --

25             MR. PRICE:  Your Honor, I'm going to move to strike

Page 2239

1   as nonresponsive.

2        THE COURT:  It is stricken.  The reporter will

3   reread the question.

4        (Record read.)

5        THE WITNESS:  I don't think I ever used Mr. Quinn

6   or anybody else.  Lie is a very strong word.  I don't think I

7   ever used that word.  If I did, I apologize.

8   Q.  BY MR. PRICE:  The word you used that Mr. Quinn made a

9   statement which was absolutely not true; correct?  That's

10  what you told the jury yesterday.

11  A.  His statement that I had wealthy Iranian parents is

12  absolutely not true.

13  Q.  Well, let's look at what he in fact said.  Go to the

14  transcript from May 27th, page 65.  I'll ask you about that.

15  I'm sorry.  68, lines 4 through --

16       THE COURT:  Counsel, this is a transcript from

17  these proceedings?

18       MR. PRICE:  Yes.

19       THE COURT:  Very well.

20  Q.  BY MR. PRICE:  Now, Mr. Larian, I'm going to represent

21  to you this is the transcript of what Mr. Quinn said, and you

22  see where it says:  "The company was founded by Isaac Larian

23  and his brother, Farhad Larian"?  Do you see that?

24  A.  I do.

25  Q.  Is that correct, that you and your brother founded the

7dc8527b-b015-4d5e-b900-118ee9139575

Page 2240

1    company?

2    A.    Actually, I started the company first, and then I

3    brought in Fred.

4    Q.    Have you ever introduced your brother as one of the

5    founders of the company?

6    A.    I believe I have.

7    Q.    "And there's actually kind of a disagreement between the

8    two of them, the brothers, as to where the money came from to

9    start the company.  Mr. Isaac Larian says he came to this

10   country from Iran.  He had only $750 in his pocket.  And that

11   really he came up with the seed money to start the company.

12   Farhad Larian said that their wealthy parents over in Iran

13   provided them with the money to start the company.  So we

14   have two different accounts."

15          Do you recall Mr. Quinn saying that?

16   A.    At the opening statement?

17   Q.    At the opening statement, yes.

18   A.    I represent if he -- if that's what you say he said, he

19   said that.

20   Q.    And that statement that Mr. Quinn made to the jury is

21   absolutely true, there are two different accounts.  You say

22   one thing, and your brother has said another.

23   A.    I know about the truth, and I know that my parents were

24   not wealthy, and I wrote my -- I worked in this country to

25   put myself through college, and I put the seed money to start

Page 2241

1    the business.  And my -- I know that.  My sister in the court

2    knows that.  My parents know that.  My mother, who is alive,

3    knows that.

4    Q.   My question is different.  I'm addressing the accusation

5    that what Mr. Quinn said was absolutely not true.

6          You were trying to leave the jury with the

7    impression that Mr. Quinn had tried to mislead them; correct?

8    A.   I said that to the jury and to Mr. Quinn.

9    Q.   So my question is simply whether or not what Mr. Quinn

10   said was true, which is that you say, as you said multiple

11   times, that you came from Iran with $750 in your pocket and

12   came up with the seed money, and that your brother Farhad has

13   said that their wealthy parents over in Iran provided them

14   with the money to start the company.

15         I'm just asking you whether or not Mr. Quinn's

16   statement is correct, that you say one thing, which you told

17   us, and that your brother says something else.

18   A.   I don't know what my brother has said.  I know the truth

19   is what I told you.

20   Q.   You do know what your brother said because you actually

21   received communication from him where he said this.

22   A.   I don't recall.  I have a disagreement with my brother,

23   and I have tried to forget about everything he has said and

24   not said.

25   Q.   Well, if you look at 4228.  Do you recognize 4228?

Page 2242

1    A.    It's 26 pages.  You want me going through every page?

2    Q.    No.  I want you to see if you look at this and recognize

3    it as something your brother said to you.  If you need to go

4    through 26 pages, then we might need to take a break, but

5    this is something you got from your brother.

6    A.    I don't recall receiving this from my brother or not

7    receiving it.

8    Q.    Let's see if I can refresh your recollection here.  Why

9    don't you look at page 18.

10   A.    Go ahead.

11   Q.    And you see the contents of that page?

12   A.    Go ahead.

13   Q.    My question is that's something you received from your

14   brother; right?

15   A.    I don't recall receiving it, no.

16   Q.    Do you recall your brother ever saying to you that you

17   know the money that started the company was your parents, and

18   that your claims of only having seed money of your own were

19   not correct.  Do you remember him ever saying that to you?

20   A.    I don't recall if he said it or not said it.  But it's

21   not true, even if he said that.

22   Q.    Okay.  And I'm not pursuing that at this moment.  I'm

23   just saying you can't deny he said that; right?

24   A.    I cannot deny or not deny.

25   Q.    So therefore, you certainly can't say that what

7dc8527b-b015-4d5e-b900-118ee9139575

Page 2243

1    Mr. Quinn told the jury was absolutely untrue, which is that

2    you have one story, and your brother has another.  You can't

3    say that is untrue, can you?

4    A.   What is untrue is that I came to this country -- what is

5    untrue that I got money from my wealthy parents to start my

6    company.  That is not true.

7    Q.   And I'm just trying to ask questions about Mr. Quinn's

8    honor and credibility.  You said that what he told the jury

9    was absolutely untrue, and you can't say that, can you?

10   A.   I can.

11   Q.   So you can say that your brother does not have say

12   different version than you do of how the company started.

13   A.   What I can say is that I started the company --

14         MR. PRICE:  Move to strike as nonresponsive.

15         THE COURT:  Sustained.  Stricken.

16   Q.   BY MR. PRICE:  You can't say that your brother has told

17   a different version -- hasn't told a different version than

18   you.

19   A.   I can't say if he has or not.  No, I cannot.

20   Q.   So you can't say what Mr. Quinn told the jury, which is

21   that there are two versions, you can't say that's false, can

22   you?

23   A.   The version that Mr. Quinn attributed to my brother is

24   false, and he knows it.

25   Q.   Sir, you can't say that this statement is false, which

Page 2244

1    is that you have one version and your brother has another

2    one.  You simply can't say that's false.

3    A.   Beside what I have testified, I have nothing else to

4    add.

5    Q.   Let's talk about the discussions you had with

6    Mr. Carter.  And you said in the September 1st meeting that

7    you said, Mr. Bryant, Mr. Carter Bryant, that you wanted

8    nothing to do with these drawings if they had anything to do

9    with Mattel; correct?

10   A.   That's right.

11   Q.   And Victoria O'Connor and Carter Bryant were at that

12   September 1st meeting; correct?

13   A.   To the best of my recollection, yes, they were.

14   Q.   I assume you were fairly emphatic about what you were

15   saying, which is you were emphatic about saying I want

16   nothing to do with these if they have anything to do with

17   Mattel.

18   A.   I apologize.  I don't know what the word emphatic means.

19   Q.   That you were very strongly saying this.

20   A.   That what?

21   Q.   That you want nothing to do with these if they have

22   anything to do with Mattel.

23   A.   I said that here.

24   Q.   And you said that September 1st as your testimony;

25   correct?

Page 2245

1   A.   I did not want -- my state of mind is there and here

2   that I want nothing to do with any drawing that Carter Bryant

3   had done if those belong to Mattel.  If they belong to

4   Mattel, I want nothing to do with it.

5   Q.   And you told the jury that's what you said at that

6   September 1st meeting, yes?

7   A.   I said I do not want to do anything with these drawings

8   if they belong to Mattel.

9   Q.   And when you said that, you weren't whispering it.  You

10  were saying something strongly; is that right?

11  A.   I don't know if I was whispering or saying it strong.

12  But I was saying it.

13  Q.   Do you have any explanation as to why neither Victoria

14  O'Connor nor Carter Bryant remembers any such statement?

15  A.   I don't know if they do or not.

16  Q.   Well, let's look at the contracts that you were looking

17  at, and you recall that Mr. Nolan asked you to compare

18  Exhibit 15 to Exhibit 13621, and maybe we can put up 15 and

19  13621.

20  A.   Can you tell me what book to look for here?

21  Q.   I believe those were in the book provided by your

22  attorney.

23  A.   Did you say 13621?

24  Q.   It's 15 and 13621.

25  A.   Yeah, go ahead.

Page 2246

1    Q.   I know that both of them are in the big binder.

2    A.   I found them.

3    Q.   But your attorney asked you questions about them, so

4    they might be in yours as well.

5    A.   I found them.

6              THE COURT:  Did you find them?

7              THE WITNESS:  I found them.

8    Q.   BY MR. PRICE:  And first Mr. Nolan's question was do you

9    remember when Mr. Price said these were the same documents?

10   A.   Yes.

11   Q.   You remember me saying that?

12   A.   I don't remember a lot of things he said.

13   Q.   Then why did you answer yes?

14   A.   I think to those effects, you were saying those are the

15   same contracts.  Indeed, if you look at them without looking

16   at the detail, they look like the same document.

17   Q.   But Mr. Nolan said do you remember Mr. Price saying they

18   are the same document.  I mean, do you actually have a memory

19   of me saying that?

20   A.   I don't have an exact memory of it.  And if I do, I

21   apologize.

22   Q.   Okay.  Now, the first page here, the first page here is

23   the same; correct?

24   A.   It's just looking at it, it appears to be the same.

25   Q.   And I pointed that out to you in your examination, that

Page 2247

1   the first pages appeared to be the same; correct?

2   A.   Yes, you did.   I believe you did.

3   Q.   Okay.  And let's go to the -- by the way, both these

4   pages -- blow up this part here.  Both these contracts say

5   dated on September 18, 2000; correct?

6   A.   Correct.

7   Q.   Incidentally, would you look at Exhibit 30.

8           It's already in evidence, your Honor.  May we

9   display?

10          THE COURT:  You may.

11          THE WITNESS:  Okay.  Go ahead.

12  Q.   BY MR. PRICE:  You see this is a letter dated September

13  18, 2000, from Mr. Bryant to Kinuyo concerning ordering

14  sample cards for MGA Entertainment?

15          MR. NOLAN:  Objection.  Although this document is

16  in evidence, there's no foundation that Mr. --

17          THE COURT:  Very well.  Foundation, Counsel.

18  Sustained.  Lay a foundation, Counsel.

19  Q.   BY MR. PRICE:  You knew this was happening in the middle

20  of September, didn't you?

21  A.   I did not.

22  Q.   You did not yourself type the words on to Exhibits 15

23  and 13621; is that right?

24  A.   You mean Carter Bryant's contract?

25  Q.   Yes.

Page 2248

1    A.    I did not.

2    Q.    Someone else did that for you; right?

3    A.    Yes.

4    Q.    Now, that was your attorney Mr. Rosembaum; correct?

5    A.    That's correct.

6    Q.    And the date that your attorney put on the contract, as

7    dated of, is September 18, 2000; is that right?

8    A.    Yes.  As of.  As of September 18, 2000.

9    Q.    All right.  And you have some understanding, do you not,

10   as to why your attorney put on the contract with Carter

11   Bryant that it was dated as of September 18, 2000.

12   A.    I have some understanding from him, yes.

13   Q.    Are you aware of any --

14   A.    I just want to make it clear to the jury, from my

15   attorney, David Rosenbaum.

16   Q.    And if we could look at -- we've seen Exhibit 15 and

17   Exhibit 13621, which both have dated as of September 18,

18   2000.  You agree that a copy that you sent to your outside

19   counsel Patty Glaser had that date whited out?

20   A.    I don't know if he did or not.  I have no idea.

21   Q.    Well, Exhibit 13383, that date is whited out; correct?

22   A.    I remember --

23         MR. NOLAN:  Objection, your Honor.  Lack of

24   foundation.

25         MR. PRICE:  Let me ask it a different way.

1          THE COURT:  Very well.  Rephrase the question.

2     Q.   BY MR. PRICE:  Exhibit 13383.  Do you have that in front

3     of you?

4     A.   Can you just tell me what book to look for?

5     Q.   13383.  It would be in the big binder.  It's also just

6     up here if you want to --

7     A.   Go ahead.  I'd like to save time.

8     Q.   For some reason, the dated as of September 18, 2000, is

9     not there.

10         Do you see that?

11    A.   I see that; that's right.

12    Q.   Now, Mr. Nolan pointed out that if you look at

13    Exhibit 15 and Exhibit 13621, the signatures appear to be

14    somewhat different, including your own; correct?

15    A.   Yes.

16    Q.   And Exhibit 15 has that fax header from MGA that

17    indicates it was sent from MGA to Mr. Bryant; correct?

18    A.   Yes, it does.  Dated October 4 at 4:38 P.M.

19    Q.   And if you go to the last page --

20    A.   That's the last page I'm looking at.

21    Q.   Sure.  If you go to the last page, obviously what is

22    faxed to you, MGA, would only have -- well, do you know

23    whether or not you signed the document before or after it was

24    sent to Mr. Bryant?

25    A.   I don't recall.

Page 2250

1    Q.   In any event, it's your understanding, is it not, that

2    this was faxed back signed by Mr. Bryant to MGA?

3    A.   I'm sorry.  Can you repeat that?

4    Q.   Sure.  That 15 was faxed back to MGA by Mr. Bryant after

5    he signed it?

6              MR. NOLAN:  Objection.  Lack of foundation.

7              THE WITNESS:  I don't recall --

8              THE COURT:  Wait a second.  Sustained.

9    Q.   BY MR. PRICE:  Well, you've got two documents with two

10   signatures; right?

11   A.   Yes.

12   Q.   Isn't the reason you have the second document, which is

13   13621, is that after Mr. Bryant faxed back his contract, you

14   wanted another copy of the contract that didn't have the fax

15   headers on them?

16   A.   Absolutely not true, sir.

17   Q.   So is it your testimony that Ms. O'Connor was not being

18   truthful when she said you asked her to white-out the fax

19   header?

20   A.   I think her recollection is not correct.

21   Q.   Now, you talked about the signing of the document

22   yesterday.

23   A.   Should I put these away?

24   Q.   If it's in your way, put it away.

25              Do you recall being asked by Mr. Nolan if you had

1    believed that he, Carter Bryant, had done these drawings, the

2    master drawings while at Mattel, would you have ever signed

3    the contract?  And you said, "I would not have signed it if

4    he had done it at Mattel, no."

5            Do you remember that question and answer?

6    A.   Yes, and the master drawing means the drawings that he

7    did in 1998 in Missouri.

8    Q.   You were asked questions about Carter Bryant's, whether

9    it be that these drawings were in 1998 or otherwise, at your

10   deposition, were you not?

11   A.   I was asked a lot of questions about this.  I take your

12   representation that yes.

13   Q.   Well, a critical issue was whether it mattered to you

14   whether Carter Bryant had done these drawings at Mattel or at

15   some other time.  That was a critical issue at your

16   deposition, wasn't it?

17   A.   If you are talking about the master drawings, the

18   original drawings, yes, that was a critical issue.

19   Q.   And if we could --

20           We played this before, your Honor, put up from the

21   deposition, page 450, lines 10 through 19.

22   A.   You may.

23   Q.   450, 10, to 451 -- let's do 450, lines 10 through 17:

24           "QUESTION:  Would it have been a problem if

25   Carter Bryant had created or made any of his

Page 2252

1          drawings when he was employed by Mattel in your

2          view?

3                  "ANSWER:  No."

4              That was your testimony under oath as of the date

5      of your deposition; correct?

6      A.   As it is today, yes.

7      Q.   (Reading.)

8                  "Why not?

9                  "ANSWER:  Because I don't think, whether it's

10         MGA or Mattel, we own the people, especially the

11         creative people, forever."

12             You also testified at your deposition, did you not,

13     that when you were told by someone that Mr. Bryant's attorney

14     had confirmed some drawings were done in 1998, that in your

15     mind that made no difference at all as to whether or not

16     Mattel owned them.

17     A.   I'm sorry.  Can you repeat the question?

18     Q.   Sure.

19     A.   I'm not sure if I understand.

20     Q.   Let's break it up.  You told us in your examination from

21     Mr. Nolan that someone did an investigation as to whether or

22     not Mr. Bryant had done some drawings in 1998.

23             Do you recall that?

24     A.   I believe I said somebody had confirmed, and that person

25     being Ann Wang, Carter Bryant's attorney, had confirmed the

Page 2253

1    chronology that Carter Bryant had given us, that he had done

2    these, the original master drawings, in 1998.  And I believe

3    that, yes.

4    Q.   And you recall during my examination of you, I asked you

5    what you actually knew about that investigation.

6         Do you recall that?

7    A.   We probably have.

8    Q.   Isn't it true, sir, that at your deposition, you

9    previously, as testified under oath, that whether the

10   drawings were done in 1998 had no significance to you as to

11   whether or not Mattel might have owned the drawings.

