Page 2610

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

---

MATTEL, INC.,                    :   PAGES 2610 - 2707
                                 :
          PLAINTIFF,             :
                                 :
     VS.                         :   NO. ED CV04-09049-SGL
                                 :   [CONSOLIDATED WITH
MGA ENTERTAINMENT, INC.,         :   CV04-9059 & CV05-2727]
ET AL.,                          :
                                 :
          DEFENDANTS.            :

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

FRIDAY, JUNE 13, 2008

JURY TRIAL - DAY 13

AFTERNOON SESSION

MARK SCHWEITZER, CSR, RPR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
181-H ROYBAL FEDERAL BUILDING
255 EAST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012
(213) 663-3494

Page 2611

1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4        Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
         By John B. Quinn, Esq.
5            B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
6            Harry Olivar, Esq.
             John Corey, Esq.
7            Diane Hutnyan, Esq.
             William Price, Esq.
8        855 South Figueroa Street
         10th Floor
9        Los Angeles, CA 90017
         (213) 624-7707

10

11

12   On Behalf of MGA Entertainment:

13       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
             Robert Herrington, Esq.
17       300 South Grand Avenue
         Los Angeles, CA 90071-3144
18       (213) 687-5000

19

20   On Behalf of Carter Bryant:

21       Keker & Van Nest
         By Christa Anderson, Esq.
22           Michael H. Page, Esq.
         710 Sansome Street
23       San Francisco, CA 94111-1704
         (415) 391-5400

24

25   (Continued)

Page 2612

1    Appearances of Counsel (Continued):

2    On Behalf of Peter Marlow:

3         Keats McFarland & Wilson
          By Larry W. McFarland, Esq.
4         9720 Wilshire Boulevard
          Penthouse Suite
5         Beverly Hills, CA 90212
          (310) 777-3750

6

7         Law Office of Steven M. Goldsobel
          By Steven M. Goldsobel, Esq.
8         1900 Avenue of the Stars
          Suite 1800
9         Los Angeles, CA 90067
          (310) 552-9291

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 2613

1                            I N D E X

2

3    (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.) ...... 2614

4    CARTER BRYANT, PREVIOUSLY SWORN....................... 2625

5    DIRECT EXAMINATION (CONTINUED) BY MR. PRICE:.......... 2625

6                          E X H I B I T S

7      (Exhibit 1155-C received.)........................... 2638

8      (Exhibit 13649 received.)........................... 2641

9      (Exhibit 13627 marked for identification.)........... 2663

10     (Exhibit 1313-C received.)........................... 2667

11     (Exhibit 60 received.)............................... 2675

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Riverside, California; Friday, June 13, 2008

2                        1:47 P.M.

3          (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

4          THE COURT:  All right, Counsel, we're back on the

5    record outside the presence of the jury.  I understand there

6    are some issues.

7          MR. NOLAN:  Your Honor, I just wanted to point out

8    to Mr. Holmes that Larry McFarland and the other attorney,

9    Mr. Goldsobel, I believe it is, he is present now to raise

10   that issue if you wanted to at this time.

11         THE COURT:  Very well.  Mr. McFarland, please.

12         MR. McFARLAND:  Thank you, your Honor.  I sent an

13   e-mail to Mr. Zeller when he asked -- put Mr. Peter Marlow on

14   the list saying he would call him on Friday.  I responded

15   that he was unfortunately not available on Friday.  He would

16   be available Tuesday or Wednesday.  In addition, I responded

17   that he has obtained independent white collar criminal

18   counsel and is prepared to sit for a deposition and answer

19   the questions ahead of his trial testimony and not assert his

20   Fifth Amendment rights.  And we're prepared to make that

21   offer.  Mr. Marlow would be available late Monday afternoon.

22         He, unfortunately, has a last day patent filing

23   that day.  So he's not available until about 3:00.  But he

24   would make himself available at about 3:00 if Mattel and

25   Quinn would like to do that.

1    THE COURT:  Very well.  Let me ask counsel for

2   Mattel their view on this issue.  Because this is the subject

3   also of a -- of briefs that have been submitted by both

4   sides.

5    MR. ZELLER:  That's right.  This has been briefed.

6   The Court has essentially deferred ruling in the sense of

7   waiting to see what happens with the particular witnesses.

8   Peter Marlow in particular invoked the Fifth Amendment in

9   response to questions over a hundred times during the course

10  of his deposition.  There was from our perspective a pattern

11  of the invocation which was sought to only provide

12  exculpatory kinds of statements that blocked further

13  examination, that blocked follow-up, that blocked

14  authentication of documents.  It ran a very broad range of

15  obstructing from our perspective our ability to get to the

16  facts.

17    This, of course, happened quite some time ago, at

18  least in the scheme of things.  It was at least a couple of

19  months, I would hazard a guess, in which this happened.  Now

20  we're being told, well, now during, what, three weeks into

21  trial almost, he's willing to actually provide answers to

22  these questions.

23    From our perspective, that is real -- that really

24  is too little, too late.  We'd have no opportunity for

25  follow-up.

1          Mr. McFarland is now saying, and I hadn't been

2     aware of this, that he's not even available until 3:00 on

3     Monday.  Presumably that is going to be by the time

4     Mr. McFarland and Mr. Marlow consider themselves done with

5     the deposition, that really doesn't leave any meaningful time

6     to examine him, particularly given the breadth of the topics

7     and the questions on which the Fifth Amendment was invoked.

8          From our perspective, this is something that it's a

9     civil case.  This was a strategy that they pursued.  These

10    were the answers he gave in the deposition.  And that is --

11    that's something that the jury is entitled to know for

12    purposes of his credibility.  And that's our perspective.

13         THE COURT:  What are you asking the Court to do,

14    Mr. Zeller?

15         MR. ZELLER:  Well, I think ultimately, your Honor,

16    what we're asking is that we intend to call Mr. Marlow to the

17    stand.  We will ask him questions.  He has his choice.  He

18    can invoke.  If he decides not to invoke on the stand, we'll

19    impeach him with his deposition.

20         THE COURT:  In what way?

21         MR. ZELLER:  In the sense of you refused to answer

22    that question at the deposition.  Like for any other reason,

23    if he had said I'm not going to tell you or he had invoked

24    some other reason that he has since decided is no longer

25    valid, we can still impeach him with it, and that's our

1   perspective on it.

2          THE COURT:  So you're not seeking his deposition at

3   this point?

4          MR. ZELLER:  That's right.  To us it doesn't cure

5   any of the problems.

6          THE COURT:  Very well.  I'll hear from

7   Mr. McFarland.  It sounds like counsel is willing to call the

8   witness without a further deposition.

9          MR. McFARLAND:  I understand.  I went back to look

10  at one of the orders in this case, and you say, your Honor,

11  the parties in this action are engaged in what they

12  themselves have described as high stakes corporate warfare;

13  however, whatever the rules of engagement may be for such

14  warfare, those rules are decidedly not representative of the

15  standard of conduct which the parties and their counsel

16  should look to for guidance as to how they should conduct

17  themselves in or before this court.

18          THE COURT:  Yes.

19          MR. McFARLAND:  And I must say it's getting tiring

20  personally to be continually accused of improper actions in

21  front of this court.  And to stand there and say that I've

22  engaged in gamesmanship or I did anything improper is

23  insulting.

24          I didn't do anything improper.  Mr. Marlow asserted

25  his Fifth Amendment rights.

1          THE COURT:  Counsel, just to be clear, I don't

2    think Mr. Zeller accused you of doing anything improper.

3          MR. McFARLAND:  I'm the one that advised him to.

4          THE COURT:  Fair enough.  I see the implication.

5          MR. McFARLAND:  I take my obligations extremely

6    seriously, I take my obligations to you extreme extremely

7    seriously.  I try very, very hard in this case to represent

8    my clients but at the same time to move this process forward.

9          So if we can just take a moment and look back at

10   how we got to where we are, first of all, the depo of

11   Mr. Marlow occurred May 2nd.  Why?  Because they chose not to

12   even attempt to serve him with a subpoena until January 17th,

13   11 days before discovery cutoff.  They could have taken his

14   depo back in '04, '05, '07.  They didn't.  That was their

15   choice.  They put him in the second tier, came to you and got

16   relief for additional depositions.  That's their right.

17         But putting things at the back end does have

18   consequences.  They then served 14 subpoenas on every bank in

19   basically the history of his and his wife's life, including

20   his daughter's bank.  Subpoenas on tax accountants.  And

21   again, we worked with him, even though we had a deal that

22   those bank records would come to us for initial review.  I

23   waived that, and I said you know, we'll let everything be

24   produced to you.

25         So 14 banks and two accountants, produced

1    everything from 1999 to date.  And Mr. Marlow produced

2    thousands, if not tens of thousands of pages in response to

3    these unbelievably overbroad subpoenas.

4            That's their right to have scorched earth

5    litigation.  But the consequences is an enormous amount of

6    documents are produced extremely late.  And not because of us

7    necessarily, because of third parties.  So that kept pushing

8    Mr. Marlow's deposition back.  He was deposed on May 2nd, he

9    asserted his Fifth Amendment rights.  After that and before

10   he was listed as someone they were actually going to call,

11   because, as you know, they have a hundred or so people on

12   their list.  There's a lot of people on it.

13           But before they said okay, we really are.  Here's

14   your 48-hour notice, before that, he retained Mr. Goldsobel

15   and worked with him on this issue and is comfortable now

16   proceeding.

17           Now, if your Honor would be more comfortable,

18   Mr. Goldsobel would be absolutely willing to meet with you in

19   camera to discuss his conversations with Mr. Marlow and what

20   this was all about.  It's just my job is to protect

21   Mr. Marlow.  You know, as much as I would like to respond to

22   clear my name, that's not what this is all about.  This is

23   about Mr. Marlow.  And I have to be very careful in anything

24   I say right now because he had a right to invoke the Fifth

25   Amendment.

1    THE COURT:  I don't want to read too much into what

2 you're saying, but are you suggesting to the Court that if

3 the Court were to -- I think I understand what you're saying.

4    MR. McFARLAND:  We're doing the best we can.  First

5 of all, I saw another e-mail where I see he's listed last on

6 Tuesday.  I don't know when they are planning to wrap up.  If

7 they wanted to call him on Wednesday, he could be available

8 Tuesday for a depo.  We're trying to do what we can here and

9 work with them.  We're not trying to play games.  I don't

10 know their schedule.  It looks like they have six or seven

11 people listed on Tuesday, which seems ambitious to me.  I

12 don't know.

13    THE COURT:  Mr. Zeller?

14    MR. ZELLER:  I don't recall using the word

15 gamesmanship.  I don't recall using the rhetoric I'm accused

16 of using.

17    THE COURT:  Let's move beyond this.  What I'm

18 taking from Mr. McFarland's statements is that perhaps

19 there's an explanation that Mr. McFarland would not want to

20 make public at this point that would explain why it was that

21 he, in an abundance of caution, advised his client to invoke

22 the Fifth Amendment, that upon further scrutiny by a criminal

23 defense specialist, has concluded that such caution is not

24 necessary and that perhaps has nothing to do with this case

25 or any of the subject matter, and that the Court should

Page 2621

1    consider that in camera prior to deciding whether or not the

2    negative inference that you understandably are suggesting be

3    made.

4            It's one of those situations where both sides are

5    to a certain measure correct.  I don't want to be reading too

6    much into what people are saying, but that's what I'm taking

7    from what Mr. McFarland has told me.  So if you could address

8    that, and the Court's understanding, be it right or I don't

9    know.

10           MR. ZELLER:  My thought would be this, your Honor.

11   Number one is that this isn't an issue that's confined just

12   to Peter Marlow.  I understand that's the one we have before

13   us.  But there were two other witnesses also represented by

14   the same counsel who did the same thing.

15           THE COURT:  Let me stop you there.  Are we

16   expecting the same change in position with respect to those

17   two other witnesses, Mr. McFarland?

18           MR. McFARLAND:  I don't represent them, your Honor.

19           THE COURT:  Very well.

20           MR. ZELLER:  And that for the record is Anna

21   Cabrera and Beatrice Morales.

22           The second --

23           THE COURT:  Who represents the two of them?

24           MR. ZELLER:  Maria Diaz at the Allred firm.

25           THE COURT:  And you have received no indication

1   that there has been a change in position --

2        MR. ZELLER:  We have heard nothing further, your

3   Honor.

4        In terms of there being an explanation that's being

5   proffered or can be proffered for the change in position from

6   invoking -- refusing to answer on Fifth Amendment grounds

7   versus, I guess, now taking the position that they will not

8   invoke it, at least live on the stand in front of the jury,

9   your Honor, again, that goes to credibility.

10       If they want to offer an explanation to the jury as

11  to why they were refusing to answer previously by invoking

12  the Fifth Amendment and now they say well, we were wrong, we

13  have a different reason, I mean that, I suppose, can be

14  played into the credibility assessment.

15       THE COURT:  I think for the Court to conduct the

16  proper 403 analysis, I need to know what that explanation is,

17  and perhaps you are correct.  But depending on that

18  explanation, I don't think I can make that decision in the

19  abstract.

20       MR. ZELLER:  Yes, your Honor.  I think I have

21  skipped that step in the sense of that I certainly agree that

22  it is -- the Court should hear whatever explanation there is.

23  I obviously am not in a position to evaluate at this moment.

24  I have not been told.

25       THE COURT:  You're in the dark, and I understand

1    that.

2            MR. ZELLER:  But I would submit that ultimately I

3    would think in many circumstances, you know, whatever reason

4    they want to offer for the change in testimony would be the

5    same as in many other situations.  I mean, if they have a

6    different -- if he has a reason why he's now changing his

7    testimony, they can give it.  The jury can assess it.

