Page 3033

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

---

|  |  |  |
|---|---|---|
| MATTEL, INC., | : | PAGES 3033 - 3190 |
|  | : |  |
| PLAINTIFF, | : |  |
|  | : |  |
| VS. | : | NO. ED CV04-09049-SGL |
|  | : | [CONSOLIDATED WITH |
| MGA ENTERTAINMENT, INC., | : | CV04-9059 & CV05-2727] |
| ET AL., | : |  |
|  | : |  |
| DEFENDANTS. | : |  |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

WEDNESDAY, JUNE 18, 2008

JURY TRIAL - DAY 15

AFTERNOON SESSION

MARK SCHWEITZER, CSR, RPR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
181-H ROYBAL FEDERAL BUILDING
255 EAST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012
(213) 663-3494

Page 3034

 1    Appearances of Counsel:

 2

 3    On Behalf of Mattel:

 4        Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
          By John B. Quinn, Esq.
 5            B. Dylan Proctor, Esq.
              Michael T. Zeller, Esq.
 6            Harry Olivar, Esq.
              John Corey, Esq.
 7            Diane Hutnyan, Esq.
              William Price, Esq.
 8        855 South Figueroa Street
          10th Floor
 9        Los Angeles, CA 90017
          (213) 624-7707

10

11

12    On Behalf of MGA Entertainment:

13        Skadden, Arps, Slate, Meagher & Flom LLP
          By Thomas J. Nolan, Esq.
14            Carl Alan Roth, Esq.
              Jason Russell, Esq.
15            Lauren Aguiar, Esq.
              David Hansen, Esq.
16            Matthew Sloan, Esq.
              Robert Herrington, Esq.
17        300 South Grand Avenue
          Los Angeles, CA 90071-3144
18        (213) 687-5000

19    On Behalf of Carter Bryant
          Keker & Van Nest
20        By:  Christa Anderson, Esq.
              Michael H. Page, Esq.
21        710 Sansome Street
          San Francisco, CA 94111-1704
22        (415) 391-5400

23

24

25

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3035

1                          I N D E X

2

3   CARTER BRYANT, PREVIOUSLY SWORN..................... 3047

4   CROSS-EXAMINATION (CONTINUED) ...................... 3047

5   REDIRECT EXAMINATION BY MR. PRICE:.................. 3070

6

7

8                        E X H I B I T S

9

10    (Exhibit 10016 received.)........................... 3067

11    (Exhibit 1127 received.)............................ 3116

12    (Exhibit 10756 received.)........................... 3134

13    (Exhibit 13657 received.)........................... 3136

14    (Exhibits 12150 and 12151 received.)................ 3138

15    (Exhibit 13666 received.)........................... 3143

16    (Exhibit 13667 received.)........................... 3144

17

18

19

20

21

22

23

24

25

Page 3036

1        Riverside, California; Wednesday, June 18, 2008

2                          1:22 P.M.

3        (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

4            THE COURT:  We're back on the record outside the

5    presence of the jury.  The Court had brought up these

6    objections filed by Mattel to the lodging of depositions of

7    Richard Irmen and Janet Bryant.

8            Mr. Nolan.

9            MR. NOLAN:  Yes, your Honor, and I could just walk

10   through briefly the time line.  The bottom line is we're

11   frankly surprised that they filed this in light of the

12   history of this case.

13           Your Honor, in March of this year, Mr. Keker,

14   Keker, Van Nest firm, had indicated a willingness to produce

15   Janet Bryant and Richard Irmen at trial if the case had

16   proceeded with Carter Bryant.  That was our understanding.

17           THE COURT:  To whom?

18           MR. NOLAN:  I don't know who made the

19   representation.  That was the understanding.  But

20   notwithstanding that, your Honor, my understanding is that

21   Mattel designated designations for both depositions and

22   lodged those in April.  The Keker, Van Nest firm did

23   counterdesignations for Richard and Janet.  And we joined in

24   those.

25           THE COURT:  When was that?

1          MR. NOLAN:  That was May 1st, your Honor.

2          THE COURT:  May 1st?

3          MR. NOLAN:  May 1st.  On May 14th and 15th -- I've

4   been told that the Keker, Van Nest firm had indicated that

5   they generally stated that the intention would be to call

6   them live, but that was back in March.

7          But in any event, there were designations and a

8   counterdesignation made by the Keker, Van Nest firm.  Around

9   May 14th to the 15th, we were alerted without any detail to

10  the potential for a settlement by Carter Bryant.

11         On May 16th we make affirmative designations on

12  those two depositions that basically overlap the Keker firm's

13  counters for Irmen and Janet Bryant.  Those would be the

14  counters to O'Melveny's original designations.  So that's as

15  of May 16th.

16         On May 14th, your Honor, just so that you

17  understand this, Mattel adds designations for Isaac Larian's

18  deposition beyond the date, but nobody takes issue with it.

19  Everybody is kind of scrambling getting ready for trial.  The

20  Court will note that on May 19th, Carter Bryant's settlement

21  is announced for the first time, and, in fact, your Honor,

22  I'll represent that it wasn't until that morning that we knew

23  that Carter Bryant had settled.

24         Mattel has had in its possession all of its own

25  designations, all of the counters, and the objections

b3c9772e-5038-4bea-95b5-2016fbb63c07

 1    thereto.  For the last two weeks we have been working, a team

 2    has been working back and forth on trying to clear the

 3    deposition designations.

 4             At no time am I told that anybody raised this issue

 5    that these were late.  The first notice we got was last

 6    night.  I will also represent that I am a conversation with

 7    John Quinn on Saturday, where Mr. Quinn was asking hey, in

 8    case we rest on Wednesday, who are your first witnesses, and

 9    I kind of teased him and I said gee, I think the 48-hour rule

10    is still in effect.  But I said John, heads up, what we'll

11    likely do is play three videos, and I'm looking to see

12    whether or not I said John, Richard, and Janet, but I refer

13    to three videos, and then possibly could you check on the

14    following witnesses, and Mr. Quinn and I had that exchange

15    over the weekend.

16             Your Honor, I submit that we have always been

17    operating under the assumption that these videos would be

18    played.  We did our designations in as timely of a fashion as

19    possible.  But frankly, there is no prejudice.  They have had

20    these designations and counters for well over a month now.

21    And both parties -- I'm sorry.

22             Last point, your Honor.  I think this is clear from

23    the record.  But we do not represent these witnesses.  They

24    are not within the subpoena power of this court.  And I

25    frankly do not know what the prejudice is since we've been

1   able to submit the binders that have all of the full

2   designations in a timely fashion for the Court to rule.

3           THE COURT:  Thank you, Counsel.  Anyone from Mattel

4   to speak on this?

5           MR. COREY:  Thank you, your Honor.  Just very

6   briefly, we're not talking about specific designations here.

7   What MGA did, when he -- when Carter Bryant made their

8   initial designations, they joined in certain designations,

9   including Ms. Galvano's designations that the Keker firm had

10  done.  As far as I'm aware, they did not join in either the

11  designations of either Janet Bryant or Thomas Bryant or

12  Mr. Irmen.  And that's the basis for the objection, your

13  Honor.

14          THE COURT:  Very good.  Thank you, Counsel.

15          MR. NOLAN:  Your Honor, if I could hand up to

16  the -- let me show this to Mr. Corey because with all of the

17  paper that has been filed, he may not have seen this.  And

18  one last point while we're doing this, the final pretrial

19  conference order that was submitted and approved by the Court

20  indicated that both of these witnesses would be testifying by

21  video.

22          THE COURT:  I did see that.  I did take a look at

23  that during the lunch hour.

24          MR. COREY:  Apparently they are relying on a

25  May 1st designation from the Keker firm.  MGA's name is on

Page 3040

1    it.

2            THE COURT:  It is on it.  Very well.  All right.

3    Well, given the totality of the circumstances here, Mr. Corey

4    and Mr. Nolan, I am going to overrule the general objection,

5    and let's go to the specific objections.  We'll handle these

6    in the same manner as we handled the other depositions, with

7    specific page numbers, and I'll make my rulings.  So if

8    you're prepared to do that.

9            Beginning on page 7, it's basically a restatement

10   of the objection that was filed.  And that is overruled.

11           Page 12, overruled.

12           Page 15, overruled.

13           Page 18 is overruled, as is 19.

14           Page 23 is sustained.  Page 23, lines 14 through

15   24.

16           I'll also sustain the objection on page 24, lines 5

17   through 25.

18           I'll continue to sustain the objection on all of

19   pages 25 and 26 and 27 and 28 up through line 8.  This is all

20   a discussion about Mr. Bryant possibly attending or desiring

21   to attend fashion institutes elsewhere.  I just don't find

22   that it's relevant at this point.

23           On page 29 I'm going to sustain in part and

24   overrule in part.  On page 29 I will overrule the objection

25   beginning on line 16 through line 25.  I'll sustain the

Page 3041

1    objection for the first 15 lines.

2            On page 30 I'll permit the testimony through line

3    4.  So I'm overruling from line 1 through 4.  I then sustain

4    the objection to the next question, lines 5 through 9.  I

5    will overrule the objections to lines 10 through 22,

6    sustaining the objection on lines 23 through 25.  That's on

7    page 30.

8            On page 31, I'll sustain the objections on lines 1

9    through 5.  I'll overrule the objections on lines 6 through

10   25.  That's on page 31.

11           On page 32, I'll overrule the objection on lines 1

12   through 6, sustain the objection on lines 7 through 18,

13   overrule the objections on lines 19 through 25.

14           On page 33, I will overrule the objections on lines

15   1 and 2 and lines 11 through 17.  Sustain the objection on

16   lines 18 through 20 as speculation.  I will overrule the

17   objection on lines 21 and 22.  Sustain the objection on 23

18   and 24.  Overrule the objection on line 25.

19           On page 34, I'm overruling the objection on lines 1

20   through 9.  Sustaining the objections on 10 through 13.

21   Overruling the objections on lines 14 through 25.  Although

22   lines 18 through 20, which is just a statement by deposing

23   counsel in the middle of the question are to be deleted,

24   beginning with the word "no" on line 18 and continuing, "You

25   understand I'm not suggesting you did anything wrong.  I'm

Page 3042

1    just trying to find out the mechanics of how this happened."

2    That interjection will be stricken.  But the question that

3    follows is admitted, as is the answer, continuing through

4    line 1 of page 35.

5              I'll sustain the objection on page 35, lines 8

6    through 24.  Overrule the objection on line 25, continuing on

7    to page 36.

8              There's a series of hearsay objections on this.

9    And this is Mrs. Bryant's description of the doll as being

10   cute.  It's not being admitted for the truth of the matter

11   asserted.  Whether the doll is or is not in fact cute is

12   something which I suspect there's a great degree of

13   disputation over.

14             No offense, Mr. Larian, but it's being admitted for

15   the purposes of identification essentially.  And so I will

16   instruct the jury on that point.  I'll try to do that without

17   any degree of sarcasm.  So the hearsay objections on page 36

18   are overruled through line 3 of page 37.

19             I didn't rule on this next one on 37.  Just give me

20   a minute.  This is getting cumulative at this point.  So I'm

21   going to sustain the objections on lines 13 through 25 and at

22   the top of 38, lines 1 through 18.

23             Page 39, lines 7 through 25 are overruled.

24             Objections on page 40 are overruled.

25             On 41, I'll overrule the objection on lines 4

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3043

1  through 6.  I'm going to sustain the objections on lines 7

2  through 24.  It's essentially cumulative.  We've got enough

3  of that information out from the earlier testimony.

4          Page 42, I'll overrule the objections, Mr. Zeller's

5  questioning on lines 12 through 25.

6          On page 45, sustain the objections.  That carries

7  over to 46.

8          Page 48, I will sustain the objections.

9          Page 52, I will sustain the objections.  That

10 carries over to page 53.

11         Next set of objections are on page 97.  I'll

12 sustain both sets of objections on 97 as well as 98.

13         On page 101, I'm going to overrule the objection.

14 It -- in isolation I can see the problem.  But read in the

15 context of the following questions, I think at lines 7

16 through 25 need to be read together.  And in light of that,

17 the objection is overruled.

18         I'll overrule the objection on page 102.  The focus

19 here again is on a physical act, not a communication.

20         I'll sustain the objection on 104.  And when I say

21 I overrule the objection on 102, that continues through the

22 objections of 103 and 104.  They are the same 402, 403

23 objections.  But I will sustain the objections on the bottom

24 of page 104, line 25; however, on page 105, I will permit the

25 question and answer at lines 7 through 11.

Page 3044

1          Overrule both sets of objections on 106.

2          Sustain the objections on 109.

3          Sustain the objections on 115.  Not relevant.

4          And we then skip to page 142.  The Court will

5     overrule the objections there.  It is slightly cumulative.

6     This is where we're actually getting into the drawings

7     themselves.

8          Overrule the objections on 143 and 144.

9          145, overruled.

10          146, overruled.

11          On page 147, I'll permit the questioning up to line

12     17.  After that, I'll sustain the objection on lack of

13     foundation and speculation, 602.

14          Sustain the objections to both sets on 148.

15          Sustain the objections on 149.

16          Overrule the objections on 150.

17          Again, it's not for the truth of the matter

18     asserted, at best the Court can tell.

19          Overrule the objection on 154.

20          Sustain the objection on 155.

21          MS. AGUIAR:  Your Honor, I'm sorry.

22          THE COURT:  Ms. Aguiar?

23          MS. AGUIAR:  Did we get a ruling on 151?

24          THE COURT:  Did I skip page 151?  Thank you.  Oh, I

25     did miss that.  MGA's objections.  Let me take a look.  I'll

Page 3045

1   sustain the objections there.  On both 402 and 403.  That's

2   lines 6 through 14.  Thank you, Counsel.

3           Now we skip forward to page 183.  We're almost

4   through this.  It's sustained on 183.  It's very cumulative

5   at this point.

6           186, I'll sustain it on both cumulative and

7   speculation.

8           187, sustained.

9           199, objection is overruled.

10          200, the objection is sustained.

11          As it is on all of 201.  There's just no foundation

12  there, given her answers.

13          On page 203, I'll overrule the objections for lines

14  2 through 10, but I'll sustain the objection from lines 11

15  through 15.

16          Sustain the objections on 205.

17          Sustain the objection on 206.

18          Skipping forward to 218.  I will overrule the

19  objection on 218.

20          On 231, I will permit -- I'll overrule the

21  objection on lines 13 through 24, but I'll sustain the

22  objection on line 25 and then sustain the objection on 232,

23  lines 1 through 11.

24          235, sustain the objection.

25          And I believe -- no, that's not it.  That's it of

Page 3046

1    volume 1.  We'll have to get back to volume 2 later.  I

2    didn't realize there was a second volume here.  So stay tuned

3    for future developments.

4             Any questions on volume 1?

5             Very good.  I'll peruse volume 2 during this next

6    set of testimony, and hopefully I'll have that and outline

7    the deposition for you by the end of the day so you can

8    prepare that.

9             Any other issues we need to take up before bringing

10   the jury in?

11            Mr. Nolan, how much longer do you believe you have

12   with Mr. Bryant?

13            MR. NOLAN:  I told Mr. Price 15 minutes.  He bet me

14   a hundred dollars.  I might lose.  I think I'm going to try

15   to do it in 20 minutes and wind up with a few more documents.

16   I think it will be less than 30 minutes.

17            THE COURT:  I suspect you'll have a couple more

18   takers on the hundred dollar bet.

19            MR. NOLAN:  I've never ever called Bill Price out

20   on his estimates.  But I -- I understand.

21            THE COURT:  Very good.  All right.  Let's try to

22   move it along.

23            And, Mr. Price, do you have anything to follow up

24   on?

25            MR. PRICE:  A little.

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3047

1          THE COURT:  All right.  Let's bring the jury in.

2          (WHEREUPON THE JURY ENTERS.)

3          THE COURT:  Good afternoon, members of the jury.

4          Mr. Bryant, Mr. Nolan, you may proceed.

5          MR. NOLAN:  Thank you.

6               CARTER BRYANT, PREVIOUSLY SWORN.

7               CROSS-EXAMINATION (CONTINUED)

8   BY MR. NOLAN:

9   Q.   Good afternoon, Mr. Bryant.

10  A.   Good afternoon.

11  Q.   I want to just try to clean this up in a short bit.

12       Before we broke, I was asking you a series of

13  questions about the time period of September 1st through

14  October 20th of the year 2000.

15  A.   Yes.

16  Q.   My question to you, sir, is when you were working at

17  Mattel in September of 2000, do you recall what your monthly

18  salary was at Mattel?

19  A.   I think I was making around $5,000 a month.

20  Q.   And, in fact, did you get paid approximately $5,000 a

21  month from Mattel in the month of September?

22  A.   Well, I don't really remember.

23  Q.   In any event, do you remember working full time for

24  Mattel from September 1st through September 30th?

25  A.   Yes.

Page 3048

1   Q.   And were you working full time?

2   A.   Yes.

3   Q.   Do you recall any of your supervisors complaining about

4   your work from September 1st through September 30th?

5   A.   No, not that I remember.

6   Q.   Now, I understand on October 4th you entered into an

7   agreement with MGA; correct?

8            MR. PRICE:  Objection.  Leading.

9            THE COURT:  Very well.

10  Q.   BY MR. NOLAN:  Did you enter into a consulting agreement

11  at any time with MGA?

12  A.   Yes.

13  Q.   What was the date that you signed that consulting

14  agreement?

15  A.   That was October 4, 2000.

16  Q.   Now, my question is under that consulting agreement,

17  were you paid a monthly distribution against future

18  royalties?

19  A.   Yes.

20  Q.   Can you tell the jury how much your monthly payment was

21  pursuant to that consulting agreement with MGA?

22  A.   I believe it was $5,500 a month.

23  Q.   So if my math is right, you got approximately a $500 a

24  month raise at that point in time?

25  A.   Yes.

Page 3049

1   Q.   Now, the jury has heard that Bratz was successful and

2   you've made a considerable sum of money on royalties,

3   Mr. Bryant.

4        Here's my question:  The October 4th consulting

5   agreement that you signed, did you have any guarantee from

6   MGA that you were going to make millions of dollars in

7   royalties from Bratz?

8   A.   No.  Actually, at that time I didn't even know if the

9   Bratz project was going to actually happen.

10  Q.   What do you mean by that?

11  A.   I mean, I didn't know that if it would actually ever

12  even make it onto the market.

13  Q.   Prior to October 4th, the year 2000, would you please

14  tell the jury what the most amount of money you had ever been

15  paid for free-lance work for any -- from any client.

16  A.   I'm sorry.  Could you ask me the question again?

17  Q.   Sure.  Maybe it's too loaded.  I'm just questioning

18  whether or not, as a free-lance artist for periods that

19  obviously you were not working at Mattel, could you give the

20  jury an estimate as to how much you had made in exchange for

21  submissions to either Ashton Drake or other similar companies

22  that you had offered your work to?

23             MR. PRICE:  Objection.  Irrelevant.

24             THE COURT:  Counsel, what does it go to?

25             MR. NOLAN:  I'm taking too much time.

1         THE COURT:  Very well.  I'll sustain the objection.

2    Q.   BY MR. NOLAN:  So you did not know, when you signed the

3    contract, whether or not Bratz would even be made; right?

4    A.   That's right.

5    Q.   The consulting agreement that you were paid -- that you

6    signed on October 4th did, however, provide a specific period

7    of time that you would be paid for -- by MGA; correct?

8    A.   Yes.

9    Q.   And what was that guaranteed period of time?

10   A.   I don't recall exactly.  I think it was around nine

11   months.

12   Q.   Did you have an understanding that any moneys that you

13   were paid would be deducted against any royalties, if any,

14   that would be made if MGA made the Bratz doll; correct?

15         MR. PRICE:  Objection.  Leading.

16         THE COURT:  Sustained.

17   Q.   BY MR. NOLAN:  What was your understanding with respect

18   to whether or not your royalty payments under the consulting

19   agreement would be credited against any royalties that you

20   earned on the Bratz dolls?

21         Did you have an understanding?

22   A.   Yes.

23   Q.   And what was that understanding?

24   A.   My understanding was that the checks that I was getting

25   from MGA were advances against royalties.  And if Bratz ever

Page 3051

1    started selling, that yes, that amount of money that I'd been

2    paid would be deducted from any royalties.

3    Q.   Did you have an understanding of what would happen if

4    Bratz did not make or was not made, what in fact would happen

5    with respect to the $5,500 a month payment under the

6    consulting agreement?

7    A.   Well, I don't believe that I thought that I was going to

8    be expected to pay it back.

9    Q.   Do you know whether or not, during the first six months

10   of your consulting agreement, whether or not the payment from

11   MGA was adjusted in any way?

12   A.   Yes, at some point it went down to 5,000 a month.

13   Q.   And do you recall how soon -- let's approach it this

14   way.  Your testimony was that you first were paid $5,500 a

15   month by MGA; correct?

16   A.   Yes.

17   Q.   And you had been making approximately $5,000 a month

18   from Mattel; correct?

19   A.   Yes.

20   Q.   And do you recall how long you were paid $5,500 a month

21   by MGA?

22   A.   I don't recall the exact number of months.

23   Q.   And do you recall that that $5,500 a month payment was

24   then reduced after a few months to a lower number?

25   A.   Yes.

Page 3052

1    Q.   And that lower number was how much?

2    A.   5,000.

3    Q.   What date did you offer your resignation to Mattel?

4    A.   October 4th, 2000.

5    Q.   And who did you give that resignation to?

6    A.   I gave it to my direct supervisor, Ann Driskill.

7    Q.   Did you provide any period of notice?

8    A.   Yes.

9    Q.   And what was the period of notice that you gave them?

10   A.   I told them that my last day would be the 19th of

11   October.

12   Q.   And did you continue to work at Mattel from the period

13   of October 4th through October 19th of the year 2000?

14   A.   Yes.

15   Q.   Why did you give Mattel two weeks' notice?

16   A.   I thought that was the right thing to do.  I didn't feel

17   that I should give them notice and just walk out the door.  I

18   felt that I needed to wrap up my projects that I was working

19   on at Mattel.  You know, I was -- in my past experience, any

20   job I had, you know, if you decided to resign, you gave some

21   sort of notice.

22   Q.   Did you work for Mattel from October 4th through October

23   19th, the year 2000?

24   A.   Yes.

25   Q.   And without disclosing the exact nature of the work, can

Page 3053

1    you generally describe for us what you were doing for Mattel

2    during that period of time?

3    A.   I just was continuing to do what I'd always done for

4    them.  I was trying to get a few of my different projects,

5    trying to get them wrapped up as much as possible before I

6    left.

