Page 3191

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

---

| | | |
|---|---|---|
| MATTEL, INC., | : | PAGES 3191 - 3319 |
| | : | |
| PLAINTIFF, | : | |
| | : | |
| VS. | : | NO. ED CV04-09049-SGL |
| | : | [CONSOLIDATED WITH |
| MGA ENTERTAINMENT, INC., | : | CV04-9059 & CV05-2727] |
| ET AL., | : | |
| | : | |
| DEFENDANTS. | : | |


REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

FRIDAY, JUNE 20, 2008

JURY TRIAL - DAY 16

MORNING SESSION


MARK SCHWEITZER, CSR, RPR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
181-H ROYBAL FEDERAL BUILDING
255 EAST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012
(213) 663-3494

Page 3192

1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4        Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
         By John B. Quinn, Esq.
5            B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
6            Harry Olivar, Esq.
             John Corey, Esq.
7            Diane Hutnyan, Esq.
             William Price, Esq.
8        855 South Figueroa Street
         10th Floor
9        Los Angeles, CA 90017
         (213) 624-7707

10

11

12   On Behalf of MGA Entertainment:

13       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
             Robert Herrington, Esq.
17       300 South Grand Avenue
         Los Angeles, CA 90071-3144
18       (213) 687-5000

19

20

21

22

23

24

25

Page 3193

1                          I N D E X

2

3    CARTER BRYANT, PREVIOUSLY SWORN....................... 3227

4    REDIRECT EXAMINATION (CONTINUED) BY MR. PRICE:........ 3228

5    RECROSS-EXAMINATION BY MR. NOLAN: .................... 3252

6    FURTHER REDIRECT EXAMINATION BY MR. PRICE:........... 3276

7    LLOYD W. CUNNINGHAM, SWORN........................... 3296

8    DIRECT EXAMINATION BY MR. QUINN: .................... 3296

9

10                        E X H I B I T S

11    (Exhibit 15364 received.)........................... 3267

12    (Exhibit 13634 and 13635 received.)................. 3311

13

14

15

16

17

18

19

20

21

22

23

24

25

cc980e32-42ca-4e68-ac04-51877b62940d

1          Riverside, California; Friday, June 20, 2008

2                          8:10 A.M.

3          WHEREUPON THE CASE HAVING BEEN CALLED

4          AND APPEARANCES GIVEN, THE FOLLOWING

5          PROCEEDINGS WERE HELD:

6          THE COURT:  Good morning.  I'd like to begin by

7   recognizing a visiting delegation from China.  I understand

8   we have 25 attorneys from the Peoples' Republic, who have

9   traveled a very long distance to attend a program at Cal

10  State University in San Bernardino.  Cal State has a very

11  intensive and developed Chinese education program that has

12  started.  And there's been exchanges, as I understand it,

13  going on between Cal State and the Peoples' Republic for some

14  time, and this is part of that program.

15          So welcome to the United States.  Welcome to

16  Riverside.  It's very, very nice to have all of you here.

17          We're going to be starting the trial at 9:00.  And

18  I know we'll have kind of tight quarters for a while once

19  people start showing up for the trial.  But our delegation is

20  only going to be with us through the morning break.  So this

21  will only go through 10:30 this morning.

22          Just so everyone knows, we have them on the MGA

23  side because of the Sennheiser -- it was being interfered

24  with by the screen.  So we had to put them all over here.

25          Anyway, what I'd like to do, before we take up the

Page 3195

1   pretrial matters this morning, is just for the benefit of our

2   visiting guests, I'm going to invite Mr. Quinn and Mr. Nolan

3   just to briefly describe the case that we have going on right

4   now and provide some context so that the visitors have a

5   sense of what's been going on, where we are right now, and

6   how you anticipate going from here.

7          Of course, this is outside the presence of the

8   jury.  So we're not -- you're not waiving -- and furthermore,

9   you're not waiving any objections by objecting to the other

10  side during this brief presentation.  This is strictly an

11  extracurricular type presentation.  And this will be off the

12  record, and I hope any reporters that might be present know

13  that this is entirely off the record.

14         (Discussion held off the record.)

15         THE COURT:  All right.  At this time let's go back

16  on the record.  We have a couple matters to take up prior to

17  bringing the jury in at 9:00.

18         First of all, I had indicated at the end of the day

19  on Wednesday that I was going to do a fix on the proposed

20  joint order regarding documents filed under seal, and I

21  indicated that I was simply going to make that fix by

22  inserting the language filed on or before May 27th, 2008.

23         We took a look at the settlement agreement with

24  Carter Bryant, and actually, that was filed under seal on

25  May 27th, 2008.  So that language would not suffice to cover

1    that.

2         So we're making some additional changes.  I'll be

3    issuing it sometime today, which I hope will cover the

4    settlement agreement, anything that's been filed since this

5    trial started, including the first day of the trial, and then

6    also any of the orders of the Court discussing sealed

7    matters, which is something that the Court will take a look

8    at itself.  Because I hadn't even given much thought to that.

9    But I will issue an order today that will hopefully address

10   all of that.

11        What I'd like counsel to do, though, is

12   double-check the Court's work.  When I issue the order, it's

13   going to take a few days for the clerk's office to go through

14   and physically do this.  I wouldn't expect the documents to

15   be physically unsealed until sometime in the middle of next

16   week, but it gives us some time for counsel and both sides to

17   look to see if the Court is missing anything when it makes

18   its modifications to the order.  I know this is a very

19   difficult thing, and I know we all want to get this right.

20        So if you would, perhaps, over the course of the

21   weekend, have somebody on each side take a look and make sure

22   that there's nothing that the Court clearly wants to have

23   under seal or counsel clearly wants to have under seal

24   unsealed before anything is made public.

25        MR. NOLAN:  Very briefly, if I might, Friday

1    afternoon, when this came up, the Court pointed out

2    rightfully a concern about why certain docket entries,

3    sensitive ones, were not included in the stipulation.  And I

4    indicated on the record that if that was so, that was

5    really -- I think I used the legal term of that was a

6    bonehead move on our part, and we apologized for it.  And

7    Mr. Quinn said it wasn't caught.

8            I do have to say that after that hearing, I was

9    presented with a document that indicated that we had filed a

10   request specifically to withdraw those two docket entries,

11   and that's the reason why.  And I only raise it, your Honor,

12   because not the record I said -- one of my closest colleagues

13   is Jason Russell, whom I care about deeply.

14           Mr. Russell called me that night, after reading the

15   transcript, and he said, "Tom, the last thing that I would

16   have ever allowed to have happened, didn't you know about

17   this identifying?"  And so I wanted to let the Court know

18   that not only had we checked this out, but actually

19   Mr. Russell, and this is what he was concerned about, had had

20   conversations with Mattel with respect to that procedure, and

21   yet, you know, nobody pointed that out.

22           So that was not intentional on our part.  This is

23   one of the most sensitive matters --

24           THE COURT:  I appreciate that.  And just so you

25   know, I received the request for withdrawal, it was handed to

1    me as I walked out.  Court is not granting that request.  I

2    think for just preserving the entire record and so we have

3    everything in the record, the better course is to keep those

4    exactly where they are for appellate purposes and then -- but

5    keep them obviously under seal.

6           I don't want -- if any part of this gets unsealed,

7    I don't want to have something -- I don't want us going back

8    into the record and pulling things out.  I think the

9    appropriate course is to seal that which is in the record so

10   that we have a complete record, and then if, for whatever

11   reason -- and frankly, I can't imagine any reason given that

12   all of this now is water under the bridge, but I think the

13   better course is to keep those where they are.

14          So I'm denying that request.  We will fashion the

15   sealing order to make sure that those are excluded.

16          As I tried to indicate on Friday, I want to

17   emphasize the seriousness of this, but I do not believe -- I

18   believe that everybody is trying as hard as they can to make

19   sure that we are accomplishing what we need to accomplish.  I

20   have no reason to believe that anything else is going on.

21          MR. NOLAN:  I appreciate that, your Honor.

22          THE COURT:  So assure Mr. Russell of that, if you

23   will.  Thank you anyways, my asking, because the Court is not

24   entirely -- is not making any claims to infallibility here.

25   So I would ask that counsel carefully review the Court's

1    order to make sure that it covers everything that needs to be

2    covered.

3              All right.  So that's that issue.  The second issue

4    that I want to take up at this point is the crime fraud

5    argument.  There are several documents, one of which was made

6    available to Mattel and later clawed back by MGA, that MGA

7    has designated as attorney-client privilege.

8              Mattel contends that the privilege should be

9    pierced due to the crime fraud exception.  And MGA takes the

10   position that the privilege is still intact and those

11   documents should not be turned over.  A previous motion was

12   brought.  Court denied that without prejudice to being

13   renewed in the course of the trial.  We're now at that point

14   in the trial where Mattel seeks to introduce these documents

15   or obtain these documents, and so now is the appropriate time

16   to resolve this issue.

17             The Court has reviewed the briefs that were

18   submitted in this matter, and I'd like to hear further

19   argument from counsel.  I'm going to begin with the moving

20   party on this, and that is Mattel.

21             Mr. Zeller, are you going to be arguing this?

22             MR. QUINN:  I will, your Honor.

23             THE COURT:  Mr. Quinn, what I'd like to start with,

24   and then you can supplement it with whatever you want, but

25   I'd like you to identify for the Court from the trial record,

Page 3200

1   what's been introduce at trial, what evidence you believe is

2   in evidence and indicates essentially that Mr. Larian was

3   engaged in a fraud.

4          And I apologize, Mr. Larian, while you were walking

5   in.  We're taking up the fraud allegations right now.

6          But what evidence is there that that was a fraud

7   that was being perpetrated either in terms of concealment by

8   Mr. Larian or trying to conceal it from his attorneys?  What

9   is the evidence that you would identify at this point?  I

10  understand this was submitted in support of the motion, but

11  part of the reason for waiting to this point is I wanted to

12  see how this played out at trial, and now that we have that

13  benefit and we're on the day that you're going to be resting

14  or very close to it, what evidence you believe has been

15  adduced that indicates that it would support a finding by

16  this court.

17         I think the standard would be preponderance of the

18  evidence that the Court would have to reach before it got to

19  that point, that a fraud has been established.

20         MR. QUINN:  Thank you, your Honor.  As the Court

21  knows, from reading the cases in the crime fraud area, I

22  think that these issues typically don't arise in the middle

23  of a trial.  It's often in the context of pretrial discovery

24  or a Grand Jury proceeding where a determination must be made

25  whether the pendency of a crime or a fraud has been

cc980e32-42ca-4e68-ac04-51877b62940d

Page 3201

1    established based upon the evidence then available at the

2    stage.

3            I think here at this point, the Court really does

4    have the benefit of a much fuller record than courts usually

5    have in making this assessment.  And in response to the

6    Court's question, I think essentially most of the evidence

7    that's reflected in the statement of facts in the moving

8    papers, I think, has been -- has actually made it into

9    evidence at trial.

10           I believe the Court is in a position to say now

11   that based on a preponderance of the evidence, this was in

12   fact Mattel's property.  It was create during the course of

13   employment.  There is contrary evidence, but if a

14   determination has to be made that do the scales tip at all, I

15   think the weight of the evidence --

16           THE COURT:  Specifically on the issue of

17   concealment, what evidence is there that Mr. Larian was

18   endeavoring to conceal?

19           MR. QUINN:  And it doesn't just have to be

20   Mr. Larian.  I mean MGA as well, your Honor.  I would point

21   to the evidence about the contract, the testimony from

22   Ms. O'Connor, that the fax header Barbie Collectibles was

23   whited out.

24           Now, that's denied by Mr. Larian.  But we also have

25   the evidence that somehow somebody at MGA also removed the

1    date before they sent that contract to Ms. Glaser.  There's

2    no evidence that that was done by Ms. Glaser.  We have in the

3    record the fax cover page and a copy of the complaint that

4    was sent to her, and the date has been removed as well.

5            There's also ample evidence, again, contrary

6    evidence, too, but at this stage it's just a question of

7    preponderance.  There's ample evidence that there was an

8    effort made to keep Carter Bryant's participation secret.  We

9    have the testimony of Rachel Harris that she was instructed

10   that there should be no reference to that.

11           The Court has seen the exhibit about we can't have

12   a signature doll signed by Carter Bryant because we want to

13   keep his name under wraps.

14           There are the journalists' reports.  I think

15   there's ample evidence that there was an effort to keep this

16   covered up and his involvement quiet.

17           So, your Honor, in terms of the preponderance

18   standard, I would submit that that's been met here.  And what

19   we have here is an e-mail.  Again, I won't quote it, that is

20   directly contrary to the theory that's been put on here.

21           Now, they can say that it's consistent in that he

22   could have been doing this activity in the time periods

23   indicated in the e-mail back in 1998.  But in the context of

24   an e-mail, that only says it was done in these time periods

25   without referencing the year 1998.  I think that speaks

Page 3203

1   volumes, your Honor.  It's to me inconceivable, illogical,

2   and makes no sense to have Mr. Larian say what he said and

3   left out -- and by the way, this was in 1998 -- if there was

4   anything to that at all.

5          There then ensues a series of communications

6   between Mr. Larian and Ms. Glaser.  We don't know what those

7   are.  And one of the things I submit that the Court can and

8   should do if it has any doubt on this is request that those

9   be submitted for in camera review.  That does not require a

10  showing of preponderance of the evidence.  That's a lower

11  standard.

12         THE COURT:  What does that require?  That was

13  unclear from the case law.

14         MR. QUINN:  I think it is unclear, but I think the

15  Napster case, the Ninth Circuit case that addresses that says

16  that it's a lower standard.  I can't recall the rubric or the

17  phrase.  I'm getting help here.  Okay.  The Zolin case I'm

18  being pointed to, U.S. Supreme Court case says it requires

19  for in camera review, quoting now, a showing of the factual

20  basis adequate to support a good faith belief by a reasonable

21  person that in camera review of the materials may reveal

22  evidence to establish the claim that the crime fraud

23  exception applies.

24         THE COURT:  And that means, Counsel?

25         MR. QUINN:  Well, it's the Supreme Court, your

Page 3204

1    Honor.

2              THE COURT:  With all due respect, of course.

3              MR. QUINN:  Of course.  Easy for them to say;

4    right, your Honor?

5              But it is a lower standard.  And whatever it is,

6    the e-mail starts out with, the initial e-mail, clear

7    anticipation of potential problem.  Clear anticipation of

8    potential problem.

9              THE COURT:  Does the anticipation of a problem by

10   itself prove concealment?

11             MR. QUINN:  No, I don't think it does.

12             THE COURT:  Then how is it relevant to the issue of

13   concealment?

14             MR. QUINN:  I think it's relevant -- I don't know

15   that it's relevant to the issue of concealment per se.  I

16   think it's relevant to the issue about whether there is a

17   fraudulent defense that's being mounted, whether we are

18   witnessing right at that point the formulation of a

19   fraudulent legal strategy.

20             THE COURT:  What's that relevant to?

21             MR. QUINN:  Ultimately, whether there's a fraud on

22   the court, I would say.  He indicates there's a potential

23   problem.  He foresees what's happening.  He makes a statement

24   to the attorney, and there's then an exchange.

25             THE COURT:  What claim that you're pressing in this

Page 3205

1    phase of the case is that relevant to?

2            MR. QUINN:  What claim?

3            THE COURT:  You're seeking to introduce this in

4    evidence at this point, or obtain this so you can use this

5    evidence in this phase of the trial.

6            MR. QUINN:  Right.

7            THE COURT:  How is it relevant?

8            MR. QUINN:  I think it's relevant to all the

9    claims, your Honor.  It's relevant in terms of --

10           THE COURT:  I'm just trying to get you to

11   articulate that.

12           MR. QUINN:  Well, it's relevant to the -- I mean,

13   it goes to the truth of the timing claims about creation and

14   ownership.  But more importantly, I would say, your Honor,

15   that that goes to the issue about whether there is, right

16   there, we're witnessing the formulation of a fraudulent

17   defense, which is going to be mounted and has been presented

18   in this court, which causes somebody at MGA, undisputed, to

19   doctor documents and send them to the lawyer.

20           Whatever else is said, it's caused somebody to take

21   that action.  And that can't be disputed.

22           THE COURT:  Very well.  Thank you, Mr. Quinn.

23           Mr. Nolan or Ms. Aguiar?

24           MR. NOLAN:  Your Honor, I think the briefs covered

25   most of the arguments, but I wanted to either address the

Page 3206

1    Court's precise question because I think the Court has framed

2    it appropriately.

3            Your Honor, Mr. Quinn's statement that viewing the

4    evidence to date, that the scales tip in favor of a

5    preponderance that some criminal activity or fraud was being

6    perpetrated, I think is not supported by the evidence, but

7    I'm not going to get into a contest as to who's ahead and

8    who's behind in this case.

9            I think, your Honor, there's not any evidence in

10   the record in this trial which would suggest that Mr. Larian,

11   at the time that he sent an e-mail communication to outside

12   counsel, Patty Glaser, in June of 2001, was concocting a

13   scheme -- using Mattel's phrase, not mine -- of any type of

14   criminal behavior or fraud on the court.

15           That position is basically not logical based on the

16   evidence.  The evidence in this record is that Carter Bryant

17   himself has testified on numerous occasions that it was he

18   who conceived of the idea, and it was done while in Missouri

19   in 1998.  Not that he did it during, you know, weekends or at

20   nights at Mattel, but he specifically has said and

21   represented to this court and to the jury numerous times that

22   it was in Missouri, that that was not the idea that was

23   devised by Isaac Larian or anybody at MGA.

24           THE COURT:  There's certainly a lot of evidence

25   which indicates that.  But you would concede, I trust, that

Page 3207

1    there's also evidence to the contrary.  I mean, this is a

2    hotly disputed factual issue.

3           MR. NOLAN:  Yes, of course, your Honor.  And much

4    like every civil case, these issues are in dispute.  But the

5    fact that they are in dispute does not give rise under

6    Napster or the Supreme Court's decision in Zolin to

7    automatically assume the basis of the crime fraud exception,

8    because the basis, the first step even under the Supreme

9    Court's analysis in Zolin, is whether or not there is good

10   faith evidence to suggest that criminal activity has been

11   engaged.

