QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  johnquinn@quinnemanuel.com
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:   (213) 443-3000
Facsimile:    (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>              Plaintiff,<br><br>       vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>              Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br><br>Consolidated with<br>Case No. CV 04-09039<br>Case No. CV 05-02727<br><br>Hon. Stephen G. Larson<br><br>DECLARATION OF B. DYLAN PROCTOR IN SUPPORT OF MATTEL, INC.'S OPPOSITION TO DEFENDANTS' *EX PARTE* APPLICATION FOR RELEASE OF *IN CAMERA* JUROR INTERVIEW TRANSCRIPTS |

**PUBLIC REDACTED VERSION**

76416/2994967.1

## Declaration of B. Dylan Proctor

I, B. Dylan Proctor, declare as follows:

1.      I am a member of the bar of the State of California and a partner at Quinn Emanuel Urquhart Oliver & Hedges, LLP, attorneys for Mattel, Inc. ("Mattel").  I make this declaration of personal, firsthand knowledge, and if called and sworn as a witness, I could and would testify competently thereto.

2.      Attached as Exhibit 1 is a true and correct copy of relevant transcript excerpts of closed court proceedings held on July 25, 2008.

3.      Attached as Exhibit 2 is a true and correct copy of relevant transcript excerpts of open court proceedings held on July 25, 2008.

4.      Attached as Exhibit 3 is a true and correct copy of MGA Parties' Motion for Mistrial, filed July 29, 2008.

5.      Attached as Exhibit 4 is a true and correct copy of relevant transcript excerpts of proceedings held on August 4, 2008.

6.      Attached as Exhibit 5 is a true and correct copy of the Court's Order of August 8, 2008 denying MGA's motion for mistrial.

7.      Attached as Exhibit 6 is a true and correct copy of Defendants' Motion for Partial Release of *In Camera* Juror Interview Transcripts, filed June 10, 2009.

8.      Attached as Exhibit 7 is a true and correct copy of the Ninth Circuit's Order dated June 29, 2009, denying Defendants' Motion for Partial Release of *In Camera* Juror Interview Transcripts.

9.      Attached as Exhibit 8 is a true and correct copy of the Court's Standing Order.

10.      Attached as Exhibit 9 is a true and correct copy of Mattel, Inc.'s Opposition to Defendants' Motion for Mistrial.

11.      Attached as Exhibit 10 is a true and correct copy of the Reply in Support of MGA Parties' Motion for Mistrial.

1          12.     Attached as Exhibit 11 is a true and correct copy of the Court's

2    Order Dated September 2, 2008.

3

4          I declare under penalty of perjury under the laws of the United States of

5    America that the foregoing is true and correct.

6          Executed on July 1, 2009, at Los Angeles, California.

7

8                                        _____

9                                        B. Dylan Proctor

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07209/2993168.1

-3-

# EXHIBIT 1

EXHIBIT FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 2

5643

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION

4                  - - -

5     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                  - - -

7     MATTEL, INC.,                    )
                                       )
8                     PLAINTIFF,       )
                                       )
9          VS.                         )   NO. CV 04-09049
                                       )
10    MGA ENTERTAINMENT, INC., ET. AL.,)
                                       )
11                    DEFENDANTS.      )   TRIAL DAY 28,
      _____)   MORNING SESSION
12    AND CONSOLIDATED ACTIONS,        )   PAGES 5643-5675
      _____)

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               RIVERSIDE, CALIFORNIA

17              FRIDAY, JULY 25, 2008

18                 10:53 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
            FEDERAL OFFICIAL COURT REPORTER
24             3470 12TH STREET, RM. 134
            RIVERSIDE, CALIFORNIA   92501
25                951-274-0844
              WWW.THERESALANZA.COM

CERTIFIED COPY

EXHIBIT _____2_____

PAGE _____12_____

5644

```
1    APPEARANCES:

2
     ON BEHALF OF MATTEL, INC.:
3
                         QUINN EMANUEL
4                        BY:   JOHN QUINN
                               JON COREY
5                              MICHAEL T. ZELLER
                         865 S. FIGUEROA STREET,
6                        10TH FLOOR
                         LOS ANGELES, CALIFORNIA  90017
7                        213-624-7707

8

9

10   ON BEHALF OF MGA ENTERTAINMENT:

11                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         BY:   THOMAS J. NOLAN
12                             LAUREN AGUIAR
                               RAOUL KENNEDY
13                             DAVID HANSEN
                         300 SOUTH GRAND AVENUE
14                       LOS ANGELES, CALIFORNIA  90071-3144
                         213-687-5000
15

16

17

18

19                             :

20                            : :

21

22

23

24

25
```

EXHIBIT 2

PAGE 13

5645

1                          I N D E X

2                                                    PAGE

3   PROCEEDINGS.....................................    5646

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FRIDAY, JULY 25, 2008                TRIAL DAY 28, MORNING SESSION

EXHIBIT 2
PAGE 14

5646

1       RIVERSIDE, CALIFORNIA; FRIDAY, JULY 25, 2008; 10:53 A.M.

2                            -OOO-

3             THE CLERK:  CALLING CASE NUMBER CV04-09049-SGL,

4    MATTEL, INC., V. MGA, INC., ET AL.

5             MR. QUINN:  JOHN QUINN, BILL PRICE, MIKE ZELLER FOR

6    MATTEL.

7             MR. NOLAN:  TOM NOLAN, LAUREN AGUIAR, RAOUL KENNEDY,

8    AND DAVID HANSEN FOR MGA.

9             THE COURT:  GOOD MORNING, COUNSEL.

10            THE COURT WANTS TO BEGIN BY PLACING ON THE RECORD

11   WHAT HAS BEEN GOING ON THIS MORNING, AND THEN I WILL PRESENT

12   THE COURT'S TENTATIVE FACTUAL FINDINGS.  I'LL BE INVITING

13   COUNSEL THE OPPORTUNITY TO MAKE ANY ARGUMENT OR REQUEST THE

14   COURT TO MAKE ANY FURTHER FACTUAL INQUIRIES.  THEN I'LL MAKE A

15   FINAL DECISION ON THIS.

16            THIS BEGAN THIS MORNING WHEN THE COURT RECEIVED THE

17   FOLLOWING NOTE FROM A JUROR, JUROR NUMBER 6:

18            "HEY, JUDGE LARSON, THERE IS AN ISSUE THAT CONCERNS

19   ME THAT I'D LIKE TO TALK TO YOU ABOUT.  THE THING IS, I DON'T

20   FEEL COMFORTABLE TALKING ABOUT IT IN FULL COURT.  COULD I SPEAK

21   WITH YOU AT SIDE-BAR WITH THE LAWYERS AND COURT REPORTER

22   PRESENT?  OTHERWISE, I'LL KEEP THIS TO MYSELF.  THANKS, PAUL,

23   NUMBER 6."

24            THE COURT INVITED COUNSEL TO CHAMBERS TO REVIEW THE

25   NOTE.  WE THEN BROUGHT THE JUROR IN AND DISCUSSED THE NOTE WITH

5647

```
 1   THE JUROR, WITHOUT GETTING INTO THE DETAILS OR THE SUBSTANCE OF

 2   THE CONCERN.

 3            COUNSEL FOR ALL PARTIES STIPULATED THAT THE COURT

 4   SHOULD INTERVIEW JUROR NUMBER 6 BY ITSELF AND THEN GO FROM

 5   THERE.  THE COURT DID FULLY INTERVIEW JUROR NUMBER 6 CONCERNING

 6   THIS MATTER.  BASED ON THE STATEMENTS THAT JUROR NUMBER 6 MADE,

 7   THE COURT ULTIMATELY FOUND THAT IT WAS NECESSARY TO INTERVIEW

 8   EACH AND EVERY ONE OF THE JURORS SEPARATELY, AND THAT'S WHAT

 9   THE COURT HAS BEEN DOING OVER THE LAST COUPLE OF HOURS, IS

10   INTERVIEWING EACH OF THE JURORS SEPARATELY IN CHAMBERS ON THE

11   RECORD BUT UNDER SEAL.

12            ALL OF THOSE PROCEEDINGS, BEGINNING FROM THE TIME

13   THAT COUNSEL CAME INTO CHAMBERS UNTIL NOW, ARE ORDERED UNDER

14   SEAL PENDING FURTHER ORDER OF THIS COURT.

15            BASED ON THE COURT'S INTERVIEW OF EACH OF THE JURORS,

16   BOTH IN THEIR TESTIMONY, THEIR DEMEANOR, AND THEIR MANNER IN

17   ADDRESSING THE COURT, THE COURT MAKES THE FOLLOWING TENTATIVE

18   FACTUAL FINDINGS:

19            JUROR NUMBER 8, MS. ANNETTE STEINGRABER, MADE AN

20   INAPPROPRIATE STATEMENT CONCERNING MR. LARIAN BASED ON HIS

21   ETHNICITY.  THE STATEMENT WAS HEARD BY MOST BUT NOT ALL OF THE

22   JURORS.  THE FOREPERSON AND SEVERAL OF THE OTHER JURORS

23   IMMEDIATELY ADMONISHED MS. STEINGRABER FOR MAKING THIS

24   STATEMENT, INDICATING THAT IT WAS INAPPROPRIATE AND IT HAD NO

25   PLACE IN THE JURY DELIBERATION PROCESS.
```

·5648

1      THE STATEMENT WAS MADE TOWARDS THE VERY END OF

2  DELIBERATIONS, AFTER VERDICTS HAD BEEN REACHED ON ALL BUT THE

3  FOUR QUESTIONS UPON WHICH THE JURY NEVER ULTIMATELY DID REACH A

4  VERDICT.  EACH JUROR INDICATED, AND THE COURT FINDS, THAT THE

5  STATEMENT DID NOT AFFECT OR IN ANY WAY INFLUENCE THEIR

6  DECISION.

7      THE JURORS APPEARED TO THE COURT MOST SINCERE AND

8  MOVED BY THIS.  THIS WAS CERTAINLY AN EMOTIONAL THING.  THERE

9  WAS A REAL SENSE FROM A GOOD NUMBER OF THE JURORS THAT THIS WAS

10  AN OUTRAGEOUS STATEMENT, TO THE POINT THAT SEVERAL OF THE

11  JURORS REACTED QUITE EMOTIONALLY.  AND, IN FACT, THIS EXPLAINS

12  JUROR NUMBER 10'S NOTE.  SHE EXPRESSLY INDICATED THAT HER NOTE

13  TO THE COURT, INDICATING THE PAIN AND WHAT SHE WAS GOING

14  THROUGH, IS CONNECTED TO THIS STATEMENT.

15      A NUMBER OF THE JURORS REQUESTED REMOVAL OF

16  MS. STEINGRABER, OR ENCOURAGED THE COURT TO DO SO, AND ALL OF

17  THE JURORS INDICATED THAT HER REMOVAL, THIS INCIDENT, THIS

18  STATEMENT, WILL HAVE NO AFFECT OR INFLUENCE ON THEIR DECISION

19  GOING FORWARD.  IN FACT, ONE OF THE JURORS EXPRESSED A CONCERN

20  THAT AS LONG AS MS. STEINGRABER STAYED ON THE JURY, SHE THOUGHT

21  THAT SHE WOULD BE PERHAPS BENDING IN FAVOR OF MGA AND

22  MR. LARIAN TO TRY TO COMPENSATE FOR HER CONCERNS ABOUT HOW

23  MS. STEINGRABER MIGHT BE VIEWING MGA AND MR. LARIAN; BUT WITH

24  HER REMOVAL, SHE BELIEVES THAT WOULD NOT BE AN ISSUE AND THAT

25  SHE COULD BE A FAIR JUROR.

EXHIBIT

PAGE       17

 1          THIS IS AN EXTRAORDINARILY UNFORTUNATE DEVELOPMENT,

 2   BUT THOSE ARE MY FINDINGS BASED ON MY INTERVIEWS WITH EACH OF

 3   THESE JURORS.

 4          AT PRESENT, NINE OF THE JURORS ARE IN THE JURY

 5   DELIBERATION ROOM ON THIS FLOOR.  MS. STEINGRABER IS IN A

 6   SEPARATE ROOM.  SHE HAS BEEN SEPARATED FROM THE REST OF THE

 7   JURY.  ALL OF THE JURORS HAVE BEEN INSTRUCTED NOT TO DISCUSS

 8   THIS AMONGST THEMSELVES PRESENTLY OR AT ANY TIME, AND I'LL

 9   CERTAINLY REEMPHASIZE, ANY TIME GOING FORWARD.

10          THAT'S WHERE WE ARE AS OF RIGHT NOW.

11          SO I AM OPEN TO ARGUMENT.  I AM OPEN TO A REQUEST FOR

12   FURTHER INQUIRY.  I AM OPEN TO ANY MOTION.  I AM OPEN TO ANY

13   SUGGESTION AS TO HOW WE PROCEED FROM THIS POINT.

14          **MR. NOLAN:**  YOUR HONOR, MAY I PROCEED FIRST?

15          **THE COURT:**  YES.

