# Exhibit 1

1

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3                        EASTERN DIVISION

 4                           -  -  -

 5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 6                           -  -  -

 7   MATTEL, INC.,                  )
                                    )
 8                    Plaintiff,    )
                                    )
 9            vs.                   )   No. CV 04-09049
                                    )
10   MGA ENTERTAINMENT, INC., ET. AL.,  )
                                    )
11                    Defendants.   )
     _____)   Motion Hearing
12   AND CONSOLIDATED ACTIONS,      )
     _____)

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  Riverside, California

17                 Monday, July 6, 2009

18                      3:47 P.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
                Federal Official Court Reporter
24              3470 12th Street, Rm. 134
                Riverside, California  92501
25                   951-274-0844
                WWW.THERESALANZA.COM
```

EXHIBIT ___1___

PAGE ___4___

2

```
 1   APPEARANCES:

 2   ON BEHALF OF MATTEL, INC.:

 3                          QUINN EMANUEL
                            By:  JOHN QUINN
 4                              MICHAEL T. ZELLER
                            865 S. FIGUEROA STREET,
 5                          10TH FLOOR
                            LOS ANGELES, California  90017
 6                          213-624-7707

 7
     ON BEHALF OF MGA ENTERTAINMENT/ISAAC LARIAN:
 8
                            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
 9                          BY:  JASON RUSSELL
                            300 SOUTH GRAND AVENUE
10                          LOS ANGELES, CALIFORNIA  90071-3144
                            213-687-5000
11

12   ON BEHALF OF MGA ENTERTAINMENT/ISAAC LARIAN:

13                          PACHULSKI STANG ZIEHL & JONES
                            BY:  JAMES I. STANG
14                          10100 Santa Monica Boulevard,
                            11th Floor
15                          Los Angeles, California  90067-4100
                            310-277-6910
16

17   ON BEHALF OF OMNI 808:

18
                            BINGHAM McCUTCHEN LLP
19                          BY:  TODD E. GORDINIER
                            BY:  PETER VILLAR
20                          600 Anton Boulevard
                            Costa Mesa, CA  92626-1924
21                          714-830-0622

22

23

24

25
```

Monday, July 6, 2009   EXHIBIT ____1____   CV 04-09049-SGL

PAGE ____5____

3

1                          I N D E X

2                                                    Page

3    Motions........................................    4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Monday, July 6, 2009 EXHIBIT _____/_____    CV 04-09049-SGL

PAGE _____6_____

```
 1   If there are sensitive, personal matters that the Court deems
 2   inappropriate to be released, it could redact those, if there's
 3   something that's so personal that it should not be released.
 4   But, certainly, the effect of Juror Number 8's comments on the
 5   deliberative process and what was and was not said by that          04:00
 6   juror and how it affected the deliberations, we believe that
 7   not only fairly, but as a matter of constitutional propriety,
 8   it should be released.
 9            THE COURT:  Thank you, Counsel.
10            The next issue I have here on my paper is the               04:00
11   receiver accounting issue.  I have a pending ex-parte
12   application from Mattel regarding its duty to respond and a
13   briefing schedule.
14            I will issue a written order on that.  The Court
15   doesn't need any further argument on that at this point.            04:00
16            MR. RUSSELL:  Are you referring to the motion for
17   clarification?  What are we referring to here?
18            THE COURT:  No.  The receiver accounting submitted by
19   the temporary receiver.
20            MR. RUSSELL:  All right.                                    04:00
21            THE COURT:  The next motion is the motion regarding
22   discovery order number 27.
23            MR. QUINN:  Yes, Your Honor.
24            Your Honor, this is an appeal from the ruling of the
25   Discovery Master.  It relates to Lexington, which, as the Court     04:00
```

```
 1   knows, is an entity organized under the laws of Nevis in the
 2   Caribbean.  According to Vision, which is one of the investors,
 3   and Omni 808, the $10 million that it contributed to obtain its
 4   interest in Omni 808, it obtained from Lexington.  And this
 5   appeal relates to a denial of a motion to compel to obtain          04:01
 6   discovery, any discovery, concerning Lexington.
 7            Under the Discovery Master's order, we've been
 8   prevented from getting any information regarding Lexington, who
 9   its shareholders are, any of the documents, the loan documents,
10   any of the transaction documents relating to this.  The            04:01
11   Discovery Master identified several grounds for a denial of our
12   motion to compel.
13            Your Honor, with all due respect to the hard-working
14   Discovery Master, we believe this is one that he got wrong, on
15   each of those grounds.                                             04:01
16            One ground is jurisdiction, that these are documents
17   in the hands of attorneys who are in this district, the Bingham
18   law firm; but it's an entity which is organizing the laws of
19   the Caribbean.  There's no showing that there's any
20   jurisdiction over the entity; so, therefore, there isn't          04:02
21   jurisdiction over the documents.
22            And, Your Honor, I respectfully submit that that's
23   inaccurate just as a proposition of law.  These documents are
24   here.  They are in the district.  There doesn't have to be
25   jurisdiction over the Nevis entity.                               04:02
```

Monday, July 6, 2009   EXHIBIT _____/_____   CV 04-09049-SGL

PAGE _____8_____

```
 1            By the way, Your Honor, even if we got past that,
 2   we've alleged that there is jurisdiction over the Nevis entity.
 3   That entity has filed two UCC financing statements against
 4   California organizations.  They've retained counsel in this
 5   district.  They are engaged in this transaction in this          04:02
 6   district.  We've alleged there's jurisdiction over it.  Until
 7   that's controverted, Your Honor, it's assumed that there is
 8   jurisdiction.  And even if we get beyond that, Your Honor, we'd
 9   be entitled to jurisdictional discovery.
10            So the notion that because there's this entity that's   04:03
11   organized under Caribbean jurisdiction that we cannot get
12   access to documents which are present in this district, I just
13   think it's clearly wrong under the law.
14            There's a suggestion also, the Discovery Master's
15   opinion, that these documents are privileged and that they are   04:03
16   in the hands of the attorney.  There really isn't any support
17   for that, Your Honor.  Both sides cite the Court to the Ratliff
18   decision.  And if you read that decision, Your Honor, it -- and
19   I'll just briefly quote -- it says, and I quote, "Documents
20   held by an attorney in the United States, on behalf of a         04:03
21   foreign client, absent privilege, are as susceptible to
22   subpoena as those stored in a warehouse within the district
23   court's jurisdiction."
24            This is not a case like the Sarrio case, which both
25   parties also cite to.  There's some dicta in the language, the   04:03
```

```
 1   district court's opinion in that case, that indicates that if
 2   -- you know, in that case, it was an E&Y Belgian-affiliated
 3   entity that had provided documents, I believe, to a law firm.
 4   I may be mistaking that, actually, with the Davis Polk case.
 5   But it was some foreign entity that had provided documents for     04:04
 6   legal advice in New York.  There was dicta suggesting that it
 7   would be inappropriate on privileged grounds to require the
 8   production of those documents.
 9            It is dicta, Your Honor.  But this is not a situation
10   where documents were provided by an entity for the purpose of      04:04
11   getting legal advice, even if that were an exception.  This is
12   the res gestae.  These are the lawyers who engaged in this
13   transaction.  They did not receive a file in order to advise a
14   client about a drug deal or something like that.  This is the
15   res gestae.  These are the transaction documents.  They are in     04:04
16   this district.
17            The Discovery Master also denied on the grounds that
18   the request was duplicative.  Your Honor, no one has produced
19   these documents.  Vision has not produced these documents.
20   MGA has not produced these documents.  No one has produced         04:05
21   these documents.  All counsel would have to say is, 'There are
22   no documents other than what other parties have already
23   produced.'  And they don't say that.
24            These transaction documents relating to this
25   $10 million, Your Honor, have been produced by no one.  So even    04:05
```

1  if it were duplicative, we all know parties have different

2  document retention policies.  It's not unusual.  We saw that in

3  the Phase 1 trial, that documents will be produced out of the

4  files of one party and somehow not out of the other party, even

5  though there are e-mails between both parties.  That's not an        04:05

6  unusual phenomenon.  So I'd submit, that's not proper grounds.

7          The Discovery Master also sustained the objection on

8  the grounds of burden.  But there was no showing required that

9  there was any burden here.  There was no indication given of

10  what the volume was.  Vision had also objected on the grounds       04:06

11  of burden to producing documents relating to its investment in

12  Omni 808.  The motion to compel was granted.  It turned out

13  they had 150 documents at the end of the day.  So we have

14  nothing in the record to show burden.  Really, it's the

15  responsibility, as to my understanding of the party responding     04:06

16  to discovery, if they do have a burdensome objection, to

17  articulate some basis.

18          So this is an important issue, Your Honor.  We

19  contend that this money that Lexington -- we don't think Nevis

20  was chosen as the jurisdiction in which to incorporate this        04:06

21  entity because it was most convenient to somebody.  We have a

22  suspicion that it was done as part of a scheme to obscure where

23  the money came from, who the principals are.

24          And if we're not permitted to obtain this discovery

25  regarding Lexington in the hands of the Bingham firm, we may       04:07

Monday, July 6, 2009 EXHIBIT ___/___          CV 04-09049-SGL

PAGE ___/ /___

```
 1   well be at a dead end in that regard.

 2          THE COURT:  Counsel, let me ask you this:  Reading

 3   the Discovery Master's order, is assessment of the relevancy of

 4   this predicated on the state of the case prior to the Court

 5   granting your third amended answer and cross claims?          04:07

 6          MR. QUINN:  Yes, Your Honor.

 7          THE COURT:  I know you object to this -- or not

 8   object to it, but you resist the suggestion that you anticipate

 9   the Court making of remanding this to the Discovery Master, in

10   light of the third amended answer and cross claims.           04:07

11          Might it not make sense in light of that?

12          MR. QUINN:  Well, Your Honor, our concern was because

13   there was multiple grounds for denying our motion to compel.

