1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 90378)
2    (johnquinn@quinnemanuel.com)
     Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
6  Facsimile: (213) 443-3100

7  Attorneys for Mattel, Inc.

8                UNITED STATES DISTRICT COURT

9                CENTRAL DISTRICT OF CALIFORNIA

10                     EASTERN DIVISION

11

12  CARTER BRYANT, an individual,          CASE NO. CV 04-9049 SGL (RNBx)

13              Plaintiff,                  Consolidated with
                                           Case No. CV 04-09059
14       vs.                               Case No. CV 05-02727

15  MATTEL, INC., a Delaware               **DISCOVERY MATTER**
    corporation,
16                                         **[To Be Heard By Discovery Master**
                                           **Robert O'Brien Pursuant to Order of**
17              Defendant.                 **January 6, 2009]**

18  _____        DECLARATION OF B. DYLAN
                                           PROCTOR IN SUPPORT OF
19  AND CONSOLIDATED ACTIONS               MATTEL INC.'S REPLY IN
                                           SUPPORT OF MOTION FOR
20                                         LIMITED RECONSIDERATION OF
                                           PHASE 2 DISCOVERY MASTER
21                                         ORDER NO. 33

22  **PUBLIC REDACTED VERSION**            Date:  TBD
                                           Time:  TBD
23                                         Place: Arent Fox LLP

24                                         **Phase 2:**
                                           Discovery Cut-off: December 11, 2009
25                                         Pre-trial Conference: March 1, 2010
                                           Trial Date: March 23. 2010

26

27

28

# DECLARATION OF B. DYLAN PROCTOR

I, B. Dylan Proctor, declare as follows:

1.     I am a member of the bar of the State of California, and partner at Quinn Emanuel Urquhart Oliver & Hedges, LLP, attorneys for Mattel, Inc. ("Mattel"). I make this declaration of personal, firsthand knowledge and, if called and sworn as a witness, I could and would testify competently thereto.

2.     Attached as Exhibit A is a true and correct copy of the Court's Order dated July 9, 2009.

3.     Attached as Exhibit B is a true and correct copy of excerpts from the court reporter's transcript of the hearing in this matter, dated February 11, 2009.

4.     Attached as Exhibit C is a true and correct copy of excerpts from the court reporter's transcript of the hearing in this matter, dated March 4, 2009.

5.     Attached as Exhibit D is a true and correct copy of the Court's Order Granting in Part and Denying in Part Mattel's Motion to Compel Deposition and Production of Documents of Christensen Glaser Fink Jacobs Weil & Shapiro LLP, dated May 1, 2008.

6.     Attached as Exhibit E is a true and correct copy of the Court's Order Discharging Order to Show Cause on Conditions, dated February 25, 2008.

7.     Attached as Exhibit F is a true and correct copy of the Court's Order Regarding Defendants' Motion to Quash Deposition Subpoenas, dated March 11, 2008.

8.     Attached as Exhibit G is a true and correct copy of the Court's Order re Mattel's Motions to Compel Farhad Larian, Kaye Scholer and Stern & Goldberg to Produce Documents, dated January 25, 2008.

9.     Attached as Exhibit H is a true and correct copy of excerpts from the Phase 1 trial transcript in this matter.

PROCTOR DECLARATION ISO MATTEL'S REPLY ISO MOTION FOR LIMITED RECONSIDERATION OF DISCOVERY MASTER ORDER NO. 33

1           10.    Attached as Exhibit I is a true and correct copy of Trial Exhibit

2  13380 from the Phase 1 Trial in this matter.

3           11.    Attached as Exhibit J is a true and correct copy of Phase 2

4  Discovery Master Order No. 33, dated May 18, 2009.

5           12.    Attached as Exhibit K is a true and correct copy of the Omnibus

6  Order, dated May 21, 2009.

7           13.    I am generally familiar with the document production in this case

8  and discovery related to Omni 808 Investors, LLC ("Omni 808"), OmniNet

9  Investors, LLC ("OmniNet") and Vision Capital, LLC ("Vision Capital").   As of

10  the date of this Declaration, to the best of my knowledge Mattel has not received

11  key information from any of these entities pursuant to subpoena or from any other

12  source.  For example, Mattel has not received information regarding even the

13  identities of the principals, members or officers of Lexington Financial Limited

14  ("Lexington"), let alone its source of funding.  Vision Capital, an alleged investor in

15  Omni 808 whose principal is Isaac Larian's brother-in-law, claims to have been

16  funded by Lexington.  Vision Capital's production as of this writing consists of only

17  149 pages of documents, the majority of which consist of previously produced Omni

18  808 corporate documents and Omni 808 promissory notes.  Although it was

19  compelled by prior Order to do so, Vision Capital has produced no documents

20  showing the source or the transfer of the $10 million allegedly provided by Vision

21  Capital to Omni 808 to fund the acquisition of the Wachovia debt.  Vision Capital

22  has not even produced any loan agreement between Vision Capital and Lexington,

23  much less any communications, other loan documents, checks, wire transfers or any

24  other information relating to Lexington's alleged loan or other funding to Vision

25  Capital.

26           14.    Although it also was compelled by prior Order to do so, Omni

27  808 has also not produced any documents purporting to document any wire transfers

28  or other fund transfers to Omni 808 from most of Omni 808's alleged investors,

including such alleged funding from Vision Capital (and ultimately Lexington), Leon Neman, Neil Kadisha, Benjamin Nazarian, David Nazarian or Joseph Moinian.

15.   For its part, OmniNet has represented that it had no responsive documents to produce beyond those produced by Omni 808.   <u>See</u> Letter from Peter N. Villar to John Quinn, dated June 22, 2009, a true and correct copy of which is attached hereto as Exhibit L.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on July 13, 2009 at Los Angeles, California.

B. Dylan Proctor

00505.07975/3007541.1

-4-

PROCTOR DECLARATION ISO MATTEL'S REPLY ISO MOTION FOR LIMITED RECONSIDERATION OF DISCOVERY MASTER ORDER NO. 33

# EXHIBIT "A"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No. CV 04-09049 SGL(RNBx)                          Date: July 9, 2009
Title:       MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
=================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

  Cindy Sasse                              None Present
  Courtroom Deputy                         Court Reporter

ATTORNEYS PRESENT FOR                 ATTORNEYS PRESENT FOR
PLAINTIFFS:                           DEFENDANTS:

None Present                          None Present

**PROCEEDINGS:**    **ORDER GRANTING EX PARTE APPLICATION RE TEMPORARY RECEIVERSHIP (DOCKET #5728)**

**ORDER GRANTING EX PARTE APPLICATION RE COST SHIFTING (DOCKET #5865)**

**ORDER GRANTING IN PART EX PARTE APPLICATION FOR RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)**

**ORDER GRANTING IN PART MATTEL'S MOTION RE DISCOVERY MASTER ORDER NO 27 AND REMANDING DISCOVERY MASTER ORDER NO. 27 FOR RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT OF THE FILING OF THE TAAC (DOCKET #5561)**

**ORDER DENYING MOTION TO STRIKE THE FORENSIC AUDITOR'S REPORTS (DOCKET #5705)**

MINUTES FORM 90                                Initials of Deputy Clerk __cls_____
CIVIL -- GEN                        1

EXHIBIT __A___
PAGE ___4A___

## I. ORDER GRANTING EX PARTE APPLICATION RE TEMPORARY RECEIVERSHIP (DOCKET #5728)

Because the only opposition to the Ex Parte Application regarding the winding up of the Temporary Receivership involves the issue of cost-shifting, which is addressed separately, below, the Court **GRANTS** the Ex Parte Application.  A separate order addressing this Ex Parte Application has been concurrently filed.

## II. ORDER GRANTING EX PARTE APPLICATION RE COST SHIFTING (DOCKET #5865)

The MGA parties' opposition to the Temporary Receiver's Ex Parte Application argued that the costs of the Temporary Receivership should be shifted to Mattel (as the party who sought appointment of a Temporary Receiver).  However, the Court has previously ruled that, at some yet-to-be defined date in the future, the Court will consider whether to shift the costs of both the Temporary Receivership and the Forensic Audit.  Therefore, Mattel filed an Ex Parte Application seeking either to be relieved of the responsibility to respond to the MGA parties' argument or, alternatively, for an order setting a briefing schedule on the issue.  It is not the intention of the Court to address the cost-shifting issue at this time; rather, as the Court has stated previously on the record, that issue is more efficiently resolved at a later date, most likely a date after completion of Phase 2 of the trial.  Accordingly, the Court **GRANTS** Mattel's Ex Parte Application re Cost Shifting.  Mattel is relieved of any duty to respond to MGA's argument regarding the appropriate allocation of costs arising from the Temporary Receiver that is set forth in the MGA parties's June 26, 2009 Opposition to the Temporary Receiver's Ex Parte Application.

## III. ORDER GRANTING IN PART EX PARTE APPLICATION FOR RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

The Court has received and reviewed the MGA Parties' Ex Parte Application For Partial Release of *In Camera* Juror Interview Transcripts, as well as the Opposition, the Reply, and the accompanying exhibits.  The Court **GRANTS IN PART** the Ex Parte Application.  Although the Court declines to award the relief sought, the Court will take steps to ensure that the transcript of the juror interviews are provided to the Ninth Circuit for its consideration of the appeal filed by the MGA parties.

The relevant *in camera* juror interviews were conducted on July 25, 2008; the findings made by the Court on the basis of those interviews are set forth in detail in the Court's Order Denying Motion for Mistrial, dated August 8, 2008.  Counsel for the parties agreed that the juror interviews, which were conducted mid-trial, should be conducted *in camera,* and the MGA parties did not request that the Court grant them access to the transcripts to prepare their Motion for Mistrial.  The Court indicated on the

EXHIBIT _A_
PAGE _6_

record around the time of the filing of the Motion for Mistrial that it was not the Court's intent to grant the parties access to the transcripts.

After the conclusion of the trial, the MGA parties did not at any time request this Court grant access to the transcripts. To the contrary, some ten months passed between the date of the Order Denying Motion for Mistrial and the MGA parties' first post-trial request for access to those transcripts. That request was made to the Ninth Circuit, not this Court, on June 10, 2009. When the Ninth Circuit denied the request in favor of the MGA's presentation of the issue to this Court in the first instance, the MGA parties thereafter filed the present Ex Parte Application in a expeditious manner.

Ostensibly, as set forth in both the Motion filed before the Ninth Circuit and the Ex Parte Application before this Court, the reason the MGA parties seek access to those transcripts is so that they may use them to challenge the Court's Order Denying Motion for Mistrial. Although the MGA parties filed its Notice of Appeal on May 4, 2009, and although that Notice clearly indicated that the Order Denying Motion for Mistrial would be implicated in the appeal, the MGA parties failed to file its Motion seeking release of the transcripts until June 10, 2009. The MGA parties' failure to seek this relief until a month after they filed their Notice of Appeal and a month before their opening brief was due, and their decision to present the issue of release of the transcripts to the appellate court (rather than this Court) in the first instance, created the very urgency that cause them to seek ex parte relief from this Court. As such, the Court declines to grant the relief sought.

Nevertheless, in the interest of due process and in order to facilitate the full consideration of the issue by the Ninth Circuit, the Court will take steps to ensure that the transcripts of the *in camera* interviews are provided to the Ninth Circuit for *in camera* filing.

## IV. ORDER GRANTING IN PART MATTEL'S MOTION RE DISCOVERY MASTER ORDER NO 27 AND REMANDING DISCOVERY MASTER ORDER NO. 27 FOR RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT OF THE FILING OF THE TAAC (DOCKET #5561)

In the challenged portion of Discovery Master Order No. 27 ("DM Order No. 27"), the Discovery Master denied Mattel's Motion to Compel discovery sought by service of a subpoena on non-party Bingham McCutchen LLP ("Bingham"), a law firm that represents Intervenor Omni 808, as well as a number of non-party entities that are familiar to those involved in this litigation: OmniNet Capital, LLC ("OmniNet"), Vision Capital, LLC ("Vision"), IGWT Group, LLC ("IGWT"), and IGWT 826 Investments, LLC ("IGWT 826"). Broadly categorized, the subpoena sought production of (1) fee agreements relating to Vision and Omni 808; (2) documents regarding the formation, control, and financing of Omni 808, Vision, and Lexington Financial Limited

EXHIBIT __A____
PAGE ___6___

("Lexington"); (3) documents identifying stakeholders and officers of Omni 808, Vision, and Lexington; (4) all contracts relating to Omni 808, Vision Capital, and Lexington; (5) all communications relating to Omni 808, Vision Capital, and Lexington, excluding attorney-client privileged documents; and (6) Bingham's representation of MGAE and certain named individuals who have some connection with MGAE, including a number of Mr. Larian's family members.

The Discovery Master correctly recognized the essential legal standard in assessing whether a subpoena may be enforced.  The information must satisfy the discovery relevance standard, i.e., it must be "'reasonably calculated to lead to the discovery of admissible evidence.'" DM Order No. 27 at 19 (quoting Fed. R. Civ. P. 26(b)(1)).  The decision of whether to enforce a subpoena ultimately implicates a balancing test that pits relevance of the materials sought and need to the requesting party against hardship to the party resisting the subpoena.  DM Order No. 27 at 20.  Non-parties are generally required to bear lesser burdens than parties in responding to subpoenas.  Exxon Shipping Co. v. United States Dept. of Interior, 34 F.3d 774, 779 (9th Cir. 1994) ("The Federal Rules also afford nonparties special protection against the time and expense of complying with subpoenas.").

However, the Discovery Master overstated the burden of proof allocated to Mattel, as the party seeking discovery.  See DM Order No. 27 at 20 ("As the party moving to compel compliance with the subpoena, Mattel bears the initial burden of establishing that the information sought is relevant and necessary to the claims or defenses at issue.")  This standard is both overstated and incomplete.  It is overstated in that Mattel need not show that the evidence sought is "necessary to the claims or defenses."  Although Mattel indeed bears the burden of establishing relevancy, that showing is not one of "necessity."  Rather, Mattel must bear the burden of establishing the discovery relevancy standard -- that the materials sought are "reasonably calculated to lead to the discovery of admissible evidence" -- is met.  It need not establish that the materials sought are "necessary" to its case.

This point leads to the manner in which the stated burden is incomplete.  As clearly articulated by cases cited by Bingham, although Mattel bears an initial burden of establishing relevancy, the party resisting discovery thereafter has the burden of establishing that discovery should be denied.  See Bryant v. Ochoa, 2009 WL 1390794 at *1 (S.D. Cal. 2009) ("The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1). . . . Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections."); DIRECTV, Inc. v. Trone, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (same); see also Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975) (reversing the district court's issuance of a protective order based on a failure of the party resisting discovery to meet its burden by asserting that the defendant's deposition would merely yield cumulative evidence).

Initials of Deputy Clerk __cls_____

EXHIBIT __A__
PAGE ___7___

The effect of this subtle variation on the burden of proof from that stated by the Discovery Master is magnified by the recent filing of the TAAC, which significantly heightens the relevancy of the issue of how the MGA parties and the parties represented by Bingham may be related, the formation of certain of those entities, and other issues implicated by Mattel's requests. Because the question of relevance is featured so prominently in the quintessential balancing test to which the present discovery motion was subjected, the filing of the TAAC dramatically altered the calculus that underlies the conclusions reached in DM No. 27.

For reasons related to judicial economy and preservation of scarce judicial resources (which this case has stretched to the outer limits), the Court defers decision, in light of the changed calculus that has occurred as the result of the filing of the TAAC, of the issues presented in the challenged portions of DM No. 27 to the Discovery Master. For that reason, the Court **REMANDS** the challenged portions of DM No. 27 to the Discovery Master for his reconsideration and re-balancing in light of the recently filed TAAC. The Discovery Master may, in his discretion, set the matter for further briefing and/or hearing, he may take the matter under submission based on the existing record, or he may take other action as he deems appropriate to resolve the present issues.

Notwithstanding the remand of DM Order No. 27, one issue raised by Mattel requires further consideration by the Court. At page 25 of DM Order No. 27, the Discovery Master appears to impose a blanket prohibition on discovery of materials that are in the possession of a subpoena recipient, but that are related to a non-party over whom the Court has not been shown to have jurisdiction. The Discovery Master cites no legal authority for such a blanket prohibition, and the Court, in its own research, has found none. Such a blanket prohibition precludes the application of the balancing test that applies almost universally to discovery motions; accordingly, and because this blanket prohibition is unprecedented, the Court finds that it is contrary to law. As to this narrow issue, the Court **GRANTS** Mattel's Motion. The issue of discovery of materials relating to Lexington is **REMANDED** to the Discovery Master for reconsideration in light of this ruling and in light of the filing of the TAAC.

## V. ORDER DENYING MOTION TO STRIKE
## THE FORENSIC AUDITOR'S REPORTS (DOCKET #5705)

In an unsealed filing that has since been ordered sealed by the Court, counsel for Omni 808 Investors, LLC ("Omni 808"), Todd E. Gordinier, made unwarranted, unsubstantiated personal attacks against the Court-Appointed Forensic Auditor, Ronald L. Durkin. Mr. Gordinier's selective public disclosure of portions of the Forensic Auditor's Summary Report, coupled with the maintenance of the Summary Report, as well as the later-filed Responsive Report and Final Report, under seal in their entirety, has led to an unbalanced public presentation of the issues discussed therein. In an

EXHIBIT __A___
PAGE ____8____

attempt to cure this deficiency, the Court has considered the possibility that it should simply unseal the relevant Reports and allow those Reports to speak for themselves.

Because the MGA entities were the primary subject of the Forensic Audit, the MGA parties have, quite understandably, objected to the proposed unsealing. Mattel, for its part, advocates quite emphatically, and not unreasonably, that the Reports should be unsealed in light of the selective disclosure. See Tr. at 31-32 ("It's the underlying analysis that refutes the selective disclosures that MGA and Omni made in a public forum to smear . . . both Mr. Durkin and Mattel.") At the other end of the spectrum, Omni 808 has moved to strike the Reports in their entirety.

In the end, although the Court does not order the unsealing of the Reports, it **DENIES** the Motion to Strike. The Court ordered the Forensic Audit to evaluate whether a receiver should be appointed; as the record bears witness, the Court eventually rejected the suggestion that it should appoint a permanent receiver, and the Court has instead appointed an MGA Monitor with more limited powers than a receiver. Nevertheless, the fact that the Reports were intended to serve a very limited purpose does not mean that there is no possibility that the Forensic Auditor's Reports will not serve any purpose henceforth.

As it currently stands, the Court **ORDERS** that no party shall cite to or rely upon the Reports for any purpose absent further Order of this Court.[1] However, the documents attached to the Reports, to the extent they are otherwise discoverable, are not insulated from discovery on the basis that they have been made part of the Reports. Conversely, documents, such as charts and interview notes, that were prepared by the Forensic Auditor are the property of the Court and are not subject to discovery or use in this or any other litigation by any party or non-party.[2]

Had it been counsel for the MGA parties who mounted the unwarranted, unsubstantiated, and public personal attacks on Mr. Durkin, the Court would find, notwithstanding the sensitive information contained therein, the unsealing of the Reports was an appropriate remedy for the selective disclosure.[3] However, here, it is

---

[1] This Order does not supersede the Court's Order permitting the Forensic Auditor to share information with the Court-Appointed Monitor.

[2] Toward that end, the Court **CLARIFIES** to the parties that the work papers, drafts, notes, detailed time records, and any other materials prepared by or at the direction of the Forensic Auditor are the property of the Court. The Court **ORDERS** the Forensic Auditor, as the custodian of those records on behalf of the Court, to retain those materials, whether maintained in electronic, hard copy, or any other medium, until further order of the Court.

[3] As it stands, counsel for MGAE, James I. Stang, wisely sought, and was granted, leave to file his more restrained, but just as unwarranted and unsubstantiated, personal attacks on Mr. Durkin under seal. See MGA Entertainment, Inc.'s Response to Final In Camera Report of Forensic Auditor Ronald L.

EXHIBIT __A__
PAGE ____9____

counsel for Omni 808 who made those attacks public, and although Mattel maintains that both the MGA parties and Omni 808 are jointly responsible for the selective disclosure, see July 6, 2009, Tr. at 33, whether, or to what extent, the MGA parties act or have acted in concert is an issue to be decided in Phase 2 of this action.

Nevertheless, Mr. Gordinier's attack on Mr. Durkin cannot pass without comment by the Court. The Court's comments are directed toward Mr. Gordinier personally, which is not the Court's usual practice. Although the irony of this form of address is not lost on the Court (given the subject of this Order), it is appropriate. Mr. Gordinier signed all three filings in which the personal attacks appear, and continues to stand behind those filings. Moreover, Mr. Gordinier expressly and unabashedly claimed personal responsibility for the brief that was not filed under seal, by both stating that he gave it a lot of thought before filing it and by implicitly acknowledging that although he considered filing his brief under seal, he ultimately rejected that course of action. See May 18, 2009 Tr. at 46-47 ("My brief speaks for itself. We have nothing to hide. . . . I didn't feel it appropriate, necessary, or desirable to file my brief under seal. And I don't have a problem with the Court or anybody reading what I have to say, because I gave it a lot of thought, and I gave it at lot of consideration.").

At the July 6, 2009, hearing, the Court outlined its concerns that while the attacks on Mr. Durkin were public, the Reports are not, and that "it doesn't seem fair" to the Court to allow those allegations to stand alone without a chance to respond to them. July 6, 2009, Tr. at 25-26. In response, Mr. Gordinier contended that his comments "respond[ed] to the report," and that "[w]hat we said was that there were problems with that report." July 6, 2009, Tr. at 28. This statement is an implicit denial that any personal attacks were made; however, as set forth in great detail below, the record belies Mr. Gordinier's *post hoc* protestations.

Lest Mr. Gordinier's statement reflecting his implicit denial that he engaged in personal attacks be perceived as one being made at oral argument without ample time to reflect upon its significance, the statement is also made by Mr. Gordinier in Omni 808's Reply Memorandum, a document upon which he had ample time to reflect: "Each and all of the references in Omni's Statement of Position refer to the contents of Mr. Durkin's Reports and the shortcomings contained therein and omitted therefrom, not to his person." Id. at 2 n.1. To be sure, the criticisms leveled at Mr. Durkin are framed in

---

Durkin (docket #5918) at 4 (accusing Mr. Durkin of "making McCarthy-like statements of non-existent buybacks and unsupported insinuations of conflicts of interest"); id. at 9 (suggesting that Mr. Durkin's formulation of certain search terms relating to criminal acts in Farsi without a concurrent formulation of those terms in English demonstrated a "predisposition that Persian members of MGA's management and staff (and only the Persian members) might be engaged in illegal conduct"). Mr. Stang's attacks pale in comparison to those advanced by Mr. Gordinier, and they were filed under seal. Thus, although the Court's analysis and conclusions regarding the Forensic Auditor's Reports applies with equal force to Mr. Stang's statements, his are not the focus of the Court's attention at this time.

