Page 4351

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

---

| | | |
|---|---|---|
| MATTEL, INC., | : | PAGES 4351 - 4517 |
| | : | |
| PLAINTIFF, | : | |
| | : | |
| VS. | : | NO. ED CV04-09049-SGL |
| | : | [CONSOLIDATED WITH |
| MGA ENTERTAINMENT, INC., | : | CV04-9059 & CV05-2727] |
| ET AL., | : | |
| | : | |
| DEFENDANTS. | : | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

THURSDAY, JULY 3, 2008

JURY TRIAL - DAY 20

AFTERNOON SESSION

MARK SCHWEITZER, CSR, RPR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
181-H ROYBAL FEDERAL BUILDING
255 EAST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012
(213) 663-3494

Page 4352

1      Appearances of Counsel:

2

3      On Behalf of Mattel:

4          Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
           By John B. Quinn, Esq.
5              B. Dylan Proctor, Esq.
               Michael T. Zeller, Esq.
6              Harry Olivar, Esq.
               John Corey, Esq.
7              Diane Hutnyan, Esq.
               William Price, Esq.
8          855 South Figueroa Street
           10th Floor
9          Los Angeles, CA 90017
           (213) 624-7707

10

11

12     On Behalf of MGA Entertainment:

13         Skadden, Arps, Slate, Meagher & Flom LLP
           By Thomas J. Nolan, Esq.
14             Carl Alan Roth, Esq.
               Jason Russell, Esq.
15             Lauren Aguiar, Esq.
               David Hansen, Esq.
16             Matthew Sloan, Esq.
               Robert Herrington, Esq.
17         300 South Grand Avenue
           Los Angeles, CA 90071-3144
18         (213) 687-5000

19

20

21

22

23

24

25

Page 4353

1                           I N D E X

2

3    MARGARET ANN LEAHY, PREVIOUSLY SWORN................... 4361

4    CROSS-EXAMINATION (CONTINUED) BY MR. PRICE:........... 4361
     REDIRECT EXAMINATION BY MR. NOLAN: ................... 4369
5    RECROSS-EXAMINATION BY MR. PRICE:..................... 4381

6    TIM KILPIN, SWORN..................................... 4392

7    DIRECT EXAMINATION BY MR. NOLAN: ..................... 4393

8    RICHARD DE ANDA, SWORN............................... 4407

9    DIRECT EXAMINATION BY MR. NOLAN: ..................... 4408

10   CROSS-EXAMINATION BY MR. ZELLER:..................... 4421

11   DEPOSITION EXCERPTS OF
     RICHARD IRMEN WERE PLAYED............................ 4447
12

13                       E X H I B I T S

14

15    (Exhibit 1132 received.)............................. 4361

16    (Exhibits 1127-A and 1127-B received.)............... 4376

17    (Exhibit 12995 received.)........................... 4381

18

19

20

21

22

23

24

25

1          Riverside, California; Thursday, July 3, 2008

2                              1:40 P.M.

3          (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

4               MR. McFARLAND:  Before the break, I'm just

5     concerned because a statement was made that seemed to infer

6     that I had done something improper, and I wanted to clear it

7     up.

8               THE COURT:  Before we get to that, I want to just

9     clear up the record.  I hope the parties have had a chance to

10    figure out what happened here.  And I was given all kinds of

11    representations, and I'm not thinking ill of anybody, if

12    that's what you're concerned about.  I just want to know

13    what's going on.

14              MR. McFARLAND:  There's document No. 1133.  And

15    that is a document in which Paula Treantafelles is redacted.

16    That is document control number SABW, Sidley, Austin, Brown

17    and Wood.  All the documents we produced have a K alpha

18    identifier.  So when a statement was made that I produced the

19    document, that's not true.

20              So just so you know what happened, so that nothing

21    was improper, and it's been fully briefed, there was a

22    meet-and-confer process.  An attorney from Quinn came to

23    my offices, and I met with that attorney from Quinn and

24    showed that person the original notebook.  As part of the

25    meet-and-confer process, she said here's everything I want

1  and redacted the other portions and produced everything that

2  she asked for that is found at document production number

3  KMWL 78, Exhibit 1132.  And that was produced well ahead --

4           THE COURT:  Does that have Paula Treantafelles's

5  name redacted?

6           MR. McFARLAND:  No.  So it is not redacted.  This

7  was produced by our firm well prior to the deposition.

8           THE COURT:  Very good.  All right.

9           MR. McFARLAND:  And then just to fill the loop in,

10  there was still dissatisfaction even though in my view we had

11  met and conferred and resolved the issue, there was still

12  dissatisfaction on behalf of the Quinn firm and an ongoing

13  meet and confer about producing the unredacted planner.

14           THE COURT:  Maybe you don't know this because you

15  say Sidley, Austin did this, but why was Paula

16  Treantafelles's name ever redacted to begin with?

17           MR. McFARLAND:  I have no idea.  I assume it was a

18  mistake.  I have no idea.  It was back in '05.  I have no

19  idea.  I didn't do it.  But in any event, well, well before,

20  months before the deposition, the properly redacted in my

21  view document was produced, that had redacted irrelevant

22  information, but, of course, did not redact Paula

23  Treantafelles.

24           And then skipping ahead to the deposition of

25  Ms. Leahy, I brought with me the original planner, and there

Page 4356

1  were discussions, and during the deposition I said here it

2  is.  Make copies of the whole thing.  My important question

3  for purposes of this trial is what was shown to the witness

4  during the deposition.

5        MR. NOLAN:  Your Honor, Mr. Price and I talked

6  about it.  Both 1132 and 1133 are in the deposition room, and

7  she's directed to both of them.  Both, you know, both were at

8  the deposition.  She's asked to go to look at the second page

9  of a document.  Mr. Price thinks it's 1132.  I think it's

10  confusing, but in any event, both redacted versions are in

11  the deposition.

12        THE COURT:  Well, we've got to eliminate the

13  confusion.  I've not going to leave something hanging like

14  this.  According to the record, and that's what I'm going to

15  make my decision based on, what does the record indicate that

16  she was shown?  Is it 1132 which is, according to

17  Mr. McFarland, the not redacted version?

18        MR. NOLAN:  They have on the screen 1132.  It's

19  Exhibit 1132.

20        THE COURT:  And that is the one that did not have

21  Paula Treantafelles's name redacted?

22        MR. NOLAN:  That has the little corner that says

23  Paula Treantafelles.

24        THE COURT:  Very good.

25        MR. NOLAN:  One page before this or two pages

1    before it, they have both 1133 and 1132 on them.

2              THE COURT:  That's fine.

3              MR. NOLAN:  This clears it up.

4              THE COURT:  But here she was clearly directing your

5    attention to the second page of 1132 and Paula

6    Treantafelles's name was on it; correct?

7              MR. NOLAN:  That's correct.

8              THE COURT:  Excellent.

9              MR. PRICE:  And, your Honor, I'm going to move that

10   the second page of 1132 come into evidence because statements

11   have been made before the jury suggesting that maybe she did

12   not have that information.  So --

13             THE COURT:  When you say "that information," you

14   mean --

15             MR. PRICE:  Paula Treantafelles's name on there.

16             THE COURT:  That needs to be made clear because

17   that was becoming horribly muddled and confused around 11:45.

18   And that's why I stopped the testimony at that point, because

19   clearly the implication was being given to the jury that

20   Paula Treantafelles's name had been redacted.  And that needs

21   to be corrected.  So I will move in 1132.  You were using

22   1137 to examine; correct?

23             MR. PRICE:  Yes.  And this refers to 1132, page 2

24   actually.

25             THE COURT:  Of course, that's not in the -- does

1   someone have 1132?

2          So here's 1132, page 2, and it has Paula

3   Treantafelles's name on it.  And this is what was referred to

4   in the deposition transcript, and then 1137, page 14, also

5   has Paula Treantafelles's.  Does anyone have any idea why

6   Denise Saffron's name was redacted on 1132, page 2?

7          MR. NOLAN:  All of this was done before --

8          MR. QUINN:  I have no idea, your Honor.  Maybe on

9   privacy grounds because she wasn't involved in this case.  I

10  just have no idea.

11         But the clear point is that --

12         THE COURT:  I think the jury needs to understand

13  that.  Because this redaction business is really -- it's

14  casting a pall on documents that I think is not proper.

15         MR. NOLAN:  Your Honor, if I might just make a

16  suggestion.

17         THE COURT:  Please.

18         MR. NOLAN:  Thank you.  First of all, I just want

19  to make certain that it's clear that 1137, page 14, is the

20  copy of the original 1132-A is a redacted version of the

21  original as is --

22         THE COURT:  I understand that, but we're not going

23  to be dwelling on that distinction with the jury because I

24  think under 403 it's leading to confusion.  I'm going to try

25  to clarify this with the jury and make it clear that both the

Page 4359

1   version of the document before the witness at the deposition

2   and the version of the document before the witness at this

3   trial had the same material information that has been

4   questioned about.

5           MR. NOLAN:  Right.  And you might add, your Honor,

6   that because other matters unrelated to this case were

7   redacted by counsel before the production of the document.

8   So that they understand that there's nothing wrong with the

9   redaction.

10          THE COURT:  And they are going to see what was

11  redacted because they are going to have the original in 1137.

12  All right.  I think that's settled now.  We'll get back on

13  track.  That takes care of that issue.  Mr. McFarland has

14  addressed his issue.  We've kept the jury waiting long

15  enough.  Are there any other issues that we need to address

16  right now?

17          MR. NOLAN:  No, your Honor, not for MGA.

18          MR. ZELLER:  Briefly, your Honor, I do have one

19  person just for purposes of our scheduling, which is Cassidy

20  Park.  She's currently out of town.  I know that there was an

21  issue about whether she was going to be recalled.  That's

22  obviously not going to happen today.  I do need to let her

23  know at some point.

24          THE COURT:  We'll take it up later.  Let's bring

25  the jury in.

Page 4360

1          And, Mr. Quinn, I have signed off on the latest

2     application for a nonresident attorney to appear in the case.

3     I just want you to know so you won't be short-handed with

4     attorneys.

5               MR. QUINN:  I appreciate that.

6               (WHEREUPON THE JURY ENTERS.)

7               THE COURT:  Please be seated.

8               THE CLERK:  Ms. Leahy, please be advised that you

9     are still under oath.

10              THE COURT:  Members of the jury, we have amongst

11    other things resolved the issue concerning the entry on the

12    notebook that was redacted.  And as it turns out, both the

13    exhibit that has been introduced in this trial, 1137, which

14    is the complete unredacted version of the notebook which you

15    will have, as well as Exhibit 1132, page 2, which is what the

16    witness had before her during the deposition, both of those

17    contain the material parts of the notebook.

18              The comments on Fiona, the list of comments on

19    Fiona, as well as the name Paula Treantafelles down in the

20    bottom right-hand corner.  Both exhibits have that.  There

21    were some redactions on 1132, the one that was used in the

22    deposition, that are not redacted on 1137, the one that's in

23    here.  But they have nothing to do with this case, as you see

24    when you look at the document yourselves back in

25    deliberations, but there was no version of this that had

Page 4361

1    Paula Treantafelles that was before the witness at the time

2    the relevant questions were asked.

3              Is that consistent with your understanding,

4    Mr. Price?

5              MR. PRICE:  Yes, your Honor.

6              THE COURT:  Mr. Nolan?

7              MR. NOLAN:  Yes.

8              THE COURT:  Very well.

9              Mr. Price, you may proceed.

10             MR. PRICE:  Your Honor, if I could --

11             THE COURT:  And 1132 is introduced in evidence.

12             (Exhibit 1132 received.)

13             MARGARET ANN LEAHY, PREVIOUSLY SWORN.

14                CROSS-EXAMINATION (CONTINUED)

15   BY MR. PRICE:

16   Q.   If I could display 163, line 12, through 22.  And just

17   to clarify, Ms. Leahy, good afternoon.

18   A.   Hi.

19   Q.   So when you were asked the question about whether the

20   comments were comments Carter Bryant gave you, do you see

21   that?  That you had mentioned that those were comments that

22   Carter Bryant gave you on your first Bratz sculpt; correct?

23             Do you see that?

24   A.   Yes, I do.

25   Q.   At the time you were answering those questions, you were

Page 4362

1    looking at Exhibit 1132, the second page; correct?

2    A.   1132.

3    Q.   Do you see where it says directing your attention to the

4    second page of Exhibit 1132.

5             Do you see that?

6    A.   I see that there.  Should I look at it now?

7    Q.   We can display it.  So Exhibit 1132, the second page.

8             So when you were asked whether those comments were

9    comments made by Mr. Bryant, you had this copy in front of

10   you which had Paula Treantafelles's name on it; correct?

11   A.   Correct.

12   Q.   And if you could unhighlight that.

13            And, in fact, you see her name is written in a

14   different color pen.

15            Do you see that?

16   A.   Yes, I do.

17   Q.   Now, we've been talking now about this September 29th

18   meeting where you presented your sculpture and got those

19   comments; correct?

20   A.   Correct.

21   Q.   And that's sort of a typical pattern.  That is, you will

22   talk to a designer, go to a sculpt without them hovering over

23   you while you're doing it.

24   A.   Hopefully.

25   Q.   And then bring it to them and get comments; correct?

Page 4363

1    A.    Correct.

2    Q.    And that's what happened here for the first sculpt.

3    That is, you spoke with Mr. Bryant.  He gave you some

4    drawings.  You went and made a sculpt.  And then you met with

5    him, and he gave you comments; right?

6    A.    Correct.

7    Q.    And I believe your testimony is that with respect to the

8    September 29th meeting, you made the changes that Mr. Bryant

9    asked for; correct?

10   A.    Correct.

11   Q.    So having -- so after September 29th, you go back to

12   make the changes that Mr. Bryant asked for; correct?

13   A.    Right.  Just the thing I can't remember, you know, I

14   remember it was Carter alone at the 26th or whatever meeting.

15   He remember Veronica and Paula definitely and Carter with the

16   October 6th meeting.  But it's the meeting in the middle

17   where I cannot say for sure now.

18          I know I said in the deposition, but that being

19   eight years ago, I remember things in different kinds of

20   ways.

21   Q.    Okay.

22   A.    So now I'm just foggy on who was at the meeting.

23   Q.    Now you're fogged.  But as of December of 2007, your

24   testimony was that those comments were made by Carter Bryant,

25   and then you went and made the changes he suggested; correct?

Page 4364

1    A.    Correct.

2    Q.    So after making those changes, as would be your

3    practice, you then said come look at my sculpt now.  I've

4    made the changes you've suggested; correct?

5    A.    Correct.

6    Q.    And that meeting is the October 6 meeting; right?

7    A.    Right.

8    Q.    So by that time, you had had two face-to-face meetings

9    with Mr. Bryant and one telephone conversation; correct?

10   A.    I don't know how many exactly telephone conversations.

11   But I know we had two face-to-face meetings.

12   Q.    So you're saying it may have actually been more than one

13   telephone conversation.

14   A.    It may have been.  I don't remember.

15   Q.    At the October 6 meeting, Ms. Garcia, or Treantafelles,

16   was there; correct?

17   A.    Correct.

18   Q.    And as was Mr. Bryant?

19   A.    Yes.

20   Q.    And you think Veronica Marlow was there was well?

21   A.    I know she was there.

22   Q.    And they gave you comments on the sculpt that you had

23   done which had incorporated all of Mr. Bryant's comments;

24   correct?

25   A.    Correct.

1    Q.   And I believe you said that then, as of October 6th,

2    that those folks had, I think your words were, made all the

3    comments they could.

4    A.   Correct.

5    Q.   Because at that point your job was to -- was to try to

6    make this into a marketable, producible sculpt; correct?

7    A.   Well, producible, yes.

8    Q.   Let me rephrase that.  That is, having received the

9    comments, then your job as a sculptor is to incorporate those

10   in a way that makes these things actually producible; right?

11   A.   Correct.

12   Q.   And that's something uniquely that a sculptor knows how

13   to do, which is to know how to sculpt it so you can actually

14   mass produce this thing; correct?

15   A.   Correct.

16   Q.   And you showed us, then -- so after October 6th, I think

17   you mentioned that you would slice off the arms and legs and

18   make changes so that it could actually be manufactured in

19   Hong Kong; right?

20        MR. NOLAN:  Objection.  Vague and ambiguous.  Also

21   beyond the time frame.

22        THE COURT:  Sustained on the -- lay a further

23   foundation.

24        MR. PRICE:  Let me rephrase.

25   Q.   So after October 6th, I think you testified how you kind

Page 4366

1    of would cut off the arms and the legs and make alterations

2    to them; correct?

3              MR. NOLAN:   Your Honor, I'm sorry about the

4    characterization.   I object to the characterization and

5    preamble of the testimony summary.

6              THE COURT:   Sustained.

7    Q.   BY MR. PRICE:   After October 6th, when you had received

8    all the comments you could receive, at that point is it

9    correct that you then began making alterations to make it

10   producible?

11   A.   Well, I sent it to be molded first, which takes a while.

12   And then I had a wax poured.

13   Q.   And by the way, those molds that you first did have been

14   lost or destroyed?

15   A.   Lost or destroyed.

16   Q.   And then having done the mold, then, it's at that point

17   you made changes so that it would be producible, that is,

18   before October 25th or October -- before October 20th.

19   A.   Yes, it was after the 6th and before the 25th.

20   Q.   And by the way, one of those molds says October 23 on

21   it; correct?

22   A.   Right.   This is like a set, four out of four.

23   Q.   And so if October 23, I -- if that were a Monday, then

24   when would you have actually given them the sculpt so that

25   they could have made the mold?

Page 4367

1   A.   These molds are after I cut up this.   These aren't this

2   mold.

3   Q.   So they are made from something you gave Gentle Giant.

4   A.   These?

5   Q.   Yes.

6   A.   Yeah, these -- do you want me to tell you what it's

7   from?

8   Q.   I want to find out when you gave that to Gentle Giant

9   from which they made what is up there in front of you as

10  1140-A through -D.

11  A.   So you want to know when I gave this sculpt that's in --

12              THE COURT:   I'm going to stop you.   Counsel, that

13  is a poor question.   Don't say you want to find out.   Why

14  don't you ask a question.

15  Q.   BY MR. PRICE:   You had to give Gentle Giant something so

16  that they could create what has been marked as 1040-A through

17  -D; correct?

18  A.   1140.

19  Q.   1140?   I'm sorry.   1140-A through -D.   So you had to

20  give Gentle Giant something from which they could make that;

21  correct?

22  A.   Correct.

23  Q.   What was it you had to give them so that they could make

24  those molds?

25  A.   It was the sculpt in between.   It was the sculpt after I

Page 4368

1   had done this.  It was the sculpt from the big mold that

2   Gentle Giant did of this.  They poured the wax.  I started

3   cutting it up, put the joints in, and gave that to them so

4   they could make this mold.

5   Q.   So when did you give that to them so that they could

6   make the mold?

7   A.   It would have been somewhere around the 23rd.

8   Q.   So the 23rd is a Monday.  Would it be a few days before?

9   Would it be a few hours before?

10  A.   It wouldn't be hours.  It takes overnight to cure.

11  Q.   So do you have any idea whether it was the 15th, 16th,

12  17th, 18th, 19th, 20th, 21st?

13  A.   I don't know the actual date.

14  Q.   Okay.  Now, you testified about whether or not you gave

15  a head of a Bratz doll to be painted by Anna Rhee.

16       Do you recall that?

17  A.   Yes, I do.

18  Q.   And it's true that you don't really have any idea what

19  Carter Bryant was doing in the summer of 2000 prior to

20  contacting you in preparing for his pitch to MGA; correct?

21  A.   I didn't know -- yeah, I had no idea what he was doing

22  before he called me.

23  Q.   I mean, you don't know, for example, whether or not

24  Carter Bryant had Anna Rhee or some other face painter do

25  some face painting; correct?

Page 4369

1   A.   I don't know anything of what Carter did before the day

2   he called me.

3             MR. PRICE:   No further questions, your Honor.

4             THE COURT:   Further direct examination?

5             MR. NOLAN:   Thank you.

6                     REDIRECT EXAMINATION

7   BY MR. NOLAN:

8   Q.   With respect to that last question, did Carter Bryant

9   ever tell you that he had asked someone else to do a sculpt

10  of the Bratz head?

11            MR. PRICE:   Objection.   Hearsay.

12            THE COURT:   What's it going to besides the truth of

13  the matter, Counsel?

14            MR. NOLAN:   Let me rephrase it.

15            THE COURT:   Very well.   Withdrawn.

16  Q.   BY MR. NOLAN:   At any meeting that you had with Carter

17  Bryant between September 1st -- sorry, end of September,

18  around September -- whatever meetings you had, did Carter

19  Bryant ever bring to any of those meetings a sculpted head of

20  his concept?

21  A.   No.

22  Q.   Do you recall that Mr. Price asked you whether or not

23  you were excited when you got the phone call from Carter

24  Bryant?   Do you recall that line of questioning?

25  A.   Yes.

Page 4370

1   Q.   And then they showed you a portion of your deposition

2   where you said you were excited because it was your first job

3   in your free-lancing?

4   A.   One of my first jobs.

5   Q.   All right.  Was --

6        Your Honor, you suggested I play the other portion

7   of the deposition transcript.

8        THE COURT:  You may.  Why don't you designate that

9   for the record.

10       MR. NOLAN:  It's page 152 through 153, line 7.

11       THE COURT:  Any objection?

12       MR. PRICE:  I do, your Honor.  I believe 152, line

13  7 through 11, was what Mr. Nolan identified.  The rest goes

14  beyond the scope of my question.  It would be hearsay.

15       MR. NOLAN:  Your Honor, to avoid the hearsay and to

16  try to move this along, I'll just limit it to lines 7 through

17  11.

18       THE COURT:  Very well.

19  Q.   BY MR. NOLAN:  Now, before we do this, this question and

20  answer that I'm about to play comes from the same deposition

21  transcript that Mr. Price read from; correct?

22  A.   Correct.

23       MR. NOLAN:  All right.  Aaron, could you play that

24  for me.

25       "QUESTION:  What do you mean by inspiration?

Page 4371

1          "ANSWER:  I mean it's rare that you get a

2     designer that says here's my vision.  You know, do

3     your magic and run with it.  Carter gave me the

4     drawings and said here's what I've done.  Let's see

5     what you come up with."

6  Q.   Do you have your original notebook in front of you,

7  1137?

8  A.   A copy of the original one.

9  Q.   A copy of the original.  Thank you.

10         And I want to ask you to turn to September 29th,

11  the September 29th entry.

12  A.   Okay.

13         MR. NOLAN:  This is in evidence, your Honor.  May

14  we have it on the screen?

15         THE COURT:  Very well.

16         MR. NOLAN:  And, Aaron, do you mind, just where

17  it's Fiona at the bottom.  I'm sorry.  I apologize.  Can we

18  go to the very top of this.

19  Q.   Mr. Price pointed this out to you.  Do you recall this?

20  And he said Carter Bryant, it says extension 6099.

21         Do you see?

22  A.   Yes.

23  Q.   The other number, is that also in your handwriting?

24  A.   Yes, it is.

25  Q.   And did you -- what did you understand that number was?

Page 4372

1   A.   That's his home number.

2   Q.   So Carter Bryant gave you his home number as well?

3   A.   Correct.

4   Q.   And if we could just go down to the bottom of the page.

5   And these are comments that were made on September 29th,

6   2000?

7   A.   Correct.

8   Q.   Now, we've seen testimony, Mrs. Leahy, from your

9   deposition where you said these were Carter Bryant's

10  comments?

11  A.   Correct.

12  Q.   As you sit here today, are you absolutely certain in

13  your mind that these comments only come from Carter Bryant?

14  A.   Today I'm not absolutely certain that they only came

15  from him.

16  Q.   And why is that?  Have you been prompted to change your

17  testimony in that regard?

