# EXHIBIT 1

**COPY**

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 90378)
2    Michael T. Zeller (Bar No. 196417)
   865 South Figueroa Street, 10th Floor
3  Los Angeles, California 90017
   Telephone:   (213) 443-3000
4  Facsimile:   (213) 443-3100

5  Attorneys for Plaintiff
   Mattel, Inc.

6

7

**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

APR 2 7 2004

John A. Clarke, Executive Officer/Clerk
By ~~~~~~~~~~~~~~~~~ Deputy
        SUE GABB

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                   FOR THE COUNTY OF LOS ANGELES

10

11  MATTEL, INC., a Delaware corporation,      )   CASE NO.  BC314398
                                               )
12                 Plaintiff,                   )
                                               )   COMPLAINT FOR:
13                                              )
            v.                                  )   (1)  BREACH OF CONTRACT;
14                                              )   (2)  BREACH OF FIDUCIARY
                                               )        DUTY;
15  CARTER BRYANT, an individual; and          )   (3)  BREACH OF DUTY OF
16  DOES 1 through 10, inclusive,              )        LOYALTY;
                                               )   (4)  UNJUST ENRICHMENT; AND
17                 Defendants.                  )   (5)  CONVERSION
                                               )
18                                              )

19

20

21

22

23

24

25

26

27                                         **EXHIBIT** 1

28                                         **PAGE** 7

07209/579342.1

COMPLAINT

1    Plaintiff Mattel, Inc. ("Mattel") brings this action against defendants Carter

2  Bryant ("Bryant") and Does 1 through 10 (all defendants being collectively referred to as

3  "defendants") and alleges as follows:

4

5                                    Parties

6

7          1.     Mattel is a corporation organized and existing under the laws of the

8  State of Delaware and has its principal place of business in El Segundo, California.

9          2.     Mattel is informed and believes, and on that basis alleges, that defendant

10  Bryant is an individual currently residing in Springfield, Missouri.

11         3.     The true names and capacities of defendants sued herein as Does 1

12  through 10, inclusive, are unknown to Mattel, which therefore sues said defendants by such

13  fictitious names.  Mattel will amend this Complaint to allege their true names and capacities

14  when the same are ascertained.

15         4.     Mattel is informed and believes, and on that basis alleges, that at all

16  times relevant herein, defendants, and each of them, were acting in concert and active

17  participation with each other in committing the wrongful acts alleged herein, and were the

18  agents of each other, and in doing the things alleged herein, each defendant was acting

19  within the course and scope of his, her or its agency and was subject to and under the

20  supervision of, and was acting with the knowledge of, his, her or its co-defendants.

21

22                           Jurisdiction and Venue

23

24         5.     During the time of the acts complained of herein, Bryant was employed

25  by Mattel in, and was a resident of, Los Angeles County.  Bryant's contracts with Mattel that

26  are at issue in this action were executed, performed and breached by Bryant in Los Angeles

27  County.   In addition, defendants committed the tortious conduct alleged herein while

28  physically located in Los Angeles County, and Mattel felt the effects of Bryant's breach and

07209/579342.1

-2-

EXHIBIT __1__

PAGE __8__                    COMPLAINT

1    defendants' other wrongful acts in Los Angeles County.   Accordingly, this Court has

2    personal jurisdiction over defendants.

3          6.     Venue is proper pursuant to <u>Code of Civil Procedure</u> §§ 393 and 395(a),

4    as the causes of action arose in Los Angeles County, the contractual obligations at issue were

5    incurred, were to be performed and were breached by Bryant in Los Angeles County, and

6    Bryant does not currently reside in California.

7

8                      <u>Factual Background</u>

9

10         7.     Mattel is a long standing and successful independent manufacturer and

11    marketer of toys, dolls, games and stuffed toys and animals.  Mattel was founded in 1945 by

12    Elliot and Ruth Handler and Harold "Matt" Mattson.  The name of the company was created

13    by incorporating the names of two of its founders, "MATT-son" and "EL-liot."  Originating

14    from the Handlers' garage in Southern California, the company greatly expanded its

15    operations following World War II and soon began to thrive as its reputation for producing

16    high-quality toys spread.  During the next several decades, Mattel became world famous for

17    producing high-quality products at reasonable prices.  Today, some of Mattel's most famous

18    brands include BARBIE, HOT WHEELS, MATCHBOX and FISHER-PRICE.

19         8.     Critical to Mattel's success, and to the livelihood of its employees, is

20    Mattel's ability to design and develop new products.  Mattel invests many millions of dollars

21    in product design and development annually, and it introduces hundreds of new products

22    each year.  In El Segundo, California alone, Mattel maintains a 180,000 square-foot design

23    center that houses more than 850 designers, sculptors, painters and other artists, whom

24    Mattel pays to work exclusively and full-time to create the products that Mattel sells and on

25    which Mattel's business depends.

26         9.     Defendant Bryant was employed by Mattel from September 1995

27    through April 1998, and then again from January 1999 through October 2000, as a product

28    designer at Mattel's design center in El Segundo, California.

-3-

EXHIBIT ___1___

PAGE ___9___

COMPLAINT

1    10.    On January 4, 1999, upon starting his second term of employment by

2  Mattel, and as a condition of and in consideration for his employment, Bryant executed an

3  Employee Confidential Information and Inventions Agreement (the "Employee

4  Agreement").  Among other things, Bryant agreed that he would not, without Mattel's

5  express written consent, "engage in any employment or business other than for [Mattel], or

6  invest in or assist (in any manner) any business competitive with the business or future

7  business plans of [Mattel]."  Bryant further acknowledged that he held a position of trust

8  with Mattel.  In addition, Bryant assigned to Mattel all rights, title and interest in

9  "inventions," including without limitation "designs," that he conceived or reduced to practice

10  during his employment by Mattel. A true and correct copy of Bryant's Employee Agreement

11  with Mattel is attached as Exhibit A.

12    11.    Also on January 4, 1999, Bryant executed Mattel's Conflict of Interest

13  Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant certified in the

14  Conflict Questionnaire that, other than as disclosed, he had not worked for any competitor

15  of Mattel in the prior twelve months and had not engaged in any business venture or

16  transaction involving a Mattel competitor that could be construed as a conflict of interest.

17  Bryant specifically agreed that he would immediately notify his supervisor of any change

18  in his situation that would cause him to change any of the foregoing certifications.  The only

19  conflict disclosure that Bryant made on the Conflict Questionnaire (or at any time

20  subsequently) concerned freelance work that is unrelated to the conduct alleged herein.  A

21  true and correct copy of the Conflict Questionnaire executed by Bryant is attached as

22  Exhibit B.

23    12.    In late November 2003, Mattel learned that Bryant had secretly aided,

24  assisted and worked for a Mattel competitor, including without limitation by entering into

25  an agreement with the competitor, during the time Bryant was employed by Mattel pursuant

26  to the above-referenced agreements and was being paid by Mattel as a product designer.

27  Bryant's agreement with the competitor obligated Bryant to provide product design services

28  to the competitor on a "top priority" basis.  Bryant's agreement also provided, among other

07209/579342.1

-4-

EXHIBIT ___1___

PAGE ___10___

COMPLAINT

1  things, that Bryant would receive royalties and other consideration for sales of products on

2  which Bryant provided aid or assistance; that all work and services furnished by Bryant to

3  the competitor under the agreement purportedly would be considered "works for hire"; and

4  that all intellectual property rights to preexisting work by Bryant purportedly would be

5  assigned to the competitor.  In addition, while Bryant was employed by Mattel, Bryant and

6  the other defendants converted, misappropriated and misused Mattel property and resources

7  for the benefit of, and to aid and assist, Bryant personally and Mattel's competitor.

8          13.     During the time that he was employed by Mattel and thereafter, Bryant

9  concealed these actions from Mattel, including without limitation by failing to notify his

10  supervisor of his conflict of interest regarding the competitor and by making affirmative

11  misrepresentations to Mattel management upon his departure from Mattel.  Because of

12  Bryant's acts of concealment and his misrepresentations to Mattel, Mattel had no reason to

13  suspect that Bryant had worked for the competitor while still employed by Mattel until late

14  November 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's

15  agreement with the competitor and saw that the date of the agreement predated Bryant's

16  departure from Mattel.

17          14.     As a consequence, Bryant breached his contracts with Mattel and

18  violated his duty of loyalty and his fiduciary duties to Mattel; the other defendants have

19  unlawfully aided and abetted his violation of such duties; and each of the defendants has

20  been unjustly enriched and engaged in acts of conversion.

21

22                          FIRST CLAIM FOR RELIEF

23                             (Breach of Contract)

24

25          15.     Mattel repeats and realleges each and every allegation set forth in

26  paragraphs 1 through 14, above, as though fully set forth at length.

27          16.     Pursuant to his Mattel Employment Agreement, and for good and

28  valuable consideration, Bryant agreed that he would not, without Mattel's express written

07209/579342.1                          -5-                    EXHIBIT __1__

                                                               PAGE __11__          COMPLAINT

1   consent, engage in any employment or business other than for Mattel or assist in any manner

2   any business competitive with the business or future business plans of Mattel during his

3   employment with Mattel.  Pursuant to his Mattel Employment Agreement, Bryant further

4   assigned to Mattel all right, title and interest in "inventions," including without limitation

5   "designs," that he conceived or reduced to practice during his employment by Mattel.  In

6   addition, pursuant to the Conflict Questionnaire, Bryant certified that, other than as

7   disclosed, he had not worked for any competitor of Mattel and had not engaged in any

8   business venture or transaction involving a Mattel competitor that could be construed as a

9   conflict of interest.  Bryant further promised that he would notify his superior immediately

10  of any change in his situation that would cause him to change any of the foregoing

11  certifications or representations.

12        17.    The Employment Agreement and the Conflict Questionnaire are valid,

13  enforceable contracts, and Mattel has performed each and every term and condition of the

14  Employment Agreement and Conflict Questionnaire required to be performed by Mattel.

15        18.    Bryant materially breached the foregoing contracts with Mattel, in that,

16  among other things, he secretly aided, assisted and worked for a Mattel competitor during

17  his employment with Mattel, without the express written consent of Mattel.

18        19.    As a consequence of Bryant's breach, Mattel has suffered and will in

19  the future continue to suffer damages in an amount to be proven at trial.  Such damages

20  include, without limitation, the amounts paid by the competitor to Bryant during his Mattel

21  employment; the amounts paid by the competitor to Bryant as a result of the work he

22  performed for the competitor during his Mattel employment; the amount that Mattel paid

23  Bryant during the time he wrongfully worked for the competitor; the value of information

24  and intellectual property owned by Mattel which Bryant provided to the competitor; the

25  value of the benefits the competitor obtained from Bryant during the time he was employed

26  by Mattel; and the value of the benefits the competitor obtained from Bryant as a result of

27  the work he performed for the competitor during his Mattel employment.

28

-6-

EXHIBIT __1__

PAGE __12__

COMPLAINT

20.     Furthermore, Bryant's conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Bryant specifically acknowledged in his Employment Agreement that his breach of the Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies."  Accordingly, Mattel is entitled to orders mandating Bryant's specific performance of his contracts with Mattel and restraining Bryant from further breach.

## SECOND CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

21.     Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 20, above, as though fully set forth at length.

22.     Bryant held a position of trust and confidence with Mattel.  In his position, Bryant had access to and was entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of his job assignments and duties.  In his position, Bryant also represented Mattel in its dealings with third parties and, in his actions in the course and scope of his employment with Mattel, was an agent of Mattel.  Bryant confirmed his relationship of trust with Mattel in the Employee Agreement.  Bryant thus owed Mattel a fiduciary duty that included, but was not limited to, an obligation not to take any action that would be contrary to Mattel's best interests or that would deprive Mattel of any opportunities, profit or advantage which Bryant might bring to Mattel.

23.     Bryant breached his fiduciary duty to Mattel in that, while employed by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including without limitation by entering into an agreement with a Mattel competitor.  As alleged

07209/579342.1

-7-

EXHIBIT ____1____

PAGE____13____

COMPLAINT

1  above, Bryant also breached the aforementioned duty by using Mattel property and resources

2  for the benefit of, and to aid and assist, himself personally and the competitor of Mattel.

3        24.    The other defendants, acting with full knowledge of Bryant's obligations

4  to Mattel, aided and abetted Bryant in such conduct.

5        25.    As a direct and proximate result of defendants' wrongful conduct,

6  Mattel has incurred damages in an amount to be determined at trial.

7        26.    Defendants acted with malice, fraud and oppression, and in conscious

8  disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages

9  against defendants in an amount to be determined at trial.

10        27.    Furthermore, defendants' conduct has caused, and unless enjoined will

11  continue to cause, irreparable injury to Mattel that cannot be adequately compensated by

12  money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel

13  is entitled to an order restraining further breach of Bryant's fiduciary duty to Mattel and/or

14  restraining defendants from continuing to benefit from such breach.

15

16                      __THIRD CLAIM FOR RELIEF__

17                      (Breach of Duty of Loyalty)

18

19        28.    Mattel repeats and realleges each and every allegation set forth in

20  paragraphs 1 through 27, above, as though fully set forth at length.

21        29.    As an employee of Mattel, Bryant owed a duty of undivided loyalty to

22  Mattel, his employer. Pursuant to this duty, Bryant could not compete with Mattel or assist

23  a competitor of Mattel during his employment with Mattel. Pursuant to this duty, Bryant

24  was required to always give preference to Mattel's business over his own, similar interests

25  during the course of his employment with Mattel.

26        30.    Bryant breached his duty of loyalty to Mattel in that, while employed

27  by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including

28  without limitation by entering into an agreement with a Mattel competitor. As alleged

-8-

EXHIBIT ____1____

PAGE ____14____

COMPLAINT

above, Bryant also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, himself personally and the competitor of Mattel.

31.     The other defendants, acting with full knowledge of Bryant's obligations to Mattel, aided and abetted Bryant in such wrongful conduct.

32.     As a direct and proximate result of defendants' wrongful conduct, Mattel has incurred damages in an amount to be determined at trial.

33.     Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

34.     Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel is entitled to an order restraining further breach of Bryant's duty of loyalty to Mattel and/or restraining defendants from continuing to benefit from such breach.

## FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment)

35.     Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 34, above, as though fully set forth at length.

36.     Defendants, by the aforementioned conduct, unfairly used and diverted Mattel property, resources and opportunities for the benefit of, and to aid and assist, themselves, all without authorization by or payment to Mattel for the same.  Defendants have been unjustly enriched as a result.

37.     Mattel is entitled to an award of all such amounts by which defendants have been unjustly enriched in an amount to be determined at trial.

EXHIBIT ___1___

PAGE ___15___

07209/579342.1

COMPLAINT

38.     Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

39.     Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel is entitled to an order restraining defendants from any further unjust enrichment.

## FIFTH CLAIM FOR RELIEF

### (Conversion)

40.     Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 39, above, as though fully set forth at length.

41.     Mattel was entitled to, inter alia, Bryant's exclusive services and the exclusive ownership of his inventions as a Mattel product designer.  However, Bryant provided such services, and purported to grant rights to such inventions, to a competitor during the time of his exclusive Mattel employment.  All such services and the inventions and work product resulting from such services, including without limitation ideas, concepts, rights, designs, proprietary information, and other intellectual property and intangible property created by Bryant during the term of the aforesaid agreements, were the property of Mattel.  Such services and property were provided by Bryant to others, including defendants, and used by them.

42.     Defendants wrongfully converted Mattel property and resources by asserting ownership thereto and by appropriating and using Mattel's property and resources for their own benefit and gain and for the benefit and gain of others, without the permission of Mattel.

EXHIBIT ___1___

PAGE ___16___

07209/579342.1

-10-

COMPLAINT

43. As a direct and proximate result of defendants' wrongful conversion of Mattel's property and resources, Mattel has incurred damages. Mattel is entitled to recover compensatory damages against defendants in an amount to be determined at trial.

44. Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

45. Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel is entitled to an order restraining defendants from further conversion of Mattel property and resources and/or restraining defendants from continuing to benefit from such conversion.

## PRAYER FOR RELIEF

WHEREFORE, Mattel hereby respectfully requests that this Court:

A. Award Mattel its damages;

B. Order defendants to disgorge to Mattel all payments, revenue, profits, monies, royalties and any other benefits derived or obtained by defendants as a result of the conduct described herein;

C. Order specific performance by Bryant to comply with and satisfy Bryant's contractual obligations to Mattel;

D. Enter an injunction restraining defendants, and all those acting in concert or participation with them, from engaging in further wrongful conduct and/or from continuing to benefit from their wrongful conduct;

E. Order defendants to pay Mattel the full cost of this action and Mattel's reasonable attorneys' fees;

F. Award Mattel punitive damages in an amount sufficient to punish defendants and deter such misconduct in the future; and

EXHIBIT __1__

PAGE __17__

COMPLAINT

1        G.      Award such other and further relief as this Court deems just and proper.

2

3  DATED:  April 27, 2004              QUINN EMANUEL URQUHART OLIVER &
                                      HEDGES, LLP
4

5                                     By _____
6                                        Michael T. Zeller
                                         Attorneys for Plaintiff
7                                        Mattel, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                                    EXHIBIT ___1___

28                                                    PAGE ___18___

07209/579342.1                        -12-
                                                    COMPLAINT

**Exhibit  A**

EXHIBIT __1__

PAGE __19__

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that: (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development or its proprietary rights; and (v) when and if my employment with the Company terminates I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

## 1. Provisions Related to Trade Secrets

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including Information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in this Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other material (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

## 2. Ownership of Inventions

(a) I agree to communicate to the Company as promptly and fully as practicable all Inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such Inventions, and all my right, title and interest in any patent, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such Inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this agreement requiring me to assign my rights in any Invention does not apply to an Invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an Invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those Inventions that either (1) relate at the time of conception or reduction to practice of the Invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an Invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

## 3. Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

## 4. Miscellaneous

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause; and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will insure to the benefit of and be binding upon the successors and assigns of the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement. In addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

_Carter H. Bryant_
Employee Signature

CARTER H. BRYANT
Employee Name (print)

01/04/99
Date

MATTEL, INC.
By: _Teresa Newcomb_
Signature

TERESA NEWCOMB
Name of Witness (print)

EXHIBIT 1

EXHIBIT A PAGE 13

PAGE 20

**Exhibit  B**

EXHIBIT ____1____

PAGE ____21____

# CONFLICT OF INTEREST QUESTIONNAIRE

*BRYANT, CARTER H.*          *PROJECT DESIGNER*

Name (Last, first, M.I.)                                         Job Title                                         Department

**Instructions:** The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel's policies concerning Conflicts of Interest. Then answer the questions by checking the correct answer. Base your answers on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

**Mattel Supplier** is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

**Mattel Competitor** is interpreted broadly for purposes of this questionnaire. A Mattel competitor is any person, partnership, trust, corporation, or other enterprise which has done business or contemplates doing business in any field that is in competition with Mattel or any Mattel subsidiary.

**Interest** means direct or indirect ownership of any stock, bond, option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to receive compensation of any kind from any supplier or competitor. You may disregard mutual investment trusts and publicly-owned corporations whose securities are traded publicly, in which you own not more than $25,000 in market value, but not to exceed 10% of an individual's net worth.

**Recipient of any commission, etc.,** means receipt of anything of value, in cash or in kind, over $60 on any one occasion or over $300 total during the past twelve months.

- ○ YES  ● NO  1. Have you owned, directly or indirectly, any interest in a Mattel supplier?
- ○ YES  ● NO  2. Have you owned, directly or indirectly, and interest in a Mattel competitor?
- ○ YES  ● NO  3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier?
- ● YES  ○ NO  4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor?
- ● YES  ○ NO  5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel competitor in any capacity?
- ○ YES  ○ NO  6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel supplier in any capacity?
- ○ YES  ● NO  7. Have you engaged in any activity including the acquisition or ownership of any interest, for personal profit, not expressly within the scope of the foregoing with respect to any supplier or competitor?
- ○ YES  ● NO  8. Excepting normal everyday transactions (purchase of toys, etc.) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance?
- ○ YES  ● NO  9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel?

If your answer to any of the above questions is "yes," please explain in the space below:

*4, 5, freelance design & artwork in 1998, from appx. 5/98 - 11/98. for the Ashton Drake galleries.*

I certify that I have read Mattel's policies concerning Conflict of Interest and the answers to the above questions are true. I understand that failure to answer this questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree not to divulge any company information to unauthorized recipients. I also agree to notify my superior immediately of any changes in my situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged in any capacity which creates a Conflict of Interest.

Signature _____                    Date  01/04/98

**EXHIBIT B PAGE 14**

**EXHIBIT 1**

**PAGE 22**

# EXHIBIT 2

RECEIVED

DEC 07 2004

1   M. RANDALL OPPENHEIMER (S.B. #77649)
    DIANA M. TORRES (S.B. #162284)
2   O'MELVENY & MYERS LLP
    400 South Hope Street
3   Los Angeles, California 90071-2899
    Telephone:  (213) 430-6000
4   Facsimile:   (213) 430-6407

5
    Attorneys for Applicant-Intervenor
6   MGA ENTERTAINMENT, INC.

7

8                  UNITED STATES DISTRICT COURT

9                CENTRAL DISTRICT OF CALIFORNIA

10

11  MATTEL, INC., a Delaware            Case No. CV 04-9059 NM (RNBx)
    Corporation,
12                                      STIPULATION PERMITTING MGA
                   Plaintiff,           TO INTERVENE AS A PARTY TO
13                                      THIS ACTION
         v.
14                                      Hon. Nora Manella
    CARTER BRYANT, an individual;
15  and DOES 1 through 10, inclusive,

16                 Defendant.

17

18

19

20

21

22

23

24

25

26                                      EXHIBIT ___2___

27                                      PAGE ___23___

28
                                STIPULATION PERMITTING MGA TO
                                   INTERVENE AS A PARTY

1    WHEREAS, on April 27, 2004, Plaintiff Mattel, Inc. ("Mattel") filed suit

2   against Carter Bryant ("Bryant") and ten unnamed "Does" alleging breach of

3   contract, breach of the duty of loyalty, breach of fiduciary duty, conversion and

4   unjust enrichment.

