# EXHIBIT 11

CONFORMED COPY

FILED

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 90378)
2      (johnquinn@quinnemanuel.com)
      Michael T. Zeller (Bar No. 196417)
3      (michaelzeller@quinnemanuel.com)
      Jon D. Corey (Bar No. 185066)
4      (joncorey@quinnemanuel.com)
    865 South Figueroa Street, 10th Floor
5   Los Angeles, California 90017-2543
    Telephone: (213) 443-3000
6   Facsimile: (213) 443-3100

2009 MAY 22  PM 4: 44

CLERK, U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

BY_____

7   Attorneys for Mattel, Inc.

8                UNITED STATES DISTRICT COURT

9                CENTRAL DISTRICT OF CALIFORNIA

10  CARTER BRYANT, an individual,          CASE NO. CV 04-9049 SGL (RNBx)

11          Plaintiff,                      Consolidated With Case No. 04-9059 and
                                            Case No. 05-2727
12          v.
                                            MATTEL, INC.'S THIRD AMENDED
13                                          ANSWER IN CASE NO. 05-2727 AND
    MATTEL, INC., a Delaware                COUNTERCLAIMS FOR:
14  corporation,
                                            1.   COPYRIGHT INFRINGEMENT;
15          Defendant.                      2.   VIOLATION OF THE
                                                 RACKETEER INFLUENCED AND
16                                               CORRUPT ORGANIZATIONS
                                                 ACT;
17                                          3.   CONSPIRACY TO VIOLATE THE
                                                 RACKETEER INFLUENCED AND
18                                               CORRUPT ORGANIZATIONS
                                                 ACT;
19  AND CONSOLIDATED CASES                  4.   MISAPPROPRIATION OF TRADE
                                                 SECRETS;
20                                          5.   BREACH OF CONTRACT;
                                            6.   INTENTIONAL INTERFERENCE
21                                               WITH CONTRACT;
                                            7.   BREACH OF FIDUCIARY DUTY;
22                                          8.   AIDING AND ABETTING
                                                 BREACH OF FIDUCIARY DUTY;
23                                          9.   BREACH OF DUTY OF
                                                 LOYALTY;
24
25                                          **PUBLIC REDACTED**
26
27                                          Volume I    EXHIBIT __11__
28
                                                        PAGE __118__

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1      10. AIDING AND ABETTING
          BREACH OF DUTY OF
2         LOYALTY;
       11. CONVERSION;
3      12. UNFAIR COMPETITION;
       13. AVOIDANCE OF INTENTIONAL
4         AND CONSTRUCTIVE
          FRAUDULENT TRANSFERS
5         UNDER UNIFORM
          FRAUDULENT TRANSFER ACT;
6         AND
       14. DECLARATORY RELIEF
7
       DEMAND FOR JURY TRIAL
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                    EXHIBIT __11__

28                                    PAGE __119__

00505.07209/2875224.1

THIRD AMENDED ANSWER AND COUNTERCLAIMS

**THIRD AMENDED ANSWER**

Defendant Mattel, Inc. ("Mattel") answers the Complaint of MGA Entertainment, Inc. ("Complaint") as follows:

Preliminary Statement

The Complaint in this case contravenes Rule 8(a) of the Federal Rules of Civil Procedure in multiple respects. For example, in many places, the Complaint improperly mixes factual averments with argumentative rhetoric. The Complaint also includes a selective recitation of alleged historical facts and "rumor," much of which is both irrelevant and inflammatory in tone and content. In addition, many of the allegations of the Complaint are overly broad, vague or conclusory and include terms which are undefined and which are susceptible to different meanings. Accordingly, by way of a general response, all allegations are denied unless specifically admitted, and any factual averment admitted is admitted only as to the specific facts and not as to any conclusions, characterizations, implications or speculations which are contained in the averment or in the Complaint as a whole. These comments and objections are incorporated, to the extent appropriate, into each numbered paragraph of this Third Amended Answer.

Mattel further submits that the use of the headings throughout the Complaint is improper, and therefore no response to them is required. In the event that a response is required, Mattel denies those allegations.

The Complaint also contains many purported photographs of various items, and it uses one or more headings purporting to describe, either individually or in groups, these various photographs. The images of these photographs contained in the Complaint are all relatively small and some are of less than optimal quality, making it difficult to evaluate the adequacy of the photographs or their fairness and accuracy in depicting what they purport to represent. The Complaint also does not describe the circumstances or time frame in which these photographs were taken, and in many cases does not identify, or does not sufficiently or properly identify, the

EXHIBIT __11__        -1-
THIRD AMENDED ANSWER AND COUNTERCLAIMS

PAGE __120__

1   item depicted in the photographs. All of these factors, as well as the use of these

2   photographs and headings out of context, or with an insufficient context, impair the

3   ability of Mattel to fully respond to these photographs and headings, or to any

4   purported allegations involving, or relying upon, the use of such photographs and

5   accompanying headings. By way of a general response, Mattel therefore does not

6   admit the authenticity of any photograph, or the accuracy or adequacy of any

7   heading, nor does it admit any allegation or inference that is based on, or purports to

8   be based on, any photograph or accompanying heading in the Complaint. Mattel

9   reserves the right to challenge the authenticity of any photograph and the accuracy

10  or adequacy of any heading (either as included in the Complaint or in the context of

11  additional material not included). Further, with reference to all photographs and

12  accompanying headings, or any averments based on the Complaint's use of such

13  photographs and headings, which might be offered into evidence, Mattel specifically

14  reserves its right to object to any use of such photographs, headings, and averments,

15  or the Complaint as a whole or in part, in evidence for any purpose whatsoever.

16          To the extent that Mattel has endeavored to answer any particular

17  allegation containing any such photographs and headings, any admission concerning

18  the item purported to be depicted in such photograph, or described in such headings,

19  shall not constitute an admission that the photograph is authentic, adequate, or

20  admissible, nor that any heading is accurate, adequate, or admissible. All such items

21  purportedly depicted in such photographs, and described in such headings, "speak

22  for themselves." Accordingly, to the extent that any such referenced materials are

23  deemed allegations against Mattel, they are denied.

24                                  Responses

25      1.      Answering paragraph 1 of the Complaint, Mattel admits that

26  plaintiff MGA Entertainment, Inc. ("plaintiff" or "MGA") is a California

27  corporation with a principal place of business in Van Nuys, California.

28                                              EXHIBIT __11__

00505.07209/2875224.1

                                    -2-          PAGE __121__
                    THIRD AMENDED ANSWER AND COUNTERCLAIMS

1           2.     Answering paragraph 2 of the Complaint, Mattel admits that

2   Mattel is a Delaware corporation with a principal place of business in El Segundo,

3   California.

4           3.     Answering paragraph 3 of the Complaint, Mattel denies that

5   there has been wrongful conduct on its part and states that it is without knowledge

6   or information sufficient to form a belief as to the truth or falsity of the remaining

7   allegations set forth therein and, on that basis, denies them.

8           4.     Answering paragraph 4 of the Complaint, Mattel admits that

9   plaintiff purports to assert claims under the Lanham Act, 15 U.S.C. §§ 1125(a) and

10  (c), California Business and Professions Code §§ 17200 *et seq.*, California Business

11  and Professions Code § 14330 and California common law, denies that plaintiff is

12  entitled to any relief thereunder and denies the truth of the remaining allegations set

13  forth in paragraph 4.

14          5.     Answering paragraph 5 of the Complaint, Mattel admits that it is

15  subject to personal jurisdiction in this District and denies the truth of the remaining

16  allegations set forth in paragraph 5.

17          6.     Answering paragraph 6 of the Complaint, Mattel admits that

18  venue is proper in this District and denies the truth of the remaining allegations set

19  forth in paragraph 6.

20          7.     Answering paragraph 7 of the Complaint, Mattel admits that

21  MGA has filed the instant lawsuit and denies the truth of the remaining allegations

22  set forth in paragraph 7.

23          8.     Answering paragraph 8 of the Complaint, Mattel states that it is

24  without knowledge or information sufficient to form a belief as to the truth or falsity

25  of the allegations regarding MGA's history set forth therein and, on that basis,

26  denies them, states that MGA has made conflicting representations, including in

27  sworn statements, that are at odds with the allegations of the Complaint and denies

28  the truth of the remaining allegations set forth in paragraph 8.    EXHIBIT __11__

00505.07209/2875224.1

-3-

PAGE __122__

1        9.    Answering paragraph 9 of the Complaint, Mattel admits that

2 MGA filed this action, states that Mattel's web site and corporate governance

3 policies speak for themselves and denies the truth of the remaining allegations set

4 forth in paragraph 9.

5        10.   Answering paragraph 10 of the Complaint, Mattel admits that it

6 is the world's most successful toy company, states that the first doll in its BARBIE

7 line was publicly introduced in 1959 and that BARBIE-branded dolls have been the

8 world's best-selling toys, states that Mattel's sales and stock price speak for

9 themselves, and denies the truth of the remaining allegations set forth in paragraph

10 10.

11       11.   Answering paragraph 11 of the Complaint, Mattel admits that

12 Adrienne Fontanella is the former president for girls' toys at Mattel, states that it is

13 without knowledge or information sufficient to form a belief as to the truth or falsity

14 of the allegations regarding an alleged statement by Ms. Fontanella, and denies the

15 truth of the remaining allegations set forth in paragraph 11.

16       12.   Answering paragraph 12 of the Complaint, Mattel is without

17 knowledge or information sufficient to form a belief as to the truth or falsity of the

18 allegations regarding alleged statements by unidentified "analysts," states that

19 Mattel's sales and stock price speak for themselves, and denies the truth of the

20 remaining allegations set forth in paragraph 12.

21       13.   Answering paragraph 13 of the Complaint, Mattel admits that Jill

22 Barad became President and Chief Executive Officer of Mattel in January 1997, that

23 Mattel acquired Tyco Industries, Inc. ("Tyco") in March 1997, that Mattel acquired

24 Pleasant Company in 1998, Mattel acquired the Learning Company in May 1999,

25 that Mattel acquired Purple Moon in 1999, that the MATCHBOX brand was owned

26 by Tyco, that the AMERICAN GIRL line of dolls was made by Pleasant Company

27 at the time of that entity's acquisition, and denies the truth of the remaining

28 allegations set forth in paragraph 13.

EXHIBIT __11__

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1       14.   Answering paragraph 14 of the Complaint, Mattel states that its

2 public announcements speak for themselves, and denies the truth of the remaining

3 allegations set forth therein.

4       15.   Answering paragraph 15 of the Complaint, Mattel states that its

5 stock price and its public announcements speak for themselves, and denies the truth

6 of the remaining allegations set forth therein.

7       16.   Answering paragraph 16 of the Complaint, Mattel states that its

8 stock price speaks for itself, states that it is without knowledge or information

9 sufficient to form a belief as to the truth or falsity of the allegations regarding the

10 alleged views of unnamed "analysts" and "[i]nvestors," and denies the truth of the

11 remaining allegations set forth therein.

12       17.   Answering paragraph 17 of the Complaint, Mattel admits that

13 Ms. Barad resigned in February 2000.

14       18.   Answering paragraph 18 of the Complaint, Mattel admits that

15 Robert Eckert became Chairman and Chief Executive Officer of Mattel in May 2000

16 and that Mr. Eckert previously was employed at Kraft Foods, Inc. for 23 years, is

17 without knowledge or information sufficient to form a belief as to the truth or falsity

18 of the allegations regarding the views of unnamed "[i]nvestors" and others, and

19 denies the truth of the remaining allegations set forth in paragraph 18.

20       19.   Answering paragraph 19 of the Complaint, Mattel admits that the

21 *Wall Street Journal* published an article on August 10, 2000, the content of which

22 speaks for itself, and denies the truth of the remaining allegations set forth therein.

23       20.   Answering paragraph 20 of the Complaint, Mattel admits that it

24 disposed of the Learning Company in October 2000, states that its sales and

25 revenues speak for themselves, states that the remainder of the allegations contained

26 therein are characterizations, not factual assertions, and therefore no response is

27 necessary under <u>Fed. R. Civ. P.</u> 8(b) and, to the extent any further response is

28 required, denies the truth of any remaining allegations set forth in paragraph 20.

EXHIBIT ___11___

PAGE ___124___

-5-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1      21.    Answering paragraph 21 of the Complaint, Mattel admits that
2  products in plaintiff's "Bratz" line compete with products in Mattel's BARBIE and
3  other product lines and states that the remainder of the allegation contained
4  therein—consisting of a sentence fragment—is unintelligible and on that basis
5  denies the truth of any such remaining allegation set forth therein.

6      22.    Answering paragraph 22 of the Complaint, Mattel admits that
7  products in plaintiff's "Bratz" line compete with Mattel products, states that the
8  remainder of the allegations contained therein are characterizations, not factual
9  assertions, and that therefore no response is necessary under Fed. R. Civ. P. 8(b)
10  and, to the extent any further response is required, denies the truth of any remaining
11  allegations set forth therein.

12      23.    Answering paragraph 23 of the Complaint, Mattel states that
13  MGA has made conflicting statements, including in sworn statements, that are
14  inconsistent with the allegations set forth in paragraph 23 of the Complaint and
15  states that it is therefore without knowledge or information sufficient to form a
16  belief as to the truth or falsity of the allegations set forth therein and, on that basis,
17  denies them.

18      24.    Answering paragraph 24 of the Complaint, Mattel states that the
19  "look" of the referenced dolls speak for themselves and denies the truth of the
20  remaining allegations set forth therein.  By way of further answer, Mattel states that
21  the photographs and their accompanying caption on page 7 of the Complaint are
22  false and misleading to the extent they are intended to suggest that MGA has
23  produced or used a consistent packaging shape or look or that it has protectible
24  rights in the matters depicted in the photographs.

25      25.    Answering paragraph 25 of the Complaint, Mattel admits that
26  Bratz dolls are between approximately 9.5 to 10 inches in height, states that the
27  appearances of the dolls speak for themselves, denies that "Bratz" dolls are or "were
28  intentionally shorter" than dolls in Mattel's BARBIE line, denies that the "Bratz"

00505.07209/2875224.1

EXHIBIT ___11___

PAGE ___125___

-6-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1   dolls "looked like no other" and denies the truth of the remaining allegations set
2   forth in paragraph 25.

3        26.    Answering paragraph 26 of the Complaint, Mattel states that the
4   use of the term "classic" is unintelligible, since Mattel has designed and sold
5   different dolls using different heads and with different fashions and themes over the
6   years, and denies the truth of any remaining allegations.  By way of further answer,
7   Mattel states that the image encaptioned "Mattel's 'Barbie'" on page 8 of the
8   Complaint is misleading in that it depicts one of the doll heads that have been used
9   as part of the BARBIE line for many years, and therefore ignores that Mattel has
10   long designed and sold an array of different BARBIE line dolls that use different
11   doll heads, including doll heads which depict different ethnicities, and that are
12   dressed in different clothing and fashion styles.

13        27.    Answering paragraph 27 of the Complaint, Mattel admits that
14   MGA has used the line "The Girls With a Passion for Fashion" in some contexts,
15   denies that MGA originated or otherwise has rights to that phrase, admits that one
16   audience for products in the "Bratz" line has been "tweens" and denies the truth of
17   the remaining allegations set forth in paragraph 27.

18        28.    Answering paragraph 28 of the Complaint, Mattel admits that
19   certain "Bratz" dolls have won certain awards, the terms of which speak for
20   themselves, states that it is without knowledge or information sufficient to form a
21   belief as to the truth or falsity of the allegations regarding the "awards" MGA claims
22   and, on that basis, denies them, denies that plaintiff has protectible rights and denies
23   the truth of any remaining allegations set forth in paragraph 28.

24        29.    Answering paragraph 29 of the Complaint, Mattel admits that
25   dolls in the "Bratz" line compete with dolls in Mattel product lines, denies that .
26   Mattel has or has ever had a "stranglehold" on any market, states that the market
27   allegations contained in paragraph 29 are vague and ambiguous, including without
28   limitation in that the allegations fail to specify what products among the parties'

EXHIBIT ___11___

PAGE ___126___

-7-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1    respective lines are being referred to and what time period is being referred to, and

2    denies the truth of any remaining allegations set forth in paragraph 29.

3        30.    Answering paragraph 30 of the Complaint, Mattel admits that

4    MGA has been a licensee of Mattel, states that the market allegations are vague and

5    ambiguous, including without limitation in that the allegations fail to specify what

6    products are being referred to and what time periods or points in time are being

7    referred to, and states that the remainder of the allegations contained therein are

8    characterizations, not factual assertions, and therefore no response is necessary

9    under Fed. R. Civ. P. 8(b) and, to the extent any further response is required, denies

10   the truth of any remaining allegations set forth in paragraph 30.

11       31.    Answering paragraph 31 of the Complaint, Mattel states that the

12   allegations contained therein are characterizations, not factual assertions, and

13   therefore no response is necessary under Fed. R. Civ. P. 8(b) and, to the extent any

14   further response is required, denies the truth of the allegations set forth in paragraph

15   31.

16       32.    Answering paragraph 32 of the Complaint, Mattel denies the

17   truth of the allegations set forth therein.

18       33.    Answering paragraph 33 of the Complaint, Mattel denies the

19   truth of the allegations set forth therein.

20       34.    Answering paragraph 34 of the Complaint, Mattel states that it

21   has released various MY SCENE dolls, including MY SCENE dolls named

22   "Madison", "Chelsea" and "Barbie," states that the appearance of the Bratz and MY

23   SCENE dolls speak for themselves, denies that Mattel designed its MY SCENE

24   dolls to "evoke" or resemble the alleged "look" of "Bratz" dolls, denies that plaintiff

25   has protectible rights, states that MGA has made conflicting representations that are

26   at odds with the allegations of the Complaint and that it is therefore without

27   knowledge or information sufficient to form a belief as to the truth or falsity of the

28   allegations regarding the "launch" of Bratz dolls set forth therein and, on that basis,

1  denies them, and denies the truth of the remaining allegations set forth therein.  By

2  way of further answer, Mattel states that the photographs and their accompanying

3  captions on page 10 of the Complaint are misleading and false to the extent they are

4  intended to suggest that a particular Mattel doll has been changed over time as

5  purportedly depicted.  Among other things, Mattel has long designed and sold an

6  array of different BARBIE line dolls using different doll heads, and the photographs

7  encaptioned "Mattel's Traditional 'Barbie'" is one of the doll heads that has been

8  used, and continues to be used, as part of the BARBIE line.  In addition, the

9  photographs encaptioned MY SCENE doll "circa 2002" is, in fact, a Mattel doll

10  character called BARBIE that continues to be sold and/or marketed with that head,

11  and the photographs encaptioned MY SCENE doll "circa 2004" depict a MY

12  SCENE doll character separate and apart from the one depicted in the "circa 2002"

13  image (and is not a revised character as plaintiff apparently attempts to imply).

14         35.  Answering paragraph 35 of the Complaint, Mattel admits that

15  Mattel released a product line called FLAVAS, states that the appearance of the

16  FLAVAS dolls speaks for themselves, states that it is without knowledge or

17  information sufficient to form a belief as to the truth or falsity of the allegations

18  regarding the "rumor" relied upon by plaintiff and the undefined "media"

19  purportedly quoting Isaac Larian and, on that basis, denies them, denies that Mattel

20  has abandoned the FLAVAS line, and denies the truth of the remaining allegations

21  set forth in paragraph 35.

22         36.  Answering paragraph 36 of the Complaint, Mattel denies the

23  truth of the allegations set forth therein.

24         37.  Answering paragraph 37 of the Complaint, Mattel denies the

25  truth of the allegations set forth therein.  By way of further answer, Mattel states that

26  the unnumbered photographs and their accompanying captions on pages 11 through

27  16 of the Complaint -- which apparently were included to purportedly support the

28  allegation that MY SCENE dolls "became 'Bratz,'" which allegation Mattel

1  specifically denies -- are false and misleading. Among other things, the heads
2  depicted are among an array of different doll heads that Mattel has used, and
3  continues to use, over the course of many years. Moreover, the images purport to
4  compare different Mattel doll lines to show alleged changes in appearance even
5  though, in fact, each of the heads are currently sold and/or marketed to the public.
6  The "Blonde" series of photographs encaptioned "original" and "recent" MY
7  SCENE is further and specifically misleading in that it purports to compare two
8  differently named and outfitted dolls in the MY SCENE doll line, both of which
9  continue to be sold and/or marketed.

10        38.    Answering paragraph 38 of the Complaint, Mattel states that the
11  phrase "the 'BRATZ' eye" is unintelligible, denies that MGA has rights therein,
12  denies that MGA was the originator of or the first to use the eye shape or makeup
13  depicted as purportedly constituting "the 'BRATZ' eye," denies that Mattel has
14  copied the "the 'BRATZ' eye" and denies the truth of the remaining allegations
15  contained in paragraph 38. By way of further answer, Mattel states that the
16  unnumbered photographs and accompanying caption on page 13 of the Complaint
17  are false and misleading. Among other things, the purported "Original Mattel 'My
18  Scene' Eye" is one of the eye and makeup designs that Mattel has used over the
19  course of many years, and Mattel continues to sell and/or market dolls using the eye
20  and makeup design depicted therein.

21        39.    Answering paragraph 39 of the Complaint, Mattel states that the
22  phrase "the 'BRATZ' eye" is unintelligible, denies that MGA has rights therein,
23  denies that MGA was the originator of or the first to use the eye shape or makeup
24  purportedly described as constituting "the 'BRATZ' eye," denies that Mattel has
25  copied "the 'BRATZ' eye," states that the relevant dolls speak for themselves and
26  denies the truth of the remaining allegations contained in paragraph 39. By way of
27  further answer, Mattel states that the unnumbered photographs and accompanying
28  captions on page 14 of the Complaint are false and misleading. Among other things,

EXHIBIT __11__

PAGE __129__

-10-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1  the purported "New Mattel 'My Scene' Eye" is one of the eye and makeup designs

2  that Mattel has used over the course of many years, and Mattel continues to sell

3  and/or market dolls using the eye and makeup design depicted on page 14 of the

4  Complaint.

5         40.    Answering paragraph 40 of the Complaint, Mattel denies the

6  truth of the allegations therein. By way of further answer, Mattel states that the

7  unnumbered photographs and their accompanying captions on pages 15 to 16 are

8  false and misleading. Among other things, the heads depicted are among an array of

9  different doll heads that Mattel has used, and continues to use, over the course of

10  many years. Moreover, the photographs purport to compare different Mattel doll

11  lines to show alleged changes in appearance even though, in fact, each of the heads

12  are currently sold and/or marketed to the public. The "Blonde" series of

13  photographs encaptioned "original" and "recent" MY SCENE is further and

14  specifically misleading in that it purports to compare two differently named and

15  outfitted dolls in the MY SCENE doll line, both of which continue to be sold and/or

16  marketed.

17         41.    Answering paragraph 41 of the Complaint, Mattel denies the

18  truth of the allegations set forth therein.

19         42.    Answering paragraph 42 of the Complaint, Mattel admits that the

20  photographs purport to depict two packages that were, among others, part of the MY

21  SCENE line, state that the packages speak for themselves and denies the truth of any

22  remaining allegations set forth therein.

23         43.    Answering paragraph 43 of the Complaint, Mattel admits that the

24  photograph purports to depict one of the packages that were, among others, part of

25  the MY SCENE line, states that the parties' packages speak for themselves, states

26  that MGA has failed to establish that it originated, or has protectible rights in, an

27  "open and transparent style" for packaging and denies the truth of the remaining

28  allegations set forth therein.

EXHIBIT  11

-11-

PAGE  130

1    44.   Answering paragraph 44 of the Complaint, Mattel admits that

2  one photograph purports to depict one of the packages that were, among others, part

3  of the MY SCENE line, admits that the other photograph purports to depict one of

4  the packages that were, among others, used as part of the Bratz line, states that the

5  parties' packages speak for themselves, denies that MGA originated, or has

6  protectible rights in, "the 'BRATZ' packaging" or in the packaging depicted in the

7  Complaint and denies the truth of any remaining allegations set forth therein.

8    45.   Answering paragraph 45 of the Complaint, Mattel admits that

9  one photograph purports to depict one of the packages that were, among others, part

10  of the MY SCENE line, admits that the other photograph purports to depict one of

11  the packages that were, among others, used as part of the Bratz line, states that the

12  parties' packages speak for themselves, denies that MGA originated, or has

13  protectible rights in, the packaging depicted in the Complaint and denies the truth of

14  any remaining allegations set forth therein.

15    46.   Answering paragraph 46 of the Complaint, Mattel states that it

16  has utilized a wide variety of packaging styles and shapes over the years, states that

17  the relevant packaging speaks for itself, states that MGA lacks protectible rights in

18  "non-rectangular shaped box" packaging or in the other elements MGA claims in

19  paragraph 46, and denies the truth of the remaining allegations set forth therein.

20    47.   Answering paragraph 47 of the Complaint, Mattel denies that

21  any alleged "theme" is "MGA's theme," denies that MGA originated or has rights to

22  any theme and denies the truth of the remaining allegations set forth therein.

23    48.   Answering paragraph 48 of the Complaint, Mattel admits that it

24  released a doll called "Chillin Out!", states that it has released such themed dolls

25  over the course of many years, admits MGA released a "Wintertime Wonderland"

26  themed doll, denies that MGA originated or has rights to such theme, states that the

27  relevant products speak for themselves and denies the truth of the remaining

28  allegations set forth therein.

EXHIBIT __11__

PAGE __131__

-12-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

49.     Answering paragraph 49 of the Complaint, Mattel admits that it released a doll called "Night on the Town", states that it has released such themed dolls over the course of many years, admits MGA released a "Formal Funk" themed doll, denies that MGA originated or has rights to such theme, states that the relevant products speak for themselves and denies the truth of the remaining allegations set forth therein.

50.     Answering paragraph 50 of the Complaint, Mattel admits that it released a doll called "Jammin' in Jamaica" and a playset called "Guava Gulch Tiki Lounge", states that it has released such themed dolls and products over the course of many years, admits that MGA released a "Sun-Kissed Summer" themed doll and playset, denies that MGA originated or has rights to such theme, states that the relevant products speak for themselves and denies the truth of the remaining allegations set forth therein.

51.     Answering paragraph 51 of the Complaint, Mattel admits that it has aired television commercials for its MY SCENE line, states that such commercials speak for themselves, denies the truth of the remaining allegations set forth therein and specifically denies that MGA was the originator of or has rights to commercials "combining live action with animated sequences" set to "pop music and lyrics".

52.     Answering paragraph 52 of the Complaint, Mattel denies the truth of the allegations set forth therein.

53.     Answering paragraph 53 of the Complaint, Mattel admits that it released a MY SCENE "Sound Lounge", admits that MGA released a product called "Runway Disco", states that the relevant products speak for themselves, denies that it "imitated MGA's trapezoidal box," denies that MGA has rights thereto, and denies the truth of the remaining allegations set forth therein.

