# EXHIBIT 20

CONFORMED COPY

LODGED                                    FILED

2007 MAY 16  PM 1:59   2007 MAY 16  PM 2:00

CLERK U.S. DISTRICT COURT   CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.   CENTRAL DIST. OF CALIF.
       RIVERSIDE              RIVERSIDE
BY                         BY

1   Hon. Edward A. Infante (Ret.)
    JAMS
2   Two Embarcadero Center
    Suite 1500
3   San Francisco, California 94111
    Telephone:    (415) 774-2611
4   Facsimile:    (415) 982-5287

5

6

7                    UNITED STATES DISTRICT COURT

8                   CENTRAL DISTRICT OF CALIFORNIA

9                          EASTERN DIVISION

10

11   CARTER BRYANT, an individual,          CASE NO. C 04-09049 SGL (RNBx)
                                            JAMS Reference No. 1100049530
12             Plaintiff,

13        v.                                Consolidated with
                                            Case No. CV 04-09059
14   MATTEL, INC., a Delaware corporation,  Case No. CV 05-2727

15             Defendant.                   **ORDER GRANTING MATTEL'S**
                                            **MOTION TO COMPEL PRODUCTION**
16                                          **OF DOCUMENTS AND**
                                            **INTERROGATORY RESPONSES BY**
17   CONSOLIDATED WITH                      **MGA**
     MATTEL, INC. v. BRYANT and
18   MGA ENTERTAINMENT, INC. v. MATTEL,
     INC.
19

20

21                            I.  INTRODUCTION

22        On February 2, 2007, Mattel, Inc. ("Mattel") submitted its Motion To Compel Production

23   of Documents and Interrogatory Answers by MGA Entertainment, Inc. ("MGA").  On February

24   20, 2007, MGA submitted its opposition brief, and on February 26, 2007, Mattel submitted a

25   reply brief.  The matter was heard on March 5, 2007.  Thereafter the motion was taken under

26   submission pending the parties' submission of a proposed protective order, which was received

27

28
     Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)

EXHIBIT  20
PAGE  935

1   on April 23, 2007. Having considered the motion papers and comments of counsel at the hearing,

2   Mattel's motion to compel is granted.

3                                    II. BACKGROUND

4        A. Requests for Documents

5        In June of 2004, two months after Mattel filed suit against Bryant, and before MGA

6   became a party to the action, Mattel served MGA with an eight-page subpoena for twenty-one

7   categories of documents, to be produced in ten days. MGA filed a motion to quash, which the

8   court granted because of the short amount of time provided for compliance with the subpoena.

9   The parties met and conferred in July of 2004, and reached an agreement to limit the scope of

10  some of Mattel's requests. In particular, the parties agreed to limit production to the "first

11  generation" Bratz dolls. On August 12, 2004, MGA produced documents.

12       In 2005, the parties stipulated to supplementing their document productions on May 16,

13  2005. Mattel agreed to continue limiting its discovery requests to "first generation" Bratz dolls.

14       In September of 2006, MGA made a supplemental production of documents. On February

15  5, 2007, MGA produced about 2,300 pages of documents to replace earlier produced documents

16  with legibility problems. On February 20, 2007, MGA produced an additional 224 pages of

17  documents to replace earlier produced documents with legibility problems.

18       Mattel now moves to compel MGA to produce documents responsive to its requests. As a

19  preliminary matter, Mattel contends that MGA's production is deficient because it contains

20  redactions and cut-off text. Further, Mattel contends that MGA's production is incomplete with

21  respect to essentially five categories of documents. First, Mattel contends that MGA is

22  withholding documents relating to the origins of Bratz and Bryant's work for MGA. Mattel

23  believes that MGA's production is incomplete based upon its review of documents that have been

24  produced by third party Steven Linker. According to Mattel, Linker's documents from October

25  of 2000 show that Bratz was much farther along before Bryant left Mattel than MGA or Bryant

26  previously represented. Mattel also contends that MGA's responses to the document requests

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT ___70___

PAGE ___530___

2

1  contain inappropriate limitations, such as MGA's statement that it will produce "relevant and

2  responsive non-objectionable documents" or only that it will produce documents "sufficient" to

3  show when certain dates relating to Bratz occurred.  Mattel contends that these "carve outs

4  purport to allow MGA to cherry-pick what it will and will not produce to Mattel."  Mattel's

5  Separate Statement at 17:11-13.  Mattel also contends that the carve-outs fail to provide notice of

6  what is or is not being withheld.  Mattel also contends that MGA's objections based upon its

7  confidentiality concerns or the privacy rights of third parties are unwarranted in light of the

8  protective order in place.  In addition, Mattel contends that MGA's objection to producing

9  documents relating to activities or conduct in foreign countries is wholly improper because those

10 documents may contain information relevant to Mattel's claims.

11     Second, Mattel seeks documents relating to the origins of Bratz, regardless of whether

12 such documents relate to the "first generation" Bratz dolls.  Mattel argues that whether the work

13 ultimately resulted in Bratz dolls that were released at a particular time does not matter for

14 discovery purposes.  Mattel contends that the works created by Bryant during his Mattel

15 employment are highly relevant because Mattel owns them, regardless of whether they resulted in

16 a Bratz doll released at a particular time.[1]

17     Mattel next contends that MGA is improperly withholding documents about designs

18 Bryant created on Bratz dolls that were released after June 2001, even though such designs may

19 be derivative of work he did when employed by Mattel.  Mattel contends that it is entitled to

20 explore whether such works and the profits from Bratz dolls other than the "first generation"

21 Bratz dolls were derived from works owned by Mattel both for purposes of establishing liability

22 and damages.  Furthermore, Mattel asserts that the "first generation" limitation on discovery is

23 improper in light of Bryant's continuing duty not to use Mattel's confidential and proprietary

24 information as well as MGA's unfair competition claims.

25 _____

26     [1]  Mattel also reiterates many of the arguments it made previously in connection with its earlier filed motion
    to compel Bryant to produce documents.

27

28 Bryant v. Mattel, Inc.,
   CV-04-09049 SGL (RNBx)

3

EXHIBIT __20__
PAGE __537__

1  Mattel also asserts that MGA is improperly withholding documents relating to products,

2  services and matters other than those relating to "dolls." According to Mattel, it has evidence that

3  Bryant conceived of marketing and advertising ideas for the Bratz line while he was employed by

4  Mattel. Mattel contends that any such ideas or contributions may belong to it pursuant to the

5  Inventions Agreement.

6  Third, Mattel seeks documents relating to all of MGA's payments to Bryant, and not just

7  payments for the "first generation" Bratz dolls. Mattel asserts that such information is relevant

8  because (1) Mattel seeks all benefits Bryant received as a result of violating his duties to Mattel;

9  (2) under the Copyright Act, Mattel is entitled to all profits from infringement as well as actual

10  damages; and (3) payments may show when and what trade secret information Bryant and other

11  defendants allegedly misappropriated from Mattel.

12  Fourth, Mattel seeks documents relating to MGA's agreements with Bryant. Mattel

13  contends that all agreements between Bryant and MGA are relevant, not just the original

14  September 18, 2000 agreement. In particular, Mattel contends that it is entitled to discover all

15  documents relating to MGA and Bryant's alleged joint defense agreement because such

16  information would be relevant to demonstrate bias and lack of credibility.

17  Fifth, Mattel seeks production of all declarations, affidavits and other sworn written

18  statements from other cases that refer or relate to Bratz or Angel. Mattel contends that such

19  information may reveal relevant information about the date of creation of Bryant's Bratz

20  drawings.

21  In response, MGA denies withholding responsive documents and asserts that it has

22  produced volumes of documents responsive to Mattel's requests. In particular, MGA represents

23  that it has produced all responsive and relevant documents that it was able to locate in response to

24  request nos. 6, 7, 9, 26, 27, 32, 33, 34, 35, 36, 55, 69, and 70. Further, MGA asserts that even

25  before the motion was filed, it had agreed to address the vast majority of the issues raised in this

26  motion. In particular, MGA represents that it is diligently working to produce documents related

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT 20
PAGE 538

1   to Bratz other than "first generation" Bratz in response to request nos. 1, 2, 8, 10, 11, 43, 45, 46,

2   49, 50, 51, 53, 57, 59, 61, 63, 64, 66, 96, 97, 98, 99 and 100.  MGA represents that it informed

3   Mattel that it would produce documents pertaining to subsequent generations of Bratz dolls that

4   have been released on the market. In addition, MGA represents that it has agreed to produce

5   documents relevant to Bratz or Prayer Angels that it received from Union Bank.  More

6   specifically, MGA represents that it agreed to review and produce documents provided to it by

7   Union Bank for the years 1999 – 2001 concerning payments that it could identify as being for

8   Bratz or Prayer Angels.  MGA also represents that it has agreed to produce royalty statements.

9   Therefore, MGA views the motion as unnecessary.

10        MGA next contends that Mattel's motion should be denied for the following additional

11   reasons.  First, MGA contends that Mattel is not entitled to MGA's product design documents for

12   unreleased products.  MGA asserts that its product design documents for its unreleased toy

13   concepts are among its most highly valuable trade secrets.  Furthermore, MGA contends that

14   designs and drawings for products currently under development, over six years after Bryant first

15   created his original Bratz drawings, have no relevance to any of Mattel's claims.  In the event that

16   documents relating to unreleased products are ordered produced, MGA requests a protective order

17   under Rule 26(c), Fed.R.Civ.P., that limits the dissemination of its documents more drastically

18   than the current protective order provides.  In the alternative, MGA requests that any order

19   compelling production of documents relating to unreleased products should essentially be stayed

20   until after MGA's products are publicly released.

