1

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    EASTERN DIVISION

4    - - -

5    HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6    - - -

7    MATTEL, INC.,                    )
                                      )
8              Plaintiff,             )
                                      )
9         vs.                         )   No. CV 04-09049
                                      )
10   MGA ENTERTAINMENT, INC., ET. AL.,)
                                      )
11             Defendants.            )
                                      )
12   _____   )   HEARING

13

14

15   REPORTER'S TRANSCRIPT OF PROCEEDINGS

16   Riverside, California

17   Tuesday, December 30, 2008

18   10:04 A.M.

19

20

21

22

23   THERESA A. LANZA, RPR, CSR
     Federal Official Court Reporter
24   3470 12th Street, Rm. 134
     Riverside, California  92501
25   951-274-0844
     WWW.THERESALANZA.COM

**CERTIFIED COPY**

Exhibit 26
Page 616

Tuesday, December 30, 2008

Mattel vs. MGA

4

1    RIVERSIDE, CALIFORNIA; TUESDAY, DECEMBER 30, 2008; 10:04 A.M.

2                              -oOo-

3         THE CLERK:   Calling calendar item one, Mattel versus

4    MGA Entertainment, Inc., CV 04-09049-SGL.

5         May we have counsel please come forward and state

6    your appearances for the record.

7         MR. QUINN:   John Quinn, Mike Zeller,

8    Dylan Proctor for Mattel.

9         MR. NOLAN:   Tom Nolan, Jason Russell,

10   Jennifer del Castillo on behalf of Isaac Larian.

11        THE COURT:   We're on calendar this morning for MGA's

12   motion for this Court to issue a stay pending appeal.

13        The Court has received the filings in this matter and

14   has reviewed them.   There are a few matters, and I'll rule on

15   them just preliminary; I think I've basically ruled on them;

16   some are moot.

17        There is before the Court Mattel's ex-parte

18   application to redesignate MGA's compendium of third-party

19   declarations.   I'm going to deny that as moot pursuant to the

20   stipulation that was reached out and communicated to the Court.

21        There is Mattel's ex-parte application regarding a

22   briefing schedule regarding the declaration.   That is also

23   denied as moot.   The Court has received and reviewed the papers

24   that were submitted, both in support of and in opposition to

25   the particular declarations, and the Court will rule on the

Exhibit 26
Page 617

Tuesday, December 30, 2008                          Mattel vs. MGA

56

1  2001 through 2007.

2        He points to $3 million of profits.  It's true, but

3  profit is different than revenues.  And the reason profits

4  suffered, respectfully, is because of extraordinary costs like

5  this case.  What we're talking about here, and the evidence is          01:37

6  uncontroverted, MGA's primary, or in Mr. Quinn's showing, only

7  profitable line, if this Court's orders are not stayed, will be

8  enjoined.  MGA's revenue from its only, according to Mr. Quinn,

9  profitable line will not be received by the company.  Mr. Wing

10  says it's at least 44 percent of the revenues.  MGA will lose          01:38

11  $150 million in sunk costs.  There is no question that this

12  will cause grave, potentially catastrophic, harm; and they

13  haven't even tried to rebut that.

14        Now, I understand he wants to get to the receiver

15  argument, which we were forced to respond to in 12 hours.  And          01:38

16  we can do that on Monday.  But for purposes of today, there is

17  absolutely no showing, none whatsoever, from Mattel that this

18  will not kill MGA.  It will kill MGA.  That is the record

19  before trial.  That is the record before you.

20        THE COURT:  Very well.                                            01:38

21        I think both prudence and equity require the Court to

22  modify its previous order, extending the stay to February 11th.

23        Having said that, I find simply no grounds to grant

24  the motion as phrased, a motion for stay pending appeal, for

25  the reasons that I stated earlier.  There is simply no way of          01:39

Exhibit 26
Page 618

57

1  measuring the likelihood of success of an appeal of a decision

2  that has yet to be made.  And, likewise, the Court does have

3  serious questions about the irreparable harm.

4      In suggesting that I need to modify my previous stay,

5  I am not making a finding of irreparable harm.  And it's not on

6  that basis.  Rather, it is on the basis that I believe there is

7  a serious concern that the Court has that the status quo would

8  not be preserved on February 11th if the Court did not take

9  appropriate steps to modify its previously-entered stay.

10     So it is my intention to do so.

11     I happen to believe that this is inextricably

12 intertwined, however, with issues raised by Mattel in terms of

13 the finances of MGA, which at this point, quite frankly, are a

14 mystery to the Court.  And that mystery was compounded in part

15 by what I read on appeal, what I've heard from counsel, what

16 I've seen in other papers.  I just don't know what exactly is

17 going on with all of that, and I want to explore that at

18 Monday's hearing on that motion.

19     What I intend to do, following Monday's hearing, is

20 issue a written order which will set forth how '09 will

21 proceed, pending, of course, any decisions that the Court makes

22 on February 11th.  Because if the Court were to rule in MGA's

23 favor on February 11th, that would, if not eviscerate,

24 certainly unravel those decisions made after Phase 1-C. But I

25 do accept the evidence that a degree of certainty needs to be

01:39
01:39
01:40
01:40
01:40

Exhibit 26
Page 619

Tuesday, December 30, 2008

Mattel vs. MGA

58

1   maintained in order to preserve the status quo; and the Court

2   will be issuing an order to that effect following the hearing

3   on Monday.

4        That is the most that I can give at this point.  I

5   trust that there is probably a lot of work for MGA to do with

6   its suppliers and buyers to make sure that we can go forward.

7   The Court would certainly provide leave to both parties to

8   submit language that the Court might wish to consider to

9   address the concern, and only the concern, that the Court has

10  identified, how to preserve the 2009 buying season, purchasing

11  and buying season, for Bratz.

12       I think that is all the evidence supports.  I think

13  that's all the relief that is warranted at this stage, at this

14  posture of the litigation, and much remains to be seen in terms

15  of how things fold out on February 11th.  The more immediate

16  concern of the Court, though, is preserving the status quo; and

17  we'll take that up and the financial questions that the Court

18  has on Monday.

19       Are there any questions concerning where the Court is

20  at at this point?

21       Mr. Nolan?

22       MR. NOLAN:  No, your Honor.  Thank you.

23       THE COURT:  Mr. Quinn?

24       MR. QUINN:  No, your Honor.

25       THE COURT:  Very well.

01:41

01:41

01:41

01:42

01:42

Exhibit 26
Page 620

Tuesday, December 30, 2008

Mattel vs. MGA

59

1          Good day.  And Happy New Year.

2

3

4                          CERTIFICATE

5

6   I hereby certify that pursuant to section 753, title 28, United
    States Code, the foregoing is a true and correct transcript of
7   the stenographically recorded proceedings held in the above-
    entitled matter and that the transcript page format is in
8   conformance with the regulations of the Judicial Conference of
    the United States.
9

10  _____          1-7-09
    THERESA A. LANZA, CSR, RPR              _____
11  Federal Official Court Reporter              Date

12

13

14

15

16

17

18

19

20

21

22

23

24                                          Exhibit 26
                                            Page 621
25

Tuesday, December 30, 2008                  Mattel vs. MGA

# EXHIBIT 27

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Ann Jones, Paralegal (404) 881-7563

