1  UNITED STATES DISTRICT COURT

2  CENTRAL DISTRICT OF CALIFORNIA

3  ---

4  **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5  ---

6  MATTEL, INC.,                    :   PAGES 1550 - 1668
                                    :
7          PLAINTIFF,               :
                                    :
8      VS.                          :   NO. ED CV04-09049-SGL
                                    :   [CONSOLIDATED WITH
9  MGA ENTERTAINMENT, INC.,         :   CV04-9059 & CV05-2727]
   ET AL.,                          :
10                                  :
           DEFENDANTS.              :
11  _____:

12

13

14

15  REPORTER'S TRANSCRIPT OF PROCEEDINGS

16  RIVERSIDE, CALIFORNIA

17  THURSDAY, JUNE 5, 2008

18  JURY TRIAL - DAY 8

19  AFTERNOON SESSION

20

21

22                           MARK SCHWEITZER, CSR, RPR, CRR
                             OFFICIAL COURT REPORTER
23  **CERTIFIED**            UNITED STATES DISTRICT COURT
                             181-H ROYBAL FEDERAL BUILDING
24  **COPY**                 255 EAST TEMPLE STREET
                             LOS ANGELES, CALIFORNIA 90012
25                           (213) 663-3494

```
 1              Please state your full name for the record, and
 2     spell your last name.
 3              THE WITNESS:  Isaac Larian, L-A-R-I-A-N.
 4              THE CLERK:  Thank you.
 5                        DIRECT EXAMINATION
 6     BY MR. PRICE:
 7     Q.   Good afternoon, Mr. Larian.
 8     A.   Good afternoon.
 9     Q.   You are the CEO of MGA Entertainment?
10     A.   I am.
11     Q.   And how long have you been the CEO of MGA Entertainment?
12     A.   I founded the company since the beginning, 1982.
13     Q.   And I believe currently you own about 81 percent of the
14     company; is that right?
15     A.   Little bit more than that, 81.8 percent.
16     Q.   And it's fair to say -- I don't want to get into any
17     numbers at this point -- that the Bratz line and Bratz
18     merchandise has been profitable for MGA Entertainment?
19     A.   It has.
20     Q.   And that you personally, as a result of that, have
21     profited from the Bratz sales?
22              MR. NOLAN:  Objection, your Honor.  Relevance as to
23     point in time.
24              THE COURT:  Overruled.
25              THE WITNESS:  Yes.
```

1   Q.   BY MR. PRICE:   I want to ask you a few questions --

2   well, let me step back.   When I say "you," that would include

3   members of your family as well; is that correct?   That

4   members of your family also have profited as a result of

5   sales of Bratz.

6   A.   My wife doesn't work, but I'm sure she has.

7   Q.   Well, certainly some of the profits have been

8   distributed to your wife?

9          MR. NOLAN:   Your Honor, again I'm going to object

10  based on 403 and relevance.

11         THE COURT:   Overruled as to his wife.

12  Q.   BY MR. PRICE:   Let me ask the question again.   Have

13  profits been distributed as a result of Bratz sales to other

14  members of your family?

15  A.   Yes.

16  Q.   Would those include your sister?

17  A.   I have three sisters.

18  Q.   Okay.   Forgive me if I mispronounce the names.   Is it

19  Shereen (phonetic)?

20  A.   She's one of my sisters.

21  Q.   And profits have been distributed to her?

22  A.   Yes.

23  Q.   And to your brother-in-law, Jahanger (phonetic)?

24  Profits have been distributed to him?

25  A.   Yes.

1   **Q.**   And your father, is it Aghdas, A-G-H-D-A-S?

2   **A.**   No, that's not my father.

3   **Q.**   Who is that?

4   **A.**   That's my mother.

5   **Q.**   Ah.   Totally my fault.   And profits have been

6   distributed to your mother?

7   **A.**   I don't know.

8   **Q.**   Is that the kind of thing you would know?

9   **A.**   Yes, my father has passed away.

10  **Q.**   Do you know whether or not checks have been issued from

11  MGA Entertainment profits to Aghdas Larian?

12  **A.**   Yes.

13  **Q.**   How about Elias Larian?   Who is that?

14  **A.**   He's my cousin.

15  **Q.**   And have profits been distributed to Elias Larian as

16  well?

17  **A.**   I'm not sure profit.   He's a consultant for the company,

18  and he gets a salary.

19  **Q.**   And Shorea Larian, who is that?

20  **A.**   She's my sister.   We're a family-owned company, and my

21  sister Shorea (phonetic) also works at the company.

22  **Q.**   And have profits been distributed to her as well?

23  **A.**   She gets a salary.   So I don't know if that's profit.

24  She gets a salary as an employee of MGA.

25  **Q.**   Is any of that tied to the results of the MGA sales?

```
 1   Any of that salary?  Is it bonuses, or is it all salary?
 2   A.    Yes.  Well --
 3   Q.    Let me ask it again.
 4   A.    Excuse me.  I have to finish.  I was not finished.
 5             THE COURT:  You may finish your question, sir.
 6             THE WITNESS:  When you asked about -- you confused
 7   because my sister and my brother-in-law Elias and Shereen,
 8   who are here, they are part owners of the company.  My mother
 9   is not.  My sister Shorea is not.  They are employees of the
10   company.  My cousin Elias is not employee of the company.
11   Q.    Now, I want to ask you quickly some questions about the
12   video deposition we just saw, and it's Ms. Tkacik.  You sat
13   here and saw the testimony?
14   A.    I did.
15   Q.    And you in fact spoke with her?
16   A.    I don't recall, but I'm sure I've spoken to her.
17   Q.    And you recall there were questions in there about
18   whether or not you had an accent.
19             Do you recall that?
20   A.    Unfortunately, I have lived here for 37 years, but I
21   still have the accent.
22   Q.    But even though you have that accent, it's correct that
23   she didn't mishear you when you said there was sort of a
24   fashion doll design contest for Bratz or for a fashion doll?
25   A.    I don't think she misheard me.  But I'm not --
```

1    Q.   You believe that that is in fact what you told her,

2    which is that there was a -- sort of the fashion doll contest

3    that resulted in Bratz being selected?

4    A.   It's possible I said that, yes.

5    Q.   And the reason you think it's possible that you said

6    that is that you said under oath that there in fact was a

7    sort of fashion doll design contest that resulted in Bratz

8    being selected as a fashion doll; correct?

9    A.   Yes.

10   Q.   Is that right?

11   A.   Yes, yes.

12   Q.   And we'll get back to the details of that contest later.

13   Right now I want to ask you about another witness's testimony

14   that I think you were here for.  You recall a couple days ago

15   when Jennifer Maurus took the stand?

16   A.   I do.

17   Q.   And you were here for that; correct?

18   A.   I do.

19   Q.   And I want to show you an exhibit which she was shown

20   and Mr. Nolan asked her some questions about.

21            It's in evidence, your Honor, and it's

22   Exhibit 13532.

23            THE COURT:  You may publish.

24            MR. PRICE:  If we can put that up.

25            THE WITNESS:  What was the exhibit number again?

```
 1            MR. PRICE:  It's 13352.  It's going to be toward
 2   the end of that single large binder I gave you.  I'm sorry.
 3   13532.
 4            THE WITNESS:  Can I open this and take this out?
 5   It's hard to see it.
 6            MR. PRICE:  I don't think it's a good idea to take
 7   it out.
 8            THE COURT:  Mr. Holmes.
 9   Q.  BY MR. PRICE:  So that doesn't spill out, if you
10   unlatched the two ends, you might want to push that back
11   together so it doesn't actually open.
12            And do you see Exhibit 13532?
13   A.  May I have a moment to read it?
14   Q.  Sure.
15   A.  Would you like me to read the whole thing here?
16   Q.  I'll ask you some questions.  If you think you need to
17   read the whole thing, you can tell me.  Why don't we start by
18   me asking you some questions.
19   A.  Well, if you're going to ask questions about this
20   document, I'd like to have a chance to read it.
21            MR. PRICE:  Your Honor, I think to save time, I can
22   ask questions, and if he says he needs to read the whole
23   thing, he can ask me at that point.
24            THE COURT:  Counsel, why don't you ask your next
25   question.
```

1        Mr. Larian, if at any point in time you need to

2   stop and read the document, you may do so.

3        Counsel, your next question.

4   Q.   BY MR. PRICE:  You recall that Mr. Nolan was asking

5   Ms. Maurus about whether or not she signed this

6   confidentiality agreement.

7        Do you recall that?

8   A.   I don't recall if he asked that question or not.

9   Q.   Okay.  And --

10  A.   Yeah, I think he did, and she said no, she hadn't signed

11  it.

12  Q.   In fact, do you recall that she said that -- testified

13  that there was somewhat of an uproar about this?

14  A.   I believe she said that.

15  Q.   And that's true, is it not?  That there was in fact an

16  uproar when this was sent to the company's employees?

17  A.   I don't recall that.  It's 2000, eight years ago.  I do

18  not recall.

19  Q.   Perhaps you can tell me, who at that time is Michelle

20  Thompson?

21  A.   I see the name.  I don't recall her.

22  Q.   You don't recall what her position was at MGA?

23  A.   No, I don't.  That was eight years ago.

24  Q.   Well, if we look at the document itself, then, if you

25  need to read the whole thing, tell me, but I'd like to call

1    your attention to a couple of sections, if I may, of this

2    proposed agreement that was sent around August 10, 2000.

3    **A.**    Excuse me.  If you're going to ask me questions about

4    this document, I'd like to be able to read it to put it all

5    into context.

6    **Q.**    Let me ask you a question.  If you need to do that,

7    we'll take the time.  Could you look at page 3, please.  It

8    says Exhibit 13532-0003 at the bottom.

9              Have you found that page?

10   **A.**    That says page 2 at the bottom.

11   **Q.**    I'd ask you to look at 13532-0003.

12   **A.**    Yes, I have that.

13   **Q.**    You have that?

14   **A.**    Yes.

15   **Q.**    And you're right.  It says page 2 right here.

16             Do you see that?

17   **A.**    That's correct.

18   **Q.**    And I want to call your attention to this paragraph

19   here, which says:  "Employee further agrees that during

20   his/her employment and for a period of 12 months after

21   termination, employee will not solicit the purchase of any

22   products or services from any supplier or vendor who supplies

23   products or services to the company."

24             Can you read that?

25   **A.**    I read that.

1   **Q.**   Now, it's true, is it not, that MGA had employees from

2   other companies who were in fact soliciting vendors who had

3   worked for those prior companies?

4   **A.**   I don't recall in 2000, yes, we had employees, and I'm

5   sure we bought from other companies, but I don't recall the

6   specifics.

7   **Q.**   For example, it's true, is it not, that there were some

8   vendors who were well known in the industry and usually by

9   numerous toy companies?

10  **A.**   I can't answer that.  At that time in 2000 I don't know

11  what other toy companies bought from who.

12  **Q.**   Well, for example, Steve Linker, who we've heard about

13  here, you knew that he did products for Mattel, and he was

14  asked to do projects for MGA.

15  **A.**   The first time I saw Steve Linker is in his video

16  deposition here.  I've never known or met Mr. Steve Linker.

17  **Q.**   How about Anna Rhee?  You understood that she was a

18  vendor who worked for numerous toy companies such as Mattel

19  and MGA and other toy companies; correct?

20  **A.**   No.  The first time I met Anna Rhee was when she was on

21  the stand here.  I had no idea who Anna Rhee is until I saw

22  her in court yesterday or whenever she was here.

23  **Q.**   How about Veronica Marlow?  She was a vendor for MGA.

24  Is it your understanding she worked for other toy companies

25  as well?

1    **A.**   I know she did work for us.  I don't know if she had

2    worked for other companies or not.  I have no idea.

3    **Q.**   Isn't it fair to say that, in August of 2000, it was

4    commonplace for vendors to provide services to more than one

5    toy company?

6    **A.**   I couldn't tell you that one way or another.

7    **Q.**   Did you have a belief that this paragraph here, that if

8    an employee leaves MGA and works for someone else, they can't

9    use one of these vendors for 12 months, do you think this

10   might deter people from leaving MGA?

11   **A.**   No, this contract, now that I have seen it, I don't

12   think it was a fair contract, I think we withdrew it.  I had

13   nothing to do with putting this contract together except my

14   signature on the last page.

15   **Q.**   But as of 2000, how long had you been in the toy

16   business?

17   **A.**   Since 1987.

18   **Q.**   So I'm trying to do my addition here.  So that's about

19   13 years?

20   **A.**   That's correct.

21   **Q.**   So you're saying your 13 years of experience in the toy

22   industry, you didn't have any knowledge that it was

23   commonplace for various vendors to work for more than one toy

24   company?

25   **A.**   I am sure people work for other toy companies, but I

1   have no specific knowledge of that.

2   **Q.**   Well, let me, if you look at this --

3   **A.**   I'm talking about free-lancers, again, or vendors for

4   material.

5   **Q.**   Well, let's look at -- if you look at MA 0006, have you

6   found that page?

7   **A.**   Yes, I have.

8   **Q.**   And I want to call your attention to the second

9   paragraph here, protection of proprietary position

10  information.  And you see the last part here:  "Accordingly,

11  for a period of one year following the termination of

12  employee's employment with the company for any reason,

13  employee shall not directly or indirectly become employed by

14  or provide any services to or for any company or business

15  that is engaged in the business throughout the United

16  States."

17          Do you see that?

18  **A.**   Well, it goes on.

19  **Q.**   It goes on.  "Unless the employee demonstrates to the

20  company's reasonable satisfaction that such employment or

21  service will not result in the unauthorized use or disclosure

22  of proprietary information."

23          Do you see that?

24  **A.**   I do.

25  **Q.**   Okay.  And you see up here, the business is the business

1   of the invention, design, development, and manufacture of

2   toys.

3           Do you see that?

4   **A.**   I do.

5   **Q.**   So in sending out this proposed contract, you understood

6   one of the provisions was if an employee left your company,

7   it was solely up to MGA as to whether or not that employee

8   could work at any other toy company in the world.

9   **A.**   Well, I did not, as I mentioned earlier, I did not send

10  this out.  And we withdrew this agreement because this

11  agreement is not a fair agreement and could not -- and should

12  not have been sent out and signed.

13  **Q.**   So now you do recall this being sent out?

14  **A.**   I saw the first date that it was -- it says it was sent

15  out to all MGA employees.  I assume it was sent out.

16  **Q.**   So do you now recall that when this was sent out, that

17  there was in fact, as Ms. Maurus said, an uproar, and the

18  people refused to sign it?

19  **A.**   I do not recall an uproar.

20  **Q.**   Well, is it your testimony that this proposed contract

21  was sent to all employees without your prior approval?

22  **A.**   Yes.

23  **Q.**   And who did that?  Who sent this out to all the

24  employees without your prior approval?

25  **A.**   Well, if you go to page --

1   Q.   First page?

2   A.   First page.  It says Michelle Thompson.  And at that

3   time the Human Resources of the company reported to my

4   brother, Fred Larian.

5   Q.   And so are you saying your brother knew about this?

6   A.   I have no idea.

7   Q.   When did you decide to withdraw this?  You told us there

8   was no uproar.  So when was it that you decided to withdraw

9   this?

10  A.   I don't recall the date.

11  Q.   Is there any document, any e-mail to employees or

12  something saying I didn't mean to try to impose this

13  agreement on you?

14  A.   I do not know.

15  Q.   You certainly haven't seen any such e-mail, have you?

16  A.   I have not looked for it, no.

17  Q.   Certainly it's true that at the time, August 10, 2000,

18  that this was sent out, where you were -- where this proposal

19  was being made by your company, that MGA had under its employ

20  former Mattel employees who had left Mattel and joined MGA?

21  A.   I'm not sure if they had left Mattel or Mattel had fired

22  them or Mattel had laid them off, to come to work for MGA.

23  So I don't know.  I don't remember that far back.  But Mattel

24  does fire a lot of people, lays off a lot of people.  So they

25  have a right to go get jobs elsewhere.

1    **Q.**   But your business plan at this time was not to hire

2    Mattel employees who might happen to be laid off.  Your

3    business plan was actually to use contacts within MGA to hire

4    people who were not being laid off by Mattel.  Isn't that

5    right?

6    **A.**   We didn't have a business plan.  We were a small company

7    at the time, and I don't recall in 2000 -- in the year this

8    was done, if there was such a thing.  We were a small company

9    at that time.

10   **Q.**   I understand your testimony that you are a small

11   company.  My question is a bit different.

12          Say August 2000, you know -- November '99 through

13   August 2000, isn't it correct that one of your strategies was

14   not to hire people that had been laid off, but actually hire

15   people who then worked at Mattel and that you learned about

16   through people working for you?

17          MR. NOLAN:  Objection, your Honor.  Relevance.

18   Also motion in limine.

19          THE COURT:  Overruled.  You may answer.

20          THE WITNESS:  We did not have a business plan, as

21   you mentioned, or a policy that I recall that says let's go

22   ahead and only hire employees of Mattel who have not been

23   laid off or fired.  Mattel fires and lays off a lot of

24   employees often.

25   **Q.**   BY MR. PRICE:  Well, if you'd look at Exhibit 11856.

1   **A.**   I'm sorry?  85?

2   **Q.**   It's 11856.

3   **A.**   May I have a moment to read this, please?

4   **Q.**   Certainly.  Mr. Larian, my question, by the way --

5   **A.**   Excuse me, sir.  If you're going to ask me a question

6   about it, you have to give me time to read it.

7   **Q.**   Well, this appears to be an e-mail from you to Mary

8   Claire Tiffany dated November 20, 1999, which then attaches

9   other e-mails in a string.

10          Do you see that?

11  **A.**   I see my name on there.  And I see Mary Claire Tiffany's

12  name on there.

13  **Q.**   And you -- you see it also has a sent date and a

14  received date, and a subject, weekly update.  Do you see

15  that?

16  **A.**   I do.

17  **Q.**   And you have no reason to believe that this is not in

18  fact an e-mail which you sent to Mary Claire Tiffany on or

19  around November 20, 1999?

20  **A.**   I don't.

21          MR. PRICE:  Your Honor, move 11856 into evidence.

22          MR. NOLAN:  No objection, subject to the earlier

23  objection.

24          THE COURT:  No objection?

25          MR. NOLAN:  Based on the earlier objection that was

 1  overruled.

 2          THE COURT:  Very well.  I'll come back to that

 3  during the recess.

 4          THE WITNESS:  Can I continue -- finish reading

 5  this?

 6          MR. PRICE:  Your Honor, may I publish now?

 7          THE COURT:  You may.

 8          **(Exhibit 11856 received.)**

 9  Q.   BY MR. PRICE:  Mr. Larian, it starts with a please see

10  my comments.

11          Do you see that?

12  A.   I do.

13  Q.   That's referring to comments that you make in an e-mail

14  that's attached.

15          Do you see that?

16  A.   I don't know.  I haven't had a chance to read it.

17  Q.   Okay.  Let's see if we can help you on that.  We go

18  here -- you see there are things such as "I passed on to Kami

19  a resume for a senior product manager," et cetera, and then

20  it says, "Let me see the resume.  Isaac."

21          Do you see that?

22  A.   That's correct.

23  Q.   One of your practices, when you got e-mails, is you

24  would go through them and put in your responses in the text

25  you received; correct?

1   **A.**    Yes.

2   **Q.**    Next page, it says:   "Kami doesn't think Mattel will

3   have any more layoffs until February."

4          Do you see that?

5   **A.**    Yes.

6   **Q.**    And Kami refers to who?

7   **A.**    Kami Gillmour, who was laid off by Mattel.

8   **Q.**    She was a former Mattel employee who he said was laid

9   off?

10  **A.**    Yes, Mattel laid her off.   And she came to work at MGA.

11  **Q.**    This is your response, isn't it?   "Why are we waiting

12  for a layoff?   They don't layoff their stars.   We should

13  aggressively recruit from inside Mattel.   People are looking

14  to move out.   Isaac."

15         Did you in fact write that?

16  **A.**    I believe I did.

17  **Q.**    Now, if you'd also look at Exhibit -- I think it's 5713.

18  You see that appears to be an e-mail from you to Mary Claire

19  Tiffany and Kami Gillmour, dated --

20  **A.**    Hold on.   I don't have it in front of me.

21  **Q.**    It's 5713.   Is this an e-mail you sent to Mary Claire

22  Tiffany and Kami Gillmour around October 1, 1999, regarding

23  hires for the marketing department?

24             MR. NOLAN:   Is the exhibit that's being published

25  the exhibit you're pointing to?

```
 1              MR. PRICE:  No.

 2              MR. NOLAN:  I don't know why it's on the screen.

 3              THE COURT:  This is in evidence.

 4              MR. PRICE:  It's in evidence.

 5              MR. NOLAN:  It's not what he's being questioned

 6   about.

 7              THE COURT:  Is this not in evidence?

 8              MR. PRICE:  This is in evidence.

 9              THE COURT:  I'm sorry.  The --

10              MR. PRICE:  What he's looking at now is not this.

11              THE COURT:  Very well.  We shouldn't be referring

12   to the substance, Counsel.

13              MR. PRICE:  I'm not referring to the substance at

14   all.  I'm just asking whether this appears to be the e-mail.

15              THE WITNESS:  Go ahead.

16   Q.  BY MR. PRICE:  Does this appear to be an e-mail from you

17   to Mary Claire Tiffany and Kami Gillmour around October 1,

18   1999?

19   A.  Yes.

20              THE COURT:  Why don't we take this off now.  It may

21   be confusing.

22              THE WITNESS:  It is.

23              MR. QUINN:  I move 5713 in evidence.

24              MR. NOLAN:  No objection.

25              THE COURT:  It's admitted.  You may publish this
```

1    one now.

2                (**Exhibit 5713 received.**)

3    **Q.**    BY MR. PRICE:  You see, Mr. Larian, this is October of

4    '99, where you need hires for marketing department.  You need

5    an associate product manager or product manager.  You need a

6    director.

7                Do you see that?

8    **A.**    I do.

9    **Q.**    And let's go to the second part of this.  And one of the

10   things you say in this is we need these positions filled

11   urgently.

12               Do you see that?

13   **A.**    Yes.

14   **Q.**    And then you told Mary Claire Tiffany:  "Please run an

15   ad and recruit from Mattel."

16               Do you see that?

17   **A.**    Yes.

18   **Q.**    By the way, who is Mary Claire Tiffany?

19   **A.**    I believe she's in Human Resources.

20   **Q.**    And if you look at Exhibit 5715, that's the very next

21   one.  Is that an e-mail dated August 11, '99, sent from you

22   to Ms. Tiffany?

23   **A.**    There are two e-mails in here.  There are actually a few

24   e-mails in here with different dates.

25   **Q.**    It's a string of e-mails which begins with Isaac Larian

1   to Mary Claire Tiffany, 8/11/99.

2           Do you see that?

3   **A.**   It's a little confusing because this exhibit has other

4   e-mails.  Second page with August 10 date on it.

5   **Q.**   And if you look at that, sir, don't you recognize that

6   as a string of e-mails beginning with an e-mail on August

7   10th, and then there's your reply, and then there's a reply

8   from Ms. Tiffany, and then there's your reply, et cetera?

9   **A.**   Yes, go ahead.

10  **Q.**   You recognize this as an e-mail string between you and

11  Ms. Tiffany in the August '99 time frame?

12  **A.**   Yes, and other people.

13          MR. PRICE:  Move Exhibit 5715 in evidence.

14          THE COURT:  Any objection?

15          MR. NOLAN:  Still a continuing objection, but based

16  on that ruling, your Honor, we have no objection --

17          THE COURT:  Counsel, I understand your objection.

18  Please don't keep repeating that.

19          MR. NOLAN:  No objection.

20          THE COURT:  Very well.  It's admitted.

21          **(Exhibit 5715 received.)**

22  **Q.**   BY MR. PRICE:  You see, actually, sir, this begins -- go

23  to the second page, with an e-mail from C.P. Bui to you and

24  Kami Gillmour, mechanical toys engineer.

25          You want to put an ad in the paper for mechanical

 1    toys engineer.

 2            Do you see that?

 3    A.    I do.

 4    Q.    And if we go to the next page here, there's this message

 5    here.  And there's a response to engineer applicants we have

 6    are for electrical engineering.

 7            Do you see that?

 8    A.    I do.

 9    Q.    And this August 10th is your response to Ms. Tiffany's

10    e-mail here; correct?

11    A.    That's correct.

12    Q.    And your response is:  "Please ask Traci and Kami if

13    they know good people out of Mattel."

14            Do you see that?

15    A.    Yes.

16    Q.    And by Traci, you are referring to Traci Feldman?

17    A.    I assume so.  I don't recall.

18    Q.    And who is Ms. Feldman?

19    A.    I have no recollection of her or he.  I don't know if

20    it's a he or she.

21    Q.    And the last e-mail I want you to look at in this vein

22    is Exhibit 13619.  Do you recognize that as a string of

23    e-mails between you and --

24    A.    I'm sorry.  I don't have that in front of me.  Hold on

25    one second.

1   Q.   Mr. Larian, my question is is this a string of e-mails

2   between you and Kami Gillmour dated around December of 1999?

3   A.   They don't start like that.  If you look at page

4   13619-003, or MGA 0183309, it's an e-mail, looks like --

5   yeah, I apologize.  It starts with somebody else.  I am on

6   these e-mails, yes.

7           MR. PRICE:  Your Honor, I would move Exhibit 13619

8   into evidence.

9           MR. NOLAN:  No objection, your Honor.

10          THE COURT:  It's admitted.  You may publish.

11          **(Exhibit 13619 received.)**

12  Q.   BY MR. PRICE:  And you see, sir, that this is your --

13  the final e-mail in the string, your December 17, 1999,

14  e-mail.

15          Do you see that?

16  A.   I do.

17  Q.   Which ends with:  "I like Traci, and if she can be

18  guided to a clear direction, she will be fine."

19          Do you see that?

20  A.   Yeah, but I see I sent an e-mail from myself to myself.

21  So that doesn't make sense.

22  Q.   Is that how it works when you've blind copied folks?

23  A.   No.  If you look at one, two, three, four rows down, can

24  you highlight that?  BCC?  That's blind copy.  That's the

25  blind copy.  I'm sending an e-mail from myself to myself.  I

1595

```
 1   don't know why that is.
 2   Q.   I understand.  When you send an e-mail to a group that
 3   you are blind copying and to yourself, when it shows up in
 4   your e-mail box, it just has it to you; is that right?
 5   Because the rest are blind copied?
 6   A.   No, I don't think so, I don't know.
 7   Q.   In any event, here, Traci here is talking about -- Traci
 8   Feldman, you're discussing her performance; is that right?
 9   A.   I need to read this.  If you're going to ask me about
10   this e-mail, I need to read it.
11   Q.   Okay.  Let me help you, if I can.  This might move
12   things along.  If you look at the second page here, do you
13   see there's an e-mail from Ms. Gillmour to you dated
14   September 16?  I'm going to highlight this part here.
15           MR. NOLAN:  Your Honor, my only point is that if
16   Mr. Price is going to take the e-mail starting with "can be
17   measured," it's only fair that Mr. Larian look at the first
18   part of this phrase.
19           THE COURT:  Fair enough.
20           MR. PRICE:  Sure.
21           THE WITNESS:  That's why I'd really like to have a
22   chance to read these e-mails.
23           MR. PRICE:  Let's go back --
24           THE WITNESS:  Excuse me.
25           THE COURT:  Very well.  Mr. Larian would like a
```

1596

 1    moment to review the document.  You may do so, sir.

 2          THE WITNESS:  Thank you.  Go ahead.

 3    **Q.**   BY MR. PRICE:  These are discussions about Traci Feldman

 4    and her performance?

 5    **A.**   It doesn't say about her performance, and I don't recall

 6    who Traci Feldman is.

 7    **Q.**   If you look at this page here, this is a portion of

 8    Ms. Gillmour's e-mail to you.  You see this where it says:

 9    "We recruited her from Mattel because of her experience and

10    qualifications.  I would say the same thing about Andy or any

11    other high-level people we recruited."

12          Do you see that?

13    **A.**   I do.

14    **Q.**   And it's true that Ms. Feldman was in fact recruited

15    from Mattel because of her experience and qualifications?

16    **A.**   This is Kami Gillmour's e-mail.  I do not recall these

17    conversations for Traci Feldman.

18    **Q.**   And here it says:  "As you know, it's been a highly

19    volatile, chaotic, and fragile time, and now is not the time

20    to be on attack mode.  We need bodies to make this happen and

21    bring MGA to the next level."

22          Do you see that?

23    **A.**   I do.

24    **Q.**   And in your response, you did not disagree with that

25    assessment of the situation in December of 1999, that is,

1    that MGA was in a volatile, chaotic, and fragile time, and it

2    wasn't the time to be in attack mode?

3    **A.**    I don't know if I responded that portion of the e-mail

4    or not, no.

5    **Q.**    Well, is it true that because MGA was in this volatile,

6    chaotic, and fragile time, that MGA had this pattern of

7    directing people -- you had a pattern of directing people,

8    when there were vacancies, to go and recruit out of Mattel?

9    **A.**    That is not correct.   I don't recall MGA being in a

10   volatile -- whatever the words that Kami Gillmour used in her

11   e-mail.   And I do not agree with her characterization.   Nor

12   do I agree with yours.

13   **Q.**    Well, if we look at the first page of 13619, it's

14   certainly fair to say that in your response to Ms. Gillmour,

15   that you did not say you disagreed with her assessment that

16   MGA was in a highly volatile, chaotic, and fragile time and

17   now is not the time to be on attack mode?

18   **A.**    I did not.

19   **Q.**    So getting back, then, to this agreement that we were

20   looking at that was sent out, that Ms. Maurus testified to,

21   which is 13532 --

22   **A.**    You want me to go back --

23   **Q.**    Fortunately, it's very close in the book there.   13532.

24   It appears you agree that --

25   **A.**    Hold on one second, sir.

1    **Q.**    Oh, sure.

2    **A.**    Go ahead.

3    **Q.**    It appears you agree that it was wise for Ms. Maurus to

4    refuse to sign this proposed contract.

5    **A.**    I have no idea what Jennifer Maurus was thinking or why

6    she wanted to sign or not sign the agreement.

7    **Q.**    Didn't you say a few minutes ago that you looked at this

8    contract and you thought it was unfair?

9    **A.**    I believe it was unfair, yes.  I -- looking at it, it's

10   unfair.

11   **Q.**    And that you had really nothing to do with this at all?

12   **A.**    To the best of my recollection, I did not.

13              MR. NOLAN:   Your Honor, asked and answered.

14              THE COURT:   Sustained.  Move along, Counsel.

15   **Q.**    BY MR. PRICE:  Let's look, if we could, at the last page

16   of this document, which is 13532-0010, the last page of this

17   unfair contract that was being sent out.

18              MR. NOLAN:   Your Honor, I'm going to object to the

19   characterization of counsel in the questions.

20              MR. PRICE:   I can rephrase.

21              THE COURT:   Rephrase.  Thank you, Counsel.

22   **Q.**    BY MR. PRICE:  You see the last page of this contract?

23   **A.**    I do.

24   **Q.**    And this is the last page of a contract which you say is

25   unfair.

1   **A.**   This is a contract, yes, it's unfair.

2   **Q.**   If we look at the last page of the contract, which you

3   say is unfair, we see a signature here dated July 25, 2000.

4           Do you see that?

5   **A.**   I do.

6   **Q.**   And if you note, that is a couple weeks before this

7   contract was actually sent out to the employees on August

8   10th; correct?

9   **A.**   It's 7/25 -- August 10.  Yes.  I really don't recall

10  this contract or the dates.  So I'm not sure if they were

11  together or separate.  I just don't -- I cannot say one way

12  or another.

13  **Q.**   Well, it's correct to say that the signature on this

14  contract, which you've characterized as unfair, is yours?

15  **A.**   It is my signature.

16  **Q.**   And so let me ask you again, having seen all of this,

17  there was an uproar when this was sent around?

18  **A.**   I don't recall an uproar, sir.

19  **Q.**   Do you recall anybody complaining?

20  **A.**   I don't recall one way or another.

21  **Q.**   It's your understanding that under this proposed

22  contract, that if someone left MGA, like, say, if Paula

23  Garcia left MGA or Kami Gillmour left MGA, that they could

24  not then try to recruit people from MGA to come to their new

25  company.

1  **A.**   This is a hypothetical question you're asking me.  As I

2  mentioned to you, we withdrew -- my recollection is that we

3  withdrew this contract.  This contract is not enforceable.

4  **Q.**   Personally, you agree the contract is not enforceable.

5  **A.**   I do.

6  **Q.**   Because some of these provisions are just illegal.  You

7  understand that?

8        MR. NOLAN:  Objection.  Your Honor, calls for a

9  legal conclusion.

10        THE COURT:  Sustained.

11  **Q.**   BY MR. PRICE:  Your understanding, you thought that some

12  of the provisions of this contract were not enforceable, to

13  your understanding.

14  **A.**   I think people can go and freely work for other

15  companies in the United States.  That's my understanding.

16  **Q.**   And I'm not talking about hypothetical.  I'm asking

17  about this contract which was sent around.  Your

18  understanding is that under this contract which was sent

19  around, that one of the provisions was that if an employee

20  like Kami Gillmour or Paula Garcia left MGA, they could not

21  then recruit people from MGA to their new company.

22  **A.**   You just asked me a hypothetical question, but you told

23  me it's not hypothetical.  So I don't know how to answer

24  that.

25  **Q.**   Let me help you out.  Look at page 13532-0007.

1   **A.**   Yes.

2   **Q.**   Do you see where it says nonsolicitation of personnel?

