1   October time frame?

2   **A.**   Not necessarily.  Over certain amount.

3   **Q.**   You see here where September 2000, Mr. Bryant says MGA

4   Entertainment, attention Carter Bryant, and there's an

5   address there in Gardena, California.

6          Do you see that?

7   **A.**   I do.  That's not MGA's address.

8   **Q.**   That was going to be my next question.  That's not MGA's

9   address; right?

10  **A.**   It is not.

11  **Q.**   And you agree that it would have been inappropriate for

12  Mr. Carter to be representing that the address of MGA

13  Entertainment was 1319 West 160th street, Gardena,

14  California?

15  **A.**   Yes.

16  **Q.**   Now, you have an understanding that Mr. Bryant in this

17  August/September time frame was also asked by

18  Ms. Treantafelles to draw some angel heads to be used to try

19  to come up with the head of a doll?

20  **A.**   I have no understanding of that.  I have no idea if she

21  did ask him or not.

22  **Q.**   You would agree that that also would be inappropriate,

23  that is, for Ms. Garcia to ask a Mattel employee to provide

24  her with drawings that might be used for a doll for MGA?

25  **A.**   If she knew that he was working at Mattel and she did

1  that, it would be inappropriate.  I would not have approved

2  that.

3  Q.    And, of course, it's your understanding that, at least

4  as of September 1st, she knew he worked at Mattel.

5  A.    I knew that -- I knew on September 1st that he worked at

6  Mattel.  He told me that.

7  Q.    Well, he told you that in your office.

8  A.    That's correct.

9  Q.    And Ms. Garcia was there.

10  A.    I believe she was.

11  Q.    And, in fact, you've told us he not only told you he was

12  working for Mattel, he talked about when he created the

13  drawings.

14  A.    That's correct.  When I asked him.

15  Q.    So how long would the conversation that you had about

16  his employment at Mattel and whether he created the drawings

17  at Mattel, how long did you discuss that in this meeting

18  September 1st?

19  A.    I don't recall exactly how many minutes.  30 to 45

20  minutes we spent on that.  Again, I recall that the whole

21  meeting took maybe half an hour to 45 minutes maximum, to the

22  best of my recollection.

23  Q.    I want to show you what we've marked as Exhibit 393.

24  A.    In this book I'm not finding it.

25  Q.    I'm going to bring it up to you.  It's a separate

1    document.

2    **A.**    Okay.

3           MR. PRICE:  Your Honor, may I approach?

4           THE COURT:  Yes, you may.

5    **Q.**    BY MR. PRICE:  You've had a chance to look at

6    Exhibit 393?

7    **A.**    I have.

8    **Q.**    Have you ever seen 393 before?

9    **A.**    I have not.

10   **Q.**    Let me show you what we'll mark as Exhibit 593 for

11   identification.

12          Do you see Exhibit 593?

13   **A.**    I do.

14   **Q.**    And do you recognize this as being an invoice?

15   **A.**    It says on the top.

16   **Q.**    And look at the second page.  Do you see something which

17   purports to be a purchase order?

18   **A.**    It does.

19   **Q.**    And if you look at this purchase order, is that the

20   format of purchase orders at MGA Entertainment?

21   **A.**    I have no idea.

22   **Q.**    You've never seen purchase orders at MGA Entertainment?

23   **A.**    I have seen different versions.  But I don't recall

24   this.

25   **Q.**    The purchase orders that you've seen, have they been in

1    a format that you see on the second page of Exhibit 593?

2    **A.**    I don't recall.  I remember what we have now.  I don't

3    recall at that time.

4    **Q.**    Can you tell me, if you look at the third page,

5    something which purports to say requisition.  Does this

6    appear to be a requisition form that MGA used in the

7    August/September 2000 time frame?

8    **A.**    I don't know one way or another.  It doesn't say MGA on

9    it.

10   **Q.**    Well, do you know who a Klegg, K-L-E-G-G, is?  You see

11   that name on the requisition, page 3?

12   **A.**    I have no idea.  I don't know anybody by the name of

13   Klegg.

14   **Q.**    Okay.  Well, look at the first page.  Paula

15   Treantafelles, you knew her.

16   **A.**    Yes.

17   **Q.**    Did you know a Kerri Brode?

18   **A.**    I do know a Kerri Brode.

19   **Q.**    And was her name before she got married Kerri Legg?

20   **A.**    I wouldn't know.

21          MR. PRICE:  Do you know -- I'll go ahead and move

22   Exhibit 593 in evidence.

23          MR. NOLAN:  Your Honor, lack of foundation.

24          THE COURT:  Lay a further foundation, Counsel.

25          I'm sorry?

1    MR. NOLAN:  If the first page was removed from it,

2    we would not object to the second two pages coming in as a

3    business record of MGA.

4    THE COURT:  You can lay further foundation for the

5    first page, Counsel, if you wish.

6    MR. PRICE:  I will try.  At this point I would move

7    in pages 2 and 3.

8    THE COURT:  No objection to that?

9    MR. NOLAN:  No objection.

10   THE COURT:  They are admitted.

11   **(Exhibit 593, Pages 2 and 3, received.)**

12   Q.   BY MR. PRICE:  So first let's then look at the second

13   page.  Do you see the date on the second page, September

14   28th, 2000?

15   A.   I do.

16   Q.   And perhaps could you tell us what is a purchase order?

17   A.   Purchase order is the purchase order.

18   Q.   When you're buying something from someone?

19   A.   That's correct.

20   Q.   And your company MGA is, at this time at least, was

21   actually ABC International Traders, Inc., doing business as

22   MGA Entertainment; correct?

23   A.   That's correct, to the best of my recollection, yes.

24   Q.   And you had an L.A. main warehouse on Schoenborn Street?

25   A.   We did.

1    Q.    And you see there's a section here which talks about

2    date requested, quantity ordered.

3              Do you see that?

4    A.    I do.

5    Q.    And there was a total bill here of about $162?

6    A.    And 38 cents.  It's 36 or 38.  I can't see.

7    Q.    And you see the name here, Carter Bryant?

8    A.    I do.

9    Q.    You'll agree that Mr. Bryant's name should not be in a

10   purchase order from MGA in the September time frame?

11   A.    If he was working at Mattel, no, he should not have been

12   doing any work for MGA.

13   Q.    And you knew he was working for Mattel in September.

14   A.    On September 1, 2000, I did.

15   Q.    In fact, you knew throughout the month of September he

16   was working for Mattel.

17   A.    That's correct.

18   Q.    It's your understanding everybody at that meeting with

19   you on September 1st knew he was working at Mattel.

20   A.    To the best of my recollection, yes.  I knew for sure.

21   Q.    And if we look at the third page in evidence here, could

22   you tell the jury what a requisition is?

23   A.    I have no idea.

24   Q.    Perhaps -- well, if you have no idea, we'll go ahead and

25   skip this.

1           Did you yourself in phone conversations that you

2   had -- strike that.

3           In conversations you had with Mr. Bryant in

4   September talk to him about doing sketches for other MGA

5   dolls other than Bratz?

6   **A.**    I did not.

7           MR. PRICE:  Your Honor, at this time I would like

8   to read into the record, and I'll show to Mr. Nolan, an

9   Interrogatory.

10          THE COURT:  Any objection?  Why don't you state for

11  the record what the Interrogatory is, Mr. Price.

12          MR. NOLAN:  We have no objection, your Honor, both

13  to the Interrogatory and to the response.

14          THE COURT:  Very well.  You may do so.  Clearly

15  state what it is.

16          MR. PRICE:  It's a Supplemental Interrogatory.

17  Your Honor, it's been pointed out to me this is the first

18  time we've used an Interrogatory in response to an answer.

19  So I'm wondering if you might explain to the jury what it is.

20          THE COURT:  Very well.  As part of the discovery

21  process, the parties are afforded leave to submit

22  Interrogatories, which is essentially questions to the other

23  side.  The other side is obliged to respond to the question.

24  That question has been certified as accurate, and it, once

25  introduced without objection into the record, it can be

1    treated by you as evidence.  It is entirely up to you as to

2    how much weight to give to that evidence as it is with any

3    evidence that you hear.

4            Counsel.

5            MR. PRICE:  Thank you, your Honor.  First, with

6    Mr. Nolan's agreement, I'm going to read a definition of a

7    term in the Interrogatory.  The term test project.  Test

8    project means any design, project, assignment, or other work

9    of any kind created, developed, improved upon, or performed

10   by any candidates, interviewee, applicant, or prospective or

11   potential employee or independent contractor in advance of,

12   in consideration of, or otherwise as part of or in connection

13   with any interview or interviewing process for employment or

14   contracting or potential employment or contracting of any

15   kind.

16           That's the definition of test project.

17           The Interrogatory to MGA is:  "Identify fully and

18   completely each and every test project that you caused, had,

19   requested, asked, or solicited any person to perform during

20   the time period January 1, 1998, through December 31, 2004,

21   inclusive.  And identify all persons with knowledge thereof

22   and all documents that refer or relate to such test project."

23           MGA's response:  "MGA does not contend that it

24   caused, had, requested, asked, or solicited Bryant to perform

25   a test project."

1  Q.   So again, talking about what was going on in September,

2  if you'd look at Exhibit 305.

3          And this is already in evidence, your Honor.

4          THE COURT:  Very well.

5  Q.   BY MR. PRICE:  Have you found 305, sir?

6  A.   I'm sorry.  I don't find it in here.  Maybe I can just

7  look.

8  Q.   Sure.  If you can view that and it's easier for you.

9  A.   Request you blow that up, please?

10 Q.   Which part would you like blown up?

11 A.   I cannot see -- if I could find it in here, that would

12 be even better.  All right.  I'm sorry.  I have it.

13 Q.   Let's first go to the top here.  You say -- this is an

14 e-mail that you sent to Victoria O'Connor and Dennis Medici;

15 is that right?

16 A.   Yes.

17 Q.   Regarding Carter compensation?

18 A.   Yes.

19 Q.   And you see Paula Treantafelles has stated here:  "I

20 would say that Carter has worked an average of about four

21 hours a day, and we began working on this line the first part

22 of September."

23          Do you see that?

24 A.   I do.

25 Q.   And then Ms. O'Connor asked you:  "Do you want to start

1    his salary for the month of October since he began in

2    September?  Please advise."

3              Do you see that?

4    **A.**    I do.

5    **Q.**    And you say from the day he signed the contract.

6    **A.**    That's correct.

7    **Q.**    Actually, under this contract, Mr. Carter wasn't paid by

8    the hour, was he?

9    **A.**    No, he was not.  The contract that he had with MGA.

10   **Q.**    Let me clarify.  Under the contract he had with MGA, he

11   wasn't paid by the hour.

12   **A.**    That's correct, he was not.

13   **Q.**    And, in fact, under the contract he had with MGA, he

14   wasn't paid a salary.

15   **A.**    No, he was paid -- because he was not an employee.  He

16   was paid, I believe, $5,000 a month per the contract for the

17   first -- I don't remember the exact term.

18   **Q.**    Let's help you out.  If you look at Exhibit 15, and this

19   is the contract between Mr. Bryant and MGA dated as of

20   September 18, 2000.  We can go to the second page, where it

21   refers to paragraph 4.  Compensation and costs?

22   **A.**    I see that.

23   **Q.**    What Mr. Carter was to be paid was not a salary but an

24   advance; is that right?  You see for the first six months of

25   the term of this agreement:  "MGA shall pay Bryant for his

1  services at the rate of $5,500 per month.  For the next three

2  months of the term, MGA shall pay Bryant for his services at

3  the rate of $5,000 per month."

4  **A.**   I see that.

5  **Q.**   "All sums paid to Bryant as monthly feels shall be

6  deemed to be nonrefundable, fully recoupable advances against

7  any royalties that may be payable to Bryant pursuant to

8  paragraph 4-B below."

9       Do you see that?

10 **A.**   I do.

11 **Q.**   So it didn't matter in terms of how much money

12 Mr. Bryant was going to receive from MGA.  It didn't at least

13 matter directly how many hours he worked.

14 **A.**   I'm sorry.  I don't think I understand your question.

15 **Q.**   It wasn't that clear.

16       In terms of what Mr. Bryant was to be paid, it

17 doesn't matter how many hours he worked.

18 **A.**   As of October 4, when he signed the contract?

19 **Q.**   As of the time he was under a contractual relationship

20 with MGA.

21 **A.**   As of October 4, my feeling was, understanding, whether

22 he's going to work full time on the Bratz project.

23 **Q.**   But my question, sir, is the compensation, the amount of

24 hours he worked did not affect the advance that he received;

25 correct?

1   **A.**    I'm sorry.  I still don't understand the question.

2   **Q.**    This advance that you are giving him, the advance

3   against his royalty.

4   **A.**    That's correct.

5   **Q.**    He gets that advance if he works 40 hours a week or 30

6   hours a week or whatever; correct?

7   **A.**    That's correct, as a free-lancer, yes, definitely yes.

8   **Q.**    And paragraph B:  "MGA shall pay to Bryant a royalty of

9   3 percent."

10           Do you see that?

11  **A.**    That's correct.

12  **Q.**    And the way this would work, then, was if, for example,

13  that 3 percent came to 35 million and you already paid him

14  5,000, you would only have to pay him 29,995,000?

15  **A.**    Your math is better.  I don't think 35 million less

16  $5,000 counts to 29 million.  So maybe it's your math which

17  is mistaken.

18  **Q.**    I could be off.  But you'd subtract $5,000 from

19  whatever he's owed in his royalty?

20  **A.**    It comes out, that's correct.

21  **Q.**    If we could go to the first page of the contract.

22           If you look at this paragraph here, the first

23  paragraph, retention as consultant/services.

24           Did you have a provision in here that it is

25  understood and agreed that Bryant shall provide his services

1   on a top priority basis as his services pertain to other

2   clients of Bryant?

3           Do you see that?

4   A.   I do.

5   Q.   So that if he's working as a consultant with other

6   people, his top priority is to be MGA.

7   A.   Absolutely.

8   Q.   So if we can go back to 305, then.  It's correct to say,

9   sir, that however many hours Mr. Bryant worked -- whether it

10  be September, October, or whatever -- had nothing to do with

11  what he would get in terms of an advance; correct?

12  A.   Against the contract, no.  And if he was working in

13  September, in my opinion, if he was doing any work in

14  September for Bratz or MGA, he should not have been doing it.

15  It's a bad judgment on his side.

16  Q.   Well, or on MGA's side by asking -- if they asked him to

17  work.

18  A.   Or on Paula's side, yes.  If Paula asked him to do that,

19  she was wrong.

20  Q.   And then in October, if you could look at Exhibit 16789.

21  A.   Yes, sir.

22  Q.   Do you recognize Exhibit 16789 as an e-mail between

23  you -- well, the top e-mail is between you and Ms. O'Connor

24  and Ms. Treantafelles?

25  A.   Yes.

1    Q.   And you see at the bottom there's an e-mail between you

2    and also Ms. Treantafelles and Victoria O'Connor.

3             Do you see that?

4    A.   Yes, I do.

5             MR. PRICE:   Your Honor, move 16789 into evidence.

6             MR. NOLAN:   No objection.

7             THE COURT:   It's admitted.

8             **(Exhibit 16789 received.)**

9    Q.   BY MR. PRICE:   And let's again look at this section

10   here.   Now, you see this appears to be to Paula and Victoria

11   about Bratz.

12   A.   Yes.

13   Q.   And the importance is high.

14             Do you see that?

15   A.   Yes.

16   Q.   So October 5th, you were referring to this project as

17   Bratz?

18   A.   October 5th.

19   Q.   Let me rephrase.   As of October 5th, 2000, you were

20   referring to this project as Bratz.

21   A.   We were.

22   Q.   And you see it says Carter here.   It doesn't look like

23   it's sent to Carter, that you expected this to get to him in

24   some way?

25   A.   I think it was sent to Carter.

1   Q.   Oh, here we go.  This is your -- I skipped this here.

2   So this goes to him at his home?

3   A.   I have no idea.

4   Q.   Okay.  And as of October 5th, you're talking about him

5   and Paula focusing 200 percent.  Do you see that?

6   A.   I do.

7   Q.   And you remind him about all of the royalty he's going

8   to make.

9   A.   That's correct.

10  Q.   As you know, he's going to be pretty happy about that?

11  A.   I'm sorry?

12  Q.   Withdraw the question.

13        And down here, you say, "Now it is up to you."

14        And you're talking about Mr. Bryant.

15  A.   I do.

16  Q.   And you say, in your belief, he needs to put 16 hours a

17  day starting now on this and nothing else; correct?

18  A.   Yes.

19  Q.   So your expectation, and I'm going to focus on a time

20  frame between the date of this e-mail and October 19th, okay?

21  Your expectation during that time frame is that he'd be

22  working for MGA or on MGA's behalf hopefully 16 hours a day;

23  correct?

24  A.   Absolutely.

25  Q.   And then if you'd look at Exhibit -- by the way, at this

1  time you were already telling Mr. Bryant to think and design

2  the accessories; correct?

3  **A.**   I do.

4  **Q.**   And you already had in mind you wanted him to think

5  about a commercial?

6  **A.**   I do.

7  **Q.**   And about a New York showroom presentation?

8  **A.**   I did.

9  **Q.**   And your expectation is that he'd be working on all of

10 this beginning immediately.

11 **A.**   Beginning October 5th.

12 **Q.**   And it's your belief he was working on those things

13 between October 5th and October 19th?

14 **A.**   I hope he was.  He was getting paid.

15 **Q.**   Well, he was getting an advance.

16 **A.**   Well, you can call it advance.  Paid.  He was getting

17 money from MGA.

18 **Q.**   And it's fair to say that the royalties have been a

19 little larger than the advances?

20 **A.**   When?  As of October 5?

21 **Q.**   Let's say as of two years later.

22 **A.**   Yes.

23 **Q.**   Now, if you look at Exhibit 1762.  Do you recognize the

24 top part of this e-mail to be an e-mail from you to Carter

25 Bryant?

1  A.   Yes, sir.

2        MR. PRICE:  Your Honor, move Exhibit 1762 into

3  evidence.

4        MR. NOLAN:  No objection.

5        THE COURT:  It's admitted.

6        **(Exhibit 1762 received.)**

7        THE COURT:  You may publish.

8  Q.   BY MR. PRICE:  You see this is dated October 6, 2000?

9  A.   Yes, that's correct.

10 Q.   And this is where you tell Mr. Bryant that, quote, you

11 are very creative, and I believe this line, if done with

12 focus and strategic thought, will be huge.

13 A.   I do.

14 Q.   And you are requesting him to meet with Paula ASAP and

15 work on this full time.

16       Do you see that?

17 A.   I do.

18 Q.   So it was your expectation, then, from October 6th --

19 well, between October 6th and October 19th, that Mr. Bryant

20 would be working on this full time?

21 A.   Yes, that's right.

22 Q.   By the way, you say "Mercedeh," is that how it's

23 pronounced?

24 A.   Your pronunciation is better than mine.  Mercedeh will

25 be starting at MGA next Tuesday.

1  Q.    What is Mercedeh's position to be with respect to Bratz?

2  A.    She was, to the best of my recollection, an engineer

3  that we hired to work on all products that we had, dolls,

4  including Bratz.

5  Q.    And she was someone who was also a former Mattel

6  employee?

7  A.    She was.

8  Q.    Now, around this time frame or October 5th, your

9  direction was that there was to be a full line extension with

10 respect to Bratz?

11 A.    I'm sorry?  I don't understand your question.

12 Q.    Let me try to make it easier for you.  If you look at

13 Exhibit 11276.

14 A.    That's correct.

15 Q.    You recognize this as e-mail communications between you

16 and among others Paula Treantafelles, now known as Paula

17 Garcia?

18 A.    Yes.

19        MR. PRICE:  Your Honor, move Exhibit 11276 into

20 evidence.

21        MR. NOLAN:  No objection.

22        THE COURT:  Admitted.

23        **(Exhibit 11276 received.)**

24 Q.    BY MR. PRICE:  And let's go to the bottom e-mail first.

25 This is an e-mail from you to all in product development,

1    about developing a 2002 line.

2          Do you see that?

3    **A.**   That's correct, yes.  I'm sorry.  It's spring 2002.

4    **Q.**   Spring 2002.

5          And if we go to the e-mail that you get in response

6    to this, you see you got an e-mail from Ms. Garcia, then

7    known as Ms. Treantafelles, what about the line extension to

8    Bratz?

9          Do you see that?

10   **A.**   I do.

11   **Q.**   Did she normally send you e-mails with everything in

12   bold?

13   **A.**   I don't know.

14   **Q.**   Did you read this as she was sort of saying what about

15   the line extension to Bratz, that it was important?

16   **A.**   No.  I know from my own practice I type two fingers at a

17   time, and it gets locks.  And I don't always look at the

18   screen, and I don't want to go back and change.  So...

19   **Q.**   Let's look at your response.  Your response to

20   Ms. Treantafelles on October 16th was "yes," in small case.

21   And then everything, all in caps.

22   **A.**   Yes.

23   **Q.**   Correct?

24   **A.**   Yes.

25   **Q.**   And that wasn't a mistake.  That was you meant to

1  emphasize everything; correct?

2  **A.**   I don't know if I meant to emphasize everything or I

3  got -- I put the E and it got locked.  But I did type that.

4  **Q.**   So by mid-October, you were talking about everything, a

5  line extension for Bratz; correct?

6  **A.**   To design.  To start designing line extension for Bratz.

7  **Q.**   What's a line extension?

8  **A.**   Other products that we would bring in later on.  We

9  designed about six to nine month in advance usually.

10  **Q.**   But when you say a line extension to Bratz, does that

11  mean there would be a Bratz line and then there would be

12  extensions to that line?

13  **A.**   Both together.  Bratz and line extension.

14  **Q.**   So what --

15  **A.**   And you're talking about Bratz the toy; right?  You're

16  not talking about the drawings.

17  **Q.**   My question is what do you mean when you distinguish

18  Bratz from an extension of Bratz?  That is, on October 16th,

19  what were you looking at as an extension to Bratz?  What

20  sorts of things?

21  **A.**   When you mean Bratz, do you mean the drawings or the

22  dolls?

23  **Q.**   Well, I'm trying to find out what this meant here.  The

24  line extension to Bratz.  So when you read Ms. Treantafelles

25  saying Bratz here, what did you read her to mean?

1   A.   Bratz toy line.

2   Q.   So what kind of extension were you saying you wanted to

3   do as of mid-October 2000 to the Bratz toy line?

4   A.   Again, for spring 2002, to design other products.  For

5   example, another character, fashions, accessories, et cetera.

6   Q.   If we could look at Exhibit 11277.

7   A.   Go ahead.

8   Q.   And do you recognize that as e-mail communication

9   between you and a Franki Tsang and Stephen Lee?

10  A.   That's correct.

11            MR. PRICE:  Your Honor, I move 11277 into evidence.

12            MR. NOLAN:  No objection.

13            THE COURT:  Admitted.  You may publish.

14            **(Exhibit 11277 received.)**

15  Q.   BY MR. PRICE:  First, I want to make sure we're not

16  confused, Mr. Larian.  Earlier today, you recall, we played a

17  section of a deposition transcript where you were asked if

18  you regarded Bratz as a fashion doll, when it was introduced,

19  and you said, "No, I think we considered it a small doll."

20  A.   Mini doll.

21  Q.   Do you recall you used the word "small"?

22  A.   Maybe.  Small or mini doll are probably the same.

23  Q.   So let's look at your e-mail in October of 2000.  And

24  first, can you tell me who Frank I. Tsang is?

25  A.   He was head of our product development in Hong Kong.

1  **Q.**   And Stephen Lee?

2  **A.**   He was the managing director of MGA Hong Kong.

3  **Q.**   And again, you have some things in bold and some things

4  aren't.  That appears to be intentional on this e-mail.

5  Would you agree?

6  **A.**   I don't remember.

7  **Q.**   You say please listen to me carefully.  This is in all

8  caps, a fashion doll.

9  **A.**   I do.

10 **Q.**   So in October of 2000, you considered Bratz to be a

11 fashion doll?

12 **A.**   Fashion doll or mini doll, yes.

13 **Q.**   And by the end of October, you considered that what you

14 projected in terms of sales was 25 million?

15 **A.**   I'm sorry.  By October?  No.  I was projecting

16 $25 million for sales of Bratz for the year 2001.

17 **Q.**   To be clear, then, you expected that within the next

18 year, the next fiscal year, that Bratz dolls would sell

19 somewhere in the neighborhood of $25 million.

20 **A.**   In the year of 2001, yes.

21 **Q.**   And you are referring to a woman named Cecelia.  Who is

22 she?

23 **A.**   I don't recall her, unfortunately.

24 **Q.**   Do you remember Cecelia Kwok?

25 **A.**   Yes, I believe she was a product manager in Hong Kong.

1  **Q.**   And if we could go down to the attached e-mail.  Do you

2  see this is from Mercedeh Ward?  That's the former Mattel

3  employee who began in October?

4  **A.**   By October 30th she was an MGA employee.

5  **Q.**   And you were copied on this?

6  **A.**   I am.

7  **Q.**   And you see Cecelia Kwok here.  Does that refresh your

8  memory that that's who you were referring to?

9  **A.**   Yes.

10  **Q.**   And by this time, by the end of October, MGA had sent to

11  Hong Kong sort of a doll to use or to look at to see how MGA

12  wanted the Bratz doll to be manufactured; correct?

13  **A.**   I don't recall what was sent to Hong Kong.

14  **Q.**   Well, let's go to the next page here and see if this

15  helps remind you.  If you go up in this area here, it says

16  doll has a movable head like the Skipper doll.

17  **A.**   What page are you on?  Yes, I see that.

18  **Q.**   And the Skipper doll refers to Skippy, Barbie's little

19  sister.

20  **A.**   I have no idea if she has a sister.

21  **Q.**   You are familiar with your competitors' products?

22  **A.**   I'm familiar with Barbie.

23  **Q.**   And her playmates?

24  **A.**   I only know Barbie and Ken.

25  **Q.**   I understand you probably don't play with dolls

1   yourself, but around this time, did you have daughters who

2   played with dolls?

3   **A.**   Don't be so sure.  Maybe I did play with them.

4   **Q.**   I'm giving you the benefit of the doubt.

5   **A.**   I have one daughter.

6   **Q.**   How old was she in 2000?  You better get this right.

7   **A.**   I think it's -- she's 12.  My wife is looking at me.  So

8   it's very scary.

9   **Q.**   She looks very pleasant.  I don't know what you're

10  talking about.

11         Do you know, then, what they are referring to when

12  they say the Skipper doll?

13  **A.**   I have no idea.  I have never seen a Skipper doll.  To

14  date I have not.

15  **Q.**   Isn't it true that in October, Paula and Mercedeh were

16  sent to Hong Kong a Skipper doll made by Mattel, Barbie's

17  little sister, so they could model the body off of Mattel's

18  Skipper doll?

19  **A.**   I have no idea what they sent and what they bought at

20  Toys-R-Us to send to Hong Kong.  I have no idea.

21  **Q.**   One way or the other?

22  **A.**   No.

23  **Q.**   And where it says the arms will move like the Skipper

24  doll, and hip joints are just like the Skipper doll, the knee

25  will bend like the Skipper doll, all of that, you don't know

Exhibit D - Page 719

1   which Skipper doll that's referring to?

2   **A.**   I have no idea.   I've never seen a Skipper doll.   I

3   promise.

4   **Q.**   Do you know whether or not it was part of the

5   responsibilities of your subordinates, though, such as Paula

6   Garcia and Mercedeh Ward, to be familiar with competitors'

7   dolls?

