1   I'm not sure if I've seen it on the actual product.  But I

2   have seen the mail order catalogs that they send to the

3   homes.  They put the names of -- sometimes, some of the

4   designers of the fashions for Barbie.

5   **Q.**   Now, in fact, do you know that Carter Bryant, while

6   employed within Barbie Collectibles, actually had his name on

7   a particular collectible doll?

8   **A.**   I believe I saw that, yes.

9   **Q.**   Did you see that before or as part of this litigation?

10  **A.**   I saw it -- actually, I got a catalog, and I saw it on a

11  catalog after Carter Bryant had left Mattel.

12  **Q.**   Well, is the fact that Carter Bryant was listed as a

13  designer in the catalog, did that factor enter any decision

14  on your part to make an offer to him?

15  **A.**   No.  Again, it had nothing to do with it.

16  **Q.**   In 1999 and 2000, MGA hired Mattel employees; correct?

17  **A.**   I'm sorry.  Can you repeat that?

18  **Q.**   In 1999 and the year 2000, you authorized the hiring,

19  the recruiting and hiring of various Mattel employees;

20  correct?

21  **A.**   I did.

22  **Q.**   Did you have an understanding, one way or the other,

23  Mr. Larian, as to whether or not Mattel was laying off

24  employees in the year 1999 or 2000?

25  **A.**   They were, yes.

1    Q.   How do you know that?

2    A.   They had purchased a company called The Learning

3    Company, and that company did not do well for them --

4              MR. PRICE:   Objection.

5              THE COURT:   This is nonresponsive.

6              MR. PRICE:   Move to strike.

7              THE COURT:   It's stricken.   The question is how did

8    you know that.

9    Q.   BY MR. NOLAN:   How did you know that, sir?

10   A.   Just industry knowledge.   It was all over the newspaper,

11   everywhere.

12   Q.   I want to ask you to go to Exhibit 16911.

13   A.   I have it.

14   Q.   Do you recognize this document?

15   A.   I do.

16   Q.   What is it?

17   A.   It starts as an e-mail I sent in March 2002, Mattel, to

18   John Handy, who was the senior vice-president of design at

19   Mattel, and the subject is people.

20   Q.   Is this an e-mail that you, yourself, sent out?

21   A.   I did.

22   Q.   On the date reflected on the e-mail?

23   A.   I did.

24   Q.   To the individual located on the address line?

25   A.   Yes.

1          MR. NOLAN:  Your Honor, we'd offer this exhibit.

2          THE COURT:  Any objection?

3          MR. PRICE:  Only that it's outside the time frame.

4   Everything else, no.

5          THE COURT:  This is March of 2000.  Overruled.

6   It's admitted.

7          **(Exhibit 16911 received.)**

8          THE WITNESS:  I earlier said March of 2002.  I

9   meant 2000.

10  **Q.**  BY MR. NOLAN:  Correct.  I was going to ask you.  Just

11  go from here.  From Isaac Larian.  Mattel, John Handy.  Sent

12  date is March 6 of the year 2000.

13  **A.**  March 2, I'm sorry.  If you look at the bottom, the

14  first e-mail is March 2nd.

15  **Q.**  All right.  Let's start from the bottom.  Thank you.

16         It says:  "From Isaac Larian, sent March 2, 2000,

17  to Mattel, subject, people.  Hi, John, hope all is well with

18  you.  We are growing like mad and need to hire more good

19  people."

20         When you said "we," who were you referring to?

21  **A.**  MGA.

22  **Q.**  And you -- and who was John Handy?

23  **A.**  He was the senior vice-president of design at Mattel.

24  **Q.**  And you sent it directly to him at his e-mail address at

25  Mattel?

1   **A.**   I did.

2   **Q.**   And it says:   "With all that is happening at Mattel with

3   all the layoff, et cetera, please let me know if you know

4   some good people we can consider.   We are looking for," and

5   then you have "directors of marketing, product managers, and

6   it goes on, doll, plush, girls product designers, engineers.

7   Thanks for your help.   Best regards."

8         Do you see that?

9   **A.**   I do.

10  **Q.**   Did Mr. Handy respond to you?

11  **A.**   Yes, he did.

12  **Q.**   Did he respond on March 6, 2000, at 11:02 A.M.?

13  **A.**   He did.

14  **Q.**   And again, subject, people.   Do you see that?

15  **A.**   I do.

16  **Q.**   Isaac -- that's you; right?

17  **A.**   It is me.

18  **Q.**   "Raime is our Human Resource person.   We aren't

19  currently laying off anyone in my division, in fact, we're

20  looking for good people ourselves.   But I know The Learning

21  Company is having layoffs, and if anyone there is a fit for

22  your needs, Raime can let you know."

23         And then you say:   "Thanks, John.   And hi, Raime."

24  And now you've e-mailed and included Raime on the CC line;

25  correct?

1  A.   I did.

2  Q.   And Raime is within Mattel?

3  A.   She was in Human Resources at Mattel.

4  Q.   And it says:  "Thanks, John.  Hi, Raime.  Mary Claire

5  Tiffany is our HR director."  And Mary Claire Tiffany was

6  HR's director?

7  A.   At that time, yes.

8  Q.   And then you said her telephone number is (818)

9  894-2525.  That's the number for MGA?

10 A.   Yes.

11 Q.   And then you gave the direct extension?

12 A.   Yes, I did.

13 Q.   "Best regards, Isaac"?

14 A.   That's correct.

15 Q.   After sending this e-mail, did anyone from Mattel call

16 and you say words to the effect, Mr. Larian, what are you

17 doing e-mailing Mattel asking them for leads on employees?

18 A.   They did not.

19         THE COURT:  Let's take our break at this time.

20         (Recess taken.)

21         **(HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)**

22         THE COURT:  We're back on the record outside the

23 presence of the jury.  The Court has received Mattel's motion

24 for leave to submit the expert reports of 42 LLC regarding

25 the review of recently provided in electronic media and

1              MR. PRICE:   And anything regarding Tina Patel?

2              THE COURT:   It's outside the time period.

3              **(WHEREUPON THE JURY ENTERS.)**

4              THE COURT:   Welcome back, ladies and gentlemen.

5    There is one question and answer that the court needs to

6    strike.   There was a question to Mr. Larian, do you know

7    whether or not Mattel has ever hired MGA personnel to work

8    for it.

9              The answer was yes.   I've sustained an objection on

10   the timing of that.   It comes from a time period that's not

11   relevant.   So that answer and question is stricken from the

12   record.

13             MR. PRICE:   Your Honor, the questions about

14   Ms. Patel were also outside the time frame.

15             THE COURT:   Yes, thank you.   It's Patel?

16             MR. NOLAN:   Tina Patel.

17             THE COURT:   And the question and answer related to

18   her is also outside the time frame, and that is stricken as

19   well.

20             Counsel, you may resume.

21             MR. NOLAN:   Thank you.

22   Q.   Mr. Larian, I want to go back a little bit, if I might,

23   just with respect to at least one other media story that you

24   were talking about.   And just to reorient you, you have

25   Exhibit 1-A in front of you, The Wall Street Journal article?

1  A.   The redacted version?

2  Q.   Yes.

3  A.   Yes.

4  Q.   And again, that date is July 18th; right?  2003.  And

5  this is the article where you mentioned Carter Bryant as

6  being the designer of Bratz; correct?

7  A.   I did.

8  Q.   And do you recall that Mr. Price in his examination

9  referred you to an e-mail communication that you had with a

10 Chris Palmeri working for the Business Week?

11 A.   He did.

12 Q.   And just for orientation, that's Exhibit No. 4941.

13      Do you have that in front of you?  And I think

14 you'll have to go to the black book.

15      And this is in evidence, your Honor.

16      THE COURT:  Very well.

17      THE WITNESS:  Go ahead.

18 Q.   BY MR. NOLAN:  This is in evidence.  Do you have it in

19 front of you, Mr. Larian?

20 A.   I do.

21 Q.   Let's put this up.

22      Now, this is dated July 14, of 2003.

23      Do you see that?

24 A.   I do.

25 Q.   And in this fact checking e-mail, Mr. Palmeri is asking

1   you to confirm certain things about what they are going to

2   say in the story.  And to go to the pertinent part, it says:

3   "We describe you as a 49-year-old immigrant, Iranian

4   immigrant, trained as a civil engineer, who modeled Bratz

5   after your own children, who wear midriff-baring shirts,

6   low-rise jeans, and baseball caps."

7           You remember that line of testimony?

8   A.   I do.

9   Q.   And you see the term "who modeled Bratz after your own

10  children."

11          Do you see that?

12  A.   I do.

13  Q.   And I believe Mr. Price asked you what did you mean, and

14  I think you admitted, unfortunately, like most dad's, that

15  their children wear midriff blouses and maybe hiphugging

16  jeans.  But in any event, that was a correct statement.

17  That's what you told Mr. Palmeri; correct?

18  A.   Yes.  And that's four days before The Wall Street

19  Journal.

20  Q.   Now I want to go to the actual story that ran in

21  Business Week.  And this is Exhibit 631.

22          Do you see this?

23  A.   I do.

24  Q.   The date of the Business Week publication is July 28,

25  2003; right?

1    A.    It is.

2    Q.    Now, that's about 10 days after The Wall Street Journal

3    article; right?

4    A.    It is.

5    Q.    Now, once you had mentioned something to The Wall Street

6    Journal with respect to Carter Bryant, did you have any

7    intent to mislead or conceal information from Business Week?

8    A.    I never had an intention to conceal Carter Bryant's

9    name, mislead Business Week or anybody else.

10   Q.    Okay.  Now, you see the fact checking e-mail from Chris

11   Palmeri said that you had modeled Bratz after your own

12   children.

13         Do you see that?

14   A.    I do.

15         MR. NOLAN:  Your Honor, I'd offer 631 subject to an

16   agreement to redact certain portions of it similar to the way

17   we've done other articles.  And so I'll try to do this on the

18   fly.

19         THE COURT:  Very well.

20         MR. NOLAN:  All right.  So if I could just have the

21   first page displayed for the jury.

22         Aaron, if you don't mind putting 631, the front

23   page.

24   Q.    Do you see that?  Now, this is -- can you highlight the

25   date of this for me in the upper left-hand corner?  It may be

1   hard to read.  Do you see that'S July 28, 2003?

2   **A.**    It is.

3   **Q.**    Okay.  This is an -- and if you look at

4   Exhibit 631-0002, there's a commentary section.  Don't put

5   this up just yet.  Just show on the second page of this

6   exhibit the point that says commentary by Chris Palmeri.

7   **A.**    Yes.

8            MR. NOLAN:  I apologize for the delay.  We're just

9   doing this real time.

10  **Q.**   See under commentary, and if you read over the

11  commentary article by Palmeri runs over to page 0003, and

12  then just go to the last paragraph.

13           All right.  Now, this is the last paragraph,

14  Mr. Larian, that would I like to draw your attention to.  And

15  this is following the e-mail that you had received where you

16  confirmed that you modeled the Bratz after, I guess, Yasmin

17  and her friends.  I won't make a comment about whether or not

18  Cameron and Jason were wearing midriff shirts.

19           But let me go here for just a moment.  Here is what

20  the article says.  IT says:  "Mattel won't live or die on

21  every new toy it develops.  But it can't just rely on

22  Barbies, either.  Quote, like they say in business school, no

23  risk, no reward, says Isaac Larian, CEO of privately held

24  MGA."

25           Did you say that?

1  A.   I don't recall it.  But if -- I cannot deny that I said

2  that.

3  Q.   And then you go on, it says:  "He should know, he got

4  the idea for Bratz after seeing his own kids run around in

5  naval-baring tops and hiphuggers, as Eckert is finding out,

6  sometimes the best ideas are right in front of you."

7          Do you see that?

8  A.   I do.

9  Q.   In the fact checking e-mail that you had received a few

10  days before, you didn't say that you came up with the idea

11  from Bratz seeing Yasmin and her friends; correct?

12  A.   I did not.

13  Q.   Did you try in any fashion in this Business Week

14  interview to mislead or conceal Carter Bryant?

15  A.   No, this Business Week article was about 10 days after

16  The Wall Street Journal with Carter Bryant's name I gave to

17  the whole world.

18  Q.   And I guess I should ask you this question.  Is it true

19  that in about early or late -- early 2001, late 2000, that

20  your own children and their friends were wearing

21  midriff-baring shirts, low-rise jeans, and baseball caps?

22  A.   They were.

23  Q.   I want to deal with something, and then we'll move on to

24  the actual contract negotiations.

25          Were you here for opening statement?

1   A.   I was.

2   Q.   Did you hear Mr. Quinn say that you were -- words to the

3   effect, you used your wealthy Iranian parents' money to start

4   MGA?

5   A.   I did hear that.

6   Q.   Is that a true statement?

7   A.   It's absolutely not a true statement.

8   Q.   Let's talk about your origin, Mr. Larian.  You weren't

9   born in the United States, were you?

10  A.   No, I was born in Iran.

11  Q.   When did you come to the United States?

12  A.   I came in 1971.

13  Q.   How old were you?

14  A.   17.

15  Q.   Why did you come to the United States?

16  A.   I came to USA for a better life.

17  Q.   Did you become a United States citizen?

18  A.   I did.

19  Q.   When?

20  A.   1990.

21  Q.   Mr. Larian, when you left Iran, were your parents still

22  living there?

23  A.   They were.

24  Q.   Were they wealthy?

25  A.   No, they were not.

1  Q.   Tell the jury what kind of business they had.

2  A.   My father had a small textile shop where my mother

3  worked in it, and I recall since I was nine years old, after

4  school I would go and work in the shop, even in the summers,

5  until age 17, when I came to this country, and then my

6  brother also worked there, and my sister worked there.  So we

7  can make a living.

8  Q.   At some point in time, did you go back to Iran to get

9  your parents?

10  A.   I'm sorry.  Can you repeat that again?

11  Q.   At some point in time, did you return to Iran to take

12  your parents to the United States?

13  A.   I did.

14  Q.   And what year was that?

15  A.   I went back to Iran after the revolution, and I arranged

16  for -- first I brought my little sister to USA.  Then my

17  brother.  Then I arranged for my parents.  They could not --

18  we're Jewish.  So we could not get out.  They could not.

19  Q.   Why don't I ask you a follow-up question.

20  A.   I arranged for my parents to leave through Afghanistan

21  and Pakistan on camels and cars with my little sister, and

22  then they went to Austria, and then they came to USA as

23  refugees.

24  Q.   How much money did you have when you came to the United

25  States at the page of 17?

1   **A.**   I had $750.

2   **Q.**   What was your first job?

3   **A.**   I was a dishwasher at a coffee shop called Spires coffee

4   shop in Lawndale, California.  I worked from 11:00 to 7:00 in

5   the morning.

6   **Q.**   Did you go to school?

7   **A.**   Yes.  Yes.  I went to L.A. Southwest College during the

8   day, and I worked during the night.

9   **Q.**   Did you earn a degree?

10   **A.**   Yes, I have a degree.

11   **Q.**   What's your degree?

12   **A.**   I'm a civil engineer.

13   **Q.**   Where did you earn the degree?

14   **A.**   From California State University in Los Angeles.  Cal

15   State L.A.

16   **Q.**   Did your parents pay for you to go to college?

17   **A.**   They did not.  I waited tables.  I bused dishes.  I

18   waited tables until I graduated from university.

19   **Q.**   Tell us about the beginning of MGA.  When was it formed?

20   **A.**   1979.  I started the company, and I named it Surprise

21   Gift Wagon.  And I had a Ford Phoenix, and I imported brass

22   giftware from Korea, and I started mail order business.  I

23   would put advertisement in the different mail order

24   magazines, and people would send me a check, and I would mail

25   them the product, the brassware.

1   Q.   The Prize Gift Wagon, did that eventually turn into MGA?

2   A.   Surprise Gift Wagon became ABC International Traders,

3   Inc. in 1982.  We were in business of consumer electronics.

4   Q.   Did MGA have an early focus in terms of the type of toys

5   or games that you were focused on?

6   A.   We got into the toy business in 1987 when we became the

7   distributor for Nintendo game and watch, which was Nintendo

8   handheld games, the first games, Donkey Kong, Super Mario

9   Brothers, et cetera.

10   Q.   Mr. Price in his examination asked you questions about

11   various family members that received distributions from MGA.

12   A.   He did.

13   Q.   He listed your mom as somebody who receives

14   distributions; right?

15   A.   My mother receives a salary at the company.  My mother

16   is 70 years old, and she cooks and brings food for the

17   children to the office and other employees.

18   Q.   Is that what she gets paid for?

19   A.   Yes.

20   Q.   Does she own any part of MGA?

21   A.   She does not.

22   Q.   They also asked you about your father.  Was your father

23   an owner of MGA?

24   A.   He was not.

25   Q.   Was he an officer?

1  **A.**   He was -- we named him the Chairman of the company out

2  of respect for him.  My father has passed away.

3  **Q.**   When did your father pass away?

4  **A.**   January 21, 2008.

5  **Q.**   You have a brother by the name of Farhad; right?

6  **A.**   I do.

7  **Q.**   In the opening statement, Mr. Quinn described for the

8  jury a business dispute that you had with Mr. Farhad, your

9  brother Farhad; right?

10 **A.**   He did.

11 **Q.**   Was that dispute resolved?

12 **A.**   It was resolved, yes.

13 **Q.**   Did Farhad prevail in that lawsuit?

14 **A.**   He did not.

15 **Q.**   What happened in that lawsuit?

16 **A.**   It went all the way to arbitration, and he, before the

17 case was over, he got up, over the objection of his attorney,

18 dropped the case, and he apologized to me.

19 **Q.**   Prior to meeting Carter Bryant at your offices, had you

20 ever met Carter Bryant?

21 **A.**   I had not.

22 **Q.**   Do you recall the first time you saw Carter's concept

23 drawings for Bratz?

24 **A.**   The first time I saw it was on that September 1 meeting

25 that I had with him.

1  **Q.**   Explain to the jury, if you can, what your first

2  reaction was, your personal reaction to the -- to Carter's

3  drawings?

4  **A.**   I thought they looked weird.

5  **Q.**   In what way?

6  **A.**   They looked like kind of alien looking.  They had these

7  big heads, his drawings, and small body.  I thought they

8  looked weird.

9  **Q.**   Did you show the drawings to anybody else that day in

10 your family?

11 **A.**   My daughter was there.

12 **Q.**   And that's Yasmin?

13 **A.**   That's correct.

14 **Q.**   She was here during the opening statements?

15 **A.**   She was.

16 **Q.**   Why did you show it to her?

17 **A.**   She was 11 or 12 at the time, and she was out of Barbie,

18 and I wanted to get her opinion as a little girl what did she

19 think about those drawings.

20 **Q.**   Why is it every time we ask you about the age of Yasmin,

21 you look at your wife?

22 **A.**   Because I'm afraid I will miss the age.

23 **Q.**   How long have you been married to your wife?

24 **A.**   24 years.

25 **Q.**   What did Yasmin say about the drawings?

1   **A.**   She liked them.  She thought they were very cool.

2   **Q.**   So was it based simply on Yasmin telling you that they

3   were cool that you decided to launch Bratz?

4   **A.**   We did not decide that day to launch Bratz.

5   **Q.**   Were you here for the testimony of Victoria O'Connor?

6   **A.**   I was.

7   **Q.**   Victoria O'Connor testified to this jury that on that

8   day you made a decision to go forward with Bratz.

9            Do you recall that testimony?

10  **A.**   I did.

11  **Q.**   Is Ms. O'Connor wrong?

12  **A.**   She's mistaken.  Absolutely.

13  **Q.**   At that point in time, September 1st, did you own Carter

14  Bryant's drawings?

15  **A.**   No.  He always owned his drawings.

16  **Q.**   Had you even offered Mr. Bryant a job at MGA as of

17  September 1st?

18  **A.**   I don't recall I did that, no.  I don't know if I did or

19  not.  I must -- I might have told him come here as a fashion

20  designer, but I don't know if it was the same day or not.

21  **Q.**   Now, sometime between September 1st and the date of the

22  signing of the agreement -- do you have that time period in

23  mind?

24  **A.**   I'm sorry.  Can you say that again?

25  **Q.**   Sure.  Your testimony is that you met on September 1st

1  of the year 2000 with Carter Bryant; right?

2  **A.**   That's correct.

3  **Q.**   And you saw his drawings for the first time at that

4  meeting; correct?

5  **A.**   I did.

6  **Q.**   And then sometime later, I believe on October 4th, did

7  you execute a contract with Carter Bryant?

8  **A.**   I executed the contract with Carter Bryant on October 4,

9  2000.

10  **Q.**   And Mr. Price asked you whether or not during the period

11  of September 1st and October 4th you had any contact with

12  Mr. Bryant.

13          Do you recall those questions?

14  **A.**   I do.

15  **Q.**   And do you recall that you testified as to what your

16  personal number is at MGA?

17  **A.**   Yes, I do.

18  **Q.**   Okay.  My question is a little bit different.  And that

19  is during the period -- turn to the date the contract was

20  actually signed, October 4th, I believe; correct?

21  **A.**   Yes, sir.

22  **Q.**   Sometime prior to that, had you had a personal

23  conversation, telephonic conversation, with Carter Bryant

24  where you made him an offer for a job?

25  **A.**   I believe I did.

1   **Q.**   And do you recall whether or not you called him at

2   Mattel or whether or not you called him at home?

3   **A.**   To the best of my recollection, I called him at home.

4   **Q.**   Do you have the specific date in mind?

5   **A.**   I don't know.  I don't.  I don't recall it exactly.

6   **Q.**   Do you recall whether or not -- what type of position

7   you offered Carter Bryant?

8   **A.**   I told him to come to MGA full time as a fashion

9   designer.

10   **Q.**   And what did Carter say in response to your offer?

11   **A.**   He said he does not want to work for anybody full time

12   anymore.  He wants to be a free-lance contractor.

13   **Q.**   Do you recognize having any discussions with Mr. Bryant

14   on the telephone with respect to -- I'm sorry.

15         Do you recall any information that you received

16   with respect to what Mr. Bryant's expectations were with

17   respect to receiving royalties?

18   **A.**   I'm sorry.  I don't understand your question.

19   **Q.**   Do you recall ever -- hold on for a minute.  I'll do it

20   a different way.  Can you turn to Exhibit 16788.  I'm sorry

21   for the delay.

22   **A.**   Go ahead.

23   **Q.**   16788.  Do you have that?

24   **A.**   I do.

25   **Q.**   And do you recognize this document?

1  **A.**    I do.

2  **Q.**    What is it?

3  **A.**    It's an e-mail.  The bottom one is an e-mail dated

4  September 12, 2000, from Victoria O'Connor to me, and on the

5  top is my e-mail to her on September 13, 2000.

6            MR. NOLAN:  Your Honor, we'd offer Exhibit 16788.

7            MR. PRICE:  No objection if it's not being offered

8  for the truth.

9            THE COURT:  Very good.  Again, ladies and

10 gentlemen, this is a document that's going to the witness's

11 state of mind, not whether or not any of the statements are

12 actually true or not.

13           It's admitted, and you may publish.

14           **(Exhibit 16788 received.)**

15 **Q.**   BY MR. NOLAN:  The date of this e-mail is September

16 13th, 2000.

17           Do you see that?

18 **A.**    Yes.  The one on the top is September 13.

19 **Q.**    And I want to turn to the first e-mail on this train,

20 which is always at the bottom, and you see from Victoria

21 O'Connor to Isaac Larian, subject, Carter Bryant, September

22 12, 2000, 4:40 P.M.

23           Do you see that?

24 **A.**    Yes, sir.

25 **Q.**    Sir, as of that date, in your mind was Carter Bryant

1    working for MGA?

2    **A.**    He was not.  We were still negotiating.

3    **Q.**    And it said -- there's an e-mail, and it says:  "I knew

4    it.  He called and said he wanted to make sure that if we

5    license out Bratz, he would like a royalty.  He said this was

6    his original intention for the property.  Do you want to tell

7    him no or me?"

8            And then you responded; correct?

9    **A.**    I did.

10   **Q.**    And you say:  "Tell him licensing royalties is a pie in

11   the sky in the future.  We are going to risk and spend

12   millions making this brand and line happen.  Maybe it does,

13   maybe it does not.  If it does, we made the brand and not

14   him.  The answer is no.  Explain the above logic to him."

15           Did you type that e-mail in response to Victoria

16   O'Connor's question?

17   **A.**    I did.

18   **Q.**    When you said we are going to risk and spend millions,

19   who are you referring to?

20   **A.**    MGA Entertainment.

21   **Q.**    And when you said making this brand and line happen,

22   which brand were you thinking of?

23   **A.**    The Bratz brand.

24   **Q.**    When you say maybe it does, maybe it does not.  If it

25   does, we made the brand and not him, what did you mean by

1   that?

2   **A.**   In the toy business and in -- there is no guarantees

3   that a toy is going to become a hit or a brand, and

4   especially in the fashion doll business, where at the time

5   Barbie owned over 90 percent market share.  And nobody has

6   ever been able to compete with Barbie.

7           So this was a major, major risk, financial risk for

8   us to go and work and build this brand.

9   **Q.**   Mr. Larian, in September of -- September 13th, 2000, had

10  every idea that you had ever come up with turned out to be a

11  success?

12  **A.**   No.

13  **Q.**   We've heard a little bit about Singing Bouncy Baby and

14  Prayer Angels.

15          Were there other toys that you had hoped to

16  introduce and thought they were going to be successful?

17  **A.**   I did.

18  **Q.**   And can you give us some examples where although you

19  thought they were going to be success, they turned out to be

20  not successful?

21  **A.**   In the doll area, the biggest one I remember was a doll

22  that we called -- that we launched in 2000 called My Dream

23  Baby.  This was a doll that actually, when you fed it, it

24  actually physically grew.  It had a voice recognition chip in

25  it so eventually it was supposed to learn and listen to your

1  commands and do different things.

2         It would grow also emotionally as you took care of

3  it.

4         And this doll was received with a lot of fanfare

5  and a lot of press, and we sold a lot of them in 2000.  But

6  in January of 2001, literally all of them came back.  Because

7  the voice recognition did not work.  That doll was too

8  complicated, and it did not sell well.  That's just one

9  example.  I can give you a lot of examples.

10  Q.   Do you remember Monkey See, Monkey Do?

11  A.   Yes.

12  Q.   What was it, first of all?

13  A.   Monkey See, Monkey Do was a toy that we came up with

14  that again, it had what we call light sensors.  So when you

15  put it in the dark, and like in the closet, you open it, it

16  will jump up and down and scream and react, and when you talk

17  to it, it talks back in monkey language.  But that doll --

18  that never made it.  We made the product.  Nobody bought it.

19  Q.   Did you lose money on it?

20  A.   Yes, we did.

21  Q.   So when you said you were going to risk and spend

22  millions making this brand line happen, it's true that at or

23  about this time you had great hopes for Bratz; right?

24  A.   I did.

25  Q.   But as you were sitting there in September and October

1    of 2003, did you believe you were taking the risk?

2    A.    In 2003?

3    Q.    Thank you.  In 2000, September and October 2000.

4    A.    Absolutely.  We were taking probably the biggest risk in

5    the -- financial risk in the history of the company.

6    Q.    Did you -- you heard Victoria O'Connor testify that you

7    did not direct her to confirm personally Carter's

8    representations to you about the origins of his drawings;

9    right?

10   A.    I heard her testimony, yes.

11   Q.    Is it true that Victoria O'Connor was tasked by you to

12   deal with the lawyers to come up with a contract in this

13   case?

14   A.    Absolutely, yes, she was.

15   Q.    Is Victoria O'Connor a lawyer?

16   A.    She's not a lawyer.

17   Q.    Did you expect her to negotiate the contract with Carter

18   Bryant?

19   A.    Yes, through a lawyer.

20   Q.    Victoria O'Connor also testified that prior to meeting

21   with Carter Bryant, you had considered other possibilities

22   for fashion dolls; correct?

23   A.    Yes.  And that's true.

24   Q.    Now, there was this discussion in the article, we saw it

25   in The Wall Street Journal article, about sort of a contest.

```
 1              Do you understand that testimony?
 2   A.    Yes, I do.
 3   Q.    And I don't want to belabor this, but when you say sort
 4   of a contest, is this a contest that, you know, was published
 5   in periodicals?
 6   A.    No, it was not.
 7   Q.    Was Victoria O'Connor testifying truthfully when she
 8   said that you and her were considering other fashion dolls?
 9   A.    Yes.   I had told Victoria O'Connor, again, as I said
10   earlier, Ron Stover, the buyer at Wal-Mart, had challenged me
11   to come up with a toy that can compete with Barbie, and he
12   will buy it.   Frankly speaking, I thought at the time he was
13   being a little bit sarcastic.   But I had asked Victoria
14   O'Connor, who was in licensing, to talk to other people to
15   come up with an idea for a fashion doll.
16   Q.    Now, was Paula Garcia employed at MGA while you were
17   having discussions with Victoria O'Connor about looking for
18   fashion dolls?
19   A.    I don't know the exact dates.   It's possible.   I know
20   Paula started in April 2000.   I think Victoria came before
21   her.
22   Q.    In any event, when Paula Treantafelles Garcia came on
23   board, did she have a specific area of responsibility?
24   A.    She was in charge of all dolls.   Large dolls, all the
25   dolls.
```

1    Q.    But at that time was MGA making a fashion doll?

2    A.    In 2000?

3    Q.    In 2000.

4    A.    When she started to work at MGA?

5    Q.    Yes.

6    A.    Again, I'm going to go back, if you look at the industry

7    definition for fashion doll, no, we did not.  But if you

8    adapt the definition that Ivy Ross gave to fashion doll, then

9    yes, we did.

10   Q.    My question, though, is this, and it's a little bit more

11   precise.  When you were meeting and considering other ideas

12   for fashion dolls before you met with Carter Bryant, was

13   Paula Garcia part of those discussions, or was it you and

14   Victoria O'Connor?

15   A.    Victoria O'Connor was in charge of licensing, talking to

16   other designers.  So I don't think Paula Garcia was part of

17   that discussion, no.

18   Q.    And at some point in time -- strike that.

19          As of September 1st, you knew Carter Bryant was an

20   employee of Mattel; yes?

21   A.    When I met with him, he told me on September 1, 2000,

22   that he works for Mattel.

23   Q.    Did you stop the discussion immediately once you heard

24   that?

25   A.    I did not.

1   Q.   Did you have any concern about whether or not you wanted

2   to get designs from Mattel?

3   A.   I'm sorry?  Can you repeat?

4   Q.   At that meeting, when he told you he was employed at

5   Mattel, did that raise a concern to you about whether or not

6   you were going to get a design from Mattel?

7   A.   Yes.

8   Q.   Did you want anything that Mattel was doing?

9   A.   I did not want anything that Mattel was doing.

10  Q.   Did you say anything to Mr. Bryant with respect to that?

11  A.   I did.

12  Q.   What did you say?

13  A.   I asked him do these belong to Mattel?  Is this

14  something that Mattel is doing?  And he said no.

15  Q.   Why did you ask that question?

16  A.   Because if this was something that he was doing for

17  Mattel or it belonged to Mattel, I was not interested in it.

18  Q.   At some point in time, did you learn that Carter Bryant

19  had retained a lawyer?

20  A.   Yes.

21  Q.   Do you remember the name of that lawyer?

22  A.   Yes.

23  Q.   What was the name of Mr. Bryant's lawyer?

24  A.   Ann Wang.

25  Q.   And were you, MGA, represented by counsel?

1  **A.**    Yes, we were.

2  **Q.**    And his name was?

3  **A.**    David Rosembaum.

4  **Q.**    Now, during the course of those negotiations -- strike

5  that.

6          Victoria O'Connor testified that during those

7  negotiations, she would keep you apprised of the status of

8  the negotiations; correct?

9  **A.**    Yes, she did.

10 **Q.**    Were there points in those discussions when you had

11 doubt as to whether or not a deal would actually be struck

12 with Mr. Bryant?

13 **A.**    Yes.

14 **Q.**    Can you explain for us the basis for your understanding

15 of that?

16 **A.**    He wanted to have -- the most major one that I remember

17 is that he wanted to have royalties on anything that we do

18 for Bratz, and I said no.  We're going to build that brand.

19 If MGA invests a lot of money and we build it, we're not

20 going to give royalties to Carter Bryant for that.  And that

21 contract negotiation almost fell apart on October 3rd, 2000.

22 **Q.**    And why did it almost fall apart?

23 **A.**    Because he through his lawyer was not accepting that.

24 **Q.**    And how do you know this?

25 **A.**    How did I know it?  Because I did call him myself on

1    that.

2    Q.   Did you -- let me ask you to take a look at

3    Exhibit 18467.

4    A.   I have it.

5    Q.   Before I ask you about that, Mr. Larian, I want to ask

6    you, did Carter Bryant ever agree to be hired as an employee

7    at MGA?

8    A.   No, he did not.  He did not want to become an employee.

9    Q.   Did you ever offer him a position as an employee of MGA?

10   A.   I did.

11   Q.   And was that in a telephone conversation you had with

12   him?

13   A.   That's correct.

14   Q.   Did Mr. Bryant tell you why he did not want to become an

15   employee at MGA?

16           MR. PRICE:   Object, unless it's not offered for the

17   truth.

18           THE COURT:   Is it being offered for the truth,

19   Counsel?

20           MR. NOLAN:   No, your Honor.  For state of mind at

21   this point in time.

22           THE COURT:   Very well, very well.

23   Q.   BY MR. NOLAN:   What did Mr. Bryant say to you?

24   A.   I'm sorry.  Can you repeat the question?

25   Q.   Sure.  After you offered Carter Bryant a position as a

 1   full-time employee at MGA, what did Mr. Bryant say to you?

