1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3                          ---

4      **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                          ---

6   MATTEL, INC.,                    :  PAGES 6048 - 6190
                                     :
7           PLAINTIFF,               :
                                     :
8       VS.                          :  NO. ED CV04-09049-SGL
                                     :  [CONSOLIDATED WITH
9   MGA ENTERTAINMENT, INC.,         :  CV04-9059 & CV05-2727]
    ET AL.,                          :
10                                   :
            DEFENDANTS.              :
11  _____ :

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                   RIVERSIDE, CALIFORNIA

17                 WEDNESDAY, AUGUST 6, 2008

18                   JURY TRIAL - DAY 30

19                   AFTERNOON SESSION

20

21

22                              MARK SCHWEITZER, CSR, RPR, CRR
                                OFFICIAL COURT REPORTER
23                              UNITED STATES DISTRICT COURT
                                181-H ROYBAL FEDERAL BUILDING
24                              255 EAST TEMPLE STREET
                                LOS ANGELES, CALIFORNIA 90012
25                              (213) 663-3494

CERTIFIED COPY

1    deposition or whatever in Hong Kong.

2    **Q.**   BY MR. QUINN:  But would you expect that, before MGA

3    gave an answer under oath to your request for particulars,

4    that MGA would speak to the authors in order to get that

5    information?

6    **A.**   Yes.  And pleadings is part of a pleaded case.  So that

7    is MGA's case as such.

8              MR. QUINN:  Thank you.

9              THE COURT:  Mr. Hansen?

10             MR. HANSEN:  We have nothing further, your Honor.

11             THE COURT:  You are excused, sir.  Thank you.

12             THE WITNESS:  Thank you.

13             THE COURT:  Plaintiff may call their next witness.

14             MR. PRICE:  We call Mr. Larian.

15             THE CLERK:  Please be advised you are still under

16   oath.

17             THE WITNESS:  Yes.

18                   **ISAAC LARIAN, PREVIOUSLY SWORN.**

19                        **DIRECT EXAMINATION**

20   BY MR. PRICE:

21   **Q.**   Mr. Larian, when Mr. Bryant showed you the drawings he

22   created at Mattel in September of 2000, when he showed you

23   Mattel's confidential information, that day changed the

24   course of MGA, didn't it?

25   **A.**   No.

6086

1  Q.   Well, prior to that day, September 2000, I think you

2  told the jury in the last phase that you had actually been

3  looking for a fashion doll.

4            Do you recall saying that?

5  A.   Yes.

6  Q.   You told the jury that you'd been looking for one ever

7  since some buyer at Wal-Mart said he wanted something to

8  compete with Barbie.

9            Do you recall that?

10  A.   Yes.

11  Q.   You told the jury that you had done a sort of fashion

12  doll contest, and tried to find some ideas for a fashion

13  doll.

14            Do you recall that?

15  A.   That's one of the things I did.

16  Q.   Pardon?

17  A.   That's one of the things, yes.

18  Q.   And how long had this search for creative ideas for a

19  fashion doll been going on?

20  A.   I think for a couple years.

21  Q.   So as of September of 2000, if wasn't for lack of effort

22  that you didn't have any ideas for a fashion doll that you

23  wanted to pursue, was it?

24  A.   No.

25  Q.   What it was is you didn't have the creativity.  You

1    didn't have people who had the idea for a fashion doll that

2    MGA might want to make; right?

3    **A.**    That's not correct.

4    **Q.**    Well, are you aware of any documentation dated prior to

5    September of 2000 where you said you liked an idea for a

6    fashion doll and were going to pursue it?

7    **A.**    No.

8    **Q.**    Didn't you tell the jury in the first phase that prior

9    to September of 2000, MGA had never done a fashion doll?

10   **A.**    That's correct, yes, I did.

11   **Q.**    Didn't you tell them that in response to this search for

12   ideas, the only thing that was brought to you was Carter

13   Bryant?

14   **A.**    At that time I did say that, but subsequent to that, I

15   got a lot of letters and e-mails for support from people in

16   the industry, and one of those was from a lady named Maureen

17   Samparro (phonetic) who works for a company called San Pan

18   (phonetic).  And she sent me a copy of a letter as well as a

19   DVD of a presentation for a fashion doll that she had made to

20   us in 1998.  When I was here in front of you in Phase 1-A, I

21   did not recall that.  She reminded me of that, and we have

22   turned over those documents to Mattel.

23   **Q.**    So you're saying that in this search for a creative

24   idea, that you actually got a response in 1998 from some

25   woman; correct?

1   A.   Yes, Maureen.

2   Q.   And in the last phase, you had forgotten about that

3   entirely?

4   A.   I did not recall.  It was so long ago.

5   Q.   And you didn't pursue that, did you?

6   A.   No, we did not.

7   Q.   You rejected it.

8   A.   I'm sorry.  You mean pursue her idea?

9   Q.   Yes.

10  A.   No, we did not pursue it.

11  Q.   You rejected that idea; right?

12  A.   Yes.

13  Q.   And so my question, then, is prior to Carter Bryant

14  coming in in September of 2000 and showing you Mattel's

15  confidential information, prior to that time, you had done a

16  two-year search for a good idea for a fashion doll and had

17  failed; right?

18  A.   I don't characterize it as a failure.  We just hadn't

19  come up with one.

20  Q.   And you finally came up with one when Mr. Bryant walked

21  through the door and showed you Mattel's confidential

22  information; right?

23  A.   That's not correct.  And that's not what I testified to.

24  Q.   Well, prior to Mr. Bryant showing you Mattel's

25  confidential information, you had not located in a two-year

1   search any designs or any ideas for a fashion doll that you

2   thought were acceptable; correct?

3   A.   We had not done one, that's correct.

4   Q.   You hadn't located one; right?

5   A.   Yes.

6   Q.   And then the designs you received in September of 2000

7   were designs that were handed to you by a Mattel designer who

8   was then working in the Mattel design center; right?

9   A.   That's correct.

10  Q.   And you understand that in the first phase of this, the

11  jury has found that you knowingly assisted Mr. Bryant in

12  breaching his fiduciary duty.

13       You understand that?

14  A.   I do.

15  Q.   And that fiduciary duty pertained to Mattel's

16  confidential information.

17       You understand that?

18  A.   I'm not a lawyer.  But I understand that and respect

19  what the jury has found.

20  Q.   I want to look, then, at this information you got in

21  September, this confidential information that Mr. Bryant

22  showed you, okay?  If you look at Exhibit 302.  And you

23  recall the testimony is that this is the presentation that

24  Mr. Bryant made --

25  A.   Can you bear with me for a moment?  These exhibits start

1  with 6?

2  **Q.**   It's 302, sir.   It should be the third one in from the

3  binder.

4  **A.**   I don't find 302.

5           MR. PRICE:  May I approach, your Honor?

6           THE WITNESS:  Thank you.

7  **Q.**   BY MR. PRICE:  Now, the testimony is that this is the

8  presentation that Mr. Bryant made in September of 2000.  And

9  if we look at the second page, you recall one of the things

10  you were aware of was his dolls are going to be trendy.  They

11  were going to have trendy, hip outfits.  That presentation

12  was made to you?

13  **A.**   Where are you referring to?  Yes.

14  **Q.**   And if you look at the next page, you see it has a

15  drawing of Zoe.  And it talks about her being the queen of

16  cool, and she has funky stompin' sneaks.

17           That presentation was made to you; correct?

18  **A.**   Yes.

19  **Q.**   And if you look at the eighth page in, you see there's a

20  character at that point called Hallidae.  Ultra trendy street

21  wear.

22           Do you see that?

23  **A.**   I do.

24  **Q.**   And if you look at the tenth page, you see there's a

25  picture of Jade, talking about how she loves far-out fashion.

1  This is part of the presentation Mr. Bryant made to you;

2  right?

3  A.   Yes.

4  Q.   Trendy, hip, cool, funky, ultra trendy street wear,

5  far-out fashion.   These were part of the concepts, Mattel's

6  confidential information, that Mr. Bryant gave to you in

7  September 2000; right?

8             MR. NOLAN:   Your Honor, I'm going to object to the

9  term confidential information with respect to concepts.

10             THE COURT:   On what ground --

11             MR. NOLAN:   I think it's an improper

12  characterization of the finding.

13             THE COURT:   Overruled.

14             THE WITNESS:   Sir, can you repeat the question?

15  Q.   BY MR. PRICE:   Sure.   As part of the ideas and concepts,

16  confidential information that Mr. Bryant gave you in

17  September of 2000 was this idea for a doll that was trendy,

18  hip, cool, funky, with far-out fashions, ultra trendy street

19  wear.   All of that was in the presentation?

20  A.   These were in the presentation of drawing.   The dolls

21  came later from MGA.

22             MR. PRICE:   Move to strike as nonresponsive.

23             THE COURT:   Stricken.

24  Q.   BY MR. PRICE:   I'll ask the question again.

25             Part of the confidential information that

1   Mr. Bryant gave you was the concept, the idea of dolls that

2   were trendy, hip, cool, funky, far-out fashions and ultra

3   trendy street wear, all of that was in the presentation you

4   got from Mr. Bryant in September of 2000?

5   A.   Yes.

6   Q.   And when you looked at these drawings, you noticed some

7   things about the drawings themselves; correct?  Let me make

8   it more clear.  If we can go to page 3.  Zoe.

9           One thing you have noticed is that in the drawings,

10  the eyes were bigger than you would have on a normal human

11  being.

12          You noticed that; right?

13  A.   They had big eyes.  But I've seen human beings with big

14  eyes, too.

15  Q.   You noticed that lips were pronounced in the drawings;

16  right?

17  A.   Yes.

18  Q.   You noticed that the feet and the head were oversized in

19  proportion to the rest of the body; right?

20  A.   I don't see any feet, but I see the shoes are oversized.

21  Q.   And if you go through it, you'd see, for example, on the

22  fourth page, or the fifth page, you see these are oversized,

23  this area here, what you call the shoes; right?

24  A.   Yes.

25  Q.   And you noticed that the shoes were kind of chunky.  You

1    said the shoes were oversized; correct?

2    **A.**    You said oversized, and I said yes.

3    **Q.**    And the fashions were trendy, hip, urban; correct?

4    **A.**    Those fashions in there?

5    **Q.**    Yes.

6    **A.**    That's what it says.

7    **Q.**    That's the presentation he made to you; correct?

8    **A.**    That's correct.

9    **Q.**    Prior to September of 2000, you didn't have doll designs

10   or doll ideas for dolls with pronounced lips, large eyes,

11   oversized feet and head that were trendy and urban; correct?

12   **A.**    What I think, if you look at the PC dolls, I think they

13   were called by Maureen Samparo (phonetic).  They had similar

14   features.

15   **Q.**    Prior to -- to?

16   **A.**    My recollection.

17   **Q.**    Prior to September 2000, after this two-year search for

18   some creative ideas so that you could do a fashion doll,

19   prior to that, you didn't have these ideas, did you?  The

20   ideas Carter Bryant gave to you in September 2000.

21   **A.**    That's correct.

22   **Q.**    And these features -- the large eyes, the pronounced

23   lips, the oversized feet, the oversized head, the urban

24   street wear -- those are the features that characterize the

25   Bratz dolls; correct?

1   **A.**   Those are some of the characteristics, some of the

2   features that characterize Bratz dolls, yes.

3   **Q.**   And your understanding is that those features were

4   unlike anything that was on the market.

5   **A.**   That's not my understanding.

6   **Q.**   Well, if you'd look at in your binder there in

7   Exhibit 13520.

8   **A.**   I'm sorry.  I'm having a tough time finding these.

9   **Q.**   You recognize that as a business plan for ABC

10  International Traders, which was doing business as MGA;

11  correct?

12  **A.**   That's what the document says, yes.

13  **Q.**   Pardon?

14  **A.**   That's what the document says, yes.

15         MR. PRICE:  Your Honor, move Exhibit 13520 into

16  evidence.

17         THE COURT:  Any objection?

18         MR. NOLAN:  No objection, your Honor.

19         THE COURT:  It's admitted.  You may publish.

20         **(Exhibit 13520 received.)**

21  **Q.**   BY MR. PRICE:  Look at the first page.  This a business

22  plan which you did in March of 2001; correct?

23  **A.**   I personally?

24  **Q.**   Someone at MGA on your behalf created this business

25  plan; correct?

1  **A.**    I see my name on it.  I don't recall it.  But I think

2  yes, it's a business plan of MGA.  It looks like a business

3  plan that MGA did.

4  **Q.**    And, in fact, go down a little bit, Ken, where you see

5  it is a business plan does not imply offering of securities.

6  It's correct, is it not, that this is a business plan that

7  you were using to try to get funding for MGA in March of

8  2001?

9  **A.**    I don't recall that one way or another.  I do not recall

10  it.  It's possible, but I don't recall it.

11  **Q.**    As of March of 2001, in any event, the Bratz dolls

12  themselves had not been presented to the public; correct?

13  **A.**    At March 2001 to the public, that's correct, no, they

14  were not.

15  **Q.**    And if you'll look at page 15 of this document, you see

16  there's a section called Strengths.  You see that in your

17  business plan?

18  **A.**    Yes.

19  **Q.**    And you say, "In terms of product strength, Bratz has

20  several distinct advantages over the competition.  First is

21  its marked advancement in the physical appearance of the

22  dolls.  The Bratz are unique in many ways; their eyes are big

23  with a hint of anime style; their lips are more pronounced.

24  Their feet and heads are oversized.  There is no fashion doll

25  on the market that bears the resemblance to the Bratz."

1          That's what MGA wrote in its business plan of March

2    of 2001; correct?

3    A.    Yes.

4    Q.    Now, prior to September of 2001, when Mr. Bryant

5    presented you -- prior to September of 2000, when Mr. Bryant

6    presented you with Mattel's confidential information and

7    design, did MGA have any plans to introduce an advanced

8    design of a doll with big eyes, pronounced lips, where their

9    head and feet were oversized?

10   A.    Not that I recall, no.

11   Q.    And you'll agree that the designs, the drawings, the

12   confidential information Mr. Bryant gave you in September

13   2000, those drawings are drawings of dolls where the eyes are

14   big, the lips are pronounced, the feet and heads are

15   oversized; correct?

16   A.    Those were drawings that were the inspiration for the

17   Bratz dolls that MGA created, yes.

18          MR. PRICE:  Move to strike as nonresponsive.

19          THE COURT:  Would you rephrase your question,

20   Counsel.

21   Q.    BY MR. PRICE:  You'll agree that the drawings you saw in

22   September 2000, Mattel's confidential information, those

23   drawings showed, were drawings of figures where the eyes were

24   big, the lips were pronounced, and the feet and heads were

25   oversized.

1        You'll agree with that; correct?

2   **A.**   Those drawings had those features, yes.

3   **Q.**   And by the way, the first phase, you described the

4   contest you had as sort of a fashion doll contest.

5        You recall that?

6   **A.**   Yes.

7   **Q.**   You didn't call it a fashion drawing contest; correct?

8   **A.**   No.

9   **Q.**   Okay.  That's correct?

10  **A.**   That's correct.

11  **Q.**   That's because you were looking for a fashion doll;

12  right?

13  **A.**   Yes.

14  **Q.**   Now, prior, in the first phase of this case, you recall

15  that you told the jury that if what you were shown in

16  September of 2000 were Mattel drawings, you wanted nothing to

17  do with them.

18        Do you recall that?

19  **A.**   Yes.

20  **Q.**   And that's because you had that thought, or you said

21  that because you knew that if what Carter Bryant was showing

22  you was Mattel property, their confidential information, you

23  shouldn't be looking at it; correct?

24  **A.**   I just didn't want to have anything to do with it.

25  **Q.**   Well, let me ask you.  You knew in September of 2000

1    that if someone came to you with confidential information of

2    a competitor, you shouldn't even look at it.

3              You knew that, didn't you?

4    A.   All I know is what I testified to.  That if they at that

5    time, if I believed that they belonged to Mattel, I didn't

6    want to have anything to do with it.  And that's the truth.

7    Q.   And my question is different, sir.  I'm asking about

8    your -- the way you practice as a businessman.

9    A.   Yes.

10   Q.   In September of 2000, you knew that if what Carter

11   Bryant was showing you belonged to Mattel and was

12   confidential and proprietary, that you should not even be

13   looking at it.  You knew that, didn't you?

14   A.   I cannot answer that one way or another state of my mind

15   at that time.  So I cannot answer that truthfully beside what

16   I answered.

17   Q.   Well, I'm just asking you about the way you would do

18   business.  Are you telling the jury it was your understanding

19   it was okay to look at another company's confidential,

20   private information -- I'll stop the question there.  That

21   was okay?  That's even okay business practice?

22   A.   No, and I told the jury it's not.  And I told you on the

23   Phase 1-A that if they belonged to Mattel, I didn't want to

24   have anything to do with it.

25   Q.   Okay.  So you just told the jury it's not okay.  And my

1    question is simple.  You knew in September 2000 that you

2    should not be looking at a competitor's confidential

3    information; right?

4    A.   I shouldn't be looking at -- I guess you can say that,

5    yes.

6    Q.   And you told us that if you knew that that was Mattel's

7    property, their confidential information, you wouldn't have

8    looked at it; right?

9    A.   I didn't say that.  I said that -- I said -- you're

10   asking me to speculate what would I have done.  And I said to

11   you and I said to this jury that if I believed those belonged

12   to Mattel, I wanted nothing to do with it.

13   Q.   And you say that because you know it would have been

14   wrong for you to build a business based upon Mattel's

15   proprietary confidential information.  You know that, don't

16   you?

17   A.   It is wrong -- I don't understand your question.  You

18   said it wouldn't be wrong?

19   Q.   It would be wrong.

20   A.   To do what?

21   Q.   It would be wrong to create a business based upon

22   Mattel's confidential proprietary information; right?

23   A.   Yes.

24   Q.   It would be wrong for you to profit a penny by using

25   Mattel's proprietary confidential information.

1          You understand that?

2    **A.**    Yes.

3    **Q.**    Now, you said that these drawings, this Mattel

4    confidential information inspired you.

5          Do you recall saying that?

6    **A.**    I said those drawings were the inspiration for what

7    became the Bratz dolls, which MGA created through many, many

8    changes and many employees.

9    **Q.**    Well, you know --

10   **A.**    And a lot of investment.  Over seven years.

11   **Q.**    You also know, sir, that you shouldn't be inspired to

12   act by looking at a competitor's private confidential

13   information.  You know that, don't you?

14   **A.**    Yes.

15   **Q.**    So let's talk about how you were inspired to act based

16   upon this Mattel information.  Within a couple of weeks you

17   had decided you are going to spend millions to make Bratz

18   into a brand.

19         Do you recall that?

20   **A.**    Yes.

21   **Q.**    And if you look at Exhibit 16788.

22         And that's already admitted, your Honor, if we can

23   put that up.

24   **A.**    Go ahead.

25   **Q.**    And this is September 13th, not even two weeks after

1   Mr. Bryant has shown you his drawings and his concept for

2   this doll; correct?

3   A.   That's correct.

4   Q.   And by this time, September 13th, you don't have a doll,

5   do you?

6   A.   We don't.

7   Q.   You don't have sculpts; right?

8   A.   No, we don't.

9   Q.   You -- no one's come and done any face painting as far

10  as you know; correct?

11  A.   That's correct.

12  Q.   All you have looked at is Mattel's proprietary

13  confidential information concerning Mr. Bryant's designs and

14  ideas; correct?

15  A.   Yes.

16  Q.   And having looked just at that, you are writing an

17  e-mail to Ms. O'Connor saying we're going to risk and spend

18  millions making this brand and line happen.

19         You see that?

20  A.   Yes.

21  Q.   Now, in the toy business, making a brand is sort of the

22  Holy Grail, isn't it?

23  A.   I apologize.  I don't know that.

24  Q.   Creating a brand is the way to really be able to make

25  high profits; correct?

1   **A.**   Making a brand is building a brand from the ground up,

2   and that's what MGA did.

3   **Q.**   You heard Ms. Pembleton, you heard her testify about how

4   MGA had created this Bratz brand.

5        Do you recall that?

6   **A.**   Yes, and we did.

7   **Q.**   And you create the brand, and you can put the name on

8   things like flip-flops because it's associated with the

9   brand, and that will help sell it; correct?

10   **A.**   I don't understand your question.  Please repeat.

11   **Q.**   Well, creating a brand, a brand is something valuable;

12   right?

13   **A.**   Yes, it is.

14   **Q.**   And having seen just Mattel's confidential information

15   about Bratz and about those designs, you had decided a few

16   weeks later you were going to try to make Bratz into a brand;

17   correct?

18   **A.**   Yes, and I said maybe it does, maybe it doesn't.  We

19   have made the brand, and not him.  And that's a fact.  And

20   that's what I said on September 13th, 2000.

21   **Q.**   You would agree that it would be wrong for you to try to

22   make a profitable brand if the inspiration for that is

23   looking at Mattel's confidential information and designs.

24   You'll agree with that; right?

25   **A.**   Yes, if we knew that at that time that those drawings

Exhibit D - Page 1064

1    were from Mattel, that would be correct.

2    **Q.**   And by the way, how long had you been in the toy

3    business as of September 2000?

4    **A.**   About 13 years.

5    **Q.**   So in that 13 years' time frame, prior to seeing Carter

6    Bryant's drawings, Mattel confidential information, had you

7    spent millions trying to make a brand?

8    **A.**   Make it what kind of brand?

9    **Q.**   A brand, like Bratz or Hippity-hoppity Baby or anything

10   like that.  Had you taken a fashion doll, for example, and

11   tried to make a brand in those 13 years prior to meeting

12   Mr. Bryant?

13            MR. NOLAN:  Your Honor, with the lead-in, I think

14   it's compound.

15            THE COURT:  Sustained.

16   **Q.**   BY MR. PRICE:  Let me rephrase.

17            THE COURT:  Rephrase, Counsel.

18   **Q.**   BY MR. PRICE:  In those 13 years that you were in the

19   toy business prior to seeing Mattel's confidential

20   information, had you spent millions or done anything to try

21   to make a brand of a fashion doll?

22   **A.**   No.

23   **Q.**   In that time frame, had you spent millions to try to

24   make a brand of Hoppity Bouncy Baby?

25   **A.**   Yes.

1   **Q.**   And so let's talk about that.  So for Hoppity Bouncy

2   Baby and making that a brand, you want to make it a name so

3   you can sell accessories, so you can license, things like

4   that?

5   **A.**   When you launch a brand, you hope that you spend the

6   money and take a lot of risk to do that.  Sometimes it

7   happens; sometimes it doesn't happen.

8   **Q.**   And it hadn't happened prior to meeting Mr. Bryant;

9   correct?

10  **A.**   Prior to --

11  **Q.**   September of 2000.  You hadn't successfully made a brand

12  with the people who worked at MGA; right?

13  **A.**   That's not true.

14  **Q.**   Well, for example, we've seen some licensed products

15  here with Bratz on it like helmets and things like that.

16          Prior to Bratz, a licensed product is where someone

17  else wants to have permission to use your brand; right?

18  **A.**   That's correct.

19  **Q.**   Where it's so valuable, others are saying we will pay

20  you for the right to, for example, put Bratz on a pillow or

21  on a bicycle helmet; correct?

22  **A.**   Yes.

23  **Q.**   And that's --

24  **A.**   Because we build the brand.

25  **Q.**   Pardon?

1   A.    Because MGA built the brand, seven years.

2   Q.    And that's a very valuable thing to be able to do, to be

3   able to license your brand that you built; correct?

4   A.    I think it's very valuable first to build the brand with

5   all the hard work of MGA employees and the investment we made

6   and then license it, yes.

7   Q.    And prior to meeting Mr. Bryant, prior to Bratz, MGA had

8   not developed a single item that it was able to license;

9   correct?

10  A.    That's not correct.

11  Q.    You had licensed items prior to that?

12  A.    Yes, we had.

13  Q.    Okay.  Sir, if you'll look at in your binder there, at

14  Exhibit 630.

15  A.    Go ahead.

16  Q.    Have you found it?

17  A.    Yes.

18  Q.    And you see this is an e-mail string.  The last one is

19  dated June 30, 2003, from Isaac Larian.

20          You see that?

21  A.    I do.

22          MR. PRICE:  Your Honor, move Exhibit 630 into

23  evidence.

24          MR. NOLAN:  No objection.

25          THE COURT:  It's admitted.

1          **(Exhibit 630 received.)**

2   **Q.**    BY MR. PRICE:  If we could just blow this up.  Do you

3   see this is an e-mail where someone from License Europe

4   Magazine has asked questions, and then answers are being

5   supplied by MGA.

6               Do you see that?

7   **A.**    Yes.

8   **Q.**    And then you are sending it to yourself where it says

9   below?

10  **A.**    I'm sending it to myself?

11  **Q.**    Isaac Larian to Isaac Larian and Bonnie Blume?

12  **A.**    Yes.

13  **Q.**    And what you did is you wrote answers to this

14  gentleman's questions.

15              Do you see that?

16  **A.**    I can't tell you one way or -- yes, it looks like it,

17  yes, that's correct.

18  **Q.**    And let's go to the second page.  And one of the

19  questions you were asked is had you been a licensor before?

20              You see that?

21  **A.**    Yes.

22  **Q.**    And a licensor is where again, you have the rights to

23  something that you built with your people, and you are giving

24  someone else, the licensee, the right to do that?

25  **A.**    That's correct.

1  **Q.**   And the answer you wrote is no.  This is the first time.

2  But we have been a licensee many times; correct?  That's what

3  you wrote.

4  **A.**   I did.

5  **Q.**   And what a licensee means is that you go to someone

6  else, say, Marvel Comics, and say can I put Spiderman on my

7  stuff; right?

8  **A.**   Right.

9  **Q.**   And so getting back, then, to your September 13th

10  e-mail, which is Exhibit 16788.  Now, when you wrote that

11  e-mail saying that we're going to make this brand happen and

12  spend millions on it, at that time are you aware of any

13  e-mails or anything saying we're going to do that, but we're

14  going to make sure the dolls don't look like the confidential

15  information Carter Bryant gave us that's inspiring us to

16  create the line?

17  **A.**   The answer to your question, if I'm aware of an e-mail

18  like that, is no.

19  **Q.**   Or even a discussion as of September 13th, when you're

20  talking about risking malls to make Carter Bryant's line

21  happen.  Any discussion saying we don't like those drawings.

22  We want the dolls to look different.

23  **A.**   No, because we didn't have a contract as of September

24  13th.

25  **Q.**   Well, let's look, then, before then, actually, on

1    September 8th, based just on the confidential information you

2    have, you are talking within MGA about selling accessories to

3    those dolls; correct?

4    **A.**    I don't recall.  Do you have something?

5    **Q.**    Sure.  If you look at Exhibit 1319.

6    **A.**    Go ahead.  I have it.

7    **Q.**    And you recognize that as an e-mail that you sent to

8    Paula Garcia and Carter Bryant on September 8th of 2001?

9    **A.**    Yes, I think before it says --

10   **Q.**    I'm going to correct that.

11   **A.**    You did it on purpose?

12   **Q.**    I'm going to correct that.  Is that something you said

13   on September 8th of 2001?

14   **A.**    I did, a year after.

15   **Q.**    But let's look at what you said.  On September 8th of

16   2001.

17          By the way, I move 1319 into evidence.

18          MR. NOLAN:  The one dated 2001, no objection.

19          THE COURT:  Very well.

20          **(Exhibit 1319 received.)**

21   **Q.**    BY MR. PRICE:  Now, look here, sir.  You're talking

22   about brands, Barbie, Amazon brands, Barbie.

23          Do you see that?

24   **A.**    I do.

25   **Q.**    Part of branding is you want to sell accessories to the

1    dolls; correct?

2    A.    That's correct.

3    Q.    And you had seen prior to September 2000, that's what

4    Barbie had done with its brand; correct?  It sold

5    accessories?

6    A.    Yes.

7    Q.    And so having -- seeing the confidential information

8    that Mr. Bryant gave you about Bratz -- ultra trendy, hip,

9    et cetera -- you decided to make a brand; right?

10   A.    We decided to license that drawing from Carter Bryant

11   and then come up with Bratz dolls.  That's what we decided to

12   do.  And then later on make a brand.

13   Q.    But by making a brand, even when you were talking about

14   it in that prior e-mail, you're talking about creating a line

15   of accessories and licensing and all of that; correct?

16   A.    That's part of building a brand.

17   Q.    That's part of creating a brand; right?

18   A.    That's correct.

19   Q.    And so you had that in mind less than two weeks after

20   seeing Mattel's confidential information, that you were going

21   to make Bratz a line with accessories where you would license

22   the Bratz products; correct?

23           MR. NOLAN:  Objection, your Honor.

24   Mischaracterizes the testimony.  Lack of foundation.

25           THE COURT:  I don't think he's -- Counsel, are you

1    referring to the document?

2           MR. PRICE:  No.

3           THE COURT:  I didn't think so.  Why don't we take

4    that document off.  He's not referring to the document,

5    Counsel.

6           MR. NOLAN:  Thank you, your Honor.

7           THE COURT:  Very well.

8    Q.   BY MR. PRICE:  As of September 2000, as we discussed

9    when you said we're going to pursue a Bratz line after seeing

10   Mattel's confidential information, when you had Bratz' line

11   in mind, you thought of something with accessories, something

12   we were going to license Bratz; correct?

