1    **MR. PRICE:**  Objection.  Irrelevant.  Move to strike.

2    **MR. NOLAN:**  Element of harm.

3    **THE COURT:**  Overruled.

4    You may answer.

5    **THE WITNESS:**  No.

6    **BY MR. NOLAN:**

7    Q    Did Mattel come out with a fashion doll called My Scene?

8    A    They did.

9    Q    Did you compete with My Scene?

10    **MR. PRICE:**  Objection.  Irrelevant.

11    **THE COURT:**  Sustained.

12    **BY MR. NOLAN:**

13    Q    Mr. Larian, when you were meeting with Carter Bryant, did

14    you believe that he was presenting to you confidential

15    information belonging to Mattel?

16    A    Absolutely not.

17    Q    If you knew that, sir, would we be sitting here in court

18    today?

19    A    No.

20    **MR. NOLAN:**  No further questions.

21    **THE COURT:**  Cross-examination.

22                    **CROSS-EXAMINATION**

23    **BY MR. PRICE:**

24    Q    Mr. Larian, is it your testimony today that you did not

25    knowingly induce Carter Bryant to share Mattel's confidential

7612

1    information with MGA?  Is that your testimony?

2    A    I don't understand your question.  Can you please rephrase

3    it.

4    Q    Is it your testimony you did not knowingly cause Carter

5    Bryant to share Mattel's confidential information with MGA?  Is

6    that your testimony?

7    A    Yes.

8    Q    So again, I think Mr. Nolan said you --

9         Do you understand there's a punitive damages element

10   of this phase?

11        Do you understand that?

12   A    I'm sorry.

13   Q    You understand there is a punitive damages issue in this

14   phase of the trial; correct?

15   A    Yes.

16   Q    And you understand that one of the issues is whether or

17   not you have sort of learned that you'll behave differently as

18   a result of the jury's verdict?  Do you understand that?

19   A    I don't understand your question.

20   Q    Do you understand one of the issues of punitive damages is

21   whether or not you will be deterred in the future from the

22   conduct which the jury has found has taken place?

23   A    Yes.

24   Q    And so despite the jury's verdict, you still maintain that

25   you did not knowingly cause Carter Bryant to share confidential

1   information with you and MGA; correct?

2   A    In 2000, when he came to show us those drawings, we did

3   not know that he had done those at Mattel, and we went further

4   to verify, through his lawyer and our lawyers, that he had not

5   done that.

6           Had I known what I know now, I would have never let

7   him in my office.

8   Q    So you're maintaining that same position despite the

9   jury's verdict; correct?

10  A    I respect the jury's verdict.

11  Q    And you recall that in phase -- first, do you recall the

12  following testimony -- and I'll put it up -- trial testimony at

13  page 2251, Line 23 to 2252, line six.  "Would it have been a

14  problem if Carter Bryant had created or made any of his

15  drawings while employed by Mattel, in your view?"

16          ANSWER:  "No."

17          QUESTION:  "That was your testimony under oath as of

18  the date of your deposition; correct?"

19          ANSWER:  "As it is today, yes."

20          **THE WITNESS:**  Yes.  But you did not show me the

21  previous five pages of that deposition.

22  **BY MR. PRICE:**

23  Q    You told the jury that you did not know Carter Bryant came

24  up with the name *Bratz* while he was at Mattel; correct?

25  A    Correct.

7614

1    Q    And if you would look at the first page of Exhibit 302,

2    which the jury has seen.

3         This is a presentation Mr. Bryant made to you when he

4    met with you; correct?

5    A    Correct.

6    Q    You also said that prior to Mr. Bryant, you had already

7    begun investigating the tween market.

8         Do you recall that testimony?

9    A    I did.

10   Q    But you have not presented any documentation, any e-mail,

11   any note, anything, to support that statement, have you, sir?

12   A    We tried, but you objected.

13   Q    Prior to meeting with Carter Bryant in September, you had

14   not found an idea that you liked for a fashion doll; is that

15   true?

