# Exhibit 1

# ***Public Redacted***

# This Exhibit Is Filed Under Seal Pursuant To Protective Order

# Exhibit 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No. CV 04-09049 SGL(RNBx)                     Date: July 9, 2009
Title:         MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
==================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

         Cindy Sasse                           None Present
         Courtroom Deputy                      Court Reporter

ATTORNEYS PRESENT FOR              ATTORNEYS PRESENT FOR
PLAINTIFFS:                        DEFENDANTS:

None Present                       None Present

PROCEEDINGS:   ORDER GRANTING EX PARTE APPLICATION RE TEMPORARY
               RECEIVERSHIP (DOCKET #5728)

               ORDER GRANTING EX PARTE APPLICATION RE COST
               SHIFTING (DOCKET #5865)

               ORDER GRANTING IN PART EX PARTE APPLICATION FOR
               RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

               ORDER GRANTING IN PART MATTEL'S MOTION RE
               DISCOVERY MASTER ORDER NO 27 AND REMANDING
               DISCOVERY MASTER ORDER NO. 27 FOR
               RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT
               OF THE FILING OF THE TAAC (DOCKET #5561)

               ORDER DENYING MOTION TO STRIKE THE FORENSIC
               AUDITOR'S REPORTS (DOCKET #5705)

MINUTES FORM 90
CIVIL -- GEN                      1            Initials of Deputy Clerk __cls_____

EXHIBIT __2__ PAGE 45

## I. ORDER GRANTING EX PARTE APPLICATION
## RE TEMPORARY RECEIVERSHIP (DOCKET #5728)

Because the only opposition to the Ex Parte Application regarding the winding up of the Temporary Receivership involves the issue of cost-shifting, which is addressed separately, below, the Court **GRANTS** the Ex Parte Application. A separate order addressing this Ex Parte Application has been concurrently filed.

## II. ORDER GRANTING EX PARTE APPLICATION RE
## COST SHIFTING (DOCKET #5865)

The MGA parties' opposition to the Temporary Receiver's Ex Parte Application argued that the costs of the Temporary Receivership should be shifted to Mattel (as the party who sought appointment of a Temporary Receiver). However, the Court has previously ruled that, at some yet-to-be defined date in the future, the Court will consider whether to shift the costs of both the Temporary Receivership and the Forensic Audit. Therefore, Mattel filed an Ex Parte Application seeking either to be relieved of the responsibility to respond to the MGA parties' argument or, alternatively, for an order setting a briefing schedule on the issue. It is not the intention of the Court to address the cost-shifting issue at this time; rather, as the Court has stated previously on the record, that issue is more efficiently resolved at a later date, most likely a date after completion of Phase 2 of the trial. Accordingly, the Court **GRANTS** Mattel's Ex Parte Application re Cost Shifting. Mattel is relieved of any duty to respond to MGA's argument regarding the appropriate allocation of costs arising from the Temporary Receiver that is set forth in the MGA parties's June 26, 2009 Opposition to the Temporary Receiver's Ex Parte Application.

## III. ORDER GRANTING IN PART EX PARTE APPLICATION FOR
## RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

The Court has received and reviewed the MGA Parties' Ex Parte Application For Partial Release of *In Camera* Juror Interview Transcripts, as well as the Opposition, the Reply, and the accompanying exhibits. The Court **GRANTS IN PART** the Ex Parte Application. Although the Court declines to award the relief sought, the Court will take steps to ensure that the transcript of the juror interviews are provided to the Ninth Circuit for its consideration of the appeal filed by the MGA parties.

The relevant *in camera* juror interviews were conducted on July 25, 2008; the findings made by the Court on the basis of those interviews are set forth in detail in the Court's Order Denying Motion for Mistrial, dated August 8, 2008. Counsel for the parties agreed that the juror interviews, which were conducted mid-trial, should be conducted *in camera*, and the MGA parties did not request that the Court grant them access to the transcripts to prepare their Motion for Mistrial. The Court indicated on the

EXHIBIT __2__ PAGE __46__

record around the time of the filing of the Motion for Mistrial that it was not the Court's intent to grant the parties access to the transcripts.

After the conclusion of the trial, the MGA parties did not at any time request this Court grant access to the transcripts. To the contrary, some ten months passed between the date of the Order Denying Motion for Mistrial and the MGA parties' first post-trial request for access to those transcripts. That request was made to the Ninth Circuit, not this Court, on June 10, 2009. When the Ninth Circuit denied the request in favor of the MGA's presentation of the issue to this Court in the first instance, the MGA parties thereafter filed the present Ex Parte Application in a expeditious manner.

Ostensibly, as set forth in both the Motion filed before the Ninth Circuit and the Ex Parte Application before this Court, the reason the MGA parties seek access to those transcripts is so that they may use them to challenge the Court's Order Denying Motion for Mistrial. Although the MGA parties filed its Notice of Appeal on May 4, 2009, and although that Notice clearly indicated that the Order Denying Motion for Mistrial would be implicated in the appeal, the MGA parties failed to file its Motion seeking release of the transcripts until June 10, 2009. The MGA parties' failure to seek this relief until a month after they filed their Notice of Appeal and a month before their opening brief was due, and their decision to present the issue of release of the transcripts to the appellate court (rather than this Court) in the first instance, created the very urgency that cause them to seek ex parte relief from this Court. As such, the Court declines to grant the relief sought.

Nevertheless, in the interest of due process and in order to facilitate the full consideration of the issue by the Ninth Circuit, the Court will take steps to ensure that the transcripts of the *in camera* interviews are provided to the Ninth Circuit for *in camera* filing.

## IV. ORDER GRANTING IN PART MATTEL'S MOTION RE DISCOVERY MASTER ORDER NO 27 AND REMANDING DISCOVERY MASTER ORDER NO. 27 FOR RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT OF THE FILING OF THE TAAC (DOCKET #5561)

In the challenged portion of Discovery Master Order No. 27 ("DM Order No. 27"), the Discovery Master denied Mattel's Motion to Compel discovery sought by service of a subpoena on non-party Bingham McCutchen LLP ("Bingham"), a law firm that represents Intervenor Omni 808, as well as a number of non-party entities that are familiar to those involved in this litigation: OmniNet Capital, LLC ("OmniNet"), Vision Capital, LLC ("Vision"), IGWT Group, LLC ("IGWT"), and IGWT 826 Investments, LLC ("IGWT 826"). Broadly categorized, the subpoena sought production of (1) fee agreements relating to Vision and Omni 808; (2) documents regarding the formation, control, and financing of Omni 808, Vision, and Lexington Financial Limited

EXHIBIT __2__ PAGE 47

("Lexington"); (3) documents identifying stakeholders and officers of Omni 808, Vision, and Lexington; (4) all contracts relating to Omni 808, Vision Capital, and Lexington; (5) all communications relating to Omni 808, Vision Capital, and Lexington, excluding attorney-client privileged documents; and (6) Bingham's representation of MGAE and certain named individuals who have some connection with MGAE, including a number of Mr. Larian's family members.

The Discovery Master correctly recognized the essential legal standard in assessing whether a subpoena may be enforced. The information must satisfy the discovery relevance standard, i.e., it must be "'reasonably calculated to lead to the discovery of admissible evidence.'" DM Order No. 27 at 19 (quoting Fed. R. Civ. P. 26(b)(1)). The decision of whether to enforce a subpoena ultimately implicates a balancing test that pits relevance of the materials sought and need to the requesting party against hardship to the party resisting the subpoena. DM Order No. 27 at 20. Non-parties are generally required to bear lesser burdens than parties in responding to subpoenas. Exxon Shipping Co. v. United States Dept. of Interior, 34 F.3d 774, 779 (9th Cir. 1994) ("The Federal Rules also afford nonparties special protection against the time and expense of complying with subpoenas.").

However, the Discovery Master overstated the burden of proof allocated to Mattel, as the party seeking discovery. See DM Order No. 27 at 20 ("As the party moving to compel compliance with the subpoena, Mattel bears the initial burden of establishing that the information sought is relevant and necessary to the claims or defenses at issue.") This standard is both overstated and incomplete. It is overstated in that Mattel need not show that the evidence sought is "necessary to the claims or defenses." Although Mattel indeed bears the burden of establishing relevancy, that showing is not one of "necessity." Rather, Mattel must bear the burden of establishing the discovery relevancy standard -- that the materials sought are "reasonably calculated to lead to the discovery of admissible evidence" -- is met. It need not establish that the materials sought are "necessary" to its case.

This point leads to the manner in which the stated burden is incomplete. As clearly articulated by cases cited by Bingham, although Mattel bears an initial burden of establishing relevancy, the party resisting discovery thereafter has the burden of establishing that discovery should be denied. See Bryant v. Ochoa, 2009 WL 1390794 at *1 (S.D. Cal. 2009) ("The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1). . . . Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections."); DIRECTV, Inc. v. Trone, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (same); see also Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975) (reversing the district court's issuance of a protective order based on a failure of the party resisting discovery to meet its burden by asserting that the defendant's deposition would merely yield cumulative evidence).

EXHIBIT  2   PAGE 48

The effect of this subtle variation on the burden of proof from that stated by the Discovery Master is magnified by the recent filing of the TAAC, which significantly heightens the relevancy of the issue of how the MGA parties and the parties represented by Bingham may be related, the formation of certain of those entities, and other issues implicated by Mattel's requests. Because the question of relevance is featured so prominently in the quintessential balancing test to which the present discovery motion was subjected, the filing of the TAAC dramatically altered the calculus that underlies the conclusions reached in DM No. 27.

