# Exhibit 19

# ***Public Redacted***

# This Exhibit Is Filed Under Seal
# Pursuant To Protective Order

# Exhibit 20

Case 2:04-cv-09049-SGL-RNB   Document 5253   Filed 04/23/2009   Page 1 of 2

1   Robert C. O'Brien (SBN 154372)
    ARENT FOX LLP
2   555 West Fifth Street, 48th Floor
    Los Angeles, CA  90013-1065
3   Telephone:  213.629.7400
    Facsimile:  213.629.7401
4   obrien.robert@arentfox.com

5   Discovery Master

6

7

8                  UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10                     EASTERN DIVISION

11

12   CARTER BRYANT, an individual,        Case No.  CV 04-09049 SGL (RNBx)

13              Plaintiff,
                                          Consolidated with
14        v.                              Case No. CV 04-09059
                                          Case No. CV 05-2727
15   MATTEL, INC., a Delaware
     corporation,                         **PHASE 2 DISCOVERY MATTER**
16
               Defendant.                 **ORDER NO. 21, REGARDING:**
17
                                              **EX PARTE APPLICATION OF**
18                                            **MATTEL FOR OSC RE: OMNI**
                                              **808's FAILURE TO COMPLY**
19                                            **WITH COURT ORDER**

20
     _____
21   CONSOLIDATED WITH
     MATTEL, INC. v. BRYANT and
22   MGA ENTERTAINMENT, INC. v.
     MATTEL, INC.
23

24

25

26

27

28
ARENT FOX LLP                                            ORDER NO. 21
ATTORNEYS AT LAW                           [Case No. CV 04-09049 SGL (RNBx)]
LOS ANGELES

EXHIBIT 20   PAGE 4/4

1    The Discovery Master, having been notified of the Court's decision to refer

2  to the Discovery Master for initial disposition Mattel's *ex parte* application for an

3  Order to Show Cause re: the alleged failure of Omni 808 Investors, LLC ("Omni

4  808") to comply with the Discovery Master's March 10, 2009 Order (the "March

5  10 Order") or, alternatively, for an Order shortening time to hear a motion for such

6  relief (the "Application"), and having reviewed the Opposition filed by Omni 808

7  and supporting papers, hereby **ORDERS** as follows:

8         1.    Omni 808 shall produce to Mattel all documents ordered to be

9  produced pursuant to the March 10 Order no later than 5:00 p.m. on April 28, 2009

10  and shall simultaneously serve on the Discovery Master a notice confirming Omni

11  808's compliance.

12        2.    In the event Omni 808 fails to comply in any respect with the

13  provisions of Paragraph 1, above, the Discovery Master shall refer this matter to the

14  Court for further action, and reserves the right to recommend to the Court that the

15  relief requested by Mattel in the Application be granted, in whole or in part.

16        3.    By way of guidance to the parties, and to reduce the likelihood of

17  unnecessary and costly motion practice, the Discovery Master reminds the parties

18  that, until and unless a deadline or other requirement imposed by the Discovery

19  Master is expressly modified by written Order, the parties shall timely comply with

20  all Orders issued by the Discovery Master, including the deadlines by which parties

21  are required to provide supplemental responses or produce documents.

22

23  Dated:      April 23, 2009

24

25                              By:      /s/ Robert C. O'Brien
                                         ROBERT C. O'BRIEN
26                                       Discovery Master

27

28

Arent Fox LLP
ATTORNEYS AT LAW
LOS ANGELES

- 1 -

ORDER NO. 21
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT  20  PAGE 415

# Exhibit 21

Bingham McCutchen LLP
TODD E. GORDINIER (SBN 82200)
todd.gordinier@bingham.com
PETER N. VILLAR (SBN 204038)
peter.villar@bingham.com
CRAIG A. TAGGART (SBN 239168)
craig.taggart@bingham.com
600 Anton Boulevard, 18th Floor
Costa Mesa, CA 92626-1924
Telephone: 714.830.0600
Facsimile: 714.830.0700

Attorneys for Non-party
Omni 808 Investors, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Carter Bryant, an individual,<br><br>Plaintiff,<br><br>v.<br><br>Mattel, Inc., a Delaware Corporation,<br><br>Defendant.<br><br><br><br><br><br><br><br>AND CONSOLIDATED ACTIONS. | Case No. CV 04-9049 SGL (RNBx)<br><br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>Hon. Stephen G. Larson<br><br>**OMNI 808 INVESTORS, LLC'S STATEMENT OF POSITION RE ORDER TO SHOW CAUSE RE APPOINTMENT OF PERMANENT RECEIVER**<br><br>**[DECLARATION OF PETER N. VILLAR FILED CONCURRENTLY**<br><br>Date:                      May 18, 2009<br>Time:                      2:00pm<br>Place:                     Courtroom 1<br><br>**Phase 2:**<br>Discovery Cut-off:      Dec. 11, 2009<br>Pre-trial Conference:  March 1, 2010<br>Trial Date:                March 23, 2010 |

A/73033920.11

Exhibit 21 Page 4/6

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ....................................................................................1

II.   THE TRANSACTION BY WHICH OMNI STEPPED INTO THE
      POSITION OF WACHOVIA WAS STRAIGHTFORWARD AND
      ARMS LENGTH .....................................................................................4

      A.   Wachovia Entered Into A Credit Agreement With MGA In
           October 2006 ...............................................................................4
      B.   The Credit Crisis Had A Profound Impact On Wachovia ..................5
      C.   Wachovia Declared MGA In Default In July 2008 ............................5
      D.   Wachovia Sought To Assign The MGA Loan......................................5
      E.   Omni Offered To Purchase The Wachovia Loan................................7
      F.   Wachovia And Omni Reached Agreement To Transfer Interest
           In The MGA Loan.........................................................................7
      G.   The Omni-Wachovia Deal Benefited All Parties Including
           Mattel........................................................................................9

III.  MR. DURKIN'S REPORT, INSOFAR AS IT PURPORTS TO
      ADDRESS THE OMNI-WACHOVIA TRANSACTION, IS BOTH
      INCOMPLETE AND INACCURATE ......................................................11

      A.   Wachovia's Assignment of the $313 Million Senior Bank
           Credit Facility to Omni Was Not A "Related Party Transaction" .....12
      B.   Wachovia's Assignment of the $313 Million Senior Bank
           Credit Facility to Omni Did Not Negatively Impact MGA's
           "Solvency"................................................................................16
      C.   There Was Nothing Improper Or Harmful About Omni's $6
           Million Loan to MGA .................................................................17
      D.   Mr. Durkin's Analysis of MGA's "Solvency" Is Erroneous ............17
      E.   Mr. Durkin's Analysis of the "Management of MGA's
           Finances" Is Erroneous...............................................................19

IV.   THERE IS NO LEGAL BASIS FOR APPOINTING A
      PERMANENT RECEIVER .....................................................................20

      A.   There Is No Finding Of Fraud Concerning Any Of The Omni-
           Related Transactions ..................................................................21
      B.   The Appointment Of A Permanent Receiver Will Do More
           Harm Than Good And Is Not The Least Drastic Equitable
           Remedy.....................................................................................23
      C.   The Court's Proposed Order Would Violate Omni's Contractual
           Rights As A Secured Creditor And Constitutional Due Process ......24

V.    CONCLUSION......................................................................................25

Exhibit 21  Page 417

1

# TABLE OF AUTHORITIES

2

Page(s)

3

## CASES

4

*Bird v. Glacier Elec. Coop., Inc.*,
255 F. 3d 1136 (9th Cir. 2001) .............................................................................13

5

6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579, 113 S. Ct. 2786 (1993).........................................................11, 12, 22

7

*Hollywood Healthcare Corp., v. Deltec, Inc.*,
2004 WL 1118610 (D. Minn. May 17, 2004).....................................................20

8

9

*Jinro America, Inc., v. Secure Investments, Inc.*,
266 F.3d 993 (9th Cir. 2001) ...............................................................................13

10

*Kuhmo Tire Co., Ltd. v. Carmichael*,
526 U.S. 137, 119 S. Ct. 1167 (1999)..................................................................22

11

12

*N.Y. Life Ins. Co. v. Watt West Inv. Corp.*,
755 F. Supp. 287 (E.D. Cal. 1991) ......................................................................20

13

*Rosen v. Siegel*,
106 F.3d 28 (2d Cir. 1997) ..................................................................................20

14

15

*Saluck v. Rosner*,
1999 WL 46620 (E.D. Pa. Jan. 6, 1999).............................................................20

16

*United States v. Cabrera*,
222 F.3d 590 (9th Cir. 2000) ...............................................................................13

17

18

*Waag v. Hamm*,
10 F. Supp. 2d 1191 (D. Colo. 1998)..................................................................20

19

## RULES

20

Rule 403 ................................................................................................................13

21

22

23

24

25

26

27

28

A/73033920.11                                            ii

Exhibit 21  Page 418

## I.    INTRODUCTION

The transaction by which Omni 808 Investors, LLC ("Omni") acquired title to the debt obligations owned by a syndicate of financial institutions led by Wachovia Bank, NA ("Wachovia") was, as counsel for Omni represented to the Court, an arms-length business transaction between non-parties to the Mattel-MGA Bratz imbroglio.  Beginning in December 2008, Mattel has embarked on what can only be described as a blitzkrieg of attacks directed at Omni, its principals and its counsel, in fora ranging from this Court to the media, whose clear aim and focused goal has been to bury the actual facts beneath a blizzard of incendiary yet unsupportable allegations.

