# EXHIBIT 1

1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
    John B. Quinn (Bar No. 90378)
2 |   (johnquinn@quinnemanuel.com)
    Michael T. Zeller (Bar No. 196417)
3 |   (michaelzeller@quinnemanuel.com)
    Jon D. Corey (Bar No. 185066)
4 |   (joncorey@quinnemanuel.com)
    Timothy L. Alger (Bar No. 160303)
5 |   (timalger@quinnemanuel.com)
    865 South Figueroa Street, 10th Floor
6 | Los Angeles, California 90017-2543
    Telephone: (213) 443-3000
7 | Facsimile: (213) 443-3100

8 | Attorneys for Mattel, Inc.

9 | UNITED STATES DISTRICT COURT

10 | CENTRAL DISTRICT OF CALIFORNIA

11 | EASTERN DIVISION

| | | |
|---|---|---|
| 12 | CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| 13 | Plaintiff, | Consolidated with |
| 14 | v. | Case No. CV 04-09059 Case No. CV 05-02727 |
| 15 | MATTEL, INC., a Delaware corporation, | MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS AND |
| 16 | Defendant. | THINGS RE CLAIMS OF UNFAIR COMPETITION TO MGA |
| 17 | | ENTERTAINMENT, INC. |
| 18 | AND CONSOLIDATED CASES. | |

21 | 		Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Mattel,

22 | Inc. hereby requests that MGA Entertainment, Inc. ("MGA") respond to these

23 | document requests ("Requests") and make available for inspection and copying

24 | originals of the following documents within 30 days of service at the offices of

25 | Quinn Emanuel Urquhart Oliver & Hedges, LLP, 865 South Figueroa Street, 10th

26 | floor, Los Angeles, CA 90017.  MGA shall be obligated to supplement responses to

27 | these requests at such times and to the extent required by Rule 26(e) of the Federal

28 | Rules of Civil Procedure.

EXHIBIT ____1____                    12-18

1 | **I.    DEFINITIONS**

2         For purposes of these Requests, the following definitions apply:

3         A.    The terms "YOU," "YOUR" and "MGA" mean MGA

4 Entertainment, Inc. and any individual or entity acting directly or indirectly by,

5 through, under or on behalf of MGA Entertainment, Inc., including but not limited

6 to current or former directors, officers, employees, agents, contractors, attorneys,

7 accountants, or representatives of MGA Entertainment, Inc. and any corporation,

8 partnership, association, trust, parent, subsidiary, division, affiliate, predecessor-in-

9 interest and successor-in-interest, and any other PERSON acting on its behalf.

10         B.    The term "MATTEL" means Mattel, Inc. and all current or

11 former directors, officers, employees, agents, contractors, attorneys, accountants,

12 representatives, subsidiaries, divisions, affiliates, predecessors-in-interest and

13 successors-in-interest, and any other PERSON acting on its behalf, pursuant to its

14 authority or subject to its control.

15         C.    "DOCUMENT" or "DOCUMENTS" means all "writings" and

16 "recordings" as those terms are defined in Rule 1001 of the Federal Rules of

17 Evidence and Rule 34 of the Federal Rules of Civil Procedure and shall include all

18 writings, including but not limited to handwriting, typewriting, printing, image,

19 photograph, photocopy, digital file of any kind, transmittal by (or as an attachment

20 to) electronic mail (including instant messages and text messages) or facsimile,

21 video and audio recordings, and every other means of recording upon any tangible

22 thing, any form of communication or representation, and any record thereby created,

23 regardless of the manner in which the record has been stored, and all non-identical

24 copies of such DOCUMENTS, in the possession, custody, or control of YOU,

25 YOUR counsel, or any other PERSON acting on YOUR behalf.

26         D.    The term "COMMUNICATION," in the plural as well as the

27 singular, means any transmittal and/or receipt of information, whether such was oral

28 or written, and whether such was by chance, prearranged, formal or informal, and

07975/1928319.2

**EXHIBIT** _____ -2-

MATTEL'S FIRST SET OF DOCUMENT REQUESTS (UNFAIR COMPETITION)

**PAGE** _____ 4

1 | specifically includes, but is not limited to, conversations in person, telephone

2 | conversations, electronic mail (including instant messages and text messages),

3 | voicemail, letters, memoranda, statements, media releases, magazine and newspaper

4 | articles, and video and audio transmissions.

5 |       E.     "EMBODIMENT" means any representation of the identified

6 | product or its retail packaging, whether two-dimensional or three-dimensional, and

7 | whether in tangible, digital, electronic or other form, including but not limited to all

8 | works, designs, artwork, sketches, drawings, illustrations, representations,

9 | depictions, blueprints, schematics, diagrams, images, sculptures, prototypes, models,

10 | samples, reductions to practice, developments, inventions and/or improvements, as

11 | well as all other items, things and DOCUMENTS in which any of the foregoing are

12 | or have been expressed, embodied, contained, fixed or reflected in any manner,

13 | whether in whole or in part.

14 |       F.     "CONTESTED MGA PRODUCTS" means the CONTESTED

15 | BRATZ DOLLS PRODUCTS, the CONTESTED BRATZ PETZ PRODUCTS, the

16 | CONTESTED BRATZ FUNKY FASHION MAKEOVER HEAD, the

17 | CONTESTED 4-EVER BEST FRIENDS PRODUCTS, the CONTESTED

18 | MOMMY'S LITTLE DOLL PRODUCTS, and the CONTESTED ALIENRACERS

19 | PRODUCTS, and any doll, toy, portion thereof, or version thereof that is now or has

20 | ever been known as, or sold, offered for sale, licensed, offered for license or

21 | marketed under the name or terms "Bratz," "4-ever Best Friends," "Mommy's

22 | Little," "Alienracers," or any derivative thereof, that provides a basis for any claim

23 | by YOU against MATTEL, including but not limited to "Bratz Dolls," "Bratz

24 | Dogz," "Winter Wonderland," "Bratz Sportz," "Formal Funk," "Sun-Kissed

25 | Summer," "Funky Fashion Makeover Head," "Runway Disco," "4-ever Best

26 | Friends," "Mommy's Little Patient," and "Alienracers."

27 |       G.     "CONTESTED BRATZ DOLLS PRODUCTS" means any of

28 | the following that provides a basis for any claim by YOU against MATTEL: (i) any

EXHIBIT _____ *1*

-3-

MATTEL'S FIRST SET OF DOCUMENT REQUESTS (UNFAIR COMPETITION)

PAGE _____ *5*

1  EMBODIMENT or project ever known by the name "Bratz" or any derivative
2  thereof (whether in whole or in part and regardless of what such EMBODIMENT or
3  project is or has been also, previously or subsequently called) and any doll or any
4  portion thereof that is now or has ever been known as, or sold, offered for sale,
5  licensed, offered for license or marketed under, the name or term "Bratz" or any
6  derivative thereof (whether in whole or in part and regardless of what such doll is or
7  has been also, previously or subsequently called), and all prototypes, models,
8  samples and versions of such EMBODIMENT, doll or any portion thereof; (ii) any
9  playset and accessory that YOU distribute under the name "Bratz" or any derivative
10  thereof; and/or (iii) any and all other goods, product packaging, advertisements,
11  promotional materials or other thing or item or material manufactured, produced,
12  printed, ordered, marketed, advertised, promoted, displayed, distributed, shipped,
13  imported, exported, licensed, offered for license, sold or offered for sale by YOU or
14  on YOUR behalf under the name "Bratz" or any derivative thereof.

15  　　　　H.　　"CONTESTED BRATZ PETZ PRODUCTS" means any of the
16  following that provides a basis for any claim by YOU against MATTEL: (i) any
17  EMBODIMENT or project ever known by the name "Bratz Petz" or any derivative
18  thereof (whether in whole or in part and regardless of what such EMBODIMENT or
19  project is or has been also, previously or subsequently called) and any toy pet or any
20  portion thereof that is now or has ever been known as, or sold, offered for sale,
21  licensed, offered for license or marketed under, the name or term "Bratz" or any
22  derivative thereof (whether in whole or in part and regardless of what such toy pet is
23  or has been also, previously or subsequently called), and all prototypes, models,
24  samples and versions of such EMBODIMENT, toy pet or any portion thereof; (ii)
25  any playset and accessory that YOU distribute under the name "Bratz Petz" or any
26  derivative thereof; and/or (iii) any and all other goods, product packaging,
27  advertisements, promotional materials or other thing or item or material
28  manufactured, produced, printed, ordered, marketed, advertised, promoted,

1   displayed, distributed, shipped, imported, exported, licensed, offered for license,
2   sold or offered for sale by YOU or on YOUR behalf under the name "Bratz Petz" or
3   any derivative thereof.

4         I.    "CONTESTED BRATZ FUNKY FASHION MAKEOVER
5   HEAD" means any of the following that provides a basis for any claim by YOU
6   against MATTEL: (i) any EMBODIMENT or project ever known by the name
7   "Bratz Funky Fashion Makeover Head" or any derivative thereof (whether in whole
8   or in part and regardless of what such EMBODIMENT or project is or has been
9   also, previously or subsequently called) and any styling head or any portion thereof
10  that is now or has ever been known as, or sold, offered for sale, licensed, offered for
11  license or marketed under, the name or term "Bratz" or any derivative thereof
12  (whether in whole or in part and regardless of what such styling head is or has been
13  also, previously or subsequently called), and all prototypes, models, samples and
14  versions of such EMBODIMENT, styling head or any portion thereof; (ii) any
15  accessory that YOU distribute under the name "Bratz Funky Fashion Makeover
16  Head" or any derivative thereof; and/or (iii) any and all other goods, product
17  packaging, advertisements, promotional materials or other thing or item or material
18  manufactured, produced, printed, ordered, marketed, advertised, promoted,
19  displayed, distributed, shipped, imported, exported, licensed, offered for license,
20  sold or offered for sale by YOU or on YOUR behalf under the name "Bratz Funky
21  Fashion Makeover Head" or any derivative thereof.

22        J.    "CONTESTED 4-EVER BEST FRIENDS PRODUCTS" means
23  any of the following that provides a basis for any claim by YOU against MATTEL:
24  (i) any EMBODIMENT or project ever known by the name "4-ever Best Friends" or
25  any derivative thereof (whether in whole or in part and regardless of what such
26  EMBODIMENT or project is or has been also, previously or subsequently called)
27  and any doll or any portion thereof that is now or has ever been known as, or sold,
28  offered for sale, licensed, offered for license or marketed under, the name or term

1 "4-ever Best Friends" or any derivative thereof (whether in whole or in part and
2 regardless of what such doll is or has been also, previously or subsequently called),
3 and all prototypes, models, samples and versions of such EMBODIMENT, doll or
4 any portion thereof; (ii) any playset and accessory that YOU distribute under the
5 name "4-ever Best Friends" or any derivative thereof; and/or (iii) any and all other
6 goods, product packaging, advertisements, promotional materials or other thing or
7 item or material manufactured, produced, printed, ordered, marketed, advertised,
8 promoted, displayed, distributed, shipped, imported, exported, licensed, offered for
9 license, sold or offered for sale by YOU or on YOUR behalf under the name "4-ever
10 Best Friends" or any derivative thereof.

11      K.    "CONTESTED MOMMY'S LITTLE DOLL PRODUCTS"
12 means any of the following that provides a basis for any claim by YOU against
13 MATTEL: (i) any EMBODIMENT or project ever known by the name "Mommy's
14 Little Patient" or similar name or any derivative thereof (whether in whole or in part
15 and regardless of what such EMBODIMENT or project is or has been also,
16 previously or subsequently called) and any doll or any portion thereof that is now or
17 has ever been known as, or sold, offered for sale, licensed, offered for license or
18 marketed under, the name or term "Mommy's Little Patient" or similar name or any
19 derivative thereof (whether in whole or in part and regardless of what such doll is or
20 has been also, previously or subsequently called), and all prototypes, models,
21 samples and versions of such EMBODIMENT, doll or any portion thereof; (ii) any
22 playset and accessory that YOU distribute under the name "Mommy's Little Patient"
23 or similar name or any derivative thereof; and/or (iii) any and all other goods,
24 product packaging, advertisements, promotional materials or other thing or item or
25 material manufactured, produced, printed, ordered, marketed, advertised, promoted,
26 displayed, distributed, shipped, imported, exported, licensed, offered for license,
27 sold or offered for sale by YOU or on YOUR behalf under the name "Mommy's
28 Little Patient" or similar name or any derivative thereof.

EXHIBIT

-6-
MATTEL'S FIRST SET OF DOCUMENT REQUESTS (UNFAIR COMPETITION)

PAGE _____ 8

1        L.    "CONTESTED ALIENRACERS PRODUCTS" means any of
2 the following that provides a basis for any claim by YOU against MATTEL: (i) any
3 EMBODIMENT or project ever known by the name "Alienracers" or any derivative
4 thereof (whether in whole or in part and regardless of what such EMBODIMENT or
5 project is or has been also, previously or subsequently called) and any toy vehicle,
6 character, or any portion thereof that is now or has ever been known as, or sold,
7 offered for sale, licensed, offered for license or marketed under, the name or term
8 "Alienracers" or any derivative thereof (whether in whole or in part and regardless
9 of what such toy is or has been also, previously or subsequently called), and all
10 prototypes, models, samples and versions of such EMBODIMENT, toy vehicle,
11 character, or any portion thereof; (ii) any playset and accessory that YOU distribute
12 under the name "Alienracers" or any derivative thereof; and/or (iii) any and all other
13 goods, product packaging, advertisements, promotional materials or other thing or
14 item or material manufactured, produced, printed, ordered, marketed, advertised,
15 promoted, displayed, distributed, shipped, imported, exported, licensed, offered for
16 license, sold or offered for sale by YOU or on YOUR behalf under the name
17 "Alienracers" or any derivative thereof.
18        M.    "CONTESTED MATTEL PRODUCTS" means the
19 CONTESTED MATTEL MY SCENE DOLLS PRODUCTS, the CONTESTED
20 MATTEL MY SCENE PETS PRODUCTS, the CONTESTED MATTEL MY
21 SCENE STYLING HEAD, the CONTESTED MATTEL WEE-3 PRODUCTS, the
22 CONTESTED MATTEL LITTLE MOMMY DOLL PRODUCTS, and the
23 CONTESTED MATTEL ACCELERACERS PRODUCTS, and any doll, toy,
24 portion thereof, or version thereof that is now or has ever been known as, or sold,
25 offered for sale, licensed, offered for license or marketed under the name or terms
26 "My Scene," "Wee-3," "Little Mommy," "AcceleRacerS," or any derivative thereof,
27 that provides a basis for any claim by YOU against MATTEL, including but not
28 limited to "My Scene Dolls," "My Scene Pets," "My Scene Chillin' Out," "My Scene

1  Miami Getaway," "My Scene Night on the Town," "My Scene Jammin' in Jamaica,"

2  "My Scene Guava Gulch Tiki Lounge," "My Scene Sound Lounge," "My Scene

3  Stylin' Head," "Mattel Wee-3," "Mattel Little Mommy Potty Training Baby Doll,"

4  and "Mattel Acceleracers."

5       N.       "CONTESTED MATTEL MY SCENE DOLLS PRODUCTS"

6  means any of the following that provides a basis for any claim by YOU against

7  MATTEL: (i) any EMBODIMENT or project ever known by the name "My Scene"

8  or any derivative thereof (whether in whole or in part and regardless of what such

9  EMBODIMENT or project is or has been also, previously or subsequently called)

10  and any doll or any portion thereof that is now or has ever been known as, or sold,

11  offered for sale, licensed, offered for license or marketed under, the name or term

12  "My Scene" or any derivative thereof (whether in whole or in part and regardless of

13  what such doll is or has been also, previously or subsequently called), and all

14  prototypes, models, samples and versions of such EMBODIMENT, doll or any

15  portion thereof; (ii) any playset and accessory that MATTEL distributes under the

16  name "My Scene" or any derivative thereof; and/or (iii) any and all other goods,

17  product packaging, advertisements, promotional materials or other thing or item or

18  material manufactured, produced, printed, ordered, marketed, advertised, promoted,

19  displayed, distributed, shipped, imported, exported, licensed, offered for license,

20  sold or offered for sale by MATTEL under the name "My Scene" or any derivative

21  thereof.

