# EXHIBIT 25

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.   CV 04-09049 SGL(RNBx)                          Date: May 21, 2009
Title:     MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
========================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

        Cindy Sasse                                   None Present
        Courtroom Deputy                              Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:          ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                                None Present

PROCEEDINGS:   ORDER DENYING MOTION TO MODIFY DISCOVERY MASTER ORDER
                NO. 11 (DOCKET #5185)

                ORDER GRANTING MOTION FOR LEAVE TO FILE A THIRD AMENDED
                ANSWER AND COUNTERCLAIMS (DOCKET #5143)

                ORDER DENYING EX PARTE APPLICATION FOR STAY PENDING
                APPEAL (DOCKET #5396)

                ORDER DENYING EX PARTE APPLICATION RE DISCLOSURE OF 2009
                PRODUCT LINE INFORMATION (DOCKET #5425)

                ORDER RE EXPIRATION OF TEMPORARY RECEIVERSHIP AND ORDER
                APPOINTING MGA MONITOR

                ORDER IMPOSING LIMITED AND TEMPORARY STAY OF PHASE 2 AND
                REQUIRING MANDATORY SETTLEMENT CONFERENCE

    These matters were heard on May 18, 2009.

EXHIBIT 25
PAGE 380

## I. MOTION TO MODIFY DISCOVERY MASTER ORDER NO. 11

Mattel moves to overrule that portion of the Discovery Master's Order No. 11 ("Order No. 11") that concludes that witnesses Pablo Vargas San Jose ("Vargas") and Mariana Trueba ("Trueba") (collectively, "the witnesses") are not "managing agents" within the scope of Fed. R. Civ. P. 30(b)(1). The Court has reviewed Order No. 11, Mattel's Motion, the MGA parties' opposition thereto, and Mattel's reply. Applying the "clearly erroneous or contrary to law" standard of review that all parties agree is applicable here, the Court **DENIES** Mattel's Motion.

In Order No. 11, the Discovery Master acknowledged the so-called Sugarhill factors, see Sugarhill Records Ltd. v. Motown Record Corp., 105 F.R.D. 166, 170 (D.C.N.Y. 1985), which the parties agreed applied. After an ancillary discussion that concluded the witnesses were not managing agents as measured by a test similar to the Sugarhill factors, the Discovery Master either applied, or explained why his conclusion would not change if he did apply, the Sugarhill factors.[1] Those factors are:

> 1) [W]hether the individual is invested with general powers allowing him to exercise judgment and discretion in corporate matters; 2) whether the individual can be relied upon to give testimony, at his employer's request, in response to the demand of the examining party; 3) whether any person or persons are employed by the corporate employer in positions of higher authority than the individual designated in the area regarding which information is sought by the examination; 4) the general responsibilities of the individual "respecting the matters involved in the litigation," . . . and 5) whether the individual can be expected to identify with the interests of the corporation.

105 F.R.D. at 170 (internal citation omitted). The Discovery Master found that although the second and fourth factors favor designating the witnesses as managing agents, the first, third, and fifth do not.

As to the first factor, Mattel argues that the Discovery Master should have focused more on

---

[1] In the relevant portion of Order No. 11, the Discovery Master first discussed, and then rejected for reasons set forth therein, an argument advanced by Mattel that the most important Sugarhill factor was the fifth factor, the so-called "loyalty factor." He next applied an alternative test articulated by Libbey Glass, Inc. v. Oneida, Ltd., 197 F.R.D. 342, 350 (N.D. Ohio 1999), which was originally adopted by the D.C. Circuit. See id. (quoting Founding Church of Scientology of Washington, D.C., Inc. v. Webster, 802 F.2d 1448, 1452 (D.C. Cir.1986)). That test is set forth in Order No. 11 at 31, and is not repeated here. It focuses on the character of the employee's control, the convergence of interest of the employee and the corporation, and the employee's area of expertise in relation to others associated with the corporation. Libbey Glass, 197 F.R.D. at 350. This test appears to the Court to implicate, to varying degrees, all of the Sugarhill factors except the second. Because the two tests are similar, and because neither is controlling, adoption of either could not be said to be contrary to law. Notwithstanding language that may be so read, the Court does not accept the notion that Order No. 11 rejected outright the Sugarhill factors. The Court does so based on the acknowledgment that the parties agreed those factors were applicable, the similarity between the two alternative tests, and the Discovery Master's articulation regarding each Sugarhill factor. See Order No. 11 at 29-36.

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT __25__
PAGE __381__

whether the witnesses were managing agents as to the particular matters at issue in the lawsuit rather than their general powers and that, in any event, the relevant time period to measure managing agent status is not at the time of deposition but is rather at the time of the events giving rise to the lawsuit. Although these arguments find some support, the Discovery Master's conclusion regarding this first <u>Sugarhill</u> factor (and its <u>Libbey Glass</u> analog) is not contrary to law. The first <u>Sugarhill</u> factor is clearly concerned with an employee's general power; the fourth factor, which the Discovery Master found in favor of Mattel, focuses on the witnesses' responsibilities regarding matters involved in the litigation. The cases cited by Mattel support its timing argument; however, cases cited by the MGA parties establish that other cases favor a contrary position. Neither side's authority is controlling, and the Court therefore concludes the position adopted by the Discovery Master is not contrary to law.

As to the third factor, Mattel argues that it was clear error for the Discovery Master to conclude that Kuemmerle, to whom Vargas reported directly and to whom Trueba's supervisor reported, could provide substitute testimony to them is clear error. Mattel's ultimate point is that no one can testify more accurately and more on point than can the two witnesses regarding their alleged trade secret theft. Again, this is not an invalid point. Indeed, it is possible that if such theft occurred (the MGA parties deny that it did), then the witnesses did not proceed at the behest of the MGA parties and instead acted on their own accord (the MGA parties alternatively contend). The fact is that if the MGA parties' alternative contention is true, then the witnesses' testimony regarding any theft would not be on behalf of MGA at all. Who can or cannot testify about these events that may or may not have occurred on behalf of any MGA party -- let alone who can testify best -- is far from clear. This area of inquiry is fraught with uncertainty. The Discovery Master's conclusion one way or another on this issue, therefore, cannot be said to be clear error. <u>See</u> <u>Wolpin v. Philip Morris Inc.</u>, 189 F.R.D. 418, 422 (C.D. Cal.1999) ("To conclude that a magistrate judge's decision is clearly erroneous, the District Court must arrive at a definite and firm conviction that a mistake has been committed.").

As to the fifth factor, it was not clearly erroneous for the Discovery Master to conclude that MGA Mexico's interests and the witnesses' interests are at odds. The witnesses are currently employed by MGA Mexico, weighing in favor of a finding of alignment, but they have also been subjected to criminal investigations regarding the allegations asserted in this lawsuit, and they have separately retained counsel to represent their interests. Additionally, the MGA parties have maintained that if any trade secret theft occurred, it occurred without their knowledge or consent. These facts support the Discovery Master's finding.

Weighing these factors, and taking into account the mixed burden of proof, as the Discovery Master did, the Court cannot find that the Discovery Master's conclusion was clearly erroneous or contrary to law, and the Court therefore **DENIES** Mattel's Motion (docket #5185).

## II. MOTION FOR LEAVE TO FILE THIRD AMENDED ANSWER AND COUNTERCLAIMS

Mattel has filed a motion seeking leave to file its proposed Third Amended Answer and

MINUTES FORM 90
CIVIL -- GEN                                              3

Initials of Deputy Clerk __cls_____
<u>Time: 03/02</u>

EXHIBIT __25__
PAGE __382__

Counterclaims ("TAAC").  In substance, the TAAC adds one additional claim and a number of
additional allegations.  First, Mattel asserts an additional claim pursuant to California's version of
the Uniform Fraudulent Transfers Act, found at Cal. Civ. Code §§ 3439 et seq.  Second, Mattel
avers facts that fall into the following broad categories:  (1) Allegations regarding certain 2008
financial transactions that were the subject of the Forensic Auditor's Report ("the Wachovia/Omni
808 transactions"); (2) allegations regarding acts of commercial bribery relating to three Mattel
seamstresses who were employed by MGA contractor Veronica Marlow; (3) allegations regarding
evidence tampering, including the alleged destruction by Isaac Larian's brother Farhad of boxes of
documents relating to the development of Bratz and Farhad's deletion of emails from a USB
device; (4) allegations that Isaac Larian and MGA perjured themselves during their Phase 1
testimony; and (5) allegations setting forth additional predicate acts of racketeering activities,
including money laundering, concealing assets, engaging in monetary transactions involving
property derived from unlawful activity, commercial bribery, destruction of evidence, and
obstruction of justice.

     The parties, quite understandably, disagree on whether the Fed. R. Civ. P. 15(a) liberal
standard or the Rule 16(b) "good cause" standard applies to the present motion.  Upon the lifting of
the stay on Phase 2 discovery, the Court set new dates for Phase 2 proceedings, but neglected to
set a deadline for amending the pleadings related to Phase 2, leading to the present dispute.  The
Court now sets that deadline for three months prior to the discovery cutoff date of December 11,
2009, or September 11, 2009.  Accordingly, the present motion is governed by the standard for
amendments to the pleadings that are sought prior to the deadline set in the Court's Scheduling
Order, which is set forth in Rule 15(a).

     Pursuant to Rule 15(a), leave to amend a pleading is granted "freely . . . when justice so
requires."  Id.; See Foman v. Davis, 371 U.S. 178, 182 (1962).  However, leave need not be
granted where the proposed amendment "(1) prejudices the opposing party; (2) is sought in bad
faith; (3) produces an undue delay in litigation; or (4) is futile."  AmerisourceBergen Corp. v.
Dialysist West, Inc., 465 F.3d 946, 951 (9th Cir. 2006).

     Allegations relating to events occurring after the filing of the Second Amended Answer and
Counterclaims ("SAAC") are governed not by the Rule 15(a) standard; rather, those amendments
are governed by the Rule 15(d) standard.  Rule 15(d) provides:

>      On motion and reasonable notice, the court may, on just terms, permit a party
> to serve a supplemental pleading setting out any transaction, occurrence, or event
> that happened after the date of the pleading to be supplemented. The court may
> permit supplementation even though the original pleading is defective in stating a
> claim or defense. The court may order that the opposing party plead to the
> supplemental pleading within a specified time.

Id.  This standard, like the Rule 15(a) standard, is liberal, and leave to file a supplemental pleading
is favored.  Planned Parenthood of S. Ariz. v. Neely, 130 F.3d 400, 402 (9th Cir.1997).  It should
not, however, be used to introduce a separate, distinct, and new cause of action.  Id.  The goal of

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT __25__
PAGE __383__

Rule 15(d) is to promote judicial efficiency, permitting "a court to award complete relief, or more nearly complete relief, in one action, and to avoid the cost, delay and waste of separate actions which must be separately tried and prosecuted." Keith v. Volpe, 858 F.2d 467, 473 (9th Cir.1988) (internal quotation marks and citation omitted).

The MGA parties contend the perjury allegations should not be permitted because there can be no present RICO injury (because Mattel prevailed in Phase 1) and/or no judgment has yet been entered and upheld on appeal. Additionally, they contend that perjury is not a predicate act of racketeering activity. The Court disagrees. Case law makes clear that what Mattel must show is injury as a result of the pattern of racketeering activity; Mattel need not prove that each and every predicate act itself caused harm. Corley v. Rosewood Care Center, Inc. of Peoria, 388 F.3d 990, 1004 (7th Cir. 2004) (improper for district court to hold that a RICO plaintiff be injured by every predicate act); Virden v. Graphics One, 623 F.Supp. 1417, 1425 (C.D. Cal. 1985) (a RICO plaintiff must be harmed by either a predicate act or the pattern of racketeering activity). As to the propriety of perjury as a predicate act, although perjury may not always rise to the level of a RICO predicate act, perjury in the course of a judicial proceeding, as is alleged here, is a predicate act of racketeering activity because it is obstruction of justice. See Streck v. Peters, 855 F.Supp. 1156, 1162 (D. Hawai'i,1994) (perjury during federal court proceedings is a RICO predicate act because it is indictable under the federal obstruction of justice statute).[2]

The MGA parties also that the allegations regarding the theft of trade secrets are improper because Mattel failed to allege them in the SAAC although the claims were known to them at that time. Mattel counters that, in light of the Rule 8(a) pleading standards, the Castilla allegations are already within the scope of the SAAC. See SAAC ¶¶ 79, 89-93. All that is required by Fed. R. Civ. P. 8(a) is a "a short and plain statement of the claim showing that the pleader is entitled to relief." The details are filled in by discovery, as has already occurred in this case, including Mr. Castilla's deposition. Accordingly, as the Court finds that these allegations are already within the scope of

---

[2] The MGA parties contend that this case is "unhelpful" to Mattel on this point: "The Streck court, in dismissing a RICO claim, simply noted that 'acts of perjury may, under the appropriate circumstances, constitute RICO predicate acts,' but did not discuss what those circumstances might be." Opp. at 12 n.11 (emphasis in the original) (citing Streck, 855 F. Supp. at 1162). The quotation from the Streck case is correct, and the Streck court did indeed dismiss the RICO claim (or, more precisely, granted summary judgment in favor of defendants as to the RICO claim); however, the MGA parties incorrectly state that the Streck case did not discuss under what circumstances perjury might constitute the RICO predicate act of obstruction of justice. The four sentences following the quoted portion clearly do exactly what the MGA parties claim the Streck court did not: Specifically, the Streck court distinguishes between perjury occurring in state-court proceedings (which it notes is not a RICO predicate act) and perjury occurring in federal-court proceedings (which it notes is a RICO predicate act):

[T]his Court finds that the acts of perjury which the defendants in the case at bar are alleged to have committed do not constitute RICO predicate acts. [The obstruction statute] applies only to perjury offered in federal court proceedings. Here, all of the alleged perjury took place in state court, not federal court. Thus, [the obstruction statute] is not implicated by Streck's perjury allegations.

Id. (internal citations and footnote omitted). Thus, the Streck case's relevance to the present issue is unmistakable.

MINUTES FORM 90
CIVIL -- GEN

5

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT  25
PAGE  384

the SAAC, the Court finds that the proposed amendments are not untimely; instead, they are in the nature of "clean up" amendments that succinctly state existing issues fairly stated in the SAAC when measured by the requirements of Rule 8(a).

The amendments setting forth additional copyright registrations come as a result of the jury's Phase 1 verdict. Although in most respects the issue of copyright infringement was resolved in Phase 1, allegations regarding criminal copyright infringement, cast in the form of RICO predicate acts, are relevant to Phase 2.

The MGA parties correctly point out, and the Court is fully aware, that the proposed amendments will dramatically expand the scope of the present litigation. Admittedly, the allegations set forth in the SAAC are already varied enough in nature and broad enough in scope to strain the Court's resources and to challenge a jury's powers of comprehension; nevertheless, this is not atypical of a successfully pleaded RICO claim, which the Court has already found was stated in the SAAC, and which has the tendency to draw together a multitude of seemingly unrelated acts into one litigation.[3]

In applying the relevant standards to the present motion, the Court's decision is not influenced by a lack of evidence supporting a particular allegation. Although Mattel attaches an unprecedented amount of evidence to the proposed TAAC, it is not required to do so. See Fed. R. Civ. P. 8(a). Accordingly, Mattel's failure (in the MGA parties' eyes) to provide evidentiary support for its allegations that Jorge Castilla stole its trade secrets, that Farhad Larian destroyed evidence, and that the MGA parties engaged in commercial bribery of certain Mattel employees is not relevant to the present inquiry.[4]

Accordingly, because the Court discerns no prejudice to the MGA parties, no bad faith or undue delay on Mattel's part, and no futility as to the present amendments, the Court **GRANTS** Mattel's Motion for Leave to File the Proposed Third Amended Answer and Counterclaims (docket #5143). To ensure proper filing, Mattel is directed to, within two days of the entry of this Order, provide the Courtroom Deputy Clerk for manual filing (1) an original and a copy of the public redacted version of the TAAC, and (2) an original and a copy of the under seal version of the TAAC.

---

[3] The allegations regarding the Wachovia/Omni 808 financial transactions illustrate this potential, and the Court has considered whether the amendments should be rejected based on the notion that Rule 15(d) should not be used to introduce a separate, distinct, and new cause of action. Here, however, the Wachovia/Omni 808 financial transactions are alleged as new predicate acts in an ongoing RICO conspiracy; as such, rejection of amendments as comprising a separate, distinct, and new cause of action is not warranted.

[4] Of course, in making factual allegations, all parties remain bound by their Rule 11(b)(3) obligation to ensure that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Moreover, whether there is evidence sufficient for a reasonable jury to find in favor of the complaining party as to a particular claim is determined after discovery, pursuant to a Rule 56 motion for summary judgment.

EXHIBIT __25__
PAGE __385__

## III.  EX PARTE APPLICATION TO STAY PENDING APPEAL

The standard for granting a stay pending appeal is similar to that for a preliminary injunction. Lopez v. Heckler, 713 F.2d 1432, 1435 (9th Cir.1983). Thus, a party seeking a stay must show either (1) a likelihood of success on the merits of its appeal and the possibility of irreparable harm, or (2) that serious questions regarding the merits exist and the balance of hardships tips sharply in its favor. See Lands Council v. McNair, 494 F.3d 771, 775 (9th Cir. 2007) (noting that the alternative tests "are extremes of a single continuum in which the greater the relative hardship to the party seeking the [stay], the less probability of success must be shown.").

As the Court explained on the record, there is the potential for harm, possibly irreparable harm, to both sides, but that balance favors Mattel, for the reasons set forth in its opposition brief. See Opp. at 16-18.  For reasons set forth at length in the Court's orders that are purportedly implicated by the appeal, see Notice of Appeal at 1-2 & Exs. A-R (docket #5340), the Court does not find a likelihood of success on the merits of its appeal.

Accordingly, the Court **DENIES** the MGA parties' Ex Parte Application and Motion to Stay.

The Court understands from the report of the Temporary Receiver that its previous Orders regarding a partial stay of enforcement of the Court's December 3, 2008, need clarification, as does the issue of the scope of the profits that are subject to the constructive trust imposed by the Court on December 3, 2008.[6]  Accordingly, to assist the newly appointed Monitor, see infra, the Court provides the following guidance regarding its rulings and sets a briefing schedule as detailed below:

(1) **Older Inventory**:  The MGA parties and others in the distribution chain may sell all 2009 Bratz products up through and including January 21, 2010.  The older inventory of Bratz products may likewise be sold, unless the Monitor determines that those sales tend to, in his reasoned judgment, diminish the value of the Bratz brand, in which case he should so report to the Court in an expeditious manner.

(2) **Profits**:  The Court's Permanent Injunction Order found that all the female fashion dolls that use the "core Bratz fashion doll production sculpt" or the "Bratz movie sculpt" were subject to the injunction; the Courts' Constructive Trust imposed a constructive trust over, inter alia, "all trademarks, service marks and domain names[,] . . . that include the terms 'Bratz' or 'Jade.'"  In order to provide meaningful guidance to the parties, the Monitor, and their accountants, the parties may brief, and the Court will resolve, the issue of the scope of the profits that must be turned over by MGA and held by the Monitor pursuant to these Orders and any other Order of this Court. The parties' simultaneous opening briefs (not to exceed 25 pages) shall be filed no later than

---

[6] This is largely due to the fact that, in issuing its December 3, 2008, order providing injunctive relief, the Court did not foresee that it would be subsequently modified by the January 7, 2009, Order staying enforcement pending sale of the 2009 Bratz line.

