# EXHIBIT 35

FILED

2009 MAY 22 PM 4: 44

CLERK, U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

BY _____

CONFORMED COPY

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 90378)
2     (johnquinn@quinnemanuel.com)
     Michael T. Zeller (Bar No. 196417)
3     (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4     (joncorey@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
6  Facsimile: (213) 443-3100

7  Attorneys for Mattel, Inc.

8              UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 10  CARTER BRYANT, an individual, <br> 11  Plaintiff, <br> 12  v. <br> 13 <br> 14  MATTEL, INC., a Delaware corporation, <br> 15  Defendant. <br> 16 <br> 17 <br> 18 <br> 19 <br> 20  AND CONSOLIDATED CASES <br> 21 <br> 22 <br> 23 <br> 24 | CASE NO. CV 04-9049 SGL (RNBx) <br><br> Consolidated With Case No. 04-9059 and Case No. 05-2727 <br><br> MATTEL, INC.'S THIRD AMENDED ANSWER IN CASE NO. 05-2727 AND COUNTERCLAIMS FOR: <br><br> 1. COPYRIGHT INFRINGEMENT; <br> 2. VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT; <br> 3. CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT; <br> 4. MISAPPROPRIATION OF TRADE SECRETS; <br> 5. BREACH OF CONTRACT; <br> 6. INTENTIONAL INTERFERENCE WITH CONTRACT; <br> 7. BREACH OF FIDUCIARY DUTY; <br> 8. AIDING AND ABETTING BREACH OF FIDUCIARY DUTY; <br> 9. BREACH OF DUTY OF LOYALTY; |

25              PUBLIC REDACTED

26

27              Volume I

28              EXHIBIT  35
              PAGE  499

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

10. AIDING AND ABETTING BREACH OF DUTY OF LOYALTY;
11. CONVERSION;
12. UNFAIR COMPETITION;
13. AVOIDANCE OF INTENTIONAL AND CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER UNIFORM FRAUDULENT TRANSFER ACT; AND
14. DECLARATORY RELIEF

DEMAND FOR JURY TRIAL

EXHIBIT __35__
PAGE __500__

00505.07209/2875224.1

THIRD AMENDED ANSWER AND COUNTERCLAIMS

### THIRD AMENDED ANSWER

Defendant Mattel, Inc. ("Mattel") answers the Complaint of MGA Entertainment, Inc. ("Complaint") as follows:

<u>Preliminary Statement</u>

The Complaint in this case contravenes <u>Rule</u> 8(a) of the <u>Federal Rules of Civil Procedure</u> in multiple respects. For example, in many places, the Complaint improperly mixes factual averments with argumentative rhetoric. The Complaint also includes a selective recitation of alleged historical facts and "rumor," much of which is both irrelevant and inflammatory in tone and content. In addition, many of the allegations of the Complaint are overly broad, vague or conclusory and include terms which are undefined and which are susceptible to different meanings. Accordingly, by way of a general response, all allegations are denied unless specifically admitted, and any factual averment admitted is admitted only as to the specific facts and not as to any conclusions, characterizations, implications or speculations which are contained in the averment or in the Complaint as a whole. These comments and objections are incorporated, to the extent appropriate, into each numbered paragraph of this Third Amended Answer.

Mattel further submits that the use of the headings throughout the Complaint is improper, and therefore no response to them is required. In the event that a response is required, Mattel denies those allegations.

The Complaint also contains many purported photographs of various items, and it uses one or more headings purporting to describe, either individually or in groups, these various photographs. The images of these photographs contained in the Complaint are all relatively small and some are of less than optimal quality, making it difficult to evaluate the adequacy of the photographs or their fairness and accuracy in depicting what they purport to represent. The Complaint also does not describe the circumstances or time frame in which these photographs were taken, and in many cases does not identify, or does not sufficiently or properly identify, the

EXHIBIT  35
PAGE  501

-1-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1 item depicted in the photographs.  All of these factors, as well as the use of these
2 photographs and headings out of context, or with an insufficient context, impair the
3 ability of Mattel to fully respond to these photographs and headings, or to any
4 purported allegations involving, or relying upon, the use of such photographs and
5 accompanying headings.  By way of a general response, Mattel therefore does not
6 admit the authenticity of any photograph, or the accuracy or adequacy of any
7 heading, nor does it admit any allegation or inference that is based on, or purports to
8 be based on, any photograph or accompanying heading in the Complaint.  Mattel
9 reserves the right to challenge the authenticity of any photograph and the accuracy
10 or adequacy of any heading (either as included in the Complaint or in the context of
11 additional material not included).  Further, with reference to all photographs and
12 accompanying headings, or any averments based on the Complaint's use of such
13 photographs and headings, which might be offered into evidence, Mattel specifically
14 reserves its right to object to any use of such photographs, headings, and averments,
15 or the Complaint as a whole or in part, in evidence for any purpose whatsoever.

16       To the extent that Mattel has endeavored to answer any particular
17 allegation containing any such photographs and headings, any admission concerning
18 the item purported to be depicted in such photograph, or described in such headings,
19 shall not constitute an admission that the photograph is authentic, adequate, or
20 admissible, nor that any heading is accurate, adequate, or admissible.  All such items
21 purportedly depicted in such photographs, and described in such headings, "speak
22 for themselves."  Accordingly, to the extent that any such referenced materials are
23 deemed allegations against Mattel, they are denied.

24 <u>Responses</u>

25     1.    Answering paragraph 1 of the Complaint, Mattel admits that
26 plaintiff MGA Entertainment, Inc. ("plaintiff" or "MGA") is a California
27 corporation with a principal place of business in Van Nuys, California.

28

EXHIBIT 35
PAGE 502

-2-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1    2.    Answering paragraph 2 of the Complaint, Mattel admits that
2  Mattel is a Delaware corporation with a principal place of business in El Segundo,
3  California.

4    3.    Answering paragraph 3 of the Complaint, Mattel denies that
5  there has been wrongful conduct on its part and states that it is without knowledge
6  or information sufficient to form a belief as to the truth or falsity of the remaining
7  allegations set forth therein and, on that basis, denies them.

8    4.    Answering paragraph 4 of the Complaint, Mattel admits that
9  plaintiff purports to assert claims under the Lanham Act, 15 U.S.C. §§ 1125(a) and
10 (c), California Business and Professions Code §§ 17200 et seq., California Business
11 and Professions Code § 14330 and California common law, denies that plaintiff is
12 entitled to any relief thereunder and denies the truth of the remaining allegations set
13 forth in paragraph 4.

14   5.    Answering paragraph 5 of the Complaint, Mattel admits that it is
15 subject to personal jurisdiction in this District and denies the truth of the remaining
16 allegations set forth in paragraph 5.

17   6.    Answering paragraph 6 of the Complaint, Mattel admits that
18 venue is proper in this District and denies the truth of the remaining allegations set
19 forth in paragraph 6.

20   7.    Answering paragraph 7 of the Complaint, Mattel admits that
21 MGA has filed the instant lawsuit and denies the truth of the remaining allegations
22 set forth in paragraph 7.

23   8.    Answering paragraph 8 of the Complaint, Mattel states that it is
24 without knowledge or information sufficient to form a belief as to the truth or falsity
25 of the allegations regarding MGA's history set forth therein and, on that basis,
26 denies them, states that MGA has made conflicting representations, including in
27 sworn statements, that are at odds with the allegations of the Complaint and denies
28 the truth of the remaining allegations set forth in paragraph 8.

EXHIBIT 35
PAGE 503

THIRD AMENDED ANSWER AND COUNTERCLAIMS

9.      Answering paragraph 9 of the Complaint, Mattel admits that MGA filed this action, states that Mattel's web site and corporate governance policies speak for themselves and denies the truth of the remaining allegations set forth in paragraph 9.

10.     Answering paragraph 10 of the Complaint, Mattel admits that it is the world's most successful toy company, states that the first doll in its BARBIE line was publicly introduced in 1959 and that BARBIE-branded dolls have been the world's best-selling toys, states that Mattel's sales and stock price speak for themselves, and denies the truth of the remaining allegations set forth in paragraph 10.

11.     Answering paragraph 11 of the Complaint, Mattel admits that Adrienne Fontanella is the former president for girls' toys at Mattel, states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding an alleged statement by Ms. Fontanella, and denies the truth of the remaining allegations set forth in paragraph 11.

12.     Answering paragraph 12 of the Complaint, Mattel is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding alleged statements by unidentified "analysts," states that Mattel's sales and stock price speak for themselves, and denies the truth of the remaining allegations set forth in paragraph 12.

13.     Answering paragraph 13 of the Complaint, Mattel admits that Jill Barad became President and Chief Executive Officer of Mattel in January 1997, that Mattel acquired Tyco Industries, Inc. ("Tyco") in March 1997, that Mattel acquired Pleasant Company in 1998, Mattel acquired the Learning Company in May 1999, that Mattel acquired Purple Moon in 1999, that the MATCHBOX brand was owned by Tyco, that the AMERICAN GIRL line of dolls was made by Pleasant Company at the time of that entity's acquisition, and denies the truth of the remaining allegations set forth in paragraph 13.

EXHIBIT __35__
PAGE __504__

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1    14.    Answering paragraph 14 of the Complaint, Mattel states that its
2  public announcements speak for themselves, and denies the truth of the remaining
3  allegations set forth therein.

4    15.    Answering paragraph 15 of the Complaint, Mattel states that its
5  stock price and its public announcements speak for themselves, and denies the truth
6  of the remaining allegations set forth therein.

7    16.    Answering paragraph 16 of the Complaint, Mattel states that its
8  stock price speaks for itself, states that it is without knowledge or information
9  sufficient to form a belief as to the truth or falsity of the allegations regarding the
10  alleged views of unnamed "analysts" and "[i]nvestors," and denies the truth of the
11  remaining allegations set forth therein.

12    17.    Answering paragraph 17 of the Complaint, Mattel admits that
13  Ms. Barad resigned in February 2000.

14    18.    Answering paragraph 18 of the Complaint, Mattel admits that
15  Robert Eckert became Chairman and Chief Executive Officer of Mattel in May 2000
16  and that Mr. Eckert previously was employed at Kraft Foods, Inc. for 23 years, is
17  without knowledge or information sufficient to form a belief as to the truth or falsity
18  of the allegations regarding the views of unnamed "[i]nvestors" and others, and
19  denies the truth of the remaining allegations set forth in paragraph 18.

20    19.    Answering paragraph 19 of the Complaint, Mattel admits that the
21  *Wall Street Journal* published an article on August 10, 2000, the content of which
22  speaks for itself, and denies the truth of the remaining allegations set forth therein.

23    20.    Answering paragraph 20 of the Complaint, Mattel admits that it
24  disposed of the Learning Company in October 2000, states that its sales and
25  revenues speak for themselves, states that the remainder of the allegations contained
26  therein are characterizations, not factual assertions, and therefore no response is
27  necessary under Fed. R. Civ. P. 8(b) and, to the extent any further response is
28  required, denies the truth of any remaining allegations set forth in paragraph 20.

00505.07209/2875224.1

EXHIBIT    35    -5-

PAGE    505

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1          21.   Answering paragraph 21 of the Complaint, Mattel admits that
2    products in plaintiff's "Bratz" line compete with products in Mattel's BARBIE and
3    other product lines and states that the remainder of the allegation contained
4    therein—consisting of a sentence fragment—is unintelligible and on that basis
5    denies the truth of any such remaining allegation set forth therein.

6          22.   Answering paragraph 22 of the Complaint, Mattel admits that
7    products in plaintiff's "Bratz" line compete with Mattel products, states that the
8    remainder of the allegations contained therein are characterizations, not factual
9    assertions, and that therefore no response is necessary under Fed. R. Civ. P. 8(b)
10   and, to the extent any further response is required, denies the truth of any remaining
11   allegations set forth therein.

12         23.   Answering paragraph 23 of the Complaint, Mattel states that
13   MGA has made conflicting statements, including in sworn statements, that are
14   inconsistent with the allegations set forth in paragraph 23 of the Complaint and
15   states that it is therefore without knowledge or information sufficient to form a
16   belief as to the truth or falsity of the allegations set forth therein and, on that basis,
17   denies them.

18         24.   Answering paragraph 24 of the Complaint, Mattel states that the
19   "look" of the referenced dolls speak for themselves and denies the truth of the
20   remaining allegations set forth therein.  By way of further answer, Mattel states that
21   the photographs and their accompanying caption on page 7 of the Complaint are
22   false and misleading to the extent they are intended to suggest that MGA has
23   produced or used a consistent packaging shape or look or that it has protectible
24   rights in the matters depicted in the photographs.

25         25.   Answering paragraph 25 of the Complaint, Mattel admits that
26   Bratz dolls are between approximately 9.5 to 10 inches in height, states that the
27   appearances of the dolls speak for themselves, denies that "Bratz" dolls are or "were
28   intentionally shorter" than dolls in Mattel's BARBIE line, denies that the "Bratz"

EXHIBIT 35 -6-
PAGE 506
THIRD AMENDED ANSWER AND COUNTERCLAIMS

00505.07209/2875224.1

1    dolls "looked like no other" and denies the truth of the remaining allegations set
2    forth in paragraph 25.

3            26.    Answering paragraph 26 of the Complaint, Mattel states that the
4    use of the term "classic" is unintelligible, since Mattel has designed and sold
5    different dolls using different heads and with different fashions and themes over the
6    years, and denies the truth of any remaining allegations.  By way of further answer,
7    Mattel states that the image encaptioned "Mattel's 'Barbie'" on page 8 of the
8    Complaint is misleading in that it depicts one of the doll heads that have been used
9    as part of the BARBIE line for many years, and therefore ignores that Mattel has
10   long designed and sold an array of different BARBIE line dolls that use different
11   doll heads, including doll heads which depict different ethnicities, and that are
12   dressed in different clothing and fashion styles.

13           27.    Answering paragraph 27 of the Complaint, Mattel admits that
14   MGA has used the line "The Girls With a Passion for Fashion" in some contexts,
15   denies that MGA originated or otherwise has rights to that phrase, admits that one
16   audience for products in the "Bratz" line has been "tweens" and denies the truth of
17   the remaining allegations set forth in paragraph 27.

18           28.    Answering paragraph 28 of the Complaint, Mattel admits that
19   certain "Bratz" dolls have won certain awards, the terms of which speak for
20   themselves, states that it is without knowledge or information sufficient to form a
21   belief as to the truth or falsity of the allegations regarding the "awards" MGA claims
22   and, on that basis, denies them, denies that plaintiff has protectible rights and denies
23   the truth of any remaining allegations set forth in paragraph 28.

24           29.    Answering paragraph 29 of the Complaint, Mattel admits that
25   dolls in the "Bratz" line compete with dolls in Mattel product lines, denies that
26   Mattel has or has ever had a "stranglehold" on any market, states that the market
27   allegations contained in paragraph 29 are vague and ambiguous, including without
28   limitation in that the allegations fail to specify what products among the parties'

EXHIBIT 35 -7-

PAGE ___507

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1 | respective lines are being referred to and what time period is being referred to, and
2 | denies the truth of any remaining allegations set forth in paragraph 29.

3 |         30.    Answering paragraph 30 of the Complaint, Mattel admits that
4 | MGA has been a licensee of Mattel, states that the market allegations are vague and
5 | ambiguous, including without limitation in that the allegations fail to specify what
6 | products are being referred to and what time periods or points in time are being
7 | referred to, and states that the remainder of the allegations contained therein are
8 | characterizations, not factual assertions, and therefore no response is necessary
9 | under Fed. R. Civ. P. 8(b) and, to the extent any further response is required, denies
10 | the truth of any remaining allegations set forth in paragraph 30.

11 |         31.    Answering paragraph 31 of the Complaint, Mattel states that the
12 | allegations contained therein are characterizations, not factual assertions, and
13 | therefore no response is necessary under Fed. R. Civ. P. 8(b) and, to the extent any
14 | further response is required, denies the truth of the allegations set forth in paragraph
15 | 31.

16 |         32.    Answering paragraph 32 of the Complaint, Mattel denies the
17 | truth of the allegations set forth therein.

18 |         33.    Answering paragraph 33 of the Complaint, Mattel denies the
19 | truth of the allegations set forth therein.

20 |         34.    Answering paragraph 34 of the Complaint, Mattel states that it
21 | has released various MY SCENE dolls, including MY SCENE dolls named
22 | "Madison", "Chelsea" and "Barbie," states that the appearance of the Bratz and MY
23 | SCENE dolls speak for themselves, denies that Mattel designed its MY SCENE
24 | dolls to "evoke" or resemble the alleged "look" of "Bratz" dolls, denies that plaintiff
25 | has protectible rights, states that MGA has made conflicting representations that are
26 | at odds with the allegations of the Complaint and that it is therefore without
27 | knowledge or information sufficient to form a belief as to the truth or falsity of the
28 | allegations regarding the "launch" of Bratz dolls set forth therein and, on that basis,

EXHIBIT 35 -8-

PAGE 508        THIRD AMENDED ANSWER AND COUNTERCLAIMS

1  denies them, and denies the truth of the remaining allegations set forth therein.  By

2  way of further answer, Mattel states that the photographs and their accompanying

3  captions on page 10 of the Complaint are misleading and false to the extent they are

4  intended to suggest that a particular Mattel doll has been changed over time as

5  purportedly depicted.  Among other things, Mattel has long designed and sold an

6  array of different BARBIE line dolls using different doll heads, and the photographs

7  encaptioned "Mattel's Traditional 'Barbie'" is one of the doll heads that has been

8  used, and continues to be used, as part of the BARBIE line.  In addition, the

9  photographs encaptioned MY SCENE doll "circa 2002" is, in fact, a Mattel doll

10 character called BARBIE that continues to be sold and/or marketed with that head,

11 and the photographs encaptioned MY SCENE doll "circa 2004" depict a MY

12 SCENE doll character separate and apart from the one depicted in the "circa 2002"

13 image (and is not a revised character as plaintiff apparently attempts to imply).

14      35.   Answering paragraph 35 of the Complaint, Mattel admits that

15 Mattel released a product line called FLAVAS, states that the appearance of the

16 FLAVAS dolls speaks for themselves, states that it is without knowledge or

17 information sufficient to form a belief as to the truth or falsity of the allegations

18 regarding the  "rumor" relied upon by plaintiff and the undefined "media"

19 purportedly quoting Isaac Larian and, on that basis, denies them, denies that Mattel

20 has abandoned the FLAVAS line, and denies the truth of the remaining allegations

21 set forth in paragraph 35.

22      36.   Answering paragraph 36 of the Complaint, Mattel denies the

23 truth of the allegations set forth therein.

24      37.   Answering paragraph 37 of the Complaint, Mattel denies the

25 truth of the allegations set forth therein.  By way of further answer, Mattel states that

26 the unnumbered photographs and their accompanying captions on pages 11 through

27 16 of the Complaint -- which apparently were included to purportedly support the

28 allegation that MY SCENE dolls "became 'Bratz,'" which allegation Mattel

EXHIBIT __35__

PAGE __507__

-9-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1   specifically denies -- are false and misleading. Among other things, the heads
2   depicted are among an array of different doll heads that Mattel has used, and
3   continues to use, over the course of many years. Moreover, the images purport to
4   compare different Mattel doll lines to show alleged changes in appearance even
5   though, in fact, each of the heads are currently sold and/or marketed to the public.
6   The "Blonde" series of photographs encaptioned "original" and "recent" MY
7   SCENE is further and specifically misleading in that it purports to compare two
8   differently named and outfitted dolls in the MY SCENE doll line, both of which
9   continue to be sold and/or marketed.

10          38.    Answering paragraph 38 of the Complaint, Mattel states that the
11  phrase "the 'BRATZ' eye" is unintelligible, denies that MGA has rights therein,
12  denies that MGA was the originator of or the first to use the eye shape or makeup
13  depicted as purportedly constituting "the 'BRATZ' eye," denies that Mattel has
14  copied the "the 'BRATZ' eye" and denies the truth of the remaining allegations
15  contained in paragraph 38. By way of further answer, Mattel states that the
16  unnumbered photographs and accompanying caption on page 13 of the Complaint
17  are false and misleading. Among other things, the purported "Original Mattel 'My
18  Scene' Eye" is one of the eye and makeup designs that Mattel has used over the
19  course of many years, and Mattel continues to sell and/or market dolls using the eye
20  and makeup design depicted therein.

21          39.    Answering paragraph 39 of the Complaint, Mattel states that the
22  phrase "the 'BRATZ' eye" is unintelligible, denies that MGA has rights therein,
23  denies that MGA was the originator of or the first to use the eye shape or makeup
24  purportedly described as constituting "the 'BRATZ' eye," denies that Mattel has
25  copied "the 'BRATZ' eye," states that the relevant dolls speak for themselves and
26  denies the truth of the remaining allegations contained in paragraph 39. By way of
27  further answer, Mattel states that the unnumbered photographs and accompanying
28  captions on page 14 of the Complaint are false and misleading. Among other things,

EXHIBIT  35
PAGE _____ 510

-10-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1  the purported "New Mattel 'My Scene' Eye" is one of the eye and makeup designs

2  that Mattel has used over the course of many years, and Mattel continues to sell

3  and/or market dolls using the eye and makeup design depicted on page 14 of the

4  Complaint.

5            40.    Answering paragraph 40 of the Complaint, Mattel denies the

6  truth of the allegations therein.  By way of further answer, Mattel states that the

7  unnumbered photographs and their accompanying captions on pages 15 to 16 are

8  false and misleading.  Among other things, the heads depicted are among an array of

9  different doll heads that Mattel has used, and continues to use, over the course of

10  many years.  Moreover, the photographs purport to compare different Mattel doll

11  lines to show alleged changes in appearance even though, in fact, each of the heads

12  are currently sold and/or marketed to the public.  The "Blonde" series of

13  photographs encaptioned "original" and "recent" MY SCENE is further and

14  specifically misleading in that it purports to compare two differently named and

15  outfitted dolls in the MY SCENE doll line, both of which continue to be sold and/or

16  marketed.

17            41.    Answering paragraph 41 of the Complaint, Mattel denies the

18  truth of the allegations set forth therein.

