

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION

4                 - - -

5     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                 - - -

**CERTIFIED COPY**

7    MATTEL, INC.,                    )
                                      )
8                    PLAINTIFF,       )
                                      )
9          VS.                        )   NO. CV 04-09049
                                      )
10   MGA ENTERTAINMENT, INC., ET. AL.,)
                                      )
11                   DEFENDANTS.      )   TRIAL DAY 31
     _____)   MORNING SESSION
12   AND CONSOLIDATED ACTIONS,        )   PAGES 6191-6350
     _____)

13

14

15     REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16               RIVERSIDE, CALIFORNIA

17            THURSDAY, AUGUST 7, 2008

18                  8:13 A.M.

19

20

21

22

23           THERESA A. LANZA, RPR, CSR
          FEDERAL OFFICIAL COURT REPORTER
24           3470 12TH STREET, RM. 134
          RIVERSIDE, CALIFORNIA  92501
25               951-274-0844
             WWW.THERESALANZA.COM

THURSDAY, AUGUST 7, 2008          TRIAL DAY 31, MORNING SESSION

6292

1   A    YES.  I HAVE A FINANCIAL MODEL THAT I USED TO CREATE THESE

2   NUMBERS; I THINK IT'S 243 PAGES IN LENGTH; IT'S JUST A BUNCH OF

3   EXCEL SPREADSHEETS THAT ACTUALLY CALCULATE THE NUMBERS.

4   Q    COULD WE TAKE A LOOK IN THE BOOK THERE, TAB 13931.

5        CAN YOU IDENTIFY THAT DOCUMENT THAT'S BEEN MARKED AS

6   EXHIBIT 13931?

7        **MR. KENNEDY:**  WE DON'T SEEM TO HAVE A 13931.

8        **THE COURT:**  CONSULT WITH COUNSEL, PLEASE.

9        **MR. KENNEDY:**  WE FOUND IT YOUR HONOR.  THANK YOU.

10  **BY MR. QUINN:**

11  Q    I THINK I ASKED YOU, WHAT IS EXHIBIT 13931?

12  A    YES.  THIS IS A PRINTOUT OF THE 243 PAGES OF SCHEDULES;

13  AND THANK YOU FOR DOUBLE-SIDING IT TO SAVE PAPER.

14  Q    AND THE SCHEDULE, CAN YOU GIVE US SOME IDEA OF THE VOLUME

15  OF DATA IS OR THE DOCUMENTS UNDERLYING THESE SCHEDULES?

16  A    YES.  THIS IS JUST A SUMMARY OF THE SCHEDULES.  THERE ARE

17  HUNDREDS OF THOUSANDS OF PAGES THAT SUPPORT THIS THAT ARE NOT

18  PART OF THIS.  THE UNDERLYING DATA WOULD FILL A NUMBER OF

19  BANKER'S BOXES AS WELL.

20  Q    IN DOING YOUR WORK IN PREPARING THE SUMMARY THAT YOU DID,

21  DID YOU ACTUALLY DO SUMMARIES BY REVENUE AND COST INFORMATION

22  FOR EACH PRODUCT?

23  A    YES.

24  Q    ALL RIGHT.

25       TO GO BACK TO EXHIBIT 13931, DOES THIS ACCURATELY

THURSDAY, AUGUST 7, 2008                    TRIAL DAY 31, MORNING SESSION

**Exhibit E - Page 143**

6363



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

**HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

- - -

MATTEL, INC.,                        :    PAGES 6363 - 6493
                                     :
          PLAINTIFF,                 :
                                     :
     VS.                             :    NO. ED CV04-09049-SGL
                                     :    [CONSOLIDATED WITH
MGA ENTERTAINMENT, INC.,             :    CV04-9059 & CV05-2727]
ET AL.,                              :
                                     :
          DEFENDANTS.                :
_____     :


REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

THURSDAY, AUGUST 7, 2008

JURY TRIAL - DAY 31

AFTERNOON SESSION


CERTIFIED COPY

MARK SCHWEITZER, CSR, RPR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
181-H ROYBAL FEDERAL BUILDING
255 EAST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012
(213) 663-3494

6375

1    but are for the willful infringement, which would not include

2    subtracting general and administrative expenses.

3            MR. QUINN:  We'd offer that exhibit as well, your

4    Honor.

5            MR. KENNEDY:  No objection subject to the Court's

6    prior ruling.

7            THE COURT:  Very well, it's admitted.  You may

8    publish.

9            **(Exhibits 13935 and 13953 received.)**

10   **Q.**   BY MR. QUINN:  Let me turn to the next subject, and that

11   is the subject of net worth, MGA and Mr. Larian.

12   **A.**   Net worth is the difference between all the assets that

13   you have, things of value, all your liabilities related to

14   those assets.  So it's your gross assets less your

15   liabilities, sometimes referred to as net assets, and that's

16   your net worth.

17   **Q.**   Now, have you calculated the net worth of MGA prior to

18   the receipt of these 40,000 additional documents that you

19   told us about within the last two weeks?

20   **A.**   I did.

21   **Q.**   And what was MGA's net worth work based on the

22   calculations you did, based on the documents and information

23   that MGA had given to you up until about two weeks ago?

24   **A.**   Well, based on a schedule of assets of Mr. Larian that

25   was dated October 25th, 2007, I estimate the total value of

**Exhibit E - Page 145**

1    MGA as of that date at $2 billion.

2    Q.    And the document you are referring to, is that 4947-4?

3    A.    I believe it is.

4    Q.    Which is in evidence.  I believe Mr. Price was

5    questioning Mr. Larian about this document earlier.  Is that

6    document that's on the screen the document that you are

7    referring to?

