Page 1

1              UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
2                    EASTERN DIVISION
3
4    CARTER BRYANT, an individual,
5              Plaintiff,
6         vs.                          No. CV 04-9049 SGL (RNBx)
                                       Consolidated with
7    MATTEL, INC., a Delaware          Nos. CV 04-9405 and
     corporation,                      05-2727
8
               Defendants.
9
10
11   _____
     AND CONSOLIDATED ACTIONS.
12   _____
13
14
15           REPORTER'S TRANSCRIPT OF PROCEEDINGS
16               Los Angeles, California
17              Wednesday, March 4, 2009
18                     Volume 1
19
20
21   Reported by:
     CHERYL R. KAMALSKI
22   CSR No. 7113
23   Job No. 106479
24
25

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1  wasn't allowed at trial is because MGA and Larian did not
2  make full, complete disclosure.  In other words, it was
3  basically a discovery issue because it was an incomplete
4  production, they had failed to produce all the documents
5  relating to that transaction.  But they themselves argued
6  quite vigorously at the phase 1 trial -- and this was I
7  don't think even a dispute, I don't think Mattel disputed
8  it, it was certainly MGA's position, and I don't think
9  Judge Larson disagreed --
10         MR. O'BRIEN:  Is this debt related to the finance
11 entities, the 808 entities?
12         MR. ZELLER:  Correct.
13         MR. O'BRIEN:  Is that what you're -- do me a
14 favor when you're talking about -- maybe you don't believe
15 there is a distinction -- if you think there's a
16 distinction between the trans- -- what I'll call the
17 transferee entities, the folks that -- the special-purpose
18 LLCs -- and I don't want to -- I'm not being pejorative by
19 calling them special purpose -- but my understanding is
20 there were entities that purchased the Bratz products and
21 then there's the financing, the 808 entities, so -- and it
22 may be that the argument applies equally to both of them,
23 and that's fine, but if you see a distinction in your
24 argument between the different entities, just give me a
25 sign post.

1          MR. ZELLER:  Sure.  I can probably parse it out,
2    because what I'm really addressing at this point is the
3    $300 million of it.  And that is the -- at the time of
4    trial, at least as it was represented to us at the time
5    when some of this dispute was going on, this debt was held
6    by Wachovia.  And that was what it is that MGA said the
7    fact that we are $300 million in debt, that we owe
8    $300 million to Wachovia, is acutely relevant to our
9    financial condition, to our status.  Because, of course,
10   at that point is when the jury was considering, as normal
11   in a punitive damages -- with a punitive damages claim,
12   was considering the financial condition and the net worth
13   of MGA.
14          So MGA itself was asserting this very
15   transaction, this very debt of $300 million was material
16   to its financial condition, it was relevant, and they were
17   the proponents of this evidence.
18          And so where the link is here is, of course,
19   today MGA is saying that same $300 million debt is now
20   held by Omni.  That's their assertion.
21          So we are trying to still get information related
22   to that transaction.
23          And I think as the Discovery Master will see, I
24   mean, that in itself has -- even apart from all the other
25   indicia that we believe do exist that make these highly

1  questionable transactions, which are relevant for another
2  reason, but even taking everything that MGA says at face
3  value and these third parties take at face value, about
4  the propriety of those transactions, the fact is whether
5  or not there is $300 million in debt and what the terms of
6  that supposed debt is is material to MGA's financial
7  condition.  There can really be no dispute about that
8  point.  And I think that in many respects completely
9  crystallizes why it is that this idea that somehow not a
10 single piece of paper, which is essentially the position
11 of MGA and these third parties here, relating to these
12 transactions could be relevant and discoverable; it just
13 really falls apart.
14          There is certainly -- you know, focusing on the
15 IGWT portion of it, you know, those same arguments do
16 apply.  Now, that wasn't the same kind of issue at the
17 phase 1 trial.  But certainly it still goes to MGA's
18 financial condition.  I mean, here we have a situation of,
19 you know, the $65 million worth of product and what its
20 disposition has been, was MGA, in fact, paid that money,
21 what was this value for, what are the circumstances of
22 this transfer?
23          There's no question that that is also a material
24 amount of money.  We're not talking about rounding errors
25 here.  I mean, when you combine these transactions, we're