12   A.   I might have.  Again, if he had done it in 1998, when he

13   was in Missouri, Mattel absolutely cannot have any ownership

14   of the drawings.

15   Q.   Well, let's look at what you said in 2006.  459, line

16   12, to 460, line 20.  It's been previously played:

17        "QUESTION:  Was the fact that Carter Bryant's

18        lawyer represented to MGA that Carter Bryant had

19        done the drawings in 1998 in Missouri, when he was

20        not a Mattel employee, have any significance to you

21        at that time?

22        "ANSWER:  It -- he confirmed what Carter

23        Bryant had told us.

24        "QUESTION:  And did you find some comfort in

25        this?

7dc8527b-b015-4d5e-b900-118ee9139575

Page 2254

1          "ANSWER:  Of course.

2          "QUESTION:  And why was that?

3          "ANSWER:  Because, you know, I hoped the

4     lawyers in court -- your profession tell the truth.

5          "QUESTION:  Well, you thought that it would

6     have some significance to whether or not Mattel

7     might have rights to those drawings; is that true?

8          "ANSWER:  No."

9          That was the answer you gave under oath in 2006;

10    correct?

11    A.   Those were the answers I gave in 2006.

12    Q.   And then it went on to ask:

13         "QUESTION:  Well, what comfort did you derive?

14         "ANSWER:  Because what I just testified.  I

15    have nothing else to add.

16         "QUESTION:  So you were just comforted by the

17    fact that he had told you the truth?

18         "ANSWER:  And his lawyer confirmed it.

19         "QUESTION:  And beyond that, it had no

20    significance to you.  Is that true?

21         "ANSWER:  That's true."

22         That was your testimony as of that date; correct?

23    A.   Yes, it is.

24         MR. PRICE:  Your Honor, for completeness purposes,

25    we would ask the jury be shown the question and answer

Page 2255

1    immediately preceding what Mr. Price just read, and it would

2    be lines 6 through 11.

3              MR. PRICE:  Sure.  We can put that up and expand

4    that.

5              THE COURT:  Very well.

6              MR. NOLAN:  Thank you.

7    Q.   BY MR. PRICE:  It began with:

8              "Do you know what assurances Carter Bryant's

9         lawyer gave?

10              "ANSWER:  In general I remember saying that

11         yes, that he did these in 1998 in Missouri, when he

12         was not working at Mattel, and that he indeed

13         himself did it."

14              That's how it started?

15   A.   I can read that, yes.

16   Q.   So it's correct, sir, that your testimony under oath,

17   when your deposition was taken, and I apologize, I've been

18   giving you the wrong date, it was March 26, 2008, so just a

19   few months ago, that your testimony was first, it would not

20   have been a problem for you if Mr. Bryant had created these

21   drawings while he was at Mattel.  That's what you testified

22   to under oath; right?

23   A.   You just read my testimony, and the jury has seen it.

24   And my testimony is correct.

25   Q.   So first, it wouldn't have mattered to you whether it

7dc8527b-b015-4d5e-b900-118ee9139575

Page 2256

1    was done at Mattel or not, and second, you testified under

2    oath when a lawyer came back and said it was done in 1998,

3    that had no significance to you as to whether or not Mattel

4    owned those drawings?

5    A.   Did you break that question to two?  You asked two

6    questions at the same time.  I'd like to answer both of them.

7    Q.   Let me break it down the way it was asked at your

8    deposition so we can be precise.

9         When you were asked whether you thought that the

10   fact these drawings -- I were told these drawings were done

11   in 1998 would have some significance to whether or not Mattel

12   might have rights to those drawings, your answer at that time

13   was no.

14        Is that true?

15   A.   It is true.  And I can explain that if you want.

16   Q.   Well, your motto, you told us, one of your mottoes is no

17   risk, no reward; right?

18   A.   I'm not a model.

19   Q.   No.  Although I'm sure you could.  My word was motto.

20   Do you understand what motto is?  And I understand that

21   English is not your first language.

22        Do you know what a motto is?

23   A.   Yes, I do.

24   Q.   And you have said that it's your philosophy, your motto

25   in business, no risk, no reward.  You have said that before.

7dc8527b-b015-4d5e-b900-118ee9139575

Page 2257

1    A.    Yes.

2    Q.    In fact, you were quoted in that Wall Street Journal

3    article as saying that; right?  No risk, no reward.

4    A.    I'm not sure if it's The Wall Street Journal, but I have

5    said that before.  And again, I apologize for my accent, sir.

6    Q.    No one has asked you to, and there's nothing wrong with

7    an accent.

8              Can you tell I'm from the South?

9              THE COURT:  Next question, Counsel.

10   Q.    BY MR. PRICE:  And then you testified, you were asked:

11             "Do you know what, if anything, Carter Bryant did

12   between the day of October 4, 2000, to October 20, 2000?

13             "Answer:  What do you mean?

14             "Meaning, do you know whether or not he was doing

15   any work at MGA?"

16             And you told the jury, "I know he was not doing any

17   work at MGA.  There was nothing to be done at MGA."

18             Do you remember those questions and answers that

19   you gave yesterday?

20   A.    I do.

21   Q.    So your testimony was that between October 4, 2000, to

22   October 20 of 2000, there was nothing to be done at MGA?

23   A.    Nothing to be done at MGA on what became Bratz dolls.

24   There was a lot of work to be done at MGA.

25   Q.    And Mr. Bryant was doing a lot of that work with Paula

Page 2258

1    Garcia between October 4 and October 20, 2000, wasn't he?

2    A.   I don't know if he was or not.  All I know, that they

3    were exploring if the Bratz doll can even be made, and it

4    took a long time before we were able to bring it to the

5    market, all the way to the end of the year they were not done

6    yet, year 2001.  I'm sorry.  2000.

7    Q.   I believe your counsel showed you Exhibit 16789.  If we

8    can put that up.

9    A.   Can you just tell me what --

10   Q.   I believe 16789.  I know your counsel showed it to you.

11   So it's probably in a number of those?

12           THE COURT:  It's in the small black binder.

13           THE WITNESS:  Thank you.

14   Q.   BY MR. PRICE:  Let's actually highlight the October 5

15   e-mail from Mr. Larian to Paula, Victoria, and to Carter.

16           Do you see this?

17   A.   Yes, I do.

18   Q.   And this was something you wrote the day after you say

19   Mr. Carter actually put his signature on the contract;

20   correct?

21   A.   The day that -- the day after we signed the contract;

22   right.

23   Q.   And at this time, you're telling him that he and Paula

24   need to focus 200 percent on getting this done; correct?

25   A.   I did say that.

Page 2259

1  Q.   But you told the jury there was absolutely nothing to do

2  between October 4 and October 20, 2000.

3  A.   From what I told him to do and if he did anything or

4  not, from October 4 to October 19, 2000, is two different

5  things.  I did say that to him.

6  Q.   Well, you told the jury that there was nothing to be

7  done at MGA between October 4 and October 20, 2000; right?

8  That's what you told them yesterday.

9  A.   I have come to know that there was nothing that they

10 were doing except for exploration from October 4, 2000, to

11 October 19, 2000.

12 Q.   How about here where you're telling Mr. Bryant on

13 October 5, "You need to put 16 hours a day starting now on

14 this and nothing else."

15      You wrote that to him October 5, 2000?

16 A.   I did.

17 Q.   And, in fact, you were emphatic -- I think I used the

18 word emphatic before.

19 A.   Again, I apologize for my English not being good.

20 Q.   No, I'm trying to find a synonym.

21      You were very strong in saying that.  That is, you

22 capitalized, intentionally capitalized starting now and

23 nothing else; right?

24 A.   I did.

25 Q.   And by the way, you just told the jury that you later

Page 2260

1    learned that Carter Bryant did nothing between October 4 and

2    October 20; is that right?

3    A.    I did.

4    Q.    When did you learn that?

5    A.    During the course of this litigation.

6    Q.    So it wasn't until, oh, some at least four years after

7    you sent this e-mail that you realized for the first time

8    Carter Bryant hadn't been doing anything between October 4

9    and October 19?

10   A.    Well, you sued me personally seven years after this

11   contract was signed.  So I don't know where you're getting

12   the four years from.

13              MR. PRICE:  Move to strike as nonresponsive, your

14   Honor.

15              THE WITNESS:  He said four years.  I'm sorry.

16              MR. PRICE:  I said at least.

17              THE COURT:  Counsel, please.

18   Q.    BY MR. PRICE:  The date which the jury has heard before,

19   April 27, 2004, okay?

20   A.    I'm sorry.  What about that date?

21   Q.    April 27, 2004.  I want you to keep that date in mind.

22              MR. NOLAN:  Your Honor --

23              THE COURT:  Stop.  Mr. Nolan?

24              MR. NOLAN:  Foundation as to why this date is to be

25   kept in mind.  There's no context.

Page 2261

1       MR. PRICE:  I'm going to ask the question.

2       THE COURT:  You may ask another question.  Overrule

3   the objection.

4   Q.   BY MR. PRICE:  And that was it was after that date,

5   April 27, 2004, you're saying, after that that you discovered

6   for the first time that Mr. Bryant was doing nothing between

7   October 5 or October 4 -- October 4 and October 20th of 2000.

8       MR. NOLAN:  Objection, your Honor.  Misstates his

9   testimony.

10      THE COURT:  It's a question.  You may answer if you

11   can.

12      THE WITNESS:  Can you repeat that question?

13      THE COURT:  Actually, it wasn't.  I'm sorry.  I was

14   relying more on the tone.  Why don't you rephrase the

15   question, Counsel.  Make it more clearly in the form of a

16   question.

17      MR. PRICE:  Okay.

18  Q.   We'll try to do it this way:  Just give me the number of

19   years, okay?

20      How many years after October 5 did you learn for

21   the first time that Carter Bryant had done nothing between

22   October 4 and October 20, 2000?  How many years after October

23   5, 2000?

24  A.   I can't tell you how many years.

25  Q.   Was it more than three or four years?

7dc8527b-b015-4d5e-b900-118ee9139575

Page 2262

1   A.   It cannot be more than four years because now we're in

2   2000 -- probably more than four years.

3   Q.   And from whom did you learn that Mr. Carter Bryant did

4   nothing between October 4 and October 20, 2000?

5   A.   From Paula Garcia, from my lawyers, from other people

6   that I talked to.  And from looking at e-mails and documents.

7   Q.   And you actually looked at the e-mails that the jury has

8   seen already in October 2000 discussing what was going on

9   with Bratz.

10  A.   I am not sure if this jury has seen every e-mail that's

11  in this case.

12  Q.   I showed you a presentation that was given to -- that

13  was supposed to have been given to Fox.

14          Do you remember that?

15  A.   I'm sorry?

16  Q.   Your attorney Mr. Nolan showed you Exhibit 16914, which

17  is a presentation, I believe, which was to be given to Fox?

18  That should be in your attorney's binder.

19          THE COURT:  Counsel, I can't find this in any of my

20  three binders.

21          MR. PRICE:  I couldn't find it either.

22          THE COURT:  I must have missed it.  Oh, there it

23  is.  My mistake.

24          MR. PRICE:  The only part, your Honor, is this.

25          THE COURT:  Right.  I recall.

Page 2263

1   Q.    BY MR. PRICE:  So you see this is June 25, 2000?

2   A.    June 25, 2002, sir.

3   Q.    I'm sorry.  2002.

4   A.    You said 2000.

5   Q.    Your eyes are pretty good.

6   A.    I'm sorry?

7   Q.    Your eyes are pretty good.  June 25, 2002.  And this is

8   a presentation, you believe, to Fox?

9   A.    No, this is not presentation to Fox.  This talks about

10  Bratz facts and then the attachment.  You put these with

11  another exhibit together, yes, that was, I believe, the

12  presentation that was made to Fox.

13  Q.    And if we can go to the -- just the part of the second

14  page, which is in evidence.  And you see here, where it says

15  four Bratz dolls -- Cloe, Sasha, Jade, and Yasmin -- also

16  known as the Bratz Pack, were launched at Toy Fair 2001.

17          Do you see that?

18  A.    I do.

19  Q.    And you testified that you saw this and sent an e-mail

20  saying we need to correct that statement for legal purposes.

21  A.    I think if you bring that e-mail, all I said is she was

22  asking if he wanted to change the date, and I said for legal

23  purposes, October 2000.

24  Q.    So it's your understanding that your employees usually

25  follow your directions?

Page 2264

1    A.    I hope so.

2    Q.    Okay.  So what you were telling her was to change this

3    presentation that was being made of Bratz facts to say that

4    the four Bratz dolls -- Cloe, Sasha, Jade, and Yasmin -- also

5    known as the Bratz Pack, were launched in October of 2000.

6    A.    2001, sir.  I'm sorry.  Can you -- I'm not following

7    you.  I'm reading that.

8    Q.    Well, remember your attorney said that you moved the

9    date back.  So just to remind you, because you may not

10   remember, it's -- Exhibit 12842 was your e-mail.

11   A.    18?

12   Q.    12842.  June 27, 2002, and there's a question as to why

13   you changed the Bratz date.  And you wrote October 2000 for

14   legal purposes.

15   A.    Yes, sir.

16   Q.    So now you're in the right mind set, this is the e-mail

17   you sent?

18   A.    I did.

19   Q.    Okay.  So let's go back to the previous document, 16914.

20   And so the way this looked after -- would have looked after

21   your change was put in there was that these four Bratz

22   dolls -- Cloe, Sasha, Jade, and Yasmin -- also known as the

23   Bratz Pack, were launched in October 2000?

24   A.    I see what you're getting at.  There were no dolls in

25   October 2000.

7dc8527b-b015-4d5e-b900-118ee9139575

Page 2265

1    Q.   I wasn't getting at.   I was just asking pursuant to what

2    you told your attorney, whether or not I'm correct, that when

3    you corrected this, that the way it read for the presentation

4    was that the four Bratz dolls were launched in October of

5    2000.

6    A.   My mind then and now is that we signed the contract on

7    October 4, 2000, and that is when the Carter Bratz started.

8    Q.   And just to be clear, the way you articulate that, the

9    way you stated that to Fox was that these four Bratz dolls

10   with those names were launched in October of 2000.   That's

11   the way this read after you made your correction; right?

12   A.   I don't have the correction that was finally presented

13   to Fox.   So I don't know if she made that change or didn't

14   make that change.   I don't have it.   If you can show it to

15   me, I can testify.

16   Q.   I can tell you I don't think we've received it, but I'm

17   just going based on your testimony --

18           MR. NOLAN:   Your Honor, move to strike.

19           THE COURT:   Counsel, sustained.   It is stricken,

20   Counsel.   Ask questions and receive answers.

21   Q.   BY MR. PRICE:   I'm just trying to clarify your testimony

22   that you gave in your cross-examination.

23           THE COURT:   Counsel, ask a question.

24   Q.   BY MR. PRICE:   And that is did you instruct your

25   subordinate to change at Toy Fair 2001 to October of 2000?

Page 2266

1    A.    The document that I showed you is my recollection.   I

2    told her to put the date October 2000.   That is the date

3    after October 4 where project Bratz started.   And that's all

4    I can testify to you because that's the truth.   And you're

5    badgering me.

6    Q.    Pardon?

7    A.    And you are badgering me.

8    Q.    Well, I -- I'll try to do the best I can not to.

9            What you had on October 2000, I believe your

10   testimony was what you had were those drawings that Carter

11   Bryant had presented to you in September of 2000; correct?

12   A.    In September 1, 2000, he had presented those drawing.

13   I'm not sure I follow your line of questioning, sir.

14   Q.    I am just asking a question.   That what you actually had

15   in October 2000, the first part, was you had the drawings

16   that Mr. Bryant had presented to you in September of 2000;

17   correct?

18   A.    That is correct.

19   Q.    And when you're talking here about the four Bratz dolls

20   being launched in October of 2000, what you are referring to

21   isn't a physical doll.   You were referring to those drawings.

22   A.    That's correct.

23   Q.    And I think one of the final topics you were asked of

24   was the history of MGA.

25            Do you recall that?

Page 2267

1    A.   Yes, sir.

2    Q.   And you were shown some, I think it was 18508, that

3    electronic Barbie -- you can tell me what it is.  I can't

4    remember.

5    A.   It's a Barbie electronic handheld game.

6    Q.   And it's fair to say that's not a fashion doll.

7    A.   It's not a fashion doll, sir.

8    Q.   And so Mr. Nolan was asking about MGA's experience in

9    the September/October 2000 time frame, and it's fair to say

10   that during that time frame, MGA did not have experience with

11   a fashion doll.