8            THE COURT:  They could, but there could be -- let

9    the Court make that evaluation.  Is Mr. -- is it Goldsobel,

10   is he present?

11           MR. McFARLAND:  Yes, your Honor.  Gold --

12           THE COURT:  Counsel, are you available later this

13   afternoon?

14           MR. GOLDSOBEL:  I can make myself available.

15           THE COURT:  If you can remain available this

16   afternoon, during the break I'll speak to you in chambers.

17   And, Mr. Zeller, depending on what the Court hears, I'll

18   address your deposition.  What you're seeking basically is

19   advanced authorization to go ahead and reference the

20   deposition that was taken.

21           What I want to do is listen to the explanation for

22   the change of position, see if it is one that under both for

23   impeachment purposes and 403 purposes is one that you should

24   be permitted to reference.  And I'll make the decision.

25           MR. ZELLER:  And just to give the lawyer caveat, I

Page 2624

1   suppose maybe the explanation will be so compelling to us,

2   we'll say we'll take the deposition instead.  But I think at

3   this moment, without knowing that --

4           THE COURT:  All right.  Well, I'll give you leave

5   to make that argument based on the Court's finding.  I think

6   that's fair enough as well.

7           All right.  Anything else?

8           MR. PROCTOR:  A ministerial matter, your Honor.

9   The stipulation and order admitting exhibits contained one

10  error.

11          THE COURT:  I see a supplemental order.

12          MR. PROCTOR:  It is an amended version of what was

13  submitted yesterday.  There was one erroneous entry included,

14  and we left off, I think, eight or ten or something like

15  that.  So this should replace the one that was submitted

16  yesterday.

17          THE COURT:  Agreed, Counsel?

18          MR. HERRINGTON:  Yes.

19          THE COURT:  Very well.  The Court has signed the

20  proposed amended order regarding admission of original Carter

21  Bryant drawings.  So I take it all objections are waived at

22  this point since I have not heard any.

23          Okay.  If there's nothing else, I'll see

24  Mr. Goldsobel during the break.  And let's resume with the

25  examination of Mr. Bryant.

Page 2625

1          And, Mr. Bryant, if you'd come forward, and let's

2    bring the jury in.

3          (WHEREUPON THE JURY ENTERS.)

4          THE COURT:  Before you begin, I did receive a note

5    from a juror who already made a doctor's appointment next

6    Thursday, and we will be taking next Thursday -- we'll be

7    dark.  And so you'll not able to take that appointment.  And

8    that's June 19th.

9          Counsel, you may proceed.

10         MR. PRICE:  Thank you, your Honor.  On a number of

11   grounds, I appreciate that.

12         A JUROR:  We don't understand what that meant.  It

13   will be dark.  All day?

14         THE COURT:  We will not be here.  The lights in the

15   courtroom will be off.  I appreciate that.  That's one of

16   our -- we will not have court next Thursday.  Thank you,

17   ma'am.

18              CARTER BRYANT, PREVIOUSLY SWORN.

19              DIRECT EXAMINATION (CONTINUED)

20   BY MR. PRICE:

21   Q.   Mr. Bryant, if we could focus, then, on this time in

22   1998.  Your testimony is that it's in 1998 and not 1999 when

23   you were working at Mattel that you came up with the first

24   Bratz drawings; correct?

25   A.   Yes.

Page 2626

1  Q.   And I believe your testimony is that you were driving by

2  a high school on your way home from work, and there were kids

3  getting out of school, and you were struck by the way they

4  looked.

5           Is that your testimony?

6  A.   I believe so.  If I could be shown that testimony.

7  Q.   If it would help refresh your memory if you look at

8  volume 1.  November 4, 2004.  It's page 140.  I was looking

9  at lines 9 through 14.  It's your deposition.

10  A.   I'm sorry.  Which volume now?

11  Q.   Volume 1.

12  A.   Okay.

13  Q.   Page 140, lines 9 through 14.  And my question was you

14  were driving by a high school on your way home from work, and

15  you were struck by the way the kids looked at the high

16  school?

17  A.   Yes.

18           MR. PRICE:  If I may approach, your Honor.

19           THE COURT:  You may.

20  Q.   BY MR. PRICE:  I'm going to show you Exhibit A-2, which

21  is already in evidence.  And first ask you, was the high

22  school that you were driving by where you were struck by the

23  way the kids looked, was that Kickapoo High School?

24  A.   Yes.

25  Q.   And I believe your testimony was this was in August of

14b72d71-1008-4256-86a8-8a62a239a6d1

1    1998.

2    A.   Yes.

3    Q.   And I've handed you A-2, which is a yearbook.  I want to

4    ask you whether or not -- I'm not going to go through this in

5    any detail, but if you'd look at -- there's a picture, and

6    it's on the third page in the book.  It says all 1998 legend,

7    and it has a picture like in the campus there.

8              Do you see that?

9    A.   Yes.

10   Q.   It's Exhibit A-2?

11   A.   Yes.

12   Q.   My question is you said you drove by the high school.

13   In fact, I think you drove by as they were getting out of

14   school?

15   A.   I think so.

16   Q.   And my question is is this part of the campus that you

17   were looking at when you were driving by to look at the high

18   school?  Do you see there's a road here, and it looks like

19   there's a building?

20   A.   Yeah, I'm not really sure.

21   Q.   Well, to try to orient you, let me ask if we can put up

22   A, page 293 and 294.  My question is did you see this portion

23   of the school as you drove by, that is, were you driving by

24   the front so you could see the campus like this?

25   A.   I don't know.  It's really hard for me to answer that

Page 2628

1    out of the context of seeing the picture of the whole school.

2    Because what I remember is seeing just the outside of the

3    school, the building you know, some parking areas or

4    something like that.

5    Q.   You can flip through that if you like and see if you see

6    a picture which kind of shows the view that you were looking

7    at when you drove by Kickapoo High School in 1998.  A lot of

8    it is just, you know, those class pictures.

9                MR. NOLAN:  The question is to go through the

10   entire yearbook?

11               MR. PRICE:  He's flipping through to see if he can

12   see a picture which represents the vantage point.

13               THE WITNESS:  This page kind of vaguely rings a

14   bell.

15               MR. PRICE:  Your Honor, may I approach?

16               THE COURT:  You may.

17               Your Honor, may I publish the book to the jury?

18               THE COURT:  You may.

19               Counsel, the Court's practice, when we publish

20   something to the jury, out of respect, we wait until they are

21   done.

22               MR. PRICE:  All right.

23               THE COURT:  All right.  Mr. Price.

24   Q.   BY MR. PRICE:  Mr. Bryant, you pointed out a page in

25   Exhibit A-2 which I think we're going to show.  The one you

1    were referring to as page 143, in that yearbook, and you said

2    this is sort of the vantage point that you had?

3    A.   Well, I'm not sure if that's exactly what I saw.  I do

4    remember a field.  I remember the building was brick.  I

5    remember seeing the sign out by the side that said Kickapoo

6    High.  So, I mean, there's something about this picture that

7    sort of rings a bell, but I'm not sure that's exactly what I

8    saw.

9    Q.   And I believe you said what inspired you from this was

10   the look of the students, the baggy jeans, the oversized

11   clothes, and that this had hip urban look.

12   A.   Yeah, I mean they had, you know, kind of neat fashions

13   on.  They had little tank tops and T-shirts and big

14   sweatshirts and things like that, baggy pants and sneakers,

15   backpacks.

16   Q.   Multi-ethnic look?

17   A.   I don't remember the multi-ethnic thing being, you know,

18   part of what struck me.

19   Q.   Actually, I don't know if you even mentioned this.  What

20   city is this in?

21   A.   This is Springfield, Missouri.

22   Q.   And I'd like to show you, if I could, a graphic, which

23   we will mark as 13630 for identification.

24            May I approach, your Honor?

25            THE COURT:  You may.

Page 2630

1    Q.   BY MR. PRICE:   And looking at 13630 for identification,

2    does this appear to be a map of the general area which shows

3    where Kickapoo High School is located and where a place

4    called the Battlefield Mall is located?

5    A.   Yes.

6              MR. PRICE:   Your Honor, if I may display the

7    graphic in 13630.

8              THE COURT:   Any objection?

9              MR. NOLAN:   No objection.

10             THE COURT:   You may.

11   Q.   BY MR. PRICE:   Now, I understand that at the time,

12   August of '98, you were working at Old Navy at the

13   Battlefield Mall?

14   A.   Yes.

15   Q.   And where did you live at this time?

16   A.   I lived in Kimberling City.

17   Q.   How long a drive is that from the Battlefield Mall?

18   A.   About an hour.

19   Q.   Now, ignore this route to your parents' house, if you

20   like.  This is just a graphic.  Because I'm going to ask you,

21   was there a typical route you would take in going from your

22   parents' -- it was your parents' house?

23   A.   Yes.

24   Q.   Your parents' house about an hour or so way to the

25   Battlefield Mall when you were going to work?

14b72d71-1008-4256-86a8-8a62a239a6d1

Page 2631

1   A.   Yeah, I took a fairly standard route.

2   Q.   And do you remember what typical route you took?

3   A.   Well, I would drive up highway -- it's got two names.

4   It's highway 13, and it's also called highway 160.

5   Q.   So your testimony is you would drive up this way?

6   A.   Yes.

7   Q.   And that was -- you now recall that's the usual route

8   you would take to or from work; correct?

9   A.   That's the way I would at least get into Springfield,

10  yes.

11          MR. PRICE:  Your Honor, if we could play from

12  Mr. Bryant's transcript, page 141.

13          THE COURT:  141.

14          MR. PRICE:  Actually, the numbers are different on

15  these transcripts.  Let me try to find it, your Honor.

16          They will find that eventually, I'm fairly sure.

17  So let me move on.

18  Q.   Your testimony here today is you would go up 13?

19  A.   Yes.

20  Q.   And see, here's the Battlefield Mall; right?

21  A.   Yes.

22  Q.   So going up 13, how would you get to the Battlefield

23  Mall?

24  A.   Well, depending on traffic, I would either continue up

25  where it says Camel Avenue.

14b72d71-1008-4256-86a8-8a62a239a6d1

Page 2632

1   Q.   Okay.  Tell me when to stop.

2   A.   Okay.  Then go right.  Now, I would sometimes go that

3   way.  If there was a lot of traffic, though, I would go up to

4   right there, and I think that is Primrose, make a right.

5   Keep going, keep going, keep following along that.  And right

6   there at National, I think I would head north to Battlefield,

7   and then make a right.

8   Q.   Now, you talked about how you would get to the mall.

9   Your testimony is this happened after work that you were

10  driving by the high school; correct?

11  A.   I'm not absolutely certain if it was going to work or if

12  it was coming home, but I think it was coming home.

13  Q.   And when school gets out, it's usually a little crowded

14  around the school, isn't it?

15  A.   Yes.

16  Q.   Buses, cars; right?

17  A.   Yes.

18  Q.   So this would be a congested area to drive through when

19  school got out.

20  A.   Not necessarily.  Actually, Battlefield Road is --

21  Battlefield and Campbell are two of the busiest streets in

22  the area.

23  Q.   And from your parents' house, was there a route -- have

24  you ever -- you knew the area pretty well.

25  A.   Um, I really didn't know Springfield all that well, no.

1  Q.   So did you ever use Google maps that said how do I, you

2  know, get from point A to point B?

3  A.   No.

4  Q.   And so your testimony is that sometime after -- your

5  best recollection is after work; right?  Is that right?

6  A.   Yes, I believe so.

7  Q.   That you drove the route that I'm showing with the light

8  here; is that right?

9  A.   Right.

10 Q.   Rather than taking the major routes; is that correct?

11 A.   Right.

12 Q.   And you drove by Kickapoo High School at a time when it

13 was getting out.  So there was a lot of people walking

14 around, buses, et cetera; right?

15 A.   Well, like I said, you know, I'm a little fuzzy on

16 whether or not it was getting out of, you know, if they were

17 getting out of school or just starting school.  I can't

18 remember exactly.

19        MR. PRICE:  I think we found the cite now, your

20 Honor.  If we could play -- well, maybe we don't.  Eventually

21 we'll get there.

22 Q.   But your testimony is that, I believe, is that when you

23 made this drive, you went home, and you immediately began

24 doing some sketches; right?

25 A.   Yes.

Page 2634

1   Q.   And I'd like to show you the originals that are in your

2   book as Exhibit 5, Bates 179, 180, 181, 182.

3            Your Honor, we have found the cite.  If we could

4   play 627.  And this is volume 3, November 8, 2004.

5            THE COURT:  Volume 3.

6            MR. PRICE:  627, line 20 to 628, line 11.

7            MR. NOLAN:  No objection.

8            THE COURT:  You may proceed.

9            MR. PRICE:  Thank you.

10           WHEREUPON THE VIDEOTAPED DEPOSITION

11           EXCERPT OF CARTER BRYANT, AS PROVIDED

12           BY COUNSEL, ARE INCORPORATED HEREIN.

13           "QUESTION:  During that time period, August

14      '98, did you often drive by the Kickapoo school, or

15      was that an unusual event when you did it on that

16      occasion?

17           "ANSWER:  I don't remember what route I

18      usually took, but it could have been a typical

19      route, yes.

20           "QUESTION:  Could have been typical?

21           "ANSWER:  Well, I don't remember exactly which

22      way I drove.

23           "QUESTION:  You just don't recall your usual

24      route to work or home from work?

25           "ANSWER:  I don't recall which way I normally

Page 2635

1       took.  It would depend on traffic or other

2       factors."

3   Q.   BY MR. PRICE:  Mr. Bryant, I'm going to give you the

4   exhibits I just spoke about, which is 5 Bates 179, 180, 181,

5   and 182 and ask if you would look at those and tell me if

6   those are some of the drawings that you claim you did after

7   driving by Kickapoo High?