7    Q.   Do you recall, Mr. Bryant, at any time during that

8    two-week period of time -- that is, October 4th through

9    October 19th, 2000 -- any Mattel supervisor complaining of

10   the quality of your work on any of the clean-up projects?

11              MR. PRICE:  Objection.  Irrelevant.

12              THE COURT:  Sustained.

13   Q.   BY MR. NOLAN:  I'd like to show you a document that's

14   already in evidence, and I believe it would be in the white

15   notebook, Exhibit 305.

16   A.   Okay.

17   Q.   Do you have Exhibit 305, and is that an e-mail chain,

18   the top one being from Isaac Larian to Victoria O'Connor?

19   A.   Yes.

20   Q.   Now, you were not copied on this e-mail, were you?

21   A.   It doesn't appear that I was, no.

22   Q.   Okay.  I want to direct your attention down midway right

23   under -- I guess it's the third message down.  It says --

24   this is dated October 10, 2000.

25              Do you see that?

Page 3054

1    A.   Yes.

2    Q.   And it says:  "I would say that Carter has worked an

3    average about four hours a day, and we began working on this

4    line the first part of September."

5             Do you see that?

6    A.   Yes.

7    Q.   Do you recall ever being asked by anybody how many hours

8    a day you were working towards the Bratz product in September

9    of 2004?

10   A.   No, I don't.

11   Q.   Is it correct, Mr. Bryant, that during the month of

12   September of 2000, you were devoting on average four hours a

13   day on the Bratz projects?

14   A.   I don't think so, no.

15   Q.   And why don't you think so?

16   A.   There wasn't really anything for me to do during this

17   period.  I had the concept.  I think the people at MGA were,

18   you know, discussing among themselves --

19             MR. PRICE:  Object to speculation.

20             THE COURT:  Very well.  Everything after "there

21   wasn't really anything for me to do."

22   Q.   BY MR. NOLAN:  During the period of October 4th, the

23   date you signed the contract, and October 19th of the year

24   2000, can you estimate whether or not you were -- or how many

25   hours you were devoting to Bratz-related subjects?

Page 3055

1   A.   I don't recall exactly, but it wasn't very much.

2   Q.   Well, do you recall any shopping trips that you may have

3   attended with Margaret -- Veronica Marlow?

4   A.   Yes, I think we did a shopping trip or two.

5   Q.   And were those shopping trips that you took during

6   Mattel work days or work hours?

7   A.   I don't think so, no.

8   Q.   By the way, when you were employed at Mattel, did Mattel

9   employees work a full day on Fridays?

10  A.   No.  We worked until approximately 1:00 in the

11  afternoon.

12          MR. NOLAN:  If I could have 11904, which is in

13  evidence, your Honor, published.

14  Q.   I don't know whether or not 11904 is in one of the

15  binders, Mr. Bryant.  Do you see it?

16  A.   Okay.  I'll look.  I don't see it, no.

17  Q.   Okay.  One moment.  It's in evidence.

18          Can you see it from where you are, Mr. Bryant?

19  A.   Yeah, I can see it fairly well.

20  Q.   And if you don't, I can get the actual exhibit in front

21  of you.

22          Do you recognize that this is an invoice dated

23  October 5th, 2000, and do you see that -- do you remember

24  that this was shown to you by Mr. Price?

25  A.   Yes.

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3056

1    Q.   And to put this into context, it says Messrs. MGA

2    Entertainment, and it shows the address of 1319 West 160th

3    Street, Gardena.

4              Do you see that?

5    A.   Yes.

6    Q.   Were you authorized by anybody at MGA to be using your

7    home address for the name MGA Entertainment?

8    A.   No.

9    Q.   Do you remember ever telling MGA that you were asking

10   for hair supply to be sent to your home address?

11   A.   It's possible, but I don't remember.

12   Q.   Well, do you remember ever telling anybody at MGA that

13   if somebody was sending samples to you, that you were using

14   the MGA Entertainment name for your personal address?

15   A.   No.

16   Q.   Now, Mr. Price asked you whether or not in fact you

17   asked for reimbursement from MGA on this shipment.

18              Do you recall that line of questioning?

19              MR. PRICE:   Objection.  Misstates the questioning.

20              MR. NOLAN:   I'll withdraw it.  Let me ask it a

21   different way.  I apologize.

22              Could we just have this whole thing blown up for a

23   moment.

24   Q.   And do you see that there's an example of all of the

25   spools?  One spool of this, one spool of that, various color

Page 3057

1   variations sent to you at your home address; correct?

2   A.   Yes.

3   Q.   Can you read the two statements that are contained on

4   the invoice that you received?

5   A.   It says no commercial value, value for custom purpose

6   only.  Free samples for evaluation purpose.

7   Q.   You don't recall paying Universal for any of these

8   samples, do you?

9   A.   No.

10  Q.   These were free samples; right?

11  A.   Yes.

12  Q.   Do you have Exhibit No. 30 in front of you?  And I

13  believe this will be in the black binder, Mr. Bryant.

14          This is already in evidence, your Honor.

15          THE COURT:  Very well.

16          THE WITNESS:  Okay.

17  Q.   BY MR. NOLAN:  Do you have that in front of you,

18  Mr. Bryant?

19  A.   Yes.

20  Q.   Do you recognize this as a letter that you sent on

21  September 18, 2000, to a person named -- or at least you

22  addressed it to Dear Kinuyo, K-I-N-U-Y-O?

23  A.   Yes.

24  Q.   You said:  "I enjoyed speaking with you on the phone

25  today about possibly ordering a supply of your hollow Saran

Page 3058

1   hair fiber."

2           Do you see that?

3   A.   Yes.

4   Q.   It says: "The company I am working with is called MGA

5   Entertainment, and we are located in Los Angeles.  You can

6   e-mail me with any questions at sophiesays@hotmail.com."

7   A.   Yes.

8   Q.   And it says:  "Please send the sample cards, along with

9   price information to the following address.  MGA

10  Entertainment, Attention Carter Bryant, 1319 West 160th

11  Street, Gardena, California 90247."

12          Do you see that?

13  A.   Yes.

14  Q.   Now, my question to you, sir, is that on September 18,

15  2000, did Isaac Larian or anybody at MGA instruct you to

16  write to Dear Kinuyo asking to have samples of Saran hair

17  sent to you under their name at your home address?

18  A.   No.

19  Q.   During the course of your negotiations with MGA which

20  led you to executing the consulting agreement on October 4th,

21  were you represented by counsel?

22  A.   Yes.

23  Q.   And what was the name of that counsel?

24  A.   I believe her name was Ann Wang.

25  Q.   Do you have Exhibit 302 in front of you?  Let's do it

Page 3059

1    this way, Mr. Bryant.  Do you have try Exhibit 502 in front

2    of you?  This is probably in the black binder.  502.

3    A.   I don't seem to have this either.

4         MR. NOLAN:  Your Honor, this is in evidence.  Can

5    we just publish it?

6         THE COURT:  Very well.

7    Q.   BY MR. NOLAN:  Mr. Bryant, if you can't read this, I'll

8    run up a copy of this.

9         THE COURT:  You may proceed.

10   Q.   BY MR. NOLAN:  Do you recall, Mr. Bryant, Mr. Price

11   asking you, Mr. Bryant, questions concerning a declaration

12   that you signed?

13   A.   Yes.

14   Q.   And I want you to just look at the front page of this,

15   and you see that the applicant was Isaac Larian, and there's

16   a date there of filing, February 24, 2003.  And the title is

17   doll with aesthetic changeable footgear.

18        Do you see that?

19   A.   Yes.

20   Q.   If I could turn your attention to the next page.  And

21   this is a declaration that you signed under oath; correct?

22   A.   Yes.

23   Q.   Do you remember during this period of time, and that is

24   in or around February of 2003, being aware, one way or the

25   other, of manufacturing issues with respect to the removable

Page 3060

1   footgear on the early generation of Bratz dolls?

2           MR. PRICE:  Objection.  Leading.

3           THE COURT:  Sustained.

4   Q.  BY MR. NOLAN:  Do you have an understanding, one way or

5   the other, as to whether or not there were any manufacturing

6   issues with respect to footgear?

7           MR. PRICE:  Same objection.

8           MR. NOLAN:  Just asking for an understanding.

9           THE COURT:  Overruled.

10          THE WITNESS:  Yes.

11  Q.  BY MR. NOLAN:  And what was your understanding?

12          MR. PRICE:  Objection.  Foundation, relevance.

13          THE COURT:  Hold on a second.  Counsel, why don't

14  you rephrase your question.  I understand where you're going

15  with this, but I think you have to lay a little bit of a

16  foundation as to whose understanding this was all about.

17          MR. NOLAN:  Let me tweak it a little way.  I don't

18  know if tweaking is a legal term.

19          THE COURT:  Sustained, Counsel.

20  Q.  BY MR. NOLAN:  Without disclosing what your

21  understanding was, can you explain to the jury what the basis

22  of your understanding was with respect to issues involving

23  footgear?

24  A.  I understood that during transit, sometimes the feet

25  were falling off in the package.

1   Q.   And do you recall, and again, without getting into the

2   contents of the conversations, but do you recall in or around

3   this time period having a conversation with any lawyers with

4   respect to a patent application?

5   A.   Yes.

6   Q.   In fact, if I could ask you to take a look at the --

7   hold on.  I think there's a cover letter that accompanies

8   this.

9           I apologize, your Honor.  Your Honor, I'd like to

10  publish 11898, which is in evidence.  I'm showing it to

11  Mr. Bryant.  And again, I apologize.  I don't have this in

12  the notebooks.  I can run it up real quick.

13          THE COURT:  You may proceed, Counsel.

14          MR. NOLAN:  Thank you.

15  Q.   And, Mr. Bryant, if you need the actual letter itself,

16  I'm happy to get a copy of it for you.  But in any event, you

17  were shown this by Mr. Price in your examination, and this is

18  the letter dated August 11, 2003.

19          Do you see that?

20  A.   Yes.

21  Q.   Now, does the name Oppenheimer Firm mean anything to

22  you?

23  A.   It rings a bell a little bit as the firm that contacted

24  me about this issue.

25  Q.   And it says:  "Dear Mr. Bryant, thank you for discussing

Page 3062

1    the above matter with me.  We are enclosing the declaration

2    for your signature.  Please sign and fax back.  For your

3    background information, enclosed is the article relied on by

4    the U.S. Patent Office.  Our patent application was filed on

5    February 24, 2003, so a release back in 2001 would be

6    anticipatory, while a release in the fall of 2002 would be

7    within the one-year grace period."

8              Do you see that?

9    A.   Yes.

10   Q.   "Please sign the declaration and return by fax to me so

11   that we can file a response by tomorrow.  Thank you."

12             Now, the declaration -- and there is a second page

13   to this.  Okay?  And this is the last page of this exhibit.

14             I want to go back to the declaration that we were

15   referring to.  And this is the declaration that had been

16   forwarded to you; correct?

17   A.   Yes.

18   Q.   Okay.  And although this is -- this copy is blank, do

19   you have a memory of having signed this declaration?

20   A.   Yes.

21   Q.   Okay.  And I believe 502 is signed.  So let's put 502

22   up.  Okay.  Now, Mr. Price was asking you to look at

23   paragraph 3, and I want to just redirect your attention there

24   for just a moment.  And you see the first sentence says:  "I

25   am familiar with the doll designs as shown in the attached

b3c9772e-5038-4bea-95b5-2016fbb63c07

1    drawings from the above-identified patent application."

2            Do you see that sentence?

3    A.   Yes.

4    Q.   And can I go to the drawings that are attached here?

5            Okay.  And these are the drawings that you are

6    referring to in paragraph 3; correct?

7    A.   Yes.

8    Q.   Okay.

9            Now, Aaron, if we could do this.

10           Your Honor, I'd like to put up Exhibit 2 -- I'm

11   sorry.  Exhibit 302, which is already in evidence.  And just

12   ask Mr. Bryant if he remembers these drawings.

13           Okay.  Now, 302 -- I'm sorry.  This page from 302,

14   which is on the screen, do you recognize these drawings?

15   A.   Yes.

16   Q.   And what are they?

17   A.   These are drawings that I had done of the ideas for the

18   removable head piece and removable foot.

19   Q.   Okay.

20           And, Aaron, do you mind just trying to blow up that

21   foot mechanism for just a moment and maybe doing the same

22   with the drawing on the exhibit that was attached to the --

23   the drawings that were attached to the declaration.

24           Do you see that?

25   A.   Yes.

Page 3064

1  Q.   Now, the drawing on the left was your drawing that was

2  part of the pitch to MGA; correct?

3  A.   Yes.

4  Q.   And that was your early concept of a removable foot?

5  A.   Yes.

6  Q.   Or I guess it's removable footgear.

7  A.   I guess you could call it either.

8  Q.   Okay.  In any event, you're not an engineer, are you?

9  A.   No.

10 Q.   However, would you agree with me that the configuration

11 that you drew in your concept drawings is different than the

12 drawing that was attached to your declaration?

13          MR. PRICE:  Irrelevant, your Honor.

14          THE COURT:  Come to sidebar.

15          (SIDEBAR CONFERENCE HELD.)

16          MR. PRICE:  This shouldn't be up.

17          THE COURT:  How is this not exactly what I heard

18 from Ms. Aguiar and Mr. Nolan at extreme length about not

19 getting into by not one but two different witnesses?  These

20 comparisons.  I heard extensive argument, and I agreed with

21 you that this is totally off base.

22          MR. NOLAN:  Mr. Price, your Honor, asked Mr. Bryant

23 specifically, specifically about him signing this declaration

24 under penalty of perjury, and he did not show Mr. Bryant the

25 actual drawing.

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3065

1          THE COURT:  Because I ruled that he couldn't get

2    into this.  Your argument and your objection, I said no.

3          MR. NOLAN:  I thought this goes to the question of

4    credibility, your Honor, of this witness.

5          THE COURT:  Fine, then it's all open, and Armstrong

6    is back in play.  It's up to you.

7          MR. NOLAN:  We'll take this down, then.  I'm sorry.

8    I misunderstood your ruling.  I thought this went to

9    credibility.

10          THE COURT:  No.  Did I miss something?  You made

11    this argument successfully.

12          MS. AGUIAR:  I absolutely did, and I can't speak

13    for Mr. Nolan.

14          THE COURT:  Very well, why don't you --

15          MR. NOLAN:  I'll make the decision.  We'll do it

16    this way.  But I want to ask one follow-up question, and it

17    will not be a comparison.

18          MR. PRICE:  Could we have a proffer?  This should

19    not be on the screen right now.

20          THE COURT:  Aaron?

21          MR. NOLAN:  Your Honor, I'm going to ask him when

22    he signed this declaration, did he believe it to be true.

23    That's the last question.

24          THE COURT:  Fair enough.

25          (CONCLUSION OF SIDEBAR CONFERENCE.)

1    Q.    BY MR. NOLAN:   Mr. Bryant, when you signed the

2    declaration under oath, did you believe it to be true at the

3    time?

4    A.    Yes.

5    Q.    Has anyone ever asked you to sign a declaration under

6    oath falsely?

7    A.    Not to my knowledge, no.

8    Q.    The last area that I want to go to has to do with

9    Exhibit 10016.   10016.

10              Do you have it in front of you?

11   A.    What notebook?

12   Q.    I think it's the white notebook.

13   A.    What number?

14   Q.    I'm sorry.   10016.   So you have the document marked as

15   10016 in front of you?

16   A.    Yes.

17   Q.    And can you identify that for me?

18   A.    This looks like a receipt from Circuit City.

19   Q.    And what's the date of the receipt?

20   A.    Well, there's two dates on here.   One is 10/22/2000.

21   One is 10/21/2000.

22   Q.    Do you recall making any purchase of electronic

23   equipment from Circuit City in around 2000?

24   A.    Yes.

25              MR. NOLAN:   Your Honor, we'd offer 10016.

Page 3067

1          THE COURT:  Any objection?

2          MR. PRICE:  Objection.  Relevance.  This relates to

3     the computer?

4          MR. NOLAN:  That and also the fax machine, your

5     Honor.  If we want to do a sidebar --

6          THE COURT:  That's all right.  I'll overrule the

7     objection conditionally.  I'll come back to it if I don't

8     think there's relevance.

9          (Exhibit 10016 received.)

10          MR. NOLAN:  Your Honor, we would offer it

11     conditionally.

12          THE COURT:  Yes.

13          MR. NOLAN:  May we publish it?

14          THE COURT:  You may.

15     Q.   BY MR. NOLAN:  I just want to point out a couple things

16     on the Circuit City.  It says there was a purchase of a

17     desktop computer.

18          Do you see that?

19     A.   Yes.

20     Q.   And the date is October 21st, 2000.  Do you see that?

21     A.   Yes.

22     Q.   And you bought some other stuff.  I want to go down to

23     the sixth item, a facsimile machine.

24          Do you see that?

25     A.   Yes.

Page 3068

1  Q.   Did you in fact by a facsimile machine in or around

2  October of 2000?

3  A.   Yes.

4  Q.   Now, Mr. Bryant, we've asked you about your skills with

5  respect to the use of a computer.  I just want to focus for

6  just a few minutes on your skills with respect to a facsimile

7  machine.

8        Do you recall whether or not, when you purchased

9  the facsimile machine in October of 2000, if you ever set the

10 date on the facsimile?

11 A.   No, I don't think I did.

12 Q.   Okay.  And do you know whether or not following the use

13 and purchase of your facsimile machine -- and this is a

14 machine that was used where?  At your home?

15 A.   Yes, at my home.

16 Q.   Do you recall ever -- strike that.

17       Do you recall any issues about dates on facsimiles

18 being incorrect?

19       MR. PRICE:  Objection.  Relevance.

20       MR. NOLAN:  Maybe I can enter into a stipulation

21 real quick.

22       THE COURT:  Very well.

23       MR. NOLAN:  Or, your Honor, I could go to sidebar

24 real quick --

25       THE COURT:  Why don't you confer with counsel.

Page 3069

1          (Pause.)

2          MR. NOLAN:  Your Honor, I think we can

3   short-circuit this if we could just maybe make a

4   representation of a stipulation that we've entered into.

5          THE COURT:  Very well.

6          MR. NOLAN:  Your Honor, there are a few documents

7   that might come up during the course of deliberations or in

8   evidence where faxes from Mr. Bryant's home facsimile machine

9   after the date of October 21st contains dates that are

10  actually inconsistent with the material dated attached to it.

11          And the reason for that is that, when Mr. Bryant

12  purchased his facsimile machine, he did not correctly set the

13  calendar date so that the calendar date that appears on the

14  top of the fax sheets are not the correct date of the

15  facsimile.

16          THE COURT:  That's the stipulation?

17          MR. PRICE:  We'll stipulate that with respect to

18  various faxes from his home fax machine -- not the contract

19  which came from Mattel --

20          THE COURT:  Okay.  Very well.

21          MR. PRICE:  Just from the home fax machine, that

22  those dates are not being relied on for anything because we

23  understand they weren't set.

24          THE COURT:  Very well.  So the jury can accept that

25  stipulation.  We're talking about the home fax machine, the

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3070

1    dates on the home fax machine or documents sent via fax from

2    the home fax machine are not reliable.  The parties have so

3    stipulated.

4              MR. NOLAN:  Thank you.

5              THE COURT:  Anything further?

6    Q.   BY MR. NOLAN:  Mr. Bryant, when did you conceive of

7    Bratz?

8              MR. PRICE:  Objection.  Asked and answered, and

9    asked and answered.

10             THE COURT:  It has been, Counsel.

11   Q.   BY MR. NOLAN:  Has anyone ever suggested to you, from

12   the law firm of Skadden, Arps, that you should in any way

13   color your testimony to testify incorrectly?

14   A.   No.

15             MR. NOLAN:  Thank you.

16             Nothing further, your Honor.

17             THE COURT:  Mr. Price.

18                   REDIRECT EXAMINATION

19   BY MR. PRICE:

20   Q.   Good afternoon.

21   A.   Good afternoon.

22   Q.   You recall that, when Mr. Nolan began his examination

23   with you, he asked you if you understood that your

24   credibility was at issue.

25             Do you remember him asking you that?

Page 3071

1    A.    Yes.

2    Q.    And it looks like you have identified about 40 drawings

3    which you've said were created in August of '98.

4              Is that about right?

5    A.    I'm not sure of the number.

6    Q.    Okay.  And you remember I went through a bunch of them

7    you said were in August of '98, and then Mr. Nolan went

8    through a bunch of them, where you said they were August of

9    '98.

10             Do you recall that?

11   A.    Yes.

12   Q.    Did it seem like about 30 to 40 we were talking about?

13   A.    I -- I don't know.  I wasn't really keeping count.

14   Q.    Okay.  In any event, there's not a date of August '98 or

15   '98 on any of those documents; right?

16   A.    I -- I don't remember.  I don't think so.

17   Q.    And so when Mr. Nolan asked you, you understand that

18   your credibility is something which just has to be evaluated;

19   right?

20   A.    Yes.

21   Q.    And one of the things that he asked you was whether or

22   not anyone had ever asked you to sign a false declaration.

23             Do you recall that question?

24   A.    Yes.

25   Q.    And if you'd look at -- I think Mr. Nolan had Exhibit --

1    let me get it right.  I think it was 11898.  He showed you

2    that a few minutes ago.

3    A.    Okay.

4    Q.    And you remember it was loose in front of you a couple

5    days ago.  I don't know if it is now, but we'll display it,

6    and I'll blow up whatever you'd need to if you'd like.  This

7    was a letter from Mr. Rose of the Oppenheimer law firm.  And

8    first of all, your understanding is Mr. Rose is no longer

9    with us.  He's passed away?

10   A.    Oh, I did not know that.

11   Q.    Okay.  In any event, this was a declaration sent to you

12   by a lawyer from MGA; correct?

13   A.    I understood that he was representing MGA, yes.

14   Q.    And he was telling you about this patent application

15   that -- that a release back in 2001 would be anticipatory,

16   while a release in the fall of 2002 would be within the

17   one-year grace period.

18          Do you recall that?

19   A.    Yes, I'm not really sure what it means by anticipatory.

20   Q.    But you kind of have an idea of what a grace period is;

21   right?  Meaning -- it means something like it's okay if this

22   is the right date.

23   A.    Um, well, I'm not really sure I understood that either.

24   Q.    Well, this letter followed a discussion that you had

25   with Mr. Rose; right?

Page 3073

1    A.    Yes.

2    Q.    And in that discussion, surely he explained to you that

3    what he wanted you to do was give him a date of 2002 instead

4    of 2001; right?