12          So regardless of whether or not someone is

13   believing this or that it was done in 1998 or 1999, the

14   question is whether or not the version of the evidence that

15   it was done in 1998 was part of a conspiracy by Mr. Larian in

16   June of 2000.

17          The record evidence defies that, your Honor,

18   because we have evidence a year before the presentation at

19   MGA, or any meeting with Isaac Larian before then, and I

20   think this is not disputed by Mattel, that Mr. Bryant goes to

21   Jacqueline Prince to notarize the drawings, and in that

22   meeting and in the journal entry, which is in August of 1999,

23   the Missouri 1998 reference is there with respect to the

24   creation.  That's a year before they meet Mr. Larian or MGA.

25          So the notion that in June of 2001 we're now going

1    to start conspiring to create this argument, I think, defies

2    logic.

3              I want to make two final points, if I might, your

4    Honor.  These motions are easily made, but very potentially

5    dangerous, and I think is represented by Napster and Zolin,

6    and I think it's especially important, your Honor, and

7    troubling that there was a procedure and a process in this

8    case where documents that were privileged and inadvertently

9    produced, and as the Court knows, I think, from reviewing the

10   record, that this document was on a privileged log by MGA but

11   inadvertently produced by the law firm of Kaye Scholer.

12             When it was brought before it was used in any

13   deposition, we clawed it back.  That was in, I believe,

14   March, your Honor, or February that we clawed it back.  Under

15   the protective order in this case, both law firms undertook a

16   responsibility as officers of the court, a protective order

17   was entered by your Honor, that in connection of the

18   procedure of a clawed back document, you would represent that

19   you have destroyed any copies of these documents, and that

20   the right procedure would then be to go to court and seek a

21   motion to compel, which wasn't done, your Honor, until far --

22   in fact, it wasn't done.

23             On the eve -- the Friday afternoon, I believe, of

24   the start of the evidence, we were told that this motion was

25   going to be filed.  And counsel has repeatedly quoted from a

Page 3209

1    document that under the protective order was supposed to have

2    been destroyed back in March.  And we cite to the case, your

3    Honor, of Lazar versus Mauney at page 3, footnote 3, that

4    disclosing the contents of an inadvertently produced

5    privileged document is not the best course of practice

6    expected of lawyers practicing.

7                THIS document, the contents of it, had been

8    mentioned on the public record.  It was done in -- at a

9    sidebar conference again this morning, and I think I needed

10   to point that out.

11               THE COURT:  Very well.

12               MR. NOLAN:  Thank you very much.

13               MR. QUINN:  We don't have a copy of the document.

14   And I have not mentioned its contents this morning.  It must

15   be the case that even a clawed back document can be

16   challenged.  And what caused us to bring this was getting the

17   document production from Ms. Glaser showing for the first

18   time a copy of the contract with the date whited out, which

19   we got, just a matter of two weeks before we filed the

20   motion.

21               So in terms of timing, your Honor, that's why it

22   was brought when it was brought.

23               There hasn't been any mention, and wholly apart

24   from the crime fraud, is the issue of waiver.  They have

25   produced or sought to offer communications with Mr. Rosembaum

Page 3210

1    in the middle of trial, which all of this time were on a

2    privilege log and were withheld from us, and we couldn't

3    follow up --

4            THE COURT:  Counsel, the Court has not allowed

5    those documents in.

6            MR. QUINN:  The Court hasn't, but it's quoted in

7    their brief.  They rely on it.

8            THE COURT:  It's not before the jury.

9            MR. QUINN:  All right.

10           THE COURT:  Very well.  Before I rule on that,

11   there's two other documents that were brought to the Court's

12   attention.  One was an exhibit that Mattel believed we needed

13   to have a ruling on before we get through these last

14   witnesses and they rest.  And that was Exhibits 13380 and

15   13381.  These are e-mail communications between Mr. Larian

16   and his brother.

17           I would like someone from Mattel to identify for

18   the Court specifically what portions of these that they

19   believe to be relevant.  There's a lot of language in here

20   which is of concern to the Court in terms of its prejudicial

21   impact.  And I suspect everybody in this room has said things

22   about a relative or a brother or sister or mother or child

23   that they probably didn't mean exactly what they said, and we

24   sometimes use language with family members carelessly.

25           MR. ZELLER:  And I think that's a fair comment.  I

1    would say this, however, your Honor, is that Fred Larian was

2    also an executive of MGA.  This was in the context of a

3    business communication.  And not only was he an executive for

4    MGA for quite some time, but even after he left MGA as an

5    executive, he was a paid consultant for many years, all the

6    way, as far as we know, up to the end of 2005.

7              THE COURT:  I do appreciate that.  That's why I'm

8    not just categorically saying this is off, but I'd like you

9    to identify precisely these two documents, what it is that

10   you think is relevant.

11             MR. ZELLER:  And I think one is more easily

12   explainable than the other.

13             THE COURT:  Okay.

14             MR. ZELLER:  So let me start with perhaps the

15   easier one.

16             THE COURT:  All right.

17             MR. ZELLER:  And that is the e-mail where Farhad

18   repeats what he says was an instruction by Isaac Larian to

19   withhold the originals of documents in the Fireman's Fund

20   litigation.

21             THE COURT:  This is in the ABC International

22   Traders stock certificate?

23             MR. ZELLER:  No, that's the other e-mail, your

24   Honor.

25             THE COURT:  You're referring to 13380.

Page 3212

1          MR. ZELLER:  Yes.  This is the e-mail where Farhad

2     describes the situation where Isaac Larian had instructed him

3     to withhold the originals of documents in the Fireman's Fund

4     litigation.  And what I would say, your Honor, is that its

5     relevance will be most properly determined, I think, in the

6     context of Farhad Larian's testimony.  Because we're not

7     certainly advocating that these come in in a vacuum.

8          Obviously, the Court does need to weigh under 403

9     its probative value versus its unfair prejudice.

10          What we expect Mr. Farhad Larian to testify to,

11     presumably today, consistent with his deposition, is that he

12     destroyed at least three boxes of documents and wiped a USB

13     device, also with materials related to Bratz from the year

14     2000, and that he did that to keep it from Mattel.

15          THE COURT:  But getting back to the document in

16     question, what this indicates is that there is a dispute

17     between the brothers as to the truth or falsity of a

18     particular declaration, a particular position.

19          MR. ZELLER:  Sure.  And I think there's no question

20     that Mr. Larian and MGA are going to say no, that's not true.

21     He did not say that.

22          THE COURT:  There's no indication that Mr. Larian

23     is telling his brother to falsify it.  He's telling his

24     brother to change your testimony to conform with what I

25     understand to be the truth.

Page 3213

1          MR. ZELLER:  I'm sorry.  Those are different

2    documents, your Honor.  I'm talking again about the

3    withholding document, it's not the long one.  It's not the

4    one that --

5          THE COURT:  It's the short one.  13380.

6          MR. ZELLER:  And this is -- and in particular,

7    where he starts off, this is May 24, 2000.

8          THE COURT:  Right.

9          MR. ZELLER:  "You have accused me of falsifying

10   documents."  And this is Fred Larian to Isaac Larian.  "You

11   were the one who was trying to falsify things."  And he goes

12   on to say that Isaac had instructed him to withhold these

13   originals in this litigation.  And the reason why we think

14   that this will become relevant is as impeachment and really

15   on Mr. Fred Larian's credibility.  As I was saying, your

16   Honor, what we expect Mr. --

17         THE COURT:  So you're going to ask Mr. Fred Larian,

18   has your brother ever instructed you to withhold originals or

19   change testimony.  And if he -- depending on how he responds

20   to that, you want to use this to impeach that credibility.

21         MR. ZELLER:  Correct, and we may frame the question

22   more narrowly, but that is fundamentally the point, your

23   Honor.  Because Mr. Fred Larian is going to say that on his

24   own initiative, he destroyed those boxes of documents and

25   wiped that USB device.

1   So that is going to be his story.  We, of course,

2   have a different view.  We think that certainly inferentially

3   the evidence will show that this was being done at least with

4   the complicity, if not at the instruction of Isaac Larian,

5   and to the Court's point, that is exactly that nexus.  This

6   e-mail provides a way of impeaching his credibility on that

7   score.

8   THE COURT:  Turning your attention, Counsel, to

9   13381.

10   MR. ZELLER:  And this one, I will say, your Honor,

11   is probably one we are going to press on far less than the

12   first one.  I think here there is certainly more ambiguity as

13   to what's going on.  I think a fair reading, or at least one

14   reading of this document is that Mr. Makabi is basically

15   saying you, Isaac Larian, are asking me to swear out a false

16   declaration.

17   That appears to be what he's saying at some point,

18   but in terms of who we actually expect to put on the stand at

19   this point, I think, frankly, again, if we're going to offer

20   this document, it's not in a vacuum.  It would be a matter of

21   credibility.

22   THE COURT:  Very well.

23   MR. ZELLER:  So I would ask on this document, your

24   Honor, we just see where things play out.  I think in this

25   context, because we don't know who they are going to call,

Page 3215

1   for example.  Mr. Makabi may take the stand, in which case it

2   may be relevant to his credibility, but I do think that the

3   other e-mail, the short one, the one about the Fireman's Fund

4   litigation, that's going to become relevant today.

5           THE COURT:  Very well, Mr. Nolan, why don't you go

6   ahead and restrict your remarks to 13380.

7           MR. NOLAN:  Your Honor, it appears, based on the

8   representations of the proffer made by Mattel's counsel, that

9   what they intend to do is call a witness who is a nonparty,

10  ask him a question not related to this litigation.

11          THE COURT:  Well, he's a nonparty, but he was with

12  the company at a relevant time period.

13          MR. NOLAN:  Correct, your Honor.

14          THE COURT:  Former employee.

15          MR. NOLAN:  I'm sorry.  Former employee.  There's

16  no doubt about that.  I wasn't trying to deny that, your

17  Honor, but then what they are going to try to do is

18  manufacture an issue.  Ask him a question, hope he denies it,

19  and then impeach him with this e-mail communication.

20          THE COURT:  And you've never done that in your

21  career as a litigator.

22          MR. NOLAN:  More times than not I've not been

23  allowed to.

24          THE COURT:  I think that was an admission, Counsel.

25          MR. NOLAN:  It was an admission I finish second

cc980e32-42ca-4e68-ac04-51877b62940d

Page 3216

1    place on most of those arguments.  In this case, your Honor,

2    in the context in which we find ourselves in front of this

3    jury, the 403 objection on this is significant because if we

4    now have to get into this exchange with Farhad Larian, we

5    will then have to get into what were the issues with respect

6    to the Fireman's Fund litigation.

7              What was the role of Marty Katz.  What was the

8    issue with respect to the production of an original as

9    opposed to the production of documents.  There's nothing here

10   that says that the originals were being changed, altered,

11   disfigured in any way or that any discovery was not being

12   provided.

13             There was a dispute with respect to the control of

14   an original document in connection with this litigation.

15   And, your Honor, we have precious time in this case.  If I

16   now have to try what was going on in this matter on Fireman's

17   Fund, we're going to be so far away from the issue that this

18   jury has to stay focused on with respect to whether or not

19   the drawings were done in 1998 or 1999 or whatever.

20             They want to say also that by inference, they then

21   want to use whatever this -- whatever was meant by this

22   e-mail and then tie it to an allegation of spoilation by Fred

23   Larian in this case where, by their own admission, there is

24   no evidence that anybody at MGA or Isaac Larian ever

25   instructed Fred to do whatever he did with respect to these

Page 3217

1   documents.  The arbitration was concluded.

2          Mr. Larian had -- Fred Larian had counsel.

3   Documents were already in the possession of Kaye Scholer,

4   Larry Feldman represented Mr. Isaac Larian.  Fred Larian had

5   his own counsel.

6          So it wasn't as though, you know, there was an

7   intent on the part of Farhad Larian to destroy specific

8   evidence that he didn't think was also duplicated in some

9   other place.  But they are doing this all on inference.  It's

10  almost like a carom shot, if you remember playing caroms,

11  your Honor.

12         What they are trying to do is use an e-mail

13  involving Fireman's Fund, take it out of context, and then

14  say gee, this issue with the USB drive occurred in connection

15  with -- after the arbitration, and boy, I bet you that's what

16  was really happening in this case, and I think that's the

17  classic definition of 403, where the probative value is

18  clearly outweighed by the prejudicial impact that this might

19  have on the jury.

20         I also think that's not a proper relevant inquiry

21  to make.

22         THE COURT:  Very well.  Thank you, Counsel.

23         MR. NOLAN:  One last point, I apologize.  The

24  record in evidence in this case was that Daphne Gronich,

25  general counsel, did send out notices to people to preserve

Page 3218

1    their documents, and Mr. Larian, Fred Larian was sent a copy

2    of that, and again, what I'm saying is this carom shot of

3    trying to use this e-mail to prove that he must have done

4    something notorious in this case and then have it relate to

5    Isaac Larian's credibility.  That's the prejudicial part.

6              THE COURT:  Very well.  Briefly.

7              MR. ZELLER:  Briefly, your Honor.  Mr. Fred Larian

8    testified specifically that he had destroyed this evidence

9    about Bratz in 2000 to keep it from Mattel in this case.

10   There is a direct nexus with respect to it.  Certainly the

11   issue of -- I won't call it spoilation because from our

12   perspective, this goes back to, for more than anything else

13   as to Fred Larian.

14             But also, with the Fireman's Fund litigation, I

15   don't think it's true that we have to get into the details of

16   what the case was about.  What matters was there was an

17   instruction according to Mr. Fred Larian to withhold those

18   documents.

19             THE COURT:  What about counsel's arguments that the

20   significance of that instruction can only be tested by having

21   some understanding of what role those originals, as opposed

22   to the copies, played.  My reading of this, it seems to be

23   that there were copies of these very same documents that were

24   produced.  There were some legibility questions with them.

25   Someone came up with the originals, and apparently there was

Page 3219

1    an instruction not to turn over the originals.  That's my

2    reading of the initial e-mail here.

3              MR. ZELLER:  Sure.  And there's no question that,

4    you know, one could try and argue about the nexus of what we

5    were holding and why.  But the fact is that it's quite clear

6    that Fred Larian is saying he was told to withhold

7    information.  Regardless.

8              And one thing that the jury could infer from that

9    evidence and the evidence that Mr. Fred Larian will testify

10   about, the circumstances of what he did, is in fact he is

11   withholding this evidence, not just simply that he destroyed

12   it, but that he is withholding it.  The circumstances under

13   which he describes his destruction of evidence, you know, I

14   think a jury may very well find doesn't mean he actually got

15   rid of it.  He's just holding it and withholding it from us.

16             THE COURT:  Thank you, Counsel.

17             MR. ZELLER:  Thank you.

18             THE COURT:  All right.  This is what I'm going to

19   do on all three of these.  I'm going to make my rulings at

20   this point.

21             With respect to the documents, the privileged

22   documents, including Bates KS 07831 and the other documents

23   in that series that have been designated, based on what's

24   before me right now, the Court does not find that there is

25   sufficient evidence to order the documents to be produced to

Page 3220

1    Mattel; however, I do believe that there is a sufficient

2    showing for the Court to examine the documents in camera.

3            So I'm going to order MGA to turn the series of

4    documents over to the Court.  Perhaps once the Court looks at

5    it, when that is combined with the evidence that is before

6    the Court, there may be sufficient evidence to produce them,

7    but I at this point don't think there's sufficient evidence

8    without knowing more about the documents themselves.

9            And, Counsel, I'm going to ask that you have

10   someone on your team do that and provide those to Mr. Holmes

11   as soon as possible, because I'd like to do this during

12   breaks or lunch today and get this done.

13           With respect to Exhibit 13381, I'm going to find on

14   402 and 403 grounds that that is precluded from Mattel's case

15   in chief based on the witnesses being called at this point.

16           As far as 13380, we are definitely going to redact

17   the line in the e-mail from Mr. Fred Larian to Isaac Larian,

18   the second sentence of that first e-mail on May 25th:  I

19   doubt you will swear on any your children's lives," through

20   the end of that sentence.  That has been redacted.  And

21   before counsel could seek to introduce this before the jury,

22   the Court will consider the testimony of Mr. Fred Larian to

23   that point and whether or not a sufficient foundation has

24   been laid for even getting into this issue, let alone into

25   this document.

Page 3221

1              So I'm going to reserve ruling on that until

2      Mr. Larian has testified.  But in any event, let's have the

3      line completely redacted, and let's do it in such a way as

4      though it appears that that line was never there.  Let's just

5      have that blanked out, because there's certainly no point in

6      getting into that.

7              So that's those three documents.

8              I do have rulings to make on all of transcripts,

9      but since we're not going to be doing that until Tuesday at

10     the earliest, I'll probably reserve those in the end of the

11     day.

12             I was just handed a note that we have all jurors

13     present.  It's two minutes before nine o'clock.  Let's have

14     Mr. Bryant up on the stand and ready to go at nine o'clock

15     unless there are other issues.

16             MR. PRICE:  There's an issue we need to take up at

17     sidebar.  It concerns a transcript.

18             THE COURT:  Very well.

19             (SIDEBAR CONFERENCE HELD.)

20             MR. PRICE:  Your Honor, you mentioned that if we

21     were going to use the in camera hearing transcript to

22     impeach, that we should request a sidebar conference first.

23             THE COURT:  What?

24             MR. PRICE:  From Mr. Bryant on the Evidence

25     Eliminator.

Page 3222

1        THE COURT:  Very good.

2        MR. PRICE:  And what I want to use --

3        THE COURT:  What specifically are you referring to?

4        MR. PRICE:  Let me show you the precise cite here.

5   It's page 12, lines 11 through 17.

6        THE COURT:  You are seeking -- you are making a

7   motion to unseal these portions?

8        MR. PRICE:  Yes.  And if you recall, we were

9   discussing with Mr. Bryant whether or not adult content was

10  still on the laptop even after the safe shut down.  And what

11  I want to use --

12       THE COURT:  He indicated here that he did not know.

13       MR. PRICE:  Right.  And in the hearing he said that

14  in fact he thought there might be.