16          **MR. NOLAN:**  YOUR HONOR, FIRST ON BEHALF OF MR. LARIAN

17   AND HIS FAMILY AND MGA, WE APPRECIATE THE TIME THAT THE COURT

18   TOOK IN INTERVIEWING THE VARIOUS JURORS REGARDING THIS VERY

19   SENSITIVE MATTER.

20          I THINK TODAY WE HAVE WITNESSED BOTH THE BEST AND THE

21   WORST ABOUT INDIVIDUAL BIASES.  I THINK THE COURAGE OF ONE OF

22   THE JURORS TO BRING THIS TO THE ATTENTION OF THE COURT IS A

23   TESTAMENT TO WHAT THE AMERICAN SYSTEM IS TRULY ABOUT AND THE

24   COMMITMENT TO JUSTICE.

25          WHAT I WOULD SUGGEST, YOUR HONOR, IS THAT WE WILL BE

1    MAKING A MOTION FOR A MISTRIAL.  I HAVE OBVIOUSLY ONLY HAD A

2    MINUTE OR TWO TO PROCESS MY THOUGHTS.  THE BASIS FOR THAT IS

3    THAT, OF COURSE, IN THE BEGINNING OF THIS CASE, DURING VOIR

4    DIRE, I SPECIFICALLY ASKED THE PANEL, THE ENTIRE PANEL, WHETHER

5    OR NOT THEY THOUGHT THEY COULD RENDER A FAIR AND IMPARTIAL

6    VERDICT, NOTWITHSTANDING THE FACT THAT I REPRESENTED A

7    GENTLEMAN WHO CAME TO THIS COUNTRY AS AN IMMIGRANT, BECAME A

8    CITIZEN, HAD ALL OF HIS CHILDREN BORN IN THE UNITED STATES, AND

9    BUILT A SUCCESSFUL COMPANY.

10            THE JURY AGREED, BY NOT DESCENDING TO THAT COMMENT,

11    THAT THEY COULD HONOR THEIR DUTY AND THEIR OATH.

12            WE ARE IN THE FEDERAL SYSTEM, AND EACH PARTY IN THE

13    FEDERAL SYSTEM IS ENTITLED TO A UNANIMOUS VERDICT, A UNANIMOUS

14    VERDICT FOUNDED ON THE PRINCIPLES OF WEIGHING THE EVIDENCE,

15    ASSESSING THE CREDIBILITY OF WITNESSES, SEPARATE AND APART FROM

16    BIAS.  A JURY INSTRUCTION IS ACTUALLY GIVEN TO THEM IN ADVANCE

17    OF THE DELIBERATIONS, ADVISING THEM THAT THERE SHOULD BE NO

18    BIAS THAT ENTERS INTO DELIBERATIONS.  IT IS CLEAR FROM THE

19    RECORD AND THE FINDINGS FROM THE COURT THAT ONE JUROR DID NOT

20    FOLLOW THE COURT'S RULING.

21            THE TIMING OF THE COMMENT THAT WAS MADE -- IN OTHER

22    WORDS, THE FACT THAT IT MAY NOT HAVE BEEN MADE UNTIL SUCH TIME

23    AS A VERDICT HAD BEEN REACHED ON ALL OF THE -- THAT IT HAD BEEN

24    MENTIONED ONLY AFTER VERDICTS HAD BEEN RENDERED ON ALL OF THE

25    ISSUES OTHER THAN FOUR DRAWINGS, I DON'T THINK IS OF ANY

EXHIBIT

PAGE _____ 19

1  MOMENT, BECAUSE IT WAS AN OPPORTUNITY FOR JUROR NUMBER 8 TO

2  APPARENTLY EXPRESS OPENLY A BIAS THAT SHE HAD.

3       THIS CASE HAS BEEN ONE THAT I THINK THIS COURT HAS

4  FOUGHT MIGHTILY TO KEEP FAIR.  I WAS STRUCK IN THE BEGINNING OF

5  THE CASE -- THE COURT MAY RECALL TWO INCIDENTS THAT OCCURRED IN

6  THE BEGINNING OF THE JURY PROCESS THAT I THINK INFLUENCES THIS

7  ISSUE.  ONE WAS THAT MR. LARIAN'S RABBI WAS PRESENT DURING THE

8  JURY VOIR DIRE, AND ONE OF THE PROSPECTIVE JURY MEMBERS WROTE A

9  NOTE TO THE COURT INDICATING THAT THEY THOUGHT IT WAS

10 INAPPROPRIATE FOR THE RABBI TO BE WEARING A RELIGIOUS YAMIKA ON

11 HIS HEAD.  THE RABBI LEFT AFTER THAT NOTE, IT WAS SO DISTURBING

12 TO MR. LARIAN AND TO THE RABBI.

13       IT WAS EQUALLY DISTURBING THAT THE OTHER JUROR MADE

14 THE COMMENT TO THE COURT -- AND I CAN SHOW YOU THE TRANSCRIPT

15 -- THAT 'I NOTICE THAT THAT IRREGULARITY HAS BEEN TAKEN CARE

16 OF,' AS THOUGH YOU YOURSELF HAD ORDERED THE RABBI TO TAKE OFF

17 HIS RELIGIOUS HAT, IN WHICH YOU HAD NOT.

18       NOT RELIGIOUS HAT, I'M SORRY, THE YAMIKA.

19       THERE HAS BEEN A TENSION IN THIS CASE.  IT HAS ALWAYS

20 BEEN A CONCERN OF OURS.  I RAISED THAT WITH THE COURT AT THAT

21 TIME, AND THE COURT, I THOUGHT, HANDLED THAT, AGAIN, EQUALLY

22 APPROPRIATE.  THERE WAS AN INCIDENT WHERE A PROSPECTIVE JUROR

23 LOOKED INTO AND PULLED OUT OF A BOX OUTSIDE A PLEADING THAT WAS

24 A COURTESY COPY FOR THE COURT, AND THE COURT EXCUSED THAT

25 JUROR, DID NOT CHARGE HIM WITH ANY WRONGDOING, JUST SAID THAT

5652

1    THAT WAS INAPPROPRIATE AND THAT HE SHOULDN'T DO THAT, AND

2    EXCUSED HIM.

3            THIS COMING BACK NOW, YOUR HONOR, OUR MISTRIAL MOTION

4    IS SIMPLY STATED AS FOLLOWS:

5            EVERY CITIZEN, EVERY PERSON, THAT COMES THROUGH THESE

6    DOORS IS ENTITLED TO A FAIR TRIAL, TO BE JUDGED ON THE MERITS,

7    NOT BY ONE'S BIASES.  AND THE FACT THAT A JUROR MAKES A COMMENT

8    IN A CASE OF THIS IMPORTANCE, ON SUCH A VERY SENSITIVE ISSUE,

9    THAT IS NOT ONLY SENSITIVE TO THIS CASE, BUT GOES TO THE HEART

10   OF THE AMERICAN JUSTICE SYSTEM, LEADS ME TO CONCLUDE THAT WE

11   DID NOT HAVE A UNANIMOUS VERDICT OF A FAIR AND IMPARTIAL JURY.

12           AND IF I COULD, YOUR HONOR, YOU MIGHT SAY, OR SOMEONE

13   MIGHT SAY, OR THE WEIGHT OF THE EVIDENCE MIGHT BE, 'WELL, GEE,

14   NINE OTHER GOOD CITIZENS ARE WILLING TO SAY NOW THAT THAT

15   DIDN'T AFFECT THEM.'

16           BUT I REMIND THE COURT THAT THERE IS A VERY FAMOUS

17   MOVIE -- I GUESS IT WAS A PLAY FIRST -- WHERE HENRY FONDA

18   STARRED IN IT, *12 ANGRY MEN*; AND THE JURY PROCESS THERE WAS

19   ALSO UNANIMOUS.  AND IT STARTED OFF WITH A LOT OF PEOPLE HAVING

20   VIEWS, AND ONE JUROR HAD THE STRENGTH OF CONVICTION, NOT

21   LABORED BY BIAS OR PREJUDICE OF RACE OR ETHNICITY OR RELIGIOUS

22   PERSUASION, AND THEY PERSUADED THE OTHER ELEVEN.  THAT'S THE

23   BENEFIT OF HAVING A UNANIMOUS VERDICT.  THAT'S THE BENEFIT OF

24   HAVING EACH JUROR GOING IN THERE WITH THE SHOT, THE ABILITY, TO

25   INFLUENCE OTHER JURORS TO SEE IT A DIFFERENT WAY.  AND WE DID

EXHIBIT ___

PAGE ___ 21

```
 1   NOT HAVE THAT ABILITY.  THERE WAS A JUROR WHO HAD A HIDDEN

 2   BIAS, WHO COULD HAVE EASILY DISCLOSED THAT.

 3          I'M STRUCK WITH A DIFFICULT DECISION, YOUR HONOR, AND

 4   THAT IS THAT I REPRESENT A MAN WHO'S VERY CLOSE TO HIS FAMILY,

 5   AND HE DRAWS A LOT OF SUPPORT FROM HIS FAMILY.  AND HIS FAMILY

 6   HAS BEEN HERE EVERY DAY.  IF THAT FAMILY WAS OF MY OWN

 7   HERITAGE, IRISH CATHOLIC, AND I HAD ALL MY COUSINS AND MY

 8   UNCLES HERE, THEY WOULD NOT STAND DOWN.

 9          I'VE EXPRESSED A CONCERN ABOUT HAVING MR. LARIAN'S

10   FAMILY SUPPORT HERE, THAT MAYBE THERE WAS A BIAS ON THE JURY.

11   BUT I DECIDED, AS A LAWYER WHO HAS COMMITTED HIS ENTIRE CAREER

12   TO TRYING CASES, THAT THE SYSTEM IS BETTER THAN THAT.  AND YET,

13   NOW, YOUR HONOR, I KNOW THAT THERE WAS A JUROR WHO WAS BIASED.

14          THE AMERICAN SYSTEM REQUIRES MORE.  AND I WOULD ASK

15   THAT AT A MINIMUM, WE NOT PRESENT ADDITIONAL EVIDENCE TODAY, IF

16   THE COURT FEELS IT IS UNABLE TO MAKE A DECISION.  I DON'T HAVE

17   A CASE -- I APOLOGIZE -- I DON'T HAVE A CASE IN MY BACK POCKET

18   ON THIS.  I'M ACTUALLY DELIVERING THIS ONE FROM MY HEART AND

19   BASED ON MY UNDERSTANDING OF THE CONSTITUTION OF A FAIR TRIAL.

20          I THINK WE SHOULD HEAR, OBVIOUSLY, ARGUMENT FROM

21   MATTEL.  BUT THIS IS A VERY SERIOUS, VERY SOBERING, IN MANY

22   WAYS A VERY SAD MOMENT, IN THE SYSTEM, BUT ALSO A GOOD MOMENT.

23          I ASK THE COURT FOR A MISTRIAL ON BEHALF OF MGA AND

24   MR. LARIAN.

25          THE COURT:  THANK YOU, COUNSEL.
```