14          THE COURT:  There were.  But relevancy seems to --

15   the weight of the relevancy seems to surface in different parts 04:07

16   of the order.

17          MR. QUINN:  I think some guidance from this Court on

18   these other points --

19          THE COURT:  I hate to issue advisories.

20          MR. QUINN:  I think the issue is joined on these       04:08

21   points, Your Honor.  We do have legal rulings by the

22   Discovery Master on some of these points.

23          If it were just a question of relevance after the

24   filing of the amended pleading, we would have gone back to the

25   Discovery Master, asked for reconsideration, as indeed we have 04:08
```

Monday, July 6, 2009  EXHIBIT _____/_____  CV 04-09049-SGL

PAGE ____12____

```
 1            You are not reviewing this as a de novo ruling.

 2            In other words, the materials that were not before

 3   the Discovery Master are not properly before you.  And there's

 4   Ninth Circuit authority, and I could cite it to you, where the

 5   courts say, 'We're not going to consider this because we don't     04:11

 6   have jurisdiction to review this de novo.'

 7            I don't want to get off on a sidetrack, Your Honor,

 8   because that's not even close to what's going on here.

 9            What's going on here is, they served subpoenas on the

10   financing entities; the Discovery Master resolved those;           04:11

11   documents were produced; then they served a subpoena on my

12   firm.  The Discovery Master resolved that.  There is no reason

13   and nothing wrong with Mr. O'Bryan's ruling here.

14            Let me just suggest one other point, Your Honor.

15            On Page 11 of their motion to you, they said, 'We do       04:12

16   not seek any privileged documents and we do not want any

17   privileged documents.'

18            The Court needs to be aware, as I said to you last

19   time, they're telling you one thing and Mr. O'Bryan another

20   thing.  They filed a motion this week asking Mr. O'Bryan to        04:12

21   waive the privilege.  They are seeking privileged documents.

22            THE COURT:  On these documents?

23            MR. GORDINIER:  Yes.

24            No, not simply these documents; all of the documents

25   that relate to Bingham.                                            04:12
```

EXHIBIT _____

Monday, July 6, 2009    PAGE _____ 12 A    CV 04-09049-SGL

22

```
 1              Now, that motion is as frivolous and as ridiculous as

 2    most of these motions have been, directed both to Bingham and

 3    to my clients.

 4              But the point is, the Court is being told one thing,

 5    and Mr. O'Bryan is being told another thing.                          04:13

 6              The Court has been told that my clients gifted

 7    $50 million to Mr. Larian, or to MGA, on the one hand.

 8    Mr. O'Bryan has been told, and now they have alleged, that

 9    there's a massive conspiracy and that this is all controlled by

10    Isaac Larian.  If either of those is true, we will get to the        04:13

11    bottom of that.  But the point I want the Court to keep in mind

12    is, there is a problem, there is a problem with parties

13    accepting one position for one motion and another position for

14    another.

15              Let me give you another example.                           04:13

16              We don't get served with about 90 percent of what's

17    going on here, even though we're mentioned in it, because they

18    have taken the position, as they do in certain things, that we

19    should not be accorded any status as a party.  And yet, when we

20    raised this with the Discovery Master, and the Discovery Master       04:13

21    was, as the Court will understand, applying Rule 45, they

22    argued, and indeed headed a point, that we are not only not a

23    party, we are an integral party, and we should not be accorded

24    the deference to nonparties.

25              Your Honor, I know that there's a lot in front of          04:14
```

Monday, July 6, 2009  EXHIBIT _____1_____  ~~CV~~ 04-09049-SGL

PAGE _____13_____

1   you, but what I'm trying to urge the Court on today is that

2   this motion was directed to Bingham.  The Discovery Master

3   acted properly in denying it.  There is plenty of discovery out

4   there directed to the financing entities, some of whom are my

5   clients, some of whom may not be.  I don't know who all they          04:14

6   are going to contend are the financing entities before we get

7   done.  But this motion should be denied.

8           Thank you, Your Honor.

9           **THE COURT:**  Thank you, Counsel.

10          Mr. Quinn?                                                    04:15

11          **MR. QUINN:**  Yes, Your Honor.

12          The previous motion relating to Lexington was a

13   question about service, whether service was effective on

14   Lexington.  The problem with getting discovery from that

15   financing entity, again, is, it's a Nevis entity.  Nevis isn't      04:15

16   even a party to the Hague Convention.  We have a situation here

17   where they don't deny they are holding documents relating to

18   this transaction between Lexington and Vision.  They are here

19   in the district.  The fact that a lawyer is holding them, I

20   submit, is irrelevant.                                              04:15

21          On the privilege question, privilege has to be shown

22   on a document-by-document basis.  If they are claiming that

23   they are holding any privileged documents, we all know that a

24   privilege log should be provided.

25          What counsel is referring to is about another matter       04:15

Monday, July 6, 2009 EXHIBIT _____/_____ CV 04-09049-SGL

PAGE _____14____

24

1  before the discovery referee where we're asserting that the

2  privilege was waived, it's a subpoena to Omni, where Omni did

3  not provide a privilege log.  There's Ninth Circuit authority

4  for the proposition that if you fail to timely provide a

5  privilege log, that affects a waiver.                    04:16

6          Thank you, Your Honor.

7          THE COURT:  Just one point.  It's not relevant to

8  this motion, but it was raised by Mr. Gordinier.

9          Are you serving the intervening party with --

10         MR. QUINN:  Perhaps I'd better defer to Mr. Zeller.  04:16

11         MR. ZELLER:  As is a number of things that

12 Mr. Gordinier has said here today, these have never been raised

13 with us, as to whether or not -- he claims he has not been

14 getting papers.  Certainly, we've served them with papers.

15         THE COURT:  Make sure he gets everything, Mr. Zeller.  04:16

16         MR. ZELLER:  And I assume we have MGA's agreement

17 that there's not an issue about us providing AEO materials, as

18 well, to Omni and so on.

19         MR. RUSSELL:  That's fine.

20         THE COURT:  Make sure Mr. Gordinier receives copies  04:16

21 of everything.

22         MR. ZELLER:  For the record, as far as I'm aware,

23 he's on every service list.  But he has never raised that with

24 us before.

25         THE COURT:  He's raised it now, so just corroborate  04:17

Monday, July 6, 2009  EXHIBIT ___1___  CV 04-09049-SGL

PAGE ___15___

1    that.

2          Last issue.  Well, actually, there's two more issues:

3    The motion to strike the reports by the Court's forensic

4    auditor, Mr. Durkin, and the related issue regarding the

5    unsealing of Mr. Durkin's reports.                              04:17

6          Let me just express my thoughts on this for the time

7    being, and then I'll hear from everyone who wants to be heard.

8          The Catch-22 that the Court finds itself in is this:

9    On the one hand, at present, there is no reason not to keep the

10   reports by Mr. Durkin sealed, or in their current state, where  04:17

11   they've been disclosed to the parties, pending further order of

12   the Court.  Except one.  And that one reason was the

13   unfortunate incident that we had at the last hearing, where

14   references on the record were made to Mr. Durkin's report.

15         Amongst those references to the report and to           04:18

16   Mr. Durkin were some pretty serious allegations concerning

17   Mr. Durkin, both in terms of his competency and in terms of his

18   objectivity, both in the papers that were filed with the Court,

19   not under seal, and the statements that were made in court, not

20   under seal.                                                     04:18

21         The question is how to rectify that.

22         I've already, I think, spoken in court, as well as in

23   the court order, to the counsel who made the statements; so

24   that is in the past at this point.  However, I can't leave

25   these allegations hanging out there, without giving an         04:19

Monday, July 6, 2009 EXHIBIT _____/_____ CV 04-09049-SGL

PAGE _____16_____

26