Initials of Deputy Clerk __cls_____

EXHIBIT ___A___
PAGE _____10___

terms of his Reports. Still other criticisms are, as counsel maintains, addressed to the Reports themselves; those must be analyzed based on their substance. However, as aptly demonstrated by the cited and quoted portions of Mr. Gordinier's filings that appear below, his criticisms do not, by any measure, confine themselves to those Reports, and instead reach out in a highly personal manner to attack the author, his professionalism, his competence, his objectivity, and his integrity.[4]

Indeed, in a display the likes of which have not been previously witnessed by this Court, Mr. Gordinier strayed far afield of legitimate criticism of the discussions, analyses, and conclusions reached in the Summary Report and the Reports that followed. To be sure, there are instances in which Mr. Gordinier addressed the message found in those Reports; just as surely, however, as detailed below, Mr. Gordinier attacked the messenger. Specifically, the papers filed by Mr. Gordinier on behalf of Omni 808 call into question Mr. Durkin's professionalism and competence, as well as his objectivity and integrity. Moreover, and alarmingly, they falsely accuse Mr. Durkin of being influenced by an ethnocentric bias against Mr. Larian and Mr. Kadisha. Such attacks, aimed at Mr. Durkin personally rather than the discussion, analyses, and conclusions set forth in his Reports, appear throughout Omni 808's papers. See Omni 808 Investors, LLC's Statement of Position re Order to Show Cause re Appointment of a Permanent Receiver (docket #5446) ("SOP"), filed May 14, 2009, at 11 (referring to Mr. Durkin's "irresponsible" analysis); id. (noting that Mr. Durkin is "far too experienced" to believe that he "produced . . . a balanced presentation"); id. (stating that "Mr. Durkin's report is a polemic" and "a piece of advocacy"); id. at 12 n.9 (calling into question Mr. Durkin's "objectivity" based on the fact that the Court ordered Mr. Durkin's fees be paid (at least in the first instance) by Mattel); id. (suggesting that Mr. Durkin's ex parte communications with Mattel were improper); id. at 13 n.10 (characterizing Mr. Durkin's quotation of Mr. Larian's and Mr. Kadisha's account of how the two men were acquainted, from "the Persian community," as "at best, unprofessional" and, "at worst,

---

[4] Adding still further to the mounting irony, in the same footnote that Mr. Gordinier disclaims engaging in improper personal attacks, he falsely accuses counsel for Mattel of advancing their own improper *ad hominen* attacks against Neil Kadisha, who has been referred to as a "common thief" in certain unspecified Mattel filings. Mr. Kadisha is the Managing Partner of a diversified investment firm, Omninet Capital, LLC, and an investor in Omni 808. To call someone a "common thief" is, undoubtably, by any measure, a highly personal attack, therefore an attack addressed "to the man," or *ad hominen*. However, in the same manner Mr. Gordinier accuses Mr. Durkin of failing to provide appropriate context to the Court in his Reports, Mr. Gordinier himself fails to acknowledge that counsel for Mattel's use of the term "common thief" in connection with Mr. Kadisha merely quotes Los Angeles County Superior Court Judge Henry W. Shatford's conclusion regarding Mr. Kadisha, as set forth in his 191-page Statement of Decision, dated October 24, 2006, which was issued after a 200-day trial, which is currently pending appeal, and which conferred upon Mr. Kadisha the oft-repeated moniker of "common thief," as well as "embezzler," and "perjurer." See Uzyel v. Kadisha, Cal. App. Nos. B196045, B203804, B198007, B199850, B201425, 2009 WL 646096 (Mar. 4, 2009) (appellate brief). As always, context is key. The use by counsel for Mattel of another court's findings and conclusions to advance an argument is not inappropriate. Those findings and conclusions may, or may not, be relevant to matters presented to the Court. Used in this manner, although undoubtably addressed "to the man" (and his credibility), it is not an improper *ad hominen* attack.

MINUTES FORM 90
CIVIL -- GEN                                          8                    Initials of Deputy Clerk __cls_____

EXHIBIT ___A___
PAGE ___11___

evidence of improper cultural bias"); id. (in the same footnote, referring to the same quotation, stating that "[t]he tone [of the report] itself is compelling proof that Mr. Durkin had no intention of providing an 'objective' report to the Court."); id. at 23 (referring to the Summary Report as "Mr. Durkin's ill-concealed advocacy piece"); id. (noting that advocacy, rather than objectivity, "is certainly the posture [Mr. Durkin] is most comfortable with"); Omni 808 Investors, LLC's Memorandum in Support of Its Requests to Strike Summary and Responsive Reports of Ronald L. Durkin (docket #5705) ("Motion to Strike"), filed June 8, 2009, at 4 (noting Omni "doubts that the Court or any party would benefit further by continuing this façade of Mr. Durkin's 'impartiality'"); id. at 7 (calling Mr. Durkin's explanation of his conclusion regarding the relatedness of certain parties as "not only fatuous[,] but [also] intellectually dishonest"); id. at 9 (suggesting that Mr. Durkin intentionally concealed from the Court the fact that Mr. Larian sought other funding sources before turning to Mr. Kadisha); id. at 10 (noting that "Mr. Durkin's repeated references to Mr. Larian's and Mr. Kadisha's common 'Persian' heritage can only be viewed as an attempt to draw some nefarious ethnic connection between them"); id. at 12 (calling the reference to Mr. Larian's and Mr. Kadisha's ethnicity "unprofessional symptoms of improper cultural bias [that] have no place in a supposedly objective report"); Omni 808 Investors, LLC's Reply Memorandum (docket #5809) ("Reply Memo") at 14 (suggesting that not only Mr. Durkin, but also counsel for Mattel, harbor "cultural biases" that lead them to "suggest[] that [Mr. Larian's and Mr. Kadisha's] common heritage makes [them] more likely to act contrary to their own interests); id. at 15 (stating that, according to his own interview notes, Mr. Durkin "misrepresented" to the Court in his Summary Report how Mr. Larian and Mr. Kadisha portrayed their relationship with each other).

As alluded to, Omni 808's criticisms have not been limited to personal attacks; some of the criticisms are in fact aimed at the Reports themselves. See e.g., SOP at 16 ("Mr. Durkin's conclusion that the Wachovia-Omni transaction impacted 'MGAEI's solvency and ability to continue conducting operations' is simply wrong."). Any comment by the Court regarding the substance of the discussions, analyses, and conclusions presented to the Court in the Forensic Auditor's Summary, Responsive, and Final Reports is inadvisable at this time. With the filing of the Third Amended Answer and Counterclaims, much of the subject matter of the Forensic Auditor's Reports have been incorporated into the claims at issue in this action. As such, it would be premature for the Court to comment upon the substance of issues that are yet to be adjudicated, and that are subject to a trial by jury. Nevertheless, the Court has reviewed the Forensic Auditor's Summary, Responsive, and Final Reports, and the exhibits attached thereto. The Court has also reviewed and considered the criticisms aimed at the Forensic Auditor, cited and quoted above, as well as the entirety of all the papers responding to the Forensic Auditor's Reports filed to date. After this review, the Court is firmly convinced that all the personal criticisms of Mr. Durkin are unwarranted and unsubstantiated.

At best, the criticism of Mr. Durkin's performance and presentation represents a

EXHIBIT ___A___
PAGE ____12____

different interpretation of available evidence. That such disagreements would arise between the analyses offered by a Court-Appointed Forensic Auditor and that offered by counsel for a party whose transactions have been a subject of that audit is by no means surprising. A jury considering the relevant evidence might ultimately make factual determinations that tend to agree with Mr. Durkin's assessment, it might ultimately tend to agree with Mr. Gordinier's assessment, or it may very well reject both positions in favor of another. The answer to the merits of the claims at issue in this action must await another day. Today, the Court merely notes that its examination of the Forensic Auditor's Reports reveal that Mr. Gordinier's personal attacks aimed at their author were unjustified.

Some specific attacks directed toward Mr. Durkin – relating to his background as a law enforcement officer, his communications with counsel for Mattel, and specific (but baseless) allegations of ethnocentric bias -- are worthy of more specific comment by the Court.

Stopping short of explicitly stating such, Mr. Gordinier appears to labor under the assumption that Mr. Durkin has been unable to put behind him the prosecutorial mindset under which he presumably operated during his former service to this Nation as an agent of the Federal Bureau of Investigation ("FBI"). At the outset, the Court notes that Mr. Gordinier's unstated assumptions do a disservice to the prosecutors and the law enforcement officers who work with those prosecutors, both of whom conduct their work under the clearly delineated duty to ferret out not only evidence of guilt but also "evidence favorable to the accused." See e.g., Berger v. United States, 295 U.S. 78, 88 (1935) (noting that the role of the prosecutor is not to win at all costs and observing that the prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."); Brady v. Maryland, 373 U.S. 83, 87 (1963) (imposing a duty on prosecutors to provide to the defense exculpatory evidence when requested to do so).

Secondly, even if prosecutorial duties were not so defined, the Court finds no suggestion that Mr. Durkin skewed the evidence in favor of any particular viewpoint. Undoubtedly, there is a **complete absence** of any evidence that, as Mr. Gordinier has suggested, Mr. Durkin has embarked upon a campaign to purposely mislead the Court.

Mr. Gordinier also suggests that, because Mr. Durkin's bills are being paid by Mattel, Mattel has, through this payment or through other communications with Mr. Durkin, bought Mr. Durkin's loyalty. This is utter nonsense. As demonstrated by the Court's communications with him, Mr. Durkin is a Court-Appointed Officer who understands that his role is to work on behalf of the Court and not on behalf of any party. In any event, the Court's Order of January 7, 2009, which appointed Mr. Durkin, imposed the costs of the audit on Mattel "in the first instance," but expressly provided for

EXHIBIT __A___
PAGE ___13___

the possibility that the audit expenses be shared or shifted to the MGA parties. Moreover, to suggest, however subtly, that ex parte communications with counsel for Mattel were improper ignores the Court's mandate to the Forensic Auditor in the January 7, 2009, Order, which states that Mr. Durkin was provided with attorney contact information and that he "shall direct his initial communications to counsel." At no time has the Court precluded the Forensic Auditor's communications with Mattel or its counsel; in fact, because the Forensic Audit was undertaken based on evidence gathered by and presented to the Court by Mattel, Mr. Durkin would have been remiss in his duties if he failed to communicate with Mattel and its counsel.

Mr. Durkin was vested with powers and discretion to complete a Court-ordered Forensic Audit. Pursuant to an Order of this Court, he undertook this task and exercised those powers and that discretion, presenting his Reports in conformity with the Court's instructions. Despite counsel's attacks, the Court's review of the evidence before it discerns no abuse of those powers or of that discretion.

Particularly troubling to the Court is that counsel speculates that, because Mr. Durkin noted in his report that Mr. Larian knew Mr. Kadisha from "the Persian Community," Mr. Durkin could be "of the view that this common heritage makes Mr. Kadisha more likely to act contrary to his own interests or to do something via third-parties that he wouldn't otherwise do?" See SOP at 13-14 n.10 (appearing to pose this thought as a rhetorical question). There is no indication in the record, or otherwise, that Mr. Durkin holds such a view. To the contrary, Mr. Durkin's comment regarding the acquaintanceship of Mr. Larian and Mr. Kadisha from "the Persian Community" (which is noted in the report within quotation marks and is expressly attributed to a reference made by Mr. Larian himself) is clearly predicated on interviews with these two individuals, each of whom related independently to Mr. Durkin and his colleagues that they knew each other from "the Persian Community." See Durkin Summary Report, Ex. 14, at 2 ¶ 3 (Notes re March 25, 2009, interview with Mr. Larian: "He indicated that he knew Kadisha from the Persian community.") and Ex. 14, at 15 ¶ 2 (Notes re March 26, 2009, interview with Mr. Kadisha: "Kadisha stated that he knows Larian from the Persian community."). The purpose for this reference is made clear in the footnote set forth at the end of the sentence in which the reference appears; namely, the Report discusses evidence that the relationship between Mr. Larian and Mr. Kadisha is stronger and more personal than either man claimed it was. See Summary Report at 5 n.18; Ex. 15 (personal emails).

In the Reply Memo, Mr. Gordinier takes issue with this explanation, this time including not only Mr. Durkin but also counsel for Mattel as the targets for his unsubstantiated allegations of "cultural bias." Mr. Gordinier first mischaracterizes an argument made by Mattel. Mattel argued, and quite correctly, both that how Mr. Larian and Mr. Kadisha knew each other was relevant to a determination of whether certain transactions between the two were arms-length transactions, and that this point was likely not lost on either of these two very sophisticated and successful

Initials of Deputy Clerk __cls_____

EXHIBIT __A__
PAGE ___14___

businessmen.[5]  As noted previously, both Mr. Larian and Mr. Kadisha stated that they knew each other from "the Persian community" which, in the Forensic Auditor's view, was intended to, or at least had the tendency to minimize the existing relationship between the two.  Mr. Gordinier incorrectly characterizes this argument as Mattel's contention that Mr. Larian's and Mr. Kadisha's "Persian relationship" and "common Persian heritage" was somehow relevant to a determination of whether the Omni 808 transaction was an arms-length transaction.  Mattel made no such argument.  Neither counsel for Mattel nor Mr. Durkin have implied that Mr. Larian's and Mr. Kadisha's ethnicity factors into the analysis.  Other than to point to Mr. Larian's and Mr. Kadisha's separate, but identical, accounts of how they knew each other which, in turn, suggests how well they know each other, neither counsel for Mattel nor Mr. Durkin have stated or implied that Mr. Larian's and Mr. Kadisha's shared ethnicity is relevant to any matter currently or potentially before the Court.  Compare Opposition at 8-9 with Reply Memo at 14-15.

Moreover, Mr. Gordinier's substantive point, that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha told him about the closeness of their relationship, fares no better.  See Reply Memo at 15.  On this point, it is important to set this stage properly.  Counsel for all parties have attempted to glean far too much from two sterile paragraphs of interview notes taken by Mr. Durkin.  Much can be inferred from conversations and interviews through not only what is said, but what is not said, by the interviewee's demeanor, by the tone of the speaker, by the length and placement of pauses, and by non-verbal gestures and body language.  With all these variables, much of what is communicated does not find its way into notes.[6]  For instance, Mr. Durkin's interview of Mr. Larian lasted over two and a half hours; however, the interview notes are a mere five and a half pages.  Similarly, a one-hour and ten minute interview of Mr. Kadisha yielded only three and a half pages of interview notes.  This is not to suggest that the notes should have been longer or that the interviews should have been recorded or transcribed; rather, it is to suggest that counsel's arguments based on another's notes are not particularly probative.

In contrast, Mr. Durkin's assessment, based on his interviews with both of them,

---

[5]  In fact, the Court just this week issued a 30-page, single-spaced opinion resolving a 10-day bench trial conducted over the sole issue of whether a transaction between "closely related" entities reflected its fair market value, one of the more significant arguments ultimately rejected by the Court in that case being that the close relationship between the parties necessarily rendered the transaction a "sweetheart deal."  See July 6, 2009, Order, Siegel v. Warner Bros. Entertainment, Inc., et al., CV 04-08400 SGL (RZ) (docket #554).

[6]  Indeed, the interview notes upon which the parties rely concede as much.  See Summary Report, Ex. 14 at 2, 15 ("This interview memorandum is a factual representation of the topics discussed during the interview and is not intended to be a word for word or exact transcription of the conversation.").  Thus, in addition to not taking into account all non-verbal communication, the notes do not even represent everything that was said during the interview.

MINUTES FORM 90
CIVIL -- GEN                                    12                    Initials of Deputy Clerk __cls_____

EXHIBIT ___A___
PAGE ___15___

Case 2:04-cv-09049-DOC-RNB   Document 5946-2   Filed 07/13/09   Page 18 of 110   Page ID
#:191707
Case 2:04-cv-09049-SGL-RNB     Document 5934     Filed 07/09/2009     Page 13 of 14

is that Mr. Larian and Mr. Kadisha attempted to minimize their relationship because both of them understand the relevance of any friendship or other connection between them to the assessment of the arms-length nature of any transactions in which they have engaged. Mr. Durkin's assessment does not come from the gentle teasing of a strained meaning from two sterile paragraphs of brief notes taken by another person; rather, his assessment springs from his participation in the interview process, the entirety of the interviews he conducted of Mr. Larian and Mr. Kadisha, and his review of all of the evidence. As such, the Court defers to his assessment, at least insofar as how Mr. Larian and Mr. Kadisha portrayed their relationship to him.

As for that scant language from which the parties glean so much meaning, the entirety of which is set forth below, it in no way supports the contention made by Mr. Gordinier that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha conveyed to him about the closeness of their relationship. On this topic, the notes of Mr. Larian's interview merely state the following:

> Larian decided to contact Neil Kadisha of OmniNet as he knew his company was in the distressed loan business. He indicated that he knew Kadisha from the Persian community. Kadisha said he wouldn't do the deal alone in today's environment and wanted Larian and their other friends to invest in the deal with MGA. Larian stated that Kadisha negotiated the debt with Wachovia and got it down significantly, Larian said he is not bitter about Kadisha getting a good deal on buying the loan.

Summary Report, Ex. 14, at 2 ¶ 3 (emphasis added). This paragraph contains the word "friends," and perhaps could even be read as an implicit statement by Mr. Larian that he and Mr. Kadisha are "friends." But the language does not compel such an inference. Moreover, it does not comport with the notes of Mr. Kadisha's interview, which on this topic state only the following:

> Larian and Kadisha have never been to dinner together. Kadisha stated that he knows Larian from the Persian community and he sees him often at religious events, etc. He has no investments with Larian. Kadisha did not talk with Larian last night, this morning or in the last two days.

Summary Report, Ex. 14, at 15, ¶ 2. Mr. Durkin's assessment that Mr. Larian and Mr. Kadisha sought to minimize the extent of their relationship is not contradicted by these short passages.

The criticism that Mr. Durkin was acting pursuant to an ethnic or cultural bias is clearly baseless. The allegations are irresponsible, and they are made to capitalize on

Initials of Deputy Clerk __cls_____

EXHIBIT ___A___
PAGE ____16____

their inherent sensational nature for counsel's own purposes of diverting attention away from the substance of the Reports. Sensationalism aside, when viewed in context, the Reports' reference to Mr. Larian and Mr. Kadisha knowing each other from "the Persian community" was plainly innocuous. The reference was a direct quotation from both Mr. Larian and Mr. Kadisha. It was used in a broader discussion regarding how (and thus, impliedly, how well) the two knew each other, which is itself relevant to the issue of whether certain transactions relevant to the present litigation were made at arms length.

This is a most unfortunate incident. The Court certainly understands, in a case as hotly contested as this one -- with such high stakes, with such complex legal issues, and with such truly extraordinary legal talent on all sides -- that lawyers, however ethical and committed to the highest standards of professionalism (as the Court presumes and has found all counsel of record here to be), make statements or commit acts in haste that they subsequently regret. All of the players to this drama, are, after all is said and done, human. As such, all of us are vulnerable to all-too-common human frailties. The Court would place itself at the very top of any list of lawyers who have spoken improvidently at one time or another in this case (and any number of others). What the Court has witnessed here, however, in both manner and substance, for the reasons noted above, goes beyond what the Court can let pass without some manner of reprobation. So let the Court be clear: Nothing excuses the attempted character assassination in which Mr. Gordinier has engaged.

**IT IS SO ORDERED.**

Initials of Deputy Clerk __cls_____

EXHIBIT ___A___
PAGE ___17___

# EXHIBIT "B"

1



1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    EASTERN DIVISION

4    - - -

5    HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6    - - -

7    MATTEL, INC.,                          )
                                            )
8                    Plaintiff,             )
                                            )
9        vs.                                )   No. CV 04-09049
                                            )
10   MGA ENTERTAINMENT, INC., ET. AL.,      )
                                            )
11                   Defendants.            )
     _____)
12   AND CONSOLIDATED ACTIONS,              )   Motions
                                            )
13   _____)

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  Riverside, California

17             Wednesday, February 11, 2009

18                    10:03 A.M.

19

20

21

22

23            THERESA A. LANZA, RPR, CSR
24         Federal Official Court Reporter
              3470 12th Street, Rm. 134
25            Riverside, California  92501
                   951-274-0844
                WWW.THERESALANZA.COM

EXHIBIT _B_
PAGE _18_

```
 1    follow the logical reason, their full amount of damages, based
 2    on the instructions that they were provided and the evidence
 3    that they were given, comes out to a consistent verdict.
 4            THE COURT:  I do understand your argument.  Thank
 5    you, Counsel.
 6            MR. ZELLER:  Your Honor --
 7            THE COURT:  No.  I've allowed the moving party to
 8    speak first and last, and let's stick to that.  You have well
 9    briefed these things.
10            I next want to take up Omni 808's ex-parte          01:34
11    application to intervene for limited purposes.
12            Mr. Gordinier.
13            MR. GORDINIER:  Thank you for offering me the
14    opportunity to address the Court.
15            We've set out in our papers, really, what we're      01:34
16    looking for here.  The transaction by which Omni 808 acquired
17    its interest and stepped into the shoes of Wachovia was
18    straightforward and it was at arm's length.  And I, frankly,
19    although naively, believed that if we would get stipulated to
20    be a party to the proceeding going forward, to the extent the  01:35
21    Court --
22            THE COURT:  Where do those funds come from?
23            MR. GORDINIER:  Mr. Kadisha, Your Honor, is a very
24    substantial individual.  Mr. Kadisha, Neil Kadisha, who is the
25    president and CEO of Omni 808, was one of the founders of      01:35
```

EXHIBIT __B__
PAGE ___19___

1   Qualcomm.  With everything that's gone on in the market in the

2   last six or seven months, I don't want to make any

3   representations, but Mr. Kadisha has from time to time appeared

4   on the Forbes 400 list.  I don't know what his net worth is.

5          What happened, Your Honor, is, Wachovia called the          01:35

6   note.  I don't know why.  I've been involved in these cases

7   where everybody feels like the world revolves around what's

8   happening in this courtroom.  As the Court knows, Wachovia had

9   other issues.

10          Wachovia and its syndicate wanted it off its balance       01:35

11  sheet, and MGA needed relief from the immediate need to pay

12  money they did not have.  And my client was approached and put

13  together people and bought the indebtedness and assumed the

14  debt at a discount, at a substantial discount; and he expects

15  to make money.                                                     01:36

16          THE COURT:  You're representing to the Court, though,

17  that this was not MGA's money; that this was -- from wherever

18  it came from, it came from someplace else.

19          MR. GORDINIER:  Your Honor, two things.  I've never

20  met Mr. Larian, and I know less about MGA than almost everybody  01:36

21  else.

22          THE COURT:  I'm not asking about what you know from

23  MGA but of what you know from your client.

24          MR. GORDINIER:  What I know from my client is, he put

25  in many millions of dollars.  He had a couple of investors with  01:36

EXHIBIT __B__
PAGE __20__


72

1   him to put in many millions of dollars.

2           THE COURT:   Those investors and that money did not

3   come from MGA?

4           MR. GORDINIER:   That's the best of my understanding,

5   Your Honor.   That's true.                                    01:36

6           And the best way to resolve that is what the Court

7   has already done.   The Court did exactly the right thing and

8   set up Mr. Durkin, who's very accomplished, to look at MGA's

9   books.   Step number one, he can tell the Court what their

10  balance sheet is, what their income statement is, and also the   01:37

11  sources and uses of cash.

12          And if there are any issues -- and, by the way, I'm

13  happy to talk to Mr. Durkin or have Mr. Durkin talk to my

14  client.   This is not intended to be -- this wasn't a fraudulent

15  transaction, Your Honor.   We negotiated -- we -- I didn't do     01:37

16  it -- Omni 808 negotiated with Davis Polk on behalf of Wachovia

17  and bought at a discount; and Omni 808 expects to and would

18  like to make money on its investment, and will not be able to

19  do so, obviously, if MGA goes out of business.   So our interest

20  here is in protecting Omni 808's investment.   And part of that   01:38

21  is wanting a say in how MGA's business on this receiver issue

22  is dealt with.

23          THE COURT:   The interest to intervene is focused, as

24  you indicate in your papers, on the receivership issue?

25          MR. GORDINIER:   That's correct, Your Honor.   That's     01:38

EXHIBIT _B_
PAGE _21_

```
 1    correct.
 2              THE COURT:  Very well.
 3              Does anyone wish to be heard in opposition to the
 4    ex-parte application?
 5              MR. ZELLER:  Yes, Your Honor.                         01:38
 6              I don't know that we've been -- and maybe the Court
 7    heard it differently, but I still do not hear anything that
 8    certainly approaches evidence that this was, in fact, an arm's
 9    length transaction.
10              THE COURT:  I have a representation from respected   01:38
11    counsel.
12              MR. ZELLER:  Well, he said -- Your Honor, the
13    Court -- all he said was to the best of his knowledge.  He
14    didn't say it didn't come from it.
15              Second, the Court asked MGA; it didn't ask from      01:39
16    Larian, Larian's brother-in-law, his wife -- there are other
17    family members involved in this, and their fingerprints are on
18    this.  So, certainly, I want to be very clear, Your Honor, we
19    have not gone so far as to say, this is a fraud, this is a
20    sham, or so on.  The fact is that there are substantial        01:39
21    questions here as to the bona fides of this transaction and
22    whether or not this has been papered in a way to basically
23    create debt and credit, where, in fact, it would simply be
24    treated by the tax code, by the bankruptcy code, by the courts,
25    for every other purpose, as, in fact, being nothing but a loan, 01:39
```

EXHIBIT __B__
PAGE ___ɔ̄ɔ̄___

105

```
1    we'll go from there.

2              MR. ZELLER:   Thank you.

3              THE COURT:   Anything further?

4              Thank you.   Good day.

5

6

7

8

9

10                              CERTIFICATE

11

12   I hereby certify that pursuant to section 753, title 28, United
     States Code, the foregoing is a true and correct transcript of
13   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
14   conformance with the regulations of the Judicial Conference of
     the United States.
15

16   _____          _____
     THERESA A. LANZA, CSR, RPR                    2-13-09
17   Federal Official Court Reporter               Date

18

19

20

21

22

23

24

25
```

dnesday, February 11, 2009

Mattel vs. MGA Entertainme

EXHIBIT ___B___

PAGE ___23___

# EXHIBIT "C"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an individual,

    Plaintiff,

    vs.