18  A.   No.

19  Q.   Well, why is it now that you are having a different

20  memory than you had at your deposition, if you know?

21  A.    I think it's because it's eight years ago.  There's

22  certain things I remember that are crystal clear.  Like

23  anything visual.  But when it comes to meetings and stuff

24  like that, it's a lot harder to remember.  So I remember

25  things at different times, you know.

Page 4373

1  Q.   Let me ask you something.  Regardless of the date, I

2  guess, do you recall any attention by Carter or direction to

3  you of a concern about the size of the waist?

4  A.   I know it's written here.  But I don't know if Carter

5  said that or if Paula said it from the other -- you know, if

6  Paula was at that meeting.  You know what I'm saying.  I'm

7  just foggy on what said, what comments.

8  Q.   And the second entry, smaller hips?  Am I reading that

9  right?

10  A.   Yes, smaller hips and thighs and ankles.

11  Q.   Okay.  Again, you, sitting here under oath, giving your

12  best memory, can you say with certainty that it was Carter

13  Bryant that made those comments to you on September 29th?

14  A.   No, I cannot say with certainty that it was him.

15  Q.   Now, going to the next entry, and I think this reads

16  neck longer.

17  A.   Thickness, okay.

18  Q.   Thickness, okay.

19       Can you say with certainty that it was only Carter

20  Bryant at that meeting who told you about measurements with

21  respect to the neck?

22  A.   No, I can't say that it was Carter.

23  Q.   The last point that I want to go to here.  Is that feet?

24  Can you read that?

25  A.   Feet bulkier on top.

Page 4374

1    Q.   Do you recall right now with certainty whether or not it

2    was only Carter Bryant -- that it was Carter Bryant, or was

3    it Carter Bryant that made that comment?

4    A.   I can't recall.

5    Q.   In any event, whether or not it was September 29th or

6    some eight days later, October 6th, are you certain that you

7    met with Paula Treantafelles?

8    A.   Yes, I am certain.

9    Q.   Concerning this sculpt?

10   A.   Correct.

11   Q.   And was Veronica Marlow also present?

12   A.   Correct.

13   Q.   And do you recall at that meeting additional comments

14   being made with respect to your sculpt?

15   A.   Which meeting?  The 26th, or the 6th?

16   Q.   October 6th.

17   A.   Yes, additional comments were made at that meeting.

18   Q.   And were those reflected in your notebook?

19   A.   Yes, they are.

20   Q.   Let's just turn to that page.  And this is

21   Exhibit 1137-0015.  And can we just highlight these comments?

22   And can you, sitting here now, recall comments that Paula

23   Treantafelles made?

24        MR. PRICE:  Objection, your Honor.  It's beyond the

25   scope of my examination, and it was asked and answered in her

Page 4375

1   direct.  She went through each one of these.

2          MR. NOLAN:  Okay.

3   Q.  In any event, these are comments that were made at that

4   meeting, yes?

5   A.  Yes.

6   Q.  Here's my question:  Following all of these meetings or

7   any of the meetings, either September 29th or the October 6th

8   meeting, did you, Mrs. Leahy, as the sculptor, exactly follow

9   the directions or comments that were being offered to you?

10  A.  I put in my interpretation of it the best I could.  But

11  I wouldn't say directly follow is the right words.

12  Q.  I want to direct your attention to Trial Exhibit 1127-A.

13  I think that's in your book.  Do you have it?

14         Your Honor, may I approach the witness?

15         THE COURT:  You may.

16  Q.  BY MR. NOLAN:  Now, I've placed in front of you Exhibits

17  1127-A and -B.  And do you recognize these two exhibits?

18  A.  As the Steve Madden ad that Carter gave me.

19  Q.  Okay.  And there are two different copies of that

20  exhibit of that Steve Madden ad; correct?

21  A.  Correct.

22  Q.  Are these the actual copies that were provided to you by

23  Mr. Bryant?

24  A.  I can't remember if he gave me the actual magazine page

25  or copies of the magazine page.

Page 4376

1   Q.   If you look in I think it's the lower left-hand corner,

2   that's actually a photograph of the advertisement, is it not?

3   I'm sorry.  A copy of the advertisement itself; correct?

4   A.   Correct.

5   Q.   And can you tell whether or not there's a piece torn out

6   on the bottom corner?

7   A.   Yes, there is.

8   Q.   Which corner is that?

9   A.   The bottom left-hand corner.

10          MR. NOLAN:  Your Honor, we'd offer 1127-A and

11   1127-B.

12          MR. PRICE:  No objection.

13          THE COURT:  They are both admitted.

14          (Exhibits 1127-A and 1127-B received.)

15   Q.   BY MR. NOLAN:  This is a pretty poor quality color.  I

16   apologize.  But if I just point to the lower left-hand

17   corner, which is dark there, is that the torn-out piece?

18   A.   Yes.

19          MR. NOLAN:  Your Honor, do you mind if she just

20   displays that to the jury, not to pass it out, but just to

21   hold up the color version?

22          THE COURT:  Very well.

23   Q.   BY MR. NOLAN:  Thank you.  Ms. Leahy, can you just hold

24   it up?

25          Okay.  Thank you.

Page 4377

1          Now, during the questioning, Mr. Price referred to

2    that as the 1999 Steve Madden ad.

3          Do you recall that?

4    A.   I don't recall that he referred to it as that.  But I

5    believe you.

6          MR. PRICE:  I'll object.  I believe I referred to

7    the other exhibit in Seventeen magazine.

8          THE COURT:  What exhibit did you refer to?

9          MR. PRICE:  That was 10179-133.

10         THE COURT:  Very well.

11   Q.   BY MR. NOLAN:  Okay.  Mrs. Leahy, when Carter Bryant

12   gave you 1127-A and 1127-B, did he ever tell you that he had

13   torn this out of an August 1999 Seventeen magazine?

14   A.   No, he never said anything about it.

15   Q.   In fact, did he ever tell you what date of a magazine

16   that he had pulled this ad out of?

17   A.   No, he didn't.

18   Q.   I'd like to have you open up to the exhibit that

19   Mr. Price just referenced, which is the ad that did appear in

20   the 1999 Seventeen magazine.  That's Trial Exhibit 10179-133.

21         Your Honor, I believe that we have the original of

22   this.

23         THE COURT:  Very well.

24         MR. NOLAN:  To make this easier, I'll put up the

25   spiral bound copy.  I don't think Seventeen magazine comes

Page 4378

1    this thick, but we just made separate copies of it.

2           THE COURT:  Very well.

3    Q.   BY MR. NOLAN:  By the way, Mrs. Leahy, did Mr. Bryant

4    ever tell you that this Steve Madden ad was the inspiration

5    for his concept drawing?

6    A.   No.  He said it was inspiration for me.

7    Q.   I want you to look now at the August -- your Honor, I'm

8    going to approach with the original.

9           Your Honor, Exhibit 10179-1 through -3 is in

10   evidence.  May I just have the front page shown first?

11          THE COURT:  Yes.

12   Q.   BY MR. NOLAN:  Mrs. Leahy, you have the actual original

13   August 1999 Seventeen magazine; correct?

14   A.   Correct.

15   Q.   And I want you to turn to page 133.  And do you see the

16   Steve Madden ad?

17   A.   Yes.

18   Q.   Okay.  Now, what I'd like to do is ask you, the

19   right-hand side is the ad that appears in the original of the

20   August 1999 Seventeen magazine; correct?

21   A.   Correct.

22   Q.   Can you compare it to the tear sheet copy of the Devil

23   Angel Steve Madden ad that Carter Bryant provided to you in

24   September of 2000?

25   A.   Compare it in which way?

Page 4379

1    Q.    Well, are they the same ads?

2    A.    No, they are not.

3    Q.    And why not?

4    A.    Because where it says Steve Madden in the upper

5    left-hand corner is a different color.  There's different

6    words at the bottom of it.

7    Q.    And when you say at the bottom different wording, what

8    do you mean?  I apologize for the poor copy.

9    A.    Well, down by their feet, the one -- the one that I have

10   says jeanswear.  And then the other one says footwear,

11   jeanswear, sportswear, outer wear, et cetera.  At the bottom.

12   And it has writing up the side, the web address.

13             MR. NOLAN:  Your Honor, may I have permission to

14   publish the original Seventeen magazine ad of the Steve

15   Madden shoe ad as well as Exhibits 1127-A and -B that

16   Mr. Bryant gave to Mrs. Leahy?

17             MR. PRICE:  No objection.

18             THE COURT:  You may.

19             MR. NOLAN:  May I circulate to the jury?

20             THE COURT:  You may.

21             MR. NOLAN:  Thank you.

22   Q.    Mrs. Leahy, the last topic I want to go to is Mr. Price

23   was talking to you about the amount of compensation you've

24   received from MGA over the course of years.

25             Do you recall that?

Page 4380

1   A.   Yes, I do.

2   Q.   Do you still have Mr. Price's black notebook in front of

3   you?

4   A.   Yes.

5   Q.   And can you turn to Exhibit 12995.

6   A.   12995?  Yes.

7   Q.   12995.

8   A.   Okay.  I have it.

9   Q.   Okay.  And do you see this as a list of payments made by

10  MGA to Margaret Leahy?

11  A.   It is hard for me to understand.  It's a lot of letters

12  and numbers.

13  Q.   Okay.  But on the top it says --

14  A.   Okay, yeah, I see that.  Sorry.

15  Q.   It says payments made by MGA to Margaret Hatch Leahy?

16  A.   I see that it says that.

17  Q.   Was Margaret Hatch your maiden name?

18  A.   Hatch was my maiden name, yes.

19  Q.   Thank you.  And is it true that you received payments

20  from MGA from approximately December of 2000 through and

21  including May 26, 2005, for various projects that you were

22  asked to do for MGA?

23  A.   That sounds about right.

24  Q.   And the total amount of compensation or total payments

25  appears to be $534,516.04?

Page 4381

1   A.   Correct.

2          MR. NOLAN:  Your Honor, we'd offer Exhibit 12995.

3          THE COURT:  Any objection?

4          MR. PRICE:  No objection.

5          THE COURT:  Admitted.  You may publish.

6          (Exhibit 12995 received.)

7   Q.   BY MR. NOLAN:  These payments were for work that you did

8   sculpting; correct?

9   A.   Correct.

10  Q.   And not all the -- was all the sculpting that you did

11  for MGA related to Bratz?

12  A.   No, it wasn't.

13  Q.   You did other projects for them?

14  A.   Yes, I did.

15         MR. NOLAN:  Nothing further.  Thank you very much.

16         THE COURT:  Very well.  Anything further?

17         MR. PRICE:  Yes.

18                RECROSS-EXAMINATION

19  BY MR. PRICE:

20  Q.   Ms. Leahy, you were shown 1127 and then that Seventeen

21  magazine August 1999 ad.  I want to ask you this:  Yesterday,

22  when Mr. Nolan was examining you and he was asking you about

23  Exhibit 1127, did you notice that what he put on the screen

24  was 10179-133?

25  A.   Okay.  Let me get the numbers straight.

1    Q.    Fair enough.  I'll make it easy.  We'll put up 10179-133

2    because I'm asking you what was shown on the screen.  And my

3    question is yesterday, when Mr. Nolan was asking you about

4    the tear sheet, do you recall that the image he actually put

5    up was the one on the right, 10179-133?

6    A.    Well, I didn't know that because I didn't see them next

7    to each other.  I didn't know there were two different ones.

8    So I was just looking at the actual figures.

9    Q.    Sure.  And you understand what an ad campaign is?

10   A.    Yes.

11   Q.    And I take it before your deposition, you had time to

12   meet with your counsel; correct?

13   A.    Correct.

14   Q.    And did you meet with MGA's counsel as well?

15   A.    Which one was MGA's counsel?

16   Q.    Well, did you meet with some attorney other than your

17   own?

18   A.    Yes.

19   Q.    Okay.  Who was that?

20   A.    Do you want their names or the --

21   Q.    Yeah.

22   A.    It was Marcus.  When did we meet with them?

23   Q.    Before your deposition?

24   A.    Yeah, Marcus and Tom briefly and I can't remember the

25   other ones' names.

Page 4383

1   Q.   Marcus and Tom, are you referring to someone right

2   there?

3   A.   Marcus Mumford right there.

4   Q.   This gentleman here at counsel table?

5   A.   Yes.

6   Q.   And Tom, Mr. Nolan?

7   A.   And Tom Nolan, yes.  And Christian Dowell, D-O-W-E-L-L.

8   Q.   And prior to trial, did you meet with your counsel?

9   A.   Prior to trial, meaning today, did I meet with my

10  lawyer?

11  Q.   Yes.  Today or -- prior to yesterday, for example.

12  A.   Prior to yesterday, yes.

13  Q.   And did you meet with any counsel from MGA?

14  A.   Yes.

15  Q.   Who did you meet with from MGA?

16  A.   When?

17  Q.   Before you testified yesterday.

18  A.   Who did I meet with yesterday?

19  Q.   Before you testified yesterday, in preparing for your

20  trial testimony, what counsel from MGA did you meet with?

21  A.   I just need to know the date because there's different

22  people.

23  Q.   Between your deposition and the time you testified

24  yesterday, tell us the MGA attorneys that you met with.

25  A.   Well, I just did.

Page 4384

1    Q.   I mean after your deposition but before you took the

2    stand yesterday.

3    A.   Correct.

4    Q.   Okay.  So my question is at any time has anyone shown

5    you a picture from an ad campaign with those two figures on

6    it from 1998?

7    A.   Well, I don't know any of the dates.  I know I produced

8    this picture because I had it from when Carter gave it to me.

9    Q.   Well, you've seen the Seventeen magazine dated August

10   1999 that had that ad campaign in it; correct?

11            MR. NOLAN:  Objection.  Reference to the ad

12   campaign as being similar to this particular exhibit.

13            THE COURT:  Counsel, what's your objection?  No

14   speaking objections.

15            MR. NOLAN:  I'm sorry.  Mischaracterizes the

16   examples.

17            THE COURT:  Sustained.

18   Q.   BY MR. PRICE:  Let me ask it this way:  You said you are

19   familiar with an ad campaign; correct?

20   A.   Correct.

21   Q.   And you know that in ad campaigns, they will use similar

22   pictures and sometimes have different writing on those

23   pictures; right?

24   A.   Well, I never gave it any thought until yesterday or

25   today, wherever it was I saw the differences.

1    Q.   Okay.  Well, and that's because you didn't give it any

2    thought because your eye is drawn to the images, not the

3    little fine print; right?

4    A.   Correct.

5    Q.   Okay.  So my question is you've seen Exhibit 10179-133

6    taken from the August 1999 Seventeen magazine.

7    A.   That's the one with the pink circle.  Let's just say

8    that.

9    Q.   Okay.  Now, has anyone, up until now, shown you a copy

10   of that picture in an ad from 1998?  Has anyone shown you

11   anything like that?

12   A.   Which one is from 1998?

13   Q.   I can't answer questions.  I'd be glad to.

14          THE COURT:  As much as counsel would like to answer

15   that, you've got to answer questions, and not ask questions.

16   If you don't understand the question --

17          THE WITNESS:  Okay.  I don't understand the

18   question.

19   Q.   BY MR. PRICE:  Let me make it clear.  I've shown you and

20   Mr. Nolan has shown you Exhibit 10179, which is from an

21   August 1999 Seventeen magazine.

22   A.   The one with the pink circle.

23   Q.   Yeah.  So my question is has anyone ever shown you an ad

24   with the picture of those two figures in it in a magazine

25   dated 1998?  Has anyone shown you that?

Page 4386

1   A.   No, I have never seen this picture in any way, no matter

2   what version it is, in an actual magazine before today.

3   Q.   And Mr. Nolan also asked you whether or not

4   Ms. Treantafelles might have been there September 29th.  Do

5   you recall that?

6   A.   Correct.

7   Q.   And if we could put up pages 114 and 115.  I guess I

8   have just two questions.  Well, we'll see.

9        First, is it your testimony that it is possible,

10  although you don't remember it, but it's possible that on

11  September 29th Paula Treantafelles, a product manager at MGA,

12  attended a meeting with you and Carter Bryant, a Mattel

13  employee, before he even tendered his resignation to Mattel,

14  to give you comments about a sculpture for Bratz?  Are you

15  saying that's possible?

16       MR. NOLAN:  Objection, your Honor.  Argumentative,

17  argumentative, lack of foundation.

18       THE COURT:  As phrased, Counsel.  You've got to

19  rephrase the question.

20  Q.   BY MR. PRICE:  Let me put it this way:  I will represent

21  to you that the evidence is that Mr. Bryant didn't even

22  tender a resignation to Mattel until October 4th.

23       MR. NOLAN:  Your Honor, argumentative.  "He didn't

24  even tender."

25       THE COURT:  Rephrase.

Page 4387

1   Q.   BY MR. PRICE:   I'll represent to you that Mr. Bryant

2   doesn't claim to have tendered a resignation to Mattel prior

3   to October 4th.

4           So are you telling us that it's possible that

5   Mr. Bryant, before he even tendered a resignation to Mattel,

6   met with you and Paula Garcia, a product manager at MGA, to

7   give you comments on how to do a Bratz sculpt?  Are you

8   saying that's possible?

9   A.   Well, I'm saying it's possible that Carter and Paula

10  were there on the 29th.

11  Q.   And you're saying you got comments on your Bratz sculpt

12  on that day and then, to the best of your ability, made the

13  changes that were requested; right?

14  A.   Correct.

15  Q.   Now, I want to ask you this:  You see -- you look at

16  pages 1137-14 and 1137-15.  We've got them up here side by

17  side.

18          Do you see that on 1137-15, it looks like on the

19  October 6th entry, it looks like you're using a black pen.

20          Do you see that?

21  A.   Pen or a pencil.

22  Q.   Pen or pencil.  Okay.

23          And then on your September 29 entry, if we can get

24  the -- it looks like for the most part you're using a blue

25  pen; correct?

Page 4388

1  A.   Yeah.   That was my favorite blue pen with sparkly ink.

2  And it's purple.

3  Q.   Purple.

4  A.   The -- oh, I'm sorry.   No, that's the blue one.

5  Q.   These are copies.   So it may actually be purple.

6          You notice that Paula Treantafelles appears to be

7  in the same color pen or ink that you used on October 6th.

8          Do you see that?

9  A.   Um, well, it's black.

10 Q.   Do you have an explanation for that?

11 A.   It's just pens.

12          MR. PRICE:   Okay.   Nothing else.

13          THE COURT:   Mr. Nolan?

14          MR. NOLAN:   Nothing further.

15          THE COURT:   You are excused.   Thank you.

16          MR. NOLAN:   May we call our next witness?

17          THE COURT:   You may.

18          MR. NOLAN:   MGA calls Tim Kilpin.

19          MR. ZELLER:   Your Honor, may we be heard at sidebar

20 briefly?

21          THE COURT:   Very briefly.

22          (SIDEBAR CONFERENCE HELD.)

23          THE COURT:   Okay.   Yes.

24          MR. ZELLER:   A couple points, your Honor.   Number

25 one, I'm not sure it was fully resolved as to whether or not

1    they could use what we consider those collateral evidence to

2    try and impeach Ms. Ross.

3             THE COURT:  I did look at the most persuasive

4    argument that Mr. Nolan made that was the kind of goosey

5    gander rule because of the use of the collateral evidence

6    with Mr. Farhad Larian.  And I called for the transcript, and

7    no objection was made at that time.  The objection is being

8    made now.

9             It is an legitimate objection and does seem to be

10   collateral evidence to impeach given the time frame involved.

11   So I'll hear from you first on that before I make a final

12   ruling.

13            What you want to do is bring in the extra evidence

14   that he did tell Ivy Ross about the out thought and out

15   executed and brand in crisis.

16            MR. NOLAN:  Correct, your Honor.  It's same

17   argument that I made this morning.  Whether or not they are

18   now lodging an objection or not, in the beginning of the

19   case, testimony was elicited -- it's the same issue.

20            THE COURT:  Very well.  It was a fair basis for

21   exploring that on cross-examination.  And it's before the

22   jury.  I'm not going to allow collateral evidence in.  So

23   I'll sustain the objection on that.

24            However, these other areas that were discussed, it

25   all depends on your laying the foundation for getting into

Page 4390

1   them.  This is the secret meetings, the legal department

2   investigation, all of this apple apple to make sure we're

3   talking about a similar comparison here.  That's going to be

4   my guiding principle as best I can.

5            MR. NOLAN:  So just to be clear, I cannot ask him

6   whether or not it was his opinion, as the manager of the

7   girls division, that the Barbie brand was in a crisis?

8            THE COURT:  In 2004, no.  If he has an opinion and

9   you can lay a foundation for 2000 or 1999 at the time Carter

10  Bryant was there, I could see a potential relevant to this

11  case, but in years later, I am just really struggling to see

12  the relevance.

13           MR. NOLAN:  I understand.  We've made our

14  objection.

15           THE COURT:  And make sure, when I talk about the

16  foundation, just so you understand the Court's view of this,

17  there's nothing improper about recruiting.  There's nothing

18  improper about having interviews while you're still working

19  for another company.  And so evidence of that is not

20  relevant.

21           Now, doing work, if Mattel knowingly was engaged or

22  read through contracts to permit that, that might be

23  evidence, allowing work for a competitor, I suppose if that

24  foundation is laid; but simply the fact that someone is doing

25  an interview or was recruited, that's not what this case is

Page 4391

1    about, unless I'm missing something.

2              MR. NOLAN:  What if he says that he signed his

3    contract and continued to work at Disney for some period of

4    time?

5              THE COURT:  Depends what the contract provides.

6    And that's the foundation I'm talking about.  There's some

7    contracts that might provide it.  But if he did that, if he

8    worked at Disney before going to Mattel, while working at

9    Mattel, and Mattel doesn't know about that, it's shame on

10   him.  And that impeaches him.  And that may call into

11   question whether Disney approved of that or didn't.  But it

12   has no relevance to this case.

13             MR. ZELLER:  What I would suggest, your Honor, is I

14   think that in order to actually establish a proper

15   foundation, if he wants to go into that area, he has to

16   establish Disney didn't know.

17             THE COURT:  That Disney?

18             MR. ZELLER:  That Disney did not know.  I mean, in

19   the hypothetical situation he's talking about --

20             THE COURT:  I guess the problem I'm having is even

21   if Disney did not know and even if this guy, Kilpin here, is

22   not violating his contract, what relevance -- violating his

23   Disney contract -- what relevance would that have to Carter

24   Bryant's contract?  This is a breach of contract for selling

25   apples.  If a company breaches a contract for selling apples

Page 4392

1    and a company breaches a contract for selling oranges, I

2    think you understand the Court's ruling.

3                MR. ZELLER:  And the follow-on points I wanted to

4    make was that I assume we're not going to have a repeat of

5    the inflammatory language itself in front of the jury today?

6                THE COURT:  Mr. Nolan knows not to do that.

7                MR. ZELLER:  And the other point, and I would

8    probably request another sidebar, but so everyone is on

9    notice that in the event Mr. Nolan does go into these areas

10   and asks about the language, I think I'm entitled to elicit

11   from Mr. Kilpin his subsequent understandings of trade

12   secret --

13               THE COURT:  We're not going to go into that because

14   Mr. Nolan is not going to go into it.

15               MR. ZELLER:  Thank you.

16               (CONCLUSION OF SIDEBAR CONFERENCE.)

17               THE CLERK:  Would you please raise your right hand,

18   sir.

19                        TIM KILPIN, SWORN.

20               THE CLERK:  Please state your full name for the

21   record and spell the last name.

22               THE WITNESS:  Tim Kilpin, K-I-L-P-I-N.

23               THE CLERK:  Thank you, sir.

24   ///

25   ///

Page 4393

1      DIRECT EXAMINATION

2  BY MR. NOLAN:

3  Q.   Mr. Kilpin, we met at your deposition, I guess, a few

4  months ago; correct?