5    WHEREAS, MGA, believes, at this time, that it has a significantly

6   protectable interest relating to the subject matter of the action, that the disposition

7   of the action may impair or impede MGA's ability to protect its interest absent

8   intervention, and that MGA's interest is not adequately represented by the existing

9   parties.

10    WHEREAS, Mattel is agreeable to the filing of the Answer in Intervention as

11   a procedural matter pursuant to this Stipulation, without waiver of, or prejudice to,

12   its rights, defenses or positions in this or any other action or to the Answer in

13   Intervention, including without limitation to Mattel's jurisdictional objections;

14    WHEREAS, Bryant is agreeable to the filing of the Answer in Intervention as

15   a procedural matter pursuant to this Stipulation, without waiver of, or prejudice to,

16   his rights, defenses or positions in this or any other action;

17    NOW THEREFORE, MGA, Mattel and Bryant hereby stipulate, subject to

18   this Court's approval, as follows:

19    1.    MGA may intervene as a party to this action; and

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

- 1 -

EXHIBIT __2__

PAGE __24__

1      2.     MGA shall be permitted to file its Answer in Intervention, lodged

2   concurrently with this Stipulation.

3

4        Dated:        December 3, 2004        O'MELVENY & MYERS LLP

5

6                                            By: _____
                                                  Diana M. Torres

7                                            Attorneys for Applicant-Intervenor
                                             MGA ENTERTAINMENT, INC.

8

9        Dated:        December___, 2004        QUINN EMANUEL URQUHART
                                             OLIVER & HEDGES LLP
10

11

12                                           By:_____
                                                  Michael T. Zeller

13                                           Attorneys for Plaintiff
                                             MATTEL, INC.

14

15       Dated:        December___, 2004        LITTLER MENDELSON, P.C.

16

17                                           By:_____
                                                  Keith A. Jacoby

18                                           Attorneys for Defendant
                                             CARTER BRYANT

19   IT IS SO ORDERED.

20

21       Dated:        December___, 2004

22                                           _____

23                                                Hon. Nora M. Manella
                                             United States District Judge

24

25

26

27

28

- 2 -

EXHIBIT 2

PAGE 25

1    2.    MGA shall be permitted to file its Answer in Intervention, lodged

2  concurrently with this Stipulation.

3

4        Dated:        December____, 2004      O'MELVENY & MYERS LLP

5

6                                             By:_____
                                                  Diana M. Torres
7                                             Attorneys for Applicant-Intervenor
                                              MGA ENTERTAINMENT, INC.
8

9        Dated:        December____, 2004      QUINN EMANUEL URQUHART
                                              OLIVER & HEDGES LLP
10

11

12                                            By: _Michael T. Zeller_____
                                                  Michael T. Zeller
13                                            Attorneys for Plaintiff
                                              MATTEL, INC.
14

15       Dated:        December____, 2004      LITTLER MENDELSON, P.C.

16

17                                            By:_____
                                                  Keith A. Jacoby
18                                            Attorneys for Defendant
                                              CARTER BRYANT
19
   IT IS SO ORDERED.
20

21       Dated:        December____, 2004

22
                                              _____
23                                               Hon. Nora M. Manella
                                                 United States District Judge
24

25

26

27

28

EXHIBIT ___2___

PAGE ___26___

1    2.    MGA shall be permitted to file its Answer in Intervention, lodged
2  concurrently with this Stipulation.

3
4    Dated:    December___, 2004    O'MELVENY & MYERS LLP
5
6    By:_____
           Diana M. Torres
7    Attorneys for Applicant-Intervenor
     MGA ENTERTAINMENT, INC.
8
9    Dated:    December___, 2004    QUINN EMANUEL URQUHART
10                                  OLIVER & HEDGES LLP
11
12    By:_____
           Michael T. Zeller
13    Attorneys for Plaintiff
     MATTEL, INC.
14
15    Dated:    December 3, 2004    LITTLER MENDELSON, P.C.
16
17    By:_____
           Keith A. Jacoby
18    Attorneys for Defendant
     CARTER BRYANT
19
     IT IS SO ORDERED.
20
21    Dated:    December___, 2004
22    _____
           Hon. Nora M. Manella
23         United States District Judge
24
25
26
27
28

                        - 2 -

EXHIBIT 2

PAGE 27

# EXHIBIT 3

DALE M. CENDALI
(of counsel, not admitted in California)
DIANA M. TORRES (S.B. #162284)
PAULA E. AMBROSINI (S.B. #193126)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
email:     dtorres@omm.com

PATRICIA GLASER (S.B. # 55668)
CHRISTENSEN, MILLER, FINK,
JACOBS, GLASER, WEIL &
SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, CA 90067
Telephone: (310) 553-3000
Facsimile: (310) 556-2920

Attorneys for Plaintiff
MGA Entertainment, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CV 04 - 02722   CBM (RZx)

| | |
|---|---|
| MGA ENTERTAINMENT, INC., | Case No. |
| Plaintiff, | **COMPLAINT FOR FALSE DESIGNATION OF ORIGIN, AFFILIATION, ASSOCIATION OR SPONSORSHIP (15 U.S.C. § 1125 (a)); UNFAIR COMPETITION (15 U.S.C. § 1125 (a), Cal. Bus. & Prof. Code § 17200 *et seq.* and California Common Law); DILUTION (15 U.S.C. § 1125 (c), Cal. Bus. & Prof Code § 14330 and California Common Law); AND UNJUST ENRICHMENT** |
| v. | |
| MATTEL, INC., a Delaware Corporation, and DOES 1-10, | |
| Defendants. | |
| | **DEMAND FOR JURY TRIAL** |

EXHIBIT __3__

PAGE __28__

1    Plaintiff MGA Entertainment, Inc. for its complaint against

2  Defendants Mattel, Inc. and DOES 1-10 alleges and avers as follows:

3

4    **PARTIES**

5    1.    Plaintiff MGA Entertainment, Inc. ("MGA") is a California

6  corporation organized and existing under the laws of the State of California, with a

7  principal place of business in Van Nuys, California.

8    2.    MGA is informed and believes, and based thereon alleges, that

9  Defendant Mattel, Inc. ("Mattel") is a Delaware corporation with a principal place

10  of business in El Segundo, California.

11    3.    MGA is ignorant of the true names and capacities of the defendants

12  sued herein under the fictitious names DOES 1 through 10 inclusive.  MGA will

13  seek leave of court to amend this complaint to allege such names and capacities

14  when they are ascertained.  MGA is informed and believes, and based thereon

15  alleges, that each of the fictitiously named DOE defendants is responsible in some

16  manner for the wrongful conduct alleged herein.  MGA further alleges that each

17  defendant acted in concert with, as agent or representative for, or at the request or

18  on behalf of another or Mattel.  Each charging allegation contained herein is,

19  therefore, also hereby alleged against each fictitiously named DOE defendant.

20

21    **JURISDICTION AND VENUE**

22    4.    Through this action MGA asserts claims against Mattel arising under

23  the Lanham Act, 15 U.S.C. Sections 1125 (a) and (c), California Business and

24  Professions Code Sections 17200 *et seq.*, California Business and Professions Code

25  Section 14330 and California common law.  This Court has original subject matter

26  jurisdiction over MGA's federal claims pursuant to 15 U.S.C. Sections 1116 and

27  1121, 28 U.S.C. Section 1338(a), and 28 U.S.C. Section 1331, and supplemental

28

1

EXHIBIT __3__

PAGE __29__

1   subject matter jurisdiction over MGA's state law claims pursuant to 28 U.S.C.

2   Section 1367(a).

3        5.       This Court has specific personal jurisdiction over Mattel, as it has

4   purposefully committed, within the State of California, the acts from which these

5   claims arise and/or has committed tortious acts outside California, knowing and

6   intending that such acts would cause injury to MGA within the state. The Court

7   also has general personal jurisdiction over Mattel, as it conducts continuous,

8   systematic and routine business within the State of California and the County of

9   Los Angeles.

10       6.       Venue is proper in the United States District Court for the Central

11  District of California pursuant to 28 U.S.C. Sections 1391(b) and 1391(c).

12

13                        **FACTUAL BACKGROUND**

14       7.       MGA seeks by this action to halt Mattel's habitual and unfair tactics of

15  competition-by-intimidation and serial copycatting of MGA's products, which

16  Mattel has used in an unbridled effort to cause confusion in the market place and

17  eliminate MGA as a competitor in the toy and fashion doll market long dominated

18  and controlled by Mattel.

19       8.       MGA is a privately-held company in the San Fernando Valley that

20  began in 1979 as a small consumer electronics business. In 1987, the company

21  made its first foray into the toy business when it secured rights to market handheld

22  LCD games featuring licensed Nintendo(R) characters. Building on that small

23  success, the company began marketing products for popular licensed properties

24  such as the "Power Rangers"(R) and "Hello Kitty"(R). This little-known but

25  successful company, however, was propelled into the limelight after its daring

26  release in June 2001 of an innovative line of fashion dolls called "BRATZ".

27  "BRATZ" are multi-ethnic fashion dolls that sport a fresh new urban and

28  contemporary look and fashion. At the time of the release of "BRATZ", "Barbie"

2

EXHIBIT __3__

PAGE __30__

1   sales were in a slump, Mattel was in turmoil, and the market was ripe for something
2   new, exciting and inventive.  "BRATZ" fit the bill.  It is the first fashion doll that
3   has been able to seriously challenge "Barbie" for market share, and begin to loosen
4   Mattel's 50-year iron-fisted grip on the fashion doll market.

5       9.      Mattel has not taken kindly to the challenge.  Either unable or
6   unwilling to compete against "BRATZ" fairly, and on a level-playing field, Mattel
7   has, instead, taken a more expeditious approach, resorting to unfair and anti-
8   competitive business practices.  Wielding its substantial clout and influence in the
9   toy industry, Mattel has tried to muscle MGA out of business.  MGA is informed
10  and believes that Mattel has intimidated, coerced and threatened retailers, licensees,
11  suppliers and others in the industry    both in the U.S. and internationally    in order
12  to inhibit and stifle MGA's ability to compete with Mattel and to prevent MGA
13  from obtaining licensees, contracts and supplies for its products.  Mattel has also
14  serially imitated and copy-catted the look of MGA products, trade dress,
15  trademarks, themes, ideas, advertising and packaging, including for the "BRATZ"
16  line of dolls.  MGA brings this action to stop Mattel's tortious, unfair and anti-
17  competitive conduct and to recover the extensive damage that Mattel's illicit
18  behavior has caused, and continues to cause, MGA.  Mattel's own website states:
19  "As the global leader in the toy industry, we believe that how we achieve success is
20  just as important as the success itself."  It also proclaims that "unwavering integrity
21  defines our corporate culture on every level, guiding how we work and how we do
22  business."  Mattel's own corporate governance standards require it to "play by the
23  rules," complete fairly and be a good corporate citizen.  Mattel's actions, however,
24  speak louder than its words.

25

26

27

28

3

EXHIBIT __3__

PAGE __31__

## Mattel History and Performance

10.     Mattel is the world's largest toy company, but it owes its immense success chiefly to a single product: "Barbie." Since her debut in 1959, "Barbie" has been the fuel for Mattel's growth and success, turning Mattel into an international powerhouse. By the late 1990's, Mattel's annual sales of the doll approached or topped $1.8 billion and Mattel stock reached a record high of approximately $45.00 a share. At that time, the average American girl had eight "Barbie" dolls, and "Barbie" was the world's best-selling toy.

11.     Mattel's reliance on a single, 40-year old product for as much as 50% of its business turned out to be a risky business model, however. Resting on its laurels, Mattel failed to react to the shifting tastes of consumers, changing dynamics in the industry, and an increasing focus on technologically advanced and interactive toys. "Barbie's" record sales fell into a tailspin. According to one report, Adrienne Fontanella, Mattel's "Barbie" brand president, would later be quoted as saying that, "The world changed very quickly, and we missed a beat. . . Barbie wasn't talking to girls. She just wasn't hitting it."

12.     Sales began to plunge in 1997, and Mattel began posting a series of net income losses. In the first quarter of 1998, sales of the "Barbie" brand dropped 17%. This steep slide was followed by another in the second quarter, when sales fell again, down by 15%. By the end of 1998, Mattel reported an overall 14% decline in "Barbie" sales for the year and analysts were using words such as "devastating" and "a catastrophe" to describe Mattel's earnings. The company's stock fell as much as 27% in a single day. "Barbie" was having a crisis.

13.     Jill Barad, who had taken over as Mattel's chairman and chief executive in January 1997, at the height of Mattel's success, had to do something fast. Instead of focusing on and investing in new product development, however, which would obviously take time, Mattel embarked on a series of acquisitions that were seemingly aimed at quickly diversifying the company's product line and

EXHIBIT __3__

PAGE __32__

1   reducing its reliance on "Barbie" and on traditional retailers, such as Toys-R-Us

2   and Wal-Mart.  Mattel spent a reported $881 million in March 1997 to purchase

3   Tyco Toys and acquire the "Matchbox" toy car brand.  Just more than a year later,

4   it spent $700 million for the Pleasant Co., a mail-order doll company and maker of

5   the "American Girl" doll collection.  And in December 1998, Mattel announced

6   plans to fork out a monumental $3.5 billion to buy the Learning Company,

7   followed quickly by Mattel's purchase, in March 1999, of a software company,

8   Purple Moon.

9         14.   Despite these acquisitions, the company continued to struggle.  The

10  retail environment and buying patterns had unquestionably changed, but Mattel had

11  not kept up.  Despite Mattel's feverish acquisitions, Mattel's mainstay and primary

12  profit-generator was still "Barbie."  But "Barbie" had grown stale, and sales

13  languished.  Posting additional losses in the first quarter of 1999, Mattel announced

14  that it would lay off 3,000 employees — 10% of its work force.

15        15.   Mattel's stock plummeted again in late 1999, dropping 30% on

16  Mattel's announcement that it would fall as much as 55% short of analysts' earning

17  estimates for the third quarter.  Mattel blamed its troubles primarily on its

18  expensive, $3.5 billion acquisition of the Learning Company, which had turned out

19  to be a disaster fraught with licensing and distribution problems, bad debt, high

20  product returns and high advertising costs.

21        16.   By early 2000, Mattel's stock had crashed to as low as $8 per share,

22  and some analysts considered Mattel vulnerable to a takeover.  Investors clamored

23  for Ms. Barad's resignation, and got their wish.

24        17.   Jill Barad resigned from Mattel in February 2000.

25        18.   For three months, the company was without a permanent chief

26  executive until Robert Eckert took the helm in May 2000.  Mr. Eckert had spent 23

27  years at Kraft Foods, a subsidiary of Altria Group, Inc., and was widely credited

28

EXHIBIT __3__

PAGE __33__

1    with reviving its ailing cheese business.  Investors looked for him to do the same

2    for Mattel.

3           19.    Upon his arrival at Mattel, Mr. Eckert's promise, according to *Wall*

4    *Street Journal* reports, was to deliver a "leaner and meaner" Mattel.

5           20.    The "leaner" Mattel came quickly.  Mr. Eckert laid off hundreds,

6    closed factories in the United States, shipped production to Mexico, and sold off the

7    Learning Company at a fraction of what Mattel had paid for it.  It helped Mattel's

8    bottom-line, but did nothing to spur sales growth.  Even under Mr. Eckert's "leaner

9    meaner" leadership, domestic "Barbie" sales remained in a slump into 2001.  In an

10   industry that had become increasingly driven by consumer whims and fads, and the

11   hot, must-have toys of the moment, Mattel remained disinterested in devoting its

12   resources to searching for or developing a new blockbuster toy.  Mr. Eckert's

13   business plan was not to diversify, but to build upon and expand sales of its existing

14   brands.  Mattel was, after all, still generating billions in revenue despite the decline

15   of "Barbie."  And so, Mattel remained committed to its age-worn icon and its two

16   other core brands, Fisher-Price and Hot Wheels, with each of the three accounting

17   for approximately a third of the company's sales.

18          21.    Then came the competition  MGA's "BRATZ".

19

20   **"BRATZ" Dolls Revolutionize The Fashion Doll Market**

21          22.    "BRATZ" challenged "Barbie's" half-century domination of the

22   fashion-doll market like nothing ever before had been able to do.

23          23.    MGA unveiled a preliminary sample of the "BRATZ" doll at the Hong

24   Kong Toy Fair in January 2001, while continuing to finalize the product throughout

25   that spring.  Finished products were first shipped in May 2001.  MGA introduced

26   the line to consumers in June 2001.

27

28

6

EXHIBIT **3**

PAGE **34**

24.    Unlike "Barbie" dolls, the "BRATZ" line of dolls and branded products sported a hip, multi-ethnic urban look that appealed to contemporary teenage and pre-teen girls.

### MGA's "BRATZ"



25.    At approximately 9.5 to 10 inches tall, the "BRATZ" dolls were intentionally shorter than "Barbie" dolls and looked like no other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which requires a stand), and up-to-date fashions.

7

EXHIBIT 3

PAGE 35

26    Indeed, the classic "Barbie" look was nowhere to be seen in these dolls; they would never be confused with "Barbie".

**MGA's "BRATZ"**                     **Mattel's "Barbie"**

     

27.    Featuring and embodying the slogan "The Girls With a Passion for Fashion!", "BRATZ" dolls revitalized, transformed and expanded the fashion doll market, in particular proving popular among "tween" age girls — those between childhood and adolescence — who had been all but abandoned as a market by Mattel.

28.    The "BRATZ" line — with its unique and distinctive look — is well recognized and has been critically acclaimed and praised by consumers, retailers and toy industry analysts alike. In 2001, the "BRATZ" line won the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award. In 2002, the "BRATZ" line again won the TIA People's Choice Toy of the Year Award and the Family Fun Toy of the Year Award. LIMA, the licensing industry's official arm, awarded MGA's "BRATZ" the best character license of the year as well as the overall best licensed property of the year for 2003. MGA's "BRATZ" also earned the coveted TIA "Property of the Year" and "Girl Toy of the Year" for 2003, as well as the Family Fun Toy of the Year Award. MSNBC named "BRATZ" the "Hottest Toy of the Year," and both MGA and "BRATZ" received several other accolades in

8

EXHIBIT __3__

PAGE __36__

1  2004, including the Suppliers Performance Award by Retail Category (the

2  "SPARC" award) in the Girls' Toys category sponsored by DSN Retailing

3  Today/Apparel Merchandising.

4      29.    Although but a tiny fraction of Mattel's size, with "BRATZ", MGA

5  was able to chip away at Mattel's stranglehold on the fashion doll market, gaining

6  shelf space and market share as "Barbie" sales remained flat or, at times, declined.

7      30.    The competition that MGA (once a licensee of Mattel!) and "BRATZ"

8  posed to Mattel was unexpected and unwelcomed by Mattel.  Where "Barbie" had

9  once enjoyed a 90% share of the fashion doll market in 1997, that share had already

10  slipped to 85% or less by the time of the release of "BRATZ".  With the company

11  still struggling under Mr. Eckert to overcome prior years of declining sales and

12  mounting debt, "Barbie," Mattel  and Mr. Eckert  simply could not afford the

13  untimely competition.  Mr. Eckert's "leaner" Mattel was not enough to battle more

14  potential erosion in "Barbie's" market share.  Mattel had to combat "BRATZ" and

15  MGA, and in the process revealed Mr. Eckert's "meaner" Mattel.

16

17  **Mattel's Response to "BRATZ" and Efforts to Thwart MGA's Competition**

18      31.    Mattel was not poised to nimbly respond to "BRATZ" with a new,

19  creative product of its own  indeed, it had been antithetical to Mattel's corporate

20  culture and mentality for Mattel to even conceive that a product might vie for shelf

21  space with "Barbie", let alone be available for sale to consumers mere months after

22  first being shown to retailers.  Mattel had to take a more expeditious route.

23      32.    Instead of fairly competing, Mattel waged war against MGA using a

24  wide-array of tortious, unfair and anti-competitive practices including systematic,

25  serial copycatting and intellectual property infringement, aided by intimidation,

26  threats and other acts of unfair competition and anti-competitive conduct, all with

27  one goal in mind – to banish MGA from the market  or minimize its ability to

28  capture any meaningful share before it could do any real harm to Mattel.

9

EXHIBIT __3__

PAGE __37__

Mattel's serial copycatting and intellectual property infringement

33.    Mattel's serial copycatting of MGA's product lines began with the "BRATZ" dolls themselves, but quickly extended to MGA's packaging, themes, accessories, advertising and even other product lines.

34.    The first four "BRATZ" dolls that MGA launched in 2001, named Jade, Yasmin, Cloe and Sasha, met their wannabe "BRATZ PACK" members in October 2002 with Mattel's launch of three "My Scene" dolls named Madison, Chelsea and "Barbie." This was no ordinary "Barbie", however. Indeed, not even close. Mattel designed its "My Scene" dolls to evoke the unique and distinctive look of the "BRATZ"   also with disproportionately oversized heads, artfully made-up almond-shaped eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and over-sized feet.

**Mattel's Traditional "Barbie"**          **Mattel's "My Scene" Doll**

circa 2002                circa 2004




10

EXHIBIT 3

PAGE 38

35.     These confusingly similar "BRATZ" imitators may have been originally intended to buy Mattel time while it worked to release another product the following summer, called "Flavas". MGA's founder, Isaac Larian, was quoted by the media as having predicted that the move would backfire on Mattel, and it did. Released in July 2003, Mattel's "Flavas" dolls took the urban, "hip-hop" look too far, and were widely viewed as portraying a trampy, "bad-girl" image. The dolls were not well-received, and rumor has it that Mattel had to sell them at below cost prices to get rid of inventory. Most apparently wound up in discount bins, and Mattel has seemingly abandoned the line.