54.     Answering paragraph 54 of the Complaint, Mattel denies the truth of the allegations set forth therein.

55.   Answering paragraph 55 of the Complaint, Mattel admits that, among the styling heads it has produced and sold over the course of many years, it released a MY SCENE styling head, admits that MGA released a styling head called "Funky Fashion Makeover Head", states that the relevant products speak for themselves, denies that MGA has protectible rights and denies the truth of the remaining allegations set forth in paragraph 55.

56.   Answering paragraph 56 of the Complaint, Mattel is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth therein because plaintiff fails to identify the alleged instances of confusion, including the source of the unidentified picture titled "Hairstyle practice", and on that basis, denies them, and denies the truth of any remaining allegations set forth in paragraph 56.

57.   Answering paragraph 57 of the Complaint, Mattel admits that it has aired television commercials for its MY SCENE line, states that such commercials speak for themselves and denies the truth of the remaining allegations set forth therein.

58.   Answering paragraph 58 of the Complaint, Mattel admits that MGA has used the line "The Girls With a Passion for Fashion" in some contexts, denies that MGA originated that phrase or otherwise has rights to it, states that Mattel's web site speaks for itself and denies the truth of the remaining allegations set forth therein.

59.   Answering paragraph 59 of the Complaint, Mattel admits that, among the plush products that it has produced and sold over the course of many years, it has released plush dogs as part of its MY SCENE "Miami Getaway" themed product line, states that Mattel has for many years sold plush pets of the type used with its MY SCENE dog, admits that MGA has released various Bratz pets, states that MGA was not the originator of and has no rights to the features and other

EXHIBIT __11__

PAGE __133__

-14-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

00505.07209/2875224.1

1  elements described therein, states that the relevant products speak for themselves

2  and denies the truth of the remaining allegations set forth therein.

3        60.    Answering paragraph 60 of the Complaint, Mattel admits that,

4  among the plush toys that it has released over the course of many years, its MY

5  SCENE dog has been sold in packaging depicted (in part) on page 22 of the

6  Complaint, states that Mattel has for many years sold plush pets and other plush

7  products in packaging of the type used with its MY SCENE dog, admits that MGA

8  has released a "Bratz" dog, states that MGA was not the originator of and has no

9  rights to the packaging described therein, states that the relevant packages speak for

10  themselves and denies the truth of the remaining allegations set forth therein.

11        61.    Answering paragraph 61 of the Complaint, Mattel denies that it

12  has intended to cause any consumer confusion and states that it is without

13  knowledge or information sufficient to form a belief as to the truth or falsity of the

14  allegations set forth therein concerning unnamed retailers, customers and others

15  because plaintiff fails to identify any source for the matters alleged and, on that

16  basis, denies them and denies the truth of any remaining allegations set forth therein.

17        62.    Answering paragraph 62 of the Complaint, Mattel denies that it

18  has intended to cause any confusion and states that it is without knowledge or

19  information sufficient to form a belief as to the truth or falsity of the allegations set

20  forth therein concerning alleged comments and conversations because plaintiff fails

21  to identify any source for the alleged comments and conversations and, on that

22  basis, denies them, and denies the truth of any remaining allegations set forth

23  therein.

24        63.    Answering paragraph 63 of the Complaint, Mattel denies that it

25  has intended to cause any confusion and states that it is without knowledge or

26  information sufficient to form a belief as to the truth or falsity of the allegations set

27  forth therein because plaintiff fails to identify any source for the alleged comments

28

EXHIBIT __11__

PAGE __134__

-15-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1  and conversations and, on that basis, denies them, and denies the truth of any

2  remaining allegations set forth therein.

3       64.    Answering paragraph 64 of the Complaint, Mattel denies that it

4  has intended to cause any confusion and states that it is without knowledge or

5  information sufficient to form a belief as to the truth or falsity of the allegations set

6  forth therein because plaintiff fails to identify any source for the alleged comments

7  and conversations and, on that basis, denies them, and denies the truth of any

8  remaining allegations set forth therein.

9       65.    Answering paragraph 65 of the Complaint, Mattel denies the

10  truth of the allegations set forth therein.

11       66.    Answering paragraph 66 of the Complaint, Mattel admits that it

12  sued a competitor in the German courts for unfair competition for copying various

13  Mattel BARBIE line products, states that such claims exclusively arose under and

14  were the subject of German law, states that since that time the Federal Supreme

15  Court has rejected the contention made by MGA in paragraph 66 that

16  "systematically copying and borrowing elements" from competing dolls supports a

17  claim for unfair competition, and denies the truth of the remaining allegations set

18  forth therein.

19       67.    Answering paragraph 67 of the Complaint, Mattel denies the

20  truth of the allegations set forth therein.

21       68.    Answering paragraph 68 of the Complaint, Mattel admits that it

22  has released dolls called "Wee 3 Friends," admits that MGA has released dolls

23  called "4-Ever Best Friends," states that the relevant products speak for themselves,

24  denies that MGA's packaging is distinctive, denies that MGA has protectible rights

25  thereto and denies the truth of the remaining allegations set forth in paragraph 68.

26       69.    Answering paragraph 69 of the Complaint, Mattel admits that its

27  Fisher Price division has released, among other dolls called "Little Mommy," the

28  "Little Mommy Potty Training Baby Doll," admits that MGA has released a

00S05.07209/2875224.1

EXHIBIT __11__

PAGE __135__

-16-

1  |  "Mommy's Little Patient" doll and denies the truth of the remaining allegations set

2  |  forth therein.

3  |      70.   Answering paragraph 70 of the Complaint, Mattel admits that it

4  |  has released die-cast cars and other products called "Acceleracers" as part of its

5  |  HOT WHEELS line, admits that MGA has released products called "AlienRacers,"

6  |  denies that MGA was the originator of or has rights to the elements and matters

7  |  described in paragraph 70, states that the relevant products speak for themselves and

8  |  denies the truth of the remaining allegations set forth therein.

9  |      71.   Answering paragraph 71 of the Complaint, Mattel admits that it

10 |  has aired commercials relating to "Acceleracers," states that such commercials

11 |  speak for themselves, denies the truth of the remaining allegations set forth therein

12 |  and specifically denies that MGA originated or has rights to the commercials and

13 |  other matters described therein.

14 |      72.   Answering paragraph 72 of the Complaint, Mattel states that its

15 |  web site speaks for itself, denies the truth of the remaining allegations contained in

16 |  paragraph 72 and specifically denies that Mattel intended to create confusion in the

17 |  marketplace.

18 |      73.   Answering paragraph 73 of the Complaint, Mattel denies the

19 |  truth of the allegations set forth therein.

20 |      74.   Answering paragraph 74 of the Complaint, Mattel denies the

21 |  truth of the allegations set forth therein.

22 |      75.   Answering paragraph 75 of the Complaint, Mattel admits that it

23 |  has reminded certain former employees who became employed by MGA by letter of

24 |  their contractual and fiduciary obligation to maintain the secrecy of all Mattel

25 |  confidential and proprietary business information, states that such letters were

26 |  prepared and sent to their recipients in good faith contemplation of litigation, admits

27 |  that it filed a complaint for declaratory relief against Ronald Brawer in Los Angeles

28 |  Superior Court, entitled Mattel, Inc. v. Brawer, Case No. BC323381, on October 21,

EXHIBIT  11          -17-

PAGE  136

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1 | 2004, states that pursuant to the Court's Order of August 25, 2005 it need not
2 | respond to the allegations in paragraph 75 relating to that action, and denies the truth
3 | of the remaining allegations set forth in paragraph 75.

4 |      76.   Answering paragraph 76 of the Complaint, Mattel states that
5 | MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,
6 | including such acts that are lawful in foreign nations, and denies the truth of
7 | allegations set forth therein.

8 |      77.   Answering paragraph 77 of the Complaint, Mattel states that
9 | MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,
10 | including such acts that are lawful in foreign nations, and denies the truth of the
11 | allegations set forth therein.

12 |      78.   Answering paragraph 78 of the Complaint, Mattel states that it is
13 | without knowledge or information sufficient to form a belief as to the truth or falsity
14 | of the allegations regarding MGA's claimed "shortage of doll hair" and, on that
15 | basis, denies them and denies the truth of the remaining allegations set forth therein.

16 |      79.   Answering paragraph 79 of the Complaint, Mattel states that
17 | MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,
18 | including such acts that are lawful in foreign nations, and denies the truth of
19 | allegations set forth therein.

20 |      80.   Answering paragraph 80 of the Complaint, Mattel denies the
21 | truth of the allegations set forth therein.

22 |      81.   Answering paragraph 81 of the Complaint, Mattel admits that
23 | NPD Funworld ("NPD") supplies sales statistics in *inter alia* the toy, PC games and
24 | video games industries, admits that to Mattel's knowledge NPD restricts the use of
25 | its subscriber information, states that MGA was sued by NPD and states that it is
26 | without knowledge or information sufficient to form a belief as to the truth or falsity
27 | of the allegations regarding the need of unspecified "toy companies" for NPD

28 |

1 statistics and, on that basis, denies them and denies the truth of any remaining
2 allegations set forth therein.

3        82.    Answering paragraph 82 of the Complaint, Mattel denies the
4 truth of the allegations set forth therein.

5        83.    Answering paragraph 83 of the Complaint, Mattel states that it is
6 without knowledge or information sufficient to form a belief as to the truth or falsity
7 of the allegations set forth therein because MGA fails to quantify its annual
8 subscription fees and, on that basis, denies them.

9        84.    Answering paragraph 84 of the Complaint, Mattel states that it is
10 without knowledge or information sufficient to form a belief as to the truth or falsity
11 of the allegations set forth therein and, on that basis, denies them.

12        85.    Answering paragraph 85 of the Complaint, Mattel states that
13 MGA was sued by NPD, states that it is without knowledge or information sufficient
14 to form a belief as to such nature and grounds for such litigation (to which Mattel
15 was not a party) and, on that basis, denies the allegations relating thereto, and denies
16 the truth of the remaining allegations set forth therein.

17        86.    Answering paragraph 86 of the Complaint, Mattel denies the
18 truth of the allegations set forth therein.

19        87.    Answering paragraph 87 of the Complaint, Mattel admits that the
20 Children's Advertising Review Unit ("CARU") is the children's arm of the
21 advertising industry's self-regulation program, states that compliance with CARU's
22 Privacy Program can provide FTC-approved Safe Harbor under the Children's
23 Online Privacy Protection Act ("COPPA"), and denies the truth of the remaining
24 allegations set forth therein.

25        88.    Answering paragraph 88 of the Complaint, Mattel admits that it
26 is one of dozens of CARU Supporters and denies the truth of the remaining
27 allegations set forth therein.

28

89.     Answering paragraph 89 of the Complaint, Mattel denies the truth of the allegations set forth therein.

90.     Answering paragraph 90 of the Complaint, Mattel states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations as to the consequences to MGA of MGA's violations of CARU standards and, on that basis, denies them.

91.     Answering paragraph 91 of the Complaint, Mattel states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations as to the consequences to MGA of MGA's violations of CARU standards and, on that basis, denies them.

92.     Answering paragraph 92 of the Complaint, Mattel admits that the Toy Industry Association, Inc. ("TIA") is a toy industry trade association, admits that at certain times TIA has given awards called the People's Choice Toy of The Year or the Toy of The Year Award, denies that Mattel wrongfully influenced TIA and states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations set forth therein and, on that basis, denies them.

93.     Answering paragraph 93 of the Complaint, Mattel states that the allegations set forth therein are vague and ambiguous, including in that they fail to properly identify the years in which the referenced awards were given and/or the particular product which won such awards, and accordingly lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth therein and, on that basis, denies them.

94.     Answering paragraph 94 of the Complaint, Mattel admits that Neil Freidman was the chairman of TIA from approximately May 2002 to May 2004, states that Fischer Price is a division of Mattel and denies the truth of the remaining allegations set forth therein.

EXHIBIT ___11___

PAGE ___139___

-20-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1         95.   Answering paragraph 95 of the Complaint, Mattel admits that

2   Hokey Pokey Elmo won the Toy of the Year Award and denies the truth of the

3   remaining allegations set forth therein.

4         96.   Answering paragraph 96 of the Complaint, Mattel states that it is

5   without knowledge or information sufficient to form a belief as to the truth or falsity

6   of the allegations set forth therein and, on that basis, denies them.

7         97.   Answering paragraph 97 of the Complaint, Mattel denies the

8   truth of the allegations set forth therein.

9         98.   Answering paragraph 98 of the Complaint, Mattel denies the

10   truth of the allegations set forth therein.

11         99.   Answering paragraph 99 of the Complaint, Mattel denies the

12   truth of the allegations set forth therein.

13         100.   Answering paragraph 100 of the Complaint, Mattel denies the

14   truth of the allegations set forth therein.

15         101.   Answering paragraph 101 of the Complaint, Mattel repeats its

16   responses contained in paragraphs 1 through 100 of this Third Amended Answer

17   and incorporates them by reference as though fully and completely set forth herein.

18         102.   Answering paragraph 102 of the Complaint, Mattel denies the

19   truth of the allegations set forth therein and specifically denies that MGA's alleged

20   trade dress is distinctive.

21         103.   Answering paragraph 103 of the Complaint, Mattel denies the

22   truth of the allegations set forth therein and specifically denies that MGA's alleged

23   trade dress is distinctive.

24         104.   Answering paragraph 104 of the Complaint, Mattel denies the

25   truth of the allegations set forth therein.

26         105.   Answering paragraph 105 of the Complaint, Mattel denies the

27   truth of the allegations set forth therein.

28

EXHIBIT __11__

PAGE __140__

THIRD AMENDED ANSWER AND COUNTERCLAIMS

00505.07209/2875224.1

1        106.   Answering paragraph 106 of the Complaint, Mattel denies the
2    truth of the allegations set forth therein.

3        107.   Answering paragraph 107 of the Complaint, Mattel denies the
4    truth of the allegations set forth therein.

5        108.   Answering paragraph 108 of the Complaint, Mattel denies the
6    truth of the allegations set forth therein and specifically denies that plaintiff is
7    entitled to injunctive relief.

8        109.   Answering paragraph 109 of the Complaint, Mattel repeats its
9    responses contained in paragraphs 1 through 108 of this Third Amended Answer
10   and incorporates them by reference as though fully and completely set forth herein.

11       110.   Answering paragraph 110 of the Complaint, Mattel denies the
12   truth of the allegations set forth therein.

13       111.   Answering paragraph 111 of the Complaint, Mattel denies the
14   truth of the allegations set forth therein.

15       112.   Answering paragraph 112 of the Complaint, Mattel denies the
16   truth of the allegations set forth therein.

17       113.   Answering paragraph 113 of the Complaint, Mattel denies the
18   truth of the allegations set forth therein.

19       114.   Answering paragraph 114 of the Complaint, Mattel denies the
20   truth of the allegations set forth therein.

21       115.   Answering paragraph 115 of the Complaint, Mattel denies the
22   truth of the allegations set forth therein.

23       116.   Answering paragraph 116 of the Complaint, Mattel denies the
24   truth of the allegations set forth therein.

25       117.   Answering paragraph 117 of the Complaint, Mattel denies the
26   truth of the allegations set forth therein and specifically denies that plaintiff is
27   entitled to injunctive relief.

28

EXHIBIT __11__

PAGE __141__

-22-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1          118.   Answering paragraph 118 of the Complaint, Mattel denies the

2 truth of the allegations set forth therein.

3          119.   Answering paragraph 119 of the Complaint, Mattel repeats its

4 responses contained in paragraphs 1 through 118 of this Third Amended Answer

5 and incorporates them by reference as though fully and completely set forth herein.

6          120.   Answering paragraph 120 of the Complaint, Mattel denies the

7 truth of the allegations set forth therein.

8          121.   Answering paragraph 121 of the Complaint, Mattel denies the

9 truth of the allegations set forth therein.

10          122.   Answering paragraph 122 of the Complaint, Mattel denies the

11 truth of the allegations set forth therein.

12          123.   Answering paragraph 123 of the Complaint, Mattel denies the

13 truth of the allegations set forth therein and specifically denies that plaintiff is

14 entitled to injunctive relief.

15          124.   Answering paragraph 124 of the Complaint, Mattel repeats its

16 responses contained in paragraphs 1 through 123 of this Third Amended Answer

17 and incorporates them by reference as though fully and completely set forth herein.

18          125.   Answering paragraph 125 of the Complaint, Mattel denies the

19 truth of the allegations set forth therein.

20

21                 General Denial

22      Unless specifically admitted herein, Mattel denies the truth of each and

23 every allegation set forth in plaintiff's Complaint and specifically denies that

24 plaintiff is entitled to any relief against Mattel.

25

26

27

28

EXHIBIT __11__

PAGE ____142____

-23-

00505.07209/2875224.1

THIRD AMENDED ANSWER AND COUNTERCLAIMS

## Affirmative Defenses

By alleging the Affirmative Defenses set forth below, Mattel does not agree or concede that it bears the burden of proof or the burden of persuasion on any of these issues, whether in whole or in part.

### First Affirmative Defense

Plaintiff's Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

Plaintiff has no valid, enforceable or protectible rights or interest in the alleged trade dress or other matters asserted, including without limitation in that plaintiff has failed to establish that its alleged trade dress is distinctive as to plaintiff.

### Third Affirmative Defense

Plaintiff's claims, including without limitation plaintiff's claims based upon alleged extra-territorial acts, are barred in whole or in part by lack of subject matter jurisdiction.

### Fourth Affirmative Defense

Plaintiff's claims are barred in whole or in part by plaintiff's unclean hands.

### Fifth Affirmative Defense

Plaintiff's claims are barred in whole or in part by virtue of Mattel's prior-creation of the elements and other matters asserted in the Complaint.

EXHIBIT __11__

PAGE __143__

-24-

00505.07209/2875224.1

THIRD AMENDED ANSWER AND COUNTERCLAIMS

<u>Sixth Affirmative Defense</u>

Plaintiff's claims are barred in whole or in part by its lack of standing.

<u>Seventh Affirmative Defense</u>

Plaintiff's claims are barred in whole or in part by the applicable statutes of limitation and the doctrine of laches.

<u>Eighth Affirmative Defense</u>

Plaintiff's claims are barred in whole or in part by the doctrines of waiver, estoppel, acquiescence, and abandonment.

<u>Ninth Affirmative Defense</u>

Plaintiff's claims are barred in whole or in part by Mattel's constitutional rights of free speech, petitioning and association, including without limitation by the litigation privilege as protected by and/or codified in *inter alia* Section 47(b) of the <u>California Civil Code</u>, the *Noerr-Pennington* doctrine, the common interest privilege and by other privileges.

<u>Tenth Affirmative Defense</u>

Plaintiff's claims are barred in whole or in part by Mattel's federal and state constitutional rights of free speech, including without limitation under the First Amendment of the United States Constitution.

<u>Eleventh Affirmative Defense</u>

Plaintiff's claims are barred in whole or in part by the competitor privilege.

EXHIBIT  II    -25-

PAGE  144

THIRD AMENDED ANSWER AND COUNTERCLAIMS

## Twelfth Affirmative Defense

Plaintiff's claims are in whole or in part preempted by the Copyright Act and barred by the *Sears-Compco* doctrine.

## Thirteenth Affirmative Defense

Plaintiff's requested relief, including plaintiff's requests for punitive and/or enhanced damages, are barred in whole or in part because all of Mattel's actions were in good faith.

## Fourteenth Affirmative Defense

Plaintiff's damages, if any, were not caused by Mattel and are not attributable to the acts or omissions of Mattel.

## Fifteenth Affirmative Defense

Plaintiff has failed to mitigate its damages, if any.

## Additional Defenses

Mattel has insufficient knowledge or information upon which to form a belief as to whether additional defenses are available. Mattel reserves the right to amend this Third Amended Answer to add, delete, or modify additional defenses based on legal theories which may or will be divulged through clarification of the Complaint, through discovery, through change or clarification of the governing law or through further legal analysis of plaintiff's positions in this litigation.

## Prayer for Relief

WHEREFORE, Mattel prays for relief as follows:

EXHIBIT  11

PAGE  145

-26-

00505.07209/2875224.1

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1     1.    That the Complaint be dismissed with prejudice;

2     2.    That plaintiff take nothing by reason of the Complaint against

3 Mattel and that judgment be entered in Mattel's favor;

4     3.    That Mattel recover its costs and attorneys' fees; and

5     4.    That this Court award such other and further relief as it deems

6 just and proper.

### COUNTERCLAIMS

Pursuant to the Court's Orders of, inter alia, January 12, 2007, June 27, 2007, and May 21, 2009, and incorporating its [Proposed] Amended Complaint dated November 19, 2006, Mattel, Inc. alleges as follows:

### Preliminary Statement

1.    For years MGA Entertainment, Inc. has engaged in a pattern of stealing and using Mattel, Inc.'s property and trade secrets. MGA's use of the stolen property and trade secrets caused and continues to cause significant harm to Mattel. MGA first stole "Bratz," a fashion doll, from Mattel, and then continued stealing Mattel's confidential and proprietary information to fuel MGA's growth. Even after Mattel originally filed this suit, MGA, Isaac Larian and their co-conspirators continued this pattern of wrongdoing, engaging in additional acts of commercial bribery, destruction of evidence, evidence tampering and perjury, and in fraudulent conveyances and bankruptcy fraud. Indeed, MGA, Larian and their co-conspirators carried out several of these wrongs while the Phase 1 trial was on-going and shortly after it concluded, and continue to engage in further misconduct up to and beyond the present, for the specific purpose of thwarting the findings of the jury in Mattel's favor, obstructing the judicial process, and damaging Mattel and its rights.

2.    Carter Bryant conceived, created and developed Bratz designs while he was employed by Mattel as a doll designer. He concealed his Bratz work from Mattel and wrongfully sold Bratz to MGA while he was a Mattel employee.

1  As MGA knows, Mattel owns the Bratz designs that Bryant made.  As the rightful
2  owner of those Bratz designs, Mattel has registered copyrights for them and seeks
3  damages arising from MGA's repeated infringement of those copyrights.

4        3.    In 2008, the jury in the Phase 1 trial in this action found that
5  Carter Bryant conceived of and created Bratz, including without limitation Bratz
6  sculpts and prototypes, the Bratz name, the Bratz characters, and more than 70
7  Bratz design drawings, while working for Mattel and that MGA and Isaac Larian
8  unlawfully aided and abetted that wrongdoing and profited from their wrongful
9  acts.  Specifically, the jury found that MGA and Larian unlawfully infringed
10  Mattel's copyrights in Bratz works created by Bryant while a Mattel employee and
11  owned by Mattel, converted Bratz drawings from Mattel, tortiously interfered with
12  Bryant's contract with Mattel, aided and abetted Bryant's breach of his duty of
13  loyalty to Mattel, and aided and abetted Bryant's breach of his fiduciary duty to
14  Mattel.  The jury further found that MGA had fraudulently concealed its wrongful
15  conduct from Mattel.  Yet MGA's wrongful conduct has not ceased.  Undeterred by
16  the jury's findings, MGA continues to infringe even to this day, and threatens to
17  infringe in the future, Mattel's rights in Bratz.

18        4.    MGA's illegal conduct in stealing Bratz was also just the
19  beginning.  Emboldened by the success of its earlier illegal conduct, MGA has
20  repeated—and even expanded through this day—its pattern of theft, bribery,
21  evidence destruction and tampering, perjury, obstruction, financial manipulations
22  and other illegal conduct.  For example, in or about 2004, MGA decided to expand
23  into Mexico.  To do so, and operating from its Southern California offices, MGA
24  hired away three key Mattel employees in Mexico, who, on their way out, stole
25  virtually every category of Mattel's sensitive and trade secret business plans and
26  information for the Mexican market, as well as a significant quantity of sensitive
27  and trade secret information for Mattel's U.S. and worldwide businesses, and took
28  them to MGA.  Armed with Mattel's confidential business plans and methods,

1  MGA claimed to have increased its market share in Mexico alone by 90% in a

2  single year.

3       5.    In 2005, MGA needed help in Canada. So MGA, again

4  operating from its Southern California headquarters, hired Janine Brisbois from

5  Mattel. At that time, Ms. Brisbois was responsible for Mattel's account with Toys

6  'R Us ("TRU") and Wal-Mart. MGA gave her responsibility for those same

7  accounts, and she took from Mattel documents containing proprietary advertising,

8  project, sales, customer and strategy information for not only Canada, but for the

9  United States. Eliminating any doubt that MGA then proceeded to use those stolen

10  materials, Brisbois subsequently accessed and modified certain of those Mattel

11  documents while employed by MGA.

12       6.    Starting no later than 2000, and continuing until at least 2005,

13  MGA bribed Mattel employees in addition to Bryant to work on Bratz and other

14  products for MGA's benefit. In the face of Court Orders compelling MGA to

15  disclose such evidence, MGA falsely denied under oath that there were such other

16  Mattel employees. In December 2007, however, the truth came to light—MGA

17  agents had bribed at least three more Mattel employees over a five-year span,

18  including even during times after this suit was filed. MGA's agents acted to

19  conceal the bribery, including by paying Mattel employees in cash and using false

20  names and false social security numbers.

21       7.    These are not the only instances of such misconduct which MGA

22  orchestrated and carried out from its headquarters in this District. Counter-

23  defendants have engaged in an ongoing, widespread pattern of illegal acts that

24  continues to this day and that threatens to continue into the future. Those acts

25  include, without limitation, inducing Mattel employees to steal Mattel's

26  confidential information or other property and take it with them to MGA to further

27  MGA's business interests and to harm Mattel. They also include, without

28  limitation, continued acts of copyright infringement, evidence destruction and

00505.07209/2875224.1

EXHIBIT 11

PAGE 148

-29-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1 perjury. They also include, without limitation, Larian's and MGA's illegal transfer,

2 transport and laundering of their ill-gotten profits, including through their use of

3 sham single-purpose entities created during or immediately after the Phase 1 trial,

4 for the purpose of thwarting the jury's Phase 1 verdict against them, continuing

5 with their acts of infringement, manipulating their financial condition and

6 defrauding Mattel.

7                                    **Jurisdiction**

8          8.     This Court has federal question jurisdiction over this action

9 pursuant to 28 U.S.C. §§ 1331, 17 U.S.C. §§ 101 *et seq.*, and 18 U.S.C. § 1964(c).

10 This Court has supplemental jurisdiction over Mattel's state law claims pursuant to

11 28 U.S.C. § 1367.

12                                    **Venue**

13         9.     Venue is proper in this District pursuant to 28 U.S.C.

14 §§ 1391(b)-(d), 1391(f) and 1400(a) and 18 U.S.C. § 1965.