21        Second, MGA contends that Mattel is not entitled to information concerning Bryant's

22   attorneys' fees because the information is privileged.  Furthermore, MGA contends that the

23   information is not relevant to demonstrate bias because "there is no dispute that Bryant's interests

24

25

26

27

28
Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

5
EXHIBIT   20
PAGE   539

1  in this case are aligned with those of MGA, and that Bryant is 'biased' in that sense." MGA's

2  Opposition at 24:9-12.[2]

3       Third, MGA asserts that Mattel is not entitled to review all non-public witness statements

4  and litigation documents concerning Bratz for a variety of reasons, including because Mattel has

5  refused to produce similar types of documents.  More significantly, MGA contends that Mattel's

6  requests for non-public witness statements are "a blatant attempt to avoid the discovery

7  limitations imposed by both the Federal Rules of Civil Procedure and those additional limitations

8  imposed by this Court."  MGA's Opposition at 25:6-7.  MGA explains its position as follows.

9  MGA is involved in litigation against a number of counterfeiters and infringers in Asia.  In 2003,

10  Mattel allegedly began feeding documents concerning "Toon Teens" to those defendants in an

11  attempt to prove that Bryant created Bratz while working at Mattel, even though Mattel

12  abandoned its claims based upon "Toon Teens" in this court.  Thereafter, those defendants took

13  the position that MGA did not own, and therefore could not enforce, the rights to Bratz.  MGA

14  was thus forced to litigate the issue of ownership.  MGA contends that "[i]n effect, by prompting

15  foreign counterfeiters to espouse a theory that Mattel now admits has no merit, Mattel has created

16  a situation in which MGA has been forced to give testimony and provide evidence related to

17  issues in this case that Mattel now seeks to obtain wholesale."  MGA's Opposition at 25:5-24.

18       Fourth, MGA contends that Mattel is not entitled to documents concerning a family

19  dispute between MGA's chief executive officer and his brother because such documents are in no

20  way relevant to this lawsuit.  MGA explains that the brothers were involved in an arbitration

21  proceeding relating to MGA's CEO's purchase of his brother's interest in MGA.  Moreover,

22  MGA contends that the brothers were bound by a protective order prohibiting the use of any

23  documents or testimony for any purpose other than the arbitration.

24

25  _____

26  [2] Nevertheless, MGA represents that it has produced the only non-privileged document responsive to the request.

27

28  Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)

EXHIBIT _2D_

PAGE _540_

6

1    Fifth, MGA contends that Mattel is not entitled to its chief executive officer's personnel

2    files because they contain confidential information and are not relevant to the lawsuit. Sixth,

3    MGA contends that Mattel is not entitled to obtain documents from MGA that belong to, and are

4    in the possession, custody and control of, its indirect foreign subsidiary, MGA HK Ltd. Lastly,

5    MGA objects to producing documents relating to any testing performed to determine the date that

6    Bratz documents were created. MGA contends that such discovery is premature and should not

7    proceed until experts are designated.

8    B. Interrogatories

9    On April 28, 2005, Mattel served its Second Set of Interrogatories. On May 20, 2005,

10   however, the district court stayed the action. On May 17, 2006, the district court lifted the stay.

11   On May 30, 2006, MGA responded to the interrogatories.

12   Mattel contends that MGA's responses to the interrogatories were untimely. Further,

13   Mattel contends that the interrogatory responses to numbers five through eleven are deficient

14   because they lack substantive information and consist almost entirely of objections. MGA

15   responds that the motion is moot because it is prepared to provide supplemental responses to its

16   interrogatories. MGA does not otherwise assert any additional grounds for opposing Mattel's

17   motion to compel responses to interrogatories.

18   III. DISCUSSION

19   A. Rule 26 of the Federal Rules of Civil Procedure

20   Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain

21   discovery regarding any matter, not privileged, that is relevant to the claim or defense of any

22   party." Fed.R.Civ.P. 26(b)(1). "Relevant information need not be admissible at trial if the

23   discovery appears reasonably calculated to lead to the discovery of admissible evidence." Id.

24   Discovery shall, however, be limited by the court if it determines that: "(i) the discovery sought is

25   unreasonably cumulative or duplicative, or is obtainable from some other source that is more

26   convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

7

EXHIBIT __90__

PAGE __41__

1 | opportunity by discovery in the action to obtain the information sought; or (iii) the burden or

2 | expense of the proposed discovery outweighs its likely benefit, taking into account the needs of

3 | the case, the amount in controversy, the parties' resources, the importance of the issues at stake in

4 | the litigation, and the importance of the proposed discovery in resolving the issues." Fed.R.Civ.P.

5 | 26(b)(2).

6 |     B. <u>Document Requests</u>

7 |     1. <u>Requests re Origins of Bratz and Bryant's Work for MGA (Nos. 6, 26, 27, 32, 33,</u>

8 |     <u>34, 35, 51, 53, 55, 64, 69, 96, 97, 98, 99, 100</u>

9 |     The requests above seek discoverable information regarding the origins of Bratz and

10 | Bryant's work for MGA. MGA represents that it has produced all responsive documents in

11 | response to request nos. 6, 26, 27, 32, 33, 34, 35, 55,and 69 (MGA's Opposition at 13:4-5), and is

12 | "diligently working to produce documents in response to" request nos. 51, 53, 64, 96, 97, 98, 99,

13 | and 100, including documents related to Bratz other than "first generation" (MGA's Opposition at

14 | 14:1-4 and note 39). MGA does, however, object to producing design documents for unreleased

15 | products and documents from MGA Hong Kong.

16 |     As a threshold matter, MGA's responses are inadequate to the extent MGA has restricted

17 | its production to "relevant and responsive non-objectionable documents" or documents

18 | "sufficient" to show when events relating to Bratz occurred. These restrictions suggest that MGA

19 | might be excluding documents that are responsive to the request based upon its unilateral

20 | determination of what is "relevant" or "sufficient." Mattel shall provide the responses to

21 | document requests ordered herein without these restrictions.

22 | Design Documents for Unreleased Products

23 |     MGA's design documents for unreleased products are relevant to Mattel's claims and

24 | defenses and must be produced. <u>See</u> Order Modifying Protective Order. On April 23, 2007, the

25 | parties submitted a stipulation to modify the existing protective order to limit the disclosure of

26 | design documents for unreleased products that constitute trade secret information. <u>See</u> Stipulation

27 |

28 |

    8

EXHIBIT 20
PAGE 542

1   to Modify Protective Order; And Proposed Order Thereon ("stipulation").  The parties' stipulation

2   has been approved and entered as an order of the court.  MGA is ordered to produce design

3   documents for unreleased products that are responsive to Mattel's document requests in

4   accordance with the terms of the stipulation and order.

5                              <u>Documents from MGA Hong Kong</u>

6           Documents relating to activities or conduct in foreign countries are relevant and

7   discoverable because Mattel has evidence indicating that MGA Hong Kong was involved with

8   Bratz.  Nevertheless, MGA objects to producing documents from Hong Kong unless Mattel

9   provides reciprocal discovery from its subsidiaries.

10          Whether MGA is entitled to discovery from Mattel's subsidiaries has not been briefed in

11  the context of this motion, and therefore is not addressed herein.  MGA is ordered to produce

12  documents from MGA Hong Kong.

13          Mattel's motion is granted with respect to request nos. 6, 26, 27, 32, 33, 34, 35, 51, 53, 55,

14  64, 69, 96, 97, 98, 99, 100.

15               2. <u>Additional Requests re Origins of Bratz (Nos. 7, 8, 9, 10, 11, 12, 13, 36, 46, 57, 59,</u>

16                      <u>61, 63, 66, 67, 70, 88, 90, 91</u>

17          Mattel contends that MGA is improperly limiting its document production to the "first

18  generation" Bratz dolls.  MGA represents, however, that it has agreed to produce subsequent

19  generations of Bratz products (MGA's Opposition at 9:20-25, 13:6-14:1), except design

20  documents for yet unreleased products.

21          As stated previously, design documents for yet unreleased products are relevant and

22  discoverable.  <u>See</u> Order Modifying Protective Order.  Accordingly, MGA is ordered to produce

23  all non-privileged documents that are responsive to request nos. 7, 8, 9, 10, 11, 12, 13, 36, 46, 57,

24  59, 61, 63, 66, 67, 70, 88, 90, and 91.

25          //

26          //

27

28
    Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)

                                                                                        9

                                            EXHIBIT ___ *70*

                                            PAGE ___ *543*

1      3. MGA's Payments to Bryant (Nos.43, 45)

2           MGA represents that it has already agreed to produce documents related to Bratz, without

3   limiting its production to "first generation" Bratz.  MGA's motion at 13:7-14:3.  Nevertheless,

4   Mattel is entitled to an order compelling production of such documents by a date certain.  Mattel's

5   motion is granted with respect to request nos. 43 and 45.

6      4. MGA's Agreements with Bryant (Nos. 1, 2, 49, 50)

7           MGA represents that it has already agreed to produce non-privileged documents

8   responsive to request nos. 1, 2, 49, and 50, even though it believes that such documents are not

9   relevant (MGA's motion at 13:7-14:3).  These requests seek documents relating to fee or

10  indemnity agreements between MGA and Bryant .

11          Fee or indemnity agreements are relevant to demonstrate bias and lack of credibility.

12  Accordingly, Mattel's motion is granted with respect to request nos. 1, 2, 49, and 50.  Any

13  responsive documents withheld on the basis of a privilege must be properly identified in a

14  privilege log.

15      5. Declarations, Affidavits & Other Sworn Written Statements (Nos. 37, 38, 39, 40,

16         41,

17          In request nos. 37, 38, 390, 40, and 41, Mattel seeks production of declarations, affidavits,

18  and other sworn written statements from cases that refer or relate to Bratz or Angel.  Mattel

19  anticipates that these documents could provide evidence relating to the conception date for Bratz.

20          Request nos. 37, 38, 39, 40, and 41 seek relevant information regarding the conception

21  date for Bratz.  MGA admits in its opposition brief that this issue was litigated in its suits against

22  alleged counterfeiters and infringers.[3]  The issue also appears to have been raised in the

23  arbitration proceedings between MGA's chief executive officer, Isaac Larian, and his brother

24  Farhad Larian.  In those proceedings, Farhad Larian alleged that Isaac Larian concealed from him

25  _____

26  [3] Although MGA questions the propriety of Mattel providing assistance to the alleged counterfeiters and infringers in raising ownership of Bratz as a defense against MGA's claims, MGA has not cited to any legal authority

27  that prohibits Mattel's conduct.