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
CT Corporation System
2295 Gateway Oaks Drive
Ste 185
Sacramento CA 95833
```

06-7090317861
10/30/2006  16:46

FILED
CALIFORNIA
SECRETARY OF STATE
SOS

10214510002   UCC 1 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| MGA Entertainment (Mexico), Inc. | | | | | |

| OR | 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 16380 Roscoe Blvd., Suite 200 | Van Nuys | CA | 91406 | USA |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| 20-0998523 | | Corporation | California | CA C2643976 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|

| OR | 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Wachovia Bank, National Association, as Agent | | | | |

| OR | 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| One South Broad Street, PA 4830 | Philadelphia | PA | 19107 | USA |

4. This FINANCING STATEMENT covers the following collateral:

All of the Debtor's right, title and interest in the following, whether now owned or hereafter acquired: (a) subject to the limitation set forth in Exhibit A attached hereto, equity interests in MGAE de Mexico SRL de CV, (b) related assets and (c) proceeds thereof, all as more particularly described on Exhibit A attached hereto.

| 5. ALTERNATIVE DESIGNATION (if applicable): | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |

File with California Secretary of State

MN11076889-15-1

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)
Gardner 19513/3 15438

Exhibit 27
Page 622

1821481002

## Exhibit A

Debtor:
MGA Entertainment (Mexico), Inc.
16380 Roscoe Blvd., Suite 200
Van Nuys, California 91406

Secured Party:
Wachovia Bank, National Association, as Agent
One South Broad Street, PA 4830
Philadelphia, Pennsylvania 19107

All of Debtor's right, title and interest in, to and under the following (collectively, the "Collateral"):

(a)  all Equity Interests now or hereafter acquired or held by Debtor in the issuer (the "Issuer") described in Schedule 1 attached hereto;

(b)  all payments due or to become due to Debtor in respect of any of the foregoing;

(d)  all of Debtor's claims, rights, powers, privileges, authority, puts, calls, options, security interests, liens and remedies, if any, in respect of any of the foregoing;

(e)  all of Debtor's rights to exercise and enforce any and every right, power, remedy, authority, option and privilege of Debtor relating to any of the foregoing including, without limitation, any power to (i) terminate, cancel or modify any agreement, (ii) execute any instruments and to take any and all other action on behalf of and in the name of Debtor in respect of any of the foregoing and the applicable Issuer thereof, (iii) exercise voting rights or make determinations, (iv) exercise any election (including, but not limited to, election of remedies), (v) exercise any "put", right of first offer or first refusal, or other option, (vi) exercise any right of redemption or repurchase, (vii) give or receive any notice, consent, amendment, waiver or approval, (viii) demand, receive, enforce, collect or receipt for any of the foregoing, (ix) enforce or execute any checks, or other instruments or orders, and (x) file any claims and to take any action in connection with any of the foregoing;

(f)  all certificates and instruments representing or evidencing any of the foregoing;

(g)  all other rights, titles, interests, powers, privileges and preferences pertaining to any of the foregoing; and

(h)  all Proceeds of any of the foregoing.

Notwithstanding the foregoing, Debtor has only granted a security interest in (x) 65% (or such greater percentage that, due to a change in an applicable law after October 27, 2006, (A) could not reasonably be expected to cause the undistributed earnings of the Issuer as determined for United States federal income tax purposes to be treated as a deemed dividend to the Issuer's United States parent and (B) could not reasonably be expected to cause any material adverse tax consequences) of the issued and outstanding Equity Interest of the Issuer entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and (y) 100% of the issued and outstanding Equity Interest of the Issuer not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)).

As used herein:

"Equity Interest" means, with respect to any Person, any share of capital stock of (or other ownership interests in) such Person, any warrant, option or other right for the purchase or other

A-1

LEGAL02/30133146v1

Exhibit 27
Page 623

acquisition from such Person of any share of capital stock of (or other ownership interests in) such Person, any security convertible into or exchangeable for any share of capital stock of (or other ownership interests in) such Person or warrant, right or option for the purchase or other acquisition from such Person of such shares (or such other ownership interests), and any other ownership interest in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such share, warrant, option, right or other interest is authorized or otherwise existing on any date of determination.

"Person" means an individual, corporation, partnership, limited liability company, association, trust or unincorporated organization, or a government or any agency or political subdivision thereof.

"Proceeds" means all proceeds (including proceeds of proceeds) of any of the Collateral including all: (a) rights, benefits, distributions, premiums, profits, dividends, interest, cash, instruments, documents of title, accounts, contract rights, inventory, equipment, general intangibles, payment intangibles, deposit accounts, chattel paper, and other property from time to time received, receivable, or otherwise distributed in respect of or in exchange for, or as a replacement of or a substitution for, any of the Collateral, or proceeds thereof (including any cash, Equity Interests, or other instruments issued after any recapitalization, readjustment, reclassification, merger or consolidation with respect to the Issuers and any security entitlements, as defined in Section 8-102(a)(17) of the UCC, with respect thereto); (b) "proceeds," as such term is defined in Section 9-102(a)(64) of the UCC; (c) proceeds of any insurance, indemnity, warranty, or guaranty (including guaranties of delivery) payable from time to time with respect to any of the Collateral, or proceeds thereof; and (d) payments (in any form whatsoever) made or due and payable to Debtor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral, or proceeds thereof.

Exhibit 27
Page 624

## SCHEDULE 1

### MGA Entertainment (Mexico), Inc.
#### Pledged Equity Interests

| Issuer | Jurisdiction of Formation | Class of Equity Interest | Certificate Number (if any) | Percentage of Ownership |
|---|---|---|---|---|
| MGAE de Mexico SRL de CV | Mexico | Shares Parts Social | N/A | 65% |

Exhibit 27
Page 625

**FILING OFFICER STATEMENT**

**INTERNAL USE ONLY**

1. Identification of the Record to which this FILING OFFICER STATEMENT relates.

  1a. INITIAL FINANCING STATEMENT #: 067090317861

  1b. RECORD TO WHICH THIS STATEMENT RELATES:

**DOCUMENT NUMBER: 10268190001**
**FILING NUMBER: 0670908369**
**FILE DATE/TIME: 11/3/2006 1:34:00 PM**

THE ABOVE SPACE IS FOR THE CA FILING OFFICE USE ONLY

2. Describe the inaccuracy or mistake on the part of the file office:

  ☒ Debtor  ☐ Secured Party
  ☐ Name and Address not indexed.
  ☒ Name indexed incorrectly
  ☐ Address indexed incorrectly

  ☐ File Date entered incorrectly
  ☐ Wrong Action type entered
  ☐ Wrong Filing Type entered
  ☐ Filed in Error
  ☐ Other

3. Describe filing office administrative action taken as a result of inaccuracy or mistake (including date of each action).

  ☐ Added Name:
  ☐ . Address:
  ☒ Corrected Name from: MGA EMTERTAINMENT (MEXICO), INC.
  ☒ To: MGA ENTERTAINMENT (MEXICO), INC.
  ☐ Corrected Address from:
  ☐ To:
  ☐ Corrected File Date from    to
  ☐ Re-entered the UCC3    as a
  ☐ Changed the Filing Type from    to
  ☐ Document Deleted
  ☐ Other:

4. Additional Explanation (if applicable):

11/03/2006 13:34

Exhibit 27
Page 626

**UCC FINANCING STATEMENT AMENDMENT**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Ann Jones, Paralegal (404) 881-7563

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

    UCC Direct Services
    1232 Q St
    Sacramento CA 95814
    Account 10010537
    CDD

**07-71137422**

**05/14/2007 11:35**

FILED
CALIFORNIA
SOS           SECRETARY OF STATE

12848650803   UCC 2 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. THIS FINANCING STATEMENT AMENDMENT is |
|---|---|
| 06-7090317861 filed 10/30/06 | to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 7d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☒ restated collateral description, or describe collateral ☐ assigned.

All of the Debtor's right, title and interest in the following, whether now owned or hereafter acquired: (a) subject to the limitation set forth in Exhibit A attached hereto, equity interests in MGAE de Mexico SRL de CV, (b) related assets and (c) proceeds thereof, all as more particularly described on Exhibit A attached hereto.

9. NAME OF SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Wachovia Bank, National Association, as Agent | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA
File with California Secretary of State; Debtor Name: MGA Entertainment (Mexico), Inc.   69264888 SO   SBM

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 07/29/98)
Cardant 19513/315438

Exhibit 27
Page 627

## Exhibit A

| | |
|---|---|
| Debtor: | Secured Party: |
| MGA Entertainment (Mexico), Inc. | Wachovia Bank, National Association, as Agent |
| 16380 Roscoe Blvd., Suite 200 | One South Broad Street, PA 4830 |
| Van Nuys, California 91406 | Philadelphia, Pennsylvania 19107 |

All of Debtor's right, title and interest in, to and under the following (collectively, the "Collateral"):

(a)    all Equity Interests now or hereafter acquired or held by Debtor in Issuer (the "Issuer") described in Schedule 1 attached hereto;

(b)    all payments due or to become due to Debtor in respect of any of the foregoing;

(c)    all of Debtor's claims, rights, powers, privileges, authority, puts, calls, options, security interests, liens and remedies, if any, in respect of any of the foregoing;

(d)    all of Debtor's rights to exercise and enforce any and every right, power, remedy, authority, option and privilege of Debtor relating to any of the foregoing including, without limitation, any power to (i) terminate, cancel or modify any agreement, (ii) execute any instruments and to take any and all other action on behalf of and in the name of Debtor in respect of any of the foregoing and the applicable Issuer thereof, (iii) exercise voting rights or make determinations, (iv) exercise any election (including, but not limited to, election of remedies), (v) exercise any "put", right of first offer or first refusal, or other option, (vi) exercise any right of redemption or repurchase, (vii) give or receive any notice, consent, amendment, waiver or approval, (viii) demand, receive, enforce, collect or receipt for any of the foregoing, (ix) enforce or execute any checks, or other instruments or orders, and (x) file any claims and to take any action in connection with any of the foregoing;

(e)    all certificates and instruments representing or evidencing any of the foregoing;

(f)    all other rights, titles, interests, powers, privileges and preferences pertaining to any of the foregoing; and

(g)    all Proceeds of any of the foregoing.

Notwithstanding the foregoing, (x) in no event shall the Debtor be required to subject to the Lien of the Pledge Agreement or any other loan document more than 65% (or such greater percentage that, due to a change in an Applicable Law after October 27, 2006, (A) could not reasonably be expected to cause the undistributed earnings of such Foreign Subsidiary as determined for United States federal income tax purposes to be treated as a deemed dividend to such Foreign Subsidiary's United States parent and (B) could not reasonably be expected to cause any material adverse tax consequences) of the issued and outstanding Equity Interest of a Foreign Subsidiary entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) determined on a collective basis, but (y) the Debtor shall be required to subject to the Lien of the Pledge Agreement 100% of the issued and outstanding Equity Interest of a Foreign Subsidiary not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)).

A-1

Exhibit 27
Page 628

As used herein:

"Equity Interest" means, with respect to any Person, any share of capital stock of (or other ownership interests in) such Person, any warrant, option or other right for the purchase or other acquisition from such Person of any share of capital stock of (or other ownership interests in) such Person, any security convertible into or exchangeable for any share of capital stock of (or other ownership interests in) such Person or warrant, right or option for the purchase or other acquisition from such Person of such shares (or such other ownership interests), and any other ownership interest in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such share, warrant, option, right or other interest is authorized or otherwise existing on any date of determination.

"Person" means an individual, corporation, partnership, limited liability company, association, trust or unincorporated organization, or a government or any agency or political subdivision thereof.

"Proceeds" means all proceeds (including proceeds of proceeds) of any of the Collateral including all: (a) rights, benefits, distributions, premiums, profits, dividends, interest, cash, instruments, documents of title, accounts, contract rights, inventory, equipment, general intangibles, payment intangibles, deposit accounts, chattel paper, and other property from time to time received, receivable, or otherwise distributed in respect of or in exchange for, or as a replacement of or a substitution for, any of the Collateral, or proceeds thereof (including any cash, Equity Interests, or other instruments issued after any recapitalization, readjustment, reclassification, merger or consolidation with respect to the Issuers and any security entitlements, as defined in Section 8-102(a)(17) of the UCC, with respect thereto); (b) "proceeds," as such term is defined in Section 9-102(a)(64) of the UCC; (c) proceeds of any insurance, indemnity, warranty, or guaranty (including guaranties of delivery) payable from time to time with respect to any of the Collateral, or proceeds thereof; and (d) payments (in any form whatsoever) made or due and payable to Debtor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral, or proceeds thereof.

Exhibit 27
Page 629

## SCHEDULE 1

### MGA Entertainment (Mexico), Inc.
#### Pledged Equity Interests

| Issuer | Jurisdiction of Formation | Class of Equity Interest | Certificate Number (if any) | Percentage of Ownership |
|---|---|---|---|---|
| MGAE de Mexico SRL de CV | Mexico | Shares Parte Social | N/A | 100% |

LEGAL02/00237046v2

Exhibit 27
Page 630

08-71714107
09/09/2008 16:03

FILED
CALIFORNIA
SECRETARY OF STATE
SOS

UCC 3 FILING
18335690005

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

74-00004454-2

CL@S
www.clasinfo.com
Information
Services

control number 1036 AM RW

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE #** 06-7080317661     10/30/06

1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the
☐ REAL ESTATE RECORDS.

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**3.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**4.** ☒ **ASSIGNMENT (full):** Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

**5. AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.
☐ DELETE name: Give record name to be deleted in item 6a or 6b.
☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

**6. CURRENT RECORD INFORMATION:**

| | | | | |
|---|---|---|---|---|
| **6a. ORGANIZATION'S NAME** | | | | |
| OR **6b. INDIVIDUAL'S LAST NAME** | FIRST NAME | MIDDLE NAME | | SUFFIX |

**7. CHANGED (NEW) OR ADDED INFORMATION**

| | | | | |
|---|---|---|---|---|
| **7a. ORGANIZATION'S NAME** | | | | |
| OR OMNI 808 Investors LLC, as Agent | | | | |
| **7b. INDIVIDUAL'S LAST NAME** | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 9420 Wilshire Blvd., Suite 400 | Beverly Hills | CA | 90212 | USA |

| 7d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION Limited Liability Company | 7f. JURISDICTION OF ORGANIZATION California | 7g. ORGANIZATIONAL ID #, if any ☐ NONE |
|---|---|---|---|---|

**8. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ deleted, or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| | | | | |
|---|---|---|---|---|
| **9a. ORGANIZATION'S NAME** | | | | |
| OR Wachovia Bank, National Association, as Agent | | | | |
| **9b. INDIVIDUAL'S LAST NAME** | FIRST NAME | MIDDLE NAME | | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA**
Debtor: MGA Entertainment (Mexico), Inc.                    CA-SOS

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC 3) (REV. 07/29/98)

Exhibit 27
Page 631

# EXHIBIT 28

Omninet Capital

Page 1 of 2

# OMNINET™

| Home | Private Equity | Real Estate | Venture Capital | About Us |

## Contact

> "Service is never an accident; it is the result of high intentions, sincere effort, intelligent direction, & skillful execution"
> —Robert Huebner

- About Us
- Team
- News
- ● Contact
- Site Map

### About Us

Omninet Capital
9420 Wilshire Boulevard, 4th Floor
Beverly Hills, CA 90212

Tel: 310.300.4100
Fax: 310.300.4101

Email: info@omninet.com

MapQuest Link

**Directions**
We are located at 9420 Wilshire Blvd. in the Rolex Building, which is located between Beverly Drive and Canon Drive in Beverly Hills, California.

There is a free private parking lot available on the Canon Drive side of our building on the south side of Wilshire Blvd. We are located on the 4th floor of the Rolex Building. If you have any questions, please call 310-300-4100.

Site Map | Contact | Copyright (c) 2007 OMNINET Capital

12/28/2008

Exhibit 28
Page 632

Page 2 of 2

Omninet Capital

12/28/2008

Exhibit 28
Page 633

# EXHIBIT 29

Omninet Capital

Page 1 of 2



# OMNINET™

| Home | Private Equity | Real Estate | Venture Capital | About Us |

## Team

> "Courage is what it takes to stand up and speak, courage is also what it takes to sit down and listen"
> — Sir Winston Churchill

**About Us**
- About Us
- Team
- News
- Contact
- Site Map

## About Us

**Neil Kadisha - Managing Partner**
Neil Kadisha is primarily responsible for providing management expertise and strategic planning for Omninet companies. He is also involved in seeking synergistic investment opportunities and offering industry insights for the evaluation of potential investments. Prior to Omninet, Neil founded and served as the CEO of numerous high-tech manufacturing companies. For over 15 years, Neil served on the Board of Directors of Qualcomm. He also serves on the Boards of various privately held companies. Neil's academic background is in Industrial Management and Economics.

**Benjamin Nazarian - Managing Partner**
Benjamin Nazarian is primarily responsible for Omninet's overall investment strategy, with an operational emphasis on the private equity portfolio. Benjamin currently serves as CEO and member of the Board of Directors of Stadco, a supplier of high precision parts and components for the defense and aerospace industry. He also serves on the Board of Directors of Alira, Paramount Scaffold, Plymouth Health, PWP Industries, and Texollini. Benjamin serves on the Board of Councilors of the Law Center at the University of Southern California and is a member of the Young Presidents Organization (YPO). He received his Juris Doctorate from the Law Center at the University of Southern California and holds a Bachelor of Science degree in Accounting, Cum Laude, from the University of Southern California.

**Parviz Nazarian - Managing Partner**
Parviz Nazarian offers his technical and industry vision for the evaluation of potential investments. He provides strategic guidance with the operation and management of Omninet's portfolio. Prior to Omninet, Parviz spent his career managing numerous companies in various industries including construction equipment, aerospace, and plastic equipment. Parviz is a member of the International Board of Governors of the Technion Institute of Technology and Tel Aviv University. Parviz served as a member of the Board of Directors of Qualcomm until 1994. He currently serves on the Board of Directors of privately-held Plymouth Health, PWP Industries and Stadco.

**Michael Daniel - Senior Vice President & General Counsel**
Michael Daniel is responsible for the evaluation and negotiation of investment opportunities, including all legal matters related to potential investments. Michael focuses his efforts on the acquisition and development of commercial and residential real estate projects for Omninet. Before joining Omninet, Michael practiced law with the firms of Brobeck, Phleger & Harrison and Buchalter, Nemer, Fields & Younger, specializing in finance, mergers & acquisitions, real estate transactions and general corporate representation of high-growth companies. Michael received his Juris Doctorate degree from the University of California, Berkeley, Boalt Hall School of Law. Michael holds a Bachelor of Arts degree in Economics, Magna Cum Laude, from the University of California, Los Angeles.

**Kevin P. Tanna - Vice President of Development**
Kevin is responsible for the origination and development of real estate investments throughout California, Nevada and Arizona. His efforts focus on the acquisition, design, and construction of commercial and multifamily residential projects and his diverse experience includes work in a real estate law firm primarily providing transactional support for the acquisition, construction, management, sales and leasing of commercial properties. Kevin is the founder of several entrepreneurial ventures, including an international trade company, and he has spent nearly a decade working alongside building contractors and developers. Kevin earned his Juris Doctorate degree from Hofstra University, School of Law and a Bachelor of Science degree in Finance, Cum Laude, from the Hawaii Pacific University.

**Andrea Costantini - Senior Associate**

Exhibit 29
Page 634

Omninet Capital

Andea is responsible for assessing investment opportunities and increasing the value of Omninet's portfolio companies. Andrea focuses on the strategic and financial assessment of new investments and supports portfolio companies in achieving distinctive growth and performance through operational improvements and strategic planning. Before joining Omninet, Andrea was an Engagement Manager at McKinsey and Company where he spent 5 years assisting Fortune 500 companies as strategic advisor in the media, tech and real estate industries across the U.S., Europe and Asia. Andrea holds a Master in Business Administration from the University of California, Los Angeles and a Master of Science in Aerospace Engineering Summa Cum Laude from Politecnico di Torino, Italy.

Daphna Salimpour - Head of Design Development
Daphna is responsible for the design and project management of Omninet's real estate developments.  Before joining Omninet, Daphna was the owner of a design firm specializing in the design of residential projects and medical offices in Los Angeles. She was also an architect at Levin & Associates, a firm specializing in the preservation and rehabilitation of historical landmarks. Daphna has a Bachelor of Architecture degree from the University of Southern California. She also attended the Syracuse Architecture Program in Florence, Italy.

Dave Johnson - Construction Manager
David is responsible for advising Omninet on building logistics, feasibility, engineering and permitting issues for various construction projects. He has over 40 years of experience in the construction industry including work as a project manager, field supervisor, superintendent and corporate consultant for commercial as well as estate home builders. David relocated to Los Angeles in 2000 from Seattle, WA where he was co-owner of a successful construction company. He has a Bachelor of Science in Construction Management from the University of Washington.

Michael Halimi - Acquisitions
Michael is responsible for sourcing opportunities to acquire commercial real estate and debt instruments. His responsibilities include interfacing with brokers, financial institutions and real estate investors. Prior to joining Omninet, Michael worked in commercial and residential real estate finance and has assisted and negotiated deals on behalf of investors for deal syndications. Michael has a bachelor degree in Law and Society from the University of California, Santa Barbara.

Site Map | Contact | Copyright (c) 2007 OMNINET Capital

Exhibit 29
Page 635

http://www.omninet.com/pe2.php?page=about_us&sub=team_Neil_Kadisha                    12/28/2008

# EXHIBIT 30

ORIGINAL FILED

OCT 2 4 2006

LOS ANGELES
SUPERIOR COURT

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

In re:  THE UZYEL IRREVOCABLE
TRUST NO. 1, established February 26, 1988

CASE NO.: BP 058 899

STATEMENT OF DECISION

In re:  THE UZYEL IRREVOCABLE
TRUST NO. 2, established February 26, 1988

CASE NO. BP 058 898

"The truth is rarely pure and never simple"

Oscar Wilde

On May 1, 1986, Rafael Uzyel ("Rafael"), 40 years of age, was driving his Mercedes Benz back to Southern California from Mammoth, California with his wife Dafna, 28 years of age, and their two small children, Izzet, 6 years of age, and Joelle, 4 years of age, when Rafael suffered a heart attack and died.

STATEMENT OF DECISION

1

Exhibit 30
Page 636

1   Rafael was successful in the fabric business. He and his wife were worth several million

2   dollars, having an apartment in Israel, cash in Switzerland, cash and real property in Beverly

3   Hills, California.

4   Rafael had a sister, Lillian Nomaz, living in Switzerland. She was the cause of Dafna

5   becoming the victim of an avalanche of legal events that are beyond bizarre and well beyond her

6   intellectual ability to cope with.

7   Ms. Nomaz had concern that Dafna would be unable to handle what she considered to be

8   her brother's money in Switzerland, to the detriment of her niece and nephew. This concern

9   caused Dafna to become the victim of two persons. The first was an attorney, Hugo DeCastro,

10  who was grossly unethical in his representation of Dafna. The second was Neil Kadisha

11  ("Kadisha") the Respondent, who became a monumentally self-serving trustee of two trusts that

12  were established with Dafna's money.

13  Kadisha was heavily involved in two corporations (Omninet Corporation and Qualcomm)

14  that were in dire need of millions of dollars to stave off impending bankruptcies. He took and

15  used trust assets for his own financial interests (much of which was tied to the two failing

16  corporations) disregarding the welfare of Dafna and her children and completely without regard

17  to his duties and responsibilities as a trustee, which he later tried to clean up with atrocious

18  amendments to the trust agreements. Kadisha took unconscionable advantage of Dafna who,

19  after the death of her husband, was in many ways similar to a person requiring evaluations as a

20  developmentally disabled person in need of protection from those who would take advantage of

21  her in a foreign and incredible economic adjustment.

22  Among his derelictions as trustee for Dafna and her children, Kadisha prepared

23  accountings to cover up, mislead and deceive Dafna (even if it be assumed arguendo she could

24  have understood them—which intellectually she could not). Kadisha took and used trust money

25  for his own benefit including but not limited to his investment in two corporations. Dafna never

26  had a chance in her dealings with DeCastro or Kadisha. There is no way this can ever be over-

27  emphasized. After witnessing Dafna on the witness stand for days on end, the court was and is

28  thoroughly convinced of Dafna's lack of learning and intellectual capacity to know really what

STATEMENT OF DECISION

2

Exhibit 30
Page 637

1   was going on in her life with the creation of the subject trusts and all that followed in relation

2   thereto. What Dafna needed was a conservator truly interested in her well being and an excellent

3   attorney, to insure the protection of her legal interests. What she got was DeCastro, a grossly

4   conflicted attorney, and a trustee, Kadisha, who was in dire need of large amounts of cash to help

5   stave off and prevent the bankruptcy of two corporations he was deeply involved with.

6       The legal treatment of Dafna by DeCastro is appalling. He had in his hands a young

7   widow attempting independent living with two small children to look after. He cared not about

8   them but about his own pocket book. It is almost inconceivable but true what he did. DeCastro

9   concocted a trust agreement with escape clauses designed to relieve Kadisha of any warranty he

10   would provide lawful trustee services to Dafna and her children. Poor dumb Dafna, a perfect

11   victim. The first was the exculpatory clause. The second was the conflict of interest clause.

12   DeCastro did not want Dafna to notice he was having her sign a document blatently against her

13   interest. And on behalf of Kadisha, he concealed from Dafna at least three things: (1) his

14   conflict of interest in representing Kadisha while holding himself out as her attorney, (2) that

15   Dafna should seek independent counsel, and (3) he never bothered to explain the terms and

16   condition of the trust to her English, Hebrew or Persian. (Farsi) DeCastro capped it off by

17   charging Dafna immense attorney fees, which Kadisha paid from Dafna's money which had

18   gone into the trusts.

19       Equally disturbing is the production by a law firm of three amendments to the original

20   trust agreement re Trust 2, relieving Kadisha from any and all civil liability for any wrongdoing.

21   And as in the creation of the original Trust 2 agreement, Dafna never had independent legal

22   representation nor was she advised to seek independent counsel.

23       The amendments to the trust documents were designed to give life support to Kadisha's

24   wanton and outrageous regimen of irresponsibility and self-dealing. They were elaborate, yet

25   transparent precautions designed to avoid answering for his defaults. They reflect a sickening

26   and callous disregard of treating an unfortunate person with dignity and respect. No law firm's

27   name appeared on the amendments nor did the individual name of a lawyer. Apparently the

28   drafter knew Mrs. Uzyel was not represented by an attorney because the document makes no

---

**STATEMENT OF DECISION**

3

Exhibit 30
Page 638

1  reference to her being represented and no acknowledgment is provided at the end of the

2  amendments to indicate by a lawyer's signature that he had fully advised Dafna about the

3  amendments and approved of her executing the same. The drafter had to know it would be

4  difficult even for a down-and-out attorney sipping Ripple in pigeon park to batter his remaining

5  conscience and sign such garbage for the benefit of a trustee.

6      Kadisha is seeking to provide answers and justification of his conduct as trustee not only

7  comes up with the novel idea that Dafna is to blame for it all, and were it not for her "thicket,"

8  he comes up with a "single investment" defense. This is based upon the fact that everything

9  involved in his trusteeship really involves Qualcomm stock as a single investment and that in the

10  end, the Qualcomm stock investment reaped the astonishing gain of 5,000%, so what are the

11  beneficiaries' damages? Of course this would take even more adjustment in the testimony of

12  Kadisha's oath helpers and the records that do exist.

13      What Kadisha really hopes is that when the court looks at the end result and finds one

14  lucky investment resulted in a total gain to the trust; far more than had the trust money been

15  invested according to the prudent investment rules, and this should wipe out any theft or willful

16  misuse of trust money. Respondent would have the court to understand this was "surely a

17  prudent strategy for the Trust under all of the circumstances." Kadisha believed it to be prudent

18  strategy to commit perjury and violate all laws applicable to trustees.

19      It is prudent to reveal all of the facts and circumstances relevant to this case to arrive at

20  an equitable resolution of this case. Even though it would appear Respondent would like to pick

21  bits and pieces from the total picture and in re-colorization have the picture reveal himself as the

22  innocent victim of the clever and deceitful Dafna. In fact, Kadisha has attempted to turn the

23  tables on the truth of the situation and declares unabashedly that it is Dafna who created what he

24  defines as a "thicket" to prevent true facts to be exposed in regard to Kadisha's defenses. It is

25  quite the other way around. It is Kadisha who engages in monumental "thicket" building. One

26  deceitful answer by Kadisha under oath must be taken as a very large and unacceptable "thicket."

27  If you then multiply all the false answers under oath Kadisha has given the "thicket" is great

28  enough for the court to declare all issues against Kadisha. Additionally, you have Kadisha's