3   **A.**   I do.

4   **Q.**   "During employee's employment with the company and for

5   one year thereafter, employee shall not, directly or

6   indirectly, solicit, induce, or attempt to solicit or induce,

7   any person known to employee to be an employee of the company

8   who, directly or indirectly, engages in the business on

9   behalf of the company, to terminate his or her employment or

10  other relationship with the company for the purpose of

11  associating with any entity that engages in the business of

12  which employee is or becomes an officer, et cetera, or any

13  competitor of the company in the business."

14          Do you see that?

15  **A.**   I see the paragraph.

16  **Q.**   All right.  So it's not a hypothetical.  You understood

17  in this contract that you signed that one of the provisions

18  was that MGA could not -- MGA personnel could not do what you

19  were doing to Mattel.  That is, you couldn't have someone

20  leave MGA and then seek to hire MGA's employees?

21          MR. NOLAN:  Objection, your Honor.

22          THE COURT:  What's the objection?

23          MR. NOLAN:  Foundation.  This contract was not

24  entered into.  It was not enforced.  He didn't write it.

25  There's no foundation for Mr. Larian --

1    THE COURT:   Sustained.   Foundation.

2  **Q.**   BY MR. PRICE:   Let me rephrase, then.   We've looked at,

3  at least on a few occasions, you directed former Mattel

4  employees to contact people they knew at Mattel to try to

5  fill job vacancies at MGA; correct?

6  **A.**   Former Mattel employees who were laid off or we hired to

7  work at MGA?   Is that what you're referring to?

8  **Q.**   I'm saying former Mattel employees who were working at

9  MGA no matter how they got there, you asked those former

10  Mattel employees to contact folks currently working at Mattel

11  to see if they wanted to come work for MGA?

12  **A.**   I did.

13  **Q.**   And you understood that when this contract went

14  around -- this draft contract which you signed, that it had a

15  provision which would have prohibited an MGA employee from

16  doing that if MGA left MGA --

17    MR. NOLAN:   Objection, your Honor.   Foundation,

18  your Honor.

19    THE COURT:   Sustained.

20  **Q.**   BY MR. PRICE:   Well, before you signed this contract,

21  which was sent to all employees, did you read the paragraphs

22  of the contract?

23    MR. NOLAN:   Objection, your Honor.   Foundation.

24  Misstates his testimony.

25    THE COURT:   Let's go ahead and take our afternoon

1    break here.

2              **(WHEREUPON THE JURY WITHDRAWS.)**

3              THE COURT:  Please be seated.  Let me start with

4    the last thing first, Counsel.  What is your foundational

5    objection to the last question?

6              MR. NOLAN:  Your Honor, oh, you mean the earlier

7    ones?

8              THE COURT:  Just the last one.

9              MR. NOLAN:  The last one, the record evidence is

10   that Mr. Larian -- I don't think there's any evidence that

11   this was transmitted to all the employees at MGA --

12             THE COURT:  Very good.  I'll sustain it on that

13   foundational basis.

14             MR. NOLAN:  Number two is the contract was never

15   put in place at MGA.  There's not any evidence that any

16   employee ever signed this agreement or that MGA tried to

17   enforce it.  Yet Mr. Price continues to build on this saying

18   it would be a violation of your contract, and there's no

19   foundation.

20             THE COURT:  I have been sustaining the foundational

21   objection.  I do need to say you've got to stop the speaking

22   objections, and I'm going to start overruling them when I

23   start hearing a speaking objection.

24             MR. NOLAN:  Okay.  Your Honor, I apologize.

25             THE COURT:  I said this at the beginning of trial.

1    THE COURT:  Very well.  We'll begin the discussion

2    at sidebar.

3         **(SIDEBAR CONFERENCE HELD AND PLACED**

4         **UNDER SEAL AND IS NOT TRANSCRIBED HEREIN.)**

5         (Recess taken.)

6         THE COURT:  We're back on the record outside the

7    presence of the jury.  The Court just wanted to place on the

8    record that the letter submitted by Mr. Nolan on behalf of

9    MGA has been received by the Court.  It has been placed under

10   seal.  It has not been admitted in evidence, and it will

11   remain under seal pending further order of the court, counsel

12   having given direction in terms of motions and filings

13   related to that letter, and we'll leave it at that.

14        Let's bring in the jury.

15        **(WHEREUPON THE JURY ENTERS.)**

16        THE COURT:  Mr. Price, you may continue.

17        MR. PRICE:  Thank you, your Honor.

18   **Q.**  Mr. Larian, I think we talked about Exhibit 13532.  And

19   is it correct, sir, that the decisions of MGA in this time

20   frame, '99, 2000 time frame, the actions all had to be

21   sanctioned by you?

22   **A.**  I am the CEO of the company.  At the end of the day, the

23   buck stops with me, yes.

24   **Q.**  Not just about, but before anything like this memo could

25   go out, August of 2000, before that could go out, that had to

1   be sanctioned by you; correct?

2   **A.**   I don't recall at that time.  My brother was 45 percent

3   owner of the company.  So I think he had as much authority as

4   I did.

5   **Q.**   Well, when did you become 81 percent owner of the

6   company?

7   **A.**   After I bought my shares from my brother.

8   **Q.**   When was that in a time frame?

9   **A.**   I believe it was either 2000 or 2001.

10  **Q.**   Wasn't the management style in late '99, early 2000,

11  that every decision had to be run by you?

12  **A.**   No, not necessarily.

13  **Q.**   Didn't your management team actually convene a meeting

14  with you to complain about that, that nothing could get done

15  unless you had your input?

16  **A.**   I don't recall that being so.

17  **Q.**   Do you know a gentleman at this time named Martin Hitch?

18  **A.**   At what time?

19  **Q.**   '99, 2000?

20  **A.**   I don't know if it was '99 or 2000 or 2001.  But we had

21  someone named Martin Hitch working for us.

22  **Q.**   He was V.P. of international?

23  **A.**   He was V.P. of international sales, yes.

24  **Q.**   And Pat Williams, who was he at this time frame?

25  **A.**   He was head of -- excuse me.  I apologize.  Again, I

1   don't know the exact date.

2   **Q.**   Hitch was head of international sales, and Mr. Williams

3   was head of domestic sales?

4   **A.**   My recollection is that Pat Williams was head of overall

5   sales.

6   **Q.**   And then Mr. Hitch worked under him as head of

7   international sales?

8   **A.**   That's to the best of my memory, yes.

9   **Q.**   And they were fairly important members of your

10  management team?

11  **A.**   Yes.

12  **Q.**   And didn't they convene a meeting with you to talk about

13  your management style and that you had to approve everything?

14  **A.**   It's possible.  I don't recall the meeting, but it's

15  possible.

16  **Q.**   Let me show you what we've marked as Exhibit 13626 for

17  identification.

18          Have you had time to look over Exhibit 13626 for

19  identification?

20  **A.**   I have, yes.

21  **Q.**   You see it is on the letterhead of MGA Entertainment?

22  **A.**   Yes.

23  **Q.**   And it is a meeting agenda between you and Mr. Williams

24  and Mr. Hitch?

25  **A.**   It says on the top "meeting," and my name is on it.

1       MR. NOLAN:  Your Honor, we're going to object to

2  the relevance of this document.

3       THE COURT:  You may proceed, Counsel.  It's not

4  been introduced yet.

5       MR. PRICE:  That's correct.

6       THE COURT:  Very well.

7  **Q.**   BY MR. PRICE:  And you said you see it's your name on

8  it, Mr. Williams and Mr. Hitch.  And you also see it says

9  agenda?

10 **A.**   That's correct, yes, I do.

11 **Q.**   And there was in fact a meeting with you three to talk

12 about management issues?

13 **A.**   I don't recall the meeting.

14 **Q.**   Do you have any reason to believe that this is not in

15 fact a document which reflects an agenda of a meeting with

16 you, Mr. Williams, and Mr. Hitch around February 2001?

17 **A.**   That's what the paper says, but I don't recall the

18 meeting.

19 **Q.**   I'm asking do you have any reason to think this is not

20 what it appears to be?

21 **A.**   I have no recollection of it.

22 **Q.**   Is it true, sir, that those individuals met with you and

23 talked about how the culture in MGA was autocratic and that

24 you had to approve everything?

25      MR. NOLAN:  Objection, your Honor.  Relevance, lack

1    of foundation, and hearsay.

2              THE COURT:   Overruled hearsay as admission of party

3    opponent.   Overrule the relevance.   Objection is overruled.

4              But, Counsel, we're not getting into the substance

5    of this.

6              MR. PRICE:   Very well.

7              THE WITNESS:   Go ahead and ask the question.

8    Q.   BY MR. PRICE:   Isn't it correct that you had a -- you

9    had meetings with Mr. Williams and Mr. Hitch where your sales

10   folks complained that there was this autocratic culture where

11   every decision had to be sanctioned by you?

12   A.   I don't recall in 2001 the meetings that I had.

13   Q.   Actually, sir, wasn't one of the things they complained

14   about was that you would take the position that if you didn't

15   put it in writing, you were going to deny it?

16   A.   I don't recall that.

17   Q.   Didn't you send an e-mail around saying -- in a joking

18   fashion, I have Alzheimer's.   So if it's not in writing, I

19   didn't say it.

20   A.   It's possible.   I have a sense of humor.

21   Q.   You meant it.   You meant that if it wasn't in writing,

22   you were going to deny that happened?

23   A.   Meant what?   That I have Alzheimer's?   I don't have

24   Alzheimer's.

25   Q.   I'm not accusing you of that yet.   What I'm saying is

1   you meant, when you told your employees that if they didn't

2   have it from you in writing, you were going to deny that it

3   happened?

4   A.   I might have.  I don't recall.

5   Q.   Because that was your position at the time, that if you

6   don't have it in writing from me, I'm going to say it didn't

7   happen.

8   A.   It's possible.  I don't remember.

9   Q.   Let's see if we can refresh your memory on that.  If

10  you'll look at 13382.

11       Have you found it?

12  A.   Yes, I have.

13  Q.   And you recognize that as an e-mail you sent around

14  January 31, 2001?

15  A.   That looks like it, yes.

16  Q.   And with an Importance of "high."

17  A.   Yes.

18       MR. PRICE:  Your Honor, move Exhibit 13382 in

19  evidence.

20       MR. NOLAN:  Objection.  Relevance.

21       THE COURT:  Overruled.

22       **(Exhibit 13382 received.)**

23       THE COURT:  You may publish.

24  Q.   BY MR. PRICE:  And this is an e-mail that you sent out

25  to everybody in marketing, everybody in sales.

1           Do you see that?

2   A.   Yes, I do.

3   Q.   And here's your sense of humor here.  It says:  "My

4   Alzheimer's Disease."

5   A.   Yes.

6   Q.   Was this your sense of humor, too, where it says "high"

7   under Importance?

8   A.   I don't recall that.

9   Q.   Is that because of the Alzheimer's?

10          Let me ask again.

11          MR. NOLAN:  We'll stipulate that Mr. Price

12   apparently has a sense of humor as well.

13          THE COURT:  Very well.

14   Q.   BY MR. PRICE:  Usually, when you put "high" on

15   Importance on an e-mail, you mean that it was in fact

16   important?

17   A.   I hope so.

18   Q.   And here we have the first line:  "Please note that I

19   have been diagnosed with having Alzheimer's, and I don't

20   remember anything anymore."

21          Do you see that?

22   A.   I see that.

23   Q.   That was a joke?

24   A.   It was a joke.

25   Q.   How about the second thing?  "So, if it is not in

1    writing, I did not approve it.  I did not say it.  Whatever."

2            Do you see that?

3    **A.**   Yes.

4    **Q.**   That, you meant.

5    **A.**   I did.

6    **Q.**   And in fact, that precipitated this meeting where one of

7    the complaints that you got from Mr. Williams and Mr. Hitch

8    was that you had an approach of denying everything if it

9    wasn't in writing.

10   **A.**   I don't remember that meeting.

11   **Q.**   Let me ask it this way.  Can you deny such a meeting

12   where you told your sales folks that, you know, "I'm going to

13   deny everything unless it's in writing"?

14   **A.**   I can't -- I don't recall it.  So I cannot agree to it

15   or deny it.

16   **Q.**   Did you have a meeting with Mr. Williams and Mr. Hitch

17   where one of the issues that they brought to your attention

18   was that there was a confrontational environment?

19   **A.**   Again, you're going back eight, nine years.  I have had

20   many meetings.  I don't recall every meeting I have had.

21   **Q.**   Do the documents sometimes help you refresh your memory

22   as to what happened?

23   **A.**   Yes.

24   **Q.**   Well, if you could look at Exhibit 13626.  Does that

25   refresh your memory?  It's the one that I handed up to you

1   separately.   Thank you.

2   **A.**   It is not.

3   **Q.**   Does that refresh your memory that one of the complaints

4   of your management was that -- was that there was a

5   confrontational environment among management?

6   **A.**   I don't recall this meeting or this memo.  So I don't

7   remember.

8   **Q.**   Now, in doing that, are you saying that because -- I'll

9   step back.

10        Well, is your current practice to deny it if it's

11   not in writing approach?

12   **A.**   No.

13   **Q.**   Wouldn't you remember a meeting with your top management

14   where they were bringing up such issues that there was a

15   confrontational environment and that everything had to be

16   sanctioned by you and that you would deny everything if it

17   wasn't in writing?  Isn't that the kind of thing you'd

18   remember?

19   **A.**   Eight years ago, no.

20   **Q.**   Well, is that still your management style?

21   **A.**   What's my management style?

22   **Q.**   To be confrontational, every decision has to be

23   sanctioned by you, that you'll deny something if it's not in

24   writing?

25        MR. NOLAN:   Your Honor, objection.  Relevance.

```
 1   Time period.
 2              MR. PRICE:  I'll lay a foundation.
 3              THE COURT:  Why don't you lay a foundation,
 4   Counsel.
 5   Q.   BY MR. PRICE:  Has your management style changed since
 6   1999, 2000, 2001 time frame?
 7              THE COURT:  I'm going to sustain the relevancy on
 8   that.  Let's move along.  The only time frame that's relevant
 9   is that period.
10              MR. PRICE:  The only reason, if it's the same, then
11   he could testify to it.
12              THE COURT:  I understand.  Let's move along.
13              MR. PRICE:  Your Honor, I would move Exhibit 13626
14   into evidence.
15              MR. NOLAN:  Lack of foundation, your Honor.
16              THE COURT:  Let's lay a foundation.
17              MR. NOLAN:  That's the exhibit we just went
18   through.
19              THE COURT:  What's the exhibit number?
20              MR. PRICE:  13626.  That's the one I handed up
21   separately.
22              THE COURT:  Very well.  Sustain the objection.
23   Q.   BY MR. PRICE:  Mr. Larian, let me focus now on
24   agreements that -- where you know employees didn't sign the
25   agreement.  And I'd like you to look at Exhibit 1117.
```

1   **A.**   I'm sorry.  I can't find this in here.

2   **Q.**   There are only four digits.  It's 1117.

3   **A.**   I got it.

4   **Q.**   And 1117 is in evidence.

5   **A.**   Yes, go ahead.

6   **Q.**   If we look at the last page of Exhibit 1117, which is

7   page 8, look at the bottom here.

8   **A.**   Yes.  Okay.

9   **Q.**   Could you tell me whose signature this is on behalf of

10  MGA?

11  **A.**   Looks like Eve Johnson, who was -- it looks like Eve

12  Johnson-Ford, who was head of Human Resources at the time.

13  **Q.**   So at this time -- this is April 2000.  Do you see that?

14  **A.**   I do.

15  **Q.**   So at this time there was contracts which were signed by

16  MGA employees; correct?

17  **A.**   Confidentiality agreements, yes.

18  **Q.**   And agreements concerning inventions as well?

19  **A.**   Yes.  Confidentiality agreements.

20  **Q.**   Did every employee have to sign such agreements?

21  **A.**   To the best of my recollection, I couldn't say.  Most

22  likely.  Well, no, I'm not sure.

23  **Q.**   Let me ask you to also look at Exhibit 13620.

24  **A.**   I'm sorry?

25  **Q.**   Exhibit 13620.

1   A.   Go ahead.

2   Q.   Look at the last page of Exhibit 13620.   Is that your

3   signature?

4   A.   It is.

5   Q.   This is dated sometime in 1999; is that right?

6   A.   Yes.

7   Q.   And you recognize this as an agreement with Kami

8   Gillmour?

9   A.   I do.

10         MR. PRICE:  Your Honor, move Exhibit 13620 into

11   evidence.

12         MR. NOLAN:  No objection.

13         THE COURT:  It's admitted.  You may publish.

14         **(Exhibit 13620 received.)**

15   Q.   BY MR. PRICE:  Previously we were looking at Paula

16   Treantafelles, now Garcia's, agreement.  This is an agreement

17   with Kami Gillmour.

18         Do you see that?

19   A.   Yes, looks like it, yes.

20   Q.   Also concerning confidentiality and inventions

21   assignment?

22   A.   That's correct.

23   Q.   And there was a reason why you had employees sign these

24   agreements; correct?

25   A.   Yes, for them to keep things confidential.

1   Q.   And if we look at the specific provisions on these, you

2   see there's a section here, assignment of interest.

3        Do you see that?

4   A.   I do.

5   Q.   And it talks about that the employee agrees to assign

6   and does hereby assign to the company all interest which the

7   employee may have in all patentable and/or not patentable

8   ideas and/or inventions made or conceived by employee solely

9   or jointly with others during employee's employment with the

10  company.

11       Do you see that?

12  A.   I do.

13  Q.   And you were familiar with this provision; correct?

14  A.   I was not -- I'm still not familiar with the whole

15  contract, but I see that's written there, yes.

16  Q.   This is the same page that your signature is on.

17  A.   That's correct.

18  Q.   And it says:  "This assignment shall not apply to any

19  idea or invention developed by employee entirely on the

20  employee's own time without equipment, supplies, facilities,

21  or trade secret information of the company, unless such

22  invention or idea relates to the business of the company or

23  to the company's actual or anticipated research or

24  development."

25       Do you see that?

1   **A.**    I do.

2   **Q.**    And the business of MGA Entertainment at that time was

3   at least in part the toy business.

4   **A.**    That's correct.

5   **Q.**    And the reason that you have this sort of agreement with

6   your employees is if you are paying them a paycheck, and they

7   are a designer, for example, if they come up with a great

8   design idea, and they say they came up with it, you know, on

9   a Saturday night while take a shower, you don't want them to

10  be able to go across the street and give that to one of your

11  competitors; correct?

12  **A.**    If they were working at MGA and they would come and go

13  with product ideas or design ideas, yes, that meant that they

14  were doing it for MGA.

15  **Q.**    And if it related to your business, that's even if they

16  said to you hey, you know, Isaac, I did this during a lunch

17  break or on the weekend, that didn't matter.  If they were

18  employed by MGA and they come up with a great idea related to

19  your business, that belonged to you.

20  **A.**    My understanding has always been that if somebody's

21  doing something on their own, when they are not on our

22  payroll, whether if they are at -- on the weekends at their

23  home, my personal understanding is that what they do on their

24  own time belongs to them.  We don't own them.

25  **Q.**    If that idea relates to your business, the toy business,

1  your understanding here, you've got a designer whose job is

2  to make toys.   They are on your payroll; correct?

3  **A.**   Correct.

4  **Q.**   And you want them to come up with their best toy ideas

5  and give them to you; correct?

6  **A.**   Yes.

7  **Q.**   And if they claim they come up with their toy ideas on

8  their own time, say, at 5:30 instead of 5:00 P.M. -- you with

9  me so far?

10  **A.**   Yes, I see what's written there.

11  **Q.**   That still belongs to you because they are employed by

12  you and it relates to your business; right?

13  **A.**   Again, my own personal understanding is that if somebody

14  is working home on Saturday or Sunday, they are not getting

15  paid for Saturday and Sunday, this is my own personal

16  understanding regardless of this contract, that if they do

17  something on the weekends on their own time, that belongs to

18  them.   I don't own the people because they just work for me.

19  **Q.**   Now, you said regardless of the contract.   You

20  understand what your contract says is that if it relates to

21  your business, an employee -- an employee comes up with a

22  design, it still belongs to you even if they claim they did

23  it in the shower before they came to work.

24  **A.**   That's correct.   That's what the contract says.

25  **Q.**   And this contract was signed by -- by, to your

1  knowledge, all of MGA's employees in this '99, 2000 time

2  frame; correct?

3  **A.**   I'm not sure if everybody in the company signed it.

4  It's possible, but I don't know.  I don't think people who

5  work in the warehouse had to sign something like this, or

6  temps who came to work.  So I don't know.

7  **Q.**   But people like designers, people in management, those

8  sorts of folks would have to sign this sort of thing;

9  correct?

10  **A.**   Yes.

11  **Q.**   And having been in the toy business for some 17 years?

12  13 years?  '87.  Is that it?

13  **A.**   21 years now, I guess.

14  **Q.**   Okay.  As of 2000 -- 1999, 2000, had you been in the toy

15  business for 13 years?

16  **A.**   Yes.

17  **Q.**   So having been in the toy business for that long a

18  period of time, you recognize that it was standard practice

19  for toy companies to have such provisions in connection with

20  their designers, that is, where the company is going to own

21  their designs related to this company's business?

22  **A.**   That's not true.  There is no such standard.

23  **Q.**   So, for example, you thought that Mattel wouldn't have

24  such an agreement with its employees?

25  **A.**   I have no idea what Mattel had or not.  I wouldn't know.

1  Q.   So having been in the toy company business for 13 years

2  at this time, you didn't have an expectation that your

3  competitor would have in a contract, such as the one you have

4  with your employees, where you tell them that if you come up

5  with a design that relates to my business, it belongs to me?

6  A.   They could have.  But you said it's a standard.  I know

7  many companies.  I can name many companies that don't have

8  it.

9  Q.   Was it your expectation that Mattel didn't have this

10  sort of provision with its employees?

11  A.   I have in --

12          MR. NOLAN:   Objection, your Honor.  In terms of

13  what provision?

14          THE COURT:   The objection is what?

15          MR. NOLAN:   Vague and ambiguous.

16          THE COURT:   Sustained.

17  Q.   BY MR. PRICE:  Is it your expectation that Mattel did

18  not have contracts with its employees that provided that if

19  the employee came up with a design, while it worked for

20  Mattel and it related to Mattel's business, that it was a toy

21  design, that Mattel owned it, is it your testimony you didn't

22  expect that they had such a provision?

23  A.   I had no expectation one way or the other.  I didn't

24  know what Mattel had or not had at the time.

25  Q.   In fact, you previously testified you didn't even recall

1   whether MGA had contracts with its employees.

2   **A.**   I don't know what I testified to.  I know that at my

3   deposition, I said we have a confidentiality agreement.  To

4   me, that was the same agreement as we have here.

5          MR. PRICE:  Your Honor, if I could play from

6   Mr. Larian's deposition transcript, it's volume 1, the date

7   is July 18, 2006.  It's lines 15 through 22.

8          THE COURT:  I'm sorry.  What page?

9          MR. PRICE:  Page 36, lines 15 through 22.

10         THE COURT:  Any objection, Mr. Nolan?

11         MR. NOLAN:  One moment, your Honor.  No objection,

12  your Honor.

13         THE COURT:  You may play it.

14         DEPOSITION EXCERPTS PLAYED AS FOLLOWS:

15         "QUESTION:  Had MGA had contracts with its

16      employees as of September of 2000?

17         "ANSWER:  I don't recall.

18         "QUESTION:  You just don't know one way or

19      another?

20         "ANSWER:  I don't.

21         "QUESTION:  Had MGA ever entered into

22      contracts with any of its employees prior to

23      September of 2000?

24         "ANSWER:  It could have.  I don't recall

25      that."

```
 1              MR. NOLAN:  I apologize.  For completeness, could
 2    we just have it continue to run from line 22 -- I'm sorry --
 3    line 23 on page 36, over to the next page, line 37, line 12
 4    for completeness?
 5              MR. PRICE:  You want to go from?
 6              MR. NOLAN:  I just wanted to continue from line 23.
 7    You stopped at line 23.  I want it from line 23 on page 36
 8    through line 12 on page 37.
 9              MR. PRICE:  I have no objection if we actually go
10    to line -- 37, line 24.
11              MR. NOLAN:  The ball is in my court.  Wait a
12    moment.
13              THE COURT:  He wants to go to 24.
14              MR. NOLAN:  That's fine, your Honor.
15              THE COURT:  Very well.  Play from page 36, line 15,
16    through page 37, line 24.  The objections contained therein
17    are overruled.
18              MR. PRICE:  We'll just continue playing from where
19    we stopped.
20              "QUESTION:  Did MGA have a practice of
21         entering into contracts with its employees as of
22         September of 2000?
23              "ANSWER:  No, I'm not aware of a practice like
24         that.
25              "QUESTION:  Does MGA have a -- that practice
```

```
 1        now of entering into contracts with its employees?
 2             "ANSWER:  I think some employees have
 3        contracts with MGA, if that's what you're talking
 4        about.
 5             "QUESTION:  Well, let me be more specific.  As
 6        of September 26, 2000, did MGA enter into
 7        confidentiality or inventions agreements with its
 8        employees?
 9             "ANSWER:  I'm only aware that we had
10        confidentiality agreements.
11             "QUESTION:  Do you know what I mean by
12        inventions agreement?
13             "ANSWER:  I don't.
14             "QUESTION:  By inventions agreement, I mean an
15        agreement which includes a term which says that
16        things an employee invents, during the course of
17        the employee's employment with MGA, in certain
18        circumstances, will be owned by the company, by
19        MGA.  That's what I'm referring to.  Do you
20        understand what I'm saying?
21             "ANSWER:  I understand what you're saying."
22             MR. PRICE:  Your Honor, if I may now play from 44,
23   line 14, to line 20.  Actually, down to 45, line 7.
24             MR. NOLAN:  That's fine, your Honor.
25             THE COURT:  Very well.
```

1        DEPOSITION EXCERPT PLAYED.

2            "QUESTION:  All right.  How about inventions

3    agreements?  Was it your experience, Mr. Larian, as

4    of September of 2000, that companies in the toy

5    industry entered into inventions agreements with

6    their employees?

7            "ANSWER:  I'm not even sure what -- if I

8    understand what is an invention agreement.

9            "QUESTION:  It's what I was referring to

10   before.  That is to say, a type of agreement where

11   it says that if an employee creates something

12   relating to the employer's business during the

13   period of the employment, in some circumstances

14   that invention will be owned by the employer.

15   That's what I'm referring to.

16           "ANSWER:  That's a contract?

17           "QUESTION:  That -- that's what I'm referring

18   to when I say inventions agreement.

19           "ANSWER:  I don't have recollection of that

20   one way or another."

21   Q.   BY MR. PRICE:  Mr. Larian, if you'd go to the first page

22   of Exhibit 13620, which is in evidence.  The document you

23   signed was called confidentiality and inventions assignment

24   agreement?

25   A.   That's correct.

1  Q.   And as of September 2000, you had hired former employees

2  of Mattel; correct?

3  A.   Yes.

4  Q.   How many had you hired before September of 2000?

5  A.   I don't know.

6  Q.   More than five?

7  A.   I couldn't tell you.   I have no idea.

8  Q.   Well, we'll get to this in a second, but there's a

9  meeting around September of 2000 with Carter Bryant; correct?

10  A.   September 2000, yes, there is a meeting with Carter

11  Bryant.

12  Q.   And Paula Garcia was there.

13  A.   She was.

14  Q.   She was a former Mattel employee.

15  A.   She was.

16  Q.   And Kami Gillmour worked at MGA at the time; correct?

17  A.   She did.

18  Q.   She was a former Mattel employee.

19  A.   She did.

20  Q.   And --

21  A.   Excuse me for one second.   If you're talking September

22  1, 2000, I'm not sure if Kami Gillmour was working at MGA at

23  that time.   I'm sorry.   I apologize.

24  Q.   Is she the one who helped recruit Paula Garcia?

25  A.   I don't know how Paula Garcia came to MGA, no.

1  **Q.**   In any event, at some point Ms. Gillmour worked for MGA?

2  **A.**   She did.

3  **Q.**   And the woman Traci we were talking about earlier, Traci

4  Feldman, she had worked at Mattel.

5  **A.**   I have no idea.  I have no recollection of Traci

6  Feldman.

7  **Q.**   But it's fair to say that, when you met with Carter

8  Bryant for the first time, that MGA had hired employees that

9  had previously worked at Mattel?

10  **A.**   Yes.

11  **Q.**   And if we can talk about what happened in connection

12  with this meeting with Mr. Bryant.  First of all, as of

13  September of 2000, for that year financially, MGA ended up

14  losing money; correct?

15  **A.**   No, not as of September 2000.  For the year 200 (Sic),

16  we ended up losing money, but as of September 2000, we were

17  very profitable.  Actually, as of September 2000, we supposed

18  to be one of our most profitable years.

19  **Q.**   Well, let's put it this way.  You do financial

20  statements for the entire year; correct?

21  **A.**   That's correct.

22  **Q.**   And those financial statements for the entire year are

23  audited by some independent auditors?

24  **A.**   That's correct.

25  **Q.**   And if you look at Exhibit 10189.  Have you found that,

1   sir?

2   **A.**   Yes, I have.

3   **Q.**   And are those MGA Entertainment's balance sheets,

4   statements of operations, basically financial records for the

5   years 2000 and 2001?

6   **A.**   I don't know if they are or not.  I don't recall.

7   **Q.**   Pardon?

8   **A.**   I do not recall them.  I don't know if they are or not.

9   On the top it says MGA Entertainment.

10  **Q.**   Do you have any reason to think that these are not your

11  financial statements, yours, meaning MGA's, for 2000, 2001?

12  **A.**   I have no reason to believe or not to believe that they

13  are.

14  **Q.**   Let's me see if we can help you recollect if they are.

15  If we look at the second page, you see at the bottom some

16  figures there concerning --

17  **A.**   Can you tell me exactly what page?  There are figures on

18  every page.

19  **Q.**   Sure.  10189-002.  Do you see that?

20  **A.**   Yes, I do.

21  **Q.**   And if we look at the last figures on those pages, does

22  that remind you that these in fact are the financial

23  statements of MGA Entertainment for 2000 and 2001?

24  **A.**   I don't recall.

25  **Q.**   Well, do you recall that MGA Entertainment for 2000,

1   for the year 2000, the yearly results were a loss of over

2   $6 million?

3   **A.**   I know we had a loss.   I don't know the exact amount.

4   **Q.**   Does this refresh your recollection as to the exact

5   amount of the loss?

6   **A.**   It does not.

7   **Q.**   And I've been asking about 2000.   Back in 1997, I

8   believe, MGA had actually filed for bankruptcy; correct?

9   **A.**   We did.

10  **Q.**   Now, moving forward, then, to 2000, September of 2000,

11  you had your first meeting, you say, with Mr. Bryant;

12  correct?

13  **A.**   In September 1, 2000, was my first meeting with

14  Mr. Bryant.

15  **Q.**   And the reason you are fairly certain about the date is

16  because your secretary has a calendar; right?

17  **A.**   Of the calendar page that I have, yes.

18  **Q.**   And one of those calendar pages reflects that you had a

19  September 2000 meeting with Mr. Bryant.

20  **A.**   September 1, 2000, yes.

21  **Q.**   And your calendar also reflects that in weeks previous

22  to that, you were not in town.   You were somewhere, I think

23  it was Hong Kong.

24  **A.**   I think I was, but I don't have that in my mind.   I

25  don't have that date and where I was in my mind.   I know that

1    I was out of town before the meeting.

2    **Q.**   Sure.   Just to refresh your recollection, perhaps, look

3    at Exhibit 11210.

4    **A.**   11 --

5    **Q.**   11210.   Look at that to refresh your recollection as to

6    whether or not in the week of August 18, you were out of

7    town.

8    **A.**   Yes.

9    **Q.**   In fact, there was a time period from about the 21st

10   through the -- let me rephrase that.

11           I don't know if I'm reading this correctly.   From

12   the 14th to the 25th, when you were out of town; is that

13   right?

14   **A.**   No.   Because on the 15th there is something at 5:00 P.M.

15           Do you see that?

16   **Q.**   I do.   Could that have been a conference call?

17   **A.**   No.   P.D., weekly P.D. status call.

18   **Q.**   Well, tell me, looking at your calendar, what's your

19   understanding as to when in August you were out of town?

20   **A.**   Again, I don't recall, but according to this, I was out

21   of town from August 15 to August 27.

22   **Q.**   And when you had this meeting on September 1st, first of

23   all, that meeting, your understanding, was set up by

24   Ms. Garcia.

25   **A.**   I don't know if it was set up by Ms. Garcia or Victoria

1    O'Connor.  I don't recall.  Or my secretary.

2         MR. PRICE:  If we could play from Mr. Larian's

3    deposition transcript 26, line 22, to 27, line 6.  This is

4    volume 1.

5         THE COURT:  Any objection?

6         MR. NOLAN:  One moment, your Honor.

7         MR. NOLAN:  No objection.

8         THE COURT:  You may play it.

9         DEPOSITION EXCERPT PLAYED.

10        "QUESTION:  So the only one that responded was

11    Paula, and she came up with the concept for Bratz;

12    is that right?

13        "ANSWER:  She showed me something that became

14    the idea for Bratz.

15        "QUESTION:  What was it that she showed you?

16        "ANSWER:  She set up an appointment on my

17    calendar, and a gentleman by the name of Carter

18    Bryant was in that meeting, and he showed me some

19    drawings at that meeting, and that was -- that was

20    the idea that became Bratz later on."