8   **A.**   I hope they were familiar with the competitors' dolls.

9   **Q.**   Would you have thought there was anything wrong if MGA

10  was copying the body of a Mattel doll to use for Bratz?

11  **A.**   Well, if they were -- if they went to Toys-R-Us and

12  bought a Skipper doll and said to use this as a reference, I

13  don't think there's anything wrong about that.

14  **Q.**   Now, on September 1st, when Mr. Bryant had his meeting

15  with you, I think we mentioned he had a prototype.

16  **A.**   He had a dummy.   He had something that to me looked like

17  an alien.   He had something.

18  **Q.**   Well, you heard Ms. O'Connor testify about the head, the

19  face?

20  **A.**   Yes, I heard her testimony.

21  **Q.**   Do you agree that the face was beautifully painted?

22  **A.**   I don't recall.   I think to me it was very ugly.   It was

23  like an alien.   I didn't pay attention.   My focus was on the

24  drawings.

25  **Q.**   Well, did you agree with what Ms. O'Connor said, that

1   that face that Mr. Bryant presented in early September looked

2   similar to what became the Bratz dolls' faces?

3   **A.**   I don't remember.   Frankly, I don't remember that rough

4   dummy.   I don't know.

5   **Q.**   Let's see if this helps refresh your recollection.   If

6   you look at Exhibit 11245.   And by the way, Mr. Larian, your

7   conversation with Mr. Bryant in September, did he mention to

8   you that he worked on the Skipper doll while he was at

9   Mattel?

10  **A.**   Not that I recall.

11  **Q.**   Did he provide you with a resume at the time?

12  **A.**   I'm sorry?

13  **Q.**   Did he provide you with a resume at the time?

14  **A.**   He did have not a resume.   To the best of my

15  recollection, he did not have a resume.

16  **Q.**   So prior to agreeing to pay him advances of 5,500 or

17  5,000 a month and 3 percent royalties on what you thought

18  would be a huge line, prior to that, you didn't ask him

19  exactly what his experience was at Mattel?

20  **A.**   I did.   He said he's a fashion designer.

21  **Q.**   If you have it in front of you, it's 11245.

22  **A.**   I do.

23  **Q.**   And you recognize that as e-mail traffic between you and

24  Mercedeh Ward and Paula Treantafelles, also known as Paula

25  Garcia?

1   A.   It is an e-mail going back and forth.  My name is on it.

2        MR. PRICE:  I move Exhibit 11245 into evidence.

3        MR. NOLAN:  No objection.

4        THE COURT:  Admitted.  You may publish.

5        **(Exhibit 11245 received.)**

6   Q.   BY MR. PRICE:  And if we look at the very short thing at

7   the top, it says please print and see me on this.  And that's

8   between you and Ms. Ward and Ms. Garcia.

9   A.   Yes.

10  Q.   And if we look to the -- so you actually wanted this

11  e-mail string printed out.

12  A.   I did.

13  Q.   And one of the things that was being discussed was the

14  movement of the Bratz doll.

15  A.   No.  I don't recall that.  I recall that this was -- if

16  you look at it, it's such a long, long e-mail.  And I didn't

17  want to sit down and read every line of this.  So I told them

18  to print it and come see me.

19  Q.   So let's look at this paragraph here, then.  There's

20  discussions about whether Hong Kong can make the armatures

21  according to the sculpture of the Bratz.

22       Do you see that?

23  A.   Yes.

24  Q.   And the next paragraph talks about right now.  Next

25  paragraph, if we can.

1    "We have already clear about the movement.  Head,

2  arms, legs, and hips."

3  **A.**    I see that.

4  **Q.**    Do you know who Samuel Wong is?

5  **A.**    He was head of product investigate in Hong Kong.

6  **Q.**    And then if we look at the next page, and again, here,

7  going down, I guess, to the bottom.  This e-mail that you

8  asked to be printed out, do you see it says noted the

9  construction of the doll movable head will be same as the

10  Skipper doll.  Answer, yes.

11  **A.**    I see that.

12  **Q.**    Talks about Skipper doll, et cetera.  Do you see that?

13  **A.**    I do.

14  **Q.**    Since you were hoping this would be such a huge line,

15  you wanted to have some idea as to what the doll looked like

16  when it would be manufactured; right?

17  **A.**    I definitely wanted the dolls to look good when they

18  were manufactured.

19  **Q.**    So certainly you would have asked in this time frame

20  toward the end of October --

21  **A.**    This is November --

22  **Q.**    What do you mean by -- what do you mean by Skipper?

23  **A.**    No, I wouldn't.  I would not get involved in that

24  detail.  And this is, by the way, November, not October.

25  **Q.**    Actually, sir, go on up to see this particular e-mail,

1  although it's right on the cusp, it's October 31?

2  **A.**   Right.

3  **Q.**   I want to focus on what was done prior to October 19th

4  during that month of October, you are getting ready, MGA is

5  getting ready for a presentation in early November to

6  retailers to tell them about Bratz; correct?

7  **A.**   And the rest of the MGA line.  Usually it's called

8  pretoy fair, when you go and see retailers with your

9  preliminary design, boards, drawings, et cetera.

10 **Q.**   And obviously, if you're going to be presenting --

11 **A.**   I'm sorry.  Not to all the retailers.  What we call top

12 four or five.  Kmart, Wal-Mart, Toys-R-Us, Target.

13 **Q.**   And obviously to do that, you have to do work in

14 preparation for that?

15 **A.**   Yes, I hope so.

16 **Q.**   And it's your view that when you had this meeting

17 with -- was it Kmart?

18 **A.**   That's one of them.  I said the top five customers.

19 **Q.**   When you had this meeting with the top five in early

20 November, it's your -- the way you would characterize this is

21 that that was the first exhibition of Bratz?

22 **A.**   The drawings, the concepts, yes.  The drawings were

23 presented to retailers in November, I believe.

24 **Q.**   Was it just the drawings in November?

25 **A.**   That's correct.  To the best of my recollection.

1    **Q.**    And if you look at Exhibit 12 in your binder, sir.

2    **A.**    I have it, yes.

3    **Q.**    Do you recognize this as an affidavit which you executed

4    in connection with litigation in Hong Kong?

5    **A.**    I believe it is.

6    **Q.**    And it was an affidavit which you signed under penalty

7    of perjury?

8    **A.**    Well, I'm not sure in Hong Kong if they said under

9    penalty of perjury or not.   But I always try to tell the

10   truth when I sign something.

11          MR. PRICE:   Your Honor, I'd like to move Exhibit 12

12   into evidence.

13          THE COURT:   Any objection?

14          MR. NOLAN:   No objection, your Honor.

15          THE COURT:   It's admitted, and you may publish.

16          **(Exhibit 12 received.)**

17   **Q.**    BY MR. PRICE:   And you see, this was a case in Hong Kong

18   concerning MGA's position that someone in Hong Kong was

19   infringing MGA's rights with respect to the Bratz dolls;

20   correct?

21   **A.**    Yes, in 2002.

22   **Q.**    And it starts out with "I, Isaac Larian," and gives your

23   address, "do make oath and say as follows."

24          Do you see that?

25   **A.**    Yes, it does.

1   Q.   And if we can skip ahead to page 4.  Do you know whose

2   handwriting -- underlining this is by the way?

3   A.   I have no idea.

4   Q.   Do you know if it was yours?

5   A.   No.  I have no idea.  It's not like handwriting.  It's

6   just underlining.

7   Q.   It's kind of hard to recognize anybody's underlining,

8   isn't it?  Could be anybody.

9             So it says:  "I am advised by my legal advisors

10  that copyright law does not protect concepts or ideas per se,

11  but the expression of an idea in a material form.  And in

12  this case, it is the 17 design drawings exhibited as LSC-3."

13            Do you see that?

14  A.   I do.

15  Q.   And that referred to an exhibit attached to somebody

16  else's affidavit that had drawings.

17  A.   I have no idea.  My attorney in Hong Kong prepared this,

18  and I believe, to the best of my recollection, under

19  Hong Kong law, that's what you have to do.

20  Q.   But you are referring here to something called LSC-3; is

21  that right?

22  A.   Yes.

23  Q.   At the time you knew what that meant?

24  A.   I had no idea.  I still don't know what LSC-3 means.

25  Q.   At the time you said, under penalty of perjury, that in

1   this case it's the 17 design drawings exhibited as LSC-3.   At

2   the time you wrote that and swore under oath that it was

3   true, at that time you knew what was being talked about;

4   right?

5   **A.**   If you're asking me what LSC-3 means, I don't know what

6   it means at that time, nor do I now.   Do you know what it

7   means?

8   **Q.**   Yes.

9           So you're telling us that you would make a

10  statement under oath for which you had no basis whatsoever?

11  **A.**   This was a matter of litigation in Hong Kong in 2002,

12  and our attorneys had prepared a lawsuit, and they had given

13  me an affidavit to sign, and I relied on my attorney that

14  what they put in there is correct, and I signed it.   I

15  usually rely on my attorneys.

16  **Q.**   But you understand that your attorneys aren't swearing

17  under oath that what you're saying is true.

18  **A.**   That's correct.

19  **Q.**   I mean, they are not that dumb.   They are not going to

20  swear under oath to that; right?

21  **A.**   I am not going to -- I'm not going to characterize

22  attorneys dumb or smart.

23  **Q.**   I half appreciate that.

24          But if you look, you're the one telling the Court,

25  under penalty of perjury, that what you're referring to here

1    as the 17 design drawings as LSC-3, you're telling the Court

2    that's what you're talking about; right?

3    A.    This is what the document says.

4    Q.    I'm just trying to say at the time you said that under

5    oath, certainly you believed it to be true.

6    A.    Yes.

7    Q.    And to believe it to be true, of course, you'd have to

8    know what LSC-3 is; right?

9    A.    I'm telling the truth, sir.  I don't know what LSC-3

10   means now or then.

11   Q.    Let's see if I can refresh your memory.  If you'd look

12   at Exhibit 10.  And I'm going to ask you to look at a page

13   which is not yet in evidence, which is the first page.  Have

14   you found that?

15   A.    Yes, I have.

16   Q.    And does that refresh your memory that what you are

17   referring to when you say LSC-3 is the exhibit marked LSC-3

18   referred to in the affirmation of Lee Shiu Cheung?

19   A.    Yes, I can see that.

20   Q.    So that kind of takes you back to the time when you were

21   looking at all of these documents; right?

22   A.    No, just looking at it right now, I think LSC probably

23   stands for the first three -- what do you call it, the

24   letters of Lee Shiu Cheung.

25          MR. PRICE:  Your Honor, I would move the first page

1    of Exhibit 10 in evidence, and I think the prior page is

2    already admitted.

3              MR. NOLAN:  No objection.

4              THE COURT:  It's admitted.  You may publish.

5              **(Exhibit 10, Page 1, received.)**

6    **Q.**   BY MR. PRICE:  So look at this all the way down, Ken.

7    So on the affidavit that you executed, when you are saying

8    that you are talking about two dimensional drawings that are

9    referred to as LSC-3, it's these 17 drawings which are part

10   of an exhibit marked LSC-3; right?

11   **A.**   Now I see the relation, yes.

12   **Q.**   And these drawings here are what you are referring to

13   when you are referring to LSC-3 in your affidavit; correct?

14   **A.**   Apparently I am referring to Lee Shiu Cheung's

15   affidavit.  I am referring to what is here, LSC-3.

16   **Q.**   But you referred to the 17 drawings in LSC-3, and those

17   are the drawings that followed; correct?

18   **A.**   I believe so.  I don't recall my state of mind, but I

19   believe so, yes.

20   **Q.**   And so this is the first one.  So you see here at the

21   bottom here?

22   **A.**   Yes, I do.

23   **Q.**   This is your signature?

24   **A.**   It is.

25   **Q.**   And is your signature, as best you can tell, at least on

1    the first, oh, 14 pages of this exhibit?

2    A.    Yes, it is.

3    Q.    And you signed this in June of 2000?

4    A.    No.   June 2002.

5    Q.    I'm sorry.   That's a 2 there?

6    A.    Yes, it is.

7    Q.    That makes sense.   Thanks for correcting me on that.

8    A.    You're welcome.

9    Q.    And then the exhibit that was then presented to the

10   Court in Hong Kong, you see it says contract date, September

11   18, 2000?

12   A.    I do.   I don't know whose handwriting this is.   I have

13   no idea what that is.

14   Q.    Well, at the time you signed this, June of 2002, the

15   contract date was put on there at the same time?

16   A.    I don't know.   That's not my handwriting, I don't know

17   who put that there, whether it was before or after.   I have

18   no idea.

19   Q.    By the way, if you look at the -- let me ask it this

20   way.   It's true that, however, if we look at your affidavit,

21   which is Exhibit 12, and go again to page 4, you had

22   obviously seen those 17 design drawings that were attached to

23   the affidavit; correct?   When you said under penalty of

24   perjury, and in this case, it is the 17 design drawings

25   exhibited as LSC-3.

1  **A.**   I had seen these drawings.  I don't know if they were

2  only 17 or not.  I don't recall at this time.  It's possible

3  that I had seen all the 17 drawings.

4  **Q.**   In fact, you saw Exhibit LSC-3, which has written on it

5  the contract date of September 18, 2000?

6  **A.**   I'm sorry?

7  **Q.**   You saw those design drawings, some of which have

8  written on them the contract date of September 18, 2000.

9  **A.**   You showed me one.

10  **Q.**   Just the first 13, 14 pages.

11        Let's make it simple.  When you signed your

12  affidavit under penalty of perjury --

13  **A.**   Excuse me for one second.  Because not all of this

14  contract date September 18.  If you look at the next page, it

15  look like 9/5 to me.

16  **Q.**   The page after this one?

17  **A.**   M 001490.  So again, I don't know who wrote this.  I

18  have no idea what these are.

19  **Q.**   The point is they were written on there before you told

20  the Court in Hong Kong that this is what you were suing on?

21  **A.**   Not correct.  I don't know if they were written before

22  or after.

23  **Q.**   Let me put it this way:  You have no reason to believe

24  that Exhibit 10 -- go to the first page, which says this is

25  the exhibit marked LSC-3.

1    Do you see that?

2  **A.**   I do.

3  **Q.**   You have no reason to believe that you were referring to

4  anything other than this exhibit when you signed your

5  affirmation under oath to the Hong Kong court?

6  **A.**   I have no -- no, I don't.  I agree with you.  I'm

7  getting tired.

8  **Q.**   If we look at Exhibit 12, you remember I was asking you

9  whether or not Bratz was first exhibited in November of 2000?

10    Do you recall me asking you about that?

11  **A.**   Yes.

12  **Q.**   And if you would look at the fifth page, you see

13  paragraph 13?

14  **A.**   Yes.

15  **Q.**   And you were stating under oath to the Hong Kong court

16  that the Bratz dolls were first exhibited in the USA in

17  November 2000; correct?

18  **A.**   That is an error.  There were no Bratz dolls in November

19  2000.  There were no Bratz dolls until 2001.  That's an

20  error.

21  **Q.**   Did you ever do anything to correct the statement to the

22  Hong Kong court?

23  **A.**   I don't believe I did, no.

24  **Q.**   And you were making these statements to the Hong Kong

25  court so the Hong Kong court would take action; correct?

1  **A.**    I was not -- I was in USA.   I sign these for my

2  attorneys in Hong Kong to take action against a company who

3  was knocking off Bratz.

4  **Q.**    Well, let me ask you this:   Let's go to the second --

5  they were further exhibited in Hong Kong in January 2001.

6           Do you see that?

7  **A.**    I do.

8  **Q.**    Is that a true statement?

9  **A.**    We had four knockoffs of Bratz dolls in January 2001,

10  Hong Kong toy show.

11  **Q.**    In any event, in order to exhibit anything to these

12  retailers, it was your expectation that Carter Bryant for the

13  month of October was working full time, in your view, 16

14  hours a day to make that possible?

15  **A.**    Yes, from October 5th.

16  **Q.**    And can you tell the jury what he was doing for 16 hours

17  a day between October 5th and October 19th to make the

18  exhibition of drawings or whatever it is of Bratz possible?

19  **A.**    He did not -- he did not have anything to do with the

20  exhibition.   I hope he was working with our people to design

21  the Bratz fashions and accessories so we can make the doll.

22  **Q.**    Well, actually, one of the things exhibited in November

23  were drawings with fashions on two-dimensional Bratz dolls;

24  right?

25  **A.**    I'm sorry.   Can you repeat that for me?

1   Q.   Let me try it again.

2        One of the things exhibited in November of 2000, at

3   the very least, were drawings of Bratz characters wearing

4   clothes, having pocketbooks, and things like that; right?

5        MR. NOLAN:   Objection.   Temporal foundation.

6        THE COURT:   Overruled.

7        THE WITNESS:   There were Bratz drawings,

8   two-dimensional Bratz drawings with -- if you can show

9   the picture, that's what it was.

10       THE COURT:   Why don't we go ahead and take our

11  break right now.

12       (Recess taken.)

13       THE COURT:   Counsel, you may continue.

14  Q.   BY MR. PRICE:   Mr. Larian, I want you to focus again on

15  Exhibit 12, your sworn affidavit.

16  A.   Go ahead.

17  Q.   I want to understand your testimony.   It's your

18  testimony, sir, that when you sign a sworn affidavit to a

19  court, you don't have to know what's in it is true?

20       MR. NOLAN:   Your Honor, objection, argumentative,

21  lack of foundation.

22       THE COURT:   Sustained.   Rephrase your question,

23  Counsel.

24  Q.   BY MR. PRICE:   Let me rephrase and get some background.

25       This affidavit was filed to support MGA's position

1  in a legal matter in Hong Kong; right?

2  **A.**    I believe so, yes.

3  **Q.**    Wherein MGA was contending that an entity was infringing

4  MGA's rights; correct?

5  **A.**    Yes, sir, I believe so.

6  **Q.**    The idea was to put a halt to that?

7  **A.**    Yes, sir.

8  **Q.**    And to be compensated for that in damages?

9  **A.**    I don't know about the compensation, but put a halt to

10  it.

11  **Q.**    And in connection with trying to win that case, you

12  signed under oath Exhibit 12; correct?

13  **A.**    I believe I did, yes, sir.

14  **Q.**    And your practice in signing such an important document

15  was sometimes you'd read it, sometimes you wouldn't?

16  **A.**    That's correct.  If my attorneys prepared it, I would

17  not necessarily read everything.  That's correct.

18  **Q.**    So if the attorney said you've got to sign this to win

19  the case, and you're signing it under oath, you would be

20  willing to sign a document without even reading it; is that

21  right?

22  **A.**    That has not happened, and I hope the legal profession

23  is more ethical than what you're suggesting.

24  **Q.**    Well, I thought you said that that might happen, that in

25  that time frame, at least, your practice was even if it's a

1    statement under oath to a court, sometimes I'd read it,

2    sometimes I wouldn't.

3    **A.**    That's what I said, yes.

4    **Q.**    And you knew that -- I take it, then, that means there

5    were occasions, obviously, where you have signed statements

6    under oath in an attempt to win a case where you didn't even

7    read the statement you were signing?

8    **A.**    I don't recall that one way or another.

9    **Q.**    Well, I thought you said sometimes you did, sometimes

10   you didn't.

11   **A.**    I did say sometimes I do and sometimes I don't.  I trust

12   my attorneys, and I hope they are ethical and they are not

13   doing anything illegal when they ask me to sign an affidavit.

14   **Q.**    I want to focus on the "sometimes I don't."  There are

15   times when you will sign sworn statements under penalty of

16   perjury when you don't read those statements, so you don't

17   personally know if what you are saying is in fact true; is

18   that correct?

19   **A.**    No, that's not the fact.  That's not correct.

20   **Q.**    It's true, sir, that the attorney who drafts your

21   affidavits doesn't always have firsthand knowledge of the

22   facts you know; correct?

23   **A.**    No, gets it from me and other people.

24   **Q.**    But the person who has firsthand knowledge who can say

25   under oath whether it's true or not is you, not your

1    attorney; correct?

2    **A.**    That's correct.

3    **Q.**    So I just want to focus on the times where you said

4    sometimes I don't.  Could you please tell us the times where

5    you have made sworn statements under penalty of perjury to a

6    court where you haven't bothered to even read the statement

7    to see if it's true?

8    **A.**    I cannot.

9    **Q.**    Has that happened in this case?

10   **A.**    I don't know.

11   **Q.**    You understand that the oath you take in signing an

12   affidavit is it has the same impact, is just as serious as

13   the oath you took when you got to that stand and took an

14   oath?

15   **A.**    Yes, sir.

16   **Q.**    Let's go back to November of 2000.  You remember you

17   said there was this meeting with Kmart?

18   **A.**    Yes.

19   **Q.**    One quick question.  Is Larry McFarland one of your

20   attorneys, one of MGA's attorneys?

21   **A.**    I think he has represented us.  I don't know if he

22   represents us now or not.

23   **Q.**    At some point in time, Mr. McFarland represented MGA?

24   **A.**    I believe so, yes.

25   **Q.**    And do you give the oath that you took, when you took

1    the witness stand, the same solemnity, the same seriousness

2    of the oath that you have taken when you have signed

3    affidavits that you have not read?

4    **A.**    I think I answered that.  And the answer is yes, sir.

5    **Q.**    So focusing now on November 2000, we were talking about

6    what Mr. Bryant was doing 16 hours a day during the month of

7    October.  And I want to focus you on November 2000.  I don't

8    have this exhibit for you.

9            It's in evidence, your Honor, and these are

10   drawings.  If I could show Exhibit 1107?

11           THE COURT:  Let me strike everything up to showing

12   Exhibit 1107.

13           MR. NOLAN:  I think my objection is --

14           THE COURT:  It's stricken.  Exhibit 1107.

15   **Q.**    BY MR. PRICE:  Let me set the stage.  Your understanding

16   was in the month of October, Mr. Bryant's working full time,

17   16 hours a day.

18   **A.**    No.

19           My understanding was he was supposed to work for

20   MGA after he signed his contract.  I have no idea what he was

21   doing.  I wasn't watching to see what he was doing or not

22   doing.

23   **Q.**    Well, let's look at Exhibit 1107.  We can show this.

24   This is a drawing.  I'll represent to you there's testimony

25   this was one of the drawings presented to Kmart in November

1    of 2000.  It's your understanding, sir, is it not --

2    A.    I'm sorry.  Can you get the --

3    Q.    It's not in your book.  It's the color drawing here.

4    Isn't it your understanding that one of the things Mr. Bryant

5    was supposed to be working on in the month of October were

6    the drawings this were presented to Kmart?

7    A.    I have no idea what he was doing.

8    Q.    Who else was doing this?

9    A.    I have no idea.  Maybe Paula, maybe other people.  I

10   have no -- my guess is as good as yours.

11   Q.    You believe that someone other than Mr. Bryant did this

12   drawing and these designs?

13   A.    I have no idea one way or another.

14   Q.    If I showed you another one, such as 1108, I'll

15   represent to you that there's testimony this was presented to

16   Kmart.  It's your understanding someone other than Carter

17   Bryant did this?

18   A.    I have no idea.

19   Q.    Well, Paula Garcia was not a designer, was she?

20   A.    No, but we had other designers at MGA.  So I have no

21   idea who was working on what.  I have no idea.

22   Q.    Well, what was your expectation that Mr. Bryant would be

23   doing from October 5th forward working full time, 16 hours a

24   day?

25   A.    Well, I was expecting that he would help in the product

1    we develop in the Bratz dolls.

2    Q.    And the first big event that was this presentation to

3    Kmart; correct?

4    A.    I have no idea if that was the first or the last.    I

5    could not tell you one way or another.

6    Q.    The only fashion doll that MGA had at the time that

7    Carter Bryant was to be working on was Bratz; right?

8    A.    Yes.

9    Q.    I'll show you what we'll mark for identification as

10   Exhibit 11336.    I'll bring that up to you.

11           And do you recognize Exhibit 11336 as an e-mail

12   with an attachment between you and Rachel Harris?

13   A.    Give me a moment to look at it, please.

14   Q.    Certainly.

15   A.    It has my name on the first page.

16   Q.    This appears to be one of your e-mails attaching another

17   e-mail; correct?

18   A.    Forwarding another e-mail.

19           MR. PRICE:    Your Honor, I move 11336 into evidence.

20           MR. NOLAN:    No objection.

21           THE COURT:    It's admitted.    You may publish.

22           **(Exhibit 11336 received.)**

23   Q.    BY MR. PRICE:    And what's happening here is you're

24   receiving an e-mail and forwarding it on to Rachel Harris;

25   correct?

1    A.    Yes.

2    Q.    And the e-mail you're receiving is from Jennifer Maurus;

3    correct?

4    A.    Yes, sir.

5    Q.    And she writes about a road show.  Items we need for our

6    road show.

7          Do you see that?

8    A.    Yes, I do.

9    Q.    And that included this meeting you were going to have

10   with Kmart; right?

11   A.    I don't recall that.  It could be.  I don't recall it.

12   Q.    It says:  "Our list comes from the meeting Isaac chaired

13   a couple of weeks ago."

14          Do you see that?

15   A.    Yes.

16   Q.    And that's a couple weeks prior to November 1st.

17   A.    Yes, I assume so.

18   Q.    Sometime in mid-October.

19   A.    That's what Jennifer said, yes.

20   Q.    And it says:  "The attached recap list was prepared by

21   Helene and sent to Kerri on October 20th."

22          Do you see that?

23   A.    Yes.

24   Q.    So you understand that the work done for that list had

25   to have been done prior to October 20th?

1   **A.**   I have no idea what work was done or anything else.

2   It's a recap.  It says recap list.  So I have no idea what

3   it's referring to.

4   **Q.**   Well, if you look at "attached are lists."

5          Do you see that?  Look at the second page.

6   **A.**   I do see that.

7   **Q.**   "Sample list for November road show, J.C. Penney,

8   Kmart."

9          Do you see that?

10  **A.**   Yes.

11  **Q.**   And it says:  "Pull from fall 2001 price list dated

12  October 18."

13         Do you see that?

14  **A.**   I do.  On the bottom, yes.

15  **Q.**   And if you would go to the last page, 11336-008.

16  **A.**   Yes, sir.

17  **Q.**   You see there's a section that says TV small dolls?

18  **A.**   I do.

19  **Q.**   And you said that at this time you would sometimes refer

20  to these Bratz dolls as small dolls?

21  **A.**   Yes, sir.

22  **Q.**   And you see here it's talking about Zoe, Jade, Hallidae,

23  Lupe.

24         Do you see that?

25  **A.**   I do.

1   Q.   At this time these were the names for the Bratz dolls;

2   correct?

3   A.   Most likely, yes.  That's the names we were considering.

4   Q.   And if we look at the categories here.  Down at the

5   bottom it says:  "Pulled from fall 2001 price list dated

6   October 18th."

7          Do you see that?

8   A.   I see that.

9   Q.   And you see here these columns, FOB L.A.?  What's that

10  stand for?

11  A.   Means free on board our Los Angeles warehouse.

12  Q.   And what would that mean to someone who doesn't know

13  anything about the toy industry?

14  A.   Means I have no idea.  Ask Mattel.

15  Q.   I think you -- they aren't on the stand yet.  You could

16  explain to the jury what free on board means.

17  A.   Means what I just said, for example, you have

18  merchandise in warehouse.  You have warehouse in Rialto.  And

19  Wal-Mart comes to pick up merchandise.  When they order, they

20  bring a truck to pick up the merchandise.  They bring their

21  own truck.  And we give them the merchandise in their truck.

22  That means FOB, basically from that moment on, it's their

23  product.