 2   **A.**   He did not want to become an employee.  He wanted to be

 3   a free-lance designer.  He wanted to go back to Israel to be

 4   near his parents.  So he did not want to work as a full-time

 5   employee.

 6   **Q.**   At any point after -- I'm sorry.  At any point before

 7   the lawyers started negotiating, did Carter Bryant make any

 8   statement to you with respect to when he conceived of the

 9   idea for his drawings known as Bratz?

10   **A.**   He did.

11   **Q.**   What did he tell you?

12   **A.**   He said he did these in 1998 when he lived in Missouri

13   with his parents.

14   **Q.**   At some point in time -- now, let me go to -- let me ask

15   you to take a look at Exhibit 18467.

16         And without disclosing the contents of it,

17   Mr. Larian, first of all, can you identify that as an e-mail?

18   **A.**   Just give me one second, please.  This is an e-mail

19   exchange.  Go ahead.

20   **Q.**   Have you seen -- did you see this document, this e-mail?

21   **A.**   Yes, I'm copied on it.

22   **Q.**   Did you read this e-mail?

23   **A.**   Did I received it?

24   **Q.**   Yes.

25   **A.**   I don't recall if I did or not.

1  Q.   Do you see that it's dated September -- the top part is

2  dated September 28, 2000?

3  A.   Yes, I do.

4  Q.   And the bottom part is also an e-mail exchange on

5  September 28, 2000, from Victoria O'Connor to David Rosembaum

6  and was copied to you; correct?

7  A.   That's correct.

8  Q.   Now, during questions that Mr. Price was asking of you,

9  you made reference to seeing an e-mail that contained certain

10  representations concerning the origins of Bratz.

11         Do you recall that?

12  A.   I do.

13         MR. PRICE:   I'm going to object to further inquiry

14  on this based on the Court's order.

15         THE COURT:   Further inquiry, that's premature,

16  Counsel.

17  Q.   BY MR. NOLAN:   In signing the October 4 employment

18  agreement with Carter Bryant --

19  A.   There was no employment agreement with Carter Bryant.

20  Q.   I apologize.   The consulting agreement with Carter

21  Bryant.   Did you rely on representations that were made to

22  you with respect to -- strike that.   Let me ask it a

23  different way.

24         Did you know ahead of time, before you signed the

25  contract, of any factual confirmation received from your

 1   lawyer concerning the chronology of the Bratz drawings?

 2            MR. PRICE:   Object.   That violates the Court's

 3   order.

 4            THE COURT:   I'm sorry?

 5            MR. PRICE:   I object.   It violates the Court's

 6   order.

 7            THE COURT:   Counsel, let's go to sidebar.

 8            **(SIDEBAR CONFERENCE HELD.)**

 9            THE COURT:   Mr. Nolan?

10            MR. NOLAN:   Your Honor, at page 1705 of this trial

11   transcript, starting at line 6, question by Mr. Price:

12            "So you're saying that Ms. O'Connor was given proof

13   of a story that these drawings were not done while Mr. Bryant

14   was at Mattel?

15            "Answer:   Ms. O'Connor went to David Rosembaum who

16   went to Anna Wang, who is Carter Bryant's lawyer, and

17   according to an e-mail that I have seen, his lawyer came back

18   and said she has proof she knows it was done in 1998 when

19   Carter said that the initial drawings --

20            "Question by Mr. Price:   Since this is a critical

21   question as to whether or not those drawings belonged to

22   Mattel, your response was what proof are you talking about

23   besides Mr. Bryant's word?   That was your response; correct?

24            "I did not ask that specific question that you just

25   asked.   I did not."

1    And then there's a long line about what kind of

2   investigation he did and stuff like that.  He testified that

3   he saw an e-mail exchange, and I believe that based on that,

4   your Honor, your ruling with respect to the production of

5   these documents prevented me from asking Victoria O'Connor

6   about them, but you did not restrict us from asking questions

7   to Mr. Larian about it.

8    I will also represent that during his deposition in

9   this case, Mr. Larian also testified with respect to an

10   e-mail that he saw, confirmation about this.  So there's no

11   surprise.  This is a factual assertion, and I think I should

12   be allowed, based on this testimony, to put in this e-mail,

13   which is an e-mail that's referenced and not have to wait to

14   do it during David Rosembaum.

15    MR. PRICE:  I don't think he should be able to do

16   it under either.  This is part of the implied waiver, which

17   you know very well.  The question was did he rely on this

18   communication from counsel.  And they prohibited us from

19   going into that at all.  We've been through this -- I luckily

20   wasn't present.

21    But you, your Honor, and Mr. Zeller and others have

22   gone through this for a long time.  And we finally get this

23   e-mail last week.  And I think you're right.  That is unfair

24   surprise.  They shouldn't be able to now say well, we're

25   waiving the privilege --

1    THE COURT:  Counsel's suggestion is that your

2  question and the unobjected to answer opened the door for

3  this at this point?

4    MR. PRICE:  Well, he points out an answer which

5  pertains to privileged material.  I can't control that.

6  Mr. Nolan keeps trying to say we opened the door because he

7  blurts out answers which he's not supposed to blurt out

8  pursuant to the Court's order.

9    THE COURT:  Well, it's more than -- I mean, what

10  were you referring to in your question?  If not this e-mail

11  or that advice?

12    MR. PRICE:  Well, the question was he said he told

13  Ms. O'Connor to find out.  My question was --

14    THE COURT:  I presume the proof was whether or not

15  Carter Bryant's attorney, namely, Anna Wang, brought back.

16    MR. PRICE:  The answer should have been yes or no.

17  Now, I can't move to strike every time he blurts out an

18  answer.  He's summarizing what he just said.

19    MR. NOLAN:  There was no motion to strike.  He came

20  in.  He asked specifically about the proof.  He moved on, and

21  then he started talking about the inadequacies of just

22  accepting the representations from Carter Bryant.  He went

23  right on with it, your Honor, and cross-examined him

24  extensively on that.  Factual as well as hypothetical

25  questions, and he did so knowing that what the Court's ruling

1   was --

2          Well, your Honor, I think when this issue came up,

3   you went back and you looked at the motions in limine that

4   were actually argued with respect to Mr. Rosembaum's

5   documents, and I think you drew a distinction between the

6   factual assertions and the privileged material, and then you

7   said since this was just given to them last night, the night

8   before Victoria O'Connor, that it would be a surprise, and

9   you shouldn't be allowed to use it with Victoria O'Connor.

10         THE COURT:  The Court did make this distinction

11  between factual and legal.  And what about the e-mail here

12  brings it into the latter?

13         MR. ZELLER:  You know, your Honor, I would say

14  this.  Is that if this -- let me start with this point, your

15  Honor.  This is one that we have made all along.

16         If there is a waiver, it is all the way, and it is

17  all the way through today, because copyright infringement is

18  a continuing wrong.  There is authority for the proposition.

19  That is how far the waiver goes.  If he is going to rely upon

20  state of mind at that time, his state of mind at all times is

21  relevant for purposes of copyright infringement.  We have

22  made that -- it has never been refuted by MGA.

23         Now, of course, what they have done, and just to

24  correct one statement that Mr. Nolan made, it is true that

25  Isaac Larian blurted out yet again at his deposition

1   previously the point about the e-mail, but when we tried to

2   follow up, and this is in the record, they instructed, they

3.  invoked the privilege.  We didn't receive these documents

4   until the course of trial.  So it's not just simply a waiver

5   issue that could have been dealt with in the normal course of

6   the case.

7           Now what we're dealing with is also a severe

8   prejudice issue.  We had been denied discovery into this

9   whole waiver matter.  Even -- so that is something that just

10  can't really be cured, and that doesn't seem to -- the

11  alleged door opening --

12          THE COURT:  But the question, again, is what is the

13  attorney-client communication here?  This is simply a factual

14  issue, and that was the distinction that I made last week.

15  How is this --

16          MR. ZELLER:  But as the Court has pointed out, if

17  they -- they asserted privilege over these communications and

18  over this very communication.  That was their assertion.

19  If -- and this has been Judge Infante's point all along.  He

20  said this from the very first ruling he made in the case.  If

21  it's factual, it's not privileged.  They asserted privilege.

22  That was their choice.  If they were going to rely upon those

23  documents and they were truly not privileged, they should

24  have been produced a year and a half ago, if not two years

25  ago.

 1          So I think that you know, they are doing precisely

 2    what the Ninth Circuit has said is not proper.  Number one, a

 3    belated waiver, and number two, extremely limited one,

 4    because they only want to show the jury and the court a very

 5    small fraction of what those communications are.

 6          THE COURT:  So, Counsel, I guess the question to

 7    you is would you be willing to waive entirely?

 8          MR. NOLAN:  Your Honor, the answer is no because of

 9    the breadth of the waiver.  What this has been is a history

10    of negotiations back and forth where we said to Mattel we are

11    going to produce, you know, the factual exchange of

12    e-mails --

13          THE COURT:  But the bottom line is it wasn't

14    produced and provided.

15          MR. NOLAN:  Right.  But this is a redo argument of

16    what we had the day that Victoria O'Connor was on the stand.

17    You indicated on the record -- you went back and looked at

18    the arguments that had been had the previous Monday with

19    respect to factual assertions --

20          THE COURT:  This is a factual assertion.

21          MR. NOLAN:  It is.  It doesn't constitute a waiver

22    of anything.  It's a factual assertion made from Carter

23    Bryant --

24          THE COURT:  But the e-mail speaks to an attorney

25    opining that the drawings are made outside the scope of

1   employment.

2           MR. NOLAN:  Your Honor, but this is Ann Wang, who

3   says I spoke with -- I'm sorry.  This is David Rosembaum

4   saying I spoke with Carter's lawyer and e-mailed her a copy

5   of the draft.  And he goes on.  And she said that she has

6   reviewed the chronology of the creation of this design and is

7   satisfied that Carter created this outside the scope of his

8   employment at Mattel.

9           It's simply a factual recitation as to chronology

10  of dates.  In other words, that he did it before he went to

11  work at Mattel.  That's simply the factual recitation that is

12  being made.

13          MR. ZELLER:  If I may interject --

14          MR. NOLAN:  May I go on?  I'm sorry.

15          She says she understands the concerns here.

16  Apparently he conceived of this product in 1998.  So I

17  recommend that your patent attorneys review this project as

18  soon as possible to avoid any time limitations in the patent

19  law.

20          So she is saying that it was done in 1998.  That's

21  a factual assertion as to evidence that's going to come into

22  this case.

23          MR. ZELLER:  MGA is on the horns of a dilemma at

24  this point.  Number one, if, as Mr. Nolan now represents

25  years into the litigation, that e-mail is not entirely

1    privileged, well, then they were in violation of a court

2    order, and specifically the January 25, 2007, order of Judge

3    Infante that the Court is now, of course, very familiar with,

4    in which all such documents were ordered produced long ago.

5            So either they have violated that court's order or

6    the court's order, or number two, they are at this point

7    revealing privileged communications.  Those are the only

8    alternatives at this point.

9            And in either case, it's either a complete

10   wholesale waiver --

11           THE COURT:  Let me stop you there.  Why wasn't this

12   produced if this is not privileged?

13           MR. NOLAN:  At the time of the production and the

14   time that this issue came up, and I wasn't personally

15   involved --

16           THE COURT:  I know that.  You are unfortunately

17   held responsible with prior counsel.

18           MR. NOLAN:  Mattel has taken the position in

19   various privilege assertions that they were making that the

20   factual recitations would not be disclosed because it would

21   be considered a waiver of the privilege.

22           We offered a scenario where both sides could work

23   out an exchange where the factual assertions would be

24   exchanged -- at the very time we were also working on the

25   investigative report.  That whole issue.

```
 1              THE COURT:  I understand.
 2              MR. NOLAN:  So then what happened, your Honor, is
 3   both of us made a motion to Judge Infante.  We asked for a
 4   disclosure of the factual assertions containing --
 5              THE COURT:  When was this disclosed?
 6              MR. NOLAN:  Oh, we had these arguments just a week
 7   ago just before Victoria O'Connor.
 8              MR. ZELLER:  We have never had these documents,
 9   your Honor, until the midst of trial.  And that, I think, is
10   undisputed.
11              THE COURT:  You may continue to examine on areas
12   that have been brought up.  I'm not going to let the document
13   itself in.  But you can certainly -- Mr. Price did elicit
14   that there was an e-mail that he relied upon related to the
15   chronology.  And I'll permit you to examine on that.  As far
16   as the document itself, given the totality of the
17   circumstances here, I'm going to sustain objection to the
18   admission of the document.  But you can ask about the e-mail
19   and the chronology that he received.
20              MR. ZELLER:  And just so, if I may, your Honor, to
21   the extent he starts going into those communications that we
22   were not allowed to take discovery on, which also occurred at
23   the deposition, so it wasn't just the documents we were
24   denied, we were also denied the opportunity to cross-examine
25   Mr. Larian about these very same --
```

1          THE COURT:  And you're going to have an opportunity

2     to cross-examine when Mr. Price stands back up.

3          MR. PRICE:  And I'm not going to make any more

4     objections on this.  They are reserved.

5          THE COURT:  Very well.  It's understood.  The

6     document is not in.

7          MR. NOLAN:  I understand.

8          THE COURT:  Very well.

9          **(CONCLUSION OF SIDEBAR CONFERENCE.)**

10         MR. NOLAN:  Your Honor, I apologize.  Mr. Larian

11    went to the restroom.

12         THE COURT:  There's no need to apologize about

13    that.

14         And just for the record, we're going to be ending

15    in about 10 minutes because we have a juror who has a car

16    issue.  And we don't want to have any tickets.

17         Mr. Nolan.

18         MR. NOLAN:  Thank you.

19    **Q.**  Mr. Larian, before signing the consulting agreement with

20    Carter Bryant on October 4th, had you had conversations with

21    Victoria O'Connor?

22    **A.**  I did.

23    **Q.**  Did Ms. O'Connor tell you anything about a chronology of

24    when the drawings were done?

25    **A.**  She did.

1  **Q.**   Based on what Ms. O'Connor advised you, did you go

2  forward and sign the agreement?

3  **A.**   I did.

4  **Q.**   When you signed the consulting agreement with

5  Mr. Bryant, what was your belief and understanding as to when

6  Carter Bryant did the concept drawings for Bratz?

7  **A.**   In 1998 in Missouri, when he was living with his

8  parents.

9  **Q.**   If you had believed that he had done these drawings, the

10  master drawings while at Mattel, would you have ever signed

11  the contract?

12  **A.**   I would not have signed it if he had done it at Mattel,

13  no.

14  **Q.**   Would you have ever risked millions of dollars to

15  develop Bratz?

16  **A.**   No, I would not.

17  **Q.**   By the way, after you released Bratz, did you ever

18  receive a letter from Mattel directly or through their

19  lawyers saying words to the effect, hey, Bratz is a name that

20  was proprietary to Mattel?  Did you ever receive such a

21  letter?

22  **A.**   I did not.

23  **Q.**   Did you ever receive a letter from anybody at Mattel or

24  their lawyers, any law firm, saying gee, the pose of one of

25  the doll drawings, Chloe, the pose is similar to Toon Teens?

1        MR. PRICE:  Object.

2        THE COURT:  Sustained.

3   **Q.**   BY MR. NOLAN:  Had you ever heard of Toon Teens before

4   this litigation?

5   **A.**   I had not.

6   **Q.**   Had you ever heard that Mattel was considering the name

7   of Bratz for any project?

8   **A.**   No.

9   **Q.**   Did Carter Bryant ever tell you any information

10  regarding product lines at Mattel?

11  **A.**   No, never.

12  **Q.**   Let me turn to 16789.  Do you have it?

13  **A.**   I do.

14  **Q.**   Do you recognize it?

15  **A.**   Yes, I do.

16  **Q.**   And what is it?

17  **A.**   It's an e-mail dated at the bottom, starts as an e-mail

18  on October 5, 2000, at 11:32 A.M. from me to Carter Bryant,

19  copy to Paula Treantafelles and Victoria O'Connor.

20        MR. NOLAN:  We'd offer Exhibit 16789.

21        THE COURT:  It's already in evidence, Counsel.

22        MR. NOLAN:  I apologize.  Can we have it up?

23  **Q.**   Mr. Larian, when you signed the consulting agreement

24  with Carter Bryant on October 4th, did you have an

25  understanding as to whether or not Carter Bryant was going to

1    resign that very day?

2    **A.**    I did.

3    **Q.**    Tell the jury what your understanding was.

4    **A.**    I told him that once his contract is signed, he needs to

5    leave Mattel and work full time on Bratz.

6    **Q.**    Now, in this e-mail that you sent to Mr. Bryant on

7    October 5th, 2000, at 11:32 A.M., that is the day after

8    you've signed the consulting agreement with Carter Bryant;

9    right?

10   **A.**    It is.

11   **Q.**    In fact, it's the very next morning.

12   **A.**    It is.

13   **Q.**    And you say:  Carter, now that we have the agreement in

14   place, we need you and Paula to focus 200 percent on getting

15   this done.  Think different.  Think the fashion.  Think and

16   design the accessories.  Think about the commercial.  Think

17   about the New York showroom presentation.  We are thinking a

18   catwalk.  Think about all the royalty you are going to make.

19           "Carter, this is your big break in business life.

20   I have put my whole resources, money, people, development,

21   et cetera, on this to make your dream happen because I

22   believe in young people's dreams.  Now it is up to you.  You

23   need to put 16 hours a day starting now on this and nothing

24   else.  That is the only way it will happen.  Let's do it.

25   Isaac."

1          Is that what you wrote to Carter Bryant?

2  **A.**   I did.

3  **Q.**   When you wrote to Carter Bryant on October 5th and told

4  him you wanted him to work 16 hours a day, did you believe

5  that Carter Bryant had already resigned from Mattel?

6  **A.**   I believed that Carter Bryant had followed my

7  instructions, resigned, and left Mattel on October 4, 2000,

8  after he signed the agreement.

9  **Q.**   Do you know what, if anything, Carter Bryant did between

10 the day of October 4, 2000, to October 20th of 2000?

11 **A.**   What do you mean anyway?

12 **Q.**   Meaning do you know whether or not he was doing any work

13 at MGA?

14 **A.**   I know he was not doing any work at MGA.   There was

15 nothing to be done at MGA.

16 **Q.**   Were you expecting him to be working on fashions and

17 other things for the Bratz dolls?

18 **A.**   I did.

19 **Q.**   Did you know that he was working at Mattel during the

20 two-week period of time of October 4th through October 19th?

21 **A.**   I did not.

22 **Q.**   Did you know that Carter Bryant gave two weeks' notice

23 to Mattel?

24 **A.**   I did not until Mattel filed the lawsuit against Carter

25 Bryant.

1  Q.   Would you have ever sent an e-mail suggesting to Carter

2  Bryant that he work 16 hours a day on Bratz development if he

3  was still working at Mattel?

4  A.   Absolutely not.

5           THE COURT:  Now would be a good time.  Very well.

6           I'll excuse the jury for this evening.  I'll see

7  you at 9:00 tomorrow morning.

8           **(WHEREUPON THE JURY WITHDRAWS.)**

9           THE COURT:  Please be seated.  Is there anything

10  further from counsel at this time?

11           MR. NOLAN:  No, your Honor.  Just maybe a lineup

12  for tomorrow.

13           MR. QUINN:  You'll recall, we have that journalist

14  that we promised we'd put on tomorrow at 9:00 A.M.,

15  Mr. Weiss.

16           THE COURT:  Very well.

17           MR. QUINN:  And we'll be continuing with

18  Mr. Larian, and then Rachel Harris and Mr. Armstrong, and

19  then I guess there's an issue we would like to discuss, and

20  perhaps bring up with the Court about Mr. Menz, the expert

21  regarding Evidence Eliminator, and then it would be Carter

22  Bryant.

23           MR. ZELLER:  And I think in terms of the -- our

24  understanding of Mr. Menz's testimony in light of what the

25  Court was saying earlier is that he would be considered by

1

2

3

4

5

6

7                       **C E R T I F I C A T E**

8

9

10          I hereby certify that pursuant to Title 28,

11    Section 753 United States Code, the foregoing is a true and

12    correct transcript of the stenographically reported

13    proceedings in the above matter.

14          Certified on June 10, 2008.

15

16

17    **MARK SCHWEITZER, CSR, RPR, CRR**
      Official Court Reporter
18    License No. 10514

19

20

21

22

23

24

25

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                   EASTERN DIVISION

4                      - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                      - - -

7    MATTEL, INC.,                    )
                                      )
8                   PLAINTIFF,        )
                                      )
9         VS.                         )    NO. CV 04-09049
                                      )
10   MGA ENTERTAINMENT, INC., ET. AL.,)
                                      )
11                  DEFENDANTS.       )    TRIAL DAY 11
     _____)    MORNING SESSION
12   AND CONSOLIDATED ACTIONS,        )    PAGES 2118-2225
     _____)

13

14

15       REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                 RIVERSIDE, CALIFORNIA

17              WEDNESDAY, JUNE 11, 2008

18                    9:02 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
              FEDERAL OFFICIAL COURT REPORTER
24               3470 12TH STREET, RM. 134
              RIVERSIDE, CALIFORNIA  92501
25                  951-274-0844
                WWW.THERESALANZA.COM

CERTIFIED COPY

1   DRAWINGS FOR BRATZ?

2   A     NO.

3             **MR. NOLAN:**  NOTHING FURTHER.

4             THANKS FOR YOUR TIME.

5             **THE COURT:**  YOU'RE EXCUSED, SIR.  THANK YOU VERY          09:18

6   MUCH.

7             **MR. NOLAN:**  YOUR HONOR, MAY MR. LARIAN NOW RESUME?

8             **THE COURT:**  PLEASE.

9                  **CROSS-EXAMINATION** (CONTINUED)

10  **BY MR. NOLAN:**

11  Q     GOOD MORNING.

12  A     GOOD MORNING.

13  Q     I'LL TRY TO WRAP THIS UP.  I JUST WANT TO COVER A COUPLE

14  OF POINTS THAT I DIDN'T GET TO BEFORE THE BREAK YESTERDAY.

15            WHEN WE BROKE LAST NIGHT, WE WERE TALKING ABOUT THE          09:19

16  SEPTEMBER, OCTOBER 2000 TIME PERIOD, SO I JUST WANT TO REORIENT

17  YOU IN TERMS OF TIME AND TAKE YOU BACK TO THE SEPTEMBER 1ST

18  MEETING WITH CARTER BRYANT.  ALL RIGHT?

19  A     YES.

20  Q     NOW, PHYSICALLY, WHERE WAS THAT MEETING CONDUCTED?             09:20

21  A     IN MY OFFICE.

22  Q     IN ADDITION TO THE DRAWINGS THAT YOU SAW ON THAT DAY, DID

23  MR. BRYANT BRING ANYTHING ELSE WITH HIM?

24  A     TO THE BEST OF MY RECOLLECTION, HE HAD A ROUGH DUMMY TO

25  SHOW HOW THE DOLLS -- IF THEY WERE MANUFACTURED, HOW WOULD THEY     09:20

2134

1    LOOK LIKE.

2    Q    IF I RECALL YESTERDAY, YOUR IMPRESSION OF CARTER'S CONCEPT

3    DRAWINGS WERE THAT THEY WERE A LITTLE BIT WEIRD, MAYBE LOOKED

4    LIKE AN ALIEN; CORRECT?

5    A    THEY DID.                                                    09:20

6    Q    DID YOU HAVE A REACTION OR A VIEW OR AN IMPRESSION OF THE

7    OTHER THING THAT MR. BRYANT BROUGHT TO THE MEETING?

8    A    BESIDES THE DRAWINGS AND THAT ROUGH DUMMY?

9    Q    I'M JUST FOCUSED NOW ON THE DUMMY ITSELF.

10          DID YOU HAVE A REACTION TO THE DUMMY?                     09:21

11   A    I DIDN'T LIKE IT.  I DIDN'T THINK IT LOOKED GOOD.  IT WAS

12   ABOUT -- IT WAS LIKE A ROBOT, ABOUT 18 INCHES TALL.  THAT'S ALL

13   I REMEMBER.

14   Q    FOLLOWING THAT MEETING, DID MR. BRYANT LEAVE THE DUMMY

15   DOLL AT MGA?                                                     09:21

16   A    NOT TO THE BEST OF MY RECOLLECTION, NO.

17   Q    HAVE YOU, AT ANYTIME AFTER THAT INITIAL MEETING, EVER

18   LOOKED AT THE DUMMY DOLL?

19   A    NO.

20   Q    DO YOU RECALL, AT ANYTIME LEADING UP TO THE CONTRACT        09:21

21   EXECUTION ON OCTOBER 4TH OF 2000, EVER ASKING ANYBODY WORDS TO

22   THE EFFECT, 'YOU KNOW, I WANT TO SEE THAT DUMMY DOLL THAT

23   CARTER BRYANT BROUGHT IN'?

24   A    NO.  THAT DUMMY DOLL WAS IRRELEVANT IN MY MIND.

25   Q    WE WERE FOCUSED ON THE CONTRACT THAT YOU EXECUTED WITH      09:21

Exhibit D, Page 921

1    CARTER BRYANT, THE CONSULTING AGREEMENT.

2    A     YES.

3    Q     AND MR. PRICE ASKED YOU A COUPLE OF QUESTIONS WITH RESPECT

4    TO THIS, AND I WANT TO TURN TO --

5              MR. NOLAN:   IF I COULD HAVE EXHIBIT 15 ON THE SCREEN.    09:22

6              THIS IS ALREADY IN EVIDENCE, YOUR HONOR.

7              THE COURT:   VERY WELL.

8              MR. NOLAN:   AND I ALSO WOULD LIKE TO HAVE PLACED ON

9    THE SCREEN FOR THE JURY EXHIBIT 13621, WHICH IS THE MGA

10   PRODUCTION NUMBER.                                                 09:22

11   BY MR. NOLAN:

12   Q     SO, MR. LARIAN, IS THE SCREEN IN FRONT OF YOU WORKING?

13   A     YES.  IT'S MY EYES THAT ARE NOT WORKING.

14   Q     EXHIBIT 15 MIGHT BE IN THE BLACK BOOK, AND THEN

15   EXHIBIT 13621 MAY BE IN THE WHITE BOOK.  AND I APOLOGIZE FOR       09:23

16   YOU HAVING TO DO THIS BALANCING ACT.

17   A     EXHIBIT 15 IS IN THE WHITE BOOK.

18   Q     THEN DON'T WORRY ABOUT THE BLACK BOOK.

19             LOOK AT EXHIBIT 15.  IT'S ON THE SCREEN.

20             THESE ARE COPIES OF THE ACTUAL CONSULTING AGREEMENT;     09:23

21   CORRECT?

22   A     THEY ARE.

23             CAN YOU TELL ME WHAT'S THE OTHER EXHIBIT.

24   Q     IT'S 13621.

25             YOU RECALL MR. PRICE ASKING YOU A QUESTION ABOUT THE     09:24

1    CONSULTING AGREEMENT THAT YOU SIGNED WITH CARTER BRYANT?

2    A    YES, I DID.

3    Q    OKAY.  AND DO YOU RECALL THAT MR. PRICE WAS COMPARING THE

4    CONTRACTS AND TELLING YOU THAT THESE ARE IDENTICAL COPIES?

5    A    YES, HE DID.                                                09:25

6    Q    WHAT I WANT TO DO NOW IS TURN TO THE LAST PAGE OF BOTH OF

7    THESE CONTRACTS.

8           MR. NOLAN:  AND, YOUR HONOR, I SHOULD ALERT THE COURT

9    THAT THE REDACTION -- A CHANGE HAS BEEN MADE IN THE REDACTION.

10   THE SOCIAL SECURITY NUMBER HAS STILL BEEN REDACTED, BUT THE     09:25

11   LAST FOUR NUMBERS HAVE NOT BEEN REDACTED, FOR PURPOSES OF THIS

12   EXAMINATION.

13          THE COURT:  VERY WELL.

14   BY MR. NOLAN:

15   Q    DO YOU HAVE BOTH PAGES IN FRONT OF YOU, MR. LARIAN?        09:25

16   A    EXCEPT 13621, EVERYTHING IS REDACTED.

17   Q    OKAY.

18          (BRIEF PAUSE.)

19          LET'S SEE IF WE CAN DO THIS FROM THE SCREEN,

20   MR. LARIAN.  WE'LL TRY TO BLOW THIS UP.                         09:26

21          MR. NOLAN:  FIRST OF ALL, AARON, DO YOU MIND BLOWING

22   UP, ON THE EXHIBIT NUMBER 15, WHICH IS A BRYANT PRODUCTION, THE

23   SIGNATURE BLOCKS ONLY.

24          AND COULD YOU ALSO DO THE SIGNATURE BLOCKS NOW ON

25   EXHIBIT 13621.                                                  09:26

BY MR. NOLAN:

Q    MR. LARIAN, DO YOU SEE THE EXHIBIT ON THE LEFT-HAND SIDE, THE NUMBERS 6324?

A    YES, I DO.

Q    AND CARTER BRYANT'S SIGNATURE?

A    YES, I DO.

Q    SIR, DOES IT APPEAR TO YOU THAT THOSE ARE IDENTICAL SIGNATURES AND NUMBERS?

A    WELL, THE SIX ON THE ONE ON THE RIGHT IS TOUCHING THE LINE ON THE BOTTOM.  632 ON THE FOUR, THE LINE FOUR, IS GOING THROUGH THE LINE, THE HORIZONTAL LINE, WHERE IT SAYS "SOCIAL SECURITY NUMBER."

Q    NOW, LET'S GO TO YOUR SIGNATURE BLOCK ON THESE DOCUMENTS.

     AND I THINK I'M GIVING YOU A COMPLIMENT BY SAYING THIS IS YOUR SIGNATURE.

     THIS SCRIBBLE, THAT IS YOUR NAME; RIGHT?

A    THAT IS MY SIGNATURE.

Q    MINE'S NOT MUCH BETTER, AND NO OFFENSE IS INTENDED.

     BUT WHAT I DO WANT YOU TO FOCUS ON IS THAT SIGNATURE ON THE LEFT-HAND SIDE, WHICH IS THE SIGNATURE FROM THE BRYANT EXHIBIT.  DO YOU SEE YOUR NAME AND THE LINE?

A    YES, I DO.

Q    AND IF YOU LOOK AT THE MGA COPY OF THE EXHIBIT, IS THAT SIGNATURE IDENTICAL TO THE ONE THAT'S SHOWN ON THE BRYANT EXHIBIT?