13   A.   No.  At that time we were thinking about if we license

14   this drawing, it can be manufactured.  So A can be

15   manufactured to a doll, B, request we make it to a brand.

16   And this was just going to give you -- Carter Bryant brought

17   to us some seeds.  And he said that he owns.  MGA bought the

18   land.  MGA hired employees --

19          MR. PRICE:  Your Honor, move to strike as

20   nonresponsive.

21          THE COURT:  The question is -- next question,

22   Counsel.

23   Q.   BY MR. PRICE:  You knew those were Mattel's drawings and

24   confidential information at the time Mr. Bryant gave them to

25   you; right?

1   A.   No.

2   Q.   You understand the jury has found that you knowingly

3   assisted Mr. Bryant in breaching his fiduciary duty of

4   confidentiality; correct?

5   A.   Yes, that's what the jury has found.  I respect the

6   jury's decision.

7   Q.   My question, though, is this:  When you think of brand,

8   when you thought of that in 2000, I think you told us a brand

9   means you're going to have accessories and try to get

10  licensees; correct?

11  A.   No.  What I told you is that's part of building a brand.

12  Q.   Okay.  So in September of 2000, when you said you were

13  going to try to build the brand, what you had in mind was

14  inspired or based on Mr. Bryant's confidential information,

15  was to build a brand which had accessories and licensees;

16  correct?

17  A.   No.

18  Q.   Well, let's look at September 2001, then, where we have

19  this e-mail Exhibit 1319.  And you see, you say don't Bratz

20  need their own house and hotel and clubs to hang out in?

21        You see that?

22  A.   Yes.

23  Q.   Now, those are accessories; right?

24  A.   That's correct.

25  Q.   And you say look at what are the three top sellers for

1    Barbie; correct?

2    **A.**    Yes, on public, on Amazon dot com.

3    **Q.**    So you're telling your people for ideas, let's look in

4    the public for nonconfidential information; correct?

5    **A.**    That's correct.

6    **Q.**    And let's look at what Barbie's done; correct?

7    **A.**    Yes.

8    **Q.**    Okay to do that, to use public information; right?

9    **A.**    I believe it is.

10    **Q.**    Okay.  And then you attached here, if we can go to the

11    next page, things such as Barbie Jam 'n Glam tour bus?  You

12    saw that?

13    **A.**    Looks like I just attached the link to the Amazon dot

14    com, where they had all of these products in it.  And I sent

15    it to Paula and other people.

16    **Q.**    By the way, did Bratz end up doing a bus at some point

17    as one of the accessories?

18    **A.**    We did.

19    **Q.**    And the next page, it has a grand hotel is a super

20    gymnast Barbie doll?

21    **A.**    Yes.

22    **Q.**    And Bratz ended up doing at some point a gymnast Bratz;

23    right?

24    **A.**    We did.

25    **Q.**    And if we go to the next page, it's got like a rock and

1    roll radio house and further on down, it's got Harley

2    Davidson.   Various types of accessories that Barbie was using

3    for its brand; correct?

4    A.   I'm sorry.   I don't understand your question.

5    Q.   This lists various accessories that Barbie was using for

6    its brand; correct?

7    A.   Which was displayed on Amazon dot com.

8    Q.   And part of branding is to try to sell accessories

9    associated with the core of your brand; correct?

10   A.   That's one of the things, yes.   That's one of the

11   things.

12   Q.   And so your idea was I've got the Bratz doll now.   Part

13   of branding is then to make money by selling accessories;

14   correct?

15   A.   2001, you mean; right?   Not 23001.

16   Q.   Let's say 2001.

17   A.   No, let's not say 2001.   If was 2001.

18   Q.   That's my question.   2001.

19   A.   Right.

20   Q.   Although that's what you're going to do with the brand

21   when you think of it in 2000.   That's what you hope to

22   accomplish; right?

23   A.   You hope to launch first the dolls to make sure they do

24   well and then build something around it.   That's what you

25   hope to do every time you get in the toy business.   And you

1    do hundreds of ideas.  One of them takes off.  99 of them

2    doesn't.

3    Q.    Getting back to 2000, before you ever had a doll, before

4    you ever had a doll, you hired Veronica Marlow to do

5    fashions; right?

6    A.    I'm sorry.  Before 2000 we did have a doll.  We did not

7    have a fashion doll.

8    Q.    Let me be clear.  September, October 2000, before you

9    had a doll, when all you had was the confidential information

10   for Mattel, you hired Veronica Marlow to do fashions; right?

11   A.    We hired Veronica Marlow, yes, to do some of the

12   fashions, yes.

13   Q.    And before you had --

14   A.    You're talking about Bratz; right?  You're not talking

15   about any doll.

16   Q.    I'm talking about Bratz.

17   A.    Right.

18   Q.    So in October -- September, October 2000, again, you

19   didn't have a Bratz doll, when all you had to inspire you was

20   Mattel's confidential information.  You hired Margaret Lahey

21   to do a sculpt; correct?

22   A.    Yes, we did.

23   Q.    And by the way, if you want to make the doll, even if

24   you want to make it look exactly like a drawing, to do that,

25   if you want to make it look like it to the millimeter, you've

1   got to have someone sculpt it; right?

2   A.    Yes.

3   Q.    And you've got to make a mould of some sort; right?

4   A.    Yes.

5   Q.    And you've got to do face painting?

6   A.    Right.

7   Q.    There are various processes you always have to go

8   through in going from a drawing to a doll; correct?

9   A.    The dolls are just inspiration.  Whether it's Bratz or

10  another product, the drawings are just the basis, the

11  inspiration for making the product.  Usually products come

12  out to be a lot different than the drawings.  You cannot just

13  manufacture those drawings.

14  Q.    My question is different.  If you want to go from a

15  drawing to a doll, even if you want to do it identically, you

16  have to go through steps of making a sculpt, making a mould,

17  doing face painting, et cetera; right?  You have to do that

18  every time.

19  A.    Yes, you do.

20  Q.    And so getting back to, then, what you were doing after

21  seeing this confidential information, in addition you hired

22  Mercedeh Ward and Rachel Harris --

23  A.    Yes.

24  Q.    Both worked for Mattel for many years; correct?

25  A.    Rachel Harris, to the best of my knowledge, Rachel

1   Harris didn't work for Mattel.  I didn't know.

2   Q.   Let me ask you about Mercedeh Ward.  You put her in

3   charge of interacting with Hong Kong with respect to the

4   manufacture of the Bratz doll; correct?

5   A.   Yes.

6   Q.   And when you hired her, you told her that you had no one

7   at MGA capable of completing the Bratz doll, and that's why

8   you wanted to hire her.

9   A.   She was one of the people we needed to make the Bratz

10  dolls, yes.  She was instrumental.

11  Q.   And so you hired her, again, in October of 2000, when

12  all you had to, I'll use your words, inspire you, was the

13  confidential information and designs that Mr. Bryant had

14  given you; correct?

15  A.   We had -- all we had at that time were the drawings that

16  became the inspiration for making the Bratz doll.

17  Q.   In fact, you hired Ms. Ward in September of 2000;

18  correct?

19  A.   I don't remember exactly when we hired her.  I don't

20  think that's correct.  But I don't know.  I don't remember

21  exactly when we hired her.

22  Q.   If you look at -- moving on as to what you did as a

23  result of seeing these drawings, if you look at

24  Exhibit 16789.  And that's way toward the back of your binder

25  here.

1          You see 15, 2000.  Now, as of this date, again, all

2     you have as your inspiration, as you put it, is this

3     confidential information that you received from Mr. Bryant;

4     correct?

5     A.    That's correct.

6     Q.    So based on that, on Mattel's property and ideas, you

7     are thinking of doing an entire new showroom for Bratz

8     products; correct?

9     A.    No, we had a new showroom.  We were going to get a new

10    showroom in New York because we were growing.  And she was

11    asking me where are we going to show it?  In the hallway?

12    And I said no, in the new showroom.

13    Q.    And let's look here in the bottom e-mail, where it says

14    Isaac to Carter Bryant and Paula, importance, high.  Where

15    you're talking about you need to think different, think

16    fashion, you know, basically put 16 hours a day.  That was

17    the e-mail that started all this; correct?

18    A.    Yes.  It started that e-mail chain.

19    Q.    Started the e-mail chain.  And then Ms. O'Connor asked

20    you in response, "Where do you think this catwalk is going to

21    be?  In the hallway?  I love the idea, but we don't have the

22    space."

23          Do you see that?

24    A.    Yes.

25    Q.    And the idea, we're talking about Bratz.

1    A.    To show the Bratz line, right.

2    Q.    Yes.  And your response is a new showroom for the Bratz

3    line; correct?

4    A.    No.  We didn't have one showroom just for the Bratz

5    line.  We had one showroom that we showed all of our toys in.

6    And we moved to a bigger showroom.

7    Q.    If you'd look at exhibit -- by the way, this is -- all

8    of this here in this e-mail, we were telling these folks to

9    think accessories, think fashion, think commercial.  All of

10   this is to exploit that idea, the confidential idea that

11   belonged to Mattel that Mr. Bryant had given you in September

12   of 2000; right?

13   A.    It was just the idea when if we're going to make these

14   dolls, we need to design accessories.  We need to do a

15   commercial, have a showroom to show it.  That's what it was

16   saying.

17   Q.    Yes, but the idea that you're talking about exploiting

18   belonged to Mattel; right?

19   A.    I think this jury has found that those drawings belonged

20   to Mattel.

21   Q.    And you will agree that it would be wrong for MGA to

22   make any profits by exploiting an idea that belonged to

23   Mattel?

24         MR. NOLAN:  Your Honor, cumulative.  Asked and

25   answered.

1          THE COURT:  Sustained.

2    Q.    BY MR. PRICE:   And then based again just on Mattel's

3    property that you had seen, you were saying we're going do

4    start doing line extensions to Bratz; is that right?   In

5    October of 2000.

6    A.    October, I'm not sure if October 2000 or before.  Can

7    you show me a document?

8    Q.    Sure.   I'll put up 11276, which is already admitted.

9    And you say there's an e-mail that begins with October 15 of

10   2000.   Talking about brainstorming, about sports activity,

11   dolls, et cetera, and then the response to that is from Paula

12   Garcia Treantafelles, what about the line extension to Bratz?

13          Do you see that?

14   A.    Yes, I do.

15   Q.    And then your response, yes, all caps, everything;

16   correct?

17   A.    Everything means all product line.

18   Q.    Including Bratz?

19   A.    That's correct.

20   Q.    So in October 2000, you were getting together to try to

21   figure out how to do line extensions based upon Mattel's

22   property?

23   A.    Based on -- we were going to launch a line of Bratz

24   dolls inspired by Carter Bryant's drawings, and we were going

25   to launch accessories and other products to go with it.

1   Q.   Okay.   And you said based on Carter Bryant's drawings.

2   Inspired by Carter Bryant's drawings.   That's all you had at

3   the time, was Mattel's property to inspire you; right?

4          MR. NOLAN:   Objection, your Honor.   Compound, based

5   on, inspired --

6          MR. PRICE:   I'll rephrase.

7   Q.   Here you are in October 2000 talking about doing

8   extensions to the Bratz line.   What you're talking about is

9   doing extensions to a Bratz concept and idea that belonged to

10  Mattel.

11  A.   That's not correct.   The only thing that the jury has

12  found that belonged to Mattel are those drawings on a piece

13  of paper.

14  Q.   But you said that as of this date, all you had to

15  inspire you, all you had to create a line was the

16  confidential information that Carter Bryant gave you which

17  belonged to Mattel; correct?

18         MR. NOLAN:   Objection, your Honor.   Misstates his

19  testimony.   Also argumentative.

20         THE COURT:   Overruled.   You may answer.

21         THE WITNESS:   Can you repeat the question again,

22  please?

23  Q.   BY MR. PRICE:   As of October 2000, what was inspiring

24  this, and the only thing inspiring this, was the confidential

25  information, the design drawings you had seen which belonged

1    to Mattel?

2              MR. NOLAN:  Objection, your Honor.  Foundation as

3    to the -- and ambiguous.  October.  There are 31 days in

4    October.

5              THE COURT:  Fair enough.  Rephrase, Counsel.

6    Q.   BY MR. PRICE:  October 16, 2000.

7    A.   That's correct.

8    Q.   As of that date, the only thing that was inspiring this

9    business, this idea of a line extension, was that you had

10   seen confidential information that belonged to Mattel;

11   correct?

12   A.   I don't know as of October 16 if we had other things

13   besides just those drawings.  I don't recall.  I got to look

14   at papers to say that.

15   Q.   You understand that the jury found that Mr. Bryant came

16   up with the name Bratz while he was at Mattel.  You

17   understand that?

18   A.   I'm not sure if we found out about that or not.  I know

19   we bought the name of Bratz from someone named --

20             MR. PRICE:  Move to strike as nonresponsive.

21             THE COURT:  Sustained.  It's stricken.

22   Q.   BY MR. PRICE:  And in fact, a sculpt had been done by

23   mid-October 2000; correct?

24   A.   It's possible, yes.

25   Q.   And you understand that the jury found that Mr. Bryant

1   created that sculpt while he was at Mattel, along with

2   others?

3            Mr. Bryant by himself or jointly with others

4   created that sculpt --

5   A.   Excuse me.  I understood that the jury found that Carter

6   Bryant, along with other people, such as Margaret Leahy and

7   other people he worked with at MGA, came up with that sculpt.

8   That's what I understood that they found.

9   Q.   Okay.  Well, why don't you look at exhibit --

10  A.   I think the verdict says jointly.

11  Q.   If you'd look at Exhibit 11277.  That's admitted.  This

12  is October 31st.  As of October 31st, you didn't have a doll;

13  correct?

14  A.   We did not.

15  Q.   As of October 31st, what you had, again, to base your

16  business plans and projections on, were the designs of Carter

17  Bryant, which belonged to Mattel; correct?

18  A.   I believe by October 31st, 2000, we had more than just

19  those drawings.  Again, I think we had done at least some

20  preliminary sculpts that the jury found was done by Carter

21  Bryant jointly with MGA.  And some other things.

22  Q.   Well, certainly the jury knows what the jury meant to

23  do.  So let me ask you --

24            MR. NOLAN:  Objection, your Honor.  Motion to

25  strike.

1      THE COURT:  It's stricken.

2  **Q.**    BY MR. PRICE:  I'll ask you this:  As of October 31st,

3  before you had -- before you had a doll, you were projecting

4  25 million in sales; correct?

5  **A.**    I was.

6  **Q.**    The entire year before, all of your revenues over all of

7  your products for 2000 was about 70 million; right?

8  **A.**    I don't remember exactly.  But I think maybe more than

9  that.  But I don't recall exactly how much it was.

10  **Q.**    And that's the year in which overall you lost money;

11  correct?

12  **A.**    I'm sorry?

13  **Q.**    In 2000 overall you lost money.

14  **A.**    We ended up losing money at the end of 2000; that's

15  correct.

16  **Q.**    So you were projecting in October 2000 that Bratz would

17  be far and away for the next year the most successful product

18  you had ever launched; correct?

19  **A.**    That is not correct.  I have -- that's not correct.

20  **Q.**    You had never launched a product which had made

21  $25 million in revenue in one year.

22  **A.**    I don't know if we have or not.  But your statement

23  before is not correct.  If we look at other projections we

24  had done at that time, if there were other brands we thought

25  was going to do better than Bratz, that they never happened.

1   Q.   Well, let's talk about what happened next.  You had

2   meetings with a major customer set up in November of 2000;

3   right?

4   A.   I'm not sure if we had major meetings.  I think we do,

5   as I explained to you last time, what we call pretoy fair,

6   prepresentation.

7   Q.   That was to Kmart in November of 2000?

8   A.   Yes.

9   Q.   And one of the things you were trying to do is see

10  whether or not they were interested in dolls you were

11  planning to come out with; correct?

12  A.   Yes, that's one of the things.

13  Q.   All right.  And you sent someone to Kmart to see if they

14  would be interested in Bratz dolls; correct?

15  A.   Amongst other products that we had made.

16  Q.   And what you used to see whether or not Kmart would be

17  interested in buying Bratz dolls, what you used to do that

18  was Mattel's property.

19  A.   I don't recall exactly what we showed them.  I know that

20  we showed them boards because there was not a doll in

21  November 2000.  But I don't remember what was on those

22  boards.

23  Q.   Well, you recall the previous testimony.  I'm going to

24  show you Exhibits 1107 -- if we can show that -- 1108, 1109,

25  and 1110.

1          When you went to Kmart to try to get customers to

2    buy Bratz dolls, what they were shown, as has been previously

3    testified, were the boards of Carter Bryant's drawings, which

4    are Mattel's property; right?

5    A.    Again, I wasn't in that presentation.  I know that our

6    salespeople showed to Kmart drawings.  I cannot tell you one

7    way or another if they were Carter Bryant's drawings or other

8    drawings that were done afterward.  I cannot testify to that.

9    Q.    You do understand that MGA had no right to try to get

10   customer interest in Bratz dolls by showing customers

11   Mattel's property.  You know that.

12   A.    Know that as of when?

13   Q.    At the time it did it.  You know that MGA had no right

14   to solicit customer interest in Bratz dolls by going out and

15   showing customers Mattel's property.

16   A.    I think this jury came to that verdict.  I believed that

17   Carter Bryant had done those drawings in 1998, when he was

18   not working at Mattel, and that's what he had represented to

19   us.  So I did not in November 2000 believe that he was lying

20   to us basically.  And you settled with him.

21   Q.    So let's ask it this way.  Certainly you would agree

22   that it would be in appropriate for MGA to make any profits

23   by soliciting customer sales by using Mattel's confidential

24   property.  You would agree that would be inappropriate?

25   A.    Yes, if you know about it, yes.

1   Q.   And by the way, you've always known that what was shown

2   to Kmart was drawings or boards, not dolls; right?

3   A.   That's correct.

4   Q.   But when you made the presentation to Kmart, I assume

5   you're telling them this is what the dolls are going to look

6   like; right?

7   A.   As I said --

8            MR. NOLAN:  Objection, your Honor.  Lack of

9   foundation, ambiguous as to what he would say, and also best

10  evidence rule, what was presented to --

11           THE COURT:  Overruled.  It's a question.  You may

12  answer it.

13           THE WITNESS:  I was, as I testified before, I was

14  not in that presentation to Kmart.  Or any of those

15  customers.  So I don't know what our salespeople showed and

16  presented.  I know that we didn't have a doll.  And I know

17  that they showed them boards.  What was on those boards, they

18  were drawings.  Were they Carter Bryant's drawings?  Were

19  they other drawings?  I cannot tell you.  I don't know.

20  Q.   BY MR. PRICE:  I take it you would have expected that

21  your salespeople would have shown a customer drawings that

22  were to be representative of the dolls that the customer's

23  going to be asked to buy; right?

24  A.   I think they were shown to them drawings that were going

25  to become the inspiration for the dolls.

6127

```
1              Your Honor?  I apologize.  But that lady back
2    there, she is making faces at me, and I don't think it's
3    appropriate.
4              THE COURT:  Very good.  Why don't we take a break
5    at this time, and I'll take that up during the break,
6    Mr. Larian.
7              (WHEREUPON THE JURY WITHDRAWS.)
8              THE COURT:  You may step down.
9              THE WITNESS:  That has been going on through the
10   trial, and I have not --
11             THE COURT:  Speak with your attorney.  Thank you,
12   Mr. Larian.
13             Mr. Nolan, I'd like to see you and your client,
14   Mr. Larian, along with Mr. Quinn and Ms. Martinez in
15   chambers.
16             (Hearing in chambers.)
17             THE COURT:  We're on the record outside the
18   presence of the jury.  Why don't you make your appearances of
19   who is here.
20             MR. QUINN:  John Quinn, Lily Martinez, who has been
21   Mattel's trial representative.
22             MR. NOLAN:  Tom Nolan and Isaac Larian.
23             THE COURT:  I understand very much that this is
24   a -- an important case to all sides.  And I understand it's
25   also a very emotional case because it not only goes -- it's
```

1    maybe it's more the nature of a CEO than a designer or an

2    artist, but he's been very stoic, and that is the demeanor

3    that is called for in a courtroom.  And I must insist upon

4    this.

5            MS. MARTINEZ:  I agree.

6            THE COURT:  So, Counsel, I will leave it to you to

7    appropriately instruct your team and everyone associated with

8    your team and your side.  You have the Court's understanding,

9    but it's the Court's tolerance only up to a point.

10           MR. QUINN:  Understood, your Honor.

11           THE COURT:  Very good.

12           (In chambers conference concluded.)

13           (Recess taken.)

14           **(WHEREUPON THE JURY ENTERS.)**

15           MR. NOLAN:  Your Honor, could we have a quick

16   sidebar?

17           THE COURT:  Very well.

18           **(SIDEBAR CONFERENCE HELD.)**

19           THE COURT:  Yes, sir.

20           MR. NOLAN:  Your Honor, I wanted to take a moment

21   and explain an objection that I made which has been repeated

22   over and over, and that is a constant use of "the jury has

23   found confidential information belonging to Mattel."  In

24   truth, your Honor, we believe that, looking back at the

25   summary judgment rulings, that the jury was asked to find

1   with respect to the designs that they were inventions, not

2   confidential information, that it could be proprietary.

3         THE COURT:  Proprietary.

4         MR. NOLAN:  And that has a significant difference,

5   because it only has value if disclosed outside -- I mean,

6   it's a nuance in the contracts and everything else, but

7   that's the basis for the objection.  And I didn't want to

8   make a speaking one, obviously, but this repeat of the

9   reference to confidential information is not in the jury

10  instructions, at least a quick look.  That was not part of

11  the elements that they were making a determination.  It was

12  more a timing of an invention during that period of time of

13  his employment.

14        MR. PRICE:  In the jury instructions, on the breach

15  of fiduciary duty, they were referring the jury to breach of

16  the confidentiality provision and the contract.

17        THE COURT:  And there has been a finding that he

18  breached the confidentiality, but you're referring to the

19  drawings as being confidential information.  It is true and

20  accurate to say that they are proprietary information, but

21  Mr. Nolan has a point that they may not be confidential in

22  the sense that --

23        MR. PRICE:  I'm saying the drawings and the idea

24  for Bratz, his discussion of the Bratz dolls, the name Bratz.

25        THE COURT:  Those might be --

1           MS. AGUIAR:  Can I take a stab at actually sort of

2    setting this out?  There's two different provisions in the

3    contract; right?  There's one --

4           THE COURT:  I'm painfully aware of that.

5           MS. AGUIAR:  But I'm saying one is proprietary.

6    And proprietary, I believe Mr. Price is using proprietary and

7    confidential almost synonymously.  So I was just wanting to

8    go back to what your Honor said about well, maybe it's

9    proprietary, but it's not confidential.  I actually disagree.

10   And I think that your Honor has held in your summary judgment

11   decision --

12          THE COURT:  The value of the proprietary

13   information depends on it remaining confidential.

14          MS. AGUIAR:  Right.  So, for example, the value of

15   the proprietary information, as we see from the definition

16   here and as you pointed out in your second summary judgment

17   ruling, for example, a customer list or trade secrets, it

18   remains private and confidential.  Therefore, it has value.

19   These drawings are almost the opposite.  These drawings have

20   value by remaining not confidential.  The only value in these

21   drawings is if someone actually --

22          THE COURT:  That's not the case at all.  If a

23   company comes up with drawings that they have not

24   manufactured, no, that's not even the case at all.  That's

25   not even close to the case.

1           A company's drawings -- think about any company

2    that has drawings.  We've almost got to think

3    counterfactually here.  Imagine -- not counterfactually.  We

4    know these drawings were now done, according to the jury,

5    while he was working for -- Carter Bryant was working for

6    Mattel.  Mattel has every right to expect that until and

7    unless it publishes in the public its drawings or its dolls,

8    that anything that is drawn, all the designs, formula,

9    patterns, et cetera, are kept confidential.

10          MS. AGUIAR:  But what you just read from, designs,

11   et cetera, that --

12          THE COURT:  I read from up here in proprietary

13   information.

14          MS. AGUIAR:  It says formula, pattern, compilation,

15   device, method, technique, or process.  And, your Honor, you

16   made a distinction in your summary judgment ruling, and you

17   found that the drawings were a design under the definition of

18   invention.  So in your first ruling --

19          THE COURT:  That does not exclude them from being

20   part of the proprietary information.  I can't think of

21   anything more proprietary to a company than design drawings.

22   I can't think of anything being more important to a toy

23   company than their design drawings.

24          If MGA had some design drawings and they had a

25   similar confidentiality agreement and someone from Mattel

 1  broke in, stole them, and started passing them around at toy

 2  fairs, would that not be a violation of proprietary and

 3  confidential information?  And the list here, proprietary

 4  information means any information that derives independent

 5  economic value from being not generally known to the public.

 6         That's clearly design drawings that have not yet

 7  been turned into a product and published certainly derive

 8  their value from being -- they are trade secrets.  They are

 9  designs of Mattel.

10         MR. NOLAN:  Your Honor, I would just add that

11  this --

12         THE COURT:  I understand you don't like the phrase,

13  but I think given the findings, it's -- and I, you know,

14  could debate whether it's effective to keep saying it over

15  and over again or counterproductive.

16         MR. NOLAN:  I've already talked about that with my

17  team.  Because the jury -- I agree.  I may have taught the

18  same trial advocacy class.  My only point --

19         THE COURT:  Not to in any way impugn upon

20  Mr. Price's outstanding litigation skills.

21         MR. NOLAN:  No, no.  My point is by using this

22  definition of confidentiality, I know the Court has ruled

23  that we're not allowed to show that Mattel would not have

24  given an economic value to these drawings.  They wouldn't

25  have designed them.  That's sort of the testimony that has

1    been brought up.  And all of that.  And I just want to

2    consider coming back and making a pitch to you.  You may not.

3    And I'm not going to take up any more time on this.

4              THE COURT:  We have a jury waiting for us.

5              MR. NOLAN:  I know.  But that's --

6              THE COURT:  The objection in terms of him using

7    that phrase is overruled.  You reserve your right to make

8    that pitch.

9              MR. NOLAN:  Thank you.

10             **(CONCLUSION OF SIDEBAR CONFERENCE.)**

11             THE COURT:  All right, Counsel.  You may proceed.

12   **Q.**   BY MR. PRICE:  Mr. Larian, we were talking about the

13   pitch to Kmart in November of 2000.  And to figure out where

14   we were, you'll agree that although you weren't there, you

15   knew that what was used at Kmart was some sort of boards, not

16   actual dolls; correct?

17   **A.**    That's correct.

18   **Q.**    But the way you characterized that, the way you

19   characterized it before this case, was that Kmart was shown

20   the Bratz dolls.

21   **A.**    I don't recall doing that.  We showed -- all I know is

22   that there were no dolls in 2000, all of 2000 there were no

23   dolls.

24   **Q.**    But the distinction you're making, that is, showing them

25   the drawings that they were based upon versus the dolls,

Exhibit D - Page 1095

1   prior to this case, the way you characterized it was that by

2   showing Kmart those drawings, those Carter Bryant drawings,

3   you described that as being the Bratz dolls; right?

4   A.   I don't recall doing that.  There were no dolls in 2000.

5   Q.   If you look at Exhibit 12 --

6   A.   Exhibit?

7   Q.   Exhibit 12, which is in evidence.  And remember, this

8   was an affidavit you signed under penalty of perjury in your

9   lawsuit against Cityworld.

10          Do you recall that?

11  A.   Do I recall what?

12  Q.   Do you recall that you signed this affidavit under

13  penalty of perjury, the same oath you're taking today, in the

14  Cityworld case?

15  A.   Yes.

16  Q.   And if we turn to page 5, paragraph 13, what you said

17  then under penalty of perjury was the Bratz dolls were first

18  exhibited in the USA in November 2000.  They were further

19  exhibited in Hong Kong in January 2001.  And then they were

20  made available for retail in August 2001.

21          You recall that that's a statement you made under

22  oath?

23  A.   That's a statement.  And may I explain?

24  Q.   Well, actually, I'll ask you, is it true that --

25  A.   May I explain or not?

Exhibit D - Page 1096

1    Q.   No, I get to ask questions.  Your attorney can ask you

2    questions.

3            It's true that in the first phase, what you told

4    the jury was that what you were referring to when you said

5    the Bratz dolls, that what you were referring to were the

6    drawing boards which had been presented to Kmart.

7    A.   I said they were boards, yes.

8    Q.   And those same drawing boards were presented not just to

9    Kmart, but later in the month, around mid-November, they were

10   also presented to Target, those same Carter Bryant drawings

11   owned by Mattel.

12   A.   It's possible.  I don't recall.  But it's very possible.

13   Q.   Well --

14   A.   But I'm not sure if they were those drawings or other

15   drawings.  Again, I was not in the presentation.  Any of

16   these presentations.  But I believe there were boards shown

17   with drawings.

18   Q.   If you look at Exhibit 12428.  This will refresh your

19   memory that there was a presentation to Target?

20   A.   Would you repeat the --

21   Q.   It's 12428.

22   A.   Are these in numerical order?

23   Q.   They are.  Sometimes four digits.  Sometimes there's

24   three.  Would you like to have someone up there helping

25   you --

1   A.   I got it.

2   Q.   That's an e-mail from you to Julie Hamilton, for the

3   Target file which attached meeting notes from the Target line

4   review November 14, 2000.