16   A    True.

17   Q    Sir, after Carter Bryant met with you, from that point on,

18   MGA was focused just on Bratz; right?

19   A    I'm sorry?

20   Q    The focus of MGA was just on Bratz?

21   A    No.

22   Q    MGA didn't really attempt to diversify, did it?

23   A    It did.

24   Q    You mean MGA spent some significant efforts trying to

25   produce products that were not related to Bratz?

```
 1   A     Yes.

 2   Q     Significant effort?

 3              Come on, how much of MGA's time was spent on products

 4   that did not relate to Bratz in any way?

 5              MR. NOLAN:  Objection, Your Honor.  Relevance.

 6              THE COURT:  Rephrase, Counsel.

 7   BY MR. PRICE:

 8   Q   After you met with Carter Bryant, going forward, what

 9   percentage of MGA's efforts were focused on anything other than

10   Bratz?

11   A     I cannot put a percentage on it because it was fluid; it

12   was from 2001 until now, so you have to tell me an exact date,

13   and I can tell you.

14   Q     Okay.

15              Year 2001.

16   A     Yes.

17   Q     What percentage was nonBratz effort?

18   A     I would say 50 percent.

19   Q     50 percent.

20              In 2002, what percentage was nonBratz effort?

21   A     About at least 50 percent.

22   Q     50?

23   A     Yes.

24              I'm estimating these numbers.

25   Q     2003, how much of MGA's efforts was not related to Bratz
```

1    in any way?

2    A    I cannot judge -- I cannot just put a number.  I don't

3    remember.

4    Q    Estimate.

5    A    30, 40, 50 percent.

6    Q    2004?

7    A    Probably the same.

8    Q    30, 40, 50 percent?

9    A    Yes.

10   Q    2005?

11   A    Same.

12   Q    30, 40, 50 percent?

13   A    Yes.

14   Q    Closer to 50 or closer to 30?

15   A    Somewhere in that range.

16   Q    2006?

17   A    2006, we put more effort in other brands.

18   Q    So in 2006, how much of MGA's efforts was in products

19   totally unrelated to Bratz?

20   A    I would say about 60, 70 percent.

21   Q    So 60, 70 percent of time and effort went to products

22   other than Bratz, you're saying.

23   A    Yes.

24   Q    Okay.

25            How about 2007?

1    A     Again, a lot of time went into nonBratz.

2    Q     About how much?

3    A     About 50, 60 percent.

4    Q     You realize, of course, that your damages expert has

5    assumed that only 20 percent of MGA's overhead costs should go

6    to nonBratz products?  You understand that, don't you?

7    A     I have not read the damage expert report.

8    Q     Anyway, that would be wrong, because what you've just told

9    us is that for every year, between 30 and 70 percent of MGA's

10   general overhead costs should be allocated to nonBratz

11   products; right?

12   A     That was not your question, and that was not my testimony.

13   Q     Well, that's how much MGA's effort went, you say, to

14   nonBratz products; 50 percent some years; 30 to 50 percent some

15   years; up to 60 percent other years; right?

16   A     Up to 60 or 70 in other years in other brands, such as

17   Little Tikes, such as Rescue Petz; other products that we have.

18   Q     I said totally nonBratz related.

19         You understood my question, didn't you?

20   A     Little Tikes and Rescue Petz are not Bratz related.

21         **MR. PRICE:**  No further questions.

22                        **REDIRECT EXAMINATION**

23   **BY MR. NOLAN:**

24   Q     Mr. Larian, on this last series of questions, have you

25   undertaken a study of the allocation of expenses between the

```
 1   various product lines that were being manufactured at the same
 2   time Bratz was being manufactured?
 3   A    No.
 4   Q    Is it true that during the time you were working on Bratz
 5   at MGA, there were other products also being manufactured at
 6   MGA?
 7   A    Yes.
 8   Q    And the production and the support of those other products
 9   also caused expenses to be attached to those efforts; correct?
10   A    Absolutely.
11   Q    Mr. Larian, Mr. Price has showed a deposition portion, and
12   I want to ask you --
13            MR. NOLAN:  Can we have that up, Aaron.
14   BY MR. NOLAN:
15   Q    QUESTION:  "So would it have been a problem if Carter
16   Bryant had created or made any of these drawings while employed
17   by Mattel, in your view?"
18            ANSWER:  "No."
19            QUESTION:  "Why not?"
20            ANSWER:  "Because I don't think, whether it's MGA or
21   Mattel, that we own the people, especially the creative people,
22   forever."
23            What did you mean by that answer, sir?
24   A    What I meant is that if somebody has said to you that they
25   came up with something in 1998, which is what Carter Bryant
```

7619

1    said, and then later on, he was working on the weekends and in

2    the evenings enhancing what he was doing, I didn't see anything

3    wrong with it.