For reasons related to judicial economy and preservation of scarce judicial resources (which this case has stretched to the outer limits), the Court defers decision, in light of the changed calculus that has occurred as the result of the filing of the TAAC, of the issues presented in the challenged portions of DM No. 27 to the Discovery Master. For that reason, the Court **REMANDS** the challenged portions of DM No. 27 to the Discovery Master for his reconsideration and re-balancing in light of the recently filed TAAC. The Discovery Master may, in his discretion, set the matter for further briefing and/or hearing, he may take the matter under submission based on the existing record, or he may take other action as he deems appropriate to resolve the present issues.

Notwithstanding the remand of DM Order No. 27, one issue raised by Mattel requires further consideration by the Court. At page 25 of DM Order No. 27, the Discovery Master appears to impose a blanket prohibition on discovery of materials that are in the possession of a subpoena recipient, but that are related to a non-party over whom the Court has not been shown to have jurisdiction. The Discovery Master cites no legal authority for such a blanket prohibition, and the Court, in its own research, has found none. Such a blanket prohibition precludes the application of the balancing test that applies almost universally to discovery motions; accordingly, and because this blanket prohibition is unprecedented, the Court finds that it is contrary to law. As to this narrow issue, the Court **GRANTS** Mattel's Motion. The issue of discovery of materials relating to Lexington is **REMANDED** to the Discovery Master for reconsideration in light of this ruling and in light of the filing of the TAAC.

## V. ORDER DENYING MOTION TO STRIKE
## THE FORENSIC AUDITOR'S REPORTS (DOCKET #5705)

In an unsealed filing that has since been ordered sealed by the Court, counsel for Omni 808 Investors, LLC ("Omni 808"), Todd E. Gordinier, made unwarranted, unsubstantiated personal attacks against the Court-Appointed Forensic Auditor, Ronald L. Durkin. Mr. Gordinier's selective public disclosure of portions of the Forensic Auditor's Summary Report, coupled with the maintenance of the Summary Report, as well as the later-filed Responsive Report and Final Report, under seal in their entirety, has led to an unbalanced public presentation of the issues discussed therein. In an

EXHIBIT __2__ PAGE 49

attempt to cure this deficiency, the Court has considered the possibility that it should simply unseal the relevant Reports and allow those Reports to speak for themselves.

Because the MGA entities were the primary subject of the Forensic Audit, the MGA parties have, quite understandably, objected to the proposed unsealing. Mattel, for its part, advocates quite emphatically, and not unreasonably, that the Reports should be unsealed in light of the selective disclosure. See Tr. at 31-32 ("It's the underlying analysis that refutes the selective disclosures that MGA and Omni made in a public forum to smear . . . both Mr. Durkin and Mattel.") At the other end of the spectrum, Omni 808 has moved to strike the Reports in their entirety.

In the end, although the Court does not order the unsealing of the Reports, it **DENIES** the Motion to Strike. The Court ordered the Forensic Audit to evaluate whether a receiver should be appointed; as the record bears witness, the Court eventually rejected the suggestion that it should appoint a permanent receiver, and the Court has instead appointed an MGA Monitor with more limited powers than a receiver. Nevertheless, the fact that the Reports were intended to serve a very limited purpose does not mean that there is no possibility that the Forensic Auditor's Reports will not serve any purpose henceforth.

As it currently stands, the Court **ORDERS** that no party shall cite to or rely upon the Reports for any purpose absent further Order of this Court.[1] However, the documents attached to the Reports, to the extent they are otherwise discoverable, are not insulated from discovery on the basis that they have been made part of the Reports. Conversely, documents, such as charts and interview notes, that were prepared by the Forensic Auditor are the property of the Court and are not subject to discovery or use in this or any other litigation by any party or non-party.[2]

Had it been counsel for the MGA parties who mounted the unwarranted, unsubstantiated, and public personal attacks on Mr. Durkin, the Court would find, notwithstanding the sensitive information contained therein, the unsealing of the Reports was an appropriate remedy for the selective disclosure.[3]  However, here, it is

---

[1] This Order does not supersede the Court's Order permitting the Forensic Auditor to share information with the Court-Appointed Monitor.

[2] Toward that end, the Court **CLARIFIES** to the parties that the work papers, drafts, notes, detailed time records, and any other materials prepared by or at the direction of the Forensic Auditor are the property of the Court.  The Court **ORDERS** the Forensic Auditor, as the custodian of those records on behalf of the Court, to retain those materials, whether maintained in electronic, hard copy, or any other medium, until further order of the Court.

[3] As it stands, counsel for MGAE, James I. Stang, wisely sought, and was granted, leave to file his more restrained, but just as unwarranted and unsubstantiated, personal attacks on Mr. Durkin under seal.  See MGA Entertainment, Inc.'s Response to Final In Camera Report of Forensic Auditor Ronald L.

Initials of Deputy Clerk __cls_____

EXHIBIT __2__ PAGE 50

counsel for Omni 808 who made those attacks public, and although Mattel maintains that both the MGA parties and Omni 808 are jointly responsible for the selective disclosure, <u>see</u> July 6, 2009, Tr. at 33, whether, or to what extent, the MGA parties act or have acted in concert is an issue to be decided in Phase 2 of this action.

Nevertheless, Mr. Gordinier's attack on Mr. Durkin cannot pass without comment by the Court. The Court's comments are directed toward Mr. Gordinier personally, which is not the Court's usual practice. Although the irony of this form of address is not lost on the Court (given the subject of this Order), it is appropriate. Mr. Gordinier signed all three filings in which the personal attacks appear, and continues to stand behind those filings. Moreover, Mr. Gordinier expressly and unabashedly claimed personal responsibility for the brief that was not filed under seal, by both stating that he gave it a lot of thought before filing it and by implicitly acknowledging that although he considered filing his brief under seal, he ultimately rejected that course of action. See May 18, 2009 Tr. at 46-47 ("My brief speaks for itself. We have nothing to hide. . . . I didn't feel it appropriate, necessary, or desirable to file my brief under seal. And I don't have a problem with the Court or anybody reading what I have to say, because I gave it a lot of thought, and I gave it a lot of consideration.").

At the July 6, 2009, hearing, the Court outlined its concerns that while the attacks on Mr. Durkin were public, the Reports are not, and that "it doesn't seem fair" to the Court to allow those allegations to stand alone without a chance to respond to them. July 6, 2009, Tr. at 25-26. In response, Mr. Gordinier contended that his comments "respond[ed] to the report," and that "[w]hat we said was that there were problems with that report." July 6, 2009, Tr. at 28. This statement is an implicit denial that any personal attacks were made; however, as set forth in great detail below, the record belies Mr. Gordinier's *post hoc* protestations.

Lest Mr. Gordinier's statement reflecting his implicit denial that he engaged in personal attacks be perceived as one being made at oral argument without ample time to reflect upon its significance, the statement is also made by Mr. Gordinier in Omni 808's Reply Memorandum, a document upon which he had ample time to reflect: "Each and all of the references in Omni's Statement of Position refer to the contents of Mr. Durkin's <u>Reports</u> and the shortcomings contained therein and omitted therefrom, not to his person." <u>Id.</u> at 2 n.1. To be sure, the criticisms leveled at Mr. Durkin are framed in

---

Durkin (docket #5918) at 4 (accusing Mr. Durkin of "making McCarthy-like statements of non-existent buybacks and unsupported insinuations of conflicts of interest"); <u>id.</u> at 9 (suggesting that Mr. Durkin's formulation of certain search terms relating to criminal acts in Farsi without a concurrent formulation of those terms in English demonstrated a "predisposition that Persian members of MGA's management and staff (and only the Persian members) might be engaged in illegal conduct"). Mr. Stang's attacks pale in comparison to those advanced by Mr. Gordinier, and they were filed under seal. Thus, although the Court's analysis and conclusions regarding the Forensic Auditor's Reports applies with equal force to Mr. Stang's statements, his are not the focus of the Court's attention at this time.

EXHIBIT  2  PAGE  51

terms of his Reports.  Still other criticisms are, as counsel maintains, addressed to the Reports themselves; those must be analyzed based on their substance.  However, as aptly demonstrated by the cited and quoted portions of Mr. Gordinier's filings that appear below, his criticisms do not, by any measure, confine themselves to those Reports, and instead reach out in a highly personal manner to attack the author, his professionalism, his competence, his objectivity, and his integrity.[4]

Indeed, in a display the likes of which have not been previously witnessed by this Court, Mr. Gordinier strayed far afield of legitimate criticism of the discussions, analyses, and conclusions reached in the Summary Report and the Reports that followed.  To be sure, there are instances in which Mr. Gordinier addressed the message found in those Reports; just as surely, however, as detailed below, Mr. Gordinier attacked the messenger.  Specifically, the papers filed by Mr. Gordinier on behalf of Omni 808 call into question Mr. Durkin's professionalism and competence, as well as his objectivity and integrity.  Moreover, and alarmingly, they falsely accuse Mr. Durkin of being influenced by an ethnocentric bias against Mr. Larian and Mr. Kadisha.  Such attacks, aimed at Mr. Durkin personally rather than the discussion, analyses, and conclusions set forth in his Reports, appear throughout Omni 808's papers.  See Omni 808 Investors, LLC's Statement of Position re Order to Show Cause re Appointment of a Permanent Receiver (docket #5446) ("SOP"), filed May 14, 2009, at 11 (referring to Mr. Durkin's "irresponsible" analysis); id. (noting that Mr. Durkin is "far too experienced" to believe that he "produced . . . a balanced presentation"); id. (stating that "Mr. Durkin's report is a polemic" and "a piece of advocacy"); id. at 12 n.9 (calling into question Mr. Durkin's "objectivity" based on the fact that the Court ordered Mr. Durkin's fees be paid (at least in the first instance) by Mattel); id. (suggesting that Mr. Durkin's ex parte communications with Mattel were improper); id. at 13 n.10 (characterizing Mr. Durkin's quotation of Mr. Larian's and Mr. Kadisha's account of how the two men were acquainted, from "the Persian community," as "at best, unprofessional" and, "at worst,