Contrary to the conclusions of the court-appointed forensic auditor, the Omni-Wachovia transaction was <u>not</u> a related party transaction and <u>did</u> <u>not</u> negatively impact MGA's solvency.  Indeed, as will be demonstrated herein, but for the Omni-Wachovia transaction, MGA almost certainly would have been dismantled and liquidated by Wachovia in the fall of 2008 and Mattel, as an unsecured party with a contingent inchoate claim, would have been left with little or nothing.

On September 3, 2008, Omni and Wachovia entered into a written Master Assignment and Exchange Agreement ("Agreement") whereby Omni acquired all right, title and interest in debt obligations then held by Wachovia, which it had, in turn, acquired in October 2006.[1]  As a result of the Agreement, Omni stepped into and presently stands, as successor-in-interest, in the position of Wachovia under the Senior Bank Credit Facility and has a senior perfected security interest in MGA's assets, including, *inter alia,* MGA's inventory and accounts receivable -- only a fraction of which are Bratz-related products.  Omni's rights are identical to

---

[1]    Other than $21,944.769 that was exchanged for unsecured promissory notes issued by MGA to Wachovia Bank, NA and the other original lenders.

A/73033920.11                                          1

Exhibit 21  Page 4/9

1   those of Wachovia, it acquired nothing more and nothing less. Omni's secured

2   interest is superior to that of any potential unsecured creditors, including Mattel.

3     As represented to this Court, and demonstrated by the contemporaneous

4   written agreements, this transaction was straightforward and common; nothing

5   about it was or is either "suspicious" or improper. Omni's lawfully acquired

6   security interest is now (just as Wachovia's was in 2006) superior to that of the

7   unsecured creditors, including Mattel. Significantly, for all his purported

8   "suspicions" regarding certain aspects of the Omni transaction (which, as will be

9   detailed herein, have no reasonable factual basis and are not justified in light of the

10  macroeconomic business context in which the transaction occurred), Mr. Durkin's

11  report does not identify a <u>single</u> "fraudulent" act, nor even <u>one</u> violation of any

12  law, regulation or accounting principle.

13    As the largest secured creditor of MGA, Omni's most pressing concern is to

14  protect its investment and to ensure repayment of the loan. Accordingly, Omni's

15  position is as follows:

16    &bull; Omni does not object to Patrick A. Fraioli, Jr.'s continued

17     engagement for a limited period of time to complete any

18     necessary fact-investigation, to implement any necessary

19     internal controls and/or to marshal assets to protect the rights of

20     Omni and other creditors, and it has so-informed him;

21    &bull; Omni does not object to and, indeed, would like to proceed to

22     implement the appointment of an independent board of

23     directors to, *inter alia*, develop corporate governance guidelines

24     and procedures for MGA and to provide periodic reports on the

25     financial status of the company;

26    &bull; Omni objects to the Court's continued appointment of a

27     "receiver" designated with that title as that term is negatively

28     associated in the marketplace with bankruptcy or liquidation

A/73033920.11

2

Exhibit 21 Page 420

1           proceedings, and its continued use would have an unintended

2           negative impact on MGA as respects its customers and

3           suppliers, which in turn will harm Omni and MGA's other

4           creditors.  Not only is there no inherent benefit to the continued

5           use of such a term but, as the case law now stands, such an

6           appointment is unjustified under these facts.  Omni requests

7           that Mr. Fraioli (or any other person appointed in his capacity)

8           be referred to as a "monitor" or "special master";

9     •   Omni is very much opposed to the institution of a bankruptcy

10          proceeding at the present time as it believes such a proceeding

11          to be unwarranted but, by the same token, objects to any order

12          purporting to prevent it from exercising its contractual and

13          constitutional rights as a non-party secured creditor of MGA

14          including, without limitation, its rights to initiate any

15          foreclosure or bankruptcy proceedings should future

16          developments warrant such action; and

17     •   Omni objects to any order purporting to grant rights to any

18          other parties or third parties (including Mr. Fraioli) that may

19          infringe Omni's rights as the senior secured creditor including,

20          without limitation, any right to initiate bankruptcy proceedings

21          without Omni's consent.

22      It is critically important for the Court to recognize that Omni is the largest

23 secured creditor of MGA and that its secured interest in MGA's inventory and

24 accounts receivable is not only superior to Mattel's unsecured contingent interest

25 but extends well beyond the Bratz-related products that are the subject of this

26 litigation.  Indeed, as Mr. Fraioli can attest, Omni has the largest amount at stake at

27 this point and the most to lose if the current "receivership" is continued indefinitely

28 in its present form, with the possible exception of the equity shareholders of MGA.

A/73033920.11         3

1    As such, Omni implores the Court to protect its interests and not to take any

2    action to Omni's detriment. The appointment of a permanent receiver, or even the

3    continued use of the term "receiver," particularly in the context of the toy business

4    that MGA is in, is neither necessary nor appropriate and will almost certainly

5    accomplish nothing more than to kill MGA, which will further Mattel's litigation

6    and competitive goals but will trample due process and contract law in the process.

7    **II.    THE TRANSACTION BY WHICH OMNI STEPPED INTO THE**

8    **POSITION OF WACHOVIA WAS STRAIGHTFORWARD AND**

9    **ARMS LENGTH**

10   It is not possible to evaluate the bona fides of the Omni-Wachovia

11   transaction without first understanding the factual background and the business and

12   economic context in which it occurred.

13   **A.    Wachovia Entered Into A Credit Agreement With MGA In**

14   **October 2006**

15   In October 2006, MGA Entertainment, Inc. ("MGA") entered into a Credit

16   Agreement with Wachovia, pursuant to which Wachovia provided a senior

17   revolving credit facility to MGA in an aggregate available amount for borrowing

18   up to $400 million (the "Senior Bank Credit Facility").[2]  (Durkin Report at 4; Ex.

19   8.) The Senior Bank Credit Facility was secured by a senior perfected security

20   interest in all of MGA's inventory and accounts receivable including, *inter alia*,

21   Moxi, Little Tikes and Bratz products. (Omni understands that Bratz-related

22   revenues are only 15% of projected MGA total revenues for 2009.) As of

23   December 2006, the principal balance of the Senior Bank Credit Facility was $150

24   million. (Id.) As of December 2007, the principal balance of the Senior Bank

25   Credit Facility was $313 million. (Id.)

26

27   [2]    The Credit Agreement was amended on or about May 23, 2007 to increase
the available amount for borrowing from $200 million to $400 million. (Id.)

28   A/73033920.11                                    4

Exhibit 21 Page 423

**B.    The Credit Crisis Had A Profound Impact On Wachovia**

Beginning in late 2007 and continuing into 2008, the subprime mortgage crises and their attendant aftereffects had a significant negative impact on the financial section of the U.S. economy generally and on national banking associations like Wachovia in particular.  For example, on April 14, 2008, Wachovia reported a first-quarter loss of approximately $400 million (which at least one analyst called "shocking") accompanied by a 41 percent dividend cut, plans to eliminate 500 jobs, and a move to sell $7 billion worth of stock.  (Villar Decl., Ex. A.)

By July 2008, most banks and financial institutions were in turmoil.  On July 11, 2008, IndyMac Bancorp Inc. became the second-biggest federally insured financial company to be seized by U.S. regulators after a run by depositors left the company short on cash.  (Villar Decl., Ex. B.)

**C.    Wachovia Declared MGA In Default In July 2008**

On July 21, 2008, Wachovia declared the Senior Bank Credit Facility to be in default and accelerated the maturity of the outstanding debt obligations owed to Wachovia by MGA, demanding full and immediate payment of the entire unpaid $313 million balance.  (Durkin Report; Ex. 11.)  As characterized by Wachovia, the default was based on, *inter alia,* MGA's failure to achieve an adequate ratio of indebtedness to EBITDA, failure to deliver audited financial statements, failure to disclose the Smoby transaction in a timely manner, and potential exposure in the Mattel litigation.  (Durkin Report at 5.)