22       O.       "CONTESTED MATTEL MY SCENE PETS PRODUCTS"

23  means any of the following that provides a basis for any claim by YOU against

24  MATTEL: (i) any EMBODIMENT or project ever known by the name "My Scene

25  Pets" or any derivative thereof (whether in whole or in part and regardless of what

26  such EMBODIMENT or project is or has been also, previously or subsequently

27  called) and any toy pet or any portion thereof that is now or has ever been known as,

28  or sold, offered for sale, licensed, offered for license or marketed under, the name or

EXHIBIT _____ 8 _____

MATTEL'S FIRST SET OF DOCUMENT REQUESTS (UNFAIR COMPETITION)

PAGE _____ 10

1 | term "My Scene" or any derivative thereof (whether in whole or in part and
2 | regardless of what such toy pet is or has been also, previously or subsequently
3 | called), and all prototypes, models, samples and versions of such EMBODIMENT,
4 | toy pet or any portion thereof; (ii) any playset and accessory that MATTEL
5 | distributes under the name "My Scene Pets" or any derivative thereof; and/or (iii)
6 | any and all other goods, product packaging, advertisements, promotional materials
7 | or other thing or item or material manufactured, produced, printed, ordered,
8 | marketed, advertised, promoted, displayed, distributed, shipped, imported, exported,
9 | licensed, offered for license, sold or offered for sale by MATTEL under the name
10 | "My Scene Pets" or any derivative thereof.

11 |      P.    "CONTESTED MATTEL MY SCENE STYLING HEAD"
12 | means any of the following that provides a basis for any claim by YOU against
13 | MATTEL: (i) any EMBODIMENT or project ever known by the name "My Scene
14 | Styling Head" or any derivative thereof (whether in whole or in part and regardless
15 | of what such EMBODIMENT or project is or has been also, previously or
16 | subsequently called) and any styling head or any portion thereof that is now or has
17 | ever been known as, or sold, offered for sale, licensed, offered for license or
18 | marketed under, the name or term "My Scene" or any derivative thereof (whether in
19 | whole or in part and regardless of what such styling head is or has been also,
20 | previously or subsequently called), and all prototypes, models, samples and versions
21 | of such EMBODIMENT, styling head or any portion thereof; (ii) any accessory that
22 | MATTEL distributes under the name "My Scene Styling Head" or any derivative
23 | thereof; and/or (iii) any and all other goods, product packaging, advertisements,
24 | promotional materials or other thing or item or material manufactured, produced,
25 | printed, ordered, marketed, advertised, promoted, displayed, distributed, shipped,
26 | imported, exported, licensed, offered for license, sold or offered for sale by
27 | MATTEL under the name "My Scene Styling Head" or any derivative thereof.

28 |

EXHIBIT _____ 1

-9-

MATTEL'S FIRST SET OF DOCUMENT REQUESTS (UNFAIR COMPETITION)

PAGE _____ 11

1    Q.    "CONTESTED MATTEL WEE-3 PRODUCTS" means any of
2  the following that provides a basis for any claim by YOU against MATTEL:  (i) any
3  EMBODIMENT or project ever known by the name "Wee-3" or any derivative
4  thereof (whether in whole or in part and regardless of what such EMBODIMENT or
5  project is or has been also, previously or subsequently called) and any doll or any
6  portion thereof that is now or has ever been known as, or sold, offered for sale,
7  licensed, offered for license or marketed under, the name or term "Wee-3" or any
8  derivative thereof (whether in whole or in part and regardless of what such doll is or
9  has been also, previously or subsequently called), and all prototypes, models,
10 samples and versions of such EMBODIMENT, doll or any portion thereof; (ii) any
11 playset and accessory that MATTEL distributes under the name "Wee-3" or any
12 derivative thereof; and/or (iii) any and all other goods, product packaging,
13 advertisements, promotional materials or other thing or item or material
14 manufactured, produced, printed, ordered, marketed, advertised, promoted,
15 displayed, distributed, shipped, imported, exported, licensed, offered for license,
16 sold or offered for sale by MATTEL under the name "Wee-3" or any derivative
17 thereof.

18    R.    "CONTESTED MATTEL LITTLE MOMMY DOLL
19 PRODUCTS" means any of the following that provides a basis for any claim by
20 YOU against MATTEL:  (i) any EMBODIMENT or project ever known by the
21 name "Little Mommy" or any derivative thereof (whether in whole or in part and
22 regardless of what such EMBODIMENT or project is or has been also, previously or
23 subsequently called) and any doll or any portion thereof that is now or has ever been
24 known as, or sold, offered for sale, licensed, offered for license or marketed under,
25 the name or term "Little Mommy" or any derivative thereof (whether in whole or in
26 part and regardless of what such doll is or has been also, previously or subsequently
27 called), and all prototypes, models, samples and versions of such EMBODIMENT,
28 doll or any portion thereof; (ii) any playset and accessory that MATTEL distributes

07975/1928319.2                          -10-
MATTEL'S FIRST SET OF DOCUMENT REQUESTS (UNFAIR COMPETITION)

EXHIBIT
PAGE    12

1  under the name "Little Mommy" or any derivative thereof; and/or (iii) any and all
2  other goods, product packaging, advertisements, promotional materials or other
3  thing or item or material manufactured, produced, printed, ordered, marketed,
4  advertised, promoted, displayed, distributed, shipped, imported, exported, licensed,
5  offered for license, sold or offered for sale by MATTEL under the name "Little
6  Mommy" or any derivative thereof.

7          S.      "CONTESTED MATTEL ACCELERACERS PRODUCTS"
8  means any of the following that provides a basis for any claim by YOU against
9  MATTEL:  (i) any EMBODIMENT or project ever known by the name
10 "AcceleRacers" or any derivative thereof (whether in whole or in part and regardless
11 of what such EMBODIMENT or project is or has been also, previously or
12 subsequently called) and any toy vehicle, character, or any portion thereof that is
13 now or has ever been known as, or sold, offered for sale, licensed, offered for
14 license or marketed under, the name or term "AcceleRacers" or any derivative
15 thereof (whether in whole or in part and regardless of what such toy is or has been
16 also, previously or subsequently called), and all prototypes, models, samples and
17 versions of such EMBODIMENT, toy vehicle, character, or any portion thereof; (ii)
18 any playset and accessory that MATTEL distributes under the name "AcceleRacers"
19 or any derivative thereof ; and/or (iii) any and all other goods, product packaging,
20 advertisements, promotional materials or other thing or item or material
21 manufactured, produced, printed, ordered, marketed, advertised, promoted,
22 displayed, distributed, shipped, imported, exported, licensed, offered for license,
23 sold or offered for sale by MATTEL under the name "AcceleRacers" or any
24 derivative thereof.

25         T.      The term "PERSON," in the plural as well as the singular, means
26 any natural person, association, partnership, corporation, joint venture, government
27 entity, organization, trust, institution, proprietorship, or any other entity recognized
28 as having an existence under the laws in United States or any other nation.

1    U.    The term "RELATING TO" means any and all of the following

2  terms and their synonyms:  refer to, discuss, constitute, evidence, pertain to,

3  mention, support, contradict, negate, bear on, touch on, contain, embody, reflect,

4  identify, state, deal with, concern, comment on, respond to, relevant to, or describe.

5    V.    "COMPLAINT"  means the Complaint for False Designation of

6  Origin, Affiliation, Association or Sponsorship (15 U.S.C. § 1125(a)); Unfair

7  Competition (15 U.S.C. § 1125(a)); Cal. Bus. & Prof. Code § 17200 *et seq.* and

8  California Common Law); Dilution (15 U.S.C. § 1125(c), Cal Bus. & Prof. Code

9  § 14330 and California Common Law); and Unjust Enrichment, filed by YOU on or

10  about April 13, 2005.

11

12  **II.    INSTRUCTIONS**

13    A.    YOU are to produce all requested DOCUMENTS in YOUR

14  possession, custody or control.

15    B.    If YOU contend that YOU are not required to produce certain

16  DOCUMENTS called for by these Requests on the grounds of a privilege or

17  protection that YOU are not prepared to waive, identify each such DOCUMENT

18  and provide the following information:

19    1.    the date and type of the DOCUMENT, the author(s) and

20      all recipients;

21    2.    the privilege or protection that YOU claim permits YOU

22      to withhold the DOCUMENT;

23    3.    the title and subject matter of the DOCUMENT;

24    4.    any additional facts on which YOU base YOUR claim of

25      privilege or protection; and

26    5.    the identity of the current custodian of the original of the

27      DOCUMENT.

28

EXHIBIT _____/_____

_____12_____

MATTEL'S FIRST SET OF DOCUMENT REQUESTS (UNFAIR COMPETITION)

PAGE _____14_____

C.     DOCUMENTS shall be produced in their original file folders, or in lieu thereof, any writing on the file folder from which each such DOCUMENT is taken shall be copied and appended to such DOCUMENT and the PERSON for whom or department, division or office for which the DOCUMENT or the file folder is maintained shall be identified.

D.     The DOCUMENTS should be produced in their complete and unaltered form. Attachments to DOCUMENTS should not be removed. The DOCUMENTS should not be cut-up, pasted over, redacted or altered in any way for any reason, including alleged nonrelevance. If emails are produced that had attachments, the attachments shall be attached when produced.

E.     DOCUMENTS in electronic form shall be produced in that form.

F.     In the event that any DOCUMENT called for by these requests has been destroyed or discarded, that DOCUMENT is to be identified by stating:

1.     the date and type of the DOCUMENT, the author(s) and all recipients;

2.     the DOCUMENT's date, subject matter, number of pages, and attachments or appendices;

3.     the date of destruction or discard, manner of destruction or discard, and reason for destruction or discard;

4.     the PERSONS who were authorized to carry out such destruction or discard;

5.     the PERSONS who have knowledge of the content, origins, distribution and destruction of the DOCUMENT; and

6.     whether any copies of the document exist and, if so, the name of the custodian of each copy.

1 | REQUEST FOR PRODUCTION NO. 74:

2      All DOCUMENTS, including but not limited to all

3 COMMUNICATIONS with any PERSON, RELATING TO Machado's resignation

4 from Mattel.

5

6 | REQUEST FOR PRODUCTION NO. 75:

7      All DOCUMENTS, including but not limited to all

8 COMMUNICATIONS with any PERSON, RELATING TO compensation, money

9 or any other item of value paid to Machado, whether directly or indirectly, by YOU.

10

11 | REQUEST FOR PRODUCTION NO. 76:

12      All DOCUMENTS received by YOU, directly or indirectly, from

13 Machado RELATING TO any MATTEL product or plan.

14

15 | REQUEST FOR PRODUCTION NO. 77:

16      All DOCUMENTS, including but not limited to all

17 COMMUNICATIONS with any PERSON, RELATING TO YOUR receipt,

18 reproduction, copying, storage, transmission, transfer, retention, destruction,

19 deletion or use of any DOCUMENTS, data and/or information, including but not

20 limited to any compilation of information, that was prepared, made, created,

21 generated, assembled or compiled by or for MATTEL and that YOU received,

22 directly or indirectly, from Machado.

23

24 | REQUEST FOR PRODUCTION NO. 78:

25      A copy of each personnel file maintained or created by YOU

26 RELATING TO Machado.

27

28

1  REQUEST FOR PRODUCTION NO. 84:

2          All DOCUMENTS, including but not limited to all

3  COMMUNICATIONS with any PERSON, RELATING TO Trueba's resignation

4  from Mattel.

5

6  REQUEST FOR PRODUCTION NO. 85:

7          All DOCUMENTS, including but not limited to all

8  COMMUNICATIONS with any PERSON, RELATING TO compensation, money

9  or any other item of value paid to Trueba, whether directly or indirectly, by YOU.

10

11  REQUEST FOR PRODUCTION NO. 86:

12          All DOCUMENTS received by YOU, directly or indirectly, from

13  Trueba RELATING TO any MATTEL product or plan.

14

15  REQUEST FOR PRODUCTION NO. 87:

16          All DOCUMENTS, including but not limited to all

17  COMMUNICATIONS with any PERSON, RELATING TO YOUR receipt,

18  reproduction, copying, storage, transmission, transfer, retention, destruction,

19  deletion or use of any DOCUMENTS, data and/or information, including but not

20  limited to any compilation of information, that was prepared, made, created,

21  generated, assembled or compiled by or for MATTEL and that YOU received,

22  directly or indirectly, from Trueba.

23

24  REQUEST FOR PRODUCTION NO. 88:

25          A copy of each personnel file maintained or created by YOU

26  RELATING TO Trueba.

27

28

07975/1928319.2

EXHIBIT _____ -31-

MATTEL'S FIRST SET OF DOCUMENT REQUESTS (UNFAIR COMPETITION)

PAGE ____ 17

1  REQUEST FOR PRODUCTION NO. 94:

2          All DOCUMENTS, including but not limited to all

3  COMMUNICATIONS with any PERSON, RELATING TO Vargas' resignation

4  from Mattel.

5

6  REQUEST FOR PRODUCTION NO. 95:

7          All DOCUMENTS, including but not limited to all

8  COMMUNICATIONS with any PERSON, RELATING TO compensation, money

9  or any other item of value paid to Vargas, whether directly or indirectly, by YOU.

10

11  REQUEST FOR PRODUCTION NO. 96:

12          All DOCUMENTS received by YOU, directly or indirectly, from

13  Vargas RELATING TO any MATTEL product or plan.

14

15  REQUEST FOR PRODUCTION NO. 97:

16          All DOCUMENTS, including but not limited to all

17  COMMUNICATIONS with any PERSON, RELATING TO YOUR receipt,

18  reproduction, copying, storage, transmission, transfer, retention, destruction,

19  deletion or use of any DOCUMENTS, data and/or information, including but not

20  limited to any compilation of information, that was prepared, made, created,

21  generated, assembled or compiled by or for MATTEL and that YOU received,

22  directly or indirectly, from Vargas.

23

24  REQUEST FOR PRODUCTION NO. 98:

25          A copy of each personnel file maintained or created by YOU

26  RELATING TO Vargas.

27

28

MATTEL'S FIRST SET OF DOCUMENT REQUESTS (UNFAIR COMPETITION)

07975/1928319.2

1 | REQUEST FOR PRODUCTION NO. 104:

2      All DOCUMENTS, including but not limited to all

3 COMMUNICATIONS with any PERSON, RELATING TO Brisbois' resignation

4 from Mattel.

5

6 | REQUEST FOR PRODUCTION NO. 105:

7      All DOCUMENTS, including but not limited to all

8 COMMUNICATIONS with any PERSON, RELATING TO compensation, money

9 or any other item of value paid to Brisbois, whether directly or indirectly, by YOU.

10

11 | REQUEST FOR PRODUCTION NO. 106:

12      All DOCUMENTS received by YOU, directly or indirectly, from

13 Brisbois RELATING TO any MATTEL product or plan.

14

15 | REQUEST FOR PRODUCTION NO. 107:

16      All DOCUMENTS, including but not limited to all

17 COMMUNICATIONS with any PERSON, RELATING TO YOUR receipt,

18 reproduction, copying, storage, transmission, transfer, retention, destruction,

19 deletion or use of any DOCUMENTS, data and/or information, including but not

20 limited to any compilation of information, that was prepared, made, created,

21 generated, assembled or compiled by or for MATTEL and that YOU received,

22 directly or indirectly, from Brisbois.

23

24 | REQUEST FOR PRODUCTION NO. 108:

25      A copy of each personnel file maintained or created by YOU

26 RELATING TO Brisbois.

27

28

EXHIBIT _____

1  REQUEST FOR PRODUCTION NO. 114:

2        All DOCUMENTS, including but not limited to all

3  COMMUNICATIONS with any PERSON, RELATING TO Brawer's resignation

4  from Mattel.

5

6  REQUEST FOR PRODUCTION NO. 115:

7        All DOCUMENTS, including but not limited to all

8  COMMUNICATIONS with any PERSON, RELATING TO compensation, money

9  or any other item of value paid to Brawer, whether directly or indirectly, by YOU.

10

11  REQUEST FOR PRODUCTION NO. 116:

12        All DOCUMENTS received by YOU, directly or indirectly, from

13  Brawer RELATING TO any MATTEL product or plan.

14

15  REQUEST FOR PRODUCTION NO. 117:

16        All DOCUMENTS, including but not limited to all

17  COMMUNICATIONS with any PERSON, RELATING TO YOUR receipt,

18  reproduction, copying, storage, transmission, transfer, retention, destruction,

19  deletion or use of any DOCUMENTS, data and/or information, including but not

20  limited to any compilation of information, that was prepared, made, created,

21  generated, assembled or compiled by or for MATTEL and that YOU received,

22  directly or indirectly, from Brawer.

23

24  REQUEST FOR PRODUCTION NO. 118:

25        All DOCUMENTS RELATING TO the existence or extent of

26  competition or substitution between any of the CONTESTED MGA PRODUCTS

27  and any of the CONTESTED MATTEL PRODUCTS.

28

EXHIBIT _____/_____

PAGE _____
07975/1928319.2

MATTEL'S FIRST SET OF DOCUMENT REQUESTS (UNFAIR COMPETITION)

1  REQUEST FOR PRODUCTION NO. 166:

2          To the extent not produced in response to any other Request for

3  Production, all DOCUMENTS and tangible things upon which YOU intend to rely

4  upon in this action.