MINUTES FORM 90
CIVIL -- GEN

7

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT __25__
PAGE __386__

Wednesday, May 27, 2009; simultaneous responsive briefs (not to exceed 25 pages) shall be filed no later than Friday, May 29, 2009, at which time the Court will take the matter under submission and issue an order as expeditiously as possible.

## IV. EX PARTE APPLICATION RE DISCLOSURE OF
## 2009 PRODUCT LINE INFORMATION (DOCKET #5425)

In light of the Court's denial of the Ex Parte Application for Stay Pending Appeal, the ex parte application seeking production of the 2009 Bratz line and the new MGA products is moot, and it is **DENIED** for that reason. Nevertheless, because it is in the interest of all parties to expeditiously resolve outstanding issues regarding MGA's new "Moxie" line of dolls, counsel for Mattel and the MGA parties are directed to meet and confer in an expeditious manner regarding those dolls.

## V. ORDER RE EXPIRATION OF TEMPORARY RECEIVERSHIP
## AND ORDER APPOINTING MGA MONITOR

The Court previously issued, on April 27, 2009, an Order to Show Cause re Appointment of Permanent Receiver. In response, the Temporary Receiver, the parties and the Court-appointed Forensic Auditor have filed, and the Court has reviewed, the following documents: (1) The Report and Recommendations of Patrick A. Fraioli, Jr., Temporary Receiver; (2) the Responsive Report of Court-appointed Forensic Auditor Ronald Durkin; and (3) all documents filed in support of the Appointment of a Permanent Receiver and in opposition thereto, including the Statement of Position filed by Omni 808. In consideration of these filings, and after hearing on these matters, as detailed in the following subsections, the Court declines to appoint a Permanent Receiver, confirms the expiration of the temporary receivership, orders the filing of an accounting of the temporary receivership, and appoints an MGA Monitor to effectuate the Court's prior Orders.

### A.  Expiration of Temporary Receivership

IT IS ORDERED THAT:

1.    The period of the Temporary Receivership imposed by this Court on April 27, 2009 has expired;

2.    The Court declines to appoint a Permanent Receiver over MGA Entertainment, Inc. or MGA Hong Kong ("MGA");

3.    The Court reserves jurisdiction to appoint a Receiver in the future, as it deems appropriate;

4.    The Temporary Receiver, Patrick A. Fraioli, Jr., is hereby directed to prepare and file with the Court a final report including a final accounting and application for fees and

8

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT __25
PAGE __387

costs, on or before May 28, 2009;

5.  The Court hereby lifts the Injunction against Omni 808's enforcement of its rights as a creditor against MGA, and **ORDERS** that should Omni 808 take any action to enforce its rights as a creditor against MGA, such action shall be filed and heard in the Central District of California;

6.  Based on MGA's representations to the Court that, should MGA file for bankruptcy protection under Title 11 of the United States Code, it shall do so in the Central District of California, and having previously found in its April 27, 2009, Order appointing a Temporary Receiver that MGA is domiciled in California and have their principal place of business in the Central District of California and have the majority of their assets located within the Central District of California, the Court hereby lifts the Injunction against MGA filing bankruptcy without permission of the Court, but **ORDERS** that any bankruptcy filing by MGA or any of its affiliates shall be filed in the Central District of California.

**B.   Appointment of MGA Monitor**

1.  For good cause shown, pursuant to the alternative recommendation of the MGA parties, and in lieu of appointing a Permanent Receiver at this time, the Court appoints Patrick A. Fraioli, Jr., Monitor, who shall have the power to take any and all action that he deems necessary, appropriate, or advisable to effectuate the purposes of the Monitorship, including but not limited to the following:

   a.   The Monitor shall maintain monitoring, supervisory, and oversight responsibilities over the Bratz Assets;[6]

---

[6]  In light of the issue regarding the scope of profits that must be accounted for, see supra section III, and because the amount of access that must be given to the Monitor almost certainly extends beyond the materials that must be turned over to Mattel and may, depending on the resolution of the issue identified above, extend beyond the products for which profits must be held in constructive trust as a result of the Court's December 3, 2008, Orders, setting forth a workable definition of "Bratz Assets" that applies in all instances is challenging. Nonetheless, the Court so defines that term at this time in order to provide to the Monitor and the parties meaningful guidance on the issue of Monitor access to facilities and information. The Court admonishes all counsel that this definition should not be taken out of its current context and may very well be further modified, for purposes of both turn-over and the constructive trust, following resolution of the issue identified above.

  Bratz Assets include all tangible or intangible assets, including, without limitation, all intellectual property necessary or materially useful for the design, manufacture, marketing, distribution and sale of any Bratz doll or other Bratz-branded product in the possession, custody or control (whether or not claimed to be encumbered by any security interest) of any of the MGA Defendants. The Bratz Assets include, without limitation:

  a. All Bratz-related intellectual property rights, including, without limitation, copyrights (whether or not registered); copyright registrations; moral rights; design rights; patents (issued and pending); service marks; trademarks; tradedress; designs; slogans; characters; product packaging in any medium; product names; product

MINUTES FORM 90
CIVIL -- GEN

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT __25__
PAGE __388__

    b.    The Monitor shall monitor, supervise, and oversee the exploitation of the Bratz Assets;

    c.    The Monitor shall have the power and authority to monitor the financial affairs and operations[7] of MGA Entertainment, Inc. and MGA Hong Kong (collectively, "MGA") as the Monitor deems appropriate in order to carry out the duties specified herein;

    d.    The Monitor shall monitor compliance by the parties with this Court's Injunction and other Orders as directed by the Court, specifically this Court's December 3, 2008, Order Granting Mattel, Inc.'s Motion for Permanent Injunction, January 7, 2009, Order re Modification and Stay of Permanent Injunction Order, and April 27, 2009, Omnibus Order (the "Injunction Orders");

---

illustrations; product designs; product concepts; conceptual drawings; engineering drawings; engineering specifications; processes; methods; trade secrets; know-how; product ideas; prototypes; line extensions; domain names; marketing and advertising materials; commercials; style guides; theme songs; soundtracks; scripts; screenplays; computer programming; digital and internet rights; video games; theatrical, television, video and DVD rights and masters; and rights in future technologies.

    b. All Bratz-related tooling for all past, current and future lines, including without limitation tools, tooling, in process tools, molds, sculptures, models, dies, and mock-ups, as well as other Bratz-related tangible items.

    c. All Bratz-related marketing and sales assets for all past, current and future lines, including, without limitation, consumer lists, marketing plans, account plans, focus group studies, marketing databases, and other consumer and marketing research.

    d. All Bratz-related records, including, without limitation, contracts, manufacturing records, inventory records and data, sales records and data, product testing data and records, vendor list and records, customer communications, and invoices and purchase orders.

    e. All Bratz-related contracts and agreements, including, without limitation, assignments, work-for-hire agreements and licensing agreements.

    f. All other Bratz-related rights, including, without limitation, distribution rights, licensing rights, exploitation rights, accounts receivable, and all choses in action relating to Bratz or the Bratz brand.

    g. All Bratz-related items referenced at Paragraph 3 and Paragraph 8 (at lines 15-19) of the Court's Order granting Mattel's Motion for Permanent Injunction (Docket No. 4443).

    h. "Bratz-related" as used in this definition, is a broad term, that applies to all products, property, and information that bears the "Bratz" trademark. It is expressly not limited to the Bratz female fashion dolls, and includes such products as the Bratz boy dolls, Baby Bratz, and Bratz Kidz.

    [7] Toward that end, the Monitor shall have full and complete access to all Bratz assets (wherever they may be found), all MGA business premises, all MGA facilities (including manufacturing and storage facilities), all real and personal MGA property (including computers), all MGA employees, all MGA information (including financial and operational information), and all MGA books and records.

MINUTES FORM 90
CIVIL -- GEN

                10

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT __25__
PAGE __389__

e.   At the appropriate time, the Monitor shall direct the MGA turnover to Mattel of any of the Bratz Assets subject to recall, impoundment, or destruction, as set forth in this Court's Injunction Orders of December 3, 2008, and as otherwise directed by the Court;

f.   The Monitor shall establish such bank accounts as the Monitor deems necessary or convenient to carry out the Monitor's duties under this Order;

g.   The Monitor shall collect from MGA, on a monthly basis, the amount of net profits derived by MGA from exploitation of the Bratz Assets during the preceding month, as well as an accounting setting forth the basis for the calculation of the net profits and the supporting documentation establishing such basis.  The Monitor shall retain these funds pending further order of this Court;[8]

h.   The Monitor is ordered and directed to obtain from MGA, and to make available to Mattel, as set forth herein, such of the Bratz Assets, and related information about the content of the Fall, 2009 Bratz line being produced and sold by MGA pursuant to this Court's Injunction Orders, as are necessary to enable Mattel to begin preparation of its own Bratz line for the Spring, 2010 sales season;

I.   The Monitor shall monitor, supervise and oversee, with authority to approve or disapprove, the following categories of financial transactions of MGA: Inter-company transfers of any amount, payments by MGA or any MGA affiliate to any related parties in excess of $50,000.00 per payment, and any payments to Omni 808;

j.   The Monitor shall file monthly reports with the Court, under seal (but served on all parties), setting forth the Monitor's activities, actions and recommendations. Nothing herein shall prevent the Monitor from filing other reports, as he deems appropriate.  As in the case of the Court-appointed Settlement Officer and Discovery Master (and as previously with the Court-appointed Temporary Receiver), the Monitor may report orally to Court concerning matters of procedure; however, any substantive inquiries or reports shall be submitted in the first instance to the Court in writing.  The Court shall determine, whether and, if so, with what restrictions, the Monitor's reports shall be served on parties and their counsel;

---

[8] The Court recognizes that resolution of the issue identified in section III, _supra_, will greatly impact on the amount of profits that must be turned over by MGA (see _infra_ ¶ 2) and retained by the Monitor; accordingly, it is the Court's intention to resolve the issue as expeditiously as possible and, in any event, prior to the first turnover of profits on June 22, 2009.

MINUTES FORM 90
CIVIL – GEN                                      11

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT _25_
PAGE _390_

k.   The Monitor may retain and/or engage the services of advisors and/or professionals, including, without limitation, accountants, attorneys, consultants and experts to assist the Monitor in carrying out his duties and responsibilities under this Order. The Monitor, without further order of this Court, is authorized to employ Ervin, Cohen & Jessup LLP, and the accounting firm of Crowe Horwath LLP, to assist him in his duties. Nothing herein shall prevent the Monitor from utilizing the same advisors and professionals as rendered services to the Temporary Receiver before the appointment of the Monitor;

l.   The Monitor may hire and employ individuals and entities as necessary or advisable to carry out the Monitor's duties under this Order;

m.   The Monitor, his employees and agents, as well as any and all of the professionals employed by the Monitor, are entitled to compensation for services rendered at their normal hourly rates and reimbursement for all expenses incurred by them in providing services to the Monitor. The Monitor shall submit to the Court, *in camera*, monthly requests for approval of payment. Upon Court approval, the Monitor shall serve on the Parties, but not file, Notice of Court Approval of Request for Payment of Interim Fees and Costs of Monitorship, along with a summary statement of the fees and costs;

n.   The Monitor shall have the status of an officer and agent of this Court, and as such shall be vested with the same immunities as enjoyed by this Court. Neither the Monitor nor any person or entity acting at the direction of the Court or pursuant to agreements with the Monitor (whether employees, vendors, contractors or otherwise) may be held liable to any party for any acts taken in good faith in compliance with this Order, including but not limited to claims of alleged copyright infringement, trademark infringement, or other alleged causes of action;

o.   Nothing herein shall alter or affect the right of Mattel to take any and all actions relating to the Bratz Assets or the Bratz brand which it otherwise lawfully could take, including, without limitation, the institution, maintenance and prosecution of legal proceedings anywhere in the world or other proceedings before any governmental or tribunal or arbitration panel;

p.   The Court shall retain jurisdiction over the Monitorship for the duration of its existence.

q.   No bond shall be required in connection with the appointment of the Monitor. Except for acts of gross negligence, the Monitor and his agents and employees shall not be liable for loss or damage incurred by any party to this action or their officers, agents, servants, employees, attorneys or others by virtue of any act performed or omitted to be performed by the Monitor in connection with the discharge of his duties and responsibilities.

EXHIBIT __25__
PAGE ___391___

2.   Unless otherwise directed by the Court, MGA is **ORDERED** to turn over to the
Monitor, on a monthly basis, the amount of net profits derived by MGA from
exploitation of the Bratz Assets during that month, as well as an accounting setting
forth the basis for the calculation of the net profits and the supporting documentation
establishing such basis. The Monitor and his accountants shall review the
accountings, and any related submissions of the Court or Monitor by Mattel, and shall
report and recommend to the Court on any disputes arising therefrom.
MGA shall make its first turnover and accounting by June 22, 2009, which shall cover
the period from the return of the jury verdict in this case through May 31, 2009, and
this shall constitute compliance with section V of the Court's April 27, 2009, Order.
Each month thereafter, the turnover and accounting shall be made by the 10th day of
the month, for the prior month period.

3.   MGA shall immediately make available to the Monitor, for transfer to Mattel, such
portion of the Bratz Assets necessary to enable Mattel to begin preparation of its own
Bratz line for the Spring, 2010 sales season.  MGA shall also provide to the Monitor
for delivery to Mattel such related information about the content of the Fall, 2009,
Bratz line being produced and sold by MGA pursuant to this Court's Injunction Orders
to enable Mattel to make appropriate commercial determinations about the content of
its own Spring, 2010, Bratz line.

4.   No action may be filed against the Monitor, or any of his agents or employees, for
any actions taken in this case, without prior permission of this Court.

5.   For the duration of Monitorship, Mattel is directed to pay to the Monitor, in the
manner directed by the Monitor, the fees and costs of the Monitorship within five (5)
days of receipt of the Notice of Court Approval of Request for Payment of Interim
Fees and Costs of Monitorship. All interim fees paid shall be subject to final review
and approval by this Court.  This Court retains jurisdiction to award a greater or
lesser amount as the full, fair, and final value of such services.

6.   Any party may later apply to the Court for relief related to any profit calculations or
profits turned over to the Monitor, or for relief related to the allocation of payment of
the fees and costs of the Monitorship, as well as for the previously imposed
Temporary Receivership.

7.   All Parties and their employees, agents and attorneys are ordered to cooperate fully
with the Monitor.

## VI.  IMPOSING LIMITED AND TEMPORARY STAY OF PHASE 2

At the May 18, 2009, hearing, the Court heard from the Court-appointed Settlement Officer,
who advised the Court that a settlement conference was scheduled for June 1, 2009.  The
Settlement Officer believes that settlement negotiations continue to be of value, and has
recommended that the Court consider the judicial officer's participation in those settlement

MINUTES FORM 90
CIVIL -- GEN                                    13                    Initials of Deputy Clerk __cls_____
                                                                     Time: 03/02

EXHIBIT _25_
PAGE _392_

negotiations -- a proposal to which no party offered objection.

The Court heard from the parties regarding whether a stay of Phase 2 discovery should be imposed to assist in settlement efforts. Counsel for MGA advocated for a four-month stay. Counsel for Mattel cautioned against a stay, outlining for the Court the various positions taken by the MGA parties as to how the Court's previous stay limited or altered their responsibility to comply with previously set deadlines.

Mindful of the concerns expressed by Mattel, the Court nevertheless imposes a stay of Phase 2 discovery that is strictly limited in scope and duration. The parties shall, notwithstanding the stay, meet and confer regarding the Moxie issue set forth in section IV. Moreover, notwithstanding any other provision of this Order, the MGA parties are not relieved of their responsibility to produce, on or before the currently imposed deadline, their responses the Interrogatories to which counsel for Mattel referred during the hearing.

The stay of discovery, as limited, is imposed up to and including June 12, 2009. Unless otherwise extended by the Court or the Discovery Master, the deadlines for all discovery responses that have previously been ordered are extended for a period, measured by calendar days, not longer than the total number of calendar days the stay of discovery is imposed. For purposes of this date calculation, both the beginning date of the stay (May 18, 2009) and the ending date (June 12, 2009) are to be included. Similarly, the deadline for responding to discovery requests that have been propounded, but to which responses are not yet due, is extended for the same period of calendar days. If depositions are scheduled during this time period, they must be rescheduled for a date certain no later than the currently scheduled date plus the number of calendar days for which the stay of discovery is imposed.

The Court further **ORDERS** the parties to participate in a Mandatory Settlement Conference ("MSC") on or about June 1, 2009 (to be coordinated by the Court-appointed Settlement Officer). Those attending the MSC shall include the chief executive officers or equivalent of Mattel, MGA, and Omni 808; the chief financial officers or equivalent of Mattel, MGA, and Omni 808; in-house counsel of Mattel and MGA; and lead counsel of record for each party. Following the MSC, the Settlement Officer shall report to the Court on the status of settlement efforts. If the parties fail to reach a full and complete settlement, the Court shall, pursuant to the parties' agreement and waiver of any conflict issues, conduct a settlement conference beginning on June 10, 2009, at 10:00 am.

## VII. NOTICE OF INTENT TO UNSEAL FORENSIC AUDITOR REPORTS

In light of Omni 808's emphatic public criticism of the Court-ordered Forensic Auditor's April 23, 2009, Report, the contents of which were expressly ordered by this Court to be maintained by the parties under seal, and the contents of which, to the Court's knowledge, were in fact maintained under seal until the filing of The Statement of Position of Omni 808 Investors, LLC, filed on May 14, 2009, it is the Court's intention to release the April 23, 2009, Summary Report (together with its Exhibits that have been redacted for privilege), absent sustained objections

MINUTES FORM 90
CIVIL -- GEN

14

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT __25__
PAGE __393__

thereto by the MGA parties.[9]

At this time, the Court **ORDERS** that the May 17, 2009, Responsive Forensic Auditor Report, maintained by the Court until this time *in camera* be released under seal to the parties.[10] The May 17, 2009, Responsive Report shall, pending resolution of any objections to its disclosure by the MGA parties, remain under seal, and distribution shall be limited to parties, their attorneys (whether or not the attorneys are of record), any Court-appointed officers, and, as necessary, the parties', attorneys', and officers' staff.

Within five days of the entry of this Order, the MGA parties, including Mr. Larian, may file, under seal, specific and supported objections to the release of the Summary Report or the Responsive Report. In the same frame and manner, any party may object to the release of specific identifying information contained in the exhibits of the report than have the tendency to reveal personal identifying information such as social security numbers, tax identification numbers, or bank account numbers. Within two days, any party may respond to these objections. No hearing will be held unless the Court orders otherwise.