19            42.    Answering paragraph 42 of the Complaint, Mattel admits that the

20  photographs purport to depict two packages that were, among others, part of the MY

21  SCENE line, state that the packages speak for themselves and denies the truth of any

22  remaining allegations set forth therein.

23            43.    Answering paragraph 43 of the Complaint, Mattel admits that the

24  photograph purports to depict one of the packages that were, among others, part of

25  the MY SCENE line, states that the parties' packages speak for themselves, states

26  that MGA has failed to establish that it originated, or has protectible rights in, an

27  "open and transparent style" for packaging and denies the truth of the remaining

28  allegations set forth therein.

EXHIBIT 35
PAGE 511

1       44.    Answering paragraph 44 of the Complaint, Mattel admits that

2  one photograph purports to depict one of the packages that were, among others, part

3  of the MY SCENE line, admits that the other photograph purports to depict one of

4  the packages that were, among others, used as part of the Bratz line, states that the

5  parties' packages speak for themselves, denies that MGA originated, or has

6  protectible rights in, "the 'BRATZ' packaging" or in the packaging depicted in the

7  Complaint and denies the truth of any remaining allegations set forth therein.

8       45.    Answering paragraph 45 of the Complaint, Mattel admits that

9  one photograph purports to depict one of the packages that were, among others, part

10  of the MY SCENE line, admits that the other photograph purports to depict one of

11  the packages that were, among others, used as part of the Bratz line, states that the

12  parties' packages speak for themselves, denies that MGA originated, or has

13  protectible rights in, the packaging depicted in the Complaint and denies the truth of

14  any remaining allegations set forth therein.

15       46.    Answering paragraph 46 of the Complaint, Mattel states that it

16  has utilized a wide variety of packaging styles and shapes over the years, states that

17  the relevant packaging speaks for itself, states that MGA lacks protectible rights in

18  "non-rectangular shaped box" packaging or in the other elements MGA claims in

19  paragraph 46, and denies the truth of the remaining allegations set forth therein.

20       47.    Answering paragraph 47 of the Complaint, Mattel denies that

21  any alleged "theme" is "MGA's theme," denies that MGA originated or has rights to

22  any theme and denies the truth of the remaining allegations set forth therein.

23       48.    Answering paragraph 48 of the Complaint, Mattel admits that it

24  released a doll called "Chillin Out!", states that it has released such themed dolls

25  over the course of many years, admits MGA released a "Wintertime Wonderland"

26  themed doll, denies that MGA originated or has rights to such theme, states that the

27  relevant products speak for themselves and denies the truth of the remaining

28  allegations set forth therein.

EXHIBIT  35

PAGE  512

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1      49.    Answering paragraph 49 of the Complaint, Mattel admits that it
2 released a doll called "Night on the Town", states that it has released such themed
3 dolls over the course of many years, admits MGA released a "Formal Funk" themed
4 doll, denies that MGA originated or has rights to such theme, states that the relevant
5 products speak for themselves and denies the truth of the remaining allegations set
6 forth therein.

7      50.    Answering paragraph 50 of the Complaint, Mattel admits that it
8 released a doll called "Jammin' in Jamaica" and a playset called "Guava Gulch Tiki
9 Lounge", states that it has released such themed dolls and products over the course
10 of many years, admits that MGA released a "Sun-Kissed Summer" themed doll and
11 playset, denies that MGA originated or has rights to such theme, states that the
12 relevant products speak for themselves and denies the truth of the remaining
13 allegations set forth therein.

14      51.    Answering paragraph 51 of the Complaint, Mattel admits that it
15 has aired television commercials for its MY SCENE line, states that such
16 commercials speak for themselves, denies the truth of the remaining allegations set
17 forth therein and specifically denies that MGA was the originator of or has rights to
18 commercials "combining live action with animated sequences" set to "pop music
19 and lyrics".

20      52.    Answering paragraph 52 of the Complaint, Mattel denies the
21 truth of the allegations set forth therein.

22      53.    Answering paragraph 53 of the Complaint, Mattel admits that it
23 released a MY SCENE "Sound Lounge", admits that MGA released a product called
24 "Runway Disco", states that the relevant products speak for themselves, denies that
25 it "imitated MGA's trapezoidal box," denies that MGA has rights thereto, and
26 denies the truth of the remaining allegations set forth therein.

27      54.    Answering paragraph 54 of the Complaint, Mattel denies the
28 truth of the allegations set forth therein.

EXHIBIT 65
PAGE 513

00505.07209/2875224.1

-13-
THIRD AMENDED ANSWER AND COUNTERCLAIMS

1        55.    Answering paragraph 55 of the Complaint, Mattel admits that,

2 among the styling heads it has produced and sold over the course of many years, it

3 released a MY SCENE styling head, admits that MGA released a styling head called

4 "Funky Fashion Makeover Head", states that the relevant products speak for

5 themselves, denies that MGA has protectible rights and denies the truth of the

6 remaining allegations set forth in paragraph 55.

7        56.    Answering paragraph 56 of the Complaint, Mattel is without

8 knowledge or information sufficient to form a belief as to the truth or falsity of the

9 allegations set forth therein because plaintiff fails to identify the alleged instances of

10 confusion, including the source of the unidentified picture titled "Hairstyle practice",

11 and on that basis, denies them, and denies the truth of any remaining allegations set

12 forth in paragraph 56.

13        57.    Answering paragraph 57 of the Complaint, Mattel admits that it

14 has aired television commercials for its MY SCENE line, states that such

15 commercials speak for themselves and denies the truth of the remaining allegations

16 set forth therein.

17        58.    Answering paragraph 58 of the Complaint, Mattel admits that

18 MGA has used the line "The Girls With a Passion for Fashion" in some contexts,

19 denies that MGA originated that phrase or otherwise has rights to it, states that

20 Mattel's web site speaks for itself and denies the truth of the remaining allegations

21 set forth therein.

22        59.    Answering paragraph 59 of the Complaint, Mattel admits that,

23 among the plush products that it has produced and sold over the course of many

24 years, it has released plush dogs as part of its MY SCENE "Miami Getaway"

25 themed product line, states that Mattel has for many years sold plush pets of the type

26 used with its MY SCENE dog, admits that MGA has released various Bratz pets,

27 states that MGA was not the originator of and has no rights to the features and other

28

EXHIBIT 35
PAGE 514

1   elements described therein, states that the relevant products speak for themselves
2   and denies the truth of the remaining allegations set forth therein.

3       60.    Answering paragraph 60 of the Complaint, Mattel admits that,
4   among the plush toys that it has released over the course of many years, its MY
5   SCENE dog has been sold in packaging depicted (in part) on page 22 of the
6   Complaint, states that Mattel has for many years sold plush pets and other plush
7   products in packaging of the type used with its MY SCENE dog, admits that MGA
8   has released a "Bratz" dog, states that MGA was not the originator of and has no
9   rights to the packaging described therein, states that the relevant packages speak for
10  themselves and denies the truth of the remaining allegations set forth therein.

11      61.    Answering paragraph 61 of the Complaint, Mattel denies that it
12  has intended to cause any consumer confusion and states that it is without
13  knowledge or information sufficient to form a belief as to the truth or falsity of the
14  allegations set forth therein concerning unnamed retailers, customers and others
15  because plaintiff fails to identify any source for the matters alleged and, on that
16  basis, denies them and denies the truth of any remaining allegations set forth therein.

17      62.    Answering paragraph 62 of the Complaint, Mattel denies that it
18  has intended to cause any confusion and states that it is without knowledge or
19  information sufficient to form a belief as to the truth or falsity of the allegations set
20  forth therein concerning alleged comments and conversations because plaintiff fails
21  to identify any source for the alleged comments and conversations and, on that
22  basis, denies them, and denies the truth of any remaining allegations set forth
23  therein.

24      63.    Answering paragraph 63 of the Complaint, Mattel denies that it
25  has intended to cause any confusion and states that it is without knowledge or
26  information sufficient to form a belief as to the truth or falsity of the allegations set
27  forth therein because plaintiff fails to identify any source for the alleged comments
28

EXHIBIT 35
PAGE 515

1   and conversations and, on that basis, denies them, and denies the truth of any
2   remaining allegations set forth therein.

3          64.   Answering paragraph 64 of the Complaint, Mattel denies that it
4   has intended to cause any confusion and states that it is without knowledge or
5   information sufficient to form a belief as to the truth or falsity of the allegations set
6   forth therein because plaintiff fails to identify any source for the alleged comments
7   and conversations and, on that basis, denies them, and denies the truth of any
8   remaining allegations set forth therein.

9          65.   Answering paragraph 65 of the Complaint, Mattel denies the
10  truth of the allegations set forth therein.

11         66.   Answering paragraph 66 of the Complaint, Mattel admits that it
12  sued a competitor in the German courts for unfair competition for copying various
13  Mattel BARBIE line products, states that such claims exclusively arose under and
14  were the subject of German law, states that since that time the Federal Supreme
15  Court has rejected the contention made by MGA in paragraph 66 that
16  "systematically copying and borrowing elements" from competing dolls supports a
17  claim for unfair competition, and denies the truth of the remaining allegations set
18  forth therein.

19         67.   Answering paragraph 67 of the Complaint, Mattel denies the
20  truth of the allegations set forth therein.

21         68.   Answering paragraph 68 of the Complaint, Mattel admits that it
22  has released dolls called "Wee 3 Friends," admits that MGA has released dolls
23  called "4-Ever Best Friends," states that the relevant products speak for themselves,
24  denies that MGA's packaging is distinctive, denies that MGA has protectible rights
25  thereto and denies the truth of the remaining allegations set forth in paragraph 68.

26         69.   Answering paragraph 69 of the Complaint, Mattel admits that its
27  Fisher Price division has released, among other dolls called "Little Mommy," the
28  "Little Mommy Potty Training Baby Doll," admits that MGA has released a

EXHIBIT ___35___
PAGE ___5\6___                    -6-   THIRD AMENDED ANSWER AND COUNTERCLAIMS

1   "Mommy's Little Patient" doll and denies the truth of the remaining allegations set
2   forth therein.

3          70.    Answering paragraph 70 of the Complaint, Mattel admits that it
4   has released die-cast cars and other products called "Acceleracers" as part of its
5   HOT WHEELS line, admits that MGA has released products called "AlienRacers,"
6   denies that MGA was the originator of or has rights to the elements and matters
7   described in paragraph 70, states that the relevant products speak for themselves and
8   denies the truth of the remaining allegations set forth therein.

9          71.    Answering paragraph 71 of the Complaint, Mattel admits that it
10  has aired commercials relating to "Acceleracers," states that such commercials
11  speak for themselves, denies the truth of the remaining allegations set forth therein
12  and specifically denies that MGA originated or has rights to the commercials and
13  other matters described therein.

14         72.    Answering paragraph 72 of the Complaint, Mattel states that its
15  web site speaks for itself, denies the truth of the remaining allegations contained in
16  paragraph 72 and specifically denies that Mattel intended to create confusion in the
17  marketplace.

18         73.    Answering paragraph 73 of the Complaint, Mattel denies the
19  truth of the allegations set forth therein.

20         74.    Answering paragraph 74 of the Complaint, Mattel denies the
21  truth of the allegations set forth therein.

22         75.    Answering paragraph 75 of the Complaint, Mattel admits that it
23  has reminded certain former employees who became employed by MGA by letter of
24  their contractual and fiduciary obligation to maintain the secrecy of all Mattel
25  confidential and proprietary business information, states that such letters were
26  prepared and sent to their recipients in good faith contemplation of litigation, admits
27  that it filed a complaint for declaratory relief against Ronald Brawer in Los Angeles
28  Superior Court, entitled Mattel, Inc. v. Brawer, Case No. BC323381, on October 21,

1 | 2004, states that pursuant to the Court's Order of August 25, 2005 it need not
2 | respond to the allegations in paragraph 75 relating to that action, and denies the truth
3 | of the remaining allegations set forth in paragraph 75.

4 |      76.     Answering paragraph 76 of the Complaint, Mattel states that
5 | MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,
6 | including such acts that are lawful in foreign nations, and denies the truth of
7 | allegations set forth therein.

8 |      77.     Answering paragraph 77 of the Complaint, Mattel states that
9 | MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,
10 | including such acts that are lawful in foreign nations, and denies the truth of the
11 | allegations set forth therein.

12 |      78.     Answering paragraph 78 of the Complaint, Mattel states that it is
13 | without knowledge or information sufficient to form a belief as to the truth or falsity
14 | of the allegations regarding MGA's claimed "shortage of doll hair" and, on that
15 | basis, denies them and denies the truth of the remaining allegations set forth therein.

16 |      79.     Answering paragraph 79 of the Complaint, Mattel states that
17 | MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,
18 | including such acts that are lawful in foreign nations, and denies the truth of
19 | allegations set forth therein.

20 |      80.     Answering paragraph 80 of the Complaint, Mattel denies the
21 | truth of the allegations set forth therein.

22 |      81.     Answering paragraph 81 of the Complaint, Mattel admits that
23 | NPD Funworld ("NPD") supplies sales statistics in *inter alia* the toy, PC games and
24 | video games industries, admits that to Mattel's knowledge NPD restricts the use of
25 | its subscriber information, states that MGA was sued by NPD and states that it is
26 | without knowledge or information sufficient to form a belief as to the truth or falsity
27 | of the allegations regarding the need of unspecified "toy companies" for NPD

28 |

EXHIBIT __35__

PAGE __518__

-18-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1 statistics and, on that basis, denies them and denies the truth of any remaining
2 allegations set forth therein.

3         82.   Answering paragraph 82 of the Complaint, Mattel denies the
4 truth of the allegations set forth therein.

5         83.   Answering paragraph 83 of the Complaint, Mattel states that it is
6 without knowledge or information sufficient to form a belief as to the truth or falsity
7 of the allegations set forth therein because MGA fails to quantify its annual
8 subscription fees and, on that basis, denies them.

9         84.   Answering paragraph 84 of the Complaint, Mattel states that it is
10 without knowledge or information sufficient to form a belief as to the truth or falsity
11 of the allegations set forth therein and, on that basis, denies them.

12        85.   Answering paragraph 85 of the Complaint, Mattel states that
13 MGA was sued by NPD, states that it is without knowledge or information sufficient
14 to form a belief as to such nature and grounds for such litigation (to which Mattel
15 was not a party) and, on that basis, denies the allegations relating thereto, and denies
16 the truth of the remaining allegations set forth therein.

17        86.   Answering paragraph 86 of the Complaint, Mattel denies the
18 truth of the allegations set forth therein.

19        87.   Answering paragraph 87 of the Complaint, Mattel admits that the
20 Children's Advertising Review Unit ("CARU") is the children's arm of the
21 advertising industry's self-regulation program, states that compliance with CARU's
22 Privacy Program can provide FTC-approved Safe Harbor under the Children's
23 Online Privacy Protection Act ("COPPA"), and denies the truth of the remaining
24 allegations set forth therein.

25        88.   Answering paragraph 88 of the Complaint, Mattel admits that it
26 is one of dozens of CARU Supporters and denies the truth of the remaining
27 allegations set forth therein.

28

EXHIBIT 35
PAGE 519

00505.07209/2875224.1

-19-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

89.    Answering paragraph 89 of the Complaint, Mattel denies the truth of the allegations set forth therein.

90.    Answering paragraph 90 of the Complaint, Mattel states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations as to the consequences to MGA of MGA's violations of CARU standards and, on that basis, denies them.

91.    Answering paragraph 91 of the Complaint, Mattel states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations as to the consequences to MGA of MGA's violations of CARU standards and, on that basis, denies them.

92.    Answering paragraph 92 of the Complaint, Mattel admits that the Toy Industry Association, Inc. ("TIA") is a toy industry trade association, admits that at certain times TIA has given awards called the People's Choice Toy of The Year or the Toy of The Year Award, denies that Mattel wrongfully influenced TIA and states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations set forth therein and, on that basis, denies them.

93.    Answering paragraph 93 of the Complaint, Mattel states that the allegations set forth therein are vague and ambiguous, including in that they fail to properly identify the years in which the referenced awards were given and/or the particular product which won such awards, and accordingly lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth therein and, on that basis, denies them.

94.    Answering paragraph 94 of the Complaint, Mattel admits that Neil Freidman was the chairman of TIA from approximately May 2002 to May 2004, states that Fischer Price is a division of Mattel and denies the truth of the remaining allegations set forth therein.

EXHIBIT 35
PAGE 520

1    95.    Answering paragraph 95 of the Complaint, Mattel admits that

2  Hokey Pokey Elmo won the Toy of the Year Award and denies the truth of the

3  remaining allegations set forth therein.

4    96.    Answering paragraph 96 of the Complaint, Mattel states that it is

5  without knowledge or information sufficient to form a belief as to the truth or falsity

6  of the allegations set forth therein and, on that basis, denies them.

7    97.    Answering paragraph 97 of the Complaint, Mattel denies the

8  truth of the allegations set forth therein.

9    98.    Answering paragraph 98 of the Complaint, Mattel denies the

10  truth of the allegations set forth therein.

11    99.    Answering paragraph 99 of the Complaint, Mattel denies the

12  truth of the allegations set forth therein.

13    100.    Answering paragraph 100 of the Complaint, Mattel denies the

14  truth of the allegations set forth therein.

15    101.    Answering paragraph 101 of the Complaint, Mattel repeats its

16  responses contained in paragraphs 1 through 100 of this Third Amended Answer

17  and incorporates them by reference as though fully and completely set forth herein.

18    102.    Answering paragraph 102 of the Complaint, Mattel denies the

19  truth of the allegations set forth therein and specifically denies that MGA's alleged

20  trade dress is distinctive.

21    103.    Answering paragraph 103 of the Complaint, Mattel denies the

22  truth of the allegations set forth therein and specifically denies that MGA's alleged

23  trade dress is distinctive.

24    104.    Answering paragraph 104 of the Complaint, Mattel denies the

25  truth of the allegations set forth therein.

26    105.    Answering paragraph 105 of the Complaint, Mattel denies the

27  truth of the allegations set forth therein.

28

EXHIBIT __35__

PAGE __52\__

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1    106.   Answering paragraph 106 of the Complaint, Mattel denies the
2    truth of the allegations set forth therein.

3    107.   Answering paragraph 107 of the Complaint, Mattel denies the
4    truth of the allegations set forth therein.

5    108.   Answering paragraph 108 of the Complaint, Mattel denies the
6    truth of the allegations set forth therein and specifically denies that plaintiff is
7    entitled to injunctive relief.

8    109.   Answering paragraph 109 of the Complaint, Mattel repeats its
9    responses contained in paragraphs 1 through 108 of this Third Amended Answer
10   and incorporates them by reference as though fully and completely set forth herein.

11   110.   Answering paragraph 110 of the Complaint, Mattel denies the
12   truth of the allegations set forth therein.

13   111.   Answering paragraph 111 of the Complaint, Mattel denies the
14   truth of the allegations set forth therein.

15   112.   Answering paragraph 112 of the Complaint, Mattel denies the
16   truth of the allegations set forth therein.

17   113.   Answering paragraph 113 of the Complaint, Mattel denies the
18   truth of the allegations set forth therein.

19   114.   Answering paragraph 114 of the Complaint, Mattel denies the
20   truth of the allegations set forth therein.

21   115.   Answering paragraph 115 of the Complaint, Mattel denies the
22   truth of the allegations set forth therein.

23   116.   Answering paragraph 116 of the Complaint, Mattel denies the
24   truth of the allegations set forth therein.

25   117.   Answering paragraph 117 of the Complaint, Mattel denies the
26   truth of the allegations set forth therein and specifically denies that plaintiff is
27   entitled to injunctive relief.

28

EXHIBIT 35
PAGE 522

00505.07209/2875224 1

-22-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1        118.   Answering paragraph 118 of the Complaint, Mattel denies the

2  truth of the allegations set forth therein.

3        119.   Answering paragraph 119 of the Complaint, Mattel repeats its

4  responses contained in paragraphs 1 through 118 of this Third Amended Answer

5  and incorporates them by reference as though fully and completely set forth herein.

6        120.   Answering paragraph 120 of the Complaint, Mattel denies the

7  truth of the allegations set forth therein.

8        121.  Answering paragraph 121 of the Complaint, Mattel denies the

9  truth of the allegations set forth therein.

10        122.   Answering paragraph 122 of the Complaint, Mattel denies the

11  truth of the allegations set forth therein.

12        123.   Answering paragraph 123 of the Complaint, Mattel denies the

13  truth of the allegations set forth therein and specifically denies that plaintiff is

14  entitled to injunctive relief.

15        124.   Answering paragraph 124 of the Complaint, Mattel repeats its

16  responses contained in paragraphs 1 through 123 of this Third Amended Answer

17  and incorporates them by reference as though fully and completely set forth herein.

18        125.   Answering paragraph 125 of the Complaint, Mattel denies the

19  truth of the allegations set forth therein.

20

21                              <u>General Denial</u>

22        Unless specifically admitted herein, Mattel denies the truth of each and

23  every allegation set forth in plaintiff's Complaint and specifically denies that

24  plaintiff is entitled to any relief against Mattel.

25

26

27

28

EXHIBIT __35__

PAGE __523__

-23-

Affirmative Defenses

By alleging the Affirmative Defenses set forth below, Mattel does not agree or concede that it bears the burden of proof or the burden of persuasion on any of these issues, whether in whole or in part.

First Affirmative Defense

Plaintiff's Complaint fails to state a claim upon which relief can be granted.

Second Affirmative Defense

Plaintiff has no valid, enforceable or protectible rights or interest in the alleged trade dress or other matters asserted, including without limitation in that plaintiff has failed to establish that its alleged trade dress is distinctive as to plaintiff.

Third Affirmative Defense

Plaintiff's claims, including without limitation plaintiff's claims based upon alleged extra-territorial acts, are barred in whole or in part by lack of subject matter jurisdiction.

Fourth Affirmative Defense

Plaintiff's claims are barred in whole or in part by plaintiff's unclean hands.

Fifth Affirmative Defense

Plaintiff's claims are barred in whole or in part by virtue of Mattel's prior-creation of the elements and other matters asserted in the Complaint.