8    A.    It is.

9    Q.    And was it based on this that you calculated MGA's net

10   worth as approximately $2 billion?

11   A.    Yes.  On this schedule, it shows Mr. Larian's percentage

12   interest of MGA Entertainment at approximately 1.6 billion.

13   Making that a hundred percent rather than 81.82 percent would

14   be $2 billion.

15   Q.    And a $1.6 billion number is in the middle of the page

16   there where it says MGA Entertainment?

17   A.    It is.

18   Q.    And it was from that same document, this same document

19   that MGA prepared that you concluded that Mr. Larian had a

20   net worth of $1.9 billion?

21   A.    Correct.  That is the bottom number on the schedule.

22   Q.    Now, have those numbers changed in your analysis?

23   A.    They have.

24   Q.    Why?

25   A.    Because I received a new schedule in the documents that

6377

1  I received that shows a significantly lower value of MGA as

2  owned by Mr. Larian.

3  **Q.**   And were those among the documents that you were given

4  within the last two weeks?

5  **A.**   Yes.

6  **Q.**   And based on those additional documents, did you make a

7  change in your calculations?

8  **A.**   I did.

9  **Q.**   Let's take a look at slide No. 13.   What does this

10 reflect?

11 **A.**   This reflects two estimates of value at two different

12 dates.   The first column are the numbers I've just previously

13 testified to, which I believe are approximately October of

14 2007.   And the right-hand column is my estimate of both MGA's

15 net worth and Mr. Larian's net worth as of last month.

16 **Q.**   And if you could just walk through those numbers for us

17 and put them in the record for us.

18 **A.**   Yes.   I have estimated that now MGA is worth only

19 $540.5 million and that Mr. Larian's net assets, both his

20 interest in MGA and his other assets, less his liabilities,

21 is $723.3 million.

22 **Q.**   And this reflects the adjustment you made for the

23 additional documents that MGA provided within the last two

24 weeks?

25 **A.**   It does.

6378

1  **Q.**   And you adjusted those numbers down from the numbers you

2  had before of net worth for MGA of $2 billion and Mr. Larian

3  of $1.9 billion; is that correct?

4  **A.**   That is correct.

5  **Q.**   Now, do you have the document, Exhibit No. 13909?

6  **A.**   I do.

7  **Q.**   And is that the document that you referred to that you

8  received in the last two weeks that resulted in your

9  adjusting these net worth numbers down?

10  **A.**   This is the document.

11  **Q.**   Do you know whether the information in that document

12  that MGA just provided is accurate?

13  **A.**   I have no idea to know whether it's accurate or not.

14  I've seen no supporting information to confirm these numbers.

15  **Q.**   Are those numbers there audited?

16  **A.**   They are not.

17  **Q.**   Do you know where those numbers came from or how MGA or

18  Mr. Larian came up with them?

19  **A.**   I do not.

20         MR. QUINN:  Your Honor, we'd like to move into

21  evidence two of the slides.  Slide No. 5, which is MGA's top

22  10 produced documents by revenue, we have marked as

23  Exhibit 13597.  And slide No. 10, MGA's profits, Bratz versus

24  non-Bratz, we have marked as Exhibit 13596.  We would move

25  both of those into evidence, your Honor, as summaries of

**Exhibit E - Page 148**

1   voluminous documents.

2           MR. KENNEDY:  No objection, your Honor.

3           THE COURT:  They are admitted.

4           **(Exhibits 13597 and 13596 received.)**

5   **Q.**  BY MR. QUINN:  Now, this kind of work that you do, and

6   you've testified in court over 100 times.  I hope you don't

7   do this for free.

8   **A.**    I do not.

9   **Q.**    You charge for your time?

10  **A.**    Well, the firm that I work for charges for my time.

11  **Q.**    And on what basis are the charges made?

12  **A.**    On an hourly basis that I work on your matter.

13  **Q.**    And what are your hourly charges?

14  **A.**    My standard hourly rate which I charge in this case is

15  $695 an hour.

16          MR. QUINN:  Thank you very much.

17          THE WITNESS:  Thank you.

18          THE COURT:  You may proceed, Mr. Kennedy.

19          MR. KENNEDY:  Thank you very much, your Honor.

20                          **CROSS-EXAMINATION**

21  BY MR. KENNEDY:

22  **Q.**    Good afternoon, Mr. Wagner.  My name is Raoul Kennedy.

23  I'm another lawyer for MGA in this case.  As you told us,

24  your role in this case is really a fairly limited one, isn't

25  it?

6395

1  **Q.**  And you made that determination sometime during the

2  first quarter of 2008, that Bratz would grow at 2 percent in

3  perpetuity; correct?

4  **A.**  Not in the current model, no, that's not correct.  I've

5  used MGA's actual internal projections of how they are going

6  to do through 2008, and they have actually projected they are

7  going to do 55 percent worse in the second half of this year

8  as they did in 2007.  And I've used that in my model.

9  **Q.**  You used that in your February model?

10  **A.**  No, I didn't have that information.

11  **Q.**  In your February model, you projected they were going to

12  grow at 2 percent in perpetuity.

13  **A.**  I did.  From 2008 forward.

14  **Q.**  Okay.  And you did that during the first quarter of

15  2008.

16  **A.**  I did.

17  **Q.**  And sometime during the second quarter of 2008, you

18  found they weren't going to be growing at 2 percent this

19  year, didn't you?

20  **A.**  No.  That's not true.

21  **Q.**  Well, what did you learn -- what's the --

22  **A.**  I learned it in the third quarter of 2008, to be

23  precise.

24  **Q.**  I stand corrected.  In the third quarter of 2008, you

25  learned that rather than growing at 2 percent a year, they

**Exhibit E - Page 150**