TRANSCRIPT OF PROCEEDINGS                                        03/04/09

Page 24

1   looking at, you know, $350 million, $365 million worth of
2   value. You know, where does that -- what bucket is this
3   supposed to be properly in? Is this MGA debt? Are they
4   assets? Are they receivables? Are they payables? We
5   don't know. And that's why we're entitled to find out
6   about these transactions.
7           And I will say that, specifically with respect to
8   IGWT, of course, you know, we -- and this is also true of
9   the Omni 808-related transactions, we would, of course,
10  think that it also relates to a whole slew of other
11  issues, including wire fraud and mail fraud and other
12  substantive allegations that we've made in the case, but I
13  won't necessarily go into all those, unless you have
14  questions about them, because, of course, we've given that
15  whole explanation and, frankly, the multiple issues that
16  it relates to. But I don't see a legitimate dispute here,
17  and it's not in the papers, that 360, 365 million,
18  whatever this number turns out to truly be, is a material
19  amount of money to MGA and what its value is and what its
20  net worth is.
21          MR. O'BRIEN: Let me ask you this. How much of
22  this discovery have you been able to obtain from MGA or
23  have you propounded discovery on MGA?
24          MR. ZELLER: We have. And we've obtained zero.
25  That is, undoubtedly -- of course, it may very well

Page 29

```
 1        MR. ZELLER:  I think that's correct.  I would
 2   also add that -- we've certainly raised others.  I don't
 3   want to give them short shrift.  But where I also think
 4   that it's very quite directly related, and I think it's
 5   quite clear, is also on disgorgement.  I mean, if these
 6   transactions were simply vehicles for moving money in and
 7   out of MGA or Isaac Larian's hands, that is something that
 8   would probably be considered, for purposes of disgorgement
 9   damages, I mean, not just punitive damages, of course, but
10   what we call loosely compensatory damages, the actual
11   damages that we'd be entitled to at trial.  It simply
12   cannot be the case that Isaac Larian can essentially move
13   out $65 million worth of Bratz product that's at issue in
14   this case, on both sides' claims, I mean, MGA has made
15   these claims, as well, they're asserting trade dress
16   claims based on their own Bratz products, as to how that
17   money should be considered, how it should be trued up.  I
18   mean, that's certainly going to be a matter of expert
19   opinion and, frankly, at the end of the day, the jury's
20   probably going to have to decide whose money was that
21   really and who should be charged with it, is it something
22   that should be properly considered to be part of the
23   disgorgement of a defendant, are they going to claim that
24   these are -- MGA's lost profits in some way based on their
25   trade dress claim.  There's obviously any number of
```

TRANSCRIPT OF PROCEEDINGS 03/04/09

Page 30

1   reasons why that is going to be acutely relevant to the
2   disgorgement damages, which, you know -- you may be aware
3   that that was, of course, the main theory of damages in
4   phase 1 as well, was a disgorgement-type damage theory.
5   And I can only assume that in the phase 2 trial here that
6   both sides, with respect to their respective claims, are
7   going to be certainly asserting a disgorgement-type
8   theory. We've certainly plead one, there's no question,
9   and it's certainly our intention to pursue a
10  disgorgement-type damages theory.
11         So I would add that that's, I think, a very
12  direct instance, too, in which why the flow of money here
13  is absolutely relevant, directly relevant to the issues in
14  the case.
15         MR. O'BRIEN: But that argument would go
16  primarily to the transferee entities, that wouldn't have
17  as much to do with the financing, the disgorgement theory?
18         MR. ZELLER: Not necessarily. I would say this
19  is -- you know, one thing we would want to know is what
20  are MGA's costs. I mean, if they're going to start saying
21  some of this supposed $300 million debt, is that part of
22  their cost that they're going to assert that should be
23  offset for the, basically, the revenues that have been
24  received as a result of their trade secret theft, the RICO
25  allegations and the like. So, no, it would certainly be a