12   A.   Again, would you like me to adopt your witness Ivy

13   Ross's definition of a fashion doll or industry?

14   Q.   I'm asking you to use your definition, which you've used

15   throughout this case.

16   A.   The definition -- if you use an industry standard, no,

17   we did not have a fashion doll experience in September 1,

18   2000.  We did not.  But we did have a doll experience before

19   that.

20   Q.   And you brought in -- you hired in October 2000 Mercedeh

21   Ward?

22   A.   We hired Mercedeh Ward.  I don't know exactly when.

23   Q.   And that was to assist in getting this Bratz project to

24   fruition?

25   A.   That's correct.  She was part of the team.

Page 2268

1   Q.   And she was someone who you hired after she left Mattel;

2   correct?

3   A.   I believe so, yes.

4   Q.   Will you look at 11277, which is in evidence.

5   A.   Can you tell me which book to look for, sir?

6   Q.   It would be in that large one, I think.  This is the one

7   where it's October 31, 2000.  This is the one where

8   projecting 25 million in sales.

9   A.   I see that.

10  Q.   And you're sending it to Franki Tsang, who is in

11  Hong Kong?

12  A.   That's correct.

13  Q.   And you're referring to Celia, who is also in Hong Kong?

14  A.   Cecelia.

15  Q.   Cecelia.  Thank you.  And you're saying Cecelia has

16  never developed any product, yet alone a fashion doll.

17          Do you see that?

18  A.   I do.

19  Q.   And what you're telling Hong Kong was you wanted someone

20  with doll development experience on this project.

21  A.   I wanted somebody other than Cecelia.  They had put

22  Cecelia on this program.

23          MR. PRICE:  Your Honor, except for the matter

24  raised previously, I don't have any further questions with

25  Mr. Larian at this time.

7dc8527b-b015-4d5e-b900-118ee9139575

Page 2269

1          THE COURT:  Mr. Nolan?

2          MR. NOLAN:  No questions.

3          THE COURT:  Very well.  You are excused.

4          THE WITNESS:  Thank you.

5          THE COURT:  Plaintiff's next witness.

6          MR. ZELLER:  Your Honor, Mattel calls Bryan

7    Armstrong.

8          THE COURT:  Very well.

9          MS. AGUIAR:  Your Honor, I'm told he's using the

10   restroom.  So if you want to wait a few minutes or take an

11   early break.  I don't think it will be very long.

12         THE COURT:  Very well.  Why don't we go ahead and

13   take a break at this time.

14         (Recess taken.)

15         THE COURT:  I have a note.  One second, Counsel.

16         The Court received the note from Juror Cilia 3

17   inquiring whether anything has happened with the matter

18   brought up yesterday.  And the Court has sent a letter, and

19   I'll make sure you have a copy of that letter that was sent

20   out today.

21         Thank you.

22         THE CLERK:  Please raise your right hand.

23              BRYAN JOSEPH ARMSTRONG, SWORN.

24         THE CLERK:  Thank you, sir.  Will you please state

25   your full name for the record, and spell the last name.

Page 2270

1          THE WITNESS:  Bryan Joseph Armstrong.  Bryan with a

2     Y, Armstrong.

3          THE CLERK:  Thank you.

4          THE COURT:  Counsel.

5          MR. ZELLER:  Thank you, your Honor.

6                      DIRECT EXAMINATION

7     BY MR. ZELLER:

8     Q.   Good afternoon, Mr. Armstrong.

9     A.   Good afternoon.

10    Q.   Nice to see you again.  We met at your deposition?

11    A.   Absolutely.

12    Q.   You're currently employed by MGA; is that correct?

13    A.   That's correct.

14    Q.   And Mattel gave you a subpoena so you'd come here and

15    testify?

16    A.   Yes.

17    Q.   And if I remember correctly, you started at Mattel on

18    November 3rd, 2003?

19    A.   That's correct.

20    Q.   And you have a title of senior paralegal?

21    A.   Yes.

22    Q.   And you've had that position since you started there at

23    MGA?

24    A.   Yes.

25    Q.   And generally speaking, one of your responsibilities

Page 2271

1    over time has been maintaining patent applications for the

2    company; is that right?

3    A.   Well, if you mean by maintaining, making sure that the

4    information is contained in the database and that it's

5    docketed and nothing slips through the cracks, then yes.

6    Q.   Part of what you do is you make sure that the company's

7    files are complete as they pertain to the patent applications

8    that the company is involved in?

9    A.   I make sure that any documents we get from outside

10   counsel make it to the file.  Anything that needs to be

11   docketed actually makes it to our docket.  It's really a

12   backup to what our outside counsel does.

13           But as for the substantive things within the file,

14   I'm not a patent paralegal, and so I'm not really familiar

15   with patent procedures.  So I don't really do a lot of work

16   on it.

17   Q.   One thing is you do recall that you were deposed in this

18   case?

19   A.   Yes, I do.

20   Q.   And you were in fact designated as a corporate

21   representative for MGA on Bratz-related patent applications.

22           Do you remember that?

23           MS. AGUIAR:  Your Honor, actually, I think could we

24   do a sidebar.

25           THE COURT:  Very well.

Page 2272

1      (SIDEBAR CONFERENCE HELD.)

2      MS. AGUIAR:  I wanted to address this now because I

3   think the issue may come up in his questioning on both the

4   issue of patents and copyrights.  We were not involved in the

5   case when Mr. Armstrong gave his deposition.  Mr. Zeller was

6   the one who took it, but I did go back and research the

7   history.

8      There was an issue between counsel regarding the

9   scope of what he was designated to testify on.  And there was

10  a letter written by O'Melveny after the first session of his

11  deposition where they clarified that he was designated only

12  on the administrative aspects of the patent registrations.

13  And then Mr. Zeller subsequently in correspondence, which I

14  can show to your Honor, acknowledged that that was the case.

15     He had a second session of his deposition where

16  counsel made it very clear -- and I don't know that I need to

17  go into this -- but I can show you where she indicated that

18  he was not speaking in any way to substance or to facts

19  regarding any MGA patents, only, you know, they were filed.

20  I keep them in the file.  In other words, he's kind of like a

21  librarian.

22     So I'm just concerned that there may be a series of

23  questions that go beyond the scope of what the witness was

24  designated for.  So I just want to get that out there now.

25     THE COURT:  Mr. Zeller?

1          MR. ZELLER:  What she's saying is substantially

2    correct.  But it's not the story.  The fact is that this

3    witness was their designee on topic 33, which involved patent

4    applications.  I took an entire day of deposition of him, and

5    I can read to the Court the testimony in which when he was

6    asked if he's there on topic 33, do you see that, question,

7    is it your understanding that you are here to testify on

8    behalf of MGA on this topic, answer, yes.  They were no

9    qualifications at that time.

10         THE COURT:  Maybe this is much ado about nothing.

11   What do you intend to get in with this witness?

12         MR. ZELLER:  There are substantive questions that

13   were taken to the patents that he was questioned on and he

14   was designated on the first day.  They subsequently then

15   tried to rescind it, but there was never an agreement on

16   that.  They said that we would provide somebody else to talk

17   about the substance, but this was their designee, and that is

18   the first day of testimony that I intend to use.

19         THE COURT:  When you say substantive, what do you

20   mean by that?

21         MR. ZELLER:  I asked him questions, for example,

22   about the truthfulness of the declaration contract Carter

23   Bryant provided to the U.S. Patent Office pertaining to the

24   date of the Bratz dolls.  This is part and parcel --

25         THE COURT:  And he responded?

Page 2274

1          MR. ZELLER:  He said that he acknowledged that the

2   information in those applications were not accurate.

3          THE COURT:  Were not what?

4          MR. ZELLER:  Were not accurate.

5          THE COURT:  Okay.

6          MS. AGUIAR:  I want to -- may I say a couple of

7   things first?  The letter that was sent is a July 25th, 2007,

8   letter from O'Melveny & Myers to Michael Zeller.  This was

9   right after Mr. Armstrong testified.  And it says Bryan

10  Armstrong --

11         THE COURT:  I see it.  Let me read it.

12         MS. AGUIAR:  I'm sorry?

13         THE COURT:  Did you depose Sam Khare?

14         MS. AGUIAR:  To my knowledge, and I don't know

15  whether they were all 30(b)(6), there were four different

16  transcripts for him.  I don't know how many of them were

17  30(b)(6), but they did depose Mr. Khare on numerous

18  occasions.

19         MR. ZELLER:  They can't rescind it after the fact.

20         THE COURT:  So essentially your objection would be

21  foundational, that he doesn't have a basis to testify to the

22  substantive issues?

23         MS. AGUIAR:  It would be foundational.  It would be

24  scope.  It would go to what we sort of discussed on Friday.

25  I sort of wanted to preview this issue for your Honor because

Page 2275

1    I had a feeling that this would come up, that this person is

2    a legal assistant.  I'm not saying he's not the company's

3    designee for a particular purpose.  There was a long chain of

4    correspondence on this.

5            MR. ZELLER:  After the --

6            THE COURT:  It's hard for the Court to do this on

7    the fly.  I don't want to give short shrift to this

8    correspondence.  At the same time I've got the jury's time.

9            MS. AGUIAR:  I understand.

10           THE COURT:  Is there any way we can come back to

11   this?

12           MR. ZELLER:  Well, we could play Odom.  We have

13   some videotape.  They can look at the yearbooks.  Assume

14   that's all settled that those are coming in and the jury

15   would have an opportunity to take a look at those.  That's

16   probably, you know, not going to use up more than I would

17   imagine 20 minutes.  But, you know, I mean, we can -- but I

18   would say this, your Honor.  In terms of what she's relying

19   on, it's all true that they changed mid-course after the

20   first day of Mr. Armstrong's --

21           THE COURT:  Let's have a quick hearing on this.

22   I'm going to send the jury back into the jury room.

23           MR. ZELLER:  Okay.  Thank you.

24           (CONCLUSION OF SIDEBAR CONFERENCE.)

25           THE COURT:  I'm sorry, members of the jury, but I'm

1    going to have to send you back on break for a few minutes.  I

2    need to take up a matter with the attorneys.

3              (WHEREUPON THE JURY WITHDRAWS.)

4              THE COURT:  Sir, why don't you step outside.  I

5    need to discuss an issue.

6              Okay, Mr. Zeller, why don't we continue what we

7    were discussing at sidebar.

8              MR. ZELLER:  Yes.

9              THE COURT:  Counsel for MGA indicates that there is

10   correspondence, which I've seen one, and I gather there was

11   more, indicating that there was an agreement between MGA's

12   prior counsel and yourself to limit the scope of this

13   witness's testimony to administrative matters, whether

14   patents were filed or not filed.  As opposed to the

15   underlying factual substantive truth or veracity of

16   assertions set forth in those patent applications,

17   particularly with respect to, I assume, timing issues.

18             What is your position?

19             MR. ZELLER:  Well, if I just could maybe walk

20   through it a little bit chronologically, your Honor.  We have

21   Exhibit 390, which is our 30(b)(6) notice, one of the

22   30(b)(6) notices.  The Court should have it there in the

23   binder.

24             Mr. Armstrong was designated on topic 15, I

25   believe, which is not terribly relevant here, but the other

Page 2277

1    one that's more important is 33.  And that's the one that

2    pertains to, it says basically copyright, patent, trademark,

3    and other kinds of registrations pertaining to Bratz, roughly

4    paraphrasing.

5            Mr. Armstrong, who is with the law department --

6    he's a paralegal there -- he has responsibility for

7    maintaining the files and does have knowledge of these

8    matters, was designated by MGA as the 30(b)(6) representative

9    on those two topics, again, most importantly for present

10   purposes, topic 33.

11           His deposition was taken on -- the first session of

12   his deposition was taken on July 18, 2007.

13           At that time, and this is quoting from page 36 of

14   the deposition transcript, I put the notice in front of him,

15   and I said, quote:

16           "QUESTION:  Directing your attention to topic

17       33, which is on page 10 of Exhibit 390, do you see

18       that?

19           "ANSWER:  Yes.

20           "QUESTION:  Is it your understanding that you

21       are here to testify on behalf of MGA as to this

22       topic?

23           "ANSWER:  Yes.

24           "QUESTION:  And you consent and agree to do

25       that; is that correct?

Page 2278

1        "ANSWER:  Yes."

2            At that time I then proceeded to ask Mr. Armstrong

3    a series of questions pertaining to the changeable foot gear

4    patent among other topics during the course of the day.  At

5    no time prior to this deposition and at no time during the

6    course of the deposition did MGA limit his designation on

7    topic 33 to so-called administrative matters.  It was on

8    topic 33.

9            The portion I just read to the Court in terms of

10   the designation and confirming it with the witness, there was

11   no objection.  There was no limitation that was placed on it,

12   no supposed clarification.

13           THE COURT:  Let me ask you this:  What exactly did

14   he testify to that you are trying to introduce at this point

15   that's relevant?

16           MR. ZELLER:  The focal point of the testimony that

17   I intend to ask Mr. Armstrong about is exactly the matters

18   that are in his deposition, the first day of deposition.

19   That pertains to what's Trial Exhibit 500, which I believe is

20   already in evidence.  That is the patent application for

21   aesthetic changeable foot gear, names an inventor of Isaac

22   Larian.

23           He was asked questions about this patent.  He was

24   also asked questions about the associated documents with this

25   process.  And he answered substantive questions.  He was

Page 2279

1    designated on these substantive matters because MGA, and I

2    hate to sound like I'm casting aspersions, but it was quite

3    clear at the end of the day and subsequent, they then tried

4    to say well, what we really want to now do is limit Bryan

5    Armstrong to administrative matters, and we'll provide

6    another witness.

7            THE COURT:  Let me stop you there.  I still want to

8    get a sense of his testimony.  What is the essence of his

9    testimony concerning the patent, for example, the one on

10   changeable foot gear?

11           MR. ZELLER:  Sure, I can provide more detail, your

12   Honor.  In particular, what Mr. Armstrong testified about the

13   contents of Exhibit 500, patent application, its meaning, its

14   scope, what it covered, the dates it was filed, the fact that

15   there was a nonfinal office action by the Patent Office

16   rejecting this patent application on the first instance,

17   basically saying that this was filed too late because the

18   Bratz dolls with this very changeable foot gear had been out

19   on the market for more than a year.

20           In response to that, your Honor, Carter Bryant,

21   with Mr. Larian, submitted a declaration to the U.S. Patent

22   Office in which they claimed that the Bratz dolls that were

23   the subject of this patent were not released until 2002 in

24   order to shoehorn them into that one-year grace period, when

25   in fact those dolls were released in 2001.

Page 2280

1          The Patent Office in fact subsequently found that

2      that declaration -- they didn't use the terms not accurate,

3      but they rejected it, and they said no, it's quite clear that

4      these dolls were on the market that have this very invention

5      for more than a year.

6          So this really boils down to two issues in terms of

7      this particular case.  Number one -- I'm sorry?

8          THE COURT:  No.

9          MR. ZELLER:  Number one, of course, that we have

10     Isaac Larian claiming to be the inventor of something Carter

11     Bryant has testified he created.  And two, perhaps more

12     importantly, we have an instance of Mr. Larian and Carter

13     Bryant making statements to the U.S. Patent Office under oath

14     about the timing of Bratz dolls that certainly has an eerie

15     parallel to the issues that we want to say are also at issue

16     here in terms of the timing of the creation of Bratz.  These

17     are sworn statements they made to the U.S. government.

18         THE COURT:  Where is this declaration?  What

19     exhibit is that?

20         MR. ZELLER:  Let's see.  502 for identification.

21     And with respect to Mr. Armstrong's particular testimony on

22     this Exhibit 502, when he was the designee, he acknowledged

23     that it was not accurate to be saying that the dolls with

24     these features described in this declaration by Carter Bryant

25     were released in the year of 2002 as he claims in paragraph 4

Page 2281

1    of the declaration.

2           THE COURT:  What is the foundation for knowing

3    that?  Simply the 30(b)(6) designation?

4           MR. ZELLER:  He's a 30(b)(6) representative.  I

5    asked him did he investigate, did he familiarize himself with

6    the documents and the records.  He confirmed that he did at

7    his deposition.  So that is part of the record of the

8    deposition.

9           THE COURT:  All right.  Okay.  Well, let me hear

10   from Ms. Aguiar as to why this should not be admitted.

11          MS. AGUIAR:  Your Honor, there are, I think, three

12   main reasons why we should not be getting into it with this

13   witness today.  I'll lay those out.

14          The first is that the scope of this witness's

15   testimony is to the administrative aspects of topic 33.  The

16   second one I'll call best evidence.  And the third is really

17   the substance of what Mr. Zeller would like to get into

18   today.  It's akin to a Markman hearing really.  And I think

19   it is totally collateral, and let me explain each one of

20   those in turn.