8   A.   Yes.

9   Q.   And it's your best recollection you did it that very

10  day; correct?

11  A.   I -- I think so, yes.

12  Q.   And if we look at the 179 document, and what I'd like

13  you to do is we have a copy of it here, but could you show it

14  to the jury.  Show the original.

15          Now, if we look at the edges, that's been torn from

16  a notebook, has it not?

17  A.    It appears to have been, yes.

18  Q.   Now, if you'd look at Exhibit 5180.  It's Bates number

19  5-00180.  It's page 40 of Exhibit No. 5.

20          Do you have the original of that there?

21  A.   Yes.

22  Q.   And that also has those rough edges that's been torn out

23  of a notebook; right?

24  A.   Yes.

25  Q.   But neither of these drawings has a date on them; is

Page 2636

1    that right?

2    A.    No.

3    Q.    Is that correct?

4    A.    That's correct.

5    Q.    And if you'd look at the next exhibit you have in front

6    of you, 5, and that's Bates No. 181.  And if we look at the

7    original there, again, it's again ripped out of a notebook of

8    some sort; correct?

9    A.    Yes.

10          MR. NOLAN:  Just for the record, we're looking at

11   Exhibit 5 through -- (inaudible.)

12          I apologize, your Honor.

13          MR. PRICE:  If we could look at 5, Bates No. 00182.

14          THE WITNESS:  Let's see, I'm not finding that one.

15   There we go.  Sorry.

16   Q.    BY MR. PRICE:  That's also been torn out of a notebook?

17   A.    Yes.

18   Q.    And it's also undated?

19   A.    Yes.

20   Q.    It's true you would sometimes keep spiral notebooks?

21   A.    Yes.

22   Q.    And you'd do your drawings in those notebooks?

23   A.    Yes.

24   Q.    Those notebooks would also have sometimes a date in them

25   which would let you figure out the date you were using the

Page 2637

1   notebook; right?

2   A.   Um, well, I don't know.  My recollection is that my

3   notebooks, I usually kept, you know, I'd keep them over a

4   period of time.

5   Q.   Well, but for example, if you had those four drawings

6   right before, say, a page in your notebook where you had a

7   bank statement, you would -- that would help you determine

8   when in fact you made those drawings; right?

9   A.   It might.  Not necessarily.

10  Q.   Well, certainly if you tear them out of the notebook,

11  you can't use the chronology to date the notebooks.  Fair

12  enough?

13  A.   That's true, but I didn't usually keep my notebooks in

14  any kind of chronological order.

15  Q.   Well, let me show you what we'll mark as Exhibit 1155-C.

16          THE COURT:  Counsel, help me out here.  1155, where

17  would C be located?

18          MR. PRICE:  If I can pass this up.

19  Q.   This is a photo copy that actually has numbers on them

20  that might make things easier to find.  I've given you the

21  original and the photocopies.

22          And you recognize that original as one of the

23  originals; right?

24  A.   Yes.

25  Q.   And if you could --

1          Your Honor, I move Exhibit 1155-C into evidence?

2          MR. NOLAN:  No objection.

3          THE COURT:  Counsel, what's the difference between

4    1155 and 1155-C?

5          MR. PRICE:  1155 was an erroneous copy of 1155-C of

6    a deposition.

7          THE COURT:  Very well.  So 1155-C is the exhibit.

8          MR. PRICE:  Yes.

9          (Exhibit 1155-C received.)

10   Q.   BY MR. PRICE:  Just to hold up the original notebooks to

11   the jury so they can see what we're talking about here.  Do

12   you see that?

13   A.   Yes.

14   Q.   Now, that on the front of it says 120.  Do you see?

15   A.   Yes.

16   Q.   That indicates the number of pages that you originally

17   would find in that notebook; right?

18   A.   I suppose so.

19   Q.   I mean, when you are buying -- the larger the number,

20   the more notebook you're getting; right?

21   A.   I think that's the way it usually works.

22   Q.   And in this particular notebook, you see that if you

23   look at the copy that was made, you see it's numbered from 1

24   until the end?

25   A.   Okay.

1    Q.   And by the way, when they give you the number of pages,

2    they are usually talking about the pages, not the cardboard

3    front and back; right?

4    A.   I think so, yes.

5    Q.   Okay.  So if you subtract, say, four for the copies of

6    the front and back, you see those in the copies, the copy of

7    the front and the back of the cardboard.  If you subtract

8    four from that, there's about 99 pages, or let's say about a

9    hundred pages in here.

10   A.   Okay.

11   Q.   Is that right?

12   A.   Well, without counting them, I would assume probably

13   somewhere around there.

14   Q.   Okay.  And so it looks like you tore out of that

15   notebook somewhere around 20 pages; right?

16   A.   That's possible.  I don't remember how many pages

17   exactly I tore out.

18   Q.   Now, if we could look in the pages here, you see, and

19   you can look at the copy will help orient you to the page,

20   and I'll give you a number, and you can find it in the

21   original, if you would like.

22        If you would look at page 57.  1155-C-57.

23   A.   Yes.

24   Q.   And you see this is about 57 pages into what's left of

25   that notebook.  You see some entries here dated July 16th,

Page 2640

1    and you see deposits to savings, deposits to savings,

2    deposits to checking.  You see that?

3    A.   Yes.

4    Q.   Now, if we looked at your bank statements, we'd be able

5    to determine what year it was that you wrote that into that

6    notebook; right?

7    A.   I suppose that's possible.

8    Q.   I'm going to show you what we've marked as Exhibit 13649

9    for identification.

10              And a copy for the Court.

11              Mr. Bryant, if you would look at this.  Do you have

12   it in front of you?

13   A.   Yes.

14   Q.   And does this appear to be a bank statement of yours?

15   A.   It looks something like a bank statement, yes.

16   Q.   And if you look at the second page, you see there's some

17   transaction amounts, and there are some dates in there.

18              Do you see that?

19   A.   Yes.

20   Q.   So as best as you can tell, this looks like one of your

21   bank statements from July of 1999.

22   A.   Yes.

23              MR. PRICE:  Your Honor, move Exhibit 13649 into

24   evidence.

25              MR. NOLAN:  No objection.

Page 2641

1          THE COURT:  Admitted.

2          (Exhibit 13649 received.)

3          THE COURT:  You may publish.

4   Q.   BY MR. PRICE:  And this is in 1999 that you were living

5   at that address on West 160th street in Gardena, California;

6   is that right?

7   A.   Yes.

8   Q.   If you could look at the second page of the document,

9   Mr. Bryant.

10  A.   Yes.

11  Q.   And do you see there's an entry here of 7/16/99,

12  $2,098.50.  Do you see that?

13  A.   Yes.

14  Q.   And if you would look now at the notebook,

15  Exhibit 1155-C.

16  A.   Yes.

17  Q.   Page 57.  Let's put those side by side.  And July 16th,

18  $2,098.50.  And you see here your deposits, you've got July

19  16th, 2098.50.

20          Do you see that?

21  A.   Yes.

22  Q.   Does that appear to reflect the July 16th, 1999, entry

23  on the bank statement?

24  A.   Yes.

25  Q.   And sorry this is slow going.  But if we can go to the

Page 2642

1    third page.

2            On 7/14, if says $36.49.  Do you see that?

3    A.   I'm sorry.  What figure?

4    Q.   July 14, 99.  And you've got 36.49.

5    A.   Yes.

6    Q.   Do you see that?

7    A.   Yes.

8    Q.   And here you have July 15, 36.49.  Do you know if that's

9    the same entry, or were you just off one?

10   A.   I'm not sure.

11   Q.   Okay.  And then we have it looks like it's between 7/15

12   and 7/16.  You see $200 here?

13           Do you see that?

14   A.   Yes.

15   Q.   And you've got 7/16.  $200 here.  Do you see that?

16   A.   Yes.

17   Q.   You've got 7/16 here, a deposit of $13.02.

18           Do you see that?

19   A.   Yes.

20   Q.   And you've got the same entry here, 7/16, $13.02.

21           Do you see that?

22   A.   Yes.

23   Q.   So does it appear to you that the notations that are in

24   Exhibit 1155-C are notations from banking records, you were

25   doing some sort of calculations or something in July of 1999?

Page 2643

1   A.   Yes.

2   Q.   And perhaps -- have you found that in the original?  So

3   you could show the jury where that is in the original?

4   A.   Yes.

5   Q.   Is it a little bit more than halfway through in the

6   book?

7   A.   Yes, approximately.

8   Q.   Now, in addition to your 1999 bank statements in that

9   book, you also have some drawings that are still in the book

10  which you know that you drew in 1999; is that right?

11          Let me call your attention, if you could.  Look in

12  the book at 1155-C, page 19.

13          Do you see there's a picture here that says Jewel?

14  A.   Yes.

15  Q.   And if you can hold that up to the jury so they can see

16  the original.  Well, I'm sorry.  If you haven't found that,

17  that's fine.  If you need to, though, please look at the

18  original.  The Jewel line, this was a doll you were working

19  on while you were at Mattel; right?

20  A.   I worked on two Jewel lines for Mattel.

21  Q.   And it's your recollection that this drawing here was

22  one done while you were working for Mattel after you joined

23  them in January 4, 1999; right?

24  A.   I'm not exactly sure.

25  Q.   Do you still have Exhibit 5 in front of you?

Page 2644

1    A.    Yes.

2    Q.    And if you would look at Exhibit 5, Bates No. 333.

3    A.    Okay.

4    Q.    This says notes/ideas on large angel?

5    A.    Yes.

6    Q.    This is something which you wrote sometime after January

7    of 1999; correct?

8    A.    I'm not exactly sure.  Because I also worked on a -- I

9    worked on an angel product also in '98.

10   Q.    Okay.  Let me call your attention to your testimony --

11         Well, your Honor, actually, if we can just play

12   from Mr. Bryant's transcript, page 393, line 25, through 394,

13   line 24.  And it's volume 2, your Honor.  393, line 25,

14   through 394, line 24, referring to Bryant 00333.

15              MR. NOLAN:  One moment, your Honor.

16              THE COURT:  Any objection?

17              MR. NOLAN:  All right, your Honor.  No objection.

18              THE COURT:  Very well.  Proceed.

19              WHEREUPON THE VIDEOTAPED DEPOSITION

20              EXCERPT OF CARTER BRYANT, AS PROVIDED

21              BY COUNSEL, ARE INCORPORATED HEREIN.

22              "QUESTION:  333?

23              "ANSWER:  These look like actually some notes

24         from a project that I worked on at Mattel.

25              "QUESTION:  And this is large angel?

14b72d71-1008-4256-86a8-8a62a239a6d1

Page 2645

1      "ANSWER:  Yes.

2      "QUESTION:  That's the Mattel project?

3      "ANSWER:  Yes, I did a project.  It was -- I

4  don't remember what it was called, but it was a

5  large size Barbie as an angel.

6      "QUESTION:  Can you tell me what you did on

7  that project?

8      "ANSWER:  I created the fashion.  I created

9  the look for the hairstyle and the look for the

10  face.

11      "QUESTION:  And can you explain what these

12  notes mean here?

13      "ANSWER:  These were just notes to myself on,

14  you know, what might be elements of the doll.

15      "QUESTION:  Can you explain them?

16      "ANSWER, the shimmery hair stuff, I don't

17  remember what that was.  Ken hair was just an idea

18  to possibly use -- I guess they used a different

19  type of hair for Ken than they did for Barbie.

20  Stained glass, I don't know.  That was just a --

21  just an idea.  17th, 18th Century, that was just --

22  I was just thinking of what time period the look

23  might be inspired by.  Empire waist look is just a

24  note on how the fashion might be cut.

25      "QUESTION:  Do you recall when you made these

14b72d71-1008-4256-86a8-8a62a239a6d1

Page 2646

1       notes?

2              "ANSWER:  No.  I believe it was in '99."

3    Q.   BY MR. PRICE:  And that document which is being referred

4    to, Bates 333, if you would look in your notebook there, the

5    spiral notebook, Exhibit 1155-C, and look at page 13, you can

6    see that's the same document.

7    A.   Yes.

8    Q.   And if you could show that to the jury.

9              Now, where does that document -- so that document

10   is, or that page which has these notes on this large angel

11   doll that you believe was in '99, that's a few pages before

12   the drawings you have of the Jewel doll; correct?

13   A.   Well, it looks like I've got some Jewel drawings before

14   it and after it.

15   Q.   If you look at -- you're looking at 1155-C, page 13.  If

16   you'd look at page 19.  See, that's about six pages in the

17   notebook after you have your 1999 notes about the large

18   angel; right?

19   A.   Yes.

20   Q.   And then you go a couple pages more on page 21.

21   A.   Yes.

22   Q.   That's also several pages that after this 1999 large

23   angel entry; correct?

24   A.   Yes.

25   Q.   Was Jewel a collectible doll, by the way?

Page 2647

1    A.    Well, one of the Jewel projects I did was, yes.

2    Q.    Which is different from main line Barbie; right?

3    A.    Yes.

4    Q.    And when you joined Mattel in January of 1999, you were

5    working at some point after that in Barbie collectibles?

6    A.    Yes.

7    Q.    And for how long were you working in Barbie

8    collectibles?

9    A.    I worked there from January of '99 to October of 2000.

10   Q.    And in what time frame, when you were there from January

11   '99 to October 2000, were you working on the Jewel

12   collectible doll?

13   A.    I don't recall the exact time frame.  I think it was --

14   I think it was in '99.

15   Q.    Do you have any particular time as to when in 1999 you

16   were working on the Jewel collectible doll?

17   A.    I thought I just answered that.

18   Q.    A month period?

19   A.    I don't remember the exact month.  I think it was early

20   on.