5            MR. NOLAN:    Objection, your Honor.    Assumes facts

6    not in evidence.    No foundation.    It's also argumentative.

7            THE COURT:    Rephrase your question, Counsel.

8    Q.    BY MR. PRICE:    In this conversation that he had with you

9    prior to you receiving this letter, didn't Mr. Rose say to

10   you that a date of 2002 is good, but a date of 2001 is not

11   good for the patent application?

12   A.    I don't recall him saying that.

13   Q.    Well, certainly when you read this, you thought a grace

14   period is a good thing.

15   A.    Again, I don't really remember what my understanding of

16   this phrase meant.

17   Q.    Okay.  So just to be clear, is it your testimony, then,

18   that you signed the declaration under penalty of perjury

19   without knowing what the cover letter from the lawyer meant?

20   A.    You know, at the time that I signed this, I -- there was

21   nothing that really made me think that it was false.

22   Q.    No, my question is different.

23            Are you saying you signed the declaration you were

24   sent without knowing what the lawyer meant when he said a

25   release back in 2001 would be anticipatory, while a release

1   in the fall of 2002 would be within the one-year grace

2   period?

3   A.   I may not have understood all of that.

4   Q.   Did you at least understand that with respect to MGA

5   getting rights, that dates were important?

6   A.   I suppose so.

7   Q.   And he was asking you to provide a declaration in which

8   you were going to give a certain date; right?

9   A.   Yes.

10  Q.   In fact, if we go a few pages into this to your unsigned

11  declaration, this was -- was this typed up by you?

12  A.   No.

13  Q.   So this was typed up by a lawyer and sent to you; right?

14  A.   Yes.

15  Q.   And if we go to the second page here, he sends it to

16  you, and, of course, it's unsigned; correct?

17  A.   Yes.

18  Q.   And your understanding is that in order to assist the

19  lawyer who represented MGA, you were to sign this

20  declaration.

21  A.   Yes, but again, I mean, when I signed this, I did not

22  have any idea -- I didn't think anything about it was false.

23  Q.   Okay.  And I'll get into that.  But you understand that

24  one of the things that the lawyer, this declaration the

25  lawyer drew up for you to sign, one of the things that he put

Page 3075

1    in here was a date of 2002; right?

2    A.    Yes.

3    Q.    I mean, you didn't put in that date.  The lawyer did;

4    right?

5    A.    That's correct.

6    Q.    And Mr. Nolan asked you about a drawing with a number on

7    it.  Do you recall that?

8    A.    Yes.

9    Q.    And it's true that at the time, that you couldn't say

10   what the number looked like on one of these legs.  That was

11   one of the things that, like okay, it works, I didn't pay too

12   much attention to that sort of thing.

13         Is that truthful testimony?

14   A.    Yes.

15   Q.    Okay.  If we can put this up, again, from the trial

16   transcript of your testimony, Mr. Bryant, page 2599, lines 19

17   through 23.

18         Mr. Bryant, do you recall telling the jury on

19   Friday that at the time you signed this statement, you knew

20   that the dolls, which had all of the features described in

21   paragraph 3, had been released in 2001; right?

22         "Yeah, I had a general understanding of that."

23         Do you recall telling the jury that on Friday?

24   A.    Yes.

25   Q.    That the time you signed the declaration, that you knew

Page 3076

1    that all the features in paragraph 3 had been on the dolls

2    released in 2001; right?

3    A.   Um, well, I also seem to remember that I discussed

4    something with the lawyer about some sort of a change of the

5    foot or some sort of a change in the attachment or something

6    like that.

7    Q.   Now, why -- I'm just curious.  You were asked a lot

8    about this on Friday; right?

9    A.   Yes.

10   Q.   Probably about a half an hour; right?

11   A.   Don't remember.

12   Q.   Okay.  So why didn't you answer no to this question?

13   "At the time you signed this statement, you knew that the

14   dolls, which had all of the features described in

15   paragraph 3, had been released in 2001; right?"

16        Your answer was "yes."  Is your answer now "no"?

17   A.   No, I'm just trying to clarify a little bit, I think, of

18   what I remember speaking with that attorney.  It seems to me

19   there was some discussion of some sort of a question of yes,

20   the things that were in 2002 -- or 2001 were on this new

21   application, that there was something different.

22   Q.   I'm talking about paragraph 3 of your declaration.

23        Do you remember that paragraph?

24   A.   Yes.

25   Q.   And you understood, at the time you signed the

Page 3077

1    declaration, that everything that was described in that

2    paragraph was a feature on the dolls that were released in

3    2001.  Isn't that correct?

4    A.   Yes, but again, like I said, I think that there were

5    some things that I discussed with the lawyer that were

6    changes of some sort.

7    Q.   Well, I'm talking about what you were asked to say under

8    oath by the lawyer, okay?

9    A.   Um-hm.

10   Q.   So let's just focus on what MGA's lawyer asked you to

11   say under oath.  Okay?

12   A.   Um-hm.

13   Q.   What he asked you to say under oath was that you were

14   familiar with doll designs which had certain features;

15   correct?

16   A.   Yes.

17   Q.   Okay.  And at the time you read that paragraph,

18   paragraph 3, you understood that every one of those features

19   was in the dolls that were released in 2001; right?  That's

20   what you told the jury on Friday.

21          MR. NOLAN:  Your Honor, misstates his testimony.

22   Also ambiguous with respect to features.

23          THE COURT:  I'll sustain the latter objection.

24   Q.   BY MR. PRICE:  Okay.  Let's go back to your testimony in

25   front of the jury, page 2599, lines 19 through 23.

Page 3078

1          You told the jury at the time you signed this

2    statement, you knew that the dolls, which had all of the

3    features described in paragraph 3, had been released in 2001;

4    right?  "Answer:  Yeah, I had a general understanding of

5    that."  That's a truthful statement, isn't it, sir?

6    A.    Yes.

7    Q.    That is, it's a truthful statement that at the time you

8    signed the declaration, you knew that dolls, which had all

9    the features described in paragraph 3, had been released in

10   2001; right?

11   A.    Again, I'm not trying to change my answer, but yes, but

12   I do think there were discussions of some sort of changes.

13   Q.    Well, I'm not talking about changes that aren't in your

14   declaration.  I'm talking about your declaration.

15   A.    Okay.

16   Q.    It's true that at the time you signed your declaration,

17   that you read paragraph 3, and you knew that the dolls

18   released in 2001 had all of the features described in

19   paragraph 3.  You knew that?

20          MR. NOLAN:  Asked and answered.  Also, your Honor,

21   same issue with respect to features.

22          THE COURT:  Overruled.  The features is limited to

23   those described in paragraph 3.  You may answer.

24          THE WITNESS:  I'm sorry.  Could you repeat the

25   question?

1    Q.   BY MR. PRICE:  At the time you signed this declaration

2    under penalty of perjury, when you read paragraph 3, you

3    understood that all of the features described in paragraph 3

4    were features of the dolls released in 2001.

5    A.   I believe so.  But at the time, again, that I signed

6    this declaration, I didn't believe it to be false.

7              MR. PRICE:  Move to strike the latter part of the

8    answer, your Honor.

9              THE COURT:  Stricken.

10   Q.   BY MR. PRICE:  So let's go to your declaration.  502,

11   the first page.  So here's paragraph 3.  I take it you read

12   this page before you read the next page; right?

13             MR. NOLAN:  Asked and answered.

14             THE COURT:  Sustained.

15   Q.   BY MR. PRICE:  So that we're clear on paragraph 3 here,

16   this is a paragraph we're referring to when you say all these

17   features are in the dolls released in 2001.

18             MR. NOLAN:  Asked and answered.

19             THE COURT:  Sustained.

20   Q.   BY MR. PRICE:  Let's go to the second page.  You just

21   testified you didn't make a false statement; right?

22             MR. NOLAN:  Asked and answered, your Honor.

23             MR. PRICE:  It's foundational.

24             THE COURT:  Overruled.

25   Q.   BY MR. PRICE:  You just testified you didn't make a

Page 3080

1   false statement in this declaration; right?

2   A.   I didn't believe that I did at the time, no.

3   Q.   Okay.  And you just testified that you knew that the

4   dolls in 2001 had all these features that were described in

5   paragraph 3; right?

6   A.   Yes.

7   Q.   But what you told the Patent Office under penalty of

8   perjury was that release didn't occur until the fall of the

9   year 2002; correct?

10          MR. NOLAN:  Objection, your Honor.  Ambiguous as to

11   the release did not occur.

12          THE COURT:  Overruled.

13          MR. NOLAN:  Lack of foundation.

14          THE WITNESS:  Again, what I remember is that there

15   was some sort of change that had been made from the 2001

16   release to the 2002 release.  But it did -- yes, it did have

17   the same features, but something had been changed.

18   Q.   BY MR. PRICE:  My question is, "I was actively involved

19   with the release of the Bratz dolls of the configuration as

20   set forth in paragraph 3 above."

21          Do you see that?

22   A.   Yes.

23   Q.   And you understood that was referring to paragraph 3;

24   right?

25   A.   I suppose.

Page 3081

1    Q.   And you just told us that the dolls with the

2    configuration as set forth in paragraph 3 above were released

3    in 2001.

4    A.   Yes.

5    Q.   So you knew they were released in 2001, but you said

6    under penalty of perjury that this release did not occur

7    until the fall of the year 2002; right?

8              MR. NOLAN:  Your Honor, asked and answered.  It's

9    also argumentative.

10             THE COURT:  I'm going to overrule the objection.

11   You're entitled to an answer on this, Counsel.

12             THE WITNESS:  Again, I did not think I was making a

13   false statement at the time.

14             MR. PRICE:  Move to strike as nonresponsive.

15             THE COURT:  It's stricken.  You may ask the

16   question again.

17   Q.   BY MR. PRICE:  Even though you understood, at the time

18   you signed this declaration, that dolls of the configuration

19   as set forth in paragraph 3 were released in 2001, even

20   though you knew that, you said under penalty of perjury that

21   the release didn't occur until the fall of the year 2002;

22   correct?

23   A.   Well, I signed the declaration, but again, I didn't

24   think it was false.

25   Q.   Well, you remember on Friday the excuse you gave was you

Page 3082

1    didn't know you were signing it under penalty of perjury?

2              MR. NOLAN:  Your Honor, I'm going to object on

3    that.

4              THE COURT:  Argumentative.  Sustained.

5    Q.   BY MR. PRICE:  Is it correct, sir, that on Friday, your

6    response was, first of all, "I don't really think that I

7    understood this was under penalty of perjury."

8              Wasn't that the explanation you gave?

9    A.   Yes.

10   Q.   And just to be clear, I take it that after reading this

11   paragraph, which begins "I hereby declare," you didn't

12   understand that that meant that the facts you were stating

13   were being stated under penalty of perjury?

14             MR. NOLAN:  Objection, your Honor.  Lack of

15   foundation.  Could we have the transcript in front of

16   Mr. Bryant.

17             THE COURT:  You may.  Sustained.

18             MR. PRICE:  Let's put up page 2598, lines 17

19   through 14.  I'm sorry.  17 to 24.

20             And the question was:

21             "Why not necessarily?  Why, if you got this, you

22   were asked to sign it under penalty of perjury, why would you

23   not have known it was going to the Patent Office?

24             "Answer:  Well, I don't really think, first of all,

25   that I understood this was under penalty of perjury.  You

Page 3083

1    know, at this time I was not familiar with these types of

2    declarations, and I, you know -- it was just something that I

3    was asked to sign.  And, you know, I tried to understand it

4    as best I could."

5    Q.   So is that a truthful answer, that at the time you

6    signed this declaration, you didn't even understand it was

7    under penalty of perjury?

8              MR. NOLAN:  Your Honor, again, it's argumentative.

9              THE COURT:  Sustained as phrased, Counsel.  You're

10   asking if it was under penalty of perjury.

11   Q.   BY MR. PRICE:  At the time you signed this declaration,

12   is it true that you didn't really think that you understood

13   that this was under penalty of perjury?

14   A.   That's right.

15   Q.   So when Mr. Nolan asked you whether you'd ever been

16   asked to make a false declaration, it's possible you had

17   been, but you didn't realize that it was under penalty of

18   perjury; right?

19   A.   That's possible.  But as I said before, I didn't

20   understand that this was under penalty of perjury.

21   Q.   I guess my question is this:  Could we look at your

22   declaration, the second page.

23              This paragraph here, I hereby declare.

24   A.   Yes.

25   Q.   What part of it did you not understand?

1   A.   You know, I don't really remember very much about this

2   declaration.  This was a long time ago when I got it.  You

3   know, it wasn't really explained all that much to me, and,

4   you know, I'm not a lawyer.  I just tried to understand it

5   the best I could.  I thought it was true.

6   Q.   Well, did you understand, when you signed it, that

7   willful false statements are punishable by fine or

8   imprisonment?  Did you understand those words when you read

9   them?

10  A.   I don't even remember reading those.

11  Q.   So it's possible what happened is you just signed the

12  declaration without reading it at all?

13  A.   Well, it's not that I didn't read it at all.  It's just,

14  you know, I had a very, I guess, limited understanding of it.

15  Q.   Well, you remember Mr. Nolan was asking you -- I'm going

16  to switch topics here -- about your activities in September

17  and October of 2000.

18       Do you remember that?

19  A.   Yes.

20  Q.   And he showed you a quote, I believe, from Ms. Ross,

21  asked you if you would agree with it.  I'd like to show you a

22  quote from Paula Garcia.  It's at page 543, lines 4 to 16.

23       That's the testimony in this trial, your Honor.

24       She was asked:

25       "You would know that it was wrong to work for

Page 3085

1    Mattel and at the same time, behind their back, work for one

2    of their competitors?

3            "Answer:  Yes.

4            "Question:  If you knew someone was doing that,

5    that in your mind would cast some doubt on their honesty and

6    their credibility; right?  If they were working for one

7    company, but at the same time, behind that company's back,

8    working for one their competitors?

9            "Answer:  Yes.

10           "Question:  It would mean perhaps you shouldn't

11   trust that person; correct?

12           "Yes."

13           Do you agree with that, that if you know someone

14   was working for someone but at the same time behind that

15   company's back is working for a competitor, would you agree

16   that that would mean maybe you shouldn't trust that person?

17   A.   Well, I mean, I don't feel like I was working for MGA

18   behind Mattel's back.  I wasn't really working for MGA.

19   Q.   Well, let's say just generally, though, you would agree

20   that -- if you thought someone was working for one company,

21   but at the same time behind that company's back working for a

22   competitor, would you agree that that person can't be

23   trusted --

24           MR. NOLAN:  Your Honor, objection.  Incomplete

25   hypothetical and also calls for speculation.

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3086

1      THE COURT:  Overruled in light of previous

2   testimony.

3      THE WITNESS:  Will you ask me the question again?

4   Q.   BY MR. PRICE:  Sure.  You would agree that if it were

5   found that someone was working for one company, but at the

6   same time, behind that company's back, working for a

7   competitor, that that person shouldn't be trusted?

8   A.   Well, I'm not sure that I would use those exact words.

9   Again, I wasn't working for MGA.

10  Q.   Well, putting aside your situation, which we'll get to,

11  you would agree that you should question the honesty and

12  credibility of a person who was working for one company but

13  at the same time, behind that company's back, working for one

14  of their competitors.  You would agree with that?

15      MR. NOLAN:  Your Honor, relevance.  It doesn't

16  include Mr. Bryant's conduct.

17      THE COURT:  Overruled.

18      THE WITNESS:  I mean, you know, I suppose that you

19  might question it, yes.

20  Q.   BY MR. PRICE:  Now, let's talk about your conduct, and

21  if we could look at Exhibit 30.

22      Do you see, this is this September 18, 2000, letter

23  that you sent to Universal; correct?

24  A.   Yes.

25  Q.   And by the way, this date is the same date, if you look

Page 3087

1    at your contract, it says dated as of September 18, 2000;

2    correct?

3    A.    Yes.

4    Q.    And that's a contract that was drawn up by your attorney

5    and MGA's attorney; right?

6    A.    I believe it was drawn up by MGA's attorney with some

7    corrections, maybe by mine.

8    Q.    So your attorney had the opportunity to review this

9    contract, which is dated as of September 18, 2000; right?

10   A.    Yes.

11   Q.    And so in this, you were telling Universal that you are

12   working with MGA Entertainment; right?

13   A.    Yes, that's what I wrote.

14   Q.    Okay.  So I guess the question is are you being

15   dishonest with Universal, or were you being dishonest with

16   Mattel by working behind their back?

17   A.    Well, you know, I don't think I was being dishonest with

18   either, necessarily.  I had -- you know, I was anticipating

19   maybe working with MGA.  I wasn't, you know, I didn't really

20   mean to say that I worked for MGA at that time.

21   Q.    Okay.  So let's examine that.

22         What you just said under oath was you didn't mean

23   to say you were working with MGA at that time; right?  That's

24   what you just told the jury.  You didn't mean to say that.

25   A.    No, it's not that I didn't mean to say it.  It's just

Page 3088

1    that I didn't mean to imply necessarily that I was working

2    for MGA.

3    Q.   Okay.  So what you just said under oath is you didn't

4    mean to imply necessarily that you were working with MGA;

5    right?

6    A.   Right.

7    Q.   Okay.  And that's as truthful an answer as any that

8    you've given since you've been on the stand; right?

9    A.   Yes.

10   Q.   So examining that answer, since you didn't mean to

11   create the impression, then why did you put on the address,

12   your address here, MGA Entertainment?

13   A.   I don't really remember.

14   Q.   Perhaps it was because you were trying to give the

15   impression that you worked with MGA?

16   A.   It's possible, but you know, I don't really -- I don't

17   really -- excuse me, remember.

18   Q.   So although it's possible you were trying to give the

19   impression that you were working with MGA, even though that's

20   possible, you just told the jury 30 seconds ago that you

21   weren't trying to give that impression; right?

22   A.   I don't know.  Can I have my transcript read back?

23   Q.   Well, you remember I asked you whether or not that

24   answer was as truthful as any answer you've given?

25   A.   Yes.

Page 3089

1   Q.   That you weren't trying to give the impression you

2   worked with MGA?  Do you remember that question and answer?

3   A.   Yes.

4   Q.   Okay.  So you told the jury, it's probably a minute and

5   a half, two minutes ago, that you weren't trying to give the

6   impression you were working with MGA, and that's as truthful

7   as anything you've said; right?

8   A.   Yes.

9   Q.   And now you just told the jury that it's possible you

10  were trying to give the impression that you worked for MGA

11  Entertainment; is that right?

12  A.   Again, I'm not exactly sure what I was thinking when I

13  put that on there.

14  Q.   But when you received the samples from Universal, you

15  received samples on two occasions.  Remember?  Early October,

16  late October?

17  A.   I don't remember how many occasions.

18  Q.   Well, you remember, when I examined you earlier, I

19  showed you an invoice, I think October 5th or so, and then

20  one on October 20th?

21  A.   Yes.

22  Q.   And both of those invoices were sent to MGA

23  Entertainment, attention Carter Bryant; right?

24  A.   I don't remember.  If you could show them to me again.

25  Q.   I think you were just shown one by your counsel.  I

1  think it was 11904.  I might have the wrong one.

2         Do you recall this invoice?

3  A.   Yes.

4  Q.   And let's go up to the top of it.  This is sent to MGA

5  Entertainment, to attention Mr. Carter Bryant; right?

6  A.   Yes.

7  Q.   I take it certainly you didn't call Universal and say

8  they had made some sort of mistake?

9  A.   No.

10 Q.   And, in fact, you spoke with Ms. Garcia at MGA about the

11 fact that you were contacting Universal and getting these

12 hair samples?

13        MR. NOLAN:  Objection, your Honor.  Lack of

14 foundation.

15        THE COURT:  You're asking if he spoke with

16 Ms. Garcia?  Overruled.

17        THE WITNESS:  I'm sorry.  What were you asking me?

18 Q.   BY MR. PRICE:  You had told Paula Garcia you were doing

19 this.  You told her that you were contacting Universal and

20 getting these hair samples.

21 A.    I may have spoken with her about that.  I don't remember

22 exactly, though.

23 Q.   Well, this wasn't something you were keeping a secret

24 from MGA, was it?

25 A.   No, I don't think so.

Page 3091

1    Q.   And you recall you had -- you called MGA's offices

2    probably about once a day during September; right?

3    A.   I don't remember that either.

4    Q.   Well, you remember, when I examined you and you were

5    looking over some phone records to refresh your recollection,

6    do you remember that?

7    A.   Yes.

8    Q.   And do you remember -- do you recall it looked like you

9    was calling about once a day?

10            MR. NOLAN:  Objection, your Honor.  Lack of

11   foundation.  Best evidence, the document.

12            THE COURT:  Overruled.  You may answer.

13            THE WITNESS:  I remember I called them several

14   times, yes.  I'm not sure if it was once a day.

15   Q.   BY MR. PRICE:  Did that document refresh your memory

16   after looking at the date after date after date after date

17   that we went through that you were calling almost every day?

18   A.   I don't know.  I'd have to see it again.

19   Q.   You weren't keeping this secret from MGA; right?

20   A.   No.

21   Q.   And then you told us that in September you contacted

22   Ms. Leahy; right?

23   A.   Yes.

24   Q.   And you actually went through a sculpt with her.  You

25   gave her your drawing.  She did a sculpt.  You gave her some

Page 3092

1   feedback.

2           Do you recall that?

3   A.   Yes.

4   Q.   And you weren't keeping that a secret from MGA either,

5   were you?

6   A.   I don't think so, no.

7   Q.   And that's because you were trying to get this project

8   rolling; right?

9   A.   You know, I was just hoping that MGA might be interested

10  in the project, yes.

11  Q.   Well, you were getting a hair vendor lined up; right?

12  A.   Yes.

13  Q.   You were getting a sculptor lined up, Ms. Leahy; right?

14  A.   Yes.

15  Q.   You -- you tried to get somebody to do the packaging

16  lined up; right?  Mr. Linker?

17  A.   That wasn't really me.  That was MGA who contacted

18  Mr. Linker.

19  Q.   You were at the very first meeting with Mr. Linker;

20  right?

21  A.   I was at that meeting, yes.

22  Q.   And you were working with Ms. Marlow on the actual

23  sewing of -- identification of the materials and the sewing

24  of the fashions; right?

25  A.   During what time period?

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3093

1   Q.   During September.   Prior to October 4th.

2   A.   I think she had maybe sewn up one thing.   But I don't

3   remember her sewing many things.