15       Question was:  "You're aware, aren't you, when

16  Mattel received the image of the laptop hard drive, that in

17  fact there was pornography on it?"

18       "Answer, I assumed, yes.  I assumed there probably

19  was."

20       "Question, in fact, you believe there was a

21  considerable amount of pornography on that drive.  Is that

22  true?"

23       "Answer, I thought there might be."

24       I'd be glad to change that to adult content by the

25  way.  But he seems to be indicating on the stand last

Page 3223

1    Wednesday that he didn't --

2            THE COURT:  Mr. Nolan?

3            MR. NOLAN:  This goes to the proffer that I made at

4    the end of the day on Friday.  Their own expert report

5    indicates that there was no pornography, no adult content

6    downloaded on Carter Bryant's folder.  Any pornography, adult

7    content, was found in Richard Irmen's folder.  He used this

8    computer.  So this testimony in chambers is, you know,

9    probably going to the fact that he probably thought well,

10   probably Richard did it.  But there's no evidence -- and

11   their own expert, your Honor, this is what troubles me --

12           THE COURT:  This is interesting, because it ties

13   into whether I'm going to allow Mr. Menz on the stand.  The

14   issue is not so much what actually is or is not on the

15   computer.  This is all about credibility.  So it's what

16   Mr. Carter Bryant believes is on there.

17           MR. NOLAN:  Right.

18           THE COURT:  I think this may work in Mr. Price's

19   favor on this issue, and it's going to work in your favor on

20   the expert testimony issue.  But the whole point is not what

21   actually is or is not still on the computer.  It's what he

22   thinks he did with Evidence Eliminator or what he thinks he

23   did achieve or didn't achieve.

24           And if, as he testified in chambers, that he didn't

25   think that he got rid of all of it and that there might be

Page 3224

1    still a lot on it, that does undercut the issue that you

2    brought up and you introduced the whole issue of whether or

3    not there was adult content.

4           So it's not like Mattel did that.  I think in that

5    case it works in your favor.  I think ultimately it's going

6    to come down, just to show a carts a cart a little bit, I'm

7    questioning whether or not we need these experts on Evidence

8    Eliminator or Mr. Menz in here precisely because I don't know

9    how relevant it is as to what was or was not deleted.

10          As Mr. Bryant has repeatedly said, he didn't know

11   what he was doing.  What's relevant is what he thinks he's

12   doing.  Why he bought this program, what he thinks he was

13   achieving by doing this.  And the like.  Does that -- do you

14   understand where I'm coming from on this?

15          MR. NOLAN:  I do, your Honor.  But now what I want

16   to do is just talk about 403 just now taking it to a further

17   step.  Their own expert report has in there the affirmative

18   finding that it wasn't on Mr. Bryant's folder, it was on

19   Richard Irmen's folder.  Now what he's trying to do is trying

20   to impeach him on this.  The 403 concern I have is I've

21   already made my point.  I lost with respect to Carter Bryant.

22          But now, with respect to Richard Irmen, it seems to

23   me that I may have to be forced in order to prove his

24   credibility, that Richard Irmen used -- didn't use Evidence

25   Eliminator --

Page 3225

1          THE COURT:  No, I don't think it's relevant for you

2    to get into whether it was on -- or try to prove through the

3    expert that it was on Richard Irmen's.  It doesn't matter.

4    Whether Richard Irmen put it there or he put it there, if

5    he's embarrassed to have that out, that's his reason for

6    getting Evidence Eliminator, then that's his reason for

7    getting Evidence Eliminator.

8          If you can establish that he thought there was a

9    difference that him running Evidence Eliminator would only

10   affect his hard drive and not Richard Irmen's, maybe there's

11   a basis for that.  But I suspect, based on his testimony so

12   far, he has no idea about hard drives and whether it was on

13   his hard drive or Irmen's hard drive.

14         MR. NOLAN:  I agree, but the question, the way it

15   was phrased in chambers --

16         THE COURT:  Let me see that.

17         MR. NOLAN:  On what did he know.

18         THE COURT:  In context, I recall there was -- we're

19   talking about when it was turned over.  And the image of the

20   hard drive that was made was July of 2004.

21         MR. NOLAN:  But, your Honor, it says here:  "You

22   are aware, aren't you, that when Mattel received the image of

23   the laptop hard drive, that in fact there was pornography?"

24         "Yes."

25         THE COURT:  That undercuts your argument to a

cc980e32-42ca-4e68-ac04-51877b62940d

Page 3226

1    certain extent.

2            MR. NOLAN:  But can I explain?  My point, your

3    Honor, is that by the time of this hearing, this Evidence

4    Eliminator, trust me, was subject of a lot of moans in front

5    of Judge Infante.

6            THE COURT:  I know there were declarations and

7    there was expert testimony.  And the fact that pornography

8    was found on the hard drive was more likely the product of

9    communications with counsel in discussing it.  So when

10   Carter -- I'm sorry.  When Mr. Bryant answers this question,

11   he's saying -- that's the problem that I'm talking about.

12   Because I can say --

13           THE COURT:  That's fair game for you to get in on

14   your redirect.  I'm going to permit lines 11 and 17 unsealed.

15   Change it from pornography to adult content.

16           MS. AGUIAR:  Can I make a suggestion in that

17   regard?

18           THE COURT:  Please.

19           MS. AGUIAR:  Because sometimes the parties have

20   actually read from a transcript prior, and sometimes they put

21   it on the screen.  Instead of redacting and changing words,

22   can we just read it rather than put it on the screen?

23           THE COURT:  And read it as adult content.  Very

24   well.

25           MR. NOLAN:  One other procedure.  Would it be

Page 3227

1    appropriate to have Mr. Bryant provided with a copy of the

2    transcript?  That's typically what you do in terms of looking

3    at it and saying does that refresh your recollection.

4           THE COURT:  I'm unsealing it.  Counsel can use it

5    as provided by the Rules of Evidence.

6           Let's go ahead and bring the jury in.

7           (CONCLUSION OF SIDEBAR CONFERENCE.)

8           (WHEREUPON THE JURY ENTERS.)

9           THE COURT:  Good morning, members of the jury.  I

10   just wanted to point out we have a visiting delegation of 25

11   attorneys from the People's Republic of China with us this

12   morning.  They will be here just for the first session this

13   morning between now and the break.  And we are fortunate to

14   have an interpreter so they can listen in.

15          They are here in the United States to observe and

16   learn about our justice system here.  So they are going to be

17   watching the trial this morning.  And we've already extended

18   our welcomes to them and given them a little bit of a

19   background about the case, which they already seemed to be

20   aware of, actually, before coming here.

21          So in any event, Mr. Price, I believe you were in

22   the middle of your examination of Mr. Bryant.

23                  CARTER BRYANT, PREVIOUSLY SWORN.

24   ///

25   ///

Page 3228

1                    REDIRECT EXAMINATION (CONTINUED)

2    BY MR. PRICE:

3    Q.   Mr. Bryant, on Wednesday, we were talking about your

4    reasons for using that safe shutdown mode on Evidence

5    Eliminator.

6              Do you recall that?

7    A.   Yes.

8    Q.   And when Mr. Nolan was questioning you, you mentioned

9    that one reason might have been that you didn't want people

10   to know that there was adult content on the laptop; correct?

11   A.   Right.

12   Q.   And you recall, when we were breaking, I was asking

13   questions about whether or not you knew that even after the

14   hard drive was handed over to be imaged, that you knew there

15   was adult content on there.

16             Do you recall those questions?

17   A.   Yes.

18             MR. PRICE:  So at this time, your Honor, I'd like

19   to read from Mr. Bryant's transcript dated June 10, 2008, at

20   page 12, lines 11 through 17.

21             THE COURT:  You may proceed, Counsel.

22             MR. PRICE:  (Reading.)

23             "QUESTION:  And you are aware, aren't you,

24        that when Mattel received the image of the laptop

25        hard drive, that in fact there was adult content on

Page 3229

1      it?

2          "ANSWER:  I assumed, yes.  I assumed that

3      there probably was.

4          "QUESTION:  In fact, you believe there was a

5      considerable amount of adult content on that hard

6      drive.  Is that true?

7          "ANSWER:  I thought there might be."

8  Q.   I'd like to show you now, if I could, sir,

9  Exhibit 13648-A for identification.  This might be fairly

10  quick.  If we look at 1364-A, do you recognize what that is a

11  photograph of?

12  A.   Yes.

13  Q.   And is your handwriting on -- what's on that photograph?

14  A.   It doesn't look like my handwriting, no.

15  Q.   What do you recognize this as being a photograph of?

16  A.   It's some kind of a floppy disk.

17  Q.   And when you used your computer in the '99, 2000 time

18  frame, either your computer or you also said you used

19  Ms. Cloonan's computer; is that right?

20  A.   Yes.

21  Q.   When you used those computers, did you ever use a drive

22  such as this, a floppy drive or a zip disk drive to download

23  images or documents?

24  A.   Not that I remember.

25  Q.   You said you didn't know much about computers, but did

1    you know how do download things onto these sorts of drives?

2    A.   I had sort a general understanding, yes.

3    Q.   And from time to time, would you do that?  That is, you

4    would download material onto a drive or -- I'll start there.

5    A.   I don't recall doing that.

6    Q.   One way or the other?

7    A.   The last time I can remember using a disk like this was

8    when I was in college.

9    Q.   So how long ago was that?

10   A.   That was in 1994.

11   Q.   And the handwriting on this, you say, is not yours; is

12   that right?

13   A.   No.

14   Q.   Double negative.  My apologies.  Is this handwriting

15   yours?

16   A.   No, it doesn't look like mine.

17   Q.   I think you have in front of you still the drawing

18   binder.  And I'd like to ask you, if you could look at

19   Exhibit 5, page 136.

20   A.   Okay.

21   Q.   And I believe your testimony is that this is an early

22   Bratz drawing?

23   A.   I recall saying something to that effect, I think, in my

24   deposition.  But I'm not positive.

25   Q.   You see this is Bates No. 341.

Page 3231

1    Do you see that, where it says Bryant 341?

2    A.   Yes.

3    MR. PRICE:  Your Honor, if we could play from

4    Mr. Bryant's deposition transcript 396, which is in volume 2.

5    396, line 14 to line 20.

6    THE COURT:  I'm sorry.  What volume is this,

7    Counsel?

8    MR. PRICE:  Volume 2.

9    THE COURT:  Thank you.  Any objection?

10   MR. NOLAN:  I apologize, your Honor.  There's some

11   confusion in the text.

12   THE COURT:  Take your time.

13   MR. NOLAN:  Your Honor, I'd ask for completeness

14   purposes to also go from lines 21 through 25, same page.

15   MR. PRICE:  I have no objection to that.

16   THE COURT:  Very well.  You may play it.

17   WHEREUPON THE VIDEOTAPED DEPOSITION EXCERPTS

18   OF CARTER BRYANT, AS PROVIDED BY COUNSEL, ARE

19   INCORPORATED HEREIN:

20   "QUESTION:  341, Jiminy Cricket.

21   "ANSWER:  This is -- this is a drawing that I

22        did -- I think this was from '98, a sketch for the

23        Bratz.

24   "QUESTION:  Was this one of those first --

25   "ANSWER:  Yes, this is from those first --

Page 3232

1       "QUESTION: -- first drawings?

2       "ANSWER:  Yes.

3       "QUESTION:  Does that come from the same

4    notebook as the other early 1998 drawings that are

5    on lined paper come from?

6       "ANSWER:  I don't recall."

7    Q.   Mr. Bryant, if we put up 341 again, you recall that the

8    last question and answer was do you recall whether this

9    drawing, this Bratz drawing, came from the same notebook as

10   those earlier lined notebook drawings.

11       Do you remember that?

12   A.   Yes.

13   Q.   And at the time of your deposition, you didn't recall

14   whether this came from the same notebook; right?

15   A.   Right.

16   Q.   Now I'd like you to look at Exhibit 1155.  That's the

17   black notebook.  The original.  And I'm going to give you a

18   number in the copy which might help you find the page in the

19   original.  And that's 1155-C-37.  And that's going to be in

20   the notebook, which is not the drawings notebook, but the

21   regular exhibits binder.

22   A.   Okay.  What was the number again?

23   Q.   It's 1155-C-37.

24   A.   I don't seem to have that.

25   Q.   Oh, actually, it may be in your counsel's white

Page 3233

1    notebook.

2    A.    Okay.  What was the page number again?

3    Q.    1155-C-37.

4    A.    Okay.

5    Q.    And you see this?

6    A.    Yes.

7    Q.    That's that same drawing?

8    A.    Yes.

9    Q.    And can you find that in the original 1155 black

10   notebook?

11   A.    I don't seem to have that up here.

12   Q.    All right.  Now, do you see that Bratz drawing, one of

13   the original Bratz drawings that is still in that black

14   notebook, 1155?

15   A.    I see the drawing.

16   Q.    Could you just hold it up so the jury can see the

17   original.

18   A.    Yes.

19   Q.    Thank you.  Now, Mr. Nolan's examination, he showed you

20   Exhibit 709.  And one of the things he asked you about was

21   blue hair.

22         You remember that?

23   A.    Yes.

24   Q.    And there was some frivolity of the question.  You

25   actually envisioned that one of the Bratz dolls would have

Page 3234

1    blue hair?

2    A.   I think I did for a couple of minutes.

3    Q.   Well, when you're saying blue hair, I'm trying to find

4    out what you meant by that.  If we can put up Exhibit 48-2.

5    This is a Toon Teens drawing that's in evidence.  Was that

6    the color you were thinking about, the light blue hair?

7    A.   Well, I don't remember exactly what I was thinking when

8    I wrote out that note, but that drawing appears to have blue

9    hair.

10   Q.   Is that the sort of color you had in your mind when you

11   wrote down on Exhibit 709?

12   A.   I don't remember.

13   Q.   Now, Mr. Nolan asked you some questions about your mom.

14        Do you recall that?

15   A.   Yes.

16   Q.   And he asked whether or not you asked your mom to lie

17   for you.

18        Do you recall that?

19   A.   Yes.

20   Q.   And, of course, you wouldn't do that, would you?

21   A.   Um, if I did that, my mom would slap me across the face.

22   Q.   And it's true that you now live in Missouri?

23   A.   Yes.

24   Q.   And you are -- it's fair to say you're close with your

25   mom; right?

Page 3235

1   A.   Yes.

2   Q.   And you know that she loves you; right?

3   A.   Yes.

4   Q.   Let me ask you, you know, I think you said when you were

5   in college, that you learned about this concept of

6   copyrighting something.

7            Do you recall that?

8   A.   I'm sorry, no.

9   Q.   Okay.  You said that you had taken some class.  Maybe it

10  wasn't in college.  But you learned about this idea of

11  copyrighting something so you could determine what date you

12  created it.

13  A.   Oh, yes, I know what you're talking about.

14  Q.   And you said you also knew about this concept of putting

15  a copy of something in an envelope and sending it to yourself

16  so it would have a date stamp on it so you could prove that

17  you did something at a certain time.

18           Do you recall that?

19  A.   Yes.

20  Q.   Was that in that same class where they told you about

21  that way to objectively prove that you did something on a

22  certain date, that is, you could mail a copy to yourself and

23  have a postmark on it?

24  A.    I think it was, but I think what I remember being

25  explained in that instance was that it didn't really mean

Page 3236

1   anything.

2   Q.   Well, it didn't mean anything.  If you had a sealed

3   envelope with a postmark of August 1998 that had these Bratz

4   drawings in it, that would be some evidence that they were

5   drawn in August of 1998; right?

6           MR. NOLAN:  Your Honor, objection.  Asked and

7   answered.

8           THE COURT:  Not exactly.  Overruled.

9           THE WITNESS:  I'm sorry.  What was the question?

10  Q.  BY MR. PRICE:  If you had a sealed envelope, where you

11  put copies of these Bratz drawings in them, sealed it, sent

12  it to yourself, and then had a postmark date on it of August

13  1998, and you came in here and opened it and said see, these

14  are these drawings, that would be some evidence that the

15  drawings in fact existed in August of 1998; correct?

16  A.   Well, I mean, I'm not a lawyer.  I don't know.  But I

17  suppose.

18  Q.   Well, you remember you talked to your father about that.

19  Do you recall that?  Saying this is a way to show that

20  drawings -- an objective way of showing that drawings existed

21  at the time you say they did; right?

22  A.   Yeah, but I don't remember that -- I don't remember

23  having that conversation with my dad.

24  Q.   Well, this class you were taking, where they were

25  talking about ways to prove that you did something on a

Page 3237

1   certain date, a date that was eight, nine years ago, is one

2   of the methods they said you should use instead of

3   copyrighting it or sending it to yourself in a sealed

4   envelope, is one of the methods they suggested you use is

5   show it to your mom?

6   A.   No.

7   Q.   Because you understand that when you're trying to think

8   back eight, nine years ago, it's sometimes difficult to

9   pinpoint precise dates; right?

10  A.   Sure.

11  Q.   And so, for example, let me -- I'm going to put up some

12  exhibits that are already in evidence, these drawings that we

13  talked to you about, and I'll start with Exhibit 712, which

14  is also 5-26.  So you recall this drawing, and I think you

15  said in your deposition you thought this was sometime in July

16  of 2000.

17          Do you remember that?

18  A.   Yes.

19  Q.   Okay.  So, for example, if your mom were to testify that

20  she saw this in August of '98, she would be mistaken?

21  A.   Well, yes.

22  Q.   Because it didn't exist then; right?

23  A.   No.

24  Q.   This didn't exist until sometime around July of 2000;

25  right?

Page 3238

1   A.   Right.

2   Q.   And then, if we look at Exhibit 713, which is also 5-27,

3   this is also one of those exhibits you said were done in July

4   of 2000; correct?

5   A.   I believe so, yes.

6   Q.   So if your mom testified that she saw this in August of

7   '98, she would be mistaken?

8   A.   On this one, yes.

9   Q.   And if you look at Exhibit 778, which is also 2-1, this

10  drawing, if someone testified that they saw this drawing in

11  1998, 2-1, again, they would be mistaken.