EXHIBIT ___

PAGE ___ 22

1     MR. QUINN?

2         **MR. QUINN:** YOUR HONOR, IT IS A SAD MOMENT, AND

3     CLEARLY, THIS JUROR SHOULD BE EXCUSED, MATTEL AGREES WITH THAT.

4     BUT UNDER OUR UNDERSTANDING OF THE NINTH CIRCUIT LAW, YOUR

5     HONOR, THERE'S NO BASIS HERE FOR A MISTRIAL.

6         THE COURT'S INQUIRY YIELDED ANSWERS FROM THE JURORS,

7     INDICATING THAT THE COMMENT MADE HAD NO AFFECT ON THE

8     DELIBERATIONS. IF ANYTHING, IT SOUNDS LIKE THESE JURORS, THE

9     OTHER JURORS, RECOGNIZED THE UTTER INAPPROPRIATENESS OF THE

10    COMMENT THAT WAS MADE. THE FOREPERSON POINTED THAT OUT. THE

11    JUROR WHO HAD COME IN AND CALLED THIS TO THE COURT'S ATTENTION

12    IN THE FIRST PLACE REBUKED THE JUROR WHO HAD MADE THE COMMENT.

13    FAR FROM INDICATING THAT THIS SOMEHOW TAINTED THE

14    DELIBERATIONS -- WHICH I SUBMIT, UNDER THE LAW, NINTH CIRCUIT

15    LAW, THERE HAS TO BE A SHOWING THIS AFFECTED THE

16    DELIBERATIONS -- WE SIMPLY DON'T HAVE THAT HERE.

17        ON THE CONTRARY, THE STATEMENTS APPARENTLY INDICATE

18    THAT, IF ANYTHING, THIS PREJUDICED MATTEL, THAT CAUSED PEOPLE

19    TO THINK IN THEIR MINDS, 'WELL, MAYBE I NEED TO' -- RIGHT

20    THINKING PEOPLE, THINKING, 'SOMEHOW I NEED TO COUNTERBALANCE

21    THAT AND PERHAPS HEAR THINGS IN A WAY MORE FAVORABLY TO MGA AND

22    MR. LARIAN.'

23        THIS IS NOT A SITUATION WHERE WE'RE REQUIRED TO HAVE,

24    GOING FORWARD, A UNANIMOUS VERDICT OF TEN JURORS. AS THE COURT

25    KNOWS, WE ONLY NEED SIX JURORS. WE HAVE EXTRA JURORS. SO I

EXHIBIT ___2___

PAGE ___23___

5656

1   THAT A JUROR, IN THIS DAY AND AGE, WOULD GO THROUGH THE VOIR

2   DIRE PROCESS THAT WE WENT THROUGH AND THEN HARBOR AND MAKE SUCH

3   A STATEMENT, HARBOR SUCH A FEELING AND THEN MAKE SUCH A

4   STATEMENT.

5        WHAT I THINK THE COURT NEEDS TO DO, THOUGH, IS GIVE

6   BOTH COUNSEL THE OPPORTUNITY TO EXAMINE THE LAW AND PRESENT TO

7   THE COURT HOW THE NINTH CIRCUIT DEALS WITH THIS.  THIS IS THE

8   FIRST TIME I'VE BEEN PRESENTED WITH THIS PARTICULAR TYPE OF

9   ISSUE, SO I NEED TO EDUCATE MYSELF AS A MATTER OF LAW, AND I

10  TRUST COUNSEL WILL ASSIST IN THAT PROCESS.

11       SO I THINK I WILL ACCEPT MR. NOLAN'S INVITATION TO

12  NOT PROCEED WITH TESTIMONY TODAY, BUT TO BRIEF THIS ISSUE GOING

13  FORWARD AND MAKE A DECISION.  I JUST DON'T KNOW.

14       THE AMOUNT OF RESOURCES THAT HAVE BEEN DEVOTED BY

15  BOTH SIDES INTO THIS CASE, IT'S HUGE.  BUT AT THE SAME TIME, NO

16  AMOUNT OF RESOURCES CAN SUBSTITUTE FOR ENSURING THAT WE HAVE A

17  FAIR AND JUST TRIAL.  I'M EXTRAORDINARILY DISAPPOINTED.  BUT I

18  THINK THAT THE COURT NEEDS BRIEFING ON THIS ISSUE.

19       AS IT'S STRUCTURED RIGHT NOW, AS I INDICATED, I HAVE

20  NINE JURORS IN ONE ROOM; I HAVE THE ONE JUROR IN ANOTHER ROOM.

21  MY SENSE IS THAT EVERYBODY AGREES THAT, UNDER ANY SCENARIO --

22  WHETHER WE GO FORWARD WITH THE NINE JURORS THAT WE HAVE, OR

23  OBVIOUSLY, IF THERE'S A MISTRIAL -- THAT JUROR NUMBER 8,

24  MS. STEINGRABER, NEEDS TO BE EXCUSED.

25       **MR. QUINN:**  YES, YOUR HONOR.

EXHIBIT
PAGE ___ 24

5657

1          **MR. NOLAN:**  YOUR HONOR, WE WOULD CERTAINLY AGREE TO

2    THAT.  AND WITHOUT, OBVIOUSLY, IMPACTING ON THE MOTION, SHE

3    SHOULD BE EXCUSED.

4          AND BEFORE WE BREAK, THERE'S ONE OTHER ISSUE THAT I

5    WANTED TO BRING TO THE COURT'S ATTENTION AT SIDE-BAR WITH

6    MR. QUINN THAT JUST CAME TO MY ATTENTION AS WELL THAT I THOUGHT

7    MIGHT ALSO BE INSTRUCTIVE TO THE COURT.

8          **THE COURT:**  ALL RIGHT.  I'LL TAKE THAT UP AT

9    SIDE-BAR.

10          **MR. NOLAN:**  IT'S A SLIGHTLY DIFFERENT ISSUE.

11          **THE COURT:**  BEFORE WE DO THAT, THE COURT WILL INTEND,

12   THEN, TO DISMISS MS. STEINGRABER WITH THE INSTRUCTION THAT

13   SHE'S NOT TO DISCUSS THIS MATTER, DISCUSS THIS CASE, UNTIL

14   ADVISED BY THE COURTROOM DEPUTY THAT THE CASE HAS BEEN

15   COMPLETED, HAS BEEN CONCLUDED.  AND I WILL ACTUALLY ISSUE A

16   WRITTEN ORDER TO THAT EFFECT; THAT SHE IS NOT TO DISCUSS THIS

17   CASE AT ALL WITH ANYBODY.

18          I THINK THAT'S APPROPRIATE IN THIS CASE.

19          COUNSEL, DO YOU AGREE?

20          **MR. NOLAN:**  YES, YOUR HONOR.

21          **MR. QUINN:**  WE AGREE.

22          **THE COURT:**  ALL RIGHT.

23          SO THAT WILL TAKE CARE OF THAT.

24          WITH RESPECT TO THE OTHER JURORS, PENDING YOUR LEGAL

25   BRIEFS ON THE ISSUE OF MISTRIAL, I'LL GIVE LEAVE TO MGA TO FILE

FRIDAY, JULY 25, 2008                    TRIAL DAY 28, MORNING SESSION

EXHIBIT
PAGE ___25___

5658

```
 1   A MOTION, A WRITTEN MOTION, FOR MISTRIAL.  OF COURSE, I'LL GIVE

 2   MATTEL AN OPPORTUNITY TO OPPOSE IT.

 3           IS THERE ANYTHING FURTHER THAT WE NEED TO DO WITH THE

 4   JURY AT THIS TIME, OR SHOULD I SIMPLY SEND THEM HOME AND

 5   INDICATE THAT THEY ARE TO RETURN ON AUGUST 5TH?

 6           MR. NOLAN:  I THINK THAT'S THE APPROPRIATE STEP TO

 7   TAKE, YOUR HONOR.

 8           MR. QUINN:  THE ONE PENDING MATTER, YOUR HONOR, WAS,

 9   THERE IS AN ISSUE ABOUT INSTRUCTION CONCERNING COMMENTS MADE IN

10   THE OPENING.  AND GIVEN THAT WAS SO RECENT, WE DON'T WANT

11   JURORS THINKING ABOUT THAT OR THAT JUST RESONATING IN THEIR

12   MINDS.  THE COURT HAS INDICATED THAT IT'S PREPARED TO GIVE SOME

13   CORRECTIVE INSTRUCTION, AND THAT'S SOMETHING WE'D REQUEST THE

14   COURT DO BEFORE THE JURORS LEAVE.

15           THE COURT:  I'LL TAKE THAT UP, AND I'LL HEAR FROM

16   MGA, BUT I JUST WANT TO GET -- IS THERE ANYTHING ELSE TO DO

17   WITH THESE JURORS?

18           MR. QUINN:  NO, YOUR HONOR.

19           MR. NOLAN:  CAN I JUST HAVE ONE MINUTE TO CONFER WITH

20   MY CLIENT.

21           BEFORE I DO THAT, COULD I JUST MAYBE BRING THIS OTHER

22   ISSUE TO THE COURT'S ATTENTION, SO THE COURT COULD BE AWARE OF

23   THAT?

24           THE COURT:  VERY WELL.  APPROACH SIDE-BAR, COUNSEL.

25           (WHEREUPON, THE FOLLOWING PROCEEDINGS .
```

EXHIBIT ____

PAGE ____ 26

5659

1          WERE HELD AT SIDE-BAR:)

2          **MR. NOLAN:**   THE WITNESS ANNETTE PIMBLETON -- WHO WAS

3    HERE LAST TIME WE WERE HERE, WEDNESDAY, SHE WAS ON THE STAND --

4    REPORTED THIS TO ME -- THIS IS THE FIRST TIME I SAW HER

5    TODAY -- REPORTED THIS TO ME WHILE YOU WERE IN CHAMBERS -- THAT

6    WHEN SHE WAS LEAVING COURT ON WEDNESDAY, SHE WAS IN THE

7    ELEVATOR AND THERE WAS A SECRETARY FROM OUR FIRM IN THERE WHO

8    WAS ACCOMPANYING HER OUT.

9          APPARENTLY, UNBEKNOWNST TO THEM WHEN THEY GOT IN THE

10   ELEVATOR, THERE WAS TWO JURORS, AND ONE OF OUR SECRETARIES WHO

11   IS NOT IN COURT ALL OF THE TIME JUST HAPPENED TO TALK

12   TO MS. PEMBLETON AND SAID 'WHERE DO YOU LIVE?'  AND

13   MS. PEMBLETON SAID SHE LIVES FAR AWAY AND SHE -- THEY WEREN'T

14   TALKING TO THE JURORS, JUST AMONG THEMSELVES -- AND

15   MS. PEMBLETON SAID SHE LIVES PRETTY FAR AWAY.  AND ONE OF THE

16   JURORS SAID 'THEY BROUGHT YOU ALL OF THE WAY OUT HERE FOR JUST

17   TWO MINUTES OF TESTIMONY.'

18         YOU WERE IN CHAMBERS DOING THIS INVESTIGATION WHEN I

19   WAS FIRST TOLD ABOUT THIS, SO THIS IS THE FIRST OPPORTUNITY

20   I'VE BEEN ABLE TO BRING IT TO YOUR ATTENTION.

21         WE DO NOT KNOW FOR CERTAIN WHO THE JUROR IS BECAUSE

22   THEY ARE NOT THAT FAMILIAR WITH THE JURY.

23         MS. AGUIAR, DO YOU HAVE A BETTER SENSE --

24         THE TWO WERE DESCRIBED AS BLONDE AND WE THINK IT MAY

25   HAVE BEEN JUROR NUMBER --

EXHIBIT    2

PAGE    27

1   MEMBERS.

2           ABOUT THE OTHER THING, YOUR HONOR, AS YOU CAN WELL

3   IMAGINE, MR. LARIAN IS VERY EMOTIONAL.

4           THE COURT:  I KNOW.  I'M SURE.

5           MR. NOLAN:  AND HE IS INSISTENT THAT HE WOULD LIKE TO

6   MAKE A STATEMENT, AND I WAS WONDERING WHETHER OR NOT --

7           THE COURT:  WHAT KIND OF STATEMENT?

8           MR. NOLAN:  I THINK HE JUST WANTS TO EXPRESS HIS

9   FEELINGS.  I WAS WONDERING WHETHER OR NOT -- I THINK IF I HAVE

10  A FEW MINUTES I MIGHT BE ABLE TO TALK HIM DOWN.  BUT I HAVE TO

11  TELL YOU --

12          THE COURT:  HE WANTS TO ADDRESS THE COURT?

13          MR. NOLAN:  YES.  HE MAY WANT TO IN OPEN COURT.

14          AS YOU MAY HAVE SUSPECTED -- AND I SAY THIS WITH ALL

15  RESPECT -- HE IS A VERY STRONG MINDED INDIVIDUAL, AND WHEN WE

16  SUSPECTED WHAT WAS HAPPENING -- AND THIS IS JUST PURE

17  SPECULATION, BUT -- I HAVE TO TELL YOU THAT HE BROKE DOWN IN

18  SUCH A WAY -- EVEN IF YOU HAD NOT EXCUSED JUROR NUMBER EIGHT, I

19  WOULD HAVE COME TO YOU AND SAID THAT MR. LARIAN CANNOT TESTIFY

20  TODAY, HE'S TOO EMOTIONAL.

21          THE COURT:  IT'S JUST TERRIBLE.  I CAN'T -- I

22  UNDERSTAND HOW HE MUST FEEL.  AT THE SAME TIME -- AND THIS IS

23  WHERE I HAVE TO WAIT TO SEE THE LAW -- I REALLY DID -- AND IT'S

24  PROBABLY NOT GOING TO COME ACROSS IN THE TRANSCRIPT VERY WELL,

25  BUT I'M CONVINCED THAT THESE JURORS WERE TRULY -- SEVERAL OF

EXHIBIT 2
PAGE ____ 28

5662

```
 1    THE JURORS IN PARTICULAR THOUGHT THIS WAS ABHORRENT, AND I'M

 2    CONVINCED WE HAVE A JURY OF NINE PEOPLE WHO ARE REALLY --

 3    NEITHER ARE THEY GOING TO BE UNFAIR TO MGA AND MR. LARIAN OR TO

 4    MATTEL.  I TRIED TO EXPLORE THIS, BECAUSE I COULD SEE AN

 5    OVERCOMPENSATION.

 6              AT THE SAME TIME, THIS IS A CANCER --

 7         MR. NOLAN:  IT'S A TOUGH ISSUE, YOUR HONOR.

 8         THE RESEARCH WE DID DURING THE BREAK, YOUR HONOR --

 9         THE COURT:  I JUST NEED TO CONSIDER THE LEGAL

10    STANDARD, IN LIGHT OF THE FINDINGS.

11              I'M GOING TO TYPE UP MY FINDINGS AND ISSUE THEM IN

12    THE FORM OF A MINUTE ORDER SO YOU HAVE THOSE FINDINGS BASED ON

13    YOUR -- YOU REQUESTED THE IN-CAMERA MEETING WITH THE JURORS --

14    I'M RELUCTANT TO GO DOWN THE ROAD OF OPENING UP FURTHER

15    QUESTIONING OF THE JURY ON THIS, UNLESS COUNSEL IS SEEKING

16    THAT.

17         MR. NOLAN:  WHAT I REALLY NEED TO DO IS REFLECT ON

18    THIS AND GET SOME OF OUR BEST MINDS UNDERSTANDING WHAT THE LAW

19    IS ON THIS STANDARD.

20         THE COURT:  MR. QUINN, ARE YOU REQUESTING ANYTHING

21    FURTHER?

22         MR. QUINN:  NO, WE'RE NOT.  JUST THAT QUESTION OF THE

23    CORRECTIVE INSTRUCTION FROM --

24         THE COURT:  IN TERMS OF THE JURY, YOU'RE NOT --

25         MR. QUINN:  NO.  WE'RE NOT REQUESTING ANYTHING
```