```
 1   opportunity for them to be addressed; that doesn't seem fair.
 2           So the question is what to do.
 3           On the one hand, one proposal -- and the Court raised
 4   this in its order -- is that we could simply release the entire
 5   report, and that way people can draw their own conclusions      04:19
 6   based on an educated understanding of what's in the report.
 7           But that, of course, raises the problem of releasing
 8   the report and releasing information that at this point, at
 9   this juncture, should probably remain under seal.
10           So that's where I'm at.                                 04:20
11           So without further exacerbating the situation, I
12   invite counsel to address the Court.
13           MR. GORDINIER:  Your Honor, since some of them were
14   my comments at the last hearing that the Court is concerned
15   about, let me suggest what I think the appropriate thing is to  04:20
16   do.
17           THE COURT:  Please.
18           MR. GORDINIER:  I think the Court is right, and the
19   Court's instincts are correct, that we ought not to exacerbate
20   this and we ought not to make it worse than it already is.  My  04:20
21   suggestion is that -- and if what I said in responding to an
22   OSC directed to my client went beyond what the Court wanted,
23   I'm sorry for that, but I do think what we ought to do, if the
24   Court is concerned about that pleading being out there, is seal
25   that pleading.                                                  04:20
```

39

1                               CERTIFICATE

2

3   I hereby certify that pursuant to section 753, title 28, United
    States Code, the foregoing is a true and correct transcript of
4   the stenographically recorded proceedings held in the above-
    entitled matter and that the transcript page format is in
5   conformance with the regulations of the Judicial Conference of
    the United States.

6

7   _____                    _____
    THERESA A. LANZA, CSR, RPR                            Date
8   Federal Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Monday, July 6, 2009   EXHIBIT _____ /              CV 04-09049-SGL

                        PAGE _____ /8

# Exhibit 2

Bingham McCutchen LLP
TODD E. GORDINIER (SBN 82200)
todd.gordinier@bingham.com
PETER N. VILLAR (SBN 204038)
peter.villar@bingham.com
CRAIG A. TAGGART (SBN 239168)
craig.taggart@bingham.com
600 Anton Boulevard, 18th Floor
Costa Mesa, CA  92626-1924
Telephone:  714.830.0600
Facsimile:  714.830.0700

Attorneys for Non-party
Omni 808 Investors, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Carter Bryant, an individual,<br><br>Plaintiff,<br><br>v.<br><br>Mattel, Inc., a Delaware Corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS. | Case No. CV 04-9049 SGL (RNBx)<br><br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>Hon. Stephen G. Larson<br><br>**NON-PARTY OMNI 808 INVESTORS, LLC'S OPPOSITION TO MATTEL, INC.'S *EX PARTE* APPLICATION FOR AN ORDER TO SHOW CAUSE RE:  OMNI 808'S FAILURE TO COMPLY WITH COURT ORDER, OR IN THE ALTERNATIVE, FOR AN ORDER SHORTENING TIME TO HEAR MOTION FOR SUCH RELIEF**<br><br>**[DECLARATION OF PETER N. VILLAR FILED CONCURRENTLY]**<br><br>**Phase 2:**<br>Discovery Cut-off:  Dec. 11, 2009<br>Pre-trial Conference:  March 1, 2010<br>Trial Date:  March 23, 2010 |

A/73017945.2

EXHIBIT ___2___

PAGE ___19___

TABLE OF CONTENTS

Page

I.     INTRODUCTION ..........................................................................................1

II.    MATTEL'S DESCRIPTION OF THE "BACKGROUND" FACTS IS FALSE, MISLEADING AND IRRELEVANT TO ITS EX PARTE APPLICATION .............................................................................................7

III.   THERE IS NO LEGAL BASIS FOR EX PARTE RELIEF ........................11

       A.    Mattel's Ex Parte Application Should Be Denied Because It Has Failed To Show Any Exigent Circumstances Or Irreparable Harm ...............................................................................................11

       B.    Mattel's Ex Parte Should Be Denied Because It Failed To Provide Notice Under Local Rules 7-19 And 7-19.1 And Judge Larson's Standing Order ............................................................12

       C.    Omni Is Being Unfairly Prejudiced By Ex Parte Filings Such as This .................................................................................................13

IV.    MATTEL'S EX PARTE APPLICATION IS ENTIRELY UNNECESSARY AND THE RELIEF REQUESTED IS NOT ONLY UNCALLED FOR BUT WOULD BE A CLEAR VIOLATION OF DUE PROCESS ...........................................................................................14

       A.    There Is No Basis To Issue An Order To Show Cause Given That Omni Has Requested Relief From The Discovery Master And There Is No Question That It Will Fully Comply With The Discovery Master's Decisions Regarding the Scope of Its Discovery Obligations .................................................................14

       B.    Mattel Cannot Obtain A Contempt Order On An Ex Parte Basis......17

V.     MATTEL'S REQUEST FOR  SANCTIONS IS MERITLESS...................20

VI.    CONCLUSION...........................................................................................21

EXHIBIT ___2___

PAGE ___20___

1       The *Mission Power* court's analysis is particularly instructive in this instance

2  considering that Omni is a non-party and that Mattel did not even bother to comply

3  with the *ex parte* notice requirements under the Central District Local Rules and

4  the Court's Standing Order.

5  **IV.   MATTEL'S EX PARTE APPLICATION IS ENTIRELY**

6        **UNNECESSARY AND THE RELIEF REQUESTED IS NOT**

7        **ONLY UNCALLED FOR BUT WOULD BE A CLEAR**

8        **VIOLATION OF DUE PROCESS**

9        **A.   There Is No Basis To Issue An Order To Show Cause Given**

10         **That Omni Has Requested Relief From The Discovery Master**

11         **And There Is No Question That It Will Fully Comply With The**

12         **Discovery Master's Decisions Regarding the Scope of Its**

13         **Discovery Obligations**

14       Omni made a written request to the Discovery Master to allow Omni to

15  produce its documents in one production after the Discovery Master decides

16  Mattel's Motion for Reconsideration of the same Order. There is ample precedent

17  granting such relief. *See, e.g., Williams v. Sprint/United Management Co.*, No. 03-

18  2200-JWL-DJW, 2006 WL 3694862, at *5 (D. Kan. Dec. 13, 2006) (granting

19  motion to stay production of documents pending review of magistrate judge's

20  order by the district judge); *Green v. Baca*, No. CV02-04744MMM(MANX), 2004

21  WL 1146595, at *2 (C.D. Cal. April 26, 2004) (noting that the court granted stay

22  of discovery order pending motion for reconsideration).

23       Omni is a non-party secured creditor of MGA by virtue of its acquisition of

24  an MGA debt obligation from Wachovia Bank. As explained above, Omni

25  understood Mattel's Motion for Reconsideration to effectively stay enforcement of

26  Order No. 3 and intended to make a production of the pertinent materials as a

27  single production once the Discovery Master resolved Mattel's request for

28  reconsideration, set to be heard on May 5.

14

EXHIBIT    2

PAGE    21

1    In fact, Mattel has taken the <u>same position</u> as Omni takes here with respect

2  to those portions of the Order with which it disagrees. Even though the Discovery

3  Master found that most of the categories of documents are not relevant to this

4  litigation, Mattel has insisted that Omni (and the other Financing Entities) continue

5  to preserve documents **pending the resolution of its Motion for**

6  **Reconsideration**. Mattel wants the best of all worlds by insisting on a de facto

7  stay of that portion of the Order with which it disagrees, while insisting on interim

8  compliance with that portion of the Order with which it has no quarrel. This is

9  neither fair, efficient nor appropriate.[8]

10    There is no reason that Omni should be required to conduct serial searches

11  or productions to comply with Order No. 3 (as it presently reads) given Mattel's

12  determination to have the Order reconsidered -- particularly where it is Mattel that

13  is seeking the reconsideration. The burden and expense this would subject non-

14  party Omni to entirely outweighs any argument Mattel has for piecemeal resolution

15  of this matter. It is neither efficient nor appropriate for Omni to conduct seriatim

16  searches for documents responsive to the same subpoena and Order thereon. This

17  would multiply the burden and expense on a non-party and would be particularly

18  cumbersome vis-à-vis electronic discovery since the search terms will be

19  determined by the scope of the Order.

20    Mattel has no good faith basis on which to object to this approach, and has

21  articulated no harm or prejudice that it may suffer by receiving one production

22  once <u>Mattel's own Motion for Reconsideration</u> of the Order has been decided and

23  the scope of the material to be produced is finally resolved. Indeed, Mattel has

24  argued, in its court filings to date, that the documents already produced by

25

26  [8] Also, while Mattel has engaged in ongoing communications and stipulations with
IGWT regarding its compliance with Order No. 3 (Mattel is not seeking
27  reconsideration of Order No. 3 as it relates to IGWT), it had not even mentioned
Omni's compliance until April 16.

28

A/73017945.2

EXHIBIT 2

PAGE 22

1  Wachovia are largely the same documents to be produced by Omni.  There is little
2  doubt that Mattel has embarked on a course of conduct designed principally to
3  impose as much burden and expense as possible on a non-party and this is just the
4  latest example.

5      Moreover, Omni asks the Court to take into consideration that Mattel is
6  attempting to hold a non-party in "contempt" for conduct that Mattel has routinely
7  engaged in since it first began seeking discovery from Omni.  In fact, just in the
8  last few weeks alone, Mattel unilaterally granted itself extensions of time to
9  comply with Court-ordered deadlines, on at least five separate occasions, without
10 first (and in certain instances ever) obtaining approval from the Court or Discovery
11 Master.  For instance:

12     • Mattel's Opposition to Motion to Quash and/or for Protective Order re
13        Subpoenas Issued by Mattel to Leon Neman, Fred Mashian and Neil
14        Kadisha was due on March 19, pursuant to the briefing schedule
15        mandated by the Court's December 6, 2006 Order for Appointment of
16        a Discovery Master ("Court Order").  The day after this Court-ordered
17        deadline had passed, Mattel faxed a letter to the Discovery Master
18        asking for an extension of time.  Mattel's request was granted after its
19        non-compliance with the Court Order.  (Villar Decl. ¶ 4.)
20     • Approximately one hour before the Discovery Master's newly ordered