MATTEL, INC., a Delaware
corporation,

    Defendants.

No. CV 04-9049 SGL (RNBx)
Consolidated with
Nos. CV 04-9405 and
05-2727

**CERTIFIED**
**COPY**

AND CONSOLIDATED ACTIONS.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Wednesday, March 4, 2009

Volume 1

Reported by:
CHERYL R. KAMALSKI
CSR No. 7113

Job No. 106479

EXHIBIT _C_
PAGE _24_

877.955.3855
www.sarnoffcourtreporters.com

IRVINE ● LOS ANGELES ● SAN FRANCISCO ● LAS VEGAS ● SEATTLE

**SARNOFF**
*Court Reporters and*
*Legal Technologies*

1    compel is improper and should be denied for both serious

2    substantive and procedural reasons.  If we're going to

3    have these rules, they have a purpose, they have to be

4    followed.  And the Court's very order, the Court's

5    standing order says if this isn't done, it won't be

6    considered.  They now are walking away from these other

7    orders and they want to rely on the discovery stipulation

8    and order which, of course, I had no knowledge of when we

9    were having this discussion.  As you're well aware of,

10   they didn't even comply with that.  Perhaps if they had,

11   and set out, as they're required to do in writing, what it

12   is they want, why they want it, let's talk about it, let's

13   sit down and discuss it, we could, perhaps, have narrowed

14   it.  In fact, both I and my colleague told Mr. Corey we

15   were pretty sure we could satisfy himself with respect to

16   the bona fides of the transaction.  That was rejected.

17        MR. O'BRIEN:  Let me ask you this question.

18   You've said the discovery's overbroad.  What narrow

19   request could Mattel make that you believe would be proper

20   under the circumstances here?  In other words, what kind

21   of request do you think would be, as a third party?  I

22   mean, I understand you don't want to respond to anything,

23   it's a burden.  But assuming there's always a burden in

24   responding to discovery, what narrow request, based on

25   your understanding of the issues in phase 2, would be

EXHIBIT ___C___

PAGE ___28___

50

1   proper for your -- that you wouldn't come in here and file

2   a motion to quash?

3           MR. GORDINIER:  What documents do we have that

4   show that either Mr. Larian or MGA paid money into this to

5   purchase this debt?  I can tell you there are none.  This

6   is a ready, fire, aim situation.  The allegations that

7   were made and were made publicly are unconscionable and

8   can't be undone.

9           MR. O'BRIEN:  What other areas?  For example,

10  would the payment history with respect to the debt from

11  MGA to 808, assuming there is one, I don't know if this is

12  a balloon payment or that sort of thing --

13          MR. GORDINIER:  I assume that's in MGA's

14  financial statements, but -- I mean, I assume that they've

15  made payments.  I don't know the answer to that, that's

16  reflected on their financial statements, which I'm

17  assuming have been exchanged, but I don't know that.

18          MR. O'BRIEN:  Mr. Russell said that there was

19  discovery that was taken of Wachovia in phase 1.  I was

20  not involved in the case.  I don't know what discovery was

21  taken of Wachovia.  But, presumably -- but it sounds like,

22  and I'll let Mr. Zeller answer this and Mr. Russell

23  address it as well, but if there was discovery in phase 1

24  that was proper as to Wachovia in establishing the debt

25  and looking at the payment terms, and all that sort of

EXHIBIT ___C___
PAGE ___26___

1    thing, would that same sort of discovery be proper

2    vis-a-vis 808 --

3             MR. GORDINIER:  We absolutely offered -- we

4    offered, without knowing any of this, to give them the

5    deal documents.  Absolutely.  I don't know that it's

6    proper.  I think it's overbroad and I think it's

7    premature, but I'll just tell you, we offered to give them

8    the deal documents.  There's no secret there.  We did buy

9    the debt at a discount.  You've read the transcript.  I

10   told Judge Larson my client wants to make money at this,

11   and so he made a business decision that -- you know,

12   Wachovia has its own reasons for doing what it's doing

13   that we all can kind of guess -- but I don't know.  My

14   client had his own reasons for doing what he's doing.  The

15   only thing that seems to relate to all this is do they

16   have -- are there any documents that show the disgorgement

17   thing, or whatever he's trying to argue, and I'm not

18   familiar with the phase 2 -- but I have no problem

19   conceptually giving them the deal documents.  None at all.

20   But that doesn't entitle them to look at all records that

21   reflect all my nonparty entities, all documents detailing

22   or setting forth.  Read through them; they're overbroad

23   and they're improper.

24             MR. O'BRIEN:  What about performance, the

25   performance of the loan.

                                                          52

EXHIBIT ___C___
PAGE ___27___

1        I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3        That the foregoing proceedings were taken

4   before me at the time and place herein set forth; that

5   any witnesses in the foregoing proceedings, prior to

6   testifying, were duly sworn; that a record of the

7   proceedings was made by me using machine shorthand

8   which was thereafter transcribed under my direction;

9   that the foregoing transcript is a true record of the

10  testimony given.

11       Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [  ] was [  ] was not requested.

15       I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or party to this action.

18       IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated: _____ MAR 0 9 2009 _____

22

23       _____Cheryl R. Kamalski_____
         CHERYL R. KAMALSKI
24       CSR No. 7113

25



EXHIBIT ___C___
PAGE ___28___

# EXHIBIT "D"

1   Hon. Edward A. Infante (Ret.)
2   JAMS
    Two Embarcadero Center
3   Suite 1500
    San Francisco, California 94111
4   Telephone:    (415) 774-2611
    Facsimile:    (415) 982-5287
5
6
7
8                       UNITED STATES DISTRICT COURT
9
10                     CENTRAL DISTRICT OF CALIFORNIA
11                            EASTERN DIVISION
12

| | |
|---|---|
| 13   CARTER BRYANT, an individual, | CASE NO. CV 04-09049 SGL (RNBx)<br>JAMS Reference No. 1100049530 |
| 14            Plaintiff, | |
| 15        v. | Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-2727 |
| 16   MATTEL, INC., a Delaware corporation, | |
| 17            Defendant. | **ORDER GRANTING IN PART AND<br>DENYING IN PART MATTEL'S<br>MOTION TO COMPEL DEPOSITION<br>AND PRODUCTION OF DOCUMENTS<br>OF CHRISTENSEN GLASER FINK<br>JACOBS WEIL & SHAPIRO LLP** |
| 18 | |
| 19 | |
| 20   CONSOLIDATED WITH<br>MATTEL, INC. v. BRYANT and<br>21   MGA ENTERTAINMENT, INC. v. MATTEL,<br>INC. | |
| 22 | |

23
24                        I. INTRODUCTION
25      On February 29, 2008, Mattel, Inc. ("Mattel") submitted a Motion to Compel Deposition
26   and Production of Documents of Christensen, Glaser, Fink, Jacobs, Weil & Shapiro ("Christensen
27   Glaser").  Specifically, Mattel seeks an order compelling Christensen Glaser to appear for
28
    Bryant v. Mattel, Inc.,                                                     1
    CV-04-09049 SGL (RNBx)

EXHIBIT ___D___
PAGE ___29___

1   deposition on Topic Nos. 1-3, 5, and 7-13 and to produce documents responsive to Request for

2   Production Nos. 1-6, 8, and 10-22 pursuant to a subpoena served January 18, 2008.  On March 21,

3   2008, MGA Entertainment, Inc., Isaac Larian, MGA Entertainment (HK) Limited, and MGAE de

4   Mexico S.R.L. de C.V. (collectively "MGA") and Christensen Glaser submitted separate

5   oppositions.  On March 28, 2008, the parties submitted a joint report in which they advised the

6   court that despite further meet and confer efforts, the parties were unable to resolve or narrow the

7   instant motion.  On March 31, 2008, Mattel submitted a reply.  Pursuant to Paragraph 5 of the

8   Stipulation and Order for Appointment of a Discovery Master, the Discovery Master finds it

9   appropriate to take the motion under submission for decision without oral argument.

10                                  II. BACKGROUND

11        Christensen Glaser has served as legal counsel to MGA and Isaac Larian in connection

12   with this action and a variety of other matters since 1999.  Gizer Decl.¶2.  Christensen Glaser was

13   trial counsel of record for MGA and Isaac Larian in this very action from the filing of the case in

14   April 2004 until October 2007.  Id.  Although Christensen Glaser is no longer trial counsel of

15   record, the firm continues to provide legal advice to MGA and Isaac Larian in connection with

16   this action and still represents them in other matters.  Id.  Christensen Glaser also represents

17   Farhad Larian in connection with this action.  Christensen Glaser Opposition at p. 1.

18        On January 7, 2008, the district court granted Mattel leave to take Christensen Glaser's

19   deposition, along with approximately forty-five other individuals and entities.  The district court

20   held that Mattel had "shown good cause to grant additional discovery given the complexity of the

21   case, the number of parties, recent developments related to the substitution of counsel, the

22   concerns regarding retention and spoliation of evidence, and the delay in receiving discovery

23   caused by numerous discovery disputes and a Court imposed stay requested by MGA upon

24   substitution of counsel."  Albán Decl., Ex. 12.

25        Mattel served a subpoena on Christensen Glaser on January 18, 2008.  The subpoena

26   contains twenty-two document requests and seeks, *inter alia*, information related to the Carter

27

28   Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)

                                                                                            2

EXHIBIT ___D___
PAGE ___30___

1   Bryant-MGA Agreement, the origination of Bratz, MGA's document preservation efforts, fee and

2   indemnity agreements entered into by MGA, and the documents that Farhad Larian's former

3   counsel showed to Mattel. The subpoena contains fourteen deposition topics on the same subject

4   matters as the document requests. On January 28, 2008, Christensen Glaser served objections to

5   Mattel's subpoena.

6           On January 28, 2008, Mattel filed an *ex parte* application with the district court requesting

7   leave to take third party depositions, including Christensen Glaser's deposition, after the discovery

8   cut-off. During the hearing conducted on February 4, 2008, Christensen Glaser requested that the

9   Court clarify that the January 7, 2008 Order granted Mattel leave to depose Christensen Glaser on

10  only one issue. The district court responded as follows:

11          That is not the case, and the request is DENIED. Mattel has been granted relief
            from the numerical limitations that previously restricted its ability to depose those
12          individuals and entities addressed by the Court's January 7, 2008, Order,
            including its ability to depose Christensen, Glaser. Unless otherwise restricted by
13          the Discovery Master upon proper presentation of the issue to him, Mattel may
            depose Christensen, Glaser on any relevant, non-privileged matter.

14

15  March Decl., Ex. A.

16          Mattel contends that the deposition topics and document requests in the subpoena are all

17  relevant to central issues in the case. Mattel's motion, however, focuses on three general issues,

18  without reference to specific topics or document requests. First, Victoria O'Connor testified that

19  Isaac Larian ("Larian") instructed her to redact a Mattel facsimile identifier on the Bratz

20  agreement between MGA and Bryant (the "Agreement") and to send the Agreement to Patricia

21  Glaser of Christensen Glaser. Ms. O'Connor testified that she followed Larian's instructions and

22  sent the Agreement. Larian denies ever giving that instruction to Ms. O'Connor. Mattel seeks

23  documents and deposition testimony to explore Christensen Glaser's receipt of that Agreement,

24  which Mattel contends is relevant to show spoliation of evidence.

25          Second, Mattel seeks information about Farhad Larian, whom Christensen Glaser

26  represents in this action. According to Mattel, Farhad Larian admitted in late November 2005,

27

28  Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)                                                              3

EXHIBIT   D
PAGE   31

1  while he was on MGA's payroll as a consultant and while Christensen Glaser represented MGA,

2  he destroyed evidence directly relevant to this action with the express intent of keeping such

3  evidence from Mattel.

4    Further, Mattel emphasizes that Christensen Glaser threatened to disqualify Mattel's

5  counsel based on counsel's purportedly improper and unethical contact with Farhad Larian and his

6  counsel in connection with Mattel's review of documents in Farhad Larian's possession in the fall

7  of 2005.  Farhad Larian destroyed most of the documents Mattel reviewed.  Mattel contends that

8  information in Christensen Glaser's possession is relevant to Bratz, Farhad Larian's alleged

9  spoliation of evidence, and Mattel's defense to Christensen Glaser's disqualification threat.

10    Third, Mattel seeks information from Christensen Glaser about payments from MGA to

11  Bryant and other witnesses in this action.  Mattel contends that evidence of payments is relevant

12  to bias and credibility of the witnesses.

13    Christensen Glaser contends that Mattel's subpoena does not satisfy the elements set forth

14  in Shelton v. American Motors Corp., 805 F.2d 1323 (8th Cir. 1986), which limits the depositions

15  of opposing counsel.  Rather, Christensen Glaser contends that all of the documents and

16  information requested by the subpoena are either privileged or available from another source, and

17  are not crucial to Mattel's preparation of its case.

18    MGA also opposes Mattel's motion, contending that the subpoena is overly broad, invades

19  privileged matters, unnecessarily disrupts the adversarial process, and unreasonably burdens and

20  harasses MGA and its counsel.  Moreover, MGA contends that Mattel fails to make the required

21  showing that there is no other means by which Mattel can obtain the information it seeks, or that

22  the information it seeks is crucial (or even necessary) to its case, as required under Shelton, supra.

23  MGA also contends that the information sought is duplicative and cumulative in view of prior

24  discovery Mattel has already sought and received in this case.

25  //

26  //

27

28
   Bryant v. Mattel, Inc.,
   CV-04-09049 SGL (RNBx)

4

EXHIBIT __D__
PAGE __32__

1

III. STANDARDS

2      In general, "[p]arties may obtain discovery regarding any nonprivileged matter that is

3 relevant to any party's claim or defense." Fed.R.Civ.P. 26(b)(1).  All discovery, however, is

4 subject to the limitations imposed by Rule 26(b)(2)(C), Fed.R.Civ.P., which provides that the

5 court must limit the frequency or extent of discovery otherwise allowed by the Federal Rules of

6 Civil Procedure or by local rule if it determines that: "(i) the discovery sought is unreasonably

7 cumulative or duplicative, or can be obtained from some other source that is more convenient,

8 less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to

9 obtain the information by discovery in the action; or (iii) the burden or expense of the proposed

10 discovery outweighs its likely benefit, considering the needs of the case, the amount in

11 controversy, the parties' resources, the importance of the issues at stake in the action, and the

12 importance of the discovery in resolving the issues."

13      Fed.R.Civ.P. 30(a) provides that depositions may be taken of "any person."  There is no

14 express prohibition against deposing opposing counsel.  See Shelton, 805 F.2d at 1327.  Courts,

15 however, have cautioned that depositions of opposing counsel should be allowed only in limited

16 circumstances.  In Shelton, the Eighth Circuit Court of Appeals explained the judicial attitude

17 toward such depositions as follows:

18         We do not hold that opposing trial counsel is absolutely immune from being
deposed. We recognize that circumstances may arise in which the court should
19         order the taking of opposing counsel's deposition.  But those circumstances
should be limited to where the party seeking to take the deposition has shown that
20         (1) no other means exist to obtain the information than to depose opposing
counsel, see e.g., Fireman's Fund Ins. Co. v. Superior Court, 72 Cal.App.3d 786,
21         140 Cal. Rptr. 677 (1977); (2) the information sought is relevant and
nonprivileged; and (3) the information is crucial to the preparation of the case.

22 Shelton, 805 F.2d at 1327.[1]

23

24

25   [1]  In its reply, Mattel contends that Shelton is not the law of this circuit, and asserts that this court should instead
follow the Second Circuit's reasoning in In re Subpoena Issued to Dennis Friedman, 350 F.3d 65, 72 (2d Cir. 2003).
26 In Friedman, the court held that the following factors should be considered when deciding whether the deposition of a
lawyer should take place:

27                                             (continued...)

28

EXHIBIT _D_
PAGE _33_

# IV. DISCUSSION

## A. Information re Carter Bryant's Agreement with MGA

The information Mattel seeks regarding the Agreement between MGA and Bryant is relevant, and indeed crucial, to the claims and defenses in the case. The Agreement is at the heart of this case and is the very document by which Bryant purportedly assigned Bratz to MGA. The date and circumstances under which the Agreement was transmitted to Christensen Glaser are relevant because they might disclose whether or not (a) Bryant and MGA finalized the Agreement while Bryant still worked for Mattel and (b) MGA believed in good faith that Bryant had the rights to Bratz -- an affirmative defense MGA has raised.

Further, the information Mattel seeks is relevant and crucial to Mattel's counterclaims, which include a RICO claim that is predicated, in part, upon an allegation that defendants altered Bryant's Agreement to conceal evidence that Bryant faxed the Agreement from the Barbie Collectibles department of Mattel, using a fax machine owned by Mattel and while Bryant was employed by Mattel. The information Mattel seeks is also relevant and crucial to Mattel's spoliation claim against MGA.[2]

---

(...continued)
the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted.... Under this approach, the fact that the proposed deponent is a lawyer does not automatically insulate him or her from a deposition nor automatically require prior resort to alternative discovery devices, but it is a circumstance to be considered.

Friedman, 350 F.3d at 72; see also Younger Mfg. Co. v. Kaenon, Inc., 247 F.R.D. 586, 588 (C.D. Cal. 2007) (finding Second Circuit's reasoning in Friedman to be more persuasive than Shelton).

The Ninth Circuit has not adopted Shelton, supra. However, Shelton is generally regarded as the leading case on deposing opposing counsel. In any event, Rule 26(b)(2)(C), Fed.R.Civ.P., ultimately dictates the appropriate limits of discovery.

[2] Arguably, Ms. O'Connor redacted the Agreement at a time when MGA was not under any duty to preserve evidence. Whether Mattel will ultimately prevail on its spoliation claim, however, is not the test for determining whether information is discoverable under Rule 26, Fed.R.Civ.P.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

6

EXHIBIT _D_
PAGE _34_

1         Ms. O'Connor and Larian testified that Christensen Glaser received a version of the

2    Agreement.  Only Christensen Glaser can verify the condition of the Agreement Ms. O'Connor

3    faxed to its office.  Furthermore, MGA has failed to establish that the Agreement Ms. O'Connor

4    faxed to Christensen Glaser is privileged.  There is no evidence that the Agreement itself – as

5    compared to any communication that might have accompanied the Agreement – is privileged.

6         MGA next contends that "merely disclosing the timing and other circumstances

7    surrounding MGA's transmittal of that contract to Christensen Glaser would divulge details about

8    a request by MGA for legal advice from its counsel, and would likely reveal legal strategies

9    surrounding one or more legal matters."  MGA's Opposition at p.13.  Mattel, however, represents

10   that it is not seeking privileged information from Christensen Glaser, but rather non-privileged

11   information regarding the date, time and manner of the Agreement's transmission, as well as the

12   form in which the Agreement was transmitted.  In view of Mattel's representation regarding the

13   limited nature of its inquiry, MGA's concerns regarding potential privileged information are

14   unfounded, and in any event, premature until Mattel poses a specific question to Christensen

15   Glaser that calls for the disclosure of privileged information.  If and when that occurs, MGA's

16   claims of privilege can be addressed on a question-by-question basis.

17        Therefore, Mattel's motion is granted to the extent Mattel seeks production of the

18   Agreement Ms. O'Connor faxed to Christensen Glaser.  Mattel's motion is also granted to the

19   extent Mattel seeks testimony regarding the date, time and manner of the Agreement's

20   transmission and the condition of the Agreement when it arrived at Christensen Glaser's office.

21   The information Mattel seeks is relevant and crucial to both Phase 1 and Phase 2 issues, and

22   accordingly Christensen Glaser's deposition should proceed without delay.

23        To the extent Mattel's subpoena seeks documents and testimony beyond the Agreement

24   itself and the date, time and manner of the Agreement's transmission and the condition of the

25   Agreement when it arrived at Christensen Glaser's office, Mattel's subpoena exceeds the bounds

26   of relevant discovery under Rule 26(b)(1), Fed.R.Civ.P., and intrudes, without justification, upon

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

7

EXHIBIT ___D___
PAGE ___35___

1  MGA's attorney-client relationship and privileged communications with Christensen Glaser,

2  taking into consideration all of the factors in Rule 26(b)(2)(C), Fed.R.Civ.P.  Mattel has had

3  ample opportunity to take discovery regarding Bryant's Agreement with MGA from multiple

4  sources.  Other than the limited discovery of Christensen Glaser permitted by this Order, Mattel

5  has not shown that Christensen Glaser possesses non-privileged information beyond that which it

6  has already sought and obtained.  The requested discovery is also cumulative and unduly

7  burdensome.

8  B. Information re Farhad Larian's Alleged Spoliation and Mattel's Threatened Disqualification

9         The information Mattel seeks regarding Farhad Larian's alleged destruction of evidence is

10  relevant and crucial to Mattel's allegations of spoliation.  Farhad Larian has testified that he

11  destroyed documents and information related to Bratz with the express intent of keeping them

12  from Mattel.  The documents Farhad Larian destroyed included:  (1) MGA Bratz-related emails

13  from the 2000 and 2001 time period; (2) financial forecasts and shipping spreadsheets that

14  included Bratz; (3) signed and draft declarations of persons knowledgeable about Bratz during the

15  2000 time period; and (4) information from the Larian v. Larian matter.

16         Christensen Glaser was MGA's counsel and was involved in MGA's evidence preservation

17  efforts.  Further, Christensen Glaser has represented Farhad Larian with respect to the instant

18  lawsuit.  Given Christensen Glaser's involvement with MGA's evidence preservation efforts and

19  Christensen Glaser's representation of Farhad Larian, it is reasonable to infer that Christensen

20  Glaser possesses information potentially relevant to Mattel's allegations regarding spoliation of

21  evidence.[3]

22         Furthermore, the information Mattel is seeking about the documents Farhad Larian has

23  admitted he destroyed and regarding the factual bases for MGA's threatened disqualification of

24  Mattel's counsel appear to be uniquely within Christensen Glaser's possession.  Mattel has a list of

25  _____

26     [3] In its opposition papers, Christensen Glaser neither admits nor denies involvement with or knowledge of MGA's efforts, if any, to preserve potential evidence in Farhad Larian's possession.

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

8



EXHIBIT  D

PAGE  36

1    the documents it inspected at the offices of Farhad Larian's attorneys in November 2005, but not

2    the documents themselves.  Farhad Larian no longer has the documents, and MGA has not

3    produced copies of those documents to date.

4         MGA and Christensen Glaser have asserted valid concerns regarding the potential

5    intrusion upon privileged information and work product.  These concerns do not automatically

6    insulate Christensen Glaser from Mattel's subpoena, particularly because of the gravity of the

7    spoliation allegations and the lack of alternative sources for the documents Farhad Larian has

8    admitted he destroyed.  Further, the privilege issues cannot be addressed in a vacuum but must

9    await the outcome of Christensen Glaser's document production and deposition.