5  A.   Yes.

6  Q.   And how are you employed?

7  A.   I work at Mattel.

8  Q.   What is your current position?

9  A.   I am the general manager of the boys and games business

10  unit.

11  Q.   And prior -- well, how long have you worked at Mattel?

12  A.   About 17 years all together.

13  Q.   Was that in one continuous stretch, or did you have any

14  breaks?

15  A.   No, I've come back a couple times.

16  Q.   Can you just tell us maybe in a narrative form, just

17  tell me what the dates were where you were working at Mattel

18  and then where did you go work after leaving Mattel, and when

19  did you come back?

20  A.   I started in 1984 and left in 1988.  I'm sorry.  To work

21  at Tonka Toys and then left Tonka Toys in 1991 to return to

22  Mattel.  And I was at Mattel then until 1999.  And then for a

23  year I worked at an Internet company, and I worked at Disney

24  from 2000 until 2003 and returned to Mattel then.

25  Q.   During period of 1991 through 1999, after you had come

Page 4394

1    back from Tonka Toys, what was your area of responsibility at

2    Mattel?

3    A.   I had a couple of different areas of responsibility.

4    From 1991 until 1994, I oversaw Hot Wheels.  And then in

5    1994, I ran the boys group for a while.  And then from 1995

6    until 1999, I was overseeing the Disney business.

7    Q.   When you were overseeing the Disney business between

8    1995 and 1999, did you have any responsibility for any of the

9    Barbie brand?

10   A.   No, I did not.

11   Q.   During the period of 1999, did you undertake any review

12   of the status of the Mattel Barbie line?

13   A.   No, I don't recall doing that.

14   Q.   During this period of time that -- during, let's say,

15   1984 through 1999, in your various positions at Mattel, did

16   you ever have an occasion to work with outside inventors with

17   respect to any of their creations?

18   A.   We would work with inventors, outside inventors from

19   time to time.  Although that responsibility was mostly with

20   the design group, and most of my time was in marketing.

21   Q.   With respect to when you came back to -- well, during

22   that period of time, what interaction would you have with

23   outside inventors?

24   A.   During -- I'm sorry.  During which time?

25   Q.   Sure.  During 1991 through 1999.

Page 4395

1   A.   During that time, I would have occasionally seen

2   presentations by outside inventors.

3   Q.   Would you become involved in the negotiations of an

4   agreement that would be entered into with the outside

5   inventor?

6   A.   I typically would not.

7   Q.   Is that something that you would typically leave to the

8   legal department?

9   A.   We would --

10        MR. ZELLER:   Objection.   The question is vague.

11  Also assumes facts.

12        THE COURT:   Rephrase the question.

13        MR. NOLAN:   Sure.

14  Q.   During this time, and I'm now focused 1991 through 1999,

15  Mr. Kilpin, on those occasions when you were having meetings

16  with outside inventors, were those outside inventors pitching

17  ideas or concepts to Mattel?

18  A.   Yes, for the most part they were.

19  Q.   And were some of those pitches successful in the sense

20  that Mattel did accept the concept?

21  A.   I'm sorry.   We're talking about that whole time frame?

22  Q.   Yes.

23  A.   Well, yeah, I can't recall specifics, but there probably

24  would have been some products that we would have accepted.

25  Q.   Do you recall ever personally being involved in signing

Page 4396

1    up the outside inventor for some agreement with Mattel?

2    A.   I was usually not involved in that specific part of the

3    process.

4    Q.   Do you know whether or not any written agreements were

5    entered into between Mattel and an outside inventor?

6    A.   Well, that was a responsibility that was belonging to

7    the inventor relations group and to the attorneys.

8    Q.   During the period of -- when you say the attorneys, are

9    you referring to the Mattel attorneys?

10   A.   Yes.

11   Q.   So they wouldn't task you with that responsibility

12   during the period of 1991 through 1999?

13             MR. ZELLER:  Relevance.

14             THE COURT:  It's foundational.  Overruled.

15             THE WITNESS:  Can you ask the question again?

16             MR. NOLAN:  Sure.

17   Q.   So it was not within your responsibility, between 1991

18   and 1999, for you to engage in negotiations with the outside

19   inventors and memorialize that into a written agreement;

20   correct?

21   A.   Typically I was not responsible for that.

22   Q.   Now, after you left Disney -- I'm sorry.  After you left

23   Mattel, you went into the Internet business; correct?

24   A.   That's correct.

25   Q.   And sometime later you entered or you joined Disney;

Page 4397

1    correct?

2    A.   Yes.

3    Q.   Now, what was your starting date as Disney?  Do you

4    recall?

5    A.   I believe I started at Disney in November of 2000.

6    Q.   And what was your position at Disney?

7    A.   I was overseeing the toys business for Disney consumer

8    products.

9    Q.   And during this period of time, that is, November of

10   2000, when you were overseeing the toy division at Disney,

11   did you have responsibility for discussions with outside

12   inventors for Disney?

13             MR. ZELLER:  Relevance.

14             THE COURT:  That's foundational.  I'll permit it.

15   Overruled.

16             THE WITNESS:  We didn't really deal with inventors

17   at Disney.  We dealt primarily with, in that role, with

18   licensees, with other companies.

19   Q.   BY MR. NOLAN:  In your responsibility as head of the toy

20   group at Disney, would you be the one that would negotiate

21   the licensees for Disney?

22             MR. ZELLER:  Foundation.  Time period.

23             MR. NOLAN:  During the period he was employed at

24   Mattel -- at Disney.

25             THE COURT:  Overruled.

Page 4398

1       THE WITNESS:  For the period that I was at Disney

2   and responsible for the toy group, I was involved in the

3   negotiations with other companies' licensees.

4   Q.   BY MR. NOLAN:  When you say you were involve with it,

5   did you actually draft the license agreement?

6   A.   Typically, no, I did not.

7   Q.   Was there a particular department within Disney that you

8   would rely on for that?

9       MR. ZELLER:  Relevance.

10      THE COURT:  Counsel, where is this going in terms

11  of the time at Disney?

12      MR. NOLAN:  Just to his custom and practice with

13  respect to what type of investigation they would do before

14  they negotiated contracts.

15      THE COURT:  I'll sustain the objection.  Let's move

16  along to another area.

17  Q.   BY MR. NOLAN:  Turning your attention to the time that

18  you returned to Mattel, what year was that?

19  A.   I believe I said October of 2003.

20  Q.   And how long before you started working at Mattel were

21  you first contacted for this possible position?

22  A.   I'm sorry.  For the position at?

23  Q.   Mattel.

24  A.   At Mattel.  I had meetings at Mattel about that

25  position, I believe, in May of 2003.

Page 4399

1    Q.   Do you recall how many meetings you had at Mattel before

2    you accepted an offer from Mattel?

3              MR. ZELLER:  Your Honor, he hasn't laid the

4    foundation for this line of inquiry.

5              THE COURT:  Lay further foundation, Counsel.

6              No speaking objections, Mr. Zeller.

7    Q.   BY MR. NOLAN:  While you were interviewing at Mattel,

8    were you also employed at Disney?

9    A.   Yes, I was.

10   Q.   How many meetings or interviews did you have at Mattel

11   while you were still employed at Disney concerning possibly

12   returning to Mattel?

13             MR. ZELLER:  Foundation.

14             THE COURT:  Sustained.

15   Q.   BY MR. NOLAN:  Who did you interview with at Mattel

16   before accepting a position?

17   A.   I spoke with Alan Kaye and Matt Bousquette.

18   Q.   And who was Matt Bousquette?

19   A.   Matt was the president of Mattel brands.

20             MR. ZELLER:  Foundation.

21             THE COURT:  Counsel, the foundation you're

22   referring to is what we discussed at sidebar.

23             MR. ZELLER:  Yes.

24             THE COURT:  That was my indication.

25             MR. NOLAN:  I understand.

1  Q.   When you signed the contract or accepted the employment

2  at Mattel, did you continue to work at Mattel for some period

3  of time?

4          MR. ZELLER:  Foundation.

5          THE COURT:  I'm going to permit it.  I'm going to

6  instruct the jury if the foundation is not completed.  So

7  it's kind of a -- I'll permit the question.

8          THE WITNESS:  Can you ask the question again?

9  Q.   BY MR. NOLAN:  Did there come a time when you accepted a

10  position at Mattel?

11  A.   Yes.

12  Q.   And did you accept that offer while you were still

13  employed at Disney?

14  A.   Yes.

15  Q.   And after accepting the position at Mattel, did you

16  continue to work at Disney?

17  A.   After I accepted the position at Mattel, I resigned from

18  Disney.

19  Q.   Was the resignation effective immediately?

20  A.   Disney didn't want me to leave, and so they didn't

21  accept my resignation immediately.

22  Q.   And so how long did you continue to work at Disney after

23  you gave your resignation?

24  A.   I worked at Disney -- well, from May until October.

25          THE COURT:  Counsel, you're not done with that yet.

Page 4401

1     MR. NOLAN:  I know.  I'm getting there.

2     THE COURT:  I'm sorry.  I thought you were turning

3  to something else.

4  Q.   Now I want to turn your attention to the period after

5  you had accepted your offer from Mattel and while you were

6  still working at Disney.  You understand that's the limited

7  time period I'm asking you for?

8  A.   The time period between May -- help me understand.

9  Q.   May and October of 2003.

10 A.   Okay.

11 Q.   When you accepted the position at Mattel, you knew what

12 your title was going to be at Mattel?

13 A.   I did.

14 Q.   And that was going to be in charge of the girls

15 division?

16 A.   My role was going to be overseeing design and marketing

17 for the girls group.

18 Q.   During that period of time of the overlap, when you had

19 accepted your offer and you were still at Disney, did you

20 look at and follow the business activities of the girls

21 division at Mattel?

22     MR. ZELLER:  Objection.  Mischaracterizes the

23 testimony.

24     THE COURT:  The preamble there.  Why don't you

25 rephrase.

Page 4402

1   Q.   BY MR. NOLAN:   While you were still working at Disney

2   but had accepted your offer at Mattel and knew what your job

3   was going to be, did you do anything in terms of following or

4   understanding anything that was going on at Mattel regarding

5   the girls division?

6           MR. ZELLER:   Your Honor, foundation.   Sidebar,

7   relevance.

8           THE COURT:   Before we get into that, Counsel, let's

9   complete this foundational issue in terms of his ability to

10  do that, knowledge to the supervisors, et cetera, that we

11  spelled out at sidebar.

12  Q.   BY MR. NOLAN:   At what point in time in the interview

13  process did you advise Disney that you were starting to be

14  interviewed by Mattel?

15  A.   I don't really recall that.

16  Q.   Do you recall that you had actual interviews at Mattel

17  before you advised anybody at Disney?

18  A.   What I recall, talking to my boss at Disney at the time,

19  that I wasn't enjoying the role I had because I was no longer

20  involved in toys.   I had another role at Disney at that time.

21  Q.   And did you tell your boss at Disney that in fact you

22  were going to go out and look for a new job?

23  A.   I don't recall exactly how I phrased it to him.

24  Q.   Is it correct, though, that you accepted the position at

25  Mattel before you told Disney that you were going to accept

Page 4403

1    the position at Mattel?

2    A.    I did accept the position at Mattel.

3    Q.    Before you told Disney; correct?

4    A.    I believe so, yes.

5    Q.    Now, during the time that you were working at Disney for

6    that period of October through November of 2003, did Disney

7    tell you that you could do work for Mattel during that period

8    of time?

9    A.    I'm confused about the time line.  Can you ask that

10   again?

11   Q.    Again, it's October -- I'm sorry.  From the time that

12   you accepted the position at Mattel, which I believe you

13   testified was in May of 2003.

14   A.    Yes, that's correct.

15   Q.    Through the time that you started working at Mattel.

16   October -- I'm sorry.  May through October.

17              Do you understand the time period?

18   A.    Yes, I do.

19   Q.    And you resigned at Disney; correct?

20   A.    Yes.

21   Q.    And you've accepted your employment at Mattel; correct?

22   A.    Yes.

23   Q.    However, your resignation was not accepted, and you

24   continued to work at Mattel; correct?

25              THE COURT:  At Disney.

Page 4404

1    Q.   BY MR. NOLAN:   I'm sorry.   At Disney; correct?

2    A.   Well, what ultimately happened was I told Disney that I

3    wanted to go back to Mattel.   Disney didn't want me to leave

4    and asked me to stay.   And ultimately we decided for some

5    period of time that I was going to stay.

6    Q.   And during that period of time that it was decided that

7    you would stay at Disney, my question, sir, is did you have

8    permission from Disney to meet with people at Mattel and

9    start familiarizing yourself with what your new obligations

10   would be?

11            MR. ZELLER:   Foundation.

12            MR. NOLAN:   It is foundational, your Honor.   I'm

13   just asking as a foundational question.

14            THE COURT:   Very well.   But you're going to have to

15   close this loop soon, Counsel, or I'm going to cut this off.

16            THE WITNESS:   I didn't ask permission because I

17   didn't expect to do anything for Mattel while I was working

18   for Disney.

19   Q.   BY MR. NOLAN:   And, in fact, did you do anything in

20   connection with Mattel while you were also working at Disney

21   during that period of time?

22   A.   No, I did not.

23   Q.   Do you recall seeing Bratz -- when was the first time

24   you saw Bratz?

25            MR. ZELLER:   Your Honor, I would at this point move

Page 4405

1    that the entire line be stricken for lack of foundation, lack

2    of relevance.

3              THE COURT:  I think it is of no moment, but there

4    was no foundation laid.  That line of questioning is of no

5    moment.

6              Move along, Counsel.

7    Q.   BY MR. NOLAN:  When was the first time you saw Bratz?

8    A.   I don't recall exactly when the first time I saw Bratz

9    was.  I don't recall the exact time.

10   Q.   Do you recall meeting Mr. Larian at a New York Toy Fair?

11   A.   I recall touring Mr. Larian's showroom at Toy Fair in

12   2002.

13   Q.   And who were you employed with at that time?

14   A.   I would have been employed at Disney.

15   Q.   When you were at Mattel and returned to Mattel in your

16   last stint, did you have occasion to meet with and negotiate

17   employment agreements with outside inventors?

18   A.   I'm confused about time frame again.

19   Q.   Sure.  When you accepted your position and you go to

20   work at Mattel; all right?  Last time.

21   A.   Yeah.

22   Q.   During that period of time, when you were overseeing the

23   girls division, did you negotiate with outside inventors who

24   came to you with concepts?

25             MR. ZELLER:  Relevance.  Time period.

Page 4406

1          THE COURT:  Sustained.

2    Q.   BY MR. NOLAN:  Isn't it true that as an executive at

3    Mattel, in any of your dealings with outside inventors, you

4    would rely on the legal department at Mattel to negotiate the

5    terms of those contracts?  Yes or no?

6          MR. ZELLER:  Relevance.  Foundation.

7          MR. NOLAN:  Your Honor, industry custom and

8    practice.  Those questions were asked of Mr. Larian with

9    respect to what extended investigation was done in his

10   negotiations.

11         THE COURT:  Practice at the time in question in

12   this case.  If you lay that foundation for this witness, you

13   may ask the questions of this witness as well.

14         MR. NOLAN:  Okay.

15   Q.   During the period of 2000, do you recall ever

16   negotiating an agreement with an inventor and memorializing

17   that in writing yourself?

18         MR. ZELLER:  Your Honor, assumes facts not in

19   evidence.

20         THE COURT:  As to what?

21         MR. ZELLER:  Asking about the year 2000.  Assuming

22   he was doing any of this for anybody at that time.

23         THE COURT:  That's implicit in the question.  I'll

24   overrule the objection.  You may answer.

25         THE WITNESS:  In 2000 I was working for an Internet

Page 4407

1    company.

2    Q.   BY MR. NOLAN:  I understand.  Thank you.

3          My last question is during the -- at any time in

4    the 1999, 2000 time period, did you ever undertake any review

5    of the marketing efforts of Mattel for the Barbie line?

6    A.   In 1999, 2000?

7    Q.   During that time period.

8    A.   Well, I worked at Mattel up until October of 1999.

9    Q.   So up until that period of time.

10   A.   I don't recall ever doing that.

11          MR. NOLAN:  Thank you.

12          MR. ZELLER:  No questions, your Honor.

13          THE COURT:  You are excused.

14          MR. NOLAN:  Your Honor, MGA would call Mr. Richard

15   De Anda.

16          THE COURT:  Very good.

17          THE CLERK:  Please remain standing and raise your

18   right hand.

19                RICHARD DE ANDA, SWORN.

20          THE CLERK:  Thank you, sir.  Please be seated.

21          THE WITNESS:  Thank you.

22          THE CLERK:  Please state your full name for record,

23   and spell the last name.

24          THE WITNESS:  Richard De Anda, D-E capital A-N-D-A.

25          THE CLERK:  Thank you.

Page 4408

1                             DIRECT EXAMINATION

2      BY MR. NOLAN:

3      Q.   Good afternoon, Mr. De Anda.   How are you employed?

4      A.   I'm employed at Mattel as vice-president of global

5      security and investigations.

6      Q.   And how long have you been in that position?

7      A.   Approximately 10 years.

8      Q.   And before joining Mattel, where were you employed?

9      A.   I was the president of my own company that managed a

10     high end financier for two years.

11     Q.   And what was the name of that company?

12     A.   Exec Pro.

13     Q.   Prior to that, how were you employed?

14     A.   Prior to that, I was employed by the Hagen Company, an

15     REIT, a real estate investment company, which was located in

16     Manhattan Beach.

17     Q.   Was there a period of time where you worked for the

18     Los Angeles Police Department?

19     A.   Yes, that is correct.

20     Q.   For how long were you employed at the Los Angeles Police

21     Department?

22     A.   Just a little over 20 years.

23     Q.   Now, during the period of time that you've been employed

24     by Mattel as the vice-president of security and

25     investigations -- I'm sorry -- security vice-president of

Page 4409

1   global security at Mattel, do you have any other business

2   activities?

3   A.   Yes, I do.

4           MR. ZELLER:  Foundation.

5           THE COURT:  Ordinarily, this would be background,

6   but given the issue involved, Counsel, let's lay the

7   foundation we discussed.  You are talking about current other

8   business activities, or are you talking about his background?

9           MR. NOLAN:  Current experience.

10          THE COURT:  Lay the foundation we discussed.

11  Q.   BY MR. NOLAN:  Mr. De Anda, when you signed on at Mattel

12  to be head of security, did you seek from Mattel permission

13  to do outside work unrelated to Mattel?

14  A.   I advised my direct report, Mr. Alan Kaye -- in fact I

15  have two corporations -- that I would be continuing with

16  that, would that be an issue.  And he said no, so long it's

17  not in conflict with Mattel's interest or impedes my ability

18  to perform at Mattel.

19  Q.   Now, did you receive written permission to engage in

20  those outside activities?

21  A.   You know, I don't recall if I did or didn't.  I don't

22  believe I did personally receive any written permission form.

23  Q.   From time to time -- let me approach it this way.  As

24  you have engaged in outside business activities, have you

25  gone back to Mattel and sought permission for each of those

Page 4410

1   assignments?

2   A.   It's not that I have sought permission.  I have pretty

3   much explained to Alan Kaye that I was either investigating a

4   case or working on a matter, yes and I don't know if it's for

5   every single one or not.  I couldn't be certain on that.

6   Q.   And would you notify Mr. Kaye before you accepted a

7   particular assignment from a client outside of Mattel to do

8   the work that was requested?

9   A.   I would say probably in most cases, but probably not all

10  cases, because some of them were so insignificant and had no

11  value of anything.

12  Q.   How do you assess whether or not it was significant or

13  not before you would seek permission or advise Mr. Kaye that

14  you were going to take on outside activities?

15  A.   Typically, if it was involved in any time, I would say.

16  Sometimes I would -- if I may.

17  Q.   Now, prior to joining Mattel, you had worked with

18  Mr. Kaye beforehand; correct?

19  A.   That's correct.

20            MR. ZELLER:  If I may, your Honor, there's no

21  foundation for that entire last line about --

22            THE COURT:  Overruled.  I think that's fine.

23  Q.   BY MR. NOLAN:  You had worked with Mr. Kaye beforehand;

24  correct?

25  A.   Yes.

Page 4411

1    Q.    And how long have you known Mr. Kaye?

2    A.    I believe I met Mr. Kaye in 1998.

3    Q.    Help me out with the math.  I'm just wondering, the math

4    by the time of when you first met Mr. Kaye before joining

5    Mattel.

6    A.    Probably nine years, nine to ten years.

7    Q.    Did you work with Mr. Kaye in any business?

8    A.    I provided services for him while he was at Kaufman &

9    Broad.  And I can't recall anything else.

10   Q.    And did you ever do any work with him in connection with

11   Columbia Savings?

12              MR. ZELLER:  Relevance.

13              THE COURT:  Counsel?

14              MR. NOLAN:  This is exploring the relationship

15   between the two, your Honor.  Foundation.

16              THE COURT:  All right.

17              THE WITNESS:  I reported to Alan Kaye at Columbia

18   Savings.  I don't know if I did work for him.  I did work for

19   the business.

20   Q.    What was your position at Columbia Savings?

21   A.    I was the vice-president of security and investigations.

22   Q.    What was Mr. Kaye's position?

23   A.    He was the senior vice-president of Human Resources.

24   Q.    And how long did the two of you work at Columbia

25   Savings?

Page 4412

1  A.   Probably just under three years.

2  Q.   Now, coming back to your time at Mattel, has there been

3  anyone else at Mattel other than Alan Kaye that you spoke to

4  concerning this business activity of yours on the side

5  outside of Mattel?

6  A.   I spoke to in what capacity?  In any capacity?

7  Q.   In a supervisory capacity.

8  A.   Being that he is my supervisor, I don't believe so, no.

9  Q.   Did you talk to -- do you recall any discussions with

10  any other person in management at Mattel other than Alan Kaye

11  concerning the outside services that you are engaged in?

12  A.   At the present time, over a 10-year period, I don't

13  believe I did.  I can't recall if I did or didn't, but I

14  don't believe I did.

15  Q.   Do you know a woman by the name of Isabel Cabrera?

16  A.   Yes.

17  Q.   Who is Isabel Cabrera?

18  A.   Excuse me.  Isabel Cabrera is a sample-maker.

19  Q.   Employed by whom?

20  A.   Was employed by Mattel, I believe.

21  Q.   During what period of time was she employed?

22       MR. ZELLER:  Foundation.

23       THE COURT:  Sustained.

24  Q.   BY MR. NOLAN:  Do you know how long Isabel Cabrera

25  worked at Mattel?

Page 4413

1  A.   I don't recall the exact period of time.

2  Q.   Isn't it true, Mr. De Anda, that you conducted an

3  interrogation --

4            MR. ZELLER:  Your Honor, this is exactly what we --

5            THE COURT:  Sidebar, Counsel.

6            (SIDEBAR CONFERENCE HELD.)

7            THE COURT:  Where is this going, Counsel?

8            MR. NOLAN:  Your Honor, I said that I was going to

9  ask him questions about Isabel Cabrera.  They said that he

10 wouldn't have personal knowledge as to --

11           THE COURT:  You indicated you were asking about

12 firing her.  Now we're into an interrogation.

13           MR. NOLAN:  Well, the investigation that he

14 conducted of Ms. Cabrera.

15           THE COURT:  Let's lay a foundation before we get

16 there.  I don't want you throwing -- and I'm going to

17 continue to maintain the belief that you're not doing this

18 intentionally.  Because it's bordering on a fictional belief

19 on the Court's part.  But please --

20           MR. NOLAN:  Your Honor --

21           THE COURT:  Please lay a foundation before you

22 blurt these things out.

23           MR. NOLAN:  Your Honor, there is no doubt that he

24 conducted an investigation.

25           THE COURT:  But that's not what's relevant.  What's

Page 4414

1   relevant and we established at sidebar was whether or not he

2   knows, and you can get evidence in that she was fired, an

3   inference made that it was in retaliation for --

4           MR. NOLAN:  Your Honor, I go directly to the

5   comment about this fictional belief.  I am honoring the

6   guidelines that I'm being provided.