36.     Realizing that "My Scene" was its best bet for riding MGA's successful coattails and capitalizing on the unique and inherently distinctive look that MGA had developed in its "BRATZ" dolls   and MGA's substantial goodwill   Mattel has systematically proceeded to modify the "My Scene" dolls since their original release, particularly their eyes, to increase their similarity to "BRATZ" more and more over time.

37.     Indeed, when Mattel found out that its initial line of "My Scene" dolls had trouble competing with "BRATZ", they simply *became* "BRATZ", in every version, whether blonde, brunette or African American. A few pictures here are worth a thousand words.

### BLONDE

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |




11

EXHIBIT ___3___

PAGE ___39___

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|
|  |  |  |

BRUNETTE

| Mattel's Traditional "Theresa" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|
|  |  |  |
|  |  |  |

12

EXHIBIT 3

PAGE 40

## AFRICAN AMERICAN

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|:---:|:---:|:---:|
|  |  |  |
|  |  |  |

38.    The original "My Scene" eye, as shown here, for example, has recently turned into a virtual carbon-copy of the "BRATZ" eye.

### Original Mattel "My Scene" Eye

  

13

EXHIBIT __3__

PAGE __41__

39.   The "My Scene" eye pictured above, for instance, has lashes that radiate almost straight out, circumferentially, from the eyelids and, although the eye is more almond shaped than a "Barbie" eye, the eye is not so sleepy and heavy lidded as a "BRATZ" eye and is only lightly shadowed.  The new "My Scene" eye, in contrast, is dramatically more similar to a "BRATZ" eye, as shown below in a side-by-side comparison.  The doe-eyed innocent look of the "My Scene" eye shown above is gone; replaced with a sultrier look, characteristic of "BRATZ."  The new "My Scene" eye, as shown below, boasts lashes that sweep out and away from the outer corner of the eye, just like the "BRATZ" eye.  The new "My Scene" eye is also more heavy lidded and thickly lined, and the make-up is more markedly pronounced and dramatic.

**MGA's "BRATZ" Eye**                    **New Mattel "My Scene" Eye**




40.   Indeed, the progression of the "My Scene" eye, as it has departed from "Barbie" and edged closer and closer to "BRATZ", is readily apparent from virtually every angle, as shown here:

14

EXHIBIT __3__

PAGE __42__

## BLONDE

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|



## BRUNETTE

| Mattel's Traditional "Theresa" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|



15

EXHIBIT ___3___

PAGE ___43___

| Mattel's Traditional "Theresa" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|
|  |  |  |

## AFRICAN AMERICAN

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|
|  |  |  |
|  |  | |

16

EXHIBIT **3**

PAGE **44**

41    Mattel has not stopped at the eyes, however.  Mattel has also incrementally but steadily modified its "My Scene" packaging, and the manner in which the dolls are displayed, to more closely mimic the packaging, trade-dress and overall look and total image of MGA's "BRATZ".

42.    To illustrate, Mattel's "My Scene" dolls were initially marketed like this:

### Mattel's Early "My Scene" Packaging



43.    Little by little, however, the packaging has changed, creeping ever closer and closer to the open and transparent style of the "BRATZ" packaging. First, the panels seen running down each side of the front of the "My Scene" box shown above, framing the doll and giving the packaging a closed-in look, were changed as shown here:

### Intermediate Mattel "My Scene" Packaging



17

EXHIBIT  3

PAGE  45

44.     Mattel replaced this intermediate packaging style with another that looked even more similar to the "BRATZ" packaging, as shown here in a side-by-side comparison:

| MGA's "BRATZ" "Wintertime Wonderland" Packaging | Mattel's "My Scene" "Chillin' Out" Packaging |
|---|---|
|  |  |

45.     Then later, Mattel changed its packaging and product display yet again to look even more closely and confusingly similar to MGA's packaging and "*tout ensemble*," as shown here

| MGA's "BRATZ" "SPORTZ" Packaging | Mattel's Recent "My Scene" "MIAMI GETAWAY" Packaging |
|---|---|
|  |  |

EXHIBIT __3__

PAGE __46__

1       46.    In this incarnation, Mattel notably abandoned the signature figure-
2   eight style design that had appeared on its prior "My Scene" packaging, making this
3   recent version clearer and more transparent on the front and sides than ever before,
4   and much more like "BRATZ", accordingly.  Mattel also discarded its traditional,
5   rectangular shaped box and, like "BRATZ", adopted an unusual, non-rectangular
6   shaped box.  Mattel even adopted the "flying banner" ribbon-style slogan running
7   across the middle of the box, similar to that used on the "BRATZ" packaging.

8       47.    As if these pointed and deliberate efforts to confuse and mislead
9   consumers were not enough, Mattel exacerbated the confusion, and furthered the
10   impression that the "My Scene" line and the "BRATZ" line are related, by taking
11   up MGA's practice of regularly releasing new dolls in connection with a theme
12   but not just *any* theme, often ***MGA's theme***.

13       48.    For example, when MGA released its "Wintertime Wonderland"
14   theme in Fall 2003, Mattel released its "Chillin Out!" theme.  Each doll in MGA's
15   line came with winter-sports accessories, such as a snowboard or skis and ski boots.
16   Each doll in Mattel's line featured winter sports accessories, also including
17   snowboards or ski and ski boots.  Even MGA's color schemes and some of the
18   clothing styles seemed to have made their way into the Mattel products.

19       49.    When MGA released its "Formal Funk" theme, Mattel released its
20   "Night on the Town" theme.  "BRATZ Formal Funk" was an elaborately themed
21   line with its dolls in hip formalwear; so was Mattel's "Night on the Town."

22       50.    When MGA released its distinctive "Sun-Kissed Summer" theme,
23   Mattel released its confusingly similar "Jammin' in Jamaica" theme.  Each line
24   featured a bright blue-and-orange color scheme, beach accessories, such as
25   surfboards, and beachwear clothing.  Mattel's "Jammin' in Jamaica" "Guava Gulch
26   Tiki Lounge" playset also contained elements remarkably similar to MGA's "Sun-
27   Kissed Summer" playset.

28

EXHIBIT __3__

PAGE __47__

1         51.    Mattel also began running television commercials for its "My Scene"

2    dolls bearing a remarkable similarity to "BRATZ" commercials, combining live

3    action with animated sequences set to similar sounding pop music and lyrics.

4         52.    Mattel even stooped so low as to mimic "BRATZ" accessories and

5    related products in order to further create consumer confusion in the marketplace.

6         53.    For instance, when MGA came up with its distinctive "BRATZ"

7    "Runway Disco", Mattel came out with a "My Scene" Sound Lounge with

8    packaging that imitated MGA's trapezoidal box.

9         54.    Mattel's conduct cannot be explained by sheer coincidence, nor is it

10   merely fair competition.  It is a calculated and intentional effort unquestionably

11   designed to trade off of MGA's hard work and goodwill, create confusion in the

12   marketplace, steal MGA's thunder and momentum, and dilute and blur away the

13   novelty and distinctiveness of MGA's products.  Out of the seemingly endless

14   possibilities that Mattel could have chosen for a new line of dolls, packaging,

15   themes, color schemes, commercials, accessories and playsets, Mattel deliberately

16   chose **not** to come out with something unique, new or different and has, instead,

17   focused its efforts and resources on flooding the market with something so close to

18   "BRATZ" that the public will, can, and does, simply mistake it for "BRATZ".

19        55.    As yet another example of this, when MGA came out with a "BRATZ"

20   "Funky Fashion Makeover Head," Mattel came out with a confusingly similar —

21   indeed, practically identical — "My Scene" styling head.

22

23

24

25

26

27

28

EXHIBIT __3__

PAGE __48__

MGA's "BRATZ"
"Funky Fashion Makeover Head"

Mattel's "My Scene"
"Stylin' Head"

   

   

56.   Indeed, Mattel's "My Scene" styling head is so close to the "BRATZ" styling head that even the press have mistakenly pictured and identified it as MGA's "BRATZ". The picture of Mattel's "My Scene" styling head shown below, for instance, appeared in the press with a caption indicating that the child was trying out different hairstyles "on a *Bratz* hair and makeup doll head."



21

EXHIBIT __3__

PAGE __49__

57.   Creating further confusion, Mattel's television commercial for its "My Scene" styling head was like watching a re-run of MGA's commercial for its "Funky Fashion Makeover Head".

58.   At one point in time, Mattel also used a portion of the "BRATZ" dolls' now-famous trademarked tag line "The Girls With a Passion for Fashion" on Mattel's' website for its "Diva Starz" dolls, asking its website users:  "Do you have a passion for fashion?"

59.   Mattel has even recently come out with a confusingly similar line of "My Scene" plush pets, which adopt the distinctive look of MGA's "BRATZ" line. The "My Scene" pets feature large, humanlike eyes and wear clothing making them remarkably and confusingly similar to "BRATZ" products, including "BRATZ PETZ", as seen in this example where the pets each wear a jacket, a cap and carry a purse:

| MGA's "BRATZ Dogz" | Mattel's "My Scene" dog |
|---|---|
|  |  |

60.   And here too, Mattel chose to package its pets the same way that MGA packaged its "BRATZ PETZ", sitting in an open box, with no top and with partial side panels that slope from a narrow front panel to a higher back panel.

61.   Indeed, the similarity of the "My Scene" pets to "BRATZ PETZ" has confused even sophisticated retailers who have mistakenly merchandised "My Scene" dogs in the middle of the "BRATZ" section of a retail display, next to and as if they were part of MGA's "BRATZ Petz" line.  It comes as no surprise that

EXHIBIT 3

PAGE 50

1  customers too have been confused.

2      62.   Indeed, Mattel's television commercials and "My Scene" products

3  have become so confusingly similar to MGA's that even advertising executives

4  have expressed concern. One went so far as to say that although imitation is the

5  best form of flattery, what the individual had seen at Mattel's showroom, and how

6  its "My Scene" dolls now look so confusingly similar to "BRATZ", was

7  "shocking." This person further opined that it was clear that Mattel is intending to

8  confuse customers and capture "BRATZ" market share, and even asked MGA if it

9  was considering legal action.

10     63.   The press also has taken notice of Mattel's attempts to confuse

11  consumers. On or about February 18, 2005, a visitor to MGA's showroom from a

12  prominent news publication stated, "Oh my, I just came from Mattel's showroom

13  and their new 'My Scene' packaging is just like 'BRATZ' minus the handle."

14  Another member of the press visiting MGA's showroom offered the unsolicited

15  comment, "have you seen the new 'My Scene' dolls eyes are exactly like

16  'BRATZ'?" Yet another opined that Mattel's "My Scene" line was exactly like

17  "BRATZ", indeed, so much so that the reporter confusingly thought that Mattel had

18  bought "BRATZ", and still another has commented on Mattel's imitation of MGA.

19  On or about February 16, 2005, during an interview of a Mattel representative on

20  local network news in New York, "My Scene Barbie" was displayed by a Mattel

21  representative. During conversation about the dolls, the interviewer exclaimed that

22  they looked like "BRATZ". The Mattel representative just laughed – but this is no

23  laughing matter. This colloquy was available for replay and viewing, and was even

24  transcribed, on the internet.

25     64.   Customers too have been similarly confused. Some actually contacted

26  MGA seeking to purchase "My Scene" dolls.

27     65.   Mattel's conduct is planned, deliberate and intentional. Mattel has

28  systematically, copied, imitated and liberally borrowed many of the distinctive,

23

EXHIBIT __3__

PAGE __51__

essential elements that identify and make "BRATZ" dolls "BRATZ" dolls, diluting the brand, creating customer confusion, and unfairly stifling competition.

66.   Ironically, Mattel sued one of its other competitors in Europe for doing much the same thing: "systematically copying and borrowing elements" from "My Scene", on grounds that "this conduct constitutes unfair competition and passing off." Indeed it does.

67.   What is more, Mattel's conduct has reached beyond "BRATZ" and "BRATZ"-related products to include other new MGA toy lines.

68.   For example, MGA's "4-Ever Best Friends" line was the obvious, and well-recognized model for Mattel's "Wee 3 Friends" line. Mattel even adopted changes to the color scheme of its similarly-shaped packaging to create confusion with MGA's distinctive packaging.

| MGA's "4-Ever Best Friends" | Mattel's "Wee 3 Friends" |
|---|---|









24

EXHIBIT __3__

PAGE __52__

69.     In the second half of 2002, MGA's "Mommy's Little Patient," originally designed as the first in a series of "Mommy's Little . . ." dolls, was followed by Mattel's "Little Mommy" doll.

|                              MGA's<br>"Mommy's Little Patient"                              |            Mattel's<br>"Little Mommy Potty Training Baby Doll"            |
| --- | --- |



70.     Sparing nothing, Mattel has also extended its monkey-see monkey-do behavior into its boys' line. When MGA came out with its "Alien Racers" line of toy racing vehicles, for instance, Mattel rushed to revamp and rename one of its "Hot Wheels" lines. Although well-known and clearly branded for decades as "Hot Wheels", Mattel's answer to MGA's "Alien Racers" was to re-brand and market its Hot Wheels Highway 35 line under an "AcceleRacerS" logo. MGA's line consists of "extreme" radio controlled racing vehicles marketed in connection with a strong, almost battle-like, science fiction theme. MGA's logo accentuates the "A", "R", and "S" in compressed block lettering. Mattel's line also consists of extreme racing vehicles marketed in connection with a strong, almost battle-like, theme. Mattel's logo too accentuates the "A", "R", and "S" in compressed block lettering.

25

EXHIBIT __3__

PAGE __53__

71.    Here, too, Mattel's mimicry has spilled over into Mattel's advertising and thematic presentation and marketing of this toy line.  In particular, Mattel has adopted MGA's "other-worldly" theme in its commercials.  For instance, in Mattel's commercials, the product, whose logo appears as "AcceleRacerS", now compete against alien-like Cyborgs engaged in a "race to save the world," mimicking MGA's alien theme and commercials in which MGA's "Alien Racers" are engaged in a "race to save the universe."

72.    None of this is coincidence.  Mattel has deliberately adopted a pattern and practice of coming out with variations of MGA's products to create confusion in the marketplace, interfere with MGA's business and divert profits away from MGA.  Mattel says, on its website, that it is in the business of creating "[t]he world's premier toy brands [of] today and tomorrow."  It seemingly does so, however, by borrowing liberally from its competitors, even when it refreshes its own existing brands and products.

73.    MGA has suffered extensive injury from Mattel's conduct.  Mattel's habitual, serial simulation of MGA's products, product lines and trade dress has allowed Mattel to take a free ride on the extensive amount of time, expense and creative development MGA expends on developing new products, product packaging and presentation, giving Mattel an unfair advantage, and making it virtually impossible for MGA to compete with Mattel on a level playing field.

**Mattel's additional unfair, manipulative, anti-competitive conduct**

74.    This already substantial injury has been exacerbated by the strong-arm tactics, and other illegitimate, unfair and anti-competitive means that Mattel has used to manipulate the market and ensure that its control and domination of the industry can continue unabated.

26

EXHIBIT _3_

PAGE _54_

75.    For example, wielding the litigation privilege as a potential shield for intimidating conduct, Mattel has sent threatening letters to several of its former employees who now work for MGA warning them not to disclose *even publicly available information* about Mattel, including the names and positions of Mattel employees. Mattel even went so far as to sue one of its former senior executives, after he had the temerity to resign and join MGA in October 2004. Not only was Mattel's lawsuit dismissed for failure to state a viable claim, but Mattel thereafter seemingly could not muster up a shred of evidence sufficient to support an amended complaint. As a result, Mattel's case against its former executive was dismissed with prejudice.

76.    Mattel has also warned a number of companies, including the biggest publishing entity in the United Kingdom, not to license MGA products, or risk retribution. The threats are not idle. In May 2004, Mattel terminated one of its licensees, apparently in retribution for licensing "BRATZ". While some companies have been courageous enough to take the risk, others have not, and MGA has lost valuable licensing opportunities as a result.

77.    Mattel has used similar intimidation to pressure distributors and retailers, particularly in foreign countries, not to distribute "BRATZ", to reduce shelf and display space for "BRATZ" and to place "BRATZ" in unfavorable locations at retail outlets.

78.    When MGA faced a shortage of doll hair in October 2002, MGA is informed and believes that the reason for that shortage was that Mattel had locked MGA out by buying up the supply from the two main hair supply companies.

79.    Mattel has also manipulated the retail market. For instance, Mattel merchandisers have been caught tampering with MGA's retail displays, replacing favorably located MGA merchandise with Mattel merchandise instead. MGA is also informed and believes that Mattel has falsely told a major United States retailer that MGA was giving another major United States retailer below-market pricing

27

EXHIBIT __3__

PAGE __55__

1   and falsely told a United Kingdom retailer that MGA was discontinuing one of its

2   lines, in order to make such line less attractive to buyers and thereby attempt to

3   increase sales of the competitive Mattel product and improve its own sales, at

4   MGA's expense.

5        80.   Even supposedly unbiased and impartial industry organizations have

6   fallen prey to Mattel's abusive wield of power, to MGA's detriment.

7        81.   NPD Funworld ("NPD"), for one, is the leading supplier of sales

8   statistics in the toy industry.  Accurate NPD statistics are essential for efficient

9   product-line management.  Without these statistics, it is difficult, if not impossible,

10  for toy companies to assess and measure the relative success of their products in

11  key categories.  It is, however, a subscription service, and NPD restricts the manner

12  in which its subscribers may use the data it provides.

13       82.   Mattel has regularly ignored the restrictions — using NPD data about

14  Mattel's comparative standing relative to other companies in press releases and in

15  communications with retailers and financial investors who are not NPD subscribers.

16       83.   Mattel generates substantially more annual subscription revenue for

17  NPD than does MGA, and carries more clout.

18       84.   After MGA had subscribed to the service for more than 12 years, NPD

19  terminated MGA's subscription in 2003 theoretically on the grounds that MGA

20  misused NPD data in a press release.

21       85.   MGA is informed and believes that the termination was the result of

22  pressure from Mattel, notwithstanding Mattel's own frequent violations of NPD's

23  restrictions.

24       86.   In addition to this, the market share numbers that NPD generates are

25  heavily dependent on the category in which NPD places a particular product.  MGA

26  is informed and believes that Mattel also pressured NPD into changing certain

27  product classifications for its "BRATZ" products in order to manipulate the data

28

28

EXHIBIT **3**

PAGE **56**

and preserve Mattel's market share rankings in the critical fashion doll category – and thereby lower MGA's.

87.    The Children's Advertising Review Unit ("CARU") is another organization that, upon information and belief, appears to have been subject to improper influence by Mattel. CARU is the toy industry's supposedly independent self-regulatory body in charge of maintaining standards in advertising. CARU's approval is considered critical within the toy industry to avoiding regulatory action by the Federal Trade Commission.

88.    CARU is heavily subsidized by Mattel.

89.    Upon information and belief, Mattel has used its influence as a major contributor to CARU's budget to induce CARU to place onerous restrictions on MGA advertisements, and require MGA to amend aspects of commercials that have gone unchallenged in other parties' commercials.

90.    As a result of CARU's restrictions, MGA has been forced to incur unnecessary costs for reshooting and producing or re-editing its commercials.

91.    On several occasions, CARU has also either strongly suggested, if not also required, that MGA respond to inquiries about its website policies and make substantial changes to the "BRATZ" website notably and significantly in excess of restrictions imposed on Mattel and others.

92.    Even TIA, the toy industry's trade association, is apparently not untainted by Mattel's influence and power. Each year, TIA presents the Toy-of-the-Year Awards, the most prestigious of which had been the award for Toy of the Year. Winning the Toy of the Year Award is a significant achievement that not only very likely increases the sales of the winning toy, but also denotes the winning company as a leader in toy innovation and generates substantial goodwill with retailers, distributors, licensees, and customers.

93.    For the years 2000 (the first year of the award), 2001 and 2002, the Toy of the Year award was chosen by consumer vote. The awards ceremony was

29

EXHIBIT  3

PAGE  57

1   then held the following year, at a dinner in New York. (For example, the awards

2   dinner for the year 2000 award was held in February 2001). Leap Frog won the

3   2000 People's Choice Toy of the Year Award and MGA won the 2001 and 2002

4   People's Choice Toy of the Year Awards. With the 2003 Toy of the Year Award,

5   however, the rules suddenly changed. Now, the award is selected by members of

6   the industry.

7        94.   Upon information and belief, this change was orchestrated by a Fisher

8   Price (a Mattel subsidiary) executive who, until recently, served as the Chairman of

9   TIA.

10       95.   Perhaps not surprisingly given this change in the winner selection

11  procedures, "Hokey Pokey Elmo" ("Elmo"), a Fisher Price toy, won for the year

12  2003 (awarded in 2004), beating out the other leading nominee, "BRATZ Formal

13  Funk Super Stylin' Runway Disco."

14       96.   TIA has refused to provide MGA with the vote count procedure and

15  totals for this award, despite repeated requests.

16       97.   MGA is also informed and believes that Mattel was instrumental in

17  attempting to keep MGA from participating as a sponsor in this year's "Kids'

18  Choice Awards."

19       98.   Mattel has clearly engaged in tortious, illegal and unethical behavior in

20  its unfettered efforts to disrupt, if not destroy, MGA. Indeed, this is apparently

21  Mattel's current *modus operandi* when it comes to "competing" in the industry.

22  The once immensely successful "LeapFrog" interactive learning product, for

23  example, has apparently been one of Mattel's other recent victims.

24       99.   Mattel may not shield its illegal, unfair and unethical business practices

25  from the public eye. It is time for the truth to be told, and the world to know of

26  Mattel's unfair, unethical and illegal business practices and unfair competition.

27  "Barbie" does not "play nice" with others (particularly her competitors), and needs

28  to be taught how "to share" (at least in the fashion doll marketplace). She cannot be

EXHIBIT ___3___

PAGE ___58___

1   allowed to continue to be the playground bully and trample on the rights of others,

2   including MGA.