15                                    **Parties**

16         10.    Mattel is a corporation organized and existing under the laws of

17 the State of Delaware, with its principal place of business in El Segundo,

18 California.

19         11.    Counter-defendant MGA Entertainment, Inc. ("MGA") is a

20 corporation organized and existing under the laws of the State of California, with

21 its principal place of business in Van Nuys, California. Mattel is informed and

22 believes, and on that basis alleges, that ABC International Traders, Inc. is a

23 predecessor corporation to MGA and that until September 16, 2002, MGA was

24 incorporated and known as ABC International Traders, Inc. Upon the filing of the

25 Complaint, Mattel, being ignorant of the nature, extent and scope of MGA

26 Entertainment, Inc.'s involvement and complicity in the conduct alleged therein and

27 having designated MGA Entertainment, Inc. in the Complaint as Doe 1 and having

28 discovered its involvement and complicity, Mattel previously amended its

EXHIBIT __11__

1  Complaint by substituting MGA Entertainment, Inc. for the fictitious Doe name
2  Doe 1.

3      12.   Counter-defendant Carter Bryant ("Bryant") is an individual who
4  formerly was employed by Mattel and has worked for and continues to work as a
5  contractor for MGA.  Mr. Bryant currently resides in the State of Missouri.

6      13.   Counter-defendant MGA Entertainment (HK) Limited is a
7  business entity organized and existing under the laws of the Hong Kong Special
8  Administrative Region, with its principal place of business in Hong Kong.  Upon
9  the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope
10  of involvement and complicity of MGA Entertainment (HK) Limited in the conduct
11  alleged therein and having designated MGA Entertainment (HK) Limited in the
12  Complaint as Doe 2 and having discovered its involvement and complicity, Mattel
13  previously amended its Complaint by substituting MGA Entertainment (HK)
14  Limited for the fictitious Doe name Doe 2.

15      14.   Counter-defendant MGAE de Mexico, S.R.L. de C.V. ("MGA
16  de Mexico") is a business entity organized and existing under the laws of Mexico,
17  with its principal place of business in Mexico City, Mexico.

18      15.   Mattel is informed and believes, and on that basis alleges, that
19  Counter-defendant Larian is the President and CEO of MGA and an individual
20  residing in the County of Los Angeles.  Upon the filing of the Complaint, Mattel,
21  being ignorant of the nature, extent and scope of involvement and complicity of
22  Larian in the conduct alleged therein and having designated Larian in the
23  Complaint as Doe 3 and having discovered his involvement and complicity, Mattel
24  previously amended its Complaint by substituting Larian for the fictitious Doe
25  name Doe 3.

26      16.   Mattel is informed and believes, and on that basis alleges, that
27  Counter-defendant Larian is directly or indirectly principal, owner, member and/or
28  controlling shareholder and alter-ego of IGWT Group, LLC ("IGWT Group") and

00505.07209/2875224.1

EXHIBIT __11__

PAGE __150__

-31-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1  IGWT 826 Investments, LLC ("IGWT 826 Investments").  On information and
2  belief, the financial affairs of Larian and these limited liability companies—which
3  were formed during and subsequent to the Phase 1 trial—are significantly
4  intermingled and interconnected, the companies being mere shells which Larian
5  used as conduits for his own business dealings, created and operated pursuant to an
6  unlawful scheme as alleged herein.

7      17.   Mattel is informed and believes, and on that basis alleges, that
8  Counter-defendant Larian is directly or indirectly trustee, principal, owner, and/or
9  controlling participant and alter-ego of several trusts devised by or on behalf of
10  Larian for the purpose of manipulating MGA's and Larian's finances, including
11  without limitation The Makabi Living Trust, The Larian Living Trust, The Angela
12  Larian Qualified Annuity Trust, The Isaac E. Larian Qualified Annuity Trust, The
13  Jahangir Eli Makabi Qualified Annuity Trust, as well as other trusts and similar
14  vehicles presently unknown to Mattel because of their concealment by Larian,
15  MGA and their co-conspirators.

16      18.   Mattel is informed and believes, and on that basis alleges, that
17  Counter-defendant Larian is directly or indirectly principal, owner, member and/or
18  controlling participant and alter-ego of several other sham entities devised by or on
19  behalf of Larian for the purpose of manipulating MGA's and Larian's finances,
20  including without limitation Omni 808 Investors, LLC, Vision Capital, LLC and
21  Lexington Financial Limited (collectively, the "Omni Parties") as well as other
22  entities currently unknown by name to Mattel because of their concealment by ·
23  Larian, MGA, the Omni Parties and their co-conspirators.

24      19.   Mattel is informed and believes, and on that basis alleges, that
25  Counter-defendant Larian has employed, directly or indirectly, other co-
26  conspirators to directly and indirectly carry out his intentional wrongdoing,
27  including in order to conceal and manipulate his and MGA's finances and to
28  conduct other fraudulent and illegal conduct, including without limitation Neil

00505.07209/2875224.1

EXHIBIT __11__

PAGE __151__

-32-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1    Kadisha, Leon Neman, Fred Mashian, Jahangir Eli Makabi, Shirin Makabi, Farhad

2    Larian, Angela Larian, Veronica Marlow and Peter Marlow, as well as other

3    persons presently unknown to Mattel because of their concealment by Larian,

4    MGA, the Omni Parties and their co-conspirators.

5            20.   Mattel is informed and believes, and on that basis alleges, that at

6    all relevant times mentioned herein such individuals, trusts, Larian, the Omni

7    Parties, IGWT Group and IGWT 826 Investments, together with their employees,

8    officers, putative owners, members and principals, agents, representatives and

9    attorneys, were acting in concert and in active participation with each other in

10   committing the wrongful acts alleged herein, and were the agents of each other and

11   were acting within the scope and authority of that agency and with the knowledge,

12   consent and approval of each other.

13           21.   Counter-defendant Carlos Gustavo Machado Gomez is an

14   individual who is employed by Counter-defendant MGA and who resided in this

15   District at the time he was named and served as a Counter-defendant in the Second

16   Amended Answer and Counterclaims and, on information and belief, currently

17   resides in Mexico.

18           22.   The true names and capacities of Counter-defendants sued herein

19   as DOES 4 through 10, inclusive, are unknown to Mattel, which therefore sues said

20   Counter-defendants by such fictitious names.  Mattel will amend its pleadings to

21   allege their true names and capacities when the same are ascertained.

22                          **Factual Background**

23   **I.   MATTEL**

24           23.   Mattel manufactures and markets toys, games, dolls and other

25   consumer products.  Harold Mattson and Elliot and Ruth Handler founded Mattel in

26   1945.  The name of the company was created by incorporating the names of two of

27   its founders, "MATT-son" and "EL-liot."  Originating from the Handlers' garage in

28   Southern California, the company greatly expanded its operations following World

00505.07209/2875224.1

EXHIBIT __11__

PAGE __152__

-33-

1  War II.  During the next several decades, Mattel became famous for producing

2  high-quality products at reasonable prices.

3      24.  Critical to Mattel's success is its ability to design and develop

4  new products.  Mattel invests millions of dollars in product design and

5  development and introduces hundreds of new products each year.  Mattel maintains

6  a 180,000 square-foot design center in El Segundo, California, that houses

7  hundreds of designers, sculptors, painters and other artists, who work exclusively to

8  create the products on which Mattel's business depends.

9      25.  Mattel also has invested substantial amounts over many years to

10  develop its business methods and practices, including, without limitation, its

11  marketing and advertising research, plans, methods and processes; its business

12  research and forecasts; its costs, budgets, pricing, credit terms, deal terms and

13  finances; its manufacturing, distribution, and sales methods and processes; and its

14  inventory methods and processes.  These represent a material part of the intellectual

15  infrastructure of Mattel and are highly valuable.

16  **II.  MGA ENTERTAINMENT**

17      26.  MGA is also a toy manufacturer.  MGA began as a consumer

18  electronics business, but expanded into the toy business with licenses to sell

19  handheld electronic games.  By approximately late 1999 or early 2000, MGA

20  developed a strategy to expand its business and compete directly with Mattel by

21  launching a fashion doll line, so it stole a fashion doll that was owned by Mattel—

22  "Bratz."

23      27.  MGA intentionally stole not just specific Mattel property, such

24  as Bratz designs, prototypes and related materials, but also a vast array of trade

25  secrets and other confidential information that comprise Mattel's intellectual

26  infrastructure.  MGA's rapid growth was not organic, but rather was based upon its

27  theft of Bratz.  As a result, MGA lacked an appropriate intellectual infrastructure

28  for a company of its size and it became increasingly difficult to manage.  To deal

1   with these problems, as detailed below, time and time again MGA simply stole

2   Mattel's proprietary business methods, practices and information. This not only

3   allowed MGA to avoid expending the time, money and effort necessary to build a

4   legitimate business, but also allowed MGA to unfairly compete against Mattel by

5   taking Mattel's playbook.

6   **III. MGA STEALS A NEW LINE OF FASHION DOLLS FROM MATTEL**

7         28.   Carter Bryant is a former Mattel employee. Bryant joined Mattel

8   in September 1995, where he worked in Mattel's Design Center as a BARBIE

9   product designer. In or about April 1998, Bryant resigned his position with Mattel

10  and moved to Missouri to live with his parents. Late in 1998, Bryant applied to

11  Mattel to be rehired. On January 4, 1999, he began working at Mattel in Mattel's

12  Design Center, again as a product designer, for Mattel's BARBIE collectibles line.

13        29.   Upon his return to Mattel in January 1999, Bryant executed an

14  Employee Confidential Information and Inventions Agreement (the "Employment

15  Agreement"), a true and correct copy of which is attached hereto as Exhibit A.

16        30.   Pursuant to his Employment Agreement and as a condition of

17  and in consideration for his employment, Bryant agreed, among other things, that

18  he held a position of trust with Mattel, that the designs and inventions he created

19  during his Mattel employment (with certain exceptions not relevant here) were

20  owned by Mattel, and that he would be loyal to the company by agreeing not to

21  assist or work for any competitor of Mattel while he was employed by Mattel.

22        31.   On January 4, 1999, Bryant also executed Mattel's Conflict of

23  Interest Questionnaire (the "Conflict Questionnaire"). Among other things, Bryant

24  certified in the Conflict Questionnaire that, other than as disclosed, he had not

25  worked for any competitor of Mattel in the prior twelve months and had not

26  engaged in any business venture or transaction involving a Mattel competitor that

27  could be construed as a conflict of interest. Bryant understood what the Conflict

28  Questionnaire required because, among other things, he disclosed on it the

**EXHIBIT** 11

**PAGE** 154

-35-

1   freelance work he had performed while in Missouri for Ashton-Drake, which is

2   unrelated to the conduct alleged herein. A true and correct copy of the Conflict

3   Questionnaire executed by Bryant is attached hereto as Exhibit B.

4         32.   Pursuant to the Conflict Questionnaire, Bryant also agreed that

5   he would immediately notify his supervisor of any change in his situation that

6   would cause him to change any of the foregoing certifications. Despite this

7   obligation, at no time did Bryant disclose to Mattel that he was engaging in any

8   business venture or transaction with MGA or any other Mattel competitor.

9         33.   More specifically, while Bryant was employed by Mattel, Bryant

10   and other Counter-defendants misappropriated and misused Mattel property and

11   Mattel resources for the benefit of Bryant and MGA. Such acts included, but are

12   not limited to, the following:

13         a.   using his exposure to Mattel development programs to

14   create the concept, design and name of Bratz;

15         b.   using Mattel resources, and while employed by Mattel,

16   Bryant worked by himself and with other Mattel employees and contractors to

17   design and develop Bratz, including without limitation by creating drawings and

18   three-dimensional models of Bratz dolls, and fashion designs for the dolls'

19   associated clothing and accessories; and

20         c.   using Mattel resources, and while employed by Mattel,

21   Bryant took steps to assist MGA to produce Bratz dolls.

22         34.   During the time that he was employed by Mattel and thereafter,

23   Bryant concealed these actions from Mattel, including by failing to notify his

24   supervisor of the conflict of interest he created when he began working on MGA's

25   behalf and when he began receiving payments from MGA. Bryant additionally

26   enlisted other Mattel employees to perform work on Bratz during the time he was

27   employed by Mattel and, by all indications, in at least some cases led them to

28   believe that they were performing work on a project for Mattel.

00S05.07209/2875224.1

EXHIBIT ____11____   -36-
PAGE ___155___
THIRD AMENDED ANSWER AND COUNTERCLAIMS

35.   Bryant also made affirmative misrepresentations to Mattel management and employees immediately before his departure from Mattel on October 20, 2000. For example, during his last few weeks at Mattel, Bryant told his co-workers and supervisors that he was going to leave Mattel for "non-competitive" pursuits. Bryant's representations to his supervisors and his co-workers were false. Bryant knew at the time that those representations were false and made those false statements to conceal from Mattel the fact that he was already working with MGA and that he had contracted with MGA to assign Bratz works to MGA and to provide design and development services to MGA, a Mattel competitor.

36.   As a result of the efforts of Bryant and other Mattel employees working on Bratz (which were done without Mattel's knowledge), the Bratz dolls had been designed and were far along in development during the time that Bryant was employed by Mattel and prior to the time that Bryant left Mattel on October 20, 2000. Not only did Bryant create and develop designs for the dolls as well as other aspects of the products such as their fashion accessories during the time he was employed by Mattel, but MGA showed Bratz prototypes and/or product to both focus groups and retailers by November 2000, less than three weeks after Bryant left Mattel. Bryant, Larian and others at MGA arranged these meetings while Bryant was still employed by Mattel.

37.   Bryant and MGA employees also repeatedly and continuously communicated with employees of MGA Entertainment (HK) Limited on subjects such as design and manufacturing of Bratz. On information and belief, at all material times, MGA Entertainment (HK) Limited has maintained regular and continuous contacts with persons in the County of Los Angeles; it regularly has shipped products that it manufactures, or that are manufactured for it, to the County of Los Angeles; and such products have been distributed to retailers and sold to consumers in the County of Los Angeles.

1        38.   Bratz also were shown to retailers at the Hong Kong Toy Fair in

2  January 2001. By early 2001, only a few months after Bryant resigned from

3  Mattel, MGA began having the Bratz fashion doll line and accessories

4  manufactured and then, shortly thereafter, began selling them at retail.

5        39.   Since 2001, MGA has distributed and sold Bratz and Bratz-

6  related products throughout the world. Mattel is informed and believes that MGA

7  also licenses Bratz to third parties. Mattel is also informed and believes that MGA

8  during certain time periods has derived annual revenue from its sales and licenses

9  of Bratz in excess of $500 million. Mattel is further informed and believes that

10  MGA and Bryant claim current ownership of Bratz, and all copyrights and

11  copyright registrations attendant thereto. MGA continues to market, sell and.

12  license Bratz and has expressed an intention to continue to do so.

13        40.   Mattel is informed and believes that MGA and Larian

14  encouraged, aided and financed Bryant to develop Bratz, knowing full well that

15  Bryant was still employed by Mattel at the time and that by performing such work,

16  including design-related work, for his own benefit and/or the benefit of MGA,

17  Bryant would be, and was, in breach of his contractual, statutory and common law

18  duties to Mattel. Mattel is also informed and believes that MGA proceeded to aid

19  and encourage Bryant to develop Bratz with the goal of obtaining a valuable

20  fashion doll line that would be commercially successful in the competitive, multi-

21  billion dollar market for fashion dolls.

22        41.   Pursuant to Bryant's contract with Mattel, among other things,

23  Mattel is the true owner of Bratz designs and works, including those specifically

24  that were conceived, created or reduced to practice during Bryant's Mattel

25  employment as well as all designs and works that are or have been derived

26  therefrom. Counter-defendants' continued use, sale, distribution and licensing of

27  Bratz thus infringes upon Mattel's rights, injures Mattel and unlawfully enriches the

28  Counter-defendants.

00505.07209/2875224.1

EXHIBIT __**ﬁ**__

PAGE __**157**__

-38-

42.   Bryant and MGA deliberately and intentionally concealed facts sufficient for Mattel to suspect or to know that it was the true owner of Bratz. Their acts of concealment include, but are not limited to, concealing the fact that Bryant conceived, created, designed and developed Bratz while employed by Mattel, including by tampering with, altering and defacing documents which showed that, in fact, Bryant was a Mattel employee while he was working for and with MGA; concealing the fact that Bryant worked with and assisted MGA during the time Bryant was employed by Mattel and was compensated for that assistance; concealing that Bryant was providing consulting services to MGA; concealing Bryant's role in Bratz by falsely claiming that Larian and others were the creators of Bratz; and concealing the fact that Mattel was the true owner of Bratz by, among other things, filing fraudulent registrations and/or amendments to registrations with the United States Copyright Office claiming MGA as the author of Bratz as a work for hire and mis-dating or altering relevant dates on such documents to further obscure the true facts of when the works were created.

43.   Because of Bryant's and MGA's acts of concealment and Bryant's misrepresentations to Mattel, Mattel had no reason to suspect that Bryant had worked with MGA, or assisted MGA, while he still employed by Mattel until approximately November 24, 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's agreement with MGA which showed that the date of Bryant's agreement with MGA predated Bryant's departure from Mattel. It was then, as a result, that Mattel learned for the first time that Bryant had secretly aided, assisted and worked for and with MGA while employed at Mattel and in violation of his Mattel Employment Agreement. Specifically, Bryant's agreement with MGA obligated Bryant to provide product design services to MGA on a "top priority" basis. Bryant's agreement with MGA also provided that Bryant would receive royalties and other consideration for sales of products on which Bryant provided aid or assistance; that all works and services furnished by Bryant under

00505 07209/2875224.1

EXHIBIT **11**

PAGE __158__

-39-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1 the agreement, including those he purportedly provided while still a Mattel

2 employee, purportedly would be considered "works for hire" of MGA; and that all

3 intellectual property rights to preexisting works by Bryant, including Bratz designs,

4 purportedly were assigned to MGA.

5 **IV.  MGA STEALS MATTEL TRADE SECRETS IN MEXICO**

6        44.    On information and belief, in or about late 2003 or early 2004,

7 MGA decided to open business operations in Mexico.  Faced with the difficult task

8 of developing an overall strategy for expanding into a market in which it had only a

9 nominal presence and no operations, MGA elected to steal Mattel's plans, strategy

10 and business information for the Mexican market and materials related to Mattel's

11 worldwide business strategies.  As detailed below, MGA and Larian approached

12 three employees of Mattel's Mexican subsidiary ("Mattel Mexico"), enticed them to

13 steal Mattel's most sensitive business planning materials, and then hired them to

14 assist in establishing and running MGA's new Mexican subsidiary.

15    A.    **MGA Hires Three Senior Mattel Employees in Mexico**

16        45.    Carlos Gustavo Machado Gomez ("Machado") was the Senior

17 Marketing Manager, Boys Division, for Mattel Mexico, a position of trust and

18 confidence.  He was employed at Mattel Mexico from April 1, 1997 until April 19,

19 2004.  His duties included short, medium and long-term marketing planning,

20 generating product sales projections, and assisting in creation of the media plan.  In

21 his position, Machado had access to highly confidential and sensitive marketing

22 and product development information.  Machado had an employment agreement

23 with Mattel in which he agreed to maintain the confidentiality of Mattel's protected

24 information.  Mattel's policies also required Machado to protect Mattel's

25 proprietary information and not to disclose it to competitors.

26        46.    Mariana Trueba Almada ("Trueba") was the Senior Marketing

27 Manager, Girls Division, for Mattel Mexico, a position of trust and confidence.

28 She was employed at Mattel Mexico from November 3, 1997 until April 19, 2004.

EXHIBIT __11__      -40-

PAGE ___159___

1  Like Machado, her duties included short, medium and long-term marketing

2  planning, generating product sales projections, and assisting in creation of the

3  media plan.  In her position, Trueba had access to highly confidential and sensitive

4  marketing and product development information.  Trueba had an employment

5  agreement with Mattel in which she agreed to maintain the confidentiality of

6  Mattel's protected information.  Mattel's policies also required Trueba to protect

7  Mattel's proprietary information and not to disclose it to competitors.

8       47.  Pablo Vargas San Jose ("Vargas") was a Senior Trade Marketing

9  Manager with Mattel Mexico, a position of trust and confidence.  He was employed

10  at Mattel Mexico from March 29, 2001 until April 19, 2004.  Vargas was

11  responsible for ensuring that point-of-sale promotions were carried out, analyzing

12  the results of such promotions, negotiating promotion budgets, and generally

13  managing promotional activities.  Vargas also had access to highly confidential and

14  sensitive marketing and product development information.  Vargas had an

15  employment agreement with Mattel in which he agreed to maintain the

16  confidentiality of Mattel's protected information.  Mattel's policies also required

17  Vargas to protect Mattel's proprietary information and not to disclose it to

18  competitors.

19       48.  Beginning in late 2003 or early 2004, Machado, Trueba and

20  Vargas began planning to leave Mattel Mexico to join MGA.  In connection with

21  that plan, and with the encouragement of Larian and other MGA officers operating

22  in the United States, they began accessing, copying and collecting proprietary

23  Mattel documents to take with them.  On April 19, 2004, Machado, Trueba and

24  Vargas each resigned their positions with Mattel, effective immediately.  They

25  stated that they had been hired by a Mattel competitor, but refused to identify that

26  competitor.  In fact, they had been offered and accepted employment by MGA to

27  establish and run MGA's new operation in Mexico.

28

B.   Machado, Trueba and Vargas Stole Dozens of Confidential Trade Secret Marketing and Sales Documents for MGA's Benefit

49.   Following these resignations, Mattel discovered that Machado, Trueba and Vargas had been in frequent telephonic and e-mail contact with MGA personnel, including Larian, for over three months prior to their resignations. The primary vehicle for these communications in furtherance of their "plot" was an America Online e-mail account with the address <plot04@aol.com>. On information and belief, during this time, Machado, Trueba and Vargas supplied Larian with certain Mattel confidential and proprietary information in order to prove their value to MGA and to improve their negotiating position vis-à-vis their respective employment contracts with MGA.

50.   In March 2004, Machado, Trueba and Vargas were making plans to travel from Mexico to Los Angeles to meet with MGA personnel in person prior to resigning their positions at Mattel. Also, by at least March 3, 2004, Machado, Trueba and Vargas were discussing with MGA personnel, including Larian, specific details regarding setting up MGA offices in Mexico City. On information and belief, prior to their resignations, Larian and others at MGA directed Machado, Trueba and Vargas to steal virtually all Mattel confidential and proprietary information that they could access and bring it with them to MGA. This was reflected in, among things, e-mail messages that Mattel had discovered after Machado, Trueba and Vargas had resigned. For example, on March 22, 2006, approximately one month before they resigned, Machado, Trueba and Vargas wrote an e-mail message from the <plot04@aol.com> e-mail account addressed to Larian, MGA's General Manager Susan Kuemmerle and another MGA officer Thomas Park. In that e-mail message, Machado, Trueba and Vargas sought to prove their value in this endeavor to MGA by writing: "Attached you will find our analysis for future discussion. We will be available during the nights of the week after 16:30 Los Angeles time . . . ." In another e-mail message, showing that the

00505.07209/2875224.1

EXHIBIT **11**          -42-

PAGE **161**

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1  participants intentionally sought to maximize the damage to Mattel from their
2  conduct, Kuemmerle wrote to Larian and Park: "Gustavo, Mariana and Pablo want
3  to resign (all at the same time, and you can believe my smile!) next Wednesday."

4       51.   Beginning on April 12, 2004, a week before his resignation and
5  after numerous communications and meetings with Larian and other MGA
6  personnel, Machado began transferring additional Mattel confidential and
7  proprietary information to a portable USB storage device (also know as a "thumb
8  drive") that he connected to his Mattel computer.  On Friday, April 16, 2004, the
9  last business day before he gave notice, Machado copied at least 70 sensitive
10 documents to the portable USB storage device.

11      52.   Starting on April 12, 2004, Vargas also copied a host of
12 confidential and proprietary materials to a portable USB storage device, including
13 sales plans, sales projections and customer profiles.

14      53.   On April 16, 2004, Trueba also copied Mattel confidential and
15 proprietary information to a portable USB storage device connected to her Mattel
16 computer.

17      54.   With full knowledge that she was going to leave Mattel for a
18 competitor, Trueba also took steps to increase further her access to Mattel's
19 confidential information shortly before her resignation.  For example, just four days
20 before leaving, Trueba went out of her way to seek to attend a meeting at which
21 Mattel personnel analyzed BARBIE programs for the United States, Canada and
22 South America.  Two days before her resignation, she contacted both a Mattel
23 employee located in El Segundo, California and Mattel's advertising agency to
24 request updated confidential information about advertising plans for BARBIE.  On
25 information and belief, Trueba acted at the direction of MGA and Larian and did so
26 in order to obtain further information that would allow MGA to obtain unfair
27 competitive advantage over Mattel.

28

EXHIBIT  11

PAGE  162

-43-
THIRD AMENDED ANSWER AND COUNTERCLAIMS

55.   Machado, Trueba and Vargas stole virtually every type of document a competitor would need to enter the Mexican market and to unlawfully compete with Mattel in Mexico, in the United States, and elsewhere.  They stole global internal future line lists that detailed anticipated future products; production and shipping costs for Mattel products; daily sales data for Mattel products; customer data; sales estimates and projections; marketing projections; documents analyzing changes in sales performance from 2003 to 2004; budgets for advertising and promotional expenses; strategic research reflecting consumer responses to products in development; media plans; consumer comments regarding existing Mattel products; customer discounts and terms of sale; customer inventory level data; assessments of promotional campaign success; market size historical data and projections; marketing plans and strategies; merchandising plans; retail pricing and marketing strategies; and other similar materials.

56.   The stolen data was not limited to the Mexican market.  The information stolen would, and did, give MGA an unfair competitive advantage in the United States and around the world.  Further, the stolen information was not located exclusively in Mexico, but included confidential and proprietary information that resided on Mattel computers in Phoenix, Arizona and El Segundo, California, and/or documents which were originally created by personnel in El Segundo.  Included among these stolen documents was one of Mattel's earliest internal global line lists, which included information for BARBIE products for the upcoming year and included, for each product, the expected profit margin, advertising expenditures, expected volume and marketing strategy.  On information and belief, Machado, Trueba or Vargas delivered that internal line list to Larian or another MGA officer during their negotiations with MGA.

57.   MGA has used the information taken from Mattel to obtain an unfair advantage over Mattel, including in both the United States and Mexico.  In fact, MGA later publicized its claim that, in 2005, it had increased its Mexican

1    market share by 90 percent over the prior year. This increase came at the expense

2    of Mattel, which lost market share during 2004 in Mexico and was forced to

3    increase its advertising and promotional spending to offset further losses.

4          58.   Machado, Trueba and Vargas attempted to conceal their

5    widespread theft of Mattel's proprietary information. For example, Machado ran a

6    software program on his Mattel personal computer in an attempt to erase

7    information, including information that would reveal the addresses to which he had

8    sent, or from which he had received, e-mail messages. On information and belief,

9    for the same purpose Machado also damaged the hard drive of the personal

10    computer that he used at Mattel.

11          59.   On information and belief, on April 19, 2004, immediately after

12    Machado, Trueba and Vargas simultaneously resigned, they traveled from Mexico

13    to Los Angeles to meet with MGA personnel, including Larian, in person.