28  Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)

                                                                                    10

EXHIBIT __20__

PAGE __541__

1   that MGA was developing Bratz by early 2000. Nevertheless, MGA objects to producing

2   documents from the Larians' arbitration on the grounds that the arbitration was governed by a

3   protective order that prohibits the use of any documents or testimony for any purpose other than

4   the arbitration. MGA, however, has not provided any evidence of the protective order.

5   Accordingly, Mattel's motion to compel is granted as to request nos. 37, 38, 39, 40 and 41.[4]

6          6. Documents Regarding Date-Testing (Request No. 92)

7          Mattel's request no. 92 seeks documents that refer or relate to "any testing of or sampling

8   from any documents that refer or relate to Bratz or Bryant, including without limitation any such

9   testing or sampling in connection with ink, paper or chemical analysis to date any such documents

10  and including without limitation all results and reports relating thereto." MGA contends that the

11  request is premature, and should proceed in the course of expert discovery.

12         The request calls for relevant discovery and there is no basis for delaying production of

13  responsive documents, other than expert reports. The timing of expert reports is governed by

14  Rule 26(a)(2)(C), Fed.R.Civ.P. Accordingly, Mattel's motion is granted as to request no. 92.

15         C. Interrogatories

16         Mattel contends that MGA's responses to interrogatories were untimely, and therefore

17  MGA has waived its objections to the interrogatories. Pursuant to Rule 33(b)(3), Fed.R.Civ.P.,

18  responses to interrogatories are due thirty days after service. In this case, Mattel served its

19  interrogatories on April 28, 2005, and responses were initially due May 31, 2005. The district

20  court, however, issued a stay on May 20, 2005, twenty-two days after the interrogatories were

21  served. The district court lifted the stay on May 17, 2006.

22

23

24

25

26   [4]   In its discussion of the arbitration proceedings, MGA raises an objection to producing Isaac Larian's
     personnel file based upon privacy grounds. The personnel file may have documents relevant to Bratz, and therefore
27   should be produced. The protective order is sufficient to alleviate Mr. Isaac Larian's privacy concerns.

28
     Bryant v. Mattel, Inc.,                                                                    11
     CV-04-09049 SGL (RNBx)

EXHIBIT _____ 70

PAGE _____ 545

1    Neither party has cited to any caselaw governing the calculation of the 30-day period

2    when there is an intervening stay in discovery.  In the absence of any caselaw, MGA's responses

3    will be treated as timely in order to preserve any valid objections MGA may have asserted.

4    Interrogatory No. 5 seeks the identity of each and every person who was involved in the

5    conception, origin, creation, design, development, sculpting, engineering, reduction to practice,

6    tooling or painting of, or who otherwise produced or contributed to any embodiment of Bratz

7    before December 31, 2001, including a description of each person's role and the start and end

8    dates of each person's involvement.  In response, MGA asserted numerous objections, but did

9    provide the names of five individuals.

10   The interrogatory clearly seeks information relevant to the claims at issue.  MGA's

11   objections are without merit.  The interrogatory is not vague, ambiguous, compound or overbroad.

12   Nor has MGA carried its burden of establishing that the interrogatory is unduly burdensome, calls

13   for confidential, proprietary or commercially sensitive information, or seeks information

14   protected by the attorney-client privilege.  Furthermore, MGA's response is incomplete insofar as

15   it fails to provide the description of each person's role and the start and end dates of each person's

16   involvement.  Accordingly, MGA is ordered to provide a complete response to Interrogatory No.

17   5 and identify documents in compliance with Rule 33(d), Fed.R.Civ.P.

18   Interrogatory No. 6 seeks the same information as Interrogatory No. 5 with respect to any

19   embodiment of Angel.  MGA is ordered to provide a complete response to Interrogatory No. 6 for

20   the reasons previously discussed in connection with Interrogatory No. 5.

21   Interrogatory No. 7 asks MGA to identify each and every embodiment of Bratz prior to

22   December 31, 2001.  In response, MGA asserted numerous objections and did not provide any

23   substantive information.

24   MGA's objections are without merit.  The interrogatory clearly seeks information relevant

25   to establishing when Bryant first conceived Bratz.  The interrogatory is not vague, ambiguous,

26   compound or overbroad.  Nor has MGA carried its burden of establishing that the interrogatory is

27

28
Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                           12

EXHIBIT 20
PAGE 546

1  unduly burdensome, calls for confidential, proprietary or commercially sensitive information, or

2  seeks information protected by the attorney-client privilege.  Accordingly, MG is ordered to

3  provide a complete response to Interrogatory No. 7.

4      Interrogatory No.8 asks MGA to identify each and every embodiment of Angel.  MGA is

5  ordered to provide a complete response to Interrogatory No. 8 for the reasons previously

6  discussed in connection with Interrogatory No. 7.

7      Interrogatory No. 9 requires MGA to identify each and every sworn statement that refers

8  or relates to the conception, origin, creation, design, development, sculpting, engineering, tooling

9  or painting of Bratz.  In response, MGA asserted numerous objections and did not provide any

10  substantive information.

11      The interrogatory seeks information relevant to establishing when Bryant first conceived

12  Bratz.  Furthermore, MGA's boiler-plate objections are unsubstantiated.  Accordingly, MGA is

13  ordered to provide a complete response to Interrogatory No. 9.

14      Interrogatory No. 10 requires MGA to identify each and every instance in which Bratz

15  was shown, displayed, or exhibited prior to June 1, 2001, including by stating the date(s) on

16  which each such instance occurred, the location of each show or exhibit, and the identity of

17  persons with knowledge of the shows or exhibits.  In response, MGA asserted numerous

18  objections and provided the following information:  Hong Kong Toy Fair in Hong Kong in or

19  about January 2001 and New York Toy Fair, New York, in or about February 2001.

20      Once again, MGA's boiler-plate objections are unsubstantiated.  The information is

21  potentially relevant to establish when Bryant conceived Bratz.  Further, the response is

22  incomplete insofar as it fails to identify any persons with knowledge.  Therefore, MGA is ordered

23  to provide a complete response to Interrogatory No. 10.

24      Interrogatory No. 11 requires MGA to state the "number for each and every telephone,

25  including without limitation each office, home and cell phone number, in the name of, for the

26  benefit of or for the account of Isaac Larian and any other telephone that Isaac Larian used from

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

13

EXHIBIT 20
PAGE 547

1  January 1, 1998 through the present, and IDENTIFY each and every carrier (including without

2  limitation any long-distance carrier) for each such number. In response, MGA asserted numerous

3  boiler-plate objections.

4      Once again, MGA has failed to substantiate any of its objections with supporting

5  declarations or legal authorities. Accordingly, all objections are overruled and MGA is ordered to

6  provide a full response to Interrogatory No. 11.

7                                  IV. CONCLUSION

8      For the reasons set forth above, Mattel's motion to compel production of documents is

9  granted. MGA shall produce all non-privileged documents that are responsive to the requests

10  identified in this Order. Further, MGA shall produce all documents in un-redacted form, except

11  for redactions that are justified by the attorney-client privilege or work product doctrine. Mattel's

12  motion to compel interrogatory answers is also granted. MGA shall produce documents and

13  provide responses to interrogatories consistent with this Order, and produce a privilege log in

14  compliance with Rule 26(b)(5), Fed.R.Civ.P., no later than May 31, 2007. Mattel's request for

15  sanctions is denied.

16      Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery

17  Master, Mattel shall file this Order with the Clerk of Court forthwith.

18

19

20

21  Dated: May 15, 2007

22                                          HON. EDWARD A. INFANTE (Ret.)
                                                Discovery Master
23

24

25

26

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

                                                                    14

EXHIBIT  20
PAGE  548

## PROOF OF SERVICE BY E-MAIL

I, Anthony Sales, not a party to the within action, hereby declare that on May 15, 2007, I served the attached ORDER GRANTING MATTEL'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND INTERROGATORY RESPONSES BY MGA in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| Robert Millman Esq. | Littler Mendelson | rfmillman@littler.com |
| Douglas Wickham Esq. | Littler Mendelson | dwickham@littler.com |
| Keith Jacoby Esq. | Littler Mendelson | kjacoby@littler.com |
| Dominic Messiha Esq | Littler Mendelson | dmessiha@littler.com |
| Diba Rastegar Esq. | Littler Mendelson | drastegar@littler.com |
| Michelle Park Esq. | Littler Mendelson | mpark@littler.com |
| Alaya B. Meyers, Esq. | Littler Mendelson | ameyers@littler.com |
| Brady Mitchell, Esq. | Littler Mendelson | bmitchell@littler.com |
| Carol Miller, Esq. | Littler Mendelson | cmiller@littler.com |
| Ryan P. Eskin, Esq. | Littler Mendelson | reskin@littler.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | jbq@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Morris Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgetmorris@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| David Hurwitz, Esq. | O'Melveny & Myers LLP | dhurwitz@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrisglase.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on May 15, 2007, at San Francisco, California.

Anthony Sales

EXHIBIT  20
PAGE  549

# EXHIBIT 21

DALE M. CENDALI
(of counsel, not admitted in California)
DIANA M. TORRES (S.B. #162284)
PAULA E. AMBROSINI (S.B. #193126)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA  90071-2899
Telephone:   (213) 430-6000
Facsimile:   (213) 430-6407
email:        dtorres@omm.com

PATRICIA GLASER (S.B. # 55668)
CHRISTENSEN, MILLER, FINK,
JACOBS, GLASER, WEIL &
SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, CA  90067
Telephone:   (310) 553-3000
Facsimile:   (310) 556-2920

Attorneys for Plaintiff
MGA Entertainment, Inc.