1  self-serving so called "accountings" which leave him with an escape hatch to declare whether his

2  taking of trust money is a "loan" or an "investment" depending on what turns out to be

3  advantageous to him at the time. Further, Kadisha had to harbor the ever present thought that if

4  Dafna went to an attorney with inquiry about Kadisha's camouflaged accounting his trusteeship

5  would come to an abrupt end followed by legal action against him. Kadisha comes up with the

6  real hallmark of "thicket" building in having created for his benefit amendments to the Trust 2

7  agreements to exculpate him from every known trustee sin known to man. Kadisha's "thicket"

8  argument as a new arsenal is totally lacking in firepower. It's a dud.

9      As in most litigated civil cases, getting a fact squarely in the cross-hairs of the truth does

10  not occur with great frequency, but more often than not proof falls within or without the newly

11  minted standard of "more likely true than not." This new standard is a confirmation that the

12  word "fact" is a slippery word. Facts in science may be well determined by scale and

13  measurement but not when based upon different human observation or opinion. Fitting facts to

14  law may be equally slippery. The court has used Petitioner's Statement of Fact where deemed

15  accurate, altering, amending or deleting same to fit the court's findings and conclusions.

16      After Rafael's death, Dafna's financial condition was precarious. She had virtually no

17  liquid assets with which to pay even her family's basic expenses. (TE 10.) Dafna did not know

18
19  how to take control of these assets or how to provide liquidity for her family's expenses. She,

20  therefore, sought the advice of Kadisha, a social friend of her family. (RT 65, 5-16-02.)

21      In or about August 1986, Kadisha referred Dafna to his own attorney, Hugo DeCastro

22  ("DeCastro") and his law firm, DeCastro, West, et al. ("DeCastro West"). (RT 67, 5-16-03; TE

23  1624A.) She retained DeCastro and DeCastro West to marshal Raphael's assets and (later on) to

24  form the Trusts. (TE 2, 3, 4.) Dafna did not know DeCastro or his firm and did not know what

25  Kadisha's and DeCastro's relationship was. (TE 4; RT 41, 1-21-03.) During the same period in

26
27  which DeCastro and DeCastro West represented Dafna, they also represented Kadisha and/or

28

---

**STATEMENT OF DECISION**

5

Exhibit 30
Page 640

1   The $8.5 million loan proceeds were first applied to satisfy the existing deed of trust on

2   the Broadway Partners' property. After that was paid off, there was $3.5 million remaining from

3   the loan proceeds to satisfy Kadisha's, Parviz, and Younes' obligations to: (1) pay Qualcomm

4   $3,156,000 for 3,156,000 shares of Qualcomm stock (at $1 per share), and (2) loan Qualcomm

5   $750,000. (TE 101, 102, 120.) (Other parties purchased the balance of the 4 million shares.)

6   As reflected on bank records and documents produced by Kadisha, Kadisha, Parviz, and

7   Younes were each allocated $1,052,000 from the Sanwa Loan to purchase 1,052,000 shares

8   each, or a total of $3,156,000 for 3,156,000 shares. (TE 120D, 120E.) The balance of the

9   remaining loan proceeds, after deducting this $3,156,000 was $344,000. The $344,000 was

10  applied to pay a portion of the $750,000 loan that was required as a condition of closing. (TE

11  120D, 120E; RT 114, 5-23-02; RT 30-37, 10-8-02; RT 3, 11-21-02.)

12  At closing, Sanwa issued cashier's checks to Qualcomm for the shares purchased by

13  Parviz (1,052,000 shares), Younes (1,052,000 shares) and Kadisha (662,000 shares), and also

14  issued cashier's checks totaling $390,000 for 390,000 shares allegedly purchased by Kadisha's

15  friends and family members. (RT 30, 10-8-02; TE 3201.)

16  On August 8, 1988, and August 9, 1988, Kadisha's friends and family members

17  reimbursed Kadisha $390,000 for the cashier's checks issued by Sanwa Bank.

18  Kadisha deposited the $390,000 in checks he received from his friends and family

19  members into his Wells Fargo Bank account. He did not produce any evidence that showed what

20  the balance was in that account on August 9, 1988 after the $390,000 deposit. Therefore, the

21  record reflects only that it contained $390,000. Kadisha did not use this $390,000 to reduce the

22  outstanding balance of the Sanwa Loan (RT 37, 10-8-02), or to repay Trust 2 the $428,000

23  Kadisha owed it for the misappropriated Namco Loan proceeds (TE 22), or to pay off the Namco

1  Loan (TE 150).  Thus, Kadisha, alone of his partners, ended up with cash from the transaction, in

2  the amount of $390,000.

3       At his deposition, Kadisha testified that he did not loan his friends and family members

4

5  money to purchase their shares.  (RT 114, 5-23-02.)  Kadisha *did* loan them money, however,

6  since the cashiers checks issued by Sanwa Bank came from Kadisha's portion of the Sanwa

7  Loan, and his friends and family members later reimbursed him for the $390,000 Kadisha had

8  advanced, through Sanwa, on their behalf.  Moreover, on the one-year anniversary of the

9  Qualcomm stock purchase, August 8, 1989, *Kadisha took $390,000 from Trust 2.*  (TE 121, 272)

10  He has never credibly accounted for the use of those funds.  As will be discussed later, when a

11

12  trustee fails to account for the use of trust funds, all presumptions must be taken against him.

13  The Court may therefore presume that the $390,000 Kadisha borrowed on the anniversary date

14  of the Qualcomm stock purchase was used to reimburse his friends and family members for *their*

15  *loan* to him of $390,000, which he used to consummate his remaining loan obligations in the

16

17  Qualcomm stock deal.)

18       After applying the entire $3.5 million from the Sanwa Loan proceeds ($3,156,000 to the

19  stock and $344,000 to the required $750,000 loan), an additional $406,000 was needed to fund

20  the balance of the $750,000 loan.  (TE 120E, 120F.)  As a result, Parviz and Younes had to come

21

22  up with an additional $135,000 each and Kadisha had to come up with $136,000.  (TE 120F.)

23       Kadisha testified that his $136,000 came from the same Wells Fargo Bank account into

24  which he had deposited the $390,000 he received from family and friends for their purported

25  purchases of 390,000 shares of Qualcomm stock.  (TE 120F, 320, 3843, 3857, 3867.)  Kadisha

26  conceded that the $136,000 did not come from the Broadway loan proceeds.  (RT 30, 5-28-02;

27  82, 10-8-02.)

28

STATEMENT OF DECISION

26

Exhibit 30
Page 642

At the time Kadisha issued his personal $136,000 check to Qualcomm from his Wells Fargo Bank account, he owed Trust 2 $428,000 for the misappropriated Namco Loan proceeds. As will be discussed in detail later, the evidence shows that Kadisha could not afford to repay Trust 2 for the misappropriated Namco Loan proceeds and still fund his remaining $136,000 obligation in the Qualcomm stock purchase.

> **5.** **Kadisha's Instructions From Attorney DeCastro Re: "Requirements of Trustee."**

On August 30, 1988, after a telephone conversation between DeCastro and Kadisha, DeCastro had delivered a letter to Kadisha enclosing a memorandum entitled "Requirements of Trustee" (TE 122) which advised him, *inter alia*, that:

- The laws regarding duties and liabilities of trustees are extremely technical and strict, and it is not a defense for a trustee to be acting in good faith or with good intention.

- **Kadisha could not rely on Dafna's request or approval regarding any of his actions.**

- **For Dafna to approve his actions, she would have to be independently represented by legal counsel who could advise her as to the significance and consequences of the situation.**

- Even Dafna's informed and advised approval would not necessarily protect Kadisha against claims by others, including her children.

- A trustee must invest Trust funds in a reasonable and prudent manner. It is an objective standard based upon what a reasonably prudent investor would do under the same circumstances.

---

STATEMENT OF DECISION

27

Exhibit 30
Page 643

**7.** **Five months after Kadisha misappropriated $500,000 from Trust 2,**

**and after defaulting on the Namco Loan, Kadisha has Trust 2 borrow**

**$2,000,000 secured by the Strathmore Residence, and used the**

**proceeds for his own needs.**

In early October, 1988, Sanwa Business Credit served Stadco and Omninet entities with a notice of default under the terms of their loans because the interest had been past due since July 1988. (TE 137.)

By October 1988, Kadisha also knew that Qualcomm needed additional funding, and he had already expended all of the Namco Loan $500,000 proceeds. Therefore, in or about early October 1988, *after defaulting on the Namco Loan*, Kadisha, acting for Trust 2, applied for a $2.0 million loan from Imperial Bank to be secured by the Strathmore Residence. (TE 139.)

If Kadisha's testimony that the purpose of the $500,000 Namco Loan was to provide for Dafna's living expenses had been true (and Kadisha had not misappropriated all of the Namco Loan proceeds), as of October 31, 1988, there should have been $314,000 in unexpended Namco Loan proceeds for Trust 2's use. In other words, the Imperial Loan was not necessarily *for Trust 2's purposes* and it was not necessary to incur the expense of the Imperial Loan. (TE 22, 186.)

Moreover, on about November 1, 1988, Kadisha received an offer from Forkay Development to purchase the Strathmore Residence for $3 million. (TE 140.) But on about November 4, 1988, Kadisha received Imperial's loan approval, and the loan went forward. (TE 143.)

On November 10, 1988, Kadisha prepared a letter for Dafna to sign that stated that the purposes of the Imperial Loan were to provide an investment fund for the Trust and to reimburse Kadisha for money he had purportedly advanced to Dafna. (TE 146.) On the same day, Kadisha

---

STATEMENT OF DECISION

30

Exhibit 30
Page 644

1    allegedly sent Dafna a letter that contradictorily stated that she needed cash for her pending

2    marriage and to bring all of her debts current. (TE 147.) Neither of these letters mentions the

3
4    *actual use* Kadisha made of the Imperial Loan proceeds, which was entirely for his own

5    purposes, not Dafna's or the Trust's.

6        The Imperial Loan closed on December 2, 1988. (TE 158.) Kadisha used the loan

7    proceeds to repay the Namco Loan (even though he had used the Namco Loan proceeds for his

8    own benefit rather than the Trust's). (TE 153, 157, 158, see item no. 504, "Payoff of first

9
10   mortgage loan $505,000" and item no. 506, "Interest 11/11 to 12/18 $3,839.56"). After

11   deductions for the repayment of the Namco Loan and other closing costs, the net proceeds of the

12   Imperial Loan was approximately $1.4 million. (TE 158.) Kadisha breached his fiduciary duties

13   by misappropriating $1 million of the net proceeds to himself (in takings of $600,000 and

14   $400,000 respectively) and by loaning $300,000 to Qualcomm in an extremely risky loan purely

15
16   to shore up his own Qualcomm holdings. (TE 164, 166, 167, 152, 1776.)

17       Kadisha did not document the $600,000 and $400,000 loans to himself – he did not sign

18   promissory notes, provide for when they would be repaid, provide for the payment of interest, or

19   provide security for the loans as required by paragraph C.6. of Trust 2. (TE 44A.) The $300,000

20
21   loan from the Imperial Loan proceeds to Qualcomm, which will be discussed in more detail

22   below, was extraordinarily risky and in no way an appropriate trust investment. At the end of

23   1988, after Kadisha's improper misappropriations to himself and to Qualcomm, Trust 2 had

24   approximately $54,000 left in cash and no projected income in 1989. (TE 22.)

25   ///

26   ///

27

28

STATEMENT OF DECISION

31

Exhibit 30
Page 645

## 8.   Kadisha's Improper $300,000 Loan to Qualcomm From Trust 2.

As part of the Qualcomm stock deal, Kadisha became a Qualcomm director. He testified that one of his duties as a Qualcomm director was to raise money for Qualcomm. (RT 14, 5-30-02.)

On August 20, 1988, Qualcomm issued a Private Placement Memorandum (the "PPM") (TE 119) for Series "A" warrants to purchase Qualcomm common stock. For each $8 loaned (of the total $8 million Qualcomm was attempting to raise) a lender would receive a warrant to purchase 1 share of Qualcomm common stock for $8 per share. The PPM provided, among other things: (1) that Qualcomm was a private company that had only been in business for a few years; (2) that Qualcomm had lost money from its inception; (3) that, as a result of Qualcomm's settlement with Omninet, its largest customer, substantial Omninet accounts receivable would be written off resulting in a significant loss; (4) that the investment was very risky; and (5) that even if fully subscribed, the company would need to raise substantial amounts of new money.

On November 23, 1988, Kadisha signed a subscription agreement as Trustee of Trust 2, committing Trust 2 to loan Qualcomm $300,000 for which it would receive a warrant to purchase 37,500 shares of Qualcomm stock for $8 per share. (TE 152.) Trust 2 did not have any cash or liquid assets with which to make the loan when Kadisha signed the subscription agreement. (TE 22.) Kadisha testified that at the time of the loan, he had read the Qualcomm PPM. (TE 119; RT 55, 5-23-02.)

On December 7 1988 (5 days after the Imperial Loan closed), Kadisha forwarded Trust 2's check for $300,000 to Qualcomm. (TE 168, 169.) On December 8, 1988, Qualcomm negotiated Trust 2's check. (TE 168.) Qualcomm, however, did not issue its promissory note for the loan until January 11, 1989. (TE 193.) The note provided for a five-year term, with interest

Exhibit 30
Page 646

to be paid as follows:  on the first anniversary date, quarterly during years 2-4, and, in 12 equal installments of principal and interest in the 5th year.  In addition to the Qualcomm promissory note, Trust 2 received a Qualcomm Series A warrant (No. 00045) granting it the right to purchase 37,500 shares of common stock at $8 per share at any time prior to January 11, 1994. (TE 194.)

At the time Kadisha had Trust 2 loan $300,000 to Qualcomm, he knew that Qualcomm was troubled financially and that it was a very risky loan.  In a declaration executed in connection with another lawsuit, Kadisha acknowledged that investing in Qualcomm was "exceedingly risky" from August 1988 through Qualcomm's initial public offering in December 1991.  (TE 1776.)

Kadisha stated:

> I was one of the investors who signed the Stock Purchase Agreement with Qualcomm and I in fact purchased in excess of 660,000 shares for my own account pursuant to that Agreement.  I consider myself to be a knowledgeable investor.  In my opinion, **Qualcomm was an extremely risky investment.  At that time, it had no proven products, and Omninet Corporation had been its major, dominant customer; Qualcomm was privately held, so that there was no secondary market for Qualcomm's shares; and Qualcomm's financial statements, attached to the Stock Purchase Agreement, showed that Qualcomm had consistently lost money -- indeed, it had lost over $3.6 million in the first ten months of fiscal 1988.**

He also stated:

> The court should recognize that we did not simply step out of Omninet and into a lucrative investment with Qualcomm.  Quite the contrary is true.  I have been a director of Qualcomm since my initial investment pursuant to the Stock Purchase Agreement in August 1988.  **For over three years, Qualcomm's very survival was questionable.  During that time, Qualcomm's losses continued to mount, and I considered my entire investment to be a substantial risk of loss.**

---

STATEMENT OF DECISION

33

Exhibit 30
Page 647

(Emphasis Added)

As will be discussed later, Kadisha's loan of $300,000 of Trust 2's funds to Qualcomm was made solely for one purpose only -- to protect Kadisha's interests which were vitally connected to Qualcomm's continuing viability.

9.    The Financial Condition of the Trust Produced by Kadisha's Self-dealing.

On December 31, 1988, after Kadisha had applied virtually all of Trust 2's assets for his own use, Trust 2 had about $54,000 in cash, a $300,000 unsecured, promissory note from Qualcomm (with no interest due for 1 year), and the Strathmore Residence that had been encumbered by a $2 million lien for the Imperial Loan proceeds utilized by Kadisha. (TE 22.) Kadisha had also two undocumented and unsecured distributions to himself from the Imperial Loan proceeds (one in the amount of $600,000 and the other in the amount of $400,000) which Kadisha was not making monthly payments of interest or principal. (TE 164, 165, 166, 167)

As well, at that time, it was uncertain whether any of the assets in Switzerland or Israel would be repatriated to the United States.

Although the terms of Trust 2 required distributions of $20,000 per month to Dafna, in addition to paying her taxes, as of the beginning of 1989 (TE 44, 44a), the Trusts had no earning power and no liquid assets to make any distributions above the $54,000 Trust 2 had in its bank account. The Trusts, and the Uzyels, were unknowingly and unwittingly forced to rely upon Kadisha's good will to provide money for their living expenses. (TE 22, 186, 186a, 186b.)

10.    Relevant Events from January – June 1989.

On January 10, 1989, DeCastro advised local counsel in Switzerland that Dafna was desperately in need of cash. (TR 3277.) There is no evidence that Kadisha ever informed

STATEMENT OF DECISION

34

Exhibit 30
Page 648

PPM which, among other things:  (1) advised that Qualcomm had continued to sustain substantial operating losses since the last balance sheet; (2) summarized the terms of Qualcomm's agreement with Sanwa Business Credit pertaining to the defaulted loans; and (3) granted Kadisha the right to unwind Trust 2's purchase of the Series "B" preferred convertible stock.

Nothwithstanding the negative financial news and the continuing pressure from Sanwa Business Credit, Kadisha refused to unwind the transaction.  This confirms that Kadisha's objectives with regard to Trust 2's extremely risky investment in Qualcomm were self-serving, and calculated to protect his own interests rather than Trust 2's.

### 13.   Kadisha's purported purchase of Qualcomm stock from Leon Farahnik and Atta Nikka and Rudy Kadisha.

Between June 1990 through May 1991, Kadisha purchased 105,000 shares of Qualcomm stock from Leon Farahnik ("Farahnik") (30,000 shares), Atta Nikka ("Nikka") (30,000 shares) and Rudy Kadisha ("Rudy") (45,000 shares).  (TE 130, 132, 355, 356, 373, 417, 419, 420, 425, 432, 437b.)  Petitioners contend the Faranik purchase was made with Trust funds, and the stock, therefore, properly belongs to Trust 2.  Petitioners also contend the Nikka and Rudy purchases were not true purchases as Nikka and Rudy were strawmen for Kadisha in the August 8, 1988 purchase.  The court does not so find with respect to the Nikka and Rudy purchases.

#### a.   The Farahnik Purchases

Kadisha was chosen to be the trustee of both Uzyel Trusts in November or December of 1987.  Trust instruments were executed on January 11, 1988, and Dafna assigned her property to Trust 2 at that time (TE 31, 33.)  ( New trusts were executed in February 1988).

---

STATEMENT OF DECISION

40

Exhibit 30
Page 649

On February 8, 1988, Kadisha borrowed $85,000 from his Union Bank line of credit (which was automatically deposited into his Union Bank account), and on February 10, 1988, loaned Farahnik $75,000. (TE 38, 40.) Kadisha could not have made the $75,000 loan without the $85,000 he borrowed from his Union Bank line of credit because he did not have sufficient funds in his account to do so.

On March 3, 1988 and March 18, 1988, Kadisha drew down $100,000 and $55,000, respectively, from his Union Bank line of credit, and the funds were deposited automatically into his Union Bank account. On March 24, 1988, Kadisha loaned Farahnik $76,000. (TE 40, 52, 60, 68, 76.) Without the $155,000 that he borrowed from his Union Bank line of credit, Kadisha could not have made the $76,000 loan to Farahnik because it would have overdrawn his account.

On April 1, 1988, Kadisha loaned Farahnik an additional $70,000 from other funds that did not come from his Union Bank line of credit. (TE 38, 60, 1044, 1076.)

Kadisha thus loaned Farahnik a total of $221,000. The $75,000 and $76,000 loans (totaling $151,000) were funded by Kadisha's Union Bank line of credit borrowings, which were repaid with Trust 2's funds when Kadisha misappropriated the $500,000 Namco Loan proceeds for his own use. Throughout discovery and a good portion of trial, Kadisha prevented Petitioners from discovering the fact that he had repaid his Union Bank line of credit advances from the Namco Loan proceeds.

In discovery, under penalty of perjury, Kadisha gave six different and untrue accounts of what he did with the Namco Loan proceeds. None of the six explanations disclosed that he had used a portion of the Namco Loan proceeds to pay down his Union Bank line of credit. It was only during trial, in Kadisha's *seventh* explanation, that he admitted that he had used $240,000 of the Namco Loan proceeds to pay down his Union Bank line of credit for the $240,000 he had

Exhibit 30
Page 650

borrowed. (TE 68, 76.) Kadisha's admission established that he used Trust 2's funds to repay the Union Bank line of credit for funds he had borrowed to loan to Farahnik.

On May 31, 1991, Kadisha and Farahnik entered into a Stock Purchase and Sale Agreement in which Farahnik sold 30,000 shares of Qualcomm stock to Kadisha at $7 per share for a total purchase price of $221,000.[9]  Kadisha paid for the Qualcomm stock by canceling $210,000 of Farahnik's $221,000 debt to Kadisha.  However, since the ultimate funding of $112,302 of this $210,000 came from Trust 2's funds, Trust 2 is entitled to 53.48% of the value of the 30,000 shares of Qualcomm stock he acquired, or 21,571 shares and the value of their progeny as of the date the trusteeship of Kadisha was terminated.  (See Damages:  Re The Loan to Farahnik.  (Page 122 Et. Seq.

The court will not impress a constructive trust on Qualcomm stock held by Kadisha, which will avoid getting into the questionable strict tracing rule Respondent finds so comforting. Damages will suit the situation quite well.  The court will cover that later on under "Damages."

### b.    The Rudy Kadisha Purchase.

Rudy, Kadisha's uncle, was a member of the group of family members and friends that purportedly purchased 390,000 shares of Qualcomm stock in the Qualcomm stock deal.  (TE 101.)  On September 30, 1988, Qualcomm issued Rudy Share Certificate No. 159 for 79,000 shares.  (TE 130.)  Petitioners contend Rudy was "Merely a strawman for Kadisha."  There is insufficient evidence to prove this allegation is more likely true than not.

### c.    The Atta Nikka Purchase.

---

[9] On March 27, 1990, Qualcomm confirmed that Omninet had transferred 30,000 shares of stock to Farahnik.  (TE 343.)

these on June 14, 1991 (TE 122), the second on February 14, 1992 (TE 428), and the third on July 30, 1992 (TE 528).

Each of the amendments was presented to Dafna as a condition to getting something that she wanted.[11] She was handed the amendment, with no prior chance to review it and no admonition for insistence that she seek independent counsel. (RT 93, 1-21-03; 38, 11-10-03) This contradicted DeCastro's earlier written advice to Kadisha that:

> You cannot rely upon Dafna's request or approval regarding any contemplated Trustee action. In order to safeguard you from possible personal liability to Dafna, she would have to be independently represented by legal counsel who could advise her as to the significance and consequences of the situation. (TE 122.)

Kadisha was also fully aware of Dafna's inability to understand a legal document. Kadisha testified at trial that he himself could not understand a legal document he was asked about without the advice of counsel (i.e., TE 1154, a lease between Carson '93 and Texollini, which Kadisha signed on behalf of Carson o'93 as the CEO of Texollini, the general partner of Carson '93). There certainly was no reason for Kadisha to have believed that Dafna could understand a legal document without the assistance of counsel.

DeCastro had also advised Kadisha that:

> For reliable protection, a Trustee must seek formal Court approval. Before taking any action on behalf of the Trusts which is controversial or uncertain, you can petition to the Court and, in a short period of time, have the Court authorize and instruct you as to whether you may take the proposed action.

---

[11] The language of the amendments corroborates Dafna's testimony. The first amendment provided for satisfying $140,000 of Dafna's debt and $50,000 of Ron's debt (TE 428). The second amendment provided for an increase in monthly distributions to Dafna and for reimbursing her for certain debts she had paid. The third amendment confirmed that funds would be made available to purchase a residence which Dafna wanted (although the original Trust required that funds be made available for that purpose.) (TE 44a, 528.)

STATEMENT OF DECISION

44

Exhibit 30
Page 652

(TE 122.) Kadisha never petitioned the Court for instructions regarding he amendments or any of the numerous other controversial actions he took.

The first amendment purported to change the method by which Kadisha could be removed as a trustee (i.e., "Settlor shall have the right to remove the trustee of the trust *only upon 36 months written notice*." (TE 428.) The first amendment also purported to:

(1) authorize Kadisha to manage the Trust assets in any manner that he determines "in his sole discretion" so long as there is no loss of principal and trust income does not fall below the income that would be earned on a one-year Bank of America certificate of deposit;

(2) authorize Kadisha to lend Trust assets to enterprises in which he has an interest and to "hold, manage and administer Trust assets in ways which might be characterized as conflicts of interest or acts of self dealing."

(3) waive the duty of loyalty contained in Probate Code section 16004;

(4) authorize Kadisha to make loans or investments "which might be deemed not prudent;" and

(5) waive the prudent person standard for Kadisha's administration of the Trust.

The first, second and third amendments also purported to release Dafna's claims against Kadisha. Kadisha testified at trial that the only purpose of the releases was to protect Kadisha because he had been distributing more funds to Dafna than were called for by the Trust. (RT 6, 6-11-02; 15-17, 6-12-02.)

15.   **The Improper May 1992 sale of Qualcomm Stock and sham Rabban loans.**

a.   **Kadisha was under extreme financial pressure in 1992.**

Exhibit 30
Page 653

During 1992, Kadisha was under extreme financial pressure. His cash flow was negative, and he was faced with the prospect of having to repay the Trusts for the millions of dollars he had unlawfully taken from 1988 through 1991. (TE 1930.1)

Kadisha's general ledger account activity detail report for 1992 demonstrates his cash flow problems and his attempts to stay afloat by arranging new loans to pay off old ones. (TE 1930.1) It also shows that despite the new loans, Kadisha issued several NSF checks in 1992, had a negative cash flow in 11 of the 12 months of 1992, and ended up with a total deficit of $1,016,012 in 1992. (TE 1930.1)

Loan proceeds came into and out of Kadisha's account as follows.

| DATE | CASH IN TO KADISHA | CASH OUT |
|---|---|---|
| 2-10-92 | | Loan from Shearson $500,000 |
| 2-10-93 | | Loan from Kadisha to Stadco 500,000 |
| 2-19-92 | | Kadisha repaid Trust 2 $90,000 |
| | Loan from Daniel $550,000 | |
| 2-28-92 | | Kadisha repaid Trust 2 $170,000 and $16,000 |
| 2-28-92 | | Kadisha loaned Stadco $350,000 |
| 3-02-92 | Loan from Daniel $200,000 | |
| 3-03-92 | | Kadisha loaned Stadco $200,000 |
| 3-09-92 | | Kadisha repaid Trust 2 $50,000 |
| 3-16-92 | Stadco loan repayment $250,000 | |
| 3-16-92 | | Kadisha repaid Trust 1 $200,000 and $58,482.19 |
| 3-18-92 | Stadco loan repayment $350,000 | |
| 3-18-92 | Stadco loan repayment $500,000 | |
| 3-19-92 | Stadco loan repayment $600,000 and $200,000 | |
| 3-20-92 | | Kadisha repaid Trust 1 $1.4 million |
| 3-20-92 | | Kadisha repaid Trust 1 $393,917.81 interest. |
| 3-27-92 | Union Bank loan $200,000 | |

| DATE | CASH IN TO KADISHA | CASH OUT |
|---|---|---|
| 3-27-92 | | Kadisha repaid Trust 1 $89,000 Principal |
| | | Kadisha repaid Trust 1 $19,304.47 Interest. |
| | | Kadisha repaid Trust 1 $61,000 principal. |
| | | Kadisha repaid Trust 1 $13,231.15 interest. |
| 3-30-92 | | Kadisha repaid Trust 2 $16,000 |
| 4-08-92 | | Union Bank NSF Charge $130 |
| 4-09-92 | | |
| 4-14-92 | Shearson loan $200,000 | Kadisha repaid Trust 2 $30,000 |
| 4-14-92 | Shearson loan $400,000 | |
| 4-14-92 | | Kadisha repaid Trust 2, $11,298.25 |
| | | Kadisha repaid Trust 2 $152,853.86 interest |
| | | Kadisha repaid Trust 2 $156,341 |
| | | Kadisha repaid Trust 2 $165,053 |
| 4-15-92 | Bank Leumi loan $400,000 | |
| 5-06-92 | Shearson loan $500,00 | |
| 5-18-92 | | Kadisha repaid Trust 2 $259,774.19 Interest |
| 5-19-92 | | Kadisha repaid Trust 2 $419,000 |
| 5-27-92 | Shearson loan $640,000 | |
| 5-28-92 | | Kadisha repaid Trust 2 $4,813.88 |
| | | Kadisha repaid Trust 2 $130,000 |
| | | Kadisha repaid Trust 2 $33,012.88 |
| | | Kadisha repaid Trust 2 $390,000 |
| | | Kadisha repaid Trust 2 $142,237.81 |
| | | Kadisha repaid Trust 2 $550,000 |
| | | Kadisha repaid Trust 2 $209,994.52 |
| 6-01-92 | Shearson loan $900,000 | |
| 6-05-92 | Shearson loan $450,000 | |
| 6-11-92 | Trust 2 loan $350,000 | |
| | | Kadisha repaid Bank Leumi $400,000 |
| | | Kadisha repaid Union Bank $300,000 |
| 6-16-92 | | Kadisha repaid Shearson $230,000 |
| | | Kadisha repaid Daniel $50,000 |
| 6-17-92 | | Kadisha repaid Daniel $50,000 |

STATEMENT OF DECISION

Exhibit 30
Page 655

| DATE | | |
|---|---|---|
| 6-18-92<br>6-18-93 | Loan from Trust 2 $200,000 | |
| 7-08-92 | | Union Bank NSF Charge $30 |
| 7-09-92 | Loan from Trust 2 $250,000 | |
| 7-09-92 | | Kadisha repaid Daniel $550,000 |
| 7-14-92 | | Union Bank NSF Charge $10 |
| 7-31-92 | | First Credit Bank late fee $157.75 |
| 8-03-92 | | Union Bank NSF Charge $20 |
| | Bank Leumi loan $400,000 | |

| DATE | CASH IN TO KADISHA | CASH OUT |
|---|---|---|
| 10-05-92 | First Boston loan $500,000 | |
| 12-09-92 | | Union Bank NSF Charge $30 |
| 12-24-92 | | Union Bank NSF Charge $10 |

**b.** **Kadisha sold Trust 2's Qualcomm stock to raise cash for his Own use.**

In May 1992, in order to raise cash for his own use, Kadisha sold Trust 2's 37,500 shares of Qualcomm stock for approximately $800,625 (the "1992 Stock Sale.") (TE 505.) Kadisha made the 1992 Stock Sale without consulting an independent investment advisor (as DeCastro had advised Kadisha to do), without consulting with Dafna and without any economic justification. Although the proceeds were funneled to Kadisha, he testified that he did not have a plan for how to use the proceeds when he made the sale. Kadisha's first communication with anyone regarding the 1992 Stock Sale was to provide instructions to Shearson on the date he initiated the sale. He did not consult with Dafna prior to the sale or even inform her of it afterwards. (RT 40, 6-17-02; RT 44, 6-17-02; RT 58, 6-17-02)

In fact, Kadisha's sole reason for the 1992 Stock Sale was to funnel Trust money back to himself -- which he did in the form of phantom loans to a David Rahban ("Rahban"), *an individual whom neither the accountant for the Trusts (Feldman) or Kadisha's secretary and booker, Theresa Mikhaili ("Mikhaili") had ever heard of.*

STATEMENT OF DECISION

48

Exhibit 30<br>Page 656

c.   **The purported loan by Trust 2 to "Rahban."**

On May 18, 1992, Kadisha deposited $1,478,823.96 into Trust 2. This consisted of the proceeds from the 1992 Stock Sale ($801,047), and $677,776.96 from Kadisha to repay principal and interest on his outstanding loans from Trust 2. (TE 563d.) The very next day, Kadisha allegedly loaned $1.4 million to David Rahban ("Rahban") from Trust 2. (TE 563d.)

There is, however, no credible evidence that there was a David Rahban. The Court finds that Rahban claim of loans to Rahban to be willfully false.

A little more than a week after the purported $1.4 million loan to "Rahban," Kadisha repaid Trust 2 $1,471,936.68 for the outstanding principal and interest he owed on a portion of his loans. (TE 563D.) *There was no loan to Rahban.* The $1.4 million loan to "Rahban" actually went to Kadisha. Kadisha took $1.4 million out of the Trust and used it to repay $1,471,936.68 of principal and interest on his prior loans. Thus, with the help of the 1992 Stock Sale proceeds, Kadisha was able to retain the use of $1.4 million of Trust 2's funds – without having any direct accountability for the money.

According to Kadisha's accountings, as of December 31, 1992, Trust 2's assets consisted of $817,129.66 in cash, unsecured loans to Kadisha in the amount of $800,000 and the unsecured "loan" to "Rahban" (i.e., Kadisha) in the amount of $1.4 million. (TE 563e.) Kadisha acknowledged that the borrowings from Trust 2 accounted for over 70% of Trust 2's assets. (TE 563d.)

d.   **The evidence shows that there was no loan to Rahban.**

Feldman, who had been hired by Kadisha to prepare the Trust accountings could not recall any investment made by either Trust to Rahban. Feldman also had never met Rahban and did not even know who Rahban was. (RT 62, 1-14-03.)