21    **Q.**  BY MR. PRICE:  And when you attended this meeting in

22    September, you assumed that Paula had previously met with

23    Mr. Bryant.

24    **A.**  I had no idea if she had met with Mr. Bryant before that

25    or not.

1    **Q.**   My question was different.  That was your assumption

2    based upon your business practice.

3    **A.**   No.

4              MR. PRICE:  If he we could play page 75, line 22,

5    to 76, line 1.

6              MR. NOLAN:  One moment, your Honor.  Your Honor,

7    for completeness, I'd like to play down to line 20.

8              THE COURT:  Any objection, Mr. Price?

9              MR. PRICE:  Let me read it, your Honor.

10             No objection.

11             THE COURT:  Very well.

12             DEPOSITION EXCERPT PLAYED.

13             "QUESTION:  So did you have the impression

14         that Paula and Victoria and Veronica had previously

15         met Mr. Bryant?

16             "ANSWER:  I don't recall.  Probably have.  I

17         think so, because they have -- I'm assuming.

18             "QUESTION:  All right.  I mean, do you

19         remember Paula or Victoria or Veronica expressing

20         to you that they were excited about this product or

21         idea or they thought it was a good one?

22             "ANSWER:  Yeah, I think Paula was very

23         excited.

24             "QUESTION:  Paula was real excited?

25             "ANSWER:  Right.

1       "QUESTION:  Did she indicate to you how much

2       time she had spent looking at this product or

3       talking to Carter before the meeting?

4           "ANSWER:  Not that I recall.

5           "QUESTION:  So somebody sort of introduces

6       you, here is Carter Bryant, and he's got this

7       product.  Then what happens?

8           "ANSWER:  They said let's see it, to the best

9       of my recollection.  You want to know what I

10      remember from the meeting?

11          "QUESTION:  Yeah."

12  Q.  BY MR. PRICE:  Now, Mr. Larian, the reason that probably

13  you were assuming that there was a meeting prior is because

14  you had expected your subordinates, your assistants, to have

15  met with Mr. Bryant before presenting him to you?

16          MR. NOLAN:  Objection, your Honor.  Assumes facts

17  not in evidence.

18          THE COURT:  Rephrase, Counsel.

19  Q.  BY MR. PRICE:  When you said -- when you were asked

20  whether you had the impression that Paula, Victoria, and

21  Veronica had previously met with Mr. Carter Bryant, you said,

22  "I don't recall, probably have, I think so.  I'm assuming."

23          Now, why do you assume that they met with

24  Mr. Bryant before this meeting with you?

25  A.  I just assumed that maybe they have seen.  As you saw in

1  my deposition, I said I don't recall. And I still don't

2  recall if they have or not. Before that. My understanding

3  now being through this proceeding is for the first time, I

4  saw it on September 1, 2000. I don't know if anybody else

5  has seen it before that or not.

6  **Q.** Why in your deposition did you say that probably that

7  Ms. Garcia and Ms. O'Connor had met Mr. Bryant before? Why

8  do you think that was probably the case?

9  **A.** Again, I was just making assumption.

10 **Q.** It wasn't based on anything, any prior experience, any

11 practice, or anything else? Is that your testimony?

12 **A.** That's my testimony.

13 **Q.** Now, your testimony is that when you had this meeting on

14 September 1st, that when you came into it, you didn't even

15 know it was about a fashion doll.

16 **A.** That's correct. I thought they had brought somebody

17 to -- for an interview for a job for fashion designer.

18 **Q.** So if Ms. Garcia testified -- has testified that, a

19 couple of days before September 1st, she had told you that

20 she was bringing a fashion doll idea to you, then would you

21 disagree with that?

22 **A.** I don't. I have no reason to agree or disagree with it.

23 My recollection was that he was coming in for a job

24 interview. That's my recollection. Again, going back seven

25 years.

1   Q.   Sure.   Now, at this meeting you had Ms. Garcia; correct?

2   A.   That's correct.

3   Q.   You had Victoria O'Connor?

4   A.   Yes.

5   Q.   You had a woman named Veronica Marlow?

6   A.   Yes.

7   Q.   And I believe your daughter was there?

8   A.   Yes, she was 12 at the time.

9   Q.   And when you got to this meeting, because you thought it

10  was for a job interview, one of the first things you asked

11  about is do you have a resume.

12  A.   I don't recall exactly.   I might have.   That's my

13  practice if someone is coming for a job interview, to ask to

14  see the resume.

15  Q.   Let me see if I can refresh your recollection.   If you

16  look at page -- you have your transcript in front of you?

17  A.   I do.   Which volume?

18  Q.   It's volume 1, page 77.

19  A.   I'm sorry.   The page?

20  Q.   Page 77.   And if you read to yourself, lines 17 through

21  19.

22  A.   Can you repeat the lines again?

23  Q.   77.   Just read to yourself 77, lines 17 through 19.

24  A.   Yes, go ahead.

25  Q.   Does that refresh your memory that because you thought

1   it was a job interview, that you said where are you working?

2   Do you have a resume?

3   **A.**   Well, can I read the whole thing to the jury?

4   **Q.**   I'm not asking you to read it to the jury.  I'm using

5   this to refresh your memory because you said you couldn't

6   recall.  Can you answer my question?  You can tell me yes,

7   no, or I don't recall.  At this meeting did you say where do

8   you work and do you have a resume?

9   **A.**   I think I have to read this whole thing to the jury so

10  they can get a context of my answer.

11  **Q.**   Well, my question is simple, and we can get to other

12  questions later.  How long did the meeting last?

13  **A.**   I don't recall.  Maybe half an hour, 45 minutes max.

14  **Q.**   Okay.  So let me talk to you about one aspect of the

15  meeting.  Did you ask Mr. Bryant where do you work and do you

16  have a resume?

17          THE COURT:  Answer the question the best you can.

18          THE WITNESS:  I believe I did.

19  **Q.**   BY MR. PRICE:  And he told you he worked at Mattel?

20  **A.**   He did.

21  **Q.**   And he said that in front of Ms. O'Connor and

22  Ms. Garcia?

23  **A.**   To the best of my recollection, yes, he did.

24  **Q.**   And he showed you at this meeting some drawings?

25  **A.**   Yes, he did.

1    Q.    And if you look at Exhibit 302, which is already in

2    evidence --

3    A.    302.  Yes.

4    Q.    -- is it your recollection that these were in fact the

5    drawings that Mr. Bryant showed in this meeting?

6    A.    Oh, you want to take a look at every page?  There are

7    many drawings in here.  Or just the one on the --

8    Q.    Just flip through the 15 pages, and your recollection

9    that this is what Mr. Bryant presented in September of 2000

10   to you.

11   A.    To the best of my recollection, yes, some of these were.

12   Some of them I remember.

13   Q.    And can you state that some weren't shown, or is it just

14   that you remember some and are not sure about others?

15   A.    The latter.

16   Q.    And looked at the second page.  It's correct, is it not,

17   that in this first presentation these dolls were called Bratz

18   with a Z?

19   A.    That's correct.

20   Q.    So in fact it was Carter Bryant who first came up with

21   the name Bratz?

22   A.    Yes.

23   Q.    And if we go to the next page, we look at

24   Exhibit 302-003.  He showed you drawings where at least one

25   of his characters was wearing hiphugger jeans and had a short

1    T-shirt; correct?

2    **A.**    That's what it says.

3    **Q.**    And you notice that if you look at the drawing, it's

4    kind of showing her midriff here?

5    **A.**    That's correct.

6    **Q.**    And let's go to the fifth page of the exhibit.  Another

7    drawing where he shows a character showing there a bare

8    midriff?

9    **A.**    Yes.

10   **Q.**    Same if you look at the next page.  Number 6.

11   **A.**    Yes.

12   **Q.**    Also have these hiphugger pants and a bare midriff?

13   **A.**    Yes.

14   **Q.**    So certainly these were sort of fashion statements that

15   were shown to you in September of 2000?

16   **A.**    These are drawings that were shown to me in September

17   2000.

18   **Q.**    And I believe you testified that according to you, I

19   guess, there was no one who worked on Bratz in September

20   because there was no contract?

21   **A.**    I'm sorry.  Can you repeat the question?

22   **Q.**    Is it true -- is it your testimony that after this

23   meeting, no one did work on Bratz in September because there

24   was no contract?

25          MR. NOLAN:  Objection, your Honor.  Vague and

1    ambiguous as to drawings for the doll.

2            THE COURT:  Rephrase, Counsel.

3    **Q.**   BY MR. PRICE:  In September 2000, was there any work at

4    all done on these drawings or on doll designs or anything

5    pertaining to Bratz after this meeting?

6            MR. NOLAN:  Compound, your Honor.

7            THE COURT:  Overruled.

8            THE WITNESS:  I don't know if there was or not.

9    It's possible that there was.

10   **Q.**   BY MR. PRICE:  It's your belief, however, that it's in

11   this month of September 2000 that, to use your words, Bratz

12   was born?

13   **A.**   In September of 2000 Bratz was born?  What do you mean

14   by Bratz?  Bratz drawings or Bratz dolls?  Bratz dolls did

15   not come to the market until 2001.

16   **Q.**   Well, if you look at Exhibit 11907.

17   **A.**   Exhibit?

18   **Q.**   11907.

19   **A.**   Yes, go ahead.

20   **Q.**   You recognize that as an e-mail that includes you and

21   Victoria O'Connor and Sandrine de Raspide?

22   **A.**   Your pronunciation is better than mine.

23   **Q.**   You recognize it as one of your e-mails?

24   **A.**   That's correct.

25           MR. PRICE:  Your Honor, move Exhibit 11907 into

1    evidence.

2              MR. NOLAN:  No objection, your Honor.

3              THE COURT:  It's admitted.

4              **(Exhibit 11907 received.)**

5    **Q.**   BY MR. PRICE:  This is one of those e-mails where

6    someone else has written you an e-mail and you're going

7    through and typing your comments or responses?

8    **A.**   That's correct.

9    **Q.**   So, for example, where it has this e-mail from Nathalie

10   Riesen to -- it says to ILarian at MGAE dot com.  Is that

11   you?

12   **A.**   That was my e-mail address at the time.

13   **Q.**   And you see it says:  "I have some questions about the

14   story of the Bratz.  I'd ask if you would" --

15   **A.**   I see that.

16   **Q.**   And one of the questions was date of birth of the Bratz,

17   time of development, first launch in the United States.

18              Do you see that?

19   **A.**   Yes.

20   **Q.**   And you've got -- what is typed here is your response;

21   correct?

22   **A.**   I'm sorry?  The one in capital is mine.

23   **Q.**   And your response is:  "Born September 2000.  Nine

24   months to develop, like a baby.  Launched in the USA in July

25   2001 and Spain June 2001, before USA."

1     Do you see that?

2  **A.**   I do.

3  **Q.**   And I take it that for this birth in September of 2000,

4  you're not taking credit for the paternity of that; right?

5  **A.**   I'm sorry?

6  **Q.**   That is, where it says born in September 2000, you are

7  not the one who bore it?

8  **A.**   I personally?

9  **Q.**   Yes.

10 **A.**   No, I have not given birth to anybody yet.

11 **Q.**   Notify me if you do.  We can make a lot of money.

12       So you're talking about born in September 2000, the

13 person who you're referring to who gave birth to Bratz in

14 September of 2000 was Carter Bryant?

15 **A.**   MGA Entertainment gave birth to Bratz dolls and Bratz

16 brand.  Carter Bryant came up with the drawings that became

17 the inspiration for Bratz.

18 **Q.**   My understanding is you weren't aware of anything being

19 done in September 2000 regarding Bratz except Mr. Carter

20 Bryant presented to you Exhibit 302.  Isn't that right?

21 **A.**   No.  My testimony was that there could have been some

22 work done on the Bratz to see if it could be done, could be

23 made to a doll or not in September or October.  I just don't

24 know the detail of that.

25 **Q.**   Well, you certainly would agree that the date that --

1    using your word here, Bratz, the date that Bratz was created

2    was in September of 2000.

3    **A.**    No.   You should refer back to the date of the e-mail.

4    That's October 31st, 2002.   And Bratz dolls were in the

5    market already for about a year when I wrote that e-mail.

6    **Q.**    Well, if you'd look at Exhibit 551.

7    **A.**    I'm sorry?

8    **Q.**    Look at Exhibit 551.

9    **A.**    Should I put this away?

10   **Q.**    Yes, we're going to 551 now, a different document.

11           And that's already in evidence, your Honor.

12           THE COURT:   Very well.

13   **Q.**    BY MR. PRICE:   Mr. Larian, you're aware of this e-mail

14   between Nana Ashong and Victoria O'Connor, Paula

15   Treantafelles, now known as Paula Garcia, and Martin Hitch?

16   **A.**    I'm not.

17   **Q.**    You've never seen this before this trial?

18   **A.**    Only through this trial I have.

19   **Q.**    Who is Nana Ashong?

20   **A.**    She was product manager, to the best of my recollection,

21   at MGA at one time.

22   **Q.**    And I think you said Martin Hitch, was he in charge of

23   sales?

24   **A.**    He was in charge of international sales.

25   **Q.**    And how about Jackie Bielke?

1  A.   I have no recollection of her.

2  Q.   Do you know why Ms. Ashong, in September of 2001, was

3  sending an e-mail saying that the date of creation for Bratz

4  was September 18, 2000?

5  A.   I have no idea.

6  Q.   Do you recall that you sent an e-mail saying for legal

7  purposes, let's say it's October of 2000?

8  A.   I don't recall that.  I might have.  I don't recall.

9  Q.   All right.  If you'd look at Exhibit 12842.

10  A.   I'm sorry.  Can you repeat the number?

11  Q.   12842.  Do you recognize this as an e-mail that you

12  wrote sometime around June 27, 2002?

13  A.   It's an e-mail that I wrote.  I don't remember the date.

14        MR. PRICE:  Move Exhibit 12842 into evidence.

15        MR. NOLAN:  No objection, your Honor.

16        THE COURT:  It's admitted, and you may publish.

17        **(Exhibit 12842 received.)**

18  Q.   BY MR. PRICE:  There's an e-mail from Caymohr,

19  C-A-Y-M-O-H-R, at AOL dot com.

20        Do you have any idea who that is?

21  A.   I have no idea.

22  Q.   The "To," that's your e-mail address; correct?

23  A.   It is.

24  Q.   Do you know whose e-mail addresses are in the CC?

25  A.   Ricardo Cruz, I think, is one of them, and the other one

1    was Fabienne, F-A-B-I-E-N-N-E, don't ask me to pronounce the

2    last name.

3    **Q.**    What was Ricardo Cruz's position?

4    **A.**    I think he was an assistant at the company.

5    **Q.**    Assistant to whom?

6    **A.**    I think to -- I don't remember who he was assistant to.

7    But he was an assistant.

8    **Q.**    And how about Fabienne, what was that person's position?

9    **A.**    I don't remember her position.

10   **Q.**    It begins:  "Hi, Isaac.  Here's the presentation for

11   Fox."

12              Who is that referring to?

13   **A.**    I assume it's presentation to 20th Century Fox.

14   **Q.**    And then:  "Isaac, I'm concerned you changed Bratz intro

15   date to October 200."  I assume that's wrong.

16   **A.**    For sure it's not done in the year 200.

17   **Q.**    Do you want to keep that or not?  Do you see that?

18   **A.**    Yes.

19   **Q.**    So apparently you understood this to mean October 2000.

20   **A.**    That's not my e-mail.  She wrote this.  I have no idea

21   what she meant, but if you want to see what I said, referring

22   to the top where I said October 2000 for legal purposes.

23   **Q.**    Okay.  That kind of gives you a hint of what you thought

24   she meant.

25   **A.**    I don't know what she meant there.  Bratz contract was

1  signed with Carter Bryant on October 4, 2000, and that's the

2  legal date that I had in mind.

3  **Q.**   And what date did you change it from?  Did you change it

4  from September of 2000?

5  **A.**   I barely recall this e-mail from October 200.  I don't

6  remember.   It's October 2000.

7  **Q.**   So for legal purposes, you wanted Fabienne to state that

8  the introduction of Bratz was in October of 2000; correct?

9  **A.**   The legal contract with Carter Bryant was signed on

10  October 4, 2000, and before that there was no such a thing as

11  Bratz.

12  **Q.**   And focusing on what Carter Bryant did in September and

13  October 2000, your view was that he was the inventor of

14  Bratz.

15  **A.**   I don't know --

16          MR. NOLAN:   Objection, your Honor.   Ambiguous with

17  respect to Bratz.

18          THE COURT:   Rephrase.

19  **Q.**   BY MR. PRICE:   You see the way you use Bratz in these

20  e-mails where you talked about the birth of Bratz and the

21  introduction of Bratz.   I'm using Bratz in the same way

22  you're using it in these e-mails.   So my question is in your

23  view in that time frame, Carter Bryant, this Mattel employee

24  who came to you and gave you these drawings, your view is he

25  was the inventor.

1  **A.**   Well, you got to look at the date of that e-mail.  If

2  you look at the date of the e-mail, it's in 2002.  So by 2002

3  there were dolls in the market.  There was a brand in the

4  market.  So that is to the reference to that when Carter

5  Bryant came to MGA on September 1, 2000, he showed us some

6  drawings that became the idea and the inspiration for Bratz.

7  **Q.**   I used a specific phrase, the inventor.  Is it your view

8  that using Bratz the same way you've been using it in these

9  e-mails, where you said it was born in September of 2000, it

10  was introduced October of 2000, using it in that same way, is

11  it your view that Carter Bryant was the inventor of Bratz?

12  **A.**   I think you can say that Carter Bryant was one of the

13  inventors of Bratz because the drawings that he did became

14  the inspiration for Bratz.

15  **Q.**   And, in fact, you've told him that in written

16  communications?

17  **A.**   It's possible.

18  **Q.**   In fact, you told him you wished you were the inventor.

19  **A.**   Of what?  I don't remember.

20  **Q.**   Look at, if you would, Exhibit 11248.

21  **A.**   Yes, go ahead.

22  **Q.**   Have you found it?

23  **A.**   I have.

24  **Q.**   Do you see this is an e-mail chain between and you

25  Mr. Bryant?

1   A.   Yes, it is.

2   Q.   Dated May 4, 2001?

3   A.   The last e-mail is dated May 4, 2001; correct.

4        MR. PRICE:  Your Honor, move Exhibit 11248 into

5   evidence.

6        MR. NOLAN:  No objection.

7        THE COURT:  It's admitted, and you may publish.

8        **(Exhibit 11248 received.)**

9   Q.   BY MR. PRICE:  If we go to the first e-mail on the

10  second page, this is a situation where Mr. Bryant had come up

11  with an idea called Sugar Planet.

12       Do you recall that?

13  A.   Yes, I do.

14  Q.   And he wanted royalties for that; correct?

15  A.   Yes, he did.

16  Q.   Now, his contract with MGA in October of 2000 or

17  September 2000 -- let me start over.

18       Your testimony is that that contract was in October

19  of 2000; correct?

20  A.   Yes.  October 4, 2000.

21  Q.   We'll get to looking at the contract in a second.  But

22  under that contract, whatever the date, he was to receive

23  royalties.

24  A.   That's correct.

25  Q.   And so here a few years -- here in May of 2001, he's

1   asking for royalties for another product?

2   **A.**   Yes.

3   **Q.**   And if we can go to the next page -- to the first page.

4   And let's look at your e-mail here.

5          I guess initially you're telling him he's asking

6   for too much.

7   **A.**   Yes, I think he was.

8   **Q.**   And you pointed out how 3 percent of numbers works.   You

9   talk 3 percent of 5 million is 150,000, et cetera.   3 percent

10  of zero is zero; right?

11  **A.**   Yes.

12  **Q.**   And then you write, "I wish I could be an inventor."

13  **A.**   In quotation mark.

14  **Q.**   "I mean it.   Starting in a couple of months, you will

15  have big fat checks coming to your house on Bratz, every

16  quarter.   No matter if MGA makes a profit or losses";

17  correct?

18  **A.**   That's correct.

19  **Q.**   And it's correct that, as the inventor, Mr. Bryant

20  actually received royalties on Bratz?

21  **A.**   As the person who had the contract with MGA who came up

22  with the drawings that became the ideas, the inspiration for

23  Bratz, yes, he did receive royalties.

24  **Q.**   And do you have an estimate as to Carter Bryant's

25  financial interest in Bratz?

1    **A.**    What do you mean by that?

2            MR. NOLAN:   Vague and ambiguous.

3            THE COURT:   Sustained.

4    **Q.**    BY MR. PRICE:   MGA has paid Carter Bryant royalties on

5    Bratz?

6    **A.**    Yes, they have.

7    **Q.**    Recognizing his contribution.

8    **A.**    Recognizing his contract with MGA.

9    **Q.**    Which recognizes his contribution; correct?

10   **A.**    He came up with the drawings, and later on, after the

11   contract was signed, yes, he came up with fashion designs and

12   accessory designs for the Bratz, and he received royalties on

13   the products that he had an input on.   Only on the product

14   that he had an input on did he receive royalties on.

15   **Q.**    And do you have some estimate on the amount of royalty

16   payments that Mr. Bryant has received?

17   **A.**    Yes.

18   **Q.**    And what's your estimate on Mr. Bryant's royalty

19   payments for his contribution?

20   **A.**    Over $30 million.

21   **Q.**    Now, let me go back to that September 1st meeting.

22   **A.**    I'm sorry.   Over $30 million from 2001 to now.

23   **Q.**    So let me go back to that September meeting.   You have

24   stated under oath that the way Mr. Bryant was brought forward

25   to you was because you instituted a sort of fashion doll

1   contest.

2   **A.**   I'm sorry?  Where do you say that I said that under

3   oath?  I was here when you played The Wall Street Journal,

4   and I think that's the only one I can recall.

5   **Q.**   Isn't it true that you have testified -- let me step

6   back.  Not only did you tell a Wall Street Journal reporter

7   that you had this sort of fashion doll contest that led to

8   Mr. Bryant being brought into MGA, you also said that under

9   penalty of perjury?

10   **A.**   If your question is did we had a fashion contest, yes,

11   we did have sort of fashion contests at MGA, which eventually

12   we settled on Carter Bryant's drawings that became the basis

13   of Bratz.

14   **Q.**   And let's be clear.  Prior to September 2000, there was

15   no fashion doll at MGA; correct?

16   **A.**   Well, if I adopt the definition that Ivy Ross gave to

17   fashion dolls, then yes, we did have a fashion doll.  Because

18   I remember her testifying that any doll that had hair and

19   clothing on it was a fashion doll.  But if you adopt the

20   definition which is in the industry, then no, we did not have

21   the fashion doll as of September 1, 2000.

22        MR. PRICE:  Just to be clear, your Honor, I'd like

23   to play from Mr. Larian's deposition page 24, line 14, to 25,

24   line 5.

25        THE COURT:  Any objection?

1    MR. NOLAN:  One moment.  Your Honor, I'd just like

2  to have it go through line 3 on page 26 for completeness.

3    MR. PRICE:  I believe 25, line 6, through 22 is

4  irrelevant to his answers and the questions that I was

5  asking.

6    THE COURT:  One second.  Let's play the entire

7  thing, 24, line 14, through 26, line 3.

8    DEPOSITION EXCERPT PLAYED.

9    "QUESTION:  At the time did MGA have a fashion

10    doll product?

11    "ANSWER:  I don't think we did.

12    "QUESTION:  Prior to your telling these folks

13    about this fashion doll contest, had MGA ever had a

14    fashion doll product?

15    "ANSWER:  I think I just answered that.  I

16    don't think we did.

17    "QUESTION:  I was asking about in the past.

18    Before I asked you at the time whether there was a

19    fashion doll.  This is a little bit different.  I'm

20    going backwards now.  At any time had MGA or its

21    predecessor company ever had a fashion doll

22    concept?

23    "ANSWER:  Not that I recall.

24    "QUESTION:  So would it be true to say -- I

25    take it Bratz is a fashion doll in your definition?

1           "ANSWER:  Some people call it a fashion doll.

2       Some people call it a small doll.

3           "QUESTION:  Did you regard it as a fashion

4       doll?

5           "ANSWER:  When?

6           "QUESTION:  When it was introduced.

7           "ANSWER:  No, I think we -- to the best of my

8       recollection, we considered it a small doll.

9           "QUESTION:  Okay.  So -- and to this day, you

10      don't regard it as a fashion doll, or you do?

11          "ANSWER:  It's a great doll.

12          "QUESTION:  Okay.  It's a great doll.  But do

13      you regard it as a fashion doll?

14          "ANSWER:  It can be a fashion doll.

15          "QUESTION:  Do you consider it such?

16          "ANSWER:  Right now, yes, I do.

17          "QUESTION:  Has Bratz ever had a fashion doll

18      product other than -- I'm sorry.  I'm going to do

19      that sort of thing.

20          "Has MGA ever had a fashion doll product at

21      any time other than Bratz?

22          "ANSWER:  Not that I recall."

23  Q.   BY MR. PRICE:  And so in September -- strike that.

24          So in 2000, not having a fashion doll product, your

25  testimony is that you started this sort of contest to tell

1    people to bring you the fashion doll concept?   That's your

2    testimony; correct?

3    **A.**   I did.   And again, we didn't have a fashion doll as of

4    September 1, 2000.   If you use the terminology that's really

5    used in the toy industry.   If you use what Ms. Ivy Ross

6    testified to, yes, I did.   Because we had dolls since 1997.

7    And I was sitting here, and I think Ms. Ivy Ross kind of put

8    all the dolls in the fashion doll category.

9            MR. PRICE:   I'll move to strike the last part of

10   the answer as nonresponsive.

11           THE COURT:   Stricken.

12   **Q.**   BY MR. PRICE:   And your testimony is, then, that you

13   specifically asked Paula Treantafelles and Kami Gillmour that

14   they were to go out and search for fashion doll ideas.

15   **A.**   And other people.

16   **Q.**   Those two in particular you recall asking; correct?

17   **A.**   To the best of my recollection, they were, designers

18   included, and Victoria O'Connor.

19   **Q.**   Those were the only two you specifically remember saying

20   we're going to have this sort of contest where you're going

21   to go out and bring in fashion doll ideas?

22   **A.**   Those were the two names that came to my mind when

23   Mr. John Quinn was taking my deposition, and those were the

24   names that I gave.

25   **Q.**   And by the way, you had an opportunity to read your

1   deposition transcript afterwards and make any corrections to

2   it?

3   **A.**   Yes, I did.

4   **Q.**   And, in fact, at the end of the deposition transcript,

5   there is a signature page where you say I've read this, and

6   everything in there is true except for where I've made

7   changes.

8   **A.**   I believe so.

9   **Q.**   And you didn't change those answers.   That is, that the

10  only people you recall, specifically recall telling about

11  this sort of fashion doll contest were Paula Treantafelles

12  and Kami Gillmour?

13  **A.**   There was no reason to change it.

14  **Q.**   And your testimony under oath was that this contest took

15  place somewhere between April and September of 2000?

16  **A.**   Yes.

17  **Q.**   And as a result of you telling Paula and Kami about this

18  contest to bring you fashion doll ideas, as a result of that,

19  that Paula brought you Bratz.

20  **A.**   No.

21  **Q.**   If we could look at page 26, lines 10 to 25.

22          Actually, your Honor, 26, line 10, to 27, line 6.

23          MR. NOLAN:   No objection, your Honor.

24          THE COURT:   To 27, line 6?

25          MR. PRICE:   Yes, your Honor.

1       THE COURT:  Very well.

2       DEPOSITION EXCERPT PLAYED.

3       "QUESTION:  After you talked to folks about

4   this sort of fashion doll contest, did Kami

5   Gillmour come back to you with any ideas?

6       "ANSWER:  Not that I recall.

7       "QUESTION:  Did Paula Treantafelles come back

8   to you with any ideas?

9       "ANSWER:  She brought Bratz, what was -- is

10  the idea that later on became Bratz.

11      "QUESTION:  Mr. Larian, did anyone else come

12  back to you with an idea for a fashion doll as a

13  result of your speaking to people about this sort

14  of contest?

15      "ANSWER:  Not that I recall.

16      "QUESTION:  So the only one who responded was

17  Paula, and she came up with the concept for Bratz;

18  is that right?

19      "ANSWER:  She showed me something that became

20  the idea for Bratz.

21      "QUESTION:  What was it that she showed you?

22      "ANSWER:  She set up an appointment on my

23  calendar, and a gentleman by the name of Carter

24  Bryant was in that meeting, and he showed me some

25  drawings at that meeting, and that was -- that was

1    the idea that became Bratz later on."

2    **Q.**   BY MR. PRICE:  Mr. Larian, you are aware that Ms. Garcia

3    has testified that she brought up the idea of a fashion doll

4    with you just days before September 1st?

5    **A.**   I'm not aware of her testimony.  My recollection and my

6    mind is very clear that I had asked people to come up with a

7    fashion doll idea.  And at the end, Bratz drawings that

8    Carter Bryant showed us in September 1, 2000, became the

9    basis, the inspiration for Bratz.

10   **Q.**   So if Ms. Garcia testified that she told you about this

11   fashion doll idea just days before September 1st, she would

12   be mistaken?

13   **A.**   Her recollection would be different than mine.

14   **Q.**   And if Ms. Garcia testified that there was no fashion

15   doll contest that she was aware of, again, she would be

16   mistaken?

17   **A.**   Her recollection would be different than mine.

18   **Q.**   And if Ms. Gillmour were to testify that there was no

19   fashion doll contest that she was aware of, then she would be

20   mistaken?

21   **A.**   Her recollection would be different than mine.

22   **Q.**   Sir, is it true that you made up this story under oath

23   about this fashion doll concept so you would get some credit

24   for the inspiration in the creation of Bratz?

25   **A.**   I did not make up any stories.

1665

1   **Q.**   Well, you said there was this contest.   So what sort of

2   prize was there?   What did Ms. Garcia get for winning this

3   contest that you say that you created?

4   **A.**   There was no prize.

5   **Q.**   Well, for this contest that you created, is there

6   anything in writing, an e-mail, a note, a scrap of paper,

7   anything that supports your story that you were the one who

8   inspired your employees to go out and look for fashion dolls

9   to bring to MGA?

10   **A.**   Not that I recall.   Not that I know of.

11   **Q.**   Going back to the September 1st meeting, if we go to

12   Exhibit 1-A, which is in evidence, Isaac Larian says he chose

13   Mr. Bryant's idea for the Bratz over several others after

14   holding a sort of fashion doll design contest in late 1999.

15            Do you see that?

16   **A.**   I do.

17   **Q.**   And that's what you told the reporter.

18   **A.**   Well, you have been listening to the way I talk for the

19   past two, three hours.   That's not how I talk.   So she

20   probably paraphrased what I told her.   That's not exact

21   quotation what I said.

22   **Q.**   But it's the gist of what you said, that you chose

23   Mr. Bryant's idea over several others after holding a sort of

24   fashion doll contest in late 1999.   That was the substance of

25   what you said.

1   **A.**   I don't recall that conversation or that interview with

2   her.   I know that I had an interview with her.   I don't

3   recall the conversation.

4   **Q.**   Well, tell us about the several other fashion doll ideas

5   that resulted from this sort of contest.

6   **A.**   All I can tell you is that at the end, what we came up

7   with was the fashion doll with Bratz.   All the other ideas

8   that were being shown to us were kind of similar to Barbie,

9   and we didn't want to have anything to do with Barbie.

10  **Q.**   Well, no, I'm asking as a result of this sort of fashion

11  doll contest, can you tell me a single idea that came to you

12  as a result of your telling your employees, "I want this

13  fashion doll contest"?

14  **A.**   Not that I recall.   Apparently they were not good enough

15  for me to recall.

16  **Q.**   You realize, of course, that Ms. Garcia did not start at

17  MGA until April of 2000?

18  **A.**   That's correct.   She started April 2000.

19  **Q.**   Do you have somewhere in a file or something in writing

20  where there are these other submissions of these false dolls

21  as a result of your sort of contest?

22  **A.**   Not that I know of or I recall sitting here, no.

23  **Q.**   Do you have any explanation as to why the two people

24  that you specifically say you told about this contest say it

25  didn't happen?

1    A.    I have no idea.   The only reason I have is their

2    recollection is different than mine.   I heard Victoria

3    O'Connor say that I had asked her to go out and look for

4    fashion dolls.   And she was your witness.

5    Q.    Do you agree with the earlier e-mail you saw that if

6    it's not in writing, you didn't say it?

7    A.    I'm sorry?

8    Q.    Do you remember the earlier e-mail we saw?

9    A.    Yes.

10   Q.    Do you agree with that?   With the e-mail where you told

11   your employees if it's not in writing, you didn't say it, it

12   didn't happen?

13   A.    What I said in that e-mail?

14   Q.    Do you agree with that?   If it's not in writing, you

15   didn't say it, it didn't happen?

16   A.    That e-mail, the context of that e-mail was that people

17   were telling other people that I had approved for them to

18   spend money here, spend money here, make a product that I did

19   not approve for them to do.   And so I just wanted to, A, have

20   a sense of humor, and B, let them know that if you want my

21   approval on a product or expenditure, if I have not approved

22   it in writing, then I didn't approve it.   It had nothing to

23   do with this context here.   You are just connecting two

24   things that have no relationship to each other.

25               MR. PRICE:   I would like to move on to another

1   topic.

2           THE COURT:  Very well.  We'll adjourn for the day.

3   We'll have the jury back tomorrow at 9:00.

4

5           (Proceedings concluded at 4:55 P.M.)

6

7

8                   C E R T I F I C A T E

9

10

11          I hereby certify that pursuant to Title 28,

12   Section 753 United States Code, the foregoing is a true and

13   correct transcript of the stenographically reported

14   proceedings in the above Mattel.