24  Q.   So --

25  A.   They own it.  I don't know if I explained it right.

1   **Q.**   So as of October 18th, you have a price list that's what

2   Wal-Mart or Kmart will pay when they come to you for the Zoe

3   doll, the Jade doll, Hallidae, and Lupe; correct?

4   **A.**   We have a suggested price, yes.  We have the preliminary

5   price list.

6   **Q.**   And obviously this is what you presented to Kmart?

7   **A.**   I have no idea what was presented to Kmart.

8   **Q.**   And to prepare to present this to Kmart, obviously you

9   have to do some work to try to figure out what the price

10   should be.

11   **A.**   Not necessarily.  We can just guess and put prices.

12   Prices change.

13   **Q.**   Well, you did something, some calculations, some

14   estimates of cost to come up with 9.69?

15   **A.**   I have, probably.  But I cannot say for sure.

16   **Q.**   And the workout dress pack and the prom dress pack at

17   3.69, those were dress packs associated with the Bratz dolls?

18   **A.**   I believe they were -- I don't remember exactly, but I

19   believe they were what we call fashion packs or accessory

20   packs.

21   **Q.**   And those had been priced out by October 18th.

22   **A.**   We had a suggested FOB L.A. price at that time,

23   preliminary selling price.

24   **Q.**   And you also had hair pack TV, carrying case TV.  What

25   does that refer to?

1  **A.**    Means that we were planning to put the hair pack,

2  preliminary again, and the carrying case on TV, to a TV

3  commercial.

4  **Q.**    And that's why it says TV small dolls?

5  **A.**    That's correct.

6  **Q.**    You preliminary priced those as well; correct?

7  **A.**    Yes.

8  **Q.**    And you also had calculated an available Hong Kong date;

9  correct?

10  **A.**    That's, again, we were hoping that this should be the

11  available Hong Kong date; that's correct, in 2001.

12  **Q.**    Now, with respect to these prices, when you're

13  presenting prices to retailers, it's not your practice just

14  to come up with a wild guess, is it?

15  **A.**    It is.

16  **Q.**    Your testimony is that -- your assumption is that there

17  was something else behind this besides a wild guess?

18  **A.**    I've been in the toy business for so many years.  You

19  look at the competition, and you back it out.  For example,

20  the retail price of this doll going to be 14.99.  The

21  retailer is going to make 35 percent.  And it's going to cost

22  them this much to take it to the warehouse.

23          So you back it out, and you come up with an

24  estimated price that you want to sell it to them at, and we

25  wanted these dolls to have a retail price of 14.99.

1    Q.   Case pack.   What are those numbers representing?

2    A.   How many we hope to come to a carton, a case pack of six

3    dolls, for instance.

4    Q.   In order to make estimates for how many would come, you

5    have to do some work on packaging, obviously.

6    A.   No.

7    Q.   Perhaps not obvious.

8         In this time frame, October 18th, your view was

9    that Bratz was going to be a huge part of your business.

10   A.   Yes, I did.

11   Q.   Your expectation --

12   A.   For 2001.   I expected it to be a huge product by

13   Christmas for 2001.   If you look at it, it says fall 2001.   I

14   just didn't want to mix the dates.

15   Q.   And your understanding was that Mr. Bryant was working

16   hard at this time from October 5th, 2000, through October

17   18th to make that happen?

18   A.   I have no idea what Carter Bryant was doing.   I hope he

19   was working hard, but I have no idea what he was doing, if he

20   was doing anything.

21   Q.   I showed you 1236, which is already in evidence.

22        May I approach, your Honor?

23        THE COURT:   You may.

24   Q.   BY MR. PRICE:   You see this is an e-mail, the first part

25   of it from you to Paula Treantafelles -- Paula Garcia -- and

1    others.

2              Do you see that?

3    **A.**   Yes, I do.

4    **Q.**   It's Re:  Bratz detail information -- urgent.

5              Do you see that?

6    **A.**   Yes, I do.

7    **Q.**   And it discusses --

8    **A.**   Well, it's forwarding an e-mail behind it; right?

9    **Q.**   And you are concerned with increasing the -- or needing

10   to increase the target cost to 2.75 for the dolls.

11             Do you see that?

12   **A.**   Yes.

13   **Q.**   Let's go to what's attached here.  So this is in

14   response to an e-mail that Paula Garcia sent to others,

15   including you, on October 24th.

16             Do you see that?

17   **A.**   Yes, sir.

18   **Q.**   And when you read this, I assume you thought that

19   Ms. Garcia was giving you accurate information?

20   **A.**   Which product are you talking about?

21   **Q.**   Well, when she sends you information on which you are to

22   base your decisions, it's your expectation that she tries to

23   give you accurate information?

24   **A.**   In general, yes, but Paula Garcia, there's a joke at MGA

25   that she's not very good with numbers.  So I would not.

1   Q.   So other than the numbers, you do rely on Paula Garcia

2   to give you accurate information?

3   A.   Yes, I do.

4   Q.   You're better at numbers than she is?

5   A.   I am not a genius; maybe I am a little better, yes.

6   Q.   But the things that you could count on her for, perhaps

7   not numbers, but when she writes to you and says we have

8   finalized the fashion designs, and I am releasing the

9   following final design packages to you on our Friday, when

10  she makes a statement like that, you rely on that statement

11  to be accurate and true; correct?

12  A.   I hope that it's accurate and true.

13  Q.   Have you seen that phrase before, that there are

14  finalized fashion designs, and there are final design

15  packages?

16  A.   That I do not recall.  It's possible that -- I see that

17  she has said that, but...

18  Q.   My question might not have been clear.  As someone

19  working in the toy industry at this time, about 13 years or

20  so, had you heard the phrase "finalized fashion designs" and

21  "final design packages" prior to October 24, 2000, when you

22  received this e-mail?

23  A.   I don't recall having heard that or not heard that.  I

24  don't recall at that time.

25  Q.   At the time you received this October 24, 2000, e-mail,

1    where your subordinate Paula Garcia was telling you we have

2    finalized the fashion designs and I am releasing the

3    following final design packages, did you know what she was

4    talking about?

5    A.    I have no idea.  I don't recall.  I don't recall this

6    e-mail or the state of mind at that time.  I don't recall.

7    It's possible that's what she was talking about.  I can see

8    that's what she is saying, but I don't recall.

9    Q.    When you say you can see that's what she's saying, tell

10   us what your understanding she is saying when she says we

11   have finalized the fashion designs?

12   A.    She wrote this e-mail.  She is a better witness to tell

13   what you that means.  I cannot guess what she was thinking.

14   Q.    So is it your testimony that at the time you got this

15   idea, you had no idea what Paula Garcia was saying when she

16   said we have finalized the fashion designs and I am releasing

17   the final design packages?

18   A.    I do not recall that, no.

19   Q.    I'm going to show you what we'll mark as Exhibit 11203

20   for identification.

21   A.    Excuse me for one second.  I want to go back to this for

22   a second.

23          THE COURT:  Wait a second.  Your attorney will have

24   a chance to follow up.

25          THE WITNESS:  But you know, I just recall

1    something --

2              THE COURT:  Mr. Larian, thank you.

3    **Q.**    BY MR. PRICE:  Do you see Exhibit 11203, Mr. Larian?

4    **A.**    I do.

5    **Q.**    Do you recognize that as an e-mail string which begins

6    from an e-mail from you to Eric Yip dated November 30, 2000?

7    **A.**    No, this starts as an e-mail from Jennifer Maurus, not

8    from me.

9    **Q.**    Fair enough.  The first e-mail on the first page is from

10   you to Eric Yip, and then it contains other e-mails; correct?

11   **A.**    Which one are you talking about?  I don't want to get

12   confused here.

13   **Q.**    First page, where it says Isaac Larian --

14   **A.**    Yes, that's correct.

15             MR. PRICE:  Your Honor, move Exhibit 11203 into

16   evidence.

17             MR. NOLAN:  Your Honor, we have no objection.

18             THE COURT:  Very well.  It's admitted.  You may

19   publish.

20             **(Exhibit 11203 received.)**

21   **Q.**    BY MR. PRICE:  Quick question.  Here, where you say we

22   need Ron Stover for sure for Bratz, which is a huge part of

23   our business, who is Ron Stover?

24   **A.**    Ron Stover was the buyer for dolls at Wal-Mart at one

25   time.  He's no longer there.

1    Q.    Again, let's focus on who is working on Bratz at the

2    September/October time frame.   In your first meeting you met

3    Veronica Marlow; correct?

4    A.    September 1, yes, I did meet her.

5    Q.    And it's your understanding that she was a friend of

6    Mr. Bryant's?

7    A.    I have no understanding how do they know each other, if

8    they were friends or not.   I met them both, to the best of my

9    recollection, I don't know if I met Veronica yet before.

10   Anyway, I met Veronica and Carter together.

11   Q.    Veronica and who?

12   A.    Carter.   At that meeting.

13   Q.    And was it your understanding that she was friends with

14   Paula Garcia?

15   A.    Who was?

16   Q.    Fair question.   That Veronica Marlow was friends with

17   Paula Garcia?

18   A.    I have no idea if they were friends or not.   I have no

19   idea.

20   Q.    It's your understanding that Ms. Garcia was working with

21   Ms. Marlow prior to September 2000 on other dolls?

22   A.    I have learned to know that she was, yes.

23   Q.    And that in the months of September and October, that

24   Veronica Marlow worked over 160 hours on the Bratz project?

25   A.    I'm sorry.   Can you repeat that question?

1    Q.   Sure.   That in September or October, that Veronica

2    Marlow billed to MGA about 160 hours on Bratz.

3    A.   I don't know if she did or she didn't.   If she did, then

4    she did.

5    Q.   You certainly came to have an understanding that

6    Veronica Marlow was providing to MGA fashions for the Bratz

7    dolls.

8              MR. NOLAN:   Objection.   Foundation as to what point

9    in time.

10             THE COURT:   I'm sorry?

11             MR. NOLAN:   Foundation.   Temporal foundation.

12             THE COURT:   Sustained.

13   Q.   BY MR. PRICE:   Did you at some time have that

14   understanding?

15   A.   That what?

16   Q.   That Veronica Marlow was providing fashions for the

17   Bratz dolls?

18   A.   I think she was part of the fashion designs, yes.

19   Q.   And that was from day one; correct?

20   A.   No, I don't know when she had started, but I know that

21   she was part of the fashion designs.

22   Q.   When is your understanding that Veronica Marlow is part

23   of that?

24   A.   From the date we signed the contract, I assume.   I

25   assume again.   I don't know.

1    Q.    You would not -- strike that.

2          You would agree that it would have been wrong for

3    Veronica Marlow to use Mattel employees to sew fashions for

4    Bratz dolls?

5              MR. NOLAN:   Your Honor, I object to the relevance.

6              THE COURT:   Overruled.   You may answer.

7              THE WITNESS:   If she did, yes, she would be wrong.

8    Q.    BY MR. PRICE:   Is it correct that if you had discovered

9    that, you would have stopped her from working on any Bratz

10   dolls?

11   A.    I would have stopped her if I knew that she was working

12   on -- she was using Mattel employees to work on Bratz dolls,

13   I would definitely stop her, yes.

14   Q.    And that's because you know that that simply is

15   inappropriate activity.

16   A.    That's correct.

17   Q.    But isn't it true that you came to know that and did not

18   stop her from working on Bratz dolls?

19   A.    I came to know about it during the course of this

20   litigation just recently.

21   Q.    Didn't you know before that that --

22   A.    I did --

23   Q.    Wait.   Let me finish the question.   Didn't you know

24   before that that Veronica Marlow was using employees from

25   another doll company to work on the fashions for Bratz dolls?

1    **A.**    I did not.  Veronica Marlow was a free-lance contractor

2    for MGA, and I had no idea who she was using.

3    **Q.**    If she had told you that, you would have done something

4    about it; right?

5    **A.**    If she would have told me that, yes, I would not -- I

6    would stop her.

7    **Q.**    And her husband told you that in 2005, didn't he?

8                MR. NOLAN:  Your Honor, objection.  Relevancy with

9    respect to the time period.

10               THE COURT:  Overruled.  Goes to other issues.  You

11   may answer.

12               THE WITNESS:  I'm sorry.  Can you repeat?

13   **Q.**    BY MR. PRICE:  It's true that her husband told you that

14   in 2005, and you did nothing about it?

15   **A.**    I can't recall.  I'm sorry.

16   **Q.**    If you look in your binder, Exhibit 13223.

17               MR. NOLAN:  Would the Court entertain a quick

18   sidebar?

19               THE COURT:  Yes.

20               **(SIDEBAR CONFERENCE HELD.)**

21               MR. NOLAN:  Your Honor, I just wanted to make

22   certain, we're now into the year 2005, and Mattel is pushing

23   and pushing and pushing this date, this relevant date of what

24   work was being done on Bratz by people not involved or hired

25   by MGA with no knowledge.

```
 1              Now, I don't know if he's going to go into this
 2   now, but I'm saying I think they are intentionally blowing
 3   through this time period that has been set up for 1-A, and
 4   we're blurred.  And I've tried to be light on my objections.
 5   I'm just -- when you said it related to other issues, I just
 6   wanted some clarification so I know where not to object.
 7              THE COURT:  It goes to issues, as I indicated,
 8   other than what Carter Bryant did -- I'll let Mr. Price --
 9              MR. PRICE:  We're not going into work that was done
10   on Bratz done in that time frame, after October 19, 2004.
11   What we're going into is this witness says, you know, it's
12   his practice he would not permit a Mattel employee to work on
13   Bratz, would not have permitted Carter Bryant to work on
14   Bratz.
15              THE COURT:  I chose my words as kind of a euphemism
16   for going to credibility.  I didn't want to say in front of a
17   jury, as I have, and I'm trying not to do that as an issue of
18   credibility.  That's what I meant when I said it goes to
19   another issue.
20              MR. NOLAN:  That's what I was getting at, your
21   Honor, because my only point is that what Isaac knew as of
22   October 19th or 20th is relevant with respect to the claims
23   that are being made to us.  There are no claims that have
24   been made against us or Veronica Marlow by Mattel regarding
25   work done by people other than Carter Bryant, and now we have
```

1    now gotten into, you know, work that Veronica Marlow is doing

2    in November, December, and now other work that is done by

3    her.

4            So I'm just seeing this as a slippery slope.  I

5    understand credibility issues.  But I want to make sure that

6    my objection -- that I was clear.

7            THE COURT:  You are clear.  And I'm glad that I had

8    the opportunity to make it clearer, not in front of the jury,

9    as to what I was ruling on.  It is credibility.  It's

10   limited.  Make your point and move on.  And then you, of

11   course, can respond in kind, absolutely.

12           MR. NOLAN:  Thank you.

13           MR. ZELLER:  If I may just for the record, because

14   that would seem to be sufficient for Mr. Larian, but

15   certainly down the road, we would also say that this goes

16   directly to elements that we have to prove for our claim.

17           THE COURT:  To your claim on the interference?

18           MR. ZELLER:  Right.

19           THE COURT:  I understand.

20           MR. NOLAN:  In 2005?

21           THE COURT:  Well, it's evidence relating back to --

22   you're shaking your head no, Counsel.

23           MS. AGUIAR:  It's not actually because Mr. Price's

24   question was didn't you at some point much later find out.

25   Well, even in his question, the wording of it is clear that

1   he's not even suggesting Mr. Larian knew in the relevant time

2   period, but he was just suggesting some time many years later

3   you found out.  So how does that go to the claim that they

4   have to prove regarding our behavior four years earlier?

5           THE COURT:  Counsel?

6           MR. ZELLER:  Again, Mr. Larian has already

7   testified that had he known, he would have done something

8   about it.  That relates back to any time.

9           THE COURT:  That's why I see this more as a

10  credibility issue as impeaching that position, that

11  Mr. Larian took.  And that was my thinking when I said it

12  relates to other issues.

13          MR. NOLAN:  Again, I just want to make a proffer

14  that the time period that they are now using is a document

15  from 2005.

16          THE COURT:  Let me get the document.  This is

17  Exhibit 13223.

18          MR. NOLAN:  Right.  This is going to be a time,

19  your Honor, where we are -- Mr. Larian is questioning the

20  costs that are being expended through Veronica Marlow in the

21  year 2005, 2004.  In response to that, Peter Marlow is

22  responding, saying the workers that we have, and he does not

23  identify them as Mattel workers, are very dedicated,

24  et cetera, et cetera, et cetera.

25          Isaac is only trying to deal with the cost issue.

```
 1   There is no suggestion here that he's being told that it's a
 2   Mattel employee.  But this door is going to open up that I'm
 3   going to have, in order to refute this, is to start talking
 4   about events in 2005, some five years later after the claim.
 5   I understand the credibility issue, but the problem, your
 6   Honor, is what they are doing is they are pushing this right
 7   open, flinging the door wide open to try to bring in all the
 8   seamstress issue that we don't believe is relevant in Phase
 9   1-A.  It may be for credibility.  But it's a question of
10   balance.
11           THE COURT:  And I appreciate that, and I'm not
12   going to let this go far, but I do think they are entitled to
13   some leeway on the credibility.
14           MR. NOLAN:  I appreciate that.  I just wanted some
15   leeway here.  And the other point I want to make, your Honor,
16   is it is now ten to 4:00, and I'm assuming that they are by
17   now --
18           THE COURT:  4:10.
19           MR. NOLAN:  What did I say?
20           THE COURT:  Ten to 4:00.
21           MR. NOLAN:  They are so far into the hours in this
22   case --
23           THE COURT:  That's their problem.
24           MR. NOLAN:  I just wanted to make certain that you
25   are still --
```

```
 1              THE COURT:  Don't worry.  Mr. Price and Mr. Quinn
 2    can watch the clock.
 3              MR. PRICE:  Whose time does this count against?
 4              MR. NOLAN:  Me.
 5              MR. PRICE:  For the record, Mr. Nolan did offer to
 6    sell us hours for a million bucks an hour.
 7              MS. AGUIAR:  Just to get closure, though, on one
 8    thing, Mr. Zeller said that he thinks this information is
 9    relevant not just to the credibility of this single witness,
10    but goes to the larger question of --
11              THE COURT:  You raise a good point on that,
12    Counsel, and I'm just allowing this for credibility.  No, you
13    did raise a good point, and I'll leave it at that.
14              MS. AGUIAR:  Thank you.
15              (CONCLUSION OF SIDEBAR CONFERENCE.)
16              THE COURT:  You may proceed.
17    Q.   BY MR. PRICE:  You have 13223 in front of you,
18    Mr. Larian?
19    A.   Yes, I do.
20    Q.   And you see it contains an e-mail from a Peter Marlow to
21    Paula Garcia, you, and M. Woods?
22    A.   I see that this is to Paula Garcia, and I'm copied, and
23    somebody named M. Woods is copied.
24              MR. PRICE:  Move Exhibit 13223 into evidence.
25              MR. NOLAN:  Objection.  Relevance, your Honor.
```

```
 1              THE COURT:  I'm going to sustain the objection,

 2   Counsel.  I don't know if the entire document is relevant.

 3              Let's go to particular sections.

 4              MR. PRICE:  Pardon?

 5              THE COURT:  Let's lay foundation for the relevance

 6   of the particular sections.

 7              MR. PRICE:  Sure.

 8   Q.   If you look at the second page of the document, and you

 9   see, by the way, this is an e-mail from Peter Marlow,

10   Veronica Marlow's husband, concerning the services she has

11   been providing to MGA; correct?

12   A.   This is an e-mail that she's -- or he's sending to Paula

13   Garcia, and I see that I'm copied.  I don't know what is it

14   concerning.  If you'd like me to read it, I don't believe

15   I've seen this before.

16   Q.   Well, if you'd look at the second page.  There is a

17   paragraph at the end beginning with "if."

18              Do you see that?

19   A.   I do.

20   Q.   And the topic is Ms. Marlow talking about the people who

21   work for her.  Do you see that?

22              THE COURT:  Counsel, which paragraph in particular?

23   You're on page 2?

24              MR. PRICE:  Second page, and it's the last

25   paragraph.
```

Exhibit D - Page 760

```
 1                THE COURT:  The last paragraph.  That spills over
 2    to the next page?
 3                MR. PRICE:  Yes.
 4                THE COURT:  Very well.  You're moving to introduce
 5    that particular paragraph?
 6                MR. PRICE:  Pardon?
 7                THE COURT:  Are you moving to introduce that
 8    particular paragraph?
 9                MR. PRICE:  Yes.
10                MR. NOLAN:  Objection with respect to foundation.
11    There's no foundation laid that he's seen this paragraph.
12                THE COURT:  Based on what's been established so
13    far, I'll overrule the foundational objection and the
14    relevancy objection to that paragraph alone.  That paragraph
15    alone may be published.
16                (Exhibit 13223, Page 2, last paragraph, received.)
17    Q.   BY MR. PRICE:  (Reading.)  "If Veronica goes to work for
18    MGA, she will no longer be able to work with her team of
19    pattern and sample makers.  They have secured day jobs with
20    an outlook of many more years of stability that they" --
21                THE COURT:  Just the first paragraph.
22                MR. PRICE:  "They only moonlight for Veronica.
23    About six months ago, we offered each of them full-time
24    employment at double their present salaries with a very
25    generous benefits package, but they all refused."
```

1          Do you see that?

2   **A.**   I do.

3   **Q.**   So this is communicating that whoever these people are,

4   they have a day job and they are moonlighting.

5   **A.**   That's what the paragraph says.  Your reading is as good

6   as mine.

7   **Q.**   And the paragraph right after that.

8          THE COURT:  One second, Counsel.

9          MR. PRICE:  And I request that that be moved into

10  evidence.

11         THE COURT:  Are there any other portions of this

12  e-mail that you are going to be seeking to introduce,

13  Counsel?

14         MR. PRICE:  It would just be the --

15         THE COURT:  Let's address this all at once.

16         MR. PRICE:  The sixth paragraph down there

17  beginning with "so."  It's really the third sentence

18  beginning with "they," which is important.

19         THE COURT:  Counsel, objections to these two

20  paragraphs, paragraphs 2 and 6 on page 3 of the exhibit,

21  Exhibit 13223.

22         MR. NOLAN:  Consistent with the prior ruling, we

23  have no objection.

24         THE COURT:  Very well.  So those two paragraphs can

25  come in.

```
 1          (Exhibit 13223, Page 3, paragraphs 2 and 6

 2          received.)

 3   Q.   BY MR. PRICE:  Let's look at that first paragraph

 4   beginning with these.  "These are older ladies, comfortable

 5   with the way things are, and they don't want to change.  We

 6   pay them very generously because they are risking their day

 7   jobs, even a nice retirement, to work for us.  If they were

 8   ever discovered, they'd certainly be painfully humiliated and

 9   fired."

10          You see that?

11   A.   I do.

12   Q.   And so this e-mail informs you that Ms. Marlow has these

13   folks working for her who have secure day jobs, who are

14   moonlighting, and would certainly be fired if it was

15   discovered that they would be moonlighting.

16   A.   Yes.

17          MR. NOLAN:  Your Honor, I'm sorry.  In addition to

18   these paragraphs, could we just have the date of this e-mail?

19          THE COURT:  I was going to get to that, Counsel.

20   Let's make sure that we have a document that has the from,

21   sent, to, and subject line along with the three paragraphs

22   the Court has admitted on a singular piece of paper.  And why

23   don't we go ahead and put that up at this time.

24          MR. NOLAN:  Thank you very much, your Honor.

25          THE COURT:  The from, sent, to, and the subject
```

1    line.  Thank you, Counsel.

2            MR. PRICE:  We will put this in one document.  It's

3    from Peter Marlow, August 1, 2005, forward, Veronica Marlow.

4    And what we are looking at now is the e-mail from Peter

5    Marlow to Paula Garcia, Isaac Larian, two e-mails to Isaac

6    Larian, and M. Woods, dated June 20, 2005, subject, Veronica

7    Marlow.

8            THE COURT:  Very well, Counsel.  Leave it on the

9    screen.

10           MR. PRICE:  The only way digitally it can be done

11   is if it's in the background --

12           THE COURT:  Very well.  We've reached our technical

13   limits.

14           MR. PRICE:  All right.  If we can get back to the

15   these are older ladies.

16   Q.  At this point, reading this e-mail, you know these

17   ladies work for another toy company, don't you?

18   A.  No.

19   Q.  You know they have day jobs.  They are moonlighting, and

20   if it's discovered, they will be painfully humiliated and

21   fired.  You know that, don't you?

22   A.  That's what he said.

23   Q.  So that tells you they are working for another toy

24   company.

25   A.  No, it doesn't.

1   Q.   So this --

2   A.   I have no idea who they were working for.

3   Q.   So this would give you no concern whatsoever that the

4   women working and making the patterns for Bratz are working

5   for a competitor?

6   A.   I had no idea -- I have no idea even today who is he

7   talking about.  I don't even recall reading this e-mail.

8   It's a long e-mail sent to Paula, I was just copied on it.

9   So I have no idea.

10  Q.   Well, this was in the midst of a discussion that you

11  were having with Peter Marlow about how much Veronica Marlow

12  was charging; correct?

13  A.   I believe I had concerns how much money we were paying

14  to Veronica Marlow for the work she was doing, yes.

15  Q.   And you recall there are e-mails between you and Paula

16  and Veronica Marlow about her coming in house to work at MGA?

17  A.   Yes, I believe there are.

18  Q.   And this e-mail is part of that discussion where she's

19  saying I can't come in house and provide you the services.

20  A.   It's possible it is, yes.

21  Q.   So this is part of a conversation you were involved in

22  at this time frame, 2005.

23  A.   Which conversation?

24  Q.   About Veronica Marlow coming in house, about how much

25  she was costing; correct?

1    **A.**   I know that I was concerned with the amount of money we

2    were paying her to do free-lance contract work for us.

3    **Q.**   And this is Peter Marlow's response as to why Veronica

4    Marlow should not come in house; correct?

5    **A.**   I have no idea if that's his response.  Possibly, yes.

6    But I cannot say it for sure.

7    **Q.**   And reading those paragraphs, sitting here right now as

8    someone who has been in the toy industry for now a number of

9    years, '87 to 2008, 21 years, that's telling you these ladies

10   work at a competitor.

11   **A.**   No.  It says they are sample makers, and what's the

12   other word?  Pattern makers.  And in Southern California,

13   there are many, many companies in downtown L.A. in the

14   textile industry, in the clothing industry.  So they could be

15   from any of those companies.  I have no idea.

16   **Q.**   Not necessarily a doll making.

17   **A.**   That's correct.

18   **Q.**   So in that case, let's look at the next paragraph, the

19   paragraph that we talked about beginning with "so."

20           "So how do we get any work done like this?  Maybe

21   it's just that they are so talented.  They have more than 100

22   years total of doll-making experience between them."

23   **A.**   I see.

24   **Q.**   You see that?

25   **A.**   Yes.

1   Q.   So it's fair, Mr. Larian, that after reading this, that

2   these women have secure day jobs with stability, that they

3   are unwilling to leave, and that they moonlight, that if they

4   are discovered, they will be painfully humiliated and fired,

5   that they are talented doll makers, that they have more than

6   a hundred years of doll making experience between them.   All

7   of these certainly lead you to suspect that Veronica Marlow

8   is using a competitor's employees to make the fashions for

9   your Bratz dolls.

10  A.   I did not pay attention, as I told you, to this whole

11  long e-mail, nor did I read every line as you're doing right

12  now.

13  Q.   Well, it's certainly accurate to say that you did not do

14  anything in response to this e-mail to determine whether or

15  not the woman making fashions for Bratz was using competitors

16  of an employee.