09:26

09:27

09:27

09:28

09:28

2138

1    A    NO.   BECAUSE ON THE ONE ON THE RIGHT, IT JUST KEEPS

2    CONTINUING, AND THE "E" IS NOT THE SAME, NO.

3    Q    BY THE WAY, DID YOU EVER ASK ANYBODY TO WHITE OUT THE LAST

4    TAIL OF YOUR SIGNATURE?

5    A    I DID NOT.                                                    09:28

6    Q    SIR, DO YOU HAVE A RECOLLECTION OF WHETHER OR NOT YOU

7    REEXECUTED THE CONSULTING AGREEMENT BETWEEN CARTER BRYANT AND

8    AFFIXED YOUR ORIGINAL SIGNATURE ON A DOCUMENT?

9    A    YES, WE DID.

10   Q    GO TO PARAGRAPH 5, PAGE 5 OF THE DOCUMENT -- PARAGRAPH 5.    09:29

11        THIS IS IN THE CONTRACT THAT WAS EXECUTED ON

12   OCTOBER 4TH.

13        YOU SEE "WARRANTIES AND INDEMNITIES"?

14   A    YES, I DO.

15   Q    AND YOU SEE WHERE IT SAYS, "BRYANT REPRESENTS, WARRANTS,     09:29

16   AND AGREES THAT, A, HE HAS THE RIGHT AND IS FREE TO EXECUTE

17   THIS AGREEMENT, TO GRANT THE RIGHTS GRANTED BY HIM TO MGA

18   HEREUNDER AND TO PERFORM EACH AND EVERY TERM AND PROVISION

19   HEREOF; B) NEITHER THE EXECUTION AND DELIVERY OF THIS

20   AGREEMENT, NOR THE PERFORMANCE BY BRYANT OF ANY OF HIS           09:30

21   OBLIGATIONS HEREUNDER WILL CONSTITUTE A VIOLATION, BREACH, OR

22   DEFAULT UNDER ANY AGREEMENT, ARRANGEMENT, OR UNDERSTANDING, OR

23   ANY OTHER RESTRICTION OF ANY KIND TO WHICH BRYANT IS A PARTY OR

24   BY WHICH BRYANT IS BOUND; C) THE BRYANT WORK PRODUCT SHALL BE

25   FREE OF ALL LIENS..."                                            09:30

1        BY THE WAY, THE "BRYANT WORK PRODUCT," DO YOU KNOW

2   WHAT IT REFERS TO?

3   A    THE DRAWINGS.

4   Q    "...SHALL BE FREE OF ALL LIENS AND ENCUMBRANCES, AND THERE

5   WILL BE NO CLAIMS, DEMANDS, OR ACTIONS PENDING OR THREATENED        09:30

6   WITH RESPECT THERETO, AND THAT THE BRYANT WORK PRODUCT IS

7   ORIGINAL AND NO PART THEREOF INFRINGES OR SHALL INFRINGE UPON

8   ANY COMMON LAW OR STATUTORY RIGHTS OR INTELLECTUAL PROPERTY

9   RIGHTS OF ANY THIRD PARTY, INCLUDING, WITHOUT LIMITATION,

10  CONTRACTUAL RIGHTS, PATENTS, COPYRIGHTS, MASS WORK RIGHTS,         09:30

11  TRADE SECRETS, RIGHTS OF PRIVACY, AND OTHER INTELLECTUAL

12  PROPERTY RIGHTS; D) HE..."

13       IS THAT REFERRING TO CARTER BRYANT?

14  A    YES, SIR.

15  Q    "HE SHALL COMPLY WITH ALL APPLICABLE LAWS AND REGULATIONS     09:31

16  IN FORCE DURING THE TERM OF THIS AGREEMENT WITH RESPECT TO THE

17  SERVICES TO BE RENDERED HEREUNDER; AND E) HE SHALL INDEMNIFY

18  AND HOLD MGA HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS,

19  LOSSES, COSTS, JUDGMENTS, SETTLEMENTS, DAMAGES, AND EXPENSES,

20  INCLUDING REASONABLE COUNSEL FEES, ARISING FROM ANY BREACH BY      09:31

21  HIM OF ANY OF THE WARRANTIES, REPRESENTATIONS, AND AGREEMENTS

22  MADE BY HIM HEREUNDER."

23       WERE THOSE PROVISIONS IN THE CONSULTING AGREEMENT IN

24  THE AGREEMENT AT THE TIME YOU SIGNED THEM ON OCTOBER 4TH?

25  A    YES.                                                          09:31

| | |
|---|---|
| 1 | Q    I WANT TO MOVE TO ANOTHER SUBJECT. |
| 2 | DURING THE EXAMINATION WITH MR. PRICE, HE PUT IN |
| 3 | FRONT OF YOU EXHIBIT 12892 [SIC].  THIS MAY BE IN THE BLACK |
| 4 | BINDER. |
| 5 | **MR. NOLAN:**  THIS IS IN EVIDENCE, YOUR HONOR. |
| 6 | **THE COURT:**  VERY WELL. |
| 7 | YOU MAY PUBLISH IT. |
| 8 | **THE WITNESS:**  CAN YOU GIVE ME THAT NUMBER AGAIN. |
| 9 | **BY MR. NOLAN:** |
| 10 | Q    12892 [SIC]. |
| 11 | I APOLOGIZE.  IT'S 12842. |
| 12 | DO YOU HAVE THAT? |
| 13 | A    YES, I DO. |
| 14 | Q    NOW, DO YOU RECALL MR. PRICE DIRECTING YOUR ATTENTION TO |
| 15 | THE OCTOBER 2000, FOR LEGAL PURPOSES, STATEMENTS? |
| 16 | A    I DO. |
| 17 | Q    THOSE ARE YOUR WORDS; YES? |
| 18 | A    YES, THEY ARE. |
| 19 | Q    AND YOU WERE RESPONDING TO CAYMOHR@AOL.COM? |
| 20 | A    YES. |
| 21 | Q    I WANT TO FOCUS YOUR ATTENTION FOR A MOMENT TO THE BOTTOM |
| 22 | PARAGRAPH.  IT SAYS, "HI, ISAAC.  HERE'S THE PRESENTATION FOR |
| 23 | FOX." |
| 24 | JUST REMIND US; "FOX" WAS THE FOX PRODUCTION COMPANY? |
| 25 | A    THE 20TH CENTURY FOX. |

09:32
09:32
09:33
09:33
09:33

1   Q    THEY WERE GOING TO DO A COMMERCIAL OR A MOVIE?

2   A    THEY WERE CONSIDERING TO DO A MOVIE FOR BRATZ, YES.

3   Q    AND I FINISHED IT FROM HERE:  "ISAAC, I'M CONCERNED YOU

4   CHANGED THE BRATZ INTRO DATE TO OCTOBER 2000" -- I ASSUME IT'S

5   2000, NOT 200 -- "DO YOU WANT TO KEEP THAT OR NOT?"                09:33

6        AND YOUR RESPONSE WAS, "OCTOBER 2000, FOR LEGAL

7   PURPOSES."

8   A    THAT'S CORRECT.

9   Q    I WANT TO SHOW YOU A DOCUMENT THAT MR. PRICE DID NOT SHOW

10  YOU, WHICH IS THE FOX PRESENTATION THAT'S BEING REFERENCED        09:34

11  HERE.

12       IF YOU COULD TURN IN THE WHITE BOOK TO 16914.

13  A    I HAVE IT.

14  Q    DO YOU HAVE 16914 IN FRONT OF YOU?

15  A    YES.                                                         09:35

16  Q    DO YOU SEE THAT THIS IS AN E-MAIL?

17       DO YOU HAVE THAT IN FRONT OF YOU?

18  A    I DO.

19  Q    AND DO YOU RECOGNIZE THIS DOCUMENT?

20  A    YES.                                                         09:36

21  Q    THIS IS AN E-MAIL SENT FROM YOU TO WHOM ELSE?

22  A    FABIENNE -- AND I DON'T KNOW HOW TO PRONOUNCE THE LAST

23  NAME.  AND RICARDO CRUZ.

24  Q    CHONAVEL, C-H-O-N-A-V-E-L.

25       AND RICARDO CRUZ?                                            09:36

2142

1   A    YES.

2   Q    YOU SEE IT SAYS, "ATTACHMENTS:  BRATZ FACTS DOCUMENT"?

3   A    YES.

4   Q    WILL YOU TURN TO THE ATTACHMENT THAT SAYS, "BRATZ FACTS."

5        DO YOU RECOGNIZE THAT?                                    09:36

6   A    YES.

7           **MR. NOLAN:**  YOUR HONOR, WE WOULD OFFER EXHIBIT 16914.

8           **MR. PRICE:**  OBJECTION.  HEARSAY AND IRRELEVANT.

9        PERHAPS MR. NOLAN CAN POINT US TO A PARTICULAR --

10          **THE COURT:**  COUNSEL, WHY DON'T YOU CONSULT.        09:36

11          **MR. NOLAN:**  YOUR HONOR, WE'RE GOING TO REDACT, BY

12   AGREEMENT, EVERYTHING THAT IS ON THIS DOCUMENT, "BRATZ FACTS,"

13   STARTING WITH, "WHO ARE THE BRATZ?"  BUT WE'LL KEEP IN THE

14   FIRST PARAGRAPH.

15          **THE COURT:**  MR. PRICE, IS THAT ACCEPTABLE?         09:37

16          **MR. PRICE:**  YES.

17          **THE COURT:**  BY STIPULATION, THE DOCUMENT IS ADMITTED

18   AS REDACTED.  THIS IS 16914.

19   **BY MR. NOLAN:**

20   Q    SO THIS IS THE E-MAIL THAT YOU SENT; CORRECT?            09:37

21   A    YES.

22   Q    JUST TO PUT IT IN PERSPECTIVE, LOOK AT 12842.  THIS IS THE

23   EXHIBIT THAT MR. PRICE SHOWED YOU.

24        YOU SEE THE PROXIMITY OF THE DATES?

25   A    YES.                                                     09:38

```
 1   Q    DO YOU ALSO SEE THAT RICARDO CRUZ IS COPIED ON BOTH OF

 2   THESE E-MAILS, AS WELL AS FABIENNE CHONAVEL?

 3   A    YES.

 4   Q    NOW, LET'S JUST GO TO THE SECOND PAGE ON THE EXHIBIT THAT

 5   WAS NOT SHOWN TO YOU BEFORE.  THIS IS WHAT YOU WERE                    09:38

 6   REFERRING TO.

 7          DO YOU SEE THIS, SIR?

 8   A    I DO.

 9   Q    NOW, THIS DOCUMENT SAYS, "TAKING THE TOY WORLD BY SURPRISE

10   (LIKE, TOTALLY), FOUR BRATZ DOLLS, CLOE, SASHA, JADE, AND             09:38

11   YASMIN, ALSO KNOWN AS THE BRATZ PACK, WERE LAUNCHED AT TOY FAIR

12   2001."

13          DO YOU SEE THAT?

14   A    I DO.

15   Q    NOW, YOU MADE A CHANGE TO THAT DATE; CORRECT?                    09:38

16   A    I DID.

17   Q    CAN YOU TELL THE JURY WHETHER OR NOT YOU EXTENDED THE DATE

18   INTO THE FUTURE BY YOUR CORRECTION, OR DID YOU ACTUALLY BRING

19   THE DATE TO AN EARLIER DATE?

20   A    I BROUGHT IT TO OCTOBER 2000.  THAT'S WHEN WE SIGNED THE         09:39

21   CONTRACT WITH CARTER BRYANT.

22   Q    DO YOU HAVE ANY REASON, MR. LARIAN, TO -- I MEAN, IF YOU

23   WERE TRYING TO CONCEAL THE DATE OF THE INTRODUCTION OF BRATZ,

24   DO YOU HAVE ANY EXPLANATION AS TO WHY YOU WOULD HAVE MOVED THE

25   DATE TO AN EARLIER DATE, IN OCTOBER OF 2000?                          09:39
```

```
 1   A    I NEVER --
 2            MR. PRICE:  ARGUMENTATIVE AS PHRASED.
 3            MR. NOLAN:  I'LL WITHDRAW IT.
 4            THE COURT:  OVERRULED.
 5            YOU MAY ANSWER.                                09:40
 6            THE WITNESS:  I NEVER WANTED TO CONCEAL THE DRAWINGS
 7   OF CARTER BRYANT AND WHO HAS DONE IT.  NEVER.
 8   BY MR. NOLAN:
 9   Q    BY THE WAY, BY MOVING THE DATE BACK TO OCTOBER OF 2000,
10   THAT'S THE DATE OF THE EMPLOYMENT CONTRACT WITH CARTER BRYANT;  09:40
11   CORRECT?
12   A    THERE WAS NO EMPLOYMENT CONTRACT WITH CARTER BRYANT.
13   Q    I APOLOGIZE.  THE CONSULTING AGREEMENT.
14   A    THAT'S THE DATE -- OCTOBER 4, 2000 IS WHEN WE SIGNED THE
15   CONSULTING CONTRACT WITH CARTER BRYANT.                 09:40
16   Q    A COUPLE OF OTHER CLEANING-UP POINTS, JUST TO MAKE CERTAIN
17   IT'S IN THE RECORD.
18            MR. LARIAN, WHEN DID YOU FIRST OFFER FOR SALE, EITHER
19   IN THE UNITED STATES OR IN EUROPE, THE BRATZ DOLLS?
20   A    I'M NOT SURE IF I UNDERSTAND YOUR QUESTION.        09:41
21   Q    WHEN WERE THEY FIRST SOLD AT RETAIL?
22   A    THE BRATZ DOLLS WERE SOLD IN SPAIN ABOUT MAY, JUNE OF 2001
23   FIRST; AND IN THE U.S.A., TO THE BEST OF MY RECOLLECTION,
24   AUGUST OF 2001.
25   Q    WHY SPAIN?                                          09:41
```

1    A    BECAUSE BANDAI WAS OUR DISTRIBUTOR FOR SPAIN, AND THEY

2    WERE THE FIRST ONES TO PLACE AN ORDER FOR THE PRODUCT; SO THEY

3    WERE SHIPPED FIRST.

4    Q    I'D LIKE TO PLACE IN FRONT OF YOU --

5         **MR. NOLAN:**  I THINK THAT THE CLOE DOLL, YOUR HONOR,    09:42

6    IS IN EVIDENCE, THE FIRST GENERATION.  I'D LIKE TO INTRODUCE

7    THE OTHER THREE.

8         YOUR HONOR, MAY I APPROACH?

9         **THE COURT:**  YOU MAY.

10        **MR. NOLAN:**  I'M PLACING IN FRONT OF MR. LARIAN    09:43

11   EXHIBIT 1369, WHICH IS A BRATZ CLOE; EXHIBIT NUMBER 17558,

12   WHICH IS SASHA; EXHIBIT NUMBER 17551, WHICH IS JADE; AND

13   EXHIBIT 17561, YASMIN.

14        WE'RE GOING TO MARK THIS, AS FOR CLOE, AS

15   EXHIBIT 12286.  THAT'S ALREADY IN EVIDENCE.    09:44

16        **THE COURT:**  VERY WELL.

17        **MR. NOLAN:**  SO CLOE WILL BE 12286.

18   **BY MR. NOLAN:**

19   Q    NOW, MR. LARIAN, CAN YOU PLEASE IDENTIFY FOR THE JURY WHAT

20   THESE EXHIBITS ARE.    09:44

21   A    THESE ARE THE ACTUAL FIRST GENERATION BRATZ DOLLS, THE

22   FIRST FOUR THAT CAME TO THE MARKET IN 2001.

23        THIS IS YASMIN; THIS IS CLOE; THIS IS JADE; AND THIS

24   IS SASHA.

25   Q    ARE THOSE FOUR DOLLS THE FIRST GENERATION BRATZ OFFERED    09:45

```
 1   FOR RETAIL SALE IN JUNE OF 2001?

 2   A    YES, THEY ARE.

 3   Q    AND HOW CAN YOU TELL THAT, SIR?

 4   A    BECAUSE WHEN YOU MAKE A TOY AND YOU BRING IT TO THE

 5   MARKET, YOU PUT THE DATE, THE COPYRIGHT OF THAT DATE, ON THE      09:46

 6   BOTTOM.  THAT'S THE FIRST DATE THAT THEY CAME TO THE MARKET.

 7        WHEN WE COME UP WITH THE NEXT ONE, IN 2002, ON THE

 8   COPYRIGHT, IT SAYS "2002."

 9        WE COME UP WITH ANOTHER ONE IN 2003.  THE COPYRIGHT

10   SAYS "2003."                                                     09:46

11        THAT'S HOW YOU CAN TRACK WHEN THE TOY FIRST CAME TO

12   THE MARKET.

13        MR. NOLAN:  YOUR HONOR, I'M SHOWING TO MR. PRICE -- I

14   WANT TO, WITH THE COURT'S PERMISSION, APPROACH THE WITNESS WITH

15   RESPECT TO TWO OTHER BRATZ DOLLS, EXHIBIT 18512, WHICH IS A      09:46

16   CLOE MODEL, AS WELL AS EXHIBIT 18513, WHICH IS ALSO A CLOE

17   MODEL.

18        THE COURT:  YOU MAY.

19        MR. NOLAN:  WITH THE COURT'S PERMISSION, MAY WE

20   PUBLISH THIS?                                                    09:47

21        THE COURT:  YES.

22        MR. NOLAN:  FOR THE RECORD, I'VE PUBLISHED TO THE

23   JURY THE FOUR FIRST GENERATION BRATZ DOLLS.

24        THE COURT:  VERY WELL.

25        (BRIEF PAUSE.)                                              09:49
```

1          **THE WITNESS:**  I'M READY IF YOU'RE READY.

2   **BY MR. NOLAN:**

3   Q    MR. LARIAN, I'VE PLACED IN FRONT OF YOU TWO OTHER DOLLS,

4   ALL CLOE DOLLS.  THE FIRST ONE IS EXHIBIT 18512.

5          DO YOU SEE THAT?                                        09:50

6   A    YES, I DO.

7   Q    AND CAN YOU TELL THE JURY WHAT GENERATION BRATZ DOLL THIS

8   IS OF CLOE.

9   A    THIS MUST BE SECOND GENERATION, BECAUSE, AGAIN, ON THE

10  BOTTOM, IT SAYS "COPYRIGHT 2002."                             09:51

11         **MR. PRICE:**  OBJECTION AS IRRELEVANT AT THIS TIME.

12  MOVE TO STRIKE.

13         **MR. NOLAN:**  IT'S JUST WITH RESPECT TO THE BOTTOM OF

14  THE BOXES, YOUR HONOR.

15         **THE COURT:**  JUST FOR PURPOSES OF IDENTIFICATION, I'LL  09:51

16  ADMIT IT.

17         WE'RE NOT GOING TO GO MUCH BEYOND THIS, MR. NOLAN.

18         **MR. NOLAN:**  NO, NO.  YOU'RE RIGHT.

19         **THE COURT:**  OVERRULED.

20  **BY MR. NOLAN:**

21  Q    AND THEN WITH RESPECT TO 18513, THAT'S ANOTHER VERSION OF

22  CLOE?

23  A    YES.  THIS IS COPYRIGHT 2004; SO THIS MUST HAVE COME TO

24  THE MARKET IN THE YEAR 2004.

25  Q    THANK YOU.                                               09:51

1           YOU CAN MOVE THE DOLLS ASIDE FOR A MOMENT.

2           I WANT TO GO TO THE NAME "BRATZ" FOR A SECOND.

3    THERE'S BEEN A LOT OF DISCUSSION ABOUT THAT.

4           MY QUESTION IS THIS, SIR:  THERE'S BEEN A LOT OF

5    TESTIMONY IN THIS CASE WITH RESPECT TO THE ORIGIN OF THE NAME          09:52

6    "BRATZ."

7    A    YES.

8    Q    DO YOU DISPUTE IN ANY WAY THAT CARTER BRYANT HAD THE IDEA

9    OF BRATZ WHEN HE PRESENTED THE DRAWINGS TO YOU?

10   A    I DO NOT.          09:52

11   Q    AND IS IT TRUE THAT FOR SOME TIME, THE TEAM AT MGA WAS

12   CONSIDERING OTHER NAMES OTHER THAN "BRATZ"?

13   A    YES, WE WERE.

14   Q    MY QUESTION TO YOU SIR, IS, WERE YOU CONSIDERING OTHER

15   NAMES OTHER THAN "BRATZ" BECAUSE YOU WERE CONCERNED THAT          09:52

16   "BRATZ" WAS PROPRIETARY TO MATTEL?

17   A    NO.

18   Q    CAN YOU EXPLAIN TO THE JURY WHY YOU WERE CONSIDERING OTHER

19   NAMES OTHER THAN "BRATZ."

20   A    ONE OF THE CONCERNS THAT WE HAD WAS, JUST NAMING A DOLL          09:53

21   "BRATZ" AT THAT TIME WOULD HAVE A NEGATIVE CONNOTATION.  LIKE,

22   I COULD CALL MY KIDS LITTLE BRATS WHEN THEY DO SOMETHING WRONG;

23   SO THAT WAS ONE OF THE CONCERNS THAT WE HAD.

24   Q    IN ANY EVENT, AFTER CONSIDERING A HOST OF OTHER NAMES, YOU

25   DID SETTLE ON "BRATZ"; CORRECT?          09:53

1    A    WE DID.

2    Q    NOW, CAN YOU TELL THE JURY WHAT STEPS YOU HAD TO TAKE TO

3    SECURE THE RIGHTS TO "BRATZ," THE NAME ITSELF.

4    A    WE HAD -- WE CONSIDERED OTHER NAMES SUCH AS "BABEZ

5    FASHION," ANOTHER NAME, BUT AT THE END, WE SETTLED ON "BRATZ."    09:53

6    WHEN WE CAME UP WITH THE PRODUCT TO THE MARKET, NAMING THEM

7    "BRATZ," WE WERE SUED BY A COMPANY CALLED LOVIN.  AND HE SHOWED

8    US A TRADEMARK REGISTRATION THAT I BELIEVE HE OWNED THE NAME

9    "BRATZ," TO THE BEST OF MY RECOLLECTION -- I DON'T REMEMBER THE

10   EXACT DATE -- GOING BACK TO '84 OR '94, WHERE HE HAD REGISTERED    09:54

11   AND USED THE NAME "BRATZ."

12        SO WE SETTLED WITH HIM AND WE BOUGHT THE NAME "BRATZ"

13   FROM HIM.

14   Q    NOW, AFTER YOU PURCHASED THE MARK AS A RESULT OF THE

15   LAWSUIT, DID YOU ALSO HAVE ANY ISSUES IN EUROPE WITH RESPECT TO    09:54

16   A CLAIM THAT SOMEONE ELSE HAD A RIGHT TO THE NAME "BRATZ"?

17        MR. PRICE:  IRRELEVANT; ANY CLAIM.

18        THE COURT:  SUSTAINED.

19   BY MR. NOLAN:

20   Q    MR. LARIAN, CAN YOU PLEASE TELL THE JURY WHEN IS THE FIRST    09:55

21   TIME YOU EVER HEARD THAT MATTEL WAS MAKING A CLAIM THAT THE

22   "BRATZ" NAME WAS PROPRIETARY TO MATTEL.

23        MR. PRICE:  OBJECTION.  THAT MISSTATES OUR CLAIMS.

24        THE COURT:  REPHRASE, COUNSEL.

25   / / /    09:55

2150

BY MR. NOLAN:

Q    MR. LARIAN, WHEN IS THE FIRST TIME YOU EVER LEARNED THAT
MATTEL WAS CONSIDERING NAMING ONE OF ITS DOLLS "BRATS"?

A    WHEN MR. QUINN MADE HIS OPENING STATEMENT HERE; THAT WAS
THE FIRST TIME.  AND WE HAD BEEN NOW IN THE BUSINESS FROM 2001
TO 2007, ALREADY SEVEN YEARS.  AND FOR THE FIRST TIME IN THIS
COURT, I HEARD THAT AT ONE TIME THEY WERE CONSIDERING NAMING A
PRODUCT "BRATS," WITH AN "S."

Q    SO I ASSUME THAT NOBODY FROM MATTEL'S LEGAL TEAM EVER
WROTE YOU A LETTER, YOU OR MGA, SAYING, 'HEY, HOW DID YOU COME
UP WITH THE NAME "BRATZ"?  WE WERE CONSIDERING IT INTERNALLY
FOR ONE OF OUR DOLLS.'

        DID YOU EVER GET A LETTER LIKE THAT?

        MR. PRICE:  OBJECTION.  IRRELEVANT.

        THE COURT:  OVERRULED.

        THE WITNESS:  WE NEVER GOT A LETTER FROM THEM, NO.

        AND WE HAD ADVERTISED THE NAME "BRATZ" IN THE
TOY MARKET --

        THE COURT:  YOU'VE ANSWERED THE QUESTION.

        NEXT QUESTION.

BY MR. NOLAN:

Q    MR. LARIAN, THERE WAS TESTIMONY WITH RESPECT TO TOON TEENS
INTRODUCED IN THE BEGINNING OF THIS CASE, AND MY QUESTION TO
YOU IS, PRIOR TO THIS LITIGATION, HAD YOU EVER HEARD OF
TOON TEENS?

09:55
09:56
09:56
09:56
09:57

WEDNESDAY, JUNE 11, 2008          TRIAL DAY 11, MORNING SESSION

Exhibit D, Page 937

1   A    NO, I HAVE NOT.  THE ONLY TIME I HEARD ABOUT SOMETHING

2   CALLED "TOON TEENS" WAS WHEN I READ THE WALL STREET JOURNAL

3   ARTICLE IN 2003.

4   Q    NOW, MY QUESTION TO YOU, SIR, IS, WHEN WAS THE FIRST TIME

5   YOU HEARD A CLAIM THAT THE POSE FOR CLOE IN THE DRAWINGS OF        09:57

6   CARTER BRYANT WERE SIMILAR TO THE POSES FOR THE TOON TEEN

7   DOLLS?

8        MR. PRICE:  OBJECTION.  THAT'S IRRELEVANT.

9        MR. NOLAN:  YOUR HONOR, MAY WE APPROACH AND HAVE A

10   QUICK SIDE-BAR?                                                  09:57

11        THE COURT:  YOU MAY.

12        (WHEREUPON, THE FOLLOWING PROCEEDINGS

13        WERE HELD AT SIDE-BAR:)

14        THE COURT:  COUNSEL, I TEND TO AGREE, BUT I'LL HEAR

15   YOUR EXPLANATION.                                                09:58

16        YESTERDAY THERE WAS A SIMILAR OBJECTION MADE, AND IT

17   WAS SUSTAINED.

18        MR. NOLAN:  I'M JUST CONFUSED BY THIS, BECAUSE I WANT

19   TO MAKE CERTAIN.  I UNDERSTOOD THE RECORD TO BE THAT THEY

20   INTRODUCED EVIDENCE, AS WEAK AS IT MAY BE, THAT THE POSE         09:58

21   BETWEEN LILY MARTINEZ'S TOON TEENS AND THE HAND POSES -- AND

22   THEY ELICITED TESTIMONY FROM IVY ROSS AND LILY MARTINEZ.  AND

23   MY POINT --

24        THE COURT:  BUT THE BASIS FOR LETTING THAT IN -- THE

25   ONLY REASON THAT COMES IN WAS FOR THE TIMING ISSUE, IN TERMS OF  09:58

2152

1   WHEN CARTER BRYANT GOT THE IDEA FOR BRATZ.  AND MATTEL, AS WEAK

2   AS IT MAY BE, IS ARGUING THAT THAT WAS THE INSPIRATION.  JUST

3   LIKE YOU HAVE THE SEVENTEEN MAGAZINE, THEY HAVE TOON TEENS.

4           WHETHER OR NOT THERE'S A COPYRIGHT CLAIM, WHETHER OR

5   NOT MR. LARIAN MAY HAVE KNOWN OF IT, THAT REALLY IS IRRELEVANT.   09:59

6           I'LL GIVE YOU SOME LEEWAY ON THE "BRATZ" NAME, JUST

7   BECAUSE OF THE WAY IT'S PLAYING OUT.  BUT ON THIS, I DON'T SEE

8   THE RELEVANCE OF THIS AT ALL.  I AGREE WITH MR. PRICE.

9           MR. NOLAN:  I DO BELIEVE, YOUR HONOR, IT GOES TO THE

10  STATUTE OF LIMITATIONS ISSUE, BECAUSE THEY KNEW ABOUT THE       09:59

11  "BRATZ" NAME.

12          THE COURT:  THAT'S NOT THE CLAIM IN THIS CASE, THOUGH

13  THIS GETS BACK TO THIS WHOLE ISSUE I'VE ALREADY REJECTED.

14          MR. NOLAN:  I'M NOT REARGUING, BUT I JUST WANT TO

15  MAKE A POINT THAT AS I UNDERSTAND THE COURT'S RULING WITH       09:59

16  RESPECT TO THE CONTRACT CLAIMS, WHICH IS PART OF THIS CASE,

17  OBVIOUSLY TORTIOUS INTERFERENCE WITH THE CONTRACT, AND

18  MISAPPROPRIATION.

19          THE COURT:  WHAT DOES HIS KNOWLEDGE OF THIS HAVE TO

20  DO --                                                           10:00

21          MR. NOLAN:  MY POINT IS, I WANT TO ESTABLISH THAT

22  MATTEL NEVER REACTED BY A LETTER SAYING BRATZ OR --

23          MR. PRICE:  THE POSE LOOKS JUST LIKE TOON TEENS.

24  THEY NEVER BOUGHT THAT.  AND THE COURT HAS RULED THOSE CLAIMS

25  ARE TIME-BARRED, UNLESS CONCEALED.  AND, AGAIN, THAT'S WHAT I'M  10:00

WEDNESDAY, JUNE 11, 2008            TRIAL DAY 11, MORNING SESSION

Exhibit D - Page 939

1    TRYING TO --

2              THE COURT:  THOSE CLAIMS AREN'T BEING BROUGHT.  THE

3    TOON TEENS CLAIMS IS NOT BEING BROUGHT.

4              MR. NOLAN:  BUT IT IS, YOUR HONOR, BEING BROUGHT,

5    BECAUSE YOU'LL REMEMBER, THEY ARE CONTENDING WE TOOK

6    PROPRIETARY INFORMATION FROM MATTEL.  THAT'S PART OF THE CLAIM.

7              THE COURT:  YES.

8              MR. NOLAN:  THAT'S WHY TOON TEENS --

9              THE COURT:  BUT THEN THIS ISN'T PROPRIETARY

10   INFORMATION.  THEY ARE PRODUCING IT ONLY RELEVANT OF TOON TEENS

11   EVER SINCE MR. QUINN FAMOUSLY STOOD UP IN MY COURTROOM STATING

12   THE TIMING OF THE DEVELOPMENT OF BRATZ BY CARTER BRYANT.

13             MR. NOLAN:  I, FRANKLY, DO NOT BELIEVE THAT'S HOW THE

14   JURY UNDERSTANDS THAT ISSUE, YOUR HONOR, BECAUSE -- AND THE

15   TESTIMONIAL ABOUT THE POSES AND HOW UNIQUE IT WAS, THAT'S --

16             THE COURT:  JUST LIKE HER TESTIMONY ABOUT THE

17   SIMILARITIES IN THOSE ADS IN SEVENTEEN MAGAZINE AND THE POSES.

18   I'VE LET ALL OF THAT IN ON BOTH SIDES, AND I'LL CONTINUE TO LET

19   THAT IN.  I THINK THAT'S ALL RELEVANT, BECAUSE IT GOES TO THE

20   CIRCUMSTANTIAL EVIDENCE OF WHEN CARTER BRYANT DEVELOPED THESE

21   DRAWINGS OR THE IDEA OR THE NAME.

22             MR. NOLAN:  THE CONTRACT CLAIM THAT IS ALIVE IN THIS

23   CASE IS THAT CARTER BRYANT BREACHED DUTY OF LOYALTY, NOT ONLY

24   IN MEETING --

25             THE COURT:  BOTH IN HIS DUTY OF LOYALTY AND IN

10:00
10:00
10:01
10:01
10:01

2154

1   FIDUCIARY DUTY.

2        MR. NOLAN:   BUT ALSO THEIR CLAIM, THE CHART, THE

3   RECEIVING CHART, TO SHOW -- AND THEY ELICITED TESTIMONY ABOUT

4   HOW CARTER BRYANT COULD HAVE COME OVER AND LOOKED AT THE TOON

5   TEENS DRAWINGS AND THEN HE SAID, 'WOW, THAT'S COOL.'  THEY COME          10:01

6   OUT.  AND THEN WE HAVE THE TESTIMONY THAT --

7        MR. PRICE:   THE EYES LOOK JUST LIKE THE EYES.

8        THE COURT:   RIGHT.

9        MR. NOLAN:   THAT IS ALL ABOUT PROPRIETARY INFORMATION

10  THAT THEY CONTEND THAT CARTER BRYANT VIOLATED.                           10:02

11       THE COURT:   THE PROPRIETARY INFORMATION, AS I

12  UNDERSTAND IT -- WHAT HE THEN ARGUES IS THAT HE WAS INSPIRED BY

13  THIS.  I TEND TO AGREE, IT'S NOT THE STRONGEST EVIDENCE IN THE

14  WORLD, BUT IT'S EVIDENCE, AND -- BUT THIS WITNESS'S KNOWLEDGE

15  OF THAT, I CAN'T SEE THE RELEVANCE.  BUT I APPRECIATE THE               10:02

16  ARGUMENT.

17       MS. AGUIAR:   I THINK WITH THAT CLARIFICATION THAT THE

18  PROPRIETARY INFORMATION THEY ARE (UNINTELLIGIBLE) WAS TAKEN

19  DOES NOT INCLUDE THE TOON TEENS DRAWINGS, THEN I THINK WE'RE

20  FINE.                                                                    10:02

21       IS THAT WHAT YOU'RE SAYING?

22       MR. QUINN:   WE'VE NEVER MAINTAINED --

23       THE COURT:   THAT'S NEVER BEEN --

24       MR. QUINN:   WE'VE NEVER MAINTAINED THAT.

25       THE COURT:   THAT'S THE BASIS OF MY UNDERSTANDING OF               10:02

Exhibit D - Page 941

2155

 1    THE RULE.

 2          **MS. AGUIAR:**  SO AS LONG AS WE'RE ALL CLEAR ON THAT,

 3    THEN WE ARE FINE.

 4          **THE COURT:**  YOU SHOULD LET HER SPEAK FIRST.

 5          **MR. NOLAN:**  I NEEDED THAT.                    10:02

 6          (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

 7          **THE COURT:**  YOU MAY PROCEED.

 8    **BY MR. NOLAN:**

 9    Q    MR. PRICE ASKED YOU QUESTIONS WITH RESPECT TO THE HISTORY

10    OF MGA, ITS EARLY HISTORY; AND YESTERDAY YOU TESTIFIED WITH    10:03

11    RESPECT TO ITS EARLY ORIGINS.  I JUST WANT TO GO BACK TO THAT

12    FOR A MOMENT.

13          CAN YOU EXPLAIN TO THE JURY WHETHER OR NOT MGA WAS

14    EVER A LICENSEE OF MATTEL PRODUCTS?

15          **MR. PRICE:**  OBJECTION.  IT'S IRRELEVANT.          10:03

16          **MR. NOLAN:**  IT GOES TO --

17          **THE COURT:**  MGA WAS A LICENSEE...

18          **MR. NOLAN:**  OF MATTEL, WITH RESPECT TO ELECTRONIC

19    PRODUCTS.

20          **THE COURT:**  WHY DON'T YOU REPHRASE.

21          IS THERE A PARTICULAR PRODUCT IN MIND, COUNSEL?      10:04

22          **MR. NOLAN:**  YES.

23          **THE COURT:**  ASK YOUR NEXT QUESTION.

24    **BY MR. NOLAN:**

25    Q    YOU'RE FAMILIAR WITH A HAND-HELD ELECTRONIC GAME FOR    10:04

1    BARBIE?

2    A    YES.

3    Q    WHO MANUFACTURED THAT GAME?

4    A    MGA DID, IN '96, '97.  WE WERE A LICENSEE OF MATTEL.

5         **MR. PRICE:**  MOVE TO STRIKE.  IT'S IRRELEVANT.        10:04

6         **THE COURT:**  BRIEFLY.

7         **MR. NOLAN:**  OPENING STATEMENT, WHETHER OR NOT THEY

8    WERE A SOPHISTICATED COMPANY IN WHAT THEY WERE DOING.

9         **THE COURT:**  OVERRULED.

10        BRIEFLY, COUNSEL.                                       10:04

11   **BY MR. NOLAN:**

12   Q    I'D LIKE TO SHOW YOU EXHIBIT 18508.

13        DO YOU RECOGNIZE EXHIBIT 18508?

14   A    YES, I DO.

15   Q    WHAT IS IT?                                             10:05

16   A    IT'S A BARBIE HAND-HELD GAME THAT MGA MADE UNDER LICENSE

17   FROM MATTEL IN 1997 BECAUSE THEY DIDN'T WANT TO DO IT

18   THEMSELVES.

19        **MR. NOLAN:**  YOUR HONOR, WE'D OFFER EXHIBIT 18508.