5           Do you see that?

6   A.   Yes, I do.

7           MR. PRICE:  Move Exhibit 12428 in, your Honor.

8           MR. NOLAN:  No objection.

9           THE COURT:  It's admitted.

10          **(Exhibit 12428 received.)**

11  Q.   BY MR. PRICE:  And if we look at the first page, you

12  see -- actually, let's go to the second page, Ken.

13          It says meeting notes from Target line review

14  November 14, 2000.  Do you see that?

15  A.   I do.

16  Q.   And down toward the bottom, in fact, the bottom bullet

17  point says:  "Bratz, Laura finally came to life when these

18  were shown."

19          Do you see that?

20  A.   Yes.

21  Q.   Do you know who Laura refers to?

22  A.   I have no idea.  This is note I think from Julie Choma

23  (phonetic), who is our salesperson.  And she was sending to

24  me, and I'm commenting back.

25  Q.   So as best as you know, in November of 2000, MGA was

6141

1   going to prospective buyers and using Mattel's property to

2   try to get interest in a Bratz doll line; correct?

3   A.    Again, I am not sure as of November 14th, 2000, if we

4   were showing Carter Bryant's drawings or other drawings that

5   were done.  All I know, there were no dolls until 2001.

6   Q.    Let me call your attention, then, to there was something

7   called the Hong Kong toy fair.  Do you recall that?

8   A.    Yes.

9   Q.    And approximately when was that?

10  A.    It is usually in the first week of January.  Every year.

11  Q.    So that would have been in January 2001.  It would have

12  been a Hong Kong toy fair?

13  A.    That's correct.

14  Q.    And MGA had a showroom at that toy fair; correct?

15  A.    Yes, we have a showroom in there.

16  Q.    And I'm going to -- it's true, sir, that at that

17  showroom, you displayed both prototype Bratz dolls as well as

18  the Mattel drawings?

19  A.    I know that we had four prototypes that we had made.

20  That's what I remember.  I don't remember drawings.  There

21  could be drawings, but I don't remember that one way or

22  another.

23          MR. PRICE:  May I approach, your Honor?

24  Q.    I'd like to show you what's been marked as 911.  I'm

25  going to ask if you could look at the attachments.  Pages 2

Exhibit D - Page 1099

1    through 4.

2            Do you see those?

3    A.    I do.

4    Q.    And do you see those -- in fact, if you look at the

5    first page, you'll see this is an e-mail from a Sarah Chui to

6    Paula Treantafelles and Victoria O'Connor, among others.

7            Do you see that?

8    A.    I do.

9    Q.    Now, you were actually at the Hong Kong toy fair;

10   correct?

11   A.    To the best of my recollection, I was.

12   Q.    And if you look at these pictures, these are pictures

13   that were taken at the Hong Kong toy fair; correct?

14   A.    I am not sure if they are or not.  It says Hong Kong

15   showroom set up.  So I assume.  But I don't recall that many

16   years back.  It's very possible.

17   Q.    And your recollection, this is kind of what your

18   showroom looked like there; right?

19   A.    Frankly, going back, what, seven, eight years, I don't

20   recall it.  I don't.  It's possible.  It's very possible.

21            MR. PRICE:  Your Honor, I move Exhibit 911 into

22   evidence.

23            MR. NOLAN:  No objection.

24            THE COURT:  It's admitted.

25            **(Exhibit 911 received.)**

1   Q.   BY MR. PRICE:   If we can put -- this is the cover page

2   which, subject, Hong Kong showroom setup.

3           Do you see that?

4   A.   Yes.

5   Q.   And let's go to the second page.   And we can blow this

6   up.   And you can see that what we have here is you have these

7   dolls; correct?

8   A.   Four dolls; that's correct.

9   Q.   And we have some large poster boards here.   You see

10  Cloe, Sasha, Yasmin, Sasha, and what's been called the hero

11  shot.

12          Do you see that?

13  A.   Yes.

14  Q.   And then at the bottom here, you see -- do you see this

15  photograph here?

16  A.   I do.

17  Q.   And that's one of the Carter Bryant Mattel drawings;

18  correct?

19  A.   I cannot make --

20          MR. NOLAN:   Your Honor, objection to the

21  mischaracterization.   Joint and solely.

22          THE COURT:   Yes.   Counsel, rephrase.

23          MR. PRICE:   Let's blow this up.

24  Q.   Do you see this drawing here?

25  A.   It's very difficult.

Exhibit D - Page 1101

1   Q.   Well, let's see if we can refresh your memory, if we can

2   put up 11 -- you see this is Cloe?

3   A.   I'm sorry.  I had eye surgery, but I can't see that.

4            THE COURT:  It is hard to see from this angle,

5   Counsel.

6   Q.   BY MR. PRICE:  How about over here?  You see this

7   drawing?

8   A.   Yes.

9   Q.   You recognize that as the Jade drawing, which the jury

10  has found Carter Bryant -- was done while Carter Bryant was

11  at Mattel?

12  A.   It's very possible.  Again, very fuzzy picture.  It's

13  very possible.

14  Q.   You can see it in front of you on the screen?

15  A.   I can.  But again, it's very difficult to see.  But I

16  don't doubt if it is or not.

17  Q.   Okay.  Well, let's step back and see.  Perhaps we can

18  see over here.  Do you recognize this as the Sasha drawing

19  here?

20  A.   Again, I'm not trying to be difficult.  But those

21  pictures are very difficult for me to recognize.  It's

22  possible.

23  Q.   As far as you know, however, the Hong Kong toy fair,

24  when you first showed prototypes of the Bratz dolls, you also

25  displayed the drawings which Carter Bryant had done while he

1   was at Mattel?

2   **A.**   It is very possible.

3   **Q.**   And by the way, these dolls that were displayed in the

4   Hong Kong toy fair, I think you previously testified that

5   they didn't look like the dolls that went to market.

6          Do you recall that?

7   **A.**   I'm sorry?

8   **Q.**   You previously testified these dolls you showed at the

9   Hong Kong toy fair did not look like the dolls that went to

10  market.

11  **A.**   I think we made a lot of changes, yes.  We made changes

12  all the way to May, but I cannot make anything out of those

13  pictures.

14  **Q.**   Well, let's look, if you could, at Exhibit 912-B, which

15  is already in evidence.  And the testimony, sir, is that

16  these were the Hong Kong toy fair dolls that were displayed.

17  Look at the first page.

18  **A.**   Yes.

19  **Q.**   This is the Cloe doll, which was displayed at the time

20  at the Hong Kong toy fair when you were also displaying the

21  drawing Carter Bryant did while at Mattel; correct?

22  **A.**   It's very possible.

23  **Q.**   And if you look a few pages in, say, page -- these do

24  not have page numbers.  So it's Bates 45955.

25  **A.**   Yes.

1  Q.   Actually, let's look at 912B-14.

2  A.   What Bates number, sir?

3  Q.   It's 912B-14.  And you see this was the Jade doll which

4  was done at the Hong Kong toy fair?

5  A.   Can you tell me the Bates page on this Exhibit.

6  Q.   912B-14.  Bates number 45956.  This is the Jade doll

7  that was presented at the Hong Kong toy fair; correct?

8  A.   I don't recall exactly.  But that's what the front page

9  of this exhibit says.

10  Q.   And if we look at 912B-18.

11  A.   912B- -- can you just refer me to the Bates number?

12  Q.   Sure.  This was the Sasha doll shown to the Hong Kong

13  toy fair.

14  A.   Yes, I believe so.  Not the doll, just the prototype.

15  Q.   The prototype.  And then the 912B-24.

16  A.   I'm sorry.  Give me Bates --

17  Q.   This is the last page.  Do you recognize this as Yasmin?

18  A.   Again, this looks like a prototype that most likely we

19  were showing Hong Kong.

20  Q.   If I could, sir, I'd like to show you and ask you some

21  questions.  There are some exhibits which are in evidence

22  which I would like you to look at and compare.  And these

23  are -- the first are Cloe.  It's Exhibit 2-3, Exhibit 1109-B,

24  Exhibit 912 --

25  A.   I'm not going to be able to remember all of --

6147

1  Q.   No, I'm going to put them up for you.  912-B, page 5,

2  and then the first generation Cloe doll, 13903.  See the far

3  left, this is what you were shown by Carter Bryant in

4  September of 2000; correct?

5  A.   Yes.

6  Q.   And to the right, this is another drawing which Carter

7  Bryant did while he was employed at Mattel; correct?

8  A.   Yes.

9  Q.   And on the right here, that is the prototype Cloe doll;

10 correct?

11 A.   Yes.

12 Q.   And the one on the far right is the first wave Cloe doll

13 that came out; right?

14 A.   I believe so, yes.

15 Q.   And now if we could do for Sasha, and we'll go through

16 the same type of exhibits.

17         You see the far left is the drawing which

18 Mr. Bryant showed you in September of 2000; right?

19 A.   Yes.

20 Q.   The one from the second from the defendant is another

21 drawing he did while still employed at Mattel; correct?

22 A.   Yes.

23 Q.   And the one third from the left is the prototype?

24 A.   Yes.

25 Q.   And the final one is the Sasha doll, the first wave that

1    came out in its box; correct?

2    A.    Looks like it, yes.

3    Q.    And if we can do Jade.

4           So here we have far left, the first drawing shown

5    to you by Mr. Bryant; correct?

6    A.    That's right.

7    Q.    Next one is another drawing Mr. Bryant did while

8    employed at Mattel; correct?

9    A.    Yes.

10   Q.    The one that others have testified was shown to Kmart in

11   November; correct?

12   A.    I don't know what they have testified to.

13   Q.    And the third from the left, that's the prototype;

14   correct?

15   A.    Looked like it, right.

16   Q.    And by the way, when you were at the Hong Kong toy fair

17   showing them Mr. Bryant's drawings and the dolls, the idea

18   was to show them, you know, what you're going to be coming

19   out with when the dolls hit the market; correct?

20   A.    We were showing them the prototypes, and those

21   prototypes changed.

22   Q.    Well, my question, sir, is you were trying to -- you

23   were showing them, saying this is substantially what we think

24   the doll is going to look like.

25   A.    We never used the word substantially or anything like

1  that.  We were showing everything we had.

2  Q.  Okay.  But was the idea to show them something that

3  would mislead them, that would look different than what you

4  were actually going to be trying to be selling them later?

5  Was that the idea?

6  A.  We were showing them four dolls and those drawings.  And

7  those dolls were not actually manufactured dolls.  They were

8  prototypes that were changed.  And I'd be happy to show the

9  jury what was shown.

10  Q.  Well, you got to admit the prototype for Jade and the

11  final doll for Jade look substantially similar, don't you

12  think?

13  A.  No, there are many differences.  May I approach and show

14  the differences, your Honor?

15  Q.  I'm not going ask the many differences.  I'm asking

16  about the overall look.  Do we agree that the Jade doll

17  prototype and the Jade doll that came out look substantially

18  similar?

19  A.  They have similarities, but there are many differences

20  that I'll be happy to approach and show the jury.

21  Q.  Well, when you showed the prototype, was your intent to

22  inform the buyers that you planned to come out with a doll

23  that looks kind of like the doll you're showing them?  Was

24  that your intent?

25  A.  Our intent was to show them that we're going to come out

6150

1  with a line of fashion dolls.

2  Q.    You didn't show them a Barbie doll, did you?

3  A.    No, we did not.

4  Q.    Okay.  So the reason you showed them this doll is you

5  wanted to give the impression that's sort of what the doll is

6  going to look like when it comes out; right?

7  A.    No.

8  Q.    Okay.  Let's go now to Yasmin.

9  A.    Would you like me to approach and show the jury the

10  differences?

11  Q.    Your attorney can ask you questions.  I'm on a clock.

12       THE COURT:  Wait for the questions.

13  Q.    BY MR. PRICE:  And Yasmin, the one to the far left was

14  the drawing that Mr. Bryant gave you in September 2000;

15  correct?

16  A.    Yes.

17  Q.    And second from the left is the drawing which was done

18  by Mr. Bryant while at Mattel and testimony is shown at

19  Hong Kong; correct?

20  A.    Yes.

21  Q.    And then this one third over is the Yasmin doll

22  prototype; correct?

23  A.    Looks like the picture you showed me, yes.

24  Q.    And then on the far right, it's what actually hit the

25  market; correct?

1    A.    That's correct.

2    Q.    Now, it's true that when -- step back.

3          It's true that MGA did not want others selling

4    dolls that look substantially similar to Bratz?

5    A.    We didn't want infringement; that's correct.

6    Q.    And you would actually pay attention to, for example,

7    what was in the market to see whether or not, hey, this looks

8    like the Bratz dolls and should not be produced; correct?

9    A.    Yes.

10   Q.    And I can call your attention to -- I think it's in the

11   smaller binder.  There's an Exhibit 13561.

12         And this is one of those documents, your Honor,

13   which was in evidence, but the only part that will actually

14   go to the jury is what we bring up in front of the witness.

15         And I'd like you to look at 13561, pages 37, 38,

16   and 39.

17   A.    Can you repeat the pages, please?

18   Q.    37, 38, and 39.

19   A.    Not the Bates number, but the page number.

20   Q.    It will say at the bottom 13561, page 37, 38, and 39.

21         And if I may display those pages, your Honor.  And

22   this is an e-mail --

23   A.    Excuse me.  I'm not there.  I have to find that.  I'm

24   sorry.  13561?

25   Q.    13561, page 37, 38, and 39.  And you see this starts

1   with an e-mail from Mr. Black to you talking about a company

2   which produce Mini Trendy Teenz dolls, which I believe are

3   similar to Bratz.

4           Do you recall getting that e-mail?

5   A.   I don't recall it, but my name is on it.  So I must have

6   received it.

7   Q.   And he sent you copies of the boxes of those dolls.

8           Do you recall that?

9   A.   I do not.  I do not recall it one way or another.

10  Q.   Who is Ray Black?

11  A.   He's an attorney for MGA in the U.K.

12  Q.   And your response to this, if we can go to the next

13  page, page 37.  I'm sorry.  The response down here to

14  Mr. Black is, "Damn these people."

15          Do you see that?

16  A.   Yes, I do.

17  Q.   And actually, if we can go to 38, your signature line on

18  your e-mails by this time is Isaac Larian, CEO, MGA

19  Entertainment.  And then it has "Meet the girls with the

20  passion for fashion, www.BratzPack dot com.

21          Do you see that?

22  A.   As of 2003, yes.

23  Q.   So that's something that automatically went on your

24  e-mails from MGA when that went out?

25  A.   I believe so, yes.

1    Q.    Bratz was a pretty important part of the company?

2    A.    Yes.  So was MGA dot com.

3    Q.    Let's go back to page 37, then.  And blowing this up,

4    you see the subject is Toy Depot Limited.  That was a

5    distributor for Double Grand; correct?

6    A.    I don't know.

7    Q.    You weren't here this morning when there was testimony

8    about Toy Depot being a distributor for Double Grand?

9    A.    I was not.  I was attending some other business.

10   Q.    Okay.  And if we go further up here, you tell Mr. Black,

11   this e-mail here, where it says original message.  "Ray, we

12   need to hurt them so the word gets out.  Don't settle for

13   just stopping and paying 10,000 pounds."

14           That's what you told Mr. Black in March 2003 in

15   connection with these tweens, mini-tweens dolls that were in

16   the market?

17   A.    It looks like what I said, yes.

18   Q.    I'm sorry?

19   A.    It looks like what I said, yes.

20   Q.    And you said that because you thought there was

21   something on the market which looked similar to your Bratz.

22   A.    I don't remember the state of mind, but yes, very

23   possible.

24   Q.    And this is already in evidence.  And this is

25   Exhibit 13696.

1   A.    In the same book?

2   Q.    I'm sure it's in the book.   It's a photograph I want to

3   show you which is in evidence.   It came in evidence today.

4   So it may not be.   13696, I believe.

5             Now, this was the doll that was getting you so

6   upset because it was in the market and looked similar to your

7   Bratz dolls; correct?

8   A.    I don't recall it, but if you say that's the doll, then

9   I accept your representation.   I don't recall the doll.

10  Q.    Well, your view is that that looked similar to your

11  Bratz doll.

12  A.    I don't recall this.   This is Ray Black coming to us and

13  saying that that doll is similar to Bratz dolls.

14  Q.    Well, he sent you photographs; correct?

15  A.    I don't recall if he did or not.

16  Q.    Your response was damn these people.   And we need to

17  hurt them; correct?

18  A.    I did, yes.   That's the response.

19  Q.    And the reason you needed to hurt them is because they

20  had put on the market this Mini Trendy Teenz doll which you

21  thought looked substantially like your Bratz dolls?

22  A.    Again, I did not -- I don't see any correspondence in

23  here where I said they look substantially similar to Bratz

24  dolls.   I am responding to Ray Black who looks like -- who

25  found these dolls in the U.K. and came to us.

Exhibit D - Page 1112

1   Q.   Now, before you did your e-mail here, where you said you

2   wanted to hurt these people, I take it you are not aware of

3   anyone doing any scientific analysis to say, for example,

4   whether or not the body sculpt on this Mini Trendy Teenz doll

5   was the same as on your Bratz dolls?

6   A.   I'm not aware of any scientific -- what did you call it?

7   Scientific test, no.

8   Q.   In fact, by the way, have you -- do you sell Bratz dolls

9   that are without clothing?

10  A.   No, we don't.  Not that I'm aware of, anyway.

11  Q.   But the face is always visible; right?

12  A.   I'm sorry?

13  Q.   The face is always visible.  Even if the body is

14  clothed.

15  A.   Yes.

16  Q.   Okay.  And at the time, certainly it's fair to say that

17  you wouldn't have said damn these people, we need to hurt

18  them, if you thought their dolls weren't similar, you

19  wouldn't be saying that; right?

20  A.   Again, I was just relating back to what Ray Black has

21  found in the market and came back to us.  And I think -- I

22  didn't read the whole e-mail.  I don't want to waste time.

23  But I think he was representing that they were a knock-off or

24  something.  I got to go back to that exhibit to read it

25  exactly.  And I was accepting his representation as my

1  lawyer.

2  Q.    I'm going to show you what's in evidence as 13695.  This

3  is the actual doll which was so similar to Bratz, that you

4  wanted to hurt the company that was selling it; correct?

5  A.    Again, I don't recall ever seeing the doll.  So I don't

6  know.

7  Q.    If we could put up 13696 again.  You'll agree with me

8  that that doll has some similarities with Bratz?

9  A.    There are some similarities, yes.

10 Q.    I mean, for example, the head is oversized in proportion

11 to the rest of the body; correct?

12 A.    It's a big head, yes.

13 Q.    And the eyes are prominent; correct?

14 A.    I can see eyes, yes.

15 Q.    And you see that they seem to be prominent just as the

16 Bratz dolls are; correct?

17 A.    I'm not sure if these are prominent.  They are ugly.

18 But they are eyes.

19 Q.    They are bigger than on a human being.  The size in

20 proportion to the rest of the face, just as with the Bratz

21 dolls.

22 A.    Can you give me any human being, maybe, who like --

23 Angelina Jolie?

24 Q.    Let's go to Angelina Jolie.  Although I haven't gotten

25 to the lips yet.  I'm talking about the eyes.

1    **A.**   I haven't looked at the eyes.

2    **Q.**   If we could look at the face there.  Remember in your

3    business plan, you talked about how the Bratz dolls had

4    prominent eyes compared to anything else in the market.

5            Do you recall that in your business plan?

6    **A.**   Yes, I do.

7    **Q.**   And these eyes are about the same size proportion as on

8    the Bratz dolls; correct?

9    **A.**   I don't think they are the same size as the Bratz dolls'

10   eyes, no.

11   **Q.**   Okay.  Well, what about this doll is similar to the

12   Bratz dolls, then?

13   **A.**   Well, first thing, you know, looking at this, the

14   packaging, I don't have a Bratz doll sample here.  So the

15   packaging, the overall look, the packaging is trapezoid also.

16   And there are similarities.  Are they exactly the same and

17   they are not.

18   **Q.**   I'm not asking you that.  I'm asking you what are the

19   similarities between this doll and the Bratz doll?

20   **A.**   Again, the oversized head -- can I take this out of the

21   box?

22   **Q.**   Feel free.

23   **A.**   I think the shoes are a little bit like platform and

24   big.

25   **Q.**   Yes.

6158

```
1   A.   And those are really the biggest similarities I see.

2   Q.   And you thought that was among the unique

3   characteristics that kind of defined the Bratz doll, was an

4   oversized head and the oversize feet and chunky shoes;

5   correct?

6   A.   Well, no feet.  I said oversize -- did I say feet?  I

7   apologize.  Oversize shoes.  But they are some of the

8   characteristics of the Bratz dolls.  There are.  Those are

9   some of the characteristics of the Bratz dolls.

10  Q.   Now, you remember another e-mail you sent was to a

11  company called Bandai concerning this Glamma Jammaz dolls.

12        Do you recall that?

13  A.   I don't.

14  Q.   If you'd look at 13729.

15  A.   Can you give me one minute to look at this.  I have

16  never seen it.

17  Q.   Actually, I don't want you to multi task, but if we can

18  put up 13696 again.  The Funky Tweens doll.  And also put up,

19  I believe this is already in evidence.  Let me show you

20  what's in evidence, Exhibit 14780.  And it's correct that

21  this is another Bratz character, Nevra?

22  A.   Yes, it is.

23  Q.   And I guess my question is it's fair to say that Nevra

24  looks more like the four original Bratz dolls than, say, the

25  doll you sued on in Hong Kong, this Mini Trendy Teenz?
```

1    A.    I'm sorry.  Can you repeat that again?

2    Q.    Sure.  It's accurate to say that Nevra, your other Bratz

3    character that you created, looks more like the first four

4    Bratz dolls than the Mini Trendy Teenz doll?

5          MR. NOLAN:  Objection, your Honor.  403.  Also

6    calls for legal conclusion with respect to Hong Kong.

7          THE COURT:  Overruled.

8          THE WITNESS:  I'm sorry.  Can you repeat the

9    question?

10         THE COURT:  You're not asking under Hong Kong

11   standards.

12         MR. PRICE:  No.

13   Q.    You'll agree that Nevra, that new Bratz character, looks

14   more like the original four Bratz dolls than the Mini Trendy

15   Teenz doll?

16   A.    But Nevra looks different than the first original four

17   Bratz dolls, but it does have more similarity to the first

18   four Bratz dolls than what we're seeing there on the screen.

19   Q.    And maybe you could just turn that around.  I don't know

20   how well the jury can see that.

21         It's true that this other Bratz character, Nevra,

22   for example, has the same oversized head as the original four

23   Bratz dolls; correct?

24   A.    It does.

25   Q.    It has -- in fact, it's the exact same sculpt, facial

1    sculpt?

2    A.   I'm not sure if it's a -- if it's the same sculpt or

3    not.  But the face paint is for sure different.

4    Q.   My question is the sculpt is the same; right?

5    A.   I believe so, yes.

6    Q.   And certainly the face painting on the Nevra doll looks

7    more like the original four Bratz dolls than, say, the Mini

8    Trendy Teenz.

9              And perhaps, your Honor, if we could put up

10   Exhibit 13934.  If I may approach.

11             THE COURT:  You may.

12   Q.   BY MR. PRICE:  Do you recognize 13934 as a picture of

13   Nevra?

14   A.   Yes, looks like it, yes.

15             MR. PRICE:  Your Honor, move Exhibit 13934 into

16   evidence.

17             MR. NOLAN:  No objection.

18             THE COURT:  It's admitted.  You may publish.

19             **(Exhibit 13934 received.)**

20   Q.   BY MR. PRICE:  And if we could put that side by side

21   with the Mini Trendy Teenz.  You'll agree that the facial

22   decorations on this other Bratz doll look more like the four

23   original Bratz dolls than the facial decorations on the Mini

24   Trendy Teenz?

25   A.   Again, as I testified, I think Nevra has more

1  similarities than the first original four Bratz dolls, but

2  definitely the faces are different.

3  Q.    And actually, if we could put up maybe both 13934 and

4  13901.   If we compared the later Bratz characters to the

5  earlier ones, again, they have the same shape head; correct?

6  A.    Yes.

7  Q.    They have the same prominent lips; correct?

8  A.    The lips are prominent, yes.

9  Q.    Same --

10  A.    But there are differences.

11  Q.    Same oversized eyes?

12  A.    Yes, but there are differences.

13  Q.    And I'm talking about similarities.

14        What you told folks in your business plan was that

15  what made Bratz unique was the oversized head, oversized

16  feet, large eyes, prominent lips; correct?  That's what made

17  them unlike anything else out there.

18  A.    What I said was that -- I didn't write that business

19  plan.   Somebody wrote it and presented it, but that's what

20  that business plan says.

21  Q.    Your name is on the business plan; right?

22  A.    It's on the front of the business plan.

23  Q.    You approved what was on that business plan, that those

24  were the unique characteristics of Bratz, what made them

25  unique from the rest of the dolls?

1    A.    I don't recall reading that business plan one way or

2    another.  It was so many years ago, I cannot recall that.

3    Q.    Well, if you look at Exhibit 13729.  I think you found

4    your way to that.  And do you see this is an e-mail which you

5    wrote to Nishimoto Cynthia around February 6, 2006?

6    A.    Looks like it, yes.

7              MR. PRICE:  Move Exhibit 13729 into evidence, your

8    Honor.

9              MR. NOLAN:  No objection.

10             THE COURT:  It's admitted.  You may publish.

11             **(Exhibit 13729 received.).**

12   Q.    BY MR. PRICE:  And here you wrote to Nishimoto Cynthia

13   that Bandai's Glamma Jammaz dolls are a shameful copyright

14   infringement of Bratz dolls.

15             Do you see that?

16   A.    I do.

17   Q.    And you say you have copied the Bratz dolls to the point

18   of copyrighted birthmark we have on the Yasmin doll, its

19   eyes, its nose, and much more; correct?

20   A.    I do.

21   Q.    And what you're referring to in this is -- I can show

22   you what's in evidence.  13732, the Glamma Jammaz doll.

23   That's a photo, if we can put that up.  What you're talking

24   about is that Mya doll, the Glamma Jammaz doll done in 2003

25   by Bandai; correct?

1    **A.**    I'll not sure if that's the doll or something else.    To

2    the best of my recollection, they did changes to the doll,

3    but again, I don't recall that far back.

4    **Q.**    Do you recall what the doll looked like that made you so

5    upset, where you said it was a shameful copyright

6    infringement?

7    **A.**    Over six years ago, no.

8    **Q.**    Can you deny that this is the doll, this 2003 Bandai

9    Glamma Jammaz doll with the birthmark near the left side?

10   Can you deny that that's the doll that was causing you to

11   write your e-mail?

12   **A.**    I cannot deny or accept it because I do not remember it.

13   **Q.**    Well, sitting here looking at it, do you believe that

14   what we have up here, this photograph, is a copy of the Bratz

15   dolls?

16   **A.**    No, it's not.

17   **Q.**    Does it look similar enough that you wouldn't want it

18   being sold on the market?

19   **A.**    That doll here is not a copy of Bratz doll.

20   **Q.**    So I guess now your testimony is there's no way this was

21   the doll that you were writing about and saying you shouldn't

22   sell this because it's a copy?

23          MR. NOLAN:  Objection, your Honor.  Argumentative.

24          THE COURT:  Why don't you rephrase your question,

25   Counsel.

1   Q.   BY MR. PRICE:  You just said that doesn't look like

2   Bratz.

3   A.   It does not.

4   Q.   Does that lead you to now -- does that lead you to

5   testify that this couldn't be the doll that you were

6   referring to in your e-mail to Nishimoto Cynthia in February

7   of 2003?

8               MR. NOLAN:  Objection to lack of foundation.

9               THE COURT:  Lack of foundation?  Overruled.

10              THE WITNESS:  My testimony is that I don't recall

11   what I was referring to.  And I don't know if it's this doll

12   or another doll.

13   Q.   BY MR. PRICE:  Would you have been referring to a

14   doll --

15   A.   Can I finish my answer?

16              THE COURT:  Wait a second.  It was a yes or no

17   question.  Go ahead and finish your answer.

18              THE WITNESS:  I don't remember if it was a doll or

19   something in the website or a picture.  I don't recall what I

20   was looking at.

21   Q.   BY MR. PRICE:  Would you have sent an e-mail saying that

22   Bandai had copied the Bratz doll to the point of a

23   copyrighted birthmark we have on Yasmin doll, its eyes, its

24   nose, and much more?  Would you have sent that e-mail out if

25   you didn't think that the doll looked like Yasmin?

1   A.    I don't recall.  I don't know.  If what I was looking at

2   was similar, again, I don't remember what it was to Bratz,

3   then I would have sent it.  And I'm not a lawyer.

4             So I see I put here copyrighted birthmark.  I'm not

5   sure we can copyright birthmarks.  But that's what the

6   lawyers --

7   Q.    At any rate, is it true that MGA attempted to prevent

8   other companies from putting on the market dolls which look

9   similar to its Bratz dolls?

10  A.    Yes, I believe we did.

11  Q.    And if we could zoom in on this.  In your mind, would it

12  have been copying or inappropriate for Bandai to put this

13  birthmark on the Glamma Jammaz doll?