4            And that's what we believed when he came to us, that

5    he had done these in 1998.  He represented that.  His lawyers

6    confirmed that in writing, and that's what we believed.

7            So after that -- maybe Mattel is different, but I

8    don't think I own people's evenings and nights when they are

9    not on my payroll.

10   Q    Mr. Larian, did you believe Carter Bryant when he told you

11   that he did the concept for Bratz in 1998?

12   A    Can you repeat that?

13   Q    Did you believe Carter Bryant when he told you that he did

14   the concept drawings in 1998?

15   A    I believed him, but we went further and looked into it to

16   make sure that he was telling the truth.

17   Q    Now, just prior to the portion of the deposition that they

18   showed you -- I want to put up from Page 445, Line 25 through

19   446, Line 9.

20   A    I don't have that deposition here.

21   Q    Can you see it on the screen?

22   A    Yes.  Go ahead.

23           **MR. PRICE:**  I object to this.  This is not in

24   evidence.  This was not played in Phase 1-A.

25           **MR. NOLAN:**  We're offering it now for completeness,

1    in light of the portions he just played.

2              THE COURT:  What page, Counsel?

3              MR. NOLAN:  Page 445, Line 25.

4              THE COURT:  Do I have the deposition here someplace?

5              Let's have a side-bar, counsel.

6              (Whereupon, the following proceedings

7              Were held at side-bar:)

8              THE COURT:  Counsel?

9              MR. NOLAN:  This is just before the portion they've

10   now played when MGA entered into the agreement with

11   Carter Bryant relating to Bratz:

12             QUESTION:  "Did you think it possible that Mattel

13   might have rights to the Carter Bryant drawings?

14             ANSWER:  "That Mattel might have -- I think we did."

15             THE COURT:  This is the part that you played?

16             MR. PRICE:  What I showed him was a transcript of the

17   prior phase of trial.  We didn't play anything new.  What I

18   showed was a transcript of the trial, when at that time they

19   played what they thought was different; so all I was saying in

20   my examination was that "you still believe what you said in the

21   first phase of the trial?"

22             I'm not playing the testimony.  I'm playing what he

23   already said at trial.

24             THE COURT:  Fair enough.  It needs to be

25   characterized properly.

Friday, August 15, 2008                    Trial Day 36, morning session

1          Is there any reason why he can't play this, from your

2   perspective?

3          **MR. PRICE:**  If it was going to be played in context,

4   it should have been done in the first phase of the trial.  And

5   the jury already decided this issue.  The issue is --

6          **MR. NOLAN:**  This goes to the willfulness

7   characterization, and that's what they were using it for.  The

8   testimony they are referring to was actually deposition

9   testimony that was imported into 1-A.  This is a different

10  issue.  These are different elements.

11         **MR. PRICE:**  Plus, in 1-A, he played --

12         **THE COURT:**  As long as it's being characterized

13  accurately, I don't have a problem with either side bringing in

14  from 1-A; it's all the same product.  As long as it's not going

15  to unseat the jury's decision.

16         **MR. PRICE:**  And this is.

17         **THE COURT:**  All you have is liability -- I think I

18  made reference to this the other day.  Some of these issues

19  were brought up again on punitive damages, and I don't think

20  it's proper for the Court to find findings of intentional acts

21  that were required for the tort to serve as a basis for the

22  punitive damages.  It is separate.  This is not like the

23  copyright or the findings on the timing of the drawings; so I'm

24  going to give you latitude to do that.

25         I'm concerned about how this is being characterized,

1  whether it was a transcript from 1-A or a deposition; so just

2  make that clear.   The objection is overruled.

3           (Whereupon, side-bar proceedings were concluded.)

4           **THE COURT:**   Okay, Counsel, the objection is

5  overruled.

6           You may proceed; but why don't you clarify for the

7  record what we discussed.

8           **MR. NOLAN:**   Your Honor, I'm now displaying from the

9  same deposition transcript conducted March 26, 2008, at

10  Page 445, Line 25, running over to Line 9, on Page 446.

11  **BY MR. NOLAN:**

12  Q    Mr. Larian, you recall that your testimony was taken on

13  days in depositions; correct?

14  A    Yes.

15  Q    And this portion of the deposition is in the same session

16  where the testimony that Mr. Price showed you earlier; is that

17  correct?

18  A    Yes.

19  Q    That question was asked of you, and that was your answer

20  given in the deposition on March 26, 2008.