---

[4] Adding still further to the mounting irony, in the same footnote that Mr. Gordinier disclaims engaging in improper personal attacks, he falsely accuses counsel for Mattel of advancing their own improper *ad hominen* attacks against Neil Kadisha, who has been referred to as a "common thief" in certain unspecified Mattel filings.  Mr. Kadisha is the Managing Partner of a diversified investment firm, Omninet Capital, LLC, and an investor in Omni 808.  To call someone a "common thief" is, undoubtably, by any measure, a highly personal attack, therefore an attack addressed "to the man," or *ad hominen*.  However, in the same manner Mr. Gordinier accuses Mr. Durkin of failing to provide appropriate context to the Court in his Reports, Mr. Gordinier himself fails to acknowledge that counsel for Mattel's use of the term "common thief" in connection with Mr. Kadisha merely quotes Los Angeles County Superior Court Judge Henry W. Shatford's conclusion regarding Mr. Kadisha, as set forth in his 191-page Statement of Decision, dated October 24, 2006, which was issued after a 200-day trial, which is currently pending appeal, and which conferred upon Mr. Kadisha the oft-repeated moniker of "common thief," as well as "embezzler," and "perjurer."  See Uzyel v. Kadisha, Cal. App. Nos. B196045, B203804, B198007, B199850, B201425, 2009 WL 646096 (Mar. 4, 2009) (appellate brief).  As always, context is key.  The use by counsel for Mattel of another court's findings and conclusions to advance an argument is not inappropriate.  Those findings and conclusions may, or may not, be relevant to matters presented to the Court.  Used in this manner, although undoubtably addressed "to the man" (and his credibility), it is not an improper *ad hominen* attack.

EXHIBIT __2__ PAGE _52_

evidence of improper cultural bias"); id. (in the same footnote, referring to the same
quotation, stating that "[t]he tone [of the report] itself is compelling proof that Mr. Durkin
had no intention of providing an 'objective' report to the Court."); id. at 23 (referring to
the Summary Report as "Mr. Durkin's ill-concealed advocacy piece"); id. (noting that
advocacy, rather than objectivity, "is certainly the posture [Mr. Durkin] is most
comfortable with"); Omni 808 Investors, LLC's Memorandum in Support of Its Requests
to Strike Summary and Responsive Reports of Ronald L. Durkin (docket #5705)
("Motion to Strike"), filed June 8, 2009, at 4 (noting Omni's "doubts that the Court or any
party would benefit further by continuing this façade of Mr. Durkin's 'impartiality'"); id. at
7 (calling Mr. Durkin's explanation of his conclusion regarding the relatedness of certain
parties as "not only fatuous[,] but [also] intellectually dishonest"); id. at 9 (suggesting
that Mr. Durkin intentionally concealed from the Court the fact that Mr. Larian sought
other funding sources before turning to Mr. Kadisha); id. at 10 (noting that "Mr. Durkin's
repeated references to Mr. Larian's and Mr. Kadisha's common 'Persian' heritage can
only be viewed as an attempt to draw some nefarious ethnic connection between
them"); id. at 12 (calling the reference to Mr. Larian's and Mr. Kadisha's ethnicity
"unprofessional symptoms of improper cultural bias [that] have no place in a supposedly
objective report"); Omni 808 Investors, LLC's Reply Memorandum (docket #5809)
("Reply Memo") at 14 (suggesting that not only Mr. Durkin, but also counsel for Mattel,
harbor "cultural biases" that lead them to "suggest[] that [Mr. Larian's and Mr. Kadisha's]
common heritage makes [them] more likely to act contrary to their own interests); id. at
15 (stating that, according to his own interview notes, Mr. Durkin "misrepresented" to
the Court in his Summary Report how Mr. Larian and Mr. Kadisha portrayed their
relationship with each other).

As alluded to, Omni 808's criticisms have not been limited to personal attacks;
some of the criticisms are in fact aimed at the Reports themselves. See e.g., SOP at 16
("Mr. Durkin's conclusion that the Wachovia-Omni transaction impacted 'MGAEI's
solvency and ability to continue conducting operations' is simply wrong."). Any
comment by the Court regarding the substance of the discussions, analyses, and
conclusions presented to the Court in the Forensic Auditor's Summary, Responsive,
and Final Reports is inadvisable at this time. With the filing of the Third Amended
Answer and Counterclaims, much of the subject matter of the Forensic Auditor's
Reports have been incorporated into the claims at issue in this action. As such, it would
be premature for the Court to comment upon the substance of issues that are yet to be
adjudicated, and that are subject to a trial by jury. Nevertheless, the Court has
reviewed the Forensic Auditor's Summary, Responsive, and Final Reports, and the
exhibits attached thereto. The Court has also reviewed and considered the criticisms
aimed at the Forensic Auditor, cited and quoted above, as well as the entirety of all the
papers responding to the Forensic Auditor's Reports filed to date. After this review, the
Court is firmly convinced that all the personal criticisms of Mr. Durkin are unwarranted
and unsubstantiated.

At best, the criticism of Mr. Durkin's performance and presentation represents a

MINUTES FORM 90
CIVIL -- GEN                               9                Initials of Deputy Clerk __cls_____

EXHIBIT __2__ PAGE 53

different interpretation of available evidence. That such disagreements would arise between the analyses offered by a Court-Appointed Forensic Auditor and that offered by counsel for a party whose transactions have been a subject of that audit is by no means surprising. A jury considering the relevant evidence might ultimately make factual determinations that tend to agree with Mr. Durkin's assessment, it might ultimately tend to agree with Mr. Gordinier's assessment, or it may very well reject both positions in favor of another. The answer to the merits of the claims at issue in this action must await another day. Today, the Court merely notes that its examination of the Forensic Auditor's Reports reveal that Mr. Gordinier's personal attacks aimed at their author were unjustified.

Some specific attacks directed toward Mr. Durkin – relating to his background as a law enforcement officer, his communications with counsel for Mattel, and specific (but baseless) allegations of ethnocentric bias -- are worthy of more specific comment by the Court.

Stopping short of explicitly stating such, Mr. Gordinier appears to labor under the assumption that Mr. Durkin has been unable to put behind him the prosecutorial mindset under which he presumably operated during his former service to this Nation as an agent of the Federal Bureau of Investigation ("FBI"). At the outset, the Court notes that Mr. Gordinier's unstated assumptions do a disservice to the prosecutors and the law enforcement officers who work with those prosecutors, both of whom conduct their work under the clearly delineated duty to ferret out not only evidence of guilt but also "evidence favorable to the accused." See e.g., Berger v. United States, 295 U.S. 78, 88 (1935) (noting that the role of the prosecutor is not to win at all costs and observing that the prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."); Brady v. Maryland, 373 U.S. 83, 87 (1963) (imposing a duty on prosecutors to provide to the defense exculpatory evidence when requested to do so).

Secondly, even if prosecutorial duties were not so defined, the Court finds no suggestion that Mr. Durkin skewed the evidence in favor of any particular viewpoint. Undoubtedly, there is a **complete absence** of any evidence that, as Mr. Gordinier has suggested, Mr. Durkin has embarked upon a campaign to purposely mislead the Court.

Mr. Gordinier also suggests that, because Mr. Durkin's bills are being paid by Mattel, Mattel has, through this payment or through other communications with Mr. Durkin, bought Mr. Durkin's loyalty. This is utter nonsense. As demonstrated by the Court's communications with him, Mr. Durkin is a Court-Appointed Officer who understands that his role is to work on behalf of the Court and not on behalf of any party. In any event, the Court's Order of January 7, 2009, which appointed Mr. Durkin, imposed the costs of the audit on Mattel "in the first instance," but expressly provided for

MINUTES FORM 90
CIVIL -- GEN                                10                    Initials of Deputy Clerk __cls_____

EXHIBIT __2__ PAGE 54

the possibility that the audit expenses be shared or shifted to the MGA parties. Moreover, to suggest, however subtly, that ex parte communications with counsel for Mattel were improper ignores the Court's mandate to the Forensic Auditor in the January 7, 2009, Order, which states that Mr. Durkin was provided with attorney contact information and that he "shall direct his initial communications to counsel." At no time has the Court precluded the Forensic Auditor's communications with Mattel or its counsel; in fact, because the Forensic Audit was undertaken based on evidence gathered by and presented to the Court by Mattel, Mr. Durkin would have been remiss in his duties if he failed to communicate with Mattel and its counsel.

Mr. Durkin was vested with powers and discretion to complete a Court-ordered Forensic Audit. Pursuant to an Order of this Court, he undertook this task and exercised those powers and that discretion, presenting his Reports in conformity with the Court's instructions. Despite counsel's attacks, the Court's review of the evidence before it discerns no abuse of those powers or of that discretion.