In connection with that default letter, Wachovia also "swept" away nearly $26 million in cash then in MGA's bank accounts and notified all of MGA's customers that further payments should be made directly to Wachovia.  (Id.)

**D.    Wachovia Sought To Assign The MGA Loan**

The business/legal options available to Wachovia were fairly clearly defined and, it is important for the Court to understand, neither unique nor unusual in these

1   difficult economic times. Indeed, creditors face them daily. Wachovia had two

2   principal options; its first option was to pursue its available foreclosure remedies,

3   liquidate MGA and recover as much of the $313 million it was owed as possible.

4   Of course, this option involved significant expense, uncertainty and perhaps most

5   critical from Wachovia's perspective, would take time. Alternatively, Wachovia

6   could achieve immediate and badly needed relief for its balance sheet and at the

7   same time receive an infusion of cash, while simultaneously eliminating the

8   expense and uncertainty of pursuing foreclosure/bankruptcy, if it could sell the

9   debt to a third party for a percentage of its face value.

10       MGA was, of course, facing a similarly dire set of alternatives. If it could

11   not find someone willing to purchase the debt from Wachovia it was facing near

12   certain extinction since all of its available cash had been swept away and all future

13   revenue (including sales having nothing whatsoever to do with Bratz) would go

14   directly to Wachovia.

15       For that purpose it engaged a consultant, Tom Allison, Executive Vice

16   President, Senior Managing Director of a prominent financial services firm,

17   Mesirow Financial Consulting LLC, who apparently shopped the transaction to

18   prospective lenders including, without limitation, Bank of Ireland, Cerberus and

19   Silverpoint. (See Durkin Interview Notes, Ex. 14, DFR 14-001.) However, the

20   timing and exigent circumstances made a deal with these institutions unworkable.

21   (Id.) Mr. Allison also suggested that MGA consider filing bankruptcy "since

22   Wachovia wouldn't budge on the repayment amount." (Id.)

23       Mr. Allison eventually approached Neil Kadisha, the Managing Partner of a

24   diversified investment firm, Omninet Capital, LLC. Mr. Kadisha and Omninet

25   Capital, LLC have substantial experience evaluating and investing in distressed

26   debt and distressed companies. Mr. Kadisha considered the proposal, evaluated

27   the risk/reward profile, reviewed available information and developed a proposal

28   which he presented to Wachovia. (Durkin Report at 5, Ex. 14, DFI 14-015-016.)

A/73033920.11                                    6

Exhibit 21  Page 425

1     Pointedly, as indicated in Mr. Durkin's interview notes, Mr. Larian told Mr.

2   Durkin that MGA's consultant presented this opportunity to several institutional

3   lenders before contacting Mr. Kadisha.  Why Mr. Durkin omits these material facts

4   from his report and, instead, misleadingly states that in "addressing this financial

5   situation," Mr. Larian "sought the assistance" only of Mr. Kadisha, a fellow

6   member of "the Persian community" is unclear but telling.  (Durkin Report at 5.)

7         **E.     Omni Offered To Purchase The Wachovia Loan**

8         On July 29, 2008, Mr. Kadisha made an offer to acquire the Senior Bank

9   Credit Facility, including the outstanding debt obligations from Wachovia for

10   approximately $110 million (representing 35% of the $313 million principal

11   amount of the debt obligations outstanding as of the acceleration date).

12         There was and is nothing either unusual or improper about banks agreeing to

13   sell assets at a steep discount (including debt obligations they carry on their

14   balance sheet at face value) when the realization of 100% of face value is in

15   substantial doubt.  That has always been true (although to read his report one

16   would conclude that this comes as news to Mr. Durkin) and was nowhere more

17   common than in 2008 when so many financial institutions badly needed cash.

18         Indeed, on the same day that Mr. Kadisha made his initial offer, it was

19   reported that Merrill Lynch agreed to sell $30.6 billion of subprime mortgage-

20   related assets for $6.7 billion -- approximately 20 cents on the dollar.  Lest the

21   Court doubt the relevance of that transaction to Wachovia, financial expert, Jim

22   Cramer, opined on that date that Merrill's "fire sale" could "pave the way for other

23   financially plagued institutions such as Citigroup, Wachovia, and Washington

24   Mutual" to use a similar approach to "save themselves."  (Villar Decl., Ex. C.)

25         **F.     Wachovia And Omni Reached Agreement To Transfer Interest In**

26               **The MGA Loan**

27         As counsel for Omni has represented to the Court, the Omni-Wachovia

28   transaction was heavily negotiated, albeit in a compressed time frame given the

A/73033920.11                                      7

Exhibit 21 Page 426

1   exigent circumstances,[3] by Davis Polk on behalf of Wachovia and Bingham

2   McCutchen on behalf of Omni.  An agreement was negotiated and the transaction

3   was entered into on September 3, 2008.  (Durkin Report at 5-6, Ex. 12.)

4         A special purpose entity, Omni 808 Investors, LLC, a California limited

5   liability company, was created for the acquisition.  (Id.)  The formation of a special

6   purpose entity is very common for these types of transactions and is neither

7   suspicious nor improper.  The Omni members entered into a Limited Liability

8   Company Agreement.  (Id.; Ex. 16.)  As amended, the Omni members will forfeit

9   their interest if they attempt to transfer their interest.

10        As represented to the Court, the Omni members invested $50 million and did

11  so with the hope and expectation of making a profit on their investment.  (Durkin

12  Report at 6; Ex. 14, DFR 14-018.)  The owners of Omni, Neil Kadisha ($15

13  million), Benjamin Nazarian ($10 million), Leon Neman ($10 million), David

14  Nazarian ($5 million), and Joseph Moinian ($10 million) are all successful and

15  experienced businessman in their own right and have made this investment, as

16  represented to the Court on February 11, with the intention of taking advantage of

17  a perceived business opportunity that was presented to Mr. Kadisha and with the

18  hope and expectation of making a profit in the process.[4]

19        Given Omni's desire for leverage, the impossibly tight credit market for

20  financing, the compressed time schedule, and the belief that it should maximize

21  MGA's incentive and ability to repay the debt, Omni asked IGWT 826 Investment,

22  _____

    [3]     Since MGA had no cash and no prospect of future revenue in the wake of
23  Wachovia's decision to institute foreclosure either a transaction had to be
    consummated or Wachovia would continue to liquidate MGA to satisfy the debt.

24  [4]     Mr. Kadisha has purchased Mr. Gozini's interest in Omni.  Mr. Durkin's
25  assertion that Mr. Larian invested any money in Omni or bought out Mr. Gozini
    based on email traffic to which Omni was not a party was, as he conceded,
26  speculation.  There was never any basis for it.  Mr. Larian does not now and never
    has had any interest in or ability to control Omni and the pages spent in Mr.
27  Durkin's report engaging in such musing, without bothering to circle back with
    Mr. Kadisha to ask what actually occurred, is telling.

28

A/73033920.11                                8

Exhibit 21  Page 427

1  LLC ("IGWT") to finance the remaining amount needed to acquire the debt. (Id.

2  at 6; Ex. 14, DFI -016.)  There was and is nothing either improper or suspicious

3  about this and Mr. Durkin did not and cannot cite any accounting or regulatory

4  problem with the transaction as structured.  Neither MGA, nor Mr. Larian, nor

5  IGWT, or indeed anybody but the members listed in the Omni Operating

6  Agreement, have any ownership in or ability to control Omni. (Id. at 6; Ex. 14,

7  DFI 14-002; Ex. 16.)[5]

8          **G.    The Omni-Wachovia Deal Benefited All Parties Including Mattel**

9          As a result of the Omni-Wachovia transaction, MGA not only got back the

10 nearly $26 million in cash that Wachovia had seized but also received an interest

11 "holiday" of six months intended to give it breathing room to get back on its feet

12 and move forward.[6]  (Durkin Report, Ex. 14, DFI 14-003.)