5

6  DATED:  December 18, 2006          QUINN EMANUEL URQUHART OLIVER &
                                       HEDGES, LLP
7

8                                      By
9                                         Timothy L. Alger
10                                        Attorneys for Mattel, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27        EXHIBIT ___1___

28        PAGE ___21___

07975/1928319.2
                                       -47-

| | |
|---|---|
| 1 | **PROOF OF SERVICE** |
| 2 | I am employed in the County of Los Angeles, State of California.  I am over |
| 3 | the age of eighteen years and not a party to the within action; my business address is |
| 4 | NOW Messenger Service, 1301 West Second Street, Suite 206, Los Angeles, |
| 5 | California 90026. |
| 6 | On December 18, 2006, I true copies of the following document(s) described |
| 7 | as: |
| 8 | **MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS** |
| 9 | **AND THINGS RE CLAIMS OF UNFAIR COMPETITION** |
| 10 | **TO MGA ENTERTAINMENT, INC.** |
| 11 | on the parties in this action as follows: |

| 12 13 14 15 | Diana M. Torres, Esq.<br>O'Melveny & Myers<br>400 So. Hope Street<br>Los Angeles, CA  90071<br>Telephone: (213) 430-6000<br>Facsimile: (213) 430-6407 | Keith A. Jacoby, Esq.<br>Littler Mendelson<br>2049 Century Park East, 5th Floor<br>Los Angeles, CA  90067-3107<br>Telephone: (310) 553-0308<br>Facsimile: (310) 553-5583 |
|---|---|---|

| | |
|---|---|
| 16 17 18 | [√ ]    [PERSONAL] by personally delivering the document listed above to the person(s) at the address(es) set forth above. |
| 19 20 21 | I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made |
| 22 23 | Executed on December 18, 2006 at Los Angeles, California. |
| 24 25 26 | David Quintana |
| 27 | |
| 28 | |

07209/2020338.1

EXHIBIT _____1_____

PAGE _____22_____

Case No. SACV 05-00953 JVS (ANx)
PROOF OF SERVICE

# EXHIBIT 2

CONFORMED COPY

FILED

2007 JAN 26  PM 12: 05

Hon. Edward A. Infante (Ret.)
JAMS
Two Embarcadero Center
Suite 1500
San Francisco, CA  94111
415-774-2611
415-982-5287 (fax)

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>v.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant. | CASE NO. C 04-09049 SGL (RNBx)<br>JAMS Reference No. 1100049530<br><br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-2727<br><br>**ORDER GRANTING MATTEL'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS** |
| CONSOLIDATED WITH<br>MATTEL, INC. v. BRYANT and<br>MGA ENTERTAINMENT, INC. v. MATTEL, INC. | |

## I. INTRODUCTION

On January 3, 2007, Mattel, Inc. ("Mattel") submitted its Motion to Compel Production of

Documents to the undersigned Discovery Master for disposition.[1]  On January 11, 2007, Carter

Bryant ("Bryant") submitted his opposition brief, and on January 18, 2007, Mattel submitted a

reply brief.  The matter was heard via telephonic conference call on January 24, 2007.  Having

---

[1]  Pursuant to a stipulation and order filed December 6, 2006, the undersigned was designated Discovery Master in accordance with Rule 53 of the Federal Rules of Civil Procedure.

EXHIBIT ____2____

PAGE ____23____

1-26

considered the motion papers and comments of counsel at the hearing, Mattel's Motion to Compel
Production of Documents is GRANTED.

## II. BACKGROUND

At the heart of this lawsuit is a dispute over the rights to the "Bratz" dolls. This highly
lucrative line of dolls was first conceived by Bryant, a former Mattel employee, and made
commercially available by MGA Entertainment, Inc. ("MGA") in the summer of 2001. Sales of
Bratz dolls now rival Mattel's Barbie doll.

A. Mattel's Original Complaint

On April 27, 2004, Mattel, the world's largest manufacturer and marketer of toys, filed
suit against its former employee Bryant in state court asserting claims for breach of contract,
breach of fiduciary duty, breach of duty of loyalty, unjust enrichment, and conversion. Mattel
employed Bryant as a product designer from September 1995 through April 1998, and from
January 1999 through October 2000. Upon starting his second term, Bryant signed an Employee
Confidential Information and Inventions Agreement which required him not to engage in any
employment or business other than for Mattel, or invest or assist in any manner any business
competitive with the business or future business plans of Mattel. Bryant also assigned to Mattel
all rights, title, and interest in the "inventions" he conceived of, or reduced to practice, during his
employment.

In addition, Bryant completed Mattel's Conflict of Interest Questionnaire, certifying that
he had not worked for any of Mattel's competitors in the prior twelve months and had not
engaged in any business dealings creating a conflict of interest. Bryant agreed to notify Mattel of
any future events raising a conflict of interest.

Mattel alleges that during his employment, Bryant secretly aided, assisted and worked for
a Mattel competitor (later identified as MGA). Bryant entered into an agreement with MGA to

EXHIBIT _____ 2
PAGE _____ 24

provide product design services on a "top priority" basis.[2]  The agreement further provided that

Bryant would receive royalties and other consideration for sales of products on which he provided

aid or assistance; that all work and services furnished by Bryant to MGA under the agreement

would be considered "works for hire"; and that all intellectual property rights to preexisting work

by Bryant purportedly would be assigned to MGA.  Mattel further alleges that Bryant converted,

misappropriated and misused Mattel property and resources while he was employed at Mattel.  In

the complaint, Mattel claims ownership of all inventions and works created by Bryant during his

Mattel employment and seeks to recover all benefits obtained as a result of his alleged breach of

duties.

In May of 2004, Bryant removed the state court action to the U.S. District Court, asserting

subject matter jurisdiction under both 28 U.S.C. §1331 (federal question jurisdiction) and 28

U.S.C. §1332 (diversity jurisdiction).  Mattel filed a motion to remand and submitted a copy of

Bryant's agreement with Mattel's competitor, namely MGA.  The agreement was dated

September 18, 2000 – a time when Bryant was still employed by Mattel — and required Bryant to

provide MGA with design services for the Bratz dolls.  In return, MGA agreed to compensate

Bryant at a monthly rate for a period of time and to pay Bryant a 3% royalty on sales of Bratz

dolls.  In August of 2004, the district court remanded the action.

B. Bryant's Cross-complaint

In September of 2004, after the case was returned to state court, Bryant filed a cross-

complaint against Mattel to challenge the legality of Mattel's Employee Confidential Information

and Inventions Agreement.  Bryant's cross-complaint included claims for unfair competition,

rescission, declaratory relief, and fraud.

//

---

[2] Bryant has already produced his agreement with MGA.  Therefore, the existence of the agreement does not appear
to be in dispute.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

3

EXHIBIT ____2____

PAGE ____25____

C. Bryant's Second Notice of Removal (CV 04-9059)

In November of 2004, Bryant filed a second notice of removal, once again invoking federal question and diversity jurisdiction. Bryant asserted that Mattel's complaint presented a federal question because events occurring since the first removal and remand demonstrated that Mattel's conversion claim involved the rights to the Bratz dolls, and therefore was preempted by the Copyright Act. Bryant also contended that there was diversity jurisdiction because he and Mattel were citizens of different states and the amount in controversy exceeded the $75,000 jurisdictional limit because the rights to the Bratz dolls were at stake. After the second notice of removal, MGA intervened as a defendant pursuant to a stipulation and order.

D. Bryant's Declaratory Relief Action Against Mattel (CV 04-9049)

On the same day that Bryant filed his second notice of removal, he also filed a complaint in federal court seeking a declaratory judgment that the Bratz dolls do not infringe Mattel's copyrights in a project known as "Toon Teens."

E. MGA's Complaint Against Mattel (CV 05-2727)

In April of 2005, MGA filed suit against Mattel alleging essentially unfair competition claims. MGA alleged that Mattel engaged in "serial copycatting" of Bratz dolls, Bratz "pets" and other Bratz products, Bratz television commercials, and Bratz packaging.

F. Mattel's Second Motion to Remand its Complaint against Bryant

Mattel filed another motion to remand its suit against Bryant. In March of 2005, the district court issued an order denying the motion to remand and certifying the order for interlocutory review. Mattel filed an appeal, and the district court stayed discovery in May of 2005. Discovery did not resume until May 2006, when the Ninth Circuit affirmed the district court ruling. After the stay was lifted the district court consolidated all three actions for all purposes. There is no scheduling order currently in place.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

4

EXHIBIT ___2___
PAGE ___26___

G. Court Dismisses Bryant's Cross-claims and Declaratory Relief Action

In July of 2006, the district court dismissed Bryant's cross-claims pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief may be granted. The district court also dismissed Bryant's declaratory relief action, finding there existed no reasonable apprehension of an imminent copyright infringement claim against him by Mattel based upon Mattel's Toon Teen intellectual property.

H. Mattel's Counterclaims against MGA

Mattel sought leave to file an amended complaint in case no. CV 05-9059 to add five defendants and nine new legal claims alleging a wide range of commercial disputes. For example, Mattel's proposed amended complaint contains RICO claims, a trade secret misappropriation claim, and aiding and abetting claims predicated on allegations that MGA cherry-picked certain high ranking Mattel executives or designers and then enticed them to steal Mattel's trade and proprietary secrets and deliver them to MGA before beginning work with MGA. Mattel also sought leave to add a copyright infringement claim. Mattel has recently filed copyright registrations with the U.S. Copyright Office claiming ownership in various Bratz doll designs created by Bryant.

On January 11, 2007, the district court granted Mattel leave to file its proposed amendments, but only insofar as they are pled in the form of an amended answer and counterclaim in the case MGA filed against Mattel, CV 05-2727. The next day, Mattel filed its amendments as ordered in case no. CV 05-2727.

I. Mattel's Requests for Production of Documents

Mattel served the requests for production of documents at issue in this motion on June 14, 2004. Bryant served objections and responses on July 16, 2004. The parties met and conferred, but ultimately Mattel moved to compel production in January of 2005. That motion, however,

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

5

EXHIBIT $\underline{\hspace{0.3cm}2\hspace{0.3cm}}$

PAGE $\underline{\hspace{0.3cm}27\hspace{0.3cm}}$

1    was not heard before the district court stayed all discovery pending resolution of Mattel's appeal

2    to the Ninth Circuit on subject matter jurisdiction issues.

3         After the stay of discovery was lifted, the parties met and conferred on June 20, 2006, at

4    the courthouse, and were able to achieve apparent agreement on the bulk of the present motion to

5    compel. The parties informed the court that they would submit a stipulation and order. See

6

7    Minutes dated June 20, 2006, Zeller Dec. Ex. 6 ("With respect to Mattel's Motion to Compel

8    Production of Documents, counsel will be submitting a stipulation and order which will be

9    dispositive of all the issues in dispute.").

10

11        Over the next several months, the parties exchanged draft stipulations and orders to

12   memorialize the parties' meet and confer session, but were unable to reach final agreement

13   because Bryant insisted upon including the following sentence in the stipulation: "The stipulation

14   resolves all issues raised in Mattel's motion to compel, which is hereby withdrawn." Bryant's

15   Opposition at 1:18-20. By including this sentence, Bryant intended to prevent further law and

16   motion regarding the requests at issue in Mattel's original motion to compel. Id. at 1:21-23.

17   From Mattel's perspective, however, the proposed sentence amounted to a demand that Mattel

18   waive its right to all further discovery in connection with its requests. Mattel proposed the

19

20   following provision as an alternative:

21

22        Except as, and only as set forth in the terms of Paragraph One above, nothing in
         this Stipulation shall preclude or limit Mattel from seeking further discovery on
23       any matter, including as to matter on which the parties could not reach complete
         agreement, or preclude or limit any right of Bryant to object or resist to such
24       discovery.

25   Bryant's Opposition at 7:5-11. Apparently Mattel's alternative language was

26   unacceptable to Bryant. At the direction of the Discovery Master, the parties met and

27   conferred again in late December 2006, but to no avail.

28

29        Despite the parties' inability to reach final agreement, Bryant produced approximately

Bryant v. Mattel, Inc.,                                                                    6
CV-04-09049 SGL (RNBx)

EXHIBIT _____2_____

PAGE _____28_____

1,600 pages of documents to date. Mattel contends, however, that the production is inadequate and consistent with a pattern of stonewalling.[3] Accordingly, Mattel filed the instant motion to compel responsive documents, which includes a request for sanctions in the amount of $7,805.

    J.  Mattel's Motion to Compel Production of Documents

    Mattel's motion has three parts. First, Mattel seeks an order compelling Bryant to produce the following categories of requested documents: (a) documents relating to Bratz designs created by Bryant while employed by Mattel; (b) doll prototypes created by Bryant while working for Mattel; (c) documents that refer to the conception, creating or development of Bratz; (d) Mattel-related documents that Bryant disclosed to MGA; (e) communications between Bryant and MGA that relate to Mattel or Mattel employees; and (f) documents showing what dolls Bryant was exposed to while working at Mattel. Mattel's Motion at 6. Mattel asserts that these categories of documents are relevant to establish Bryant's liability and would reveal works rightfully owned by Mattel.

    Second, as to other categories of documents which Bryant has agreed to produce, Mattel contends that Bryant has imposed unjustified limitations. According to Mattel, Bryant will not produce any responsive documents that were created after the suit was filed; Bryant will not produce any communications with MGA "created" after the end of his Mattel employment; Bryant is limiting production of Bratz-related documents to designs that, in Bryant's view, "resulted in" the first line of Bratz dolls released in June 2001; Bryant has not produced known contracts between him and MGA and refuses to produce non-privileged communications relating to those contracts; and Bryant has withheld all but one category of financial documents relating to

---

[3] According to Mattel, Bryant evaded a deposition until Mattel obtained a court order compelling him to appear. Similarly, MGA allegedly refused to permit its CEO, Isaac Larian, from being deposed. Mattel again obtained a court order compelling the deposition and sanctions. To date, only Bryant and Larian have been deposed.

EXHIBIT _____ 2 _____

PAGE _____ 29 _____

his earnings from his work for MGA. Mattel's Motion at 7. Mattel seeks full production of responsive documents without any of the limitations described above.

Third, Mattel contends that the documents Bryant has produced are inadequate for a number of reasons: the financial documents are so heavily redacted they are useless; faxed documents are missing fax header information, including the sending and receiving parties[4]; e-mails and other electronic documents that are known to exist have not been produced; Bryant refuses to inspect, and refuses to permit Mattel to inspect, the hard drive of a computer he used during the relevant period; and Bryant's privilege log is facially incomplete and lists only four documents.

K. Bryant's Opposition to Mattel's Motion to Compel

Bryant opposes Mattel's motion to compel. He views the motion as nothing more than Mattel's unwillingness to allow closure on any discovery matter after a lengthy meet and confer process which began back in 2004. Bryant emphasizes that the document requests at issue were first propounded at a time when Mattel was attempting to remand the case, making the claim that it did not know whether $75,000 was in controversy and insisting that it was asserting solely state law claims. Bryant explains that given Mattel's view of the case in 2004, he took the position that discovery should be limited to what occurred in his last days at Mattel and shortly thereafter. See Bryant's Opposition at 4-5 ("Bryant's activities and earnings in connection with Bratz in later years could have no conceivable relevance to the case because if those activities and earnings were at stake, the case was worth millions, not pennies."). Accordingly, in the summer and fall of 2004, he produced the following categories of documents: documents evidencing the artwork used to create the "First Generation" of Bratz dolls – the first dolls sold to the public in the summer of 2001; hundreds of pieces of artwork he was permitted to retain from his employment

---

[4]   There is evidence that MGA's CEO instructed an employee to obliterate the fax header on a fax Bryant sent to MGA from Mattel's Design Center. MGA denies the accusation.

EXHIBIT ___2___

PAGE ___30___

at Mattel; MGA statements revealing his earnings connected with the sale of the First Generation

Bratz dolls and his 2000 contract with MGA; personal phone records and bank records; and

hundreds of three dimensional doll parts and toy accessories that came into his possession over

the years, including a prototype of the First Generation "Jade" doll.