**IT IS SO ORDERED.**

---

[9] Despite an express Order of this Court to maintain the Summary Report and its exhibits under seal, counsel for Omni 808 revealed the Report's contents in Omni 808's Statement of Position. Similarly, counsel for Mattel also revealed certain contents of the Receiver's Report and Recommendation regarding MGAE's liquidity and solvency, also released under seal. All counsel are reminded of their responsibilities to maintain information under seal. Unless otherwise ordered, the Court's hearings are open to the public. The Court does not close hearings unless and until requested to do so by one or more of the parties, and only then does so when and to the extent that such closure is justified when counterbalanced with important First Amendment concerns.

[10] Sua sponte, the Court has already redacted certain portions of the Forensic Auditor's Responsive Report on the basis that the emails reflect highly personal electronic conversations between Mr. Larian, Mr. Kadisha, and their spouses.

MINUTES FORM 90
CIVIL -- GEN                                 15

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT __25__
PAGE __394__

# EXHIBIT 26

1

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                  EASTERN DIVISION

4                     - - -

5       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                     - - -

7    MATTEL, INC.,                    )
                                      )
8                      Plaintiff,     )
                                      )
9            vs.                      )   No. CV 04-09049
                                      )
10   MGA ENTERTAINMENT, INC., ET. Al.,)
                                      )
11                     Defendants.    )   MOTIONS
     _____)
12   AND CONSOLIDATED ACTIONS,        )
     _____)
13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17             MONDAY, MAY 18, 2009

18                 1:52 P.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
              Federal Official Court Reporter
24              3470 12th Street, Rm. 134
              Riverside, California  92501
25                 951-274-0844
                www.theresalanza.com

EXHIBIT 26
PAGE 395

Monday, May 18, 2009                    Mattel vs. MGA, et. Al.

2

```
 1   APPEARANCES:

 2
     On behalf of Mattel, Inc.:
 3
                         QUINN EMANUEL
 4                       By:  JOHN QUINN
                              MICHAEL T. ZELLER
 5                            DYLAN PROCTOR
                              SCOTT B. KIDMAN
 6                       865 S. FIGUEROA STREET,
                         10th Floor
 7                       Los Angeles, California  90017
                         213-624-7707
 8
                         KLEE, TUCHIN, BOGDANOFF & STERN LLP
 9                       BY:  DAVID M. STERN
                         1999 Avenue of the Stars
10                       Thirty-Ninth Floor
                         Los Angeles, CA  90067
11                       310-407-4025

12

13   On Behalf of MGA Entertainment/Isaac Larian:

14                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         BY:  THOMAS J. NOLAN
15                            JASON RUSSELL
                              CARL ROTH
16                       300 South Grand Avenue
                         Los Angeles, California  90071-3144
17                       213-687-5000

18                       GLASER, WEIL, FINK, JACOBS
                          HOWARD & SHAPIRO, LLP
19                       BY:  PATRICIA GLASER
                         BY:  JOEL N. KLEVENS
20                       10250 Constellation Blvd.
                         Los Angeles, CA  90067
21                       310-553-3000

22                       MITCHELL SILBERBERG & KNUPP LLP
                         BY:  RUSSELL J. FRACKMAN
23                       11377 West Olympic Blvd.
                         Los Angeles, CA  90064-1683
24                       310-312-2000

25   /  /  /
     /  /  /
```

EXHIBIT _76_
PAGE _396_

Monday, May 18, 2009                    Mattel vs. MGA, et. Al.

3

```
 1 │ APPEARANCES (cont'd):
   │
 2 │
   │ On Behalf of MGA Entertainment/Isaac Larian:
 3 │
   │                    PACHULSKI STANG ZIEHL & JONES
 4 │                    BY:  JAMES I. STANG
   │                    BY:  RICHARD PACHULSKI
 5 │                    10100 Santa Monica Blvd.,
   │                    11th Floor
 6 │                    Los Angeles, CA  90067-4100
   │                    310-277-6910
 7 │
   │
 8 │ On Behalf of Isaac Larian:
   │
 9 │                    JEFFER MANGELS BUTLER & MARMARO LLP
   │                    BY:   JOSEPH A. EISENBERG
10 │                    1900 Avenue of the Stars
   │                    7th Floor
11 │                    Los Angeles, CA  90067-4308
   │                    310-203-8080
12 │
   │
13 │ On Behalf of Defendants Omni 808:
   │
14 │                    BINGHAM McCUTCHEN LLP
   │                    BY:   TODD E. GORDINIER
15 │                    BY:   PETER N. VILLAR
   │                    600 Anton Boulevard,
16 │                    18th Floor
   │                    Costa Mesa, CA  92626-1924
17 │                    714-830-0622
   │
18 │
   │ On Behalf of Crum & Forster:
19 │
   │                    MUSICK, PEELER & GARRETT LLP
20 │                    BY:   JENNIFER M. KOKES
   │                    One Wilshire Boulevard
21 │                    Los Angeles, CA  90017
   │                    213-629-7618
22 │
   │
23 │ ALSO PRESENT:       Patrick A. Fraioli, Jr.,
   │                    Ambassador Pierre Prosper
24 │                    Robert O'Bryan
   │                    Michael J. Bidart
25 │
```

EXHIBIT _24_
PAGE _397_

Monday, May 18, 2009                    Mattel vs. MGA, et. Al.

```
 1              When you look at -- not the general powers --

 2              THE COURT:  But you can see that it's mixed.  There

 3    are certainly divergent opinions with respect to the timing

 4    issue.

 5              MR. KIDMAN:  There are cases that suggest that even      02:08

 6    for purposes of taking the deposition, you look at

 7    responsibilities at the time of the deposition.

 8              Even if you apply that law, Your Honor, there's no

 9    dispute that these individuals are responsible for, in

10    Mr. Vargas's case, sales, in Ms. Trueba's case, media and        02:08

11    public relations, now.  Not four years ago, not five years ago.

12    Now.  So the timing issue is not really dispositive with

13    respect to that factor:  Do they exercise responsibility for

14    areas that are relevant to the issues in this lawsuit?

15              The answer is yes, and the answer is yes currently.     02:08

16              As far as the alignment --

17              THE COURT:  But their positions have changed.

18              MR. KIDMAN:  I haven't seen any evidence of that,

19    Your Honor.  There's lots of discussion in the papers and

20    accusations and characterizations of these people being          02:09

21    mid-level employees.  There's been no evidence presented that

22    their position has changed from their position four years ago

23    or five years ago.

24              THE COURT:  You said yourself they were demoted.

25              MR. KIDMAN:  No, no, no.  I was referring to one of     02:09
```

EXHIBIT _26_
PAGE _398_

1    the cases we cited, the <u>Dubai Islamic Bank</u> case, where the

2    employees there, like the employees here, were accused of being

3    part of the misconduct that was at issue in the lawsuit. And

4    they were demoted. They continued to be employed, and their

5    interests were found to still be aligned with the corporation.        02:09

6            **THE COURT:** But what's not clear to the Court,

7    though, is exactly what role they play at present.

8            **MR. KIDMAN:** Well, I think what the record shows is,

9    Mr. Vargas is still responsible for sales and Ms. Trueba is

10   still responsible for marketing and public relations. But          02:09

11   there's been no evidence that their positions have changed,

12   other than characterizations of these people as being mid-level

13   employees by mere virtue of the fact that they happen to report

14   to somebody else. As we submit, that's true of everyone but

15   the CEO.                                                             02:10

16           On the alignment of interests issue, Mr. Klevens

17   referred to the fact that these individuals are represented by

18   separate counsel in Mexico. We've been attempting to get --

19   and I believe there's court orders requiring them to produce

20   information as to who's paying those legal fees. That               02:10

21   information hasn't been produced, despite court orders.

22           We think we know what the information will show. But

23   the point being, they have not been deposed. They have not

24   asserted the Fifth Amendment. Speculation about what they

25   might do in the future, whether MGA may toss these people aside     02:10

EXHIBIT __26__

PAGE __399__

1    in the future and distance themselves, whether the witnesses

2    may choose to distance themselves, is not relevant for the

3    purposes of the inquiry today:  Are their interests aligned?

4    Their continued employment is sufficient on that point.

5            As I've mentioned, the law is clear that the                    02:11

6    burden -- and Mr. Klevens talked about burden -- the burden is

7    a modest one for purposes of getting the deposition, which is a

8    different issue than under Rule 32, whether that testimony will

9    ultimately bind.

10            **THE COURT:**  I understand.                                   02:11

11            Very well.  Thank you, Counsel.

12            The Court next wants to take up the motion -- again,

13    this is Mattel's motion -- for leave to file a third amended

14    answer and counterclaim.

15            I'm going to start with the defense on this.                    02:11

16            The Court is tentatively of the mind, based on the

17    papers, that leave should be freely given in this case for the

18    amendment.  The Court, probably on its own oversight, although

19    nobody else raised it at the time of the scheduling conference

20    on this phase of the litigation, did not set a cutoff for          02:11

21    amending or adding parties.  We probably should have set a

22    cutoff, but looking back at the scheduling conference order, we

23    didn't.  So it would seem that the Rule 15 standard applies.

24            The defense does a very good job of explaining how

25    unquestionably the addition of the claims, the parties, and        02:12

EXHIBIT __ 26 __

PAGE __ 400 __

20

```
 1   then, arguably, the necessary parties that would have to flow

 2   from that would exceedingly complicate an already exceedingly

 3   complicated case.

 4           I don't know if that's really relevant to the issue

 5   of whether or not amendments should be afforded.  It's a         02:12

 6   complicated case to begin with.  It will be more complicated.

 7   As much as I might like there to be, there's not a cutoff in

 8   terms of complication, where I could just say, 'This is too

 9   much; we're stopping here.'

10           So that's kind of where I am right now, Ms. Glaser.      02:12

11           I'm going to give you the first opportunity to

12   respond, given my tentative thoughts.

13           MS. GLASER:  Your Honor -- and I don't want to be

14   glib, because obviously, these are serious allegations being

15   made, which we believe 95 percent of them have no basis in fact  02:13

16   or law.

17           But, Your Honor, under your theory, if Mr. Larian

18   runs a stop sign out here in front of the courthouse tomorrow,

19   can we amend the complaint and include that as well, simply

20   because we have a Rule 15 and that rules -- the Court wishes      02:13

21   to --

22           THE COURT:  Well, no.  The Court doesn't have

23   jurisdiction over a stop sign out in front of the courthouse.

24           MS. GLASER:  My point is this -- and, again, let's

25   start with the RICO -- the predicate acts.                       02:13
```

EXHIBIT __96__
PAGE __401__

Monday, May 18, 2009                    Mattel vs. MGA, et. Al.

21

1          **THE COURT:**  The Court does have jurisdiction over

2   RICO.

3          **MS. GLASER:**  Thank you, Your Honor.

4          Under the rubric of a fraudulent conveyance, we have

5   a whole new theory, a whole new theory.  There is no legitimate   02:13

6   reason to add these claims to the lawsuit.  This is a separate

7   and distinct counterclaim, with 17 new individuals.  And to

8   blindly come in and tell Your Honor, in a reply brief, 'not to

9   worry, it's all alter ego anyway, so what's the problem,' is

10  offensive to everybody in this courtroom.  That is not the       02:14

11  appropriate standard.  And that is not the law.  And it's

12  certainly not the truth.

13         Again, each one of these people are entities; they

14  have to be served.  A number of them, presumably -- I don't

15  know that for a fact -- are going to object to jurisdiction.     02:14

16  There are alter-ego issues, by Mattel's own description.  At

17  least ten different entities are going to have to be litigated.

18  The 2008 financial transactions have no relationship whatsoever

19  to Mattel's other claims of predicate acts and RICO, et cetera.

20  There are no damages yet.  There is a contingent final           02:15

21  judgment, and there's an appeal.

22         It is no surprise to Your Honor that MGA doesn't

23  agree with the verdict, and we'll be appealing.

24         **THE COURT:**  I understand.

25         **MS. GLASER:**  That's contingent.   EXHIBIT __2u__   02:15

                                              PAGE  402

```
 1          Our view -- and I don't say this lightly; I'm
 2    certainly not addressing this to the Court -- we think the
 3    purpose of this, quote, big new conspiracy, this big new RICO,
 4    is to throw around foreign-sounding names and character
 5    assassinations when there is no basis, in fact, for this.     02:15
 6          You're going to hear from Omni's counsel.  Before we
 7    even get -- I've given you eight reasons; I've tried to give
 8    you eight reasons -- before you even get to the merits of the
 9    claim -- Omni's counsel is going to address that part of it --
10    but these, Your Honor, if I'm understanding the claims being   02:15
11    made in, I guess, new proposed Paragraph 136, there is no
12    basis, in fact, for the Omni claims.  And Omni will address
13    that separately.
14          With respect to the IGWT, the buying back of
15    merchandise, that's been addressed.  There's no nefarious thing 02:16
16    going on here.  Our papers address that.  We haven't heard
17    anything on the merits that would justify expanding the case
18    geometrically.
19          THE COURT:  But is this the time to address that,
20    Counsel?  I understand in the context of the receivership       02:16
21    issue -- and the Court certainly wants to take up those
22    allegations -- but putting that aside, in terms of where we
23    are, applying the standard -- and you haven't addressed the
24    standard, and I really wish you would, because I do want to
25    make sure that I'm correct in that.                             02:16
```

EXHIBIT __26__

PAGE __403__

125

1    **MS. GLASER:**  And we haven't had the benefit of that.

2    I think if we're paying -- at least temporarily, we at least

3    ought to see --

4         **THE COURT:**  Part of what will occur at this point is

5    a complete accounting of all money spent during the 20-day          05:05

6    temporary receivership.  You will be receiving that shortly

7    from Mr. Fraioli, which will account for all of the money

8    spent.  And on a going-forward basis, the Court will specify

9    how future payments are to be made.

10        And as I indicated before, at the end of the day,               05:05

11   everyone will have the opportunity to revisit the issue of cost

12   sharing.

13        **MS. GLASER:**  Thank you very much.

14        **THE COURT:**  Is there anything further?

15        **MR. QUINN:**  No, Your Honor.                                 05:06

16        **THE COURT:**  Have a good evening.

17        (Court is adjourned.)

18                    CERTIFICATE

19

20   I hereby certify that pursuant to section 753, title 28, United
     States Code, the foregoing is a true and correct transcript of
21   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
22   conformance with the regulations of the Judicial Conference of
     the United States.

23

24   _____            _May 29, 2009_
     THERESA A. LANZA, CSR, RPR                  / Date
25   Federal Official Court Reporter

Monday, May 18, 2009                    Mattel vs. MGA, et. Al.

EXHIBIT _26_
PAGE _404_

# EXHIBIT 27

Westlaw.

**NewsRoom**

12/23/06 ABCNIGHTLINE (No Page)

Page 1

12/23/06 ABC Nightline (Pg. Unavail. Online)
2006 WLNR 22434503

ABC Nightline
Copyright 2006 American Broadcasting Company

December 23, 2006

NIGHTLINE

[SHOW: ABC Nightline] [AIRDATE: 12/22/06] [AIRTIME: 23:35] [ANCHOR: MARTIN BASHIR]
[ANCHOR LOCATION: NEW YORK, NY USA] [STORY: NIGHTLINE]

TOPIC:

CONTENT:

GRAPHICS: NIGHTLINE

GRAPHICS: BRAWL IN THE DOLLHOUSE

MARTIN BASHIR (ABC NEWS): Tonight on 'Nightline," brawl in the dollhouse.  After
almost 50 years of domination, Barbie is facing brash new competition from the
Bratz dolls.  Billions of dollars are on the line.  It's a toy story where nobody
is playing nice.

GRAPHICS: CHRISTMAS JOURNEY

MARTIN BASHIR (ABC NEWS): A Christmas journey.  Retracing the root historians say
Joseph and Mary would have taken from Nazareth to Bethlehem.  The dangers, the
difficulties, then and today.

GRAPHICS: FANTASY VS REALITY

MARTIN BASHIR (ABC NEWS): Fantasy versus reality.  It seems like the perfect gift
for a romantic holiday season.  So why do so many of us get it wrong?  Tonight, we
take you inside one store that thinks it has the answer.

MATT NEELY (STOCKING FELLA): The 34B should look good.

ANNOUNCER: From the global resources of ABC News, with Terry Moran in Washington,
Martin Bashir and Cynthia McFadden in New York City, this is 'Nightline," December
22nd, 2006.

GRAPHICS: NIGHTLINE: DECEMBER 22, 2006

REPORTER: JOHN BERMAN
REPORTER LOCATION: LOS ANGELES, CA USA

TOPIC:

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 27
PAGE 405

M 0062148

12/23/06 ABCNIGHTLINE (No Page)                                    Page 2

CONTENT: BARBIE, BRATZ, MATTEL, MICRO GAMES OF AMERICA, CHUCK SCOTHON

MARTIN BASHIR (ABC NEWS): (Off-camera)  Good evening.  Many of us have spent at least part of today rushing around the shops looking for that perfect Christmas present particularly for our children.  Toys are now big business.  Almost $11 billion will be spent on them during the holiday season alone.  And nowhere is the business more competitive than in the world of dolls.  Yes.  Barbie has long been the biggest-selling toy doll of all, but now there's a serious challenger.  And in the fight to be number one nobody's backing down.  Here's ABC's John Berman.

JOHN BERMAN (ABC NEWS): (Voiceover)  In this corner, measuring nine inches tall with big eyes and even bigger bling, the challenger, Bratz.  And in this corner, with flowing blond hair and impossibly disproportionate bust, a 47-year undisputed, undefeated champion from Mattel, Barbie.  Now you might think the world of dolls isn't the kind of place for a knock down, drag out brawl but you'd be wrong.

ISAAC LARIAN (CEO: Ken is not gonna save Barbie.  Barbie is not gonna save Barbie. And the leadership that they have at Mattel right now, it's not gonna save Barbie.

JOHN BERMAN (ABC NEWS): (Off-camera)  You sound like a linebacker on a football team.  You're like taunting Mattel.

ISAAC LARIAN (CEO: It's good.  It's good for the business.

JOHN BERMAN (ABC NEWS): (Off-camera)  It's good?  Trash talking in the doll business is good?

ISAAC LARIAN (CEO: I'm not trash talking.  I'm telling - I'm talking about the facts.

JOHN BERMAN (ABC NEWS): (Voiceover)  Meet Isaac Larian.  The seemingly nice man who wants to pummel Barbie.  He is the CEO of Micro Games of America, which makes the Bratz doll.  He might not strike you as the doll kind of guy.  He came to the US from Iran with nothing.

ISAAC LARIAN (CEO: I came here in 1971 with a one-way ticket and $750 in my pocket and a big American dream.  And I have lived the American dream.

JOHN BERMAN (ABC NEWS): (Voiceover)  Larian went from washing dishes to building a toy company to the American dream on steroids.  Largely due to this big-eyed, big-headed cartoonish doll.  When Larian first saw the Bratz design in 2001, he thought they looked like aliens.

JOHN BERMAN (ABC NEWS): (Off-camera)  Do you still they look like aliens?

ISAAC LARIAN (CEO: No.  I think now they look beautiful.  I've grown to like them.

JOHN BERMAN (ABC NEWS): (Voiceover)  Last year's $2 billion in sales can make many things beautiful.  Larian now says Bratz has a 40% market share and is the number two doll in the US market.  Number two for now.  Larian claims his Bratz girls are breathing down the lanky plastic neck of number one.  That would be Barbie.