EXHIBIT 35
PAGE 524

00505.07209/2875224.1

-24-

<u>Sixth Affirmative Defense</u>

Plaintiff's claims are barred in whole or in part by its lack of standing.

<u>Seventh Affirmative Defense</u>

Plaintiff's claims are barred in whole or in part by the applicable statutes of limitation and the doctrine of laches.

<u>Eighth Affirmative Defense</u>

Plaintiff's claims are barred in whole or in part by the doctrines of waiver, estoppel, acquiescence, and abandonment.

<u>Ninth Affirmative Defense</u>

Plaintiff's claims are barred in whole or in part by Mattel's constitutional rights of free speech, petitioning and association, including without limitation by the litigation privilege as protected by and/or codified in *inter alia* Section 47(b) of the <u>California Civil Code</u>, the *Noerr-Pennington* doctrine, the common interest privilege and by other privileges.

<u>Tenth Affirmative Defense</u>

Plaintiff's claims are barred in whole or in part by Mattel's federal and state constitutional rights of free speech, including without limitation under the First Amendment of the United States Constitution.

<u>Eleventh Affirmative Defense</u>

Plaintiff's claims are barred in whole or in part by the competitor privilege.

EXHIBIT __35__
PAGE __525__

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1    <u>Twelfth Affirmative Defense</u>

2          Plaintiff's claims are in whole or in part preempted by the Copyright

3    Act and barred by the *Sears-Compco* doctrine.

4

5    <u>Thirteenth Affirmative Defense</u>

6          Plaintiff's requested relief, including plaintiff's requests for punitive

7    and/or enhanced damages, are barred in whole or in part because all of Mattel's

8    actions were in good faith.

9

10   <u>Fourteenth Affirmative Defense</u>

11         Plaintiff's damages, if any, were not caused by Mattel and are not

12   attributable to the acts or omissions of Mattel.

13

14   <u>Fifteenth Affirmative Defense</u>

15         Plaintiff has failed to mitigate its damages, if any.

16

17   <u>Additional Defenses</u>

18         Mattel has insufficient knowledge or information upon which to form a

19   belief as to whether additional defenses are available.  Mattel reserves the right to

20   amend this Third Amended Answer to add, delete, or modify additional defenses

21   based on legal theories which may or will be divulged through clarification of the

22   Complaint, through discovery, through change or clarification of the governing law

23   or through further legal analysis of plaintiff's positions in this litigation.

24

25   <u>Prayer for Relief</u>

26

27         WHEREFORE, Mattel prays for relief as follows:

28

EXHIBIT __35__

PAGE __526__

00505.07209/2875224.1

-26-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1      1. That the Complaint be dismissed with prejudice;

2      2. That plaintiff take nothing by reason of the Complaint against

3    Mattel and that judgment be entered in Mattel's favor;

4      3. That Mattel recover its costs and attorneys' fees; and

5      4. That this Court award such other and further relief as it deems

6    just and proper.

7           **COUNTERCLAIMS**

8      Pursuant to the Court's Orders of, inter alia, January 12, 2007, June 27,

9    2007, and May 21, 2009, and incorporating its [Proposed] Amended Complaint

10   dated November 19, 2006, Mattel, Inc. alleges as follows:

11          **Preliminary Statement**

12     1. For years MGA Entertainment, Inc. has engaged in a pattern of

13   stealing and using Mattel, Inc.'s property and trade secrets. MGA's use of the

14   stolen property and trade secrets caused and continues to cause significant harm to

15   Mattel. MGA first stole "Bratz," a fashion doll, from Mattel, and then continued

16   stealing Mattel's confidential and proprietary information to fuel MGA's growth.

17   Even after Mattel originally filed this suit, MGA, Isaac Larian and their co-

18   conspirators continued this pattern of wrongdoing, engaging in additional acts of

19   commercial bribery, destruction of evidence, evidence tampering and perjury, and

20   in fraudulent conveyances and bankruptcy fraud. Indeed, MGA, Larian and their

21   co-conspirators carried out several of these wrongs while the Phase 1 trial was on-

22   going and shortly after it concluded, and continue to engage in further misconduct

23   up to and beyond the present, for the specific purpose of thwarting the findings of

24   the jury in Mattel's favor, obstructing the judicial process, and damaging Mattel

25   and its rights.

26     2. Carter Bryant conceived, created and developed Bratz designs

27   while he was employed by Mattel as a doll designer. He concealed his Bratz work

28   from Mattel and wrongfully sold Bratz to MGA while he was a Mattel employee.

EXHIBIT __35__

~~27~~

PAGE __527__

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1   As MGA knows, Mattel owns the Bratz designs that Bryant made.  As the rightful
2   owner of those Bratz designs, Mattel has registered copyrights for them and seeks
3   damages arising from MGA's repeated infringement of those copyrights.
4          3.     In 2008, the jury in the Phase 1 trial in this action found that
5   Carter Bryant conceived of and created Bratz, including without limitation Bratz
6   sculpts and prototypes, the Bratz name, the Bratz characters, and more than 70
7   Bratz design drawings, while working for Mattel and that MGA and Isaac Larian
8   unlawfully aided and abetted that wrongdoing and profited from their wrongful
9   acts.  Specifically, the jury found that MGA and Larian unlawfully infringed
10  Mattel's copyrights in Bratz works created by Bryant while a Mattel employee and
11  owned by Mattel, converted Bratz drawings from Mattel, tortiously interfered with
12  Bryant's contract with Mattel, aided and abetted Bryant's breach of his duty of
13  loyalty to Mattel, and aided and abetted Bryant's breach of his fiduciary duty to
14  Mattel.  The jury further found that MGA had fraudulently concealed its wrongful
15  conduct from Mattel.  Yet MGA's wrongful conduct has not ceased.  Undeterred by
16  the jury's findings, MGA continues to infringe even to this day, and threatens to
17  infringe in the future, Mattel's rights in Bratz.
18         4.     MGA's illegal conduct in stealing Bratz was also just the
19  beginning.  Emboldened by the success of its earlier illegal conduct, MGA has
20  repeated—and even expanded through this day—its pattern of theft, bribery,
21  evidence destruction and tampering, perjury, obstruction, financial manipulations
22  and other illegal conduct.  For example, in or about 2004, MGA decided to expand
23  into Mexico.  To do so, and operating from its Southern California offices, MGA
24  hired away three key Mattel employees in Mexico, who, on their way out, stole
25  virtually every category of Mattel's sensitive and trade secret business plans and
26  information for the Mexican market, as well as a significant quantity of sensitive
27  and trade secret information for Mattel's U.S. and worldwide businesses, and took
28  them to MGA.  Armed with Mattel's confidential business plans and methods,

00505.07209/2875224.1

EXHIBIT ___35___
PAGE ___528___            -28-
                          THIRD AMENDED ANSWER AND COUNTERCLAIMS

1    MGA claimed to have increased its market share in Mexico alone by 90% in a
2    single year.

3           5.     In 2005, MGA needed help in Canada. So MGA, again
4    operating from its Southern California headquarters, hired Janine Brisbois from
5    Mattel. At that time, Ms. Brisbois was responsible for Mattel's account with Toys
6    'R Us ("TRU") and Wal-Mart. MGA gave her responsibility for those same
7    accounts, and she took from Mattel documents containing proprietary advertising,
8    project, sales, customer and strategy information for not only Canada, but for the
9    United States. Eliminating any doubt that MGA then proceeded to use those stolen
10   materials, Brisbois subsequently accessed and modified certain of those Mattel
11   documents while employed by MGA.

12          6.     Starting no later than 2000, and continuing until at least 2005,
13   MGA bribed Mattel employees in addition to Bryant to work on Bratz and other
14   products for MGA's benefit. In the face of Court Orders compelling MGA to
15   disclose such evidence, MGA falsely denied under oath that there were such other
16   Mattel employees. In December 2007, however, the truth came to light—MGA
17   agents had bribed at least three more Mattel employees over a five-year span,
18   including even during times after this suit was filed. MGA's agents acted to
19   conceal the bribery, including by paying Mattel employees in cash and using false
20   names and false social security numbers.

21          7.     These are not the only instances of such misconduct which MGA
22   orchestrated and carried out from its headquarters in this District. Counter-
23   defendants have engaged in an ongoing, widespread pattern of illegal acts that
24   continues to this day and that threatens to continue into the future. Those acts
25   include, without limitation, inducing Mattel employees to steal Mattel's
26   confidential information or other property and take it with them to MGA to further
27   MGA's business interests and to harm Mattel. They also include, without
28   limitation, continued acts of copyright infringement, evidence destruction and

00505.07209/2875224.1

EXHIBIT __35__
PAGE __529__

-29-
THIRD AMENDED ANSWER AND COUNTERCLAIMS

1  perjury. They also include, without limitation, Larian's and MGA's illegal transfer,

2  transport and laundering of their ill-gotten profits, including through their use of

3  sham single-purpose entities created during or immediately after the Phase 1 trial,

4  for the purpose of thwarting the jury's Phase 1 verdict against them, continuing

5  with their acts of infringement, manipulating their financial condition and

6  defrauding Mattel.

### Jurisdiction

8      8.    This Court has federal question jurisdiction over this action

9  pursuant to 28 U.S.C. §§ 1331, 17 U.S.C. §§ 101 *et seq.*, and 18 U.S.C. § 1964(c).

10  This Court has supplemental jurisdiction over Mattel's state law claims pursuant to

11  28 U.S.C. § 1367.

### Venue

13      9.    Venue is proper in this District pursuant to 28 U.S.C.

14  §§ 1391(b)-(d), 1391(f) and 1400(a) and 18 U.S.C. § 1965.

### Parties

16      10.    Mattel is a corporation organized and existing under the laws of

17  the State of Delaware, with its principal place of business in El Segundo,

18  California.

19      11.    Counter-defendant MGA Entertainment, Inc. ("MGA") is a

20  corporation organized and existing under the laws of the State of California, with

21  its principal place of business in Van Nuys, California. Mattel is informed and

22  believes, and on that basis alleges, that ABC International Traders, Inc. is a

23  predecessor corporation to MGA and that until September 16, 2002, MGA was

24  incorporated and known as ABC International Traders, Inc. Upon the filing of the

25  Complaint, Mattel, being ignorant of the nature, extent and scope of MGA

26  Entertainment, Inc.'s involvement and complicity in the conduct alleged therein and

27  having designated MGA Entertainment, Inc. in the Complaint as Doe 1 and having

28  discovered its involvement and complicity, Mattel previously amended its

EXHIBIT __35__

PAGE __530__

-30-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1 Complaint by substituting MGA Entertainment, Inc. for the fictitious Doe name
2 Doe 1.

3      12.   Counter-defendant Carter Bryant ("Bryant") is an individual who
4 formerly was employed by Mattel and has worked for and continues to work as a
5 contractor for MGA.  Mr. Bryant currently resides in the State of Missouri.

6      13.   Counter-defendant MGA Entertainment (HK) Limited is a
7 business entity organized and existing under the laws of the Hong Kong Special
8 Administrative Region, with its principal place of business in Hong Kong.  Upon
9 the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope
10 of involvement and complicity of MGA Entertainment (HK) Limited in the conduct
11 alleged therein and having designated MGA Entertainment (HK) Limited in the
12 Complaint as Doe 2 and having discovered its involvement and complicity, Mattel
13 previously amended its Complaint by substituting MGA Entertainment (HK)
14 Limited for the fictitious Doe name Doe 2.

15      14.   Counter-defendant MGAE de Mexico, S.R.L. de C.V. ("MGA
16 de Mexico") is a business entity organized and existing under the laws of Mexico,
17 with its principal place of business in Mexico City, Mexico.

18      15.   Mattel is informed and believes, and on that basis alleges, that
19 Counter-defendant Larian is the President and CEO of MGA and an individual
20 residing in the County of Los Angeles.   Upon the filing of the Complaint, Mattel,
21 being ignorant of the nature, extent and scope of involvement and complicity of
22 Larian in the conduct alleged therein and having designated Larian in the
23 Complaint as Doe 3 and having discovered his involvement and complicity, Mattel
24 previously amended its Complaint by substituting Larian for the fictitious Doe
25 name Doe 3.

26      16.   Mattel is informed and believes, and on that basis alleges, that
27 Counter-defendant Larian is directly or indirectly principal, owner, member and/or
28 controlling shareholder and alter-ego of IGWT Group, LLC ("IGWT Group") and

00505.07209/2875224.1

EXHIBIT 35
PAGE 531

-31-
THIRD AMENDED ANSWER AND COUNTERCLAIMS

1   IGWT 826 Investments, LLC ("IGWT 826 Investments"). On information and

2   belief, the financial affairs of Larian and these limited liability companies—which

3   were formed during and subsequent to the Phase 1 trial—are significantly

4   intermingled and interconnected, the companies being mere shells which Larian

5   used as conduits for his own business dealings, created and operated pursuant to an

6   unlawful scheme as alleged herein.

7           17.   Mattel is informed and believes, and on that basis alleges, that

8   Counter-defendant Larian is directly or indirectly trustee, principal, owner, and/or

9   controlling participant and alter-ego of several trusts devised by or on behalf of

10  Larian for the purpose of manipulating MGA's and Larian's finances, including

11  without limitation The Makabi Living Trust, The Larian Living Trust, The Angela

12  Larian Qualified Annuity Trust, The Isaac E. Larian Qualified Annuity Trust, The

13  Jahangir Eli Makabi Qualified Annuity Trust, as well as other trusts and similar

14  vehicles presently unknown to Mattel because of their concealment by Larian,

15  MGA and their co-conspirators.

16          18.   Mattel is informed and believes, and on that basis alleges, that

17  Counter-defendant Larian is directly or indirectly principal, owner, member and/or

18  controlling participant and alter-ego of several other sham entities devised by or on

19  behalf of Larian for the purpose of manipulating MGA's and Larian's finances,

20  including without limitation Omni 808 Investors, LLC, Vision Capital, LLC and

21  Lexington Financial  Limited (collectively, the "Omni Parties") as well as other

22  entities currently unknown by name to Mattel because of their concealment by

23  Larian, MGA, the Omni Parties and their co-conspirators.

24          19.   Mattel is informed and believes, and on that basis alleges, that

25  Counter-defendant Larian has employed, directly or indirectly, other co-

26  conspirators to directly and indirectly carry out his intentional wrongdoing,

27  including in order to conceal and manipulate his and MGA's finances and to

28  conduct other fraudulent and illegal conduct, including without limitation Neil

00505.07209/2875224.1

EXHIBIT __35__

PAGE __732__

-32-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1  Kadisha, Leon Neman, Fred Mashian, Jahangir Eli Makabi, Shirin Makabi, Farhad

2  Larian, Angela Larian, Veronica Marlow and Peter Marlow, as well as other

3  persons presently unknown to Mattel because of their concealment by Larian,

4  MGA, the Omni Parties and their co-conspirators.

5          20.    Mattel is informed and believes, and on that basis alleges, that at

6  all relevant times mentioned herein such individuals, trusts, Larian, the Omni

7  Parties, IGWT Group and IGWT 826 Investments, together with their employees,

8  officers, putative owners, members and principals, agents, representatives and

9  attorneys, were acting in concert and in active participation with each other in

10  committing the wrongful acts alleged herein, and were the agents of each other and

11  were acting within the scope and authority of that agency and with the knowledge,

12  consent and approval of each other.

13          21.    Counter-defendant Carlos Gustavo Machado Gomez is an

14  individual who is employed by Counter-defendant MGA and who resided in this

15  District at the time he was named and served as a Counter-defendant in the Second

16  Amended Answer and Counterclaims and, on information and belief, currently

17  resides in Mexico.

18          22.    The true names and capacities of Counter-defendants sued herein

19  as DOES 4 through 10, inclusive, are unknown to Mattel, which therefore sues said

20  Counter-defendants by such fictitious names.  Mattel will amend its pleadings to

21  allege their true names and capacities when the same are ascertained.

22                               **Factual Background**

23  I.    **MATTEL**

24          23.    Mattel manufactures and markets toys, games, dolls and other

25  consumer products.  Harold Mattson and Elliot and Ruth Handler founded Mattel in

26  1945.  The name of the company was created by incorporating the names of two of

27  its founders, "MATT-son" and "EL-liot."  Originating from the Handlers' garage in

28  Southern California, the company greatly expanded its operations following World

EXHIBIT __35__
                                                  -33-
PAGE __553__          THIRD AMENDED ANSWER AND COUNTERCLAIMS

War II.  During the next several decades, Mattel became famous for producing high-quality products at reasonable prices.

24.    Critical to Mattel's success is its ability to design and develop new products.  Mattel invests millions of dollars in product design and development and introduces hundreds of new products each year.  Mattel maintains a 180,000 square-foot design center in El Segundo, California, that houses hundreds of designers, sculptors, painters and other artists, who work exclusively to create the products on which Mattel's business depends.

25.    Mattel also has invested substantial amounts over many years to develop its business methods and practices, including, without limitation, its marketing and advertising research, plans, methods and processes; its business research and forecasts; its costs, budgets, pricing, credit terms, deal terms and finances; its manufacturing, distribution, and sales methods and processes; and its inventory methods and processes.  These represent a material part of the intellectual infrastructure of Mattel and are highly valuable.

## II.    MGA ENTERTAINMENT

26.    MGA is also a toy manufacturer.  MGA began as a consumer electronics business, but expanded into the toy business with licenses to sell handheld electronic games.  By approximately late 1999 or early 2000, MGA developed a strategy to expand its business and compete directly with Mattel by launching a fashion doll line, so it stole a fashion doll that was owned by Mattel—"Bratz."

27.    MGA intentionally stole not just specific Mattel property, such as Bratz designs, prototypes and related materials, but also a vast array of trade secrets and other confidential information that comprise Mattel's intellectual infrastructure.  MGA's rapid growth was not organic, but rather was based upon its theft of Bratz.  As a result, MGA lacked an appropriate intellectual infrastructure for a company of its size and it became increasingly difficult to manage.  To deal

1    with these problems, as detailed below, time and time again MGA simply stole

2    Mattel's proprietary business methods, practices and information.  This not only

3    allowed MGA to avoid expending the time, money and effort necessary to build a

4    legitimate business, but also allowed MGA to unfairly compete against Mattel by

5    taking Mattel's playbook.

6    **III.  MGA STEALS A NEW LINE OF FASHION DOLLS FROM MATTEL**

7             28.    Carter Bryant is a former Mattel employee.  Bryant joined Mattel

8    in September 1995, where he worked in Mattel's Design Center as a BARBIE

9    product designer.  In or about April 1998, Bryant resigned his position with Mattel

10   and moved to Missouri to live with his parents.  Late in 1998, Bryant applied to

11   Mattel to be rehired.  On January 4, 1999, he began working at Mattel in Mattel's

12   Design Center, again as a product designer, for Mattel's BARBIE collectibles line.

13            29.    Upon his return to Mattel in January 1999, Bryant executed an

14   Employee Confidential Information and Inventions Agreement (the "Employment

15   Agreement"), a true and correct copy of which is attached hereto as Exhibit A.

16            30.    Pursuant to his Employment Agreement and as a condition of

17   and in consideration for his employment, Bryant agreed, among other things, that

18   he held a position of trust with Mattel, that the designs and inventions he created

19   during his Mattel employment (with certain exceptions not relevant here) were

20   owned by Mattel, and that he would be loyal to the company by agreeing not to

21   assist or work for any competitor of Mattel while he was employed by Mattel.

22            31.    On January 4, 1999, Bryant also executed Mattel's Conflict of

23   Interest Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant

24   certified in the Conflict Questionnaire that, other than as disclosed, he had not

25   worked for any competitor of Mattel in the prior twelve months and had not

26   engaged in any business venture or transaction involving a Mattel competitor that

27   could be construed as a conflict of interest.  Bryant understood what the Conflict

28   Questionnaire required because, among other things, he disclosed on it the

1 | freelance work he had performed while in Missouri for Ashton-Drake, which is
2 | unrelated to the conduct alleged herein.  A true and correct copy of the Conflict
3 | Questionnaire executed by Bryant is attached hereto as Exhibit B.

4 |      32.   Pursuant to the Conflict Questionnaire, Bryant also agreed that
5 | he would immediately notify his supervisor of any change in his situation that
6 | would cause him to change any of the foregoing certifications.  Despite this
7 | obligation, at no time did Bryant disclose to Mattel that he was engaging in any
8 | business venture or transaction with MGA or any other Mattel competitor.

9 |      33.   More specifically, while Bryant was employed by Mattel, Bryant
10 | and other Counter-defendants misappropriated and misused Mattel property and
11 | Mattel resources for the benefit of Bryant and MGA.  Such acts included, but are
12 | not limited to, the following:

13 |      a.   using his exposure to Mattel development programs to
14 | create the concept, design and name of Bratz;

15 |      b.   using Mattel resources, and while employed by Mattel,
16 | Bryant worked by himself and with other Mattel employees and contractors to
17 | design and develop Bratz, including without limitation by creating drawings and
18 | three-dimensional models of Bratz dolls, and fashion designs for the dolls'
19 | associated clothing and accessories; and

20 |      c.   using Mattel resources, and while employed by Mattel,
21 | Bryant took steps to assist MGA to produce Bratz dolls.

22 |      34.   During the time that he was employed by Mattel and thereafter,
23 | Bryant concealed these actions from Mattel, including by failing to notify his
24 | supervisor of the conflict of interest he created when he began working on MGA's
25 | behalf and when he began receiving payments from MGA.  Bryant additionally
26 | enlisted other Mattel employees to perform work on Bratz during the time he was
27 | employed by Mattel and, by all indications, in at least some cases led them to
28 | believe that they were performing work on a project for Mattel.