1  component, potentially, of an MGA assertion that those
2  revenues that they received should be offset, basically
3  decreased in some amount, to reach a profits number
4  because they have debt, they're carrying debt, it's
5  supposedly for the company overall or, perhaps, an
6  individual product line, but however they carve it up,
7  unless they're going to disavow that that $300 million
8  will never be asserted as being some type of cost that
9  should be, you know, fairly taken into account by the jury
10 in deciding disgorgement damages, then it has that
11 relevance as well.
12        MR. O'BRIEN: Well, let me ask you this. With
13 respect to the debt, because I think I understand the
14 point you're making on the transferee entities -- with
15 respect to the debt, whether the debt is owned by Wachovia
16 or Isaac Larian or anybody else, how does that have
17 anything to do with disgorgement? What if Isaac Larian
18 made a personal investment -- I don't know this, I have no
19 idea who owns this -- but he bought the Wachovia debt
20 because Wachovia's going under and was able to buy it at
21 20¢ on the dollar but he's got the paper, the original
22 debt, if he made a separate transaction with Wachovia that
23 doesn't have anything to do with the Bratz -- the
24 production of Bratz dolls and now owns that paper, how is
25 that in any way relevant, other than to his personal net

Page 67

1  response to.
2      And it seems to me, to the extent the issue you
3  raised earlier was somehow relevant documents sufficient
4  to show the Bratz-related purchases, that sale would do
5  that.
6      MR. O'BRIEN: Anything further? Thank you.
7      All right. I assume you're going to -- I assume
8  you're pleased that I reserved some time for you,
9  Mr. Zeller, after -- in retrospect.
10      MR. ZELLER: Absolutely.
11      MR. O'BRIEN: The floor is yours.
12      MR. ZELLER: I'm certainly happy to address
13  anything that has been said here, but I'll go through, I
14  think, some of the high points of this.
15      I'll start with IGWT, because I think it really
16  provides a good example here, which is literally you have
17  attorneys for IGWT invoking, as a shield, this principle
18  supposedly that we should go to MGA first.
19      Number 1, it is undisputed here that IGWT is an
20  Isaac Larian company set up during the course of trial
21  with his home address as its office. I would submit that
22  whatever protections would legitimately, in some
23  circumstances, be provided to a third party, absolutely
24  could not apply in those circumstances. And I think it's
25  quite telling that IGWT fronts its defense against

TRANSCRIPT OF PROCEEDINGS                                        03/04/09

Page 68

1   providing any discovery, because we have done, let's be
2   very clear about that, notwithstanding all the statements
3   here today as to what they've offered they claim or what
4   they might have provided and so on, they have produced
5   nothing. So they could have certainly produced some
6   documents and at least said to the Discovery Master, look,
7   that's off the table because we've already provided those
8   deal documents or we provided all the information related
9   to this particular issue.
10              So I would suggest, your Honor, that what we're
11  looking at, just factually --
12              MR. O'BRIEN: I'm not "your Honor."
13              MR. ZELLER: I knew I was going to eventually do
14  it. Mr. O'Brien.
15              MR. O'BRIEN: You're getting me in trouble with
16  not only Judge Larson, but my law partners here would be
17  appalled.
18              MR. ZELLER: So what I would submit is that
19  factually what we're talking about is paper thin at best,
20  in terms of the parties here, who are the subpoenaed
21  parties, attempting to claim that somehow they are
22  innocent bystanders. I think that there is ample evidence
23  to suggest that that is far from correct, even without
24  going as far as to determine whether or not these things
25  are just shams, clearly there are interested parties that

Page 69

```
 1   are involved, defendants, named defendants, Isaac Larian
 2   is a named defendant in this case, this is activity he
 3   undertook during the trial.
 4           MR. O'BRIEN:  Let me interrupt you just briefly
 5   again.  I understand that with IGWT.
 6           MR. ZELLER:  Sure.
 7           MR. O'BRIEN:  Does that also -- is it your
 8   contention or Mattel's contention that that also applies
 9   to the Omni 808 entities?
10           MR. ZELLER:  Yes, it does.  And what we have
11   established, and there is no dispute of this, there's been
12   no explanation, and certainly no evidence provided by any
13   of those Omni 808-related entities is that Leon Neiman,
14   who is at some point, maybe even today, a director of MGA
15   and Isaac Larian's brother-in-law was clearly involved in
16   both Vision Capital and Lexington Financial.  And this is
17   what we've been able to piece together through
18   relationships and everything else without the benefit of a
19   single piece of paper produced in discovery by any of
20   these entities.  And that is the kind of thing we're
21   looking for.  In fact, many of the statements made here
22   today, and this will apply to both IGWT, and I'll parse
23   this out, as well the Omni 808 entities, they have
24   acknowledged here that there is, in fact, discovery that
25   MGA could not even possibly have that would be in their
```