21          Mr. Armstrong was in fact designated on topic 33,

22   and I don't know if we can get Exhibit 390 back up here just

23   so we can have it again.  And I don't think MGA's counsel has

24   ever disputed that he was the designee on that in some

25   respect.  It says the applications for registration and the

Page 2282

1    registrations for copyright, patent, and trademark.

2              It does say including, without limitation,

3    communications pertaining thereto.

4              THE COURT:  Right.

5              MS. AGUIAR:  But the idea that when Mr. Armstrong

6    was offered for his deposition, that he would be testifying

7    about a declaration submitted by Carter Bryant after the date

8    of the -- that the patent was filed and then asked questions

9    that really required him to compare the patent claim with

10   that declaration, I think once that became clear that this

11   was really going well beyond just patent and trademark and

12   copyright registrations.  The first session of his deposition

13   was in July.  And then there was a letter --

14             THE COURT:  Before you read beyond the deposition,

15   is a declaration submitted on behalf or in connection with a

16   patent -- is it your position that that's not a communication

17   pertaining to the patent?

18             MS. AGUIAR:  No, I guess what I'm saying is that

19   when he was offered up as the designee on this topic, I

20   don't think that they foresaw that it would get into this

21   far-reaching area.  But let me --

22             THE COURT:  Subjectively, what they did or didn't

23   foresee is not my question.  My question is you agree that

24   that is a declaration submitted, communicating to the Patent

25   Office certain dates to clarify would be a communication

7dc8527b-b015-4d5e-b900-118ee9139575

Page 2283

1   related to a patent application.

2          MS. AGUIAR:  I'm just trying to explain why I think

3   that he was not prepared to answer those questions.

4          THE COURT:  I know what you're trying to do.  But

5   go with the Court.  Just try to answer my questions.

6          MS. AGUIAR:  Yes, I would agree with that,

7   absolutely.

8          THE COURT:  All right.  My second question is was

9   an objection made during the deposition itself on this basis?

10          MS. AGUIAR:  I think in the first day of the

11   deposition, I believe that at various points an objection was

12   made, it is correct that they did not stop him from answering

13   these questions.

14          THE COURT:  May I see the objections that were

15   made?  I must have the deposition testimony in front of me.

16          MS. AGUIAR:  What I'm saying is he did in fact

17   answer certain questions on the first day of his deposition.

18   I'm not trying to unring that bell.  I'm not trying to say

19   that they made an objection that would have been sufficient

20   to say -- I'm not suggesting that.

21          But right after the deposition, they wrote a letter

22   to Mr. Zeller, the prior law firm, and they said Bryan

23   Armstrong, who, as you know, is a paralegal who does the

24   administrative work for the registrations, was unable and

25   never prepared to answer your questions regarding the factual

Page 2284

1    basis for information in the registrations.  And that would

2    include the patents.

3              Bryan is therefore not MGA's 30(b)(6) witness for

4    this component of topic 33, in parens, the factual basis for

5    the information on the registrations.  Now that we understand

6    your view as to what is encompassed in topic 33, we designate

7    Sam Khare, K-H-A-R-E, to testify on this component of topic

8    33.

9              Mr. Khare, who is an attorney with MGA, who was

10   then and still is, did testify at length on this topic.  They

11   had the opportunity to depose him.  At Mr. Armstrong's second

12   session of his deposition, there were several exchanges that

13   made it very clear.  So if you look, for example, on page 308

14   of Mr. Armstrong's second session, where it says to the

15   extent your question is going into the content of the

16   documents, Mr. Sam Khare is MGA's designee with regard to

17   that and not Mr. Armstrong.

18             And the document before this was a document, I

19   believe, that pertained to patents.

20             Then if you look at page 310 of that same

21   transcript, there is a question whether Mr. Khare will,

22   quote, address anything in terms of the action, just even in

23   terms of the substance, period?  Answer, right.

24             Okay.  And there was subsequent correspondence on

25   this from Mr. Zeller in October of 2000 with our firm that he

Page 2285

1    said that he understood that Mr. Khare was being designated

2    on the substance.

3              THE COURT:  Can I see that?

4              MS. AGUIAR:  It's a letter dated October 25, 2007,

5    and at page 9.

6              THE COURT:  Let me take a look at it.  I just want

7    to see if --

8              MR. ZELLER:  Maybe I can cut through some of this

9    because --

10             THE COURT:  Give me a chance, Mr. Zeller.  I'll

11   give you a chance to respond.  You know the letter I'm

12   referring to?

13             MR. ZELLER:  I don't know that I have a copy of it,

14   but I'm sure that -- because there's no disagreement about

15   this part.

16             THE COURT:  What it says is to provide additional

17   testimony on the substance of MGA's registrations and

18   applications, MGA designated Mr. Khare to testify on the

19   topic as well.  It sounds like what he's agreed to was a

20   supplemental 30(b)(6), not as a replacement.

21             MS. AGUIAR:  Right, but the quotes that I was

22   pointing you to in Mr. Armstrong's deposition was after we --

23   after MGA's counsel told Mr. Zeller that we were designating

24   Mr. Armstrong only on administrative aspects.  So I'm not

25   trying to take back --

Page 2286

1        THE COURT:  What I'm getting to is that if there is

2   evidence that -- first of all, looking at the 30(b)(6)

3   designation, it looks pretty clear what it's calling for.

4   It's not an ambiguous statement.  The applications for

5   registrations for copyright, patent, trademark, and any other

6   that refer to Bratz, including without limitation

7   communications pertaining thereto.  That's a pretty -- as

8   30(b)(6) topics go, that's really not that complicated.

9        We then have MGA designates a witness,

10  Mr. Armstrong, who apparently competently testifies to the

11  substance of communications pertaining to these patent

12  applications.

13        We'll get to your objections in a minute.  I

14  understand you have objections to that.  But you haven't

15  highlighted any objections yet for me on that.  There's no

16  objections in this first deposition at all to the designation

17  or to scope.

18        Sometime after the deposition, after any such

19  objections would be waived, an objection is made.  And

20  certainly if Mr. Zeller then agrees to that, I'd be -- I'd

21  enforce any agreement.  But that's not what this is saying.

22  Is there someplace else that you can point me to that he

23  agrees to, in lieu of Mr. Armstrong, accept somebody else as

24  the 30(b)(6) witness?

25        MS. AGUIAR:  What I would say is that what they

Page 2287

1   agreed to is not to go back and undo anything from

2   Mr. Armstrong's first session, but it is clear from the

3   deposition of the second session of Mr. Armstrong that that

4   was what happened.

5           In other words, there were at every turn in the

6   second session of Mr. Armstrong's deposition, at every turn,

7   when there was anything remotely related to substance, there

8   was an objection lodged.

9           THE COURT:  I understand that MGA's attorneys

10  figured out after the deposition that this was a mistake.

11  That's clear.  You don't get to undo a deposition, though,

12  once you've been given notice of the topic.  You've shown up

13  with your attorneys.  You've given the testimony, and the

14  attorneys waive the objection.  You don't get a redo on that.

15          Now, it may be that -- and I always encourage

16  professional stipulations.  If Mr. Zeller agreed.  But this

17  is not an agreement.  This is to provide additional testimony

18  on substance, we agree that there can be another person

19  designated.  So let's move on to your other objection.

20          MS. AGUIAR:  Okay.  So with regard to the other

21  points, and these two -- they are all interrelated, but

22  Mr. Armstrong was asked questions that would require him to

23  read a declaration by Carter Bryant that was filed after the

24  patent was filed, that he was not involved in drafting, had

25  never seen before, and had not spoken with anyone about that

Page 2288

1   declaration.

2           Take that declaration, read and construe the claim

3   in the patent, and then take a physical Bratz doll and was

4   asked to compare what was claimed in the patent to what the

5   physical doll looked like, then was asked look at the doll,

6   look at the figure in the patent description, and tell me

7   aren't those two things the same.

8           THE COURT:  Let me stop you there.

9           Mr. Zeller, is this what you plan on doing with

10  this witness?

11          MR. ZELLER:  I apologize, your Honor.

12          THE COURT:  Is this what you plan on doing with

13  this witness?

14          MR. ZELLER:  Yes.

15          THE COURT:  How is this relevant?

16          MR. ZELLER:  This is relevant because, as I was

17  explaining previously, your Honor, the -- and part of it can

18  be potentially short-circuited because, as I was saying, the

19  punch line here is when Carter Bryant submitted this

20  declaration to the Patent Office claiming that this

21  configuration of Bratz doll was not released until the fall

22  of 2002, in order to meet that one-year grace period, that

23  that was not a correct statement.

24          Mr. Armstrong acknowledged that that was the case

25  at his deposition.  So while yes, there are mechanics

7dc8527b-b015-4d5e-b900-118ee9139575

Page 2289

1    involved with the process of examination during his

2    deposition, the bottom line is he was testifying as to the

3    accuracy or inaccuracy of documents that were submitted --

4            THE COURT:  Where is that in his deposition?  Where

5    does he say that?

6            MR. ZELLER:  I can show that.  Well, bear with me.

7            MS. AGUIAR:  Basically, what he says is that he

8    looks at the doll, and he looks at the patent, and he said

9    well, if the doll -- if the doll is the same as the patent,

10   and he says and by the way, there were -- this is kind of

11   getting complicated because in his first deposition they ask

12   him about the foot gear, okay, in the patent, and the foot

13   gear in the doll.  And he says well, the foot gear, meaning

14   the shoe, in other words, the shoe looks the same.

15           So if the shoe on the doll is the same as the shoe

16   in the patent, then I guess what Mr. Bryant said in his

17   declaration would have to be incorrect.

18           THE COURT:  Let me look at what was actually said.

19           Mr. Zeller, what pages?

20           MR. ZELLER:  Yes.  There were a couple places where

21   I address this with him.  And I think that more salient

22   pages, and there are others, page 246.

23           THE COURT:  Okay.

24           MR. ZELLER:  Line 6 through -- actually 247 through

25   line 4.  That's one of the kind of key passages.  And --

Page 2290

1          THE COURT:  One second.  Give me a second.

2          MR. ZELLER:  Sure.

3          THE COURT:  Anything else?

4          MR. ZELLER:  Yes, your Honor.  252, line 15,

5   through 254, line 23, and for context here, these quotes are

6   from the Carter Bryant declaration that I'm asking him about.

7          THE COURT:  Ms. Aguiar, the problem I'm having with

8   all of this in reading this deposition -- and this is not

9   your fault.  You were not counsel of record at this time.

10          But the only objection that has been made is an

11   objection as to form of the question.  There is no best

12   evidence objection.  There is no foundational objection.

13   There is no objection as to the scope of Rule 30(b).  There's

14   no objection of substance as all.

15          So they are waived with respect to this designated

16   witness.

17          MS. AGUIAR:  I totally understand.  Let me just go

18   to the next step, though.  Because if this jury is going to

19   hear this testimony from the first day of his deposition

20   where he says well, okay, I'm the legal assistant at MGA, and

21   you're asking me to look at a declaration, and you're asking

22   me to look at a complex patent claim, and then you're asking

23   me to look at a doll and compare it, and as far as they went

24   in this first session was that the shoe was the same.

25          And then when he then says -- then he asks them

Page 2291

1   about the attachment, okay?  So now we're off the shoe.

2   We're on the connector or the attachment between the leg and

3   the shoe, and here he starts saying well, actually, I'm

4   looking at the patent in its entirety.  And the patent in its

5   entirety doesn't just relate to a shoe.  In fact, the crux of

6   the patent is this connector or protuberance is the word

7   that's used in the patent.

8           So when Mr. Armstrong, as a layperson, frankly,

9   looks at this doll and looked at the patent, he goes well,

10  you know what, if you ask me, the connector doesn't look the

11  same.  And then Mr. Zeller says well, but that's not the

12  question I'm asking you.  And he goes back to the foot gear.

13  And then in his second session, they didn't go back to,

14  because Mr. Armstrong was not designated on substance, they

15  didn't go back to whether this connector is the same.

16          So this kind of leads into my last two objections,

17  which is best evidence.  They had Mr. Larian on the stand,

18  and instead of going into this with someone who may have been

19  able to more artfully address this, they want to get a legal

20  assistant from MGA on the stand so that the jury can hear

21  that in his first deposition he gave a couple of answers that

22  said well, yeah, I mean the shoe on that doll looks like the

23  shoe in the patent.  So if those are the same, then the

24  declaration is wrong.

25          Mr. Bryant --

Page 2292

1          THE COURT:  I'm very sympathetic to your argument.

2     But you said they want to get a legal assistant.  And this is

3     who you, MGA, through their counsel, designated as the person

4     most knowledgeable about this particular subject.  And I

5     understand why you want a do-over on that.  But that would be

6     a really dangerous road for this court to go down in the

7     middle of trial.

8          This was not brought as a motion in limine.  There

9     was no effort prior to trial to preclude this testimony.

10    This was brought to the Court's attention after the witness

11    had been called.

12          And I'm not faulting you for that other than I'm

13    saying this:  I have real concerns as to where this goes to.

14    The safer alternative is to allow what you designated and

15    what did you not object to, and I know it was not you

16    personally.  It was MGA's prior law firm, and if you want to

17    impeach this witness, if you want to bring in somebody else

18    that you think is more knowledgeable and can explain why this

19    person doesn't know what they are talking about, that's all

20    fine.

21          But you are asking me to basically insert

22    objections that were waived on a witness that you designated,

23    that MGA designated as the person most knowledgeable about

24    this topic.

25          MS. AGUIAR:  Like I said, I won't go back to my

Page 2293

1    original point because I understand what your Honor's ruling

2    is.  But I think realistically, when they did designate this

3    person, they didn't -- they clearly understood -- you're

4    right.  It's easy to understand, I think, what the scope of

5    that topic 33 was.

6             But let me just make the final point here, your

7    Honor, which is that if we -- when I stood up here on Friday

8    and said -- last Friday, and I raised an issue regarding this

9    witness, I really didn't believe that we would be getting

10   into this area of testimony because I said you know what, I

11   think the sole area of testimony would be copyright, and then

12   we started to talk about the date correction.

13            Mr. Zeller said it would also be the patent

14   applications.  But there had been this objection asserted,

15   that he's not the witness on substance.

16            So that's the reason I didn't, you know, I did try

17   to raise this on Friday.

18            Let me just lastly say that in terms of getting

19   into this at this point, this is, I believe, such a

20   collateral issue.  I mean, as the Court is aware, you've had

21   a Markman case.  You've had the Elite Aluminum case.  You

22   know what it means to construe a patent claim.  And you know

23   and you said in the opinion that you issued in that case that

24   the interpretation of a patent claim is a question of law for

25   the Court.

Page 2294

1            So whether we're going to get into an extended

2     analysis of comparing a physical doll to a fairly complex

3     patent, I just am wondering to what end and how collateral

4     are we getting here.  You're totally right that he gave the

5     testimony that he gave in his first deposition.  But there

6     were witnesses that were offered for deposition that gave

7     substantive testimony on this.  There are other witnesses in

8     this case who are directly --

9            THE COURT:  Let me ask you, are those witnesses to

10    give the same testimony -- they would have to make the same

11    Markman type analysis; correct?

12            MS. AGUIAR:  I'm just saying that if what they

13    really wanted to do, and I'm sort of conflating two points,

14    and I'm sorry.  If what they really wanted to do was get the

15    person who MGA designated on this topic and they know that,

16    they wouldn't be calling Bryan Armstrong.  Bryan is a legal

17    assistant.  We subsequently designated an attorney from MGA.

18    I think if --

19            THE COURT:  What was the attorney's position on all

20    of this?

21            MS. AGUIAR:  Mr. Khare did give testimony to the

22    extent he could.

23            THE COURT:  What did he say?

24            MS. AGUIAR:  I can't recite chapter and verse off

25    the top of my head.

Page 2295

1          THE COURT:  I guess the bottom line of

2   Mr. Armstrong's testimony is the 2002 declaration, saying the

3   Bratz dolls came on line in 2002 is false; right?

4          MS. AGUIAR:  Again, I think --

5          THE COURT:  Did the attorney agree or disagree?

6   The declaration says he came on line in 2002.

7          MS. AGUIAR:  I do not think Mr. Khare supports

8   that, but I don't want to step beyond what I know.  I'm not

9   as familiar with four days of deposition for Mr. Khare.  So

10  look, I'll leave it at this, but I feel like we're getting

11  exceedingly collateral here at this point.

12         THE COURT:  I'd like Mr. Zeller's response to that

13  collateral issue.

14         And, Mr. Nolan, did you want to add something

15  briefly?