21   Q.    Now, you understand, do you not, that when you have a

22   notebook like that, and you draw on it, that sometimes the

23   pressure you make in your drawing can create indentations on

24   the next page?

25   A.    Yes.

1   Q.   So that even if you tear a page out of a notebook, you

2   can sometimes see by looking at the page after it whether or

3   not a certain drawing had originally been in that notebook.

4   A.   Yes.

5   Q.   And I believe that with respect to the notebook we've

6   been looking at, which has your '99 bank statements in it and

7   this '99 angel notation in it, that you have torn out of that

8   notebook at least 20 pages of something; right?

9   A.   Again, I'm not sure exactly how many pages were torn

10  out.

11  Q.   Well, clearly there aren't 120 pages left in that

12  notebook; right?

13  A.   Right.

14  Q.   And sometimes, when you make a drawing in a notebook,

15  even if you tear the page out, there will sometimes be

16  bleed-throughs, you know, from the ink on the page behind it?

17  A.   Yes.

18  Q.   So sometimes you can still determine whether or not a

19  drawing was originally in that notebook; right?

20  A.   Yes.

21  Q.   Okay.  But if we -- if you look at 179, 180, 181, and

22  182 --

23               THE COURT:  Exhibit 1155-C?

24               MR. PRICE:  We're out of that exhibit, your Honor.

25  I'm sorry.  Let me be clear.  It's Exhibit 5-179, 180, 181,

1   182.   Those are those drawings which you say you did right

2   after you went by Kickapoo High School.   And you have the

3   originals there.

4   A.   Oh, yes.

5   Q.   You can't tell us what notebook that came from; right?

6   A.   I'm not exactly sure, no.

7   Q.   You can't tell us if it came out of that 1155-C, that

8   black notebook which has '99 information in it or whether it

9   came out of some earlier notebook; is that right?

10   A.   Yeah, I'm not exactly sure.

11   Q.   Do you see any difference in the sheets, though, like in

12   the number of lines or whatever, between the exhibits you're

13   looking at right now, the originals -- 5-179, 5-180, 5-181,

14   and 5-182 -- which you say are like your original Bratz

15   drawings, do you see any difference in the paper there and

16   the paper in Exhibit 1155-C, that 1999 notebook?

17   A.   No.   I mean, they look fairly similar.

18   Q.   By the way, you have -- you mentioned that they are

19   similar.   Do you see any differences between those torn-out

20   drawings, which is 5-179 through 5-182, and the pages that

21   are in 1155-C, the 1999 notebook?

22           MR. NOLAN:   Your Honor, I'm going to object to the

23   characterization as the 1999 notebook.

24           THE COURT:   Fair enough.

25           MR. PRICE:   I'll rephrase.

1   Q.   Do you see any differences between those torn out

2   drawings and 1155-C, the black notebook which has your 1999

3   bank statement records in it?

4   A.   No.  I mean, it looks like there have been some things

5   cut out of them.  Some holes punched in, but other than that,

6   no.

7   Q.   When you began working at Mattel again in January 1999,

8   you filled out a conflict of interest form.

9        Do you recall that?

10  A.   Yes.

11  Q.   And in that conflict of interest form, you mentioned

12  that you had done some design work; right?

13  A.   Yes.

14  Q.   And it's fair to say you didn't mention the Bratz design

15  work that you claimed to have done in 1998?

16  A.   I think the only thing I mentioned in that

17  confidentiality agreement was work that I hadn't been paid

18  for.

19  Q.   So the answer to my question is that yes, Mr. Bill, I

20  didn't in that conflict of interest questionnaire, mention

21  the Bratz design work.

22  A.   There were a lot of things I did in 1998 that I didn't

23  mention on that conflict of interest because I didn't really,

24  you know -- I assumed that the work that I had done on my own

25  was not a conflict of interest.  I hadn't been paid for any

Page 2651

1   of it.

2   Q.   Was Bratz mentioned in the conflict of interest

3   questionnaire that you filled out when you went back to

4   Mattel in January of 1999?

5   A.   Well, again, like I said, I don't, it wasn't, but

6   neither were a lot of other projects I worked on.

7           THE COURT:  Let's go ahead and take our break at

8   this time.

9           (Recess taken.)

10          (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

11          THE COURT:  Mr. Zeller and I guess it would be

12  someone from MGA.  This is the issue of Mr. Marlow and what

13  the Court is going to do with the previous Fifth Amendment

14  invocation.  Based on the in camera discussion with

15  Mr. Marlow's criminal defense attorney, the Court believes

16  that the best course of action to take right now is simply to

17  permit Mattel to proceed with their examination of

18  Mr. Marlow.  Based on the Court's understanding of the

19  information that Mattel is seeking as well as the Court's

20  understanding of what Mr. Marlow will now be testifying to, I

21  don't think there's any purpose for impeachment.

22          MR. ZELLER:  I apologize.  I couldn't hear all the

23  last part of it.

24          THE COURT:  Based on what I understand -- the

25  information Mattel is seeking from Mr. Marlow and the

Page 2652

1   information that Mr. Marlow's attorney has proffered that he

2   is going to give, I don't see any basis for impeachment of

3   Mr. Marlow with his prior invocation of the Fifth Amendment.

4   That analysis might change, depending on how Mr. Marlow's

5   testimony actually proceeds.

6         So what I'm going to do is permit you to proceed

7   with the testimony and instruct that you do not impeach with

8   the prior invocation of the Fifth Amendment without clearing

9   it with the Court at sidebar, and the Court will take that

10  analysis up, which is basically another 403 analysis at the

11  time after the Court has heard Mr. Marlow's testimony.

12        MR. ZELLER:  I suppose a couple things, your Honor.

13  Number one, then, I surmise we need to proceed with the

14  deposition without waiver to our position on this.  From our

15  perspective, the prejudice has been done.  We're in a

16  position now well into trial where we're going to be hearing

17  his answers for the first time.

18        I mean, it seems a little like we're in a Catch-22

19  if he gives up that he testifies, now he's not going to

20  invoke the Fifth Amendment and we have effectively no

21  transcript to impeach him with.

22        THE COURT:  You have no transcript, but you have a

23  judge who has received a proffer from his attorney as to what

24  he's going to say.

25        MR. ZELLER:  But we don't know what he's going to

Page 2653

1   say.

2          THE COURT:  I understand that.  Sometimes you don't

3   know everything, Counsel.  You know, there was a time when

4   you just tried cases.

5          MR. NOLAN:  Could we do that for Phase 2?

6          THE COURT:  Everything wasn't perfectly scripted.

7          But the Court is mindful of the -- at the same time

8   I'm not saying -- Mr. Marlow's attorney has offered to submit

9   his client to a deposition.  So that's not undoable, but just

10  in terms of the Fifth Amendment issue, based on what I

11  understand from what you have submitted to the Court through

12  various briefs in terms of what you expect Mr. Marlow would

13  truthfully testify to and what I'm hearing from his attorney,

14  I don't see any justification under these circumstances for

15  getting into his prior invocation of the Fifth Amendment.

16         MR. ZELLER:  Not having the benefit of his

17  attorney's explanation, it's a little hard for me to comment.

18         THE COURT:  I understand.

19         MR. ZELLER:  I will say this, however, your Honor.

20  The invocation of the Fifth Amendment at his deposition, and

21  this is an issue that we briefed in our papers, went far

22  beyond any justification that ever could have been raised.

23  And I would submit to the Court, and I --

24         THE COURT:  But if he comes in and -- I have every

25  reason to believe that Mr. Marlow is going to come in here

Page 2654

1   and testify completely truthfully, and you know what you

2   believe the information he has and what information that he

3   could reveal.  Assuming, for the sake of this discussion,

4   that he testifies truthfully and provides the information

5   that you in good faith believe that he possesses, what is

6   there to impeach with his prior invocation of the Fifth

7   Amendment other than just a drive home to the jury that not

8   only is he now testifying the way that we believed he should

9   have testified a month ago, but, ladies and gentlemen, just

10   to add another nail in the coffin, we want to let you know

11   that he invoked his Fifth Amendment.

12         MR. ZELLER:  Notwithstanding that the --

13         THE COURT:  I may not be presenting this in the

14   most artful way, but isn't that essentially what you're

15   asking for?  Assuming that he testifies as the Court at this

16   point, based on the in camera disclosure, believes he will

17   testify.

18         MR. ZELLER:  I don't know if I would put it that

19   starkly, but yes, your Honor, we want to use it in order to

20   comment on his credibility.  Questions that he invoked the

21   Fifth Amendment on included, for example, whether one of the

22   purposes why they went through the concealment that they went

23   through, which I don't think is really -- I don't think it's

24   disputed at this point that they used false names, made

25   payments, using these false, if not erroneous Social Security

14b72d71-1008-4256-86a8-8a62a239a6d1

Page 2655

1   numbers in an effort to cover up what was being done.

2   Questions were asked of him such as well, wasn't this being

3   done to cover it up from Mattel, to hide it from Mattel.

4          THE COURT:  If that's the purpose that you want to

5   get into it and suggest that his invocation of the Fifth

6   Amendment was in furtherance of a cover-up and that you want

7   that as evidence not simply to impeach him but essentially

8   now you're suggesting that it's substantive evidence of the

9   concealment itself, am I reading you correctly on that?

10         MR. ZELLER:  I wouldn't put it that way, your

11  Honor.  I think what we are saying is that he is now giving a

12  different answer.

13         THE COURT:  And the answer, which from your

14  perspective -- well, truth isn't relative, if it is a

15  truthful answer, what's there to impeach?

16         MR. ZELLER:  Well, certainly that could be said

17  true of any witness, your Honor.  I mean, I don't know how

18  the Court can evaluate in advance whether a witness is being

19  truthful.

20         THE COURT:  I'm not suggesting that I can.  But I

21  can evaluate, after the testimony has been made, but before

22  the impeachment takes place.  And that's all I'm suggesting

23  at this point.

24         MR. ZELLER:  And it seems to me that that creates

25  tremendous risk to us of unfair surprise.

Page 2656

1        THE COURT:  And that would justify perhaps a

2   deposition.

3        MR. ZELLER:  I mean, I think, based on the Court's

4   rationale, where the Court is now, I think we do want to

5   proceed with the deposition.  I think it ought to be more

6   than an offer, though, at this point.  I think it ought to be

7   ordered.  And we ought to be given leave to take it.  And I

8   would also submit that, you know, we ought to be allowed, you

9   know, more than just starting at three o'clock.

10        I mean, one concern that I do have about the

11   deposition is not only is it in the midst of trial, but

12   starting at three o'clock seems like a very small amount of

13   time for to us try and find out.  Because he invoked on a lot

14   of subjects.

15        THE COURT:  I don't disagree.

16        Mr. McFarland, perhaps you could provide some

17   indication of how we might have some additional time to do

18   this.

19        MR. McFARLAND:  I understand, your Honor.  I'll

20   give you the honest answer.  He has a last day filing for a

21   patent application.  He had two of them, one is the last day

22   is today, and one is the last day is Monday.  We would be

23   willing to stay, of course.  If they want another set of

24   hours, we could go back and look at, and it's kind of another

25   issue here of how many hours do they want, but anything

1   reasonable, we would stay to nine, ten o'clock.

2           All tentatively, they have a very ambitious

3   schedule on Tuesday.  We would be having to have him deposed

4   at nine or ten A.M. on Tuesday on a regular day, and they

5   could put him up on Wednesday.  That would be fine, too.  I

6   don't know that there's a magic about him going on Tuesday.

7   It looks likely, especially given how today is going, that

8   things are running over.

9           THE COURT:  Counsel?  Mr. Zeller?  And don't get me

10  wrong.  I am not ruling right now that you are not going to

11  be able to impeach with the Fifth Amendment.  I'm just saying

12  that I'm not going to permit you to do so until the Court has

13  had a chance to hear the testimony, and what I want to avoid,

14  and there's a couple of cases that one of my law clerks

15  pulled quickly.  I'm doing this somewhat on the fly here,

16  which suggests that the Court needs to balance this and there

17  needs to be a clear grounds for impeachment before it's

18  brought in.

19          I mean, there's certainly no bar to bringing in the

20  invocation of the Fifth Amendment in a civil jury trial.  You

21  briefed this issue yourself.  But it's -- there needs to be

22  some sense -- anyway, how do you respond to the deposition?

23          MR. ZELLER:  I appreciate that, your Honor.  I do

24  understand that the Court is not making a determination one

25  way or another as to whether or not we could use it.

1          My concern stems from the fact that, you know,

2     assuming that the Court does say well, you can't use that for

3     impeachment, then we effectively have no transcript.  And

4     that's what's driving my concern in terms of -- and would

5     suggest to me, anyway, that there ought to be a deposition.

6          In terms of scheduling, we're happy to do whatever

7     can be done.  I mean, I would suspect that Tuesday is a

8     little late.  I mean, we could offer to do it tomorrow,

9     Sunday, anytime on Monday.  I'm certainly not unmindful of

10    Mr. Marlow's concerns that he has some deadline he has to

11    meet on Monday, but we, of course, have our own deadlines we

12    have to meet.  And if we -- even taking it on Tuesday seems

13    to be cutting it pretty razor thin.

14         THE COURT:  Mr. McFarland, is there any chance

15    that -- would taking the deposition tomorrow interfere with

16    any business or religious observance?

17         MR. McFARLAND:  Not the latter.  Sunday might.  But

18    let me call him.

19         THE COURT:  Why don't do you so.  I don't want it

20    to be -- this would be the second Saturday deposition we've

21    had in this case.  I certainly don't want to develop the

22    reputation as ordering Saturday depositions, but these are

23    unusual circumstances.