4   Q.   Okay.   Well, let's just say before October 4th, when you

5   gave your two weeks' notice, you had lined up Ms. Leahy as a

6   sculptor; correct?

7   A.   Well, I had contacted her, but I think it was MGA who

8   asked her to go ahead and work on the sculpt.

9   Q.   After you introduced her to them.

10  A.   Yes.

11  Q.   Okay.   And you lined up Ms. Marlow.   You said she'd

12  already created one fashion; right?

13  A.   Yes.

14  Q.   And then you contacted the hair vendor; right?

15  A.   Yes.

16  Q.   And this isn't something you're keeping from Ms. Garcia.

17  During these phone calls you're making throughout September,

18  you're tell her this is going on; right?

19  A.   Um, again, I don't really recollect the nature of our

20  conversations.

21  Q.   You don't recall trying to hide any of this from MGA,

22  the fact that you were getting your ducks in a row so you

23  could start production of the Bratz project?

24       MR. NOLAN:   Your Honor, I'm sorry.   Vague and

25  ambiguous.

Page 3094

1          THE COURT:  Why don't you rephrase.

2    Q.   BY MR. PRICE:  You weren't hiding from MGA the fact that

3    you were contacting the sculptor and contacting Ms. Marlow to

4    do the fashions or contacting Universal for the hair?

5          MR. NOLAN:  Your Honor, asked and answered.

6          THE COURT:  Overruled.

7          THE WITNESS:  No, I mean, I don't think I was

8    trying to hide it.

9    Q.   BY MR. PRICE:  Mr. Nolan asked you about your -- the pay

10   difference between MGA and Mattel.

11         Do you recall those questions?

12   A.   Yes.

13   Q.   And he said it was only a few hundred dollars a month.

14   Do you recall that?

15   A.   Yes.

16   Q.   But as you told the jury in your direct examination,

17   when you had these discussions with Mr. Larian in September,

18   he said the advantage of going with MGA is you have the

19   possibility of getting rich.

20   A.   I don't remember saying that.

21   Q.   Well, let's see if you said the following.  Look at page

22   2157, lines 21 to 25.  Actually, before putting it up, let me

23   ask you whether or not that's true.

24         In this time frame in September and October, in

25   that time frame, did Mr. Larian say you had the possibility

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3095

1    of getting rich?

2    A.   I don't remember him saying that.

3    Q.   Okay.  Do you recognize the following question and

4    answer --

5            MR. NOLAN:  I'm sorry, your Honor.  I just want to

6    get this to see if it's complete.

7            THE COURT:  Why don't we go ahead and take our

8    afternoon break at this time.

9            (WHEREUPON THE JURY WITHDRAWS.)

10           THE COURT:  Please be seated.  Ms. Aguiar?

11           MS. AGUIAR:  I just wanted to alert the Court that

12   we had two nonparties who were scheduled to testify this

13   afternoon.  One we discussed last evening, Mitchell Kamarck.

14   He arrived at 1:30, and it is understood about the issue of

15   not interrupting Mr. Bryant's testimony, but I did mention

16   yesterday that he, if they wanted him here, he cannot come

17   back.  And I think you may have already been alerted that

18   there's another nonparty here.

19           THE COURT:  Who is that?

20           MS. AGUIAR:  I saw the attorney for Mr. Marlow, and

21   I think he was --

22           THE COURT:  I did see Mr. McFarland in the

23   courtroom.

24           MS. AGUIAR:  I think they mentioned to you that

25   they were here.  That's not so much my issue, because I don't

Page 3096

1  know what his availability is.  I did just want to raise the

2  other issue with this other witness and see what Mattel's

3  plans were.

4          THE COURT:  Very well.

5          Mr. Zeller, did you wish to speak to this?

6          MR. ZELLER:  Yes, your Honor.  Taking them

7  separately, number one, with Mr. Kamarck, our plan is that

8  presuming Mr. Bryant is off the stand today, we will call him

9  immediately after.

10         We have Mr. Marlow here.  I did speak with him

11  earlier today.  He arrived in the afternoon, and what I

12  basically said to him is depending on, you know, whether

13  Carter Bryant was still on the stand as of the first break of

14  the afternoon, which is where we are, that I anticipated that

15  it was quite unlikely that he would be on the stand today and

16  that I would basically talk with him about a future date of

17  coming back, which is presumably going to be Friday.

18         But it's my intention, once we're done here, to

19  speak with Mr. Marlow and basically, you know, release him

20  for the day.  Because there's no point in him waiting.  It's

21  highly unlikely, obviously given where we are right now, that

22  both Mr. Kamarck and Mr. Marlow would be testifying today.

23         THE COURT:  Mr. McFarland has returned to the

24  courtroom.  So why don't you speak with him about that.  And

25  then as far as Mr. Kamarck, then there's no question that we

Page 3097

1    will get him on sometime this afternoon.

2            MR. ZELLER:  I think that's the plan, your Honor.

3    Obviously, it's Mr. -- once Mr. Bryant is done.  I just don't

4    know that anyone has a very good idea of when that's going to

5    be precisely.

6            THE COURT:  The Court will go to five o'clock.

7            MR. NOLAN:  Your Honor, do you have the trial

8    transcripts readily available to you if I make objections?

9            THE COURT:  Approach the lectern, Counsel.

10           MR. NOLAN:  I'm sorry.  From a mechanical point of

11   view, I know that you've had depositions lodged with you, but

12   now they are going to the court transcripts.  And if I make

13   an objection to the court transcripts, I didn't know if the

14   court had the trial transcripts generally available.

15           THE COURT:  You know, I don't.  I don't encourage

16   this practice, although I permitted MGA to do it, so it's

17   only fair that I give MGA an opportunity to do it, and I'm

18   hoping that both sides keep this to a minimum.

19           MR. NOLAN:  Well, your Honor, so far my minimum was

20   one time.

21           THE COURT:  I understand.

22           MR. NOLAN:  And we continue to do this.  But if

23   we're going to do it, it should be complete.  That's my only

24   point.

25           THE COURT:  What I will do is give you leave to

Page 3098

1     bring up whatever transcript that you want to bring up in

2     your redirect, Counsel.

3               MR. NOLAN:  I appreciate that.

4               THE COURT:  Very well.

5               (Recess taken.)

6               (WHEREUPON THE JURY ENTERS.)

7               THE COURT:  Counsel, you may proceed.

8     Q.   BY MR. PRICE:  We're just putting up a citation.

9               Mr. Bryant.

10              "Question:  I'm not talking about you saying that.

11    I'm talking about during these conversations, didn't

12    Mr. Larian say something to the effect of, with the deal

13    we're talking about, you could be rich?

14              "Answer:  Yeah, he might have said something like

15    that."

16              Do you recall telling the jury that in your

17    examination on Friday?

18    A.   Yes.

19    Q.   Now, Mr. Nolan also asked you whether or not you had

20    changed or put dates on a drawing as a result of a request

21    from an attorney.

22              Do you recall that question?

23    A.   Yes.

24    Q.   And I think I placed before you, and it may be loose up

25    there, but I can put it on the overhead, Exhibit 10, which is

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3099

1    in evidence, your Honor.  And if we can look at the first

2    page.

3            You see if you look at 10-001, you see this looks

4    to you like a legal document of some sort?

5            MR. NOLAN:  Your Honor, this first page is not in

6    evidence, I don't believe.

7            MR. PRICE:  It is.

8            MR. NOLAN:  Very well.  I'll accept your word.

9            THE COURT:  Very well.  You may proceed.

10   Q.   BY MR. PRICE:  This looks to you like a legal proceeding

11   of some sort; right?

12   A.   I'm not exactly sure I've ever seen this before, but

13   yes.

14   Q.   And I'd like you to look, if you would, at three pages

15   in here, 10-003.  Here's something I think you will

16   recognize.  And you see, this is a drawing which has the date

17   on it August 1998; correct?

18   A.   Yes.

19   Q.   And it's correct, is it not, sir, that if there's any

20   date in these exhibits or these originals that say '98, to

21   your knowledge, those dates were put in there sometime after

22   1999; correct?

23   A.   I believe so, yes.

24   Q.   And you've testified previously that you have no

25   recollection as to why at some point after 1999 you put in

Page 3100

1    dates of 1998 on these drawings; correct?

2    A.   That's right.

3    Q.   What you do know is that drawings with that date that

4    you put on there, August 1998, that you put on it at some

5    time after '98, you do know those drawings have been used by

6    MGA in legal proceedings.

7    A.   Yes.

8    Q.   Does that refresh your memory that the reason that you

9    went back and put these August 1998 dates on drawings that

10   were done after '98, is the reason you did that because you

11   were asked to do so so these drawings could be used in legal

12   proceedings instituted by MGA?

13   A.   No, that's not my memory.

14   Q.   Well, do you have a memory one way or the other on that?

15   A.   Well, my only memory is that at some point I was asked

16   to turn over the originals to MGA.

17   Q.   You were asked that by their attorneys?

18   A.   I believe so.

19   Q.   And did their attorneys ask you to go back and put

20   August '98 dates on documents that were not created in August

21   of '98?

22   A.   No, not that I remember.

23   Q.   But that's what you -- you think that's when you in fact

24   did that?

25   A.   I think so.

Page 3101

1    Q.   By the way, getting back to MGA's knowledge about what

2    you were doing in September, I want to put up what's been

3    marked as Exhibit 18, and this is an e-mail from

4    Ms. Treantafelles, September 27, to Hong Kong, where it says

5    the very last page of this binder indicates preferred hair

6    vendor, contact name, address, and phone number.

7             You came to know who Franki Tsang and Judy Fich

8    were?

9             MR. NOLAN:  Objection.  Foundation.

10            THE COURT:  Sustained.

11   Q.   BY MR. PRICE:  Let me ask you this.  The preferred

12   vendor, hair vendor, that MGA identified to Hong Kong was the

13   one you found; right?

14   A.   I don't know.  I don't remember ever seeing this e-mail

15   before.

16   Q.   Well, the hair vendor MGA used was the one you located;

17   right?

18   A.   Eventually, yes.

19   Q.   Does this refresh your recollection that in September,

20   you told Ms. Garcia here's who I want you to use as the

21   vendor, Universal?

22   A.   I'm not sure I said exactly that.  I just said, you

23   know, I just said that I know these people have a nice

24   product.

25   Q.   And you shared the hair samples with Ms. Garcia?

Page 3102

1    A.    Yes.

2    Q.    And did you explain to her why it was a good product?

3    A.    I don't remember.

4    Q.    Let me switch to another topic.  Mr. Nolan was talking

5    to you about a route from your home to the Battlefield Mall.

6          Do you remember that?

7    A.    Yes.

8    Q.    And do you recall you went over in some detail the route

9    you would take from the Battlefield Mall to your home?  Do

10   you remember that?

11   A.    Yes.

12   Q.    And it's true that at your deposition previously, you

13   said you didn't recall the route that you took to and from

14   the Battlefield Mall?

15   A.    That's possible.

16   Q.    Now, why do you think that -- by the way it's possible

17   where previously you said you didn't recall the route you

18   took, but you were able to tell the jury in some detail today

19   the route you took.  Why is it possible that you gave

20   different answers under oath?

21   A.    Um, well, I think maybe, at the time of my deposition, I

22   just didn't recall.

23   Q.    I'm going to play 627, volume 3, line 20, to 24.

24         THE COURT:  Any objection?

25         MR. NOLAN:  No objection.

Page 3103

1          THE COURT:  You may play it.

2          WHEREUPON THE VIDEOTAPED DEPOSITION EXCERPTS

3          OF CARTER BRYANT, AS PROVIDED BY COUNSEL,

4          ARE INCORPORATED HEREIN:

5      "During that time period, August 1998, did you often

6   drive by the Kickapoo school, or was that an unusual event

7   when you did it on that occasion?

8      "ANSWER:  I don't remember what route I usually took,

9   but it could have been a typical route, yes."

10  Q.   BY MR. PRICE:  So you were asked that in 2004?

11  A.   Yes.

12  Q.   And it's probably fair to say your memory was better in

13  2004 as to what you did in 1998 than it is in 2008?

14  A.   Well, you know, I had some time to think about, you

15  know, the way things happened.

16  Q.   You were asked, by the way, whether or not you had

17  spoken with anyone with the Skadden law firm since you last

18  took the stand.  Do you recall that question?  By Mr. Nolan.

19  It is the first question today.

20  A.   Yes.

21  Q.   Did you have an opportunity to speak with your attorney?

22  A.   Yes.

23  Q.   And it's correct, is it not, that your attorney is being

24  paid 97 percent of his fees by MGA?

25          MR. NOLAN:  Your Honor, objection.  Asked and

Page 3104

1    answered.

2              THE COURT:  It has been.  Sustained.

3              MR. PRICE:  In that case, I'd like to play from his

4    deposition transcript.

5              MR. NOLAN:  Your Honor, this is cumulative.

6              MR. PRICE:  It's inconsistent.

7              THE COURT:  Well, let me see what it is.

8    Mr. Nolan, I can't predict what he's going to have.

9              MR. PRICE:  It would be from volume 4, your Honor,

10   page 834, lines 10 through 14.

11             THE COURT:  What volume is that?

12             MR. PRICE:  That's volume 4, January 23, 2008.

13             MR. NOLAN:  Your Honor, I'd ask to have a quick

14   sidebar on this.

15             (SIDEBAR CONFERENCE HELD.)

16             THE COURT:  The question that was asked and

17   answered was whether or not there was 39 percent arrangement,

18   and his answer was I don't know.  We've never gotten into the

19   deposition testimony at that time.  So I agree that that

20   can't be asked and answered again.  But the deposition seems

21   to be something else.

22             MR. NOLAN:  But, your Honor, I believe he followed

23   up by asking isn't it true that you've only paid 3 percent,

24   and he says, "No, I don't think that's it.  I've paid more

25   than that."  And this testimony, your Honor, goes to what the

Page 3105

1    basic agreement was, but -- and it's 403, because if he gets

2    into this, we're going to have to get into all of the fee

3    arrangements because it didn't turn out to be 3 percent.  It

4    turned out to be much more.

5              THE COURT:  How much more ?

6              MR. NOLAN:  I don't know the percentage, but I can

7    tell you, Judge, that there's been an issue about legal fees

8    in this case for some period of time with the Keker, Van Nest

9    firm.  And Mr. --

10             THE COURT:  I guess my thought is that for

11   impeachment purposes, they are entitled to get into what the

12   arrangement was.  Because it goes to this whole issue of

13   credibility and the relationship between MGA and Carter

14   Bryant.  Obviously, this would be a lot easier if we could

15   just get a straight answer from Carter Bryant on this point.

16   If he doesn't remember, I understand that, then he may not

17   remember.

18             MR. NOLAN:  Could I ask the Court to have Mr. Price

19   ask the question that has not been asked, and that is what

20   was the basic agreement in this case.

21             THE COURT:  Okay.

22             MR. NOLAN:  And then -- because that hasn't been

23   asked.

24             THE COURT:  Fair enough.

25             MS. AGUIAR:  Could we get a clarification?

Page 3106

1      THE COURT:  Yes.

2      MS. AGUIAR:  If we go ahead and ask these

3   questions, will we then be allowed to ask is that how it

4   actually ended up playing out?

5      THE COURT:  Sure.  That's fine.

6      (CONCLUSION OF SIDEBAR CONFERENCE.)

7      THE COURT:  You may proceed, Counsel.

8      MR. PRICE:  Thank you.

9   Q.   Mr. Bryant, was it the basic agreement between you and

10  MGA that you'd pay 3 percent of the attorneys' fees and MGA

11  pays the rest?

12  A.   I'm not exactly sure.

13      MR. PRICE:  May I read this, your Honor?

14      THE COURT:  You may.

15      MR. PRICE:  (Reading.)

16      "Question:  Who is paying your attorneys' fees?

17      "Answer:  My attorneys' fees are partly paid by MGA

18  and myself.

19      "Question:  You pay 3 percent, and MGA pays the

20  rest?

21      "Answer:  That's the basic arrangement."

22      THE WITNESS:  Okay.

23  Q.   BY MR. PRICE:  I'd like you to look, Mr. Bryant, at some

24  maps which you saw on your direct.  It's Exhibit 18507.  And

25  I want to call your attention to the last page in that,

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3107

1    18507-004.

2         Do you recall you were shown this during your

3    examination; correct?

4    A.   Yes.

5    Q.   And this is where you lived in Kimberling City; correct?

6    A.   Yes.

7    Q.   And I think your testimony was that this 65 is an

8    interstate; correct?

9    A.   I think so, yes.

10   Q.   And 160 is a state road?

11   A.   I'm not sure what you call it.  It's a highway.

12   Q.   And I think your testimony was that if you took the

13   Battlefield Mall and took the route that takes you to 65,

14   you'd end up somewhere besides Kimberling City; correct?

15   A.   I believe so, yes.

16   Q.   But, sir, isn't it true that there's a place around

17   Highlandville where you go over and you get on the 65?

18   A.   I'm not sure.

19   Q.   As you're driving up 160, you don't notice a sign saying

20   interstate that-away?

21   A.   There could be.  I don't recall it.

22        MR. NOLAN:  Is that an offer of proof?  There's

23   lack of foundation.

24        THE COURT:  Overruled.

25   Q.   BY MR. PRICE:  I think when you showed us the

Page 3108

1   Battlefield Mall, if we can go to maybe 18507-002.  And this

2   is where you worked; correct?

3   A.   Approximately, yes.

4   Q.   And to get onto the freeway, you'll just get off onto

5   this area here -- correct? -- and go down the 65

6   A.   I know that -- I know now that you can do that, but at

7   the time I had no idea of the fact that you could do that.

8   Q.   How long had you been going to Springfield?

9   A.   Well, I lived in Kimberling City.  So I went to

10  Springfield for church, and I went to Springfield for work.

11  Q.   It's the nearest big city?

12  A.   Yes.

13  Q.   And you said you lived in Kimberling City for how long?

14  A.   I think it was about a year, a little over a year.

15  Q.   And you didn't know where the 65 went?

16  A.   I didn't know where the 65 was.  I took route 160.

17  Q.   And between the time of your deposition and trial, you

18  have now recalled that that is your route; right?

19  A.   Well, I always remembered that I took 160.

20  Q.   But I guess your testimony is that you go out of the

21  mall, and you take a left; correct?

22  A.   Yes.

23  Q.   And then you said you turned here?

24  A.   I can't see the street name.  Yes, National.

25  Q.   And instead of continuing this way.

Page 3109

1    A.    Right.

2    Q.    And that's because you want to avoid traffic?

3    A.    Right.

4    Q.    Now, of course, if you went towards 65, you would avoid

5    the traffic altogether; right?

6    A.    Yes, but again, I didn't know that that was a possible

7    route.

8    Q.    And so your testimony is that the route you took, I

9    guess, went down this street here and then past Kickapoo High

10   School; correct?

11   A.    Yes.

12   Q.    At the time that school is being let out was your

13   testimony; right?

14   A.    I think so, yes.

15   Q.    And what's the speed limit around the high school at the

16   time when the school is in session and the kids are let out?

17   A.    I'm not sure.  20, 30.

18   Q.    And it's your testimony that this was a faster route of

19   going, which is taking this street down to East Primrose and

20   then going through the school, as it was being let out, that

21   that was a quicker route than going on the 65?

22   A.    To the best of my knowledge, back then, yes, it was,

23   because I knew nothing about taking the 65.

24   Q.    Did you ever at that time go onto MapQuest or something

25   like that and just plug in what's the fastest way to get from

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3110

1    Kimberling City to the Battlefield Mall?

2    A.   I don't even know that I knew MapQuest existed.

3    Q.   So is it correct that -- how long did you work at this

4    mall?

5    A.   I don't remember exactly.  A few months.

6    Q.   And you worked at this mall for a few months and didn't

7    know it was right near an interstate?

8    A.   As I've said before, I had no idea that that route went

9    anywhere down by Kimberling City.  I did not have any clue

10   about that.  I went the way that I said that I went.

11   Q.   And I take it, at the time of your deposition, you just

12   didn't recall that that's the way you went?

13   A.   All I recalled at that time was that I took highway 160.

14   There were a couple different, you know, ways that you could

15   get to the mall.  And this is the way I recall that I -- when

16   I passed the high school.

17   Q.   I'm approaching, sir, with Exhibit 1361 for

18   identification.

19              Your Honor, I've handed 1361 to the witness.

20              And Mr. Bryant --

21              MR. NOLAN:  May I have a copy of this?

22              MR. PRICE:  Your Honor, as a reciprocal agreement,

23   we're going to display the second page, just the map part.

24   Your Honor, may I display 13631, page 2?

25              THE COURT:  Any objection?

Page 3111

1    MR. NOLAN:  No, your Honor.

2    THE COURT:  You may.

3  Q.   BY MR. PRICE:  It says this is Kimberling City here.

4       Do you see that?

5  A.   Yes.

6  Q.   And you see there's a 60 here?

7  A.   Yes.

8  Q.   And there's this interstate 65?

9  A.   Yes.

10 Q.   And you see the B, that's the Battlefield Mall that you

11 worked at for all of these months?

12 A.   Yes.

13 Q.   And so your testimony is that you were never aware of

14 the route shown in this map from Kimberling City going over

15 the interstate at Highlandville up the 65 to the Battlefield

16 Mall?

17 A.   You know, you can ask me this many times, but I'm going

18 to keep telling you the route I took was to take highway 160

19 up to Springfield.

20 Q.   Well, is it your testimony that in that time frame, I

21 think you said you didn't know MapQuest existed; is that

22 right?

23 A.   Probably not.

24 Q.   And you also testified that in this '98 time frame, that

25 you looked at some ads in Seventeen magazine.  Do you recall

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3112

1   that?

2   A.   Yes.

3   Q.   And I think you said that was professionally something

4   you did, is you would look at Seventeen magazine.

5   A.   I would look at various fashion type magazines.

6   Q.   And Seventeen was one?

7   A.   Yes.

8   Q.   And was there a period of time when you looked at

9   Seventeen and stopped looking and started looking, or is that

10  something you kind of generally did as part of your vocation,

11  your job?

12  A.   I mean, I don't know that I had a pattern of buying that

13  particular magazine.  I would buy lots of different types of

14  magazines.

15  Q.   And you identified some ads that were from August of

16  '98; is that right?

17  A.   Yes.

18  Q.   Now, do these ads usually run, in your experience, for a

19  long period of time such that an ad you would see in August

20  of '98 you would also see in August of '99?