12  A.   Well, the line drawing existed, the master drawing.  But

13  the color did not.

14  Q.   You say the master drawing.  You see -- who is the one

15  that's the fourth over?  Is that Lupe?

16  A.   Lupe.

17  Q.   The master drawing you're talking about had that figure

18  on it in 1998?

19  A.   Yes, it did.  It just had a different hairstyle on it.

20  Q.   Well, when you say it had a different hairstyle, so this

21  drawing with this hairstyle did not exist in 1998; correct?

22  A.   I think the drawing of the alternate hairstyle existed.

23  It just wasn't all put together.

24  Q.   Okay.  So this drawing didn't exist in 1998; correct?

25  A.   Well, the master drawing, yes, it did.

Page 3239

1   Q.   I'm talking about this exact drawing with this

2   hairstyle.

3   A.   Well, the entire drawing except for the hairstyle, yeah,

4   it was already in existence.

5   Q.   When you say except for the hairstyle, that's what I'm

6   saying.  This drawing with these dolls with these hairstyles

7   in this form didn't exist in 1998, did it?

8   A.   Just the one hairstyle.

9   Q.   Okay.  So what you're saying is the drawings in 1998

10  didn't show Lupe looking like this; right?

11  A.   Well, again, she looked exactly like that except for the

12  hairstyle.

13  Q.   So since, obviously, this hairstyle didn't exist in

14  1998, if someone said they had seen this drawing in 1998,

15  they would be mistaken.

16  A.   Yes.

17  Q.   And if you look at Exhibit 737, which is 2004, if

18  someone said they saw this drawing in 1998, again, they would

19  be mistaken?

20  A.   I would think so, yes.

21  Q.   And if we look at Exhibit 743, which is 2-8.  And if,

22  for example, your mom testified she had seen this drawing in

23  August of '98, she would be mistaken?

24  A.   Well, again, the master drawing existed.  You know, she

25  could have just been thinking about that, but the color did

Page 3240

1    not exist.

2    Q.   When you say the master drawing existed, are you saying

3    they're a master drawing in '98 with these fashions and this

4    face?

5    A.   Yes.

6    Q.   And if we could go on -- we'll come back to this.

7            Ken, can we go back to the full drawing?

8            If we can go to Exhibit 779.  This is one of those

9    where you put the date August '98 on it.

10           Do you remember that?

11   A.   Yes.

12   Q.   And you testified you put this on sometime after 1999?

13   A.   Yes.

14   Q.   Because this drawing in this form didn't exist until

15   after 1999; right?

16           MR. NOLAN:  Objection.  Ambiguous.

17           THE COURT:  Sustained.  Rephrase.

18   Q.   BY MR. PRICE:  This drawing on this piece of paper

19   didn't exist until 1999?

20           MR. NOLAN:  Your Honor, same objection.

21           THE COURT:  You're referring to -- why don't you

22   rephrase, Counsel.

23   Q.   BY MR. PRICE:  The exhibit we just put up, Exhibit 779,

24   which we've already gone through, I'm just verifying, I

25   think, what you've already said --

1          MR. NOLAN:  Your Honor, I apologize.  Strike the

2    comments of counsel.

3          THE COURT:  Overruled.  Continue, Counsel.

4    Q.   BY MR PRICE:  This drawing, Exhibit 779, did not exist

5    until after 1999?

6    A.   Well, again, I said the master drawing existed, but the

7    color -- we didn't put the color on there until 1999.

8    Q.   Okay.  Well, just so we can clarify, let's look at

9    Exhibit 62-2.  You see this is a drawing you had notarized on

10   August 26, 1999.

11   A.   Yes.

12   Q.   And you see this is Lupe here?

13   A.   Yes.

14   Q.   And then if we can go back to 779.  This is a Lupe with

15   a different hairstyle and with some coloring done on the

16   drawing?

17   A.   Yes.

18   Q.   And this picture didn't exist until after 1999,

19   Exhibit 779; right?

20   A.   Yes, you're right.

21   Q.   And if we look at Exhibit 791, also 3-5.  791, please.

22   You see this drawing with a handbag and in this form, this

23   did not exist until after 1999; is that correct?

24   A.   The master drawing did.  Color was added in '99.

25   Q.   The master drawing including the handbag?

Page 3242

1    A.    Yes.  Well, I believe so.

2    Q.    This drawing we're seeing here, which you have 8/1998

3    on, did not exist until 1999, this particular drawing.

4    A.    The drawing with the color, no.

5    Q.    And if you'd look at Exhibit 735, this drawing did not

6    exist in any form until after 1999; correct?

7    A.    Well, I believe the master drawing existed, yes.

8    Q.    With the face in this fashion?

9    A.    I believe so, yes.

10   Q.    This particular drawing, which is Exhibit 735, did not

11   exist until after 1999; correct?

12   A.    Color was added in '99, yes.

13   Q.    Well, I mean, if you look at this drawing, it's on a

14   piece of paper.  It didn't exist until after 1999; right?

15   A.    Right.

16   Q.    And if you look at Exhibit 792, which is also in 312.

17   This drawing on this piece of paper also did not exist until

18   after 1999; correct?

19   A.    Again, the master drawing did.  The drawing with the

20   color did not exist until 1999.

21   Q.    And when you say the drawing with color, let me clarify.

22   This drawing, this exhibit on this piece of paper did not

23   exist until after 1999.

24         MR. NOLAN:  Your Honor, objection to the ambiguity

25   of the use of this drawing.

Page 3243

1        THE COURT:  Overruled.

2        THE WITNESS:  Well, again, as I said, the master

3  did, but this particular picture, no.

4  Q.  BY MR. PRICE:  You mentioned early on, when you had

5  these prep sessions with your counsel and Skadden's counsel

6  at the same time, you mentioned there were suggestions given

7  to you in the way to phrase things.

8        Do you remember that?

9  A.  Yes.

10  Q.  Was one of the suggestions that if I showed you a

11  drawing which was put on paper after 1999, that you were to

12  always add, oh, but the master drawing was in 1998?  Was that

13  one of the suggestions made to you?

14  A.  The suggestions that were made to me were to just answer

15  the question as completely and honestly as I possibly could.

16  Q.  Somebody needed to suggest that to you?

17  A.  Well, they did.

18  Q.  So answer my question, then.  How many times did they

19  give you suggestions during this -- these few days when you

20  were preparing?

21  A.  I don't remember.

22  Q.  More than a dozen?

23  A.  I don't know.

24  Q.  Well, they wouldn't have to tell you more than once to

25  tell the truth; right?

Page 3244

1   A.   No.

2   Q.   Okay.  So since they made suggestions more than once;

3   right?

4   A.   Yes.

5   Q.   So let me ask you about those other suggestions.  Was

6   one of the suggestions they made to you in answering

7   questions that, when I showed you a drawing that was put on

8   paper after 1999, that you were to add oh, but the master

9   drawing was before that?

10  A.   I don't -- I don't recall being told that, no.

11  Q.   All right.  But this drawing wasn't put on this paper

12  until after 1999; right?

13  A.   Yes, that's right.

14  Q.   And if you'd look at Exhibit 35-2, which is also 589.

15  Your testimony was that this drawing was done sometime in

16  November of 2000; correct?

17  A.   To the best of my recollection, yes.

18  Q.   And this was a drawing which was given to Ms. Leahy at

19  some time; correct?

20  A.   Yes.

21  Q.   Okay.  So if someone were to testify, trying to think

22  back eight, nine years that they saw this drawing in August

23  of 1998, they would be mistaken.

24  A.   Yes.

25  Q.   And you would agree it's sort of unfair to ask someone,

Page 3245

1    you know, think back eight or nine years, and tell me, did

2    you see this drawing eight years ago or nine years ago or

3    nine and a half years ago.  That's kind of hard to do, isn't

4    it?

5    A.   I don't know.  You've been doing it to me for the past

6    five days.

7    Q.   The difference is I've been showing you something in

8    writing; right?

9    A.   Yes.

10   Q.   Okay.  And that's why you use a copyright or put

11   something in an envelope and seal it.  That way you can

12   document something that happened a long time ago; right?

13              MR. NOLAN:  Objection.  Asked and answered.

14              THE COURT:  Overruled.

15              THE WITNESS:  I mean yeah, that's a way to do it,

16   but, I mean, I don't really recall ever doing that with any

17   of my drawings.

18   Q.   BY MR. PRICE:  And let me show you Exhibit 791, which is

19   62-6 as well.  I'm sorry.  Let me show Exhibit 62-6.  This is

20   what you term master drawing; right?

21   A.   Yes.

22   Q.   There's no face in the master drawing; right?

23   A.   There was a different page for the master drawings of

24   the faces.

25   Q.   So had you a page of faces?

Page 3246

1    A.    Yes.

2    Q.    And you had a page where you had something like this of

3    the, right?

4    A.    Yes.

5    Q.    So when I showed you something like 791 and you said

6    there was a master drawing, there was no master drawing that

7    combined the two as of 1998; right?

8    A.    No.

9    Q.    Was my statement correct?

10   A.    Yes.

11   Q.    Okay.  So if someone said that August of '98 they saw a

12   drawing like this with this body and this face, they would be

13   mistaken.

14   A.    I suppose so, yes.

15   Q.    Because a drawing with a body and a face together for

16   you didn't exist in 1998; correct?

17   A.    I don't remember that it did.

18   Q.    And that's true of the other exhibits I was showing you,

19   which had the characters, you know, with the body and the

20   face and you would say oh, but there was a master drawing.

21   The master drawings in August 1998 didn't have the fashions

22   and the face and the body all together; right?

23   A.    No, I don't think so.

24   Q.    So if someone said they saw such a drawing in August

25   '98, a drawing like, you know, 735, they would be mistaken.

Page 3247

1   A.    Well, yes.

2   Q.    You also spoke about a Ms. Galvano.

3         Do you recall that?

4   A.    Yes.

5   Q.    And she's a good friend of your mother's?

6   A.    Yes.

7   Q.    And as of 2004, when you were asked who did you show

8   these drawings to, you mentioned your mother; correct?

9   A.    Yes.

10  Q.    And you didn't mention Ms. Galvano; right?

11  A.    I didn't show those to Ms. Galvano.

12  Q.    And then in 2008, you testified that you believed that

13  in 2007, that your mom talked to Ms. Galvano; is that right?

14  A.    I don't remember.

15  Q.    Okay.  Just to refresh your memory, if you'd look at

16  your deposition transcripts, a transcript page, and that's

17  1100, line 16?

18        MS. AGUIAR:  What volume?

19        MR. PRICE:  That's 1100.

20        MS. AGUIAR:  Which volume?

21        MR. PRICE:  It's volume 5.  January 24, 2008.

22  Q.    And you'll see 1100 there.

23  A.    Okay.

24  Q.    And beginning at line 6, and if you go down to --

25  A.    What was the number again?  I'm sorry.

Page 3248

1    Q.   It's page -- it's your transcript, not an exhibit

2    number.

3    A.   Okay.

4    Q.   And it's page 1100.  It goes on down to 1102, but the

5    specific line to refresh your memory is look at 1102, lines 4

6    through 9.

7    A.   Okay.

8    Q.   And does that refresh your memory that it wasn't until

9    2007, some nine years after 1999, that you heard that your

10   mom had spoken to Ms. Galvano concerning the Bratz drawings.

11   A.   Yes.

12   Q.   Now, I also want to ask you about Mr. Irmen.  I think

13   Mr. Nolan asked you about him.  He has been your partner off

14   and on for about 16 years?

15   A.   Yes.

16   Q.   And I assume he loves you.  You think he does?

17   A.   He better by now.

18   Q.   And he moved with you to Missouri?

19   A.   I'm sorry?

20   Q.   Did he move with you to Missouri?

21        MR. NOLAN:  Objection as to time.

22        THE COURT:  Sustained.

23   Q.   BY MR. PRICE:  Sometime after 2000, you moved back to

24   Missouri; correct?

25   A.   Yes.

Page 3249

1    Q.    When was that?

2    A.    It was in 2002.

3    Q.    Did Mr. Irmen move back with you?

4    A.    Yes.

5    Q.    And do you remember during my examination, I asked you

6    about royalties you had received?  I asked you whether you

7    received royalties for Bratz?

8          Do you recall that?

9    A.    I don't recall being asked that.

10   Q.    I just want to look at the transcript.  I don't think I

11   actually got a number from you.  You'll agree that the amount

12   of royalties you received has exceeded $30 million.

13   A.    I'm not sure of the exact amount.

14   Q.    And I know you might not know precisely down to the

15   number, whether it's 30, 35, 39, but you will agree it's

16   somewhere north of 30 million?

17   A.    Again, I'm not really sure.

18   Q.    Was it somewhere north of 20 million?

19   A.    I think so, yes.

20   Q.    And if Mr. Larian had testified it was something more

21   than 30 million, you'd have no reason to disagree with that,

22   would you?

23   A.    No.

24   Q.    And your partner Irmen runs a company called BTE

25   Associates?

Page 3250

1    A.    BT Associates.

2              MR. NOLAN:   Relevance.

3              THE COURT:   Overruled.   It's a foundational

4    question.

5    Q.    BY MR. PRICE:   And that's a land development company

6    that you've created?

7    A.    Yes.

8    Q.    And when you say he runs that, is he responsible for

9    that day to day?

10   A.    Well, no, not really.   There's a manager.

11   Q.    So he just oversees that?

12   A.    Yes.

13   Q.    And that business is funded from your royalties; right?

14   A.    Yes, it has been partially funded by royalties.

15   Q.    And there's also a company called Dark Ops Knives?

16   A.    Yes.

17   Q.    That refers to dark operations, I assume?

18   A.    I guess so.   I don't know much about it.

19   Q.    Dark meaning not that it's closed for the day, but like

20   it's secret?

21             MR. NOLAN:   Your Honor, objection.   Foundation and

22   also relevance.

23             THE COURT:   Ask another question, Counsel.

24   Q.    BY MR. PRICE:   That company is a company in which

25   Mr. Irmen is a vice-president; correct?

1    A.    Yes.

2    Q.    And he has invested in that company; right?

3    A.    Yes.

4    Q.    And you've assisted in that investment as well?

5    A.    I don't believe so.  I think that all the money that's

6    gone into that has come from money that he's earned, you

7    know, working with me.

8    Q.    Well, money earned working with you?

9    A.    Right.

10   Q.    Okay.  So you pay him money?

11   A.    Yes.

12   Q.    And what have been the source of those funds you are

13   paying?

14   A.    Those have been from my royalties.

15   Q.    And when you say you pay him, is that a salary for BT

16   Associates?

17            MR. NOLAN:  Your Honor, objection.  Relevance.

18            THE COURT:  Overruled.

19            THE WITNESS:  It's a salary for generally running

20   our businesses, yes.

21   Q.    BY MR. PRICE:  So how much salary would you say you pay

22   your partner from these royalties per year?

23   A.    Well, it sounds stupid, but I really don't know.

24   Q.    Well, is one of the reasons you really don't know is

25   that you two, as partners do, share things?

Page 3252

1    A.    Yes.

2    Q.    Sort of like what's yours is his, and what's his is

3    yours?

4    A.    Yes.

5              MR. PRICE:  Nothing else, your Honor.  Thank you.

6              THE COURT:  Very well.

7              Mr. Nolan.

8                        RECROSS-EXAMINATION

9    BY MR. NOLAN:

10   Q.    Good morning, Mr. Bryant.

11   A.    Good morning.

12   Q.    I want to place on the screen, if I might,

13   Exhibit 00794.

14             Your Honor, this is in evidence.

15             THE COURT:  Very well.

16   Q.    BY MR. NOLAN:  Mr. Bryant, if it's easier for you to

17   look at a binder, you can do that.

18   A.    That's fine.  I can see it.

19   Q.    You recall that Mr. Price was asking you questions about

20   Lupe?

21   A.    Yes.

22   Q.    Formerly known in this case as Lupee, I guess?

23   A.    Yeah.

24   Q.    All right.  And what is Exhibit 00794?

25   A.    That's the master drawing.

Page 3253

1    Q.   And just to be clear, the figure to the right, what is

2    that?

3    A.   That was an alternate hairstyle idea.

4    Q.   And these -- this drawing with the alternative

5    hairstyles was done at what time?

6    A.   It was in '98.

7    Q.   Now, Mr. Price showed you a number of color images of

8    the Bratz characters.  Do you recall that from his

9    examination?

10   A.   Yes.

11   Q.   Now, there is no doubt that you added color after 1998

12   to the Bratz drawings; correct?

13   A.   That's correct.

14   Q.   In your opinion, by adding color, did you intend to

15   change the concept of Bratz?

16           MR. PRICE:  Objection.  Asked and answered several

17   times.

18           THE COURT:  I think we covered this, Counsel.  I'm

19   going to sustain the objection.

20   Q.   BY MR. NOLAN:  When you created the master drawings,

21   what was your intent with respect to these two alternative

22   hairstyles?

23   A.   Well, I think that I wasn't really sure that I liked the

24   one that I had put on the figure.  So I added an alternate

25   version that I might use later.

Page 3254

1  Q.   Do you recall the exercise we went through with the

2  light box?

3  A.   Yes.

4  Q.   Would you use that light box process in changing the

5  master drawing with the hairstyles?

6  A.   Yes.

7  Q.   And can you just real briefly again explain how you

8  would do that to put a new hairstyle, the alternative

9  hairstyle on Lupe?

10  A.   What I would do would be to take this drawing.  I would

11  put it on the light box.  Draw in the body.  Then I would get

12  my drawing with the heads on it and add the head.  And then

13  I'd go back to this drawing and put that on the light box and

14  then add the hairstyle.

15  Q.   Now, Mr. Price showed you a few pictures with backpacks.

16        Do you recall the pictures?

17  A.   Yes.

18  Q.   Okay.  I'd like to have placed on the screen, it's in

19  evidence, Exhibit 18281.

20        What is depicted in Exhibit 18281?

21  A.   These are the backpacks for the four characters.

22  Q.   Now, again, did you have a purpose in creating master

23  drawings which contained four different types of backpacks or

24  styles?