EXHIBIT 2

PAGE 29

1   FURTHER.

2           THE COURT:   AND YOU'RE NOT SEEKING ANY QUESTIONS AT

3   THIS TIME?

4           MR. NOLAN:   NO.  NOT AT THIS TIME.

5           THE COURT:   WHAT I'M GOING TO INCLUDE IN MY FINDING

6   IS THE STATEMENT ITSELF.  I'VE HEARD THE STATEMENT.  THERE'S

7   NINE VARIATIONS, BUT I HAVE THE ESSENCE OF IT AND WHAT IT IS IS

8   THAT APPARENTLY SHE STATED THAT HER HUSBAND IS AN ATTORNEY, AND

9   THAT HE HAS ANY NUMBER OF IRANIAN CLIENTS -- SHE SAID ONE, A

10   CLIENT, OR SOME SEVERAL CLIENTS -- AND ESSENTIALLY THAT THEY

11   ARE STUBBORN AND THAT THEY ARE THIEVES, BASICALLY.

12           MR. NOLAN:   YOUR HONOR, THAT'S WHAT I NEEDED TO -- I

13   WANT TO GO HOME.  IT'S ONE OF THOSE TROUBLING MOMENTS.

14           THE COURT:   I KNOW HOW TROUBLING THIS MUST BE TO

15   MATTEL.

16           MR. QUINN:   WE DON'T KNOW HOW IT SHAKES OUT IN

17   PEOPLE'S MINDS.  IT RAISES A QUESTION.

18           MR. NOLAN:   I'M NOT GOING TO ARGUE THAT.  MY

19   MOTHER --

20           HERE'S MY PROBLEM, AND I NEED THE COURT'S GUIDANCE ON

21   THIS.

22           WOULD THE COURT ENTERTAIN HEARING FROM MR. LARIAN?

23           THE COURT:   IN CHAMBERS?

24           MR. NOLAN:   YES.

25           THE COURT:   YES, IN CHAMBERS.

1           **THE COURT:**  YES.  THEN WE'LL TAKE UP THAT OTHER

2    MATTER.

3           **MR. NOLAN:**  THANK YOU.

4           **THE COURT:**  COURT IS IN RECESS.

5           (OPEN COURT PROCEEDINGS CONCLUDED.)

6

7

8                         CERTIFICATE

9

10   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
11   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

13

14   _____          8-7-08
     THERESA A. LANZA, CSR, RPR                 DATE
15   FEDERAL OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25

EXHIBIT
PAGE ___ 31

# EXHIBIT 3

EXHIBIT FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 4

5676

1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3                     EASTERN DIVISION

4                       - - -

5     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                       - - -

**CERTIFIED COPY**

7     MATTEL, INC.,                    )
                                       )
8                   PLAINTIFF,         )
                                       )
9          VS.                         )  NO. CV 04-09049
                                       )
10    MGA ENTERTAINMENT, INC., ET. AL.,)
                                       )
11                  DEFENDANTS.        )  DEFENDANT'S
                                       )  MOTION FOR MISTRIAL
12    AND CONSOLIDATED ACTIONS,        )  PAGES 5676-5721
                                       )
13    _____)

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                RIVERSIDE, CALIFORNIA

17               MONDAY, AUGUST 4, 2008

18                    1:06 P.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
            FEDERAL OFFICIAL COURT REPORTER
24             3470 12TH STREET, RM. 134
              RIVERSIDE, CALIFORNIA  92501
25                  951-274-0844
                WWW.THERESALANZA.COM

5677

```
 1    APPEARANCES:

 2

      ON BEHALF OF MATTEL, INC.:
 3
                          QUINN EMANUEL
 4                        BY:   JOHN QUINN
                                JON COREY
 5                              MICHAEL T. ZELLER
                                BILL PRICE
 6                              DYLAN PROCTOR
                          865 S. FIGUEROA STREET,
 7                        10TH FLOOR
                          LOS ANGELES, CALIFORNIA  90017
 8                        213-624-7707

 9

10

11    ON BEHALF OF MGA ENTERTAINMENT:

12                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                          BY:   THOMAS J. NOLAN
13                              JASON RUSSELL
                                LAUREN AGUIAR
14                              CARL ROTH
                          300 SOUTH GRAND AVENUE
15                        LOS ANGELES, CALIFORNIA  90071-3144
                          213-687-5000
16

17    ALSO PRESENT:       JEROME FALK

18

19

20

21

22

23

24

25
```