21        deadline for Mattel's Opposition to Motion to Quash and/or for
22        Protective Order re Subpoenas Issued by Mattel to Leon Neman, Fred
23        Mashian and Neil Kadisha, Mattel faxed a letter to the Discovery
24        Master requesting another extension of time to file its Opposition.
25        The Court-ordered deadline passed again, so Mattel unilaterally
26        granted itself the extension anyway.  Mattel's request was granted
27        after its non-compliance with the Court Order.  (Villar Decl. ¶ 5.)
28     • Mattel's Reply in Support of its Motion to Compel Bingham to

16

A/73017945.2

EXHIBIT  2
PAGE  23

1          Produce Documents Responsive to Subpoena was due on March 17,

2          pursuant to the Court Order.  Approximately an hour and a half before

3          the Court-ordered deadline, Mattel faxed a letter to the Discovery

4          Master asking for an extension of time to file its Reply.  The Court-

5          ordered deadline passed, so Mattel unilaterally granted itself the

6          extension anyway.  Mattel's request was granted a day after its non-

7          compliance with the Court Order.  (Villar Decl. ¶ 6.)

8      •  Mattel's Reply to MGA's Opposition to Mattel's Motion for

9          Reconsideration of Phase II Discovery Master Order No. 3 was due on

10         April 8, pursuant to the Court Order.  Mattel apparently sought and

11         received an informal agreement from MGA for an extension of time

12         to file its Reply.  However, to date, Mattel has still not sought or

13         obtained relief or approval from the Court or the Discovery Master.

14         (Villar Decl. ¶ 7.)

15      •  Mattel's Reply to Omni's Opposition to Mattel's Motion for

16         Reconsideration of Phase II Discovery Master Order No. 3 was due on

17         April 22, pursuant to the Court Order.  However, Mattel filed and

18         served its Reply after the Court-ordered "prior to 6:00 p.m." deadline

19         without seeking or obtaining relief from the Court or the Discovery

20         Master.  (Villar Decl. ¶ 8.)

21     Accordingly, Mattel's improper application seeking to hold non-party Omni

22 in "contempt" for making a request for a single rather than seriatim document

23 productions is inconsistent with both Mattel's own course of conduct in this case

24 and with a standard that repeatedly has been applied to Mattel.

25     **B.**    **Mattel Cannot Obtain A Contempt Order On An Ex Parte Basis**

26     It is basic law in the United States that a party may only be held liable for

27 contempt after being provided due process.  In contempt proceedings, "due process

28 of law ... requires that one charged with contempt of court be advised of the

17

EXHIBIT   2

PAGE   24

1   appropriate.  Indeed, if anyone is to be sanctioned, it is Mattel for refusing to

2   respond to Omni's reasonable request to produce the documents after Mattel's own

3   request for reconsideration is resolved and, instead, opting to bring an *ex parte*

4   application for contempt, which is procedurally improper, factually baseless,

5   legally unsupportable and much more tedious and costly for all parties and the

6   Court.  This continues Mattel's "pattern" of "abusing," "annoying," "harassing"

7   and "exerting pressure" on non-parties for tactical reasons and "not really for the

8   purpose of getting information." *See Mattel, Inc. v. Walking Mountain*

9   *Productions*, 353 F.3d 792, 814 (9th Cir. 2003).

10  **VI.   CONCLUSION**

11         For the foregoing reasons, Omni respectfully requests that the Court deny

12  Mattel's *ex parte* application and all relief requested therein.  Omni further

13  requests that the Court enter an Order permitting Omni to respond to these matters

14  in a single production once the Discovery Master issues his decision on Mattel's

15  Motion for Reconsideration and the scope of Omni's third-party discovery

16  obligation is resolved.

17

18  DATED: April 23, 2009          Bingham McCutchen LLP

19

20

21                                 By:
                                   Todd E. Gordinier
22                                 Attorneys for Non-party
                                   Omni 808 Investors, LLC
23

24

25

26

27

28

EXHIBIT _____ *2*

PAGE _____ *25*

# Exhibit 3

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# Exhibit 4

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No. CV 04-09049 SGL(RNBx)                    Date: July 9, 2009
Title:       MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
==================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

           Cindy Sasse                          None Present
           Courtroom Deputy                      Court Reporter

ATTORNEYS PRESENT FOR                  ATTORNEYS PRESENT FOR
PLAINTIFFS:                            DEFENDANTS:

None Present                           None Present

PROCEEDINGS:    ORDER GRANTING EX PARTE APPLICATION RE TEMPORARY
                RECEIVERSHIP (DOCKET #5728)

                ORDER GRANTING EX PARTE APPLICATION RE COST
                SHIFTING (DOCKET #5865)

                ORDER GRANTING IN PART EX PARTE APPLICATION FOR
                RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

                ORDER GRANTING IN PART MATTEL'S MOTION RE
                DISCOVERY MASTER ORDER NO 27 AND REMANDING
                DISCOVERY MASTER ORDER NO. 27 FOR
                RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT
                OF THE FILING OF THE TAAC (DOCKET #5561)

                ORDER DENYING MOTION TO STRIKE THE FORENSIC
                AUDITOR'S REPORTS (DOCKET #5705)

EXHIBIT ___4___

PAGE ___52___

## I. ORDER GRANTING EX PARTE APPLICATION
## RE TEMPORARY RECEIVERSHIP (DOCKET #5728)

Because the only opposition to the Ex Parte Application regarding the winding up of the Temporary Receivership involves the issue of cost-shifting, which is addressed separately, below, the Court **GRANTS** the Ex Parte Application. A separate order addressing this Ex Parte Application has been concurrently filed.

## II. ORDER GRANTING EX PARTE APPLICATION RE
## COST SHIFTING (DOCKET #5865)

The MGA parties' opposition to the Temporary Receiver's Ex Parte Application argued that the costs of the Temporary Receivership should be shifted to Mattel (as the party who sought appointment of a Temporary Receiver). However, the Court has previously ruled that, at some yet-to-be defined date in the future, the Court will consider whether to shift the costs of both the Temporary Receivership and the Forensic Audit. Therefore, Mattel filed an Ex Parte Application seeking either to be relieved of the responsibility to respond to the MGA parties' argument or, alternatively, for an order setting a briefing schedule on the issue. It is not the intention of the Court to address the cost-shifting issue at this time; rather, as the Court has stated previously on the record, that issue is more efficiently resolved at a later date, most likely a date after completion of Phase 2 of the trial. Accordingly, the Court **GRANTS** Mattel's Ex Parte Application re Cost Shifting. Mattel is relieved of any duty to respond to MGA's argument regarding the appropriate allocation of costs arising from the Temporary Receiver that is set forth in the MGA parties's June 26, 2009 Opposition to the Temporary Receiver's Ex Parte Application.

## III. ORDER GRANTING IN PART EX PARTE APPLICATION FOR
## RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

The Court has received and reviewed the MGA Parties' Ex Parte Application For Partial Release of *In Camera* Juror Interview Transcripts, as well as the Opposition, the Reply, and the accompanying exhibits. The Court **GRANTS IN PART** the Ex Parte Application. Although the Court declines to award the relief sought, the Court will take steps to ensure that the transcript of the juror interviews are provided to the Ninth Circuit for its consideration of the appeal filed by the MGA parties.

The relevant *in camera* juror interviews were conducted on July 25, 2008; the findings made by the Court on the basis of those interviews are set forth in detail in the Court's Order Denying Motion for Mistrial, dated August 8, 2008. Counsel for the parties agreed that the juror interviews, which were conducted mid-trial, should be conducted *in camera*, and the MGA parties did not request that the Court grant them access to the transcripts to prepare their Motion for Mistrial. The Court indicated on the

MINUTES FORM 90
CIVIL -- GEN                                    2                    Initials of Deputy Clerk __cls_____

EXHIBIT ___4___

PAGE ___53___

record around the time of the filing of the Motion for Mistrial that it was not the Court's intent to grant the parties access to the transcripts.

After the conclusion of the trial, the MGA parties did not at any time request this Court grant access to the transcripts. To the contrary, some ten months passed between the date of the Order Denying Motion for Mistrial and the MGA parties' first post-trial request for access to those transcripts. That request was made to the Ninth Circuit, not this Court, on June 10, 2009. When the Ninth Circuit denied the request in favor of the MGA's presentation of the issue to this Court in the first instance, the MGA parties thereafter filed the present Ex Parte Application in a expeditious manner.

Ostensibly, as set forth in both the Motion filed before the Ninth Circuit and the Ex Parte Application before this Court, the reason the MGA parties seek access to those transcripts is so that they may use them to challenge the Court's Order Denying Motion for Mistrial. Although the MGA parties filed its Notice of Appeal on May 4, 2009, and although that Notice clearly indicated that the Order Denying Motion for Mistrial would be implicated in the appeal, the MGA parties failed to file its Motion seeking release of the transcripts until June 10, 2009. The MGA parties' failure to seek this relief until a month after they filed their Notice of Appeal and a month before their opening brief was due, and their decision to present the issue of release of the transcripts to the appellate court (rather than this Court) in the first instance, created the very urgency that cause them to seek ex parte relief from this Court. As such, the Court declines to grant the relief sought.

Nevertheless, in the interest of due process and in order to facilitate the full consideration of the issue by the Ninth Circuit, the Court will take steps to ensure that the transcripts of the *in camera* interviews are provided to the Ninth Circuit for *in camera* filing.