10        However, to the extent Mattel's subpoena seeks documents and testimony beyond

11   document preservation efforts relating to Farhad Larian and Mattel's threatened disqualification,

12   the subpoena exceeds the bounds of relevant discovery under Rule 26(b)(1), Fed.R.Civ.P., and

13   intrudes, without justification, upon MGA's attorney-client relationship with Christensen Glaser

14   and privileged communications, taking into consideration all of the factors in Rule 26(b)(2)(C),

15   Fed.R.Civ.P.

16   C. Payments to Witnesses

17        Lastly, Mattel seeks information regarding payments made to witnesses to this lawsuit.

18   The information sought is clearly relevant to credibility and bias, but not crucial to Mattel's

19   preparation of its case.  Furthermore, Mattel has had ample opportunity to pursue such discovery,

20   and indeed has obtained such discovery from many other sources.  The requested information is

21   also duplicative and cumulative of other discovery Mattel has sought and received, and unduly

22   burdensome, taking into consideration all of the factors set forth in Rule 26(b)(2)(C)(iii),

23   Fed.R.Civ.P.

                              V. CONCLUSION

25        For the reasons set forth above, Mattel's motion to compel the deposition of Christensen

26   Glaser and for documents is granted in part and denied in part as follows:

27

28
     Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)                                                    9

EXHIBIT _D_

PAGE ___37

1.     No later than May 15, 2008, Christensen Glaser shall produce all non-privileged documents that are responsive to the following requests: Nos. 1 (limited to the Agreement that Ms. O'Connor testified she sent to Christensen Glaser), 17, 21 (limited to documents sought by or the subject of Request Nos. 1 (as limited above) and 17) and 22 (limited to documents sought by or the subject of Request No. 17).  Documents withheld on the basis of privilege must be identified on a privilege log, which shall be produced to Mattel no later than May 15, 2008.

2.     Christensen Glaser shall appear for deposition and testify regarding Topic Nos. 8 and 13.  Topic No. 13 is limited to the Agreement Ms. O'Connor testified she sent to Christensen Glaser, the date, time and manner of the Agreement's transmission, and the condition of the Agreement when it arrived at Christensen Glaser's office.  The deposition shall proceed at a place and time mutually convenient to all parties and witness(es), and shall be completed no later than May 20, 2008.

3.     All claims of privilege are preserved.  Nothing in this Order is intended to authorize or preclude any party from asserting claims of privilege with respect to specific documents and/or deposition questions, if appropriate.

4.     Pursuant to Rule 26(b)(2)(C), Fed.R.Civ.P., Mattel's motion is denied with respect to all topics and document requests set forth in the subpoena that are not specifically identified in paragraphs 1 and 2 above.

5.     Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery Master, MGA shall file this Order with the Clerk of Court forthwith.

Dated: May 1, 2008                         /S/
                                   _____
                                   HON. EDWARD A. INFANTE (Ret.)
                                        Discovery Master



EXHIBIT _D_
PAGE _38_

## PROOF OF SERVICE BY E-MAIL

I, Anthony Sales, not a party to the within action, hereby declare that on May 1, 2008, I served the attached ORDER GRANTING IN PART AND DENYING IN PARTMATTEL'S MOTION TO COMPEL DEPOSITION AND PRODUCTION OF DOCUMENTS OF CHRISTENSEN GLASER FINK JACOBS WEIL & SHAPIRO LLP in the within action by email addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| Matthew M. Werdegar, Esq. | Keker & Van Nest | mwerdegar@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| Audrey Walton-Hadlock, Esq. | Keker & Van Nest | awalton-hadlock@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| John Gordon | Quinn, Emanuel, Urquhart, Oliver & Hedges | johngordon@quinnemanuel.com |
| Thomas J. Nolan, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tnolan@skadden.com |
| Raoul D. Kennedy, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | rkennedy@skadden.com |
| Amy S. Park, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | apark@skadden.com |
| Harriet S. Posner, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | hposner@skadden.com |
| Carl Alan Roth, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | croth@skadden.com |
| Timothy A. Miller, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tmiller@skadden.com |
| Marcus R. Mumford, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Mmumford@skadden.com |
| Paul M. Eckles, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Paul.eckles@skadden.com |
| Lance A. Etcheverry, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Lance.etcheverry@skadden.com |
| Robert J. Herrington, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Robert.herrington@skadden.com |
| Mark Overland, Esq. | Overland, Borenstein, et al. | moverland@obsklaw.com |
| Alexander Cote, Esq. | Overland, Borenstein, et al. | acote@obsklaw.com |
| David C. Scheper, Esq. | Overland, Borenstein, et al. | dscheper@obsklaw.com |
| Patricia L. Glaser, Esq. | Christensen, Glaser, Fink, et al. | pglaser@chrisglase.com |
| Alisa Morgenthaler-Lever, Esq. | Christensen, Glaser, Fink, et al. | amorgenthaler@chrisglase.com |
| Scott E. Gizer, Esq. | Christensen, Glaser, Fink, et al. | sgizer@chrisglase.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on May 1, 2008, at San Francisco, California.

Anthony Sales

# EXHIBIT "E"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.   CV 04-09049 SGL(RNBx)                    Date:  February 25, 2008
Title:     CARTER BRYANT -v- MATTEL, INC.
           AND CONSOLIDATED ACTIONS
=======================================================================
=
PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

          Jim Holmes                            Anne Kielwasser
          Courtroom Deputy Clerk                Court Reporter

ATTORNEYS PRESENT FOR CARTER           ATTORNEYS PRESENT FOR MATTEL:
BRYANT:

                                       John Quinn
                                       Jon D. Corey

                                       ATTORNEY PRESENT FOR THIRD-PARTY
ATTORNEYS PRESENT FOR MGA:             WITNESSES:

Thomas J. Nolan                        Larry McFarland
Carl A. Roth

PROCEEDINGS:   **ORDER GRANTING MOTION OBJECTING TO PORTIONS OF THE
               DISCOVERY MASTER'S DECEMBER 31, 2007, ORDER RE HARD DRIVES**

               **ORDER DISCHARGING ORDER TO SHOW CAUSE ON CONDITIONS**

               **ORDER STRIKING EX PARTE APPLICATION**

       These matters were heard on February 25, 2008.

       As set forth in the concurrently filed order, the Court **GRANTS** Mattel's motion objecting to portions of the Discovery Master's December 31, 2007, Order regarding hard drives.

       As set forth on the record, the Court orders that counsel Larry McFarland be deemed timely served with a notice for his deposition and that he serve notices of deposition on his clients, Lucy Arant, Sarah Halpern, and Peter Marlow.  Neither Mr. McFarland nor his clients may object to the

MINUTES FORM 90                                    Initials of Deputy Clerk __jh_____
CIVIL -- GEN                    1                  Time: 00/35

EXHIBIT ___E___
PAGE ____40___

taking of their depositions on the basis of notice, service, or timeliness, but may assert any other objections they may have thereto and may seek any appropriate protective orders from the Discovery Master. Subject to these conditions, the Court **DISCHARGES** the order to show cause.

As for the final item, the Court **STRIKES** the ex parte application to compel the depositions of Matthew Bousquette and Tina Patel, for two reasons. First, the entire application and all exhibits thereto were filed under seal without the requisite showing of the necessity of filing it under seal. Putting aside for consideration on another day the much broader issue of the necessity of filing under seal the narrower category of all documents designated under the protective order as "Confidential" and/or "Attorneys Eyes Only", there is no possible justification for filing the present ex parte application under seal. Secondly, and importantly, the present ex parte application ignores the Court's previous orders that discovery matters must be presented in the first instance to the Discovery Master. It is **STRICKEN** for that reason.

IT IS SO ORDERED.

Initials of Deputy Clerk __jh_____
Time: 00/35

EXHIBIT ___É___
PAGE ___41___

# EXHIBIT "F"

1  Hon. Edward A. Infante (Ret.)
   JAMS
2  Two Embarcadero Center
   Suite 1500
3  San Francisco, California  94111
   Telephone:    (415) 774-2611
4  Facsimile:    (415) 982-5287

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                       EASTERN DIVISION

11

12                                      | CASE NO. CV 04-09049 SGL (RNBx)
   CARTER BRYANT, an individual,        | JAMS Reference No. 1100049530
13
           Plaintiff,
14                                         Consolidated with
       v.                                  Case No. CV 04-09059
15                                         Case No. CV 05-2727
   MATTEL, INC., a Delaware corporation,
16                                         **ORDER RE MGA DEFENDANTS'**
           Defendant.                      **MOTION TO QUASH DEPOSITION**
17                                         **SUBPOENAS**

18  CONSOLIDATED WITH
    MATTEL, INC. v. BRYANT and
19  MGA ENTERTAINMENT, INC. v. MATTEL,
    INC.
20

21

22          On January 23, 2008, MGA Entertainment, Inc., Isaac Larian, MGA Entertainment (HK)

23  Limited, and MGAE de Mexico S.R.L. de C.V. (collectively, "MGA parties") submitted a motion

24  to quash subpoenas issued by Mattel, Inc. ("Mattel") to several non-parties.  On February 7, 2008,

25  Mattel submitted an opposition.  On February 14, 2008, the MGA parties submitted a

26  supplemental and second amended motion to quash the subpoenas issued by Mattel to the

27  following non-parties:  (1) Lucy Arant, (2) Ana Isabel Cabrera, (3) Kami Gilmour, (4) Daphne

28
    Bryant v. Mattel, Inc.,                                                    1
    CV-04-09049 SGL (RNBx)

                                                              EXHIBIT  F
                                          3/11/08             PAGE  42

1   Gronich, (5) Sarah Halpern, (6) Rachel Harris, (7) Andreas Koch, (8) Cecilia Kwok, (9) Stephen

2   Lee, (10) Peter Marlow, (11) Beatriz Morales, (12) Moss Adams, (13) Amy Myers, (14) NPD

3   Group, Inc., (15) Maria Elena Salazar, (16) Joe Tiongco, (17) Mercedeh Ward, (18) Jeff Weiss,

4   (19) Carol Witschell, (20) Wachovia Corporation, (21) Mel Woods and (22) Eric Yip.  On

5   February 22, 2008, Mattel submitted an opposition to the MGA parties' supplemental and second

6   amended motion to quash, and on February 28, 2008, the MGA parties submitted a reply.  The

7   parties were directed to meet and confer further regarding the motion, which has been completed.

8   The motion was heard on March 10, 2008.

9          Having considered all of the papers submitted by the parties and the comments of counsel

10  at the hearing, it is ordered as follows:

11         1.      Based upon the parties' representations at the hearing, the motion is moot with

12  respect to the following individuals:  Lucy Arant, Sarah Halpern, Rachel Harris, Andreas Koch,

13  Peter Marlow, Jeff Weiss and Amy Myers.

14         2.      Mattel acknowledges that it did not subpoena the following individuals before the

15  January 28, 2008 discovery cut-off and that their depositions cannot be taken without seeking and

16  obtaining leave of court:  Cecilia Kwok, Stephen Lee, Mercedeh Ward, Carol Witschell and Eric

17  Yip.

18         3.      The parties agree that because the subpoenas served on Moss Adams and

19  Wachovia Corporation are the subject of a separate discovery motion, the court should defer

20  consideration of these two subpoenas until the separate motion is heard.

21         4.      The MGA parties' motion to quash is denied as to Ana Isabel Cabrera, Kami

22  Gilmour, Beatriz Morales and Maria Elena Salazar.  Mattel served subpoenas on these individuals

23  before the January 28, 2008 discovery cut-off.  Although Mattel failed to provide the standard

24  ten-day notice, the shortened notice was reasonable under the circumstances.

25         5.      The MGA parties' motion to quash is denied as to Daphne Gronich, MGA's in-

26  house counsel, and Joe Tiongco, an MGA "IT" employee.  These witnesses have potentially

27  relevant information regarding document retention, preservation and collection, and arguably

28

EXHIBIT _F_
PAGE _43_

1    other issues in the case.  However, in light of the substantial 30(b)(6) testimony Mattel has

2    already received on the subject of document retention, preservation and collection, and to reduce

3    the burden on the witnesses, each deposition is limited to 3 hours.  Mattel may question Daphne

4    Gronich and Joe Tiongco on any subject that is relevant within the meaning of Rule 26,

5    Fed.R.Civ.P.

6        6.      The MGA parties' motion to quash is denied as to NPD Group, Inc. and Mel

7    Woods based upon Mattel's representation that these witnesses have potentially relevant

8    information regarding damages for the Phase I trial.

9        7.      Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a

10    Discovery Master, the MGA parties shall file this Order with the Clerk of Court forthwith.

11

12    Dated: March //, 2008

                                    HON. EDWARD A. INFANTE (Ret.)

13                                     Discovery Master

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                                                    3

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT ___F___

PAGE ___44___

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on March 11, 2008, I served the attached ORDER RE MGA DEFENDANTS' MOTION TO QUASH DEPOSITION SUBPOENAS in the within action by email addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| Matthew M. Werdegar, Esq. | Keker & Van Nest | mwerdegar@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| Audrey Walton-Hadlock, Esq. | Keker & Van Nest | awalton-hadlock@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| John Gordon | Quinn, Emanuel, Urquhart, Oliver & Hedges | johngordon@quinnemanuel.com |
| Thomas J. Nolan, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tnolan@skadden.com |
| Raoul D. Kennedy, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | rkennedy@skadden.com |
| Amy S. Park, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | apark@skadden.com |
| Harriet S. Posner, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | hposner@skadden.com |
| Carl Alan Roth, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | croth@skadden.com |
| Timothy A. Miller, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tmiller@skadden.com |
| Marcus R. Mumford, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Mmumford@skadden.com |
| Paul M. Eckles, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Paul.eckles@skadden.com |
| Lance A. Etcheverry, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Lance.etcheverry@skadden.com |
| Robert J. Herrington, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Robert.herrington@skadden.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on March 11, 2008, at San Francisco, California.

_____
Sandra Chan

EXHIBIT ___F___
PAGE ___45___

# EXHIBIT "G"

1    Hon. Edward A. Infante (Ret.)
     JAMS
2    Two Embarcadero Center
     Suite 1500
3    San Francisco, California 94111
     Telephone:   (415) 774-2611
4    Facsimile:   (415) 982-5287

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                        EASTERN DIVISION

11

12                                              CASE NO. CV 04-09049 SGL (RNBx)
                                                JAMS Reference No. 1100049530
13   CARTER BRYANT, an individual,

14             Plaintiff,

15        v.                                    Consolidated with
                                                Case No. CV 04-09059
16   MATTEL, INC., a Delaware corporation,      Case No. CV 05-2727

17             Defendant.                       **ORDER RE MATTEL'S MOTIONS TO
                                                COMPEL FARHAD LARIAN, KAYE
18                                              SCHOLER AND STERN &
                                                GOLDBERG TO PRODUCE
                                                DOCUMENTS**
19
     CONSOLIDATED WITH
20   MATTEL, INC. v. BRYANT and
     MGA ENTERTAINMENT, INC. v. MATTEL,
21   INC.

22

23

24                        I. INTRODUCTION

25        The following motions are pending for decision, each of which seeks discovery from non-

26   parties: Mattel, Inc.'s ("Mattel") (1) Motion to Compel Farhad Larian to Produce Documents; (2)

27   Motion to Compel Kaye Scholer to Produce Documents; and (3) Motion to Compel Stern &

28

*1-25*    EXHIBIT ___G___
          PAGE ___46___

1   Goldberg to Produce Documents. Each of the non–parties submitted oppositions.[1]  In addition,

2   MGA Entertainment, Inc., Isaac Larian, MGA Entertainment (HK) Limited, and MGAE de

3   Mexico S.R.L. de C.V. (collectively "MGA") submitted oppositions to the motions. Mattel

4   submitted a consolidated reply on January 3, 2008. The motions were heard on January 16, 2008,

5   at which time Mattel agreed to hold in abeyance its Motion to Compel Stern & Goldberg to

6   Produce Documents. This Order, therefore, addresses only Mattel's motions to compel Farhad

7   Larian and Kaye Scholer to produce documents.

8        On January 22, 2008, the parties submitted a Stipulation Regarding Protective Orders to

9   facilitate production of documents responsive to the subpoenas at issue.

10                                   II. BACKGROUND

11        Since the inception of MGA in 1979 until December of 2000, Isaac Larian, a defendant

12   herein and MGA's CEO, and his brother Farhad Larian, a non-party, shared ownership and

13   management of MGA. A dispute developed between the two brothers and in March of 2000,

14   Isaac Larian proposed that Farhad Larian sell his interest in MGA to him.

15        On September 28, 2000, the Larian brothers agreed to have their uncle, Morad Zarabi,

16   arbitrate their dispute and decide a fair value for MGA and also decide which brother should sell

17   his ownership interest to the other. The brothers' agreement to arbitrate was entered into ten days

18   after the alleged effective date of Carter Bryant's contract purportedly assigning rights to Bratz to

19   MGA. Isaac Larian did not tell his brother about the contract with Bryant.

20        Mr. Zarabi retained an appraiser, Ernest Dutcher, to value MGA based on "the period

21   ending December 31, 1999." By December 4, 2000, Mr. Zarabi determined that Farhad Larian

22   should sell his 45% ownership interest in MGA to Isaac Larian and the two entered into an

23   Agreement for Sale of Stock by which Farhad Larian sold his interest for $8.775 million.

24

25

26        ───────────────

27        [1] Mattel contends that Kaye Scholer's opposition was not timely filed and therefore should not be considered. Although the opposition was ten days late, Kaye Scholer's brief will nevertheless be considered in the interest of resolving these disputes on the merits.

28

EXHIBIT ___G___
PAGE ___97___

1   In the summer of 2002, Farhad Larian complained to Mr. Zarabi that Isaac Larian had

2   allegedly fraudulently concealed Bratz during the negotiations that led to Farhad Larian's sale of

3   MGA stock. Mr. Zarabi oversaw another appraisal of MGA based upon information he gathered

4   in 2002. Mr. Dutcher produced an appraisal on February 13, 2003 that valued MGA as of

5   December 31, 2000 and projected a 2001 revenue growth rate of twenty-five percent (25%) based

6   upon "hot projects that came along." Mattel's Motion at p.4, Ex. 8 to Decl. of Juan Pablo Albán.

7   Other information relied upon by Mr. Dutcher suggests that MGA had expansionary plans in 2000

8   compared to the prior four years.

9   Unable to resolve his disputes through Mr. Zarabi, Farhad Larian sued Isaac Larian,

10   alleging, among other things, that (a) in late 1999 or early 2000, Isaac Larian and MGA became

11   aware of a new product line called Bratz; (b) starting in early 2000 and throughout 2000, Isaac

12   Larian and MGA devised plans to develop and distribute Bratz; and (c) Isaac Larian concealed the

13   plans for Bratz from Farhad Larian and Mr. Zarabi in order to keep the valuation of MGA

14   artificially low. Notably, MGA and Bryant claim in the instant lawsuit that they did not even

15   meet until September 2000.

16   Isaac Larian successfully moved to compel arbitration of Farhad Larian's claims. In early

17   February 2005, Mr. Zarabi declined to serve as arbitrator and the court appointed another

18   arbitrator. A few weeks later, Farhad Larian filed suit against Mr. Zarabi alleging that he

19   conspired with Isaac Larian to conceal facts.

20   The arbitration of Farhad Larian's claims started on November 16, 2005. Two days into

21   the proceedings, however, Farhad Larian dismissed his claims. Isaac Larian sought to recover his

22   attorneys' fees and won an award in excess of $1 million against his brother.

23   Mattel Subpoenas Farhad Larian to Produce Documents

24   On August 31, 2007, Mattel subpoenaed Farhad Larian to appear for deposition and to

25   produce (1) documents relating to the Larian v. Larian disputes; (2) documents related to non-

26   Bratz allegations by Mattel and MGA, primarily related to allegations of trade secret theft; (3)

27   documents relating to Farhad Larian's relationship to MGA, including his position there,

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

3

EXHIBIT ___G___
PAGE ___48___

1   ownership interests, and payments from MGA or Isaac Larian to Farhad Larian; (4) Farhad

2   Larian's knowledge and possession of documents specifically from the instant lawsuit, including

3   his communications with Mattel; and (5) information about the location of responsive documents.

4   The majority of Mattel's requests seek documents in the first category described above.

5          On September 21, 2007, Farhad Larian served responses and objections in which he

6   agreed to produce documents responsive to eleven of Mattel's forty-one document requests.

7   After a brief stay of discovery, counsel for Farhad Larian and Mattel met and conferred beginning

8   on November 20, 2007.  During the meet and confer process, Farhad Larian agreed to produce

9   documents responsive to some, but not all of Mattel's forty-one requests.  On November 21,

10  2007, Farhad Larian produced approximately one red well of documents.

11         The parties held a second meet and confer conference call on November 27, 2007, and

12  were able to resolve their disputes regarding many more, but not all requests.  In particular, the

13  parties were ultimately able to resolve their disputes regarding the requests for documents related

14  to non-Bratz allegations.  At the conclusion of the second meet and confer session, it was agreed

15  that Farhad Larian would make a supplemental production of documents on December 6, 2007,

16  and provide a written supplemental response.  The parties attempted to schedule another meet and

17  confer session, but could not agree upon a date.  On the evening of December 6, 2007, Mattel

18  filed the instant motion.  Mattel seeks an order compelling Farhad Larian to produce documents

19  responsive to every request in its subpoena; overruling each of Farhad Larian's objections; and

20  ordering him to produce a document-by-document privilege log.

21  Mattel Subpoenas Isaac Larian's Attorney –Kaye Scholer

22         On or about September 6, 2007, Mattel also subpoenaed Kaye Scholer, the firm that

23  represented Isaac Larian in the Larian v. Larian proceedings.  The subpoena consisted of thirty-

24  five (35) requests seeking the same five categories of documents it subpoenaed from Farhad

25  Larian.  Kaye Scholer's representation of Isaac Larian included defending him in two related

26  Superior Court actions, two arbitration proceedings and an appeal to the California Court of

27  Appeals, all of which covered a period of several years.  As a result of this representation Kaye

28  

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

4

EXHIBIT ___G___
PAGE ___49___

1   Scholer has accumulated approximately fifty-six (56) boxes of its client's files, including, among

2   other things, correspondence files, pleading files, discovery files, witness preparation files,

3   research files, exhibits, attorney work files, and billing files.

4        On or about September 18, 2007, Kaye Scholer served its objections, asserting, among

5   other things, that the requests are duplicative, unreasonably cumulative, harassing and oppressive.

6   The parties met and conferred on October 11 and 29, 2007.  Kaye Scholer agreed to review the

7   following files for responsive documents:  (1) pleading files; (2) discovery files; and (3)

8   arbitration exhibits.  Kaye Scholer's rationale for limiting its search for responsive documents to

9   these three files was to avoid undue burden because most of the documents in other files would be

10   protected by the work product doctrine and/or the attorney-client privilege.  Kaye Scholer also

11   agreed to produce documents responsive to the majority of Mattel's requests.  However, Kaye

12   Scholer repeatedly informed Mattel that it objected to producing a document-by-document

13   privilege log because it would be unduly burdensome, expensive and inconvenient.

14        In the instant motion, Mattel seeks an order compelling Kaye Scholer to produce

15   documents responsive to every request in its subpoena and overruling Kaye Scholer's objections,

16   including privilege, or alternatively, compelling Kaye Scholer to produce a document-by-

17   document privilege log.

18   <u>Mattel's Other Discovery Efforts</u>

19        Mattel has attempted to obtain documents related to the <u>Larian v. Larian</u> proceedings from

20   MGA and Isaac Larian.  As far as Mattel can ascertain, however, MGA has produced only four

21   documents relating to the <u>Larian v. Larian</u> proceedings and Isaac Larian has produced none.

22        Mattel also searched public filings in the <u>Larian v. Larian</u> and <u>Larian v. Zarabi et al.</u> civil

23   lawsuits.  Mattel found Mr. Dutcher's declaration that included the appraisals described above,

24   however, Mattel was not able to locate any of the raw data on which Mr. Dutcher relied.  Mattel

25   also served subpoenas on third parties involved in the <u>Larian v. Larian</u> proceedings, and met with

26   limited success.

27   //

28



EXHIBIT    G
PAGE     50

### III. STANDARDS

Rule 45 of the Federal Rules of Civil Procedure requires third parties to produce documents (and reasonably accessible electronically stored information) that are responsive to a subpoena that a party serves on them. Fed.R.Civ.P. 45(b), (d). If the subpoenaed documents are relevant and there is good cause for their production, the subpoena is enforced unless the documents are privileged or the subpoena is unreasonable, oppressive, annoying or embarrassing. The factors to be balanced by the trial court in determining the propriety of a subpoena are the relevance of the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena. A person withholding subpoenaed information under a claim of attorney-client privilege or protected by the work product doctrine must expressly make the claim and "describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." Fed.R.Civ.P. 45(d)(2).