7           THE COURT:  This is the first time you've mentioned

8   that you wanted to ask questions about interrogation.  I have

9   my notes.

10          MR. NOLAN:  I'm not up here giving you a proffer on

11  everything I'm getting into.  The reason why I want to ask

12  this gentleman questions is that we listened to testimony

13  from Peter Marlow that there were seamstresses at Mattel that

14  were concerned about their work at Mattel if they were doing

15  outside services.

16          THE COURT:  But the only relevance of the Peter

17  Marlow testimony is whether or not MGA knew that Mattel

18  employees were working for them.  That was it.

19          MS. AGUIAR:  May I add something, because I was the

20  one handling the Peter Marlow witness.

21          THE COURT:  Yes.

22          MS. AGUIAR:  Mr. Zeller stood here at numerous

23  sidebars and said that Mr. Marlow's credibility was very much

24  at issue.  And to the extent that Mr. Marlow's credibility

25  was put at issue by Mattel, not by us, but by Mattel, I

Page 4415

1   believe that we need to be able to elicit from this witness

2   or from any other appropriate witness testimony regarding

3   what in fact happened to those seamstresses once their names

4   were revealed to Mattel.

5           THE COURT:  I would agree with you, Counsel, if

6   that somehow rehabilitated Mr. Marlow's credibility.  How

7   does it do that?

8           MS. AGUIAR:  Because Mr. Marlow testified in detail

9   that he kept the names of those women secret and kept them

10  confidential for a reason and that they were -- there was

11  concern about what would happen if that wasn't the case.

12          THE COURT:  All right.  So let me think this

13  through.  So Marlow says we're keeping these secret because

14  we don't want them retaliated against.  You want to introduce

15  evidence that they were retaliated against to bolster his

16  position?

17          MR. NOLAN:  The moment that the names of the

18  seamstresses were disclosed in the Veronica Marlow --

19          THE COURT:  I understand.  They got fired.

20          MR. NOLAN:  A deposition that was marked AEO was

21  turned over to Mr. De Anda, who is not AEO.  And they

22  conducted an interrogation.  And I wanted to establish, as

23  Ms. Aguiar was getting into, that that bolsters the

24  credibility of Mr. Marlow, who we objected to, said it wasn't

25  relevant --

Page 4416

1          THE COURT:  Please, we don't have the time,

2     Counsel.  On the credibility issue alone.

3          MR. ZELLER:  Well, your Honor, number one, I will

4     say for the record because it has now happened repeatedly

5     over the course of two days.

6          THE COURT:  I said the credibility issue alone.

7          MR. ZELLER:  On the credibility issue, the fact is

8     it does not, as the Court has noted, do anything to

9     rehabilitate Peter Marlow.  We are well outside the time

10    period.  First and foremost.  The only reason we were into

11    the time period where these sample makers were terminated,

12    which was this year, is because MGA opened the door.  They

13    cannot use their opening the door and my attack on Peter

14    Marlow's credibility as a result of their opening the door,

15    then, to open the door further as to this witness.  It is

16    collateral and extrinsic.

17         THE COURT:  I don't know if I agree with that.  I

18    agree that -- I'll tell you what my concern is.  That this is

19    an effort just to basically go back and make, you know,

20    Mattel look bad.

21         And I am reserving all of these affirmative

22    defenses to Phase 1-B, and you are going to have your

23    opportunity to get into all of this stuff in Phase 1-B.  But

24    not now.

25         Now, in terms of the narrow issue of credibility,

Page 4417

1   if the seamstresses were in fact fired, which they were, and

2   I understand they were, and understanding they were, once

3   Mattel found out that they had basically been doing

4   something.  But that's not a point in contention.  Is there

5   any way we can simply stipulate to that?

6           MR. ZELLER:  If the Court is willing to take

7   judicial notice that there were in fact administrative law

8   determinations, that the terminations were with cause, we

9   will do it.  But to, you know, to open this door, because

10  then, of course, what the Court is going to have to allow us

11  to do is put on witnesses who actually do know what occurred,

12  and we will put on that evidence.

13          There are court decisions and a whole variety of

14  reasons why we were totally justified in doing it.  It would

15  be a complete side show, but we will do it.  But going

16  through this witness, this witness has no foundation for it.

17  And Mr. Nolan's question is interrogation.

18          THE COURT:  Does this witness know whether they

19  were fired?

20          MR. NOLAN:  Your Honor, I'm sure he does.  He said

21  he thought that they used to work there.

22          THE COURT:  Why don't we simply ask that one

23  question.  I'm not going to get into this interrogation --

24          MS. AGUIAR:  May I make a suggestion?  That we take

25  you up on the stipulation about them being fired.  I don't

Page  4418

1    think it's reasonably in dispute.

2              THE COURT:  Is that something you can do?

3              MR. ZELLER:  I would want to talk with the client,

4    obviously.  It's totally irrelevant first and foremost, your

5    Honor.  It is irrelevant.

6              THE COURT:  I --

7              MR. ZELLER:  It does nothing for the credibility,

8    and it is, by the way, as we were talking about earlier,

9    collateral.  And we can't be bolstering witnesses'

10   credibility through --

11             THE COURT:  That's an impeachment.  That's an

12   impeachment argument.  In this case, it's bolstering.

13             MR. ZELLER:  But bear in mind how we end up where

14   we are.  They opened the door to it, and now they are trying

15   to basically rehabilitate his credibility by opening the door

16   further.

17             THE COURT:  I think it's a fair point for the jury

18   to understand in a nonpejorative way towards Mattel that they

19   were terminated as a result of basically violating -- it's

20   not something that -- I don't see how that's prejudicial to

21   you.

22             MR. ZELLER:  I don't see how it's relevant, and I

23   do think it's prejudicial because then we're going to be

24   attacked for how they were treated, how they were terminated,

25   the whole bit, and we are going to have to bring a bunch of

Page 4419

1    witnesses in --

2          THE COURT:  I can instruct the jury that they are

3    not to consider any of that information.

4          MS. AGUIAR:  And we will, if we get the stip, leave

5    it at that.

6          THE COURT:  We're wasting a lot of time right here.

7    I'm going to sustain the objection.  I want to give you leave

8    perhaps to bring in this particular issue on the termination.

9    That's the only thing that may be relevant, and let's take

10   that up after this witness.

11         MR. ZELLER:  But I would ask that the Court

12   instruct that this be phrased in a neutral way, and not even

13   about termination.

14         THE COURT:  We'll work that out amongst ourselves.

15         MR. ZELLER:  But Mr. Nolan has been blurting these

16   things out repeatedly in front of the jury.

17         THE COURT:  We've got to stop with this.  The

18   interrogation, you're not going to come close to the

19   interrogation.  I thought I made it clear at sidebar that you

20   could lay the foundation with this witness about the

21   termination.  And that's all I said.  And that's all you

22   said.  And now to start with interrogation is -- it wasn't

23   even a completed question.  So let's make this of no moment.

24   I'm going to sustain the objection.

25         MR. NOLAN:  This is the last question.  So I don't

Page 4420

1   have to get back here.

2           THE COURT:  Is this your last question?

3           MR. NOLAN:  I want to ask this if I can.  Did you

4   conduct an interview of Isabela Cabrera.  Do you know whether

5   or not Isabela Cabrera is still employed at Mattel.  Those

6   are the two questions that I was going to ask.

7           THE COURT:  If you're willing to leave it, then, at

8   that and be done with this whole thing, that's fine.

9           MR. NOLAN:  I will be.

10          MR. ZELLER:  But understand he does not have the

11  foundation.  The only thing he knows is whether other people

12  told him.

13          THE COURT:  Then that's the end of this termination

14  discussion.

15          MR. NOLAN:  Yes.

16          THE COURT:  Very well.

17          MR. NOLAN:  Can we get a stipulation?

18          MR. ZELLER:  I have to talk with the client first

19  on something like this.  I do have some reservations about

20  the relevance.

21          THE COURT:  I understand.  We'll take that up

22  outside.

23          MR. NOLAN:  Did he interview her.

24          THE COURT:  And is she still with Mattel.

25          MR. NOLAN:  Thank you.

Page 4421

1        (CONCLUSION OF SIDEBAR CONFERENCE.)

2   Q.   BY MR. NOLAN:  Mr. De Anda, have you ever interviewed

3   Isabela Cabrera?

4   A.   Yes.  I know her as Anna Cabrera.

5   Q.   I may be wrong.  Anna Cabrera.

6        Do you know whether or not Anna Cabrera is still

7   working at Mattel?

8   A.   I believe she is not.

9        MR. NOLAN:  Nothing further.

10        THE COURT:  Very well.  Cross-examination?

11                   CROSS-EXAMINATION

12   BY MR. ZELLER:

13   Q.   Mr. Nolan didn't ask you what it is that you have

14   done --

15        THE COURT:  Counsel, rephrase your question from

16   the start.

17        MR. ZELLER:  Thank you, your Honor.

18   Q.   There was some discussion during your examination about

19   some of the work that you have done over the years while at

20   Mattel.  I can't recall exactly how it was phrased, but the

21   idea was outside employment.

22        Do you recall those questions?

23   A.   Yes.

24   Q.   Why don't you tell us what it is that you've done as

25   this outside employment?

Page 4422

1   A.    Well, I've had -- I own a corporation by the name of

2   Richard De Anda and Associates.  I've owned it since the

3   70's, and basically what it provides is investigative and

4   security services.  Since I've been with Mattel, I do

5   virtually no work at all with Richard De Anda and Associates.

6   It amounts to just maybe 50 hours a year, if that.

7          But I'm very selective.  I have attorney friends,

8   believe it or not, that I do services for.  And mainly to do

9   with some of my cases have involved children.  And I

10  represent -- some of the cases involve children that I assist

11  the attorneys, assist in the cases.

12  Q.    Without going into the details, when you say involve

13  children, what are you talking about?

14  A.    I do expert witness testimony, and sometimes I provide

15  my expert opinions where a child has been assaulted, let's

16  say.

17  Q.    Now, does any of this activity have anything to do with

18  the toy business?

19  A.    No, none whatsoever.

20  Q.    Has it ever had anything to do with this line of

21  business that Mattel has been in?

22  A.    No.

23  Q.    And if I understand what you've been saying correctly,

24  the business that you've been talking about, this limited

25  outside activity, has involved testifying as an expert in

Page 4423

1    court and investigations?

2    A.   Yes.

3    Q.   And as far as you know, Mattel has never been in the

4    investigation business.  It doesn't have a private eye

5    business, does it?

6    A.   No, it doesn't.

7              MR. NOLAN:   Objection.  Lack of foundation.

8              THE COURT:   Sustained.

9    Q.   BY MR. ZELLER:  Well, do you know of any business, line

10   of business of MGA that -- of Mattel that competes with these

11   outside activities that you've done?

12   A.   No, I do not.

13   Q.   What is it that you did when you came out of high

14   school?

15   A.   I went to college for a short period of time.  Then I

16   went into the United States Marine Corps.

17   Q.   Now, in terms of the activities that you were

18   describing, expert services and these investigation services,

19   which I think you said mainly is related to children, were

20   you doing that prior to the time that you joined Mattel?

21   A.   Yes.

22   Q.   And at the time when you went to Mattel, did you tell

23   people at Mattel that you had those businesses?

24   A.   Alan Kaye was well aware because, as I recall, he knew

25   of it back in the Columbia Savings days and knew that I had

Page 4424

1   provided services for him at Kaufman & Broad also.

2   Q.   And, Mr. Kaye, as you were talking about, was the head

3   of HR there at Mattel?

4   A.   Yes.

5   Q.   And so you had discussions with him which you advised

6   him about these activities prior to the time that you began

7   working at Mattel?

8   A.   Yes.

9   Q.   And as far as you know, Mr. Kaye has been aware and has

10  given permission for these activities since the time you've

11  been at Mattel?

12          MR. NOLAN:   Objection.   Lack of foundation.

13  Misstates his testimony.

14          THE COURT:   As far as you know.   It's compound.

15  Let's rephrase it, Counsel.

16          MR. ZELLER:   Sure.   Thank you, your Honor.

17  Q.   Do you have any reason to believe that -- well, I'm

18  sorry.   Strike that.   I'll start it over again.

19          As far as you know, has Mr. Kaye been aware of the

20  investigation activities and the expert witness activities

21  that you've done since you've been at Mattel?

22  A.   For the most part.

23  Q.   Well, I'm not talking about on a specific assignment by

24  assignment basis.   I'm saying just generally speaking, he's

25  been aware that you've been doing this?

Page 4425

1    A.    Absolutely.

2              MR. ZELLER:  I have nothing further.  Thank you.

3              THE COURT:  Mr. Nolan?

4              MR. NOLAN:  Your Honor, I apologize for this.  Can

5    we have a two-minute sidebar?

6              THE COURT:  Why don't we take our afternoon break.

7              (WHEREUPON THE JURY WITHDRAWS.)

8              THE COURT:  Please be seated.

9              MR. NOLAN:  Your Honor, may I --

10             THE COURT:  Hold on a second.

11             All right.  Yes.

12             MR. NOLAN:  Could I do this outside the presence of

13   the witness?

14             THE COURT:  Yes, if you would step outside.  Thank

15   you.

16             (The witness withdraws from the courtroom.)

17             MR. NOLAN:  Your Honor, Mr. Zeller, in his

18   examination of Mr. De Anda, elicited from Mr. De Anda that

19   his private company on the side does not compete with Mattel.

20             THE COURT:  Yes.

21             MR. NOLAN:  For services.  And he specifically

22   asked whether or not Mattel does any investigations or

23   investigative surveillance.  He didn't use the word

24   surveillance.  But I think that -- and I think he has opened

25   the door for me to ask whether or not in fact Mattel has

Page 4426

1    hired his outside company to conduct investigations or

2    conduct surveillance.

3          THE COURT:  Why would it open the door for that,

4    Counsel?

5          MR. NOLAN:  Because for impeachment purposes,

6    Mr. Zeller knowingly raised an issue in this case by

7    suggesting that Mattel does not do any of these types of

8    services, and so therefore, he's allowed to do this.  But

9    what we want to establish --

10         THE COURT:  Wait a second.  Maybe I'm just missing

11   the logic of this.  But what he was asking was whether Mattel

12   itself does surveillance as opposed to -- that would compete

13   with his company's surveillance.  And what you're saying is

14   that Mattel wanted to do the surveillance, assuming they did,

15   and I'm not saying Mattel did, but assuming they did, they

16   didn't do it themselves.  They went to an outside source,

17   namely, this witness.

18         MR. NOLAN:  That's right.  Who is wearing two hats.

19   That's my proffer.  I wanted to get clearance from, but he

20   clearly opened the door just from a credibility point of

21   view --

22         THE COURT:  No.

23         MR. NOLAN:  -- for me to be able to say that when

24   Mattel hires outside private investigators, they do so

25   through his agency, or he hires them.

Page 4427

1          THE COURT:  How is that a conflict?

2          MR. NOLAN:  It doesn't go to the issue of conflict,

3    your Honor.  It goes to the fact that Mr. Zeller made this

4    point that Mattel doesn't do this.

5          THE COURT:  He made it for the purpose of showing

6    that there was not a conflict.  This was responding -- I

7    mean, you raised this whole thing to establish, I presume,

8    and it's not clear what evidentiary value it would have, but

9    that some other employee did exactly what -- let's not forget

10   that this case is about Carter Bryant and what Carter Bryant

11   did and what MGA knows or doesn't know that Carter Bryant

12   did.

13          And the argument is that Carter Bryant broke his

14   contract with Mattel, and you want to argue that somehow, and

15   it's a weak link to begin with, that because somebody else

16   may have broken their contract with Mattel, that that is

17   evidence that relates to Carter Bryant breaking his contract

18   with Mattel.

19          Nothing I heard from this witness suggests that he

20   was in violation of any contract, but rather, there was

21   acquiescence by Mattel in doing this outside, unrelated,

22   noncompetitive work.  How would evidence that Mattel actually

23   use that work?  If anything, that undercuts any potential

24   conflict, suggesting that not only was Mattel aware of his

25   outside work, but actually utilized his outside work.

Page 4428

1           I mean, the more I think about it, that actually

2     further undercuts any potential relevancy and bolsters the

3     credibility of the position that is being taken.

4           MR. NOLAN:  Well, your Honor, the record is what it

5     is.

6           What I understand is that he testified under oath

7     contrary to what your Honor just said, that he did not get

8     permission for every assignment that he got at Mattel.  We

9     know that Mr. Eckert didn't know he was doing outside work,

10    and so his friend has told him it's okay to do.  I guess --

11          THE COURT:  Obviously he had permission to do the

12    work that Mattel hired him to do.

13          MR. NOLAN:  On that part of it.

14          THE COURT:  So that part is not relevant to

15    impeach.

16          MR. NOLAN:  Your Honor, I just think that they

17    created --

18          THE COURT:  You had something else.  If there was

19    some other work that falls in this subcategory of things that

20    he did not tell Mattel about and that competes with Mattel,

21    that would be the type of impeachment that you would now

22    be -- that the door would be opened to, but certainly not

23    something that Mattel itself commissioned him to do, because

24    that would certainly be known to Mattel and wouldn't be a

25    conflict with Mattel.

Page 4429

1        MR. NOLAN:  Of course, I don't know that.  We don't

2  know that because we have not been allowed to take the

3  deposition or get the records from De Anda and Associates.

4        So we don't know whether or not they are doing any

5  business that is in conflict with Mattel.  I'm blocked in

6  that regard.  I've accepted -- I understand the Court's

7  ruling in that regard, and I also understand the Court's

8  ruling with respect to that.  I made my point.  I thought

9  the door was open.  I just have one brief question for

10  Mr. De Anda when he resumes.

11        THE COURT:  Very well.  Anything further,

12  Mr. Zeller?

13        MR. ZELLER:  No, your Honor.

14        MR. NOLAN:  Your Honor, would the Court entertain

15  at some point in time a ruling on Mr. Palmer?

16        THE COURT:  Sure.  Why don't we do that now.

17        My inclination on this is to let -- let me deal

18  with the general objection and hear the general objection

19  first.  I think that MGA is correct on this, that this should

20  come in.  I don't see any basis to keep missing October month

21  out.  So I'll hear from somebody on that.

22        MR. ZELLER:  I mean, I think the Court put it

23  perfectly well the other day, which is at MGA's behest, there

24  have been certain standards that have been applied before

25  this kind of evidence comes in.  We were precluded --

Page 4430

1          THE COURT:  Right.  But now I've read Mr. Palmer's

2    deposition.  And the Court has considered that testimony now,

3    and so now -- I mean, Mr. Price just asked a few minutes ago

4    about molds being -- that have disappeared.  The jury has

5    heard on both sides a lot of testimony about stuff that's no

6    longer available for whatever reason.  Mr. Palmer doesn't

7    know where they are.  I don't think there's any evidence that

8    anyone intentionally destroyed these.  I haven't seen any

9    evidence.  But they are missing.

10          MR. ZELLER:  Fair enough, your Honor.

11          THE COURT:  Certain molds are missing.  Certain

12   drawings are missing.  Certain what else?  I had another

13   thought.  Things are missing.

14          Now, I thought there was going to be something

15   about an intentional destruction here.  And there's no

16   evidence of that.  So there's no evidence -- there's not

17   going to be an adverse jury instruction with the Evidence

18   Eliminator thing, and we went through the hoops on that.

19   That was because there was an actual negative inference

20   implicit, if not explicit, in how that went along.

21          Here we're missing a month of telephone records.

22   We don't know why.  They are missing.  I think it's only fair

23   to MGA that a jury knows that they are missing.  It's not

24   like they are there.  If someone's got to account for why

25   they are missing, it's going to have to be Mattel.  Certainly

1   not MGA.  That's my reasoning up to this point.  But I'll

2   hear from you on this.

3          MR. ZELLER:  And you know, your Honor, taken in a

4   vacuum, I'm not sure that I would necessarily have a lot of

5   disagreement with what the Court had said.  If that had been

6   the standard that we applied since the beginning of the

7   trial.

8          THE COURT:  That is the standard to innocuous -- I

9   understand your concern about two standards here.  But I'm

10  not going to -- now that I've read what Palmer says, and I've

11  also made rulings on what I'm going to allow in and not allow

12  in.  Because there's no grounds for any negative -- any

13  suggestion or any question which implies that this was

14  somehow destroyed by Mattel or intentionally.

15          There's no evidence of that, and I don't take it

16  from MGA that they are suggesting that, at least not at this

17  point or not in the context of this trial.  But they are

18  missing.  And for innocuous, just like certain molds are

19  missing.  I think those are legitimate questions to ask a

20  witness and to have out before the jury.

21          MR. ZELLER:  And I can certainly address, say, for

22  example, the mold situation and the like.  But what I would

23  say as a global point, your Honor, is that in some ways it

24  kind of turns things on its head to have a standard that says

25  well, if it's unintentional and just missing, no inference of

1    anything unintentional, it can come in as a matter of course,

2    or at least some lower standard.  But if there is a tinge of

3    intentionality to it, that's where you have to meet a very

4    high hurdle.  That seems to me in some ways to be a

5    standard --

6              THE COURT:  Well, no, it all comes in if it's

7    missing, but just before I allow you to make arguments and

8    introduce that evidence that this was intentional, there is,

9    as the case law suggests, there needs to be a certain

10   standard.

11             MR. ZELLER:  And I would raise this point.  Because

12   there is a considerable amount of evidence we have not put in

13   related to missing, spoliated, whatever you want to describe

14   it, MGA evidence.  And I assume with this standard that we

15   will be permitted to do it in rebuttal, because that is not

16   the standard that was being applied previously.  There are

17   hard drives, tapes, things have been erased during time

18   periods that -- and if it doesn't matter anymore, as I had

19   understood the standard, then at least there was some

20   inference that there was something that was deliberately

21   afoot as there was with Evidence Eliminator.

22             Because the Court will recall that all we were

23   allowed to get into was the fact that it was on the laptop,

24   not even the fact that it was on the desktop because the

25   Court thought that there was less evidence of intentionality

Page 4433

1    there and less linkage, direct linkage or direct inference

2    that it was intentionality.

3              THE COURT:  I was trying to balance the prejudicial

4    effect of the Evidence Eliminator and all of the attendant

5    evidence that went along with it.  Recall, Counsel, it wasn't

6    just the fact that -- it wasn't just that -- and Mattel did

7    not want to draw the line and just simply say 9,400 files are

8    missing.  You wanted and you did introduce and the Court let

9    you introduce evidence of how the process worked.  There was

10   a stipulation.  We got into the description of what Evidence

11   Eliminator was and how it operated.

12             So there was a lot more to it than simply the fact

13   that files were missing.

14             MR. ZELLER:  I understand, and I completely

15   recognize that, your Honor.  But ultimately underlying all of

16   that was this point of the Court saying, you know, it wasn't

17   really intentional.  That is in the record, and that is a

18   large part of what we sought to explore.  Because certainly

19   just the abstract, things like the other prejudicial effects,

20   you know, there are plenty of ways of trying to mitigate

21   that.  You know, didn't call it Evidence Eliminator, used

22   euphemisms, diminish the impacts.

23             But ultimately, it had to do with intentionality.

24   And what I'm ultimately concerned about is sort of no good

25   deed goes unpunished.  There were obviously denials,

Page 4434

1    litigation, and back and forth about the intentionality of

2    what was done with Evidence Eliminator.

3         Now we're going to have basically, then, thrown in

4    at the end of the case oh, and Mattel is missing a tape, too.

5    Where, you know, those are going to be treated as equivalent.

6    There's no question.  And, in fact, they are going to say no

7    one has come in to deny from Mattel that they did this on

8    purpose.

9         THE COURT:  Mattel is going to admit that.

10   Mr. Palmer admits it's missing.  We don't know why.  There's

11   no explanation.  It's just gone.