3        100.   As a result of Mattel's manipulative, illegal, unfair, unethical and anti-

4   competitive conduct, MGA has suffered and, unless abated, will continue to suffer

5   lost sales, lost licensing fees, lost contracts, lost relationships, lost business

6   opportunities and other damages and harm for which there is no adequate remedy at

7   law.  Its ability to enter new markets and product lines has been hampered and

8   delayed.  Its production costs have increased, its reputation and relationships with

9   important players in the industry have been negatively impacted, the value of its

10  business has been diminished, and its ability to attract, hire and retain employees

11  has been affected.

12

13                          **FIRST CLAIM FOR RELIEF**

14  **(False Designation of Origin or Affiliation in Violation of 15 U.S.C. § 1125 (a))**

15       101.   MGA repeats and realleges the allegations contained in paragraphs 1

16  through 100 of this Complaint and incorporates them by reference as though fully

17  and completely set forth herein.

18       102.   MGA's "BRATZ" line has a unique and distinctive style and

19  distinctive characteristics, such as the disproportionately large head, large dramatic

20  eyes with a distinctive presentation (including the eye shape, make-up and lashes),

21  pouty, plump lips with a distinctive presentation (including the lip shape and make-

22  up), small, thin bodies, oversized feet, and up-to-date fashions.  MGA's "BRATZ"

23  line is known for and recognized by the total image that is presented by its product

24  and the style and arrangement of the packaging and display.  This "*tout ensemble*"

25  is representatively described and depicted herein.  The characteristics of MGA's

26  "BRATZ" line, alone or in combination, have come to identify the "BRATZ" line

27  and its source, MGA, and thus serve as protectable trade dress.  MGA's trade dress

28  in its "BRATZ" line is purely aesthetic and non-functional or, if any utility exists, it

                                      31

EXHIBIT __3__

PAGE __59__

1   is not essential to the purpose, quality or source identifying attributes of the

2   aesthetics. MGA's trade dress in its "BRATZ" line is inherently distinctive or has

3   acquired distinction within the meaning of the Lanham Act.

4        103.   Similarly, MGA's "BRATZ PETZ," part of the "BRATZ" line, also

5   has its own unique and distinctive characteristics, such as the humanlike eye and

6   unusual appearance of the animals dressed in clothing. MGA's "BRATZ PETZ"

7   line has become known for and recognized by the total image that is presented by

8   the product and the style and arrangement of its packaging. This "*tout ensemble*" is

9   representatively described and depicted herein. The characteristics of MGA's

10  "BRATZ PETZ", alone or in combination, have come to identify the "BRATZ

11  PETZ" line and its source, MGA, and thus serve as protectable trade dress. MGA's

12  trade dress in its "BRATZ PETZ" line is purely aesthetic and non-functional or, if

13  any utility exists, it is not essential to the purpose, quality or source identifying

14  attributes of the aesthetics. MGA's trade dress in its "BRATZ PETZ" line is

15  inherently distinctive or has acquired distinction within the meaning of the Lanham

16  Act.

17       104.   Mattel's production, sale and marketing of "My Scene" dolls,

18  including styling heads and doll heads, and "My Scene" pets that are confusingly

19  similar to MGA's "BRATZ" line (including its "BRATZ PETZ"), without MGA's

20  permission or consent, constitutes designation and use of a term, symbol, device or

21  combination thereof that is false or misleading within the meaning of 15 U.S.C.

22  Section 1125 and is likely to cause confusion, or to cause mistake, or to deceive as

23  to the affiliation, connection, or association, or as to the origin, sponsorship, or

24  approval of Mattel's goods or commercial activities, within the meaning of 15

25  U.S.C. Section 1125. MGA has been damaged by Mattel's acts.

26       105.   Mattel's conduct has been intentional and willful, and is calculated

27  specifically to trade off the goodwill that MGA has developed in its successful

28  "BRATZ" line. By its aforesaid acts, particularly its imitation of the distinctive

32

EXHIBIT __3__

PAGE __60__

1  features of MGA's "BRATZ" line in connection with goods sold and distributed in

2  interstate commerce, Mattel has infringed and is likely to continue to infringe on

3  MGA's substantial rights in and to the "BRATZ" line trade dress. In so doing,

4  Mattel has falsely represented and designated to the public generally and consumers

5  of fashion doll products specifically the source and origin of Mattel's "My Scene"

6  fashion doll products in violation of 15 U.S.C. § 1125(a).

7       106.  MGA has been damaged by, and Mattel has profited from, Mattel's

8  wrongful conduct in an amount to be proven at trial.

9       107.  For each act of infringement, MGA is entitled to recover its actual

10  damages as well as Mattel's profits from such infringement.

11      108.  Monetary relief alone, however, is not adequate to address fully the

12  irreparable injury that Mattel's illegal actions have caused and will continue to

13  cause MGA, if not enjoined. MGA is therefore entitled to preliminary and

14  permanent injunctive relief to stop Mattel's ongoing infringement of MGA's trade

15  dress.

16                    **SECOND CLAIM FOR RELIEF**

17    **(Unfair Competition in Violation of 15 U.S.C. § 1125 (a) and Unfair**

18  **Competition and Unfair Business Practices in Violation of Cal. Bus. & Prof.**

19             **Code § 17200 *et seq.* and California Common Law)**

20      109.  MGA repeats and realleges the allegations contained in paragraphs 1

21  through 108 of this Complaint and incorporates them by reference as though fully

22  and completely set forth herein.

23      110.  Mattel has deliberately and, indeed, repeatedly adopted, imitated and

24  mimicked the make-up, appearance, features, trade dress, and image of MGA's

25  products, packaging and advertising, including its repackaging and refreshing of

26  older Mattel toys. Mattel's actions were and are done with the intent to deceive

27  consumers, cause confusion and mistake, and interfere with the ability of

28  consumers to identify the source of goods by appearance and packaging. By this

33

EXHIBIT **3**

PAGE **61**

1   conduct, Mattel pirates and exploits, by subliminal or conscious association with

2   MGA, the goodwill and reputation of MGA and derives benefit therefrom.

3        111.  Mattel has particularly and deliberately poached upon the commercial

4   magnetism of MGA's "BRATZ" and the success of "BRATZ".  Mattel's conduct

5   has been intentional and willful, and is calculated specifically to trade off the

6   goodwill that MGA has developed in its successful "BRATZ" line.

7        112.  By its acts, including its intentional imitation of the distinctive features

8   of MGA's "BRATZ" dolls, which has progressively become closer and closer, as

9   well as its imitation of "BRATZ" themes, packaging and the overall look, feel and

10   total image of the "BRATZ" line, imitation of other MGA products, packaging and

11   advertising, and other conduct alleged herein, Mattel has engaged in unfair

12   competition under both federal and California state law.

13        113.  Mattel has also willfully and maliciously used its power, influence and

14   intimidation to threaten certain retailers, suppliers, licensees, distributors and

15   manufacturers so as to limit, if not prevent, MGA from doing business with these

16   retailers, suppliers, licensees, distributors and manufacturers, using its power and

17   influence to intimidate and manipulate industry bodies.  Mattel has further used its

18   power and influence to attempt to, if not actually, intimidate and threaten MGA's

19   current and potential employees so as to cause MGA competitive injury.

20        114.  Alone, in combination, or in totality, Mattel's actions discussed and

21   alleged herein constitute unfair competition and unfair business practices within the

22   meaning of federal law, California statutory law and/or California common law.

23        115.  As a result of its conduct, Mattel has derived substantial monetary and

24   non-monetary benefit and business advantage.  Mattel has also wrongfully diverted

25   profits away from MGA and to Mattel and, on information and belief, deprived

26   MGA of the patronage of a large number of actual and potential customers.

27        116.  MGA has been damaged by, and Mattel has profited from, Mattel's

28   wrongful conduct in an amount to be proven at trial.

34

EXHIBIT 3

PAGE 62

117.   Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel, and all persons acting in concert with Mattel, from engaging in acts of unfair competition and unfair business practices.

118.   MGA is further entitled to relief whereby Mattel is ordered to pay restitution for damages resulting from Mattel's unfair competition and unfair business practices.

## THIRD CLAIM FOR RELIEF

### (Dilution in Violation of 15 U.S.C. § 1125 (c); Cal. Bus. & Prof. Code § 14330 and California Common Law)

119.   MGA repeats and realleges the allegations contained in paragraphs 1 through 118 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

120.   The look and trade dress of the MGA products referenced herein are distinctive and famous, and have been since before Mattel launched its similar versions.  By its aforesaid acts, Mattel caused and continues to cause blurring and dilution of the distinctive look of MGA's products and trade dress, which previously served as a unique source identifier for MGA, within the meaning of the Lanham Act, California Business and Professions Code § 14330 and/or California common law.

121.   Mattel's conduct has been intentional and willful, calculated specifically to trade on MGA's goodwill and reputation and to cause dilution of MGA's famous marks, particularly those connected with MGA's famous and successful "BRATZ" doll head, "BRATZ" doll product line, "BRATZ Funky Fashion Makeover Head" and "BRATZ PETZ" line.

122.   MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

35

EXHIBIT __3__

PAGE __63__

123.  Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing dilution.

## FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment)

124.  MGA repeats and realleges the allegations contained in paragraphs 1 through 123 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

125.  As a result of the conduct alleged herein, Mattel has been unjustly enriched to MGA's detriment.  MGA seeks a worldwide accounting and disgorgement of all ill-gotten gains and profits resulting from Mattel's inequitable activities.

## PRAYER FOR RELIEF

WHEREFORE, MGA prays for relief, as follows:

1.   That Mattel, its agents, servants and employees and all persons acting in concert be restrained preliminarily and permanently from directly or indirectly:

    a.   using confusingly similar trade dress;

    b.   improperly influencing, or attempting to improperly influence, standard-setting and industry organizations;

    c.   engaging in unfair competition and unfair business practices; and

    d.   diluting MGA's trade dress;

2.   For general and actual damages, according to proof at trial but believed to reach or exceed tens of millions of dollars;

3.   For the disgorgement of all profits derived by Mattel for its acts of:

    a.   false designation of origin or affiliation;

36

EXHIBIT 3

PAGE 64

1             b.    unfair competition and unfair business practices; and

2             c.    dilution;

3     4.    For costs of suit and reasonable attorneys' fees;

4     5.    For punitive and/or exemplary damages as a result of Mattel's willful

5 and malicious conduct to the extent allowable by law; and

6     6.    For such other and further relief as the Court deems just and proper.

8 Dated:    April 13, 2005        PATRICIA GLASER
CHRISTENSEN, MILLER, FINK, JACOBS, GLASER, WEIL & SHAPIRO LLP

DALE M. CENDALI
DIANA M. TORRES
PAULA E. AMBROSINI
O'MELVENY & MYERS LLP

By:
Diana M. Torres
Attorneys for Plaintiff
MGA ENTERTAINMENT, INC.

EXHIBIT 3
PAGE 65

## DEMAND FOR JURY TRIAL

MGA hereby demands a jury trial on all triable issues.

Dated:        April 13, 2005

PATRICIA GLASER
CHRISTENSEN, MILLER, FINK,
JACOBS, GLASER, WEIL &
SHAPIRO LLP

DALE M. CENDALI
DIANA M. TORRES
PAULA E. AMBROSINI
O'MELVENY & MYERS LLP

By: _____
    Diana M. Torres
Attorneys for Plaintiff
MGA ENTERTAINMENT, INC.

38

EXHIBIT __3__

PAGE __66__

# EXHIBIT 4

Westlaw.                                                    NewsRoom

12/23/06 ABCNIGHTLINE (No Page)                                Page 1

12/23/06 ABC Nightline (Pg. Unavail. Online)
2006 WLNR 22434503

                              ABC Nightline
              Copyright 2006 American Broadcasting Company

                            December 23, 2006


                                NIGHTLINE


[SHOW: ABC Nightline] [AIRDATE: 12/22/06] [AIRTIME: 23:35] [ANCHOR: MARTIN BASHIR]
[ANCHOR LOCATION: NEW YORK, NY USA] [STORY: NIGHTLINE]

TOPIC:

CONTENT:

GRAPHICS: NIGHTLINE

GRAPHICS: BRAWL IN THE DOLLHOUSE

MARTIN BASHIR (ABC NEWS): Tonight on 'Nightline," brawl in the dollhouse.  After
almost 50 years of domination, Barbie is facing brash new competition from the
Bratz dolls.  Billions of dollars are on the line.  It's a toy story where nobody
is playing nice.

GRAPHICS: CHRISTMAS JOURNEY

MARTIN BASHIR (ABC NEWS): A Christmas journey.  Retracing the root historians say
Joseph and Mary would have taken from Nazareth to Bethlehem.  The dangers, the
difficulties, then and today.

GRAPHICS: FANTASY VS REALITY

MARTIN BASHIR (ABC NEWS): Fantasy versus reality.  It seems like the perfect gift
for a romantic holiday season.  So why do so many of us get it wrong?  Tonight, we
take you inside one store that thinks it has the answer.

MATT NEELY (STOCKING FELLA): The 34B should look good.

ANNOUNCER: From the global resources of ABC News, with Terry Moran in Washington,
Martin Bashir and Cynthia McFadden in New York City, this is 'Nightline," December
22nd, 2006.

GRAPHICS: NIGHTLINE: DECEMBER 22, 2006

REPORTER: JOHN BERMAN
REPORTER LOCATION: LOS ANGELES, CA USA

TOPIC:

        ©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __4__

PAGE __67__

M 0062148

12/23/06 ABCNIGHTLINE (No Page)                                    Page 2


CONTENT: BARBIE, BRATZ, MATTEL, MICRO GAMES OF AMERICA, CHUCK SCOTHON

MARTIN BASHIR (ABC NEWS): (Off-camera)  Good evening.  Many of us have spent at
least part of today rushing around the shops looking for that perfect Christmas
present particularly for our children.  Toys are now big business.  Almost $11
billion will be spent on them during the holiday season alone.  And nowhere is the
business more competitive than in the world of dolls.  Yes.  Barbie has long been
the biggest-selling toy doll of all, but now there's a serious challenger.  And in
the fight to be number one nobody's backing down.  Here's ABC's John Berman.

JOHN BERMAN (ABC NEWS): (Voiceover)  In this corner, measuring nine inches tall
with big eyes and even bigger bling, the challenger, Bratz.  And in this corner,
with flowing blond hair and impossibly disproportionate bust, a 47-year undisputed,
undefeated champion from Mattel, Barbie.  Now you might think the world of dolls
isn't the kind of place for a knock down, drag out brawl but you'd be wrong.

ISAAC LARIAN (CEO: Ken is not gonna save Barbie.  Barbie is not gonna save Barbie.
And the leadership that they have at Mattel right now, it's not gonna save Barbie.

JOHN BERMAN (ABC NEWS): (Off-camera)  You sound like a linebacker on a football
team.  You're like taunting Mattel.

ISAAC LARIAN (CEO: It's good.  It's good for the business.

JOHN BERMAN (ABC NEWS): (Off-camera)  It's good?  Trash talking in the doll
business is good?

ISAAC LARIAN (CEO: I'm not trash talking.  I'm telling - I'm talking about the
facts.

JOHN BERMAN (ABC NEWS): (Voiceover)  Meet Isaac Larian.  The seemingly nice man who
wants to pummel Barbie.  He is the CEO of Micro Games of America, which makes the
Bratz doll.  He might not strike you as the doll kind of guy.  He came to the US
from Iran with nothing.

ISAAC LARIAN (CEO: I came here in 1971 with a one-way ticket and $750 in my pocket
and a big American dream.  And I have lived the American dream.

JOHN BERMAN (ABC NEWS): (Voiceover)  Larian went from washing dishes to building a
toy company to the American dream on steroids.  Largely due to this big-eyed, big-
headed cartoonish doll.  When Larian first saw the Bratz design in 2001, he thought
they looked like aliens.

JOHN BERMAN (ABC NEWS): (Off-camera)  Do you still they look like aliens?

ISAAC LARIAN (CEO: No.  I think now they look beautiful.  I've grown to like them.

JOHN BERMAN (ABC NEWS): (Voiceover)  Last year's $2 billion in sales can make many
things beautiful.  Larian now says Bratz has a 40% market share and is the number
two doll in the US market.  Number two for now.  Larian claims his Bratz girls are
breathing down the lanky plastic neck of number one.  That would be Barbie.

JOHN BERMAN (ABC NEWS): (Off-camera)  What's wrong with Barbie?

ISAAC LARIAN (CEO: It's time for her to retire.  She's been around for too long.

JOHN BERMAN (ABC NEWS): (Voiceover)  And you want to help Barbie retire?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ___4___

PAGE __68__

M 0062149

12/23/06 ABCNIGHTLINE (No Page)                                    Page 3

ISAAC LARIAN (CEO: Yes, I would help her retire.  I would throw a party for her.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): He's welcome to
throw a party for Barbie any time he wants, but it won't be a retirement party.
She has been and will remain the number one fashion doll in the industry.

JOHN BERMAN (ABC NEWS): (Voiceover)  Meet Chuck Scothon.  A senior Mattel executive
and former high school offensive lineman.  His product is the long-legged goliath
of the toy business.  Since she was first created in 1959, Barbie has been an icon
among icons with almost absurd success.  One study found that 90% of American girls
between 3 and 10-years-old owns a Barbie doll.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): Now, we're traveling
through the world of fairytopia.

JOHN BERMAN (ABC NEWS): (Voiceover)  Scothon doesn't like to talk about Bratz.  Let
alone the fact that they might pose a challenge.

JOHN BERMAN (ABC NEWS): (Off-camera)  How was it, do you think, this become a
story?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): I think a lot of
people like to talk about the underdog and the leadership positions.  I think at
the end of the day it's really about making more out of something than there really
is.

JOHN BERMAN (ABC NEWS): (Voiceover)  But last year, Barbie might have started to
show her age.  Sales dropped 13%, just as Bratz were getting white hot.

JOHN BERMAN (ABC NEWS): (Off-camera)  Is Barbie in danger?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): Not in the least.
Barbie has been and will continue to be the number one fashion doll.

JOHN BERMAN (ABC NEWS): (Voiceover)  Barbie has rebounded a bit this year, but
Isaac Larian is not impressed.  He says he has the key to cool.  A multicultural
doll with the edgy sassy attitude girls want these days.

ISAAC LARIAN (CEO: The kids look at Bratz dolls and they think they are teenagers.
And we ask them how old do you think Bratz dolls are?  They say they are teenagers.
And when they look at Barbie doll they think it's old mom.

JOHN BERMAN (ABC NEWS): (Off-camera)  They think mom when they look at Barbie
dolls?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): What I would suggest
and say to that is, first of all if Barbie, for some girls, reminds them of their
mothers, I would think of nothing better.  The most important job a woman can have
in many ways is being a mom.

JOHN BERMAN (ABC NEWS): (Voiceover)  There is no mistaking a Bratz doll for a mom.

JOHN BERMAN (ABC NEWS): (Off-camera)  I look at that Bratz doll.  She's wearing,
you know, the leopard skin top, she's got the sequins, she's got the hairs, I mean,
you know, people have compared them to street walkers.  They look a little, you
know, trashy.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __4__

PAGE __69__

M 0062150

ISAAC LARIAN (CEO: They don't look trashy to me.  And this is - I think trashy is in the eye of the adults.  When we show these to the little girls, and we have done that over and over, everybody said they're beautiful.  They never say they look like a streetwalker.

JOHN BERMAN (ABC NEWS): (Voiceover)  Barbie is clearly going for a different image. What image, you ask?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): First and foremost, I would say the Barbie doll is truly based on some great values for little girls. The courage, inspiration, imaginative play.

JOHN BERMAN (ABC NEWS): (Voiceover)  Whatever that means exactly, Barbie is famous for having careers like Doctor Barbie and Astronaut Barbie.  The Bratz dolls? Well, they like...

CARTOON VOICEOVER (GROUP): Shopping.

JOHN BERMAN (ABC NEWS): (Voiceover)  This is their motto.

ISAAC LARIAN (CEO: The girls with the passion for fashion.

JOHN BERMAN (ABC NEWS): (Off-camera)  The girls with the passion for fashion.

ISAAC LARIAN (CEO: Right.

JOHN BERMAN (ABC NEWS): (Off-camera)  What's that about?

ISAAC LARIAN (CEO: They have good fashion.  It's okay to look good.  It's okay, who said that you have to, who said that girls don't have to look good?

JOHN BERMAN (ABC NEWS): (Off-camera)  And Barbie doesn't look good?  I could tell you, there are a lot of people who think Barbie looks good.

ISAAC LARIAN (CEO: I don't know.  The consumers who are buying Bratz doll don't think Barbie is good.

JOHN BERMAN (ABC NEWS): (Voiceover)  If all this is true why hasn't Bratz yet overtaken Barbie as number one?  According to Larian...

ISAAC LARIAN (CEO: We would have beaten them up this year and year before if they had not engaged in, what I call, really unfair competition.

JOHN BERMAN (ABC NEWS): (Off-camera)  Really unfair competition?  Those are fighting words.

ISAAC LARIAN (CEO: They are fighting words.

JOHN BERMAN (ABC NEWS): (Voiceover)  The Barbie-Bratz battle has moved beyond the Barbie dream house to the courthouse.  Round one.  Mattel filed a lawsuit alleging that the designer of the Bratz concept came up with the idea when he was working at Mattel.  Round two, Isaac Larian sued back saying that Mattel tried to corner the market on doll hair, and more seriously that Mattel ripped off the Bratz concept for a new line of Barbie dolls.  The MyScene dolls.

JOHN BERMAN (ABC NEWS): (Off-camera) This is, the MyScene Barbies are what has, to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __4__

PAGE __70__

M 0062151

12/23/06 ABCNIGHTLINE (No Page)                                    Page 5

some extent, they're in the center of a little bit of a controversy now because Bratz says these look just like their dolls.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): Okay.

JOHN BERMAN (ABC NEWS): (Off-camera)  I mean, don't you see the resemblance between MyScene Barbie and the Bratz doll?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): What we see is an evolution to the Barbie brand.  And again, the Barbie brand is made up of dolls that target girls of every age because it's really an evolution of where the Barbie doll has been with a little bit more animated look, but not necessarily something that's been inspired by the competition at all.