14          60.   Mattel notified Mexican authorities about the theft of its trade

15    secret and confidential information. On October 27, 2005, the Mexican Attorney

16    General Office obtained a search warrant from the Mexican Federal Criminal

17    Courts for MGA's facilities in Mexico City. In that search, the Mexican authorities

18    found and seized from MGA's offices both electronic and paper copies of a large

19    number of documents containing Mattel trade secrets, including those that Mattel

20    discovered through its forensic investigations, plus many others that Mattel had not

21    known had been stolen.

22          61.   Based on Machado's "performance" in Mexico, Isaac Larian

23    subsequently promoted Machado, and he was transferred to MGA's main office in

24    Van Nuys, California. When deposed in connection with this case, Machado

25    refused to answer questions about his misconduct and instead invoked the Fifth

26    Amendment over 100 times. On information and belief, Machado has resided at

27    times relevant hereto in the County of Los Angeles, California, and on information

28    and belief, currently resides in Mexico.

V.   **MGA HIRES MATTEL'S SENIOR VICE PRESIDENT AND GENERAL MANAGER TO FACILITATE ITS THEFT AND USE OF MATTEL'S HIGHLY VALUABLE BUSINESS METHODS AND PRACTICES**

62.   On October 1, 2004, Mattel's Senior Vice President and General Manager, Ron Brawer, left Mattel and joined MGA.  Tyco Toys, Inc. ("Tyco"), a predecessor to Mattel, had hired Brawer on April 22, 1996.  The same day, Brawer entered into an Employee Invention & Trade Secret Agreement with Tyco.  On April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel, New Jersey, and remained bound by his Employee Invention & Trade Secret Agreement.

63.   In January 2003, while Brawer held a position of trust and confidence at Mattel, Mattel's "Code of Conduct" was circulated to all Mattel employees worldwide.  Included in the Code of Conduct were statements that:

> Employees and Directors have an obligation to protect the confidentiality of Mattel's proprietary information.  Proprietary information is any information not generally known to the public that is useful to Mattel, that would be useful to its competitors or other third parties or that would be harmful to Mattel or its customers if disclosed.  Proprietary information includes trade secrets, revenue and profit information and projections, new product information, marketing plans, design and development efforts, manufacturing processes and any information regarding potential acquisitions, divestitures and investments.
> We can protect the security of Mattel's proprietary information by limiting access to it.  Confidential information should not be discussed with those who are not obligated to maintain the information in confidence and in public places where the

EXHIBIT _11_

PAGE _165_

-46-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1     information is not likely to be kept secret, such as planes,

2     restaurants and elevators.  The obligation to preserve confidential

3     information continues even after employment ends.

4  The Code of Conduct applied to Brawer and required that he meet his obligations

5  under the Code of Conduct.

6     64.   By 2003, Brawer had advanced within Mattel to a Senior Vice

7  President position over customer marketing, a position of trust and confidence.  In

8  his executive position, Brawer was provided access to information that was both

9  sensitive and confidential, including, but not limited to, detailed information related

10  to development, manufacture, marketing, pricing, shipping, and performance of

11  Mattel's then-current and anticipated future product lines, and other confidential

12  business plans between Mattel and its most significant retail customers.

13     65.   In December 2003, Alan Kaye, Mattel's Senior Vice President of

14  Human Resources, asked Brawer whether he was discussing potential employment

15  with MGA.  Brawer denied that he had been in contact with MGA and represented

16  that he would not talk to MGA.  Throughout 2004, Mattel reminded and stressed to

17  its employees, including Brawer, the importance of protecting Mattel's confidential

18  and proprietary materials and information.

19     66.   On March 18, 2004, in response to a survey from the President of

20  Mattel Brands, Matt Bousquette, confirming compliance with Mattel's Code of

21  Conduct, Brawer wrote back that he "applaud[ed] the company's vigorous

22  protection of it's [sic] intellectual property," reflecting Brawer's clear

23  understanding that Mattel required its proprietary information to be kept

24  confidential.

25     67.   In April 2004, Mattel promoted Brawer to Senior Vice

26  President/General Manager.  The General Manager position also is an executive

27  position of trust and confidence.  The role of a General Manager is to lead a cross-

28  functional "Customer Business Team."  Each General Manager is accountable for a

EXHIBIT 11

PAGE 166

-47-

1    strategic partnership with a key Mattel retailer, covering all aspects of the business,

2    including both traditional toy sales and retail development of licensed products.

3          68.   In or about late May 2004, Brawer began performing General

4    Manager duties, working with one of Mattel's major retail customer accounts.

5    Thereafter, Brawer began receiving information related not only to the Senior Vice

6    President, Customer Marketing position that he still formally held, but also began

7    receiving detailed information related to his role as General Manager. Brawer

8    began requesting and analyzing detailed information related to Mattel and its four

9    key retail accounts.

10         69.   On September 15, 2004, Brawer left work at noon for observance

11   of Rosh Hashanah. As Brawer left, he carried a large cardboard box with binders

12   and other materials. Several hours after his departure, Brawer instructed his

13   assistant to print Mattel's 2004 Sales Plan for one of Mattel's significant customers

14   and to provide it to him, falsely claiming he needed it for a meeting

15         70.   On September 17, 2004, Brawer returned to Mattel and

16   immediately informed his supervisor that he was leaving Mattel, effective October

17   1, 2004, to work for competitor MGA.

18         71.   On September 20, 2004, Mattel hand-delivered a letter to Brawer

19   reminding him of his continuing obligation to preserve the confidentiality of

20   Mattel's proprietary information and trade secrets not only through October 1,

21   2004, but continuing beyond the termination of his employment.

22         72.   At his exit interview on September 29, 2004, Mattel reminded

23   Brawer that he had ongoing duties of confidentiality to Mattel, even after the

24   termination of his employment. Brawer was given a copy of his Original

25   Confidentiality Agreement, which he had signed on April 22, 1996, and another

26   copy of the Code of Conduct. During the exit interview, however, Brawer noted

27   that he had not signed the Code of Conduct, which he intended and Mattel

28   understood to mean that Brawer believed he was not bound by Mattel's policy

EXHIBIT 11

PAGE 167

1  because he had not signed it.  Brawer was unwilling to complete or sign the form

2  that sought to confirm that Brawer understood his ongoing obligations under the

3  Code of Conduct, which included the obligation to preserve the confidentiality of

4  Mattel's proprietary and trade secret information.

5         73.    On October 1, 2004, Brawer's final day of employment with

6  Mattel, Mattel hand-delivered to Brawer a letter that, among other things, reminded

7  Brawer of his confidentiality obligations to Mattel under the Code of Conduct.

8         74.    Upon joining MGA, Brawer became its Executive Vice-

9  President of Sales and Marketing.  In that role he was responsible for MGA's sales

10  worldwide.  As part of those responsibilities, Brawer had and continues to have

11  responsibility for MGA's accounts with the same retailers that he worked with

12  while at Mattel.

13         75.    Brawer represented during his Mattel exit interview that he had

14  returned all proprietary information to Mattel.  That representation was false.  On

15  information and belief, Brawer removed proprietary and trade secret information

16  from Mattel that he did not return.  Mattel is informed and believes that Brawer did

17  not return to Mattel, for example, the information contained in his contacts file.

18  The contacts file included contact information for Mattel customers, most notably

19  TRU, and extensive contact information for Mattel employees, including titles, e-

20  mail addresses and telephone numbers.

21         76.    Brawer has used that contact information on a regular basis.

22  Since leaving Mattel, Brawer has had contacts with Mattel employees, both by

23  telephone and by electronic mail.  Based on his knowledge of Mattel's operations

24  and the roles of certain Mattel employees, he has targeted certain Mattel employees

25  who have broad access to Mattel proprietary information in an effort to induce and

26  encourage them to join MGA and to steal or otherwise wrongfully misappropriate

27  Mattel confidential information and trade secrets.  Brawer has done so by

28  promising these Mattel employees salaries 25 percent or more higher than they earn

at Mattel and stating to them that they should not be concerned by legal action taken by Mattel to protect its trade secrets and its rights because such claims are hard to prove and easy to defeat.

## VI.  MGA HIRES OTHER KEY PERSONNEL FROM MATTEL IN ORDER TO OBTAIN TRADE SECRET AND HIGHLY CONFIDENTIAL INFORMATION REGARDING MATTEL'S FORECASTING & INVENTORY MANAGEMENT SYSTEMS

77.   On March 13, 2006, MGA recruited Jorge Castilla, Mattel's Planning Specialist for Operations, Planning & Finance. Before he left Mattel, Castilla stole on behalf of counter-defendants significant Mattel trade secrets and proprietary information.

78.   Castilla joined Mattel in November 1999 and, in positions both in Europe and the U.S., played a role in Mattel's development of highly proprietary processes and systems for forecasting and inventory management in which Mattel invested heavily. In Mattel's European operations, Mr. Castilla was involved in Mattel's development of a pilot program to improve sales forecasting in the United Kingdom, and later, with the potential application of the pilot program to Mattel's world-wide sales forecasting.

79.   In late 2004, Castilla worked with the International Planning group at Mattel's headquarters in El Segundo, California, where he was responsible for establishing Mattel's Electronic Data Warehouse system, a proprietary database containing highly confidential business information, such as sales, future/pending orders, product availability and sales forecasts at the stock keeping unit level. Additionally, he was responsible for implementing Mattel's customized sales forecasting system and preparing information for senior financial officers regarding inventory levels, sales demands and related topics.

80.   Throughout his tenure at Mattel, Castilla became privy to some of Mattel's most confidential and valuable information. Castilla acknowledged his

1  position of trust confidence and agreed that he would preserve and would not

2  disclose or misuse Mattel's proprietary or confidential information on numerous

3  occasions. For example, in Castilla's Employee Confidential Information and

4  Inventions Agreement, which he signed on October 29, 1999, he acknowledged

5  that he would develop and have access to Mattel proprietary information. Castilla

6  further agreed not to "disclose or use at any time either during or after my

7  employment with [Mattel], any Proprietary Information," and to "cooperate with

8  the Company and use [his] best efforts to prevent the unauthorized disclosure, use

9  or reproduction of all Proprietary Information." He also agreed that when he left

10  Mattel's employ, he would deliver to Mattel "all tangible, written, graphical,

11  machine readable and other materials (including all copies in [his] possession or

12  under [his] control containing or disclosing Proprietary Information."

13        81.  Castilla had agreed to the terms in Mattel's Code of Conduct to

14  preserve Mattel's confidential and proprietary information and was specifically

15  warned that "the unauthorized use or disclosure of [Mattel's] confidential,

16  proprietary or trade secret information" may result in the termination of his

17  employment. He further agreed:

18        Employees have an obligation to protect the Company's

19        confidential and proprietary information. Confidential and

20        proprietary information is any information which is not

21        generally known to the public that is useful to the

22        Company and that would either be useful to the

23        Company's competitors or third parties or harmful to the

24        Company or its customers, if disclosed. Confidential and

25        proprietary information includes, but is not limited to,

26        trade secrets, revenue and profit information and

27        projections, new product information, sales and marketing

28        plans, design and development plans, manufacturing

EXHIBIT ___11___

PAGE ___170___

-51-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1             processes, confidential personnel information and

2             information regarding potential acquisitions, divestitures

3             and/or investments.

4        82.  On Monday, March 13, 2006, Castilla informed Mattel that he

5 was resigning to take a position with MGA, as a Manager of Global Sales Planning,

6 with responsibilities that substantially paralleled those that he had at Mattel.

7        83.  During Castilla's exit interview on March 13, 2006, he was

8 provided with a document reminding him of his obligations to preserve Mattel's

9 confidential and proprietary information, including his obligations under Mattel's

10 Employee Confidential Information and Inventions Agreement, including but not

11 limited to "inventions, marketing plans, product plans, business strategies, forecasts

12 and personnel information." Further, Castilla filled out an exit interview checkout

13 form, in which he acknowledged receiving not only the reminder, but also the

14 Mattel Code of Conduct. Castilla also acknowledged that, during the course of his

15 employment at Mattel, he had received materials containing confidential and

16 proprietary information, and affirmed that he did not copy or disclose any of the

17 listed documents or the information that they contained to anyone outside of

18 Mattel, and denied having possession of any of the listed documents. He also

19 affirmed that he returned to Mattel all of its confidential and proprietary documents

20 by representing that he "brought them in on March 12, 2006, filed them and put

21 together a summary of ongoing projects for supervisor, Brenda [Ray-Martin],"

22        84.  Despite his affirmations to the contrary, as of Friday, March 10,

23 2006, Castilla had created a folder on his Mattel network share drive that he labeled

24 "To Take." The folder contained approximately 56 megabytes of information. The

25 bulk of that information was made up of documents containing Mattel trade secrets

26 and confidential information, including documents related to inventory

27 management and forecasting for Mattel, as well as a highly confidential document

28 prepared by Mattel's senior executives that laid out Mattel's future international

00505.07209/2875224.1      EXHIBIT  11      -52-
THIRD AMENDED ANSWER AND COUNTERCLAIMS
PAGE  171

1   business strategies and marketing priorities not only up to today, but also for the
2   coming years.

3       85.   Just prior to his resignation, Castilla entered Mattel's
4   headquarters building at approximately 9:30 a.m. on Sunday, March 12, 2006 and
5   departed at approximately 2:00 p.m. By Monday, March 13, 2006, Castilla had
6   deleted the "To Take" folder and its contents from his network share drive. Castilla
7   had transferred the information in the "To Take" folder and potentially the folder
8   itself to an e-mail account <hoclau04@gmail.com>, <hoclau04@yahoo.com>
9   and/or to a personal digital assistant device.

10      86.   When he was later interviewed by the FBI about his theft, on
11  information and belief Castilla turned over to the FBI agents the storage media
12  from his personal digital device which contained Mattel trade secrets. When
13  deposed in connection with this case, Castilla refused to answer questions about his
14  misconduct and instead invoked the Fifth Amendment nearly 500 times.

15      87.   Much of the Mattel trade secrets and confidential information
16  that Castilla took from Mattel related to the successful processes for efficient and
17  cost-effective management of inventory and the use of sophisticated forecasting
18  techniques that Mattel, through significant investment, developed to obtain a
19  competitive advantage in the toy industry with its unique order, manufacture and
20  delivery cycles. The former Mattel employees working at MGA recognized the
21  value of Castilla's knowledge. MGA was in dire need of improved inventory
22  management and forecasting, and to remedy this problem MGA targeted Castilla—
23  and the Mattel-specific knowledge that he possessed—and lured him to MGA.
24  With the benefit of the information that he brought with him, on information and
25  belief, MGA, including through Castilla, has used that proprietary and confidential
26  information to improve MGA's sales forecasting and inventory planning, thus
27  saving MGA many millions of dollars, and providing it with other advantages.

28

EXHIBIT  11

PAGE  172

-53-
THIRD AMENDED ANSWER AND COUNTERCLAIMS

## VII. MGA STEALS MATTEL TRADE SECRETS IN CANADA

88.   In an effort to increase its market share and sales in Canada and elsewhere, MGA stole Mattel trade secrets regarding Mattel's customers, sales, projects, advertising and strategy, not only for Canada, but the United States and the rest of the world.

89.   Janine Brisbois was a Director of Sales for the Girls Division in Canada. Mattel hired her as a National Account Manager in August 1999. When she was hired as a Mattel employee, Brisbois agreed that she would preserve and would not disclose Mattel's proprietary or confidential information. For example, Brisbois agreed:

> You must keep Mattel's Proprietary Information confidential,
> and you may only use or disclose such information as necessary
> to perform your job responsibilities in accordance with Mattel
> policies. Your obligation to keep Mattel's Proprietary
> Information confidential will continue even after any termination
> of your employment with your employer.
>
> . . .
>
> Mattel takes steps to maintain the secrecy and confidential nature
> of Mattel's Proprietary Information and, if a competitor
> discovered Mattel's Proprietary Information, it could
> significantly damage Mattel and your Employer.

90.   While with Mattel, Brisbois had responsibility for Mattel's account with TRU and later had responsibility for Mattel's Wal-Mart account. In her capacity as Sales Director-Wal-Mart/CTC/Girls Team, Brisbois had access to Mattel confidential and proprietary information regarding Mattel's future product lines, advertising and promotional campaigns and product profitability.

91.   On September 26, 2005, Brisbois resigned from Mattel to take a position as Vice President of Sales at MGA. Mattel is informed and believes that

00505.07209/2875224.1

EXHIBIT __11__           -54-
                        THIRD AMENDED ANSWER AND COUNTERCLAIMS

PAGE __173__

in that position Brisbois has responsibility for MGA's accounts with both TRU and Wal-Mart. During Brisbois' exit interview she was specifically asked whether she was "taking anything." Brisbois responded, "No." Both during and after her exit interview, Brisbois was advised by Mattel of her obligations to preserve Mattel's confidential and proprietary information.

92.   Mattel is informed and believes that Brisbois spoke with Isaac Larian, MGA's CEO, on September 22, 2005 at approximately 8:30 p.m., when he called Ms. Brisbois at her home. Mattel subsequently learned that on the same day that she spoke with Mr. Larian and four days before she resigned, Brisbois copied approximately 45 Mattel documents on to a USB or "thumb" drive with the volume label "BACKPACK." On information and belief, Brisbois removed the thumb drive from Mattel Canada's office by concealing it in her backpack or gym bag the last time that she left that office. These documents contained Mattel trade secret and proprietary information, and included:

- a document containing the price, cost, sales plan and quantity of every Mattel product ordered by every Mattel customer in 2005 and 2006;
- the BARBIE television advertising strategy and information concerning sales increases generated by television advertisements;
- competitive analysis of Mattel vis-à-vis its competitors in Canada;
- an analysis of Mattel's girls business sales beginning in 2003 and forecasts through 2006;
- profit and loss reviews for Mattel's products being sold in Wal-Mart, including margins and profit in not only Canada, but in the United States and Mexico; and
- a document containing the product launch dates and related advertising for all Mattel new products between Fall 2005 and Spring 2006.

93.   After Mattel discovered that Brisbois had copied these sensitive documents to a thumb drive, Mattel notified Canadian law enforcement authorities.

00505.07209/2875224.1

EXHIBIT   11

PAGE   174

-55-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1   Canadian law enforcement authorities recovered from Brisbois a thumb drive with

2   the volume label "BACKPACK" containing the documents that Brisbois had

3   copied from Mattel's computer system.  Mattel later learned that while she was

4   working as a Vice President of Sales at MGA, Brisbois accessed and modified

5   documents on that thumb drive.

6         94.   After joining MGA, Brisbois repeatedly traveled to MGA's

7   offices in Van Nuys, California and met with Larian and Brawer.  In February,

8   2006, knowing that Mattel trade secrets had been seized from MGA's Mexico City

9   offices and that at least three MGA employees were under criminal investigation,

10   MGA nonetheless issued a press release trumpeting its 2005 performance, with

11   Larian himself concluding, "Our international teams in Mexico and Canada have

12   done a fantastic job."

13   **VIII. AT MGA'S DIRECTION, MATTEL EMPLOYEES IN ADDITION TO**

14         **BRYANT SECRETLY WORK ON BRATZ FOR YEARS**

15         95.   MGA also knowingly bribed and secretly used Mattel employees

16   in addition to Bryant to work on MGA products such as Bratz while they were

17   Mattel employees and, furthermore, fraudulently concealed such activity.  On

18   December 28, 2007, MGA vendor and agent Veronica Marlow revealed at her

19   deposition that, beginning in 2000 and continuing over a time period spanning at

20   least five years, at least three Mattel employees in addition to Bryant worked on

21   Bratz while employed by Mattel:  Ana Isabel Cabrera, Beatriz Morales and Maria

22   Elena Salazar.  Like Bryant, these Mattel employees all signed agreements

23   assigning Mattel all rights to intellectual property they created while employed by

24   Mattel.  Each of the three Mattel employees worked for MGA through Marlow, to

25   whom MGA and Bryant have paid millions of dollars since 2000.

26         96.   Following Marlow's December 2007 deposition, Ms. Cabrera

27   and Ms. Morales, who were still Mattel employees, admitted to being paid for and

28   working on Bratz while Mattel employees and to knowing that such conduct was

wrong. Both specifically acknowledged that they continued to work on Bratz even after Mattel had made them aware of this litigation involving Bryant's secret, illegal work with MGA and had reiterated the need to protect Mattel's intellectual property. Both admitted that they tried to conceal their work for MGA.

97.   MGA and Larian knew that their bribery and use of Mattel employees was wrongful and took steps to conceal that misconduct. Among other things: (a) MGA and Larian, by and through their agents Peter Marlow and Veronica Marlow, used devices such as paying the Mattel employees in cash and using false names and false social security numbers in tax and other business records; (b) MGA and Larian continued their acts of bribery and other misconduct after this litigation was filed; (c) MGA and Larian failed to disclose their payments to these Mattel employees despite Court Orders compelling them to disclose any such instances; and (d) MGA and Larian hired Maria Elena Salazar after she left Mattel, even though she specifically touted in her employment application to MGA that she worked on the "first patterns for [the] Bratz doll and release;" and (e) in an email from Peter Marlow to Larian and Paula Garcia of MGA dated June 20, 2005, Marlow informed MGA that the pattern and sample makers "have secure day jobs with an outlook of many more years of stability," they "moonlight" to work on Bratz and "[t]hey have more than 100 years total of doll-making experience between them."

## IX.  MGA PERSUADES OTHER EMPLOYEES LEAVING MATTEL TO JOIN MGA TO MISAPPROPRIATE MATTEL TRADE SECRETS FOR THE BENEFIT OF MGA

98.   In the past few years, MGA has hired directly over 100 Mattel employees, ranging from Senior Vice-President level to lower level employees. On information and belief, many of these employees were specifically targeted and recruited by MGA, including by Larian and Brawer, based on the Mattel confidential and proprietary information they could access. Many of these

1    employees had access to proprietary and confidential Mattel information. Mattel
2    believes that some of those former Mattel employees may be observing their
3    obligations not to misappropriate, disclose or use Mattel's confidential and
4    proprietary information. Mattel is informed and believes, however, that certain
5    additional employees accessed, copied and took from Mattel confidential and
6    proprietary information, including Mattel's strategic plans; business operations,
7    methods and systems; marketing and advertising strategies and plans; future
8    product lines; product profit margins; and customer requirements. The
9    misappropriated confidential and proprietary information included information that
10   these Mattel employees were not authorized to access. On information and belief,
11   the misappropriated confidential and proprietary information taken from Mattel is
12   being disclosed to and used by MGA for the benefit of MGA and to the detriment
13   of Mattel.

14   **X.   LARIAN MAKES MISREPRESENTATIONS TO RETAILERS ABOUT**
15   **MATTEL'S PRODUCTS**

16            99.   Counter-defendants have engaged in other illegal practices in
17   their efforts to compete unfairly with Mattel. Larian has a practice of sending e-
18   mail messages to a "Bratz News" distribution list that Larian created or that was
19   created for him. Mattel is informed and believes that the recipients of e-mail
20   messages sent to the "Bratz News" distribution list include members of the media
21   as well as representatives of many of Mattel's most significant customers.

22            100.  On May 12, 2006, Larian sent an e-mail message to the "Bratz
23   News" distribution list that included a reference to Mattel's updated MY SCENE
24   MY BLING BLING product with real gems. Mattel had not publicly announced
25   this product at the time that Larian sent his May 12, 2006 e-mail. In fact, Mattel
26   had guarded the identification of this particular product.

27            101.  Shortly thereafter, Larian engaged in a campaign of calling
28   Mattel's most significant customers, including but not limited to Target and TRU,

00505 07209/2875224 1

**EXHIBIT** 11       -58-
**PAGE** 177          THIRD AMENDED ANSWER AND COUNTERCLAIMS

1  regarding the MY SCENE MY BLING BLING product with real gems.  In an

2  effort to dissuade these retailers from purchasing Mattel's MY SCENE MY BLING

3  BLING product with real gems, Larian knowingly made false factual statements

4  about that product to each retailer.  As of the writing of this Third Amended

5  Answer and Counterclaims, Mattel is aware that Larian represented to each retailer

6  that each was the only retailer to purchase the product and that Mattel would not be

7  supporting the product with television advertising.  At the time that Larian made

8  these statements, he knew them to be false.  As a result of Larian's

9  misrepresentations, at least one retailer cancelled its order for 75,000 units of the

10  MY SCENE MY BLING BLING product with real gems.  Only after Mattel

11  learned of Larian's misrepresentations and was able to correct them was Mattel able

12  to assure the retailer that Larian's representations were false and to persuade the

13  retailer to reinstate the order.

14        102.  Such conduct is not an isolated incident.  MGA and Larian, in an

15  effort to gain an unfair competitive advantage, repeatedly issued false and

16  misleading press releases and spread false rumors in the marketplace.  In these

17  press releases and in their other statements made in marketplace, MGA and Larian

18  have deliberately misrepresented Bratz's sales, Bratz's market share, Bratz's

19  position vis-à-vis Mattel's BARBIE products, sales of Mattel's BARBIE products

20  and the market share of Mattel's BARBIE products.

21  **XI.  LARIAN AND MGA DESTROY DOCUMENTS, ENGAGE IN**

22  **PERJURY, CONSPIRACY TO COMMIT PERJURY AND**

23  **OBSTRUCTION OF JUSTICE**

24        103.  On information and belief, Larian and MGA have themselves,

25  and through their agents and co-conspirators, destroyed, altered, fabricated and

26  back-dated documents and engaged in other acts of spoliation to conceal the

27  existence, nature and breadth of their wrongful conduct.  For example, and without

28  limitation, Farhad Larian, a former MGA executive and director and Isaac Larian's

1  brother, deliberately destroyed several boxes of documents relevant to Mattel's

2  claims against Bryant and MGA to keep them from Mattel.  Farhad Larian did so

3  while still on MGA's payroll.

4         104.  On information and belief, Larian and MGA have also conspired

5  to commit perjury and engaged in acts of perjury and other acts of obstruction in

6  connection with MGA's theft of Mattel's property and Mattel's claims relating

7  thereto.  These actions include, among others, MGA's submission of false

8  information in sworn applications to the U.S. Copyright Office; Larian's repeated

9  sworn testimony during Phase 1 that Bryant told him, and that Larian believed, that

10 Bryant had not created Bratz while employed by Mattel; MGA's and Larian's

11 submission of false statements regarding MGA's ability to receive outside funding

12 in court pleadings and false statements regarding its financial condition in this

13 action.

14 **XII. MGA AND LARIAN LAUNDER MONEY, ENGAGE IN**

15      **FRAUDULENT TRANSFERS AND ATTEMPT TO OBTAIN SHAM**

16      **PRIORITY OVER MATTEL'S CLAIMS**

17        105.  MGA and Larian, on information and belief, have engaged in

18 and continue to engage in a complex scheme to transfer, launder or otherwise hide

19 the ill-gotten funds they have obtained by virtue of their unlawful conduct and have

20 gone to extensive lengths to cover up and obscure such activities.  On information

21 and belief, this scheme was orchestrated and/or commenced no later than 2007, but

22 accelerated during the pendency of trial, especially after the Jury's Phase 1A

23 verdict in Mattel's favor.  This scheme continues to and beyond this day and

24 threatens to continue into the future.