FILED

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MGA ENTERTAINMENT, INC., | Case No. CV 05-02727 CBM(RZx) |
| Plaintiff, | **COMPLAINT FOR FALSE DESIGNATION OF ORIGIN, AFFILIATION, ASSOCIATION OR SPONSORSHIP (15 U.S.C. § 1125 (a)); UNFAIR COMPETITION (15 U.S.C. § 1125 (a), Cal. Bus. & Prof. Code § 17200 _et seq._ and California Common Law); DILUTION (15 U.S.C. § 1125 (c), Cal. Bus. & Prof Code § 14330 and California Common Law); AND UNJUST ENRICHMENT** |
| v. | |
| MATTEL, INC., a Delaware Corporation, and DOES 1-10, | |
| Defendants. | |
| | **DEMAND FOR JURY TRIAL** |

EXHIBIT 21
PAGE 550

Plaintiff MGA Entertainment, Inc. for its complaint against
Defendants Mattel, Inc. and DOES 1-10 alleges and avers as follows:

## PARTIES

1.    Plaintiff MGA Entertainment, Inc. ("MGA") is a California corporation organized and existing under the laws of the State of California, with a principal place of business in Van Nuys, California.

2.    MGA is informed and believes, and based thereon alleges, that Defendant Mattel, Inc. ("Mattel") is a Delaware corporation with a principal place of business in El Segundo, California.

3.    MGA is ignorant of the true names and capacities of the defendants sued herein under the fictitious names DOES 1 through 10 inclusive. MGA will seek leave of court to amend this complaint to allege such names and capacities when they are ascertained. MGA is informed and believes, and based thereon alleges, that each of the fictitiously named DOE defendants is responsible in some manner for the wrongful conduct alleged herein. MGA further alleges that each defendant acted in concert with, as agent or representative for, or at the request or on behalf of another or Mattel. Each charging allegation contained herein is, therefore, also hereby alleged against each fictitiously named DOE defendant.

## JURISDICTION AND VENUE

4.    Through this action MGA asserts claims against Mattel arising under the Lanham Act, 15 U.S.C. Sections 1125 (a) and (c), California Business and Professions Code Sections 17200 *et seq.*, California Business and Professions Code Section 14330 and California common law. This Court has original subject matter jurisdiction over MGA's federal claims pursuant to 15 U.S.C. Sections 1116 and 1121, 28 U.S.C. Section 1338(a), and 28 U.S.C. Section 1331, and supplemental

1

EXHIBIT __21__
PAGE __591__

1   subject matter jurisdiction over MGA's state law claims pursuant to 28 U.S.C.

2   Section 1367(a).

3       5.    This Court has specific personal jurisdiction over Mattel, as it has

4   purposefully committed, within the State of California, the acts from which these

5   claims arise and/or has committed tortious acts outside California, knowing and

6   intending that such acts would cause injury to MGA within the state. The Court

7   also has general personal jurisdiction over Mattel, as it conducts continuous,

8   systematic and routine business within the State of California and the County of

9   Los Angeles.

10       6.    Venue is proper in the United States District Court for the Central

11   District of California pursuant to 28 U.S.C. Sections 1391(b) and 1391(c).

12

13   ## FACTUAL BACKGROUND

14       7.    MGA seeks by this action to halt Mattel's habitual and unfair tactics of

15   competition-by-intimidation and serial copycatting of MGA's products, which

16   Mattel has used in an unbridled effort to cause confusion in the market place and

17   eliminate MGA as a competitor in the toy and fashion doll market long dominated

18   and controlled by Mattel.

19       8.    MGA is a privately-held company in the San Fernando Valley that

20   began in 1979 as a small consumer electronics business. In 1987, the company

21   made its first foray into the toy business when it secured rights to market handheld

22   LCD games featuring licensed Nintendo® characters. Building on that small

23   success, the company began marketing products for popular licensed properties

24   such as the "Power Rangers"® and "Hello Kitty"®. This little-known but

25   successful company, however, was propelled into the limelight after its daring

26   release in June 2001 of an innovative line of fashion dolls called "BRATZ".

27   "BRATZ" are multi-ethnic fashion dolls that sport a fresh new urban and

28   contemporary look and fashion. At the time of the release of "BRATZ", "Barbie"

2

EXHIBIT __21__
PAGE __552__

1  sales were in a slump, Mattel was in turmoil, and the market was ripe for something

2  new, exciting and inventive. "BRATZ" fit the bill. It is the first fashion doll that

3  has been able to seriously challenge "Barbie" for market share, and begin to loosen

4  Mattel's 50-year iron-fisted grip on the fashion doll market.

5        9.    Mattel has not taken kindly to the challenge. Either unable or

6  unwilling to compete against "BRATZ" fairly, and on a level-playing field, Mattel

7  has, instead, taken a more expeditious approach, resorting to unfair and anti-

8  competitive business practices. Wielding its substantial clout and influence in the

9  toy industry, Mattel has tried to muscle MGA out of business. MGA is informed

10 and believes that Mattel has intimidated, coerced and threatened retailers, licensees,

11 suppliers and others in the industry -- both in the U.S. and internationally -- in order

12 to inhibit and stifle MGA's ability to compete with Mattel and to prevent MGA

13 from obtaining licensees, contracts and supplies for its products. Mattel has also

14 serially imitated and copy-catted the look of MGA products, trade dress,

15 trademarks, themes, ideas, advertising and packaging, including for the "BRATZ"

16 line of dolls. MGA brings this action to stop Mattel's tortious, unfair and anti-

17 competitive conduct and to recover the extensive damage that Mattel's illicit

18 behavior has caused, and continues to cause, MGA. Mattel's own website states:

19 "As the global leader in the toy industry, we believe that how we achieve success is

20 just as important as the success itself." It also proclaims that "unwavering integrity

21 defines our corporate culture on every level, guiding how we work and how we do

22 business." Mattel's own corporate governance standards require it to "play by the

23 rules," complete fairly and be a good corporate citizen. Mattel's actions, however,

24 speak louder than its words.

25

26

27

28

3

EXHIBIT __21__
PAGE __553__

## Mattel History and Performance

10.     Mattel is the world's largest toy company, but it owes its immense success chiefly to a single product: "Barbie." Since her debut in 1959, "Barbie" has been the fuel for Mattel's growth and success, turning Mattel into an international powerhouse. By the late 1990's, Mattel's annual sales of the doll approached or topped $1.8 billion and Mattel stock reached a record high of approximately $45.00 a share. At that time, the average American girl had eight "Barbie" dolls, and "Barbie" was the world's best-selling toy.

11.     Mattel's reliance on a single, 40-year old product for as much as 50% of its business turned out to be a risky business model, however. Resting on its laurels, Mattel failed to react to the shifting tastes of consumers, changing dynamics in the industry, and an increasing focus on technologically advanced and interactive toys. "Barbie's" record sales fell into a tailspin. According to one report, Adrienne Fontanella, Mattel's "Barbie" brand president, would later be quoted as saying that, "The world changed very quickly, and we missed a beat. . . Barbie wasn't talking to girls. She just wasn't hitting it."

12.     Sales began to plunge in 1997, and Mattel began posting a series of net income losses. In the first quarter of 1998, sales of the "Barbie" brand dropped 17%. This steep slide was followed by another in the second quarter, when sales fell again, down by 15%. By the end of 1998, Mattel reported an overall 14% decline in "Barbie" sales for the year and analysts were using words such as "devastating" and "a catastrophe" to describe Mattel's earnings. The company's stock fell as much as 27% in a single day. "Barbie" was having a crisis.

13.     Jill Barad, who had taken over as Mattel's chairman and chief executive in January 1997, at the height of Mattel's success, had to do something fast. Instead of focusing on and investing in new product development, however, which would obviously take time, Mattel embarked on a series of acquisitions that were seemingly aimed at quickly diversifying the company's product line and

4

EXHIBIT ___71___
PAGE ___554___

reducing its reliance on "Barbie" and on traditional retailers, such as Toys-R-Us and Wal-Mart. Mattel spent a reported $881 million in March 1997 to purchase Tyco Toys and acquire the "Matchbox" toy car brand. Just more than a year later, it spent $700 million for the Pleasant Co., a mail-order doll company and maker of the "American Girl" doll collection. And in December 1998, Mattel announced plans to fork out a monumental $3.5 billion to buy the Learning Company, followed quickly by Mattel's purchase, in March 1999, of a software company, Purple Moon.

14.     Despite these acquisitions, the company continued to struggle. The retail environment and buying patterns had unquestionably changed, but Mattel had not kept up. Despite Mattel's feverish acquisitions, Mattel's mainstay and primary profit-generator was still "Barbie." But "Barbie" had grown stale, and sales languished. Posting additional losses in the first quarter of 1999, Mattel announced that it would lay off 3,000 employees -- 10% of its work force.

15.     Mattel's stock plummeted again in late 1999, dropping 30% on Mattel's announcement that it would fall as much as 55% short of analysts' earning estimates for the third quarter. Mattel blamed its troubles primarily on its expensive, $3.5 billion acquisition of the Learning Company, which had turned out to be a disaster fraught with licensing and distribution problems, bad debt, high product returns and high advertising costs.

16.     By early 2000, Mattel's stock had crashed to as low as $8 per share, and some analysts considered Mattel vulnerable to a takeover. Investors clamored for Ms. Barad's resignation, and got their wish.

17.     Jill Barad resigned from Mattel in February 2000.

18.     For three months, the company was without a permanent chief executive until Robert Eckert took the helm in May 2000. Mr. Eckert had spent 23 years at Kraft Foods, a subsidiary of Altria Group, Inc., and was widely credited

5

EXHIBIT 71
PAGE 555

1   with reviving its ailing cheese business. Investors looked for him to do the same
2   for Mattel.

3       19.    Upon his arrival at Mattel, Mr. Eckert's promise, according to *Wall*
4   *Street Journal* reports, was to deliver a "leaner and meaner" Mattel.