Mikhaili, who was Kadisha's assistant and who maintained the Trust records and made the accounting entries, also could not recall any investment made by either Trust to Rahban. She too had never met Rahban and did know who Rahban was. (RT 76, 3-10-04) Mikhaili could not recall keeping a file for Rahban or seeing a promissory note for him. (RT 81, 3-10-04) When asked to review account 1610 of the Trust accountings pertaining to the purported loans to Rahban by Trust 1 and Trust 2, Mikhaili said that she did not make the entries. (RT 77-80, 3-10-04; RT 81, 3-10-04.) Kadisha was not able to produce copies of the executed promissory notes. (RT 81, 6-17-02.)

Kadisha also testified that Rahban resided somewhere in Switzerland, Israel and Iran; he did not have any assets in the United States, and that he had not received or reviewed Rahban's financial statement before allegedly loaning money to him. (RT 81-84, 6-17-02; RT 90, 6-17-02; RT 22, 6-18-02.) Kadisha never discussed the terms of the purported loans with Dafna, or even with Ron Levi, whom Kadisha claims was Dafna's agent for her financial affairs. (RT 52, 11-10-03.)

Moreover – and not uncoincidentally – the purported loan to Rahban from Trust 2 was also made on precisely the same (non)-terms as all of the undisguised loans Kadisha made to himself – there was no security for the loan, no points were paid and interest was purportedly to be paid annually.[12] (TE 494, 495, 503; all Trust Accountings for the period 1992-1999.)

---

[12] At deposition, Kadisha admitted that the Rahban loans were unsecured – even though the Trust instruments required that any Trust loans be made on "adequate security." (TE 44, 44a; RT 91, 6-17-02.) However, at trial, Kadisha adopted a new position, i.e., that the promissory notes were "secured" because he personally guaranteed them. Kadisha did not, however, produce any written guaranty. (RT 89, 6-17-02.) Instead, he (speciously) claimed that the following language in paragraph 1 from the (unenforceable) First Amendment to Trust 2 constituted his guaranty: "...relying on trustee's personal ability to assure that the guarantee of the first sentence of paragraph 1 is honored." (TE 428.) This is clearly not a guaranty. According to Kadisha, the First Amendment was drafted by Irell & Manella, which undoubtedly was able to draft an express guaranty that satisfied the requirements of the Civil Code if that is indeed what was intended. Kadisha did not call anyone from Irell & Manella at trial to confirm that the language he is now referring to as his personal guaranty was, in fact, intended to be a guaranty. Moreover, it is not believable that Kadisha, without any consideration, would guarantee a total of $2.6 million in purported loans to

STATEMENT OF DECISION

Kadisha also engaged in the same elaborate sham with Trust 1.  In March 1992, Kadisha paid Trust 1 approximately $2.2 million in principal and interest.  (TE 491b.)  He thereafter, on April 16, 1992,  purportedly loaned $1.2 million to Rahban.  (TE 494, 495, 550D, 560A.)  Kadisha thereby retained the use of $1.2 million of Trust 1's funds and was not directly accountable for the debt.  Trust 1's accountings also show that the interest payments on the "Rahban" loan were not made when due.  (RT 133, 6-17-02.)  Kadisha did not charge "Rahban," i.e., himself, any additional interest or points for the untimely interest payments.  (RT 146, 6-17-02.)[13]

### e.    Petitioner's Expert, Irwin Goldring, opined that the 1992 sale fell below the standard of care.

Petitioner's expert, Irwin Goldring, opined that the 1992 Stock Sale fell below the standard of care for a California trustee because:  (1) Kadisha used the proceeds for self-dealing loans to himself, or made unsecured loans to Rahban; (2) he did not consult with an investment advisor to determine whether the sale made sense, and (3) he did not have a plan to diversify the sale proceeds if the sale did make sense.  (RT 42-44, 7-30-03.)

Kadisha has incorrectly claimed that Mr. Goldring agreed on cross-examination that the 1992 Stock Sale was a proper exercise of fiduciary power.  Kadisha misrepresents Mr. Goldring's testimony.  What Mr. Goldring agreed with was that Kadisha should never have

Rahban, a foreign national with no assets in the United States, without retaining a record of Rahban's address, phone number or other contact information to enable him or a successor trustee to contact Rahban.  Kadisha did not need this information, however, since he had the money.  The creation of the Rahban "loans" was simply part of Kadisha's pattern of creating phony transactions, backdating documents and transferring assets to avoid taxes and his creditors.

[13] As to Trust 1's $1.2 million "loan:"  no interest payments were made when due in 1994.  The "loan" was brought current by a double interest payment in 1995.  In 1996, interest of $144,000 was owed.  Only $36,000 was paid, leaving a balance of $108,000, which was not paid until over three years later in 1999.  (TE 3553.)  As to Trust 2's $1.4 million loan, no interest payments were made when due in 1994.  Instead of making the next interest payment when due on May 19, 1995, "Rahban" made two payments, totaling $308,000, in July 1995.  On May 19, 1996, interest in the amount of $154,000 was due, but only $38,500 was paid, leaving a balance of $115,500 that was not paid until more than two years later.  (TE 3553.)

STATEMENT OF DECISION

51

Exhibit 30
Page 659

loaned Qualcomm $300,000 from Trust 2 (which was how Trust 2 got its Qualcomm stock), and that once he acquired the stock (in breach of his fiduciary duties), he should have sold it to diversify Trust 2's investments. (RT 42-44, 7-30-03) Mr. Goldring *did not agree* that it was a proper exercise of fiduciary duty for Kadisha to sell Trust 2's Qualcomm stock solely for the purpose of raising cash for his own use rather than for diversifying the Trust's investments. In other words, although a sale of the stock to diversify the Trust's assets would have been proper, a sale of the stock to promote Kadisha's self-dealing was not.

### 16.    Kadisha made millions of dollars of improper loans to himself, his businesses and his friends from the Trusts

Kadisha made millions of dollars of misappropriations (takings) from the Trusts to himself, Dan Investments or his friends. The following schedule sets forth the date of each taking, the amount, the Trust from which it was made, and the trial exhibits documents for each taking.

| 12/07/88 | $600,000 | Trust 2 | TE 166,176 |
| 12/07/88 | $400,000 | Trust 2 | TE 164,165 |
| 06/12/89 | $700,000 | Trust 2 | TE 254, 255, 1719a |
| 06/21/89 | $550,000 | Trust 2 | TE 257,258 |
| 12/14/89 | $200,000 | Trust 1 | TE 173, 303, 304[14] |
| 08/08/89 | $390,000 | Trust 2 | TE 271,272[15] |
| 01/22/90 | $1,400,000 | Trust 1 | TE 332,333[16] |

---

[14] Kadisha made the check for the 12/14/89 loan payable to himself. He did not have a note documenting the loan prepared until after he had repaid the loan in 1992. When the note was prepared, the obligor was not Kadisha, but Dan Investments, the real estate partnership in which Kadisha was a partner.

[15] On August 8, 1988, Kadisha received checks totaling $390,000 from his family and friends who purchased 390,000 shares of Qualcomm stock. On August 8, 1989, the one year anniversary, Kadisha took from Trust 2 $390,000.

STATEMENT OF DECISION

52

Exhibit 30
Page 660

that the Ericcson settlement provided for a single CDMA standard was an "enormous advantage" for Qualcomm.  (RT 21, 8-6-02.)

Although Kadisha held Trust 2's Qualcomm stock when Qualcomm's economic news was bad, when the economic news was *extraordinary*, Kadisha sold the 53,348 shares of Trust 2's Qualcomm stock on April 27, 28 and 29, 1999 (the "1999 Stock Sale").  (TE 976.)

b.      Kadisha's untrue pretexts for the 1999 Stock Sale

Kadisha testified that the reasons for the 1999 Stock Sale were:  (1) that the sale was in accordance with his long term strategy for Trust 2, which was purportedly to increase the principal to a level that, with very conservative investments, would support the Uzyels with an income of $400,000 to $500,000 per year, and (2) that holding the stock of a publicly traded company was too risky for Trust 2, because (among other things) Kadisha did not have control over the investment.  (RT 29, 7-11-02; RT 100, 7-10-02; RT 88, 9-10-02.)

The first reason – that Kadisha's strategy was to increase the principal to a point where it would yield income of $400,000 to $500,000 a year with conservative investments is untrue because:

- Kadisha had been distributing over $400,000-$500,000 per year to Dafna (including over $600,000 in 1994 and 1995, over $900,000 in 1996 and over $500,000 in 1990, 1993 and 1997), and *knew* that Dafna was unable to cover all of her expenses with these distributions because she was constantly asking him for more money. (TE 4643; Trust accountings from 1988-1999.)  It is not believable that Kadisha had a long term strategy that provided for far *less* income to Dafna.

- Kadisha did not have any conservative investments in mind at the time of the sale that would yield $400,000 to $500,000 per year, in accordance with his purported strategy. Kadisha did not consult with an investment advisor to determine how to produce that level of income and did not receive any written recommendations for investing the proceeds of the April 1999 Sale. (RT 33-35, 7-11-02.)

- In fact, the major investments Kadisha made with the proceeds were *not* conservative investments. Kadisha invested in two highly risky funds: The Directors Fund ($2 million) and the Value Realization Fund ($1 million). Both Funds employed leverage, were illiquid, used short selling and advised their investor that a percent of the Funds' investments would be risky. In fact, as Kadisha was well aware, the Value Realization Fund had lost money in 1998. (RT 138, 9-10-02; TE 1357, 1358, 1501, 1504.) The Value Realization Fund continued to lose money in 1999 and the Directors Fund also lost money. (TE 1402)

- The Trust income Kadisha was able to generate – following his purported strategy – was far below $400,000 to $500,000 per year. (RT 110, 9-10-02. TE 1310, 1373, 1357, 1608; Trust accountings for 1990-2000.)

- Kadisha never told Dafna he was going to sell Trust 2's Qualcomm stock and never discussed with her whether she agreed with his purported strategy of providing her with an annual income of $400,000 to $500,000 per year *from her assets,* or whether $400,000 to $500,000 per year was sufficient for her needs. (RT 34, 7-11-02.) Nor did Kadisha consult with Arnold Kahn, whom he had hired to administer the Trust.

STATEMENT OF DECISION

61

Exhibit 30
Page 662

- Kadisha did not even inform Dafna of the sale after it had taken place. If the sale had been as wildly beneficial to Dafna as Kadisha claims it was, why did he forego letting Dafna in on the good news?

Kadisha's purported second reason for the April 1999 Sale (that holding the stock of a public company was risky and that Kadisha did not have control over the investment) is also untrue because:

- Kadisha's investments from the sale proceeds, the Directors Fund and the Value Realization Fund, both purchased stocks of public companies. (TE 1359, 1358)

- Kadisha had no control over what the Directors and Value Funds invested in, and there were restrictions on Kadisha's ability to redeem the Trust's investments. (RT 121, 9-10-02.)

- Although Kadisha claimed that continuing to hold Trust 2's Qualcomm stock was too risky, Kadisha contradictorily continued to hold Trust 1's shares as, in his words, a "conservative investment strategy." (RT 31, 7-11-02.)

Kadisha's confidence that Qualcomm stock would appreciate is also demonstrated by the fact that he continued to hold onto his Qualcomm stock, except for a small number of shares he acquired through the exercise of options. (TE 1930.1-11.)

## 19. The Purported October 8, 1998 Sale was a phony, backdated transaction.

Concurrently with the 1999 Sale, Kadisha created a phony, backdated sale to conceal the fact that he had transferred Trust 2's remaining 10,000 shares of Qualcomm stock and all of its Leap Wireless stock to Trust 1 *at the same time* he made the 1999 Sale (the "October 1998

Exhibit 30
Page 663

1  Sale"). The evidence at trial overwhelmingly showed that the October 1998 Sale was a phony,

2  backdated transaction for the following reasons:

   First.  None of the people who regularly assisted Kadisha with the Trusts learned that

4  there had supposedly been a sale in October 1998 until at least June 1999. That includes:  (1) Jo

5  Sharma, who had maintained that the Trust records since January 1, 1995, (RT 74, 110, 11-12-

6  02; 132, 129-9-02); (2) Arnold Kahn, the attorney Kadisha had hired to administer the Trusts, (3)

7  David Gottlieb, whom Kadisha had retained to document all of the Trust transactions and to do

8

9  retroactive accountings frm the inception of the Trusts (RT 49, 1-7-03); (4) Ricky Van Rijn, a

10 paralegal whom Kadisha had hired to assist in preparing the Trust accountings (RT 136-137, 1-6-

11 03); (5) Ron Panting, a retired CPA whom Kadisha had hired to review the Trust accountings;

12

13 and (6) Feldman, who had prepared the Trusts' tax returns since 1988 (and who would have

14 needed the information about the purported October 1988 Sale for Dafna's 1998 tax returns).

15

16 (RT 9, 1-22-03; 15, 1-14-03.)[21]

17

18 [21] There is only one person (besides Kadisha) who claims to have known about the sale on October 8, 1998 and his
   testimony is not believable. At deposition, Kadisha testified that he could not remember who prepared the stock

19 purchase agreement for the Purported October 1998 Sale (TE 1201) or even if it was prepared by an attorney. (RT
   49, 7-11-02; RT 115, 7-31-02; RT 47, 7-12-02.) At trial, Kadisha suddenly remembered that his *brother-in-law and*

20 *business partner*, Benjamin Nazarian prepared the stock purchase agreement. (RT 25, 7-15-02.) A very nervous
   Benjamin Nazarian testified at trial that he prepared the stock purchase agreement (TE 1201) on October 8, 1998,

21 shortly after his graduation from law school and admission to the California Bar. (RT 96, 7-31-02; RT 117-118, 7-
   31-02.) Mr. Nazarian's testimony is not believable for many reasons. For one, Kadisha was working with both

22 Attorney Arnold Kahn and Irell & Manella on Trust matters in October 1998, but the stock purchase agreement,
   *which no one else knew about* was supposedly drafted by Mr. Nazarian. (RT 4, 7-15-02.) Three, Nazarian did not

23 do any of the things an attorney representing a client would do.  He did not maintain a file copy of the stock
   purchase agreement, did not maintain a computer copy, and did not give a copy to his secretary. (RT 27, 8-1-02; RT

24 115, 131, 7-30-02.) He did not prepare a promissory note for the balance of the purchase price, which under the
   terms of the stock purchase agreement was not due, with interest, until June 1999. Nor did he prepare a UCC filing

25 to secure the debt. (RT 130, 7-31-02; RT 126, 7-31-02.) He never saw an executed copy of the agreement and
   never inquired whether the sale was executed. (RT 112, 113, 131, 7-31-02.) On October 8, 1998, when he

26 supposedly prepared the stock purchase agreement, he did not talk with Kadisha about it. (RT 137, 7-31-02.)
   Josephine Sharma, Kadisha's assistant from 1995 through the trial, testified at trial that on or about October

27 8, 1998 Kadisha asked her to prepare interest calculations for how much interest Trust 2 owed Trust 1, that she gave
   the calculations to Kadisha around October 8, 1998, and that after the pretextual 1999 sale, she back dated

28 promissory notes evidencing advances from Trust 1 to Trust 2. The Court finds her testimony because there were
   glaring inconsistencies between her trial and her deposition testimony. At her deposition she testified that:  when
   Kadisha asked her to prepare the interest calculations, he didn't tell her the reason, she could not remember when

   STATEMENT OF DECISION

   63
   Exhibit 30
   Page 664

Second.  Kadisha's reason for the purported October 1998 Sale was untrue.  Kadisha claimed that the main reason for the purported sale was for Trust 2 to repay money it allegedly owed to Trust 1.  (RT 76, 7-11-02.)  However, it was actually the other way around.  Trust 1 actually owed Trust 2 money because Kadisha had not been distributing to Dafna 75% of Trust 1's net income as required by the terms of Trust 1.  (RT 15, 7-30-02; TE 44, 44a.)  In late September or early October 1998, Ricky Van Rijn informed Kadisha that his accountings erroneously showed Trust 2 owing Trust 1 money when it was actually the other way around.  (TE 1740; RT 33, 7-8-02; RT 7, 7-15-02.)

Third.  The stock purchase agreement for the purported October 1998 sale provided for an installment sale, with a balance of $203,729 due (with interest) on June 8, 1999.  (TE 1201.)  No promissory note for the unpaid balance was prepared until June 1999.

Fourth.  The terms of the stock purchase agreement do not make economic sense.  Kadisha claims that Trust 2 owed Trust 1 money.  The amount he claims Trust 2 owed was greater than the value of the Qualcomm and Leap Wireless stock on October 8, 1998.  There was therefore no economic reason to make the sale an installment sale and for Trust 1 to pay interest to Trust 2 on an unpaid balance of the purchase price for the stock.  Kadisha could simply have credited Trust 2 for the full value of the stock (against the amount Trust 2 allegedly owed Trust 1).  The only reason to make the sale an installment sale was to explain why the Qualcomm and Leap Wireless shares were not transferred from Trust 2 to Trust 1 on October 8, 1988 when the sale purportedly occurred.

---

she prepared the interest calculations but thought it was sometime during the last 6 months of the year, she didn't remember if she gave them to Kadisha, and she never placed a copy of the alleged calculations in any trust file.
    Kadisha's story that he asked Sharma for interest calculations in October 1998 is unbelievable.  Why would Kadisha not tell Sharma the purpose of the calculations?  Why didn't Sharma keep a copy of her interest calculation in the Trust files or on her computer?  Why was Sharma's memory so much more precise at trial as to when she was asked to prepare the interest calculations and whether she gave them to Kadisha than at her deposition?  The inevitable conclusion is that Kadisha never asked Sharma to prepare interest calculations in 1998.

STATEMENT OF DECISION

64

Exhibit 30
Page 665

1       In addition to being aware of the daily volatility of the Qualcomm stock, Kadisha, as a

2   member of Qualcomm's audit committee and its board of directors, was well aware of the

3   depressed nature of Qualcomm's business during the first half of 2000. Qualcomm's 10-Q for

4   the period ending March 26, 2000 indicated a substantial decrease in revenues. (TE 1539.1.)

5

6   Qualcomm's 10-Q dated June 25, 2000 rendered a similar report. (TE 1576.1.)

7           24.   <u>Kadisha's Trust Accountings Were Fraudulent, Misleading, and</u>

8                        <u>Inaccurate and Concealed his Wrongdoings.</u>

10       Four sets of fiscal reports have been prepared for the Trusts. (They are termed "financial

11   reports" here because they do not comply with Probate Code section 16062 requirements for a

12   trust accounting.) The first reports were prepared in the format illustrated by TE 22 by Feldman

13   using a program called the "Dec-easy" program and consisted of "G/L Account Activity Detail

14   Reports." Beginning in the Fall of 1991, Feldman created financial reports in a different format

15   using the Peachtree program (illustrated by TE 392a).

16

17       In 1998, Kadisha retained Arnold Kahn of Greenberg, Glusker, et al. and Riky Van Rijn,

18   to, among other things, prepare "accountings" from 1988 through the present (TE 1120; see TE

19   389 as an example of the "accountings" prepared by Ricky Van Rijn). Then, in late 1998 and

20   early 1999, Kadisha, retained the services of David Gottlieb of Grobstein Horwath after

21

22   consulting with Ron Panting (a former partner of Peat Marwick who advised Kadisha that there

23   were errors in the Arnold Kahn and Van Rijn "accountings"). In late 1999, Grobstein began

24   preparing new accountings from 1988 through the present (see, e.g., TE 389A). The final

25   version of Grobstein's accountings were presented to Petitioners in June 2001 after litigation was

26

27   underway. Petitioners contend that the Grobstein accountings are still erroneous in that, among

28   other things, they do not account for monies that should have been distributed from Trust 1 to

1  Dafna from 1989-1999 but were not, they incorrectly reflect inter-Trust loans, and they

2  understate David Rahban's interest payments.

3        Kadisha contends that annual accountings were given to either Ron or Dafna during the

4  first quarter of each year. (For example, the 1988 accounting would have been given to Ron or

5  Dafna in the first quarter of 1989.) Kadisha also testified, however, that he gave Dafna or Ron

6

7  Levi general ledger activity detail reports for 1988 through 1990 in the format which Feldman

8  testified was not created until the Fall of 1991. (T1 1900 Investments by Neil Kadisha; TE

9  (Trust 2) 183g, 319j, 395e; TE (Trust 1) 183a, 319b, 394a) Feldman testified that he never gave

10

11  Dafna copies of the accountings for 1988-1991. (RT 132, 1-23-03; RT 15, 1-24-03) Moreover,

12  Sharma testified at trial that after she began working for Kadisha on January 1, 1995, she never

13  disseminated accountings to Dafna for January 1, 1995 through the end of 1999. (RT 9, 12-9-02)

14        Even if Dafna had received the accountings, they were confusing and/or intentionally

15

16  misleading.

17        Feldman testified that the accountings were not set up in a typical balance sheet format

18  (RT 8, 1-24-03); that some transactions had been entered on an accrual basis and others on a cash

19  basis (RT 30, 12-12-02); that from 1988 to 1991 all monies remitted by Kadisha to the Trust

20

21  were (mis)labled as "loans," (RT 31, 12-11-02) and that Dafna would have been unable to

22  understand what the "interest accruals" in account 1500 of Trust 2's 1989 accounting pertained

23  to. (RT 30, 12-12-02). Feldman also testified that Dafna would have needed some knowledge of

24  accounting to have understood the accountings. (RT 6, 1-24-03)

25        All of the loans to Kadisha were recorded in an account misleading labeled "Investment —

26

27  N. Kadisha." Feldman testified that he was the one who came up with the idea of using the term

28  "investment" instead of "loan" in the accountings to describe the money Kadisha was taking

from the Trusts. (RT 36, 12-11-02) Feldman also testified that reading "investment Kadisha" would not mean loan receivable Kadisha (RT 110, 1-27-03). It is highly unlikely that Feldman was telling the truth. It is inconceivable that Feldman, who is a CPA, does not know that the Kadisha loans should have been labeled "loan receivables" to disclose what they actually were.

Petitioners' expert, Irving Goldring, who is a CPA, testified that the trust accountings were not in a proper trust accounting format. Moreover, even after the trust accounting format was changed in 1991, it was still not a proper format (RT 15, 7-30-03). Goldring also testified that there was no mention in the accountings of the warrants owned by Trust 2 (RT 12, 7-30-03); that even when Trust 2 received 31, 679 shares of Qualcomm stock, it was not reflected in Trust 2's accountings (RT 17, 7-30-03), that the trust accountings should have been prepared so that the beneficiary could understand them (RT 29-33, 7-30-03); and that it was the trustee's responsibility to consider the education, economic and business sophistication, and experience of the beneficiary when preparing his accountings (RT 29-33, 7-30-03).

Kadisha, a sophisticated businessman and a Qualcomm director, was *himself* unable to answer questions at trial about the "accountings" and repeatedly testified that *he* could not understand them. Kadisha admitted: (1) that he had not reviewed the accountings for accuracy (RT 15, 6-18-02); (2) that he did not understand what the term "CR" in the "accountings" meant (RT 18, 6-18-02); (3) that he did not know what the term "BJ" in the "accountings meant" (8, 6-18-02); (4) that he did not know what the term "journal entries" in the "accountings" meant (RT 77, 7-15-02); (5) that the "debit column" in Trust 2's 1988 accounting (TE 22) was "to reflect monies going *out* of the Trust" (RT 59, 6-24-03) when, in truth, it is monies coming *in*; (6) that he did not know what the "net worth" account reflected; and (7) that he would need an accountant to help him understand the meaning of certain entries. (RT 154, 5-28-02).

STATEMENT OF DECISION

73

Exhibit 30
Page 668

Moreover "[i]n order to provide the necessary flexibility to apply an equitable doctrine to individual cases, these sections state general principles for a court's guidance rather than restrictive rules." *Id.* at page 237. Thus:

> It has been pointed out that a constructive trust may be imposed in practically any case where there is a wrongful acquisition or detention of property to which another is entitled.

*Id.* at p. 238.

In other words, "[a]ll that must be shown is that the acquisition of the property was wrongful and that the keeping of the property by the defendant would constitute unjust enrichment." *Calistoga Civic Club v. City of Calistoga* (1983) 143 Cal.App.3d 111, 116.

Where a trustee acquires property by an advantage gained from the trust assets or his position as trustee, the acquisition is wrongful (as it is the result of the trustee's breach of duty) and the keeping of the property, which rightfully belongs to the trust, constitutes unjust enrichment. Therefore, where a trustee acquires property by an advantage gained from the trust assets or his position as trustee, the beneficiaries are entitled to the remedy of a constructive trust.

13.   **Kadisha gained numerous advantages from the "administration of the trust, dealing with trust property, or the trustee's relation to the trust estate," and he is therefore liable for and must disgorge his profits.**

    a.   **Kadisha benefits from the use of Trust assets in 1988 through 1989.**

Kadisha benefited from the use of Trust assets during 1988 and 1989 by, among other things:

- Misappropriating the $500,000 Namco Loan proceeds for his own use,

- Defaulting on the Namco Loan and buying Qualcomm stock for himself instead of repaying Trust 2 for the misappropriated Namco Loan proceeds,

- Loaning Qualcomm $100,000 to protect his Qualcomm holdings instead of repaying Trust 2 for the misappropriated Namco Loan proceeds,

- Using Trust assets to secure an unnecessary $2 million loan to raise cash for Trust 2 to loan Qualcomm $300,000 in an extremely risky loan, to insure Qualcomm's survival until it could raise other money,

- Selling the Strathmore Residence, misappropriating the proceeds and loaning $1,250,000 to Stadco, a corporation in which Kadisha, Parviz and Younes had a substantial investment, and which had guaranteed Omninet's Sanwa loans;

- Converting the risky $300,000 note to an even riskier equity investment to help Qualcomm, and

- Misappropriating from the Trust to pay back the $390,000 money that his family and friends advanced that he used to meet his obligations in the 1998 Qualcomm stock acquisition.

**Kadisha's claims that he did not need to use the Trust asset because he had other money available is not credible.**

Kadisha's claims that he had other money available to him at the time of the Qualcomm stock purchase are not credible. Although he testified that he transferred $750,000 from an offshore account to his Independence Bank account on July 1988, this is unbelievable (RT 89, 10-8-02).

STATEMENT OF DECISION

102

P

Exhibit 30
Page 670

Tellingly, Kadisha did not produce at trial a copy of the account statement showing the purported transfer. Instead, he called Parviz Semsar ("Semsar"), a former Independence Bank employee who testified, incredibly, that he remembered receiving the transfer – some 15 *years ago* from among the 300 *accounts* (including 50 hight net worth accounts) he was handling at the time. (RT 15, 2-23-04, RT 21, 2-23-04.) Semsar also testified that Kadisha deposited the overseas proceeds into certificates of deposit that remained at Independence Bank as of September 1988. (RT 17-19, 2-23-04.)

In addition to being incredible, Semsar's testimony is contradicted by the documentary evidence. Kadisha's January 27, 1988 financial statement (TE 35) reflects "cash overseas" of $650,000. The October 24, 1988 financial statement that Kadisha submitted to Imperial Bank (for purposes of the Imperial Loan) does not mention either an Independence Bank account or the purported certificates of deposit and reflects overseas deposits of $600,000. (TE 139.) Thus, if Kadisha had $650,000 in overseas cash on January 27, 1988, and still had overseas cash of $600,000 on October 24, 1988, he did not transfer $750,000 as he and Semsar testified.[24]

<u>**Kadisha's actions at the time of the Qualcomm stock transaction are a more reliable indicator of his financial condition – and they are not the actions of a man with a surplus of cash.**</u>

Kadisha's actions at the time of the Qualcomm stock transaction are a more reliable indicator of his financial condition – and they were not the actions of a man with a surplus of cash. The evidence shows that Kadisha was, in fact, short of cash and could not have completed the Qualcomm stock purchase if he had repaid Trust 2 the $428,000 he owed it. For example:

---

[24] ~~Semsar's testimony represents one of many instances of Kadisha's pattern of soliciting untrue or dubious trial testimony from third-party witnesses.~~

1    Kadisha used trust assets to acquire 30,000 shares of Qualcomm stock from Farahnik

2    (Which has nothing to do with Farahnik's original purchase thereof by money other than from

3    either Trust 1 or 2).

4        One of the principal claims of Petitioner Dafna Uzyel relates to Kadisha loaning money

5    to Farahnik—which he used to buy Qualcomm stock—and to subsequent forgiveness by Kadisha

6    of the loan money due him in exchange for receiving 30,000 shares of Qualcomm stock.  The

7    Petitioner contends the two transactions between Kadisha and Farahnik resulted in damages to

8    Petitioner because Trust 2's money was used by Kadisha to (1) make the original loans to

9    Farahnik by which he was able to purchase the subject shares of Qualcomm stock, and (2) the

10   second claim of Petitioner Dafna Uzyel that Kadisha used some of Trust 2's money to acquire

11   the subject shares of Qualcomm stock is valid.  The first claim is not.

12       While Petitioner Dafna Uzyel would have it in respect to the first claim that Kadisha had

13   his eye on Trust 2's probable assets at the time he loaned Farahnik the $76,000 on March 24,

14   1988 and $70,000 on April 5, 1988, such contention is without proof, falling into the legal

15   junkyard of speculation.

16       The second claim is valid.

17       Kadisha loaned Farahnik a total of $221,000.  (The $7,000 and the $76,000 loans totaling

18   $151,000) were funded by Kadisha's Union Bank line of credit advance—which was repaid with

19   Trust 2's funds when Kadisha misappropriated the $500,000 Namco loan proceeds (the property

20   of Trust 2) for his own use.  The court finds beyond any doubt the acquisition of the subject

21   30,000 shares of Qualcomm was enabled by Kadisha embezzlement of practically all the subject

22   Namco loan proceeds.  The damages are detailed subsequently under the Damages section.

///

## DAMAGES

"Equitable relief is flexible and expanding, and the theory that 'for every wrong there is a remedy' (CC 3523) may be invoked by equity courts to justify the invention of new methods of relief for new types of wrongs" (See Witkin, 9th Ed. Vol. 11, Equity #3, pg. 681). By classification, this case falls within the jurisdiction of the probate court which can fashion an equitable remedy against a trustee who has breached his lawful duties to the beneficiaries and caused them damages or the right to a constructive trust of assets acquired by trust money.

Kadisha's reliance on certain terms of trust agreements as escape hatches to relieve himself of his numerous derelictions as trustee and damages resulting therefrom is, as stated elsewhere in this opinion, totally lacking in merit as the trust agreements are the product of fraud by the respondent.

Respondent contends that Petitioners have not presented any "damage model" upon which the Court can calculate damages. Although it is unclear what Respondent means by a "damage model," the evidence, case law and common sense provide an adequate basis for calculating Petitioners' damages. Respondent's argument is also belied by the fact that Respondent presented his own formulas for calculating damages, in the event the Court awarded them.

"Where the fact of damages is certain, the amount of damages need not be calculated with absolute certainty." (Emphasis in original; *GHK Associates v. Mayer Group, Inc.* (2nd District 1990) 24 Cal.App.3d 856, 873, citing *Channell v. Anthony* (1976) 58 Cal.App.3d 290, 371, and *Noble v. Tweedy* (1949) 90 Cal.App.2d 738, 745, 746 [203 P.2d 778]) "The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." (Emphasis