15          Certified on June 5, 2008.

16

17          _____

18          MARK SCHWEITZER, CSR, RPR, CRR
            Official Court Reporter
19          License No. 10514

20

21

22

23

24

25

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    EASTERN DIVISION

4    - - -

5    HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6    - - -

**CERTIFIED COPY**

7    MATTEL, INC.,                        )
                                          )
8                        PLAINTIFF,       )
                                          )
9            VS.                          )    NO. CV 04-09049
                                          )
10   MGA ENTERTAINMENT, INC., ET. AL.,    )
                                          )
11                       DEFENDANTS.      )    TRIAL DAY 9
     _____)    MORNING SESSION
12   AND CONSOLIDATED ACTIONS,            )    PAGES 1669-1756
                                          )
13   _____)

14

15   REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16   RIVERSIDE, CALIFORNIA

17   FRIDAY, JUNE 6, 2008

18   9:27 A.M.

19

20

21

22

23   THERESA A. LANZA, RPR, CSR
     FEDERAL OFFICIAL COURT REPORTER
24   3470 12TH STREET, RM. 134
     RIVERSIDE, CALIFORNIA   92501
25   951-274-0844
     WWW.THERESALANZA.COM

```
 1    MOTION.

 2           AN ORDER WILL BE ISSUED SHORTLY VACATING THAT ORDER.

 3           ARE WE READY TO PROCEED, OR ARE THERE ANY OTHER

 4    ISSUES WE NEED TO TAKE UP AT THIS TIME?

 5           MR. QUINN:  WE'RE READY.                               09:29

 6           MR. NOLAN:  YES, YOUR HONOR.

 7           THE COURT:  VERY WELL.

 8           MR. LARIAN, IF YOU WOULD COME BACK TO THE WITNESS

 9    STAND; AND I THINK MR. HOLMES IS GETTING THE JURY.

10           (WHEREUPON, JURORS ENTER COURTROOM.)                  09:32

11           THE COURT:  GOOD MORNING, MEMBERS OF THE JURY.

12           MR. PRICE, YOU MAY PROCEED.

13                       DIRECT EXAMINATION

14    BY MR. PRICE:

15    Q    MR. LARIAN, I WANT TO CONTINUE WITH SOME QUESTIONS ABOUT  09:33

16    THIS SEPTEMBER 1ST MEETING THAT YOU HAD WITH MR. BRYANT AND

17    VICTORIA O'CONNOR AND PAULA TREANTEFELLAS -- PAULA GARCIA.

18           YOU WERE HERE WHEN MS. O'CONNOR TESTIFIED?

19    A    YES, I WAS.

20    Q    AND DO YOU RECALL HER TESTIFYING THAT ON THAT VERY DAY   09:33

21    THAT YOU HAD THIS MEETING, THE DECISION WAS MADE BETWEEN YOU

22    AND PAULA AND HERSELF THAT MGA WAS GOING TO MAKE THIS DOLL

23    NAMED "BRATZ"?

24    A    I HEARD THAT TESTIMONY.

25    Q    AND THAT'S ACCURATE, ISN'T IT?                          09:33
```

```
 1   A     IT IS NOT.

 2   Q     SO MS. O'CONNOR WAS, IN YOUR VIEW AGAIN, MISTAKEN ON THIS

 3   MATTER AS WELL?

 4   A     MAYBE SHE HAD THE WRONG RECOLLECTION.  I'M VERY CLEAR IN

 5   MY MIND THAT FOR A FEW WEEKS, WE HAD NOT DECIDED TO DO THIS,          09:34

 6   BECAUSE WE DIDN'T KNOW IF IT COULD EVEN BE MADE INTO A DOLL OR

 7   NOT.

 8   Q     LET ME ASK YOU ABOUT YOUR RECOLLECTION.

 9         DO YOU RECALL YESTERDAY WE PUT UP ON THE OVERHEAD --

10   I THINK IT'S 12842.  DO YOU REMEMBER THAT E-MAIL CONCERNING          09:34

11   WHEN BRATZ WAS INTRODUCED?

12   A     WHEN DOES IT SAY IT WAS INTRODUCED?

13   Q     WHERE IT SAYS "...CONCERNED YOU CHANGED BRATZ, ENTER DATE

14   TO OCTOBER WHERE IT SAID TWO HUNDRED, AND YOU SAID OCTOBER 2000

15   FOR LEGAL PURPOSES."                                                 09:34

16   A     YES.

17   Q     AND DO YOU RECALL YOUR TESTIMONY THAT YOU BARELY RECALL

18   THIS E-MAIL BECAUSE IT WAS SO LONG AGO?

19   A     I'M SORRY?

20   Q     DO YOU RECALL YOUR TESTIMONY THAT YOU BARELY RECALL THIS       09:34

21   E-MAIL BECAUSE IT WAS SO LONG AGO?

22   A     I DON'T REMEMBER THE EXACT E-MAIL.

23   Q     AND DO YOU REMEMBER I WAS ASKING QUESTIONS ABOUT WHETHER

24   YOU HAD A MEETING WITH PAT WILLIAMS AND MARTIN HITCH IN

25   FEBRUARY OF 2001?  DO YOU RECALL THOSE QUESTIONS?                    09:35
```

1    A    YES, I DO.

2    Q    AND YOU SAID, AGAIN, IT'S POSSIBLE YOU DON'T REMEMBER

3    BECAUSE THAT WAS SO LONG AGO.

4    A    I DID.

5    Q    SO WE'RE TALKING ABOUT EVENTS THAT HAPPENED SEVEN, EIGHT          09:35

6    YEARS AGO; AND IT'S SOMETIMES DIFFICULT TO REMEMBER THOSE

7    THINGS; CORRECT?

8    A    THAT'S CORRECT.

9    Q    SO LET'S FOCUS, THEN, ON THIS SEPTEMBER 2000 MEETING.

10         YOU DO REMEMBER THAT MR. BRYANT WAS THERE.                       09:35

11   A    YES.

12   Q    YOU DO REMEMBER THAT HE SHOWED YOU THESE DRAWINGS AND

13   CALLED THEM "BRATZ."

14   A    YES.

15   Q    AND IF YOU GO BACK AND THINK ABOUT IT, YOU REALLY DON'T          09:35

16   RECALL ONE WAY OR ANOTHER -- IT'S POSSIBLE HE DID; IT'S

17   POSSIBLE HE DIDN'T -- WHETHER HE SAID THAT HE WORKED ON THESE

18   DRAWINGS AT NIGHTS AND ON WEEKENDS?

19   A    I'M SORRY.  CAN YOU REPEAT THAT.

20   Q    YOU DON'T REALLY RECALL WHETHER IN THIS MEETING, WHEN           09:36

21   MR. BRYANT PRESENTED THESE DRAWINGS TO YOU, WHETHER HE SAID

22   THAT HE WORKED ON THESE DRAWINGS AT NIGHTS OR ON THE WEEKENDS?

23   A    HE TOLD ME HE DID THEM IN 1998, WHEN HE WAS IN MISSOURI,

24   ON NIGHTS AND WEEKENDS.

25   Q    SO SITTING BACK EIGHT YEARS AGO, YOU HAVE A SPECIFIC            09:36

1    RECOLLECTION THAT MR. BRYANT TOLD YOU THAT HE WORKED ON THESE

2    IN 1998; IS THAT RIGHT?

3    A    YES, I DO.

4    Q    AND DID HE TELL YOU THAT HE HAD WORKED AT MATTEL BETWEEN

5    APRIL '95 AND APRIL 1998?                                    09:36

6    A    NO, NOT TO THAT DETAIL.  HE TOLD ME HE WORKED AT MATTEL

7    RIGHT NOW.

8    Q    HE TOLD YOU AT THAT TIME HE WORKED AT MATTEL?

9    A    CORRECT; IN SEPTEMBER OF 2000.

10   Q    AND IF MS. O'CONNOR TESTIFIED SHE HAS NO RECOLLECTION OF   09:36

11   THERE BEING ANY DISCUSSION AS TO WHEN MR. BRYANT CREATED THESE

12   DRAWINGS, SHE WOULD BE, AGAIN, INCORRECT.

13   A    HER RECOLLECTION WOULD BE WRONG AGAIN.  I HEARD HER SAY

14   THAT THE CONTRACT WAS SIGNED ON SEPTEMBER 18TH, AND WHEN YOU

15   SHOWED HER, OR MR. NOLAN SHOWED HER, THE CONTRACT, THE TIME     09:37

16   STAMP ON THE BOTTOM, WHERE IT SAYS OCTOBER 4TH, SHE SAID,

17   'OKAY, MAYBE IT WAS DONE ON OCTOBER 4, 2000.'

18   Q    LET ME ASK YOU THIS, SIR:  IT'S TRUE, IS IT NOT, THAT,

19   SITTING THERE IN SEPTEMBER, YOU NEVER TOLD MR. BRYANT AT THAT

20   MEETING THAT IF HE CREATED THESE DOLLS WHILE THEY WERE AT       09:37

21   MATTEL, THAT THAT WASN'T SOMETHING YOU WERE INTERESTED IN?

22   A    THERE WERE NO DOLLS THAT HE WAS SHOWING US IN SEPTEMBER 1,

23   2000, WITH THE DRAWINGS.

24        ARE YOU REFERRING TO THE DRAWINGS?

25   Q    LET ME REPHRASE IT SO THAT WE'RE NOT BICKERING ABOUT       09:37

1  DEFINITIONS HERE.

2          IT'S TRUE, IS IT NOT, THAT IN THAT MEETING, YOU HAVE

3  NO RECOLLECTION OF SAYING TO MR. BRYANT THAT IF HE HAD MADE ANY

4  OF THESE DRAWINGS THAT HE WAS SHOWING YOU DURING THE TIME HE

5  WAS AT MATTEL, YOU DIDN'T WANT THEM?  YOU DON'T RECALL SAYING          09:38

6  ANYTHING LIKE THAT?

7  A    NO.  I RECALL SAYING TO HIM THAT IF THIS WAS SOMETHING

8  THAT WAS DONE AT MATTEL, I WAS -- I HAD NO INTEREST IN IT.

9          MR. PRICE:  IF WE COULD PLAY FROM PAGE 439,

10  VOLUME II.                                                           09:38

11          THE WITNESS:  WHICH VOLUME IS THAT, SIR?

12          MR. PRICE:  PAGE 439, LINE 7 TO LINE 14.

13          THE WITNESS:  WHICH VOLUME IS THAT, PLEASE?

14          MR. PRICE:  SECOND VOLUME.  IT'S MARCH 26, 2008;

15  439, LINE 7 THROUGH LINE 14.                                         09:38

16          MR. NOLAN:  NO OBJECTION, YOUR HONOR.

17          THE COURT:  YOU MAY READ, OR PLAY IT.

18          (WHEREUPON, VIDEO DEPOSITION IS PLAYED.)

19          (EXCERPTS ARE INCLUDED AS PROVIDED BY COUNSEL.)

20          "Q.  NOW, DURING THAT MEETING DID YOU TELL

21          CARTER BRYANT THAT IF HE HAD MADE ANY OF THOSE

22          DRAWINGS THAT HE WAS SHOWING YOU DURING THE TIME HE

23          WAS A MATTEL EMPLOYEE THAT M.G.A. DID NOT WANT THEM?

24          A.  I DON'T RECALL HAVING THAT -- HAVING SAID

25          THAT.

```
 1            Q.    WAS THAT EVER CONVEYED TO HIM?

 2            A.    I DON'T KNOW.  I DON'T THINK SO."

 3        (END OF EXERPT PROVIDED.)

 4            MR. NOLAN:  YOUR HONOR, IT'S NOT FROM THE SAME

 5    DEPOSITION.  IT'S FROM THE FIRST VOLUME, JULY 18TH OF 2006.     09:40

 6    THIS WAS JUST HANDED UP TO ME FOR COMPLETION PURPOSES.  OR I

 7    COULD DO IT IN MY DIRECT.

 8            MR. PRICE:  I THOUGHT THE COMPLETENESS APPLIES -- WE

 9    WERE TALKING ABOUT IT EARLIER --

10            THE COURT:  CLARIFY FOR THE RECORD, COUNSEL, THE DATE   09:40

11    OF THE DEPOSITION.

12            MR. PRICE:  THE DATE OF THE DEPOSITION I PLAYED WAS

13    MARCH 26, 2008.  THE DATE MR. NOLAN WANTS TO PLAY IS JULY 18,

14    2006.

15            MR. NOLAN:  CORRECT, YOUR HONOR.  AND I'LL PLAY IT      09:41

16    DURING MY EXAMINATION.

17            THE COURT:  VERY WELL.

18        YOU MAY PROCEED.

19    BY MR. PRICE:

20    Q   IN FACT, MR. LARIAN, SITTING THERE IN THAT MEETING, YOUR   09:41

21    VIEW WAS -- IT WOULDN'T HAVE BEEN A PROBLEM TO YOU IF

22    CARTER BRYANT HAD CREATED OR MADE ANY OF THESE DRAWINGS WHEN HE

23    WAS EMPLOYED AT MATTEL; THAT WOULDN'T HAVE BOTHERED YOU AT ALL?

24    A   THAT IS NOT CORRECT.  IF HE HAD MADE THESE DRAWINGS OR HAD

25    DONE ANYTHING WITH THEM AT MATTEL, I WAS NOT -- OR ANYWHERE     09:41
```

1    ELSE, ANY OTHER TOY COMPANY -- I WAS NOT INTERESTED.

2         MR. PRICE:  I'D LIKE TO PLAY FROM MARCH 26, 2008,

3    PAGE 450, LINES 10 THROUGH 17.

4         THE COURT:  ANY OBJECTION?

5         MR. NOLAN:  NO OBJECTION.                              09:42

6         THE COURT:  YOU MAY PLAY.

7         (WHEREUPON, VIDEO DEPOSITION IS PLAYED.)

8         (EXCERPTS ARE INCLUDED AS PROVIDED BY COUNSEL:)

9         "Q.   WOULD IT HAVE BEEN A PROBLEM IF CARTER.

10        BRYANT HAD CREATED OR MADE ANY OF HIS DRAWINGS WHEN

11        HE WAS EMPLOYED BY MATTEL IN YOUR VIEW?

12        A.   NO.

13        Q.   WHY NOT?

14        A.   BECAUSE I DON'T THINK, WHETHER IT'S M.G.A.

15        OR MATTEL, WE OWN THE PEOPLE, ESPECIALLY THE

16        CREATIVE PEOPLE, FOREVER."

17        (END OF EXERPT PROVIDED.)

18   BY MR. PRICE:

19   Q    MR. LARIAN, YOU BELIEVE IN THE GOLDEN RULE; RIGHT?

20   A    WHAT'S THE GOLDEN RULE?                                09:42

21   Q    THE SAME RULES SHOULD APPLY TO YOU AS TO EVERYBODY ELSE.

22   A    YES.

23   Q    IF WE CAN LOOK AT EXHIBIT 1117, WHICH IS ALREADY IN

24   EVIDENCE, THE THIRD PAGE.

25        NOW, YOU SEE EXHIBIT 1117 WE SPOKE ABOUT YESTERDAY.    09:43

1    THIS IS THE AGREEMENT THAT MS. GARCIA SIGNED WITH MGA

2  IN APRIL OF 2000; IS THAT CORRECT?

3  A    CORRECT.

4  Q    AND AS WE DISCUSSED YESTERDAY, YOU UNDERSTAND THAT UNDER

5  HER CONTRACT WITH MGA, IF SHE CAME UP WITH ANYTHING THAT          09:43

6  RELATED TO THE COMPANY'S WORK WHILE SHE WAS AT MGA, THAT

7  BELONGED TO MGA; RIGHT?

8  A    THAT'S WHAT THE CONTRACT SAID, YES.

9  Q    YET, YOUR TESTIMONY UNDER OATH WAS THAT IT WOULD NOT HAVE

10 BEEN A PROBLEM FOR YOU IF CARTER BRYANT HAD CREATED OR MADE ANY    09:44

11 OF HIS DRAWINGS WHEN HE WAS EMPLOYED BY MATTEL; THAT WAS YOUR

12 TESTIMONY UNDER OATH; CORRECT?

13 A    I DID NOT SAY ANY OF HIS DRAWINGS.  HE HAD DONE HIS

14 INITIAL DRAWINGS IN 1998 IN MISSOURI, AND AFTER -- WHEN HE WAS

15 NOT WORKING AT MATTEL -- AND AFTERWARD, IF HE WAS WORKING ON       09:44

16 THEM AND REFINING THEM WHILE HE WAS STILL WORKING AT MATTEL, I

17 WOULDN'T SEE ANY PROBLEM WITH THAT.

18 Q    MR. LARIAN, YOU DON'T RECALL ANY STORY ON SEPTEMBER 1,

19 2000, ABOUT MR. BRYANT CREATING THESE DRAWINGS BETWEEN A SMALL

20 EIGHT-MONTH WINDOW, BETWEEN TWO STINTS AT MATTEL, DO YOU?         09:44

21 A    I'M NOT TELLING STORIES.  I'M TELLING THE TRUTH HERE.

22 Q    YOU SAID THAT YOU WERE NOT REFERRING TO -- YOU DIDN'T SAY

23 THAT IT WOULDN'T BOTHER YOU IF ANY OF HIS DRAWINGS --

24    LET'S PUT UP THE TRANSCRIPT OF WHAT WE JUST LOOKED

25 AT, THEN; PAGE 450, LINE 10 THROUGH 17.                          09:45

```
 1          THE QUESTION WAS, "WOULD IT HAVE BEEN A PROBLEM IF
 2  CARTER BRYANT HAD CREATED OR MADE ANY OF HIS DRAWINGS WHEN HE
 3  WAS EMPLOYED BY MATTEL, IN YOUR VIEW?"
 4          "NO."
 5          AND THEN IT GOES ON.                                    09:45
 6  BY MR. PRICE:
 7  Q    THIS IS ONE OF THOSE TRANSCRIPTS THAT YOU ACTUALLY
 8  REVIEWED; CORRECT?
 9  A    YES.  AND MAYBE AT THE TIME, WHEN MR. ZELLER WAS ASKING ME
10  THOSE QUESTIONS, I DID NOT PAY ATTENTION TO THE WORD "ANY."    09:45
11  AND I APOLOGIZE FOR THAT.
12  Q    MY QUESTION IS DIFFERENT.
13          THIS IS ONE OF THOSE TRANSCRIPTS THAT YOU ACTUALLY,
14  AFTERWARDS, READ AND MADE CORRECTIONS ON; CORRECT?
15  A    I BELIEVE I DID, YES.                                     09:45
16  Q    IN FACT, YOU MADE CORRECTIONS TO THE TRANSCRIPT.
17  A    I BELIEVE I DID, YES.
18  Q    THEN YOU SIGNED AT THE LAST PAGE WHERE IT SAYS, "I DECLARE
19  UNDER PENALTY OF PERJURY THAT THIS IS AN ACCURATE TRANSCRIPT."
20  A    I DID.                                                    09:46
21  Q    YOU DID NOT CORRECT THE ANSWER THAT WE PLAYED UNDER OATH,
22  WHICH IS THAT IT WOULDN'T HAVE BEEN A PROBLEM IF MR. BRYANT HAD
23  CREATED OR MADE ANY OF HIS DRAWINGS WHEN HE WAS EMPLOYED BY
24  MATTEL?  YOU DIDN'T CORRECT THAT, DID YOU?
25  A    NO.  I MISSED THAT ONE.  I'M SORRY.  I APOLOGIZE.         09:46
```

1    Q    NOW, IT'S YOUR TESTIMONY THAT YOU ASKED

2    VICTORIA O'CONNOR --

3    A    YES.

4    Q    -- TO LOOK INTO WHETHER OR NOT CARTER BRYANT ACTUALLY

5    OWNED THE DRAWINGS.                                          09:46

6    A    I TOLD VICTORIA O'CONNOR, TO THE BEST OF MY RECOLLECTION,

7    TO MAKE SURE THAT THE STORY HE WAS TELLING US IS TRUE, THAT HE

8    DID THESE IN 1998, WHEN HE WAS IN MISSOURI.  AND I BELIEVE HE

9    DID THAT -- I MEAN, SHE DID THAT.  I'M SORRY.

10   Q    ACTUALLY, SIR, ISN'T IT TRUE THAT YOU ASKED              09:47

11   VICTORIA O'CONNOR TO MAKE SURE THAT HIS DRAWINGS DIDN'T BELONG

12   TO ANOTHER DESIGNER OR ANOTHER PERSON, BECAUSE YOU HAD NO

13   CONCERNS, REALLY, ABOUT WHETHER THEY BELONGED TO MATTEL?

14   A    I'M SORRY.  I DON'T UNDERSTAND YOUR QUESTION.

15   Q    SURE.                                                    09:47

16        ISN'T IT TRUE THAT BECAUSE YOU WOULDN'T HAVE HAD ANY

17   PROBLEM IF HE HAD DRAWN THESE WHEN HE WAS AT MATTEL, WHAT YOU

18   ASKED VICTORIA O'CONNOR TO LOOK INTO WAS, ACCORDING TO YOU,

19   WHETHER OR NOT THESE DRAWINGS BELONGED TO ANOTHER DESIGNER?

20   A    THAT'S NOT CORRECT.  I WANTED TO MAKE SURE THAT IF HE WAS  09:47

21   TELLING US THAT HE HAD DONE THESE IN 1998, WHEN HE WAS LIVING

22   WITH HIS PARENTS IN MISSOURI, IF THAT'S WHAT HE IS SAYING, TO

23   MAKE SURE THAT STORY IS TRUE.  AND SHE DID VERIFY THAT IT WAS

24   TRUE.

25        **MR. PRICE:**  YOUR HONOR, IF WE COULD PLAY FROM        09:47

1683

```
 1   MR. LARIAN'S DEPOSITION TRANSCRIPT, VOLUME II, MARCH 26, 2008,

 2   457.

 3              THE COURT:  YOU SAID LINE 2 THROUGH --

 4              MR. PRICE:  LINE 15 THROUGH 23, PAGE 457.

 5              THE COURT:  VERY WELL.                          09:48

 6              ANY OBJECTION, MR. NOLAN?

 7              MR. NOLAN:  I WOULD JUST ASK UP TO PAGE 458, LINE 16,

 8   FOR COMPLETENESS.

 9              MR. PRICE:  NO OBJECTION TO THAT AT ALL.

10              THE COURT:  VERY WELL.                          09:48

11              (WHEREUPON, VIDEO DEPOSITION IS PLAYED.)

12              (EXCERPTS ARE INCLUDED AS PROVIDED BY COUNSEL:)

13              "Q.   WHAT IS IT YOU ASKED VICTORIA O'CONNOR TO

14              CONFIRM?

15              A.   TO GO AHEAD AND MAKE SURE THAT IF HE SAYS

16              THESE DRAWINGS BELONG TO HIM, THAT IN FACT THESE

17              DRAWINGS BELONG TO HIM AND -- AND NOT -- AND NOT --

18              THAT'S -- THAT'S ALL I'M GOING TO ANSWER.

19              Q.   AND -- AND NOT TO WHOM?

20              A.   NOT, FOR EXAMPLE, ANOTHER DESIGNER, ANOTHER

21              ARTIST.

22              Q.   WERE YOU CONCERNED THAT CARTER BRYANT'S

23              DRAWINGS MIGHT BELONG TO ANOTHER DESIGNER OR ARTIST?

24              A.   NO.  I BELIEVED WHAT HE SAID; I JUST -- AS

25              A PRUDENT BUSINESSMAN, I JUST WANTED TO MAKE SURE
```

Exhibit D - Page 620

```
 1              THAT WHAT HE WAS SAYING WAS RIGHT BEFORE WE GO AHEAD

 2              AND INVEST A LOT OF MONEY IN SOMETHING.

 3              Q.   DID YOU ASK VICTORIA O'CONNOR TO CONFIRM

 4              THAT CARTER BRYANT HAD MADE THE DRAWINGS THAT HE

 5              SHOWED YOU IN 1998?

 6              A.   NOT AS SPECIFIC LIKE THAT.  I JUST TOLD --

 7              TOLD HER WHAT I JUST TOLD YOU EARLIER.

 8              Q.   DID VICTORIA O'CONNOR EVER COME BACK AND

 9              TELL YOU WHETHER OR NOT SHE HAD CONFIRMED WHEN

10              CARTER BRYANT HAD MADE THE DRAWINGS?

11              A.   DIRECTLY TO ME?

12              Q.   YES.

13              A.   I DON'T RECALL.  SHE MIGHT HAVE.  I DON'T

14              RECALL IT WITHOUT LOOKING AT DOCUMENTS."

15              (END OF EXERPT PROVIDED.)
```

16 **BY MR. PRICE:**

17 Q    NOW, YOUR TESTIMONY, MR. LARIAN, IS THAT SOMEONE CAME BACK

18 AND SAID, YES, MR. BRYANT MADE THESE DRAWINGS IN 1998.

19 A    SPECIFICALLY, HIS ATTORNEY, ANNE WANG; AND I HAVE SEEN AN

20 E-MAIL TO THAT EFFECT.                                      09:50

21              **MR. PRICE:**  YOUR HONOR, MOVE TO STRIKE THE ANSWER.

22              **THE COURT:**  IT'S NONRESPONSIVE.

23              JUST ANSWER THE QUESTION.

24 **BY MR. PRICE:**

25 Q    IT'S A YES OR NO QUESTION.                             09:50

1    YOUR TESTIMONY IS THAT -- AND THIS IS, I THINK, A YES

2  OR NO QUESTION -- IS THAT, ESSENTIALLY, AT SOME POINT, SOMEONE

3  CAME TO YOU AND SAID, 'I CONFIRM CARTER BRYANT DID THIS IN

4  1998'?

5  A    THAT IS CORRECT.                                          09:51

6  Q    AND ACCORDING TO YOUR TESTIMONY, ACCORDING TO YOU, WHETHER

7  CARTER BRYANT DID IT IN 1998 HAD NO SIGNIFICANCE AT ALL AS TO

8  WHETHER OR NOT MATTEL MIGHT HAVE RIGHTS TO THOSE DRAWINGS.

9        IS THAT YOUR TESTIMONY?

10 A    MY TESTIMONY IS THAT IF HE DID THESE IN 1998, WHEN HE WAS   09:51

11 NOT WORKING AT MATTEL, THEN THERE WAS NO QUESTION THAT THOSE

12 BELONGED TO HIM AND HE COULD DO WHATEVER HE WANTED TO DO WITH

13 THEM.

14 Q    ISN'T THE TRUTH OF THE MATTER, SIR, THAT IN THIS TIME

15 FRAME, IT DIDN'T MATTER TO YOU WHETHER MATTEL HAD RIGHTS TO     09:51

16 THESE DRAWINGS?

17 A    THAT'S NOT CORRECT.  AT THAT TIME, I WANTED TO KNOW IF --

18 TWO THINGS WERE IN MY MIND:  A, DID THEY BELONG TO HIM; AND, B,

19 CAN THEY BE MADE INTO A DOLL; CAN WE MAKE A DOLL FROM THIS?

20      **MR. PRICE:**  YOUR HONOR, IF I COULD PLAY FROM 459,       09:52

21 LINE 12, THROUGH 460, LINE 3.

22      **MR. NOLAN:**  WE WOULD ASK THAT WE CONTINUE THROUGH TO

23 PAGE 460, LINE 20.

24      **MR. PRICE:**  ABSOLUTELY.

25      **THE COURT:**  VERY WELL.                                  09:52

1            (WHEREUPON, VIDEO DEPOSITION IS PLAYED.)

2            (EXCERPTS ARE INCLUDED AS PROVIDED BY COUNSEL:)

3            "Q.   WAS THE FACT THAT CARTER BRYANT'S LAWYER

4    REPRESENTED TO M.G.A. THAT CARTER BRYANT HAD DONE

5    THE DRAWINGS IN 1998 IN MISSOURI WHEN HE WAS NOT A

6    MATTEL EMPLOYEE HAVE ANY SIGNIFICANCE TO YOU AT THAT

7    TIME?

8    A.   IT -- HE CONFIRMED WHAT CARTER BRYANT HAD

9    TOLD US.

10    Q.   AND DID YOU FIND SOME COMFORT IN THIS?

11    A.   OF COURSE.

12    Q.   AND WHY WAS THAT?

13    A.   BECAUSE, YOU KNOW, I HOPED THE LAWYERS IN

14    COURT -- YOUR PROFESSION TELL THE TRUTH.

15    Q.   WELL, YOU THOUGHT THAT IT WOULD HAVE SOME

16    SIGNIFICANCE TO WHETHER OR NOT MATTEL MIGHT HAVE

17    RIGHTS TO THOSE DRAWINGS; IS THAT TRUE?

18    A.   NO.

19    Q.   WELL, THEN, PLEASE TELL ME WHAT COMFORT YOU

20    DERIVED FROM THE FACT THAT THIS, AS YOU DESCRIBE IT,

21    CONFIRMED WHAT CARTER BRYANT HAD TOLD YOU ABOUT

22    CREATING THESE DRAWINGS IN 1998 IN MISSOURI WHEN HE

23    WAS NOT EMPLOYED BY MATTEL.

24    A.   BESIDE WHAT I JUST TESTIFIED, I HAVE

25    NOTHING ELSE TO ADD.

```
 1          Q.   SO YOU WERE JUST COMFORTED BY THE FACT THAT

 2          HE HAD TOLD YOU THE TRUTH?

 3          A.   AND HIS LAWYER CONFIRMED IT.

 4          Q.   AND BEYOND THAT IT HAD NO SIGNIFICANCE TO

 5          YOU; IS THAT TRUE?

 6          A.   THAT'S TRUE."

 7          (END OF EXERPT PROVIDED.)

 8   BY MR. PRICE:

 9   Q    THIS, AGAIN, IS TESTIMONY THAT YOU DID NOT CORRECT.

10          I'M GOING TO GET A DOUBLE NEGATIVE HERE.  I'LL REASK    09:54

11   IT.

12          WHEN YOU WERE ASKED, "WELL, YOU THOUGHT IT WOULD HAVE

13   SOME SIGNIFICANCE TO WHETHER OR NOT MATTEL MIGHT HAVE RIGHTS TO

14   THOSE DRAWINGS; IS THAT TRUE?"  AND YOU ANSWERED "NO," THIS IS

15   NOT AN ANSWER UNDER OATH THAT YOU CORRECTED WHEN YOU WENT       09:54

16   THROUGH THE TRANSCRIPT.

17   A    NO.  THERE WAS NOTHING TO CORRECT.  WHAT I SAID WAS THAT

18   HIS LAWYER HAD CONFIRMED THAT HE HAD DONE THIS IN 1998, AND HE

19   HAD SAID THE SAME THING; SO THERE WAS NOTHING TO CORRECT.  THEY

20   DIDN'T BELONG TO MATTEL.                                       09:54

21   Q    MY QUESTION WAS DIFFERENT, SIR.

22          FIRST, THE QUESTION WAS WHETHER OR NOT THAT WOULD

23   HAVE ANY SIGNIFICANCE TO YOU WITH RESPECT TO WHETHER OR NOT

24   MATTEL HAD RIGHTS TO THE DRAWINGS.

25          YOUR ANSWER WAS, 'IT HAD NOTHING TO DO -- NO, IT HAD     09:55
```

1    NOTHING TO DO WITH THAT.'

2              DID YOU CORRECT YOUR ANSWER OF 'NO' IN THAT

3    TRANSCRIPT?

4    A    I DID NOT, BECAUSE, AGAIN, HIS LAWYER HAD CONFIRMED THAT

5    HE HAD DONE THIS IN 1998 IN MISSOURI, AS HE HAD SAID, AND THERE        09:55

6    WAS NOTHING FOR ME TO CORRECT.

7    Q    THE QUESTION YOU WERE ASKED, IF THAT, IN FACT, HAPPENED,

8    WHETHER THAT WOULD HAVE SOME SIGNIFICANCE TO YOU AS TO WHETHER

9    OR NOT MATTEL MIGHT HAVE RIGHTS TO THOSE DRAWINGS.

10   A    TO ME, THAT WAS A HYPOTHETICAL QUESTION, THAT WAS NOT THE         09:55

11   FACT.  THE FACT WAS, AND IS, THAT HE DID THESE DRAWINGS IN 1998

12   WHEN HE WAS IN MISSOURI LIVING WITH HIS PARENTS.  AND HE COULD

13   PROVE THAT.

14   Q    BY THE WAY, YOU WERE HERE WHEN MS. O'CONNOR DENIED THAT

15   YOU EVER DIRECTED HER TO FIND OUT WHEN THE DRAWINGS WERE            09:55

16   CREATED.

17   A    YES.  BUT THERE ARE E-MAILS IN HERE THAT I GUESS YOU DID

18   NOT WANT TO SHOW HER.

19              MR. PRICE:  MOVE TO STRIKE AS NONRESPONSIVE AFTER

20   "YES."                                                              09:55

21              THE COURT:  STRIKE AFTER "YES."  "YES" IS THE ANSWER.

22   BY MR. PRICE:

23   Q    I TAKE IT YOU'RE SAYING HER TESTIMONY THAT YOU DID NOT

24   DIRECT HER TO DO THIS IS MISTAKEN?

25   A    HER TESTIMONY IS A MISTAKE.  AND I HAVE SEEN E-MAILS TO         09:56

```
 1   THAT EFFECT.
 2           MR. PRICE:  MOVE TO STRIKE, YOUR HONOR.
 3           THE COURT:  JUST TRY TO ANSWER THE QUESTION,
 4   MR. LARIAN.
 5           THAT LAST PORTION IS STRICKEN.                    09:56
 6   BY MR. PRICE:
 7   Q    AND YOU SAID YOU WANTED TO CONFIRM A STORY ABOUT 1998.
 8           I BELIEVE YOU SAID THAT EVEN IF IT HAD NO
 9   SIGNIFICANCE AS TO WHETHER MATTEL OWNED THE DRAWINGS, YOU DID
10   WANT TO CONFIRM THAT CARTER BRYANT WAS TRUTHFUL.            09:56
11   A    YES.
12   Q    NOW, OBVIOUSLY, IF YOU WANT TO INVESTIGATE SOMEONE'S
13   WORD --
14   A    CAN YOU REPEAT THAT QUESTION AGAIN, BECAUSE I THINK IT WAS
15   A LITTLE BIT CONVOLUTED.  CAN YOU REPEAT THAT FIRST QUESTION  09:56
16   ONE MORE TIME.
17   Q    YOU WANTED TO CONFIRM CARTER BRYANT WAS TRUTHFUL.
18   A    YES, I WANTED TO MAKE SURE WHAT HE WAS TELLING US WAS THE
19   TRUTH.
20   Q    NOW, OBVIOUSLY, IF YOU WANT TO INVESTIGATE SOMEONE'S WORD,  09:56
21   YOU HAVE TO GO BEHIND HIS WORD; RIGHT?
22   A    THAT'S WHAT WE DID.  YES.
23   Q    IF YOU REALLY WANT TO DO AN INVESTIGATION, YOU HAVE TO GO
24   BEHIND HIS WORD; YOU CAN'T JUST TAKE HIS WORD FOR IT AGAIN;
25   RIGHT?                                                    09:57
```