17  A.   I did not do anything one way or another that I recall,

18  no.

19  Q.   And you didn't, for example, communicate with Mr. Marlow

20  or Veronica Marlow and say identify who these ladies are who

21  have a hundred years total doll-making experience and have

22  this secure employment and who are moonlighting and who would

23  be fired and humiliated if it was discovered.

24  A.   Again, as I testified, I did not read this long e-mail.

25  It was not sent to me.   It was sent to Paula.   I was copied

1    on it.  So I didn't recall even reading this whole e-mail.

2  **Q.**    Well, sitting here today, your business-making decision

3    would be I would do nothing if I received this.  I wouldn't

4    investigate it?

5  **A.**    I'm sorry?

6  **Q.**    I -- sitting here reading this today, your decision

7    still would be I wouldn't do anything about it, I wouldn't

8    investigate it?

9  **A.**    Paula was working with Veronica, and I hope she would

10   look into it.  I was not involved in that detail, no.

11 **Q.**    My question was different.  You said that you don't

12   recall reading this e-mail on which you are copied.

13 **A.**    That's correct.

14 **Q.**    My question is, sitting here today reading it, you still

15   wouldn't do anything about it?

16 **A.**    Probably I would not.

17          THE COURT:  Now, in recognition to the tech people,

18   they were able to get the date up there and the paragraph.

19          MR. PRICE:  He surprised himself.

20 **Q.**    And is that the same attitude you had when Mr. Bryant

21   came to you, as a Mattel employee, and showed you drawings?

22   That you didn't really care whether he had done those

23   drawings while he was at Mattel or not?

24 **A.**    I asked Carter Bryant specifically if he done those

25   drawings at Mattel, and he has told them he had done them in

1842

1    1998 when he was not working for Mattel.

2    Q.   Do you have any reason to believe that the facts in this

3    e-mail about how Veronica Marlow's workers had secure

4    full-time jobs and were moonlighting and would be humiliated

5    and fired and had all of this doll-making experience, do you

6    have any reason to believe that Paula Garcia didn't know all

7    of this?

8    A.   I have no idea what she knew or not.  There are

9    statements in there like hundred years of doll making.  I

10   don't know if any of those are facts are not.  I have no

11   idea.  I didn't write this e-mail.

12   Q.   Well, the truth is you didn't want to know; right?

13   A.   That is not true, Mr. Price.  Your statement is not

14   true.

15   Q.   Then tell me everything you did after receiving this

16   e-mail to find out whether or not these women were working at

17   Mattel and working on the Bratz dolls at the same time.  Tell

18   me everything you did.

19   A.   I don't even know if they worked at Mattel or anywhere

20   else.  I told you I don't recall reading this e-mail.  This

21   long e-mail.  It was not addressed to me.

22   Q.   So it's your practice not to read e-mails that are --

23   let's see, three pages long?

24   A.   I get over 4- to 500 e-mails a day, and I cannot sit

25   down and read every one of them every line.  Yes, that's

1    true.

2    Q.   But this e-mail was in the middle of e-mail exchanges

3    between whether or not Ms. Marlow was going to join MGA;

4    correct?

5    A.   Probably, yes.

6    Q.   E-mails saying -- in which you were involved.

7    A.   I was concerned about the amount of money that Veronica

8    Marlow was charging, and I wanted to know if she can come and

9    work in house.   That's what I was focused on and concerned

10   with.

11   Q.   Well, Ms. Garcia, did she come to you and say Isaac,

12   Peter has put in this e-mail that the women working for

13   Veronica Marlow have secure day jobs, that they are

14   moonlighting, that they will be humiliated and fired if

15   anybody finds out, and that they have a hundred hours --

16   years of doll-making experience between them?   Did Paula

17   Garcia, to whom this was addressed, come to you and tell

18   you that?

19   A.   Not that I recall, no.

20   Q.   It's certainly something you would have expected her to

21   talk to you about if you didn't already know about it;

22   correct?

23   A.   Not necessarily, no.

24   Q.   Why wouldn't you expect your subordinate to tell you

25   that they had received an e-mail from a vendor which

1   confessed that they were using workers of another company who

2   would be fired if they -- if it was learned they were working

3   for you and who had a hundred years of doll-making experience

4   between them?  Why wouldn't you expect her to tell you that?

5   A.   We have over 1,000 employees.  If everyone came to tell

6   me about every e-mail they have, I would never get any work

7   done.  So I expect them to do their jobs.

8   Q.   Mr. Larian, I want to show you some documents to see if

9   you can identify them.  And I'll identify the first as

10  Exhibit 11665 for identification.

11          MR. NOLAN:  These are not on the exhibit list.

12          One moment, your Honor.

13          THE COURT:  You may.

14          MR. PRICE:  Can we go to sidebar on this?

15          THE COURT:  Sidebar.

16          **(SIDEBAR CONFERENCE HELD.)**

17          THE COURT:  Can I see the document?  Thanks.

18          MR. PRICE:  I don't want to examine Mr. Larian on

19  these documents.  They are three documents.  They are e-mails

20  from Mr. Gronich saying preserve your e-mails.  We want them

21  authenticated in case they become relevant.  Because he's the

22  one to authenticate them.  So I suggested that we agree that

23  they are authentic.  They are not admitted into evidence.

24  But the authenticity is stipulated to, and if they become

25  relevant.

1845

```
 1          THE COURT:  What's the objection?
 2          MR. NOLAN:  We don't have an issue with respect to
 3   the authenticity.  I was just handed this.  I'm assuming this
 4   is the exact copy that was sent out.  I was just handed this.
 5   This is in 2005.  This has nothing to do with Mr. Larian's
 6   testimony right now, and I told Mr. Price that we could work
 7   this out, and that Ms. Gronich is going to be a witness in
 8   this case, and we're not going back on the basis of
 9   authenticity, but it shouldn't be used with this witness in a
10   2005 document.
11          MS. AGUIAR:  And it also goes to basically what is
12   essentially discovery in this litigation.  And I don't want
13   to over-interpret the motion in limine, but we've been
14   objecting to each other's attempt to get into the discovery
15   in this case.  And so I also don't see how this even
16   conceivably could become relevant.
17          THE COURT:  Let me hear counsel.  I'm not really
18   sure.  I'm not finding what's relevant about these documents,
19   05, 06, and 07 regarding document retention as a result of
20   litigation.
21          MR. PRICE:  Two responses.  I'll let Mr. Zeller
22   respond to that particular question.
23          I don't plan to go into these with him.  So what
24   I'm saying --
25          THE COURT:  Let me hear from Mr. Zeller.
```

Exhibit D - Page 772

1    MR. ZELLER:  As the Court knows, there will be

2   spoliation issues.  Obviously, they may or may not come in.

3   But this would be a predicate in the event that these issues

4   of spoliation evidence come in, as we believe that they

5   should.

6    THE COURT:  I think this is premature at this point

7   in time.  Mr. Larian is not going anywhere.  The Court will

8   give you leave to recall him.

9    MR. NOLAN:  It's not going to be an issue.  Let's

10  move along.

11   **(CONCLUSION OF SIDEBAR CONFERENCE.)**

12   THE COURT:  You may proceed, Counsel.

13   MR. PRICE:  Thank you, your Honor.

14  **Q.**  By the way, so that we know what Ms. Garcia's position

15  was in 2005 when that e-mail, 13223, was sent to you and --

16  sent to her and copied to you, at that time she was a

17  vice-president of the company?

18  **A.**  Either director or vice-president.

19  **Q.**  Pardon?

20  **A.**  Either a director or vice-president.

21  **Q.**  And could you explain to the jury what a director of the

22  company is?

23  **A.**  It's basically she has people working for her

24  underneath.  She was promoted from a product manager to a

25  director.

1    **Q.**    And she reported directly to you?

2    **A.**    She did.

3    **Q.**    Switch topics now.

4              Did at any time MGA have a P.R. department?

5    **A.**    Yes, we do.

6    **Q.**    And for how long have you had a P.R. department?

7    **A.**    I believe since late 2000.

8    **Q.**    And one of your concerns back in, say --

9              THE COURT:  Counsel, identify the P.R. department.

10   **Q.**    BY MR. PRICE:  What does P.R. stand for?

11   **A.**    Public relations.

12   **Q.**    Thank you.  And one of your concerns, since the Bratz

13   dolls went on the market, was you wanted MGA to have a

14   consistent story about Bratz?

15             MR. NOLAN:  Objection as to the relevancy, when the

16   Bratz dolls come into the market.

17             THE COURT:  I'm going to sustain it.

18             Rephrase your question, counsel.  I'm not sure what

19   you mean by consistent story.

20   **Q.**    BY MR. PRICE:  Through your P.R. department, it was your

21   policy that no one talked to the press about Bratz unless

22   there was clearance in advance about what was to be said?

23             MR. NOLAN:  Objection.  Relevance.  Temporal

24   foundation.

25             THE COURT:  I'll sustain the temporal foundation.

1   Q.   BY MR. PRICE:   Beginning in 2001, 2002, there were press

2   reports about Bratz; correct?

3   A.   Yes.

4   Q.   And you were quoted in press reports saying certain

5   things about who was the inspiration for Bratz, how Bratz was

6   created, et cetera; correct?

7   A.   There were press reports about Bratz, sure.

8   Q.   And in those press reports, for example, we saw The Wall

9   Street Journal article, which talked about the sort of

10  fashion doll contest.

11          Do you recall that?

12  A.   I do.

13  Q.   And I just want to establish that in talking to the

14  press about those topics, it was important to you that there

15  would be agreement in advance as to what was going to be said

16  to the press.

17  A.   We have a company policy that I don't want other

18  people's names to be -- who worked for MGA to be in the

19  press, and the reason for that is I don't want headhunters to

20  be calling them.

21          MR. PRICE:   Move to strike as nonresponsive.

22          THE COURT:   I suppose it is, Counsel.   I'll strike.

23  The question is whether or not there was a -- an agreement,

24  not what the agreement was or why the agreement existed.

25  Sustained.   Stricken.

1   **Q.**   BY MR. PRICE:   Let me try to help move this along.   If

2   you look at Exhibit 633 for identification.   Have you found

3   that?

4   **A.**   Yes, go ahead.

5   **Q.**   Did you have a policy that no one was talking to the

6   press until they got clearance and they knew in advance what

7   was to be said?

8   **A.**   Yes.

9   **Q.**   And that policy is reflected in this e-mail; correct?

10  **A.**   No, that policy is not reflected in this e-mail.   But

11  that's the policy which I just explained to you, that I don't

12  want other people in the company to be talking to the press

13  or quoting to the press for the reason that I don't want

14  headhunters to be calling them.

15  **Q.**   There's nothing in this e-mail about headhunters, is

16  there?

17  **A.**   No, there's not.

18  **Q.**   And my question was this e-mail reflects your policy

19  that there be clearance and knowing in advance what people

20  are going to say so the same story comes out of everyone's

21  mouth.

22  **A.**   Yes, I can see that that's what's said in this.

23              MR. PRICE:   Your Honor, I move 633 into evidence.

24              MR. NOLAN:   No objection.

25              THE COURT:   It's admitted.   You may publish.

1    **(Exhibit 633 received.)**

2    **Q.**   BY MR. PRICE:   So this is June 19, 2001.   And perhaps

3    you can tell me there are some names we haven't seen.   Lon

4    Ross?

5    **A.**   I think he worked at MGA.   I don't know what position he

6    was in.

7    **Q.**   Dave Malacrida?

8    **A.**   He's our P.R. person, public relations person.

9    **Q.**   And in this e-mail, it attaches an article which you had

10   seen; correct?   Or that Mr. Malacrida, your public relations

11   person, had sent to you?

12   **A.**   Yes, I can see that.

13   **Q.**   And this is like some of your other e-mails where you

14   look at the e-mail and make your comments by writing things

15   in the attached e-mail.

16   **A.**   I do.

17   **Q.**   So for example, where it said the tween age is about 8

18   to 12, which is what Bratz is.

19           You have got your comment here about who said the

20   target is 8 to 12.

21   **A.**   I do.   I did that.   Those are my comments.

22   **Q.**   And this article quotes, for example, Mr. Ross; correct?

23   **A.**   Yes, I see his name there, yes.

24   **Q.**   And if we go to the next page, see up here, it quotes

25   Ms. O'Connor; correct?

1    A.    Yes.

2    Q.    And then you have your little comments here about more

3    like real girls.

4            Do you see that?

5    A.    Yes.

6    Q.    And in the next few pages, it also quotes either

7    Mr. Ross or Ms. O'Connor; correct?

8    A.    Yes, it does.  I can see a couple of them.

9    Q.    And certainly at this time you regarded Ms. O'Connor --

10   what was her position at this time?

11   A.    She was in charge of licensing, and I believe she was --

12   I believe public relations reported to her at the same time.

13   Q.    And licensing obviously was an important activity of

14   MGA.

15   A.    As of 2001, no, we hadn't started licensing yet.

16   Q.    So at that point you're planning to license, obviously.

17   A.    That's right.

18   Q.    You predicted that it would be a large profit area for

19   MGA.

20   A.    We wanted to start the licensing department, and she

21   started it.

22   Q.    So let's go to the first page again.  Your response

23   here.  You'll agree that nothing in here says I don't want

24   Victoria O'Connor or Mr. Ross to be quoted.

25   A.    It doesn't say that.  I'm sorry.  It says that no one

1    talks to the press.  I assume that means Victoria O'Connor

2    and Lon Ross.

3    Q.   What you say is we had a policy that no one talks to the

4    press until we get clearance and know in advance what we are

5    going to say; correct?

6    A.   Yes.

7    Q.   And your reason for saying you wanted to get clearance

8    and know what we're going to say is because we need to have

9    the same story come out of everyone's mouth.

10   A.   That's what it says.  That's what the paper says.

11   Q.   So you wanted the same story to come out of your mouth

12   that came out of Victoria O'Connor's mouth, that came out of

13   Mr. Ross's mouth; correct?

14   A.   We wanted to have consistency, yes.

15   Q.   Now, I'd like you to look at Exhibit 4941.

16   A.   Yes, go ahead.

17   Q.   And do you recognize 4941 as an e-mail which is Isaac

18   Larian to Isaac Larian, which includes an e-mail from a Chris

19   Palmeri to you?

20   A.   Yes.

21            MR. PRICE:  Move Exhibit 4941 into evidence, your

22   Honor.

23            MR. NOLAN:  No objection.

24            THE COURT:  It's admitted.  You may publish.

25            **(Exhibit 4941 received.)**

1    **Q.**    BY MR. PRICE:   Now, Chris Palmeri was a reporter at

2    Business Week; correct?

3    **A.**    Yes.   To the best of my recollection, he was, yes.

4    **Q.**    And these are your e-mail addresses?

5    **A.**    Yes.

6    **Q.**    And the subject of this is fact checking?

7    **A.**    Yes.

8    **Q.**    And what was going on here is Mr. Palmeri was sending

9    you an e-mail to fact check what he was going to put into his

10   article?

11   **A.**    That's correct.

12   **Q.**    And one thing he wanted to make sure is accurate, it

13   says:   "We describe you as a 49-year-old Iranian immigrant,

14   trained as a civil engineer, who modeled Bratz after your own

15   children, who wear midriff-baring shirts, low-rise jeans, and

16   baseball caps"; correct?

17   **A.**    I do see that, yes.

18   **Q.**    And actually the article was published which said the

19   Bratz were modeled, inspired by you seeing your own children

20   wearing these midriff-baring shirts?

21          MR. NOLAN:   Objection, your Honor.   Lack of

22   foundation.

23          THE COURT:   Sustained.

24   **Q.**    BY MR. PRICE:   Step back.   As we saw before, you were

25   concerned about the press that Bratz got; correct?

1   **A.**   I was not concerned about the -- I am sorry.  Say that

2   again.  I'm getting tired.  So I'm sorry.

3   **Q.**   It's Friday afternoon.  I don't blame you.

4          You wanted a consistent story about Bratz to come

5   out through the press.

6   **A.**   Yes.

7   **Q.**   And you would monitor to make sure that that consistent

8   story came out through the press.

9   **A.**   I did not monitor every piece of press that came out on

10  Bratz.  It's not possible to do that.

11  **Q.**   Well, did you monitor, when you have reporters contact

12  you for fact checking, would you then -- when reporters would

13  contact you to fact check an article, would you then read the

14  article?

15  **A.**   I have no idea whether I did or not.

16  **Q.**   Did you read the Business Week article that came out as

17  a result of this fact checking?

18  **A.**   I don't recall that.  I might have.  It's very possible.

19  **Q.**   You did read the e-mail, however, that you got from

20  Mr. Palmeri.

21  **A.**   Again, my name is on it.  So I assume I have read it.

22  **Q.**   And it was your understanding that what was going to be

23  published in the article was that you were a 49-year-old

24  Iranian immigrant, trained as a civil engineer, who modeled

25  Bratz after your own children, who wear midriff-baring

1    shirts, low-rise jeans, and baseball caps?

2    **A.**    What's your question?

3    **Q.**    It's your understanding that that information was the

4    information that was going to go into the article published

5    by Business Week?

6    **A.**    Probably, yes.

7    **Q.**    And that's why the fact checking, to make sure they

8    should say that; right?

9    **A.**    I hope so.   I don't know what was in his mind to send me

10   that e-mail.   You should ask him.

11   **Q.**    You don't understand he's trying to accurately make sure

12   he's going to say the right thing?

13   **A.**    His e-mail says fact checking.

14   **Q.**    So that's what you understood he was doing; right?   He

15   was saying hey, can I publish this and would it be accurate?

16   **A.**    Yes.

17   **Q.**    Okay.   Now, we're talking here about midriff-baring

18   shirts, low-rise jeans.   If you'd look at Exhibit 302.

19   **A.**    Yes, go ahead.

20   **Q.**    These are the drawings that Mr. Bryant gave you in

21   September of 2000; correct?

22   **A.**    I believe so, yes.

23   **Q.**    And if we look at 302-003, for example, the drawings

24   included hiphugger jeans; right?

25   **A.**    Yes.

1    **Q.**    Same as low-rise jeans?

2    **A.**    Yes, that's what my daughter wore.  That's what all the

3    other girls wore at that time.

4    **Q.**    Short T-shirt; right?

5    **A.**    Yes.

6    **Q.**    Midriff-baring?

7    **A.**    Yes.

8    **Q.**    In fact, a number of drawings in here like that.

9    **A.**    Yes, they are.

10   **Q.**    Where you have these hip hugging jeans and

11   midriff-baring shirt; right?

12   **A.**    Yes.

13   **Q.**    Mr. Bryant's drawings were the inspiration for Bratz.

14   **A.**    They were the inspiration for Bratz.

15   **Q.**    It's correct that -- if we can put up 4941 again.

16        Sitting here today, you consider that statement as

17   being partly true?

18        MR. NOLAN:  Objection, your Honor.  Foundation as

19   to what time.  2003?  Partly true of what?

20        THE COURT:  You are asking for foundation.

21   Sustained.

22   **Q.**    BY MR. PRICE:  Do you have an understanding as to

23   whether or not that statement is true or not?

24   **A.**    As of when?

25   **Q.**    Well, say, at the time of your deposition.

1    **A.**   Well, you know, this goes back to the 2000 -- September

2    2000.  And at that time my daughter Yasmin and her friends

3    were also wearing clothing that had midriff and -- I don't

4    even know how to say that.  I'm sorry.  Low-rise jeans,

5    et cetera.  And I put the two together.  That's what the kids

6    were wearing at that time.  And again, Carter Bryant's

7    drawings and -- look at my own kids -- was I put the two and

8    two together that I thought this kind of doll would be

9    successful.  That was one of the reasons we launched Bratz.

10   **Q.**   Were you trying to give the impression that you came up

11   with the Bratz look by just seeing the kind of clothes that

12   your daughter wore?

13   **A.**   No, I was not.

14   **Q.**   But you didn't tell Mr. Palmeri that the first time you

15   saw that look was associated with Bratz, was when Mr. Bryant

16   showed you these drawings?

17   **A.**   I did not.  Nor did I mention Paula Garcia or any other

18   designer who had worked on the Bratz.

19   **Q.**   Well, Ms. Garcia, are you saying she's the one who first

20   thought of these dolls having low-rise jeans, midriff-baring

21   shirts?

22   **A.**   No, she did not.  She was part of the whole design team

23   for the dolls.

24   **Q.**   It would be inaccurate to say that the Bratz dolls were

25   your son Jason's idea?

1   **A.**   Absolutely they were not my son Jason's idea.

2   **Q.**   But you did tell a reporter that.

3   **A.**   I did not.

4   **Q.**   If you look at Exhibit 12058.

5   **A.**   I'm not sure I can find this in this folder.

6   **Q.**   Do you have it in front of you?

7   **A.**   I do.

8   **Q.**   Have you ever seen this article before?

9   **A.**   I don't recall if I have or not.

10  **Q.**   And let me clarify.  Have you seen this article before

11  this litigation?

12  **A.**   Before this litigation?  No, I have seen it during this

13  litigation.

14  **Q.**   Before it, do you not recall one way or the other?

15  **A.**   I do not.

16  **Q.**   Did you talk with a reporter named Wes Weiss?

17  **A.**   I don't recall him, no.  I don't remember.  Maybe I

18  have.  I don't know.

19  **Q.**   Did you tell a reporter that your 17-year-old son Jason

20  came up with the idea for Bratz?

21  **A.**   I did not.  My son came up with a product called

22  Commandobot, but not Bratz.

23  **Q.**   If you look at Exhibit 11209.

24  **A.**   Yes, go ahead.

25  **Q.**   Have you seen the article that's Exhibit 11259?

1  **A.**   Only during the course of this litigation I have.

2  **Q.**   Did you ever tell a reporter that the idea for Bratz

3  came from when your daughter Yasmin and her cousins

4  complained that they were tired of Barbie?

5  **A.**   I don't recall -- I know that my daughter and her

6  friends were tired of Barbie.

7  **Q.**   The idea for Bratz came from Carter Bryant?

8  **A.**   It did.  The original idea for Bratz came from Carter

9  Bryant.

10  **Q.**   You weren't talking to your daughter, and then you came

11  up with the idea for Bratz.  That would be inaccurate;

12  correct?

13  **A.**   I did not come up with the idea for Bratz.  Bratz was

14  inspired by Carter Bryant's drawings.

15  **Q.**   So it would be false to say that you were the brain

16  child behind Bratz?

17  **A.**   For the Bratz drawings or Bratz dolls?

18  **Q.**   Say, for -- for however you use Bratz.

19  **A.**   No, I --

20  **Q.**   Let me finish.  It would be inaccurate to say that you

21  were the brain child behind Bratz?

22  **A.**   Absolutely.  I was the brain child behind the Bratz

23  dolls.  I created it.  I spent my money on it.  I put my

24  creative force into it.  I put my company's resources into it

25  to make it happen.  As far as the drawings were concerned

1  that became the basis for the Bratz, no, I have nothing to do

2  with that.

3  Q.   You have testified a number of times that Mr. Bryant was

4  the inspiration behind Bratz.

5         Do you recall that?

6  A.   His drawings were the inspiration for Bratz.

7  Q.   So it would be less than the complete truth if you

8  stated that you were the inspiration for Bratz.

9  A.   I don't even understand what less than completely true

10  means.  So can you rephrase that question?

11  Q.   You would not be telling the whole truth if you said

12  that you were the inspiration behind Bratz?

13         MR. NOLAN:   Objection.   Vague and ambiguous as to

14  the doll or the drawings --

15         THE COURT:   Fair enough.   Rephrase, Counsel.

16  Q.   BY MR. PRICE:   Let me do it this way.   If you'd look at

17  Exhibit 947.   It appears to be an affidavit.

18  A.   It's about 52 pages, yes.

19  Q.   Is this your affidavit in the case of MGA Entertainment

20  versus Thomas Christopher Joseph Metson?

21  A.   Yes.

22         MR. PRICE:   Your Honor, move Exhibit 947 in

23  evidence.

24         MR. NOLAN:   Your Honor, we have objection with

25  respect to relevance of most of this affidavit.   If Mr. Price

```
 1   can point to it, it's a 52-page affidavit.
 2           THE COURT:  You're not planning to complete the
 3   examination this afternoon, are you?  Or is this your last
 4   part?
 5           MR. PRICE:  No, probably not.  I was going to
 6   complete it on this topic.
 7           THE COURT:  Very well.  Why don't we go ahead and
 8   break for the day.
 9           Ladies and gentlemen -- for the weekend, actually.
10   Well, this is your last document on this topic?
11           MR. PRICE:  The last document on this topic, yes.
12           THE COURT:  Let me see you at sidebar.
13           (SIDEBAR CONFERENCE HELD.)
14           THE COURT:  Mr. Nolan?
15           MR. NOLAN:  Your Honor, Exhibit No. 947, the
16   52-page document from Hong Kong, contains a lot of references
17   to stuff that is just totally irrelevant to 1-A and 1-B.  And
18   I think it raises a significant 403 --
19           THE COURT:  Can we identify particular paragraphs,
20   as we did with the last document?
21           MR. PRICE:  All I wanted to do is identify the
22   caption and identify that he swore under oath and identify --
23   it's actually just -- I think it's paragraph 14 at this
24   point.
25           THE COURT:  14?
```

```
 1              MR. PRICE:  No, it's not 14.  If I had my copy me,
 2    I could tell you.
 3              8.   Paragraph 8.
 4              MR. NOLAN:  That's the only one you want to use out
 5    of the whole document?
 6              MR. PRICE:  At this point.
 7              MR. NOLAN:  Retract.
 8              THE COURT:  Yes.  It's admitted except for that
 9    paragraph and the front caption.
10              MR. PRICE:  And the statement under oath at the
11    end.
12              (Exhibit 947, paragraph 8, received.)
13              (CONCLUSION OF SIDEBAR CONFERENCE.)
14              THE COURT:  Counsel, you may proceed.
15              MR. PRICE:  Thank you, your Honor.
16    Q.   If you'd look at Exhibit 947, the caption, down to "I,
17    Isaac Larian, make oath and say as follows."
18              Mr. Larian, this is an affidavit you signed in this
19    case, in the case of MGA Entertainment and Thomas Christopher
20    Joseph Metson; correct?
21    A.   Yes.
22    Q.   And this was -- let me ask this:  Is this affidavit one
23    that you gave under oath?
24    A.   Yes.
25    Q.   Is this one of those affidavits you read before you
```

1    signed it under oath or one you did read before you signed it

2    under oath?

3    **A.**   For sure I didn't read this one.  It's 52 pages.  I

4    don't think I read it.  For sure I don't think I read it.  I

5    relied on my lawyers to prepare this.

6    **Q.**   What was MGA trying to accomplish by submitting under

7    oath to the court a 52-page affidavit signed by you?

8    **A.**   I don't remember the case.  I think it was about

9    somebody -- an infringement, I believe, in general.  In the

10   U.K.

11   **Q.**   And you didn't read any of these 52 pages to determine

12   whether what you were saying to the court under oath to get

13   legal relief was in fact accurate?

14   **A.**   I don't recall reading it, no.

15   **Q.**   Let's go to paragraph 8.

16            Before signing this affidavit under oath, did you

17   read this paragraph, saying, "I established the claimant and

18   was the inspiration behind the Bratz dolls"?

19   **A.**   Yes, I am absolutely the inspiration, the driving force

20   behind the Bratz dolls.  There's no question about it.  You

21   can ask anybody.  I think Victoria O'Connor even testified to

22   that.

23   **Q.**   My question was did you read this statement under oath

24   before you signed that affidavit?