20        **THE COURT:**  OBJECTION?                              10:05

21        **MR. PRICE:**  403, RELEVANT.

22        **THE COURT:**  OVERRULED.

23        IT'S ADMITTED.

24        **THE COURT:**  AT THE END OF THIS TRIAL, I ASSUME ALL OF

25   THIS CAN GO TO TOYS-FOR-TOTS?                                10:05

1          **THE WITNESS:**  TO CHARITY.

2          **MR. NOLAN:**  MOST DEFINITELY.

3    **BY MR. NOLAN:**

4    Q    WITHOUT GOING INTO ALL THE -- IS EXHIBIT 18508, THE BARBIE

5    HAND-HELD, THE ONLY ELECTRONIC GAME THAT YOU MANUFACTURED UNDER        10:06

6    LICENSE AGREEMENT WITH MATTEL?

7    A    NO.  WE MADE --

8    Q    NO FURTHER.

9          SO YOU MADE OTHERS; RIGHT?

10   A    WE MADE TOYS FOR MATTEL, YES.        10:06

11   Q    THANK YOU.

12   A    NOT FOR MATTEL.  UNDER LICENSE FOR MATTEL.

13   Q    BUT MGA MANUFACTURED IT.

14   A    THAT'S RIGHT.  BECAUSE THEY WOULD NOT DO IT THEMSELVES.

15   Q    SO YOU HAD MANUFACTURING CAPABILITIES IN HONG KONG; IS        10:06

16   THAT RIGHT?

17   A    IN HONG KONG AND CHINA.

18   Q    MR. PRICE ASKED YOU QUESTIONS WITH RESPECT TO THE FILING

19   OF A BANKRUPTCY CLAIM BY MGA IN THE LATE 1990'S.  I JUST WANT

20   TO ASK YOU A QUESTION ABOUT THAT.        10:07

21         CAN YOU EXPLAIN, FIRST OF ALL, WHEN THE BANKRUPTCY

22   PETITION WAS FILED.

23   A    IT WAS ON MARCH 19, 1997.

24   Q    WHERE WAS THE BANKRUPTCY PETITION FILED?

25   A    IN THE BANKRUPTCY COURT IN SAN FERNANDO VALLEY,        10:07

```
 1   CALIFORNIA.  I DON'T REMEMBER THE EXACT NAME OF THE COURT.
 2   Q    AS BRIEFLY AS POSSIBLE, WITHOUT GETTING INTO THE DETAILS,
 3   CAN YOU PUT INTO CONTEXT THE CIRCUMSTANCES WHICH LED TO THE
 4   FILING OF THE BANKRUPTCY AND WHAT HAPPENED.
 5   A    WE WERE SET UP FOR AN INSURANCE SCAM IN TEXAS, MCALLEN,      10:07
 6   TEXAS, WHERE SOMEBODY HAD CLAIMED THAT, BELIEVE IT OR NOT, MY
 7   BROTHER HAD SPIT ON THE FLOOR AND HAD DEFAMED HIM; SO THEY HAD
 8   FILED A LAWSUIT.  AND WE WERE NEVER GIVEN NOTICE OF GOING TO
 9   COURT FOR THE -- I THINK A HEARING OR SOMETHING.  AND THEN,
10   THEY -- ONE DAY WE GOT A JUDGMENT FOR $6.7 MILLION FOR           10:08
11   DEFAMATION.
12        AND FOR MEDIATION, WE WENT TO AUSTIN, TEXAS, WHERE
13   OUR INSURANCE COMPANY WAS THERE, THE LAWYERS FOR THE OTHER
14   GENTLEMAN WERE THERE, AND I WAS THERE; AND THEY ASKED FOR A
15   SETTLEMENT OF $985,000 INSTEAD OF $6.7 MILLION.                  10:08
16        MR. PRICE:  THIS APPEARS TO BE BEYOND THE SCOPE; LACK
17   OF FOUNDATION.
18        THE COURT:  SUSTAINED.
19        LET'S ASK ANOTHER QUESTION, COUNSEL.
20   BY MR. NOLAN:                                                    10:09
21   Q    MR. PRICE ASKED YOU QUESTIONS ABOUT WHETHER OR NOT YOU
22   MADE DISTRIBUTIONS TO FAMILY MEMBERS FROM MGA.
23        DO YOU RECALL THAT?
24   A    YES.
25   Q    YESTERDAY WE TALKED ABOUT YOUR PARENTS.                     10:09
```

1          DO YOU RECALL THAT?

2    A    YES.

3    Q    NOW, IT IS TRUE THAT YOU HAVE MADE DISTRIBUTIONS TO BOTH

4    YOUR MOTHER AND YOUR FATHER; CORRECT?

5    A    I MADE DISTRIBUTION TO MY MOTHER.  MY FATHER WAS GETTING          10:09

6    OLDER IN AGE, AND THEY LIVE TOGETHER.  I MADE DISTRIBUTION TO

7    MY MOTHER.

8    Q    AND IT'S TRUE THAT YOU'VE MADE DISTRIBUTIONS ALSO TO OTHER

9    FAMILY MEMBERS; CORRECT?

10   A    YES.                                                             10:09

11   Q    I WANT TO TURN TO THE LAST SUBJECT OF THE WALL STREET

12   JOURNAL ARTICLE THAT WAS PUBLISHED IN 2003.  AND I THINK THAT

13   THE REDACTED VERSION IS EXHIBIT 1-A.  WE'VE SEEN THIS A COUPLE

14   OF TIMES, MR. LARIAN.  I FORGOT TO ASK YOU A QUICK QUESTION ON

15   THAT.                                                                 10:10

16         THERE'S A QUOTE IN HERE WITH RESPECT TO THE SORT-OF

17   DOLL CONTEST, AND I JUST WANT TO SHOW IT AGAIN SO WE KNOW WHAT

18   WE'RE TALKING ABOUT HERE.

19         IT SAYS THAT MR. BRYANT -- HE SAYS HE CHOSE

20   "MR. BRYANT'S IDEA FOR THE BRATZ OVER SEVERAL OTHERS AFTER           10:10

21   HOLDING A SORT-OF DOLL FASHION DESIGN CONTEST IN LATE 1999."

22         DO YOU SEE THAT?

23   A    I DO.

24   Q    WHEN DID YOU ACCEPT OR WHEN DID YOU CHOOSE MR. BRYANT'S

25   IDEA FOR A NEW LINE OF DOLLS?                                        10:11

1    A    IN 2000.

2    Q    WHY DID YOU TELL THE WALL STREET JOURNAL THAT YOU WERE

3    HOLDING A SORT-OF FASHION DOLL DESIGN CONTEST IN LATE 1999?

4    A    THERE WAS NO SUCH A THING IN 1999.  EITHER I MISQUOTED,

5    BECAUSE I'M KIND OF DYSLEXIC IN MY MIND, MIXING YEARS, OR SHE    10:11

6    MADE A MISTAKE; EITHER ONE OF THOSE TWO.

7    Q    DID YOU HOLD A DOLL CONTEST IN 1999?

8    A    NOT TO THE BEST OF MY RECOLLECTION, NO.

9    Q    WAS VICTORIA O'CONNOR EVEN WORKING AT MGA IN 1999?

10   A    I DON'T KNOW.  I DON'T THINK SO, BUT I DON'T KNOW EXACTLY    10:11

11   WHEN SHE STARTED WORKING AT MGA.

12   Q    WHAT ABOUT PAULA GARCIA?  WAS SHE EVEN WORKING IN 1999?

13   A    NO.  PAULA GARCIA STARTED IN APRIL OF 2000.

14   Q    DID YOU EVER MEET CARTER BRYANT IN 1999?

15   A    I DID NOT MEET CARTER BRYANT UNTIL SEPTEMBER 1, 2000, IN    10:12

16   MY OFFICE.

17   Q    YOU WERE INTERVIEWED BY TELEPHONE FOR THIS ARTICLE?

18   A    I DON'T RECALL IF IT WAS BY PHONE OR IN PERSON.

19   Q    YOU DON'T HAVE ANY RECOLLECTION OF WHETHER OR NOT YOU WERE

20   IN THE UNITED STATES OR ANYWHERE ELSE WHEN YOU WERE BEING    10:12

21   INTERVIEWED.

22   A    FOR SURE, I HAD A PORTION OF THIS INTERVIEW, OR MAYBE ALL

23   OF IT, WHEN I WAS IN HONG KONG.

24   Q    WHEN DID YOU FIRST LEARN THAT CARTER BRYANT DID NOT RESIGN

25   AND WALK OUT THE DOOR OF MATTEL ON OCTOBER 4, 2000, AFTER    10:13

1   SIGNING HIS AGREEMENT?

2   A    I THINK THE DAY, THE EVENING -- LET'S PUT IT THIS WAY; I

3   REMEMBER IT VERY CLEARLY:  THE EVENING BEFORE MATTEL SUED

4   CARTER BRYANT IN 2004.  THAT'S WHEN I WAS OUT TO DINNER WITH A

5   GENTLEMAN NAMED MICHAEL BLOCK.  I RECEIVED A CALL FROM A WALL          10:13

6   STREET JOURNAL REPORTER ON MY CELL PHONE BY THE NAME OF

7   QUEENA KIM, AND SHE TOLD ME THAT MATTEL HAD JUST LEAKED TO HER

8   A LAWSUIT THAT THEY HAD FILED AGAINST CARTER BRYANT.  AND I

9   ASKED HER, 'WHAT IS THE BASIS OF THE LAWSUIT?'  AND SHE SAID,

10  TO ME, THAT CARTER BRYANT -- THEY CLAIMED CARTER BRYANT              10:13

11  WORKED --

12          **MR. PRICE:**  YOUR HONOR, OBJECTION.

13          **THE COURT:**  SUSTAINED.

14          THE QUESTION WAS, WHEN DID YOU FIRST LEARN?

15          IT WAS A TEMPORAL QUESTION.                                  10:14

16          **MR. PRICE:**  MOVE TO STRIKE THE ANSWER.

17          **THE COURT:**  THE ANSWER IS STRICKEN.

18  **BY MR. NOLAN:**

19  Q    WHEN DID YOU FIRST LEARN THAT CARTER BRYANT HAD NOT EXITED

20  MATTEL WHEN HE SIGNED THE CONTRACT ON OCTOBER 4TH?                   10:14

21  A    THE DAY BEFORE MATTEL FILED THE LAWSUIT IN 2004 AGAINST

22  CARTER BRYANT.

23  Q    THANK YOU.

24          WHAT DID YOU DO, IF ANYTHING, AFTER YOU LEARNED OF

25  THAT LAWSUIT?                                                        10:14

2162

1   A   I PICKED UP THE PHONE AND CALLED CARTER BRYANT.

2   Q   AND WHY DID YOU DO THAT?

3   A   I WANTED TO KNOW IF WHAT THE WALL STREET JOURNAL REPORTER

4   WAS TELLING ME IS TRUE; THAT HE HAD NOT LEFT MATTEL ON

5   OCTOBER 4TH, AS HE WAS SUPPOSED TO.                             10:14

6   Q   AND WHAT DID MR. BRYANT TELL YOU?

7   A   HE TOLD ME THAT HE GAVE MATTEL A TWO-WEEKS NOTICE.

8   Q   MR. LARIAN, DO YOU RECALL EVER SEEING CARTER BRYANT IN THE

9   MGA OFFICES BETWEEN OCTOBER 4TH AND OCTOBER 19TH?

10        THE COURT:  OF WHAT YEAR, COUNSEL?                        10:15

11        MR. NOLAN:  OF 2000.

12        THE WITNESS:  I DO NOT.

13  BY MR. NOLAN:

14  Q   DO YOU HAVE ANY KNOWLEDGE OF WHAT MR. BRYANT WAS DOING

15  BETWEEN OCTOBER 4TH AND OCTOBER 19TH OF THE YEAR 2000?         10:15

16  A   I DO NOT.  NOT MUCH OF ANYTHING, IF I CAN THINK ABOUT IT.

17  Q   MR. LARIAN, WHEN YOU OFFERED A CONSULTING AGREEMENT WITH

18  CARTER BRYANT, WERE YOU ATTEMPTING TO BRIBE HIM TO LEAVE

19  MATTEL?

20  A   WAS I -- I'M SORRY.  CAN YOU ASK THAT QUESTION AGAIN.       10:15

21  Q   WHEN YOU OFFERED CARTER BRYANT A CONSULTING AGREEMENT WITH

22  MGA IN OCTOBER OF 2000, WERE YOU BRIBING CARTER BRYANT TO LEAVE

23  MATTEL WITH MATTEL DESIGNS?

24  A   ABSOLUTELY NOT.  HE WAS MAKING $5,000 A MONTH, OR --

25  SORRY -- $55,000 A YEAR AT MATTEL, AND WE OFFERED HIM --        10:16

2163

```
 1              MR. PRICE:  OBJECTION.  FOUNDATION.

 2              THE COURT:  LAY A FOUNDATION, COUNSEL.

 3     BY MR. NOLAN:

 4     Q    SO THE ANSWER TO MY QUESTION IS, NO, YOU WERE NOT

 5     ATTEMPTING TO BRIBE HIM?                                    10:16

 6     A    THE ANSWER TO YOUR QUESTION IS ABSOLUTELY NOT.

 7     Q    DO YOU KNOW HOW MUCH CARTER BRYANT WAS BEING PAID AT

 8     MATTEL?

 9     A    YES.

10     Q    HOW DO YOU KNOW THAT?                                  10:16

11     A    HE TOLD ME.

12     Q    WHAT DID HE TELL YOU HE WAS MAKING AT MATTEL?

13              MR. PRICE:  HEARSAY.  OBJECTION.

14              MR. NOLAN:  GOES TO HIS STATE OF MIND.

15              THE COURT:  ONLY FOR THE STATE OF MIND, NOT        10:17

16     NECESSARILY FOR WHAT HE ACTUALLY MADE AT MATTEL, BUT FOR WHAT

17     MR. LARIAN UNDERSTOOD HE MADE AT MATTEL.

18              THE WITNESS:  TO THE BEST OF MY RECOLLECTION, HE SAID

19     HE WAS MAKING $55,000 A YEAR, EITHER $50,000 OR $55,000 A YEAR.

20     I DON'T REMEMBER THE EXACT AMOUNT.                          10:17

21     BY MR. NOLAN:

22     Q    AND THE AMOUNT THAT YOU WERE OFFERING AGAINST ROYALTIES TO

23     BE EARNED ON THE BRATZ LINE WAS HOW MUCH A MONTH FOR

24     MR. BRYANT?

25     A    TO THE BEST OF MY RECOLLECTION, IT WAS $5,500 A MONTH FOR  10:17
```

Exhibit D, Page 950

```
 1   THE FIRST THREE MONTHS, AND IT WENT DOWN TO $5,000 AFTER THE

 2   SECOND THREE MONTHS; AND IT WAS FOR SIX MONTHS.

 3   Q    SO THE SMALL DIFFERENCE BETWEEN WHAT CARTER BRYANT WAS

 4   MAKING AS AN EMPLOYEE AT MATTEL AND WHAT HE WOULD BE PAID AS A

 5   FREELANCE CONSULTANT FOR MGA, THAT LITTLE DIFFERENCE, IN YOUR    10:17

 6   MIND, WERE YOU OFFERING HIM A LITTLE BIT MORE TO BRIBE HIM?

 7             MR. PRICE:  OBJECTION.  IT'S ARGUMENTATIVE AS

 8   PHRASED.

 9             THE COURT:  REPHRASE YOUR QUESTION.

10   BY MR. NOLAN:

11   Q    YOU WERE OFFERING MR. BRYANT A LITTLE BIT MORE MONEY THAN

12   HE WAS MAKING AT MATTEL; RIGHT?

13   A    WE DID.

14   Q    AT THE TIME THAT YOU OFFERED MR. BRYANT THE FREELANCING

15   AGREEMENT WITH MGA, DID YOU KNOW FOR CERTAIN WHETHER OR NOT YOU  10:18

16   WOULD, IN FACT, EVEN MANUFACTURE A BRATZ DOLL?

17   A    NO.  WE DID NOT KNOW IF THOSE DRAWINGS CAN BE MANUFACTURED

18   TO A DOLL.

19   Q    DID YOU KNOW, AS OF OCTOBER 4, 2000, WHETHER OR NOT IT WAS

20   EVEN FEASIBLE TO MANUFACTURE A BRATZ DOLL?                       10:18

21   A    IT WAS NOT -- AT THAT TIME, WE DIDN'T THINK IT WAS

22   FEASIBLE.  AND IT WENT THROUGH -- IN FACT, IT WENT THROUGH

23   MANY, MANY RENDITIONS BEFORE THEY BECAME THESE DOLLS.

24   Q    MR. LARIAN, DID YOU EVER INTEND TO INTERFERE WITH ANY

25   CONTRACT THAT CARTER BRYANT HAD WITH MATTEL?                     10:19
```

```
 1    A    I DID NOT.

 2    Q    DID YOU EVEN KNOW WHAT THE TERMS OF CARTER BRYANT'S

 3    CONTRACT WAS AT MATTEL?

 4    A    I DID NOT.

 5    Q    DID YOU STEAL THE BRATZ IDEA FROM MATTEL?          10:19

 6    A    I DID NOT.

 7              MR. NOLAN:  NOTHING FURTHER.

 8              THE COURT:  FURTHER EXAMINATION BY MR. PRICE?

 9              MR. PRICE:  YES, YOUR HONOR.

10                  FURTHER DIRECT EXAMINATION              10:19

11    BY MR. PRICE:

12    Q    MR. LARIAN, LET ME START WITH SOME OF YOUR MOST RECENT

13    ANSWERS.  I BELIEVE MR. NOLAN ASKED YOU WHETHER YOU KNEW WHAT

14    CARTER BRYANT WAS MAKING AT MATTEL.

15              DO YOU RECALL THAT?                          10:19

16    A    I DO.

17    Q    AND THEN HE ASKED THE AMOUNT YOU HAD AGREED TO PAY

18    MR. BRYANT PER MONTH.

19              DO YOU RECALL THAT?

20    A    I DO.                                             10:20

21    Q    IF WE LOOK AT THE CONTRACT, THOUGH, I BELIEVE -- LET'S

22    LOOK AT -- THERE'S SEVERAL VERSIONS -- I THINK IT'S 15.

23              DOES EXHIBIT 15 CONTAIN ALL OF THE PROMISES THAT MGA

24    MADE TO CARTER BRYANT IN TRYING TO ATTEMPT TO CONVINCE HIM TO

25    BECOME A CONSULTANT WITH MGA?                          10:20
```

1    A    THIS CONTRACT, MUTUAL CONTRACT, THE PROMISES THAT MGA MADE

2    TO HIM AND THE PROMISES THAT MR. BRYANT MADE TO MGA.

3    Q    AND IF YOU LOOK AT THE SECOND PAGE HERE, THERE'S A SECTION

4    THERE THAT SAYS, "COMPENSATION COSTS."  THAT'S SECTION FOUR.

5         DO YOU REMEMBER THAT?                              10:2C

6    A    YES.

7    Q    AND IT TALKED ABOUT THIS $5,500 PER MONTH, AND THEN THE

8    $5,000 PER MONTH.

9         DO YOU SEE THAT?

10   A    CORRECT.                                           10:21

11   Q    AND AS YOU TOLD US, THOSE WERE ADVANCES AGAINST ROYALTY;

12   CORRECT?

13   A    CORRECT.

14   Q    AND PARAGRAPH B THERE IS WHERE IT SAYS HE'S GETTING HIS

15   3 PERCENT ROYALTY; CORRECT?                             10:21

16   A    THAT'S CORRECT.

17   Q    AND HE INSISTED ON A ROYALTY; CORRECT?

18   A    CORRECT.

19   Q    AND IN SEPTEMBER, YOUR INITIAL REACTION WAS, 'I DON'T WANT

20   TO GIVE YOU A ROYALTY'; RIGHT?                          10:21

21   A    NO, THAT'S NOT -- YOUR QUESTION IS NOT CORRECT.

22   Q    WERE THERE EVER ANY DISCUSSIONS IN SEPTEMBER WHERE YOU

23   WERE TAKING THE POSITION WITHIN MGA THAT IT WOULD BE

24   INAPPROPRIATE TO GIVE MR. BRYANT ROYALTY?

25   A    NO.  WE DID NOT WANT TO GIVE HIM ROYALTY ON LICENSING   10:21

2167

1   REVENUE THAT WE WOULD GET FOR BRATZ.

2   Q    IN ANY EVENT, IN THESE CONVERSATIONS THAT YOU HAD WITH

3   MR. BRYANT, ONE OF THE THINGS YOU SAID TO HIM WAS, 'THINK ABOUT

4   ALL OF THE MONEY YOU'RE GOING TO MAKE BECAUSE YOU'RE GOING TO

5   GET A ROYALTY OF 3 PERCENT'; CORRECT?                          10:21

6   A    I TOLD HIM, 'THINK ABOUT ALL OF THE MONEY YOU'RE GOING TO

7   GET,' THAT'S RIGHT.   'AND YOU'RE GOING TO GET A 3 PERCENT

8   ROYALTY.'

9   Q    SO IN HAVING THE DISCUSSIONS, IN TRYING TO GET HIM TO SIGN

10  WITH MGA AND LEAVE MATTEL, YOU TOLD HIM, ONE, 'YOU'RE GOING TO  10:22

11  GET AN ADVANCE ON ROYALTY'; CORRECT?

12  A    THAT'S RIGHT.

13  Q    AND, TWO, 'YOU SHOULD THINK ABOUT ALL OF THE ROYALTY

14  YOU'RE GOING TO MAKE ON THIS'; CORRECT?

15  A    I DID.                                                     10:22

16  Q    AND, IN FACT, AROUND THAT TIME FRAME, YOUR ESTIMATE AS TO

17  THE REVENUES FOR BRATZ IN JUST THE FIRST YEAR WAS ABOUT

18  $25 MILLION; RIGHT?

19  A    THAT'S CORRECT.

20  Q    SO FOR THAT FIRST YEAR ALONE, MR. BRYANT'S ROYALTY WOULD   10:22

21  BE ABOUT -- EXPECTED, NOT ACTUAL -- WOULD BE ABOUT 3 PERCENT OF

22  $25 MILLION; CORRECT?

23  A    THAT'S CORRECT.   EXPECTED.

24  Q    YOU'RE PROBABLY AS BAD AT MATH AS I AM.

25       DO YOU KNOW WHAT 3 PERCENT OF $25 MILLION WOULD BE?       10:22

Exhibit D - Page 954

1    A    I'M NOT AS BAD AS YOU ARE.   I THINK IT'S $750,000.

2    Q    SO IN TRYING TO CONVINCE MR. BRYANT TO SIGN WITH MGA AND

3    LEAVE MATTEL, IN YOUR DISCUSSIONS WITH HIM, YOU SAID HE SHOULD

4    EXPECT TO GET SOMEWHERE AROUND $750,000 FOR THE YEAR 2001.

5    A    NO.   I EXPECTED HIM TO GET A 3 PERCENT ROYALTY ON THE

6    PRODUCT THAT WE BRING TO THE MARKET AND SELL.   AND THAT'S WHAT

7    HE GOT, AGAINST THE ADVANCES HE WAS RECEIVING.

8    Q    BUT AS YOU SAID, YOU EXPECTED THAT TO BE ABOUT $25

9    MILLION.

10   A    THAT WAS MY FORECAST, AND NOT ALL OF MY FORECASTS HAVE

11   COME TRUE.

12   Q    BUT I'M JUST TALKING ABOUT TRYING TO CONVINCE MR. BRYANT

13   TO LEAVE MATTEL AND JOIN MGA.

14        ONE OF THE THINGS YOU SAID TO HIM WAS, 'WE FORECAST

15   $25 MILLION, OR A LOT OF SALES, AND YOU SHOULD THINK ABOUT ALL

16   OF THE MONEY YOU'RE GOING TO MAKE FROM THOSE SALES.'

17   A    WE DID NOT.   TO THE BEST OF MY RECOLLECTION, WE NEVER TOLD

18   HIM THAT WE'RE GOING TO FORECAST $25 MILLION.   THIS WAS AN

19   INTERNAL FORECAST THAT WE DO FOR OUR SALES REPORT, TO HAVE A

20   BUDGETED PLAN.   BUT I DID TELL HIM THAT HE SHOULD THINK ABOUT

21   THE ROYALTIES HE WILL MAKE ON THIS LINE IF IT BECOMES

22   SUCCESSFUL.

23   Q    AND THAT'S BECAUSE, IN YOUR VIEW, THE ROYALTIES ON THE

24   LINE WERE GOING TO DWARF THESE ADVANCES OF $5,500 PER MONTH, OR

25   $5,000 PER MONTH; CORRECT?

10:23
10:23
10:23
10:24
10:24

2169

1  A    I DEFINITELY HOPED THAT THE BRATZ LINE WILL BE SUCCESSFUL

2  FOR MGA, WHICH LATER ON, THEY BECAME SUCCESSFUL, AND THE

3  ROYALTIES THAT HE WILL MAKE WILL BE MORE THAN THE SALARY HE WAS

4  MAKING AT MATTEL.

5  Q    AND AS IT TURNED OUT, I BELIEVE YOU SAID THAT THE          10:24

6  ROYALTIES HE HAS MADE AS A RESULT OF MOVING FROM MATTEL ARE

7  SOMEWHERE IN EXCESS OF $30 MILLION?

8  A    FROM 2001 TO 2007, YES, I BELIEVE THE ROYALTIES HE HAS

9  MADE IS IN EXCESS OF $30 MILLION.

10 Q    I WANT TO ASK YOU SOME QUESTIONS -- NEXT TO THE LAST TOPIC  10:25

11 YOU TALKED ABOUT WAS ABOUT THIS FASHION DOLL CONTEST.

12          DO YOU RECALL MR. NOLAN ASKED YOU ABOUT THAT?

13 A    YES.

14 Q    AND HE SHOWED YOU EXHIBIT 1-A, AND MAYBE WE CAN PUT THAT

15 UP.  AND IF WE COULD, GO TO THE LAST PARAGRAPH.                  10:25

16          MR. NOLAN ASKED YOU ABOUT THIS STATEMENT THAT YOU

17 CHOSE MR. BRYANT'S IDEA FOR THE BRATZ OVER SEVERAL OTHERS AFTER

18 HOLDING A SORT-OF FASHION DOLL CONTEST IN LATE 1999.

19          DO YOU RECALL BEING ASKED QUESTIONS ABOUT THAT?

20 A    I DO.                                                       10:26

21 Q    AND, IN FACT, YESTERDAY YOU TESTIFIED THAT YOU HAD THIS

22 SORT-OF FASHION DOLL CONTEST BECAUSE RON STOVER, THE BUYER AT

23 WAL-MART, HAD CHALLENGED YOU TO COME UP WITH A TOY THAT COULD

24 COMPETE WITH BARBIE AND THEN HE WOULD BUY IT.

25 A    THAT'S CORRECT.                                             10:26

Exhibit D - Page 956

2170

```
1              MR. PRICE:  YOUR HONOR, I'D LIKE TO PLAY FROM

2    MR. LARIAN'S DEPOSITION, PAGE 58, LINE 16, TO 60, LINE 15.

3    IT'S THE FIRST VOLUME.

4              THE COURT:  ANY OBJECTION, MR. NOLAN?

5              MR. NOLAN:  NO OBJECTION.                    10:27

6              THE COURT:  VERY WELL.

7              THE OBJECTIONS SET FORTH IN THE TRANSCRIPT ARE

8    OVERRULED.

9              YOU MAY PLAY IT.

10             (WHEREUPON, VIDEO DEPOSITION PLAYS;            10:27

11             EXCERPTS PROVIDED BY COUNSEL AS FOLLOWS: )

12             Q    ALL RIGHT.  SO CAN YOU TELL ME WHEN

13        APPROXIMATELY IT WAS YOU HAD THIS CONVERSATION WITH

14        STOVER, WHEN HE SAID BRING ME SOMETHING TO COMPETE.

15        WITH BARBIE.

16        A    I CAN'T.

17        Q    CAN YOU TELL ME WHAT YEAR?

18        A    I CAN'T.

19        Q    WAS IT BEFORE PAULA JOINED MGA?

20        A    MOST LIKELY.

21        Q    DO YOU THINK IT WAS WITHIN A YEAR OF HER

22        JOINING?

23        A    I CAN'T TELL YOU.  I DON'T KNOW.

24        Q    WAS IT MORE -- WAS IT FIVE YEARS BEFORE SHE

25        JOINED -- BEFORE SHE JOINED YOU?
```

Exhibit D - Page 957

1      A    I CAN'T ESTIMATE THAT.

2      Q    ALL RIGHT.  IT MIGHT HAVE BEEN FIVE YEARS?

3  IT MIGHT HAVE BEEN MORE THAN FIVE YEARS?  YOU'RE NOT

4  SURE?

5  THE WITNESS:  I DON'T THINK IT WAS MORE THAN

6  FIVE YEARS, BUT I CAN'T REMEMBER.

7  BY MR. QUINN:

8      Q    ALL RIGHT.  CAN YOU NARROW DOWN THE TIMEFRAME

9  AT ALL FOR ME?

10     A    BESIDES WHAT I JUST TOLD YOU, I CAN'T.

11     Q    ALL RIGHT.  WELL, WHAT YOU'VE TOLD ME DIDN'T

12  NARROW IT DOWN VERY MUCH.

13     A    RIGHT.

14     Q    ALL RIGHT.  SO DID YOU DO ANYTHING AS A

15  RESULT OF MR. STOVER'S COMMENT TO YOU?

16     A    LEFT THE WAL-MART BEING UPSET THAT I DIDN'T

17  GET AN ORDER YET.

18     Q    ALL RIGHT.

19     A    STILL DIDN'T GET AN ORDER.

20     Q    DID YOU -- DID YOU PROCEED TO LOOK FOR A

21  FASHION DOLL IDEA AS A RESULT OF HIS COMMENT, SOMETHING

22

23  TO COMPETE WITH BARBIE?

24     A    I DON'T RECALL THAT.  PROBABLY WE WERE

25  LOOKING A LOT OF DIFFERENT IDEAS, A LOT OF DIFFERENT

1    PRODUCTS ALL THE TIME.  COULD HAVE SEE A FASHION
      DOLL.

2

3    NOTHING THAT PROBABLY GOT MY INTEREST.  I DON'T
      RECALL.

4        Q    UH-HUH.  SO YOU MIGHT HAVE -- AS A RESULT OF

5    MR. STOVER'S COMMENTS, YOU MIGHT HAVE GONE TO LOOK
      FOR SOMETHING TO COMPETE WITH BARBIE OR YOU MIGHT NOT

6    HAVE, YOU'RE JUST NOT SURE; IS THAT TRUE?

7        THE WITNESS:  I DON'T RECALL THAT I DID,

8    ACTUALLY, BESIDES GOT PISSED OFF THAT, YET AGAIN, HE

9    DIDN'T GIVE ME AN ORDER.

10       (CONCLUSION OF EXCERPTS.)                        10:29

11   **BY MR. PRICE:**

12   Q    LET'S TALK ABOUT THE FASHION DOLL CONTEST YOU WERE

13   ACTUALLY REFERRING TO IN THE <u>WALL STREET JOURNAL</u>.

14   A    GO AHEAD.

15   Q    YOU TOLD THE JURY YESTERDAY THAT THIS FASHION DOLL   10:29

16   CONTEST, TO YOUR BEST RECOLLECTION, OCCURRED -- YOU DON'T

17   BELIEVE PAULA GARCIA WAS PART OF THE DISCUSSION ABOUT THAT

18   CONTEST; IS THAT RIGHT?

19   A    AS TO THE BEST OF MY RECOLLECTION.

20   Q    SO WHAT YOU TOLD THE JURY WAS, THERE WAS A FASHION DOLL   10:29

21   CONTEST THAT CAME OUT AS A RESULT OF WHAT MR. STOVER SAID;

22   CORRECT?

23   A    NO.  WHAT I TOLD THE JURY WAS I GOT THE FIRST IDEA ABOUT

24   DOING A FASHION DOLL WHEN RON STOVER WOULD STILL NOT GIVE ME AN

25   ORDER AFTER BEING DOWN THERE SO MANY TIMES.  AND WHEN I ASKED   10:30

2173

```
 1   HIM, 'WHEN ARE YOU GOING TO GIVE ME AN ORDER," HE SAID, 'COME
 2   UP WITH SOMETHING THAT WILL COMPETE WITH BARBIE, AND I'LL GIVE
 3   YOU AN ORDER.'
 4   Q    AND YOU SAID THAT AS A RESULT OF THAT, YOU DID A FASHION
 5   DOLL CONTEST AND TALKED WITH VICTORIA O'CONNOR; RIGHT?          10:30
 6   A    NO.  I SAID THAT I KEPT THAT IN MY MIND AND I TOLD
 7   VICTORIA O'CONNOR, 'LOOK FOR IDEAS FOR FASHION DOLLS WHICH ARE
 8   DIFFERENT THAN BARBIE.'
 9   Q    AND THE DISCUSSIONS YOU HAD WITH VICTORIA O'CONNOR, YOU
10   DON'T THINK PAULA GARCIA WAS PART OF THAT DISCUSSION; CORRECT?  10:30
11   A    NO.  I DON'T RECALL IF SHE WAS OR NOT.
12   Q    WELL, DO YOU RECALL TESTIFYING WHEN MR. NOLAN ASKED YOU,
13   "WHEN YOU WERE MEETING AND CONSIDERING OTHER IDEAS FOR FASHION
14   DOLLS, BEFORE YOU MET WITH CARTER BRYANT, WAS PAULA GARCIA PART
15   OF THOSE DISCUSSIONS, OR WAS IT YOU AND VICTORIA O'CONNOR?"     10:31
16          ANSWER:  "VICTORIA O'CONNOR IS IN CHARGE OF
17   LICENSING, TALKING TO OTHER DESIGNERS; SO I DON'T THINK
18   PAULA GARCIA WAS PART OF THAT DISCUSSION, NO.'
19   BY MR. PRICE:
20   Q    DO YOU RECALL TELLING THE JURY THAT YESTERDAY?            10:31
21   A    AND I STAY WITH THAT.  I DON'T RECALL IF PAULA GARCIA WAS
22   PART OF THAT DISCUSSION OR NOT.
23   Q    AND THIS IS ALL PART OF THE FASHION DOLL CONTEST, WHICH
24   YOU WERE REFERRING TO IN THAT WALL STREET JOURNAL ARTICLE;
25   CORRECT?                                                       10:31
```