14  A.    No, it would not.

15  Q.    Let me switch topics and ask you about branding and

16  about what happened after the Hong Kong toy fair.  You

17  remember I had asked you to look at your business plan for

18  March of 2001.

19  A.    Right.

20  Q.    If you'd look at that again, that's 13520.

21  A.    135 --

22  Q.    13520.  It's almost right in the middle of the binder.

23  And I'm going to turn to page 16.  There's a section,

24  unexploited opportunities.

25            Do you see that?

1    A.    I do.

2    Q.    And you talk about ABC -- and that was the official

3    name?  The company was doing business as MGA?

4    A.    ABC International, right.

5    Q.    -- can effectively leverage the Bratz brand by

6    introducing not only apparel, but accessories such as

7    handbags, book bags, footwear, eyewear, headwear, jewelry,

8    watches, and luggage to name a few.

9          Do you see that?

10   A.    Yes.

11   Q.    And this was your concept, again, before the Bratz dolls

12   were even being sold to the public; right?

13         MR. NOLAN:  Objection, your Honor.  Lack of

14   foundation.

15         THE COURT:  Lay a foundation for that, Counsel.

16   Q.    BY MR. PRICE:  If you look at the first page of this,

17   this is March of 2001?

18   A.    It is.

19   Q.    That's before any Bratz dolls were being sold to the

20   public; correct?

21   A.    That's correct.

22   Q.    And so getting back to page 16, then, this was part

23   of -- you remember back in September 2000, you said we're

24   going to develop a Bratz brand.

25         Do you recall that?

1    A.    I do.

2    Q.    And this was part of the idea, that you could leverage

3    that brand by putting out accessories, eyewear, headwear,

4    et cetera; correct?

5    A.    That's correct.

6    Q.    And you have here the cost to do that is minimal.  The

7    cost to begin licensing is minimal.

8              Do you see that?

9    A.    That's what the business plan says, yes.

10   Q.    And that's because basically someone is paying you to

11   use the brand; right?

12   A.    Somebody is paying us to use the brand; that's correct.

13   Q.    So you're not paying for their manufacturing costs or

14   anything.  They are just -- you're getting paid for the right

15   to use the Bratz brand; right?

16   A.    That's correct.

17   Q.    And you point out that the only risk involved is that

18   the Bratz dolls do not sell through at retail; correct?

19   A.    Yes.

20   Q.    So in other words, you're not going to be able to

21   license this very effectively unless the public goes for the

22   core of the brand Bratz dolls?

23   A.    The four Bratz dolls were originally what came out to

24   the market, and we spent a lot of money --

25              MR. PRICE:  Move to strike as nonresponsive.

6168

1          THE COURT:  Sustained.  Stricken.

2          Mark, would you please read back the last question?

3          (Record read.)

4          THE WITNESS:  I'm not sure I can understand the

5    question.  I can't answer it the way you phrased it.

6    Q.   BY MR. PRICE:  Let me rephrase it, then.

7          You're not going to get the licensing revenue

8    unless the public accepts the Bratz dolls.

9    A.   No.  If the Bratz brand becomes successful, then we can

10   get licensing.

11   Q.   And the core, the core of the Bratz brand, what you are

12   leveraging off of here, is the dolls; right?

13   A.   No, we are leveraging the Bratz brand.  The Bratz brand

14   was launched with four dolls in 2001.

15   Q.   If you look at Exhibit 13858.  Do you recognize that as

16   an e-mail you sent in March 2002 to a Gariochi Dario Berte?

17   And I apologize for the pronunciation.

18   A.   Looks like an e-mail I send.

19          MR. PRICE:  Move Exhibit 13858 into evidence.

20          MR. NOLAN:  No objection.

21          THE COURT:  It's admitted.

22          **(Exhibit 13858 received.)**

23   Q.   BY MR. PRICE:  And you see.  E-mail is concerning

24   licensing products for Bratz.  Do you see it talks about we

25   will not over license this brand and make products that do

Exhibit D - Page 1126

1    not fit within the core consumer need and our marketing

2    timing strategy.

3              Do you see that?

4    A.   Yes.

5    Q.   And if you go to the third to the last paragraph, which

6    again is at the same time:  "Please understand that we will

7    not license every category.  This is for every territory, and

8    not only Italy.  And every product right away.  The core of

9    the brand are the dolls, and we do not want to harm the sales

10   of the dolls."

11             That's what you were telling Mr. Gariochi Dario in

12   March of 2002; correct?

13   A.   That's correct.

14   Q.   Let's go back to your 13520, your business plan, and we

15   were at page 16.  We were talking about the only risk

16   involved is that the Bratz dolls do not sell through at

17   retail.

18             Do you see that?

19   A.   I do.

20             MR. PRICE:  And if I may approach the well, your

21   Honor, to pick up an exhibit.

22   Q.   I have Exhibit 18801, which you may have seen yesterday,

23   a bicycle helmet.  The point is if the core of the brand, the

24   Bratz dolls, aren't selling through, you're not going to have

25   anyone interested in putting Bratz names or pictures on a

1   bicycle helmet; right?

2   **A.**   If the brand is not successful, yes, you cannot license

3   the Bratz brand.   That's correct.

4   **Q.**   My question is a little more specific.   If the Bratz

5   dolls aren't selling through at retail, no one is going to be

6   interested in licensing a bicycle helmet that has Bratz on

7   it; right?

8             MR. NOLAN:   Objection.   Lack of foundation as to

9   time.   At what point?

10            THE COURT:   As to time, overruled.

11            THE WITNESS:   Again, the Bratz brand started with

12  four dolls.   The four dolls had to sell with marketing and

13  advertising to establish the brand, and then once the brand

14  became successful, we were able to license it, and that's how

15  the licensing business works.

16  **Q.**   BY MR. PRICE:   And with respect to -- actually, let's do

17  this.   If you look at page 17.   And if we look at the last

18  paragraph of your business plan.   It says, "If the fashion

19  dolls to (Sic) not sell through at retail, this can cause a

20  backlash with licensees who have already spent moneys in

21  advances and product development."

22            Do you see that?

23  **A.**   I do.

24  **Q.**   You're tying this to the dolls; correct?

25  **A.**   That's what the business plan is saying, yes, that if

1    the dolls that were -- basis of launching the Bratz brand

2    were not successful, then the licenses will not be

3    successful.

4    Q.   And then if we look at page 18, it says:   "To be

5    effective, other financial -- other licensed products depend

6    on the presence of our Bratz."

7             Do you see that?

8    A.   Bratz trademark, Bratz brand, yes.

9    Q.   And this is before a Bratz doll had ever been shown to

10   the retail public; correct?

11   A.   No, they were shown -- to the public.   They were not

12   shown to the public yet.   They were not in the market yet.

13   Q.   You wouldn't have gone down this road to develop a Bratz

14   brand with dolls that have oversized heads and prominent eyes

15   and prominent lips if Carter Bryant hadn't shown you Mattel's

16   confidential proprietary property in September of 2000;

17   right?

18   A.   I'm sorry.   Can you repeat the question?

19   Q.   You never would have gone down this road.   You never

20   would have been here trying to license Bratz, trying to sell

21   these dolls if Carter Bryant hadn't shown up at MGA and shown

22   you Mattel's confidential information, these designs, Bratz

23   designs, and the concept of these dolls with oversized heads

24   and prominent eyes and prominent lips?

25   A.   Again, as I said, Carter Bryant showed us some drawings

1   that became the inspiration and basis for Bratz.  The Bratz

2   dolls came to the market in many, many changes, and we

3   marketed it and built it.  And that's what became the brand.

4   So I don't know how else to answer your question.

5   Q.   Without that inspiration, you never would have done what

6   you did, which was create the Bratz dolls, license the Bratz

7   name, create the Bratz brand; correct?

8   A.   You ask so many questions all at the same time.  We

9   could have -- theoretically we could have had the name Bratz

10  because it was in existence since 1984 and put it on another

11  product.  And it belonged to somebody else, didn't belong to

12  Mattel or Carter Bryant or MGA.

13  Q.   It's certainly correct to say that after a two-year

14  search leading up to September of 2000, you had not, even

15  with all your efforts, found a fashion doll like Bratz.

16  A.   Which was Carter Bryant's drawings as an inspiration to

17  launch the Bratz dolls.

18  Q.   Your definition of inspiration is you wouldn't have

19  done anything if not for Carter Bryant showing you that

20  confidential information; right?

21  A.   That's not correct.  We would have found something else.

22  Q.   And getting back to this branding.  You recall, I think

23  there was a Bratz pet that was shown to Ms. Pembleton.

24         You recall that?

25  A.   I do.

1    Q.   And when you are developing something like that, one of

2    the things you're trying to do is connect that extension,

3    line extension, to the Bratz dolls; right?

4    A.   The execution of it, yes.  For all the brand to

5    basically mesh together, yes.

6    Q.   So, for example, if you look at Exhibit 13859, you

7    recognize this as an e-mail you sent in 2002?

8    A.   November of 2002, yes.

9             MR. PRICE:  Move 13859 into evidence, your Honor.

10            MR. NOLAN:  No objection.

11            THE COURT:  It's admitted.

12            **(Exhibit 13859 received.)**

13   Q.   BY MR. PRICE:  And you say -- you see this is talking

14   about Bratz pets, and you say:  "We want the pets to look

15   like Bratz, big face, big eyes, fantasy, and not like the

16   plush in slumber party"; correct?

17   A.   Yes.

18   Q.   And this is an example of tying kind of an unrelated

19   product back to the core of the brand, which are the Bratz

20   dolls.

21   A.   Again, it has to all -- it's mixed together.  It's like

22   Nike.  When you buy the shoes, the shirt has -- they all -- a

23   shirt doesn't look like a shoe, but as a brand, they all mesh

24   together.

25   Q.   And if you look at 13871, do you recognize this as an

1    e-mail string between you and Karen Bonde?

2    **A.**    Yes, looks like it, yes.

3              MR. PRICE:  Move 13871 into evidence, your Honor.

4              MR. NOLAN:  No objection.

5              THE COURT:  It's admitted.

6              **(Exhibit 13871 received.)**

7    **Q.**    BY MR. PRICE:  And you see e-mails to you concerning the

8    Bratz pets:  "I think we've done a good job of that.  Now we

9    have to make the most of the Bratz connection.  At one point

10   we talked about creating a cross-sell piece to be included in

11   the Tokyo Bratz dolls.  Did that happen?  Can we do something

12   on the website that explains where these little pets came

13   from and their connection to the Bratz girls?"

14             Do you see that?

15   **A.**    I do.

16   **Q.**    And your response is:  "Thanks for being proactive on

17   this.  Please follow through."

18             Do you recall that?

19   **A.**    Yes.

20   **Q.**    And then the ideas for commercials included having the

21   Bratz dolls, for example, with one of the pets.

22             Do you recall that?

23   **A.**    I'm sorry?

24   **Q.**    Ideas for commercials for the Bratz pets was to --

25   **A.**    What are you referring to, sir?

1    Q.    I'll refer you to a document if we need to.  I'm just

2    asking if you recall this.  That one of the ideas, then, was

3    to -- well, you understood kids kind of wanted the owners of

4    each pet associated with a pet?

5    A.    I'm having a tough time understanding you.

6    Q.    Your marketing people told you that the way to sell this

7    commercial is to have a Bratz character in a commercial with

8    a Bratz pet.

9    A.    How do you sell a commercial?  I'm not sure if I

10   understand your question.  I'm sorry.

11   Q.    Let me see if I can just go -- look at Exhibit 13872.

12   It's dated February 8, 2006, an e-mail that you are copied on

13   from Shoreh Larian?  I know I mispronounced that.  How is

14   that pronounced, sir?

15   A.    It's okay.  Go ahead.

16   Q.    Okay.  Do you have 13872 in front of you?

17   A.    I do.

18   Q.    And is that an e-mail that you received?

19   A.    It has my name on it, yes.

20          MR. PRICE:  Move that into evidence, your Honor.

21          MR. NOLAN:  No objection.

22          THE COURT:  It's admitted.  You may publish.

23          **(Exhibit 13872 received.)**

24   Q.    BY MR. PRICE:  And the subject is hot button research

25   for ad development results for Bratz pets?

1  A.    I see that.

2  Q.    And if we go to the third page, there's a section:

3  "Commercial to include most kids want the owners of each pet

4  associated with the pet itself in the commercial, i.e., Sasha

5  could be displayed with Bunny Boo."

6          And was Bunny Boo the icon that was put on some of

7  Sasha's accessories?

8  A.    I believe so, yes.

9  Q.    And it says:  "It will be good to have the owners

10 displayed with the pet so that people recognize them and buy

11 them together, so that people know who each pet belongs to,

12 so that if you have a specific doll, you know which pet to

13 buy for it."

14         Do you see that?

15 A.    I do.

16 Q.    The idea was to leverage the idea of the popularity of

17 the Bratz dolls so you can sell the Bratz dolls --

18 A.    To leverage the Bratz brand in order to sell Bratz pets

19 and other products.  It's all about branding, sir.

20 Q.    And specifically you're talking about Bratz dolls;

21 correct?

22 A.    Let me see that.

23 Q.    Sasha is a doll; right?

24 A.    Yes.  But Sasha is also a TV character.  Sasha is many

25 things.  But Sasha is one of the dolls.

1    Q.    Now, again, Ms. Pembleton was talking about accessories

2    and such.   You remember she mentioned something about -- she

3    talked about doing Bratz twins.

4              Do you recall that?

5    A.    I'm sorry?

6    Q.    Do you recall she was talking about doing Bratz twins as

7    kind of an extension of the Bratz line?

8    A.    I don't remember exactly.   But she might have, yes.

9    Q.    And I'd like you to look, if you would, at

10   Exhibit 13918.

11   A.    Go ahead.

12   Q.    You found it?

13   A.    Yes.

14   Q.    There is an e-mail from you to Ms. Garcia?

15   A.    Yes.

16   Q.    This is an e-mail from you to Ms. Garcia?

17   A.    Yes, it is.

18   Q.    And Ms. Pembleton?

19   A.    Yes.

20            MR. PRICE:   Move 13918 into evidence.

21            MR. NOLAN:   No objection.

22            THE COURT:   Admitted.

23            **(Exhibit 13918 received.)**

24   Q.    BY MR. PRICE:   It says:   "Subject, Bratz twins," and an

25   attachment, "Olsen twins, TRST."

1          Do you see that?

2   A.   Yes, I do.

3   Q.   And if we go all the way down, it says:   "Spreadsheet

4   attached.   I'll bring pictures to you."

5          Do you see that?

6   A.   Yes.

7   Q.   And do you know what TRST stands for?

8   A.   Toy retail sales tracking.

9   Q.   If we go to the attached spreadsheet, this is showing

10  you are tracking sales of a Mattel doll, the Olsen twins?

11  A.   TRST is toy retail sales tracking is a system that

12  tracks sales of not only Mattel products or MGA products.

13  All the toy products.

14  Q.   But when --

15  A.   And you can buy it, and we did buy.   So you can buy that

16  service.

17  Q.   But here what you're tracking is the Olsen twins, which

18  are manufactured by Mattel.

19  A.   They were licensed to Mattel.   Yes, Mattel was

20  manufacturing those; that's correct.

21  Q.   And if we go back to the first page of this, in addition

22  to getting these spreadsheets, what you wanted to get from

23  the Ninette in connection with this subject, Bratz twins, was

24  you wanted to get pictures of the Mattel product.

25  A.   They are available at retail.   You can get pictures of

1   them.  You can go to Wal-Mart or Toys-R-Us and buy them and

2   take pictures of them.

3   Q.   And if you go to 13917, that's the same e-mail string,

4   but Ms. Pembleton has sent you what you asked for, which are

5   attachments which show pictures of the Olsen twins?

6   A.   I'm sorry, I cannot find it.

7   Q.   13917.  It's right before 13918.

8   A.   I found it.  Go ahead.

9   Q.   Is this the response from Ms. Pembleton to you, giving

10  you what you asked for?

11  A.   Looks like, yes, with a series of pictures attached

12  which she probably got from -- I don't know where she got it

13  from.

14             MR. PRICE:  Move Exhibit 13917 into evidence.

15             MR. NOLAN:  No objection.

16             THE COURT:  It's admitted.

17             (Exhibit 13917 received.)

18  Q.   BY MR. PRICE:  And this is the response.  "Here's a

19  start."  And then has attachments, and if you look at them,

20  those are pictures of the Olsen twins dolls; correct?

21  A.   As of 2004, yes.

22  Q.   And this --

23  A.   Looks like it.  Again, I don't remember the Olsen twins

24  dolls.  These are black and white pictures.  But it looks

25  like them, yes.

1    Q.   And this is something which you do with a brand.  You

2    look at competitors' ideas, and you come up with your own

3    ideas, and you compete; right?

4    A.   That's correct.  We come up with our own execution.

5    Q.   Another product you had was something called Bratz Big

6    Head.

7         Do you recall that?

8    A.   I don't think we have a product called Bratz Big Head.

9    Q.   Let me rephrase that.  Bratz Funky Fashion Makeover.

10        MR. NOLAN:  It's close but not --

11        MR. PRICE:  Yes.

12        THE WITNESS:  I hope it wasn't a southern

13   interpretation of a big head.  Go ahead.

14   Q.   BY MR. PRICE:  So Bratz Funky Fashion Makeover.  Let me

15   show you 17533, which is in evidence.  This is an example of

16   something else that MGA came out with to leverage the Bratz

17   brand; right?

18   A.   That's correct.

19   Q.   And in doing that --

20   A.   Hold on one second.  It says date of 2004, yes.

21   Q.   And doing that, one thing it did was sent to the

22   manufacturer enlarged Barbie heads; right?

23   A.   It's possible.  I don't know.

24   Q.   If you'd look at Exhibit 11179.

25   A.   Can you repeat that again?  119 --

1   Q.   11179.

2   A.   This is a series of e-mails.  You want me to read the

3   whole thing?

4   Q.   Well, if you'd turn 11179-0008 and -0010, you see there

5   are some photographs there?

6   A.   There is.

7   Q.   One being of a large Barbie head?

8   A.   Yes.

9   Q.   And you see this is an e-mail from Elly Shinohara to

10  Paula Treantafelles concerning Bratz Big Head?

11  A.   Yes.

12  Q.   And were you aware of this communication concerning the

13  development of this large head Bratz doll?

14  A.   I was not.  I'll not on the e-mail.

15  Q.   You never talked to Ms. Garcia about sending Barbie

16  large heads to the manufacturing company to assist in

17  developing the Bratz head?

18  A.   I might have.  I don't remember.  This is dated 2001.  I

19  don't recall that far back.

20          MR. PRICE:  I'd move in 11179 into evidence.

21          MR. NOLAN:  Your Honor, lack of foundation.

22          THE COURT:  Counsel?

23          MR. PRICE:  Best I can do with it.  It's an MGA

24  document produced by MGA.  They are calling Ms. Garcia.  We

25  could put it in through her, if necessary --

1          MR. NOLAN:  Your Honor, I apologize.  We'll take a

2     look at the document.  Right now --

3          THE COURT:  It's past five o'clock.  Why don't we

4     take it up in the evening, and we'll take it up first thing

5     in the morning.

6          Members of the jury, I'll see you at nine o'clock

7     tomorrow morning.

8          **(WHEREUPON THE JURY WITHDRAWS.)**

9          THE COURT:  Please be seated.  The Court has a

10    conference call at 5:15 that I need to take up.  Is there

11    anything else that you need the Court to attend to this

12    evening that cannot wait until tomorrow morning at 8:00?

13    Mr. Proctor, are we all right?

14         MR. PROCTOR:  I think it can wait until tomorrow.

15         THE COURT:  There's another binder you were going

16    to get me for Brode, did you say?

17         MR. PROCTOR:  I believe it's in MGA's hands right

18    now.  I think we should have it, but it may not be here yet.

19         THE COURT:  Thank you.

20         MS. AGUIAR:  Very quickly, your Honor.  We reached

21    a stipulation with Mr. Quinn because during the exam of

22    Mr. Yeung, we meant to move in a couple of exhibits.  May I

23    read the numbers in?  13784 and 13785.

24         THE COURT:  Very well.  Those are admitted.

25         **(Exhibits 13784 and 13785 received.)**

1          Court is in recess.

2          (Proceedings concluded at 5:12 P.M.)

3

4

5                    C E R T I F I C A T E

6

7

8          I hereby certify that pursuant to Title 28,

9    Section 753 United States Code, the foregoing is a true and

10   correct transcript of the stenographically reported

11   proceedings in the above matter.

12          Certified on August 6, 2008.

13

14

15   **MARK SCHWEITZER, CSR, RPR, CRR**
     Official Court Reporter
16   License No. 10514

17

18

19

20

21

22

23

24

25

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION

4                 - - -

5     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                 - - -

7   MATTEL, INC.,                    )

8                    PLAINTIFF,      )

9          VS.                       )     NO. CV 04-09049

10  MGA ENTERTAINMENT, INC., ET. AL.,)

11                   DEFENDANTS.      )     TRIAL DAY 31
                                    )     MORNING SESSION
12  AND CONSOLIDATED ACTIONS,        )     PAGES 6191-6350
                                    )

13

14

15     REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16            RIVERSIDE, CALIFORNIA

17          THURSDAY, AUGUST 7, 2008

18                8:13 A.M.

19

20

21

22

23          THERESA A. LANZA, RPR, CSR
          FEDERAL OFFICIAL COURT REPORTER
24          3470 12TH STREET, RM. 134
          RIVERSIDE, CALIFORNIA  92501
25               951-274-0844
          WWW.THERESALANZA.COM

**CERTIFIED COPY**

```
 1              MR. QUINN:  JOHN QUINN, BILL PRICE, MIKE ZELLER FOR

 2    MATTEL.

 3              MR. NOLAN:  TOM NOLAN, LAUREN AGUIAR,

 4    JONATHAN USLANER ON BEHALF OF MGA AND ISAAC LARIAN.

 5              THE COURT:  GOOD MORNING, COUNSEL.

 6         MR. PRICE, YOU MAY PROCEED.

 7                   DIRECT EXAMINATION (CONTINUED)

 8    BY MR. PRICE:

 9    Q    MR. LARIAN, I'VE PROVIDED YOU WITH A SMALLER BINDER, SO

10    YOU CAN GET TO SOME DOCUMENTS FAIRLY EASILY.  I JUST NEED TO

11    GET SOME DOCUMENTS IDENTIFIED HERE.  IN THAT SMALL BINDER,

12    THERE'S AN EXHIBIT 655.

13              HAVE YOU FOUND IT?

14    A    YES.

15    Q    DO YOU RECOGNIZE THAT AS AN AUDITED CONSOLIDATED FINANCIAL

16    STATEMENT FOR MGA ENTERTAINMENT, INC., FOR THE YEARS ENDED

17    DECEMBER 31, 2002, AND 2001?

18    A    THAT'S WHAT IT SAYS, YES.

19              MR. PRICE:  MOVE EXHIBIT 655 INTO EVIDENCE.

20              MR. NOLAN:  NO OBJECTION.

21              THE COURT:  IT'S ADMITTED.

22         YOU MAY PUBLISH.

23         (EXHIBIT 655 RECEIVED.)

24    BY MR. PRICE:

25    Q    WE'RE GOING TO GO THROUGH THESE QUICKLY.
```

1          IF YOU'LL LOOK AT 656, DO YOU RECOGNIZE THAT AS

2   CONSOLIDATED FINANCIAL STATEMENTS FOR MGA ENTERTAINMENT, YEAR

3   ENDED DECEMBER 31, 2003, ALONG WITH THE REPORTED INDEPENDENT

4   AUDITORS?

5   A    YES.

6          **MR. PRICE:**  MOVE EXHIBIT 656 INTO EVIDENCE,

7   YOUR HONOR.

8          **MR. NOLAN:**  NO OBJECTION.

9          **THE COURT:**  IT'S ADMITTED.

10         YOU MAY PUBLISH.

11         (EXHIBIT 656 RECEIVED.)

12  **BY MR. PRICE:**

13  Q    DO YOU RECOGNIZE EXHIBIT 657 AS MGA'S AUDITED CONSOLIDATED

14  FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2004, AND

15  2003?

16  A    YES.  THAT'S WHAT IT SAYS.

17         **MR. PRICE:**  MOVE EXHIBIT 657 INTO EVIDENCE,

18  YOUR HONOR.

19         **MR. NOLAN:**  NO OBJECTION.

20         **THE COURT:**  IT'S ADMITTED.

21         YOU MAY PUBLISH.

22         (EXHIBIT 657 RECEIVED.)

23  **BY MR. PRICE:**

24  Q    DO YOU RECOGNIZE EXHIBIT 658 AS MGA'S AUDITED CONSOLIDATED

25  FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2005, AND

6238

1    2004?

2    A    YES.

3         **MR. PRICE:**  MOVE EXHIBIT 658 INTO EVIDENCE,

4    YOUR HONOR.

5         **MR. NOLAN:**  NO OBJECTION.

6         **THE COURT:**  IT'S ADMITTED.

7         YOU MAY PUBLISH.

8         (EXHIBIT 658 RECEIVED.)

9    **BY MR. PRICE:**

10   Q    AND THEN IF YOU'LL LOOK AT 659.

11        DO YOU RECOGNIZE THAT AS MGA'S AUDITED CONSOLIDATED

12   FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2006, AND

13   2005?

14   A    YES.

15        **MR. PRICE:**  MOVE EXHIBIT 659 INTO EVIDENCE,

16   YOUR HONOR.

17        **MR. NOLAN:**  NO OBJECTION.

18        **THE COURT:**  IT'S ADMITTED.

19        YOU MAY PUBLISH.

20        (EXHIBIT 659 RECEIVED.)

21   **BY MR. PRICE:**

22   Q    THEN IF YOU'LL LOOK AT 10188.

23        DO YOU RECOGNIZE THIS AS THE AUDITED CONSOLIDATED

24   FINANCIAL STATEMENTS FOR THE YEARS ENDED 1999 AND 2000?

25   A    YES.

Exhibit D - Page 1145

6239

1          MR. PRICE:  MOVE EXHIBIT 10188 INTO EVIDENCE,

2  YOUR HONOR.

3          THE COURT:  IT'S ADMITTED.

4          YOU MAY PUBLISH.

5          (EXHIBIT 10188 RECEIVED.)

6  BY MR. PRICE:

7  Q    THEN IF YOU'LL LOOK AT EXHIBIT 10722.

8          DO YOU RECOGNIZE THIS AS MGA'S AUDITED CONSOLIDATED

9  FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2001, AND

10  2000?

11  A   IT DOESN'T HAVE A LOT OF PAGES, BUT THAT'S WHAT IT SAYS ON

12  THE DOCUMENT, SO I'D SAY YES.

13          MR. PRICE:  MOVE EXHIBIT 10722 INTO EVIDENCE,

14  YOUR HONOR.

15          MR. NOLAN:  NO OBJECTION.

16          THE COURT:  IT'S ADMITTED.

17          YOU MAY PUBLISH.

18          (EXHIBIT 10722 RECEIVED.)