21  A    Correct.

22  Q    Mr. Larian, has the jury verdict had an impact on you?

23  A    Yes, it has.

24  Q    Has it had an impact on MGA?

25  A    Yes, it has.

Friday, August 15, 2008

Trial Day 36, morning session

1    **MR. NOLAN:**  Nothing further.

2    **THE COURT:**  We're going to take a break at this time,

3    and we'll resume with further examination after the break.

4    (Whereupon, jurors depart courtroom.)

5    **THE COURT:**  Mr. Price, you said you had another

6    objection to take up; or Mr. Zeller, or somebody.

7    Mr. Quinn?

8    You weren't at the side-bar.

9    **MR. QUINN:**  Your Honor, we've now gotten back into

10   what the lawyers told the lawyers and the representations that

11   were made; that subject has now been opened up.

12   In 1-A, that issue was always paired, from my

13   understanding, with the e-mails to Ms. Glazier about nine

14   months later, where Mr. Larian makes the statements that he

15   makes.

16   Now the one has been opened up, and we had multiple

17   emphatic denials from the stand from Mr. Larian that he ever

18   knew that Mr. Bryant did this work at Mattel.  In fairness now,

19   we should be able to use that e-mail to Ms. Glazier.

20   There's been a waiver here.

21   Your Honor, those two were always paired.  And the

22   Court cautioned --

23   **THE COURT:**  Let me look at the actual testimony.

24   Let me see what was displayed.

25   This is Page 445, Line 25, through Line 9 at

1          The e-mail to Ms. Glazier says what it says.

2          **THE COURT:**  I still want to see what was precisely

3    before the jury in 1-A and what the Court's previous ruling

4    was.

5          Let me take a break here.

6          **MS. AGUIAR:**  In your binder, I just want you to know

7    that the "A" documents are the ones that we redacted; so I

8    didn't want you to see the unredacted one and get upset.

9          **THE COURT:**  Thank you, Counsel.

10         (Whereupon, a brief recess was held.)

11         (Morning session is concluded; subsequent

12          further morning proceedings are sealed.)

13

14

15

16

17                    CERTIFICATE

18

19   I hereby certify that pursuant to section 753, title 28, united
     states code, the foregoing is a true and correct transcript of
20   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
21   conformance with the regulations of the judicial conference of
     the united states.
22

23                                              8-19-08

24   THERESA A. LANZA, CSR, RPR                   Date
     FEDERAL Official COURT Reporter

25

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                              - - -

4        **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                              - - -

6    MATTEL, INC.,                 :  PAGES 7652 - 7873
                                    :
7            PLAINTIFF,             :
                                    :
8        VS.                        :  NO. ED CV04-09049-SGL
                                    :  [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,       :  CV04-9059 & CV05-2727]
     ET AL.,                        :
10                                  :
             DEFENDANTS.            :
11   _____:

12

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                    RIVERSIDE, CALIFORNIA

17                 FRIDAY, AUGUST 15, 2008

18                    JURY TRIAL - DAY 36

19                    AFTERNOON SESSION

20

21

22                              MARK SCHWEITZER, CSR, RPR, CRR
                                OFFICIAL COURT REPORTER
23   **CERTIFIED**                UNITED STATES DISTRICT COURT
                                181-H ROYBAL FEDERAL BUILDING
24   **COPY**                     255 EAST TEMPLE STREET
                                LOS ANGELES, CALIFORNIA 90012
25                              (213) 663-3494

1    forward.

2              MR. ROTH:  Very good, your Honor.

3              THE COURT:  All right.  Let's bring the jury in.

4              **(WHEREUPON THE JURY ENTERS.)**

5              THE COURT:  Good afternoon, members of the jury.

6    The Court has an instruction to provide concerning some

7    testimony you heard earlier.  You heard testimony earlier

8    about conversations between Mr. Larian and his counsel

9    concerning when Carter Bryant did the drawings and the works

10   in question.

11             That testimony is stricken, and you are instructed

12   to disregard any testimony or evidence concerning

13   communications between Mr. Larian and his counsel.  That

14   should not affect your decision at all.

15             Counsel, you may continue.

16             **ISAAC LARIAN, PREVIOUSLY SWORN.**

17             **RECROSS-EXAMINATION (CONTINUED)**

18   BY MR. PRICE:

19   **Q.**   I think you said a couple times in your examination that

20   you respected the jury's verdict; is that right?

21   **A.**   I do.