Particularly troubling to the Court is that counsel speculates that, because Mr. Durkin noted in his report that Mr. Larian knew Mr. Kadisha from "the Persian Community," Mr. Durkin could be "of the view that this common heritage makes Mr. Kadisha more likely to act contrary to his own interests or to do something via third-parties that he wouldn't otherwise do?" See SOP at 13-14 n.10 (appearing to pose this thought as a rhetorical question). There is no indication in the record, or otherwise, that Mr. Durkin holds such a view. To the contrary, Mr. Durkin's comment regarding the acquaintanceship of Mr. Larian and Mr. Kadisha from "the Persian Community" (which is noted in the report within quotation marks and is expressly attributed to a reference made by Mr. Larian himself) is clearly predicated on interviews with these two individuals, each of whom related independently to Mr. Durkin and his colleagues that they knew each other from "the Persian Community." See Durkin Summary Report, Ex. 14, at 2 ¶ 3 (Notes re March 25, 2009, interview with Mr. Larian: "He indicated that he knew Kadisha from the Persian community.") and Ex. 14, at 15 ¶ 2 (Notes re March 26, 2009, interview with Mr. Kadisha: "Kadisha stated that he knows Larian from the Persian community."). The purpose for this reference is made clear in the footnote set forth at the end of the sentence in which the reference appears; namely, the Report discusses evidence that the relationship between Mr. Larian and Mr. Kadisha is stronger and more personal than either man claimed it was. See Summary Report at 5 n.18; Ex. 15 (personal emails).

In the Reply Memo, Mr. Gordinier takes issue with this explanation, this time including not only Mr. Durkin but also counsel for Mattel as the targets for his unsubstantiated allegations of "cultural bias." Mr. Gordinier first mischaracterizes an argument made by Mattel. Mattel argued, and quite correctly, both that how well Mr. Larian and Mr. Kadisha knew each other was relevant to a determination of whether certain transactions between the two were arms-length transactions, and that this point was likely not lost on either of these two very sophisticated and successful

MINUTES FORM 90
CIVIL -- GEN

11

Initials of Deputy Clerk ___cls_____

EXHIBIT __2__ PAGE 55

businessmen.[5]  As noted previously, both Mr. Larian and Mr. Kadisha stated that they knew each other from "the Persian community" which, in the Forensic Auditor's view, was intended to, or at least had the tendency to minimize the existing relationship between the two.  Mr. Gordinier incorrectly characterizes this argument as Mattel's contention that Mr. Larian's and Mr. Kadisha's "Persian relationship" and "common Persian heritage" was somehow relevant to a determination of whether the Omni 808 transaction was an arms-length transaction.  Mattel made no such argument.  Neither counsel for Mattel nor Mr. Durkin have implied that Mr. Larian's and Mr. Kadisha's ethnicity factors into the analysis.  Other than to point to Mr. Larian's and Mr. Kadisha's separate, but identical, accounts of how they knew each other which, in turn, suggests how well they know each other, neither counsel for Mattel nor Mr. Durkin have stated or implied that Mr. Larian's and Mr. Kadisha's shared ethnicity is relevant to any matter currently or potentially before the Court.  Compare Opposition at 8-9 with Reply Memo at 14-15.

Moreover, Mr. Gordinier's substantive point, that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha told him about the closeness of their relationship, fares no better.  See Reply Memo at 15.  On this point, it is important to set this stage properly.  Counsel for all parties have attempted to glean far too much from two sterile paragraphs of interview notes taken by Mr. Durkin.  Much can be inferred from conversations and interviews through not only what is said, but what is not said, by the interviewee's demeanor, by the tone of the speaker, by the length and placement of pauses, and by non-verbal gestures and body language.  With all these variables, much of what is communicated does not find its way into notes.[6]  For instance, Mr. Durkin's interview of Mr. Larian lasted over two and a half hours; however, the interview notes are a mere five and a half pages.  Similarly, a one-hour and ten minute interview of Mr. Kadisha yielded only three and a half pages of interview notes.  This is not to suggest that the notes should have been longer or that the interviews should have been recorded or transcribed; rather, it is to suggest that counsel's arguments based on another's notes are not particularly probative.

In contrast, Mr. Durkin's assessment, based on his interviews with both of them,

---

[5]  In fact, the Court just this week issued a 30-page, single-spaced opinion resolving a 10-day bench trial conducted over the sole issue of whether a transaction between "closely related" entities reflected its fair market value, one of the more significant arguments ultimately rejected by the Court in that case being that the close relationship between the parties necessarily rendered the transaction a "sweetheart deal."  See July 6, 2009, Order, Siegel v. Warner Bros. Entertainment, Inc., et al., CV 04-08400 SGL (RZ) (docket #554).

[6]  Indeed, the interview notes upon which the parties rely concede as much.  See Summary Report, Ex. 14 at 2, 15 ("This interview memorandum is a factual representation of the topics discussed during the interview and is not intended to be a word for word or exact transcription of the conversation.").  Thus, in addition to not taking into account all non-verbal communication, the notes do not even represent everything that was said during the interview.

Initials of Deputy Clerk __cls_____

EXHIBIT __2__ PAGE 56

is that Mr. Larian and Mr. Kadisha attempted to minimize their relationship because both of them understand the relevance of any friendship or other connection between them to the assessment of the arms-length nature of any transactions in which they have engaged. Mr. Durkin's assessment does not come from the gentle teasing of a strained meaning from two sterile paragraphs of brief notes taken by another person; rather, his assessment springs from his participation in the interview process, the entirety of the interviews he conducted of Mr. Larian and Mr. Kadisha, and his review of all of the evidence. As such, the Court defers to his assessment, at least insofar as how Mr. Larian and Mr. Kadisha portrayed their relationship to him.

As for that scant language from which the parties glean so much meaning, the entirety of which is set forth below, it in no way supports the contention made by Mr. Gordinier that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha conveyed to him about the closeness of their relationship. On this topic, the notes of Mr. Larian's interview merely state the following:

> Larian decided to contact Neil Kadisha of OmniNet as he knew his company was in the distressed loan business. He indicated that he knew Kadisha from the Persian community. Kadisha said he wouldn't do the deal alone in today's environment and wanted Larian and their other friends to invest in the deal with MGA. Larian stated that Kadisha negotiated the debt with Wachovia and got it down significantly, Larian said he is not bitter about Kadisha getting a good deal on buying the loan.

Summary Report, Ex. 14, at 2 ¶ 3 (emphasis added). This paragraph contains the word "friends," and perhaps could even be read as an implicit statement by Mr. Larian that he and Mr. Kadisha are "friends." But the language does not compel such an inference. Moreover, it does not comport with the notes of Mr. Kadisha's interview, which on this topic state only the following:

> Larian and Kadisha have never been to dinner together. Kadisha stated that he knows Larian from the Persian community and he sees him often at religious events, etc. He has no investments with Larian. Kadisha did not talk with Larian last night, this morning or in the last two days.

Summary Report, Ex. 14, at 15, ¶ 2. Mr. Durkin's assessment that Mr. Larian and Mr. Kadisha sought to minimize the extent of their relationship is not contradicted by these short passages.

The criticism that Mr. Durkin was acting pursuant to an ethnic or cultural bias is clearly baseless. The allegations are irresponsible, and they are made to capitalize on

MINUTES FORM 90
CIVIL -- GEN                                    13                  Initials of Deputy Clerk __cls_____

EXHIBIT ___2___ PAGE 57

their inherent sensational nature for counsel's own purposes of diverting attention away from the substance of the Reports. Sensationalism aside, when viewed in context, the Reports' reference to Mr. Larian and Mr. Kadisha knowing each other from "the Persian community" was plainly innocuous. The reference was a direct quotation from both Mr. Larian and Mr. Kadisha. It was used in a broader discussion regarding how (and thus, impliedly, how well) the two knew each other, which is itself relevant to the issue of whether certain transactions relevant to the present litigation were made at arms length.

This is a most unfortunate incident. The Court certainly understands, in a case as hotly contested as this one -- with such high stakes, with such complex legal issues, and with such truly extraordinary legal talent on all sides -- that lawyers, however ethical and committed to the highest standards of professionalism (as the Court presumes and has found all counsel of record here to be), make statements or commit acts in haste that they subsequently regret. All of the players to this drama, are, after all is said and done, human. As such, all of us are vulnerable to all-too-common human frailties. The Court would place itself at the very top of any list of lawyers who have spoken improvidently at one time or another in this case (and any number of others). What the Court has witnessed here, however, in both manner and substance, for the reasons noted above, goes beyond what the Court can let pass without some manner of reprobation. So let the Court be clear: Nothing excuses the attempted character assassination in which Mr. Gordinier has engaged.

**IT IS SO ORDERED.**

EXHIBIT _2_ PAGE 58

# Exhibit 3

# ***Public Redacted***

# This Exhibit Is Filed Under Seal

# Pursuant To Protective Order

# Exhibit 4

# California Business Portal

## Secretary of State DEBRA BOWEN

**DISCLAIMER:** The information displayed here is current as of Jul 17, 2009 and is updated weekly. It is not a complete or certified record of the Limited Partnership or Limited Liability Company.

| LP/LLC | | |
|---|---|---|
| OMNI 808 INVESTORS LLC | | |
| **Number:** 200822610026 | **Date Filed:** 8/12/2008 | **Status:** active |
| **Jurisdiction:** CALIFORNIA | | |
| **Address** | | |
| 355 SO GRAND AVE STE 4400 | | |
| LOS ANGELES, CA 90071 | | |
| **Agent for Service of Process** | | |
| CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA | | |
| AS CSC - LAWYERS INCORPORATING SERVICE 9 | | |
| C1592199) | | |

Blank fields indicate the information is not contained in the computer file.

If the agent for service of process is a corporation, the address of the agent may be requested by ordering a status report. Fees and instructions for ordering a status report are included on the Business Entities Records Order Form.