13         As Wachovia no doubt had foreseen, it did not have either the time or capital

14 to finish the foreclosure it had embarked on in July 2008.  Rather, it needed to

15 position itself as a viable acquisition target and before the month of September was

16 over it would have no choice.  On September 26, 2008, Wachovia's stock price

17 plunged 27 percent due to the U.S. government's seizure of Washington Mutual

18 the previous night. (Villar Decl., Ex. D.)  On September 29, 2008, the FDIC

19 announced that Citigroup would acquire Wachovia's banking operations.  On

20 October 3, 2008, Wells Fargo announced that it would acquire Wachovia for $15

21 billion ($7 per share), nullifying the Citigroup deal.  On October 22, 2008,

22 Wachovia reported a staggering third-quarter loss of nearly $24 billion, then a

23

24    [5]    Notably, Mr. Durkin's report, at a minimum, puts to rest Mattel's previous
      repeated, baseless accusations that MGA or Larian had an "ownership interest" in
25    Omni.  It also puts to rest Mattel's prior unsupported assertion that MGA or Larian
      are "affiliates" of Omni, based on Mattel's misinterpretation of certain Wachovia
26    documents deliberately taken out of context.

27    [6]    The interest during this six-month period was not forgiven by Omni.  The
      accrued interest during this period was added to the principal obligation.
28

Exhibit 21 Page 428

1  record quarterly deficit for a banking company in the global credit crisis. (Villar
2  Decl., Ex. E.)

3       Nor was that the last macroeconomic shock to impact MGA or the Omni-
4  Wachovia transaction. In September 2008, MGA engaged Goldman Sachs to help
5  it pursue alternative financing or restructuring alternatives, but the spiraling credit
6  crisis effectively froze not only the M&A market but imperiled Goldman Sachs
7  itself and no such transaction could be consummated. Omni has no idea why Mr.
8  Durkin did not bring this to the Court's attention.

9       By the end of 2008, the subprime mortgage crisis had inflicted severe
10 damage on banks and other financial institutions resulting in a global credit crisis
11 that is still far from resolved. The five largest U.S. investment banks either went
12 bankrupt (Lehman Brothers), were taken over by other companies (Bear Stearns
13 and Merrill Lynch), or were bailed-out by the U.S. government (Goldman Sachs
14 and Morgan Stanley).[7]

15      In sum, the Omni-Wachovia transaction was NOT, in any sense, intended to
16 evade any Court Order in this action or, indeed, driven by anything in this action at
17 all. It was driven entirely by Wachovia's decision on July 21, 2008 to foreclose on
18 the debt which, in turn, was no doubt impelled at least in part by its own internal
19 issues but which in any event had nothing to do with Omni. Moreover, had Mr.
20 Kadisha and Omni not stepped in to consummate the Omni-Wachovia transaction,
21 MGA would have been dismantled and liquidated in 2008. As a potential
22 judgment creditor, Mattel is far better off as a result of the transaction unless, of
23 course, Mattel's real objective is to drive MGA out of business.

24

25

26  _____
    [7]   It was these subsequent events that necessitated MGA approaching Omni for
27  a further cash loan of $6 million.

28

A/73033920.11                                    10

Exhibit 21 Page 429

III.   **MR. DURKIN'S REPORT, INSOFAR AS IT PURPORTS TO ADDRESS THE OMNI-WACHOVIA TRANSACTION, IS BOTH INCOMPLETE AND INACCURATE**

In this section, Omni will, as requested by the Court in its April 27, 2009 Order, respond to Mr. Durkin's report to the extent that he purports to characterize its involvement in this matter.[8] Omni has no knowledge of, nor involvement with, many of the issues and events referenced in Mr. Durkin's report and cannot comment on their veracity or significance.

Omni assumes, and fervently hopes and believes, that the Court asked Mr. Durkin to present a balanced and objective report based on accepted accounting principles. Regrettably, that is not what was produced. Mr. Durkin's analysis, at least as it relates to the Omni-Wachovia transaction, is at best sloppy, includes serious errors both of omission and commission and, in some instances, is simply irresponsible.

Omni and its counsel know Mr. Durkin's extensive background as a party plaintiff on occasion and as an advocate as well, and he is far too experienced to mistake the report that was produced for a balanced presentation, and we trust the Court will not do so either. Mr. Durkin's report is a polemic, it is a piece of advocacy which this Court would never admit as work product professing to be an objective expert report if it knew what actually occurred. This Court and the parties deserved much better; *Daubert* requires much more. *Daubert v. Merrell*

---

[8]     In its Order dated April 27, 2009, the Court granted Omni's motion to intervene for the limited purpose of addressing the receivership issues. The Court also stated that it "will consider whether, as counsel for Omni 808 represented to this Court, 'Omni's purchase of the Senior Bank Credit Facility from Wachovia was a straightforward, arm's-length business deal between non-parties to this action,' or whether, as counsel for Mattel contends, the purchase was by entities formed for the 'improper purpose of attempting to leapfrog over Mattel's claims and shield their assets from creditors and other rights-holders such as Mattel.'"

Exhibit 21 Page 430

1    *Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786 (1993). [9]

2        A.    **Wachovia's Assignment of the $313 Million Senior Bank Credit**

3             **Facility to Omni Was <u>Not</u> A "Related Party Transaction"**

4        Mr. Durkin asserts that "It appears from the evidence that MGAEI has

5    regularly engaged in related party transactions" and of those that "most impact

6    MGAEI's solvency" the first transaction that he lists at page 4 of his report is

7    Omni's purchase of the $313 million Wachovia loan. (Durkin Report at 4.)

8    Contrary to Mr. Durkin's assertion, not only was this <u>not</u> a "related party

9    transaction" but, perhaps more importantly, it did not negatively impact MGA's

10   solvency.

11       Wachovia's assignment of the $313 million Senior Bank Credit Facility to

12   Omni was not a "related party transaction." There is simply no evidence that the

13   purchaser, Omni, and the seller, Wachovia, are or ever were  <u>related parties</u> in any

14   sense. Omni is owned by the signatories to its Operating Agreement and Mr.

15   Durkin offers no explanation for why that document should be ignored. It is, in

16   fact, unfortunate that for all of his "suspicions" that Mr. Durkin declined to provide

17   the Court with a definition of a related party transaction, which is found, *inter alia*,

18   at FASB Statement No. 57. (Villar Decl., Ex. F.) Had he done so, it would be

19   abundantly clear that the Omni-Wachovia transaction cannot be categorized as a

20   related party transaction.

21       Further, the fact that a portion of the proceeds used by Omni to purchase the

22   Senior Bank Credit Facility from Wachovia came from a loan from IGWT (a

23

24   ───────────────
     [9]    Omni understands that Mr. Durkin has been paid by Mattel for his
25   investigation and report, which, if true, alone raises questions about his objectivity.
     Omni has no idea what communications Mr. Durkin had with Mattel or what
26   materials were supplied to him by Mattel. Moreover, the terms of this Court's
     Orders regarding this matter did not permit Omni to have an independent expert
27   review the report at all. Omni hereby objects to the report on these grounds and
     urges that the Court Order is sealed and inadmissible for any purpose going
28   forward.

Exhibit 21 Page 431

1    Larian-affiliated entity), does not make the Wachovia-Omni deal a "related party

2    transaction." Nor does Mr. Durkin contend that IGWT's loan to Omni was

3    improper. Neither Mr. Durkin nor Mattel has identified any legal or accounting

4    issue with the IGWT loan.

5         Indeed, at the March 4, 2009 hearing, the Discovery Master correctly

6    questioned why it even mattered "whether the debt is owned by Wachovia or Isaac

7    Larian or anybody else ...." (March 4, 2009 Hearing Trans. at 31.) Mattel's

8    counsel acknowledged that "if Isaac Larian came in and bought up the $300

9    million in debt and paid $100 million for it, the -- certainly that is -- that would be

10   a transaction that would potentially be permissible if, of course, it were aboveboard

11   and everything else ...." (Id. at 32-33.) There is no evidence nor finding by Mr.

12   Durkin, nor could there be, that IGWT's loan to Omni was in any way improper.

13        Nor does the fact that Mr. Larian and Mr. Kadisha previously knew each

14   other and share a common Persian/Jewish heritage make the Wachovia-Omni deal

15   a "related party transaction." In fact, this "personal relationship" between Mr.

16   Larian and Mr. Kadisha would not even make the IGWT-Omni loan agreement a

17   "related party transaction" under the applicable accounting literature. Nor is there

18   anything wrong with Mr. Larian's broker presenting this opportunity to an

19   acquaintance. The manner in which Mr. Kadisha's relationship with Mr. Larian is

20   presented in the report is, unfortunately, very telling nonetheless. [10]

21   _____
     [10]    Most troubling is that Mr. Durkin felt this to be probative of anything at all.
22   Is he of the view that this common heritage makes Mr. Kadisha more likely to act
     contrary to his own interests or to do something via third-parties that he wouldn't
23   otherwise do? It is, at best, unprofessional, and at worst, evidence of an improper
     cultural bias. See Jinro America, Inc., v. Secure Investments, Inc., 266 F.3d 993,
24   1006 (9th Cir. 2001) (expert testimony that is "so tinged with ethnic bias and
     stereotyping" should be excluded under Rule 403); Bird v. Glacier Elec. Coop.,
25   Inc. 255 F.3d 1136, 1151 (9th Cir. 2001) (racial stereotyping is not condoned in
     civil cases); United States v. Cabrera, 222 F.3d 590, 594 (9th Cir. 2000) ("appeals
26   to racial, ethnic, or religious prejudice during the course of a trial violate a
     defendant's Fifth Amendment right to a fair trial."). Just imagine, for example, the
27   phrase "Persian community" substituted with "black community" or any similar
     such irrelevant but charged identifying term. The tone itself is compelling proof

28   A/73033920.11                        13
                                                        (Footnote Continued on Next Page.)