Bryant generally agrees with Mattel's description of the meet and confer session held at

the courthouse on June 20, 2006 and the parties' exchange of draft stipulations. According to

Bryant, all the requests addressed in Mattel's original motion to compel and the instant motion led

to agreement on the following points: (a) Bryant would produce all agreements for work he

performed with or on behalf of MGA prior to June 30, 2001 (the approximate date the First

Generation Bratz dolls were released to the public); (b) Bryant would waive the attorney-client

privilege with respect to communications with the attorney who assisted him in negotiating his

contract with MGA, so long as that waiver would be limited and in no way waive the privilege

with respect to litigation counsel; (c) Bryant would produce any documents relating to any

payments he received from MGA while employed at Mattel, irrespective of the date of creation;

(d) Bryant agreed to make a diligent search for all computers referenced in his deposition and

search them for responsive documents; (e) Bryant agreed to produce all documents and tangible

things obtained from Mattel during the course of his employment at Mattel; (f) Bryant agreed to

conduct a search and produce any patent, trademark or copyright applications, registrations and

other non-privileged documents in his possession in connection with his work with MGA prior to

June 2001; (g) Bryant agreed to identify documents responsive to particular requests if Mattel

could demonstrate that the requests asked for such identification of documents; (h) Bryant agreed

to sign a verification that none of the information redacted from his phone records related to Bratz

or his work for MGA prior to June 30, 2001; (i) Bryant agreed to supplement his privilege log;

and (j) the parties agreed that the stipulation modified Bryant's prior response to the discovery

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

9

EXHIBIT 2

PAGE 31

1   requests and that the stipulation controlled to the extent they were inconsistent. Bryant's

2   Opposition at 5:22-6:21.

3         Bryant emphasizes that the parties have engaged in an extensive meet and confer process

4   and asks the Discovery Master to order the disposition of this motion in a manner consistent with

5
6   the parties' draft stipulation. If the draft stipulation is not adopted, Bryant fears the parties will

7   have no incentive to compromise in the future. Bryant's Opposition at 1:24-2:3. Bryant also asks

8   the Discovery Master to order Mattel not to revisit any of the requests that were the subject of

9   Mattel's original motion to compel or the instant motion to compel. Id. at 2:11-13 and 10:9-10.

10        Furthermore, Bryant asserts that Mattel's requests are overbroad in numerous respects. In
11
12  particular, Bryant asserts that Mattel is not entitled to all communications with MGA relating to

13  Mattel employees. Bryant also asserts that Mattel is not entitled to unredacted personal phone

14  records and financial information because these records are protected by privacy rights. Lastly,

15
16  Bryant asserts that Mattel is not entitled to all Bratz related documents created after the lawsuit

17  was filed.

18                                    III. DISCUSSION

19        A. The Parties Did Not Reach a Stipulation to Resolve the Instant Motion

20        The parties' extensive submissions make it clear that the parties did not resolve the issues
21
22  raised in the instant motion. The parties met and conferred extensively and in good faith,

23  reaching compromises on virtually all categories of documents in dispute. Despite their efforts,

24  however, the parties were ultimately unable to execute a binding stipulation because they were

25
26  unable to agree on any provision to govern Mattel's future right to pursue additional discovery

27  from Bryant. It is clear that the parties deemed it necessary to include such a provision in the

28  draft stipulation in order to protect their respective positions. Because the parties did not execute

29  a binding stipulation, there is no legal basis to enforce the terms contained in the draft stipulation.

EXHIBIT ___2___

PAGE ___32___

Therefore, Mattel's right to the discovery it seeks in the instant motion to compel is governed by the familiar guidelines set forth in Rule 26 of the Federal Rules of Civil Procedure.

Furthermore, because the parties met and conferred in good faith and because they had a legitimate dispute over language governing Mattel's future right to pursue additional discovery from Bryant, the Discovery Master denies Mattel's request for sanctions.

B. Rule 26 of the Federal Rules of Civil Procedure

Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Fed.R.Civ.P. 26(b)(1). "Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Id. Discovery shall, however, be limited by the court if it determines that: "(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Fed.R.Civ.P. 26(b)(2).

C. Mattel's Requests for Production

Request Nos. 2, 13, 48: Documents Relating to Bryant's Agreements with MGA

Mattel seeks documents relating to Bryant's agreements with MGA, including doll-related agreements. Bryant is withholding responsive documents, including (a) documents relating to his Bratz agreements with MGA other than final signed agreements, including communications exchanged by the parties and drafts of the agreements, (b) documents relating to doll-related

EXHIBIT ___2___

PAGE ___33___

agreements discussed or negotiated by Bryant and third parties while he was employed by Mattel

other than signed agreements that were "reached" while Bryant was employed by Mattel, and (c)

documents relating to Bryant's fee agreements with MGA or other indemnity agreements relating

to this action.

The Discovery Master finds that the withheld documents are relevant to Mattel's claims.

Among other things, the withheld documents could establish the timing, nature and scope of

Bryant's work for MGA (or others), ongoing acts of copyright infringement, and damages. In

addition, the withheld documents could be used for impeachment purposes. Further, documents

relating to fee or indemnity agreements between MGA and Bryant are relevant to demonstrate

bias and lack of credibility. Bryant has failed to establish that the requested discovery is barred

by Rule 26(b)(2), Fed.R.Civ.P. Accordingly, Bryant is ordered to produce all non-privileged

documents responsive to Request Nos. 2, 13, and 48.

Request Nos. 11, 12, 19, 37, 40, 41, 42, 43, 53, 54, 55: Documents Relating to Bratz's
Development and Other Projects that Bryant Worked on for MGA

Mattel seeks documents relating to the Bratz project and any other projects Bryant worked

on for MGA. Bryant produced documents relating only to the First Generation Bratz dolls.

Bryant is prepared to produce additional documents relating to work he performed for MGA prior

to June 30, 2001, acknowledging that those documents are relevant to Mattel's claim that Bryant

breached his employee agreement by allegedly performing services for Mattel and MGA at the

same time. Bryant objects to the requests to the extent they seek any additional documents on

relevancy and overbreadth grounds.

The Discovery Master finds that Mattel's requests seek relevant information and are not

overbroad. The lawsuit is much broader than the First Generation Bratz dolls issued in June 30,

2001. For example, Mattel alleges that it is entitled all works created by Bryant during his Mattel

EXHIBIT ___2___

PAGE ___34___

employment, regardless of whether they resulted in a Bratz doll released in June of 2001. Mattel

also alleges that Bryant has breached his ongoing contractual duties not to use any of Mattel's

confidential and proprietary information, not just information relating to the Bratz dolls released

in June of 2001. Mattel also alleges that Bryant has infringed Mattel's alleged copyrights in Bratz

works – works that are allegedly owned by Mattel because they were created while Bryant was

employed by Mattel – through his ongoing conduct of reproducing and creating derivative works.

Accordingly, Bryant is ordered to produce all non-privileged documents responsive to Request

Nos. 11, 12, 19, 37, 40, 41, 42, 43, 53, 54, and 55.

> Request Nos. 29, 30, 31, 32, 33, 34, 35, 36, 45, 46:  Documents Relating to Bryant's
> Payments from MGA

Mattel seeks documents relating to Bryant's payments from MGA.  Bryant acknowledges

that Mattel is entitled to know how much money Bryant has earned from MGA, and represents

that he has produced, in redacted form, all royalty statements he has received related to the First

Generation Bratz dolls and his 2000 contract with MGA.  Bryant asserts that his redactions are

justified as a means to avoid disclosing the breakdown of MGA's revenue by particular product,

which information Bryant believes constitutes MGA's trade secret information.  Bryant also

objects to producing tax returns, asserting that Mattel cannot show a "compelling need" for the

returns.  Bryant's Opposition at 29:21-27.

The Discovery Master finds that documents relating to MGA's payments to Bryant,

including royalty statements and other payment information, are relevant to several Mattel claims.

First, Mattel's claims against Bryant include breach of contract, breach of fiduciary duty, breach

of duty of loyalty, unjust enrichment, and conversion.  Mattel seeks to recover all benefits Bryant

received as a result of his alleged violations of duties to Mattel.  Payments to Bryant from MGA

and others might be traceable to work Bryant performed while employed by Mattel, regardless of

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

13

EXHIBIT ___2___

PAGE ___35___

1  when the payments were actually made. Such payments might also lead to evidence to support

2  Mattel's allegation that Bryant converted, misappropriated, or misused Mattel information.

3      Second, the payments are relevant to Mattel's recently added claim for copyright

4  infringement. Mattel alleges that Bryant, MGA, and others have infringed Mattel's rights in the

5  Bratz drawings and works by copying and preparing derivative works from those works. Under

6

7  the Copyright Act, a plaintiff is entitled to recover profits from infringement as well as actual

8  damages. 17 U.S.C. §504(b). The works that potentially infringe Mattel's copyrights, therefore,

9  include all Bratz doll products that MGA released to the market. For this reason, and for reasons

10  already discussed in the previous subsection, Bryant's limited production of documents relating to

11

12  only the First Generation of Bratz dolls is inadequate.

13      Third, payments to Bryant are relevant to Mattel's recently added claims for trade secret

14  misappropriation. Payments could show when and what trade secret information Bryant and

15  other defendants allegedly misappropriated from Mattel. Any proof of trade secret theft is also

16

17  relevant to Mattel's defense against MGA's unfair competition claims.

18      Lastly, the breakdown of gross royalty payments may be required to prove actual

19  causation of damages.

20      The protective order filed on January 4, 2005, is sufficient to address any confidentiality

21

22  concerns raised by Bryant. Among other things, the protective order provides protection for

23  confidential trade secret information. It has two tiers of protection, allowing a party to designate

24  documents as either "Confidential" or "Confidential – Attorney's Eyes Only." The protective

25  order also requires the parties to use information produced in discovery only for purposes of this

26

27  litigation and not for any other purpose.

28      Accordingly, Bryant is ordered to produce, without redactions, all non-privileged

29  documents responsive to Request Nos. 29, 30, 31, 32, 33, 34, 35, 36, 45, and 46. Bryant,

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                                    14

EXHIBIT ___2___

PAGE ___36___

1    however, is not required to produce tax returns, provided that he otherwise fully complies with

2    these requests as ordered.

3            Request Nos. 20, 23, 27, 28: Communications Between Bryant and MGA

4            Mattel seeks production of Bratz-related communications and communications with

5
6    MGA. More specifically, Mattel seeks production of four categories of documents Bryant has

7    refused to produce: (1) communications between Bryant and MGA or third parties that explicitly

8    relate to designs Bryant created while employed by Mattel; (2) communications between Bryant

9    and MGA that relate to Mattel employees; (3) communications between Bryant and MGA relating

10   to Bryant's Mattel employment or work Bryant performed for Mattel, except those

11
12   communications "created" prior to the close of Bryant's Mattel employment; and (4)

13   communications between Bryant and MGA that post-date Bryant's Mattel employment. Bryant

14   contends that the discovery requests for communications between Bryant and MGA are

15   overbroad. Bryant asserts that there are many former Mattel employees and friends of his who

16
17   have privacy rights that would be impinged upon if he were to disclose his communications.

18   Bryant also asserts that he has his own confidentiality interest regarding any information that he

19   shared with MGA. In particular, he objects to Mattel's discovery requests to the extent they

20   would require him to reveal the identity of current Mattel employees seeking employment with

21
22   MGA or Bryant.

23           The Discovery Master finds that Mattel's requests for all communications between Bryant

24   and MGA unquestionably seek information relevant to Mattel's claims: they will reveal what

25   Mattel information Bryant shared with MGA, if any, and when. The protective order is sufficient

26
27   to address Bryant's confidentiality concerns. It allows parties to designate as "Confidential"

28   private information about current or former employees, contractors or vendors (including

29   employee, contractor and personnel records). Therefore, Bryant is ordered to produce all non-

Bryant v. Mattel, Inc.,                                                          15
CV-04-09049 SGL (RNBx)

EXHIBIT _____ 2 _____

PAGE _____ 37 _____

privileged documents responsive to Request Nos. 20, 23, 27, and 28. However, Bryant may continue to redact his telephone records, and shall provide a signed verification that none of the telephone calls that were redacted relate or refer in any way to MGA, Bratz, or any other project that Bryant worked on, with, for, or on behalf of MGA. Telephone calls that do not relate or refer in any way to MGA or Bratz are irrelevant.

Request Nos. 49, 51: Mattel-Related Documents

Mattel seeks production of Mattel-related documents, and Bryant agrees to produce them. Accordingly, Bryant is ordered to produce all documents responsive to Request Nos. 49 and 51.

Request No. 9: Documents re Registrations and Applications for Registrations

Lastly, in Request No. 9 Mattel seeks production of documents registrations and registrations and applications for registration. Bryant deems the motion moot with respect to Request No. 9 because he agrees to produce any patent, copyright and trademark applications, registrations or other non-privileged documents in his possession, custody or control that constitute or relate to such applications and registrations obtained or applied in connection with (1) work on Bratz prior to January 1, 2001; (2) work related to the release of the First Generation Bratz dolls; and (3) work related to any work Bryant performed with, for or on behalf of MGA during the term of Bryant's employment with Mattel.

As discussed previously, the Discovery Master finds that the First Generation Bratz limitation is improper. Therefore, Bryant is ordered to produce all non-privileged documents responsive to Request No. 9.

IV. CONCLUSION

For the reasons set forth above, the Discovery Master orders as follows:

1. Mattel's motion to compel production of documents responsive to its First Set of Requests for Production, Request Nos. 2, 9, 11, 12, 13, 19, 20, 23, 27, 28, 29, 30, 31, 32, 33, 34,

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

16

EXHIBIT _____ 2 _____

PAGE _____ 38 _____

35, 36, 37, 40, 41, 42. 43. 45, 46, 48, 49, 51, 53, 54, and 55, is GRANTED.  However, Bryant

need not produce his tax returns, on the condition that he complies fully with Request Nos. 29, 30,

31, 32, 33, 34, 35, 36, 45, and 46.

· 2.  Bryant shall produce all redacted documents in un-redacted form, except for redactions

that are justified by the attorney-client privilege or work product doctrine or his telephone records

pursuant to the terms of this Order.

3.  Bryant shall serve a complete privilege log in conformity with Rule 26(b)(5),

Fed.R.Civ.P.

4.  Pursuant to Rule 34, Fed.R.Civ.P., Bryant shall produce the hard drives of his

computers for forensic imaging.

5.  Bryant shall complete his production by producing missing attachments, fax cover

pages and all other missing responsive documents.

6.  Mattel's request for an award of sanctions in the amount of $7,805 is DENIED.

7.  Bryant shall comply with this Order no later than February 23, 2007.

Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery Master,

Mattel shall file this Order with the Clerk of Court forthwith.


IT IS SO ORDERED.


Dated: January 25, 2007

HON. EDWARD A. INFANTE (Ret.)
Discovery Master

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT _____2_____

PAGE _____39_____

17

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on January 25,

2007, I served the attached ORDER GRANTING MATTEL'S MOTION TO COMPEL

PRODUCTION OF DOCUMENTS in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| Robert Millman Esq. | Littler Mendelson | rfmillman@littler.com |
| Douglas Wickham Esq. | Littler Mendelson | dwickham@littler.com |
| Keith Jacoby Esq. | Littler Mendelson | kjacoby@littler.com |
| Dominic Messiha Esq | Littler Mendelson | dmessiha@littler.com |
| Diba Restagar Esq. | Littler Mendelson | drestagar@littler.com |
| Michelle Park Esq. | Littler Mendelson | mpark@littler.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | jbq@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Valerie Nannery Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | valerienannery@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Morris Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgetmorris@quinnemanuel.com |
| Tamar Buchjakian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchjakjian@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| Benjamin Kim Esq. | O'Melveny & Myers LLP | bjkim@omm.com |
| Hamid Jabbar Esq. | O'Melveny & Myers LLP | hjabbar@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrismill.com |

EXHIBIT    2

PAGE    40

# EXHIBIT 3

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority ____ ✓ Send ____
Entered ____ ✓ Closed ____
JS-5/JS-6 ____  JS-2/JS-3 ____
Scan Only____  Docketed on CM ____
____THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)

JUN 2 7 2007

EASTERN DIVISION
BY _____ DEPUTY

FILED - EASTERN DIVISION
CLERK, U.S. DISTRICT COURT

JUN 2 7 2007

CENTRAL DISTRICT OF CALIFORNIA
BY     JIM HOLMES     DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT, | CASE NO. CV 04-09049 SGL |
| Plaintiff, | CONSOLIDATED WITH<br>CV 04-09059 SGL<br>CV 05-02727 SGL |
| v. | |
| MATTEL, INC., | ORDER RE MOTIONS HEARD ON<br>JUNE 11, 2007 |
| Defendant, | |
| AND CONSOLIDATED ACTIONS | |

Presently before the Court is a multitude of motions filed by a number of
parties in these consolidated cases. The factual allegations underlying the present
actions are expansive and complex. They are set forth below only to the extent
necessary for the Court's consideration of the present motions. At their essence,
although involving a number of other legal and factual issues, these cases involve
the rights to certain fashion dolls.

The present motions, six in total, focus on four basic issues: Two of the
motions, filed by certain counter-defendants, address the sufficiency of the
allegations made by Mattel, Inc. ("Mattel") in its counterclaims; most notably, these
motions challenge the sufficiency of the allegations which underlie Mattel's claims
based on the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.