JOHN BERMAN (ABC NEWS): (Off-camera)  What's wrong with Barbie?

ISAAC LARIAN (CEO: It's time for her to retire.  She's been around for too long.

JOHN BERMAN (ABC NEWS): (Voiceover)  And you want to help Barbie retire?

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __27__
PAGE __406__

M 0062149

ISAAC LARIAN (CEO: Yes, I would help her retire.  I would throw a party for her.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): He's welcome to throw a party for Barbie any time he wants, but it won't be a retirement party. She has been and will remain the number one fashion doll in the industry.

JOHN BERMAN (ABC NEWS): (Voiceover)  Meet Chuck Scothon.  A senior Mattel executive and former high school offensive lineman.  His product is the long-legged goliath of the toy business.  Since she was first created in 1959, Barbie has been an icon among icons with almost absurd success.  One study found that 90% of American girls between 3 and 10-years-old owns a Barbie doll.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): Now, we're traveling through the world of fairytopia.

JOHN BERMAN (ABC NEWS): (Voiceover)  Scothon doesn't like to talk about Bratz.  Let alone the fact that they might pose a challenge.

JOHN BERMAN (ABC NEWS): (Off-camera)  How was it, do you think, this become a story?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): I think a lot of people like to talk about the underdog and the leadership positions.  I think at the end of the day it's really about making more out of something than there really is.

JOHN BERMAN (ABC NEWS): (Voiceover)  But last year, Barbie might have started to show her age.  Sales dropped 13%, just as Bratz were getting white hot.

JOHN BERMAN (ABC NEWS): (Off-camera)  Is Barbie in danger?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): Not in the least. Barbie has been and will continue to be the number one fashion doll.

JOHN BERMAN (ABC NEWS): (Voiceover)  Barbie has rebounded a bit this year, but Isaac Larian is not impressed.  He says he has the key to cool.  A multicultural doll with the edgy sassy attitude girls want these days.

ISAAC LARIAN (CEO: The kids look at Bratz dolls and they think they are teenagers. And we ask them how old do you think Bratz dolls are?  They say they are teenagers. And when they look at Barbie doll they think it's old mom.

JOHN BERMAN (ABC NEWS): (Off-camera)  They think mom when they look at Barbie dolls?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): What I would suggest and say to that is, first of all if Barbie, for some girls, reminds them of their mothers, I would think of nothing better.  The most important job a woman can have in many ways is being a mom.

JOHN BERMAN (ABC NEWS): (Voiceover)  There is no mistaking a Bratz doll for a mom.

JOHN BERMAN (ABC NEWS): (Off-camera)  I look at that Bratz doll.  She's wearing, you know, the leopard skin top, she's got the sequins, she's got the hairs, I mean, you know, people have compared them to street walkers.  They look a little, you know, trashy.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __27__
PAGE __407__
M 0062150

ISAAC LARIAN (CEO: They don't look trashy to me. And this is - I think trashy is
in the eye of the adults. When we show these to the little girls, and we have done
that over and over, everybody said they're beautiful. They never say they look
like a streetwalker.

JOHN BERMAN (ABC NEWS): (Voiceover)  Barbie is clearly going for a different image.
What image, you ask?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): First and foremost,
I would say the Barbie doll is truly based on some great values for little girls.
The courage, inspiration, imaginative play.

JOHN BERMAN (ABC NEWS): (Voiceover)  Whatever that means exactly, Barbie is famous
for having careers like Doctor Barbie and Astronaut Barbie. The Bratz dolls?
Well, they like...

CARTOON VOICEOVER (GROUP): Shopping.

JOHN BERMAN (ABC NEWS): (Voiceover)  This is their motto.

ISAAC LARIAN (CEO: The girls with the passion for fashion.

JOHN BERMAN (ABC NEWS): (Off-camera)  The girls with the passion for fashion.

ISAAC LARIAN (CEO: Right.

JOHN BERMAN (ABC NEWS): (Off-camera)  What's that about?

ISAAC LARIAN (CEO: They have good fashion. It's okay to look good. It's okay, who
said that you have to, who said that girls don't have to look good?

JOHN BERMAN (ABC NEWS): (Off-camera)  And Barbie doesn't look good?  I could tell
you, there are a lot of people who think Barbie looks good.

ISAAC LARIAN (CEO: I don't know. The consumers who are buying Bratz doll don't
think Barbie is good.

JOHN BERMAN (ABC NEWS): (Voiceover)  If all this is true why hasn't Bratz yet
overtaken Barbie as number one? According to Larian...

ISAAC LARIAN (CEO: We would have beaten them up this year and year before if they
had not engaged in, what I call, really unfair competition.

JOHN BERMAN (ABC NEWS): (Off-camera)  Really unfair competition?  Those are
fighting words.

ISAAC LARIAN (CEO: They are fighting words.

JOHN BERMAN (ABC NEWS): (Voiceover)  The Barbie-Bratz battle has moved beyond the
Barbie dream house to the courthouse. Round one. Mattel filed a lawsuit alleging
that the designer of the Bratz concept came up with the idea when he was working at
Mattel. Round two, Isaac Larian sued back saying that Mattel tried to corner the
market on doll hair, and more seriously that Mattel ripped off the Bratz concept
for a new line of Barbie dolls. The MyScene dolls.

JOHN BERMAN (ABC NEWS): (Off-camera) This is, the MyScene Barbies are what has, to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __27__
PAGE __408__
M 0062151

some extent, they're in the center of a little bit of a controversy now because Bratz says these look just like their dolls.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): Okay.

JOHN BERMAN (ABC NEWS): (Off-camera)  I mean, don't you see the resemblance between MyScene Barbie and the Bratz doll?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): What we see is an evolution to the Barbie brand.  And again, the Barbie brand is made up of dolls that target girls of every age because it's really an evolution of where the Barbie doll has been with a little bit more animated look, but not necessarily something that's been inspired by the competition at all.

JOHN BERMAN (ABC NEWS): (Voiceover)  The cases are still pending, but both companies say they are confident they will win the legal battle, though they say it differently.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): I'm not really gonna talk about the legal piece of this.  I have all the confidence in the world that the justice system and that, that our attorneys can work through those issues.

ISAAC LARIAN (CEO: When we're done with Mattel, we will get them for billions of dollars, not only for this, but for defamation.

JOHN BERMAN (ABC NEWS): (Voiceover)  Who will prevail in this doll brawl?  It's one thing to be hot.  Bratz are hot, but another to be iconic.

ISAAC LARIAN (CEO: We're gonna become number one.  I promise you that.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): I can't speak to his guarantee.  What I can speak to is I believe that Barbie will continue to be the number fashion doll around the globe.

JOHN BERMAN (ABC NEWS): (Off-camera)  We're talking about dolls.  I mean, shouldn't everyone be able to play nice?

ISAAC LARIAN (CEO: They have gotten away too much with bullying everybody around. And somebody has to stand up to them.  I will.

JOHN BERMAN (ABC NEWS): (Off-camera)  So you're gonna fight them on the schoolyard?

ISAAC LARIAN (CEO: I'm gonna fight, I'm gonna, not in the school schoolyard.  I'm gonna fight them in the courthouse.

JOHN BERMAN (ABC NEWS): (Off-camera)  And with this thing?

ISAAC LARIAN (CEO: With this thing and many other things.  But all 100% the old American fashion way.

JOHN BERMAN (ABC NEWS): (Voiceover)  Merry Christmas.  I'm John Berman for 'Nightline" in Los Angeles.

MARTIN BASHIR (ABC NEWS): (Off-camera)  The doll wars in a store near you.

GRAPHICS: ROAD TO BETHLEHEM

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __27__
PAGE __409__

M 0062152

MARTIN BASHIR (ABC NEWS): (Voiceover)  And just ahead on 'Nightline," retracing the journey that has inspired millions for centuries.  In the footsteps of Joseph and Mary.

GRAPHICS: STOCKING FELLAS

MARTIN BASHIR (ABC NEWS): (Voiceover)  And stocking fellas.  One store's solution to the challenge of buying lingerie.  It's a 'Sign of the times."

ANNOUNCER: ABC News 'Nightline," brought to you by...

COMMERCIAL BREAK

REPORTER: WILF DINNICK
REPORTER LOCATION: NAZARETH, ISRAEL

TOPIC:

CONTENT: CHRISTMAS STORY, CHURCH OF NATIVITY, JESUS, MARY, JOSEPH, ISRAEL

MARTIN BASHIR (ABC NEWS): (Off-camera)  It's easy and commonplace to sentimentalize the Christmas story.  Mary and Joseph, traveling for days on a donkey from their home in Nazareth to Bethlehem.  Mary eventually giving birth to Jesus in a stable because there was no room for them at the inn.  It wasn't an easy journey back then, but imagine making the same trek today in 2006.  Here's ABC's Wilf Dinnick.

WILF DINNICK (ABC NEWS): (Voiceover)  A heavily pregnant woman, traveling across deserts, through ancient cities and river crossings.  The story of a trip inspiring Christians around the world.  The gospel according to Luke says it began in Nazareth, a city where it's believed an angel told Mary she would have a son named Jesus.

WILF DINNICK (ABC NEWS): (Off-camera)  Today, Nazareth is a city of about 70,000 people.  But back in Joseph and Mary's day, it was only a small village of about 1,000.  Now, to get to Bethlehem, it's actually only 65 miles, as the crow flies but Joseph and Mary, they had a complicated route.  We're gonna take the exact same route.  Well, they had a donkey.  We've got this car.

WILF DINNICK (ABC NEWS): (Voiceover)  The Bible does not have details of the journey.  But historians told us, Mary and Joseph probably did not take the direct way to Bethlehem because then, like today, the Middle East was a complicated, sometimes dangerous, place.  From Nazareth they headed east to the Jordan River to avoid hostile territory controlled by the Samaritans who hated Jews.  They crossed the river by foot by the ancient city of Bet She'an.  Then through the Jordan Valley, land that was controlled by Jewish kings, back into Israel, over the Jordan River again and through the ancient city of Jericho passed Jerusalem and then on to Bethlehem.  Steve Pfann sees similarities between today and 2,000 years ago.

STEPHEN PFANN (PRESIDENT: There is an interesting parallel that can be drawn with border crossings, and police at the border, soldiers at the border, questions of taxation and other types of things put more into a modern context.

WILF DINNICK (ABC NEWS): (Voiceover)  So, we drove from Nazareth to the Jordan River.  It was in shallow areas like this where Mary and Joseph simply walked across the river.

ISRAELI SECURITY PERSONNEL (MALE): But you don't understand.  Hey, I'm telling you,

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __27__
PAGE __410__

M 0062153

there is a problem.

WILF DINNICK (ABC NEWS): (Voiceover)  But today, crossing the Jordan is not so
simple.  We were greeted by Israeli security.

WILF DINNICK (ABC NEWS): (Off-camera)  The security here is so tight in fact that
they won't even let us shoot here, even though we have permission.  This is the
Jordan Valley and this as far as we can come here because this is now an
international border.

WILF DINNICK (ABC NEWS): (Voiceover)  So from here on in, it was hidden cameras
only.  Passport checks, departure tax and duty-free.

WILF DINNICK (ABC NEWS): (Off-camera)  And then we have to get on a bus to make the
very short trip from Israel to Jordan.  This is how you have to do it in 2006.

WILF DINNICK (ABC NEWS): (Voiceover)  I did manage to sneak a few shots as we
crossed the Jordan River.  On the other side, Jordanians were also nervous about
our cameras.

WILF DINNICK (ABC NEWS): (Off-camera)  We face yet another delay here.  This is now
on the Jordanian side and the security here says we can't actually use the camera,
even though we applied for permission weeks ago, they somehow have lost our
permission.  So we're trying to go down to the Jordan Valley now, as quickly as we
can, and then we'll cross over to the Israeli side.

WILF DINNICK (ABC NEWS): (Voiceover)  The Jordan Valley is flat, perfect for
traveling.  In Joseph and Mary's day there would have been hardly anything here.
Today, plenty of busy Arab towns.

WILF DINNICK (ABC NEWS): (Off-camera)  Okay, let's go in.  A lot has changed over
the last 2,000 years but one thing that has remained the same is the type of bread
made almost exactly the same way as when Joseph and Mary made their journey.

WILF DINNICK (ABC NEWS): (Voiceover)  Then back into Israel, just before the border
closes.

WILF DINNICK (ABC NEWS): (Off-camera)  We're now gonna cross the Jordan River for
the second time here, where Mary and Joseph would have waded across on their way to
Bethlehem.

WILF DINNICK (ABC NEWS): (Voiceover)  Then on to the ancient town of Jericho, it is
Palestinian and the Israeli army demands special ID to enter.

WILF DINNICK (ABC NEWS): (Off-camera)  Could I get a falafel with hummus and pita?
Pita, yeah.  Okay.

WILF DINNICK (ABC NEWS): (Voiceover)  This was a chance for Mary and Joseph to rest
before the final, grueling leg of the trip, which was a treacherous road that was
yet again blocked for us by the Israeli army.

WILF DINNICK (ABC NEWS): (Off-camera)  This is the part of the trip we cannot do by
car.  This is the ancient route between Jericho and Bethlehem.  The silence here is
amazing, the view is stunning, but it must have been a daunting part of the journey
for Mary and Joseph.

WILF DINNICK (ABC NEWS): (Voiceover)  The last stretch of the journey that Mary and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __27__
PAGE __411__
M 0062154

12/23/06 ABCNIGHTLINE (No Page)                                    Page 8

Joseph took into Bethlehem is now impossible.  Blocked by Israel's security wall.
Even Bethlehem itself is cut off by the wall.  We had to drive through this gate
controlled by Israeli soldiers.

WILF DINNICK (ABC NEWS): (Off-camera)  We finally arrive in Bethlehem, and that's
the church of the nativity behind us.  Now our trip took 15 hours, we crossed two
international borders and dozens of military checkpoints.  Joseph and Mary's trip
took about a week.

WILF DINNICK (ABC NEWS): (Voiceover)  But on our trip, we met at least one
historian who believes Joseph and Mary's journey never happened.  The gospel
according to Luke says the couple made the trip to Bethlehem for a Roman census,
but historians now know there was no census at the time.

REVEREND JEROME MURPHY-O'CONNOR (ECOLE BIBLIQUE: I have no problem with the
divinity of Christ.  I have no problem with his birth in Bethlehem.  It's just the
colorful little bits that writers, storytellers, felt inclined to add.  Those, we
can legitimately question.

WILF DINNICK (ABC NEWS): (Voiceover)  He also believes, like many other historians,
the couple already lived in Bethlehem and went to Nazareth later to look for work.
But don't tell that to anyone here.  In the Church of the Nativity, in this small
spot where it's believed Mary gave birth to Jesus.  For the faithful, a miracle,
after such a grueling journey.

REVEREND JEROME MURPHY-O'CONNOR (ECOLE BIBLIQUE: It's an extremely good yarn, and
that's why it has survived because people prefer good yarns to the truth.

WILF DINNICK (ABC NEWS): (Voiceover)  And it is a good story.  And for us, an
amazing journey.  Wilf Dinnick for "Nightline" in Bethlehem.

MARTIN BASHIR (ABC NEWS): (Off-camera)  The Christmas journey then and now.  And
when we come back, Santa's little helpers like you've never seen them before.  It's
a "Sign of the Times."

GRAPHICS: SIGN OF THE TIMES

COMMERCIAL BREAK

ANNOUNCER: 'Nightline" continues from New York City with Martin Bashir.

REPORTER: NICK WATT
REPORTER LOCATION: LONDON, ENGLAND

TOPIC:

CONTENT: LINGERIE, STOCKING FELLA, MARKS AND SPENCER, MYLA

MARTIN BASHIR (ABC NEWS): (Off-camera)  It seems like the perfect gift, the sexy
little outfit for the one we love this Christmas.  If only it were that simple.
According to experts, men are simply hopeless at choosing lingerie.  So now, a
department store in Britain is employing Santa's little helpers to guide men away
from any lingerie land mines and, according to ABC's Nick Watt, it's a "Sign of the
Times."

MATT NEELY (STOCKING FELLA): (Inaudible) nice, actually.  You guys doing okay?
Finding everything you want?  Yeah?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ___27___
PAGE ___412___

M 0062155

12/23/06 ABCNIGHTLINE (No Page)                                    Page 9

CUSTOMER (MALE): Yeah, we're fine.

CUSTOMER (FEMALE): Yes, thank you.

CUSTOMER (MALE): Thank you, sir.

MATT NEELY (STOCKING FELLA): Give me a shout if you need any more help.

NICK WATT (ABC NEWS): (Voiceover) Here at Marks and Spencer they noticed a lot of
lingerie returned by women after Christmas. The problem? Men were buying it.
Matt Neely is part of the solution.

MATT NEELY (STOCKING FELLA): We were given all sorts of training about the styles
of bra and what function it performs in terms pushing it together or lifting up, or
squashing it down.

MATT NEELY (STOCKING FELLA): There we are.

NICK WATT (ABC NEWS): (Voiceover) Two hundred stocking fellas were sent out to
help hapless husbands.

MATT NEELY (STOCKING FELLA): That's quite sweet.

CUSTOMER (MALE): Mm-hmm.

MATT NEELY (STOCKING FELLA): Okay?

CUSTOMER (MALE): No.

MATT NEELY (STOCKING FELLA): You know, if the guys are wandering around not really
know what they're doing, or kind of skirting around the outside too afraid to step
in.

NICK WATT (ABC NEWS): (Voiceover) He helps the unromantic.

NICK WATT (ABC NEWS): (Off-camera) Do you always buy underwear for Christmas?

CUSTOMER (MALE): No.

NICK WATT (ABC NEWS): (Off-camera) So why this year?

CUSTOMER (MALE): Because I've run out of ideas.

MATT NEELY (STOCKING FELLA): Yeah.

NICK WATT (ABC NEWS): (Voiceover) He helps the clueless.

MATT NEELY (STOCKING FELLA): What color are you looking for?

CUSTOMER (MALE): Well...

NICK WATT (ABC NEWS): (Voiceover) He even helps those who think they know better.

NICK WATT (ABC NEWS): (Off-camera) Do you have the right size?

CUSTOMER (MALE): I have the right size, yeah.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __27__
PAGE __418__
M 0062156

12/23/06 ABCNIGHTLINE (No Page)                                    Page 10

NICK WATT (ABC NEWS): (Off-camera)  Color?

CUSTOMER (MALE): Well, color is my, my choice really, actually.

MATT NEELY (STOCKING FELLA): Hopefully, the presence of another man in the department will put them at ease.

NICK WATT (ABC NEWS): (Off-camera)  Now, this is Myla, an upmarket lingerie boutique where they have a very different philosophy.  Here, they only employ women.

TAMARA DAVIES (MANAGER: I would say 75% of my customers are men.

NICK WATT (ABC NEWS): (Off-camera)  Are men?

TAMARA DAVIES (MANAGER: Are men.  Male.

NICK WATT (ABC NEWS): (Voiceover)  Men, like Anatoly (PH).

TAMARA DAVIES (MANAGER: Do you know what she likes?  Do you know what color?