EXHIBIT 35
PAGE 536
-36-
THIRD AMENDED ANSWER AND COUNTERCLAIMS

00505.07209/2875224.1

1        35.   Bryant also made affirmative misrepresentations to Mattel
2   management and employees immediately before his departure from Mattel on
3   October 20, 2000.  For example, during his last few weeks at Mattel, Bryant told
4   his co-workers and supervisors that he was going to leave Mattel for "non-
5   competitive" pursuits.  Bryant's representations to his supervisors and his co-
6   workers were false.  Bryant knew at the time that those representations were false
7   and made those false statements to conceal from Mattel the fact that he was already
8   working with MGA and that he had contracted with MGA to assign Bratz works to
9   MGA and to provide design and development services to MGA, a Mattel
10  competitor.
11       36.   As a result of the efforts of Bryant and other Mattel employees
12  working on Bratz (which were done without Mattel's knowledge), the Bratz dolls
13  had been designed and were far along in development during the time that Bryant
14  was employed by Mattel and prior to the time that Bryant left Mattel on
15  October 20, 2000.  Not only did Bryant create and develop designs for the dolls as
16  well as other aspects of the products such as their fashion accessories during the
17  time he was employed by Mattel, but MGA showed Bratz prototypes and/or
18  product to both focus groups and retailers by November 2000, less than three
19  weeks after Bryant left Mattel.  Bryant, Larian and others at MGA arranged these
20  meetings while Bryant was still employed by Mattel.
21       37.   Bryant and MGA employees also repeatedly and continuously
22  communicated with employees of MGA Entertainment (HK) Limited on subjects
23  such as design and manufacturing of Bratz.  On information and belief, at all
24  material times, MGA Entertainment (HK) Limited has maintained regular and
25  continuous contacts with persons in the County of Los Angeles; it regularly has
26  shipped products that it manufactures, or that are manufactured for it, to the County
27  of Los Angeles; and such products have been distributed to retailers and sold to
28  consumers in the County of Los Angeles.

EXHIBIT 35
PAGE 531
-37-
THIRD AMENDED ANSWER AND COUNTERCLAIMS

38.   Bratz also were shown to retailers at the Hong Kong Toy Fair in January 2001. By early 2001, only a few months after Bryant resigned from Mattel, MGA began having the Bratz fashion doll line and accessories manufactured and then, shortly thereafter, began selling them at retail.

39.   Since 2001, MGA has distributed and sold Bratz and Bratz-related products throughout the world. Mattel is informed and believes that MGA also licenses Bratz to third parties. Mattel is also informed and believes that MGA during certain time periods has derived annual revenue from its sales and licenses of Bratz in excess of $500 million. Mattel is further informed and believes that MGA and Bryant claim current ownership of Bratz, and all copyrights and copyright registrations attendant thereto. MGA continues to market, sell and license Bratz and has expressed an intention to continue to do so.

40.   Mattel is informed and believes that MGA and Larian encouraged, aided and financed Bryant to develop Bratz, knowing full well that Bryant was still employed by Mattel at the time and that by performing such work, including design-related work, for his own benefit and/or the benefit of MGA, Bryant would be, and was, in breach of his contractual, statutory and common law duties to Mattel. Mattel is also informed and believes that MGA proceeded to aid and encourage Bryant to develop Bratz with the goal of obtaining a valuable fashion doll line that would be commercially successful in the competitive, multi-billion dollar market for fashion dolls.

41.   Pursuant to Bryant's contract with Mattel, among other things, Mattel is the true owner of Bratz designs and works, including those specifically that were conceived, created or reduced to practice during Bryant's Mattel employment as well as all designs and works that are or have been derived therefrom. Counter-defendants' continued use, sale, distribution and licensing of Bratz thus infringes upon Mattel's rights, injures Mattel and unlawfully enriches the Counter-defendants.

1        42.   Bryant and MGA deliberately and intentionally concealed facts

2   sufficient for Mattel to suspect or to know that it was the true owner of Bratz.

3   Their acts of concealment include, but are not limited to, concealing the fact that

4   Bryant conceived, created, designed and developed Bratz while employed by

5   Mattel, including by tampering with, altering and defacing documents which

6   showed that, in fact, Bryant was a Mattel employee while he was working for and

7   with MGA; concealing the fact that Bryant worked with and assisted MGA during

8   the time Bryant was employed by Mattel and was compensated for that assistance;

9   concealing that Bryant was providing consulting services to MGA; concealing

10   Bryant's role in Bratz by falsely claiming that Larian and others were the creators

11   of Bratz; and concealing the fact that Mattel was the true owner of Bratz by, among

12   other things, filing fraudulent registrations and/or amendments to registrations with

13   the United States Copyright Office claiming MGA as the author of Bratz as a work

14   for hire and mis-dating or altering relevant dates on such documents to further

15   obscure the true facts of when the works were created.

16        43.   Because of Bryant's and MGA's acts of concealment and Bryant's

17   misrepresentations to Mattel, Mattel had no reason to suspect that Bryant had

18   worked with MGA, or assisted MGA, while he still employed by Mattel until

19   approximately November 24, 2003, when Mattel received, through an unrelated

20   legal action, a copy of Bryant's agreement with MGA which showed that the date

21   of Bryant's agreement with MGA predated Bryant's departure from Mattel. It was

22   then, as a result, that Mattel learned for the first time that Bryant had secretly aided,

23   assisted and worked for and with MGA while employed at Mattel and in violation

24   of his Mattel Employment Agreement. Specifically, Bryant's agreement with

25   MGA obligated Bryant to provide product design services to MGA on a "top

26   priority" basis. Bryant's agreement with MGA also provided that Bryant would

27   receive royalties and other consideration for sales of products on which Bryant

28   provided aid or assistance; that all works and services furnished by Bryant under

EXHIBIT  **35**

PAGE   **539**

-39-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1  the agreement, including those he purportedly provided while still a Mattel

2  employee, purportedly would be considered "works for hire" of MGA; and that all

3  intellectual property rights to preexisting works by Bryant, including Bratz designs,

4  purportedly were assigned to MGA.

5  **IV.  MGA STEALS MATTEL TRADE SECRETS IN MEXICO**

6         44.  On information and belief, in or about late 2003 or early 2004,

7  MGA decided to open business operations in Mexico.  Faced with the difficult task

8  of developing an overall strategy for expanding into a market in which it had only a

9  nominal presence and no operations, MGA elected to steal Mattel's plans, strategy

10  and business information for the Mexican market and materials related to Mattel's

11  worldwide business strategies.  As detailed below, MGA and Larian approached

12  three employees of Mattel's Mexican subsidiary ("Mattel Mexico"), enticed them to

13  steal Mattel's most sensitive business planning materials, and then hired them to

14  assist in establishing and running MGA's new Mexican subsidiary.

15      **A.  MGA Hires Three Senior Mattel Employees in Mexico**

16         45.  Carlos Gustavo Machado Gomez ("Machado") was the Senior

17  Marketing Manager, Boys Division, for Mattel Mexico, a position of trust and

18  confidence.  He was employed at Mattel Mexico from April 1, 1997 until April 19,

19  2004.  His duties included short, medium and long-term marketing planning,

20  generating product sales projections, and assisting in creation of the media plan.  In

21  his position, Machado had access to highly confidential and sensitive marketing

22  and product development information.  Machado had an employment agreement

23  with Mattel in which he agreed to maintain the confidentiality of Mattel's protected

24  information.  Mattel's policies also required Machado to protect Mattel's

25  proprietary information and not to disclose it to competitors.

26         46.  Mariana Trueba Almada ("Trueba") was the Senior Marketing

27  Manager, Girls Division, for Mattel Mexico, a position of trust and confidence.

28  She was employed at Mattel Mexico from November 3, 1997 until April 19, 2004.

EXHIBIT __35__

PAGE __540__

-40-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1   Like Machado, her duties included short, medium and long-term marketing
2   planning, generating product sales projections, and assisting in creation of the
3   media plan. In her position, Trueba had access to highly confidential and sensitive
4   marketing and product development information. Trueba had an employment
5   agreement with Mattel in which she agreed to maintain the confidentiality of
6   Mattel's protected information. Mattel's policies also required Trueba to protect
7   Mattel's proprietary information and not to disclose it to competitors.

8          47.   Pablo Vargas San Jose ("Vargas") was a Senior Trade Marketing
9   Manager with Mattel Mexico, a position of trust and confidence. He was employed
10  at Mattel Mexico from March 29, 2001 until April 19, 2004. Vargas was
11  responsible for ensuring that point-of-sale promotions were carried out, analyzing
12  the results of such promotions, negotiating promotion budgets, and generally
13  managing promotional activities. Vargas also had access to highly confidential and
14  sensitive marketing and product development information. Vargas had an
15  employment agreement with Mattel in which he agreed to maintain the
16  confidentiality of Mattel's protected information. Mattel's policies also required
17  Vargas to protect Mattel's proprietary information and not to disclose it to
18  competitors.

19         48.   Beginning in late 2003 or early 2004, Machado, Trueba and
20  Vargas began planning to leave Mattel Mexico to join MGA. In connection with
21  that plan, and with the encouragement of Larian and other MGA officers operating
22  in the United States, they began accessing, copying and collecting proprietary
23  Mattel documents to take with them. On April 19, 2004, Machado, Trueba and
24  Vargas each resigned their positions with Mattel, effective immediately. They
25  stated that they had been hired by a Mattel competitor, but refused to identify that
26  competitor. In fact, they had been offered and accepted employment by MGA to
27  establish and run MGA's new operation in Mexico.

28

EXHIBIT __35__
PAGE __541__

-41-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

B.   **Machado, Trueba and Vargas Stole Dozens of Confidential Trade Secret Marketing and Sales Documents for MGA's Benefit**

49.   Following these resignations, Mattel discovered that Machado, Trueba and Vargas had been in frequent telephonic and e-mail contact with MGA personnel, including Larian, for over three months prior to their resignations. The primary vehicle for these communications in furtherance of their "plot" was an America Online e-mail account with the address <plot04@aol.com>. On information and belief, during this time, Machado, Trueba and Vargas supplied Larian with certain Mattel confidential and proprietary information in order to prove their value to MGA and to improve their negotiating position vis-à-vis their respective employment contracts with MGA.

50.   In March 2004, Machado, Trueba and Vargas were making plans to travel from Mexico to Los Angeles to meet with MGA personnel in person prior to resigning their positions at Mattel. Also, by at least March 3, 2004, Machado, Trueba and Vargas were discussing with MGA personnel, including Larian, specific details regarding setting up MGA offices in Mexico City. On information and belief, prior to their resignations, Larian and others at MGA directed Machado, Trueba and Vargas to steal virtually all Mattel confidential and proprietary information that they could access and bring it with them to MGA. This was reflected in, among things, e-mail messages that Mattel had discovered after Machado, Trueba and Vargas had resigned. For example, on March 22, 2006, approximately one month before they resigned, Machado, Trueba and Vargas wrote an e-mail message from the <plot04@aol.com> e-mail account addressed to Larian, MGA's General Manager Susan Kuemmerle and another MGA officer Thomas Park. In that e-mail message, Machado, Trueba and Vargas sought to prove their value in this endeavor to MGA by writing: "Attached you will find our analysis for future discussion. We will be available during the nights of the week after 16:30 Los Angeles time . . . ." In another e-mail message, showing that the

EXHIBIT __35__

PAGE ___542___

-42-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1  participants intentionally sought to maximize the damage to Mattel from their
2  conduct, Kuemmerle wrote to Larian and Park: "Gustavo, Mariana and Pablo want
3  to resign (all at the same time, and you can believe my smile!) next Wednesday."
4      51.   Beginning on April 12, 2004, a week before his resignation and
5  after numerous communications and meetings with Larian and other MGA
6  personnel, Machado began transferring additional Mattel confidential and
7  proprietary information to a portable USB storage device (also know as a "thumb
8  drive") that he connected to his Mattel computer. On Friday, April 16, 2004, the
9  last business day before he gave notice, Machado copied at least 70 sensitive
10 documents to the portable USB storage device.
11     52.   Starting on April 12, 2004, Vargas also copied a host of
12 confidential and proprietary materials to a portable USB storage device, including
13 sales plans, sales projections and customer profiles.
14     53.   On April 16, 2004, Trueba also copied Mattel confidential and
15 proprietary information to a portable USB storage device connected to her Mattel
16 computer.
17     54.   With full knowledge that she was going to leave Mattel for a
18 competitor, Trueba also took steps to increase further her access to Mattel's
19 confidential information shortly before her resignation. For example, just four days
20 before leaving, Trueba went out of her way to seek to attend a meeting at which
21 Mattel personnel analyzed BARBIE programs for the United States, Canada and
22 South America. Two days before her resignation, she contacted both a Mattel
23 employee located in El Segundo, California and Mattel's advertising agency to
24 request updated confidential information about advertising plans for BARBIE. On
25 information and belief, Trueba acted at the direction of MGA and Larian and did so
26 in order to obtain further information that would allow MGA to obtain unfair
27 competitive advantage over Mattel.
28

EXHIBIT  35
PAGE     543

-43-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

55.   Machado, Trueba and Vargas stole virtually every type of document a competitor would need to enter the Mexican market and to unlawfully compete with Mattel in Mexico, in the United States, and elsewhere.  They stole global internal future line lists that detailed anticipated future products; production and shipping costs for Mattel products; daily sales data for Mattel products; customer data; sales estimates and projections; marketing projections; documents analyzing changes in sales performance from 2003 to 2004; budgets for advertising and promotional expenses; strategic research reflecting consumer responses to products in development; media plans; consumer comments regarding existing Mattel products; customer discounts and terms of sale; customer inventory level data; assessments of promotional campaign success; market size historical data and projections; marketing plans and strategies; merchandising plans; retail pricing and marketing strategies; and other similar materials.

56.   The stolen data was not limited to the Mexican market.  The information stolen would, and did, give MGA an unfair competitive advantage in the United States and around the world.  Further, the stolen information was not located exclusively in Mexico, but included confidential and proprietary information that resided on Mattel computers in Phoenix, Arizona and El Segundo, California, and/or documents which were originally created by personnel in El Segundo.  Included among these stolen documents was one of Mattel's earliest internal global line lists, which included information for BARBIE products for the upcoming year and included, for each product, the expected profit margin, advertising expenditures, expected volume and marketing strategy.  On information and belief, Machado, Trueba or Vargas delivered that internal line list to Larian or another MGA officer during their negotiations with MGA.

57.   MGA has used the information taken from Mattel to obtain an unfair advantage over Mattel, including in both the United States and Mexico.  In fact, MGA later publicized its claim that, in 2005, it had increased its Mexican

00505.07209/2875224.1

EXHIBIT __35__
PAGE __544__

-44-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

market share by 90 percent over the prior year. This increase came at the expense of Mattel, which lost market share during 2004 in Mexico and was forced to increase its advertising and promotional spending to offset further losses.

58.    Machado, Trueba and Vargas attempted to conceal their widespread theft of Mattel's proprietary information. For example, Machado ran a software program on his Mattel personal computer in an attempt to erase information, including information that would reveal the addresses to which he had sent, or from which he had received, e-mail messages. On information and belief, for the same purpose Machado also damaged the hard drive of the personal computer that he used at Mattel.

59.    On information and belief, on April 19, 2004, immediately after Machado, Trueba and Vargas simultaneously resigned, they traveled from Mexico to Los Angeles to meet with MGA personnel, including Larian, in person.

60.    Mattel notified Mexican authorities about the theft of its trade secret and confidential information. On October 27, 2005, the Mexican Attorney General Office obtained a search warrant from the Mexican Federal Criminal Courts for MGA's facilities in Mexico City. In that search, the Mexican authorities found and seized from MGA's offices both electronic and paper copies of a large number of documents containing Mattel trade secrets, including those that Mattel discovered through its forensic investigations, plus many others that Mattel had not known had been stolen.

61.    Based on Machado's "performance" in Mexico, Isaac Larian subsequently promoted Machado, and he was transferred to MGA's main office in Van Nuys, California. When deposed in connection with this case, Machado refused to answer questions about his misconduct and instead invoked the Fifth Amendment over 100 times. On information and belief, Machado has resided at times relevant hereto in the County of Los Angeles, California, and on information and belief, currently resides in Mexico.

**V.    MGA HIRES MATTEL'S SENIOR VICE PRESIDENT AND
GENERAL MANAGER TO FACILITATE ITS THEFT AND USE OF
MATTEL'S HIGHLY VALUABLE BUSINESS METHODS AND
PRACTICES**

62.    On October 1, 2004, Mattel's Senior Vice President and General Manager, Ron Brawer, left Mattel and joined MGA.  Tyco Toys, Inc. ("Tyco"), a predecessor to Mattel, had hired Brawer on April 22, 1996.  The same day, Brawer entered into an Employee Invention & Trade Secret Agreement with Tyco.  On April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel, New Jersey, and remained bound by his Employee Invention & Trade Secret Agreement.

63.    In January 2003, while Brawer held a position of trust and confidence at Mattel, Mattel's "Code of Conduct" was circulated to all Mattel employees worldwide.  Included in the Code of Conduct were statements that:

> Employees and Directors have an obligation to protect the
> confidentiality of Mattel's proprietary information.  Proprietary
> information is any information not generally known to the public
> that is useful to Mattel, that would be useful to its competitors or
> other third parties or that would be harmful to Mattel or its
> customers if disclosed.  Proprietary information includes trade
> secrets, revenue and profit information and projections, new
> product information, marketing plans, design and development
> efforts, manufacturing processes and any information regarding
> potential acquisitions, divestitures and investments.
> We can protect the security of Mattel's proprietary information
> by limiting access to it.  Confidential information should not be
> discussed with those who are not obligated to maintain the
> information in confidence and in public places where the

00505.07209/2875224.1

EXHIBIT  35
PAGE  546

-46-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1    information is not likely to be kept secret, such as planes,

2    restaurants and elevators.  The obligation to preserve confidential

3    information continues even after employment ends.

4  The Code of Conduct applied to Brawer and required that he meet his obligations

5  under the Code of Conduct.

6    64.   By 2003, Brawer had advanced within Mattel to a Senior Vice

7  President position over customer marketing, a position of trust and confidence.  In

8  his executive position, Brawer was provided access to information that was both

9  sensitive and confidential, including, but not limited to, detailed information related

10  to development, manufacture, marketing, pricing, shipping, and performance of

11  Mattel's then-current and anticipated future product lines, and other confidential

12  business plans between Mattel and its most significant retail customers.

13    65.   In December 2003, Alan Kaye, Mattel's Senior Vice President of

14  Human Resources, asked Brawer whether he was discussing potential employment

15  with MGA.  Brawer denied that he had been in contact with MGA and represented

16  that he would not talk to MGA.  Throughout 2004, Mattel reminded and stressed to

17  its employees, including Brawer, the importance of protecting Mattel's confidential

18  and proprietary materials and information.

19    66.   On March 18, 2004, in response to a survey from the President of

20  Mattel Brands, Matt Bousquette, confirming compliance with Mattel's Code of

21  Conduct, Brawer wrote back that he "applaud[ed] the company's vigorous

22  protection of it's [sic] intellectual property," reflecting Brawer's clear

23  understanding that Mattel required its proprietary information to be kept

24  confidential.

25    67.   In April 2004, Mattel promoted Brawer to Senior Vice

26  President/General Manager.  The General Manager position also is an executive

27  position of trust and confidence.  The role of a General Manager is to lead a cross-

28  functional "Customer Business Team."  Each General Manager is accountable for a

EXHIBIT 35

PAGE 541

-47-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

strategic partnership with a key Mattel retailer, covering all aspects of the business, including both traditional toy sales and retail development of licensed products.

68.    In or about late May 2004, Brawer began performing General Manager duties, working with one of Mattel's major retail customer accounts. Thereafter, Brawer began receiving information related not only to the Senior Vice President, Customer Marketing position that he still formally held, but also began receiving detailed information related to his role as General Manager.  Brawer began requesting and analyzing detailed information related to Mattel and its four key retail accounts.

69.    On September 15, 2004, Brawer left work at noon for observance of Rosh Hashanah.  As Brawer left, he carried a large cardboard box with binders and other materials.  Several hours after his departure, Brawer instructed his assistant to print Mattel's 2004 Sales Plan for one of Mattel's significant customers and to provide it to him, falsely claiming he needed it for a meeting

70.    On September 17, 2004, Brawer returned to Mattel and immediately informed his supervisor that he was leaving Mattel, effective October 1, 2004, to work for competitor MGA.

71.    On September 20, 2004, Mattel hand-delivered a letter to Brawer reminding him of his continuing obligation to preserve the confidentiality of Mattel's proprietary information and trade secrets not only through October 1, 2004, but continuing beyond the termination of his employment.

72.    At his exit interview on September 29, 2004, Mattel reminded Brawer that he had ongoing duties of confidentiality to Mattel, even after the termination of his employment.  Brawer was given a copy of his Original Confidentiality Agreement, which he had signed on April 22, 1996, and another copy of the Code of Conduct.  During the exit interview, however, Brawer noted that he had not signed the Code of Conduct, which he intended and Mattel understood to mean that Brawer believed he was not bound by Mattel's policy

EXHIBIT   35
PAGE   548

-48-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1  because he had not signed it. Brawer was unwilling to complete or sign the form

2  that sought to confirm that Brawer understood his ongoing obligations under the

3  Code of Conduct, which included the obligation to preserve the confidentiality of

4  Mattel's proprietary and trade secret information.

5         73.   On October 1, 2004, Brawer's final day of employment with

6  Mattel, Mattel hand-delivered to Brawer a letter that, among other things, reminded

7  Brawer of his confidentiality obligations to Mattel under the Code of Conduct.

8         74.   Upon joining MGA, Brawer became its Executive Vice-

9  President of Sales and Marketing. In that role he was responsible for MGA's sales

10  worldwide. As part of those responsibilities, Brawer had and continues to have

11  responsibility for MGA's accounts with the same retailers that he worked with

12  while at Mattel.

13         75.   Brawer represented during his Mattel exit interview that he had

14  returned all proprietary information to Mattel. That representation was false. On

15  information and belief, Brawer removed proprietary and trade secret information

16  from Mattel that he did not return. Mattel is informed and believes that Brawer did

17  not return to Mattel, for example, the information contained in his contacts file.

18  The contacts file included contact information for Mattel customers, most notably

19  TRU, and extensive contact information for Mattel employees, including titles, e-

20  mail addresses and telephone numbers.

21         76.   Brawer has used that contact information on a regular basis.