1  possession that is directly relevant to the issues in this
2  case.  And let me take those in order.  What we heard was,
3  in the exchange where you asked about would the price be
4  relevant as to what it is that IGWT charged its customers,
5  you know, would that be relevant.
6          Certainly there was no dispute, and I think it's
7  quite obvious that it really couldn't be reasonably
8  disputed that, of course, that's relevant.  If it turns
9  out that MGA sold, for pennies on the dollar, Bratz
10 product, then -- to IGWT, an Isaac Larian vehicle, which
11 then turned around and sold it at full retail value?  I
12 mean, obviously that would be pertinent for a whole
13 variety of reasons, not the least of which would be
14 disgorgement, as well as, of course, refuting their claims
15 that this was a legitimate transaction because these were
16 obsolete or old products.  They sold those products to
17 some well-known retailer or some standard party who MGA is
18 also contemporaneously doing business with?  I think that
19 would actually completely destroy that argument on their
20 part.
21         But focusing on that particular kind of data,
22 which I think is indisputably relevant, MGA would not have
23 that.  There is no possible argument that MGA is going to
24 have, among its records, what price IGWT, this
25 Isaac Larian vehicle, charged its customers.  And there's

1  no representation, no argument, and common sense would
2  dictate that MGA doesn't have those records.
3           So I do think that -- then the other argument
4  that is made here, and it was made by, really, each of the
5  parties, that somehow the forensic auditor bears on this.
6           And Judge Larson absolutely, flatly rejected
7  that.  He said no one should be relying on the forensic
8  auditor.  And I'll quote Mr. Russell when he talked about
9  this, and they all made variations of this argument, he
10 literally said, we can rely on Mr. Durkin.  That is
11 absolutely, flatly contrary to what it is that
12 Judge Larson had made clear and said explicitly.
13          So -- and those are really the only two arguments
14 that we get out of IGWT.
15          And, by the way, I would like to, because it was
16 raised by IGWT, but it was also raised by, I think, each
17 of the parties, which is this whole issue about Mattel's
18 gotten this discovery, Mattel's gotten discovery from
19 Wachovia and the like.
20          Two points on that.  Number 1, as I think you
21 were, I think, rightfully pointing out, or at least
22 suggesting or questioning, or raising as an issue, the
23 fact is that just shows -- the fact that there was
24 discovery on that shows exactly why it's pertinent here.
25 I mean, it shows the relevance of it.  But, number 2,

TRANSCRIPT OF PROCEEDINGS                                      03/04/09

Page 72

1   what's omitted here is that we do not have the discovery
2   on this $300 million loan they claim that they -- that's
3   at issue here, at any time since, essentially, last year.
4           And there's no dispute about that.  In fact, the
5   discovery we got from Wachovia was, basically, up to --
6   that there was a $120 million loan agreement.  This was --
7   by the way, some of this stuff was produced for the first
8   time ever by MGA mid-trial.  But here, of course, what we
9   have is we have a different amount that's at issue, we
10  have $300 million-plus, supposedly, we don't have any
11  documentation for that, we have no documentation from what
12  transaction occurred between Omni, Vision Capital
13  Lexington and so on, on that side of the table, and
14  Wachovia.  There is no dispute about that.
15          So ironically enough, in my view, the very fact
16  that they have acknowledged that somehow we had that
17  discovery, it shows that it was relevant and it shows why
18  it's relevant.  What we need is the discovery as to what's
19  happened since.  And that's what these parties have.
20          Moreover, the fact is, as we heard from
21  Omni 808's counsel, going back to my point as to just even
22  factually, these are not documents that MGA would have, he
23  said MGA was not a party to the transaction directly.
24  There is absolutely no reason to think that documents
25  between Omni 808 or Vision Capital and Lexington and in