16         MR. NOLAN:  Real briefly.  Your Honor, there's been

17  approximately 140 depositions in this case.  Your Honor, the

18  rule has been -- rules -- rules of engagement is that only

19  objections as to form are made at depositions.  Other

20  objections are not waived.  That was the agreement.

21         THE COURT:  Wait a second.  No one is rewriting the

22  Federal Rules of Civil Procedure without letting me know

23  about it.  So I'm not going to -- and that's not been -- I've

24  seen substantive objections made in a number of depositions.

25         MR. NOLAN:  Your Honor, I agree, but I'm just

Page 2296

1   saying that there are other depositions --

2          THE COURT:  I'm using the Federal Rules of Civil

3   Procedure to decide these cases, not stipulated modifications

4   to the rules by the parties.

5          MR. NOLAN:  Your Honor, okay, I just -- all right.

6   And then the other thing is that I would make a proffer with

7   respect to what the testimony would be with respect to

8   whether or not Carter Bryant's declaration is truthful or

9   not.  There's a proffer of evidence that we could put on

10  evidence with respect to changes that were made to the foot

11  gear and the protuberance, and it's not the same that's in

12  Carter Bryant's drawings.  It's quite clear from the drawings

13  that are attached to the patent application.  It's not a

14  false declaration.

15         THE COURT:  So you'll be able to impeach whatever

16  Mr. Armstrong says, then.

17         MR. NOLAN:  We will impeach the corporate designee

18  who is a paralegal, not legally trained.

19         THE COURT:  But it's not like Mattel designated

20  this person, Counsel.  I mean, that's the fairness issue

21  here, is that I understand you don't like what he said, but

22  he was designated by MGA to respond to this topic.

23         MR. NOLAN:  No, let's talk about fairness for a

24  moment, your Honor, with all due respect.

25         When this issue came up and was raised with

7dc8527b-b015-4d5e-b900-118ee9139575

Page 2297

1    Mr. Zeller, everybody understood that a paralegal is not a

2    competent witness to make a Markman analysis.  And although

3    everyone is saying Exhibit No. -- designation 33 is clear, I

4    personally did not by reading that, if I was there, believe

5    that at a deposition they would be asking a paralegal a

6    Markman hearing.

7              You talk about fairness, your Honor, we followed it

8    up and said if that's what you're getting into in the form of

9    question 33, we will give you a competent witness, and they

10   accepted that.  They took a competent deposition of that

11   case.  In terms of fairness, what is unfair is for Mattel now

12   to take advantage of a paralegal offering up claim

13   construction language, when they know they have testimony

14   from a lawyer who after we realized, when we came into the

15   case and realized what the content was of the actual

16   questions and how far it was going, then we offered up a

17   competent witness.

18             And I respectfully submit, your Honor, that a

19   communication thereto does not indicate in any fashion that

20   you are going to conduct a Markman analysis in the course of

21   the deposition.

22             THE COURT:  Well, a couple things, Counsel.

23   Counsel, before you sit down, the Court's trying to speak to

24   you.

25             MR. NOLAN:  I'm sorry, your Honor.

Page 2298

1          THE COURT:  I know you're finished, but I'm not.

2          MR. NOLAN:  I'm sorry.

3          THE COURT:  As you well know, for a 30(b)(6)

4    deposition, a corporation can designate the facility's

5    engineer to be the person most knowledgeable and educate

6    them.  They can designate a secretary or receptionist.  The

7    fact that this person is a paralegal does not make it

8    dispositive.  MGA could appoint whoever they want to be their

9    person most knowledgeable if they believe that is the person

10   most knowledgeable; correct?

11         MR. NOLAN:  Correct.

12         THE COURT:  So it doesn't matter that this person

13   is a paralegal.  This is the person who MGA said, through

14   their counsel, O'Melveny & Myers, is the person most

15   knowledgeable about communications pertaining to these patent

16   applications.

17         MR. NOLAN:  But, your Honor, under 403 right now,

18   with this type of ruling and allowing this testimony to go

19   forward, we will have to call Ms. Cendali to the stand to

20   explain what they did immediately afterwards, and I would ask

21   that Mr. Zeller be called to the stand with respect to the

22   explanations and exchanges of communication, and then we'll

23   put on the fact that Mr. Khare was then resubmitted as a

24   30(b)(6) witness and was asked all of these questions.

25   That's what we'll do in this case.

1          THE COURT:  You're not going to do any of that,

2     Counsel.  If there was any basis for this Court to believe

3     that Mr. Zeller or anyone from Mattel entered into an

4     agreement to basically vacate the 30(b)(6) deposition and

5     have a replacement come in, I would enforce that in a

6     heartbeat.

7          What has been offered up to me as evidence, as the

8     only evidence that I have before me that Mr. Zeller agreed to

9     anything, is the following.  He agrees to provide additional

10    testimony, additional testimony on the substance of MGA's

11    registration and applications.  MGA designated Mr. Khare to

12    testify on the topic as well.

13         That's pretty unambiguous.  Mr. Zeller is not

14    agreeing to replace.  If he is, if he did, if there's

15    something out there, please put it before me.

16         MR. NOLAN:  Your Honor, what I believe is out there

17    is that rather than taking the position and the

18    interpretation that you are now applying, that wait a minute,

19    MGA, you designated Mr. Armstrong as the most knowledgeable

20    on this subject, and I took his deposition, in fact, what

21    Mr. Zeller did was take a second session, acknowledge during

22    the course of that argument or that deposition that they

23    weren't going to go into the areas.  Mr. Khare was --

24         THE COURT:  Where is that?  Where does he

25    acknowledge that he's not going to go into the areas?

7dc8527b-b015-4d5e-b900-118ee9139575

1    Because I'm not taking the position of anybody.  I'm trying

2    to figure out what the evidence shows here.

3            And I'm not suggesting for a moment that Mr. Zeller

4    indicated that he is only relying on the first deposition.

5    He's relying on all of it.  I mean, this is all supplemental.

6    Mr. Khare's, Mr. Armstrong's first deposition,

7    Mr. Armstrong's second deposition.

8            What you are trying to do is carve out this first

9    deposition.  You don't want what happened here in this trial.

10   And I have no basis -- you're not giving me any legal basis

11   to exclude it.

12           MR. NOLAN:  Your Honor, I'll sit down, and

13   Ms. Aguiar will give you the quotations.  Let me just finish

14   the last point that I was going to make.

15           I think what is evident by the conduct of the

16   counsel in this case, once they finish the 30(b)(6)

17   deposition on Mr. Armstrong, rather than resubmitting another

18   request on a different topic, Mattel's counsel agreed to take

19   an additional deposition on this same topic through a

20   witness, and I would submit that they by that conduct, your

21   Honor, acknowledge, and they ask those questions of Mr. Khare

22   going to the substance of the issue.

23           And I believe that the conduct of Mattel in

24   conducting a 30(b)(6) deposition and allowing, whether or not

25   it was supplemental or a substitution or a redo, the fact of

Page 2301

1    the matter is that Mattel acknowledged that there was going

2    to be a need to ask testimony of a competent witness.  That's

3    the point I wanted to make on the Khare deposition.  And then

4    with the objections, I'll leave it with Ms. Aguiar.

5              THE COURT:  Ms. Aguiar.

6              MS. AGUIAR:  I can't stand up here and tell you

7    today I found what I could in preparation for anticipating

8    what would happen today.  I can't stand up here and tell you

9    that Mr. Zeller ever said okay, I'll agree to undo the first

10   deposition.  I can't imagine Mr. Zeller, from what Lily knows

11   about him in the last few months, would every have agreed to

12   do that.

13             I don't know whether he did.  But to Mr. Nolan's

14   point, during the second session of Mr. Armstrong's

15   deposition, for example, when they started to get into

16   substance --

17             THE COURT:  The objection is made that you referred

18   me to earlier.

19             MS. AGUIAR:  Right.  He basically said so, Dale,

20   when you say the substance of what Mr. Khare --

21             THE COURT:  I'm sorry.  Where are you reading from?

22             MS. AGUIAR:  I want to make sure I have the right

23   thing on the patent.  308.  And this is the one I pointed you

24   to before.  So I don't mean to be repetitive.  It's page 308,

25   line 14.

1          And this is a patent document.  Question:  Is it

2     true that the Bratz dolls reference that is mentioned here in

3     the nonfinal action by the Patent Office are the references

4     that we marked as Exhibit 547?

5          And then I won't keep reading because I know you're

6     reading.

7          THE COURT:  Right.

8          MS. AGUIAR:  But then Ms. Cendali makes an

9     objection.  And then if your Honor wouldn't mind reading

10    straight through --

11         THE COURT:  Well, then the witness gives an answer.

12    I'm looking at line 8 of 309.

13         MS. AGUIAR:  Right.  And the witness says I don't

14    know.

15         THE COURT:  How am I supposed to take this as a

16    concession by Mr. Zeller that this is beyond the scope?  I

17    mean, Mr. Zeller can't control what is stated by Ms. Cendali

18    or anybody else for that matter.

19         MS. AGUIAR:  Understood, but then at the bottom of

20    309, question, so maybe I should clarify something.  Because

21    I'm not sure that -- so when you say the substance, you're

22    talking -- because I think the way that Ms. Grossman had said

23    it in the e-mail was something like, you know, validity or

24    accuracy, I should say.  The validity or accuracy, I should

25    say, of the statements that were in there.  But it sounds

1   like -- and I'll undoubtedly mispronounce his name --

2   Mr. Khare.  Ms. Cendali, Khari.  Mr. Khari, he'll -- he'll

3   address anything in terms of the action just even in terms of

4   the substance, period?  Ms. Cendali, right.

5          THE COURT:  I'll tell you, topic 33 is a lot

6   clearer than that exchange.  Wow, let me look at this again.

7          Substance.  He's referring to --

8          MS. AGUIAR:  He's referring back to an e-mail

9   exchange, I take it, between Ms. Grossman which happened

10  before this second session, and I can only guess, because I

11  must admit I don't have that e-mail, that she said Mr. Khare

12  was going to address anything pertaining to the substance of

13  patent, trademark, and copyright applications.

14         And then, I'm sorry, just on the top of page 310,

15  where you were reading, Ms. Cendali says, it's beyond this

16  witness's -- and then Mr. Zeller says, again, okay, well,

17  then, that will -- that will speak some of this up.  I think

18  "speak" is probably "speed."

19         That will speed some of this up.  And then for the

20  whole rest of the day in the second session, every time it's

21  something remotely substantive, Ms. Cendali pipes up and says

22  not substance.

23         And I certainly don't want to have to ask your

24  Honor to go through that, but any time it is outside the

25  witness's scope of, you know, administrative or was this

Page 2304

1    filed, she instructs, and he says I don't know.  And, in

2    fact, it's later in this day that the witness is shown things

3    that pertain, other communications that pertain to the -- I'm

4    sorry.

5              THE COURT:  Oh, no, no.  I'm reading along here.

6              MS. AGUIAR:  The witness is shown multiple

7    copyright registrations and asked do you know anything about

8    whether the dates in there are right.  No, I have no

9    information.  And Mr. Zeller moves on and asks on the next

10   one and the next one and the next one.

11             So -- and I will also note, your Honor, that for

12   example, when he starts to get in again, to this Markman type

13   thing, on page 315.  So if you look at 315, line 19, and

14   we're talking here again, he has a physical doll in front of

15   him, the witness does.  And then he has the patent in front

16   of him.

17             And the witness says so the question is whether or

18   not that connector is different on subsequent dolls?

19   Mr. Zeller says the ones that were released in 2002.

20   Witness:  I have no idea.  But do you know of any changes

21   that were made?  Answer:  To the connector?  Right.  No.

22             And then he just says he has no idea, when he's

23   asked repeatedly about these same questions, he says he

24   doesn't know, and again, over the objection to outside the

25   scope.

Page 2305

1          THE COURT:  Thank you, Counsel.

2          MS. AGUIAR:  So I'll sit down.

3          THE COURT:  Let Mr. Zeller have a chance to respond

4   to some of this.

5          MR. ZELLER:  Just briefly, your Honor.  And this is

6   essentially, I think, what the Court has already stated and

7   recognized.  What happened in session 2 does not rewrite the

8   history of what happened in session 1.  That he was the

9   designee at the time.  That is the testimony that he gave.

10  There was no objection to outside the scope as to those

11  questions.  There was no foundational objections.  I mean,

12  there were none of those things.  And I'm trying to find a

13  neutral way of putting it, but obviously after --

14         THE COURT:  I accept that, and, Mr. Nolan, you said

15  that there was an agreement that only objections as to form

16  were going to be made.  Well, that was belied by what

17  Ms. Aguiar just put before the Court.  I just -- she just

18  cited to a number of objections that are not form only;

19  correct?

20         MR. NOLAN:  Correct.

21         THE COURT:  So there was not an agreement in this

22  case that only form objections would be made during

23  depositions; correct?

24         MR. NOLAN:  Not in that deposition, your Honor.

25         THE COURT:  All right.

Page 2306

1          I don't want to hear this in this trial again.

2          MR. NOLAN:  Your Honor, may I cite to Rule 32?

3          THE COURT:  You may.

4          MR. NOLAN:  Rule 32, in so many paragraphs, talks

5  about the waiver on objections at depositions.  And Rule

6  32(5)(d) says, and before that, it's talking about -- and (d)

7  says waiver of objections.  And then under (5)(d)(3()A),

8  objection to competence --

9          THE COURT:  I'm sorry.  Where are you?

10         MR. NOLAN:  Rule 32.

11         THE COURT:  Yes.

12         MR. NOLAN:  5 --

13         THE COURT:  Wait, it's got to be -- well, start

14  with a letter.

15         MR. NOLAN:  I'm sorry.  I think it's D as in

16  David.  Where it says waiver of objections.  And then it goes

17  to notice and to the officer's qualification.

18         THE COURT:  Right.

19         MR. NOLAN:  And go to 3, to the taking of the

20  deposition.  It says objection to competence, which is really

21  what we're testifying here, an objection to a deponent's

22  competence, over the competence, relevance or materiality of

23  testimony is not waived by the failure to make the objection

24  before or during the deposition unless the ground for it

25  might have been corrected at that time.

Page 2307

1      And, I would submit --

2      THE COURT:  So you do want me to use the Federal

3  Rules now.

4      MR. NOLAN:  Your Honor, I apologize to the extent

5  that I was suggesting that the agreement that I was referring

6  to, which is exactly -- this was my understanding.  I

7  couldn't cite you to the point, that I've always understood

8  during a deposition that you can make whatever objections you

9  want, relevance and everything else like that, but the

10 failure to make an objection with respect to let's say the

11 competency of a witness, because at that point in time, you

12 don't know, or the relevancy for purposes of the trial.

13     Now that we're at trial, I am saying, your Honor,

14 that this is a situation where I believe the rules of

15 engagement applied throughout these depositions, and we never

16 agreed to remove this issue, and that's the point that I was

17 making, your Honor.

18     I wasn't asking you not to apply the rules.  I was

19 just asking you in my humble way of saying that was always my

20 understanding, and I couldn't cite to the specific rule until

21 someone pointed that to me.

22     MS. AGUIAR:  Can I just finish up on one point?

23     THE COURT:  All right, Counsel.  And we're going to

24 stop this tag teaming.  Well, Ms. Aguiar, I'm sorry.  You

25 started this.  Let's get everything out.  I don't want either

Page 2308

1    side to have a moving target.  So let's get everything out,

2    but this tag teaming is going to have to stop.

3              MS. AGUIAR:  I'm sorry.

4              THE COURT:  Very well.

5              MS. AGUIAR:  On the issue that Mr. Zeller, I think,

6    has not yet had the opportunity to address, but on the

7    collateral issue, I am not sure, I've lost track of when you

8    stood up and sat down, but on the issue of what's collateral,

9    if you look at Exhibit 500, which is the patent application,

10   I just want to have the Court appreciate what is going to

11   happen with Mr. Armstrong because I do believe respectfully

12   that your Honor has discretion in terms of what comes in and

13   how far we go in 1-A and what this goes to.

14             I mean, they are going to ask, if you look at page

15   6 of the patent, that's where it starts setting out the

16   claim, okay?  We claim.  And there are actually, I believe

17   there are 17 separate claims, and I'm not a patent lawyer.

18   So I understand that this is where the specific design is set

19   forth.

20             Then if you look at page 10 of that document, which

21   is the figures, and page 11, which is the continuation of the

22   figures.  Essentially what I believe this witness is going to

23   be asked to do is to look at the claim description, look at

24   the figures, and then look at a physical doll.  He will be

25   asked whether the doll is the same as the figures in the

Page 2309

1  patent and if it's the same as what is claimed.  And I think

2  the question of construing a patent claim is not an issue for

3  fact witnesses, let alone a 30(b)(6) deponent.