24         So why don't you check on that and report back.  It

25    would address the concern about being too untimely, and I

Page 2659

1   think it would go a long way to resolving this matter.

2          MR. McFARLAND:  And I'll make -- Sunday is usually

3   a day, but I'll make whatever sacrifice the client is willing

4   to.

5          THE COURT:  I appreciate that.  So why don't we

6   report back on that.  Are we otherwise ready to proceed with

7   the examination, Mr. Price?

8          MR. PRICE:  Yes, your Honor.

9          THE COURT:  Let's go ahead and bring the jury in.

10          (WHEREUPON THE JURY ENTERS.)

11          THE COURT:  Counsel, you may proceed.

12          MR. PRICE:  Thank you.

13   Q.   Mr. Bryant, your testimony is that by January 4, 1999,

14   you had come up with the Bratz characters; correct?

15   A.   Yes.

16   Q.   And, in fact, I think it's page 43, you had -- 5-0043.

17   Exhibit 5, Bates 43, you had actually named the characters.

18   You had drawn each character; correct?

19   A.   Yes.

20   Q.   Your view is you had put it all together.  You had the

21   Bratz concept pretty much done by January 1999?  That's your

22   testimony?

23   A.   I had it done, yes, before then, actually.

24   Q.   And you were excited about that?

25   A.   Yes, I was.

1    Q.   Now, you knew January 4, 1999, you were starting

2    employment at Mattel again for the second time; correct?

3    A.   Yes.

4    Q.   At the time you were signing these documents saying that

5    work you did at Mattel would belong to Mattel; right?

6    A.   Right.

7    Q.   Now, if you wanted to prove that you did something

8    before you joined Mattel on January 4, 1999, you knew from

9    your past that there were ways that you could do that.   You

10   could prove that you actually drew something, created

11   something on a certain date; right?

12   A.   I'm sorry.   I didn't understand your question.

13   Q.   Well, you knew that if it was important to show that you

14   created something before you joined Mattel for a second time,

15   you knew there were ways that you could do that.

16   A.   I don't know that I knew that one way or the other, or

17   really thought about it.

18   Q.   Well, well, I think you at one point had hopes of

19   becoming a songwriter; right?

20   A.   Yes.

21   Q.   And you would come up with song lyrics and songs; right?

22   A.   Yes.

23   Q.   And this is -- how far back was that when you were an

24   aspiring young songwriter?

25   A.   Oh, I think this was back in the late 1980's.

1  Q.   And you wanted to make sure that if you wrote a song,

2  that you could prove when you wrote the song; right?

3  A.   Yes.

4  Q.   Because you didn't want someone coming in later and

5  saying no, I thought of that, not you; right?

6  A.   Well, I think that was part of the reason.  Part of the

7  reason was also that, you know, I was performing these songs

8  in public.

9  Q.   And to prove that -- when you wrote your songs, by the

10  way, I take it you did it on a piece of paper?

11  A.   At least the lyrics.

12  Q.   And to prove when you wrote that, you would file a

13  copyright application; right?

14  A.   Sometimes, yes.

15  Q.   Well, sometimes, did you do it, oh, say, more than 20

16  times?

17  A.   I don't recall how many times I did it.

18  Q.   By the way, in doing a copyright application, there's a

19  printed form you can use; is that right?

20  A.   Yes.

21  Q.   It's about two pages?

22  A.   I don't remember how long it is.

23  Q.   Well, you remember that you would fill out the title of

24  your work?

25  A.   Yes.

1  Q.   And that you authored it?

2  A.   Yes.

3  Q.   And the year in which you authored it?

4  A.   Yes.

5  Q.   Right?

6  A.   Yes.

7  Q.   And at the time that you did these copyright

8  applications so you could prove when you authored these

9  works, you certainly had no legal training; right?

10  A.   No.

11  Q.   So where did you get these forms that allowed you to

12  fill out applications to prove that you created something

13  valuable at the time you said you did?

14  A.   I think I became aware of them through a songwriting

15  course that I was taking, and they gave information on how to

16  apply for musical copyrights.

17  Q.   And the forms apply to other works as well, artistic

18  creations; right?

19  A.   I don't remember.

20  Q.   And you did a filing in, let's see, 1992 for Teach Me

21  How to Love You?

22  A.   I remember the name of the form.  I don't remember

23  actually filing a copyright.

24  Q.   How about 1987, Big Dreamer?

25  A.   Yes.

1  Q.   And did you copyright around 1990 Burn a Candle?

2  A.   Well, I remember writing it.  I don't remember

3  copyrighting it.

4  Q.   Would it refresh your recollection if you saw a list of

5  your copyrights?

6  A.   It may.

7          MR. PRICE:  Mark for identification 13627.

8          THE COURT:  You may.

9          (Exhibit 13627 marked for identification.)

10  Q.   BY MR. PRICE:  Mr. Bryant, I'm going to ask you if you

11  filled out the form so you could copyright certain songs to

12  prove you created the song on a certain date.

13          Teach Me How to Love You, did you copyright that in

14  1992?

15  A.   Well, that seems to be the registration date.

16  Q.   And again, I don't want you to testify about the

17  document.  But just tell me if that reminds you that yes, I

18  actually took this to page form and filed something to prove

19  that I had created this song when I said I did.  Okay?

20  A.   Or we could do it another way.  I could just look at the

21  ones I do remember filing a copyright for.

22  Q.   Okay.  Why don't do you that.

23  A.   I remember filing a copyright of a song with a wonderful

24  title called Slow Down, Baby.

25          THE COURT:  That's for the court reporter.

1          THE WITNESS:  I remember filing a copyright for a

2    song Talk Is Cheap.

3          THE COURT:  I'll stop commenting.

4          THE WITNESS:  I wrote Big Dreamer.  Hands of Love.

5    Perfect Reflection.

6          Those are the only ones that I can pretty clearly

7    remember copyrighting.

8    Q.   BY MR. PRICE:  You don't recall Lunatic Lover?

9    A.   I recall the song.  I don't remember putting a copyright

10   on it.

11   Q.   Were you more excited about creating this Bratz concept

12   than you were about creating, say, Lunatic Lover?

13   A.   Well, I don't know.  I mean the song Lunatic Lover was

14   written in 1986.  I don't remember how excited I was about

15   that song.  I was excited about Bratz, sure.

16   Q.   And you knew that if you wanted to prove you created

17   Bratz before you joined Mattel, if, in fact, you created them

18   before you joined Mattel, you could prove that by getting a

19   preprinted form and filling it out and sending it in.

20   A.   Well, I mean, I guess I probably had a general knowledge

21   of that, but I don't think I ever copyrighted any of my

22   drawings.

23   Q.   Well, but this Bratz concept that you say you came up

24   with in '98, you began pursuing because you thought it was

25   valuable; right?

1          MR. NOLAN:  Objection.  Lack of foundation as to

2     time.

3          THE COURT:  Sustained.

4     Q.   BY MR. PRICE:  You thought that this Bratz concept was

5     something of value; correct?

6          MR. NOLAN:  Objection again.  Foundation.  Time.

7          THE COURT:  Sustained.

8     Q.   BY MR. PRICE:  Prior to joining Mattel in January of

9     '99, you thought that this Bratz concept had some value.

10    A.   Well, I thought there were a lot of things I was working

11    on that had some value.

12    Q.   Do you recall at some point you had conversations with

13    your father about something called the poor man's copyright?

14    A.   No.  I don't recall that.

15    Q.   Were you ever aware of a way to -- let me step back.

16         The copyrights that you did, the official ones, you

17    had to do something to get this two-page form; right?

18    A.   Yes.

19    Q.   And you had to file some fee?

20    A.   I believe so, yes.

21    Q.   And so wasn't -- weren't you aware of this technique

22    where, if you created something, you would make a copy of it,

23    put it in an envelope, a copy, seal it, mail it to yourself

24    so you'd have a postmark, and then you would have in this

25    sealed envelope a copy of what you created with a date on it

Page 2666

1   sanctioned by the U.S. Postal Service?

2           MR. NOLAN:  Your Honor, objection.  Lack of

3   foundation.  Also calls for speculation.  I believe counsel

4   is testifying.

5           THE COURT:  Rephrase your question, Counsel.

6   Q.   BY MR. PRICE:  Were you aware of the technique which I

7   just described, which is that you make a copy, you put it in

8   an envelope, you send it to yourself sealed?  Are you aware

9   of that technique of showing when you created something?

10  A.   Yes.

11  Q.   And how long had you been aware of that technique to

12  show that you had created something on a certain day?

13  A.    I don't remember exactly when I learned of that

14  technique, but I think it was sometime during the time when I

15  was studying songwriting.

16  Q.   So that would have been certainly before January of

17  1999.

18  A.   Yes.

19  Q.   Now, another technique to show when you did original

20  drawings would be to keep sketches in a notebook where you

21  could look at other pages in the notebook and see when you

22  drew something; right?

23  A.   Well, I guess that certainly could be a possibility.

24  But I never kept notebooks that way.

25  Q.   Well, what do you mean you never kept notebooks that

1    way?  You have notebooks that are pretty much -- where you've

2    done drawings -- where the notebooks are pretty much fully

3    intact, that is, where you haven't ripped a drawing out of

4    the notebook; right?

5    A.   Right.

6    Q.   And if we look at, let's see, exhibits -- the four

7    drawings you said you did right after Kickapoo, seeing

8    Kickapoo high, those have been torn out of some notebook;

9    right?

10   A.   Yes.

11   Q.   If you'd look at -- I'm going to hand you

12   Exhibit 1313-C.  I'll hand you the original and a copy.  You

13   see 1313-C is one of your notebooks?

14   A.   This is the one you're talking about?

15   Q.   Yes.

16   A.   Yes.

17   Q.   And you see this one is supposed to be 80 pages.  Do you

18   see that on the front?

19   A.   Yes.

20            MR. NOLAN:  We have no objection.

21            THE COURT:  Very good.  It's admitted.  You may

22   publish.

23            (Exhibit 1313-C received.)

24   Q.   BY MR. PRICE:  This is a notebook where you have things

25   in it from a time after you left Mattel; correct?

Page 2668

1   A.   Yes.

2          MR. NOLAN:   Objection, your Honor.  I apologize.

3   Which phase of Mattel?

4          THE COURT:  Very well.

5   Q.   BY MR. PRICE:  After October 19 of 2000.

6   A.   Yes.

7   Q.   And, for example, we've got 1313-C-10, the 10th page,

8   where it looks like there's a bedroom suite for Bratz.

9          Do you see that?

10  A.   Yes.

11  Q.   And about when did you create that drawing?

12  A.   Um, that was sometime, I think, in either late 2000 or

13  early 2001.

14  Q.   And if you look at 1313-C, page 27, you see there's "By

15  11/7, presenting to major retailers, final wax date."

16          Do you see that?

17  A.   Yes.

18  Q.   So like some of these pages actually have dates on them,

19  or at least a month and a day; correct?

20  A.   Yes.

21  Q.   In this time frame, looking at 1313-C, page 69, there's

22  "He has no clouds, has no rainbows."

23  Bereavement/encouragement card.

24          Do you see that?

25  A.   I'm trying to find the page.

Page 2669

1        MR. NOLAN:  Your Honor, the original is not

2   numbered.  That's the problem.

3        MR. PRICE:  Right.  The copy does.

4        THE WITNESS:  Yes, okay.

5   Q.   BY MR. PRICE:  And this appears to be for a possible

6   bereavement -- a card like a Hallmark card?

7   A.   A greeting card.

8   Q.   Pardon?

9   A.   A greeting card.

10  Q.   And you did greeting card work as well?

11  A.   Yeah, I did greeting card work from like -- I think I

12  started doing that in 1995.  I still dabble in it a little

13  bit.

14  Q.   And is this one of the -- I was going to say lyrics, but

15  I would say lines, I guess, for a greeting card?

16  A.   Sentiment, yes.

17  Q.   And three pages after that, I think 1313-C-072, is this

18  meant to be some kind of greeting card, or do you know?

19  A.   I think so.

20  Q.   In any event, if you look at 1313-C, which is supposed

21  to be 80 pages, can you tell that there aren't many pages

22  torn out that have one; right?

23  A.   It looks like there's a few missing pages, at least five

24  or six.

25  Q.   Well, if you look at the copy, which has Bates numbers

Page 2670

1    starting at page 1, it goes from Bates 1, page 1, to page

2    100, but, of course, that includes that cardboard stuff and

3    everything.

4              Do you see that?

5    A.   Okay.

6              MR. NOLAN:  Your Honor, objection.  Foundation.

7    He's looking -- he should be looking at the original if the

8    question is has something been torn out, not the Bates

9    numbers.

10             MR. PRICE:  I believe he was looking at the

11   original.

12             THE COURT:  Hold on one second.  Are you looking --

13             THE WITNESS:  I'll look at this one.

14             THE COURT:  I'm going to sustain the objection,

15   Counsel.  Let's clarify.  Just for purposes of

16   identification, 1313-C, is that the original notebook itself?

17             MR. PRICE:  It is.

18             THE COURT:  Without Bates stamps?

19             MR. PRICE:  Without.  And there's a copy, 1313-C as

20   well, which has Bates stamps.

21             THE COURT:  Let's refer to these as 1313-C, and the

22   1313-C copy.

23             MR. PRICE:  Very good.

24   Q.   I'll ask you to look at the originals, then, 1313, and

25   the black notebook, 1155.  Okay?  Do you have those two in

Page 2671

1   front of you?

2   A.   Yes.

3   Q.   Does it appear to you, looking at the originals, that

4   1155, which used to have 120 pages, what's remaining of it is

5   smaller than 1313-C, the original, which originally would

6   have 80 pages?