21  A.   It's possible.

22  Q.   For example, these fashion ads, I think you had a Steve

23  Madden ad.  Is that the kind of ad that, if it was running in

24  August of '98, that same ad might be running in August of

25  '99?

b3c9772e-5038-4bea-95b5-2016fbb63c07

1          MR. NOLAN:  Objection.  Lack of foundation.  Calls

2     for speculation.

3          THE COURT:  Sustained.

4     Q.   BY MR. PRICE:  In your experience, my understanding is

5     you looked at these magazines to look at these ads for

6     inspiration; correct?

7     A.   I'm sorry.  What was your question?

8     Q.   My understanding is you look at these magazines and

9     these fashion ads for inspiration; correct?

10    A.   Sure.

11    Q.   Did you have some general understanding as to kind of

12    what the fashion cycle was, how long a fashion ad would be in

13    a magazine?

14    A.   No.

15    Q.   And I believe in the Seventeen magazine you looked at,

16    if we could show Exhibit 789, I'm going to show you one of

17    your drawings in this case.  You recognize this as one of

18    your Toon Teens?  I'm sorry.

19         MR. NOLAN:  Objection.  He is not --

20         MR. PRICE:  Good objection.

21         THE COURT:  I think he's withdrawing that, Counsel.

22    Q.   BY MR. PRICE:  You recognize this as one of your Bratz?

23    A.   Yes.

24    Q.   And I think you were saying in Exhibit 17246 there was

25    a, page 126, there was a Dixie Chicks ad which inspired you?

Page 3114

1    A.    Yes.

2    Q.    And if we can do these side by side.  So this was one of

3    the inspirations; right?  The Dixie Chicks?

4    A.    I think the phrase.

5    Q.    And then you said also there was an ad at page 127 for

6    Paris Blues; right?

7    A.    Yes.

8    Q.    So this was another inspiration, this Paris Blues ad?

9    A.    Yes.

10   Q.    And you also mentioned page 115, which is a Steve Madden

11   ad; is that right?

12   A.    Yes.

13   Q.    And then I guess it was Exhibit 193, which was a --

14   17246-193, which is a Coke ad.  This was an inspiration?

15   A.    Yes.

16   Q.    Now, I want to show you Exhibit 48-2, which is in

17   evidence, and ask you whether or not this was also an

18   inspiration.  This is Toon Teens.

19   A.    No.

20   Q.    Well, you said the Steve Madden ad was an inspiration in

21   August of '98?

22         Do you recall that?

23   A.    Yes.

24   Q.    Do you recall that when you talked to Ms. Leahy in

25   '99 -- that's the sculptor.  You remember her?

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3115

1    A.   Yes.

2    Q.   When you spoke with her in '99, in addition to your

3    drawing, you gave her an ad to give her some kind of

4    indication of what you wanted the sculpt to look like; right?

5    A.   I think so, yes.

6    Q.   This was September of 2000 that you gave her this ad?

7    A.   Yes.

8    Q.   And if I could show you what's been marked as

9    Exhibit 1127.

10        Do you see that, sir?

11   A.   Yes.

12   Q.   That's the ad you gave Ms. Leahy in the 2000 time frame

13   to assist in coming up with the concept for Bratz; right?

14   A.   I'm not sure in it was this ad or not.

15   Q.   Well, if Ms. Leahy said it was this ad, would you have

16   any reason to dispute it?

17   A.   No, I just don't remember the particular ad that I gave

18   her.

19   Q.   Do these figures in Exhibit 1127 look -- have the look

20   that you were trying to get in the -- in your Bratz sculpt?

21        MR. NOLAN:  Your Honor, I'm sorry.  Is this what's

22   on the screen?

23        MR. PRICE:  No.

24        THE COURT:  Thank you, COUNSEL.

25   Q.   BY MR. PRICE:  Exhibit 1127, which is in front of you,

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3116

1   was this sort of the look you were going for?

2   A.   Well, I remember that I liked this ad.  I always liked

3   the Steve Madden ads.

4   Q.   So this is an ad that you saw, the Steve Madden ad?

5   A.   Yes.

6          MR. PRICE:  Your Honor, I move Exhibit 1127 in

7   evidence.

8          MR. NOLAN:  No objection.

9          THE COURT:  It's admitted.  You may publish.

10         (Exhibit 1127 received.)

11  Q.   BY MR. PRICE:  And if we look back to comparing this to

12  Exhibit 789, which is one of your Bratz, you'll agree that

13  this Steve Madden, these figures, look more like your Bratz

14  figures than the one that was in the August '98 Seventeen

15  magazine?

16  A.   Well, you know, the head in the Steve Madden ad here is

17  larger than the one that I remember from '98.

18  Q.   These look more like Bratz than the one in '98; right?

19         MR. NOLAN:  Objection, your Honor.  Bratz, the

20  dolls, or Bratz, the drawings?

21         MR. PRICE:  Bratz, the Exhibit 789.

22         THE COURT:  Very well.  Thanks for the

23  clarification, Counsel.

24         THE WITNESS:  Well, I think there's similarities in

25  both of the ads.

Page 3117

1    Q.   BY MR. PRICE:  Let's look at both of those.  Let's put

2    up 17246-115, the Steve Madden ad, which you say you saw in

3    '98.  So you're saying this ad looks more like Exhibit 789,

4    your Bratz drawing.  You think this looks more like it than

5    Exhibit 1127?

6    A.   I don't, I don't think it looks more like it.  Like I

7    said, I think there's a couple similarities in both of them.

8    Q.   Well, you didn't give Ms. Leahy the '98 Steve Madden ad,

9    did you?

10   A.   I don't remember which ad I gave her.

11   Q.   This is the ad you gave her, isn't it?  The

12   Exhibit 1127?

13   A.   It's possible, but I don't remember.

14   Q.   Well, you do recall the ad, seeing it in magazines;

15   correct?

16   A.   Yes.

17   Q.   It was in the August 1999 Seventeen magazine, wasn't it?

18   An ad with this picture.

19   A.   I don't remember that.

20   Q.   Well, August '99, that's the date when you had a number

21   of drawings notarized by Ms. Prince.

22   A.   Yes.

23   Q.   Okay.  If I could show you, for example, I've handed you

24   10179.  I've also given you the original, which is a

25   Seventeen magazine, August 1999.

Page 3118

1    A.    Yes.

2    Q.    Do you have that in front of you?

3    A.    Yes.

4    Q.    And looking at the original, do you recognize that as

5    being a Seventeen magazine?

6    A.    It appears to be, yes.

7           MR. PRICE:  Your Honor, I move Exhibit 10179 into

8    evidence.

9           THE COURT:  Any objection?

10          MR. NOLAN:  Yes, your Honor.  It's 287 pages.

11          THE COURT:  Why don't we do what we did with

12   another issue of Seventeen.  And if there's no objection, you

13   can refer to a page, and whatever page you refer to will be

14   admitted.  And that will be the exhibit.

15   Q.    BY MR. PRICE:  If you could look at page 133.  And I

16   think it's tapped in the original.

17   A.    Okay.

18   Q.    Do you see Exhibit 10179-0133?

19   A.    Yes.

20   Q.    And that's a Steve Madden ad which you saw at some

21   point?

22   A.    Yes.

23   Q.    Does this refresh your recollection that the first time

24   you saw that ad was in 1999?

25   A.    No, I don't remember the first time I saw that ad.

Page 3119

1    Q.   So you have no recollection of seeing that ad in 1998;

2    correct?

3    A.   I don't know.

4    Q.   Do you know any reason why you would have given

5    Ms. Leahy, the sculptor, in 2000, this ad with these figures?

6    A.   I just remember from this ad, that I liked the -- I sort

7    of liked the stance of the girl on the right.

8    Q.   There's also actually, I think, the very next page a

9    Paris Blues ad.

10            Do you see that?

11   A.   Yes.

12   Q.   That's 10179-134.  Again, this is in the August '99

13   Seventeen magazine; right?

14   A.   Yes.

15   Q.   Was that an inspiration for your Bratz drawings, this

16   August 1999 ad in Paris Blues in Seventeen magazine?

17   A.   No, the one that I remember was the one where she was

18   sitting on a disco ball or something.

19   Q.   You would agree with me that if I took a drawing, say,

20   today, and then searched through magazines over the last

21   several years, I could find something in fashion magazines

22   that might resemble it?

23   A.   Probably.

24   Q.   By the way, in describing the Bratz dolls, have you ever

25   described them as multi-ethnic?

Page 3120

1    A.    I don't know.   I don't remember.

2    Q.    They are multi-ethnic; correct?

3          MR. NOLAN:   Your Honor, we're talking about the

4    dolls now or the -- the question is --

5          THE COURT:   Counsel, objection, ambiguous,

6    sustained.

7          MR. NOLAN:   Thank you.

8          THE COURT:   Counsel.

9    Q.    BY MR. PRICE:   The drawings you did of the Bratz, they

10   are multi-ethnic; right?

11   A.    Yes.

12   Q.    Have you described them as hip-hop?

13   A.    I think one of the girls I described as being -- I think

14   that was her nickname.

15   Q.    And if we look at Exhibit 709.   This is Hallidae you

16   describe as hip-hop.

17   A.    Yes.

18   Q.    Would it be an unfair characterization to describe your

19   Bratz drawings as being hip-hop?

20   A.    I wouldn't describe any of them as hip-hop except maybe

21   the -- that one character.

22   Q.    Urban?

23   A.    What do you mean by Urban?

24   Q.    Well, a look you're more likely to see in the city than

25   in the country.

Page 3121

1   A.   I mean, I think there's some urban elements, sure.

2   Q.   Now, the drawings that Mr. Nolan went over with you, the

3   ones that you say you created in 1998, 12 of those have

4   notarization dates on them of August '99; correct?

5   A.   Yes.

6   Q.   And three of those have handwritten dates of 1999;

7   correct?

8   A.   I don't remember that.

9   Q.   Well, Exhibit 777, for example, that has August 27,

10  1999, written on it?

11  A.   Yes.

12  Q.   And Exhibit 1327.  That has the September 19, 1999, date

13  on it; do you recall that?

14  A.   Yes.

15  Q.   And then it was 1328.  It has the September 19, 1999;

16  correct?

17  A.   Yes.

18  Q.   And if we looked at Exhibit 62, you recall that's a

19  collection of the ones that were notarized in August of '99?

20  A.   Yes.

21  Q.   And you testified about going to see Ms. Prince.  And

22  first, you said that in response to Mr. Nolan's yes, that you

23  weren't close friends, but you were friends.

24  A.   I mean, you know, we were friendly at work.

25  Q.   But you didn't go to her at work to get your drawings

Page 3122

1    notarized; right?

2    A.    No.

3    Q.    You went to her home.

4    A.    Yes.

5    Q.    And as you told the jury earlier, that wasn't the first

6    time you'd been to her home.

7    A.    I think that's what I said, but I don't clearly recall

8    another occasion of being there.

9    Q.    And I guess Mr. Nolan pointed out, you testified that

10   she was an administrative assistant to a vice-president at

11   Mattel; right?

12   A.    Yes.

13   Q.    And you gave her these drawings; right?

14   A.    Yes.

15   Q.    And you certainly didn't tell her that you created these

16   while you were at Mattel, did you?

17   A.    I'm sorry.  What, now?

18   Q.    You did not tell her that you created the documents at

19   Mattel, did you?

20   A.    No.

21   Q.    Your testimony is that you went to Ms. Prince and told

22   her that you did them in 1998; right?

23   A.    That's right.

24   Q.    So she would have no reason to be concerned that they

25   were done while you were at Mattel if you're telling her they

1  were in '98; right?

2  A.   What do you mean done at Mattel?

3  Q.   Well, Mr. Nolan was asking you whether or not you were

4  concerned about taking these drawings to Ms. Prince; right?

5  A.   Yes, I think I remember that.

6  Q.   A nice woman?

7  A.   Sure.

8  Q.   And you didn't have any reason to be concerned, unless

9  you were going to tell her you did these at Mattel; right?

10  A.   I'm sorry.  I'm not following your question.

11  Q.   Well, you told her, "These don't belong to Mattel.  I

12  created them earlier"; right?

13  A.   I told her that I created them in 1998, yes.

14  Q.   Now, you remember the drawing you did in front of the

15  jury yesterday?

16  A.   Yes.

17  Q.   Now, I just want to see your understanding.  You could

18  take that drawing to a notary; correct?

19  A.   Sure.

20  Q.   You could have the notary notarize it as of the date you

21  took it to the notary; correct?

22  A.   Yes.

23  Q.   And you could tell the notary I'd like you to put in the

24  book that this is an original drawing by me created in Paris,

25  France, in 1934.  Well, let's pick a date that -- well, in

Page 3124

1    1995; right?

2    A.   Yes, that's possible.

3    Q.   And the notary will write down what you say.  You

4    understand that?

5    A.   Yes.

6    Q.   I mean, they don't do an investigation to see whether or

7    not you in fact created the document you drew yesterday, they

8    don't do an investigation to see whether you did it in Paris,

9    France, in 1995; right?

10   A.   I wouldn't imagine so, no.

11   Q.   So all the notarization shows is that as of August 1999,

12   with respect to those drawings, they existed; right?

13   A.   Yes.

14   Q.   And you wanted that established, that they existed in

15   August of 1999, because you were going to send them to this

16   company.  I've forgotten the name.  Alaska Mama.  How could I

17   forget?

18   A.   Right.

19   Q.   So as of January '99, then, you had no Bratz-related

20   documents which have any dates on them at all; correct?

21   A.   No, not that I remember.

22   Q.   You haven't copyrighted any Bratz drawings; right?

23   A.   No.

24   Q.   Is my statement correct?

25   A.   Yes.  Not that I remember.

1   Q.   And as of '99, you hadn't done the poor man's copyright

2   of putting a copy in an envelope and sending it to yourself.

3   A.   No, I don't think so.

4   Q.   And I think you said that in the '98 time frame, while

5   you were there in Missouri, you actually tried to hook up

6   with an agent; correct?

7   A.   Yes.

8   Q.   To represent your works potentially to other folks;

9   right?

10  A.   Yes.

11  Q.   And there's no evidence that you actually showed any of

12  these agents your Bratz drawing; is that right?

13  A.   I don't know if I did or not.

14  Q.   Well, you didn't get notarized in '98 any Bratz drawings

15  so you could give them to your agent to try to shop around;

16  right?

17  A.   I don't believe so, no.

18  Q.   And then we have this notebook, which is 1155.

19          Do you have that original in front of you?

20  A.   That black one?  Yes.

21  Q.   And I think I misspoke in my examination of you.  I said

22  it was something over a hundred pages because I was counting

23  front and back with the Bates numbering.  If you look at that

24  notebook, more than half the pages are torn out; right?

25  A.   Yeah, I mean, there are a lot of pages missing.

Page 3126

1   Q.   I mean, it's not even close to a hundred pages; right?

2   A.   Right.

3   Q.   And it's correct that at your deposition, you thought

4   that you had thrown away the notebook on which you had done

5   your drawings, which you say were done right after you drove

6   by Kickapoo High School?

7   A.   I don't remember saying that.

8   Q.   You recall those drawings, Exhibit 5-179.  Maybe we can

9   show those.  That was 5-179, 5-180, 5-181, and -182.  And do

10  you recall testifying at your deposition that you said that

11  notebook was probably thrown away?

12  A.   I don't really recall what I said at my deposition.

13            MR. PRICE:  If we could play 328, lines 4 through

14  15.

15            THE COURT:  Any objection?

16            MR. NOLAN:  No objection.

17            THE COURT:  You may play it.

18            WHEREUPON THE VIDEOTAPED DEPOSITION EXCERPTS

19            OF CARTER BRYANT, AS PROVIDED BY COUNSEL,

20            ARE INCORPORATED HEREIN:

21            "QUESTION:  179?

22            "ANSWER:  This was one of the very first --

23       this was one of the drawings that I did on my

24       notebook paper in 1998.

25            "QUESTION:  All right.  Did you do the very,

Page 3127

1    very first drawings on notebook paper?

2         "ANSWER:  Yes, and that was one of them.

3         "QUESTION:  Do you still have that original

4    notebook?

5         "ANSWER:  No, I don't.

6         "QUESTION:  Do you know where that is?

7         "ANSWER:  I have no idea.

8         "QUESTION:  You tossed it at some point?

9         "ANSWER:  More than likely."

10   Q.   Now, your understanding, you have been informed that a

11   forensic expert has determined --

12        MR. NOLAN:  Your Honor, I'm going to object to

13   characterization of what an expert has --

14        THE COURT:  Sustained.  Rephrase, Counsel.

15   Q.   BY MR. PRICE:  Yes, you testified that it's your belief

16   that the drawings came out of that notebook 1155.

17        Do you recall that?

18   A.   Vaguely.  We talked about a lot of things yesterday.

19   Q.   Well, you understand this is an important fact, where

20   these drawings came from?

21   A.   Yes.

22   Q.   So yesterday you recall you told the jury that you

23   believe those documents came out of that exhibit, that black

24   notebook; correct?

25   A.   Honestly, I don't remember.

Page 3128

1    Q.   Well, that's your belief sitting here right now;

2    correct?

3    A.   You know, I'm not really sure.  I mean, it's -- it's the

4    same type of paper it looks like.  So I'm not, you know, I'm

5    not sure that they came out of this notebook or not.

6    Q.   So if you said during my examination that they did come

7    out of that notebook, then you think you are now mistaken?

8    A.   Um, no, maybe just a little confused.

9    Q.   Well, speaking of that, let's talk about what is in the

10   notebook.

11   A.   Okay.

12   Q.   And you talked about Jewel, the project Jewel.

13        Do you recall that?

14   A.   Yes.

15   Q.   And I believe your testimony was that the Jewel project

16   you worked on both in '98 and '99.

17   A.   Yes, there were two different projects.

18   Q.   Now, could you tell us who was your supervisor was in

19   '98 on the Jewel project?

20   A.   Cassidy Park.

21   Q.   And that was during your first stint at Mattel; correct?

22   A.   Yes.

23   Q.   But it's correct, sir, that previously, when asked to

24   identify the projects you worked at in your first stint, you

25   didn't identify Jewel?

Page 3129

1   A.   I might not have.   I might just not have remembered it

2   at the time.

3   Q.   If we could play page 544, lines 2 through 13.

4           MR. NOLAN:   No objection.

5           THE COURT:   Very well.   You may play it.

6           WHEREUPON THE VIDEOTAPED DEPOSITION EXCERPTS

7           OF CARTER BRYANT, AS PROVIDED BY COUNSEL,

8           ARE INCORPORATED HEREIN:

9           "QUESTION:   Who was your supervisor during

10          your -- the first period of your employment at

11          Mattel?

12          "ANSWER:   Cassidy Park.

13          "QUESTION:   And was she your supervisor during

14          the entire first period?

15          "ANSWER:   Yes.

16          "QUESTION:   What projects did you work on

17          under her direction?

18          "ANSWER:   Oh, gosh.   Well, there were a number

19          of projects.   There was Teen Skipper.   There was an

20          Avon Barbie project.   There was a Bicycling Stacie

21          project.   There were a lot of projects.   There was

22          a cowboy project.   Oh, gosh.   That's all I can

23          remember off the top of my head right now."

24   Q.   Now, Mr. Bryant, do you recall the testimony in front of

25   the jury in response to the question that this is the

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3130

1    original of 1155-C, is it your understanding that those

2    original drawings that you made, which were 5-39, 5-40, 5-41,

3    and 5-42, came out of that notebook?

4           "ANSWER:  I believe so, yes."

5           Do you recall giving that testimony to the jury on

6    June 17th?

7    A.   I'm a little bit confused as to what it is you are

8    referring to.

9    Q.   1155-C is the black notebook.

10   A.   Okay.

11   Q.   You've got the original.  The question was was it your

12   understanding that those original drawings that you made came

13   out of that notebook?  "Answer:  I believe so, yes."

14          Do you recall giving that testimony?

15   A.   Yes.

16   Q.   And so it's your understanding, obviously, then, that

17   that notebook is just a 1999 notebook.  That means the

18   original drawings were in 1999.

19          MR. NOLAN:  Objection, your Honor.  Argumentative.

20   Characterization regarding the 1999 notebook.

21          THE COURT:  Rephrase, Counsel.

22   Q.   BY MR. PRICE:  Your understanding is that if it can be

23   established that that notebook contains only entries you made

24   in 1999, that would mean that the drawings were in 1999.

25          MR. NOLAN:  Objection, your Honor.  Vague and

Page 3131

1    ambiguous as to what remains in the book or was missing in

2    the book.

3              THE COURT:  Rephrase.

4    Q.   BY MR. PRICE:  Let me do it this way:  So there are some

5    drawings in this notebook which appear to be the Jewel

6    project; correct?

7    A.   Yes.

8    Q.   And there's also a few pages from that, an entry, notes,

9    ideas on large Angel.  The copy is 1155-C-013.

10             Do you see that?

11   A.   Yes.

12   Q.   And Angel is a 1999 project; right?

13   A.    I worked on a number of Angel projects.  I worked on one

14   for Ashton Drake.  I worked on illustration of an angel for

15   my portfolio.  And I also worked  on an angel at Mattel at my

16   second stint.

17   Q.    And you said you worked on an angel at Mattel at your

18   second stint, that means after January 1999?

19   A.    Correct.

20   Q.    And what does that say there?

21   A.    I think it says Ken hair.

22   Q.    That probably refers to something at Mattel.  Wouldn't

23   you agree?

24   A.    It could.  I don't know.

25   Q.    And the angel in 1999 ideas you were working on included

Page 3132

1    empire waist look; right?

2    A.   I don't remember.  I don't think so.

3    Q.   Is it your understanding that these notes referring to

4    Ken hair refers to 1999, your second stint at Mattel?

5    A.   You know, I don't know.  These are just sort of, you

6    know, random notes.  I don't remember exactly which project

7    they were referring to.  Could have been that one.

8    Q.   Well, let's talk about Jewel.  You were shown some

9    drawings which have a date for Jewel of January 1998; is that

10   right?

11   A.   Yes.

12   Q.   And among them, for example, was, let's say, 15601.  You

13   remember this?

14   A.   Yes.

15   Q.   And also 15603.  This is January 28, 1998?

16   A.   Yes.

17   Q.   And 15603.  I think there's a 15604.  There are a number

18   that had this January '98 date on them.

19            Do you remember that?

20   A.   Yes.

21   Q.   Now, I would like you to look at the last page of

22   Exhibit 26.  That's your conflict of interest questionnaire

23   when you joined Mattel in '99.  That's Exhibit 26.

24            Could we show the last page.

25            I'll show you your signature here.

Page 3133

1          Now, what date did you put in your conflict of

2    interest questionnaire in January of 1999?