25  A.   Well, I wanted them each to have different backpacks.  I

Page 3255

1    don't remember exactly why I put them all on one page.  But

2    it could have just been for convenience so that I wouldn't

3    have to have, you know, four separate drawings that I would

4    have to shuffle through.

5    Q.   And how would you transfer the backpack master drawing

6    to another drawing?

7    A.   With the same method.  I would just choose the backpack

8    that I wanted to use, put it on the light box, put down my

9    illustration paper, and then just trace the backpack that I

10   wanted to use.

11          MR. NOLAN:  Could we have up, Aaron, in evidence,

12   0003.012.  Okay.

13   Q.   Now, do you recall that Mr. Price showed you a colored

14   version of Trial Exhibit No. 3.012?

15   A.   Yes.

16   Q.   And can you identify for us the origins of the backpack

17   that appeared on this particular Bratz character drawing?

18   A.   It's the backpack in the drawing on the left, lower left

19   corner.

20   Q.   And you are referring to the lower left-hand corner of

21   Exhibit 18281?

22   A.   Yes.

23   Q.   And again, this will be the last time I'll ask you to do

24   this.  Can you just explain to us what the process was in

25   transferring over.

1    A.   I would just take that drawing, and since I had chosen

2    that backpack for that character, I'd put the master drawing

3    onto the light box, put the illustration paper on top of

4    that, and trace the drawing.

5    Q.   I want to show you Exhibit 01748 for just a moment.

6         And this exhibit, again, is what, sir?

7    A.   That looks like a master drawing.

8    Q.   And when did you do this?

9    A.   That was also '98.

10   Q.   And can we also have up on the same screen, just split

11   the screen for me, Exhibit 0062-001.

12        And Exhibit No. 0062.001.  Can you just quickly

13   identify that for us.

14   A.   That's the master drawing of the different characters'

15   heads.

16   Q.   And this master drawing was created when?

17   A.   1998.

18   Q.   Why do you create a faceless master drawing and separate

19   master drawings for faces?

20   A.   That's just kind of a technique that we learned how to

21   do in college.  I guess one of the reasons being, you know,

22   if you have a page of several different faces, it's easy to

23   refer back to.  You don't have a whole lot of things you have

24   to shuffle through to find a face that you want to use.

25   Q.   Okay.  And you would do that through the light box?

Page 3257

1    A.    Yes.

2    Q.    Just merely tracing?

3    A.    Yes.

4    Q.    Same process that you would use to add a backpack?

5    A.    Yes.

6    Q.    If we could have up Exhibit 757.  And can we blow this

7    up so we could see this a little bit better.  This is a

8    drawing.

9              When did you do this drawing?

10   A.    That was also '98.

11   Q.    Okay.  And this is Hallidae; correct?

12   A.    Right.

13   Q.    Whose name was later changed to?

14   A.    I think the name was -- Sasha.  Sorry.  I had a brain

15   freeze.

16   Q.    Who changed the name to Sasha?

17             MR. PRICE:  Object.  Beyond the scope, relevance.

18             THE COURT:  Overruled.

19             THE WITNESS:  I don't remember exactly, but I think

20   it was a decision that MGA and I made together.

21   Q.    BY MR. NOLAN:  Mr. Price showed you a drawing of Toon

22   Teens.

23             Do you recall?

24   A.    Yes.

25   Q.    Prior to this litigation, had you ever seen a drawing of

Page 3258

1  Toon Teens?

2  A.   Well, I don't remember.  I remember seeing the 3-D

3  dolls, but I don't really remember the -- I don't remember

4  the drawings.

5  Q.   Now, the hair color indicated for this master drawing

6  for Hallidae is what color?

7  A.   The hair color?

8  Q.   Does it say hair color up there?

9  A.   I can't really read it.

10  Q.   Do you have that exhibit in front of you?

11  A.   Okay.  I see it.  I think it says favorite color.

12  Q.   Okay.  Favorite color.  And what's the favorite color?

13  A.   Lavender.

14  Q.   When I asked you questions about the notes regarding

15  Hallidae, where you had said you thought about blue hair for

16  a little bit, did Hallidae ever come out with blue hair?

17  A.   No, none of them ever did.

18  Q.   You were asked a lot of questions about your mother.

19  And I suppose it would be fair to say that you are close to

20  your mom; correct?

21  A.   Yes.

22  Q.   And you do not live with her now, do you?

23  A.   No.

24  Q.   And she has a lot of -- well, let me approach it this

25  way.  I guess moms make mistakes sometimes?

Page 3259

1    A.    Yes, of course.

2    Q.    The master drawings that you showed your mother, when

3    did you do the master drawings that you showed your mother?

4    A.    Those were 1998.

5    Q.    And they included -- did they include master drawings of

6    the poses?

7    A.    Yes.

8    Q.    Did they include master drawings of the faces?

9    A.    Yes.

10            MR. PRICE:  Ambiguous and also leading.

11            THE COURT:  Sustained.

12   Q.    BY MR. NOLAN:  What type of master drawings did you show

13   to your mom?

14   A.    Um, well, I think I showed her -- I think I showed her

15   all of them, the faces, the bodies, the poses, the drawing of

16   the four characters all together.

17   Q.    And you showed those master drawings to her where?

18   A.    I think it was -- I know it was somewhere in the house.

19   Q.    And the house is located?

20   A.    Kimberling City.

21   Q.    I want to talk a little bit about Kimberling City and go

22   back to Kickapoo High School for just a moment.

23            Prior to moving to Kimberling City in 1998, had you

24   ever lived there before?

25   A.    I spent some time in Kimberling City in 1995.  I spent

Page 3260

1    about six months living there.

2    Q.   When you moved back in 1998, what date, if you can, a

3    month generally of when you started your job at Old Navy?

4    A.   When did I start?  I don't remember exactly.  I think it

5    was sometime in the summer.

6    Q.   Summer of 1998?

7    A.   Yes.

8    Q.   Did you ever drive to the general area where I think

9    it's Springfield, Missouri, where the Battlefield Mall was

10   located prior to starting work at Old Navy?

11   A.   Yeah.

12   Q.   And would you ever travel with your parents to the

13   Springfield, Missouri, area?

14   A.   Yes.  We went out there every Sunday.

15   Q.   And for what purpose would you go with your parents up

16   to that area?

17   A.   We all went to church together.

18   Q.   And the route that you described to this jury that you'd

19   taken, is that the same route that you went to church with

20   your parents?

21   A.   Um, yeah, to get into Springfield, yes.

22   Q.   Mr. Price showed you Exhibit 01155 C-037.  And this is

23   in evidence.

24           And I'd like to put it up on the screen for just a

25   moment?

Page 3261

1          THE COURT:  You may.

2  Q.   BY MR. NOLAN:  And again, Mr. Bryant, I think it's in

3  the white book, but hopefully you can see it on the screen.

4  A.   Okay.

5  Q.   Do you see this?

6  A.   Yes.

7  Q.   Now, you were shown -- were you shown a number of

8  drawings by Mr. Quinn during the various days your deposition

9  was taken?

10  A.   Yes.

11  Q.   And I recall from your deposition testimony that this

12  was one of the drawings that you were shown at your

13  deposition; correct?

14  A.   I believe so, yes.

15  Q.   Now I'd like to -- just leave that up, if you don't

16  mind.

17          And ask that 15393 be placed up on the screen.

18          Do you recognize 15393?

19  A.   Yes.

20  Q.   And what does 153393 depict?

21  A.   That was just a really rough sketch for, I think, a

22  greeting card idea featuring characters, these Rainy Day

23  characters that I kind of had been trying to develop.

24  Q.   And can I ask you to look at Exhibit 15333 -- which is

25  also in evidence, your Honor.  And have that put up.

1        Again, do you recognize 1533?

2   A.   Yes.

3   Q.   And what is depicted in 1533?

4   A.   Again, it's just another really, really rough sketch of

5   an idea that I had for these Rainy Day greeting cards.

6   Q.   And by the way, the first Rainy Day exhibit I showed

7   you, 15393, and this one, 15333, what year did you do these?

8   A.   I did those in '98.

9   Q.   And can we have 18497 on the screen?  And again, what is

10  depicted here?

11  A.   Again, just another really rough sketch of an idea for

12  the Rainy Day card line.

13  Q.   And again, 18497 was done when?

14  A.   '98.

15  Q.   And Exhibit 18494.  And this is -- what do you recognize

16  18494 to be?

17  A.   It was just -- this was just a list of some ideas that I

18  had for some different -- different characters I was thinking

19  to develop into greeting card lines or, you know, figurines

20  or whatever.

21  Q.   Now, were any of the exhibits that I've just gone

22  through with you, the Rainy Day figures, to the best of your

23  recollection, ever shown to you in your deposition?

24  A.   I don't think so.

25  Q.   And now directing your attention back to 01155-C-037.

Page 3263

1    That's still on the screen.

2           Do you see that?

3    A.    Yes.

4    Q.    Do you have an opinion now as to whether or not dash 037

5    is a Bratz character or a Rainy Day Rascal character?

6    A.    Well, I mean, I guess, you know, it has elements of

7    both.  You know, the character looks like she's wearing some

8    kind of a rain hat and a slicker.  It's got the big feet that

9    the Bratz had.  I'm not really sure.

10   Q.    Do you recall ever introducing a Bratz fashion doll that

11   had a rain slicker?

12          MR. PRICE:  Objection.  Relevance.

13          THE COURT:  Overruled.  You may answer.

14          THE WITNESS:  No.

15   Q.    BY MR. NOLAN:  Mr. Price asked you more questions about

16   adult content.

17          Do you recall that line of questioning?

18   A.    Yes.

19   Q.    In your view, does the fact that you visited adult sites

20   have any relevance to your credibility as a witness?

21          MR. PRICE:  Objection.  Argumentative.

22          MR. NOLAN:  Just to his state of mind.

23          THE COURT:  Rephrase the question, Counsel.

24   Q.    BY MR. NOLAN:  Do you believe that your concern that a

25   family member might be able to see Internet sites that you

1   visited have any impact on your credibility as a witness?

2          MR. PRICE:  Objection.  Argumentative.  That's not

3   the position we're taking.

4          THE COURT:  Sustained.

5   Q.   BY MR. NOLAN:  Your partner Richard, did he also use the

6   laptop?

7   A.   Yes.

8   Q.   Do you know whether or not Richard downloaded any adult

9   content material on the laptop?

10  A.   It's possible.  I'm not sure.

11  Q.   Did Richard have his own folder on the laptop separate

12  from yours?

13  A.   I don't remember.

14  Q.   Mr. Price Wednesday asked you questions about the fact

15  that Mr. Larian had told you that you were going to make

16  millions of dollars on licensing arrangements with respect --

17  I'm sorry, on your royalty arrangement with MGA; correct?

18  A.   Well, I don't really remember him saying that I was

19  going to make millions.  But he said something to the fact

20  that, you know, it was possible that, you know, I might get

21  rich.  Wealthy.

22  Q.   Do you ever recall you and Mr. Larian having a similar

23  discussion about another concept that you came up with and

24  worked with MGA on?

25          MR. PRICE:  Object.  It's ambiguous.

Page 3265

1     THE COURT:  Rephrase, Counsel.

2   Q.   BY MR. NOLAN:  Do you recall a project by the name of

3   Sugar Planet?

4   A.   Yes.

5   Q.   And could you tell us what Sugar Planet was?

6   A.   Sugar Planet was a line of very small dolls, probably

7   about two inches high, and they were little figures that you

8   could -- well, they had brushable hair, and you could pop the

9   bodies apart and reassemble them with different fashions, and

10  they came with a little -- sort of like a little environment.

11  They had like a little set, a little world that they lived

12  in.

13  Q.   And were you excited about that project?

14  A.   Yes, I was.

15  Q.   And was Mr. Larian excited about that project?

16        MR. PRICE:  Objection.  Irrelevant, hearsay.

17        THE COURT:  Sustained.

18  Q.   BY MR. NOLAN:  Did you make a lot of royalties on Sugar

19  Planet?

20        MR. PRICE:  Objection.  Irrelevant.

21        THE COURT:  Counsel, where is this going?

22        MR. NOLAN:  Your Honor, do you want me to do it at

23  sidebar?  It just goes to his expectation at the time that he

24  was doing Bratz.

25        THE COURT:  Very well.

cc980e32-42ca-4e68-ac04-51877b62940d

Page 3266

1    MR. NOLAN:  Compared to what happened with Sugar

2  Planet.

3    THE COURT:  I'll sustain the objection.

4  Q.  BY MR. NOLAN:  There was some testimony with respect to

5  an Angel project.

6    Do you recall that testimony?

7  A.  Yes.

8  Q.  Do you have in front of you Exhibit 15364?  And this

9  should be in the white book.  It will be in the small white

10  binder, I've been told, that's right in front of you,

11  Mr. Bryant.

12  A.  Okay.  What was the number again?

13  Q.  It's Exhibit 15364.

14  A.  Okay.  All right.

15  Q.  Do you recognize the contents of Exhibit 15364?

16  A.  Yes.

17  Q.  And what is 15364?

18  A.  These are some drawings and correspondence that I had

19  done for the Ashton Drake galleries on an Angel project.

20    MR. NOLAN:  Your Honor, we'd offer 15364.

21    THE COURT:  Any objection?

22    MR. PRICE:  Objection.  Relevance.

23    THE COURT:  Counsel?

24    MR. NOLAN:  Your Honor, I'll just lay more

25  foundation.

Page 3267

1    Q.    What time period did you work on the Angel project

2    that's referred to in 15364?

3    A.    That was in 1998.

4    Q.    While you were in Missouri?

5    A.    Yes.

6    Q.    Living with your parents?

7    A.    Yes.

8              MR. NOLAN:   Your Honor, we offer 15364.

9              MR. PRICE:   It's still irrelevant.

10             THE COURT:   Overruled.

11             (Exhibit 15364 received.)

12   Q.    BY MR. NOLAN:   Can I just have -- the first page is

13   simply a copy of an UPS envelope.  I want to turn to the

14   second page.

15             Do you see this letter?

16   A.    Yes.

17   Q.    And it's dated August 7, 1998.

18   A.    Yes.

19   Q.    And it talks -- it's from Sandy.

20   A.    Yes.

21   Q.    Did you receive this letter?

22   A.    Yes.

23   Q.    What does this letter refer to?

24   A.    These are just some notes that the lady from Ashton

25   Drake had given me, sort of some directions on this Angel

Page 3268

1   project that she was asking me to work on.

2   Q.   I want to direct your attention to the -- I guess it

3   would be the third to the last paragraph, which starts:  "You

4   may now proceed."

5           Do you see that?

6   A.   Yes.

7   Q.   It says, "You may now proceed to finished art, black and

8   white, for these images.  Until such time as the brochure is

9   designed, you will not use any color at all."

10           Do you see that?

11  A.   Yes.

12  Q.   So do you have a recollection that the project you were

13  working on was to be done in black and white?

14  A.   Yes.

15  Q.   If you would turn to some of the pages in this document,

16  for example, page 003, do you see what's depicted there?

17  A.   Yes.

18  Q.   And what are these pictures of, or drawings of?

19  A.   These were just some face drawings, head drawings.

20  Q.   Are these face drawings for a male or female?  Can you

21  tell?

22  A.   I'm pretty sure they were supposed to be for a female.

23  But they look a little bit masculine.

24  Q.   And if you go into the Angel exhibit here, page 008, do

25  you see that?

Page 3269

1    A.    Yes.

2    Q.    Do you recognize 008?

3    A.    Yes.

4    Q.    What is 008?

5    A.    This is a drawing, again, from the Angel project that I

6    worked on for Ashton Drake.

7    Q.    And can you look at page 010 in the series.  This is the

8    last one I'm going to show you.

9    A.    Okay.

10   Q.    And what is this?

11   A.    That was a sketch that they had sent me as to the

12   general direction for the fashion.

13   Q.    And I'd ask you to take a look at the top of the page.

14   Do you see a fax line there?

15   A.    Yes.

16   Q.    And this was dated 7/13/98?

17   A.    Yes.

18   Q.    And is this a fax that you sent to -- or received from

19   Patricia Smith at Ashton Drake?

20   A.    I believe so, yes.

21   Q.    Now, do you recognize the handwriting just to the left

22   here?

23   A.    Yes.

24   Q.    Okay.  And whose handwriting is that?

25   A.    It's mine.

Page 3270

1    Q.   You have the -- maybe you have a better copy, but what

2    is this handwriting doing on the left-hand side?  What are

3    you doing there?

4    A.   I was keeping track of my time, you know, how long I was

5    working on the project and breaks and things like that.

6    Q.   So it says 2:30 you took a break.  And then at 2:40 what

7    does that say?  Resume?

8    A.   I think so, yes.

9    Q.   And then you took another break at 4:50.  Do you see

10   that?

11   A.   Yes.

12   Q.   And then you have a total of three hours and ten

13   minutes; is that right?

14   A.   Yes.

15   Q.   Now, why were you recording your time like this?

16   A.   I was getting paid hourly when I was working on these

17   projects.

18   Q.   Let me turn to -- do you remember Mr. Price asking you

19   whether or not -- well, directing your attention to your

20   conflict of interest questionnaire where you incorrectly

21   recorded the date as '98 instead of 1999.

22   A.   Yes.

23   Q.   And then he asked you a series of questions as to

24   whether or not, since you made a mistake on that one form, is

25   it possible you made mistakes on other drawings?

Page 3271

1    A.    Yes.

2    Q.    You recall that?

3    A.    Yes.

4    Q.    I want to show you just, if I could, real quickly

5    Exhibit 15601.

6    A.    Okay.

7    Q.    What's the date on that document?

8    A.    It's 1/28/98.

9    Q.    Did you put that down by mistake, Mr. Bryant?

10   A.    No.

11   Q.    Now, can I ask you to take a look at Exhibit 15603.

12   Again, what is depicted in 15603?

13   A.    This was another illustration from the Jewel project

14   that I did in '98.

15   Q.    And you have dated this 1998?

16   A.    Yes.

17   Q.    Did you make a mistake on that date?

18   A.    No.

19   Q.    I'd ask you to look at 15605.  And can you identify this

20   for us?

21   A.    This was another illustration from the Jewel theme

22   project that I was working on in '98.