MONDAY, AUGUST 4, 2008

MOTION FOR MISTRIAL

EXHIBIT ___4___

PAGE ___63___

5678

```
 1                        I N D E X

 2                                                PAGE

 3     MOTION FOR MISTRIAL............................   5679

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MONDAY, AUGUST 4, 2008                    MOTION FOR MISTRIAL

EXHIBIT        4
PAGE        64

5679

1    RIVERSIDE, CALIFORNIA; MONDAY, AUGUST 4, 2008; 1:06 P.M.

2                              -O0O-

3           THE CLERK:  CALLING CALENDAR ITEM 10, CASE NUMBER

4    CV04-09049-SGL, MATTEL, INC., V. MGA, INC., ET AL.

5           MAY WE HAVE COUNSEL PLEASE COME FORWARD AND STATE

6    YOUR APPEARANCES FOR THE RECORD.

7           MR. QUINN:  GOOD AFTERNOON.  JOHN QUINN, BILL PRICE,

8    DYLAN PROCTOR AND MIKE ZELLER, APPEARING FOR MATTEL.

9           MR. NOLAN:  GOOD AFTERNOON, YOUR HONOR.  TOM NOLAN,

10   JASON RUSSELL, LAUREN AGUIAR, RAOUL KENNEDY FROM SKADDEN ARPS

11   ON BEHALF OF MGA, AND ALSO INTRODUCING JEROME FALK FROM

12   HOWARD RICE.

13          THE COURT:  COUNSEL, GOOD AFTERNOON.

14           WE'RE ON CALENDAR THIS AFTERNOON FOR DEFENDANT'S

15   MOTION FOR MISTRIAL.  THERE IS ONE DEVELOPMENT I WANT TO BRING

16   TO COUNSEL'S ATTENTION.  THE COURT RECEIVED A LETTER FROM JUROR

17   NUMBER EIGHT WHICH THE COURT IS NOT GOING TO DISCLOSE TO THE

18   PARTIES.  I'M GOING TO SUMMARIZE THE CONTENT.

19           THE LETTER IS DIRECTED PERSONALLY TO THE COURT.  SHE

20   EXPRESSES HER SHOCK AND SENSE OF PERSONAL HUMILIATION OVER THE

21   ENTIRE INCIDENT, INDICATING THAT SHE VEHEMENTLY OBJECTS TO THE

22   STATEMENTS THAT HAVE BEEN ATTRIBUTED TO HER.  SHE INDICATES

23   THAT HER REFERENCE TO MR. LARIAN'S ETHNICITY WAS IN THE CONTEXT

24   OF A POSSIBLE LANGUAGE BARRIER.  SHE INDICATES SHE HAS NOT

25   DISCUSSED THIS CASE WITH ANYBODY ELSE.  SHE INDICATES THAT SHE

MOTION FOR MISTRIAL

EXHIBIT ___4___

PAGE ___65___

5682

1    OUR SYSTEM.

2         THE CORNERSTONE OF THE AMERICAN SYSTEM OF JUSTICE IS

3    THAT ANY PARTY, REGARDLESS OF RACE, ETHNICITY, NATIONAL ORIGIN,

4    WALK THROUGH THESE DOORS WITH ONE SIMPLE GUARANTEE, AND THAT IS

5    THAT IF THEY ARE FACING A TRIAL, THEY HAVE A CONSTITUTIONAL

6    RIGHT TO A UNANIMOUS VERDICT OF FAIR AND IMPARTIAL JURORS.

7         DESPITE THE LETTER THAT YOU REFERENCED AT THE START

8    OF TODAY'S HEARING, THE COURT'S FINDINGS MAKE IT CLEAR.  JUROR

9    NUMBER EIGHT -- AFTER YOU INTERVIEWED NINE OF THE JURORS, YOU

10   MADE A FINDING THAT SHE MADE GROSSLY INAPPROPRIATE REMARKS

11   REGARDING ISAAC LARIAN.  NOT BASED ON THE WEIGHT OF THE

12   EVIDENCE, NOT BASED ON THE QUALITY OF THE ARGUMENTS, BUT RATHER

13   BASED ON A PRECONCEIVED IDEA, BIAS, THAT IRANIANS ARE STUBBORN,

14   RUDE, STINGY, ARE THIEVES AND HAVE STOLEN OTHER PERSON'S IDEAS.

15   STATEMENTS THAT ARE REPUGNANT EVEN TO MENTION AND REPEAT.  YET

16   THE NOTION THAT A JUROR WOULD UTTER THESE STATEMENTS IN THE

17   DELIBERATION ROOM CANNOT BE IGNORED, AND, I RESPECTFULLY

18   SUBMIT, UNDER NO CIRCUMSTANCE CAN BE VIEWED AS HAVING SAT

19   THROUGH THIS TRIAL AS A FAIR AND IMPARTIAL JUROR, A RIGHT THAT

20   WE WERE REQUIRED TO HAVE.

21        MATTEL TAKES THE POSITION THAT YOU SHOULD ACTUALLY

22   APPLY A RULE OF EVIDENCE, 606(B), TO IGNORE WHAT WE NOW KNOW TO

23   BE THE FACTS; THAT IS, THAT THE STATEMENT WAS MADE.

24        THIS IS NOT LIKE IN THE HENLEY CASE, WHERE THE COURT,

25   IN DICTUM, ALBEIT BUT VERY WELL REASONED DICTUM, REMANDED THE

MONDAY, AUGUST 4, 2008          MOTION FOR MISTRIAL    EXHIBIT    4

                                              PAGE    66

1   MATTER BACK TO JUDGE TAYLOR BECAUSE JUDGE TAYLOR HAD NOT DONE

2   WHAT THIS COURT DID IN THE FIRST INSTANCE.  UPON RECEIPT OF THE

3   NOTE FROM JUROR NUMBER SIX, YOU ACTED SWIFTLY, DECISIVELY; YOU

4   EXERCISED YOUR POWERS AND AUTHORITY TO GET TO THE BOTTOM OF

5   WHAT THE ISSUE WAS THAT WAS EXPRESSED IN JUROR NUMBER SIX,

6   WITHOUT ANY INTENT AND WITHOUT ANY DESIGN TO PROBE THE

7   DELIBERATIVE PROCESS WHICH, OF COURSE, 606(B) MIGHT PROHIBIT.

8        WHAT MATTEL, THOUGH, IS NOW POSING FOR YOUR HONOR IS

9   HAVING DONE WHAT WE AGREED WAS THE RIGHT THING FOR YOU TO DO --

10.  MR. QUINN SUGGESTED IT; I AGREED WITH IT -- TO INTERVIEW THE

11   JURORS TO CONFIRM OR DETERMINE WHAT WAS SAID -- NOW THAT YOU

12   HAVE FOUND IT, NOW THAT WE ALL KNOW ABOUT IT, THEY PROPOSE THAT

13   WE IGNORE IT; THAT WE ONLY LOOK AT IT PROSPECTIVELY.

14        THE COURT, IN DESCRIBING JUROR NUMBER EIGHT, USED

15   SUCH TERMS AS "A CANCER IN THIS JURY;" THAT EVERY JUROR HAD

16   AGREED THAT IT WOULD BE WRONG FOR THIS CASE TO PROCEED WITH

17   JUROR NUMBER EIGHT AS A JUROR.  AND YOU CAME OUT AND YOU MADE

18   THAT STATEMENT AND BOTH SIDES AGREED THAT PROSPECTIVELY JUROR

19   NUMBER EIGHT SHOULD NOT SIT.

20        BUT THAT ONLY DEALT WITH ONE OF THE ISSUES, AND THAT

21   IS THE PROSPECTIVE NATURE OF HER SERVICE.  IT IGNORED WHAT I

22   SUBMIT, YOUR HONOR, IS WHAT EVERY COURT THAT HAS EVER DEALT

23   WITH THIS ISSUE, THAT HAS EVER RECOGNIZED THIS ISSUE, FACED

24.  WITH RACIAL COMMENTS, RACIAL BIAS EXPRESSED BY A JUROR, THERE

25   HAS BEEN NO COURT THAT HAS IGNORED IT.

5684

1    AND I RESPECTFULLY SUBMIT, YOUR HONOR, THAT THE

2   REASON FOR THAT IS THAT NO RULE OF EVIDENCE OF 606(B), NO

3   INTERVIEW OF A JUROR WHERE THEY DENY OR TRY TO MINIMIZE THE

4   EFFECT OF THEIR COMMENTS CAN JUSTIFY ALLOWING IN THIS CIRCUIT

5   ONE PARTIAL JUROR SITTING THROUGH THE PROCESS.  ONE BIASED

6   JUROR IS ALL THAT IS NECESSARY TO TAINT A VERDICT.

7    A JURY IS VIEWED AS ACTING AS A UNIT.  THERE IS NO

8   ISSUE IN THIS CASE THAT AS A UNIT, THAT UNIT RETURNED A VERDICT

9   WHICH WE RESPECTFULLY SUBMIT, YOUR HONOR, IS TAINTED.  AND YOU

10  DON'T HAVE TO GO TO THE DELIBERATIVE PROCESS; YOU MERELY HAVE

11  TO GO TO THE FACT THAT JUROR NUMBER EIGHT HAD THE BELIEF, AND

12  EXPRESSED IT, THAT IRANIANS ARE THIEVES AND THEY STEAL OTHER

13  PEOPLE'S IDEAS.

14    YOU KNOW, IN HENLEY WHERE THEY SAY IT'S DICTUM AND IN

15  ESTRADA THEY SAY IT'S STILL AN OPEN ISSUE IN THE NINTH CIRCUIT.

16  IF YOU LOOK AT THE COMMENTS COMPLAINED OF IN HENLEY, THERE, AS

17  INCREDIBLE AS IT IS THAT IN A CASE LIKE THIS, IN TODAY'S WORLD,

18  SOMEBODY WOULD MAKE A STATEMENT SUCH AS JUROR NUMBER EIGHT DID

19  IN THIS CASE.  IN HENLEY THEY USED THE "N" WORD.  THE NINTH

20  CIRCUIT AGAIN NOTED 'HOW CAN IT BE IN OUR SYSTEM, IN TODAY'S

21  WORLD, THAT SOMEBODY COULD MAKE THAT COMMENT?'

22    BUT, YOU KNOW, THE COMMENT THAT WAS MADE IN HENLEY

23  WAS A GENERAL COMMENT.  IN THIS CASE, JUROR NUMBER EIGHT, NOT

24  ONLY IN EXPRESSING AN OBVIOUS BIAS APPLIED THAT BIAS TO THE

25  FACTUAL SITUATION PRESENTED IN THIS CASE A LA THE ALLEGATION

1  THAT MGA AND MR. LARIAN STOLE AN IDEA FROM MGA.  ·SHE NOT ONLY

2  EXPRESSED IT WITH PARTICULARITY TOWARDS THE FACTS OF THIS CASE,

3  BUT SHE ALSO DID SO IN TRYING TO CONVINCE OTHER JURORS IN THE

4  VOTING PROCESS.

5        YOUR HONOR, I WANT TO END -- AND I HOPE I HAVE ONE

·6  MORE MINUTE LEFT -- BECAUSE I THINK THAT WHAT IS ALSO ON

7  EVERYBODY'S MIND IS, 'MY GOSH, LOOK AT THE RESOURCES THAT HAVE

8  BEEN DEVOTED, NOT ONLY BY THIS COURT, BY THE STAFF, BY THE

9  LAWYERS, THE EXPENSE; IT'S BEEN ENORMOUS -- BUT I THOUGHT THAT

10 IN HELLER, UNITED STATES VERSUS HELLER, THE ELEVENTH CIRCUIT

11 DECISION, I THOUGHT THEY PUT IT PROBABLY THE MOST APTLY, AND I

12 WOULD JUST ASK THAT I COULD READ IT.  THIS IS READING FROM

13 PAGE 5 OF THE OPINION:

14        "THE BIGOTRY DISPLAYED IN THIS CASE IS REMINISCENT OF

15 ANOTHER LESS CIVILIZED ERA WHEN ANTI SEMATIC AND RACIST

16 SENTIMENTS WERE UNFORTUNATELY CONSIDERED ACCEPTABLE, EVEN IN

17 POLITE SOCIETY.  WE CONCLUDE THAT WE MUST ACT IN THE ONLY WAY

18 OPEN TO US TO ENSURE THAT PREJUDICE PLAYS NO ROLE IN THE

19 FUNCTIONING OF OUR JUDICIAL SYSTEM.  ALTHOUGH WE ARE AWARE THAT

20 THE TRIAL IN THIS CASE LASTED 12 WEEKS, AND THE TRIAL WILL

21 ENTAIL CONSIDERABLE TIME AND EXPENSE, THIS FACTOR CANNOT EVEN

22 BE WEIGHED IN THE BALANCE WHEN THE RIGHT OF AN INDIVIDUAL TO A

23 FAIR TRIAL HAS BEEN SO SEVERELY COMPROMISED."

24        YOUR HONOR, WE RESPECTFULLY SUBMIT THAT THE COURT

25 CONDUCTED THE RIGHT INVESTIGATION, ASCERTAINED THAT JUROR

5686

1   NUMBER EIGHT WAS, IN FACT, BIASED.  AS A RESULT OF THAT,

2   UNFORTUNATELY MGA AND ISAAC LARIAN DID NOT HAVE THE GUARANTEED

3   UNANIMOUS VERDICT OF TEN FAIR AND IMPARTIAL JURORS.  NINE

4   SIMPLY WAS NOT ENOUGH.

5            THANK YOU.

6            **THE COURT:**  THANK YOU, COUNSEL.

7            MR. QUINN?

8            **MR. QUINN:**  GOOD AFTERNOON, YOUR HONOR.

9            ON A GENERAL LEVEL, IT'S IMPOSSIBLE TO DISAGREE WITH

10  THE GENERAL PRINCIPALS THAT MR. NOLAN ENUNCIATED AND WITH WHICH

11  HE BEGAN HIS REMARKS TO THE COURT.  BUT THERE'S SOMETHING ELSE

12  THAT IS AT ISSUE HERE THAT'S OF EQUAL IMPORTANCE, AND THAT IS

13  THAT THIS IS A COURT OF LAW AND THERE ARE LAWS AND RULES THAT

14  HAVE CONDUCTED THIS TRIAL.  THERE HAVE BEEN EVIDENTIARY RULINGS

15  THAT THE COURT IS WELL AWARE THAT HAVE BEEN SIGNIFICANT;

16  EVIDENCE HAS NOT COME IN.  THE COURT HAS MADE ITS JUDGMENTS.

17           AND THERE ARE EVIDENTIARY RULINGS THAT APPLY TO THIS

18  SITUATION HERE.

19           RULE 606(B) ABSOLUTELY EXCLUDES THE COURT'S

20  CONSIDERATION OF THE JUROR'S COMMENT FOR THE PURPOSE OF

21  IMPEACHING THE JURY VERDICT.  WE NEVER AGREED THAT WAS

22  ADMISSIBLE FOR THE PURPOSE OF IMPEACHING THE VERDICT.  LET ME

23  JUST BE CLEAR ABOUT THAT.  IN AGREEING TO THE PROCESS THAT THE

24  COURT WOULD RESPOND TO JUROR NUMBER SIX'S CONCERNS BY FOLLOWING

25  UP, WE NEVER AGREED TO THAT THAT IT WOULD BE ADMISSIBLE FOR

5692

1          THAT'S AS CLOSE AS IT GOT.

2          IN OTHER WORDS, THE TOOL THAT'S AVAILABLE HERE TO

3    FERRET OUT BIAS OR PREJUDICE SIMPLY WASN'T UTILIZED.

4          IT'S NOT ENOUGH TO EXPECT, AND THE LAW IS CLEAR THAT

5    WE DON'T EXPECT JURORS TO VOLUNTEER PREJUDICE OR BIAS; THAT'S

6    THE UNITED STATES VS. AGUON CASE, AND THE HARD CASE WHERE THE

7    JUROR HAD FORMERLY BEEN EMPLOYED BY A PREDECESSOR RAILROAD THAT

8    WAS A PARTY TO THE CASE, AND THE CLAIM WAS MADE, 'WELL, YOU

9    SHOULD HAVE VOLUNTEERED THE FACT' -- 'THE JUROR SHOULD HAVE

10   VOLUNTEERED THE FACT THAT THEY HAD BEEN EMPLOYED BY A

11   PREDECESSOR ENTITY.' AND THE COURT SAID 'NO, WE DON'T EXPECT

12   THAT OF JURORS. YOU HAVE TO ASK DIRECTLY. IF YOU WANTED TO

13   KNOW THAT, COUNSEL SHOULD HAVE ASKED THAT.'

14         THE LOPEZ VERSUS ARAMARK CASE, IT WAS A SEXUAL ABUSE

15   CASE, AND THE JUROR WAS ASKED QUESTIONS ABOUT SEXUAL HARASSMENT

16   BUT NOT SEXUAL ABUSE AND DENIED THAT THEY HAD ANY EXPERIENCE

17   WITH SEXUAL ABUSE, ALTHOUGH APPARENTLY THE ISSUE IN THE CASE

18   WAS SEXUAL HARASSMENT. IN OTHER WORDS, THE QUESTION ASKED OF

19   THE JUROR WASN'T SQUARELY ON POINT. AND THE NINTH CIRCUIT SAID

20   YOU'VE GOT TO ASK; DELVE INTO THE SPECIFIC CONDUCT AT ISSUE.

21   THAT'S SIMPLY NOT CLOSE ENOUGH.

22         BUT, YOUR HONOR, THE COURT DID INTERVIEW THE JURORS

23   HERE, AND WHAT HAPPENED IS, AND WE KNOW AND THE COURT KNOWS,

24   THAT NINE FAIR AND IMPARTIAL JURORS RULED AGAINST MGA AND

25   MR. LARIAN AND THEIR VERDICT WAS NOT INFLUENCED BY JUROR NUMBER

EXHIBIT  4
PAGE  71

5693

1   EIGHT.  THE COURT KNOWS THAT.  YET MGA SAYS THAT JUROR NUMBER

2   EIGHT'S COMMENTS REQUIRE THIS COURT TO THROW OUT THIS VERDICT

3   EVEN THOUGH THOSE OTHER JURORS EXPRESSED DISMAY AT THE COMMENT.

4          I SUBMIT, YOUR HONOR, THAT THE LAW DOES NOT REQUIRE

5   SUCH AN ABSURD RESULT.

6          THE COURT:  THANK YOU, COUNSEL.

7          LET ME BEGIN WITH THE 606 ANALYSIS.

8          MATTEL IS CORRECT THAT 606 DOES PRECLUDE CERTAIN

9   INQUIRIES.  HOWEVER, MY SENSE, HAVING INTERVIEWED THE JURORS,

10  IS THAT THIS FALLS SQUARELY WITHIN THE EXCEPTION TO 606(B).

11         I KNOW BOTH COUNSEL -- AND I RECOGNIZE THIS AT THE

12  OUTSET -- ARE AT SOMEWHAT OF A DISADVANTAGE.  I HAVE NOT

13  RELEASED THE TRANSCRIPTS OF THOSE IN-CAMERA JUROR INTERVIEWS.

14  YOU STIPULATED FOR THE COURT TO DO IT.  I THINK COUNSEL FOR MGA

15  HAD ASKED ME TO RELEASE THEM.  BUT I'M HOLDING OFF PRECISELY

16  BECAUSE OF THE 606 ISSUE, BECAUSE THERE ARE QUESTIONS AND

17  DISCUSSIONS WITH A JUROR THAT DO TOUCH UPON THEIR

18  DELIBERATIONS, WHICH I DO NOT BELIEVE, LEGALLY OR ETHICALLY,

19  CAN OR SHOULD BE DISCLOSED.

20         BUT IT PUTS THE COURT IN THE AWKWARD POSITION OF

21  BEING THE SOLE POSSESSOR OF THE INFORMATION.  AND I'M RELATING

22  MY FINDINGS, AND THE RECORD IS THERE, OF COURSE, FOR THE

23  APPELLATE COURTS TO REVIEW NO MATTER WHAT THE OUTCOME OF THIS

24  IS; SO I FEEL VERY CONVINCED ON THOSE FINDINGS.  I HAVE READ

25  AND REREAD THOSE TRANSCRIPTS.

MONDAY, AUGUST 4, 2008                    MOTION FOR MISTRIAL

EXHIBIT    4
PAGE    78

5694

1         BUT I THINK IT'S IMPORTANT THAT EVERYONE UNDERSTAND

2  WHAT IT IS THE COURT FOUND AND WHAT IT IS THAT THE COURT DID

3  NOT FIND.

4         FIRST OF ALL, WITH RESPECT TO THE STATEMENT, THERE'S

5  NO QUESTION THAT THERE WAS A GROSSLY INAPPROPRIATE STATEMENT

6  MADE.  ALL OF THE JURORS WHO HEARD SUCH A STATEMENT, WHICH IS

7  EIGHT OF THE NINE, PUTTING ASIDE OF COURSE JUROR NUMBER EIGHT

8  FOR A MOMENT, CHARACTERIZED OR AGREED THAT THE STATEMENT WAS

9  GROSSLY INAPPROPRIATE.  THERE WAS ONE JUROR WHO DID NOT HEAR

10  THE STATEMENT; A COUPLE OF THE OTHER JURORS INDICATED THEY

11  THOUGHT PERHAPS A JUROR MAY HAVE BEEN AWAY; SO IT WAS VERY

12  CONSISTENT.  I HAVE NO CONCERN OVER THAT ONE JUROR WHO DID NOT

13  HEAR THE STATEMENT.  THAT DOESN'T ADD TO THIS MIX ONE WAY OR

14  THE OTHER.  BUT A GOOD EIGHT OF THEM ALL HEARD THE STATEMENT

15  AND THEY VIEWED IT AS INAPPROPRIATE.

16         SOMETHING WHICH MAY BE A COMMENTARY ON EYEWITNESS

17  TESTIMONY, ALL EIGHT HAD A SLIGHTLY DIFFERENT VERSION OF WHAT