## IV. ORDER GRANTING IN PART MATTEL'S MOTION RE DISCOVERY MASTER ORDER NO 27 AND REMANDING DISCOVERY MASTER ORDER NO. 27 FOR RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT OF THE FILING OF THE TAAC (DOCKET #5561)

In the challenged portion of Discovery Master Order No. 27 ("DM Order No. 27"), the Discovery Master denied Mattel's Motion to Compel discovery sought by service of a subpoena on non-party Bingham McCutchen LLP ("Bingham"), a law firm that represents Intervenor Omni 808, as well as a number of non-party entities that are familiar to those involved in this litigation: OmniNet Capital, LLC ("OmniNet"), Vision Capital, LLC ("Vision"), IGWT Group, LLC ("IGWT"), and IGWT 826 Investments, LLC ("IGWT 826"). Broadly categorized, the subpoena sought production of (1) fee agreements relating to Vision and Omni 808; (2) documents regarding the formation, control, and financing of Omni 808, Vision, and Lexington Financial Limited

MINUTES FORM 90
CIVIL -- GEN

3

Initials of Deputy Clerk __cls_____

EXHIBIT ___4___

PAGE ___54___

("Lexington"); (3) documents identifying stakeholders and officers of Omni 808, Vision, and Lexington; (4) all contracts relating to Omni 808, Vision Capital, and Lexington; (5) all communications relating to Omni 808, Vision Capital, and Lexington, excluding attorney-client privileged documents; and (6) Bingham's representation of MGAE and certain named individuals who have some connection with MGAE, including a number of Mr. Larian's family members.

The Discovery Master correctly recognized the essential legal standard in assessing whether a subpoena may be enforced. The information must satisfy the discovery relevance standard, i.e., it must be "'reasonably calculated to lead to the discovery of admissible evidence.'" DM Order No. 27 at 19 (quoting Fed. R. Civ. P. 26(b)(1)). The decision of whether to enforce a subpoena ultimately implicates a balancing test that pits relevance of the materials sought and need to the requesting party against hardship to the party resisting the subpoena. DM Order No. 27 at 20. Non-parties are generally required to bear lesser burdens than parties in responding to subpoenas. Exxon Shipping Co. v. United States Dept. of Interior, 34 F.3d 774, 779 (9th Cir. 1994) ("The Federal Rules also afford nonparties special protection against the time and expense of complying with subpoenas.").

However, the Discovery Master overstated the burden of proof allocated to Mattel, as the party seeking discovery. See DM Order No. 27 at 20 ("As the party moving to compel compliance with the subpoena, Mattel bears the initial burden of establishing that the information sought is relevant and necessary to the claims or defenses at issue.") This standard is both overstated and incomplete. It is overstated in that Mattel need not show that the evidence sought is "necessary to the claims or defenses." Although Mattel indeed bears the burden of establishing relevancy, that showing is not one of "necessity." Rather, Mattel must bear the burden of establishing the discovery relevancy standard -- that the materials sought are "reasonably calculated to lead to the discovery of admissible evidence" -- is met. It need not establish that the materials sought are "necessary" to its case.

This point leads to the manner in which the stated burden is incomplete. As clearly articulated by cases cited by Bingham, although Mattel bears an initial burden of establishing relevancy, the party resisting discovery thereafter has the burden of establishing that discovery should be denied. See Bryant v. Ochoa, 2009 WL 1390794 at *1 (S.D. Cal. 2009) ("The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1). . . . Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections."); DIRECTV, Inc. v. Trone, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (same); see also Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975) (reversing the district court's issuance of a protective order based on a failure of the party resisting discovery to meet its burden by asserting that the defendant's deposition would merely yield cumulative evidence).

MINUTES FORM 90                                              Initials of Deputy Clerk __cls_____
CIVIL -- GEN                          4

EXHIBIT ___4___

PAGE ___55___

The effect of this subtle variation on the burden of proof from that stated by the Discovery Master is magnified by the recent filing of the TAAC, which significantly heightens the relevancy of the issue of how the MGA parties and the parties represented by Bingham may be related, the formation of certain of those entities, and other issues implicated by Mattel's requests. Because the question of relevance is featured so prominently in the quintessential balancing test to which the present discovery motion was subjected, the filing of the TAAC dramatically altered the calculus that underlies the conclusions reached in DM No. 27.

For reasons related to judicial economy and preservation of scarce judicial resources (which this case has stretched to the outer limits), the Court defers decision, in light of the changed calculus that has occurred as the result of the filing of the TAAC, of the issues presented in the challenged portions of DM No. 27 to the Discovery Master. For that reason, the Court **REMANDS** the challenged portions of DM No. 27 to the Discovery Master for his reconsideration and re-balancing in light of the recently filed TAAC. The Discovery Master may, in his discretion, set the matter for further briefing and/or hearing, he may take the matter under submission based on the existing record, or he may take other action as he deems appropriate to resolve the present issues.

Notwithstanding the remand of DM Order No. 27, one issue raised by Mattel requires further consideration by the Court. At page 25 of DM Order No. 27, the Discovery Master appears to impose a blanket prohibition on discovery of materials that are in the possession of a subpoena recipient, but that are related to a non-party over whom the Court has not been shown to have jurisdiction. The Discovery Master cites no legal authority for such a blanket prohibition, and the Court, in its own research, has found none. Such a blanket prohibition precludes the application of the balancing test that applies almost universally to discovery motions; accordingly, and because this blanket prohibition is unprecedented, the Court finds that it is contrary to law. As to this narrow issue, the Court **GRANTS** Mattel's Motion. The issue of discovery of materials relating to Lexington is **REMANDED** to the Discovery Master for reconsideration in light of this ruling and in light of the filing of the TAAC.

## V. ORDER DENYING MOTION TO STRIKE
## THE FORENSIC AUDITOR'S REPORTS (DOCKET #5705)

In an unsealed filing that has since been ordered sealed by the Court, counsel for Omni 808 Investors, LLC ("Omni 808"), Todd E. Gordinier, made unwarranted, unsubstantiated personal attacks against the Court-Appointed Forensic Auditor, Ronald L. Durkin. Mr. Gordinier's selective public disclosure of portions of the Forensic Auditor's Summary Report, coupled with the maintenance of the Summary Report, as well as the later-filed Responsive Report and Final Report, under seal in their entirety, has led to an unbalanced public presentation of the issues discussed therein. In an

EXHIBIT ___4___

PAGE ___56___

attempt to cure this deficiency, the Court has considered the possibility that it should simply unseal the relevant Reports and allow those Reports to speak for themselves.

Because the MGA entities were the primary subject of the Forensic Audit, the MGA parties have, quite understandably, objected to the proposed unsealing. Mattel, for its part, advocates quite emphatically, and not unreasonably, that the Reports should be unsealed in light of the selective disclosure. See Tr. at 31-32 ("It's the underlying analysis that refutes the selective disclosures that MGA and Omni made in a public forum to smear . . . both Mr. Durkin and Mattel.") At the other end of the spectrum, Omni 808 has moved to strike the Reports in their entirety.

In the end, although the Court does not order the unsealing of the Reports, it **DENIES** the Motion to Strike. The Court ordered the Forensic Audit to evaluate whether a receiver should be appointed; as the record bears witness, the Court eventually rejected the suggestion that it should appoint a permanent receiver, and the Court has instead appointed an MGA Monitor with more limited powers than a receiver. Nevertheless, the fact that the Reports were intended to serve a very limited purpose does not mean that there is no possibility that the Forensic Auditor's Reports will not serve any purpose henceforth.

As it currently stands, the Court **ORDERS** that no party shall cite to or rely upon the Reports for any purpose absent further Order of this Court.[1] However, the documents attached to the Reports, to the extent they are otherwise discoverable, are not insulated from discovery on the basis that they have been made part of the Reports. Conversely, documents, such as charts and interview notes, that were prepared by the Forensic Auditor are the property of the Court and are not subject to discovery or use in this or any other litigation by any party or non-party.[2]

Had it been counsel for the MGA parties who mounted the unwarranted, unsubstantiated, and public personal attacks on Mr. Durkin, the Court would find, notwithstanding the sensitive information contained therein, the unsealing of the Reports was an appropriate remedy for the selective disclosure.[3] However, here, it is

---

[1] This Order does not supersede the Court's Order permitting the Forensic Auditor to share information with the Court-Appointed Monitor.

[2] Toward that end, the Court **CLARIFIES** to the parties that the work papers, drafts, notes, detailed time records, and any other materials prepared by or at the direction of the Forensic Auditor are the property of the Court. The Court **ORDERS** the Forensic Auditor, as the custodian of those records on behalf of the Court, to retain those materials, whether maintained in electronic, hard copy, or any other medium, until further order of the Court.

[3] As it stands, counsel for MGAE, James I. Stang, wisely sought, and was granted, leave to file his more restrained, but just as unwarranted and unsubstantiated, personal attacks on Mr. Durkin under seal. See MGA Entertainment, Inc.'s Response to Final In Camera Report of Forensic Auditor Ronald L.

EXHIBIT ___4___

PAGE ___57___

counsel for Omni 808 who made those attacks public, and although Mattel maintains that both the MGA parties and Omni 808 are jointly responsible for the selective disclosure, see July 6, 2009, Tr. at 33, whether, or to what extent, the MGA parties act or have acted in concert is an issue to be decided in Phase 2 of this action.

Nevertheless, Mr. Gordinier's attack on Mr. Durkin cannot pass without comment by the Court. The Court's comments are directed toward Mr. Gordinier personally, which is not the Court's usual practice. Although the irony of this form of address is not lost on the Court (given the subject of this Order), it is appropriate. Mr. Gordinier signed all three filings in which the personal attacks appear, and continues to stand behind those filings. Moreover, Mr. Gordinier expressly and unabashedly claimed personal responsibility for the brief that was not filed under seal, by both stating that he gave it a lot of thought before filing it and by implicitly acknowledging that although he considered filing his brief under seal, he ultimately rejected that course of action. See May 18, 2009 Tr. at 46-47 ("My brief speaks for itself. We have nothing to hide. . . . I didn't feel it appropriate, necessary, or desirable to file my brief under seal. And I don't have a problem with the Court or anybody reading what I have to say, because I gave it a lot of thought, and I gave it at lot of consideration.").