Rule 45(c)(1), Fed.R.Civ.P., provides that "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Furthermore, "[t]he issuing court must enforce this duty and impose an appropriate sanction--which may include lost earnings and reasonable attorney's fees-- on a party or attorney who fails to comply." Id.

### IV. DISCUSSION

A. Documents Subpoenaed from Farhad Larian

Mattel contends that each of the categories of documents it seeks from Farhad Larian is relevant and that there is good cause for production. First, Mattel contends that the Larian v. Larian proceedings are relevant because Farhad Larian's allegations about the timing of the origins and early development of Bratz and MGA's concealment thereof parallel and provide support for the crux of Mattel's claims in the instant litigation. Second, Mattel contends that documents about Farhad Larian's relationship with MGA are relevant to his credibility. In particular, Mattel contends that payments from Isaac Larian and/or MGA to Farhad Larian are

EXHIBIT ___G___
PAGE ___51___

1  relevant to credibility and possible bias.  Third, Mattel contends that documents relating to this

2  action are clearly relevant, especially in light of MGA and Isaac Larian's threat to disqualify

3  Mattel's counsel based upon purported communications between Mattel's counsel and Farhad

4  Larian.  Fourth, Mattel contends that it seeks information about the location of responsive

5  documents to determine whether Farhad Larian destroyed documents or for another reason no

6  longer has them.

7      Mattel next contends that Farhad Larian has failed to carry his burden of demonstrating

8  that the requests at issue are unreasonable, oppressive, annoying or embarrassing.  Further, Mattel

9  contends that the protective order in place in this lawsuit is sufficient to address Farhad Larian's

10  confidentiality or privacy concerns.  Lastly, Mattel contends that Farhad Larian's privilege log is

11  inadequate because it fails to justify his claims of privilege and work product protection on a

12  document-by-document basis.

13      Farhad Larian contends that Mattel's motion should be denied because Mattel violated its

14  meet and confer obligations by filing the motion before he made his scheduled supplemental

15  production and before the parties' meet and confer discussions had concluded.  According to

16  Farhad Larian, on November 27, 2007, it was agreed that he would make a supplemental

17  production of documents on December 6, 2007, and that he would provide a written supplemental

18  response.  Farhad Larian complied with this agreement and, on December 6, 2007, provided a

19  written supplemental response and, as Mattel acknowledges, approximately six boxes containing

20  approximately 12,000 pages of documents.  Nevertheless, Mattel filed the instant motion on

21  December 6, 2007, without reviewing the supplemental document production and written

22  supplemental response.  Farhad Larian also represents that as of December 6, 2007, the day

23  Mattel filed the instant motion, the parties acknowledged the need for a further meet and confer

24  session, as reflected in the numerous e-mails and correspondence exchanged between counsel.

25  Furthermore, Farhad Larian represents that after Mattel filed the instant motion, he requested that

26  Mattel take the motion off-calendar because his supplemental responses resolved the parties'

27  disputes as to all but three requests and because there was potential for resolving the remaining

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

7

EXHIBIT   G
PAGE   52

1   requests as well, but that Mattel refused.

2          Farhad Larian contends that in light of his supplemental production, he is now in full

3   compliance with Mattel's subpoena, except for three requests. He represents that he has produced

4   over 12,000 documents, including all non-privileged documents from the <u>Larian v. Larian</u> matters

5   that relate to Bratz (including its origin), Carter Bryant, Mattel, a fee agreement between Farhad

6   and MGA, and all documents related to appraisals of MGA that are not privileged or otherwise

7   covered by a protective order. He also contends that the privilege log he has produced to Mattel,

8   which describes the withheld documents by category instead of document-by-document, is

9   sufficient to substantiate his claims of privilege and work product protection. As for the three

10  remaining requests, Nos. 23, 24 and 41, Farhad Larian contends that they are overbroad, harassing

11  and cumulative and invade his and his family's privacy.

12                    <u>Farhad Larian Has Substantially Complied with the Subpoena</u>

13         Farhad Larian made a substantial supplemental production and provided a supplemental

14  written response on December 6, 2007. Indeed, Mattel acknowledges that it received

15  approximately six boxes of documents from Farhad Larian, which contain approximately 12,000

16  pages of documents. Nevertheless, Mattel contends in its reply brief that there are a few

17  deficiencies in Farhad Larian's production. For example, Mattel contends that Farhad Larian has

18  not produced (1) documents bates stamped "MZ" and "ED"; (2) raw data provided to the

19  appraisers in the <u>Larian v. Larian</u> litigations and the 2000 financial models that Farhad Larian

20  claimed Isaac Larian prepared; (3) three boxes of documents that Farhad Larian's counsel showed

21  Mattel's counsel and upon which MGA's disqualification threats against Mattel's counsel are

22  based; (4) the Dutcher Declaration; and (5) documents responsive to Request Nos. 17-19. Mattel

23  also contends that Farhad Larian has improperly limited its production to only those documents

24  that directly reference Bratz and Carter Bryant.

25         At the hearing, counsel for Farhad Larian confirmed that all responsive documents,

26  including the documents identified in Mattel's reply brief, had been or would be produced after

27  the parties executed the Stipulation Regarding Protective Orders, which has now been

28

8

1   accomplished.  Significantly, counsel represented that Farhad Larian did not limit his production

2   to only those documents that directly reference Bratz and Carter Bryant, and that his supplemental

3   responses make this point clear.  Counsel for Farhad Larian also represented that all privileged

4   documents have been identified on a privilege log.

5        In light of the December 6, 2007 supplementation, and based upon the representations

6   made by counsel for Farhad Larian at the hearing, Farhad Larian has substantially discharged his

7   obligation to comply with Mattel's subpoena.  Therefore, there is no need for an order compelling

8   any further production of documents.

9        <u>Farhad Larian's Objections to the Three Remaining Requests are Justified</u>

10       The only three requests to which Farhad Larian objects are Nos. 23, 24 and 41, which are

11  set forth in full below:

12       <u>Request No. 23</u>:  All DOCUMENTS RELATING TO any and all payments of
         money or transfers of anything of value that ISAAC LARIAN, his FAMILY
13       MEMBERS and/or MGA have made, have offered or have proposed, promised or
         agreed to make, to or for the benefit of YOU or YOUR FAMILY MEMBERS at
14       any time from January 1, 1999 through the present.

15       <u>Request No. 24</u>:  All DOCUMENTS RELATING TO any and all payments of
         money or transfers of anything of value that any PERSON has made, has offered
16       or has proposed, promised or agreed to make, to or for the benefit of YOU or
         YOUR FAMILY MEMBERS and that was related in any way to BRATZ,
17       BRYANT, MGA or this ACTION at any time from January 1, 1999 through the
         present.

18
         <u>Request No. 41</u>:  DOCUMENTS sufficient to IDENTIFY since January 1, 1999
19       through the present (a) each account with any bank or financial institution that
         YOU have or have had, or that YOU have or have had any legal beneficial
20       interest in; (b) each telephone subscription service account that YOU have or have
         had, or that YOU use or have used; and (c) each email account that YOU have or
21       have had, or that YOU use or have used.

22
    Farhad Larian contends that Mattel's stated justification for the requests – bias and credibility – is
23
    questionable because he is not an adverse witness to Mattel.  Farhad Larian represents that MGA
24
    has never asked him to testify on the company's behalf.  Rather, only Mattel intends to call him as
25
    a witness.  Farhad Larian asserts that there is no reason for Mattel to impeach its own witness.
26
         Furthermore, Farhad Larian contends that even if it is advantageous for Mattel to attack
27

28
    Bryant v. Mattel, Inc.,                                                           9
    CV-04-09049 SGL (RNBx)

EXHIBIT  G
PAGE  54

1  his credibility, the scope of Mattel's requests go far beyond what Mattel is reasonably entitled to

2  receive through discovery. He contends that pursuant to Rule 26, Fed.R.Civ.P., he should not be

3  subjected to discovery that is burdensome, cumulative, unnecessarily costly, or insufficiently

4  probative to the issues in the litigation to warrant the expense of production. Furthermore, he

5  contends that the usual restrictions on discovery set forth in Rule 26 should be rigorously applied

6  to protect non-parties such as himself.

7       Farhad Larian contends that the three requests at issue are overbroad and harassing in

8  several respects. First, he points out that the requests seek documents from 1999, which is five

9  years before this action was filed and six years before MGA was involved in this action. Farhad

10  Larian contends that payments made to him and his family before this action was filed and before

11  MGA was a party to the case have no relevance to his credibility as a witness in this case.

12  Second, Farhad Larian contends that the requests, as phrased, would include any card that

13  accompanied a gift to anyone in the Larian family, regardless of the dollar value of the gift.

14  Farhad Larian contends that family gifts for birthdays, Chanukah, or general gifts of money

15  between family members, have nothing to do with bias and violate his and his family's privacy

16  rights. Third, Farhad Larian contends that the requests are overbroad because they would require

17  him to disclose all documents reflecting payments he received as an employee of MGA and its

18  predecessor, a company he was employed by for decades.

19       Furthermore, Farhad Larian contends that he has already produced all non-privileged

20  documents which could potentially show bias, including the amount of money he was paid for his

21  shares of MGA, his consulting agreement with MGA after he sold his shares, and his fee

22  agreement with MGA. He contends that requiring him to search for and produce additional

23  payment documents would only result in him producing cumulative information, which is not

24  only irrelevant but violates his and his family's right to privacy under the California Constitution.

25  Farhad Larian also contends that it would be far less intrusive for Mattel to question him at a

26  deposition about payments he received from Isaac Larian and MGA than for him to respond to the

27  three requests at issue.

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

10

EXHIBIT ___G___
PAGE ___55___

1    Mattel's motion is denied with respect to Request Nos. 23, 24 and 41. The requests seek

2    information that is only minimally relevant to the claims and defenses in the case. Mattel's only

3    stated justification for the discovery is that it is relevant to establish Farhad Larian's credibility

4    and bias. Although impeachment information is discoverable, Mattel is not entitled to the type of

5    unfettered discovery it is now seeking. Rather, Rule 26(b)(2), Fed.R.Civ.P., requires the court to

6    restrict or prevent discovery if (i) the discovery is unreasonably cumulative or duplicative, or is

7    obtainable from some other source that is more convenient, less burdensome, or less expensive;

8    (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the

9    information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely

10   benefit, taking into account the needs of the case, the amount in controversy, the parties'

11   resources, the importance of the issues at stake in the litigation, and the importance of the

12   proposed discovery in resolving the issues. These restrictions are particularly important to

13   consider where the discovery requests are directed at a non-party. See Moon v. SCP Pool Corp.,

14   232 F.R.D. 633, 638 (C.D. Cal. 2005) (citing Dart Indus. Co., Inc. v. Westwood Chem. Co., Inc.,

15   649 F.2d 649 (9th Cir. 1980) (discovery should be "more limited to protect third parties from

16   harassment, inconvenience, or disclosure of confidential information.").

17   Aside from asserting that the requested information is relevant to bias and credibility,

18   Mattel has made no attempt to justify the significant breadth and burden of its requests. The

19   requests are so broad as to include every payment or gift, regardless of amount, made between

20   Farhad and Isaac Larian, their family members and MGA since 1999. The number of years for

21   which Mattel seeks financial information is overbroad. Mattel is seeking documents since 1999,

22   five years before this action was filed and six years before MGA became a party to this action.

23   Mattel fails to explain how any payments MGA or Isaac Larian made to Farhad or his family

24   members before this action was filed or MGA was a party to the action have any bearing on his

25   credibility as a witness in this action. The requests are also overbroad in that they encompass

26   customary gifts between family members and Farhad Larian's routine salary payments, which

27   have only minimal relevance to Farhad Larian's credibility and bias as a witness in this case.

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                                              11

EXHIBIT ___G___
PAGE _____56_____

1    The requests are also cumulative of discovery Farhad Larian has already provided. In

2  particular, Farhad Larian represents that he has already disclosed to Mattel the amount of money

3  he was paid for his shares of MGA, his consulting agreement with MGA after he sold his shares,

4  and his fee agreement with MGA. In light of this production , it is unreasonable to require Farhad

5  Larian to search for and produce gift receipts, cards, and the breadth of other financial documents

6  responsive to Request Nos. 23, 24 and 41. Furthermore, there are other less intrusive and

7  burdensome means of obtaining discovery regarding Farhad Larian's credibility and bias. For

8  example, Mattel may question Farhad Larian about payments he received from his brother and

9  MGA during his deposition.

10    Nor has Mattel justified the intrusive and harassing nature of the requests. Personal

11  financial information is afforded protection by the California Constitution that is also recognized

12  by federal courts. Cal. Const., Art. I, §1; Valley Bank of Nevada v. Superior Court, 15 Cal.3d

13  652, 656 (1975); Kelly v. City of San Jose, 114 F.R.D. 653, 656 (N.D. Cal. 1987) (federal courts

14  should give "some weight" to privacy rights that are protected by state constitutions); Soto v. City

15  of Concord, 162 F.R.D. 603, 616 (N.D. Cal. 1995) (right to privacy in financial information has

16  been recognized by federal courts). When a privacy right is asserted as an objection to discovery,

17  the court must balance the need for the information versus the privacy right asserted. Soto, 162

18  F.R.D. at 616.

19    As discussed previously, there is little to no need for the breadth of financial information

20  sought by Mattel. Many of the documents covered by Request Nos. 23, 24, and 41 have little to

21  no relevance to Farhad Larian's credibility and bias as a witness in this case. Furthermore,

22  Farhad Larian has already produced numerous documents showing payments he received from

23  both his brother and MGA. There are also other less intrusive means for obtaining discovery

24  relating to Farhad Larian's credibility and bias. Furthermore, the scope of these three requests

25  unduly intrude into Farhad Larian's private affairs. The requests are so broad as to include gifts

26  exchanged between family members and Farhad Larian's paycheck stubs, and would require

27  Farhad Larian to disclose every account number he has at a bank or financial institution since

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

12

EXHIBIT __G__
PAGE __57__

1    1999.  Thus, the balance tips sharply in favor of protecting Farhad Larian's personal financial

2    information.

3                        Farhad Larian's Privilege Log is Inadequate

4          Mattel challenges the sufficiency of Farhad Larian's privilege log.  At issue is whether

5    Farhad Larian must describe and assert claims of privilege on a document-by-document basis, or

6    whether he may do so categorically.  Farhad Larian is withholding approximately one bankers'

7    box of documents based upon claims of privilege and work product protection.  Farhad Larian's

8    Opposition at p.20, n. 9.

9          Rule 45(d)(2), Fed.R.Civ.P., requires a party responding to a subpoena to provide

10   sufficient information to enable the party seeking discovery to assess the claims of privilege and

11   work product protection.  The "universally accepted" means of claiming that requested documents

12   are privilege is by producing a document-by-document privilege log.  Gail v. New England Gas

13   Co., Inc., 234 F.R.D. 28, 33 (D. R.I. 2007).  The advisory comments to the 1993 amendment to

14   Rule 26(b), however, state that a description of documents by category is appropriate where it

15   would be "unduly burdensome" to provide a document-by-document privilege log.  Specifically,

16   the advisory comment states, "Details concerning time, persons, general subject matter, etc., may

17   be appropriate if only a few items are withheld, but may be unduly burdensome when voluminous

18   documents are claimed to be privileged or protected, particularly if the items can be described by

19   categories."

20         Farhad Larian relies upon the advisory comments and cases citing the advisory comments

21   to support his contention that as a non-party, it would be unduly burdensome to require a

22   document-by-document privilege log in this case.  The cases cited by Farhad Larian, however, are

23   distinguishable from the present case.  In SEC v. Thrasher, 1996 WL 125661 (S.D. N.Y. 1996),

24   the Commission sought production of all communications between defense counsel concerning

25   the lawsuit.  The court observed that this demand, on it face, sought wholesale production of

26   documents that are ordinarily protected from disclosure.  Further, the defendant represented that

27   the requested documents were extremely voluminous and that a document-by-document privilege

28   Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)                                                              13

EXHIBIT _G_
PAGE _58_

1  log would be a long and fairly expensive project to undertake.  In <u>Fifty-Six Hope Road Music,</u>

2  <u>Ltd. v. Mayah Collections, Inc.</u>, 2007 WL 1726558 (Nev. 2007), the withheld documents

3  consisted of e-mail communications between plaintiffs and their counsel or between plaintiffs'

4  counsel.  Plaintiffs represented that there were hundreds and perhaps thousands of such email

5  communications which were protected by the attorney-client privilege and work product doctrine.

6        In contrast to the volume of documents at issue in <u>Thrasher</u> and <u>Fifty-Six Hope Road</u>

7  <u>Music</u>, Farhad Larian represents that he has about one bankers' box of privileged documents.

8  Farhad has not established that to produce a privilege log on a document-by-document basis for

9  this volume of documents is unduly burdensome.  Furthermore, even if it were appropriate for

10  Farhad Larian to produce a privilege log that described documents categorically, which it is not,

11  the information provided in Farhad Larian's privilege log is insufficient to enable Mattel to assess

12  the claims of privilege and work product protection as required by Rule 45, Fed.R.Civ.P.  For

13  example, in some instances, Farhad Larian fails to identify the author and recipient of the

14  documents being withheld.  In other instances, Farhad Larian fails to provide the date or date

15  ranges for the documents being withheld.  Therefore, Farhad Larian is ordered to provide a

16  supplemental privilege log that complies with Rule 45.

17  B. Documents Subpoenaed from Kaye Scholer

18        Mattel contends that the documents it seeks from Kaye Scholer are relevant for all the

19  same reasons previously articulated in the context of Mattel's motion to compel Farhad Larian to

20  produce documents.  Mattel contends that its requests are not unreasonable, oppressive, annoying

21  or embarrassing.  Mattel points out that Kaye Scholer has separate case files containing all or the

22  vast majority of responsive documents, which undermines Kaye Scholer's boilerplate burden

23  objections.  Mattel also points out that it offered to alleviate some of the burden to Kaye Scholer

24  by paying for Kay Scholer's copying costs and by providing a paralegal to inspect documents

25  from Kaye Scholer's files with an agreement that the inspection would not result in a waiver of

26  any privileges.  Further, Mattel contends that the protective order in place in this action is

27  sufficient to address any confidentiality concerns Kaye Scholer may have.

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

14

EXHIBIT ____G____
PAGE ____59____

1       Mattel next contends that the documents it seeks from Kaye Scholer are not available from

2   other sources, as evidenced by Mattel's repeated and unsuccessful attempts to seek the same

3   documents from MGA.  Indeed, Mattel contends that the documents in Kaye Scholer's possession

4   are in fact documents within MGA's possession, custody and control that should have, but have

5   not yet been, produced pursuant to prior discovery orders obligating MGA and Isaac Larian to

6   produce documents from the Larian v. Larian proceedings.  Mattel also points out that it has

7   searched public files and served additional subpoenas on other third parties involved in the Larian

8   v. Larian proceedings.  Moreover, Mattel argues that federal law requires Kaye Scholer to comply

9   with the subpoena, even if the evidence sought is obtainable from another source.  See e.g. State

10  Farm Mut. Auto. Ins. Co. v. Accurate Medical, P.C., 2007 WL 2993840 at *1 (E.D. N.Y. 2007).

11       Mattel contends that Kaye Scholer's proposal to search only certain files for responsive

12  documents is unacceptable because it would inevitably exclude relevant documents.  In particular,

13  Mattel contends that Kaye Scholer's proposal would exclude relevant documents likely to be

14  found in its correspondence file, such as an August 29, 2003 letter from Isaac Larian to Mr.

15  Zarabi relating to an appraisal of MGA, and a letter from Farhad Larian's attorney to Kaye

16  Scholer detailing the evidence of Isaac Larian's alleged concealment of Bratz.  Mattel contends

17  that the relevance of these documents and others that are likely to exist justifies the burden of

18  production on Kaye Scholer.

19       Further, Mattel contends that Kaye Scholer has failed to produce a privilege log in

20  violation of Rule 45(d)(2), Fed.R.Civ.P., and therefore Kaye Scholer has waived any claims of

21  privilege.  In the alternative, Mattel requests an order compelling Kaye Scholer to produce a

22  document-by-document privilege log.

23       Kaye Scholer contends that the instant motion is premature, unnecessary and a waste of

24  judicial resources.  Kaye Scholer represents that after meeting and conferring in good faith, it

25  agreed to produce documents responsive to thirty of the thirty-five requests, and that the

26  remainder of the requests are grossly overbroad.  Further, Kaye Scholer represents that it has

27  completed its review pursuant to the agreement, and is prepared to produce responsive

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

15

EXHIBIT ___G___
PAGE ___60___

1    documents. However, Kaye Scholer continues to object to producing a document-by-document

2    privilege log on the grounds that it would be unduly burdensome and expensive. Kaye Scholer

3    emphasizes that Mattel is seeking documents from a law firm, and therefore the vast majority of

4    responsive documents are protected by multiple privileges, including but not limited to the

5    attorney-client privilege and the work product doctrine. Kaye Scholer estimates that it would take

6    in excess of seventy (70) hours to create a document-by-document privilege log for this case, and

7    that the Federal Rules of Civil Procedure do not require Kaye Scholer to undertake such an

8    unreasonable burden. Furthermore, Kaye Scholer contends that the failure to produce a

9    document-by-document privilege log does not result in a per-se waiver of any privilege.

10        MGA also opposes Mattel's motion for several reasons. First, MGA contends that

11   Mattel's requests are overbroad, encompassing documents that are only marginally related, if at

12   all, to the claims and defenses in the case. Second, MGA contends that Mattel's requests are

13   completely duplicative of requests it has served on the parties in the case. In particular, MGA

14   contends that Mattel has sought the Larian v. Larian documents from both MGA Entertainment,

15   Inc. and Isaac Larian. See Mattel's Request No. 41 in Mattel's First Set of Request for

16   Production of Documents and Tangible Things to MGA, and Request Nos. 123-125 in Mattel's

17   First Set of Requests for Documents and Things to Isaac Larian. MGA and Isaac Larian are both

18   under court order to comply with the requests, although Isaac Larian is only required to produce

19   documents that refer or relate to Bratz in response to Request Nos. 123-125. Third, MGA

20   contends that Mattel's requests to Kaye Scholer are much broader than requests Mattel previously

21   served on the parties to this case. Fourth, MGA contends that there is no reason Mattel cannot

22   obtain a complete set of all relevant documents from the Larian v. Larian proceedings without this

23   third-party subpoena. Fifth, MGA contends that the vast majority of documents Mattel seeks

24   from Kaye Scholer are protected by the attorney-client privilege, the work product doctrine, or

25   other privileges, and that it is improper for Mattel to attempt to subpoena these documents and

26   then insist that Kaye Scholer produce a document-by-document privilege log. In summary, MGA

27   contends that Mattel has misused the subpoena process by serving deliberately overbroad and

28

16

EXHIBIT  G
PAGE  61

1    burdensome requests in an attempt to harass and intimidate MGA and non-parties.  Accordingly,

2    MGA contends that Mattel's motion should be denied or Mattel's subpoena should be

3    substantially limited in scope.

4          <u>Mattel's Subpoena is Overbroad, Unduly Burdensome and Cumulative</u>

5        Mattel's subpoena to Kaye Scholer is overbroad and is not reasonably tailored to seek

6    documents relevant to the claims and defenses in this case.  Of the thirty-five requests Mattel

7    served on Kaye Scholer, all but one begin with the phrase "all documents" or a similarly broad

8    phrase.  For example, Request Nos. 1-3, which are set forth below, seek virtually all documents

9    relating to lawsuits and/or arbitrations between Isaac Larian and Farhad Larian:

10      <u>Request No. 1</u>:  All DOCUMENTS, including all COMMUNICATIONS,
11      RELATING TO any and all arbitration proceedings between FARHAD LARIAN and ISAAC LARIAN, including without limitation all video and/or sound recordings, transcripts, exhibits, memoranda, witness statements, declarations,
12      affidavits and sworn testimony given by any PERSON in connection with such arbitration proceedings.

13

14      <u>Request No. 2</u>:  All DOCUMENTS including all COMMUNICATIONS, RELATING TO Los Angeles Superior Court Case No. BC301371 filed by FARHAD LARIAN against ISAAC LARIAN and/or any related proceedings,
15      including any appeal thereof, and including without limitation all video and/or sound recordings, transcripts, exhibits, pleadings, briefs, memoranda, witness
16      statements, declarations, affidavits and sworn proceedings and/or any appeal related to such lawsuit.