12        MR. ZELLER:  But that's the point.  There's no

13   explanation.  We're going to have to call somebody in here to

14   explain.  That's what the jury is going to expect, is that

15   we're going to have to come in and explain why we don't have

16   that tape, and it's going to be painted during closing and

17   what is essentially an empty chair manner if we do not do so.

18        And that's why I'm saying in some respects this

19   seems to turn things on its head, because they will, of

20   course, say there is no evidence that MGA did anything wrong

21   with Evidence Eliminator.  Carter Bryant got up on the stand

22   and gave all of these explanations and these denials, but in

23   contrast, look what Mattel did.

24        There's the mysteriously missing October 2000 tape.

25   They didn't bring anyone in to explain it.

Page 4435

1          THE COURT:  What does that have?  It's not even

2     clear to me what -- so presumably there was no calls.  There

3     was one call.  There were two dozen calls from Carter Bryant

4     to MGA.  How is that one way or the other really make all

5     that much of a difference?

6          MR. ZELLER:  Your Honor, I mean, certainly we don't

7     think it's relevant at all.  I mean, the fact that we do or

8     do not have October records --

9          THE COURT:  Doesn't the lack of relevance minimize

10    the -- it's not like these were recorded conversations.  It's

11    just the frequency of conversations.  Can't you just as

12    easily argue that we would love to have this month of -- it's

13    unfortunate to us.  We're being hamstrung by not having this

14    month of calls because it probably would have shown that

15    Carter Bryant called MGA every day.  I don't know.  I guess I

16    don't -- precisely because the relevance value is so low, the

17    prejudicial impact of it being missing doesn't seem to be

18    that great.  I mean, these aren't --

19          MR. ZELLER:  But, I mean, the Court's point is

20    exactly right.  I mean -- and that's why it shouldn't come

21    in.  Because of the fact that its absence is the only

22    prejudice.  There's no dispute in this case that there were

23    communications between Carter Bryant and MGA during that time

24    period.  The only party that has been harmed by this, this

25    loss of evidence, is us.

1          You know, even if there wasn't a single phone call

2    between Carter Bryant and -- from Mattel to MGA, while he was

3    actually in that time period at Mattel, all that -- that

4    wouldn't prove anything.

5          THE COURT:  All right.  Let me hear from MGA.

6          MR. NOLAN:  Your Honor, all I'm trying to get in

7    through a video of a 30(b)(6) witness is the fact that there

8    are no October phone records.  There has been testimony and

9    question after question about -- to Carter Bryant about the

10   number of phone calls that he made in September.  He's still

11   working there in October.  I think the trier of fact may be

12   wondering, well, where is the October phone records?  I have

13   not asked this in the context an adverse inference.

14         Mr. Zeller, I know that he --

15         THE COURT:  But what are you planning to do?

16   Mr. Zeller is concerned about how this is going to play out

17   and be argued.  Can you proffer to the Court how it is?  I

18   don't see this as much moment either.  There's no phone calls

19   for October.  We don't have October phone calls; so we don't

20   know if Carter Bryant called zero times, one time, or one

21   hundred times from his phone at Mattel.

22         We know that he was working at MGA at some point in

23   time.  We know that he met with MGA while he was at Mattel

24   and that he communicated with people from MGA while he was

25   working at Mattel in the month of October.  Whether he used

Page 4437

1   his MGA phone or not --

2          MR. NOLAN:  Your Honor, I agree.  Mr. Zeller is

3   writing a closing argument that even I would not think of

4   arguing based on the strength of this.

5          THE COURT:  Well, give him some assurance --

6          MR. NOLAN:  I'm not going to say that it was

7   intentionally destroyed.

8          THE COURT:  You're not going to ask him anything

9   because it's a deposition.

10          MR. NOLAN:  No, no.  I meant in my closing

11   argument.  That we don't have the phone records.  The phone

12   records don't exist.

13          THE COURT:  And what's the import of that?  What's

14   the argument that you want to make?

15          MR. NOLAN:  That therefore, we can't produce

16   evidence that he wasn't dutifully working at Mattel.  Nor can

17   Mattel tell with certainty that while he was there during the

18   two-week overlap period of time, that he did anything at

19   Mattel other than his assigned projects.  Both of us can't

20   argue that because those phone records aren't there.

21          THE COURT:  But there were September phone calls;

22   correct?

23          MR. NOLAN:  The September phone records, but they

24   never introduced them, your Honor.  They questioned it

25   extensively to Carter Bryant about that.  I want to be able

Page 4438

1   to show on the phone -- from the phone records the number of

2   phone calls that were actually made, the length of those

3   phone calls.  I think the jury is going to be surprised.  I

4   just want to get this into evidence.

5           THE COURT:  How many phone calls were made from

6   Carter Bryant --

7           MR. NOLAN:  In September?

8           THE COURT:  In September.

9           MR. NOLAN:  I don't know the exact number.  I've

10  been told that the total aggregate time is about 45 minutes.

11  And that the longest phone call is something less than a few

12  minutes.

13          THE COURT:  You're planning to introduce this?

14          MR. NOLAN:  Your Honor, I believe it's being

15  introduced through this video person.

16          I think the impression has been --

17          THE COURT:  Do you have any objection, Mr. Zeller,

18  to the September records coming in?

19          MR. ZELLER:  No, I don't think so, your Honor.  I

20  mean --

21          THE COURT:  Is there any question on the

22  authenticity or foundation of any of these records?

23          MR. NOLAN:  It's their records, your Honor.  Who

24  knows?

25          THE COURT:  Gentlemen, Counsel, let me suggest

Page 4439

1    this.  I say gentlemen because they are the two before me

2    right now.  I'm sorry, Ms. Aguiar.

3              MR. NOLAN:  I thought you were going to exclude me.

4              THE COURT:  Counsel, why don't we simply get the

5    records in.  We have records for September.  Records are

6    unavailable for October.  There is no explanation as to where

7    the records are, and call it a day on the phone records.

8              MR. ZELLER:  I do agree that certainly the

9    September records seem to be a different animal.  Presumably

10   we could do that by stipulation.  I don't think that's the

11   issue for us.

12             THE COURT:  You've got to go one step further,

13   because that begs the question.  Well, where are the October

14   records?  We have records from September.  And I'll even tell

15   it to the jury.  We have records from September that the

16   parties have stipulated to.  There are no records available

17   for October.  That's what we have.  That's all the evidence

18   before you.  And that's it.

19             MR. NOLAN:  Your Honor, that's what -- that's what

20   the 30(b)(6) witness was for.

21             THE COURT:  I understand that.

22             MR. NOLAN:  You know, earlier you said to me on

23   Jewel Barbie why didn't you take a 30(b)(6), Mr. Nolan, on

24   this one.  So I don't get that in.  Now I have a 30(b)(6)

25   witness on a particular subject, and they are objecting that

Page 4440

1    that's not good enough.  All we want is what they designated

2    as the person most knowledgeable --

3              THE COURT:  This is apples and oranges because

4    you're telling me now, and I'm accepting your representation

5    that you're not seeking to draw a negative or an adverse

6    inference from this.  There would be a real adverse inference

7    from this, Counsel.  And this one actually goes to an issue

8    in this case.  And I suppose this one does, as well.

9              MR. NOLAN:  Don't even go back to that one, your

10   Honor.

11             THE COURT:  Let's put that aside because that's a

12   different --

13             MR. NOLAN:  It sure is.  But these documents, your

14   Honor, I'm just saying we had a 30(b)(6) witness.  We have

15   them.  We've designated the videos.  There are objections

16   that have been made.  And I just don't know why we can't play

17   Mattel's own witness explaining the status of these records

18   for the jury.

19             THE COURT:  And I'm not --

20             MR. NOLAN:  I'm just saying rhetorically why

21   Mr. Zeller, when I say I'm not going to argue, like I guess

22   they are going to argue, about Evidence Eliminator --

23             THE COURT:  You're back to that, Counsel, then

24   you're back to exactly what Mr. Zeller is saying.

25             MR. NOLAN:  I said I'm not going to argue that.

Page 4441

1          THE COURT:  Oh, you're not.

2          MR. NOLAN:  No, I said that I'm not.

3          THE COURT:  Okay.

4          MR. NOLAN:  Mr. Zeller seems to suggest, and he

5   proffers that that's the reason why you shouldn't --

6          THE COURT:  If you're not going to argue that, then

7   my question is why are we having this discussion?  If it's

8   just a matter of foundation, let's get the records in and

9   argue on the records that we have.

10         MR. NOLAN:  I mean, that's what we thought we were

11  going to do through the video.  It's 17 minutes, very short.

12  It's in the process of how the evidence was presented in this

13  case by Mattel.  It's Mattel's representative explaining the

14  situation and laying the foundation for these records.

15         MR. ZELLER:  Your Honor, if we could cut to the

16  chase.  Mattel's viewpoint on this.  We would be agreeable to

17  what the Court has proposed in terms of just telling the

18  jury.  We think that an additional sentence ought to be added

19  that the jury isn't to draw any adverse inference from the

20  fact that October is missing.  But we think that that does

21  resolve a lot of these issues for the Court just simply to

22  provide it, or if it could be done in the form of a

23  stipulation that the parties agreed.

24         THE COURT:  And, Mr. Nolan, to make it clear on

25  Jewel Barbie, unlike this case, there's no contention by

Page 4442

1   either side about authenticity or foundation.

2            Here there is.

3            MR. NOLAN:  Oh, I know there is.

4            THE COURT:  Very good.

5            MR. NOLAN:  But only one party has objected to the

6   authenticity, and it's the party that produced that document,

7   your Honor.  It may be apples and oranges.

8            THE COURT:  Okay.

9            MR. NOLAN:  But I got to tell you the orange is

10  much larger than the apple.

11           THE COURT:  Perhaps.

12           MR. NOLAN:  And much more important.

13           THE COURT:  Very well.  Anything further the Court

14  needs to consider besides the Palmer deposition at this

15  point?

16           MR. ZELLER:  Well, just the last point on the

17  Palmer designation, your Honor.  Mattel would request in the

18  alternative that in the event that the Court does allow it to

19  go forward in this form of a video deposition and that it

20  comes out about that there's a missing October tape, we would

21  ask that the jury be explicitly instructed that it cannot

22  draw any adverse inference against Mattel as a result of that

23  missing tape.

24           THE COURT:  A reverse adverse inference

25  instruction?

1          MR. NOLAN:  Why don't we at the same time, your

2     Honor, then ask you -- maybe Mr. Zeller is going to want you

3     to just accompany me through the closing argument.  When

4     questions are asked about missing molds, I mean, it comes

5     out.  Things happen.  Things are missing here.

6          If they are going to say that Margaret Leahy threw

7     out the molds, I hope they make that argument, to be honest

8     with you.  Because I think she was a credible witness.

9     Listen, you know what?  We're both big sides here --

10          THE COURT:  Counsel, watch your tone a little bit.

11     The Court is listening.  You don't need to tell me to listen.

12          MR. NOLAN:  I'm sorry.

13          THE COURT:  That's all right.  It's a long day, and

14     we're nearing the end here.

15          MR. NOLAN:  No, it's more than that.

16          I'm not going to make these arguments.  But asking

17     you to make comments, you know, like the reverse adverse

18     inference shouldn't be applied, I respectfully submit that

19     that's not your role.  I just want the evidence to come in.

20     There will be a closing argument.  If I overstep the line,

21     not only will they yell at me, they will object.  I'm sure

22     I'll be taken to sidebar.  I don't intend to do that.  I just

23     want the evidence in.

24          THE COURT:  Very well.  Anything further on this

25     point?

Page 4444

1          MR. ZELLER:  I would just remind the Court that

2     when Evidence Eliminator was introduced, it was for a very

3     limited purpose, and the Court specifically instructed the

4     jury as to what inferences could be drawn and that they

5     couldn't be drawn against MGA.

6          THE COURT:  Very well.  Is there anything further

7     on this?

8          MR. NOLAN:  No, your Honor.

9          THE COURT:  All right.  Anything further that needs

10    to be taken up before this last hour of trial today?

11         MR. QUINN:  If I could ask, your Honor, we have a

12    document custodian who has been waiting.  It's a Mattel

13    attorney.  It's her day off.  She's been here all day.  I've

14    been told that it will be very brief.  I would ask that we do

15    that before we play a tape.  Rather than having her come back

16    next Tuesday.

17         THE COURT:  Mr. Nolan?

18         MR. NOLAN:  Your Honor, I was advised just before

19    the start of this that they wanted to put the Custodian of

20    Records on.  I have been interrupted in the presentation of

21    my case on so many times.  This is the last day before a long

22    holiday.  I have a video that I would rather play.  I

23    apologize to this person who is, you know, maybe it's her day

24    off, I don't know, but she's employed at Mattel.

25         A lot of people have been inconvenienced.  But we

Page 4445

1    have not had a day where we haven't been interrupted because

2    of some scheduling issue.  And I just want to play the video

3    and let the jury go home for the weekend.

4              THE COURT:  I take it that's a "no"?

5              MR. NOLAN:  That's right.

6              THE COURT:  Very well.  All right.  You may call,

7    after Mr. De Anda, you may call your next witness.

8              MR. NOLAN:  Thank you.

9              MR. ZELLER:  And I assume that Mr. De Anda is

10   excused?

11             THE COURT:  He's not.  I believe Mr. Nolan had

12   a few more questions.  So I'm going to take a break for

13   about six minutes.  We'll resume at 4:00, finish up with

14   Mr. De Anda.  And Mr. Nolan will call his next witness.

15   We'll go to five o'clock, and the Court will make its Palmer

16   rulings and any other rulings that it needs to make.

17             Court is in recess.

18             (Recess taken.)

19             (WHEREUPON THE JURY ENTERS.)

20             THE COURT:  Mr. De Anda.

21             Counsel, you may proceed.

22             MR. NOLAN:  Thank you.

23   Q.   Mr. De Anda, did you also interview Beatrice Morales?

24   A.   Yes.

25   Q.   Other than the interviews of Anna Cabrera and Beatrice

Page 4446

1   Morales, have you ever interviewed any other Mattel employees

2   who have moonlighted?

3            MR. ZELLER:  Foundation.

4            THE COURT:  Overruled.

5            THE WITNESS:  I'm sorry.  Could -- have I

6   interviewed?

7   Q.   BY MR. NOLAN:  Sure.  Other than your interviews of Anna

8   Cabrera and Beatrice Morales, have you ever interviewed any

9   other Mattel employees who have moonlighted?

10  A.   Regarding secondary employment?

11  Q.   I'm sorry, yes.  Secondary employment.

12  A.   I don't -- I don't recall that I have.

13  Q.   Is Beatrice Morales still employed at Mattel, if you

14  know?

15  A.   I don't believe she is.

16           MR. NOLAN:  Nothing further.

17           THE COURT:  Mr. Zeller?

18           MR. ZELLER:  Nothing, your Honor.

19           THE COURT:  Very well.  You are excused.

20           THE WITNESS:  Thank you, your Honor.

21           MR. NOLAN:  Your Honor, not to be rude to

22  Mr. De Anda, but while he's walking out, we'll call our

23  next witness by video.

24           THE COURT:  Please.

25           MR. NOLAN:  The next witness will be by deposition,

Page 4447

1    your Honor.  And timing should be 46 minutes.

2              THE COURT:  Very well.  That will work out

3    perfectly.

4              MR. NOLAN:  This is the deposition of Richard Irmen

5    conducted by Mr. Zeller on September 28, 2007, in

6    San Francisco, California.  And the running time is 46

7    minutes.

8                   WHEREUPON THE DEPOSITION EXCERPTS OF

9                   RICHARD IRMEN WERE PLAYED AS FOLLOWS:

10   Q.   Good morning.

11   A.   Good morning.

12   Q.   Please tell us your full name for the record.

13   A.   Richard William Irmen.

14   Q.   And what is your current residential address?

15   A.   1303 South Farm Road, 115, Springfield, Missouri 65802.

16   Q.   You mentioned that you had two office locations

17   currently.  One of them you described as a business that you

18   have called BT Associates?

19   A.   Um-hm.

20   Q.   And what's that business?

21   A.   Land development.

22   Q.   And then the other office that you mentioned was on

23   Sunset Street, which you said was for Dark Ops?

24   A.   Yes.

25   Q.   And what line of business is that?

Page 4448

1    A.    It's tactical fighting knives.

2    Q.    Is it in, I guess, the design, the manufacturing, both?

3    A.    Everything above, yes.

4    Q.    Distribution as well?

5    A.    Yes.

6    Q.    When was Carter Bryant Enterprises started up?

7    A.    I believe it was 2000.

8    Q.    And as you mentioned, it's a general partnership.   Who

9    are the partners of Carter Bryant Enterprises?

10   A.    Carter Bryant and myself.

11   Q.    And who are the owners of BT Associates?

12   A.    Myself and Carter Bryant.

13   Q.    At some point you worked for Mattel; is that correct?

14   A.    That is correct.

15   Q.    And what time period did you work for Mattel?

16   A.    Approximately August of '96 through February of '98.

17   Q.    And did you work for Mattel continuously throughout that

18   time period?

19   A.    Yes.

20   Q.    And then have you worked for Mattel any other time

21   periods?

22   A.    No.

23   Q.    During the time that you worked at Mattel, what did you

24   do?

25   A.    I was a model maker.

Page 4449

1    Q.   And you were -- as you understood it, an actual

2    employee, or were you hired through an agency of some kind?

3    A.   I was not an actual Mattel employee.   I was hired

4    through their temporary agency.

5    Q.   Were you a model maker the whole time you worked for

6    Mattel?

7    A.   Yeah.

8    Q.   Do you remember the name of the agency?

9    A.   No.   It was their in-house agency.   I don't remember the

10   name.

11   Q.   And how is it you came to get a job there at Mattel?

12   A.   Through a recommendation from Carter Bryant.

13   Q.   So this was a time period when Carter was already

14   working for Mattel?

15   A.   Yes, I believe he had worked there almost a year.

16   Q.   So I take it you knew Carter prior to the time he

17   started at Mattel?

18   A.   Yes.

19   Q.   What year did you and Carter meet?

20   A.   1991.

21   Q.   And then so -- if you could maybe describe the

22   circumstances under which Carter suggested or recommended or

23   whatever the case was that perhaps you seek employment there

24   at Mattel.

25   A.   To my understanding, his supervisor let him know, or

Page 4450

1    their general group, that they were looking for model makers,

2    and he said my friend Richard, you know, might be interested.

3    And then I called him and set up an interview.

4    Q.   So I take it, then, you had the interview and you

5    received an offer?

6    A.   Yes.

7    Q.   And you accepted it?

8    A.   Yes.

9    Q.   When you first started working there at Mattel, who did

10   you report to?

11   A.   Cassidy Park.

12   Q.   Is she the person you reported to the whole time you

13   worked at Mattel, or did it change?

14   A.   No, she was my supervisor.

15   Q.   And during that time period, did you work with Carter as

16   well?

17   A.   Yes, I did.

18   Q.   Were there other people you worked with?

19   A.   Yes.

20   Q.   Can you recall whether there were any instances in which

21   you worked on creating a model of a mainline Barbie doll?

22   A.   Yes.

23   Q.   And who did you do that with?

24   A.   Carter, I believe.

25   Q.   And I take it it was a three-dimensional prototype?

Page 4451

1    A.    Yes.

2    Q.    And was this prototype a rotocast?

3    A.    Well, body was injection molded.

4    Q.    And I think you told me that you left Mattel in about

5    February of 1998?

6    A.    I believe so.

7    Q.    And what is it that occasioned your departure from

8    Mattel?

9    A.    I was laid off.

10   Q.    During the time you were working there at Mattel, did

11   you have any complaints or issues with your work there?

12   A.    No, not really.

13   Q.    Well, you say not really to a lawyer, it -- it means

14   I'll have to follow up.

15          I mean did you have any problems, or did you -- I

16   mean what was your general -- your general feeling about your

17   employment there at Mattel?

18   A.    I enjoyed working there, but I can't say there was never

19   a problem because you always have problems in any of your

20   work spaces or, you know, anybody you work for, not

21   everything is peachy all the time.

22   Q.    I know you mentioned that you left Mattel in February of

23   1998.  Was Carter still actually working there in the design

24   center as of that time?

25   A.    No.

Page 4452

1  Q.   At some point he moved to Missouri?

2  A.   Yes.

3  Q.   When did he do that?

4  A.   He moved in -- I believe it was December of '97.

5  Q.   Is that when he moved to that house in Kimberling,

6  Missouri, where his parents were living?

7  A.   I believe so.

8  Q.   That's your understanding?

9  A.   Yes.

10  Q.   Were you -- were you with Carter when he moved back from

11  Kimberling City to California?  In other words, did you

12  travel with him on that occasion?

13  A.   No, I did not.

14  Q.   So you were in California, and then Carter moved from

15  Kimberling City back to California, and you were already

16  there?

17  A.   Yes.

18  Q.   And where were you living at that time, then?

19  A.   I was living in the Palmdale-Lancaster area of

20  California.

21  Q.   And then when Carter moved back, was he living with you

22  again?

23  A.   No.  He was living in the house in Gardena with Elise

24  Cloonan, the house we eventually bought.

25  Q.   I see.  So when Carter moved back from Kimberling City

Page 4453

1    to California in late 1998, he moved into the same house that

2    Elise was living in?

3    A.   Yes.

4    Q.   Elise Cloonan.

5    A.   Yes.

6    Q.   And that was the house on 160th Street in Gardena?

7    A.   Yes.

8    Q.   And then at some point later, you moved from the place

9    in Lancaster to the house in Gardena?

10   A.   Yes.

11   Q.   And can you recall when you first saw him after he had

12   moved back from Kimberling City to California?

13   A.   January 1st or 2nd, but I believe it was the 1st.

14   Q.   That was January 1st or 2nd, 1999?

15   A.   Yes.

16   Q.   And where did you see him?

17   A.   I was house sitting for a friend in Lancaster, and when

18   he drove in from Missouri, he stayed a couple days with me.

19   Q.   Oh, I see.  Before he actually moved into the Gardena

20   place?

21   A.   Yes.

22   Q.   And you said you were house sitting for a friend in

23   Lancaster.  So was that the house you'd been staying in, or

24   was that a separate house?

25   A.   Separate house.

Page 4454

1  Q.   So you were living in Lancaster at that time, and during

2  that January 1st or 2nd, 1999, time period, you were house

3  sitting and, therefore, in another house in Lancaster?

4  A.   Yes.

5  Q.   And that's where Carter came and stayed with you once he

6  came back from Kimberling City?

7  A.   Yes.  He stayed like overnight with me and then went to

8  L.A. sometime before he started work.

9  Q.   Did there come a time when you became involved in a

10  request by Veronica Marlow or Peter Marlow that she receive

11  some royalties in connection with Bratz?

12  A.   Yes.

13  Q.   What was the first occasion in which you can recall that

14  occurring?

15  A.   It was -- Carter had told me of an agreement that he had

16  made with Veronica concerning the royalties.

17  Q.   And so you initially learned of it from Carter?

18  A.   Yes.

19  Q.   And what did he say about that agreement?

20  A.   He said that he had verbally promised Veronica a

21  percentage of his royalties for a thank you for the

22  introduction and gratitude.

23  Q.   Did he say anything else about it?

24  A.   Not that I recall.

25  Q.   Did he say what the percentage was?

Page 4455

1   A.   Yes.

2   Q.   And what was that?

3   A.   10 percent of the dolls or the product that she works

4   on.

5   Q.   As of today, is Veronica Marlow being paid 10 percent of

6   the royalties that you described on Bratz?

7   A.   Yes.

8   Q.   And has that been true the whole time since the time

9   that she first raised this, by your understanding?

10  A.   Yes.

11  Q.   I think you mentioned that Carter had said that he had

12  made this agreement with Veronica Marlow as a thank you for

13  the introduction.

14       What did you mean by as a thank you for the

15  introduction?