JOHN BERMAN (ABC NEWS): (Voiceover)  The cases are still pending, but both companies say they are confident they will win the legal battle, though they say it differently.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): I'm not really gonna talk about the legal piece of this.  I have all the confidence in the world that the justice system and that, that our attorneys can work through those issues.

ISAAC LARIAN (CEO: When we're done with Mattel, we will get them for billions of dollars, not only for this, but for defamation.

JOHN BERMAN (ABC NEWS): (Voiceover)  Who will prevail in this doll brawl?  It's one thing to be hot.  Bratz are hot, but another to be iconic.

ISAAC LARIAN (CEO: We're gonna become number one.  I promise you that.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): I can't speak to his guarantee.  What I can speak to is I believe that Barbie will continue to be the number fashion doll around the globe.

JOHN BERMAN (ABC NEWS): (Off-camera)  We're talking about dolls.  I mean, shouldn't everyone be able to play nice?

ISAAC LARIAN (CEO: They have gotten away too much with bullying everybody around. And somebody has to stand up to them.  I will.

JOHN BERMAN (ABC NEWS): (Off-camera)  So you're gonna fight them on the schoolyard?

ISAAC LARIAN (CEO: I'm gonna fight, I'm gonna, not in the school schoolyard.  I'm gonna fight them in the courthouse.

JOHN BERMAN (ABC NEWS): (Off-camera)  And with this thing?

ISAAC LARIAN (CEO: With this thing and many other things.  But all 100% the old American fashion way.

JOHN BERMAN (ABC NEWS): (Voiceover)  Merry Christmas.  I'm John Berman for 'Nightline" in Los Angeles.

MARTIN BASHIR (ABC NEWS): (Off-camera)  The doll wars in a store near you.

GRAPHICS: ROAD TO BETHLEHEM

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __4__

PAGE __71__

M 0062152

12/23/06 ABCNIGHTLINE (No Page)                                           Page 6

MARTIN BASHIR (ABC NEWS): (Voiceover)  And just ahead on 'Nightline," retracing the journey that has inspired millions for centuries.  In the footsteps of Joseph and Mary.

GRAPHICS: STOCKING FELLAS

MARTIN BASHIR (ABC NEWS): (Voiceover)  And stocking fellas.  One store's solution to the challenge of buying lingerie.  It's a 'Sign of the times."

ANNOUNCER: ABC News 'Nightline," brought to you by...

COMMERCIAL BREAK

REPORTER: WILF DINNICK
REPORTER LOCATION: NAZARETH, ISRAEL

TOPIC:

CONTENT: CHRISTMAS STORY, CHURCH OF NATIVITY, JESUS, MARY, JOSEPH, ISRAEL

MARTIN BASHIR (ABC NEWS): (Off-camera)  It's easy and commonplace to sentimentalize the Christmas story.  Mary and Joseph, traveling for days on a donkey from their home in Nazareth to Bethlehem.  Mary eventually giving birth to Jesus in a stable because there was no room for them at the inn.  It wasn't an easy journey back then, but imagine making the same trek today in 2006.  Here's ABC's Wilf Dinnick.

WILF DINNICK (ABC NEWS): (Voiceover)  A heavily pregnant woman, traveling across deserts, through ancient cities and river crossings.  The story of a trip inspiring Christians around the world.  The gospel according to Luke says it began in Nazareth, a city where it's believed an angel told Mary she would have a son named Jesus.

WILF DINNICK (ABC NEWS): (Off-camera)  Today, Nazareth is a city of about 70,000 people.  But back in Joseph and Mary's day, it was only a small village of about 1,000.  Now, to get to Bethlehem, it's actually only 65 miles, as the crow flies but Joseph and Mary, they had a complicated route.  We're gonna take the exact same route.  Well, they had a donkey.  We've got this car.

WILF DINNICK (ABC NEWS): (Voiceover)  The Bible does not have details of the journey.  But historians told us, Mary and Joseph probably did not take the direct way to Bethlehem because then, like today, the Middle East was a complicated, sometimes dangerous, place.  From Nazareth they headed east to the Jordan River to avoid hostile territory controlled by the Samaritans who hated Jews.  They crossed the river by foot by the ancient city of Bet She'an.  Then through the Jordan Valley, land that was controlled by Jewish kings, back into Israel, over the Jordan River again and through the ancient city of Jericho passed Jerusalem and then on to Bethlehem.  Steve Pfann sees similarities between today and 2,000 years ago.

STEPHEN PFANN (PRESIDENT: There is an interesting parallel that can be drawn with border crossings, and police at the border, soldiers at the border, questions of taxation and other types of things put more into a modern context.

WILF DINNICK (ABC NEWS): (Voiceover)  So, we drove from Nazareth to the Jordan River.  It was in shallow areas like this where Mary and Joseph simply walked across the river.

ISRAELI SECURITY PERSONNEL (MALE): But you don't understand.  Hey, I'm telling you,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __4__

PAGE __72__

M 0062153

there is a problem.

WILF DINNICK (ABC NEWS): (Voiceover)  But today, crossing the Jordan is not so simple.  We were greeted by Israeli security.

WILF DINNICK (ABC NEWS): (Off-camera)  The security here is so tight in fact that they won't even let us shoot here, even though we have permission.  This is the Jordan Valley and this as far as we can come here because this is now an international border.

WILF DINNICK (ABC NEWS): (Voiceover)  So from here on in, it was hidden cameras only.  Passport checks, departure tax and duty-free.

WILF DINNICK (ABC NEWS): (Off-camera)  And then we have to get on a bus to make the very short trip from Israel to Jordan.  This is how you have to do it in 2006.

WILF DINNICK (ABC NEWS): (Voiceover)  I did manage to sneak a few shots as we crossed the Jordan River.  On the other side, Jordanians were also nervous about our cameras.

WILF DINNICK (ABC NEWS): (Off-camera)  We face yet another delay here.  This is now on the Jordanian side and the security here says we can't actually use the camera, even though we applied for permission weeks ago, they somehow have lost our permission.  So we're trying to go down to the Jordan Valley now, as quickly as we can, and then we'll cross over to the Israeli side.

WILF DINNICK (ABC NEWS): (Voiceover)  The Jordan Valley is flat, perfect for traveling.  In Joseph and Mary's day there would have been hardly anything here.  Today, plenty of busy Arab towns.

WILF DINNICK (ABC NEWS): (Off-camera)  Okay, let's go in.  A lot has changed over the last 2,000 years but one thing that has remained the same is the type of bread made almost exactly the same way as when Joseph and Mary made their journey.

WILF DINNICK (ABC NEWS): (Voiceover)  Then back into Israel, just before the border closes.

WILF DINNICK (ABC NEWS): (Off-camera)  We're now gonna cross the Jordan River for the second time here, where Mary and Joseph would have waded across on their way to Bethlehem.

WILF DINNICK (ABC NEWS): (Voiceover)  Then on to the ancient town of Jericho, it is Palestinian and the Israeli army demands special ID to enter.

WILF DINNICK (ABC NEWS): (Off-camera)  Could I get a falafel with hummus and pita?  Pita, yeah.  Okay.

WILF DINNICK (ABC NEWS): (Voiceover)  This was a chance for Mary and Joseph to rest before the final, grueling leg of the trip, which was a treacherous road that was yet again blocked for us by the Israeli army.

WILF DINNICK (ABC NEWS): (Off-camera)  This is the part of the trip we cannot do by car.  This is the ancient route between Jericho and Bethlehem.  The silence here is amazing, the view is stunning, but it must have been a daunting part of the journey for Mary and Joseph.

WILF DINNICK (ABC NEWS): (Voiceover)  The last stretch of the journey that Mary and

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT _4_

PAGE _73_

M 0062154

Joseph took into Bethlehem is now impossible.  Blocked by Israel's security wall. Even Bethlehem itself is cut off by the wall.  We had to drive through this gate controlled by Israeli soldiers.

WILF DINNICK (ABC NEWS): (Off-camera)  We finally arrive in Bethlehem, and that's the church of the nativity behind us.  Now our trip took 15 hours, we crossed two international borders and dozens of military checkpoints.  Joseph and Mary's trip took about a week.

WILF DINNICK (ABC NEWS): (Voiceover)  But on our trip, we met at least one historian who believes Joseph and Mary's journey never happened.  The gospel according to Luke says the couple made the trip to Bethlehem for a Roman census, but historians now know there was no census at the time.

REVEREND JEROME MURPHY-O'CONNOR (ECOLE BIBLIQUE: I have no problem with the divinity of Christ.  I have no problem with his birth in Bethlehem.  It's just the colorful little bits that writers, storytellers, felt inclined to add.  Those, we can legitimately question.

WILF DINNICK (ABC NEWS): (Voiceover)  He also believes, like many other historians, the couple already lived in Bethlehem and went to Nazareth later to look for work. But don't tell that to anyone here.  In the Church of the Nativity, in this small spot where it's believed Mary gave birth to Jesus.  For the faithful, a miracle, after such a grueling journey.

REVEREND JEROME MURPHY-O'CONNOR (ECOLE BIBLIQUE: It's an extremely good yarn, and that's why it has survived because people prefer good yarns to the truth.

WILF DINNICK (ABC NEWS): (Voiceover)  And it is a good story.  And for us, an amazing journey.  Wilf Dinnick for "Nightline" in Bethlehem.

MARTIN BASHIR (ABC NEWS): (Off-camera)  The Christmas journey then and now.  And when we come back, Santa's little helpers like you've never seen them before.  It's a "Sign of the Times."

GRAPHICS: SIGN OF THE TIMES

COMMERCIAL BREAK

ANNOUNCER: 'Nightline" continues from New York City with Martin Bashir.

REPORTER: NICK WATT
REPORTER LOCATION: LONDON, ENGLAND

TOPIC:

CONTENT: LINGERIE, STOCKING FELLA, MARKS AND SPENCER, MYLA

MARTIN BASHIR (ABC NEWS): (Off-camera)  It seems like the perfect gift, the sexy little outfit for the one we love this Christmas.  If only it were that simple. According to experts, men are simply hopeless at choosing lingerie.  So now, a department store in Britain is employing Santa's little helpers to guide men away from any lingerie land mines and, according to ABC's Nick Watt, it's a "Sign of the Times."

MATT NEELY (STOCKING FELLA): (Inaudible) nice, actually.  You guys doing okay? Finding everything you want?  Yeah?

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ___4___

PAGE ___74___

M 0062155

CUSTOMER (MALE): Yeah, we're fine.

CUSTOMER (FEMALE): Yes, thank you.

CUSTOMER (MALE): Thank you, sir.

MATT NEELY (STOCKING FELLA): Give me a shout if you need any more help.

NICK WATT (ABC NEWS): (Voiceover)  Here at Marks and Spencer they noticed a lot of lingerie returned by women after Christmas.  The problem?  Men were buying it. Matt Neely is part of the solution.

MATT NEELY (STOCKING FELLA): We were given all sorts of training about the styles of bra and what function it performs in terms pushing it together or lifting up, or squashing it down.

MATT NEELY (STOCKING FELLA): There we are.

NICK WATT (ABC NEWS): (Voiceover)  Two hundred stocking fellas were sent out to help hapless husbands.

MATT NEELY (STOCKING FELLA): That's quite sweet.

CUSTOMER (MALE): Mm-hmm.

MATT NEELY (STOCKING FELLA): Okay?

CUSTOMER (MALE): No.

MATT NEELY (STOCKING FELLA): You know, if the guys are wandering around not really know what they're doing, or kind of skirting around the outside too afraid to step in.

NICK WATT (ABC NEWS): (Voiceover)  He helps the unromantic.

NICK WATT (ABC NEWS): (Off-camera)  Do you always buy underwear for Christmas?

CUSTOMER (MALE): No.

NICK WATT (ABC NEWS): (Off-camera)  So why this year?

CUSTOMER (MALE): Because I've run out of ideas.

MATT NEELY (STOCKING FELLA): Yeah.

NICK WATT (ABC NEWS): (Voiceover)  He helps the clueless.

MATT NEELY (STOCKING FELLA): What color are you looking for?

CUSTOMER (MALE): Well...

NICK WATT (ABC NEWS): (Voiceover)  He even helps those who think they know better.

NICK WATT (ABC NEWS): (Off-camera)  Do you have the right size?

CUSTOMER (MALE): I have the right size, yeah.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __4__

PAGE __75__

M 0062156

NICK WATT (ABC NEWS): (Off-camera)  Color?

CUSTOMER (MALE): Well, color is my, my choice really, actually.

MATT NEELY (STOCKING FELLA): Hopefully, the presence of another man in the department will put them at ease.

NICK WATT (ABC NEWS): (Off-camera)  Now, this is Myla, an upmarket lingerie boutique where they have a very different philosophy.  Here, they only employ women.

TAMARA DAVIES (MANAGER: I would say 75% of my customers are men.

NICK WATT (ABC NEWS): (Off-camera)  Are men?

TAMARA DAVIES (MANAGER: Are men.  Male.

NICK WATT (ABC NEWS): (Voiceover)  Men, like Anatoly (PH).

TAMARA DAVIES (MANAGER: Do you know what she likes?  Do you know what color?

CUSTOMER (MALE): Colors, yeah, yeah.

TAMARA DAVIES (MANAGER: Size?

CUSTOMER (MALE): Size, yeah.  I think, it's a must if you - you have to know your woman.

NICK WATT (ABC NEWS): (Voiceover)  But even at Myla, some men aren't quite so sure about the size.

TAMARA DAVIES (MANAGER: So they're like this, or, I mean, as a woman, you know, female working here, we have men come in and said, 'She's your size, what size are you?"

NICK WATT (ABC NEWS): (Voiceover)  So, there's one bonus of a female assistant but it's not male bonding.

NICK WATT (ABC NEWS): (Off-camera)  And how do you put them at ease?

TAMARA DAVIES (MANAGER: Smiling, 'Hello, how are you today?"  Talk about the weather.

NICK WATT (ABC NEWS): (Off-camera)  Bit of humor?

TAMARA DAVIES (MANAGER: A bit of humor, yes.  We do that.

NICK WATT (ABC NEWS): (Off-camera)  Do you flirt a little bit?

TAMARA DAVIES (MANAGER: Yes, a little.

NICK WATT (ABC NEWS): (Off-camera)  Apparently a lot of men end up buying two pairs, something safe and something saucy that they're both gonna enjoy.

NICK WATT (ABC NEWS): (Voiceover)  As Bridget Jones found out in the movie, safe can also be sexy.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ___4___

PAGE __76__

M 0062157

CLIP FROM "BRIDGET JONES'S DIARY"

HUGH GRANT (ACTOR): Oh, absolutely enormous panties. No, no, don't apologize. I like them. Hello, mommy.

TAMARA DAVIES (MANAGER: Men don't wanna leave here. I got a guy here in yesterday, and he was looking around. He spent about half an hour, and he said to me, 'I just, I just don't wanna leave. I wanna stay here forever."

MATT NEELY (STOCKING FELLA): It's a 34B, which will be no good.

NICK WATT (ABC NEWS): (Voiceover)  I wonder if any one's ever said that...

MATT NEELY (STOCKING FELLA): Yeah.

NICK WATT (ABC NEWS): (Voiceover)  ...to a stocking fella?  I'm Nick Watt for "Nightline" in Lingerie Land.

MARTIN BASHIR (ABC NEWS): (Off-camera)  And in case you're wondering, I bought my wife a rather fetching handbag.  And when we come back, a special look at the achievements and events of the past year.

COMMERCIAL BREAK

MARTIN BASHIR (ABC NEWS): (Off-camera)  Next week on "Nightline," a look at some memorable moments and provocative people we've covered during 2006.  The year in entertainment, power, money and love.  It's all part of our special series beginning on Christmas Day with the 'Year in Jesus."  We hope you'll join us.  But that's our report for tonight.  I'm Martin Bashir.  For Cynthia McFadden, Terry Moran, and all of us at ABC News, good night America and have a very happy and peaceful Christmas.

FOR INFORMATION ON ORDERING A VIDEO OR TRANSCRIPT COPY OF ABC NEWS OR ABC NEWS NOW PROGRAMMING, PLEASE VISIT THE SECURE ONLINE ORDER FORM LOCATED AT WWW.TRANSCRIPTS.TV

                    ---- INDEX REFERENCES ----

COMPANY: MATTEL INC; ABC NEWS; BRATZ F C; REACH TRADE AND MARKETING; ABC

INDUSTRY:  (TV (1TV19); Underwear (1UN06); Entertainment (1EN08); Gen Y Entertainment (1GE14); TV Programming (1TV26); Games & Toys (1GA85); Gen Y TV (1GE33); Apparel (1AP19); Consumer Products & Services (1CO62); Children's Apparel (1CH40); Apparel & Textiles (1AP20))

REGION:  (Americas (1AM92); North America (1NO39); Mediterranean (1ME20); Middle East (1MI23); USA (1US73); Palestine (1PA37); New York (1NE72); Israel (1IS16); Arab States (1AR46))

Language:  EN

OTHER INDEXING:  (MARTIN BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS); MATT NEELY (STOCKING FELLA); ANNOUNCER; MARTIN BASHIR (ABC NEWS); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ____4____

PAGE __77__

M 0062158

BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); CARTOON VOICEOVER (GROUP); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); MARTIN BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS); ANNOUNCER; MARTIN BASHIR (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); STEPHEN PFANN (PRESIDENT; WILF DINNICK (ABC NEWS); ISRAELI SECURITY PERSONNEL (MALE); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); REVEREND JEROME MURPHY-O'CONNOR (ECOLE BIBLIQUE; WILF DINNICK (ABC NEWS); REVEREND JEROME MURPHY-O'CONNOR (ECOLE BIBLIQUE; WILF DINNICK (ABC NEWS); MARTIN BASHIR (ABC NEWS); ANNOUNCER; MARTIN BASHIR (ABC NEWS); MATT NEELY (STOCKING FELLA); CUSTOMER (MALE); CUSTOMER (FEMALE); CUSTOMER (MALE); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); MATT NEELY (STOCKING FELLA); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); MATT NEELY (STOCKING FELLA); CUSTOMER (MALE); MATT NEELY (STOCKING FELLA); CUSTOMER (MALE); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); NICK WATT (ABC NEWS); CUSTOMER (MALE); NICK WATT (ABC NEWS); CUSTOMER (MALE); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); MATT NEELY (STOCKING FELLA); CUSTOMER (MALE); NICK WATT (ABC NEWS); NICK WATT (ABC NEWS); CUSTOMER (MALE); NICK WATT (ABC NEWS); CUSTOMER (MALE); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; CUSTOMER (MALE); TAMARA DAVIES (MANAGER; CUSTOMER (MALE); NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); NICK WATT (ABC NEWS); HUGH GRANT (ACTOR); TAMARA DAVIES (MANAGER; MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); MARTIN BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS))   (ABC; ABC NEWS; BASHIR; BETHLEHEM; BIBLE; BRATZ; BRAWL; CHRISTMAS; CHRISTMAS JOURNEY; CHUCK; CONTENT; CONTENT: BARBIE; CONTENT: CHRISTMAS; CONTENT: LINGERIE; CYNTHIA MCFADDEN TERRY MORAN; DIARY; DIVISION; DOLLHOUSE; FANTASY; FELLAS; GRAPHICS; GRAPHICS: BRAWL; GRAPHICS: CHRISTMAS; GRAPHICS: FANTASY; GRAPHICS: SIGN; HUGH; ISAAC; JEWISH; JOSEPH; JOURNEY; KEN; LUKE; MARTIN BASHIR; MARY GRAPHICS: STOCKING; MATT; MATTEL; NICK; NIGHTLINE; NIGHTLINE: DECEMBER; PALESTINIAN; SIGN; STOCKING; TAMARA; TERRY MORAN; TOPIC; USA) (Astronaut Barbie; Barbie; Barbies; BRATZ; Bratz DOLL WARS; Cynthia McFadden; Doctor Barbie; Finding; Hey; Isaac; Isaac Larian; JOHN BERMAN; Jordanians; Largely; Larian; Mary; Matt Neely; MyScene Barbie; Passport; Round; Steve Pfann)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT _4_

PAGE __78__

M 0062159

12/23/06 ABCNIGHTLINE (No Page)                                    Page 13


Word Count: 5025
12/23/06 ABCNIGHTLINE (No Page)




END OF DOCUMENT

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT   4

PAGE   79

M 0062160

# EXHIBIT 5

CALENDARED        RECEIVED

JUN 2 3 2006

# PRIORITY SEND &
# ENTER JS-6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.    CV 05-02727 SGL(RNBx)                    Date:  June 19, 2006

Title:    MGA ENTERTAINMENT, INC. -v- MATTEL, INC.
=============================================================================

PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

        Jim Holmes                          None Present
        Courtroom Deputy                    Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:     ATTORNEYS PRESENT FOR DEFENDANTS:

None present                          None present

PROCEEDINGS:    MINUTE ORDER (IN CHAMBERS) RE CONSOLIDATION

        On May 16, 2006, this Court issued orders to show cause why the following three cases
should not be consolidated:  Bryant v. Mattel, Inc., CV 04-09049; Mattel, Inc. v. Bryant, CV 04-
09059; MGA Entertainment, Inc. v. Mattel, Inc., CV 05-02727.  All parties have responded, and the
Court has reviewed those responses.  Because the Court has determined that these actions
involve a number of common issues of law and fact, the Court orders that these three cases be
consolidated for all purposes.

        Mattel's request that the Court stay MGA Entertainment, Inc. v. Mattel, Inc., CV 05-02727,
pending the outcome of the other two cases.  The Court denies this request.

        For ease of record keeping, the Court ORDERS that all further documents and proceedings
occur under Bryant v. Mattel, 04-09049 SGL, and that Case Number CV 04-09059 and 05-02727
be CLOSED by the Clerk.  Counsel are directed to file all further documents under Case Number
CV 04-09049.  The first paragraph of any document filed with the Court shall inform the Court to
which case(s) the document relates.

        IT IS SO ORDERED.