25        106.  On information and belief, in concert with various co-

26 conspirators and shell companies controlled by them, acting on their behalf or in

27 which they have an interest, MGA and Larian have transferred or transported, or

28 caused to be transferred or transported, funds obtained through their unlawful

1   conduct in interstate commerce, including without limitation out of the United
2   States. At least some of these funds, on information and belief, were later returned
3   to the United States through shell entities that attempt to disguise not only the true
4   owners of the companies, but the origin and source of the funds as well.

5          107. These entities have, on information and belief, funded further
6   wrongdoing by MGA and Larian, including the purported purchase, at a substantial
7   discount, of notes held by MGA's then-largest creditor, Wachovia, and other
8   members of a bank syndicate. By this scheme, Larian and his co-conspirators
9   sought to disguise their identities and to obtain purported priority as an alleged
10  secure creditor (rather than as a shareholder) over Mattel's claims against MGA
11  and MGA's assets, including without limitation Bratz assets. On information and
12  belief, MGA and Larian conducted and participated in this scheme with the purpose
13  of concealing and manipulating their assets and liabilities and the appearance of
14  their financial condition in anticipation of their liability to Mattel, and for the
15  purpose of minimizing any exposure due to that liability. The scheme has directly
16  assisted MGA and Larian in committing the other wrongs against Mattel identified
17  herein.

18  **A.     Larian and MGA Create Various Shell and Off-Shore Entities**

19         108. On information and belief, Larian and MGA, and those acting in
20  concert with them, have created, affiliated with, employed or purchased one or
21  more shell entities to either transfer or assist in the transfer of proceeds generated
22  by their unlawful conduct and the criminal enterprises. These include, but are not
23  limited to, the following entities and transactions:

24      • Lexington Financial Limited ("Lexington"), a company purportedly
25        based in the Caribbean island nation of Nevis that is notorious for its
26        secrecy laws. Lexington, whose purported London business address
27        listed in filings with the State of California is nothing more than a
28        virtual office provided by a London company for a few dollars a month,

00505.07209/2875224.1

EXHIBIT __11__          -61-
                              THIRD AMENDED ANSWER AND COUNTERCLAIMS

PAGE __180__

1  appears to be a non-operating shell corporation.  Lexington was
2  registered on March 3, 2006 by persons who, on information and belief,
3  were acting on behalf of or in concert with Larian, and Larian and his
4  co-conspirators used and continue to use Lexington to conceal, receive,
5  hold and transfer funds generated by the wrongful conduct alleged
6  herein.

7  • Vision Capital, LLC, a Delaware limited liability company ("Vision
8  Capital"), which, on information and belief, was created by persons at
9  the direction or on behalf of Larian on August 19, 2008, just after the
10  Phase 1A verdict in Mattel's favor.  On information and belief, Larian
11  and his co-conspirators used and continue to use Vision Capital to
12  conceal, receive, hold and transfer funds generated by their wrongful
13  conduct alleged herein.

14  • Omni 808 Investors, LLC, a California limited liability corporation
15  ("Omni 808"), which, on information and belief, was created at the
16  direction or on behalf of Larian on August 12, 2008, just after the Phase
17  1A verdict in Mattel's favor.  On information and belief, Larian and his
18  co-conspirators used and continue to use Omni 808 to conceal, receive,
19  hold and transfer funds generated by their wrongful conduct alleged
20  herein.  In 2006, Neil Kadisha, the alleged CEO of Omni 808 and a
21  Larian co-conspirator, was found by a court after trial to be "no more
22  than a common thief" and was held liable for stealing millions of
23  dollars as part of a decade-long pattern of fraudulent conduct that
24  included perjury, subornation of perjury, fabrication of financial
25  records, sham transactions, preparation of back-dated documents,
26  fraudulent accountings, acts of looting, embezzlement and other
27  misappropriations of funds, breaches of fiduciary duty, conflicts of
28  interest and illegal self-dealing.

109.  Lexington claims a purported security interest in the assets of Vision Capital.  Vision Capital claims a purported security interest in the assets of Omni 808.

110.  MGA and Larian, and their co-conspirators, have, on information and belief, used these entities to transfer their ill-gotten funds from the United States and/or to move laundered funds back into the United States, including without limitation in an attempt to obtain purported priority as an alleged secured creditor over Mattel's claims and to deprive Mattel of assets to which it has a legitimate claim.

111.  On information and belief, Lexington, Vision Capital and Omni 808 are alter-egos of each other, the companies being mere shells created and operated pursuant to a fraudulent scheme as alleged herein, and with their financial affairs being significantly intermingled and interconnected.

112.  On information and belief, Larian, either alone or with other co-conspirators, formed or caused to be formed the alter-ego entity IGWT Group on June 26, 2008—during the Phase 1 trial—and registered its place of business as Larian's home address.  On information and belief, Larian, either alone or with other co-conspirators, also formed or caused to be formed an affiliate alter-ego entity called IGWT 826 Investments on August 27, 2008—the day after the Phase 1 trial ended.  IGWT 826 Investments is registered at the home address of Shirin Makabi and Jahangir Eli Makabi.  Shirin Makabi is Isaac Larian's sister, Jahangir Eli Makabi is Isaac Larian's brother-in-law, and both are shareholders or beneficial shareholders of MGA through various trusts.

B.    The Purported Acquisition of the Wachovia Debt

113.  After the Phase 1A verdict, MGA and Larian represented on multiple occasions to both this Court and the Ninth Circuit that MGA was in dire financial straits and might file imminently for bankruptcy.  MGA and Larian represented to the Court that MGA had not obtained and could not obtain funding

1    (a representation that MGA later was forced to retract as false).  At the same time

2    MGA's largest lender, Wachovia, accelerated over $313 million dollars worth of

3    debt that MGA owed it and triggered the lock-box provision of its loan agreements

4    with MGA, which required the transfer to Wachovia of all, or substantially all, of

5    the revenue that MGA received.

6            114.  On information and belief, Larian and MGA, and their co-

7    conspirators, in order to maintain control over MGA's revenue and to frustrate the

8    jury's verdicts in Mattel's favor, determined to purchase the Wachovia note

9    through various entities affiliated with Larian or with MGA.  On information and

10   belief, Larian intended to use Lexington, Vision Capital, Omni 808, the IGWT

11   entities and other vehicles currently unknown to Mattel (because of the efforts by

12   MGA, Larian, Omni 808 and their co-conspirators to conceal them) to distance

13   himself from the transaction and thereby conceal the true source of the funds used

14   to purportedly purchase the Wachovia note and to conceal that Larian in fact

15   participated in or controlled the acquisition of the debt, directly or indirectly.  On

16   information and belief, at Larian's urging and acting in concert with Larian, Omni

17   808 purportedly acquired the bulk of that debt at a massive discount.

18           115.  Omni 808 has represented to the Court that its claimed

19   acquisition of the Wachovia note was an arms-length business deal.  Omni 808 has

20   also represented to the Court that the funds used for the purported acquisition did

21   not originate from MGA or Larian.  Wachovia and others, however, recently

22   produced documents that undermine these claims and representations.  For

23   example, a July 29, 2008 offer letter to Wachovia states that Larian would have a

24   non-voting limited interest in the loan acquisition.  As another example, a Senior

25   Promissory Note between MGA and Wachovia, dated September 3, 2008,

26   specifically identifies Omni 808 as an affiliate of MGA.

27           116.  Moreover, Vision Capital, which claims it holds a purported

28   security interest in Omni 808, is also affiliated with MGA.  Vision Capital has

C0505.07209/2875224.1

EXHIBIT 11                          -64-
                              THIRD AMENDED ANSWER AND COUNTERCLAIMS

PAGE ___183___

1   listed its address as 1525 South Broadway, Los Angeles, California. Mattel has not

2   been able to identify an active business named Vision Capital located there. Mattel

3   did identify this as the location of Neman Brothers & Associates, a business owned

4   by Leon Neman, Larian's brother-in-law who has served as an MGA director.

5   After Mattel uncovered these facts, Mr. Neman claimed to be an alleged principal

6   of Vision Capital.

7        117. On information and belief, the funds Omni 808 used to

8   purportedly purchase the Wachovia note were, in whole or in part, generated by

9   Larian's and MGA's wrongful conduct directed towards Mattel. On information

10   and belief, Larian has used, at least in part, IGWT Group, IGWT 826 Investments,

11   Lexington, Vision Capital and other shell and alter-ego companies as conduits to

12   transfer funds to Omni 808 and others and to conceal the source of such funds.

13       118. MGA and Larian have now also admitted that Omni 808

14   provided additional funds to MGA beyond the Wachovia debt purchase, though

15   MGA first denied that was the case. MGA and Omni 808 entered into a Secured

16   Delayed Draw Demand Note on October 16, 2008. Pursuant to the terms of that

17   Note, Omni 808 would make available up to $40 million of additional purported

18   credit to MGA. Pursuant to a written request submitted by MGA on October 17,

19   2008, Omni 808 loaned MGA an additional $6 million under that Note. On

20   information and belief, those funds also were, in whole or in part, generated by

21   Larian's and MGA's wrongful conduct towards Mattel and transferred through

22   Larian-controlled conduits to conceal the true source of the funds. In fact, the

23   Secured Delayed Draw Demand Note between MGA and Omni 808 states that

24   Omni 808's funding came, at least in part, from IGWT 826 Investments.

25       119. On information and belief, Omni 808's claimed acquisition of

26   the Wachovia note was not an "arms-length" transaction by an independent

27   investor or investors. Instead it was, on information and belief, an insider

28   transaction facilitated by Larian and MGA through the use of nominally

1   independent but affiliated entities, for wrongful purposes that include without
2   limitation maintaining substantial control over MGA's revenues in the near term,
3   continuing with their wrongful activities despite the jury's verdict against them and
4   establishing purported priority as a secured creditor over Mattel's claims in any
5   eventual bankruptcy. On information and belief, Larian participated and was
6   involved in the purported acquisition of MGA's debt, though the claimed
7   acquisition was structured to conceal it from Mattel.

8       120.   While the precise mechanisms by which Larian transferred funds
9   and manipulated MGA's and Larian's finances through these conduits is not yet
10  known to Mattel because such information is in the exclusive possession and
11  control of MGA, Larian and their co-conspirators, and they have refused to disclose
12  or misrepresented even basic information such as the alleged owners of the entities,
13  on information and belief Larian and his affiliates have created shell entities for the
14  purpose of obscuring and concealing the true ownership of assets held and origin of
15  funds transferred, while Larian and his family members and affiliates further have
16  made massive distributions and other payments totaling hundreds of millions of
17  dollars from MGA to themselves and engaged in a series of related-party
18  transactions as part of a scheme to convert at least tens of millions of dollars in
19  MGA equity into debt.

20      121.   For example, according to an MGA Lender Update dated
21  November 1, 2007, in approximately August 2007, MGA made purported loans in
22  the amount of 2.5 million euros for investments in another toy company, called
23  Zapf, purportedly on behalf of Larian and his family. Another 12 million euros
24  were due in November 2007, for which MGA was liable if Larian did not
25  contribute. As shown in a Master Assignment and Exchange Agreement between
26  Omni 808, MGA, and MGA de Mexico and Wachovia and dated September 3,
27  2008, soon after the Phase 1A verdict and during the Phase 1B trial Larian and his
28  family members (including, without limitation, Jahangir Eli Makabi and Shirin

1   Larian Makabi as Co-Trustees of the Makabi Living Trust, Isaac Larian and Angela

2   Larian as Trustees of the Larian Living Trust, the Angela Larian Qualified Annuity

3   Trust, the Isaac E. Larian Qualified Annuity Trust, the Jahangir Eli Makabi

4   Qualified Annuity Trust, Jahangir Eli Makabi, and the Shirin Larian Makabi

5   Qualified Annuity Trust) executed a series of twenty-two separate transactions (on

6   August 4, 5, 8, 19, 25, 2008) which purported to transfer as loans by shareholders

7   over $13.3 million from U.S. based trust accounts to MGA Entertainment (HK)

8   Limited.  Another series of twenty-two transfers (also on August 4, 5, 8, 19, 25,

9   2008) show that Larian and these same family members, MGA shareholders, have

10   also purported to loan nearly $6 million in funds to MGA.

11       C.    **Larian Loots MGA's Assets by Selling MGA Inventory to Himself**

12              **at Fire Sale Prices**

13          122.  On information and belief, Larian and MGA have transferred and

14   are continuing to transfer assets from MGA by coordinating the sale of significant

15   MGA inventory, at substantial discounts, to companies affiliated with Larian.

16   These transactions have had the effect of denuding MGA of its most valuable

17   inventory, sold to Larian's own companies for pennies on the dollar, while

18   permitting Larian to substantially benefit by reselling MGA's inventory, and while

19   further infringing Mattel's intellectual property.

20          123.  On information and belief, Larian, through the Larian-controlled

21   IGWT entities, is purchasing Bratz products that infringe Mattel's rights and other

22   MGA products for steep discounts and reselling, distributing and offering for sale

23   such products.  MGA has admitted that it sold tens of millions of dollars in Bratz

24   inventory to IGWT entities at a "substantial discount."  Documents show that the

25   discount on this self-dealing transaction was in fact massive.

26          124.  In May of 2008, when MGA was undergoing cash-flow

27   problems for reasons that included Larian's on-going de facto liquidation of MGA

28   assets, Larian arranged to have MGA purportedly sell vast amounts of MGA

1  inventory, including infringing Bratz products, to himself through the IGWT

2  Group.  As shown by an Inventory Purchase Agreement between MGA and IGWT

3  Group, dated July 7, 2008, MGA purportedly agreed to sell hundreds of thousands

4  of inventory items to Larian's IGWT Group.  This agreement was signed by Larian

5  on behalf of both MGA and IGWT Group.  Through this transaction, MGA sold

6  inventory with a retail value of more than $65 million for just $5.3 million.

7        125.  MGA and Larian have claimed that the arrangement was to

8  MGA's benefit because the deal involved obsolete and overstock inventory.

9  However, as the Bill of Sale accompanying the agreement (which shows the SKUs

10  of the products IGWT Group purchased) shows, inventory MGA sold to IGWT

11  Group included current inventory, including current Bratz products.

12        126.  The full extent of this and other transactions by which Larian has

13  arranged the substantially discounted sale of MGA assets to IGWT Group or other

14  Larian-controlled entities or affiliates is not yet known to Mattel because such

15  information is in the exclusive possession and control of MGA, Larian, the IGWT

16  entities and their co-conspirators, and they have refused to disclose information to

17  Mattel.  On information and belief, by arranging this type of transaction with

18  IGWT Group and other similar insider transactions yet unknown to Mattel, Larian

19  has siphoned significant MGA assets for his own personal benefit.  On information

20  and belief, the purported transaction with IGWT Group is only the most recent in a

21  series of insider arrangement facilitated by Larian, which, by May 16, 2008, led

22  Wachovia to conclude that Larian had engaged in a de-facto liquidation of MGA's

23  assets over the course of 2008 and other times.

24

25

26

27

28

00505.07209/2875224.1

EXHIBIT __11__

PAGE __187__

-68-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

# CLAIMS FOR RELIEF

## First Counterclaim

### Copyright Infringement

### (Against MGA, MGA Entertainment (HK) Limited,

### Larian, Bryant and Does 4 through 10)

127. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 126, above, as though fully set forth at length.

128. Mattel is the owner of copyrights in works that are fixed in tangible media of expression and that are the subject of valid, and subsisting, copyright registrations owned by Mattel. These include, without limitation, the works that are the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-378-650, VA 1-378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-378-655, VA 1-378-656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-378-660, VAu 715-270, VAu 715-271 and VAu 715-273. These also include, without limitation, the works that are the subject of Registrations VAu 960-439, VAu 964-304, VAu 964-306, VAu 964-308, VAu 964-309, VAu 964-310, VAu 964-311, VAu 964-315, VAu 964-318, VAu 964-319, VAu 964-320 and VAu 964-321.

129. Counter-defendants have reproduced, created derivative works from and otherwise infringed upon the exclusive rights of Mattel in its protected works without Mattel's authorization. Counter-defendants' acts violate Mattel's exclusive rights under the Copyright Act, including without limitation Mattel's exclusive rights to reproduce its copyrighted works and to create derivative works from its copyrighted works, as set forth in 17 U.S.C. §§ 106 and 501.

130. Counter-defendants' infringement (and substantial contributions to the infringement) of Mattel's copyrighted works is and has been knowingly made without Mattel's consent and for commercial purposes and the direct financial benefit of Counter-defendants. Counter-defendants, moreover, have deliberately

00505.07209/2875224.1

EXHIBIT __11__

PAGE __188__

-69-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1  failed to exercise their right and ability to supervise the infringing activities of
2  others within their control to refrain from infringing Mattel's copyrighted works
3  and have failed to do so in order to deliberately further their significant financial
4  interest in the infringement of Mattel's copyrighted works.  Accordingly, Counter-
5  defendants have engaged in direct, contributory and vicarious infringement of
6  Mattel's copyrighted works.

7         131.  By virtue of Counter-defendants' infringing acts, Mattel is
8  entitled to recover Mattel's actual damages plus Counter-defendants' profits,
9  Mattel's costs of suit and attorneys' fees, and all other relief permitted under the
10 Copyright Act.

11        132.  Counter-defendants' actions described above have caused and
12 will continue to cause irreparable damage to Mattel, for which Mattel has no
13 remedy at law.  Unless Counter-defendants are restrained by this Court from
14 continuing their infringement of Mattel's copyrights, these injuries will continue to
15 occur in the future.  Mattel is accordingly entitled to injunctive relief restraining
16 Counter-defendants from further infringement.

17                            Second Counterclaim

18       Violation of the Racketeer Influenced and Corrupt Organizations Act

19                         18 U.S.C. §§ 1962(c) and 1964(c)

20                        (Against All Counter-defendants)

21        133.  Mattel repeats and realleges each and every allegation set forth in
22 paragraphs 1 through 132, above, as though fully set forth at length.

23        134.  Beginning at various times from approximately 1999 through the
24 filing of this Third Amended Answer and Counterclaims, in the Central District of
25 California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK)
26 Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and
27 Brawer, Trueba, Vargas, Castilla and Brisbois were employed by and associated-in-
28 fact with an enterprise engaging in, and the activities of which affect, interstate and

00505.07209/2875224.1

EXHIBIT __11__

PAGE __189__

-70-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1 │ foreign commerce (the "MGA Criminal Enterprise"). The MGA Criminal
2 │ Enterprise is made up of the MGA Group (MGA, MGA Entertainment (HK)
3 │ Limited, MGA de Mexico, Larian, certain of the Doe Counter-defendants and
4 │ Brawer), the Bryant Group (Bryant and certain of the Doe Counter-defendants), the
5 │ Mexican Group (Machado, Trueba and Vargas) and the Canadian Group (Brisbois).
6 │      135. In addition, beginning at various times from approximately 1999
7 │ through the filing of this Third Amended Answer and Counterclaims, in the Central
8 │ District of California and elsewhere, Counter-defendants MGA, MGA
9 │ Entertainment (HK) Limited, Larian and Bryant, and certain of the Doe Counter-
10 │ defendants, were employed by and associated-in-fact with a second enterprise
11 │ engaging in, and the activities of which affect, interstate and foreign commerce (the
12 │ "Bratz Criminal Enterprise").
13 │      136. Further, beginning at least as early 2007, and through the filing
14 │ of this Third Amended Answer and Counterclaims, in the Central District of
15 │ California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK)
16 │ Limited and Larian, as well as IGWT Group, IGWT 826 Investments, Lexington,
17 │ Omni 808, Vision Capital, Leon Neman, Fred Mashian, Neil Kadisha, Jahangir Eli
18 │ Makabi, Shirin Larian Makabi, Angela Larian, The Makabi Living Trust, The
19 │ Larian Living Trust, The Angela Larian Qualified Annuity Trust, The Isaac E.
20 │ Larian Qualified Annuity Trust, The Jahangir Eli Makabi Qualified Annuity Trust,
21 │ The Shirin Larian Makabi Qualified Annuity Trust and certain of the Doe Counter-
22 │ defendants, and others acting in concert with or on behalf of the foregoing, were
23 │ employed by and associated-in-fact with another enterprise engaging in, and the
24 │ activities of which affect, interstate and foreign commerce (the "IGWT Criminal
25 │ Enterprise").
26 │      137. MGA, MGA Entertainment (HK) Limited, MGA de Mexico,
27 │ Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas,
28 │ Brisbois, Castilla and the Other Former Employees, and each of them, for the

EXHIBIT **11**

PAGE **190**

-71-

1    purpose of executing and attempting to execute the scheme to improperly defraud

2    Mattel and steal its trade secret or otherwise confidential and proprietary

3    information and infringe Mattel's rights and conceal such misconduct, by means of

4    tortious, fraudulent and criminal conduct, did and do unlawfully, willfully and

5    knowingly conduct and participate, directly and indirectly, in the conduct of the

6    MGA Criminal Enterprise's affairs and, in the case of MGA, MGA Entertainment

7    (HK) Limited, Larian, Bryant, and certain of the Doe Counter-defendants, the Bratz

8    Criminal Enterprise's affairs, through a pattern of racketeering activity. Their

9    actions include multiple, related acts in violation of: 18 U.S.C. § 1341 (mail fraud),

10   18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1503 (influencing or injuring officer or

11   juror generally), 18 U.S.C. § 1512 (tampering with a witness victim, or informant),

12   18 U.S.C. § 1952 (interstate and foreign travel to aid racketeering), and 18 U.S.C. §

13   2319(a) and 17 U.S.C. § 506(a)(1)(A) (criminal copyright infringement).

14          138.  In addition, MGA, MGA Entertainment (HK) Limited, Larian,

15   IGWT Group, IGWT 826 Investments, Lexington, Omni 808, Vision Capital, Leon

16   Neman, Fred Mashian, Neil Kadisha, Jahangir Eli Makabi, Shirin Larian Makabi,

17   Angela Larian, The Makabi Living Trust, The Larian Living Trust, The Angela

18   Larian Qualified Annuity Trust, The Isaac E. Larian Qualified Annuity Trust, The

19   Jahangir Eli Makabi Qualified Annuity Trust, The Shirin Larian Makabi Qualified

20   Annuity Trust and Does 4 through 10, and each of them, for the purpose of

21   executing and attempting to execute the scheme to infringe Mattel's rights and

22   transfer, transport or launder the ill-gotten gains from their infringements and the

23   MGA and Bratz Criminal Enterprises' thefts and infringements, and secret MGA

24   assets and purportedly obtain priority over Mattel, by means of tortious, fraudulent,

25   and criminal conduct, did and do unlawfully, willfully, and knowingly conduct and

26   participate, directly and indirectly, in the conduct of the IGWT Criminal

27   Enterprise's affairs through a pattern of racketeering activity. Their actions include

28   multiple, related acts in violation of:  18 U.S.C. § 1341 (mail fraud), 18 U.S.C.

EXHIBIT  11                      -72-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1  § 1343 (wire fraud), 18 U.S.C. § 1952 (interstate and foreign travel to aid

2  racketeering), 18 U.S.C. § 152(7) (concealment of assets), 18 U.S.C. § 1956

3  (money laundering) and 18 U.S.C. § 1957 (use of unlawful funds) and 18 U.S.C. §

4  2319(a) and 17 U.S.C. § 506(a)(1)(A) (criminal copyright infringement).

5  139. MGA, MGA Entertainment (HK) Limited, MGA de Mexico,

6  Larian, Bryant, Machado, Does 4 through 10, and the other members of the MGA

7  Criminal Enterprise, Bratz Criminal Enterprise and IGWT Criminal Enterprise, and

8  each of them, shared the common purpose of enabling MGA to defraud Mattel and

9  infringe its rights, and obtain confidential, proprietary and otherwise valuable

10  Mattel property through improper means, and conceal and transfer, transport or

11  launder the ill-gotten gains from such misconduct, and secret MGA assets and

12  purportedly obtain priority over Mattel, in order to assist MGA in illegally

13  competing with Mattel domestically and throughout the world.

14  140. The MGA Criminal Enterprise, Bratz Criminal Enterprise and

15  IGWT Criminal Enterprise as described herein are and have been at all relevant

16  times continuing enterprises. The conduct of each enterprise continues through the

17  date of this Third Amended Answer and Counterclaims and is ongoing, including

18  by virtue of MGA's continuing use and infringement of Mattel's information,

19  property and rights, and its use of ill-gotten gains from such thefts, all to the

20  detriment of Mattel. Said enterprises furthermore threaten to continue such

21  conduct into the future, to the detriment of Mattel.

22  141. The pattern of racketeering activity, as defined by 18 U.S.C.