5       20.    The "leaner" Mattel came quickly. Mr. Eckert laid off hundreds,
6   closed factories in the United States, shipped production to Mexico, and sold off the
7   Learning Company at a fraction of what Mattel had paid for it. It helped Mattel's
8   bottom-line, but did nothing to spur sales growth. Even under Mr. Eckert's "leaner
9   meaner" leadership, domestic "Barbie" sales remained in a slump into 2001. In an
10  industry that had become increasingly driven by consumer whims and fads, and the
11  hot, must-have toys of the moment, Mattel remained disinterested in devoting its
12  resources to searching for or developing a new blockbuster toy. Mr. Eckert's
13  business plan was not to diversify, but to build upon and expand sales of its existing
14  brands. Mattel was, after all, still generating billions in revenue despite the decline
15  of "Barbie." And so, Mattel remained committed to its age-worn icon and its two
16  other core brands, Fisher-Price and Hot Wheels, with each of the three accounting
17  for approximately a third of the company's sales.

18      21.    Then came the competition -- MGA's "BRATZ".

19

20  **"BRATZ" Dolls Revolutionize The Fashion Doll Market**

21      22.    "BRATZ" challenged "Barbie's" half-century domination of the
22  fashion-doll market like nothing ever before had been able to do.

23      23.    MGA unveiled a preliminary sample of the "BRATZ" doll at the Hong
24  Kong Toy Fair in January 2001, while continuing to finalize the product throughout
25  that spring. Finished products were first shipped in May 2001. MGA introduced
26  the line to consumers in June 2001.

27

28

EXHIBIT _____21_____
PAGE _____550_____

24.    Unlike "Barbie" dolls, the "BRATZ" line of dolls and branded products sported a hip, multi-ethnic urban look that appealed to contemporary teenage and pre-teen girls.

### MGA's "BRATZ"



 

 

25.    At approximately 9.5 to 10 inches tall, the "BRATZ" dolls were intentionally shorter than "Barbie" dolls and looked like no other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which requires a stand), and up-to-date fashions.

EXHIBIT __21__
PAGE __557__

26.  Indeed, the classic "Barbie" look was nowhere to be seen in these dolls; they would never be confused with "Barbie".

| MGA's "BRATZ" | Mattel's "Barbie" |
| :---: | :---: |

 

27.  Featuring and embodying the slogan "The Girls With a Passion for Fashion!", "BRATZ" dolls revitalized, transformed and expanded the fashion doll market, in particular proving popular among "tween" age girls – those between childhood and adolescence – who had been all but abandoned as a market by Mattel.

28.  The "BRATZ" line – with its unique and distinctive look – is well recognized and has been critically acclaimed and praised by consumers, retailers and toy industry analysts alike. In 2001, the "BRATZ" line won the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award. In 2002, the "BRATZ" line again won the TIA People's Choice Toy of the Year Award and the Family Fun Toy of the Year Award. LIMA, the licensing industry's official arm, awarded MGA's "BRATZ" the best character license of the year as well as the overall best licensed property of the year for 2003. MGA's "BRATZ" also earned the coveted TIA "Property of the Year" and "Girl Toy of the Year" for 2003, as well as the Family Fun Toy of the Year Award. MSNBC named "BRATZ" the "Hottest Toy of the Year," and both MGA and "BRATZ" received several other accolades in

8

EXHIBIT  21
PAGE  558

1    2004, including the Suppliers Performance Award by Retail Category (the

2    "SPARC" award) in the Girls' Toys category sponsored by DSN Retailing

3    Today/Apparel Merchandising.

4        29.    Although but a tiny fraction of Mattel's size, with "BRATZ", MGA

5    was able to chip away at Mattel's stranglehold on the fashion doll market, gaining

6    shelf space and market share as "Barbie" sales remained flat or, at times, declined.

7        30.    The competition that MGA (once a licensee of Mattel!) and "BRATZ"

8    posed to Mattel was unexpected and unwelcomed by Mattel.  Where "Barbie" had

9    once enjoyed a 90% share of the fashion doll market in 1997, that share had already

10   slipped to 85% or less by the time of the release of "BRATZ".  With the company

11   still struggling under Mr. Eckert to overcome prior years of declining sales and

12   mounting debt, "Barbie," Mattel — and Mr. Eckert — simply could not afford the

13   untimely competition.  Mr. Eckert's "leaner" Mattel was not enough to battle more

14   potential erosion in "Barbie's" market share.  Mattel had to combat "BRATZ" and

15   MGA, and in the process revealed Mr. Eckert's "meaner" Mattel.

16

17   **Mattel's Response to "BRATZ" and Efforts to Thwart MGA's Competition**

18       31.    Mattel was not poised to nimbly respond to "BRATZ" with a new,

19   creative product of its own — indeed, it had been antithetical to Mattel's corporate

20   culture and mentality for Mattel to even conceive that a product might vie for shelf

21   space with "Barbie", let alone be available for sale to consumers mere months after

22   first being shown to retailers.  Mattel had to take a more expeditious route.

23       32.    Instead of fairly competing, Mattel waged war against MGA using a

24   wide-array of tortious, unfair and anti-competitive practices including systematic,

25   serial copycatting and intellectual property infringement, aided by intimidation,

26   threats and other acts of unfair competition and anti-competitive conduct, all with

27   one goal in mind — to banish MGA from the market — or minimize its ability to

28   capture any meaningful share before it could do any real harm to Mattel.

9

EXHIBIT __21__
PAGE __591__

**Mattel's serial copycatting and intellectual property infringement**

33.   Mattel's serial copycatting of MGA's product lines began with the "BRATZ" dolls themselves, but quickly extended to MGA's packaging, themes, accessories, advertising and even other product lines.

34.   The first four "BRATZ" dolls that MGA launched in 2001, named Jade, Yasmin, Cloe and Sasha, met their wannabe "BRATZ PACK" members in October 2002 with Mattel's launch of three "My Scene" dolls named Madison, Chelsea and "Barbie." This was no ordinary "Barbie", however. Indeed, not even close. Mattel designed its "My Scene" dolls to evoke the unique and distinctive look of the "BRATZ" -- also with disproportionately oversized heads, artfully made-up almond-shaped eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and over-sized feet.

<u>**Mattel's Traditional "Barbie"**</u>          <u>**Mattel's "My Scene" Doll**</u>

                                 circa 2002          circa 2004





10

EXHIBIT 21
PAGE 200

35. These confusingly similar "BRATZ" imitators may have been originally intended to buy Mattel time while it worked to release another product the following summer, called "Flavas". MGA's founder, Isaac Larian, was quoted by the media as having predicted that the move would backfire on Mattel, and it did. Released in July 2003, Mattel's "Flavas" dolls took the urban, "hip-hop" look too far, and were widely viewed as portraying a trampy, "bad-girl" image. The dolls were not well-received, and rumor has it that Mattel had to sell them at below cost prices to get rid of inventory. Most apparently wound up in discount bins, and Mattel has seemingly abandoned the line.

36. Realizing that "My Scene" was its best bet for riding MGA's successful coattails and capitalizing on the unique and inherently distinctive look that MGA had developed in its "BRATZ" dolls – and MGA's substantial goodwill – Mattel has systematically proceeded to modify the "My Scene" dolls since their original release, particularly their eyes, to increase their similarity to "BRATZ" more and more over time.

37. Indeed, when Mattel found out that its initial line of "My Scene" dolls had trouble competing with "BRATZ", they simply *became* "BRATZ", in every version, whether blonde, brunette or African American. A few pictures here are worth a thousand words.

## BLONDE

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |

  

EXHIBIT __21__
PAGE __501__



Mattel's Traditional "Barbie"

Mattel's Original "My Scene"

Mattel's Recent "My Scene"

**BRUNETTE**

Mattel's Traditional "Theresa"

Mattel's Original "My Scene"

Mattel's Recent "My Scene"

12

EXHIBIT 21
PAGE 562

## AFRICAN AMERICAN

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|

  

  

38.   The original "My Scene" eye, as shown here, for example, has recently turned into a virtual carbon-copy of the "BRATZ" eye.

### Original Mattel "My Scene" Eye

 

13

EXHIBIT ___21___
PAGE ___503___

39.   The "My Scene" eye pictured above, for instance, has lashes that radiate almost straight out, circumferentially, from the eyelids and, although the eye is more almond shaped than a "Barbie" eye, the eye is not so sleepy and heavy lidded as a "BRATZ" eye and is only lightly shadowed.  The new "My Scene" eye, in contrast, is dramatically more similar to a "BRATZ" eye, as shown below in a side-by-side comparison.  The doe-eyed innocent look of the "My Scene" eye shown above is gone; replaced with a sultrier look, characteristic of "BRATZ."  The new "My Scene" eye, as shown below, boasts lashes that sweep out and away from the outer corner of the eye, just like the "BRATZ" eye.  The new "My Scene" eye is also more heavy lidded and thickly lined, and the make-up is more markedly pronounced and dramatic.

**MGA's "BRATZ" Eye**                    **New Mattel "My Scene" Eye**

          

40.   Indeed, the progression of the "My Scene" eye, as it has departed from "Barbie" and edged closer and closer to "BRATZ", is readily apparent from virtually every angle, as shown here:

14

EXHIBIT __n__
PAGE __564__



**BLONDE**

Mattel's Traditional "Barbie"

Mattel's Original "My Scene"

Mattel's Recent "My Scene"

**BRUNETTE**

Mattel's Traditional "Theresa"

Mattel's Original "My Scene"

Mattel's Recent "My Scene"

15

EXHIBIT 21
PAGE 565



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

16

EXHIBIT 21
PAGE 566

41.    Mattel has not stopped at the eyes, however. Mattel has also incrementally but steadily modified its "My Scene" packaging, and the manner in which the dolls are displayed, to more closely mimic the packaging, trade-dress and overall look and total image of MGA's "BRATZ".