added; *Id.* At p. 874, citing *Allen v. Gardner* (1954) 126 Cal.App.2d 335, 340.) "**This is especially true where…it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits…or where it is the wrongful acts of the defendant that have caused the other party to not realize a profit to which that party is entitled.**" (Emphases added; *Id.* Citing *Ramona Manor Convalescent Hospital v. Care Enterprises* (1986) 177 Cal.App.3d 1120, 1140; *Mann v. Jackson* (1956) 141 Cal.App.2d 6, 12 and *James v. Herbert* (1957) 149 Cal.App.2d 741, 749.) The selection of which measure of damages to apply is within the sound discretion of the trier of fact. (Id.) The measure that most appropriately compensates the injured party for the loss sustained should be adopted. *Strebel v. Brenlar Investments, Inc.* (2006) 135 Cal.App.4th 740, 749.

Furthermore, this is a court of equity and:

> "The object of equity is to do right and justice. It 'does not wait upon precedent which exactly squares with the facts in controversy, but will assert itself in those situations where right and justice would be defeated but for its intervention.' 'It has always been the pride of courts of equity that they will so mold and adjust their decrees as to award substantial justice according to the requirements of the varying complications that may be presented to them for adjudication.' [Citations omitted.] 'The powers of a court of equity, dealing with the subject-matters within its jurisdiction, are not cribbed or confined by the rigid rules of law. From the very nature of equity, a wide play is left to the conscience of the chancellor in formulating his decrees. It is the very essence of equity that its powers should be so broad as to be capable of dealing with novel conditions.' [Citation omitted.] Equity acts 'in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition, in which new primary rights and duties are constantly arising, and new kinds of wrongs are constantly committed.' [Citation omitted.]"

*Toscano v. Green Music* (2004) 124 Cal.App.4th 685, 693-694.

The Court has been cognizant of these principles in arriving at its damages award on the following claims.

1    The Court is using the date of September 18, 2000 as the date for determining Petitioners'

2    damages on certain of their claims.  This was the last day upon which Kadisha turned over Trust

3    assets to Petitioners.  Therefore, the assets were under Kadisha's control and subject to his

4    fiduciary duties until September 18, 2000.

5

6         During trial, Kadisha attempted to introduce evidence about what happened to the assets

7    once Petitioners regained control of them.  The Court ruled that such evidence was irrelevant.

8    Kadisha's argument in support of introducing the evidence was, in substance, that Petitioners

9    should have done something after he turned over the assets to them to mitigate, for example, the

10

11   $10 million loss Petitioners suffered when he stood idly by while the value of Trust 1's

12   Qualcomm stock plummeted.  In other words, Kadisha is looking to Petitioners as if they have a

13   fiduciary duty to him to cure his intentional breaches of duty.  This is another of Kadisha's

14   attempts to blame the victim and the Court rejects it.  Kadisha had control of the assets until

15   September 18, 2000, they were subject to his fiduciary duties until then, and that is the date the

16

17   Court is using to calculate damages.  see amendment

18        Damages:  Re $300,000 loan to Qualcomm from Trust 2.

19        Since it is evident that the loan was not made for Dafna's benefit, and that Kadisha was

20

21   the only other person who stood to benefit from the loan, the only conclusion that can be drawn

22   is that Kadisha made the loan for his own benefit; Qualcomm was losing money; Kadisha's own

23   Qualcomm's investments were at risk, and he loaned Trust 2's money to Qualcomm to aid

24   Qualcomm, which in turn would improve his holdings of Qualcomm stock.

25

26        Kadisha is incorrect when he argues that he should be excused from liability because of

27   the high rate of return earned by the $300,000 loan to Qualcomm.  The loan was an extremely

28   bad gamble by Kadisha and violated every investment rule for trustees in the book.  But Kadisha

---

STATEMENT OF DECISION

114

Exhibit 30
Page 675

1    got lucky and the gamble paid off.  Naturally, Kadisha expects to be rewarded, and all his

2    derelictions excused because of one lucky bet, but such is not the case.  Otherwise, trustees

3    would be given license to steal millions of dollars but be excused by some lucky bet.  No such

4    license is issued by any decision.

5

6        In fact, the opposite is true.  Probate Code section 16440 gives courts discretion to excuse

7    a trustee from liability only where the trustee has acted reasonably and in good faith, and it

8    would be equitable to excuse the trustee's liability.  In fact, Kadisha *intentionally* set out to take

9    advantage of Dafna's inexperience and lack of sophistication to gain control over the trust assets

10   so that he could use them for his own benefit.  Subjecting Dafna and her children to such

11   extreme risk in a conflicted transaction to loan Qualcomm $300,000 made purely to protect his

12   own investment – when Kadisha knew that Dafna was utterly incapable of replenishing the Trust

13

14   principal if this risky investment failed -- was neither reasonable nor in good faith.  Kadisha

15   never stopped to consider the welfare of Dafna and her children.  He was solely interested in his

16   own financial welfare, and there is no evidence of any instances in which Kadisha acted in the

17   beneficiaries' interests.  There is *no* evidence that Kadisha acted reasonably and in good faith.

18

19       Nor did Kadisha provide any financial analysis to show how Trust 2's $300,000 loan to

20   Qualcomm would actually contribute to generating the required monthly distributions.

21   Qualcomm was a private company and losing more money than it was able to make or raise from

22   investors.  There was thus no performance or financial data from which to project what the future

23   value of Trust 2's $300,000 loan would be and therefore how it would enable Trust 2 to make

24   $20,000 monthly distributions to Dafna.  In fact, because Kadisha agreed to defer interest on the

25   loan to help Qualcomm, Trust 2's ability to generate the monthly distributions was *reduced by*

26   the $300,000 loan, not enhanced.

27

28

---

STATEMENT OF DECISION

· 115

Exhibit 30
Page 676

Kadisha also incorrectly contends that Qualcomm did not need Trust 2's money because it could raise all of the cash it needed, and that Kadisha did not, therefore benefit from Trust 2's loan to Qualcomm. The evidence is exactly the opposite – Qualcomm was losing money, it needed additional working capital that it could not raise, and it needed Trust 2's $300,000.

Entering into the $300,000 loan transaction with Trust 2, which provided the beneficial right to acquire 37,500 shares of Qualcomm stock at $8 per share, is one indication that Qualcomm was *not* wallowing in cash, as suggested by Kadisha, particularly since Qualcomm made repayment of the loan a five-year obligation with deferred interest.

As well, at the time of Trust 2's loan on December 7, 1988, Qualcomm's liabilities (including its payroll and short-term payables) exceeded its available cash by millions of dollars. Qualcomm was consistently losing money. Its financial position had been further weakened by the Omninet transaction. On the date of Trust 2's loan, December 7, 1988, Qualcomm's August 20, 1988 "Series A" offering had not raised all of the money Qualcomm needed. In fact, the evidence was that as of December 1988, Qualcomm had raised only $300,000 in addition to Trust 2's loan. In February 1989, Qualcomm amended its "Series A" PPM. The amended PPM disclosed that a substantial portion of the money that had ultimately been raised came from officers and directors, not unaffiliated third parties. It also admitted that there was no assurance that Qualcomm would be able to raise all of the financing it needed.

Kadisha, as a director, was intimately familiar with these facts. The evidence of Qualcomm's financial conditions shows that the $300,000 loan was so risky that no faithful trustee would have made it. The evidence amply supports the inference that Trust 2's $300,000 contribution was looked for aid by Qualcomm in its financial dilemma.

1  Petitioners were not required to show precisely what Qualcomm did with Trust 2's

2  money, as Kadisha contends.   Since money is fungible, it would have been impossible for

3  Petitioners to determine precisely how Qualcomm used their $300,000.  It is abundantly clear,

4  however, that Qualcomm needed additional cash to survive.  In each of its PPM's between

5  August 20, 1988 and August 24, 1989, Qualcomm consistently indicated that even if it raised the

6  money sought, it would need more money, and it was uncertain whether it would be able to raise

7  enough money to continue operating.  The evidence is thus clear that Qualcomm was struggling

8  to survive, that it needed more money, that Kadisha knew it needed more money to survive, and,

9

10  that during this period he loaned it $300,000 of Trust 2's money.  Moreover, Petitioners are

11  aided by the presumption of Probate Code section 16004(c).  They established that Kadisha

12  breached his fiduciary duties by making the $300,000 loan for his own benefit.  The burden then

13  shifted to Kadisha to show that he did not benefit from the loan.  Kadisha failed to meet this

14

15  burden.

16

17  Kadisha incorrectly contends that the loan was a permissible exercise of his fiduciary

18  duties because only a small percentage of the Trust's principal was at risk.  Kadisha is wrong.

19  The loan was a conflicted transaction that breached his fiduciary duties regardless of whether it

20  involved 10% or 100% of the value of the Trust assets.  Moreover, Kadisha also misappropriated

21  the rest of the Imperial Loan proceeds for his own use so the $300,000 loan was Trust 2's only

22  documented asset (other than the now heavily mortgaged Strathmore Residence).

23

24  Kadisha's claim that he is entitled to the protection of the conflict of interest provision in

25  the Trust is equally far fetched.  The Court finds that the conflict of interest provision, and

26  others, are unconscionable as created, and Kadisha therefore cannot rely on them.

27

28

STATEMENT OF DECISION

117

Exhibit 30
Page 678

1    Kadisha also testified that he was forced to make such a risky investment to meet the

2    terms of the Trusts, which required him to make $20,000 monthly distributions to Dafna.  As

3    previously noted, the Court is disregarding Kadisha's testimony.  As well, Kadisha was regularly

4    consulted throughout the preparation of  Trust 2, and he expressly agreed to be bound by its

5    terms.  If he thought that the Trust's assets were not substantial enough to generate monthly

6    $20,000 distributions through conservative investments, why did he agreed to be bound by the

7    requirement that the trust estate be conservatively invested, "with primary consideration being

8    given to preserving principal.  Kadisha did not offer any credible evidence that in December

9    1988 when the loan was made, the trust's assets were too unsubstantial to make the required

10   distributions to Dafna with conservative investments.

11        Having determined all of the above, the Court is unable to find Petitioner's claim for

12   damages in the sum of $19,202,211 as being Trust 2's proportionate share of Kadisha's

13   Qualcomm stock transactions, plus prejudgment interest from September 20, 2000.  The method

14   of calculation is unsupportable proof of damages.  What the Petitioners would do is take the

15   percentage $300,000 was at the time of the loan to the total cash investments of Kadisha and

16   determine this to be 22.86%.  This percentage was taken by adding Kadisha's Qualcomm stock

17   investments as $662,000, $250,000, $100,000 and the $300,000 for a total of $1,312,000.  The

18   $300,000 is 22.86% of the $1,312,000.  But while practically everything Kadisha did in his so-

19   called management of the Trusts was done by embezzlement of trust money for his own interests

20   and without regard to any of his obligations as trustee his gain in loaning the $300,000 has not

21   been shown by Petitioners, even by the use of power-point boards, which Yossi Vardi, a tech

22   investor and distinguished prankster from Israel remarked: "Power Point presentations damage

STATEMENT OF DECISION

118

Exhibit 30
Page 679

your brain. If you look at too many, you become immoral." The court did not look at too many but enough to discount Petitioner's theory of damages by the formula above described.

The court is not denying that Kadisha benefited Qualcomm in some degree by the $300,000 loan but it was hardly the economic lifeline the Petitioners would have it. And Kadisha probably benefited himself in the eyes of Qualcomm's Board of Directors by showing his dedication and financial acumen in obtaining the $300,000 for Qualcomm. And obviously in some hardly calculable measure increased the value of his Qualcomm stock. But saying the foregoing does not equate to proof of damages suffered by Trust 2 in Kadisha's making of the subject $300,000 loan.

Petitioner's claim for damages against Kadisha for his loaning $300,000 of Trust 2's money acquired by Kadisha in the making of the Namco loan is denied.

### Damages: Re the Farahnik loan, funding by Trust 2, and Acquisition by Kadisha.

Because Kadisha used a portion of the Namco Loan proceeds (the property of Trust 2) to wipe out his obligation to Union Bank, there was clearly substitute funding of $112,302 of the Farahnik loans by the use of Trust 2's money. Kadisha, by his actions and conduct, had to know that what he was doing with Trust 2's money was wrongful. He abstained from making any note to trust 2 concurrent with his taking of the Namco Loan proceeds. He never had a note signed by Farahnik to Trust 2 concurrent with Kadisha paying off Union Bank with Trust 2's money. He gave six different, incorrect explanations for what he did with the Namco Loan proceeds prior to trial to prevent Petitioners from discovering that he had used a portion of the proceeds to pay off his Union Bank line of credit for funds he had borrowed to loan to Farahnik.

1   Under the circumstances of this case, the idea that Kadisha, being guilty of perjury

2   among other misdeeds as trustee, can suggest that he should be the total beneficiary of millions

3   of dollars of profit on the 30,000 shares of Qualcomm stock he acquired from Farahnik made

4   possible by the use of Trust 2's money is unbelievable.  He would have it that Dafna and her

5   children are well rewarded by his paying 13% on the money he took from Trust 2 via the Namco

6   Loan.  Equity is shocked by such a conception of justice.  It is tantamount to rewarding a thief

7   for stealing money.  Kadisha must instead disgorge any profit, benefit or advantage he acquired

8   through his dealings with trust assets.

9   Petitioner Dafna Uzyel is awarded $15,818,000, plus prejudgment interest at 10% per

10  annum from September 19, 2000.  The amount is calculated as follows:

11  Petitioners are entitled to a proportionate share of the 30,000 shares.  The court arrives at

12  the $112,302 figure by first determining that $151,000 is part of the amount Kadisha wrongfully

13  stole in taking practically all the $500,000 Namco loan proceeds for his own use.  But the court

14  is giving Kadisha credit for $38,698 of his own money ($10,000 being highly questioned by

15  Petitioners, who contend he got $10,000 of Trust 2's money and used it for his own purposes)

16  which reduces the Petitioner's correct contention that the $112,302 was used by Kadisha in the

17  acquisition off the subject 30,000 shares of Qualcomm stock and said stock so acquired is their

18  property or they are entitled to damages equal to the value of the stock and its progeny as of the

19  date of termination of the trusts in September 2000.  Damages are computed as follows:  Using

20  the 17,540 shares as acquired by Trust 2 by Kadisha's use of Trust 2 money there followed stock

21  splits bringing the total stock held by Kadisha from 30,000 to 480,000 shares in September 2000.

22  Applying 53.48 percent to 480,000 reveals Trust 2 owns or is entitled to the value of 256,704

23  shares which multiplied by $61.62 a share (being the lowest price between September 14 and

STATEMENT OF DECISION

120

Exhibit 30
Page 681

1    September 18, 2000) brings the value of the subject shares to $15,818,000.  Petitioner Dafna

2    Uzyel is awarded $15,818,000 as damages, plus interest at 10% per annum from September 18,

3    2000.

4

5      The Court rejects Kadisha's  reason for asserting that the percentage of Trust 2's shares

6    should be other than 53.48% is that the consideration for Kadisha's acquisition of the

7    misappropriated shares was $221,000 rather than $210,000.  The Stock Purchase and Sale

8    Agreement between Kadisha and Farahnik for the acquisition of the misappropriated shares

9    specified consideration of $210,000.  There is no evidence that the consideration for the shares

10   was $221,000.

11

12     **Damages – Kadisha's 1992 Sale of Trust 2's 37,500 Shares of Qualcomm**

13     **Stock:**

14     Kadisha was self-dealing when he sold Trust 2's assets when he sold Trust 2's 37,500

15   shares of stock in May 1992.  He needed money for his own use, being under substantial

16   financial pressure.  But this time, he did not use any "loan" or "investment" acknowledgement of

17   his taking.  Instead, he concocted a phony loan of $1,400,000 to a real or fictitious person by the

18   name of David Rahban who reputedly lives in Switzerland or Israel.  He might just as well be

19   living on the moon or on Mars with an odd-shaped head.  Nothing by way of a note, letter,

20   address, security or usual evidence of a loan has been provided by Kadisha.  The Court finds

21   Kadisha is not telling the truth.  That in fact, he just took the money for his own use.  That in

22   addition to the $1,400,000, he took $1,200,000 with the same phony ploy that it was a loan to

23   Rahban.  Good story telling is not a major or credential of Kadisha.  He does it badly.  Theresa

24   Makhaili, Kadisha's assistant, gave untrue testimony on direct examination to support Kadisha's

25   untrue testimony about the Rahban loan.  However, she admitted on cross-examination that she

26

27

28

<div align="center">

STATEMENT OF DECISION

121

Exhibit 30
Page 682

</div>

never knew Rahban, never saw a promissory note from Rahban, and never had an address for him. Mikhaili, who kept the Trust records, also admitted on cross-examination that she did not make the entries on the Trust accounting that showed Rahban's purported $1.4 million loan, or his alleged payments. The Court finds that Kadisha and Mikhaili are not telling the truth when they claim that Kadisha loaned $1.4 million to Rahban. That in fact Kadisha sold Trust 2's Qualcomm stock solely for his own benefit and took the proceeds of the sale, along with other Trust funds, for his own use in the guise of the phony loan to Rahban.

The May 1992 sale and the Rahban loan represent two separate transactions (albeit closely related ones) and different damages pertain to each. The May 1992 sale violated Kadisha's fiduciary duty of loyalty, his duty to refrain from using Trust assets for his own purposes, his duty to keep the Trust assets separate from his own, and his duty to prudently invest Trust 2's assets. (The "Rahban" loan is dealt with in the section in the decision on Kadisha's misappropriations.) Although courts generally do not like to second-guess a trustee's investment decisions, Kadisha's self-dealing in selling Trust 2's Qualcomm stock to raise cash for his own use did not constitute prudent investing. Furthermore, Kadisha did not consult with an investment advisor about the advisability of the sale, or invest or diversify the sale proceeds (he embezzled them instead), or tell Dafna about the sale either beforehand or afterwards.

Petitioners have also raised the issue of Kadisha's bad faith in selling Trust 2's Qualcomm stock for his own use. There is no question that Kadisha had an ever-present, continuing appetite for the use of trust assets for his own benefit. This is crystal clear. But when Kadisha sold Trust 2's stock at its then market value for his own beneficial use, was this "bad faith?"

STATEMENT OF DECISION

122

Exhibit 30
Page 683

"Bad faith implies or involves actual or constructive fraud, or a design to mislead or deceive another, or a neglect to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interest or sinister motive. The term 'bad faith' is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong, because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with a furtive design or ill will." Black's Law Dictionary; 5th Edition.

Kadisha breached his fiduciary duties in many ways, including, but not limited to using trust assets for his own benefit. Selling Trust 2's Qualcomm stock to raise cash for his own use and concocting the fiction of the Rahban loan to cover up his embezzlement of the sale proceeds were conscious doings of wrong. Kadisha was not merely negligent. His purpose was dishonest. His acts were the turning aside of moral conduct. In short, they were in bad faith -- and they breached Kadisha's duty to treat Trust 2's beneficiaries with the *utmost* good faith.

Probate Code section 16440(a) provides that if a trustee commits a breach of trust, he is chargeable with any of the following that is appropriate under the circumstances: (1) any loss or depreciation in the value of the trust estate resulting from the breach of trust, with interest; (2) any profit made by the trustee through the breach of trust, with interest; or (3) any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust.

Kadisha's actions in selling Trust 2's Qualcomm stock in 1992 with no economic justification and for his own benefit resulted in a loss to the value of Trust 2, and/or lost profits, because of the subsequent increase in the value of Qualcomm stock. By absconding with the sale proceeds, Kadisha also foreclosed Trust 2's ability to make other profitable investments. That opportunity was lost to Trust 2 forever. In addition, because Kadisha sold Trust 2's stock to

STATEMENT OF DECISION

123

Exhibit 30
Page 684

raise the cash he needed, he did not have to sell his own stock.  He therefore profited from the appreciation of *his* stock but prevented Trust 2's beneficiaries from similarly profiting from the appreciation of *their* stock.

The Court cannot excuse Kadisha from liability for the Trust's loss (and his corresponding gain) under Probate Code section 16440(b).  That section states:  "If the trustee has acted *reasonably and in good faith* under the circumstances as known to the trustee, the Court, in its discretion, may excuse the trustee in whole or in part from liability under subsection (a) *if it would be equitable to do so*.  Kadisha did not act reasonably or in good faith in selling Trust 2's Qualcomm stock for his own purposes and attempting to conceal his wrongdoing in the fraudulent guise of the Rahban loan.  Kadisha therefore cannot be excused from liability for Trust 2's loss from his self-dealing sale of its Qualcomm stock (or for his corresponding gain).

Accordingly, on this claim, the proper measure of damages is $35,389,242, plus prejudgment interest from September 19, 2000.  This is calculated as follows.

Kadisha improperly sold 37,500 shares of Trust 2's Qualcomm stock in May 1992 for $801,000.  Interest on the $801,000 as of September 18, 2000 was $781,750 (using 13% interest from May 1 1992 until November 30, 1996 and 10% thereafter.)  Petitioners' total benefit from the May 1992 stock sale was therefore $801,000 plus $781,750 or $1,582,758 ("Petitioner's 1992 Sale Benefits").  On September 18, 2000, 37,500 shares, after stock splits, had grown to 600,000 shares.  Using the stock price of $61.62 per share that the Court has used on other claims, the 600,000 shares were worth $36,972,000 on September 18, 2000.  After deducting Petitioners' 1992 Sale Benefits ($1,582,758) from $36,972,000, the damages are $35,389,242.

In considering what measure of damages to assess against Kadisha for his many derelictions as trustee, the Court is fully aware of his effort to have the court ignore the totality of his conduct, which reveals his complete pattern of treating Trust 2's assets as those which he could embezzle and use for his own purposes, and have the court focus on denial of each embezzlement, converting each to some sort of minor transgression of his trustee's duties. The compartmental device of Respondent's as a cover-up is not acceptable to the court as a blind-sided approach. This is not to say the court ignores analyzing each of the claimed abuses of his trust as alleged by the Petitioners but such analysis may reveal a pattern of conduct that produces a true picture of Kadisha's embezzlement driven takings. A look below the surface of the veneer of his argument reveals the truth.

Petitioners, in seeking damages elect to ignore the sale of the 37,500 shares and treat it as though it had never happened, contending Kadisha's sale was a part of his intent to embezzle Trust 2's money, and, therefore, the Court must treat the sale as not having been made, and the stock should have been held until the termination of Trust 2 when it was worth $35,389,942.

The truth of the business is that Kadisha needed money, and this is plainly obvious as he then made the fictitious "loans" to Rebhan. They were nothing more than a clear integral part of the embezzlement by Kadisha of Trust 2's money.

Kadisha's defense is that all is forgiven once he repaid the Rebhan embezzlements and paid interest thereon. As empathized herein, Kadisha as embezzler does not determine when he is to return the embezzled money or what penalty shall be imposed upon him for his embezzlement. The Petitioners have the option on how to treat the embezzlement. They were never consulted about the sale and obviously Kadisha did not suggest the Petitioners seek legal

advice about the sale.  So Petitioners have every right to contend we are seeking damages against you for the amount of money our Qualcomm stock was worth had you held it until your control over the trusts were terminated.  Hence, the Petitioner Dafna Uzyel is awarded $35,389,242 in damages as computed above, plus interest at the legal rate of 10% per annum as andd from September 18, 2000.

**Damages:  Kadisha's Misappropriations of Trust Funds.**

The Uzyel Trusts provide that:  (1) [t]he principal of the Trust estate be invested in a conservative manner with primary consideration being given to preserving principal and protecting against inflation, (2) within such guidelines to maximize the income from the trust estate, and (3) the trustee may lend money at an adequate interest rate and with adequate security.

Kadisha's misappropriation of millions of dollars of trust money from 1988 to 1996 were not loans made at an adequate interest rate or with adequate security, as Kadisha contends. Kadisha embezzled the funds in flagrant violation of his fiduciary duties.  In fact, Kadisha could have been charged under the Penal Code for Grand Theft (Penal Code section 487) for embezzlement for his misappropriations.  Section 503 of the Penal Code defines embezzlement as "the fraudulent appropriation of property by a person to whom it has been entrusted."

Fortunately, this does not require the Court to forego awarding damages, as Kadisha erroneously contends.

Where the fact of damages is certain, the amount of damages need not be calculated with absolute certainty. (Emphasis in original; *GHK Associates v. Mayer Group, Inc.* (2nd District,

1   1990) 24 Cal.App.3d 856, 873, citing *Channell v. Anthony* (1976) 58 Cal.App.3d 290, 317 and

2   *Noble v. Tweedy* (1949) 90 Cal.App.2d 738, 745, 746 [203 P.2d 778].) "<u>The law requires only</u>

3   <u>that some reasonable basis of computation of damages be used, and the damages may be</u>

4   <u>computed even if the result reached is an approximation.</u>" (Emphasis added; *Id.* At p. 874,

5   citing *Allen v. Gardner* (1954) 126 Cal.App.2d 335, 340.) "<u>This is especially true where...it is</u>

6   <u>the wrongful act of the defendant that have created the difficulty in proving the amount of</u>

7   <u>loss of profits...or where it is the wrongful acts of the defendant that have caused the other</u>

8   <u>party to not realize a profit to which that party is entitled.</u>" (Emphasis added; *Id.* Citing

9   *Ramona Manor Convalescent Hospital v. Care Enterprises* (1986) 177 Cal.App.3d 1120, 1140;

10  *Mann v. Jackson* (1956) 141 Cal.App.2d 6, 12, and *James v. Herbert* (1957) 149 Cal.App.2d

11  741, 749.) The selection of which measure of damages to apply is within the sound discretion of

12  the trier of fact. (Id.) The measure that most appropriately compensates the injured party for the

13  loss sustained should be adopted. *Strebel v. Brenlar Investments, Inc., supra,* 135 Cal.App.4th at

14  p. 749.

15  Furthermore, this is a court of equity and:

16  "The object of equity is to do right and justice. It 'does not wait
    upon precedent which exactly squares with the facts in
    controversy, but will assert itself in those situations where right
    and justice would be defeated but for its intervention.' 'It has
    always been the pride of courts of equity that they will so mold and
    adjust their decrees as to award substantial justice according to the
    requirements of the varying complications that may be presented to
    them for adjudication.' [Citations omitted.] 'The powers of a
    court of equity, dealing with the subject matters within its
    jurisdiction are not cribbed or confined by the rigid rules of law.
    From the very nature of equity, a wide play is left the conscience
    of the chancellor in formulating his decrees. It is of the very
    essence of equity that its powers should be so broad as to be
    capable of dealing with novel conditions.' [Citation omitted.]
    Equity acts 'in order to meet the requirements of every case, and to

STATEMENT OF DECISION

127

Exhibit 30
Page 688

$1.6 million decline in value in one day should have been a wake-up call for Kadisha to take immediate action to preserve Trust principal. Nevertheless, he did nothing. He got another wake-up call when the market opened on January 4, and again on January 5, and he did nothing to preserve Trust principal. He never informed Petitioners or their counsel about the situation, and he never consulted with an investment advisor about stemming the Trust's losses. When he finally turned the Trust assets over to Petitioners, the value of Trust 1's Qualcomm stock had declined by approximately 60%, from $15,940,000 to $5,299,944.

The Court finds that when Trust 1's 80,000 shares of Qualcomm stock declined in value from $176.12 (January 3, 2000) to $156.44 (January 5, 2000) {TE 4633}, it was an unacceptable breach of duty by Kadisha to not act to preserve the asset. Kadisha was required under the terms of the Trust and the Probate Code to preserve the Trust's principal and had demonstrated the investment skills that would have enabled him to do so.[26] Nevertheless, he did nothing to preserve Trust principal in January 2000 or at any other time over the nine-month catastrophic drop in the share value of Trust 1's Qualcomm stock.

He did nothing, in fact, other than watch the stock continue to decline. Kadisha's continuing to hold the stock was a gambler's choice not available to him. He could gamble with his own stock, but not the beneficiaries.' By doing nothing to preserve the value of Trust 1's Qualcomm stock upon a $19.68 per share (or a total of $1,575,400) decline in value, Kadisha violated his fiduciary duties to preserve principal, to use the full extent of his skills in investing

---

[26] From 1991 through 2000, Kadisha was a Qualcomm director, owned and sold thousands of shares of his Qualcomm stock, bought and sold stock in other companies, and demonstrated extensive knowledge of complex transactions in dealing with publicly traded stock. For example, in December 1998, Kadisha collared 500,000 shares of his Qualcomm stock. In preserving Trust 1's Qualcomm stock after it lost 15% of its value, he could have sold it, entered into a collar, purchased a "put," placed a stop-loss order with the broker, or utilized other available options.

STATEMENT OF DECISION

140

Exhibit 30
Page 689

1    the Trust assets and to act as a prudent investor. A prudent trustee cannot stand idly by when the

2    stock market goes into a free fall, particularly when a stock comprises about 90% of the trust

3    assets. It requires a different state of mind than a gambler's choice.

4

5        Accordingly, on this claim, the Court awards Petitioners the sum of $5,792,000 plus