1690

1   A    I TOOK HIS WORD.  BUT AS A PRUDENT BUSINESSMAN, I ALSO

2   DIRECTED OUR HEAD OF LICENSING TO CHECK WITH OUR ATTORNEY AND

3   HIS ATTORNEY TO MAKE SURE WHAT HE WAS TELLING ME WAS TRUE.  AND

4   THEY DID.  AND HE CAME BACK AND SAID IT IS TRUE.  HIS ATTORNEY

5   CAME BACK IN WRITING SAYING THAT HE DID THIS IN 1998.          09:57

6   Q    NOW, LET'S SEE IF WE CAN LISTEN TO MY QUESTION.

7        WHAT YOU WANTED TO DO, ACCORDING TO YOU, WAS TO SEE

8   WHETHER OR NOT MR. BRYANT'S WORD WAS TRUE; CORRECT?

9   A    YES; THAT HE HAD DONE THIS IN 1998, IN MISSOURI; I WANTED

10  TO MAKE SURE THAT'S TRUE.  AND THAT CAME BACK TO BE TRUE.       09:57

11  Q    AND, OBVIOUSLY, IF YOU REALLY WANTED TO DETERMINE THAT,

12  YOU WOULDN'T JUST GO ASK MR. BRYANT AGAIN, 'HEY, DO THESE

13  BELONG TO YOU?'  YOU WOULDN'T TRUST HIS WORD TO TEST HIS WORD.

14  A    I DON'T THINK I UNDERSTAND YOUR QUESTION, SIR.

15  Q    YOU'RE SAYING MR. BRYANT TOLD YOU SOMETHING; CORRECT?     09:58

16  A    CORRECT.

17  Q    YOU WANTED TO SEE WHETHER OR NOT WHAT HE TOLD YOU WAS

18  TRUE, ACCORDING TO YOU.

19  A    CORRECT.

20  Q    AND YOU WANTED TO DO A REAL INVESTIGATION, NOT JUST       09:58

21  SOMETHING YOU COULD SHOW LATER AND SAY, 'SEE, I LOOKED INTO

22  IT.'

23  A    BESIDES THAT INVESTIGATION, I DIDN'T KNOW WHAT ELSE YOU

24  WANTED ME TO DO.  HIRE PRIVATE DETECTIVES?

25  Q    BY THE WAY, WAS IT YOUR TESTIMONY THAT MR. BRYANT'S       09:58

1    ATTORNEY CAME BACK IN WRITING WITH SOMETHING?

2           THAT'S A YES OR NO QUESTION.

3    A    CAN YOU ASK THE QUESTION AGAIN.

4    Q    ARE YOU TESTIFYING MR. BRYANT'S ATTORNEY PROVIDED YOU

5    SOMETHING IN WRITING?                                              09:58

6    A    OUR ATTORNEY --

7    Q    NO, NO.  MY QUESTION IS, DID MR. BRYANT'S ATTORNEY PROVIDE

8    YOU SOMETHING IN WRITING?

9    A    TO ME PERSONALLY?  NO.

10   Q    NOW, MY QUESTION IS THIS:  IF YOU WERE TO FIND OUT WHETHER   09:58

11   SOMEONE'S WORD IS ACCURATE, AND YOU WANTED TO DO A REAL

12   INVESTIGATION AND NOT JUST A SHOW, WOULDN'T YOU DO SOMETHING

13   BESIDES JUST ASK THEM, 'HEY, DID YOU REALLY MEAN THAT'?

14   A    WHAT I DID IS -- NO.  THAT'S NOT HOW I -- MAYBE LAWYERS DO

15   IT LIKE THAT, BUT I DON'T.  I DID NOT.                            09:59

16   Q    SO YOUR TESTIMONY IS THAT MR. BRYANT TOLD YOU SOMETHING;

17   RIGHT?

18   A    RIGHT.

19   Q    YOU WANTED TO SEE WHETHER OR NOT WHAT MR. BRYANT TOLD YOU

20   WAS TRUE; CORRECT?                                                09:59

21   A    RIGHT.

22   Q    AND SO THEN YOU HAD MR. BRYANT'S LAWYER GO AND ASK HIM,

23   'WILL YOU TELL ME THE SAME THING?'

24   A    NO.  THAT'S NOT WHAT HAPPENED.

25   Q    WELL, SIR, ISN'T THAT EXACTLY WHAT YOU'RE SAYING HAPPENED,   09:59

1    THAT MR. BRYANT'S LAWYER -- AND YOU SAID YOU ASKED HIM THE SAME

2    QUESTION AND GOT THE SAME ANSWER AND SAID, 'I GOT THE SAME

3    ANSWER.'

4    A    NO.   THIS IS NOT EXACTLY THE SEQUENCE OF EVENTS THAT

5    HAPPENED.

6            I DIRECTED VICTORIA O'CONNOR TO MAKE SURE, TO FIND

7    OUT, THAT IF HE SAID HE HAD DONE THIS IN 1998 IN MISSOURI, THAT

8    HE HAD.

9            SHE WENT TO OUR ATTORNEY, DAVID ROSENBAUM, WHO WENT

10   TO CARTER BRYANT'S ATTORNEY AND ASKED THIS.   CARTER BRYANT'S

11   ATTORNEY CAME BACK LATER ON -- AND I HAVE SEEN AN E-MAIL TO

12   THAT EFFECT -- AND SAID SHE HAD INVESTIGATED AND THAT HIS STORY

13   WAS TRUE, THAT HE HAD DONE THIS IN 1998 WHEN HE WAS IN

14   MISSOURI.

15           **MR. PRICE:**  MOVE TO STRIKE A REFERENCE TO ANY

16   E-MAILS, GIVEN THE COURT'S ORDER.

17           **THE COURT:**  OVERRULED.

18   **BY MR. PRICE:**

19   Q    SIR, ISN'T IT TRUE THAT THE ONLY THING THAT HAPPENED WAS,

20   YOUR ATTORNEY WENT TO MR. BRYANT'S ATTORNEY AND SAID, 'SEE IF

21   HE'LL TELL YOU THE SAME THING THAT HE'S TOLD US'?

22           **MR. NOLAN:**  OBJECTION, YOUR HONOR.   LACK OF

23   FOUNDATION WITH RESPECT TO CONVERSATIONS THAT WERE GOING ON,

24   WHETHER MR. LARIAN WAS PRESENT OR NOT.

25           **THE COURT:**  SUSTAINED.

1693

```
 1            JUST FOUNDATION, COUNSEL.

 2   BY MR. PRICE:

 3   Q    SO SITTING HERE TODAY, YOU HAVE ABSOLUTELY NO IDEA WHAT

 4   MR. BRYANT'S ATTORNEY SAID TO YOUR ATTORNEY.  THERE'S NO

 5   FOUNDATION FOR THAT.                                          10:01

 6            MR. NOLAN:  OBJECTION.  MR. PRICE IS POINTING TO ME.

 7   I WAS NOT --

 8            THE COURT:  COUNSEL, REPHRASE YOUR QUESTION.

 9            PLEASE, NO SPEAKING OBJECTIONS, COUNSEL.

10   BY MR. PRICE:                                                 10:01

11   Q    IS IT CORRECT THAT YOU HAVE NO IDEA WHAT MR. BRYANT'S

12   ATTORNEY -- WELL, LET'S TAKE IT IN STEPS.

13            YOU HAVE NO IDEA WHAT MR. BRYANT'S ATTORNEY DID AS

14   PART OF THIS INVESTIGATION; CORRECT?

15   A    I PERSONALLY HAVE NO DIRECT KNOWLEDGE OF THAT, NO.        10:01

16   Q    AND YOU HAVE NO DIRECT KNOWLEDGE AS TO WHAT MR. BRYANT'S

17   ATTORNEY AND YOUR ATTORNEY TALKED ABOUT; YOU HAVE NO DIRECT

18   KNOWLEDGE.

19   A    YES, I DO.  I HAVE SEEN AN E-MAIL TO THE EFFECT.

20   Q    BY "DIRECT KNOWLEDGE," I THINK THE QUESTION IS, WERE YOU  10:01

21   THERE?  WERE YOU PART OF THE CONVERSATION?  DID YOU HEAR IT?

22   A    NO, I WAS NOT PART OF THE CONVERSATION OR -- I WAS NOT

23   PART OF THE CONVERSATION TO HEAR SOMETHING.

24   Q    CERTAINLY, IT'S FAIR TO SAY THAT YOU WOULD NOT BE

25   SATISFIED -- IF YOU WERE TRYING TO FIND OUT WHETHER MR. BRYANT 10:02
```

Exhibit D, Page 630

1694

1  WAS TRUTHFUL, YOU WOULDN'T BE SATISFIED WITH AN INVESTIGATION

2  THAT CONSISTED MERELY OF GOING TO MR. BRYANT AND SAYING, 'WILL

3  YOU TELL ME THAT YOU CREATED THIS WHEN YOU WEREN'T WITH

4  MATTEL'?

5  A    I WAS SATISFIED WHEN WE GOT CONFIRMATION BACK FROM          10:02

6  VICTORIA O'CONNOR THAT HIS LAWYER, CARTER BRYANT'S LAWYER,

7  AFTER INVESTIGATION, HAD TESTIFIED -- HAD SENT CONFIRMATION

8  THAT HE HAD DONE THIS.

9         FURTHERMORE, IF YOU LOOK AT CARTER BRYANT'S CONTRACT

10  WITH US --                                                     10:02

11         MR. PRICE:  YOUR HONOR, MOVE TO STRIKE NOW AS

12  NONRESPONSIVE.

13         THE COURT:  I'LL STRIKE THAT.

14         RESTATE THE QUESTION -- LET THE COURT REPORTER REREAD

15  THE QUESTION.                                                  10:02

16         MR. PRICE:  YES.

17         (WHEREUPON, THE LAST QUESTION WAS READ

18          BACK BY THE COURT REPORTER.)

19         THE COURT:  COUNSEL, REPHRASE THE QUESTION.

20         PERHAPS THE CONFUSION WAS IN THE LENGTH OF THE --       10:03

21  IT'S A COMPLICATED QUESTION.

22         THE WITNESS:  I WAS GOING TO ASK THAT.  THANKS.

23         THE COURT:  FAIR ENOUGH.

24         REPHRASE.

25  /  /  /                                                        10:03

1    **BY MR. PRICE:**

2    Q    MR. LARIAN, AS CEO, TRYING TO INVESTIGATE WHETHER SOMEONE

3    SAID THE TRUTH --

4    A    YES.

5    Q    -- WOULD YOU BE SATISFIED WITH AN INVESTIGATION THAT                10:03

6    CONSISTED OF NO MORE THAN SOMEONE ELSE GOING TO THAT PERSON AND

7    SAYING, 'DID YOU SAY THE TRUTH?'

8            **MR. NOLAN:**  OBJECTION.  ASSUMES FACTS NOT IN

9    EVIDENCE.  IT'S ALSO ARGUMENTATIVE.

10           **THE COURT:**  REPHRASE THAT QUESTION.                          10:04

11           SUSTAINED.

12   **BY MR. PRICE:**

13   Q    MR. LARIAN, YOU TOLD US THAT YOU WERE SEEKING THE TRUTH;

14   CORRECT?

15   A    YES, I DID.                                                         10:04

16   Q    SEEKING THE TRUTH ABOUT WHETHER OR NOT MR. BRYANT TOLD YOU

17   SOMETHING WAS TRUE; CORRECT?

18   A    I WANTED TO MAKE SURE THAT IF CARTER BRYANT SAID HE DID DO

19   THE ORIGINAL DRAWINGS IN 1998 IN MISSOURI, THAT THAT WAS A TRUE

20   STORY.  THAT'S WHAT I WANTED TO KNOW, AND I GOT SATISFACTION            10:04

21   FOR THAT.

22   Q    AND IT'S FAIR TO SAY YOU WOULD NOT HAVE BEEN SATISFIED

23   WITH AN INVESTIGATION THAT CONSISTED OF SOMEONE ELSE GOING TO

24   MR. BRYANT AND SAYING, 'WILL YOU TELL ME THE STORY?'

25           **MR. NOLAN:**  OBJECTION, YOUR HONOR.  ASSUMES FACTS NOT       10:04

```
 1    IN EVIDENCE; ARGUMENTATIVE.

 2           THE COURT:  IT'S A HYPOTHETICAL.

 3           OVERRULED.

 4           THE WITNESS:  I DON'T KNOW HOW TO ANSWER THAT

 5    QUESTION.                                                      10:04

 6           I ASKED VICTORIA O'CONNOR TO MAKE SURE THAT --

 7           MR. PRICE:  MOVE TO STRIKE AS NONRESPONSIVE.

 8           THE COURT:  IT'S STRICKEN.

 9           MAKE IT CLEAR THAT IT'S A HYPOTHETICAL, COUNSEL.

10    BY MR. PRICE:                                                 10:05

11    Q   WE HAVEN'T HAD YOUR ATTORNEY HERE YET TO TESTIFY, SO I

12    NEED TO ASK YOU TO ASSUME THE FOLLOWING, WHETHER YOU WOULD BE

13    SATISFIED WITH THE FOLLOWING TYPE OF INVESTIGATION:

14           WOULD YOU BE SATISFIED WITH AN INVESTIGATION FROM

15    MR. BRYANT'S ATTORNEY SIMPLY REPORTING BACK TO YOUR ATTORNEY, 10:05

16    'HE TOLD ME THE SAME THING'?

17    A   AGAIN, I WAS NOT PART OF THAT CONVERSATION.

18           IF MY ATTORNEY AND HIS ATTORNEY, AS OFFICERS OF THE

19    COURT, CAME BACK IN WRITING AND SAID THAT THEY HAD

20    INVESTIGATED -- HIS ATTORNEY HAS INVESTIGATED AND HIS STORY IS 10:05

21    TRUE, I BELIEVE THAT.

22    Q   THAT WASN'T MY QUESTION.

23           I'M TALKING ABOUT THE TYPE OF INVESTIGATION.

24           YOU WERE TRYING TO GET TO THE TRUTH; RIGHT?

25    A   I DID.                                                     10:05
```

1    Q    SO IN TRYING TO GET TO THE TRUTH, WOULD YOU BE SATISFIED

2    WITH SIMPLY A REPRESENTATION FROM MR. BRYANT'S ATTORNEY THAT

3    SHE ASKED MR. BRYANT AND HE TOLD HER THE SAME THING?  WOULD YOU

4    BE SATISFIED WITH THAT INVESTIGATION, TO TRY TO FIND THE TRUTH?

5    A    I DON'T KNOW IF -- I WASN'T THERE, SO I DON'T KNOW IF SHE        10:06

6    JUST CALLED HIM AND ASKED HIM, 'IS THIS TRUE OR NOT,' OR SHE

7    WENT BEYOND THAT.  I DON'T KNOW.  I THINK YOU SHOULD GET HER ON

8    THE STAND AND ASK HER.

9             THE COURT:  MR. LARIAN, HE'S NOT ASKING YOU ABOUT

10   WHAT ACTUALLY HAPPENED, BUT JUST HYPOTHETICALLY, TRYING TO FIND        10:06

11   OUT WHAT TYPE OF INVESTIGATION YOU WOULD BE SATISFIED WITH.

12            THE WITNESS:  IF I WAS HIS ATTORNEY, CARTER BRYANT'S

13   ATTORNEY?  IS THAT WHAT YOU'RE ASKING?

14   BY MR. PRICE:

15   Q    NO.  I'M ASKING YOU WHAT WOULD SATISFY YOU.  IF YOU WERE        10:06

16   REALLY LOOKING FOR THE TRUTH, WOULD YOU BE SATISFIED IF ALL

17   THAT THE INVESTIGATION CONSISTED OF WAS JUST MR. BRYANT'S

18   ATTORNEY ASKING HIM THE SAME QUESTION AND GETTING THE SAME

19   ANSWER?

20   A    BEING THROUGH THIS CASE NOW, I HOPE I ASSUME THAT HE WOULD        10:06

21   ASK, 'DID YOU DO THIS IN 1998?'  AND HE WOULD SAY 'YES.'  'DO

22   YOU HAVE PROOF OF IT?'  HE WOULD SAY 'YES.  LOOK AT THE

23   SEVENTEEN MAGAZINE.  LOOK AT THE PICTURES OF PARIS BLUE.  THIS

24   WAS IN AUGUST 1998, AND THOSE WERE INSPIRATIONS FOR MY

25   DRAWINGS.'

                                                                            10:07

1    AND THEN I WOULD TAKE IT A STEP FURTHER.

2         IF THEY CAME BACK WITH THAT CONFIRMATION, AND HE HAD

3    A CONTRACT, JUST TO MAKE SURE, WE ASKED CARTER BRYANT --

4         **MR. PRICE:**  IT'S BEYOND THE SCOPE AT THIS POINT.

5         **THE COURT:**  IT IS BEYOND THE SCOPE.                    10:07

6         NEXT QUESTION, COUNSEL.

7         **MR. NOLAN:**  IT'S A HYPOTHETICAL AS TO WHAT HE WOULD

8    EXPECT AN INVESTIGATION TO DO, AND MR. LARIAN IS EXPLAINING

9    WHAT THE REASONABLE --

10        **THE COURT:**  AND IT WAS GOING BEYOND THE INVESTIGATIVE  10:07

11   STAGE INTO THE CONTRACT STAGE.

12        **MR. NOLAN:**  EXCEPT THAT -- I DON'T WANT TO MAKE A

13   SPEAKING OBJECTION.  I JUST THINK THAT HE WAS IN THE MIDDLE OF

14   COMPLETING THE ANSWER TO A HYPOTHETICAL OF WHAT HE WOULD DO TO

15   MAKE CERTAIN THAT THE REPRESENTATIONS WERE TRUTHFUL, IN HIS    10:08

16   PURSUIT OF THE TRUTH.

17        **THE COURT:**  THANK YOU, COUNSEL.

18        ACTUALLY, IT WAS A YES OR NO QUESTION THE WAY IT WAS

19   POSED; SO THE OBJECTION IS SUSTAINED.

20        NEXT QUESTION.                                            10:08

21        MR. NOLAN, YOU'LL HAVE AN OPPORTUNITY TO FULLY

22   EXAMINE THIS ON YOUR REDIRECT.

23        **MR. NOLAN:**  I'M LOOKING FORWARD TO THAT.

24   **BY MR. PRICE:**

25   Q   MR. LARIAN, IN YOUR ANSWER, WHICH WENT BEYOND YES OR NO,  10:08

1   YOU MENTIONED FACTS ABOUT MAGAZINES AND OTHER FACTS WHICH YOU

2   WOULD HAVE WANTED TO UNCOVER IN AN INVESTIGATION; CORRECT?

3   A    NO.   YOU ASKED ME A HYPOTHETICAL QUESTION, AND I WAS

4   TRYING TO GIVE YOU A HYPOTHETICAL ANSWER; IF I WAS DOING IT,

5   WHAT I WOULD DO.                                                    10:08

6   Q    EXACTLY.

7        SO WHAT YOU WOULD DO TO SATISFY WHETHER SOMEONE WAS

8   TELLING THE TRUTH, IF THAT'S WHAT YOU WERE TRYING TO DO, WOULD

9   BE TO GO BEYOND JUST SAYING, 'TELL ME THE STORY AGAIN'?   YOU'D

10  GO BEYOND THAT?                                                     10:09

11  A    AND I THINK WE DID GO BEYOND THAT.

12  Q    I THOUGHT YOUR TESTIMONY WAS THAT YOU HAD ABSOLUTELY NO

13  FIRST-HAND KNOWLEDGE AS TO WHAT MR. BRYANT'S ATTORNEY DID; IS

14  THAT RIGHT?

15  A    THAT IS CORRECT, I HAVE NO PERSONAL KNOWLEDGE WHAT          10:09

16  CARTER BRYANT'S ATTORNEY DIRECTLY DID.

17  Q    SO WHAT YOU WOULD DO AS AN INVESTIGATOR --

18  A    I'M NOT AN INVESTIGATOR.

19  Q    LET ME FINISH THE QUESTION.

20       WHAT YOU WOULD DO AS AN INVESTIGATOR IS SAY, 'PROVE       10:09

21  IT TO ME.   I'M NOT GOING TO TAKE YOUR WORD FOR IT.   PROVE IT TO

22  ME'; RIGHT?

23  A    SIR, I'M NOT AN INVESTIGATOR; I'M A TOY MAKER.   SO I DON'T

24  KNOW.   I DON'T KNOW HOW TO ANSWER YOUR QUESTION.   YOU DON'T

25  LIKE MY ANSWER, BUT I DON'T KNOW HOW TO ANSWER IT ANY BETTER     10:09

1    THAN I DID.

2    Q    AS A TOY MAKER AND THE CEO OF MGA, YOU KNEW THAT IT WAS AN

3    IMPORTANT, CRITICAL QUESTION AS TO WHO OWNED THESE DRAWINGS;

4    RIGHT?

5    A    YES.                                                    10:10

6    Q    AND, AS YOU SAID, YOU WEREN'T WILLING JUST TO TAKE THE

7    WORD OF SOMEONE YOU HAD NEVER MET BEFORE; CORRECT?

8    A    I MET HIM FOR THE FIRST TIME.

9    Q    AND YOU WEREN'T WILLING TO JUST TAKE THE WORD OF A MATTEL

10   EMPLOYEE, CURRENTLY EMPLOYED BY MATTEL, WHOSE JOB WAS TO MAKE    10:10

11   DRAWINGS -- YOU WEREN'T WILLING TO TAKE HIS WORD THAT, 'OH, I

12   DID THESE DRAWINGS AT SOME OTHER TIME'?

13   A    YOU JUST PUT A LOT OF THINGS IN THAT QUESTION.

14        HIS JOB WAS NOT TO DO DRAWINGS AT MATTEL.  AS MUCH AS

15   I KNOW, HE WAS JUST A FASHION DESIGNER AT MATTEL, NOT SOMEBODY   10:10

16   WHO JUST DOES THE DRAWINGS.

17        SO PLEASE REPHRASE YOUR QUESTION SO I CAN ANSWER.

18   Q    BE GLAD TO.

19        MR. BRYANT CAME TO YOU ON SEPTEMBER 1ST AND PRESENTED

20   YOU WITH DRAWINGS OF DOLLS CALLED "BRATZ"; RIGHT?               10:10

21   A    HE DID NOT COME WITH DRAWINGS OF A DOLL CALLED "BRATZ."

22   THERE WERE NO DOLLS ON SEPTEMBER 1, 2000, WHEN HE CAME TO US.

23   HE CAME UP WITH SOME DRAWINGS THAT BECAME THE INSPIRATION FOR

24   THE BRATZ DOLLS LATER ON, WHICH MGA CREATED.

25   Q    I DON'T WANT TO NITPICK WITH YOU.  LET'S LOOK AT           10:11

```
 1   EXHIBIT 302.

 2            YOU SAID YOU SAW THIS ON SEPTEMBER 1ST; RIGHT?

 3   A    I'M SORRY?

 4   Q    THIS IS WHAT YOU SAW ON SEPTEMBER 1ST:  "MEET THE BRATZ,

 5   THE TOTALLY TRANSFORMABLE TEENAGE DOLLS.  THEY ARE FOUR BEST    10:11

 6   FRIENDS FROM HIGH SCHOOL WHO LOVE TO TRADE CLOTHES, SHOES, AND

 7   HAIRDOS, ET CETERA."

 8            THAT'S AMONG THE THINGS HE PRESENTED TO YOU IN

 9   SEPTEMBER OF 2000; CORRECT?

10   A    TO THE BEST OF MY RECOLLECTION, YES.                       10:11

11   Q    THEN HE GAVE YOU DRAWINGS OF THESE TOTALLY TRANSFORMABLE

12   TEENAGE DOLLS NAMED "BRATZ."

13   A    YOU CHANGED THE PAGE.

14            WHERE DOES IT SAY "TEENAGE DOLLS"?

15   Q    LET'S GO BACK TO WHAT WE JUST WENT THROUGH.               10:12

16            "MEET THE BRATZ, THE TOTALLY TRANSFORMABLE TEENAGE

17   DOLLS."

18   A    I SEE THAT, YES.

19   Q    IN FACT, HE HAD A PROTOTYPE WITH HIM TO GIVE YOU AN IDEA

20   OF WHAT THIS WOULD LOOK LIKE IN THREE DIMENSIONS, AS OPPOSED TO  10:12

21   TWO DIMENSIONS; CORRECT?

22   A    HE DID HAVE A ROUGH PROTOTYPE, THAT'S CORRECT.

23   Q    LET'S GO TO THE NEXT PAGE AGAIN.

24            HE PRESENTED YOU WITH A SERIES OF DRAWINGS OF THESE

25   TOTALLY TRANSFORMABLE TEENAGE DOLLS, THE BRATZ.                 10:12
```

1702

1    A      THOSE WERE THE DRAWINGS THAT HE SHOWED US.   THE BRATZ

2    DOLLS DID NOT LOOK LIKE THEM.

3             **MR. PRICE:**  MOVE TO STRIKE EVERYTHING AFTER "THOSE

4    WERE THE DRAWINGS HE SHOWED US."

5             **THE COURT:**  OVERRULED.                                    10:12

6    **BY MR. PRICE:**

7    Q      AND YOU KNEW AT THAT POINT HE WAS A MATTEL EMPLOYEE.

8    A      YES, I DID KNOW.  WHEN HE CAME TO US -- WHEN HE CAME TO MY

9    OFFICE ON SEPTEMBER 1ST, HE TOLD ME THAT HE WAS A MATTEL

10   EMPLOYEE AT THE TIME, THAT'S CORRECT.                             10:13

11   Q      SO SITTING THERE, YOU KNEW THAT THIS MATTEL EMPLOYEE WAS

12   SITTING THERE PITCHING YOU A DOLL IDEA?

13   A      YES, HE WAS PITCHING DRAWINGS FOR A DOLL IDEA, THAT'S

14   CORRECT.

15   Q      AND YOU KNEW THAT IF HE HAD COME UP WITH THESE DRAWINGS AT   10:13

16   THE TIME HE WAS A MATTEL EMPLOYEE, THEY BELONGED TO MATTEL.

17   A      THESE DRAWINGS, AGAIN, IF HE HAD DONE THEM IN 1998 AND

18   THEN LATER ON HAD WORKED ON THEM, DIDN'T BELONG TO MATTEL.

19             **MR. PRICE:**  MOVE TO STRIKE AS NONRESPONSIVE.

20             **THE COURT:**  IT'S STRICKEN.                              10:13

21             ANSWER THE QUESTION.

22             **MR. PRICE:**  DO YOU WANT ME TO REPEAT THE QUESTION?

23             **THE COURT:**  LET THE COURT REPORTER DO SO.

24             (WHEREUPON, THE LAST QUESTION WAS READ

25             BACK BY THE COURT REPORTER.)

FRIDAY, JUNE 6, 2008                      TRIAL DAY 9, MORNING SESSION

```
1        THE WITNESS:  YES.  I WAS NOT INTERESTED IN THEM IF

2   HE HAD DONE THEM WHEN HE WAS WORKING AT MATTEL.  THAT'S

3   CORRECT.

4        MR. PRICE:  MOVE TO STRIKE EVERYTHING AFTER "YES,"

5   YOUR HONOR.                                              10:14

6        THE COURT:  OVERRULED.

7   BY MR. PRICE:

8   Q    SO YOU KNEW THAT ONE OF THE CRITICAL QUESTIONS WAS, DID

9   MATTEL OWN THESE DRAWINGS?

10  A    YES.                                                10:14

11  Q    ASSUMING THAT MR. BRYANT AT THAT MEETING TOLD YOU, 'OH, I

12  DID THEM IN 1998, IN THIS TIME FRAME WHEN I WASN'T AT MATTEL,'

13  YOU WOULD WANT TO INVESTIGATE THAT CRITICAL QUESTION; CORRECT?

14  A    FIRST OF ALL, IT WASN'T AN ASSUMPTION.  HE DID SAY THAT HE

15  DID THEM IN 1998 WHEN HE WAS IN MISSOURI.  AND, YES, WE DID    10:14

16  WANT TO INVESTIGATE THAT.  AND WE DID THAT.

17  Q    AND WHAT YOU'D WANT TO DO IS SAY, BASICALLY, 'PROVE IT TO

18  ME'?

19  A    TELL HIM TO PROVE IT TO ME, DIRECTLY TO ME?  NO, I DID NOT

20  ASK THAT, TO PROVE IT TO ME.  I GAVE DIRECTION TO MY HEAD OF   10:15

21  LICENSING TO MAKE SURE THAT WHAT HE WAS SAYING WAS THE TRUTH.

22  Q    WHOEVER YOU TOLD TO LOOK INTO IT, THE GOAL WAS TO TRY TO

23  PROVE TO YOU, THE CEO OF MGA, THAT THESE DRAWINGS DIDN'T BELONG

24  TO MATTEL; CORRECT?

25  A    CORRECT.                                            10:15
```

1    Q    AND IT'S FAIR TO SAY THAT YOU WOULDN'T BE SATISFIED IF THE

2    ONLY PROOF WAS THAT MR. BRYANT TOLD HIS LAWYER THE SAME THING

3    HE TOLD YOU; CORRECT?

4         **MR. NOLAN:**  OBJECTION.  ASKED AND ANSWERED.

5         **THE COURT:**  IT HAS BEEN ASKED AND ANSWERED, COUNSEL.     10:15

6    **BY MR. PRICE:**

7    Q    SO YOU TOLD US ABOUT WHAT, THEN, THE CERTAIN INVESTIGATION

8    YOU MIGHT DO IF YOU HAD BEEN IN MR. BRYANT'S LAWYER'S SHOES;

9    CORRECT.

10   A    I'M NOT A LAWYER.  BUT YOU'RE ASKING FOR A HYPOTHETICAL     10:16

11   QUESTION, AND I ANSWERED IT.  AND I DON'T LIKE TO BE A LAWYER.

12   Q    IT'S TRUE, IS IT NOT, THAT IN TRYING TO FIND THE ANSWER TO

13   THIS CRITICAL QUESTION, YOU HAVE NO FIRST-HAND KNOWLEDGE WHAT

14   MR. BRYANT'S LAWYER DID TO TRY TO, QUOTE, "PROVE THE STATEMENT

15   OF MR. BRYANT THAT THESE DIDN'T BELONG TO MATTEL"?             10:16

16        **MR. NOLAN:**  AGAIN, YOUR HONOR, ASKED AND ANSWERED.

17        **THE COURT:**  OVERRULED.