25   **A.**   I don't recall if I read it or not, but that statement

1864

1    is accurate.  I am the inspiration behind the Bratz dolls.

2    I'm the driving force behind the Bratz dolls.  And Victoria

3    O'Connor in this courthouse, your witness, testified to that.

4    **Q.**   Would you bet your case on that, that she said you were

5    the inspiration behind the Bratz dolls?

6              MR. NOLAN:  Objection, your Honor.  We're not

7    betting anything.

8              THE COURT:  Sustained.

9              Counsel, let's end for the day.  Ladies and

10   gentlemen, we're going to start Tuesday at 10:00.  We have

11   some matters to take up.  Remember, do not read about this

12   case in the paper.  Just a reminder.  And don't discuss it.

13             Enjoy your weekend, and we'll see you Tuesday

14   morning at 10:00.

15             **(WHEREUPON THE JURY WITHDRAWS.)**

16             THE COURT:  Counsel, please be seated.

17             Counsel, the Court is working on -- struggling with

18   trying to figure out what Judge Infante meant with his order

19   concerning the computer hard drives, and I need some

20   assistance from you in terms of some documents.  The

21   documents were filed with Judge Infante, and I'm referring to

22   the original motion before Judge Infante that triggered Judge

23   Infante's order.

24             I'm having trouble, and my law clerks are having

25   trouble retrieving for me those documents because the

Exhibit D - Page 791

1

2

3

4

5

6                          **C E R T I F I C A T E**

7

8

9           I hereby certify that pursuant to Title 28,

10   Section 753 United States Code, the foregoing is a true and

11   correct transcript of the stenographically reported

12   proceedings in the above matter.

13           Certified on June 6, 2008.

14

15

16   **MARK SCHWEITZER, CSR, RPR, CRR**
     Official Court Reporter
17   License No. 10514

18

19

20

21

22

23

24

25

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    EASTERN DIVISION

4    - - -

5    HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6    - - -

7    MATTEL, INC.,                    )

8                    PLAINTIFF,       )

9            VS.                      )    NO. CV 04-09049

10   MGA ENTERTAINMENT, INC., ET. AL., )

11                   DEFENDANTS.      )    TRIAL DAY 10

12   AND CONSOLIDATED ACTIONS,        )    MORNING SESSION
                                      )    PAGES 1889 - 1975

13

14

15          REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                    RIVERSIDE, CALIFORNIA

17                  TUESDAY, JUNE 10, 2008

18                        8:13 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
            FEDERAL OFFICIAL COURT REPORTER
24             3470 12TH STREET, RM. 134
             RIVERSIDE, CALIFORNIA  92501
25                  951-274-0844
                WWW.THERESALANZA.COM

CERTIFIED COPY

1948

```
 1   NEEDS TO LEAVE TO RETRIEVE THEIR CAR AT 11:45, SO WE'LL BREAK
 2   AT THAT TIME.
 3          I ALSO UNDERSTAND THAT ANOTHER JUROR NEEDS TO TAKE UP
 4   AN ISSUE WITH THE COURT.  JUROR NUMBER THREE, MS. JOHNSON.
 5   WE'VE RECEIVED YOUR LETTER.  WHAT WE'LL DO IS, WE'LL TAKE THAT        11:09
 6   UP AT 1:15 THIS AFTERNOON.
 7          SO LET'S RESUME WITH THE EXAMINATION OF MR. LARIAN AT
 8   LEAST FOR THE NEXT 35 MINUTES.
 9          COUNSEL.
10              DIRECT EXAMINATION (CONTINUED)                             11:10
11   BY MR. PRICE:
12   Q    I'M GOING TO SHOW YOU A DOCUMENT.  IT'S BEEN IDENTIFIED AS
13   EXHIBIT 10175.
14          MR. LARIAN, LOOK THAT OVER BRIEFLY, AND I'M GOING TO
15   ASK YOU WHETHER YOU HAVE SEEN THIS DOCUMENT BEFORE.                   11:10
16   A    I DON'T RECALL EVER SEEING IT.
17   Q    DID YOU EVER HAVE ANY DISCUSSIONS CONCERNING A LAWYER
18   NAMED RAYMOND DAVID BLACK, REPRESENTING MGA?
19   A    I KNOW A LAWYER NAMED DAVID BLACK.  I DO KNOW HIM.
20   Q    AND WHO IS HE?                                                   11:11
21   A    HE'S A LAWYER FOR US IN THE UK.
22   Q    AND DID MR. BLACK FILE, ON YOUR BEHALF, AN ACTION AGAINST
23   DOUBLE GRAND CORPORATION, LIMITED?
24   A    I DON'T RECALL THAT.
25   Q    MORE PARTICULARLY, IF YOU'D LOOK AT PAGE 30.  I'LL ASK YOU       11:11
```

Exhibit D - Page 794

1949

1   WHETHER YOU RECOGNIZE THAT DOCUMENT, OR THAT PORTION OF

2   EXHIBIT 10175.

3   A    I DO NOT.

4   Q    DID YOU EVER BECOME AWARE THAT ATTORNEYS ON BEHALF OF MGA

5   REPRESENTED TO COURTS IN THE UK THAT CARTER BRYANT CAME UP WITH     11:11

6   THE DESIGNS OF THE BRATZ DOLLS IN 1999?

7            MR. NOLAN:  OBJECTION, YOUR HONOR.  LACKS FOUNDATION;

8   REFERRING TO THE DOCUMENT.

9            THE COURT:  LAY A FOUNDATION, COUNSEL.

10  BY MR. PRICE:                                                       11:12

11  Q    DO YOU HAVE ANY UNDERSTANDING AS TO WHETHER OR NOT MGA HAS

12  MADE REPRESENTATIONS TO COURTS AS TO WHEN MR. BRYANT CREATED

13  THE BRATZ DESIGN?

14  A    I DO NOT.

15  Q    ARE YOU AWARE THAT ISSUE CAME UP, THAT IS, WHEN MR. BRYANT     11:12

16  CREATED THE BRATZ DESIGNS -- ARE YOU AWARE OF WHETHER OR NOT

17  THAT ISSUE HAS EVER COME UP IN ANY LITIGATION OTHER THAN THIS

18  ONE IN WHICH MGA HAS BEEN INVOLVED?

19  A    NOT THAT I RECALL AS I SIT HERE, NO.

20  Q    DID YOU PERSONALLY EVER HAVE DISCUSSIONS WITH MR. BLACK        11:12

21  ABOUT THE FACTUAL BACKGROUND OF WHEN BRATZ WAS ORIGINATED OR

22  THE HISTORY OF MGA OR ANYTHING OF THAT NATURE?

23            MR. NOLAN:  YOUR HONOR, I'M GOING TO OBJECT TO THE

24  EXTENT THAT HE HAD CONVERSATIONS WITH COUNSEL FOR MGA THAT

25  WOULD BE PRIVILEGED.                                                11:13

1         THE COURT:  REPHRASE.

2    BY MR. PRICE:

3    Q    WITHOUT GETTING INTO ANY SUBSTANCE, HAVE YOU HAD

4    DISCUSSIONS WITH FOREIGN LAWYERS CONCERNING THE HISTORY OF

5    BRATZ?                                                           11:13

6    A    I'M SORRY?  WITH FOUR LAWYERS?

7    Q    FOREIGN LAWYERS, LIKE MR. BLACK, OR OTHERS, CONCERNING THE

8    HISTORY OF BRATZ.

9    A    I DON'T RECALL ONE WAY OR ANOTHER.

10   Q    IF ONE OF YOUR LAWYERS WANTED TO LEARN THE HISTORY OF       11:13

11   BRATZ, WHEN MR. BRYANT CREATED THESE DESIGNS OR ANYTHING OF

12   THAT NATURE, WOULD IT BE THE PRACTICE THAT THEY WOULD TALK TO

13   YOU OR SOMEBODY ELSE WITHIN MGA?

14        MR. NOLAN:  OBJECTION.  LACKS FOUNDATION; CALLS FOR

15   SPECULATION WITH SOMEONE HE WOULD HAVE TALKED TO.                11:13

16        THE COURT:  OVERRULED.

17        YOU MAY ANSWER.

18        THE WITNESS:  MOST LIKELY WE WOULD TALK TO OUR

19   IN-HOUSE GENERAL COUNSEL.

20   BY MR. PRICE:                                                    11:14

21   Q    THAT WOULD BE WHOM?

22   A    AT WHAT TIME?

23   Q    IN 2003.

24   A    I BELIEVE THAT WOULD BE DAPHNE GRONICH, IF I'M NOT

25   MISTAKEN.  AGAIN, I DON'T KNOW EXACTLY IF IT WAS HER OR          11:14

Exhibit D - Page 796

1951

```
 1   SOMEBODY ELSE.  I DON'T RECALL EXACTLY WHO WAS THE GENERAL
 2   COUNSEL IN 2003.
 3   Q    BEFORE PLEADINGS WERE FILED IN CASES THAT MGA WAS PURSUING
 4   IN WHICH THE COMPANY WAS TAKING POSITIONS ON WHEN THE BRATZ
 5   DESIGNS WERE CREATED, BEFORE THAT HAPPENED, WAS IT YOUR
 6   PRACTICE TO REVIEW THOSE PLEADINGS FOR ACCURACY?
 7   A    NO.
 8   Q    WAS THERE SOMEONE AT MGA WHO HAD THAT RESPONSIBILITY?
 9   A    AGAIN, I'M SPECULATING.  MOST LIKELY, OUR LAWYERS, OUR
10   GENERAL COUNSEL.
11   Q    JUST A FEW MORE QUESTIONS.
12        MR. LARIAN, WE SHOWED YOU EXHIBIT 633, WHICH IS IN
13   EVIDENCE, ON FRIDAY.  WE'LL PUT THAT UP AGAIN.
14        THAT WAS AN E-MAIL THAT YOU WROTE TO MR. ROSS,
15   MS. O'CONNOR, AND DAVID MALACRIDA ABOUT THE POLICY OF NO ONE
16   TALKING TO THE PRESS UNLESS YOU KNEW IN ADVANCE WHAT THEY WERE
17   GOING TO SAY.
18   A    YES.
19   Q    SO MY QUESTION IS THIS:  I THINK YOU SAID MR. MALACRIDA
20   HAD FUNCTIONS IN PUBLIC RELATIONS; IS THAT RIGHT?
21   A    YES.  HE'S HEAD OF PUBLIC RELATIONS.
22   Q    AND YOU WERE HERE WHEN MS. O'CONNOR TESTIFIED?
23   A    I WAS.
24   Q    IS IT TRUE THAT AFTER MS. O'CONNOR'S DEPOSITION WAS TAKEN,
25   IN WHICH SHE SAID YOU INSTRUCTED HER TO WHITE OUT THE FAX
```

11:14

11:14

11:15

11:15

11:15

Exhibit D - Page 797

1   HEADER FOR MATTEL -- IS IT TRUE THAT AFTER THAT, YOU INSTRUCTED

2   MR. MALACRIDA TO ADD HER BROTHER, CHARLES O'CONNOR, TO A LAYOFF

3   LIST?

4   A    THAT IS ABSOLUTELY NOT TRUE.

5   Q    DO YOU RECALL THERE BEING A LAYOFF LIST IN WHICH                    11:15

6   MS. O'CONNOR'S BROTHER WAS ON?

7   A    I BELIEVE MS. O'CONNOR'S BROTHER WAS LAID OFF, YES.

8   Q    AND IT'S YOUR UNDERSTANDING THAT WAS ABOUT FOUR MONTHS

9   AFTER MS. O'CONNOR TESTIFIED IN HER DEPOSITION.

10  A    I DON'T RECALL WHEN WAS IT.  I HAVE NO IDEA.                        11:16

11  Q    IT'S FAIR TO SAY, THOUGH, AT SOME POINT AFTER

12  MS. O'CONNOR'S DEPOSITION, YOU HEARD ABOUT HER TESTIMONY UNDER

13  OATH THAT YOU HAD INSTRUCTED HER TO WHITE OUT THE FAX HEADER

14  SAYING THAT THE CONTRACT WAS FAXED FROM MATTEL, THE BRYANT

15  CONTRACT?                                                               11:16

16  A    CAN YOU PLEASE -- I DON'T UNDERSTAND YOUR QUESTION.

17  Q    SURE.

18       AT SOME TIME AFTER MS. O'CONNOR'S DEPOSITION, IT'S

19  TRUE, IS IT NOT, THAT YOU LEARNED THAT MS. O'CONNOR HAD SAID

20  THAT YOU HAD INSTRUCTED HER TO WHITE OUT THE FAX HEADER THAT       11:16

21  SAID THAT MR. BRYANT'S CONTRACT WAS FAXED FROM MATTEL?

22  A    I DON'T RECALL THAT.

23  Q    THAT SORT OF ACCUSATION WOULD MAKE YOU SOMEWHAT UPSET IF

24  IT WEREN'T TRUE; CORRECT?

25  A    WELL, TO THE BEST OF MY RECOLLECTION, MOST OF THESE            11:17

Exhibit D - Page 798

1953

```
 1   DEPOSITIONS WERE TAKEN AS ATTORNEYS' EYES ONLY, AND OUR

 2   ATTORNEYS WERE NOT SUPPOSED TO TELL US ANYTHING ABOUT ANY OF

 3   THE DEPOSITIONS; SO I HAVE NO RECOLLECTION OF THAT ONE WAY OR

 4   ANOTHER.

 5   Q    IS IT YOUR TESTIMONY THAT THAT PART OF MS. O'CONNOR'S        11:17

 6   DEPOSITION WAS FOR ATTORNEYS' EYES ONLY; THAT IS, THE PART

 7   WHERE SHE SAID YOU TOLD HER TO WHITE OUT THE FAX HEADER SHOWING

 8   THAT MR. BRYANT'S CONTRACT WAS FAXED FROM MATTEL?

 9   A    I DON'T KNOW.  I WAS NOT AT HER DEPOSITION, SO I DON'T

10   KNOW IF IT WAS OR NOT.                                            11:17

11   Q    SO IS IT YOUR TESTIMONY THAT YOU NEVER LEARNED THAT SHE

12   HAD TESTIFIED IN THAT DEPOSITION UNDER OATH THAT YOU HAD

13   DIRECTED HER TO WHITE OUT THIS FAX HEADER?

14   A    BESIDES WHAT I LEARNED DURING THE COURSE OF THIS

15   LITIGATION?                                                       11:17

16   Q    WELL, THAT WOULD BE DURING THE COURSE OF THE LITIGATION.

17        AFTER HER DEPOSITION.

18   A    TECHNICALLY, YEAH, YOU CAN SAY AFTER THE DEPOSITION, YES,

19   I DID LEARN THAT SHE SAID THAT.

20   Q    HOW SOON WAS IT AFTER MS. O'CONNOR'S DEPOSITION THAT YOU     11:18

21   LEARNED THAT SHE HAD SAID THAT YOU HAD WHITED OUT THE FAX

22   HEADER THAT SHOWED THAT MR. BRYANT'S CONTRACT WAS FAXED TO MGA

23   FROM MATTEL?

24   A    I WOULD NOT BE ABLE TO PUT A DATE ON THAT.  I DON'T KNOW

25   WHEN WAS HER DEPOSITION.                                          11:18
```

1954

```
 1   Q    BUT JUST SAY WITHIN A CERTAIN TIME PERIOD.

 2            WAS IT WITHIN A MONTH?  A DAY?  A FEW WEEKS?  TWO

 3   MONTHS?  TWO YEARS?

 4   A    I DON'T RECALL.  I DON'T THINK IT WOULD BE TWO YEARS,

 5   BECAUSE -- BUT I DON'T RECALL.                                    11:18

 6   Q    SO YOU DON'T RECALL AN INSTANCE WHERE YOU LEARNED OF THAT

 7   AND YOU WERE UPSET BECAUSE YOU THOUGHT THAT WAS UNTRUE?

 8   A    I AM UPSET, BECAUSE IT IS UNTRUE.  BUT I DON'T RECALL WHEN

 9   I LEARNED ABOUT IT.

10   Q    DO YOU RECALL THAT YOU WERE ASKED ABOUT EXHIBIT 13223; AND  11:18

11   THIS IS THE REDACTED E-MAIL FROM PETER MARLOW.  YOU RECALL THAT

12   THE E-MAIL WAS FROM MR. MARLOW TO MS. GARCIA, COPYING YOU.

13            I WANT TO ASK YOU ABOUT MS. GARCIA'S RELATIONSHIP TO

14   VERONICA MARLOW.

15            WAS IT YOUR UNDERSTANDING THAT THEY WERE FRIENDS?       11:19

16   A    AS OF WHEN?

17   Q    LET'S SAY AS OF 2005.

18   A    I DON'T KNOW IF THEY WERE FRIENDS OR NOT.  I KNOW THAT

19   VERONICA MARLOW WAS A FREELANCE CONTRACTOR TO MGA.  I HAVE NO

20   IDEA IF THEY WERE FRIENDS OR NOT.                                11:19

21   Q    WAS IT YOUR UNDERSTANDING THAT IT WAS MS. GARCIA WHO MADE

22   THE DECISION AS TO WHETHER OR NOT TO SEND WORK TO

23   VERONICA MARLOW?

24   A    I UNDERSTAND THAT, FOR HER TO BE -- YES.  YES, THAT'S

25   CORRECT.                                                         11:19
```

```
 1   Q    AND MS. GARCIA WOULD BE THE ONE WHO WOULD APPROVE THE

 2   INVOICES THAT CAME IN FROM VERONICA MARLOW.

 3   A    I DON'T KNOW IF IT WAS HER WHO APPROVED THEM OR THE

 4   ACCOUNTING DEPARTMENT OR SOMEBODY ELSE.  I HAVE NO IDEA WHO

 5   APPROVED HER INVOICES.                                        11:20

 6   Q    IT'S YOUR UNDERSTANDING THAT MS. GARCIA, BEING THE PERSON

 7   WHO WOULD SEND THE WORK TO MS. MARLOW, WOULD BE EXPECTED TO

 8   OVERSEE THAT WORK; CORRECT?

 9   A    CAN YOU REPEAT THAT QUESTION.

10   Q    SURE.                                                    11:20

11        SINCE MS. GARCIA WAS THE ONE SENDING THE WORK TO

12   MS. MARLOW, SHE WAS THE ONE WHO WOULD BE OVERSEEING THAT WORK,

13   TO MAKE SURE IT WAS SATISFACTORY.

14   A    I HOPE SO.  THAT'S MY BEST RECOLLECTION -- EXPECTATION, I

15   GUESS.                                                        11:20

16   Q    AND YOU WOULD EXPECT THAT MS. MARLOW WOULD OVERSEE THE

17   WORK TO MAKE SURE SHE WAS GETTING HER MONEY'S WORTH; THAT IS,

18   THAT MGA WAS GETTING ITS MONEY'S WORTH.

19   A    CAN YOU REPEAT THAT AGAIN.

20   Q    YOU WOULD EXPECT THAT MS. GARCIA, IN THIS OVERSIGHT       11:20

21   FUNCTION, WOULD BE MAKING SURE THAT MGA WAS GETTING ITS MONEY'S

22   WORTH FOR THE WORK THAT IT WAS GETTING FROM MS. MARLOW.

23   A    I'M SORRY.  I DON'T UNDERSTAND EXACTLY WHAT YOUR QUESTION

24   IS.

25   Q    I'LL BREAK IT UP.                                        11:21
```

1956

1     MGA WANTS TO MAKE SURE IT DOESN'T OVERPAY ITS

2   VENDORS; RIGHT?

3   A     YES.  I HOPE SO.

4   Q     YOU'RE CONCERNED ABOUT COSTS.

5   A     WE ARE CONCERNED ABOUT COSTS.                      11:21

6   Q     AND YOU SAID MS. GARCIA WAS THE ONE RESPONSIBLE FOR

7   SENDING BUSINESS TO MS. MARLOW; CORRECT?

8   A     I THINK SHE WAS, YES.

9   Q     AND PART OF HER DUTIES WOULD BE TO MAKE SURE THAT THE WORK

10  SHE WAS GETTING FROM MS. MARLOW WAS WORTH THE COST.       11:21

11  A     YES.  YOU CAN SAY THAT.

12  Q     DOES MGA HAVE ANY POLICIES ABOUT WHETHER OR NOT A VENDOR

13  WHO'S RECEIVING WORK FROM AN MGA EMPLOYEE CAN GIVE GIFTS TO

14  THAT MGA EMPLOYEE?

15  A     IF WE HAVE A POLICY, WE CAN GIVE GIFTS TO THE MGA        11:21

16  EMPLOYEE?

17  Q     YES.

18        FOR EXAMPLE, MS. GARCIA IS THE ONE SENDING WORK TO

19  MS. MARLOW.

20        DID MGA HAVE A POLICY THAT MS. GARCIA, YOU KNOW,        11:21

21  SHOULDN'T BE ACCEPTING MONEY FROM MS. MARLOW?

22  A     IT'S POSSIBLE.  I DON'T KNOW ONE WAY OR ANOTHER.

23  Q     WELL, WOULD YOU EXPECT THAT THERE WOULD BE SOME POLICY

24  AGAINST THAT?

25  A     I DON'T KNOW IF THERE IS OR NOT.  I DON'T THINK THERE'S   11:22

TUESDAY, JUNE 10, 2008          TRIAL DAY 10, MORNING SESSION

Exhibit D - Page 802

1957

```
 1   ANYTHING WRONG IF SOMEBODY IS GIVING GIFTS TO SOMEBODY ELSE, AS
 2   FAR AS MGA IS CONCERNED.
 3   Q    LET ME SHOW YOU WHAT'S IN EVIDENCE AS EXHIBIT 13172.  IT'S
 4   NOT IN YOUR BINDER.  I'M PUTTING IT UP HERE.
 5             IT'S A CHECK FROM MS. MARLOW TO PAULA TREANTAFELLES,     11:22
 6   MS. GARCIA, FOR $8,000, IN AUGUST OF 2004.
 7             DO YOU HAVE ANY AWARENESS AS TO THIS CHECK; THAT IS,
 8   MS. MARLOW, THE VENDOR, SENDING MS. GARCIA, THE PERSON WHO GAVE
 9   HER BUSINESS, A CHECK FOR $8,000?
10   A    I DO NOT.                                                    11:23
11   Q    SINCE FRIDAY, HAVE YOU HAD THE OPPORTUNITY TO TALK WITH
12   ANYONE ABOUT YOUR TESTIMONY?
13   A    NO, I HAVE NOT.
14   Q    HAVE YOU HAD ANY DISCUSSIONS WITH ATTORNEYS OR ANYONE
15   ABOUT YOUR TESTIMONY?                                            11:23
16   A    I HAVE NOT.
17   Q    PRIOR TO TAKING THE STAND LAST WEEK, DID YOU HAVE ANY
18   MEETINGS WITH YOUR COUNSEL CONCERNING YOUR TESTIMONY?
19   A    I DID.
20   Q    AND WITHOUT GETTING INTO ANY SUBSTANCE, CAN YOU TELL US      11:23
21   WHO YOU MET WITH.
22   A    MR. TOM NOLAN.  CRAIG HOLDEN, I BELIEVE, CAME IN AND OUT.
23   I THINK EVEN TOM NOLAN CAME IN AND OUT.  HE WENT TO DO HIS
24   LAUNDRY.
25             MR. NOLAN:  OBJECTION, YOUR HONOR.  ACTUALLY, I         11:23
```

1958

```
 1    PICKED IT UP FROM THE LAUNDRY.

 2              MR. QUINN:  WE'RE JUST GRATEFUL HE DID IT,

 3    YOUR HONOR.

 4              THE COURT:  VERY WELL.

 5              THE WITNESS:  AND ROB HERRINGTON.          11:23

 6    BY MR. PRICE:

 7    Q    PADDINGTON?

 8    A    NO.  ROB HERRINGTON.

 9    Q    AND COULD YOU IDENTIFY -- WE KNOW MR. NOLAN.

10    A    YES.                                           11:24

11    Q    THE OTHER FOLKS ARE IN HERE AS WELL?

12    A    ROB HERRINGTON IS RIGHT THERE.

13              AGAIN, CRAIG HOLDEN CAME IN AND OUT.

14    Q    HOW LONG WERE YOU MEETING WITH THESE FOLKS?

15    A    ABOUT TWO TO THREE HOURS.                      11:24

16    Q    DURING THAT TIME, DID YOU LOOK AT ANY DOCUMENTS TO REFRESH

17    YOUR MEMORY?

18    A    I LOOKED AT DOCUMENTS, YES.

19    Q    DID ANY OF THEM REFRESH YOUR RECOLLECTION?

20    A    NOT AS I RECALL THEM HERE ONE WAY OR ANOTHER.  THEY MIGHT   11:24

21    BE, BUT -- YEAH, I SAW A BUNCH OF DOCUMENTS.

22    Q    WAS THIS THE ONLY TIME, THIS TWO- OR THREE-HOUR PERIOD,

23    WAS THIS THE ONLY TIME YOU MET WITH THESE GENTLEMEN TO DISCUSS

24    YOUR TESTIMONY?

25    A    BEFORE I CAME ON THE STAND HERE?                11:24
```

1959

1    Q    AT THIS POINT, LIMIT IT TO THAT, YES.

2    A    YES.

3    Q    HAD THERE BEEN PREVIOUS TIMES WHEN YOU HAD MET WITH

4    ATTORNEYS TO DISCUSS YOUR TESTIMONY?

5    A    I HAVE MET WITH MY LAWYERS TO DISCUSS MY DEPOSITION, WHEN        11:25

6    I WAS GIVING MY DEPOSITION, YES.

7    Q    AND ABOUT HOW MANY HOURS DID YOU MEET WITH YOUR LAWYERS IN

8    THAT CONNECTION?

9    A    I DON'T RECALL.  I GAVE TWO DEPOSITIONS TWO DIFFERENT

10   TIMES.  I DON'T RECALL EXACTLY.                                        11:25

11   Q    DURING ANY OF THESE TIMES, WAS ANY OF THIS VIDEOTAPED?

12   A    NO, IT WAS NOT.

13        MR. PRICE:  YOUR HONOR, I HAVE NO FURTHER QUESTIONS

14   OF MR. LARIAN AT THIS TIME.

15        THE COURT:  VERY WELL.                                            11:25

16        CROSS-EXAMINATION.

17                      CROSS-EXAMINATION

18   BY MR. NOLAN:

19   Q    MR. LARIAN, I WANT TO TURN TO THAT LAST SUBJECT WE

20   DISCUSSED, ABOUT MEETINGS WITH COUNSEL.                                11:25

21        I THINK YOU INDICATED THAT YOU MET LAST WEEK SOMETIME

22   WITH COUNSEL.

23        IS IT TRUE, MR. LARIAN, THAT AFTER JURY SELECTION AND

24   BEFORE YOU TOOK THE STAND, YOU TOOK A TRIP OUT OF THE

25   UNITED STATES?                                                         11:26

1   A    I DID.

2         **MR. PRICE:**  OBJECTION.  IRRELEVANT AND LEADING.

3         **THE COURT:**  OVERRULED.

4         **THE WITNESS:**  YES, I DID.

5   **BY MR. NOLAN:**

6   Q    WHAT WERE THE CIRCUMSTANCES?  WHY DID YOU TRAVEL ABROAD?

7         **MR. PRICE:**  OBJECTION.  THIS IS NOT RELEVANT.

8         **THE COURT:**  OVERRULED.