2174

```
 1    A    THAT'S CORRECT.

 2    Q    BUT YOU RECALL, SIR, THAT YOU WERE ASKED ABOUT WHAT YOU

 3    MEANT BY A "FASHION DOLL CONTEST" IN YOUR DEPOSITION?  DO YOU

 4    REMEMBER THAT?

 5    A    I BELIEVE I WAS.  I DON'T REMEMBER EXACTLY WHEN IT WAS,      10:31

 6    BUT, YES, I BELIEVE I WAS ASKED QUESTIONS, NOW FOR THE FIFTIETH

 7    TIME, ON THE SORT-OF FASHION DOLL CONTEST.

 8    Q    ACTUALLY, THESE WERE QUESTIONS YOU WERE ASKED ON THE VERY

 9    FIRST DAY OF YOUR DEPOSITION.

10         DO YOU RECALL THAT?                                        10:31

11    A    I DON'T RECALL IF IT WAS MY FIRST DAY OF DEPOSITION OR THE

12    LAST TIME.  I DON'T.

13    Q    WE'VE ALREADY PLAYED THIS, SO I'M JUST GOING TO ASK YOU

14    WHETHER OR NOT THIS ANSWER IS TRUE.

15         MR. PRICE:  IF WE CAN PUT UP 15, LINE 10, TO 16,           10:32

16    LINE 25.

17         THE COURT:  ANY OBJECTION?

18         MR. NOLAN:  NO OBJECTION, YOUR HONOR.

19         THE COURT:  YOU MAY PUBLISH.

20    BY MR. PRICE:                                                   10:32

21    Q    DO YOU REMEMBER YOU WERE ASKED TO TELL US UNDER OATH ABOUT

22    THIS CONTEST?  DO YOU REMEMBER THAT?

23    A    YES.

24    Q    AND YOU SAID THAT YOU HAD IT SOMETIME IN 2000.

25         DO YOU RECALL THAT?                                        10:33
```

```
1   A     I'M SORRY?  LET ME READ THAT AGAIN.

2           CAN I JUST READ IT IN CONTEXT?

3   Q     PLEASE, READ IT.

4   A     GO AHEAD.  YES.

5   Q     SO YOUR TESTIMONY UNDER OATH THEN WAS THAT THE FASHION      10:33

6   CONTEST YOU WERE REFERRING TO WAS SOMETIME IN 2000.

7           DO YOU RECALL THAT?

8   A     YES.

9           MR. PRICE:  AND IF WE COULD PUT UP PAGE 17, LINE 4,

10  TO PAGE 18, LINE 1, WHICH HAS BEEN PREVIOUSLY PLAYED.            10:33

11          THE COURT:  ANY OBJECTION, MR. NOLAN?

12          MR. NOLAN:  NO OBJECTION.

13          THE WITNESS:  CAN YOU GIVE ME THE LINES AGAIN,

14  PLEASE.

15  BY MR. PRICE:

16  Q     SURE.

17          17, LINE 4, TO 18, LINE 1.

18          I BELIEVE YOU MAY HAVE THE TRANSCRIPT IN FRONT OF

19  YOU, SO YOU CAN READ WHATEVER YOU WOULD LIKE.

20  A     I'D LIKE TO READ IT, SO I DON'T WASTE TIME.               10:34

21  Q     DO YOU RECALL THIS TESTIMONY?

22  A     I DO.

23  Q     AND WHEN YOU FIRST TESTIFIED ABOUT THIS SORT-OF FASHION

24  DOLL CONTEST, THE ORIGINAL TESTIMONY WAS THAT THIS CONTEST TOOK

25  PLACE AFTER PAULA GARCIA JOINED MGA; CORRECT?                   10:35
```

1    A    NO.

2              PLEASE GO AHEAD AND READ MY TESTIMONY.

3    Q    "HOW ABOUT SEPTEMBER?  I THINK YOU'VE ALREADY TOLD ME YOU

4    KNOW IT TOOK PLACE BEFORE SEPTEMBER."

5              ANSWER:  "BETWEEN APRIL AND SEPTEMBER."                10:35

6              **THE WITNESS:**  GO UP, PLEASE.  I WANT TO READ THAT

7    WHOLE THING TO THE JURY, IF YOU DON'T MIND, THE WHOLE --

8              NO?

9              **MR. NOLAN:**  I RULED ON THAT REQUEST, YOUR HONOR.  I

10   APOLOGIZE.                                                       10:35

11             **THE COURT:**  THANK YOU, COUNSEL.

12   **BY MR. PRICE:**

13   Q    THE REASON YOU CHOSE APRIL IS BECAUSE YOU SAID IT WAS

14   "PROBABLY AFTER APRIL, BECAUSE THAT'S WHEN PAULA STARTED";

15   CORRECT?                                                         10:35

16   A    AT FIRST, I SAY, "I CAN'T TELL YOU.  PROBABLY AFTER APRIL,

17   BECAUSE THAT'S WHEN PAULA STARTED."

18   Q    RIGHT.  YOU LINKED IT TO AN EVENT; WHEN YOU FIRST TOLD

19   THIS STORY, YOU SAID THIS CONTEST TOOK PLACE AFTER PAULA

20   STARTED; RIGHT?                                                  10:36

21             **MR. NOLAN:**  OBJECTION.  ARGUMENTATIVE AS TO THE

22   REFERENCE OF "STORY."

23             **THE COURT:**  REPHRASE.

24   **BY MR. PRICE:**

25   Q    WHEN YOU GAVE YOUR VERSION OF EVENTS AT YOUR DEPOSITION --   10:36

1          **MR. NOLAN:**  OBJECTION, YOUR HONOR.  ARGUMENTATIVE.

2    IT'S TESTIMONY.

3          **THE COURT:**  IT IS.

4          COUNSEL, LET'S JUST ASK THE QUESTION.

5    **BY MR. PRICE:**                                              10:36

6    Q    WHEN YOU TESTIFIED AT YOUR DEPOSITION, YOU SAID THIS

7    CONTEST TOOK PLACE -- YOU LINKED IT WHEN PAULA STARTED; RIGHT?

8    A    I SAID, "I CAN'T TELL YOU.  PROBABLY AFTER APRIL, BECAUSE

9    THAT'S WHEN PAULA STARTED. "

10         AND THAT'S WHAT I RECALLED AT MY DEPOSITION, WHEN I      10:36

11   WAS SITTING THERE AND GIVING TESTIMONY.

12   Q    AND THE REASON YOU SAID THAT IS BECAUSE AT THAT TIME, AT

13   YOUR DEPOSITION, UNDER OATH, YOU SAID YOU TOLD TWO PEOPLE ABOUT

14   THIS CONTEST, PAULA GARCIA AND KAMI GILLMORE.

15   A    AGAIN, I DON'T REMEMBER EXACTLY WHAT I SAID THERE.        10:37

16         MY BEST RECOLLECTION, WHEN I WAS GIVING THIS

17   DEPOSITION, GOING BACK, SETTING UP IN MY MIND -- NOW WE'RE

18   2006, I BELIEVE YOU WERE TAKING MY DEPOSITION AS TO WHAT HAD

19   HAPPENED, AND I TRIED TO LINK IT IN MY HEAD THAT IT MOST LIKELY

20   MUST HAVE BEEN WHEN PAULA WAS THERE AND KAMI GILLMORE.         10:37

21   Q    IF WE COULD LOOK AT -- AGAIN, THIS HAS BEEN PLAYED.  WE

22   HAD IT UP FOR A SECOND THERE; 16, 4, TO 25.

23         DO YOU RECALL YOU WERE ASKED AT YOUR DEPOSITION, "WHO

24   PARTICIPATED IN THIS CONTEST, THIS FASHION DOLL CONTEST?"  DO

25   YOU RECALL?                                                   10:37

1   A    YES.

2   Q    AND THEN YOU SAID, "WE ASKED OUR PEOPLE TO LOOK FOR

3   FASHION DOLLS," ET CETERA.

4            DO YOU SEE THAT?

5   A    IT DOESN'T SAY "ET CETERA."                              10:37

6            **MR. NOLAN:**  YOUR HONOR, MR. PRICE IS NOT READING FROM

7   THE START OF THE TESTIMONY, THE FIRST QUESTION AND ANSWER.

8            **THE COURT:**  HE ASKED FOR LINE 4; AND FOR SOME REASON,

9   WE HAVE LINES 1 THROUGH 3.

10           **MR. NOLAN:**  I APOLOGIZE.  I DIDN'T REALIZE THAT.      10:38

11           **THE COURT:**  YOU DID SKIP A SENTENCE ON LINE 7.  WHY

12   DON'T YOU INCLUDE THAT.

13   **BY MR. PRICE:**

14   Q    "WHO PARTICIPATED IN THIS CONTEST?"

15           ANSWER:  "IT WAS SORT-OF A CONTEST I MENTIONED TO      10:38

16   YOU.  WE ASKED OUR PEOPLE TO LOOK FOR FASHION DOLLS, OUR

17   DESIGNERS, OUR MARKETING PEOPLE, THE EMPLOYEES."

18           QUESTION:  "WHEN YOU SAY 'WE,' SIR, ARE YOU REFERRING

19   TO YOURSELF?"

20           ANSWER:  "YES."                                      10:38

21           QUESTION:  "ISAAC LARIAN, YOU'RE THE ONE THAT ASKED

22   PEOPLE TO LOOK FOR IDEAS; IS THAT TRUE?"

23           ANSWER:  "I DO.  THAT'S TRUE."

24           QUESTION:  "AND WHO WAS IT THAT YOU ASKED TO LOOK FOR

25   IDEAS FOR FASHION DOLLS?"                                    10:38

1          ANSWER:  "I ASKED PAULA TREANTAFELLES AND I BELIEVE

2    KAMI GILLMORE."

3          QUESTION:  "IS THERE ANYONE ELSE THAT YOU ASKED TO

4    LOOK FOR THIS AS PART OF THIS SORT-OF CONTEST?"

5          ANSWER:  "I DON'T REMEMBER."                          10:39

6    **BY MR. PRICE:**

7    Q    THAT WAS YOUR TESTIMONY UNDER OATH ON JULY 18, 2006;

8    CORRECT?

9    A    YES, SIR.

10   Q    AND YOU SUBSEQUENTLY LEARNED THAT BOTH MS. TREANTAFELLES,   10:39

11   MS. GARCIA, AND MS. GILLMORE DENIED THAT THEY HAD EVER

12   PARTICIPATED IN ANY SORT-OF CONTEST.

13   A    I HAVE NOT LEARNED IF THEY HAVE DENIED OR AGREED THAT THEY

14   PARTICIPATED OR NOT.  I DID NOT.

15   Q    IN ANY EVENT, IN YOUR EXAMINATION --                    10:39

16   A    NOT IN ANY EVENT.  I DID NOT REMEMBER THAT.

17   Q    IN THE EXAMINATION THAT MR. RYAN {SIC} MADE OF YOU IN

18   FRONT OF THE JURY YESTERDAY, YOUR TESTIMONY WAS THAT IT WAS

19   VICTORIA O'CONNOR WHO WAS PART OF THE FASHION DOLL CONTEST, AND

20   NOT PAULA GARCIA; CORRECT?                                  10:39

21          **MR. NOLAN:**  YOUR HONOR, I ASSUME HE'S --

22          **THE COURT:**  WHAT'S YOUR OBJECTION, COUNSEL?

23          **MR. NOLAN:**  WRONG NAME.  THAT'S ANOTHER IRISHMAN.

24          **MR. PRICE:**  YOU'RE RIGHT.

25          **THE COURT:**  FAIR ENOUGH.                          10:40

1          **MR. PRICE:**  I'LL JUST POINT.

2          **MR. NOLAN:**  I'M MR. NOLAN.

3  **BY MR. PRICE:**

4  Q    IN RESPONSE TO QUESTIONS FROM YOUR ATTORNEY, WHAT YOU TOLD

5  THE JURY UNDER OATH WAS THAT THE CONTEST INVOLVED          10:40

6  VICTORIA O'CONNOR, AND NOT PAULA TREANTAFELLES.

7  A    SINCE MY DEPOSITION, I HAVE GONE AND LOOKED AT PAPERWORK

8  AND OTHER THINGS AND REFRESHED MY MEMORY.  I STILL BELIEVE THAT

9  I MIGHT HAVE ASKED PAULA GARCIA AND KAMI GILLMORE FOR THAT, BUT

10 FOR SURE, VICTORIA O'CONNOR WAS IN CHARGE OF LICENSING, TO LOOK   10:40

11 FOR NEW FASHION DOLL IDEAS.

12 Q    OKAY.

13          SO YOU FOUND PAPERWORK SINCE THEN THAT TALKS ABOUT A

14 FASHION DOLL CONTEST?

15 A    NO.  I'M SORRY.  IF I SAID "PAPERWORK," I MISSPOKE.  I   10:40

16 HAVE TALKED TO OTHER PEOPLE.

17 Q    WELL, YOU'LL AGREE WITH THIS:  YOU'VE CHANGED YOUR STORY

18 SINCE YOUR DEPOSITION.

19 A    I HAVE NOT CHANGED MY STORY.  I HAVE JUST REFRESHED MY

20 RECOLLECTION.          10:41

21 Q    WELL, LET ME ASK YOU, IS THIS STATEMENT THAT YOU MADE

22 UNDER OATH STILL TRUE?  DO YOU STILL BELIEVE IT'S TRUE, THAT

23 YOU HAD A FASHION DOLL CONTEST AND THAT YOU ASKED

24 PAULA TREANTAFELLES AND KAMI GILLMORE TO LOOK FOR IDEAS FOR

25 FASHION DOLLS?          10:41

1    A    I BELIEVE AT THAT TIME, WHEN I WAS GIVING MY TESTIMONY, I

2    STILL BELIEVED THAT I MIGHT HAVE ASKED THEM THAT, YES.

3          **THE COURT:**  COUNSEL, ARE WE READY TO MOVE ON TO

4    ANOTHER AREA?

5          **MR. PRICE:**  WE CAN TAKE OUR BREAK NOW.                    10:41

6          **THE COURT:**  MEMBERS OF THE JURY -- AND I'LL ADDRESS

7    THIS TO EVERYBODY -- CURIOSITY HAS GOTTEN THE BETTER PART OF

8    MRS. LARSON, SO SHE SHOWED UP TODAY.  I JUST WANTED TO IDENTIFY

9    FOR YOU THAT SHE'S IN THE COURTROOM TODAY.

10          OBVIOUSLY, YOU'RE NOT TO DISCUSS THE CASE OR THE           10:41

11    JUDGE WITH MRS. LARSON.

12          (LAUGHTER.)

13          WE'LL SEE THE JURY IN 15 MINUTES.

14          (WHEREUPON, JURORS DEPART COURTROOM.)

15          **THE COURT:**  COUNSEL, I'LL COME OUT BEFORE THE JURY TO    10:42

16    DO THE SARAH HOLDEN OBJECTIONS.

17          (BRIEF RECESS.)

18          (HEARING OUTSIDE THE PRESENCE OF THE JURY.)

19          **THE COURT:**  WE'RE BACK ON THE RECORD OUTSIDE OF THE

20    PRESENCE OF THE JURY.                                            11:00

21          I WANT TO GO THROUGH THE SARAH ODOM OBJECTIONS.

22          BUT BEFORE I DO, I HAVE RECEIVED A NEW PAGE 9 WITH A

23    NOTE FROM MY COURTROOM DEPUTY SAYING "PLAINTIFF SUBMITTED THIS

24    AS SUBSTITUTE FOR PREVIOUS VERSION."

25          BUT IT DIDN'T HAVE THE PAGE 10 ON BACK, AND I CAN'T        11:00

1    MR. ROTH'S REPRESENTATION, THAT THERE WILL BE A STIPULATION IN

2    TERMS OF HOW THIS IS GOING TO PLAY OUT.  BECAUSE I HAVE ALREADY

3    TENTATIVELY RULED THAT THE EXPERT REPORT IS PROPER,

4    NOTWITHSTANDING THE SCHEDULING ORDER.

5            MR. ZELLER HAS SAT BACK DOWN, SO APPARENTLY THERE WAS        11:11

6    A FALSE ALARM ON HIS PART.

7            **MR. ZELLER:**  I THINK THE COURT CERTAINLY HIT IT ON

8    THAT.

9            **THE COURT:**  MR. LARIAN IS BACK UP HERE ON THE WITNESS

10   STAND.                                                             11:11

11           THERESA, WHAT TIME DID WE BREAK?

12           **COURT REPORTER:**  10:42.

13           **THE COURT:**  WE'LL BRING THE JURY IN.  WE'LL BREAK

14   AGAIN AT NOONTIME.

15           MR. PRICE, AFTER MR. LARIAN -- HOW MUCH LONGER DO YOU       11:12

16   BELIEVE YOU HAVE WITH MR. LARIAN?

17           **MR. PRICE:**  PROBABLY 45 MINUTES TO AN HOUR.

18           **THE COURT:**  SO YOU'RE GOING TO TRY AND WRAP UP BEFORE

19   NOON; 46 MINUTES.

20           **MR. PRICE:**  I'D SAY AN HOUR TO AN HOUR AND A HALF.      11:12

21           **THE COURT:**  LET'S DO WHAT WE CAN TO WRAP THIS UP AT

22   NOON.

23           (JURORS ENTER COURTROOM.)

24   **BY MR. PRICE:**

25   Q    MR. LARIAN, WE WERE TALKING ABOUT YOUR TESTIMONY AT YOUR      11:13

1   DEPOSITION IN 2006 ABOUT THIS FASHION DOLL CONTEST WHERE YOU

2   ASKED MS. TREANTAFELLES AND KAMI GILLMORE TO PARTICIPATE IN

3   THAT.

4           IN FACT, YOUR TESTIMONY AT THAT TIME WAS THAT THE

5   REASON PAULA GARCIA, PAULA TREANTAFELLES, CAME TO YOU WITH        11:13

6   CARTER BRYANT WAS BECAUSE OF THIS CONTEST YOU HAD INVOLVED HER

7   IN.

8   A   I DON'T RECALL THAT.  BUT AT THE END SHE CAME TO ME WITH

9   THE DRAWINGS THAT BECAME THE FASHION DOLL FOR MGA.

10  Q   BUT I'M TALKING ABOUT THIS FASHION CONTEST YOU'RE             11:14

11  TESTIFYING ABOUT.  YOUR TESTIMONY THEN WAS THAT YOU NOT ONLY

12  TOLD MS. GARCIA ABOUT IT, BUT THAT'S THE REASON SHE BROUGHT

13  CARTER BRYANT TO YOU.

14          THAT WAS YOUR TESTIMONY UNDER OATH THEN; CORRECT?

15  A   I BELIEVE MY TESTIMONY WAS THAT AT THE END, WHAT CAME OUT     11:14

16  OF THE WHOLE THING WAS CARTER BRYANT'S DRAWINGS BECAME THE

17  BASIS FOR BRATZ.

18  Q   IN YOUR EXAMINATION, WHEN WE PLAYED, I THINK, PAGE 26,

19  LINES 10 THROUGH 25; SO LET ME ASK YOU ABOUT THAT, THEN, IF I

20  MAY.                                                             11:14

21          **THE COURT:**  YOU MAY PUBLISH.  THIS HAS BEEN

22  PREVIOUSLY DISPLAYED.

23          **MR. NOLAN:**  NO OBJECTION, YOUR HONOR.

24          **MR. PRICE:**  (READING) "AFTER YOU TALKED WITH THE

25  FOLKS ABOUT THIS SORT OF FASHION DOLL CONTEST, DID               11:15

1    KAMI GILLMORE COME BACK TO YOU WITH ANY IDEAS?

2              ANSWER:  NOT THAT I RECALL.

3              QUESTION:  DID PAULA TREANTAFELLES COME BACK TO YOU

4    WITH ANY IDEAS?

5              ANSWER:  SHE BROUGHT BRATZ; WHAT WAS -- IS THE IDEA          11:15

6    THAT LATER ON BECAME BRATZ.

7              QUESTION:  MR. LARIAN, DID ANYONE ELSE COME BACK TO

8    YOU WITH AN IDEA FOR A FASHION DOLL AS A RESULT OF YOUR

9    SPEAKING TO PEOPLE ABOUT THIS SORT-OF CONTEST.

10             ANSWER:  NOT THAT I RECALL.                                 11:15

11             QUESTION:  SO THE ONLY ONE THAT RESPONDED WAS PAULA,

12   AND SHE CAME UP WITH THE CONCEPT FOR BRATZ; IS THAT RIGHT?

13             ANSWER:  SHE SHOWED ME SOMETHING THAT BECAME THE IDEA

14   FOR BRATZ."

15   BY **MR. PRICE**:                                                    11:15

16   Q    THAT WAS YOUR TESTIMONY UNDER OATH AS OF 2006; CORRECT?

17   A    AND AS OF TODAY, YES.

18   Q    WELL, SIR, I THOUGHT YOU TOLD THE JURY YESTERDAY, YOU

19   DON'T EVEN KNOW THAT PAULA GARCIA WAS TOLD ABOUT THIS CONTEST?

20   ISN'T THAT WHAT YOU TOLD THE JURY JUST YESTERDAY?                    11:15

21   A    I SAID I DON'T RECALL IF SHE WAS PART OF THE CONTEST OR

22   NOT, AND THAT'S NOT CONTRARY TO WHAT I SAID HERE.

23   Q    YOUR TESTIMONY AT YOUR DEPOSITION THAT YOU TOLD MS. GARCIA

24   AND KAMI GILLMORE ABOUT A CONTEST AND THAT MS. GARCIA CAME TO

25   YOU WITH AN IDEA AS A RESULT OF THAT CONTEST, THAT'S SIMPLY NOT      11:16

2192

```
 1    TRUE, IS IT?

 2    A    EXCUSE ME.  CAN YOU TELL ME WHERE I SAY HERE THAT AS A

 3    RESULT OF THE CONTEST, SHE CAME UP WITH BRATZ?

 4    Q    THE ONLY ONE THAT RESPONDED.

 5          YOU UNDERSTOOD THAT YOU WERE BEING ASKED WHETHER          11:16

 6    ANYBODY RESPONDED TO THIS SORT-OF FASHION DOLL CONTEST;

 7    CORRECT?

 8    A    I SAID THE ONLY ONE THAT RESPONDED WAS PAULA, AND SHE CAME

 9    UP WITH THE CONCEPT FOR BRATZ.

10          THAT WAS THE QUESTION YOU WERE ASKING.  MY ANSWER IS      11:16

11    BELOW:  SHE SHOWED ME SOMETHING THAT BECAME THE IDEA FOR BRATZ.

12          THAT'S YOU ASKING.  I DON'T KNOW IF MR. ZELLER OR

13    MR. QUINN WAS ASKING.

14    Q    LET ME PUT IT THIS WAY SO WE CAN BE CLEAR.

15          IT IS SIMPLY NOT TRUE THAT YOU HAD A FASHION DOLL         11:17

16    CONTEST IN WHICH YOU INVOLVED MS. GILLMORE AND

17    MS. TREANTAFELLES; CORRECT?

18    A    I BELIEVE, TO THE BEST OF MY RECOLLECTION, THAT THEY COULD

19    HAVE BEEN INVOLVED IN IT.  I CANNOT TELL YOU FOR SURE.  I KNOW

20    VICTORIA O'CONNOR WAS LOOKING FOR FASHION DOLLS TO COME TO THE   11:17

21    COMPANY.

22    Q    ARE YOU SAYING THAT YOU CAN'T BE SURE TODAY AT YOUR

23    DEPOSITION UNDER OATH, YOU SAID THOSE WERE THE ONLY TWO PEOPLE

24    YOU REMEMBER BEING INVOLVED IN THIS CONTEST, RIGHT,

25    MS. GILLMORE AND MS. TREANTAFELLES; CORRECT?                    11:17
```

Exhibit D - Page 972

1    A    THOSE WERE THE NAMES THAT I RECALL AT THAT TIME, YES, AT

2    THE TIME OF DEPOSITION.

3    Q    DO YOU HAVE ANY EXPLANATION AS TO WHY NEITHER MS. GILLMORE

4    NOR MS. GARCIA-TREANTAFELLES OR ANYONE ELSE RECALLS A FASHION

5    DOLL CONTEST?                                                    11:17

6    A    I CANNOT SPECULATE.  MAYBE THEY DON'T HAVE -- MAYBE THEIR

7    RECOLLECTION FOR SO MANY YEARS BACK IS NOT THE SAME AS MINE; OR

8    THE SAME AS VICTORIA O'CONNOR, YOUR WITNESS.

9    Q    I'M SORRY.  DO YOU BELIEVE VICTORIA O'CONNOR TESTIFIED

10   THERE WAS A FASHION DOLL CONTEST?                                11:18

11   A    I BELIEVE SHE TESTIFIED THAT WE WERE LOOKING.  I HAD TOLD

12   HER TO LOOK FOR FASHION DOLL IDEAS.

13   Q    IS IT YOUR RECOLLECTION THAT YOUR ATTORNEY ASKED

14   MS. O'CONNOR WHETHER THERE WAS A FASHION DOLL CONTEST?

15   A    NO, IT'S NOT.                                               11:18

16   Q    IN FACT, YOU KNOW HE DID NOT ASK HER THAT QUESTION;

17   CORRECT?

18   A    I DON'T KNOW WHAT HE ASKED HER OR NOT; SO MUCH GOING ON IN

19   THIS CASE.

20   Q    WELL, LETS TALK ABOUT SOMETHING ELSE GOING ON IN THIS      11:18

21   CASE.

22           MR. NOLAN ASKED YOU, WHEN HE FIRST STARTED HIS

23   EXAMINATION OF YOU, EARLY ON ABOUT WHETHER YOU RECALL ME ASKING

24   YOU ABOUT MGA HIRING MATTEL EMPLOYEES.

25           DO YOU RECALL THAT?                                      11:18

1   A    I DON'T RECALL ALL OF THE QUESTIONS THAT HAVE BEEN ASKED,

2   BUT MAYBE YOU DID.

3   Q    WELL, YOU RECALL MR. NOLAN SAID 'DO YOU RECALL MR. PRICE

4   ASKING YOU ABOUT MGA HIRING MATTEL EMPLOYEES?'  AND YOU SAID

5   YES AT THAT TIME.                                                11:18

6        YOU DO RECALL ME ASKING ABOUT IT; RIGHT?

7   A    YES.

8   Q    AND I BELIEVE YOU TESTIFIED THAT OBVIOUSLY THERE'S NOTHING

9   WRONG WITH MGA HIRING MATTEL EMPLOYEES OR MATTEL HIRING MGA

10  EMPLOYEES; CORRECT?                                              11:19

11  A    THERE'S NOTHING WRONG.

12  Q    NOW, DO YOU REMEMBER, THOUGH, THE CONTEXT IN WHICH I ASKED

13  YOU THAT QUESTION?

14  A    NO, I DON'T.

15  Q    LET ME TRY AND REFRESH YOU.                                 11:19

16       IF YOU WOULD LOOK AT EXHIBIT 13532.

17  A    WHAT BOOK?

18  Q    IT'S THE BLACK BOOK.

19       THE COURT:  NOW WE HAVE TWO BLACK BOOKS, I

20  UNDERSTAND.                                                      11:19

21       MR. PRICE:  THE LARGER BLACK BOOK; IT'S IN THE

22  SMALLER ONE AS WELL.

23       THE WITNESS:  REPEAT THE NUMBER.

24  BY MR. PRICE:

25  Q    13532.                                                      11:19

1    DO YOU RECALL I WAS ASKING YOU ABOUT THIS PROPOSED

2 AGREEMENT WITH YOUR EMPLOYEES, DATED AUGUST 10, 2000?

3 A    YES.

4 Q    AND I HAD CALLED YOUR ATTENTION TO PAGE 6.

5 A    GO AHEAD.                                                    11:20

6 Q    IN PARTICULAR, THE CLAUSE WHICH SAID THAT FOR A YEAR AFTER

7 LEAVING THE COMPANY, THAT YOUR EMPLOYEES COULD NOT WORK WITH

8 ANOTHER COMPANY WITHOUT YOUR PERMISSION.

9    DO YOU RECALL THAT?

10 A    YES.                                                        11:20

11 Q    AND YOU RECALL AT THAT POINT I ASKED 'WASN'T IT YOUR

12 BUSINESS PRACTICE TO HAVE YOUR FORMER MATTEL EMPLOYEES CONTACT

13 EMPLOYEES AT MATTEL TO TRY AND SOLICIT THEM TO JOIN MGA?

14 A    CAN YOU REPEAT THAT QUESTION.

15 Q    YOU RECALL AT THAT POINT I SAID "DIDN'T YOU HAVE YOUR      11:21

16 EMPLOYEES AT MGA, WHO USED TO WORK FOR MATTEL, WEREN'T YOU

17 TELLING THEM TO CONTACT THE MATTEL EMPLOYEES YOU KNOW AND SEE

18 IF THEY WILL JOIN MGA"?

19 A    YES.

20 Q    AND THERE'S NOTHING WRONG WITH THAT, YOU THINK.           11:21

21 A    THERE'S NOTHING WRONG WITH THAT.

22 Q    BUT YOU PROHIBITED YOUR EMPLOYEES FROM DOING THAT IF THEY

23 LEFT MGA.

24 A    I DID NOT PROHIBIT THEM.  AND IF WE DID, IT'S ILLEGAL.

25 YOU CANNOT STOP EMPLOYEES GOING FROM ONE COMPANY TO ANOTHER, AT  11:21

1    LEAST IN THE UNITED STATES OF AMERICA.

2    Q    LET ME REPHRASE THE QUESTION.

3           ISN'T IT TRUE -- DO YOU RECALL WE SHOWED YOU

4    EXHIBIT 5715, WHICH IS IN THERE; THAT SMALL BINDER?

5           I'M CROSSING MY FINGERS AND HOPING.                    11:21

6    A    YES.

7    Q    IF WE COULD SHOW THAT, PLEASE; IT'S IN EVIDENCE.

8           IN AUGUST OF 1999 YOU WERE ASKING TRACY AND KAMI IF

9    THEY KNEW GOOD PEOPLE OUT OF MATTEL THAT COULD BE HIRED AS

10   ENGINEERS.                                                    11:22

11          DO YOU RECALL THAT?

12   A    YES.  I RECALL THAT -- YOU'RE GOING TOO FAST --

13          I RECALL THAT I MIGHT HAVE SENT THAT E-MAIL.

14   Q    AND BOTH TRACY AND KAMI WERE FORMER MATTEL EMPLOYEES.

15   A    I DON'T RECALL TRACY.  I REMEMBER KAMI BEING.  I DON'T   11:22

16   RECALL TRACY.

17   Q    AND AGAIN, YOUR VIEW IS THERE'S NOTHING WRONG WITH THAT;

18   RIGHT?

19   A    NOTHING WRONG, NO, NOTHING WRONG WITH THAT.

20   Q    BUT IN YOUR AGREEMENT WITH YOUR EMPLOYEES, YOU PROHIBITED 11:22

21   THEM, IF THEY LEFT MGA, FROM CONTACTING ANYONE AT MGA AND

22   TRYING TO HIRE THEM.

23   A    ARE YOU TALKING ABOUT THE PROPOSED AGREEMENT THAT I SAID

24   WE WITHDREW BECAUSE IT WAS NOT LEGAL?

25          IS THAT THE ONE YOU'RE REFERRING TO, SIR?            11:23

Exhibit D - Page 976

1    Q     LET'S LOOK AT EXHIBIT 13620, WHICH IS ONE OF THE SIGNED

2    AGREEMENTS THAT YOU HAD, IN FACT, I BELIEVE IT'S WITH KAMI

3    GILLMORE.

4    A     IS THAT IN THE SMALL BOOK?

5    Q     IT'S 13620; I BELIEVE THAT'S IN THE BIG BOOK.                      11:23

6    A     GO AHEAD.

7    Q     THIS YOU RECOGNIZE AS AN AGREEMENT YOU HAD WITH

8    MS. GILLMORE.

9    A     YES.

10   Q     IF YOU LOOK AT THE SECOND PAGE -- BY THE WAY, WAS THIS ONE         11:24

11   OF YOUR STANDARD FORMS AT THIS TIME, THIS CONFIDENTIALITY AND

12   INVENTIONS ASSIGNMENT AGREEMENT, WHICH IS EXECUTED APPARENTLY

13   SOMETIME IN 1999, IF YOU LOOK AT THE LAST PAGE?

14   A     WHAT WAS THE QUESTION?

15   Q     THIS IS THE FORM THAT YOU REQUIRED YOUR EMPLOYEES TO SIGN          11:25

16   IN THIS TIME FRAME; RIGHT?

17   A     IT LOOKS LIKE IT, YES.  AT LEAST THAT'S THE ONE

18   KAMI GILLMORE SIGNED.

19   Q     ONE OF THE PROVISIONS YOU HAD HERE IN THE SECOND PAGE IS

20   THAT THEY WILL PRESERVE THE COMPANY'S TRADE SECRETS.                     11:25

21         DO YOU RECALL THAT?

22   A     CAN YOU POINT ME, PLEASE.

23   Q     SURE.  IT'S THESE TWO PARAGRAPHS HERE.

24         DO YOU SEE THAT?

25   A     YES.                                                               11:25

```
 1   Q    AND, IN FACT, YOU'VE GOT A PROVISION HERE THAT "EMPLOYEE

 2   AGREES TO MAINTAIN THE SAME LEVEL OF CONFIDENTIALITY REGARDING

 3   CO-WORKERS."

 4           DO YOU SEE THAT?

 5   A    YES.                                                          11:26

 6   Q    AND YOUR COMPANY TOOK THE POSITION THAT BECAUSE OF THIS

 7   CONTRACT, IF SOMEONE LEFT MGA, THEY COULD NOT THEN APPROACH MGA

 8   TO TRY AND HIRE SOMEONE FOR THEIR COMPANY.

 9   A    I DON'T RECALL IF WE DID THAT OR NOT.  BUT IF WE DID, IT'S

10   ILLEGAL, IT'S NOT ENFORCEABLE.                                    11:26

11   Q    WELL, YOU SAID IT'S OKAY TO DO THAT; RIGHT?  IT'S OKAY FOR

12   AN EMPLOYEE TO LEAVE A COMPANY AND THEN TRY AND HIRE EMPLOYEES

13   FROM THE COMPANY THAT THEY LEFT; RIGHT?

14   A    THAT'S MY BELIEF; THAT IN CALIFORNIA, OR IN THE UNITED

15   STATES, YOU CAN HIRE EMPLOYEES FROM ONE COMPANY TO ANOTHER.       11:26

16   Q    BUT YOU ACTUALLY WOULD SEND OUT LETTERS TO FORMER

17   EMPLOYEES WHO TRIED TO DO THAT AND SAY 'THAT'S ILLEGAL, WE'LL

18   SUE YOU IF YOU DO IT.'

19   A    WE MIGHT HAVE SAID THAT, YES, BUT THAT'S NOT LEGAL, AND WE

20   HAVE NOT SUED ANYBODY OVER THAT.                                  11:27

21   Q    IF YOU WOULD LOOK AT EXHIBIT 10036, THAT'S IN THE SMALLER

22   BINDER, YOU SEE ON THE FIRST PAGE, THERE IS A LETTER ON MGA

23   LETTERHEAD, WRITTEN BY YOU.

24   A    GO AHEAD.

25   Q    DO YOU RECOGNIZE THAT?                                       11:27
```