19  BY MR. PRICE:

20  Q   MR. LARIAN, WHAT WE JUST WENT THROUGH, WE'VE DESCRIBED

21  THESE AS AUDITED FINANCIAL STATEMENTS.

22          FOR THESE STATEMENTS, IT'S TRUE THAT AN AUDITOR, A

23  THIRD PARTY, CAME IN AND AUDITED MGA'S FINANCIAL RECORDS;

24  CORRECT?

25  A   I'M NOT AN ACCOUNTANT, BUT I THINK THAT'S WHAT THEY DO.

6240

```
 1   Q    IN OTHER WORDS, THESE AREN'T JUST THE NUMBERS AS YOU

 2   REPRESENTED THEM; THEY WERE THE NUMBERS AS AUDITED BY AN

 3   OUTSIDE AUDITOR; CORRECT?

 4   A    AGAIN, I'M NOT AN ACCOUNTANT, BUT MY UNDERSTANDING IS THAT

 5   THAT'S WHAT THE AUDITORS DO.

 6   Q    ONE THING THAT MGA DOES IN ITS BUSINESS IS TO GET

 7   FINANCING TO FINANCE ITS OPERATIONS; CORRECT?

 8   A    AT WHAT TIME?

 9   Q    WELL, THROUGHOUT MGA'S HISTORY.

10   A    I BELIEVE AT CERTAIN TIMES, WE DIDN'T HAVE -- AGAIN, I

11   DON'T REMEMBER.  I DON'T -- I'M MORE OF A CREATIVE PERSON THAN

12   A FINANCE PERSON.  BUT MY RECOLLECTION IS, MOST OF THE TIME WE

13   HAVE, BUT AT CERTAIN TIMES, I DON'T THINK WE HAD FINANCING

14   NEEDS.

15   Q    WELL, IT'S TRUE THAT, SAY, FOR EXAMPLE, FOR THE LAST FEW

16   YEARS, AT CERTAIN TIMES, MGA HAS HAD TO BORROW MONEY, AS ALL

17   BUSINESSES DO, TO FINANCE OPERATIONS?

18   A    THAT'S CORRECT.

19   Q    AND ONE OF THE THINGS THAT THESE OUTSIDE FINANCING

20   COMPANIES, SOMETIMES BANKS, REQUIRE IS THAT MGA HAVE AUDITED

21   FINANCIAL RECORDS AS OPPOSED TO JUST THE NUMBERS AS MGA WOULD

22   REPRESENT THEM?

23   A    SOMETIMES THEY DO; SOMETIMES THEY DON'T.  AGAIN, I'M

24   NOT -- I CANNOT SAY FOR SURE THAT THEY ALL REQUIRE THIS.

25   Q    SO IF YOU CAN'T SAY ALL, THEN YOU CAN'T SAY THE SUM OF THE
```

```
 1    FINANCIAL INSTITUTIONS HAVE REQUIRED THAT MGA PRESENT AUDITED

 2    FINANCIAL STATEMENTS RATHER THAN JUST MGA'S OWN

 3    REPRESENTATIONS?

 4    A    TO THE BEST OF MY KNOWLEDGE, THAT'S CORRECT.

 5    Q    AND IT'S YOUR UNDERSTANDING THAT WHAT THE AUDITORS DO IS

 6    GIVE AN INDEPENDENT OPINION OF MGA'S FINANCIAL SITUATION?

 7    A    I BELIEVE THAT'S WHAT THEY DO.

 8    Q    I'D ALSO LIKE YOU TO LOOK AT EXHIBIT 10195.

 9    A    YES.

10    Q    HAVE YOU FOUND THAT?

11    A    YES.

12    Q    AND AT SOME POINT, YOU WERE GOING TO MAKE AN OFFER TO

13    MR. TOM PARKS FOR THE POSITION OF CHIEF OPERATIONS OFFICER OF

14    MGA; CORRECT?

15    A    YES.

16    Q    AND DID MR. PARKS BECOME THE CHIEF OPERATIONS OFFICER?

17    A    I BELIEVE HE DID, YES.

18    Q    SO HE ACCEPTED YOUR OFFER?

19    A    I BELIEVE HE DID.

20    Q    AND DO YOU RECOGNIZE EXHIBIT 10195 AS A LETTER THAT WAS

21    DRAFTED WITH RESPECT TO THE OFFER TO MR. PARKS?

22    A    IT'S JUST A LETTER.  I DON'T RECALL THIS DOCUMENT.  I SEE

23    IT THE WAY YOU SEE IT.  I DON'T RECALL THIS DOCUMENT, NOR IS IT

24    ON MGA'S LETTERHEAD, SO...

25    Q    YOU SEE IT CAME FROM MGA'S PRODUCTION; YOU SEE IT HAS
```

6242

```
 1   MGA'S BATES NUMBER ON IT?

 2   A    YES, I DO.

 3   Q    AND IT HAS YOUR NAME AT THE END OF IT?

 4   A    MY NAME IS TYPED IN THERE, YES.

 5        MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 10195 INTO

 6   EVIDENCE.

 7        MR. NOLAN:  OBJECTION.  LACK OF FOUNDATION.

 8        THE COURT:  MOVE ALONG, COUNSEL.  COME BACK TO IT.

 9        DO YOU HAVE QUESTIONS ON THIS PARTICULAR DOCUMENT?

10        MR. PRICE:  I DO HAVE QUESTIONS ON THIS DOCUMENT.

11   THERE'S ONE OTHER DOCUMENT I NEED TO GET IN, BUT I CAN COME

12   BACK TO IT AFTER THAT.

13        THE COURT:  GO TO THAT, PLEASE.

14   BY MR. PRICE:

15   Q    FINALLY, MR. LARIAN, AT SOME IN THIS LITIGATION, YOU WERE

16   REQUESTED TO PROVIDE DOCUMENTS WHICH REFLECTED YOUR NET WORTH.

17        DO YOU RECALL THAT?

18   A    PRECISELY, NO.  BUT I TURNED EVERYTHING OVER TO MY

19   ATTORNEYS TO PROVIDE.

20   Q    THERE'S A WOMAN WHO WORKS AT MGA CALLED LISA TONNU?

21   A    YES.

22   Q    THERE CAME A TIME WHEN YOU ASKED MS. TONNU, OR SOMEONE

23   ELSE WITHIN MGA, TO PUT TOGETHER CERTAIN FINANCIAL INFORMATION

24   FOR YOU IN CONNECTION WITH THIS CASE; CORRECT?

25   A    I BELIEVE SO, YES.
```

Exhibit D - Page 1149

6243

1  Q    AND IF YOU WOULD LOOK AT EXHIBIT 4947.  IT SHOULD HAVE, I

2  BELIEVE, FOUR PAGES.

3  A    I SEE ONLY THREE PAGES.

4  Q    IT'S FRONT AND BACK.

5  A    THAT'S CORRECT.  I'M SORRY.

6  Q    IT'S YOUR UNDERSTANDING THAT EXHIBIT 4947 IS ONE OF THE

7  DOCUMENTS THAT WAS PUT TOGETHER BY MS. TONNU AS A RESULT OF

8  YOUR REQUEST; CORRECT?

9  A    I DON'T KNOW, BUT I HAVE NO REASON TO DOUBT IT.

10 Q    AND YOU RECALL THIS WAS PROVIDED TO MATTEL SOMETIME IN

11 JANUARY OF 2008?

12 A    I DON'T KNOW WHEN IT WAS OR IF IT WAS.  I DON'T KNOW.

13         **MR. PRICE:**  MOVE EXHIBIT 4947 INTO EVIDENCE.

14         **MR. NOLAN:**  NO OBJECTION.

15         **THE COURT:**  IT'S ADMITTED, AS IS 10195.

16         YOU MAY PUBLISH BOTH.

17         (EXHIBITS 4947 AND 10195 RECEIVED.)

18 **BY MR. PRICE:**

19 Q    LET'S GO BACK TO 10195.

20         THE DATE OF THIS DOCUMENT IS OCTOBER 2003; CORRECT?

21 A    YES.

22         EXHIBIT WHAT?

23 Q    10195.

24 A    THAT'S CORRECT, OCTOBER 26, 2003.

25 Q    AND ONE OF THE METHODS OF COMPENSATION YOU WERE GOING TO

THURSDAY, AUGUST 7, 2008          TRIAL DAY 31, MORNING SESSION

1    USE WITH MR. PARKS WAS TO GIVE HIM STOCK OPTIONS; CORRECT?

2    A    THAT'S CORRECT.

3    Q    AND IN CONNECTION --

4    A    THAT'S WHAT THE DOCUMENT SAYS.

5    Q    AND IN CONNECTION WITH THE STOCK OPTIONS, THERE WAS A

6    VALUE PUT ON THE COMPANY, OF MGA, OF APPROXIMATELY $1.95

7    BILLION; CORRECT?

8    A    THAT'S WHAT THE DOCUMENT SAYS, YES.

9    Q    IF WE COULD TURN YOUR ATTENTION TO THE OTHER DOCUMENT THAT

10   WE JUST DISCUSSED BRIEFLY, 4947.

11         YOU RECOGNIZE THIS PREPARED BY MGA WHICH HAS YOUR NET

12   WORTH ON 2006 AND 2007?  DO YOU SEE THAT?

13   A    WHERE DO YOU SEE THAT?  MARCH, 2006.

14   Q    THAT'S THE FIRST FEW PAGES.

15   A    MY CONFUSION WAS THAT YOU SAID 2007.

16   Q    I'M GOING TO ASK YOU TO LOOK AT THE LAST PAGE.

17   A    YES.  IT SAYS 2006.

18   Q    SEE THE LAST PAGE, WHICH IS THE FOURTH PAGE.  THIS WAS

19   YOUR LIST OF ASSETS AS OF -- IF WE CAN LOOK AT THE BOTTOM DATE

20   THERE -- IT'S DATED OCTOBER 25, 2007.

21   A    I SEE THAT, YES.

22   Q    AND AMONG THE ASSETS LISTED ARE -- THERE'S A SECTION HERE

23   CALLED MARKETABLE SECURITIES FOR LARIAN LIVING TRUST AND

24   QUALIFIED ANNUITY TRUST.

25         THESE WERE ASSETS AS OF OCTOBER 25, 2007; CORRECT?

1   A    I AM NOT ONE HUNDRED PERCENT SURE, BUT I THINK SO, AGAIN.

2   Q    AND THESE TOTAL SOMEWHERE OVER $200 MILLION, JUST THE

3   MARKETABLE SECURITIES; CORRECT?

4   A    CORRECT.

5   Q    BY "MARKETABLE," WHAT YOU'RE SAYING IS, IF YOU WANTED TO

6   CASH OUT -- THIS WAS AT THE TIME, THE AMOUNT YOU COULD HAVE

7   RECEIVED FOR THESE SECURITIES?

8   A    I BELIEVE SO, YES.

9   Q    AND THEN WE HAVE HERE MGA ENTERTAINMENT.  WE HAVE A FIGURE

10  OF $1,636,380,000 AS PRORATED SHARE OF INVESTMENT.

11        DO YOU SEE THAT?

12  A    I DO.

13  Q    AND BY "PRORATED SHARE," YOU OWN -- YOUR OWNERSHIP OF MGA

14  ENTERTAINMENT IS 81.82 PERCENT; CORRECT?

15  A    THAT'S CORRECT.

16  Q    AND THEN WE HAVE TOTAL ASSETS HERE OF OVER $1.9 BILLION.

17        DO YOU SEE THAT?

18  A    YES.

19  Q    FROM THAT, YOU SUBTRACT LIABILITIES, SO THAT WE END UP

20  WITH NET ASSETS IN EXCESS OF $1.9 BILLION AS OF OCTOBER 25,

21  2007; CORRECT?

22  A    THAT'S WHAT THAT DOCUMENT SAYS.  I DON'T AGREE WITH THE

23  NUMBERS, BUT THAT'S WHAT THE DOCUMENT SAYS.

24  Q    THESE ARE THE NUMBERS THAT WERE PROVIDED TO MATTEL BY MGA

25  IN RESPONSE TO A REQUEST FOR ANY DOCUMENTS PERTAINING TO YOUR

6246

```
 1   NET WORTH; CORRECT?

 2   A    AGAIN, TO THE BEST OF MY KNOWLEDGE, YES.

 3   Q    AND THIS IS THE ONLY CALCULATION PROVIDED TO MATTEL PRIOR

 4   TO THE START OF THIS TRIAL; CORRECT?

 5   A    I DO NOT KNOW THAT.

 6   Q    BY THE WAY, I WAS PREVIOUSLY ASKING ABOUT AUDITED

 7   FINANCIAL RECORDS, AND I THINK THE LAST YEAR WE HAD WAS

 8   EXHIBIT 659, WHICH WAS THE YEAR 2006.

 9         THAT IS THE LAST INDEPENDENTLY-AUDITED FINANCIAL

10   RECORD THAT MGA HAS; IS THAT CORRECT?

11   A    I WOULD NOT KNOW IF THAT'S CORRECT OR NOT.  AGAIN, I DO

12   MOST OF THE CREATIVE WORK, AND WE HAVE AN ACCOUNTING

13   DEPARTMENT, SO I DON'T KNOW IF WE HAVE AN AUDITED FINANCIAL

14   STATEMENT AFTER THIS OR NOT.  I DO NOT KNOW.

15   Q    THANK YOU, MR. LARIAN.

16         MR. PRICE:  NO FURTHER QUESTIONS, YOUR HONOR.

17         THE COURT:  CROSS-EXAMINATION?

18                    CROSS-EXAMINATION

19   BY MR. NOLAN:

20   Q    GOOD MORNING, MR. LARIAN.

21         I WANT TO GO BACK TO WHAT MR. PRICE JUST SHOWED YOU.

22   THAT WAS EXHIBIT 4947, A LIST OF YOUR PERSONAL ASSETS.

23         DO YOU HAVE THAT?

24   A    GO AHEAD.

25   Q    DO YOU HAVE THAT IN FRONT OF YOU?
```

Exhibit D - Page 1153

1    A    I DO.

2    Q    4947 WAS PRODUCED AS PART OF THIS LITIGATION; CORRECT?

3    A    I DON'T KNOW IF IT WAS OR NOT.

4    Q    DID YOU PERSONALLY PREPARE THIS LIST OF ASSETS?

5    A    I DID NOT.

6    Q    I WANT TO DRAW YOUR ATTENTION, IF I MIGHT, TO THE LINE

7    ITEM ON THIS REFERRING TO THE VALUE OF MGA.

8              DO YOU SEE THAT?

9    A    I DO SEE IT ON MY PAPER.

10   Q    WE'LL HIGHLIGHT THAT.

11             NOW, FIRST OF ALL, IT REFERS TO MGA ENTERTAINMENT AS

12   AN S-CORP.

13             DO YOU SEE THAT?

14   A    YES, I DO.

15   Q    AND THEN THE VALUE THAT'S ATTACHED IS $1.2 BILLION;

16   CORRECT?

17   A    YES.

18   Q    TOTAL ASSETS OF ABOUT $1,347,000,000.

19             DO YOU SEE THAT?

20   A    I DO.

21   Q    SO THE GREATEST PERCENTAGE OF YOUR NET WORTH IS TIED TO

22   THE VALUE OF MGA; CORRECT?

23   A    CORRECT.

24   Q    NOW, DO YOU NOW HAVE KNOWLEDGE -- WELL, FIRST OF ALL, IS

25   THAT WHAT YOUR VALUE OF MGA WAS AS OF 2007?

THURSDAY, AUGUST 7, 2008          TRIAL DAY 31, MORNING SESSION

6248

```
 1   A    I WOULD NOT KNOW.

 2   Q    HAVE YOU HAD CONVERSATIONS WITH LISA TONNU ABOUT WHAT

 3   INFORMATION WAS USED TO PREPARE THIS CALCULATION?

 4   A    YES.

 5   Q    AND DO YOU KNOW NOW WHAT THE $1.2 BILLIONS VALUE OF MGA

 6   WAS BASED ON, WHAT YEAR?

 7            MR. PRICE:  OBJECTION.  THAT'S HEARSAY.

 8            THE COURT:  LAY A FOUNDATION, COUNSEL.

 9   BY MR. NOLAN:

10   Q    I'LL GO BACK IN TIME.

11            IS IT TRUE, MR. LARIAN -- LET'S APPROACH IT THIS WAY:

12   THE FINANCIAL PERFORMANCE OF THE BRATZ LINE --

13   A    YES.

14   Q    -- AT THE END OF 2007, WAS IT YOUR UNDERSTANDING THAT THE

15   BRATZ LINE WAS PERFORMING, THAT IS SELLING, AS PROFITABLY AS IT

16   HAD IN THE YEAR 2005?

17   A    IT WAS NOT.

18   Q    AND CAN YOU EXPLAIN THE DIFFERENCE BETWEEN THE PERFORMANCE

19   OF BRATZ IN 2005 AND 2007.

20   A    TO THE BEST OF MY KNOWLEDGE, THE BRATZ LINE DROPPED ABOUT

21   30 TO 40 PERCENT IN 2007, DUE TO SEVERAL FACTORS.

22   Q    WHAT WERE THOSE FACTORS?

23            MR. PRICE:  OBJECTION.  SPECULATION; LACK OF

24   FOUNDATION.

25            THE COURT:  SUSTAINED.
```

Exhibit D - Page 1155

```
 1              LAY A FURTHER FOUNDATION, COUNSEL.

 2   BY MR. NOLAN:

 3   Q    AS THE CEO AND THE LARGEST MAJOR SHAREHOLDER OF AN

 4   S CORPORATION KNOWN AS MGA, DO YOU HAVE INFORMATION WITH

 5   RESPECT TO THE FINANCIAL PERFORMANCE AT VARIOUS TIMES?

 6   A    I DO.

 7   Q    AND DO YOU RECEIVE REGULAR REPORTS WITH RESPECT TO

 8   REVENUES BY MGA, AND IN PARTICULAR, THE BRATZ LINE?

 9   A    I DO.

10   Q    AND YOU REVIEW THAT INFORMATION?

11   A    SOMETIMES I DO.

12   Q    AND DO YOU MAKE ANY ATTEMPT TO DETERMINE WHETHER OR NOT

13   THE BRATZ LINE IS SELLING AT A CERTAIN LEVEL OR DECLINING OR

14   INCREASING?

15   A    I DO THAT REGULARLY.

16   Q    SO BASED ON YOUR REVIEW OF AVAILABLE FINANCIAL REPORTS, DO

17   YOU ALSO TRY TO ANALYZE WHAT IS CONTRIBUTING EITHER TO THE

18   SUCCESS OF THE LINE OR TO THE DECLINING NATURE OF THE LINE?

19   A    I DO ON A REGULAR BASIS.

20   Q    AND CAN YOU EXPLAIN TO THE JURY WHAT YOU DO IN THAT

21   REGARD.  WHAT DO YOU DO TO TRY TO FIGURE OUT WHAT'S AFFECTING

22   YOUR BUSINESS?

23   A    I LOOK AT COMPETITION, WHAT COMES IN THE MARKET.  I LOOK

24   AT WHAT WE CALL POS, RATE OF SALES AT RETAIL.  I LOOK AT THOSE

25   REGULARLY, AND THEN COMPARE IT TO THE YEAR BEFORE.  I LOOK AT
```

```
 1   WHAT OTHER COMPETITORS ARE DOING WITH THE PRODUCT.  THOSE ARE
 2   SOME OF THE THINGS I DO.  I LOOK AT OUR PRODUCT LINE VERSUS
 3   WHAT WE HAVE DONE IN THE PAST, HOW SUCCESSFUL THEY WERE OR NOT.
 4   Q    NOW, BASED ON THE INFORMATION THAT YOU WERE RECEIVING
 5   REGARDING THE PERFORMANCE OF MGA AND BRATZ, AND YOUR REVIEW OF
 6   COMPETITIVE AND INDUSTRY DATA, WERE YOU ABLE TO DETERMINE WHAT
 7   FACTORS WERE LEADING TO A DECLINE IN OVERALL SALES FOR BRATZ?
 8   A    YES, I WAS.
 9   Q    AND WHAT WERE THE FACTORS THAT YOU BELIEVED WERE LEADING
10   TO THE DECLINE OF THE BRATZ SALES?
11            MR. PRICE:  OBJECTION.  LACK OF FOUNDATION.  BEST
12   EVIDENCE AS TO WHAT THOSE NUMBERS ARE.  AND IT'S IRRELEVANT.
13            THE COURT:  IT'S HARD TO RULE WITHOUT KNOWING THE
14   FACTORS.
15            LET'S TALK AT SIDE-BAR.
16            (WHEREUPON, THE FOLLOWING PROCEEDINGS
17            WERE HELD AT SIDE-BAR:)
18            THE COURT:  CAN YOU PROFFER WHAT THE FACTORS ARE HE'S
19   GOING TO GET INTO?  IT'S HARD FOR ME TO RULE WITHOUT KNOWING
20   WHAT THE FACTORS ARE.
21            MR. NOLAN:  SURE.
22            THE FOUNDATION HE'S LAID ABOUT LOOKING AT COMPETITIVE
23   INDUSTRY STANDARDS, WHAT'S GOING ON, HE TALKED ABOUT THE
24   DECLINING MARKET SHARE FOR BRATZ IS AFFECTED BY, FOR INSTANCE,
25   NEW PRODUCTS COMING TO THE LINE, HANNAH MONTANA, HIGH SCHOOL
```

```
 1   MUSICAL, A CHANGING GENRE OF WHAT GIRLS ARE LOOKING AT AND

 2   PLAYING WITH; THE DECLINE OF THE TOY INDUSTRY IN GENERAL SINCE

 3   1998, WHICH I DON'T THINK CAN BE DISPUTED BY MATTEL.  IF IT IS,

 4   MAYBE I SHOULD PUT ON MR. ECKERT BECAUSE HE MAKES REGULAR

 5   STATEMENTS WITH RESPECT TO THE DECLINE OF THE SALE OF FASHION

 6   DOLLS, AGE COMPRESSION OF THE TARGET MARKET; THAT'S A PHENOMENA

 7   THAT CONTINUES TO GO ON.  THE INCREASING POPULARITY OF VIDEO

 8   GAMES, JUST THE SWITCHING OF THE GIRLS, AND EVEN BOYS, AWAY

 9   FROM STATIC DOLLS LIKE THIS TO MORE OF VIDEO INTERACTIVE GAMES.

10          THIS IS WHAT HE DID AS A CEO, ANALYZING TRENDS ON

11   WHAT'S GOING ON IN THE INDUSTRY.

12          THE COURT:  MR. PRICE?

13          MR. PRICE:  I THINK THERE'S AN ADEQUATE FOUNDATION

14   FOR IT.  IN FACT, I THOUGHT HE SAID HE DIDN'T PAY ATTENTION;

15   THAT HE WAS CREATIVE.  AND SECOND, THIS IS JUST IMPROPER LAY

16   OPINION ABOUT WHAT --

17          THE COURT:  HE'S A CEO.  BOB ECKERT STOOD UP THERE

18   AND TALKED ABOUT THE TOY -- WHO BETTER TO KNOW WHAT'S GOING ON

19   IN THE TOY INDUSTRY THAN A CEO OF A TOY COMPANY.

20          MR. PRICE:  ONE WOULD THINK.  EXCEPT FOR WHAT HE SAID

21   WHEN I WAS EXAMINING HIM, WHICH IS HE DOES NOT PAY ATTENTION TO

22   THESE THINGS; HE'S CREATIVE; SO I THINK SOME CEOS ARE INVOLVED,

23   SOME ARE NOT.

24          THE COURT:  THAT GOES MORE TO THE WEIGHT OF THE

25   EVIDENCE.  I'M MORE CONCERNED ABOUT THE RELEVANCE OF ALL OF
```

6252

1    THIS.  THE BOTTOM LINE IS CERTAINLY SIGNIFICANT, I SUPPOSE.

2    THE VALUE OF MGA AND THE PROJECTED VALUE OF MGA IS RELEVANT.

3          MY INCLINATION IS TO OVERRULE THE OBJECTION.  IT'S

4    IMPEACHABLE; YOU HAVE OTHER EVIDENCE TO BRING IN IN TERMS OF

5    THE VALUE.

6          **MR. PRICE:**  ON RELEVANCE, YOUR HONOR, THE JURY CANNOT

7    MAKE ANY CONCLUSIONS ON THIS AS TO WHETHER THEY ARE GOING TO

8    CONTINUE USING -- OR WHETHER THEY ARE TO GET BETTER.

9          **THE COURT:**  YOU'RE RIGHT.

10         **MR. PRICE:**  THEY HAVE EXPERTS COME IN AND TESTIFY

11   ABOUT THAT, ABOUT FUTURE VALUE, AND IF THE EXPERT DOESN'T

12   CONNECT THIS UP, THEN THIS REALLY HAS NO RELEVANCE TO THE JURY.

13   IT'S JUST GENERAL OPINIONS.

14         **THE COURT:**  IT DOESN'T, AND AT THAT POINT IN TIME, I

15   WILL -- LET'S DO THIS VERY BRIEFLY.  THIS SHOULD NOT BE A

16   LONG -- I'M GOING TO OVERRULE THE OBJECTION.

17         (SIDE-BAR PROCEEDINGS CONCLUDED.)

18   **BY MR. NOLAN:**

19   Q    MR. LARIAN, GOING BACK TO MY QUESTION, COULD YOU EXPLAIN

20   TO THE JURY, BASED ON YOUR REVIEW, SOME OF THE FACTORS THAT

21   WERE CAUSING A DECLINE IN, AND ARE CAUSING A DECLINE IN, THE

22   BUSINESS OF BRATZ.

23   A    THERE WERE SEVERAL FACTORS, ESPECIALLY LAST YEAR.  A

24   PRODUCT CALLED "HANNAH MONTANA" CAME TO THE MARKET AS A FASHION

25   DOLL.  IT WAS VERY SUCCESSFUL.  IT TOOK BUSINESS AWAY FROM US.

1          ANOTHER PROPERTY, ANOTHER DOLL, CAME CALLED "HIGH

2     SCHOOL MUSICAL."  THAT WAS VERY SUCCESSFUL.  IT TOOK BUSINESS

3     AWAY.

4          ANOTHER PRODUCT THAT BECAME IN THE TOY MARKET FOR THE

5     SAME AGE GROUP THAT HAS BEEN VERY, VERY SUCCESSFUL IS CALLED

6     "WEBKINZ."  THAT HAS TAKEN THOSE DOLLARS AWAY FROM BRATZ

7     FASHION DOLLS.  KIDS ARE NOW COLLECTING WEBKINZ, WHICH IS A

8     PIECE OF PLUSH THAT YOU PLAY AT HOME, BUT YOU ALSO COLLECT

9     THEM.  BUT YOU CAN ALSO GO ON THE COMPUTER.

10          ANOTHER PROPERTY THAT BECAME VERY SUCCESSFUL FOR THAT

11    AGE GROUP IS CALLED "LITTLEST PET SHOP."  THAT'S BY A COMPANY

12    CALLED HASBRO.  IT'S BEEN VERY SUCCESSFUL.  KIDS IN GENERAL ARE

13    BUYING LESS FASHION DOLLS, WHETHER IT'S BRATZ OR BARBIE.  I

14    THINK BARBIE SALES HAVE DECLINED ALSO.  BECAUSE THE MONEY THAT

15    THE KIDS HAVE BASICALLY IS GOING TO OTHER PRODUCTS.

16          THE OTHER THING THAT ATTRIBUTED TO THE DECLINE OF

17    BRATZ DOLL WAS THAT WE LOST FOCUS ON WHAT IS THE CORE ESSENCE

18    OF THE BRATZ DOLL.  THAT WAS DIFFERENT FASHIONS FOR EACH

19    CHARACTER.  WE LOST FOCUS OF THAT.

20    Q    MR. LARIAN, ADDRESSING THAT LAST POINT, YOU LOST FOCUS,

21    THIS LAWSUIT HAS BEEN GOING ON FOR HOW MANY YEARS?

22    A    AT LEAST FOUR YEARS.

23          **MR. PRICE:**  OBJECTION.  THE LAWSUIT IS IRRELEVANT.

24          **THE COURT:**  I THINK THE JURY IS WELL AWARE OF WHEN

25    THE LAWSUIT WAS FILED.

1          **MR. NOLAN:**  IN FACT, I BELIEVE THERE WAS A

2    STIPULATION TO THAT.

3          **THE COURT:**  I THINK THERE WAS A STIPULATION FOR THE

4    FILING OF THE LAWSUIT.

5          **MR. NOLAN:**  THANK YOU.

6          **THE WITNESS:**  MATTEL SUED CARTER BRYANT IN 2004 AND

7    SUED MGA IN 2007.  THEY SUED ME IN 2007 PERSONALLY, SEVERAL

8    YEARS.

9    **BY MR. NOLAN:**

10   Q    MR. LARIAN, DO YOU CONSIDER YOURSELF, OVER THE YEARS OF

11   THE BRATZ LINE, TO HAVE BEEN A CREATIVE FORCE IN PUSHING THE

12   BRAND?

13   A    I DO.

14   Q    DURING THE LAST FEW YEARS, HAVE YOU SPENT A CONSIDERABLE

15   AMOUNT OF TIME DEVOTED TO THIS LITIGATION?

16          **MR. PRICE:**  OBJECTION.  RELEVANCE.

17          **THE COURT:**  SUSTAINED.

18   **BY MR. NOLAN:**

19   Q    HOW MANY EMPLOYEES DOES MGA HAVE?

20   A    I THINK WE HAVE --

21          **MR. PRICE:**  OBJECT TO THE RELEVANCE.

22          **THE COURT:**  SUSTAINED.

23   **BY MR. NOLAN:**

24   Q    HAS MGA BEEN FORCED TO LAY OFF EMPLOYEES AS A RESULT OF

25   THE DECLINE IN THE MARKET?

1  A    YES.

2          **MR. PRICE:**  OBJECTION.  THERE'S A MOTION *IN LIMINE* ON

3  THIS, I'M TOLD IN MY RIGHT EAR.

4          **THE COURT:**  SIDE-BAR, COUNSEL.

5          (WHEREUPON, THE FOLLOWING PROCEEDINGS

6          WERE HELD AT SIDE-BAR:)

7          **THE COURT:**  MR. ZELLER?