22   **Q.**   The day of the jury's verdict, you spoke with The Wall

23   Street Journal, didn't you?

24   **A.**   I don't recall.  I might have.

25   **Q.**   And do you recall telling that reporter in connection

1    with the jury's verdict that, quote, Mattel succeeded in

2    confusing the jury.

3    **A.**    I said that, yes.

4    **Q.**    You also -- Mr. Nolan asked you about whether you had

5    any malice toward Mattel.

6              Do you recall that?

7    **A.**    I'm sorry?

8    **Q.**    Mr. Nolan asked you whether you had any malice toward

9    Mattel.

10             Do you recall that?

11   **A.**    Do I have any malice toward Mattel?

12   **Q.**    Yes.  Do you recall Mr. Nolan's --

13   **A.**    In regards to what?

14   **Q.**    Mattel.

15   **A.**    Yes, I heard the question.

16   **Q.**    And you said you did not; correct?

17   **A.**    That's correct.

18   **Q.**    I believe your testimony was that the idea for a fashion

19   doll began when someone at Wal-Mart said they wanted

20   something to compete with Mattel?

21   **A.**    I believe one of the things that was -- that I said

22   created the idea for fashion doll was Ron Stover, who was a

23   Wal-Mart buyer, said bring me something that competes with

24   Barbie.

25   **Q.**    And in connection with that competition and talking with

1  employees at MGA, you have used the phrase that you want to,

2  quote, kick Mattel's ass; correct?

3  **A.**   I'm sorry?  Have I said that?

4  **Q.**   Yes, to your employees.

5  **A.**   Yes, I have.

6          MR. PRICE:  No further questions.

7                **FURTHER REDIRECT EXAMINATION**

8  BY MR. NOLAN:

9  **Q.**   Mr. Larian, do you compete with Mattel in the

10 marketplace?

11 **A.**   Yes, fiercely.

12 **Q.**   For how long?

13 **A.**   For at least the past seven years.

14 **Q.**   Do you want to kick their ass in the marketplace?

15 **A.**   Yes, I do.

16         MR. NOLAN:  Nothing further.

17 **Q.**   Well, you know, Mr. Price asked you a series of

18 questions regarding percentages of effort with respect to

19 various product lines at MGA.

20         Do you remember that line of questioning?

21 **A.**   I do.

22 **Q.**   And he was asking you percentages.  Have you done any

23 analysis on the percentages --

24         MR. PRICE:  I'll object.  It is beyond the scope of

25 my recross.

1        THE COURT:  It is beyond the scope.

2        MR. NOLAN:  Your Honor, permission just to reopen

3    for one moment on this?

4        THE COURT:  Make it brief, Counsel.

5    **Q.**  BY MR. NOLAN:  Remember those questions and answers?

6    **A.**  I do.

7    **Q.**  Asking you various percentages?

8    **A.**  Yes.

9    **Q.**  Prior to today, have you done any calculations with

10   respect to the amount of expenses or allocation of expenses

11   on product lines?

12   **A.**  I have never done any calculation prior to today or

13   today.  I just was guessing.

14   **Q.**  And there's an expert that has been retained for MGA to

15   offer such an opinion; is that correct?

16   **A.**  I believe it is.  I don't know the exact.

17   **Q.**  Would you defer to his analysis of the actual records of

18   MGA on those points?

19       MR. PRICE:  Object.  Lack of foundation that

20   Mr. Larian knows the basis of that analysis.

21       THE COURT:  Sustained.

22   **Q.**  BY MR. NOLAN:  Have you met with the damage expert in

23   this case?

24   **A.**  I have met him, just somebody introduced me, as Paul

25   somebody.  But I don't even remember his last name.  If your

1    question is I've met with him to discuss anything, I have

2    not.

3    Q.    Okay.  One way or the other, you've not done any factual

4    calculations, though, with respect to efforts on one product

5    versus another product; correct?

6    A.    I have not.  I'm not an accountant.

7              MR. NOLAN:   Thank you.  Nothing further.

8                   **FURTHER RECROSS-EXAMINATION**

9    BY MR. PRICE:

10   Q.    You said you just want to compete with Mattel in the

11   marketplace; right?

12   A.    Absolutely.

13   Q.    You have a website for MGA, don't you?

14   A.    Yes, called MGA dot com.

15   Q.    And if you go to that website, one of the questions it

16   asks is is Mattel racist.  That's still on your website right

17   now.  Isn't it?