Exhibit _4_ Page _162_

# Exhibit 5

# ***Public Redacted***

# This Exhibit Is Filed Under Seal
# Pursuant To Protective Order

# Exhibit 6

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
    John B. Quinn (Bar No. 90378)
2    (johnquinn@quinnemanuel.com)
    Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
    Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California  90017-2543
   Telephone:  (213) 443-3000
6  Facsimile:  (213) 443-3100

7  Attorneys for Mattel, Inc.

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                         EASTERN DIVISION

11

12  | CARTER BRYANT, an individual, | CASE NO. CV 04-09049 SGL (RNBx) |
13  |              Plaintiff,       | Consolidated with Case Nos. CV 04-9059 and CV 05-2727 |
14  |         v.                    | NOTICE OF SUBPOENA ISSUED TO BINGHAM MCCUTCHEN LLP |
15  | MATTEL, INC., a Delaware Corporation, | |
16  |                               | |
17  |              Defendant,       | |
18  | AND CONSOLIDATED CASES        | |

19

20

21

22

23

24

25

26

27

28

2-12.

Exhibit 6  Page 23

NOTICE OF SUBPOENA

1   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2       PLEASE TAKE NOTICE that, pursuant to Rule 45 of the <u>Federal Rules of</u>

3   <u>Civil Procedure</u>, Mattel, Inc., has issued a subpoena attached as Exhibit 1 requesting

4   the production of specified documents to the following witness:

5       Bingham McCutchen LLP, 355 South Grand Avenue, Suite 4400, Los

6   Angeles, CA 90071-3106.

7

8   DATED: February 12, 2009        QUINN EMANUEL URQUHART OLIVER &
                                     HEDGES, LLP
9

10                                   By /s/ Michael T. Zeller
11                                       Michael T. Zeller
                                         Attorneys for Mattel, Inc.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

Exhibit 6  Page 125

AO88 (Rev. 12/07) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

_____CENTRAL_____ _____CALIFORNIA_____

CARTER BRYANT, an individual,

**SUBPOENA IN A CIVIL CASE**

V.

MATTEL, INC., a Delaware corporation,

Case Number: CV 04-9049 SGL (RNBx)
Consolidated with cases 04-9059
and 05-2727

TO: Bingham McCutchen, LLP
     355 South Grand Avenue, Suite 4400
     Los Angeles, CA 90071-3106

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment A

| PLACE | DATE AND TIME |
|---|---|
| Quinn Emanuel Urquhart Oliver & Hedges, LLP | February 26, 2009 |
| 865 S. Figueroa Street, 10th Floor | 9:00 a.m. |
| Los Angeles, CA 90017 | |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _Michael T. Zeller_ /s/ Attorney for Plaintiff, Mattel, Inc. | February 12, 2009 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Michael T. Zeller, QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
865 S. Figueroa Street, 10th Floor, Los Angeles, CA 90017 (213) 443-3000

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] f action is pending in district other than district of issuance, state district under case number.

AO-88

Exhibit _6_ Page _126_

AO88  (Rev.  12/07) Subpoena in a Civil Case (Page 2)

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|

SERVED

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

'   I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA.
(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.
(2) Command to Produce Materials or Permit Inspection.
(A) Appearance Not Required. A person commanded to produce documents, not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
(3) Quashing or Modifying a Subpoena.
(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information;
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial
(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.
(d) DUTIES IN RESPONDING TO A SUBPOENA.
(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:
(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) Claiming Privilege or Protection.
(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT.
The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

Exhibit _6_  Page/77

## ATTACHMENT A

1.      All documents referring or relating to any fee agreement or fee arrangement referring or relating to Bingham McCutchen LLP's ("Bingham") representation of Vision Capital, LLC ("Vision Capital") and/or Omni 808 Investors, LLC ("Omni 808"), and any amendments or modifications thereto, and any communications referring or relating to any such agreements or arrangements.

2.      Documents sufficient to identify each and every person or entity billed for, liable to pay, responsible for payment of, or who has paid or promised to pay, whether directly or indirectly, Bingham's fees in connection with Bingham's representation of Omni 808 or Vision Capital.

3.      All documents referring or relating to the formation, governance, ownership, capitalization and/or funding of, or credit for, Omni 808, Vision Capital and/or Lexington Financial Limited ("Lexington"), including the source(s) and terms of such capitalization, funding and/or credit.

4.      All documents identifying any member, managing member, shareholder, holder of any ownership interest in, officer, director, employee and/or agent of, or investor in, Omni 808, Vision Capital and/or Lexington.

5.      All contracts and agreements, and proposed or offered contracts or agreements, referring or relating to Omni 808, Vision Capital and/or Lexington, including without limitation all drafts thereof disclosed to, shared with, exchanged with or received from Wachovia, MGA Entertainment, Inc., Fred Mashian, Leon Neman, Isaac Larian and/or any other person or entity other than Omni 808.

6.      All communications referring or relating to Omni 808, Vision Capital and/or Lexington.  For purposes of this Request, Bingham may exclude (a) privileged communications with its client Omni 808 after its attorney-client relationship arose; (b) privileged communications with its client Vision Capital after its attorney-client relationship arose; and (c) communications with Mattel's counsel or the Court in the matter of Carter Bryant v. Mattel, No. CV 04-9059, and consolidated cases.

7.      Documents sufficient to identify any instances in which Bingham has represented MGA Entertainment, Inc., any affiliate of MGA Entertainment, Inc., Fred Mashian, Leon Neman, any entity associated with Leon Neman, Yoel Neman, Monia Neman (aka Monia Mashian), Angela Larian, Farhad Larian, Isaac Larian and/or any entity associated with Isaac Larian at any time since June 1, 2001.

Exhibit _6_ Page _78_

AO88 (Rev. 12/07) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

CENTRAL      CALIFORNIA

CARTER BRYANT, an individual,

V.

MATTEL, INC., a Delaware corporation,

**SUBPOENA IN A CIVIL CASE**

Case Number: CV 04-9049 SGL (RNBx)
Consolidated with cases 04-9059
and 05-2727

TO: Bingham McCutchen, LLP
355 South Grand Avenue, Suite 4400
Los Angeles, CA 90071-3106

[ ] YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

[ ] YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

[X] YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment A

| PLACE | DATE AND TIME |
|---|---|
| Quinn Emanuel Urquhart Oliver & Hedges, LLP 865 S. Figueroa Street, 10th Floor Los Angeles, CA 90017 | February 26, 2009 9:00 a.m. |

[ ] YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Michael T. Zeller* /s/ Attorney for Plaintiff, Mattel, Inc. | February 12, 2009 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Michael T. Zeller, QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
865 S. Figueroa Street, 10th Floor, Los Angeles, CA 90017 (213) 443-3000

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

Exhibit 6 Page 179

AO88 (Rev. 12/07) Subpoena in a Civil Case (Page 2)

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED |  |  |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
|  |  |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
|  |  |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER _____

ADDRESS OF SERVER _____

Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA.

(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) Command to Produce Materials or Permit Inspection.

(A) Appearance Not Required. A person commanded to produce documents, not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a  written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) Quashing or Modifying a Subpoena.

(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

(d) DUTIES IN RESPONDING TO A SUBPOENA.

(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:

(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.

(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) Claiming Privilege or Protection.

(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT.

The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

Exhibit _6_   Page _180_

## ATTACHMENT A

1. All documents referring or relating to any fee agreement or fee arrangement referring or relating to Bingham McCutchen LLP's ("Bingham") representation of Vision Capital, LLC ("Vision Capital") and/or Omni 808 Investors, LLC ("Omni 808"), and any amendments or modifications thereto, and any communications referring or relating to any such agreements or arrangements.

2. Documents sufficient to identify each and every person or entity billed for, liable to pay, responsible for payment of, or who has paid or promised to pay, whether directly or indirectly, Bingham's fees in connection with Bingham's representation of Omni 808 or Vision Capital.

3. All documents referring or relating to the formation, governance, ownership, capitalization and/or funding of, or credit for, Omni 808, Vision Capital and/or Lexington Financial Limited ("Lexington"), including the source(s) and terms of such capitalization, funding and/or credit.

4. All documents identifying any member, managing member, shareholder, holder of any ownership interest in, officer, director, employee and/or agent of, or investor in, Omni 808, Vision Capital and/or Lexington.

5. All contracts and agreements, and proposed or offered contracts or agreements, referring or relating to Omni 808, Vision Capital and/or Lexington, including without limitation all drafts thereof disclosed to, shared with, exchanged with or received from Wachovia, MGA Entertainment, Inc., Fred Mashian, Leon Neman, Isaac Larian and/or any other person or entity other than Omni 808.

6. All communications referring or relating to Omni 808, Vision Capital and/or Lexington. For purposes of this Request, Bingham may exclude (a) privileged communications with its client Omni 808 after its attorney-client relationship arose; (b) privileged communications with its client Vision Capital after its attorney-client relationship arose; and (c) communications with Mattel's counsel or the Court in the matter of <u>Carter Bryant v. Mattel</u>, No. CV 04-9059, and consolidated cases.

7. Documents sufficient to identify any instances in which Bingham has represented MGA Entertainment, Inc., any affiliate of MGA Entertainment, Inc., Fred Mashian, Leon Neman, any entity associated with Leon Neman, Yoel Neman, Monia Neman (aka Monia Mashian), Angela Larian, Farhad Larian, Isaac Larian and/or any entity associated with Isaac Larian at any time since June 1, 2001.