Exhibit 21 Page 432

1      Curiously, Mr. Durkin's report neglects to inform the Court, as he was told

2 by Mr. Kadisha, that Mr. Kadisha actually had more contact with Mattel's CEO,

3 Bob Eckert, through common business organizations than he did with Mr. Larian,

4 and had hoped to act as a go-between to help the parties resolve their business

5 differences. (Cf. Durkin Report, Ex. 14, DFI 14-017.)

6      Mr. Durkin spends several pages of his report speculating about the meaning

7 of emails Mr. Larian sent to various investors which he deems "suspicious." First,

8 Omni was not a party to any such discussions, and no purpose is served by further

9 speculation. However, the evidentiary support which Mr. Durkin was charged

10 with adducing does not, apparently, include notifying the Court that the terms of

11 the Operating Agreement for Omni and the proceeds of the investors provides no

12 indication that either MGA or Mr. Larian has any interest in or ability to control

13 the business of Omni (and the Operating Agreement, as amended, provides that

14 any alienation by a member operates to forfeit his interest in Omni).

15      Indeed, Mr. Kadisha told Mr. Durkin that he was unaware of any "buy-back"

16 agreement and, as explained above, at least with respect to Mr. Gozini, Mr.

17 Durkin's "suspicions" were untrue. Mr. Larian did not buy back Mr. Gozini's

18 interest and, in fact, it was Mr. Kadisha who has done so. That is why "suspicion"

19 doesn't constitute evidence either in a court of law or in the accounting literature.

20 Mr. Durkin never bothered to ask Mr. Kadisha about the emails he finds so

21 suspicious or, indeed, what Mr. Gozini's current position is. More fundamentally,

22 Mr. Durkin nowhere explains how any such buy back agreements would either

23 have been improper or negatively affected MGA, let alone Mattel.

24      Mr. Durkin also suggests, without citing any legal, regulatory or accounting

25 (Footnote Continued from Previous Page.)

26 that Mr. Durkin had no intention of providing an "objective" report to the Court.
27 The Report is replete with speculative "conclusions" that fall far outside the
province of a CPA to express a proper opinion on.

28

Exhibit 21 Page 733

1   principle, that there was something "suspicious" about the fact that Omni

2   purchased the $313 million obligation for a significant discount. However, as

3   explained above, such transactions are not uncommon -- particularly in this credit

4   market. In fact, at about the same time, Merrill Lynch agreed to sell $30.6 billion

5   of subprime mortgage-related assets for $6.7 billion, approximately 20 cents on the

6   dollar.

7       The decision to sell was made by Wachovia for what it presumably believed

8   was a fair price and to serve its best business interests and there can be no doubt it

9   would enter into the identical transaction today. Although nowhere referenced in

10   Mr. Durkin's report, the admittedly brief overview of the business context in which

11   Wachovia made its decision to sell, offered herein, provides the clearest

12   explanation for why it chose to take the certainty of immediate cash, albeit at a

13   discount, rather than deal with the inherent expense or uncertainty of

14   bankruptcy/foreclosure proceedings.

15       Significantly, Mattel has never even alleged that the Omni-Wachovia

16   transaction was improper or unlawful. As the Discovery Master correctly stated in

17   his May 6, 2009 Order, "**Mattel does not contend, and has presented no**

18   **evidence, that the purchase of that debt was in any way collusive or**

19   **fraudulent as between Wachovia and the Financing Entities.**" (Phase 2

20   Discovery Master Order No. 27 at 5, fn 3.) [11]

21

22

23  [11]    In what can only be construed as an attempt to attack Mr. Kadisha's
credibility, Mr. Durkin claims that Mr. Kadisha's alleged statement that "he had no

24  investments with Mr. Larian," somehow conflicts with evidence that Larian
invested in Omninet Biofuels II LP. (Durkin Report at 10.) That gratuitous

25  "observation" is not only unnecessary but it is simply erroneous. The fact that
Larian made an investment in an entity managed by a partner of Mr. Kadisha (in

26  which Mr. Kadisha also invested but had no management or other role) is neither
inconsistent with Mr. Kadisha's truthful statement that he had no investments with

27  Mr. Larian nor does it relate to MGA's solvency. If he is going to discuss it at all,
the least Mr. Durkin could have done was correctly describe it.

28

A/73033920.11                 15

Exhibit 21 Page 434

1    **B.    Wachovia's Assignment of the $313 Million Senior Bank Credit**

2    **Facility to Omni Did Not Negatively Impact MGA's "Solvency"**

3         Mr. Durkin's conclusion that the Wachovia-Omni transaction impacted

4    "MGAEI's solvency and ability to continue conducting operations" is simply

5    wrong. As a matter of basic accounting, the Wachovia loan had exactly zero effect

6    on the "solvency" of MGA. Wachovia extended a line of credit to MGA in the

7    sum of $400 million. MGA borrowed $313 million. The only impact of the Omni-

8    Wachovia transactions on MGA's balance sheet was to change the identity of the

9    creditor from Wachovia to Omni.

10        Mr. Durkin fails to acknowledge that Wachovia's assignment of the debt

11   obligation to Omni, if anything, improved MGA's solvency and liquidity situation.

12   Before the assignment, Wachovia had "called the note ... swept $25.8 million in

13   cash from MGAEI's bank accounts and notified MGAEI's customers that all

14   payments should be made to Wachovia." (Durkin Report at 4-5.) As a result of

15   the Omni-Wachovia transaction, MGA not only got back the nearly $26 million in

16   cash that Wachovia had seized but also received an interest "holiday" of six

17   months intended to give it breathing room to get back on its feet and move

18   forward. (Id.; Ex. 14, DFI 14-003.) Had Omni not gotten involved, MGA would

19   have been liquidated, gone bankrupt and Wachovia would have obtained all of its

20   assets. Mattel likely would have gotten nothing and certainly would be in worse

21   position than it is now.

22        In the same vein, Mattel's often-repeated allegation that Mr. Kadisha and his

23   colleagues "gifted" their $50 million and do not expect to be repaid is utterly

24   baseless and there is absolutely no evidence that any such "agreement" exists. In

25   fact, both Mr. Durkin's report and interview notes clearly demonstrate that Omni

26   expects to be repaid and expects to make a profit -- and there is no evidence to

27   suggest otherwise. (Durkin Report at 6-7, 17-18, Ex. 14, DFI 14-018.) Incredibly,

28   Mr. Durkin seems to accept the fact that Omni expects repayment in his analysis of

Exhibit 21 Page 435

1   MGA's "solvency," yet he fails to refute Mattel's baseless allegation (which is a

2   principal basis of its request for a receiver) anywhere in his report.

3           This Court does not and should not have to check its common sense at the

4   door; there is no reason to believe the Omni-Wachovia transaction is anything

5   other than what all the related documents, i.e., evidence, establish that it is, a

6   straightforward, arms-length transaction.

7           **C.      There Was Nothing Improper Or Harmful About Omni's $6**

8                   **Million Loan to MGA**

9           Mr. Durkin also references Omni's loan of $6 million to MGA separate and

10  apart from the original Wachovia transaction. Mr. Durkin correctly indicates that

11  the funds for this loan were provided by IGWT. However, Mr. Durkin does not

12  suggest any manner in which he feels that there was anything improper about this

13  loan beyond his amorphous feeling that it is somehow "suspicious." He doesn't

14  even opine how this loan hypothetically could be improper. Principals of private

15  close corporations often make loans to their companies, and the 9% interest rate

16  was the same rate charged by Wachovia.

17          More importantly, and directly contrary to Mr. Durkin's statement, this loan

18  did not negatively effect MGA's solvency. The amount of cash into the company

19  (+$6 million) was exactly equal to the amount of debt reported on its balance sheet

20  (-$6 million). Most pertinently, it would seem, this entire matter directly

21  undercuts, indeed it contradicts, the premise behind Mattel's allegations and the

22  Court's concerns about MGA's finances. Mr. Larian seems to be INJECTING

23  MONEY INTO MGA, not removing it or otherwise improperly draining MGA of

24  its operating capital.