EXHIBIT      3

PAGE         41

Docket No. 577

06/27/07

1   §§ 1961-1968 ("RICO"). Another motion challenges the Court's exercise of

2   personal jurisdiction over a foreign corporation, MGAE de México, S.R.L. de C.V.

3   ("MGA Mexico"). Two additional motions seek review of a ruling, issued by a court-

4   appointed discovery master, overruling objections made during a party's deposition

5   that were based on the attorney-client and joint-defense privileges. A final motion

6   heard on June 11, 2007, addresses the Court's scheduling order that divided the

7   issues to be tried in these consolidated cases into two phases. This last motion will

8   be addressed in a separate order.

9         The Court has reviewed the parties' filings regarding these motions and held

10  a hearing on June 11, 2007. For the reasons and in the manner set forth more fully

11  herein, the Court makes the following rulings regarding these motions:

12        1.      Motion of MGA Entertainment, Inc., ("MGA") and Issac Larian

13  ("Larian") to Dismiss Mattel's Amended Answer and Counterclaims (docket # 189):[1]

14  **GRANTED IN PART AND DENIED IN PART.**

15        2.      Motion of Carter Bryant to Dismiss Counterclaims II, III, V, VII, IX, and

16  XI (docket # 191): **GRANTED IN PART AND DENIED IN PART.**

17        3.      Motion of MGA Mexico to Dismiss Mattel's Amended Answer and

18  Counterclaims (docket # 266): **DENIED.**

19        4.      Motion of MGA Objecting to Discovery Master's March 7, 2007, Order

20  (docket # 308): **GRANTED IN PART AND DENIED IN PART.**

21        5.      Motion of Carter Bryant Objecting to Discovery Master's March 7,

22  2007, Order (docket # 306): **GRANTED IN PART AND DENIED IN PART.**

23

24

25

26

27         [1] Joining in this Motion were MGA Entertainment (HK) Ltd. ("MGA Hong

28  Kong"), Carter Bryant ("Bryant"), and MGA Mexico.

EXHIBIT____3____

PAGE____42____

1                          **I. Factual Allegations**

2          The following allegations appear in the Amended Answer and Counterclaims

3    ("AAC"):

4    **A.    Bryant's Employment by Mattel**

5          Carter Bryant was hired by Mattel as a Barbie product designer in January

6    1999. (AAC ¶ 21.) At that time, Bryant signed an "Employee Confidential

7    Information and Inventions Agreement," wherein he agreed not to assist or work for

8    a Mattel competitor while employed by Mattel and that the designs and inventions

9    he created while employed by Mattel were Mattel property. (AAC ¶¶ 22-23.) Bryant

10   also executed a "Conflict of Interest Questionnaire" wherein he certified that, other

11   than as disclosed, he had not worked for a Mattel competitor in the past year, had

12   not engaged in a business transaction with a Mattel competitor that could create a

13   conflict of interest, and that he would inform Mattel immediately if such an event

14   occurred. (AAC ¶¶ 24-25.) While still employed by Mattel, Bryant used Mattel

15   property and resources to develop and design the Bratz concept. (AAC ¶ 26.)

16   Bryant also allegedly enlisted other Mattel employees to perform work on the Bratz

17   line, in some cases, falsely informing those employees that they were working on a

18   Mattel project. (AAC ¶ 27.)

19   **B.    MGA's Involvement in Bryant's Conduct**

20         MGA knew of and encouraged Bryant's misappropriation of Mattel property

21   and resources. (AAC ¶ 33). Bryant made affirmative misrepresentations to Mattel,

22   including that he was leaving Mattel for "non-competitive" pursuits. (AAC ¶ 28.)

23   Bryant and MGA concealed from Mattel that Bryant developed Bratz while

24   employed by Mattel, that Bryant worked with MGA during the time he was

25   employed by Mattel, and that Larian and others, not Bryant, were the creators of

26   Bratz. (AAC ¶ 35.) Prior to his departure from MGA, Bryant entered into a contract

27   with MGA to provide design services to MGA on a "top priority" basis. (AAC ¶ 36.)

28         Bryant left Mattel's employ on October 20, 2000; three weeks later, MGA

                    EXHIBIT _____3_____
                                        3
                    PAGE ____43____

1   showed the Bratz prototypes to focus groups and retailers. (AAC ¶ 29.) Soon

2   thereafter, MGA showed the Bratz line to retailers at the Hong Kong Toy Fair in

3   January, 2001, and then began manufacturing and selling the dolls to retailers for

4   an annual revenue in the excess of $500 million. (AAC ¶¶ 31-32.)

5   C.    **Proprietary Information**

6       1.    **Mexico**

7           Counter-defendant Carlos Gustavo Machado Gomez ("Machado"), nonparty

8   Mariana Trueba Almada ("Trueba"), and nonparty Pablo Vargas San Jose

9   ("Vargas") were upper-level employees at Mattel Mexico. (AAC ¶¶ 38-40.) In the

10  three months before all three simultaneously resigned from Mattel Mexico on April

11  19, 2004, they were in contact with MGA via an email account with the address

12  "plot04@aol.com". (AAC ¶ 42.) The three former employees allegedly used this

13  account to supply MGA with confidential and proprietary Mattel information. (AAC

14  ¶ 42.) The three also copied various proprietary Mattel documents onto USB flash

15  drives prior to resigning. (AAC ¶ 44-46.) Shortly before her departure, Trueba

16  increased her access to Mattel's confidential information and attended a meeting at

17  which Mattel personnel analyzed Barbie programs for the United States, Canada,

18  and South America. (AAC ¶ 47.)

19          Among them, Machado, Trueba, and Vargas stole documents containing

20  information regarding Mattel's future products, production and shipping costs, sales

21  information, customer information, marketing information, and strategic research

22  information both in Mexico and worldwide. (AAC ¶ 48.) The stolen data was not

23  limited to the Mexican market; rather, the information stolen had the potential, and

24  in fact did, give MGA an unfair competitive advantage in the United States and

25  around the world. (AAC ¶ 49.)

26          In an attempt to conceal his actions, Machado ran a software program on his

27  Mattel computer in order to erase information pertaining to his contact with MGA.

28  (AAC ¶ 51.) When Mattel alerted Mexican authorities about the theft, they seized

EXHIBIT ____3____   4

PAGE ____44____

1  from MGA's Mexico City offices, pursuant to a search warrant, a large number of
2  documents containing Mattel trade secrets and confidential information.  (AAC
3  ¶ 53.)

4      Shortly after the theft, Machado, Trueba, and Vargas traveled to Los
5  Angeles to meet face-to-face with MGA personnel.  (AAC ¶ 52.)

6      **2.    Canada**

7      Jane Brisbois was the Director of Sales for the Girls Division in Canada.
8  (AAC ¶ 71.)  When she was hired in 1999, she agreed to preserve and not disclose
9  Mattel's proprietary information.  (AAC ¶ 71.)  While still employed by Mattel,
10  Brisbois spoke with Larian on September 22, 2005.  (AAC ¶ 74.)  That same day,
11  Brisbois copied approximately 45 Mattel documents containing Mattel trade secret
12  information into a USB flash drive that she took from the Mattel Canada office.
13  (AAC ¶ 74.)  The files taken by Brisbois included documents regarding Mattel sales,
14  advertising strategies, market analyses, product launch dates, and profit margins in
15  Canada, Mexico, and the United States.  (AAC ¶ 74.)  Four days later, she resigned
16  from Mattel.  (AAC ¶ 74.)

17      When Mattel learned of Brisbois' misappropriation of Mattel documents, it
18  notified Canadian law enforcement officials, who were able to recover the flash
19  drive and the documents from Brisbois.  (AAC ¶ 75.)

20      **3.    United States**

21      Ron Brawer was Mattel's Senior Vice President and General Manager.
22  (AAC ¶ 55.)  On September 17, 2004, Brawer informed Mattel that he was leaving
23  Mattel to work for MGA.  (AAC ¶ 63.)  During Brawer's exit interview, he falsely
24  represented that he had returned all proprietary information to Mattel; specifically,
25  Brawer took the information in his contacts file which included contact information
26  for Mattel customers and Mattel employees.  (AAC ¶ 68.)  Brawer has since used
27  the contact information to induce certain Mattel employees to join MGA and
28  misappropriate Mattel trade secrets.  (AAC ¶ 69.)

EXHIBIT ___3___   5

PAGE ___45___

1    MGA has also allegedly hired at least 25 other Mattel employees, some of
2    whom have provided MGA with Mattel's confidential information. (AAC ¶ 77.)

3    **D.    Larian's Communications Regarding Mattel's New Product Line**

4    On May 12, 2006, Larian sent an email message to an email distribution list
5    that included a reference to a new Mattel Barbie line ("MY SCENE MY BLING
6    BLING") which Mattel had not yet made public. (AAC ¶ 79.) The distribution of the
7    email included members of the media and many of Mattel's most significant
8    customers. (AAC ¶ 78.) Soon after sending the email, Larian began calling these
9    significant customers and making false representations about the product;
10   specifically, Larian told each that it was the only retailer to purchase the product
11   and that Mattel would not be supporting the product with television advertising.
12   (AAC ¶ 80.)

13   **E.    Exhibit C**

14   In Exhibit C to the AAC, Mattel references a number of communications,
15   numbering well over one hundred, that it contends constitutes predicate acts of mail
16   fraud or wire fraud. Exhibit C does not describe the contents of those
17   communications.

18                          **II. Counterclaims Asserted**

19   Based on these allegations, Mattel asserts the following counterclaims:
20   (1) Copyright Infringement, including willful, vicarious, and contributory
21   infringement, asserted against MGA, MGA Hong Kong, Larian and Bryant;
22   (2) violation of RICO's substantive prohibition, 18 U.S.C. § 1962(c), asserted as
23   authorized by 18 U.S.C. § 1964(c) against all defendants, which alleges predicate
24   acts of, *inter alia*, mail fraud, wire fraud, and criminal copyright infringement; (3) a
25   violation of RICO's prohibition against conspiracies, 18 U.S.C. § 1962(d), asserted
26   against all defendants; (4) state-law misappropriation of trade secrets against MGA,
27   MGA Mexico, Larian, and Machado; (5) breach of contract, asserted against Bryant
28   only and based on certain employment agreements between Bryant and Mattel;

EXHIBIT ___3___
PAGE ___46___

1   (6) intentional interference with contract, asserted against MGA and Larian and

2   based on Bryant's employment agreements; (7) breach of fiduciary duty, asserted

3   against Bryant and Machado; (8) aiding and abetting breach of fiduciary duty,

4   asserted against MGA and Larian; (9) breach of the duty of loyalty, asserted

5   against Bryant and Machado; (10) aiding and abetting breach of the duty of loyalty,

6   asserted against MGA and Larian; (11) conversion, asserted against all counter-

7   defendants; (12) violation of California's unfair competition law, Cal. Bus. & Prof.

8   Code § 17200, asserted against all counter-defendants; and finally, (13) a claim for

9   declaratory relief.

10          **III. Counter-Defendants' Motions to Dismiss for Failure to State a Claim**

11          The parties have moved to dismiss a number of Mattel's counterclaims on

12   various grounds. The Court addresses each claim in turn, considering at all times

13   the standard for dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

14   **A.     Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)**

15          In lieu of an answer, a party may, as the counter-defendants have here, file a

16   motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), which provides that such a

17   motion may be made where the pleader has "fail[ed] to state a claim upon which

18   relief can be granted." Id. In deciding a Rule 12(b)(6) motion, the Court must also

19   consider the requirements of Fed. R. Civ. P. 8(a), which requires only a "short and

20   plain statement of the claim showing that the pleader is entitled to relief" or, when

21   the claim at issue avers fraud or mistake, the motion must be considered in

22   conformity with Fed. R. Civ. P. 9(b), which requires fraud and mistake to be pleaded

23   with particularity. See 5A Charles A. Wright & Arthur Miller, Federal Practice and

24   Procedure, §1356 (1990); James Wm. Moore, Moore's Federal Practice, Vol. 2

25   § 12.34[1][c].

26          In bringing a motion pursuant to Rule 12(b)(6), the moving party has the

27   burden of persuading the Court that the complaint has failed to state a claim upon

28   which relief can be granted. Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406,

EXHIBIT ___3___

PAGE ___47___

Case 2:04-cv-09049-DOC-RNB   Document 6049-3   Filed 07/27/09   Page 49 of 77   Page ID
#:201205

RightFAX                    6/7  2007 3:04    PAGE 009/037     ax Server

1   1409 (3d Cir.), cert. denied, 501 U.S. 1222 (1991). In considering the motion,

2   "courts must consider the complaint in its entirety," and read it in the light most

3   favorable to the plaintiff, accepting as true all factual allegations in the complaint, as

4   well as reasonable inferences to be drawn therefrom. Tellabs, Inc. v. Makor Issues

5   & Rights, Ltd., __ U.S. __, No. 06-484, 2007 WL 1773208, at *9 (June 21, 2007);

6   Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998). However, the Court need not

7   accept any unwarranted deductions of fact, or conclusory legal statements cast in

8   the form of factual allegations. See Western Mining Council v. Watt, 643 F.2d 618,

9   624 (9th Cir.), cert. denied, 454 U.S. 1031 (1981).

10   Generally, a court cannot consider evidence in deciding a Rule 12(b)(6)

11   motion; however, a court may consider exhibits attached to the complaint as well as

12   documents that are not physically attached to the complaint but "whose contents

13   are alleged in [the] complaint and whose authenticity no party questions." Branch v.

14   Tunnell, 14 F.3d 449, 453-54 (9th Cir. 1994), cert. denied, 512 U.S. 1219 (1994).

15   Facts of which a court may take judicial notice pursuant to Fed. R. Evid. 201 are

16   also properly considered. Mir v. Little Company of Mary Hospital, 844 F.2d 646,

17   649 (9th Cir. 1988).

18   **B.    RICO Claims**

19   The counter-defendants devote most of their motions to the sufficiency of the

20   allegations regarding Mattel's RICO claims. The Court's analysis begins, as it must

21   when considering a federal statute, with the language of that statute. The

22   substantive RICO prohibition at issue is found in 18 U.S.C. § 1962(c):

23   It shall be unlawful for any person employed by or associated

24   with any enterprise engaged in, or the activities of which affect,

25   interstate or foreign commerce, to conduct or participate, directly or

26   indirectly, in the conduct of such enterprise's affairs through a pattern

27   of racketeering activity or collection of unlawful debt.

28   Id. Conspiracies to violate this substantive prohibition are themselves prohibited by

EXHIBIT ___3___
PAGE ___48___

1   § 1962(d), which states that "[i]t shall be unlawful for any person to conspire to

2   violate any of the provisions of subsection (a), (b), or (c) of this section." Id. Many

3   of these terms are defined by the statutory language, including "racketeering

4   activity," "enterprise," and "pattern of racketeering activity":

5           (1) "racketeering activity" means . . . (B) any act which is

6       indictable under any of the following provisions of title 18, United

7       States Code: . . . section 1341 (relating to mail fraud), section 1343

8       (relating to wire fraud), . . . section 1512 (relating to tampering with a

9       witness, victim, or an informant), . . . section 1952 (relating to

10      [interstate and foreign travel or transportation in aid of racketeering

11      enterprises]), [and] section 2319 (relating to criminal infringement of a

12      copyright)[.]

13              . . . .

14          (4) "enterprise" includes any individual, partnership,

15      corporation, association, or other legal entity, and any union or group

16      of individuals associated in fact although not a legal entity;

17          (5) "pattern of racketeering activity" requires at least two acts of

18      racketeering activity, one of which occurred after the effective date of

19      this chapter and the last of which occurred within ten years (excluding

20      any period of imprisonment) after the commission of a prior act of

21      racketeering activity[.]

22  18 U.S.C. § 1961.

23          In considering a Rule 12(b)(6) motion seeking to dismiss a RICO claim, the

24  Court measures the sufficiency of alleged predicate acts of wire fraud and mail

25  fraud by the Rule 9(b) "pleading-with-particularity" standard; however, the Court

26  measures the sufficiency of all other predicate acts by the more lenient standard set

27  forth in Rule 8(a). Compare Fed. R. Civ. P. 9(b) ("In all averments of fraud or

28  mistake, the circumstances constituting fraud or mistake shall be stated with

EXHIBIT___3___

PAGE___49___

1    particularity. Malice, intent, knowledge, and other condition of mind of a person
2    may be averred generally.") with Fed. R. Civ. P. 8(a) ("A pleading which sets forth a
3    claim for relief, . . . shall contain . . . (2) a short and plain statement of the claim
4    showing that the pleader is entitled to relief . . . ."); see Lancaster Community Hosp.
5    v. Antelope Valley Hosp. Dist., 940 F.2d 397, 405 (9th Cir. 1991) (applying Rule
6    9(b) standard to allegations of mail fraud and noting that "[t]he Ninth Circuit has
7    repeatedly insisted that [Rule 9(b)] be followed in RICO actions alleging the
8    predicate act of mail fraud."), cert. denied, 502 U.S. 1094 (1992).