CUSTOMER (MALE): Colors, yeah, yeah.

TAMARA DAVIES (MANAGER: Size?

CUSTOMER (MALE): Size, yeah.  I think, it's a must if you - you have to know your woman.

NICK WATT (ABC NEWS): (Voiceover)  But even at Myla, some men aren't quite so sure about the size.

TAMARA DAVIES (MANAGER: So they're like this, or, I mean, as a woman, you know, female working here, we have men come in and said, 'She's your size, what size are you?"

NICK WATT (ABC NEWS): (Voiceover)  So, there's one bonus of a female assistant but it's not male bonding.

NICK WATT (ABC NEWS): (Off-camera)  And how do you put them at ease?

TAMARA DAVIES (MANAGER: Smiling, 'Hello, how are you today?"  Talk about the weather.

NICK WATT (ABC NEWS): (Off-camera)  Bit of humor?

TAMARA DAVIES (MANAGER: A bit of humor, yes.  We do that.

NICK WATT (ABC NEWS): (Off-camera)  Do you flirt a little bit?

TAMARA DAVIES (MANAGER: Yes, a little.

NICK WATT (ABC NEWS): (Off-camera)  Apparently a lot of men end up buying two pairs, something safe and something saucy that they're both gonna enjoy.

NICK WATT (ABC NEWS): (Voiceover)  As Bridget Jones found out in the movie, safe can also be sexy.

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __27__

PAGE __414__

M 0062157

CLIP FROM "BRIDGET JONES'S DIARY"

HUGH GRANT (ACTOR): Oh, absolutely enormous panties. No, no, don't apologize. I like them. Hello, mommy.

TAMARA DAVIES (MANAGER: Men don't wanna leave here. I got a guy here in yesterday, and he was looking around. He spent about half an hour, and he said to me, 'I just, I just don't wanna leave. I wanna stay here forever."

MATT NEELY (STOCKING FELLA): It's a 34B, which will be no good.

NICK WATT (ABC NEWS): (Voiceover)  I wonder if any one's ever said that...

MATT NEELY (STOCKING FELLA): Yeah.

NICK WATT (ABC NEWS): (Voiceover)  ...to a stocking fella?  I'm Nick Watt for "Nightline" in Lingerie Land.

MARTIN BASHIR (ABC NEWS): (Off-camera)  And in case you're wondering, I bought my wife a rather fetching handbag. And when we come back, a special look at the achievements and events of the past year.

COMMERCIAL BREAK

MARTIN BASHIR (ABC NEWS): (Off-camera)  Next week on "Nightline," a look at some memorable moments and provocative people we've covered during 2006.  The year in entertainment, power, money and love.  It's all part of our special series beginning on Christmas Day with the 'Year in Jesus."  We hope you'll join us.  But that's our report for tonight.  I'm Martin Bashir.  For Cynthia McFadden, Terry Moran, and all of us at ABC News, good night America and have a very happy and peaceful Christmas.

FOR INFORMATION ON ORDERING A VIDEO OR TRANSCRIPT COPY OF ABC NEWS OR ABC NEWS NOW PROGRAMMING, PLEASE VISIT THE SECURE ONLINE ORDER FORM LOCATED AT WWW.TRANSCRIPTS.TV

                        ---- INDEX REFERENCES ----

COMPANY: MATTEL INC; ABC NEWS; BRATZ F C; REACH TRADE AND MARKETING; ABC

INDUSTRY:  (TV (1TV19); Underwear (1UN06); Entertainment (1EN08); Gen Y Entertainment (1GE14); TV Programming (1TV26); Games & Toys (1GA85); Gen Y TV (1GE33); Apparel (1AP19); Consumer Products & Services (1CO62); Children's Apparel (1CH40); Apparel & Textiles (1AP20))

REGION:  (Americas (1AM92); North America (1NO39); Mediterranean (1ME20); Middle East (1MI23); USA (1US73); Palestine (1PA37); New York (1NE72); Israel (1IS16); Arab States (1AR46))

Language:  EN

OTHER INDEXING:  (MARTIN BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS); MATT NEELY (STOCKING FELLA); ANNOUNCER; MARTIN BASHIR (ABC NEWS); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ___27___

PAGE ___415___

M 0062158

BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); CARTOON VOICEOVER (GROUP); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); MARTIN BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS); ANNOUNCER; MARTIN BASHIR (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); STEPHEN PFANN (PRESIDENT; WILF DINNICK (ABC NEWS); ISRAELI SECURITY PERSONNEL (MALE); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); REVEREND JEROME MURPHY-O'CONNOR (ECOLE BIBLIQUE; WILF DINNICK (ABC NEWS); REVEREND JEROME MURPHY-O'CONNOR (ECOLE BIBLIQUE; WILF DINNICK (ABC NEWS); MARTIN BASHIR (ABC NEWS); ANNOUNCER; MARTIN BASHIR (ABC NEWS); MATT NEELY (STOCKING FELLA); CUSTOMER (MALE); CUSTOMER (FEMALE); CUSTOMER (MALE); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); MATT NEELY (STOCKING FELLA); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); MATT NEELY (STOCKING FELLA); CUSTOMER (MALE); MATT NEELY (STOCKING FELLA); CUSTOMER (MALE); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); NICK WATT (ABC NEWS); CUSTOMER (MALE); NICK WATT (ABC NEWS); CUSTOMER (MALE); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); MATT NEELY (STOCKING FELLA); CUSTOMER (MALE); NICK WATT (ABC NEWS); NICK WATT (ABC NEWS); CUSTOMER (MALE); NICK WATT (ABC NEWS); CUSTOMER (MALE); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; CUSTOMER (MALE); TAMARA DAVIES (MANAGER; CUSTOMER (MALE); NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); NICK WATT (ABC NEWS); HUGH GRANT (ACTOR); TAMARA DAVIES (MANAGER; MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); MARTIN BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS))    (ABC; ABC NEWS; BASHIR; BETHLEHEM; BIBLE; BRATZ; BRAWL; CHRISTMAS; CHRISTMAS JOURNEY; CHUCK; CONTENT; CONTENT: BARBIE; CONTENT: CHRISTMAS; CONTENT: LINGERIE; CYNTHIA MCFADDEN TERRY MORAN; DIARY; DIVISION; DOLLHOUSE; FANTASY; FELLAS; GRAPHICS; GRAPHICS: BRAWL; GRAPHICS: CHRISTMAS; GRAPHICS: FANTASY; GRAPHICS: SIGN; HUGH; ISAAC; JEWISH; JOSEPH; JOURNEY; KEN; LUKE; MARTIN BASHIR; MARY GRAPHICS: STOCKING; MATT; MATTEL; NICK; NIGHTLINE; NIGHTLINE: DECEMBER; PALESTINIAN; SIGN; STOCKING; TAMARA; TERRY MORAN; TOPIC; USA) (Astronaut Barbie; Barbie; Barbies; BRATZ; BRATZ DOLL WARS; Cynthia McFadden; Doctor Barbie; Finding; Hey; Isaac; Isaac Larian; JOHN BERMAN; Jordanians; Largely; Larian; Mary; Matt Neely; MyScene Barbie; Passport; Round; Steve Pfann)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __27__
PAGE __416__

M 0062159

12/23/06 ABCNIGHTLINE (No Page)                              Page 13


Word Count: 5025
12/23/06 ABCNIGHTLINE (No Page)




END OF DOCUMENT

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __27__
PAGE __417__
M 0062160

# EXHIBIT 28

1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2 | John B. Quinn (Bar No. 090378)
   | johnquinn@quinnemanuel.com
3 | Michael T. Zeller (Bar No. 196417)
   | (michaelzeller@quinnemanuel.com)
4 | Jon D. Corey (Bar No. 185066)
   | (joncorey@quinnemanuel.com)
5 | 865 South Figueroa Street, 10th Floor
   | Los Angeles, California 90017-2543
6 | Telephone: (213) 443-3000
   | Facsimile: (213) 443-3100

7 | Attorneys for Mattel, Inc.

8

9 | UNITED STATES DISTRICT COURT

10 | CENTRAL DISTRICT OF CALIFORNIA

11 | EASTERN DIVISION

12 | CARTER BRYANT, an individual,

13 | Plaintiff,

14 | vs.

15 | MATTEL, INC., a Delaware corporation,

16

17 | Defendant.

18 | AND CONSOLIDATED CASES

19

20

21 | PROPOUNDING PARTY: MATTEL, INC.

22 | RESPONDING PARTY: ISAAC LARIAN

23 | SET NO.: FIRST (PHASE 2)

24

25

26

27

28

CASE NO. CV 04-9049 SGL (RNBx)

Consolidated with
Case No. CV 04-09059
Case No. CV 05-02727

MATTEL, INC.'S FIRST SET OF
REQUESTS FOR DOCUMENTS AND
THINGS TO ISAAC LARIAN
(PHASE 2)

EXHIBIT _28_
PAGE _418_

01-08-09

07209/2753498.1

MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS TO ISAAC LARIAN (Phase 2)

1      Pursuant to <u>Rule</u> 34 of the <u>Federal Rules of Civil Procedure,</u>

2  Mattel, Inc. hereby requests that Isaac Larian ("Larian") respond to these document

3  requests ("Requests") and make available for inspection and copying originals of the

4  following documents within 30 days of service at the offices of Quinn Emanuel

5  Urquhart Oliver & Hedges, LLP, 865 South Figueroa Street, 10th floor,

6  Los Angeles, CA 90017.  Larian shall be obligated to supplement responses to these

7  requests at such times and to the extent required by <u>Rule</u> 26(e) of the <u>Federal Rules</u>

8  <u>of Civil Procedure.</u>

9

10  **I.      DEFINITIONS**

11      A.      "YOU," "YOUR," "ISAAC LARIAN" or "LARIAN" means

12  Isaac Larian and any individual or entity acting directly or indirectly by, through,

13  under or on behalf of Isaac Larian, including but not limited to current or former

14  directors, officers, agents, attorneys, employees, partners, joint venturers,

15  contractors, accountants, or representatives of Isaac Larian or any entity under the

16  control or direction of Isaac Larian (including but not limited to MGA), and any

17  corporation, partnership, association, limited liability company, trust, predecessor-

18  in-interest and successor-in-interest, and any other PERSON acting on behalf of

19  Isaac Larian or pursuant to his authority or subject to his control..

20      B.      "MGA" means MGA Entertainment, Inc. and any PERSON

21  acting directly or indirectly by, through, under or on behalf of MGA Entertainment,

22  Inc., including but not limited to, current or former directors, officers, agents,

23  attorneys, employees, partners, joint venturers, contractors, accountants, or

24  representatives of MGA Entertainment, Inc., and any current or former corporation,

25  partnership, association, trust, parent, subsidiary, division, AFFILIATE,

26  predecessor-in-interest and successor-in-interest of MGA Entertainment, Inc., and

27  any other PERSON acting on its behalf

28

EXHIBIT 28
PAGE 419

1    C.    "MATTEL" means Mattel, Inc. and all current or former

2    directors, officers, employees, agents, contractors, attorneys, accountants,

3    representatives, subsidiaries, divisions, AFFILIATES, predecessors-in-interest and

4    successors-in-interest, and any other PERSON acting on its behalf, pursuant to its

5    authority or subject to its control.

6    D.    "MASHIAN" means Fred Mashian and any individual or entity

7    acting directly or indirectly by, through, under or on behalf of Fred Mashian,

8    including but not limited to current or former directors, officers, agents, attorneys,

9    employees, partners, joint venturers, contractors, accountants, or representatives of

10   Fred Mashian or any entity under the control or direction of Fred Mashian, and any

11   corporation, partnership, association, limited liability company, trust, predecessor-

12   in-interest and successor-in-interest, and any other PERSON acting on behalf of

13   Fred Mashian or pursuant to his authority or subject to his control.

14   E.    "BRATZ" means any project, product, doll or DESIGN ever

15   known by that name (whether in whole or in part and regardless of what such

16   project, product or doll is or has been also, previously or subsequently called) and

17   any product, doll or DESIGN or any portion thereof that is now or has ever been

18   known as, or sold or marketed under, the name or term "Bratz" (whether in whole or

19   in part and regardless of what such product, doll or DESIGN or portion thereof is or

20   has been also, previously or subsequently called) or that is now or has ever been

21   sold or marketed as part of the "Bratz" line, and each version or iteration of such

22   product, doll or DESIGN or any portion thereof.  As used herein, "product, doll or

23   DESIGNS or any portion thereof" also includes without limitation any names,

24   fashions, accessories, artwork, packaging or any other works, materials, matters or

25   items included or associated therewith.  Without limiting the generality of the

26   foregoing, the term "BRATZ" does not and shall not require that there be a doll,

27   product or three-dimensional embodiment existing at the time of the event, incident

28

EXHIBIT __28__

PAGE __420__

07209/2753498.1

-3-

1   or occurrence that is the subject of, or otherwise relevant or responsive to, the

2   Requests herein.

3        F.    "DESIGN" or "DESIGNS" means any and all representations,

4   whether two-dimensional or three-dimensional, and whether in tangible, digital,

5   electronic or other form, including but not limited to all works, designs, artwork,

6   sketches, drawings, illustrations, representations, depictions, blueprints, schematics,

7   diagrams, images, sculptures, prototypes, models, samples, rotocasts, reductions to

8   practice, developments, inventions and/or improvements, as well as all other items,

9   things and DOCUMENTS in which any of the foregoing are or have been

10  expressed, embodied, contained, fixed or reflected in any manner, whether in whole

11  or in part.

12       G.    "DOCUMENT" or "DOCUMENTS" means all "writings" and

13  "recordings" as those terms are defined in Rule 1001 of the Federal Rules of

14  Evidence and Rule 34 of the Federal Rules of Civil Procedure and shall include all

15  writings, including but not limited to, handwriting, typewriting, printing, image,

16  photograph, photocopy, digital file of any kind, transmittal by (or as an attachment

17  to) electronic mail (including instant messages and text messages) or facsimile,

18  video and audio recordings, and every other means of recording upon any tangible

19  thing, any form of COMMUNICATION or representation, and any record thereby

20  created, regardless of the manner in which the record has been stored, and all non-

21  identical copies of such DOCUMENTS, in the possession, custody, or control of

22  YOU, YOUR counsel, or any other PERSON acting on YOUR behalf.

23       H.    "AFFILIATES" means any and all corporations, limited liability

24  companies, associations, proprietorships, d/b/a's, partnerships, joint ventures and

25  business entities of any kind that, directly or indirectly, in whole or in part, own or

26  control, are under common ownership or control with, or are owned or controlled by

27  a PERSON, party or entity, including without limitation, each parent, subsidiary and

28  joint venture of such PERSON, party or entity.

EXHIBIT __28__

PAGE __421__

07209/2753498.1

-4-

I.    "REFERRING OR RELATING TO," "REFER OR RELATE TO," "RELATING," "RELATING TO" or "REFERS TO" means any and all of the following terms and their synonyms: refer to, discuss, constitute, evidence, pertain to, mention, support, undermine, disprove, refute, contradict, negate, bear on, amend, revise, modify, touch on, contain, embody, reflect, identify, state, deal with, concern, comment on, summarize, respond to, relate to, or describe.

J.    "PERSON," in the plural as well as the singular, means any natural person, association, partnership, corporation, joint venture, government entity, organization, limited liability company, trust, institution, proprietorship, or any other entity recognized as having an existence under the laws in the United States or any other nation.

K.    "ITEM OF VALUE," in the plural as well as the singular, means any and all articles, units, goods, commodities, property, products, services, assistance, shares, stocks, bonds, financial instruments, indebtedness, credit, capital, and currency, in any form, or any other tangible or intangible matter that have current, past or future material worth, monetary worth or use, of any type and in any amount. Gifts of individual units of manufactured MGA products that are not intended for re-transfer, that were not and have not been re-transferred and that do not exceed $500 in retail value in total may be excluded from this Definition.

L.    "IDENTIFY," "IDENTIFYING" OR "IDENTITY" means the following:

(a)    With reference to an individual, means such individual's name, current or last known business title, current or last known business affiliation, current or last known relationship to YOU, current or last known residential and business address, and current or last known telephone number.

(b)    With reference to an entity or entities, such entity's full name, state (or country) of incorporation or organization, present or last known address, and present or last known telephone number.

EXHIBIT 28
PAGE 422

-5-

07209/2753498.1

1    (c)    With reference to any other DOCUMENT or DOCUMENTS,

2  means the date, identity of the author, addressee(s), signatories, parties, or other

3  PERSONS identified therein, its present location or custodian and a description of

4  its contents.

5    (d)    With reference to an account with a bank or financial institution,

6  means the name and address of the bank or financial institution, the account

7  number(s) for or otherwise associated with such account and the name of each

8  holder, including without limitation, each beneficial holder, of each such account.

9    M.    "OMNI 808 INVESTORS, LLC" means OMNI 808

10  INVESTORS, LLC and all current or former directors, officers, employees, agents,

11  contractors, attorneys, accountants, representatives, subsidiaries, divisions,

12  AFFILIATES, predecessors-in-interest and successors-in-interest, and any other

13  PERSON acting on its behalf, pursuant to its authority or subject to its control.

14    N.    "VISION CAPITAL, LLC" means VISION CAPITAL, LLC and

15  all current or former directors, officers, employees, agents, contractors, attorneys,

16  accountants, representatives, subsidiaries, divisions, AFFILIATES, predecessors-in-

17  interest and successors-in-interest, and any other PERSON acting on its behalf,

18  pursuant to its authority or subject to its control.

19    O.    "LEXINGTON INVESTORS, LLC" means LEXINGTON

20  INVESTORS, LLC and all current or former directors, officers, employees, agents,

21  contractors, attorneys, accountants, representatives, subsidiaries, divisions,

22  AFFILIATES, predecessors-in-interest and successors-in-interest, and any other

23  PERSON acting on its behalf, pursuant to its authority or subject to its control.

24    P.    "COMMUNICATION," in the plural as well as the singular,

25  means any transmittal and/or receipt of information, whether such was oral or

26  written, and whether such was by chance, prearranged, formal or informal, and

27  specifically includes, but is not limited to, conversations in person, telephone

28  conversations, electronic mail (including instant messages and text messages),

07209/2753498.1

EXHIBIT __28__

PAGE __423__

1  voicemail, letters, memoranda, statements, media releases, magazine and newspaper

2  articles, and video and audio transmissions.

3        Q.    The singular form of a noun or pronoun includes within its

4  meaning the plural form of the noun or pronoun so used, and vice versa; the use of

5  the masculine form of a pronoun also includes within its meaning the feminine form

6  of the pronoun so used, and vice versa; the use of any tense of any verb includes

7  also within its meaning all other tenses of the verb so used, whenever such

8  construction results in a broader request for information; and "and" includes "or"

9  and vice versa, whenever such construction results in a broader disclosure of

10  documents or information.

11

12  **II.**    **INSTRUCTIONS**

13        A.    YOU are to produce all requested DOCUMENTS in YOUR

14  possession, custody or control.