22  Since leaving Mattel, Brawer has had contacts with Mattel employees, both by

23  telephone and by electronic mail. Based on his knowledge of Mattel's operations

24  and the roles of certain Mattel employees, he has targeted certain Mattel employees

25  who have broad access to Mattel proprietary information in an effort to induce and

26  encourage them to join MGA and to steal or otherwise wrongfully misappropriate

27  Mattel confidential information and trade secrets. Brawer has done so by

28  promising these Mattel employees salaries 25 percent or more higher than they earn

EXHIBIT **35**

PAGE **547**

-49-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1    at Mattel and stating to them that they should not be concerned by legal action

2    taken by Mattel to protect its trade secrets and its rights because such claims are

3    hard to prove and easy to defeat.

4    **VI.  MGA HIRES OTHER KEY PERSONNEL FROM MATTEL IN**

5        **ORDER TO OBTAIN TRADE SECRET AND HIGHLY**

6        **CONFIDENTIAL INFORMATION REGARDING MATTEL'S**

7        **FORECASTING & INVENTORY MANAGEMENT SYSTEMS**

8            77.    On March 13, 2006, MGA recruited Jorge Castilla, Mattel's

9    Planning Specialist for Operations, Planning & Finance. Before he left Mattel,

10   Castilla stole on behalf of counter-defendants significant Mattel trade secrets and

11   proprietary information.

12           78.    Castilla joined Mattel in November 1999 and, in positions both

13   in Europe and the U.S., played a role in Mattel's development of highly proprietary

14   processes and systems for forecasting and inventory management in which Mattel

15   invested heavily. In Mattel's European operations, Mr. Castilla was involved in

16   Mattel's development of a pilot program to improve sales forecasting in the United

17   Kingdom, and later, with the potential application of the pilot program to Mattel's

18   world-wide sales forecasting.

19           79.    In late 2004, Castilla worked with the International Planning

20   group at Mattel's headquarters in El Segundo, California, where he was responsible

21   for establishing Mattel's Electronic Data Warehouse system, a proprietary database

22   containing highly confidential business information, such as sales, future/pending

23   orders, product availability and sales forecasts at the stock keeping unit level.

24   Additionally, he was responsible for implementing Mattel's customized sales

25   forecasting system and preparing information for senior financial officers regarding

26   inventory levels, sales demands and related topics.

27           80.    Throughout his tenure at Mattel, Castilla became privy to some

28   of Mattel's most confidential and valuable information. Castilla acknowledged his

1  position of trust confidence and agreed that he would preserve and would not

2  disclose or misuse Mattel's proprietary or confidential information on numerous

3  occasions.  For example, in Castilla's Employee Confidential Information and

4  Inventions Agreement, which he signed on October 29, 1999, he acknowledged

5  that he would develop and have access to Mattel proprietary information.  Castilla

6  further agreed not to "disclose or use at any time either during or after my

7  employment with [Mattel], any Proprietary Information," and to "cooperate with

8  the Company and use [his] best efforts to prevent the unauthorized disclosure, use

9  or reproduction of all Proprietary Information."  He also agreed that when he left

10  Mattel's employ, he would deliver to Mattel "all tangible, written, graphical,

11  machine readable and other materials (including all copies in [his] possession or

12  under [his] control containing or disclosing Proprietary Information."

13         81.   Castilla had agreed to the terms in Mattel's Code of Conduct to

14  preserve Mattel's confidential and proprietary information and was specifically

15  warned that "the unauthorized use or disclosure of [Mattel's] confidential,

16  proprietary or trade secret information" may result in the termination of his

17  employment.  He further agreed:

18              Employees have an obligation to protect the Company's

19              confidential and proprietary information.  Confidential and

20              proprietary information is any information which is not

21              generally known to the public that is useful to the

22              Company and that would either be useful to the

23              Company's competitors or third parties or harmful to the

24              Company or its customers, if disclosed.  Confidential and

25              proprietary information includes, but is not limited to,

26              trade secrets, revenue and profit information and

27              projections, new product information, sales and marketing

28              plans, design and development plans, manufacturing

00505.07209/2875224.1

EXHIBIT ___35___

PAGE ___551___

-51-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1   processes, confidential personnel information and

2   information regarding potential acquisitions, divestitures

3   and/or investments.

4       82.   On Monday, March 13, 2006, Castilla informed Mattel that he

5   was resigning to take a position with MGA, as a Manager of Global Sales Planning,

6   with responsibilities that substantially paralleled those that he had at Mattel.

7       83.   During Castilla's exit interview on March 13, 2006, he was

8   provided with a document reminding him of his obligations to preserve Mattel's

9   confidential and proprietary information, including his obligations under Mattel's

10  Employee Confidential Information and Inventions Agreement, including but not

11  limited to "inventions, marketing plans, product plans, business strategies, forecasts

12  and personnel information."  Further, Castilla filled out an exit interview checkout

13  form, in which he acknowledged receiving not only the reminder, but also the

14  Mattel Code of Conduct.  Castilla also acknowledged that, during the course of his

15  employment at Mattel, he had received materials containing confidential and

16  proprietary information, and affirmed that he did not copy or disclose any of the

17  listed documents or the information that they contained to anyone outside of

18  Mattel, and denied having possession of any of the listed documents.  He also

19  affirmed that he returned to Mattel all of its confidential and proprietary documents

20  by representing that he "brought them in on March 12, 2006, filed them and put

21  together a summary of ongoing projects for supervisor, Brenda [Ray-Martin]."

22      84.   Despite his affirmations to the contrary, as of Friday, March 10,

23  2006, Castilla had created a folder on his Mattel network share drive that he labeled

24  "To Take."  The folder contained approximately 56 megabytes of information.  The

25  bulk of that information was made up of documents containing Mattel trade secrets

26  and confidential information, including documents related to inventory

27  management and forecasting for Mattel, as well as a highly confidential document

28  prepared by Mattel's senior executives that laid out Mattel's future international

EXHIBIT   35   -52-

PAGE   552   THIRD AMENDED ANSWER AND COUNTERCLAIMS

1   business strategies and marketing priorities not only up to today, but also for the
2   coming years.

3         85.   Just prior to his resignation, Castilla entered Mattel's
4   headquarters building at approximately 9:30 a.m. on Sunday, March 12, 2006 and
5   departed at approximately 2:00 p.m.  By Monday, March 13, 2006, Castilla had
6   deleted the "To Take" folder and its contents from his network share drive.  Castilla
7   had transferred the information in the "To Take" folder and potentially the folder
8   itself to an e-mail account <hoclau04@gmail.com>, <hoclau04@yahoo.com>
9   and/or to a personal digital assistant device.

10        86.   When he was later interviewed by the FBI about his theft, on
11  information and belief Castilla turned over to the FBI agents the storage media
12  from his personal digital device which contained Mattel trade secrets.  When
13  deposed in connection with this case, Castilla refused to answer questions about his
14  misconduct and instead invoked the Fifth Amendment nearly 500 times.

15        87.   Much of the Mattel trade secrets and confidential information
16  that Castilla took from Mattel related to the successful processes for efficient and
17  cost-effective management of inventory and the use of sophisticated forecasting
18  techniques that Mattel, through significant investment, developed to obtain a
19  competitive advantage in the toy industry with its unique order, manufacture and
20  delivery cycles.  The former Mattel employees working at MGA recognized the
21  value of Castilla's knowledge.  MGA was in dire need of improved inventory
22  management and forecasting, and to remedy this problem MGA targeted Castilla—
23  and the Mattel-specific knowledge that he possessed—and lured him to MGA.
24  With the benefit of the information that he brought with him, on information and
25  belief, MGA, including through Castilla, has used that proprietary and confidential
26  information to improve MGA's sales forecasting and inventory planning, thus
27  saving MGA many millions of dollars, and providing it with other advantages.
28

00505.07209/2875224.1

EXHIBIT __35__     -53-
PAGE ____553____     THIRD AMENDED ANSWER AND COUNTERCLAIMS

## VII. MGA STEALS MATTEL TRADE SECRETS IN CANADA

88. In an effort to increase its market share and sales in Canada and elsewhere, MGA stole Mattel trade secrets regarding Mattel's customers, sales, projects, advertising and strategy, not only for Canada, but the United States and the rest of the world.

89. Janine Brisbois was a Director of Sales for the Girls Division in Canada. Mattel hired her as a National Account Manager in August 1999. When she was hired as a Mattel employee, Brisbois agreed that she would preserve and would not disclose Mattel's proprietary or confidential information. For example, Brisbois agreed:

> You must keep Mattel's Proprietary Information confidential, and you may only use or disclose such information as necessary to perform your job responsibilities in accordance with Mattel policies. Your obligation to keep Mattel's Proprietary Information confidential will continue even after any termination of your employment with your employer.
>
> . . .
>
> Mattel takes steps to maintain the secrecy and confidential nature of Mattel's Proprietary Information and, if a competitor discovered Mattel's Proprietary Information, it could significantly damage Mattel and your Employer.

90. While with Mattel, Brisbois had responsibility for Mattel's account with TRU and later had responsibility for Mattel's Wal-Mart account. In her capacity as Sales Director-Wal-Mart/CTC/Girls Team, Brisbois had access to Mattel confidential and proprietary information regarding Mattel's future product lines, advertising and promotional campaigns and product profitability.

91. On September 26, 2005, Brisbois resigned from Mattel to take a position as Vice President of Sales at MGA. Mattel is informed and believes that

00505.07209/2875224.1

EXHIBIT   35

PAGE ___ 554

-54-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1   in that position Brisbois has responsibility for MGA's accounts with both TRU and

2   Wal-Mart.  During Brisbois' exit interview she was specifically asked whether she

3   was "taking anything."  Brisbois responded, "No."  Both during and after her exit

4   interview, Brisbois was advised by Mattel of her obligations to preserve Mattel's

5   confidential and proprietary information.

6           92.   Mattel is informed and believes that Brisbois spoke with Isaac

7   Larian, MGA's CEO, on September 22, 2005 at approximately 8:30 p.m., when he

8   called Ms. Brisbois at her home.  Mattel subsequently learned that on the same day

9   that she spoke with Mr. Larian and four days before she resigned, Brisbois copied

10  approximately 45 Mattel documents on to a USB or "thumb" drive with the volume

11  label "BACKPACK."  On information and belief, Brisbois removed the thumb

12  drive from Mattel Canada's office by concealing it in her backpack or gym bag the

13  last time that she left that office.  These documents contained Mattel trade secret

14  and proprietary information, and included:

- a document containing the price, cost, sales plan and quantity of every
  Mattel product ordered by every Mattel customer in 2005 and 2006;
- the BARBIE television advertising strategy and information concerning
  sales increases generated by television advertisements;
- competitive analysis of Mattel vis-à-vis its competitors in Canada;
- an analysis of Mattel's girls business sales beginning in 2003 and
  forecasts through 2006;
- profit and loss reviews for Mattel's products being sold in Wal-Mart,
  including margins and profit in not only Canada, but in the United
  States and Mexico; and
- a document containing the product launch dates and related advertising
  for all Mattel new products between Fall 2005 and Spring 2006.

27          93.   After Mattel discovered that Brisbois had copied these sensitive

28  documents to a thumb drive, Mattel notified Canadian law enforcement authorities.

00505.07209/2875224.1

EXHIBIT 35

PAGE 599

-55-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1    Canadian law enforcement authorities recovered from Brisbois a thumb drive with
2    the volume label "BACKPACK" containing the documents that Brisbois had
3    copied from Mattel's computer system. Mattel later learned that while she was
4    working as a Vice President of Sales at MGA, Brisbois accessed and modified
5    documents on that thumb drive.

6         94.    After joining MGA, Brisbois repeatedly traveled to MGA's
7    offices in Van Nuys, California and met with Larian and Brawer. In February,
8    2006, knowing that Mattel trade secrets had been seized from MGA's Mexico City
9    offices and that at least three MGA employees were under criminal investigation,
10   MGA nonetheless issued a press release trumpeting its 2005 performance, with
11   Larian himself concluding, "Our international teams in Mexico and Canada have
12   done a fantastic job."

13   **VIII. AT MGA'S DIRECTION, MATTEL EMPLOYEES IN ADDITION TO**
14   **BRYANT SECRETLY WORK ON BRATZ FOR YEARS**

15        95.    MGA also knowingly bribed and secretly used Mattel employees
16   in addition to Bryant to work on MGA products such as Bratz while they were
17   Mattel employees and, furthermore, fraudulently concealed such activity. On
18   December 28, 2007, MGA vendor and agent Veronica Marlow revealed at her
19   deposition that, beginning in 2000 and continuing over a time period spanning at
20   least five years, at least three Mattel employees in addition to Bryant worked on
21   Bratz while employed by Mattel: Ana Isabel Cabrera, Beatriz Morales and Maria
22   Elena Salazar. Like Bryant, these Mattel employees all signed agreements
23   assigning Mattel all rights to intellectual property they created while employed by
24   Mattel. Each of the three Mattel employees worked for MGA through Marlow, to
25   whom MGA and Bryant have paid millions of dollars since 2000.

26        96.    Following Marlow's December 2007 deposition, Ms. Cabrera
27   and Ms. Morales, who were still Mattel employees, admitted to being paid for and
28   working on Bratz while Mattel employees and to knowing that such conduct was

EXHIBIT   35
PAGE      556

-56-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1   wrong. Both specifically acknowledged that they continued to work on Bratz even

2   after Mattel had made them aware of this litigation involving Bryant's secret, illegal

3   work with MGA and had reiterated the need to protect Mattel's intellectual

4   property. Both admitted that they tried to conceal their work for MGA.

5       97. MGA and Larian knew that their bribery and use of Mattel

6   employees was wrongful and took steps to conceal that misconduct. Among other

7   things: (a) MGA and Larian, by and through their agents Peter Marlow and

8   Veronica Marlow, used devices such as paying the Mattel employees in cash and

9   using false names and false social security numbers in tax and other business

10   records; (b) MGA and Larian continued their acts of bribery and other misconduct

11   after this litigation was filed; (c) MGA and Larian failed to disclose their payments

12   to these Mattel employees despite Court Orders compelling them to disclose any

13   such instances; and (d) MGA and Larian hired Maria Elena Salazar after she left

14   Mattel, even though she specifically touted in her employment application to MGA

15   that she worked on the "first patterns for [the] Bratz doll and release;" and (e) in an

16   email from Peter Marlow to Larian and Paula Garcia of MGA dated June 20, 2005,

17   Marlow informed MGA that the pattern and sample makers "have secure day jobs

18   with an outlook of many more years of stability," they "moonlight" to work on

19   Bratz and "[t]hey have more than 100 years total of doll-making experience

20   between them."

21  **IX. MGA PERSUADES OTHER EMPLOYEES LEAVING MATTEL TO**

22  **JOIN MGA TO MISAPPROPRIATE MATTEL TRADE SECRETS**

23  **FOR THE BENEFIT OF MGA**

24      98. In the past few years, MGA has hired directly over 100 Mattel

25   employees, ranging from Senior Vice-President level to lower level employees. On

26   information and belief, many of these employees were specifically targeted and

27   recruited by MGA, including by Larian and Brawer, based on the Mattel

28   confidential and proprietary information they could access. Many of these

00505.07209/2875224.1

EXHIBIT __35__    -57-

PAGE __557__    THIRD AMENDED ANSWER AND COUNTERCLAIMS

1   employees had access to proprietary and confidential Mattel information.  Mattel

2   believes that some of those former Mattel employees may be observing their

3   obligations not to misappropriate, disclose or use Mattel's confidential and

4   proprietary information.  Mattel is informed and believes, however, that certain

5   additional employees accessed, copied and took from Mattel confidential and

6   proprietary information, including Mattel's strategic plans; business operations,

7   methods and systems; marketing and advertising strategies and plans; future

8   product lines; product profit margins; and customer requirements.  The

9   misappropriated confidential and proprietary information included information that

10  these Mattel employees were not authorized to access.  On information and belief,

11  the misappropriated confidential and proprietary information taken from Mattel is

12  being disclosed to and used by MGA for the benefit of MGA and to the detriment

13  of Mattel.

14  **X.    LARIAN MAKES MISREPRESENTATIONS TO RETAILERS ABOUT**

15  **       MATTEL'S PRODUCTS**

16          99.    Counter-defendants have engaged in other illegal practices in

17  their efforts to compete unfairly with Mattel.  Larian has a practice of sending e-

18  mail messages to a "Bratz News" distribution list that Larian created or that was

19  created for him.  Mattel is informed and believes that the recipients of e-mail

20  messages sent to the "Bratz News" distribution list include members of the media

21  as well as representatives of many of Mattel's most significant customers.

22          100.  On May 12, 2006, Larian sent an e-mail message to the "Bratz

23  News" distribution list that included a reference to Mattel's updated MY SCENE

24  MY BLING BLING product with real gems.  Mattel had not publicly announced

25  this product at the time that Larian sent his May 12, 2006 e-mail.  In fact, Mattel

26  had guarded the identification of this particular product.

27          101.  Shortly thereafter, Larian engaged in a campaign of calling

28  Mattel's most significant customers, including but not limited to Target and TRU,

EXHIBIT __35__

PAGE ____598____

-58-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

00505.07209/2875224.1

1  regarding the MY SCENE MY BLING BLING product with real gems.  In an

2  effort to dissuade these retailers from purchasing Mattel's MY SCENE MY BLING

3  BLING product with real gems, Larian knowingly made false factual statements

4  about that product to each retailer.  As of the writing of this Third Amended

5  Answer and Counterclaims, Mattel is aware that Larian represented to each retailer

6  that each was the only retailer to purchase the product and that Mattel would not be

7  supporting the product with television advertising.  At the time that Larian made

8  these statements, he knew them to be false.  As a result of Larian's

9  misrepresentations, at least one retailer cancelled its order for 75,000 units of the

10  MY SCENE MY BLING BLING product with real gems.  Only after Mattel

11  learned of Larian's misrepresentations and was able to correct them was Mattel able

12  to assure the retailer that Larian's representations were false and to persuade the

13  retailer to reinstate the order.

14        102.  Such conduct is not an isolated incident.  MGA and Larian, in an

15  effort to gain an unfair competitive advantage, repeatedly issued false and

16  misleading press releases and spread false rumors in the marketplace.  In these

17  press releases and in their other statements made in marketplace, MGA and Larian

18  have deliberately misrepresented Bratz's sales, Bratz's market share, Bratz's

19  position vis-à-vis Mattel's BARBIE products, sales of Mattel's BARBIE products

20  and the market share of Mattel's BARBIE products.

21  **XI.  LARIAN AND MGA DESTROY DOCUMENTS, ENGAGE IN**

22         **PERJURY, CONSPIRACY TO COMMIT PERJURY AND**

23         **OBSTRUCTION OF JUSTICE**

24        103.  On information and belief, Larian and MGA have themselves,

25  and through their agents and co-conspirators, destroyed, altered, fabricated and

26  back-dated documents and engaged in other acts of spoliation to conceal the

27  existence, nature and breadth of their wrongful conduct.  For example, and without

28  limitation, Farhad Larian, a former MGA executive and director and Isaac Larian's

1  brother, deliberately destroyed several boxes of documents relevant to Mattel's

2  claims against Bryant and MGA to keep them from Mattel. Farhad Larian did so

3  while still on MGA's payroll.

4        104. On information and belief, Larian and MGA have also conspired

5  to commit perjury and engaged in acts of perjury and other acts of obstruction in

6  connection with MGA's theft of Mattel's property and Mattel's claims relating

7  thereto. These actions include, among others, MGA's submission of false

8  information in sworn applications to the U.S. Copyright Office; Larian's repeated

9  sworn testimony during Phase 1 that Bryant told him, and that Larian believed, that

10  Bryant had not created Bratz while employed by Mattel; MGA's and Larian's

11  submission of false statements regarding MGA's ability to receive outside funding

12  in court pleadings and false statements regarding its financial condition in this

13  action.

14  **XII. MGA AND LARIAN LAUNDER MONEY, ENGAGE IN**

15      **FRAUDULENT TRANSFERS AND ATTEMPT TO OBTAIN SHAM**

16      **PRIORITY OVER MATTEL'S CLAIMS**

17        105. MGA and Larian, on information and belief, have engaged in

18  and continue to engage in a complex scheme to transfer, launder or otherwise hide

19  the ill-gotten funds they have obtained by virtue of their unlawful conduct and have

20  gone to extensive lengths to cover up and obscure such activities. On information

21  and belief, this scheme was orchestrated and/or commenced no later than 2007, but

22  accelerated during the pendency of trial, especially after the Jury's Phase 1A

23  verdict in Mattel's favor. This scheme continues to and beyond this day and

24  threatens to continue into the future.

25        106. On information and belief, in concert with various co-

26  conspirators and shell companies controlled by them, acting on their behalf or in

27  which they have an interest, MGA and Larian have transferred or transported, or

28  caused to be transferred or transported, funds obtained through their unlawful

00505.07209/2875224.1

EXHIBIT 35

PAGE 560

-60-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1    conduct in interstate commerce, including without limitation out of the United

2    States. At least some of these funds, on information and belief, were later returned

3    to the United States through shell entities that attempt to disguise not only the true

4    owners of the companies, but the origin and source of the funds as well.

5            107. These entities have, on information and belief, funded further

6    wrongdoing by MGA and Larian, including the purported purchase, at a substantial

7    discount, of notes held by MGA's then-largest creditor, Wachovia, and other

8    members of a bank syndicate. By this scheme, Larian and his co-conspirators

9    sought to disguise their identities and to obtain purported priority as an alleged

10   secure creditor (rather than as a shareholder) over Mattel's claims against MGA

11   and MGA's assets, including without limitation Bratz assets. On information and

12   belief, MGA and Larian conducted and participated in this scheme with the purpose

13   of concealing and manipulating their assets and liabilities and the appearance of

14   their financial condition in anticipation of their liability to Mattel, and for the

15   purpose of minimizing any exposure due to that liability. The scheme has directly

16   assisted MGA and Larian in committing the other wrongs against Mattel identified

17   herein.