TRANSCRIPT OF PROCEEDINGS                                                03/04/09

Page 73

```
 1   that nexus are in MGA's possession.  There's none.  And,
 2   in fact, it would make no sense by their own theory, which
 3   is that supposedly these have nothing to do with MGA or
 4   Larian.  But literally there could be, by their own
 5   hypothesis, there could be, in the files of Omni 808, a
 6   document, a memo from Neil Kadisha to some other investor,
 7   say, one in Vision Capital that says, by the way, I wanted
 8   to let you know that while we papered this in a certain
 9   way, the reality of the transaction is that I've talked
10   about it with Isaac Larian and they'll never pay that,
11   it's just on the books for tax reasons.  By their own
12   account and their own arguments, we wouldn't be entitled
13   to that, and we would never get it because, of course, MGA
14   wouldn't possibly be in possession of this memorandum,
15   even assuming that, you know, it were compelled and so on.
16           So I think the problem here is quite clear.
17   We've got literally these interested related parties who
18   are engaged in these transactions for which we have been
19   provided no information, and then for them also,
20   conversely, then, to complain that somehow these requests
21   are overbroad, you know, it really is attempting to use
22   their own discovery obstinance as a sword and a shield and
23   saying well, because you don't know any facts whatsoever
24   and just take our word for it that these are all
25   legitimate transactions, so, you know, you'll have no
```

TRANSCRIPT OF PROCEEDINGS                                    03/04/09

Page 74

1  guidance, no possible way of tailoring the discovery in
2  any way that would suit us.  And, I mean, really,
3  fundamentally, the very fact that you've heard from every
4  one of these attorneys over and over and over these are
5  legitimate transactions, there's no smoke here, there's
6  nothing going on, number 1, that's a merits dispute, it
7  has nothing to do with discovery; number 2, in fact, it is
8  a disputed issue, which shows why there's discovery, and
9  that's to get to the bottom of this.  Discovery isn't cut
10 off by just some notion that the attorneys are willing to
11 give their word that there's really nothing wrong here,
12 otherwise I could just simply say with respect to MGA's
13 claim, don't worry, Mr. O'Brien, there's absolutely no
14 merit to their trade dress infringement claims, and that
15 that would be the end of discovery.  That's just not the
16 law, and I don't think anyone could legitimately argue
17 that it is.
18         But we also heard it over and over this whole
19 notion about MGA actually having the documents, number 1,
20 that they've actually admitted that they couldn't have
21 them, but, number 2, that it's just sheer speculation.  We
22 heard from Omni 808's counsel talking about well, I assume
23 that MGA has those documents, but I don't know.  I mean,
24 that is literally the kind of language you are hearing
25 from people.  Meanwhile saying but force them to go and

1  get them from MGA which meanwhile, there's no dispute, has
2  produced nothing on this and has refused to produce
3  anything on this.
4        I wish I could come up with a less pejorative
5  term here to describe this, but we're really being treated
6  like this is a shell game, you know, go ask them, go
7  ask -- you know, go ask them. And meanwhile no one has
8  provided any of that discovery.
9        Now, I'm happy to discuss the issues like the
10 meet and confers. I mean, when people make accusations
11 that we didn't try, we didn't follow up, we ignored them,
12 that's actually belied by the written record, and I think
13 if you have any interest in those issues whatsoever, and,
14 I, frankly, don't think that there should be an issue --
15        MR. O'BRIEN: You don't need to address those
16 issues. I want to talk generally about meet and confers
17 when we're done, but you don't need to address it in the
18 context of this motion.
19        MR. ZELLER: Sure. What I would like to do is --
20 and this also goes to the Walking Mountain point.
21 Substantively that case had absolutely nothing to do with
22 a subpoena being quashed because it was a third party or
23 it could have been obtained from a party. Also, I was not
24 personally sanctioned, as counsel was suggesting in that
25 case. So, I mean, there were other mischaracterizations