4          And by virtue of undertaking that process, that

5  sort of analysis of the claim compared to a physical doll,

6  that, let's keep in mind, that is going to be done for

7  purposes of trying to show that a declaration that was not

8  submitted by this witness, but by another witness, is

9  incorrect.

10         So I'm just suggesting that we're trying to get

11 through this.  We have a jury here who is trying to hear this

12 case.  You're trying to get through this with some modicum of

13 efficiency.  Where is this going?  And if we're going to do

14 this with this witness, it's going to take a lot of time.

15 And we have the person who made the declaration coming up on

16 the stand tomorrow.  And I just don't think at this juncture,

17 given the question in 1-A, which is who made the drawings,

18 that this is an issue we need to be getting into.

19         THE COURT:  All right.  Mr. Zeller.

20         MR. ZELLER:  I don't know if the Court is still

21 interested in addressing the 30(b)(6) aspect of this.  I

22 would say, just as a summary of this, that certainly the rule

23 cannot be that you get a designated witness, and then you get

24 to decide whether you like that person's testimony or not,

25 and then sandbag the other side.  Particularly during trial.

1           I mean, this -- there was no motion ever made to

2      withdraw Mr. Armstrong's first day of deposition.  There was

3      no relief ever sought.  There was no statement made to me

4      that I can certainly recall and that I know that the Court

5      certainly --

6           THE COURT:  The best argument that I think that's

7      been presented by Ms. Aguiar on this is the -- your

8      acquiescence.  I don't know if that's the right word or not,

9      to the objections by Ms. Cendali at the second deposition.

10     You seem -- and I haven't read the entire deposition, I'm

11     only looking at the few pages that were put in front of me.

12          You seem to be going along with the objection at

13     that point.  And I think her point is that's almost -- she

14     asked me to look at your conduct as opposed to any words

15     because you're correct.  There's no words here that clearly

16     indicate an agreement on your part to vitiate the first

17     deposition.  There's no memorialization of that agreement

18     that shows a meeting of the minds at that point.

19          She urges the Court to look at the conduct.  And it

20     does appear there's an acquiescence.

21          MR. ZELLER:  I don't think that that would be a

22     fair conclusion to draw from the circumstances.  Look at it

23     this way, your Honor.  I had already taken a full-day

24     deposition.  What was done was done.  Then I have a second

25     session, and in the interim, they attempt to narrow his

Page 2311

1    designation, which from my perspective is fair enough.  They

2    could entirely de-designate him at that point.  They could

3    just simply -- my own view, rules of engagement would be that

4    a party could after the first session say you know what?

5    This person really is not suitable.

6           But they can't unring the bell of what was done

7    that is testimony.  That's 30(b)(6) testimony.  They can

8    supplement and provide additional witnesses.  They can try

9    and provide corrections.  There is a whole process.  And

10   ultimately, if somebody thought it was truly outrageous,

11   unfair, whatever the case may be to rely upon that first day

12   of deposition testimony and say that is the corporate's

13   testimony, I think the party asserting that is the one who

14   has to seek relief from the Court.

15          My acquiescence, we will call it, in terms of the

16   second deposition is look at it in context.  At that point

17   she's objecting.  She's saying he is no longer designated on

18   these new, you know, going forward at that deposition.  I

19   can't -- there's no self-help that's available to an attorney

20   in those circumstances.

21          THE COURT:  Very well.  Address the last argument

22   that she said about the complexity of this issue.  That this

23   really is putting aside whether or not this is competent

24   evidence and admissible evidence, should we really be getting

25   into this just to prove up a point that while relevant, the

Page 2312

1   way that we have to get to that point is by going through

2   essentially a Markman analysis, comparing the doll drawing to

3   the claims and then the -- linking that up with the

4   declaration of Carter Bryant and the date that was asserted

5   there, are we talking about the same doll or not the same

6   doll.

7         And then, of course, that invites the response, of

8   course, to have other attorneys and other witnesses say that

9   that's not an accurate interpretation of the claims.  Putting

10  aside the procedural issues, do we really want to go down

11  that road?  We've spent an hour on this.  It sounds like we

12  may spend many more hours on this if we go down this road.

13        MR. ZELLER:  Well, if we could, what I'm really

14  focused on, and it's true that obviously the patent

15  application needs to be -- I mean, the jury has to have

16  enough context as to the importance of this process.  In

17  other words, this was something that was being done with the

18  U.S. Patent Office.  These are statements being made under

19  oath.

20        But the bottom line is I'm driving at what is

21  Exhibit 502, if maybe we can pull it up.  That's a two-page

22  declaration with few attachments.  I mean, we're not talking

23  about the Magna Carta or something.  We're talking about a

24  very straightforward declaration that is, by the way, done by

25  a layperson.  You know, and also I would say, you know, we

Page 2313

1  pointed this out in opening.  I mean, this is something that

2  we have said in opening, that there are a series of

3  misrepresentations that were made about timing, about

4  inventorship to the U.S. government.  And this is one of

5  these instances.

6         So you have fundamentally here paragraph 4.  I was

7  actively involved with the release of the Bratz dolls of the

8  configuration as set forth in paragraph 3 above, which I'll

9  come back to, and this release did not occur until the fall

10 of the year 2002.

11        And then paragraph 3, which is the one before it,

12 describes what this is.  It consists of exactly, you know,

13 two sentences.  These dolls have strap type shoes, and the

14 dolls have a snap-on feature at about the ankle of the dolls

15 so that different foot gear may be mounted on the doll.

16        Next sentence, regarding the strap type shoes, as

17 disclosed in the patent application, the coloring of the skin

18 tone on the exposed areas of the feet are matched to the

19 coloring of the lower legs of the dolls.

20        THE COURT:  And so the attachment here, of course,

21 this is the same attachment as Exhibit 500.

22        MR. ZELLER:  Correct.  Well, it includes other

23 figures, but part of the attachment of this declaration

24 includes figure 1 of the patent application.

25        THE COURT:  All right.  So your position is that

7dc8527b-b015-4d5e-b900-118ee9139575

Page 2314

1    the 2002 date is false.

2         MR. ZELLER:  And knowingly so.  There's additional

3    evidence of that.

4         THE COURT:  All right.  Well, we're not dealing

5    with the additional evidence right now.  The evidence for

6    Mr. Armstrong, how does Mr. Armstrong know -- what is the

7    simplest way?  I'm trying to cut out as much of this as we

8    can.  What would be the simplest way for Mr. Armstrong to,

9    through the testimony that he's given, establish that fact?

10        MR. ZELLER:  What I think would be the nub of

11   it, and I'm trying to come up with, I guess, the most

12   stripped-down version of what this would look like.  And I'm

13   not saying I could do it, but, you know, that would be

14   comprehensible, but I'm trying to think this through.

15        What I could say potentially is put this

16   declaration in front of him and ask him the same questions I

17   asked at deposition, which is basically okay, you know, here

18   is a Jade doll.  This is a doll from 2001; right?  Now, let's

19   take a look at what Carter Bryant said.  Sentence one, here's

20   where he says these are the features.

21        Those features are present in the 2001 doll you

22   have there in front of you; correct?  Yes.  Then second

23   sentence, same thing, same features that are there in the

24   dolls.  You would agree with me that when Mr. Bryant then

25   says in paragraph 4 that dolls, Bratz dolls with those

7dc8527b-b015-4d5e-b900-118ee9139575

1    features were not released until the fall of 2002, that

2    that's not correct.

3         All of that is within the scope of what he

4    testified to during the first day.  Those are in fact the

5    kinds of questions and answers that he gave.  And so, you

6    know, obviously I would like to at least put some context on

7    it in the sense of saying look, being truthful and honest

8    with the Patent Office is, of course, important.  These are

9    patent applications.

10        THE COURT:  Ms. Aguiar?

11        Thank you, Mr. Zeller.

12        MS. AGUIAR:  I'll be brief.

13        THE COURT:  No, I had a question.

14        MS. AGUIAR:  Great.

15        THE COURT:  I take it the fact that we have spent

16   an hour on this, there is a dispute as to whether or not this

17   figure, these elements, these claims were in fact extant in

18   the 2001 line.

19        MS. AGUIAR:  I think the question was whether it

20   was 2002.  Did you mean to say 2002?

21        THE COURT:  The declaration says 2002.  Their

22   position is that it was extant in 2001.

23        MS. AGUIAR:  I'm sorry.  I missed that for a

24   second.  Yes, there absolutely is a dispute.  And we, as

25   Mr. Nolan, I think, said but I'll say now, to make a proffer

Page 2316

1    that they were different.  That they are -- that they were

2    different and are different.

3            We'd like to make that without having to go

4    through, I think, the fairly useless exercise of the jury of

5    having this witness testify like he was doing in his first

6    session as a layperson looking at these, and he's saying, you

7    know, the shoe kind of looks the same to me.  He's not a

8    patent lawyer.  He doesn't know how to construe a claim.  He

9    was looking at a shoe and a picture.

10           And we'll have someone come in who actually knows

11   something about it.  He does work for MGA, but he doesn't

12   know about doll construction, and he doesn't know about

13   patent claims.  So we absolutely will make a proffer that --

14   hold on one second.

15           Yes, and a witness could be recalled conceivably

16   who has already testified who can testify to the fact that

17   the patent claim and the dolls were different.

18           THE COURT:  Very well.  All right.  I want to take

19   a brief recess, and I'll come out and announce the decision

20   on this and move forward.

21           Do we have any other witnesses?

22           MR. QUINN:  We have the videotape to play from the

23   high school, Kickapoo, and we have Mr. Bryant on standby.

24           THE COURT:  So all we have left is Mr. Armstrong,

25   the videotape.  Why don't we do this.  Why don't we bring the

1    jury back in and let's do the videotape, and I'll -- I

2    apologize, Mr. Zeller.  I know you've already called this

3    witness, but that way we'll at least have that done, and if

4    worse comes to worse, we can start with Mr. Armstrong

5    tomorrow morning if I need to spend more time thinking about

6    this.

7              MR. ZELLER:  Whatever the Court thinks is best on

8    that, your Honor.  We have no issue with that.

9              THE COURT:  Mr. Holmes, please bring the jury in.

10             MR. NOLAN:  Your Honor, before the jury comes in,

11   the proffer would be that we would agree if they wanted to

12   recall the inventor Isaac Larian and ask specific questions

13   on this.  We would not object to that, your Honor.  That was

14   the proffer and the witness.

15             MR. QUINN:  Your Honor, would it be appropriate to

16   tell the jury that there are some issues that need to be

17   resolved?

18             THE COURT:  I will, yes.  I'll take responsibility

19   for this.

20             MR. QUINN:  Thank you.  Your Honor, this is only

21   going to be seven and a half minutes.  Just to inform you.

22             THE COURT:  And do we know who it's charged to, I

23   presume?

24             MR. NOLAN:  It's always them, your Honor.

25             MR. QUINN:  We'll get that, your Honor.

Page 2318

1          THE COURT:  All right.

2          MR. ZELLER:  We do have the yearbooks we could

3    publish.  I assume they will want to spend a little bit of

4    time looking through that.

5          THE COURT:  All right.  Fair enough.  All rise for

6    the jury.

7          (WHEREUPON THE JURY ENTERS.)

8          THE COURT:  Members of the jury, I'm sorry that I

9    kept you waiting as long as I did.  And I've now asked the

10   parties to move on to another witness.  We're going to have

11   to come back to Mr. Armstrong.  The Court has some thinking

12   it needs to do itself before we go forward with that.

13         But that's my responsibility.

14         So I've directed Mattel to call their next witness.

15         MR. QUINN:  The next witness, your Honor, will be

16   Sarah Odom, who will testify by videotape.

17         WHEREUPON THE VIDEOTAPED DEPOSITION EXCERPTS

18         OF SARAH ODOM, AS PROVIDED BY COUNSEL, ARE

19         INCORPORATED HEREIN:

20   Q.   All right, do you understand that the oath that you took

21   today is the same as if you were in court today and were

22   testifying?

23   A.   Yes.

24   Q.   What is your full name, please?

25   A.   Sarah Dianne Odom.

Page 2319

1   Q.   What is your position currently?

2   A.   I'm an assistant principal at Kickapoo High School.

3   Q.   When did you start in that position?

4   A.   In 2004.

5   Q.   Prior to your taking the position as vice-principal, did

6   you have a position within Kickapoo High School?

7   A.   I did.

8   Q.   What was that position?

9   A.   Social studies teacher.

10  Q.   And from when to when?

11  A.   From the fall of '96 until I assumed my position as an

12  assistant principal.

13  Q.   Was there any period of time in which you were absent

14  from the school during those school years, in other words, a

15  leave of absence or anything like that?

16  A.   No.

17  Q.   Do you personally have any duties in connection with the

18  yearbook?

19  A.   I supervise the communication arts program, and

20  journalism is under the -- you know, the auspices of the

21  communications art department.

22  Q.   And journalism includes the yearbook; correct?

23  A.   Correct.

24  Q.   How long have you had those duties?

25  A.   As assistant principal.  So since 2004.

7dc8527b-b015-4d5e-b900-118ee9139575

Page 2320

1  Q.   Did you have any duties in connection with the yearbook

2  prior to that time?

3  A.   No, I did not.

4  Q.   In connection with preparing for the deposition, did you

5  speak with anyone else?

6  A.   No, I did not.

7  Q.   Have you at any time spoken with any persons at Kickapoo

8  High School about the yearbooks from the years 1997 to 1999?

9  A.   Just other staff members who might have been there at

10 the same time, mostly -- yeah, mostly just people who had

11 been there at the same time.

12 Q.   Does Kickapoo High School keep copies of the yearbooks

13 for each year?

14 A.   They do.

15 Q.   Do you recall the yearbooks from 1997 to 1999?

16 A.   Yes, I had copies of them.

17 Q.   So you have personal recollection of the contents of

18 those yearbooks; correct?

19 A.   Yes.

20 Q.   All right.  With respect to topic No. 1, the address of

21 the school currently is what?

22 A.   3710 South Jefferson, Springfield, Missouri 65807.

23 Q.   And since 1996, when you first started there, has the

24 school ever had a different address?

25 A.   No, it has not.

1   Q.   So in 1997, its address was 3710 South Jefferson;

2   correct?

3   A.   That's correct.

4   Q.   And 1998 as well?

5   A.   Correct.

6   Q.   And 1999 as well?

7   A.   Correct.

8   Q.   And that -- that school is located within the

9   Springfield Public School District; correct?

10  A.   That's correct.

11  Q.   Who prepares the yearbooks?

12  A.   The students in the Journalism 2 class.

13  Q.   In the course and scope of your duties as a teacher from

14  1997 to 1999, did you have any occasion to see the children

15  in school wearing what they wore during that time period?

16  A.   Yes.

17  Q.   And so you would be -- you would have known what they

18  looked like at the time; correct?

19  A.   Yes.

20  Q.   And you would also know generally what activities they

21  engage in on campus; correct?

22  A.   On campus, yes.

23  Q.   And you would also generally know what kind of clothes

24  they wore during that time period -- correct? -- and those

25  photographs accurately depict what they look like; correct?

Page 2322

1   A.   Yes.

2   Q.   And what they were wearing?

3   A.   Yes.

4   Q.   And the yearbooks from 1997 to 1999 were prepared by

5   student staff editors in part; correct?

6   A.   Yes.

7   Q.   And part of their duties in connection with their

8   classroom activities and the credits that they would receive

9   for preparing the yearbook was to actually prepare the

10  yearbook; correct?

11  A.   That is correct.

12  Q.   And they were supervised by at least one staff member

13  each year; correct?

14  A.   Yes.

15  Q.   And her duty, Ms. Middleton's duty, was to prepare those

16  yearbooks; correct?

17  A.   Was to oversee.

18  Q.   Oversee the preparation of the students preparing the

19  yearbook?

20  A.   Yes.

21  Q.   You wouldn't expect to find photographs in the 1960's in

22  the 1997 yearbook; correct?

23  A.   That's correct.

24  Q.   And the people that were depicted in the photographs

25  were the people who were on campus during those particular

Page 2323

1    years; correct?

2    A.    Correct.

3    Q.    And it's the regular practice of Kickapoo High School to

4    prepare a yearbook each year; correct?

5    A.    That is correct.

6    Q.    And there is no other yearbook that was prepared for

7    Kickapoo High School from 1997 through 1999 other than the

8    one that appears in Exhibits 1 through 3; correct?

9    A.    That's correct.

10   Q.    Can you briefly describe how, in your experience, the

11   yearbooks are prepared by the students and staff?