7   A.   Yes, it does appear a little smaller.

8   Q.   Now, getting back, then, to the '98-99 time frame, it's

9   true, is it not, that in August of 1999, about the end of

10  August of 1999, about eight months after you joined Mattel,

11  you went to a notary to prove that you had certain documents

12  as of August 1999.

13  A.   Yes.

14  Q.   The documents you wanted to be notarized were these

15  Bratz drawings; right?

16           MR. NOLAN:   Your Honor, objection to the

17  description.   It's ambiguous.

18           THE COURT:   Sustained.

19  Q.   BY MR. PRICE:   The drawings that were in the exhibit, I

20  believe we went over it yesterday, Exhibit 62, at least some

21  of which are in Exhibit 62.

22  A.   Okay.   Got it.

23  Q.   You see we went through these yesterday where you

24  have -- where there appear to be notary stamps dated August

25  26, 1999.

Page 2672

1   A.   Right.

2   Q.   And you understood that, by going to this notary with

3   these drawings that we went through yesterday, that all you

4   were proving by that was that the drawings existed as of

5   August 1999; right?

6   A.   I think that's what I remember.

7   Q.   And that's another method you could use to prove you

8   created something as of a certain date.  You could go to a

9   notary and have the notary notarize the documents as of a

10  certain date; right?

11  A.   I think so, yes.

12  Q.   And that's actually a method you decided to use in

13  August of 1999 so you could show that you had created these

14  documents at least as of August of '99; right?

15  A.   I think that was my reasoning.

16  Q.   The woman you went to, could you tell us her name?  The

17  notary?

18  A.   Her name was Ramona Prince.

19  Q.   Now, you knew Ms. Prince from Mattel; correct?

20  A.   Correct.

21  Q.   Would you say you were friends?

22  A.   We were casual acquaintances.

23  Q.   Was she an official Mattel notary?

24  A.   I don't know.

25  Q.   You were talking to her, and you learned at one point

Page 2673

1   that she was a notary?

2   A.   Yes.

3   Q.   It wasn't that you saw her at Mattel officially

4   notarizing documents or anything like that.

5   A.   I don't remember her doing anything like that.

6   Q.   So it basically came up in casual conversation that she

7   mentioned to you that she was a notary; right?

8   A.   I think so, yes.

9   Q.   And when you had these documents notarized on August 26,

10  1999, did you have that done at the Mattel design center

11  where you worked?

12  A.   No.

13  Q.   You actually went to Ms. Prince's home to have these

14  documents notarized; correct?

15  A.   Yes.

16  Q.   And you had been to her residence more than once; right?

17  A.   Not that I can remember.

18          MR. PRICE:   If we could play from Mr. Bryant's

19  deposition transcript, page 692, line 25, to 693, line 7.

20  This is volume 3.

21          MR. NOLAN:   No objection.

22          THE COURT:   You may proceed.

23          WHEREUPON THE VIDEOTAPED DEPOSITION

24          EXCERPT OF CARTER BRYANT, AS PROVIDED

25          BY COUNSEL, ARE INCORPORATED HEREIN.

Page 2674

1           "QUESTION:  Ramona Prince.

2           "ANSWER:  Yes.

3           "QUESTION:  Where did they she live at the

4      time she notarized those things for you?

5           "ANSWER:  I believe she lived in Hawthorne,

6      California.

7           "QUESTION:  Had you been to her residence on

8      more than one occasion?

9           "ANSWER:  I think I had, actually, yes."

10     Q.   BY MR. PRICE:  Now, when you went to Ms. Prince's home

11     in Hawthorne, how far was that from where you lived?

12     A.   Oh, I'm not sure of the miles, but it was maybe 15

13     minutes or so.

14     Q.   And when you went to her, she had a notary book;

15     correct?

16     A.   Yes.

17     Q.   And I'd like to show you what we'll mark as Exhibit 60

18     for identification.

19          May I approach with the original, your Honor?

20          THE COURT:  You may.

21          MR. PRICE:  And hopefully, copies are right behind

22     me.

23     Q.   Do you recognize that as Mrs. Prince's notary book?

24     A.   Well --

25     Q.   You need to probably open it up first.

1   A.   Well, it looks like she's made some entries in here.

2            THE COURT:  Do you have a copy for the Court?

3            MR. NOLAN:  Your Honor, I don't know if Mr. Bryant

4   can lay the foundation.  We have no objection to this being

5   offered into evidence.

6            THE COURT:  Mr. Price?

7            MR. PRICE:  In that case, offer it in evidence,

8   your Honor.

9            THE COURT:  It's admitted.

10           (Exhibit 60 received.)

11           THE COURT:  You may publish.

12  Q.   BY MR. PRICE:  And if you could look at the date, August

13  26, 1999.

14  A.   Okay.

15  Q.   Do you see that there's an entry acknowledgment?

16  A.   Yes.

17  Q.   And there's your name, Carter Bryant?

18  A.   Yes.

19  Q.   And if we could put -- it's page 19.  It's kind of hard

20  to see the date here in the copy, August 26, 1999.

21           Do you see that?

22  A.   Yes.

23  Q.   And there it says original sketches of -- can you read

24  that for us?  Is it easier in the original?

25  A.   I think it says original sketches of doll idea

Page 2676

1    characters, six total.  Names are Zoe, Lupe, Hallidae, Jade,

2    two males from 1998.  I think that says Missouri.

3              MR. PRICE:  Your Honor, actually could we publish

4    the original to the jury?

5              MR. NOLAN:  No objection, your Honor.

6              THE COURT:  You may.

7              MR. PRICE:  It looks like at the top it says page

8    11.

9              THE COURT:  You just want that page published to

10   the jury?

11             MR. PRICE:  Yes.

12             THE COURT:  You want it passed around?

13             MR. PRICE:  Yes, it looks like that's what we're

14   doing now.

15   Q.   You'll notice there appear to be some holes in the ink

16   there.

17             Do you see that?

18   A.   Yes.

19   Q.   You understand that was some samples taken for this

20   case?

21   A.   Yes.

22   Q.   And what you've got with Ms. Prince, what is put down

23   here is what you requested that she write down; correct?

24   A.   Yes, to the best of my recollection.

25   Q.   And would you agree that this last line here, the first

Page 2677

1    four lines appear to be fairly equally spaced?

2            Do you see that?

3    A.   Well, it looks like she started writing awfully big and

4    then started running out of room.

5    Q.   The first four lines appear to have the same size and be

6    equally spaced.   Would you agree with that?

7    A.   No.

8    Q.   Would you agree that the last line appears to be

9    fairly -- it's going to be smaller than the other lines?

10   A.   Yes.

11   Q.   Kind of scrunched in; right?   It's not a technical term.

12   A.   Like I said, it looks like she started writing bigger

13   than she thought she was going to need to and ran out of

14   room.

15   Q.   The last line, the line that is tinier than the rest,

16   that's the one that says from 1998, Missouri; is that right?

17   A.   Yes.

18   Q.   You knew that having these drawings notarized in August

19   of 1999 could in no way prove that they were done in 1998;

20   right?

21   A.    I don't know if I had that understanding or not.

22   Q.   Well, you understand all that the notary can say is that

23   she saw those documents on the day she notarized the

24   documents; right?

25   A.   Right.

1    Q.   And that the notary wasn't saying oh, these documents

2    were done in 1998.  You understood that.

3    A.   I mean, I seem to remember what I told her was when they

4    were created, and that's what she put into the -- into the

5    book.

6    Q.   Exactly.  She put this into the book because you told

7    her to put that into the book.

8    A.   Yes.

9    Q.   But you understood, as someone familiar with copyrights

10   and poor man's copyrights and notaries, that all the

11   notarization on these drawings would prove is those drawings

12   were in existence as of August 26, 1999; right?

13   A.   Well, I think, yeah, I generally understood that.

14   Q.   In fact, you testified that's the reason you wanted them

15   notarized at that point, because you were about to send them

16   to Alaska Mama; right?

17   A.   Yes.

18   Q.   And you wanted to establish that they existed on August

19   26, 1999, before someone else saw them; right?

20   A.   Yes.

21   Q.   And are you aware of any of your drawings, any of them,

22   which you claim were done in 1998, that have a date on them

23   of 1998 where that date was put on them in 1998?

24   A.   I'm not sure.

25   Q.   Sitting here today, you can't think of a single drawing

Page 2679

1   that you claim you created in 1998 where you put a date of

2   1998 on it contemporaneously, that is, in 1998?

3   A.   I can't think of anything right offhand, but in doing

4   random sketches, I didn't really have a practice of

5   necessarily dating them.

6   Q.   You are aware this lawsuit was filed in April 2004;

7   correct?

8   A.   Yes.

9   Q.   And I think as of the time that you lawsuit was filed

10  and during the summer of 2004, you had a laptop computer?

11  A.   Yes.

12  Q.   It's a computer which you had bought in 2001; is that

13  right?

14  A.   It was either 2001 or early 2002.

15  Q.   Let me just see if I can refresh your recollection

16  rather than play it.  If you'd look at volume 4 of your

17  deposition.  It's dated January 23, 2008.

18  A.   Okay.

19  Q.   Page 749, lines 2 to 4.

20  A.   Okay.  Which lines?

21  Q.   Lines 2 to 4.

22  A.   Okay.

23  Q.   2, 3, and 4.

24  A.   Okay.

25  Q.   Does that refresh your recollection that this laptop

Page 2680

1    that you bought was in 2001?

2    A.   Well, as I said here in my deposition, that was the best

3    of my recollection, that it was bought in 2001.

4    Q.   And this laptop which you to your best recollection had

5    bought in 2001, from time to time you did Bratz work on it?

6    A.   Yes.

7    Q.   And you understood that once this lawsuit was filed in

8    April of 2004, that you were to preserve, that is, to keep

9    everything that you had relating to Bratz; correct?

10   A.   Yes, I think I basically understood that.

11   Q.   And in fact you filed a declaration under penalty of

12   perjury where you said that since the outset of this

13   litigation, that you sought to retain everything in your

14   possession that relates to Bratz or your employment at Mattel

15   or your work as an independent contractor for MGA.

16   A.   Yes.

17   Q.   Now, at some point, after the suit was filed, you began

18   discussing with your lawyers the fact that they would come

19   and collect documents from you for this lawsuit; right?

20   A.   Yes.

21   Q.   And you knew it was important to preserve the evidence

22   that you had; correct?

23   A.   Yes.

24   Q.   I mean, you knew this evidence might be relevant for,

25   for example, a trial in front of a jury; right?

Page 2681

1    A.    Right.

2    Q.    And so your lawyers actually visited you in May of 2004

3    in Missouri; right?

4    A.    Yes.

5    Q.    And they collected a bunch of documents?

6    A.    Yes.

7    Q.    And at some point your lawyers and you began discussing

8    the fact that you had this laptop computer that you had used

9    for some Bratz work; right?

10         MS. ANDERSON:   Objection, your Honor.   Regarding

11   privilege and discussions with lawyers.

12         THE COURT:   Sustained.   Counsel, avoid discussions

13   concerning privilege and communications with lawyers.

14   Q.    BY MR. PRICE:   At some point you learned that your

15   laptop was going to be imaged for this lawsuit; correct?

16   A.    Yes.

17   Q.    That is, you had an idea generally what computer imaging

18   was; right?

19   A.    I mean, I think -- I guess a very limited general idea.

20   Q.    That technicians were going to come to your house and

21   make copies of the hard drive in your laptop so that it could

22   be preserved and searched for evidence relating to this case.

23   A.    Right.

24   Q.    And you knew, in advance of the time that the laptop was

25   going to be imaged, that someone was going to be coming out

Page 2682

1   and imaging it.

2   A.   Yes.

3   Q.   It wasn't a surprise knock on the door.  You knew ahead

4   of time that someone was being sent out to look at your 2001

5   laptop and do an image of what was on the hard drive.

6   A.   Right.

7   Q.   And the hard drive was in fact imaged by technicians

8   around July 14th of 2004; right?

9   A.   I don't recall the exact date, but it was sometime in

10   2004.

11   Q.   Do you recall that it was in July of 2004?

12   A.   I don't remember the exact date.

13   Q.   The imaging was done at your home in Missouri; correct?

14   A.   Yes.

15   Q.   And you were there for at least part of it?

16   A.   I was at the house when they were doing this, yes.

17   Q.   Now, I'd like you -- I know you don't recall the exact

18   date.  But I'd like you to focus on the two days or so before

19   the computer technicians came to image your laptop for this

20   lawsuit.  Okay?  In that time period, just two days before

21   that imaging was to be done to preserve evidence for this

22   lawsuit, a program called Evidence Eliminator was run on your

23   laptop; isn't that right?

24   A.   You know, I guess it was.  I don't remember anything

25   about that being run.  I have no knowledge of it being run.

Page 2683

1  Q.   When you say you guess it was, you know that a couple of

2  experts hired by both sides have determined that?

3  A.   Yes.

4  Q.   And you are familiar with this computer program called

5  Evidence Eliminator; right?

6  A.   Yes, sort of.

7  Q.   Well, you learned about it on the Internet; right?

8  A.   Yes, I think I got like a pop-up ad or something that

9  advertised it.

10  Q.   And what you did is you went onto the website that had

11  Evidence Eliminator; right?

12  A.   Yes.

13  Q.   And you looked at the Evidence Eliminator website;

14  correct?

15  A.   Yes.

16  Q.   You read through it to find out what is this thing which

17  is called Evidence Eliminator; right?

18  A.   I didn't really read it very thoroughly.  But I did, you

19  know, kind of glance through it.