3    A.    I'm sorry.  What, now?

4    Q.    What date did you put, in January 1999, when you

5    rejoined Mattel, the new year, and you filled out the

6    conflict of interest questionnaire, what date did you put on

7    that conflict of interest questionnaire?

8    A.    Oh, at the bottom?

9    Q.    Or anywhere else you can see it.

10   A.    There are some dates that say 5/98 through 11/98.

11   Q.    How about here where you signed it?

12   A.    Yes.

13   Q.    And you were -- your intent was to sign it on the date

14   that you signed it.  Your intent was to date that on the date

15   you signed it; right?

16   A.    Yes.

17   Q.    And what date did you put on there in January of 1999?

18   A.    I put 01/04/98.

19   Q.    Now, let me show you what we'll mark as Exhibit 10756.

20          May I approach, your Honor?

21          THE COURT:  You may.

22   Q.    BY MR. PRICE:  Do you recognize 10756 as a sketch, Jewel

23   Barbie sketch that you did?

24   A.    Yes.

25          MR. PRICE:  Move Exhibit 10756 into evidence.

Page 3134

1          MR. NOLAN:  Just foundation as to time, when he did

2     it.

3          MR. PRICE:  That will come after I show him some --

4          THE COURT:  Is there an objection?

5          MR. NOLAN:  No.

6          THE COURT:  Very well.  Received.

7          (Exhibit 10756 received.)

8     Q.   BY MR. PRICE:  So this is a Jewel Barbie diagram you

9     did; correct?

10    A.   Yes.

11    Q.   So looking at it, can you tell what date this is?

12    A.   Well, not with absolute certainty.

13    Q.   Fathom a guess?  What's your best estimate?

14    A.   It was either '98 or '99.

15    Q.   Well, if you'd look at your black notebook, and we can

16    put these side by side, 1155-C, if you look at the copy, it

17    might help you orient yourself.  1155-C-027.  Do you see

18    1155-C-027 in that black notebook?

19    A.   Yes.

20    Q.   And do you see any similarities between that drawing and

21    the drawing that's in Exhibit 10756?

22    A.   Um, a little bit.

23    Q.   For example, there's a -- these are Jewel Barbies;

24    right?

25    A.   Yes.

Page 3135

1    Q.   And now, Jewel refers actually to a jewel of some sort?

2    A.   Right.

3    Q.   And what's this sort of design here which we have in the

4    middle?

5    A.   Well, I'm not really sure exactly what you'd call it,

6    but I think it's just some sort of where the fabric is

7    gathered together.

8    Q.   Is that a design you use for a lot of Barbies?

9    A.   Oh, I -- I don't know.

10   Q.   And the thing on the neck, is there a name for that

11   other than a necklace?

12   A.   No.

13   Q.   It would just be a necklace?

14   A.   Yes.

15   Q.   I guess you've got the hand looks sort of similar here,

16   doesn't it?

17   A.   Um, yes.

18   Q.   Do these look like sketches you make, kind of a

19   progression?

20   A.   It's possible.

21   Q.   And let me show you now Exhibit 13657.

22        Do you recognize 13657?

23   A.   Yes.

24   Q.   This is a Jewel Barbie drawing you did?

25   A.   Yes.

Page 3136

1          MR. PRICE:  Move that into evidence, your Honor.

2          MR. NOLAN:  No objection.

3          THE COURT:  It's admitted.  You may publish.

4          (Exhibit 13657 received.)

5   Q.   BY MR. PRICE:  And maybe at the same time you could hold

6   this up so the jury can see it.

7          Do you see this has the same sort of waist

8   treatment?

9   A.   Yes.

10  Q.   Same kind of hand pose?

11  A.   Yes.  I normally draw hands like that.

12  Q.   You say it has also a necklace or choker or whatever

13  you'd call it?

14  A.   Yes.

15  Q.   Does this appear to be the last step at a progression

16  for this drawing from 10756 to 115-C-027?

17  A.   It's possible.  I often did a lot of, you know,

18  preliminary type sketches.

19  Q.   And what's the date of this sketch, which is

20  Exhibit 13657?

21  A.   It looks like it says 2/99.

22  Q.   If we could put 13657 perhaps side by side with that

23  page from the black notebook, 1155-C-027.  13657 is the end

24  result after kind of starting out with a rough sketch

25  1155-C-027; right?

Page 3137

1      MR. NOLAN:  Objection, your Honor.  Lack of

2  foundation.

3      THE COURT:  Overruled.  You may answer.

4      THE WITNESS:  I couldn't say definitively.  Like I

5  said, I did, you know, a lot of preliminary type sketches.

6  Some looked pretty similar.  Some looked similar to the --

7  more similar to the finished product than others.

8  Q.  BY MR. PRICE:  I'm going to show you what we'll mark for

9  identification 12150 and 12151.

10      Is 12150 a drawing you did?

11  A.  Yes.

12  Q.  Is 12151 another drawing you did?

13  A.  I'm sorry.  What was the first one you asked me?

14  Q.  12150.

15  A.  I don't think I have that.

16  Q.  Those are both drawings you did?

17  A.  Yes.

18  Q.  They are both Jewel Barbie drawings?

19  A.  Yes.

20  Q.  And Jewel Barbie was not a main line Barbie, was it?

21  A.  Well, the first one that I worked on, I don't really

22  know what they ended up doing with it, but this other one was

23  for the collectible group.

24      MR. PRICE:  Move 12150 and 12151 in evidence, your

25  Honor.

Page 3138

1      MR. NOLAN:  No objection.

2      THE COURT:  It's admitted.

3      (Exhibits 12150 and 12151 received.)

4  Q.   BY MR. PRICE:  If we could show 12150.  Now, this is --

5      Blow that up, Ken.

6      Now, Barbie Collectibles, that was what you worked

7  on in your second stint beginning in January of 1999;

8  correct?

9  A.   Yes.

10 Q.   And your date on this is March '99; correct?

11 A.   Yes.

12 Q.   And if you look at 12151.  You see this is your

13 signature in February of '99; is that right?

14 A.   Yes.

15 Q.   It's true, sir, is it not, that those earlier drawings,

16 all the same day, dated January '98, were simply misdated by

17 you, just as your conflict of interest questionnaire was?

18 A.   I'm sorry.  Which drawings are you talking about?

19 Q.   The drawings I showed you earlier that were all dated

20 January 28, '98, 15601, 15603, the ones that were shown

21 earlier.  Those simply were misdated by you just as your

22 conflict of interest questionnaire was in January of '99?

23 A.   No, absolutely not.

24 Q.   I'd like you to look at Exhibit 333, Mr. Bryant.  I'm

25 not sure it's in your -- actually Exhibit 5, Bates 333.

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3139

1    A.    Okay.  Which folder?

2    Q.    That's going to be the large dark black folder.

3    Exhibit 5 is in there.  Bates 333.  It's page 128 of the

4    exhibit.  We've blown it up here on the screen if you're

5    having a hard time of it.  It says Bryant 333.  Notes/ideas

6    on large Angel?

7    A.    Yes.

8    Q.    That's a photocopy of the page which is in 1155, that

9    original notebook; right?

10   A.    It appears to be, yes.

11   Q.    And I asked you earlier whether that was a 1999 project,

12   and you said you couldn't tell me one way or the other.

13   A.    Well, I am not exactly sure.  Like I said, I worked on a

14   few different angel projects.

15              MR. PRICE:  Your Honor, I'd like to play from the

16   second volume of Mr. Bryant's deposition transcript, page

17   393, line 25, to 394, line 24.

18              MR. NOLAN:  No objection.

19              THE COURT:  You may proceed.

20              WHEREUPON THE VIDEOTAPED DEPOSITION EXCERPTS

21              OF CARTER BRYANT, AS PROVIDED BY COUNSEL,

22              ARE INCORPORATED HEREIN:

23              "QUESTION:  333?

24              "ANSWER:  These look like actually some notes

25         from a project that I worked on at Mattel.

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3140

1      "QUESTION:  And this is large angel?

2      "ANSWER:  Yes.

3      "QUESTION:  That's the Mattel project?

4      "ANSWER:  Yes, I did a project.  It was -- I

5      don't remember what it was called, but it was a

6      large-size Barbie as an angel.

7      "QUESTION:  Can you tell me what you did on

8      that project?

9      "ANSWER:  I created the fashion.  I created

10     the look for the hairstyle and the look for the

11     face.

12     "QUESTION:  And can you explain what these

13     notes mean here?

14     "ANSWER:  These were just notes to myself on,

15     you know, what might be elements of the doll.

16     "QUESTION:  Can you explain them?

17     "ANSWER:  The shimmery hair stuff, I don't

18     remember what that was.  Ken hair was just an idea

19     to possibly use -- I guess they used a different

20     type of hair for Ken than they did for Barbie.

21     Stained glass, I don't know.  That was just a --

22     just an idea.  17th/18th Century, that was just --

23     I was just thinking of what time period the look

24     might be inspired by.  Empire waist look is just a

25     note on how the fashion might be cut.

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3141

1          "QUESTION:  Do you recall when -- when you

2     made these notes?

3          "ANSWER:  I don't.  I believe it was in '99."

4     Q.  BY MR. PRICE:  And it's correct, sir, that if it refers

5     to the Mattel angel project, that was after January of 1999?

6     A.  Yes.

7     Q.  Now, in that notebook, the black notebook, 1155,

8     Mr. Nolan asked you about a notation or a note from Wade,

9     Lisa, Christopher, and Allison to mom and dad.

10         Do you recall that?

11    A.  Yes.

12    Q.  And 1155-C-087 for the copy.  Have you found that on the

13    original?

14    A.  Yes.

15    Q.  And where does Wade live in the '98, '99 time frame?

16    A.  They lived in Kentucky.

17    Q.  How far away was that from Springfield, Missouri?

18    A.  I don't know.  About a 12-hour drive.

19    Q.  And do you have a fairly close family?

20    A.  Yeah, we're pretty close.

21    Q.  Get together on holidays?

22    A.  Sometimes, yes.

23    Q.  Thanksgiving and Christmas?

24    A.  Sometimes.

25    Q.  And if we look at the note, it says:  "We look forward

Page 3142

1    to coming back again in the next few weeks."

2           Do you see that?

3    A.    Yes.

4    Q.    Kind of a long drive to make, you know, just a few weeks

5    down the road; right?

6    A.    Sure, I guess.

7    Q.    Unless it's Thanksgiving and Christmas.  Was it your

8    memory that your family would get together sometimes on

9    Thanksgiving and Christmas and that Wade would come with his

10   family?

11   A.    Sometimes they would.

12   Q.    For example, Thanksgiving in 1999?

13   A.    It's possible.  I don't remember.

14   Q.    You don't recall one way or another whether or not the

15   family, including Wade and his family, was at your parents'

16   house in November of '99 and then came back -- around

17   Thanksgiving time and then also came back around

18   Christmastime?

19   A.    No, I don't recall.

20   Q.    You certainly can't deny that happening, can you?

21   A.    No, it's possible.  I just don't remember it.

22   Q.    And it's true that -- I mean, don't you think that's the

23   reason saying we're going to be back in a few minutes --

24   we're going to make that 12-hour drive in a few weeks?

25   A.    You know, I have absolutely no idea.  I didn't write

1    this note.  I have no idea what they meant.

2    Q.   Well, it's certainly true that in Thanksgiving of '99,

3    you made the trip back to your parents' house; right?

4    A.   I don't remember.

5    Q.   Let me show you what we'll mark as 13666 for

6    identification.

7              Do you recognize 13666 as one of your bank records?

8    A.   I don't really recognize it.

9    Q.   That's what it appears to be; correct?  It's got your

10   name and address on it?

11   A.   Yes.

12             MR. PRICE:  Your Honor, move Exhibit 13666 into

13   evidence.

14             MR. NOLAN:  No objection.

15             THE COURT:  It's admitted.  You may publish.

16             (Exhibit 13666 received.)

17   Q.   BY MR. PRICE:  And if we could go to the third page in,

18   Ken.  And starting at 1123, do you see it shows some

19   withdrawals?

20   A.   Yes.

21   Q.   And these are in November of 1999; correct?

22   A.   Yes.

23   Q.   And they appear to be at Nixa.  What's Nixa?

24   A.   Nixa is a town just south of Springfield.

25   Q.   How about P-R-E-A-U-T-H?  Well, that's something else,

Page 3144

1    isn't it?

2    A.    I don't know what that is.

3    Q.    Springfield is Springfield, Missouri?

4    A.    Right.

5    Q.    And Branson, where is that?

6    A.    Branson.  Branson is southeast of Springfield.

7    Q.    So does this refresh your memory that in November of

8    1999, you were at your -- visiting your parents for

9    Thanksgiving?

10   A.    Well, I very well could have been.

11   Q.    And that it was a family get-together at which your

12   brother was there?

13   A.    I don't really remember them being there.  I'm not

14   saying it's not possible.  But I don't remember that.

15   Q.    How about Christmas of that year?  You were there

16   Christmas, weren't you?

17   A.    I don't remember.

18   Q.    Let me show you 13667 for identification.  Do you

19   recognize 13667 as some of your bank records?

20   A.    Well, it appears to be.

21            MR. PRICE:  Move 13667 in evidence.

22            MR. NOLAN:  No objection.

23            THE COURT:  It's admitted.

24            (Exhibit 13667 received.)

25            THE COURT:  You may publish.

1    Q.    BY MR. PRICE:   And this is your name and address at the

2    front page; right?

3    A.    Yes.

4    Q.    And if we can go to -- I guess it's Bates No. 348, Ken.

5    And look at starting at 12/26/99.

6    A.    I'm sorry.  Which page is this?

7    Q.    At the bottom it has this Bates number MFCU 0348.

8    A.    Okay.  Thank you.

9    Q.    It's the fifth page in, I'm told.  And you see you have

10   withdrawals, Empire Bank of Nixa, Commerce, Springfield, Bank

11   of America, Springfield.

12            Do you see that?

13   A.    Yes.

14   Q.    So you were also back with your family in December of

15   '99; correct?

16   A.    Um, well, apparently.

17   Q.    And I think -- perhaps you said this in your examination

18   with Mr. Nolan, that you had made trips back to see your

19   folks; correct?

20   A.    Yes.

21   Q.    And was this something which would -- was kind of a

22   yearly thing, when you were living here in California, that

23   around Thanksgiving and New Years, or Christmas and New

24   Years, for example, you'd go back and visit your folks?

25   A.    Um, I think I usually tried to, yes.

1   Q.   So getting back to 1155-C, which is that black notebook,

2   we've looked at Jewel and Angel and this mom and dad, the one

3   thing you can definitively date in this notebook is the bank

4   statements, though; correct?  If you look at 1155-C-057.

5   A.   Yes.

6   Q.   We went from the note from Wade, the Jewel drawing,

7   Angel.  This is something you know you wrote from 1999;

8   correct?

9   A.   Yes.

10  Q.   Your exception by Mr. Nolan, you were also asked about

11  this Evidence Eliminator program.

12          Do you recall those questions?

13  A.   Yes.

14  Q.   And I believe you were shown graphic 10.  Do you recall

15  being asked about this time line, the employment history with

16  Mattel and some entries on the area past October 21, 2000?

17          You remember those questions?

18  A.   Yes.

19  Q.   And I believe -- do you recall Mr. Nolan was asking you

20  questions concerning whether or not you had used your laptop

21  computer to access Internet addresses?

22          Do you remember that?

23  A.   Yes.

24  Q.   And he asked whether any of those were of an adult

25  content type.

1          Do you recall that?

2     A.    Yes.

3     Q.    And whether or not you had concerns that others would

4     have access to that if they looked at your laptop computer.

5          Do you recall that?

6     A.    Yes.

7     Q.    Now, you recall that earlier, your deposition was taken

8     where you were asked questions about why you put Evidence

9     Eliminator on your laptop.

10         Do you recall that?

11    A.    Yes.

12    Q.    And at that time you said the reason you did it was to

13    make your computer run faster.

14         Do you remember that?

15    A.    Yes.

16    Q.    And at that time you didn't mention anything about

17    putting Evidence Eliminator on because you were worried about

18    adult content.

19         Do you recall that?

20    A.    Yes, I just -- I think I just didn't think of it at that

21    time.

22    Q.    Well, did you think of it later when you reviewed the

23    transcript of your deposition and signed it under penalty of

24    perjury?

25    A.    I don't remember one way or the other.

1    Q.   So when's the first time that you ever testified that

2    one of the reasons Evidence Eliminator was used was because

3    you didn't want concerns -- you had concerns that others

4    would have access to adult content if you didn't use it?

5    A.   I don't remember exactly.

6    Q.   Was it in the last week?

7    A.   That could have been the first time I mentioned it, but

8    I'm not sure.

9    Q.   Now, let's talk about the way Evidence Eliminator works.

10   You understand what Evidence Eliminator does is it makes sure

11   what you delete is difficult to recover.

12            MR. NOLAN:  Objection, your Honor.  Lack of

13   foundation.  Also --

14            THE COURT:  Sustained.

15   Q.   BY MR. PRICE:  Well, let me ask about the way you used

16   Evidence Eliminator, okay?  Or your understanding of it.

17            Your understanding is that to use Evidence

18   Eliminator, the first thing you had to do was to push the

19   delete key on your computer.

20   A.   I don't remember that.

21   Q.   Well, did you have an understanding that one of the

22   things Evidence Eliminator did was to make it very difficult

23   to access things that you deleted?

24   A.   I think I had some understanding of that, yes.

25   Q.   So that the first step was for you to push delete, and

1    then second step was to access the safe shutdown mode of

2    Evidence Eliminator; right?

3    A.   Again, I don't really recall exactly how -- what the

4    method was to use it.  But I'm not saying that's not

5    possible.

6    Q.   And so I guess my question is this:  If we can put up

7    the time line again.  The safe shutdown mode is activated

8    just two days before the laptop was imaged.  Is that the

9    reason you -- is the reason you activated the safe shutdown

10   mode because you were concerned about access to adult content

11   on your computer?

12   A.   That's very possible.  Again, as I said before, I don't

13   remember using -- I don't remember using this program on that

14   date.

15   Q.   Right.  You've testified -- it's possible that your

16   housekeeper used the program to make sure adult content

17   couldn't be viewed?

18   A.   I guess it's possible, yes.

19   Q.   Well, but the things are -- the laptop you handed over

20   still had a lot of adult content on it, didn't it?

21             MR. NOLAN:  Your Honor, objection.  Lack of

22   foundation.  Also --

23             THE COURT:  Rephrase your question, Counsel.

24             MR. PRICE:  Sure.

25             THE COURT:  Tie it to his personal knowledge.  I'll

Page 3150

1    sustain the objection.  No foundation.

2    Q.   BY MR. PRICE:  I take it you are saying that you had

3    concerns about whether or not there was adult content on your

4    computer; correct?

5    A.   Yes.

6    Q.   And if you had those concerns, you'd certainly check

7    your computer to see whether or not it had such content

8    before you handed it over.

9    A.   I don't remember if I checked it for that or not.

10   Q.   Well, would you expect that if that's the reason that

11   you used Evidence Eliminator, that is, if it wasn't to

12   eliminate evidence, but was instead to eliminate adult

13   content, if that's the reason you did it, wouldn't you check

14   to see if it worked?

15   A.   I don't think I knew how to check to see if it worked.

16   Q.   Wouldn't you turn on the computer and see if you could

17   access adult content; right?

18   A.   I suppose, but, you know, my understanding of the

19   program was pretty limited.

20   Q.   Well, you downloaded adult content on your computer;

21   right?

22   A.   Um, I don't know if I downloaded it.  But I know, you

23   know, I had visited adult content sites, sure.

24   Q.   And you will agree with me that you knew enough about

25   computers that you could open your computer and check to see

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3151

1    what you had downloaded.

2    A.    What do you mean checked to see what I downloaded?

3    Q.    Whether you downloaded pictures or videos or some sort

4    of adult content --

5              MR. NOLAN:   Your Honor, objection.  Lack of

6    foundation.   He testified he didn't download.

7              THE COURT:   Sustained.

8    Q.    BY MR. PRICE:   Is that your testimony?  That you did not

9    download adult content on your computer?

10   A.    I don't remember downloading anything, no.

11   Q.    Have you ever downloaded anything on your computer?

12             MR. NOLAN:   Objection.  Relevance, your Honor.

13             THE COURT:   Overruled.

14   Q.    BY MR. PRICE:   Have you ever downloaded anything on your

15   computer?

16   A.    Yes.

17   Q.    For example, you downloaded Evidence Eliminator; right?

18   A.    Yes.

19   Q.    And you've downloaded interesting things from other

20   websites?

21   A.    Yes.   I mean, I can't think of anything specifically,

22   but probably.

23   Q.    And after downloading it, you knew how to access it.

24   A.    Yes.

25   Q.    And so my question is between July 12th and July 14th,

Page 3152

1    between the time that the safe shutdown mode was activated on

2    Evidence Eliminator and the time that the laptop was given to

3    be imaged for this case, did you look at your computer and

4    see whether or not there was any adult content on it?

5            MR. NOLAN:  Objection.  Asked and answered, your

6    Honor.

7            THE COURT:  Sustained.  It has been.

8    Q.   BY MR. PRICE:  Well, I'll ask it this way:  If you were

9    concerned about adult content being on your computer, you

10   certainly knew how to check it between July 1th and July 14th

11   to see whether or not there was anything on there.  You knew

12   how to do that?

13   A.   I mean, I suppose.  I don't really -- I don't really

14   remember, you know, checking it for adult content at that

15   time.

16   Q.   And, in fact, you don't remember running the safe

17   shutdown mode two days before the computer was to be imaged

18   for the purpose of eliminating adult content.  You don't

19   remember doing it for that purpose, do you?

20   A.   I don't remember running the program at all, no.

21   Q.   And in answer to Mr. Nolan, I think you said that you

22   don't recall ever downloading anything relating to Bratz onto

23   your computer.

24           Do you remember that?

25   A.   Yes, I think so.

Page 3153

1   Q.   And, of course, the way to determine whether or not

2   that's true is to be able to actually look at what's on the

3   computer; right?

4   A.   Yes.

5   Q.   But it can't do that if you've already run the safe

6   shutdown mode on Evidence Eliminator, can it?

7   A.   I don't know.

8   Q.   You prevented us from testing what you told the jury

9   under oath; right?

10          MR. NOLAN:   Objection, your Honor.

11          THE COURT:   Sustained.   This brings us to the close

12  of the day.

13          Members of the jury, we are, as I indicated, dark

14  tomorrow, which means we're not having court.   So I will see

15  you on Friday at 9:00 A.M.   We'll resume on Friday.   Enjoy

16  the day off or work or whatever you need to do.