23   Q.    Now, do you see you dated that in 1998?

24   A.    Yes.

25   Q.    Did you misdate that, Mr. Bryant?

Page 3272

1  A.    No.

2  Q.    When did you do that?

3  A.    When did I do the drawing?

4  Q.    Yes.

5  A.    1998.

6  Q.    Now, why did you put the dates on these drawings in

7  1998?

8  A.    Well, I was turning -- it was a project for Mattel.  I

9  was turning it over to my supervisor.

10  Q.    Could I have Exhibit 1327.  And by the way, your

11  supervisors were at Mattel; right?

12  A.    Yes.

13  Q.    Sir, Mr. Bryant, you heard testimony referencing poor

14  man's copyrighting?

15  A.    Yes.

16  Q.    And you heard testimony with respect to songs that you

17  wrote and the classes you took with respect to writing songs?

18  A.    Yes.

19  Q.    Sir, have you ever copyrighted the drawings that you've

20  done?

21  A.    No.  I don't think so.

22  Q.    Can I have exhibit -- do you have Exhibit 1327 in front

23  of you, sir?

24  A.    Yes.

25  Q.    01327.  Do you have that in front of you?

Page 3273

1   A.   Yes.

2           MR. NOLAN:  And this is in evidence.

3           Your Honor, may I approach with the original?

4           THE COURT:  You may.

5   Q.   BY MR. NOLAN:  Now, I believe Mr. Price showed you this

6   document.  Do you see -- do you recognize this document?

7   A.   Yes.

8   Q.   When did you do the master drawing of this document?

9   A.   1998.

10  Q.   Why, if you did it in 1998, is it dated at the top

11  9/19/99?

12  A.   Well, I added some measurements, and I think I used it

13  for the pack that I sent to Alaska Mama.

14  Q.   So a date of 9/19/99, is that the date that you did the

15  original master drawing of that?

16  A.   No.

17          MR. NOLAN:  Your Honor, I'd like to place on the

18  screen something that's in evidence, 01328-001.

19          THE COURT:  You may.

20          MR. NOLAN:  May I approach with the original?

21  Q.   And you recognize this exhibit?

22  A.   Yes.

23  Q.   And what is it?

24  A.   This is two of the master drawing -- or master drawings

25  of the heads.

Page 3274

1    Q.   And when did you do the master drawings of the heads?

2    A.   That was in 1998.

3    Q.   Why does this copy have a date of 9/19/99 on it?

4    A.   I think it was for the same purpose.  I added some

5    measurements and was getting the package ready to send off to

6    Alaska Mama.

7    Q.   Did you know Isaac Larian in 1999?

8    A.   No.

9    Q.   Did you know anybody at MGA in September of 1999?

10   A.   No.

11   Q.   Mr. Bryant, Mr. Price asked you about the original

12   agreement with respect to the payment of legal fees for your

13   defense in this case.

14        Do you recall that?

15   A.   Yes.

16   Q.   And you recall he played a portion of your testimony

17   where you said that the basic agreement was that you would

18   pay 3 percent of the attorney fees incurred in the cost of

19   defending yourself in this litigation; correct?

20   A.   Yes.

21   Q.   And that 3 percent, what was that based on, that

22   formula?

23   A.   I'm not sure I understand what you mean.

24   Q.   Well, in other words, do you know how the split came

25   about between 97 percent and 3 percent?

Page 3275

1    A.   No, I don't.

2    Q.   Do you have any recollection as to whether or not it had

3    any relationship to the amount of royalty arrangement you

4    earned with MGA?

5    A.   It's possible, but I don't know.

6    Q.   Mr. Bryant, did you have the personal financial

7    wherewithal to pay all of the litigation defense costs you

8    incurred in four years of litigation in this case?

9            MR. PRICE:  Object.  Relevance.

10           THE COURT:  Overruled.  It's been opened up.

11           THE WITNESS:  No, I do not.

12   Q.   BY MR. NOLAN:  Five days of testimony.  When did you

13   create the concept for Bratz?

14           MR. PRICE:  Objection.  Asked and answered.  And

15   asked and answered.

16           THE COURT:  Sum it up, Counsel.  Overruled.

17           MR. NOLAN:  I am.

18           THE WITNESS:  1998.

19   Q.   BY MR. NOLAN:  Were you working for Mattel when you

20   created the concept of Bratz?

21   A.   No.

22   Q.   Were you working for Mattel when you did the master

23   drawings for the Bratz concept?

24   A.   No.

25           MR. NOLAN:  Thank you very much.

Page 3276

1          THE COURT:  Anything further, Mr. Price?

2          MR. PRICE:  Just a couple.

3          THE COURT:  I'd like to wrap this testimony up

4   before the break.  So I'll give you five minutes.

5                  FURTHER REDIRECT EXAMINATION

6   BY MR. PRICE:

7   Q.   What's an empire waist?

8   A.   Well, it's a cut of a -- let's see, how would I best

9   describe it.  It's a cut where the waistline starts right

10  under the chest.

11  Q.   And you were talking about an Angel project with Ashton

12  Drake.

13          Do you recall that?

14  A.   Yes.

15  Q.   And look at Exhibit 1155-C-13.  Are those notes in that

16  black notebook that say large angel?  Do you see that with

17  Ken hair, empire waist look?  Do you see that?

18  A.   Yes.

19  Q.   And in your deposition, you testified that that referred

20  to a large size Barbie Angel project that you did in 1999;

21  right?

22  A.   I believe so, yes.

23  Q.   And now your counsel showed you Exhibit 15364, which was

24  a project for Ashton Drake in '98; right?

25  A.   Yes.

Page 3277

1    Q.   That's a different project than the large size angel

2    project in 1999; right?

3    A.   Yes.

4    Q.   And I think he showed you, for example, page 10.

5         You have these sorts of drawings?

6    A.   Yes.

7    Q.   That's not an empire waist, is it?

8    A.   No.

9    Q.   An empire waist is a formal waist right below the chest

10   area; right?

11   A.   Yes.

12   Q.   You've drawn some of those for Barbie; right?

13   A.   Yes, but I don't think I used that on the angel project

14   that I did for Barbie.

15   Q.   That's what you were considering at the time, initially?

16            MR. NOLAN:  Objection.  Vague and ambiguous.

17            THE COURT:  Overruled.

18            THE WITNESS:  I suppose that was one of the ideas,

19   yes.

20   Q.   BY MR. PRICE:  And you wrote that down in the back

21   notebook, that was one of your ideas.  1155-C, page 13,

22   right?

23   A.   Yes.

24   Q.   So what's the relevance of this angel project and Ashton

25   Drake in 1998 except to confuse?

cc980e32-42ca-4e68-ac04-51877b62940d

Page 3278

1        MR. NOLAN:  Objection.  Argumentative.

2        THE COURT:  Sustained.

3   Q.   BY MR. PRICE:  Mr. Nolan also showed you a number of

4   these January '98 Barbie drawings where you said you did not

5   get the date wrong.

6        Do you recall that?

7   A.   Yes.

8   Q.   They are all the same date, aren't they?

9   A.   Yes.

10  Q.   And in your deposition, you were asked to tell us about

11  the projects you did in your first stint at Barbie, you

12  didn't mention Jewel Barbie, did you?

13  A.   No, I didn't.  I had a lot of projects.

14  Q.   And originally, you said to Mr. Nolan you put the

15  January '98 drawings on those drawings because you were

16  mailing them to Barbie.

17       Do you recall that?

18  A.   I was mailing them to my supervisor at Mattel.

19  Q.   And because you were mailing them, you put in this

20  January '98 date.  That was your testimony originally.

21       Do you recall that?

22  A.   I don't remember exactly what I said.

23  Q.   Well, if you look at Exhibit 13657.  Do you recall I

24  showed you these Jewel Barbie drawings?  You see that one is

25  dated February '99, the second month in '99.

Page 3279

1   A.   Yes.

2   Q.   And you weren't mailing that to anyone, were you?

3   A.   No.

4   Q.   There was some testimony about these Rainy Day greeting

5   cards.

6        Do you recall that?

7   A.   Yes.

8   Q.   Are you aware of any evidence that those were done in

9   1998 other than your testimony?

10  A.   I think I have some finished drawings of the Rainy Day

11  Rascals that are dated in 1998.

12  Q.   Are they exhibits here?  Do you know?

13  A.   I don't know.

14  Q.   Okay.  If we look, though, at 1155-C-37, and maybe you

15  can show the jury the original in 1155 because I think it's a

16  little clearer.  This is a little whited out.  At your

17  deposition under oath you said that was a Bratz drawing;

18  correct?

19  A.   Yes.

20  Q.   And you see those large feet?

21  A.   Yes.

22  Q.   That was one of the characteristics of your Bratz

23  characters; right?

24  A.   Yes.

25  Q.   Mr. Nolan asked you whether or not there would have ever

Page 3280

1  been a Bratz doll that had rain gear.

2          Do you recall that?

3  A.   Yes.

4  Q.   And you did Bratz drawings with evening wear; right?

5  A.   Yes.

6  Q.   But there weren't any Bratz dolls with evening wear

7  either, were there?

8  A.   There were eventually.  Not the drawings that we've been

9  looking at.

10  Q.   Okay.  The ones in 2000.

11  A.   Right.

12  Q.   Because I think you said there's evening wear.  We never

13  did that evening wear.

14          Do you recall that?

15  A.   Yes.

16  Q.   Finally and, by the way, I think, as you testified

17  during your initial examination, you've been dabbling with

18  greeting cards up to the present; right?

19  A.   Yes.

20  Q.   In fact, you remember I showed you a notebook which you

21  thought had 2000 entries, and there was a Martha Stuart kind

22  of greeting card?

23  A.   Yes.

24  Q.   And kind of a lyric or something you put into the

25  greeting card?

Page 3281

1   A.   Yes.

2   Q.   And finally, Mr. Nolan was showing you Exhibit 1748 and

3   62001, where you had some poses and faces separately.

4         Do you see that?

5   A.   Yes.

6   Q.   And these are the -- this one is notarized August of

7   '99; right?

8   A.   Yes.

9   Q.   And then he showed you Exhibit, I think, 792.  Now, that

10  combination -- volume, face, hair -- that combination you

11  didn't draw until after 1999; correct?

12        MR. NOLAN:  Objection.  Asked and answered.  Also

13  ambiguous in terms of the context of the question.

14        THE COURT:  As to the first -- I think we covered

15  this, Counsel.

16        MR. PRICE:  Well, he was showing it in parts.  I

17  just want to make sure --

18        THE COURT:  Asked and answered.  Sustained.

19  Q.   BY MR. PRICE:  Mr. Nolan asked you about little hair and

20  Bratz.  If you look at Exhibit 276, I believe this is the

21  photograph, I think Mr. Nolan showed you, of something you

22  may have seen.  That is, remember you said you didn't see

23  drawings, but you saw -- you saw -- that's a horrible copy.

24  Do we have a better copy here?  Here we go.  276.  You saw

25  the actual 3-D set up with these dolls in it is what you

Page 3282

1    said; right?

2    A.    Yes.

3    Q.    And you see the doll on the left?

4    A.    Yes.

5    Q.    So you saw one of these Toon Teen dolls with blue hair?

6    A.    Yeah.  I don't remember what colors the hair was.  Were.

7    Q.    And Mr. Nolan asked you if you had ever copyrighted your

8    drawings.

9          Do you recall that?

10   A.    Yes.

11   Q.    But before you went to do your presentation to MGA, you

12   wrote copyright 2000 on your presentation.

13   A.    Yes.

14   Q.    And you can see that on Exhibit 302.  Is this something

15   you put at the bottom of the page?  All materials copyrighted

16   2000, Carter Bryant?

17   A.    Yes.  I just put that there.  I never actually filed a

18   copyright.

19   Q.    But you wanted to give them notice that you were

20   claiming rights to that as of 2000; right?

21   A.    Yes.

22         MR. PRICE:  No further questions.

23         THE COURT:  Anything further?

24         MR. NOLAN:  Nothing further.

25         THE COURT:  Mr. Bryant, you are excused.  Very

Page 3283

1    well.  We'll take our morning recess at this time.

2             (WHEREUPON THE JURY WITHDRAWS.)

3             THE COURT:  Counsel, please be seated.  Now that

4    we've heard the testimony from Mr. Bryant, at this time the

5    Court is not going to permit testimony of Mr. Menz on both

6    702 and the 403 grounds; however, I will give leave to

7    counsel for MGA to bring an expert in your case, and if they

8    do so, then Mattel can bring Mr. Menz in rebuttal.  But I'm

9    basically going to go to MGA to determine how much further

10   they want to get into it.

11            I believe, as I indicated to Mr. Price at sidebar,

12   the issue here is not so much precisely what was or wasn't

13   done on the computer as much as it is to the credibility of

14   this witness, what he believes he did and didn't do.  And I

15   think that was fully explained.  While there's no question

16   Mr. Menz might add some addition to detail and fleshing out,

17   I think that the overall -- the other 403 issues would

18   outweigh that.

19            MR. PRICE:  Your Honor, if I may make a further

20   comment, but just a quick comment on this.  And that is

21   first, we don't even have in evidence, I don't think, the

22   fact that the safe shut-down mode was run two days before the

23   computer was picked up.  That fact has to be established.

24   And I know it's undisputed.  But you know, that's one fact

25   that Mr. Menz can testify about.

Page 3284

1        The second is at sidebar, I know your explanation

2   was what's important is what Mr. Bryant thought, not what the

3   facts were.

4        But you can test his credibility by the facts.   If

5   someone says, you know, I thought the sky was pink --

6        THE COURT:  Yes, but he's not denying that he ran

7   the safe shutdown.  Or he admits that he had the Evidence

8   Eliminator.  I would agree with you, Counsel, if he took the

9   position I haven't heard of Evidence Eliminator.  It's not on

10  my computer.  It was never run.  This is categorically false.

11  That would certainly set up your right to bring in the

12  collateral evidence to establish it.

13       But neither side has disputed that Evidence

14  Eliminator was on there or that it was run.  That is clearly

15  before the jury at this point, and I don't think -- my

16  concern is that an expert is going to come in and talk

17  about -- and I don't want the expert to put into the mind of

18  the jury facts that were not in the mind of the witness when

19  he ran the program.

20       You've fully explored that.  This would be

21  different.  I admit it's quite close.  And this would be a

22  lot different if this was a situation where Mr. Bryant had

23  denied any of this, but he didn't, didn't deny any of it.  He

24  can't remember running it, but both sides seem to have it in

25  there.

Page 3285

1          I -- that's where I'm at right now.

2          MR. PRICE:  Well, first, again, I don't think

3   there's even evidence that it was run two days before yet.

4   He says he didn't do it.

5          THE COURT:  Besides that, what else?

6          MR. PRICE:  The second issue, your Honor, is that

7   yes, he says he doesn't -- did not know about these functions

8   of Evidence Eliminator.  That's his testimony.  But we can

9   test his credibility by showing, for example, the web page

10  that existed at that time that he went to explain this.  He

11  can deny he read it thoroughly, but that goes to his

12  credibility.  And obviously, he would not identify that web

13  page.  Mr. Menz can.  The help part --

14         THE COURT:  You explored that web page with him.

15  And there were several things about that web page that he did

16  remember.  Again, it's not like there's no evidence of that.

17  I was struck that he did remember particular pieces of the

18  web page.

19         MR. PRICE:  Right, but not the stuff that helps us.

20         THE COURT:  That was not lost on the Court.

21         MR. PRICE:  That goes to his credibility.  Someone

22  should be able to say this is the web page that existed at

23  that time, this is what it said, so that the jury can

24  evaluate Mr. Bryant's credibility as to whether or not he

25  just read the stuff that helps him.  The same thing for the

1    help file that came with the program.

2            THE COURT:  Counsel, neither of these things,

3    either the use of the machine, which has been essentially

4    stipulated by the parties, or the contents of the web page

5    are things that require an expert witness and expert

6    testimony.

7            MR. PRICE:  Well, we need a witness.  And we need

8    someone to say I did the search.  And this is the 2002 web

9    page, this is the 2002 help file.

10           And finally, with respect to what the program

11   actually does, again, Mr. Bryant says he doesn't know what it

12   does.  But we can't just accept that.  I mean, we get to test

13   his credibility.  Part of the test is, well, what does it do?

14   You know, he read the web page.

15           THE COURT:  This is where we get into this area

16   of -- I can see where MGA would want to get in and have it

17   explained what it does, because as it stands right now before

18   the jury, all we have is a program that eliminates evidence

19   by its name.

20           MR. PRICE:  Yes, but I think it's fair for the jury

21   to know what it does, and they can decide whether Mr. Bryant

22   is being truthful.  And finally, remember I asked the

23   questions about -- is it defragging?

24           THE COURT:  There were questions about that.

25           MR. PRICE:  And he said he had heard of it, knew

1    what it was, which surprised me because I hadn't heard of it

2    before.

3            And we would like to put into evidence that that

4    program was also run, which there is a dispute about.  And,

5    of course, we need to have evidence of what that does.

6            Now, again, just because he denies it doesn't mean

7    we can't attack his credibility by showing factually it was

8    run and this is what it does.

9            So I think if the issue is credibility, we're

10   hearing his side of the story.  And while the Court might

11   think that, you know, we've been able to infer that -- or

12   suggest that his side of the story is completely truthful or

13   is not complete, we don't really have evidence that it's not

14   complete.

15           THE COURT:  Very well.  Let me hear from Mr. Nolan

16   unless Mr. Zeller has a supplement.

17           MR. ZELLER:  I do, your Honor.  What I'd like to do

18   is raise some of this in the context of an offer of proof,

19   what it is I think that Mr. Menz would testify, specifically

20   to address the Court's concern about does this really go to

21   state of mind.

22           THE COURT:  Assume he's not going to testify, then,

23   to anything more than is already in his expert report.

24           MR. ZELLER:  Well, I don't know to what degree it

25   was in front of the Court in the papers.  As I mentioned,

Page 3288

1    certainly additional things were discussed in deposition.

2    And additional things came out other than just in the

3    reports.