18  WAS SAID.  AND WHEN I SET FORTH MY FINDING INDICATING THE

19  VARIOUS STATEMENTS, THAT WAS AN AMALGAM OF ALL OF THE DIFFERENT

20  STATEMENTS.  NO ONE JUROR INDICATED THAT ALL THOSE THINGS WERE

21  SAID; SO I DON'T WANT IT TO BE VIEWED OR PORTRAYED ON THE

22  RECORD THAT SOMEHOW ALL OF THOSE THINGS WERE NECESSARILY SAID.

23  IT WAS AN AMALGAM OF THE DIFFERENT COMMENTS THAT THE JURORS

24  HEARD.

25         OF SIGNIFICANCE TO 606(B) IS THE FACT THAT OF THE

MONDAY, AUGUST 4, 2008        MOTION FOR MISTRIAL

EXHIBIT  4

PAGE  13

1  TO THINK I'M GIVING THEM SHORT SHRIFT --

2         **MR. NOLAN:** WE WOULD NEVER SUGGEST THAT, YOUR HONOR.

3         **THE COURT:** -- BECAUSE IT'S QUITE THE CONTRARY.  IT'S

4  SOMETHING WHICH I HAVE REVIEWED OVER AND OVER AND OVER AGAIN.

5  I REALLY BELIEVE THAT RACISM AND ETHNICISM, AND ANY OF THE

6  OTHER -ISMS, HAVE NO PLACE IN THIS COUNTRY.  BUT WE CANNOT

7  ALLOW OUR COMMITMENT TO ERADICATING RACISM OR BIGOTRY TO

8  PARALYZE US.

9         AND WE HAVE A JURY HERE WHO I AM CONVINCED IS NOT

10  ONLY COMPETENT IN THE SENSE THAT THEY HAVE PAID TREMENDOUS

11  ATTENTION IN THIS TRIAL.  THEY DIDN'T EVEN FLINCH WHEN WE

12  ANNOUNCED -- WHICH WAS A SURPRISE TO THEM -- ABOUT PHASE TWO;

13  THEY REALLY THOUGHT THEY WERE DONE.  THAT CAME ACROSS LOUD AND

14  CLEAR IN MY INTERVIEWS AS WELL.  THEY THOUGHT THIS WAS ALL OVER

15  WHEN THEY RETURNED THAT VERDICT.  BUT THEY DID NOT FLINCH IN

16  THEIR DUTY.  WHEN SOMETHING INAPPROPRIATE CAME UP, THEY

17  IMMEDIATELY SHUT IT DOWN.

18         IF ONLY EVERY JUROR IN THIS COUNTRY WOULD REACT TO

19  RACISM OR BIGOTRY THE WAY THIS JURY REACTED TO THIS STATEMENT

20  THAT WAS INTRODUCED INTO THE JURY DELIBERATION ROOM, WE WOULD

21  HAVE A MUCH BETTER JURY SYSTEM.

22         **MR. NOLAN:** YOUR HONOR, I ACCEPT THAT.

23         IF I COULD JUST IMPROVE UPON THAT ONE MOMENT SO THAT

24  WE WOULD AVOID THIS ISSUE AND WHY I IMPLORE THE COURT TO

25  RECONSIDER ON THIS BASIS, IS THAT I COMMEND THE JUROR FOR

MOTION FOR MISTRIAL
EXHIBIT 4
PAGE 74

5712

1   REBUKING JUROR NUMBER EIGHT. BUT WHAT I CANNOT COMMEND IS THEM

2   NOT REPORTING THAT TO THE COURT. BECAUSE HAD THEY REPORTED IT

3   TO THE COURT AT THAT TIME, WE WOULD NOT HAVE THIS ISSUE AND WE

4   WOULD NOT HAVE THIS DOUBT. BECAUSE THE COURT WOULD HAVE

5   IMMEDIATELY EXCUSED JUROR NUMBER EIGHT AND ORDERED THE JURY TO

6   GO BACK AND RE DELIBERATE TO START OVER AGAIN.

7           THE COURT: AND MR. NOLAN, THE COURT IS WILLING TO DO

8   SO AT THIS POINT. I WILL GIVE MGA LEAVE TO SEEK A RE

9   DELIBERATION. I WILL INSTRUCT THE JURY THAT THEY ARE TO

10  COMPLETELY DISREGARD ANYTHING THEY HEARD IN THE OPENING

11  STATEMENTS FOR PHASE 1-B. AND I WILL ORDER THAT JURY, WHICH I

12  HAVE COMPLETE CONFIDENCE IN, TO FULLY RE DELIBERATE, IF THAT IS

13  WHAT MGA WANTS.

14          I TOOK IT FROM YOUR REPLY THAT YOU WERE REBUKING THAT

15  SUGGESTION BY PLAINTIFF. BUT IF THAT IS SOMETHING THAT YOU

16  WANT, I WOULD DO IT IN A HEARTBEAT.

17          MR. NOLAN: IN LIGHT OF THIS, YOUR HONOR, I'LL HAVE

18  TO CONSIDER THIS WITH MY CLIENT.

19          BUT THE LAST POINT I WANT TO MAKE ON THE ANALYSIS ON

20  ESTRADA. YOU MADE REFERENCE TO THE VOIR DIRE AND I WANT TO GO

21  BACK TO THIS VERY QUICKLY, BECAUSE IT IS INCOMPREHENSIBLE TO ME

22  THAT IN THE MANNER IN WHICH THE VOIR DIRE WAS CONDUCTED, WHICH

23  FIRST WAS PRECEDED BY MINI OPENING STATEMENTS, WHERE MY

24  REFERENCE AFTER BOTH MINI OPENING STATEMENTS TALKED ABOUT

25  MR. LARIAN'S TRAVELS TO THE UNITED STATES TO BECOME A CITIZEN,

EXHIBIT    4

PAGE    74

5713

1  BECOME A SUCCESSFUL BUSINESSMAN; THAT WAS WHAT I ATTRIBUTED TO

2  THE AMERICAN DREAM.

3         **THE COURT:**  I UNDERSTAND THAT.  AND THERE WERE EVEN

4  MORE -- I DON'T THINK MR. QUINN NECESSARILY DID JUSTICE --

5  THERE'S OTHER QUESTIONS AS WELL WHERE WE, PARTICULARLY THE

6  COURT, OVER AND OVER AND OVER AGAIN, ASKED THIS JURY "IS THERE

7  ANYTHING THAT WOULD SUGGEST THAT YOU WOULD NOT BE FAIR TO BOTH

8  PARTIES?"  TIME AND TIME AGAIN, I ASKED THEM IF ANYTHING COMES

9  UP.

10         BUT I'M CONVINCED THIS JUROR, JUROR NUMBER EIGHT DOES

11  NOT BELIEVE THAT HER -- THROUGH WHATEVER PRECONCEPTIONS SHE

12  DOES AND DOES NOT HAVE, WOULD HAVE AFFECTED HER JURY.  IT'S

13  RECONFIRMED IN THIS LETTER ONCE AGAIN THAT SHE JUST SENT TO THE

14  COURT.  SHE BELIEVES SHE DECIDED THIS CASE STRICTLY ON THE

15  EVIDENCE; THAT THIS COMMENTARY HAD ABSOLUTELY NOTHING TO DO

16  WITH ANY BIAS OR UNFAIRNESS TO ONE SIDE OR THE OTHER.

17         **MR. NOLAN:**  RESPECTFULLY, YOUR HONOR, I DON'T BELIEVE

18  THAT'S THE TEST.  I THINK THE TEST UNDER ESTRADA AND OTHER

19  CASES WOULD BE THAT I WAS ENTITLED TO KNOW -- WHEN WE ASKED --

20  AND YOU ASKED MORE TIMES THAN MOST JUDGES HAVE DONE IN THIS

21  SYSTEM -- ABOUT "ARE THERE ANY PREJUDICES?  ARE THERE ANY

22  BIASES?"

23         **THE COURT:** -- THAT WOULD AFFECT YOUR ABILITY -- WE

24  ALL HAVE BIASES.  MR. NOLAN, YOU HAVE BIASES.  YOU'VE MADE

25  REFERENCE TO BEING IRISH CATHOLIC.  WE ALL HAVE OUR NOTIONS AND

MOTION FOR MISTRIAL

EXHIBIT _____ 4

PAGE _____ 75

5721

1    BECAUSE THE TRAIN IS LEAVING TOMORROW.  IF THE NINTH CIRCUIT

2    BELIEVES THAT SHOULD NOT OCCUR, THE ONLY WAY WE CAN EFFECTIVELY

3    PROCEED IS TO PRESENT OUR PAPERS.

4            THE COURT:  I THINK COUNSEL'S POINT IS WELL TAKEN.

5    YOU SHOULD FILE AN APPLICATION FOR CERTIFICATION OF

6    APPEALABILITY.  I WILL INVITE MATTEL TO FILE OPPOSITION AND THE

7    COURT WILL PROMPTLY ISSUE A RULING.

8            MR. FALK:  OKAY.  FAIR ENOUGH.

9            THE COURT:  THANK YOU, COUNSEL.

10           MR. FALK:  THANK YOU VERY MUCH, YOUR HONOR.

11           THE COURT:  VERY WELL.

12           COURT IS IN RECESS.

13           (PROCEEDINGS CONCLUDED.)

14

15

16

17                          CERTIFICATE

18

19   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
20   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
     ENTITLED MATTER AND THAT THE TRANSCRIPT FALK FORMAT IS IN
21   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.
22

23                                           8-8-08
     THERESA A. LANZA, CSR, RPR               DATE
24   FEDERAL OFFICIAL COURT REPORTER

25

MONDAY, AUGUST 4, 2008                    MOTION FOR MISTRIAL

                                          EXHIBIT        4

                                          PAGE         76

# EXHIBIT 5

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.     CV 04-09049 SGL(RNBx)                              Date: August 8, 2008

Title:     CARTER BRYANT -v- MATTEL, INC.
            AND CONSOLIDATED ACTIONS
==============================================================================

PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

            Jim Holmes                              None Present
            Courtroom Deputy Clerk                  Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:          ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                               None Present


PROCEEDINGS:   **ORDER DENYING MOTION FOR MISTRIAL**

    This matter is before the Court on MGA's motion for a mistrial.[1]  The matter was heard on August 4, 2008, at which time the Court announced its ruling.  This Order reiterates that ruling and sets forth the rationale for the Court's ruling.

### I. BACKGROUND

    After the verdict in Phase 1(a) had been rendered, on July 25, 2008, and the day after opening arguments in Phase 1(b) trial, Juror No. 6 delivered to the Court a note, stating:

    HEY, JUDGE LARSON, THERE IS AN ISSUE THAT CONCERNS
    ME THAT I'D LIKE TO TALK TO YOU ABOUT.  THE THING IS, I DON'T FEEL

_____

    [1] Herein, the Court refers collectively to the MGA entities defendants and Isaac Larian as "MGA."

MINUTES FORM 90                                        Initials of Deputy Clerk:  jh
CIVIL -- GEN

                              1

EXHIBIT ___5___
PAGE ___11___

COMFORTABLE TALKING ABOUT IT IN FULL COURT.  COULD I SPEAK WITH
YOU AT SIDE-BAR WITH THE LAWYERS AND COURT REPORTER PRESENT?
OTHERWISE, I'LL KEEP THIS TO MYSELF.  THANKS, [JUROR] NUMBER 6.

July 25, 2008, Unsealed Tr. at 4.  After a preliminary interview with Juror No. 6 in the presence of
counsel, counsel agreed that the Court should interview Juror No. 6 in camera, outside the
presence of counsel.  Unsealed Tr. at 12-13.

The Court's interview with Juror No. 6 revealed that Juror  No. 8 made inappropriate
remarks regarding defendant Isaac Larian's ethnicity.  As a result of this interview, the Court
determined that interviews of additional jurors was necessary; counsel consented to the additional
interviews.  Thereafter, the Court interviewed in chambers each juror individually.

The transcripts of the juror interviews shall remain in camera and under seal; nevertheless,
those interviews may be summarized as follows:  All ten jurors were interviewed, including Juror
No. 8.  All jurors except one, Juror No. 2, were able to confirm that comments regarding the
ethnicity and/or national origin of Isaac Larian were made in the jury room.  Juror No. 8 herself
confirmed that she made comments regarding Mr. Larian's ethnicity and/or national origin.  Of
those nine jurors, six (including Juror No. 8 herself) recounted that the remarks at issue were
attributed by Juror No. 8 to her attorney-husband and that the remarks represented his
assessment of individuals of Persian ethnicity and/or Iranian national origin.[2]  Of the remaining nine
jurors, four of those independently recalled that Juror No. 8 used the word "stubborn" in recounting
her husband's assessment of Persians and/or Iranians.  One juror specifically recalled a remark to
the effect that Persians and/or Iranians "stole ideas."  Another juror recalled the adjective "stingy"
being used; yet another recalled the adjective "rude"; and finally, another recalled the verb "lie"
being used.  Juror No. 8's account differed:  She explained her remark was about immigrants and
the potential for a language barrier problem.

As a result of those interviews, the Court made certain factual findings, which were set forth

---

[2] Although the distinction is not of any particular relevance to the Court's current inquiry, and is one that neither
the Court nor the parties have focused upon thus far, for the sake of precision, the Court must take note of the exact
nature of the improper remarks.  Notably, it is unclear from the record whether the remarks were directed toward what
the Court understands to be Mr. Larian's ethnicity (Persian) or his national origin (Iranian), or both.  It appears to the
Court that either they were directed toward both or that the speaker was unaware of any distinction to be made.
Regardless, this point does not bear on the Court's analysis and these remarks were inappropriate in any event.
Having taken note as to what the remarks were directed, the Court also takes note of to what the remarks were not
directed:  Clearly, from the record, the remarks were not directly reflective of a broader group of ethnicities and/or
national origins generically described as those from "the Middle East," although it is clear that Persians and/or Iranians
fall into this broader category.  Compare Tr. at 317 (MGA and Mr. Larian's counsel's reference to Mr. Larian having left
"the Middle East" at an early age).  Similarly, the remarks were not directed toward Mr. Larian's race (Caucasian) rather
than his ethnicity or national origin, as suggested by MGA.  See Motion at 25 (referring to Juror No. 8's "racial bias").
Finally, it is also clear from the record (and no party has suggested otherwise), that although Mr. Larian revealed his
religion during his testimony (Jewish), the remarks were not directed toward his religion.

MINUTES FORM 90                                                        Initials of Deputy Clerk:  jh
CIVIL -- GEN

EXHIBIT ___5___
PAGE ___78___

in detail in the Court's July 25, 2008, Order.[3]  The Court found that specific inappropriate comments based on Mr. Larian's ethnicity were made during jury deliberations; that the jury foreperson and other jurors immediately admonished Juror No. 8 that there was no room in the deliberation process for such remarks; that the remarks were made toward the end of the deliberation process while the jury was attempting to reach a unanimous verdict on four specific drawings that were the subject of dispute among the jurors;[4] that the remarks did not influence the jury's verdict in Phase 1(a); that some jurors believed that Juror No. 8 should be removed from the jury; and that all jurors indicated that the remarks would have no effect on any deliberations or decision to be made in Phase 1(b) of this trial.  See docket # 4155 at ¶¶ 1-7.

After interviewing the jurors, the Court met with counsel, who agreed with the Court's assessment that Juror No. 8 should be excused.  Thereafter, the Court met with Juror No. 8 in chambers with counsel present.  The Court explained to Juror No. 8 that she would be excused from further service in this case based on the statements she had made and ordered her to refrain from speaking about this case until the conclusion of Phase 1(b) of this trial.

In a letter to the Court dated July 29, 2008, Juror No. 8 reiterated her denial of wrongdoing and, in her view, the "neutral context" in which she posited certain statements relating to Isaac Larian's ethnicity and/or national origin.  The letter also delves into Juror No. 8's subjective beliefs regarding the responsible approach she believes she took in the jury's deliberations.  She also conveyed her personal negative reaction to the Court's factual findings and decision to dismiss her from the jury.

Based on the Court's findings, MGA made an oral motion for a mistrial on July 25, 2008.  The Court granted leave to MGA to file its motion in written form and set an expedited briefing schedule for that motion.  It is MGA's written motion that is presently before the Court.