At the July 6, 2009, hearing, the Court outlined its concerns that while the attacks on Mr. Durkin were public, the Reports are not, and that "it doesn't seem fair" to the Court to allow those allegations to stand alone without a chance to respond to them. July 6, 2009, Tr. at 25-26. In response, Mr. Gordinier contended that his comments "respond[ed] to the report," and that "[w]hat we said was that there were problems with that report." July 6, 2009, Tr. at 28. This statement is an implicit denial that any personal attacks were made; however, as set forth in great detail below, the record belies Mr. Gordinier's *post hoc* protestations.

Lest Mr. Gordinier's statement reflecting his implicit denial that he engaged in personal attacks be perceived as one being made at oral argument without ample time to reflect upon its significance, the statement is also made by Mr. Gordinier in Omni 808's Reply Memorandum, a document upon which he had ample time to reflect: "Each and all of the references in Omni's Statement of Position refer to the contents of Mr. Durkin's Reports and the shortcomings contained therein and omitted therefrom, not to his person." Id. at 2 n.1. To be sure, the criticisms leveled at Mr. Durkin are framed in

---

Durkin (docket #5918) at 4 (accusing Mr. Durkin of "making McCarthy-like statements of non-existent buybacks and unsupported insinuations of conflicts of interest"); id. at 9 (suggesting that Mr. Durkin's formulation of certain search terms relating to criminal acts in Farsi without a concurrent formulation of those terms in English demonstrated a "predisposition that Persian members of MGA's management and staff (and only the Persian members) might be engaged in illegal conduct"). Mr. Stang's attacks pale in comparison to those advanced by Mr. Gordinier, and they were filed under seal. Thus, although the Court's analysis and conclusions regarding the Forensic Auditor's Reports applies with equal force to Mr. Stang's statements, his are not the focus of the Court's attention at this time.

Initials of Deputy Clerk __cls_____

EXHIBIT ___4___

PAGE ___58___

terms of his Reports.  Still other criticisms are, as counsel maintains, addressed to the Reports themselves; those must be analyzed based on their substance.  However, as aptly demonstrated by the cited and quoted portions of Mr. Gordinier's filings that appear below, his criticisms do not, by any measure, confine themselves to those Reports, and instead reach out in a highly personal manner to attack the author, his professionalism, his competence, his objectivity, and his integrity.[4]

Indeed, in a display the likes of which have not been previously witnessed by this Court, Mr. Gordinier strayed far afield of legitimate criticism of the discussions, analyses, and conclusions reached in the Summary Report and the Reports that followed.  To be sure, there are instances in which Mr. Gordinier addressed the message found in those Reports; just as surely, however, as detailed below, Mr. Gordinier attacked the messenger.  Specifically, the papers filed by Mr. Gordinier on behalf of Omni 808 call into question Mr. Durkin's professionalism and competence, as well as his objectivity and integrity.  Moreover, and alarmingly, they falsely accuse Mr. Durkin of being influenced by an ethnocentric bias against Mr. Larian and Mr. Kadisha.  Such attacks, aimed at Mr. Durkin personally rather than the discussion, analyses, and conclusions set forth in his Reports, appear throughout Omni 808's papers.  See Omni 808 Investors, LLC's Statement of Position re Order to Show Cause re Appointment of a Permanent Receiver (docket #5446) ("SOP"), filed May 14, 2009, at 11 (referring to Mr. Durkin's "irresponsible" analysis); id. (noting that Mr. Durkin is "far too experienced" to believe that he "produced . . . a balanced presentation"); id. (stating that "Mr. Durkin's report is a polemic" and "a piece of advocacy"); id. at 12 n.9 (calling into question Mr. Durkin's "objectivity" based on the fact that the Court ordered Mr. Durkin's fees be paid (at least in the first instance) by Mattel); id. (suggesting that Mr. Durkin's ex parte communications with Mattel were improper); id. at 13 n.10 (characterizing Mr. Durkin's quotation of Mr. Larian's and Mr. Kadisha's account of how the two men were acquainted, from "the Persian community," as "at best, unprofessional" and, "at worst,

---

[4]  Adding still further to the mounting irony, in the same footnote that Mr. Gordinier disclaims engaging in improper personal attacks, he falsely accuses counsel for Mattel of advancing their own improper ad hominen attacks against Neil Kadisha, who has been referred to as a "common thief" in certain unspecified Mattel filings.  Mr. Kadisha is the Managing Partner of a diversified investment firm, Omninet Capital, LLC, and an investor in Omni 808.  To call someone a "common thief" is, undoubtably, by any measure, a highly personal attack, therefore an attack addressed "to the man," or ad hominen.  However, in the same manner Mr. Gordinier accuses Mr. Durkin of failing to provide appropriate context to the Court in his Reports, Mr. Gordinier himself fails to acknowledge that counsel for Mattel's use of the term "common thief" in connection with Mr. Kadisha merely quotes Los Angeles County Superior Court Judge Henry W. Shatford's conclusion regarding Mr. Kadisha, as set forth in his 191-page Statement of Decision, dated October 24, 2006, which was issued after a 200-day trial, which is currently pending appeal, and which conferred upon Mr. Kadisha the oft-repeated moniker of "common thief," as well as "embezzler," and "perjurer."  See Uzyel v. Kadisha, Cal. App. Nos. B196045, B203804, B198007, B199850, B201425, 2009 WL 646096 (Mar. 4, 2009) (appellate brief).  As always, context is key.  The use by counsel for Mattel of another court's findings and conclusions to advance an argument is not inappropriate.  Those findings and conclusions may, or may not, be relevant to matters presented to the Court.  Used in this manner, although undoubtably addressed "to the man" (and his credibility), it is not an improper ad hominen attack.

EXHIBIT  4
PAGE  59

evidence of improper cultural bias"); id. (in the same footnote, referring to the same
quotation, stating that "[t]he tone [of the report] itself is compelling proof that Mr. Durkin
had no intention of providing an 'objective' report to the Court."); id. at 23 (referring to
the Summary Report as "Mr. Durkin's ill-concealed advocacy piece"); id. (noting that
advocacy, rather than objectivity, "is certainly the posture [Mr. Durkin] is most
comfortable with"); Omni 808 Investors, LLC's Memorandum in Support of Its Requests
to Strike Summary and Responsive Reports of Ronald L. Durkin (docket #5705)
("Motion to Strike"), filed June 8, 2009, at 4 (noting Omni's "doubts that the Court or any
party would benefit further by continuing this façade of Mr. Durkin's 'impartiality'"); id. at
7 (calling Mr. Durkin's explanation of his conclusion regarding the relatedness of certain
parties as "not only fatuous[,] but [also] intellectually dishonest"); id. at 9 (suggesting
that Mr. Durkin intentionally concealed from the Court the fact that Mr. Larian sought
other funding sources before turning to Mr. Kadisha); id. at 10 (noting that "Mr. Durkin's
repeated references to Mr. Larian's and Mr. Kadisha's common 'Persian' heritage can
only be viewed as an attempt to draw some nefarious ethnic connection between
them"); id. at 12 (calling the reference to Mr. Larian's and Mr. Kadisha's ethnicity
"unprofessional symptoms of improper cultural bias [that] have no place in a supposedly
objective report"); Omni 808 Investors, LLC's Reply Memorandum (docket #5809)
("Reply Memo") at 14 (suggesting that not only Mr. Durkin, but also counsel for Mattel,
harbor "cultural biases" that lead them to "suggest[] that [Mr. Larian's and Mr. Kadisha's]
common heritage makes [them] more likely to act contrary to their own interests); id. at
15 (stating that, according to his own interview notes, Mr. Durkin "misrepresented" to
the Court in his Summary Report how Mr. Larian and Mr. Kadisha portrayed their
relationship with each other).

As alluded to, Omni 808's criticisms have not been limited to personal attacks;
some of the criticisms are in fact aimed at the Reports themselves. See e.g., SOP at 16
("Mr. Durkin's conclusion that the Wachovia-Omni transaction impacted 'MGAEI's
solvency and ability to continue conducting operations' is simply wrong."). Any
comment by the Court regarding the substance of the discussions, analyses, and
conclusions presented to the Court in the Forensic Auditor's Summary, Responsive,
and Final Reports is inadvisable at this time.  With the filing of the Third Amended
Answer and Counterclaims, much of the subject matter of the Forensic Auditor's
Reports have been incorporated into the claims at issue in this action.  As such, it would
be premature for the Court to comment upon the substance of issues that are yet to be
adjudicated, and that are subject to a trial by jury.  Nevertheless, the Court has
reviewed the Forensic Auditor's Summary, Responsive, and Final Reports, and the
exhibits attached thereto.  The Court has also reviewed and considered the criticisms
aimed at the Forensic Auditor, cited and quoted above, as well as the entirety of all the
papers responding to the Forensic Auditor's Reports filed to date.  After this review, the
Court is firmly convinced that all the personal criticisms of Mr. Durkin are unwarranted
and unsubstantiated.

At best, the criticism of Mr. Durkin's performance and presentation represents a

EXHIBIT __4____

PAGE ___60____

different interpretation of available evidence. That such disagreements would arise between the analyses offered by a Court-Appointed Forensic Auditor and that offered by counsel for a party whose transactions have been a subject of that audit is by no means surprising. A jury considering the relevant evidence might ultimately make factual determinations that tend to agree with Mr. Durkin's assessment, it might ultimately tend to agree with Mr. Gordinier's assessment, or it may very well reject both positions in favor of another. The answer to the merits of the claims at issue in this action must await another day. Today, the Court merely notes that its examination of the Forensic Auditor's Reports reveal that Mr. Gordinier's personal attacks aimed at their author were unjustified.

Some specific attacks directed toward Mr. Durkin – relating to his background as a law enforcement officer, his communications with counsel for Mattel, and specific (but baseless) allegations of ethnocentric bias -- are worthy of more specific comment by the Court.