17

18      <u>Request No. 3</u>:  All DOCUMENTS RELATING TO Los Angeles Superior Court Case No. BC329501 filed by FARHAD LARIAN against ISAAC LARIAN,
19      MORAD ZARABI and Kambiz Zarabi, and/or any related proceedings and/or any appeal of such lawsuit, including without limitation all video and/or sound recordings, transcripts, exhibits, pleadings, briefs, memoranda, witness
20      statements, declarations, affidavits and sworn testimony given by any PERSON in connection with such suit and/or related proceedings and/or any appeal related to
21      such lawsuit.

22

23    Mattel has not limited the subject matter of these requests (and others) in any way to exclude

24    irrelevant information.  To the contrary, Request Nos. 1-3 are drafted in the broadest possible

25    language, encompassing documents that are only marginally related, if at all, to this case.  As

26    such, Mattel's requests are also unduly burdensome.

27        Furthermore, Mattel's requests are clearly duplicative of other requests propounded to the

28

EXHIBIT   G

PAGE   62

1  parties in this action.  In particular, the requests relating to the <u>Larian v. Larian</u> proceedings are

2  duplicative of Mattel's Request No. 41 to MGA and Request Nos. 123-125 to Isaac Larian.

3  During the hearing, counsel for MGA acknowledged that Isaac Larian is required to comply with

4  Request Nos. 123-125, and is prepared to review Kaye Scholer's files for responsive documents

5  to fulfill his responsibility.  Also during the hearing, Kaye Scholer agreed to make its

6  correspondence file available to MGA's counsel for review.

7        In light of Mattel's failure to take reasonable steps to avoid unduly burdening Kaye

8  Scholer and in light of MGA's and Kaye Scholer's representations during the hearing as outlined

9  above, Mattel's motion to compel Kaye Scholer to comply with the full scope of the subpoena is

10  denied.

11            <u>Kaye Scholer's Compromise is Reasonable Under the Circumstances</u>

12        As an alternative to complying with the full scope of the subpoena, Kaye Scholer agreed

13  to review the following files for documents responsive to every one of Mattel's requests except

14  Nos. 1-3, 6 and 10:  (1) pleading files; (2) discovery files; and (3) arbitration exhibits. Kaye

15  Scholer's Opposition at p.5.  Kaye Scholer's compromise is reasonable under the circumstances.

16  Narrowing the scope of Kaye Scholer's search in this manner will significantly minimize the

17  burden, expense, and inconvenience imposed by the subpoena because, unlike Kaye Scholer's

18  other files, most of the documents in the three files it agreed to search are not likely to be covered

19  by the attorney-client privilege or work product doctrine.  Further, narrowing Kaye Scholer's

20  search in this manner will not significantly deprive Mattel of relevant discovery to which it is

21  entitled because, as stated previously, MGA's counsel represented during the hearing that Isaac

22  Larian is prepared to review Kaye Scholer's documents, including the correspondence file, to

23  comply with Request Nos. 123-125.

24        Accordingly, to the extent it has not already done so, Kaye Scholer shall conduct the

25  agreed upon search of its three files and produce documents responsive to all of Mattel's requests,

26  except Nos. 1-3, 6 and 10.

27  //

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT __G__
PAGE __69__

<u>Kaye Scholer Must Produce a Privilege Log in Compliance with Rule 45</u>

1   Mattel contends that Kaye Scholer has waived its claims of privilege by failing to produce

2   any privilege log. The law is clear, however, that the failure to produce a document-by-document

3   privilege log does not result in a per-se waiver of any privilege. <u>See</u> <u>Burlington Northern & Santa</u>

4   <u>Fe Ry. Co. v. U.S. Dist. Court for Dist. Of Mont.</u>, 408 F.3d 1142, 1147 (9th Cir. 2005). In this

5   case, Kaye Scholer raised a legitimate objection to producing a document-by-document privilege

6   log on the grounds that it would impose an undue burden. Under these circumstances, a finding

7   of waiver is unjustified.

8   Nevertheless, Kaye Scholer's claim of undue burden is unpersuasive. Kaye Scholer has

9   acknowledged that most of the documents in the three files it has agreed to search are not likely to

10   be covered by the attorney-client privilege or work product doctrine. Kaye Scholer Opposition at

11   pp. 5 and 9. Indeed Kaye Scholer agreed to search these files precisely because they were not

12   likely to contain privileged documents. Therefore, requiring Kaye Scholer to produce a

13   document-by-document privilege log for documents withheld from these three files should not

14   impose an undue burden. Accordingly, Kaye Scholer is ordered to produce a document-by-

15   document privilege log for documents withheld from the three files it agreed to search.

## V. CONCLUSION

16   For the reasons set forth above, it is ordered as follows:

17   1. Farhad Larian is in substantial compliance with Mattel's subpoena with respect to all of

18   the requests, except Nos. 23, 24 and 41. Request Nos. 23, 24 and 41 are overbroad, unduly

19   burdensome, cumulative, harassing and invade the right of privacy of Farhad Larian and his

20   family. Therefore, Mattel's motion to compel Farhad Larian to produce documents in response to

21   the subpoena is denied.

22   2. Farhad Larian shall produce a document-by-document privilege log to Mattel no later

23   than January 30, 2008.

24   3. Farhad Larian's request for sanctions against Mattel is denied.

25   4. Mattel's subpoena to Kaye Scholer is overbroad, unduly burdensome and cumulative.

EXHIBIT   G
PAGE   64

1   Therefore, Mattel's motion to compel Kaye Scholer to produce documents responsive to the

2   subpoena is denied.  Instead, Kaye Scholer is ordered to abide by its agreement to review its

3   pleading files, discovery files, and arbitration exhibits for documents responsive to all of Mattel's

4   requests, except Request Nos. 1-3, 6 and 10.  Kaye Scholer shall produce responsive documents

5   no later than January 30, 2008.

6         5. Kaye Scholer shall also produce a document-by-document privilege log identifying all

7   documents withheld from its pleading files, discovery files, and arbitration exhibits, no later than .

8   January 30, 2008.

9         6. Mattel shall abide by its agreement to reimburse Farhad Larian and Kaye Scholer for

10   their copying costs.

11         7. Isaac Larian is granted an extension of time to comply with Request Nos. 123-125.

12   Isaac Larian shall deliver documents responsive to these requests to Mattel no later than 12:00

13   p.m. on January 25, 2008.

14         8. Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery

15   Master, Mattel shall file this Order with the Clerk of Court forthwith.

16

17   Dated: January 25, 2008                    /s/Edward A. Infante
                                          HON. EDWARD A. INFANTE (Ret.)
18                                              Discovery Master

19

20

21

22

23

24

25

26

27

28
     Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)

                                                                                    20

EXHIBIT ___G___
PAGE ___65___

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on January 25, 2008, I served the attached ORDER RE MATTEL'S MOTIONS TO COMPEL FARHAD LARIAN, KAYE SHOLER AND STERN & GOLDBERG TO PRODUCE DOCUMENTS in the within action by email addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| Matthew M. Werdegar, Esq. | Keker & Van Nest | mwerdegar@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| Audrey Walton-Hadlock, Esq. | Keker & Van Nest | awalton-hadlock@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Thomas J. Nolan, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tnolan@skadden.com |
| Raoul D. Kennedy, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | rkennedy@skadden.com |
| Amy S. Park, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | apark@skadden.com |
| Harriet S. Posner, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | hposner@skadden.com |
| Carl Alan Roth, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | croth@skadden.com |
| Timothy A. Miller, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tmiller@skadden.com |
| Marcus R. Mumford, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Mmumford@skadden.com |
| Patricia Glaser, Esq. | Christensen, Glaser, Fink, et al. | pglaser@chrisglase.com |
| Scott E. Glzer, Esq. | Christensen, Glaser, Fink, et al. | sglzer@chrisglase.com |
| Alisa Morgenthaler-Lever, Esq. | Christensen, Glaser, Fink, et al. | amorgentaler@chrisglase.com |
| Alan N. Goldberg, Esq. | Stern & Goldberg | agoldberg@sgattys.com |
| Mark Overland, Esq. | Overland, Borenstein, et al. | moverland@obsklaw.com |
| Alexander Cote, Esq. | Overland, Borenstein, et al. | acote@obsklaw.com |
| Bryant S. Delgadillo, Esq. | Kaye Scholer | bdelgadi@kayscholer.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on January 25, 2008, at San Francisco, California.

_____
Sandra Chan

CM/ECF - California Central District

# Miscellaneous Filings (Other Documents)

2:04-cv-09049-SGL-RNB Carter Bryant v. Mattel Inc

(RNBx), AO279, DISCOVERY, PROTORD, RELATED-G

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

### Notice of Electronic Filing

The following transaction was entered by Alban, Juan on 1/28/2008 at 12:54 PM PST and filed on 1/28/2008

**Case Name:**  Carter Bryant v. Mattel Inc
**Case Number:**  2:04-cv-9049
**Filer:**  Mattel Inc
**Document Number:** 1699

**Docket Text:**
Order re Mattel's Motions to Compel Farhad Larian, Kaye Scholer and Stern & Goldberg to Produce Documents filed by Defendant Mattel Inc (Alban, Juan)

### 2:04-cv-9049 Notice has been electronically mailed to:

Juan Pablo Alban    juanpabloalban@quinnemanuel.com

Timothy L Alger    timalger@quinnemanuel.com

Christa M Anderson    canderson@kvn.com

Michelle M Campana    michelle.campana@skadden.com

Jon D Corey    joncorey@quinnemanuel.com

Alexander H Cote    acote@obsklaw.com

Leah Chava Gershon    leah@spertuslaw.com

Alan Neil Goldberg    agoldberg@sgattys.com

Emil W Herich    eherich@kmwlaw.com

John W Keker    jkeker@kvn.com, DRoberts@kvn.com, efiling@kvn.com

Raoul D Kennedy    rkennedy@skadden.com

Alisa Morgenthaler Lever    amorgenthaler@chrisglase.com

Nathan Meyer    nmeyer@kayescholer.com, dclow@kayescholer.com

EXHIBIT ___G___
PAGE ___67___

Cyrus S Naim    cyrusnaim@quinnemanuel.com

Thomas J Nolan    tnolan@skadden.com, carl.roth@skadden.com, marcus.mumford@skadden.com

Mark E Overland    moverland@obsklaw.com

Michael H Page    mhp@kvn.com

Kenneth A Plevan    kenneth.plevan@skadden.com, drogosa@skadden.com, sumclaug@skadden.com

Brett Dylan Proctor    dylanproctor@quinnemanuel.com

John B Quinn    johnquinn@quinnemanuel.com

David C Scheper    dscheper@obsklaw.com, feseroma@obsklaw.com

Oleg Stolyar    alexstolyar@quinnemanuel.com

Kien C Tiet    ktiet@sgattys.com

John Elliot Trinidad    jtrinidad@kvn.com, efiling@kvn.com, yjayasuriya@kvn.com

Audrey Walton-Hadlock    awaltonhadlock@kvn.com

Matthew M Werdegar    mmw@kvn.com

Michael T Zeller    michaelzeller@quinnemanuel.com

**2:04-cv-9049 Notice has been delivered by First Class U. S. Mail or by fax to: :**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\Documents and Settings\lorrainerobles\Desktop\MATTEL\Order re Mattel's Motions to Compel.PDF
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=1/28/2008] [FileNumber=5265683-0]
[b90e9037e8c528f2d567bc85114c4aaa1713c671077be21a773ae6519e5f91c70a37
3be159128f53671daae8ab9cc894a0d7711b23710d92b5162f8da4167739]]

EXHIBIT    G
PAGE    68

# EXHIBIT "H"

3690

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                    EASTERN DIVISION

4                       - - -

5       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                       - - -

7    MATTEL, INC.,                )       **CERTIFIED COPY**
                                  )
8                  PLAINTIFF,      )
                                  )
9          VS.                     )       NO. CV 04-09049
                                  )
10   MGA ENTERTAINMENT, INC., ET. AL.,  )
                                  )
11                 DEFENDANTS.     )       TRIAL DAY 18
     _____)       MORNING SESSION
12   AND CONSOLIDATED ACTIONS,     )       PAGES 3690-3821
                                  )
13   _____)

14

15       REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                 RIVERSIDE, CALIFORNIA

17               TUESDAY, JULY 1ST, 2008

18                     8:44 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
             FEDERAL OFFICIAL COURT REPORTER
24              3470 12TH STREET, RM. 134
              RIVERSIDE, CALIFORNIA  92501
25                   951-274-0844
                 WWW.THERESALANZA.COM

EXHIBIT __H__
PAGE __69__

3801

```
 1    THAT ON 403 GROUNDS.

 2              MR. QUINN:  UNDERSTOOD, YOUR HONOR.

 3         MAY WE PUBLISH THAT?

 4         THE COURT:  JUST THE BOTTOM ONE.

 5         MR. NOLAN:  CAN I BE HEARD AT SIDE-BAR?          11:39

 6         THE COURT:  YES, YOU MAY.

 7         (WHEREUPON, THE FOLLOWING PROCEEDINGS

 8         WERE HELD AT SIDE-BAR:)

 9         THE COURT:  I SHOULD CHANGE THAT RESPONSE:  'UNLESS

10    YOU WANT TO DO IT THAT WAY," COUNSEL.  PERHAPS YOU MIGHT WANT  11:39

11    TO DO THAT.

12         MR. NOLAN:  "YOUR APPLICATION PROVES FALSE."

13         THE COURT:  CORRECT.

14         MR. QUINN:  WELL, THEN WE SHOULD HAVE THIS LINE HERE.

15         THE COURT:  LET'S INCLUDE THE RESPONSE.               11:40

16         MR. QUINN:  RIGHT.

17         THE COURT:  OUT OF COMPLETENESS, I'LL PERMIT THAT.

18         MR. QUINN:  RIGHT.  THEN WOULDN'T THE TOP LINE IN

19    RESPONSE TO THE RESPONSE --

20         THE COURT:  NO.  GET THAT OUT.  THAT'S THE PART --   11:40

21         MR. NOLAN:  JUST THAT --

22         THE COURT:  UNLESS THERE'S NO OBJECTION.

23         MR. NOLAN:  NO.  LET'S DO IT THIS WAY.  I THINK THIS

24    IS THE WAY.

25         THE COURT:  I AGREE.                                 11:40
```

TUESDAY, JULY 1, 2008                TRIAL DAY 18, MORNING SESSION

EXHIBIT _H_
PAGE _70_

3802

1        THE COURT:  SO I'LL INCLUDE IN THE RECORD THE

2   ORIGINAL MESSAGE, DATED MAY 24 AT 6:32 P.M., THE RESPONSE, MAY

3   24, 2000 -- THE COURT IS EXCLUDING ON 403 GROUNDS THE NEXT

4   DAY'S RESPONSE ON MAY 25, 12:49.

5        AND JUST SO YOU KNOW, IT'S BASICALLY BECAUSE OF THE        11:40

6   ANSWERS, THE MUDDLED ANSWERS WE'RE GETTING.

7        MR. NOLAN:  I UNDERSTAND THAT.

8        THE COURT:  VERY GOOD.

9        (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

10        THE COURT:  COUNSEL, AS I INDICATED, I'M ADMITTING        11:41

11   THE BOTTOM TWO MESSAGES.

12        MR. QUINN:  UNDERSTOOD, YOUR HONOR.

13        THE COURT:  YOU MAY PROCEED.

14        MR. QUINN:  IF WE MAY PUBLISH THAT, YOUR HONOR.

15   BY MR. QUINN:                                                 11:41

16   Q    THIS E-MAIL AT THE BOTTOM IS THE E-MAIL WE'VE BEEN

17   DISCUSSING.

18        DO YOU RECALL WHAT THIS FIREMAN'S FUND LAWSUIT WAS

19   ABOUT?

20   A    YES, I DO.                                               11:41

21   Q    WHAT DID IT CONCERN, JUST IN GENERAL TERMS?

22   A    BAD FAITH CLAIM AGAINST INSURANCE COMPANY.

23   Q    MGA WAS BRINGING A CLAIM AGAINST ITS INSURANCE COMPANY; IS

24   THAT CORRECT?

25   A    YES.                                                     11:41

TUESDAY, JULY 1, 2008              TRIAL DAY 18, MORNING SESSION

EXHIBIT  H
PAGE  71

3803

```
 1   Q    THERE WAS A QUESTION ABOUT -- WHO WAS MARTY KATZ?

 2   A    MGA'S ATTORNEY.

 3   Q    MGA'S ATTORNEY?

 4   A    AND MY ATTORNEY, YES.

 5   Q    THERE WAS AN ISSUE ABOUT WHETHER LEGIBLE COPIES EXISTED OF    11:42

 6   CERTAIN DOCUMENTS.

 7        DO YOU RECALL THAT?

 8   A    YES, I DO.

 9   Q    WHAT YOU WROTE TO YOUR BROTHER IS THAT "YOU INSTRUCTED ME

10   TO NOT PROVIDE THOSE TO MARTY AND TO TELL HIM WE COULD NOT FIND    11:42

11   THE ORIGINALS"; CORRECT?

12   A    THAT'S WHAT I WROTE THERE.

13   Q    BUT, IN FACT, WHAT YOU WROTE WAS, YOU FOUND THE ORIGINAL;

14   YOU HAD THE ORIGINALS; CORRECT?

15   A    THAT'S WHAT IT SAYS, YES.                                     11:42

16   Q    SO YOUR BROTHER HAD INSTRUCTED YOU -- WHAT YOU WROTE WAS,

17   YOUR BROTHER HAD INSTRUCTED YOU TO LIE TO THE ATTORNEY AND SAY

18   THAT THEY COULDN'T BE FOUND; CORRECT?

19   A    AS I SAID, THAT PART, I HAD ADDED MYSELF AS PART OF MY

20   TIT-FOR-TAT GAME WITH ISAAC.                                       11:42

21   Q    ARE YOU SAYING THAT YOU MADE THIS UP?

22   A    YES.

23   Q    WHAT YOU'RE TELLING US IS THAT YOU LIED IN THIS E-MAIL;

24   CORRECT?

25   A    I LIED IN THAT E-MAIL AS FAR AS HIM TELLING ME NOT TO GIVE    11:42
```

TUESDAY, JULY 1, 2008                    TRIAL DAY 18, MORNING SESSION

EXHIBIT ___H___
PAGE ___72___

3804

```
 1   THE ORIGINALS TO MARTY KATZ.

 2   Q    YOU INDICATED THAT ANY OF THE DOCUMENTS YOU HAD THAT YOU

 3   HAD COLLECTED IN CONNECTION WITH YOUR CASE CONCERNING BRATZ --

 4   IN RESPONSE TO MR. NOLAN'S QUESTION, YOU SAID THAT MGA WOULD

 5   HAVE COPIES OF ALL OF THOSE; CORRECT?                          11:43

 6   A    EXCEPT FOR DECLARATIONS AND THINGS THAT I GATHERED

 7   PERSONALLY; AND THOSE DID NOT BELONG TO MGA OR TO MATTEL.

 8   Q    THAT'S WHAT I WAS GOING TO ASK YOU ABOUT.

 9        THOSE DECLARATIONS, THOSE THINGS THAT YOU HAD

10   PERSONALLY COLLECTED, MGA WOULDN'T NECESSARILY HAVE; CORRECT?  11:43

11   A    THAT'S CORRECT.

12   Q    THOSE ARE GONE FOREVER.

13   A    UNLESS YOU GUYS GOT THEM FROM SOME PEOPLE.  AND I BELIEVE

14   YOU DID.

15   Q    WE GOT ALL OF THE DECLARATIONS THAT YOU HAD DRAFTED; IS   11:43

16   THAT YOUR UNDERSTANDING?

17   A    MY UNDERSTANDING IS, YOU GOT AT LEAST A FEW OF THEM.

18   Q    WE GOT ALL OF THE INFORMATION THAT YOU DESTROYED BEFORE

19   YOU DESTROYED IT.

20   A    AS I SAID, I HAVE NO OBLIGATION TO KEEP ANYTHING, SO I    11:44

21   DON'T KNOW WHAT YOU'RE TRYING TO INSINUATE HERE.

22        MAYBE YOUR HONOR CAN TELL ME IF I HAD ANY OBLIGATION

23   TO KEEP ANY OF THESE DOCUMENTS.

24   Q    AND THE REASON YOU DISMISSED YOUR CASE -- DO YOU RECALL

25   YOU FILED AN OPPOSITION TO YOUR BROTHER'S -- WHEN YOUR BROTHER 11:44
```

TUESDAY, JULY 1, 2008                    TRIAL DAY 18, MORNING SESSION

EXHIBIT ___H___

PAGE ___73___

3815

```
 1   SUBJECT TO CROSS-EXAMINATION CONCERNING A STATEMENT AND THE

 2   STATEMENT IS INCONSISTENT WITH THE DECLARANT'S TESTIMONY WAS

 3   GIVEN UNDER OATH SUBJECT TO PENALTY OF PERJURY IN A TRIAL OR

 4   CONSISTENT WITH THE DECLARANT'S TESTIMONY AND IS OFFERED TO

 5   REBUT EXPRESS OR IMPLIED CHARGES AGAINST FABRICATION."          12:00

 6           I THINK THAT'S WHAT WE HAVE HERE; SO I THINK EVEN

 7   THOUGH IT WAS NOT MADE UNDER OATH, I THINK THAT IT CAN BE

 8   OFFERED NOW.

 9           NOW WE'RE OPENING A DOOR HERE, THOUGH, COUNSEL.

10           MR. NOLAN:  I KNOW.  I GOT WHAT I NEEDED.             12:00

11           THE COURT:  BECAUSE IF THE TRANSCRIPT COMES IN, IT

12   ALL COMES IN.  AND THEN MR. QUINN STANDS UP --

13           MR. NOLAN:  I REALIZE THAT.  I CAN TAKE YOUR COURSE.

14           THE COURT:  VERY WELL.

15           (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)     12:00

16           MR. NOLAN:  YOUR HONOR, I BELIEVE I ASKED A QUESTION,

17   AND THERE WAS AN OBJECTION.  I WAS ASKING HIM -- LET ME REDO

18   IT.

19           THE COURT:  REPHRASE YOUR QUESTION.

20   BY MR. NOLAN:

21   Q   MR. LARIAN, ALL OF THIS STUFF, THESE QUESTIONS, THEY DON'T

22   GO TO THE QUESTION OF WHEN CARTER BRYANT DID THE BRATZ CONCEPT,

23   DO THEY?

24           MR. QUINN:  YOUR HONOR, THIS IS CLOSING ARGUMENT.

25           THE COURT:  LET'S MAKE A QUESTION, COUNSEL.  ASK A    12:0
```

TUESDAY, JULY 1, 2008                TRIAL DAY 18, MORNING SESSION

EXHIBIT __H__
PAGE __74__

3816

1  QUESTION, NOT A STATEMENT.

2  BY MR. NOLAN:

3  Q    DID ANY OF THE QUESTIONS THAT MR. QUINN ASKED YOU GO TO

4  WHEN CARTER BRYANT CAME UP WITH THE CONCEPT FOR BRATZ?

5          MR. QUINN:  SAME OBJECTION.                          12:01

6          THE COURT:  IT'S RELEVANCE.

7          SUSTAINED.

8          MR. NOLAN:  NOTHING FURTHER.

9          THE COURT:  MR. QUINN, WE'RE AT THE NOON HOUR HERE.

10         MAKE IT QUICK.                                       12:0

11                     REDIRECT EXAMINATION

12 BY MR. QUINN:

13 Q    YOU TOLD US YOU DESTROYED SOME E-MAILS FROM THE TIME

14 PERIOD BACK IN 2000 RELATING TO BRATZ; CORRECT?

15 A    I DISCARDED DOCUMENTS THAT I NO LONGER NEEDED.         12:0

16 Q    AND THOSE MIGHT HAVE HAD SOMETHING TO DO WITH THE ORIGIN

17 OF BRATZ; CORRECT?

18 A    AND MGA HAS THE ORIGINAL OF ALL OF THOSE E-MAILS.

19 Q    WELL, I KNOW YOU SAID THAT, BUT THIS FIREMAN'S FUND

20 EXHIBIT, FOR EXAMPLE, THAT'S EXHIBIT 13380, THAT'S ONE OF THE  12:0

21 DOCUMENTS THAT YOU DESTROYED; CORRECT?  YOU DIDN'T PRODUCE THIS

22 DOCUMENT IN RESPONSE TO A SUBPOENA?

23         MR. NOLAN:  OBJECTION.  MISCHARACTERIZES HIS

24 TESTIMONY.

25         THE COURT:  SUSTAINED AS PHRASED.                    12:0

TUESDAY, JULY 1, 2008              TRIAL DAY 18, MORNING SESSION

EXHIBIT ___H___
PAGE ___75___

3817

BY MR. QUINN:

1

2  Q    ISN'T IT TRUE THAT THIS IS ONE OF THE DOCUMENTS THAT YOU

3  DESTROYED?

4  A    YOU'RE PROVING MY POINT THAT MGA HAD THE DOCUMENT, AND

5  OBVIOUSLY, THEY GAVE IT TO YOU.                                    12:02

6  Q    WHAT MAKES YOU THINK THAT MGA PRODUCED THIS DOCUMENT, THAT

7  WE GOT IT FROM MGA?

8  A    BECAUSE I KNOW I DIDN'T.

9  Q    BUT DO YOU SEE DOWN THERE "CG"?

10 A    YES, I DO.                                                    12:02

11 Q    DO YOU KNOW WHETHER A SUBPOENA WAS SERVED ON THE

12 CHRISTENSEN GLASER FIRM AND WHETHER THEY PRODUCED THIS

13 DOCUMENT?

14 A    SAME THING.  SOMEBODY PRODUCED IT.

15 Q    RIGHT.                                                        12:02

16       YOU DON'T KNOW THAT MGA PRODUCED IT, ONE WAY OR THE

17 OTHER; CORRECT?

18 A    CG IS ALSO MGA'S ATTORNEY, OR WAS MGA'S ATTORNEY SO...

19 Q    THERE'S NO MGA -- ON THAT COPY THAT YOU'RE LOOKING AT,

20 THERE'S NO MGA PRODUCTION STAMP, IS THERE?                        12:03

21 A    THE ATTORNEY IS THE SAME AS -- THE ATTORNEY IS ACTING FOR

22 THE COMPANY.

23 Q    I UNDERSTAND WHAT YOU'RE SAYING.

24 A    I DON'T SEE A BATES STAMP.

25 Q    AND YOUR ATTORNEY HERE IS FROM THE CHRISTIANSEN FIRM.        12:03

TUESDAY, JULY 1, 2008              TRIAL DAY 18, MORNING SESSION

EXHIBIT ___H___
PAGE ___76___

3818

1    A    YES.

2    Q    AND SHE'S BEING PAID BY MGA.

3    A    YES.

4         MR. QUINN:   AND, YOUR HONOR, NOW, I THINK, BECAUSE OF

5    THE QUESTION MR. NOLAN ASKED ABOUT -- I THINK THE FIRST PART

6    NOW COMES IN.                                                    12:03

7         THE COURT:   I AGREE.

8         MR. QUINN:   SO IF WE COULD PUT THE WHOLE EXHIBIT UP.

9         THE COURT:   NOT JUST THE QUESTION THAT WAS ASKED, BUT

10   THE ANSWER THAT WAS GIVEN.                                       12:03

11        MR. QUINN:   RIGHT.

12   BY MR. QUINN:

13   Q    MR. NOLAN ASKED YOU -- HE SAID THAT MR. QUINN DIDN'T ASK

14   YOU ABOUT YOUR BROTHER'S RESPONSE TO THIS E-MAIL WHERE YOU SAY

15   HE HAD INSTRUCTED YOU TO WITHHOLD DOCUMENTS.                     12:03

16        YOU RESPONDED TO THAT, DIDN'T YOU, SIR?

17   A    YES.

18   Q    AND WHAT YOU RESPONDED WAS, "YOUR DENIAL DOES NOT MAKE MY

19   ALLEGATION ANY LESS TRUE, AND TIME WILL PROVE WHAT THE REAL

20   TRUTH IS.  WHEN THE TIME COMES, WE'LL GO THROUGH BOTH OF OUR     12:04

21   TESTIMONIES AND PROVE WHO LIED ABOUT WHAT."

22        CORRECT?  THAT'S WHAT YOU WROTE AT THE TIME?

23   A    YES.

24   Q    BUT YOU'RE TELLING US THAT DOWN HERE IN THE ORIGINAL

25   E-MAIL, YOU WEREN'T TELLING THE TRUTH.                           12:04

EXHIBIT    H
PAGE    77

3819

1    A    I ALREADY SAID THAT.

2    Q    IS THAT SOMETHING THAT YOU MAKE A PRACTICE OF; THAT YOU

3    LIE IN ORDER TO MAKE A POINT?

4    A    AS I SAID, WE WERE PLAYING TIT-FOR-TAT; WE HAD SIBLING

5    RIVALRIES; AND I PUT SOMETHING OUT THERE AND I DENIED IT.          12:0(

6    Q    AND YOU'RE NOW TELLING US IT WASN'T TRUE.

7    A    YES.

8    Q    THEN THIS EXHIBIT THAT CAME IN, EXHIBIT 18569, WHERE

9    YOU'RE BEING TOLD THAT YOU SHOULD RETURN ALL DOCUMENTS OF MGA

10   IN YOUR POSSESSION -- IT'S DATED DECEMBER 30, 2005.                12:0(

11        DO YOU HAVE THAT THERE, SIR?

12   A    I DO.

13   Q    BY THEN, THE ARBITRATION WAS OVER, RIGHT, HAD BEEN OVER

14   FOR SOME TIME?

15   A    CORRECT.                                                      12:0!

16   Q    AND THE DOCUMENTS THAT YOU DESTROYED, YOU SAID YOU

17   DESTROYED JUST DAYS AFTER YOU DISMISSED THE ARBITRATION;

18   CORRECT?

19   A    CORRECT.

20   Q    SO THOSE DOCUMENTS WERE ALL GONE BY THE TIME THEY WROTE       12:0!

21   YOU AND TOLD YOU TO RETURN EVERYTHING; CORRECT?

22   A    THEY HAD WRITTEN ME A LETTER PRIOR TO THIS ASKING FOR THE

23   DOCUMENTS AS WELL.

24   Q    BUT LONG BEFORE THIS DOCUMENT DATED DECEMBER 31, 2005, YOU

25   HAD DESTROYED THOSE DOCUMENTS BECAUSE YOU DESTROYED THEM WITHIN    12:0.

TUESDAY, JULY 1, 2008                TRIAL DAY 18, MORNING SESSION

EXHIBIT ___H___
PAGE ___78___

3821

1    COMING BACK UNTIL 1:45.

2            ANYTHING FROM MGA?

3            MR. NOLAN:  NO.  WE'RE FINE.

4            (MORNING SESSION CONCLUDED.)

5

6

7

8

9

10

11

12

13                           CERTIFICATE

14

15   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
16   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD·IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
17   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

18

19

20   THERESA A. LANZA, RPR, CSR            7-2-08
     OFFICIAL COURT REPORTER                DATE

21

22

23

24

25

TUESDAY, JULY 1, 2008                    TRIAL DAY 18, MORNING SESSION

EXHIBIT __H__
PAGE __79__

# EXHIBIT "I"

ATTORNEYS' EYES ONLY

## Isaac Larian (President / CEO)

**From:** Fred Larian
**Sent:** Thursday, May 25, 2000 12:49 PM
**To:** Isaac Larian
**Subject:** RE: Information requested by Marty Katz regarding Fireman's Fund

Your denial does not make my allegation any less true and time will prove what the real truth is.  I doubt you will swear on any of your children's lives that my allegations are not true (then again, I have been surprised before).

When the time comes, we will go through both of our testimonies and prove who lied about what.

-----Original Message-----
**From:** Isaac Larian
**Sent:** Wednesday, May 24, 2000 7:15 PM
**To:** Fred Larian
**Subject:** RE: Information requested by Marty Katz regarding Fireman's Fund

Your allegation stated below is false, and self serving , as usual.

The records we have ( including your testimony in the Fireman Insurance case) speak for themselves.

-----Original Message-----
**From:** Fred Larian
**Sent:** Wednesday, May 24, 2000 6:32 PM
**To:** Isaac Larian
**Subject:** Information requested by Marty Katz regarding Fireman's Fund

You have accused me of falsifying documents.  You are the one who is trying to falsify things.  For example, during the week of April 24, I informed you that in response to a fax from Risa of Marty Katz's office, the originals of the health insurance termination forms on Leon Michanie (copies of which had been previously provided to Fireman's Fund) were located and that legible copies were made.  You instructed me to not provide those to Marty and to tell him we could not find the originals. On April 30, 2000, at my preparation meeting with Marty, I ignored your instructions and gave the copies to Marty.

1

CG 0009

EXHIBIT _I_
PAGE _80_

EX 13380-0001

# EXHIBIT "J"

EXHIBIT FILED UNDER SEAL
PURSUANT TO PROTECTIVE
ORDER

# EXHIBIT "K"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
CIVIL MINUTES -- GENERAL

Case No:   CV 04-09049 SGL(RNBx)                               Date: May 21, 2009
Title:        MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
=================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

             Cindy Sasse                                    None Present
             Courtroom Deputy                               Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:          ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                                      None Present

PROCEEDINGS:    ORDER DENYING MOTION TO MODIFY DISCOVERY MASTER ORDER
                NO. 11 (DOCKET #5185)

                ORDER GRANTING MOTION FOR LEAVE TO FILE A THIRD AMENDED
                ANSWER AND COUNTERCLAIMS (DOCKET #5143)

                ORDER DENYING EX PARTE APPLICATION FOR STAY PENDING
                APPEAL (DOCKET #5396)

                ORDER DENYING EX PARTE APPLICATION RE DISCLOSURE OF 2009
                PRODUCT LINE INFORMATION (DOCKET #5425)

                ORDER RE EXPIRATION OF TEMPORARY RECEIVERSHIP AND ORDER
                APPOINTING MGA MONITOR

                ORDER IMPOSING LIMITED AND TEMPORARY STAY OF PHASE 2 AND
                REQUIRING MANDATORY SETTLEMENT CONFERENCE

         These matters were heard on May 18, 2009.

MINUTES FORM 90                                   Initials of Deputy Clerk __cls_____
CIVIL -- GEN                        1            Time: 03/02

EXHIBIT __K__
PAGE __142__

## I. MOTION TO MODIFY DISCOVERY MASTER ORDER NO. 11

Mattel moves to overrule that portion of the Discovery Master's Order No. 11 ("Order No. 11") that concludes that witnesses Pablo Vargas San Jose ("Vargas") and Mariana Trueba ("Trueba") (collectively, "the witnesses") are not "managing agents" within the scope of Fed. R. Civ. P. 30(b)(1). The Court has reviewed Order No. 11, Mattel's Motion, the MGA parties' opposition thereto, and Mattel's reply. Applying the "clearly erroneous or contrary to law" standard of review that all parties agree is applicable here, the Court **DENIES** Mattel's Motion.

In Order No. 11, the Discovery Master acknowledged the so-called Sugarhill factors, see Sugarhill Records Ltd. v. Motown Record Corp., 105 F.R.D. 166, 170 (D.C.N.Y. 1985), which the parties agreed applied. After an ancillary discussion that concluded the witnesses were not managing agents as measured by a test similar to the Sugarhill factors, the Discovery Master either applied, or explained why his conclusion would not change if he did apply, the Sugarhill factors.[1] Those factors are:

> 1) [W]hether the individual is invested with general powers allowing him to exercise judgment and discretion in corporate matters; 2) whether the individual can be relied upon to give testimony, at his employer's request, in response to the demand of the examining party; 3) whether any person or persons are employed by the corporate employer in positions of higher authority than the individual designated in the area regarding which information is sought by the examination; 4) the general responsibilities of the individual "respecting the matters involved in the litigation," . . . and 5) whether the individual can be expected to identify with the interests of the corporation.

105 F.R.D. at 170 (internal citation omitted). The Discovery Master found that although the second and fourth factors favor designating the witnesses as managing agents, the first, third, and fifth do not.

As to the first factor, Mattel argues that the Discovery Master should have focused more on

---

[1] In the relevant portion of Order No. 11, the Discovery Master first discussed, and then rejected for reasons set forth therein, an argument advanced by Mattel that the most important Sugarhill factor was the fifth factor, the so-called "loyalty factor." He next applied an alternative test articulated by Libbey Glass, Inc. v. Oneida, Ltd., 197 F.R.D. 342, 350 (N.D. Ohio 1999), which was originally adopted by the D.C. Circuit. See id. (quoting Founding Church of Scientology of Washington, D.C., Inc. v. Webster, 802 F.2d 1448, 1452 (D.C. Cir.1986)). That test is set forth in Order No. 11 at 31, and is not repeated here. It focuses on the character of the employee's control, the convergence of interest of the employee and the corporation, and the employee's area of expertise in relation to others associated with the corporation. Libbey Glass, 197 F.R.D. at 350. This test appears to the Court to implicate, to varying degrees, all of the Sugarhill factors except the second. Because the two tests are similar, and because neither is controlling, adoption of either could not be said to be contrary to law. Notwithstanding language that may be so read, the Court does not accept the notion that Order No. 11 rejected outright the Sugarhill factors. The Court does so based on the acknowledgment that the parties agreed those factors were applicable, the similarity between the two alternative tests, and the Discovery Master's articulation regarding each Sugarhill factor. See Order No. 11 at 29-36.

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT ___K___
PAGE _____143___

whether the witnesses were managing agents as to the particular matters at issue in the lawsuit rather than their general powers and that, in any event, the relevant time period to measure managing agent status is not at the time of deposition but is rather at the time of the events giving rise to the lawsuit.  Although these arguments find some support, the Discovery Master's conclusion regarding this first Sugarhill factor (and its Libbey Glass analog) is not contrary to law. The first Sugarhill factor is clearly concerned with an employee's general power; the fourth factor, which the Discovery Master found in favor of Mattel, focuses on the witnesses' responsibilities regarding matters involved in the litigation.  The cases cited by Mattel support this timing argument; however, cases cited by the MGA parties establish that other cases favor a contrary position. Neither side's authority is controlling, and the Court therefore concludes the position adopted by the Discovery Master is not contrary to law.

As to the third factor, Mattel argues that it was clear error for the Discovery Master to conclude that Kuemmerle, to whom Vargas reported directly and to whom Trueba's supervisor reported, could provide substitute testimony to them is clear error.  Mattel's ultimate point is that no one can testify more accurately and more on point than can the two witnesses regarding their alleged trade secret theft.  Again, this is not an invalid point.  Indeed, it is possible that if such theft occurred (the MGA parties deny that it did), then the witnesses did not proceed at the behest of the MGA parties and instead acted on their own accord (the MGA parties alternatively contend).   The fact is that if the MGA parties' alternative contention is true, then the witnesses' testimony regarding any theft would not be on behalf of MGA at all.  Who can or cannot testify about these events that may or may not have occurred on behalf of any MGA party -- let alone who can testify best -- is far from clear.  This area of inquiry is fraught with uncertainty.  The Discovery Master's conclusion one way or another on this issue, therefore, cannot be said to be clear error.  See Wolpin v. Philip Morris Inc., 189 F.R.D. 418, 422 (C.D. Cal.1999) ("To conclude that a magistrate judge's decision is clearly erroneous, the District Court must arrive at a definite and firm conviction that a mistake has been committed.").

As to the fifth factor, it was not clearly erroneous for the Discovery Master to conclude that MGA Mexico's interests and the witnesses' interests are at odds.  The witnesses are currently employed by MGA Mexico, weighing in favor of a finding of alignment, but they have also been subjected to criminal investigations regarding the allegations asserted in this lawsuit, and they have separately retained counsel to represent their interests.  Additionally, the MGA parties have maintained that if any trade secret theft occurred, it occurred without their knowledge or consent. These facts support the Discovery Master's finding.

Weighing these factors, and taking into account the mixed burden of proof, as the Discovery Master did, the Court cannot find that the Discovery Master's conclusion was clearly erroneous or contrary to law, and the Court therefore DENIES Mattel's Motion (docket #5185).

## II. MOTION FOR LEAVE TO FILE THIRD AMENDED ANSWER AND COUNTERCLAIMS

Mattel has filed a motion seeking leave to file its proposed Third Amended Answer and

EXHIBIT  K
PAGE  144

Counterclaims ("TAAC"). In substance, the TAAC adds one additional claim and a number of additional allegations. First, Mattel asserts an additional claim pursuant to California's version of the Uniform Fraudulent Transfers Act, found at Cal. Civ. Code §§ 3439 et seq. Second, Mattel avers facts that fall into the following broad categories: (1) Allegations regarding certain 2008 financial transactions that were the subject of the Forensic Auditor's Report ("the Wachovia/Omni 808 transactions"); (2) allegations regarding acts of commercial bribery relating to three Mattel seamstresses who were employed by MGA contractor Veronica Marlow; (3) allegations regarding evidence tampering, including the alleged destruction by Isaac Larian's brother Farhad of boxes of documents relating to the development of Bratz and Farhad's deletion of emails from a USB device; (4) allegations that Isaac Larian and MGA perjured themselves during their Phase 1 testimony; and (5) allegations setting forth additional predicate acts of racketeering activities, including money laundering, concealing assets, engaging in monetary transactions involving property derived from unlawful activity, commercial bribery, destruction of evidence, and obstruction of justice.

The parties, quite understandably, disagree on whether the Fed. R. Civ. P. 15(a) liberal standard or the Rule 16(b) "good cause" standard applies to the present motion. Upon the lifting of the stay on Phase 2 discovery, the Court set new dates for Phase 2 proceedings, but neglected to set a deadline for amending the pleadings related to Phase 2, leading to the present dispute. The Court now sets that deadline for three months prior to the discovery cutoff date of December 11, 2009, or September 11, 2009. Accordingly, the present motion is governed by the standard for amendments to the pleadings that are sought prior to the deadline set in the Court's Scheduling Order, which is set forth in Rule 15(a).

Pursuant to Rule 15(a), leave to amend a pleading is granted "freely . . . when justice so requires." Id.; See Foman v. Davis, 371 U.S. 178, 182 (1962). However, leave need not be granted where the proposed amendment "(1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." AmerisourceBergen Corp. v. Dialysist West, Inc., 465 F.3d 946, 951 (9th Cir. 2006).

Allegations relating to events occurring after the filing of the Second Amended Answer and Counterclaims ("SAAC") are governed not by the Rule 15(a) standard; rather, those amendments are governed by the Rule 15(d) standard. Rule 15(d) provides:

> On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

Id. This standard, like the Rule 15(a) standard, is liberal, and leave to file a supplemental pleading is favored. Planned Parenthood of S. Ariz. v. Neely, 130 F.3d 400, 402 (9th Cir.1997). It should not, however, be used to introduce a separate, distinct, and new cause of action. Id. The goal of

MINUTES FORM 90
CIVIL -- GEN

4

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT __K__
PAGE __145__

Rule 15(d) is to promote judicial efficiency, permitting "a court to award complete relief, or more nearly complete relief, in one action, and to avoid the cost, delay and waste of separate actions which must be separately tried and prosecuted." Keith v. Volpe, 858 F.2d 467, 473 (9th Cir.1988) (internal quotation marks and citation omitted).

The MGA parties contend the perjury allegations should not be permitted because there can be no present RICO injury (because Mattel prevailed in Phase 1) and/or no judgment has yet been entered and upheld on appeal. Additionally, they contend that perjury is not a predicate act of racketeering activity. The Court disagrees. Case law makes clear that what Mattel must show is injury as a result of the pattern of racketeering activity; Mattel need not prove that each and every predicate act itself caused harm. Corley v. Rosewood Care Center, Inc. of Peoria, 388 F.3d 990, 1004 (7th Cir. 2004) (improper for district court to hold that a RICO plaintiff be injured by every predicate act); Virden v. Graphics One, 623 F.Supp.1417, 1425 (C.D. Cal. 1985) (a RICO plaintiff must be harmed by either a predicate act or the pattern of racketeering activity). As to the propriety of perjury as a predicate act, although perjury may not always rise to the level of a RICO predicate act, perjury in the course of a judicial proceeding, as is alleged here, is a predicate act of racketeering activity because it is obstruction of justice. See Streck v. Peters, 855 F.Supp. 1156, 1162 (D. Hawai'i,1994) (perjury during federal court proceedings is a RICO predicate act because it is indictable under the federal obstruction of justice statute).[2]

The MGA parties also that the allegations regarding the theft of trade secrets are improper because Mattel failed to allege them in the SAAC although the claims were known to them at that time. Mattel counters that, in light of the Rule 8(a) pleading standards, the Castilla allegations are already within the scope of the SAAC. See SAAC ¶¶ 79, 89-93. All that is required by Fed. R. Civ. P. 8(a) is a "a short and plain statement of the claim showing that the pleader is entitled to relief." The details are filled in by discovery, as has already occurred in this case, including Mr. Castilla's deposition. Accordingly, as the Court finds that these allegations are already within the scope of

---

[2] The MGA parties contend that this case is "unhelpful" to Mattel on this point: "The Streck court, in *dismissing* a RICO claim, simply noted that 'acts of perjury may, *under the appropriate circumstances*, constitute RICO predicate acts,' but did not discuss what those circumstances might be." Opp. at 12 n.11 (emphasis in the original) (citing Streck, 855 F. Supp. at 1162). The quotation from the Streck case is correct, and the Streck court did indeed dismiss the RICO claim (or, more precisely, granted summary judgment in favor of defendants as to the RICO claim); however, the MGA parties incorrectly state that the Streck case did not discuss under what circumstances perjury might constitute the RICO predicate act of obstruction of justice. The four sentences following the quoted portion clearly do exactly what the MGA parties claim the Streck court did not: Specifically, the Streck court distinguishes between perjury occurring in state-court proceedings (which it notes is *not* a RICO predicate act) and perjury occurring in federal-court proceedings (which it notes *is* a RICO predicate act):

> [T]his Court finds that the acts of perjury which the defendants in the case at bar are alleged to have committed do not constitute RICO predicate acts. [The obstruction statute] applies only to perjury offered in federal court proceedings. Here, all of the alleged perjury took place in state court, not federal court. Thus, [the obstruction statute] is not implicated by Streck's perjury allegations.

Id. (internal citations and footnote omitted). Thus, the Streck case's relevance to the present issue is unmistakable.

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT ___K___
PAGE ___146___

the SAAC, the Court finds that the proposed amendments are not untimely; instead, they are in the nature of "clean up" amendments that succinctly state existing issues fairly stated in the SAAC when measured by the requirements of Rule 8(a).

The amendments setting forth additional copyright registrations come as a result of the jury's Phase 1 verdict. Although in most respects the issue of copyright infringement was resolved in Phase 1, allegations regarding criminal copyright infringement, cast in the form of RICO predicate acts, are relevant to Phase 2.

The MGA parties correctly point out, and the Court is fully aware, that the proposed amendments will dramatically expand the scope of the present litigation. Admittedly, the allegations set forth in the SAAC are already varied enough in nature and broad enough in scope to strain the Court's resources and to challenge a jury's powers of comprehension; nevertheless, this is not atypical of a successfully pleaded RICO claim, which the Court has already found was stated in the SAAC, and which has the tendency to draw together a multitude of seemingly unrelated acts into one litigation.[3]

In applying the relevant standards to the present motion, the Court's decision is not influenced by a lack of evidence supporting a particular allegation. Although Mattel attaches an unprecedented amount of evidence to the proposed TAAC, it is not required to do so. See Fed. R. Civ. P. 8(a). Accordingly, Mattel's failure (in the MGA parties' eyes) to provide evidentiary support for its allegations that Jorge Castilla stole its trade secrets, that Farhad Larian destroyed evidence, and that the MGA parties engaged in commercial bribery of certain Mattel employees is not relevant to the present inquiry.[4]

Accordingly, because the Court discerns no prejudice to the MGA parties, no bad faith or undue delay on Mattel's part, and no futility as to the present amendments, the Court **GRANTS** Mattel's Motion for Leave to File the Proposed Third Amended Answer and Counterclaims (docket #5143). To ensure proper filing, Mattel is directed to, within two days of the entry of this Order, provide the Courtroom Deputy Clerk for manual filing (1) an original and a copy of the public redacted version of the TAAC, and (2) an original and a copy of the under seal version of the TAAC.