16  A.   As I stated earlier, Veronica introduced -- made the

17  connection of MGA and Carter Bryant and for that, for her

18  setting up -- whatever she did, I don't really know, but it

19  was a thank you for the introduction.

20  Q.   The introduction to MGA?

21  A.   Yeah.

22  Q.   Prior to 2004 had you ever had any communications with

23  any MGA lawyers?

24  A.   I don't believe I ever had any conversations with MGA

25  lawyers.

1   Q.   Are you aware as to whether or not Carter hired any

2   attorney in connection with his deal with MGA?

3   A.   Yes.

4   Q.   And is that something you were aware of in the 2000 time

5   period?

6   A.   Yes.

7   Q.   Is that something that you discussed with Carter?

8   A.   Yes.

9   Q.   And the reason you knew that Carter had hired a lawyer

10  in the approximate 2000 time period in connection with this

11  deal with MGA is because Carter told you?  You can provide a

12  yes or no.

13  A.   Yes.

14  Q.   Do you have any knowledge as to when Carter first spoke

15  with or had any contact with that lawyer?

16  A.   I don't recall.

17  Q.   Do you know who the lawyer is?

18  A.   Yes.

19  Q.   Who was it?

20  A.   Her name, Ann Wang.

21  Q.   And how did you know Ms. Wang's name?

22  A.   'cause that's the lawyer we went and seen.

23  Q.   So you went with Carter?

24  A.   On one occasion.

25  Q.   Have you and Carter Bryant ever discussed the

Page 4457

1   circumstances under which he came to first become involved

2   with MGA when lawyers were not present at the conversation

3   you had with Carter?

4   A.   Yes.

5   Q.   Carter told you he was pitching an idea to a company in

6   the Valley; right?

7   A.   Right.

8   Q.   And did you have any idea at that time what the idea was

9   that he was pitching?

10  A.   No, I did not.

11  Q.   At some point did you -- you did learn that Carter was

12  negotiating a deal with MGA?

13  A.   Yes.

14  Q.   By that time did you know it was about Bratz?

15  A.   Yes.

16  Q.   So as far as you remember what happened was he told you

17  in the first conversation he was pitching an idea, but you

18  didn't know what the idea was, to the company in the Valley,

19  and the next thing you recall is that he was negotiating a

20  deal?

21  A.   No.  He had pitched -- he had pitched an idea to -- the

22  negotiation was at the very end.  So there was a few

23  different instances in that time frame that he had met with

24  MGA or something like that.  I'm not really sure.  I knew of

25  those because I'd get home and say hey, what did you do

Page 4458

1   today?  But I don't remember anything specific.  It was

2   summer, and I'm an air-conditioning mechanic.  So I was

3   pretty hashed out.

4   Q.   Do you have any time frame that you can tell me that

5   Carter first told you about this -- the fact he was pitching

6   this idea to the company in the Valley?

7   A.   I believe it was -- it was like 2000, September -- late

8   September, something like that.

9   Q.   And then what was the time frame in which you learned

10  that he was negotiating a deal with MGA?

11  A.   Would have been early October of 2000.

12  Q.   What is it that happened next after you learned about

13  Carter negotiating this deal with MGA as it pertained to

14  Bratz?

15  A.   Can you be a little more specific with your question?

16  Q.   I'm trying to find out what happened next with respect

17  to Bratz.

18  A.   I believe he signed the contract with MGA.

19  Q.   Is that something you learned from Carter as well, in

20  conversations you had with him?

21  A.   That he signed the contract and quit Mattel?  Yeah, we

22  had a house payment.  So I was really worried about all that.

23  Q.   So Carter -- Carter told you that he had signed the

24  contract with MGA?

25  A.   Yes.  He had quit Mattel, signed the contract with MGA,

Page 4459

1    and then started working at home.

2    Q.    And did Carter tell you that he had quit Mattel and then

3    signed the contract with MGA?

4    A.    Yes, to my recollection that's what happened.

5    Q.    Did Carter ever tell you whether he showed Bratz or the

6    Bratz concept to anyone at Mattel?

7    A.    No.

8    Q.    He didn't tell you one way or another?

9    A.    No, I know he did not show anybody -- to the best of my

10   knowledge, he never showed anybody at Mattel.

11   Q.    Have you ever heard of a Mattel project called Toon

12   Teens?

13   A.    No, I haven't.

14   Q.    Did you ever have any discussions with Elise Cloonan

15   about the Toon Teens project there at Mattel?

16   A.    No.

17   Q.    Did you ever have any discussions with Carter regarding

18   the Toon Teens project?

19   A.    No.

20   Q.    Prior to April of 2004, had anyone ever contacted you in

21   connection with a lawsuit or potential lawsuit against

22   Mattel?

23   A.    No.

24   Q.    When did you first hear about Bratz, B-R-A-T-Z, as a

25   name?

Page 4460

1   A.   I believe that was the January 1st when Carter visited

2   me in '99.

3   Q.   And that was the visit you described earlier where you

4   were staying and house sitting --

5   A.   Yes.

6   Q.    -- for someone there in Lancaster; is that correct?

7   A.   Yes, that is correct.

8   Q.   And what is it that -- what were the circumstances under

9   which you first heard the name Bratz?

10  A.   I believe Carter told me the name.  Excuse me.

11  Q.   What did he say?

12  A.   Something like "These are the Bratz."

13  Q.   I take it he was showing you something?

14  A.   Yes.

15  Q.   And what was he showing you?

16  A.   His portfolio.

17  Q.   Were these drawings?

18  A.   Yes.

19  Q.   In that portfolio, were there drawings of things other

20  than Bratz?

21  A.   Yes.

22  Q.   What other things do you recall being in that portfolio?

23  A.   Greeting cards, Christmas cards, fashion illustration

24  is.  All the stuff that he had been working on in '98.

25  Q.   Is there anything else that you can recall?

1    A.    And the Bratz.

2    Q.    No, I understand.  I'll assure you we'll talk some more

3    about that part of it.  But right now I'm trying to find

4    out -- you mentioned that you saw other things pertaining to

5    greeting cards, Christmas cards, and fashion illustrations in

6    his portfolio.

7    A.    Yes.

8    Q.    So my question is other than Bratz and other than those

9    three things that you just mentioned, was there anything else

10   that you saw in his portfolio at that time?

11   A.    No.

12   Q.    And at that time -- what is it that Carter showed you in

13   terms of written materials that pertained to Bratz?

14   A.    I don't recall.  Written materials?

15   Q.    Um-hm.

16   A.    I don't -- I'm not sure.

17   Q.    You remember seeing drawings?

18   A.    Yes.

19   Q.    Did you see anything that was written out as text that

20   pertained to Bratz?

21   A.    I could have.  I don't remember.

22   Q.    Is it fair to say you don't have a recollection of

23   seeing anything in text?

24   A.    No, I don't.

25   Q.    How many drawings did you see that pertained to Bratz?

Page 4462

1    A.    I remember one.

2    Q.    Do you remember seeing more than one drawing as it

3    pertained to Bratz?

4    A.    As it pertained to Bratz, I don't recollect exactly.

5    Q.    So it's fair to say that you remember one Bratz drawing,

6    but you don't remember further Bratz drawings beyond that at

7    that time?

8    A.    Right.

9    Q.    And what did that one drawing look like?

10   A.    It was the four characters all together.

11   Q.    Were there faces on those characters?

12   A.    I believe so.

13   Q.    Were they -- did the drawings depict fashions on the

14   characters?  In other words, were they clothed?

15   A.    Yes, they had clothes on, yes.

16   Q.    Was the drawing in color?

17   A.    No.  It was more in sketch or pencil.

18   Q.    What kind of paper was it on?

19   A.    White.

20   Q.    Did you see it on any kind of tracing paper or

21   translucent kind of paper?

22   A.    I don't remember.

23   Q.    You do remember it being on white paper; is that

24   correct?

25   A.    Yes.  It was on a sheet of paper.

Page 4463

1   Q.   When you say white paper, you're referring to regular

2   printer paper?

3   A.   It was white paper.  I don't know if it was printer

4   paper or airplane paper or -- I don't remember.

5   Q.   Was it 8 by 10 regular-size paper?

6   A.   Yeah, something probably pretty close to that.

7   Q.   You mentioned that you remember it being in pencil.

8   A.   It wasn't colored in.  I don't know if it was in pencil

9   or pen or what medium he had used.

10   Q.   And when you saw this -- well, let me back up.

11            You mentioned Carter was showing you a portfolio of

12   the -- was it the traditional kind of artist portfolio where

13   it's literally a big portfolio that physically holds the

14   drawings?

15   A.   Yes.

16   Q.   And among the drawings that you'd mentioned was this

17   black and white sketch that you saw?

18   A.   Yes.

19   Q.   What I'm really driving at is it was part of the

20   portfolio, the physical portfolio that you saw.

21   A.   It was inside his portfolio when he was showing it to

22   me.

23   Q.   And you've mentioned so far that Carter said to you

24   these are the Bratz; right?

25   A.   Yes.

Page 4464

1   Q.   What, if anything else, did Carter say to you at that

2   time about Bratz?

3   A.   I don't remember.

4   Q.   You don't remember anything else?

5   A.   I don't remember anything specific.   We were thumbing

6   through his portfolio.

7   Q.   Well, do you recall anything else generally as it

8   pertained to Bratz?

9   A.   Not specifically.

10  Q.   Well, again, when you say specifically --

11  A.   I --

12  Q.   I'm trying to find out do you even have a general

13  recollection of you and Carter discussing anything else about

14  the Bratz other than what you told me?

15  A.   I believe he gave me the rundown of there is four

16  characters, different ethnicity.   They're funky with attitude

17  or however he would explain it.   Hip.

18  Q.   Anything else?

19  A.   No.

20  Q.   Did you say anything to him?

21  A.   I don't recall.

22  Q.   Have you told me now everything you can remember that

23  Carter said to you and that you said to him as it pertained

24  to Bratz?

25            MS. ANDERSON:   In that conversation?

Page 4465

1      MR. ZELLER:  Yes, in that conversation.

2      THE WITNESS:  Yeah, as we were flipping through the

3  portfolio.

4  Q.   BY MR. ZELLER:  Do you recognize what that other

5  reaction was?

6  A.   I remember -- they stuck out in my head because they

7  were -- the sketches and the way he had presented it was very

8  different than his other work.

9  Q.   When you say his other work, you're talking about the

10  other artistic and design work Carter had done?

11  A.   Yes, the other illustrations, et cetera.

12  Q.   When you saw that black and white sketch of the four

13  characters all together, was that one signed by Carter?

14  A.   I don't know.

15  Q.   Did it have a date on it?

16  A.   I don't remember.

17  Q.   You'd seen, prior to that time, other Carter Bryant

18  drawings that had dates on them; is that correct?

19  A.   Yes, he usually dates his drawings and illustrations.

20  Q.   And that's been true the whole time since you've known

21  him?

22  A.   Yeah.

23  Q.   When you saw the drawings that Carter showed you at that

24  time there in Lancaster, was the word Bratz written down on

25  any of the drawings?

Page 4466

1   A.   I'm not sure.

2   Q.   At that time, when Carter showed you the drawings when

3   you were in Lancaster, did Carter say anything about what the

4   inspiration was behind Bratz?

5   A.   I don't recall.

6   Q.   You'd said that Carter had mentioned to you how he came

7   up with Bratz.

8        Do you remember that?

9   A.   Yes.

10   Q.   Can you put a time of the year on it, a season of when

11   he said this?

12   A.   I believe it was September of 2000.

13   Q.   And what did Carter say to you in that regard?

14   A.   He told me the story of when he was in Springfield

15   driving to work, and he had thought of the idea of the Bratz.

16   Q.   Did he mention where he saw the teens that inspired him?

17   A.   I believe it was at the high school.

18   Q.   At the high school there in Springfield?

19   A.   Yeah.

20   Q.   And that was Kickapoo High School?

21   A.   Yes.

22   Q.   Is there anything else that Carter said with respect to

23   how it is that he came up with Bratz or was inspired to come

24   up with Bratz other than what you told me?

25   A.   I don't remember specifically, no, I don't.

Page 4467

1    Q.    You've told me everything you can recall?

2    A.    Yeah.

3    Q.    I guess maybe a simpler way of putting what I was

4    driving at is, you know, you've told me now this conversation

5    you had with Carter in September of 2000.

6    A.    Yes.

7    Q.    In which he described to you how he came up with Bratz

8    or the inspiration behind it.  Did he at any other time ever

9    say anything to you that was different from what he had told

10   you in September of 2000 regarding how he came up with Bratz?

11   A.    No.

12   Q.    Did Carter ever tell you how it is that he came up with

13   the name Bratz?

14   A.    Yes.

15   Q.    When did he do that?

16   A.    I don't recall exactly.

17   Q.    Do you recall generally?

18   A.    Probably in the time frame of 2000, September.

19   Q.    And what did Carter say to you about how he came up with

20   the name Bratz?

21   A.    The name Bratz, like I said, was the attitude and

22   personalities of the four characters because they were like

23   little brats.  If you guys have children, brats, that's where

24   he came up with the idea.  And the Z gave it a little more

25   attitude.  It looked cooler than an S.

Page 4468

1  Q.   And this is what Carter told you; is that true?

2  A.   Yes.

3  Q.   Did Carter say anything else about how he came up with

4  the name Bratz?

5  A.   No.

6  Q.   Let me try it this way.  Did Carter -- let's just start

7  with the time period when you were there in Lancaster and you

8  first saw that drawing.

9        Did Carter say anything to you about individual

10 doll names or potential names?

11 A.   I don't recall.

12 Q.   Did Carter ever discuss with you the potential name Cloe

13 in any way prior to October of 2000?

14 A.   No.

15 Q.   Did Carter ever discuss with you the potential name of

16 Zoe prior to October of 2000?

17 A.   No.

18 Q.   The name Yasmin?

19 A.   No.

20 Q.   Hallidae?

21 A.   No.

22 Q.   Fiona?

23 A.   No.

24 Q.   Kenesha?

25 A.   No.

Page  4469

1   Q.   Jade?

2   A.   No.

3   Q.   Any other individual name that he ever discussed with

4   you prior to that time?

5   A.   No.

6   Q.   You've had a chance to look at Exhibits 701 through 796?

7   A.   Yes.

8   Q.   Did you recognize any of those drawings as being any

9   drawing that you saw there in Lancaster that Carter showed

10  you in January of 1999 as you testified to earlier?

11  A.   Yes.

12  Q.   Which one?

13  A.   It was -- it was one of these.

14       MR. ZELLER:  For the record, the witness has handed

15  me Exhibits 4774, 778, and 779.

16  Q.   I'm going to show you, then, Exhibits 774, 778, and 779

17  and give these back to you.

18       Directing your attention to Exhibit 774, the one

19  below there.  That's a black and white sketch?

20  A.   Yes.

21  Q.   Is this the one that you recall seeing there in

22  Lancaster?

23  A.   It was -- I don't know if it was the exact one here, but

24  it was the four girls grouped together like this.  That's why

25  I -- they all look pretty much the same to me.  So it was --

Page 4470

1   but it was the group of the four girls is what I remember

2   seeing.

3   Q.   Is it fair to say that you can't be certain as to which

4   of those three drawings it was that you saw?

5   A.   No.  Whether it was this black and white drawing or that

6   one, I don't know which one it was.  It's four characters

7   standing there to me.

8   Q.   Well, let's see if we can be a little bit more precise

9   about some of this.

10  A.   Sure.

11  Q.   Exhibit 774 and 778, those are the black and white ones?

12  A.   779 is the black and white one.  777 and 779.

13  Q.   So let's focus on 778 for a second.

14  A.   778, yes.

15  Q.   That one is colored in?

16  A.   Yes.

17  Q.   And you're relatively confident that the drawing you

18  saw, the Bratz drawing that you saw there in Lancaster in

19  January of 1999, you testified to previously, was not in

20  color; right?

21  A.   No, it wasn't.

22  Q.   So you feel pretty confident that you could exclude

23  Exhibit 778 as being the actual drawing that you saw.

24  A.   Right.  It was -- it was just, this is the four

25  characters that I wanted to -- which specific one it is I

Page 4471

1    don't know.

2    Q.   Right.  I'm trying to, like I say, let's be a little bit

3    more precise just to see if we can narrow the candidates down

4    a little bit.

5    A.   Sure.

6    Q.   So you'll agree with me that at least, as it's shown

7    here, that Exhibit 778 is not one that you saw in Lancaster

8    in January of 1999; right?

9    A.   No, because it's colored in.

10   Q.   You would agree with my statement?

11   A.   Yes.

12   Q.   Directing your attention to -- since I can't see that

13   far.

14   A.   779.

15   Q.   779.  779 is the one that at least is, if not colored

16   in, at least is somewhat more finished than the other

17   exhibit; is that right?

18   A.   Yes.  There's more pencilling in.

19   Q.   Was the one that you saw there in Lancaster shaded in,

20   even if it was black and white?

21   A.   I don't recall.

22   Q.   So it might have been.  It might not have been.  You're

23   not sure?

24   A.   No, I'm not -- I -- I couldn't tell you.  I don't

25   remember.

Page 4472

1   Q.   Focusing first on 774, can you tell me under oath, you

2   know, where you're sworn to tell the truth, that that's the

3   drawing that you saw there in Lancaster in January of 1999?

4   A.   Under oath, I can tell you that these look very similar.

5   I don't know which one I've seen, but it was of the four

6   characters like they're presented here.  I don't know if it's

7   774 or 779 or one I missed, but this is -- this is what I

8   seen.

9   Q.   And what I'm now just following up to find out is about

10  something, and namely, do you know that the particular

11  drawing that's in front of you that we've marked as

12  Exhibit 774 is in fact the same drawing that you saw there in

13  Lancaster in January of 1999?

14  A.   No.

15  Q.   Focusing on the particular drawing that you have in

16  front of you as Exhibit 779, can you tell me that the

17  particular drawing that you saw there in Lancaster in January

18  of 1999 that you testified about earlier when Carter showed

19  you drawings is in fact the same drawing that you saw at that

20  time?

21  A.   Yes, it looks very much like the one that I remember

22  seeing.

23  Q.   And for the record, which one are we --

24  A.   779.

25  Q.   What was it, then, that you can remember happening next?

1  A.   Carter and I -- we were moving him into a studio, and he

2  had unpacked some of his -- well, his boxes of crap and the

3  Bratz were one of many that were in a box, and I remember

4  seeing then -- them then.

5  Q.   And when you say "them," are you talking about drawings?

6  A.   Yes.

7  Q.   And these were Bratz drawings?

8  A.   I believe it was something similar to this one, yes.

9  Q.   Well, they were additional Bratz drawings?

10  A.   They were Bratz drawings, yes.

11  Q.   You said that he was moving into a studio?

12  A.   Yes.

13  Q.   And this was in September of 2000?

14  A.   No, it was a little bit earlier than that.

15  Q.   When did that happen?

16  A.   Late August, early September of 2000.  Something like

17  that.

18  Q.   When you say he was moving into a studio, was this an

19  art studio?

20  A.   It was what we called his studio.  It was at the house

21  in Gardena that we had purchased.  We had fixed it up.  It

22  was an apartment out back that we had fixed up for him to set

23  up his drawing table and all that kind of stuff.

24  Q.   Oh, I see.  So this is where the tenant used to live but

25  apparently by that time was gone?

Page 4474

1   A.   Yes.

2   Q.   And so in that interim period, it got fixed up to be an

3   art studio for Carter to work in?

4   A.   Yes.

5   Q.   And so you said that in this late August, early

6   September 2000 time period you were unpacking boxes in that

7   studio?

8   A.   Yes.

9   Q.   And where had these boxes been?  Had they been in the

10  house?

11  A.   In the house, in the garage, in storage.

12  Q.   Was -- were some of them in a separate storage facility?

13  A.   No, I don't believe we had a storage facility.  I think

14  they were all in the garage or stacked up someplace.

15  Q.   But just when you said earlier that they were in

16  storage, what were you referring to?

17  A.   Storage in the garage or in a closet.

18  Q.   And so I take it, when you said you were unpacking the

19  boxes and then you saw those drawings, the Bratz drawings,

20  this was actually in the studio; right?

21  A.   Yes.

22  Q.   Because people were -- you and Carter were taking things

23  out of the boxes, and that's when you saw the Bratz boxes?

24  A.   No.  Cart was unpacking stuff.  I was moving it.

25  Q.   I see.  You got the good job.

Page 4475

1   A.   Yeah.

2   Q.   So just to be clear, then, you were moving the boxes

3   from the house into the studio.  Carter was in the studio,

4   and he was unpacking boxes?

5   A.   More or less.

6   Q.   Did you help unpack at all, or did you just move?

7   A.   I probably just moved.  He has a bad habit of unpacking

8   while we're moving and reminiscing, slowing the process down.

9   Q.   So I take it Carter was the one who actually unpacked

10  the Bratz drawings that he showed you?

11  A.   Yes.

12  Q.   And when he showed them to you, this was in the studio?

13  A.   Yes, as he was unpacking.

14  Q.   Anything else that you can remember?

15  A.   No, not -- no, I can't.

16  Q.   And just so it's clear, there's nothing else that you

17  can remember that he said to you or that you said to him

18  regarding these drawings?

19  A.   No, nothing regarding the drawings, no.

20  Q.   Anything else generally about Bratz as a concept?

21  A.   No.

22  Q.   Or just Bratz, period?

23  A.   No.

24  Q.   And then what is it you remember next happening with

25  respect to Bratz?

Page 4476

1   A.   I'm not really sure what happened next.  They were

2   unpacked, and that was -- I think the next thing was that he

3   had showed them to MGA.

4   Q.   Had Carter said to you specifically, back in the 2000

5   time period, that Veronica Marlow was the one who had

6   introduced him to MGA, or was that something that you first

7   learned later on?

8   A.   No.

9   Q.   Let me try it this way:  Do you remember learning that

10  more or less at the time that it first happened, or was that

11  sometime subsequent to it?

12  A.   What first happened?

13  Q.   When -- when Veronica Marlow had introduced Carter to

14  MGA.

15  A.   I believe I found out a little bit before they were

16  introduced.

17  Q.   And do you remember if that was something that occurred

18  before or after the move to the studio and when Carter

19  unpacked the drawings that you talked about?

20  A.   It was after the move into the studio.

21  Q.   On that day you described in which Carter unpacked the

22  Bratz drawings in his studio and he showed them to you, were

23  any of those drawings in color?

24  A.   I don't recall because it was more him looking at them.

25  I was moving boxes.

Page 4477

1   Q.   Can you give us an estimation of how many Bratz drawings

2   you saw on that day?

3   A.   I don't know.  I didn't really see that many -- I didn't

4   see -- he was going through them.  I was busy.

5   Q.   Is it fair to say that you wouldn't be able to identify

6   for us a particular drawing that you saw on that day?

7   A.   That would be fair to say.

8   Q.   I understand you have a clarification?

9       MS. ANDERSON:  Yes.

10      THE WITNESS:  I know that we kind of got confused

11  on which of these drawings, 774 to 779 earlier, and I just

12  wanted to clarify that I'm not sure which drawings I seen in

13  1999, but they were very similar, if not one of these, but

14  similar to it.

15  Q.   BY MR. ZELLER:  Similar to Exhibits 774 and 779?

16  A.   Yes.

17  Q.   But you can't be sure as to -- whether you saw those

18  exact drawings as they're depicted in Exhibit 774 and 779.

19  Is that true?

20  A.   Yes.

21  Q.   And as between those two, you can't be certain as to

22  which one you saw?

23  A.   Yes.

24  Q.   Does one of those two exhibits, 774 versus 779, look

25  closer to what you saw?

Page 4478

1    A.    I couldn't say either way.

2    Q.    Focusing on the time period of October of 2000.  At that

3    time Carter bought a new desktop computer; is that correct?

4    A.    Yes.

5    Q.    So it's the case that you didn't have a computer prior

6    to October of 2000 in that house?