MINUTES FORM 90
CIVIL -- GEN

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority ___✓___  Send ___✓___
Entered _____  Closed _____
JS-5/JS-6 _____  JS-2/JS-3 _____
Scan Only _____  Docketed on CM _____ /Initials of Deputy Clerk __jh__
_____ THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)

JUN 2 0 2006

EASTERN DIVISION

EXHIBIT    5

PAGE    80

# EXHIBIT 6

1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   | John B. Quinn (Bar No. 90378)
2 | Michael T. Zeller (Bar No. 196417)
   | Jon D. Corey (Bar No. 185066)
3 | Shane H. McKenzie (Bar No. 228978)
   | 865 South Figueroa Street, 10th Floor
4 | Los Angeles, California  90017-2543
   | Tel.: (213) 443-3000
5 | Fax: (213) 443-3100

6 | Attorneys for Plaintiff and Counter-Defendant
   | Mattel, Inc.

7

8 | UNITED STATES DISTRICT COURT

9 | CENTRAL DISTRICT OF CALIFORNIA

10

11 | MATTEL, INC., a Delaware corporation,

12 |        Plaintiff,

13 | v.

14 | CARTER BRYANT, an individual, and
15 | DOES 1 through 10, inclusive,

16 |        Defendants.

17

18 | CARTER BRYANT, on behalf of himself, all present and former
19 | employees of Mattel, Inc., and the general public,

20 |        Cross-Complainant,

21 | v.

22 | MATTEL, INC., a Delaware corporation,

23 |        Cross-Defendant.

24

Case No. CV 04-09059 NM (RNBx)

NOTICE OF DEPOSITION OF ISAAC LARIAN

Date:     January 4, 2005
Time:     9:30 a.m.
Location:  865 S. Figueroa Street
            10th Floor
            Los Angeles, CA 90017

EXHIBIT _L_

PAGE _81_

07209/616304.1

NOTICE OF DEPOSITION OF ISAAC LARIAN

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2          PLEASE TAKE NOTICE that on January 4, 2005, beginning at 9:30

3  a.m., plaintiff and counter-defendant Mattel, Inc. ("Mattel") will take the

4  deposition upon oral examination of Isaac Larian at the office of Quinn Emanuel

5  Urquhart Oliver & Hedges LLP, 865 S. Figueroa Street, 10th Floor, Los Angeles,

6  CA 90017.

7          PLEASE TAKE FURTHER NOTICE that the deposition will take

8  place before a duly authorized notary public or other officer authorized to

9  administer oaths at depositions, and will continue from day to day, Sundays,

10  Saturdays and legal holidays excepted, until completed.

11          PLEASE TAKE FURTHER NOTICE that, pursuant to Fed. R. Civ.

12  P. 30(b)(2), the deposition will be videotaped.

13

14  DATED: December 15, 2004

15                              QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

16

17

18                              By  Shane McKenzie
                                    Shane H. McKenzie
19                                  Attorneys for Plaintiff and Counter-Defendant
                                    Mattel, Inc.
20

21

22

23

24

25

26

27                              EXHIBIT __6__

28                              PAGE __82__

07209/616304.1                          -2-
                                NOTICE OF DEPOSITION OF ISAAC LARIAN

1

## PROOF OF SERVICE
1013A(3) CCP Revised 5/1/88

2    **STATE OF CALIFORNIA**        )
                                    ) SS
3    **COUNTY OF LOS ANGELES**      )

4          I am employed in the county of Los Angeles State of California. I am over the age of 18 and not a party to the within action; my business address is: 865 South Figueroa Street, 10th Floor, 5    Los Angeles, California 90017.

6          On December 15, 2004, I served the foregoing document described as **NOTICE OF DEPOSITION OF ISAAC LARIAN** on all interested parties in this action.

7                              Douglas A. Wickham, Esq.
                               Keith A. Jacoby, Esq.
8                              Dominic Messiha, Esq.
                               Littler Mendelson
9                              A Professional Corporation
                               2049 Century Park East, 5th Floor
10                             Los Angeles, California 90067-3107
                               **FAX: 310-553-5583**
11

[    ]    By placing [ ] the original [ ] true copies thereof enclosed in sealed envelopes addressed as
12        follows:

13   [    ]    **BY MAIL:**    I deposited such envelope in the mail at Los Angeles, California. The
              envelope was mailed with postage thereon fully prepaid. As follows: I am "readily familiar"
14            with the firm's practice of collection and processing correspondence for mailing. Under that
              practice it would be deposited with U.S. postal service on that same day with postage thereon
15            fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that
              on motion of the party served, service is presumed invalid if postal cancellation date or
16            postage meter date is more than one day after date of deposit for mailing in affidavit.

17   [ X ]    **BY TELECOPIER** By transmitting the above listed document(s) to the fax number(s)
              set forth above on this date.
18

19   Executed on December 15, 2004, at Los Angeles, California.

20   [    ]    (State) I declare under penalty of perjury under the laws of the State of California that the
              above is true and correct.

21   [ X ]    (Federal) I declare that I am employed in the office of a member of the bar of this court at
              whose direction the service was made.
22

23

24   Rebecca A. Ramos
     Print Name                              Signature

25

26

27

28

EXHIBIT    6

PAGE    83

## PROOF OF SERVICE
1013A(3) CCP Revised 5/1/88

STATE OF CALIFORNIA        )
COUNTY OF LOS ANGELES )

      I am employed in the county of Los Angeles  State of California.  I am over the age of 18 and not a party to the within action; my business address is: 1055 West Seventh Street, Los Angeles, CA  90017.

      On **December 15, 2004,** I caused to be served by personal service the foregoing document(s) described as **Notice of Deposition of Isaac Larian** on all interested parties in this action.

[ X ]   By placing [  ] the original [ X ] true copies thereof enclosed in sealed envelopes addressed as follows:

**Diana M. Torres, Esq.**
**O'Melveny & Meyers**
400 So. Hope Street
Los Angeles, CA  90071
(213) 430-6407

[ X ]   **BY PERSONAL DELIVERY** I delivered such envelope by hand to the office of the addressee.

Executed on **December 15, 2004,** at Los Angeles, California.

[  ]   (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

[ X ]   (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

      Leandro Dimonriva

_____        _____
Type or Print Name                                        Signature

EXHIBIT ___C___

PAGE ___84___

# EXHIBIT 7

Priority ✓
Send ✓
Enter ___
Closed ___
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES—GENERAL

Case No.  CV 04-9059-NM (RNBx)                    Date: **March 23, 2005**

Title: **Mattel, Inc. v. Carter Bryant, et al.**

## DOCKET ENTRY

PRESENT:

### HON. ROBERT N. BLOCK, UNITED STATES MAGISTRATE JUDGE

|  |  |
|---|---|
| Marsha Eugene | n/a |
| Deputy Clerk | Court Reporter |

ATTORNEYS PRESENT FOR PLAINTIFFS:        ATTORNEYS PRESENT FOR DEFENDANTS:
   None present                                                  None present

DOCKETED ON CM
MAR 25 2005
BY _____ 061

## PROCEEDINGS:  (IN CHAMBERS)

Having reviewed Judge Manella's ruling on the remand motion and conferred with Judge Manella, the Court has concluded that Judge Manella's ruling sufficiently changes the posture of this case to warrant the Court requiring counsel to meet and confer further with respect to the following pending discovery motions:

1.     **Mattel's Motion to Compel Production of Documents**

2.     **MGA's Motion to Compel the Declassification of Certain Documents Produced by Mattel as "Confidential-Attorneys' Eyes Only"**

3.     **Mattel's Motion to Compel Inspection of Original Documents and Tangible Things**

4.     **Bryant's Motion to Compel Further Deposition Testimony from Ann Driskill and Alan Kaye and for the Appointment of a Special Master**

Further, the Court has concluded that it cannot rely on counsel to meet and confer in good faith with respect to the foregoing motions on their own.  Accordingly, **lead counsel of record for Mattel, Bryant and MGA** are ORDERED to appear before the Court in person on April 26, 2005 at 9:30 a.m. in Courtroom 540 of the Roybal Building, for the purpose of meeting and conferring under the Court's auspices.  If and

195

MINUTES FORM 11
CIVIL-GEN

Initials of Deputy Clerk _____ for ME

EXHIBIT **7**

PAGE **85**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.:   CV 04-9059-NM (RNBx)                                    March 23, 2005
            Mattel, Inc. v. Carter Bryant, et al.                   Page 2

---

when the Court is satisfied that counsel indeed have made a good faith effort to eliminate the necessity for hearing these Motions and/or to eliminate as many of the disputes as possible, the Court will determine whether to (a) allow counsel to orally supplement their written submissions, and then rule on the Motions, or (b) require counsel to submit further briefing.

With respect to Mattel's just-filed **Motion to Compel Deposition of Isaac Larian**, the Court has concluded after reviewing the parties' respective contentions in the Joint Stipulation and their respective Supplemental Memoranda that oral argument will not be of material assistance in determining the Motion. Accordingly, the hearing currently set for April 5, 2005 is ORDERED off calendar (see Local Rule 7-15), and the Court now rules as follows.

The Court does not find the authorities cited by MGA to be particularly persuasive. Further, MGA's purported concern about the possibility of Mr. Larian being subjected to multiple and repeated depositions is a complete red herring. Federal Rule 30(d)(2) limits the deposition to one day of seven hours, unless otherwise authorized by the Court or stipulated to by the parties. If Mattel later seeks to redepose Mr. Larian on the basis of additional information developed in subsequent discovery, the Court will take into account the fact that Mattel persisted in going forward with Mr. Larian's deposition at the outset of discovery. The Motion therefore is GRANTED, and MGA is ORDERED to produce Mr. Larian for a deposition on a date mutually convenient to the parties within 20 days of the date of this ruling.

MGA's request that the Court impose in advance "strict limits on the length and scope of the deposition" is DENIED without prejudice to MGA availing itself of the procedures specified in Federal Rule 30(d)(4) if MGA truly believes that the deposition is being conducted in bad faith or in such manner as unreasonably to annoy, embarrass, or oppress the deponent or party. Of course, if MGA does suspend the deposition for the purpose of seeking protective relief, and the Court then finds that MGA's position was not well taken, Mr. Larian will end up being subjected to another deposition session.

With respect to the sanctions issue, the Court has concluded that notwithstanding

MINUTES FORM 11
CIVIL-GEN

Initials of Deputy Clerk _ADD_ _for_ ME

EXHIBIT 7
PAGE 86

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES--GENERAL

Case No.:    CV 04-9059-NM (RNBx)                                    March 23, 2005
             Mattel, Inc. v. Carter Bryant, et al.                   Page 3

--------------------------------------------------------------------------------

MGA's failure to convince the Court of the merits of its position, MGA's objection to
the taking of the Larian deposition at the outset of discovery was substantially justified
and/or that the totality of the circumstances here make an award of expenses to Mattel
unjust.  Accordingly, each side is ORDERED to bear its own expenses incurred in
connection with this Motion.

         Finally, as to the issue raised by MGA concerning Mattel's alleged practice of
serving its portion of the Joint Stipulations with citations to declarations that are not
served concurrently but rather are merely referenced with blank spaces for the paragraph
citations, the Court concurs with MGA that the "better practice" is for the moving party
to serve its portion(s) of the Joint Stipulation with all citations filled in and to serve
concurrently with its portion(s) of the Joint Stipulation all referenced declarations and
exhibits.  The Court will expect all the parties to conform with this "better practice"
henceforth.


cc:    Judge Manella


MINUTES FORM 11                                    Initials of Deputy Clerk _____ for ME
CIVIL-GEN

EXHIBIT  2

PAGE  87

# EXHIBIT 8

Case 2:04-cv-09059-SGL-RNB   Document 230   Filed 06/16/2006   Page 1 of 3

I hereby certify that this document was faxed
to all counsel (or parties) at their respective,
most recent fax number of record, in this action,
on this date.

DATED: 6-16-06

J. De Bose
DEPUTY CLERK

☐ Priority
☐ Send
☐ Enter
☐ Closed
☐ JS-6/JS-5
☐ JS-3
☐ Scan Only

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

CIVIL MINUTES--GENERAL

Case No.   CV 04-9059-SGL (RNBx)                     Date: **June 16, 2006**

Title:   **Mattel, Inc. v. Carter Bryant, et al.**

DOCKETED ON CM
JUN 19 2006
BY _____ 024

**DOCKET ENTRY**

PRESENT:

      HON. **ROBERT N. BLOCK**, UNITED STATES MAGISTRATE JUDGE

| Trina DeBose | n/a |
|---|---|
| Deputy Clerk | Court Reporter |

ATTORNEYS PRESENT FOR PLAINTIFFS:                ATTORNEYS PRESENT FOR DEFENDANTS:
  None present                                                               None present

PROCEEDINGS:   (IN CHAMBERS)

    **Mattel's Motion to Enforce the Court's Order of March 23, 2005 and for**
**Sanctions**

    After reviewing the parties' respective contentions in the Joint Stipulation, the
Court has concluded that neither further briefing nor oral argument will be of material
assistance in determining this Motion.  Accordingly, the hearing currently set for July
11, 2006 is ORDERED off calendar (see Local Rule 7-15), and the Court now rules as
follows.

    The consequence of Mattel not insisting on the Larian deposition going forward
within 20 days of the Court's March 23, 2005 ruling is that the Court's order that MGA
produce Mr. Larian for a deposition on a date mutually convenient to the parties within
20 days of the date of the ruling became subject to Judge Manella's May 20, 2005 order
staying all discovery.

    However, once the stay was lifted by Judge Larson on May 16, 2006, and Mattel's
counsel sent his May 24, 2006 letter expressing Mattel's desire to proceed with the
deposition in accordance with the terms of the Court's March 23, 2005 ruling, it again
became incumbent on MGA to comply with that ruling.  While it would not have been
unreasonable for MGA's counsel to respond with alternative proposed dates within the
20-day time frame from receipt of Mattel's counsel's May 24, 2006 letter, insisting that
Mr. Larian would not be available until July 25-26 (and not even committing to those
dates as firm dates) was neither reasonable nor in compliance with the Court's original

MINUTES FORM 11
CIVIL-GEN

EXHIBIT _____8_____

PAGE _____88_____

Initials of Deputy Clerk _____

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES--GENERAL

Case No.:    CV 04-9059-SGL (RNBx)                          June 16, 2006
             <u>Mattel, Inc. v. Carter Bryant, et al.</u>                       Page 2

---

ruling. Accordingly, Mattel's Motion is GRANTED as follows. MGA is ORDERED
to produce Mr. Larian for a deposition either (a) on a mutually convenient date agreed
upon by the parties, or (b) if the parties are unable to agree on a mutually convenient
deposition date, then on any date noticed by Mattel provided that 10 days' notice is
given. MGA and Mr. Larian are forewarned in advance that the Court will not tolerate
any further delaying tactics.

    With respect to the sanctions issue, the Court finds that Mattel did make a good
faith effort to obtain the discovery sought without court action. Moreover, the Court
declines to find that MGA's opposition to the motion was substantially justified or that
other circumstances here make an award of Mattel's reasonable expenses unjust. The
Court also notes that, contrary to MGA's contention, there is no requirement under Fed.
R. Civ. P. 37(a)(4) that the prevailing party in a discovery motion show prejudice before
sanctions can be imposed on the party whose conduct necessitated the motion, the
attorney advising such conduct, or both of them. Accordingly, the Court finds pursuant
to Fed. R. Civ. P. 37(a)(4)(A) that Mattel is entitled to an award of its reasonable
expenses incurred in making this Motion. However, the $3,800 in expenses sought by
Mattel appears to the Court to be unreasonable and excessive. In the Court's view, it
should not have taken more than 3 hours of associate time and 1 hour of partner time to
prepare this relatively straightforward motion, in compliance with Local Rule 37-2. It
therefore is ORDERED that, within 10 days of this ruling, MGA's counsel pay Mattel
the sum of <u>$1,360</u>, which the Court finds to be Mattel's reasonable expenses incurred
in making this Motion.

    The clerk is directed to fax courtesy copies of this Minute Order to counsel, and
to confirm telephonically their receipt of it.


cc:    Judge Larson

EXHIBIT   8

PAGE   89

Initials of Deputy Clerk

# EXHIBIT 9

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-624-7707 FAX 213-624-0643

July 7, 2006

**VIA FACSIMILE AND U.S. MAIL**

Diana Torres, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California 90071

Re:   Mattel v. Bryant

Dear Diana:

Enclosed please find a notice of deposition for Isaac Larian.

The noticed date is for July 18, 2006, which is the one that MGA offered and Mattel agreed to in
order to accommodate Mr. Larian's schedule. As you and I previously discussed, and as you had
stated as an incentive for Mattel's agreement to that accommodation, this deposition of Mr.
Larian will relate to *Mattel v. Bryant* issues only and Mr. Larian will be made available on a
separate, later day for deposition on issues in the *MGA v. Mattel* suit.

Also, in resolving the scheduling of Mr. Larian's deposition as well as the Union Bank subpoena,
Dale Cendali and Paula Ambrosini agreed that we would receive two categories of financial
information in advance of Mr. Larian's deposition. One category was MGA's audited financial
statements. I had understood from Paula at the meet and confer session on June 20 that she
would endeavor to produce copies of those by the end of that week. We have not received those
audited financial statements as of yet, however, and so I would appreciate your letting us know
when we can expect them. (The other category consists of the agreed-upon Union Bank
documents, which are now being sent to MGA's counsel directly for review. From what Pam
Lloyd at Union Bank last told me, MGA's counsel should be receiving at least two boxes of
documents from Union Bank this week.)

EXHIBIT ___9___

PAGE ___90___

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 335 Madison Avenue, 17th Floor, New York, New York 10017 | TEL 212-702-8100 FAX 212-702-8200
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94104 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-620-4500 FAX 650-620-4555
PALM SPRINGS | 45-025 Manitou Drive, Suite 8, Indian Wells, California 92210 | TEL 760-345-4757 FAX 760-345-1414
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3107 FAX 858-812-3336

I look forward to hearing from you.

Very truly yours,

*Mim~ T. Z~*

Michael T. Zeller

07934/1906820.3

EXHIBIT __9__

PAGE __91__

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 90378)
2     (johnquinn@quinnemanuel.com)
     Michael T. Zeller (Bar No. 196417)
3     (michaelzeller@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
4  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
5  Facsimile: (213) 443-3100

6  Attorneys for Plaintiff and Counter-Defendant
   Mattel, Inc.

7

8                  UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10                      EASTERN DIVISION

11                                        Case No. CV 04-09049 SGL (RNBx)
    CARTER BRYANT, an individual,
12                                        NOTICE OF DEPOSITION OF ISAAC
                    Plaintiff,            LARIAN
13
         v.                               Discovery Cutoff Date: Not Set
14                                        Trial Date: Not Set
    MATTEL, INC., a Delaware
15  Corporation,

16                  Defendant.

17

18

19

20

21

22

23

24

25

26

27                                          EXHIBIT ___9___

28                                          PAGE ___92___

209/1914956.1

                                                    NOTICE OF DEPOSITION

1    This document relates to *Mattel v. Carter Bryant, et al.*, formerly Case

2    No. CV 04-09059 SGL (RNBx).

3        TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

4        PLEASE TAKE NOTICE that plaintiff and counter-defendant Mattel,

5    Inc. will take the deposition of Isaac Larian on July 18, 2006 beginning at 9:00 a.m.,

6    at the offices of Quinn Emanuel Urquhart Oliver & Hedges, LLP, 865 South

7    Figueroa Street, 10th Floor, Los Angeles, California, 90017.

8        PLEASE TAKE FURTHER NOTICE that the deposition will take

9    place upon oral examination before a duly authorized notary public or other officer

10   authorized to administer oaths at depositions, and will continue from day to day,

11   Sundays, Saturdays and legal holidays excepted, until completed.

12       PLEASE TAKE FURTHER NOTICE that, pursuant to <u>Fed. R. Civ. P.</u>

13   30(b)(2), the deposition will be videotaped.

14

15   DATED:  July 7, 2006        QUINN EMANUEL URQUHART OLIVER &
                                  HEDGES, LLP
16

17                              By _____
18                                 Michael T. Zeller
                                   Attorneys for Plaintiff and Counter-
19                                 defendant Mattel, Inc.

20

21

22

23

24

25

26

27                                          EXHIBIT __9__

28                                          PAGE __93__

209/1914956.1                    -2-
                                          NOTICE OF DEPOSITION

1            **PROOF OF SERVICE**

2       I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 865 South Figueroa

3 Street, 10th Floor, Los Angeles, California 90017-2543.

4       On July 7, 2006, I served true copies of the following document(s) described as **NOTICE OF DEPOSITION OF ISAAC LARIAN** on the parties in this action as follows:

5

6                      **SEE ATTACHED LIST**

7 **BY MAIL:** I enclosed the foregoing into sealed envelope(s) addressed as shown above, and I deposited such envelope(s) in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid.

8

9 **BY FACSIMILE:** On July 7, 2006, I caused said document(s) to be transmitted by facsimile pursuant to Federal Rule of Civil Procedures 5 (b)(2)(d). The telephone number of the sending facsimile machine was (213) 443-3100. The name(s) and facsimile machine telephone number(s)

10 of the person(s) served are set forth in the service list. The document was transmitted by facsimile transmission, and the sending facsimile machine properly issued a transmission report confirming

11 that the transmission was complete and without error.

12       I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

13

14       Executed on July 7, 2006, at Los Angeles, California.

15

16                        Mia Albert

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 9

PAGE 94

07209/1886691.1

1

### SERVICE LIST

2

3    Keith A. Jacoby, Esq.
     Littler Mendelson
4    2049 Century Park East, 5th Floor
     Los Angeles, CA  90067-3107
5    Telephone: (310) 553-0308
     Facsimile: (310) 553-5583
6
     Diana M. Torres, Esq.
7    O'Melveney & Meyers
     400 So. Hope Street
8    Los Angeles, CA  90071
     Telephone: (213) 430-6000
9    **Facsimile: (213) 430-6407**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT ____9____

PAGE ____95____

# EXHIBIT 10

CALENDARED

ENTERED
CLERK, U.S. DISTRICT COURT

JAN 12 2006

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION      BY DEPUTY

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(D).