23  §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat

24  of continuing criminal activity. This activity consists of multiple acts of

25  racketeering by each member of the MGA Criminal Enterprise, Bratz Criminal

26  Enterprise and IGWT Criminal Enterprise, is interrelated, not isolated and is

27  perpetrated for the same or similar purposes by the same persons. This activity

28  extends over a substantial period of time, up to and beyond the date of this Third

1   Amended Answer and Counterclaims.  These activities occurred after the effective
2   date of 18 U.S.C. §§ 1961 *et seq.,* and the last such act occurred within 10 years
3   after the commission of a prior act of racketeering activity.  These racketeering
4   activities included repeated acts of:

5        (a)   Mail Fraud:  Counter-defendants MGA, MGA Entertainment
6   (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, and
7   Does 4 through 10, as well as some or all other members of the
8   MGA and IGWT Criminal Enterprises, aided and abetted by each
9   other, having devised a scheme or artifice to defraud Mattel of its
10   confidential trade secret information and property by conversion,
11   false representations, concealment and breaches of fiduciary duty,
12   and transfer, transport or launder the ill-gotten gains from such
13   thefts, and secret MGA assets and purportedly obtain priority
14   over Mattel, did for the purpose of furthering and executing such
15   a scheme or artifice to defraud, deposited or caused to be
16   deposited matters or things to be sent or delivered by the Postal
17   Service, or any private or commercial interstate carrier, or took or
18   received matters or things therefrom, or knowingly caused
19   matters or things to be delivered by mail or such carrier according
20   to the direction thereon, or at the place at which it is directed to
21   be delivered by the person to whom it is addressed, in violation of
22   18 U.S.C. § 1341 and 18 U.S.C. § 2, as alleged with greater
23   particularity in the foregoing paragraphs and as evidenced by,
24   among other acts of mail fraud, the true and correct copies of
25   communications and other evidence included in Exhibit C, D and
26   E;

27        (b)   Wire Fraud: C ounter-defendants MGA, MGA Entertainment
28   (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, and

00505.07209/2875224.1

EXHIBIT **11**

PAGE ____ **193**

-74-

Does 4 through 10, as well some or all other members of the MGA and IGWT Criminal Enterprises, aided and abetted by each other, having devised a scheme or artifice to defraud Mattel of its confidential and trade secret information and property by conversion, false representations, concealment and breaches of fiduciary duty, and transfer, transport or launder the ill-gotten gains from such thefts, and secret MGA assets and purportedly obtain priority over Mattel, did for the purpose of furthering and executing such a scheme or artifice to defraud, transmit and cause to be transmitted by means of wire communications in interstate or foreign commerce, writing, signs, signals, pictures or sound, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs and as evidenced by, among other acts of wire fraud, the true and correct copies of communications and other evidence included in Exhibit C, D and E;

(c) Tampering With a Witness, Victim or Informant: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, did corruptly alter, destroy, mutilate, or conceal more than one record, document, or other object, or attempted to do so, with the intent to impair the object's integrity or availability for use in an official proceeding, including this action, including without limitation by:

i.      altering Bryant's contract with MGA relating to Bratz to conceal evidence that Bryant faxed the contract from the BARBIE COLLECTIBLES department of Mattel, using a fax

EXHIBIT 11

PAGE 194

-75-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

machine owned by Mattel and while Bryant was employed by Mattel;

      ii.    altering numerous original Bratz drawings created by Bryant by adding false and misleading date notations of "8/1998" and "© 8/1998" to the drawings even though the drawings were not created in August 1998; and

      iii.    destroying electronic and other evidence, including by destroying evidence previously contained on Carter Bryant's and Isaac Larian's computer hard drives, and destroying or causing to be destroyed evidence in possession of Farhad Larian;

      iv.    altering tax records and other business documents, including by use of false names and false social security numbers, to conceal the bribery of Mattel employees;

      Such actions are in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(d)    <u>Influencing or Injuring Officer or Juror Generally</u>:  Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, as well as some or all of the remaining members of the MGA Criminal Enterprise, aided and abetted by each other, did seek to corruptly impede, obstruct or influence the due administration of justice, including without limitation by:

      i.    Larian's and MGA's submission of false information in sworn applications to the U.S. Copyright Office and the U.S. Patent Office;

EXHIBIT 11

PAGE 195

-76-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

0505 07209/2875224.1

ii.     Larian repeatedly giving false testimony during the Phase 1 trial that Bryant told him (and that Larian believed) that Bryant had not created Bratz while employed by Mattel;

iii.     Larian's and MGA's submission of false statements regarding MGA's ability to receive outside funding and numerous false statements regarding its financial condition in this action;

Such actions are in violation of 18 U.S.C. § 1503 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(e)     Interstate and Foreign Travel in Aid of Racketeering Enterprises: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, as well as some or all of the remaining members of the MGA Criminal Enterprise and IGWT Criminal Enterprise, aided and abetted by each other, traveled in interstate and foreign commerce, or used the mail or any facility in interstate or foreign commerce, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity, *i.e.* bribery, in violation of the laws of the State of California, *Cal. Penal Code* § 641.3, all in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing and following paragraphs; money laundering in violation of 18 U.S.C. § 1956(a), as alleged with greater particularity in the foregoing and following paragraphs; and engaging in monetary transactions involving property derived from unlawful activities in violation of 18

EXHIBIT __11__

PAGE __196__

THIRD AMENDED ANSWER AND COUNTERCLAIMS

00505.07209/2875224.1

U.S.C. § 1957(a), as alleged with greater particularity in the foregoing and following paragraphs;

(f)   <u>Money Laundering</u>:  Counter-defendants MGA, MGA Entertainment (HK) Limited and Larian and Does 4 through 10, as well as some or all of the remaining members of the MGA and IGWT Criminal Enterprises, aided and abetted by each other, willfully engaged in financial transactions which were intended to conceal or disguise the nature, the location, the source, the ownership, or the control of the ill-gotten proceeds of their criminal activities or were intended to further promote the carrying on of their criminal activities, all in violation of 18 U.S.C. § 1956(a), as alleged with greater particularity in the foregoing paragraphs;

(g)   <u>Engaging in Monetary Transactions in Property Derived from Unlawful Activity</u>:  Counter-defendants MGA, MGA Entertainment (HK) Limited, Larian, and Does 4 through 10, as well as some or all of the remaining members of the MGA and IGWT Criminal Enterprises, aided and abetted by each other, willfully engaged in monetary transactions in criminally derived property of a value greater than $10,000 derived from their unlawful criminal activities, all in violation of 18 U.S.C. § 1957(a), as alleged with greater particularity in the foregoing paragraphs;

(h)   <u>Concealment of Assets</u>:  Counter-defendants MGA, MGA Entertainment (HK) Limited, Larian, and Does 4 through 10, as well as some or all of the remaining members of the MGA and IGWT Criminal Enterprises, aided and abetted by each other, willfully sought to transfer or conceal property, and/or concealed,

destroyed, mutilated, falsified or made false entries in recorded information relating to such property, in contemplation of a bankruptcy proceeding, all in violation of 18 U.S.C. § 152(7) & (8), as alleged with greater particularity in the foregoing paragraphs;

(i) <u>Criminal Copyright Infringement</u>: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, as well as some or all other members of the MGA and IGWT Criminal Enterprises, aided and abetted by each other, willfully infringed and continue to willfully infringe Mattel's copyrights, including without limitation with respect to documents containing Mattel trade secret and confidential information and Bratz works created by Bryant and others while Mattel employees, for purposes of commercial advantage and private financial gain, all in violation of 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A), as alleged with greater particularity in the foregoing paragraphs.

142. The persons alleged herein to have violated 18 U.S.C. § 1962(c) are separate from, though employed by or associated with, MGA, the MGA Group, the Bryant Group, the Mexican Group and the Canadian Group.

143. MGA had a role in the racketeering activity that was distinct from the undertaking of those acting on its behalf. MGA also attempted to benefit, and did benefit, from the activity of its employees and agents alleged herein, and thus was not a passive victim of racketeering activity, but an active perpetrator.

144. Mattel has been injured in its business or property as a direct and proximate result of the Counter-defendants' and the other enterprise members' violations of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

1    145. As a result of the violations of 18 U.S.C. § 1962(c), by MGA,

2    MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado,

3    Does 4 through 10, Brawer, Trueba, Vargas, Brisbois, Castilla and the Other ,

4    Former Employees, and IGWT Group, IGWT 826 Investments, Lexington, Omni

5    808, Vision Capital, Leon Neman, Fred Mashian, Neil Kadisha, Jahangir Eli

6    Makabi, Shirin Larian Makabi, The Makabi Living Trust, The Larian Living Trust,

7    The Angela Larian Qualified Annuity Trust, The Isaac E. Larian Qualified Annuity

8    Trust, The Jahangir Eli Makabi Qualified Annuity Trust and The Shirin Larian

9    Makabi Qualified Annuity Trust, Mattel has suffered substantial damages, in an

10   amount to be proved at trial.  Pursuant to 18 U.S.C. § 1964(c), Mattel is entitled to

11   recover treble its general and special compensatory damages, plus interest, costs

12   and attorneys, fees, incurred by reason of Counter-defendants' violations of 18

13   U.S.C. § 1962(c).

### Third Counterclaim

### Conspiracy To Violate the Racketeer

### Influenced And Corrupt Organizations Act

### (18 U.S.C. §§ 1962(d) and 1964(c))

### (Against All Counter-defendants)

19   146. Mattel repeats and realleges each and every allegation set forth in

20   paragraphs 1 through 145, above, as though fully set forth at length.

21   147. Beginning at various times from approximately 1999 through the

22   filing of this Third Amended Answer and Counterclaims, in the Central District of

23   California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK)

24   Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and

25   Brawer, Trueba, Vargas, Brisbois, Castilla and the Other Former Employees

26   willfully, knowingly and unlawfully, did conspire, combine, confederate and agree

27   together to violate 18 U.S.C. § 1962(c).          EXHIBIT __II__

28                                                      PAGE __199__

148.  These conspirators were employed by and associated-in-fact with the MGA Criminal Enterprise engaging in, and the activities of which affect, interstate and foreign commerce.  Specifically, the MGA Group, the Bryant Group, the Mexican Group and the Canadian Group, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the MGA Criminal Enterprise's affairs through a pattern of racketeering activity.  In addition, MGA, MGA Entertainment (HK) Limited, Larian and Bryant, and certain of the Doe Counter-defendants, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the Bratz Criminal Enterprise's affairs through a pattern of racketeering activity.

149.  Beginning at least as early as 2007 through the filing of this Third Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, and Does 4 through 10, and IGWT Group, IGWT 826 Investments, Lexington, Omni 808, Vision Capital, Leon Neman, Fred Mashian, Neil Kadisha, Angela Larian, Jahangir Eli Makabi, Shirin Larian Makabi, The Makabi Living Trust, The Larian Living Trust, The Angela Larian Qualified Annuity Trust, The Isaac E. Larian Qualified Annuity Trust, The Jahangir Eli Makabi Qualified Annuity Trust and The Shirin Larian Makabi Qualified Annuity Trust, willfully, knowingly and unlawfully, did conspire, combine, confederate and agree together to violate 18 U.S.C. § 1962(c).

150.  These conspirators were employed by and associated-in-fact with the IGWT Criminal Enterprise engaging in, and the activities of which affect, interstate and foreign commerce.  Specifically, MGA, MGA Entertainment (HK) Limited, Larian, and IGWT Group, IGWT 826 Investments, Lexington, Omni 808, Vision Capital, Leon Neman, Fred Mashian, Neil Kadisha, Jahangir Eli Makabi, Shirin Larian Makabi, Angela Larian, The Makabi Living Trust, The Larian Living

EXHIBIT __11__           -81-
                                THIRD AMENDED ANSWER AND COUNTERCLAIMS

PAGE __200__

1   Trust, The Angela Larian Qualified Annuity Trust, The Isaac E. Larian Qualified

2   Annuity Trust, The Jahangir Eli Makabi Qualified Annuity Trust, The Shirin Larian

3   Makabi Qualified Annuity Trust and certain of the Doe Counter-defendants,

4   constituting a group of individuals associated-in-fact, did unlawfully, willfully, and

5   knowingly participate in and conduct, directly and indirectly, the IGWT Criminal

6   Enterprise's affairs through a pattern of racketeering activity.

7          151.  The pattern of racketeering activity, as defined by 18 U.S.C.

8   §§ 1961(1) and (5), includes acts of mail fraud in violation of 18 U.S.C. § 1341 and

9   18 U.S.C. § 2; acts of wire fraud in violation of 18 U.S.C. § 1343 and 18 U.S.C.

10  § 2; conspiracy to commit perjury and acts of influencing or injuring officer or

11  juror generally in violation of 18 U.S.C. § 1503 and 18 U.S.C. § 2; acts of

12  tampering with witnesses, victims or informants in violation of 18 U.S.C. § 1512

13  and 18 U.S.C. § 2; acts of interstate and foreign travel in aid of racketeering

14  enterprises in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2; acts of unlawful

15  concealment of assets in violation of 18 U.S.C. § 152(7) & (8); acts of money

16  laundering in violation of 18 U.S.C. § 1956; acts of engaging in monetary

17  transactions in property derived from unlawful activities in violation of 18 U.S.C.

18  § 1957; and acts of criminal copyright infringement in violation of 18 U.S.C.

19  § 2319(a) and 17 U.S.C. § 506(a)(1)(A).

20         152.  Counter-defendants and the other members of the MGA Criminal

21  Enterprise schemed to improperly defraud Mattel and steal its trade secret or

22  otherwise confidential and proprietary information and infringe Mattel's rights and

23  conceal such misconduct, as more fully set forth in the foregoing paragraphs.

24  Further, counter-defendants and the other members of the IGWT Criminal

25  Enterprise schemed to infringe Mattel's rights and transfer, transport or launder the

26  ill-gotten gains from their infringements and the MGA and Bratz Criminal

27  Enterprises' thefts and infringements, and secret MGA assets and purportedly

28  obtain priority over Mattel, as more fully set forth in the foregoing paragraphs.

00505.07209/2875224.1

EXHIBIT __11__

PAGE __201__

-82-
THIRD AMENDED ANSWER AND COUNTERCLAIMS

153. In furtherance of this unlawful conspiracy, and to effect its objectives, Counter-defendants and various co-conspirators committed numerous overt acts, including but not limited to those set forth in the foregoing paragraphs.

154. Mattel has been injured in its business or property as a direct and proximate result of the Counter-defendants' and the other enterprise members' violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

155. As a result of the conspiracies between and among all Counter-defendants and the other conspirators to violate 18 U.S.C. § 1962(c), Mattel has suffered substantial damages, in an amount to be proved at trial. Pursuant to 18 U.S.C. § 1964(c), Mattel is entitled to recover treble its general and special compensatory damages, plus interest, costs and attorneys, fees, incurred by reason of Counter-defendants' violations of 18 U.S.C. § 1962(d).

**Fourth Counterclaim**

**Misappropriation of Trade Secrets**

*(Cal. Civ. Code § 3426 et seq.)*

**(Against Counter-defendants MGA, MGA de Mexico,**

**Larian, Machado and Does 4 through 10)**

156. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 155, above, as though fully set forth at length.

157. As used herein, "Trade Secret Material" shall mean the documents, materials and information stolen by Machado, Trueba, Vargas, Brisbois, Castilla, the Other Former Employees, and other persons acting for, on behalf of or at the direction of MGA and/or Larian. Prior to their theft by Counter-defendants, the Trade Secret Materials gave Mattel a significant competitive advantage over its existing and would-be competitors, including MGA. This advantage, as to MGA, has now been compromised as a result of Counter-defendants' unlawful activities.

1       158. Mattel made reasonable efforts under the circumstances to
2   maintain the confidentiality of the Trade Secret Materials, including by having
3   employees and consultants who may have access the Trade Secret Materials sign
4   confidentiality agreements that oblige them not to disclose the Trade Secret
5   Materials or characteristics of the Trade Secret Materials; by limiting the
6   circulation of said materials within Mattel; by protecting and limiting access to
7   computers with log-in identifications and passwords; by limiting each employee's
8   access to electronic files to those that the particular employee needs to access; by
9   educating employees on the nature of Mattel's information that is confidential and
10  proprietary; and by reminding employees on a regular and periodic basis of their
11  obligation to protect and maintain Mattel's confidential and proprietary
12  information.

13      159. Mattel's Trade Secret Materials derive independent economic
14  value from not being generally known to the public or to other persons who can
15  obtain economic benefit from their disclosure.

16      160. Counter-defendants have illegally obtained the trade secret
17  materials, as set forth above, and through other means of which Mattel is presently
18  unaware.

19      161. Counter-defendants have used and disclosed Mattel's Trade
20  Secret Materials without Mattel's consent and without regard to Mattel's rights, and
21  without compensation, permission, or licenses for the benefit of themselves and
22  others.

23      162. Counter-defendants' conduct was, is, and remains willful and
24  wanton, and was taken with blatant disregard for Mattel's valid and enforceable
25  rights.

26      163. Counter-defendants' wrongful conduct has caused and, unless
27  enjoined by this Court, will continue in the future to cause irreparable injury to
28  Mattel. Mattel has no adequate remedy at law for such wrongs and injuries. Mattel

1  is therefore entitled to a permanent injunction restraining and enjoining Counter-

2  defendants, and each of them, as well as their agents, servants, and employees, and

3  all persons acting thereunder, in concert with, or on their behalf, from further using

4  in any manner Mattel's trade secrets.

5          164.  In addition, as a proximate result of Counter-defendants'

6  misconduct, Mattel has suffered actual damages, and Counter-defendants have been

7  unjustly enriched.

8          165.  The aforementioned acts of the Counter-defendants were willful

9  and malicious, including in that Counter-defendants misappropriated Mattel's trade

10  secrets with the deliberate intent to injure Mattel's business and improve their own.

11  Mattel is therefore entitled to enhanced damages.  Mattel is also entitled to

12  reasonable attorney's fees.

13                    **Fifth Counterclaim**

14                    **Breach of Contract**

15                    **(Against Bryant)**

16          166.  Mattel repeats and realleges each and every allegation set forth in

17  paragraphs 1 through 165, above, as though fully set forth at length.

18          167.  Pursuant to his Employment Agreement, Bryant agreed that he

19  would not, without Mattel's express written consent, engage in any employment or

20  business other than for Mattel or assist in any manner any business competitive

21  with the business or future business plans of Mattel during his employment with

22  Mattel.  Pursuant to his Mattel Employment Agreement, Bryant further assigned to

23  Mattel all right, title and interest in "inventions," including without limitation

24  "designs" and other works that he conceived, created or reduced to practice during

25  his employment by Mattel.  In addition, pursuant to the Conflict Questionnaire,

26  Bryant certified that, other than as disclosed, he had not worked for any competitor

27  of Mattel and had not engaged in any business venture or transaction involving a

28  Mattel competitor that could be construed as a conflict of interest.  Bryant further

1   promised that he would notify his supervisor immediately of any change in his

2   situation that would cause him to change any of the foregoing certifications or

3   representations.

4          168. The Employment Agreement and the Conflict Questionnaire are

5   valid, enforceable contracts, and Mattel has performed each and every term and

6   condition of the Employment Agreement and Conflict Questionnaire required to be

7   performed by Mattel.

8          169. Bryant materially breached the foregoing contracts with Mattel,

9   in that, among other things, he secretly aided, assisted and worked for a Mattel

10   competitor during his employment with Mattel without the express written consent

11   of Mattel.

12          170. As a consequence of Bryant's breach, Mattel has suffered and

13   will, in the future, continue to suffer damages in an amount to be proven at trial.

14   Such damages include, without limitation, the amounts paid by the competitor to

15   Bryant during his Mattel employment; the amounts paid by MGA to Bryant during

16   his Mattel employment; the amount that Mattel paid Bryant during the time he

17   wrongfully worked with MGA; the value of information and intellectual property

18   owned by Mattel which Bryant provided to MGA; the value of the benefits that

19   MGA obtained from Bryant during the time he was employed by Mattel; and the

20   value of the benefits that MGA obtained from Bryant as a result of the work he

21   performed for or with MGA during his Mattel employment.

22          171. Bryant's conduct has caused, and unless enjoined will continue to

23   cause, irreparable injury to Mattel that cannot be adequately compensated by

24   money damages and for which Mattel has no adequate remedy at law. Bryant

25   specifically acknowledged in his Employment Agreement that his breach of the

26   Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be

27   entitled to injunctive relief to enforce this Agreement, in addition to damages and

28   other available remedies." Accordingly, Mattel is entitled to orders mandating

EXHIBIT   11

-86-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

00505.07209/2875224.1

1    Bryant's specific performance of his contracts with Mattel and restraining Bryant
2    from further breach.

### Sixth Counterclaim

### Intentional Interference with Contract

### (Against MGA, Larian and Does 4 through 10)

172. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 171, above, as though fully set forth at length.

173. Valid agreements existed between Mattel and the Mattel employees who MGA induced to steal or was complicit in stealing Mattel trade secrets and other proprietary and confidential information and who MGA bribed or induced to work for or assist MGA while Mattel employees (collectively, the "Mattel Employees"), including without limitation Bryant, Brawer, Machado, Trueba, Vargas, Brisbois, Castilla, Cabrera, Morales, Salazar, and the Other Former Employees.

174. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees had a duty under their agreements not to work for or assist any competitor of Mattel, such as MGA. In addition, at all times mentioned herein, MGA, Larian and Does 4 through 10 knew that Bryant had assigned to Mattel, and was obligated to disclose to Mattel all inventions, including designs and other works, created, conceived or reduced to practice during their employment with Mattel.

175. Despite such knowledge, Counter-defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, induced and encouraged the Mattel Employees to breach their contracts with Mattel.

176. As a direct and proximate result of Counter-defendants' efforts and inducements, the Mattel Employees did breach their contracts with Mattel.

EXHIBIT __11__

PAGE __206__

THIRD AMENDED ANSWER AND COUNTERCLAIMS

00505.07209/2875224.1

177. As a result of said breaches, Mattel has suffered damages and will imminently suffer further damages, including the loss of its competitive position and lost profits, in an amount to be proven at trial.

178. Counter-defendants performed the aforementioned conduct with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

**Seventh Counterclaim**

**Breach of Fiduciary Duty**

**(Against Bryant and Machado)**

179. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 178, above, as though fully set forth at length.

180. Bryant and Machado held positions of trust and confidence with Mattel. In their positions, Bryant and Machado had access to and were entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of their job assignments and duties. In their positions, Bryant and Machado also represented Mattel in its dealings with third parties and, in actions in the course and scope of their employment with Mattel, were agents of Mattel. They confirmed their relationship of trust with Mattel in respective employee agreements. Bryant and Machado thus owed Mattel a fiduciary duty that included, but was not limited to, an obligation not to take any action that would be contrary to Mattel's best interests or that would deprive Mattel of any opportunities, profit or advantage which Bryant or Machado might bring to Mattel.

181. Bryant breached his fiduciary duty to Mattel in that, while employed by Mattel, he secretly aided and assisted a competitor of Mattel, including without limitation by entering into an agreement with a Mattel competitor. As alleged above, Bryant also breached the aforementioned duty by

1  using Mattel property and resources for the benefit of, and to aid and assist, himself
2  personally and MGA.

3      182. Machado breached his fiduciary duty to Mattel, in that while
4  employed by Mattel, he secretly aided and assisted a competitor of Mattel by,
5  among other things, misappropriating Mattel trade secret and proprietary
6  information and providing said information to officers of MGA. Machado also
7  breached the aforementioned duty by using Mattel property and resources for the
8  benefit of, and to aid and assist, himself personally and MGA.

9      183. As a direct and proximate result of Counter-defendants' wrongful
10  conduct, Mattel has incurred damages in an amount to be determined at trial.

11      184. Counter-defendants acted with malice, fraud and oppression, and
12  in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an
13  award of exemplary damages against Counter-defendants in an amount to be
14  determined at trial.

15      185. Furthermore, Counter-defendants' conduct has caused, and unless
16  enjoined will continue to cause, irreparable injury to Mattel that cannot be
17  adequately compensated by money damages and for which Mattel has no adequate
18  remedy at law. Accordingly, Mattel is entitled to an order restraining further
19  breach of Bryant's fiduciary duty to Mattel and/or restraining Counter-defendants
20  from continuing to benefit from such breach.

21          **Eighth Counterclaim**
22      **Aiding and Abetting Breach of Fiduciary Duty**
23          **(Against MGA, Larian and Does 4 through 10)**

24      186. Mattel repeats and realleges each and every allegation set forth in
25  paragraphs 1 through 185, above, as though fully set forth at length.

26      187. At all times herein mentioned, MGA, Larian and Does 4 through
27  10 knew that Bryant held a position of trust and confidence at Mattel. At all times
28  herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant owed a

00505.07209/2875224.1

EXHIBIT __11__   -89-
                 THIRD AMENDED ANSWER AND COUNTERCLAIMS

PAGE __208__

1  fiduciary duty to Mattel not to take any action that would be contrary to Mattel's

2  best interests, including but not limited to secretly developing and designing Bratz

3  while employed by Mattel and by secretly assisting Larian and MGA .

4       188. At all times herein mentioned, MGA, Larian and Does 4 through

5  10 knew that the Mattel Employees (excluding Bryant) held positions of trust and

6  confidence at Mattel. At all times herein mentioned, MGA, Larian and Does 4

7  through 10 knew that the Mattel Employees (excluding Bryant) owed a fiduciary

8  duty to Mattel not to take any action that would be contrary to Mattel's best

9  interests, including but not limited to taking confidential trade secret information

10  from Mattel's premises and providing that information to a competitor.

11       189. Despite such knowledge, Counter-defendants MGA, Larian and

12  Does 4 through 10 intentionally and without justification solicited, encouraged,

13  aided and abetted and gave substantial assistance to the Mattel Employees to breach

14  their fiduciary duties to Mattel, knowing that their conduct would constitute

15  breaches of their fiduciary duties to Mattel.

16       190. As a direct and proximate result of Counter-defendants' efforts,

17  the Mattel Employees did breach their fiduciary duties to Mattel and Mattel has

18  incurred damages in an amount to be proven at trial. Mattel, therefore, is entitled to

19  recover compensatory damages in an amount to be determined at trial.

20       191. In taking the aforesaid actions, MGA, Larian and Does 4 through

21  10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

22  rights. Accordingly, Mattel is entitled to recover exemplary damages from

23  Counter-defendants in an amount to be determined at trial.

24  **Ninth Counterclaim**

25  **Breach of Duty of Loyalty**

26  **(Against Bryant and Machado)**

27       192. Mattel repeats and realleges each and every allegation set forth in

28  paragraphs 1 through 191, above, as though fully set forth at length.

00505.07209/2875224.1

EXHIBIT 11 -90-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

PAGE 209

1    193. As employees of Mattel, Bryant and Machado owed a duty of

2  undivided loyalty to Mattel. Pursuant to this duty, Bryant and Machado could not

3  compete with Mattel or assist a competitor of Mattel during their employment with

4  Mattel. Pursuant to this duty, Bryant and Machado were required to always give

5  preference to Mattel's business over their own, similar interests during the course of

6  their employment with Mattel.

7    194. Bryant and Machado breached their duty of loyalty to Mattel in

8  that, while employed by Mattel, they secretly aided, assisted and worked for a

9  competitor of Mattel, including without limitation by entering into agreements with

10  a Mattel competitor. As alleged above, they also breached the aforementioned duty

11  by using Mattel property and resources for the benefit of, and to aid and assist,

12  themselves personally and the competitor of Mattel.

13    195. As a direct and proximate result of Counter-defendants' wrongful

14  conduct, Mattel has incurred damages in an amount to be determined at trial.

15    196. Counter-defendants acted with malice, fraud and oppression, and

16  in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an

17  award of punitive damages against Counter-defendants in an amount to be

18  determined at trial.

19    197. Furthermore, Counter-defendants' conduct has caused, and unless

20  enjoined will continue to cause, irreparable injury to Mattel that cannot be

21  adequately compensated by money damages and for which Mattel has no adequate

22  remedy at law. Accordingly, Mattel is entitled to an order restraining further

23  breach of Counter-defendants' duty of loyalty to Mattel and/or restraining Counter-

24  defendants from continuing to benefit from such breach.

25    198. In breaching their duty of loyalty to Mattel, Bryant and Machado

26  acted with malice, fraud and oppression, and in conscious disregard of Mattel's

27  rights. Accordingly, Mattel is entitled to recover exemplary damages from

28  Counter-defendants in an amount to be determined at trial.

## Tenth Counterclaim

### Aiding and Abetting Breach of Duty of Loyalty

### (Against MGA, Larian and Does 4 through 10)

199. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 198, above, as though fully set forth at length.

200. MGA, Larian and Does 4 through 10 knew that Bryant, as an employee of Mattel, owed a duty of loyalty to his employer. MGA, Larian and Does 4 through 10 knew that this duty included an obligation on the part of Bryant not to compete with Mattel or assist a competitor of Mattel during the term of his employment with Mattel. MGA, Larian and Does 4 through 10 also knew that Bryant was required to give preference to Mattel's business over his own, similar interests or those of Mattel's competitors during the course of his employment with Mattel.

201. MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) were employed by Mattel, and, as employees of Mattel, that they owed duties of loyalty to Mattel. MGA, Larian and Does 4 through 10 knew that these duties included an obligation on the part of the Mattel Employees (excluding Bryant) not to compete with Mattel or assist a competitor of Mattel during their Mattel employment.