42.    To illustrate, Mattel's "My Scene" dolls were initially marketed like this:

### Mattel's Early "My Scene" Packaging

 

43.    Little by little, however, the packaging has changed, creeping ever closer and closer to the open and transparent style of the "BRATZ" packaging. First, the panels seen running down each side of the front of the "My Scene" box shown above, framing the doll and giving the packaging a closed-in look, were changed as shown here:

### Intermediate Mattel "My Scene" Packaging



17

EXHIBIT ___21___
PAGE ___567___

44.    Mattel replaced this intermediate packaging style with another that looked even more similar to the "BRATZ" packaging, as shown here in a side-by-side comparison:

**MGA's "BRATZ"**
**"Wintertime Wonderland" Packaging**

**Mattel's "My Scene"**
**"Chillin' Out" Packaging**





45.    Then later, Mattel changed its packaging and product display yet again to look even more closely and confusingly similar to MGA's packaging and "*tout ensemble,*" as shown here

**MGA's "BRATZ"**
**"SPORTZ" Packaging**

**Mattel's Recent "My Scene"**
**"MIAMI GETAWAY" Packaging**





18

EXHIBIT ___21___
PAGE ___58___

46.     In this incarnation, Mattel notably abandoned the signature figure-eight style design that had appeared on its prior "My Scene" packaging, making this recent version clearer and more transparent on the front and sides than ever before, and much more like "BRATZ", accordingly.  Mattel also discarded its traditional, rectangular shaped box and, like "BRATZ", adopted an unusual, non-rectangular shaped box.  Mattel even adopted the "flying banner" ribbon-style slogan running across the middle of the box, similar to that used on the "BRATZ" packaging.

47.     As if these pointed and deliberate efforts to confuse and mislead consumers were not enough, Mattel exacerbated the confusion, and furthered the impression that the "My Scene" line and the "BRATZ" line are related, by taking up MGA's practice of regularly releasing new dolls in connection with a theme – but not just *any* theme, often *MGA's theme.*

48.     For example, when MGA released its "Wintertime Wonderland" theme in Fall 2003, Mattel released its "Chillin Out!" theme.  Each doll in MGA's line came with winter-sports accessories, such as a snowboard or skis and ski boots.  Each doll in Mattel's line featured winter sports accessories, also including snowboards or ski and ski boots.  Even MGA's color schemes and some of the clothing styles seemed to have made their way into the Mattel products.

49.     When MGA released its "Formal Funk" theme, Mattel released its "Night on the Town" theme.  "BRATZ Formal Funk" was an elaborately themed line with its dolls in hip formalwear; so was Mattel's "Night on the Town."

50.     When MGA released its distinctive "Sun-Kissed Summer" theme, Mattel released its confusingly similar "Jammin' in Jamaica" theme.  Each line featured a bright blue-and-orange color scheme, beach accessories, such as surfboards, and beachwear clothing.  Mattel's "Jammin' in Jamaica" "Guava Gulch Tiki Lounge" playset also contained elements remarkably similar to MGA's "Sun-Kissed Summer" playset.

EXHIBIT 21
PAGE 569

51.   Mattel also began running television commercials for its "My Scene" dolls bearing a remarkable similarity to "BRATZ" commercials, combining live action with animated sequences set to similar sounding pop music and lyrics.

52.   Mattel even stooped so low as to mimic "BRATZ" accessories and related products in order to further create consumer confusion in the marketplace.

53.   For instance, when MGA came up with its distinctive "BRATZ" "Runway Disco", Mattel came out with a "My Scene" Sound Lounge with packaging that imitated MGA's trapezoidal box.

54.   Mattel's conduct cannot be explained by sheer coincidence, nor is it merely fair competition. It is a calculated and intentional effort unquestionably designed to trade off of MGA's hard work and goodwill, create confusion in the marketplace, steal MGA's thunder and momentum, and dilute and blur away the novelty and distinctiveness of MGA's products. Out of the seemingly endless possibilities that Mattel could have chosen for a new line of dolls, packaging, themes, color schemes, commercials, accessories and playsets, Mattel deliberately chose *not* to come out with something unique, new or different and has, instead, focused its efforts and resources on flooding the market with something so close to "BRATZ" that the public will, can, and does, simply mistake it for "BRATZ".

55.   As yet another example of this, when MGA came out with a "BRATZ" "Funky Fashion Makeover Head," Mattel came out with a confusingly similar -- indeed, practically identical -- "My Scene" styling head.

EXHIBIT _21_
PAGE _570_

|  MGA's "BRATZ" "Funky Fashion Makeover Head" | Mattel's "My Scene" "Stylin' Head" |

   

   

56.   Indeed, Mattel's "My Scene" styling head is so close to the "BRATZ" styling head that even the press have mistakenly pictured and identified it as MGA's "BRATZ". The picture of Mattel's "My Scene" styling head shown below, for instance, appeared in the press with a caption indicating that the child was trying out different hairstyles "on a *Bratz* hair and makeup doll head."

Hairstyle practice

21

EXHIBIT __21__
PAGE __571__

57.     Creating further confusion, Mattel's television commercial for its "My Scene" styling head was like watching a re-run of MGA's commercial for its "Funky Fashion Makeover Head".

58.     At one point in time, Mattel also used a portion of the "BRATZ" dolls' now-famous trademarked tag line "The Girls With a Passion for Fashion" on Mattel's' website for its "Diva Starz" dolls, asking its website users: "Do you have a passion for fashion?"

59.     Mattel has even recently come out with a confusingly similar line of "My Scene" plush pets, which adopt the distinctive look of MGA's "BRATZ" line. The "My Scene" pets feature large, humanlike eyes and wear clothing making them remarkably and confusingly similar to "BRATZ" products, including "BRATZ PETZ", as seen in this example where the pets each wear a jacket, a cap and carry a purse:

**MGA's "BRATZ Dogz"**              **Mattel's "My Scene" dog**

   

60.     And here too, Mattel chose to package its pets the same way that MGA packaged its "BRATZ PETZ", sitting in an open box, with no top and with partial side panels that slope from a narrow front panel to a higher back panel.

61.     Indeed, the similarity of the "My Scene" pets to "BRATZ PETZ" has confused even sophisticated retailers who have mistakenly merchandised "My Scene" dogs in the middle of the "BRATZ" section of a retail display, next to and as if they were part of MGA's "BRATZ Petz" line. It comes as no surprise that

EXHIBIT _____ 71
PAGE _____ 572

1    customers too have been confused.

2        62.    Indeed, Mattel's television commercials and "My Scene" products

3    have become so confusingly similar to MGA's that even advertising executives

4    have expressed concern. One went so far as to say that although imitation is the

5    best form of flattery, what the individual had seen at Mattel's showroom, and how

6    its "My Scene" dolls now look so confusingly similar to "BRATZ", was

7    "shocking." This person further opined that it was clear that Mattel is intending to

8    confuse customers and capture "BRATZ" market share, and even asked MGA if it

9    was considering legal action.

10        63.    The press also has taken notice of Mattel's attempts to confuse

11    consumers. On or about February 18, 2005, a visitor to MGA's showroom from a

12    prominent news publication stated, "Oh my, I just came from Mattel's showroom

13    and their new 'My Scene' packaging is just like 'BRATZ' minus the handle."

14    Another member of the press visiting MGA's showroom offered the unsolicited

15    comment, "have you seen the new 'My Scene' dolls eyes are exactly like

16    'BRATZ'?" Yet another opined that Mattel's "My Scene" line was exactly like

17    "BRATZ", indeed, so much so that the reporter confusingly thought that Mattel had

18    bought "BRATZ", and still another has commented on Mattel's imitation of MGA.

19    On or about February 16, 2005, during an interview of a Mattel representative on

20    local network news in New York, "My Scene Barbie" was displayed by a Mattel

21    representative. During conversation about the dolls, the interviewer exclaimed that

22    they looked like "BRATZ". The Mattel representative just laughed – but this is no

23    laughing matter. This colloquy was available for replay and viewing, and was even

24    transcribed, on the internet.

25        64.    Customers too have been similarly confused. Some actually contacted

26    MGA seeking to purchase "My Scene" dolls.

27        65.    Mattel's conduct is planned, deliberate and intentional. Mattel has

28    systematically, copied, imitated and liberally borrowed many of the distinctive,

EXHIBIT ___71___
PAGE ___573___

1  essential elements that identify and make "BRATZ" dolls "BRATZ" dolls, diluting
2  the brand, creating customer confusion, and unfairly stifling competition.

3      66.    Ironically, Mattel sued one of its other competitors in Europe for doing
4  much the same thing: "systematically copying and borrowing elements" from "My
5  Scene", on grounds that "this conduct constitutes unfair competition and passing
6  off." Indeed it does.

7      67.    What is more, Mattel's conduct has reached beyond "BRATZ" and
8  "BRATZ"-related products to include other new MGA toy lines.

9      68.    For example, MGA's "4-Ever Best Friends" line was the obvious, and
10  well-recognized model for Mattel's "Wee 3 Friends" line. Mattel even adopted
11  changes to the color scheme of its similarly-shaped packaging to create confusion
12  with MGA's distinctive packaging.

13

14  **MGA's "4-Ever Best Friends"**          **Mattel's "Wee 3 Friends"**

15

16

17            

18

19

20

21

22

23  

24

25

26

27

28

EXHIBIT ___21___
PAGE ___574___

69.   In the second half of 2002, MGA's "Mommy's Little Patient," originally designed as the first in a series of "Mommy's Little . . ." dolls, was followed by Mattel's "Little Mommy" doll.

| **MGA's** **"Mommy's Little Patient"** | **Mattel's** **"Little Mommy Potty Training Baby Doll"** |
|---|---|

 

70.   Sparing nothing, Mattel has also extended its monkey-see monkey-do behavior into its boys' line. When MGA came out with its "Alien Racers" line of toy racing vehicles, for instance, Mattel rushed to revamp and rename one of its "Hot Wheels" lines. Although well-known and clearly branded for decades as "Hot Wheels", Mattel's answer to MGA's "Alien Racers" was to re-brand and market its Hot Wheels Highway 35 line under an "AcceleRacerS" logo. MGA's line consists of "extreme" radio controlled racing vehicles marketed in connection with a strong, almost battle-like, science fiction theme. MGA's logo accentuates the "A", "R", and "S" in compressed block lettering. Mattel's line also consists of extreme racing vehicles marketed in connection with a strong, almost battle-like, theme. Mattel's logo too accentuates the "A", "R", and "S" in compressed block lettering.