6    prejudgment interest from September 19, 2000. The amount represents the difference

7    between what Petitioners should have received if Kadisha had protected the stock upon a

8    19.68 decline and what they actually received (i.e., the value of Trust 1's Qualcomm stock

9    when it was finally turned over to them). (The $5,792,000 is arrived at by multiplying the

10   total value of the subject 30,000 shares of stock on January 5, 2000 at 156.44 per share)

11   which equals $11,715,200. Deducting the 75.05 per share due September 20, 2000 (which

12   totals $5,923,200) = $5,792,000.

13

14       Kadisha argues (incorrectly) that he should not be found liable for Trust 1's losses

15   because there were periods in which Qualcomm's stock rose (briefly) during the nine-month

16

17   decline, and it was therefore impossible to predict its future price. However, Kadisha has it

18   backwards. He created the situation in which 90% of the principal of Trust 1 was highly

19

20   sensitive to fluctuations in the price of Qualcomm stock by holding such a high concentration of

21   stock rather than diversifying. The unpredictability of the stock price only made it more

22   imperative that Kadisha take action when the stock's price began to fall so precipitously since he

23

24   had made Trust 1 so vulnerable to dips in the price of its Qualcomm stock.

25       Furthermore, Kadisha's failure to take advantage of any of the price increases to

26   minimize the beneficiaries' losses adds to the deplorability of his conduct rather than excusing it.

27   It also supports Petitioners' claim that he was intentionally retaliating against them for suing

28   him.

STATEMENT OF DECISION

141

Exhibit 30
Page 690

*Simon v. San Paolo* (2005) 35 Cal.4[th] 1159, held that "at a minimum, California law requires conduct done with 'willful and conscious disregard of the rights or safety of others' or despicable conduct done 'in conscious disregard' of a person's rights." "Conscious disregard" means that 'the defendant was aware of the probable dangerous consequences of his conduct and that he willfully and deliberately failed to avoid those consequences." *Taylor v. Superior Court* (1979) 24 Cal.3d 890, 895-896.

The Court finds that Kadisha's acts, as enumerated below and throughout this decision, constitute conduct that was vile, base, and contemptible, and would be looked down on as despised by reasonable people. The Court also finds that these acts were intentional, or done with a willful and conscious disregard of Petitioners' rights. The Court is persuaded by clear and convincing evidence that Kadisha was aware of the financially dangerous consequences of his conduct and willfully and deliberately failed to avoid those consequences.

In addition to Civil Code section 3294 and California judicial decisions, in *BMW v. Gore* (1996) 517 U.S. 559 and *State Farm v. Campbell* (2003) 538 U.S. 408, the United States Supreme Court set forth constitutional guideposts for determining whether punitive damages should be awarded and their amount. These guideposts are: (1) the degree of reprehensibility of a respondent's misconduct; (2) the disparity between the actual or potential harm suffered by Petitioners and the punitive damage award; and (3) the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases.

The degree of reprehensibility of the defendant's conduct is the most important indicia of the reasonableness of the punitive damages award against a defendant. *State Farm*, supra, 538 U.S. at 419.

There are five factors to be evaluated in determining the reprehensibility of the defendant's conduct: (a) whether the harm caused was physical as opposed to economic; (b) whether the tortuous conduct evinced an indifference to or a reckless disregard of the health or safety of others; (c) whether the target of the conduct had financial vulnerability; (d) whether the conduct involved repeated actions or was an isolated incident; and (e) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.*

These factors were adopted for use in California in *Simon,* and *Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191. In determining the reprehensibility of Kadisha's conduct, the Court has considered Petitioners' financial vulnerability, the recidivism of Kadisha's acts and omissions, and whether the harm was the result of malice, trickery or deceit, or mere accident.

With the foregoing in mind, the Court finds that Petitioners have shown, by clear and convincing evidence, that they are entitled to punitive damages against Kadisha for his conduct in the management of both Trusts 1 and 2.

In considering Kadisha's conduct, the total pattern of Kadisha's conduct comes into play. His malice, fraud, recidivism, and reprehensibility may be singular. The evidence of his overall conduct over the 12 years of his trusteeship establishes by clear and convincing evidence that none of his acts were innocent or an accident, and that each of them was undertaken with a conscious disregard of Petitioners' rights and their extreme financial vulnerability.

The following facts, among others, support the Court's finding by clear and convincing evidence that Kadisha's acts were extremely reprehensible.

Throughout Kadisha's trusteeship and, in particular, from 1988 through 1992, Petitioners were extremely financially vulnerable. Dafna had a 10th-grade education, minimal understanding of the English language, and a total lack of financial business experience. Her only job

1  experience in her entire life had been a short stint as a makeup artist. Prior to her husband's

2  death, she had never even opened a bank account by herself. During this same period, Kadisha

3  misappropriated substantially all of the Trust's assets for his own use to bolster his shaky

4  finances and the shaky finances of business in which he was heavily invested, including Omninet

5  and Qualcomm. Dafna did not have any assets to replace the Trust assets that Kadisha put at

6

7  extreme risk for his own benefit, and she had no skills with which to earn enough income to

8  support herself and her two young children if Kadisha lost the Trust principal. Izzet and Joelle,

9  who were the primary beneficiaries of Trust 1, were minors when Kadisha was risking the trust

10 assets for his own benefit.

11

12       In addition, in 1988 Kadisha took the entire $500,000 Namco Loan proceeds and used the

13 money to pay his personal loans and expenses. Kadisha defaulted on the loan, exposing

14 Petitioners to the possibility of losing the Strathmore Residence, which was the security for the

15 loan. The Strathmore Residence was the only Trust asset at the time and represented the vast

16 bulk of Dafna's property. Kadisha did not document his taking of the Namco Loan proceeds.

17 His accountant testified that Kadisha's purported accountings would not apprise a reader of the

18

19 Namco Loan.

20       Also in 1988, Kadisha loaned $300,000 of Trust 2's funds to Qualcomm, knowing that

21 there was a substantial likelihood that the entire $300,000 would be lost. In order to raise cash

22 for the $300,000 Qualcomm loan, Kadisha took out a second loan on the Strathmore Residence

23 (the "Imperial Loan"). He misappropriated $1 million of the $2 million Imperial Loan proceeds

24 for his own use. (The balance was used to repay the delinquent Namco Loan and fund the

25

26 $300,000 extremely risky loan to Qualcomm.) If Kadisha was not able to repay the $1 million

27

28

STATEMENT OF DECISION

153

Exhibit 30
Page 693

he misappropriated and Qualcomm went under, Petitioners would have lost substantially all of the then-existing Trust assets.

From 1988-1991, Kadisha misappropriated virtually all of the Trusts' cash for his personal use, without documentation or security. Kadisha's own finances were in turmoil. His inability to repay the Trusts for his misappropriations is amply demonstrated by the fact that he did not repay them. Petitioners were therefore at extreme risk of losing all of their assets.

In 1992, Kadisha sold all of Trust 2's Qualcomm stock to raise cash for his own use. He then misappropriated the sale proceeds for his own use, but claimed that he had loaned the money to Rahban. Kadisha knew there was no Rahban, and that even if there was, Rahban had no assets in the United States, and the supposed loan was unsecured. In 1992, Kadisha's expenditures exceeded his cash by over $1 million. Kadisha was therefore not only putting the sale proceeds at extreme risk by taking it when his finances were in the red, but he was throwing up a smoke screen that the beneficiaries would have to penetrate if he could not repay the money.

In 1993, Kadisha invested $600,000 of the Trusts' funds in Carson '93 Ltd. so that the partnership could purchase real property to lease to Texollini. Kadisha was the CEO and a substantial shareholder of Texollini. Texollini was not only the tenant, but also the general partner of Carson '93. There were thus not only conflicts of interest here, but lawyers of conflicts.

Kadisha's expert, Andrew Minstein, made it abundantly clear, at trial, that Carson '93's purchase of the 2575 El Presidio building was an imprudent investment. He testified that the El Presidio property had numerous physical deficiencies and was burdened by restrictive CC&R's.

STATEMENT OF DECISION

154

Exhibit 30
Page 694

The Court therefore finds by clear and convincing evidence that Dafna, Izzet and Joelle were all extremely vulnerable financially, and that Kadisha consistently disregarded their financial vulnerability for his own gain.

### Kadisha's Recidivism and Intentional Versus Accidental Acts

"[C]ertainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law. [Citations omitted.] Our holdings that a recidivist may be punished more severely than a first offender recognized that repeated misconduct is more reprehensible than an individual instance of malfeasance." *Johnson, supra*, 35 Cal.4th at page 1203, citing *BMW*.

Kadisha did not engage in an isolated act of misconduct -- he repeatedly, systematically and intentionally engaged in conduct that he knew was prohibited to him as a trustee. Kadisha's numerous and egregious acts establish, by clear and convincing evidence, a pattern of extreme recidivism. As previously noted, his course of conduct also establishes that his acts were intentionally malicious and/or fraudulent or undertaken with a conscious disregard of Petitioners' rights and that none of them was inadvertent or an accident.

### Kadisha's Malice and Fraud

Respondent's first line of defense is to attempt to overcome Kadisha's deficiencies by the very large ultimate financial gain by the Petitioners. But malice or fraud is not waived, ignored, or forgiven by a fortuitous financial gain. The almighty dollar does not bear a cross or other religious symbol.

Kadisha took advantage of Petitioners for his own benefit throughout his trusteeship. He exploited Dafna's helplessness after the death of her husband, her lack of experience, and her

---

STATEMENT OF DECISION

155

Exhibit 30
Page 695

cognitive insufficiencies to gain control of her assets. He intentionally and consistently violated his fiduciary duties. He looted the Trusts. He induced Dafna to sign unconscionable amendments. He concealed his wrongdoings with fraudulent accountings, backdated promissory notes and phony transactions. As one example of his fraud, Kadisha intentionally concealed from the beneficiaries that fact that he had used $240,000 of Namco Loan proceeds to repay his Union Bank line of credit and, in connection therewith, had acquired 21,571 shares of Farahnik's Qualcomm stock as another example of his fraud, Kadisha stole money from the Trusts under the guise of making loans to David Rahban, whom the Court has found to be a non-existent person in the claimed loan transaction. Had the District Attorney stepped in after the taking, he could have charged Kadisha with Grand Theft (Penal Code section 487) or embezzlement. Section 503 of the Penal Code defines embezzlement as "the fraudulent appropriation of property by a person to whom it has been entrusted."

Kadisha's malice and/or fraud also includes his bad faith stock sales in 1992 and 1999; his persistent refusal to account for his use of Trust funds; his intentional self-dealing with trust assets, his continuing exploitation of Dafna's inability to understand or grasp almost anything about the Trusts; his use of money or promise of money, as a carrot to get Dafna to sign trust amendments that purported to relieve Kadisha of his fiduciary duties and release him from liability for his egregious acts; his use of Ron Levi, Dafna's second husband, as a willing dupe (having the same cognitive insufficiency as Dafna); his retaliation against Petitioners for suing him by allowing Trust 2's Qualcomm stock to decline in value by over $10 million; his taking of $500,000 from Petitioners to pay his legal fees and refusing to return it after Judge Gary Klausner ordered him to do so; his backdating of promissory notes and creating backdated, phony transactions; his misappropriations of over $10 million of the Trusts' cash without

adequate security or even the most minimal documentation; investing Trust funds in Carson '93 Ltd. for Kadisha's own economic benefit, and purchasing Trust 2's partnership interest without Dafna's knowledge in yet another conflicted transaction.

Each of these acts was malicious or fraudulent, despicable, and done with intentional or willful and conscious disregard of Petitioners' rights.

Kadisha would like the Court to believe he was well fixed financially at all times so it cannot be said that he acted with malice, i.e., that his conduct was despicable and done with a willful and knowing disregard of Petitioners' rights.

The clear and convincing evidence is to the contrary. While the Court might entertain the thought early on in his acting that Kadisha made a simple mistake in taking all of the available cash from the Namco Loan available to Dafna for the support of herself and her children, such a thought dissipates like fog on a hot summer day as Kadisha set the course of his entire trusteeship on the impermissible taking of Trust assets, false accountings, back-dating of notes and the many other intentional breaches of trust hereinbefore set forth.

Kadisha's actions immediately after the Namco taking fortify the Court's position. After defaulting on the Namco Loan, Kadisha procured an additional loan of $2 million on Dafna's home (i.e., the "Imperial Loan"). Kadisha took practically all of the Imperial Loan proceeds for his own use. He amazingly used her money to pay off his taking of the Namco Loan proceeds. Swindlers present and past would marvel at this taking, and they would marvel at how Kadisha was able to bypass the consent of Dafna to such a huge taking.

But the Namco and Imperial Loans were only the beginning of Kadisha's malice and fraud. The Court has found that Kadisha's acts in loaning Qualcomm $300,000 and subsequently converting the loan to equity (which plunged the Trust into even more troubled

financial waters) was by clear and convincing evidence conduct that was despicable and done with willful and knowing disregard of Petitioners' rights. These acts and the subsequent acts of Kadisha discussed above and in the earlier discussion of the United States Supreme Court guidelines are contemptible in "that [they] would be looked down upon as despised by reasonable people.

Kadisha also contends that the Court can only award punitive damages on a claim on which it has awarded compensatory damages. The California and United States Supreme Courts disagree. *Johnson*, citing *State Farm*, stated that the relevant relationship is between punitive damages and actual or potential harm. *Johnson, supra*, 35 Cal.4th at page 1207. The potential harm that is properly included in the analysis is "harm that is likely to occur from the defendant's conduct." *Simon, supra*, 35. Cal.4th at page 1177. In arriving at its conclusions, the Court has considered the claims on which Petitioners were awarded compensatory damages, and also the claims on which there was potential harm. The Court can, and has also considered the totality of Kadisha's conduct in arriving at its conclusions regarding Kadisha's deliberateness in disregarding Petitioners' rights and his recidivism, among other things.

**Punitive Damages Award**

The Court fixes punitive damages against Kadisha at $5 million for his numerous pre-litigation acts as trustee.

While it may be repetitive, Kadisha didn't borrow Trust funds -- he embezzled them, millions of dollars of them. He made bad-faith sales of Trust 2's Qualcomm stock in 1992 and 1999. He backdated notes in an effort to cover up his wrongful takings. He intentionally and carelessly caused accountings to be prepared that were deliberately designed to deceive and did deceive Dafna. Although thoroughly advised by his counsel, DeCastro, as to his limitations and

obligations as a trustee, he totally ignored DeCastro's advice and repeatedly entered into conflicted transactions. He considered his beneficiary Dafna "stupid," and took every opportunity to blatantly and deliberately breach his fiduciary duty of loyalty to her and her children. He contrived a phony transaction that robbed her of $3 million. He willfully, maliciously and despicably induced Dafna to execute Trust amendments by which she released all of his then-existent derelictions of duty and purported to give him unfettered control over her assets. He retaliated against Petitioners for suing him by doing nothing while the Trusts' only remaining Qualcomm stock catastrophically declined. He invented the fiction of the Rahban loans to conceal his stealing over $2 million of Trust funds. He placed the Petitioners in financial jeopardy over and over again by risking the Trust assets on his own speculative ventures.

While Petitioners would like to see the Court award punitive damages against Kadisha in a sum vastly greater, and one calculated at least two, three or four times the compensatory damages as fixed by the court, what the Court has done is apply ample punishment to Kadisha, knowing that making him pay $5 million will batter his delusion that he can prevail over his abandonment of principle and obligations under the law and engage in malicious and fraudulent conduct. Ample notice will be given to those who elect to assume the duties and obligations of a trustee that the laws respecting trustee mean what they say and are not to be ignored.

Consistent with the Supreme Courts' guidelines, the Court in arriving at the amount of punitive damages has taken into account Kadisha's financial condition. Throughout the trial, Kadisha made numerous applications for the release of funds from his Qualcomm stock that was subject to the Court's restraining order. In each of these applications, Kadisha attached a copy of his then current general ledger. During the punitive damages phase of the trial, Kadisha

### Carson '93 Ltd.

When he opposed this claim, Kadisha knew, among other things, that:

- He was prohibited from engaging in conflicted transactions.

- Nonetheless, he invested $600,000 of Trust funds to enable his partnership to buy a property to house his corporation.

- He intentionally engaged in yet another conflicted transaction when he bought Trust 2's interest in Carson '93, without Dafna's consent, an appraisal or Court approval.

### Kadisha's misappropriations.

When he opposed this claim, Kadisha knew, among other things, that:

- His takings were not "loans" as he persisted in claiming throughout trial. He had embezzled the money for his own use without executing a promissory note or any other form of documentation; he only paid interest retroactively when, years later, he had enough money to repay the misappropriations; and he had fraudulent accountings prepared that concealed his takings.

- He backdated promissory notes prepared after he repaid the misappropriations and knew that he had to conceal the fact that they were backdated, as demonstrated by his untruthful testimony at his deposition about the preparation and execution of the notes.

- He intentionally designed his accountings to conceal his misappropriations.

### The 2000 Stock Decline.

When he opposed this claim, Kadisha knew, among other things, that:

- He did not inform Petitioners that Trust 1 owned Qualcomm stock.

- He was watching the stock on a daily basis in 2000, and would do nothing to preserve the value of Trust 1's Qualcomm stock.

- He never diversified Trust 1's assets to reduce Petitioners' risk.

- He never acted in Petitioners' best interests during the entire time he was trustee.

- He did not do anything to staunch the losses to Trust 1's Qualcomm stock because he was retaliating against Petitioners for suing him.

- After Petitioners sued him, he used his control of Petitioners' assets to extort them to settle.

### $500,000 Legal Fees

When he opposed this claim, Kadisha knew, among other things, that:

- He ignored DeCastro's admonition that he not obtain any benefit or advantage from the use of trust assets.

- He ignored DeCastro's admonition that whenever he contemplated an act that could be beneficial to himself, he should obtain court approval.

- He did not provide any form of notice to Petitioners that he was taking the money.

- He opposed Petitioners' attempts to terminate the trusts and require him to turn over the Trust assets.

### Affirmative Defenses

In asserting his (baseless) affirmative defenses, Kadisha knew, among other things, that he had not given Dafna the accountings he claimed he had given her; that his accountings concealed rather than disclosed his malfeasance; that he had never acted for the benefit of Petitioners; that the three egregious trust amendments that purportedly exculpated and released him had been extracted from Dafna through economic coercion; and that he had intentionally ignored DeCastro's advice regarding what his fiduciary duties were over and over again.

1    But one of the most important things that Kadisha knew, which relates to his opposition

2    to each of Petitioners' claims as well as his affirmative defenses, is that he would have to give

3    false testimony and suborn perjury in order to prevent his wrongdoings from being discovered by

4    the Court.

5

6    **Would any reasonable attorney have thought Kadisha's opposition legally tenable?**

7    The next question is, based on those facts, would any reasonable attorney have thought

8    Kadisha's opposition legally tenable?  The answer is a resounding no.

9

10    Rule 5-200 of the California Rules of Professional Conduct provides that an attorney, in

11    presenting a matter in court, shall only provide a defense that is consistent with truth and shall

12    not seek to mislead the judge with a false statement of fact.  No reasonable attorney could

13    believe that presenting the facts outlined above in a way that is consistent with the truth could

14    result in Kadisha's exoneration on any legal ground.  And no reasonable attorney could have put

15

16    Kadisha and his witnesses on the stand knowing that they would have to give untrue testimony

17    (as they did) in order to provide a defense.  In addition, a reasonable attorney would have known

18    that if the Court did not believe Kadisha or his witnesses, it could disregard all of their testimony

19    (as the Court has done), and that, as a result, Kadisha would have no evidence to support his

20

21    opposition.  In short, no reasonable attorney could have believed that an opposition based on

22    false testimony was legally tenable.

23    Since no reasonable attorney would have thought Kadisha's opposition legally tenable,

24    the Court finds that Kadisha's opposition was unreasonable.

25    **Bad Faith**

26

27    Probate Code section 17211 also requires the Court to find that Kadisha's opposition was

28    in bad faith.  The Court finds that it was.

In determining whether Kadisha's opposition was in bad faith, the Court must determine whether Kadisha's opposition was subjectively in bad faith. "Bad faith" is closely analogous to "malice" as defined in malicious prosecution actions. "[T]he malice required in an action for malicious prosecution is not limited to actual hostility or ill will towards plaintiff, but exists when the proceedings are instituted primarily for an improper purpose."

"Good faith" has been defined as "that state of mind denoting honesty of purpose, freedom from intention to defraud; and, generally speaking, being faithful to one's duty or obligation." *Efron v. Kalmonovitz* (1967) 249 Cal.App.2d 187, 192.

The question is therefore whether Kadisha's opposition was conducted primarily for an improper purpose. Throughout Kadisha's trusteeship, he acted in bad faith and in total derogation of his fiduciary duties. There can be no doubt that Kadisha knew that what he did was wrong – he did exactly what DeCastro advised him not to do and then tried to cover up his misconduct.

As well, since the Court has concluded that Kadisha knew what he did was wrong, the conclusion that he mounted his opposition for an improper purpose must follow. The Court has found that Kadisha acted in bad faith by continuously breaching his fiduciary duties throughout his trusteeship, and with intentional, willful and conscious disregard of Petitioners' rights. The court has also found that Kadisha perjured and suborned perjury at trial. The Court therefore concludes that he would have lied to his lawyer and never conveyed any of the facts set forth above and therefore no lawyer could have presented a tenable opposition to Petitioners' claims.

The finding that Kadisha knew that what he did was wrong is bolstered by the Evidence Code.

Supreme Court's holding in *Ketchum*, this Court has calculated attorney's fees in precisely the same way.

Kadisha also incorrectly argues that when you divide the Court's award by the number of hours Petitioners' counsel worked on this case, the result is an hourly rate in excess of any reasonable hourly rate. This is a nonsensical analysis in a case, such as this, where the Court has enhanced the award.

The issue of apportionment that Kadisha has raised and any other issues involving attorney's fees will be dealt with when the court rules on Petitioners motion for attorneys' fees, which will be heard after entry of judgment.

## IV.   KADISHA'S AFFIRMATIVE DEFENSES

Since the court has found that Kadisha and his witnesses gave perjured testimony and is disregarding their testimony, Respondent has not produced any credible evidence to support any of his defenses.

Nevertheless, in analyzing Respondent's defenses, the court finds some review of important facts very revealing as to how equity should consider Respondent's defenses and, in particular, the statute of limitations defense.

The court granted Dafna's request to be questioned and give her answers in Hebrew, the court finding her oral communication ability, however, weak, would be better in Hebrew. While Respondent cites pages of her testimony, they do not reveal the bewildered look on her face as she sought to understand Nussbaum's questions. "I don't remember," is the best she could do. The court finds these answers were not evasive. Dafna is plain and simply a person who lacks understanding of financial matters, let alone what trusts are all about and her rights to know how her funds and her children's funds were being handled by Kadisha.

STATEMENT OF DECISION

173

Exhibit 30
Page 704

The court has already covered the appalling legal representation by DeCastro. The more the court reviews his conduct, the more disgusting the picture becomes.

Equally appalling as DeCastro's representation of Dafna is the production by a law firm — of three amendments to the original Trust agreement re Trust 2, relieving Kadisha from any and all liability for anything, as herein before stated, as well as the fact a reasonable person could well consider the amendments as acknowledgment of wrong doing and, further the obtaining of all waivers was without consideration. Equity cannot permit such an attempted travesty of justice.

Respondent seeks legal cover in the statute of limitations by advancing a very chilling ~ proposition akin to "buyer beware." Respondent urges upon the court the belief, a very chilling one, that beneficiaries must assume their trustee is not to be trusted based upon some sort of due diligence requirement. Apparently, Respondent would have it that all beneficiaries employ Pinkertons and constant auditors to investigate everything a trustee does, and if not, the beneficiaries will be victimized not only by their trustee, but also the statute of limitations. The court finds this profoundly shocking. There must be medication for Respondent to overcome this aberration.

Probate Code sections 16460 and 16460(b) re the Statute of Limitations cannot be applied to bar Petitioners' claims. How could equity ever think of applying the Statute of Limitations to a helpless, not-too-bright lady when her lawyer and trustee have left her bereft of any thought of inquiry as to their conduct? Consideration of Dafna is in many ways similar to drafting a complete evaluation of a developmentally disabled person in need of protection from those who would take advantage of her in an incredibly difficult social and economic adjustment.

An interesting question arises when a defendant seeks to raise the Statute of Limitations as a barrier to his fraudulent conduct. Mildred Lillie, one of the all-time great Appellate Court Justices of the State of California had zero tolerance for a witness testifying falsely under oath. In one case, she declared that a witness giving false testimony under oath was not entitled to the attorney-client privilege. The court is certain she would regard, as does this court, the idea that a witness can give false testimony and later attempt to change the impact thereof by an "amendment" should be treated as contemptuous of testifying truthfully as a cornerstone of the judicial process, i.e., having the duty to tell the truth under oath. The court having found Kadisha as giving false testimony under oath, he should be deprived of any benefit of a statute of limitations. His fraud is a continuing thread during his term as trustee eliminating his statute of limitations defense.

While Petitioners have pointed out the lacking of ability of Kadisha to charge Dafna with inquiry or notice, the court cannot express too strongly her intellectual inability in matters Respondent would like to show knowledge, duty to inquire or whatever. Dafna was badgered by Respondent with an array of questions that left her baffled as to how to answer. A typical question was to ask her if she received a certain document. When she would answer "No," then the following question would be asked: "Do you have any reason to believe you did not receive this document?" Dafna would look bewildered and then say she didn't see or get the document counsel referred to. The examination of Dafna took many days and only offered further proof she was not capable of being "reasonably capable of understanding any account or report," or if present with some document, "reasonably should have inquired into the existence of the claim."

The court cannot accept, as Kadisha urges, that the provisions of Probate Code Sections 16460(a) and 16460(b) can be used to shield a trustee who has unlawfully used trust funds,

STATEMENT OF DECISION

175

Exhibit 30
Page 706

1   stolen trust money and committed perjury. There is also no way a beneficiary can be reasonably

2   capable of knowing what the trustee has done as to wrongdoing if that cannot be ascertained

3   from an account or report which provides insufficient information for the beneficiary to

4

5   reasonably know the claim or be put on notice of the claim.

6         The Legislature has not provided and determined a trustee can keep a little black book of

7   all his misdeeds and then run up the victory flag after the statutory period has run. In fact, the

8   Legislature in 2004 recognized a deficiency in Probate Code sections 16460(a) and 16460(b) and

9

10   enacted Probate Code section 16461 which provides for a specified notice and a period in which

11   a beneficiary may object. But in doing this, the Legislature did not find any notice requirement

12   where the trustee has committed fraud, perjury or outright theft of trust assets.

13         The court must put to rest any idea that Ron Levi is a responsible factor in determining

14   Dafna's mental capacity to know or understand the terms and conditions of the trust documents

15   or the so-called accountings made by Kadisha or his employee or anything relating to what

16   Kadisha was doing with trust money. Levi is as dumb as a fence post. He is not a party to this

17

18   action. There is no legal document authorizing Levi to act as Dafna's agent. There is no

19   evidence that Dafna made or regarded Levi as her agent. There is no evidence Levi read any

20   trust documents. He was, at best, a delivery boy. He got checks from Kadisha. The fact he may

21   have received documents is meaningless. Proof would have to be that he read and understood

22   them. If he did, he would not know how to interpret them, and his understanding would not be

23   binding on Dafna. He had no knowledge of Kadisha's self dealing and using trust funds to his

24

25   own advantage. Accountings (if they can be so improperly labeled) were meaningless to him.