18        YOU MAY ANSWER.

19        **THE WITNESS:**  THAT IS TRUE.  I DON'T HAVE FIRST-HAND

20   KNOWLEDGE OF WHAT HIS LAWYER DID TO MAKE SURE THAT WHAT HE WAS   10:16

21   SAYING IS TRUE OR NOT.

22   **BY MR. PRICE:**

23   Q    YOU LEFT YOURSELF INTENTIONALLY IN THE DARK, DIDN'T YOU?

24   A    NO, I DID NOT.

25   Q    WELL, DID YOU GO TO EITHER MR. ROSENBAUM OR MS. O'CONNOR,   10:16

```
 1   OR EVEN MR. BRYANT'S LAWYER, AND SAY, 'I WANT YOU TO TELL ME,
 2   TO PROVE TO ME, THAT THESE DON'T BELONG TO MATTEL'?
 3   A    I PERSONALLY DID NOT DO THAT.  I DELEGATED THAT -- WE HAD
 4   EMPLOYEES.  I DELEGATED THAT TO AN EMPLOYEE WHOSE JOB WAS TO DO
 5   THIS.  AND SHE DID.                                             10:17
 6   Q    SO YOU'RE SAYING THAT MS. O'CONNOR WAS GIVEN PROOF OF A
 7   STORY THAT THESE DRAWINGS WERE NOT DONE WHILE MR. BRYANT WAS AT
 8   MATTEL?
 9   A    MS. O'CONNOR WENT TO DAVID ROSENBAUM, WHO WENT TO
10   ANNE WANG, WHO WAS CARTER BRYANT'S LAWYER; AND ACCORDING TO AN   10:17
11   E-MAIL THAT I HAVE SEEN, HIS LAWYER CAME BACK AND SAID THAT SHE
12   HAS PROOF, SHE KNOWS IT WAS DONE IN 1998 WHEN CARTER SAID THAT,
13   THE INITIAL DRAWINGS.
14   Q    SO, OF COURSE, SINCE THIS IS A CRITICAL QUESTION AS TO
15   WHETHER OR NOT THESE DRAWINGS BELONGED TO MATTEL, YOUR RESPONSE  10:17
16   WAS, 'WHAT PROOF ARE YOU TALKING ABOUT BESIDES MR. BRYANT'S
17   WORD?'  THAT WAS YOUR RESPONSE; CORRECT?
18   A    I DID NOT ASK THAT SPECIFIC QUESTION THAT YOU JUST ASKED.
19   I DID NOT.
20   Q    INSTEAD, YOU WENT FORWARD TO CREATE DOLLS BASED ON THESE    10:18
21   DRAWINGS THAT A MATTEL EMPLOYEE PRESENTED TO YOU IN SEPTEMBER
22   OF 2000.
23   A    FIRST WHAT WE DID IS, WE ENTERED INTO A CONTRACT WITH
24   CARTER BRYANT ON OCTOBER 4, 2000, AND THEN WE PROCEEDED TO
25   START DEVELOPMENT OF THE BRATZ DOLLS, WHAT BECAME BRATZ DOLLS    10:18
```

```
 1    LATER ON.

 2    Q    IT'S FAIR TO SAY, WITHOUT GETTING INTO NUMBERS, THE BRATZ

 3    DOLLS, THE BRATZ MERCHANDISE, ARE A SIGNIFICANT PERCENTAGE OF

 4    MGA'S BUSINESS?

 5    A    YES.  OVER THE YEARS, THEY HAVE BECOME SIGNIFICANT.  THEY      10:18

 6    WERE NOT SIGNIFICANT IN 2001 WHEN THEY WERE LAUNCHED, BUT THEY

 7    HAVE BEEN OUT NOW FOR SEVEN YEARS, AND THEY HAVE BECOME

 8    SIGNIFICANT.

 9    Q    IN FACT, YOU, EVEN AS EARLY AS OCTOBER OF 2000, PREDICTED

10    THAT JUST FOR THE FIRST YEAR, YOU WERE GOING TO SELL 25 MILLION    10:19

11    OF THESE DOLLS?

12    A    YES, I DID PREDICT THAT, AS I DID WITH A LOT OF OTHER TOYS

13    THAT WERE NOT SUCCESSFUL.

14    Q    BUT SOMETIMES YOU'RE RIGHT; SOMETIMES YOU'RE WRONG.

15    A    IN THE TOY BUSINESS, THAT'S A FACT.                           10:19

16    Q    WHEN YOU MAKE A PREDICTION, THOUGH, YOU'RE DOING THE BEST

17    YOU CAN; RIGHT?

18    A    I'M SORRY?

19    Q    WHEN YOU MAKE THESE PREDICTIONS, YOU'RE DOING THE BEST YOU

20    CAN.                                                               10:19

21    A    YES.

22    Q    AND YOU PUT RESOURCES INTO CERTAIN DOLL LINES BASED UPON

23    YOUR PREDICTIONS.

24    A    WE SURE DID PUT A LOT OF RESOURCES IN MAKING BRATZ DOLLS,

25    WHAT THEY BECAME, BY NOW.                                          10:19
```

1    Q    OKAY.

2    A    BY "NOW," I MEAN BY 2008.

3    Q    AND SO IN OCTOBER OF 2000, PREDICTING THAT THESE DOLLS

4    WERE GOING TO SELL AROUND 25 MILLION FOR THE FIRST YEAR ALONE

5    --                                                              10:20

6    A    YES.

7    Q    -- BEFORE PUTTING THE RESOURCES INTO MAKING THAT HAPPEN,

8    DID YOU ASK ANYONE WHAT WAS BEHIND THIS INVESTIGATION, WHAT WAS

9    DONE TO PROVE THAT MATTEL DOESN'T OWN THESE?

10   A    BESIDES WHAT I TOLD YOU, I HAVE NOTHING ELSE TO ADD.       10:20

11   Q    WELL, LET'S TALK ABOUT THE CONTRACT, THEN, THAT YOU

12   ENTERED INTO WITH MR. BRYANT.

13             I'D LIKE YOU TO LOOK AT, IF YOU WOULD, EXHIBIT 13621.

14             DO YOU RECOGNIZE EXHIBIT 13621 AS A CONTRACT BETWEEN

15   MGA AND CARTER BRYANT?                                          10:21

16   A    I DO.

17             I WANT TO READ THE WHOLE CONTRACT.

18   Q    IF YOU RECOGNIZE THIS AS THE CONTRACT RIGHT NOW, THAT'S

19   ENOUGH.

20   A    I DO.                                                      10:21

21             **MR. PRICE:**  YOUR HONOR, I'D MOVE 13621 INTO EVIDENCE.

22             **MR. NOLAN:**  NO OBJECTION, YOUR HONOR, ALTHOUGH THIS

23   IS ALREADY IN EVIDENCE.

24             **MR. PRICE:**  I DON'T BELIEVE IT IS.  THEY ARE

25   DIFFERENT, ACTUALLY, SOMEWHAT.                                  10:21

1    **MR. NOLAN:**  WE HAVE NO OBJECTION TO THIS ONE.

2    **THE COURT:**  IS IT THE SAME DOCUMENT, THOUGH?

3    **MR. PRICE:**  SOMEWHAT.

4    **MR. NOLAN:**  WE HAVE NO OBJECTION TO THIS DOCUMENT.

5    **THE COURT:**  VERY WELL.                                    10:22

6        IT'S ADMITTED.

7        ONE THING I WANT TO AVOID, COUNSEL, IS ANY DUPLICATES

8    OF DOCUMENTS, PARTICULARLY KEY DOCUMENTS LIKE THIS; SO THIS IS

9    SOMETHING WE CAN REVISIT.

10       **MR. PRICE:**  I UNDERSTAND.  IN EXAMINATION, IT WILL      10:22

11   BECOME CLEAR.

12       **THE COURT:**  VERY WELL.

13   **BY MR. PRICE:**

14   Q    THERE'S SOME HANDWRITING HERE THAT SAYS "FINAL."

15       DO YOU KNOW WHOSE HANDWRITING THAT IS?                     10:22

16   A    I DO NOT.

17   Q    IF YOU'D LOOK AT THE LAST PAGE OF THIS, IS THIS YOUR

18   SIGNATURE HERE?

19   A    IT IS.

20   Q    AND YOU RECOGNIZE THIS AS CARTER BRYANT'S SIGNATURE?      10:22

21   A    I DON'T RECOGNIZE HIS SIGNATURE, BUT THAT'S MY SIGNATURE.

22   Q    LET'S GO BACK TO THE FIRST PAGE.

23       THIS DOCUMENT, YOU RECEIVED THIS FROM YOUR ATTORNEY;

24   CORRECT?

25   A    I RECEIVED THIS FROM MY ATTORNEY?                         10:22

```
 1          I DON'T KNOW IF I RECEIVED IT FROM MY ATTORNEY OR IF
 2    I RECEIVED IT FROM VICTORIA O'CONNOR.  I DON'T RECALL WHO I
 3    RECEIVED IT FROM.
 4    Q    IN ANY EVENT, MGA HAD AN ATTORNEY INVOLVED IN DRAFTING
 5    THIS DOCUMENT.                                                  10:23
 6    A    YES, WE DID.
 7    Q    AND THAT WAS MR. ROSENBAUM.
 8    A    DAVID ROSENBAUM, YES.
 9    Q    YOU UNDERSTOOD THERE WERE SOME NEGOTIATIONS THAT TOOK
10    PLACE THAT LED TO THIS DOCUMENT.                                10:23
11    A    YES.  THERE WERE NEGOTIATIONS BETWEEN DAVID ROSENBAUM AND
12    CARTER BRYANT'S LAWYER, ANNE WANG.
13    Q    AND IT'S CORRECT THAT WHEN YOU RECEIVED THIS CONTRACT, YOU
14    LOOKED THROUGH IT TO MAKE SURE IT REFLECTED THE TERMS OF THE
15    CONTRACT THAT YOU WANTED TO AGREE TO.                           10:23
16    A    I DON'T REMEMBER IF I READ THE WHOLE CONTRACT OR NOT.  I
17    KNOW THERE WAS LENGTHY NEGOTIATIONS GOING BACK AND FORTH, AND I
18    REMEMBER ONE E-MAIL ON OCTOBER 3RD -- OCTOBER 4TH, IN THE
19    MORNING, THAT THEY HAD FINALLY REACHED AN AGREEMENT BETWEEN
20    DAVID ROSENBAUM AND ANNE WANG, AND THEY GAVE ME A SIGNATURE     10:23
21    PAGE TO SIGN, WHICH I DID.
22    Q    SO I GUESS MY QUESTION IS, BEFORE SIGNING THIS, DID YOU
23    CHECK IT TO MAKE SURE THAT, FOR EXAMPLE, THE AMOUNT YOU
24    INTENDED TO PAY MR. BRYANT WAS IN HERE AND THAT HE WAS GRANTING
25    CERTAIN RIGHTS TO YOU?                                          10:24
```

```
1   A    I DON'T RECALL IF I -- NOW, SITTING HERE, I DON'T RECALL
2   IF I DID THAT AT THAT TIME OR NOT.  I DON'T KNOW.
3   Q    THAT WOULD BE YOUR PRACTICE, IF YOU WERE GOING TO ENTER
4   INTO A CONTRACT WITH SOMEONE -- THAT WOULD BE YOUR PRACTICE, IF
5   YOU'RE GOING TO BIND MGA TO PAY SOMEONE MONEY AND YOU WERE            10:24
6   TRYING TO GET SOMETHING IN RETURN, IT WOULD PROBABLY BE YOUR
7   PRACTICE TO READ THE OFFICIAL LEGAL CONTRACT SO YOU'D KNOW YOUR
8   OBLIGATIONS?
9   A    NO, THAT'S NOT PROBABLY MY PRACTICE.  I GET A LOT OF
10  THINGS TO DO.                                                         10:24
11         MOST OF MY CONTRACTS AND EVERYTHING ELSE, I DELEGATE
12  TO MY LAWYERS AND OTHER PEOPLE IN THE COMPANY TO NEGOTIATE AND
13  LOOK AT, MAKING SURE THE BASIC TERMS ARE IN THERE.  THEN I'LL
14  SIGN IT.
15  Q    WELL, LOOK AT THE FIRST PAGE.  THERE'S A LINE HERE DATED         10:25
16  AS OF SEPTEMBER 18, 2000.
17         DO YOU SEE THAT?
18  A    I DO.
19  Q    SIR, DO YOU RECALL YESTERDAY THAT WE SHOWED SOME DOCUMENTS
20  WHERE YOU SAID THAT BRATZ WAS BORN IN SEPTEMBER OF 2000, A            10:25
21  DOCUMENT THAT BRATZ WAS CREATED ON SEPTEMBER 18, 2000?
22  A    I DIDN'T SEE A DOCUMENT THAT SAYS BRATZ WERE BORN ON
23  SEPTEMBER 18, 2000.
24  Q    NO, NO.
25  A    THAT'S WHAT YOU JUST SAID.                                       10:25
```

1   Q    TWO DOCUMENTS.  I DIDN'T MEANT TO CONFUSE YOU.

2        REMEMBER THERE WAS A DOCUMENT THAT SAID 'BRATZ WAS

3   BORN IN SEPTEMBER OF 2000,' AND THEN ANOTHER DOCUMENT SAYING

4   'THE DATE OF CREATION OF BRATZ WAS SEPTEMBER 18, 2000'?

5        DO YOU RECALL THAT?                                    10:25

6   A    I DON'T REMEMBER HER SAYING SEPTEMBER 18, 2000.  MAYBE SHE

7   DID.  I DON'T RECALL IT.

8   Q    LET'S REFRESH YOUR RECOLLECTION, THEN, IF WE CAN.

9        IF WE CAN GO TO EXHIBIT 551.  I MIGHT BE SLIGHTLY OFF

10  ON THE DATE, BUT I DON'T THINK SO.                          10:26

11       DO YOU SEE THIS?  DO YOU REMEMBER WE SHOWED YOU THIS

12  YESTERDAY, SIR, THIS E-MAIL WITH NANA ASHONG, WHERE IT TALKED

13  ABOUT DATE OF CREATION, SEPTEMBER 18, 2000?

14  A    YES.  AND I RECALL TELLING YOU THAT I'M NOT COPIED ON THIS

15  E-MAIL AND I HAVE NEVER SEEN THAT BEFORE.                   10:26

16  Q    ALL THESE FOLKS WORK FOR YOU.

17  A    YES.  EXCEPT I DON'T REMEMBER WHO JACKIE -- I DON'T KNOW

18  HOW TO PRONOUNCE HER LAST NAME.  I APOLOGIZE.

19  Q    CERTAINLY, IT'S FAIR TO SAY THAT WHEN YOU SIGNED THIS

20  AGREEMENT, WHICH OBLIGATED MGA TO DO CERTAIN THINGS AND      10:26

21  MR. BRYANT TO DO CERTAIN THINGS, THAT ONE OF THE THINGS YOU

22  TOOK NOTE OF WAS THAT THE CONTRACT PROVIDED TO YOU,

23  REPRESENTED, DATED AS OF SEPTEMBER 18, 2000?

24  A    I DON'T RECALL MY STATE OF MIND AT THAT TIME, EIGHT YEARS

25  AGO, WHEN THIS WAS SIGNED.                                  10:27

1712

1    Q    WHAT YOU DO RECALL IS THAT ON SEPTEMBER 18, 2000,

2    CARTER BRYANT WAS STILL AN EMPLOYEE OF MATTEL.

3    A    YES.  ON SEPTEMBER 18, 2000, HE WAS STILL AN EMPLOYEE OF

4    MATTEL.

5    Q    NOW, IF YOU WOULD LOOK AT -- YOU SEE THE BOTTOM OF THESE          10:27

6    DOCUMENTS THERE, THESE NUMBERS, MGA 001, 002, ET CETERA?

7    A    YES.

8    Q    IF YOU WOULD LOOK AT THIS COPY OF THE CONTRACT, DO YOU SEE

9    ANY FAX HEADERS AT ALL ON THIS CONTRACT, ANYTHING SAYING THIS

10   WAS FAXED TO MR. BRYANT OR THAT MR. BRYANT FAXED IT BACK?          10:27

11   A    I DON'T SEE ANY FAX HEADER ON THIS DOCUMENT.

12   Q    LET ME SHOW YOU, THEN, WHAT'S BEEN ADMITTED AS EXHIBIT 15.

13        DO YOU SEE EXHIBIT 15?

14   A    I DO.

15   Q    DO YOU SEE AT THE BOTTOM, EXHIBIT 15, YOU NOTICE AT THE          10:28

16   BOTTOM, THERE ARE THESE DESIGNATIONS THAT SAY "BRYANT'S," AND

17   IT HAS CERTAIN PAGE NUMBERS.

18        DO YOU SEE THAT?

19   A    YES.

20   Q    DO YOU HAVE ANY IDEA WHAT THE SIGNIFICANCE IS OF THAT?          10:28

21   A    YES.

22   Q    WHAT'S THAT?

23   A    THOSE ARE PROBABLY DOCUMENTS THAT CARTER BRYANT PRODUCED,

24   AND THAT'S FROM, I LEARNED TO UNDERSTAND DURING THIS LEGAL

25   MATTER, IS WHAT LAWYERS PUT; LIKE THIS DOCUMENT CAME FROM          10:29

1  CARTER BRYANT AND THOSE ARE HIS BATES NUMBERS, AS YOU GUYS

2  IDENTIFY IT.

3  Q    AND THE PREVIOUS ONE, 13621, THAT HAD MGA ON IT, WHAT'S

4  YOUR UNDERSTANDING OF WHAT THAT MEANS?

5  A    THOSE ARE DOCUMENTS THAT MGA PRODUCED.                   10:29

6  Q    SO THE CONTRACT WHICH MGA PRODUCED, TO YOUR UNDERSTANDING,

7  HAS NO FAX HEADLINERS ON IT AT ALL; CORRECT?

8  A    THAT'S CORRECT.

9  Q    IF WE LOOK AT THIS --

10 A    THAT DOCUMENT YOU SHOWED ME DID NOT HAVE FAX HEADERS,      10:29

11 THAT'S CORRECT.

12 Q    LOOK AT EXHIBIT 15, AND GO TO THE LAST PAGE.

13        YOU NOTICE THAT THIS HAS A FAX HEADER WHICH INDICATES

14 SOMETHING WAS SENT FROM MGA.

15        DO YOU SEE THAT?                                        10:30

16 A    I DO.

17 Q    AND IT'S YOUR UNDERSTANDING THAT THE CONTRACT WHICH WAS

18 FAXED TO MR. BRYANT WAS FAXED BACK TO MGA?

19 A    WELL, LET ME EXPLAIN THIS TO YOU, FIRST OF ALL.

20        THIS IS A SIGNATURE PAGE.                               10:30

21 Q    ANSWER MY QUESTION.

22 A    OKAY.  GO AHEAD.

23 Q    IT'S YOUR UNDERSTANDING THAT MGA FAXED A CONTRACT TO

24 MR. BRYANT; CORRECT?

25 A    YES.                                                      10:30

1   Q    AND IT'S YOUR UNDERSTANDING THAT MR. BRYANT FAXED THAT

2   CONTRACT BACK, SIGNED; CORRECT?

3   A    I HOPE SO.  I ASSUME SO, YES.

4   Q    AND SO YOUR UNDERSTANDING IS THAT THIS DOCUMENT THAT YOU

5   BELIEVE WAS PRODUCED BY MR. BRYANT HAS THE FAX HEADER                    10:30

6   INDICATING WHEN MGA SENT IT TO HIM; CORRECT?

7   A    YES.  AT 4:36 P.M., ON OCTOBER 4TH.

8   Q    YOU THEN RETAINED IN YOUR POSSESSION 13621; THAT IS, THE

9   ONE WE LOOKED AT EARLIER WITHOUT ANY FAX HEADERS ON IT AT ALL;

10  CORRECT?                                                                 10:31

11  A    I PERSONALLY DID NOT RETAIN IT.  I THINK IT WENT TO

12  VICTORIA O'CONNOR OR THE LEGAL DEPARTMENT.

13  Q    SO MGA.

14  A    WELL, I DON'T KNOW WHICH ONE -- WHAT WAS THE OTHER ONE,

15  PLEASE?  13 --                                                           10:31

16  Q    13621.

17          MR. PRICE:  WE HAVE AN EXTRA COPY.

18          THE COURT:  VERY WELL.

19  BY MR. PRICE:

20  Q    YOU WANT THAT OUTSIDE OF THE BINDER; CORRECT?                       10:32

21  A    YES, I DO.

22  Q    YOU NOW HAVE BOTH 13621, MGA, AND EXHIBIT 15,

23  CARTER BRYANT; CORRECT?

24  A    YES.

25  Q    SO MY QUESTION, SIR, ON 13621 --                                    10:34

1    A    YES.

2    Q    -- WHAT HAPPENED TO THE FAX HEADER THAT SHOWED MGA SENT

3    THE FAX TO CARTER BRYANT?

4    A    MY UNDERSTANDING IS, WHEN SOMEBODY SENDS A FAX TO SOMEBODY

5    ELSE, IT STAMPS THAT SENDER'S NAME AND TIME, ET CETERA; SO          10:34

6    COULD THAT BE KNOWN ON HIS RECEIVING IT, BUT NOT ON THE SENDING

7    SIDE.

8    Q    BUT THE WAY YOU GOT THE CONTRACT BACK WAS, HE FAXED IT

9    BACK TO YOU.

10   A    YES.                                                          10:34

11   Q    IT WOULD HAVE BOTH FAX HEADERS ON IT.

12   A    I DON'T KNOW, BECAUSE I HAVE SEEN FAX MACHINES THAT -- AS

13   A MATTER OF FACT, I HAVE ONE AT HOME, BECAUSE I DON'T WANT

14   PEOPLE TO HAVE MY HOME NUMBER -- THAT YOU CAN BLOCK, THAT

15   DOESN'T SHOW THE FAX THAT IT WAS SENT FROM, THE SENDER.            10:35

16          SO I DON'T KNOW IF MATTEL'S, OR ANYBODY ELSE'S THING,

17   WOULD HAVE A TIME STAMP, AS THEY SAY IN THE TERMINOLOGY.

18   Q    IS IT YOUR UNDERSTANDING THAT FEDERAL LAW REQUIRES A FAX

19   HEADER ON FAXES?

20   A    I HAVE NO IDEA ABOUT THAT.  I'M NOT A LAWYER.                 10:35

21   Q    AS FOR YOUR PERSONAL USE, YOU MIGHT NOT.  BUT, PERHAPS,

22   MGA'S LAWYERS, YOU WOULD EXPECT TO BE AWARE OF WHAT SUCH LAWS

23   REQUIRED.

24          MR. NOLAN:  YOUR HONOR, OBJECTION.  LACK OF

25   FOUNDATION.                                                        10:35

1         I DON'T EVEN KNOW THAT LAW.

2         **THE COURT:**  WE DON'T HAVE ANY EVIDENCE OF THE FEDERAL

3   LAW CONCERNING THAT, SO...

4         MOVE ON TO THE NEXT QUESTION.

5   **BY MR. PRICE:**

6   Q    YOU WERE HERE WHEN MS. O'CONNOR SAID THAT WHEN SHE

7   RECEIVED THE FAX FROM CARTER BRYANT, IT HAD A FAX HEADER THAT

8   SAID "BARBIE COLLECTIBLES."

9   A    I HEARD THAT TESTIMONY.

10  Q    YOU HAVE NO REASON TO DOUBT THAT THE CONTRACT YOU GOT FROM

11  CARTER BRYANT HAD THE FAX HEADER "BARBIE COLLECTIBLES."

12  A    I DON'T KNOW IF IT DID OR NOT.

13  Q    LET ME SHOW YOU WHAT'S ALREADY BEEN MARKED AS

14  EXHIBIT 13383.  IT'S ALREADY IN EVIDENCE, AND I'M GOING TO HAND

15  YOU A COPY.

16        DO YOU HAVE THAT?

17  A    YES.

18  Q    IF YOU WOULD TURN TO THE NEXT PAGE, THE SECOND PAGE ON

19  THAT.  THIS IS IDENTICAL TO EXHIBIT 15, ON THE FIRST PAGE, AND

20  EXHIBIT 13621, EXCEPT THE "DATED AS OF SEPTEMBER 18, 2000" IS

21  NOT THERE.

22        **MR. NOLAN:**  OBJECTION AS TO THE CHARACTERIZATION.

23        **THE COURT:**  REPHRASE, COUNSEL.

24  **BY MR. PRICE:**

25  Q    IF YOU LOOK AT EXHIBIT 15, THE FRONT PAGE, AND

10:36
10:36
10:36
10:37
10:38

1717

```
 1    EXHIBIT 1333 HERE, YOU NOTICE THAT ONE HAS A DATE ON IT, THE
 2    OTHER DOESN'T; CORRECT?
 3    A    I DO.
 4    Q    AND THE SAME THING IS TRUE OF 13621?  THAT ALSO HAS A
 5    DATED AS OF --                                                    10:38
 6    A    NOW YOU'RE CONFUSING ME.
 7    Q    EXHIBIT 15, EXHIBIT 13621, ALL SAY "DATED AS OF
 8    SEPTEMBER 18, 2000"; CORRECT?
 9    A    EXHIBIT 15?  YES, THEY DO.
10    Q    AND IT'S TRUE THAT YOU DIDN'T WANT ANYONE TO KNOW THAT YOU   10:38
11    HAD A CONTRACT WITH CARTER BRYANT DATED AS OF SEPTEMBER 18,
12    2000, BECAUSE HE WORKED AT MATTEL THEN.
13    A    ABSOLUTELY NOT.  YOUR TESTIMONY IS NOT CORRECT.
14    Q    ACTUALLY, I ASKED A QUESTION.
15    A    BUT IT CAME TO ME AS TESTIMONY.  I APOLOGIZE.                10:39
16    Q    AGAIN, YOU WERE HERE WHEN MS. O'CONNOR TESTIFIED.
17    A    YES.
18    Q    IT'S TRUE, IS IT NOT, THAT THE FAX THAT CARTER BRYANT SENT
19    OF HIS CONTRACT HAD THAT HEADER ON IT, "BARBIE COLLECTIBLES,"
20    AND YOU TOLD MS. O'CONNOR, 'I WANT YOU TO WHITE THAT OUT'?       10:39
21    A    THAT IS NOT TRUE.
22    Q    SO YOUR TESTIMONY IS, MS. O'CONNOR WAS COMMITTING PERJURY?
23    A    NO.  I DON'T KNOW WHAT SHE WAS SAYING.  I HEARD THAT.
24    THERE WAS NO REASON FOR ME TO DO THAT.  SHE WAS FAXING THIS TO
25    PATTI GLASER, WHO'S MY ATTORNEY, WHO IS A PERSONAL FRIEND OF MY  10:39
```

Exhibit D - Page 654

1718

1    FAMILY FOR THE PAST 15 YEARS.   THERE WAS NOTHING I WAS GOING TO

2    HIDE FROM HER OR ANYBODY ELSE.

3              AT THE BOTTOM OF EACH ONE OF THOSE PAGES, IF YOU LOOK

4    ON THE BOTTOM -- I DON'T HAVE YOUR LASER POINTER --

5    Q    I HAVE IT RIGHT HERE.

6    A    NO.   A LITTLE BIT TO THE LEFT.

7              THE TIME STAMP OF THE CONTRACT, CAN SOMEBODY

8    HIGHLIGHT THAT.

9    Q    OKAY.

10   A    OCTOBER 4, 2000, AT 3:05 P.M., WHEN THE CONTRACT WAS

11   FINALLY DRAFTED.

12             AND THERE IS NO QUESTION ABOUT THAT.   AND THAT DATE

13   IS ON EVERY PAGE OF THESE THREE DOCUMENTS THAT YOU SHOWED ME.

14   Q    BUT MY QUESTION WAS ABOUT THE FAX HEADER.

15             YOU DIDN'T WANT PEOPLE TO KNOW THAT WHEN

16   CARTER BRYANT SENT THE FAX TO YOU OF HIS CONTRACT, WHEN HE

17   SIGNED IT, HE WAS STANDING AT MATTEL AT THE TIME AND WAS A

18   MATTEL EMPLOYEE.

19   A    HE WAS A MATTEL EMPLOYEE, AND I WAS NOT HAPPY IF HE WAS

20   DOING ANYTHING FROM MATTEL, INCLUDING SENDING A CONTRACT, A

21   SIGNED CONTRACT, TO US.   BUT I GUESS YOU GUYS FIGURED THAT OUT

22   AND SETTLED WITH HIM.

23             **MR. PRICE:**   MOVE TO STRIKE THE LAST PART.

24             **THE COURT:**   THAT LAST PART IS STRICKEN.   IT WAS

25   NONRESPONSIVE, THE LAST SENTENCE.

BY MR. PRICE:

Q    SO, AS YOU JUST SAID, CERTAINLY YOU WOULD HAVE BEEN
UNHAPPY IF MR. BRYANT SIGNED THE CONTRACT WITH MGA AND ACTUALLY
FAXED IT FROM MATTEL?  THAT'S WHAT YOU JUST SAID; CORRECT?

A    IF HE WAS USING MATTEL MATERIALS OR FAX MACHINE TO SEND
THIS, YES, I WAS NOT HAPPY ABOUT THAT.                             10:41

Q    THAT'S WHY YOU TOLD MS. O'CONNOR TO GET RID OF THE FAX
HEADER.

A    SIR, I NEVER TOLD HER TO GET RID OF THE FAX HEADER.  THERE
WAS NO REASON TO DO THAT.                                         10:41

Q    WELL, THEN, PERHAPS YOU CAN TELL US WHY THERE'S NO FAX
HEADER FOR MATTEL AND WHY THERE'S NO DATE HERE AS OF
SEPTEMBER 18, 2000.

A    I HAVE NO IDEA.

Q    SO SITTING HERE TODAY, YOU HAVE NO EXPLANATION AS TO WHY   10:41
THOSE TWO THINGS ARE MISSING FROM THIS DOCUMENT; IS THAT RIGHT?

A    I HAVE NO IDEA WHY THEY'RE MISSING, NO.

          THE COURT:  LET'S TAKE OUR MORNING BREAK AT THIS
TIME.

          (WHEREUPON, JURORS DEPART COURTROOM.)                  10:42

          THE COURT:  COUNSEL, THE COURT HAS JUST ISSUED THE
FOLLOWING ORDER:

          "ORDER VACATING THE COURT'S JUNE 5, 2008 ORDER
GRANTING MATTEL'S MOTION REGARDING ADVERSE JURY INSTRUCTION.

          "ON JUNE 5, 2008, THE COURT ISSUED AN ORDER CAPTIONED  10:42

1724

1        (JURORS ENTER COURTROOM.)

2              **THE COURT:**  COUNSEL, YOU MAY PROCEED.

3              **MR. PRICE:**  THANK YOU, YOUR HONOR.

4    **BY MR. PRICE:**

5    Q    MR. LARIAN, WE WERE LOOKING AT 13383; PERHAPS WE CAN PUT     11:12

6    THAT BACK UP, THE SECOND PAGE.

7              THIS IS THE CONTRACT THAT WAS FAXED TO MS. GLASER.

8              YOU RECALL THAT I WAS ASKING YOU ABOUT THE DATE NOT

9    BEING HERE, AS OF SEPTEMBER 18, 2000, AND FAX HEADER.

10             LET ME ASK YOU THIS:  I TAKE IT YOUR TESTIMONY IS      11:12

11   THAT YOU DIDN'T ASK FOR THIS TO BE DONE BECAUSE YOU HAVE

12   NOTHING TO HIDE.

13   A    THAT'S CORRECT.

14   Q    THAT IS, THERE WAS NO REASON TO HIDE FROM MS. GLASER OR

15   ANYONE THAT MR. BRYANT WORKED FOR MGA; IS THAT RIGHT?          11:12

16   A    I'M SORRY.  MR. BRYANT NEVER WORKED FOR MGA.  MR. BRYANT

17   WAS A CONTRACTOR WITH MGA.

18   Q    AND THERE WAS NO REASON TO HIDE THAT FROM ANYONE.

19   A    YES.  THERE'S NEVER BEEN A REASON TO HIDE THAT, NO.

20   Q    NEVER BEEN A REASON TO HIDE FROM ANYONE THAT MR. BRYANT    11:13

21   WAS INVOLVED IN BRATZ.

22   A    NO REASON TO HIDE THAT HE WAS INVOLVED WITH BRATZ.

23   Q    WELL, YOU KNOW THERE WAS A WOMAN WHO WORKED FOR YOU NAMED

24   RACHEL HARRIS; SHE WAS THE DIRECTOR OF THE CREATIVE SERVICES AT

25   MGA.                                                            11:13

```
 1   A    THAT'S CORRECT.

 2   Q    IT'S TRUE, SIR, THAT YOU CANNOT DENY THAT YOU TOLD

 3   MS. HARRIS THAT YOU DID NOT WANT BRYANT TO BE PUBLICALLY

 4   ASSOCIATED WITH BRATZ?

 5   A    I NEVER TOLD HER OR ANYBODY ELSE THAT I DON'T WANT TO HIDE    11:13

 6   CARTER BRYANT'S NAME OR ASSOCIATION WITH THE BRATZ.

 7   Q    SO SITTING HERE TODAY, YOU'RE DENYING YOU EVER SAID

 8   ANYTHING LIKE THAT TO HER; CORRECT?

 9   A    I DO.

10        MR. PRICE:   YOUR HONOR, IF WE COULD PLAY FROM             11:14

11   MR. LARIAN'S DEPOSITION TRANSCRIPT, MARCH 26, 2008, PAGE 278,

12   LINE 23, TO 279, LINE 15.

13        THE COURT:   ANY OBJECTION?

14        MR. NOLAN:   JUST ONE.

15        FOR COMPLETENESS, COULD WE GO DOWN TO LINE 15.             11:14

16        MR. PRICE:   15 IS WHERE I'M GOING.

17        MR. NOLAN:   NO OBJECTION.

18        THE COURT:   VERY WELL.

19        (VIDEO DEPOSITION PLAYS;

20        EXCERPTS AS PROVIDED BY COUNSEL:)                          11:15

21        "Q.    DID YOU EVER TELL RACHEL HARRIS IN WORDS OR

22        SUBSTANCE THAT SHE SHOULDN'T TALK ABOUT CARTER

23        BRYANT BEING INVOLVED WITH BRATZ?

24        A.    I DON'T RECALL IF I HAVE OR NOT.

25        Q.    YOU'RE NOT SURE IF YOU DID?
```

1        A.    I DON'T EVEN RECALL HER.

2        Q.    WELL, SO IS -- ARE YOU SAYING THAT IT'S --

3    YOU DON'T RECALL ONE WAY OR ANOTHER?

4        A.    I JUST DON'T RECALL.

5        Q.    WELL, ARE YOU DENYING YOU TOLD HER THAT?

6    THE WITNESS:  I JUST DON'T RECALL IT.

7    BY MR. ZELLER:

8        Q.    SO YOU MIGHT HAVE SAID IT TO HER, MIGHT

9    NOT; YOU'RE NOT SURE?

10       A.    NO.  I JUST DON'T RECALL IT."

11       (END OF EXERPT PROVIDED.)