9         I THINK THE DOOR HAS BEEN OPENED TO THIS.

10        **THE WITNESS:**  I WAS NAMED ENTREPRENEUR OF THE YEAR    11:26

11  FOR THE UNITED STATES, AND I WAS GOING TO EUROPE TO COMPETE FOR

12  ENTREPRENEUR OF THE WORLD.

13  **BY MR. NOLAN:**

14  Q    AND DO YOU HAVE IN FRONT OF YOU EXHIBIT 18480?

15  A    YES.                                                       11:27

16  Q    DO YOU RECOGNIZE THIS DOCUMENT?

17  A    I DO.

18  Q    WHAT IS IT, SIR?

19  A    THIS WAS BASICALLY THE STORY THAT WAS ON U.S. STATE

20  DEPARTMENT'S WEBSITE REGARDING I WINNING THE ENTREPRENEUR --     11:27

21        **MR. PRICE:**  OBJECTION.  THIS IS TESTIFYING TO BEFORE

22  THE EXHIBIT IS IN.

23        **THE COURT:**  LET'S GO TO SIDE-BAR, COUNSEL, BRIEFLY.

24        (SIDE-BAR PROCEEDINGS WERE HELD AS FOLLOWS:)

25        **THE COURT:**  MR. NOLAN, I'LL GIVE YOU LEEWAY -- THE     11:27

1961

```
 1   DOOR HAS BEEN OPENED -- BY ASKING ABOUT THIS MEETING.  WHAT IS
 2   YOUR EXPLANATION ABOUT WHY HE WAS THERE?  IT'S TO UPDATE HIM ON
 3   WHAT HAPPENED WHILE HE WAS GONE?
 4           MR. NOLAN:  RIGHT.
 5           THE COURT:  THERE IS INFORMATION ABOUT THAT, BUT        11:28
 6   THERE'S NO DISPUTE THAT HE WENT OVER AND WAS AMERICAN
 7   ENTREPRENEUR OF THE YEAR.  WHY GET INTO THE ARTICLE AT THIS
 8   TIME?  DOES IT LEAD TO ANOTHER ARTICLE, I'M AFRAID?
 9           MR. NOLAN:  IT PROBABLY DOES.  I WON'T GO INTO THIS.
10           WELL, AS JUDGE TAKASUGI WOULD SAY, A LITTLE BIT TOO     11:28
11   MUCH MUSTARD ON THE HOT DOG.
12           THE COURT:  WISE MAN.
13           (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)
14   BY MR. NOLAN:
15   Q    MR. LARIAN, WITHOUT REFERENCE TO THIS PARTICULAR DOCUMENT, 11:29
16   WHAT COUNTRIES WERE REPRESENTED IN THIS INTERNATIONAL
17   COMPETITION, IF YOU KNOW?
18           MR. PRICE:  OBJECTION.  THE 'MUSTARD' RELEVANCE.
19           THE COURT:  OVERRULED, COUNSEL.
20           THEN LET'S MOVE ON FROM THIS QUESTION.               11:29
21           THE WITNESS:  OVER 49 COUNTRIES WERE REPRESENTED IN
22   THIS COMPETITION.
23   BY MR. NOLAN:
24   Q    DO YOU KNOW WHETHER OR NOT YOU WERE SELECTED BECAUSE OF
25   YOUR INVOLVEMENT WITH THE DEVELOPMENT OF THE BRATZ DOLL?      11:29
```

Exhibit D - Page 807

```
 1   A    NO.  I WAS SELECTED BECAUSE --

 2             MR. PRICE:  OBJECTION.  LACK OF FOUNDATION.

 3             THE COURT:  SUSTAINED.

 4   BY MR. NOLAN:

 5   Q    DID THE UNITED STATES WIN THE COMPETITION?              11:29

 6   A    NO, WE DID NOT.

 7   Q    WHICH COUNTRY DID?

 8   A    SWITZERLAND.

 9   Q    MR. PRICE ASKED YOU A NUMBER OF QUESTIONS CONCERNING

10   ALLEGED CONCEALMENT OF CARTER BRYANT AS THE ILLUSTRATOR FOR THE   11:30

11   DRAWINGS OF BRATZ.

12             DO YOU RECALL THAT LINE OF QUESTIONS?

13   A    I DO.

14   Q    DO YOU HAVE EXHIBIT NUMBER 17281 IN FRONT OF YOU, SIR?

15   A    YES.                                                   11:30

16   Q    DO YOU RECOGNIZE 17281?

17   A    I DO.

18   Q    WHAT IS IT?

19   A    THIS IS AN E-MAIL THAT ERIC YIP, WHO WORKED FOR MGA HONG

20   KONG, SENT TO A LADY NAMED ELING POON, WHO WORKED AT THE TIME   11:31

21   FOR PREL, WHICH WAS THE AGENT FOR WAL-MART IN HONG KONG.

22             MR. NOLAN:  YOUR HONOR, WE'D OFFER EXHIBIT 17281.

23             MR. PRICE:  OBJECTION.  FOUNDATION AS TO HOW HE'S

24   SEEN THIS DOCUMENT.

25             THE COURT:  SUSTAINED.                            11:31
```

1963

1    BY MR. NOLAN:

2    Q    DO YOU RECALL THE CIRCUMSTANCES BY WHICH THIS E-MAIL WAS

3    SENT?

4    A    YES.

5    Q    DID ANYBODY APPROACH YOU AND ASK YOU FOR PERMISSION TO

6    TAKE THE ACTIONS THAT ARE SET FORTH IN THIS E-MAIL?

7    A    YES.  ERIC YIP DID.  AND I GAVE HIM AN INSTRUCTION TO DO

8    IT.

9    Q    WAS THIS E-MAIL SENT PURSUANT TO YOUR SPECIFIC

10   INSTRUCTIONS?

11   A    YES, IT WAS.

12        MR. NOLAN:  YOUR HONOR, WE'D NOW OFFER EXHIBIT 17281.

13        MR. PRICE:  NO OBJECTION.

14        THE COURT:  IT'S ADMITTED.

15        YOU MAY PUBLISH.

16   BY MR. NOLAN:

17   Q    I JUST WANT TO GO TO THIS BEFORE THE LUNCH HOUR, AND THEN

18   WE'LL COME BACK AND TALK ABOUT OTHER ISSUES.

19        DO YOU SEE WHERE IT SAYS, "SUBJECT:  FASHION DOLLS

20   BRATZ FOR RON STOVER"?  DO YOU SEE THAT?

21   A    YES.

22   Q    AND IMMEDIATELY ABOVE THAT, IT'S THE SENT DATE; AND,

23   AGAIN, BECAUSE WE'RE READING IT, THE WAY IT'S SET FORTH IN THE

24   ADDRESS THERE, IT'S DECEMBER 14, 2000.

25   A    THAT'S CORRECT.

1964

1    Q    AND CARTER BRYANT HAS BEEN WORKING AT MGA SINCE

2    APPROXIMATELY OCTOBER 20TH; CORRECT?

3    A    THAT'S CORRECT.

4    Q    NOW, THIS SAYS, "FASHION DOLLS FOR RON STOVER."

5            WOULD YOU MIND EXPLAINING TO THE JURY WHO                    11:32

6    RON STOVER IS.

7    A    RON STOVER WAS THE BUYER FOR WAL-MART AT THE TIME FOR

8    FASHION DOLLS.

9    Q    AND HAD YOU EVER HAD ANY CONVERSATIONS WITH MR. STOVER

10   CONCERNING MGA DEVELOPING FASHION DOLLS?                             11:33

11   A    YES.  RON STOVER WAS A BUYER AT WAL-MART.  WAL-MART IS,

12   PERHAPS, THE BIGGEST RETAILER IN THE U.S.A., AND AT THE TIME, I

13   WAS THE SALESMAN WHO WOULD CALL ON WAL-MART.  I USED TO GO TO

14   WAL-MART FROM HERE.  I HAD TO FLY TO DALLAS, AND FROM DALLAS,

15   TAKE A SMALL PLANE TO FAYETTEVILLE, ARKANSAS.  FROM THERE, I         11:33

16   HAD TO DRIVE TO BENTONVILLE, ARKANSAS, WHERE THE HEADQUARTERS

17   OF WAL-MART IS.  AND I HAD MADE MANY, MANY PRESENTATIONS TO HIM

18   OF PRODUCTS, AND UNFORTUNATELY, HE WOULD NOT BUY ANYTHING FROM

19   ME.  I RECALL ON ONE OCCASION --

20           MR. PRICE:  YOUR HONOR, THIS SEEMS TO BE BEYOND THE          11:34

21   SCOPE AT THIS POINT.

22           THE COURT:  LET'S BREAK IT UP, COUNSEL.

23   BY MR. NOLAN:

24   Q    YOU WERE TALKING ABOUT NUMEROUS TRIPS THAT YOU HAD TAKEN

25   TO MEET WITH MR. WAL-MART, OR A REPRESENTATIVE OF WAL-MART.          11:34

Exhibit D - Page 810

```
 1          WAS THERE A TIME THAT YOU HAD A MEETING WITH
 2   MR. STOVER WHERE THE SUBJECT OF MGA POSSIBLY DEVELOPING A
 3   FASHION DOLL CAME UP?
 4   A    NOT SPECIFICALLY A FASHION DOLL.
 5   Q    DO YOU RECALL DISCUSSIONS WITH MR. STOVER AT WAL-MART WITH    11:34
 6   RESPECT TO THE POTENTIAL OF PRESENTING ADDITIONAL NEW PRODUCTS
 7   TO HIM?
 8   A    I REMEMBER ONE SPECIFIC MEETING WHERE HE SAID -- BECAUSE
 9   HE WOULD NOT BUY ANYTHING FROM ME, SO -- AND I SAID, 'WHAT IS
10   IT GOING TO TAKE?'  HE SAID, 'BRING ME SOMETHING THAT COMPETES    11:34
11   WITH BARBIE, AND I WOULD BUY IT.'
12   Q    AND WHAT YEAR WAS THAT?
13   A    IT WAS -- I DON'T REMEMBER THE EXACT YEAR, BUT IT WAS
14   DEFINITELY BEFORE 2000.
15   Q    NOW, TURNING BACK TO THIS EXHIBIT THAT WE HAVE UP HERE,      11:34
16   ELING, IT SAYS "ELING."  AND THIS IS FROM ERIC YIP.  AND ELING,
17   AGAIN, WORKS FOR PREL.
18          AND PREL IS CONNECTED TO WHOM?
19   A    PREL WAS, AS OF 2000, WHAT THEY CALL THE AGENT, THE BUYING
20   AGENT, FOR WAL-MART, IN HONG KONG AND CHINA.                     11:35
21   Q    AND THEN YOU SEE THAT IT SAYS, "ELING, PLEASE SEE ATTACHED
22   PICTURES AND PHOTOS FOR THE FASHION DOLLS THAT WE ARE GOING TO
23   PRESENT TO RON IN JANUARY.  IN FACT, THIS SERIES OF DOLLS IS
24   ONE OF OUR KEY ITEMS FOR 2001.  PLEASE NOTE THAT THESE PICTURES
25   ARE PRELIMINARY CONCEPT DRAWINGS AND ARE FOR YOUR REFERENCE      11:35
```

1966

1    ONLY.  THE FINAL PRODUCTS MAY VARY WHEN WE PUT THESE IN

2    PRODUCTION.  HOWEVER, WE WILL HAVE MOCK-UPS/WORKING SAMPLES

3    AVAILABLE IN THE JANUARY TOY SHOW."

4              DO YOU SEE THAT?

5    A    YES.                                                          11:35

6    Q    DID I READ THAT CORRECTLY?

7    A    YOU DID.

8    Q    SO YOU KNEW THAT ERIC YIP FROM MGA WAS GOING TO SEND TO

9    THE AGENT OF WAL-MART CONCEPT DRAWINGS; CORRECT?

10   A    I INSTRUCTED HIM TO DO SO.  YES.                              11:36

11   Q    WOULD YOU TURN TO THE SECOND PAGE OF THIS EXHIBIT.

12             DO YOU RECOGNIZE THE DRAWING THAT'S DEPICTED ON THE

13   VERY FIRST PICTURE THAT WAS INCLUDED IN THIS E-MAIL?

14   A    I DO.

15   Q    AND WHAT IS THAT?                                             11:36

16   A    THIS IS WHAT WE CALL THE HERO DRAWINGS THAT HE DREW, TO

17   THE BEST OF MY RECOLLECTION, FOR THE CONCEPT OF BRATZ, AFTER HE

18   HAD LEFT MATTEL.

19   Q    CAN I JUST SHOW YOU ON THE BOTTOM -- YOU SEE WHERE IT

20   SAYS, "ALL MATERIALS COPYRIGHT 2000, CARTER BRYANT?"             11:36

21             DO YOU SEE THAT?

22   A    I DO.

23   Q    IF YOU WERE CONCEALING CARTER BRYANT AS THE ILLUSTRATOR

24   FOR THE BRATZ DRAWING, WHY ARE YOU ALLOWING CARTER BRYANT'S

25   NAME TO BE ATTACHED TO DRAWINGS SENT TO WAL-MART?                 11:37

1967

1   A    WE WERE NOT CONCEALING CARTER BRYANT'S NAME.

2   Q    DO YOU HAVE EXHIBIT NUMBER 01703 IN FRONT OF YOU?

3   A    I DO.

4   Q    DO YOU RECOGNIZE THIS DOCUMENT?

5   A    I DO.                                                    11:38

6   Q    WHAT IS THIS DOCUMENT?

7   A    THESE WERE DOCUMENTS THAT WE FILED, TO THE BEST OF MY

8   RECOLLECTION, IN BRAZIL, TO REGISTER THE COPYRIGHT FOR BRATZ.

9   Q    AND DO YOU SEE IN THE LOWER RIGHT-HAND CORNER, WHERE IT

10  SAYS "RIO DE JANEIRO," THERE'S A DATE?                        11:38

11  A    YES.

12  Q    WHAT IS THE DATE?

13  A    JANUARY 26, 2002.

14        AGAIN, I DON'T READ PORTUGUESE, BUT I CAN READ THOSE

15  NUMBERS.                                                      11:38

16        MR. NOLAN:   YOUR HONOR, WE'D OFFER EXHIBIT 1703.

17        THE COURT:   ANY OBJECTION?

18        MR. PRICE:   LACK OF FOUNDATION.

19        THE COURT:   WHAT IS YOUR OBJECTION?

20        MR. PRICE:   HE CAN'T READ THIS.  LACK OF FOUNDATION.   11:38

21        THE COURT:   SUSTAINED.

22  BY MR. NOLAN:

23  Q    REGARDLESS OF WHETHER OR NOT YOU CAN READ PORTUGUESE, DO

24  YOU HAVE AN UNDERSTANDING OF WHAT THIS DOCUMENT IS?

25  A     IT IS A COPYRIGHT REGISTRATION FOR BRATZ IN PORTUGAL, AND   11:39

Exhibit D - Page 813

1968

1  THE DATE IS ON THE TOP ALSO; AND THE DATE -- YOU CAN FIGURE OUT

2  THAT IT'S JANUARY 26, 2002.

3  Q    WERE YOU AWARE THAT MGA WAS --

4  A    IT'S IN NUMBERS.  IT'S NOT IN PORTUGUESE.  IT WAS JUST

5  BASICALLY ENGLISH NUMBERS.                                    11:39

6  Q    WERE YOU AWARE THAT MGA WAS REGISTERING THE TRADEMARK OF

7  BRATZ IN RIO DE JANEIRO?

8  A    IN BRAZIL.

9  Q    IT'S IN BRAZIL.

10 A    RIO DE JANEIRO IS IN BRAZIL, YES.                        11:39

11 Q    NOW, LOOKING AT THIS DOCUMENT, NOT ALL OF THE WORDS ARE IN

12 PORTUGUESE; RIGHT?

13 A    NO, THEY ARE NOT.

14         MR. NOLAN:  YOUR HONOR, WE'D OFFER EXHIBIT 1703.

15         MR. PRICE:  SAME OBJECTION.  LACK OF FOUNDATION.      11:40

16         THE COURT:  COUNSEL, I THINK YOU CAN GO A LITTLE BIT

17 FURTHER IN CONNECTING THE TWO POINTS THAT YOU JUST MADE, IN

18 TERMS OF HOW HE KNOWS THAT THESE DOCUMENTS ARE ACTUALLY

19 CONNECTED WITH THAT REGISTRATION.

20         I'M GOING TO SUSTAIN THE OBJECTION AGAIN.             11:40

21 BY MR. NOLAN:

22 Q    CONTINUING TO LOOK AT EXHIBIT 1703 FOR A MOMENT, DID YOU

23 UNDERSTAND THAT WITH RESPECT TO SELLING THE BRATZ DOLLS AND

24 OFFERING THEM FOR COMMERCE IN VARIOUS PARTS OF THE WORLD, THAT

25 TRADEMARK REGISTRATION WOULD BE FILED IN VARIOUS COUNTRIES?    11:40

1    A    YES.

2    Q    DID YOU EVER, AT ANY TIME, DIRECT YOUR LAWYERS TO CONCEAL

3    THE NAME OF CARTER BRYANT IN ANY OF THE FILINGS?

4    A    ABSOLUTELY NOT.

5              MR. PRICE:  OBJECTION.  MOVE TO STRIKE AS TO                    11:41

6    PRIVILEGE.

7              THE COURT:  SUSTAINED.

8              REPHRASE YOUR QUESTION.

9    BY MR. NOLAN:

10   Q    EXHIBIT NUMBER 01703 CONSISTS OF NUMEROUS PAGES; CORRECT?           11:41

11   A    THAT'S CORRECT.

12             THE COURT:  COUNSEL, YOU'RE ASKING FOR ALL OF 1703?

13   THERE APPEARS TO BE ENGLISH TRANSLATIONS, BUT THERE'S NO

14   FOUNDATION LAID FOR THOSE ENGLISH TRANSLATIONS.

15             MR. NOLAN:  I WAS GOING TO TRY A DIFFERENT WAY,                  11:41

16   YOUR HONOR.

17             THE COURT:  VERY WELL.

18   BY MR. NOLAN:

19   Q    IN SEPTEMBER OF 2002, WAS A DOLL BY THE NAME OF "JADE"

20   MANUFACTURED AND OFFERED FOR SALE BY MGA?                                 11:42

21   A    IT WAS.

22   Q    WAS IT YOUR INTENT TO HAVE THAT "JADE" NAME TRADEMARKED IN

23   BRAZIL --

24   A    I DID.

25   Q    -- IN 2002?                                                          11:42

1970

```
1   A    THAT'S CORRECT.

2   Q    AND ALSO IN 2002, WAS MGA MANUFACTURING AND OFFERING FOR

3   SALE A BRATZ DOLL BY THE NAME OF "SASHA"?

4   A    WE DID.

5   Q    WAS IT YOUR INTENTION TO HAVE THE TRADEMARK FOR SASHA        11:42

6   REGISTERED IN BRAZIL?

7   A    YES, WE DID.

8   Q    IN OR AROUND SEPTEMBER OF 2002?

9   A    YES, WE DID.

10  Q    AND, ALSO, IN OR ABOUT SEPTEMBER OF 2002, WAS MGA           11:42

11  MANUFACTURING AND OFFERING FOR SALE IN BRAZIL A BRATZ DOLL WITH

12  THE NAME "YASMIN"?

13  A    YES, WE DID.

14  Q    DID YOU INTEND TO HAVE THE NAME "YASMIN" TRADEMARKED IN

15  BRAZIL?                                                          11:42

16  A    YES, WE DID.

17  Q    AND IN SEPTEMBER OF 2002, WAS MGA MANUFACTURING AND

18  OFFERING FOR SALE IN BRAZIL A BRATZ DOLL WITH THE NAME "CLOE"?

19  A    YES, WE DID.

20  Q    WAS IT YOUR INTENT TO HAVE THE NAME "CLOE" REGISTERED IN    11:43

21  BRAZIL?

22  A    YES, WE DID.

23       MR. NOLAN:   YOUR HONOR, WITH THAT FOUNDATION, I WOULD

24  OFFER EXHIBIT 1703, PAGES 001, 002, 003, AND 004, OFFERED INTO

25  EVIDENCE.                                                        11:43
```

1       **MR. PRICE:**  THERE'S NO FOUNDATION FOR THIS WITNESS.

2       **THE COURT:**  LET'S COME BACK TO THIS, COUNSEL.

3       ACTUALLY, WE'RE A MINUTE AWAY FROM 11:45.  LET'S TAKE

4    OUR BREAK NOW, AND WE CAN DISCUSS THIS DURING THE BREAK.

5       LET'S EXCUSE THE JURY.                                    11:43

6       (WHEREUPON, JURORS DEPART COURTROOM.)

7       **THE COURT:**  MR. NOLAN, THE PROBLEM WITH THESE SERIES

8    OF DOCUMENTS, BESIDES BEING A FOREIGN LANGUAGE, IS THAT YOU

9    HAVEN'T TIED THE DOCUMENTS THEMSELVES TO MR. LARIAN'S

10   TESTIMONY.  HE'S TESTIFIED THAT, YES, HE HAD THESE PREPARED, OR   11:44

11   WANTED TO HAVE THEM PREPARED, BUT THERE'S NOT A CONNECTION OF

12   THESE DOCUMENTS TO HIM.

13      **MR. NOLAN:**  YOUR HONOR, I'LL LAY THE FOUNDATION THAT

14   HE IS AWARE THAT, IN FACT, THESE DOCUMENTS WERE FILED AT HIS

15   DIRECTION IN RIO DE JANEIRO.  AND, OF COURSE, THE IMPORT OF ALL   11:44

16   OF THIS IS THAT THE NAME "CARTER BRYANT" IS PROMINENTLY

17   DISPLAYED HERE, NOT IN PORTUGUESE, BUT IN ENGLISH.

18      **THE COURT:**  I UNDERSTAND WHY YOU WANTED TO GET THEM

19   IN.  THERE'S JUST A QUESTION OF THE FOUNDATION TO GET THEM IN

20   THROUGH THIS WITNESS.                                        11:45

21      **MR. NOLAN:**  WELL, YOUR HONOR --

22      **THE COURT:**  CAN HE TESTIFY TO HAVING REVIEWED THESE

23   DOCUMENTS BEFORE THEY WERE SUBMITTED?

24      **MR. NOLAN:**  YOUR HONOR, RESPECTFULLY, I DOUBT THAT,

25   IN TERMS OF LOOKING AT THIS.  BUT WHAT HE WILL SAY IS THAT HE   11:45

1975

1

2                                    CERTIFICATE

3

4    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
5    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
6    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

7

8

9    THERESA A. LANZA, RPR, CSR                         6-14-08
     OFFICIAL COURT REPORTER                               DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TUESDAY, JUNE 10, 2008                    TRIAL DAY 10,  MORNING SESSION

Exhibit D - Page 818

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4    **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                    ---

6  MATTEL, INC.,                    :   PAGES 1976 - 2117
                                    :
7            PLAINTIFF,             :
                                    :
8      VS.                          :   NO. ED CV04-09049-SGL
                                    :   [CONSOLIDATED WITH
9  MGA ENTERTAINMENT, INC.,         :   CV04-9059 & CV05-2727]
   ET AL.,                          :
10                                  :
            DEFENDANTS.             :
11  _____

12

13

14

15       REPORTER'S TRANSCRIPT OF PROCEEDINGS

16            RIVERSIDE, CALIFORNIA

17          TUESDAY, JUNE 10, 2008

18           JURY TRIAL - DAY 10

19            AFTERNOON SESSION

20

21

22                                  MARK SCHWEITZER, CSR, RPR, CRR
                                    OFFICIAL COURT REPORTER
23  CERTIFIED                       UNITED STATES DISTRICT COURT
                                    181-H ROYBAL FEDERAL BUILDING
24  COPY                            255 EAST TEMPLE STREET
                                    LOS ANGELES, CALIFORNIA 90012
25                                  (213) 663-3494

1992

```
 1          MR. PRICE:  And I would -- what Mr. Nolan is trying
 2   to show is that Mr. Larian did not mind Mr. Bryant's name was
 3   public, even though that's inconsistent with what Mr. Nolan
 4   said in his opening and what Mr. Larian said in my
 5   examination of him.  Even if this is authenticated as a
 6   business record, it doesn't go to Mr. Larian's state of mind,
 7   which is what he's trying to offer it for.  That is, he would
 8   need to show that Mr. Larian knew that their Brazilian
 9   attorneys were going to put Mr. Bryant's name on this, and he
10   apparently doesn't know that.  If he says he knows that --
11          THE COURT:  Well, that's part of the foundation
12   that needs to be laid.  Mr. Nolan knows what he needs to do.
13          Very well.  Let's bring the jury in, and let's get
14   started.
15               (WHEREUPON THE JURY ENTERS.)
16          THE COURT:  Good afternoon, members of the jury.
17          Mr. Nolan, you may continue.
18               ISAAC LARIAN, PREVIOUSLY SWORN.
19               CROSS-EXAMINATION (CONTINUED)
20   BY MR. NOLAN:
21   Q.   Good afternoon.  Before we broke for lunch, Mr. Larian,
22   we were talking about Exhibit No. 01703.  Do you still have
23   that in front of you in the white book?
24   A.   Yes, I do.
25   Q.   And these are documents, some of which is in Portuguese,
```

1   just to reorient everybody.  Do you see that?

2   A.   Some in English translation, yes.

3   Q.   All right.  And these are trademark applications filed

4   in -- for Brazil in or around September 2002; correct?

5            MR. PRICE:  Objection.  Lack of foundation.

6            MR. NOLAN:  I'm just laying the foundation, your

7   Honor.

8            THE COURT:  I'm going to sustain the objection,

9   Counsel.  This is leading.  Let's start over.

10  Q.   BY MR. NOLAN:  Mr. Larian, I think it's undisputed, but

11  for the record, were you the CEO of MGA in September of 2002?

12  A.   I was.

13  Q.   Do you have an understanding as to whether or not in

14  September 2002 MGA had a practice of applying for various

15  trademark registrations in various countries?

16  A.   We did.

17  Q.   And do you understand -- do you have an understanding as

18  to whether or not those trademark registrations, once filed,

19  were maintained in the business records of MGA?

20  A.   They were.

21  Q.   And would you, as the CEO of MGA, assume that if

22  information needed to be corroborated with respect to whether

23  or not a trademark application was in fact filed, that people

24  could go to the files of MGA and actually confirm that a

25  document was filed in a particular country?

1    MR. PRICE:  Objection.  Leading, lacks foundation.

2    THE COURT:  You need to rise, Counsel.

3    MR. PRICE:  Leading and lacks foundation.

4    THE COURT:  Sustained.

5  **Q.**  BY MR. NOLAN:  Do you have an understanding, as the CEO

6  of MGA, why MGA might maintain in its files copies of

7  trademark applications?

8  **A.**  So we can refer back to them in the future whether it is

9  to see somebody is infringing our name, somebody is using it,

10  not using it so we can refer back to it.

11  **Q.**  Do you have a recollection one way or the other as to

12  whether or not you authorized legal action to be filed

13  against anybody in Brazil?

14  **A.**  I did.  Against a company called Estella.

15  **Q.**  In any event, when was that lawsuit initiated, if you

16  know?

17  **A.**  Somewhere between 2002, 2003.

18  **Q.**  And do you understand the general circumstances behind

19  filing that lawsuit?

20  **A.**  Yes.

21  **Q.**  What were they?

22  **A.**  That company had come up with a doll that looked exactly

23  like Bratz dolls.

24  **Q.**  Now, in connection with -- and did you authorize the

25  filing of that lawsuit?

1   **A.**    I did.

2   **Q.**    And in connection with the authorization of filing that

3   lawsuit, did it come to your attention, one way or the other,

4   as to whether or not in fact MGA had filed trademark

5   applications in Brazil?