1    A    I DO.

2    Q    THAT'S YOUR SIGNATURE?

3    A    IT IS.

4    Q    IT'S A LETTER SENT TO KAMI GILLMORE; CORRECT?

5    A    IT IS.                                                    11:27

6    Q    AFTER SHE LEFT MGA.

7    A    I DON'T KNOW.  IT MUST BE AFTER SHE LEFT MGA; RIGHT.

8    Q    AND IT'S SENT TO HER TO TELL HER YOU CANNOT RECRUIT

9    EMPLOYEES AT MGA.

10   A    HOLD ON ONE SECOND.                                       11:27

11        IT SAYS SOMETHING TO THAT EFFECT IN PARAGRAPH TWO,

12   YES.

13        MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 11036 INTO

14   EVIDENCE.

15        THE COURT:  ANY OBJECTION?                                11:28

16        MR. NOLAN:  NO OBJECTION, YOUR HONOR.

17        THE COURT:  ADMITTED.  YOU MAY PUBLISH.

18        MR. PRICE:  JUST ADMITTING THE FIRST PAGE AT THIS

19   POINT.

20   BY MR. PRICE:                                                  11:28

21   Q    SO THIS IS NOVEMBER 10, 2000; CORRECT?

22   A    YES.

23   Q    AND LOOK AT THE SECOND PARAGRAPH:  "I WAS TOLD BY

24   MATT HEDRICK THAT YOU SUGGESTED THAT HE HAD ATTEMPT TO RECRUIT

25   COLLEEN O'HIGGINS TO WORK FOR PLAY HUT."                       11:28

```
 1              DO YOU SEE THAT?

 2    A    YES.

 3    Q    "ANY SUCH ATTEMPT TO SOLICIT THE COMPANY'S PERSONNEL

 4    REPRESENTS SERIOUS INTERFERENCE WITH THE COMPANY'S BUSINESS AND

 5    FINANCIAL INTERESTS AND, IF TRUE, WOULD VIOLATE THAT PART OF        11:28

 6    THE AGREEMENT IN WHICH YOU AGREED TO, QUOTE, 'MAINTAIN THE SAME

 7    LEVEL OF CONFIDENTIALITY' REGARDING CO-WORKERS, EMPLOYEE

 8    RELATION MATTERS, AND COMPANY OPERATIONS AS REGARDS TO TRADE

 9    SECRETS AND CONFIDENTIAL INFORMATION."

10              THAT'S WHAT YOU WROTE TO HER.                             11:29

11    A    I DID.

12    Q    WERE YOU TRYING TO SCARE HER?

13    A    I DON'T RECALL WHAT I WAS TRYING TO DO.  ALL I KNOW IS

14    THAT WE GOT A LETTER FROM HER ATTORNEY AFTERWARD SAYING THAT

15    THIS IS ILLEGAL, AND WE DROPPED THE WHOLE THING.  WE NEVER SUED     11:29

16    OR TOOK ACTION AGAINST KAMI GILLMORE.

17    Q    WELL, HERE YOU TOLD HER ON NOVEMBER 2000, "PLEASE BE AWARE

18    THAT I WILL TAKE ANY APPROPRIATE ACTION WITH REGARD TO SAFE-

19    GUARDING THE COMPANY'S CONFIDENTIAL INFORMATION AND IMPROPER

20    ATTEMPTS TO SOLICIT CURRENT EMPLOYEES."                            11:29

21              THAT'S WHAT YOU TOLD HER IN NOVEMBER OF 2000;

22    CORRECT?

23    A    IT APPEARS SO, YES.

24    Q    SO THEN, YOUR BELIEF, THEN, PRIOR TO THIS, OBVIOUSLY, IN

25    1999, WAS -- THIS IS NOVEMBER 2000 -- AS OF NOVEMBER 2000, MGA     11:29
```

```
 1   TOOK THE POSITION, YOU KNOW, IF YOU LEAVE MGA, YOU CAN'T

 2   SOLICIT ANY EMPLOYEES FOR MGA; RIGHT?

 3   A    WE TOOK THAT POSITION.  THAT POSITION IS WRONG.  YOU

 4   CANNOT STOP EMPLOYEES TO MOVE FROM ONE COMPANY TO ANOTHER IN

 5   CALIFORNIA.

 6   Q    I UNDERSTAND THAT YOU NOW SAY THAT WAS WRONG.

 7          BUT MY QUESTION IS, IN 1999 AND AT LEAST AS OF UP TO

 8   NOVEMBER 10, 2000, THAT'S THE POSITION YOU TOOK; RIGHT?

 9   A    YES.

10   Q    AND AT THE SAME TIME YOU TOOK THAT POSITION, AS IN

11   EXHIBIT 5715, YOU WERE ENCOURAGING FORMER MATTEL EMPLOYEES TO

12   RECRUIT EMPLOYEES FROM MATTEL; CORRECT?

13   A    WE WERE ENCOURAGING EX-MATTEL EMPLOYEES WHO WERE AT MGA TO

14   LOOK FOR OTHER PEOPLE, AND WE WERE ALSO ASKING MATTEL HUMAN

15   RESOURCES IF THEY HAD PEOPLE TO COME TO US.

16   Q    AND FOCUSING ON NOW HAVING FORMER MATTEL EMPLOYEES CONTACT

17   CURRENT MATTEL EMPLOYEES TO RECRUIT THEM, IN THIS AREA YOU

18   WEREN'T APPLYING THE SAME RULES TO BOTH COMPANIES; RIGHT?  YOU

19   WERE SAYING 'MY FORMER EMPLOYEES CAN'T DO THAT, BUT I'M GOING

20   TO ASK MATTEL EMPLOYEES TO DO THAT.'

21   A    I DON'T UNDERSTAND YOUR QUESTION.  CAN YOU CLARIFY?

22   Q    I'LL TRY TO CLARIFY.  THIS IS 5715.

23          WHERE YOU'RE ASKING KAMI, WHO YOU KNOW AS A FORMER

24   MATTEL EMPLOYEE, TO COME UP WITH NAMES OF PEOPLE WHO WORK AT

25   MATTEL.
```

11:30
11:30
11:30
11:30
11:31

```
 1   A    RIGHT.

 2   Q    FOR RECRUITING; CORRECT?

 3   A    YES.

 4   Q    DO YOU SEE ANYTHING INCONSISTENT WITH TELLING YOUR OWN

 5   EMPLOYEES IN THIS TIME FRAME, 'IF YOU LEAVE, YOU CAN'T RECRUIT   11:31

 6   MGA EMPLOYEES.'  BUT, AT THE SAME TIME, TELLING THE FORMER

 7   MATTEL EMPLOYEES WHO WERE WORKING WITH YOU, 'GO GET 'UM AT

 8   MATTEL.'

 9   A    I DO SEE AN INCONSISTENCY IN THAT.

10   Q    YOU MENTIONED PEOPLE WHO WERE LAID OFF; CORRECT?          11:31

11        YOU ALSO RECRUITED PEOPLE WHO WERE LAID OFF; CORRECT?

12   A    CORRECT.

13   Q    AND WE LOOKED AT I THINK IT WAS EXHIBIT 16911, WHICH IS A

14   LETTER THAT YOU ACTUALLY WROTE TO SOMEONE AT MATTEL CONCERNING

15   LAYOFFS.  DO YOU RECALL THAT?                                  11:31

16   A    CAN YOU PLEASE REPEAT.

17   Q    16911 WHICH IS ALSO --

18   A    I HAVE IT.

19   Q    DO YOU RECALL THIS IN JUNE OF 2000, WHERE YOU'RE WRITING

20   TO MR. HANDY AT MATTEL, SAYING "WITH THE LAYOFFS, LET ME KNOW   11:32

21   IF YOU KNOW SOME GOOD PEOPLE WE CAN CONSIDER."

22        DO YOU SEE THAT?

23   A    YOU MEAN MARCH OF 2000?

24   Q    YOU'RE RIGHT.  MARCH OF 2000.

25        AND JOHN HANDY, AGAIN, WAS WHO?                           11:32
```

1   A    TO THE BEST OF MY RECOLLECTION, HE WAS A SENIOR VICE

2   PRESIDENT OF DESIGN AT MATTEL.

3   Q    DOES YOUR COMPANY HAVE POLICIES AS TO THE SORT OF BENEFITS

4   IT GIVES TO ITS EMPLOYEES WHEN IT HAS LAYOFFS?

5   A    I'M NOT SURE IF WE DO.  I THINK WE DO.  I'M NOT FAMILIAR          11:32

6   WITH IT.

7   Q    WELL, IT'S TRUE, IS IT NOT, YOUR UNDERSTANDING, THAT MOST

8   COMPANIES, PARTICULARLY THE SIZE OF MATTEL, HAVE BENEFITS THEY

9   GIVE TO THE EMPLOYEES THAT THEY HAVE TO LAYOFF?

10  A    I HAVE NO IDEA WHAT POLICIES MATTEL HAS ONE WAY OR              11:33

11  ANOTHER.

12  Q    WOULD IT SURPRISE YOU THAT IF WHEN MATTEL LAYS OFF

13  EMPLOYEES, IT TRIES TO GIVE THEM ASSISTANCE TO FIND JOBS?

14         MR. NOLAN:  OBJECTION.  LACKS FOUNDATION, YOUR HONOR;

15  ALSO CALLS FOR SPECULATION.                                          11:33

16         THE COURT:  REPHRASE YOUR QUESTION OR LAY THE

17  FOUNDATION.

18  BY MR. PRICE:

19  Q    IS IT YOUR UNDERSTANDING THAT IT IS GOOD CORPORATE POLICY,

20  GOOD CORPORATE CITIZENSHIP, FOR A COMPANY WHO LAYS OFF             11:33

21  EMPLOYEES TO TRY TO HELP ITS EMPLOYEES FIND JOBS?

22  A    IT IS.

23  Q    AND HERE IN MARCH OF 2000 YOU'RE ASKING MR. HANDY ABOUT

24  EMPLOYEES THAT MATTEL HAS LAID OFF; CORRECT?

25         I'LL CALL YOUR ATTENTION TO THIS:

2204

1          "WITH ALL THAT IS HAPPENING AT MATTEL, ALL THE

2    LAYOFFS, ET CETERA, PLEASE LET ME KNOW IF YOU KNOW GOOD PEOPLE

3    WE CAN CONSIDER."

4          AND THEN YOU ACTUALLY LIST SOME POSITIONS; CORRECT?

5    A    YES.                                                     11:34

6    Q    AND OF COURSE YOU THOUGHT THERE'S NOTHING WRONG WITH

7    ASKING MATTEL, IF THEY HAVE SOME GOOD PEOPLE WHO THEY ARE

8    LAYING OFF, THAT THEY MIGHT BE ABLE TO WORK WITH US.

9    A    ET CETERA.

10   Q    ET CETERA?  YOU THOUGHT NOTHING WRONG WITH THAT?       11:34

11   A    NOTHING WRONG.

12   Q    AND YOU AGREE IT'S GOOD CORPORATE CITIZENSHIP, EVEN IF YOU

13   DON'T KNOW MATTEL'S POLICIES, FOR A COMPANY WHO'S LAYING OFF

14   ITS EMPLOYEES, TO TRY AND HELP THEM FIND JOBS; RIGHT?

15   A    IT IS GOOD CITIZENSHIP, YES.                            11:34

16   Q    THAT'S A DIFFERENT SITUATION, THAN, FOR EXAMPLE,

17   KAMI GILLMORE LEAVING MGA AND CONTACTING CURRENT MGA EMPLOYEES.

18   A    WHAT IS THE DIFFERENCE?

19        I DON'T UNDERSTAND YOUR QUESTION.

20   Q    WELL, DO YOU BELIEVE IT'S GOOD CORPORATE CITIZENSHIP THAT  11:34

21   A COMPANY SHOULD BE HAPPY WHEN ITS COMPETITORS TRY TO POACH

22   THEIR EMPLOYEES?

23   A    SHOULD NOT BE HAPPY.  BUT IT'S NOT ILLEGAL.  IT'S DONE ALL

24   OF THE TIME.  YOU DID IT.

25   Q    AND MR. HANDY'S RESPONSE WAS "RAIME IS OUR HUMAN RESOURCE  11:35

2205

```
 1   PERSON" -- AND YOU UNDERSTAND HUMAN RESOURCE PEOPLE DEAL WITH
 2   LAYOFFS AND EMPLOYEE MATTERS?
 3   A     AND RECRUITMENT, YES.
 4   Q     "WE AREN'T CURRENTLY LAYING OFF ANYONE IN MY DIVISION.  IN
 5   FACT, WE'RE LOOKING FOR GOOD PEOPLE OURSELVES.  BUT I KNOW THE      11:35
 6   LEARNING COMPANY IS HAVING LAYOFFS, AND IF ANYONE THERE IS A
 7   FIT FOR YOUR NEEDS, RAIME, LET ME KNOW."
 8   A     YES.
 9   Q     YOU THOUGHT THIS IS GOOD CORPORATE CITIZENSHIP THAT IF
10   SOMEONE IS LAYING OFF PEOPLE, THAT THEY SHOULD BE WILLING TO        11:35
11   HELP THOSE FOLKS FIND JOBS.
12   A     I KNOW IT'S A GOOD CORPORATE CITIZENSHIP TO DO THAT, YES,
13   SIR.
14   Q     I ASKED YOU EARLIER, I TAKE IT YOU DON'T KNOW IF YOU HAVE
15   POLICIES, IF MGA HAS POLICIES, WHERE THEY TRY AND DO THAT.          11:36
16   A     I TOLD YOU I DON'T KNOW IF WE HAVE A POLICY SIMILAR TO
17   YOURS OR NOT.  I'M NOT AWARE COMPLETELY OF THE POLICY.
18         IF YOU WOULD LIKE, I CAN FIND OUT AND COME BACK TO
19   YOU.
20   Q     LET'S MOVE TO ANOTHER TOPIC NOW.                             11:36
21         AT THE END OF YOUR EXAMINATION, I BELIEVE YOU SAID,
22   RATHER EMPHATICALLY, "WE HAVE HAD NO REASON TO HIDE CARTER
23   BRYANT."
24   A     THAT'S ABSOLUTELY TRUE.
25   Q     NOW, HERE'S MY QUESTION:                                     11:36
```

Exhibit D, Page 985

1          DO YOU REMEMBER MR. NOLAN ASKED YOU WHETHER YOU WERE

2    HERE DURING MR. QUINN'S OPENING STATEMENT?

3    A    I WAS.

4    Q    WERE YOU HERE DURING MR. NOLAN'S OPENING STATEMENTS?

5    A    YES, SIR, I WAS.                                          11:36

6    Q    AND DO YOU RECALL DURING THAT OPENING STATEMENT THAT

7    MR. NOLAN SAID TO THE JURY THAT "ISAAC LARIAN WILL EXPLAIN WHY

8    HE DID MAKE EFFORTS AT SOME TIMES TO CONCEAL WHO THE DESIGNER

9    WAS ON BRATZ FOR A VERY GOOD REASON.  ISAAC LARIAN WILL EXPLAIN

10   TO YOU THIS IS A VERY, VERY COMPETITIVE MARKET.  HE DID NOT     11:37

11   WANT THE IDENTITY OF CARTER BRYANT OR ANY OF HIS EMPLOYEES OUT

12   THERE."

13          DID YOU HEAR YOUR ATTORNEY SAY THAT?

14   A    I DID.

15   Q    SO ON THE ONE HAND, YOU'RE SAYING TO THE JURY 'THERE IS NO  11:37

16   REASON THAT WE EVER HAD TO HIDE CARTER BRYANT.'

17   A    THAT'S ABSOLUTELY TRUE.  WE HAVE NEVER HAD THE REASON TO

18   HIDE THE IDENTITY OF CARTER BRYANT.

19   Q    BUT ON THE OTHER HAND, YOU'RE SAYING YOU DID HAVE A REASON

20   AND YOU DID HIDE HIM AT SOME TIMES BECAUSE YOU DON'T WANT YOUR   11:37

21   EMPLOYEES -- YOU'RE TAKING THE POSITION THAT YOU DID CONCEAL

22   CARTER BRYANT ON SOME OCCASIONS, BECAUSE YOU DIDN'T WANT HIS

23   IDENTITY OR ANY OF YOUR EMPLOYEES' IDENTITIES OUT THERE.

24   A    WE DON'T WANT OUR COMPANY'S EMPLOYEES IDENTITIES OUT THERE

25   BECAUSE NO OTHER TOY COMPANY DOES, FRANKLY.                     11:38

2207

1  Q    WELL, WE'LL GET TO THAT, BECAUSE YOU'RE TALKING ABOUT

2  COLLECTIBLES.

3         SO WHICH ONE IS IT?  IS IT THAT AT NO TIME YOU HAD

4  ANY REASON TO HIDE CARTER BRYANT?  OR IS IT THAT AT SOME TIMES

5  YOU TRIED TO CONCEAL CARTER BRYANT BECAUSE YOU DIDN'T WANT        11:38

6  OTHER PEOPLE TO KNOW WHO YOUR EMPLOYEES WERE?

7  A    WE ABSOLUTELY NEVER INTENTIONALLY WENT OUT OF OUR WAY TO

8  CONCEAL CARTER BRYANT'S NAME FROM ANYBODY.  NEVER.

9  Q    LET ME ASK YOU THIS:  WE TALKED ABOUT THAT WALL STREET

10 JOURNAL ARTICLE ON JULY 18, 2003.  DO YOU REMEMBER THAT?          11:38

11 A    YES.

12 Q    AND DO YOU RECALL, I READ THE ADMISSIONS INTO EVIDENCE

13 THAT MGA HAD MADE ABOUT THAT ARTICLE.

14 A    I RECALL A LOT OF THINGS.  I'M NOT SURE IF I RECALL EVERY

15 WORD YOU SAID, SIR.                                               11:38

16 Q    I CAN'T BLAME YOU.

17        NOW, JULY 18, 2003, THAT'S ALMOST THREE YEARS, ABOUT

18 TWO AND A HALF YEARS, TEN AND A HALF MONTHS, FROM THE TIME YOU

19 BEGAN MEETING WITH CARTER BRYANT IN SEPTEMBER OF 2000; CORRECT?

20 A    YES.                                                         11:39

21 Q    AND IT'S FAIR TO SAY THAT IF YOU HAD NO REASON TO HIDE

22 CARTER BRYANT, YOU CERTAINLY WOULD NOT HAVE BEEN TELLING ANY

23 EMPLOYEES THAT YOU WANTED CARTER BRYANT'S NAME TO BE KEPT UNDER

24 WRAPS.

25 A    I NEVER, TO THE BEST OF MY RECOLLECTION, EVER TOLD ANY       11:39

Exhibit D - Page 987

2208

1   EMPLOYEE THAT I WANT CARTER BRYANT'S NAME UNDER WRAP.

2   Q    AND YOU CAN DENY THAT EMPHATICALLY, BECAUSE YOU HAD NO

3   REASON TO HIDE CARTER BRYANT; RIGHT?

4   A    I HAD NO REASON, THEN OR NOW, TO HIDE CARTER BRYANT'S

5   NAME.                                                          11:39

6   Q    AND BECAUSE YOU'RE SO EMPHATICALLY SURE OF THAT, IF YOU

7   HAD EVER BEEN ASKED UNDER OATH, 'HEY, DID YOU TELL EMPLOYEES

8   THEY SHOULD HIDE CARTER BRYANT'S NAME,' YOUR ANSWER WOULD BE

9   'NO, I NEVER DID THAT.'

10  A    NO.  I WOULD SAY, BECAUSE I COULD NEVER SAY I NEVER DID   11:39

11  THAT, MY ANSWER WOULD BE 'I DON'T RECALL EVER DOING THAT.'

12  Q    OR WOULD IT BE 'I DON'T RECALL ONE WAY OR THE OTHER'?

13  A    OR IT COULD BE 'I DON'T RECALL ONE WAY OR THE OTHER.'

14  Q    YOU UNDERSTAND THE DIFFERENCE BETWEEN THOSE TWO ANSWERS?

15  IF YOU SAY 'I DON'T RECALL ONE WAY OR THE OTHER,' THAT SUGGESTS 11:40

16  THAT SOMETHING THAT MIGHT HAVE HAPPENED.

17  A    I JUST KNOW I DON'T RECALL DOING IT ONE WAY OR ANOTHER, OR

18  IF I'M EVER ASKED THAT.

19       I DON'T KNOW HOW ELSE TO ANSWER THAT.

20  Q    WE PLAYED THIS DURING YOUR INITIAL EXAMINATION; IT'S YOUR  11:40

21  SECOND VOLUME, PAGE 278, LINE 2, TO 270, LINE 15.

22       QUESTION:  "DID YOU EVER TELL RACHEL HARRIS,

23            IN WORDS OR SUBSTANCE, THAT SHE SHOULDN'T TALK

24            ABOUT CARTER BRYANT BEING INVOLVED WITH BRATZ?

25            ANSWER:  I DON'T RECALL IF I HAVE OR NOT."        11:41

1    **BY MR. PRICE:**

2    Q    DO YOU SEE THAT?

3    A    I DO.

4    Q    TODAY AND YESTERDAY YOU WERE EMPHATIC THAT YOU WOULD NEVER

5    HAVE SAID THAT TO ANYONE BECAUSE YOU WEREN'T TRYING TO HIDE        11:41

6    CARTER BRYANT.

7    A    NO.   TODAY AND YESTERDAY AND TOMORROW, I EMPHATICALLY WILL

8    TELL YOU, LADIES AND GENTLEMEN OF THE JURY, THERE WAS NO REASON

9    FOR US TO HIDE CARTER BRYANT'S NAME.   AND WE NEVER DID.

10   Q    SO THEREFORE, IF THAT'S TRUE, IF YOU WERE GOING TO ANSWER     11:41

11   THIS TRUTHFULLY, THE ANSWER WOULD BE, NO.

12        "DID YOU EVER TELL RACHEL HARRIS, IN WORDS OR IN

13   SUBSTANCE, THAT SHE SHOULDN'T TALK ABOUT CARTER BRYANT BEING

14   INVOLVED WITH BRATZ?

15        IF WHAT YOU'RE SAYING IS TRUE, YOU NEVER HAD THE             11:41

16   INTENTION OF DOING THAT, YOU NEVER DID THAT, THE TRUTHFUL

17   ANSWER WOULD BE NO; RIGHT?

18   A    MY ANSWER WAS 'I DON'T RECALL IF I HAVE OR NOT.'

19   Q    SO AT THAT TIME, AS OF JULY 2006, YOU WEREN'T WILLING TO

20   DENY AT THAT TIME THAT YOU HAD TOLD EMPLOYEE RACHEL HARRIS THAT    11:42

21   SHE SHOULDN'T TALK ABOUT CARTER BRYANT BEING INVOLVED WITH

22   BRATZ.   YOU WERE NOT WILLING TO DENY THAT, WERE YOU?

23   A    I DID NOT RECALL, AND I STILL DO NOT RECALL, IF I HAVE

24   EVER DONE THAT.   THAT'S THE ANSWER.

25   Q    SO IF RACHEL HARRIS CAME IN HERE AND SAID "I SPOKE WITH      11:42

```
 1   MR. LARIAN AND HE TOLD ME THAT MGA DID NOT WANT CARTER BRYANT'S

 2   NAME ASSOCIATED WITH BRATZ," IF SHE CAME IN HERE AND SAID THAT,

 3   YOU CANNOT DENY SHE SAID THAT -- THAT YOU SAID THAT.

 4   A    I'M SORRY?

 5   Q    I BLEW IT AT THE END, DIDN'T I.

 6        IF RACHEL HARRIS CAME IN HERE AND SAID "ISAAC LARIAN

 7   TOLD ME HE DID NOT WANT CARTER BRYANT'S NAME ASSOCIATED WITH

 8   BRATZ," IF SHE TESTIFIED TO THAT, YOU COULD NOT DENY THAT YOU

 9   SAID THAT TO HER.

10   A    I STILL DON'T UNDERSTAND YOUR QUESTION.

11        I DON'T KNOW WHAT SHE SAYS OR HASN'T SAID.

12        I KNOW WHAT I AM SAYING, AND I HAVE SAID THAT FROM

13   THE BEGINNING AND I HAVE SAID THAT TO YOU TODAY.  I HAD NO

14   REASON EVER TO HIDE CARTER BRYANT'S NAME.  CARTER BRYANT'S NAME

15   WAS GIVEN IN JANUARY OF 2001 -- DECEMBER OF 2000 TO WAL-MART,

16   THE BIGGEST CUSTOMER IN THE WORLD.

17   Q    YOU CAN'T DENY THAT YOU TOLD RACHEL HARRIS THAT YOU DON'T

18   WANT CARTER BRYANT'S NAME BEING INVOLVED IN BRATZ.  YOU CAN'T

19   DENY THAT, CAN YOU?

20   A    MY ANSWER IS, I DON'T RECALL IF I HAVE SAID THAT TO HER OR

21   NOT.  I DON'T RECALL THAT.  MY ANSWER IS I DO NOT RECALL.

22   Q    AND IT'S CERTAINLY TRUE THAT WHEN CARTER BRYANT FAXED HIS

23   CONTRACT BACK TO MGA, IT'S TRUE THAT IF YOU WEREN'T TRYING TO

24   HIDE CARTER BRYANT'S NAME, THERE WOULD BE NO REASON FOR YOU, OR

25   ANYONE, TO WHITE OUT A FAX HEADER FROM BARBIE COLLECTIBLES;
```

11:42

11:42

11:43

11:43

11:43

11:44

1    RIGHT?

2    A    THERE WAS NO REASON FOR ME OR ANYONE TO HIDE THE BARBIE

3    COLLECTIBLES FAX LETTER WHEN I WAS SENDING THAT FAX TO MY

4    ATTORNEY PATRICIA GLASER, WHO'S BEEN A FAMILY FRIEND OF MINE

5    FOR THE PAST 15 YEARS.                                           11:44

6    Q    BUT, IN FACT, THAT'S WHAT YOU DID.

7    A    I DID NOT.

8    Q    YOU JUST SAID THAT YOU TOLD YOUR BIGGEST CUSTOMER,

9    WAL-MART, ABOUT CARTER BRYANT.  DO YOU RECALL THAT?

10   A    I DID.                                                      11:44

11   Q    IS THAT REFERRING TO EXHIBIT 17281?

12   A    THE BIG BOOK OR THE SMALL BOOK?

13   Q    IT'S IN BOTH THE SMALL BOOK AND IN YOUR ATTORNEY'S SMALL

14   BOOK; IT'S SOMETHING YOU TALKED ABOUT YESTERDAY.

15   A    YES; THAT'S WHAT I AM REFERRING TO.                         11:45

16           MR. PRICE:  MAY WE PUT THIS UP?  IT'S IN EVIDENCE.

17           THE COURT:  YOU MAY.

18   BY MR. PRICE:

19   Q    FIRST OF ALL, THIS IS AN E-MAIL WITHIN MGA; RIGHT?

20   A    IT IS FROM ERIC YIP, WHO WORKED FOR MGA, AND ELING POON,    11:45

21   WHO WORKED FOR WAL-MART -- WAS THE AGENT FOR WAL-MART.  PREL

22   WAS THE AGENT, THE BUYING AGENT, FOR WAL-MART IN HONG KONG.

23   Q    SO ELING POON WAS NOT AN EMPLOYEE OR A CONTRACTOR FOR MGA;

24   IS THAT RIGHT?

25   A    NO.  SHE WORKED FOR A COMPANY CALLED PREL, WHICH I BELIEVE  11:45

1    STANDS FOR PACIFIC RESOURCE, I DON'T REMEMBER.  THEY WERE A BIG

2    AGENT FOR WAL-MART IN HONG KONG AND CHINA.

3    Q    AND YOU'RE SAYING THAT YOU REVIEWED --

4         DO YOU SEE WHERE IT SAYS J-PEG?

5    A    YES.                                                    11:46

6    Q    YOU'RE SAYING YOU INTERVIEWED EACH AND EVERY ONE BEFORE IT

7    WAS SENT OUT.

8    A    NO.  I INSTRUCTED ERIC YIP TO SEND THESE DRAWINGS, THIS

9    J-PEG, TO WAL-MART TO GET RON STOVER TO COME OVER TO VISIT,

10   BECAUSE HE DIDN'T WANT TO COME AND VISIT US.                 11:46

11   Q    AND YOU SELECTED THE PRECISE ONES TO SEND, YOU'RE SAYING.

12   A    NO.  I JUST SAID SEND THOSE DRAWINGS TO HER.

13   Q    SO ALL YOU TOLD MR. YIP WAS 'I WANT YOU TO SEND THESE

14   DRAWINGS OF THE BRATZ DOLLS SO THE CUSTOMER WILL KNOW WHAT THEY

15   LOOK LIKE.'                                                  11:46

16   A    THEY WERE NOT DOLLS; THESE WERE THE DRAWINGS THAT WERE

17   GOING TO BECOME THE BASIS FOR BRATZ.  AND I DID ASK ERIC YIP TO

18   SEND THAT TO ELING POON OF PREL.  I DID.

19   Q    AND YOU DID NOT SAY, 'I WANT TO SEE EACH AND EVERY ONE OF

20   THOSE BEFORE YOU SEND IT'; CORRECT?                          11:47

21   A    I DON'T RECALL SAYING THAT ONE WAY OR ANOTHER.  I DO NOT

22   RECALL THAT.

23   Q    AND IF WE LOOK AT WHAT WAS ATTACHED, THE VERY FIRST ONE

24   MENTIONS CARTER BRYANT'S NAME; CORRECT?

25   A    YES.                                                    11:47

2213

```
 1   Q    BUT YOU CAN'T TELL US THAT YOU REVIEWED THAT BEFORE IT WAS
 2   SENT; CORRECT?
 3   A    I DON'T RECALL ONE WAY OR ANOTHER IF I REVIEWED EVERY ONE
 4   OF THESE, NO.
 5   Q    IN FACT, MGA OFTEN WILL TALK WITH POTENTIAL CUSTOMERS,      11:47
 6   SUCH AS K-MART OR WAL-MART, ABOUT WHAT IT'S GOING TO BE DOING
 7   IN THE NEXT SEASON; CORRECT?
 8   A    WE TALK TO THEM, WE SHOW THEM OUR IDEAS FOR THE NEXT
 9   SEASON; THAT'S CORRECT.
10   Q    AND YOU MENTIONED THAT AT THE TOY FAIR HOW, FOR EXAMPLE,    11:47
11   WHEN YOU ARE SHOWING THINGS, EVEN AT THE TOY FAIR, THERE'S SOME
12   SORT OF SECURITY INVOLVED.
13   A    IN OUR PRIVATE SHOWS, YES.  NOT IN THE OPEN SHOWS.
14   Q    IN YOUR PRIVATE SHOWS.
15   A    RIGHT.                                                      11:47
16   Q    IN YOUR PRIVATE SHOWS, WHAT ARE YOU SHOWING IN YOUR
17   PRIVATE SHOWS, NORMALLY?
18   A    PRODUCT IDEA CONCEPTS THAT ARE GOING TO COME OUT FOR NEXT
19   SEASON, AS WELL AS SOME PRODUCTS THAT HAVE BEEN IN THE MARKET
20   BEFORE THAT THEY ARE GOING TO CARRY FORWARD TO THE FUTURE.      11:48
21   Q    SO WHY DO YOU HAVE THE SECURITY FOR YOUR PRIVATE SHOWS
22   WHERE YOU'RE GOING TO BE SHOWING PRODUCTS COMING OUT NEXT
23   SEASON?
24   A    WHY DO WE HAVE --
25   Q    SECURITY ON THESE PRIVATE SHOWS WHEN YOU ARE TALKING ABOUT  11:48
```