8          **MR. ZELLER:**  THERE WAS A MOTION *IN LIMINE*, YOUR

9  HONOR, WHERE WE DISCUSSED, BASICALLY, TO EXCLUDE EVIDENCE

10  ARGUMENT, COMMENTARY, ABOUT BASICALLY CONSEQUENCES OF THE

11  LAWSUIT, THE VERDICT, TO MGA.  THIS IS RIGHT IN THE HEART OF

12  IT.  THEY HAVE SOMEBODY SAY MATTEL {SIC} BASICALLY, THROUGH

13  LITIGATION, HAD THESE LAYOFFS, I THINK IS EXACTLY THE CONCERN

14  THAT WE WERE EXPRESSING THROUGH THIS MOTION.  AND OF COURSE

15  IT'S IRRELEVANT; IT'S 403; IT DOES NOT HAVE ANY BEARING ON ANY

16  ISSUE IN THIS CASE.

17          **THE COURT:**  THE ONLY ISSUE I CAN SEE IT BEARING ON IS

18  THIS WHOLE ECONOMIC DOWNTURN IN THE DOLL MARKET.  BUT THE

19  QUESTION IS, ARE WE ABLE TO FACTOR OUT THE OTHER FACTORS THAT

20  MIGHT INFLUENCE THAT?  AND DOES THE PROBATIVE VALUE OUTWEIGH

21  THE PREJUDICIAL EFFECT FOUND IN THE MOTION *IN LIMINE*?

22          **MR. NOLAN:**  TWO, AT LEAST, MAYBE THREE RESPONSES,

23  YOUR HONOR.

24          FIRST OF ALL, MR. PRICE QUESTIONED MR. LARIAN

25  SUGGESTING THAT BECAUSE 2007 AND 2008 ARE NOT AUDITED FINANCIAL

```
 1   RESULTS; HE CALLED THEM -- I SUGGEST HE INFUSED INTO THIS CASE

 2   A SUGGESTION THAT MAYBE THOSE NUMBERS ARE NOT ACCURATE.

 3            IN VIEW OF THAT, I THINK WE SHOULD BE ABLE TO SAY

 4   THAT IN RESPONSE TO THOSE MARKET CONDITIONS WE'VE IDENTIFIED,

 5   MGA WAS FORCED TO LAYOFF EMPLOYEES; THAT'S NUMBER ONE.

 6            NUMBER TWO, I DO THINK THAT IN ADDITION TO THIS

 7   FINANCIAL ASPECT, IT GOES TO THE NOTION OF HOW MANY EMPLOYEES

 8   WORLDWIDE CONTRIBUTE TO ALL OF THE ACTIVITIES THAT GO ON TO

 9   MAKE THE BRAND, WHAT IT IS; SO I BELIEVE IT'S RELEVANT IN THAT

10   RESPECT TO SHOW THAT THIS IS NOT JUST ONE PERSON DOING THIS

11   JOB; SO I THINK TO HOLD US OFF FROM HOW MANY EMPLOYEES MGA HAS

12   JUST --

13            THE COURT:  YOU SAID THERE MAY BE A THIRD, BUT I'LL

14   GIVE YOU LEAVE TO MAKE THAT THIRD ARGUMENT.

15            THE SECOND ONE ACTUALLY TIES DIRECTLY INTO THE

16   ARGUMENT THAT MR. ZELLER WAS HAVING -- NOT ARGUMENT -- WITH

17   MS. AGUIAR HAVING WITH THE COURT CONCERNING THE -- THAT MAKES

18   THIS AN EASY DECISION TO SUSTAIN THE OBJECTION.  THAT'S

19   PRECISELY WHERE YOU CANNOT GO IN THIS CASE, AND WHERE YOU'RE

20   NOT GOING TO GO IN THIS PHASE, IS DESCRIBING ALL THESE PEOPLE

21   THAT ARE WORKING ON IT, LABORING SO HARD TO DO THIS WORK.  THIS

22   IS PRECISELY -- THAT IS THE PRECISE POINT MR. ZELLER WAS MAKING

23   THIS MORNING; SO THAT'S NOT COMING IN.

24            I CAN SEE SOME MARGINAL RELEVANCE ON YOUR FIRST

25   POINT, BUT I THINK THE PREJUDICIAL EFFECT OUTWEIGHS WHATEVER
```

1    PROBATIVE VALUE, BECAUSE LAYOFFS CAN HAPPEN FOR A VARIETY OF

2    REASONS.  AND WITHOUT HAVING A MINI TRIAL TO DETERMINE WHAT

3    FACTORS CAUSED THE LAYOFFS AND WHETHER OR NOT THEY ARE RELATED

4    TO THIS MARKET DOWNTURN OR RELATED TO OTHER FACTORS -- I SEE

5    THIS GOING NOWHERE.  I'M GOING TO SUSTAIN THE OBJECTION.

6             WE'RE GOING TO COME BACK TO THAT SECOND POINT,

7    BECAUSE THIS IS PRECISELY THE PROBLEM.  THE COURT HAS TO COME

8    UP WITH A WAY TO CLEARLY ARTICULATE THE DIVIDING LINE.  I'LL BE

9    LOOKING TO COUNSEL FOR ASSISTANCE ON THAT.

10            **MR. PRICE:**  THANK YOU.

11            (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

12            **MR. PRICE:**  MOVE TO STRIKE THE ANSWER MR. LARIAN

13   GAVE.

14            **THE COURT:**  IT'S STRICKEN.

15            YOU MAY PROCEED.

16   **BY MR. NOLAN:**

17   Q    MR. PRICE ASKED YOU ON DIRECT EXAMINATION WHETHER OR NOT

18   AT VARIOUS TIMES, MGA HAS SOUGHT FINANCING ARRANGEMENTS WITH

19   BANKS.

20            DO YOU RECALL THAT LINE OF QUESTIONS?

21   A    I DO.

22   Q    ARE YOU AWARE OF A FINANCING ORGANIZATION KNOWN AS

23   WACHOVIA SECURITIES?

24   A    I DO.

25   Q    COULD YOU IDENTIFY FOR THE JURY WHAT RELATIONSHIP MGA HAS

```
1   WITH WACHOVIA SECURITIES.

2   A    WACHOVIA -- I DON'T KNOW IF IT'S CALLED WACHOVIA

3   SECURITIES OR WACHOVIA BANK, BUT THEY ARE -- THE BEST I CAN

4   DESCRIBE IT, WE HAVE A SYNDICATED -- THEY'RE HEAD OF

5   SYNDICATION OF A CREDIT LINE THAT THEY PROVIDED TO MGA.  AND SO

6   BASICALLY, WHAT THEY DO IS, THEY GIVE YOU -- THEY SAY, 'WE'RE

7   GOING TO GIVE YOU A $300, $400 MILLION LOAN TO RUN YOUR

8   COMPANY,' BUT THEN THEY GO AHEAD AND GET OTHER BANKS AND THEY

9   DIVIDE THAT LOAN BETWEEN THOSE BANKS, AND THEN THEY PROVIDE THE

10  FINANCING TO THE COMPANY.

11           I DON'T KNOW IF I DESCRIBED IT...

12  Q    AS PART OF THE LOAN ARRANGEMENTS WITH WACHOVIA SECURITIES,

13  ARE THERE CERTAIN CONDITIONS BY WHICH WACHOVIA IS ALLOWED TO

14  ACCELERATE ITS LOANS TO MGA?

15           MR. PRICE:  YOUR HONOR, OBJECTION.  SIDE-BAR ON THIS.

16  THIS CONCERNS PRODUCTIONS.

17           THE COURT:  VERY WELL.

18           (WHEREUPON, THE FOLLOWING PROCEEDINGS

19           WERE HELD AT SIDE-BAR:)

20           THE COURT:  WHERE ARE WE ON THIS?

21           MR. NOLAN:  TO THE WACHOVIA LETTERS.

22           THE COURT:  I KNEW THIS WAS GOING TO BE A POINT OF

23  CONTENTION; THEY EVEN BROUGHT IN MR. COREY FOR THIS ONE.

24           MR. NOLAN:  AND I HAVE MR. ROTH, SO...

25           MR. COREY:  THE ISSUE HERE IS WE SOUGHT DISCOVERY.
```

1    WE ASKED FOR INFORMATION REGARDING CREDIT AGREEMENT

2    SPECIFICALLY WITH RESPECT TO THE 2006 CREDIT AGREEMENT AND THEY

3    OBJECTED, THIS MOTION PRACTICE, AND WE LOST.

4         SO NOW THEY WANT TO BRING IN THE AGREEMENT; BRING IN

5    WHAT HAPPENED RECENTLY.  WE DON'T KNOW, AND ALL WE HAVE ARE

6    THESE LETTERS, AND WE DON'T KNOW WHAT ELSE HAS HAPPENED.

7         **THE COURT:**  I THOUGHT ALL THAT WAS ORDERED TURNED

8    OVER.

9         **MR. ROTH:**  WE TURNED OVER LETTERS AND THE LOAN

10   AGREEMENT.

11        **MR. COREY:**  WE HAVE THE LOAN AGREEMENT.  WE GOT IT

12   TWO DAYS AGO.  IT WAS DESIGNATED THE HIGHEST TIER, AND THERE

13   ARE REFERENCES TO LETTERS TO AMENDMENT; THERE'S NO OTHER

14   CORRESPONDENCE THAT WE HAVE, OTHER THAN DEMAND LETTERS FROM

15   WACHOVIA; SO WE HAVE ABSOLUTELY NO IDEA WHAT REALLY IS THE

16   STATE OF PLAY WITH RESPECT TO THE DEMAND LETTERS.

17        **THE COURT:**  WHAT DO YOU WANT TO GET INTO HERE?

18        **MR. NOLAN:**  RECEIPT OF THE LETTERS.

19        **THE COURT:**  AND THE LETTERS SAY 'WE'RE CUTTING YOU

20   OFF.'

21        **MR. NOLAN:**  YES.

22        **MR. COREY:**  THE LETTERS SAY WE WANT $300 MILLION

23   BACK.  AND THEY INVOKED THE LOCK BOX PROVISION.  ONE OF THE

24   REVENUES JUST FLOW THROUGH THE WACHOVIA; THEY DON'T GO TO MGA.

25        **THE COURT:**  LET ME HEAR YOUR ARGUMENT.

1          **MR. NOLAN:**  YOUR HONOR, WE'VE RAISED THIS.  WE

2     PRODUCED THIS.  WE BROUGHT IT TO THE COURT'S ATTENTION TEN DAYS

3     AGO.  WE PRODUCED THE DOCUMENTS TO THEM.  THEY HAVE THE

4     LETTERS.  THEY HAVE THE LOAN AGREEMENTS.  WE SHOULD BE ENTITLED

5     TO SHOW RIGHT NOW THE EFFECT THE RECEIPT OF THESE LETTERS FROM

6     WACHOVIA THAT ENFORCE THE LOCK BOX AGREEMENT SUCH THAT ANYTHING

7     HAVING TO DO WITH THE OPERATIONS OF MGA ARE NOW SUBJECT TO

8     THESE CONDITIONS.  IT GOES TO THE IMMEDIATE VALUATION AND

9     FINANCIAL CONDITION OF MGA AND ITS BEARING ON MR. LARIAN'S NET

10    WORTH.

11         **THE COURT:**  PART OF THE CONCERN I HAVE FOR THIS IS

12    REPRESENTATIONS WERE MADE TO THE COURT THAT -- I ASSUME WE'RE

13    NOW -- YOU ASKED FOR CERTAIN THINGS REMAIN IN CHAMBERS; I

14    ASSUME THIS IS ALL NOW OUT IN THE OPEN?

15         **MR. NOLAN:**  YES.

16         **THE COURT:**  JUST WANTED TO MAKE SURE BEFORE I SAID

17    ANYTHING.

18         YOU HAD MADE AN INDICATION THAT ACCOUNTS HAD BEEN

19    FROZEN AND THERE'S BEEN AN ATTEMPT TO NEGOTIATE A RESOLUTION.

20         THIS IS SOMETHING WHICH IS AWKWARD, BECAUSE OBVIOUSLY

21    AT THIS POINT MR. LARIAN AND MGA HAS INCENTIVE NOT TO --

22    THERE'S A CONCERN HERE IN TERMS OF TRANSPARENCY.

23         I'M NOT SUGGESTING ANYBODY IS DOING ANYTHING WRONG.

24    BUT MATTEL IS IN A POSITION NOT TO KNOW WHAT IS GOING ON.  MGA

25    HAS EVERY INCENTIVE RIGHT NOW, AT LEAST FOR THE NEXT WEEK, TO

```
 1   PORTRAY THEMSELVES IN THE WORST POSSIBLE LIGHT TO THIS JURY,

 2   FINANCIALLY.  AND THE ONLY WAY TO ENSURE EVERYTHING IS ABOVE

 3   BOARD IS TO HAVE COMPLETE DISCLOSURE OF ALL FINANCIAL RECORDS

 4   RELATE TO WACHOVIA.

 5            I ASSUME THAT'S WHAT YOU'RE --

 6        MR. COREY:  YES.  FOR EXAMPLE, THE CREDIT AGREEMENT

 7   HAS A $200 MILLION CAP ON THE ACCELERATION AMOUNT.

 8        THE COURT:  YOU DON'T HAVE A COPY OF THAT?

 9        MR. COREY:  I DO BUT IT HAS A $200 MILLION CAP.

10   THERE ARE THREE HUNDRED MILLION DOLLARS OF INDEBTEDNESS.  WHERE

11   DOES THAT COME FROM?

12            THAT'S THE KIND OF ISSUE WE'RE DEALING WITH.

13        THE COURT:  I LET YOU, MGA, GET IN ANY INFORMATION

14   LEGITIMATELY THAT SHOWS A FINANCIAL PROBLEM.  BUT THERE NEEDS

15   TO BE A FULL DISCLOSURE AT THIS POINT; THAT'S THE CONCERN I

16   HAVE GOING FORWARD.

17        MR. PRICE:  IF I COULD SUGGEST.  MR. NOLAN SAID HE

18   WAS GOING TO CALL MR. LARIAN IN THE CASE.  AGAIN, WE NEED TO

19   GET ALL OF THE DOCUMENTS, THE CORRESPONDENCE THAT'S BEEN GOING

20   ON.  THERE WAS A REPRESENTATION THEY ARE TRYING TO WORK THIS

21   OUT.  WE KNOW NOTHING ABOUT THAT.  WE NEED TO KNOW.

22        THE COURT:  YOU'RE GOING TO BE RECALLING MR. LARIAN

23   IN YOUR CASE.

24        MR. NOLAN:  I DIDN'T KNOW IF I COULD, BECAUSE I TRIED

25   TO ALERT YOU TO THIS ISSUE.
```

6262

1          **THE COURT:**  I'LL PERMIT YOU TO DO THAT.

2          LET'S PUT THIS ISSUE OFF UNTIL YOU CALL MR. LARIAN IN

3    YOUR CASE.  AND THEN, IN THE MEANTIME, MR. ROTH AND MR. COREY

4    CAN GET TOGETHER ON THIS AND PROVIDE EVERYTHING THAT'S NEEDED.

5    BUT I AGREE WITH MR. COREY'S POINT, THEY NEED TO HAVE

6    EVERYTHING.

7          I'M NOT SUGGESTING ANYONE IS DOING ANYTHING WRONG.

8    IT'S JUST THE PROCESS.  WE NEED TO HAVE -- EVERYBODY NEEDS TO

9    HAVE ALL OF THE INFORMATION ABOUT THIS BEFORE WE GET INTO THIS

10   ANY FURTHER.

11         **MR. NOLAN:**  BACK TO ONE THING, YOUR HONOR.

12         THERE IS NO INCENTIVE ON OUR PART TO DELAY A

13   RESOLUTION OF THIS FOR TRANSPARENCY PURPOSES FOR THIS COURT OR

14   FOR THIS JURY.  AND I CAN'T STRESS THAT ENOUGH.  IT'S NOT IN

15   OUR BEST INTERESTS YOUR HONOR.  WE'RE TRYING TO SURVIVE.

16         AS THE COURT POINTED OUT YESTERDAY, THE COURT

17   APPOINTED MEDIATOR HAD A CHECK BOUNCE ON AN ACCOUNT THAT'S BEEN

18   LOCKED.  THAT'S NOT OUR DESIGN.

19         **THE COURT:**  I UNDERSTAND.  THAT'S WHY I BACKED AWAY

20   FROM THE COMMENTS.  I'M NOT SUGGESTING ANYTHING IS GOING ON.

21   IT'S JUST THAT, IF IT WAS THE OTHER WAY AROUND -- YOU JUST NEED

22   TO HAVE TRANSPARENCY HERE.  AND THE WAY TO DO THAT IS TO HAVE

23   ALL OF THE DOCUMENTS OUT ON THE TABLE AND HAVE EVERYONE SEE

24   WHAT'S GOING ON.  AND THEN I'LL LET YOU GET INTO IT.  IT'S A

25   LEGITIMATE AREA TO GET INTO.  MR. COREY'S POINT IS LEGITIMATE

```
 1   AS WELL.  WE JUST NEED TO HAVE IT, SO THERE'S NO QUESTION.

 2        MR. NOLAN:  JUST SO.

 3        THE COURT:  AND SUBJECT TO APPROPRIATE PROTECTIVE

 4   ORDERS, OF COURSE, BECAUSE THIS IS ALL --

 5        MR. NOLAN:  JUST SO I CAN ROUND OFF THIS AND MOVE OFF

 6   THE STAGE GRACEFULLY; I'D LIKE TO FINISH OFF WITH A SPIKE HERE.

 7        THE COURT:  I'LL TAKE CARE OF IT.  I'LL TELL THE JURY

 8   THERE ARE CERTAIN MATTERS -- THAT MR. LARIAN IS GOING TO BE

 9   RECALLED AGAIN IN THE MGA CASE, AND THERE ARE CERTAIN MATTERS

10   THAT I'M RESERVING FOR THAT.  I'LL TAKE THE FALL FOR THAT.

11        MR. NOLAN:  I APPRECIATE THAT.

12        THEY MAY NOT BELIEVE IT TO BE HONEST WITH YOU, BUT

13   WHAT I WOULD LIKE TO DO IS MAYBE ASK THREE OR FOUR DIFFERENT

14   QUESTIONS, AND THEN SIT DOWN.

15        THE COURT:  ABSOLUTELY.  BUT I DON'T WANT THE JURY TO

16   BE -- BECAUSE YOU'VE ALREADY ASKED THAT QUESTION, I DON'T WANT

17   THEM TO THINK WE'RE SHUTTING YOU DOWN; WE'RE JUST PUTTING IT

18   OFF FOR ANOTHER TIME, AND THEN YOU GUYS CAN WORK OUT WHAT NEEDS

19   TO BE DONE.

20        (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

21        THE COURT:  MEMBERS OF THE JURY, THIS IS AN AREA THAT

22   MR. NOLAN IS GOING TO GET INTO WITH MR. LARIAN WHEN HE RECALLS

23   HIM IN HIS CASE-IN-CHIEF.  THE COURT HAS REQUESTED THE PARTIES

24   TO PUT OFF THIS PARTICULAR AREA UNTIL THAT TIME SO THAT CERTAIN

25   OTHER MATTERS CAN BE ADDRESSED.
```

6264

1          **MR. NOLAN:**  THANK YOU, YOUR HONOR.

2          **THE COURT:**  MR. NOLAN, I UNDERSTAND YOU DO HAVE A FEW

3  OTHER QUESTIONS.

4          **MR. NOLAN:**  I DO.  THEN I'LL RESERVE THE RIGHT TO

5  CALL MR. LARIAN BACK IN OUR CASE-IN-CHIEF.

6          THANK YOU FOR THAT.

7          **THE COURT:**  YES.

8  **BY MR. NOLAN:**

9  Q    MR. LARIAN, I WANT TO GO BACK TO A COUPLE OF OTHER MATTERS

10 THAT WERE TOUCHED UPON YESTERDAY WITH MR. PRICE.

11         CAN YOU EXPLAIN TO THE JURY THE IDEA OF A BRATZ LIFE

12 BRAND.  WHEN THAT TERM IS USED BY MGA AND YOU, CAN YOU EXPLAIN

13 THE COMPONENTS OF THAT MGA BRATZ LINE, BRAND LINE.

14 A    BRATZ, WE LAUNCHED IT IN 2001 WITH FOUR DOLLS.  IT HAS

15 BECOME A MAJOR BRAND, FRANKLY THE ONLY BRAND THAT'S BEEN ABLE

16 TO COMPETE WITH THE MONOPOLY THAT BARBIE HAS HAD FOR 48 YEARS.

17         **MR. PRICE:**  MOVE TO STRIKE THE ANSWER AS

18 NONRESPONSIVE AT THIS POINT.  IT'S WITHOUT FOUNDATION.

19         **THE COURT:**  IT'S STRICKEN.  LET'S DO IT AGAIN.

20 **BY MR. NOLAN:**

21 Q    I WANT TO JUST FOCUS ON THE BRATZ LIFE BRAND AND THE

22 VARIOUS COMPONENTS OF IT, WITHOUT REFERENCE TO ANY OTHER

23 COMPETITIVE PRODUCTS.

24 A    I UNDERSTAND.

25         BRATZ, WE LAUNCHED IT IN 2001 WITH FOUR DOLLS, AND WE

THURSDAY, AUGUST 7, 2008                    TRIAL DAY 31, MORNING SESSION

```
 1   EXPANDED IT WITH OTHER PRODUCTS AS YEARS WENT ON.  WE SPENT A

 2   LOT OF MONEY IN MARKETING AND ADVERTISING.  WE GOT NEW

 3   LICENSEES.  IT BECAME A LIFESTYLE BRAND, BASICALLY, IN THE

 4   INDUSTRY.  AND IT BECAME A PHENOMENON SUCCESS FOR OVER SEVEN

 5   YEARS ALL OVER THE WORLD.

 6            SO NOW, FOR EXAMPLE, SOMEBODY WHO BOUGHT A DOLL

 7   FIRST; LATER ON, THEY WENT AHEAD AND BOUGHT OTHER DOLLS.  THEY

 8   BOUGHT ACCESSORIES.  THEY WENT AHEAD AND BOUGHT BEDDING, FOR

 9   EXAMPLE, TO DECORATE THEIR ROOMS, LIKE BRATZ.  THEY HAD

10   BIRTHDAY PARTIES, BRATZ CAKES.  AND THEY WORE BRATZ SHOES,

11   LITTLE GIRLS.  I'M SURE YOU HAVE -- YOUR GRANDDAUGHTERS.  AND

12   IT BASICALLY BECAME A LIFESTYLE BRAND, INSTEAD OF JUST BEING

13   THE FOUR DOLLS THAT WERE ORIGINALLY LAUNCHED.

14   Q    DEVELOPING THE BRATZ LINE, DID IT REQUIRE YOU TO MAKE

15   FINANCIAL INVESTMENTS?

16   A    WE MADE MAJOR FINANCIAL INVESTMENTS OVER SEVEN YEARS, FROM

17   2001 UNTIL 2007, WHEN MATTEL FINALLY SUED US, SUED ME, TO MAKE

18   THIS BRAND WHAT IT IS NOW, BOTH IN FINANCIAL RISK AND MONEY,

19   BOTH IN PEOPLE --

20            MR. PRICE:  OBJECTION, YOUR HONOR.  AT THIS POINT,

21   IT'S NONRESPONSIVE.

22            THE COURT:  IT IS.

23            NEXT QUESTION, COUNSEL.

24   BY MR. NOLAN:

25   Q    WHAT TYPE OF INVESTMENTS HAVE YOU MADE, FOR INSTANCE, IN
```

1    PRODUCT DEVELOPMENT?

2    A    FIRST OF ALL, WE HIRED A LOT OF PEOPLE TO MAKE NEW

3    PRODUCTS, NEW MARKETING, LICENSING.  WE CAME UP WITH -- ONE OF

4    THE THINGS WE DID, WE CREATED A BRATZ TV SERIES.  THAT WAS ON

5    FOX FOR A WHILE.  AND THAT COST A LOT OF MONEY TO DO IT.  WE

6    CAME UP WITH THE BRATZ HOME MOVIES.  THAT WAS DISTRIBUTED BY

7    FOX, AND NOW BY LIONS GATE.  WE MADE MAJOR, MAJOR INVESTMENTS,

8    MILLIONS AND MILLIONS OF DOLLARS, IN TOOLING, IN TV COMMERCIAL

9    PRODUCTION, IN ADVERTISING, IN PACKAGING, IN CREATING NEW SUB

10   BRANDS.

11          THOSE ARE SOME OF THE THINGS WE HAVE DONE.

12          OPENING UP OFFICES IN OTHER COUNTRIES SO WE CAN

13   DISTRIBUTE IT.

14   Q    MR. PRICE WAS ASKING YOU ABOUT THE EARLY MEETINGS WITH

15   MR. BRYANT IN SEPTEMBER.  I JUST WANT TO TAKE YOU BACK TO THE

16   PITCH MEETING FOR A MINUTE.

17          PRIOR TO MEETING CARTER BRYANT, MGA WAS IN THE TOY

18   BUSINESS; YES?

19   A    WE WERE.

20   Q    AND PRIOR TO MEETING CARTER BRYANT, HAD MGA OR YOU

21   RECEIVED ANY ACCOMMODATIONS OR AWARDS FOR PRODUCTS THAT YOU HAD

22   MANUFACTURED?

23          **MR. PRICE:**  OBJECTION.  IT WAS AWHILE AGO THIS WAS

24   ASKED AND ANSWERED.  AND I THINK BOTH PHASES ARE --

25          **THE COURT:**  OVERRULED.

1        YOU MAY ANSWER.

2        **THE WITNESS:**  YES.  WE'VE RECEIVED MANY, MANY AWARDS

3   FOR THE TOYS THAT WE CREATED.  FOR EXAMPLE, IN 1997, WE HAD A

4   DOLL CALLED "SINGING BOUNCY BABY."  THAT WON FAMILY FUN TOY OF

5   THE YEAR AWARD.  IT WAS A DOLL -- FAMILY FUN IS REFERRED TO IN

6   THE TOY INDUSTRY AS THE OSCARS OF THE TOY BUSINESS.  SO THAT

7   WAS VERY REWARDING.

8        AND WE HAVE WON MANY, MANY OTHER AWARDS FOR PRODUCTS

9   AND PACKAGING BEFORE BRATZ AND SINCE.

10  **BY MR. NOLAN:**

11  Q    MR. LARIAN, MR. PRICE WAS ASKING YOU DIRECT QUESTIONS

12  ABOUT CARTER BRYANT, AND WE WELL KNOW THAT CARTER BRYANT

13  ENTERED INTO A CONTRACT WITH MGA PURSUANT TO WHICH HE HAD A

14  ROYALTY RATE.

15       WHAT I WANT TO ASK YOU IS, SIR, WAS CARTER BRYANT THE

16  FIRST DESIGNER THAT MGA EVER MET WITH?

17  A    NO.  IN THE TOY INDUSTRY, ONE OF THE THINGS YOU DO IS, YOU

18  GET DESIGNS FROM OTHER DESIGNERS WHO BRING YOU IDEAS TO MAKE A

19  TOY.  IT'S NOT ONLY TO MGA.  IT'S TO MATTEL.  EVERYBODY.  AND

20  WE HAVE MANY OF THEM; MANY, MANY OF THEM.

21  Q    AND HAVE YOU ALWAYS, AFTER MEETING WITH THE DESIGNERS,

22  ENTERED INTO ROYALTY AGREEMENTS WITH THEM?

23  A    IF WE LIKE THE PRODUCT, WE HAVE.  IF WE LIKE THE IDEA THAT

24  THEY HAVE FOR THE PRODUCT, WE HAVE.  AND IF WE DIDN'T, WE DID

25  NOT.  NOT WITH ALL OF THEM, NO.

1   Q    CAN YOU TELL THE JURY WHAT THE RANGE OF THE ROYALTY RATE

2   WAS THAT YOU ENTERED INTO WITH VARIOUS DESIGNERS.

3            **MR. PRICE:**  OBJECTION.  RELEVANCE, YOUR HONOR.

4            ALSO OBJECT TO BEST EVIDENCE.

5            **THE COURT:**  COUNSEL, IT'S NOT CLEAR WHAT THE

6   RELEVANCE IS.

7            IS THIS GOING TO SOME FINANCIAL CALCULATION?

8            **MR. NOLAN:**  YES, YOUR HONOR.  IF I COULD AT SIDE-BAR,

9   RATHER THAN DOING IT IN FRONT OF THE JURY.

10           **THE COURT:**  WE'LL TAKE IT UP AT THE NEXT SIDE-BAR.

11           **MR. NOLAN:**  OKAY.

12           CAN WE MAKE A RESERVATION?

13           I APOLOGIZE.

14           **THE COURT:**  MOVE ALONG.

15           **MR. NOLAN:**  I HAVEN'T HAD A CHANCE TO MAKE A JOKE IN

16  AWHILE, SO...

17           **THE COURT:**  FAIR ENOUGH.