18   A.    Yes.

19   Q.    And with respect to the expenses, I was asking you about

20   people's efforts on Bratz versus non-Bratz products.

21         Do you recall that?

22   A.    I'm sorry.  Can you repeat that?

23   Q.    I was asking you about folks' efforts, the time they

24   spent on Bratz versus non-Bratz product; correct?

25   A.    Yes.

1   **Q.**   And as the Chief Executive Officer of the company, you

2   gave me your best estimate; correct?

3   **A.**   I gave you my guess, yes.

4   **Q.**   Are you saying you don't know what your employees are

5   working on?

6   **A.**   We have 1,600 employees.  And I don't know what everyone

7   is working on.  Mr. Eckert didn't know what the senior

8   vice-president of Mattel was working on.

9   **Q.**   But you have an idea as to how your company is using its

10  resources so that you can try to make a profit.  You have

11  some general idea about that, don't you?

12  **A.**   I do.

13  **Q.**   Okay.  And that's what you were using when you were

14  telling me the percentage of MGA's time and effort that went

15  to non-Bratz products; right?

16          MR. NOLAN:  Objection, your Honor.  Misstates the

17  question that was asked in the first instance by Mr. Price.

18          THE COURT:  Rephrase your question, Counsel.  Watch

19  the speaking objections, please.

20  **Q.**   BY MR. PRICE:  When you were saying, when you were

21  testifying that, quote, a lot of time went into non-Bratz

22  products, do you recall saying that?

23  **A.**   Yes.

24  **Q.**   And you recall giving percentages between 50 percent to

25  30 to 50 percent to 60 to 70 percent.

1          Do you recall that?

2    **A.**    That's my guess, yes.

3    **Q.**    And you said at the time that was your best estimate;

4    correct?

5    **A.**    Best estimate or best guess.  I have a language barrier.

6    **Q.**    And you were giving that best estimate of the amount of

7    time that was spent on non-Bratz products based on your

8    general understanding as to how MGA was allocating its

9    resources over those years; correct?

10   **A.**    I gave you just my best estimate.

11   **Q.**    Based upon your general understanding as the CEO of MGA;

12   correct?

13   **A.**    That's right.

14          MR. PRICE:  No further questions.

15                    **FURTHER REDIRECT EXAMINATION**

16   BY MR. NOLAN:

17   **Q.**    The actual acting and allocations would be best found in

18   the financial records of MGA; is that correct?

19   **A.**    100 percent accurate.

20          MR. NOLAN:  Thank you.  Nothing further.

21                    **FURTHER RECROSS-EXAMINATION**

22   BY MR. PRICE:

23   **Q.**    Those general expenses, people's salary, research and

24   development, you know, how much time they are working on

25   different products, that's not allocated in MGA's accounting

1    records; right?

2         MR. NOLAN:  Objection, your Honor.  Lack of

3    foundation.

4         THE COURT:  Overruled.

5         THE WITNESS:  I don't know.  I'm not an accountant.

6         MR. PRICE:  Nothing further.

7         MR. NOLAN:  Nothing further.

8         THE COURT:  All right.  Mr. Larian, you may step

9    down.  Thank you.

10        Defendant's next witness.

11        MR. KENNEDY:  Your Honor, we call Paul K. Meyer.

12        THE CLERK:  Please raise your right hand.

13                    **PAUL KEVIN MEYER, SWORN.**

14        THE CLERK:  Please take the stand.

15        Please be seated.  State your full name for the

16   record, and spell your last name.

17        THE WITNESS:  Paul Kevin Meyer, M-E-Y-E-R.

18                    **DIRECT EXAMINATION**

19   BY MR. KENNEDY:

20   **Q.**   Good afternoon, Mr. Meyer.  Would you tell us where

21   you're currently employed.

22   **A.**   Yes.  I'm a managing director at a consultant company

23   called Navigant Consulting.

24   **Q.**   What does Navigant Consulting do?

25   **A.**   It's a large consulting company, about 2,000 people.

```
 1

 2

 3

 4

 5

 6

 7                    C E R T I F I C A T E

 8

 9

10          I hereby certify that pursuant to Title 28,

11   Section 753 United States Code, the foregoing is a true and

12   correct transcript of the stenographically reported

13   proceedings in the above matter.

14          Certified on August 15, 2008.

15

16

17          MARK SCHWEITZER, CSR, RPR, CRR
             Official Court Reporter
18           License No. 10504

19

20

21

22

23

24

25
```

Exhibit D - Page 1244