Exhibit _6_ Page /_8_/

# Exhibit 7

CONFORMED COPY

FILED

1  Hon. Edward A. Infante (Ret.)
2  JAMS
   Two Embarcadero Center
   Suite 1500
3  San Francisco, CA  94111
4  415-774-2611
   415-982-5287 (fax)
5

6

7              UNITED STATES DISTRICT COURT

8             CENTRAL DISTRICT OF CALIFORNIA

9                   EASTERN DIVISION

10

11  CARTER BRYANT, an individual,        CASE NO. C 04-09049 SGL (RNBx)
                                         JAMS Reference No. 1100049530
12          Plaintiff,

13       v.                              Consolidated with
                                         Case No. CV 04-09059
14  MATTEL, INC., a Delaware corporation, Case No. CV 05-2727

15          Defendant.                   **ORDER GRANTING MATTEL'S
                                         MOTION TO COMPEL PRODUCTION
16                                       OF DOCUMENTS**

17

18  CONSOLIDATED WITH
    MATTEL, INC. v. BRYANT and
19  MGA ENTERTAINMENT, INC. v. MATTEL,
    INC.
20

21

22

23              I.  INTRODUCTION

24      On January 3, 2007, Mattel, Inc. ("Mattel") submitted its Motion to Compel Production of

25  Documents to the undersigned Discovery Master for disposition.[1] On January 11, 2007, Carter

26  Bryant ("Bryant") submitted his opposition brief, and on January 18, 2007, Mattel submitted a

27  reply brief.  The matter was heard via telephonic conference call on January 24, 2007.  Having

28

29  _____
   [1] Pursuant to a stipulation and order filed December 6, 2006, the undersigned was designated Discovery Master in
   accordance with Rule 53 of the Federal Rules of Civil Procedure.

   Bryant v. Mattel, Inc.,
   CV-04-09049 SGL (RNBx)                                                    1

   EXHIBIT __7__ PAGE _18_   1-26

considered the motion papers and comments of counsel at the hearing, Mattel's Motion to Compel

Production of Documents is GRANTED.

## II. BACKGROUND

At the heart of this lawsuit is a dispute over the rights to the "Bratz" dolls. This highly lucrative line of dolls was first conceived by Bryant, a former Mattel employee, and made commercially available by MGA Entertainment, Inc. ("MGA") in the summer of 2001. Sales of Bratz dolls now rival Mattel's Barbie doll.

### A. Mattel's Original Complaint

On April 27, 2004, Mattel, the world's largest manufacturer and marketer of toys, filed suit against its former employee Bryant in state court asserting claims for breach of contract, breach of fiduciary duty, breach of duty of loyalty, unjust enrichment, and conversion. Mattel employed Bryant as a product designer from September 1995 through April 1998, and from January 1999 through October 2000. Upon starting his second term, Bryant signed an Employee Confidential Information and Inventions Agreement which required him not to engage in any employment or business other than for Mattel, or invest or assist in any manner any business competitive with the business or future business plans of Mattel. Bryant also assigned to Mattel all rights, title, and interest in the "inventions" he conceived of, or reduced to practice, during his employment.

In addition, Bryant completed Mattel's Conflict of Interest Questionnaire, certifying that he had not worked for any of Mattel's competitors in the prior twelve months and had not engaged in any business dealings creating a conflict of interest. Bryant agreed to notify Mattel of any future events raising a conflict of interest.

Mattel alleges that during his employment, Bryant secretly aided, assisted and worked for a Mattel competitor (later identified as MGA). Bryant entered into an agreement with MGA to

EXHIBIT ___7___ PAGE _183_

provide product design services on a "top priority" basis.[2]  The agreement further provided that Bryant would receive royalties and other consideration for sales of products on which he provided aid or assistance; that all work and services furnished by Bryant to MGA under the agreement would be considered "works for hire"; and that all intellectual property rights to preexisting work by Bryant purportedly would be assigned to MGA.  Mattel further alleges that Bryant converted, misappropriated and misused Mattel property and resources while he was employed at Mattel.  In the complaint, Mattel claims ownership of all inventions and works created by Bryant during his Mattel employment and seeks to recover all benefits obtained as a result of his alleged breach of duties.

In May of 2004, Bryant removed the state court action to the U.S. District Court, asserting subject matter jurisdiction under both 28 U.S.C. §1331 (federal question jurisdiction) and 28 U.S.C. §1332 (diversity jurisdiction).  Mattel filed a motion to remand and submitted a copy of Bryant's agreement with Mattel's competitor, namely MGA.  The agreement was dated September 18, 2000 – a time when Bryant was still employed by Mattel — and required Bryant to provide MGA with design services for the Bratz dolls.  In return, MGA agreed to compensate Bryant at a monthly rate for a period of time and to pay Bryant a 3% royalty on sales of Bratz dolls.  In August of 2004, the district court remanded the action.

B. <u>Bryant's Cross-complaint</u>

In September of 2004, after the case was returned to state court, Bryant filed a cross-complaint against Mattel to challenge the legality of Mattel's Employee Confidential Information and Inventions Agreement.  Bryant's cross-complaint included claims for unfair competition, rescission, declaratory relief, and fraud.

//

---

[2]  Bryant has already produced his agreement with MGA.  Therefore, the existence of the agreement does not appear to be in dispute.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

3

EXHIBIT __7__ PAGE _184_

C. Bryant's Second Notice of Removal (CV 04-9059)

In November of 2004, Bryant filed a second notice of removal, once again invoking federal question and diversity jurisdiction. Bryant asserted that Mattel's complaint presented a federal question because events occurring since the first removal and remand demonstrated that Mattel's conversion claim involved the rights to the Bratz dolls, and therefore was preempted by the Copyright Act. Bryant also contended that there was diversity jurisdiction because he and Mattel were citizens of different states and the amount in controversy exceeded the $75,000 jurisdictional limit because the rights to the Bratz dolls were at stake. After the second notice of removal, MGA intervened as a defendant pursuant to a stipulation and order.

D. Bryant's Declaratory Relief Action Against Mattel (CV 04-9049)

On the same day that Bryant filed his second notice of removal, he also filed a complaint in federal court seeking a declaratory judgment that the Bratz dolls do not infringe Mattel's copyrights in a project known as "Toon Teens."

E. MGA's Complaint Against Mattel (CV 05-2727)

In April of 2005, MGA filed suit against Mattel alleging essentially unfair competition claims. MGA alleged that Mattel engaged in "serial copycatting" of Bratz dolls, Bratz "pets" and other Bratz products, Bratz television commercials, and Bratz packaging.

F. Mattel's Second Motion to Remand its Complaint against Bryant

Mattel filed another motion to remand its suit against Bryant. In March of 2005, the district court issued an order denying the motion to remand and certifying the order for interlocutory review. Mattel filed an appeal, and the district court stayed discovery in May of 2005. Discovery did not resume until May 2006, when the Ninth Circuit affirmed the district court ruling. After the stay was lifted the district court consolidated all three actions for all purposes. There is no scheduling order currently in place.

G. Court Dismisses Bryant's Cross-claims and Declaratory Relief Action

In July of 2006, the district court dismissed Bryant's cross-claims pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief may be granted. The district court also dismissed Bryant's declaratory relief action, finding there existed no reasonable apprehension of an imminent copyright infringement claim against him by Mattel based upon Mattel's Toon Teen intellectual property.

H. Mattel's Counterclaims against MGA

Mattel sought leave to file an amended complaint in case no. CV 05-9059 to add five defendants and nine new legal claims alleging a wide range of commercial disputes. For example, Mattel's proposed amended complaint contains RICO claims, a trade secret misappropriation claim, and aiding and abetting claims predicated on allegations that MGA cherry-picked certain high ranking Mattel executives or designers and then enticed them to steal Mattel's trade and proprietary secrets and deliver them to MGA before beginning work with MGA. Mattel also sought leave to add a copyright infringement claim. Mattel has recently filed copyright registrations with the U.S. Copyright Office claiming ownership in various Bratz doll designs created by Bryant.

On January 11, 2007, the district court granted Mattel leave to file its proposed amendments, but only insofar as they are pled in the form of an amended answer and counterclaim in the case MGA filed against Mattel, CV 05-2727. The next day, Mattel filed its amendments as ordered in case no. CV 05-2727.

I. Mattel's Requests for Production of Documents

Mattel served the requests for production of documents at issue in this motion on June 14, 2004. Bryant served objections and responses on July 16, 2004. The parties met and conferred, but ultimately Mattel moved to compel production in January of 2005. That motion, however,

EXHIBIT __7__ PAGE _186_

1   was not heard before the district court stayed all discovery pending resolution of Mattel's appeal

2   to the Ninth Circuit on subject matter jurisdiction issues.

3       After the stay of discovery was lifted, the parties met and conferred on June 20, 2006, at

4   the courthouse, and were able to achieve apparent agreement on the bulk of the present motion to

5   compel. The parties informed the court that they would submit a stipulation and order. See

6   Minutes dated June 20, 2006, Zeller Dec. Ex. 6 ("With respect to Mattel's Motion to Compel

7   Production of Documents, counsel will be submitting a stipulation and order which will be

8   dispositive of all the issues in dispute.").

9

10      Over the next several months, the parties exchanged draft stipulations and orders to

11  memorialize the parties' meet and confer session, but were unable to reach final agreement

12  because Bryant insisted upon including the following sentence in the stipulation: "The stipulation

13  resolves all issues raised in Mattel's motion to compel, which is hereby withdrawn." Bryant's

14  Opposition at 1:18-20. By including this sentence, Bryant intended to prevent further law and

15  motion regarding the requests at issue in Mattel's original motion to compel. Id. at 1:21-23.

16  From Mattel's perspective, however, the proposed sentence amounted to a demand that Mattel

17  waive its right to all further discovery in connection with its requests. Mattel proposed the

18  following provision as an alternative:

19

20          Except as, and only as set forth in the terms of Paragraph One above, nothing in
            this Stipulation shall preclude or limit Mattel from seeking further discovery on
21          any matter, including as to matter on which the parties could not reach complete
            agreement, or preclude or limit any right of Bryant to object or resist to such
22          discovery.

23  Bryant's Opposition at 7:5-11. Apparently Mattel's alternative language was

24  unacceptable to Bryant. At the direction of the Discovery Master, the parties met and

25  conferred again in late December 2006, but to no avail.