25          **D.      Mr. Durkin's Analysis of MGA's "Solvency" Is Erroneous**

26          Mr. Durkin asserts that "MGAEI appears to be insolvent and has been so for

27  some time." (Durkin Report at 15.) Mr. Durkin bases his conclusion on his

28  application of the balance sheet test, the capital test and the cash flow test. (Id.)

A/73033920.11                                    17

1    Since Omni has not had an opportunity to conduct its own investigation and

2    analysis, Omni cannot comment on MGA's solvency. However, Mr. Durkin's

3    application of the three tests is erroneous, on its face, at least as far as they relate to

4    Omni.

5         Mr. Durkin asserts that there are "a number of transfers, transactions and

6    obligations, which appear to have caused MGAEI's insolvency" including, *inter*

7    *alia*, Wachovia's assignment of the $313 million Senior Bank Credit Facility to

8    Omni and Omni's $6 million loan to MGA. (Id.)

9         As an initial matter, it is important to note that for the purposes of analyzing

10   the "related party transactions," Mr. Durkin questions the validity of these loans,

11   but for purposes of analyzing MGA's "solvency," Mr. Durkin assumes they are

12   perfectly legitimate and require repayment. Aside from this internal inconsistency,

13   as explained above, as a matter of basic accounting, these loans did not affect

14   MGA's solvency.

15        Moreover, Mr. Durkin's application of the cash flow test fails to take into

16   account the positive impact of Wachovia's assignment of the Senior Bank Credit

17   Facility to Omni on MGA's cash flow. Mr. Durkin acknowledges that, in July

18   2008, Wachovia "called the note ... swept $25.8 million in cash from MGAEI's

19   bank accounts and notified MGAEI's customers that all payments should be made

20   to Wachovia." Wachovia's actions caused a liquidity crisis at MGA, placing in

21   question MGA's ability to continue as a going concern. The Omni transaction

22   effectively saved MGA by infusing much needed liquidity and increasing MGA's

23   cash flows. Mr. Durkin's report, however, fails to point out that, as a result of the

24   Omni transaction, MGA not only got back the nearly $26 million in cash that

25   Wachovia had seized but also received an interest "holiday" of six months

26   intended to give it breathing room to get back on its feet and move forward.

27

28

A/73033920.11                                  18

Exhibit 21 Page 437

### E.   Mr. Durkin's Analysis of the "Management of MGA's Finances" Is Erroneous

In discussing this final aspect of MGA's finances, Mr. Durkin briefly addresses the Omni transactions. Mr. Durkin starts this subsection by stating, "As discussed above, MGAEI's transactions with Omni 808 may have damaged MGAEI and its creditors." (Durkin Report at 26.) However, curiously, there is <u>no prior discussion</u> in the report about how MGA's transactions with Omni may have "damaged" MGA, and certainly not its creditors. In fact, as explained above, Wachovia's assignment of the $313 million Senior Bank Credit Facility to Omni and Omni's $6 million loan to MGA had no negative effect on MGA or its creditors. To the contrary, it likely was MGA's only chance to survive.

Mr. Durkin then states, "The Larian Parties' loan to Omni 808 of $60 million for Omni 808's use in purchasing the Wachovia Loan, coupled with the $6 million loan to MGAEI through Omni 808, raises serious questions regarding management decisions by Mr. Larian." (<u>Id.</u>) Mr. Durkin fails to articulate anywhere in his report what those purported "serious questions" may be. Mr. Durkin has failed to cite a <u>single violation</u> of any law, regulation or accounting principle in connection with these loans, and he cannot do so because they were entirely proper and intended to assist MGA. That is certainly why his report does not even attempt to show any nexus between those transactions and any harm to MGA. Moreover, under the dire circumstances MGA was facing, these transactions demonstrated not only sound management decisions by Mr. Larian but a willingness to put money <u>into</u> the enterprise rather than remove it. The very best one can say about Mr. Durkin's recitation of these circumstances is that he utterly ignores the actual agreements, relevant accounting principles and the relevant macroeconomic background and business context in which the transactions occurred.

Mr. Durkin then repeats his unsupported suspicions regarding Larian's

A/73033920.11

19

1   alleged "buy back" agreements with various Omni investors. He claims that these

2   alleged agreements raise unspecified "suspicions," but he fails to explain how Mr.

3   Larian's alleged agreements with these investors were improper or, more

4   importantly, how they had any negative effect on MGA's finances. According to

5   Mr. Durkin, these were potential agreements between Mr. Larian personally and

6   certain investors that <u>did not involve MGA or its funds</u>. In fact, Mr. Durkin

7   expressly found that there were no improper transfers of MGA funds. (Durkin

8   Report at 3.) Mr. Durkin thoroughly investigated these matters for more than three

9   months, reviewed thousands of documents and interviewed dozens of witnesses

10   and yet found <u>no acts of wrongdoing</u>.

11   IV.   **THERE IS NO LEGAL BASIS FOR APPOINTING A PERMANENT**

12            **RECEIVER**

13       "The appointment of a receiver is considered to be an **extraordinary**

14   **remedy**, and should be employed cautiously and granted **only when clearly**

15   **necessary** to protect plaintiff's interest in the property." *Rosen v. Siegel*, 106 F.3d

16   28, 34 (2d Cir. 1997) (emphasis added). "A receiver is an extraordinary equitable

17   remedy that is only justified in extreme situations. *Hollywood Healthcare Corp.,*

18   *v. Deltec, Inc.*, 2004 WL 1118610, at *10 (D. Minn. May 17, 2004) (emphasis

19   added); *see also Waag v. Hamm*, 10 F. Supp. 2d 1191, 1193 (D. Colo. 1998).

20   Moreover, "the appointment of a receivership of a solvent corporation is a drastic

21   remedy." *Saluck v. Rosner*, 1999 WL 46620, at *2 (E.D. Pa. Jan. 6, 1999).

22       Additionally, courts impose a heavy burden of a party seeking appointment

23   of a receiver and look to a number of factors, including, *inter alia*, a finding of

24   fraudulent conduct that will impair plaintiff's interests; the probability that harm to

25   plaintiff by denial of appointment would outweigh injury to parties opposing

26   appointment; imminent danger of property being lost, impaired or destroyed; the

27   lack of a less drastic equitable remedy; and the likelihood that appointment of a

28   receiver will do more harm than good. *See N.Y. Life Ins. Co. v. Watt West Inv.*

A/73033920.11                  20

Exhibit 2-1 Page 439

1    *Corp.*, 755 F. Supp. 287, 292 (E.D. Cal. 1991); *Waag*, 10 F. Supp. 2d at 1193.

2    Since none of these factors weigh in Mattel's favor of appointing a permanent

3    receiver, its application for the appointment of a receiver should be denied.

4          **A.**    **There Is No Finding Of Fraud Concerning Any Of The Omni-**

5              **Related Transactions**

6       Mr. Durkin conducted an investigation of, *inter alia*, the Omni-related

7    transactions that lasted three months. He claims to have reviewed thousands of

8    documents, including all agreements and correspondence between the parties, and

9    interviewed dozens of percipient witnesses. Having now completed his

10    investigation, without citing to a <u>single</u> "fraudulent" act or violation of any law,

11    regulation or accounting principle, he nonetheless recommended that the Court

12    appoint a permanent receiver.

13       Mr. Durkin's purported "suspicions" regarding certain aspects of the Omni

14    transactions are solely based on his admitted speculation and are neither reasonable

15    nor justified within the macroeconomic business context in which the transactions

16    occurred -- which is entirely ignored in Mr. Durkin's report. As explained in detail

17    above, the most fundamental premises of Mr. Durkin's report, at least as they

18    relate to Omni, are fatally flawed.

19       Perhaps most glaring is Mr. Durkin's repeated erroneous assertion that

20    Wachovia's assignment of the $313 Senior Bank Credit Facility to Omni was a

21    "related party transaction" that negatively impacted "MGAEI's solvency."

22    Contrary to Mr. Durkin's statements, there is simply no evidence that the

23    purchaser, Omni, and the seller, Wachovia, are or ever were related parties in any

24    sense. <u>See</u> FASB Statement No. 57.

25       Not only was this not a "related party transaction" but, perhaps more

26    importantly, it did not negatively impact MGA's solvency. As a matter of basic

27    accounting, the Wachovia loan had exactly <u>zero effect</u> on the "solvency" of MGA.