9         In order to state its claim under § 1962(c), Mattel "must allege (1) conduct
10   (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing
11   injury to [its] business or property." Ove v. Gwinn, 264 F.3d 817, 825 (9th Cir.
12   2001) (internal quotation marks and citation omitted). Here, counter-defendants'
13   motions challenge the first, second, fourth, and fifth elements.

14        1.      **"Conduct or Participate"**

15        Bryant contends that his role in any alleged scheme or enterprise is too
16   tenuous to constitute the "conduct" necessary to impose RICO liability. In order to
17   have RICO liability imposed upon him, a defendant must "conduct or participate,
18   directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of
19   racketeering activity . . . ." 18 U.S.C. § 1962(c). The United States Supreme Court
20   has elaborated on this statutory language in Reves v. Ernst & Young, 507 U.S. 170,
21   179 (1993), wherein it noted:

22        [T]he word "participate" makes clear that RICO liability is not limited to
23        those with primary responsibility for the enterprise's affairs, just as the
24        phrase "directly or indirectly" makes clear that RICO liability is not
25        limited to those with a formal position in the enterprise, but some part
26        in directing the enterprise's affairs is required.

27   Id. Here, Mattel has alleged that Bryant secretly developed Bratz while employed
28   by Mattel and using Mattel's resources and employees, that he concealed that fact

EXHIBIT ___3___
                        10
PAGE ___50___

1  when he had a duty to disclose it, and that he did these things in order to facilitate
2  the development of the Bratz concept by Mattel's direct competitor, in violation of,
3  *inter alia*, criminal copyright law.  These allegations, if proven to be true, are
4  sufficient to impose RICO liability on Bryant.

5      **2.    Enterprise**

6      Bryant's motion challenges the sufficiency of the allegations regarding a
7  RICO enterprise.  That enterprise is alleged to be an "association-in-fact" enterprise
8  comprised of the counter-defendants, Brawer, Trueba, Vargas, Brisbois, and
9  others.  (AAC ¶ 89.)  Mattel alleges that counter-defendants participated in or
10 conducted the affairs of the association-in-fact enterprise through a pattern of
11 racketeering activities, including, as detailed in the AAC, predicate acts of mail
12 fraud, wire fraud, evidence tampering, interstate and foreign travel to aid
13 racketeering activities, and criminal copyright infringement.  (AAC ¶ 90.)  The
14 counter-defendants' goal is alleged to have been to "execut[e] or attempt to
15 execut[e] [a] scheme to improperly defraud Mattel and steal its trade secret or
16 otherwise confidential and proprietary information . . . ."  (AAC ¶ 90.)

17     A recent *en banc* decision of the Ninth Circuit sets forth a comprehensive
18 analysis of the sufficiency of allegations regarding a RICO enterprise necessary to
19 state a claim.  See Odom v. Microsoft Corp., 486 F.3d 541, 2007 WL 1297249 (9th
20 Cir. 2007) (designated for publication).  That decision provides the blueprint for the
21 Court's present analysis.

22     Odom involved an alleged scheme involving consumers who purchased
23 computers from Best Buy retail stores.  Id. at 543.  The computers would include a
24 Microsoft compact disc that the cashier would scan; the consumer's credit card was
25 also scanned for purchase.  Id.  The credit card information was transmitted to
26 Microsoft, and Microsoft would, at some point, begin making unauthorized charges
27 to the credit card used to purchase the computer, ostensibly for Microsoft's
28 provision of internet services.  Id.  Odom brought substantive RICO and RICO

EXHIBIT __3__ 11

PAGE __51__

1  conspiracy claims based on these allegations. Id. at 544.

2      The Ninth Circuit first noted the evidenced judicial resistance to RICO in the
3  lower courts, contrasted with the Supreme Court's four reversals of such narrow
4  readings of RICO. Id. at 545-47 (citing United States v. Turkette, 452 U.S. 576
5  (1981) (rejecting notion that RICO prohibited only the infiltration of legitimate
6  businesses by organized crime); Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 481
7  (1985) (rejecting notion that RICO could be used to impose civil liability only where
8  the defendant had been criminally convicted and that such liability was limited to a
9  narrow measure of damages); National Organization for Women v. Scheidler, 510
10  U.S. 249 (1994) (rejecting the notion that RICO liability could be imposed only when
11  the acts of a RICO enterprise had an economic motive); and Cedric Kushner
12  Promotions v. King, 533 U.S. 158 (2001) (reversing lower court's ruling that no
13  RICO claim was stated where president and sole shareholder of a corporation was
14  alleged to have associated with his wholly owned corporation as a RICO
15  "enterprise," and relying on fact that person and corporation were separate legal
16  entities). In Odom, the Ninth Circuit understandably viewed these four holdings as
17  a "general instruction that we should not read the statutory terms of RICO
18  narrowly." Odom, 486 F.3d at 547 (internal citation omitted).

19      In Odom, the Ninth Circuit clarified -- and relaxed -- the standard for pleading
20  and proving an "associated-in-fact" enterprise such as the one alleged here:

21          The definition of "enterprise" in the text of RICO is fairly
22      straightforward. In its entirety, the definition is as follows: "'enterprise'
23      includes any individual, partnership, corporation, association, or other
24      legal entity, and any union or group of individuals associated in fact
25      although not a legal entity." 18 U.S.C. § 1961(4). As is evident from
26      the text, this definition is not very demanding. A single "individual" is
27      an enterprise under RICO. Similarly, a single "partnership," a single
28      "corporation," a single "association," and a single "other legal entity"

EXHIBIT 3
PAGE 52

1    are all enterprises.  At issue in this case is the last kind of enterprise

2    listed in the definition -- a "group of individuals associated in fact."  It is

3    undisputed that a corporation can be an "individual" for purposes of

4    an associated-in-fact enterprise.

5    Id. at 548.

6        The Ninth Circuit acknowledged that "enterprise" must be something greater

7    than merely a pattern of racketeering activity; however, the court rejected the notion

8    that an enterprise must have a particular ascertainable organizational structure.  Id.

9    at 551 ("We take this opportunity to join the circuits that hold that an

10   associated-in-fact enterprise under RICO does not require any particular

11   organizational structure, separate or otherwise.") (citations omitted).  A party need

12   only set forth factual allegations of "a group of persons associated together for a

13   common purpose of engaging in a course of conduct," "evidence of an ongoing

14   organization, formal or informal," and "evidence that the various associates function

15   as a continuing unit."  Id. at 552 (internal citations and quotation marks omitted).

16       As for the common purpose, it was met in Odom, where the plaintiff had

17   alleged the following:

18            [D]efendants had the common purpose of increasing the

19       number of people using Microsoft's Internet Service, and doing so by

20       fraudulent means.  Best Buy furthered this common purpose by

21       distributing Microsoft Internet Trial CD's and conveying its customers'

22       debit and credit card information to Microsoft.  Microsoft then used the

23       information to activate customer accounts.

24   Id.  Here, Mattel has alleged the common purpose of attempting to defraud Mattel

25   and steal its trade secrets.  Mattel's many factual allegations, detailed herein,

26   support this alleged common purpose.

27       As for the "ongoing organization" requirement, the Ninth Circuit in Odom

28   noted that the plaintiffs had met that element, which was met where the

EXHIBIT  3  _13_

PAGE  53

1  organization was alleged to be "a vehicle for the commission of two or more
2  predicate crimes." Id. (internal quotation marks and citation omitted).  The Ninth
3  Circuit noted the following factual allegations:

4          Microsoft and Best Buy established mechanisms for
5      transferring plaintiffs' personal and financial information from Best Buy
6      to Microsoft. That information then allowed Microsoft to activate
7      plaintiffs' Internet accounts without their knowledge or permission.
8      These mechanisms enabled Microsoft to bill plaintiffs improperly for
9      MSN services in 2001, 2002 and 2003.

10  Id.  Here, plaintiffs have alleged that the counter-defendants coordinated their many
11  efforts at depriving Mattel of its proprietary information and its intellectual property.
12  The allegations regarding common use of the "plot04@aol.com" email address to
13  transfer confidential Mattel information to MGA support the finding of an "ongoing
14  organization." So, too, do the allegations regarding the repeated communications
15  between Bryant and MGA.

16      The "continuing unit" requirement does not appear to the Court to mandate
17  that the organization continues to this day;[2] rather, the requirement is related to the
18  notion that RICO was not meant to address discrete instances of fraud or criminal
19  conduct.  "[T]he continuity requirement focuses on whether the associates'
20  behavior was 'ongoing' rather than isolated activity." Id. at 553 (internal quotation
21  marks and citation omitted).  Related to that concern, it is also clear to the Court
22  that this requirement is related to the duration of the racketeering activities.  See id.
23  ("An almost two-year time span is far more than adequate to establish that Best
24  Buy and Microsoft functioned as a continuing unit.").  Here, the allegations do not
25  reveal that the conduct complained of was mere isolated activity; rather, Mattel sets
26  forth allegations of racketeering activity that spanned a period of three years.  The

27
28      [2] Nevertheless, Mattel alleges that the enterprise exists to this day by virtue
of its continued use of Mattel's information and property.

EXHIBIT __3__ 14

PAGE ___54___

1   allegations describe a scheme consisting of corporate warfare between competitors
2   that has been waged over a long period of time and waged on a number of fronts,
3   both foreign and domestic. The "continuing unit" requirement is therefore satisfied.
4       Accordingly, the Court finds that Mattel has sufficiently pleaded the existence
5   of a RICO enterprise.

6       **3.    Predicate Acts of Racketeering Activity**

7           **a.    Mail Fraud and Wire Fraud**

8       The criminal prohibition against mail fraud is found at 18 U.S.C. § 1341:

9           Whoever, having devised or intending to devise any scheme or
10          artifice to defraud, . . . for the purpose of executing such scheme or
11          artifice or attempting so to do, places in any post office or authorized
12          depository for mail matter, any matter or thing whatever to be sent or
13          delivered by the Postal Service, or deposits or causes to be deposited
14          any matter or thing whatever to be sent or delivered by any private or
15          commercial interstate carrier, or takes or receives therefrom, any such
16          matter or thing, . . . shall be fined under this title or imprisoned not
17          more than 20 years, or both.

18  Id. The Ninth Circuit has described the elements of mail fraud as "(1) proof of a
19  scheme to defraud; (2) using or causing the use of the mails to further the
20  fraudulent scheme; and (3) specific intent to defraud." United States v. Rogers, 321
21  F.3d 1226, 1229 (9th Cir. 2003) (internal citation omitted).

22      The criminal prohibition against wire fraud is similar:

23          Whoever, having devised or intending to devise any scheme or
24          artifice to defraud, . . . transmits or causes to be transmitted by means
25          of wire, radio, or television communication in interstate or foreign
26          commerce, any writings, signs, signals, pictures, or sounds for the
27          purpose of executing such scheme or artifice, shall be fined under this
28          title or imprisoned not more than 20 years, or both.

EXHIBIT ___3___ 15

PAGE ___55___

1   18 U.S.C. § 1343. The Ninth Circuit has described the elements of wire fraud as
2   "(1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and
3   (3) a specific intent to deceive or defraud." United States v. Shipsey, 363 F.3d 962,
4   971 (9th Cir. 2004) (citations omitted).

5        As all parties acknowledge, the predicate acts of mail fraud and wire fraud
6   must be pleaded with particularity pursuant to Fed. R. Civ. P. 9(b). Specifically,
7   Mattel must detail "the time, place, and manner of each act of fraud, [and it must
8   set forth] the role of each defendant in each scheme." Lancaster Community
9   Hosp., 940 F.2d at 405. This standard applies in RICO actions alleging predicate
10  acts of mail fraud. Id.

11       Here, Mattel sets forth allegations of predicate acts of mail fraud and wire
12  fraud referenced in Exhibit C to the AAC. However, these alleged predicate acts
13  are insufficiently pleaded because they fail to adequately describe the contents of
14  the communications; specifically, they fail to detail time, place and manner of "each
15  act of fraud." The substantive RICO claim is therefore dismissed to the extent it is
16  premised on those communications. Mattel is **GRANTED** leave to amend the RICO
17  claim based on this insufficiency; Mattel must attach to the Second Amended
18  Answer and Counterclaims ("SAAC") copies of the referenced communications.
19  The contents of packages referenced in Exhibit C must be described in order to
20  meet the Rule 9(b) requirements.

21       At oral argument, counsel for MGA argued that the substance of many, if not
22  all of the communications, cannot be read to further a scheme to defraud. That
23  argument will be considered another day, after Mattel files the SAAC. However, the
24  Court takes the opportunity today to note that, given the broad scope of the alleged
25  scheme to defraud, including the criminal copyright infringement allegations,
26  otherwise innocuous and routine communications regarding day-to-day operations
27  and product development may be found to be in furtherance of that scheme. See
28  Tellabs, Inc. v. Makor Issues & Rights, Ltd., __ U.S. __, No. 06-484, 2007 WL

EXHIBIT 3 16

PAGE 56

1773208, at *9 (June 21, 2007) (noting that, in considering a Rule 12(b)(6) motion,

"courts must consider the complaint in its entirety").

Counter-defendants also argue that Mattel failed to plead each defendant's role in furtherance of the scheme to defraud. As interpreted by the Ninth Circuit, the Rule 9(b) standard clearly requires that a plaintiff so plead. Lancaster Community Hosp., 940 F.2d at 405. However, the Court will view the communications alleged to constitute mail and wire fraud in conjunction with all the allegations set forth regarding the alleged scheme in the counterclaims. See Flood v. Makowski, No. 3:CV-03-1803, 2004 WL 1908221, at.*14 (M.D. Pa., Aug. 24, 2004) (applying the principle that reasonable inferences in favor of a plaintiff must be made when considering a Rule 12(b)(6) motion and noting that "[a]lthough Plaintiffs' Complaint does not expressly identify how each particular mail or wire communication furthered the scheme, the Complaint clearly alleges facts which create an unquestionable inference that the alleged communications furthered the scheme.").

Counter-defendants also argue that, because the emails alleged to constitute wire fraud were sent among individuals physically located in the same state, Mattel will not be able to establish the interstate nature of the communications. See 18 U.S.C. § 1343 (setting forth the requirement that communications be transmitted "in interstate or foreign commerce"). Mattel has alleged that the communications were transmitted in interstate or foreign commerce. (AAC ¶ 93(b).) This suffices at the pleadings stage; however, eventually Mattel will be called upon to support these allegations with evidence. See First Pacific Bancorp, Inc. v. Bro, 847 F.2d 542, 547 (9th Cir. 1988) (implicitly holding that wire fraud must be supported, at the summary judgment stage, by evidence of interstate wire fraud).

The Court dismisses the RICO claim to the extent it is based on the alleged predicate acts of mail fraud and wire fraud because those acts are not pleaded with

EXHIBIT 3

PAGE 57

1   particularity as required by Rule 9(b).  Mattel is **GRANTED** ten days' leave to file a

2   SAAC that incorporates and attaches and/or describes the communications and the

3   contents of packages referenced in Exhibit C.

4                    b.    <u>Evidence Tampering</u>

5        Unlike the mail fraud and wire fraud allegations, the allegations regarding the

6   remaining predicate acts are governed by the more lenient pleading standards of

7   Rule 8(a).  <u>See</u> <u>Slade v. Gates</u>, No. 01-8244-RMT, 2002 WL 31387263, at *6 (C.D.

8   Cal., Oct. 11, 2002).  The Court considers the sufficiency of those remaining

9   allegations pursuant to this Rule.

10       The criminal prohibition against tampering with evidence is found at 18

11  U.S.C. § 1512:

12           Whoever corruptly . . . alters, destroys, mutilates, or conceals a

13           record, document, or other object, or attempts to do so, with the intent

14           to impair the object's integrity or availability for use in an official

15           proceeding . . . shall be fined under this title or imprisoned not more

16           than 20 years, or both.

17  <u>Id.</u>  Mattel's opposition makes clear that its evidence tampering allegations are

18  based upon two categories of documents:  The first category of documents,

19  perhaps composed of only one multi-page document, involves the alleged alteration

20  of Bryant's contract with MGA to remove a fax header showing that the date of its

21  execution, which predated the effective date of Bryant's resignation from Mattel.[3]

22  The second category of documents are those filed with the United States Copyright

23  Office, which are alleged to omit the disclosure that certain Bratz drawings were

24  "works for hire," and which are alleged to have had alterations made to certain

25

26         [3]  The AAC merely alleges that counter-defendants Bryant and MGA
27  "tamper[ed] with and defac[ed] documents which showed that . . . Bryant was a
    Mattel employee while he was working for and with MGA . . . ."  (AAC ¶ 35.)
28  However, it is clear from other filings by the parties that, at a minimum, this
    allegation refers to MGA's contract with Bryant.