15        B.    If YOU contend that YOU are not required to produce certain

16  DOCUMENTS called for by these Requests on the grounds of a privilege or

17  protection that YOU are not prepared to waive, IDENTIFY each such DOCUMENT

18  and provide the following information:

19              1.    the date and type of the DOCUMENT, the author(s) and all

20                   recipients;

21              2.    the privilege or protection that YOU claim permits YOU to

22                   withhold the DOCUMENT;

23              3.    the title and subject matter of the DOCUMENT;

24              4.    any additional facts on which YOU base YOUR claim of

25                   privilege or protection; and

26              5.    the IDENTITY of the current custodian of the original of the

27                   DOCUMENT.

28

**EXHIBIT** 78
**PAGE** 474

-7-

C.     DOCUMENTS shall be produced in their original file folders, or other native format. If the DOCUMENTS are in their original file folders, in lieu thereof, any writing on the file folder from which each such DOCUMENT is taken shall be copied and appended to such DOCUMENT and the PERSON for whom or department, division or office for which the DOCUMENT or the file folder is maintained shall be identified.

D.     The DOCUMENTS should be produced in their complete and unaltered form. Attachments to DOCUMENTS should not be removed. The DOCUMENTS should not be cut-up, pasted over, redacted or altered in any way for any reason, including alleged nonrelevance. If emails are produced that had attachments, the attachments shall be attached when produced.

E.     DOCUMENTS in electronic form shall be produced in that form.

F.     In the event that any DOCUMENT called for by these requests has been destroyed or discarded, that DOCUMENT is to be identified by stating:

     1.     the date and type of the DOCUMENT, the author(s) and all recipients;

     2.     the DOCUMENT's date, subject matter, number of pages, and attachments or appendices;

     3.     the date of destruction or discard, manner of destruction or discard, and reason for destruction or discard;

     4.     the PERSONS who were authorized to carry out such destruction or discard;

     5.     the PERSONS who have knowledge of the content, origins, distribution and destruction of the DOCUMENT; and

     6.     whether any copies of the DOCUMENT exist and, if so, the name of the custodian of each copy.

EXHIBIT _26_

PAGE _425_

07209/2753498.1

-8-

MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS TO ISAAC LARIAN (Phase 2)

III.   **REQUESTS FOR DOCUMENTS AND THINGS**

REQUEST FOR PRODUCTION NO. 1:

All YOUR audited and unaudited monthly, quarterly and annual financial statements covering or RELATING TO any period on or after January 1, 2007, including without limitation balance sheets, income statements, profit and loss statements, consolidated statements of operations, cash flow statements and statements of retained earnings.

REQUEST FOR PRODUCTION NO. 2:

All agreements and contracts with any lenders to or creditors of MGA covering, RELATING TO, in effect, dated or entered into on or after January 1, 2007, including without limitation loan agreements, credit agreements, financing agreements, lines of credit and promissory notes, and any amendments or modifications thereto, and any notices of default and COMMUNICATIONS REFERRING OR RELATING TO any such agreements and contracts.

REQUEST FOR PRODUCTION NO. 3:

To the extent not produced in response to any other Request, DOCUMENTS sufficient to IDENTIFY each other PERSON from whom YOU sought, solicited, requested, obtained, received or were denied credit, financing or funding on or after January 1, 2007 and sufficient to show the amount(s) and terms involved.

REQUEST FOR PRODUCTION NO. 4:

All DOCUMENTS REFERRING OR RELATING TO YOUR solvency or insolvency, or whether YOUR liabilities exceed YOUR assets, for any period on or after January 1, 2007 (excluding pleadings served by YOU on MATTEL in this action).

EXHIBIT _28_
PAGE _426_

1  REQUEST FOR PRODUCTION NO. 5:

2          All DOCUMENTS REFERRING OR RELATING TO any

3  representation or statement made by YOU about YOUR solvency or insolvency, or

4  whether YOUR liabilities exceed YOUR assets, for any period on or after January 1,

5  2007 (excluding pleadings served by YOU on MATTEL in this action).

6

7  REQUEST FOR PRODUCTION NO. 6:

8          All DOCUMENTS REFERRING OR RELATING TO YOUR net

9  worth for any period on or after January 1, 2007 (excluding pleadings served by

10  YOU on MATTEL in this action).

11

12  REQUEST FOR PRODUCTION NO. 7:

13          All DOCUMENTS REFERRING OR RELATING TO ISAAC

14  LARIAN's net worth for any period on or after January 1, 2007 (excluding

15  pleadings served by YOU on MATTEL in this action).

16

17  REQUEST FOR PRODUCTION NO. 8:

18          All DOCUMENTS REFERRING OR RELATING TO orders,

19  including without limitation cancelled or held orders, for BRATZ products for

20  Spring 2009, and all COMMUNICATIONS with retailers and other prospective

21  purchasers REFERRING OR RELATING TO any such orders.

22

23  REQUEST FOR PRODUCTION NO. 9:

24          All DOCUMENTS REFERRING OR RELATING TO orders,

25  including without limitation cancelled or held orders, for BRATZ products for Fall

26  2009, and all COMMUNICATIONS with retailers and other prospective purchasers

27  REFERRING OR RELATING TO any such orders.

28

EXHIBIT __28__
PAGE __427__

1    REQUEST FOR PRODUCTION NO. 10:

2           All DOCUMENTS REFERRING OR RELATING TO the transfer of

3    any ITEM OF VALUE by MGA to, or for the benefit of, ISAAC LARIAN, any

4    member of ISAAC LARIAN's family or any entity controlled by ISAAC LARIAN

5    or any member of ISAAC LARIAN's family, since January 1, 2007.

6

7    REQUEST FOR PRODUCTION NO. 11:

8           All COMMUNICATIONS between YOU and any third-party,

9    including without limitation any retailer or distributor but excluding MATTEL and

10   any Court, REFERRING OR RELATING TO YOUR *ex parte* application for stay

11   pending appeal, filed December 11, 2008, including without limitation any

12   declaration, whether final, draft, proposed or requested, in connection therewith and

13   copies of all draft declarations in connection therewith.

14

15   REQUEST FOR PRODUCTION NO. 12:

16          All DOCUMENTS REFERRING OR RELATING TO capital

17   contributions to MGA since January 1, 2007.

18

19   REQUEST FOR PRODUCTION NO. 13:

20          All DOCUMENTS showing MGA's projected revenue, costs, profits or

21   financial performance for any period since January 1, 2007.

22

23   REQUEST FOR PRODUCTION NO. 14:

24          All DOCUMENTS REFERRING OR RELATING TO any transfer of

25   any ITEM OF VALUE or other transaction between (i) MGA, and (ii) ISAAC

26   LARIAN, any ISAAC LARIAN family member, any PERSON controlled, directly

27   or indirectly by ISAAC LARIAN, or any PERSON controlled, directly or indirectly,

28   by any ISAAC LARIAN family member since January 1, 2007.

EXHIBIT **28**

PAGE **428**

07209/2753498.1

-11-

MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS TO ISAAC LARIAN  (Phase 2)

1    REQUEST FOR PRODUCTION NO. 15:

2          All W-2s REFERRING OR RELATING TO any ISAAC LARIAN

3    family member since January 1, 2007.

4

5    REQUEST FOR PRODUCTION NO. 16:

6          All DOCUMENTS REFERRING OR RELATING TO any sale,

7    distribution or transfer by MGA of BRATZ products having a retail value greater

8    than $50,000 other than to retailers in the ordinary course of business since

9    January 1, 2007.

10

11    REQUEST FOR PRODUCTION NO. 17:

12          All DOCUMENTS REFERRING OR RELATING TO agreements,

13    transactions, sales, shipments or the transfer of any ITEM OF VALUE between

14    MGA and IGWT Group, LLC.

15

16    REQUEST FOR PRODUCTION NO. 18:

17          All DOCUMENTS REFERRING OR RELATING TO the alleged

18    transfer of product from MGA to IGWT Group, LLC pursuant to the Inventory

19    Purchase Agreement dated July 7, 2008, including without limitation all audits or

20    other valuations performed in connection with such product, any opinions

21    RELATING TO the fairness or unfairness of such transfer, all MGA corporate or

22    director resolutions or approvals of such transfer, all bids received or solicited in

23    connection with the purported sale or offering for sale of such product, the terms of

24    such bids and any other and all COMMUNICATIONS relating to any of the

25    foregoing.

26

27

28

EXHIBIT __28__

PAGE __425__

REQUEST FOR PRODUCTION NO. 19:

All DOCUMENTS REFERRING OR RELATING TO the revenue generated by IGWT Group, LLC's sales, licensing, distribution or other transfer of BRATZ products and the transfer or disposition of such revenue.

REQUEST FOR PRODUCTION NO. 20:

All DOCUMENTS REFERRING OR RELATING TO agreements, contracts, transactions, sales, shipments or transfers of any ITEM OF VALUE between MGA and IGWT 826 Investments, LLC.

REQUEST FOR PRODUCTION NO. 21:

All DOCUMENTS REFERRING OR RELATING TO the revenue generated by IGWT 826 Investments, LLC's sales, licensing, distribution or other transfer of BRATZ products and the transfer or disposition of such revenue.

REQUEST FOR PRODUCTION NO. 22:

All agreements, contracts and written COMMUNICATIONS between MGA and Wachovia since January 1, 2007.

REQUEST FOR PRODUCTION NO. 23:

All agreements and contracts REFERRING OR RELATING TO any indebtedness owed to Wachovia or any credit extended by Wachovia since January 1, 2007, and any amendments or modifications thereto, and any COMMUNICATIONS RELATED TO any such agreements or contracts.

REQUEST FOR PRODUCTION NO. 24:

All DOCUMENTS REFERRING OR RELATING TO agreements, contracts or transactions between MGA and OMNI 808 INVESTORS, LLC, and

1   any amendments or modifications thereto, and any COMMUNICATIONS

2   REFERRING OR RELATING TO any such agreements, contracts or transactions.

3

4   REQUEST FOR PRODUCTION NO. 25:

5           All DOCUMENTS containing financial information, including but not

6   limited to YOUR historical and prospective financial performance, provided by

7   YOU to OMNI 808 INVESTORS, LLC, VISION CAPITAL, LLC or LEXINGTON

8   FINANCIAL, LLC since January 1, 2008.

9

10  REQUEST FOR PRODUCTION NO. 26:

11          All DOCUMENTS REFERRING OR RELATING TO agreements,

12  contracts or transactions between LEXINGTON FINANCIAL, LLC and MGA or

13  any other PERSON, and any amendments or modifications thereto, and any

14  COMMUNICATIONS REFERRING OR RELATING TO any such agreements,

15  contracts or transactions.

16

17  REQUEST FOR PRODUCTION NO. 27:

18          All DOCUMENTS REFERRING OR RELATING TO agreements,

19  contracts or transactions between VISION CAPITAL, LLC and MGA or any other

20  PERSON, and any amendments or modifications thereto, and any

21  COMMUNICATIONS REFERRING OR RELATING TO any such agreements,

22  contracts or transactions.

23

24  REQUEST FOR PRODUCTION NO. 28:

25          DOCUMENTS sufficient to IDENTIFY each member, managing

26  member, holder of any ownership interest in, shareholder, officer and director of

27  IGWT Group, LLC.

28

EXHIBIT _28_

PAGE _431_

MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS TO ISAAC LARIAN (Phase 2)

1   REQUEST FOR PRODUCTION NO. 29:

2           DOCUMENTS sufficient to IDENTIFY each member, managing

3   member, holder of any ownership interest in, shareholder, officer and director of

4   IGWT 826 Investments, LLC.

5

6   REQUEST FOR PRODUCTION NO. 30:

7           DOCUMENTS sufficient to IDENTIFY each member, managing

8   member, holder of any ownership interest in, shareholder, officer and director  of

9   OMNI 808 INVESTORS, LLC.

10

11  REQUEST FOR PRODUCTION NO. 31:

12          DOCUMENTS sufficient to IDENTIFY each member, managing

13  member, holder of any ownership·interest in, shareholder, officer and director of

14  VISION CAPITAL, LLC.

15

16  REQUEST FOR PRODUCTION NO. 32:

17          DOCUMENTS sufficient to IDENTIFY each member, managing

18  member, holder of any ownership interest in, shareholder, officer and director of

19  LEXINGTON FINANCIAL, LLC.

20

21  REQUEST FOR PRODUCTION NO. 33:

22          All DOCUMENTS RELATING TO any transfer of any funds, monies

23  or any ITEM OF VALUE from, or any extension of credit or funding by,

24  LEXINGTON FINANCIAL, LLC to YOU or LARIAN.

25

26

27

28

EXHIBIT __28__
PAGE __432__

MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS TO ISAAC LARIAN  (Phase 2)

1  REQUEST FOR PRODUCTION NO. 34:

2          All DOCUMENTS RELATING TO any transfer of any funds, monies

3  or any ITEM OF VALUE to or from, or any extension of credit or funding by or to,

4  LEXINGTON FINANCIAL, LLC, whether directly or indirectly.

5

6  REQUEST FOR PRODUCTION NO. 35:

7          DOCUMENTS sufficient to IDENTIFY each member, managing

8  member, holder of any ownership interest in, shareholder, officer and director of

9  IGWT Group, LLC.

10

11  REQUEST FOR PRODUCTION NO. 36:

12          DOCUMENTS sufficient to IDENTIFY each member, managing

13  member, holder of any ownership interest in, shareholder, officer and director of

14  IGWT 826 Investments, LLC.

15

16  REQUEST FOR PRODUCTION NO. 37:

17          DOCUMENTS sufficient to IDENTIFY each of YOUR bank accounts

18  since January 1, 2007.

19

20  REQUEST FOR PRODUCTION NO. 38:

21          DOCUMENTS sufficient to IDENTIFY each bank account to or from

22  which Isaac Larian has transferred or has had transferred any ITEM OF VALUE

23  since January 1, 2007.

24

25  REQUEST FOR PRODUCTION NO. 39:

26          DOCUMENTS sufficient to IDENTIFY each bank account to or from

27  which OMNI 808 INVESTORS, LLC has transferred or has had transferred any

28  ITEM OF VALUE since January 1, 2007.

EXHIBIT 28
PAGE 433

07209/2753498.1

-16-

MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS TO ISAAC LARIAN (Phase 2)

REQUEST FOR PRODUCTION NO. 40:

DOCUMENTS sufficient to IDENTIFY each bank account to or from which IGWT Group, LLC has transferred or has had transferred any ITEM OF VALUE since January 1, 2007.

REQUEST FOR PRODUCTION NO. 41:

DOCUMENTS sufficient to IDENTIFY each bank account to or from which IGWT 826 Investments, LLC has transferred or has had transferred any ITEM OF VALUE since January 1, 2007.

REQUEST FOR PRODUCTION NO. 42:

All COMMUNICATIONS between or among YOU, IGWT 826 Investments, LLC and/or IGWT Group, LLC REFERRING OR RELATING TO MATTEL and/or BRATZ.

REQUEST FOR PRODUCTION NO. 43:

All COMMUNICATIONS between or among YOU, OMNI 808 INVESTORS, LLC, VISION CAPITAL, LLC and/or LEXINGTON FINANCIAL, LLC REFERRING OR RELATING TO MATTEL, MGA, LARIAN and/or BRATZ.

REQUEST FOR PRODUCTION NO. 44:

All COMMUNICATIONS between YOU and MASHIAN REFERRING OR RELATING TO OMNI 808 INVESTORS, LLC, VISION CAPITAL, LLC, LEXINGTON FINANCIAL, LLC, MATTEL, MGA, LARIAN and/or BRATZ.

EXHIBIT 28
PAGE 434

MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS TO ISAAC LARIAN (Phase 2)

1   REQUEST FOR PRODUCTION NO. 45:

2          All COMMUNICATIONS between YOU and Neil Kadisha

3   REFERRING OR RELATING TO OMNI 808 INVESTORS, LLC, VISION

4   CAPITAL, LLC, LEXINGTON FINANCIAL, LLC, MATTEL, MGA, LARIAN

5   and/or BRATZ.

6

7   REQUEST FOR PRODUCTION NO. 46:

8          All COMMUNICATIONS between YOU and OMNI 808

9   INVESTORS, LLC REFERRING OR RELATING TO VISION CAPITAL, LLC,

10  LEXINGTON FINANCIAL, LLC, MATTEL, MGA, LARIAN and/or BRATZ.

11

12  REQUEST FOR PRODUCTION NO. 47:

13         All COMMUNICATIONS REFERRING OR RELATING TO VISION

14  CAPITAL, LLC, LEXINGTON FINANCIAL, LLC and/or OMNI 808

15  INVESTORS, LLC.

16

17  REQUEST FOR PRODUCTION NO. 48:

18         DOCUMENTS sufficient to IDENTIFY each bank account to or from

19  which VISION CAPITAL, LLC has transferred or has had transferred any ITEM

20  OF VALUE since January 1, 2007.

21

22  REQUEST FOR PRODUCTION NO. 49:

23         DOCUMENTS sufficient to IDENTIFY each bank account to or from

24  which LEXINGTON FINANCIAL, LLC has transferred or has had transferred any

25  ITEM OF VALUE since January 1, 2007.

26

27

28

EXHIBIT _28_
PAGE _435_

1  REQUEST FOR PRODUCTION NO. 50:

2          DOCUMENTS sufficient to IDENTIFY each licensee of any BRATZ

3  product since January 1, 2007.

4

5  REQUEST FOR PRODUCTION NO. 51:

6          DOCUMENTS sufficient to show the amount of payments made to

7  YOU by each licensee of any BRATZ product since January 1, 2007.

8

9  REQUEST FOR PRODUCTION NO. 52:

10          A sample of each BRATZ product manufactured, sold, offered for sale,

11  marketed or distributed by YOU since January 1, 2008.

12

13  REQUEST FOR PRODUCTION NO. 53:

14          To the extent not produced in response to any other Request, a sample

15  of each core BRATZ female fashion doll manufactured, sold, offered for sale,

16  marketed or distributed by YOU since January 1, 2008.

17

18  REQUEST FOR PRODUCTION NO. 54:

19          All registrations, and applications for registration, for any trademark or

20  service mark that constitutes, includes or incorporates in any manner the term

21  "BRATZ."

22

23  REQUEST FOR PRODUCTION NO. 55:

24          All registrations, and applications for registration, for any trademark or

25  service mark that constitutes, includes or incorporates in any manner the term

26  "Jade."

27

28

EXHIBIT __28__
PAGE ___436___

-19-

MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS TO ISAAC LARIAN (Phase 2)

1 | REQUEST FOR PRODUCTION NO. 56:

2 |        All COMMUNICATIONS with any Trademark Office or governmental

3 | entity REFERRING OR RELATING TO any registration, or application for

4 | registration, for any trademark or service mark that constitutes, includes or

5 | incorporates in any manner the term "BRATZ."

6 |

7 | REQUEST FOR PRODUCTION NO. 57:

8 |        All COMMUNICATIONS with any Trademark Office or governmental

9 | entity REFERRING OR RELATING TO any registration, or application for

10 | registration, for any trademark or service mark that constitutes, includes or

11 | incorporates in any manner the term "Jade."

12 |

13 |

14 | DATED:  January 7, 2009                    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

15 |

16 |                                            By  Jon D Corey

17 |                                              Jon D. Corey
                                                 Attorneys for Mattel, Inc.