18   **A.    Larian and MGA Create Various Shell and Off-Shore Entities**

19           108. On information and belief, Larian and MGA, and those acting in

20   concert with them, have created, affiliated with, employed or purchased one or

21   more shell entities to either transfer or assist in the transfer of proceeds generated

22   by their unlawful conduct and the criminal enterprises. These include, but are not

23   limited to, the following entities and transactions:

24   • Lexington Financial Limited ("Lexington"), a company purportedly

25     based in the Caribbean island nation of Nevis that is notorious for its

26     secrecy laws. Lexington, whose purported London business address

27     listed in filings with the State of California is nothing more than a

28     virtual office provided by a London company for a few dollars a month,

EXHIBIT  35

PAGE  561

-61-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1   appears to be a non-operating shell corporation. Lexington was

2   registered on March 3, 2006 by persons who, on information and belief,

3   were acting on behalf of or in concert with Larian, and Larian and his

4   co-conspirators used and continue to use Lexington to conceal, receive,

5   hold and transfer funds generated by the wrongful conduct alleged

6   herein.

7   • Vision Capital, LLC, a Delaware limited liability company ("Vision

8   Capital"), which, on information and belief, was created by persons at

9   the direction or on behalf of Larian on August 19, 2008, just after the

10   Phase 1A verdict in Mattel's favor. On information and belief, Larian

11   and his co-conspirators used and continue to use Vision Capital to

12   conceal, receive, hold and transfer funds generated by their wrongful

13   conduct alleged herein.

14   • Omni 808 Investors, LLC, a California limited liability corporation

15   ("Omni 808"), which, on information and belief, was created at the

16   direction or on behalf of Larian on August 12, 2008, just after the Phase

17   1A verdict in Mattel's favor. On information and belief, Larian and his

18   co-conspirators used and continue to use Omni 808 to conceal, receive,

19   hold and transfer funds generated by their wrongful conduct alleged

20   herein. In 2006, Neil Kadisha, the alleged CEO of Omni 808 and a

21   Larian co-conspirator, was found by a court after trial to be "no more

22   than a common thief" and was held liable for stealing millions of

23   dollars as part of a decade-long pattern of fraudulent conduct that

24   included perjury, subornation of perjury, fabrication of financial

25   records, sham transactions, preparation of back-dated documents,

26   fraudulent accountings, acts of looting, embezzlement and other

27   misappropriations of funds, breaches of fiduciary duty, conflicts of

28   interest and illegal self-dealing.

1    109. Lexington claims a purported security interest in the assets of

2    Vision Capital. Vision Capital claims a purported security interest in the assets of

3    Omni 808.

4    110. MGA and Larian, and their co-conspirators, have, on information

5    and belief, used these entities to transfer their ill-gotten funds from the United

6    States and/or to move laundered funds back into the United States, including

7    without limitation in an attempt to obtain purported priority as an alleged secured

8    creditor over Mattel's claims and to deprive Mattel of assets to which it has a

9    legitimate claim.

10    111. On information and belief, Lexington, Vision Capital and Omni

11    808 are alter-egos of each other, the companies being mere shells created and

12    operated pursuant to a fraudulent scheme as alleged herein, and with their financial

13    affairs being significantly intermingled and interconnected.

14    112. On information and belief, Larian, either alone or with other co-

15    conspirators, formed or caused to be formed the alter-ego entity IGWT Group on

16    June 26, 2008—during the Phase 1 trial—and registered its place of business as

17    Larian's home address. On information and belief, Larian, either alone or with

18    other co-conspirators, also formed or caused to be formed an affiliate alter-ego

19    entity called IGWT 826 Investments on August 27, 2008—the day after the Phase 1

20    trial ended. IGWT 826 Investments is registered at the home address of Shirin

21    Makabi and Jahangir Eli Makabi. Shirin Makabi is Isaac Larian's sister, Jahangir

22    Eli Makabi is Isaac Larian's brother-in-law, and both are shareholders or beneficial

23    shareholders of MGA through various trusts.

24    **B.    The Purported Acquisition of the Wachovia Debt**

25    113. After the Phase 1A verdict, MGA and Larian represented on

26    multiple occasions to both this Court and the Ninth Circuit that MGA was in dire

27    financial straits and might file imminently for bankruptcy. MGA and Larian

28    represented to the Court that MGA had not obtained and could not obtain funding

00505.07209/2875224.1

EXHIBIT 35

PAGE 503

-63-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1   (a representation that MGA later was forced to retract as false). At the same time

2   MGA's largest lender, Wachovia, accelerated over $313 million dollars worth of

3   debt that MGA owed it and triggered the lock-box provision of its loan agreements

4   with MGA, which required the transfer to Wachovia of all, or substantially all, of

5   the revenue that MGA received.

6        114.  On information and belief, Larian and MGA, and their co-

7   conspirators, in order to maintain control over MGA's revenue and to frustrate the

8   jury's verdicts in Mattel's favor, determined to purchase the Wachovia note

9   through various entities affiliated with Larian or with MGA. On information and

10   belief, Larian intended to use Lexington, Vision Capital, Omni 808, the IGWT

11   entities and other vehicles currently unknown to Mattel (because of the efforts by

12   MGA, Larian, Omni 808 and their co-conspirators to conceal them) to distance

13   himself from the transaction and thereby conceal the true source of the funds used

14   to purportedly purchase the Wachovia note and to conceal that Larian in fact

15   participated in or controlled the acquisition of the debt, directly or indirectly. On

16   information and belief, at Larian's urging and acting in concert with Larian, Omni

17   808 purportedly acquired the bulk of that debt at a massive discount.

18        115.  Omni 808 has represented to the Court that its claimed

19   acquisition of the Wachovia note was an arms-length business deal. Omni 808 has

20   also represented to the Court that the funds used for the purported acquisition did

21   not originate from MGA or Larian. Wachovia and others, however, recently

22   produced documents that undermine these claims and representations. For

23   example, a July 29, 2008 offer letter to Wachovia states that Larian would have a

24   non-voting limited interest in the loan acquisition. As another example, a Senior

25   Promissory Note between MGA and Wachovia, dated September 3, 2008,

26   specifically identifies Omni 808 as an affiliate of MGA.

27        116.  Moreover, Vision Capital, which claims it holds a purported

28   security interest in Omni 808, is also affiliated with MGA. Vision Capital has

EXHIBIT 35

PAGE    364

-64-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1 listed its address as 1525 South Broadway, Los Angeles, California. Mattel has not

2 been able to identify an active business named Vision Capital located there. Mattel

3 did identify this as the location of Neman Brothers & Associates, a business owned

4 by Leon Neman, Larian's brother-in-law who has served as an MGA director.

5 After Mattel uncovered these facts, Mr. Neman claimed to be an alleged principal

6 of Vision Capital.

7        117. On information and belief, the funds Omni 808 used to

8 purportedly purchase the Wachovia note were, in whole or in part, generated by

9 Larian's and MGA's wrongful conduct directed towards Mattel. On information

10 and belief, Larian has used, at least in part, IGWT Group, IGWT 826 Investments,

11 Lexington, Vision Capital and other shell and alter-ego companies as conduits to

12 transfer funds to Omni 808 and others and to conceal the source of such funds.

13        118. MGA and Larian have now also admitted that Omni 808

14 provided additional funds to MGA beyond the Wachovia debt purchase, though

15 MGA first denied that was the case. MGA and Omni 808 entered into a Secured

16 Delayed Draw Demand Note on October 16, 2008. Pursuant to the terms of that

17 Note, Omni 808 would make available up to $40 million of additional purported

18 credit to MGA. Pursuant to a written request submitted by MGA on October 17,

19 2008, Omni 808 loaned MGA an additional $6 million under that Note. On

20 information and belief, those funds also were, in whole or in part, generated by

21 Larian's and MGA's wrongful conduct towards Mattel and transferred through

22 Larian-controlled conduits to conceal the true source of the funds. In fact, the

23 Secured Delayed Draw Demand Note between MGA and Omni 808 states that

24 Omni 808's funding came, at least in part, from IGWT 826 Investments.

25        119. On information and belief, Omni 808's claimed acquisition of

26 the Wachovia note was not an "arms-length" transaction by an independent

27 investor or investors. Instead it was, on information and belief, an insider

28 transaction facilitated by Larian and MGA through the use of nominally

00505.07209/2875224.1

EXHIBIT __35__

PAGE __505__

-65-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1  independent but affiliated entities, for wrongful purposes that include without
2  limitation maintaining substantial control over MGA's revenues in the near term,
3  continuing with their wrongful activities despite the jury's verdict against them and
4  establishing purported priority as a secured creditor over Mattel's claims in any
5  eventual bankruptcy. On information and belief, Larian participated and was
6  involved in the purported acquisition of MGA's debt, though the claimed
7  acquisition was structured to conceal it from Mattel.

8          120.  While the precise mechanisms by which Larian transferred funds
9  and manipulated MGA's and Larian's finances through these conduits is not yet
10  known to Mattel because such information is in the exclusive possession and
11  control of MGA, Larian and their co-conspirators, and they have refused to disclose
12  or misrepresented even basic information such as the alleged owners of the entities,
13  on information and belief Larian and his affiliates have created shell entities for the
14  purpose of obscuring and concealing the true ownership of assets held and origin of
15  funds transferred, while Larian and his family members and affiliates further have
16  made massive distributions and other payments totaling hundreds of millions of
17  dollars from MGA to themselves and engaged in a series of related-party
18  transactions as part of a scheme to convert at least tens of millions of dollars in
19  MGA equity into debt.

20          121.  For example, according to an MGA Lender Update dated
21  November 1, 2007, in approximately August 2007, MGA made purported loans in
22  the amount of 2.5 million euros for investments in another toy company, called
23  Zapf, purportedly on behalf of Larian and his family. Another 12 million euros
24  were due in November 2007, for which MGA was liable if Larian did not
25  contribute. As shown in a Master Assignment and Exchange Agreement between
26  Omni 808, MGA, and MGA de Mexico and Wachovia and dated September 3,
27  2008, soon after the Phase 1A verdict and during the Phase 1B trial Larian and his
28  family members (including, without limitation, Jahangir Eli Makabi and Shirin

1    Larian Makabi as Co-Trustees of the Makabi Living Trust, Isaac Larian and Angela

2    Larian as Trustees of the Larian Living Trust, the Angela Larian Qualified Annuity

3    Trust, the Isaac E. Larian Qualified Annuity Trust, the Jahangir Eli Makabi

4    Qualified Annuity Trust, Jahangir Eli Makabi, and the Shirin Larian Makabi

5    Qualified Annuity Trust) executed a series of twenty-two separate transactions (on

6    August 4, 5, 8, 19, 25, 2008) which purported to transfer as loans by shareholders

7    over $13.3 million from U.S. based trust accounts to MGA Entertainment (HK)

8    Limited.  Another series of twenty-two transfers (also on August 4, 5, 8, 19, 25,

9    2008) show that Larian and these same family members, MGA shareholders, have

10    also purported to loan nearly $6 million in funds to MGA.

11       **C.**     **Larian Loots MGA's Assets by Selling MGA Inventory to Himself**

12              **at Fire Sale Prices**

13       122.  On information and belief, Larian and MGA have transferred and

14    are continuing to transfer assets from MGA by coordinating the sale of significant

15    MGA inventory, at substantial discounts, to companies affiliated with Larian.

16    These transactions have had the effect of denuding MGA of its most valuable

17    inventory, sold to Larian's own companies for pennies on the dollar, while

18    permitting Larian to substantially benefit by reselling MGA's inventory, and while

19    further infringing Mattel's intellectual property.

20       123.  On information and belief, Larian, through the Larian-controlled

21    IGWT entities, is purchasing Bratz products that infringe Mattel's rights and other

22    MGA products for steep discounts and reselling, distributing and offering for sale

23    such products.  MGA has admitted that it sold tens of millions of dollars in Bratz

24    inventory to IGWT entities at a "substantial discount."  Documents show that the

25    discount on this self-dealing transaction was in fact massive.

26       124.  In May of 2008, when MGA was undergoing cash-flow

27    problems for reasons that included Larian's on-going de facto liquidation of MGA

28    assets, Larian arranged to have MGA purportedly sell vast amounts of MGA

EXHIBIT   35

PAGE   567

-67-

1  inventory, including infringing Bratz products, to himself through the IGWT
2  Group. As shown by an Inventory Purchase Agreement between MGA and IGWT
3  Group, dated July 7, 2008, MGA purportedly agreed to sell hundreds of thousands
4  of inventory items to Larian's IGWT Group. This agreement was signed by Larian
5  on behalf of both MGA and IGWT Group. Through this transaction, MGA sold
6  inventory with a retail value of more than $65 million for just $5.3 million.

7       125. MGA and Larian have claimed that the arrangement was to
8  MGA's benefit because the deal involved obsolete and overstock inventory.
9  However, as the Bill of Sale accompanying the agreement (which shows the SKUs
10  of the products IGWT Group purchased) shows, inventory MGA sold to IGWT
11  Group included current inventory, including current Bratz products.

12       126. The full extent of this and other transactions by which Larian has
13  arranged the substantially discounted sale of MGA assets to IGWT Group or other
14  Larian-controlled entities or affiliates is not yet known to Mattel because such
15  information is in the exclusive possession and control of MGA, Larian, the IGWT
16  entities and their co-conspirators, and they have refused to disclose information to
17  Mattel. On information and belief, by arranging this type of transaction with
18  IGWT Group and other similar insider transactions yet unknown to Mattel, Larian
19  has siphoned significant MGA assets for his own personal benefit. On information
20  and belief, the purported transaction with IGWT Group is only the most recent in a
21  series of insider arrangement facilitated by Larian, which, by May 16, 2008, led
22  Wachovia to conclude that Larian had engaged in a de-facto liquidation of MGA's
23  assets over the course of 2008 and other times.

24
25
26
27
28

EXHIBIT 35
PAGE 568

THIRD AMENDED ANSWER AND COUNTERCLAIMS

## CLAIMS FOR RELIEF

### First Counterclaim

### Copyright Infringement

### (Against MGA, MGA Entertainment (HK) Limited,

### Larian, Bryant and Does 4 through 10)

127. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 126, above, as though fully set forth at length.

128. Mattel is the owner of copyrights in works that are fixed in tangible media of expression and that are the subject of valid, and subsisting, copyright registrations owned by Mattel. These include, without limitation, the works that are the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-378-650, VA 1-378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-378-655, VA 1-378-656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-378-660, VAu 715-270, VAu 715-271 and VAu 715-273. These also include, without limitation, the works that are the subject of Registrations VAu 960-439, VAu 964-304, VAu 964-306, VAu 964-308, VAu 964-309, VAu 964-310, VAu 964-311, VAu 964-315, VAu 964-318, VAu 964-319, VAu 964-320 and VAu 964-321.

129. Counter-defendants have reproduced, created derivative works from and otherwise infringed upon the exclusive rights of Mattel in its protected works without Mattel's authorization. Counter-defendants' acts violate Mattel's exclusive rights under the Copyright Act, including without limitation Mattel's exclusive rights to reproduce its copyrighted works and to create derivative works from its copyrighted works, as set forth in 17 U.S.C. §§ 106 and 501.

130. Counter-defendants' infringement (and substantial contributions to the infringement) of Mattel's copyrighted works is and has been knowingly made without Mattel's consent and for commercial purposes and the direct financial benefit of Counter-defendants. Counter-defendants, moreover, have deliberately

EXHIBIT 35

PAGE 569

-69-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

00505.07209/2875224.1

1  failed to exercise their right and ability to supervise the infringing activities of
2  others within their control to refrain from infringing Mattel's copyrighted works
3  and have failed to do so in order to deliberately further their significant financial
4  interest in the infringement of Mattel's copyrighted works.  Accordingly, Counter-
5  defendants have engaged in direct, contributory and vicarious infringement of
6  Mattel's copyrighted works.

7       131.  By virtue of Counter-defendants' infringing acts, Mattel is
8  entitled to recover Mattel's actual damages plus Counter-defendants' profits,
9  Mattel's costs of suit and attorneys' fees, and all other relief permitted under the
10  Copyright Act.

11       132.  Counter-defendants' actions described above have caused and
12  will continue to cause irreparable damage to Mattel, for which Mattel has no
13  remedy at law.  Unless Counter-defendants are restrained by this Court from
14  continuing their infringement of Mattel's copyrights, these injuries will continue to
15  occur in the future.  Mattel is accordingly entitled to injunctive relief restraining
16  Counter-defendants from further infringement.

17                    <u>**Second Counterclaim**</u>
18       **Violation of the Racketeer Influenced and Corrupt Organizations Act**
19                    **18 U.S.C. §§ 1962(c) and 1964(c)**
20                    **(Against All Counter-defendants)**

21       133.  Mattel repeats and realleges each and every allegation set forth in
22  paragraphs 1 through 132, above, as though fully set forth at length.

23       134.  Beginning at various times from approximately 1999 through the
24  filing of this Third Amended Answer and Counterclaims, in the Central District of
25  California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK)
26  Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and
27  Brawer, Trueba, Vargas, Castilla and Brisbois were employed by and associated-in-
28  fact with an enterprise engaging in, and the activities of which affect, interstate and

1   foreign commerce (the "MGA Criminal Enterprise").  The MGA Criminal

2   Enterprise is made up of the MGA Group (MGA, MGA Entertainment (HK)

3   Limited, MGA de Mexico, Larian, certain of the Doe Counter-defendants and

4   Brawer), the Bryant Group (Bryant and certain of the Doe Counter-defendants), the

5   Mexican Group (Machado, Trueba and Vargas) and the Canadian Group (Brisbois).

6           135.  In addition, beginning at various times from approximately 1999

7   through the filing of this Third Amended Answer and Counterclaims, in the Central

8   District of California and elsewhere, Counter-defendants MGA, MGA

9   Entertainment (HK) Limited, Larian and Bryant, and certain of the Doe Counter-

10  defendants, were employed by and associated-in-fact with a second enterprise

11  engaging in, and the activities of which affect, interstate and foreign commerce (the

12  "Bratz Criminal Enterprise").

13          136.  Further, beginning at least as early 2007, and through the filing

14  of this Third Amended Answer and Counterclaims, in the Central District of

15  California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK)

16  Limited and Larian, as well as IGWT Group, IGWT 826 Investments, Lexington,

17  Omni 808, Vision Capital, Leon Neman, Fred Mashian, Neil Kadisha, Jahangir Eli

18  Makabi, Shirin Larian Makabi, Angela Larian, The Makabi Living Trust, The

19  Larian Living Trust, The Angela Larian Qualified Annuity Trust, The Isaac E.

20  Larian Qualified Annuity Trust, The Jahangir Eli Makabi Qualified Annuity Trust,

21  The Shirin Larian Makabi Qualified Annuity Trust and certain of the Doe Counter-

22  defendants, and others acting in concert with or on behalf of the foregoing, were

23  employed by and associated-in-fact with another enterprise engaging in, and the

24  activities of which affect, interstate and foreign commerce (the "IGWT Criminal

25  Enterprise").

26          137.  MGA, MGA Entertainment (HK) Limited, MGA de Mexico,

27  Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas,

28  Brisbois, Castilla and the Other Former Employees, and each of them, for the

1   purpose of executing and attempting to execute the scheme to improperly defraud

2   Mattel and steal its trade secret or otherwise confidential and proprietary

3   information and infringe Mattel's rights and conceal such misconduct, by means of

4   tortious, fraudulent and criminal conduct, did and do unlawfully, willfully and

5   knowingly conduct and participate, directly and indirectly, in the conduct of the

6   MGA Criminal Enterprise's affairs and, in the case of MGA, MGA Entertainment

7   (HK) Limited, Larian, Bryant, and certain of the Doe Counter-defendants, the Bratz

8   Criminal Enterprise's affairs, through a pattern of racketeering activity.  Their

9   actions include multiple, related acts in violation of:  18 U.S.C. § 1341 (mail fraud),

10   18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1503 (influencing or injuring officer or

11   juror generally), 18 U.S.C. § 1512 (tampering with a witness victim, or informant),

12   18 U.S.C. § 1952 (interstate and foreign travel to aid racketeering), and 18 U.S.C. §

13   2319(a) and 17 U.S.C. § 506(a)(1)(A) (criminal copyright infringement).

14          138.   In addition, MGA, MGA Entertainment (HK) Limited, Larian,

15   IGWT Group, IGWT 826 Investments, Lexington, Omni 808, Vision Capital, Leon

16   Neman, Fred Mashian, Neil Kadisha, Jahangir Eli Makabi, Shirin Larian Makabi,

17   Angela Larian, The Makabi Living Trust, The Larian Living Trust, The Angela

18   Larian Qualified Annuity Trust, The Isaac E. Larian Qualified Annuity Trust, The

19   Jahangir Eli Makabi Qualified Annuity Trust, The Shirin Larian Makabi Qualified

20   Annuity Trust and Does 4 through 10, and each of them, for the purpose of

21   executing and attempting to execute the scheme to infringe Mattel's rights and

22   transfer, transport or launder the ill-gotten gains from their infringements and the

23   MGA and Bratz Criminal Enterprises' thefts and infringements, and secret MGA

24   assets and purportedly obtain priority over Mattel, by means of tortious, fraudulent,

25   and criminal conduct, did and do unlawfully, willfully, and knowingly conduct and

26   participate, directly and indirectly, in the conduct of the IGWT Criminal

27   Enterprise's affairs through a pattern of racketeering activity.  Their actions include

28   multiple, related acts in violation of:  18 U.S.C. § 1341 (mail fraud), 18 U.S.C.

EXHIBIT   35

PAGE _____ 572

-72-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1  § 1343 (wire fraud), 18 U.S.C. § 1952 (interstate and foreign travel to aid
2  racketeering), 18 U.S.C. § 152(7) (concealment of assets), 18 U.S.C. § 1956
3  (money laundering) and 18 U.S.C. § 1957 (use of unlawful funds) and 18 U.S.C. §
4  2319(a) and 17 U.S.C. § 506(a)(1)(A) (criminal copyright infringement).

5         139. MGA, MGA Entertainment (HK) Limited, MGA de Mexico,
6  Larian, Bryant, Machado, Does 4 through 10, and the other members of the MGA
7  Criminal Enterprise, Bratz Criminal Enterprise and IGWT Criminal Enterprise, and
8  each of them, shared the common purpose of enabling MGA to defraud Mattel and
9  infringe its rights, and obtain confidential, proprietary and otherwise valuable
10  Mattel property through improper means, and conceal and transfer, transport or
11  launder the ill-gotten gains from such misconduct, and secret MGA assets and
12  purportedly obtain priority over Mattel, in order to assist MGA in illegally
13  competing with Mattel domestically and throughout the world.