12   A.    Yes.  There's a newspaper staff and a yearbook staff,

13   but they share responsibilities.  And the newspaper staff is,

14   you know, kind of the current events, while this is more of a

15   snapshot of the entire year.

16          So you have newspaper staff kids working on the

17   yearbook as well as yearbook staff is, I guess, what I'm

18   trying to say.  Each group of students, there are various

19   editors with the various sections in here, and that editor

20   was responsible for getting that portion of the yearbook

21   completed.

22          The staff then would be assigned what's called a

23   spread.  And a spread is pages 2 and 3 together when you open

24   it up, 2 and 3 is a spread.

25          Usually they have a theme to the yearbook, and then

Page 2324

1    the theme is carried out on each page as well.  It is the

2    person who is responsible for a spread's duty to get

3    pictures -- or actually conceptualize what they want to do on

4    that page first and then go about the process of getting

5    pictures, writing captions, getting on the computer, laying

6    it out, editing it, and getting it in within a certain time

7    frame.

8            Various portions of the yearbook have various

9    deadlines.  Your colored pages, which are at the front, are

10   due earlier in the year than the black and white that follow

11   throughout.  And so it's based on a -- you know, a deadline.

12   Usually, if you were on a newspaper staff, you were given

13   fewer spreads to do because your responsibility first was to

14   the newspaper, but you did have to do yearbook spreads and

15   vice versa.

16           So there were some people on staff who did more

17   spreads than others just by virtue of they were on yearbook

18   staff or -- I don't know if that's too confusing.  Did I

19   answer your question?

20   Q.   I think you did.

21   A.   Okay.

22   Q.   And how do you come to the understanding that you just

23   described?

24   A.   I was on the yearbook staff under Mrs. Middleton as a

25   student and also as a former student and then a teacher at

Page 2325

1   the time.  You go by.  You say hi.  Sometimes they have you

2   come in and talk about your experiences with the kids and

3   that kind of thing.  So that's where my knowledge comes in

4   from.

5   Q.   So you actually saw the yearbooks being prepared from

6   '97 to '99; is that correct?

7   A.   You could walk by and see them working on something, and

8   because of your previous experience with it, you could

9   understand that that was what was going on.

10  Q.   And you made visits like that in each of those years

11  from '97 to '99; correct?

12  A.   I'm not sure I went by every single year, but you walk

13  by the room all the time just in the course of your

14  traversing around the building.

15          CONCLUSION OF DEPOSITION EXCERPT.

16          MR. QUINN:  Your Honor, that concludes the

17  videotaped deposition of Sarah Odom.

18          THE COURT:  Very well.

19          MR. QUINN:  We'd move into evidence, your Honor,

20  Plaintiff's Exhibit A-1, the Kickapoo High School yearbook

21  for 1997.  As A-2, the yearbook for 1998, and as A-3, the

22  yearbook from 1999.

23          THE COURT:  Any objection?

24          MR. NOLAN:  No objection.

25          THE COURT:  Very well.  All three year books are

Page 2326

1    admitted.

2            (Exhibits A-1, A-2, and A-3 received.)

3            THE COURT:  Counsel, you may call your next

4    witness.

5            MR. QUINN:  The next witness is Carter Bryant.

6            THE COURT:  Very well.

7            Ms. Anderson.  Would you like to speak at sidebar?

8            MS. ANDERSON:  May I?

9            THE COURT:  Yes.

10            (SIDEBAR CONFERENCE HELD.)

11            MS. ANDERSON:  Christa Anderson for Carter Bryant.

12            THE COURT:  Yes.

13            MS. ANDERSON:  There are two brief requests.

14    Because I represent the witness, I was hoping if a privilege

15    objection or issue came up that might not be immediately

16    apparent to counsel involved here, may I have permission to

17    assert that objection?

18            THE COURT:  Yes.

19            MS. ANDERSON:  Thank you.  My second question, I

20    don't know if the Court has ruled on this issue or not, but

21    there was discussion in camera yesterday in the hearing about

22    questions of my client about sort of sensitive personal kind

23    of materials.

24            THE COURT:  Right.

25            MS. ANDERSON:  And I don't know to what extent your

Page 2327

1    Honor has ruled or has considered the question about whether

2    that's going to come up today.  But I certainly would hope it

3    would not.  But if it was, if your Honor was thinking that

4    that would come in, I certainly would hope that the words

5    would be chosen very carefully.

6              THE COURT:  There's no motion before the Court

7    right now for the Court to rule on.  But I would certainly

8    consider a request regarding this.  I could hear from counsel

9    how they intend to handle this.  Who is going to be doing the

10   initial examination?

11             MR. PRICE:  I will be doing the initial

12   examination.  And certainly in the next half hour, I don't

13   think anything like that is going to come up.

14             THE COURT:  Maybe we could take this up tomorrow

15   morning at 8:30, and you can talk amongst yourselves and see

16   if you can't come up with a way to resolve in.

17             MR. NOLAN:  Two quick points.  I believe you asked

18   us to prepare a draft instruction that you were going to give

19   to the jury.

20             THE COURT:  That's concerning the Evidence

21   Eliminator.  Can we do that today?  No?  We'll take that up

22   tomorrow morning as well.

23             MR. NOLAN:  The second thing is can Ms. Anderson be

24   allowed to make an appearance so it doesn't appear as if

25   she's working with MGA?

1          THE COURT:  I'm going to make it clear that

2    Ms. Anderson, if there's no objection, that you are not

3    associated with any side, either side at this point, and that

4    wherever you happen to be sitting in the courtroom doesn't

5    matter.  That's why I had Ambassador Prosper sit over here.

6    I would offer you the same thing, but it may not be an

7    effective place to see the witness.  So you can sit wherever

8    you want, and I'll just tell the jury that they should not

9    read anything into that.

10          MS. ANDERSON:  Thank you, your Honor, and my

11    partner is also here.  I didn't know when the testimony would

12    come up.

13          THE COURT:  I ask that only one attorney make the

14    objections.

15          MS. ANDERSON:  Absolutely.  But my query is if

16    you're going to be taking a moment to introduce the jury to

17    me, could you also just say Michael Page so at the time that

18    he's here and I'm not here --

19          THE COURT:  I'll do that right now.  Anything else?

20          MS. ANDERSON:  Thank you, your Honor.

21          MR. NOLAN:  Thank you.

22          THE COURT:  Very well.  All right.

23          (CONCLUSION OF SIDEBAR CONFERENCE.)

24          THE COURT:  Ladies and gentlemen of the jury, the

25    plaintiffs have called Carter Bryant as a witness in this

Page 2329

1   case.  I previously instructed you that Carter Bryant is no

2   longer a party in this case.  He does have his counsel

3   present with him.  And right now I'm going to introduce you

4   to his counsel.  Ms. Anderson and Mr. Page.  If you would --

5   here he comes.  Here comes Mr. Page and Mr. Bryant.

6          Mr. Page, I'm introducing you to the jury.  So this

7   is Mr. Page and Ms. Anderson.  I am affording him an

8   opportunity to make objections.  They are not affiliated or

9   associated with either side at this point.  So wherever they

10  happen to sit in the courtroom, that should be of no moment

11  to anybody.  But they are free to make objections on behalf

12  of Mr. Bryant.  When they make an objection, it's not on

13  behalf of one party or another.

14         Very well, Ms. Anderson, Mr. Page, you may be

15  seated.  And, Mr. Bryant, if you'd come forward and be sworn

16  in.

17             THE CLERK:  Please raise your right hand.

18                    CARTER BRYANT, SWORN.

19             THE CLERK:  Thank you, sir.  Would you please be

20  seated.  Please state your full name for the record, and then

21  the last name.

22             THE WITNESS:  Carter Bryant, B-R-Y-A-N-T.

23             THE CLERK:  Thank you, sir.

24                    DIRECT EXAMINATION

25  BY MR. PRICE:

Page 2330

1    Q.   Good afternoon, Mr. Bryant.

2    A.   Good afternoon.

3    Q.   If I call you Mr. Carter at any time, would you please

4    correct me?

5    A.   I sure will.

6    Q.   Okay.  I want to start by asking you about time frames

7    in which you worked at Mattel.  There's some time period in

8    which you worked at Mattel; correct?

9    A.   Yes.

10   Q.   And I want to try, if I can show this on a time line,

11   I've done my best to kind of sketch one out, and you can

12   perhaps tell me where to put in the dates.

13             THE COURT:  Mr. Nolan, you've seen this.

14             MR. NOLAN:  No.

15             THE COURT:  Why don't you show it to Mr. Nolan

16   before you publish it.

17             MR. NOLAN:  That's fine.  So far it's just a line.

18             THE COURT:  Do you have any objection to the line?

19             MR. NOLAN:  No, nor the sequencing of the dates.

20             THE COURT:  Very well.  Proceed, Mr. Price.

21   Q.   BY MR. PRICE:  As you can tell, I'm not a designer nor

22   an artist.  But perhaps you could tell us, Mr. Bryant, when

23   is the first month in which you worked at Mattel?

24   A.   Are you talking about the first month when I began my

25   full-time employment, or are you talking about when I just

7dc8527b-b015-4d5e-b900-118ee9139575

Page 2331

1   began?

2   Q.   Just when you began.

3   A.   Just when I began.  I believe that was September of

4   1995.

5   Q.   And was there a time when you then became a full-time

6   employee at Mattel?

7   A.   Yes.

8   Q.   And when was that?

9   A.   That was November of 1995.

10  Q.   Okay.  So somewhere -- and let's see if we can make

11  it -- this says October '95.  So it's sometime around

12  November of '95 you are full time at Mattel; correct?

13  A.   Yes.

14  Q.   So for how long a period did you work for Mattel during

15  your first stint?

16  A.   Well, let's see, it was a little over two years.

17  Q.   Does April of '98 ring a bell?

18  A.   Yes.

19  Q.   Perhaps April 29th, 1998?

20  A.   I'm not sure of the exact last date, but sometime around

21  April, yes.

22  Q.   So on the time line, this is October '98, this is

23  October '99.  November, December, January, February, March,

24  April.  That's midway between those two points; correct?

25  A.   I'm sorry.  What was the question?

1    Q.   April '98 -- it would be between October '97 and October

2    '98; right?  October, November, December, January, February,

3    March, April.  That's six months; right?

4    A.   Right.

5    Q.   Would you agree with that?

6    A.   Okay.

7    Q.   So you were initially employed with Mattel from this

8    time frame, from basically November '95 to April of '98; is

9    that right?

10   A.   Yes.

11   Q.   And then there came a time when you left Mattel and went

12   to stay with your parents in Missouri?

13   A.   Yes.

14   Q.   So when did you start working at Mattel again?

15   A.   I went back to Mattel January of 1999.

16   Q.   Okay.  So in October '98, November '98, December '98,

17   January '99 -- three months after October '98; right?

18   A.   Yes, I went back to work in January of 1999.

19   Q.   So how long was it, then, that you worked at Mattel once

20   you started in January of 1999?

21   A.   I worked for them until October of 2000.

22   Q.   So basically from this time period I'm showing here from

23   January '99 until October 2000.  I'm sorry.  I can't even

24   draw a straight line.  But basically that blue shaded area on

25   this time line represented the time you were working at

Page 2333

1    Mattel between November '95 and October of 2000; correct?

2    A.   Yes.

3    Q.   And so there's this time period here when you're not

4    working at Mattel; right?

5    A.   Right.

6    Q.   Okay.  Now, let me start by asking when you began full

7    time at Mattel, what was your job?

8    A.   I was an associate designer in the Barbie main line

9    group.

10   Q.   And could you tell us what a designer -- an associate

11   designer, anyway, did on the Barbie main line?

12   A.   Well, it could be anything from just doing sketches to

13   coming up with fashion designs or working on features of the

14   doll itself.  In other words, what the doll might do.  Those

15   sorts of things.

16   Q.   Now, at the time you began in November of '95, there

17   were some agreements, confidentiality agreements, conflicts

18   of interest questionnaires that you filled out; correct?

19   A.   Yes.

20   Q.   And if you'd look, and there's a book in front of you

21   which says volume 1, Carter Bryant.  One of these black

22   binders here, Mr. Bryant.  One contains drawings, and another

23   contains something other than drawings.  Documents.  And

24   you'll see they are tabbed.  I think the one I'm looking at

25   starts with tab 15 and goes forward.  Did you find it?

Page 2334

1   A.   Yes.

2   Q.   If you'd look at what's been marked as 23.

3   A.   Okay.

4   Q.   And if you'd look at 23, and I call your attention to

5   the last page, and tell me whether or not this is an employee

6   confidential information and inventions agreement which you

7   executed in November of '95.

8   A.   That's what it appears to be.

9        MR. PRICE:  Your Honor, I move Exhibit 23 into

10  evidence.

11       MR. NOLAN:  No objection.

12       THE COURT:  It's admitted.

13       (Exhibit 23 received.)

14  Q.   BY MR. PRICE:  If we can go to the second page, and at

15  the bottom here, this is your signature dated November 6,

16  1995?  Do you see that?

17  A.   Yes.

18  Q.   And if we can go to the first page.  Do you see under

19  ownership of inventions, there's a paragraph which says:  "I

20  agree to communicate to the company as promptly and fully as

21  practicable all inventions as defined below conceived or

22  reduced to practice by me," and it says alone or jointly by

23  others at any time during my employment by the company.  And

24  then if you see section B here:  "As used in this agreement,

25  the term inventions includes, but is not limited to, all

Page 2335

1   discoveries, improvements, processes, developments, designs,

2   know-how, data, computer programs, and formulae, whether

3   patentable or unpatentable."

4           Do you see those sections?

5   A.   Yes.

6   Q.   Now, when you began at Mattel in November '95, exactly

7   what kind of designs were you working on?

8   A.   I was working on designs for the Barbie group.  I'm

9   trying to think.  Some of my projects for Teen Skipper.  What

10  else did I work on?  I think I worked on a Stacy character

11  along with a number of work projects.

12  Q.   You mentioned a Teen Skipper.  Can you tell the jury

13  what Teen Skipper is?

14  A.   Teen Skipper was a character that had existed within the

15  Barbie brand for quite a while.  And they were looking to

16  update her image, update her look.

17  Q.   And did you actually assist in creating a new body

18  design for Teen Skipper?

19  A.   Not that I remember, no.

20  Q.   What did you do with respect to Teen Skipper?

21  A.   Designed fashions, designed some hairstyles, looks for

22  the face, some of her accessories.

23  Q.   So I just want to get some kind of idea on the type of

24  designs you were working on.  If we can go to the second page

25  of Exhibit 23.

Page 2336

1          You see there's a section there conflicts and other

2     activities, which says:  "My employment with the company

3     requires my undivided attention and effort.  Therefore,

4     during my employment with the company, I will fully comply

5     with the company's conflict of interest policy as it may be

6     amended from time to time.  I shall not, without the

7     company's express written consent, engage in any employment

8     or business other than for the company or invest in or assist

9     in any manner any business competitive with the business or

10    the future business plans of the company."

11          Without even seeing this sort of agreement, you

12    knew common sense that you weren't supposed to be competing

13    with Mattel while you were working at Mattel; right?

14    A.   Well, I don't know that I had that much of an

15    understanding about that at the time.

16    Q.   Well, you knew it would be unfair to, for example, take

17    a paycheck from a company which pays you for doll designs and

18    at the same time work at a competitive company that would pay

19    you for doll designs.  You know that without seeing this sort

20    of agreement; right?

21    A.   I don't know that I had that kind of an understanding.

22    I knew that other people in the company also did side

23    projects.  It was generally common knowledge.

24    Q.   When you signed this document November 6, 1995, were you

25    agreeing to devote your undivided attention and effort to

Page 2337

1   Mattel for the time period that you were employed by Mattel?

2   A.   Well, the thing with this agreement was, you know, it

3   was never really -- it was never really explained much.  It

4   was part of a packet that we were required to sign in order

5   to commence employment at Mattel.  There were no explanations

6   given.  So I'm not sure that I had the best understanding of

7   this contract at that time.

8   Q.   Well, whether you had a best understanding or any

9   understanding, let me ask you this:  When you worked for

10  Mattel, during this initial time period, did you believe that

11  you were obligated either legally or ethically or morally to

12  use your undivided attention and effort for Mattel?  I'm

13  talking about this first time frame when you were there

14  from -- full time from November '95 to April of '98.

15  A.   Well, again, I'm not sure what the extent of my

16  understanding was about that.

17  Q.   Well, let me ask it this way:  During this time period,

18  from November '95 to April '98, did you work for a competitor

19  at the same time you worked at Mattel?

20  A.   Well, not knowingly, no.

21  Q.   Did you during this time period assist any competitor,

22  between, November '95 to April '98?