20  Q.   Well, had you some idea of what it did just by its name,

21  Evidence Eliminator; right?

22  A.   Yeah, I mean, I had some kind of an idea.

23  Q.   And it was a program which you downloaded; right?

24  A.   Yes.

25  Q.   And you had to pay to buy that program; right?

Page 2684

1          MR. NOLAN:  Your Honor, objection.  Foundation.

2   Temporal foundation.

3          THE COURT:  Sustained.

4   Q.   BY MR. PRICE:  Well, let's talk about when you first

5   downloaded the program.  Okay?  When you first downloaded

6   this Evidence Eliminator, was that in 2002?

7   A.   I believe so, yes.

8   Q.   Now, at that time frame, were you having discussions

9   with Mr. Larian about Mattel?

10  A.   I might have been.  I don't recall.

11  Q.   Did he share with you his view that there were rumors

12  that Mattel was going to sue about Bratz?

13  A.   It's possible, but I don't remember hearing -- I don't

14  remember that.

15  Q.   So in any event, you downloaded this program Evidence

16  Eliminator in about 2002; right?

17  A.   Right.

18  Q.   Now, the way this works is once you download it, you

19  actually have to activate the program to make it work; right?

20  A.   I seem to recall that, yes.

21  Q.   That is, just having it downloaded doesn't mean it's

22  going to do what it's supposed to do unless you push a

23  button; right?  Or an icon.

24  A.   Yeah, I don't remember exactly how it worked.

25  Q.   Well, you recall there's something called the safe

Page 2685

1   shutdown mode?

2   A.   Yes.

3   Q.   And normally when you turn off your computer, you use

4   regular logging off or whatever; right?

5   A.   Are you talking about then or now?

6   Q.   I'm talking about, let's say, in 2004.

7   A.   I don't remember exactly how you normally did it, but I

8   know the safe shutdown took a long time.

9   Q.   That is, if you actually wanted to run this Evidence

10  Eliminator, you had to press this button called safe

11  shutdown; right?

12  A.   I think so.

13  Q.   And from 2002 to 2004, you didn't use this Evidence

14  Eliminator frequently; right?

15  A.   No.

16  Q.   You didn't often push this safe shutdown feature; right?

17  A.   No, just occasionally.

18  Q.   But you did use it two days before you knew people were

19  coming to your house to image your computer to collect

20  evidence for this case.

21  A.   You know, that's possible.  I just don't remember doing

22  it.

23  Q.   Well, let's talk about your knowledge of Evidence

24  Eliminator.  You said that you went to the website; right?

25  A.   Yes.

1  Q.   And in addition to reading what was on the website, once

2  Evidence Eliminator was downloaded, there were files that

3  kind of guided you through how to use it; correct?

4  A.   I don't remember exactly.

5  Q.   I mean, you recall something called a Help Me file which

6  kind of told you what it was that Evidence Eliminator would

7  do when you pushed that button for a safe shutdown?

8  A.   I don't remember that file.

9  Q.   Well, you recall that one thing Evidence Eliminator did

10  or would do is it would delete information from your computer

11  as the name suggests.

12           MR. NOLAN:   Objection.   Lack of foundation.

13           MR. PRICE:   It's a leading question.

14           THE COURT:   Overruled.   You may answer the

15  question.

16           THE WITNESS:   I'm sorry.   Can you ask me again?

17  Q.   BY MR. PRICE:   One thing you knew was that, when you

18  pushed the safe shutdown feature, that Evidence Eliminator

19  would delete information from your computer.

20  A.   Well, what I remember thinking that it was doing in safe

21  shutdown was basically kind of going through my Internet

22  search histories and things like that.

23  Q.   Was it your understanding that Evidence Eliminator

24  permanently erases computer files which you have selected for

25  deletion?

Page 2687

1    A.    No, I don't think I knew that at the time.

2    Q.    Was it your understanding that Evidence Eliminator

3    overrided deleted files on your hard drive so that they could

4    not be recovered by computer experts?

5    A.    Well, you know, I'm not a computer expert either or a,

6    you know, program expert.  So I didn't really know everything

7    that Evidence Eliminator did.

8    Q.    Was it the name that attracted you to the program,

9    Evidence Eliminator?

10   A.    Well, I mean, I had kind of been thinking about finding

11   some sort of program that would help my computer run faster,

12   that would help maybe, you know, erase my Internet search

13   history, block pop-ups.

14   Q.    Well, there are free programs that do that; right?  That

15   block pop-ups?

16   A.    I don't know.  Are there?

17   Q.    Well, you had them running on your computer, didn't you?

18   A.    What?  Free programs to block pop-ups?

19   Q.    Yes.

20   A.    I have no idea.  I'm very, very limited in my computer

21   knowledge.

22   Q.    Well, let's talk about your experience with Evidence

23   Eliminator prior to when it was run before the technicians

24   came out.

25              From 2002 to 2004, you don't remember if running

Page 2688

1    Evidence Eliminator helped with pop-ups; right?

2    A.    Well, not sitting here today, I can't remember if it did

3    or not.

4    Q.    And you don't remember whether Evidence Eliminator

5    helped you run your computer any faster?

6    A.    I don't know.  I don't know that it did or not.

7    Q.    And so when someone, two days before your computer was

8    to be imaged, pushed the safe shutdown on eliminator -- on

9    Evidence Eliminator -- let me rephrase that.

10           Two days before your computer drive was to be

11   imaged, you did not believe that Evidence Eliminator assisted

12   you in blocking pop-ups or made your computer run any faster,

13   did you?

14   A.    I can't recall if I believed that or not.

15   Q.    In fact, you had on your laptop a program you had paid

16   for called Spyware; right?

17   A.    I don't remember if I did or not.

18   Q.    I'm sorry.  I mispronounced it, and that could have been

19   misleading or confusing.

20           You had on your computer a program called Spy

21   Hunter, which you had downloaded and paid for?

22   A.    I don't remember that program.

23   Q.    You remember a program you had purchased that was

24   specifically designed to block pop-up ads?

25   A.    No, I don't.

Page 2689

1    Q.   You actually used Spy Hunter, this program, to set what

2    sites you wanted to block and what sites you didn't want to

3    block; is that right?

4    A.   I have no recollection of that.

5    Q.   So as of two days before your computer was to be imaged,

6    since you don't recall believing that Evidence Eliminator

7    made your computer faster or Evidence Eliminator blocked

8    pop-ups, why would you push that safe shutdown mode?

9    A.   I don't know that I did.  I can't remember doing it.  I

10   have no idea.  I have absolutely no recollection of running

11   Evidence Eliminator at that time.

12   Q.   It's fair to say that if you had nothing to hide on that

13   computer, you would not have pushed that button, safe

14   shutdown, for Evidence Eliminator; right?

15   A.   I'm sorry.  What was the question?

16   Q.   It's safe to say that if you didn't have evidence that

17   you wanted eliminated, that you wanted to hide, that you

18   wouldn't have press the safe shutdown button two days before

19   your hard drive was going to be imaged to collect evidence

20   for this case?

21            MR. NOLAN:  Your Honor, objection.  Lack of

22   foundation.  Also argumentative.

23            THE COURT:  Argumentative.  Sustained.

24            MR. NOLAN:  Your Honor, there was an instruction

25   that we discussed.

Page 2690

1          THE COURT:  Let's go to sidebar for a moment,

2     counsel.

3               (SIDEBAR CONFERENCE HELD.)

4          THE COURT:  You're correct.  The Court was going to

5     entertain suggestions on what instruction.

6          MR. NOLAN:  I think we submitted something to you.

7          THE COURT:  In the order?

8          MS. AGUIAR:  No, I think in the proposed order

9     ruling on the Motion in Limine 13, I think there's a

10    paragraph at the end.

11         THE COURT:  One second.

12         MR. ZELLER:  I assume we signed off on this filing?

13         MS. AGUIAR:  We jointly submitted it.

14         THE COURT:  It was jointly submitted.  Very good.

15    It says joint.  So I am assuming it's joint.

16         MR. ZELLER:  I assume so as well.

17         THE COURT:  Fair enough.  I will read that.

18         MR. NOLAN:  We've been in this area for a while,

19    and I was waiting for him to make the argumentative question

20    before the instruction.

21         THE COURT:  Very well.  It would be an appropriate

22    time to do it.

23              (CONCLUSION OF SIDEBAR CONFERENCE.)

24         THE COURT:  Members of the jury, this is probably

25    an appropriate time to instruct you on this testimony

Page 2691

1   concerning Evidence Eliminator.  The Court instructs you that

2   this evidence that you have heard and are hearing may only be

3   considered for purposes of evaluating Mr. Bryant's

4   credibility and his consciousness of guilt, and that there is

5   no evidence that any of the MGA parties had any connection

6   with Mr. Bryant's purchase, installation, or use of Evidence

7   Eliminator.

8           Counsel, you may proceed.

9           MR. PRICE:  Thank you.

10  Q.   Mr. Bryant, may I ask you to assume that both sides'

11  experts in this case are correct, in that Evidence Eliminator

12  safe shutdown mode was used two days before your computer was

13  imaged?  Assuming that?

14  A.   Yes.

15  Q.   Who else would have done it besides you?

16  A.   Again, I am totally in the dark on this.  I'm not saying

17  that it couldn't have been me.  I just have no recollection

18  of doing it.

19  Q.   Previously under oath you suggested maybe your

20  housekeeper did it; right?

21  A.   It could have been.  You know, other people did have

22  access to my computer.

23  Q.   Your computer, though, you have testified was password

24  protected?

25  A.   Yes, but, you know, some of the other people that I know

1    are a lot more computer literate than I am, and they know how

2    to create their own passwords to get on the computer.

3    Q.    So it's possible that your housekeeper is more computer

4    literate than you and found out some way to break your

5    password code?

6                MR. NOLAN:   Objection, your Honor.   Argumentative.

7                THE COURT:   Sustained.

8    Q.    BY MR. PRICE:   You said that you believed it could have

9    been your housekeeper.   Do you honestly believe that she

10   could have entered your computer and bypassed your passwords?

11   A.    She's a lot more computer literate than I am.   Actually,

12   most everyone is.

13   Q.    Since you were buying this program Evidence Eliminator,

14   I take it you would have had to rely on the literature to

15   figure out, you know, what it did, to see whether or not it

16   was worth buying.

17   A.    I just remember, you know, the ad coming up on the

18   computer screen for this program, and after -- I didn't read

19   it really carefully, but what I thought it did was to help

20   Internet run faster.   I thought it would help, you know,

21   erase, you know, Internet searches, Internet history

22   searches, block pop-ups, you know.   I didn't want things

23   like, you know, adult content coming up on my computer when

24   kids are around or anything like that.

25   Q.    Well, actually, so in order to get an idea of whether or

1   not you want to buy it, since you weren't computer literate,

2   you had to read what the website said about why someone

3   should spend money to buy Evidence Eliminator; right?

4   A.   Yeah, I read some of it.

5   Q.   And do you recall everything that was on the website?

6   A.   No.

7   Q.   Might it help your recollection if I showed you some

8   screen shots of the current website?  Might it refresh your

9   recollection of the sorts of things you saw when you were

10  looking at Evidence Eliminator and deciding to purchase it?

11          MR. NOLAN:  Objection, your Honor.  Lack of

12  foundation.

13          THE COURT:  It is a foundational question.

14          THE WITNESS:  It might.  Again, you know, I bought

15  that program in 2002.  So I don't remember a whole lot about

16  what I actually saw.

17  Q.   BY MR. PRICE:  Let's see if it does, then.  I'll place

18  before you what we'll mark as 13629, which we'll mark for

19  identification.

20          I may have misspoken.  My understanding is this

21  actually is from 2002.  But if it doesn't refresh your

22  memory, that's fine.  Why don't you look at it, and I'll see

23  if your memory is refreshed.  Just kind of flip through it.

24  A.   I kind of recollect this phrase, it says defend

25  yourself.  Make your Internet access safer.  Get yourself a

1   truly clean and faster like new PC.  Get Evidence Eliminator

2   and be safe.  Do your children or friends use computers?

3   What have they downloaded and tried to delete?  Get total

4   protection now.  If you do not use Evidence Eliminator, your

5   PC is a ticking time bomb waiting to go off.

6           I mean, those might have been some of the things

7   that, you know, made me think it was a worthy program.

8   Q.   Did you have the understanding, after looking at the web

9   page, that Evidence Eliminator was proven to defeat the

10  forensic software that was used by the U.S. Secret Service,

11  the Customs department, and the Los Angeles Police

12  Department?

13  A.   I don't remember ever knowing that.

14  Q.   Did you know from reading this, did you have the

15  understanding --

16           MR. NOLAN:  Your Honor, I'm going to object to

17  Mr. Price reading from a document that's not in evidence.

18           THE COURT:  Counsel, I don't think he indicated

19  that he was reading from the document.  Overruled.

20  Q.   BY MR. PRICE:  After reading the web page, did you have

21  an understanding that Evidence Eliminator used the same

22  techniques for eliminating evidence that the government used

23  to get rid of classified material?

24  A.   No --

25           MR. NOLAN:  Lack of foundation.  Assumes facts not

Page 2695

1    in evidence, your Honor.

2              THE WITNESS:  No.

3              THE COURT:  Overruled.  You may answer.  You did

4    answer.

5              THE WITNESS:  Right.  No.

6    Q.   BY MR. PRICE:  When you read this web page, after

7    reading it, did you have the understanding that Evidence

8    Eliminator would defeat certain types of programs that were

9    designed to collect data from your computer to be used as

10   evidence?

11   A.   Well, I think maybe I had a partial understanding of

12   what you're talking about, but I thought it would be more

13   like for, you know, things like sending, you know, cookies

14   and spam and things like that.

15   Q.   In reading the Evidence Eliminator ad, did you have the

16   understanding that if you just deleted files from your

17   computer without using Evidence Eliminator, that that

18   wouldn't really get rid of what you were trying to get rid

19   of, that someone could recover that if they ever imaged your

20   computer?