17          (WHEREUPON THE JURY WITHDRAWS.)

18          THE COURT:   Please be seated.   Mr. Price, let me --

19          First of all, Mr. Nolan, there was an exhibit that

20  I know I didn't give you an opportunity to object to, that

21  map, but I trust there was no objection to that.   It appeared

22  to be identical to the one that was already published.

23          MR. NOLAN:   I didn't have an objection.   We do have

24  an agreement, though, that the only thing that comes into

25  evidence is this map.   Because the MapQuest, of course, all

Page 3154

1   of that content.

2           THE COURT:  Assume so, given that there's no

3   foundation for that at this point.

4           MR. PRICE:  And that's all we displayed.

5           THE COURT:  There is a very small portion at the

6   top of the map that has a MapQuest.  I assume you'll redact

7   that.

8           MR. PRICE:  That was blocked out for the jury.

9           THE COURT:  Very well.  I was just looking at the

10  copy I had.

11          Mr. Price, how much longer do you anticipate with

12  Mr. Bryant?

13          MR. PRICE:  I think my guess would be 15 minutes,

14  which probably means 15 minutes to a half hour.

15          THE COURT:  15 minutes or so.  So where do we stand

16  on additional witnesses for Friday?

17          MR. QUINN:  I think after Mr. Bryant, your Honor,

18  we would like to call Mr. Menz to discuss how Evidence

19  Eliminator works and what his findings were on the computer.

20  We believe we've laid the foundation that Mr. Bryant could

21  not explain that and has left some things unanswered, which

22  Mr. Menz can address.

23          THE COURT:  I permitted the Evidence Eliminator in

24  as to go to motive -- to go to credibility.  And certainly

25  Mr. Bryant's understanding of what he was doing and why he

Page 3155

1    was doing it is relevant, I think, to credibility, and that

2    has been fully explored by both sides.  Going beyond that

3    into what Evidence Eliminator does and doesn't do, it's not

4    clear to me how that goes to the limited issue of

5    credibility.  But the Court has allowed it to be introduced

6    for and perhaps goes beyond that.  And that's my concern.

7                MR. QUINN:  I think Mr. Menz's findings, your

8    Honor, his testimony would be that Mr. Bryant did a number of

9    things which he has denied doing.  Or has claimed ignorance

10   of doing.

11               THE COURT:  I see.

12               MR. QUINN:  There is evidence of intentional

13   conduct.

14               THE COURT:  I see.

15               Mr. Nolan, what are your thoughts?

16               MR. NOLAN:  Well, your Honor, we go back to the

17   403.  It's a slippery slope.  If they are going to put on

18   their expert, we're going to have to put on our expert, and

19   this is a mini trial within a trial.  The use of Evidence

20   Eliminator in this case, the way it was used, I know it was

21   for a limited purpose.  The amount of time that has been

22   spent and devoted on this, it's just startling to me.  But if

23   we have to go further and go into the testimony of Mr. Menz

24   and then I have to bring in our expert, we're going to be

25   confusing this jury.

1          Mr. Bryant was asked, I know, as of Friday, like 37

2     times about his use of Evidence Eliminator.  I'll also

3     represent, your Honor, that I don't know if Mr. Price is

4     aware of this, but my understanding of the report that has

5     been submitted by their expert with respect to the existence

6     of pornography on this computer, which is a representation

7     that was made now twice to you, my understanding, your Honor,

8     is that it's not on Mr. Bryant's side of the computer, if you

9     will.

10          In other words, it is -- my understanding is that

11     the disks are shared between Richard and Carter --

12     Mr. Bryant, I'm sorry.  And that my understanding -- I may be

13     wrong, but that's been my understanding coming in here, and

14     that's why I was taken aback by an earlier representation

15     that the pornography may be -- I respectfully request the

16     Court to say enough is enough.

17          MR. QUINN:  Your Honor, I would say the experts

18     really don't have any disagreement about what was done with

19     the program.  I mean, they both agree.  The instructions that

20     were given, whether it was executed, what happened.

21     Mr. Nolan raises an issue about we're going to have competing

22     experts.  My understanding is that the experts basically

23     agree on their findings.

24          MR. NOLAN:  Your Honor, I cannot concur with that,

25     your Honor.  There are significant differences in the

Page 3157

1    testimony, and that is evidenced by the various reports that

2    were submitted to the Court on this very point.

3            THE COURT:  I'm going to take another look at those

4    reports between now and Monday.  You should have your witness

5    prepared to go, but understand that I may exclude him on the

6    403 grounds.

7            MR. QUINN:  Monday or Friday?

8            THE COURT:  Friday.

9            MR. QUINN:  Friday.

10           THE COURT:  Okay.  So that's one expert.  That's

11   Menz.  And I'll take a look at both reports, and I'll be

12   mindful of your objection where we are on the 403 grounds and

13   whether or not we have enough on this or not.  And I'll wait

14   until I've heard all of Mr. Bryant's testimony before I make

15   that decision.  Because I think I previously indicated that's

16   my inclination.

17           Going forward, is there anything more on that?  I'm

18   asking Mr. Quinn.  There's a pending question to him in terms

19   of witnesses.

20           MR. NOLAN:  Nothing further on that, your Honor.

21           THE COURT:  All right.  Very good.

22           MR. ZELLER:  If I may add one point about the

23   Evidence Eliminator.  The areas of disagreement, just so it's

24   clear to the Court, the areas of disagreement between the

25   experts tended to be more on the desk top.  It was not on the

Page 3158

1    laptop.  So the basic events of what happened with the

2    laptop, those are what the experts were in substantial

3    agreement with.  I don't know to what degree the Court has

4    before it, say, for example, Mr. Funck's deposition

5    testimony.  That also eliminates it.  I'm not sure how clear

6    it is from the face of the reports.

7            THE COURT:  I think all I have is the reports.  I'm

8    not sure if I have anything from the deposition transcripts,

9    it would only be excerpts.  But let me take a look at those,

10   and if I need further illumination, I'll call for it.

11           MR. ZELLER:  Yes, thank you.

12           THE COURT:  Ms. Aguiar, did you want to weigh in on

13   this one?

14           MS. AGUIAR:  No.

15           THE COURT:  I thought I saw you make a move.

16           All right.  Let's get back to the witness lineup.

17   Mr. Quinn, Mr. Zeller, somebody.

18           MR. ZELLER:  Well, I think that there are -- there

19   are some issues that I think both parties potentially need

20   some clarification on.  Mr. Kamarck is one of the witnesses

21   who -- he's former general counsel of MGA.  He unfortunately

22   was waiting here today, but for reasons beyond, obviously,

23   everyone's control, Mr. Bryant is still testifying.

24           THE COURT:  I suspect between the two of you, you

25   ultimately control that.  But I'm not going to accept that.

Page 3159

1          MR. ZELLER:  Beyond my control.

2          So he obviously was not able to go on today.  I

3    understand that there's some issue about when he can appear

4    next.  We obviously would prefer Friday when we resume.  But

5    we do have Mr. Kamarck.  We have Mr. Menz, who we've

6    discussed.  There is another forensic expert, Mr. Cunningham,

7    who we'll be calling.

8          THE COURT:  That's the questioned document expert?

9          MR. ZELLER:  That's correct.

10          THE COURT:  Anybody else?

11          MR. ZELLER:  Yes, your Honor.  We also have Daphne

12    Gronich, who I understand her scheduling is still somewhat up

13    in the air.  We're waiting for some confirmation as to when

14    she can appear.

15          We have, in addition to that, Margaret Leahy, who

16    is the sculptor, who we intend to call briefly.  Peter

17    Marlow.  And Farhad Larian.

18          THE COURT:  All right.  That's it?

19          MR. ZELLER:  I believe -- we also had Patty Glaser

20    on the list.  There are some people, as I've characterized

21    them, and Mr. Quinn has characterized them before, are really

22    here just for documents.  Patty Glaser is one of them.

23          THE COURT:  Is that it?

24          MR. ZELLER:  I believe so.  I'll have to

25    double-check when I sit down.  But I believe that's the

Page 3160

1    entirety of it.

2              THE COURT:  All right.

3              MR. ZELLER:  I apologize.  I do remember one more

4    now, which is Elise Cloonan.  But she's also sort of a

5    document person.  We've asked to stipulate to the

6    admissibility of a single zip disk.  That would be the only

7    reason we'd be calling her.

8              THE COURT:  Anybody else?

9              MR. ZELLER:  I will double-check.

10             THE COURT:  Please let me know before we conclude

11   this court session.

12             MR. ZELLER:  I'll sit down and check my list.

13             THE COURT:  All right.

14             MS. AGUIAR:  So I think I counted 10 for Friday.  I

15   know one of the ones I forgot, which is Sam Khare, which is

16   one of the MGA people.

17             MR. ZELLER:  Yes, he's a document person as well.

18             THE COURT:  Sam Khare.  Of course.  We discussed

19   him previously.

20             MS. AGUIAR:  So let me just comment to the extent I

21   can to give you a little clarification here.  Mr. Kamarck, I

22   knew what his issue was.  I didn't want to make a big deal of

23   it, but he has a full-time job and a family medical issue

24   with his daughter.  It was very difficult for him to get here

25   today.

1          We verified as much as we could when they wanted

2     him on.  And I did mention that if he came today, then he'd

3     have to go on today and that he couldn't come back.  So I

4     just want to put that out there.  We don't -- he's no longer

5     employed by MGA.

6          We're checking on Ms. Gronich.  I think we do have

7     to have -- I would like to raise an issue with regard to one

8     of the document people, Patty Glaser.  She is a nonparty.

9     They have informed us that there are three documents that

10    they want to get in through Ms. Glaser, and they have

11    identified those for us.  One is a privileged document, which

12    is the subject of a claw back, which we have alleged is

13    privileged.  So I don't see the point there.

14          THE COURT:  Is this one the Court has ruled on?  I

15    trust there's nothing outstanding at this point.

16          MR. QUINN:  That's the subject of the crime fraud

17    motion, which is still hanging.

18          THE COURT:  Very good.

19          MS. AGUIAR:  And there are two other documents they

20    want to get in through Ms. Glaser.  One of which is an e-mail

21    chain between Isaac Larian and his brother Fred Larian.  So

22    one of the people in the e-mail chain has already been on

23    stand, and one is due to be on the stand.  And the other, the

24    third document that they want to get in through Ms. Glaser,

25    according to Mr. Zeller, is another e-mail chain between

Page 3162

1   Isaac Larian, his brother Fred Larian, and another family

2   member.

3            Your Honor, this is a nonparty.  I'm not trying

4   to -- I have no problem with her taking the stand if she is

5   here to discuss substantive issues and it's relevant to this

6   phase, but they have represented to us that those are the

7   only three documents that she -- that pertain to her, and

8   that is why they want her here.

9            THE COURT:  Well, this kind of ties in with the

10  discussion we had yesterday.  I did indicate that given the

11  Court's insistence that we have a witness bringing in any

12  documents, if we don't have a -- what I indicated yesterday

13  was that if we don't have a witness -- if we don't have a

14  stipulation to a document, that we need to have a witness.

15           And if there's no issue on authenticity, the only

16  issue of -- the relevance, but there's no witness to bring

17  up -- to testify to the relevance, but it's self-evident, I

18  indicated they could bring up anybody they want.

19           So I don't know if that's really -- whether they

20  bring up Ms. Glaser or Mr. Zeller, it really doesn't matter

21  if there's no issue in terms of authenticity and it's just a

22  matter of introducing it and having a channel through which

23  to introduce the document.

24           MS. AGUIAR:  Well, I will -- two things.  With

25  regard to the three documents with Ms. Glaser, the first one

Page 3163

1    is privileged.  Let's talk about the other two.  The other

2    two are e-mails which were produced from the files of her

3    firm.  I will make a proffer that she will say that she can

4    neither attest to the authenticity or the admissibility of

5    either of those documents.  She is not cc'd on them.  They

6    are not to her.  They are not from her.  And they do not

7    reference her.

8              THE COURT:  What is your objection to these two

9    documents?

10             MS. AGUIAR:  It's not that I have an objection to

11   the documents.  I'm just trying to --

12             THE COURT:  If there's no objection, why are we not

13   stipulating to their admissibility?

14             MS. AGUIAR:  Let me be clear.  My point is that if

15   a nonparty is going to come out here, sit, wait, take the

16   stand for the purpose of trying to get in documents which we

17   already know that witness will not be able to get in, and the

18   people who are listed on the e-mail have already taken the

19   stand or are supposed to be on the stand the same day, I

20   guess I'm just saying why are we bringing in a nonparty when

21   an hour later there's going to be another nonparty who is

22   actually copied on the e-mail, who actually authored it.  I

23   just don't understand why we're doing this.

24             THE COURT:  I don't necessarily understand either,

25   Counsel.  Are you asking?  Are you making a motion?  Are you

Page 3164

1    lodging an objection?  Or are you just making a general

2    announcement?

3              MS. AGUIAR:  I'm not making a general announcement.

4    I wouldn't waste the Court's time.

5              THE COURT:  What are you doing?  Are you making a

6    motion to quash a trial subpoena?  What are you asking the

7    Court to do right now?

8              MS. AGUIAR:  I'm asking that with regard to this

9    document issue, which your Honor has tried to let the parties

10   resolve amongst themselves, but you've sort of weighed in to

11   some extent on this, I guess we need to know where we are on

12   the one privileged document.  Because if it's a privileged

13   document and that's one of the things --

14             THE COURT:  You're absolutely correct.  I'm going

15   to have a hearing on that on Friday morning.

16             MS. AGUIAR:  And with regard to the other two

17   documents, there's got to be some rule of reason here that if

18   they want to bring a nonparty in here on e-mails that she

19   didn't author and didn't receive and hasn't discussed, then

20   there's got to be some enough is enough, that if there's a

21   witness that same day, they have to be able to bring that in

22   through the witness that authored the document.

23             THE COURT:  What are you asking me to do?

24             MS. AGUIAR:  I guess what I'm asking you to do is

25   to require that documents such as these be brought in through

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3165

1    the most reasonable means.

2            THE COURT:  I will do that.  The documents should

3    be brought in through the most reasonable means.

4            MS. AGUIAR:  All right.  Thank you, your Honor.

5            THE COURT:  Do you understand the point?  I decide

6    motions.  I rule on objections.  I issue judgments.  I --

7    that's what a judge does.  A judge doesn't sit and advise

8    counsel on the best way to conduct their case.

9            MS. AGUIAR:  I appreciate that, your Honor.  And

10   you've been patient.  I'm just trying to -- we've been

11   working together --

12           THE COURT:  I'm not saying -- everything you are

13   saying here makes a tremendous amount of sense, but if you're

14   asking the Court to make a decision, I need to have a motion,

15   an objection.

16           MS. AGUIAR:  Okay.  I'm obviously not making a

17   motion.  I've made my objection to dragging in a nonparty for

18   these reasons, and I understand that it may not be a formal

19   request or technically a request that I can put a name on,

20   but I think I've made my point.  And I am just trying to get

21   through this and trying to reduce the burden on nonparties to

22   this litigation.

23           THE COURT:  I appreciate the concern.

24           Does Mattel wish to respond to the concern raised

25   by counsel?

Page 3166

1          MR. ZELLER:  Well, your Honor, obviously we are

2     where we are on the documents.  We have to get certain

3     documents in.  The way that things are currently situated is

4     that we need witnesses to bring them in through.

5          THE COURT:  Well, counsel indicates that two of the

6     three documents -- one of the documents that's subject to

7     this issue on crime fraud.  We got to decide that.  I'll

8     decide that Friday morning.  The two other documents

9     apparently have Farhad Larian's name on them.  And apparently

10    you told me a moment ago he's coming on Friday.

11          Is there a reason, just to answer counsel's

12    information, that we can't introduce that document through

13    Mr. Larian as opposed to Ms. Glaser?

14          MR. ZELLER:  That will certainly be something that

15    we will attempt to do.  But the Court has also seen testimony

16    by witnesses such as Lucy Arant.  And I don't take these

17    things lightly.  That was, shall we say, more than a little

18    difficult and time-consuming.  We have a right to put these

19    documents in.

20          If it takes more than one witness, because of the

21    testimony that's been given, then it's going to take more

22    than one witness.  And while obviously I would very much like

23    to only have one witness to put up there and put all those

24    documents in through, I can't take the chance.

25          THE COURT:  Very well.

Page 3167

1          MR. ZELLER:  That's how it's going to occur.

2          THE COURT:  I appreciate that.  I would hope if

3    there is really no fundamental objection, and I haven't yet

4    heard one, at least to the two e-mail chain documents, I have

5    heard an objection to the first document.  MGA is claiming

6    privilege.  Mattel is claiming crime fraud exception.  That's

7    something I can grapple with.  The other two, there's no

8    objection.

9          So I really am failing to see why there's not

10   simply a stipulation.  I've yet to hear a single reasonable

11   explanation as to why this is not being admitted through

12   stipulation.  And until I do, I'm not going to take anyone's

13   invitation to short-circuit the process.

14         If I hear there's a reason why it can't be admitted

15   through stipulation or if can't be admitted through a

16   witness, then I've got to revisit the model, the paradigm

17   I've set up here.  But right now I'm not hearing a reasonable

18   suggestion from either side why this cannot be admitted

19   through stipulation.

20         You're proffering to the Court that there's no

21   objection.  I've asked counsel for MGA is there any

22   objection.  And I'm hearing no.  Other than to bring Patty

23   Glaser in to do -- be the witness.  That's not an objection

24   to the documents.

25         So I'm going to leave it the way it is, and we can

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3168

1    proceed reasonably, Counsel.

2           MR. ZELLER:  Thank you, your Honor.  And if I may,

3    just to make sure, since I didn't have my complete list with

4    me previously, if I can just run down the witnesses to make

5    sure.

6           THE COURT:  Yes.

7           MR. ZELLER:  Who I have is Mr. Kamarck, Mr. Menz,

8    Mr. Cunningham, Ms. Gronich, Mr. Khare, Ms. Glaser, Peter

9    Marlow, Margaret Leahy, Fred Larian, and then there is the

10   other one, which we have as a Custodian of Records witness,

11   who will be for any other documents we were unable to get in

12   through these other witnesses.  Again, hopefully the document

13   witnesses will not darken the Court's door, but that's the

14   way we have it currently planned.

15          THE COURT:  Now, you omitted Elise Cloonan's name

16   in this go-round.

17          MR. ZELLER:  I meant to include Ms. Cloonan.

18          THE COURT:  Okay.

19          MR. ZELLER:  Ms. Cloonan is on the list for that

20   zip disk.

21          THE COURT:  Very good.  And just so you know, you

22   have passed the 36-hour mark.  You're now at 37 hours and 40

23   minutes.

24          MR. ZELLER:  Thank you.

25          THE COURT:  Very well.

Page 3169

1        Ms. Aguiar?

2        MS. AGUIAR:  I apologize for not being more precise

3   when you were asking me is there any issue with the

4   documents.  I was trying to limit my comments to their

5   relevance to Ms. Glaser.  I think they are irrelevant, and I

6   think under 403 they shouldn't come in.  If you want to look

7   at them, you can look at them.  I think they have nothing to

8   do with the facts of this case, and I think they are back and

9   forth between brothers concerning issues that don't pertain

10   to this litigation.

11        THE COURT:  What are the exhibit numbers?

12        MS. AGUIAR:  13380 and 13381.

13        THE COURT:  May I have copies of those?

14        MS. AGUIAR:  Oh, sure.  And just on a totally

15   different subject, when it's appropriate to mention it.

16        THE COURT:  Yes.

17        MS. AGUIAR:  We're just wanting to inquire about

18   the Prince deposition designation so we can plan for cutting

19   the tape.

20        THE COURT:  It sounds like there is with 11

21   witnesses on line, and we still have Mr. Bryant on the stand,

22   that there is no way that this is going to happen on Friday.

23   I have gotten through the -- just about all the way through

24   them, but what I thought I would do is wait until Friday to

25   do that.

Page 3170

1          MS. AGUIAR:  That's completely fine.  When I put it

2     on my list, I didn't realize -- when I put it on my list to

3     talk to you, I didn't realize there would be 10 witnesses for

4     Friday.

5          THE COURT:  Very good.  I'm going to take these two

6     documents up on Friday morning when I take up the crime fraud

7     issue, and we'll resolve these three documents on Friday

8     morning.

9          Mr. Zeller, these will be the only three introduced

10    through Ms. Glaser?

11         MR. ZELLER:  I'm sorry.  I couldn't hear all of

12    that.

13         THE COURT:  What I said is that I plan to take up

14    these two documents, namely, 13380 and 13381, and counsel's

15    objections on 403 grounds, both of them, and 402 grounds on

16    Friday, along with the allegedly privileged document or

17    allegedly crime fraud document.  I just want to make sure

18    that those are the only three documents related to

19    Ms. Glaser; is that correct?

20         MR. ZELLER:  I believe yes, that's correct, your

21    Honor.

22         THE COURT:  Very well.  And I know it's in the

23    motion, but could you identify for the Court the exhibit

24    number of the privileged document in question or the

25    allegedly privileged document in question?

Page 3171

1        MS. AGUIAR:  I have it, your Honor, if that would

2   be helpful.  It does not have a trial exhibit number because

3   it's a privileged document, but the Bates number is AS-07831.

4        THE COURT:  Is that an extra copy of it?

5        MS. AGUIAR:  It is an extra copy.

6        THE COURT:  Mr. Zeller, why don't you confirm that

7   that is the document in question.

8        MR. ZELLER:  Yes, it is.

9        THE COURT:  Counsel, could I have that copy?

10       MS. AGUIAR:  Absolutely.

11       THE COURT:  Thank you.

12       MS. AGUIAR:  And there is an issue -- well, we'll

13   deal with it on Friday.

14       THE COURT:  Yes, the Court will do that.

15       MR. ZELLER:  There's one simplification.  This is

16   what specific issue -- this is not necessarily Patty Glaser,

17   but the Court will note that our original motion also put at

18   issue some additional documents reflected in the privilege

19   log, which we don't know what they are and we have not seen.

20       THE COURT:  I understand that.

21       MR. ZELLER:  Thank you.

22       THE COURT:  And I'll be taking that up on Friday

23   morning as well.

24       All right.  This is the one that was subject to the

25   claw back that you are aware of.