4            THE COURT:  Besides what Mr. Price has articulated,

5    what other information relevant to this issue of credibility

6    do you think is -- and keep in mind the 403, 702 danger that

7    I'm trying to avoid here and that I'm concerned about is that

8    the jury is going to take Mr. Menz's excellent understanding

9    of Evidence Eliminator and impute that to Mr. Bryant.  And I

10   don't know if that's fair for the limited purpose that we're

11   admitting that evidence of Evidence Eliminator.

12           MR. ZELLER:  I would completely agree with that.  I

13   would expect that MGA would turn that against us and saying,

14   of course, Carter Bryant didn't know these things.  But here

15   is what Mr. Menz can say, is that number one, notwithstanding

16   what it is that Carter Bryant says about his lack of

17   experience or knowledge with computer programs, Evidence

18   Eliminator is extremely simple to run.  Here's how you do it.

19   You press a button.

20           Number two, this is a process that takes a while.

21   This is something that in the configuration that Carter

22   Bryant had, anywhere from half an hour just to run.  So that

23   doesn't -- that's not something that bespeaks of

24   inadvertence, something that suggests this would be

25   overlooked, and particularly given that this was two days

Page 3289

1   before Carter Bryant acknowledges he knew the computer was

2   going to be imaged.

3           Number three, when Carter Bryant or whoever it may

4   be ran Evidence Eliminator on July 12th, 2004, two days

5   before the imaging, they specifically checked off an

6   additional box to delete additional files.  That was a

7   conscious decision.  That is not something that was a default

8   of the program.

9           So whoever ran this went through that screen,

10  checked off the additional box to wipe out additional types

11  of information.  And these are these things called swap

12  files, and the reason they are important is that that shows

13  basically recent activity on the computer.  And also

14  something that also bespeaks of something that's deliberate.

15  Not just this casual episode where perhaps it was

16  inadvertently run, that Carter Bryant might understandably

17  have forgotten about.

18          There's also evidence, and this is what Mr. Menz

19  can speak to, is that after Evidence Eliminator was purchased

20  and installed by Carter Bryant on the laptop, he actually

21  went out and bought a program that did specifically block pop

22  up adds.  And this is the program that's called Spy Hunter.

23  And that thing was specifically configured, that program was

24  specifically configured to block certain websites and allow

25  certain websites.

1          So I mean the fact is that that also bespeaks of

2     this idea that Carter Bryant -- I mean, he understood, I

3     think a jury could infer, that contrary to his testimony now,

4     Evidence Eliminator is not a pop-up blocker.  I mean, he went

5     and bought another program and actually had to purchase it to

6     do that.

7               THE COURT:  Very well, Counsel.  Anything else?

8               MR. ZELLER:  There are additional details, but I

9     think those are the major aspects.  What I would say overall,

10    your Honor, just as a headline to this, is that there are

11    certain things that were done with these programs that I do

12    think contradict with objective evidence what Carter Bryant

13    claims his state of mind was.

14         So I don't think this is a matter of trying to get

15    down into the guts of exactly how all of this operated, but

16    rather what did people have to do, what did Carter Bryant, if

17    he was the operator, what did he have to do in order to run

18    this program.

19               THE COURT:  Very well.

20               MR. ZELLER:  That, I think contradicts his claims

21    of, you know, innocent state of mind.

22               THE COURT:  Thank you, Counsel.

23               MR. NOLAN:  Your Honor, so much for the rule, I

24    guess, about double teaming on arguments, but nevertheless,

25    it's --

Page 3291

1          THE COURT:  It's been a rule that's been --

2          MR. NOLAN:  There was been --

3          THE COURT:  I would like to take a break myself.

4   But I -- most of the issues that I just heard from Mr. Price

5   and Mr. Zeller don't seem to be in dispute and seem to be

6   implicit in the questions that both of you asked of

7   Mr. Bryant, namely, the use of the evidence -- the running of

8   Evidence Eliminator by somebody two days -- on July 12th,

9   2004, the existence of or his knowledge of and the existence

10  of this web page.  The relative ease or the manner which the

11  program is run by affirmatively hitting the safe exit

12  function.  The amount of time it takes to run, and what it

13  actually does.  None of these things are in dispute.

14          And as I indicated when I -- when I started this, I

15  would really like to keep the experts out if we could.  And I

16  guess my question, my first question to you before I hear

17  further argument is is there a way we can simply state to

18  this and bypass having this, using the Court to have a trial

19  within the trial of the Evidence Eliminator.  These are all

20  kind of factual things that -- I don't think there's a

21  dispute between your experts.  At least my reading of your

22  expert reports are that there's not a dispute on these

23  fundamental issues.  Am I mistaken on that?

24          MR. NOLAN:  Well, I think that the Devil is in the

25  details with respect to what the inferences are that can be

Page 3292

1    drawn from any such stipulation.  And my understanding going

2    into this, your Honor, and I thought that the 702 analysis

3    and the 403 analysis that was first placed on this issue is

4    the credibility of Carter Bryant and the concern is that

5    Carter be asked questions, which he did.  And he answered

6    them fully.

7            As of this morning, it was 51 questions by

8    Mr. Price.  He has gotten his money's worth on Evidence

9    Eliminator.

10           THE COURT:  But let me stop you there.  The problem

11   is, and I don't -- I mean, I would definitely be in agreement

12   with that if Mr. Bryant had said yes, I used Evidence

13   Eliminator on July 12th, 2004, or yes, I remember using it

14   two or three or four days before.  That answer was never out

15   there.  And Mr. Price's point right now is that he, they

16   don't have the evidence that it was actually run.  It's

17   implicit.  You are both acknowledging it.  Your questions

18   seem to acknowledge it.

19           But I think that Mr. Price is probably correct that

20   he's entitled to have that evidence.

21           Now, if you can stipulate to that, that it was run,

22   and this is what happens when it's run, this is how long it

23   takes to run, this is the information that is submitted by

24   the company describing why it's run, we probably could

25   short-circuit this process.

Page 3293

1          But if not, perhaps I have to go now and give a

2     limited -- just on these identified areas, some discretion to

3     Mattel to use the -- to call their expert.  But that's where

4     I'm at.  I really don't want to get into this.

5          MR. NOLAN:  Well, I don't want you to either, but,

6     your Honor, there's been a lot of testimony.  We're up to I

7     don't know what page now of the transcript.  But, your Honor,

8     I will -- because I think Mattel's memory of the testimony is

9     incomplete, and I'd like to refresh everyone's recollection.

10          THE COURT:  Please.

11          MR. NOLAN:  At page 2685, the following questions

12     were asked by Mr. Price, and the following answers were given

13     by Carter Bryant.  I'm starting at 2685.

14          "QUESTION:  And normally when you turn off

15          your computer, you use regular logging off or

16          whatever; right?

17          "ANSWER:  Are you talking about then or now?

18          "QUESTION:  I'm talking about, let's say, in

19          2004.

20          "ANSWER:  I don't remember exactly how you

21          normally did it.  But I know the safe shutdown took

22          a long time.

23          "QUESTION:  That is if you actually wanted to

24          run this Evidence Eliminator, you had to press this

25          button called safe shutdown; right?

Page 3294

1          "ANSWER:  I think.

2          "QUESTION:  And from 2002 to 2004, you didn't

3      use this Evidence Eliminator frequently; right?

4          "ANSWER:  No.

5          "QUESTION:  You didn't often push the safe

6      feature -- safe shutdown feature; right?

7          "ANSWER:  No, just occasionally.

8          "QUESTION:  But you did use it two days before

9      you knew people were coming to your house to image

10     your computer to collect evidence for this case?

11         "ANSWER:  You know, that's possible.  I just

12     don't remember doing it."

13         He said it's possible.  So he acknowledges --

14         THE COURT:  That's what I was referring to.  It's

15  not that unequivocal response that would put this issue to

16  rest.  Perhaps a stipulation can.  And you are right, we

17  have -- we have Mr. Bryant describing that it's a long

18  program, whether it's an hour or an hour and a half or 30

19  minutes, Mattel is able to make the argument that they want

20  to make, that this is not something that's a 30-second

21  function.  So that's been covered.  But I think --

22         MR. NOLAN:  I would offer up the stipulation, your

23  Honor, we would stipulate that the Evidence Eliminator was

24  run on that particular date.

25         THE COURT:  Well, why don't we do this:  Mr. Price

Page 3295

1   and Mr. Zeller have identified the areas, and I think each of

2   the areas that they have identified are legitimate areas for

3   evidence.  Let's see if we can't stipulate to this and see

4   what you can come up with and hopefully we can avoid this.

5           Mattel, let's have a witness ready to go.  I know

6   you wanted to call Mr. Menz next.  Let's have one of these

7   other 15-minute witnesses that you promised the other day.

8   I'm anxious to see.  Let's get a series of 15-minute

9   witnesses.

10          MR. QUINN:  This is the 45-minute one, your Honor.

11          THE COURT:  But of course.  Let's take a break.

12          MR. ZELLER:  I just wanted to add we did offer a

13   stipulation on this very issue.

14          THE COURT:  Very well.  Let's follow up on that.

15          MR. ZELLER:  Mr. Nolan probably didn't know about

16   that --

17          MR. NOLAN:  Your Honor, I knew about it, and the

18   only thing short of it was asking for a directed verdict.

19          THE COURT:  Very well.  I'm not going to get into

20   that.  Court is in recess.

21          (Recess taken.)

22          (WHEREUPON THE JURY ENTERS.)

23          THE COURT:  Counsel, you may call your next

24   witness.

25          MR. QUINN:  Thank you, your Honor.  Mattel calls

cc980e32-42ca-4e68-ac04-51877b62940d

Page 3296

1    Lloyd Cunningham.

2            THE CLERK:  Please come forward, and raise your

3    right hand.

4                    LLOYD W. CUNNINGHAM, SWORN.

5            THE CLERK:  State your full name, and spell the

6    last name for the record.

7            THE WITNESS:  Yes.  My name is Lloyd W.

8    Cunningham, C-U-N-N-I-N-G-H-A-M.

9            THE CLERK:  Thank you.

10                    DIRECT EXAMINATION

11   BY MR. QUINN:

12   Q.   Good morning, Mr. Cunningham.

13   A.   Good morning, sir.

14   Q.   What is it that you do?

15   A.   I'm a forensic document examiner.

16   Q.   And what is a forensic document examiner?

17   A.   A forensic document examiner is commonly referred to as

18   a handwriting identification expert; however, most in the

19   field of forensic document examination also examine and

20   compare typewritten material.  We examine and compare

21   computer-generated material.  We examine documents for any

22   types of alterations, additions, or erasures, and we examine

23   preliminary inks and paper fiber.

24   Q.   How long have you worked as a forensic document

25   examiner?

Page 3297

1   A.   Full time for 28 years.

2   Q.   Now, we at Mattel retained you to examine some documents

3   in this case; isn't that correct?

4   A.   This is, sir.

5   Q.   And as part of your work in what we asked you to do, did

6   you examine a black notebook, Exhibit 1155?

7   A.   I did, sir.

8   Q.   Do you have that up there with you, sir?

9   A.   Yes, I have this black spiral ring notebook.

10  Q.   And did we also ask you to examine some loose pages,

11  Exhibits 5-39 to 5-42?

12  A.   Yes, I did examine those as well, sir.

13  Q.   And do you see those up there somewhere?

14  A.   I'll have to look, sir.

15  Q.   I'm told it's 179 to 182.

16       Do you see those?

17  A.   I have Exhibit 5-42 now, and I also have Exhibit 539,

18  the originals.

19  Q.   And could you hold those up so that the jury can see

20  what we're talking about there.

21  A.   Yes, sir.

22  Q.   And did you examine those documents as well?

23  A.   I did examine these as well, sir.

24  Q.   Were you able to reach any conclusions about whether

25  those loose pages came out of that black spiral notebook?

Page 3298

1    A.    Yes, I did reach conclusions.

2    Q.    And what conclusions did you reach?

3    A.    My conclusions are that 5-39 and 5-42 positively were at

4    one point part of the spiral ring notebook.

5    Q.    Can you tell where in the notebook they were located?

6    A.    Yes, in the back section there is a page divider which

7    is peach in color.  Just prior to the page divider, there is

8    an intact spiral ring page with some sort of calculations on

9    it.  And right after this peach divider are two blank pages

10   and the documents, Exhibit 5-39 and 5-42, were resting on top

11   of these documents, blank pages, when they were drawn.

12   Q.    Towards the back of the notebook?

13   A.    Towards the back of the notebook, yes, sir.

14   Q.    Did we also ask you to take a look at a notary book?

15   A.    Yes, you did, sir.

16   Q.    And do you have that in front of you?

17   A.    I do, sir.

18   Q.    And that is Exhibit 60 in evidence?

19   A.    Yes.

20   Q.    Can you hold that up, please?

21   A.    It's a notary journal, and it's Exhibit 60.

22   Q.    And did you examine that as well?

23   A.    I did, sir.

24   Q.    And were you -- was your attention directed to a

25   particular entry in that notary book?

Page 3299

1    A.    It was, sir.

2           MR. QUINN:  And this is in evidence, your Honor.

3    If we could project onto the screen page Exhibit 60-19.

4           THE COURT:  You may.

5    Q.    BY MR. QUINN:  Is this the entry at the top there on

6    this page that you were asked to examine?

7    A.    Yes.  As I'm pointing with the laser pointer, sir, it's

8    the section that is at the top of the entry for Carter

9    Bryant, and it's actually in a block entitled document kind

10   or type.

11   Q.    And did you reach any conclusions regarding that entry

12   in the notary book?

13          MR. SLOAN:  Your Honor, I'm going to lodge a

14   preliminary interjection here.  I'm assuming --

15          THE COURT:  What's your objection, Counsel?

16          MR. SLOAN:  Foundation.

17          THE COURT:  Sustained.

18   Q.    BY MR. QUINN:  The point is did you reach any

19   conclusions, yes or no?  Don't tell me what the conclusions

20   were?

21   A.    Yes, I did.

22   Q.    We're going to get into your conclusions, but first

23   let's back up, if we can.  And I'd like to talk to you about

24   your experience and your background as a forensic document

25   examiner.

1          How did you come to be a forensic document

2    examiner?

3    A.   I was the inspector of police with the San Francisco

4    Police Department Fraud Unit.  And at that time I was invited

5    to attend a questioned document school sponsored by the

6    Secret Service in Washington, D.C.  After completion of the

7    Secret Service course for document examination, I was then

8    accepted into a full-time two-and-a-half-year internship

9    program with the United States Postal Crime Laboratory.

10         Upon completion of my training and education with

11   the United States Postal Crime Laboratory, I was accepted

12   into the FBI's questioned document school in Quantico,

13   Virginia.

14         During my training as an intern, I also attended

15   numerous continuing education seminars sponsored by my

16   associations, and part of my assignments were to do research

17   papers and present those papers at the scientific meetings

18   and workshops.

19         Currently and for a number of years, I still attend

20   at least two continuing educational workshops a year

21   sponsored by forensic societies.

22   Q.   Were you involved in establishing a questioned document

23   section within the San Francisco Police Department?

24              MR. SLOAN:  Objection.  Leading, your Honor.

25              THE COURT:  Overruled.

Page 3301

1          THE WITNESS:  Yes.  While a member of the

2     San Francisco Police Department, I established the first

3     forensic document section within the San Francisco Police

4     Department Crime Laboratory.

5     Q.    BY MR. QUINN:  And while you've been with the

6     San Francisco Police Department, have you examined documents

7     at the request of other law enforcement agencies?

8     A.    Yes.  While with San Francisco police and currently, I

9     examine numerous cases for law enforcement agencies.

10    Q.    Can you give us some examples of other law enforcement

11    agencies that have asked you to examine documents for them?

12    A.    Yes.  I'm examined documents for the FBI, the United

13    States Secret Service, the IRS, the U.S. Customs, the Drug

14    Enforcement Agency, for the Northern California U.S.

15    Attorney's Office.  Currently I examine most of the cases for

16    the Alameda County District Attorney's Office, and I examine

17    cases for local police departments in the San Francisco Bay

18    area.

19          In fact, I just examined a case for the Palm

20    Springs Police Department.

21    Q.    And do you routinely examine documents in connection

22    with civil cases such as this one?

23    A.    I do, sir.

24    Q.    And in that connection, are you retained just by

25    plaintiffs or by defendants, or do you work both sides?

1  A.   Oh, I work for both plaintiffs and defendants.  It

2  doesn't matter who I work for.  They will all get the same

3  answer.

4  Q.  Can you tell us in approximately how many cases or how

5  many instances you've given reports regarding questioned

6  documents?

7  A.   Well, at this point in my career, it's in excess of

8  6,000 reports I've prepared on the subject of forensic

9  document examination.

10  Q.  And on how many occasions have you actually testified as

11  a forensic document examination expert?

12  A.   In excess of 500 times.

13  Q.  Are you a member of any recognized professional

14  questioned document examiner associations?

15  A.   I am, sir.

16  Q.  And can you give us some examples of those?

17  A.   I am a member of the Southwestern Association of

18  Forensic Document Examiners.  In fact, I am the past

19  president of that particular forensic association.

20          I'm a life member of the questioned document

21  section for the International Association for Identification.

22          I'm an honorary member with the American Society of

23  Questioned Document Examiners.

24  Q.  Is there such a thing as national standards that exist

25  for forensic document examiners?

1   A.   Yes.   There are national standards and guidelines.

2   Q.   And have you been involved at all in establishing what

3   those standards and guidelines should be?

4   A.   I was, yes, sir.

5   Q.   Can you describe for the jury what your experience has

6   been in establishing national standards for examination of

7   questioned documents?

8   A.   Yes.   Approximately 10 years ago, the federal government

9   through the FBI decided they wanted to standardize the

10   protocols and guidelines for all forensic sciences throughout

11   the United States.

12         I was invited by the federal government through the

13   FBI as a civilian forensic document examiner to serve on a

14   committee to establish the guidelines and protocols for

15   handwriting identification.   There are in fact only two of us

16   from the civilian sector who were invited to serve on this

17   federal committee.

18         Since then, the guidelines and standards set in

19   handwriting identification have been registered with the

20   American Society of Testing Materials in Washington, D.C.,

21   and they are widely used through many civilian and government

22   crime laboratories in the United States.