## II.  AMENDMENT TO COURT'S JULY 25, 2008, ORDER

### A.     Improper Remarks

Upon review of the transcript of the juror interviews, the Court finds that it must amend the factual findings set forth in its July 25, 2008, Order.  Specifically, the Court previously found, in ¶ 1 of that Order, that Juror No. 8 remarked to the other jurors that her husband has told her about a "client or clients who are Iranian and who are stubborn, rude, stingy, are thieves, and have stolen other person's ideas."  Id.

---

[3]  Upon a more deliberated and comprehensive review of the transcript of the juror interviews, the Court finds that it must make a slight amendment the factual findings set forth in its July 25, 2008, Order.  That amendment, and the reasons therefor, are set forth infra, section II.

[4]  The jury was ultimately unable to reach a verdict on these four drawings.

MINUTES FORM 90                                                          Initials of Deputy Clerk: jh
CIVIL -- GEN

3

EXHIBIT  5
PAGE  79

Although only one juror specifically recounted the remark regarding stealing another's ideas, the Court finds that the remark was made. It does so based on the fact that the juror recounting this fact was the same juror who brought this incident to the Court's attention, and who therefore had ample time to reflect upon his recollection before reporting it. Moreover, the content of this juror's interview and his demeanor throughout leads the Court to conclude that he not only recalled the details of this incident but that he also understood at the time the remarks were made that the notion of the theft of ideas was an important issue in Phase 1(a) of the trial. Finally, his recollection is supported by another juror's recollection that the term "lie" was used.

Relatedly, however, although the Court previously found that the term "thieves" was used, a review of the transcript of the interviews reveals that no juror recounted the use of that term.

The Court finds that Juror No. 8 used the term "stubborn" because it was specifically recalled, without prompting by the Court, by four of the eight jurors who heard the remarks.

The Court does not find that the adjective "stingy" was used. Only one juror recalled use of that term and, by her own admission, her recollection was not clear on this issue. In fact, the juror stated that she didn't remember the term Juror No. 8 used, but stated that she thought it was "stingy or something" or "[s]omething on that order."

The Court finds that Juror No. 8 used the term "rude" as recounted by one juror. Based on her statements during the Court's interview and her demeanor during the interview, the Court finds that the juror who recounted the use of the term "rude" was not equivocal in her recollection of the use of that term. The juror who recounted the use of the term "rude" was also personally involved in the immediate admonishment given to Juror No. 8 that there was no room in the deliberation process for such remarks and thus was, in the Court's view, fully engaged in this incident.

Accordingly, the Court **AMENDS** the factual findings set forth in the July 25, 2008, Order, by **VACATING** the second sentence of ¶ 1 and **SUBSTITUTING** the following sentence: "Specifically, Juror No. 8 indicated that her husband, an attorney, has told her about a client or clients who are Persian and/or Iranian and who are stubborn, rude, and who have stolen other people's ideas."

## B. Effect of Remarks on Jury

The Court does not find it necessary to amend its factual findings regarding the effect of the remark on the other jurors, set forth at ¶ 5 of the Court's July 25, 2008, Order. Specifically, the Court found that "the remarks did not, in any way, effect or influence the decision made by the jury."

At the time of the juror interviews, the Court inquired of a number of the remaining jurors (and all jurors asked responded in the negative) whether Juror No. 8's comments affected their deliberations. The Court previously expounded upon the finding of fact set forth in ¶ 5 by noting

EXHIBIT ___5___
PAGE ___80___

Case 2:04-cv-09049-DOC-RNB  Document 5876  Filed 07/02/09  Page 51 of 58  Page ID
#:190530
Case 2:04-cv-09049-SGL-RNB     Document 4238     Filed 08/08/2008     Page 5 of 12

that "[a]ll the jurors clearly indicated, by both their verbal and non-verbal response to the Court's
questioning, that the remarks had no impact on their decision in Phase 1(a)."

As acknowledged by both parties in connection with the present motion, Rule 606(b) of the
Federal Rules of Evidence bars consideration of the jury's mental processes.[5]  Therefore, the
Court finds it appropriate to more fully articulate the basis for its finding of fact that the remarks had
no impact on the jury's decision in Phase 1(a).  The Court has re-examined the transcript of its
juror interviews and reconsidered whether this factual finding should be made if the Court does not
consider any juror's answer that may have been based on his or her mental processes.  Excising
such evidence, the Court reaffirms the finding set forth in ¶ 5 on an alternative, independent basis.
Specifically, the Court finds that the improper remarks had no effect on the jury's decision based
on the reaction of the individual jurors to the remarks and based on the timing of the remarks.

### III. FED. R. EVID. 606(b)

Both sides take positions on the Court's interviews of the jurors and how the fruits thereof
may be considered.  Mattel contends that the information obtained from the juror interviews may
not, consistent with Fed. R. Evid. 606(b), be considered at all in connection with the current
motion.  MGA, for its part, contends that although information may be used to establish the
existence of bias, the Court's inquiry must end there and a mistrial must be declared based on that
limited inquiry.  In the Court's view, neither side is correct about how the Court must apply Rule
606(b) and, in any event, both sides consented to the Court's interviews of the jurors without any
limitation on how the results thereof could be used, thereby waiving the objections they now raise.

The Court's analysis begins with the language of the relevant Federal Rule of Evidence:

(b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a
verdict or indictment, a juror may not testify as to any matter or statement occurring
during the course of the jury's deliberations or to the effect of anything upon that or
any other juror's mind or emotions as influencing the juror to assent to or dissent from
the verdict or indictment or concerning the juror's mental processes in connection
therewith. But a juror may testify about (1) whether extraneous prejudicial information
was improperly brought to the jury's attention, (2) whether any outside influence was
improperly brought to bear upon any juror, or (3) whether there was a mistake in
entering the verdict onto the verdict form. A juror's affidavit or evidence of any
statement by the juror may not be received on a matter about which the juror would
be precluded from testifying.

Fed. R. Evid. 606(b).

---

[5] See Motion at 18; Opp. at 3; Sea Hawk Seafoods, Inc. v. Alyeska Pipeline Service Co., 206 F.3d 900, 908
(9th Cir. 2000) (citing Rushen v. Spain, 464 U.S. 114, 120 n.5 (1983)).

EXHIBIT __5__
PAGE __81__

At issue here are Juror No. 8's recounting of statements made by her attorney-husband. These statements clearly were not part of the evidence submitted to the jury. Therefore, the Court concludes that the statements constituted "extraneous prejudicial information" into which the Court may inquire.

In cases in which extraneous information has been received by the jury, the Ninth Circuit directs the trial court to consider the following factors to determine whether a new trial is warranted:

> (1) [W]hether the material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the juror discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict.

Estrada v. Scribner, 512 F.3d 1227, 1238 (9th Cir. 2008).

As to the first factor, it is clear that the material was actually received in the jury room.

As to the second and fourth factors, the Court found, as set forth in the July 25, 2008, Order, that the remarks were made toward the end of the deliberation and after the jury had reached agreement on the Verdict Form questions that were ultimately returned unanimously. All remaining jurors who heard the remark were in agreement that the remarks came very near the end of their deliberations, and four of them specifically recalled that the remarks were made after agreement had been reached on all subjects upon which the jury ultimately reached a verdict.

As to the third factor, the Court notes that all remaining jurors who heard the remark were either involved in or witnessed an immediate admonishment of Juror No. 8 that a jury room was no place to express such remarks. By all accounts, there was no discussion or consideration of the substance of Juror No. 8's remarks.

As to the fifth factor, the Court can discern no other issues that suggest in any way that the extrinsic material affected the verdict. In fact, the Court is very confident, based on both the verbal and, even more importantly, non-verbal responses to the Court's questioning that the extrinsic material had no effect on the verdict.

Thus, application of the Estrada factors clearly compel the conclusion that MGA's motion for mistrial be denied.

In any event, prior to the Court's interview of the jurors, both sides consented thereto without limitation, and thereby have waived any objection to the Court's inquiry or use of the

EXHIBIT ___5___
PAGE ___82___

information from those interviews.

## IV. VOIR DIRE OF JUROR NO. 8

MGA also argues that the motion for mistrial should be granted because Juror No. 8 was dishonest in her responses – or more accurately, in her failure to respond -- to certain questions during voir dire. Claims of this type of juror misconduct are evaluated in accordance with McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984). The Ninth Circuit has articulated the relevant inquiry as follows: "(1) [W]hether 'a juror failed to answer honestly a material question on voir dire;' and (2) whether 'a correct answer would have provided a valid basis for a challenge for cause.'" Price v. Kramer, 200 F.3d 1237, 1254 (9th Cir. 2000) (quoting McDonough Power Equip.)).

At the outset, the Court must again note its factual finding is not that Juror No. 8 was biased in the legal sense, see section VI, infra, or even that she herself held certain preconceptions regarding Persians and/or Iranians. Rather, the Court found that "Juror No. 8 indicated that her husband, an attorney, has told her about a client or clients who are Persian and/or Iranian and who are stubborn, rude, and who have stolen other people's ideas." MGA's argument regarding dishonesty in voir dire is based on an unsound premise -- that the Court has found Juror No. 8 held the views expressed by her statements. See e.g., Motion at 21 ("Where a potential juror does not truthfully disclose biases or prejudices that would render them unable to be impartial and then participates in the verdict, a civil litigant has a right to a mistrial.").

Nevertheless, the Court is mindful of the Ninth Circuit's suggestion that those who use racial slurs – and thus, by extension, statements regarding ethnocentric bias – generally subscribe to the views that the use of such terms imply. See e.g., United States v. Henley, 238 F.3d 1111, 1121 (9th Cir. 2001). Assuming, however, that the Court were to make the factual finding upon which MGA's argument is premised, MGA's argument would still be unpersuasive.

Counsel for MGA and Mr. Larian did not, in voir dire, ask any specific questions about Mr. Larian's ethnicity and/or national origin. The closest reference in voir dire related to Mr. Larian's experience as an "immigrant" from the "Middle East" and disclosure that the claims at issue involved allegations of dishonesty on his part. Motion at 24. Counsel for MGA and Mr. Larian failed to ask questions designed to ferret out preconceptions regarding Persians and/or Iranians (or even Middle Easterners in general), nor did he ask any questions regarding the jury panel's personal experiences or business dealings – or those of their family or friends – with other individuals who share Mr. Larian's ethnicity and/or national origin. MGA simply cannot fault a juror for failing to answer a question during voir dire that it did not ask. See e.g., Sanders v. Lamarque, 357 F.3d 943, 949 (9th Cir. 2004) (no juror dishonesty in failure to disclose past gang-related issues where questions were posed to jury panel in present tense); Hard v. Burlington Northern R. Co., 870 F.2d 1454, 1460 (9th Cir. 1989) (no duty to disclose past employment where juror was questioned regarding present but not past employment); U.S. v. Aguon, 851 F.2d 1158, 1170 (9th

EXHIBIT ___S___
PAGE ___83___

Cir. 1988) (no duty to disclose juror was under investigation for crime similar to the one at issue in the case in which he served as a juror).

The question wasn't asked; therefore, there was no answer to all, let alone a dishonest answer. Therefore the first part of the McDonough Power Equip. test has not been met. Moreover, in the absence of an answer, the Court cannot consider whether that answer would have provided a basis for a challenge for cause. The second part of the McDonough Power Equip. test has not been met.

The Court accordingly rejects MGA's contention that Juror No. 8 was dishonest in her voir dire answers.