Stopping short of explicitly stating such, Mr. Gordinier appears to labor under the assumption that Mr. Durkin has been unable to put behind him the prosecutorial mindset under which he presumably operated during his former service to this Nation as an agent of the Federal Bureau of Investigation ("FBI"). At the outset, the Court notes that Mr. Gordinier's unstated assumptions do a disservice to the prosecutors and the law enforcement officers who work with those prosecutors, both of whom conduct their work under the clearly delineated duty to ferret out not only evidence of guilt but also "evidence favorable to the accused." See e.g., Berger v. United States, 295 U.S. 78, 88 (1935) (noting that the role of the prosecutor is not to win at all costs and observing that the prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."); Brady v. Maryland, 373 U.S. 83, 87 (1963) (imposing a duty on prosecutors to provide to the defense exculpatory evidence when requested to do so).

Secondly, even if prosecutorial duties were not so defined, the Court finds no suggestion that Mr. Durkin skewed the evidence in favor of any particular viewpoint. Undoubtedly, there is a **complete absence** of any evidence that, as Mr. Gordinier has suggested, Mr. Durkin has embarked upon a campaign to purposely mislead the Court.

Mr. Gordinier also suggests that, because Mr. Durkin's bills are being paid by Mattel, Mattel has, through this payment or through other communications with Mr. Durkin, bought Mr. Durkin's loyalty. This is utter nonsense. As demonstrated by the Court's communications with him, Mr. Durkin is a Court-Appointed Officer who understands that his role is to work on behalf of the Court and not on behalf of any party. In any event, the Court's Order of January 7, 2009, which appointed Mr. Durkin, imposed the costs of the audit on Mattel "in the first instance," but expressly provided for

the possibility that the audit expenses be shared or shifted to the MGA parties. Moreover, to suggest, however subtly, that ex parte communications with counsel for Mattel were improper ignores the Court's mandate to the Forensic Auditor in the January 7, 2009, Order, which states that Mr. Durkin was provided with attorney contact information and that he "shall direct his initial communications to counsel." At no time has the Court precluded the Forensic Auditor's communications with Mattel or its counsel; in fact, because the Forensic Audit was undertaken based on evidence gathered by and presented to the Court by Mattel, Mr. Durkin would have been remiss in his duties if he failed to communicate with Mattel and its counsel.

Mr. Durkin was vested with powers and discretion to complete a Court-ordered Forensic Audit. Pursuant to an Order of this Court, he undertook this task and exercised those powers and that discretion, presenting his Reports in conformity with the Court's instructions. Despite counsel's attacks, the Court's review of the evidence before it discerns no abuse of those powers or of that discretion.

Particularly troubling to the Court is that counsel speculates that, because Mr. Durkin noted in his report that Mr. Larian knew Mr. Kadisha from "the Persian Community," Mr. Durkin could be "of the view that this common heritage makes Mr. Kadisha more likely to act contrary to his own interests or to do something via third-parties that he wouldn't otherwise do?" See SOP at 13-14 n.10 (appearing to pose this thought as a rhetorical question). There is no indication in the record, or otherwise, that Mr. Durkin holds such a view. To the contrary, Mr. Durkin's comment regarding the acquaintanceship of Mr. Larian and Mr. Kadisha from "the Persian Community" (which is noted in the report within quotation marks and is expressly attributed to a reference made by Mr. Larian himself) is clearly predicated on interviews with these two individuals, each of whom related independently to Mr. Durkin and his colleagues that they knew each other from "the Persian Community." See Durkin Summary Report, Ex. 14, at 2 ¶ 3 (Notes re March 25, 2009, interview with Mr. Larian: "He indicated that he knew Kadisha from the Persian community.") and Ex. 14, at 15 ¶ 2 (Notes re March 26, 2009, interview with Mr. Kadisha: "Kadisha stated that he knows Larian from the Persian community."). The purpose for this reference is made clear in the footnote set forth at the end of the sentence in which the reference appears; namely, the Report discusses evidence that the relationship between Mr. Larian and Mr. Kadisha is stronger and more personal than either man claimed it was. See Summary Report at 5 n.18; Ex. 15 (personal emails).

In the Reply Memo, Mr. Gordinier takes issue with this explanation, this time including not only Mr. Durkin but also counsel for Mattel as the targets for his unsubstantiated allegations of "cultural bias." Mr. Gordinier first mischaracterizes an argument made by Mattel. Mattel argued, and quite correctly, both that how well Mr. Larian and Mr. Kadisha knew each other was relevant to a determination of whether certain transactions between the two were arms-length transactions, and that this point was likely not lost on either of these two very sophisticated and successful

MINUTES FORM 90
CIVIL -- GEN                                    11                    Initials of Deputy Clerk __cls_____

EXHIBIT __4_____
PAGE __62____

businessmen.[5] As noted previously, both Mr. Larian and Mr. Kadisha stated that they knew each other from "the Persian community" which, in the Forensic Auditor's view, was intended to, or at least had the tendency to minimize the existing relationship between the two. Mr. Gordinier incorrectly characterizes this argument as Mattel's contention that Mr. Larian's and Mr. Kadisha's "Persian relationship" and "common Persian heritage" was somehow relevant to a determination of whether the Omni 808 transaction was an arms-length transaction. Mattel made no such argument. Neither counsel for Mattel nor Mr. Durkin have implied that Mr. Larian's and Mr. Kadisha's ethnicity factors into the analysis. Other than to point to Mr. Larian's and Mr. Kadisha's separate, but identical, accounts of how they knew each other which, in turn, suggests how well they know each other, neither counsel for Mattel nor Mr. Durkin have stated or implied that Mr. Larian's and Mr. Kadisha's shared ethnicity is relevant to any matter currently or potentially before the Court. Compare Opposition at 8-9 with Reply Memo at 14-15.

Moreover, Mr. Gordinier's substantive point, that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha told him about the closeness of their relationship, fares no better. See Reply Memo at 15. On this point, it is important to set this stage properly. Counsel for all parties have attempted to glean far too much from two sterile paragraphs of interview notes taken by Mr. Durkin. Much can be inferred from conversations and interviews through not only what is said, but what is not said, by the interviewee's demeanor, by the tone of the speaker, by the length and placement of pauses, and by non-verbal gestures and body language. With all these variables, much of what is communicated does not find its way into notes.[6] For instance, Mr. Durkin's interview of Mr. Larian lasted over two and a half hours; however, the interview notes are a mere five and a half pages. Similarly, a one-hour and ten minute interview of Mr. Kadisha yielded only three and a half pages of interview notes. This is not to suggest that the notes should have been longer or that the interviews should have been recorded or transcribed; rather, it is to suggest that counsel's arguments based on another's notes are not particularly probative.

In contrast, Mr. Durkin's assessment, based on his interviews with both of them,

---

[5] In fact, the Court just this week issued a 30-page, single-spaced opinion resolving a 10-day bench trial conducted over the sole issue of whether a transaction between "closely related" entities reflected its fair market value, one of the more significant arguments ultimately rejected by the Court in that case being that the close relationship between the parties necessarily rendered the transaction a "sweetheart deal." See July 6, 2009, Order, Siegel v. Warner Bros. Entertainment, Inc., et al., CV 04-08400 SGL (RZ) (docket #554).

[6] Indeed, the interview notes upon which the parties rely concede as much. See Summary Report, Ex. 14 at 2, 15 ("This interview memorandum is a factual representation of the topics discussed during the interview and is not intended to be a word for word or exact transcription of the conversation."). Thus, in addition to not taking into account all non-verbal communication, the notes do not even represent everything that was said during the interview.

MINUTES FORM 90                                    Initials of Deputy Clerk __cls_____
CIVIL -- GEN                          12

EXHIBIT ___4___

PAGE ___63___

is that Mr. Larian and Mr. Kadisha attempted to minimize their relationship because both of them understand the relevance of any friendship or other connection between them to the assessment of the arms-length nature of any transactions in which they have engaged. Mr. Durkin's assessment does not come from the gentle teasing of a strained meaning from two sterile paragraphs of brief notes taken by another person; rather, his assessment springs from his participation in the interview process, the entirety of the interviews he conducted of Mr. Larian and Mr. Kadisha, and his review of all of the evidence. As such, the Court defers to his assessment, at least insofar as how Mr. Larian and Mr. Kadisha portrayed their relationship to him.

As for that scant language from which the parties glean so much meaning, the entirety of which is set forth below, it in no way supports the contention made by Mr. Gordinier that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha conveyed to him about the closeness of their relationship. On this topic, the notes of Mr. Larian's interview merely state the following:

> Larian decided to contact Neil Kadisha of OmniNet as he knew his company was in the distressed loan business. He indicated that he knew Kadisha from the Persian community. Kadisha said he wouldn't do the deal alone in today's environment and wanted Larian and their other friends to invest in the deal with MGA. Larian stated that Kadisha negotiated the debt with Wachovia and got it down significantly, Larian said he is not bitter about Kadisha getting a good deal on buying the loan).

Summary Report, Ex. 14, at 2 ¶ 3 (emphasis added). This paragraph contains the word "friends," and perhaps could even be read as an implicit statement by Mr. Larian that he and Mr. Kadisha are "friends." But the language does not compel such an inference. Moreover, it does not comport with the notes of Mr. Kadisha's interview, which on this topic state only the following:

> Larian and Kadisha have never been to dinner together. Kadisha stated that he knows Larian from the Persian community and he sees him often at religious events, etc. He has no investments with Larian. Kadisha did not talk with Larian last night, this morning or in the last two days.

Summary Report, Ex. 14, at 15, ¶ 2. Mr. Durkin's assessment that Mr. Larian and Mr. Kadisha sought to minimize the extent of their relationship is not contradicted by these short passages.

The criticism that Mr. Durkin was acting pursuant to an ethnic or cultural bias is clearly baseless. The allegations are irresponsible, and they are made to capitalize on

MINUTES FORM 90
CIVIL -- GEN

13

Initials of Deputy Clerk __cls_____

EXHIBIT ____4____

PAGE ____64____

their inherent sensational nature for counsel's own purposes of diverting attention away from the substance of the Reports. Sensationalism aside, when viewed in context, the Reports' reference to Mr. Larian and Mr. Kadisha knowing each other from "the Persian community" was plainly innocuous. The reference was a direct quotation from both Mr. Larian and Mr. Kadisha. It was used in a broader discussion regarding how (and thus, impliedly, how well) the two knew each other, which is itself relevant to the issue of whether certain transactions relevant to the present litigation were made at arms length.

This is a most unfortunate incident. The Court certainly understands, in a case as hotly contested as this one -- with such high stakes, with such complex legal issues, and with such truly extraordinary legal talent on all sides -- that lawyers, however ethical and committed to the highest standards of professionalism (as the Court presumes and has found all counsel of record here to be), make statements or commit acts in haste that they subsequently regret. All of the players to this drama, are, after all is said and done, human. As such, all of us are vulnerable to all-too-common human frailties. The Court would place itself at the very top of any list of lawyers who have spoken improvidently at one time or another in this case (and any number of others). What the Court has witnessed here, however, in both manner and substance, for the reasons noted above, goes beyond what the Court can let pass without some manner of reprobation. So let the Court be clear: Nothing excuses the attempted character assassination in which Mr. Gordinier has engaged.

IT IS SO ORDERED.

MINUTES FORM 90                                                    Initials of Deputy Clerk __cls_____
CIVIL -- GEN                                    14

EXHIBIT ____4____

PAGE ____65____

# Exhibit 5

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   John B. Quinn (Bar No. 090378)
2  johnquinn@quinnemanuel.com
   Michael T. Zeller (Bar No. 196417)
3  (michaelzeller@quinnemanuel.com)
   Jon D. Corey (Bar No. 185066)
4  (joncorey@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California  90017-2543
   Telephone:  (213) 443-3000
6  Facsimile:  (213) 443-3100

7  Attorneys for Mattel, Inc.

8              UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10                  EASTERN DIVISION

| | |
|---|---|
| 11  CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| 12         Plaintiff, | Consolidated with<br>Case No. CV 04-09039<br>Case No. CV 05-02727 |
| 13      vs. | |
| 14  MATTEL, INC., a Delaware corporation, | Hon. Stephen G. Larson |
| 15         Defendant. | [PUBLIC REDACTED] MATTEL,<br>INC.'S REPLY IN SUPPORT OF<br>MOTION OBJECTING TO |
| 16  AND CONSOLIDATED ACTIONS | PORTIONS OF DISCOVERY<br>MASTER ORDER NO. 27 |
| 17 | REGARDING MOTION OF<br>MATTEL, INC. TO COMPEL |
| 18 | DOCUMENTS FROM BINGHAM<br>MCCUTCHEN |
| 19 | |
| 20 | [Declaration of Scott B. Kidman filed<br>concurrently] |
| 21 | |
| 22 | Hearing Date:    July 6, 2009<br>Time:             10:00 a.m.<br>Place:            Courtroom 1 |
| 23 | |
| 24 | **Phase 2** |
| 25 | Discovery Cutoff:     Dec. 11, 2009<br>Pre-trial Conference:  March 1, 2010<br>Trial:                March 23, 2010 |
| 26 | |
| 27 | |
| 28 | |

07975/2990479.1

EXHIBIT _____5_____

PAGE _____66_____

1

## TABLE OF AUTHORITIES

2

PRELIMINARY STATEMENT ........................................................................ 1

ARGUMENT ........................................................................................................ 2

I.    THE POTENTIAL FOR ENCOMPASSING SOME PRIVILEGED
      MATERIALS IS NOT GROUNDS FOR REFUSING TO ENFORCE
      A SUBPOENA .......................................................................................... 2

II.   PARTIAL DUPLICATION IS NOT GROUNDS FOR REFUSING TO
      ENFORCE A SUBPOENA ...................................................................... 5

III.  THE BINGHAM SUBPOENA IS NOT BARRED BECAUSE
      LEXINGTON HAS YET TO BE EFFECTIVELY SERVED ................ 7

IV.   ███████████████████████████████████ .......................... 9

V.    THE REQUESTS ARE CLEARLY RELEVANT TO PHASE 2
      ISSUES ........................................................................................................ 10

CONCLUSION .................................................................................................... 12

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07975/2990479.1

-i-

EXHIBIT ___5___

PAGE ___67___

1 ████████████████████████ (Opp. at 10, emphasis added.) But

2 Bingham fails to address any of the authority cited in Mattel's motion--including the

3 prior order of this Court--finding refusals to provide discovery based on blanket

4 privilege objections improper.[1] Bingham claims ████████████████████

5 ███████████████████████████████████████████████████

6 ███████ As the former discovery master recognized, however, <u>Rule</u> 45(d)(2) "requires

7 a party responding to a subpoena to provide sufficient information to enable the party

8 seeking discovery to assess the claims of privilege and work product protection," and

9 the "*universally accepted' means of claiming that requested documents are privileged*

10 *is by a producing a document-by-document privilege log.*"[2] Bingham, of course, has

11 provided no such information.

12        Instead of providing information, Bingham offers sweeping speculation. For

13 example, Bingham does not dispute that the Ninth Circuit holds that the information

14 about fee agreements and arrangements sought by Request Nos. 1 and 2 is not

15 privileged, but merely asserts that ██████████████████████████████

16 ███████████████████████████████████████████████████

17 ████████████ (Opp. at 11.) It may or may not. If, as the evidence shows, Isaac

18 Larian/MGA are paying Bingham's fees, the request may encompass mainly, if not

19 entirely, non-privileged communications which Mattel is entitled to discover. Unless

20 Bingham is required to produce these non-privileged documents and properly identify

21 _____

22 [1]  <u>See</u> Mattel's Motion at 7-9.

23 [2]  Order dated January 25, 2008 at 13, attached to the concurrently filed Declaration of
Scott B. Kidman ("Kidman Decl.") as Ex. 1 (emphasis added).  Similarly, in <u>Fairview</u>

24 <u>Development Corp. v. Aztex Custom Homebuilders, LLC</u>, 2008 WL 2113492, *2 (D. Ariz.
May 16, 2008), also cited by Bingham, the court *rejected* a claim of trade secret privilege

25 because the subpoenaed party failed to demonstrate the materials at issue were privileged. "A

26 witness who withholds information on a claim of privilege or other protection must state the
claim expressly and support it with sufficient documentation to enable the demanding party to

27 contest the claim." <u>Id</u>.

28

07975/2990479.1

-3-

EXHIBIT ____5____

PAGE ____68____

1   his order.  Rule 72(a) does not preclude the Court from considering the issue of

2   relevance in light of those new allegations.  See Hunter v. Copeland, 2004 WL

3   1562832, at *1 (E.D. La. July 12, 2004) (while a party is "not entitled to raise new

4   theories or arguments in its objections[,]" it is appropriate to consider "new evidence

5   that could not have been obtained through the exercise of due diligence").[22]

6                                    **Conclusion**

7          Mattel respectfully requests that the Court overrule the portion of Discovery

8   Master Order No. 27 regarding Mattel, Inc.'s Motion To Compel Bingham to Produce

9   Documents Responsive to Subpoena and compel Bingham to produce.

10  DATED:  June 29, 2009          QUINN EMANUEL URQUHART OLIVER &
                                    HEDGES, LLP
11

12                                 By Michael T Zeller  ML

13                                    Michael T. Zeller
                                      Attorneys for Mattel, Inc.
14

15

16

17

18

19

20

21

22  [22]  Certainly, it would serve no purpose--other than further delay--to require Mattel to go
     back to the Discovery Master on the issue of relevance ████████████████████████
23  ██████████████████████████████████████████████████████████████████████████
24  ███████████████████████████████████████  Bingham also frivolously requests that
     ██████████████████████████████████████████████████████████████████████████
25  ██████████████████████████████████████████████████████████████████████████
26  ██████████████████████████████████████████████████████████████████████████
27  ██████████████████████████████████████████████████████████████████████████
28

07975/2990479.1

EXHIBIT _____5_____

PAGE _____69_____

## **PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543.

On July 10, 2009, I served true copies of the following document(s) described as **SUPPLEMENTAL DECLARATION OF B. DYLAN PROCTOR IN SUPPORT OF MATTEL INC.'S NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS FOR WHICH ANY CLAIMS OF PRIVILEGE HAVE BEEN WAIVED** on the parties in this action as follows:

Thomas J. Nolan, Esq.
Jason D. Russell, Esq.
Skadden Arps Slate Meagher & Flom
300 S. Grand Avenue, Suite 3400
Los Angeles, CA 90071
thomas.nolan@skadden.com
jason.russell@skadden.com

Melinda Haag
Annette L. Hurst
Warrington S. Parker III
Orrick, Herrington & Sutcliffe, LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
mhaag@orrick.com
ahurst@orrick.com
wparker@orrick.com

William A. Molinski
Orrick, Herrington & Sutcliffe, LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017
wmolinski@orrick.com

Mark E. Overland, Esq.
Alexand H. Cote, Esq.
Overland Borenstein Scheper & Kim
LLP
601 West Fifth Street, 125th Floor
Los Angeles, CA 90071
moverland@scheperkim.com
acote@scheperkim.com

Todd E. Gordinier
Bingham McCutchen LLP
600 Anton Boulevard, 18th Floor
Costa Mesa, CA 92626
todd.gordinier@bingham.com

**BY ELECTRONIC MAIL TRANSMISSION:** By electronic mail transmission from cyrusnaim@quinnemanuel.com on July 10, 2009, by transmitting a PDF format copy of such document(s) to each such person at the e-mail address listed below their address(es).  The document(s) was/were transmitted by electronic transmission and such transmission was reported as complete and without error.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on July 10, 2009, at Los Angeles, California.

/s/ Cyrus Naim
Cyrus Naim