---

[3] The allegations regarding the Wachovia/Omni 808 financial transactions illustrate this potential, and the Court has considered whether the amendments should be rejected based on the notion that Rule 15(d) should not be used to introduce a separate, distinct, and new cause of action. Here, however, the Wachovia/Omni 808 financial transactions are alleged as new predicate acts in an ongoing RICO conspiracy; as such, rejection of amendments as comprising a separate, distinct, and new cause of action is not warranted.

[4] Of course, in making factual allegations, all parties remain bound by their Rule 11(b)(3) obligation to ensure that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Moreover, whether there is evidence sufficient for a reasonable jury to find in favor of the complaining party as to a particular claim is determined after discovery, pursuant to a Rule 56 motion for summary judgment.

EXHIBIT __K__
PAGE __142__

## III.  EX PARTE APPLICATION TO STAY PENDING APPEAL

The standard for granting a stay pending appeal is similar to that for a preliminary injunction. Lopez v. Heckler, 713 F.2d 1432, 1435 (9th Cir.1983). Thus, a party seeking a stay must show either (1) a likelihood of success on the merits of its appeal and the possibility of irreparable harm, or (2) that serious questions regarding the merits exist and the balance of hardships tips sharply in its favor. See Lands Council v. McNair, 494 F.3d 771, 775 (9th Cir. 2007) (noting that the alternative tests "are extremes of a single continuum in which the greater the relative hardship to the party seeking the [stay], the less probability of success must be shown.").

As the Court explained on the record, there is the potential for harm, possibly irreparable harm, to both sides, but that balance favors Mattel, for the reasons set forth in its opposition brief. See Opp. at 16-18.  For reasons set forth at length in the Court's orders that are purportedly implicated by the appeal, see Notice of Appeal at 1-2 & Exs. A-R (docket #5340), the Court does not find a likelihood of success on the merits of its appeal.

Accordingly, the Court **DENIES** the MGA parties' Ex Parte Application and Motion to Stay.

The Court understands from the report of the Temporary Receiver that its previous Orders regarding a partial stay of enforcement of the Court's December 3, 2008, need clarification, as does the issue of the scope of the profits that are subject to the constructive trust imposed by the Court on December 3, 2008.[5]  Accordingly, to assist the newly appointed Monitor, see infra, the Court provides the following guidance regarding its rulings and sets a briefing schedule as detailed below:

(1) **Older Inventory**:  The MGA parties and others in the distribution chain may sell all 2009 Bratz products up through and including January 21, 2010.  The older inventory of Bratz products may likewise be sold, unless the Monitor determines that those sales tend to, in his reasoned judgment, diminish the value of the Bratz brand, in which case he should so report to the Court in an expeditious manner.

(2) **Profits**:  The Court's Permanent Injunction Order found that all the female fashion dolls that use the "core Bratz fashion doll production sculpt" or the "Bratz movie sculpt" were subject to the injunction; the Courts' Constructive Trust imposed a constructive trust over, inter alia, "all trademarks, service marks and domain names[,] . . . that include the terms 'Bratz' or 'Jade.'"  In order to provide meaningful guidance to the parties, the Monitor, and their accountants, the parties may brief, and the Court will resolve, the issue of the scope of the profits that must be turned over by MGA and held by the Monitor pursuant to these Orders and any other Order of this Court.  The parties' simultaneous opening briefs (not to exceed 25 pages) shall be filed no later than

---

[5] This is largely due to the fact that, in issuing its December 3, 2008, order providing injunctive relief, the Court did not foresee that it would be subsequently modified by the January 7, 2009, Order staying enforcement pending sale of the 2009 Bratz line.

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT  K
PAGE  178

Wednesday, May 27, 2009; simultaneous responsive briefs (not to exceed 25 pages) shall be filed no later than Friday, May 29, 2009, at which time the Court will take the matter under submission and issue an order as expeditiously as possible.

## IV. EX PARTE APPLICATION RE DISCLOSURE OF
## 2009 PRODUCT LINE INFORMATION (DOCKET #5425)

In light of the Court's denial of the Ex Parte Application for Stay Pending Appeal, the ex parte application seeking production of the 2009 Bratz line and the new MGA products is moot, and it is **DENIED** for that reason. Nevertheless, because it is in the interest of all parties to expeditiously resolve outstanding issues regarding MGA's new "Moxie" line of dolls, counsel for Mattel and the MGA parties are directed to meet and confer in an expeditious manner regarding those dolls.

## V. ORDER RE EXPIRATION OF TEMPORARY RECEIVERSHIP
## AND ORDER APPOINTING MGA MONITOR

The Court previously issued, on April 27, 2009, an Order to Show Cause re Appointment of Permanent Receiver. In response, the Temporary Receiver, the parties and the Court-appointed Forensic Auditor have filed, and the Court has reviewed, the following documents: (1) The Report and Recommendations of Patrick A. Fraioli, Jr., Temporary Receiver; (2) the Responsive Report of Court-appointed Forensic Auditor Ronald Durkin; and (3) all documents filed in support of the Appointment of a Permanent Receiver and in opposition thereto, including the Statement of Position filed by Omni 808. In consideration of these filings, and after hearing on these matters, as detailed in the following subsections, the Court declines to appoint a Permanent Receiver, confirms the expiration of the temporary receivership, orders the filing of an accounting of the temporary receivership, and appoints an MGA Monitor to effectuate the Court's prior Orders.

### A.   Expiration of Temporary Receivership

**IT IS ORDERED THAT:**

1.   The period of the Temporary Receivership imposed by this Court on April 27, 2009 has expired;

2.   The Court declines to appoint a Permanent Receiver over MGA Entertainment, Inc. or MGA Hong Kong ("MGA");

3.   The Court reserves jurisdiction to appoint a Receiver in the future, as it deems appropriate;

4.   The Temporary Receiver, Patrick A. Fraioli, Jr., is hereby directed to prepare and file with the Court a final report including a final accounting and application for fees and

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT __K__
PAGE __149__

costs, on or before May 28, 2009;

5.    The Court hereby lifts the Injunction against Omni 808's enforcement of its rights as a creditor against MGA, and **ORDERS** that should Omni 808 take any action to enforce its rights as a creditor against MGA, such action shall be filed and heard in the Central District of California;

6.    Based on MGA's representations to the Court that, should MGA file for bankruptcy protection under Title 11 of the United States Code, it shall do so in the Central District of California, and having previously found in its April 27, 2009, Order appointing a Temporary Receiver that MGA is domiciled in California and have their principal place of business in the Central District of California and have the majority of their assets located within the Central District of California, the Court hereby lifts the Injunction against MGA filing bankruptcy without permission of the Court, but **ORDERS** that any bankruptcy filing by MGA or any of its affiliates shall be filed in the Central District of California.

**B.    Appointment of MGA Monitor**

1.    For good cause shown, pursuant to the alternative recommendation of the MGA parties, and in lieu of appointing a Permanent Receiver at this time, the Court appoints Patrick A. Fraioli, Jr., Monitor, who shall have the power to take any and all action that he deems necessary, appropriate, or advisable to effectuate the purposes of the Monitorship, including but not limited to the following:

a.    The Monitor shall maintain monitoring, supervisory, and oversight responsibilities over the Bratz Assets;[6]

---

[6] In light of the issue regarding the scope of profits that must be accounted for, see supra section III, and because the amount of access that must be given to the Monitor almost certainly extends beyond the materials that must be turned over to Mattel and may, depending on the resolution of the issue identified above, extend beyond the products for which profits must be held in constructive trust as a result of the Court's December 3, 2008, Orders, setting forth a workable definition of "Bratz Assets" that applies in all instances is challenging.  Nonetheless, the Court so defines that term at this time in order to provide to the Monitor and the parties meaningful guidance on the issue of Monitor access to facilities and information.  The Court admonishes all counsel that this definition should not be taken out of its current context and may very well be further modified, for purposes of both turn-over and the constructive trust, following resolution of the issue identified above.

Bratz Assets include all tangible or intangible assets, including, without limitation, all intellectual property necessary or materially useful for the design, manufacture, marketing, distribution and sale of any Bratz doll or other Bratz-branded product in the possession, custody or control (whether or not claimed to be encumbered by any security interest) of any of the MGA Defendants.  The Bratz Assets include, without limitation:

a. All Bratz-related intellectual property rights, including, without limitation, copyrights (whether or not registered); copyright registrations; moral rights; design rights; patents (issued and pending); service marks; trademarks; tradedress; designs; slogans; characters; product packaging in any medium; product names; product

EXHIBIT __K__
PAGE __150__

b.     The Monitor shall monitor, supervise, and oversee the exploitation of the Bratz Assets;

c.     The Monitor shall have the power and authority to monitor the financial affairs and operations[7] of MGA Entertainment, Inc. and MGA Hong Kong (collectively, "MGA") as the Monitor deems appropriate in order to carry out the duties specified herein;

d.     The Monitor shall monitor compliance by the parties with this Court's Injunction and other Orders as directed by the Court, specifically this Court's December 3, 2008, Order Granting Mattel, Inc.'s Motion for Permanent Injunction, January 7, 2009, Order re Modification and Stay of Permanent Injunction Order, and April 27, 2009, Omnibus Order (the "Injunction Orders");

---

illustrations; product designs; product concepts; conceptual drawings; engineering drawings; engineering specifications; processes; methods; trade secrets; know-how; product ideas; prototypes; line extensions; domain names; marketing and advertising materials; commercials; style guides; theme songs; soundtracks; scripts; screenplays; computer programming; digital and internet rights; video games; theatrical, television, video and DVD rights and masters; and rights in future technologies.

  b. All Bratz-related tooling for all past, current and future lines, including without limitation tools, tooling, in process tools, molds, sculptures, models, dies, and mock-ups, as well as other Bratz-related tangible items.

   c. All Bratz-related marketing and sales assets for all past, current and future lines, including, without limitation, consumer lists, marketing plans, account plans, focus group studies, marketing databases, and other consumer and marketing research.

   d. All Bratz-related records, including, without limitation, contracts, manufacturing records, inventory records and data, sales records and data, product testing data and records, vendor list and records, customer communications, and invoices and purchase orders.

   e. All Bratz-related contracts and agreements, including, without limitation, assignments, work-for-hire agreements and licensing agreements.

    f. All other Bratz-related rights, including, without limitation, distribution rights, licensing rights, exploitation rights, accounts receivable, and all choses in action relating to Bratz or the Bratz brand.

    g. All Bratz-related items referenced at Paragraph 3 and Paragraph 8 (at lines 15-19) of the Court's Order granting Mattel's Motion for Permanent Injunction (Docket No. 4443).

    h. "Bratz-related" as used in this definition, is a broad term, that applies to all products, property, and information that bears the "Bratz" trademark. It is expressly not limited to the Bratz female fashion dolls, and includes such products as the Bratz boy dolls, Baby Bratz, and Bratz Kidz.

    [7] Toward that end, the Monitor shall have full and complete access to all Bratz assets (wherever they may be found), all MGA business premises, all MGA facilities (including manufacturing and storage facilities), all real and personal MGA property (including computers), all MGA employees, all MGA information (including financial and operational information), and all MGA books and records.

MINUTES FORM 90                                                    Initials of Deputy Clerk __cls_____
CIVIL -- GEN                              10                        Time: 03/02

EXHIBIT __K__
PAGE __15-1__

e.  At the appropriate time, the Monitor shall direct the MGA turnover to Mattel of any of the Bratz Assets subject to recall, impoundment, or destruction, as set forth in this Court's Injunction Orders of December 3, 2008, and as otherwise directed by the Court;

f.  The Monitor shall establish such bank accounts as the Monitor deems necessary or convenient to carry out the Monitor's duties under this Order;

g.  The Monitor shall collect from MGA, on a monthly basis, the amount of net profits derived by MGA from exploitation of the Bratz Assets during the preceding month, as well as an accounting setting forth the basis for the calculation of the net profits and the supporting documentation establishing such basis.  The Monitor shall retain these funds pending further order of this Court;[8]

h.  The Monitor is ordered and directed to obtain from MGA, and to make available to Mattel, as set forth herein, such of the Bratz Assets, and related information about the content of the Fall, 2009 Bratz line being produced and sold by MGA pursuant to this Court's Injunction Orders, as are necessary to enable Mattel to begin preparation of its own Bratz line for the Spring, 2010 sales season;

I.  The Monitor shall monitor, supervise and oversee, with authority to approve or disapprove, the following categories of financial transactions of MGA: Inter-company transfers of any amount, payments by MGA or any MGA affiliate to any related parties in excess of $50,000.00 per payment, and any payments to Omni 808;

j.  The Monitor shall file monthly reports with the Court, under seal (but served on all parties), setting forth the Monitor's activities, actions and recommendations. Nothing herein shall prevent the Monitor from filing other reports, as he deems appropriate.  As in the case of the Court-appointed Settlement Officer and Discovery Master (and as previously with the Court-appointed Temporary Receiver), the Monitor may report orally to Court concerning matters of procedure; however, any substantive inquiries or reports shall be submitted in the first instance to the Court in writing.  The Court shall determine, whether and, if so, with what restrictions, the Monitor's reports shall be served on parties and their counsel;

---

[8] The Court recognizes that resolution of the issue identified in section III, supra, will greatly impact on the amount of profits that must be turned over by MGA (see infra ¶ 2) and retained by the Monitor; accordingly, it is the Court's intention to resolve the issue as expeditiously as possible and, in any event, prior to the first turnover of profits on June 22, 2009.

MINUTES FORM 90
CIVIL -- GEN                                    11

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT ___K___
PAGE ___152___

k.   The Monitor may retain and/or engage the services of advisors and/or professionals, including, without limitation, accountants, attorneys, consultants and experts to assist the Monitor in carrying out his duties and responsibilities under this Order. The Monitor, without further order of this Court, is authorized to employ Ervin, Cohen & Jessup LLP, and the accounting firm of Crowe Horwath LLP, to assist him in his duties. Nothing herein shall prevent the Monitor from utilizing the same advisors and professionals as rendered services to the Temporary Receiver before the appointment of the Monitor;

l.   The Monitor may hire and employ individuals and entities as necessary or advisable to carry out the Monitor's duties under this Order;

m.   The Monitor, his employees and agents, as well as any and all of the professionals employed by the Monitor, are entitled to compensation for services rendered at their normal hourly rates and reimbursement for all expenses incurred by them in providing services to the Monitor. The Monitor shall submit to the Court, *in camera*, monthly requests for approval of payment. Upon Court approval, the Monitor shall serve on the Parties, but not file, Notice of Court Approval of Request for Payment of Interim Fees and Costs of Monitorship, along with a summary statement of the fees and costs;

n.   The Monitor shall have the status of an officer and agent of this Court, and as such shall be vested with the same immunities as enjoyed by this Court. Neither the Monitor nor any person or entity acting at the direction of the Court or pursuant to agreements with the Monitor (whether employees, vendors, contractors or otherwise) may be held liable to any party for any acts taken in good faith in compliance with this Order, including but not limited to claims of alleged copyright infringement, trademark infringement, or other alleged causes of action;

o.   Nothing herein shall alter or affect the right of Mattel to take any and all actions relating to the Bratz Assets or the Bratz brand which it otherwise lawfully could take, including, without limitation, the institution, maintenance and prosecution of legal proceedings anywhere in the world or other proceedings before any governmental or tribunal or arbitration panel;

p.   The Court shall retain jurisdiction over the Monitorship for the duration of its existence.

q.   No bond shall be required in connection with the appointment of the Monitor. Except for acts of gross negligence, the Monitor and his agents and employees shall not be liable for loss or damage incurred by any party to this action or their officers, agents, servants, employees, attorneys or others by virtue of any act performed or omitted to be performed by the Monitor in connection with the discharge of his duties and responsibilities.

MINUTES FORM 90
CIVIL -- GEN                                    12

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT __K__
PAGE __/5�a__

2. Unless otherwise directed by the Court, MGA is **ORDERED** to turn over to the Monitor, on a monthly basis, the amount of net profits derived by MGA from exploitation of the Bratz Assets during that month, as well as an accounting setting forth the basis for the calculation of the net profits and the supporting documentation establishing such basis. The Monitor and his accountants shall review the accountings, and any related submissions of the Court or Monitor by Mattel, and shall report and recommend to the Court as directed on any disputes arising therefrom. MGA shall make its first turnover and accounting by June 22, 2009, which shall cover the period from the return of the jury verdict in this case through May 31, 2009, and this shall constitute compliance with section V of the Court's April 27, 2009, Order. Each month thereafter, the turnover and accounting shall be made by the 10th day of the month, for the prior month period.

3. MGA shall immediately make available to the Monitor, for transfer to Mattel, such portion of the Bratz Assets necessary to enable Mattel to begin preparation of its own Bratz line for the Spring, 2010 sales season. MGA shall also provide to the Monitor for delivery to Mattel such related information about the content of the Fall, 2009, Bratz line being produced and sold by MGA pursuant to this Court's Injunction Orders to enable Mattel to make appropriate commercial determinations about the content of its own Spring, 2010, Bratz line.

4. No action may be filed against the Monitor, or any of his agents or employees, for any actions taken in this case, without prior permission of this Court.

5. For the duration of Monitorship, Mattel is directed to pay to the Monitor, in the manner directed by the Monitor, the fees and costs of the Monitorship within five (5) days of receipt of the Notice of Court Approval of Request for Payment of Interim Fees and Costs of Monitorship. All interim fees paid shall be subject to final review and approval by this Court. This Court retains jurisdiction to award a greater or lesser amount as the full, fair, and final value of such services.

6. Any party may later apply to the Court for relief related to any profit calculations or profits turned over to the Monitor, or for relief related to the allocation of payment of the fees and costs of the Monitorship, as well as for the previously imposed Temporary Receivership.

7. All Parties and their employees, agents and attorneys are ordered to cooperate fully with the Monitor.

### VI. IMPOSING LIMITED AND TEMPORARY STAY OF PHASE 2

At the May 18, 2009, hearing, the Court heard from the Court-appointed Settlement Officer, who advised the Court that a settlement conference was scheduled for June 1, 2009. The Settlement Officer believes that settlement negotiations continue to be of value, and has recommended that the Court consider the judicial officer's participation in those settlement

EXHIBIT ___K___
PAGE ___/57___

negotiations -- a proposal to which no party offered objection.

The Court heard from the parties regarding whether a stay of Phase 2 discovery should be imposed to assist in settlement efforts. Counsel for MGA advocated for a four-month stay. Counsel for Mattel cautioned against a stay, outlining for the Court the various positions taken by the MGA parties as to how the Court's previous stay limited or altered their responsibility to comply with previously set deadlines.

Mindful of the concerns expressed by Mattel, the Court nevertheless imposes a stay of Phase 2 discovery that is strictly limited in scope and duration. The parties shall, notwithstanding the stay, meet and confer regarding the Moxie issue set forth in section IV. Moreover, notwithstanding any other provision of this Order, the MGA parties are not relieved of their responsibility to produce, on or before the currently imposed deadline, their responses the Interrogatories to which counsel for Mattel referred during the hearing.

The stay of discovery, as limited, is imposed up to and including June 12, 2009. Unless otherwise extended by the Court or the Discovery Master, the deadlines for all discovery responses that have previously been ordered are extended for a period, measured by calendar days, not longer than the total number of calendar days the stay of discovery is imposed. For purposes of this date calculation, both the beginning date of the stay (May 18, 2009) and the ending date (June 12, 2009) are to be included. Similarly, the deadline for responding to discovery requests that have been propounded, but to which responses are not yet due, is extended for the same period of calendar days. If depositions are scheduled during this time period, they must be rescheduled for a date certain no later than the currently scheduled date plus the number of calendar days for which the stay of discovery is imposed.

The Court further **ORDERS** the parties to participate in a Mandatory Settlement Conference ("MSC") on or about June 1, 2009 (to be coordinated by the Court-appointed Settlement Officer). Those attending the MSC shall include the chief executive officers or equivalent of Mattel, MGA, and Omni 808; the chief financial officers or equivalent of Mattel, MGA, and Omni 808; in-house counsel of Mattel and MGA; and lead counsel of record for each party. Following the MSC, the Settlement Officer shall report to the Court on the status of settlement efforts. If the parties fail to reach a full and complete settlement, the Court shall, pursuant to the parties' agreement and waiver of any conflict issues, conduct a settlement conference beginning on June 10, 2009, at 10:00 am.

## VII. NOTICE OF INTENT TO UNSEAL FORENSIC AUDITOR REPORTS

In light of Omni 808's emphatic public criticism of the Court-ordered Forensic Auditor's April 23, 2009, Report, the contents of which were expressly ordered by this Court to be maintained by the parties under seal, and the contents of which, to the Court's knowledge, were in fact maintained under seal until the filing of The Statement of Position of Omni 808 Investors, LLC, filed on May 14, 2009, it is the Court's intention to release the April 23, 2009, Summary Report (together with its Exhibits that have been redacted for privilege), absent sustained objections

MINUTES FORM 90
CIVIL -- GEN

14

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT ___K___
PAGE ___153___

thereto by the MGA parties.[9]

At this time, the Court **ORDERS** that the May 17, 2009, Responsive Forensic Auditor Report, maintained by the Court until this time *in camera* be released under seal to the parties.[10] The May 17, 2009, Responsive Report shall, pending resolution of any objections to its disclosure by the MGA parties, remain under seal, and distribution shall be limited to parties, their attorneys (whether or not the attorneys are of record), any Court-appointed officers, and, as necessary, the parties', attorneys', and officers' staff.

Within five days of the entry of this Order, the MGA parties, including Mr. Larian, may file, under seal, specific and supported objections to the release of the Summary Report or the Responsive Report. In the same time frame and manner, any party may object to the release of specific identifying information contained in the exhibits of the report than have the tendency to reveal personal identifying information such as social security numbers, tax identification numbers, or bank account numbers. Within two days, any party may respond to these objections. No hearing will be held unless the Court orders otherwise.

**IT IS SO ORDERED.**

---

[9] Despite an express Order of this Court to maintain the Summary Report and its exhibits under seal, counsel for Omni 808 revealed the Report's contents in Omni 808's Statement of Position. Similarly, counsel for Mattel also revealed certain contents of the Receiver's Report and Recommendation regarding MGAE's liquidity and solvency, also released under seal. All counsel are reminded of their responsibilities to maintain information under seal. Unless otherwise ordered, the Court's hearings are open to the public. The Court does not close hearings unless and until requested to do so by one or more of the parties, and only then does so when and to the extent that such closure is justified when counterbalanced with important First Amendment concerns.

[10] Sua sponte, the Court has already redacted certain portions of the Forensic Auditor's Responsive Report on the basis that the emails reflect highly personal electronic conversations between Mr. Larian, Mr. Kadisha, and their spouses.

MINUTES FORM 90                                                   Initials of Deputy Clerk __cls_____
CIVIL -- GEN                              15                      Time: 03/02

EXHIBIT __K__
PAGE __156__

# EXHIBIT "L"

# BINGHAM

JUN 2 2 2009

Peter N. Villar
Direct Phone:   714.830.0640
Direct Fax:   714.830.0719
peter.villar@bingham.com

June 22, 2009

**Via Hand Delivery**

John Quinn, Esq.
Michael Zeller, Esq.
Quinn, Emanuel, Urqhart, Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543

**Re:  Mattel, Inc. v. MGA Entertainment, Inc., et al**

Counsel:

Pursuant to the Discovery Master's Order No. 27, enclosed is Omni 808
Investors, LLC's supplemental production of documents (Bates Nos.
OMNI0010220-OMNI0010382).  Also enclosed are Vision Capital, LLC's
production of documents (Bates Nos. VISION000001-VISION000149).  Finally,
Omninet Capital, LLC has no responsive documents beyond those already
produced by Omni 808 Investors, LLC.

We are in the process of updating and completing our privilege log and will serve
it once it's completed.

Sincerely,

Peter N. Villar

Enclosures

Boston
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Walnut Creek
Washington

Bingham McCutchen LLP
Plaza Tower, 18th Floor
600 Anton Boulevard
Costa Mesa, CA
92626-1924

T 714.830.0600
F 714.830.0700
bingham.com

A/73066426.1

EXHIBIT _____L_____
PAGE ___157___