7    A.    No, we did not.

8    Q.    Neither you nor Carter did?

9    A.    No, we didn't.

10   Q.    And we were talking about Carter bought a desktop

11   computer in October of 2000, but that was in the Gardena

12   house?

13   A.    Yes.

14   Q.    Did you use that computer?

15   A.    Yes.

16   Q.    Did Carter use that computer that you saw?

17   A.    Yes.

18   Q.    At some point on that desktop computer a program called

19   Evidence Eliminator was installed; is that correct?

20   A.    I believe so.

21   Q.    Was that something that you did or Carter did?

22   A.    I believe Carter did.

23   Q.    Were you involved in any way in the purchase of the

24   Evidence Eliminator program that was on the desktop computer?

25   A.    No, I wasn't.

Page 4479

1   Q.   Did you, yourself, ever run it?

2   A.   No.

3   Q.   At some time after Carter's purchase of the desktop

4   computer in October of 2000, did he buy a Compaq laptop?

5   A.   Yes.

6   Q.   And do you know when he bought that?

7   A.   I believe it was around February of 2002.

8   Q.   Did you install Evidence Eliminator on that laptop?

9   A.   No, I did not."

10          (End of deposition playing.)

11          MR. NOLAN:  We ran out of time today for witnesses,

12   your Honor.

13          THE COURT:  Thank you, Counsel.

14          Members of the jury, I will wish you all a happy

15   4th of July.  We will not have court tomorrow, but I'll see

16   you all at 9:00 on Tuesday morning.

17          (WHEREUPON THE JURY WITHDRAWS.)

18          THE COURT:  Please be seated.  Okay.  I'd like to

19   schedule a hearing for Monday afternoon.  We've got motions

20   on the criminal calendar taken care of.  There's a few

21   matters I need to take up at 2:00, which shouldn't last long.

22   So if everyone could be ready at 3:00, if that works for

23   everyone.  At that time I want to go through the jury

24   instructions and the verdict form.

25          Does everyone have in what the Court had asked from

Page 4480

1    each side in terms of the binders, the jury instructions, the

2    verdict forms?  I want to make sure I don't have any --

3    anything additional.

4           MR. ZELLER:  I believe that's the case.  But I can

5    double-check as soon as we are done here to make sure.  But

6    my last information is I thought we had done that.

7           THE COURT:  I'll be here for a while tonight.  So

8    before the Court leaves tonight, let me know that I have

9    everything.  Because when I leave tonight, I'm not coming

10   back to the courthouse until Monday.

11          MR. NOLAN:  Your Honor, I believe we have

12   everything.

13          THE COURT:  Very good.  So that's the jury

14   instruction issue, and the hearing on Monday at 3:00.

15          Mr. Nolan, where are we now on witnesses?  We've

16   gotten through Ms. Leahy.  The Court has to work out the

17   Palmer issue.  On the Custodian of Records --

18          MR. NOLAN:  We have the Custodian of Records and

19   Cassidy Park, your Honor.

20          THE COURT:  Is that it?

21          MR. NOLAN:  For the live witnesses.  We've got

22   Galvano.

23          THE COURT:  So Irmen is done, De Anda is done, and

24   Kilpin is done.

25          So Galvano, Cassidy Park.  What about Jill Thomas?

Page 4481

1    MR. NOLAN:  I had a meeting with Mr. Quinn.  And he

2    made a proffer, which I asked him to put on the record, and

3    based on that proffer, we would not call.

4    THE COURT:  Okay.  You need to put something on the

5    record?

6    MR. QUINN:  If you'd like to.

7    MR. NOLAN:  Just what you represented to me.

8    MR. QUINN:  That Ms. Thomas did meet with Rachel

9    Harris.  She had provided no documents to Ms. Harris.

10   Ms. Harris provided no documents to Ms. Thomas and did not

11   show any documents to her.  Neither showed any documents or

12   provided any documents to each other.

13   THE COURT:  Very good.  And you are accepting his

14   representation?

15   MR. NOLAN:  Yes.

16   THE COURT:  Very good.  Based on that, we won't be

17   calling Ms. Thomas.

18   All right.  So Jeanne Galvano, Cassidy Park, the

19   Custodian of Records, and Mr. Palmer.  Those are the four

20   that you have left; correct?

21   MR. NOLAN:  Correct, your Honor.

22   THE COURT:  All right.  As far as a rebuttal case,

23   we have --

24   MR. QUINN:  Your Honor, before we get to that,

25   Cassidy Park, we went back and looked at the transcript, and

Page 4482

1    she was excused.  We thought her testimony was concluded.

2    The transcript indicates that the Court did excuse her.  And

3    we don't think there's a basis for calling her again.  We can

4    provide the transcript citation.

5              THE COURT:  Okay.  I'll take up Cassidy Park and

6    Mr. Palmer, and we'll take up these matters in a moment.  But

7    I want to get a sense of at the outside, there are four

8    witnesses left for the defense; correct?

9              MR. NOLAN:  That's correct, your Honor.

10             THE COURT:  And from a rebuttal perspective, we

11   have Carter Bryant and then a motion from Mattel on that.

12   When should I anticipate an opposition from MGA to that

13   motion?

14             MS. AGUIAR:  I realize the timing is difficult

15   given the holiday.  And while I completely understand the

16   time pressures that Quinn Emanuel was under, I think we got

17   it like 2:30 in the morning.  So we essentially didn't have

18   it until this morning.  And obviously, I'm not being

19   critical.  But is there a way that we could get it to you

20   sometime between now and Monday?

21             THE COURT:  Yes.  Absolutely.  I'll be home

22   working.  I'm just not planning to be here.

23             MS. AGUIAR:  Of course.

24             THE COURT:  If the Court were to decide to permit

25   Carter Bryant to be recalled, how much lead time does he

Page 4483

1    reasonably need to get back out here?

2           MS. AGUIAR:  Mr. Nolan will address that.

3           MR. NOLAN:  Your Honor, obviously what's absent

4    here is Carter Bryant's counsel.  And we're not privy to the

5    communications between Quinn Emanuel and Ms. Anderson or

6    whomever is there.  I got an e-mail from Ms. Anderson during

7    the lunch break asking me when the matter was going to be

8    taken up.  And I said I didn't have any idea.  I believe they

9    are filing an opposition as well.

10          So the short answer is I have no idea.  We're not

11   in communication with Mr. Bryant.  And maybe counsel for

12   Quinn Emanuel can inform us on what the status of their

13   communications are with the Keker Van Nest firm because we

14   don't know that.

15          THE COURT:  Yes.

16          MR. QUINN:  We don't know exactly where he is.  One

17   of the things I was going to propose to your Honor is that,

18   at the end of the day today, we get in touch with his counsel

19   and just let his counsel know that this matter was set for

20   hearing, assuming that the Court is going to set it for

21   hearing sometime Monday morning.  And just alert them to the

22   possibility that depending upon the Court's ruling, he might

23   need to be here Tuesday morning.

24          THE COURT:  I'll take this in camera at sidebar if

25   you want.  But is there anything relevant to this in the

Page 4484

1   settlement agreement?

2           MR. QUINN:  Nothing that isn't also in the public

3   document.

4           THE COURT:  Okay.  All right.  Then why don't you

5   discuss it.  Is there -- basically what I'm asking is is part

6   of the settlement agreement an agreement to be available?

7           MR. QUINN:  There is a statement in the public

8   document, the dismissal, that he agrees to appear in our case

9   in chief, and so they are taking the position that that

10  exhausts his obligations.

11          THE COURT:  Who is "they"?

12          MR. QUINN:  Mr. Bryant.  His counsel is.

13          THE COURT:  I see.

14          MR. QUINN:  That they have informed us of that.

15          THE COURT:  So I probably should hear from them as

16  well, then, on this motion.

17          MR. QUINN:  It would seem.

18          THE COURT:  All right.  I would like to get,

19  then -- today is Thursday.  Tomorrow is Friday.  Do they

20  deliver on Sunday?

21          MR. NOLAN:  Anytime you want.  Unfortunately, your

22  Honor.  I mean not by public mail but by messenger.

23          THE COURT:  There's somebody who is out there

24  around the clock?

25          MR. NOLAN:  For a price, it can be done.

Page 4485

1          THE COURT:  All right.  Why don't we have delivered

2   to -- I'll give leave to both MGA and counsel for Mr. Bryant

3   to file a response to the motion to order Mr. Bryant to

4   return, and that can be filed -- delivered to the Court at

5   the Court's residence by 3:00 on Sunday.

6          Mr. Nolan, I believe you have my home residence

7   address?

8          MR. NOLAN:  Somewhere I do, yes, your Honor.  I

9   think you've provided it before for special deliveries.

10          THE COURT:  So you could provide that to Mr. Keker

11   or Ms. Anderson.  And have it delivered by three o'clock on

12   Sunday.

13          MR. NOLAN:  We'll try to coordinate the delivery.

14          THE COURT:  If you could.  That would be great.

15   And then I'll take a look at it.  And then I think it's

16   probably better that we have a hearing on this Monday morning

17   as opposed to the Monday afternoon.  We have a lot of

18   scheduling conferences scheduled for 9:30, I believe.  With

19   you we don't have much at 10:00.  We have five scheduling

20   conferences scheduled for 9:30.  And we have four hearings at

21   10:00.  Why don't we simply add this to the 10:00 calendar.

22          MR. NOLAN:  This limited issue, your Honor?

23          THE COURT:  This limited issue.  Just provide

24   notice.  So we'll hear this at 10:00, and then we'll hear

25   everything else at 3:00.

Page 4486

1    MR. NOLAN:  Your Honor, I have no reason to ask

2 this other than anticipation since I've not talked to them,

3 Keker Van Nest, as to whether or not they have other

4 commitments at ten or eleven o'clock.  Is there any

5 possibility, if they were to ask, that they could attend by

6 phone?

7    THE COURT:  You know, given these circumstances,

8 that would be appropriate.

9    MR. NOLAN:  It would be appropriate?

10    THE COURT:  That's fine, yes.

11    MR. NOLAN:  And it may not be necessary.  I just --

12    THE COURT:  Well, yes, that's fine with the Court.

13    MR. NOLAN:  All right.  Thank you.

14    THE COURT:  And, in fact, I'm not going to order

15 them to attend at all.  If they want to submit on the written

16 opposition and have you represent their interests, that's

17 fine as well on this limited point.  Because, quite frankly,

18 this affects -- the only reason I'm offering them is simply

19 to protect Carter Bryant's interests, and to the extent they

20 want to waive appearance, that's fine.

21    MR. NOLAN:  Your Honor, I know that a declaration

22 was submitted in camera.

23    THE COURT:  I have that, yes.  I did review that.

24    MR. NOLAN:  And I just want to --

25    THE COURT:  It puts you in an awkward position.

5a666c2b-fb16-4818-aa53-d777012970ec

1        MR. NOLAN:  In any other case, any other situation,

2    any other factual situation we would now be in a situation

3    where we would know exactly why they are calling someone for

4    rebuttal, what the justification is.  And it's very difficult

5    for us to be shooting in the dark.

6        THE COURT:  Let me hear a response to that,

7    Mr. Quinn.

8        MR. QUINN:  Your Honor, I think if we are down to

9    their playing a videotape and calling a Custodian of Records,

10   and that's all, there's not going to be any response, then,

11   to our proffered rebuttal, I don't mind their seeing the

12   declaration.

13       THE COURT:  I'm sorry?

14       MR. QUINN:  If the remainder of their case, if they

15   will represent it's going to consist solely of the videotape

16   that hasn't been played --

17       THE COURT:  Maybe two videotapes.

18       MR. QUINN:  Or two, and calling the Custodian of

19   Records, and we have to deal with the Cassidy Park issue, and

20   that's another separate issue.

21       THE COURT:  They have already represented that's

22   all that's left in their case.

23       MR. QUINN:  I know.  But my agreement to this would

24   really depend on the Court's ruling on Cassidy Park.  I

25   wouldn't want that -- if they are going to get another live

Page 4488

1  substantive witness up there, it would be my preference that

2  they not see the declaration.

3          So perhaps if the Court could take a look at the

4  Cassidy Park issue, and depending on how that's resolved, we

5  may not have an objection to their seeing that.  If we're

6  just looking at tape and a Custodian of Records deposition,

7  and that's the end of the case.  What I'm concerned about is

8  that they see it and that that somehow then shapes the

9  remainder of their case.

10          THE COURT:  Your remark, Mr. Nolan, when you say

11  ordinarily you would know what the rebuttal witness is going

12  to be testifying to, I don't think that's necessarily

13  accurate.  By definition, rebuttal witnesses are normally not

14  decided upon until the end of the defense case.

15          MR. NOLAN:  My point is that we're at the end of

16  the case.  I would assume that we're going to be through on

17  Tuesday, and Mr. Bryant, if he's going to testify, would be

18  right there afterwards.

19          THE COURT:  Mr. Quinn is saying you're not quite

20  there.  If you really are at the end of the case, okay, I

21  think we've resolved this by removing the Cassidy Park issue

22  and going forward on that.

23          Okay.  So no other rebuttal from Mattel, I take it,

24  unless the Court rules in a certain way on the Palmer case;

25  correct?

Page 4489

1          MR. QUINN:  The only other possible rebuttal that
2    we're considering is some other witness on this Jewel doll
3    issue.

4          THE COURT:  Well, you mean this?

5          MR. QUINN:  Not that one, no.  Not on that.

6          THE COURT:  The Jewel doll issue that you raised
7    in --

8          MR. QUINN:  Yes.

9          THE COURT:  Yes.  Well, it sounds like we're going
10   to be able to wrap this up on Tuesday, even if all of this
11   comes in because of the limited nature of these rebuttal
12   witnesses.

13         MR. NOLAN:  If I could just go back on the comment
14   with respect to Jewel Barbie.  Our case, we didn't -- I mean,
15   Jewel Barbie was put on in their case.  The only time that we
16   tried to do something with respect to Jewel Barbie was with
17   respect to getting an authentication of this copyright
18   application, and I didn't get it in.

19         Now, to say that they are going to use that now in
20   rebuttal, I mean, I always do the -- the test for rebuttal
21   has got to be that it's something that shouldn't have been
22   anticipated --

23         THE COURT:  I understand.  It's helpful that we
24   could have the in camera declaration provided.  So let's deal
25   with the Cassidy Park issue.  Who wants to lead off on that?

Page 4490

1  And someone has to refresh my recollection on what Cassidy

2  Park has to do with any of this.

3          MR. NOLAN:  She was called as a witness, and the

4  date of her testimony really doesn't matter, but it was

5  sometime at page 3530, whatever date that was.  But here was

6  the gist of it.  They took Cassidy Park for just a few

7  minutes.  She was the supervisor of Carter Bryant during

8  the -- the corporate supervisor during the period back in

9  Missouri.  And you'll recall we were backing up on third

10 party witnesses.

11         I had been taking -- I went a little bit long.

12 They went short.  And you said to me during a period of time,

13 Mr. Zeller -- reading from page 3530 -- "Mr. Zeller is going

14 to get beat up at the end of the day by a bunch of third

15 party lawyers who are not going to have their witnesses on.

16 A 25-minute witness has now taken an hour and 20 minutes.

17 And I understand she's on your witness list.  All that's

18 relevant to the Court is that the chess clock is going as we

19 speak."

20         And then it is true, your Honor, I -- you know, I

21 asked a few more questions, and then I sat down.  I confess I

22 fully understood that the message was we're burning up time

23 that needs to be used for third parties.  If you've got her

24 on your witness list, she'll come back.  That's how I

25 interpreted.

5a666c2b-fb16-4818-aa53-d777012970ec

Page 4491

1        THE COURT:  You're saying the Court rushed you?

2        MR. NOLAN:  No, I made a decision based on trying

3   to please the Court, in trying to accommodate the third party

4   witnesses.  But I will admit, your Honor, that at the end,

5   you did excuse the witness.  And at that time I did not say

6   time out.  But I did give them notice --

7        THE COURT:  What do you want to bring her back to

8   say?

9        MR. NOLAN:  I'm always faced with these proffers

10  that I'm giving.  There's certain topics that I'm going to

11  look at carefully to see whether or not we need to cover

12  them.  There were areas that I did not cover with her, and in

13  light of the Court's comments and rulings, I want to take

14  that in consideration.  I can't make a proffer right now,

15  nor, frankly, your Honor, they have never had to do this on a

16  particular witness.

17        THE COURT:  You are asking them do it with regard

18  to Carter Bryant.

19        MR. NOLAN:  That's a totally different subject.

20        THE COURT:  Right.  That's a rebuttal witness.

21  This is your case in chief.  But the difference here,

22  Counsel, is you're asking the Court to set aside the fact

23  that I excused a witness and reopen testimony.  I think the

24  Court is not out of line to ask why is it that you are asking

25  the Court to take what is extraordinary relief and recall a

Page 4492

1   witness who has been excused to have them recalled not as a

2   rebuttal witness, but just to come again in the case in

3   chief?

4              MR. NOLAN:  I understand, your Honor.  One of the

5   areas that I wanted to explore with her had to do with when

6   she first learned about Carter Bryant's involvement in Bratz.

7   I wanted to get into her involvement.  She's on the

8   inventions committee at Mattel during the relevant period of

9   time here.  I want to explore really what her status is as an

10  employee of Mattel because there's conflicting testimony on

11  that.

12             But, your Honor, I need -- I mean, that's my

13  proffer right now.  But I need to go back.  I mean, I can

14  take a few minutes and think about it more, but it's been a

15  long day, and I'm trying to assess where we're at.

16             We want to end this case, but I do think that the

17  standards -- you know what?  I agree.  You excused her.  I

18  misunderstood something because she was on our witness list,

19  that we would have the right to call her back.  And I gave

20  notice to Mr. Quinn.  Mr. Quinn raised the issue about gee, I

21  thought she was through.  We all looked at the transcript.

22  It is what it is.

23             I could think more about it and make a definitive

24  decision in a few minutes, if I could just have leave to do

25  that.

Page 4493

1           THE COURT:  Very well.  Let me hear a response from

2   Mattel.

3           MR. QUINN:  Your Honor, the transcript reflects

4   that Mr. Nolan did do a recross-examination.  He asked a

5   question, and then said, "Nothing further."

6           The Court asked us, "Anything further?"

7           "No, your Honor."

8           "All right.  You're excused, ma'am."

9           The two subjects that counsel has identified, when

10  she first learned about Bratz, that sounds like a statute of

11  limitations or laches issue, and conceivably he's going to

12  have a chance to question her about that if there is another

13  phase to this.

14          And then the question about her status as an

15  employee, she's an employee.  The CEO of a company that's got

16  30,000 employees didn't think she was an employee now.

17  Although he acknowledges he wouldn't necessarily know if

18  she's a part-time employee.  That doesn't really sound like a

19  significant enough issue that we should do this very unusual

20  procedure of bringing back somebody.

21          MR. NOLAN:  I made this argument irrelevant.  I

22  apologize for taking up the time.  Your Honor, we will not

23  call Cassidy Park.

24          THE COURT:  All right.

25          MR. NOLAN:  So we will accept the deal that Mattel

1    offered about giving us the declaration of Carter Bryant so

2    we can use that to respond.

3              THE COURT:  Very well.

4              MR. QUINN:  And so there won't be any other

5    witnesses, as I understand it.  We're looking at two tapes

6    and the Custodian of Records.

7              THE COURT:  Two tapes, the Custodian of Records,

8    yes.  Okay.  That takes care of everything except the Palmer

9    issue.  I'd like to speak a little bit more about the Palmer

10   issue tonight.  But besides the Palmer issue, is there

11   anything else?

12             MR. ZELLER:  If I could just get a clarification

13   and make sure I correctly communicate to Carter Bryant's

14   counsel the Court's expectations.  I understood the 3:00 P.M.

15   Sunday deadline, which I'll obviously advise them of.  And

16   I'll send them this portion of the transcript as well.

17             THE COURT:  And a 10:00 A.M. hearing, and it's up

18   to them whether they want to be there for the hearing or not.

19   They can either have Mr. Nolan or counsel for MGA represent

20   their interests, or they can participate by telephone, or

21   they can -- they are always certainly welcome to attend in

22   person.

23             MR. ZELLER:  And also to anticipate potentially a

24   question.  Is it okay for them to send by e-mail to you any

25   opposition brief that they have by 3:00 P.M. on Sunday?

Page 4495

1          THE COURT:  I'll tell you the problem is that my --

2     we really don't have a printer that works all that well at

3     home.  And there's only so much I can read.  I really would

4     rather have a hard copy.  So maybe you can e-mail it to

5     someone else who can print it out and give it to MGA and get

6     it in.  I would prefer a hard copy.

7          MR. ZELLER:  Very well.

8          THE COURT:  And then if there's a Phase 2 of this

9     trial, if there's an extra printer around here that the Court

10    can borrow --

11         MS. AGUIAR:  We'll chip in.

12         MR. QUINN:  Done, your Honor.

13         THE COURT:  In any event, yes, what else?

14         MR. ZELLER:  Also we were interested in the time

15    count.

16         THE COURT:  I'll get back to you on that.  I have a

17    pretrial service officer waiting in chambers since 5:00.

18    Somebody wants to get out for the weekend.  So I'll come back

19    and deal with Palmer and the time count.  And we've got a

20    couple dolls.

21         MS. AGUIAR:  I understand that you want to cut this

22    short.  So we can do this on Tuesday.

23         THE COURT:  That's what I'm trying to do now.  I

24    really want to know if there's anything else.

25         MS. AGUIAR:  I did want to raise it, and you can

Page 4496

1    tell me when you want to deal with it.  There's a couple

2    dolls that were marked with different witnesses.  There was

3    testimony elicited on both the My Scene and the Flavas doll

4    throughout the course of the testimony in 1-A.  And neither

5    one of these came into evidence.  There was discussion at a

6    sidebar regarding My Scene, not about Flavas.  I think Flavas

7    was just an oversight of not moving it in.  We can deal with

8    it on Tuesday, but we do want to move both of them into

9    evidence.

10            THE COURT:  We'll talk about the dolls when I come

11   back out.  Anything else?

12            MS. AGUIAR:  And we would like leave to submit a

13   supplemental expert report.  I can walk through with you what

14   the basis for that is, and there's one other exhibit that

15   needs to be moved in.  But again, nothing that can't wait.

16            THE COURT:  Supplemental expert report on?

17            MS. AGUIAR:  Sure.  It is on damages.

18            THE COURT:  Okay.  This is for the next phase.

19            MS. AGUIAR:  Well, it's for 1-B, yes.  But I wanted

20   to raise it because we want leave to file a motion to submit

21   it.

22            THE COURT:  Very good.

23            MS. AGUIAR:  So there are those three things which

24   we can deal with whenever your Honor thinks it is

25   appropriate.

Page 4497

1          THE COURT:  Just give me a few minutes here.  It's

2     not going to take me long in chambers.

3          MS. AGUIAR:  And in the midst of your time count,

4     we have the Irmen video.

5          THE COURT:  Oh, yes, please.  What is that?

6          MS. AGUIAR:  MGA is 32 minutes, five seconds.  And

7     Mattel is 14 minutes, 25 seconds.

8          THE COURT:  Got it.  All right.  I'll take a brief

9     recess.  We'll resume around 5:30.

10          (Recess taken.)

11          THE COURT:  Okay.  Let's deal with the most

12     difficult issue first.  Why don't we take up the Palmer

13     matter.  And now that we've all settled down a little bit,

14     I'd like to take the Palmer argument from the top.  So

15     whoever would like to proceed on that first.

16          MR. NOLAN:  Palmer was designated as the person

17     most knowledgeable with respect to the phone records.  We

18     took the deposition.  We want to play the video.  We would

19     like to have it sponsored by the person most knowledgeable at

20     Mattel.  We're not asking the Court to instruct the jury.  We

21     don't believe a 403 argument is appropriate.  We're not

22     attaching an intentional aspect to it.