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CARTER BRYANT,

                    Plaintiff,

        v.

MATTEL, INC.,

                    Defendant.

and related actions.

CASE NO. CV-04-9049-SGL

(Consolidated with cases CV-04-9059 and CV-05-2727)

ORDER REGARDING MATTEL'S MOTION FOR LEAVE TO AMEND

        This case has, increasingly, become one of the proverbial tail wagging the proverbial dog.

        Back in April, 2004, Mattel, Inc., ("Mattel") filed a complaint in Los Angeles County Superior Court against its former employee and the reputed creator of the BRATZ dolls, Carter Bryant. The complaint pressed five separate state-law theories relating to certain agreements Bryant signed while an employee with Mattel, namely, an Employee Confidential Information and Inventions Agreement ("Inventions Agreement") and a Conflict of Interest Questionnaire ("COI Questionnaire"). Although couched in state law terms and ostensibly pled as a simple employment action, lurking beneath the allegations in the complaint was whether Bryant had either misappropriated Mattel's intellectual property or

EXHIBIT  10

PAGE  96

resources in creating and/or developing the BRATZ dolls or whether he continued to develop his BRATZ design while still working in Mattel's employ. In either event, the rights to the BRATZ dolls could become the property of Mattel, either through infringement or through operation of the agreements noted above. The case was later removed to this Court and was assigned the case number CV-04-9059. MGA Entertainment, Inc. ("MGA"), the maker of the BRATZ doll line, then intervened "to protect its rights to Bratz dolls" that were at stake in the action. Mattel, Inc. v. Bryant, 446 F.3d 1011, 1012 (9th Cir. 2006); see also id. at 1013 ("Mattel argues, 'a significant risk of prejudice' to MGA [exists] if the ownership of rights to intellectual property, i.e., the Bratz creations, were decided in the absence of MGA").

In the interim, Bryant filed a declaratory judgment action in this Court, seeking for the Court to declare that his BRATZ doll creations did not infringe Mattel's copyright in its Toon Teens products. See Court's July 18, 2006, Order at 3 (noting that, although "Bryant's complaint . . . makes reference to 'other Mattel products,' . . . the substance of his allegations all address the product 'Toon Teens'"). The declaratory judgment action was assigned the case number CV-04-9049.

MGA then filed an action against Mattel in this Court broadening the scope of the controversy beyond that concerned with the ownership rights to the BRATZ doll line. MGA's complaint asserted various Lanham Act claims and their California state law equivalent arising out of Mattel's alleged "habitual and unfair tactics of competition-by-intimidation and serial copycatting of MGA's products." (Compl. ¶ 7). In essence, although the prior actions were concerned with ownership in the rights to the BRATZ doll line, the allegations in 05-2727 concerned whether there had been unlawful efforts to block the marketing of those rights in the BRATZ dolls. MGA's complaint did make mention of other products that were affected by Mattel's alleged predatory business practices, but by far the largest portion of its complaint concerned Mattel's conduct in undermining (or seeking to undermine) MGA's rival

EXHIBIT __10__

PAGE __97__

1  line of BRATZ dolls.[1]

2       By Order dated June 19, 2006, the Court consolidated all three cases "for all

3  purposes" as they "involve[d] a number of common issues of law and fact." As the

4  Court later noted in its August 10, 2006, Order: "At its heart, this case asks the

5  question: Who owns the rights to the Bratz dolls?" Resolution of this question lies

6  at the heart of or, at the very least, affects many of the other claims set forth in

7  each of the three respective cases. For instance, even though the allegations in

8  05-2727 concern Mattel's alleged efforts at defeating the marketing of the BRATZ

9  dolls, resolution of who owned the rights to the BRATZ dolls could serve to moot

10 many of those allegations. It is hard to imagine how it is unlawful for a company to

11 thwart or otherwise undermine the marketing of a product it owns. Thus, if Mattel

12 owned the rights to the BRATZ dolls, many of the allegations in the 05-2727

13 complaint would become moot. That said, such consolidation did not do away with

14 the distinctions that do exist between the three cases. As the Court highlighted in

15 its consolidation order, when either party files a pleading in the case, "the first

16 paragraph of [that] document . . . shall inform the Court to which case(s) the

17 document relates."

18      On July 18, 2006, the Court dismissed Bryant's declaratory judgment action,

19 04-9049, finding there existed no reasonable apprehension of an imminent

20 copyright infringement claim being filed against him by Mattel based on Mattel's

21 Toon Teen intellectual property. See Court's July 18, 2006, Order at 4. The

22 Court's Order was predicated entirely upon counsel for Mattel's representation

23 during oral argument that it "will not maintain that Bratz infringes the copyright in

24 Toon Teens." Owing to this representation, the Court, in dismissing the declaratory

25 judgment action, made clear that any future "claim by Mattel of copyright

26 _____

27      [1] That the marketing of the BRATZ dolls lies at the heart of the issues
   between the rival doll makers in the 05-2727 case is best illustrated by the Court's
28 discussion of those allegations in its August 26, 2005, Order, Granting in Part and
   Denying Part Mattel's Motion to Strike portions of MGA's complaint.

3

EXHIBIT 10

PAGE 98

1  infringement based on the Toon Teens product is barred by counsel's
2  representation." July 18, 2006, Order at 4.

3      Presently before the Court is Mattel's request for leave to file an amended
4  complaint in the 04-9059 action.  The complaint broadens considerably the nature
5  of the action from its genesis in state court.  Whereas before the complaint simply
6  sought to litigate alleged contractual and fiduciary breaches by Bryant while in the
7  employ of Mattel (no doubt geared toward procuring a legal basis for Mattel to lay
8  claim to the BRATZ doll line), the amended complaint adds five more defendants
9  and nine new legal claims, alleging a wide range of commercial disputes between
10  the rival doll makers that spans three countries.  For instance, the amended
11  complaint now contains RICO claims, a misappropriation of trade secrets claim,
12  and various aiding and abetting claims all stemming from allegations that MGA
13  cherry-picked certain high-ranking Mattel executives in foreign markets (many also
14  named as defendants in the amended complaint) or designers (namely, Bryant),
15  and then enticed or encouraged those same individuals to steal various trade and
16  proprietary secrets (be it sales plans, sales projections, customer profiles, or
17  intellectual property) from Mattel and hand them over to MGA before going to work
18  at MGA.

19      Moreover, the amended complaint expands upon the existing breaches of
20  contract and fiduciary duty claims in the original complaint by expanding the
21  universe of former employees (namely, the cherry-picked executives) to whom
22  those claims now apply.

23      Finally, Mattel now makes plain what was always lurking in its original
24  complaint — a copyright claim, but one directed not only to Bryant but also to MGA,
25  MGA's Hong Kong subsidiary, and MGA's President and CEO Isaac Larian.
26  Moreover, Mattel characterizes its copyright claim somewhat differently from that at
27  issue in Bryant's declaratory relief action: "The Amended Complaint does not
28  include a claim for infringement of copyrights in Toon Teens, but rather

4

EXHIBIT __10__

PAGE __99__

1  infringement of copyrights in Bratz." (Reply to MGA Opp. at 11).  Toward that end,

2  Mattel has recently filed copyright registrations with the U.S. Copyright Office

3  claiming ownership in various BRATZ doll design drawings penned by Bryant.

4  A.    ANALYSIS

5         Federal Rule of Civil Procedure 15(a) provides that, once a responsive

6  pleading has been served, "a party may amend the party's pleading only by leave of

7  court or by written consent of the adverse party; and leave shall be freely given

8  when justice so requires."  With no consent to Mattel's proposed filing proffered by

9  MGA and Bryant, determining whether to grant Mattel leave to file an amended

10  complaint is gauged by looking to the familiar formulation of factors set forth by the

11  Supreme Court in Forman v. Davis:

12             In the absence of any apparent or declared
             reason—such as undue delay, bad faith or dilatory
13             motive on the part of the movant, repeated failure to
             cure deficiencies by amendments previously allowed,
14             undue prejudice to the opposing party by virtue of
             allowance of the amendment, futility of amendment,
15             etc.—the leave sought should, as the rules require, be
             'freely given.'  Of course, the grant or denial of an
16             opportunity to amend is within the discretion of the
             District Court, but outright refusal to grant the leave
17             without any justifying reason appearing for the denial is
             not an exercise of discretion; it is merely abuse of that
18             discretion and inconsistent with the spirit of the Federal
             Rules.
19

20  371 U.S. 178, 182 (1962).

21         MGA and Bryant offer the following reasons for denying Mattel leave to

22  amend:  (1) Mattel has long known of the factual predicates underlying its copyright

23  and intentional interference claims but delayed in asserting them; (2) the proposed

24  amendment to add the copyright claim and the intentional interference claims

25  (against the new defendants) are futile because they are barred by the applicable

26  statute of limitations; (3) the copyright claim had been brought in bad faith by Mattel

27  because of its prior public disavowal of an intent to assert such a claim; and (4)

28  MGA and Bryant would incur undue prejudice were the copyright claim added to the

5

EXHIBIT ___10

PAGE ___100

1   suit because of alleged spoilation of evidence issues involving Mattel's ZEUS

2   computer system used by doll designers at Mattel and its e-mail system.  None of

3   these arguments are persuasive.

4       1.    Awareness of Factual Predicate for Copyright and Intentional

5              Interference Claims

6         MGA argues that Mattel has long known about the factual predicate for its

7   recently added copyright claim, observing that, "[o]ver four years ago, in August

8   2002, Mattel CEO Bob Eckert received an anonymous letter stating that Bryant

9   created the project that became the 'Bratz' dolls — and worked with MGA to 'steal'

10  that project — while still employed at Mattel."  (MGA Opp. at 9).  Similarly, MGA

11  argues that Mattel has long known of the factual predicate for its intentional

12  interference claim with respect to Bryant's contract given that, "[b]y Mattel's own

13  admission, it learned in November 2003 — more than three years ago — that

14  Bryant had signed a contract with MGA 'dated as of' a month prior to his final day at

15  Mattel."  (MGA Opp. at 11-12).

16        At the outset it must be observed that "[m]ere delay in proffering an

17  amendment does not justify denying leave to amend."  Sierra Club v. Union Oil Co.

18  of California, 813 F.2d 1480, 1493 (9th Cir. 1987), vacated on other grounds by,

19  485 U.S. 931 (1988), and reinstated by, 853 F.2d 667 (9th Cir. 1988).  Seizing upon

20  this point of law, Mattel argues that "only in . . . cases" when "granting leave would

21  require discovery to be reopened after summary judgment motions have been filed"

22  has the Ninth Circuit found the denial of leave "justified" based on the passage of

23  time alone.  (Reply to MGA Opp. at 3).  That is incorrect.  There is a line of cases

24  from the Ninth Circuit finding that, if a "party seeking amendment knows or should

25  know of the facts underlying the amendment when the original complaint is filed,

26  the motion to amend may be denied."  Sierra Club, 813 F.2d at 1493 (citing Jordan

27  v. County of Los Angeles, 669 F.2d 1311, 1324 (9th Cir. 1982)).  And, recently, the

28  Ninth Circuit upheld the denial of leave to amend based on the passage of time

EXHIBIT __10__

PAGE __101__

1 | even though the requested leave to amend was tendered <u>before</u> the time, as set
2 | forth in a Rule 16(b) pre-trial scheduling order, for amending pleadings had expired.
3 | See <u>AmerisourceBergen Corp. v. Dialysist West, Inc.</u>, 465 F.3d 946 (9th Cir. 2006).
4 | The Ninth Circuit observed that, even when a request for leave to amend is timely
5 | under a Rule 16(b) schedule for pretrial motions, the district court may nonetheless
6 | still deny the request based on any of the <u>Forman</u> factors. <u>Id.</u> at 951-52.  The Ninth
7 | Circuit then noted that the issue of untimeliness (regardless of whether the
8 | amendment is tendered "within the period of time allotted by the district court in a
9 | Rule 16 scheduling order") in seeking to amend can constitute a justification for
10 | denying leave to amend if "the moving party knew or should have known the facts
11 | and theories raised by the amendment in the original pleading." <u>Id.</u> at 953.
12 | Toward that end, the Ninth Circuit observed that "an eight month delay between the
13 | time of obtaining a relevant fact and seeking a leave to amend is unreasonable."
14 | <u>Id.</u>  In this regard, the Ninth Circuit in <u>Dialysist</u> was unpersuaded by the fact that,
15 | even though the moving party had known of the facts prompting the amendment for
16 | a long period of time, there still remained eight more months of discovery for the
17 | parties to marshal facts against the allegations raised by the amended pleading:
18 | "Even though eight months of discovery remained, requiring the parties to scramble
19 | and attempt to ascertain whether the Procrit purchased by AmerisourceBergen was
20 | tainted, would have unfairly imposed potentially high, additional litigation costs on
21 | Dialysist West that could have easily been avoided had AmerisourceBergen
22 | pursued its 'tainted product' theory in its original complaint or reply." <u>Id.</u>  Thus,
23 | absent "a satisfactory explanation" for the delay in amending the complaint, the
24 | Court is well within its rights to deny leave to amend. <u>Id.</u>
25 |     Mattel proffers the following reasons for taking the time that it did before
26 | presenting its amended complaint: (1) Acting out of an abundance of caution to its
27 | obligations under Rule 11 to present "factual contentions [that] have evidentiary
28 | support," Mattel waited until its claims were better supported by evidence

EXHIBIT ___10___

PAGE ___102___

1   uncovered in discovery; and (2) the delay in the proceedings caused by "the year-
2   long stay and the parties' prior jurisdictional disputes" have left the case still in its
3   "nascent stage." (Reply to MGA Opp. at 2, 4).

4         The first reason is not well-founded.  Rule 11 specifically allows parties to
5   aver factual allegations that "are likely to have evidentiary support after a
6   reasonable opportunity for further investigation or discovery" so long as the party
7   makes clear in its pleading that its factual contentions on those points are with the
8   caveat that they are based on a good faith belief that further discovery would
9   unearth evidence to support them. See FED. R. CIV. P. 11(b)(3).  Simply put, Rule
10  11 did not stand in the way of Mattel averring the factual contentions it now claims it
11  "merely suspected" as being the case based on the limited information before it.
12  Mattel could have gone ahead and made such suspected factual allegations so
13  long as it caveated those claims with the declaration that it reasonably believed that
14  those allegations would be borne out by further discovery.  Perhaps the time by
15  which Mattel could have reasonably believed such allegations would be borne out
16  by further discovery occurred after the dates noted by MGA, but it is hard to fathom
17  that such materialization took three or four years to occur.

18        The second reason would have some merit to it but for the fact that the
19  information that alerted (or should have alerted) Mattel to the existence of its now
20  asserted copyright and intentional interference claims was brought to Mattel's
21  attention well before the case was stayed on May 20, 2005. The stay, therefore,
22  did not operate as an obstacle to Mattel asserting its claims; nor even if it did, the
23  stay does not explain why Mattel waited nearly six months after the stay was lifted
24  on May 16, 2006, to present those claims now.

25        All of that being said, the one thing that gives the Court pause in denying
26  leave based on the tardiness in Mattel's presentation is the lack of any evidence
27  that MGA or Bryant have been prejudiced by the delay.  Delay unconnected to
28  some showing of prejudice, be it prejudice to the parties or disruption in judicial

8

EXHIBIT __10__

PAGE __103__

1   management of the case, does not suffice to deny granting leave to amend. The
2   Ninth Circuit has noted that, "where a defendant is on notice of the facts contained
3   in an amendment to a complaint, there is no serious prejudice to defendant in
4   allowing the amendment" even if it is made tardily. <u>Sierra Club</u>, 813 F.2d at 1493.
5   Indeed, the denial of leave was proper in the <u>Dialysist</u> case not simply because of
6   the length of the delay, but because the delay itself was "detrimental" in that it
7   would entail the opposing party to have "unfairly" incurred "potentially high,
8   additional litigation costs" that could have been avoided if the moving party had
9   made clear its intentions earlier. 465 F.3d at 953.
10          Here, as well demonstrated in Mattel's papers, it is readily apparent from the
11   pleadings filed by MGA and Bryant in this case that both have been aware for some
12   time of the factual predicates now underlying Mattel's copyright claim and
13   intentional interference claim. (<u>See</u> MGA Opp. at 5 ("<u>As Bryant and MGA</u>
14   <u>suspected at the time of filing</u> — and Mattel now concedes by conduct — those
15   deceptively-pled state-law claims [in 04-9059] were copyright infringement claims all
16   along")(emphasis added)). The parties have engaged in meaningful discovery
17   regarding many of the facts touched upon by these new claims, be it tracking down
18   experts in various forensic fields or taking depositions of various of the key players
19   to those claims. In point of fact, in their papers filed with this Court before this
20   present motion, both Bryant and MGA have made it abundantly clear that they have
21   long suspected that a copyright infringement claim was in the offing as evidenced
22   by Bryant's filing of the declaratory judgment action and MGA's intervention in the
23   05-9059 matter to protect its rights to the BRATZ dolls. Similarly, MGA and Bryant
24   have been on notice to the facts comprising the interference claim concerning
25   Bryant's contract as evidenced by the identity of the individuals who have been
26   deposed by Mattel, as well as the nature of the questions posed and the testimony
27   proffered at those depositions. MGA's argument that, with the amendments, it
28   faces the prospect of defending "against stale claims" owing to faded memories and

9

EXHIBIT __10__

PAGE __104__

1  loss of documents caused by the great passage of time, (see MGA Opp. at 3, 13),

2  is diminished by the fact that (no doubt owing to the sophistication of all counsel

3  involved) discovery on these very issues have been proceeding apace by both

4  sides long before Mattel filed its proposed amendments.  This is simply not a case

5  where "additional litigation costs" will be "unfairly" visited upon Bryant and MGA by

6  allowing the proposed amendments; much of those costs have already been borne

7  by the parties for some time.

8          2.      Spoilation of Evidence

9          MGA next argues that Mattel's delay in bringing the amended complaint has

10  caused it prejudice as, in the interim, critical pieces of evidence have been or are

11  suspected of having become lost.  For instance, MGA asserts that Mattel's Rule

12  30(b)(6) witness concerning its Zeus computer system, Julia Marine, testified that,

13  "although Mattel identified and segregated its most relevant backup tapes available

14  for Zeus, Mattel allowed its tape backup system to expire the database for those

15  backup tapes, thereby eliminating all information about what was actually stored on

16  those backup tapes." (MGA Opp. at 9-10).  Information on the Zeus computer

17  system is critical because of Mattel's assertion that part of its copyright claim rests

18  on Bryant's exposure to Mattel development programs.  (First Am. Compl. ¶ 26(a)).

19  As explained by MGA: "[C]oncept data and drawings created by [Mattel] design

20  center personnel are stored on Zeus.  Thus, the electronic documents stored on

21  Zeus – which should include the metadata showing who created, edited and

22  accessed Mattel's concept drawings and designs – during the time Bryant worked

23  in the design center at Mattel is vitally important to defending against Mattel's

24  claims." (MGA Opp. at 14).  MGA's argument is neither an accurate

25  characterization of Ms. Marine's testimony nor of the nature of Mattel's exposure

26  claim.

27          Ms. Marine did not testify that the information on the backup tapes (some

28  fifty in total) was lost, but rather that Mattel no longer carried the type of hardware

10

EXHIBIT  10

PAGE  105

1 | that could restore the information still found on those tapes:

2 |         Q.    So if you wanted to restore that 2002 backup tape[s] then, how would you go about doing that?

3 |                        . . . .

4 |         A.    You need the hardware so if we don't have the hardware — if [the technology used by the tape is] DLT we don't have the hardware and you've got to buy it and – well, first you have to find a place to put it with adequate power which we don't have in the design center.  You need to have a tape library.  You need to have the tape drives that carried those tapes.  You need a server that has the capability to – that's big enough to handle all of the hardware.  You need the software – the license for the backup software[, Net Backup].  You need the disk space to restore it to and then you have to start reading in all those tapes.

12 |         Q.    You said that you don't have that in the design center.  Do you have that hardware anywhere else in the company?

14 |         A.    DLT?  No, no.

15 |         Q.    At what point did you get rid of the hardware?

16 |         A.    Once the last backups — DLT backups expired so it would have been a couple years ago probably.

18 | (Decl. Diana Torres, Ex. K at 118-119).

19 | The above testimony clearly denotes the difficulty in restoring what was on

20 | Mattel's Zeus computer system during the relevant time frame, but it certainly does

21 | not demonstrate that the information on those backup tapes has been "eliminated"

22 | or forever lost.  Undoubtedly it will be a costly endeavor to recover that information

23 | (not to mention to later search and sort through it); but to argue, as MGA does, that

24 | the information is "unavailable" or "lost", (MGA Opp. at 9, 14), exaggerates its

25 | plight.  Indeed, Ms. Marine's testimony indicates that the difficulty in retrieving the

26 | information on the Zeus backup tapes has been present for some time (maybe

27 | since 2004 or perhaps even earlier).  This is important because it undermines

28 | MGA's claim that Mattel's undue delay in bringing its amended complaint will cause

EXHIBIT __10__

PAGE __106__

1   it to suffer prejudice it otherwise would not have faced if the amendments were

2   brought sooner. Such prejudice has been present for years, and Mattel's failure to

3   bring its amended complaint sooner would not have changed this situation.

4        Similarly, MGA's point that access to what was on the Zeus computer

5   system is vital in demonstrating that Bryant was not exposed to or otherwise did not

6   hack the system to steal other designers work is diminshed to some extent by the

7   fact that Bryant himself testified that he did not use the Zeus computer system and

8   was "pretty much computer illiterate" while employed at Mattel. Admittedly, the

9   ability to point to information on the Zeus system backup tapes to prove that Bryant

10  did not access other designers drawings or to prove the date those drawings were

11  created by those other designers would be useful evidence to negate Mattel's

12  factual claims. Nonetheless, such evidence still would not discount other avenues

13  outside of the Zeus computer system by which Mattel could seek to prove that

14  Bryant was exposed to its copyrighted works, e.g., witness testimony that Bryant

15  saw drawings of the same posted on other designers' cubicles.