202. Despite such knowledge, Counter-defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, encouraged, aided and abetted and gave substantial assistance to the Mattel Employees to breach their duties of loyalty to Mattel, knowing that their conduct would constitute breaches of their duties of loyalty to Mattel.

203. As a further consequence of Counter-defendants' efforts, Mattel has suffered injury and is entitled to compensatory damages in an amount to be proven at trial.

EXHIBIT  11

PAGE  210

00505.07209/2875224.1

-92-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1    204. In taking the aforesaid actions, MGA, Larian and Does 4 through

2    10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

3    rights. Accordingly, Mattel is entitled to recover exemplary damages from

4    Counter-defendants in an amount to be determined at trial.

## Eleventh Counterclaim

### Conversion

### (Against All Counter-defendants)

8    205. Mattel repeats and realleges each and every allegation set forth in

9    paragraphs 1 through 204, above, as though fully set forth at length.

10    206. Counter-defendants wrongfully converted Mattel property and

11    resources by appropriating and using them for their own benefit and gain and for

12    the benefit and gain of others, without the permission of Mattel.

13    207. Mattel was entitled to, among other things, the exclusive right

14    and enjoyment in property and tangible materials owned by Mattel, including

15    without limitation such proper and materials that were created by Bryant while he

16    was a Mattel product designer. Such property was taken by Bryant from Mattel to

17    further his own interests and, in at least some instances, provided by Bryant to

18    Larian and MGA in furtherance of the interests of Bryant, Larian and MGA.

19    208. In addition, Counter-defendants wrongfully converted Mattel's

20    property by removing the Trade Secret Materials in electronic and paper form from

21    Mattel's offices. Counter-defendants did so without Mattel's permission and

22    continue to possess them.

23    209. As a direct and proximate result of Counter-defendants' wrongful

24    conversion of Mattel property, including those relating to Bratz and Mattel's Trade

25    Secret Materials, Mattel has incurred damages. Mattel, therefore, is entitled to

26    recover compensatory damages in an amount to be determined at trial.

27    210.  As a result of Counter-defendants' acts of conversion, Mattel is

28    entitled to damages in an amount sufficient to indemnify Mattel for the loss

00505.07209/2875224.1

EXHIBIT __11__            -93-

PAGE __211__            THIRD AMENDED ANSWER AND COUNTERCLAIMS

1   suffered, which is not measured by the value of the property misappropriated, but

2   includes the lost profits that Mattel suffered as a result of the conversion or,

3   alternatively, the profits generated by the Counter-defendants that would not have

4   been generated but for the conversion.  Only such a measure of damages would

5   fully and fairly compensate Mattel for the injury it suffered due to Counter-

6   defendants' acts of conversion.

7        211.  Counter-defendants performed the aforementioned conduct with

8   malice, fraud and oppression, and in conscious disregard of Mattel's rights.

9   Accordingly, Mattel is entitled to recover exemplary damages from Counter-

10   defendants in an amount to be determined at trial.

11        212.  Furthermore, Counter-defendants' conduct has caused, and unless

12   enjoined will continue to cause, irreparable injury to Mattel that cannot be

13   adequately compensated by money damages and for which Mattel has no adequate

14   remedy at law.  Accordingly, Mattel is entitled to an order restraining Counter-

15   defendants from further conversion of Mattel property and resources and/or

16   restraining Counter-defendants from continuing to benefit from such conversion.

17        <u>Twelfth Counterclaim</u>

18        **Unfair Competition**

19        (Common Law and *Cal. Bus. & Prof. Code* § 17200)

20        **(Against All Counter-defendants)**

21        213.  Mattel repeats and realleges each and every allegation set forth in

22   paragraphs 1 through 212, above, as though fully set forth at length.

23        214.  Section 17200 of the California Business and Professions Code

24   prohibits unfair competition, including "any unlawful, unfair or fraudulent business

25   act or practice . . . ."

26        215.  By engaging in the foregoing conduct, Counter-defendants have,

27   individually and in combination, engaged in unlawful, unfair and/or fraudulent acts

28   of unfair competition in violation of both the common law of the state of California

OUS05.07209/2875224.1

EXHIBIT  11

PAGE  212

-94-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1  and *Cal. Bus. & Prof. Code* § 17200 *et seq.* Such conduct included, without

2  limitation, MGA's commercial bribery of Bryant in violation of *Cal. Penal Code*

3  § 641.3 and misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a).

4  Such conduct also included, without limitation, MGA's and Larian's disparagement

5  of Mattel's products and misrepresentations as alleged above.

6       216. As a result of the aforementioned conduct, Mattel has suffered

7  damages and will imminently suffer further damages, including but not limited to

8  lost profits in an amount to be proven at trial. No adequate remedy at law exists for

9  the wrongs and injuries Mattel has suffered and will continue to suffer, and Mattel

10  is entitled to an injunction enjoining Counter-defendants' continued wrongful acts.

11  Mattel is also entitled to recover compensatory and exemplary damages pursuant to

12  the doctrine of common law unfair competition and *Cal. Civ. Code* § 3294.

**Thirteenth Counterclaim**

**Avoidance of Intentional and Constructive Fraudulent Transfers Under**

**Uniform Fraudulent Transfer Act**

**(Common Law and *Cal. Civil Code* §§ 3439 *et seq.*)**

**(Against MGA and Larian)**

18       217. Mattel repeats and realleges each and every allegation set forth in

19  paragraphs 1 through 216, above, as though fully set forth at length.

20       218. Mattel is a creditor of MGA and Larian, and his alter-egos,

21  because Mattel has substantial claims against MGA and Larian, including but not

22  limited to claims that have already resulted in a jury verdict in this action in

23  Mattel's favor. *Cal. Civil Code* § 3439.01(b), (c).

24       219. After Mattel's claims had been asserted and continuing until the

25  Phase 1A verdict and dates thereafter, MGA and Larian engaged in fraudulent

26  transfers, *Cal. Civ. Code* § 3439.01(i), 3439.04, 3439.05, including, without

27  limitation, by transferring tens of millions of dollars of Bratz inventory from MGA

28  to the Larian-controlled IGWT Group. These transfers were at massive discounts,

1    and on information and belief MGA did not receive reasonably equivalent value for

2    the Bratz inventory that it transferred.

3         220.   On information and belief, and based on the foregoing, these

4    fraudulent transfers were made with actual intent to hinder, delay, and/or defraud

5    MGA's and Larian's creditor, Mattel.

6         221.   MGA has represented that it was on the verge of filing

7    bankruptcy. If true, on information and belief at the time of the transfers MGA was

8    unable to pay its debts as they became due and was engaged in a transaction, or was

9    about to engage in a business, for which its remaining assets were unreasonably

10   small, and MGA was insolvent. On information and belief, MGA intended to

11   incur, or believed or reasonably should have believed it would incur, debts beyond

12   its ability to pay as they became due.

13        222.   By virtue of the foregoing, MGA's and Larian's fraudulent

14   transfers, including without limitation the transfers of Bratz inventory to the IGWT

15   Group, should be avoided, the transferred assets and their proceeds, including

16   without limitation the Bratz inventory and/or and the proceeds of the sales of any

17   Bratz inventory by IGWT Group, should be restored to MGA and attached, and

18   injunctions should issue against any further fraudulent transfers and against any

19   disposition of the transferred assets and/or their proceeds, pursuant to *Cal. Civil*

20   *Code* § 3439.07.

### Fourteenth Counterclaim

### Declaratory Relief

### (Against All Counter-defendants)

23        223.   Mattel repeats and realleges each and every allegation set forth in

25   paragraphs 1 through 222, above, as though fully set forth at length.

26        224.   As shown in the foregoing paragraphs above, an actual

27   controversy exists between Mattel and Counter-defendants regarding Counter-

28   defendants' lack of ownership interests in Bratz and Mattel's rights in the same.

00505.07209/2875224.1

EXHIBIT __11__

PAGE __214__

225. Accordingly, Mattel seeks a declaration of the Court that Counter-defendants have no valid or protectable ownership rights or interests in Bratz, and that Mattel is the true owner of the same, and further seeks an accounting and imposition of a constructive trust over Bratz, including without limitation registrations and applications for registrations relating thereto made or filed by Counter-defendants and third parties, and over all revenues and other monies or benefits derived or obtained from MGA's and Bryant's purported ownership, use, sale, distribution and licensing of Bratz.

226. Mattel seeks a declaration of the Court that any and all agreements between Bryant and/or any other individuals then-employed by Mattel, on the one hand, and MGA, on the other hand, in which Bryant or any of them purport to assign to MGA any right, title or interests in any work or properties that they conceived, created or reduced to practice while Mattel employees, including but not limited to the Bratz designs, is void and of no effect, including without limitation because Bryant and/or any other such individuals had previously assigned said right, title or interest to Mattel and because Mattel was otherwise the owner of said right, title or interest.

### Prayer for Relief

WHEREFORE, Mattel respectfully requests judgment:

1. For a declaration that Counter-defendants have no valid or protectable ownership interests or rights in Bratz designs, works or properties conceived, made, created or reduced to practice by Bryant during the term of his Mattel employment and/or by any others then-employed by Mattel, as well as in all derivatives prepared therefrom, and that Mattel is the true owner of the foregoing;

2. For a declaration that any agreement between Bryant and/or by any others then-employed by Mattel, on the one hand, and MGA or any person or entity, on the other hand, in which Bryant or such others then-employed by Mattel purported to assign any right, title or interests in any work or properties that they

1  conceived, made, created or reduced to practice while employed by Mattel,

2  including but not limited to the Bratz designs, is void and of no effect;

3         3.    For an Order enjoining and restraining Counter-defendants, their

4  agents, servants and employees, and all persons in active concert or participation

5  with them, from further wrongful conduct, including without limitation from

6  imitating, copying, distributing, importing, displaying, preparing derivatives from

7  and otherwise infringing Mattel's copyright-protected works;

8         4.    For an Order, pursuant to 17 U.S.C. § 503(a) and other

9  applicable law, impounding all of Counter-defendants' products and materials that

10  infringe Mattel's copyrights, as well as all plates, molds, matrices and other articles

11  by which copies of the works embodied in Mattel's copyrights may be reproduced

12  or otherwise infringed;

13         5.    For an Order mandating that Counter-defendants return to Mattel

14  all tangible items, documents, designs, diagrams, sketches or any other

15  memorialization of inventions conceived, created, made or reduced to practice

16  during Bryant's employment with Mattel as well as all Mattel property converted

17  by Counter-defendants;

18         6.    For an Order mandating specific performance by Bryant to

19  comply with and satisfy Bryant's contractual obligations to Mattel;

20         7.    That Mattel be awarded, and Counter-defendants be ordered to

21  disgorge, all payments, revenues, profits, monies and royalties and any other

22  benefits derived or obtained as a result of the conduct alleged herein, including

23  without limitation of all revenues and profits attributable to Counter-defendants'

24  infringement of Mattel's copyrights under 17 U.S.C. § 504;

25         8.    For an accounting of all profits, monies and/or royalties from the

26  exercise of ownership, use, distribution, sales and licensing of Bratz;

27         9.    For the imposition of a constructive trust over Bratz, including

28  without limitation all rights and benefits relating thereto and registrations and

EXHIBIT __11__

PAGE __216__

-98-

1   applications for registrations relating thereto made or filed by Counter-defendants

2   and third parties, and all profits, monies, royalties and any other benefits derived or

3   obtained from Counter-defendant's exercise of ownership, use, sale, distribution

4   and licensing of Bratz;

5       10.   That Mattel recover its actual damages and lost profits;

6       11.   That Counter-defendants be ordered to pay exemplary damages

7   in a sum sufficient to punish and to make an example of them, and deter them and

8   others from similar wrongdoing;

9       12.   That Counter-defendants be ordered to pay treble its general and

10  special damages, plus interest, costs and attorney's fees incurred by reason of

11  Counter-defendants' violations of 18 U.S.C. §§ 1962(c)-(d).

12      13.   That Counter-defendants be ordered to pay double damages due

13  to their willful and malicious misappropriation of Mattel's trade secrets with

14  deliberate intent to injure Mattel's business and improve its own;

15      14.   That Counter-defendants pay to Mattel the full cost of this action

16  and Mattel's attorneys' and investigators' fees;

17      15.   For an Order that Larian is liable for all wrongs of his agents,

18  alter-egos or others committed on his behalf;

19      16.   That Counter-defendants' fraudulent transfers, including their

20  transfers of Bratz inventory, be avoided and set aside; the transferred assets and

21  their proceeds be restored to MGA and attached and/or subjected to a constructive

22  trust for Mattel's benefit; and Counter-defendants be enjoined against any further

23  fraudulent transfers and any disposition of the transferred assets and/or their

24  proceeds; and

25  //

26  //

27  //

28  //

EXHIBIT __II__

PAGE __217__

00505.07209/2875224.1

-99-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1            17.   That Mattel have such other and further relief as the Court may

2    deem just and proper.

3

4    DATED:  May 22, 2009        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

5

6                            By /s/ John B. Quinn

7                            John B. Quinn
                             Attorneys for Defendant and Counter-

8                            claimant Mattel, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                                  EXHIBIT  11

28                                                  PAGE  218

-100-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

# DEMAND FOR JURY TRIAL

Mattel, Inc. respectfully requests a jury trial on all issues triable thereby.

DATED:  May 22, 2009          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP


                              By /s/ John B. Quinn
                                  John B. Quinn
                                  Attorneys for Defendant and Counter-
                                  claimant Mattel, Inc.

EXHIBIT **11**

PAGE **219**

00505.07209/2875224.1

-101-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

# EXHIBIT 12

1

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                    EASTERN DIVISION

 4                       - - -

 5      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 6                       - - -

 7   CARTER BRYANT,                )
                                   )
 8                  PLAINTIFF,     )
                                   )
 9        VS.                      )  NO. ED CV 04-09049
                                   )  (LEAD LOW NUMBER)
10   MATTEL, INC.,                 )
                                   )
11                  DEFENDANTS.    )  STATUS/SCHEDULING
                                   )       CONFERENCE
12   AND RELATED ACTIONS,          )
     _____   )

13

14

15         REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               RIVERSIDE, CALIFORNIA

17            MONDAY, FEBRUARY 12, 2007

18                    1:49 P.M.

19

20

21

22

23            THERESA A. LANZA, RPR, CSR
           FEDERAL OFFICIAL COURT REPORTER
24            3470 12TH STREET, RM. 134
           RIVERSIDE, CALIFORNIA  92501
25                (951) 274-0844
           CSR11457@SBCGLOBAL.NET
```

**CERTIFIED COPY**

EXHIBIT 12

PAGE 220

2

1   APPEARANCES:

2

3   ON BEHALF OF PLAINTIFF/COUNTER DEFENDANT MATTEL, INC.:

4

5                           QUINN EMANUEL
                            BY:   JOHN B. QUINN
                            865 S. FIGUEROA STREET,
6                           10TH FLOOR
                            LOS ANGELES, CALIFORNIA  90017
7                           (213) 624-7707

8

9   ON BEHALF OF PLAINTIFF/COUNTER COMPLAINANT/DEFENDANT,
    CARTER BRYANT:
10

11                          LITTLER MENDELSON
                            BY:   KEITH A. JACOBY
                            2049 CENTURY PARK EAST,
12                          FIFTH FLOOR
                            LOS ANGELES, CALIFORNIA  90067
13                          (310) 553-0308

14

15  ON BEHALF OF MGA ENTERTAINMENT:

16                          O'MELVENY & MYERS LLP
                            BY:   DIANA M. TORRES
17                          400 SOUTH HOPE STREET
                            LOS ANGELES, CA  90071-2899
18                          (213) 430-6556

19

20

21

22

23

24                                      EXHIBIT __12__

25                                      PAGE __221__

            2-12-07              CV 04-09049

3