25

EXHIBIT ___71___
PAGE ___575___

71.   Here, too, Mattel's mimicry has spilled over into Mattel's advertising and thematic presentation and marketing of this toy line.  In particular, Mattel has adopted MGA's "other-worldly" theme in its commercials.  For instance, in Mattel's commercials, the product, whose logo appears as "AcceleRacerS", now compete against alien-like Cyborgs engaged in a "race to save the world," mimicking MGA's alien theme and commercials in which MGA's "Alien Racers" are engaged in a "race to save the universe."

72.   None of this is coincidence.  Mattel has deliberately adopted a pattern and practice of coming out with variations of MGA's products to create confusion in the marketplace, interfere with MGA's business and divert profits away from MGA.  Mattel says, on its website, that it is in the business of creating "[t]he world's premier toy brands [of] today and tomorrow."  It seemingly does so, however, by borrowing liberally from its competitors, even when it refreshes its own existing brands and products.

73.   MGA has suffered extensive injury from Mattel's conduct.  Mattel's habitual, serial simulation of MGA's products, product lines and trade dress has allowed Mattel to take a free ride on the extensive amount of time, expense and creative development MGA expends on developing new products, product packaging and presentation, giving Mattel an unfair advantage, and making it virtually impossible for MGA to compete with Mattel on a level playing field.

**Mattel's additional unfair, manipulative, anti-competitive conduct**

74.   This already substantial injury has been exacerbated by the strong-arm tactics, and other illegitimate, unfair and anti-competitive means that Mattel has used to manipulate the market and ensure that its control and domination of the industry can continue unabated.

EXHIBIT ___21___
PAGE ___576___

75.   For example, wielding the litigation privilege as a potential shield for intimidating conduct, Mattel has sent threatening letters to several of its former employees who now work for MGA warning them not to disclose *even publicly available information* about Mattel, including the names and positions of Mattel employees.  Mattel even went so far as to sue one of its former senior executives, after he had the temerity to resign and join MGA in October 2004.  Not only was Mattel's lawsuit dismissed for failure to state a viable claim, but Mattel thereafter seemingly could not muster up a shred of evidence sufficient to support an amended complaint.  As a result, Mattel's case against its former executive was dismissed with prejudice.

76.   Mattel has also warned a number of companies, including the biggest publishing entity in the United Kingdom, not to license MGA products, or risk retribution.  The threats are not idle.  In May 2004, Mattel terminated one of its licensees, apparently in retribution for licensing "BRATZ".  While some companies have been courageous enough to take the risk, others have not, and MGA has lost valuable licensing opportunities as a result.

77.   Mattel has used similar intimidation to pressure distributors and retailers, particularly in foreign countries, not to distribute "BRATZ", to reduce shelf and display space for "BRATZ" and to place "BRATZ" in unfavorable locations at retail outlets.

78.   When MGA faced a shortage of doll hair in October 2002, MGA is informed and believes that the reason for that shortage was that Mattel had locked MGA out by buying up the supply from the two main hair supply companies.

79.   Mattel has also manipulated the retail market.  For instance, Mattel merchandisers have been caught tampering with MGA's retail displays, replacing favorably located MGA merchandise with Mattel merchandise instead.  MGA is also informed and believes that Mattel has falsely told a major United States retailer that MGA was giving another major United States retailer below-market pricing

EXHIBIT __ 21 __

PAGE __ 377 __

and falsely told a United Kingdom retailer that MGA was discontinuing one of its
lines, in order to make such line less attractive to buyers and thereby attempt to
increase sales of the competitive Mattel product and improve its own sales, at
MGA's expense.

80.     Even supposedly unbiased and impartial industry organizations have
fallen prey to Mattel's abusive wield of power, to MGA's detriment.

81.     NPD Funworld ("NPD"), for one, is the leading supplier of sales
statistics in the toy industry. Accurate NPD statistics are essential for efficient
product-line management. Without these statistics, it is difficult, if not impossible,
for toy companies to assess and measure the relative success of their products in
key categories. It is, however, a subscription service, and NPD restricts the manner
in which its subscribers may use the data it provides.

82.     Mattel has regularly ignored the restrictions -- using NPD data about
Mattel's comparative standing relative to other companies in press releases and in
communications with retailers and financial investors who are not NPD subscribers.

83.     Mattel generates substantially more annual subscription revenue for
NPD than does MGA, and carries more clout.

84.     After MGA had subscribed to the service for more than 12 years, NPD
terminated MGA's subscription in 2003 theoretically on the grounds that MGA
misused NPD data in a press release.

85.     MGA is informed and believes that the termination was the result of
pressure from Mattel, notwithstanding Mattel's own frequent violations of NPD's
restrictions.

86.     In addition to this, the market share numbers that NPD generates are
heavily dependent on the category in which NPD places a particular product. MGA
is informed and believes that Mattel also pressured NPD into changing certain
product classifications for its "BRATZ" products in order to manipulate the data

28

EXHIBIT __11__
PAGE __518__

1    and preserve Mattel's market share rankings in the critical fashion doll category —

2    and thereby lower MGA's.

3        87.    The Children's Advertising Review Unit ("CARU") is another

4    organization that, upon information and belief, appears to have been subject to

5    improper influence by Mattel. CARU is the toy industry's supposedly independent

6    self-regulatory body in charge of maintaining standards in advertising. CARU's

7    approval is considered critical within the toy industry to avoiding regulatory action

8    by the Federal Trade Commission.

9        88.    CARU is heavily subsidized by Mattel.

10       89.    Upon information and belief, Mattel has used its influence as a major

11   contributor to CARU's budget to induce CARU to place onerous restrictions on

12   MGA advertisements, and require MGA to amend aspects of commercials that have

13   gone unchallenged in other parties' commercials.

14       90.    As a result of CARU's restrictions, MGA has been forced to incur

15   unnecessary costs for reshooting and producing or re-editing its commercials.

16       91.    On several occasions, CARU has also either strongly suggested, if not

17   also required, that MGA respond to inquiries about its website policies and make

18   substantial changes to the "BRATZ" website notably and significantly in excess of

19   restrictions imposed on Mattel and others.

20       92.    Even TIA, the toy industry's trade association, is apparently not

21   untainted by Mattel's influence and power. Each year, TIA presents the Toy-of-

22   the-Year Awards, the most prestigious of which had been the award for Toy of the

23   Year. Winning the Toy of the Year Award is a significant achievement that not

24   only very likely increases the sales of the winning toy, but also denotes the winning

25   company as a leader in toy innovation and generates substantial goodwill with

26   retailers, distributors, licensees, and customers.

27       93.    For the years 2000 (the first year of the award), 2001 and 2002, the

28   Toy of the Year award was chosen by consumer vote. The awards ceremony was

EXHIBIT ___21___
PAGE ___579___

1  then held the following year, at a dinner in New York. (For example, the awards

2  dinner for the year 2000 award was held in February 2001). Leap Frog won the

3  2000 People's Choice Toy of the Year Award and MGA won the 2001 and 2002

4  People's Choice Toy of the Year Awards. With the 2003 Toy of the Year Award,

5  however, the rules suddenly changed. Now, the award is selected by members of

6  the industry.

7      94.    Upon information and belief, this change was orchestrated by a Fisher

8  Price (a Mattel subsidiary) executive who, until recently, served as the Chairman of

9  TIA.

10     95.    Perhaps not surprisingly given this change in the winner selection

11 procedures, "Hokey Pokey Elmo" ("Elmo"), a Fisher Price toy, won for the year

12 2003 (awarded in 2004), beating out the other leading nominee, "BRATZ Formal

13 Funk Super Stylin' Runway Disco."

14     96.    TIA has refused to provide MGA with the vote count procedure and

15 totals for this award, despite repeated requests.

16     97.    MGA is also informed and believes that Mattel was instrumental in

17 attempting to keep MGA from participating as a sponsor in this year's "Kids'

18 Choice Awards."

19     98.    Mattel has clearly engaged in tortious, illegal and unethical behavior in

20 its unfettered efforts to disrupt, if not destroy, MGA. Indeed, this is apparently

21 Mattel's current *modus operandi* when it comes to "competing" in the industry.

22 The once immensely successful "LeapFrog" interactive learning product, for

23 example, has apparently been one of Mattel's other recent victims.

24     99.    Mattel may not shield its illegal, unfair and unethical business practices

25 from the public eye. It is time for the truth to be told, and the world to know of

26 Mattel's unfair, unethical and illegal business practices and unfair competition.

27 "Barbie" does not "play nice" with others (particularly her competitors), and needs

28 to be taught how "to share" (at least in the fashion doll marketplace). She cannot be

EXHIBIT ___21___
PAGE ___580___

1  allowed to continue to be the playground bully and trample on the rights of others,
2  including MGA.

3      100.  As a result of Mattel's manipulative, illegal, unfair, unethical and anti-
4  competitive conduct, MGA has suffered and, unless abated, will continue to suffer
5  lost sales, lost licensing fees, lost contracts, lost relationships, lost business
6  opportunities and other damages and harm for which there is no adequate remedy at
7  law. Its ability to enter new markets and product lines has been hampered and
8  delayed. Its production costs have increased, its reputation and relationships with
9  important players in the industry have been negatively impacted, the value of its
10  business has been diminished, and its ability to attract, hire and retain employees
11  has been affected.

12

13                    **FIRST CLAIM FOR RELIEF**

14  **(False Designation of Origin or Affiliation in Violation of 15 U.S.C. § 1125 (a))**

15      101.  MGA repeats and realleges the allegations contained in paragraphs 1
16  through 100 of this Complaint and incorporates them by reference as though fully
17  and completely set forth herein.