26   Levi's sole interest was how much Dafna was getting from Kadisha.

27

28

---

STATEMENT OF DECISION

176

Exhibit 30
Page 707

1    The wild conjecture is based upon the fact Levi and Dafna "discussed" the accountings.

2    There is not a vestige of acceptable evidence that they did.  Respondent would have the court

3    draw an inference of knowledge of what Levi and Dafna discussed.  It is the court's opinion that

4    the Levis together or singly could not understand the so-called accountings.  The Respondent is

5    grasping at thin air in attempting to use the so-called accountings as placing Dafna on notice of

6    anything.  To the contrary, the so-called accountings were designed to deceive and hide

7    Kadisha's devious and gross abuse of the trust assets given to his care.

8

9         Kadisha's "accountings" are basically fraudulent as they fail to disclose the willful and

10   unlawful taking by Kadisha of trust money, his conflicted transactions and his profits from Trust

11   assets.  The Respondent cannot rely on such concealment as a statute of limitations defense.  If

12   you fraudulently and unlawfully administer a trust, there is no way you can charge a beneficiary

13   with knowledge or duty to inspect – it is not the beneficiary's duty to be on constant vigilance for

14   fraudulent conduct of the trustee.  A beneficiary must have the comfort a trust is supposed to

15   provide, not administered by a dishonest person.  Concealment and fraud cannot be used as a

16   sword in favor of the statute of limitations.  What Kadisha is really saying is that if I can cleverly

17   disguise my so-called accounting but provide some slight clue as to my wrongful dealing and

18   you are not smart enough to find it, you can suffer without equity's assistance.  It does not work

19   that way.

20

21        There is a further basis for disallowing Kadisha to escape from liability by use of the

22   statute of limitations.  The court finds the case of *Gold v. Weissman* (2004) 114 Cal.App.4th 1195

23   supportive of the concept that where a trustee continues to act as a trustee on any claim of breach

24   of a trustees duties, the statute of limitations will be tolled, and the breach need not involve the

25   same matter, but only that the trustee continued to act as trustee.

26

27

28

STATEMENT OF DECISION

180

Exhibit 30
Page 708

1    While the *Gold* case involved malpractice, the same assumptions are made, i.e., duty, and

2    the continued duty tolls the statute.  It is particularly applicable in this case where Kadisha has

3    control of trust documents and the creation or modification of same over which Dafna would

4    have no knowledge or control.  It cannot be just to allow Kadisha to drop the iron curtain on any

5    of his derelictions as long as he is in power and places an innocent, bewildered beneficiary from

6    

7    having the right of legal action.

8        Kadisha's arguments regarding the statute of limitations, laches, failure to mitigate,

9    equitable estoppel, unclean hands, and ratification/affirmation are all fatally defective.  These

10   arguments either fail to comply with the express language of the Probate code or are based on

11   inapposite or miss-cited cases cited by Respondent.  Most critical, Kadisha disingenuously

12   

13   argues that the true meaning of his intentionally misleading and deceptive accountings – which

14   Kadisha claims he gave to Dafna – could have been deciphered by his hypothetical "reasonable

15   person beneficiary."  The threshold question, assuming arguendo that Dafna actually received the

16   "accountings," (which the Court does not believe she did) is whether *Dafna* was "reasonably

17   capable" of understanding them.  Since it required a Herculeon effort by Petitioners' counsel and

18   their experts to unravel Kadisha' accountings," the answer can only be no.

19       In short, the evidence unequivocally showed that Kadisha exploited Dafna's lack of

20   capacity to reasonably understand the accountings.  Since Dafna was not reasonable capable of

21   understanding the "accountings," therefore, she cannot be deemed to have received them under

22   Probate Code section 16460(b)(1) and the three-year limitations period did not commence

23   running.

24       Kadisha's argument that Petitioner's pre-1996 claims are barred by the statute of

25   limitations because Petitioners allegedly received accountings and other documents

---

**STATEMENT OF DECISION**

Exhibit 30
Page 709

("Respondent's Documents") for the years 1988-1992 that would have put a reasonable person on notice of financial transactions between Kadisha and the Trusts pointedly ignores Probate Code sections 16460(b) and 16460(b)(1).[29]  Since this analysis must be based on *Dafna's* capabilities and Dafna was *not* reasonably capable of understanding Respondent's documents, she cannot be deemed to have received them, and therefore the statute of limitations cannot be deemed to have commenced running.

It is undeniable that for the entire duration of Kadisha's trusteeship, Dafna could *not* have understood the accountings.  This is underscored by Kadisha's admission during trial that even *he* could not understand the critical components of the accountings that he professes Dafna should have understood.  Finally, although Kadisha knew that he did not understand the accountings, and that Dafna (whom he described as "stupid") could not have understood them, i.e., Hugo DeCastro ("DeCastro") and Aaron Doodkevitch ("Doodkevitch"), Dafna's accountant.

Even assuming arguendo that Kadisha *could* have established at trial that Dafna was reasonably capable of understanding Kadisha's accountings – which he did not – Respondent's Documents do not meet the disclosure requirements of Probate Code section 16460(a), nor did they disclose Petitioners' claims.  Under that section, the statute of limitations does not begin running unless the accountings received by the beneficiary adequately disclosed the existence of a claim.[30]  The issue framed by this section is whether *Dafna* knew or, given her capabilities, should have known of the existence of her claims.  Kadisha's argument that this issue must be decided on the basis of what a hypothetical "reasonable person beneficiary" should have

---

[29] Sections 16460(b) and 16460(b)(1) provide, inter alia, that: "For purposes of subdivision (a), a beneficiary is deemed to have received the accounting or report as follows:  (1)  In the case of an adult *who is reasonably capable of understanding the account or report,* if it is received by the adult personally."  (Emphasis added.)
[30] An account or report adequately disclosed the existence of a claim if it provide sufficient information so that *the beneficiary* knows of the claim or reasonably should have inquired into the existence of the claim."  (Probate Code section 16460(a).)

STATEMENT OF DECISION

182

Exhibit 30
Page 710

1   understood is not supported by his inapposite cases, the plain wording of the statute, or logic.[31]

2   In addition to the plain wording of the statute, Goldring, Petitioners' expert testified that under

3   the standard of care for a California trustee, (1) trust accountings should be prepared so that the

4   beneficiary can understand them; and (2) it is the trustee's responsibility to consider the

5   education, economic and business sophistication, and experience of the beneficiary when

6   preparing his accountings.  (RT 17, 7-30-03; RT 29-33, 7-30-03.)  These are obvious corollaries

7   to Probate Code section 16460's rule that an accounting is not deemed received by a beneficiary

8

9   unless the beneficiary can understand it.

10

11          The evidence established that Respondent's Documents were *intended* to confuse and

12   mislead Dafna or anyone else who might see them.  Kadisha is estopped to now argue that Dafna

13   should have discovered and pierced through his deliberate and fraudulent deceptions (e.g.,

14   Kadisha identifying his misappropriations of Trust funds "investments" and backdating

15   promissory notes to retroactively convert his takings into loans).

16

17          Even if a "reasonable person beneficiary" standard applies, Respondent's Documents did

18   not disclose Petitioners' claims to a reasonable person and would not have put a reasonable

19   person on notice.  They were *intentionally* misleading, deceptive, confusing and fraudulent and

20   were designed to hide Kadisha's breaches of fiduciary duty:

21

22          In sum, there is no credible evidence that Dafna received Respondent's Documents.

23   Even if Dafna had received the documents, she could not have understood them.  She lacked the

24   intelligence and education to do so.  Kadisha's accountant admitted that understanding the

25

26   _____

27   [31] In determining a reasonable person standard, should an inexperienced, elderly uneducated beneficiary be held to
     the same standard as a Wharton graduate CFO beneficiary?  Or vise versa?  That would obviously impose an
     impossible burden on the elderly beneficiary.  Is a "reasonable person beneficiary" then the average of the two?

28   That would still impose an impossible burden on the elderly beneficiary.  Kadisha's objective reasonable person
     standard – which is derived exclusively from non-Trust cases – simply does not make sense in the trust context
     where the duty of loyalty is owed to a specific individual with specific characteristics.

STATEMENT OF DECISION

183

Exhibit 30
Page 711

1   of evidence that does so. To the contrary, Petitioners proved by clear and convincing evidence

2   that Kadisha did *not* act in good faith and that he retaliated against Petitioner's.

3

4

5   ## CONCLUSION

6       From the inception of the Trusts, Kadisha totally ignored the Trusts' terms, DeCastro's

7   memorandum detailing his duties as a trustee, his fiduciary duties, and his duty of loyalty in

8   favor of his own economic self-interest. Even a perfunctory review of his defenses exposes their

9   defects. No respondent could, in good faith, believe that the statute of limitations or the other

10  asserted defenses would bar Petitioners' claims. Kadisha's acts and omissions were flagrant,

11

12  numerous and deceptively hidden. Kadisha's actions are not worthy of reward, but, to the

13  contrary, call for compensation, the disgorgement of profits and punitive damages.

14      Kadisha has the arrogance to ask equity to uphold provisions in the trust agreements

15

16  which inure to his benefit. Cheat Dafna's trust. Steal from Dafna's trust. Take from Dafna's

17  trust what you want for personal gain. Kadisha lost any such rights. Equity under the

18  circumstances will give to Dafna and her children any benefits of the trust agreements. Kadisha

19  forfeited any considerations in his favor by his dishonest and deceitful conduct.

20      Kadisha attempts to make a mark against Dafna because in mid-1999, Dafna employed

21

22  Krane & Smith. Kadisha neglects to mention that Dafna went to Krane & Smith re enforcement

23  of certain provisions in Trust 2 that she be paid $300,000, and she had not received said sum at

24  any time. Little did Krane & Smith know or have any inkling at that time of what a can of

25  worms they had gotten themselves into. Obviously, they did not know of the many derelictions

26  of Kadisha as trustee of Trust 1 or Trust 2, yet Kadisha accuses them of playing "dog in the

27  manger," waiting to see if Qualcomm stock would rise or fall. He further charges that "no

28

---

STATEMENT OF DECISION

189

Exhibit 30
Page 712

professional or lay trustee should be subject to such "Heads-I-win, tails-you-lose" conduct. The foregoing accusation is pure desperation on behalf of Kadisha. It is an attack on the moral fiber of Krane & Smith, who have represented Dafna and her children with extraordinary excellence, reflecting both legal ability and the very best of moral character.

Samuel Krane of Krane & Smith shall now cause to be prepared a judgment based upon this Statement of Decision. Said judgment shall be filed and served within 15 days from the date of mailing of this Statement of Decision, but Krane may request additional time from the court (ex parte) upon good cause being shown.

Dated: October 24, 2006                  _Henry Shatford_
                                          Honorable Henry W. Shatford (A)
                                          Judge of the Los Angeles Superior Court

STATEMENT OF DECISION

190

Exhibit 30
Page 713

1  professional or lay trustee should be subject to such "Heads-I-win, tails-you-lose" conduct. The

2  foregoing accusation is pure desperation on behalf of Kadisha. It is an attack on the moral fiber

3

4  of Krane & Smith, who have represented Dafna and her children with extraordinary excellence,

5  reflecting both legal ability and the very best of moral character.

6      Samuel Krane of Krane & Smith shall now cause to be prepared a judgment based upon

7  this Statement of Decision. Said judgment shall be filed and served within 15 days from the date

8
   of mailing of this Statement of Decision, but Krane may request additional time from the court
9
10  (ex parte) upon good cause being shown.

11

12  Dated:  October 24, 2006                    _Henry  Shatford_____

13                                              Honorable Henry W. Shatford (A)
                                                Judge of the Los Angeles Superior Court
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

_____

**STATEMENT OF DECISION**

190

Exhibit 30
Page 714

# EXHIBIT 31

# State of California
## Secretary of State

### CERTIFICATE OF STATUS

ENTITY NAME:   OMNI 808 INVESTORS LLC

FILE NUMBER:            200822610026
FORMATION DATE:         08/12/2008
TYPE:                   DOMESTIC LIMITED LIABILITY COMPANY
JURISDICTION:           CALIFORNIA
STATUS:                 ACTIVE (GOOD STANDING)

I, DEBRA BOWEN, Secretary of State of the State of California, hereby certify:

The records of this office indicate the entity is authorized to exercise all of its powers, rights and privileges in the State of California.

No information is available from this office regarding the financial condition, business activities or practices of the entity.



IN WITNESS WHEREOF, I execute this certificate and affix the Great Seal of the State of California this day of December 13, 2008.

**DEBRA BOWEN**
**Secretary of State**

## State of California
### Secretary of State



I, DEBRA BOWEN, Secretary of State of the State of California, hereby certify:

That the attached transcript of ___1___ page(s) was prepared by and in this office from the record on file, of which it purports to be a copy, and that it is full, true and correct.



IN WITNESS WHEREOF, I execute this certificate and affix the Great Seal of the State of California this day of

DEC 1 3 2008

DEBRA BOWEN
Secretary of State

SecIState Form CE 108 (REV 1/2007)

Exhibit 31
Page 716

OSP 06 99733

2 0 0 8 2 2 6 1 0 0 2 6   File # _____



## State of California
### Secretary of State

**LIMITED LIABILITY COMPANY ARTICLES OF ORGANIZATION**

A $70.00 filing fee must accompany this form.

IMPORTANT — Read instructions before completing this form.

LLC-1

**FILED**
In the office of the Secretary of State
of the State of California

AUG 1 2 2008

This Space For Filing Use Only

**ENTITY NAME** (End the name with the words "Limited Liability Company," or the abbreviations "LLC" or "L.L.C." The words "Limited" and "Company" may be abbreviated to "Ltd." and "Co.," respectively.)

1. NAME OF LIMITED LIABILITY COMPANY

OMNI 808 Investors LLC

**PURPOSE** (The following statement is required by statute and should not be altered.)

2. THE PURPOSE OF THE LIMITED LIABILITY COMPANY IS TO ENGAGE IN ANY LAWFUL ACT OR ACTIVITY FOR WHICH A LIMITED LIABILITY COMPANY MAY BE ORGANIZED UNDER THE BEVERLY-KILLEA LIMITED LIABILITY COMPANY ACT.

**INITIAL AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and both Items 3 and 4 must be completed. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 3 must be completed (leave Item 4 blank).

3. NAME OF INITIAL AGENT FOR SERVICE OF PROCESS

Corporation Service Company which will do business in California as CSC-Lawyers Incorporating Service

4. IF AN INDIVIDUAL, ADDRESS OF INITIAL AGENT FOR SERVICE OF PROCESS IN CALIFORNIA    CITY        STATE    ZIP CODE

CA

**MANAGEMENT** (Check only one)

5. THE LIMITED LIABILITY COMPANY WILL BE MANAGED BY:

☐ ONE MANAGER

☑ MORE THAN ONE MANAGER

☐ ALL LIMITED LIABILITY COMPANY MEMBER(S)

**ADDITIONAL INFORMATION**

6. ADDITIONAL INFORMATION SET FORTH ON THE ATTACHED PAGES, IF ANY, IS INCORPORATED HEREIN BY THIS REFERENCE AND MADE A PART OF THIS CERTIFICATE.

**EXECUTION**

7. I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

August 12, 2008
DATE

_signature_
SIGNATURE OF ORGANIZER

Tricia A. Church
TYPE OR PRINT NAME OF ORGANIZER

LLC-1 (REV 04/2007)

APPROVED BY SECRETARY OF STATE

Exhibit 31
Page 717

# EXHIBIT 32

# Delaware

PAGE 1

### The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "VISION CAPITAL, LLC" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF FORMATION, FILED THE NINETEENTH DAY OF AUGUST, A.D. 2008, AT 12:36 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID LIMITED LIABILITY COMPANY, "VISION CAPITAL, LLC".

4589295   8100H

081207227

You may verify this certificate online
at corp.delaware.gov/authver.shtml

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 7032931

DATE: 12-17-08

Exhibit 32
Page 718

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 12:41 PM 08/19/2008*
*FILED 12:36 PM 08/19/2008*
*SRV 080883130 - 4589295 FILE*

## CERTIFICATE OF FORMATION

### OF

### VISION CAPITAL, LLC

This Certificate of Formation of **VISION CAPITAL, LLC** the ("Company"), is being executed by the undersigned for the purpose of forming a limited liability company pursuant to the Delaware Limited Liability Company Act.

1. The name of the Company is **VISION CAPITAL, LLC.**

2. The address of the registered office of the Company in Delaware is 800 Delaware Avenue, City of Wilmington, New Castle County, 19801. The Company's registered agent at that address is Delaware Corporations LLC.

IN WITNESS WHEREOF, the undersigned, an authorized person, has caused this Certificate of Formation to be duly executed as of the 19th day of August, 2008.

DELAWARE CORPORATIONS LLC,
Authorized Person

By: _____

Robin G. Brooks, Vice President

Exhibit 32
Page 719

# EXHIBIT 33

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER (optional)
FRED MASHIAN
3102747601

B. SEND ACKNOWLEDGMENT TO: (Name and Address)
FRED MASHIAN
9255 SUNSET BOULEVARD
SUITE 630
LOS ANGELES, CA 90069
USA

DOCUMENT NUMBER: 18230830002
FILING NUMBER: 08-7170419103
FILING DATE: 09/29/2008 14:35
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME VISION CAPITAL, LLC, A DELAWARE LIMITED LIABILITY COMPANY | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| 1c. MAILING ADDRESS 1525 SOUTH BROADWAY | CITY LOS ANGELES | STATE CA | POSTAL CODE 90015 | COUNTRY USA |
| 1d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 1e. TYPE OF ORGANIZATION LLC | 1f. JURISDICTION OF ORGANIZATION DIS | 1g. ORGANIZATIONAL ID#, if any 4569296 ☐NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any ☐NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME LEXINGTON FINANCIAL LIMITED, A NEVIS COMPANY | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| 3c. MAILING ADDRESS 33-35 DAWS LANE | CITY LONDON | STATE | POSTAL CODE NW7 4SD | COUNTRY UK |

4. This FINANCING STATEMENT covers the following collateral:
ALL OF DEBTOR'S RIGHT, TITLE AND INTEREST IN MEMBERSHIP INTERESTS OF OMNI 808 INVESTORS, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, SECRETARY OF STATE FILING #200812610026,

| | | |
|---|---|---|
| 5. ALT DESIGNATION: ☐LESSEE/LESSOR ☐CONSIGNEE/CONSIGNOR ☐BAILEE/BAILOR ☐SELLER/BUYER ☐AG. LIEN ☐NON-UCC FILING | | |
| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] ☐All Debtors ☐Debtor 1 ☐Debtor 2 | |
| 8. OPTIONAL FILER REFERENCE DATA | | |

FILING OFFICE COPY

Exhibit 33
Page 720

# EXHIBIT 34

M&L | Nevis LLC

Page 1 of 3

  



17 December, 2008

- En Español
- Home
- About Us
- Why Offshore?
- Contact Us
- Fee Schedule
- Order Online
- Why Panama?
- Panama as a Tax Haven
- Panama Foundation
- Panama Corporation
- Corporation / Foundation Combined
- Panama Charitable Foundation
- Panama Real Estate
- Real Estate Title / Escrow Services
- Offshore Banking
- Why Belize?
- Belize IBC
- Costa Rica Corporation
- Why Nevis?
- Nevis IBC
- Nevis LLC
- Why Seychelles?
- Seychelles IBC
- Offshore Trust
- Management Services
- International Fiduciary Structure
- Account Signatory Services
- Offshore Debit Card
- E-Commerce Solutions
- Offshore Web Hosting
- Internet Banking Software
- Offshore Bank Formations
- Swedish Credit Union
- NZ Offshore Finance Co.
- Uruguay SAFI
- Panama Financial Company
- Captive Insurance
- Offshore FAQ's
- Mail Forwarding
- Virtual Office Services
- Re-Invoicing Services
- Relocation Services
- Panama Immigration/ Panama Passport
- Ship / Yacht Registration Services
- Investments
- Reseller Program
- Panama Links

## OFFSHORE-BASED LIMITED LIABILITY COMPANY (LLC)

**DEFINITION:** If your primary goal is not legal tax efficiency but simply access to a low cost way of sheltering assets and providing privacy, a standalone Nevis Limited Liability Company may be ideal. A Limited Liability Company (or LLC) is a form of company or corporation that enjoys some distinctions from "normal" companies. At the most simple level, think of an LLC as a sleek cross between a company and a partnership, with all of the benefits of both.

The general advantages of LLCs are enhanced by the jurisdictional advantage of Nevis, the first offshore financial centre anywhere to enact a Limited Liability Ordinance.

### EXCELLENT PRIVACY:

- Since the beneficial owners and/or managers are not registered anywhere an LLC provides complete anonymity.
- Nevis has strict privacy oriented laws that forbid any registering, recording, or disclosure of directors and shareholders of exempt companies incorporated there. This means that no annual or other reports by members need to be filed in the public records of Nevis; therefore, there is complete anonymity and their identities are not accessible by any outside party.
- The company's records may be located anywhere in the world

### EXCELLENT ASSET PROTECTION FEATURES:

- A Nevis LLC enables you to protect your assets and funds from government agencies, creditors, and lawsuits.
- As an owner, you are not exposed to personal liability.
- As an owner, you can participate in management without becoming personally liable for the company's debts.
- A Nevis LLC is particularly advantageous for asset protection purposes since there are no shares that can be attached by a court of law.
- Members are not liable for obligations of the company.

### OTHER LLC BENEFITS: LLCs provide these additional advantages:

- LLCs provide a mechanism by which managers can limit the authority of non-managing members.
- LLCs have no limitation on the number of members.
- There are no limitations on ownership of an LLC.
- No corporate tax, income tax, withholding tax, stamp tax, asset tax, exchange controls or other fees or taxes are levied in Nevis on assets or income originating outside of Nevis.
- Members of Nevis LLCs may be individuals or business entities of any nationality or domicile.
- Nevis LLCs may amend their Articles of Organisation, merge, or consolidate with other domestic or


Member of The
NETCHECK
Commerce Bureau
Member Since 10/03
CLICK TO VERIFY

Exhibit 34
Page 721



PAN AMCHAM
**Proud Member**

foreign LLCs or other business entities.
- Members of Nevis LLCs may assign their interests to other parties unless restricted otherwise.
- Nevis permits sole member LLCs.
- Management of LLCs may be accomplished by the members or by managers designated by the members.
- Nevis LLCs face no stock limitations and can issue preferred interests analogous to preferred stock of corporations.
- A Nevis LLC is an excellent vehicle if used by a group of investors for a joint venture investment. In this respect it functions as if it were a Limited Partnership, but with all the added features and advantages mentioned above of an LLC that Limited Partnerships for the most part do not have.
- A Nevis LLC can be set up within 24 hours and has low initial cost and low annual fees.

Deeper Understanding on the efficacy of LLC's

LLC vs. a "Normal" Corporation:

The primary distinction between an LLC and a "normal" company such as a "C" corporation (USA) or a PLC (United Kingdom), is that the LLC is a tax-neutral vehicle because it is taxed as a partnership, rather than as a corporation. Thus, using an LLC eliminates tax at the corporate level. In this regard, it is somewhat like a U.S. "S" corporation or a German GmbH but,without all the restrictions and disadvantages. So if the LLC itself has no tax payment obligation - then who does? The obligation for any taxes that would otherwise be owed by the LLC bypasses the LLC itself and attaches directly to the members of the LLC. Members are to LLCs what shareholders are to normal companies. Other companies, as well as individuals and trusts, can be members of an LLC. There are no limits on the number of members or the classes of members that an LLC may have. The important thing to remember is that each member is responsible for his, her or its own pro-rata part of any overall tax obligation of the LLC and that the LLC itself has no tax obligations.

LLC as Trust Alternative:

Because of the flexibility available in LLC management structuring and because of the favorable way in which the laws of Nevis are drafted, LLCs can also be used as alternatives to a trust. The manager of the LLC is akin to the trustee of a trust and the members are akin to the beneficiaries of a trust. Sovereign Management & Legal can act as a manager of an LLC on behalf of a client who desires to take advantage of our corporate management services. Substituting an LLC for a trust can change the reporting requirements of taxpayers in onshore jurisdictions. Many providers have abandoned the trust as an offshore planning vehicle because trusts have become a target on onshore legislation and unfavourable court decisions (especially in the U.S.). Hence many are instead recommending either an LLC or a Foundation depending on what the client requirements are. The income or capital gain of an LLC is not reportable as trust income or gain or as corporate income or gain but is treated as personal income or gain.

Multi-National Joint Ventures:

LLCs are excellent vehicles for structuring joint venture arrangements between project participants from different countries. This is so because the venture can enjoy all of the benefits of incorporation, but each member is liable for his own taxation in his own country. Moreover, the membership flexibility allows different joint ventures to have different levels of ownership and reward based upon the value that each constituent member brings to the project. The only drawback is that prior to forming LLCs for multi-national joint ventures, the parties must check to see that this hybrid entity is granted the requisite corporate and pass through (partnership) status in the jurisdictions in which the joint ventures are located. Advice from a local onshore lawyer should be sought.

Tax Free:

All LLCs are free from all forms of Nevisian taxation. There are no Nevisian taxes on dividends, income, capital distribution, or wages whatsoever. Moreover, unlike many onshore jurisdictions, Nevis does not tax an LLC for accumulated (but undistributed) earnings

Exhibit 34
Page 722

M&L | Nevis LLC

**Privacy:**

All of the affairs of the LLC are private and cannot be disclosed except under truly exceptional circumstances such as links to international terrorism. The only document that needs to be filed with the government is the annual corporate license and this contains minimal information. There is no annual report or annual financial return that needs to be made to the government. There is no public inspection of your LLCs' records. Confidentiality is further enhanced if the LLC appoints our company as manager and we perform the minimal corporate duties required under Nevisian law.

**Enhanced Confidentiality:**

Nevisian LLC laws contain many requirements related to confidentiality including strict financial secrecy laws. Strict legal requirements, known as fiduciary duties, would also govern Sovereign Manager Services behavior as a manager of an LLC. These fiduciary duties are imposed on managers by both the equivalent of the LLCs bylaws and by the proper law of the LLC (usually the law of the country where the manager is located, i.e. Panama). Many of these fiduciary requirements relate to secrecy and accounting obligations by which the manager must abide. Nevisian LLC and Panamanian law prevent our company from discussing your LLC business with anyone you have not instructed us to talk to.

Other governments' agencies such as the Internal Revenue Service in the United States, Revenue Canada, or the Inland Revenue in the United Kingdom cannot force us to discuss your business with them unless they obtain a court order against you or us both ordering us to make disclosure. But a court order from their respective jurisdiction is useless in Nevis or Panama. In accordance with strong Nevisian law, a judgement from outside of Nevis will not be recognised by Nevisian courts. This means an onshore judgement creditor who won a lawsuit against you or your LLC in, for example, the U.S. or Germany cannot take that U.S. or German judgement and require a Nevisian court to enforce it.

In addition to not recognizing the judgements of other countries, Nevisian law and Nevisian courts do not favor the granting of court orders against LLCs except under truly exceptional circumstances. Nevisian law favors upholding the independence and application of its own law over the enforcement of foreign, onshore laws.

To view pricing, the components of our special offshore packages and to order click here.

Top

Home | About Us | Why Offshore? | Contact Us | Fee Schedule | Order Online | Why Panama?
Panama as a Tax Haven | Panama Foundation | Panama Corporation | Panama Charitable Foundation
Panama Real Estate | Why Belize? | Belize IBC | Belize LLP | Belize PCC | Costa Rica Corporation
Why Nevis? | Nevis LLC | Nevis IBC | Why Seychelles? | Seychelles IBC | Offshore Trust | IBC/Foundation Combined
Offshore Banking | Management Services | Account Signatory Services | Re-Invoicing Services
E-Commerce Solutions | Offshore Debit Card | Offshore Web Hosting | Offshore Bank Formations | Swedish Credit Union
NZ Offshore Finance Company | Uruguay SAFI | Panama Financial Company | Internet Banking Software
Captive Insurance | Offshore FAQ's | Mail Forwarding | Virtual Office Services
Ship / Yacht Registration Services | Relocation Services in Panama | Panama Passport Programs
Investments | Reseller Program | Panama Links | Sitemap

For optimal viewing and navigation, please enable javascript.

Exhibit 34
Page 723

# EXHIBIT 35



# NEVIS ISLAND ADMINISTRATION

*Ministry of Finance, Statistics & Economic Planning*
*REGULATION AND SUPERVISION DEPARTMENT*

December, 12th 2008

Austin Lescott
Clay Ghaut
St. John's Parish
Nevis

Dear Sir

## RE: INFORMATION REQUESTED ON 12th December, 2008

In connection with the above, we advise as follows:

| | |
|---|---|
| **Exact Company Name:** | LEXINGTON FINANCIAL LIMITED |
| **Date of Incorporation:** | 03rd March, 2006 |
| **Company Number:** | C 29848 |
| **Registered Agent & Address:** | Trust Services Nevis Limited<br>Springates Building<br>Government Road, Charlestown, Nevis<br>Telephone Number: 1 (869) 469-7270/1<br>Fax Number: 1 (869) 469-7272 |
| **Shares:** | 100,000 shares with par value USD$1.00 |
| **Status (standing, etc.):** | The Company is in Good Standing |

**Public Record Documents (Art. Of Inc./Org., Amendments, etc):** *FILED*

There are no charges, liens, mortgages or encumbrances filed for or on behalf of the company and/or its shareholders. Also note that information on directors, shareholders, officers, beneficial owners, annual returns and financial statements are not required to be filed by law. Consequently, such information is not available.

Should you require any further information, please do not hesitate to contact us.

Yours sincerely,

Clevelan Williams (Mr.)
REGISTRAR

NEVIS FINANCIAL
SERVICES DEPARTMENT

P. O. Box 689, Main Street, Charlestown, Nevis, West Indies
Tel: 1(869) 469-1469 • 1(869) 469-5521 Ext. 2150 • Fax: 1(869) 469-7739
Website: www.nevisfinance.com • Email: nevfin@sisterisles.kn

Exhibit 35
Page 724

# EXHIBIT 36

Office Front - Virtual Office, Call Handling, Call Answering, Virtual Receptionist & Mai...   Page 1 of 2



**HOME**
**OUR SERVICES**
**WHO CAN BENEFIT**
**WHY USE US?**
**OUR PRICES**
**OBTAIN A QUOTE**
**ORDER ONLINE**
**CASE STUDIES**
**ARTICLES**
**NEWS**
**TESTIMONIALS**
**POST & FAX SERVICE**
**F.A.Q**
**HEAR OUR OPERATORS**
**PARTNERS**

Home

## A TOTAL VIRTUAL OFFICE OR TELEPHONE ANSWERING SERVICE

IDEAL FOR SOLE TRADERS/PROFESSIONALS, MEDIUM/LARGE COMPANIES FO
COMPANIES WISHING A UK PRESENCE

IMAGE - TIME - EFFICIENCY ...we do more for you than just answer phones

NO GIMMICKS - NO HIDDEN CHARGES - NO SETUP FEE - NO REGISTRATION TO GET A QUO

JUST AN EASY TO UNDERSTAND AND FULLY TRANSPARENT SERVICE THAT DELIVERS EVE