12   **BY MR. PRICE:**

13   Q    SITTING HERE TODAY THOUGH, SIR, YOU CAN EMPHATICALLY STATE

14   UNDER OATH THAT IF MS. HARRIS SAYS YOU TOLD HER THAT YOU DIDN'T

15   WANT BRYANT TO BE PUBLICLY ASSOCIATED WITH BRATZ, THAT SHE IS            11:15

16   MISTAKEN.

17   A    I DON'T KNOW WHAT SHE HAD SAID OR NOT SAID.  I JUST DON'T

18   RECALL EVER SAYING THAT TO HER OR ANYBODY ELSE.

19   Q    AGAIN WE'RE GETTING INTO THE 'I DON'T RECALL.'

20        MY QUESTION IS, IF SHE SAYS UNDER OATH THAT'S WHAT             11:16

21   YOU TOLD HER, CAN YOU DENY THAT YOU TOLD HER THAT?

22   A    I DON'T RECALL IF I EVER SAID THAT.  THERE'S NO REASON FOR

23   ME TO DO THAT.

24   Q    CAN YOU DENY THAT YOU TOLD MS. HARRIS THAT IF ANYONE ASKS,

25   THAT YOU WERE GOING TO SAY THAT EITHER YOU OR YOUR DAUGHTER          11:16

1727

1   WERE THE ONE THAT CREATED BRATZ?

2   A    MGA CREATED BRATZ.   THERE'S NO QUESTION ABOUT THAT.

3   Q    MY QUESTION IS DIFFERENT.

4        CAN YOU DENY THAT YOU TOLD MS. HARRIS THAT IF ANYONE

5   ASKS, THAT YOU WERE GOING TO SAY YOU OR YOUR DAUGHTER CREATED    11:16

6   BRATZ AND NOT MR. BRYANT?

7   A    HER RECOLLECTION, THE TESTIMONY, IF THAT'S EXACTLY WHAT

8   SHE SAID, WOULD BE WRONG.

9   Q    AGAIN, THAT'S BECAUSE YOU HAVE NOTHING TO HIDE WITH

10  RESPECT TO MR. BRYANT'S INVOLVEMENT WITH BRATZ; IS THAT RIGHT?    11:16

11        MR. NOLAN:   OBJECTION, YOUR HONOR.   ASKED AND

12  ANSWERED.

13        THE COURT:   OVERRULED.

14        THE WITNESS:   I HAVE NOTHING TO HIDE, AND SHE WAS A

15  DISGRUNTLED EMPLOYEE.    11:17

16  BY MR. PRICE:

17  Q    SO NOW YOU'RE SAYING YOU BELIEVE MS. HARRIS IS NOT TELLING

18  THE TRUTH -- POTENTIALLY NOT TELLING THE TRUTH ABOUT IT.

19  A    NO, I'M NOT SAYING THAT.

20  Q    MS. O'CONNOR WHO TESTIFIED, SHE'S ALSO A DISGRUNTLED    11:17

21  EMPLOYEE?

22  A    I DON'T WANT TO GET INTO THAT, IF SHE WAS OR NOT, FOR

23  CONFIDENTIALITY REASONS.

24  Q    I'LL TAKE THAT UP LATER.

25        LET ME ASK YOU THEN, SIR, IF YOU WOULD LOOK AT    11:17

Exhibit D - Page 660

1    EXHIBIT 4507.  DO YOU RECOGNIZE 4507 AS AN E-MAIL STRING WHICH

2    INCLUDES AN E-MAIL FROM YOU TO VICTORIA O'CONNOR AND OTHERS?

3    A    THAT'S CORRECT.

4    Q    AND THIS IS DATED MARCH 12, 2002.  DO YOU SEE THAT?

5    A    YES.

6    Q    IF YOU GO INTO WHAT'S ATTACHED HERE, THE BOTTOM HALF OF

7    THIS E-MAIL, YOU SEE WHAT'S ATTACHED IS AN E-MAIL FROM A

8    DAVID DEES TO CARTER BRYANT, DATED MARCH 29, 2002.

9            DO YOU SEE THAT?

10   A    YES.

11   Q    AND MR. DEES ACTUALLY ATTACHED -- IF WE GO TO THE NEXT

12   PAGE -- AN E-MAIL FROM A FAN TO HIM -- IT STARTS HERE,

13   ACTUALLY, AND GOES DOWN -- FROM A FAN TO HIM AND THEN HIS

14   RESPONSE.

15           DO YOU SEE THAT?

16   A    I'M NOT SURE WHERE THE FAN IS.

17   Q    YOU SEE WHERE IT SAYS "HELLO, MY NAME IS CHRISTIAN.  I'M A

18   GIRL..."

19   A    YES.

20   Q    AND THEN YOU SEE THE "HI, CHRISTIAN"?

21   A    YES, I DO.

22   Q    DOWN HERE, IN THIS PARAGRAPH, YOU SEE --

23           BY THE WAY, DAVID DEES WAS AN ILLUSTRATOR?

24   A    I DON'T RECALL HIM.

25   Q    IT SAYS "HOWEVER, I CAN'T TAKE CREDIT FOR CREATING THE

1    BRATZ DOLLS OR EVEN THE FIRST BRATZ ILLUSTRATIONS, FOR THAT

2    HONOR SHOULD GO TO A FELLOW NAMED CARTER BRYANT WHO'S TRULY A

3    GENIUS OF FASHION AND THE SOLE AND ONLY PERSON WHO FIRST DREW

4    THOSE GREAT POUTY LIPS AND THAT EXTREME LOOK THAT ONLY OUR

5    HEROES SHARE."

6          THIS IS PART OF THAT E-MAIL THAT YOU READ AND THEN

7    RESPONDED TO?

8    A    YES.

9    Q    GO TO THE FIRST PAGE.  WE'LL HIGHLIGHT THIS.  THIS IS YOUR

10   RESPONSE ASKING "WHO GAVE DAVID DEES INFO TO WHAT HE DOES FOR    11:20

11   US TO THIS YAHOO LADY, AND WHY?"

12   A    YES, SIR, I DO.

13   Q    AND THERE'S A SECTION HERE, "JULIE, BETH, ABE, THERE MUST

14   BE NO MENTION ABOUT MATTEL OR ANY OF THEIR PROPERTIES, CARTER,

15   OR ANY MGA BRATZ PARTS, ET CETERA."  DO YOU SEE THAT?    11:20

16   A    I DO.

17   Q    SO HERE AT THIS POINT YOU'RE SAYING "DON'T MENTION CARTER

18   BRYANT"; CORRECT?

19   A    OR MGA OR BRATZ OR ANY OTHER PROPERTIES.

20   Q    WHAT YOU'RE UPSET ABOUT IS HE'S TALKING ABOUT CARTER    11:20

21   BRYANT.

22   A    NO.  I'M UPSET THAT HE'S -- TWO THINGS I'M UPSET ABOUT.

23   WOULD YOU LIKE ME TO EXPLAIN WHY I AM UPSET?

24   Q    THAT WAS MY QUESTION.  YOU CAN ANSWER IT FULLY.

25          YOU'RE UPSET BECAUSE HE MENTIONED CARTER BRYANT AS    11:20

1730

1    BEING THE CREATOR AND GENIUS BEHIND BRATZ/?

2    A     NO.   IF YOU READ THIS WHOLE DOCUMENT COMPLETELY, GO TO THE

3    PAGES, MGA 3801821, AND 801822, HE'S TALKING ABOUT EVERYTHING

4    ABOUT MGA, WHAT DO WE DO, BUSINESS, WHERE IS THE OFFICES; A LOT

5    OF INFORMATION ABOUT THE COMPANY THAT I DID NOT WANT TO HAVE ON          11:21

6    PUBLIC YAHOO WEB SITE.

7             SECONDLY, I HAD RECEIVED A LETTER, TO THE BEST OF MY

8    RECOLLECTION, FROM YOUR LAW FIRM, A CEASE AND DESIST LETTER,

9    REGARDING YAHOO TELLING ME THAT 'IF YOU DON'T PUT THIS WEB SITE

10   DOWN, WE ARE GOING TO SUE YOU,' AND I DIDN'T WANT TO BE               11:21

11   INVOLVED WITH MATTEL WITH ANY TYPE OF A LAWSUIT.

12   Q    THAT'S NOT WHAT THAT LETTER SAID, IS IT?

13            THE LETTER YOU GOT FROM OUR LAW FIRM HAD NOTHING TO

14   DO WITH SHUTTING DOWN A WEB SITE, DID IT?

15   A    I DON'T RECALL THE EXACT CONTENTS, BUT I'M SURE IT'S IN          11:21

16   THE EVIDENCE AND SOMEBODY WILL SHOW IT TO YOU.

17   Q    THAT'S EXHIBIT 17252.

18   A    I DON'T FIND 17252.

19   Q    I'VE BEEN TOLD IT'S THE LAST TAB.

20   A    YES, I HAVE IT NOW.                                            11:23

21   Q    IS THAT THE E-MAIL THAT YOU WERE REFERRING TO, DATED

22   FEBRUARY 7, 2002?

23   A    E-MAIL?

24   Q    IS THIS THE LETTER YOU WERE TALKING ABOUT, DATED

25   FEBRUARY 7, 2002?                                                   11:23

1    A    THAT'S ONE OF THE LETTERS THAT I RECEIVED -- ONE OF THE

2    LETTERS THAT I RECEIVED FROM YOUR LAW FIRM.

3    Q    WELL, YOU RECALL YOU PREVIOUSLY TESTIFIED UNDER OATH, THIS

4    LETTER IS THE REASON IN EXHIBIT 4507 HERE, THAT YOU SAID

5    'YOU'RE NOT TO MENTION MATTEL OR OTHER PROPERTIES, CARTER, MGA      11:23

6    BRATZ, ARTS, ET CETERA.'

7    A    THESE, TOGETHER WITH, THERE WERE RUMORS IN THE MARKET THAT

8    WE WERE GETTING FROM RETAILERS THAT MATTEL WAS JUST ABOUT TO

9    SUE US BECAUSE OF BRATZ, AND I DIDN'T WANT TO HAVE ANY ISSUES,

10   LEGAL BATTLE, WITH MATTEL.                                          11:24

11   Q    ACTUALLY, YOU PREVIOUSLY TESTIFY UNDER OATH THAT THE ONLY

12   THING YOU REMEMBER THAT CAUSED YOU TO BE UPSET WAS GETTING THIS

13   LETTER, EXHIBIT 17252.

14   A    MAYBE I, AT MY DEPOSITION, THAT'S WHAT I RECALLED.  BUT

15   GOING BACK AND LOOKING, THERE ARE OTHER DOCUMENTS THAT IT          11:24

16   SHOWS, AND THOSE ARE IN WRITING, THAT WE WERE HEARING FROM THE

17   RETAILERS THAT MATTEL WANTS TO SUE US BECAUSE BRATZ WAS

18   SUCCESSFUL.  AND THAT'S WHAT MATTEL DOES, FRANKLY, IN THE TOY

19   BUSINESS.

20        MR. PRICE:  YOUR HONOR, MOVE TO STRIKE THE LATTER             11:24

21   PART AS NONRESPONSIVE, AND REQUEST AN INSTRUCTION THAT ANYTHING

22   HE SAYS IS NOT OFFERED FOR THE TRUTH CONCERNING WHAT ANYONE

23   ELSE SAID.

24        THE COURT:  IS THERE ANY OBJECTION TO THAT

25   INSTRUCTION?                                                       11:24

1      **MR. NOLAN:**  YES, YOUR HONOR.  WE WOULD HAVE AN

2      OBJECTION, YOUR HONOR.  THERE'S GOING TO BE --

3          **THE COURT:**  ARE YOU SUGGESTING THAT IT IS BEING

4      OFFERED FOR THE TRUTH?

5          **MR. NOLAN:**  WITH RESPECT TO THAT IT'S NOT BEING                    11:25

6      OFFERED FOR THE TRUTH OF THE MATTER, BUT WHAT HIS STATE OF MIND

7      WAS.

8          **MR. PRICE:**  RIGHT.  THAT'S WHY I ASKED FOR THE

9      INSTRUCTION.

10          **THE COURT:**  VERY WELL.  THE LAST PORTION IS STRICKEN,        11:25

11      AND THE OUT-OF-COURT STATEMENT ESSENTIALLY IS NOT BEING OFFERED

12      FOR THE TRUTH OF THE MATTER ASSERTED.

13          COUNSEL.

14      **BY MR. PRICE:**

15      Q    SO SINCE YOU TELL US THAT'S YOUR STATE OF MIND AND WHY YOU        11:25

16      WROTE THIS, I'D LIKE TO PLAY, IF I COULD, YOUR HONOR, FROM THE

17      MARCH 26, 2008 DEPOSITION TRANSCRIPT, PAGE 279, LINE 16 TO PAGE

18      280, LINE ONE.

19          **MR. NOLAN:**  NO OBJECTION, YOUR HONOR.

20          **THE COURT:**  YOU MAY PROCEED.                                    11:25

21          (VIDEO DEPOSITION PLAYS; EXCERPTS

22          PROVIDED BY COUNSEL AS FOLLOWS: )

23          "Q.   DO YOU RECALL THAT THERE WAS A TIME WHEN AN

24          OUTSIDE DESIGNER NAMED DAVID DEES SENT AN EMAIL TO A

25          BRATZ FAN WEBSITE?

1733

```
 1          A.   I DON'T RECALL DAVID DEES.

 2          Q.   DO YOU RECALL ANY OUTSIDE DESIGNER SENDING

 3     AN EMAIL TO A BRATZ FAN WEBSITE THAT CAUSED YOU SOME

 4     CONCERN OR -- OR UPSET?

 5          A.   THE ONLY THING I REMEMBER THAT CAUSED ME

 6     UPSET WAS GETTING A LETTER FROM YOUR LAW FIRM ABOUT

 7     SOMEBODY'S -- SOMEBODY'S YAHOO WEBSITE.  THAT'S THE

 8     ONLY THING I REMEMBER."

 9          (END OF EXERPTS PROVIDED.)

10  BY MR. PRICE:

11  Q   NOW TURNING TO THAT LETTER, MR. LARIAN, EXHIBIT 17252 IS

12  THE LETTER YOU WERE REFERRING TO; CORRECT?

13  A   AGAIN, I DON'T RECALL, BECAUSE, AS I SAID, WE RECEIVED

14  SEVERAL LETTERS FRO YOUR LAW FIRM; SO I'M NOT SURE IF THIS IS

15  THE ONE OR ANOTHER ONE.

16  Q   YOU SEE THAT THIS IS A LETTER YOU RECEIVED FEBRUARY 7,

17  2002, FROM QUINN EMANUEL; CORRECT?

18  A   YES.

19          MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 17252 INTO

20  EVIDENCE.

21          MR. NOLAN:  NO OBJECTION.

22          THE COURT:  ADMITTED.  YOU MAY PUBLISH.

23  BY MR. PRICE:

24  Q   JUST SO WE'RE CLEAR, THE DATE OF EXHIBIT 4507 WAS MARCH

25  2002; CORRECT?
```

11:26

11:26

11:27

11:27

1734

1   A    CORRECT.

2   Q    SO THIS IS THE LETTER YOU RECEIVED -- IF WE COULD BLOW IT

3   UP HERE -- AND YOU SEE IT TALKS ABOUT THE 'MATTEL MARKS, BARBIE

4   AND DIVA STARZ TRADEMARKS, ARE BEING INFRINGED BY THE BRATZ

5   YAHOO DISCUSSION GROUP'?                                           11:27

6   A    I DO SEE THAT.

7   Q    AND A COPY OF THE HOME PAGE WAS ATTACHED TO THAT LETTER.

8         DO YOU SEE THAT?

9   A    SORRY?

10  Q    IT SAYS "ENCLOSED IS A COPY OF THE HOME PAGE."              11:27

11  A    I SEE THIS LETTER SAYS THAT.

12  Q    IT SAYS "THE KEY WORDS DESIGNATED BY MGA INCLUDE BARBIE

13  AND DIVA STAR."

14        DO YOU SEE THAT?

15  A    YES.                                                         11:27

16  Q    AND THE WAY THAT WORKS IS THAT IF SOMEONE IS DOING AN

17  INTERNET SEARCH, SAY, FOR BARBIE OR DIVA STAR, IF THAT'S A KEY

18  WORD, THAT MEANS THAT THE SEARCH RESULTS WILL INCLUDE A

19  WEB SITE ABOUT BRATZ.

20  A    I WOULD HAVE NO IDEA.  YOU GUYS WROTE THE LETTER.  I HAVE   11:28

21  NO IDEA.

22  Q    WELL, YOU CERTAINLY DIDN'T WRITE BACK AND SAY THIS IS

23  INCORRECT.

24  A    NO.  I TURNED THIS LETTER OVER TO MY ATTORNEY PATTY

25  GLASER.                                                          11:28

1    Q    SO WHEN INTERNET USERS SEARCH YAHOO FOR DISCUSSION GROUPS

2    RELATED TO MATTEL'S BARBIE AND DIVA STAR DOLLS, THE BRATZ

3    DISCUSSION GROUPS ARE IDENTIFIED.  DO YOU SEE THAT?

4    A    YES.

5    Q    AND THEN IT TALKS ABOUT 'THE COURTS HAVEN'T HESITATED TO         11:28

6    ENJOIN THE USE OF A COMPETITOR'S MARK TO DIVERT INTERNET USER

7    FROM FINDING A COMPETITOR'S WEB SITE OR TO DRIVE TRAFFIC TO THE

8    INFRINGER YOU CITE.'

9    A    I SEE WHAT THE LETTER SAYS.

10   Q    IF WE COULD GO TO THE SECOND PAGE.  AND AFTER HAVING SOME        11:28

11   OTHER CASES DISCUSSED, IT SAYS "MATTEL MUST REQUEST MGA

12   ENTERTAINMENT PROVIDE WRITTEN CONFIRMATION WITHIN ONE WEEK THAT

13   ALL KEY WORDS ON BRATZ SITES THAT CONSIST OF TERMS IDENTICAL OR

14   CONFUSINGLY SIMILAR TO MATTEL MARKS HAVE BEEN REMOVED AND THAT

15   MGA ENTERTAINMENT WILL NOT AGAIN USE MATTEL'S MARKS IN SUCH A        11:29

16   MANNER.'  DO YOU SEE THAT?

17   A    YES.

18   Q    AND THE MARKS THAT THEY WERE REFERRING TO -- WELL, YOU

19   WOULD AGREE THAT IF THA'S WHAT'S HAPPENING, THAT SHOULDN'T BE

20   HAPPENING; THAT IS, THAT MGA SHOULDN'T HAVE BEEN USING MATTEL'S      11:29

21   MARKS INTENTIONALLY TO DIVERT TRAFFIC TO THEIR WEB SITE.

22   A    SIR, MGA WAS NOT USING MATTEL'S MARKS.  THIS IS A FAN WHO

23   HAD COME UP WITH THE PUBLIC WEB SITE CALLED YAHOO ON HIS OWN,

24   WHAT HE WAS PUTTING DIVA STARZ AND BRATZ, AND YOU GUYS WERE

25   TRYING TO SUE ME BECAUSE SOMEBODY OUTSIDE -- LIKE A MEMBER OF        11:29

1   JURY COULD HAVE A WEB SITE AND PUT BARBIE AND BRATZ ON IT AND

2   DIVA STARZ, SAYING THAT, OKAY, IF YOU DON'T DO THIS, WE GOING

3   TO COME AND TAKE YOUR CHILDREN.

4   Q    SO SHOW ME WHERE THAT IS HERE.  I MUST HAVE MISSED THAT.

5   WHERE IS THAT?                                                    11:30

6   A    READ THE WHOLE LETTER.  IF YOU DON'T TAKE THIS OFF WITHIN

7   ONE WEEK -- I'M GOING TO READ IT COMPLETELY.

8   Q    SURE.  LET'S GO AND SEE WHERE THE KIDS ARE MENTIONED HERE.

9   A    NO, THEY ARE NOT MENTIONED.  I WAS BEING SARCASTIC.

10          MR. NOLAN:  WE'LL STIPULATE THAT THE CHILDREN ARE NOT     11:30

11   IN THIS LETTER.

12          THE COURT:  MOVE ALONG, COUNSEL.

13   BY MR. PRICE:

14   Q    IF WE GO HERE, WHAT IT'S TALKING ABOUT IS ENJOINING THE

15   USE OF A COMPETITOR'S MARK.                                      11:30

16          YOU KNOW WHAT THAT MEANS; RIGHT?

17   A    NO.  I'M NOT A LAWYER.  YOU WROTE THIS.  I HAVE NO IDEA

18   WHAT THAT MEANS.

19   Q    ARE YOU SAYING MGA HASN'T TOLD PEOPLE WHO ARE INFRINGING

20   ITS MARKS THAT IT WILL SEEK TO ENJOIN THEM FROM DOING THAT?      11:30

21   A    I AM SURE WE HAVE AND OUR LAWYERS HAVE DONE THAT.  I'M NOT

22   A LAWYER.

23   Q    IN FACT, YOU'VE HAD DOZENS OF CASES WHERE MGA HAS FILED

24   LAWSUITS TO PROTECT ITS INTELLECTUAL PROPERTY.

25   A    I BELIEVE WE HAVE.  I DON'T KNOW IF THERE ARE DOZENS, BUT    11:31

```
 1    I BELIEVE WE HAVE FILED TO STOP PEOPLE IN USING OUR
 2    INTELLECTUAL PROPERTY.
 3    Q    SO, FOR EXAMPLE, YOU DON'T WANT A COMPETITOR USING THE
 4    NAME BRATZ ON THEIR DOLLS; RIGHT?
 5    A    NO, I DON'T.  WITHOUT OUR PERMISSION, I DON'T.          11:31
 6    Q    SO YOU UNDERSTAND WHAT AN INJUNCTION IS AN ORDER SAYING
 7    YOU CAN'T DO THAT.
 8    A    CORRECT.
 9    Q    AND I GUESS WHAT YOU'RE TELLING US IS THIS SITE WASN'T
10    EVEN MGA'S SITE, SO YOU DIDN'T REALLY CARE IF IT WAS SHUT DOWN  11:31
11    OR NOT.
12    A    NO.  ALL I'M SAYING IS THAT THIS WAS NOT AN MGA SITE.  WE
13    HAD NOT PUT THAT UP.  SOMEBODY ELSE HAD PUT THAT UP.  YET, YOU
14    WROTE US A LETTER TELLING US TO -- I DON'T KNOW, WHATEVER YOUR
15    LETTER SAYS TO DO.                                           11:31
16    Q    BUT I GUESS YOU'RE TELLING US IS THAT YOU DIDN'T CARE IF
17    THE SITE WAS ENJOINED OR NOT BECAUSE IT WASN'T YOURS.
18    A    I HAVE NO IDEA.  I DON'T HAVE A RECOLLECTION.  ALL I
19    REMEMBER IS THAT WHEN I GET THIS LETTER, I WAS VERY UPSET.  AND
20    KNOWING MATTEL, THAT THEY SUE EVERYBODY, I SENT THIS TO MY    11:32
21    LAWYER.
22         MR. PRICE:  MOVE TO STRIKE AS NONRESPONSIVE, THOUGH
23    NOT UNEXPECTED.
24         THE COURT:  EVERYTHING AFTER "I HAVE NO IDEA AND I
25    DON'T HAVE ANY RECOLLECTION AT ALL"; AFTER THAT, THE ANSWER IS  11:32
```

```
 1   STRICKEN.

 2   BY MR. PRICE:

 3   Q    YOU'LL AGREE, THOUGH, THAT WHAT THIS LETTER IS TALKING

 4   ABOUT ARE THESE MATTEL MARKS, BARBIE AND DIVA STARZ; IS THAT

 5   CORRECT?

 6   A    THIS IS BARBIE AND DIVA STAR; IT DOESN'T HAVE THE Z AT THE

 7   END.

 8   Q    BUT THAT'S WHAT IT'S TALKING ABOUT.

 9   A    YES.

10   Q    SO LET'S GO BACK TO EXHIBIT 4507.

11        CARTER IS NOT A MATTEL TRADEMARK, AS FAR AS YOU KNOW;

12   CORRECT?

13   A    HE'S NOT.

14   Q    AND THE LETTER YOU GOT FROM MATTEL HAD NOTHING TO DO WITH

15   NOT MENTIONING CARTER BRYANT, DID IT?

16   A    NO.  BUT THAT YAHOO WEB SITE HAD CARTER BRYANT'S NAME AND

17   OTHER THINGS IN THERE, AND I JUST DIDN'T WANT TO HAVE A LAWSUIT

18   BASICALLY BROUGHT FROM MATTEL REGARDING ANY MATTER THAT WILL

19   UPSET YOU.

20   Q    SO AT THIS POINT, THEN, YOU'RE SAYING IT WASN'T YOUR

21   INTENTION TO KEEP CARTER BRYANT UNDER WRAPS?

22   A    HE WAS NOT UNDER WRAPS.  HE WAS ALREADY IN THE NEWS.

23   Q    I'M TALKING ABOUT YOUR INTENTION -- IN THIS TIME FRAME,

24   SPRING 2002, IT WAS NOT YOUR INTENTION TO KEEP CARTER BRYANT

25   UNDER WRAPS BECAUSE YOU'RE TRYING TO HIDE SOMETHING; IS THAT
```

11:32
11:32
11:33
11:33
11:33

```
 1   CORRECT?

 2   A    THAT IS TRUE.  WE'VE NEVER TRIED TO HIDE CARTER BRYANT'S

 3   NAME.

 4   Q    IN THAT CASE, LOOK AT EXHIBIT 4942 THEN IN FRONT OF YOU.

 5        DO YOU RECOGNIZE THAT AS AN E-MAIL STRING WHICH AT       11:34

 6   THE TOP HAS AN E-MAIL BETWEEN YOU AND DEEDEE VALENCIA?

 7   A    YES.

 8   Q    AND COULD YOU TELL US WHO DEEDEE VALENCIA IS?

 9   A    I DON'T RECOLLECT WHO SHE WAS.  I THINK SHE WAS A PRODUCT

10   MANAGER, BUT I DO NOT REMEMBER EXACTLY.                       11:34

11   Q    AND BY A PRODUCT MANAGER, WHAT WOULD THE DUTIES OF A

12   PRODUCT MANAGER BE?

13   A    PRODUCT MANAGERS MANAGE PRODUCTS; THEY COME UP WITH

14   PRODUCT IDEAS, ET CETERA.

15   Q    NO RELATION TO DAVID DEES, AS FAR AS YOU KNOW?           11:34

16   A    WHO?

17   Q    DEEDEE VALENCIA.

18   A    I DON'T UNDERSTAND YOUR QUESTION.  WAS IT A JOKE?

19   Q    YOU DO RECOGNIZE THE EXHIBIT; CORRECT?

20   A    I DO.                                                    11:34

21        MR. PRICE:  MOVE EXHIBIT 4942 INTO EVIDENCE, YOUR

22   HONOR.

23        MR. NOLAN:  NO OBJECTION.

24        THE COURT:  IT'S ADMITTED YOU MAY PUBLISH.

25   / / /                                                        11:35
```

1740

BY MR. PRICE:

1    Q    AND IT BEGINS WITH AN E-MAIL SENT BY DEEDEE VALENCIA TO

3    YOU.

4            DO YOU SEE THAT?

5    A    YES.                                                    11:35

6    Q    THIS IS IN FEBRUARY OF 2003; RIGHT?

7    A    CORRECT.

8    Q    HER IDEA IS "LET'S DO A LIMITED EDITION COLLECTIBLE."

9    A    I SEE THAT.

10   Q    WHAT OFTEN HAPPENS ON THESE LIMITED EDITION COLLECTIBLES,  11:35

11   THERE'S A SIGNATURE OF SOME SORT OF A CREATOR OR SOMEONE

12   ASSOCIATED WITH THE PRODUCT.

13   A    ALL I CAN DO IS TALK ABOUT MGA, AND WE HAVE DONE

14   COLLECTIBLE DOLLS AND THEY DON'T HAVE A SIGNATURE OR ANYTHING

15   ELSE ON IT.                                                 11:35

16   Q    WELL, ACTUALLY, IN THIS E-MAIL, MS. DEES FIRST TALKS ABOUT

17   HOW ONE WOULD SELL AND DISTRIBUTE THIS COLLECTIBLE DOLL;

18   CORRECT?

19   A    WHERE ARE YOU LOOKING AT?

20   Q    LIMITED EDITION COLLECTIBLE, SELLING/DISTRIBUTION, THERE'S  11:36

21   A PARAGRAPH HERE ON WHAT THE DISTRIBUTION WOULD BE OF THE DOLL;

22   CORRECT?

23   A    IT SAYS 'SELLING AND DISTRIBUTION.'

24   Q    AND THEN THERE'S A THING HERE, WHAT WERE THE FEATURES OF

25   THIS COLLECTIBLE DOLL.                                       11:36

1    A    THAT'S CORRECT; THAT'S WHAT SHE'S SAYING.

2    Q    SO WHEN YOU READ THIS, YOU WERE LOOKING AT HER IDEAS AS TO

3    WHAT KINDS OF FEATURES YOU MIGHT WANT TO PUT ON A COLLECTIBLE

4    DOLL; CORRECT?

5    A    SHE HAD A WHOLE BUNCH OF IDEAS ABOUT PRODUCTS HERE, AND I    11:36

6    REPLIED IN THE TOP SAYING "GOOD IDEAS, LET'S DISCUSS IN

7    NEW YORK."

8    Q    AND THE FIRST THING IS "SIGNED BY ?  I KNOW WE WANT TO

9    KEEP CARTER UNDER WRAPS."

10          THAT'S ONE OF THE THINGS YOU READ WHEN YOU READ THIS    11:36

11   E-MAIL IN FEBRUARY 2003, YOU READ MS. DEES SAYING TO YOU, WE

12   WANT TO KEEP CARTER UNDER WRAPS, SO WHO'S GOING TO SIGN THIS.

13   A    I DON'T RECALL PAYING ATTENTION TO THAT PORTION OF THE

14   E-MAIL.  I COULD HAVE, BUT I DON'T RECALL IT.  THERE WAS NO

15   REASON TO HIDE CARTER BRYANT'S NAME.    11:37

16   Q    WELL, THEN IF THERE'S NO REASON TO HIDE CARTER BRYANT'S

17   NAME, THIS MUST HAVE REALLY SURPRISED YOU OR UPSET YOU, WHERE

18   ONE OF YOUR PRODUCT MANAGERS SAYS TO YOU "I KNOW WE WANT TO

19   KEEP HIM UNDER WRAPS."

20   A    NO, IT DID NOT.    11:37

21   Q    SO IT WOULDN'T SURPRISE YOU IF ONE OF YOUR PRODUCT

22   MANAGERS SAID TO YOU "I KNOW THAT WE WANT TO KEEP CARTER BRYANT

23   UNDER WRAPS."

24   A    THERE WAS NO NEED TO KEEP CARTER BRYANT'S NAME UNDER

25   WRAPS; SO I DON'T KNOW WHAT YOU'RE GETTING AT.    11:37

1  Q    SO YOU WOULDN'T WANT YOUR PEOPLE TO HAVE THE IMPRESSION

2  THAT IT WAS YOUR DESIRE TO KEEP CARTER BRYANT UNDER WRAPS.  YOU

3  WOULDN'T WANT THAT.

4  A    ALL I CAN REMEMBER IS THAT WE HAD NO IDEA TO HIDE

5  CARTER BRYANT'S NAME.  AS A MATTER OF FACT, WE HAD NOT.  IT WAS    11:37

6  ALL OVER.

7  Q    MY QUESTION IS DIFFERENT.

8         IT'S THAT CERTAINLY YOU WOULDN'T WANT YOUR EMPLOYEES,

9  LIKE YOUR PRODUCT MANAGERS, TO BE UNDER THE MISIMPRESSION THAT

10 THEY ARE TO KEEP CARTER BRYANT UNDER WRAPS.  YOU WOULDN'T WANT    11:38

11 THEM TO HAVE THAT IMPRESSION IF IT WEREN'T TRUE.

12 A    I HAVE NO RECOLLECTION OF HAVING ANYBODY WANTING TO KEEP

13 HIS NAME UNDER WRAPS.

14         I DON'T THINK I UNDERSTAND YOUR QUESTION.

15 Q    I THINK YOU SAID THAT YOU DIDN'T WANT TO KEEP CARTER    11:38

16 BRYANT UNDER WRAPS; RIGHT?

17 A    WE HAD NO REASON TO KEEP CARTER BRYANT OR ANYBODY ELSE

18 UNDER WRAPS.

19 Q    SO IF THAT'S CORRECT, THEN CERTAINLY YOU WOULDN'T WANT THE

20 PEOPLE WORKING FOR YOU TO THINK THAT; YOU WOULDN'T WANT THEM TO    11:38

21 THINK THAT THEY HAD TO HIDE CARTER BRYANT; RIGHT?

22 A    I WAS NOT IN THEIR HEAD.  I DON'T KNOW WHAT THEY WERE

23 THINKING OR NOT THINKING.

24 Q    SURE YOU KNOW WHAT THEY WERE THINKING.  DEEDEE VALENCIA

25 JUST WROTE TO YOU AND SAID "I KNOW WE WANT TO KEEP CARTER UNDER    11:38

1    WRAPS."

2    A    I SEE WHAT SHE WROTE.

3    Q    YOU'RE TELLING US THAT IS UNTRUE AND YOU WOULDN'T WANT

4    PEOPLE TO THINK THAT; RIGHT?

5    A    WE HAD NO REASON TO HIDE CARTER BRYANT'S NAME UNDER WRAPS.    11:38

6    Q    SO IF THAT'S TRUE, THEN CLEARLY WHAT YOU WOULD SAY IN YOUR

7    RESPONSE IS, "I DON'T KNOW WHERE YOU'RE GETTING THIS, BUT

8    PLEASE, YOU GUYS, QUIT KEEPING CARTER BRYANT UNDER WRAPS."

9    A    NO.  NOT NECESSARILY.  I WAS LOOKING AT HER PRODUCT IDEAS,

10   I'M A PRODUCT PERSON, AND I SAID 'YOU HAVE GOOD IDEAS.'    11:39

11   Q    YOU'RE CORRECT.  IN YOUR RESPONSE, YOU DIDN'T SAY ANYTHING

12   LIKE 'YOU'RE MISTAKEN, MS. VALENCIA.  I DON'T KNOW WHERE THIS

13   IS COMING FROM.'

14   A    I DID NOT.

15   Q    SO BASED UPON YOUR RESPONSE, YOUR BELIEF IS MS. VALENCIA    11:39

16   KEPT THINKING THAT YOU WANTED HER TO KEEP CARTER BRYANT UNDER

17   WRAPS.

18   A    I DON'T KNOW WHAT SHE WAS THINKING.  ALL I CAN TELL YOU IS

19   I THOUGHT SHE HAD GOOD PRODUCT IDEAS, AND I REPLIED TO THAT.

20   Q    DO YOU HAVE ANY IDEA HOW MS. VALENCIA CAME TO THE    11:39

21   CONCLUSION THAT YOU WANTED TO KEEP CARTER BRYANT UNDER WRAPS?

22   A    I HAVE NO IDEA.  YOU SHOULD CALL HER IN AND ASK HER.

23   Q    WELL, DID YOU ASK HER WHEN SHE TOLD YOU THAT IN FEBRUARY

24   OF 2003?

25   A    NOT BESIDE THE E-MAIL THAT I SENT, NO.    11:40

1744

```
 1    Q    WAS THIS ONE OF HER GOOD IDEAS:  "I KNOW WE WANT TO KEEP

 2    CARTER BRYANT UNDER WRAPS"?

 3    A    NO.  THE PRODUCT WAS A GOOD IDEA; TO DO A DOLL WITH PLUSH

 4    BODY WITH A PLASTIC HEAD WAS A GOOD IDEA, AND MAKE IT A

 5    COLLECTIBLE.                                                      11:40

 6    Q    IF YOU LOOK AT EXHIBIT 1932, DO YOU RECOGNIZE THIS AS A

 7    LIST OF FORMER MATTEL EMPLOYEES WORKING AT MGA THAT WAS CREATED

 8    BY MGA?

 9    A    I DO NOT.  I'VE NEVER SEEN THIS DOCUMENT BEFORE.

10    Q    YOU DON'T RECOGNIZE THIS AT ALL?                            11:41

11    A    I DO NOT.

12    Q    DID YOU EVER TELL ANYONE AT MGA THAT WITH RESPECT TO

13    CARTER BRYANT'S DATES OF WORKING FOR MATTEL, THAT THEY WERE NOT

14    TO ASK THAT QUESTION?

15    A    I DID NOT.                                                  11:42

16    Q    WERE YOU HERE A COUPLE OF DAYS AGO WHEN MR. NOLAN WAS

17    EXAMINING MS. O'CONNOR ABOUT THE -- THERE WAS A TOY OF THE YEAR

18    AWARDS IN 2002.  DO YOU RECALL THAT?

19    A    NO.

20    Q    DID YOU ATTEND A TOY OF THE YEAR AWARDS IN 2002?            11:42

21    A    I BELIEVE I DID.

22    Q    AND DO YOU RECALL MR. NOLAN ASKING MS. O'CONNOR WHETHER OR

23    NOT AT THAT AWARDS CEREMONY YOU, IN FACT, IDENTIFIED

24    MS. O'CONNOR AS SOMEONE WHO HAD CONTRIBUTED TO BRATZ?

25    A    I THINK YOU'RE MAKING A MISTAKE OF THE TWO SHOWS.  THERE    11:42
```