6   **A.**    Yes.

7          MR. NOLAN:   Your Honor, we'd offer Exhibits 1703,

8   001, 002, 003, 004, and 005.

9          MR. PRICE:   Objection.   Lack of foundation.

10          THE COURT:   Sustained.

11  **Q.**    BY MR. NOLAN:   Mr. Larian, at any time do you recall

12  ever directing anybody within MGA to white-out the name

13  Carter H. Bryant from any trademark application?

14  **A.**    I did not.

15  **Q.**    Do you recall ever giving instructions to anybody at

16  MGA, words to the effect whatever you do, do not list Carter

17  Bryant on any application filed in any country?

18  **A.**    I did not.

19          MR. PRICE:   Object.   That assumes facts not in

20  evidence, which is that it would be called for, for a name to

21  be listed in the first place.

22          THE COURT:   Lay a foundation for that.

23  **Q.**    BY MR. NOLAN:   You're not a lawyer, are you?

24  **A.**    I'm not.

25  **Q.**    Let me just approach it a different way, then.

1    This whole idea of concealment of Carter Bryant. I

2  want to ask you this, Mr. Larian. Was there ever a reason in

3  your mind to conceal Carter Bryant as the individual who drew

4  the initial concept drawings for what became later the doll

5  Bratz?

6  A.    Never.

7  Q.    Well, weren't you worried that Mattel might find out

8  that Carter Bryant was in fact affiliated with the Bratz

9  doll?

10 A.    I was not worried about that, no.

11 Q.    Mr. Price asked you numerous questions with respect to

12 statements made to various press articles.

13    Do you recall all those?

14 A.    Do I recall every question he asked?

15 Q.    Well, do you remember generally the questions about

16 newspaper articles?

17 A.    Yes.

18 Q.    Here's a question I have for you: Do you recall ever

19 being asked specifically words to the effect, by the way, who

20 did the original concept drawings for Bratz?

21 A.    I know of no journalist who ever asked me that question.

22 Q.    Well, do you have Exhibit 1-A in front of you? This is

23 The Wall Street Journal article.

24 A.    What exhibit number?

25 Q.    It's Exhibit 1-A.

1997

```
 1              THE COURT:  In the black binder?

 2              MR. NOLAN:  Yes, I'm sorry.

 3              THE COURT:  I have a binder that starts with 10.

 4              MR. PRICE:  I believe that document was loose,

 5   because it was redacted so it was handed up.

 6              THE CLERK:  One moment, your Honor.

 7              MR. NOLAN:  I have an extra copy if that would

 8   help.

 9              THE COURT:  I think we have it as Exhibit 11.  Both

10   Mr. Larian and I -- is that the same one?

11              MR. NOLAN:  We have it marked as 1-A.

12              MR. PRICE:  Your Honor, I think 11 was the complete

13   article, and 1-A was the redaction.

14              THE COURT:  11 is the full article.

15              MR. NOLAN:  Right.

16              THE COURT:  Do you have an extra copy of the

17   redacted one?

18              MR. NOLAN:  I do.

19              THE COURT:  Thank you.

20   Q.   BY MR. NOLAN:  So you have that in front of you,

21   Mr. Larian?

22   A.   Yes, sir.

23   Q.   All right.  Now, I don't want this to become a balancing

24   act because I know there's a lot of exhibits in this case,

25   but I want you now to go to Exhibit 4942.  This is the e-mail
```

1    exchange with Dee Dee Valencia.  Do you have that in front of

2    you?  And you can look in the white book or the black.

3    00942?

4    A.   Go ahead.

5         MR. NOLAN:  This is in evidence.  Can we have this

6    on the screen.

7    Q.   The date on this e-mail exchange between Dee Dee

8    Valencia and yourself is February 6, 2003; correct?

9    A.   That's correct.

10   Q.   Do you recall that Mr. Price asked you under features,

11   and it says signed by, I know we want to keep Carter under

12   wraps.

13        Do you see that?

14   A.   I do.

15   Q.   Do you see any response here, any specific response to

16   the statement of keeping Carter under wraps?

17   A.   I do not.

18   Q.   Now, in this exchange, Ms. Valencia is asking you about

19   features or collectible dolls for Bratz; correct?

20   A.   Yes.

21   Q.   Can you tell the jury whether or not you have ever

22   released a Bratz collectible doll?

23   A.   We have released a Bratz collectible doll in the past,

24   yes.

25   Q.   Have you at any time ever listed or disclosed the

1    designer for any of those Bratz doll collectibles?

2    **A.**   We have never released any designer, whether Carter

3    Bryant or anybody else who designs a toy for us.  The name on

4    the product or on the press.  Furthermore, I don't know of

5    any toy company that does.

6    **Q.**   Well, in that regard, does Mattel have a competitive

7    doll that it offers for sale against Bratz in the market?

8    **A.**   Later on in 2002, they came up with a product called My

9    Scene Barbie, which is, yes, competitive with Bratz.

10   **Q.**   Now, Mr. Larian, you're in the industry.  It's a

11   competitive industry; yes?

12   **A.**   It is.

13   **Q.**   Can you tell the jury whether or not you know who the

14   designer was for the doll My Scene?

15   **A.**   I did not until I came to this court, no.

16   **Q.**   Now, after My Scene, did Mattel release another doll

17   called Flavas?

18   **A.**   They did.

19   **Q.**   And was that also in the competitive range where Bratz

20   is being sold?

21   **A.**   Yes, and that is in reference to this -- in The Wall

22   Street Journal.

23   **Q.**   We're going to get to the article in just a moment.

24           My question to you is this:  Do you know, have you

25   ever seen any advertisements or disclosures by Mattel of who

1    the designer of Flavas is?

2    **A.**    I have not.

3    **Q.**    The date on this, sir, is February 6, 2003; correct?

4    **A.**    That is correct.

5    **Q.**    And Mr. Price was asking you to confirm that in fact it

6    was true that within MGA, MGA was keeping Carter Bryant under

7    wraps.  Yes?

8    **A.**    Yes.

9    **Q.**    And you deny that, yes?

10   **A.**    Absolutely.

11   **Q.**    Now please look at The Wall Street Journal article.

12         Now, The Wall Street Journal article I'm asking you

13   to look at is the redacted one, and I believe it's

14   Exhibit 1-A.

15         Do you have that?

16   **A.**    I do.

17   **Q.**    All right.  And could you tell the jury what the date of

18   The Wall Street Journal article is?

19   **A.**    Friday, July 18, 2003.

20   **Q.**    So approximately five months after an e-mail talking

21   about a design feature where somebody makes a comment about

22   keeping Carter under wraps, there's an article that's

23   published in the national press in July of 2003; correct?

24   **A.**    That is correct.

25   **Q.**    Were you interviewed for that story?

1    A.    I was.

2    Q.    Were you asked in that story anything regarding Carter

3    Bryant?

4    A.    Yes.

5    Q.    Did you tell The Wall Street Journal -- let me put it

6    this way -- tell the jury whether or not you concealed from

7    The Wall Street Journal author Carter Bryant's involvement

8    with Bratz?

9    A.    I did not.

10   Q.    Did you know that when you were being interviewed by The

11   Wall Street Journal author of this article, that they were

12   going to publish a story with national distribution?

13   A.    You mean The Wall Street Journal?

14   Q.    Yes.

15   A.    I knew they were going to do a story, yes.

16   Q.    Did you ever tell that reporter --

17   A.    The reporter told me they are going to do a story.

18   Q.    Did you ever tell that reporter words to the effect,

19   please, on background, I'm going to tell you about Carter

20   Bryant, but I'm not going to let you print that in the press.

21   A.    I did not.

22   Q.    Now, following -- let me ask you this:  Do you know of

23   anything, Mr. Larian, that would have occurred between

24   February of 2003 and July of 2003 that would have led you to

25   believe in July of 2003, if you were concealing Carter

2002

1    Bryant, that it would be okay to release it to The Wall

2    Street Journal?

3    A.    I know of no event that would do that.

4    Q.    This Wall Street Journal article dealt with a doll that

5    was being offered by Mattel.  Yes?

6    A.    That's right.

7    Q.    Flavas?

8    A.    That's correct.

9    Q.    This story was being written about Mattel, not MGA;

10   correct?

11   A.    It was.

12   Q.    But notwithstanding that, you still released Carter

13   Bryant's name?

14           MR. PRICE:   Objection.  Leading.

15           MR. NOLAN:   I'll withdraw it.

16           THE COURT:   Sustained.

17           MR. NOLAN:   I'll withdraw that.

18   Q.    Did you know that The Wall Street Journal story was

19   about Mattel?

20   A.    Yes.  They were interviewing me about a line of dolls

21   that Mattel, they called it hip-hop dolls that they were

22   going to introduce called Flavas in response to Bratz.

23   Q.    Did you expect Mattel to read a story about its own doll

24   Flavas in The Wall Street Journal?

25   A.    Yes, the picture of Mr. Matt Bousquette, who was the

1   president of Mattel, Barbie division at the time, was on the

2   front cover of this article, front cover of The Wall Street

3   Journal in 2003.

4   Q.   Was The Wall Street Journal article -- and let's turn it

5   around -- not to the attribution of Carter Bryant in the

6   story?

7           Mr. Larian, can you read what is published in The

8   Wall Street Journal?

9   A.   "Isaac Larian, chief executive of MGA, says he had never

10  heard of a project similar to the Bratz at Mattel.  He says

11  he chose Mr. Bryant's idea for the Bratz over several others

12  after holding a sort of fashion doll design contest in late

13  1999.

14          "Mr. Larian, who immigrated to the U.S. from Iran,

15  founded his company in the late 1970's."

16  Q.   On the second page of the exhibit, did you read this

17  paragraph?

18  A.   "MGA says the Bratz were designed by Carter Bryant, a

19  former member of the Barbie team."

20  Q.   Did you ever send out an e-mail to anybody within MGA

21  saying who said this to The Wall Street Journal?

22  A.   No, I said that to The Wall Street Journal.

23  Q.   Mr. Price asked you a number of questions about an

24  article that appeared in a publication where you were quoted

25  attributing the Bratz idea to your son Jason.

```
 1          Do you recall that line of questions?
 2   A.    Yes.
 3   Q.    First of all, approximately how many times have you been
 4   interviewed with respect to articles being printed about
 5   Bratz?
 6   A.    Hundreds.
 7   Q.    And do you recall specifically every conversation that
 8   you've had with a writer?
 9   A.    I do not.
10   Q.    I'd ask you to turn to Exhibit 12058.
11          Do you have that in front of you?
12   A.    I do.
13   Q.    This is an article published March 29, 2004.
14          Do you see this?
15   A.    I do.
16   Q.    And this is a download of it.  So it's not the actual
17   copy like The Wall Street Journal, but this is an article
18   that Mr. Price asked you about in the San Fernando Valley
19   Business Journal; correct?
20   A.    That's correct.
21          MR. NOLAN:  Your Honor, we'd offer into evidence
22   Exhibit 12058.
23          MR. PRICE:  Your Honor, we object to the entire
24   article.  We need to do the same process we did with The Wall
25   Street Journal.
```

2005

1        THE COURT:  Just the title?

2        MR. PRICE:  No, no.  With The Wall Street Journal,

3  how we had to redact that because of hearsay, et cetera, we

4  need to do the same thing with this article.

5        THE COURT:  Very well.  Why don't we go through

6  portions of it, Counsel, and we'll see what needs to come in

7  at the end.  You may examine on the document.

8        MR. NOLAN:  Thank you.

9  Q.   Mr. Larian, just in keeping with this --

10       May I just lead so that we can point to the

11  paragraph?

12       THE COURT:  Yes, you may lead on particular

13  paragraphs.

14       MR. NOLAN:  Thank you.

15  Q.   First of all, you see the date of March 29, 2004?

16  A.   Yes, I do.

17  Q.   And you see the headline of the story reads immigrant's

18  creative company shakes up toy industry?

19  A.   I do.

20  Q.   Now, do you have a specific recollection of being

21  interviewed by a gentleman by the name of Jeff Weiss?

22  A.   I do not.

23  Q.   In his story, there's a mention that MGA had been

24  awarded a family toy award by an organization in the

25  San Fernando Valley.

1          Do you remember that occasion?

2   **A.**    I remember -- I remember we were awarded something in

3   San Fernando, but I don't remember the exact occasion.   I

4   think it was for businesses in San Fernando Valley.

5   **Q.**    Okay.  And for those who live in the Inland Empire, San

6   Fernando Valley, is that a geographic area where MGA is

7   located?

8   **A.**    Yes, we're in Van Nuys, which is part of San Fernando

9   Valley.

10  **Q.**    And just a rough guess, if you know, do you expect that

11  The Wall Street Journal has a wider circulation than the San

12  Fernando Valley Business Journal?

13  **A.**    Absolutely.

14  **Q.**    Okay.  Now, I want to turn your attention to the second

15  page of the document, and I'll ask you to take a look down to

16  the paragraph that has a quote.  It says:  "My oldest son."

17          Do you see that?

18  **A.**    I do.

19  **Q.**    And then following that, there's another quote starting

20  off with "Yasmin."  Do you see that?

21  **A.**    I do.

22  **Q.**    Okay.

23          MR. PRICE:  No objection to those two.

24          THE COURT:  Very well.

25          MR. NOLAN:  So if we could, Aaron, only present to

2007

```
 1    the jury -- okay.
 2    Q.    Now, these are two paragraphs that are included in the
 3    March 29, 2004, San Fernando Valley Business Journal article;
 4    correct?
 5    A.    They are.
 6    Q.    All right.  And the first one, I believe, is what
 7    Mr. Price was questioning you about, and that is, "My oldest
 8    son, 17-year-old Jason, is very creative and a music writer.
 9    He has come up with some of our popular toys," Larian said.
10    "He came up with Commandobot, a robot that was the first ever
11    robot toy to work on voice recognition.  It was a fantastic
12    seller that was featured in Wired magazine."
13              Is this a true statement about Jason?
14    A.    It is true.
15    Q.    Is he very creative?
16    A.    He is.
17    Q.    Did he come up with the idea for Commandobot?
18    A.    He did.
19    Q.    And the last sentence says it was Jason's idea for
20    Bratz.
21    A.    That's a wrong statement.
22    Q.    Do you know if that's an accurate quote, Mr. Larian?
23    A.    It is not accurate.  I never said it.  If you see him,
24    you will know that he will not have anything to do with dolls
25    or creating -- looking at them.
```

1    Q.   But here's my question --

2    A.   My wife is laughing back there.

3    Q.   Here's my question:   Can you offer the jury any

4    explanation as to why you would have disclosed to The Wall

5    Street Journal in July of 2003 that Carter Bryant was the

6    designer of Bratz and yet almost a year later was telling the

7    Valley Business Journal that it was really Jason's idea?

8    A.   There was no reason to hide Carter Bryant's name.   I had

9    told National, in my opinion the biggest financial newspaper

10   in the world that's published and distributed worldwide, not

11   only in the USA, that Carter Bryant was the designer behind

12   the idea for Bratz.   Why would I tell a local newspaper

13   perhaps with not less than 10-, 15,000 subscription that --

14   why would I hide it from them?

15   Q.   And let's just go to the next paragraph.

16        "Yasmin, my 15-year-old daughter, is involved in

17   the business as well.   She's particularly interested in

18   fashion and focus groups.   One of the Bratz is named after

19   her," Larian said.   My 10 -- first of all, is that a true

20   statement?

21   A.   Yes, and she goes to FIT now in New York.

22   Q.   Was Yasmin present at the first meeting with Carter

23   Bryant?

24   A.   She was.   She was in the office with me.   It was summer

25   vacation.   She was in the office with me.

1   Q.   And what was the date of that meeting?

2   A.   September 1, 2000.

3   Q.   And then it goes on to say:  "My 10-year-old son Cameron

4   is also the namesake for one of the boy Bratz.  Cameron comes

5   up with different product ideas.  One of our best ideas was a

6   winter wonderland Bratz line.  We were on a family ski

7   vacation, and he said, 'Dad, should you do a Bratz winter

8   break.'  So we did it, and it sold wonderfully."

9        Was that a true statement?

10  A.   It is a true statement.

11  Q.   Did Jason design Bratz?

12  A.   No, Jason did not design Bratz.  Again, if you see

13  Jason, you will see that he is not interested in dolls.

14  Q.   Earlier, before the lunch hour, I showed you drawings

15  that had been sent to Wal-Mart that had Carter Bryant's name

16  on it.

17        I want to talk about toy fairs for a moment.  And I

18  know there's been some testimony, but can you give an

19  explanation to the jury about how toys are rolled out into

20  the market and talked about where they are located?

21  A.   Okay.  Usually what happens, right now that I'm sitting

22  here, there are customers at MGA showroom looking at product

23  ideas for spring of '09 that they will buy in November,

24  December, January of -- November, December of this year and

25  January of next year.

1    So there are toy fairs.  There's one called the

2  pretoy fair, which is usually in October.  It has gone back

3  and forth in different places.  Right now it's in Dallas.

4    Then the next toy fair is in January in Hong Kong,

5  where everybody goes the first week of January in Hong Kong

6  and shows the products.

7    Then after Hong Kong there are various different

8  shows.  There is a show in Tokyo, and those dates change.

9  Anywhere between February to June.

10    And then there is a toy show in New York called

11  New York Toy Fair.  That's been around for a hundred years.

12    And then there is a show in Nuremberg, Germany,

13  which is basically another toy show about that time period.

14    During these shows, the customers go and see the

15  product ideas and over and over again to make a decision what

16  to buy for the next season.  So right now, for example, the

17  customers that I told you who are in our showroom, they are

18  looking at our product ideas.  They go to other people's

19  showroom to look at product ideas.  And then two months,

20  three months, they make a decision what to buy, again, for

21  spring of 2009.  They have already made the decisions for

22  fall of this year, fall 2008.

23  **Q.**   Mr. Larian, did you ever exhibit the Bratz line in toy

24  fairs in 2001?

25  **A.**   Yes.

1  Q.   Which was the first toy fair that you exhibited a Bratz

2  doll?

3  A.   We had four prototype samples and the drawings, the hero

4  drawings of the dolls displayed in our Hong Kong showroom in

5  January 2001.  I don't recall the exact date, but it was

6  first week of January 2001.

7  Q.   You talk about having four prototypes.  Did you have the

8  actual doll yet?

9  A.   We did not.  Those were just what we call mock-up

10 samples that you make.  And they went over many, many

11 renditions before they became a doll because you have to

12 change the tooling.  You have to change the faces.  Sometimes

13 the clothing doesn't fit.  So you have to start with the

14 sculpting all over.

15        So what we had in Hong Kong were four samples with

16 clothing literally put on them and held on with little safety

17 pins, and the hair was basically taped with the scotchtape to

18 the head of the doll.

19 Q.   Now, after the Hong Kong toy fair in 2001, was there a

20 toy fair conducted in the United States?

21 A.   Yes.

22 Q.   And what city was that toy fair located?

23 A.   It was in New York in February 2001.

24 Q.   Let me ask you to open up your binder to 16925.  It's a

25 white binder.

1      Now, Mr. Larian, before we get to this document, I

2  just want to try to set the stage for the New York Toy Fair.

3  Is that in your opinion a pretty big show?

4  **A.**   New York Toy Fair in that time in 2001 was a pretty big

5  show.  Now, in 2008, it's no longer a big show.

6  **Q.**   But in the year 2001, did a lot of manufacturers go to

7  it?

8  **A.**   I think everybody in the toy industry went to toy show

9  in New York in 2001.

10  **Q.**   Let me ask you this:  Is the toy fair that was conducted

11  in New York secret or confidential?

12  **A.**   It was by invitation only.  Only invited people could

13  come to the toy show.  The public could not just walk into

14  the showroom.

15  **Q.**   How did you control the people coming to the booth?  In

16  other words, did you record people who actually came and

17  looked at the Bratz line at the New York Toy Fair?

18  **A.**   They had to have a schedule in advance.  The name had to

19  be on the list, on the schedule list, and we had somebody

20  secretly at the front to check their name and make sure they

21  are on the schedule before they were allowed into the

22  showroom.

23  **Q.**   Now, I ask you to look at Exhibit 16925 and take a look

24  at it.  And my question will be do you recognize this

25  document, sir?

2013

1   **A.**    Yes, this is the schedule of February 2001 toy show,

2   schedule of the people who were coming to the showroom.

3            MR. NOLAN:   Your Honor, we'd offer Exhibit 16925 in

4   evidence.

5            MR. PRICE:   Object on relevance and hearsay, your

6   Honor.

7            THE COURT:   I'm sorry.   What was the objection?

8            MR. PRICE:   Relevance and hearsay throughout this

9   time frame.

10           THE COURT:   One second.   Overrule the relevance,

11  Counsel.   Hearsay?

12           MR. NOLAN:   Your Honor, I'll lay a foundation.

13           THE COURT:   Very well.

14           MR. NOLAN:   Thank you.

15  **Q.**   Mr. Larian, with respect to Exhibit 16925, could you

16  explain again why log sheets are maintained or were

17  maintained at the New York Toy Fair?

18  **A.**   If you look at this, on the left-hand side, it has the

19  name of the MGA personnel who were meeting different

20  customers, and on the first page on line 20, for example, I

21  was meeting with a company called Factory to You --

22  **Q.**   Mr. Larian, without referring to anything specific,

23  could we talk about just the purpose of this document.

24           So on the first column it has a listing called MGA

25  personnel?

1    A.    That's correct.

2    Q.    And then there's names listed under that?

3    A.    Yes, the name of the MGA personnel.  And the next column

4    is the name of customers.  On the next column is a buyer's

5    name.  And the next column again is the buyer's name.  And

6    the next column is a --

7    Q.    Did you only use such a log sheet for the February 2001

8    toy fair?

9    A.    No.  We have used this for every show.

10   Q.    Now, following the toy show, do you maintain the log

11   sheets?

12   A.    Yes, we do.

13   Q.    And are they kept in the ordinary course of business?

14   A.    They do.

15   Q.    And have you seen the log sheets following those

16   meetings?

17   A.    I have.

18   Q.    And why is it important for you -- strike that.

19         Is it important for you, as the CEO of MGA, to

20   review the people that have visited your showcase at the toy

21   fair?

22   A.    During that time, and we were a smaller company, I

23   wanted to get a recap, and I'm talking 2000, 2001 up to 2003,

24   2004 time period, I wanted to get a recap from our

25   salespeople of what happened with each customer, the buyer,

1    et cetera.  So I wanted to know what has transpired.

2    Q.    And why was that important to you?

3    A.    Because these shows are very expensive.  We go to these

4    shows.  We show a lot of products.  I just want to make sure

5    that there's a follow-up to get orders.  The purpose of the

6    show is to go there and hopefully later on get orders for

7    your products.

8    Q.    So, Mr. Larian, did you review the document that we've

9    marked in this trial as Exhibit 16925 at or about the time of

10   the New York Toy Fair?

11   A.    Yes, I did.

12   Q.    And the entries on this time log, are these entries made

13   at or about the time of the toy fair?

14   A.    Actually, they are done before that.  Before we go to

15   the toy fair.

16              MR. NOLAN:  Your Honor, we'd offer Exhibit 16925.

17              MR. QUINN:  Objection.  Hearsay.

18              THE COURT:  It's admitted.

19              **(Exhibit 16925 received.)**

20              THE COURT:  You may publish.

21              MR. NOLAN:  May we have it on the screen?

22              THE COURT:  You may.

23   Q.    BY MR. NOLAN:  So this is -- now that we have had on the

24   screen the New York Toy Fair, Thursday, February 8, 2001.

25   MGA personnel, customer, buyer name, buyer name, and

2016

```
 1    comments.

 2              Do you see that?

 3    A.    I do.

 4    Q.    Now, I'd ask you to go to the page 015 of this document.

 5    And if we could blow that up.  Number 35.

 6              Now, do you see the name Martin under MGA

 7    personnel?

 8    A.    I do.

 9    Q.    Do you know of anybody with the last name Martin was

10    working for MGA in February of 2001?

11    A.    It's not the last name.  Martin is his first name.  His

12    last name is Hitch, H-I-T-C-H.

13    Q.    And what was Mr. Hitch's position at MGA in February of

14    2001, if you know?

15    A.    He was in charge of international sales for MGA.

16    Q.    And under -- and the time is listed at 3:00.  Is that

17    3:00 in the afternoon?

18    A.    That's correct.

19    Q.    And then there's a customer name Mattel Mexico?

20    A.    That's correct.

21    Q.    The buyer name, do you see an individual's name there,

22    Mateo Romano and his boss?

23    A.    I do.  I know Mateo Romano.

24    Q.    Following the New York Toy Fair, do you know whether or

25    not MGA and representatives of Mattel ever had discussions
```

1  about whether or not Mattel would license the Bratz dolls in

2  Latin America?

3  **A.**   We did.

4            MR. PRICE:   Object.   Relevance, lack of foundation.

5            THE COURT:   I'll overrule the objection to the

6  question as asked, but let's lay a foundation for this,

7  Counsel, before you get into the substance of it.

8  **Q.**   BY MR. NOLAN:   What is the basis for your understanding

9  with respect to any conversations that were going on between

10  representatives of Mattel on the one hand, in February of

11  2001, and conversations with representatives of MGA

12  concerning Bratz?

13  **A.**   In 2001, we wanted Mattel to license and distribute

14  Bratz.   I was getting regular feedback --

15            MR. PRICE:   Objection.   This is nonresponsive.

16            THE COURT:   It is nonresponsive.

17            MR. PRICE:   Move to strike.

18            THE COURT:   It is stricken.

19            Will the reporter read back the question.

20            (Record read.)

21            THE WITNESS:   The recaps I was getting from Martin

22  Hitch.

23  **Q.**   BY MR. NOLAN:   And were those recaps from Martin Hitch

24  at or about the time the conversations were being had?

25  **A.**   Or after.

1  Q.  Do you recall any conversations with Mr. Hitch where he

2  was asking you questions with respect to Mattel?

3         MR. PRICE:  Objection.  Hearsay.

4         THE COURT:  Without getting into the substance of

5  the questions.

6  Q.  BY MR. NOLAN:  Without disclosing the substance of the

7  conversations, do you recall having any conversations

8  following the New York Toy Fair with Martin Hitch?

9  A.  I do.

10  Q.  Do you recall having any conversations with Mr. Hitch

11  concerning appointments that he had with various customers at

12  the New York Toy Fair?

13  A.  Some of them I do.  Some of them I don't.

14  Q.  Do you recall any conversations with Mr. Hitch

15  concerning conversations that he had with representatives of

16  Mattel at the New York Toy Fair?

17  A.  Yes.

18  Q.  What did Mr. Hitch tell you about those conversations?

19         MR. PRICE:  Hearsay.

20         THE COURT:  Counsel?

21         MR. NOLAN:  Goes to his state of mind as to what

22  was being said at that time, your Honor.

23         THE COURT:  Let me see you at sidebar.

24         **(SIDEBAR CONFERENCE HELD.)**

25         THE COURT:  Counsel, how is this not going to the

1    truth of the matter asserted?

2              MR. NOLAN:  We're going to tie it up later.  The

3    actual e-mail exchange will go to -- my question is more to

4    his state of mind that he knew there was conversations being

5    had, and my next question would be did you ever tell anyone

6    not to offer Bratz to Mattel as a licensee.

7              THE COURT:  That's different than what you're

8    asking right now, for one thing.  You're asking right now for

9    the substance of the communications.