Exhibit D - Page 993

1    PRODUCTS COMING OUT NEXT SEASON?

2    A    TO STOP THE COMPETITORS WHO COME TO OUR SHOWROOM AND FIND

3    OUT WHAT THOSE PRODUCTS ARE AND GO KNOCK THEM OFF.

4    Q    SO WHEN YOU'RE TALKING TO YOUR CUSTOMERS LIKE K-MART AND

5    WAL-MART ABOUT THINGS THAT ARE GOING TO HAPPEN IN THE FUTURE,          11:48

6    LIKE NEXT SEASON, YOU WANT THEM TO BE QUIET ABOUT IT; RIGHT?

7    A    WE WANT THE RETAILERS TO BE QUIET ABOUT IT?

8    Q    WHEN YOU'RE SHOWING THINGS YOU'RE GOING TO HAVE IN THE

9    NEXT SEASON, YOU DON'T WANT THEM GOING TO HASBRO OR MATTEL AND

10   SAYING 'HEY, MGA HAS THIS GREAT IDEA?'                                 11:48

11   A    LET ME PUT IT THIS WAY:  WE EXPECT THEM NOT TO DO THAT.

12   BUT I'M NOT SURE IF THAT HAPPENS IN REALITY.

13   Q    WELL, NOT ONLY DO YOU EXPECT THEM NOT TO DO THAT; BUT,

14   THEY ALSO SIGN CONFIDENTIALITY AGREEMENTS AS YOUR VENDORS WHERE

15   THEY SAY THEY ARE NOT GOING TO DO THAT.                                11:49

16   A    I AM NOT AWARE OF IF THEY DO THAT OR NOT.  IT'S POSSIBLE

17   THEY DO SIGN.  I DON'T REMEMBER.

18   Q    AND WHEN YOU'RE COMMUNICATING TO SOMEONE SUCH AS -- THIS

19   IS K-MART, I BELIEVE, IF WE GO TO EXHIBIT 17281 -- THIS IS

20   DECEMBER OF 2000?                                                      11:49

21   A    WAL-MART, YOU MEAN?

22   Q    WAL-MART.  OKAY.

23        IF YOU LOOK HERE, THIS IS DECEMBER 14, 2000.  YOU HAD

24   NOT EVEN HAD YOUR SHOW IN HONG KONG AT THAT POINT, HAD YOU?

25   A    WE HAD NOT.                                                       11:49

1   Q    AND YOU HAD NOT HAD YOUR NEW YORK SHOW WHEN YOU SENT THIS

2   OUT; CORRECT?

3   A    NO.

4   Q    AND IT'S TRUE, IS IT NOT --

5   A    EXCUSE ME.  YOU MEAN THE COMING SHOW, IN 2001; RIGHT?          11:50

6   Q    THE ONE YOU TESTIFIED ON YOUR DIRECT EXAMINATION.

7   A    YES.

8   Q    SO THIS IS BEFORE YOU EVEN HAVE YOUR PRIVATE SHOW, WHERE

9   YOU'RE SHOWING THESE MOCK-UPS OF THE BRATZ DOLLS; CORRECT?

10  A    SORRY?                                                         11:50

11       THERE WERE NO MOCK-UPS OF BRATZ DOLLS AS OF

12  DECEMBER 14, 2000, IF THAT'S WHAT YOU ARE ASKING ME.

13  Q    SO IT'S FAIR TO SAY THAT YOU EXPECTED THIS COMMUNICATION

14  WITH WAL-MART TO BE CONFIDENTIAL.

15  A    I DON'T REMEMBER MY EXPECTATION AT THE TIME.  I THINK, AS      11:50

16  A MATTER OF FACT, MATTEL WAS A CATEGORY MANAGER FOR WAL-MART AT

17  THE TIME, AND I'M PRETTY SURE THEY SAW ALL OF THE COMPETITOR

18  INFORMATION FROM EVERYBODY.

19  Q    LET ME ASK YOU AGAIN.

20       I THINK YOU SAID YOU DON'T RECALL WHETHER YOU               11:50

21  EXPECTED THIS TO BE CONFIDENTIAL IN DECEMBER OF 2000.

22  A    I DON'T RECALL MY STATE OF MIND.

23       LET'S PUT IT THIS WAY:  I HOPED THAT THE WAL-MART

24  BUYER -- AGAIN, MY EXPECTATION IS THAT THEY WOULD KEEP THINGS

25  CONFIDENTIAL, WHAT'S GOING TO COME IN THE FUTURE.                   11:51

```
 1   Q    YOU ALSO TESTIFIED, THOUGH, IN YOUR EXAMINATION FROM

 2   MR. NOLAN, THAT AT SOME POINT YOU DID HAVE A REASON TO HIDE

 3   MR. BRYANT'S NAME BECAUSE YOU THOUGHT THERE MIGHT BE

 4   LITIGATION.  DO YOU RECALL THAT?

 5   A    I DON'T RECALL SAYING THAT I WANTED TO HIDE                    11:51

 6   CARTER BRYANT'S NAME BECAUSE THERE'S GOING TO BE LITIGATION.  I

 7   DID NOT WANT TO HAVE -- CAN I EXPLAIN?

 8        WE GOT A LETTER FROM YOUR LAW FIRM, I DON'T KNOW IF

 9   IT WAS MR. QUINN HIMSELF OR SOMEONE WORKING FOR HIM, TELLING US

10   THAT THE PUBLIC FAN, THE BRATZ FAN WHO'S PULLED UP A YAHOO        11:52

11   WEB SITE, WAS SOMEHOW INFRINGING MATTEL'S TRADEMARKS.  AND

12   KNOWING MATTEL AND THAT THEY WOULD FIND ANY EXCUSE TO SUE ANY

13   COMPETITOR WHO COMPETES WITH THEM, ESPECIALLY IN THE FASHION

14   DOLL, I DIDN'T WANT TO HAVE A LAWSUIT.

15   Q    LET ME ASK YOU ABOUT THIS STATEMENT YOU JUST MADE.            11:52

16        IN YOUR DIRECT EXAMINATION, YOU MENTIONED FOUR

17   LAWSUITS YOU WERE AWARE OF; CORRECT?

18   A    IN REGARDS TO FASHION DOLLS ONLY.  I KNOW MORE, IF YOU

19   WOULD LIKE TO KNOW.

20   Q    YOU MENTIONED THE FOUR CASES.  CAN I FOLLOW UP ON THAT?      11:52

21   A    ON THE FASHION DOLLS, YES.

22   Q    OF COURSE, YOU KNOW THAT THOSE ARE LAWSUITS WHERE MATTEL

23   IS SAYING SOMEONE IS USING OUR INTELLECTUAL PROPERTY; CORRECT?

24   THOSE FOUR CASES?

25   A    EITHER INTELLECTUAL PROPERTY OR -- YOU GUYS COME UP WITH A   11:53
```

1    LOT OF DIFFERENT EXCUSES TO SUE PEOPLE.

2    Q    IN FACT, MATTEL PREVAILED IN EVERY ONE OF THOSE CASES;

3    CORRECT?

4    A    I DON'T THINK YOU DID.

5    Q    DID YOU KNOW WHAT THE ALLEGATIONS WERE?  DO YOU KNOW WHAT          11:53

6    WAS BEING SAID IN THOSE CASES?

7    A    I THINK ON THE GROBURGER CASE, YES, YOUR ALLEGATION WAS

8    THAT THE RADIO CITY DOLL LOOKED LIKE BARBIE, AND I BELIEVE YOU

9    LOST THAT CASE AND YOU APPEALED THAT AND YOU SETTLED.  AND I

10   REMEMBER THAT EITHER THE FEDERAL COURT JUDGE IN THAT CASE OR          11:53

11   ANOTHER CASE SPECIFICALLY SAID -- IT'S PUBLISHED -- THAT

12   ANYBODY WHO DECIDES IN THE TOY BUSINESS TO GET INTO THE FASHION

13   DOLL BUSINESS, THEY HAVE A TARGET PAINTED ON THEIR BACK BY

14   MATTEL.

15   Q    LET'S TALK ABOUT THE TARGETS THAT YOU HAVE GONE AFTER.           11:53

16            MGA HAS FILED DOZENS OF LAWSUITS --

17   A    WE HAVE.

18   Q    -- SAYING PEOPLE HAVE INFRINGED BRATZ.

19   A    WE HAVE.

20   Q    YOU SUED ABC, BRIAN DUBINSKY, MANLEY TOY QUEST.                  11:54

21   A    HE HAD NOTHING TO DO WITH BRATZ.

22   Q    IT WAS A LAWSUIT FOR MISAPPROPRIATION OF TRADE SECRETS,

23   UNFAIR COMPETITION.

24   A    I DON'T REMEMBER THE SPECIFICS OF THAT LAWSUIT.

25   Q    IN FACT, YOU HAD A SUIT AGAINST ABC INTERNATIONAL TRADERS        11:54

1    IN BRAZIL.  DO YOU RECALL THAT?

2    A    WE DID SUE ESTRELA IN BRAZIL, YES.

3    Q    YOU SUED MATSUSHITA ELECTRIC.

4    A    HAD NOTHING TO DO WITH BRATZ.

5    Q    BUT IT WAS A CASE ABOUT UNFAIR COMPETITION.          11:54

6    A    NO IT WAS NOT.

7    Q    WASN'T IT A CALIFORNIA SUPREME COURT CASE CONSTRUING THE

8    CALIFORNIA UNFAIR PRACTICES ACT?

9    A    I DON'T REMEMBER THAT CASE AND WHEN IT WAS.

10   Q    YOU SUED DYSCOM CORPORATION.                          11:55

11   A    I DON'T RECALL.

12   Q    BARRY MANUFACTURING COMPANY.

13   A    NO; THAT DOESN'T RING A BELL TO ME.

14   Q    HOW ABOUT CRUM & FORSTER SPECIALTY INSURANCE?

15   A    I DON'T REMEMBER IF IT WAS THEM OR NOT; THAT WAS PROBABLY   11:55

16   IN RELATION TO THE TEXAS MATTER THAT I WAS TELLING YOU ABOUT.

17   Q    THE FASHION ACCESSORIES BAZAAR.

18   A    YES, WE DID.  AND IT WAS NOT REGARDING BRATZ.

19   Q    ONE OF THE CASES YOU SAID THAT MATTEL SUED WAS HASBRO.

20        DO YOU RECALL THAT?                                   11:55

21   A    YES.

22   Q    YOU SUED HASBRO.

23   A    NOT OVER BRATZ.

24   Q    YOU SUED THEM FOR MERCHANDISE LICENSING AGREEMENT, BREACH

25   OF CONTRACT; RIGHT?                                        11:55

1   A     I DID.

2   Q     YOU SUED A COMPANY CALLED MULTITOY, WHICH WAS CONCERNING

3   BRATZ DOLLS.

4   A     I DON'T RECALL.

5   Q     SEIZURE OF COUNTERFEIT, INFRINGING BRATZ DOLLS IN FOUR          11:56

6   L.A. RAIDS.

7   A     THERE WERE A LOT OF COUNTERFEIT BRATZ DOLLS IN DIFFERENT

8   PARTS OF THE WORLD.

9   Q     IN FACT, IF WE EXPAND IT, AS YOU SAID, WE'VE TALKED ABOUT

10  SOME CASES WHERE YOU SUED IN HONG KONG.                              11:56

11  A     YES.

12  Q     AND IN THE U.K.

13  A     YES.

14  Q     YOU TRY TO PROTECT WHAT YOU BELIEVE ARE YOUR RIGHTS;

15  CORRECT?                                                             11:56

16  A     YES.  BUT I DON'T SAY ANYBODY WHO COMES IN TO THE FASHION

17  DOLL; I DON'T PAINT A TARGET ON THEIR BACK, AS MATTEL DOES.

18  Q     AND CERTAINLY YOU DON'T KNOW ANY DETAILS ABOUT -- OR MAYBE

19  YOU'RE SAYING YOU DO KNOW DETAILS ABOUT ONE OF THE FOUR CASES

20  YOU'RE TESTIFYING ABOUT; RIGHT?                                      11:56

21  A     I HAVE DETAILS.  IF YOU WOULD LIKE TO ASK ME QUESTIONS, I

22  WILL GIVE YOU THE DETAILS.

23  Q     DID YOU FOLLOW THOSE FOUR CASES?

24  A     WHICH ONE?

25  Q     YOU MENTIONED FOUR TO THE JURY.  I'M JUST WONDERING            11:56

2220

1   WHETHER OR NOT YOU TOOK IT UPON YOURSELF TO FOLLOW THOSE CASES.

2   A    I BELIEVE JUDGE LARSON -- OR YOU ASKED ME TO ONLY TALK

3   ABOUT THE ONES ON FASHION DOLLS, AND I HAVE.  I BELIEVE THAT

4   WAS THE CASE.

5   Q    MY QUESTION WAS, I'VE ASKED YOU ABOUT A NUMBER OF YOUR OWN        11:57

6   CASES, AND YOU DON'T EVEN REMEMBER SOME OF YOUR OWN CASES.

7   A    SOME OF THEM I DO, SOME I DON'T.

8   Q    BUT IT'S YOUR TESTIMONY THAT YOU DO TRACK CASES THAT

9   MATTEL FILES.

10   A    I TRACKED THOSE FOUR CASES.                                      11:57

11   Q    AND GETTING BACK TO, THEN, YOUR MINDSET IN 2000, WHEN YOU

12   RECEIVED -- I'M GOING TO SHOW IT TO YOU -- EXHIBIT 17252 --

13   A    YES, SIR.

14   Q    -- THIS IS WHAT YOU RECEIVED IN FEBRUARY OF 2002; IS THAT

15   CORRECT?                                                             11:57

16   A    YES.

17   Q    IT TALKED ABOUT USING BARBIE AND DIVA STARZ, THOSE NAMES;

18   CORRECT?

19   A    HE TALKED ABOUT BEING INFRINGED BY A BRATZ YAHOO

20   DISCUSSION GROUP WEB SITE.  YES.  THAT'S WHAT YOU WERE               11:58

21   CLAIMING.

22   Q    AND THE TWO TRADEMARKS THAT WERE BEING DISCUSSED WERE

23   BARBIE AND DIVA STARZ; CORRECT?

24   A    YES.

25   Q    AND THEN IF WE LOOK AT EXHIBIT 4507.                            11:58

Exhibit D - Page 1000

1    A    GO AHEAD.

2    Q    AND THIS IS THE E-MAIL WHERE IT INCLUDES THE DAVID DEES

3    LETTER; CORRECT?

4    A    I'M SORRY?

5              YEAH, THAT INCLUDES THE DAVID DEES LETTER.                    11:58

6              I'M NOT SURE.  I THINK CHRISTIAN'S LETTER, SOMEBODY

7    NAMED CHRISTIAN -- BRATZ.

8    Q    AND THEN DAVID DEES' RESPONSE.

9    A    I'M CONFUSED.

10   Q    LET'S FOCUS ON WHAT YOU SAY HERE.                                  11:59

11             IN MARCH OF 2002 AFTER SEEING WHAT'S ATTACHED TO THIS

12   E-MAIL, YOU DIRECT THERE'S TO BE NO MENTION ABOUT MATTEL.

13             YOU UNDERSTAND MATTEL IS A TRADEMARK OF MATTEL;

14   CORRECT?

15   A    YES.                                                              11:59

16   Q    OR ANY OF THEIR PROPERTIES.

17   A    YES.

18   Q    THAT WOULD INCLUDE BARBIE OR DIVA STARZ; RIGHT?

19   A    YES.

20   Q    NOW, HERE WE HAVE CARTER.  YOU'RE TALKING ABOUT CARTER            11:59

21   BRYANT HERE.

22   A    YES, I AM.

23   Q    AND OBVIOUSLY THAT LETTER YOU GOT FROM OUR LAW FIRM

24   CONCERNED BARBIE AND DIVA STARZ; RIGHT?

25   A    YES.                                                              11:59

1   Q    BUT YOUR FEAR HERE WAS IF CARTER WAS MENTIONED PUBLICALLY

2   AS BEING ASSOCIATED WITH BRATZ, MGA MIGHT BE SUED.

3   A    SORRY?

4   Q    YOUR CONCERN HERE IS THAT IF CARTER IS MENTIONED PUBLICLY

5   IN ASSOCIATION WITH BRATZ, THEN MGA MIGHT BE SUED BY MATTEL.        12:00

6   A    NO.  THIS LETTER, AS I TESTIFIED EARLIER, WAS, ONE, I

7   DIDN'T WANT TO HAVE A TARGET PAINTED ON MY BACK, AGAIN, AS I

8   SAID, A FEDERAL JUDGE FOUND AGAINST MATTEL --

9           MR. PRICE:  MOVE TO STRIKE.

10          THE COURT:  OVERRULED.  YOU MAY PROCEED.                    12:00

11          THE WITNESS:  SECONDLY, I DIDN'T WANT THIS GENTLEMAN,

12  MR. DAVID DEES, TALKING ABOUT ALL OF THE THINGS IN MY COMPANY

13  THAT WHERE MY OFFICES WERE, WHERE THE TOY DEPARTMENT IS, WHAT

14  FLOOR IS THE DESIGN CENTER THAT WE HAVE THERE; THAT'S THE

15  REASON.                                                             12:00

16  BY MR. PRICE:

17  Q    BUT I'M FOCUSING ON CARTER, WHICH REFERS TO CARTER BRYANT.

18  A    YES.

19  Q    DIDN'T YOU SAY THAT AS A RESULT OF THE CEASE AND DESIST

20  LETTER YOU GOT FROM MATTEL, THAT YOU WERE AFRAID MGA MIGHT BE       12:00

21  SUED.

22          DO YOU RECALL SAYING THAT?

23  A    I RECALL IT, YES.  BECAUSE, IN FACT, IN YOUR LETTER YOU

24  SAID 'IF YOU DON'T RESPOND IN A WEEK, WE WILL SUE YOU.'

25  Q    AND AS OF CERTAINLY MARCH OF 2002, THE BRATZ DOLLS HAD         12:01

1  BEEN OUT IN THE MARKET FOR SOME TIME.

2  A    THEY HAD.

3  Q    SO I THINK YOU PROBABLY THINK THAT MATTEL KNEW THAT YOU

4  MADE BRATZ DOLLS AT THAT TIME.

5  A    THEY KNEW FROM AT LEAST JANUARY 2001 THAT MGA MADE BRATZ    12:01

6  DOLLS.

7  Q    SO CERTAINLY AT THIS POINT YOU'RE NOT SAYING 'I DON'T WANT

8  MATTEL TO KNOW THAT WE DON'T HAVE BRATZ DOLLS,' BECAUSE

9  OBVIOUSLY THE WHOLE WORLD KNOWS THAT IN MARCH OF 2002; RIGHT?

10 A    YES.                                                        12:01

11 Q    BUT, WHAT YOU'RE SAYING NOT TO MENTION IS CARTER BRYANT;

12 RIGHT?

13 A    IT'S VERY CLEAR WHAT I SAID:  "THERE MUST BE NO MENTION

14 ABOUT MATTEL OR ANY OF THEIR PROPERTIES, CARTER, ANY MGA BRATZ

15 ARTS, ET CETERA."  THAT'S WHAT I SAID.                          12:02

16 Q    THIS E-MAIL IS THE E-MAIL IN WHICH DAVID DEES SAID

17 CARTER BRYANT WAS THE PERSON RESPONSIBLE FOR THOSE WONDERFUL

18 BRATZ DOLLS; RIGHT?

19 A    AMONG OTHER THINGS, YES.

20         THE COURT:  COUNSEL, WE'RE AT THE NOONTIME HOUR.        12:02

21         MR. PRICE:  WE CAN BREAK NOW.

22         (WHEREUPON JURORS DEPART COURTROOM.)

23         THE COURT:  THERE WAS NO OBJECTION OR MOTION TO

24 STRIKE THE FIRST TIME THE REFERENCE WAS MADE TO THE ALLEGED

25 STATEMENT BY THE FEDERAL JUDGE IN THE OTHER CASE, SO I WASN'T   12:03

1    FURTHER INTO THAT.

2              MR. NOLAN:   I UNDERSTAND.

3              THE CLERK:   COURT STANDS IN RECESS.

4

5

6

7

8

9

10

11

12                              CERTIFICATE

13

14   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
15   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
16   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.
17

18

19   THERESA A. LANZA, RPR, CSR          6-12-08
     OFFICIAL COURT REPORTER                    DATE
20

21

22

23

24

25

WEDNESDAY, JUNE 11, 2008          TRIAL DAY 11, MORNING SESSION

Exhibit D   Page 1004

1                  UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3                            - - -

4        **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                            - - -

6   MATTEL, INC.,                :   PAGES 2226 - 2352
                                 :
7             PLAINTIFF,         :
                                 :
8       VS.                      :   NO. ED CV04-09049-SGL
                                 :   [CONSOLIDATED WITH
9   MGA ENTERTAINMENT, INC.,     :   CV04-9059 & CV05-2727]
    ET AL.,                      :
10                               :
                                 :
11   _____DEFENDANTS._____:

12

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  RIVERSIDE, CALIFORNIA

17               WEDNESDAY, JUNE 11, 2008

18                 JURY TRIAL - DAY 11

19                  AFTERNOON SESSION

20

21

22                              MARK SCHWEITZER, CSR, RPR, CRR
                                OFFICIAL COURT REPORTER
23                              UNITED STATES DISTRICT COURT
                                181-H ROYBAL FEDERAL BUILDING
24                              255 EAST TEMPLE STREET
                                LOS ANGELES, CALIFORNIA 90012
25                              (213) 663-3494

CERTIFIED COPY

1   statement by another Federal Court out there, it is awkward.

2   But why don't we do this.  Why don't we proceed with the

3   examination, and let's see how this plays out.  Depending on

4   the circumstances, Mr. Price, I may or may not allow you to

5   recall the witness.  But it really depends how it plays out.

6           MR. PRICE:  Sure.  I don't intend to pursue that,

7   obviously, until -- I won't accuse Mr. Larian of totally

8   making it up until I've had the research done.

9           THE COURT:  I appreciate your putting it in that

10  order.  The allegations should follow the investigation.

11          MR. PRICE:  I agree.

12          THE COURT:  All right.  Let's bring the jury in.

13          **(WHEREUPON THE JURY ENTERS.)**

14          THE COURT:  Good afternoon, members of the jury.

15          Mr. Price, you may resume.

16          MR. PRICE:  Can we put up 4507.

17                  **ISAAC LARIAN, PREVIOUSLY SWORN.**

18                  **REDIRECT EXAMINATION (CONTINUED)**

19  BY MR. PRICE:

20  **Q.**   Mr. Larian, you recall during your examination with

21  Mr. Nolan, if we go to the second page of this, where we have

22  Mr. Dees saying that he couldn't take credit for Bratz, that

23  that honor would have to go to a fellow named Carter Bryant.

24          Do you recall being asked by Mr. Nolan that, if

25  there's a concealment, do you have any understanding as to

1    how David Dees would have known about Carter Bryant, and you

2    said, "I have no idea."

3            Do you recall that?

4    **A.**   Yes.

5    **Q.**   And do you have any idea how David Dees apparently had

6    Carter Bryant's e-mail address?  And you said, "I have no

7    idea."

8            Do you recall that?

9    **A.**   Yes, I do.

10   **Q.**   Well, you have an idea that Mr. Dees was an illustrator,

11   a vendor, who worked for MGA on Bratz.

12   **A.**   No, I have no idea.  I testified I have never met David

13   Dees.  I have no idea what he was doing.

14   **Q.**   Okay.  Reading this, you say they are asking him about

15   whether or not he can post pictures of Bratz, and he says I

16   work as a free-lance -- as an illustrator, have my own studio

17   at home.

18           Do you see that?

19   **A.**   I do.

20   **Q.**   All right.  MGA used vendors such as Ms. Leahy and

21   Ms. Rhee and others to assist with Bratz; correct?

22   **A.**   We did.

23   **Q.**   And you just don't know who all the vendors are.

24   **A.**   I don't know Mr. David --

25   **Q.**   David Dees.

1   A.   David Dees.

2   Q.   If we look at -- well, you see, it says, "I can't take

3   credit for creating the Bratz dolls."

4        Do you see that?

5   A.   I do.

6   Q.   That's because someone was complimenting his fashions

7   for Bratz; correct?

8   A.   I have no idea what he was saying.  I don't know who

9   this gentleman needs to be.  I don't know who he is.

10  Q.   Let's put it this way.  If Mr. Dees was a vendor who

11  worked as an illustrator on Bratz and worked with Carter

12  Bryant, he would know who Carter Bryant is.

13       MR. NOLAN:  Objection, your Honor.  Lack of

14  foundation.  Calls for speculation.

15       THE COURT:  Sustained.

16  Q.   BY MR. PRICE:  Well, your vendors again, such as Anna

17  Rhee and Ms. Leahy and Ms. Marlow, you have them sign

18  typically confidentiality agreements when they are working on

19  projects for MGA; correct?

20  A.   I believe so, again.  That's what I believe.

21  Q.   If we look at Exhibit 4942, which Mr. Nolan asked you

22  about.

23  A.   Yes.

24  Q.   And if we could blow up the bottom part of this.  This

25  was the e-mail from Dee Dee Valencia.  This was the e-mail to

```
 1   you from Dee Dee Valencia about Bratz.

 2              Do you recall Mr. Nolan asking you questions about

 3   this?

 4   A.   I did.

 5   Q.   And he pointed out that she's talking here about doing a

 6   limited edition collectible.

 7              Do you recall that?

 8   A.   Limited edition collectible.   Yes.

 9   Q.   And then Mr. Nolan asked you can you tell the jury

10   whether or not you know who the designer for the doll My

11   Scene is.

12              You recall that question?

13   A.   I do.

14   Q.   And, of course, you don't know who designed My Scene.

15   You didn't know until recently.

16   A.   I didn't know until recently.

17   Q.   And he said after My Scene, Mattel released a doll

18   called Flavas.

19              You remember that?

20   A.   I do.

21   Q.   And you said you didn't really know who designed that;

22   correct?

23   A.   I still don't know who designed that.

24   Q.   But this e-mail isn't talking about mass market dolls,

25   is it?
```

2235

1    A.    It's talking about -- no.  It's talking about -- it says

2    about limited edition collectibles.  And sometimes limited

3    edition collectibles are sold to mass markets, sometimes.

4    Q.    Well, whether or not you knew who the designer of My

5    Scene was or Flavas is sort of irrelevant to the question of

6    whether or not on limited edition collectibles, the designer

7    signs the package or something associated with the doll.

8              MR. NOLAN:  Objection, your Honor.  Argumentative.

9    Lack of foundation.

10             THE COURT:  Rephrase it, Counsel.

11             MR. PRICE:  Sure.

12   Q.    Let's ask it this way.  You know that Mattel has done

13   limited edition collectibles?

14   A.    I believe they have.

15   Q.    And, in fact, you've heard of a -- you keep track of the

16   competition sometimes; right?

17   A.    Sometimes.

18   Q.    You know about Grand Entrance Barbie?

19   A.    I'm sorry?

20   Q.    Grand Entrance Barbie, a limited edition collectible?

21   A.    I don't.  I'm sorry.  I don't know that one.

22   Q.    Well, you have seen Barbie collectibles signed by --

23   where the packaging is signed by the designer; right?

24   A.    I have seen a catalog where they give credit to

25   designers, a mail order catalog.

1   Q.   And some of these are also in stores; right?

2   A.   I'm sorry?

3   Q.   These are also in stores; correct?

4   A.   I don't know if they are or not.

5   Q.   Well, in any event, Mattel does limited edition

6   collectibles that are signed by designers; correct?

7   A.   Again, I have seen a mail order catalog from Barbie

8   collectible where they have given credit for some, not all,

9   some of the designers in that catalog to the best of my

10  recollection.

11  Q.   And, for example, Carter Bryant had his signature on a

12  Mattel doll; correct?

13  A.   I saw that, yes.

14  Q.   And also Robert Best?

15  A.   I don't know who Robert Best is.

16  Q.   Sharon Zuckerman?

17  A.   She applied for a job at MGA.

18  Q.   Good for her.  She also had her signature on a Mattel

19  limited edition doll; right?

20  A.   I have no idea.  I don't know.

21  Q.   In any event, what Ms. Valencia here is talking to you

22  about is whether or not the limited edition collectible

23  should be signed by question mark, I know we can't keep

24  Carter under wraps.

25          You understood she was talking about having a

1    designer sign not your mass market brands, but a limited

2    edition collectible.

3    A.    I have no idea what was on her mind when she wrote this

4    e-mail.  You should ask her to come and testify.

5    Q.    I'm just asking you as someone who read it.  You'll

6    agree that she's only talking about a signature in connection

7    with a limited edition collectible doll for Bratz.

8    A.    I believe reading that e-mail, yes, I believe that's

9    what she's asking.

10   Q.    And you understand that there's some thought why at

11   least some folks in the toy industry, that if you have the

12   designer sign the packaging, it might make it more

13   collectible.

14   A.    I believe the collectors like -- again, this is my

15   assumption.  I'm not a doll collector, but I believe the

16   collectors probably put more value on the dolls that are

17   signed.

18   Q.    Let me switch to a different topic.  You recall that in

19   your examination Mr. Nolan asked you did you hear Mr. Quinn

20   say that you were -- words to the effect, you used your

21   wealthy Iranian parents' money to start MGA.

22              Do you recall him asking that?

23   A.    I do.

24   Q.    And your answer was that I did hear that; correct?

25   A.    I did hear Mr. Quinn say that, yes.

1   **Q.**   And then you said basically that what Mr. Quinn said was

2   false.   In fact, absolutely not a true statement.

3   **A.**   Absolutely right, yes.

4   **Q.**   Now, when Mr. Nolan asked you did you hear Mr. Quinn say

5   that you were -- words to the effect you used your wealthy

6   Iranian parents' money to start MGA, when he asked you that

7   question, did you really remember what Mr. Quinn had said in

8   his opening?

9   **A.**   I remember he trying to intimate that I had wealthy

10  Iranian parents, and that's not the case.   I washed dishes,

11  bussed tables, waited tables, and put myself through college

12  in this country.

13  **Q.**   My question is do you recall what he said.   You're

14  accusing him of making a false statement.   Do you remember

15  what he said in making that accusation -- that he made a

16  false statement?

17  **A.**   I am not going to accuse him of making a false

18  statement.   He knows the statement he make.

19  **Q.**   You told the jury that Mr. Quinn lied to them.

20  **A.**   I said to the jury, and I say that to them again right

21  now, I came to this country at the age of 17.   I had $750 in

22  my pocket, a one-way ticket, which meant I cannot go back.   I

23  washed dishes.   That was my first job, at Spires coffee shop.

24  Lawndale from 11:00 to 7:00 in the morning --

25           MR. PRICE:   Your Honor, I'm going to move to strike

1   as nonresponsive.

2           THE COURT:  It is stricken.  The reporter will

3   reread the question.

4           (Record read.)

5           THE WITNESS:  I don't think I ever used Mr. Quinn

6   or anybody else.  Lie is a very strong word.  I don't think I

7   ever used that word.  If I did, I apologize.

8   Q.  BY MR. PRICE:  The word you used that Mr. Quinn made a

9   statement which was absolutely not true; correct?  That's

10  what you told the jury yesterday.

11  A.  His statement that I had wealthy Iranian parents is

12  absolutely not true.

13  Q.  Well, let's look at what he in fact said.  Go to the

14  transcript from May 27th, page 65.  I'll ask you about that.

15  I'm sorry.  68, lines 4 through --

16          THE COURT:  Counsel, this is a transcript from

17  these proceedings?

18          MR. PRICE:  Yes.

19          THE COURT:  Very well.

20  Q.  BY MR. PRICE:  Now, Mr. Larian, I'm going to represent

21  to you this is the transcript of what Mr. Quinn said, and you

22  see where it says:  "The company was founded by Isaac Larian

23  and his brother, Farhad Larian"?  Do you see that?

24  A.  I do.

25  Q.  Is that correct, that you and your brother founded the

Exhibit D - Page 1014

1    company?

2    **A.**    Actually, I started the company first, and then I

3    brought in Fred.

4    **Q.**    Have you ever introduced your brother as one of the

5    founders of the company?

6    **A.**    I believe I have.

7    **Q.**    "And there's actually kind of a disagreement between the

8    two of them, the brothers, as to where the money came from to

9    start the company.  Mr. Isaac Larian says he came to this

10   country from Iran.  He had only $750 in his pocket.  And that

11   really he came up with the seed money to start the company.

12   Farhad Larian said that their wealthy parents over in Iran

13   provided them with the money to start the company.  So we

14   have two different accounts."

15          Do you recall Mr. Quinn saying that?

16   **A.**    At the opening statement?

17   **Q.**    At the opening statement, yes.

18   **A.**    I represent if he -- if that's what you say he said, he

19   said that.

20   **Q.**    And that statement that Mr. Quinn made to the jury is

21   absolutely true, there are two different accounts.  You say

22   one thing, and your brother has said another.

23   **A.**    I know about the truth, and I know that my parents were

24   not wealthy, and I wrote my -- I worked in this country to

25   put myself through college, and I put the seed money to start

1   the business.  And my -- I know that.  My sister in the court

2   knows that.  My parents know that.  My mother, who is alive,

3   knows that.

4   **Q.**   My question is different.  I'm addressing the accusation

5   that what Mr. Quinn said was absolutely not true.

6           You were trying to leave the jury with the

7   impression that Mr. Quinn had tried to mislead them; correct?