18  **BY MR. NOLAN:**

19  Q    I WANT TO TAKE A MOMENT AND ASK YOU, WHAT SIZE DOLL IS

20  BRATZ?

21  A    IT'S ABOUT NINE AND A HALF -- IT GOES -- WE HAVE SOME AT

22  NINE AND A HALF INCHES.  IT GOES UP TO ABOUT TEN AND A HALF.

23  Q    AND WAS THERE A PARTICULAR SIGNIFICANCE, IN YOUR VIEW,

24  WITH RESPECT TO THE SIZE OF BRATZ, THE LENGTH OF BRATZ?

25  A    YES.  TRADITIONALLY, FASHION DOLLS HAVE BEEN KNOWN AS

```
 1    BARBIE, AND BARBIE IS ELEVEN AND A HALF INCHES TALL.  AND WHEN

 2    WE LAUNCHED BRATZ, WE WANTED TO MAKE SURE THAT IT HAD DIFFERENT

 3    PROPORTIONS THAN BARBIE, BECAUSE OTHERWISE, TRADITIONALLY,

 4    BARBIE WAS SUCH A BIG PORTION OF THE BUSINESS THAT THEY WOULD

 5    USE THE FASHIONS THAT WERE ON BARBIE TO PUT ON OTHER FASHION

 6    DOLLS.  AND WE WANTED TO HAVE SPECIAL FASHIONS THAT OUR DOLLS

 7    WORE.

 8            AND THE OTHER THING THAT WE DIDN'T WANT TO DO IS --

 9    WE WANTED BRATZ TO APPEAL TO GIRLS BETWEEN THE AGES OF 6 TO 11,

10    AND FOR THEM TO LOOK AT IT AS THEIR OLDEST SISTER, RATHER THAN

11    SOMEBODY -- I DON'T KNOW WHAT'S THE WORD THAT YOU WERE USING

12    YESTERDAY -- VOLUPTUOUS OR VAVAVOOM.  I DON'T KNOW WHAT THAT

13    WAS.

14    Q    EITHER ONE OF THEM HAVE BEEN USED.

15            MY QUESTION IS THIS, SIR:  THIS IDEA WITH RESPECT TO

16    THE COMPETITION FOR FASHION DOLLS AND THE PARTICULAR HEIGHT, IS

17    THAT SOMETHING THAT CAME SOLELY FROM CARTER BRYANT, OR WAS THAT

18    AN IDEA THAT YOU HAD ALSO BEEN THINKING ABOUT AND CONSIDERING?

19    A    WE HAD BEEN THINKING ABOUT A PRODUCT THAT WOULD BECOME A

20    FASHION DOLL FOR QUITE A WHILE.

21    Q    YESTERDAY YOU REFERENCED A WOMAN BY THE NAME MS. PANZERA.

22            DO YOU RECALL THAT?

23    A    YES.  MAUREEN.

24    Q    MAUREEN PANZERA?

25    A    YES.
```

6270

```
 1   Q    COULD YOU REMIND THE JURY WHO MAUREEN PANZERA WAS, OR IS.

 2   A    MAUREEN PANZERA IS ANOTHER DESIGNER, AGAIN SIMILAR TO

 3   CARTER BRYANT.

 4            MR. PRICE:  YOUR HONOR, OBJECT ON RELEVANCE.

 5            THE COURT:  COUNSEL?

 6            MR. NOLAN:  YOUR HONOR, IT GOES TO -- IT WAS OPENED

 7   UP IN DIRECT EXAMINATION, AND IT WOULD BE OUR INTENT TO FOLLOW

 8   UP AND SHOW THE ACTUAL PRESENTATION THAT WAS MADE.

 9            THE COURT:  I'M SORRY?  MAUREEN?

10            MR. NOLAN:  MAUREEN PANZERA, P-A-N-Z-E-R-A.

11            THE COURT:  MR. PRICE REFERRED TO HER?

12            MR. NOLAN:  YES.  IT CAME OUT ON DIRECT EXAMINATION.

13            MR. PRICE:  MR. LARIAN SOMETIMES VOLUNTEERS STUFF.  I

14   DIDN'T ASK ABOUT THIS AT ALL.

15            MR. NOLAN:  THE ANSWER WAS NOT STRICKEN, YOUR HONOR.

16            THE COURT:  SUSTAIN THE OBJECTION.

17            LET'S MOVE ALONG.

18            REVISIT THIS IN YOUR RECALL.

19   BY MR. NOLAN:

20   Q    THERE WERE DOCUMENTS SHOWN TO YOU, MR. LARIAN, CONCERNING

21   HONG KONG LITIGATION.

22            DO YOU RECALL THAT?

23   A    I DO.

24   Q    NOW, DID BRATZ FACE A COMPETITIVE THREAT IN HONG KONG

25   THROUGH KNOCKOFFS?
```

THURSDAY, AUGUST 7, 2008                TRIAL DAY 31, MORNING SESSION

```
 1    A    YES.

 2    Q    AND IN CONNECTION WITH TRYING TO ADDRESS THAT BUSINESS

 3    RISK, DID YOU RETAIN LAWYERS?

 4    A    WE DID.

 5    Q    WAS WILLIAM FAN ONE OF THOSE LAWYERS?

 6    A    YES, HE WAS.

 7    Q    AND HE WAS LOCATED IN HONG KONG; CORRECT?

 8    A    STILL IS LOCATED IN HONG KONG.

 9    Q    AND DID YOU HIRE ANYBODY IN THE UK TO ALSO ASSIST YOU?

10    A    YES, WE DID.

11    Q    WHO DID YOU RETAIN THERE?

12    A    RAY BLACK.  I THINK HE'S WITH THE LAW FIRM CALLED

13    SJ BERWIN, OR SOMETHING LIKE THAT.

14    Q    DO YOU HAVE ANY EXPERIENCE IN HONG KONG OR UK LITIGATION?

15    A    I DO NOT.

16         MR. NOLAN:  YOUR HONOR, WE'LL COME BACK TO THE OTHER

17    ISSUES WHEN WE RECALL MR. LARIAN, AND ALSO HAVE AN ABILITY TO

18    MAYBE ADDRESS SOME OF THESE ISSUES AT SIDE-BAR WITH YOU.

19         THE COURT:  VERY WELL.  LET'S TAKE THOSE UP WHEN YOU

20    RECALL HIM.

21         ANYTHING FURTHER FROM MATTEL?

22              REDIRECT EXAMINATION

23    BY MR. PRICE:

24    Q    YOU WERE ASKED ABOUT THESE CASES IN HONG KONG, AND YOU

25    SAID THAT THERE WERE INSTANCES OF PEOPLE THAT WERE KNOCKING OFF
```

1    BRATZ.

2            DO YOU RECALL THAT?

3    A    YES.

4    Q    AND CERTAINLY, YOU WOULDN'T MAKE A CHARGE LIKE THAT

5    LIGHTLY; THAT IS, YOU WOULDN'T SAY SOMEONE IS KNOCKING OFF

6    BRATZ OR MAKING SOMETHING SIMILAR TO BRATZ OR COPYING BRATZ

7    UNLESS YOU HAD INFORMATION THAT WAS ACTUALLY HAPPENING; RIGHT?

8    A    PERSONALLY, ME?

9    Q    EITHER THROUGH YOU OR YOUR AGENTS OR SOMEONE TELLING YOU

10   ABOUT IT AND SHOWING YOU PHOTOGRAPHS; IS THAT RIGHT?

11   A    I THINK OUR HONG KONG OFFICE AND THE HONG KONG LAWYERS IN

12   THAT CASE, IN THE UK, THEY HANDLED IT, YES.  AND I WAS MADE

13   AWARE OF THOSE, THAT'S CORRECT.

14   Q    AND AS I SAID, YOU WOULD NOT MAKE ALLEGATIONS OF COPYING

15   OR REPRODUCING OR KNOCKING OFF LIGHTLY; YOU WOULD WANT TO MAKE

16   SURE THERE WAS SOMETHING TO SUPPORT IT; RIGHT?

17   A    YES.

18   Q    BY THE WAY, HOW MANY HONG KONG AND UK CASES WERE THERE

19   THAT WERE FILED?

20   A    I KNOW OF ONE IN THE UK.  I DON'T KNOW OF ALL OF THE ONES

21   IN HONG KONG.  MORE THAN THREE OR FOUR.

22   Q    IN ANY OF THOSE CASES, OR IN ANY CASE THAT YOU'RE AWARE

23   OF, HAS MGA EVER CONTENDED THAT THE CARTER BRYANT DESIGNS ARE

24   NOT PROTECTABLE BY COPYRIGHT?

25           **MR. NOLAN:**  OBJECTION.

```
 1              UNDER WHAT JURISDICTION, YOUR HONOR?

 2         MR. PRICE:  ANY JURISDICTION.

 3         MR. NOLAN:  LACK OF FOUNDATION.

 4         THE COURT:  REPHRASE, COUNSEL.

 5  BY MR. PRICE:

 6  Q   HAS MGA EVER TAKEN THE POSITION IN ANY COURT, OTHER THAN

 7  THIS CASE, THAT THE CARTER BRYANT DRAWINGS AREN'T PROTECTABLE

 8  BY COPYRIGHT?

 9         MR. NOLAN:  OBJECTION.  ALSO CALLS FOR A LEGAL

10  CONCLUSION; AND 403.

11         THE COURT:  SUSTAINED.

12  BY MR. PRICE:

13  Q   ARE YOU AWARE OF MGA, IN ANY COURT, TAKING THE POSITION

14  THAT THE CARTER BRYANT DRAWINGS ARE NOT PROTECTABLE IN ANY

15  RESPECT?  ARE YOU AWARE OF MGA EVER TAKING THAT POSITION?

16         I'M NOT ASKING FOR YOUR LEGAL OPINION, BUT WHETHER

17  YOU'RE AWARE WHETHER MGA HAS EVER TAKEN THAT POSITION.

18         MR. NOLAN:  YOUR HONOR, LACK OF FOUNDATION.  ALSO

19  403.  CALLS FOR A LEGAL CONCLUSION.

20         THE COURT:  LIMIT THAT, COUNSEL, TO AMERICAN COURTS.

21  BY MR. PRICE:

22  Q   YOU'VE FILED CASES IN AMERICAN COURTS FOR KNOCKOFFS;

23  CORRECT?

24  A   I THINK WE HAVE, YES.

25  Q   HOW MANY CASES HAVE YOU FILED IN AMERICAN COURTS?
```

```
1    A    I CAN JUST RECALL ONE IN LOS ANGELES AGAINST A COMPANY

2    CALLED MULTITOY.  THAT'S THE ONE I CAN RECALL.

3    Q    AND IN THAT CASE, DO YOU KNOW WHETHER MGA EVER TOOK THE

4    POSITION THAT CARTER BRYANT'S DRAWINGS WEREN'T PROTECTED BY

5    COPYRIGHT?

6    A    I DON'T KNOW.  I'M NOT A LAWYER.  I JUST HAND THIS OVER TO

7    THE LAWYERS TO HANDLE.

8    Q    BY THE WAY, TALKING ABOUT NOT BEING A LAWYER, YOU WERE

9    ASKED QUESTIONS BY MR. NOLAN ABOUT THE FINANCIAL SITUATION OF

10   MGA AND BRATZ SINCE YOUR LAST AUDITED FINANCIAL STATEMENT OF

11   2006.

12            DO YOU RECALL THOSE QUESTIONS?

13   A    YES.

14   Q    AND DO YOU RECALL I WAS ASKING YOU QUESTIONS ABOUT THE

15   AUDITED FINANCIAL STATEMENTS, AND YOU SAID THAT YOU WERE A

16   CREATIVE GUY, NOT REALLY A FINANCIAL GUY; IS THAT RIGHT?

17   A    NO.  YOUR QUESTION WAS DIFFERENT.  YOU WERE ASKING ME

18   ABOUT AUDITED FINANCIAL STATEMENTS.  MR. NOLAN WAS ASKING ME

19   QUESTIONS ABOUT THE FINANCIAL STATUS AND SALES AND

20   PROFITABILITY OF BRATZ.  I DO FOLLOW AND MONITOR THE SALES AND

21   PROFITABILITY AND CREATIVITY OF BRATZ ON A REGULAR, ALMOST

22   DAILY, BASIS.  I DO NOT MONITOR THE WHOLE COMPANY -- OVERALL

23   FINANCES OF THE COMPANY.  SO THEY WERE TWO DIFFERENT QUESTIONS,

24   MR. PRICE.

25   Q    WHEN YOU WERE TELLING THE JURY ABOUT THE INDUSTRY
```

1   TRENDS -- WHEN DID YOU BECOME AWARE OF THOSE TRENDS?  ABOUT

2   WHAT TIME FRAME?

3   A    I'M SORRY?

4   Q    YOU WERE TALKING ABOUT THE TRENDS AND THE REASONS FOR

5   TRENDS.

6           WHEN DID YOU FIRST FIGURE THAT OUT AND BECOME AWARE

7   OF THAT?

8   A    SINCE WE BECAME A FORCE IN THE TOY BUSINESS, SOMETIME

9   SINCE 1993.  WE TALKED ABOUT IT YESTERDAY, THAT THERE IS A

10  SERVICE THAT WE USE CALLED THRIFT TOY DATA SALES DATA, THAT

11  SHOWS THE MARKET SHARE OF SALES OF DIFFERENT BRANDS, DIFFERENT

12  PRODUCTS.  WE HAVE BEEN A SUBSCRIBER TO -- AND THE NAME OF THE

13  COMPANY WHO SELLS THAT -- IT'S CALLED NPD.  AND WE HAVE BEEN A

14  SUBSCRIBER TO THAT SERVICE FOR MANY, MANY YEARS, MORE THAN 10,

15  15 YEARS.  THAT'S ONE OF THE WAYS THAT I MONITORED THE TREND.

16  Q    MY QUESTION WASN'T CLEAR.  I APOLOGIZE.

17          YOU GAVE SPECIFIC CONCLUSIONS TO THE JURY ABOUT THE

18  MARKET DOWNTURNING, ABOUT FASHION DOLLS NOT HAVING AS MUCH

19  IMPACT IN THE MARKET.

20          MY QUESTION IS, CAN YOU GIVE ME A TIME FRAME WHEN YOU

21  FIRST CAME TO THAT CONCLUSION?

22  A    WELL, AGAIN, I HAVE BEEN MONITORING THE TOY BUSINESS, THE

23  FASHION DOLL, FOR MANY YEARS.  FOR EXAMPLE, IN --

24          **MR. PRICE:**  MOVE TO STRIKE AS NONRESPONSIVE.

25          **THE COURT:**  THE FIRST PART WAS.

**BY MR. PRICE:**

Q    I'M NOT ASKING ABOUT 2000.  I JUST WANT A DATE.  YOU TOLD HIM YOU CAME TO THESE CONCLUSIONS ABOUT THERE'S REASONS WHY THE FASHION MARKET IS DECREASING.

DO YOU HAVE A DATE WHERE YOU FIRST FIGURED THAT OUT? 2004?  2005?

A    EVERY YEAR I'VE BEEN MONITORING IT.  SINCE 2001, BARBIE HAD OVER 90 PERCENT MARKET SHARE; SO I MONITORED THAT IN 2001. AND I MONITORED IT EVER SINCE.  BARBIE HAD THE MONOPOLY.

**MR. PRICE:**  YOUR HONOR, MOVE TO STRIKE.

**THE COURT:**  IT'S STRICKEN.

**BY MR. PRICE:**

Q    MR. LARIAN, YOU TOLD THE JURY THAT THE FASHION DOLL MARKET WAS DECREASING BECAUSE OF HANNAH MONTANA, BECAUSE OF ALL OF THESE THINGS.  I'M TRYING TO FIND OUT WHEN YOU FIGURED THAT OUT.  JUST GIVE ME DATE.

A    I'M TRYING TO GIVE YOU -- THAT HANNAH MONTANA, IT SPECIFICALLY STARTED --

Q    MR. NOLAN ASKED YOU ABOUT THESE FACTORS, AND YOU SAID YOU FIGURED OUT A BUNCH OF FACTORS THAT RESULTED IN MGA NOT MAKING AS MUCH AS IT HAD.  I'M TRYING TO ASK WHEN YOU FIGURED THAT OUT.

A    MR. NOLAN, TO THE BEST OF MY RECOLLECTION, ASKED IN 2007 WHAT WERE THE REASONS FOR THE DECLINE IN BRATZ, IF I UNDERSTOOD HIS QUESTIONS CORRECTLY.  AND MY ANSWER WAS, IN 2007 OTHER

1    COMPETITIVE PRODUCTS BECAME SUCCESSFUL IN THE U.S.A. THAT TOOK

2    AWAY FROM BRATZ.  HANNAH MONTANA DOLL WAS ONE.  HIGH SCHOOL

3    MUSICAL WAS ANOTHER ONE.  WEBKINZ, WHO --

4         **MR. PRICE:**  YOUR HONOR, BEYOND THE SCOPE OF THE

5    QUESTION, WHICH WAS A DATE.

6         **THE COURT:**  LISTEN CAREFULLY TO THE QUESTION.  LET'S

7    NOT ADD ADDITIONAL INFORMATION.

8         **THE WITNESS:**  I THINK I DID SAY 2007.

9         **THE COURT:**  THANK YOU.

10   **BY MR. PRICE:**

11   Q    NOW THAT WE'VE GOT THE DATE, I'D LIKE YOU TO LOOK AT

12   EXHIBIT 4947.

13   A    YES.

14   Q    AND IF WE TURN TO THE LAST PAGE OF THIS, 4947, PAGE 4,

15   THIS WAS INFORMATION THAT WAS CREATED ON OCTOBER 25TH OF 2007;

16   CORRECT?

17   A    THAT'S THE DATE OF THAT DOCUMENT, YES.

18   Q    AND THIS WAS CREATED BY SOMEONE AT MGA AT YOUR REQUEST SO

19   MGA COULD RESPOND TO MATTEL AND GIVE US ALL DOCUMENTS RELATING

20   TO YOUR NET WORTH; CORRECT?

21   A    I KNOW THAT AT MY DEPOSITION, MR. ZELLER ASKED ME THAT

22   QUESTION.  I THOUGHT THAT WAS PREPARED IN REGARDS TO THIS

23   LITIGATION.  I SUBSEQUENTLY FOUND OUT THAT WAS NOT THE CASE,

24   AND I ALSO SUBSEQUENTLY FOUND OUT THAT SOME OF THIS INFORMATION

25   IN THIS PAPER IS INACCURATE AND RELATES BACK TO YEARS BEFORE.

1  Q    IN ANY EVENT, THIS WAS WHAT WAS PRODUCED BY MGA IN

2  RESPONSE TO THAT REQUEST FOR INFORMATION CONCERNING YOUR NET

3  WORTH; CORRECT?

4  A    TO THE BEST OF MY RECOLLECTION, YES.

5  Q    AND ON THIS DATE, OCTOBER 25, 2007 -- AND THIS IS FAR

6  ALONG INTO 2007 THAT YOU HAD NOTICED TRENDS AND WHAT WAS

7  HAPPENING WITH THE MARKET; CORRECT?

8  A    YES.

9  Q    SO AS OF THIS DATE, WHAT YOU GAVE TO MATTEL, IN JANUARY OF

10  2008, WAS THIS FIGURE HERE OF A NET WORTH OF $1.9 BILLION AND

11  THE VALUE OF MGA ENTERTAINMENT, YOUR PORTION, OF $1.6 BILLION;

12  CORRECT?

13           **MR. NOLAN:**  OBJECTION.  AND ALSO THE CHARACTERIZATION

14  THAT THIS WAS PREPARED FOR PURPOSES OF THIS LITIGATION.

15           **THE COURT:**  REPHRASE YOUR QUESTION.

16           **MR. NOLAN:**  IT'S ARGUMENTATIVE AND IT'S LACK OF

17  FOUNDATION.

18  **BY MR. PRICE:**

19  Q    WHAT WAS GIVEN TO MATTEL IN RESPONSE TO A REQUEST FOR

20  DOCUMENTS CONCERNING YOUR NET WORTH IN JANUARY OF 2008 WAS THIS

21  DOCUMENT, CORRECT, WHICH LISTED MGA'S VALUE -- YOUR PERCENTAGE

22  AS $1.6 BILLION AND YOUR NET ASSETS AS $1.9 BILLION?  THAT'S

23  WHAT YOU GAVE US; RIGHT?

24  A    YES.  AND I SAID THAT FIGURE IS A MISTAKE.

25           MAY I EXPLAIN?

1    Q    YOU WANT TO EXPLAIN SOMETHING NOW AS TO WHY THIS IS

2    INACCURATE.

3         HAVE YOU EXPLAINED TO MATTEL PRIOR TO 10:25 A.M. THIS

4    DATE WHY THE DOCUMENT YOU GAVE US, WHICH REFLECTED YOUR NET

5    WORTH, IS NOT ACCURATE?

6    A    I BELIEVE OUR ATTORNEYS HAVE; AND YOU KNOW ABOUT IT.

7    Q    SIR, I'M TALKING ABOUT EVENTS OCCURRING PRIOR TO THE START

8    OF THIS TRIAL -- LET ME ASK YOU, YOU'RE SAYING THAT THIS IS NOT

9    ACCURATE AS OF OCTOBER 25, 2007; RIGHT?

10   A    I'M SAYING THAT DOCUMENT, THAT VALUE OF MGA ENTERTAINMENT,

11   INC., AS OF 2007, IS INACCURATE.

12        AND IF YOU WANT THE JURY TO KNOW WHY, I WILL BE HAPPY

13   TO EXPLAIN IT.

14   Q    LET ME GIVE YOU A PRECISE QUESTION.

15        PRIOR TO RIGHT NOW, HAVE YOU EVER GIVEN ANY

16   EXPLANATION AS TO WHY, AS OF OCTOBER 25, 2007, THE DOCUMENT YOU

17   PREPARED, OR WAS PREPARED AT MGA, IS NOT ACCURATE?

18   A    I BELIEVE AUDITOR GAVE YOU FULL EXPLANATION AND

19   DOCUMENTATION WHY THAT THING IS NOT ACCURATE.  AND THOSE

20   HAPPENED WAY PRIOR TO 10:25 OR 10:30 TODAY.

21   Q    I'M SAYING NOT ACCURATE AS OF OCTOBER 25, 2007, NOT

22   CHANGES SINCE THEN.

23        I'M SAYING, HAVE YOU EVER, IN WRITING OR UNDER OATH

24   OR IN A PAPER, SAID ANYTHING AS TO WHY THIS NUMBER, AS OF THIS

25   DATE, WAS NOT ACCURATE?

```
 1   A    BESIDES WHAT I TESTIFIED, I CANNOT ADD ANYTHING MORE.

 2   AND, AGAIN, I WOULD LIKE TO GIVE AN EXPLANATION SO THE JURY

 3   KNOWS THE FACTS.

 4   Q    AND MR. NOLAN CAN ASK YOU, AND I CAN EXAMINE YOU ON THAT.

 5          THE COURT:  MR. PRICE, WE'RE GOING TO TAKE A BREAK

 6   HERE FOR THE COURT REPORTER.

 7              (BRIEF RECESS TAKEN.)

 8              (WHEREUPON, JURORS ENTER COURTROOM.)

 9          THE COURT:  COUNSEL, YOU MAY CONTINUE.

10          MR. PRICE:  I'VE RUN OUT OF TIME, SO YOU CAN HIT

11   MGA'S SIDE NOW.

12          THE COURT:  MR. NOLAN.

13          MR. NOLAN:  THANK YOU.

14                    RECROSS-EXAMINATION

15   BY MR. NOLAN:

16   Q    JUST VERY BRIEFLY, MR. LARIAN.

17          THE LIST OF ASSETS, NET WORTH, THAT MR. PRICE WAS

18   ASKING YOU ABOUT, DO YOU BELIEVE THAT IS AN ACCURATE REFLECTION

19   OF YOUR NET WORTH AS OF TODAY?

20   A    IT IS NOT.

21          MR. NOLAN:  THANK YOU.  NOTHING FURTHER.

22          THE COURT:  ANYTHING FURTHER?

23          MR. PRICE:  NO.

24          THE COURT:  YOU MAY STEP DOWN.

25              PLAINTIFF'S NEXT WITNESS?
```

```
 1    IS, AS COMMONLY UNDERSTOOD.  MGA MAY INTRODUCE EVIDENCE TO

 2    CONTRADICT THAT.  BUT I THINK ON BOTH THOSE POINTS, ON

 3    "REPRODUCTION" AND "ANTECEDENT," WE HAVE SIMPLE DEFINITIONS FOR

 4    THE JURY.  IF THERE'S ANY CONCERN THAT THOSE DEFINITIONS ARE

 5    INADEQUATE, BOTH SIDES ARE AFFORDED LEAVE TO SUPPLEMENT THE

 6    EVIDENCE IN THE RECORD.

 7              MR. QUINN:  YOUR HONOR, I WILL SAY THAT I THINK WE

 8    DID TRY TO AVOID USE OF THE WORD "INFRINGEMENT," BUT IT WAS

 9    MENTIONED A COUPLE OF TIMES BY BOTH --

10              THE COURT:  IT WAS.  AND THERE WAS NO OBJECTION BY

11    EITHER SIDE.

12              MR. QUINN:  AND, ALSO, MR. HANSEN ELICITED TESTIMONY

13    REGARDING INFRINGEMENT.

14              THE COURT:  HE DID.  BOTH SIDES DID THAT, AND THERE

15    WAS NO OBJECTION.  I'M NOT GOING TO START MAKING SUA SPONTE

16    OBJECTIONS AT THIS POINT.  I TRUST THAT BOTH SIDES ARE MORE

17    THAN CAPABLE OF DOING THAT ON THEIR OWN.

18              IS THERE ANYTHING FURTHER ON ANY OF THESE POINTS?

19              ALL RIGHT.  THE MOTION FOR SANCTIONS IS DENIED.

20              I'LL SEE YOU AT 1:30.

21

22

23    /  /  /

24    /  /  /

25                        CERTIFICATE
```

Exhibit D - Page 1188

6350

1

2  I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
3  THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
4  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
THE UNITED STATES.

5

6                                                    8-9-08

7  THERESA A. LANZA, CSR, RPR                        DATE
FEDERAL OFFICIAL COURT REPORTER

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

THURSDAY, AUGUST 7, 2008                TRIAL DAY 31, MORNING SESSION

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                         EASTERN DIVISION

4                            - - -

5           HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                            - - -

7   MATTEL, INC.,                )
                                 )
8                    Plaintiff,  )
                                 )
9            vs.                 )   No. CV 04-09049
                                 )
10  MGA ENTERTAINMENT, inc., et. Al.,  )   Trial Day 36
                                 )   MORNING session
11                   Defendants. )   Pages 7548-7627
                                 )
12  AND CONSOLIDATED ACTIONS,    )
    _____)

13

14

15        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                    RIVERSIDE, CALIFORNIA

17                  FRIDAY, AUGUST 15, 2008

18                        8:36 A.M.

19

20

21

22

23                THERESA A. LANZA, RPR, CSR
                  Federal Official Court Reporter
24                  3470 12th Street, Rm. 134
                  RIVERSIDE, CALIFORNIA  92501
25                      951-274-0844
                    WWW.THERESALANZA.COM

CERTIFIED COPY

7581

1          THE CLERK:  Mr. Larian, please be advised that you're

2     still under oath.

3          THE COURT:  You may proceed.

4                    DIRECT EXAMINATION

5     BY MR. NOLAN:

6     Q     Good morning, Mr. Larian.  I want to turn to a document

7     that Mr. Price showed you.

8          Could you turn to 13520; that is the business plan.

9          MR. NOLAN:  This is in evidence, Your Honor.

10         THE COURT:  Very well.  Yes, it is.

11    BY MR. NOLAN:

12    Q     Mr. Larian, I'd like to direct your attention to

13    Exhibit 13520.

14         First of all, do you see the date, March 2001?

15    A     I do.

16    Q     And this is "Business plan, copy number one"; correct?

17    A     Correct.

18    Q     And it's for MGA?

19    A     Yes.  ABC International, which was MGA.

20    Q     Now, Mr. Price asked you whether or not this business plan

21    had been prepared before you even sold the Bratz doll to the

22    public.

23         Do you recall that?

24    A     I do.

25    Q     I want to ask you a different question.

7582

1    By March of 2001, had you presented prototypes of

2 dolls to retailers?

3 A    Yes.

4 Q    Had you presented prototypes of the 3-D rendition of the

5 3-D dolls at toy fairs?

6 A    Yes, we did.

7 Q    All by March of 2001?

8 A    Sorry?

9 Q    All before March of 2001?

10 A    Yes.

11 Q    Could you tell the jury which toy shows you had already

12 presented the prototype doll to.

13 A    We first showed it in January of 2001 in Hong Kong; then

14 in February 2001, in New York.  And also our distributor told

15 me he showed that in Tokyo toy show in February.  I don't

16 remember the exact date.

17 Q    By March of 2001, had you already met with retailers?

18 A    Yes, we had.

19 Q    Let me ask you, does MGA sell Bratz dolls directly to the

20 public?

21 A    At what time?  Now?

22 Q    Yes.

23 A    Now we do so, yes.

24 Q    But in 2001, did you?

25 A    We did not.

Exhibit D - Page 1192

```
 1   Q     Were you selling any out of the back of your offices?

 2   A     I'm sorry?

 3   Q     Were you selling Bratz to the public outside of the

 4   offices of MGA?

 5   A     We were only selling it to retailers and distributors in

 6   other countries.

 7   Q     By March of 2001, had you already received orders from

 8   retailers?

 9   A     Yes, we had.

10   Q     I'm going to ask you to turn to Page 14 of the business

11   plan, market analysis.

12              Do you see that, sir?

13   A     Yes.

14   Q     I want to read the first sentence to you:  "The target

15   audience for the Bratz are tween girls from 7 to 11 years old."

16              Do you see that?

17   A     I do.

18   Q     Was that Carter Bryant's idea?

19   A     No, it was not.

20   Q     Whose idea was that?

21   A     MGA Entertainment.

22   Q     It goes on to say, "Tweens consist of three markets in

23   one:  The primary market, spending money on their own wants and

24   needs; the influence market, directing the spending of the

25   parents' money on their wants and needs; and the future market,
```

1    for all goods and services who have all of their purchases

2    ahead of them.  All three markets combined, tweens have more

3    market potential than any other demographic group."

4              Did I read that right?

5    A    Yes, you did.

6    Q    Sir, did you ever discuss with Carter Bryant the potential

7    of these three primary market opportunities available for a

8    doll?

9    A    No.

10   Q    Prior to meeting Carter Bryant, had you identified any

11   business opportunities in the fashion doll industry as

12   presenting an opportunity for a new doll entrant?

13   A    Yes.

14   Q    And how did you go about doing that, sir?

15   A    By, frankly, looking at my own family; my daughter

16   Jasmine, who at the time was about 11, and her friends; looking

17   at information available publicly.  Girls and kids were more

18   and more on the computer at that age, 7 to 11.  They did not

19   want to play with the ordinary fashion dolls that were out at

20   that time.

21   Q    I want to turn to Page 15 for a moment and look at

22   "strengths."

23             It says, "In terms of product strength, Bratz" -- and

24   it has a TM on that.

25             What does that stand for?

1          **MR. PRICE:**  Objection.  Irrelevant, Your Honor.