26      Despite the parties' inability to reach final agreement, Bryant produced approximately

EXHIBIT ___7___ PAGE _187_

1,600 pages of documents to date. Mattel contends, however, that the production is inadequate and consistent with a pattern of stonewalling.[3] Accordingly, Mattel filed the instant motion to compel responsive documents, which includes a request for sanctions in the amount of $7,805.

J.   Mattel's Motion to Compel Production of Documents

Mattel's motion has three parts. First, Mattel seeks an order compelling Bryant to produce the following categories of requested documents: (a) documents relating to Bratz designs created by Bryant while employed by Mattel; (b) doll prototypes created by Bryant while working for Mattel; (c) documents that refer to the conception, creating or development of Bratz; (d) Mattel-related documents that Bryant disclosed to MGA; (e) communications between Bryant and MGA that relate to Mattel or Mattel employees; and (f) documents showing what dolls Bryant was exposed to while working at Mattel. Mattel's Motion at 6. Mattel asserts that these categories of documents are relevant to establish Bryant's liability and would reveal works rightfully owned by Mattel.

Second, as to other categories of documents which Bryant has agreed to produce, Mattel contends that Bryant has imposed unjustified limitations. According to Mattel, Bryant will not produce any responsive documents that were created after the suit was filed; Bryant will not produce any communications with MGA "created" after the end of his Mattel employment; Bryant is limiting production of Bratz-related documents to designs that, in Bryant's view, "resulted in" the first line of Bratz dolls released in June 2001; Bryant has not produced known contracts between him and MGA and refuses to produce non-privileged communications relating to those contracts; and Bryant has withheld all but one category of financial documents relating to

---

[3]   According to Mattel, Bryant evaded a deposition until Mattel obtained a court order compelling him to appear. Similarly, MGA allegedly refused to permit its CEO, Isaac Larian, from being deposed. Mattel again obtained a court order compelling the deposition and sanctions. To date, only Bryant and Larian have been deposed.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

7

EXHIBIT ___7___ PAGE _188_

his earnings from his work for MGA. Mattel's Motion at 7. Mattel seeks full production of responsive documents without any of the limitations described above.

Third, Mattel contends that the documents Bryant has produced are inadequate for a number of reasons: the financial documents are so heavily redacted they are useless; faxed documents are missing fax header information, including the sending and receiving parties[4]; e-mails and other electronic documents that are known to exist have not been produced; Bryant refuses to inspect, and refuses to permit Mattel to inspect, the hard drive of a computer he used during the relevant period; and Bryant's privilege log is facially incomplete and lists only four documents.

K. Bryant's Opposition to Mattel's Motion to Compel

Bryant opposes Mattel's motion to compel. He views the motion as nothing more than Mattel's unwillingness to allow closure on any discovery matter after a lengthy meet and confer process which began back in 2004. Bryant emphasizes that the document requests at issue were first propounded at a time when Mattel was attempting to remand the case, making the claim that it did not know whether $75,000 was in controversy and insisting that it was asserting solely state law claims. Bryant explains that given Mattel's view of the case in 2004, he took the position that discovery should be limited to what occurred in his last days at Mattel and shortly thereafter. See Bryant's Opposition at 4-5 ("Bryant's activities and earnings in connection with Bratz in later years could have no conceivable relevance to the case because if those activities and earnings were at stake, the case was worth millions, not pennies."). Accordingly, in the summer and fall of 2004, he produced the following categories of documents: documents evidencing the artwork used to create the "First Generation" of Bratz dolls – the first dolls sold to the public in the summer of 2001; hundreds of pieces of artwork he was permitted to retain from his employment

---

[4] There is evidence that MGA's CEO instructed an employee to obliterate the fax header on a fax Bryant sent to MGA from Mattel's Design Center. MGA denies the accusation.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

8

EXHIBIT __7__ PAGE _189_

at Mattel; MGA statements revealing his earnings connected with the sale of the First Generation Bratz dolls and his 2000 contract with MGA; personal phone records and bank records; and hundreds of three dimensional doll parts and toy accessories that came into his possession over the years, including a prototype of the First Generation "Jade" doll.

Bryant generally agrees with Mattel's description of the meet and confer session held at the courthouse on June 20, 2006 and the parties' exchange of draft stipulations. According to Bryant, all the requests addressed in Mattel's original motion to compel and the instant motion led to agreement on the following points: (a) Bryant would produce all agreements for work he performed with or on behalf of MGA prior to June 30, 2001 (the approximate date the First Generation Bratz dolls were released to the public); (b) Bryant would waive the attorney-client privilege with respect to communications with the attorney who assisted him in negotiating his contract with MGA, so long as that waiver would be limited and in no way waive the privilege with respect to litigation counsel; (c) Bryant would produce any documents relating to any payments he received from MGA while employed at Mattel, irrespective of the date of creation; (d) Bryant agreed to make a diligent search for all computers referenced in his deposition and search them for responsive documents; (e) Bryant agreed to produce all documents and tangible things obtained from Mattel during the course of his employment at Mattel; (f) Bryant agreed to conduct a search and produce any patent, trademark or copyright applications, registrations and other non-privileged documents in his possession in connection with his work with MGA prior to June 2001; (g) Bryant agreed to identify documents responsive to particular requests if Mattel could demonstrate that the requests asked for such identification of documents; (h) Bryant agreed to sign a verification that none of the information redacted from his phone records related to Bratz or his work for MGA prior to June 30, 2001; (i) Bryant agreed to supplement his privilege log; and (j) the parties agreed that the stipulation modified Bryant's prior response to the discovery

EXHIBIT __7__ PAGE _190_

requests and that the stipulation controlled to the extent they were inconsistent. Bryant's Opposition at 5:22-6:21.

Bryant emphasizes that the parties have engaged in an extensive meet and confer process and asks the Discovery Master to order the disposition of this motion in a manner consistent with the parties' draft stipulation. If the draft stipulation is not adopted, Bryant fears the parties will have no incentive to compromise in the future. Bryant's Opposition at 1:24-2:3. Bryant also asks the Discovery Master to order Mattel not to revisit any of the requests that were the subject of Mattel's original motion to compel or the instant motion to compel. Id. at 2:11-13 and 10:9-10.

Furthermore, Bryant asserts that Mattel's requests are overbroad in numerous respects. In particular, Bryant asserts that Mattel is not entitled to all communications with MGA relating to Mattel employees. Bryant also asserts that Mattel is not entitled to unredacted personal phone records and financial information because these records are protected by privacy rights. Lastly, Bryant asserts that Mattel is not entitled to all Bratz related documents created after the lawsuit was filed.

### III.   DISCUSSION

#### A.   The Parties Did Not Reach a Stipulation to Resolve the Instant Motion

The parties' extensive submissions make it clear that the parties did not resolve the issues raised in the instant motion. The parties met and conferred extensively and in good faith, reaching compromises on virtually all categories of documents in dispute. Despite their efforts, however, the parties were ultimately unable to execute a binding stipulation because they were unable to agree on any provision to govern Mattel's future right to pursue additional discovery from Bryant. It is clear that the parties deemed it necessary to include such a provision in the draft stipulation in order to protect their respective positions. Because the parties did not execute a binding stipulation, there is no legal basis to enforce the terms contained in the draft stipulation.

EXHIBIT ___7___ PAGE _9_1_

Therefore, Mattel's right to the discovery it seeks in the instant motion to compel is governed by the familiar guidelines set forth in Rule 26 of the Federal Rules of Civil Procedure.

Furthermore, because the parties met and conferred in good faith and because they had a legitimate dispute over language governing Mattel's future right to pursue additional discovery from Bryant, the Discovery Master denies Mattel's request for sanctions.

B. Rule 26 of the Federal Rules of Civil Procedure

Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Fed.R.Civ.P. 26(b)(1). "Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Id. Discovery shall, however, be limited by the court if it determines that: "(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Fed.R.Civ.P. 26(b)(2).

C. Mattel's Requests for Production

Request Nos. 2, 13, 48: Documents Relating to Bryant's Agreements with MGA

Mattel seeks documents relating to Bryant's agreements with MGA, including doll-related agreements. Bryant is withholding responsive documents, including (a) documents relating to his Bratz agreements with MGA other than final signed agreements, including communications exchanged by the parties and drafts of the agreements, (b) documents relating to doll-related

EXHIBIT ___7___ PAGE _192_

agreements discussed or negotiated by Bryant and third parties while he was employed by Mattel other than signed agreements that were "reached" while Bryant was employed by Mattel, and (c) documents relating to Bryant's fee agreements with MGA or other indemnity agreements relating to this action.

The Discovery Master finds that the withheld documents are relevant to Mattel's claims. Among other things, the withheld documents could establish the timing, nature and scope of Bryant's work for MGA (or others), ongoing acts of copyright infringement, and damages. In addition, the withheld documents could be used for impeachment purposes. Further, documents relating to fee or indemnity agreements between MGA and Bryant are relevant to demonstrate bias and lack of credibility. Bryant has failed to establish that the requested discovery is barred by Rule 26(b)(2), Fed.R.Civ.P. Accordingly, Bryant is ordered to produce all non-privileged documents responsive to Request Nos. 2, 13, and 48.

Request Nos. 11, 12, 19, 37, 40, 41, 42, 43, 53, 54, 55:  Documents Relating to Bratz's Development and Other Projects that Bryant Worked on for MGA

Mattel seeks documents relating to the Bratz project and any other projects Bryant worked on for MGA. Bryant produced documents relating only to the First Generation Bratz dolls. Bryant is prepared to produce additional documents relating to work he performed for MGA prior to June 30, 2001, acknowledging that those documents are relevant to Mattel's claim that Bryant breached his employee agreement by allegedly performing services for Mattel and MGA at the same time. Bryant objects to the requests to the extent they seek any additional documents on relevancy and overbreadth grounds.