28    Wachovia extended a line of credit to MGA in the sum of $400 million. MGA

Exhibit 21 Page 446

1   borrowed $313 million. The only impact of the Omni-Wachovia transactions on

2   MGA's balance sheet was to change the identity of the creditor from Wachovia to

3   Omni.

4         Mr. Durkin also fails to acknowledge that Wachovia's assignment of the

5   debt obligation to Omni, if anything, improved MGA's solvency and liquidity

6   situation. Before the assignment, Wachovia had "called the note ... swept $25.8

7   million in cash from MGAEI's bank accounts and notified MGAEI's customers

8   that all payments should be made to Wachovia." (Durkin Report at 4-5.) As a

9   result of the Omni-Wachovia transaction, MGA not only got back the nearly $26

10  million in cash that Wachovia had seized but also received an interest "holiday" of

11  six months intended to give it breathing room to get back on its feet and move

12  forward. (Id.; Ex. 14, DFI 14-003.) Had Omni not gotten involved, MGA would

13  have been liquidated, gone bankrupt and Wachovia would have obtained all of its

14  assets. Mattel likely would have gotten nothing and certainly would be in worse

15  position than it is now.

16        Additionally, as demonstrated above, the fact that IGWT made a loan to

17  Omni does not make the Wachovia-Omni deal a "related party transaction." Nor

18  does Mr. Durkin contend that IGWT's loan to Omni was fraudulent or otherwise

19  improper or harmful. Neither Mr. Durkin nor Mattel has identified any legal or

20  accounting issue with the IGWT loan.

21        Because Mr. Durkin has made no finding of fraudulent or wrongful conduct,

22  and since his analysis regarding the "related party transactions," MGA's

23  "solvency" and "management of MGA's finances" is fundamentally flawed, his

24  recommendation to appoint a receiver cannot be relied upon. See Daubert v.

25  Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597, 113 S. Ct. 2786 (1993);

26  Kuhmo Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141, 152, 119 S. Ct. 1167

27  (1999) (holding that the objective of Daubert's "gatekeeping requirement" is "to

28  ensure the reliability and relevancy of expert testimony" and "to make certain that

A/73033920.11                                   22

Exhibit 21  Page 441

1    an expert, whether basing testimony upon professional studies or personal

2    experience, employs in the courtroom the same level of intellectual rigor that

3    characterizes the practice of an expert in the relevant field.").

4        Mr. Durkin's ill-concealed advocacy piece is certainly the posture he is most

5    comfortable with, and with which he has considerable experience, but serves only

6    Mattel's purposes here; it does not begin to constitute a balanced, objective report

7    to this Court. Indeed, he does not even pretend to consider the legitimate concerns

8    raised by Omni, the largest and only secured creditor of MGA, or its members

9    who, as represented to this Court on February 11 and corroborated by Mr. Durkin,

10   have invested $50 million dollars and have lawfully assumed the debt position first

11   held by Wachovia in 2006.

12       **B.    The Appointment Of A Permanent Receiver Will Do More Harm**

13             **Than Good And Is Not The Least Drastic Equitable Remedy**

14       The appointment of a permanent receiver, particularly in the context of the

15   toy business that MGA is in, will almost certainly accomplish nothing more than to

16   kill MGA, which will certainly advance Mattel's litigation and competitive goals

17   but will trample due process and contract law in the process. Omni has proposed a

18   less drastic equitable remedy that will both protect creditors and allow MGA to

19   continue to operate efficiently.

20       As explained above, Omni does not object to Patrick A. Fraioli, Jr.'s

21   continued engagement for a limited period of time to complete any necessary fact-

22   investigation, to implement any necessary internal controls and/or to marshal assets

23   to protect the rights of Omni and other creditors, and it has so-informed him.

24   Omni also does not object to and, indeed, would like to proceed to implement the

25   appointment of an independent board of directors to, *inter alia*, develop corporate

26   governance guidelines and procedures for MGA and to provide periodic reports on

27   the financial status of the company.

28       However, Omni objects to the Court's continued appointment of a "receiver"

A/73033920.11                        23

Exhibit 21 Page 442

1   designated with that title as that term is negatively associated in the marketplace

2   with bankruptcy or liquidation proceedings and its continued use will have an

3   unintended negative impact on MGA as respects its customers and suppliers,

4   which in turn will harm Omni and MGA's other creditors.  There is no inherent

5   benefit to the continued use of such a term and the applicable case law and these

6   facts do not justify it.  Omni also believes that the time for such intrusive,

7   expensive and distracting interference in MGA's business has come and gone.

8   Apparently, despite all the time and effort expended there is no indication that Mr.

9   Larian is improperly diverting MGA funds.  Indeed, to Omni's knowledge, he has

10  been infusing cash over the last several months.

11       Omni requests that Mr. Fraioli (or any other person appointed in his

12  capacity) be referred to as a "monitor" or "special master," his role be carefully

13  circumscribed and a tight "sunset" provision be built in as well.

14       **C.    The Court's Proposed Order Would Violate Omni's Contractual**

15               **Rights As A Secured Creditor And Constitutional Due Process**

16       It is critically important for the Court to recognize that Omni is the largest

17  secured creditor of MGA and that its secured interest in MGA's inventory and

18  accounts receivable is not only superior to Mattel's unsecured contingent interest

19  but extends well beyond the Bratz-related products that are the subject of this

20  litigation.

21       The Senior Bank Credit Facility was secured by a senior perfected security

22  interest in all of MGA's inventory and accounts receivable including, *inter alia*,

23  Moxi, Little Tikes and Bratz products.  (Omni understands that Bratz-related

24  revenues are only 15% of projected MGA total revenues for 2009.)  Indeed, Omni

25  has the largest amount at stake at this point, with the possible exception of the

26  equity shareholders of MGA.  As such, Omni implores the Court to protect its

27  interests and not to take any action to Omni's detriment.

28       Omni is very much opposed to the institution of a bankruptcy proceeding at

A/73033920.11                         24

Exhibit 21  Page 443

1    the present time as it believes such a proceeding to be unwarranted but, by the

2    same token, objects to any order purporting to prevent it from exercising its

3    contractual and constitutional rights as a non-party secured creditor of MGA

4    including, without limitation, its rights to initiate any foreclosure or bankruptcy

5    proceedings should future developments warrant such action.

6        Omni also objects to any order purporting to grant rights to any other parties

7    or third parties (including Mr. Fraioli) that may infringe Omni's rights as the senior

8    secured creditor including, without limitation, any right to initiate bankruptcy

9    proceedings without Omni's consent.

10       Prior to this Court's April 27, 2009 Order, Omni was a non-party and even

11   now is only a party for the limited purpose of this motion, has not had a chance to

12   conduct any discovery in this action, and was not permitted to have an independent

13   expert review or respond to Mr. Durkin's report.  Therefore, any order that

14   infringes on Omni's rights as the senior secured creditor of MGA would violate

15   constitutional due process.

16   **V.    CONCLUSION**

17       Omni has a compelling interest in the financial health and stability of MGA

18   and its assets.  If MGA fails, MGA's ability to repay the outstanding debt

19   obligation on $313 million owed to Omni will certainly be imperiled.  The

20   appointment of a permanent receiver to "oversee and control all financial and

21   business aspects" of MGA, or indeed any continued use of the term "receiver,"

22   solely to satisfy Mattel's litigation and competitive interests, would certainly harm

23   MGA's ability to operate independently and efficiently and would similarly

24   operate to improperly infringe upon the interests of Omni and other creditors.

25       Accordingly, Omni objects to the appointment of a permanent receiver.  If

26   the Court deems it appropriate, as described herein, Omni would not be opposed to

27   the continued engagement of Mr. Fraioli for a limited period of time as a "monitor"

28   or "special master" to complete any necessary further fact-investigation, to

A/73033920.11                              25

Exhibit 21  Page 444

1   implement any necessary internal controls and/or to marshal assets to protect the

2   rights of Omni and other creditors.  However, Omni objects to any Order

3   purporting to prevent it from exercising its contractual and constitutional rights as

4   a non-party secured creditor of MGA, or purporting to grant rights to any other

5   party or non-party (including any receiver) that would infringe upon Omni's rights

6   as a senior secured creditor.

7

8   DATED: May 14, 2009            Bingham McCutchen LLP

9

10  By: _Todd Gordinier_ /rv

11                                  Todd E. Gordinier
                                    Attorneys for Non-party
12                                  Omni 808 Investors, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
    A/73033920.11                          26

Exhibit _21_ Page _445_

# Exhibit 22

# BINGHAM

# Facsimile

DATE:   July 17 2009

| | NAME | FAX | PHONE |
|---|---|---|---|
| TO: | Michael Zeller, Esq. Quinn Emanuel Urquhart Oliver & Hedges, LLP | (213) 443-3100 | (213) 443-3000 |
| FROM: | Peter N. Villar peter.villar@bingham.com | 714.830.0719 | 714.830.0640 |

PAGES:   (INCLUDING THIS COVER PAGE): 3

RE:   Mattel, Inc. v. MGA Entertainment, Inc., et al.