                        EXHIBIT _____3_

                        PAGE _____58

1   relevant dates.  (See AAC ¶ 35; Mattel Opp. to MGA's Motion at 9.)

2          As to the first category, a predicate act is sufficiently alleged.  Mattel has

3   alleged that a document was altered in a manner designed to conceal critical

4   evidence, highly relevant to the present official proceeding, regarding the timing of

5   the execution of the document.

6          Conversely, it is unclear whether Mattel has alleged a predicate act with

7   respect to the second category of documents.  The issue of whether submitting

8   fraudulent registrations and "altering relevant dates" on documents submitted to the

9   United States Copyright Office has not been fully briefed by the parties; the issue

10  was framed in this manner only upon the filing of the reply.[4]  Therefore, the Court

11  reserves this issue for a later date, and anticipates that it will be addressed by the

12  parties in a motion to dismiss the SAAC.

13                      c.      **Travel Act Violation**

14         Federal criminal law prohibits interstate or foreign travel to aid in

15  racketeering activities.  18 U.S.C. § 1952; see also 18 U.S.C. § 1961 (defining a

16  violation of § 1962 as a RICO predicate act).  In relevant part, the criminal

17  prohibition states:

18             Whoever travels in interstate or foreign commerce or uses the

19         mail or any facility in interstate or foreign commerce, with intent to . . .

20         promote, manage, establish, carry on, or facilitate the promotion,

21         management, establishment, or carrying on, of any unlawful activity,

22         and thereafter performs or attempts to perform . . . [such an act,] shall

23         be fined under this title, imprisoned not more than 5 years, or

24         both . . . .

25                              . . . .

26             As used in this section . . . "unlawful activity" means . . .

27  _____

28         [4]  The Court does not view this failure as the fault of any party.

EXHIBIT ____3____

PAGE ___59___

1    extortion, bribery, or arson in violation of the laws of the State in which

2    committed or of the United States . . . .

3    Id.  Mattel alleges that Bryant and others traveled in interstate commerce to commit

4    commercial bribery in violation of California's prohibition against commercial

5    bribery, which in relevant part provides:

6        (a) Any employee who solicits, accepts, or agrees to accept

7        money or any thing of value from a person other than his or her

8        employer, other than in trust for the employer, corruptly and without

9        the knowledge or consent of the employer, in return for using or

10       agreeing to use his or her position for the benefit of that other person,

11       and any person who offers or gives an employee money or any thing

12       of value under those circumstances, is guilty of commercial bribery.

13   Cal. Penal Code § 641.3.  Several allegations support a violation of § 641.3(a),

14   which in turn supports a violation of 18 U.S.C. § 1952.  Mattel has alleged that

15   Bryant, while still employed by Mattel, entered into a contract with MGA to provide

16   design services to MGA on a "top priority" basis, and used Mattel property,

17   employees, and resources to develop and design the Bratz concept.

18       Counter-defendants argue that the requirement under California's

19   commercial bribery statute that a violator act "corruptly" is not met because Bryant

20   did not intend to injure Mattel.  Such an intent is not required; rather it is sufficient

21   that Bryant is alleged to have intended to defraud Mattel.  See Cal. Penal Code

22   § 341.3(d)(3) (defining "corruptly" as involving the intent "to injure or defraud")

23   (emphasis added).

24       **d.    Criminal Copyright Violations**

25       The parties dispute the relevant pleading standard that governs the

26   allegations which underlie the criminal copyright violation claim.  Counter-

27   defendants would have the Court apply the more exacting Rule 9(b) standards

28   because, in their assessment, the claim "sounds in fraud."  Mattel, however,

EXHIBIT ___3___

PAGE ___60___

1   contends that there is no reason to depart from the more lenient Rule 8(a) standard
2   generally applied to copyright claims because, in its assessment, the claims "sound
3   in copying, not fraud." (Mattel Opposition to MGA's Motion at 4.)

4        The recent Ninth Circuit case on this issue, cited by both parties, stands for
5   the unremarkable proposition that, consistent with Rule 9(b), all *averments* of fraud
6   must be pleaded with particularity, regardless of whether fraud is an essential
7   element of the claim to which the averment relates. See Vess v. Ciba-Geigy Corp.
8   USA, 317 F.3d 1097, 1103 (9th Cir. 2003); Fed. R. Civ. P. 9(b) ("In all *averments*
9   of fraud or mistake, the circumstances constituting fraud or mistake shall be stated
10  with particularity.") (emphasis added).

11       Considering Rules 8(a), 9(b), and the teachings of Vess, a spectrum
12  emerges. At the left end of this spectrum are claims that do not involve any
13  allegations of fraud. Those need only satisfy Rule 8(a)'s "short and plain
14  statement" standard. At the opposite end of the spectrum are claims based solely
15  on fraud, and the facts underlying such a claim must be alleged with particularity
16  pursuant to Rule 9(b). Lying closer to the Rule 9(b) end of the spectrum is a
17  category of claims discussed in Vess:

18            In cases where fraud is not a necessary element of a claim, a
19       plaintiff may choose nonetheless to allege in the complaint that the
20       defendant has engaged in fraudulent conduct. In some cases, the
21       plaintiff may allege a unified course of fraudulent conduct and rely
22       entirely on that course of conduct as the basis of a claim. In that
23       event, the claim is said to be "grounded in fraud" or to "sound in
24       fraud," and the pleading of that claim as a whole must satisfy the
25       particularity requirement of Rule 9(b).

26  Vess, 317 F.3d at 1103-04 (internal citations omitted). It is into this category MGA
27  contends that the allegations of criminal copyright claims fit, and MGA therefore
28  contends that all allegations regarding the criminal copyright claims must be

EXHIBIT    3
PAGE    6 /

1  pleaded with particularity.

2      However, <u>Vess</u> sets up another category, lying closer to the Rule 8(a) part of
3  the spectrum (but nevertheless requiring pleading with some particularity):

4          In other cases, however, a plaintiff may choose not to allege a
5      unified course of fraudulent conduct in support of a claim, but rather
6      to allege some fraudulent and some non-fraudulent conduct. In such
7      cases, only the allegations of fraud are subject to Rule 9(b)'s
8      heightened pleading requirements. . . . The rule does not require that
9      allegations supporting a claim be stated with particularity when those
10     allegations describe non-fraudulent conduct.

11         [In other words,] in a case where fraud is not an essential
12     element of a claim, only allegations ("averments") of fraudulent
13     conduct must satisfy the heightened pleading requirements of Rule
14     9(b). Allegations of non-fraudulent conduct need satisfy only the
15     ordinary notice pleading standards of Rule 8(a).

16  <u>Id.</u> at 1104-05.

17     Whether fraud is an essential element of criminal copyright infringement
18  must be determined by reference to the statutory language and any interpretative
19  case law. In relevant part, the prohibition against criminal copyright infringement
20  provides: "Any person who violates section 506(a) (relating to criminal offenses) of
21  title 17 shall be punished as provided [herein] in and such penalties shall be in
22  addition to any other provisions of title 17 or any other law." 18 U.S.C. § 2319. In
23  turn, the relevant provision in 17 U.S.C. § 506 states that "[a]ny person who willfully
24  infringes a copyright shall be punished as provided under section 2319 of title 18, if
25  the infringement was committed . . . for purposes of commercial advantage or
26  private financial gain . . . ." 17 U.S.C. § 506(a)(1)(A). The elements of the offense
27  are easily gleaned from the straightforward statutory language: "Criminal
28  infringement of copyright has three elements: (1) infringement of a copyright

EXHIBIT    3
PAGE    62

1  (2) done wilfully (3) for purposes of commercial advantage or private financial gain."
2  United States v. Goss, 803 F.2d 638, 642 (11th Cir. 1986).

3      Clearly, fraud is not an essential element of a criminal copyright claim, taking
4  it out of the category at the far end of the spectrum described above, and
5  necessitating an inquiry into whether Mattel has chosen to incorporate a fraud
6  element into its criminal copyright claim. The AAC at ¶ 93(e) reveals that the
7  criminal copyright claim is premised upon the "willfull[] infringe[ment of] Mattel's
8  copyrights, including with respect to documents containing Mattel trade secret and
9  confidential information . . . ." The Opposition fills in more details regarding this
10 claim, noting that the criminal copyright claim is premised upon the Bratz-related
11 works, Bratz-derivative works, and works contained within Mattel's allegedly
12 purloined trade secrets and confidential information. (Mattel Opposition to MGA's
13 Motion at 5).

14     These allegations do not "allege a unified course of fraudulent conduct and
15 rely entirely on that course of conduct as the basis of a claim" such that the claim
16 could be said to "sound in fraud" and therefore require pleading with particularity as
17 to the entire claim. The allegations establish that much of the conduct complained
18 of consists of simple copying of the Bratz-related works or the creation of Bratz-
19 derivative works. Such allegations are unrelated to allegations of fraud. Therefore,
20 if this claim falls anywhere on the spectrum other than the Rule 8(a) category, it
21 falls in the category described by Vess as those claims in which a claimant chooses
22 to "allege some fraudulent and some non-fraudulent conduct." Id. at 1104.

23     When one considers that the alleged predicate acts of criminal copyright
24 infringement are but a small part of a larger, and singular, claim brought pursuant to
25 RICO, it is evident that the RICO claim falls neatly into the category of claims that
26 are based partly on fraudulent and partly on non-fraudulent conduct. The Court
27 has already found that certain fraudulent conduct -- that supporting the alleged
28 predicate acts of mail fraud and wire fraud -- is insufficiently pleaded. The current

EXHIBIT ___3___

PAGE ___63___

1  focus, however, is whether the allegations supporting the predicate acts of criminal
2  copyright infringement involve fraudulent conduct.

3      Here, there are two types of works allegedly infringed. The first type is the
4  Bratz-related and Bratz-derivative works. The second type is Mattel's other trade
5  secrets and confidential information. Both types are alleged -- with particularity -- to
6  have been procured by MGA through fraudulent conduct, but the criminal copyright
7  infringement predicate acts do not implicate that fraudulent conduct. Rather, they
8  implicate only questions of whether counter-defendants wilfully infringed Mattel's
9  works for commercial advantage or private financial gain. Here, Mattel has
10  sufficiently alleged predicate acts of criminal copyright infringement by alleging that
11  MGA and other counter-defendants willfully infringed its copyrights for purposes of
12  gaining commercial advantage and private financial gain. As Mattel correctly
13  contends, state of mind, in this instance willfulness, may be pleaded generally. See
14  Ferguson Beauregard/Logic Controls v. Mega systems, LLC, 350 F.3d 1327, 1343
15  (Fed. Cir. 2003).

16      **4.    Injury to Business or Property**

17      "Recovery under RICO is limited to those injuries flowing from predicate
18  acts . . . ." Resolution Trust Corp. v. Keating, 186 F.3d 1110, 1117 (9th Cir. 1999)
19  (citing Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 497 (1985)). Here, Mattel
20  has alleged damages flowing from the alleged acts of racketeering activity. (AAC
21  ¶ 96). Damages easily flow from theft of trade secrets and confidential information
22  committed by a direct competitor and from infringement of copyrights that are
23  alleged to have been used to make millions -- if not billions -- of dollars.

24      Counter-defendants argue that Mattel lacks standing to sue on behalf of its
25  subsidiaries. This issue arises because many of the allegations of the thefts of
26  trade secrets involve actions taken in Mexico or Canada by employees of Mattel's
27  foreign subsidiaries. Mattel argues that it is not attempting to sue for damages
28  incurred by its subsidiaries; rather, Mattel alleges that much of the confidential

EXHIBIT  3

PAGE  64

1 information stolen by the employees of Mattel's subsidiaries belonged not to

2 Mattel's subsidiaries, but to Mattel itself.  Based on these allegations, Mattel may

3 sue for damages it sustained.  Mattel may not sue for damages incurred by its

4 foreign subsidiaries.

5                **5.**   **Ruling on Motions to Dismiss**

6       The Motions to Dismiss the RICO claims are **GRANTED** in part.  As set forth

7 herein, the alleged predicate acts of mail fraud and wire fraud are insufficiently

8 alleged, and Mattel is **GRANTED** leave to amend the AAC.

9 **C.**   **Trade Secrets**

10       MGA contends that Mattel has failed to plead its trade secrets with sufficient

11 particularity to comply with its duties under Cal. Code Civ. P. § 2019.210, which

12 provides:

13          In any action alleging the misappropriation of a trade secret

14         under the Uniform Trade Secrets Act . . . , before commencing

15         discovery relating to the trade secret, the party alleging the

16         misappropriation shall identify the trade secret with reasonable

17         particularity subject to any orders that may be appropriate under

18         Section 3426.5 of the Civil Code [involving in camera reviews and

19         sealing of court documents].

20 Id.  Based on the unambiguous language of the statute, the Court agrees with

21 Mattel's characterization of this requirement as one related to discovery rather than

22 related to pleading.

23       The Court also agrees that, by identifying documents in discovery by Bates-

24 stamp number, Mattel has complied with the dictates of § 2019.210.  See

25 Advanced Modular Sputtering, Inc. v. Superior Court, 132 Cal.App.4th 826, 835-36,

26 (2005) (internal quotation marks and citations omitted) ("[Reasonable particularity]

27 means that the plaintiff must make some showing that is reasonable, i.e., fair,

28 proper, just and rational[,] . . . under all of the circumstances to identify its alleged

EXHIBIT ___3___

PAGE ___65___

1  trade secret in a manner that will allow the trial court to control the scope of
2  subsequent discovery, protect all parties' proprietary information, and allow them a
3  fair opportunity to prepare and present their best case or defense at a trial on the
4  merits."). MGA's complaints regarding the volume of documents so identified, and
5  their skepticism of Mattel appropriately attaching such an identification to many of
6  those identified documents, are not properly addressed at this stage of the
7  proceedings.

8       The motion to dismiss the trade secrets claim on this basis is therefore
9  **DENIED**.

10 **D.    Duplicative State-Law Claims**

11      Bryant's motion to dismiss Mattel's duplicative state-law claims is **DENIED**.
12 The state-law counterclaims asserted against Bryant in the AAC admittedly overlap
13 with the claims asserted against him in the 04-9059 case, however, the factual
14 allegations underlying the claims asserted in the AAC are broader in scope than
15 those underlying the claims asserted in the 04-9059 case.

16             **IV. Motion to Dismiss for Lack of Personal Jurisdiction**

17      MGA Mexico challenges this Court's exercise of personal jurisdiction over it.
18 As set forth below, the Court concludes that it may, consistent with California law
19 and the federal Due Process Clause, exercise specific personal jurisdiction over
20 this admittedly foreign corporation.

21 **A.    The Constitutional Exercise of Personal Jurisdiction**

22      Where a party moves to dismiss a claim for lack of personal jurisdiction, the
23 party asserting the claim bears the burden of demonstrating that jurisdiction is
24 appropriate. Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800 (9th Cir.
25 2004). However, in opposing a motion to dismiss for lack of personal jurisdiction,
26 the party asserting the claim need only make a *prima facie* showing of jurisdictional
27 facts. Id. Disputed facts are to be resolved in favor of the exercise of personal
28 jurisdiction. Id.

EXHIBIT ___3___

PAGE ___66___

1  Because there is no applicable federal statute governing personal
2  jurisdiction, the Court applies the law of the state in which the district court sits. Id.
3  (citations omitted). "Because California's long-arm jurisdictional statute is
4  coextensive with federal due process requirements, the jurisdictional analyses
5  under state law and federal due process are the same." Id. at 800-01 (citations
6  omitted). In order for a court's exercise of personal jurisdiction over a nonresident
7  defendant to be constitutionally permissible, the defendant must have "minimum
8  contacts" with the forum state "such that the exercise of jurisdiction does not offend
9  traditional notions of fair play and substantial justice." Id. at 801 (internal quotation
10  marks and citation omitted).

11  Personal jurisdiction may be either general or specific. For general personal
12  jurisdiction to apply, a defendant (or here, a counter-defendant) "must engage in
13  continuous and systematic general business contacts . . . that approximate a
14  physical presence in the forum state." Id. (internal quotation marks and citations
15  omitted).