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

EXHIBIT __78__
PAGE __437__

07209/2753498.1

-20-

# EXHIBIT 29

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 090378)
2      johnquinn@quinnemanuel.com
      Michael T. Zeller (Bar No. 196417)
3      (michaelzeller@quinnemanuel.com)
      Jon D. Corey (Bar No. 185066)
4      (joncorey@quinnemanuel.com)
    865 South Figueroa Street, 10th Floor
5   Los Angeles, California 90017-2543
    Telephone: (213) 443-3000
6   Facsimile: (213) 443-3100

7   Attorneys for Mattel, Inc.

8

9                    UNITED STATES DISTRICT COURT

10               CENTRAL DISTRICT OF CALIFORNIA

11                       EASTERN DIVISION

| 12 | CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
|----|-------------------------------|--------------------------------|
| 13 | Plaintiff, | Consolidated with |
| 14 | vs. | Case No. CV 04-09059 Case No. CV 05-02727 |
| 15 | MATTEL, INC., a Delaware corporation, | MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS AND |
| 16 | | THINGS TO MGA |
| 17 | Defendant. | ENTERTAINMENT, INC. (PHASE 2) |
| 18 | AND CONSOLIDATED CASES | |
| 19 | | |

20

21   PROPOUNDING PARTY: MATTEL, INC.

22   RESPONDING PARTY:   MGA ENTERTAINMENT, INC.

23   SET NO.:              FIRST (PHASE 2)

24

25

26

27

28

EXHIBIT ___29___

PAGE ___438___

01-08-09

2752004.1

MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS TO MGA ENTERTAINMENT (Phase 2)

1          Pursuant to <u>Rule</u> 34 of the <u>Federal Rules of Civil Procedure,</u>

2 Mattel, Inc. hereby requests that MGA Entertainment, Inc. ("MGA") respond to

3 these document requests ("Requests") and make available for inspection and

4 copying originals of the following documents within 30 days of service at the

5 offices of Quinn Emanuel Urquhart Oliver & Hedges, LLP, 865 South Figueroa

6 Street, 10th floor, Los Angeles, CA 90017.  MGA shall be obligated to supplement

7 responses to these requests at such times and to the extent required by <u>Rule</u> 26(e) of

8 the <u>Federal Rules of Civil Procedure.</u>

9

10 **I.**     **<u>DEFINITIONS</u>**

11         A.    "YOU," "YOUR" and "MGA" mean MGA Entertainment, Inc.

12 and any PERSON acting directly or indirectly by, through, under or on behalf of

13 MGA Entertainment, Inc., including but not limited to, current or former directors,

14 officers, agents, attorneys, employees, partners, joint venturers, contractors,

15 accountants, or representatives of MGA Entertainment, Inc., and any current or

16 former corporation, partnership, association, trust, parent, subsidiary, division,

17 AFFILIATE, predecessor-in-interest and successor-in-interest of MGA

18 Entertainment, Inc., and any other PERSON acting on its behalf.

19         B.    "ISAAC LARIAN" or "LARIAN" means Isaac Larian and any

20 individual or entity acting directly or indirectly by, through, under or on behalf of

21 Isaac Larian, including but not limited to current or former directors, officers,

22 agents, attorneys, employees, partners, joint venturers, contractors, accountants, or

23 representatives of Isaac Larian or any entity under the control or direction of Isaac

24 Larian (including but not limited to MGA), and any corporation, partnership,

25 association, limited liability company, trust, predecessor-in-interest and successor-

26 in-interest, and any other PERSON acting on behalf of Isaac Larian or pursuant to

27 his authority or subject to his control.

28

EXHIBIT __39__

PAGE __439__

-2-

MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS TO MGA ENTERTAINMENT (Phase 2)

1        C.    "MATTEL" means Mattel, Inc. and all current or former

2  directors, officers, employees, agents, contractors, attorneys, accountants,

3  representatives, subsidiaries, divisions, AFFILIATES, predecessors-in-interest and

4  successors-in-interest, and any other PERSON acting on its behalf, pursuant to its

5  authority or subject to its control.

6        D.    "MASHIAN" means Fred Mashian and any individual or entity

7  acting directly or indirectly by, through, under or on behalf of Fred Mashian,

8  including but not limited to current or former directors, officers, agents, attorneys,

9  employees, partners, joint venturers, contractors, accountants, or representatives of

10 Fred Mashian or any entity under the control or direction of Fred Mashian, and any

11 corporation, partnership, association, limited liability company, trust, predecessor-

12 in-interest and successor-in-interest, and any other PERSON acting on behalf of

13 Fred Mashian or pursuant to his authority or subject to his control.

14        E.    "BRATZ" means any project, product, doll or DESIGN ever

15 known by that name (whether in whole or in part and regardless of what such

16 project, product or doll is or has been also, previously or subsequently called) and

17 any product, doll or DESIGN or any portion thereof that is now or has ever been

18 known as, or sold or marketed under, the name or term "Bratz" (whether in whole or

19 in part and regardless of what such product, doll or DESIGN or portion thereof is or

20 has been also, previously or subsequently called) or that is now or has ever been

21 sold or marketed as part of the "Bratz" line, and each version or iteration of such

22 product, doll or DESIGN or any portion thereof.  As used herein, "product, doll or

23 DESIGNS or any portion thereof" also includes without limitation any names,

24 fashions, accessories, artwork, packaging or any other works, materials, matters or

25 items included or associated therewith.  Without limiting the generality of the

26 foregoing, the term "BRATZ" does not and shall not require that there be a doll,

27 product or three-dimensional embodiment existing at the time of the event, incident

28

EXHIBIT __29__

PAGE __440__

27522004.1

-3-

MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS TO MGA ENTERTAINMENT (Phase 2)

1 or occurrence that is the subject of, or otherwise relevant or responsive to, the
2 Requests herein.

3       F.    "DESIGN" or "DESIGNS" means any and all representations,
4 whether two-dimensional or three-dimensional, and whether in tangible, digital,
5 electronic or other form, including but not limited to all works, designs, artwork,
6 sketches, drawings, illustrations, representations, depictions, blueprints, schematics,
7 diagrams, images, sculptures, prototypes, models, samples, rotocasts, reductions to
8 practice, developments, inventions and/or improvements, as well as all other items,
9 things and DOCUMENTS in which any of the foregoing are or have been
10 expressed, embodied, contained, fixed or reflected in any manner, whether in whole
11 or in part.

12       G.    "DOCUMENT" or "DOCUMENTS" means all "writings" and
13 "recordings" as those terms are defined in Rule 1001 of the Federal Rules of
14 Evidence and Rule 34 of the Federal Rules of Civil Procedure and shall include all
15 writings, including but not limited to, handwriting, typewriting, printing, image,
16 photograph, photocopy, digital file of any kind, transmittal by (or as an attachment
17 to) electronic mail (including instant messages and text messages) or facsimile,
18 video and audio recordings, and every other means of recording upon any tangible
19 thing, any form of COMMUNICATION or representation, and any record thereby
20 created, regardless of the manner in which the record has been stored, and all non-
21 identical copies of such DOCUMENTS, in the possession, custody, or control of
22 YOU, YOUR counsel, or any other PERSON acting on YOUR behalf.

23       H.    "AFFILIATES" means any and all corporations, limited liability
24 companies, associations, proprietorships, d/b/a's, partnerships, joint ventures and
25 business entities of any kind that, directly or indirectly, in whole or in part, own or
26 control, are under common ownership or control with, or are owned or controlled by
27 a PERSON, party or entity, including without limitation, each parent, subsidiary and
28 joint venture of such PERSON, party or entity.

EXHIBIT 39
PAGE 441

-4-
MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS TO MGA ENTERTAINMENT (Phase 2)

1        I.       "REFERRING OR RELATING TO," "REFER OR RELATE

2   TO," "RELATING," "RELATING TO" or "REFERS TO" means any and all of the

3   following terms and their synonyms:  refer to, discuss, constitute, evidence, pertain

4   to, mention, support, undermine, disprove, refute, contradict, negate, bear on,

5   amend, revise, modify, touch on, contain, embody, reflect, identify, state, deal with,

6   concern, comment on, summarize, respond to, relate to, or describe.

7        J.       "PERSON," in the plural as well as the singular, means any

8   natural person, association, partnership, corporation, joint venture, government

9   entity, organization, limited liability company, trust, institution, proprietorship, or

10  any other entity recognized as having an existence under the laws in the United

11  States or any other nation.

12       K.       "ITEM OF VALUE," in the plural as well as the singular, means

13  any and all articles, units, goods, commodities, property, products, services,

14  assistance, shares, stocks, bonds, financial instruments, indebtedness, credit, capital,

15  and currency, in any form, or any other tangible or intangible matter that have

16  current, past or future material worth, monetary worth or use, of any type and in any

17  amount.  Gifts of individual units of manufactured MGA products that are not

18  intended for re-transfer, that were not and have not been re-transferred and that do

19  not exceed $500 in retail value in total may be excluded from this Definition.

20       L.       "IDENTIFY," "IDENTIFYING" OR "IDENTITY" means the

21  following:

22       (a)       With reference to an individual, means such individual's name,

23  current or last known business title, current or last known business affiliation,

24  current or last known relationship to YOU, current or last known residential and

25  business address, and current or last known telephone number.

26       (b)       With reference to an entity or entities, such entity's full name,

27  state (or country) of incorporation or organization, present or last known address,

28  and present or last known telephone number.

EXHIBIT __71__

PAGE __442__

MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS TO MGA ENTERTAINMENT (Phase 2)

1    (c)    With reference to any other DOCUMENT or DOCUMENTS,

2  means the date, identity of the author, addressee(s), signatories, parties, or other

3  PERSONS identified therein, its present location or custodian and a description of

4  its contents.

5    (d)    With reference to an account with a bank or financial institution,

6  means the name and address of the bank or financial institution, the account

7  number(s) for or otherwise associated with such account and the name of each

8  holder, including without limitation, each beneficial holder, of each such account.

9    M.    "OMNI 808 INVESTORS, LLC" means OMNI 808

10  INVESTORS, LLC and all current or former directors, officers, employees, agents,

11  contractors, attorneys, accountants, representatives, subsidiaries, divisions,

12  AFFILIATES, predecessors-in-interest and successors-in-interest, and any other

13  PERSON acting on its behalf, pursuant to its authority or subject to its control.

14    N.    "VISION CAPITAL, LLC" means VISION CAPITAL, LLC and

15  all current or former directors, officers, employees, agents, contractors, attorneys,

16  accountants, representatives, subsidiaries, divisions, AFFILIATES, predecessors-in-

17  interest and successors-in-interest, and any other PERSON acting on its behalf,

18  pursuant to its authority or subject to its control.

19    O.    "LEXINGTON INVESTORS, LLC" means LEXINGTON

20  INVESTORS, LLC and all current or former directors, officers, employees, agents,

21  contractors, attorneys, accountants, representatives, subsidiaries, divisions,

22  AFFILIATES, predecessors-in-interest and successors-in-interest, and any other

23  PERSON acting on its behalf, pursuant to its authority or subject to its control.

24    P.    "COMMUNICATION," in the plural as well as the singular,

25  means any transmittal and/or receipt of information, whether such was oral or

26  written, and whether such was by chance, prearranged, formal or informal, and

27  specifically includes, but is not limited to, conversations in person, telephone

28  conversations, electronic mail (including instant messages and text messages),

2752004.1

EXHIBIT   21
PAGE   443

1 | voicemail, letters, memoranda, statements, media releases, magazine and newspaper
2 | articles, and video and audio transmissions.

3          Q.    The singular form of a noun or pronoun includes within its
4 | meaning the plural form of the noun or pronoun so used, and vice versa; the use of
5 | the masculine form of a pronoun also includes within its meaning the feminine form
6 | of the pronoun so used, and vice versa; the use of any tense of any verb includes
7 | also within its meaning all other tenses of the verb so used, whenever such
8 | construction results in a broader request for information; and "and" includes "or"
9 | and vice versa, whenever such construction results in a broader disclosure of
10 | documents or information.

11

12 | **II.**    <u>**INSTRUCTIONS**</u>

13          A.     YOU are to produce all requested DOCUMENTS in YOUR
14 | possession, custody or control.

15          B.     If YOU contend that YOU are not required to produce certain
16 | DOCUMENTS called for by these Requests on the grounds of a privilege or
17 | protection that YOU are not prepared to waive, IDENTIFY each such DOCUMENT
18 | and provide the following information:

19             1.     the date and type of the DOCUMENT, the author(s) and all
20                    recipients;

21             2.     the privilege or protection that YOU claim permits YOU to
22                    withhold the DOCUMENT;

23             3.     the title and subject matter of the DOCUMENT;

24             4.     any additional facts on which YOU base YOUR claim of
25                    privilege or protection; and

26             5.     the IDENTITY of the current custodian of the original of the
27                    DOCUMENT.

28

EXHIBIT __29__
PAGE __444__

2752004.1

-7-

1    C. DOCUMENTS shall be produced in their original file folders, or

2 other native format.  If the DOCUMENTS are in their original file folders, in lieu

3 thereof, any writing on the file folder from which each such DOCUMENT is taken

4 shall be copied and appended to such DOCUMENT and the PERSON for whom or

5 department, division or office for which the DOCUMENT or the file folder is

6 maintained shall be identified.

7    D. The DOCUMENTS should be produced in their complete and

8 unaltered form.  Attachments to DOCUMENTS should not be removed.  The

9 DOCUMENTS should not be cut-up, pasted over, redacted or altered in any way for

10 any reason, including alleged nonrelevance.  If emails are produced that had

11 attachments, the attachments shall be attached when produced.

12    E. DOCUMENTS in electronic form shall be produced in that form.

13    F. In the event that any DOCUMENT called for by these requests

14 has been destroyed or discarded, that DOCUMENT is to be identified by stating:

15     1. the date and type of the DOCUMENT, the author(s) and all

16      recipients;

17     2. the DOCUMENT's date, subject matter, number of pages, and

18      attachments or appendices;

19     3. the date of destruction or discard, manner of destruction or

20      discard, and reason for destruction or discard;

21     4. the PERSONS who were authorized to carry out such destruction

22      or discard;

23     5. the PERSONS who have knowledge of the content, origins,

24      distribution and destruction of the DOCUMENT; and

25     6. whether any copies of the DOCUMENT exist and, if so, the

26      name of the custodian of each copy.

27

28

EXHIBIT __29__

PAGE ___445___

2752004.1

-8-

## III.   REQUESTS FOR DOCUMENTS AND THINGS

REQUEST FOR PRODUCTION NO. 1:

All YOUR audited and unaudited monthly, quarterly and annual financial statements covering or RELATING TO any period on or after January 1, 2007, including without limitation balance sheets, income statements, profit and loss statements, consolidated statements of operations, cash flow statements and statements of retained earnings.

REQUEST FOR PRODUCTION NO. 2:

All agreements and contracts with any lenders to or creditors of MGA covering, RELATING TO, in effect, dated or entered into on or after January 1, 2007, including without limitation loan agreements, credit agreements, financing agreements, lines of credit and promissory notes, and any amendments or modifications thereto, and any notices of default and COMMUNICATIONS REFERRING OR RELATING TO any such agreements and contracts.

REQUEST FOR PRODUCTION NO. 3:

To the extent not produced in response to any other Request, DOCUMENTS sufficient to IDENTIFY each other PERSON from whom YOU sought, solicited, requested, obtained, received or were denied credit, financing or funding on or after January 1, 2007 and sufficient to show the amount(s) and terms involved.

REQUEST FOR PRODUCTION NO. 4:

All DOCUMENTS REFERRING OR RELATING TO YOUR solvency or insolvency, or whether YOUR liabilities exceed YOUR assets, for any period on or after January 1, 2007 (excluding pleadings served by YOU on MATTEL in this action).

EXHIBIT __29__
PAGE __446__

2752004.1

MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS TO MGA ENTERTAINMENT (Phase 2)

1   REQUEST FOR PRODUCTION NO. 5:

2           All DOCUMENTS REFERRING OR RELATING TO any

3   representation or statement made by YOU about YOUR solvency or insolvency, or

4   whether YOUR liabilities exceed YOUR assets, for any period on or after January 1,

5   2007 (excluding pleadings served by YOU on MATTEL in this action).

6

7   REQUEST FOR PRODUCTION NO. 6:

8           All DOCUMENTS REFERRING OR RELATING TO YOUR net

9   worth for any period on or after January 1, 2007 (excluding pleadings served by

10  YOU on MATTEL in this action).

11

12  REQUEST FOR PRODUCTION NO. 7:

13          All DOCUMENTS REFERRING OR RELATING TO ISAAC

14  LARIAN's net worth for any period on or after January 1, 2007 (excluding

15  pleadings served by YOU on MATTEL in this action).

16

17  REQUEST FOR PRODUCTION NO. 8:

18          All DOCUMENTS REFERRING OR RELATING TO orders,

19  including without limitation cancelled or held orders, for BRATZ products for

20  Spring 2009, and all COMMUNICATIONS with retailers and other prospective

21  purchasers REFERRING OR RELATING TO any such orders.

22

23  REQUEST FOR PRODUCTION NO. 9:

24          All DOCUMENTS REFERRING OR RELATING TO orders,

25  including without limitation cancelled or held orders, for BRATZ products for Fall

26  2009, and all COMMUNICATIONS with retailers and other prospective purchasers

27  REFERRING OR RELATING TO any such orders.

28

EXHIBIT __29__
PAGE __447__

27520004.1

MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS TO MGA ENTERTAINMENT (Phase 2)

1 | REQUEST FOR PRODUCTION NO. 10:

2        All DOCUMENTS REFERRING OR RELATING TO the transfer of

3 | any ITEM OF VALUE by MGA to, or for the benefit of, ISAAC LARIAN, any

4 | member of ISAAC LARIAN's family or any entity controlled by ISAAC LARIAN

5 | or any member of ISAAC LARIAN's family, since January 1, 2007.

6

7 | REQUEST FOR PRODUCTION NO. 11:

8        All COMMUNICATIONS between YOU and any third-party,

9 | including without limitation any retailer or distributor but excluding MATTEL and

10 | any Court, REFERRING OR RELATING TO YOUR *ex parte* application for stay

11 | pending appeal, filed December 11, 2008, including without limitation any

12 | declaration, whether final, draft, proposed or requested, in connection therewith and

13 | copies of all draft declarations in connection therewith.

14

15 | REQUEST FOR PRODUCTION NO. 12:

16        All DOCUMENTS REFERRING OR RELATING TO capital

17 | contributions to MGA since January 1, 2007.

18

19 | REQUEST FOR PRODUCTION NO. 13:

20        All DOCUMENTS showing MGA's projected revenue, costs, profits or

21 | financial performance for any period since January 1, 2007.

22

23 | REQUEST FOR PRODUCTION NO. 14:

24        All DOCUMENTS REFERRING OR RELATING TO any transfer of

25 | any ITEM OF VALUE or other transaction between (i) MGA, and (ii) ISAAC

26 | LARIAN, any ISAAC LARIAN family member, any PERSON controlled, directly

27 | or indirectly by ISAAC LARIAN, or any PERSON controlled, directly or indirectly,

28 | by any ISAAC LARIAN family member since January 1, 2007.