14         140. The MGA Criminal Enterprise, Bratz Criminal Enterprise and
15  IGWT Criminal Enterprise as described herein are and have been at all relevant
16  times continuing enterprises. The conduct of each enterprise continues through the
17  date of this Third Amended Answer and Counterclaims and is ongoing, including
18  by virtue of MGA's continuing use and infringement of Mattel's information,
19  property and rights, and its use of ill-gotten gains from such thefts, all to the
20  detriment of Mattel. Said enterprises furthermore threaten to continue such
21  conduct into the future, to the detriment of Mattel.

22         141. The pattern of racketeering activity, as defined by 18 U.S.C.
23  §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat
24  of continuing criminal activity. This activity consists of multiple acts of
25  racketeering by each member of the MGA Criminal Enterprise, Bratz Criminal
26  Enterprise and IGWT Criminal Enterprise, is interrelated, not isolated and is
27  perpetrated for the same or similar purposes by the same persons. This activity
28  extends over a substantial period of time, up to and beyond the date of this Third

EXHIBIT   35

PAGE   573

-73-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1    Amended Answer and Counterclaims.  These activities occurred after the effective

2    date of 18 U.S.C. §§ 1961 *et seq.,* and the last such act occurred within 10 years

3    after the commission of a prior act of racketeering activity.  These racketeering

4    activities included repeated acts of:

5           (a)   Mail Fraud:  Counter-defendants MGA, MGA Entertainment

6                   (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, and

7                   Does 4 through 10, as well as some or all other members of the

8                   MGA and IGWT Criminal Enterprises, aided and abetted by each

9                   other, having devised a scheme or artifice to defraud Mattel of its

10                  confidential trade secret information and property by conversion,

11                  false representations, concealment and breaches of fiduciary duty,

12                  and transfer, transport or launder the ill-gotten gains from such

13                  thefts, and secret MGA assets and purportedly obtain priority

14                  over Mattel, did for the purpose of furthering and executing such

15                  a scheme or artifice to defraud, deposited or caused to be

16                  deposited matters or things to be sent or delivered by the Postal

17                  Service, or any private or commercial interstate carrier, or took or

18                  received matters or things therefrom, or knowingly caused

19                  matters or things to be delivered by mail or such carrier according

20                  to the direction thereon, or at the place at which it is directed to

21                  be delivered by the person to whom it is addressed, in violation of

22                  18 U.S.C. § 1341 and 18 U.S.C. § 2, as alleged with greater

23                  particularity in the foregoing paragraphs and as evidenced by,

24                  among other acts of mail fraud, the true and correct copies of

25                  communications and other evidence included in Exhibit C, D and

26                  E;

27          (b)   Wire Fraud: C ounter-defendants MGA, MGA Entertainment

28                  (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, and

EXHIBIT   35

PAGE   514

-74-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

Does 4 through 10, as well some or all other members of the
MGA and IGWT Criminal Enterprises, aided and abetted by each
other, having devised a scheme or artifice to defraud Mattel of its
confidential and trade secret information and property by
conversion, false representations, concealment and breaches of
fiduciary duty, and transfer, transport or launder the ill-gotten
gains from such thefts, and secret MGA assets and purportedly
obtain priority over Mattel, did for the purpose of furthering and
executing such a scheme or artifice to defraud, transmit and cause
to be transmitted by means of wire communications in interstate
or foreign commerce, writing, signs, signals, pictures or sound, in
violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, as alleged with
greater particularity in the foregoing paragraphs and as evidenced
by, among other acts of wire fraud, the true and correct copies of
communications and other evidence included in Exhibit C, D and
E;

(c)     Tampering With a Witness, Victim or Informant:  Counter-
defendants MGA, MGA Entertainment (HK) Limited, MGA de
Mexico, Larian, Bryant, Machado and Does 4 through 10, aided
and abetted by each other and some or all of the remaining
members of the MGA Criminal Enterprise, did corruptly alter,
destroy, mutilate, or conceal more than one record, document, or
other object, or attempted to do so, with the intent to impair the
object's integrity or availability for use in an official proceeding,
including this action, including without limitation by:

i.     altering Bryant's contract with MGA relating to
Bratz to conceal evidence that Bryant faxed the contract from the
BARBIE COLLECTIBLES department of Mattel, using a fax

00505.07209/2875224.1

EXHIBIT ___35___
PAGE ___575___

-75-

machine owned by Mattel and while Bryant was employed by Mattel;

      ii.    altering numerous original Bratz drawings created by Bryant by adding false and misleading date notations of "8/1998" and "© 8/1998" to the drawings even though the drawings were not created in August 1998; and

      iii.   destroying electronic and other evidence, including by destroying evidence previously contained on Carter Bryant's and Isaac Larian's computer hard drives, and destroying or causing to be destroyed evidence in possession of Farhad Larian;

      iv.   altering tax records and other business documents, including by use of false names and false social security numbers, to conceal the bribery of Mattel employees;

Such actions are in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(d)    <u>Influencing or Injuring Officer or Juror Generally</u>:  Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, as well as some or all of the remaining members of the MGA Criminal Enterprise, aided and abetted by each other, did seek to corruptly impede, obstruct or influence the due administration of justice, including without limitation by:

      i.    Larian's and MGA's submission of false information in sworn applications to the U.S. Copyright Office and the U.S. Patent Office;

00505.07209/2875224.1

EXHIBIT ___35___
PAGE ___576___

-76-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

      ii.    Larian repeatedly giving false testimony during the Phase 1 trial that Bryant told him (and that Larian believed) that Bryant had not created Bratz while employed by Mattel;

      iii.    Larian's and MGA's submission of false statements regarding MGA's ability to receive outside funding and numerous false statements regarding its financial condition in this action;

Such actions are in violation of 18 U.S.C. § 1503 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(e)  <u>Interstate and Foreign Travel in Aid of Racketeering Enterprises</u>: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, as well as some or all of the remaining members of the MGA Criminal Enterprise and IGWT Criminal Enterprise, aided and abetted by each other, traveled in interstate and foreign commerce, or used the mail or any facility in interstate or foreign commerce, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity, *i.e.* bribery, in violation of the laws of the State of California, *Cal. Penal Code* § 641.3, all in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing and following paragraphs; money laundering in violation of 18 U.S.C. § 1956(a), as alleged with greater particularity in the foregoing and following paragraphs; and engaging in monetary transactions involving property derived from unlawful activities in violation of 18

EXHIBIT 35
PAGE 511

-77-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

00505.07209/2875224.1

1  U.S.C. § 1957(a), as alleged with greater particularity in the
2  foregoing and following paragraphs;
3  (f)  Money Laundering:  Counter-defendants MGA, MGA
4       Entertainment (HK) Limited and Larian and Does 4 through 10,
5       as well as some or all of the remaining members of the MGA and
6       IGWT Criminal Enterprises, aided and abetted by each other,
7       willfully engaged in financial transactions which were intended to
8       conceal or disguise the nature, the location, the source, the
9       ownership, or the control of the ill-gotten proceeds of their
10      criminal activities or were intended to further promote the
11      carrying on of their criminal activities, all in violation of 18
12      U.S.C. § 1956(a), as alleged with greater particularity in the
13      foregoing paragraphs;
14  (g)  Engaging in Monetary Transactions in Property Derived from
15       Unlawful Activity:  Counter-defendants MGA, MGA
16       Entertainment (HK) Limited, Larian, and Does 4 through 10, as
17       well as some or all of the remaining members of the MGA and
18       IGWT Criminal Enterprises, aided and abetted by each other,
19       willfully engaged in monetary transactions in criminally derived
20       property of a value greater than $10,000 derived from their
21       unlawful criminal activities, all in violation of 18 U.S.C. §
22       1957(a), as alleged with greater particularity in the foregoing
23       paragraphs;
24  (h)  Concealment of Assets:  Counter-defendants MGA, MGA
25       Entertainment (HK) Limited, Larian, and Does 4 through 10, as
26       well as some or all of the remaining members of the MGA and
27       IGWT Criminal Enterprises, aided and abetted by each other,
28       willfully sought to transfer or conceal property, and/or concealed,

00505.07209/2875224.1

EXHIBIT __35__
PAGE __578__

-78-
THIRD AMENDED ANSWER AND COUNTERCLAIMS

destroyed, mutilated, falsified or made false entries in recorded
information relating to such property, in contemplation of a
bankruptcy proceeding, all in violation of 18 U.S.C. § 152(7) &
(8), as alleged with greater particularity in the foregoing
paragraphs;

(i)  Criminal Copyright Infringement: Counter-defendants MGA,
MGA Entertainment (HK) Limited, MGA de Mexico, Larian,
Bryant, Machado and Does 4 through 10, as well as some or all
other members of the MGA and IGWT Criminal Enterprises,
aided and abetted by each other, willfully infringed and continue
to willfully infringe Mattel's copyrights, including without
limitation with respect to documents containing Mattel trade
secret and confidential information and Bratz works created by
Bryant and others while Mattel employees, for purposes of
commercial advantage and private financial gain, all in violation
of 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A), as alleged
with greater particularity in the foregoing paragraphs.

142.  The persons alleged herein to have violated 18 U.S.C. § 1962(c)
are separate from, though employed by or associated with, MGA, the MGA Group,
the Bryant Group, the Mexican Group and the Canadian Group.

143.  MGA had a role in the racketeering activity that was distinct
from the undertaking of those acting on its behalf.  MGA also attempted to benefit,
and did benefit, from the activity of its employees and agents alleged herein, and
thus was not a passive victim of racketeering activity, but an active perpetrator.

144.  Mattel has been injured in its business or property as a direct
and proximate result of the Counter-defendants' and the other enterprise members'
violations of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts
constituting the pattern of racketeering activity.

1    145. As a result of the violations of 18 U.S.C. § 1962(c), by MGA,

2    MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado,

3    Does 4 through 10, Brawer, Trueba, Vargas, Brisbois, Castilla and the Other

4    Former Employees, and IGWT Group, IGWT 826 Investments, Lexington, Omni

5    808, Vision Capital, Leon Neman, Fred Mashian, Neil Kadisha, Jahangir Eli

6    Makabi, Shirin Larian Makabi, The Makabi Living Trust, The Larian Living Trust,

7    The Angela Larian Qualified Annuity Trust, The Isaac E. Larian Qualified Annuity

8    Trust, The Jahangir Eli Makabi Qualified Annuity Trust and The Shirin Larian

9    Makabi Qualified Annuity Trust, Mattel has suffered substantial damages, in an

10    amount to be proved at trial. Pursuant to 18 U.S.C. § 1964(c), Mattel is entitled to

11    recover treble its general and special compensatory damages, plus interest, costs

12    and attorneys, fees, incurred by reason of Counter-defendants' violations of 18

13    U.S.C. § 1962(c).

**Third Counterclaim**

**Conspiracy To Violate the Racketeer**

**Influenced And Corrupt Organizations Act**

**(18 U.S.C. §§ 1962(d) and 1964(c))**

**(Against All Counter-defendants)**

19    146. Mattel repeats and realleges each and every allegation set forth in

20    paragraphs 1 through 145, above, as though fully set forth at length.

21    147. Beginning at various times from approximately 1999 through the

22    filing of this Third Amended Answer and Counterclaims, in the Central District of

23    California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK)

24    Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and

25    Brawer, Trueba, Vargas, Brisbois, Castilla and the Other Former Employees

26    willfully, knowingly and unlawfully, did conspire, combine, confederate and agree

27    together to violate 18 U.S.C. § 1962(c).

28

00505.07209/2875224.1

EXHIBIT ___35___

PAGE ___580___

-80-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

148.  These conspirators were employed by and associated-in-fact with the MGA Criminal Enterprise engaging in, and the activities of which affect, interstate and foreign commerce.  Specifically, the MGA Group, the Bryant Group, the Mexican Group and the Canadian Group, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the MGA Criminal Enterprise's affairs through a pattern of racketeering activity.  In addition, MGA, MGA Entertainment (HK) Limited, Larian and Bryant, and certain of the Doe Counter-defendants, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the Bratz Criminal Enterprise's affairs through a pattern of racketeering activity.

149.  Beginning at least as early as 2007 through the filing of this Third Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, and Does 4 through 10, and IGWT Group, IGWT 826 Investments, Lexington, Omni 808, Vision Capital, Leon Neman, Fred Mashian, Neil Kadisha, Angela Larian, Jahangir Eli Makabi, Shirin Larian Makabi, The Makabi Living Trust, The Larian Living Trust, The Angela Larian Qualified Annuity Trust, The Isaac E. Larian Qualified Annuity Trust, The Jahangir Eli Makabi Qualified Annuity Trust and The Shirin Larian Makabi Qualified Annuity Trust, willfully, knowingly and unlawfully, did conspire, combine, confederate and agree together to violate 18 U.S.C. § 1962(c).

150.  These conspirators were employed by and associated-in-fact with the IGWT Criminal Enterprise engaging in, and the activities of which affect, interstate and foreign commerce.  Specifically, MGA, MGA Entertainment (HK) Limited, Larian, and IGWT Group, IGWT 826 Investments, Lexington, Omni 808, Vision Capital, Leon Neman, Fred Mashian, Neil Kadisha, Jahangir Eli Makabi, Shirin Larian Makabi, Angela Larian, The Makabi Living Trust, The Larian Living

1  Trust, The Angela Larian Qualified Annuity Trust, The Isaac E. Larian Qualified

2  Annuity Trust, The Jahangir Eli Makabi Qualified Annuity Trust, The Shirin Larian

3  Makabi Qualified Annuity Trust and certain of the Doe Counter-defendants,

4  constituting a group of individuals associated-in-fact, did unlawfully, willfully, and

5  knowingly participate in and conduct, directly and indirectly, the IGWT Criminal

6  Enterprise's affairs through a pattern of racketeering activity.

7      151.  The pattern of racketeering activity, as defined by 18 U.S.C.

8  §§ 1961(1) and (5), includes acts of mail fraud in violation of 18 U.S.C. § 1341 and

9  18 U.S.C. § 2; acts of wire fraud in violation of 18 U.S.C. § 1343 and 18 U.S.C.

10  § 2; conspiracy to commit perjury and acts of influencing or injuring officer or

11  juror generally in violation of 18 U.S.C. § 1503 and 18 U.S.C. § 2; acts of

12  tampering with witnesses, victims or informants in violation of 18 U.S.C. § 1512

13  and 18 U.S.C. § 2; acts of interstate and foreign travel in aid of racketeering

14  enterprises in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2; acts of unlawful

15  concealment of assets in violation of 18 U.S.C. § 152(7) & (8); acts of money

16  laundering in violation of 18 U.S.C. § 1956; acts of engaging in monetary

17  transactions in property derived from unlawful activities in violation of 18 U.S.C.

18  § 1957; and acts of criminal copyright infringement in violation of 18 U.S.C.

19  § 2319(a) and 17 U.S.C. § 506(a)(1)(A).

20      152.  Counter-defendants and the other members of the MGA Criminal

21  Enterprise schemed to improperly defraud Mattel and steal its trade secret or

22  otherwise confidential and proprietary information and infringe Mattel's rights and

23  conceal such misconduct, as more fully set forth in the foregoing paragraphs.

24  Further, counter-defendants and the other members of the IGWT Criminal

25  Enterprise schemed to infringe Mattel's rights and transfer, transport or launder the

26  ill-gotten gains from their infringements and the MGA and Bratz Criminal

27  Enterprises' thefts and infringements, and secret MGA assets and purportedly

28  obtain priority over Mattel, as more fully set forth in the foregoing paragraphs.

EXHIBIT  35

PAGE     582

-82-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1         153. In furtherance of this unlawful conspiracy, and to effect its

2 objectives, Counter-defendants and various co-conspirators committed numerous

3 overt acts, including but not limited to those set forth in the foregoing paragraphs.

4         154. Mattel has been injured in its business or property as a direct and

5 proximate result of the Counter-defendants' and the other enterprise members'

6 violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts

7 constituting the pattern of racketeering activity.

8         155. As a result of the conspiracies between and among all Counter-

9 defendants and the other conspirators to violate 18 U.S.C. § 1962(c), Mattel has

10 suffered substantial damages, in an amount to be proved at trial. Pursuant to 18

11 U.S.C. § 1964(c), Mattel is entitled to recover treble its general and special

12 compensatory damages, plus interest, costs and attorneys, fees, incurred by reason

13 of Counter-defendants' violations of 18 U.S.C. § 1962(d).

14 **Fourth Counterclaim**

15 **Misappropriation of Trade Secrets**

16 (*Cal. Civ. Code* § 3426 *et seq.*)

17 **(Against Counter-defendants MGA, MGA de Mexico,**

18 **Larian, Machado and Does 4 through 10)**

19         156. Mattel repeats and realleges each and every allegation set forth in

20 paragraphs 1 through 155, above, as though fully set forth at length.

21         157. As used herein, "Trade Secret Material" shall mean the

22 documents, materials and information stolen by Machado, Trueba, Vargas,

23 Brisbois, Castilla, the Other Former Employees, and other persons acting for, on

24 behalf of or at the direction of MGA and/or Larian. Prior to their theft by Counter-

25 defendants, the Trade Secret Materials gave Mattel a significant competitive

26 advantage over its existing and would-be competitors, including MGA. This

27 advantage, as to MGA, has now been compromised as a result of Counter-

28 defendants' unlawful activities.

1    158.  Mattel made reasonable efforts under the circumstances to
2  maintain the confidentiality of the Trade Secret Materials, including by having
3  employees and consultants who may have access the Trade Secret Materials sign
4  confidentiality agreements that oblige them not to disclose the Trade Secret
5  Materials or characteristics of the Trade Secret Materials; by limiting the
6  circulation of said materials within Mattel; by protecting and limiting access to
7  computers with log-in identifications and passwords; by limiting each employee's
8  access to electronic files to those that the particular employee needs to access; by
9  educating employees on the nature of Mattel's information that is confidential and
10  proprietary; and by reminding employees on a regular and periodic basis of their
11  obligation to protect and maintain Mattel's confidential and proprietary
12  information.

13    159.  Mattel's Trade Secret Materials derive independent economic
14  value from not being generally known to the public or to other persons who can
15  obtain economic benefit from their disclosure.

16    160.  Counter-defendants have illegally obtained the trade secret
17  materials, as set forth above, and through other means of which Mattel is presently
18  unaware.

19    161.  Counter-defendants have used and disclosed Mattel's Trade
20  Secret Materials without Mattel's consent and without regard to Mattel's rights, and
21  without compensation, permission, or licenses for the benefit of themselves and
22  others.

23    162.  Counter-defendants' conduct was, is, and remains willful and
24  wanton, and was taken with blatant disregard for Mattel's valid and enforceable
25  rights.

26    163.  Counter-defendants' wrongful conduct has caused and, unless
27  enjoined by this Court, will continue in the future to cause irreparable injury to
28  Mattel.  Mattel has no adequate remedy at law for such wrongs and injuries.  Mattel

EXHIBIT  35

PAGE  584

-84-

1  is therefore entitled to a permanent injunction restraining and enjoining Counter-
2  defendants, and each of them, as well as their agents, servants, and employees, and
3  all persons acting thereunder, in concert with, or on their behalf, from further using
4  in any manner Mattel's trade secrets.

5       164. In addition, as a proximate result of Counter-defendants'
6  misconduct, Mattel has suffered actual damages, and Counter-defendants have been
7  unjustly enriched.

8       165. The aforementioned acts of the Counter-defendants were willful
9  and malicious, including in that Counter-defendants misappropriated Mattel's trade
10  secrets with the deliberate intent to injure Mattel's business and improve their own.
11  Mattel is therefore entitled to enhanced damages. Mattel is also entitled to
12  reasonable attorney's fees.

13  **Fifth Counterclaim**
14  **Breach of Contract**
15  **(Against Bryant)**

16       166. Mattel repeats and realleges each and every allegation set forth in
17  paragraphs 1 through 165, above, as though fully set forth at length.

18       167. Pursuant to his Employment Agreement, Bryant agreed that he
19  would not, without Mattel's express written consent, engage in any employment or
20  business other than for Mattel or assist in any manner any business competitive
21  with the business or future business plans of Mattel during his employment with
22  Mattel. Pursuant to his Mattel Employment Agreement, Bryant further assigned to
23  Mattel all right, title and interest in "inventions," including without limitation
24  "designs" and other works that he conceived, created or reduced to practice during
25  his employment by Mattel. In addition, pursuant to the Conflict Questionnaire,
26  Bryant certified that, other than as disclosed, he had not worked for any competitor
27  of Mattel and had not engaged in any business venture or transaction involving a
28  Mattel competitor that could be construed as a conflict of interest. Bryant further

EXHIBIT __35__

PAGE __585__

-85-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1   promised that he would notify his supervisor immediately of any change in his

2   situation that would cause him to change any of the foregoing certifications or

3   representations.

4          168.  The Employment Agreement and the Conflict Questionnaire are

5   valid, enforceable contracts, and Mattel has performed each and every term and

6   condition of the Employment Agreement and Conflict Questionnaire required to be

7   performed by Mattel.

8          169.  Bryant materially breached the foregoing contracts with Mattel,

9   in that, among other things, he secretly aided, assisted and worked for a Mattel

10  competitor during his employment with Mattel without the express written consent

11  of Mattel.

12         170.  As a consequence of Bryant's breach, Mattel has suffered and

13  will, in the future, continue to suffer damages in an amount to be proven at trial.

14  Such damages include, without limitation, the amounts paid by the competitor to

15  Bryant during his Mattel employment; the amounts paid by MGA to Bryant during

16  his Mattel employment; the amount that Mattel paid Bryant during the time he

17  wrongfully worked with MGA; the value of information and intellectual property

18  owned by Mattel which Bryant provided to MGA; the value of the benefits that

19  MGA obtained from Bryant during the time he was employed by Mattel; and the

20  value of the benefits that MGA obtained from Bryant as a result of the work he

21  performed for or with MGA during his Mattel employment.