23  A.   No, not that I can remember.

24  Q.   All right.  And you didn't think -- let me ask you this:

25  You're not telling us you thought it would be perfectly fine

1   to go ahead and compete with Mattel without them knowing it

2   at the same time you worked for them.  You didn't think that,

3   did you?

4   A.   Well, no, I don't think I thought that.

5   Q.   So I've been focusing now on this first time frame when

6   you worked for Mattel.  Now I'd like to ask you about --

7   well, let me ask you this.  Your mom lives in Missouri?

8   A.   Yes.

9   Q.   And you recall there came a time when you were speaking

10  with her about -- when you were working at Mattel, and we're

11  talking about needing to do something to make some money.

12  A.   I'm not sure of the exact conversation you're referring

13  to.

14  Q.   Okay.  Do you remember a time when your mother suggested

15  that to make some money, perhaps you could sell some of the

16  drawings that you had done?

17  A.   No, I don't remember ever talking to her about that.

18  Q.   Do you remember your mom -- strike that.

19       Do you remember saying to your mom something to the

20  effect of I can't sell these drawings, mom, because they

21  belong to Mattel.  I did them at Mattel.

22  A.   It's possible we had that conversation, but I don't

23  recall it.

24  Q.   Certainly if your mom were to testify to something of

25  that effect, you wouldn't deny that you told her that, that

7dc8527b-b015-4d5e-b900-118ee9139575

Page 2339

1    is, I can't sell these drawings I did at Mattel because they

2    belong to Mattel.

3    A.   Well, I wouldn't deny that that's her memory, but I

4    don't have any recollection of that conversation.

5    Q.   Okay.  And it's a long time ago.  So that's why my

6    question is a little bit different.  Although you may not

7    have a recollection of it, you certainly can't deny that you

8    said that to your mother; correct?

9    A.   Well, I can't deny that I might have said that to her.

10   But again, I don't have any recollection of that

11   conversation.

12   Q.   Well, that was in fact your understanding, which is that

13   if you did designs while you were at Mattel that relate to

14   the dolls, that related to Mattel, that Mattel owns those

15   designs.

16   A.   Well, if you're talking about in the context of this

17   conversation that I don't remember, then, you know, I'm not

18   really sure how to answer your question.

19   Q.   I'm just asking in terms of kind of your general

20   understanding in this time frame between, say, October '95,

21   April of '98, that you understood that if you're doing

22   designs while you're being paid by Mattel to do designs for

23   dolls, and you do designs for dolls, that those belong to

24   Mattel.

25            You understood that?

7dc8527b-b015-4d5e-b900-118ee9139575

Page 2340

1    A.    I think what my understanding would have been more

2    clearly would have been that any designs that I had been

3    assigned by Mattel, any drawings that I had been assigned to

4    work on would belong to Mattel.

5    Q.    So your view was that you were being paid as a designer;

6    correct?

7    A.    Yes.

8    Q.    And that if, while being paid as a designer for Mattel,

9    you came up with a great idea that would be of benefit to

10   Mattel, that you could just go across the street to a

11   competitor and say I've got this great idea.  I want to give

12   it to you?

13   A.    I don't know that I had that understanding.

14   Q.    Well, let's talk about what you executed, the documents

15   you executed when you went back to Mattel.

16         Now, we were talking about November '95 to April

17   '98.  So at this point I want to ask you about this second

18   stint, January '99 until October of 2000, okay?

19   A.    Um-hm.

20   Q.    And if you look in your booklet there, there's an

21   Exhibit 25.  Have you found it?

22   A.    Yes.

23   Q.    Okay.  And you recognize this as -- actually, I didn't

24   mean to do this.  Let me go back to your first stint.  I may

25   have forgotten this.

Page 2341

1          If you'd look at Exhibit 24.  It's right before

2     that.  And I'm sorry to switch back here.

3     A.   That's all right.

4     Q.   And if you'd look at Exhibit 24, is that a conflict of

5     interest questionnaire that you filled out?

6     A.   That's what it appears to be.

7          MR. PRICE:  Move Exhibit 24 in evidence, your

8     Honor.

9          MR. NOLAN:  No objection.

10          THE COURT:  It's admitted.  You may publish.

11          (Exhibit 24 received.)

12     Q.   BY MR. PRICE:  You see this is something that you

13     executed in November '95; correct?

14     A.   Yes.

15     Q.   And there are a bunch of questions here that you are

16     supposed to answer yes or no.

17          Do you see that?

18     A.   Right.

19     Q.   And if we can go to the second page of this.  You see

20     there's a paragraph 8.  "Excepting normal everyday

21     transactions, purchase or toys, et cetera, have you engaged

22     in any business venture or transaction involving a Mattel

23     supplier or competitor or engaged in any activity which could

24     be objectively construed as being a conflict of interest or

25     allegiance?"

Page 2342

1            Do you see that's a question that you answered?

2    A.   Yes.

3    Q.   And this is something that you answered as of November

4    '95?

5    A.   Right.

6    Q.   Did you engage in everyday transactions like buying toys

7    at that time?

8    A.   I might have.

9    Q.   You knew those weren't counted in this question; right?

10   A.   Well, I'm not really sure what I remember about this

11   question or about this paragraph.

12   Q.   Okay.  It's fair to say that you looked at it before you

13   checked that box no; correct?

14   A.   Right.

15   Q.   I mean, that is -- I don't know if you recognize your

16   own X's, but your best recollection is you actually filled

17   this out; right?

18   A.   Yes.

19   Q.   Okay.  And as of November '95, had you engaged in any

20   activity which could be objectively construed as being a

21   conflict of interest or allegiance to Mattel?

22   A.   I'm sorry.  Could you re-ask the question?

23   Q.   Sure.  As of November '95, had you engaged in any

24   activity which could be objectively construed as a conflict

25   of interest or allegiance to Mattel?

Page 2343

1    A.    No, not to my knowledge.

2    Q.    So now let's shift forward slightly to January of '99

3    and the second stint with Mattel.  Now, when you start again,

4    you've got to fill out the same documents again; right?

5    A.    Right.

6    Q.    What position, by the way, did you have when you came

7    back to Mattel in January of 99?

8    A.    I think my position was project designer.

9    Q.    And generally, what sort of duties did you have as

10   project designer?

11   A.    As a project designer, again, I would design fashions

12   for Barbie.  I worked in the Barbie collectible department.

13   We would come up with hairstyles, outfits, makeup,

14   accessories, things like that.

15   Q.    And was that pretty much what you did from January '99

16   until October of 2000?

17   A.    Yes.

18   Q.    Did your position ever change?

19   A.    Um, yes, I think I got a promotion, but I can't remember

20   what my title changed to.

21   Q.    What was the nature of the promotion?

22   A.    I'm not sure what you mean.

23   Q.    You said you were promoted.  Did you have different

24   duties?  Were you supervising people?

25   A.    No, I didn't really have any new duties or supervision.

Page 2344

1   I think, you know, I got some sort of a raise.  And other

2   than that, my position was basically the same.

3   Q.   Okay.  Now I'm going to take you to those other

4   agreements.  If you'd look at Exhibit 25.  Is that an

5   employee confidential information and inventions agreement

6   that you signed in January of '99?

7   A.   It appears to be, yes.

8          MR. PRICE:  Your Honor, move Exhibit 25 into

9   evidence.

10         MR. NOLAN:  No objection.

11         THE COURT:  It's admitted.  You may publish.

12         (Exhibit 25 received.)

13  Q.   BY MR. PRICE:  And this is your signature here at the

14  bottom; is that right?

15  A.   Yes.

16  Q.   And if we look at paragraph 2, you see they have the

17  same basic paragraph concerning ownership of inventions which

18  includes designs, et cetera.

19         Do you see that?

20  A.   Yes.

21  Q.   And if we go to paragraph 3 here, it has a similar

22  provision about your employment requiring undivided attention

23  and effort.

24         Do you see that?

25  A.   Yes.

1   Q.   In addition do this, you also filled out Exhibit 26;

2   correct?  And that's -- should be the next tab there.

3   A.   There we go.  Sorry about that.

4   Q.   That's okay.  And is that a conflict of interest

5   questionnaire that you filled out in -- well, I'm going to

6   say January of '99.

7   A.   Yes.

8   Q.   And as often happens, when the new year comes in,

9   someone put '98 on this instead; right?

10  A.   Oh, at the bottom?

11  Q.   Yes.

12  A.   Yes.

13  Q.   And Mr. Nolan has stipulated it's actually January '99?

14         MR. NOLAN:  Yes, your Honor.  We stipulate that

15  appears to be an error.

16         THE COURT:  Very well.

17         MR. PRICE:  Move Exhibit 26 in evidence, your

18  Honor.

19         MR. NOLAN:  No objection.

20         THE COURT:  It's admitted.

21         (Exhibit 26 received.)

22  Q.   BY MR. PRICE:  And this is your signature misdated by

23  one year?

24  A.   Yes.

25  Q.   You probably did that on some checks at the time, too;

Page 2346

1    right?

2    A.    Could be, sure.

3    Q.    And you filled in these questions here, yes or no,

4    again; correct?

5    A.    Right.

6    Q.    And one of the questions -- a couple of them you filled

7    in as being yes.  You see that?

8    A.    Yes.

9    Q.    And then there's a section, if your answer to any of the

10   above questions is yes, please explain in the space below.

11          Do you see that?

12   A.    Yes.

13   Q.    And then you filled out on those three lines; correct?

14   A.    Yes.

15   Q.    So it's clear that with respect to the conflict of

16   interest questionnaire, you actually read it and in fact

17   added in your handwriting some detail to your answers; right?

18   A.    Yes, I added information that I thought referred to any

19   kind of work that I had done during that time period that I

20   had been paid for.

21          MR. PRICE:  Your Honor, I'm about to switch topics.

22          THE COURT:  Very well.  We'll recess for the day,

23   and I'll see the jury tomorrow morning at 9:00.

24          (WHEREUPON THE JURY WITHDRAWS.)

25          THE COURT:  Please be seated.  Counsel, what I'd

1    like to do is regroup tomorrow morning at 8:30, and I'm

2    hoping to have a decision made on the Bryan Armstrong

3    testimony at that time.

4              Who else do we anticipate tomorrow?

5              MR. QUINN:  Your Honor, there was a witness Rachel

6    Harris.  She was here yesterday, and we promised we would

7    take her out of order at 9:00 tomorrow.

8              THE COURT:  How long is that testimony going to be?

9              MR. QUINN:  I'm going to think that the direct is

10   maybe 20 minutes.

11             THE COURT:  And there's no objection, Mr. Nolan, to

12   that?

13             MR. NOLAN:  No.  I'm accepting their representation

14   that she's only available on Thursday.  I mean, is she

15   possibly available on Friday so we don't have to interrupt?

16   I know that she had a graduation on Wednesday, today.

17             MR. QUINN:  I don't know.  She came out here, and

18   what we promised her -- and I thought everybody was on board

19   with this the other day when we discussed it -- was that she

20   would go on at nine o'clock tomorrow.

21             MR. NOLAN:  I'm not withdrawing my agreement.

22             THE COURT:  Let's go with that if there's no

23   objection.

24             Very well.  Who else do we have?

25             MR. QUINN:  Carter Bryant and then Mr. Cunningham,

Page 2348

1   an expert witness.

2           THE COURT:  Is that one of the ones -- that's not

3   one of the ones that's subject to a motion in limine;

4   correct?

5           MR. QUINN:  I do not believe so, your Honor.

6           THE COURT:  Very well.  I don't see that.  All

7   right.  That should take us through tomorrow.

8           MR. QUINN:  Certainly.

9           THE COURT:  Very well.  Any other issues?

10          MR. NOLAN:  Could we have a time count?

11          THE COURT:  Give me a second.  I just received a

12  note from my assistant that 8:30 is too early.

13          Ah.  Let's say 8:45.  Father's Day breakfast at

14  preschool at 8:00.

15          MR. QUINN:  Your Honor, on the Odom tape, MGA's

16  time is a minute 24.

17          THE COURT:  Thank you, Counsel.

18          Very well.  Mr. Zeller, you're standing up.

19          MR. ZELLER:  One is we were hoping to get a time

20  count as well as an understanding as to whether or not either

21  party was being charged time for the hour hearing.

22          THE COURT:  No one was.  I wasn't running the clock

23  during that hour period.  I was running the clock when

24  Mr. Bryant's counsel were at sidebar, and I've already

25  readjusted the clock for that.  As it stands right now, I

1    have -- we've gone round the chess clock twice, which is 24,

2    25, 26 hours and 15 minutes for plaintiff, and the defense

3    has used approximately 16 hours and 15 minutes.  As it stands

4    right now.

5            MR. ZELLER:  And then the second matter, your

6    Honor, concerns -- and I will try and be a little bit

7    elliptical -- perhaps we need to deal with this at sidebar,

8    but there was an additional filing pertaining to the matter

9    that the Court last week sealed by the MGA parties that

10   apparently is not under seal.

11           So it airs again, these same matters that we raised

12   an issue with and that the Court placed under seal.  For some

13   reason that is not known to us, it is not under seal by MGA.

14           THE COURT:  Let me see you at sidebar.

15           (SIDEBAR CONFERENCE HELD.)

16           THE COURT:  You can be less elliptical about it.

17           MR. ZELLER:  I'm admittedly offering off of

18   somewhat limited information because it's an MGA filing.  It

19   is the filing that pertains to the motion that the Court

20   provided leave that pertains to, I believe, the discovery

21   that MGA is seeking in connection with that anonymous letter

22   that came in.  The Court will recall --

23           THE COURT:  Has that been filed?  Because I haven't

24   physically seen that yet.

25           MR. NOLAN:  Your Honor, my latest information, as

Page 2350

1    of a minute ago, is that it has not been filed.  But

2    Mr. Zeller tells me he has word that it was filed.  My latest

3    information was that it was not filed.  I will tell the Court

4    that I have directed that it be filed under seal.  I don't

5    believe it's been filed.  But that's my understanding.

6            THE LAW CLERK:  For the record, the response is a

7    notice of manual filing has been mailed.  The problem that

8    might be arising is the title of the motion.

9            THE COURT:  Is included in the notice?

10           THE LAW CLERK:  I would invite you to view it on my

11   computer screen.

12           THE COURT:  Do we happen to have one?

13           THE LAW CLERK:  If you want to come to the computer

14   screen.

15           (Pause.)

16           THE COURT:  Very good.  We've taken a look at the

17   docket sheet, and the docket number 3956 is a notice of an

18   under seal filing.  Unfortunately, the notice, the title of

19   the notice reveals the substance of the filing.  The Court is

20   ordering the clerk, the courtroom deputy clerk, to block

21   public access to 3956.  I'm going to order counsel for Mattel

22   to re-file their notice, this time not disclose the subject

23   matter in the notice of the under seal filing.

24           MR. ZELLER:  For MGA.

25           THE COURT:  You said Mattel.  I'm ordering counsel

7dc8527b-b015-4d5e-b900-118ee9139575

Page 2351

1  for MGA.  Very well.  So let's get that cleared up.  And

2  let's just be careful.

3           MR. NOLAN:  That was just -- I don't even

4  understand -- this is just a notice of the manual filing

5  under seal.

6           THE COURT:  And that's all it needs to say.  It

7  doesn't need to say what it is.

8           Counsel, are you seeking any other relief at this

9  point?

10          MR. ZELLER:  Not at this moment.  I do appreciate

11  the Court's diligence on this and making sure --

12          THE COURT:  Trying to stay on top of this.

13          Was there anything else?

14          MR. NOLAN:  No, your Honor.

15          MR. ZELLER:  That was it.

16          THE LAW CLERK:  If I may, the related ex parte

17  application also needs to be placed under seal.

18          THE COURT:  And that is docket number?

19          THE LAW CLERK:  The next one.  3957.

20          THE COURT:  And I don't think we've referenced the

21  substance of it.  So this sidebar doesn't need to be sealed.

22  And we'll have this taken care of momentarily.  I'll see you

23  tomorrow morning after the pancake breakfast.

24          Court is in recess.

25

Page 2352

1          (Proceedings concluded at 5:10 P.M.)

2

3

4

5

6

7

8                    C E R T I F I C A T E

9

10

11        I hereby certify that pursuant to Title 28,

12  Section 753 United States Code, the foregoing is a true and

13  correct transcript of the stenographically reported

14  proceedings in the above matter.

15          Certified on June 11, 2008.

16

17

18                    _____
                      MARK SCHWEITZER, CSR, RPR, CRR
                      Official Court Reporter
19                    License No. 10514

20

21

22

23

24

25

7dc8527b-b015-4d5e-b900-118ee9139575