21   A.   You know, I don't know that I have that understanding.

22   Q.   I think you told us that you're not a technical person

23   when it comes to computers?

24   A.   That's totally correct.

25   Q.   Did you think, after reading the Evidence Eliminator web

Page 2696

1   page, that this software did what its name implies, which it

2   will eliminate evidence if someone copies your hard drive?

3   A.   Well, I don't know.  Like I said, I read the

4   information.  You know, understood it the best I could, put

5   it on my computer, and I don't really think I thought about

6   it too much after that.

7   Q.   Well, when you installed it on your computer, you

8   actually have to select, or you can select options to make it

9   even more efficient in eliminating data from your computer;

10  right?

11          MR. NOLAN:  Objection.  Lack of foundation.

12          THE COURT:  Ask it differently, Counsel.  Rephrase

13  your question.

14          MR. PRICE:  Sure.

15  Q.   When you downloaded Evidence Eliminator, it walked you

16  through steps to install it; correct?

17  A.   I think so.

18  Q.   And one of the things, is it true that one of the things

19  it asked you to do is select options as to how much, what

20  kind of data you wanted eliminated when you pushed that safe

21  shutdown mode?

22  A.   That I don't remember.

23  Q.   So you don't recall selecting one option over others?

24  A.   No.

25  Q.   Now, you also -- let me ask you this:  Have you heard of

14b72d71-1008-4256-86a8-8a62a239a6d1

Page 2697

1    something called defragging?

2    A.   I've heard the term, yes.

3    Q.   Are you aware of when something like Evidence Eliminator

4    deletes files from a hard drive, there are gaps where that

5    data used to be located so you can tell where something has

6    been erased?

7              MR. NOLAN:   Objection, your Honor.   Lack of

8    foundation.   And also assumes facts not in evidence.

9              THE COURT:   It does, as phrased.

10   Q.   BY MR. PRICE:   Did you have an understanding that

11   without doing something called defragging, that if you use an

12   Evidence Eliminator program to eliminate data, that you can

13   determine that data has in fact been eliminated?

14   A.   I don't know.   I'm sorry.   I didn't understand one thing

15   about what you just asked me.

16   Q.   Okay.   That's fair enough.   Right after you ran that --

17   right after someone pushed that safe shutdown mode two days

18   before technicians were to arrive to copy the hard disk,

19   didn't you run a defragging program so that no one could

20   tell?

21   A.   I don't recall ever running a defragging program.

22   Q.   Are you aware of anyone else who might have run such a

23   program on your computer just a couple days before your

24   computer was to be retrieved and imaged so that evidence

25   could be collected for this case?

1    A.    Well, I think Richard Irmen sometimes would run some

2    sort of defragging program.

3    Q.    Now, he is your partner?

4    A.    Yes.

5    Q.    And you are aware of his testimony on this topic?

6    A.    No, I haven't read his testimony.

7    Q.    You don't think your housekeeper would have done that;

8    correct?

9    A.    I can't say it's not possible.  But I don't know why she

10   would have done that.

11            MR. PRICE:  Your Honor, is this a good time to

12   break?

13            THE COURT:  Very well, yes.  Why don't we adjourn

14   for the day.

15            Ladies and gentlemen, I'll see you on Tuesday.  I

16   know you've heard it many times, but just a reminder, don't

17   discuss the case.  Don't read anything about this case in the

18   press.  Don't listen to anything on the television or radio.

19   Just think of other things and do other things this weekend.

20   Enjoy it, and I'll see you Tuesday morning at 9:00.

21            (WHEREUPON THE JURY WITHDRAWS.)

22            THE COURT:  Please be seated.  Mr. Price, how much

23   longer do you anticipate with this witness?

24            MR. PRICE:  My guess would be a half an hour.  It's

25   a guess.

Page 2699

1        THE COURT:  And additional witnesses on Tuesday and

2   Wednesday?

3        MR. QUINN:  Your Honor, we would request permission

4   to call Mr. Menz, the expert on these issues, in view of the

5   witness's testimony after he steps down.

6        THE COURT:  And then?

7        MR. QUINN:  And then we would call Mr. Cunningham,

8   who is a questioned document examiner, and Mr. Aginsky.

9        MR. ZELLER:  Mr. Flynn, however, after --

10        MR. QUINN:  Mr. Flynn in between Cunningham and

11   Aginsky.

12        MR. PRICE:  And I think Mr. Nolan has told me that

13   he may go several hours with Mr. Bryant.  So I kind of doubt

14   we'll get through more than one additional witness on

15   Tuesday, if that.

16        THE COURT:  Very well.  None of these are on the

17   list of witnesses that we need to conduct a Daubert hearing

18   for.

19        MR. QUINN:  I think that's right, your Honor.

20        THE COURT:  All right.  That will take us through

21   Tuesday and Wednesday.  As I indicated, Thursday we'll be

22   dark, which I guess I don't need to translate for you, and

23   then we'll have a full day on Friday.

24        Anything else from Mattel before I turn to MGA?

25        MR. QUINN:  The one thing we didn't get, your

1   Honor, was the different versions of the potential

2   instruction regarding that case.  We just -- we've exchanged

3   different versions.  We don't have an agreement.  So we're

4   going to have to present it to the Court on Tuesday.

5              THE COURT:  That's fine.

6              MR. ZELLER:  And we haven't received an answer yet

7   in terms of Mr. Marlow's availability.

8              THE COURT:  I trust we should have one now.

9   Mr. McFarland.

10             MR. McFARLAND:  I'm here.

11             THE COURT:  Mr. Price has been kind of monopolizing

12   the lectern.

13             MR. McFARLAND:  He seemed busy.

14             THE COURT:  Yes.

15             MR. McFARLAND:  So shame on me.  I forgot.  I did

16   talk to Mr. Marlow.  Sunday is Father's Day.  I had forgotten

17   that.  He's very, very tight on Saturday.  What I did

18   convince him to do is to move his appointments and push it

19   back to 1:00 on Monday.  And they went look, I don't know,

20   the record is what it is.  They went almost seven hours the

21   first time.  I thought it would be helpful if we could reach

22   an agreement on how much time they think they need, and I

23   think starting at 1:00 should allow plenty of time to do it,

24   and he'll stay.  Whatever needs to be done, he'll stay.

25             THE COURT:  Very well.  Let me hear from Mr. Zeller

1    on that point.

2            MR. ZELLER:  I appreciate one o'clock.  I think

3    that is doable and gives us more time.  While I do not have

4    the exact time count for Mr. Marlow's deposition, given the

5    number of times he invoked the Fifth Amendment, that

6    obviously used up a considerable amount of time.  We don't

7    know what follow-up questions are going to be necessary.  I

8    mean, in all frankness, your Honor, I would be surprised if

9    it took another seven hours.

10           But on the other hand, we do not know his answers.

11   And we were closed off from, you know, substantial areas of

12   inquiry and not be able to have that kind of follow-up.  So

13   while I certainly want to be respectful of his time, it's

14   very difficult for us to estimate and say we will be done in

15   two hours or we will be done in three.

16           I think in fairness, particularly given what's

17   happened here, and perhaps the deposition will ultimately

18   resolve these issues, I do think in fairness that putting

19   some sort of time limitation on it in advance without us

20   knowing that much, it would put us in somewhat of a difficult

21   position.

22           THE COURT:  Well, I gather -- if you start at one

23   o'clock, I gather you will move as expeditiously as you can,

24   and Mr. McFarland will be as accommodating as he can, and I

25   gather none of you will call me at home on Monday night to

Page 2702

1   tell me there's a dispute on his deposition.

2           MR. ZELLER:  I think that's fair to say.

3           THE COURT:  Very well.

4           MR. ZELLER:  And could we get a time count?

5           THE COURT:  I wish I could give you a better time

6   count.  I have an accurate time count on MGA, but there was

7   some time yesterday afternoon that unfortunately got erased

8   on Mattel's side, and we're working on that, and we'll have

9   that on Tuesday.

10          What I have definitely accounted for on Mattel is

11  right at 30 1/2 hours, but it's more than that.  That's

12  probably another four or five hours in addition to that, but

13  I will get that from the court reporter.

14          It was 26 hours and 15 minutes at the end of the

15  day on Wednesday.  And what I have to do is -- and I have the

16  time fully for today, but it was yesterday's time that has to

17  be added to that.  By it's 30 1/2 hours as we stand right

18  now.  And for MGA, it stands at 17 hours.

19          MR. ZELLER:  Thank you.

20          THE COURT:  That's according to my calculations,

21  but ultimately I'll be able to have the -- the court

22  reporters have time stamps and all.  But we're going by this

23  clock here.

24          MR. NOLAN:  Your Honor, this will be really brief

25  on this.  A question -- I think we're getting, at least we're

Page 2703

1    turning the corner and hopefully getting to the end of the

2    case.  Either that or they are going to run out of hours.

3            My point is with our scheduling, there's a question

4    as to whether or not the statute of limitations issue, which

5    is alive for the contract claims, based on the summary

6    judgment motion or the ruling, rather, that came in after we

7    started trial.

8            My understanding is that that evidence can be

9    introduced in Phase 1-A, or is that 1-B?  Just from a

10   scheduling point of view.  And I'm not asking you to rule

11   right now.  If you want to think about it.  We're just trying

12   to schedule our witnesses.

13           THE COURT:  Let me think about that and get back to

14   you, Counsel.  I don't want that to be -- I don't want

15   allowing that to be introduced in 1-A to somehow open the

16   door for evidence that should stay in 1-B.  So let me think

17   that through.  I'm not suggesting that that's what you're

18   trying to do.  It's the unintended consequences of a decision

19   that I want to think through as best I can.  I'll address

20   that Tuesday morning.

21           MR. NOLAN:  Okay.  Great.

22           Anything else from MGA?  Ms. Aguiar?

23           MS. AGUIAR:  Your clerk, Mr. Holmes, was nice

24   enough earlier today to start talking about some scheduling

25   issues with us in terms of days that the Court is dark.  And

14b72d71-1008-4256-86a8-8a62a239a6d1

Page 2704

1    Mattel indicated that they may be done presenting their case,

2    again, nothing committed, just intending Tuesday, Wednesday

3    of next week.  And if we would then --

4              THE COURT:  You mean Tuesday and Wednesday the

5    following week?

6              MS. AGUIAR:  No, of next week.

7              THE COURT:  Great.

8              MR. QUINN:  It's not looking like Tuesday, I will

9    say.

10             THE COURT:  More like Wednesday.  All right.

11             MS. AGUIAR:  And there was an indication of which

12   days your Honor -- the Court will be dark.

13             THE COURT:  We'll be dark on Thursday, the 19th.

14             MS. AGUIAR:  And then looking into the next week or

15   two in terms of planning for witnesses who are out of town

16   and counsel, I'm wondering if we can get some indication --

17             THE COURT:  Yes, the other dates this month that

18   the Court is going to be dark is then the last three -- the

19   last three days -- the week of the 23rd we're only going to

20   have court one day.  The Court is going to be attending a

21   Ninth Circuit matter up in Anchorage on the 25th, 26th, and

22   27th.

23             So the only full day we'll have will be a full day

24   the 24th.  And then the week of June 30th, which actually is

25   July 1st, 2nd, and 3rd.  The 4th is a federal holiday.  And I

Page 2705

1   would anticipate at that point in time, that that would

2   probably be one, two, three, four, five days for MGA, I

3   presume, we'll be pretty close to wrapping this phase of the

4   case up is what we're anticipating.

5            MR. NOLAN:  That's what we're hoping too.

6            THE COURT:  I was hoping we'd have this phase done

7   before the 4th of July, but that's -- that depends on how

8   much time you all reserve for a possible Phase 1-B.

9            MR. NOLAN:  Right now, your Honor, we'll work with

10   the schedule that you've outlined.  Thank you.

11            THE COURT:  There is a criminal trial that's

12   pushing a speedy trial clock on July 8th.  If I have to, I

13   will pick a jury on July 8th in that case and send the jury

14   home pending the conclusion of this trial.  But that's

15   something which I will take up at a pretrial conference in a

16   couple weeks.

17            I'm hoping that the parties in that case stipulate

18   to continue the criminal matter until August.  But we have

19   not received a stipulation from the defense in that.  So I

20   may have to pick a trial -- pick a jury and then continue

21   with this trial.

22            MR. NOLAN:  Assuming that we can meet the goal, and

23   I personally from trying this case want to do the same thing

24   in terms of trying to get this to the jury, does the Court

25   have any idea with respect to like charging conferences?  Is

Page 2706

1    that something we should be thinking about now?

2              THE COURT:  We should.

3              MR. NOLAN:  What is the best way to assist the

4    Court in that regard?

5              THE COURT:  It's not been out of mind.  They are

6    sitting right here to my left.

7              MR. NOLAN:  That's what I was afraid of.

8              THE COURT:  No, I see them every day.  What I'd

9    like to do is spend a Monday afternoon doing that.  Probably

10   the 23rd.  I think it's easier to do it once the plaintiff

11   has rested, and so I guess I'm inclined to say the 23rd.

12   And, I mean, we know the parameters of the plaintiff's case.

13   You can make any motions you feel are appropriate.  By that

14   point in time, you'll know for sure where we're at, and we

15   can have our charging conference.

16             MR. NOLAN:  Okay.  Thank you.

17             THE COURT:  Is that it?

18             MR. NOLAN:  Yes.

19             THE COURT:  Have a good weekend.

20

21             (Proceedings concluded at 5:15 P.M.)

22

23

24

25

Page 2707

C E R T I F I C A T E

    I hereby certify that pursuant to Title 28, Section 753 United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings in the above matter.

    Certified on June 13, 2008.

_____
MARK SCHWEITZER, CSR, RPR, CRR
Official Court Reporter
License No. 10514