Page 3172

1          All right.  Very good.

2          Mr. McFarland, with respect to Peter Marlow.

3          MR. McFARLAND:  How are you?

4          THE COURT:  I'm doing well.

5          MR. McFARLAND:  Thank you.  As you said earlier,

6    this is not something that is in my client's control or your

7    control.  I understand there's a lot of moving around of

8    things, but I'd like to go over some issues that are kind of

9    practical issues for the three clients that I have that are

10   all on the list for Friday.  And also Mr. Goldsobel with

11   Mr. Marlow, Ms. Leahy, and Ms. Cloonan.

12          As you know, Mr. Goldsobel and Mr. Marlow were here

13   today by 1:15, as requested.  Mr. Goldsobel rearranged his

14   schedule.

15          THE COURT:  Wait a second.  That's not one of the

16   names that I'm hearing.  You said Ms. Leahy, Ms. Cloonan, and

17   Mr. --

18          MR. McFARLAND:  Mr. Goldsobel is the attorney.

19          THE COURT:  Oh, very good.

20          MR. McFARLAND:  Mr. Goldsobel is the attorney for

21   Mr. Marlow.

22          THE COURT:  Got it.  That's right.  Of course.  I

23   met with him in chambers.  Yes.

24          MR. McFARLAND:  So he was here at 1:15 today, as

25   your Honor knows.

Page 3173

1          THE COURT:  I saw him come in and out.

2          MR. McFARLAND:  Exactly.  And he rearranged his

3     schedule to do that.  So he's communicating directly with

4     Mr. Zeller because he needs to be here with Mr. Marlow, with

5     you.  But I want to raise a practical concern, and that is

6     that he has commitments.  He changed his schedule to be here

7     today.  Until at least two o'clock on Friday in Century City.

8     As we all know, Fridays in summer heading towards Palm

9     Springs and Las Vegas is bad to say the least, especially

10    coming from Century City.

11          There are 10 or 11 witnesses listed on Friday.  So

12    it's a tremendous inconvenience, expense, and burden for him

13    to get on the road at two-ish and possibly not make it.

14    There's no control over that.

15          THE COURT:  I have to ask you, Counsel, the same

16    thing I asked Ms. Aguiar.  What is it you want the Court to

17    do?

18          MR. McFARLAND:  I think a realistic schedule.  I

19    think honestly this is not going to wrap up on Friday and

20    Tuesday.  And I mean a more realistic approach to this and

21    say let's have a realistic schedule Friday, given a normal

22    amount of time on Carter, and nothing against anybody here, I

23    kind of doubt it's 15 minutes from what I've been seeing

24    today.  It is what it is.  It could be a couple hours.  All

25    of these other witnesses.

Page 3174

1        I would just say it seems that we have this rolling

2   last day that we never hit.  Let's just say let's do these on

3   Friday, and let's do these on Tuesday.  Same thing with

4   Ms. Leahy.  She has serious child care issues.  She has two

5   children, a husband that works full time.  This is extremely

6   inconvenient.  Anything could be arranged, of course, but

7   these are very inconvenient things, and, of course, as you

8   know, we're pretty far from where most of these people live.

9        So again, for Ms. Leahy, and I'm trying to do the

10  best I can, but to turn her schedule upside down and the

11  child care and get here only to sit on Friday and not be

12  called, and again, with all due respect, this is the woman

13  that sculpted Bratz.  I just have a hard time believing she's

14  a 15-minute witness.  I just -- it kind of boggles the mind a

15  little bit, given the pace at which things have been going.

16       Ms. Cloonan also, she has a one year old.  She has

17  no nanny, no family, a husband, of course.  We had reached

18  out earlier that if Mattel would give her the day off -- her

19  husband happens to work for Mattel.  But she doesn't have a

20  nanny or daycare, a one year old.

21       So you have all of these very practical issues, and

22  all I would ask, that if these witnesses really are going to

23  be called, that's not our decision.  That's between you and

24  MGA and Mattel as to who actually gets called or not called,

25  but if we're going to do it.  I would respectfully request

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3175

1    that we do it in kind of a more orderly, organized fashion

2    with a high likelihood that these people are really going to

3    go, these third parties are really going to go when Mattel

4    says they are going to go.  With all respect.

5              THE COURT:  Thank you, Counsel.

6              Mr. Zeller, sounds like a reasonable position.

7              MR. ZELLER:  I would first of all expect that some

8    of these witnesses will fall out.  I mean, they are only

9    there for documents.  If we reach a stipulation beforehand --

10             THE COURT:  I agree with you, and that's why I'm

11   impressing, you know, what Mr. McFarland is suggesting, and I

12   suppose Ms. Aguiar to a certain extent as well, is that this

13   Court take a more proactive role in directing the parties

14   when to call witnesses and how long for those witnesses.  I

15   was hoping that I could avoid that in this case by simply

16   giving you an allotment of time and relying on your

17   professionalism to work these out amongst yourselves and with

18   other counsel for third parties.

19             I guess what I'm hearing now is perhaps I was

20   mistaken.

21             MR. ZELLER:  I would make a couple of preliminary

22   comments, your Honor.  Number one, the nonparties who we're

23   discussing here, the third parties, they are all MGA

24   affiliated people.  They are being -- their lawyers are being

25   paid for by MGA.  They have been involved in this lawsuit.

Page 3176

1        So I mean they are not just completely unrelated

2   people who are being burdened.

3        THE COURT:  No, but, Mr. Zeller, these people have

4   lives.  They have children.  They have child care

5   responsibilities, and those people are truly, whether their

6   parents work for MGA or not, are not subject to whim and

7   caprice.

8        MR. ZELLER:  I understand.  And we have worked

9   mightily, your Honor, to schedule these things.  We have

10  asked people repeatedly when are they available.  We have

11  tried to work -- I, myself, I, myself spend hours every day

12  talking to people and trying to get the schedule lined up.

13  What obviously we cannot afford to have happen is for us to

14  run out of witnesses.  We know what will happen if we do

15  that.  There will be a motion.  And these are people who are

16  within their control.  We have tried mightily to reach

17  stipulations to eliminate some witnesses.  It is our

18  intention on many of these people to ask them an extremely

19  limited number of questions.  They are put up there just to

20  get their documents in and get them off the stand.

21        Now, if MGA is going to examine them on a host of

22  other issues, that, we cannot predict.  That, we cannot

23  control.

24        But if we have our druthers, we will be through

25  these people.  Because like Margaret Leahy, for example, we

1    do have only a very limited number of questions.  The other

2    things that we care about we already have in the case.

3           What we're trying to do at this point is move

4    expeditiously to get the rest of our evidence in.  And the

5    people on that list who have really major substantive things

6    to talk about are very limited.  So, I mean, it's -- I am

7    certainly mindful, and we have worked extremely hard to make

8    sure that people are not unduly inconvenienced.

9           Conversely, your Honor, you know, as the Court is

10   well aware, there have been other third party witnesses who

11   have been inconvenienced.  We raised issues and tried to get

12   people taken out of order.  MGA refused.

13          So I'm not trying to point fingers at anyone, but

14   the fact is that we have all, I think, worked very hard to

15   deal with the schedule.  And I really just don't think that,

16   you know, for Mr. McFarland to come in and sort of Monday

17   morning quarterback and say well, my clients ought to be

18   treated differently than what we have so far, I just don't

19   think that's very realistic.

20          I mean, we hope to get through these witnesses.  We

21   have tried to work with people to get that done, and we'll

22   continue to do that.

23          MR. PRICE:  Your Honor, just to alleviate some

24   concerns --

25          THE COURT:  I'm looking at my calendar for Friday.

Page 3178

1        Yes.  I'm sorry.

2        MR. PRICE:  I'll commit.  I'm not going to go more

3    than an hour with Mr. Bryant.  I think less than that.  I

4    can't predict the recross.  Ms. Leahy, 15 minutes.  She might

5    be here longer because she wants to open and go beyond the

6    scope, which we think is inappropriate.  But those are pretty

7    short witnesses.

8        THE COURT:  We don't need the editorials.

9        What about some of these other witnesses?  For

10   example, Peter Marlow.  How much time do you expect with

11   Peter Marlow?

12       MR. ZELLER:  It's 20 minutes, your Honor, for him.

13   What we're trying to do at this point is, you know, put in

14   particular pieces of evidence.  These are not witnesses like

15   Mr. Bryant or some of the other witnesses we've had where we

16   have knowledge of a wide range of subjects.  They are very

17   particular targeted things.

18       MR. QUINN:  I can give some additional estimates,

19   your Honor.  Mr. Kamarck, I think, should be no more than a

20   half hour.  That's basically getting some documents in.

21   Farhad Larian, I would guess a half hour.  Mr. Cunningham's

22   direct, I'm going to guess 45 minutes.

23       THE COURT:  All right.  Well, I'll take you at

24   those representations, Counsel.  And if that plays out, then

25   this should not be an issue, and we should be able to rest

Page 3179

1    the plaintiff's case on Friday afternoon and proceed with the

2    defense case on Tuesday morning.  And I'll take you at those

3    representations.

4              If it becomes clear that that's not the case, then

5    the Court may have to alter its approach to manage this trial

6    and employ techniques that I've used in other trials where

7    you won't have the same degree and confidence that I have in

8    counsel.

9              MR. ZELLER:  And some of these witnesses, by the

10   way, just to show that we are working with them on their

11   schedule, we haven't even heard whether they are available on

12   Friday.  Ms. Gronich is an example.  So, I mean, that's

13   another reason why -- while it looks like an ambitious list,

14   some of those people, I imagine, are going to say they just

15   can't do it on Friday.

16             THE COURT:  Very well.  Mr. Nolan?

17             MR. NOLAN:  Your Honor, they are at 37 hours.

18             THE COURT:  Yes.

19             MR. NOLAN:  They have announced that they have 10

20   more witnesses, all estimates being what they are.  We are

21   into the fourth week of this trial, and MGA has not been able

22   to put on its case.  We now have a calendar where we're going

23   to be sitting one day next week, an abbreviated schedule the

24   following week, and then we get to the Fourth of July

25   holiday.  We wanted to do everything as economically as

Page 3180

1    possible.

2         I have operated under a clock in a lot of

3    courtrooms.  I know you don't want to know about my other

4    experience, but I can say this, your Honor.  I have not ever

5    seen a situation where a plaintiff in a case allocated 60

6    hours for the entire case, 1-A and 1-B, is 37 and some

7    change, and they are still 10 witnesses short of finishing

8    their case in chief in Phase 1-A.

9         Something is fishy, your Honor.

10        THE COURT:  So what are you suggesting?

11        MR. NOLAN:  Your Honor, first of all, I'm assuming

12   that, at some point in time, in these proceedings we're going

13   to get to talking an awful lot, and they don't say anything

14   because they are out of time.

15        THE COURT:  Counsel, you both have 60 hours.  You

16   got a lot of your 60 hours left.

17        MR. NOLAN:  I understand that.

18        THE COURT:  And --

19        MR. NOLAN:  We're not selling them.

20        THE COURT:  Fair enough.  You will have all your 60

21   hours, and they will have all of their 60 hours.  If they

22   want to use all their 60 hours in Phase 1-A, that's kind of

23   their problem, isn't it?

24        MR. NOLAN:  I think it is.  And I'm just making the

25   record as we go along.

Page 3181

1          Last point, your Honor, at sidebar --

2          THE COURT:  Duly noted.

3          MR. NOLAN:  At sidebar in your -- with your Irish

4    charm, you said this is the first time you figured out that

5    they were abandoning this issue about Toon Teens and what is

6    Toon Teens' relevance.  So I'm sitting here today and all of

7    a sudden on redirect I have examination from Mr. Price, in

8    fact, at sidebar Mr. Price offered to stipulate to the jury

9    that they are not contending that there are similarities with

10   Toon Teens.  And that's not their case.

11         And yet on cross-examination or redirect -- I don't

12   know what they call it now when he's asking the questions.

13   I'm seeing testimony now from client where he's comparing

14   Toon Teens to one of his drawings and the similarities to it.

15   When they had affirmatively represented to you that that was

16   not going to be part of the case.  Because if it had been

17   part of the claim, we would have been asking those type of

18   questions.  We can't have it as a moving target on this, your

19   Honor.

20         And the last request.  Last request.  At the end of

21   Carter Bryant's testimony, God willing it's in this

22   millennium, seriously, I would ask you to reinstruct the jury

23   with respect to the instruction that you gave earlier that

24   Carter Bryant settled and is not a party to this case.  I

25   think, given the length of his testimony and the nature of

Page 3182

1    the questions that were asked, I think it would be

2    appropriate.  I think the jury is hopelessly confused on that

3    point.

4                 THE COURT:  Oh, have more faith in the jury,

5    Counsel.

6                 THE COURT:  Mr. Price, do you wish to respond to

7    the Toon Teens issue?  Because I thought -- I've tried to be

8    as clear as I can on what role Toon Teens plays.  And --

9                 MR. PRICE:  In context, he said he was influenced,

10   inspired by these ads.  And so my point was you say you were

11   inspired by this, this, and this, showing him three things --

12                THE COURT:  I guess I don't need to hear.

13                Mr. Nolan, perhaps I'm just not expressing or

14   explaining my ruling on Toon Teens, on the ads that you've

15   introduced, the Seventeen magazine, the other edition of

16   Seventeen magazine.  I've now seen two more Seventeen

17   magazines than I've seen prior to this.  And from the cover

18   of it, the thought that what 12-, 13-year-old girls are

19   actually getting in these magazines is frightening.

20                MR. QUINN:  Oh, it's much worse, your Honor.

21   Seventeen is tame.

22                THE COURT:  Wow.  In any event, we've all learned a

23   lot in this case, I suspect.  But the only relevance of Toon

24   Teens, the only relevance of Seventeen magazine, the only

25   relevance of these ads or any of these things is not for

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3183

1    trying to compare properties and elements a la copyright now,

2    but establishing the timing of when Carter Bryant had the

3    inspiration, the idea, and that turned into a drawing.

4            Mattel is using this to attempt -- they are using

5    the October 1999 edition of Seventeen to suggest that that's

6    when they got the idea and did these ads.  You're using the

7    October 1998 edition of Seventeen to say that's when he got

8    the idea.  They are using Toon Teens for the same purpose to

9    try to say no, it was when he walked by somebody's cubicle

10   someplace in Mattel, and that's one area where I guarantee

11   you the jury is confused, as to what the layout of Mattel

12   looks like.  Because I'm thoroughly confused on that point.

13           But that's the point of this.  And that's what I'm

14   allowing it in for, and I will be instructing the jury on

15   that purpose.  And I'm going to continue to hold the line on

16   this, Counsel.  This does not open up and does not bring in

17   whether Bratz is a copyright or a derivative work or anything

18   else of Toon Teens.

19           MR. NOLAN:  Well, your Honor, and it's late.

20           THE COURT:  That's the best I can do to explain it

21   at this hour.

22           MR. NOLAN:  And if I might, your Honor.  They ran

23   away from Toon Teens during the hearings on statute of

24   limitations and said oh, we're not claiming anything about

25   Toon Teens.

Page 3184

1        THE COURT:  No, they didn't say that they are not

2   claiming.  And the Court did not rule that they are not

3   claiming.  They are not claiming that Bratz is a copyright

4   infringement of Toon Teens.  Not that there's no relevance of

5   Toon Teens.  I mean, it's not that nuanced of an argument.

6        MR. NOLAN:  Maybe mine is too nuanced.  Let me be

7   blunt about it.  If part of their claim is that Toon Teens is

8   an impression or was used as an impression or inspiration,

9   rather, by Carter Bryant, and that puts the timing of this in

10  1999, which is what they are trying to do, they can't have it

11  both ways.  And that is if that's their argument, then the

12  statute of limitations and the notice argument and whether or

13  not they are on a reasonable duty of inquiry, which has

14  always been our point, is then triggered once Bratz comes

15  out, whether or not it has anything to do with the drawings.

16        Because that's -- that's what they are claiming

17  here.  The drawings that they show on the left-hand side,

18  your Honor, are drawings that are depicted in the toy fairs

19  in New York, Tokyo, Hong Kong.

20        THE COURT:  This is part of what the Court

21  struggled with, and, as you all know, I took a very long time

22  on this particular motion on the statute of limitations, and

23  I went round and round in my own mind on this.

24        I think I explained this in my order, and I'll try

25  to explain it again now.  Where I come out on that particular

b3c9772e-5038-4bea-95b5-2016fbb63c07

Page 3185

1   issue is you are correct if the claim they had been bringing

2   was a copyright infringement of Toon Teens, then you are

3   right.  They were certainly on notice.

4          But that's not what they are bringing.  They are

5   bringing an entirely different theory, namely, the theory

6   that this was -- their copyright, their intellectual property

7   by virtue of a contract that the Court has found to be a

8   valid, enforceable contract, and that's what they weren't on

9   notice on or had any reason to have notice until 2003 or the

10  dates I set out in my order.

11         But it's that particular theory, and not the one

12  Mr. Quinn disavowed before this court back in 2006, that is

13  the only issue that's at stake in Phase 1-A.

14         And I understand that you respectfully disagree

15  with the Court's reasoning on this, Counsel, and I appreciate

16  that.  But I --

17         MR. NOLAN:  No, no.  I -- listen, we did that in

18  the motions, and that's not the point.

19         THE COURT:  Very well.

20         MR. NOLAN:  It is frankly just confusion on my part

21  as to how they are using it.  But I'll -- we'll work with it.

22  I understand the point, and we've made the record on it.

23         THE COURT:  Very good.  All right.  And as far as

24  your instruction at the end of Carter Bryant's testimony, any

25  response from Mattel on that?

Page 3186

1          MR. PRICE:  Well, the Court not only told the jury

2    that, but it came out during his examination.  He was asked

3    about his settlement agreement.  I don't know if you recall

4    that.

5          THE COURT:  I do.  And I'm struggling with that

6    point.

7          MR. PRICE:  The jury knows he's not a party.  And

8    to -- Mr. Nolan wants you to say to the jury that he's not

9    relevant.  But he is.  The fact that he's been on the stand a

10   lot doesn't suggest he's a party.  It suggests he's

11   important.

12         THE COURT:  I'll consider Mr. Nolan's request.

13         MR. NOLAN:  Thank you.

14         THE COURT:  And I'll decide that on Friday morning

15   as well.

16         Anything else from either party?  I have a few more

17   issues myself.  But is there anything more from the parties?

18         MR. NOLAN:  No.

19         THE COURT:  All right.  You're resting.  All right.

20         Now, the sealing order -- I'm sorry.  Let me start

21   with the motion on the -- for additional discovery that has

22   been submitted under seal by MGA.

23         The Court is going to issue two orders with respect

24   to that motion.  They will not be issued until Friday

25   morning.  But one will be an order that is public, which will

Page 3187

1    simply have the Court's decision.  And the other order will

2    be issued under seal, and that will contain the Court's

3    reasoning and analysis and directives to the parties.  So the

4    latter will remain under seal, as best I can keep things

5    under seal.

6            Now, the joint proposed order regarding documents

7    filed under seal.  It is entitled order regarding documents

8    filed under seal on or before May 27th, 2008.  And it lists a

9    whole bunch of documents that shall remain under seal.  And

10   to be honest, I don't know a lot of docket numbers.  But

11   there are two that stick out in my mind, and that is 3956 and

12   3957.  Because that was the subject of a very unpleasant

13   issue earlier.  And they are not on here.

14           The language in this joint order is other than

15   those documents identified by docket number above, all

16   documents in case 04-9049 are hereby unsealed.

17           And if I sign this order and it would have gone

18   downstairs to the clerk's office, those documents would have

19   been unsealed as of 6:00 tonight.  And we would have been

20   back in my chambers again come Friday morning.

21           We've got to take care on these things.  And I

22   think the language that I need to insert here is that other

23   than those documents identified by docket number above, all

24   documents in this case filed on or before May 27th, 2008, are

25   hereby unsealed.  Because I certainly don't want to affect

Page 3188

1    documents that have been filed under seal and orders that

2    have been filed under seal in the course of this case.

3            And I really, once again, have got to urge all

4    counsel to take care on this thing.  I don't want to jump to

5    any conclusions.  But please, this would have been another

6    brouhaha.

7            MR. QUINN:  I apologize for not catching that, your

8    Honor.

9            MR. NOLAN:  Your Honor, I apologize for not

10   catching that.  I have no explanation.  This is like the

11   wildest thing I would have -- I could have expected you to

12   have raised a hundred things other than this one.  So I don't

13   even have an excuse for it other than this is a bonehead move

14   on our part.

15           THE COURT:  I'm not saying -- the two people --

16   it's --

17           MR. NOLAN:  The explanation may simply be, your

18   Honor, that I think at sidebar the Court blocked the docket

19   entries as I recall it, but I don't know.  I'm just guessing

20   right here.  Maybe that's it.  I can certainly tell you I do

21   not believe it was out of blatant negligence or anything

22   else, because Mr. Quinn would have been calling me right

23   away.

24           THE COURT:  All right.

25           MR. NOLAN:  But we'll change that stipulation

Page 3189

1    immediately, your Honor.  And we'll put that in.

2              THE COURT:  The Court is going to interlineate, and

3    there's no need to submit anything more.  I just bring it up

4    because I -- to emphasize to both sides to exercise care in

5    this because these are the things, and I believe that

6    mistakes happen, and I believe that they are innocent

7    mistakes, but unfortunately, innocent mistakes in such a high

8    stakes trial as this get blown into conspiracies, get blown

9    into allegations and concerns that the other side is out to

10   do something that I would only hope they are not trying to

11   do.

12             So it just serves as a reminder for us to all

13   exercise.  The Court included.  Greater care.  I certainly

14   don't exempt myself from the very same admonition.

15             All right.  Friday morning, 8:00.  I'd like counsel

16   here to argue the crime fraud motion issue related to Bates

17   07831, Exhibits 13380, 13381, and we'll take you at that

18   time.  The Court should have its ruling on the motion for

19   discovery by that time.  And I think that is it as far as

20   what the Court has.

21             The Court will have issued the order as modified on

22   the unsealing of documents.  I've given you your times.

23   Anything else?

24             MR. QUINN:  Don't think so, your Honor.

25             THE COURT:  Very good.  I'll see you on Friday.

Page 3190

1

2                  (Proceedings concluded at 5:50 P.M.)

3

4

5

6

7                         C E R T I F I C A T E

8

9

10        I hereby certify that pursuant to Title 28,

11   Section 753 United States Code, the foregoing is a true and

12   correct transcript of the stenographically reported

13   proceedings in the above matter.

14             Certified on June 18, 2008.

15

16

17                    _____
                      MARK SCHWEITZER, CSR, RPR, CRR
                      Official Court Reporter
18                    License No. 10514

19

20

21

22

23

24

25

b3c9772e-5038-4bea-95b5-2016fbb63c07