23   Q.   The work that you did in this case in examining the

24   documents that you examined at our request, did you comply

25   with and follow those standards and guidelines?

Page 3304

1    A.    I certainly did, sir.

2    Q.    Have you ever been involved in teaching forensic

3    document examination?

4    A.    I have, sir.

5    Q.    And what has your experience been in that regard?

6    A.    For approximately 14 years I taught at San Jose State

7    University through their Administration of Justice

8    Department, and for the same number of years, I taught for

9    the California Department of Justice.  I taught police

10   officers in their continuing education on how to investigate

11   and handle cases involving documents.  I've taught to many

12   police academies in the San Francisco Bay area.  I've taught

13   to and taught District Attorney's offices, Public Defender's

14   offices, trial lawyers associations, and I've also taught for

15   the American Bar Association.

16          Currently, I do teach the subject of handwriting

17   identification in advanced matters at workshops and seminars

18   for my colleagues.

19   Q.   Thank you, Mr. Cunningham.

20          Let's talk first about the black notebook,

21   Exhibit 1155, which you have before you there.

22          Did you examine this notebook to determine whether

23   any pages were missing?

24   A.    I certainly did, sir.

25   Q.    And what conclusion did you reach in that regard?

1    A.    I concluded that quite a number of the pages had been

2    removed from the black spiral notebook, approximately half of

3    them had been removed.

4    Q.    And how did you determine that?

5    A.    Well, on the face of the notebook, there is a 120-count

6    number, and based on the 120-count number, I counted the

7    remaining pages, and I determined that approximately half the

8    pages were removed.

9          Also at the time I examined the notebook, there

10   were some fragments of paper still embedded in the spiral

11   ring as you tear a piece out, sometimes a little piece may

12   stick to the spiral ring.  And I found some of those pieces

13   as well.  But all in all, it's the number of pages and the

14   thickness of the notebook, I was able to determine many pages

15   had been removed.

16   Q.    Now, you showed us those two loose pages, 5-39 and 5-42.

17   Do you have those with you there still?

18   A.    Yes, I do, sir.

19   Q.    Let me talk to you about what you found regarding these

20   pages.  Based on the work that you did, were you able to

21   determine whether those pages were ever in the notebook?

22   A.    Yes.  I positively concluded that both of these pages

23   were part of the notebook.

24          MR. SLOAN:  Objection, your Honor.  Lack of

25   foundation.

Page 3306

1          THE COURT:  Sustained.  Counsel -- well, at this

2     point in time, are you ready to seek designation?

3          MR. QUINN:  Yes, your Honor.

4          THE COURT:  Very well.  Do you wish to voir dire?

5          MR. SLOAN:  No, your Honor.

6          MR. QUINN:  We request that he be designated by the

7     Court as an expert.

8          THE COURT:  In?

9          MR. QUINN:  Questioned document examination.

10         THE COURT:  Any objection?

11         MR. NOLAN:  No objection, your Honor.

12         THE COURT:  Very well.  The witness is so

13    designated.  You may now proceed.

14         MR. QUINN:  Thank you, your Honor.

15    Q.   Mr. Cunningham, did you find in that notebook a page

16    where there appears to be what looks like some financial

17    information, maybe some bank entries, deposits, and that sort

18    of thing?

19    A.   Yes.  I did.

20         MR. SLOAN:  Your Honor, objection.  Relevance.

21         THE COURT:  Overruled.

22         THE WITNESS:  I'm turning to the page now, and it

23    has some type of calculation that I'm not familiar with;

24    however, the next page is a page divider.

25    Q.   BY MR. QUINN:  All right.  If we could put up on the

1   screen.  And this is in evidence.  Page 57 of Exhibit 1155.

2   Is that the page that you're referring to, sir?

3   A.   Yes.  This is the page that I'm referring to, and I

4   considered these to be some form of calculations.

5   Q.   Now, you started to tell us that behind this page you

6   found what?

7   A.   Behind that page is a page or sheet divider, and it's

8   kind of light brown in color.  And that was the next page

9   behind that calculation.

10  Q.   And how many of those dividers are in this black

11  notebook?

12  A.   I'm not sure, sir.  I think there are two.

13  Q.   And is that the second one, the last one?

14  A.   This one I'm referring to is the second of the two page

15  dividers near the back portion of the notebook.

16  Q.   All right.  So the next page after the divider is page

17  61; correct?

18  A.   That's correct, sir.

19  Q.   And did you examine that page?

20  A.   Yes.  I examined page 61, which comes right after the

21  divider.

22  Q.   And why did you examine that page?

23  A.   I had conducted a preliminary examination of all the

24  pages in the spiral notebook with what's called side light or

25  light grazing over the surface of the pages.  That enables me

1    to see if there are any almost invisible indentations in the

2    paper fiber.  And once I reach page 61, I was able to see

3    that there were some indentations in that paper fiber, and

4    that prompted me to use a scientific instrument to develop

5    these indentations in the paper fiber of 61.

6    Q.   What did you find when you examined that page, page 61

7    after the divider?

8    A.   When I examined page 61 with the scientific instrument,

9    which is called the indentation materializer, I developed

10   sketches or drawings of several types of media, and one of

11   these sketches that I developed was the sketch from

12   Exhibit 5-42, which is an image of a doll with long curly

13   hair.

14   Q.   And can you tell us what page it was that you found an

15   indentation of 5-42?  What page in the exhibit?

16   A.   Page 61 in the spiral ring notebook, I found this image,

17   5-42, indented into that page.

18   Q.   All right.  And what does that tell you as a forensic

19   document examiner?

20   A.   That page 42 was positively in the notebook when the

21   image was drawn, and page 42 was resting on top of page 61

22   when it was drawn in order for these indentations to go

23   through to the next page.

24   Q.   How about the other loose drawing that you showed us,

25   Exhibit 5-39?  Did you find any evidence of these

Page 3309

1   indentations indicating that that had also been in the

2   notebook?

3   A.   Yes, I did.   I found portions of Exhibit 539 indented

4   into the paper fiber, especially around the eyes and eyebrows

5   that I'm pointing to into the paper fiber of Exhibit page 63.

6   Q.   You made reference to indentation and some of the

7   equipment that you use to identify this.   I'd like to back up

8   a little bit and talk about some of these concepts.

9           What is indented writing?

10  A.   Indented writing, the best way that I can describe what

11  indented writing is is if I wrote on the top sheet of this

12  yellow tablet, what I wrote on the top sheet with normal pen

13  pressure and a ball-point pen, I should be able to develop on

14  the second page.   I should be able to develop it on the third

15  page, and probably even onto the fourth page by using the

16  scientific instrument called the indentation materializer.

17          I would also be able to, once I've developed the

18  indentation, to preserve it and use it as an exhibit at a

19  later time.

20  Q.   You called that an indentation materializer?

21  A.   Yes, sir.

22  Q.   And what does that do?   How does that work?

23  A.   It's an electrostatic process.   It's very similar to the

24  electrostatic process used in photocopy machines.   And it's

25  nondestructive to the document.   It doesn't harm the document

Page 3310

1    in any way.  And it's placed on the instrument.  An imaging

2    film is pooled over the document.  The document and the

3    imaging film are then electrostatically charged, and when we

4    apply toner, similar to dry toner used in the laser jet

5    printer or photocopy machine, then we can develop what we

6    call visualize the indented writing.  It's just a wonderful

7    instrument.

8    Q.   What do you mean by develop in this context?

9    A.   Develop means that if you looked at the page with your

10   naked eye, you probably wouldn't see the indented writing,

11   but the instrument is capable of making it so you can see

12   this indented writing by developing it.

13   Q.   All right.  Do you have there in front of you Exhibits

14   13634 and 13635?

15   A.   I do, sir.

16   Q.   And can you identify those for us, please?

17   A.   Yes.

18   Q.   What are they?

19   A.   Exhibits 13635 and 13634 are my actual developments of

20   the indented writing.  This is the form they are in once I

21   develop the indented writing in the paper fiber from a

22   document, and I'm able to preserve these indentations.  So

23   13634 and 13635 are the results of what I developed in the

24   paper fiber in the notebook of pages 61 and 63.

25              MR. QUINN:  Your Honor, offer those in evidence.

Page 3311

1        MR. SLOAN:  No objection.

2        THE COURT:  They are admitted.  You may publish.

3        (Exhibit 13634 and 13635 received.)

4        MR. QUINN:  If we could put these up on the screen.

5   Q.   This is 13634 that we're looking at?

6   A.   I have to get a little closer to the screen.

7        MR. QUINN:  With the Court's permission?

8        THE COURT:  Yes.

9        THE WITNESS:  Thank you.

10        This is 13634, and this is my indented development.

11   Q.   BY MR. QUINN:  And the other page, 13635.  If we could

12   put that up on the screen, please.  Can't see much there.

13   A.   Right.  But right in the area I'm circling, these are

14   some indented writing images from 13635, which would be

15   eyebrows and the outline of eyes.

16   Q.   All right.  So what you're holding are the actual films

17   you use that lift these images off the page?

18   A.   Yes, they are.

19   Q.   And how do you do that?

20   A.   I do that with use of the indentation materializer, and

21   I lift them with imaging film and a sealant and dry toner.

22   Q.   Have you prepared some demonstrative exhibits to help us

23   understand what you found here?

24   A.   I have prepared those, sir.

25   Q.   All right.  What is -- the first one I think is

Page 3312

1    demonstrative C-2.  If we could put that up on the screen.

2    Can you tell us what we're looking at here?

3    A.   Yes, this is an enhanced scan of my indented writing

4    development.  It's somewhat hard to see until it's been

5    enlarged like it is now.  For example, you can see the lips

6    of a doll, the chin of a doll.  You can see some curly Q's of

7    the hair coming down from the doll.  You can also see the

8    cuff on the right hand of the doll and the hand.  You can see

9    the cuff and the left hand of the doll, and you can see the

10   legs.

11           These are the images I developed in the paper fiber

12   of page 61, which came from Exhibit 5-42.

13   Q.   And you say this one is enhanced.

14   A.   Yes.

15   Q.   How do you enhance it?  In what ways is it enhanced?

16   A.   This was enhanced through a scanning process.  And the

17   purpose it was enhanced is so the jurors and the trier of

18   fact would be able to see what I'm talking about.

19   Q.   Did you prepare another demonstrative to help with us

20   this?

21   A.   I did, sir.

22   Q.   If we could look at C-3.  Is this a demonstrative

23   exhibit that you prepared, Mr. Cunningham?

24   A.   It is, sir.  And this particular demonstrative is the

25   same image that I just previously showed; however, to make it

1   even more easier to see the outline, I highlighted it with

2   the yellow highlighter.  And when I'm speaking about

3   highlighted it, I highlighted what we call the ball-point pen

4   impressions that indented into the next page, which was page

5   61.

6   Q.   And the next demonstrative, C-4.  What are we looking at

7   here?

8   A.   Right here, this is what I considered to be an overlay.

9   This is the actual image of the doll of Exhibit 5-42, and the

10  highlighted areas are the ball-point pen ink areas --

11  Q.   The dark black?

12  A.   Pardon me?

13  Q.   The dark black is the ball-point?

14  A.   No.  This particular document was prepared on spiral

15  ring notebook paper with lines.  The softer, finer lines are

16  ball-point pen ink lines.  The heavier lines, which I am

17  showing with the laser pointer, those are a fiber-tip or

18  felt-tip pen line with a water-based ink.  Ball-point ink is

19  more of a viscous thick ink.  Whereas in a fiber-tip pen, you

20  have more of a flowing water-based ink.  So the thicker lines

21  are prepared with a fiber-tip water-based ink.  The thinner

22  softer lines were prepared with a ball-point ink.

23  Q.   Which would you expect to leave a firmer indentation on

24  the page below?  The ball-point or the felt-tip?

25  A.   Oh, no doubt, a ball-point pen, when you're writing on

Page 3314

1    paper with normal pen pressure, will leave much better

2    indentations than a soft or spongy felt-tip pen with water

3    ink because the ball-point ink generally has a sharper point,

4    which embeds or makes a trough in the paper fiber, and in

5    turn, that trough causes much clearer indentations on the

6    following sheet or sheets of paper.

7    Q.    Now, you indicated that this demonstrative C-4 is an

8    overlay.  It's an overlay of what over what?

9    A.    The indentations that I developed are overlaid over the

10   original drawing to show how they perfectly match.

11   Q.    So the indentations come from the page that you believe

12   had to have been underneath?

13   A.    Yes, the indentations came from page 61, which in my

14   opinion, that page was underneath Exhibit 5-42 when this

15   image was drawn.

16          MR. SLOAN:  Your Honor, I'm going to object to

17   Mr. Cunningham --

18          THE COURT:  At this point you're right.  There's no

19   need to be standing there.  Please return to the witness

20   stand.

21          Thank you, Counsel.

22   Q.    BY MR. QUINN:  Did you prepare some additional

23   demonstratives to help us understand this better?

24   A.    Yes, sir, I did.

25   Q.    So the next one I think would be C-5.

Page 3315

1   A.    Yes, that's correct.

2   Q.    What does this represent?

3   A.    This is an enlargement of the image of the doll on

4   Exhibit 5-42, and it's an enlargement of the doll's right

5   hand and some of the curly Q's from the hair coming down the

6   right side of the doll.  It also shows some areas of the pant

7   leg and upper torso.

8   Q.    Now, this image that we're looking at here, does that

9   have any of the indented image that you lifted reflected on

10  it?

11  A.    Not on this particular image here.  I think it will be

12  in the next.

13  Q.    Okay.  So next one would be C-6?

14          MR. SLOAN:  Your Honor, I'm going to raise one

15  objection here.  I think the Court should explain to the jury

16  that these are demonstratives.  They are not coming into

17  evidence.

18          MR. QUINN:  They are demonstratives, your Honor.

19  What I've identified as demonstratives we won't be offering

20  into evidence.

21          THE COURT:  Very good.  Since this is the first

22  time we're doing this, why don't we refer to them as

23  demonstrative exhibits.  Generally, ladies and gentlemen,

24  everything that you have seen that the Court has not stricken

25  is going to go back into evidence with you at the end of this

Page 3316

1   trial.  These demonstrative exhibits that are being used by

2   the expert to explain his testimony are simply that.  They

3   are demonstrative exhibits that are assisting in the aid of

4   his testimony but will not be back with you at the end of

5   trial.  Why not, for the jury's understanding, refer to them

6   as demonstrative exhibits.

7          MR. QUINN:  I thought I had.  But I will continue

8   to.

9          THE COURT:  Very well.  Thank you, Counsel.

10  Q.   BY MR. QUINN:  So C-6 here, the demonstrative, what are

11  we looking at here?  Can you see it from here?

12  A.   Yes, I can.  Yes, this is an enlargement of the section

13  of my indented writing development.  And this is the right

14  hand, the right cuff, some of the curly Q of hair coming down

15  the right side of the image, part of the torso, and a portion

16  of the legs.

17  Q.   And then C-7.

18  A.   Now, to make it easier for you to see, I have

19  highlighted my indented writing image, and that is the

20  portion that's been enlarged.  Once again, the curly Q of the

21  hair on the right side.  The cuff and the hand, portions of

22  the leg and torso.

23  Q.   And then demonstrative C-8.

24  A.   Yes, this is another overlay of the original image that

25  was drawn on Exhibit 5-42, and it shows exactly the same

Page 3317

1    curly Q of the ball-point pen ink impression, and note that

2    the fiber-tip thicker line of the cuff is formed quite

3    differently than the ball-point ink portion of the cuff.  And

4    if you can go back to the previous image, please.

5    Q.    Demonstrative C-7?

6    A.    Yes.  This is what I developed in the indented writing

7    of that.  The exact same curly Q of the hair, and the cuff,

8    not the cuff that was written with the black water-based

9    fiber-tip ink, but the cuff that was drawn with the

10   ball-point ink.  Everything is in full agreement between my

11   indented writing development and that portion and other

12   portions on Exhibit 5-42.

13   Q.   You just used a phrase "full agreement."  Does that have

14   a meaning for a questioned document examiner?

15   A.    Yes.  Full agreement means that I could find no

16   differences between my indented writing development and those

17   portions found on Exhibit 542 which, in my opinion, just the

18   evidence from the curly Q of hair, the way the cuff was

19   written, the way the hand was -- excuse me, the way the cuff

20   was drawn and the way the hand was drawn is sufficient

21   enough, although I did have other information, but that is

22   sufficient enough to conclude that they are one and the same.

23   Q.   And as a questioned document examiner, what did that

24   cause you to conclude?  That correlation between the

25   indentation for the ball-point pen, that the ball-point pen

Page 3318

1    left, and the image on the exhibit?

2    A.   That causes me to conclude that Exhibit 535, that drawn

3    image of the doll was in fact in the spiral ring notebook

4    resting on top of the blank page 61 when at least the

5    ball-point pen image was drawn.

6    Q.   Let's take a look at the other image, other drawing,

7    loose drawing, Exhibit 5-39.  Did you find in the notebook

8    any indentations which related to this design as well?

9    A.   Yes.  And specifically, in the upper part, the eyes and

10   the eyebrows, I found indented writing from this particular

11   image, which is 5-39 in the paper fiber of page 63 that is

12   still contained in the spiral ring notebook.

13              MR. QUINN:  Your Honor, is this a good time?

14              THE COURT:  Yes.  Let's take our lunch break at

15   this time.

16              (WHEREUPON THE JURY WITHDRAWS.)

17              THE COURT:  Very good, Counsel.  I'll see you after

18   lunch.  1:30.

19

20              (Lunch recess taken at 12:00 P.M.)

21

22

23

24

25

Page 3319

1

2

3

4

5

6

7                               C E R T I F I C A T E

8

9

10           I hereby certify that pursuant to Title 28,

11   Section 753 United States Code, the foregoing is a true and

12   correct transcript of the stenographically reported

13   proceedings in the above matter.

14           Certified on June 20, 2008.

15

16

                        _____
17                      MARK SCHWEITZER, CSR, RPR, CRR
                        Official Court Reporter
18                      License No. 10514

19

20

21

22

23

24

25