## V. APPLICABILITY OF SIXTH AMENDMENT PRECEDENT TO CIVIL TRIALS

The Sixth Amendment to the United States Constitution guarantees an accused the right to a fair trial. See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."). Pursuant to the Sixth Amendment, the Ninth Circuit has held that "[t]he bias . . . of even a single juror would violate [an accused's] right to a fair trial." Estrada v. Scribner, 512 F.3d 1227, 1239 (9th Cir. 2008) (internal quotation marks and citation omitted). MGA contends that this principle should be applied to the current civil trial because a fair trial by jury is also guaranteed to civil litigants by virtue of the Seventh Amendment. See U.S. Const. amend. VII ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.").

MGA argues because both the Sixth and Seventh Amendments guarantee the right to a fair trial, "the standards governing the Sixth and Seventh Amendment rights to a fair and impartial jury are the same." Motion at 12 n.4. It makes this contention in support of its overarching argument that the presence of one biased juror violates this right and, therefore, the Court should declare a mistrial without further inquiry. Id. at 12-13. However, this argument is unpersuasive both on the facts as found by the Court and on the authority cited by MGA in support of its argument.

As a factual matter, the Court has not found, and there is not evidence before the Court to support a finding, that Juror No. 8 was biased in the legal sense of that term. See section VI, infra.

Moreover, in support of its argument, MGA cites authority that does not support the broad proposition it advances. Specifically, MGA cites Sea Hawk Seafoods v. Alyeska Pipeline Service

EXHIBIT 5
PAGE 84

Case 2:04-cv-09049-DOC-RNB   Document 5876   Filed 07/02/09   Page 55 of 58   Page ID
#:190534
Case 2:04-cv-09049-SGL-RNB      Document 4238      Filed 08/08/2008      Page 9 of 12

Co., 206 F.3d 900, 906 n.4 (9th Cir. 2000); Rinker v. County of Napa, 724 F.2d 1352, 1354 (9th Cir. 1983); and Caterpillar, Inc. v. Sturman Indus., Inc., 387 F.3d 1358, 1371 n.2 (Fed. Cir. 2004) .

A reading of the relied-upon footnote in the Sea Hawk case, as well as the text to which it is appended, reveals only the Ninth Circuit applies precedent on a specific Rule 606(b) issue developed in criminal cases (which implicate the Sixth Amendment) to civil cases (which implicate the Seventh Amendment). 206 F.3d at 906 ("Our precedents distinguish between introduction of 'extraneous evidence' to the jury, and ex parte contacts with a juror that do not include the imparting of any information that might bear on the case. Our precedents are mostly in criminal cases, but we have applied the same rules in civil cases."). Absent from this case is any articulation of the wholesale incorporation of Sixth Amendment principles in cases implicating the Seventh Amendment.

In Rinker, the Ninth Circuit considered the issue of an unauthorized communication between a party and a juror regarding the jury's ongoing deliberations. 724 F.2d at 1353. It appears that MGA cites this case for the unremarkable proposition that "the integrity of the jury system is no less to be desired in civil cases." Id. (internal quotation marks and citation omitted). This proposition, like that stated in Sea Hawk, stops well short of the wholesale incorporation of Sixth Amendment principles to cases implicating the Seventh Amendment that MGA advances.

However, MGA's position is supported, at least up to a point, by the Ninth Circuit's reliance in Rinker, on a criminal case that sets up a rebuttable presumption of prejudice in cases in which a jury is presented with an outside influence such as a party's unauthorized communication with a juror. 724 F.2d at 1354 (citing United States v. Armstrong, 654 F.2d 1328, 1332 (9th Cir. 1981)). Nevertheless, this case severely undercuts MGA's overarching argument that the presence of one biased juror violates this right and therefore the Court should declare a mistrial without further inquiry. In Rinker, the Ninth Circuit specifically noted that the district court failed to undertake an extensive enough investigation into the jury incident. Rinker, 724 F.2d at 1354 ("Given the added fact that in questions about jury incidents, we are ultimately not so concerned with their nature as with the prejudice they may have worked on the fairness of the defendant's trial, we conclude that the question of prejudicial effect deserved more consideration.") (internal quotation marks, alteration mark, and citations omitted).

Finally, the cited-to portion of Caterpillar, when read in conjunction with the authority upon which it relies, Skaggs v. Otis Elevator Co., 164 F.3d 511, 514 (10th Cir. 1998), again stands only for the unremarkable proposition that both the Sixth and the Seventh Amendments guarantee the right to a fair trial, and that, therefore, juror issues arising in criminal cases are "germane" to civil cases. The Caterpillar case, like Sea Hawk and Rinker, does not suggest that there has been a wholesale incorporation of Sixth Amendment principles to cases implicating the Seventh Amendment.

None of the cases cited by MGA support the contention that the mere presence of a juror

MINUTES FORM 90
CIVIL -- GEN

Initials of Deputy Clerk: jh

EXHIBIT __5__
PAGE __85__

who makes improper remarks based on a party's ethnicity compels the Court to grant a mistrial without further inquiry. Therefore, as set forth in section III, supra, the Court has applied the test set forth in Estrada and denied the motion.

Related to MGA's argument discussed in this section is its argument that it is entitled to the unanimous verdict of all ten jurors. Implicit in this argument is that because Juror No. 8 was biased, her verdict should be treated as having been, more or less, excised from the jury's verdict, and thus MGA is left with a unanimous verdict of nine jurors although ten jurors deliberated. For support, MGA relies upon Parker v. Gladden, 385 U.S. 363 (1966).

In Parker, an accused was convicted of second-degree murder in a state-court proceeding. Id. at 363. During the jury's sequestration, a bailiff made statements on two occasions to two different jurors regarding his opinion of defendant's guilt, as well as his opinion that if the defendant was not guilty, the Supreme Court, through the appeal process, would "correct" the verdict. Id. The Supreme Court rejected the argument that, although a jury of twelve deliberated, the verdict could stand on the untainted verdict of the remaining ten jurors, as a jury of ten was permissible under the laws of the state in which the defendants was convicted. Id. at 365. The Supreme Court's decision was influenced, however, by a number of concerns not at issue here.

First, the Court was concerned with the weight of authority statements of the bailiff, as "an officer of the State" carried. Second, the Court was also concerned with the defendant's right to cross-examination. Neither of those issues are implicated here. The statements in the instant case were made not by any authority figure but by a peer. Certainly, there is no indication here that the other jurors accorded any additional weight to her statements because they were attributed to her attorney-husband. To the contrary, the record is clear that the other jurors gave no weight to her statements and, beginning with the foreperson, other jurors strongly rebuked Juror No. 8 for making the remarks. Accordingly, the concern of the lack of the opportunity to cross examine Juror No. 8 regarding her statements is of no moment because the remaining jurors could not have given any less weight to her statements.

In addition to the concerns regarding the appearance of official imprimatur on and lack of the right of cross-examination as to the remarks at issue in Parker, the Court was also concerned with the defendant's Confrontation Clause rights. That right is not implicated here. Austin v. United States, 509 U.S. 602, 608 n.4 (1993) (Confrontation Clause does not apply in civil cases).

Accordingly, the Court does not read Parker as requiring the Court to grant MGA's motion.

## VI. PRECONCEPTIONS AND PARTIALITY

In the events that gave rise to the present motion and in the proceedings that followed on the heels of those events, the term "bias" has been used, sometimes by the Court, without regard to the term's specific legal meaning in this particular context. When the Court and the parties use

EXHIBIT     5
PAGE       86

the term "bias," what is implicated is a juror's impartiality – or more precisely, lack thereof. Cases decided under the Sixth Amendment jury trial right in a criminal case, cited by MGA, indeed conclude that the right is violated where just one biased juror participates in a verdict. See Motion at 3 (citing, e.g., United States v. Henley, 238 F.3d 1111, 1120 (9th Cir. 2001)). However, this rule invites the inquiry of what is meant by the term "bias."

Supreme Court precedent establishes what is not required of jurors. Courts do not require that jurors who are called upon to serve be without preconceived notions. Irvin v. Dowd, 366 U.S. 717, 723 (1961). Specifically, in the cited case, the Court did not require that the jurors be without preconceived notions of the guilt or innocence of a criminal defendant, which was the ultimate issue in the case. Id. ("To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.") (citation omitted). In a human system, we cannot expect perfection. Truly, perfect justice is not of this world. Our legal system and precedent take into account our inherent imperfections. Indeed, as has been observed before, and this Court today concurs, if a standard of perfection on jury verdicts were to be imposed, "[i]t is doubtful whether more than one in a hundred verdicts would stand such a test." Jorgensen v. York Ice, 160 F.2d 432, 435 (2d Cir.1947) (Hand, J.).

MGA contends that "'[d]oubts regarding bias must be resolved against the juror.'" United States v. Gonzalez, 214 F.3d 1109, 1114 (9th Cir. 2000) (quoting Burton v. Johnson, 948 F.2d 1150, 1158 (10th Cir. 1991)). The case upon which MGA relies was decided at the voir dire stage when the question at issue was whether a juror who was unable to state on the record that she was able to serve fairly and impartially. See id. ("When a juror is unable to state that she will serve fairly and impartially despite being asked repeatedly for such assurances, we can have no confidence that the juror will 'lay aside' her biases or her prejudicial personal experiences and render a fair and impartial verdict."). Juror No. 8 had no such difficulty here. This Court repeatedly asked the venire, including Juror No. 8, whether each could be fair and impartial, and Juror No. 8 responded affirmatively. Notwithstanding MGA's protestations to the contrary, prospective jurors are presumed to be impartial. See Irvin, 366 U.S. at 723.

With this standard in mind, the Court cannot, and reiterates that it has not, found that Juror No. 8 is biased -- i.e., not impartial -- in the legal sense. Instead, as more fully set forth elsewhere, the Court has found only that Juror No. 8 introduced into the jury inappropriate comments attributed to her attorney-husband.

As explained at length herein, the jury's verdict in Phase 1(a) need not be set aside on the basis of a juror's bias.

MINUTES FORM 90                                                          Initials of Deputy Clerk: jh
CIVIL -- GEN

EXHIBIT ___5___
PAGE ___87___

## VII. CONCLUSION

Nothing is more important to this Court than providing a fair trial to all parties. The right to trial by jury is certainly among the greatest contributions to the rule of law in the last millennium; nevertheless, this human system, as recognized by the Supreme Court, it is not a perfect system, nor could it survive if such was the standard. See e.g., Tanner v. United States, 483 U.S. 107, 120 (1987) (O'Connor, J.) ("There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it.").

The Court deeply regrets that Juror No. 8 introduced remarks into the jury room that have no place in any courthouse, as evidenced by Juror No. 8's dismissal from the jury. At the same time, the Court is encouraged, and deeply so, by the swift and decisive response of the foreperson and other jurors who heard the extraneous remarks, a response that demonstrates that this jury fully shares the Court's commitment to fairness and justice for all of the parties.[6] This jury reacted to extraneous, potentially prejudicial information exactly as a just society would have them react. They are to be commended, not disbanded.

After careful and deliberate consideration of the circumstances present, the Court finds that a mistrial is not required.

The motion for mistrial is **DENIED**.

**IT IS SO ORDERED.**

---

[6] Defendants complain that the jury failed to report the incident to the Court in a timely manner. However, it is clear from the record that the jurors acted very promptly. Immediately after the remarks were made, the foreperson and several other jurors immediately admonished Juror No. 8. Juror No. 10 submitted a note to the Court on the same day of the remarks indicating her discomfort with jury service (which she subsequently revealed to the Court was prompted by her disgust with Juror No. 8's remarks.) Juror No. 6 submitted his note to the Court, quoted in the opening paragraph of this Order, the second trial day after the remarks were made. His delay was due in part to his mistaken assumption that Juror No. 10's note reported the remark to the Court. His delay was also due to, and the foreperson's failure to report the remark was due to, the Court's own jury instruction on July 10, 2008. See docket # 4115 at 35. As such, the limited delay in bringing the matter to the Court's attention does not strike the Court as in any way indicating the jurors' acquiescence to the remarks; to the contrary, the jurors were rightfully outraged. Rather, their delay was due to the uncertainty about the propriety of submitting such information to the Court. This sentiment is borne out in Juror No. 6's remark.

MINUTES FORM 90
CIVIL -- GEN

Initials of Deputy Clerk:  jh

EXHIBIT ___5___
PAGE ___88___