23          As the Court noted, there's been a lot of testimony

24     about things that are missing.  But I don't want the jury to

25     be sitting there wondering I wonder whatever happened to the

Page 4498

1    October phone records.  And what I'd like, because they are

2    going to have the September phone records in evidence, I'd

3    like to have those in evidence.  That one sheet of paper that

4    shows the phone calls.  And I just think that they need to

5    know that this document does not exist.

6              So from the absence of proof, they don't have to

7    draw any conclusions.  I'm not going to say that it was

8    intentional by Mattel.  I am going to say that had these

9    records been available, and they are not, they likely would

10   have confirmed what the story is here, and that is that there

11   were meetings, some Friday afternoons.  I mean, I think the

12   Court understands our position in that respect.

13             THE COURT:  No, no.  Please elaborate.  That's

14   actually what I was listening for.  So what do you believe,

15   if we would have had the phone records, what do you believe,

16   best case scenario for MGA, those phone records would have

17   shown?

18             MR. NOLAN:  Carter Bryant never called MGA during

19   this period of time after he signed the contract and gave

20   notice that --

21             THE COURT:  And, of course, they don't

22   necessarily -- what they would show, then, in that instance

23   is that there is no evidence that Carter Bryant ever used his

24   phone at Mattel to call MGA; correct?

25             MR. NOLAN:  Correct.  That's correct.

Page 4499

1          THE COURT:  Would Mattel be willing to stipulate to

2    that fact, that there is no evidence that Carter Bryant used

3    his phone at Mattel to call MGA?

4          MR. ZELLER:  In October of 2000.

5          THE COURT:  In October of 2000.

6          MR. ZELLER:  I think with some wordsmithing, the

7    answer to that is yes.

8          THE COURT:  The Devil is always in the details.

9    What possible wordsmithing would you like?

10         MR. ZELLER:  It's a matter of what we would

11    stipulate to and what is told to the jury.

12         THE COURT:  This is what I would tell the jury.

13    The parties have stipulated that there is no evidence that

14    Carter Bryant called MGA -- that Carter Bryant called MGA

15    using his Mattel phone during the month of October.  And

16    assume there would be a further stipulation to admit the

17    phone records from September and all the other months that

18    you want to get in.

19         MR. NOLAN:  Right, your Honor.  And I think I would

20    just include no phone calls to MGA or Margaret Leahy.

21         THE COURT:  This is essentially the same thing that

22    the Court organized when it was -- when the ball was on the

23    other side on the Menz expert witness when it gets down to

24    the mechanics of it.  Because that's all Palmer is.  He can't

25    offer any opinion.  There's no issue of culpability or intent

Page 4500

1    with respect to Palmer.

2          Palmer is very much like Menz and the issue of the

3    Evidence Eliminator, and if there's no disagreement,

4    Mr. Nolan just told me that the best case scenario for MGA is

5    evidence that at the end of the day, there is no evidence of

6    these phone calls.  And if Mattel will stipulate to that, and

7    MGA is willing to stipulate to that, that not only saves

8    time, but it eliminates this issue.

9          MR. ZELLER:  I guess in a matter of preference, the

10   way the Court originally had it before the break, I think,

11   was really --

12         THE COURT:  I understand that.

13         MR. ZELLER:  Just a problem with the phrase there

14   is no evidence.  I mean, if something more specific --

15         THE COURT:  There is no evidence.  That's the

16   problem.  I think they are entitled to that.  Just like there

17   is no evidence of what the molds look like.  There's no

18   evidence that any number of things in this trial.

19         MR. ZELLER:  And that gets us into that very issue.

20   I mean, why are we talking about that?  We're just -- this

21   particular one, I mean, a stipulation or an instruction that

22   the October phone records do not exist, that seems

23   appropriate.

24         All I'm saying is in terms of, you know, the

25   particular wording used in front of the jury.  I mean, if the

1   Court is looking for, say, a stipulation in terms of what

2   will we argue or not argue, you know, I think we can

3   certainly say that in broader terms, we're not going to

4   argue, you know, that our case depends on or is based on or

5   rests on the fact that Carter Bryant was calling MGA from his

6   Mattel extension in October of 2000.  I mean, that's not an

7   issue that we have raised.

8           That's why I think it seems like a little bit of

9   overkill to be emphasizing to the jury well, there's a

10  missing piece.  You know, when it seems to emphasize

11  something where, you know, the same point could be made about

12  any number of other things that, as the parties have been

13  discussing and there is testimony about, that they are

14  missing.

15          THE COURT:  Like what?

16          MR. ZELLER:  Well, the missing molds.  I mean, we

17  could say, you know, there's --

18          THE COURT:  There's evidence.  There was a question

19  asked, where are the molds?  They are gone.  So that's out in

20  front of the jury.  And I'm basically trying to treat this in

21  the same way.  I haven't placed any limitation on any of the

22  questions that have been asked about evidence that -- or

23  items that are missing.  And I don't see any reason to do so

24  now.

25          I have some concerns, and this is what MGA needs to

Page 4502

1    be mindful of, of the -- of some of the testimony in the

2    Palmer deposition which I think goes beyond and gets into

3    this negative inference aspect of it.  And that's why I asked

4    the question that I did, and I'm satisfied with MGA's answer,

5    that all they are looking for is the statement of fact that

6    there are no phone records for October of 2000.  There's no

7    evidence of these communications, whereas there is evidence

8    for September.

9              And I agree with Mr. Nolan's point, that it does

10   seem odd that if there's going to be evidence introduced for

11   the September phone records, and I gather you have no

12   objection for the September records.

13             MR. ZELLER:  True.

14             THE COURT:  And if that comes in, there needs to be

15   an explanation.  I really think it is of moment at the end of

16   the -- frankly, it's a nonentity in my view at the end of the

17   day.  But it seems to be important to both sides.  So I'm

18   sure I'm missing something.

19             MR. ZELLER:  I would just point out, your Honor,

20   that the phraseology that the Court was suggesting most

21   recently, I mean, that could actually be consistent with the

22   idea that the phone records still exist but do not show that

23   there were calls.  That's part of, I guess, why, you know,

24   respectfully I would suggest that it's more, as the Court is

25   saying, the Devil is in the details.

Page 4503

1            I think conceptually we have absolutely no problem

2     with a stipulation, with the Court, you know, instructing the

3     jury and short-circuiting all of this.  But it is something

4     of a concern where it makes it sound, you know, not only a

5     matter of emphasis, but it makes it sound like, because this

6     jury is going to see the September records, they are not

7     going to have October records.

8            And then they are going to be told, you know,

9     there's no evidence suggesting that we have the records.  And

10    they show he did not call.  And I recognize this is a fine

11    line.  I mean, there's no question, but this is the

12    wordsmithing aspect of it.

13            THE COURT:  Let me suggest this:  The Court cannot

14    force anyone to stipulate.  So if I don't have both sides

15    agreeing, then I go back to the drawing board.  What if we

16    say the parties have stipulated that exhibit, whatever the

17    exhibit is that has the -- is it just the September -- well,

18    just the September records that you want to get in; is that

19    correct?

20            MR. NOLAN:  The September telephone records.

21            THE COURT:  So it's relatively short.  So that

22    exhibit, whatever it is that has the September records, is a

23    record of telephone calls from Carter Bryant's extension at

24    Mattel to MGA.  There are no records available for the month

25    of October.

Page 4504

1          So the Court's proposed stipulation would be the

2     parties have stipulated that exhibit, whatever it is, is a

3     record of telephone calls from Carter Bryant's extension at

4     Mattel to MGA for the month of September 2000.  There are no

5     records available for the month of October, 2000.

6          MR. PRICE:  We're not introducing the September

7     records.  I don't know if he wants them redacted to just

8     reflect Carter Bryant to MGA.

9          THE COURT:  I'm sure he can speak for his view on

10    that.

11         MR. PRICE:  I thought he said he didn't want that.

12         THE COURT:  Mr. Nolan, what are your thoughts?

13         MR. NOLAN:  Your Honor, this is a business record

14    of Mattel.  I don't want it to be redacted.  I think that it

15    should just come in in the form that it was presented to the

16    witnesses.

17         THE COURT:  Can I take a look at it?

18         MS. AGUIAR:  Sure.

19         THE COURT:  What about the Court's proposal,

20    though?  The parties have stipulated this is a record of

21    telephone calls from Carter Bryant's extension at Mattel to

22    MGA for the month of September 2000.  We can highlight the

23    ones that are going to MGA, and there are no records

24    available for the month of October 2000.  And that treats

25    this very much like all of the other missing stuff that's

Page 4505

1   come out during this trial.  There's no request for an

2   adverse inference to be made either in argument or

3   instruction, and we'll leave it at that.

4           MR. NOLAN:  The exhibit that's been handed up to

5   you is Exhibit 472.  The version you have may have all of the

6   months in it, and my intention would be only the month of

7   October.  We would take that out.  Your Honor, with respect

8   to the Court's proposal, I don't -- my concern is that the

9   Court is directing that these are the phone calls to MGA.  If

10  you -- if the stipulation was just saying that Exhibit 472

11  represents the phone calls made by Carter Bryant from his

12  extension at Mattel for September, there are no records

13  available for the period for October.

14          THE COURT:  Yes.  That's acceptable.

15          MR. NOLAN:  Yes.

16          THE COURT:  Acceptable?

17          MR. ZELLER:  It is, your Honor.

18          THE COURT:  Very well.

19          Regarding the dolls.

20          MS. AGUIAR:  The two exhibits, two tangible

21  exhibits, 18555, which is a Flavas doll.

22          THE COURT:  Yes.

23          MS. AGUIAR:  And 17378, which is a My Scene doll,

24  and I think in connection with a presentation that was made

25  earlier today to the Court, and as the Court is aware, as

Page 4506

1  you've been sitting here the whole time, there has been a lot

2  of evidence about Flavas and My Scene both in testimonial

3  evidence and also in documentary evidence.  So we would

4  move --

5            THE COURT:  Tell me what you think the relevance,

6  though, of actually seeing the dolls as to perhaps curiosity

7  or whatever.  The concern that Mr. Zeller expressed at

8  sidebar, or maybe it was Mr. Quinn, somebody expressed at

9  sidebar regarding the My Scene dolls is that we don't want to

10  get into a Phase 1-B type issue where the jury is comparing

11  the dolls to Bratz and wondering --

12            MS. AGUIAR:  Understood.  I think the jury,

13  though -- I don't really know or have any basis for saying

14  this other than observing them for the last six weeks.  I

15  think they have been paying attention and are savvy, and I

16  think they know what their task is going to be in this phase.

17  You have your instructions.

18            But specifically, your Honor, almost every time

19  there's been a doll mentioned specifically, there's been

20  testimony about it, it has come into evidence.  So for that

21  matter we could say that when -- and I think it is my memory

22  that Mattel actually was the one who offered a Bratz doll

23  into evidence, and so for that matter, we could say they are

24  going to be looking at the drawings and looking at the Bratz

25  doll.  So dolls have come into evidence that people have

Page 4507

1    testified about.

2            We've got Prayer Angel into evidence.  And I do

3    think that the jury is entitled to see these tangible items

4    about which there's been testimony.

5            THE COURT:  Again, the Court's question is for what

6    purpose?

7            MS. AGUIAR:  I think that -- I don't see that

8    there's any other -- to the extent that there was testimony

9    on the other dolls, and therefore, we wanted the jury to be

10   able to actually see the tangible item that people were

11   testifying about, presumably that was why a number of the

12   other dolls were introduced.  So I think it's for the same

13   reason --

14           THE COURT:  Well, the fact that the dolls were

15   passed around and there were particular reasons why they were

16   passed around.  There was no objection made, or if there was,

17   it was dealt with.  I can't remember them all at this point.

18   But there was a particularized reason.  What I'm asking you

19   for is let's do the same thing here.  What is the reason for

20   these dolls, outside of curiosity or completeness or

21   whatever?

22           MS. AGUIAR:  And I do think that -- both of these

23   dolls were introduced after Bratz, and there was testimony

24   elicited from witnesses that your Honor permitted on that

25   regarding the timing.  And that these would allow the jury to

Page 4508

1  know that and to see that because the dates on these boxes,

2  just like the dates on some of the other boxes, are what they

3  are, and the jury can see them.

4          THE COURT:  Don't the dates on these boxes render

5  them irrelevant for purposes of timing?

6          MS. AGUIAR:  I don't think this is a timing

7  question.

8          THE COURT:  I don't think so either.

9          MS. AGUIAR:  And I do think there are dolls that

10 have come into evidence, I don't think over objection that

11 have dates on there that have dates outside the time frame.

12 So that really is not a reason.  I really just think look,

13 the jury has seen dolls come into evidence when there's been

14 testimony about it.  So I just don't see any harm, and I

15 think it -- anyway.

16         THE COURT:  Okay.  Let me hear Mattel's thoughts.

17         MR. QUINN:  Your Honor, I think when other dolls

18 have come in, they have been for a particular reason because

19 they are relevant to issues in this case.

20         THE COURT:  Give me an example.

21         MR. QUINN:  Cabbage Patch dolls.  Would somebody

22 have been painting a Cabbage Patch head in the fall or summer

23 of 2000.  Is that an adequate explanation as to -- I mean,

24 Prayer Angel heads weren't available, and we had an invoice

25 which refers to Prayer Angel.  There was a whole question

Page 4509

1   about what is that.  There was testimony from Anna Rhee and

2   others.  I think there's a Cabbage Patch doll in evidence and

3   a Prayer Angel doll in evidence.  They were part of the story

4   about the development of Bratz, and there was testimony on

5   that.

6          These may be, you know, My Scene in particular is

7   going to be relevant to Phase 2.  I don't even think it's

8   relevant to Phase 1-B.  This one is a 2004 doll.  I mean,

9   that's what the date is on it.

10         It's not relevant to any issue in this case.  I

11  mean, what I'm hearing is there's really no harm.  There

12  should be a complete set of all the dolls that have ever been

13  referred to.

14         I think there is harm.

15         THE COURT:  Let me -- articulate that harm.  I'm

16  trying to get an articulated reason for either putting them

17  in or not putting them in.  Can you articulate a reason for

18  not putting them in?

19         MR. QUINN:  The Court knows that there are

20  contentions in this case and other claims which are not part

21  of this phase that My Scene is a knock-off of Bratz.  And

22  they point to certain features about the eyes in particular,

23  which are called out.  And you know, I think putting this

24  into evidence invites the jury to sort of speculate about

25  that and go off in directions which really aren't relevant to

Page 4510

1    this phase.  There has been no testimony about these

2    particular dolls.

3              THE COURT:  Anything else?

4              MR. QUINN:  Nothing, your Honor.

5              THE COURT:  Very well.  Okay.  I'll make a decision

6    on that on Monday when I'm not so tired.

7              And, Ms. Aguiar, if you're half as tired as I am,

8    you may need some sleep as well.  If you can come up with an

9    articulable reason as to why these dolls should come in, I'll

10   consider that on Monday.

11             MS. AGUIAR:  Fair enough.

12             THE COURT:  All right.  As it stands right now, I

13   don't see a justification at all for admitting them.  But if

14   there is a reason, I'll give you leave to bring that up.  The

15   expert reports, someone needs leave to file an expert report

16   for Phase 1-A?  Or 1-B?

17             MR. NOLAN:  Yes, I understand this has been the

18   subject of discussions with Mattel.  They know that we were

19   going to be -- we've had a supplemental report ready to go.

20   There were discussions.  We just need leave of the Court to

21   ask permission to file it.  It has to do with potential

22   damages in 1-B.

23             THE COURT:  Is there any objection to it being

24   filed?

25             MR. ZELLER:  No objection to them seeking leave.  I

Page 4511

1    don't know the details because I haven't been part of this

2    conversation, but I do understand we have some substantive

3    issues with what is being requested.

4           THE COURT:  Very good.

5           MR. ZELLER:  But the leave part is fine with us.

6           THE COURT:  If all you're seeking is permission to

7    seek leave to file, that's -- sure, and just to refresh,

8    Magistrate Infante had allowed a 30(b)(6) witness to be

9    taken.  It was actually taken either during the course of the

10   trial or immediately before, having to do with damages.  It

11   was a supplemental.  And that's why we had to add that

12   information out to the report.

13          THE COURT:  All right.

14          MR. NOLAN:  So we can file the motion for leave?

15          THE COURT:  Yes.  All right.  I think that wraps up

16   the list.  I know there's a few other exhibits.

17          And, Ms. Aguiar, I'll take those up on Monday after

18   we go through the jury instructions and the verdict form.

19   10:00 Monday, we will deal with the Carter Bryant issue.

20   Three o'clock we'll deal with jury instructions, verdict

21   form, and exhibits.  We will hear on Tuesday morning from --

22   not necessarily in this order -- Custodian of Records, Jeanne

23   Galvano, and the stipulation on Exhibit 472.

24          MS. AGUIAR:  Great.  I was just wondering, your

25   Honor, about one thing.  We are going to be filing our

Page 4512

1    judgment as a matter of law.  Were you hoping to take that

2    with you?  Did you want us to somehow --

3              THE COURT:  Do you have it done?

4              MS. AGUIAR:  Not right this minute, but we may have

5    it soon.  So not to get into your schedule too much, but how

6    long are you going to be here?

7              THE COURT:  I'll be here until 7:00.

8              MS. AGUIAR:  Okay.  And the same thing would be

9    true for the jury instructions.  We're making sure, and your

10   law clerk asked us to do that.

11             THE COURT:  I'm take all of those home with me this

12   evening.

13             MS. AGUIAR:  One last question regarding

14   scheduling.  Was your Honor anticipating that if everybody

15   rests on Tuesday, that we would run right Wednesday morning

16   into closing, or were you thinking -- or were you thinking a

17   day in between or what?

18             THE COURT:  We need to start on Wednesday.  I'm

19   pushing up against some commitments at the end of the month

20   of July.  I want this to move along here.  I don't know how

21   long the jury is going to take to deliberate.  So that's

22   something he can't say.  But we need to --

23             MR. NOLAN:  Your Honor, if we finish -- we'll have

24   the charging conference on Monday.  And if we finish Tuesday

25   morning, and let's assume, and now that we've seen the

Page 4513

1   declaration, we're going to have, I think, a vigorous

2   opposition as to why this wasn't dealt with in the case, in

3   their case in chief, because it's Jewel Barbie and Rainy Day

4   Rascals.  And I'm tired, but I think I remember hearing about

5   that in the case in chief.

6           But my question is this, your Honor.  If we finish

7   Tuesday morning, would it be the Court's intention to

8   instruct the jury Tuesday afternoon, and would we start --

9           THE COURT:  I don't think so.  What I'd like to do

10  is Wednesday, you know, fresh, give the instructions,

11  probably take an hour, hour and a half to get through the

12  instructions and the verdict form.  And counsel -- we are

13  going to get through closings all on one day.  So I say that

14  before I ask this, but what are your estimates on closing

15  arguments at this point?

16          MR. QUINN:  Can we give that on Monday, your Honor?

17          THE COURT:  You can.  But be mindful of the Court's

18  statement.  We will be getting through closings in one day.

19          MR. QUINN:  Right.  Understood.

20          THE COURT:  I'm not going to have --

21          MR. QUINN:  I assume one day meaning a day ending

22  at 5:00 P.M.

23          THE COURT:  Right.

24          MR. NOLAN:  And as sarcastic as this may sound,

25  it's the Irish and being tired, that's closing arguments from

Page 4514

1   both of them.

2          THE COURT:  Right.

3          MS. AGUIAR:  One thing I forgot, and I apologize.

4   With regard to the judgment as a matter of law, we are filing

5   it, obviously, before Mattel has its rebuttal.  And I think

6   this probably goes without saying, but whatever is in our

7   motion will not be the subject of testimony by Mattel in its

8   rebuttal case.  Because obviously, we're pretty much done.

9   They know what our case is now.  It's a video, and it doesn't

10  have to do with their motion.  So I --

11         THE COURT:  They have identified what they are

12  calling their rebuttal witness for.

13         MS. AGUIAR:  Right.

14         THE COURT:  And you have that.  So worst case

15  scenario from your perspective is that that subject matter

16  comes in, but nothing beyond that.  So given what you've

17  indicated that the JMOL is on, that should be fine.

18         The only thing is if you're getting Mr. Bryant out

19  here on Tuesday -- and I'm not saying if he is or if he is

20  not -- but if he is, we need to make sure he's out here early

21  Tuesday morning.  Because it doesn't sound like there's going

22  to be a lot to do Tuesday.  How long is Jeanne Galvano?

23         MR. NOLAN:  An hour and two minutes.

24         THE COURT:  Okay.  And then the Custodian of

25  Records, probably a half hour or so.

Page 4515

1      MR. NOLAN:  With as much knowledge as they probably

2  have, maybe two hours.  I don't know.  No, I think you're

3  right.  A half hour would be generous.

4      THE COURT:  All right.  So very good.  I'm just

5  starting to think, if we are -- if we did get through the

6  jury instructions on Monday afternoon and we finish up early

7  enough on Tuesday, maybe I might instruct on Tuesday

8  afternoon so that we can start with the closing argument

9  first thing Wednesday morning.  I wouldn't start with closing

10  arguments any earlier than Wednesday morning.  But maybe it

11  might make sense.

12      Let's just see how we do.  We may need some more

13  time on Tuesday afternoon to finish up our charging

14  instruction, but let's see how that plays out.  But in any

15  event, closing arguments for Wednesday.

16      I'm getting a note.  See, you guys get notes all

17  the time.  I get them, too.

18      Anything else?

19      MR. QUINN:  No, your Honor.

20      MR. NOLAN:  No, your Honor.

21      THE COURT:  Getting back to this issue that I'm

22  concerned about about Carter Bryant getting out here, what I

23  don't want to do is if the Court does find in favor of Mattel

24  on that point, I don't want this to be an issue of having to

25  put the trial off another day to get him out here.

Page 4516

1          So I think perhaps what Mattel should do is arrange

2     to have a ticket for Mr. Bryant to come out here so that that

3     does not become an issue.  So that on Monday, if the Court

4     were to find some Mattel's favor, that we're scrambling

5     around and not have to continue the matter to another day.

6          MR. QUINN:  We will do that, your Honor.

7          THE COURT:  I'm sorry?

8          MR. QUINN:  We will do that.

9          THE COURT:  Very well.  That's a good suggestion.

10         MR. NOLAN:  Your Honor, they have a plane.

11         THE COURT:  I'm sorry?

12         MR. NOLAN:  They have a plane.  I know that from

13    taking the deposition of --

14         THE COURT:  Very good.  The last point I want to

15    make is that I know we're all getting -- we've been in trial

16    now seven weeks, and I say this to no one in particular and

17    everyone in general, including myself.  We've got to be

18    mindful of our tone and respect for everyone involved.  So

19    let's keep that in mind, particularly as we head into next

20    week.  Let's all have a good weekend.

21         Get some rest -- some rest, anyway -- and a Happy

22    Independence Day to everyone, and I will see you on Monday at

23    10:00.

24         MR. QUINN:  I'm sorry.  Your Honor, the time count?

25         THE COURT:  MGA is right at 37 1/2 hours.  And

Page 4517

1    Mattel is at 46 hours and 45 minutes.

2              MR. QUINN:  Thank you, your Honor.

3              THE COURT:  Approximately.

4              MR. NOLAN:  Your Honor, have a great weekend.

5              THE COURT:  You too.  Take care.

6

7              (Proceedings concluded at 6:10 P.M.)

8

9                    C E R T I F I C A T E

10

11

12         I hereby certify that pursuant to Title 28,

13   Section 753 United States Code, the foregoing is a true and

14   correct transcript of the stenographically reported

15   proceedings in the above matter.

16              Certified on July 3, 2008.

17

18

19                      _____
                        MARK SCHWEITZER, CSR, RPR, CRR
                        Official Court Reporter
20                      License No. 10514

21

22

23

24

25