16       MGA next surmises that Mattel's e-mail records have disappeared, not

17  because it has any proof on that point, but simply because Mattel has postponed

18  the deposition of the individual most knowledgeable of Mattel's e-mail records until

19  after the hearing on Mattel's motion for leave to amend. (MGA Opp. at 10).

20  Speculation of spoilation does not suffice. That MGA's argumentation on this point

21  is nothing more than speculation is best exhibited by the evidence it has proffered

22  in support of its argument: "[I]f the sole retained backup for Zeus is no longer

23  available, it is not hard to imagine that Mattel's electronic mail archives are similarly

24  out of reach." (MGA Opp. at 15 (emphasis added)). MGA then makes much of a

25  deposition from a Mattel executive, Alan Kaye, who testified that e-mails in his

26  inbox would be automatically deleted if they had remained there for more than a

27  certain time period. (Decl. Diana Torres, Ex. H at 292-93). MGA takes from this

28  acknowledgment that Mattel has an "automatic email deletion system" that has

12

EXHIBIT __10__

PAGE __107__

1   compromised Mattel's "duty to preserve documents." (MGA's Opp. at 14).

2   Noticeably absent from MGA's argument is any evidence that the e-mails so

3   deleted from a Mattel employee's inbox are forever lost or, as is far more likely,

4   whether such information remains or is otherwise archived on some backup file on

5   Mattel's computer system.  Absent concrete proof that spoilation has occurred,

6   nothing in MGA's argument forms a basis for denying Mattel its requested leave to

7   amend.

8          3.    <u>Statute of Limitations</u>

9         MGA next argues that Mattel's copyright and intentional interference claims

10   are futile as both are barred by the applicable statute of limitations.  This argument

11   was pressed emphatically at oral argument.  With respect to the copyright claim,

12   MGA argues that the applicable statute of limitations is three years, with the

13   limitations period accruing from when a party has knowledge of a violation or when

14   a reasonably diligent person would have been put on inquiry of the infringement.

15   (MGA Opp. at 16 (citing <u>Roley v. New World Pictures</u>, 19 F.3d 479, 481 (9th Cir.

16   1994)).  MGA argues that Mattel was put on notice about its copyright claim in

17   August, 2002, upon the receipt of the anonymous letter to Mattel's CEO that Bryant

18   had stolen the idea for BRATZ while working at Mattel.  Thus, according to MGA,

19   the limitations period on Mattel's claim expired in August, 2005, rendering Mattel's

20   current copyright claim stale.

21         The problem with MGA's analysis is it fails to take into account the relations-

22   back principles found in Rule 15(c), which provides that "[a]n amendment of a

23   pleading relates back to the date of the original pleading when "the claim . . . in the

24   amended pleading arose out of the conduct, transaction, or occurrence set forth . . .

25   in the original pleading," or if such relation back is otherwise permissible by the

26   state "law that provides the statute of limitations applicable to the action."  By

27   MGA's own admission Mattel's copyright claim arises out of the same conduct or

28   transaction contained in the original complaint filed in April, 2004, well within the

13

EXHIBIT __10__

PAGE __108__

1  applicable limitations period.[2] (MGA Opp. at 12 ("These very same allegations

2  [contained in the original complaint] underlie the copyright infringement and

3  intentional interference contract claims Mattel now seeks to allege against MGA,

4  Mr. Larian and Bryant")).

5      MGA's statute of limitations argument with respect to the intentional

6  interference claims fares no better. According to MGA, the applicable statute of

7  limitations is two years for an intentional interference with contract claim and Mattel

8  was aware of the facts alerting it to this claim (insofar as Bryant's contract is

9  concerned) on November 24, 2003, when it learned "that Bryant worked with MGA

10  to develop the 'Bratz' dolls prior to his last day of employment by Mattel and, hence,

11  prior to the expiration of his contractual relationship with Mattel."[3] (MGA Opp. at 18

12  (citing Knoell v. Petrovich, 76 Cal. App.4th 164, 168 (1999)) . Such a time line

13  would, according to MGA, mean that the applicable limitations period expired on

14  Mattel's interference with Bryant's contract claim on November 24, 2005, well

15  before Mattel sought leave to file its amended complaint. (Id). The problem again

16  with MGA's argument is that it ignores that through Rule 15(c) Mattel's intentional

17  interference claim would relate back to when it filed its original complaint in April,

18

19

20      [2] The same would appear to be true — that the amendments would be timely

21  — if the amendments related back to Mattel's answer (filed on May 13, 2005) to
MGA's complaint in the 05-2727 case.

22

23      [3] With respect to Mattel's interference with contract claim as to one of its
former executives, Ron Brawer, MGA claims Mattel was put on notice of that claim

24  on September 17, 2004, when Brawer informed Mattel that he leaving to go to work
for MGA. (MGA Opp. at 19-20). The problem with this argument is that nothing from

25  that simple event — Brawer's declaration of his intent to leave — in any way would
apprise Mattel that MGA had encouraged Brawer to engage in nefarious conduct

26  (the stealing of proprietary information) causing Brawer to breach his contract with
Mattel that he would not do anything to help a competitor while working for them.

27  MGA's contention that Mattel must have known of those misdeeds in mid-September
is nothing more than speculation. Futility cannot be founded on what might or might

28  not be the case; either a claim is futile to bring or it is not.

14

EXHIBIT __10__

PAGE __109__

1    2004, well before the limitations period expired.[4]

2         Accordingly, MGA's futility argument is not well-founded.

3         **4.    Prior Disavowals of Asserting a Copyright Claim**

4         Finally, MGA takes umbrage with the cageyness to which Mattel has taken in

5    this case as to whether or not it is asserting a copyright infringement claim against

6    it. To MGA, such ducking and weaving on Mattel's part renders its effort to now

7    bring such a copyright claim as one done in bad faith.  No doubt the Court itself has

8    been subjected to Mattel's overly vague statements on this point, but in the end

9    nothing in those statements has ever foreclosed the possibility that such a claim

10   may be in the offing.  Indeed, during the oral argument on Mattel's motion to

11   dismiss Bryant's declaratory judgment action, the Court pressed Mattel's counsel as

12   to whether it would assert such a copyright claim against Bryant as it is currently

13   seeking to do.  The most that Mattel's counsel would proffer was that Mattel would

14   not assert a copyright claim against Bryant based on Mattel's copyright rights in

15   TOON TEENS. At that point, the Court directed the parties to engage in a meet

16   and confer based on counsel for Mattel's representation and to provide a report to

17   the Court based on those discussions.  The report submitted to the Court made

18   clear that, although Mattel was willing to accede that it would not bring a copyright

19   claim based on TOON TEENS, it refused to accede to Bryant's broader request

20   that "Bryant 'never copied anything' and that no Mattel product has any 'relevance'

21   to any claim that Mattel has or ever will assert against Bryant."  This by itself should

22   have dispelled any illusion either Bryant or MGA was operating under that Mattel's

23   prior statements had foreclosed any potential copyright claim against them.[5]

24   _____

25        [4] Again the relations-back principle would also seem to render its claim timely
     if it were filed as an amended answer (the original having been filed in May, 2005) in
26   the 05-2727 case.

27        [5] MGA also argues that Mattel's effort to substitute MGA and its CEO, Isaac
     Larian, for the "Doe" defendants listed in its original complaint is improper because
28   Mattel knew of their identity when it filed the original complaint.  The argument is

                                    15

                              EXHIBIT ____10____

                              PAGE ____110____

1   That said, Mattel's allegation in the amended complaint as to how it is

2   seeking to lay claim to the copyright in BRATZ is disconcerting. Paragraph 26,

3   subsection a, in the amended complaint alleges that Bryant "misappropriated and

4   misused Mattel property" by "using his exposure to Mattel development programs to

5   create the concept, design and name of Bratz." (First Am. Compl. ¶ 26(a)). Such

6   "exposure" could include Bryant misappropriating the Mattel design concept in

7   TOON TEENS in drawing his inspiration for the BRATZ doll. Were Mattel's

8   copyright claim so predicated it would be barred by this Court's July, 2006, Order,

9   dismissing Bryant's declaratory judgment action. Mattel was pressed on this point

10  during oral argument and conceded that such "exposure" to Mattel "development

11  programs" did not include TOON TEENS. With this representation, nothing in

12  Mattel's proposed copyright claim is barred under the rubric of bad faith.

13      5.    Judicial Economy Considerations

14      In his opposition, Bryant adds an additional reason for denying leave beyond

15  those contained in MGA's papers — the amendment would muddy the waters in the

16  04-9059 by adding "tangential" issues that would only serve to delay resolution of

17  the key issue lying at the heart of the complaint: Who owns the rights to the

18  BRATZ line of dolls. (Bryant Opp. at 2 ). Bryant notes that the case has proceeded

19  apace in moving toward resolving that issue, and the amendment would "transform

20

21  misplaced. As made clear by Mattel, California law allows a plaintiff to substitute in a

22  defendant for a "Doe" if the plaintiff was ignorant of that defendant's identity or
    ignorant of the basis for liability at the time the complaint was filed. See Miller v.

23  Thomas, 121 Cal.App.3d 440 (1981). MGA does not dispute this legal contention
    but at oral argument disputed that Mattel did not know the basis for liability against

24  itself or Mr. Larian due to the "uncanny" similarity between the allegations averred in

25  the original complaint and those now proffered against the two in the amended
    complaint. Specifically, MGA notes that the original complaint spoke of Bryant

26  working for one of Mattel's competitiors and of that employee's theft of Mattel's
    intellectual property before leaving to work for that competitior. At most, all this

27  shows is that Mattel knew that Bryant went to work for MGA, not that MGA or Mr.
    Larian encouraged Bryant's alleged unlawful behavior recited in the original

28  complaint.

16

EXHIBIT __10__

PAGE __111__

● ● 

1   what Mattel has always claimed was a straightforward employment action against

2   an individual defendant into a global commercial dispute against Mattel's primary

3   competitor, MGA," that "will last years" thereby "delay[ing]" resolution of who owns

4   BRATZ.[6] (Bryant Opp. at 2). Mattel argues that "the law does not deny leave to

5   amend because claims are 'tangential'" and then reiterates its point that some

6   showing of prejudice, namely, seeking leave after expiration of discovery, is

7   necessary. (Reply to Bryant Opp. at 3). That is not entirely correct.

8      As noted previously, the Ninth Circuit recently upheld a denial for leave to

9   amend because the amendment would have "drastically changed" the litigation,

10  even though the leave request was tendered before the time, as set forth in a Rule

11  16(b) pre-trial scheduling order, for filing a motion to amend had expired and well

12  before the discovery cut-off. See AmerisourceBergen Corp. v. Dialysist West, Inc.,

13  465 F.3d 946, 953 (9th Cir. 2006). In justifying its reasoning the Ninth Circuit cited

14  approvingly to the following statement from a well-respected treatise: "If an

15  amendment substantially changes the theory on which the case has been

16  proceeding and is proposed late enough so that the opponent would be required to

17  engage in significant new preparation, the court may deem it prejudical." Id. at 953

18  n.2 (quoting 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE,

19  FEDERAL PRACTICE AND PROCEDURE § 1487 (2nd ed. 1990)). Thus, Dialysist

20  recognized that the introduction of "different legal theories" and/or proof of

21  materially different facts well into the litigation can itself be a basis for finding

22  prejudice regardless of whether the period for discovery has expired (or is even

23  close to expiring) or the parties have already filed summary judgment motions. Id.

24  at 953-54.

25     Although the parties can safely be said to be at this point well into the

26

27      _____

28      [6] Bryant also brings intricate legal arguments about the sufficiency of the allegations Mattel has averred in building its RICO claims against him. Such considerations are best left to be resolved on a properly filed motion to dismiss.

17

EXHIBIT ___10___

PAGE ___112___

1   litigation in this consolidated action (as evidenced by the protracted discovery

2   disputes contained in the docket sheet that the parties have had before the

3   magistrate judge and now the special master, and the litigation of motions to

4   dismiss in both the 04-9049 and 04-9059 cases), the fact remains that, as Mattel

5   has made painfully clear in its papers, no scheduling order has been entered in this

6   case.[7] This takes away somewhat from the prejudice Dialysist found to exist when

7   a "drastic change [in a party's] litigation theory" takes place mid-stream in the

8   litigation process. Id. at 953. Simply put, without a schedule for the filing of pre-trial

9   motions and other matters (e.g., discovery cutoff), the parties have been given free

10  reign in how to conduct the litigation in this case.

11          That the delay in bringing the proposed amendments and the relative length

12  of time into the litigation when those amendments were brought may not neatly fold

13  into Dialysist's reasoning does not mean that leave must nonetheless be granted.

14  The 04-9059 action, as it is presently constituted, is not a complex one. It asks a

15  rather narrow and straightforward question — Did anything from Bryant's

16  employment at Mattel during the 1999-2000 period give Mattel ownership rights to

17  the BRATZ doll line? The proposed amendments would radically alter the litigation

18  in that case to include far ranging disputes involving multiple parties and concerning

19  events not connected with the BRATZ ownership issue. That the original action

20  was a relatively simple and straight-forward matter raises another point beyond the

21  change in the action's litigation posture — whether entangling the rival doll makers'

22  other commercial disputes into this particular case would serve to muddy the waters

23  and make the matter that much more difficult to manage from the Court's

24  perspective.

25  ────────────────

26          [7] Mattel's repeated refrain that the matter is in its nascent stage as evidenced
    by the fact that the parties only just recently exchanged in initial disclosures is
27  misleading. The exchange of initial disclosures referred to by Mattel is in the 05-
    2727 case. With respect to the 04-9059 case it appears that such initial disclosures
28  were completed long ago as evidenced by the fact that discovery disputes appeared
    in that case as far back as January, 2005.

EXHIBIT _____10_____

PAGE _____113_____

1        As has long been recognized, equally important in determining whether to

2   grant such leave is what impact such amendments would have on the court's ability

3   to manage the case.  See 3 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE

4   § 15.15[1] at 15-42.1 to 15-43 (3rd ed. 2006)("A court should also consider judicial

5   economy and its ability to manage the case. . . . The court should also temper the

6   policy favoring freely granting leave to amend with consideration of the ability of the

7   district court to manage the case adequately if amendment is allowed").  As Judge

8   Clark for the Fifth Circuit once observed: "In keeping with the purposes of the rule,

9   the court should consider judicial economy and whether the amendments would

10  lead to expeditious disposition of the merits of the litigation.  Finally, the court

11  should consider whether the amendment adds substance to the original allegations,

12  and whether it is germane to the original case of action."  Chitimacha Tribe of

13  Louisiana v. Harry L. Laws Co., 690 F.2d 1157, 1163 (5th Cir. 1982); see also

14  Sierra Club v. Union Oil Co. of California, 813 F.2d 1480, 1493 (9th Cir.

15  1987)("General considerations of judicial economy also justify allowing the

16  amendments. The violations included in the proposed amendment relate to the

17  same subject matter as the original complaint.  Allowing the amendment will further

18  the federal policy of 'wrapping in one bundle all matters concerning the same

19  subject matter.'").

20       Mattel's amendments do not add substance to the claims contained in its

21  original complaint.  Rather, they would expand the universe of claims and

22  defendants stretching well-beyond the questions raised in the original complaint

23  over whether Bryant's conduct while in the employ of Mattel subjected his later

24  attributed creation of the BRATZ dolls to the provisions in Mattel's Inventions

25  Agreement or otherwise rendered his creation subject to an infringement action.

26  Nowhere does Mattel seek to reconcile the breadth of its present amendments with

27  the narrowness of the allegations contained in its original complaint.  In fact, the

28  precise opposite is true.  Mattel acknowledges that its proposed amendments bear

19

EXHIBIT __10__

PAGE __114__

1 more congruity to the allegations leveled against it in MGA's Lanham Act case than

2 to those in the action to which it seeks to add them:

3        [M]any of the matters raised by Mattel's proposed

4        Amended Complaint are and will remain at issue
       because of MGA's Complaint, whether or not leave to

5        amend is granted. MGA's claims allege that a broad
       array of purported Mattel conduct across the globe,

6        starting at least as early as 1999, has violated the
       Lanham Act and unfair competition law. This includes

7        Mattel's alleged infringement of Bratz and other MGA
       products. As a result, <u>issues in the proposed Amended</u>

8        <u>Complaint are already part and parcel of Mattel's</u>
       <u>defenses to MGA's unfair competition claims</u>, including

9        because they show that MGA and Bryant, and not
       Mattel, are ones who stole the products and other

10        properties involved.

11 (Reply to Bryant Opp. at 7 (emphasis added)).  Mattel apparently finds this

12 discongruity unimportant because "all of these matters have been consolidated with

13 the <u>Bryant</u> case." (<u>Id</u>. at 7).  As noted earlier, the fact that the cases have been

14 consolidated does not mean that the parties can ignore the distinctions that still

15 exist between them.  If, as Mattel acknowledges, the present amendments are

16 nothing more than re-formulated defenses and counterclaims it presently has to

17 MGA's complaint against it in the 05-2727 case, then such amendments should be

18 brought in the form of an amended answer and counterclaim in that case.

19       Consideration of the distinctions between the two cases is wise as it serves

20 as a useful tool in providing the Court a better means to manage the cases now

21 that they have been consolidated.  The proverbial dog (ownership in BRATZ)

22 should be wagging the proverbial tail (the remaining commercial disputes), not the

23 other way around.  Admittedly, the dog's tail has grown in size both by MGA's filing

24 of its complaint in the 05-2727 action and Mattel's response thereto through its

25 proposed amendments.  Nonetheless, it is readily apparent to the Court that the

26 crown jewel in this action still remains the ownership rights to the BRATZ dolls.  The

27 parties have engaged in extensive and undoubtedly expensive discovery on this

28 very issue (from hiring world-renowned experts to test the age of Bryant's design

EXHIBIT ___10___

PAGE ___115___

1   drawings to technically complex discovery of what is on each other's computers).

2       Indeed the separateness of the two matters is reflected in how the cases are

3   currently structured, namely, the narrowness of the issue involved in 04-9059 and

4   the expansiveness of the facts at issue in 05-2727.  In light of this fact, the Court

5   believes a two-track scheduling order wherein the 04-9059 matter's discovery cut

6   off and trial date are set well-ahead of those in 05-2727 makes the most sense.  As

7   noted earlier, many of the legal claims being pressed in 05-2727 will be affected by

8   the result of the litigation in 04-9059.  If, for instance, Mattel does own the rights to

9   the BRATZ dolls (either owing to Bryant's stealing his idea from one of Mattel's

10  "development programs" or by way of the Inventions Agreement because he

11  continued to work on his designs while at Mattel), then large portions of MGA's

12  Lanham Act infringement claims may become moot.  By the same token, if Mattel

13  does not own rights to BRATZ, then some of the defenses and counterclaims set

14  forth as independent claims in the present amended complaint may become moot,

15  including Mattel's copyright infringement claim as well as portions of its remaining

16  RICO, misappropriation, and aiding and abetting claims.  If, however, the Court

17  were to allow the amended complaint to be filed in the 04-9059 action, such case

18  management would be difficult, if not impossible as many of the issues being

19  litigated in the 05-2727 case would have been poured into the 04-9059 case by the

20  amendment.  Due to this substantial overlap in claims and facts, a two-track

21  scheduling order utilizing the case number distinctions would be impossible to craft.

22  When pressed by the Court at oral argument as to which of its proposed claims it

23  believed would not undermine the BRATZ ownership posture of the 04-9059 case,

24  Mattel cited to its copyright and RICO claims.  However, upon further questioning

25  by the Court, counsel for Mattel acknowledged that much of those claims were, like

26  the claims at issue in 05-2727, dependent upon resolution of the ownership issue.

27      In light of the burden allowing Mattel's amendment to proceed would have on

28  this Court's ability to efficiently manage these consolidated matters denial of

EXHIBIT __10__

PAGE __116__

1    Mattel's request to amend its complaint in the 04-9059 matter is justified.  See

2    Perrian v. O'Grady, 958 F.2d 192, 195 (7th Cir. 1992)("The burden to the judicial

3    system can justify a denial of a motion to amend 'even if the amendment would

4    cause no hardship at all to the opposing party'").  Buttressing the Court's decision is

5    the fact that, even with such a denial, Mattel may file (and the Court provides leave

6    to Mattel to so file) an amended answer and counterclaim in the 05-2727 case

7    raising all the new claims and defendants presently sought to be achieved through

8    amendment of its complaint in the 04-9059 action.  None of the substantive

9    concerns raised by MGA and Bryant to the present amended complaint, e.g.,

10   statutes of limitations, would appear to be affected if the new claims and

11   defendants were brought as defenses and counterclaims in the 05-2727 case as

12   opposed to the 04-9059 one.

13        Accordingly, the Court GRANTS Mattel's motion for leave to file its proposed

14   amendments, but only insofar as they are pled in the form of an amended answer

15   and counterclaim in the 05-2727 case.

16        Finally, the lack of a scheduling order in this case is problematic; one should

17   have been entered long ago.  See Fed. R. Civ. P. 16(b)(noting that a scheduling

18   "order shall issue as soon as practicable but in any event within 90 days after the

19   appearance of a defendant and within 120 days after the complaint has been

20   served on a defendant").  In light of the fact that entry of a scheduling order is

21   woefully overdue in this case, the Court hereby ORDERS that a Rule 16(b)

22   scheduling conference be held in this consolidated matter on February 12, 2007, at

23   1:30 p.m. in Courtroom One.  The parties are directed to file a Joint Rule 26(f)

24   report with the Court by February 5, 2007.

25        IT IS SO ORDERED.

26   DATE:  *1-11-07*

27

28                                        STEPHEN G. LARSON
                                          UNITED STATES DISTRICT JUDGE

                                22

EXHIBIT    10

PAGE    117