```
 1        RIVERSIDE, CALIFORNIA; MONDAY, FEBRUARY 12, 2007; 1:49 P.M.
 2                            -OOO-
 3           THE CLERK:  CALLING CALENDAR ITEM 13, CARTER BRYANT
 4   VERSUS MATTEL, INC., CV 04-09049.
 5           MAY WE HAVE COUNSEL PLEASE COME FORWARD AND STATE          01:49
 6   YOUR APPEARANCES FOR THE RECORD.
 7           MR. QUINN:  JOHN QUINN, MIKE ZELLER FOR MATTEL.
 8           MR. ZELLER:  GOOD AFTERNOON.
 9           MS. TORRES:  DIANA TORRES FOR MGA.
10           MR. JACOBY:  KEITH JACOBY FOR CARTER BRYANT.             01:50
11           THE COURT:  GOOD AFTERNOON.  WE'RE ON CALENDAR FOR A
12   STATUS/SCHEDULING CONFERENCE TODAY.  I'VE RECEIVED THE REPORTS
13   SUBMITTED BY COUNSEL REGARDING THE CASES.
14           I'VE ALSO, JUST AS A SIDE NOTE, RECEIVED A
15   STIPULATION AND ORDER REGARDING THE REQUEST TO EXTEND THE        01:50
16   DEADLINE WITHIN WHICH TO FILE A MOTION FOR REVIEW OF THE
17   DISCOVERY SPECIAL MASTER'S ORDER, WHICH I WILL SIGN.
18           I'VE SEEN, FROM ALL OF THE VARIOUS UNDER-SEAL
19   MATTERS, THAT YOU HAVE CERTAINLY NOT BEEN SHY ABOUT USING THE
20   SPECIAL MASTER.                                                  01:50
21           I'D LIKE TO HEAR YOUR FINAL THOUGHTS ON THIS BEFORE I
22   MAKE A FINAL DECISION, BUT I'M EVEN MORE CONVINCED TODAY THAN I
23   WAS WHEN I FIRST SUGGESTED IT THAT, IN MY VIEW, THE
24   9059-CASE -- THE CASE THAT, FROM MY ASSESSMENT OF IT, WILL
25   HOPEFULLY ANSWER THE QUESTION AS TO WHO OWNS BRATZ BETWEEN       01:51
```

2-12-07                     CV 04-09049

EXHIBIT 12

PAGE 222

4

1   MATTEL AND CARTER BRYANT -- IS THE CASE THAT SHOULD GO FIRST.

2   IN MY VIEW, IT'S THE DOG THAT KIND OF WAGS THE TAIL HERE, THE

3   TAIL BEING THE 2727-CASE.  NOT TO SUGGEST THAT ONE CASE IS ANY

4   MORE OR ANY LESS IMPORTANT THAN THE OTHER.  I JUST THINK IT

5   MAKES MORE SENSE, IN TERMS OF THE SEQUENCE, THAT IF WE CAN          01:51

6   RESOLVE WHO OWNS THE DOLL IN QUESTION, THAT MANY OF THE ISSUES

7   IN THE OTHER CASE MAY BE RESOLVED, AND IT'S JUST A CLEANER WAY

8   OF PROCEEDING.  THAT'S WHAT I'M INCLINED TO DO.

9           AND I APPRECIATE COUNSEL PUTTING ALTERNATIVE DATES

10  OUT, BUT BEFORE I MAKE THAT FINAL, I THOUGHT YOU MIGHT HAVE         01:52

11  SOME ADDITIONAL THOUGHTS AS YOU PREPARED FOR THE STATUS

12  CONFERENCE.

13          MR. QUINN?

14          MR. QUINN:  THANK YOU, YOUR HONOR.

15          WHEN WE WERE LAST HERE BEFORE YOUR HONOR, THE COURT          01:52

16  RAISED THE ISSUE ABOUT 'WOULD IT MAKE SENSE TO TRY THE ISSUE OF

17  BRATZ' OWNERSHIP FIRST.'  AND WHAT THE COURT JUST SAID, I

18  HEARD, TO DESCRIBE SOMETHING A LITTLE BIT DIFFERENT; THE COURT

19  REFERRED TO THE FIRST-FILED COMPLAINT, WHICH IS SOMEWHAT

20  BROADER.                                                            01:52

21          THE COURT:  SOMEWHAT, YES.

22          MR. QUINN:  BECAUSE THAT DOES ANSWER SOME OF OUR

23  CONCERNS ABOUT THAT, BECAUSE THE BREACH OF FIDUCIARY DUTIES,

24  INTERFERENCE CLAIMS AND OTHERS, ALL KIND OF AROSE FROM THE SAME

25  FACTS.                                                              01:52

EXHIBIT __12__

1          THE COURT:  YES.

2          MR. QUINN:  I GUESS THERE ARE STILL -- I THINK THERE

3    ARE SOME ISSUES, YOUR HONOR, WITH TRYING TO BIFURCATE TRIAL

4    THAT WAY, OR AT LEAST TO TRY TO MAKE THAT DECISION NOW.

5          FOR EXAMPLE, IN THAT FIRST COMPLAINT, THERE ARE NO            01:53

6    CLAIMS ASSERTED AGAINST MGA.  THESE CASES EVOLVED AS ADDITIONAL

7    FACTS CAME TO LIGHT.  MGA INTERVENED IN THAT FIRST CASE BEFORE

8    THERE WAS AN AMENDMENT TO OUR PLEADING; SO IF WE WERE JUST TO

9    TRY THAT CASE, I GUESS WE HAVE MGA THERE AS AN

10   INTERVENOR-DEFENDANT, NEITHER ASSERTING ANY CLAIMS, NOR ON THE    01:53

11   RECEIVING END OF ANY CLAIMS.  IN EFFECT, WE HAVE TWO SETS OF

12   LAWYERS AT EVERY STAGE SPEAKING FOR THE DEFENDANTS.

13         THE COURT:  BUT DO WE EVER REALLY GET AWAY FROM THAT?

14         MR. QUINN:  WELL, I THINK WE DO GET AWAY FROM THAT IF

15   WE INCLUDE THE CLAIMS AGAINST MGA THAT NATURALLY GROW OUT OF      01:53

16   THAT FIRST COMPLAINT.

17         FOR EXAMPLE, THERE ARE CLAIMS FOR -- AND THESE ARE

18   NOW IN THE AMENDED PLEADING WHICH IS PRESENTLY FRAMED AS A

19   COUNTERCLAIM --

20         THE COURT:  RIGHT.                                          01:54

21         MR. QUINN -- CLAIMS FOR TORTIOUS INTERFERENCE; CLAIMS

22   FOR CONSPIRACY TO BREACH EMPLOYMENT OBLIGATIONS.  THOSE CLAIMS

23   MADE AGAINST MGA THAT ARISE OUT OF THOSE SAME SET OF FACTS,

24   YOUR HONOR, IT SEEMS TO ME QUITE LOGICALLY OUGHT TO BE TRIED

25   WITH THOSE OTHER CLAIMS AGAINST CARTER BRYANT.                    01:54

EXHIBIT __12__

1  THIS ADJUDICATION.  HE'S THE ONE PERSON IN THIS MIX WHO'S NOT A

2  CORPORATION, AND HE HAS THIS CLOUD OVER HIS WELL-BEING THAT'S

3  BEEN THERE FOR A PRETTY LONG TIME NOW, AND HE WOULD LIKE TO SEE

4  IT DISPOSED OF, IN ONE WAY OR THE OTHER, AS QUICKLY AS

5  POSSIBLE.                                                          02:14

6         AND I THINK THAT AT THE LAST HEARING, THE COURT

7  ALREADY SORTED THESE ISSUES WHEN IT SAID THAT THE CLAIMS -- AND

8  THERE WERE CLAIMS AGAINST LARIAN AND CLAIMS AGAINST BRYANT IN

9  THE AMENDED COMPLAINT THAT MATTEL MOVED TO FILE, AND THOSE WERE

10 MOVED OVER TO THE OTHER CASE.  AND I THINK THAT TO BLEED THEM     02:14

11 BACK IN TO THE ORIGINAL CASE WOULD JUST CREATE A LOT OF

12 CONFUSION.

13        WITHOUT ARGUING THE CASE HERE NOW, MR. BRYANT

14 OBVIOUSLY DISPUTES THAT THE ACTIVITIES THAT HE DID, WHAT HE DID

15 AND DIDN'T DO, IN SEPTEMBER AND OCTOBER OF 2000 IS GOING TO      02:14

16 ENTITLE MATTEL TO THE RELIEF THEY ARE SEEKING.  BUT WE'LL

17 DECIDE THAT AT THE TRIAL.  AND WHEN THAT HAPPENS, I THINK THE

18 ISSUES WILL BE NARROWED.  SO WE AGREE WITH YOU, VERY

19 SOPHISTICATED LAWYERS ON ALL SIDES, THAT YOU CAN WRAP THE CASE

20 UP IN A YEAR.                                                    02:14

21        SURE, IT'S A BIG CASE, BUT THEY HAVE 13 LAWYERS

22 WORKING ON THEIR CASE; 13 LAWYERS GET COPIES OF WHAT THE

23 DISCOVERY MASTER IS SENDING OUT EVERY DAY.  IT'S AN AMAZINGLY

24 LONG LIST.  THEY HAVE THE RESOURCES TO BRING THIS CASE TO TRIAL

25 BY THE END OF THIS YEAR, AND THAT'S EXACTLY WHAT I THINK SHOULD  02:15

EXHIBIT __12__

20

1    BE DONE.

2            THE COURT:  THANK YOU, ALL THREE OF YOU.

3            MR. QUINN, YOU SEEM TO BE ANXIOUS TO SAY SOMETHING; A

4    VERY, BRIEF RESPONSE.

5            MR. QUINN:  THE CLAIMS AGAINST MGA, WHICH I THINK GO    02:15

6    HAND IN HAND WITH THESE CLAIMS REGARDING MR. BRYANT -- THE

7    INDUCEMENT AND THE AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

8    ARE -- IN THE COUNTERCLAIM THEY ARE CLAIM SIX, INTENTIONAL

9    INTERFERENCE; CLAIM EIGHT, AIDING AND ABETTING; BREACH OF

10   FIDUCIARY DUTY; CLAIM TEN, BREACH OF DUTY OF LOYALTY.          02:15

11           AND THEN, YOUR HONOR, TO THE EXTENT THAT WE WANT TO

12   FOCUS ON OWNERSHIP OF BRATZ, THERE IS NOT A CLAIM IN THE

13   ORIGINAL COMPLAINT THAT ADDRESSES OWNERSHIP OF BRATZ.  AT THAT

14   POINT WHEN THIS WAS FIRST STARTED AGAINST MR. BRYANT, MATTEL

15   WASN'T SURE WHAT IT WAS HE HAD BEEN WORKING ON OR WHAT HE HAD   02:15

16   CREATED.  THAT CLAIM IS A DEC RELIEF CLAIM THAT IS IN COUNT 13

17   NOW IN THE COUNTERCLAIM; SO IF WE WERE GOING TO FOCUS ON THOSE

18   BRATZ ISSUES AND MR. BRYANT, I'D SUBMIT THAT THOSE CLAIMS ALL

19   OUGHT TO GO IN THE FIRST TRIAL.

20           THANK YOU, YOUR HONOR.                                 02:16

21           THE COURT:  ALL RIGHT.  VERY WELL.

22           THIS IS WHAT WE'RE GOING TO DO.  I'M GOING TO SET TWO

23   SCHEDULING MATTERS; ONE FOR CASE 04-9059, AND A SEPARATE

24   SCHEDULING ORDER FOR 05-2727, AND MY SENSE IS TO BIFURCATE THEM

25   ALONG THOSE LINES.                                             02:16

EXHIBIT  12

1      MR. QUINN, I WILL ENTERTAIN A MOTION FROM THE

2  PLAINTIFFS IN -9059 FROM MATTEL THAT SOME OF THOSE LIMITED

3  CLAIMS, AS YOU JUST IDENTIFIED, ARE MORE APPROPRIATELY

4  CONSIDERED IN THAT FIRST CASE.  AND THEN OF COURSE THE DEFENSE

5  MAY OPPOSE THAT.                                              02:17

6      I CAN SEE HOW ONE OR MORE OF THOSE CLAIMS MIGHT BE,

7  BUT THEY MIGHT NOT BE AS WELL.  I'M NOT GOING TO DECIDE THAT

8  TODAY.  I'LL GIVE YOU LEAVE TO BRING THAT MOTION ON THAT NARROW

9  ISSUE IF THERE SHOULD BE CERTAIN CLAIMS THAT WE SHOULD DO IN

10 THIS FIRST PHASE AS OPPOSED TO THE SECOND PHASE.  BUT ABSENT AN 02:17

11 ORDER FROM THE COURT, THE ONLY CLAIMS THAT WE ARE GOING TO SET

12 IN THE FIRST TRIAL ARE THOSE SET FORTH IN 04-9059, AND THE ONLY

13 CLAIMS IN THE SECOND ARE GOING TO BE THE CLAIMS AND

14 COUNTERCLAIMS IN 05-2727.  I WILL GIVE YOU THAT OPPORTUNITY.

15     I'M GOING TO SET A JURY TRIAL DATE FOR FEBRUARY 12,    02:17

16 2008, ONE YEAR FROM TODAY, AT 9:30 A.M. IN 04-9049.  A HEARING

17 ON ANY MOTIONS IN LIMINE WILL BE SCHEDULED FOR FEBRUARY 4,

18 2008, 10:00 A.M., AND A FINAL PRE-TRIAL CONFERENCE WILL BE

19 CONDUCTED JANUARY 14, 2008, AT 11:00 A.M.

20     LAST DATE TO CONDUCT A SETTLEMENT CONFERENCE IN THAT   02:18

21 CASE WILL BE DECEMBER 3, 2007; THE LAST DATE FOR HEARING ANY

22 DISPOSITIVE MOTIONS WILL BE NOVEMBER 19, 2007 AT 10:00 A.M.;

23 THE COMPLETE DISCOVERY CUTOFF ON THE FIRST CASE WILL BE

24 OCTOBER 22ND, 2007.

25     I'LL SPEAK IN A FEW MOMENTS ABOUT LIMITS IN TERMS OF   02:18

EXHIBIT  12

25

1    AND THE RESOURCES THAT QUINN EMANUEL AND O'MELVENY & MYERS AND

2    LITTLER ARE ALL DEVOTING TO THIS, THESE DATES ARE PRETTY FIRM;

3    SO PLAN ACCORDINGLY.

4               MR. JACOBY:   THANK YOU, YOUR HONOR.

5               MR. QUINN:   THANK YOU, YOUR HONOR.                      02:23

6               THE COURT:   ALL RIGHT.   GOOD LUCK.

7

8

9

10

11

12

13

14

15

16

17                          CERTIFICATE

18

19   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
20   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
21   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

22

23   _____              _____
     THERESA A. LANZA, CSR, RPR               DATE
24   FEDERAL OFFICIAL COURT REPORTER

25

                                              EXHIBIT  12

     2-12-07                    CV 04-09049   PAGE  228

# EXHIBIT 13

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
#### <u>CIVIL MINUTES -- GENERAL</u>

Case No.    CV 04-09049 SGL(RNBx)                    Date: February 4, 2008
Title:      CARTER BRYANT -v- MATTEL, INC.
            AND CONSOLIDATED ACTIONS

==================================================================================

PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

|  |  |
|---|---|
| Jim Holmes | Theresa Lanza |
| Courtroom Deputy Clerk | Court Reporter |

ATTORNEYS PRESENT FOR CARTER          ATTORNEYS PRESENT FOR MATTEL:
BRYANT:

Michael Page                           John Quinn
                                       Jon D. Corey

                                       ATTORNEY PRESENT FOR CARLOS
ATTORNEYS PRESENT FOR MGA:             GUSTAVO MACHADO GOMEZ:

Thomas J. Nolan
Carl A. Roth
Robert J. Harrington

ATTORNEYS PRESENT FOR THIRD-
PARTY WITNESSES

Larry W. McFarland
Scott Gizer
Ramit Mizrahi
Henry H. Gonzalez
Neal A. Potischman
John Patrick Petrullo

Alexander H. Cote

MINUTES FORM 90                                Initials of Deputy Clerk __jh__
CIVIL -- GEN                        1          Time: 1/45

EXHIBIT 13

PAGE 229

PROCEEDINGS:

HEARING ON EX PARTE APPLICATIONS:

**1722 EX PARTE APPLICATION to Compel Deposition of Ana Cabrera, Beatriz Morales, and Maria Salazar and Mel Woods**

**1724 EX PARTE APPLICATION to Compel Depositions of Daphne Gronich, Joe Tiongco, Mariana Trueba, Pablo Vargas, MGA Entertainment, Inc.**

**1538 EX PARTE APPLICATION for Relief from 01-07-2008 Order re Motion Hearing**

**1583 EX PARTE APPLICATION to Compel Production of Electronic Media from Third Parties Elise Cloonan, Margaret Hatch-Leahy, and Veronica Marlow**

**1624 EX PARTE APPLICATION to Enforce Court's Orders Compelling Production of Tangible Items**

**1628 EX PARTE APPLICATION to Stay pending Review of Discovery Master's January 11, 2008 Order Granting MGA's and Bryant's Motion to Compel**

**ORDER TO SHOW CAUSE DIRECTED TO COUNSEL LARRY McFARLAND**

Having considered the documents submitted in support of and opposition to the applications set forth above, and having heard oral argument, the Court issues its rulings on these matters as stated on the record and as follows:

**EX PARTE APPLICATIONS REGARDING DEPOSITIONS**
**(DOCKET #1722 AND #1724) AND ORDER TO SHOW CAUSE**

These applications are DENIED IN PART, subject to the following rulings:

(1)   The Court's January 7, 2008, Order was intended to grant certain specified relief from the numerical limitations on discovery requests; it was not meant to make definitive rulings on burdensomeness, relevance, privilege, or service of discovery requests.

(2)   The Phase 1 discovery deadline has expired. Any Phase 1 discovery not properly served on or before this deadline may not now be pursued. Based on the representation of counsel that process for the letters rogatory on the Hong Kong witnesses has not been initiated, these witnesses may not be deposed on Phase 1 issues. Notwithstanding this ruling, however, the Court is concerned with the allegations by Mattel in its ex parte application regarding certain actions of Larry

MINUTES FORM 90
CIVIL -- GEN                                        2                        Initials of Deputy Clerk __jh_____
                                                                            Time: 1/45

EXHIBIT 13

PAGE 230

McFarland, who represents certain third-party witnesses. Mattel submits that Mr. McFarland has been deliberately evading service of a notice of deposition on him and his clients – serious allegations when made by an officer of the Court against another officer of the Court.   Accordingly, Mr. McFarland is **ORDERED TO SHOW CAUSE** why he and his clients should not be ordered to appear for deposition. A written response to this OSC must be filed no later than February 11, 2008.   Other parties may file written replies no later than February 19, 2008.   The Court will hear the matter at 10:00 a.m., February 25, 2008, in Courtroom One of the above-referenced Court.

(3)     Phase 1 depositions that have been scheduled past the discovery deadline for the convenience of the witnesses or pursuant to the stipulation of the parties and/or witnesses may proceed as scheduled.

(4)     All discovery related to Phase 2, other than certain individual depositions that may be related to both Phase 1 and Phase 2, is STAYED until further order of the Court.

(5)     As previously ordered and reaffirmed by this Court, all discovery matters shall be presented in the first instance to the Discovery Master.   The fact that the Discovery Master's ruling might impact upon the Court's scheduling order does not relieve the parties of following this procedure.   For instance, motions to compel, motions to quash, or motions challenging service as to existing discovery requests shall be brought before the Discovery Master.   So, too, must objections based on burdensomeness, relevancy, or privilege.   In general, and on the matters touched upon herein, the Court expresses no opinion as to these issues, and instead leaves those issues to the Discovery Master to decide in the first instance.

(6)     To the extent that certain challenged depositions are within the scope of the Court's January 7, 2008, Order, and are related to Phase 1 (or to the extent that a given deposition (other than a Rule 30(b)(6) deposition) is related to both Phase 1 and Phase 2), said deposition may proceed subject to the challenges set forth in the previous paragraph.   To the extent that the depositions are related to Phase 2, they are STAYED, as set forth above, notwithstanding the January 7, 2008, Order.

(7)     The parties' arguments require the Court to resolve an internal inconsistency in the Court's January 7, 2008, Order.   The Court's Order was meant to grant all parts of Mattel's Motion for Leave to Take Additional Discovery (docket #1134) except the relief sought as to the deposition of Carter Bryant.   The Court amends its 01.07.08 Order as follows:

> Delete: <Specifically, the Court grants Mattel's request to take the individual depositions relating to the Bratz claims (set forth in the moving papers at 9-11) and relating to the trade secret and RICO

MINUTES FORM 90
CIVIL -- GEN

3

Initials of Deputy Clerk ___jh_____
Time: 1/45

EXHIBIT **13**

PAGE **231**

claims (set forth in the moving papers at 13).>

Replace with: <Specifically, the Court grants Mattel's request to take the individual depositions relating to the Bratz claims (set forth in the moving papers at 9-11), relating to the trade secret and RICO claims (set forth in the moving papers at 13), and relating to document preservation (set forth in the moving papers at 14 (Joe Tiongco and Daphne Gronich)).>

(8)   The Court's January 7, 2008, Order granted leave to take additional discovery over and above the previously allocated 24 depositions per side. Nevertheless, as to all other depositions, how to "count" the previously allocated depositions is left to the discretion of the Discovery Master.

(9)   At the hearing, counsel for Christensen, Glaser requested that the Court clarify that its January 7, 2008, ruling granted leave to depose it on only one issue. That is not the case, and the request is DENIED. Mattel has been granted relief from the numerical limitations that previously restricted its ability to depose those individuals and entities addressed by the Court's January 7, 2008, Order, including its ability to depose Christensen, Glaser. Unless otherwise restricted by the Discovery Master upon proper presentation of the issue to him, Mattel may depose Christensen, Glaser on any relevant, non-privileged matter.

## MACHADO GOMEZ'S EX PARTE APPLICATION RE
## JANUARY 7, 2008, ORDER (DOCKET # 1504)

This application is GRANTED. As noted above, Phase 2 discovery is STAYED until further order of the Court. The Court will address Phase 2 discovery, motions, pretrial, and trial dates after the conclusion of Phase 1 of the trial.

## MATTEL'S EX PARTE APPLICATION RE MOTION TO COMPEL PRODUCTION OF
## ELECTRONIC MEDIA FROM THIRD PARTIES (DOCKET #1538)

This application is DENIED. This matter must be addressed in the first instance by the Discovery Master.

## MATTEL'S EX PARTE APPLICATION TO ENFORCE COURT'S ORDERS
## COMPELLING PRODUCTION OF TANGIBLE ITEMS (#1624)

This application is GRANTED IN PART. Counsel for MGA shall employ its best efforts to arrange for shipment of those tangible things located in the Peoples' Republic of China ("PRC") to Hong Kong Special Administrative Region ("Hong Kong") for examination in conjunction with those tangible things already located in Hong Kong. Otherwise, counsel for MGA shall cooperate in the

EXHIBIT 13

PAGE 232

arrangements for inspection in both Hong Kong and the PRC.   Mattel's request for costs is denied without prejudice.

Counsel are encouraged to meet and confer with the intent of reaching a stipulation regarding the supplementation of expert reports.  Absent such stipulation, at the appropriate time, the Court will entertain an ex parte application from any party regarding this issue.

### MATTEL'S EX PARTE APPLICATION TO STAY PENDING REVIEW OF DISCOVERY MASTER'S JANUARY 11, 2008 ORDER (DOCKET # 1628)

This application is GRANTED IN PART.  The Court sets the motion for hearing on February 11, 2008.  Opposition shall be filed no later than February 6, 2008; any reply shall be filed no later than February 8, 2008.  The Discovery Master's January 11, 2008, Order is stayed until the issuance of the Court's minute order regarding the February 11, 2008, hearing.

**IT IS SO ORDERED.**

MINUTES FORM 90
CIVIL -- GEN                                   5

Initials of Deputy Clerk __jh_____
Time: 1/45

EXHIBIT __13__

PAGE __233__

# EXHIBIT 14

CALENDARED

RECEIVED

JAN 0 8 2009

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
CIVIL MINUTES -- GENERAL

Case No.    CV 04-09049 SGL(RNBx)                    Date: January 6, 2009

Title:    MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
=============================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

            James Holmes                   None Present
            Courtroom Deputy Clerk         Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:     ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                          None Present

PROCEEDINGS:   ORDER APPOINTING DISCOVERY MASTER

      As in Phase 1 of this case, the Court intends to appoint a Discovery Master to govern any discovery disputes that might arise in Phase 2 of this case.  The appointment of the Discovery Master was made at the joint request of the parties in this case.  See Stipulation for Appointment of a Discovery Master and Order, December 6, 2006.

      Pursuant to Federal Rule of Civil Procedure 53(a)(1)(C), the Court continues to believe that a Discovery Master, as opposed to the assigned Magistrate Judge, is necessary to address what MGA has aptly described to the Court as "the massive administrative burdens in time and labor necessary to deal with the enormous complexities, both legal and practical, of the issues in Phase 2" and the "sheer volume of complex civil discovery disputes likely to arise in Phase 2."  Based on the Court's experience in this case, there is no question that a Discovery Master is needed to "effectively and timely" address the anticipated discovery matters in this case.

      The Court previously submitted to all counsel of record the names of eight attorneys for consideration by the parties and invited counsel to submit, in camera, any objections to those attorneys to serve as a Discovery Master (or as a Special Master to oversee the implementation of the permanent injunction, if needed).  The Court has carefully considered the objections submitted.  Two of the individuals named were not the subject of an objection by any party.  Of those two, the Court selects Robert C. O'Brien of Arent, Fox to serve as Discovery Master for Phase 2 of this

MINUTES FORM 90                                    Initials of Deputy Clerk: jh
CIVIL -- GEN                        1

EXHIBIT  14
PAGE  234

01-06

case.

The Discovery Master will serve under the terms and conditions of the Stipulation and Order dated December 6, 2006, the terms and conditions of which were previously agreed to by the parties. The stay on discovery for Phase 2 of this case is hereby VACATED.

Notwithstanding the parties' stated lack of objection to the appointment of Mr. O'Brien as Discovery Master, the Discovery Master is directed to promptly disclose to counsel for all parties any potential grounds for conflict of interest or disqualification, and the parties shall, within three days of receipt of said disclosure, submit any objection to the Court in camera.   A failure to object will be deemed by the Court as a waiver of any objections and consent to Mr. O'Brien to serve as Discovery Master.  The Discovery Master is further directed to contact counsel for all parties and resolve any and all outstanding discovery motions as expeditiously as possible.

IT IS SO ORDERED.

MINUTES FORM 90                                        Initials of Deputy Clerk: jh
CIVIL -- GEN                          2

EXHIBIT __14__

PAGE __235__

# EXHIBIT 15

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

September 14, 2007

<u>VIA FACSIMILE AND U.S. MAIL</u>

Amman Kahn, Esq.
Christensen, Glaser, Fink, Jacobs, Weil &
Shapiro, LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067

Diana Torres, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899

Michael Page, Esq.
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111

James W. Spertus, Esq.
Law Offices of James W. Spertus
12100 Wilshire Blvd., Ste. 620
Los Angeles, CA 90025

Larry McFarland, Esq.
Keats McFarland & Wilson LLP
9720 Wilshire Boulevard, Penthouse Suite
Beverly Hills, California 90212

Re:   <u>Mattel v. Bryant</u>

Dear Counsel:

In anticipation of the conference before Judge Infante on Monday, Mattel identifies below those witnesses whose deposition Mattel currently seeks:

EXHIBIT ___15___

PAGE ___236___

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 17th Floor, New York, New York 10017 | TEL 212-702-8100 FAX 212-702-8200
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94104 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
PALM SPRINGS | 45-025 Manitou Drive, Suite 10, Indian Wells, California 92210 | TEL 760-345-4757 FAX 760-345-2414
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3107 FAX 858-812-3336

07209/2221385.1

**Witnesses Whose Depositions Have Been Ordered But For Whom MGA Has Provided No Dates Despite Mattel's Requests**

1. Paula Garcia -- Topics Nos. 1-10, 12-13, 16-17, 29-30 and 35-36 of Mattel's Second Rule 30(b)(6) Notice to MGA ("Second Notice"); and Topic Nos. 1-3 and 6-8 of Mattel's First Rule 30(b)(6) Notice to MGA ("First Notice") -- 2 days by 9/28.
2. Lisa Tonnu -- Topic Nos. 21, 24, 25, 26, 31, 37, 39, 40 and 41 of Second Notice -- 2 days by 9/30
3. Ken Lockhart -- Topics No. 39 of Second Notice -- by 9/30
4. Topic Nos. 16, 18, 20 and 32 of Mattel's Second Notice of MGA -- by 6/30

**Witnesses Whose Depositions Have Been Ordered And For Whom There Are Agreed Dates**

5. Spencer Woodman -- Topic No. 34 of Second Notice -- 9/24
6. Tom Bryant -- 9/25
7. Janet Bryant -- 9/26
8. Richard Irmen -- 9/28

**Witnesses Whose Dates Have Been Agreed Upon And Set After Meet and Confers Requested By Mattel**

9. Schuyler Bacon -- Topic Nos. 4, 5, 10, and 14 of Mattel's Third Rule 30(b)(6) Notice to MGA ("Third Notice") -- 9/27
10. Sarah Chui -- 9/28
11. Edmond Lee -- MGA Hong Kong designee on all Rule 30(b)(6) Topics -- Starting on 10/4
12. Susan Kuemmerele -- 10/24
13. Carlos Gustavo Machado -- 10/26

**Witnesses for Whom Mattel Needs Dates, Including Witnesses MGA Promised Dates For But Have Never Provided**

14. Charlene Brooks -- MGA Designee on Topics 15 and 16 of Mattel's Third Notice
15. Topic Nos. 1-3, 6-8, 9, and 11-13 of Mattel's Third Notice
16. Rachel Harris, for completion of her Rule 30(b)(6) testimony on Second Notice
17. Kerri Brode, for completion of her Rule 30(b)(6) testimony on Second Notice
18. Dave Malacrida
19. Ron Brawer
20. Carter Bryant
21. Dan Cooney
22. Farhad Larian
23. Shirin Salemnia
24. Mariana Trueba
25. Pablo Vargas
26. Elise Cloonan
27. Sarah Halpern

EXHIBIT ___15___

PAGE ___237___

28.  Margaret Hatch Leahy
29.  Veronica Marlow
30.  Jorge Castilla
31.  Jeanine Brisbois
32.  Isaac Larian
33.  Stephen Lee
34.  Lucy Arant
35.  Joe Tiongco


Best regards,

Jon D. Corey

JDC:jcl
07209/2221385.1

EXHIBIT ___15___

PAGE ___238___

# EXHIBIT 16



**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3112**
WRITER'S INTERNET ADDRESS
**dylanproctor@quinnemanuel.com**

October 1, 2007

<u>VIA FACSIMILE AND U.S. MAIL</u>

Amman A. Khan, Esq.
Christensen, Glaser, Fink, Jacobs, Weil &
Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, California  90067

Re:    <u>Mattel, Inc. v. Bryant et al.</u>

Dear Amman:

This responds to your September 27, 2007 letter regarding Isaac Larian's deposition.  We have previously asked, on several occasions, that you confirm with MGA's lawyers from O'Melveny & Myers that Mattel and MGA, acting through the O'Melveny firm, agreed that Mr. Larian's prior deposition would be limited to the <u>Mattel v. Bryant</u> case.  I find it remarkable that MGA denies knowledge even of important agreements reached with its litigation counsel.

Nevertheless, to avoid further delays, some of the correspondence between the parties evidencing this agreement is enclosed for your convenience.  As the enclosed July 7, 2006 letter from Michael T. Zeller to Diana Torres reveals, the parties unequivocally agreed, before Mr. Larian was deposed, that Mattel would be entitled to depose him on issues in the <u>MGA v. Mattel</u> case at a later time.  Mattel would like to now schedule that deposition.

This issue has been outstanding for several weeks now.  We are entitled to at least know MGA's position on whether it will produce Mr. Larian for deposition in the <u>MGA v. Mattel</u> case or not. Please provide a firm answer in this regard no later than Wednesday, October 3, 2007, at noon. If we do not receive a written response confirming Mr. Larian will so appear by that time, we intend to file a motion.

EXHIBIT __*16*__

PAGE __239__

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100

Please do not hesitate to contact me if you have any questions.

Very truly yours,

*Dylan Proctor O.S.*

B. Dylan Proctor

07209/2239640.1

EXHIBIT _16_

PAGE _240_

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-624-7707 FAX 213-624-0643

July 7, 2006

<u>VIA FACSIMILE AND U.S. MAIL</u>

Diana Torres, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California 90071

Re:   <u>Mattel v. Bryant</u>

Dear Diana:

Enclosed please find a notice of deposition for Isaac Larian.

The noticed date is for July 18, 2006, which is the one that MGA offered and Mattel agreed to in order to accommodate Mr. Larian's schedule. As you and I previously discussed, and as you had stated as an incentive for Mattel's agreement to that accommodation, this deposition of Mr. Larian will relate to *Mattel v. Bryant* issues only and Mr. Larian will be made available on a separate, later day for deposition on issues in the *MGA v. Mattel* suit.

Also, in resolving the scheduling of Mr. Larian's deposition as well as the Union Bank subpoena, Dale Cendali and Paula Ambrosini agreed that we would receive two categories of financial information in advance of Mr. Larian's deposition. One category was MGA's audited financial statements. I had understood from Paula at the meet and confer session on June 20 that she would endeavor to produce copies of those by the end of that week. We have not received those audited financial statements as of yet, however, and so I would appreciate your letting us know when we can expect them. (The other category consists of the agreed-upon Union Bank documents, which are now being sent to MGA's counsel directly for review. From what Pam Lloyd at Union Bank last told me, MGA's counsel should be receiving at least two boxes of documents from Union Bank this week.)

EXHIBIT __16__

PAGE __241__

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 335 Madison Avenue, 17th Floor, New York, New York 10017 | TEL 212-702-8100 FAX 212-702-8200
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94104 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-620-4500 FAX 650-620-4555
PALM SPRINGS | 45-025 Manitou Drive, Suite 8, Indian Wells, California 92210 | TEL 760-345-4757 FAX 760-345-2414
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3107 FAX 858-812-3336

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2    John B. Quinn (Bar No. 90378)
     (johnquinn@quinnemanuel.com)
     Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
4  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
5  Facsimile: (213) 443-3100

6  Attorneys for Plaintiff and Counter-Defendant
   Mattel, Inc.

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  EASTERN DIVISION

11
   CARTER BRYANT, an individual,        Case No. CV 04-09049 SGL (RNBx)
12                                       NOTICE OF DEPOSITION OF ISAAC
                  Plaintiff,             LARIAN
13
        v.                               Discovery Cutoff Date: Not Set
14                                       Trial Date: Not Set
   MATTEL, INC., a Delaware
15 Corporation,

16                Defendant.

17

18

19

20

21

22

23

24

25

26

27                                                    EXHIBIT _16_

28                                                    PAGE ___243

209/1914956.1
                                       NOTICE OF DEPOSITION

1   This document relates to *Mattel v. Carter Bryant, et al.*, formerly Case

2   No. CV 04-09059 SGL (RNBx).

3       TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

4       PLEASE TAKE NOTICE that plaintiff and counter-defendant Mattel,

5   Inc. will take the deposition of Isaac Larian on July 18, 2006 beginning at 9:00 a.m.,

6   at the offices of Quinn Emanuel Urquhart Oliver & Hedges, LLP, 865 South

7   Figueroa Street, 10th Floor, Los Angeles, California, 90017.

8       PLEASE TAKE FURTHER NOTICE that the deposition will take

9   place upon oral examination before a duly authorized notary public or other officer

10  authorized to administer oaths at depositions, and will continue from day to day,

11  Sundays, Saturdays and legal holidays excepted, until completed.

12      PLEASE TAKE FURTHER NOTICE that, pursuant to <u>Fed. R. Civ. P.</u>

13  30(b)(2), the deposition will be videotaped.

14

15  DATED: July 7, 2006     QUINN EMANUEL URQUHART OLIVER &
16                          HEDGES, LLP

17              By _____
18                Michael T. Zeller
19                Attorneys for Plaintiff and Counter-
                  defendant Mattel, Inc.

20

21

22

23

24

25

26

27

28

EXHIBIT __16__

PAGE __244__

1

**PROOF OF SERVICE**

2     I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is 865 South Figueroa

3     Street, 10th Floor, Los Angeles, California 90017-2543.

4     On July 7, 2006, I served true copies of the following document(s) described as **NOTICE OF DEPOSITION OF ISAAC LARIAN** on the parties in this action as follows:

5

**SEE ATTACHED LIST**

6

**BY MAIL:**  I enclosed the foregoing into sealed envelope(s) addressed as shown above, and I

7     deposited such envelope(s) in the mail at Los Angeles, California.  The envelope was mailed with postage thereon fully prepaid.

8

**BY FACSIMILE:**  On July 7, 2006, I caused said document(s) to be transmitted by facsimile

9     pursuant to Federal Rule of Civil Procedures 5 (b)(2)(d).  The telephone number of the sending facsimile machine was (213) 443-3100.  The name(s) and facsimile machine telephone number(s)

10    of the person(s) served are set forth in the service list.  The document was transmitted by facsimile transmission, and the sending facsimile machine properly issued a transmission report confirming

11    that the transmission was complete and without error.

12    I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

13

14    Executed on July 7, 2006, at Los Angeles, California.

15

16    _____
                         Mia Albert

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT  16
PAGE  245

07209/1886691.1

1

**SERVICE LIST**

2

3   Keith A. Jacoby, Esq.
    Littler Mendelson
4   2049 Century Park East, 5th Floor
    Los Angeles, CA  90067-3107
5   Telephone: (310) 553-0308
    Facsimile: (310) 553-5583
6
    Diana M. Torres, Esq.
7   O'Melveney & Meyers
    400 So. Hope Street
8   Los Angeles, CA  90071
    Telephone: (213) 430-6000
9   **Facsimile: (213) 430-6407**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT _16_

PAGE _246_