18      102.  MGA's "BRATZ" line has a unique and distinctive style and
19  distinctive characteristics, such as the disproportionately large head, large dramatic
20  eyes with a distinctive presentation (including the eye shape, make-up and lashes),
21  pouty, plump lips with a distinctive presentation (including the lip shape and make-
22  up), small, thin bodies, oversized feet, and up-to-date fashions. MGA's "BRATZ"
23  line is known for and recognized by the total image that is presented by its product
24  and the style and arrangement of the packaging and display. This "*tout ensemble*"
25  is representatively described and depicted herein. The characteristics of MGA's
26  "BRATZ" line, alone or in combination, have come to identify the "BRATZ" line
27  and its source, MGA, and thus serve as protectable trade dress. MGA's trade dress
28  in its "BRATZ" line is purely aesthetic and non-functional or, if any utility exists, it

EXHIBIT ___21___
PAGE ___581___

is not essential to the purpose, quality or source identifying attributes of the aesthetics. MGA's trade dress in its "BRATZ" line is inherently distinctive or has acquired distinction within the meaning of the Lanham Act.

103. Similarly, MGA's "BRATZ PETZ," part of the "BRATZ" line, also has its own unique and distinctive characteristics, such as the humanlike eye and unusual appearance of the animals dressed in clothing. MGA's "BRATZ PETZ" line has become known for and recognized by the total image that is presented by the product and the style and arrangement of its packaging. This "*tout ensemble*" is representatively described and depicted herein. The characteristics of MGA's "BRATZ PETZ", alone or in combination, have come to identify the "BRATZ PETZ" line and its source, MGA, and thus serve as protectable trade dress. MGA's trade dress in its "BRATZ PETZ" line is purely aesthetic and non-functional or, if any utility exists, it is not essential to the purpose, quality or source identifying attributes of the aesthetics. MGA's trade dress in its "BRATZ PETZ" line is inherently distinctive or has acquired distinction within the meaning of the Lanham Act.

104. Mattel's production, sale and marketing of "My Scene" dolls, including styling heads and doll heads, and "My Scene" pets that are confusingly similar to MGA's "BRATZ" line (including its "BRATZ PETZ"), without MGA's permission or consent, constitutes designation and use of a term, symbol, device or combination thereof that is false or misleading within the meaning of 15 U.S.C. Section 1125 and is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association, or as to the origin, sponsorship, or approval of Mattel's goods or commercial activities, within the meaning of 15 U.S.C. Section 1125.. MGA has been damaged by Mattel's acts.

105. Mattel's conduct has been intentional and willful, and is calculated specifically to trade off the goodwill that MGA has developed in its successful "BRATZ" line. By its aforesaid acts, particularly its imitation of the distinctive

32

EXHIBIT _____ 21
PAGE _____ 582

features of MGA's "BRATZ" line in connection with goods sold and distributed in interstate commerce, Mattel has infringed and is likely to continue to infringe on MGA's substantial rights in and to the "BRATZ" line trade dress. In so doing, Mattel has falsely represented and designated to the public generally and consumers of fashion doll products specifically the source and origin of Mattel's "My Scene" fashion doll products in violation of 15 U.S.C. § 1125(a).

106. MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

107. For each act of infringement, MGA is entitled to recover its actual damages as well as Mattel's profits from such infringement.

108. Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's illegal actions have caused and will continue to cause MGA, if not enjoined. MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing infringement of MGA's trade dress.

## SECOND CLAIM FOR RELIEF

**(Unfair Competition in Violation of 15 U.S.C. § 1125 (a) and Unfair Competition and Unfair Business Practices in Violation of Cal. Bus. & Prof. Code § 17200 *et seq.* and California Common Law)**

109. MGA repeats and realleges the allegations contained in paragraphs 1 through 108 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

110. Mattel has deliberately and, indeed, repeatedly adopted, imitated and mimicked the make-up, appearance, features, trade dress, and image of MGA's products, packaging and advertising, including its repackaging and refreshing of older Mattel toys. Mattel's actions were and are done with the intent to deceive consumers, cause confusion and mistake, and interfere with the ability of consumers to identify the source of goods by appearance and packaging. By this

33

EXHIBIT 21
PAGE 983

conduct, Mattel pirates and exploits, by subliminal or conscious association with MGA, the goodwill and reputation of MGA and derives benefit therefrom.

111. Mattel has particularly and deliberately poached upon the commercial magnetism of MGA's "BRATZ" and the success of "BRATZ". Mattel's conduct has been intentional and willful, and is calculated specifically to trade off the goodwill that MGA has developed in its successful "BRATZ" line.

112. By its acts, including its intentional imitation of the distinctive features of MGA's "BRATZ" dolls, which has progressively become closer and closer, as well as its imitation of "BRATZ" themes, packaging and the overall look, feel and total image of the "BRATZ" line, imitation of other MGA products, packaging and advertising, and other conduct alleged herein, Mattel has engaged in unfair competition under both federal and California state law.

113. Mattel has also willfully and maliciously used its power, influence and intimidation to threaten certain retailers, suppliers, licensees, distributors and manufacturers so as to limit, if not prevent, MGA from doing business with these retailers, suppliers, licensees, distributors and manufacturers, using its power and influence to intimidate and manipulate industry bodies. Mattel has further used its power and influence to attempt to, if not actually, intimidate and threaten MGA's current and potential employees so as to cause MGA competitive injury.

114. Alone, in combination, or in totality, Mattel's actions discussed and alleged herein constitute unfair competition and unfair business practices within the meaning of federal law, California statutory law and/or California common law.

115. As a result of its conduct, Mattel has derived substantial monetary and non-monetary benefit and business advantage. Mattel has also wrongfully diverted profits away from MGA and to Mattel and, on information and belief, deprived MGA of the patronage of a large number of actual and potential customers.

116. MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

EXHIBIT ___21___
PAGE ___584___

1    117.  Monetary relief alone, however, is not adequate to address fully the

2  irreparable injury that Mattel's actions have caused and will continue to cause

3  MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent

4  injunctive relief to stop Mattel, and all persons acting in concert with Mattel, from

5  engaging in acts of unfair competition and unfair business practices.

6    118.  MGA is further entitled to relief whereby Mattel is ordered to pay

7  restitution for damages resulting from Mattel's unfair competition and unfair

8  business practices.

9    ### THIRD CLAIM FOR RELIEF

10  **(Dilution in Violation of 15 U.S.C. § 1125 (c); Cal. Bus. & Prof. Code § 14330**

11  **and California Common Law)**

12    119.  MGA repeats and realleges the allegations contained in paragraphs 1

13  through 118 of this Complaint and incorporates them by reference as though fully

14  and completely set forth herein.

15    120.  The look and trade dress of the MGA products referenced herein are

16  distinctive and famous, and have been since before Mattel launched its similar

17  versions.  By its aforesaid acts, Mattel caused and continues to cause blurring and

18  dilution of the distinctive look of MGA's products and trade dress, which

19  previously served as a unique source identifier for MGA, within the meaning of the

20  Lanham Act, California Business and Professions Code § 14330 and/or California

21  common law.

22    121.  Mattel's conduct has been intentional and willful, calculated

23  specifically to trade on MGA's goodwill and reputation and to cause dilution of

24  MGA's famous marks, particularly those connected with MGA's famous and

25  successful "BRATZ" doll head, "BRATZ" doll product line, "BRATZ Funky

26  Fashion Makeover Head" and "BRATZ PETZ" line.

27    122.  MGA has been damaged by, and Mattel has profited from, Mattel's

28  wrongful conduct in an amount to be proven at trial.

EXHIBIT __21__
PAGE __585__

123.   Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing dilution.

## FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment)

124.   MGA repeats and realleges the allegations contained in paragraphs 1 through 123 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

125.   As a result of the conduct alleged herein, Mattel has been unjustly enriched to MGA's detriment.  MGA seeks a worldwide accounting and disgorgement of all ill-gotten gains and profits resulting from Mattel's inequitable activities.

## PRAYER FOR RELIEF

WHEREFORE, MGA prays for relief, as follows:

1.    That Mattel, its agents, servants and employees and all persons acting in concert be restrained preliminarily and permanently from directly or indirectly:

    a.    using confusingly similar trade dress;

    b.    improperly influencing, or attempting to improperly influence, standard-setting and industry organizations;

    c.    engaging in unfair competition and unfair business practices; and

    d.    diluting MGA's trade dress;

2.    For general and actual damages, according to proof at trial but believed to reach or exceed tens of millions of dollars;

3.    For the disgorgement of all profits derived by Mattel for its acts of:

    a.    false designation of origin or affiliation;

36

EXHIBIT __21__

PAGE __526__

1          b.    unfair competition and unfair business practices; and

2          c.    dilution;

3      4.    For costs of suit and reasonable attorneys' fees;

4      5.    For punitive and/or exemplary damages as a result of Mattel's willful

5 and malicious conduct to the extent allowable by law; and

6      6.    For such other and further relief as the Court deems just and proper.

7

8 Dated:     April 13, 2005         PATRICIA GLASER

9                            CHRISTENSEN, MILLER, FINK, JACOBS, GLASER, WEIL &

10                            SHAPIRO LLP

11                            DALE M. CENDALI

12                            DIANA M. TORRES

                             PAULA E. AMBROSINI

13                            O'MELVENY & MYERS LLP

14

15                      By:

16                           Diana M. Torres

                           Attorneys for Plaintiff

17                           MGA ENTERTAINMENT, INC.

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT _21_
PAGE _587_

1

## DEMAND FOR JURY TRIAL

2

3        MGA hereby demands a jury trial on all triable issues.

4

5    Dated:        April 13, 2005          PATRICIA GLASER
                                           CHRISTENSEN, MILLER, FINK,
6                                          JACOBS, GLASER, WEIL &
                                           SHAPIRO LLP
7
                                           DALE M. CENDALI
8                                          DIANA M. TORRES
                                           PAULA E. AMBROSINI
9                                          O'MELVENY & MYERS LLP

10

11                                         By:
                                           Diana M. Torres
12                                         Attorneys for Plaintiff
                                           MGA ENTERTAINMENT, INC.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT ___21___
PAGE ___588___

**EXHIBIT 22 REMOVED**

**PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT 23 REMOVED**

**PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT 24 REMOVED**

**PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT 25 REMOVED**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 26