TELEPHONE LINES - LOW COST INTERNATIONAL CALLS - INTERNATIONAL TELEPHONE NUMBERS - FAX TO EMAIL

SMALL/MEDIUM SIZE BUSINESS?

| Subscribe to our Newsletter |
| Become an Affiliate |
| Write articles for Officefront |
| Become a Referral Agent |

- Superb IMAGE for your company
- We ANSWER your inbound calls
- Your clients talk to a REAL receptionist!
- Friendly, PROFESSIONAL manner
- LOW, clear pricing
- Bespoke FLEXIBLE service

LARGER BUSINESS?

- Up to 70% direct cost savings over direct employment
- Redirect your staff to revenue generation
- Comprehensive switchboard facilities
- Friendly, Professional manner
- No need for Holiday/Sick Cover/Cost
- No HR Cost

**Excellent Value**
Services from as little as £10 per month + CALLS
You can be operational TODAY or order for later activation
Present a professional image to your clients

### Call NOW for a NO OBLIGATION quote
### FREEFONE ..08000 19 15 39

OUR CREDIT-CRUN
BUSTER
SPECIAL OFFERS & DISC
TO HELP WITH CURRI
ECONOMIC SITUATIC
LET'S WORK TOGETHER
THROUGH IT



officefront

Thanks for
Calling

How May I
Help You?





Exhibit 36
Page 725

OfficeFront Ltd | 33-35 Daws Lane | London NW7 4SD
Tel +44 20 8906 6666 | Fax +44 20 8906 6611 | Email sales@officefront.co.uk
Copyright © 2008 Officefront Limited. Registered in England & Wales Company number 04752787.

Sitemap

Exhibit 36
Page 726

# EXHIBIT 37

California Business Search

# California Business Portal

### Secretary of State DEBRA BOWEN

**DISCLAIMER:** The information displayed here is current as of Dec 26, 2008 and is updated weekly. It is not a complete or certified record of the Limited Partnership or Limited Liability Company.

| LP/LLC | | |
|---|---|---|
| IGWT GROUP, LLC | | |
| **Number: 200817910004** | **Date Filed: 6/26/2008** | **Status: active** |
| **Jurisdiction:** CALIFORNIA | | |
| Address | | |
| 237 NORTH CAROLWOOD DRIVE | | |
| LOS ANGELES, CA 90077 | | |
| Agent for Service of Process | | |
| NATIONAL CORPORATE RESEARCH, LTD. (C2003899) | | |

Blank fields indicate the information is not contained in the computer file.

If the agent for service of process is a corporation, the address of the agent may be requested by ordering a status report. Fees and instructions for ordering a status report are included on the Business Entities Records Order Form.

Exhibit 37
Page 727

# EXHIBIT 38

California Business Search

# California Business Portal

Secretary of State DEBRA BOWEN

**DISCLAIMER:** The information displayed here is current as of Jan 30, 2009 and is updated weekly. It is not a complete or certified record of the Limited Partnership or Limited Liability Company.

| LP/LLC | | |
|---|---|---|
| IGWT 826 INVESTMENTS, LLC | | |
| Number: 200824110196 | Date Filed: 8/27/2008 | Status: active |
| Jurisdiction: CALIFORNIA | | |
| Address | | |
| 156 COPLEY PL | | |
| BEVERLY HILLS, CA 90210 | | |
| Agent for Service of Process | | |
| NATIONAL CORPORATE RESEARCH, LTD. (C2003899) | | |

Blank fields indicate the information is not contained in the computer file.

If the agent for service of process is a corporation, the address of the agent may be requested by ordering a status report. Fees and instructions for ordering a status report are included on the Business Entities Records Order Form.

Exhibit 38
Page 728

# EXHIBIT 39

1 | Hon. Edward A. Infante (Ret.)
   | JAMS
2 | Two Embarcadero Center
   | Suite 1500
3 | San Francisco, California 94111
   | Telephone:    (415) 774-2611
4 | Facsimile:    (415) 982-5287

5

6

7.

8

9

10

11

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>v.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant. | CASE NO. CV 04-09049 SGL (RNBx)<br>JAMS Reference No. 1100049530<br><br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-2727<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MGA PARTIES' MOTION TO QUASH SUBPOENAS; GRANTING IN PART AND DENYING IN PART MATTEL'S COUNTER MOTION TO COMPEL** |
| CONSOLIDATED WITH<br>MATTEL, INC. v. BRYANT and<br>MGA ENTERTAINMENT, INC. v. MATTEL, INC. | |

## I. INTRODUCTION

On December 21, 2007, MGA Entertainment, Inc. ("MGA"), Isaac Larian, MGA Entertainment (HK) Limited, and MGAE de Mexico S.R.L. de C.V. (collectively, the "MGA Parties") submitted their motion for an order quashing subpoenas issued by Mattel, Inc. ("Mattel") to non-parties ConsumerQuest, Deloitte & Touche, Ernst & Young, the Isaac and

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

Exhibit 39
Page 729

5-7-08

1  Angela Larian Trust, the Isaac Larian Annuity Trust, Moss Adams, Wachovia Bank and Wells

2  Fargo, or in the alternative, a protective order limiting the scope of those subpoenas. On

3  December 27, 2007, the MGA Parties submitted a supplemental brief to add to their motion to

4  quash three more subpoenas Mattel served on the Isaac E. Larian Qualified Annuity Trust 2004,

5  the Isaac and Angela Larian Family Trust, and the Isaac and Angela Larian Trust. On January 18,

6  2008, Mattel submitted an opposition and counter motion to compel production of documents

7  responsive to the subpoenas and a privilege log. On February 7, 2008, the MGA Parties

8  submitted a reply, and on February 15, 2008, Mattel submitted a reply in support of its counter

9  motion. The parties were directed to meet and confer further regarding the motions, which has

10  been completed. See Joint Report dated March 28, 2008. Despite the additional meet and confer

11  sessions, the parties were unable to resolve or narrow their disputes regarding the instant motions.

12  Pursuant to Paragraph 5 of the Stipulation and Order for Appointment of a Discovery Master, the

13  Discovery Master finds it appropriate to take the motions under submission for decision without

14  oral argument.

15  ## II. BACKGROUND

16      Ernst & Young and Deloitte & Touche are MGA's auditors. Mattel's subpoenas to MGA's

17  auditors seek production of documents: (1) relating to MGA's annual audits and the identity of

18  other auditors; (2) indicating or calculating MGA's net worth and the value of MGA's goodwill

19  and intellectual property; (3) relating to Bratz; and (4) relating to the legal dispute between Isaac

20  and Farhad Larian.

21      Wachovia lent money to MGA to fund the creation and/or development of Bratz and to

22  acquire Little Tikes. Mattel's subpoena to Wachovia seeks documents related to: (1) the loans

23  Wachovia extended to MGA; (2) the legal dispute between Isaac and Farhad Larian; (3) MGA's

24  net worth, goodwill, and intellectual property; (4) Bratz; and (5) this action.

25      ConsumerQuest is a marketing research firm that performed market research and analysis

26  for MGA products, including Bratz. Mattel's subpoena to ConsumerQuest seeks documents

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

Exhibit 35
Page 730

2

1   related to: (1) Bratz and other products involved in this action; (2) consumer research and
2   marketing work done regarding other MGA products underlying the parties' claims; and (3)
3   communications with MGA, Isaac Larian, and other parties relevant to this action, such as Carter
4   Bryant or other former Mattel employees and vendors.

5      Wells Fargo is and has been MGA's bank during periods relevant to this action. Mattel's
6   subpoena to Wells Fargo contains five requests, seeking MGA's banking and financial documents,
7   including account information, cancelled checks, monthly and daily transactional history, and
8   bank statements.

9      Moss Adams is and has been Isaac Larian's accountant during the relevant period. The
10  subpoena to Moss Adams seeks: (1) accounting records, tax records, and schedules for MGA,
11  Isaac Larian, Isaac Larian's trusts and Farhad Larian; (2) documents indicating or calculating
12  MGA's and Isaac Larian's net worth; (3) documents relating to the value of MGA's intellectual
13  property and goodwill; (4) documents relating to Bratz and this action; (5) evidence of payments
14  from MGA or Isaac Larian to Bryant and other Mattel employees; and (6) Isaac Larian's
15  involvement with other trust or institutions in which he has an interest.

16     Mattel also served subpoenas on several of Isaac Larian's trusts. Mattel's subpoenas to
17  Isaac Larian's trusts seek: (1) documents related to the trusts' organization, including the
18  identities of its trustees and beneficiaries; (2) the trusts' tax records; (3) documents indicating the
19  trusts' assets; and (4) information related to other trusts in which Larian has an interest.

20     All of the non-parties objected to Mattel's subpoenas on the grounds that, *inter alia*, they
21  are overly broad, unduly burdensome and seek irrelevant and/or duplicative information. Park
22  Decl., Exs. 15-26.

23     The MGA Parties contend that Mattel's subpoenas are overly broad, unduly burdensome,
24  and cumulative and duplicative of discovery Mattel has already sought and received. More
25  specifically, the MGA Parties raise the following objections to each of the four categories of
26  documents Mattel seeks. First, the MGA Parties contend that Mattel's subpoenas essentially seek
27
28

1   unfettered access to MGA and Isaac Larian's financial histories for a nine-year period from 1999

2   to the present, and that there is no claim or defense at issue that could possibly justify the breadth

3   and intrusiveness of the subpoenas.  Further, the MGA parties contend that they have already

4   produced vast amounts of relevant financial documents in response to Mattel's discovery requests.

5   To make their point, the MGA Parties prepared a detailed chart that identifies Mattel's subpoenas

6   requests to the non-parties and for each such request, identifies an exemplary list of duplicative

7   document requests and/or interrogatories that Mattel served on Carter Bryant and/or the MGA

8   Parties.  See Decl. of Amy Park in Support of MGA Defendants' Motion to Quash, Ex. 28.

9          Second, the MGA Parties contend that Mattel's subpoenas are overbroad in that they call

10   for production of the financial records of every person who ever did any work for MGA or Isaac

11   Larian, and every conceivable relative of Isaac Larian.  The MGA Parties contend that the private

12   financial records of these non-parties are not relevant to the case, and that Mattel's subpoenas

13   constitute an abuse of the non-party discovery process.

14          Third, the MGA Parties contend that Mattel has already sought and received documents

15   relating to the litigation between Isaac Larian and his brother Farhad Larian from multiple

16   sources.  More specifically, the MGA Parties contend that Mattel has sought and received

17   relevant documents from Isaac and Farhad Larian, as well as MGA and at least two law firms

18   involved in the litigation between the Larian brothers.

19          Fourth, the MGA Parties object to the various requests for all documents obtained from

20   MGA or Isaac Larian relating to Bratz, other MGA products or Carter Bryant.  Although the

21   MGA Parties acknowledge that some of the requested documents may be relevant, the MGA

22   Parties contend that the document requests are objectionable because Mattel has already requested

23   and received well over three million pages of relevant documents from the MGA Parties. The

24   MGA Parties also contend that Mattel's requests are so overly broad that it is impossible to

25   discern what specific, relevant, non-duplicative documents Mattel is requesting from the non-

26   parties.

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

Exhibit 39
Page 732

4

1     In contrast, Mattel contends that all of the subpoenas seek documents that are relevant to

2  several issues in the case, including, but not limited to, the creation and development of Bratz,

3  Mattel's damages claim (including Mattel's claims for punitive damages and disgorgement),

4  Mattel's claim against MGA for commercial bribery, MGA's damages claims, the value of MGA's

5  goodwill and intellectual property, and the credibility and bias of MGA and Isaac Larian, as well

6  as other potential witnesses.  Mattel contends that it should be permitted to pursue discovery from

7  non-parties, and not have to rely upon the good faith of MGA and Isaac Larian to comply with

8  their discovery obligations.  Mattel also contends that it should be permitted to pursue discovery

9  from the non-parties in order to guard against the possibility of spoliation of evidence and/or

10  document tampering.

11     Furthermore, Mattel contends that the MGA Parties have not shown that they possess,

12  much less have produced, all of the documents Mattel is seeking from the non-parties.  More

13  specifically, Mattel contends that the MGA Parties have failed to produce the following

14  documents that Mattel has requested from the various non-parties:  documents related to Isaac

15  Larian's net worth and the value of MGA's intellectual property and goodwill; MGA's tax records;

16  Wells Fargo banking records for MGA; documents related to payments to by MGA, Larian, or the

17  Larian trusts to Bryant and other Mattel employees and vendors; documents from the Larian v.

18  Larian litigation; documents related to the Larian trusts, including any documents showing Isaac

19  Larian's interest in, payments received from, or transfer to those trusts; and documents regarding

20  the 1999-2000 and 2006 loans MGA received from Wachovia, including what documents MGA

21  and Larian gave to Wachovia to justify the loans.  Furthermore, Mattel contends that MGA's

22  descriptions of the documents it has produced are vague, inaccurate or misleading.

23     Mattel also contends that the MGA Parties' burden objection is unsubstantiated in that

24  none of the subpoenaed parties has filed a declaration in opposition to the motion or offered any

25  specific evidence that the subpoenas impose an undue burden.  Rather, Mattel represents that

26  some of the subpoenaed parties were already in the process of preparing documents for

27

28

1  production or meeting and conferring with Mattel when MGA filed the instant motion. Corey

2  Decl., ¶¶7-9. Furthermore, Mattel points out that it has offered to reimburse the non-parties for

3  copying costs and to have its own paralegal and counsel inspect documents gathered.

### III. STANDARDS

5  Rule 26, Fed.R.Civ.P., provides that "[p]arties may obtain discovery regarding any matter,

6  not privileged, that is relevant to the claim or defense of any party." Fed.R.Civ.P. 26(b)(1). The

7  court shall, however, limit the frequency or extent of use of the discovery methods if the court

8  determines that (i) the discovery sought is unreasonably cumulative or duplicative, or is

9  obtainable from some other source that is more convenient, less burdensome, or less expensive;

10  (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the

11  information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely

12  benefit, taking into account the needs of the case, the amount in controversy, the parties'

13  resources, the importance of the issues at stake in the litigation, and the importance of the

14  proposed discovery in resolving the issues. Fed.R.Civ.P. 26(b)(2)(C).

15  Rule 45, Fed.R.Civ.P., requires third parties to produce documents (and reasonably

16  accessible electronically stored information) that are responsive to a subpoena that a party serves

17  on them. Fed.R.Civ.P. 45(b), (d). If the subpoenaed documents are relevant and there is good

18  cause for their production, the subpoena is enforced unless the documents are privileged or the

19  subpoena is unreasonable, oppressive, annoying or embarrassing. U.S. v. American Optical Co.,

20  39 F.R.D. 580, 583 (N.D. Cal. 1966).

21  Rule 45(c)(1), Fed.R.Civ.P., requires a party serving a subpoena to take reasonable steps

22  to avoid imposing undue burden or expense on a person subject to the subpoena. Furthermore,

23  "[t]he issuing court must enforce this duty and impose an appropriate sanction--which may

24  include lost earnings and reasonable attorney's fees--on a party or attorney who fails to comply."

25  Id. Rule 45 also provides that the issuing court must quash or modify a subpoena under certain

26  circumstances, including among others, when the subpoena requires the disclosure of privileged

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

Exhibit 39
Page 734

1   or other protected matter or subjects a person to undue burden. Fed.R.Civ.P. 45(c)(3)(A)(iii) and

2   (iv). A motion to quash a subpoena or for a protective order as to that subpoena may be made by

3   a party-opponent. See Moon v. SCP Pool Corp., 232 F.R.D. 633, 636 (C. D. Cal. 2005) (granting

4   defendants' motion to quash subpoena).

5          In evaluating whether a subpoena imposes an undue burden, Rule 45(c)(3)(A),

6   Fed.R.Civ.P., "'requires the court to weigh the burden to the subpoenaed party against the value of

7   the information to the serving party,' . . . and in particular requires the court to consider: 'such

8   factors as relevance, the need of the party for the documents, the breadth of the document request,

9   the time period covered by it, the particularity with which the documents are described and the

10  burden imposed.'" Moon, 232 F.R.D. at 637, quoting Travelers Indem. Co. v. Metropolitan Life

11  Ins. Co., 228 F.R.D. 111, 113 (D. Conn. 2005). Another important factor in evaluating burden is

12  whether the subpoenaing party can more easily and inexpensively obtain the documents from

13  another party, rather than from the nonparty. Moon, 232 F.R.D. at 638.

## IV. DISCUSSION

### A. Financial Information re MGA and Isaac Larian

16         Mattel has subpoenaed five different entities that perform financial services for MGA or

17  Isaac Larian: Wells Fargo, Wachovia, Ernst & Young, Deloitte & Touche and Moss Adams.

18  Although Mattel's requests encompass documents that are relevant to several issues in the case,

19  the requests are unduly burdensome, exceedingly overbroad and unreasonably cumulative of

20  other discovery Mattel has already sought and received in this case.

21         For example, the subpoena to Wells Fargo demands production of the following broad

22  categories of financial documents: (1) "[a]ll DOCUMENTS REFERRING OR RELATING TO

23  MGA from January 1, 1999 to the present, inclusive"; (2) "[a]ll DOCUMENTS REFERRING OR

24  RELATING TO the ACCOUNT maintained by YOU numbered 9600112551, including but not

25  limited to statements, monthly statements, annual statements, daily transaction history reports,

26  monthly transaction history reports, deposit reports; deposit slips, canceled checks, signature

27

28

1   cards, and COMMUNICATIONS REFERRING OR RELATING TO such ACCOUNT, created

2   between January 1, 1999 and the present, inclusive"; (3) "[a]ll DOCUMENTS REFERRING OR

3   RELATING TO" any other accounts created between January 1, 1999 and the present, inclusive;

4   (4) DOCUMENTS sufficient to show the account number for all accounts maintained in the name

5   of, for the benefit of or concerning MGA between January 1, 1999 and the present, inclusive; (5)

6   and "[a]ll DOCUMENTS showing or relating to any account(s) held by MGA or any account(s)

7   on which MGA has signatory authority at any other financial institution."

8          The breadth of the requests to Wells Fargo is compounded by the fact that "MGA" is

9   defined to include MGA Entertainment Inc., any of its current or former employees, officers,

10  directors, agents, representatives, attorneys, parents, subsidiaries, divisions, affiliates,

11  predecessors-in-interest and successors-in-interest, and any other PERSON acting on its behalf.

12  Furthermore, the phrase "REFERRING OR RELATING TO" is defined expansively as

13  "reflecting, identifying, describing, summarizing, evidencing, referencing, concerning, discussing

14  or indicating in any way." Park Decl., Ex. 11.

15         The subpoena to Isaac Larian's tax accounting firm, Moss Adams, is similarly overbroad.

16  For example, Mattel seeks "[a]ll DOCUMENTS RELATING TO MGA [and] ISAAC LARIAN,

17  including without limitation, accounting records, tax returns and schedules . . . and drafts thereof,

18  W-2s, work papers, worksheets, payroll records, financial statements (audited and unaudited), pro

19  formas, budgets, account information and account statements." Park Decl., Ex. 12.  The phrase

20  "RELATING TO" in the subpoena to Moss Adams is drafted in the broadest possible manner to

21  include "referencing, referring to, constituting, evidencing, pertaining to, mentioning, supporting,

22  contradicting, negating, bearing on, touching on, containing, embodying, reflecting, identifying,

23  stating, dealing with, concerning, commenting on, summarizing, responding to, relating to,

24  describing or discussing in any way." Id.  As another example, Mattel's subpoena to Moss Adams

25  includes a request for all documents relating to any non-payroll payment or transfer of value from

26  MGA or Isaac Larian to any "FORMER MATTEL EMPLOYEE." Mattel does not identify any

27

28

of these "FORMER MATTEL EMPLOYEES" or otherwise limit the request to any specific time period.

The subpoenas to Deloitte & Touch and Ernst & Young are similarly unrestrained in scope, seeking the following categories of financial documents: all documents constituting or relating to MGA's annual audits, including without limitation accounting records, audit programs, audit reports and drafts thereof, tax returns, work papers, worksheets, payroll records, financial projections, pro formas and budgets, from the period beginning January 1, 1999 to the present; all documents indicating or calculating MGA's net worth; and all documents indicating the value of MGA's intellectual property or goodwill. Park Decl., Exs. 7-8.

With respect to Wachovia, Mattel seeks the following categories of financial documents: all documents relating to any loan agreement that Wachovia entered into with MGA since January 1, 1999, including drafts of any agreements; all documents that MGA or any other person provided to Wachovia for purposes of entering into any loan agreement between Wachovia and MGA; all documents that were in the "three (3) boxes of loan documents" that Wachovia referred to in a November 15, 2005 letter to Robert G. Wilson, Esq.; all documents relating to any loan agreement entered into by MGA, or sought or requested by MGA, during the time period January 1, 1999 and December 31, 2000, inclusive; all communications between Wachovia and MGA during the time period January 1, 1999 and December 31, 2000, inclusive; all documents indicating or showing a calculation of MGA's net worth or value; all documents indicating or calculating the value of MGA's intellectual property or goodwill; all documents relating to Bratz, including without limitation those obtained from MGA, since January 1, 1999; and documents sufficient to identify any other MGA lender or person who extended or was requested to extend a line of credit to MGA since January 1, 1998. Park Decl., Ex. 9. Mattel contends that the loan documents will contain information about the timing and creation of Bratz. However, all of the requests for financial documents, except for portions of Request Nos. 4 and 5, are much broader,

1    seeking everything relating to any loan between MGA and Wachovia from 1999 through the

2    present.

3         Furthermore, to the extent any of Mattel's requests for financial information encompass

4    relevant materials, the requests remain unreasonably duplicative and cumulative of discovery

5    Mattel has already sought and obtained from MGA and Isaac Larian (with the exception of

6    Request Nos. 4 and 5 in the Wachovia subpoena). MGA has produced the following: audited and

7    unaudited quarterly and annual profit and loss statements; audited and unaudited quarterly and

8    annual statements; annual reports; various MGA financial reports; various financial documents

9    relating to Veronica Marlow; documents showing royalty payments to Carter Bryant; documents

10   showing MGA's sales, returns and costs of goods sold for each month, by SKU, since 2001;

11   documents showing MGA's promotional advertising and media expenditures, including MGA's

12   internal allocation of those expenditures by brand and/or product; documents showing MGA's

13   amortization and depreciation of certain capital assets and expenditures; documents showing

14   MGA's monthly general ledger entries aggregated by account, including income and expense

15   accounts, reserves and liabilities; and documents sufficient to explain MGA's various accounts as

16   presently and historically maintained in MGA's books and records. Park Decl., ¶3.

17        The MGA Parties also represent that Isaac Larian recently produced over 50,000 pages of

18   documents which included, among other things, documents showing his net worth; his gross

19   income, wages, dividend income, interest income, and other income; his banks and bank

20   accounts; and various other financial documents. Park Decl., ¶2. Thus, Mattel has received

21   ample financial documents. Mattel has also deposed MGA, Isaac Larian, and other witnesses

22   regarding relevant financial information. In view of the discovery Mattel has already sought and

23   received, Mattel's over-reaching, broad subpoenas to the various non-parties seeking more

24   financial information regarding MGA and Isaac Larian are unjustified under Rule 26(b)(2),

25   Fed.R.Civ.P.

26   //

27

28

Exhibit 39
Page 738

1  B. Financial Information re Non-Parties

2      Mattel's subpoenas also seek financial documents regarding numerous non-parties,

3  including everyone who has ever worked for or represented MGA or Isaac Larian, and every

4  relative of Isaac Larian. Once again, although the subpoenas encompass documents that are

5  potentially relevant to Mattel's claims and defenses, the subpoenas are overly broad, sweeping in

6  vast amounts of documents that have little to no relevance. For example, Mattel's subpoenas to

7  Moss Adams and the various trusts include requests for all formation documents, all tax returns,

8  any other tax-related documents from 1999 to the present, and documents relating to the operation

9  of the trust, including every trustee and beneficiary of each trust, every disbursement by each

10  trust, every asset owned by each trust, and every liability of each trust. Mattel has not shown that

11  all of the requested documents are relevant to the claims and defenses in the case.

12      Mattel's subpoenas to the non-parties are also unreasonably duplicative and cumulative of

13  discovery Mattel has already sought and received in this case. Furthermore, to the extent Mattel's

14  subpoenas might include requests that are not unreasonably duplicative and/or cumulative of

15  other discovery requests, the probative value of the information Mattel seeks is substantially

16  outweighed by the burden of production, especially in light of the privacy interests of the many

17  non-parties who would be affected.[1]

18  C. Information re Litigation Between Isaac and Farhad Larian

19      All of Mattel's subpoenas to the non-parties, except Wells Fargo, include a request for all

20  documents relating to any litigation between Isaac Larian and Farhad Larian. These requests are

21  unreasonably duplicative and cumulative of many requests Mattel previously served on Isaac

22  Larian, MGA, Farhad Larian, Stern & Goldberg and Kaye Scholer. Mattel has sought and

23  received substantial discovery regarding the litigation between Isaac and Farhad Larian. See

24

25     [1] In its reply brief, Mattel contends that Isaac Larian is the trustee of all of the trusts that Mattel has
26  subpoenaed, and therefore he was required, but purportedly failed, to search for and produce trust documents when
  responding to the discovery requests directed to him. These issues are beyond the scope of the present motion, and
  will not be addressed herein.

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

Exhibit 39
Page 739

11.

1  Order Re Mattel's Motions to Compel Farhad Larian, Kaye Scholer and Stern & Goldberg to

2  Produce Documents dated January 25, 2008.  Mattel has not shown that the non-parties possess

3  any relevant, non-privileged materials beyond what Mattel has already sought and received from

4  other sources.  Furthermore, the burden and expense of complying with the non-party subpoenas

5  substantially outweigh their likely benefit under Rule 26(b)(2), Fed.R.Civ.P.

6  D. Documents re MGA's Products or Carter Bryant

7      Mattel's subpoenas to the non-parties include requests for documents relating to Carter

8  Bryant, Bratz and other MGA products or work performed for MGA.  Although this category of

9  requests encompasses documents that are potentially relevant to the claims and defenses in the

10 case. the requests are nevertheless objectionable because they are overly broad and not tailored to

11 exclude irrelevant, duplicative or unreasonably cumulative information.  Mattel has taken vast

12 amounts of discovery regarding Carter Bryant, Bratz, and other MGA products from several

13 different sources.  Mattel has not shown that the non-parties possess any relevant, non-privileged

14 materials beyond what Mattel has already sought and received from other sources.  Furthermore,

15 the burden and expense of complying with the non-party subpoenas substantially outweigh their

16 likely benefit under Rule 26(b)(2), Fed.R.Civ.P.

17                                V. CONCLUSION

18      For the reasons set forth above, the MGA Parties' motion to quash, or in the alternative for

19 a protective order, is granted, except with respect to the following requests:

20      •   Wachovia subpoena, Request No. 4, limited to "all documents relating to any loan

21          agreement entered into by MGA, or sought or requested by MGA, during the time

22          period January 1, 1999 and December 31, 2000, inclusive"; and Request No. 5,

23          limited to "all communications between YOU and MGA during the time period

24          January 1, 1999 and December 31, 2000, inclusive" regarding any loan agreement

25          entered into by MGA, or sought or requested by MGA, during the time period

26          January 1, 1999 and December 31, 2000, inclusive.

27

28

1   Mattel's counter motion to compel is granted in part and denied in part in accordance with the

2   Court's ruling on the MGA Parties' motion to quash, or in the alternative for a protective order, as

3   set forth immediately above.  Wachovia shall produce documents responsive to Request Nos. 4

4   and 5 as set forth above on or before May 16, 2008.

5           Nothing in this Order is intended to authorize or preclude Mattel from seeking documents

6   from the non-parties identified herein as part of Phase 2 discovery, if appropriate.

7           Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery

8   Master, the MGA Parties shall file this Order with the Clerk of Court forthwith.

9

10  Dated: May 7, 2008                              _____/S/_____

11                                                  HON. EDWARD A. INFANTE (Ret.)
                                                          Discovery Master
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                                          Exhibit 39
                                                            Page 741
28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

## PROOF OF SERVICE BY E-MAIL

I, Anthony Sales, not a party to the within action, hereby declare that on May 7, 2008, I served the attached ORDER GRANTING IN PART AND DENYING IN PART MGA PARTIES' MOTION TO QUASH SUBPOENAS; GRANTING IN PART AND DENYING IN PART MATTEL'S COUNTER MOTION TO COMPEL in the within action by email addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| Matthew M. Werdegar, Esq. | Keker & Van Nest | mwerdegar@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | ltrinidad@kvn.com |
| Audrey Walton-Hadlock, Esq. | Keker & Van Nest | awalton-hadlock@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| John Gordon, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johngordon@quinnemanuel.com |
| Diane Hutnyan, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dianehutnyan@quinnemanuel.com |
| Thomas J. Nolan, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tnolan@skadden.com |
| Raoul D. Kennedy, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | rkennedy@skadden.com |
| Amy S. Park, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | apark@skadden.com |
| Harriet S. Posner, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | hposner@skadden.com |
| Carl Alan Roth, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | croth@skadden.com |
| Timothy A. Miller, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tmiller@skadden.com |
| Marcus R. Mumford, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Mmumford@skadden.com |
| Paul M. Eckles, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Paul.eckles@skadden.com |
| Lance A. Etcheverry, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Lance.etcheverry@skadden.com |
| Robert J. Herrington, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Robert.herrington@skadden.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on  May 7, 2008, at San Francisco, California.

Anthony Sales

Exhibit 39
Page 742