1745

1   WAS A LICENSING SHOW, AND I DON'T REMEMBER THE EXACT DATE OF

2   IT, WHERE BRATZ WAS NAMED PROPERTY OF THE YEAR, AND WE WON, AND

3   AT THAT SHOW I STOOD UP IN FRONT OF A THOUSAND PEOPLE AND I

4   SAID VICTORIA O'CONNOR WAS ONE OF THE PEOPLE WHO WAS

5   INSTRUMENTAL IN MAKING A LICENSING PROGRAM FOR MGA, FOR          11:43

6   STARTING THE LICENSING DEPARTMENT AT MGA; SO YOU'RE MISTAKING

7   THE TWO SHOWS.

8   Q    I'M BASING THAT ON THE TRANSCRIPT.

9        SO IF MS. O'CONNOR TESTIFIED IN RESPONSE TO

10  MR. NOLAN'S QUESTIONS, OR AGREED THAT YOU HAD SINGLED HER OUT    11:43

11  AT SOME TOY OF THE YEAR AWARD CEREMONY, THAT WOULD BE MISTAKEN

12  AS TO WHICH ONE IT WAS?

13  A    MAYBE MR. NOLAN MADE A MISTAKE.  HE'S A LAWYER.

14       IT WAS DEFINITELY A LICENSING SHOW IN 2002 OR 2003, I

15  DON'T REMEMBER THE EXACT DATE, WHERE BRATZ WAS NAMED PROPERTY    11:43

16  OF THE YEAR; AND, AGAIN, I GOT UP AND I ACKNOWLEDGED

17  VICTORIA O'CONNOR AS BEING THE PERSON WHO STARTED THE LICENSING

18  DEPARTMENT AT MGA.

19  Q    WELL, THERE WAS A TOY OF THE YEAR AWARD IN 2002.

20  A    I THINK THERE WAS, YES.                                     11:44

21  Q    AND BRATZ WAS RECOGNIZED.

22  A    YES, AS TOY OF THE YEAR.

23  Q    AND AT THE TIME BRATZ WAS RECOGNIZED, I TAKE IT YOU MADE

24  SOME REMARKS.

25  A    I DID.                                                      11:44

Exhibit D - Page 678

1    Q    AND WHEN YOU MADE THE REMARKS ABOUT BRATZ, IT'S TRUE, IS

2   IT NOT, THAT YOU DIDN'T MENTION CARTER BRYANT?

3   A    NO, I DID NOT.

4    Q    IN FACT, AT THAT CEREMONY, AND PERHAPS IT WAS AFTER, THERE

5   WAS SOMEONE INTERVIEWING YOU AND ASKED YOU WHO CAME UP WITH THE      11:44

6   NAME BRATZ.  DO YOU RECALL THAT?

7   A    I DO NOT RECALL THAT.

8          MR. PRICE:  YOUR HONOR, WE'VE SUPPLIED TO MR. NOLAN A

9   VIDEO CLIP MARKED EXHIBIT 13182-B, STATEMENTS BY MR. LARIAN.

10         I WONDER IF WE COULD PLAY THAT.                               11:45

11         THE COURT:  ANY OBJECTION?

12         MR. NOLAN:  WE HAVE IT.  THERE'S A PORTION --

13         MAY I JUST TALK TO MR. PRICE FOR JUST ONE MOMENT.

14         THE COURT:  YOU MAY.

15         (SOTTO VOCE DISCUSSION BETWEEN COUNSEL. )                     11:45

16         MR. PRICE:  IT'S A FULL CLIP.  IT SHOWS MR. LARIAN'S

17  ACCEPTANCE SPEECH.  THE PART WE'RE PLAYING IS THE INTERVIEW.

18         THE COURT:  VERY WELL.

19         ANY OBJECTION?

20         MR. NOLAN:  NO, YOUR HONOR.  WE'LL PLAY THE                   11:45

21  ACCEPTANCE SPEECH IN OUR PORTION OF THE CASE.

22         MR. PRICE:  I MAY OBJECT TO HEARSAY, BUT I'LL LOOK AT

23  IT.

24         THE COURT:  WE'LL DEAL WITH THAT AT THE TIME.

25         GO AHEAD AND PLAY WHAT'S NOT OBJECTED TO.                     11:46

```
 1              (MEDIA CLIP PLAYED; EXCERPT NOT PROVIDED.)

 2    BY MR. PRICE:

 3    Q    SIR, THIS WAS THE INTERVIEW AFTER YOUR ACCEPTANCE SPEECH;

 4    CORRECT?

 5    A    I DON'T KNOW IF IT WAS BEFORE OR AFTER.                    11:46

 6    Q    AND IN YOUR SPEECH ITSELF, YOU DID SINGLE OUT SOME MGA

 7    FOLKS.

 8    A    I'M NOT SURE IF I DID.  I DON'T REMEMBER.  I THANK ALL OF

 9    THE MGA EMPLOYEES.  I DIDN'T KNOW IF I SINGLED OUT PEOPLE.

10    MAYBE I HAVE.  I DON'T RECALL.                                 11:46

11    Q    I THINK YOU TOLD US YOU DIDN'T CONSIDER CARTER BRYANT TO

12    BE AN EMPLOYEE; IS THAT RIGHT?

13    A    HE WAS NEVER AN EMPLOYEE OF MGA.

14    Q    IT'S FAIR TO SAY THAT IN THE SPEECH YOU GAVE, YOU MADE NO

15    MENTION OF CARTER BRYANT; CORRECT?                             11:47

16    A    I DON'T THINK I DID.  I DON'T RECALL IF I DID OR NOT.

17    Q    AND YOU WERE ASKED HOW DID YOU COME UP WITH THIS NAME

18    BRATZ; THAT WAS SOMETHING YOU WERE ASKED AFTERWARDS; CORRECT?

19    A    CORRECT.

20    Q    AND IF WE GO TO EXHIBIT 302, I THINK YOU'VE AGREED THAT   11:47

21    THE PERSON WHO CAME UP WITH THE NAME BRATZ -- IF WE CAN SHOW

22    THAT -- WAS CARTER BRYANT; THAT WAS PRESENTED TO YOU IN

23    SEPTEMBER.

24    A    ABSOLUTELY.  CARTER BRYANT CAME UP WITH THE NAME BRATZ.

25    WE CONSIDERED MANY NAMES, AND AT THE END WE SETTLED ON THE NAME 11:47
```

```
 1   THAT CARTER BRYANT HAD COME UP WITH.

 2   Q    SO IF YOU WEREN'T TRYING TO KEEP CARTER BRYANT UNDER

 3   WRAPS, THEN WHEN YOU WERE ASKED 'HOW DID YOU COME UP WITH THE

 4   NAME BRATZ,' WHY DIDN'T YOU TELL THE REPORTER THE INDIVIDUAL

 5   WHO FIRST GAVE YOU THE NAME BRATZ TO ATTACH TO THESE DOLLS?        11:47

 6   A    BECAUSE WE CONSIDERED MANY NAMES -- ONE OF THEM WAS

 7   FASHION FRIENDS, ANOTHER ONE WAS BABEZ, THOSE ARE THE ONES THAT

 8   I REMEMBER -- AND I RECALL SITTING IN THE ROOM LOOKING AT THE

 9   DOLLS AND CONSIDERING THE NAMES.  ORIGINALLY I HAD CONCERNS

10   WITH NAMING THESE 'BRATZ' BECAUSE IT HAD KIND OF NEGATIVE          11:48

11   CONNOTATION.  BUT ONE OF THE PEOPLE IN THE MEETING SAID THEY

12   LOOK LIKE LITTLE BRATZ; SO THAT'S WHAT I SAID, LET'S CALL IT

13   BRATZ.  AND THAT'S WHAT THAT CLIP IS REFERRING TO.

14   Q    YOU SAID YOU HAD A LIST OF NAMES YOU WERE LOOKING AT.

15   A    YES.                                                          11:48

16   Q    AND VARIOUS PEOPLE PROVIDED VARIOUS NAMES TO CONSIDER.

17   A    CORRECT.

18   Q    AND DID YOU HAVE AN OUTSIDE COMPANY WHO ACTUALLY SAID

19   'HERE'S SOME NAMES YOU MIGHT CONSIDER'?

20   A    IT MIGHT BE.  I DON'T RECALL.  I REMEMBER TWO OF THE          11:48

21   NAMES, BECAUSE ONE CAME FROM ME AND IT WASN'T GOOD ENOUGH.

22   Q    AND ONE OF THE NAMES ON THAT LIST WAS BRATZ WITH A "Z"?

23   A    BRATZ WITH A "Z" CAME FROM CARTER BRYANT.

24   Q    THAT WAS ONE OF THE NAMES ON LIST.

25   A    CORRECT.                                                      11:49
```

1    Q    AS YOU SAID, THAT NAME ON THAT LIST CAME FROM

2    CARTER BRYANT.

3    A    CORRECT.

4    Q    I THINK YOU JUST SAID YOU WERE IN A ROOM LOOKING AT THE

5    DOLLS.                                                          11:49

6    A    LOOKING AT PICTURES OF THE DRAWINGS.

7    Q    BUT I THOUGHT YOU SAID YOU WERE IN A ROOM LOOKING AT THE

8    DOLLS.

9    A    MAYBE I MISSPOKE.  WE WERE LOOKING AT THE DRAWINGS.

10   Q    SO YOU AGREE WITH MS. GARCIA THAT IT ALL STARTS WITH THE   11:49

11   DRAWING; IT ALL STARTS WITH THAT SKETCH.

12   A    THE DRAWINGS WERE THE INSPIRATION FOR THE BRATZ.  THE

13   DRAWINGS THAT CARTER BRYANT SHOWED US ARE ABSOLUTELY THE

14   INSPIRATION FOR THE BRATZ.

15   Q    SO IT'S NOT UNEXPECTED THAT YOU MIGHT SAY, WITHOUT GREAT   11:49

16   PRECISION, 'WE WERE LOOKING AT THE DOLLS,' WHEN ACTUALLY YOU

17   WERE LOOKING AT THE DRAWINGS?

18   A    I DON'T UNDERSTAND YOUR QUESTION.

19   Q    IT'S AN UNDERSTANDABLE MISTAKE TO MAKE THAT YOU JUST MADE,

20   SAYING WHEN YOU ARE LOOKING AT THE DRAWINGS, SAYING WE'RE       11:50

21   LOOKING AT THE DOLLS?

22   A    EIGHT YEARS LATER, NOW THAT WE HAVE THE DOLLS, WE REALLY

23   ARE FOCUSING ON THE DOLLS AND NOT THE DRAWINGS.  BUT AT THE

24   TIME THERE WERE NO DOLLS, THERE WERE JUST DRAWINGS; SO YOU HAVE

25   TO PUT THAT IN CONTEXT.                                         11:50

1750

1    Q    SO THEN IF, IN FACT, IT WAS MR. BRYANT WHO WAS RESPONSIBLE

2    FOR THAT NAME BRATZ BEING ON THAT LIST, WHEN YOU WERE ASKED

3    'HOW DID YOU COME UP WITH THE NAME?'  WHY DIDN'T YOU SAY,

4    'WELL, THAT WAS THE NAME THE CREATOR GAVE US WHEN HE FIRST GAVE

5    US THE DRAWINGS; THEY WERE CALLED BRATZ'?                            11:51

6    A    BECAUSE.  YOU SAW THE CLIP.  THAT'S WHAT I SAID.  THAT'S

7    WHAT I SAID IN THERE, IS THAT WE WERE SITTING AROUND THE ROOM

8    LOOKING AT -- I WILL CORRECT MYSELF, THE DRAWINGS, AND SOMEBODY

9    SAID THEY LOOK LIKE LITTLE BRATZ, LET'S CALL THEM BRATZ.  AND I

10   SAID LET'S JUST CALL THEM BRATZ.                                     11:51

11   Q    IF YOU WEREN'T TRYING TO KEEP CARTER BRYANT UNDER WRAPS,

12   AS MS. VALENCIA THOUGHT YOU WERE TRYING TO DO, IF YOU WEREN'T

13   TRYING TO DO THAT, WHY DIDN'T YOU SAY, WHEN YOU WERE ASKED 'HOW

14   DID YOU COME UP WITH THIS?'  'THE CREATOR CAME UP WITH IT;

15   CARTER BRYANT.  GOOD JOB.'                                           11:51

16   A    BECAUSE THERE WAS NO REASON TO BRING CARTER BRYANT INTO IT

17   OR NOT TO BRING INTO IT.  I WASN'T THINKING.  I WAS VERY

18   EXCITED.  WE HAD JUST WON TOY OF THE YEAR AWARD.  IT WAS RIGHT

19   AFTER THE AWARD CEREMONY.  FRANKLY, IT WAS A BIG SURPRISE THAT

20   WE HAD WON.  AND I JUST RECALL THAT MEETING, AND THAT'S WHAT I     11:52

21   SAID.

22   Q    WELL, AT THE CEREMONY ITSELF, WHY DIDN'T YOU SAY "I

23   PARTICULARLY WANT TO GIVE THANKS TO CARTER BRYANT, THE MAN WHO

24   CREATED THIS'?

25   A    MGA CREATED BRATZ.  MGA TOOK CARTER BRYANT'S DRAWINGS AS     11:52

FRIDAY, JUNE 6, 2008                    TRIAL DAY 9, MORNING SESSION
Exhibit D - Page 683

1751

```
 1    INSPIRATION.  MGA INVESTED MILLIONS OF DOLLARS, TIME AND

 2    EFFORT, TO MAKE BRATZ HAPPEN.  MGA EMPLOYEES DID.  AND I

 3    THANKED ALL OF THEM TO THE BEST OF MY RECOLLECTION.  I DID NOT

 4    THINK OF NAMES.  THAT'S THE BEST OF MY RECOLLECTION.

 5    Q    I THINK EARLIER WHEN WE WERE TALKING ABOUT MS. VALENCIA      11:52

 6    SAYING 'WE WANT TO CAN KEEP CARTER BRYANT UNDER WRAPS,' YOU

 7    SAID THAT THERE WAS NO NEED TO IN THAT TIME FRAME, SPRING OF

 8    2002, BECAUSE IT WAS IN THE NEWS AND PEOPLE KNEW ABOUT

 9    MR. BRYANT CREATING BRATZ.

10            MR. NOLAN:  OBJECTION.  MISSTATES HIS TESTIMONY.         11:53

11            THE COURT:  IT'S A QUESTION.

12            IS THAT ACCURATE?

13            THE WITNESS:  CAN YOU PLEASE REPEAT THE QUESTION.

14            THE COURT:  REPHRASE THE QUESTION, COUNSEL.

15    BY MR. PRICE:                                                    11:53

16    Q    WE WERE TALKING ABOUT MS. VALENCIA'S E-MAIL, WHERE SHE

17    SAID 'WE WERE TRYING TO KEEP CARTER BRYANT UNDER WRAPS.'

18    DIDN'T YOU SAY THERE WAS NO REASON TO, BECAUSE HIS NAME IS OUT

19    THERE IN THE PRESS?

20    A    NO.  I TOLD YOU, WE HAVE NEVER TRIED TO HIDE                11:53

21    CARTER BRYANT'S NAME.  AS A MATTER OF FACT, I RECALL -- YOU

22    KNOW WHAT, I JUST DON'T WANT TO --

23            MR. PRICE:  MOVE TO STRIKE AS NONRESPONSIVE.

24            THE COURT:  IT IS.

25            ASK YOUR QUESTION AGAIN, COUNSEL.                        11:53
```

1    **BY MR. PRICE:**

2    Q    I'M ASKING, MR. LARIAN, PREVIOUSLY DIDN'T YOU SAY THAT ONE

3    OF THE REASONS YOU HAD NO DESIRE TO KEEP CARTER BRYANT'S NAME

4    UNDER WRAPS WAS BECAUSE HIS NAME WAS ALREADY OUT THERE IN

5    CONNECTION WITH BRATZ IN THE 2002 TIME FRAME?                              11:53

6    A    IT WAS ALREADY OUT THERE.

7    Q    THAT IT WAS ALREADY OUT THERE IN THE PRESS.

8    A    IT WAS IN YAHOO FOR SURE.  YAHOO IS PUBLIC.  EVERYONE CAN

9    GO ON YAHOO.COM; SO, TO ME, THAT'S PUBLIC.  THAT'S ALREADY IN

10   THE PUBLIC.  IT'S LIKE TODAY'S INTERNET; IT'S PRESS.              11:54

11   Q    BUT THAT'S THE ONE WHERE YOU SAID 'GET THE NAME OUT OF

12   THERE.'

13   A    I DID NOT SAY 'GET THE NAME OUT OF THERE.'  I SAID I DON'T

14   WANT TO HAVE ANY ISSUES.  YOU SAW MY E-MAIL.

15   Q    YOU'LL AGREE THAT MGA IS NOT AWARE OF ANY PRESS REPORT OR    11:54

16   PUBLICATION THAT IDENTIFIED BRYANT AS THE CREATOR OF BRATZ

17   PRIOR TO JULY 15, 2003?

18   A    WHAT DO YOU CALL THAT YAHOO WEB SITE?  PRESS OR DO YOU NOT

19   CALL IT THE PRESS?

20   Q    I'M ASKING IF YOU AGREE THAT YOU ADMIT THAT MGA IS NOT      11:54

21   AWARE OF ANY PRESS REPORT OR PUBLICATION THAT IDENTIFIED BRYANT

22   AS THE CREATOR OF BRATZ PRIOR TO JULY 15, 2003?

23   A    I GUESS I AGREE WITH THAT STATEMENT, BECAUSE I ASSUME THEY

24   ARE NOT PUTTING YAHOO AS PART OF THAT.

25   Q    AND YOU ALSO AGREE THAT THE FIRST PRESS REPORT OR           11:55

1   PUBLICATION THAT MGA'S AWARE OF THAT IDENTIFIED BRYANT AS THE

2   CREATOR OF BRATZ WAS THAT WALL STREET JOURNAL ARTICLE PUBLISHED

3   JULY 18, 2003.

4   A    IF YOU CHARACTERIZE PRESS AS THAT, YES.

5   Q    AND WITH RESPECT TO CARTER BRYANT'S NAME, DO YOU RECALL AT      11:55

6   SOME POINT YOU ACTUALLY FILED A PATENT APPLICATION FOR REMOVING

7   THE FOOT FROM THE DOLL.  DO YOU RECALL THAT?

8   A    I DID.

9   Q    IF YOU WOULD LOOK AT EXHIBIT 500.

10  A    I HAVE IT.                                                     11:56

11  Q    DO YOU RECOGNIZE THAT AS THE PATENT APPLICATION?

12  A    YES.

13       MR. PRICE:  YOUR HONOR, WE WOULD MOVE EXHIBIT 500

14  INTO EVIDENCE.

15       THE COURT:  ANY OBJECTION?                                     11:56

16       MR. NOLAN:  NO OBJECTION TO 500, YOUR HONOR.

17       THE COURT:  VERY WELL.  IT'S ADMITTED.

18       YOU MAY PUBLISH.

19  BY MR. PRICE:

20  Q    THIS IS AN APPLICATION DONE FOR "DOLL AESTHETIC WITH           11:56

21  CHANGEABLE FOOTWEAR."

22       DO YOU SEE THAT?

23  A    YES.

24  Q    WHERE IT SAYS "THE INVENTOR IS ISAAC LARIAN"; CORRECT?

25  A    THAT DOCUMENT SAYS THAT, YES.                                  11:56

1    Q    AND IN CONNECTION WITH THIS DOCUMENT, YOU FILED A

2    DECLARATION UNDER OATH.  DO YOU RECALL THAT?

3    A    I DID.

4    Q    AND IF YOU COULD LOOK AT 1701, DO YOU RECOGNIZE THAT AS

5    THE DECLARATION YOU FILED UNDER PENALTY OF PERJURY IN                11:57

6    CONNECTION WITH MAKING THAT PATENT APPLICATION?

7    A    CORRECT.

8            **MR. PRICE:**  MOVE EXHIBIT 1701 INTO EVIDENCE.

9            **MR. NOLAN:**  NO OBJECTION, YOUR HONOR.

10           **THE COURT:**  VERY WELL.  IT IS ADMITTED; YOU MAY        11:57

11   PUBLISH.

12   **BY MR. PRICE:**

13   Q    AND IT SAYS "AS A BELOW-NAMED INVENTOR, I HEREBY DECLARE

14   THAT..."

15   A    YES.                                                         11:58

16   Q    AND YOU SAY "I BELIEVE I AM THE ORIGINAL, FIRST, AND SOLE

17   INVENTOR, IF ONLY ONE NAME IS LISTED BELOW," AND ONLY ONE NAME

18   IS LISTED BELOW:  YOURS.

19   A    YES.

20   Q    SO YOU'RE SAYING THAT YOU'RE THE ORIGINAL, FIRST, AND SOLE   11:58

21   INVENTOR OF THIS DOLL WITH AESTHETIC, CHANGEABLE FOOTWEAR;

22   CORRECT?

23   A    THAT VERSION WHICH IS USING THE PATENT, YES, I AM.

24   Q    IF WE CAN SHOW EXHIBIT 302.

25           THIS IS ONE OF THE DRAWINGS WHICH CARTER BRYANT           11:58

1   SHOWED YOU IN SEPTEMBER OF 2000; CORRECT?

2   A    HE DID.

3   Q    IT'S CORRECT, IS IT NOT, THAT PRIOR TO CARTER BRYANT

4   TELLING YOU ABOUT THE CONCEPT OF CHANGEABLE FOOTWEAR, YOU DON'T

5   RECALL PREVIOUSLY HAVING EVER HEARD THE IDEA; THAT'S CORRECT,

6   IS IT NOT?

7   A    THAT'S CORRECT.

8   Q    AND MR. BRYANT ALSO HERE, I GUESS, TALKED ABOUT CHANGEABLE

9   HEADWEAR AS WELL.

10  A    HE DID.

11  Q    IN FACT, DO YOU RECALL THAT LATER IN THAT YEAR, YOU WERE

12  SUGGESTING TO THE FOLKS WHO WORKED FOR YOU THAT YOU REALLY

13  WANTED THAT FEATURE ON YOUR DOLL?  DO YOU RECALL THAT?

14  A    WHAT FEATURE?

15  Q    THE CHANGEABLE HEADWEAR.

16  A    I DID.

17            **MR. PRICE:**  WOULD THIS BE A GOOD TIME FOR A BREAK?

18            **THE COURT:**  WE'LL TAKE OUR LUNCH BREAK NOW.  THE JURY

19  WILL RECONVENE AT 1:30.

20            COURT IS IN RECESS.

21            (CONCLUSION OF MORNING SESSION.)

22

23  / / /

24  / / /

25  / / /

1756

1       CERTIFICATE

2

3   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
    STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
4   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
    ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
5   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
    THE UNITED STATES.

6

7

8   THERESA A. LANZA, RPR, CSR          6-8-08
    OFFICIAL COURT REPORTER                DATE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FRIDAY, JUNE 6, 2008                    TRIAL DAY 9, MORNING SESSION

Exhibit D - Page 689

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    ---

4    **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5    ---

6    MATTEL, INC.,                    :   PAGES 1753 - 1888
                                      :
7         PLAINTIFF,                  :
                                      :
8      VS.                            :   NO. ED CV04-09049-SGL
                                      :   [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,         :   CV04-9059 & CV05-2727]
     ET AL.,                          :
10                                    :
          DEFENDANTS.                 :
11   _____ :

12

13

14

15    REPORTER'S TRANSCRIPT OF PROCEEDINGS

16    RIVERSIDE, CALIFORNIA

17    FRIDAY, JUNE 6, 2008

18    JURY TRIAL - DAY 9

19    AFTERNOON SESSION

20

21

22                           MARK SCHWEITZER, CSR, RPR, CRR
                             OFFICIAL COURT REPORTER
23   **CERTIFIED**           UNITED STATES DISTRICT COURT
                             181-H ROYBAL FEDERAL BUILDING
24   **COPY**                255 EAST TEMPLE STREET
                             LOS ANGELES, CALIFORNIA 90012
25                           (213) 663-3494

1    THE COURT:  Total time used at this point?

2    MR. PRICE:  Yes.

3    THE COURT:  Right now 12 plus 8, so 20 hours and 40

4  minutes by Mattel and approximately 12 hours and 5 minutes by

5  MGA.  Approximately.

6    MR. PRICE:  Thank you.

7    **(WHEREUPON THE JURY ENTERS.)**

8    THE COURT:  Counsel, you may proceed.

9    **ISAAC LARIAN, PREVIOUSLY SWORN.**

10    **DIRECT EXAMINATION (CONTINUED)**

11  BY MR. PRICE:

12  **Q.**  Good afternoon, Mr. Larian.

13  **A.**  Good afternoon.

14  **Q.**  I want to go back in the time frame now to September of

15  2000, when you had a meeting with Mr. Bryant.  That month, of

16  course, it was your understanding that entire month he was

17  working for Mattel?

18  **A.**  Yes.

19  **Q.**  So that month after this meeting did you have further

20  communications with Mr. Bryant after this September 1st

21  introduction?

22  **A.**  Personally, I think the only one I recall is that I made

23  a phone call to him at home sometime in October, to the best

24  of my recollection, to negotiate the terms of the contract.

25  **Q.**  You said October.  I'm referring to September, when you

1    knew he was a Mattel employee.  Did you have -- after the

2    September 1st meeting, did you have conversations with

3    Mr. Carter about anything in the month of September?

4    **A.**    I don't recall one way or another.  I might have; I

5    might not have.  I don't recall.

6    **Q.**    What kind of conversations would you have been having

7    with him?

8    **A.**    Again, if I don't recall it, I don't know what type of

9    conversations.

10   **Q.**    All right.  To clarify, I mean, you don't recall any

11   conversations with Mr. Bryant after September 1st, from

12   September 1st to October?

13   **A.**    From September 1st to October?

14   **Q.**    Yes.

15   **A.**    I don't recall.  It could be, but I don't recall.

16   **Q.**    It's fair to say you agree that he should not be working

17   for MGA in any way in that time frame?

18   **A.**    That's correct.

19   **Q.**    MGA at that time had a -- what was its general phone

20   number?  If you just wanted to call MGA, do you recall what

21   that extension was?

22   **A.**    Yes, I do.

23   **Q.**    What was that?

24   **A.**    The general number at MGA is (818) 894-2525.

25   **Q.**    Is there some way to go directly to your phone?

1   A.   Yes.

2   Q.   How would you do that?

3   A.   My direct phone number is (818) 894-3150.

4   Q.   So if someone called that 3150 extension, would that

5   ring directly to your office?

6   A.   My secretary's office.  It would ring my secretary's

7   office.

8   Q.   Would it also ring in your office?  It just had to be

9   picked up by the woman who is your secretary?

10  A.   My secretary picks it up.  And usually my secretary

11  picks it up and checks who the person is before she sends it

12  to me.

13  Q.   And so that phone number, to clarify, (818) 894-3150;

14  correct?

15  A.   That's correct.

16  Q.   And again, during the entire month of September, you

17  knew that Mr. Bryant worked at Mattel during the day;

18  correct?

19  A.   I did.

20  Q.   So, for example, if you got direct calls to your direct

21  line in the afternoon, say, at 3:00 P.M., or 4:00 P.M., you

22  would understand that Mr. Bryant was calling you from his

23  work at Mattel?

24  A.   Not necessarily.  Could have been on vacation.  He could

25  have been out sick.  I have no idea if he was calling me from

1  Mattel or not.  There's no way to know if he was calling me

2  from Mattel or not.

3  **Q.**   If he were calling you in the middle of the day and you

4  had the understanding that he shouldn't be doing any work for

5  MGA during the month of September, certainly you would ask

6  him, it's the middle of the day, aren't you at work?

7  **A.**   I did not ask that kind of question.

8  **Q.**   Certainly you can't deny that Mr. Bryant called you

9  during the month of September from his office at Mattel to

10 your direct line at MGA?

11 **A.**   I cannot deny or not deny.  He might have.  I just don't

12 know.

13 **Q.**   If you look at Exhibit 30, which I believe is already in

14 evidence -- this is already in evidence.  It's Exhibit 30.

15 It's dated September 18, 2000, from Mr. Bryant to a

16 Mr. Kinuyo?

17 **A.**   That's what it says.

18 **Q.**   Have you found it?

19 **A.**   Yes.

20 **Q.**   And my first question is prior to this trial, had you

21 ever seen this letter before?

22 **A.**   No, I have seen it during this trial.

23 **Q.**   Did Mr. Bryant call you at your office just a couple

24 days after this letter?

25 **A.**   I have no idea.

1  **Q.**   In the letter, it says:  "The company I am working with

2  is called MGA Entertainment, and we are located in

3  Los Angeles, California"?

4  **A.**   I do see that.

5  **Q.**   You'll agree that it would have been inappropriate for

6  Mr. Carter to contact vendors in September of 2000 saying

7  that he was working with MGA Entertainment?

8  **A.**   Yes, it would be inappropriate.

9  **Q.**   And you see this is regarding ordering a supply of

10  Hollow Saran Hair fiber.

11         Do you see that?

12  **A.**   Yes.

13  **Q.**   By the way, do you know if in fact MGA paid for the

14  Hollow Saran Hair fiber which Mr. Bryant ordered in

15  September?

16         MR. NOLAN:  Objection, your Honor.  Lack of

17  foundation.  Misstates the document.

18         THE COURT:  Lay a foundation.

19  **Q.**   BY MR. PRICE:  You know whether or not there actually

20  was Hollow Saran Hair fiber ordered by Mr. Bryant on behalf

21  of MGA in September of 2000?

22  **A.**   I have no idea.

23  **Q.**   Did you approve the invoices that were paid by MGA?

24  **A.**   When?

25  **Q.**   In -- I'm sorry.  Good question.  In the September,