10             MR. NOLAN:  I was just laying the foundation that

11   there were conversations going on at Mattel that he -- that's

12   what he was told, and then the follow-up question would be

13   did you discourage that.  Answer is no.  There would be an

14   e-mail exchange from Mattel where they reject the opportunity

15   to be a licensee for Bratz because it looked too similar to

16   products within their own line.  This goes to the very time

17   period where he's alleged to be concealing Bratz and Carter

18   Bryant and everything else.

19             Our point is why would he approve an offer of a

20   license to Mattel if he was concerned about Carter Bryant.

21             MR. PRICE:  It's apples and oranges.  Whether

22   Mattel was offered a license is irrelevant.  There's no

23   testimony to any connection of that.  He told Mattel, by the

24   way, these were designed by Carter Bryant, your former

25   employee.  There's no connection at all here.  This is

1   irrelevant to anything in this phase.

2           THE COURT:  Did he disclose that it was Carter

3   Bryant?

4           MR. NOLAN:  No, there's no basis for that, your

5   Honor.  But they can cross-examine --

6           THE COURT:  Wait a second.  That's what would make

7   these relevant.  If he was -- I can see there, that would

8   blow the concealment theory out of the water if he was going

9   back to Mattel or any of Mattel's people and saying Carter

10  Bryant's involved in this.  But if he's just talking

11  licensing of Bratz, I don't see how that moves the ball

12  forward.

13          MR. NOLAN:  With all due respect, Mattel had full

14  rein in their examination to ask questions about Bratz

15  without drawing distinction between drawings and dolls.  And

16  much of the concealment that is mentioned in the evidence has

17  to deal with Bratz and the doll.  And I'm going through it

18  one by one to show him that this man had no guilty conscience

19  with respect to Bratz.  Some of the testimony that they

20  have --

21          THE COURT:  Let me stop you.  As I recall the

22  testimony, it was -- the evidence was that the questions were

23  geared towards concealing Carter Bryant.  I don't recall

24  anything about concealing Bratz.  And you can't -- this is, I

25  think, the apples and oranges that Mr. Price is referring to.

1   The fact that Mr. Larian was willing to talk about Bratz or

2   even Bratz with Mattel doesn't go to the issue of whether he

3   was willing to disclose Bryant.

4          For example, that trademark stuff you tried to get

5   in, I think that's relevant if you could have connected it to

6   Isaac Larian, if he would have been the one to say include

7   Carter Bryant on the trademark application, or if he would

8   have reviewed the trademark application before it went out.

9   What was missing there was a connection to Mr. Larian, and

10  what's missing here is a connection to Carter Bryant.  You

11  need to have both to rebut the concealment.

12          MR. NOLAN:  But it also -- your Honor --

13          THE COURT:  Do you understand what I'm saying?

14          MR. NOLAN:  I understand that, your Honor.  Let me

15  be more articulate.  This also goes to the issue of Mr. Quinn

16  was asking Ivy Ross about the similarities between Bratz on

17  the one hand and Toon Teens.  At this point in time, they are

18  making the contention that Bratz looks like Toon Teens.  And

19  what I'm saying is that if there's any sense on Mr. Larian's

20  part that these are in any way similar to, or he thought the

21  designs were being made that were similar to this, he would

22  have stayed a country mile away from Mattel --

23          THE COURT:  But that's not what this case is.  The

24  Toon Teens comes in or timing issues with respect to when

25  Carter Bryant developed Bratz.  Personally, I don't find it

```
 1   all that dispositive on the issue, but that's their argument,
 2   and that's the limited basis that that came in.
 3              MR. NOLAN:  The other point --
 4              THE COURT:  We are mixing and matching here,
 5   Counsel.
 6              MR. NOLAN:  I know, but also in the order on
 7   summary judgment, you said that the contract claims are time
 8   barred unless there's concealment.
 9              THE COURT:  Right.
10              MR. NOLAN:  And so the issue here, and it's very
11   relevant, is that on the concealment factor for the Bratz
12   dolls, for him to be contemplating a business transaction
13   with Mattel where the Bratz doll, which by their own
14   testimony has similarities to Toon Teens, suggests that they
15   were on notice right away the minute they saw the Bratz
16   dolls.
17              THE COURT:  It's not concealment of Bratz.
18              MR. NOLAN:  But it's concealment, your Honor -- we
19   believe that it should be concealment of the idea of Bratz,
20   the name Bratz, okay, number one, because remember they are
21   taking the position that Bratz was proprietary information
22   and known only within Mattel.
23              THE COURT:  This is 2001.  Everyone -- well, the
24   objection is sustained.
25              MR. NOLAN:  Okay.
```

1          **(CONCLUSION OF SIDEBAR CONFERENCE.)**

2                THE COURT:  You may proceed, Counsel.

3                MR. NOLAN:  Thank you.  And the objection was

4     sustained?

5                THE COURT:  Yes.

6     **Q.**   BY MR. NOLAN:  You recall a lot of testimony with

7     respect to the Yahoo fan site.  Do you recall that?

8     **A.**   I do.

9     **Q.**   All right.  First of all, I want to just make it

10    absolutely clear that the Yahoo fan site, was that hosted by

11    MGA?  In other words, did MGA control it?

12    **A.**   It was a fan who had set up the site.

13    **Q.**   Do you know an individual by the name of David Dees?

14    **A.**   I do not.

15    **Q.**   Could you look at Exhibit 04507 for a moment.  And this

16    is in evidence.

17                I want to first turn to the second page of it.  And

18    let's go down to the date of the e-mail exchange.

19    **A.**   I don't have it.

20    **Q.**   You don't have it?

21                THE COURT:  I don't either.

22                MR. NOLAN:  You don't have it either?

23                THE COURT:  4507?

24                MR. NOLAN:  04507.

25                THE COURT:  I do.  I'm sorry.  It's in the white

1    one.  Very well.  We both have it.

2    Q.   BY MR. NOLAN:  Mr. Larian, do you have that now in front

3    of you?

4    A.   Yes, I do.

5    Q.   Okay.  You were shown this e-mail by Mr. Price; correct?

6    A.   Yes.

7    Q.   All right.  Now, I want to go, and let's just pick up

8    first where there's two e-mails, and I just want to make

9    certain we keep this into context.  Do you see on the bottom

10   of the first page, it says:  "Hi, Carter.  I thought you

11   would enjoy this letter.  I wrote to the Bratzworld club on

12   Yahoo.  It starts off with the club leader introducing it.

13   Dees."

14          Did I read that right?

15   A.   Yes.

16   Q.   Now, in the exchange, do you see that it's from David

17   Dees to Carter Bryant at an e-mail address sent Saturday,

18   March 29th.

19          Do you see that?

20   A.   Yes.

21   Q.   2002?

22   A.   That's correct.

23   Q.   And it starts off "Hi, Carter."

24   A.   Yes.

25   Q.   Okay.  And that's being forwarded from David Dees?

1   A.    I think that's an e-mail that he is sending to Carter
2   Bryant.
3   Q.    Correct.  He's forwarding it to Carter a posting that
4   had been put on the Yahoo fan site; right?
5   A.    Yes.
6   Q.    So my question to you, Mr. Larian, is if there's a
7   concealment and Carter Bryant is being concealed from the
8   world, do you have any understanding as to how David Dees
9   would have known about Carter Bryant?
10  A.    I have no idea.
11  Q.    Do you have any idea how David Dees apparently had
12  Carter Bryant's e-mail address?
13  A.    I have no idea.
14  Q.    And just to put this into perspective, if you turn to
15  the second page, this is the Yahoo fan posting.  And this is
16  now "Hi, Christian."
17          Do you see that?
18  A.    I do.
19  Q.    And then there is -- and this is apparently the note
20  that David Dees is posting.  If you look down to the third
21  paragraph, it says:  "I am swamped right now with colorizing
22  lots of the new whacky funk styles, and there are new hats
23  and boas and tops that I get a kick out of.  However, I can't
24  take credit for creating the Bratz dolls, or even the first
25  Bratz illustrations, for that honor would go to a fellow

1   named Carter Bryant, who is truly a genius of fashion, and

2   the soul, and the only person who first drew those great

3   pouty lips and that extreme look that only our heroes share."

4          Did I read that right?

5   A.   You missed an S in the hero.

6   Q.   Do you have any understanding as to how it is that David

7   Dees had information in March of 2002 to be responding to

8   Christian on a Yahoo fan site not controlled by MGA?

9   A.   I have no idea.

10  Q.   You are forwarded this e-mail exchange by Paula to you,

11  and let's go up to where it's sent -- the first part of it.

12  It says:  "Victoria, Dave, who gave David Dees information

13  and what he does for us to this Yahoo lady and why?  This

14  Yahoo lady is giving us too much legal brief even though she

15  does not mean it.  Please do not send any information or

16  reply to her e-mails unless you have cleared it with me.

17          "Julie, Beth, Abe, there must be no mention about

18  Mattel or any of their properties, Carter, any MGA Bratz

19  arts, et cetera."

20          Do you see that?

21  A.   I do.

22  Q.   Now, Mr. Price pointed you to that information; correct?

23  A.   He did.

24  Q.   Do you have a recollection of who Julie, Beth, and Abe

25  were?

1   A.   Julie was the legal counsel for MGA.  Beth, and I don't

2   recall her last name, I think it was Cahill, was the

3   paralegal for MGA, and Abe, his last name was Mesieux.  And

4   he was, I believe, either the COO or the CFO of MGA at the

5   time.

6   Q.   All right.  Mr. Larian, when you read this, you read the

7   posting that it appeared on the Yahoo fan site; right?

8   A.   Yes.

9   Q.   Is the issue about the disclosure of Carter Bryant what

10  was a concern to you, or was there anything else about the

11  posting that was a concern?

12  A.   There was something else that was a concern.

13  Q.   And what was that, sir?

14  A.   I had received a letter, cease-and-desist letter from

15  these lawyers right here, telling me that this Yahoo fan club

16  had put, I think, name of Barbie or Diva Starz in his website

17  in regards to the Bratz website that this person had

18  created -- I don't know if it was a he or a she -- and that

19  Mattel claimed that that was a trademark infringement.  And

20  they gave us an ultimatum to do something about it.  And I

21  didn't want to get into a lawsuit with Mattel.  They sue

22  everybody.

23  Q.   Mr. Larian, in that cease-and-desist letter, and we'll

24  get to it --

25            MR. PRICE:  Your Honor, may I move to strike the

```
 1    last comment, "They sue everybody"?  No foundation.  Not
 2    responsive.
 3              THE COURT:  That's stricken.  The last line about
 4    suing everybody is stricken.
 5    Q.   BY MR. NOLAN:  Mr. Larian, in 2000, when you launched
 6    Bratz, did you have any knowledge of Mattel ever filing
 7    lawsuits against competitors at that time, sir, personal
 8    knowledge?
 9              MR. PRICE:  Object.  This is irrelevant.
10              THE COURT:  Overruled.
11              THE WITNESS:  Bratz was launched in 2001, not 2000.
12    And yes, Mattel had sued literally anybody who got into the
13    fashion doll business.  I can name them.
14    Q.   Mr. Larian --
15              MR. PRICE:  Move to strike.  Nonresponsive and
16    irrelevant.  And if we can have a sidebar, I'd make a proffer
17    on this.
18              THE COURT:  We need another sidebar.
19              (SIDEBAR CONFERENCE HELD.)
20              THE COURT:  I can see the relevance of -- you are
21    offering alternative explanation of this language as to why
22    he didn't want to have any mention of Mattel.  And that's
23    fair enough.  We got to watch Mr. Larian's statements about
24    they sue everybody, and we have to limit it to what he has a
25    foundation to say.
```

1    MR. NOLAN:  That's what I was trying to do.  And
2  with a little leeway, I'll say limited to only at the time in
3  2001, what was your understanding of the other lawsuits filed
4  by Mattel.

5    MR. PRICE:  The problem with this, your Honor, is
6  that -- and I know it can be covered in cross-examination,
7  but because it can be, there's still a 403 issue.  And at his
8  deposition, he said the only reason he wrote that e-mail was
9  because he got the cease and desist on not using Barbie and
10  Diva Starz.  His answer does not say Barbie sues everybody
11  for anything.  But he was concerned about that letter.  And I
12  actually brought that out.

13    Now, he's using that as an excuse to try to get
14  into evidence that Barbie is this, you know, Darth Vader --

15    THE COURT:  You can certainly impeach with that
16  information, and I'll give you leeway to ask these questions,
17  but we've got to come up with a way to keep Mr. Larian from
18  painting with this broad brush.

19    MR. NOLAN:  Your Honor, I'll make a proffer, and I
20  mean this with all due respect, I don't believe that
21  Mr. Price has read the entire transcript because there's
22  other testimony exactly on point with respect to knowledge of
23  the lawsuits.

24    THE COURT:  That you can work out, and I'll let the
25  adversarial process play out.  Even if you need to lead a

1  little bit on this, let's control the broad brush.

2          MR. PRICE:  I think this opens a door.  I have a

3  list of lawsuits they filed against competitors.  So I just

4  want to --

5          THE COURT:  I trust Mr. Nolan can control the

6  witness.

7          **(CONCLUSION OF SIDEBAR CONFERENCE.)**

8  **Q.**  BY MR. NOLAN:  Mr. Larian, could you just limit your

9  answer to your own personal knowledge about any lawsuits that

10 had been filed by Mattel against competitors in the fashion

11 doll industry in the year as of, let's say, 2001.

12 **A.**  The biggest one was Hasbro, who made a doll called

13 Cindy, that Mattel sued a company in Italy called Gio over a

14 doll called Tanya.

15         They sued the company called Lund over a doll

16 called Petra.  If you're talking about fashion dolls, those

17 are the ones I remember, and they also sued a company called

18 Goldberger over a doll called Radio City, a doll that they

19 had done.  I don't remember the exact date when that lawsuit

20 was filed.  Was it before 2001 or after?  I don't remember

21 that.

22 **Q.**  Prior to receiving the cease-and-desist letter from the

23 law firm of Quinn Emanuel, had you received any information

24 or intelligence about Mattel considering one way or the other

25 to sue concerning Bratz?

2031

```
 1              MR. PRICE:  Objection.  This is 403, irrelevant.
 2              THE COURT:  As phrased, Counsel, let's rephrase.
 3   Be mindful of the Court's admonition at sidebar.
 4   Q.   BY MR. NOLAN:  Keep your finger on this one e-mail,
 5   Mr. Larian.  But I want you to go to Exhibit 04900.
 6              Do you recognize Exhibit 04900?
 7   A.   I'm sorry.  White book?  Black book?
 8   Q.   It's in the white book.  Do you have it in front of you,
 9   sir?
10   A.   Yes, I do.
11   Q.   Do you recall this document?
12   A.   May I have just one moment?
13   Q.   Sure.
14   A.   Yes, I do recall this.
15   Q.   First of all, what is it?
16   A.   It's an e-mail that I sent to everybody in sales at MGA,
17   and I copied Paula Treantafelles, Nana Ashong, Lon Ross,
18   David Malacrida, and the subject is Bratz.
19   Q.   And the date of this e-mail?
20   A.   June 29, 2001.
21   Q.   Did you send this out, Mr. Larian?
22   A.   I did.
23              MR. NOLAN:  Your Honor, we'd offer Exhibit 4900.
24              MR. PRICE:  It's irrelevant and contains hearsay.
25   Also 403.
```

1          THE COURT:   I'm going to admit this over the

2   objection.   But I'm going to instruct the jury that this is

3   admitted not for the truth of what's set forth, but just for

4   evidence of Mr. Larian's state of mind at this time, just

5   what he was thinking when this statement was made.   It's

6   admitted subject to that limitation.

7          **(Exhibit 4900 received.)**

8          THE COURT:   You may publish.

9          MR. NOLAN:   Thank you.

10  **Q.**   This is an e-mail entitled Bratz.   It says MGA has full,

11  free, and clear rights to Bratz trademark and Bratz dolls.

12          Did you write that?

13  **A.**   I did.

14  **Q.**   Did you believe it when you sent it out?

15  **A.**   I did.

16  **Q.**   It says:   "I've been advised that Mattel is spreading

17  rumors that there are legal issues regarding Bratz.   This is

18  untrue."

19          Did you believe that to be true when you wrote that

20  in the e-mail?

21  **A.**   I did.

22  **Q.**   And it says:   "We are and will deliver our full capacity

23  of Bratz products with no delays."

24          Did you believe that at the time, sir?

25  **A.**   I did.

1   Q.   In fact, did you deliver your full capacity of Bratz

2   products with no delays?

3   A.   I don't remember exactly if we did or not.

4   Q.   And then you said:  "If you or your customers have any

5   questions, please call me directly."

6          Do you see that?

7   A.   I do.

8   Q.   I want to go back to the David Dees e-mail.  There's

9   other information -- is there other information in the

10  posting on the website other than just Carter Bryant?  Do you

11  see that, sir, 4057?

12  A.   I'm looking at this.

13  Q.   We'll make it easier.  Why don't I take it from the top.

14  You see where it says:  "Hi, Christian, thanks so much for

15  your letter and interest in the world of Bratz.  I talked to

16  the art director at MGA, and she said that, of course, I am

17  not the one to be releasing any Bratz art ahead of time.  So

18  I will check and see if I can post some of that older air

19  brush art for you.  She also said MGA is in the process of

20  building a new website that is going to be packed to the hilt

21  with cool art of all the new fashions."

22          The question to you, Mr. Larian, is did you at any

23  time authorize anybody to be disclosing information with

24  respect to the status of any website that MGA was considering

25  for the Bratz line?

1  A.   I did not.

2  Q.   And then you go on to the second paragraph.  It says:

3  "I work free-lance as an illustrator and have my own studio

4  at home where I paint at my leisure.  But if a job comes in,

5  you can be sure that it is usually being rushed."

6       And then it goes on and talks about the Bratz dolls

7  and Carter Bryant.

8       Do you see that?

9  A.   I do.

10 Q.   Okay.  First of all, it says in that next paragraph:   "I

11 am swamped right now with colorizing lots of the new whacky

12 funk styles, and there are new hats and boas and tops that I

13 got a kick out of."

14      Do you see that?

15 A.   I do.

16 Q.   Mr. Larian, at any time do you recall ever authorizing

17 anybody, including David Dees, to be posting on a Yahoo fan

18 site internal information regarding designs or styles or

19 fashions under consideration within MGA?

20 A.   No, I did not.

21 Q.   Now on page 3 it says:  "Let me tell you about MGA.  It

22 is located in North Hills, California, at the west end of the

23 beautiful San Fernando Valley, where I've lived for many

24 years."

25      And it goes on:  "Anyway, when you walk into the

1    big, high ceiling lobby, there is a real pretty receptionist

2    with reddish brown hair and that sometimes wears leopard

3    prints, and if you look to the left, you will see the stairs

4    wind up to the second floor where all the cool stuff happens.

5    And as you start up them, there is, to the right, a little

6    rock garden with plants, and it always has some of the new

7    toys, like robot dogs, insectobots, or baby dolls sitting in

8    there as if they are playing."

9           Sir, did you ever authorize anybody to ever

10   disclose, including David Dees, disclose the physical layout

11   of the MGA offices?

12   **A.**   I did not.

13   **Q.**   And then skip down.  It says:  "As you get to the top of

14   the stairs, that is, if you can get permission to come up to

15   this top secret place, the first thing you notice to your

16   right is two big doors opening into a spacious office with a

17   fancy glass deck, usually covered with toys, and sitting

18   there working busily away is a great fellow named Isaac, who

19   is the owner, president, and creator of most of the MGA toys.

20          "He always seems to leave his doors open, and when

21   I stop by to pick up a job, I glance in and wave if he

22   happens to look up."

23          Mr. Larian, as the CEO of MGA, did you ever

24   authorize anybody, including David Dees, to be laying out

25   information on a website, fan website where your office is

1    located and whether or not you keep the doors open or not?

2    **A.**    I did not.   That second floor where we have most of our

3    designs and other things done was off limits.   People could

4    not come there.

5    **Q.**    Now, the next paragraph says:   "The first big area past

6    there has lots of low partition cubicles with all the

7    business people who keep the finances working, but then the

8    next rows are the package and advertising designers, which is

9    sort of the frontline of the creativity, and as you continue

10   up the steps, there is a silly sign hanging there that says

11   Design Farm, and that is the beginning of the art studios.

12   It always freaks me out to go in there because it is a busy

13   beehive of toy ideas and designers flying around like a

14   tornado."

15           Did you ever authorize anybody, including David

16   Dees, to be posting internal information regarding the

17   construct of offices where finances are being kept, where

18   designs are being made within MGA?

19   **A.**    I did not.

20   **Q.**    Did this posting by David Dees upset you?

21   **A.**    It did.

22   **Q.**    Turn to Exhibit 17252.   This is the February 7, 2002,

23   letter from the law firm of Quinn Emanuel.

24           Do you see that?

25   **A.**    Yes, sir.

1   Q.   This is in evidence.

2        Can we have this up, please, your Honor?

3        THE COURT:   You may.

4   Q.   BY MR. NOLAN:   Now, the date on this letter is February

5   7th, 2002; correct?

6   A.   It is.

7   Q.   And that is before the e-mail that you -- exchange you

8   had concerning David Dees that we just looked at; right?

9   A.   Yes, it is.

10  Q.   Were you surprised to get the cease-and-desist letter

11  from Mattel?

12       MR. PRICE:   Objection.   Irrelevant.

13       THE COURT:   Sustained.

14  Q.   BY MR. NOLAN:   What steps did you do, sir, to comply

15  with Mattel's lawyers' direction of a cease-and-desist

16  letter?

17  A.   I forwarded this letter to my attorney, Patricia Glaser,

18  and asked her to respond to it.

19  Q.   Did you take any other steps, sir?

20  A.   That's the only step I recall.

21  Q.   What about with respect to where you received the

22  information concerning the posting on the Yahoo website?

23  A.   To the best of my recollection, I don't think we gave

24  any more information to that website.   That was confidential.

25  Q.   Now, going back to this February 7th letter, do you see

1    the second paragraph, it says:  "The marks are being

2    infringed by the Bratz Yahoo discussion group website"?

3    **A.**    I do.

4    **Q.**    Do you know whether that Bratz Yahoo discussion group

5    website is the same Yahoo website we just walked through

6    regarding the David Dees e-mail?

7    **A.**    Yes, and it was set up by a Bratz fan.

8    **Q.**    Mr. Price was also asking you questions but hiring

9    people from Mattel.

10           Do you remember that question?

11   **A.**    I do, I do.

12   **Q.**    Do you believe there is anything wrong with hiring

13   employees who are employed at Mattel?

14   **A.**    No, it's not.

15   **Q.**    Mr. Larian, do you know whether or not Mattel has ever

16   hired MGA personnel to work for it?

17   **A.**    Yes, many.

18   **Q.**    Do you know --

19           MR. PRICE:  I object and move to strike as to time

20   frame.  I was limited to up to October 19 of 2000.

21           THE COURT:  Focus on the time frame, Counsel.  Can

22   you specify the time?

23           MR. NOLAN:  Your Honor, before, though, can I just

24   make a sidebar presentation on this point, your Honor, or do

25   you want me to wait?

```
 1              THE COURT:  I'm going to overrule the objection,
 2    but just follow up, Counsel.
 3              MR. NOLAN:   Thank you.
 4    Q.   Do you know a woman named Tina Patel?
 5    A.   Yes.
 6    Q.   Was she employed a MGA?
 7    A.   She was employed by MGA.
 8    Q.   What was her position at MGA?
 9    A.   She was the brand manager for Bratz line of product.
10    Q.   And thereafter, did she leave MGA?
11    A.   She was recruited by Mattel.
12    Q.   And was she hired at Mattel?
13    A.   She was.
14    Q.   And what was her position at Mattel?
15    A.   She became, to the best of my knowledge from the
16    industry, she became the brand manager for My Scene.
17              MR. PRICE:   Objection.  Lack of foundation.  It
18    appears to be --
19              THE COURT:  Foundation, Counsel.
20    Q.   BY MR. NOLAN:  Do you have knowledge, first of all, that
21    Tina Patel was hired at Mattel?
22    A.   I do.
23    Q.   And do you have knowledge as to whether or not Tina
24    Patel works in connection with a particular doll line at
25    Mattel?
```

1   **A.**   At that time she worked, yes --

2          THE COURT:  It's a yes or no question.

3          THE WITNESS:  Yes.

4   **Q.**   BY MR. NOLAN:  And what is the basis for your knowledge

5   as to what doll line at Mattel Tina Patel went to work for

6   after she left MGA as the brand manager for Bratz?

7   **A.**   Chris Hackstead of Target told me --

8          MR. PRICE:  Objection.  Move to strike.  Hearsay.

9          THE COURT:  Sustained.

10         MR. NOLAN:  Okay.

11  **Q.**   Other than Chris telling you what the position of Tina

12  Patel is, do you have knowledge as to what line of doll Tina

13  Patel was working on after for she left MGA?

14  **A.**   Yes.

15  **Q.**   What's the basis for your knowledge?

16  **A.**   Again, it was industry-wide knowledge that she was

17  working on My Scene doll.

18         MR. PRICE:  Objection.  Move to strike.  It's based

19  on hearsay.

20         THE COURT:  Sustained.

21         MR. NOLAN:  Your Honor, I'll get it a different

22  way.

23         THE COURT:  Last answer is stricken.

24  **Q.**   BY MR. NOLAN:  Do you know whether or not Tina Patel is

25  still employed at Mattel?

1   A.    Yes.  She's not.

2   Q.    I asked you earlier whether or not you recall Mattel

3   advertising the identity of any of its designers.

4          Do you recall that?

5   A.    I do.

6   Q.    And your answer was what?

7   A.    I have not seen except for the Barbie collectible line

8   that sometimes in the catalog they give the name of a

9   designer.  The product that sold to the mass merchants, to

10  Wal-Mart, Target, Toys-R-Us, Kmart, Mattel, Hasbro, MGA, Spin

11  Master, nobody ever says oh, this product was designed by

12  this designer or by this inventor.

13  Q.    Now, have you ever disclosed, in any publication that

14  you are aware of, that Paula Treantafelles Garcia was the

15  project manager for the development of the Bratz dolls?

16  A.    I have not.

17  Q.    Were you trying to conceal Paula Treantafelles's

18  involvement with Bratz?

19  A.    I was not.

20  Q.    Have you ever disclosed in any publication that Veronica

21  Marlow was doing fashion designs for the Bratz dolls?

22  A.    I have not.

23  Q.    Were you trying to conceal Veronica Marlow's involvement

24  with Bratz?

25  A.    No.

1  Q.   Do you know an individual by the name of Margaret Leahy?

2  A.   I do.

3  Q.   And who is Margaret Leahy?

4  A.   She's a free-lance sculptress.  She's very good in

5  sculpting dolls especially.

6  Q.   Was she involved in the sculpting of early prototypes

7  that led to the Bratz doll?

8  A.   Yes.  She was a final sculptor of the Bratz dolls.

9  Q.   Mr. Larian, have you ever disclosed to anybody that

10 Margaret Leahy was a sculptor involved in the Bratz doll?

11 A.   I have not.

12 Q.   By the way, who did the packaging for Bratz?

13 A.   A combination of people.  Aileen -- I don't know how to

14 pronounce the last name.

15 Q.   Store?

16 A.   Store.  I believe a lady named Rachel Harris.  Myself.

17 There was a lot people involved in final design of the

18 packaging for the Bratz dolls.

19 Q.   Were you trying to conceal them?

20 A.   I was not.

21 Q.   Mr. Larian, you talked about not seeing any designers

22 advertised by Mattel.

23       Have you seen that on some collectible Barbie dolls

24 certain designers are identified on the Mattel boxes?

25 A.   I have on the catalogs.  I have seen it on the catalogs.