8   **A.**   I said that to the jury and to Mr. Quinn.

9   **Q.**   So my question is simply whether or not what Mr. Quinn

10   said was true, which is that you say, as you said multiple

11   times, that you came from Iran with $750 in your pocket and

12   came up with the seed money, and that your brother Farhad has

13   said that their wealthy parents over in Iran provided them

14   with the money to start the company.

15          I'm just asking you whether or not Mr. Quinn's

16   statement is correct, that you say one thing, which you told

17   us, and that your brother says something else.

18   **A.**   I don't know what my brother has said.  I know the truth

19   is what I told you.

20   **Q.**   You do know what your brother said because you actually

21   received communication from him where he said this.

22   **A.**   I don't recall.  I have a disagreement with my brother,

23   and I have tried to forget about everything he has said and

24   not said.

25   **Q.**   Well, if you look at 4228.  Do you recognize 4228?

1   **A.**   It's 26 pages.  You want me going through every page?

2   **Q.**   No.  I want you to see if you look at this and recognize

3   it as something your brother said to you.  If you need to go

4   through 26 pages, then we might need to take a break, but

5   this is something you got from your brother.

6   **A.**   I don't recall receiving this from my brother or not

7   receiving it.

8   **Q.**   Let's see if I can refresh your recollection here.  Why

9   don't you look at page 18.

10  **A.**   Go ahead.

11  **Q.**   And you see the contents of that page?

12  **A.**   Go ahead.

13  **Q.**   My question is that's something you received from your

14  brother; right?

15  **A.**   I don't recall receiving it, no.

16  **Q.**   Do you recall your brother ever saying to you that you

17  know the money that started the company was your parents, and

18  that your claims of only having seed money of your own were

19  not correct.  Do you remember him ever saying that to you?

20  **A.**   I don't recall if he said it or not said it.  But it's

21  not true, even if he said that.

22  **Q.**   Okay.  And I'm not pursuing that at this moment.  I'm

23  just saying you can't deny he said that; right?

24  **A.**   I cannot deny or not deny.

25  **Q.**   So therefore, you certainly can't say that what

1    Mr. Quinn told the jury was absolutely untrue, which is that

2    you have one story, and your brother has another.  You can't

3    say that is untrue, can you?

4    A.    What is untrue is that I came to this country -- what is

5    untrue that I got money from my wealthy parents to start my

6    company.  That is not true.

7    Q.    And I'm just trying to ask questions about Mr. Quinn's

8    honor and credibility.  You said that what he told the jury

9    was absolutely untrue, and you can't say that, can you?

10   A.    I can.

11   Q.    So you can say that your brother does not have say

12   different version than you do of how the company started.

13   A.    What I can say is that I started the company --

14              MR. PRICE:  Move to strike as nonresponsive.

15              THE COURT:  Sustained.  Stricken.

16   Q.    BY MR. PRICE:  You can't say that your brother has told

17   a different version -- hasn't told a different version than

18   you.

19   A.    I can't say if he has or not.  No, I cannot.

20   Q.    So you can't say what Mr. Quinn told the jury, which is

21   that there are two versions, you can't say that's false, can

22   you?

23   A.    The version that Mr. Quinn attributed to my brother is

24   false, and he knows it.

25   Q.    Sir, you can't say that this statement is false, which

1  is that you have one version and your brother has another

2  one.  You simply can't say that's false.

3  **A.**   Beside what I have testified, I have nothing else to

4  add.

5  **Q.**   Let's talk about the discussions you had with

6  Mr. Carter.  And you said in the September 1st meeting that

7  you said, Mr. Bryant, Mr. Carter Bryant, that you wanted

8  nothing to do with these drawings if they had anything to do

9  with Mattel; correct?

10 **A.**   That's right.

11 **Q.**   And Victoria O'Connor and Carter Bryant were at that

12 September 1st meeting; correct?

13 **A.**   To the best of my recollection, yes, they were.

14 **Q.**   I assume you were fairly emphatic about what you were

15 saying, which is you were emphatic about saying I want

16 nothing to do with these if they have anything to do with

17 Mattel.

18 **A.**   I apologize.  I don't know what the word emphatic means.

19 **Q.**   That you were very strongly saying this.

20 **A.**   That what?

21 **Q.**   That you want nothing to do with these if they have

22 anything to do with Mattel.

23 **A.**   I said that here.

24 **Q.**   And you said that September 1st as your testimony;

25 correct?

1   **A.**   I did not want -- my state of mind is there and here

2   that I want nothing to do with any drawing that Carter Bryant

3   had done if those belong to Mattel.  If they belong to

4   Mattel, I want nothing to do with it.

5   **Q.**   And you told the jury that's what you said at that

6   September 1st meeting, yes?

7   **A.**   I said I do not want to do anything with these drawings

8   if they belong to Mattel.

9   **Q.**   And when you said that, you weren't whispering it.  You

10  were saying something strongly; is that right?

11  **A.**   I don't know if I was whispering or saying it strong.

12  But I was saying it.

13  **Q.**   Do you have any explanation as to why neither Victoria

14  O'Connor nor Carter Bryant remembers any such statement?

15  **A.**   I don't know if they do or not.

16  **Q.**   Well, let's look at the contracts that you were looking

17  at, and you recall that Mr. Nolan asked you to compare

18  Exhibit 15 to Exhibit 13621, and maybe we can put up 15 and

19  13621.

20  **A.**   Can you tell me what book to look for here?

21  **Q.**   I believe those were in the book provided by your

22  attorney.

23  **A.**   Did you say 13621?

24  **Q.**   It's 15 and 13621.

25  **A.**   Yeah, go ahead.

1    Q.   I know that both of them are in the big binder.

2    A.   I found them.

3    Q.   But your attorney asked you questions about them, so

4    they might be in yours as well.

5    A.   I found them.

6             THE COURT:  Did you find them?

7             THE WITNESS:  I found them.

8    Q.   BY MR. PRICE:  And first Mr. Nolan's question was do you

9    remember when Mr. Price said these were the same documents?

10   A.   Yes.

11   Q.   You remember me saying that?

12   A.   I don't remember a lot of things he said.

13   Q.   Then why did you answer yes?

14   A.   I think to those effects, you were saying those are the

15   same contracts.  Indeed, if you look at them without looking

16   at the detail, they look like the same document.

17   Q.   But Mr. Nolan said do you remember Mr. Price saying they

18   are the same document.  I mean, do you actually have a memory

19   of me saying that?

20   A.   I don't have an exact memory of it.  And if I do, I

21   apologize.

22   Q.   Okay.  Now, the first page here, the first page here is

23   the same; correct?

24   A.   It's just looking at it, it appears to be the same.

25   Q.   And I pointed that out to you in your examination, that

1    the first pages appeared to be the same; correct?

2    **A.**    Yes, you did.   I believe you did.

3    **Q.**    Okay.   And let's go to the -- by the way, both these

4    pages -- blow up this part here.   Both these contracts say

5    dated on September 18, 2000; correct?

6    **A.**    Correct.

7    **Q.**    Incidentally, would you look at Exhibit 30.

8            It's already in evidence, your Honor.   May we

9    display?

10           THE COURT:   You may.

11           THE WITNESS:   Okay.   Go ahead.

12   **Q.**   BY MR. PRICE:   You see this is a letter dated September

13   18, 2000, from Mr. Bryant to Kinuyo concerning ordering

14   sample cards for MGA Entertainment?

15           MR. NOLAN:   Objection.   Although this document is

16   in evidence, there's no foundation that Mr. --

17           THE COURT:   Very well.   Foundation, Counsel.

18   Sustained.   Lay a foundation, Counsel.

19   **Q.**   BY MR. PRICE:   You knew this was happening in the middle

20   of September, didn't you?

21   **A.**    I did not.

22   **Q.**    You did not yourself type the words on to Exhibits 15

23   and 13621; is that right?

24   **A.**    You mean Carter Bryant's contract?

25   **Q.**    Yes.

1  **A.**   I did not.

2  **Q.**   Someone else did that for you; right?

3  **A.**   Yes.

4  **Q.**   Now, that was your attorney Mr. Rosembaum; correct?

5  **A.**   That's correct.

6  **Q.**   And the date that your attorney put on the contract, as

7  dated of, is September 18, 2000; is that right?

8  **A.**   Yes.  As of.  As of September 18, 2000.

9  **Q.**   All right.  And you have some understanding, do you not,

10  as to why your attorney put on the contract with Carter

11  Bryant that it was dated as of September 18, 2000.

12  **A.**   I have some understanding from him, yes.

13  **Q.**   Are you aware of any --

14  **A.**   I just want to make it clear to the jury, from my

15  attorney, David Rosembaum.

16  **Q.**   And if we could look at -- we've seen Exhibit 15 and

17  Exhibit 13621, which both have dated as of September 18,

18  2000.  You agree that a copy that you sent to your outside

19  counsel Patty Glaser had that date whited out?

20  **A.**   I don't know if he did or not.  I have no idea.

21  **Q.**   Well, Exhibit 13383, that date is whited out; correct?

22  **A.**   I remember --

23          MR. NOLAN:  Objection, your Honor.  Lack of

24  foundation.

25          MR. PRICE:  Let me ask it a different way.

```
 1              THE COURT:  Very well.  Rephrase the question.
 2   Q.    BY MR. PRICE:  Exhibit 13383.  Do you have that in front
 3   of you?
 4   A.    Can you just tell me what book to look for?
 5   Q.    13383.  It would be in the big binder.  It's also just
 6   up here if you want to --
 7   A.    Go ahead.  I'd like to save time.
 8   Q.    For some reason, the dated as of September 18, 2000, is
 9   not there.
10              Do you see that?
11   A.    I see that; that's right.
12   Q.    Now, Mr. Nolan pointed out that if you look at
13   Exhibit 15 and Exhibit 13621, the signatures appear to be
14   somewhat different, including your own; correct?
15   A.    Yes.
16   Q.    And Exhibit 15 has that fax header from MGA that
17   indicates it was sent from MGA to Mr. Bryant; correct?
18   A.    Yes, it does.  Dated October 4 at 4:38 P.M.
19   Q.    And if you go to the last page --
20   A.    That's the last page I'm looking at.
21   Q.    Sure.  If you go to the last page, obviously what is
22   faxed to you, MGA, would only have -- well, do you know
23   whether or not you signed the document before or after it was
24   sent to Mr. Bryant?
25   A.    I don't recall.
```

1    Q.   In any event, it's your understanding, is it not, that

2    this was faxed back signed by Mr. Bryant to MGA?

3    A.   I'm sorry.  Can you repeat that?

4    Q.   Sure.  That 15 was faxed back to MGA by Mr. Bryant after

5    he signed it?

6              MR. NOLAN:  Objection.  Lack of foundation.

7              THE WITNESS:  I don't recall --

8              THE COURT:  Wait a second.  Sustained.

9    Q.   BY MR. PRICE:  Well, you've got two documents with two

10   signatures; right?

11   A.   Yes.

12   Q.   Isn't the reason you have the second document, which is

13   13621, is that after Mr. Bryant faxed back his contract, you

14   wanted another copy of the contract that didn't have the fax

15   headers on them?

16   A.   Absolutely not true, sir.

17   Q.   So is it your testimony that Ms. O'Connor was not being

18   truthful when she said you asked her to white-out the fax

19   header?

20   A.   I think her recollection is not correct.

21   Q.   Now, you talked about the signing of the document

22   yesterday.

23   A.   Should I put these away?

24   Q.   If it's in your way, put it away.

25              Do you recall being asked by Mr. Nolan if you had

2251

1   believed that he, Carter Bryant, had done these drawings, the

2   master drawings while at Mattel, would you have ever signed

3   the contract?  And you said, "I would not have signed it if

4   he had done it at Mattel, no."

5           Do you remember that question and answer?

6   A.    Yes, and the master drawing means the drawings that he

7   did in 1998 in Missouri.

8   Q.    You were asked questions about Carter Bryant's, whether

9   it be that these drawings were in 1998 or otherwise, at your

10  deposition, were you not?

11  A.    I was asked a lot of questions about this.  I take your

12  representation that yes.

13  Q.    Well, a critical issue was whether it mattered to you

14  whether Carter Bryant had done these drawings at Mattel or at

15  some other time.  That was a critical issue at your

16  deposition, wasn't it?

17  A.    If you are talking about the master drawings, the

18  original drawings, yes, that was a critical issue.

19  Q.    And if we could --

20          We played this before, your Honor, put up from the

21  deposition, page 450, lines 10 through 19.

22  A.    You may.

23  Q.    450, 10, to 451 -- let's do 450, lines 10 through 17:

24          "QUESTION:  Would it have been a problem if

25      Carter Bryant had created or made any of his

1    drawings when he was employed by Mattel in your

2    view?

3            "ANSWER:  No."

4        That was your testimony under oath as of the date

5    of your deposition; correct?

6  A.    As it is today, yes.

7  Q.    (Reading.)

8            "Why not?

9            "ANSWER:  Because I don't think, whether it's

10       MGA or Mattel, we own the people, especially the

11       creative people, forever."

12          You also testified at your deposition, did you not,

13   that when you were told by someone that Mr. Bryant's attorney

14   had confirmed some drawings were done in 1998, that in your

15   mind that made no difference at all as to whether or not

16   Mattel owned them.

17  A.    I'm sorry.  Can you repeat the question?

18  Q.    Sure.

19  A.    I'm not sure if I understand.

20  Q.    Let's break it up.  You told us in your examination from

21   Mr. Nolan that someone did an investigation as to whether or

22   not Mr. Bryant had done some drawings in 1998.

23          Do you recall that?

24  A.    I believe I said somebody had confirmed, and that person

25   being Ann Wang, Carter Bryant's attorney, had confirmed the

1    chronology that Carter Bryant had given us, that he had done

2    these, the original master drawings, in 1998.  And I believe

3    that, yes.

4    **Q.**   And you recall during my examination of you, I asked you

5    what you actually knew about that investigation.

6            Do you recall that?

7    **A.**   We probably have.

8    **Q.**   Isn't it true, sir, that at your deposition, you

9    previously, as testified under oath, that whether the

10   drawings were done in 1998 had no significance to you as to

11   whether or not Mattel might have owned the drawings.

12   **A.**   I might have.  Again, if he had done it in 1998, when he

13   was in Missouri, Mattel absolutely cannot have any ownership

14   of the drawings.

15   **Q.**   Well, let's look at what you said in 2006.  459, line

16   12, to 460, line 20.  It's been previously played:

17           "QUESTION:  Was the fact that Carter Bryant's

18       lawyer represented to MGA that Carter Bryant had

19       done the drawings in 1998 in Missouri, when he was

20       not a Mattel employee, have any significance to you

21       at that time?

22           "ANSWER:  It -- he confirmed what Carter

23       Bryant had told us.

24           "QUESTION:  And did you find some comfort in

25       this?

```
 1              "ANSWER:  Of course.

 2              "QUESTION:  And why was that?

 3              "ANSWER:  Because, you know, I hoped the

 4      lawyers in court -- your profession tell the truth.

 5              "QUESTION:  Well, you thought that it would

 6      have some significance to whether or not Mattel

 7      might have rights to those drawings; is that true?

 8              "ANSWER:  No."

 9              That was the answer you gave under oath in 2006;

10      correct?

11   A.  Those were the answers I gave in 2006.

12   Q.  And then it went on to ask:

13              "QUESTION:  Well, what comfort did you derive?

14              "ANSWER:  Because what I just testified.  I

15      have nothing else to add.

16              "QUESTION:  So you were just comforted by the

17      fact that he had told you the truth?

18              "ANSWER:  And his lawyer confirmed it.

19              "QUESTION:  And beyond that, it had no

20      significance to you.  Is that true?

21              "ANSWER:  That's true."

22              That was your testimony as of that date; correct?

23   A.  Yes, it is.

24              MR. PRICE:  Your Honor, for completeness purposes,

25      we would ask the jury be shown the question and answer
```

1    immediately preceding what Mr. Price just read, and it would

2    be lines 6 through 11.

3              MR. PRICE:  Sure.  We can put that up and expand

4    that.

5              THE COURT:  Very well.

6              MR. NOLAN:  Thank you.

7    Q.   BY MR. PRICE:  It began with:

8              "Do you know what assurances Carter Bryant's

9         lawyer gave?

10             "ANSWER:  In general I remember saying that

11        yes, that he did these in 1998 in Missouri, when he

12        was not working at Mattel, and that he indeed

13        himself did it."

14             That's how it started?

15   A.   I can read that, yes.

16   Q.   So it's correct, sir, that your testimony under oath,

17   when your deposition was taken, and I apologize, I've been

18   giving you the wrong date, it was March 26, 2008, so just a

19   few months ago, that your testimony was first, it would not

20   have been a problem for you if Mr. Bryant had created these

21   drawings while he was at Mattel.  That's what you testified

22   to under oath; right?

23   A.   You just read my testimony, and the jury has seen it.

24   And my testimony is correct.

25   Q.   So first, it wouldn't have mattered to you whether it

1   was done at Mattel or not, and second, you testified under

2   oath when a lawyer came back and said it was done in 1998,

3   that had no significance to you as to whether or not Mattel

4   owned those drawings?

5   **A.**   Did you break that question to two?  You asked two

6   questions at the same time.  I'd like to answer both of them.

7   **Q.**   Let me break it down the way it was asked at your

8   deposition so we can be precise.

9          When you were asked whether you thought that the

10  fact these drawings -- I were told these drawings were done

11  in 1998 would have some significance to whether or not Mattel

12  might have rights to those drawings, your answer at that time

13  was no.

14         Is that true?

15  **A.**   It is true.  And I can explain that if you want.

16  **Q.**   Well, your motto, you told us, one of your mottoes is no

17  risk, no reward; right?

18  **A.**   I'm not a model.

19  **Q.**   No.  Although I'm sure you could.  My word was motto.

20  Do you understand what motto is?  And I understand that

21  English is not your first language.

22         Do you know what a motto is?

23  **A.**   Yes, I do.

24  **Q.**   And you have said that it's your philosophy, your motto

25  in business, no risk, no reward.  You have said that before.

1   **A.**   Yes.

2   **Q.**   In fact, you were quoted in that <u>Wall Street Journal</u>

3   article as saying that; right?  No risk, no reward.

4   **A.**   I'm not sure if it's <u>The Wall Street Journal</u>, but I have

5   said that before.  And again, I apologize for my accent, sir.

6   **Q.**   No one has asked you to, and there's nothing wrong with

7   an accent.

8           Can you tell I'm from the South?

9           THE COURT:  Next question, Counsel.

10   **Q.**   BY MR. PRICE:  And then you testified, you were asked:

11           "Do you know what, if anything, Carter Bryant did

12   between the day of October 4, 2000, to October 20, 2000?

13           "Answer:  What do you mean?

14           "Meaning, do you know whether or not he was doing

15   any work at MGA?"

16           And you told the jury, "I know he was not doing any

17   work at MGA.  There was nothing to be done at MGA."

18           Do you remember those questions and answers that

19   you gave yesterday?

20   **A.**   I do.

21   **Q.**   So your testimony was that between October 4, 2000, to

22   October 20 of 2000, there was nothing to be done at MGA?

23   **A.**   Nothing to be done at MGA on what became Bratz dolls.

24   There was a lot of work to be done at MGA.

25   **Q.**   And Mr. Bryant was doing a lot of that work with Paula

1  | Garcia between October 4 and October 20, 2000, wasn't he?

2  | **A.**   I don't know if he was or not.  All I know, that they

3  | were exploring if the Bratz doll can even be made, and it

4  | took a long time before we were able to bring it to the

5  | market, all the way to the end of the year they were not done

6  | yet, year 2001.  I'm sorry.  2000.

7  | **Q.**   I believe your counsel showed you Exhibit 16789.  If we

8  | can put that up.

9  | **A.**   Can you just tell me what --

10 | **Q.**   I believe 16789.  I know your counsel showed it to you.

11 | So it's probably in a number of those?

12 | THE COURT:  It's in the small black binder.

13 | THE WITNESS:  Thank you.

14 | **Q.**   BY MR. PRICE:  Let's actually highlight the October 5

15 | e-mail from Mr. Larian to Paula, Victoria, and to Carter.

16 | Do you see this?

17 | **A.**   Yes, I do.

18 | **Q.**   And this was something you wrote the day after you say

19 | Mr. Carter actually put his signature on the contract;

20 | correct?

21 | **A.**   The day that -- the day after we signed the contract;

22 | right.

23 | **Q.**   And at this time, you're telling him that he and Paula

24 | need to focus 200 percent on getting this done; correct?

25 | **A.**   I did say that.

1   Q.   But you told the jury there was absolutely nothing to do

2   between October 4 and October 20, 2000.

3   A.   From what I told him to do and if he did anything or

4   not, from October 4 to October 19, 2000, is two different

5   things.  I did say that to him.

6   Q.   Well, you told the jury that there was nothing to be

7   done at MGA between October 4 and October 20, 2000; right?

8   That's what you told them yesterday.

9   A.   I have come to know that there was nothing that they

10  were doing except for exploration from October 4, 2000, to

11  October 19, 2000.

12  Q.   How about here where you're telling Mr. Bryant on

13  October 5, "You need to put 16 hours a day starting now on

14  this and nothing else."

15       You wrote that to him October 5, 2000?

16  A.   I did.

17  Q.   And, in fact, you were emphatic -- I think I used the

18  word emphatic before.

19  A.   Again, I apologize for my English not being good.

20  Q.   No, I'm trying to find a synonym.

21       You were very strong in saying that.  That is, you

22  capitalized, intentionally capitalized starting now and

23  nothing else; right?

24  A.   I did.

25  Q.   And by the way, you just told the jury that you later

1  learned that Carter Bryant did nothing between October 4 and

2  October 20; is that right?

3  **A.**   I did.

4  **Q.**   When did you learn that?

5  **A.**   During the course of this litigation.

6  **Q.**   So it wasn't until, oh, some at least four years after

7  you sent this e-mail that you realized for the first time

8  Carter Bryant hadn't been doing anything between October 4

9  and October 19?

10 **A.**   Well, you sued me personally seven years after this

11 contract was signed.  So I don't know where you're getting

12 the four years from.

13         MR. PRICE:  Move to strike as nonresponsive, your

14 Honor.

15         THE WITNESS:  He said four years.  I'm sorry.

16         MR. PRICE:  I said at least.

17         THE COURT:  Counsel, please.

18 **Q.**   BY MR. PRICE:  The date which the jury has heard before,

19 April 27, 2004, okay?

20 **A.**   I'm sorry.  What about that date?

21 **Q.**   April 27, 2004.  I want you to keep that date in mind.

22         MR. NOLAN:  Your Honor --

23         THE COURT:  Stop.  Mr. Nolan?

24         MR. NOLAN:  Foundation as to why this date is to be

25 kept in mind.  There's no context.

```
1              MR. PRICE:  I'm going to ask the question.

2              THE COURT:  You may ask another question.  Overrule

3    the objection.

4    Q.   BY MR. PRICE:  And that was it was after that date,

5    April 27, 2004, you're saying, after that that you discovered

6    for the first time that Mr. Bryant was doing nothing between

7    October 5 or October 4 -- October 4 and October 20th of 2000.

8              MR. NOLAN:  Objection, your Honor.  Misstates his

9    testimony.

10             THE COURT:  It's a question.  You may answer if you

11   can.

12             THE WITNESS:  Can you repeat that question?

13             THE COURT:  Actually, it wasn't.  I'm sorry.  I was

14   relying more on the tone.  Why don't you rephrase the

15   question, Counsel.  Make it more clearly in the form of a

16   question.

17             MR. PRICE:  Okay.

18   Q.   We'll try to do it this way:  Just give me the number of

19   years, okay?

20        How many years after October 5 did you learn for

21   the first time that Carter Bryant had done nothing between

22   October 4 and October 20, 2000?  How many years after October

23   5, 2000?

24   A.   I can't tell you how many years.

25   Q.   Was it more than three or four years?
```

1  **A.**   It cannot be more than four years because now we're in

2  2000 -- probably more than four years.

3  **Q.**   And from whom did you learn that Mr. Carter Bryant did

4  nothing between October 4 and October 20, 2000?

5  **A.**   From Paula Garcia, from my lawyers, from other people

6  that I talked to.  And from looking at e-mails and documents.

7  **Q.**   And you actually looked at the e-mails that the jury has

8  seen already in October 2000 discussing what was going on

9  with Bratz.

10  **A.**   I am not sure if this jury has seen every e-mail that's

11  in this case.

12  **Q.**   I showed you a presentation that was given to -- that

13  was supposed to have been given to Fox.

14         Do you remember that?

15  **A.**   I'm sorry?

16  **Q.**   Your attorney Mr. Nolan showed you Exhibit 16914, which

17  is a presentation, I believe, which was to be given to Fox?

18  That should be in your attorney's binder.

19         THE COURT:  Counsel, I can't find this in any of my

20  three binders.

21         MR. PRICE:  I couldn't find it either.

22         THE COURT:  I must have missed it.  Oh, there it

23  is.  My mistake.

24         MR. PRICE:  The only part, your Honor, is this.

25         THE COURT:  Right.  I recall.

2263

1   **Q.**   BY MR. PRICE:   So you see this is June 25, 2000?

2   **A.**   June 25, 2002, sir.

3   **Q.**   I'm sorry.   2002.

4   **A.**   You said 2000.

5   **Q.**   Your eyes are pretty good.

6   **A.**   I'm sorry?

7   **Q.**   Your eyes are pretty good.   June 25, 2002.   And this is

8   a presentation, you believe, to Fox?

9   **A.**   No, this is not presentation to Fox.   This talks about

10   Bratz facts and then the attachment.   You put these with

11   another exhibit together, yes, that was, I believe, the

12   presentation that was made to Fox.

13   **Q.**   And if we can go to the -- just the part of the second

14   page, which is in evidence.   And you see here, where it says

15   four Bratz dolls -- Cloe, Sasha, Jade, and Yasmin -- also

16   known as the Bratz Pack, were launched at Toy Fair 2001.

17          Do you see that?

18   **A.**   I do.

19   **Q.**   And you testified that you saw this and sent an e-mail

20   saying we need to correct that statement for legal purposes.

21   **A.**   I think if you bring that e-mail, all I said is she was

22   asking if he wanted to change the date, and I said for legal

23   purposes, October 2000.

24   **Q.**   So it's your understanding that your employees usually

25   follow your directions?

1   A.   I hope so.

2   Q.   Okay.  So what you were telling her was to change this

3   presentation that was being made of Bratz facts to say that

4   the four Bratz dolls -- Cloe, Sasha, Jade, and Yasmin -- also

5   known as the Bratz Pack, were launched in October of 2000.

6   A.   2001, sir.  I'm sorry.  Can you -- I'm not following

7   you.  I'm reading that.

8   Q.   Well, remember your attorney said that you moved the

9   date back.  So just to remind you, because you may not

10   remember, it's -- Exhibit 12842 was your e-mail.

11   A.   18?

12   Q.   12842.  June 27, 2002, and there's a question as to why

13   you changed the Bratz date.  And you wrote October 2000 for

14   legal purposes.

15   A.   Yes, sir.

16   Q.   So now you're in the right mind set, this is the e-mail

17   you sent?

18   A.   I did.

19   Q.   Okay.  So let's go back to the previous document, 16914.

20   And so the way this looked after -- would have looked after

21   your change was put in there was that these four Bratz

22   dolls -- Cloe, Sasha, Jade, and Yasmin -- also known as the

23   Bratz Pack, were launched in October 2000?

24   A.   I see what you're getting at.  There were no dolls in

25   October 2000.

1    **Q.**   I wasn't getting at.   I was just asking pursuant to what

2    you told your attorney, whether or not I'm correct, that when

3    you corrected this, that the way it read for the presentation

4    was that the four Bratz dolls were launched in October of

5    2000.

6    **A.**   My mind then and now is that we signed the contract on

7    October 4, 2000, and that is when the Carter Bratz started.

8    **Q.**   And just to be clear, the way you articulate that, the

9    way you stated that to Fox was that these four Bratz dolls

10   with those names were launched in October of 2000.   That's

11   the way this read after you made your correction; right?

12   **A.**   I don't have the correction that was finally presented

13   to Fox.   So I don't know if she made that change or didn't

14   make that change.   I don't have it.   If you can show it to

15   me, I can testify.

16   **Q.**   I can tell you I don't think we've received it, but I'm

17   just going based on your testimony --

18             MR. NOLAN:   Your Honor, move to strike.

19             THE COURT:   Counsel, sustained.   It is stricken,

20   Counsel.   Ask questions and receive answers.

21   **Q.**   BY MR. PRICE:   I'm just trying to clarify your testimony

22   that you gave in your cross-examination.

23             THE COURT:   Counsel, ask a question.

24   **Q.**   BY MR. PRICE:   And that is did you instruct your

25   subordinate to change at Toy Fair 2001 to October of 2000?

1  **A.**    The document that I showed you is my recollection.  I

2  told her to put the date October 2000.  That is the date

3  after October 4 where project Bratz started.  And that's all

4  I can testify to you because that's the truth.  And you're

5  badgering me.

6  **Q.**    Pardon?

7  **A.**    And you are badgering me.

8  **Q.**    Well, I -- I'll try to do the best I can not to.

9         What you had on October 2000, I believe your

10  testimony was what you had were those drawings that Carter

11  Bryant had presented to you in September of 2000; correct?

12  **A.**    In September 1, 2000, he had presented those drawing.

13  I'm not sure I follow your line of questioning, sir.

14  **Q.**    I am just asking a question.  That what you actually had

15  in October 2000, the first part, was you had the drawings

16  that Mr. Bryant had presented to you in September of 2000;

17  correct?

18  **A.**    That is correct.

19  **Q.**    And when you're talking here about the four Bratz dolls

20  being launched in October of 2000, what you are referring to

21  isn't a physical doll.  You were referring to those drawings.

22  **A.**    That's correct.

23  **Q.**    And I think one of the final topics you were asked of

24  was the history of MGA.

25         Do you recall that?

1   A.   Yes, sir.

2   Q.   And you were shown some, I think it was 18508, that

3   electronic Barbie -- you can tell me what it is.  I can't

4   remember.

5   A.   It's a Barbie electronic handheld game.

6   Q.   And it's fair to say that's not a fashion doll.

7   A.   It's not a fashion doll, sir.

8   Q.   And so Mr. Nolan was asking about MGA's experience in

9   the September/October 2000 time frame, and it's fair to say

10  that during that time frame, MGA did not have experience with

11  a fashion doll.

12  A.   Again, would you like me to adopt your witness Ivy

13  Ross's definition of a fashion doll or industry?

14  Q.   I'm asking you to use your definition, which you've used

15  throughout this case.

16  A.   The definition -- if you use an industry standard, no,

17  we did not have a fashion doll experience in September 1,

18  2000.  We did not.  But we did have a doll experience before

19  that.

20  Q.   And you brought in -- you hired in October 2000 Mercedeh

21  Ward?

22  A.   We hired Mercedeh Ward.  I don't know exactly when.

23  Q.   And that was to assist in getting this Bratz project to

24  fruition?

25  A.   That's correct.  She was part of the team.

1  Q.   And she was someone who you hired after she left Mattel;

2  correct?

3  A.   I believe so, yes.

4  Q.   Will you look at 11277, which is in evidence.

5  A.   Can you tell me which book to look for, sir?

6  Q.   It would be in that large one, I think.  This is the one

7  where it's October 31, 2000.  This is the one where

8  projecting 25 million in sales.

9  A.   I see that.

10  Q.   And you're sending it to Franki Tsang, who is in

11  Hong Kong?

12  A.   That's correct.

13  Q.   And you're referring to Celia, who is also in Hong Kong?

14  A.   Cecelia.

15  Q.   Cecelia.  Thank you.  And you're saying Cecelia has

16  never developed any product, yet alone a fashion doll.

17       Do you see that?

18  A.   I do.

19  Q.   And what you're telling Hong Kong was you wanted someone

20  with doll development experience on this project.

21  A.   I wanted somebody other than Cecelia.  They had put

22  Cecelia on this program.

23       MR. PRICE:  Your Honor, except for the matter

24  raised previously, I don't have any further questions with

25  Mr. Larian at this time.

```
 1              THE COURT:  Mr. Nolan?

 2              MR. NOLAN:  No questions.

 3              THE COURT:  Very well.  You are excused.

 4              THE WITNESS:  Thank you.

 5              THE COURT:  Plaintiff's next witness.

 6              MR. ZELLER:  Your Honor, Mattel calls Bryan

 7    Armstrong.

 8              THE COURT:  Very well.

 9              MS. AGUIAR:  Your Honor, I'm told he's using the

10    restroom.  So if you want to wait a few minutes or take an

11    early break.  I don't think it will be very long.

12              THE COURT:  Very well.  Why don't we go ahead and

13    take a break at this time.

14              (Recess taken.)

15              THE COURT:  I have a note.  One second, Counsel.

16              The Court received the note from Juror Cilia 3

17    inquiring whether anything has happened with the matter

18    brought up yesterday.  And the Court has sent a letter, and

19    I'll make sure you have a copy of that letter that was sent

20    out today.

21              Thank you.

22              THE CLERK:  Please raise your right hand.

23              BRYAN JOSEPH ARMSTRONG, SWORN.

24              THE CLERK:  Thank you, sir.  Will you please state

25    your full name for the record, and spell the last name.
```

1     (Proceedings concluded at 5:10 P.M.)

2

3

4

5

6

7

8     **C E R T I F I C A T E**

9

10

11   I hereby certify that pursuant to Title 28,

12 Section 753 United States Code, the foregoing is a true and

13 correct transcript of the stenographically reported

14 proceedings in the above matter.

15   Certified on June 11, 2008.

16

17

18 **MARK SCHWEITZER, CSR, RPR, CRR**
  Official Court Reporter
19 License No. 10514

20

21

22

23

24

25