2          **MR. NOLAN:**  I'll withdraw the question.

3          **THE COURT:**  Very well.

4    BY MR. NOLAN:

5    Q    "In terms of product strength, Bratz has several distinct

6    advantages over the competition."

7          First of all, when you're referring to Bratz, are you

8    referring to the doll or the drawings?

9    A    We were referring to the trademark, the brand.

10         **MR. PRICE:**  Move to strike "trademark."  It's

11   irrelevant.

12         **THE COURT:**  Sustained.

13         "Trademark" is stricken, but "brand" is not stricken.

14   BY MR. NOLAN:

15   Q    Were you referring to the 2-D drawings?

16   A    No, we were not.

17   Q    "First, it is marketed advancement in the physical

18   appearance of the dolls."

19         Do you see that?

20   A    Yes.

21   Q    Then it goes on, "The Bratz are unique in many ways.

22   Their eyes are big, with a hint of anime style.  Their lips are

23   more pronounced.  Their feet and heads are oversized."

24         Did I read that correctly?

25   A    You did.

1    Q     Was Bratz the first doll that you had ever seen that had

2    big eyes with a hint of anime style, lips that were more

3    pronounced, and feet and heads that were oversized?

4              MR. PRICE:  Objection.  Irrelevant.

5              MR. NOLAN:  We can have a quick side-bar, if

6    necessary.

7              THE COURT:  You can impeach your own witness.

8              You're calling into question what was stated there;

9    correct?

10             MR. NOLAN:  Not at all, Your Honor.

11             THE COURT:  Well, then, I need to have a side-bar.

12             MR. NOLAN:  Okay.

13             (Whereupon, the following proceedings were held at

14   side-bar:)

15             THE COURT:  Maybe I misunderstood, because Mr. Larian

16   indicated that these are unique elements.  "Unique" meaning

17   unique.

18             MR. NOLAN:  Right.  To the doll.  I was then going to

19   go back and ask him whether or not he believed --

20             THE COURT:  Oh, okay.  I thought you were then going

21   to get him to say, No, that's not a true statement; they are

22   not unique.

23             You can impeach your own witness, but if that's not

24   what you're doing --

25             MR. NOLAN:  I'm not.  But I --

1          Respectfully -- and this is the first time I've ever

2   done it -- I thought the Court's comment about impeaching my

3   own witness in front of the jury was prejudicial.

4          I was not in any way attempting to try to impeach my

5   own witness.

6          **THE COURT:**  I completely misunderstood what you were

7   doing.  There's a statement that he previously testified to

8   that they were unique, and when you said "you've seen it

9   before" suggested that they are not unique.  That's fine to do.

10         And I mean "impeachment" in the legal sense.

11         I'll make it clear to the jury.

12         **MR. NOLAN:**  I appreciate that.  Thank you.

13         **THE COURT:**  I'll make it abundantly clear to the

14  jury.

15         **MR. NOLAN:**  I'm worried about the impression.

16         **THE COURT:**  Right.  Very well.

17         But then I'm going to sustain the objection.  You

18  have to rephrase the question.  I'll make it clear that you

19  were not --

20         **MR. PRICE:**  After the next question, I think, in

21  effect, that he's trying to get Mr. Larian to say there were

22  other dolls out there with these features, which then he begins

23  to do --

24         **MR. NOLAN:**  No.  Let's not anticipate where I'm

25  going.

```
 1                (Whereupon, side-bar proceedings were concluded.)

 2          THE COURT:  Just to be clear to the jury, the jury

 3    should disregard, obviously, any comments that counsel or the

 4    Court makes when we're having our discussions.  The impeachment

 5    reference was a misinterpretation of Mr. Nolan's last question.

 6    Completely disregard that exchange.

 7          Counsel, you may proceed.

 8          MR. NOLAN:  Thank you, Your Honor.

 9          Let me rephrase.

10    BY MR. NOLAN:

11    Q    Mr. Larian, in the sentence that you say "The Bratz are

12    unique in many ways.  Their eyes are big with the hint of anime

13    style.  Their lips are more pronounced.  Their feet and heads

14    are oversized" -- do you see that?

15    A    Yeah.

16    Q    You were referring to the dolls?

17    A    I'm sorry?

18    Q    Were you referring to the Bratz dolls?

19    A    Yes.

20    Q    Were you referring to Carter Bryant's drawings?

21    A    No.

22    Q    As the CEO of MGA, did you have an understanding as to

23    whether or not differences were made and imputed into the doll

24    that did not exist in the drawings?

25    A    Yes.  Many.
```

1    Q    If you look for a moment under "strengths," do you see

2    anywhere a mention that Carter Bryant's drawings were the

3    driving force of the Bratz doll?

4    A    I do not.

5    Q    Did you believe, sir, when you saw Carter Bryant's

6    drawings, the concept drawings, that those drawings were

7    appropriate for the tween market?

8    A    The way they were drawn by itself, they were not.  We had

9    to make many changes to them.

10   Q    I want to look at Page 17 for a moment, under "elements of

11   risk."

12        Sir, there's been a lot of references to your early

13   enthusiasm about the Bratz dolls.

14        Do you remember that testimony?

15   A    Yes.

16   Q    And your projections of making millions of dollars?

17   A    Yes.

18   Q    Millions of sales?

19   A    And sales, yes.

20   Q    Even in the first year?

21   A    Yes.

22   Q    Even though you had never achieved those kind of sales on

23   any other product that you had ever made?

24   A    To the best of my recollection, we had not.

25   Q    But you still --

7590

1    A    You know what?  I'm sorry.  I think we had made those kind

2    of sales on other products.

3    Q    In any event, Mr. Larian, did you understand that there

4    were risks in introducing Bratz into the marketplace?

5    A    Yes.  Absolutely.

6    Q    I want to turn to Page 17.  It says, "Since the initial

7    introduction of ABC International Traders, Inc., into the

8    fashion doll market, ABC runs the risk of failure from trade

9    acceptance by retailers."

10            Do you see that?

11   A    I do.

12   Q    And it says, "This is being overcome already by the orders

13   placed from the top five major retailers."

14            Correct.

15   A    I do.

16   Q    And then on Page 18, you start talking about the marketing

17   plan.

18            Do you see that?

19   A    Yes, I do.

20   Q    And then you talk about sales strategy.

21   A    Yes.

22   Q    And I see here under "sales strategy," there's some bullet

23   points.  It says, "The Bratz should be treated as a long-term

24   brand with future line extensions."

25   A    Yes, I do see that.

```
 1   Q    Was there a reason why, in March of 2001, you were already

 2   thinking about line extensions for the next year?

 3   A    We wanted to build Bratz as a brand, and in order to do

 4   that, you had to do many steps; one of them was to build line

 5   extensions just for dolls.

 6   Q    And then under "sales strategy," there's bullets point of

 7   "securing end caps," "free-standing inserts, "floor minders,"

 8   "point-of-purchase displays."

 9        Do you see that?

10   A    Yes.

11   Q    And then you have "positioning."

12        You're talking about positioning there; is that

13   correct?

14   A    Yes.

15   Q    Then on Page 19, you talk about direct sales.  And I want

16   to go to the third paragraph there.

17        It says, "We have chosen to use a direct sales force

18   because our products require considerable customer education

19   and post-sales support directly from the company.  Our

20   price-point pricing structure and profits are such that our

21   costs of sales warrants person-to-person selling strategy."

22        Do you see that?

23   A    I do.

24   Q    Mr. Larian, why was it necessary to engage in all of this

25   to try to sell Bratz?
```

1    A    We used to have what we call manufacturer reps, who go and

2    sell to customers, many, many products.  And since we wanted to

3    build this brand, we believed that we should have our own sales

4    force, rather than having a manufacturer rep sales force, to go

5    to retailers to explain why it's important for them to buy the

6    product, what are we going to do with it, what kind of

7    advertising we're going to send, et cetera.

8    Q    I want to go back to Page 15 for just a moment, under

9    "strengths."  It says here in the last paragraph, "The

10   Bratz will be offered to retailers at a price point close to

11   that of Barbie's.  ABC is confident that girls will purchase

12   the Bratz over Barbie because they are not defined by race or

13   ethnicity.  This was a conscious decision, so the consumer can

14   choose the doll that reflects their own fashion, style, or

15   appearance."

16   A    Yes.

17   Q    Whose idea was it to make Bratz dolls not defined by race

18   or ethnicity?

19   A    It was MGA's, because we didn't want to have divisions.

20   We didn't want somebody to say, This is an African-American

21   doll, or this is a Brazilian doll, or have any religious or any

22   race attached to it.  It was a conscious decision that we made

23   as a company.

24   Q    Did Carter Bryant come up with that idea?

25   A    He did not.

7593

1    Q    Was that decision based on your own experiences in

2    America?

3    A    America; and where I came from, yes.

4    Q    Yesterday, we had a branding expert testify.

5         Were you here then?

6    A    I was.

7    Q    Mr. Larian, did you attend Harvard University?

8    A    I'm sorry.

9    Q    Did you attend Harvard University?

10   A    I have not.

11   Q    Do you have a degree in branding?

12   A    I do not.

13   Q    Has Bratz won awards for branding?

14   A    Yes, it has.

15        **MR. PRICE:**  Objection.  Irrelevant.

16        **THE COURT:**  It's already been covered.

17        Oh, for branding?

18        **MR. NOLAN:**  Yes.

19        **THE COURT:**  Overruled.

20        **MR. NOLAN:**  Thank you.

21        May I approach?

22        **THE COURT:**  You may.

23   **BY MR. NOLAN:**

24   Q    Mr. Larian, I've placed in front of you a large book.

25        Do you recognize that book?

Friday, August 15, 2008                    Trial Day 36, Morning Session

Exhibit D, Page 1203

```
1    A     I do.

2    Q     What is it?

3    A      This is a publication called Superbrands, 10th Anniversary

4    Edition.  This is a publication that looks at brands worldwide

5    and what is their essence and how they were built, and they

6    identify them as Superbrands.  And we got the -- we won the --

7    this is the year.  For year 2005, we were on the cover of the

8    Superbrand.

9              MR. NOLAN:  Your Honor, we'd offer Exhibit 18819 into

10   evidence.

11             MR. PRICE:  Objection.  First, it's irrelevant.

12   Second, I've only seen the first cover page.  That's all I

13   have.

14             THE COURT:  Counsel, what portion of this do you want

15   to introduce?

16             MR. NOLAN:  The cover, as well as the page on Bratz,

17   as well as the back cover, which shows the listing of just the

18   names of the other brands.

19             THE COURT:  What is the page on Bratz?

20             MR. NOLAN:  Page 34 through 35, Your Honor.

21             And I can respond to one of the objections at

22   side-bar, if necessary.

23             THE COURT:  Let's do that.

24             (Whereupon, the following proceedings

25             Were held at side-bar:)
```

Friday, August 15, 2008                    Trial Day 36, Morning Session

1          **THE COURT:**  The cover, the back cover, and these two

2    pages?

3          **MR. NOLAN:**  Yes.

4          **THE COURT:**  The concern I have -- I'm just reading

5    this for first time -- but there's information that is going to

6    be problematic.

7          I agree with you that, I mean, winning the award

8    shows strength of the brand or the importance of -- it's

9    relevant, I think.  But I'm concerned --

10         **MR. NOLAN:**  How about just the front and the back

11   covers?

12         **THE COURT:**  That may be the easiest thing to do.

13         Is it 7 to 12 years old?  You've taken the position

14   it's 8 to 12; they have taken the position that it's 6 to 12;

15   and then --

16         **MR. NOLAN:**  It's sometimes defined a little

17   differently.

18         **THE COURT:**  I have to give a jury instruction on

19   this.

20         **MR. NOLAN:**  I think the range is 6 to 12.

21         **THE COURT:**  You're saying 8 to 12.

22         **MR. PRICE:**  Their instruction said --

23         **THE COURT:**  I thought it was the other way.

24         **MR. NOLAN:**  It changes.  I'll go back to the jury

25   instruction.

7596

1    **THE COURT:**  In your substantial similarity

2    instruction, one side said -- I see this is 7 to 12.

3    **MR. PRICE:**  The document just used said 7 to 11.

4    **THE COURT:**  It's a minor point.

5    **MR. PRICE:**  My objection is, one, I don't know if

6    this is an award or if it's just articles about a strong brand,

7    "Britain's strongest brand, 2005."  It seems to be of minimal

8    relevance, talking about "Britain's strongest brand," because

9    it sounds like it's an award.  And I've never even seen the

10   book.

11   **MR. NOLAN:**  Your Honor, this book was made --

12   **THE COURT:**  "Superbrand investigates over 90 of the

13   strongest brands to establish how they managed to achieve such

14   phenomenal success."

15   I mean, it is what it is.

16   **MR. NOLAN:**  Mr. Price may not have seen it.  It was

17   available to Mattel.  I'll represent to you that they took

18   pictures of it --

19   **MR. PRICE:**  This is what I got today in my exhibit

20   book.  We're supposed to be given exhibits.

21   **THE COURT:**  The front and back cover can come in.

22   That's fine.

23   **MR. NOLAN:**  Thank you.

24   (Whereupon, side-bar proceedings were concluded.)

25   **MR. NOLAN:**  Your Honor, we'd offer Exhibit 18819, the

```
 1    front and back cover.

 2              THE COURT:  Very well.

 3              It's in evidence.

 4              (Exhibit 18819 received.)

 5              MR. NOLAN:  Let's put that on the screen.

 6    BY MR. NOLAN:

 7    Q    Mr. Larian, are those Carter Bryant's concept drawings?

 8              MR. PRICE:  I object.  This on the screen doesn't

 9    show the entire cover.  You can't read --

10              THE COURT:  What's the objection?

11              MR. PRICE:  The picture doesn't show everything on

12    the cover, so I object to that display.

13              THE COURT:  Can we enhance that at all?

14              MR. NOLAN:  I think it's just a reproduction copy.  I

15    apologize for the poor quality.

16              THE COURT:  Let's proceed, Counsel.

17              MR. NOLAN:  Thank you.

18    BY MR. NOLAN:

19    Q    I want to turn to the name Bratz.

20    A    I don't think I answered your last question.

21    Q    Were Carter Bryant's concept drawings on the cover?

22    A    These are not Carter Bryant's concept drawings.

23    Q    Mr. Larian, I want to turn to the name Bratz.

24              You understand that the jury has found that Carter

25    Bryant conceived of the idea of Bratz while employed at Mattel?
```

1   Do you understand that?

2   A    Yes.

3   Q    Mr. Larian, at some point in time, were you sued for the

4   use of the name *Bratz*?

5            MR. PRICE:  Objection.  Relevance; move to strike.

6            THE COURT:  What does this go to, Counsel?

7            MR. NOLAN:  It goes to intentional acts, conduct.

8            THE COURT:  You're asking if --

9            MR. NOLAN:  And in the ultimate acquisition of the

10   name rights.

11            THE COURT:  Let's lay a foundation for that.  I'm

12   going to sustain it for the time being.

13            MR. NOLAN:  Lay a foundation, you said?

14            THE COURT:  Yes.  I guess I'm not seeing how this

15   goes to -- I'm going to sustain the objection for the time

16   being.

17   BY MR. NOLAN:

18   Q    Mr. Larian, when you started to use the name *Bratz*, did

19   you know that Carter Bryant had come up with the name *Bratz*

20   while employed at Mattel?

21   A    No.

22   Q    Did you have any reason to believe the name *Bratz* was

23   confidential to Mattel?

24   A    No.

25   Q    Sometime after launching the name *Bratz*, associated with

1   the 3-D dolls, did you come to learn that the name *Bratz* was

2   actually owned by another person?

3            **MR. PRICE:**  Objection.  Move to strike; irrelevant.

4            **THE COURT:**  As phrased.

5            Sustained.

6   **BY MR. NOLAN:**

7   Q    At some point in time, Mr. Larian, did you acquire,

8   through the purchase of money, the right to use the name *Bratz*?

9            **MR. PRICE:**  Objection.  Irrelevant.  Move to strike.

10           **THE COURT:**  Counsel, side-bar on this.

11           (Whereupon, the following proceedings

12           Were held at side-bar:)

13           **THE COURT:**  Where are we going with this?

14           Who sued who for the name *Bratz*?

15       **MR. NOLAN:**  Curt Loven, trademark owner of the name

16  *Bratz*, sued Mr. Larian in a lawsuit by using the name Bratz.

17  Mr. Larian had to acquire and purchase the name.  Curt Loven

18  worked out a deal with Mr. Larian where Mr. Loven actually uses

19  the name Bratz -- they are available at Costco.

20           **THE COURT:**  Who's Loven?

21           **MR. NOLAN:**  A third party.

22           **THE COURT:**  So this is not Mattel?

23           **MR. NOLAN:**  No.  Clearly not Mattel, your Honor.

24           And they are asking for punitive damages on

25  intentional conduct on the part of Mr. Larian.  This goes to

1    his good faith.

2              **THE COURT:**  It seems to, Mr. Price.

3              **MR. PRICE:**  Your Honor, just because you enter into a

4    settlement with someone to get rid of a pesky allegation, which

5    has nothing do with whether or not Carter Bryant came up with

6    the name Bratz.  That's the issue.  He was using Mattel's

7    confidential information.

8              **THE COURT:**  Mr. Larian is certainly able to testify,

9    "I did not get it from Carter Bryant, and I did not get it

10   from..."

11             **MR. PRICE:**  That's not what he's saying.  Bratz was

12   presented to him, that's undisputed, in September.  This is

13   after Carter Bryant gave him the Bratz concept.

14             **THE COURT:**  Then somebody else came along and sued

15   him for --

16             **MR. PRICE:**  Yes.

17             **THE COURT:**  How is that irrelevant?

18             **MR. NOLAN:**  It goes to his good faith belief he was

19   using confidential information at Mattel or whether or not it

20   was even proprietary.  Mattel could have no claim -- could not

21   be harmed by the use of the name *Bratz*, because it wasn't even

22   available to the public, to Mattel.

23             **THE COURT:**  That's a different argument.

24             But getting back to the one you just made, let's

25   assume Mr. Larian stole the name *Bratz* from Mattel by getting

7601

1    it from Carter Bryant; somebody else sues; he settles with

2    them.  How does that show that he did or did not steal it from

3    Mattel to begin with, given the time frame that has now been

4    exchanged.

5           MR. NOLAN:  It goes to whether or not he was acting

6    intentionally.

7           THE COURT:  How?  What's the argument?  How do you

8    make that argument?

9           MR. NOLAN:  If you have damages -- the purpose is if

10   it injured Mattel, and how could it be --

11          THE COURT:  That's a separate argument.  We'll get to

12   that.  Go back to this.  It doesn't explain the damages.

13          MR. NOLAN:  It now goes to the question of whether or

14   not he should be punished for use of the name *Bratz* when he

15   didn't know that it was being claimed -- some proprietary

16   information.  It couldn't be proprietary to Mattel because they

17   didn't own it.  They did not have a right to that name at that

18   time.

19          THE COURT:  That Mattel did not have a right to that

20   name?

21          MR. NOLAN:  They could not have used the name without

22   acquiring the rights from Curt Loven.

23          THE COURT:  That's a separate issue.

24          You can ask Mr. Larian all you want about whether he

25   obtained this from Carter Bryant, whether he took this from

```
 1   Mattel, when he intentionally took it from Mattel.  But I'll
 2   sustain the objection on this lawsuit.
 3              MR. ZELLER:  One thing to also clarify in terms of
 4   the Loven suit, there's also 403 problems because of the fact
 5   there's no showing.  And as far as I know about that case from
 6   the public file, they are not comparable products.  As
 7   Mr. Nolan alluded to, we're talking about bed clothing, or
 8   pajamas; that's what is at issue as to what MGA was sued over.
 9   The circumstances of it, all that is going to cause multiple
10   layers of confusion.
11              THE COURT:  I'll sustain the objection.
12              MR. NOLAN:  The clock is running, Your Honor.  I want
13   to get back to the question.
14              MR. PRICE:  Move to strike the answer.
15              THE COURT:  Yes.
16              (Whereupon, side-bar proceedings were concluded.)
17              THE COURT:  Members of the jury, please disregard the
18   testimony about the trademark lawsuit.
19   BY MR. NOLAN:
20   Q    Mr. Larian, did you ever, before the return of the jury's
21   verdict, ever know that Carter Bryant conceived the name Bratz
22   while an employee at Mattel?
23   A    No.
24   Q    If you had known that, would you have ever used the name
25   Bratz?
```

```
 1   A     No.

 2   Q     Please turn to Exhibit 18844 through 45, 001 through 045.

 3   A     I have it.

 4   Q     Do you recognize these?

 5   A     Yes.

 6   Q     What are they, sir?

 7   A     These are checks that we paid for taxes to I.R.S.

 8   Q     Is MGA an "S" corporation?

 9   A     Yes.

10   Q     Are these the checks that were paid and distributed to you

11   in order to pay U.S. taxes?

12   A     That's correct.

13         MR. NOLAN:  Your Honor, we'd offer Exhibits 18844

14   -001 through 045.

15         THE COURT:  Any objection?

16         MR. PRICE:  Yes, Your Honor.  Transparency.

17         THE COURT:  I'm sorry?

18         MR. PRICE:  I'm trying to use a code word, so as not

19   to use a speaking objection.

20         THE COURT:  I assume you'll address those later,

21   Counsel?

22         MR. PRICE:  Objection.  Production issue.

23         THE COURT:  What exhibit number?

24         THE WITNESS:  18844.

25         MR. PRICE:  18844.
```

1          **THE COURT:**  Let me see you all at side-bar, Counsel.

2          (Whereupon, the following proceedings

3          Were held at side-bar:)

4          **THE COURT:**  What's your concern?

5          **MR. PRICE:**  My concern is, these were produced to us

6    after opening statements of 1-B, tax returns.  Any examination

7    in the case of discovery on those documents, they weren't

8    produced until after we both sat down; so it's sandbagging.

9          **MR. ROTH:**  These documents are confirmatory of

10   payments that are set out in the schedule that was produced

11   from Mattel.

12         **THE COURT:**  So you produced the schedule which has

13   all these documents; these are just the checks that back that

14   up?

15         **MR. ROTH:**  These checks back that up, yes, the

16   payments.

17         **MR. PRICE:**  We're not disputing that the schedule

18   shows the payments --

19         **MR. ZELLER:**  The Court will recall we had issues over

20   their production of tax credit.  They refused to provide it.

21   We did not have any opportunity for discovery on these things.

22   They produced it late.  Our position was at that time, and it

23   still remains, that having failed to produce it, they should

24   not get credit for it now.  And we have had no opportunity to

25   test any of this in discovery.  That was the choice they made,

7605

1    and we made that point even at the time, that if they were not

2    going to produce that tax information, then they should not

3    be --

4            **THE COURT:**  Did you produce the documents they

5    requested?

6            **MR. ROTH:**  We produced the schedules which show

7    disbursements made to Mr. Larian for purposes of paying his

8    taxes.

9            **MR. NOLAN:**  The motion practice for production

10   regarding production of the tax returns, I think was both

11   before you and an appeal from the magistrate judge.

12           **THE COURT:**  Judge Infante.

13           **MR. NOLAN:**  Yes.  With respect to the actual tax

14   returns, some summaries were provided that -- they all add up

15   to the same payments; these are just the actual checks.

16           **THE COURT:**  So your position is you can't test any of

17   this?

18           **MR. ZELLER:**  That's right.  And it was produced

19   after -- I don't think there's any dispute about that -- if I'm

20   wrong about the timing of the production, certainly I would

21   take a different viewpoint; but as far as I know, as of the

22   time when the court had that motion in front of it --

23           **THE COURT:**  What is the dispute?

24           The taxes were paid.  Unless they found willful

25   infringement, the taxes could offset the damages.

7606

1          **MR. ZELLER:**  Our point is they were taking their

2    chances by not putting that cost information in.  They

3    shouldn't get to produce it now.

4          **THE COURT:**  I understand.  What is the dispute?  Is

5    there any question that he paid these taxes?

6          **MR. ZELLER:**  We can't raise questions about it

7    because we were denied the discovery in the first instance.  We

8    put those in front of him and asked him questions:  "Are these

9    the complete..."

10         To use Mr. Price's words, there's no transparency.

11         I don't want to make it sound like we have an

12   investigation that has uncovered some activity.  The problem

13   is, they were obligated to provide discovery and allow us to

14   take discovery, and we just were not ever given that

15   opportunity.

16         **THE COURT:**  I don't have presently in mind the

17   rulings of Judge Infante on tax records, so I can't say

18   really -- you're disputing that?

19         **MR. NOLAN:**  Your Honor --

20         **THE COURT:**  What are you saying about the rules of

21   Judge Infante?

22         **MR. NOLAN:**  That our tax returns -- his tax returns,

23   his personal tax returns were not ever required to be turned

24   over.

25         We provided summaries of the relevant information

Friday, August 15, 2008                    Trial Day 36, morning session

Exhibit D - Page 1216

1    from those tax returns in the form of the amount of money that

2    was being paid.  We now are just introducing the checks to

3    avoid any issue with respect to them saying that the summaries

4    are inaccurate.  Here are the checks; it adds up to the amount

5    of the summaries.

6         THE COURT:  You're saying there's something in

7    Judge Infante's ruling or this Court's ruling which suggests

8    that if he didn't turn over the tax returns, that you weren't

9    going to get the tax payments in?

10        MR. ZELLER:  No.  I was stating what our position was

11   in that we made it very clear that we were not being given that

12   transparency.

13        THE COURT:  That's not part of any ruling at this

14   point.

15        MR. ZELLER:  What I'm saying is, all of that is post

16   all of that, post-discovery.  We were not given the opportunity

17   to take discovery on it.  That's our point.

18        MR. ROTH:  They were given the opportunity.  They had

19   the schedules with the distribution amounts.  Their expert

20   relied on that.  They had taxation in the deposition.

21        THE COURT:  You're representing the amounts here are

22   consistent with the amounts that were submitted through his

23   expert?

24        MR. ROTH:  Yes.  They are consistent with those

25   amounts.

7608

1          THE COURT:  Is there any reason why we can't just use

2    what was produced already?

3          MR. NOLAN:  We were concerned they would be arguing

4    that we didn't put the actual checks in.

5          THE COURT:  Your expert did take this into account in

6    the tax payments; that's in evidence already.

7          MR. PRICE:  I think our expert said as a matter of

8    law the tax payments should not be deducted because it's a tax

9    credit.

10         THE COURT:  But you didn't do that calculation.

11         MR. PRICE:  Right.  But we're not --

12         THE COURT:  If the jury finds it's willful, it comes

13   out anyway; if they don't find it's willful, it's relevant.

14   It's been produced.  Come up with a stipulation.  Let's do it

15   by stipulation on the total amount.  Otherwise, they come in.

16         (Whereupon, side-bar proceedings were concluded.)

17         THE COURT:  Ladies and gentlemen of the jury, the way

18   we're going to deal with these tax payments is, the parties are

19   going to work on a stipulation on the amount, instead of

20   getting into the actual documents themselves; that will avoid a

21   lot of problems.  So we'll see how that all works out.

22         Counsel, you may proceed.

23   BY MR. NOLAN:

24   Q    Mr. Larian, the last document I want to show you is

25   Exhibit 18837.

7609

```
1              Do you have that, sir?
2    A    Yes, I do.
3    Q    Do you know what these are?
4    A    Yes, I do.
5    Q    What are they?
6    A    This is a projection income statement for the year 2008.
7    Q    For whom?
8    A    For our company, MGA Entertainment.
9    Q    And when are they done?
10   A    These were done in March of this year.
11   Q    Now, in the lower right-hand corner, there's a print date
12   of August.
13             Do you see that?
14   A    Yes, I do.
15   Q    That print date is just a date that is put on
16   automatically when you print it off of the electronic version;
17   correct?
18   A    Every time you print something from the computer, it gives
19   a time stamp on the bottom when it was printed.
20   Q    So these projections were done in March?
21   A    Correct.
22   Q    Of 2008; correct?
23   A    2008.
24             MR. NOLAN:  Your Honor, we'd offer 18837.
25             MR. PRICE:  Objection.  Lacks foundation; relevance.
```

Friday, August 15, 2008                    Trial Day 36, morning session

Exhibit D - Page 1219

1          **THE COURT:**  Lay a further foundation, Counsel.

2          **MR. NOLAN:**  Your Honor, in light of the time, I'm

3     going to move on and see if we can just handle it by

4     stipulation.

5          **THE COURT:**  Very well.

6          **MR. NOLAN:**  Thank you.

7     **BY MR. NOLAN:**

8     Q    Mr. Larian, do you understand that Mattel is asking this

9     jury to award punitive damages against you individually?

10    A    I do.

11    Q    And do you understand that Mattel is arguing that you

12    acted with malice and oppression and fraud?

13         Do you understand that?

14    A    I understand that's what they contend, yes.

15    Q    Sir, when you met with Carter Bryant on September 1, 2000,

16    through the time that he left Mattel in October 20th, did you

17    ever intend to harm Mattel in meeting with Mr. Bryant?

18    A    Absolutely not.

19    Q    Did you ever intend to cause injury to Mattel in meeting

20    with Carter Bryant during that period of time?

21    A    Absolutely not.

22    Q    Did you ever intend to prevent Mattel from introducing

23    into the marketplace fashion dolls that could compete with

24    Bratz?

25    A    No.