The Discovery Master finds that Mattel's requests seek relevant information and are not overbroad. The lawsuit is much broader than the First Generation Bratz dolls issued in June 30, 2001. For example, Mattel alleges that it is entitled all works created by Bryant during his Mattel

EXHIBIT  7  PAGE 193

employment, regardless of whether they resulted in a Bratz doll released in June of 2001. Mattel also alleges that Bryant has breached his ongoing contractual duties not to use any of Mattel's confidential and proprietary information, not just information relating to the Bratz dolls released in June of 2001. Mattel also alleges that Bryant has infringed Mattel's alleged copyrights in Bratz works – works that are allegedly owned by Mattel because they were created while Bryant was employed by Mattel – through his ongoing conduct of reproducing and creating derivative works. Accordingly, Bryant is ordered to produce all non-privileged documents responsive to Request Nos. 11, 12, 19, 37, 40, 41, 42, 43, 53, 54, and 55.

Request Nos. 29, 30, 31, 32, 33, 34, 35, 36, 45, 46: Documents Relating to Bryant's Payments from MGA

Mattel seeks documents relating to Bryant's payments from MGA. Bryant acknowledges that Mattel is entitled to know how much money Bryant has earned from MGA, and represents that he has produced, in redacted form, all royalty statements he has received related to the First Generation Bratz dolls and his 2000 contract with MGA. Bryant asserts that his redactions are justified as a means to avoid disclosing the breakdown of MGA's revenue by particular product, which information Bryant believes constitutes MGA's trade secret information. Bryant also objects to producing tax returns, asserting that Mattel cannot show a "compelling need" for the returns. Bryant's Opposition at 29:21-27.

The Discovery Master finds that documents relating to MGA's payments to Bryant, including royalty statements and other payment information, are relevant to several Mattel claims. First, Mattel's claims against Bryant include breach of contract, breach of fiduciary duty, breach of duty of loyalty, unjust enrichment, and conversion. Mattel seeks to recover all benefits Bryant received as a result of his alleged violations of duties to Mattel. Payments to Bryant from MGA and others might be traceable to work Bryant performed while employed by Mattel, regardless of

EXHIBIT ___7___ PAGE _194_

when the payments were actually made. Such payments might also lead to evidence to support Mattel's allegation that Bryant converted, misappropriated, or misused Mattel information.

Second, the payments are relevant to Mattel's recently added claim for copyright infringement. Mattel alleges that Bryant, MGA, and others have infringed Mattel's rights in the Bratz drawings and works by copying and preparing derivative works from those works. Under the Copyright Act, a plaintiff is entitled to recover profits from infringement as well as actual damages. 17 U.S.C. §504(b). The works that potentially infringe Mattel's copyrights, therefore, include all Bratz doll products that MGA released to the market. For this reason, and for reasons already discussed in the previous subsection, Bryant's limited production of documents relating to only the First Generation of Bratz dolls is inadequate.

Third, payments to Bryant are relevant to Mattel's recently added claims for trade secret misappropriation. Payments could show when and what trade secret information Bryant and other defendants allegedly misappropriated from Mattel. Any proof of trade secret theft is also relevant to Mattel's defense against MGA's unfair competition claims.

Lastly, the breakdown of gross royalty payments may be required to prove actual causation of damages.

The protective order filed on January 4, 2005, is sufficient to address any confidentiality concerns raised by Bryant. Among other things, the protective order provides protection for confidential trade secret information. It has two tiers of protection, allowing a party to designate documents as either "Confidential" or "Confidential – Attorney's Eyes Only." The protective order also requires the parties to use information produced in discovery only for purposes of this litigation and not for any other purpose.

Accordingly, Bryant is ordered to produce, without redactions, all non-privileged documents responsive to Request Nos. 29, 30, 31, 32, 33, 34, 35, 36, 45, and 46. Bryant,

EXHIBIT ___7___ PAGE _195_

however, is not required to produce tax returns, provided that he otherwise fully complies with these requests as ordered.

Request Nos. 20, 23, 27, 28: Communications Between Bryant and MGA

Mattel seeks production of Bratz-related communications and communications with MGA. More specifically, Mattel seeks production of four categories of documents Bryant has refused to produce:  (1) communications between Bryant and MGA or third parties that explicitly relate to designs Bryant created while employed by Mattel; (2) communications between Bryant and MGA that relate to Mattel employees; (3) communications between Bryant and MGA relating to Bryant's Mattel employment or work Bryant performed for Mattel, except those communications "created" prior to the close of Bryant's Mattel employment; and (4) communications between Bryant and MGA that post-date Bryant's Mattel employment.  Bryant contends that the discovery requests for communications between Bryant and MGA are overbroad.  Bryant asserts that there are many former Mattel employees and friends of his who have privacy rights that would be impinged upon if he were to disclose his communications. Bryant also asserts that he has his own confidentiality interest regarding any information that he shared with MGA.  In particular, he objects to Mattel's discovery requests to the extent they would require him to reveal the identity of current Mattel employees seeking employment with MGA or Bryant.

The Discovery Master finds that Mattel's requests for all communications between Bryant and MGA unquestionably seek information relevant to Mattel's claims:  they will reveal what Mattel information Bryant shared with MGA, if any, and when.  The protective order is sufficient to address Bryant's confidentiality concerns.  It allows parties to designate as "Confidential" private information about current or former employees, contractors or vendors (including employee, contractor and personnel records).  Therefore, Bryant is ordered to produce all non-

EXHIBIT ___7___ PAGE _196_

privileged documents responsive to Request Nos. 20, 23, 27, and 28.  However, Bryant may continue to redact his telephone records, and shall provide a signed verification that none of the telephone calls that were redacted relate or refer in any way to MGA, Bratz, or any other project that Bryant worked on, with, for, or on behalf of MGA.  Telephone calls that do not relate or refer in any way to MGA or Bratz are irrelevant.

> Request Nos. 49, 51:  Mattel-Related Documents

Mattel seeks production of Mattel-related documents, and Bryant agrees to produce them.  Accordingly, Bryant is ordered to produce all documents responsive to Request Nos. 49 and 51.

> Request No. 9:  Documents re Registrations and Applications for Registrations

Lastly, in Request No. 9 Mattel seeks production of documents registrations and registrations and applications for registration.  Bryant deems the motion moot with respect to Request No. 9 because he agrees to produce any patent, copyright and trademark applications, registrations or other non-privileged documents in his possession, custody or control that constitute or relate to such applications and registrations obtained or applied in connection with (1) work on Bratz prior to January 1, 2001; (2) work related to the release of the First Generation Bratz dolls; and (3) work related to any work Bryant performed with, for or on behalf of MGA during the term of Bryant's employment with Mattel.

As discussed previously, the Discovery Master finds that the First Generation Bratz limitation is improper.  Therefore, Bryant is ordered to produce all non-privileged documents responsive to Request No. 9.

### IV. CONCLUSION

For the reasons set forth above, the Discovery Master orders as follows:

1. Mattel's motion to compel production of documents responsive to its First Set of Requests for Production, Request Nos. 2, 9, 11, 12, 13, 19, 20, 23, 27, 28, 29, 30, 31, 32, 33, 34,

EXHIBIT __7__ PAGE _197_

35, 36, 37, 40, 41, 42. 43. 45, 46, 48, 49, 51, 53, 54, and 55, is GRANTED.  However, Bryant need not produce his tax returns, on the condition that he complies fully with Request Nos. 29, 30, 31, 32, 33, 34, 35, 36, 45, and 46.

2. Bryant shall produce all redacted documents in un-redacted form, except for redactions that are justified by the attorney-client privilege or work product doctrine or his telephone records pursuant to the terms of this Order.

3. Bryant shall serve a complete privilege log in conformity with Rule 26(b)(5), Fed.R.Civ.P.

4. Pursuant to Rule 34, Fed.R.Civ.P., Bryant shall produce the hard drives of his computers for forensic imaging.

5. Bryant shall complete his production by producing missing attachments, fax cover pages and all other missing responsive documents.

6. Mattel's request for an award of sanctions in the amount of $7,805 is DENIED.

7. Bryant shall comply with this Order no later than February 23, 2007.

Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery Master, Mattel shall file this Order with the Clerk of Court forthwith.

IT IS SO ORDERED.

Dated: January 25, 2007

HON. EDWARD A. INFANTE (Ret.)
Discovery Master

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

17

EXHIBIT __7__ PAGE _198_

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on January 25,

2007, I served the attached ORDER GRANTING MATTEL'S MOTION TO COMPEL

PRODUCTION OF DOCUMENTS in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| Robert Millman Esq. | Littler Mendelson | rfmillman@littler.com |
| Douglas Wickham Esq. | Littler Mendelson | dwickham@littler.com |
| Keith Jacoby Esq. | Littler Mendelson | kjacoby@littler.com |
| Dominic Messiha Esq | Littler Mendelson | dmessiha@littler.com |
| Diba Restagar Esq. | Littler Mendelson | drestagar@littler.com |
| Michelle Park Esq. | Littler Mendelson | mpark@littler.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | jbq@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Valerie Nannery Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | valerienannery@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Morris Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgetmorris@quinnemanuel.com |
| Tamar Buchjakian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchjakjian@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| Benjamin Kim Esq. | O'Melveny & Myers LLP | bjkim@omm.com |
| Hamid Jabbar Esq. | O'Melveny & Myers LLP | hjabbar@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrismill.com |

EXHIBIT ___7___ PAGE _199_