**MESSAGE:**

Please see attached.

Boston
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Washington

Bingham McCutchen LLP
Plaza Tower, 18th Floor
600 Anton Boulevard
Costa Mesa, CA
92626·1924

T 714.830.0600
F 714.830.0700
bingham.com

For transmission problems, please call 714.830.0600
The information in this transmittal (including attachments, if any) is privileged and confidential and is intended only for the recipient(s) listed above. If you are neither the intended recipient(s) nor a person responsible for the delivery of this transmittal to the intended recipient(s), you are hereby notified that any unauthorized reading, distribution, copying or disclosure of this transmittal is prohibited. If you have received this transmittal in error, please notify us immediately at (same telephone number as in first paragraph - will duplicate) and return the transmittal to the sender. Thank you.

| Timekeeper No: | 34216 | Client/Matter No: | 3009108 | DATE/TIME STAMP |
|---|---|---|---|---|
| Client/Matter Name: | 0000337036 | | | |
| Return To: | Paul McConnell | | Floor No: 18th | |

A/73088860.1/3009108-0000337036

**EXHIBIT 22 PAGE 446**

# BINGHAM

Peter N. Villar
Direct Phone:   714.830.0640
Direct Fax:   714.830.0719
peter.villar@bingham.com

July 17, 2009

**Via Facsimile**

Michael T. Zeller, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA  90017

**Re:  Mattel, Inc. v. MGA Entertainment, et al.**

Dear Mr. Zeller:

As promised, this letter is meant to update you regarding the issues raised in your
July 3 letter and addressed in our subsequent written correspondence and phone
conference regarding Omni's and Vision Capital's document productions.

First, you contended that we have improperly redacted certain documents in
Omni's production.  As I previously indicated to you, we have reviewed the more
than 10,000 pages of documents we produced and can confirm that we have not
redacted any documents.  The redactions in the UCC filings appear to have been
done by Wachovia before they were sent to Omni.

Second, you contended that we placed confidentiality designations on certain
pleadings that are inconsistent with the original designations for those pleadings.
As I previously indicated to you, we agree to treat those pleadings according the
original designations referenced in your prior correspondence and spreadsheet.

Finally, you contended that Omni and Vision Capital have failed to produce "any
source financial documents" relating to the Wachovia debt acquisition.  However,
based on our review of the documents, we have produced multiple documents
reflecting and relating to the source of funding including, without limitation, the
Omni 808 Investors, LLC Limited Liability Agreement and the Amendment to the
Omni 808 Investors, LLC Limited Liability Agreement, which identify each of
the members of Omni and the specific amount of each of their investments.
Additionally, we have produced all documents reflecting or relating to IGWT's
loans to Omni.  Therefore, we have produced documents demonstrating all of the
sources of funding for Omni and the Wachovia debt acquisition.

Boston
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Walnut Creek
Washington

Bingham McCutchen LLP
Plaza Tower, 18th Floor
600 Anton Boulevard
Costa Mesa, CA
92626-1924

T 714.830.0600
F 714.830.0700
bingham.com

**EXHIBIT 22 PAGE 447**

07/17/2009 15:57 FAX                                                          ☎0003/0003

Michael T. Zeller, Esq.
July 17, 2009
Page 2

We do not agree that the Discovery Master's Order was intended to include all
highly sensitive "wire transfers, checks or bank statements." However, in an
effort to avoid another discovery dispute, we will endeavor to determine whether
such documents are in our clients' possession, custody or control. We do not
believe the Discovery Master's Order extends to Lexington Financial Limited
since, among other reasons, it is not a member of Omni and did not provide any
funds to Omni or Wachovia.

We will follow up with you next week once we have heard back from our clients.

Best regards,

Peter N. Villar

cc:   Todd Gordinier
      Annette Hurst
      Jason Russell

EXHIBIT _22_ PAGE _448_

# Exhibit 23

1 | Robert C. O'Brien (SBN 154372)
2 | ARENT FOX LLP
  | 555 West Fifth Street, 48th Floor
3 | Los Angeles, CA 90013-1065
  | Telephone: 213.629.7400
4 | Facsimile: 213.629.7401
  | obrien.robert@arentfox.com
5 | Discovery Master
6 |
7 |
8 | UNITED STATES DISTRICT COURT
9 | CENTRAL DISTRICT OF CALIFORNIA
10 | EASTERN DIVISION
11 |

| | |
|---|---|
| CARTER BRYANT, an individual, | Case No. CV 04-09049 SGL (RNBx) |
| Plaintiff, | |
| v. | Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-2727 |
| MATTEL, INC., a Delaware corporation, | **PHASE 2 DISCOVERY MATTER** |
| Defendant. | **ORDER NO. 40, REGARDING:** |
| | **(1) HEARING DATES FOR NEW DISCOVERY MATTERS; and** |
| | **(2) BRIEFING SCHEDULE** |
| CONSOLIDATED WITH MATTEL, INC. v. BRYANT and MGA ENTERTAINMENT, INC. v. MATTEL, INC. | |

EXHIBIT 23  PAGE 449

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

ORDER NO. 40
[Case No. CV 04-09049 SGL (RNBx)]

# I.    <u>HEARING DATES FOR NEW DISCOVERY MATTERS</u>

The following discovery matters order are set for hearing on the dates specified below at the offices of Arent Fox LLP:

**<u>August 6, 2009 at 10:00 a.m.</u>**

1.    Motion to Compel Responses from Isaac Larian to 1st set of Phase 2 Interrogatories filed by Mattel, Inc. on or about June 19, 2009.

2.    Motion For Limited Reconsideration of Phase 2 Discovery Matter Order No. 33 filed by Mattel, Inc. on or about June 30, 2009.

3.    Motion for Protective Order Regarding MGA'S First Set of Phase 2 Interrogatories filed by Mattel, Inc. on or about June 30, 2009.

**<u>August 13, 2009 at 10:00 a.m.</u>**

1.    Motion for Reconsideration of certain portions of Phase 2 Discovery Matter Order No. 27 remanded for further consideration by the Court to the Discovery Master on or about July 9, 2009.

2.    Motion to Compel Production of Documents for Which Any Claims of Privilege Have Been Waived filed by Mattel, Inc. on or about June 29, 2009.

**<u>August 19, 2009 at 10:00 a.m.</u>**

1.    Motion to Compel Responses from MGAE De Mexico, S.R.L. De C.V. to 1st Set of Requests for Documents and Things (Phase 2) filed by Mattel, Inc. on or about July 15, 2009.

2.    Motion to Compel Responses from MGAE De Mexico, S.R.L. De C.V. to 1st, 2nd and 3rd Sets of Requests for Production filed by Mattel, Inc. on or about July 15, 2009.

# II.    <u>SUPPLEMENTAL BRIEFING SCHEDULE REGARDING THE PORTION OF ORDER NO. 27 REMANDED BY THE COURT TO THE DISCOVERY MASTER FOR FURTHER CONSIDERATION</u>

On or about July 9, 2009, the Court remanded certain challenged portions of Order No. 27 to the Discovery Master for further consideration in light of, among

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 1 -

ORDER NO. 40
[Case No. CV 04-09049 SGL (RNBx)]

**EXHIBIT _23_ PAGE _450_**

1    other things, the filing of the Third Amended Answer and Counterclaims by Mattel,

2    Inc.  The Court further stated that "[t]he Discovery Master may, in his discretion,

3    set the matter for further briefing and/or hearing . . ."  Because the Discovery

4    Master finds that the parties should have an opportunity to address the issues raised

5    in the Court's July 9, 2009 Order, a hearing date for this matter has been set for

6    August 13, 2009 (*see* Section I above).  The Discovery Master further **ORDERS** as

7    follows:

8         1.     Mattel, Inc. shall file any supplemental memoranda in support of its

9    motion to compel responses to the subpoena served on Bingham McCutchen LLP

10   on or before July 27, 2009.

11        2.     Bingham McCutchen LLP shall file any supplemental opposition to

12   the motion to compel responses to the subpoena served on it by Mattel, Inc. on or

13   before August 3, 2009.

14        3.     No supplemental reply papers shall be filed.

15

16   Dated:      July 20, 2009

17

18                                  By:     /s/ Robert C. O'Brien

19                                          ROBERT C. O'BRIEN
                                            Discovery Master

20

21

22

23

24

25

26

27

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

-2-

ORDER NO. 40
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 23   PAGE 45