16  To determine whether it has specific personal jurisdiction over a nonresident
17  defendant, the Court employs a three-part test:

18  (1) The non-resident defendant must purposefully direct his
19  activities or consummate some transaction with the forum or resident
20  thereof; or perform some act by which he purposefully avails himself
21  of the privilege of conducting activities in the forum, thereby invoking
22  the benefits and protections of its laws; (2) the claim must be one
23  which arises out of or relates to the defendant's forum-related
24  activities; and (3) the exercise of jurisdiction must comport with fair
25  play and substantial justice, i.e. it must be reasonable.

26  Id. at 802.

27  The party asserting the claim bears the burden of establishing the first two
28  parts of the test. Id. If that party establishes the first two parts, then the burden

EXHIBIT __3__

PAGE __67__

1  shifts to the party resisting the Court's exercise of personal jurisdiction "to present a

2  **compelling case** that the exercise of jurisdiction would not be reasonable." Id.

3  (emphasis added).

4          The first part of the test is satisfied by either "purposeful availment" or

5  "purposeful direction." Id. Purposeful availment is shown when a defendant avails

6  itself of the privilege of doing business in a forum state, usually met when the

7  defendant took some action in the forum, such as executing or performing a

8  contract there. Id. By virtue of such actions, a defendant "purposefully avails itself

9  of the privilege of conducting activities within the forum State, thus invoking the

10 benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958).

11 When taking advantage of these "benefits and protections," a defendant must also

12 "submit to the burdens of litigation in that forum." Burger King Corp. v. Rudzewicz,

13 471 U.S. 462, 476 (1985).

14         By contrast, purposeful direction, involves actions by the defendant outside

15 of the forum state but that are directed at the forum. Schwarzenegger, 374 F.3d at

16 803. The purposeful direction analysis is derived from a three-part "effects test"

17 that finds its roots in the Supreme Court's decision in Calder v. Jones, 465 U.S. 783

18 (1984). Pursuant to this analysis, the defendant must "have (1) committed an

19 intentional act, (2) expressly aimed at the forum state, (3) causing harm that the

20 defendant knows is likely to be suffered in the forum state." Id.; Schwarzenegger,

21 374 F.3d at 803. All three parts of the test must be satisfied. The second part of

22 the effects test is described by the Ninth Circuit as the "express aiming"

23 requirement, and requires that the counter-defendants "expressly aimed" its

24 intentional act at California. See Schwarzenegger, 374 F.3d at 806. Specifically,

25 "express aiming" is found where the defendant is alleged to have engaged in

26 wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident

27 of the forum state." Bancroft & Masters, Inc. v. Augusta Nat. Inc., 223 F.3d 1082,

28

28 EXHIBIT _____3_____

PAGE _____68_____

1  1087 (9th Cir. 2000).[5]

2      Assuming that the party asserting a claim can establish that the party

3  resisting the Court's exercise of personal jurisdiction has met either the purposeful

4  availment or express aiming part of the three-part test regarding the exercise of

5  specific personal jurisdiction, courts next consider whether the claim arises out of or

6  relates to the forum-related activities.  In making this determination, the Court

7  considers whether the contacts with the forum gave rise to the claims asserted,

8  employing a "but for" standard.  See Doe v. Unocal Corp., 248 F.3d 915, 924 (9th

9  Cir. 2001).

10      Once the purposeful availment/express aiming and relatedness requirements

11  are established, the burden shifts to the party resisting the Court's exercise of

12  jurisdiction to show that exercise of jurisdiction is unreasonable.  In determining

13  reasonableness, the Court considers seven factors:

14      1) the extent of the defendant's purposeful interjection into the forum

15      state's affairs; 2) the burden on the defendant; 3) conflicts of law

16      between the forum and defendant's home jurisdiction; 4) the forum's

17      interest in adjudicating the dispute; 5) the most efficient judicial

18      resolution of the dispute; 6) the plaintiff's interest in convenient and

19      effective relief; and 7) the existence of an alternative forum.

20

21      [5] What constitutes, or doesn't constitute, "express aiming" is best
illustrated by example.  For instance, in Pebble Beach Co. v. Caddy, 453 F.3d
22  1151 (9th Cir. 2006), no express aiming was found where the owner of a bed-and-
breakfast in England (overlooking a pebbly beach) used the term "pebblebeach,"
23  the name of a famous golf course located in California, on its web site.  Id. at
24  1153, 1156-57.  The Ninth Circuit acknowledged that it might be foreseeable that
the defendant's use of the web site might have some effect on California, but
25  noted that mere foreseeability of effect in a forum state is not enough to constitute
express aiming.  Id. at 1157.  In contrast to Pebble Beach is the case of
26  Panavision Intern., L.P. v. Toeppen,141 F.3d 1316, 1321 (9th Cir. 1998), in which
the Ninth Circuit found that the express aiming requirement was met where the
27  defendant registered plaintiff's marks as Internet domain names in order to force a
28  California plaintiff to pay him money.

29  EXHIBIT ___3___

PAGE ___69___

1    Roth v. Garcia Marquez, 942 F.2d 617, 623 (9th Cir. 1991) (internal citation

2    omitted). No factor is dispositive and the Court must balance all seven. Id.

3    (internal citation omitted).

4    **B.    MGA Mexico's Contacts with the Forum State**

5        The AAC alleges that Issac Larian and other MGA officers, while in

6    California, executed a plot to target three high-level employees of Mattel Mexico,

7    and entice them to steal Mattel's trade secrets. In written offers of employment to

8    these three individuals, Issac Larian held himself out to be the CEO of MGA

9    Mexico. This plot was facilitated by a number of cross-border communications

10   among the participants as well as travel to the United States by the targeted

11   employees.

12   **C.    The Court May Exercise Personal Jurisdiction over MGA Mexico**

13       The AAC repeatedly alleges that Larian, who held himself out to be MGA

14   Mexico's CEO, and who was designated as MGA Mexico's "legal agent" in Mexican

15   registration document actively sought to induce others to access and steal Mattel's

16   trade secrets while located in the California. See Velázquez Decl. Exs. A-C; Salem

17   Decl. Ex. B. This constitutes purposeful availment.

18       To the extent that any of the actions taken in Mexico by the three Mexican

19   employees may be imputed to Mattel Mexico, there is also purposeful direction.

20   The alleged actions taken on behalf of MGA Mexico were specifically engineered to

21   result in the alleged illegal acquisition of trade secrets belonging to Mattel, a

22   California resident.[6]

23       The relatedness requirement is also clearly met. The contacts with

24   California involve actions allegedly taken in order to further the illegal acquisition of

25   Mattel's trade secrets, leading to the present claims against MGA Mexico for

26   misappropriation of trade secrets and the related RICO claims.

27

28       [6] The AAC alleges the theft of trade secrets belonging not only to Mattel's
     Mexican subsidiary, but also to Mattel itself, which is a California corporation.

30
EXHIBIT  3

PAGE  70

1    The burden, therefore, is on MGA Mexico to show that the exercise of
2    jurisdiction is unreasonable.[7] As noted previously, the Court considers seven
3    factors. The first factor the Court considers is the defendant's purposeful
4    interjection. For the reasons the Court has found purposeful availment and
5    purposeful direction, this factor favors the exercise of personal jurisdiction.

6    MGA Mexico argues, without elaboration, that the burden of defending itself
7    in California is "significant." However, the assumption underlying this argument is
8    that the present action is more properly litigated by MGA's and Mattel's Mexican
9    subsidiaries. This assumption misses the point of Mattel's claim against MGA
10   Mexico; Mattel, the parent company, was itself injured by MGA's Mexico's alleged
11   misappropriation of its own trade secrets because the alleged misappropriation was
12   not limited to trade secrets belonging to its Mexican subsidiary. The argument
13   based on this faulty assumption is therefore unconvincing. In order to show
14   unreasonableness, the burden on the defendant must be great. See Panavision,
15   141 F.3d at 1323 ("A defendant's burden in litigating in the forum is a factor in the
16   assessment of reasonableness, but unless the inconvenience is so great as to
17   constitute a deprivation of due process, it will not overcome clear justifications for
18   the exercise of jurisdiction.") (internal quotation marks and citation omitted).

19   As to the third and seventh factors, regarding conflicts of law and the

20
21       [7] In its reply, MGA Mexico declares that it "made a 'compelling case' in
     support of its motion to dismiss that it would be unreasonable to force it to litigate
22   in this forum." MGA Mexico Reply at 10. However, MGA Mexico's motion papers
     fail to acknowledge that they bear the burden on this issue. See MGA Mexico's
23   Memorandum of Points and Authorities at 10 ("Finally, Mattel has failed to satisfy
     the third element required for specific jurisdiction -- that the exercise of jurisdiction
24   over the defendant would be reasonable."). As Mattel accurately predicted in its
     opposition papers, MGA Mexico implicitly acknowledged its burden in the reply,
25   and used the occasion to improperly present additional arguments for the first
     time. Although the Court ordinarily would not consider such arguments, it does so
26   here because it does not change the Court's ultimate conclusion. See In re Intuit
     Privacy Litigation, 138 F.Supp.2d 1272, 1275 n.3 (C.D. Cal. 2001) ("this court
27   does not consider arguments raised anew for the first time in a reply brief as to do
28   so would unfairly deny the non-moving party an opportunity to respond.").

                              31  EXHIBIT    3
                                  PAGE       71

1   existence of an alternative forum, MGA Mexico makes veiled references to the
2   criminal action in Mexico as constituting a choice of forum made by Mattel,
3   apparently implying that Mattel, having chosen to pursue criminal charges in
4   Mexico, should be precluded from invoking the power of this Court. It appears to
5   the Court that MGA Mexico has failed to fully and clearly articulate this argument
6   because it is untenable. Whether Mexican authorities pursue criminal charges
7   based on the same conduct underlying the claims in this action is irrelevant to
8   whether this Court may constitutionally exercise personal jurisdiction over MGA
9   Mexico. Therefore, MGA Mexico's argument on this issue is unpersuasive.
10       The fourth factor, the interest in adjudicating the dispute, weighs in favor of
11   the exercise of personal jurisdiction, as does the sixth, the plaintiff's interest in
12   convenient and effective relief.
13       MGA Mexico argues that the fifth factor weighs in its favor when the Court
14   considers that the site of injury, which it does not believe is California, is the most
15   efficient forum. However, this argument is premised on the rejected assumption
16   that the present action is more properly litigated between MGA's and Mattel's
17   Mexican subsidiaries.
18       On balance, a consideration of the reasonableness factors reveals that MGA
19   Mexico has fallen far short of establishing the "compelling case" necessary to
20   render the Court's exercise of personal jurisdiction unreasonable.
21       The Court concludes that Mattel has established the first two parts of the
22   specific personal jurisdiction test, and that MGA Mexico has failed to establish that
23   the Court's exercise of personal jurisdiction over it is otherwise unreasonable.
24   Accordingly, the Court **DENIES** MGA Mexico's motion to dismiss.
25                  **V. MGA's and Bryant's Motions Regarding**
26                  **the Discovery Master's March 7, 2007, Order**
27       MGA and Bryant seek review of a decision that resolved discovery disputes
28   that arose during Bryant's deposition, and that was rendered by the Court-

EXHIBIT ____3____

PAGE ____72____

1   appointed discovery master, Judge Edward A. Infante (Ret.), on March 7, 2007.
2   The Court's order appointing Judge Infante provides that his orders resolving
3   discovery disputes shall be reviewed in the same manner as those made by a
4   magistrate judge of this Court.

5       Pursuant to Fed. R. Civ. P. 72(a), when the parties object to the ruling of a
6   magistrate judge on a non-dispositive manner, such as a discovery dispute, the
7   district judge may modify or set aside only those portions of the magistrate judge's
8   order that are "clearly erroneous or contrary to law." Id.

9       The "clearly erroneous" language refers to factual findings. See e.g.,
10  Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension
11  Trust, 508 U.S. 602, 622 (1993) (discussing the clearly erroneous standard). Here,
12  there were no explicit factual findings or legal conclusions made by Judge Infante
13  regarding the relevant rulings; therefore, the Court reviews the record presented to
14  Judge Infante to determine whether his rulings are contrary to law. See March 7,
15  2007, Order.

16      Questions that do not seek the substance of attorney-client communications
17  generally do not implicate the attorney-client privilege. United States v. Carrillo, 16
18  F.3d 1046, 1050 (9th Cir. 1994) (finding no violation of the attorney-client privilege
19  where prosecutor, who asked whether a criminal defendant had consulted with his
20  attorney during a recess in order to raise an inference of attorney coaching of
21  testimony during the trial, stopped short of asking defendant the substance of
22  defendant's communications with his attorney). Therefore, questions such as the
23  one addressed by objection No. 38, asking whether Bryant talked to counsel for
24  MGA during a break from his deposition, are not subject to objection based on the
25  attorney-client privilege. This conclusion is consistent with Judge Infante's Order.

26      Mattel's question regarding who is paying Bryant's legal fees, addressed by
27  objection No. 42, is likewise not objectionable. MGA and Bryant argue that state
28  law applies; however, because the present consolidated actions involve both

EXHIBIT ___3___

PAGE ___73___

1   federal and state-law claims, the federal law of privilege applies. _Agster v._

2   _Maricopa County_, 422 F.3d 836, 839-40 (9th Cir. 2005) ("Where there are federal

3   question claims and pendent state law claims present, the federal law of privilege

4   applies."). To that end, consistent with federal privilege law, fee-payment

5   arrangements are relevant to credibility and bias, and if asked in discovery, Bryant

6   must disclose who is paying his legal fees. See _United States v. Blackman_, 72 F.3d

7   1418, 1424 (9th Cir. 1995) ("As a general rule, client identity and the nature of the

8   fee arrangement between attorney and client are not protected from disclosure by

9   the attorney-client privilege."). This conclusion is also consistent with Judge

10  Infante's Order.

11          However, in this case, the joint-defense privilege protects from disclosure the

12  substance of certain statements made by Bryant and his attorneys in the presence

13  of attorneys representing MGA. "The joint defense privilege protects

14  communications between an individual and an attorney for another when the

15  communications are 'part of an on-going and joint effort to set up a common

16  defense strategy.'" _United States v. Bay State Ambulance and Hosp. Rental_

17  _Service, Inc._, 874 F.2d 20, 28 (1st Cir. 1989) (internal quotation marks and citation

18  omitted). Generally, to rely on the joint-defense privilege, a party must establish

19  three elements: "(1) [T]he communications were made in the course of a joint

20  defense effort, (2) the statements were designed to further the effort, and (3) the

21  privilege has not been waived." _Id._

22          The Court finds the first element was met. The Court, based on its review of

23  the record pending before Judge Infante, is satisfied that the parties had in place at

24  the time of Bryant's deposition, and have in place today, a valid joint-defense

25  agreement. The Court also finds that the second element was met. Mattel cannot

26  seriously contend that MGA's interests are not aligned with Bryant's in this action,

27  or that counsels' thorough preparation of Bryant for his deposition was not designed

28  to further the joint defense effort. Finally, as for the third element, there is no

34   EXHIBIT __3__

     PAGE __74__

1  suggestion in the record that any party has waived the attorney-client privilege.

2         Accordingly, the Court holds that Judge Infante's rulings on Objection Nos.

3  39 and 50 are contrary to law to the extent those rulings require Bryant to divulge

4  the substance of his communications with counsel for MGA.

### VII. Conclusion

5

6         In the manner set forth more fully herein, the Court makes the following

7  rulings:

8         1.    Motion of MGA Entertainment, Inc., ("MGA") and Issac Larian

9  ("Larian") to Dismiss Mattel's Amended Answer and Counterclaims (docket # 189):

10  **GRANTED IN PART AND DENIED IN PART.**

11        2.    Motion of Carter Bryant to Dismiss Counterclaims II, III, V, VII, IX, and

12  XI (docket # 191): **GRANTED IN PART AND DENIED IN PART.**

13        3.    Motion of MGA Mexico to Dismiss Mattel's Amended Answer and

14  Counterclaims (docket # 266): **DENIED.**

15        4.    Motion of MGA Objecting to Discovery Master's March 7, 2007, Order

16  (docket # 308): **GRANTED IN PART AND DENIED IN PART.**

17        5.    Motion of Carter Bryant Objecting to Discovery Master's March 7,

18  2007, Order (docket # 306): **GRANTED IN PART AND DENIED IN PART.**

19        Mattel is **GRANTED** ten days' leave to amend the AAC in conformity with

20  this Order.  The Counter-defendants shall answer or otherwise respond to the

21  SAAC no later than thirty days after the filing of the SAAC.

22

23

24

25

26

27

28

35    EXHIBIT    3

PAGE    75

1    The Motion Re Trial Structure (docket #462) has been the subject of further

2    briefing by the parties and is set for further oral argument on July 2, 2007.  Ruling

3    on that matter is **DEFERRED** pending oral argument.

4        DATE:  June 27, 2007

5                                              STEPHEN G. LARSON
6                                              UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT  3

36

PAGE  76