EXHIBIT 29

PAGE 448

MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS TO MGA ENTERTAINMENT (Phase 2)

1  REQUEST FOR PRODUCTION NO. 15:

2          All W-2s REFERRING OR RELATING TO any ISAAC LARIAN

3  family member since January 1, 2007.

4

5  REQUEST FOR PRODUCTION NO. 16:

6          All DOCUMENTS REFERRING OR RELATING TO any sale,

7  distribution or transfer by MGA of BRATZ products having a retail value greater

8  than $50,000 other than to retailers in the ordinary course of business since

9  January 1, 2007.

10

11  REQUEST FOR PRODUCTION NO. 17:

12          All DOCUMENTS REFERRING OR RELATING TO agreements,

13  transactions, sales, shipments or the transfer of any ITEM OF VALUE between

14  MGA and IGWT Group, LLC.

15

16  REQUEST FOR PRODUCTION NO. 18:

17          All DOCUMENTS REFERRING OR RELATING TO the alleged

18  transfer of product from MGA to IGWT Group, LLC pursuant to the Inventory

19  Purchase Agreement dated July 7, 2008, including without limitation all audits or

20  other valuations performed in connection with such product, any opinions

21  RELATING TO the fairness or unfairness of such transfer, all MGA corporate or

22  director resolutions or approvals of such transfer, all bids received or solicited in

23  connection with the purported sale or offering for sale of such product, the terms of

24  such bids and any other and all COMMUNICATIONS relating to any of the

25  foregoing.

26

27

28

EXHIBIT __29__
PAGE __449__

2752004.1

MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS TO MGA ENTERTAINMENT (Phase 2)

1   REQUEST FOR PRODUCTION NO. 19:

2        All DOCUMENTS REFERRING OR RELATING TO the revenue

3   generated by IGWT Group, LLC's sales, licensing, distribution or other transfer of

4   BRATZ products and the transfer or disposition of such revenue.

5

6   REQUEST FOR PRODUCTION NO. 20:

7        All DOCUMENTS REFERRING OR RELATING TO agreements,

8   contracts, transactions, sales, shipments or transfers of any ITEM OF VALUE

9   between MGA and IGWT 826 Investments, LLC.

10

11  REQUEST FOR PRODUCTION NO. 21:

12       All DOCUMENTS REFERRING OR RELATING TO the revenue

13  generated by IGWT 826 Investments, LLC's sales, licensing, distribution or other

14  transfer of BRATZ products and the transfer or disposition of such revenue.

15

16  REQUEST FOR PRODUCTION NO. 22:

17       All agreements, contracts and written COMMUNICATIONS between

18  MGA and Wachovia since January 1, 2007.

19

20  REQUEST FOR PRODUCTION NO. 23:

21       All agreements and contracts REFERRING OR RELATING TO any

22  indebtedness owed to Wachovia or any credit extended by Wachovia since January

23  1, 2007, and any amendments or modifications thereto, and any

24  COMMUNICATIONS RELATED TO any such agreements or contracts.

25

26  REQUEST FOR PRODUCTION NO. 24:

27       All DOCUMENTS REFERRING OR RELATING TO agreements,

28  contracts or transactions between MGA and OMNI 808 INVESTORS, LLC, and

2752004.1

-13-

EXHIBIT ___7___
PAGE ___450___

1  any amendments or modifications thereto, and any COMMUNICATIONS

2  REFERRING OR RELATING TO any such agreements, contracts or transactions.

3

4  REQUEST FOR PRODUCTION NO. 25:

5          All DOCUMENTS containing financial information, including but not

6  limited to YOUR historical and prospective financial performance, provided by

7  YOU to OMNI 808 INVESTORS, LLC, VISION CAPITAL, LLC or LEXINGTON

8  FINANCIAL, LLC since January 1, 2008.

9

10  REQUEST FOR PRODUCTION NO. 26:

11          All DOCUMENTS REFERRING OR RELATING TO agreements,

12  contracts or transactions between LEXINGTON FINANCIAL, LLC and MGA or

13  any other PERSON, and any amendments or modifications thereto, and any

14  COMMUNICATIONS REFERRING OR RELATING TO any such agreements,

15  contracts or transactions.

16

17  REQUEST FOR PRODUCTION NO. 27:

18          All DOCUMENTS REFERRING OR RELATING TO agreements,

19  contracts or transactions between VISION CAPITAL, LLC and MGA or any other

20  PERSON, and any amendments or modifications thereto, and any

21  COMMUNICATIONS REFERRING OR RELATING TO any such agreements,

22  contracts or transactions.

23

24  REQUEST FOR PRODUCTION NO. 28:

25          DOCUMENTS sufficient to IDENTIFY each member, managing

26  member, holder of any ownership interest in, shareholder, officer and director of

27  IGWT Group, LLC.

28

EXHIBIT __29__
PAGE __451__

2752004.1

-14-

1  REQUEST FOR PRODUCTION NO. 29:

2         DOCUMENTS sufficient to IDENTIFY each member, managing

3  member, holder of any ownership interest in, shareholder, officer and director of

4  IGWT 826 Investments, LLC.

5

6  REQUEST FOR PRODUCTION NO. 30:

7         DOCUMENTS sufficient to IDENTIFY each member, managing

8  member, holder of any ownership interest in, shareholder, officer and director  of

9  OMNI 808 INVESTORS, LLC.

10

11  REQUEST FOR PRODUCTION NO. 31:

12        DOCUMENTS sufficient to IDENTIFY each member, managing

13  member, holder of any ownership interest in, shareholder, officer and director of

14  VISION CAPITAL, LLC.

15

16  REQUEST FOR PRODUCTION NO. 32:

17        DOCUMENTS sufficient to IDENTIFY each member, managing

18  member, holder of any ownership interest in, shareholder, officer and director of

19  LEXINGTON FINANCIAL, LLC.

20

21  REQUEST FOR PRODUCTION NO. 33:

22        All DOCUMENTS RELATING TO any transfer of any funds, monies

23  or any ITEM OF VALUE from, or any extension of credit or funding by,

24  LEXINGTON FINANCIAL, LLC to YOU or LARIAN.

25

26

27

28

EXHIBIT ___29___

PAGE ___452___

2752004.1

1  REQUEST FOR PRODUCTION NO. 34:

2         All DOCUMENTS RELATING TO any transfer of any funds, monies

3  or any ITEM OF VALUE to or from, or any extension of credit or funding by or to,

4  LEXINGTON FINANCIAL, LLC, whether directly or indirectly.

5

6  REQUEST FOR PRODUCTION NO. 35:

7         DOCUMENTS sufficient to IDENTIFY each member, managing

8  member, holder of any ownership interest in, shareholder, officer and director of

9  IGWT Group, LLC.

10

11  REQUEST FOR PRODUCTION NO. 36:

12         DOCUMENTS sufficient to IDENTIFY each member, managing

13  member, holder of any ownership interest in, shareholder, officer and director of

14  IGWT 826 Investments, LLC.

15

16  REQUEST FOR PRODUCTION NO. 37:

17         DOCUMENTS sufficient to IDENTIFY each of YOUR bank accounts

18  since January 1, 2007.

19

20  REQUEST FOR PRODUCTION NO. 38:

21         DOCUMENTS sufficient to IDENTIFY each bank account to or from

22  which Isaac Larian has transferred or has had transferred any ITEM OF VALUE

23  since January 1, 2007.

24

25  REQUEST FOR PRODUCTION NO. 39:

26         DOCUMENTS sufficient to IDENTIFY each bank account to or from

27  which OMNI 808 INVESTORS, LLC has transferred or has had transferred any

28  ITEM OF VALUE since January 1, 2007.

EXHIBIT __27__
PAGE __453__

MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS TO MGA ENTERTAINMENT (Phase 2)

2752004.1

1  REQUEST FOR PRODUCTION NO. 40:

2          DOCUMENTS sufficient to IDENTIFY each bank account to or from

3  which IGWT Group, LLC has transferred or has had transferred any ITEM OF

4  VALUE since January 1, 2007.

5

6  REQUEST FOR PRODUCTION NO. 41:

7          DOCUMENTS sufficient to IDENTIFY each bank account to or from

8  which IGWT 826 Investments, LLC has transferred or has had transferred any

9  ITEM OF VALUE since January 1, 2007.

10

11  REQUEST FOR PRODUCTION NO. 42:

12          All COMMUNICATIONS between or among YOU, IGWT 826

13  Investments, LLC and/or IGWT Group, LLC REFERRING OR RELATING TO

14  MATTEL and/or BRATZ.

15

16  REQUEST FOR PRODUCTION NO. 43:

17          All COMMUNICATIONS between or among YOU, OMNI 808

18  INVESTORS, LLC, VISION CAPITAL, LLC and/or LEXINGTON FINANCIAL,

19  LLC REFERRING OR RELATING TO MATTEL, MGA, LARIAN and/or

20  BRATZ.

21

22  REQUEST FOR PRODUCTION NO. 44:

23          All COMMUNICATIONS between YOU and MASHIAN

24  REFERRING OR RELATING TO OMNI 808 INVESTORS, LLC, VISION

25  CAPITAL, LLC, LEXINGTON FINANCIAL, LLC, MATTEL, MGA, LARIAN

26  and/or BRATZ.

27

28

EXHIBIT __37__
PAGE __454__

MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS TO MGA ENTERTAINMENT (Phase 2)

2752004.1

1  REQUEST FOR PRODUCTION NO. 45:

2          All COMMUNICATIONS between YOU and Neil Kadisha

3  REFERRING OR RELATING TO OMNI 808 INVESTORS, LLC, VISION

4  CAPITAL, LLC, LEXINGTON FINANCIAL, LLC, MATTEL, MGA, LARIAN

5  and/or BRATZ.

6

7  REQUEST FOR PRODUCTION NO. 46:

8          All COMMUNICATIONS between YOU and OMNI 808

9  INVESTORS, LLC REFERRING OR RELATING TO VISION CAPITAL, LLC,

10 LEXINGTON FINANCIAL, LLC, MATTEL, MGA, LARIAN and/or BRATZ.

11

12 REQUEST FOR PRODUCTION NO. 47:

13         All COMMUNICATIONS REFERRING OR RELATING TO VISION

14 CAPITAL, LLC, LEXINGTON FINANCIAL, LLC and/or OMNI 808

15 INVESTORS, LLC.

16

17 REQUEST FOR PRODUCTION NO. 48:

18         DOCUMENTS sufficient to IDENTIFY each bank account to or from

19 which VISION CAPITAL, LLC has transferred or has had transferred any ITEM

20 OF VALUE since January 1, 2007.

21

22 REQUEST FOR PRODUCTION NO. 49:

23         DOCUMENTS sufficient to IDENTIFY each bank account to or from

24 which LEXINGTON FINANCIAL, LLC has transferred or has had transferred any

25 ITEM OF VALUE since January 1, 2007.

26

27

28

EXHIBIT ___29___

PAGE ___455___

-18-

1  REQUEST FOR PRODUCTION NO. 50:

2          DOCUMENTS sufficient to IDENTIFY each licensee of any BRATZ

3  product since January 1, 2007.

4

5  REQUEST FOR PRODUCTION NO. 51:

6          DOCUMENTS sufficient to show the amount of payments made to

7  YOU by each licensee of any BRATZ product since January 1, 2007.

8

9  REQUEST FOR PRODUCTION NO. 52:

10          A sample of each BRATZ product manufactured, sold, offered for sale,

11  marketed or distributed by YOU since January 1, 2008.

12

13  REQUEST FOR PRODUCTION NO. 53:

14          To the extent not produced in response to any other Request, a sample

15  of each core BRATZ female fashion doll manufactured, sold, offered for sale,

16  marketed or distributed by YOU since January 1, 2008.

17

18  REQUEST FOR PRODUCTION NO. 54:

19          All registrations, and applications for registration, for any trademark or

20  service mark that constitutes, includes or incorporates in any manner the term

21  "BRATZ."

22

23  REQUEST FOR PRODUCTION NO. 55:

24          All registrations, and applications for registration, for any trademark or

25  service mark that constitutes, includes or incorporates in any manner the term

26  "Jade."

27

28

EXHIBIT 29
PAGE 456

1    REQUEST FOR PRODUCTION NO. 56:

2          All COMMUNICATIONS with any Trademark Office or governmental

3 entity REFERRING OR RELATING TO any registration, or application for

4 registration, for any trademark or service mark that constitutes, includes or

5 incorporates in any manner the term "BRATZ."

6

7    REQUEST FOR PRODUCTION NO. 57:

8          All COMMUNICATIONS with any Trademark Office or governmental

9 entity REFERRING OR RELATING TO any registration, or application for

10 registration, for any trademark or service mark that constitutes, includes or

11 incorporates in any manner the term "Jade."

12

13

14 DATED:  January 7, 2009          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

15

16                        By _____

17                          Jon D. Corey
                          Attorneys for Mattel, Inc.

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT __27__
PAGE __457__

# EXHIBIT 30

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  johnquinn@quinnemanuel.com
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
  Timothy L. Alger (Bar No. 160303)
  (timalger@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727 |
| vs. | |
| MATTEL, INC., a Delaware corporation, | NOTICE OF DEPOSITION OF SHIRIN SALEMNIA |
| Defendant. | Date:   February 6, 2009<br>Time:   9:00 a.m.<br>Place.:  Quinn Emanuel Urquhart Oliver<br>         & Hedges<br>         865 S. Figueroa St., 10th Floor<br>         Los Angeles, CA 90017 |
| AND CONSOLIDATED CASES | |

EXHIBIT 30
PAGE 458

01-07

NOTICE OF DEPOSITION

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2  PLEASE TAKE NOTICE that Mattel, Inc. will take the deposition of

3  Shirin Salemnia on February 6, 2009 beginning at 9:00 a.m., at the offices of Quinn

4  Emanuel Urquhart Oliver & Hedges, LLP, 865 S. Figueroa St., Los Angeles, CA

5  90017.

6  PLEASE TAKE FURTHER NOTICE that the deposition will take

7  place upon oral examination before a duly authorized notary public or other officer

8  authorized to administer oaths at depositions, and will continue from day to day,

9  Sundays, Saturdays and legal holidays excepted, until completed.

10  PLEASE TAKE FURTHER NOTICE that, pursuant to <u>Fed. R. Civ.</u>

11  <u>P.</u> 30(b)(2), the deposition will be videotaped.  Mattel also reserves the right to use

12  Livenote or other technology for real-time transcription of the testimony.

13

14  DATED:  January 7, 2009        QUINN EMANUEL URQUHART OLIVER &
                                   HEDGES, LLP
15

16                      By_____
17                        Jon D. Corey
                          Attorneys for Mattel, Inc.
18

19

20

21

22

23

24

25

26

27

28

EXHIBIT __30__
PAGE __459__

07209/2753510.1

-2-

NOTICE OF DEPOSITION

# EXHIBIT 31

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
     Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
     Timothy L. Alger (Bar No. 160303)
5    (timalger@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
7  Facsimile: (213) 443-3100

8  Attorneys for Mattel, Inc.

9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12                    EASTERN DIVISION

13  CARTER BRYANT, an individual,          CASE NO. CV 04-9049 SGL (RNBx)

14              Plaintiff,                  Consolidated with
                                            Case No. CV 04-09059
15       vs.                                Case No. CV 05-02727

16  MATTEL, INC., a Delaware               NOTICE OF DEPOSITION OF
    corporation,                           MARIANA TRUEBA
17
              Defendant.                    Date:   February 4, 2009
18                                          Time:   9:00 a.m.
                                            Place.: Quinn Emanuel Urquhart Oliver
19  AND CONSOLIDATED CASES                         & Hedges
                                                   865 S. Figueroa St., 10th Floor
20                                                 Los Angeles, CA 90017

21

22

23

24

25

26

27                                         EXHIBIT 31
28                                         PAGE 460

01-07

07209/2753506.1

NOTICE OF DEPOSITION

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2    PLEASE TAKE NOTICE that Mattel, Inc. will take the deposition of

3 Mariana Trueba on February 4, 2009 beginning at 9:00 a.m., at the offices of Quinn

4 Emanuel Urquhart Oliver & Hedges, LLP, 865 S. Figueroa St., Los Angeles, CA

5 90017.

6    PLEASE TAKE FURTHER NOTICE that the deposition will take

7 place upon oral examination before a duly authorized notary public or other officer

8 authorized to administer oaths at depositions, and will continue from day to day,

9 Sundays, Saturdays and legal holidays excepted, until completed.

10    PLEASE TAKE FURTHER NOTICE that, pursuant to Fed. R. Civ.

11 P. 30(b)(2), the deposition will be videotaped.  Mattel also reserves the right to use

12 Livenote or other technology for real-time transcription of the testimony.

13

14 DATED:  January 7, 2009        QUINN EMANUEL URQUHART OLIVER &
                                   HEDGES, LLP
15

16                         By
17                            Jon D. Corey
                             Attorneys for Mattel, Inc.
18

EXHIBIT 31
PAGE 461

07209/2753506.1

-2-

NOTICE OF DEPOSITION

# EXHIBIT 32

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
   Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
   Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
   Timothy L. Alger (Bar No. 160303)
5    (timalger@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California  90017-2543
   Telephone:  (213) 443-3000
7  Facsimile:  (213) 443-3100

8  Attorneys for Mattel, Inc.

9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12                  EASTERN DIVISION

| | |
|---|---|
| 13  CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| 14         Plaintiff, | Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727 |
| 15     vs. | |
| 16  MATTEL, INC., a Delaware corporation, | NOTICE OF DEPOSITION OF PABLO VARGAS |
| 17         Defendant. | |
| 18 | Date:   February 3, 2009<br>Time:   9:00 a.m. |
| 19  AND CONSOLIDATED CASES | Place.:  Quinn Emanuel Urquhart Oliver<br>& Hedges<br>865 S. Figueroa St., 10th Floor<br>Los Angeles, CA 90017 |
| 20 | |

21

22

23

24

25

26

27

28

EXHIBIT __32__
PAGE __462__

*01-07*

NOTICE OF DEPOSITION

1           TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2               PLEASE TAKE NOTICE that Mattel, Inc. will take the deposition of

3 Pablo Vargas on February 3, 2009 beginning at 9:00 a.m., at the offices of Quinn

4 Emanuel Urquhart Oliver & Hedges, LLP, 865 S. Figueroa St., Los Angeles, CA

5 90017.

6               PLEASE TAKE FURTHER NOTICE that the deposition will take

7 place upon oral examination before a duly authorized notary public or other officer

8 authorized to administer oaths at depositions, and will continue from day to day,

9 Sundays, Saturdays and legal holidays excepted, until completed.

10               PLEASE TAKE FURTHER NOTICE that, pursuant to Fed. R. Civ.

11 P. 30(b)(2), the deposition will be videotaped.  Mattel also reserves the right to use

12 Livenote or other technology for real-time transcription of the testimony.

13

14 DATED:  January 7, 2009          QUINN EMANUEL URQUHART OLIVER &
                                         HEDGES, LLP

15

16                             By_____

17                               Jon D. Corey
                              Attorneys for Mattel, Inc.

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 32
PAGE 463

-2-

NOTICE OF DEPOSITION

# EXHIBIT 33

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 34

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**