22         171.  Bryant's conduct has caused, and unless enjoined will continue to

23  cause, irreparable injury to Mattel that cannot be adequately compensated by

24  money damages and for which Mattel has no adequate remedy at law.  Bryant

25  specifically acknowledged in his Employment Agreement that his breach of the

26  Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be

27  entitled to injunctive relief to enforce this Agreement, in addition to damages and

28  other available remedies."  Accordingly, Mattel is entitled to orders mandating

00505.07209/2875224.1

EXHIBIT ___35___

PAGE ___586___

-86-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1   Bryant's specific performance of his contracts with Mattel and restraining Bryant
2   from further breach.

### Sixth Counterclaim

### Intentional Interference with Contract

### (Against MGA, Larian and Does 4 through 10)

6        172.  Mattel repeats and realleges each and every allegation set forth in
7   paragraphs 1 through 171, above, as though fully set forth at length.

8        173.  Valid agreements existed between Mattel and the Mattel
9   employees who MGA induced to steal or was complicit in stealing Mattel trade
10  secrets and other proprietary and confidential information and who MGA bribed or
11  induced to work for or assist MGA while Mattel employees (collectively, the
12  "Mattel Employees"), including without limitation Bryant, Brawer, Machado,
13  Trueba, Vargas, Brisbois, Castilla, Cabrera, Morales, Salazar, and the Other Former
14  Employees.

15       174.  At all times herein mentioned, MGA, Larian and Does 4 through
16  10 knew that the Mattel Employees had a duty under their agreements not to work
17  for or assist any competitor of Mattel, such as MGA.  In addition, at all times
18  mentioned herein, MGA, Larian and Does 4 through 10 knew that Bryant had
19  assigned to Mattel, and was obligated to disclose to Mattel all inventions, including
20  designs and other works, created, conceived or reduced to practice during their
21  employment with Mattel.

22       175.  Despite such knowledge, Counter-defendants MGA, Larian and
23  Does 4 through 10 intentionally and without justification solicited, induced and
24  encouraged the Mattel Employees to breach their contracts with Mattel.

25       176.  As a direct and proximate result of Counter-defendants' efforts
26  and inducements, the Mattel Employees did breach their contracts with Mattel.

27

28

1    177.  As a result of said breaches, Mattel has suffered damages and
2    will imminently suffer further damages, including the loss of its competitive
3    position and lost profits, in an amount to be proven at trial.
4    178.  Counter-defendants performed the aforementioned conduct with
5    malice, fraud and oppression, and in conscious disregard of Mattel's rights.
6    Accordingly, Mattel is entitled to recover exemplary damages from Counter-
7    defendants in an amount to be determined at trial.

8                          Seventh Counterclaim
9                        Breach of Fiduciary Duty
10                      (Against Bryant and Machado)

11   179.  Mattel repeats and realleges each and every allegation set forth in
12   paragraphs 1 through 178, above, as though fully set forth at length.
13   180.  Bryant and Machado held positions of trust and confidence with
14   Mattel.  In their positions, Bryant and Machado had access to and were entrusted
15   with Mattel's proprietary and confidential information, supervised the work of
16   others, exercised discretion and worked independently in many of their job
17   assignments and duties.  In their positions, Bryant and Machado also represented
18   Mattel in its dealings with third parties and, in actions in the course and scope of
19   their employment with Mattel, were agents of Mattel.  They confirmed their
20   relationship of trust with Mattel in respective employee agreements.  Bryant and
21   Machado thus owed Mattel a fiduciary duty that included, but was not limited to,
22   an obligation not to take any action that would be contrary to Mattel's best interests
23   or that would deprive Mattel of any opportunities, profit or advantage which Bryant
24   or Machado might bring to Mattel.
25   181.  Bryant breached his fiduciary duty to Mattel in that, while
26   employed by Mattel, he secretly aided and assisted a competitor of Mattel,
27   including without limitation by entering into an agreement with a Mattel
28   competitor.  As alleged above, Bryant also breached the aforementioned duty by

00505.07209/2875224.1

EXHIBIT ___35___
PAGE ___588___

-88-
THIRD AMENDED ANSWER AND COUNTERCLAIMS

1  using Mattel property and resources for the benefit of, and to aid and assist, himself
2  personally and MGA.

3       182. Machado breached his fiduciary duty to Mattel, in that while
4  employed by Mattel, he secretly aided and assisted a competitor of Mattel by,
5  among other things, misappropriating Mattel trade secret and proprietary
6  information and providing said information to officers of MGA. Machado also
7  breached the aforementioned duty by using Mattel property and resources for the
8  benefit of, and to aid and assist, himself personally and MGA.

9       183. As a direct and proximate result of Counter-defendants' wrongful
10  conduct, Mattel has incurred damages in an amount to be determined at trial.

11       184. Counter-defendants acted with malice, fraud and oppression, and
12  in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an
13  award of exemplary damages against Counter-defendants in an amount to be
14  determined at trial.

15       185. Furthermore, Counter-defendants' conduct has caused, and unless
16  enjoined will continue to cause, irreparable injury to Mattel that cannot be
17  adequately compensated by money damages and for which Mattel has no adequate
18  remedy at law. Accordingly, Mattel is entitled to an order restraining further
19  breach of Bryant's fiduciary duty to Mattel and/or restraining Counter-defendants
20  from continuing to benefit from such breach.

21                      **Eighth Counterclaim**
22            **Aiding and Abetting Breach of Fiduciary Duty**
23          **(Against MGA, Larian and Does 4 through 10)**

24       186. Mattel repeats and realleges each and every allegation set forth in
25  paragraphs 1 through 185, above, as though fully set forth at length.

26       187. At all times herein mentioned, MGA, Larian and Does 4 through
27  10 knew that Bryant held a position of trust and confidence at Mattel. At all times
28  herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant owed a

00505.07209/2875224.1

EXHIBIT __35__
PAGE __589__

-89-

fiduciary duty to Mattel not to take any action that would be contrary to Mattel's best interests, including but not limited to secretly developing and designing Bratz while employed by Mattel and by secretly assisting Larian and MGA .

188.  At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) held positions of trust and confidence at Mattel.  At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's best interests, including but not limited to taking confidential trade secret information from Mattel's premises and providing that information to a competitor.

189.  Despite such knowledge, Counter-defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, encouraged, aided and abetted and gave substantial assistance to the Mattel Employees to breach their fiduciary duties to Mattel, knowing that their conduct would constitute breaches of their fiduciary duties to Mattel.

190.  As a direct and proximate result of Counter-defendants' efforts, the Mattel Employees did breach their fiduciary duties to Mattel and Mattel has incurred damages in an amount to be proven at trial.  Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial.

191.  In taking the aforesaid actions, MGA, Larian and Does 4 through 10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

### Ninth Counterclaim

### Breach of Duty of Loyalty

### (Against Bryant and Machado)

192.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 191, above, as though fully set forth at length.

193. As employees of Mattel, Bryant and Machado owed a duty of undivided loyalty to Mattel. Pursuant to this duty, Bryant and Machado could not compete with Mattel or assist a competitor of Mattel during their employment with Mattel. Pursuant to this duty, Bryant and Machado were required to always give preference to Mattel's business over their own, similar interests during the course of their employment with Mattel.

194. Bryant and Machado breached their duty of loyalty to Mattel in that, while employed by Mattel, they secretly aided, assisted and worked for a competitor of Mattel, including without limitation by entering into agreements with a Mattel competitor. As alleged above, they also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, themselves personally and the competitor of Mattel.

195. As a direct and proximate result of Counter-defendants' wrongful conduct, Mattel has incurred damages in an amount to be determined at trial.

196. Counter-defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages against Counter-defendants in an amount to be determined at trial.

197. Furthermore, Counter-defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel is entitled to an order restraining further breach of Counter-defendants' duty of loyalty to Mattel and/or restraining Counter-defendants from continuing to benefit from such breach.

198. In breaching their duty of loyalty to Mattel, Bryant and Machado acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

## Tenth Counterclaim

### Aiding and Abetting Breach of Duty of Loyalty

### (Against MGA, Larian and Does 4 through 10)

199. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 198, above, as though fully set forth at length.

200. MGA, Larian and Does 4 through 10 knew that Bryant, as an employee of Mattel, owed a duty of loyalty to his employer. MGA, Larian and Does 4 through 10 knew that this duty included an obligation on the part of Bryant not to compete with Mattel or assist a competitor of Mattel during the term of his employment with Mattel. MGA, Larian and Does 4 through 10 also knew that Bryant was required to give preference to Mattel's business over his own, similar interests or those of Mattel's competitors during the course of his employment with Mattel.

201. MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) were employed by Mattel, and, as employees of Mattel, that they owed duties of loyalty to Mattel. MGA, Larian and Does 4 through 10 knew that these duties included an obligation on the part of the Mattel Employees (excluding Bryant) not to compete with Mattel or assist a competitor of Mattel during their Mattel employment.

202. Despite such knowledge, Counter-defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, encouraged, aided and abetted and gave substantial assistance to the Mattel Employees to breach their duties of loyalty to Mattel, knowing that their conduct would constitute breaches of their duties of loyalty to Mattel.

203. As a further consequence of Counter-defendants' efforts, Mattel has suffered injury and is entitled to compensatory damages in an amount to be proven at trial.

204. In taking the aforesaid actions, MGA, Larian and Does 4 through 10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

### Eleventh Counterclaim

### Conversion

### (Against All Counter-defendants)

205. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 204, above, as though fully set forth at length.

206. Counter-defendants wrongfully converted Mattel property and resources by appropriating and using them for their own benefit and gain and for the benefit and gain of others, without the permission of Mattel.

207. Mattel was entitled to, among other things, the exclusive right and enjoyment in property and tangible materials owned by Mattel, including without limitation such proper and materials that were created by Bryant while he was a Mattel product designer. Such property was taken by Bryant from Mattel to further his own interests and, in at least some instances, provided by Bryant to Larian and MGA in furtherance of the interests of Bryant, Larian and MGA.

208. In addition, Counter-defendants wrongfully converted Mattel's property by removing the Trade Secret Materials in electronic and paper form from Mattel's offices. Counter-defendants did so without Mattel's permission and continue to possess them.

209. As a direct and proximate result of Counter-defendants' wrongful conversion of Mattel property, including those relating to Bratz and Mattel's Trade Secret Materials, Mattel has incurred damages. Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial.

210. As a result of Counter-defendants' acts of conversion, Mattel is entitled to damages in an amount sufficient to indemnify Mattel for the loss

00505.07209/2875224.1

EXHIBIT __35__

PAGE __593__

-93-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1 | suffered, which is not measured by the value of the property misappropriated, but
2 | includes the lost profits that Mattel suffered as a result of the conversion or,
3 | alternatively, the profits generated by the Counter-defendants that would not have
4 | been generated but for the conversion.  Only such a measure of damages would
5 | fully and fairly compensate Mattel for the injury it suffered due to Counter-
6 | defendants' acts of conversion.

7 |      211.  Counter-defendants performed the aforementioned conduct with
8 | malice, fraud and oppression, and in conscious disregard of Mattel's rights.
9 | Accordingly, Mattel is entitled to recover exemplary damages from Counter-
10 | defendants in an amount to be determined at trial.

11 |      212.  Furthermore, Counter-defendants' conduct has caused, and unless
12 | enjoined will continue to cause, irreparable injury to Mattel that cannot be
13 | adequately compensated by money damages and for which Mattel has no adequate
14 | remedy at law.  Accordingly, Mattel is entitled to an order restraining Counter-
15 | defendants from further conversion of Mattel property and resources and/or
16 | restraining Counter-defendants from continuing to benefit from such conversion.

### Twelfth Counterclaim

### Unfair Competition

#### (Common Law and *Cal. Bus. & Prof. Code* § 17200)

#### (Against All Counter-defendants)

21 |      213.  Mattel repeats and realleges each and every allegation set forth in
22 | paragraphs 1 through 212, above, as though fully set forth at length.

23 |      214.  Section 17200 of the California Business and Professions Code
24 | prohibits unfair competition, including "any unlawful, unfair or fraudulent business
25 | act or practice . . . ."

26 |      215.  By engaging in the foregoing conduct, Counter-defendants have,
27 | individually and in combination, engaged in unlawful, unfair and/or fraudulent acts
28 | of unfair competition in violation of both the common law of the state of California

1  and *Cal. Bus. & Prof. Code* § 17200 *et seq.*  Such conduct included, without

2  limitation, MGA's commercial bribery of Bryant in violation of *Cal. Penal Code*

3  § 641.3 and misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a).

4  Such conduct also included, without limitation, MGA's and Larian's disparagement

5  of Mattel's products and misrepresentations as alleged above.

6      216.  As a result of the aforementioned conduct, Mattel has suffered

7  damages and will imminently suffer further damages, including but not limited to

8  lost profits in an amount to be proven at trial.  No adequate remedy at law exists for

9  the wrongs and injuries Mattel has suffered and will continue to suffer, and Mattel

10  is entitled to an injunction enjoining Counter-defendants' continued wrongful acts.

11  Mattel is also entitled to recover compensatory and exemplary damages pursuant to

12  the doctrine of common law unfair competition and *Cal. Civ. Code* § 3294.

13                    **Thirteenth Counterclaim**

14  **Avoidance of Intentional and Constructive Fraudulent Transfers Under**

15                **Uniform Fraudulent Transfer Act**

16        **(Common Law and *Cal. Civil Code* §§ 3439 *et seq.*)**

17                    **(Against MGA and Larian)**

18      217.  Mattel repeats and realleges each and every allegation set forth in

19  paragraphs 1 through 216, above, as though fully set forth at length.

20      218.  Mattel is a creditor of MGA and Larian, and his alter-egos,

21  because Mattel has substantial claims against MGA and Larian, including but not

22  limited to claims that have already resulted in a jury verdict in this action in

23  Mattel's favor.  *Cal. Civil Code* § 3439.01(b), (c).

24      219.  After Mattel's claims had been asserted and continuing until the

25  Phase 1A verdict and dates thereafter, MGA and Larian engaged in fraudulent

26  transfers, *Cal. Civ. Code* § 3439.01(i), 3439.04, 3439.05, including, without

27  limitation, by transferring tens of millions of dollars of Bratz inventory from MGA

28  to the Larian-controlled IGWT Group.  These transfers were at massive discounts,

1   and on information and belief MGA did not receive reasonably equivalent value for

2   the Bratz inventory that it transferred.

3       220. On information and belief, and based on the foregoing, these

4   fraudulent transfers were made with actual intent to hinder, delay, and/or defraud

5   MGA's and Larian's creditor, Mattel.

6       221. MGA has represented that it was on the verge of filing

7   bankruptcy. If true, on information and belief at the time of the transfers MGA was

8   unable to pay its debts as they became due and was engaged in a transaction, or was

9   about to engage in a business, for which its remaining assets were unreasonably

10  small, and MGA was insolvent. On information and belief, MGA intended to

11  incur, or believed or reasonably should have believed it would incur, debts beyond

12  its ability to pay as they became due.

13      222. By virtue of the foregoing, MGA's and Larian's fraudulent

14  transfers, including without limitation the transfers of Bratz inventory to the IGWT

15  Group, should be avoided, the transferred assets and their proceeds, including

16  without limitation the Bratz inventory and/or and the proceeds of the sales of any

17  Bratz inventory by IGWT Group, should be restored to MGA and attached, and

18  injunctions should issue against any further fraudulent transfers and against any

19  disposition of the transferred assets and/or their proceeds, pursuant to *Cal. Civil*

20  *Code* § 3439.07.

21                  **Fourteenth Counterclaim**

22                   **Declaratory Relief**

23              **(Against All Counter-defendants)**

24      223. Mattel repeats and realleges each and every allegation set forth in

25  paragraphs 1 through 222, above, as though fully set forth at length.

26      224. As shown in the foregoing paragraphs above, an actual

27  controversy exists between Mattel and Counter-defendants regarding Counter-

28  defendants' lack of ownership interests in Bratz and Mattel's rights in the same.

00505.07209/2875224.1

EXHIBIT ___35___

PAGE ___596___

-96-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1      225.  Accordingly, Mattel seeks a declaration of the Court that

2  Counter-defendants have no valid or protectable ownership rights or interests in

3  Bratz, and that Mattel is the true owner of the same, and further seeks an

4  accounting and imposition of a constructive trust over Bratz, including without

5  limitation registrations and applications for registrations relating thereto made or

6  filed by Counter-defendants and third parties, and over all revenues and other

7  monies or benefits derived or obtained from MGA's and Bryant's purported

8  ownership, use, sale, distribution and licensing of Bratz.

9      226.  Mattel seeks a declaration of the Court that any and all

10  agreements between Bryant and/or any other individuals then-employed by Mattel,

11  on the one hand, and MGA, on the other hand, in which Bryant or any of them

12  purport to assign to MGA any right, title or interests in any work or properties that

13  they conceived, created or reduced to practice while Mattel employees, including

14  but not limited to the Bratz designs, is void and of no effect, including without

15  limitation because Bryant and/or any other such individuals had previously

16  assigned said right, title or interest to Mattel and because Mattel was otherwise the

17  owner of said right, title or interest.

18  **Prayer for Relief**

19  WHEREFORE, Mattel respectfully requests judgment:

20      1.  For a declaration that Counter-defendants have no valid or

21  protectable ownership interests or rights in Bratz designs, works or properties

22  conceived, made, created or reduced to practice by Bryant during the term of his

23  Mattel employment and/or by any others then-employed by Mattel, as well as in all

24  derivatives prepared therefrom, and that Mattel is the true owner of the foregoing;

25      2.  For a declaration that any agreement between Bryant and/or by

26  any others then-employed by Mattel, on the one hand, and MGA or any person or

27  entity, on the other hand, in which Bryant or such others then-employed by Mattel

28  purported to assign any right, title or interests in any work or properties that they

EXHIBIT   35

PAGE   597

-97-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1   conceived, made, created or reduced to practice while employed by Mattel,

2   including but not limited to the Bratz designs, is void and of no effect;

3        3.    For an Order enjoining and restraining Counter-defendants, their

4   agents, servants and employees, and all persons in active concert or participation

5   with them, from further wrongful conduct, including without limitation from

6   imitating, copying, distributing, importing, displaying, preparing derivatives from

7   and otherwise infringing Mattel's copyright-protected works;

8        4.    For an Order, pursuant to 17 U.S.C. § 503(a) and other

9   applicable law, impounding all of Counter-defendants' products and materials that

10   infringe Mattel's copyrights, as well as all plates, molds, matrices and other articles

11   by which copies of the works embodied in Mattel's copyrights may be reproduced

12   or otherwise infringed;

13        5.    For an Order mandating that Counter-defendants return to Mattel

14   all tangible items, documents, designs, diagrams, sketches or any other

15   memorialization of inventions conceived, created, made or reduced to practice

16   during Bryant's employment with Mattel as well as all Mattel property converted

17   by Counter-defendants;

18        6.    For an Order mandating specific performance by Bryant to

19   comply with and satisfy Bryant's contractual obligations to Mattel;

20        7.    That Mattel be awarded, and Counter-defendants be ordered to

21   disgorge, all payments, revenues, profits, monies and royalties and any other

22   benefits derived or obtained as a result of the conduct alleged herein, including

23   without limitation of all revenues and profits attributable to Counter-defendants'

24   infringement of Mattel's copyrights under 17 U.S.C. § 504;

25        8.    For an accounting of all profits, monies and/or royalties from the

26   exercise of ownership, use, distribution, sales and licensing of Bratz;

27        9.    For the imposition of a constructive trust over Bratz, including

28   without limitation all rights and benefits relating thereto and registrations and

00505.07209/2875224.1

EXHIBIT __35__

PAGE __598__

-98-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1  applications for registrations relating thereto made or filed by Counter-defendants

2  and third parties, and all profits, monies, royalties and any other benefits derived or

3  obtained from Counter-defendant's exercise of ownership, use, sale, distribution

4  and licensing of Bratz;

5          10.   That Mattel recover its actual damages and lost profits;

6          11.   That Counter-defendants be ordered to pay exemplary damages

7  in a sum sufficient to punish and to make an example of them, and deter them and

8  others from similar wrongdoing;

9          12.   That Counter-defendants be ordered to pay treble its general and

10  special damages, plus interest, costs and attorney's fees incurred by reason of

11  Counter-defendants' violations of 18 U.S.C. §§ 1962(c)-(d).

12          13.   That Counter-defendants be ordered to pay double damages due

13  to their willful and malicious misappropriation of Mattel's trade secrets with

14  deliberate intent to injure Mattel's business and improve its own;

15          14.   That Counter-defendants pay to Mattel the full cost of this action

16  and Mattel's attorneys' and investigators' fees;

17          15.   For an Order that Larian is liable for all wrongs of his agents,

18  alter-egos or others committed on his behalf;

19          16.   That Counter-defendants' fraudulent transfers, including their

20  transfers of Bratz inventory, be avoided and set aside; the transferred assets and

21  their proceeds be restored to MGA and attached and/or subjected to a constructive

22  trust for Mattel's benefit; and Counter-defendants be enjoined against any further

23  fraudulent transfers and any disposition of the transferred assets and/or their

24  proceeds; and

25  //

26  //

27  //

28  //

EXHIBIT 35
PAGE 599

THIRD AMENDED ANSWER AND COUNTERCLAIMS

00505.07209/2875224.1

1          17.    That Mattel have such other and further relief as the Court may

2   deem just and proper.

3

4   DATED:  May 22, 2009              QUINN EMANUEL URQUHART OLIVER &
                                      HEDGES, LLP
5

6                                     By /s/ John B. Quinn
                                          John B. Quinn
7                                         Attorneys for Defendant and Counter-
                                          claimant Mattel, Inc.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT   35
PAGE   600

00505.07209/2875224.1

-100-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1                    **DEMAND FOR JURY TRIAL**

2

3         Mattel, Inc. respectfully requests a jury trial on all issues triable

4 thereby.

5

6 DATED: May 22, 2009          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

7

8                          By /s/ John B. Quinn

9                           John B. Quinn
                          Attorneys for Defendant and Counter-

10                           claimant Mattel, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                      EXHIBIT   35

28                                       PAGE   601

00505.07209/2875224.1

EXHIBIT A

EXHIBIT 35
PAGE 402