Westlaw.

62 BUSLAW 983
62 Bus. Law. 983

Page 1

C

Business Lawyer
May, 2007

Article

**\*983** SOLVENCY TESTS

J.B. Heaton [FNa1]

Copyright © 2007 by the American Bar Association; J.B. Heaton

*This Article explains the basic economic function of solvency tests and the relations among the three solvency tests applied in bankruptcy and corporate law. It also explains why solvency diagnoses can differ, depending on the test that is applied. Although one of these tests-the ability-to-pay test- is probably best, it may suffer from significant measurement error in practice. Multiple solvency tests ultimately make sense because the costs of failing to detect insolvency when it exists exceed the costs of detecting insolvency when it does not exist.*

## INTRODUCTION

Three solvency tests appear in bankruptcy and corporate law:

> • a test of whether a firm [FN1] reasonably can be expected to pay its debts as they come due (the *ability-to-pay solvency test*, sometimes referred to as *cash-flow solvency* or *equitable solvency*), [FN2]
> • a test of whether the fair value of a firm's assets exceed the face value of its liabilities (the *balance-sheet solvency test*, performed on either a *going-concern* or *liquidation* basis), [FN3] and
> • a much less well defined test of whether a firm has adequate capital (the *capital-adequacy solvency test*). [FN4]

It is easy to identify these tests but hard to apply them in practice. [FN5] This is nothing new. Commentators in a 1929 *Columbia Law Review* article lamented that "courts have not yet developed any clear-cut principles or rules" for **solvency \*984** testing. [FN6] Seventy-five years later, Delaware's Court of Chancery complained that "it is not always easy to **determine** whether a company even meets the test for **solvency**." [FN7] Practitioners often complain that uncertainty about the application of **solvency** tests makes it difficult to advise on corporate restructuring. [FN8] Those involved in high stakes financial litigation spend as much time litigating *how* to **determine insolvency** as they do litigating *whether* a given firm is **insolvent**. As the leading bankruptcy treatise notes, litigation on the meaning of **insolvency** "generates a formidable and, on the surface, not always consistent stream of adjudications." [FN9]

This Article begins by explaining the basic economic function of **solvency** tests in bankruptcy and corporate law. Limitations on a firm's activities based on **solvency** tests-embedded in laws such as fraudulent transfer law, preference law, and the law of fiduciary duties-allow a borrower to increase its debt capacity *ex ante* by protect-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Exhibit T - Page 677

62 BUSLAW 983
62 Bus. Law. 983

ing creditors *ex post* from actions that make it less likely that the firm will pay its debts. Creditors who know that such limits are in place are willing to lend more money to the firm in the first place. Firms would have little or no debt capacity if there were no controls on their power to intentionally reduce their ability to pay debts after they have borrowed money. [FN10]

The Article turns next to the real challenge in understanding **solvency** tests: sorting out the relations among the three **solvency** tests used in bankruptcy and corporate law. Most of the confusion in the application of these tests traces to the fact that diagnoses of **solvency** (or **insolvency**) can differ depending on the **solvency** test that is applied. **Solvency** under the ability-to-pay test, for example, does not imply balance-sheet **solvency**, and *vice versa*; while **solvency** of neither type implies capital adequacy. It is impossible to gain a good grasp of **solvency** tests without cataloging the ways that different **solvency** tests can yield different diagnoses of **solvency** or **insolvency**. In general, the three tests measure different things and the indications they give of **solvency** or **insolvency** need not agree with each other. Understanding how and why these differences occur is the key to understanding **solvency** tests and reducing confusion about their application in practice.

The inconsistency that different **solvency** tests generate compels one to ask an obvious question: is there a best or optimal **solvency** test among the three that *\*985 could apply, exclusively, in all cases? From a theoretical perspective the answer is yes. If the right assumptions are made, then it is easy to conclude that the ability-to-pay **solvency** test is the optimal **solvency** test. It best captures what creditors care most about-the match between their matured obligations and the firm's cash flow at the contracted payment date- and it does not generate complications that may cause the other tests to indicate insolvency when the firm can, in fact, reasonably expect to pay its debts as they come due, or, the other way around, to indicate solvency when the firm cannot, in fact, reasonably expect to pay its debts as they come due.

The problem, if the other tests are abandoned, is that one needs to be very sure there is an ability to measure the likelihood and amount of future cash flows that may be quite distant. Predicting the future is never easy, and predicting distant future cash flows is no exception. Future cash flows do not sit cooperatively for sampling and inspection. They are notoriously difficult to estimate. By measuring other things that might be correlated with the presence of the inability to pay debts as they come due, like low going concern and liquidation values, other solvency tests add useful information about solvency despite the confusion that multiple, sometimes inconsistent, solvency tests cause. Liquidation-based solvency tests that look to observable market values rather than projected cash flows might be much easier to apply.

One way to think about this question is to view the solvency test for what it really is: a diagnosis of a condition that creditors care about. From the creditors' perspective, insolvency is like a cancer. The cancer is harmful because it will prevent the creditor from being repaid according to its terms. When the cancer is present, the creditor wants the firm to get treatment, especially the "treatment" of avoiding gratuitous asset transfers. Each of the solvency tests is a test for the cancer but the going-concern and liquidation balance-sheet tests are quite crude. They do not so much identify the inability to pay debts as they come due as they identify conditions that are often, but not always, associated with that condition. The ability-to-pay solvency test, to carry the analogy further, is like the actual biopsy that puts cells under a microscope. Because the "biopsy" of the ability-to-pay test is just as easy and no more invasive than the other tests-unlike the real world of cancer diagnosis-why not just skip to the best test? The answer is that the "microscope" of the ability-to-pay solvency test is sometimes just not that good. Also, as with many diseases, the costs to debt capacity of failing to detect insolvency greatly

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Exhibit T - Page 678

62 BUSLAW 983                                                                                   Page 3
62 Bus. Law. 983

exceed the costs of detecting insolvency when it does not exist. Multiple solvency tests are beneficial even though they may indicate insolvency for a firm diagnosed as solvent under the ability-to-pay solvency test. The cure of avoiding gratuitous asset transfers is never that harmful for firms whose solvency is in doubt and may lead to large increases in *ex ante* debt capacity.

## I. WHAT SOLVENCY TESTS DO

Practically since the advent of credit, borrowers have been attracted to illicit actions that might relieve them of their debt burden. English debtors of the Middle **\*986** Ages escaped their creditors by hiding in their houses with goods bought on credit, a practice called *keeping house:* English law did not allow creditors to violate the sanctity of a debtor's home for the mere pursuit of debt satisfaction. Debtors could also flee the realm (taking their personal property with them) to places where the King's law could not follow. Some could use legal process and government favors to escape imprisonment for fraudulent asset transfers, or reside with their fortunes in one of the numerous sanctuaries, some as large as cities, where the King's law could not reach. [FN11]

In modern times, borrowers may try to strip the firm of its assets through mechanisms such as gifts, [FN12] dividends, or exorbitant salaries and benefits, [FN13] conducting a leveraged buyout of the borrower's equity in excess of its value, [FN14] causing the borrower to provide nonrecourse financing to a third party for an over-valued purchase of some asset from the borrower's insiders, [FN15] causing the borrower to make concessionary personal loans to the borrower's insiders, [FN16] causing the firm to make loans to shell corporations owned by the borrower's insiders or third parties who share the proceeds with the insiders, [FN17] or exchanging assets at exaggerated prices benefiting the borrower's insiders. [FN18]

Generally speaking, solvency tests form parts of laws that increase a borrower's debt capacity *ex ante* by protecting creditors *ex post* from such creditor-harming activities. For example, federal and state fraudulent transfer statutes prohibit asset transfers from insolvent debtors for less than "reasonably equivalent value" or "fair consideration." [FN19] Insolvent firms may not favor some similarly situated creditors over others. [FN20] Corporate law prevents an insolvent corporation from paying **\*987** dividends or redeeming its stock. [FN21] Some states, including Delaware, give creditors of an insolvent firm standing to enforce fiduciary duties that a corporation's directors and officers owe to the corporation. [FN22]

One of the reasons these laws provide such powerful protections to creditors is that they typically do not require the creditor to prove reliance on any particular representation of the debtor. Instead of creditor belief or reliance on anything the debtor says or does, the objective condition of insolvency (or near insolvency) plays the critical role, dividing permissible from impermissible gratuitous transfers. Put simply, there are things a solvent firm may do-such as pay dividends-that an insolvent firm may not, and this restriction on an insolvent firm's activity increases debt capacity dramatically. Testing solvency is key to finding the dividing line.

Given the acknowledged difficulty of solvency testing, why not simply prohibit all potentially credit-harming actions all of the time rather than only when the firm is insolvent? One answer is that a total ban on gratuitous asset transfers would probably lead to much costly fighting between the firm and its creditors about what business decisions amounted to gratuitous asset transfers. It is easy to identify a gift, a dividend, or a share repurchase as a gratuitous asset transfer, but what about an investment in a highly speculative new business?

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Exhibit T - Page 679

Alternatively, consider the problem of dealing with contingent claimants, e.g., tort claimants the debtor has wronged and must eventually compensate in or out of court. It can be very hard-and essentially impossible out-side a class action settlement-to pay off all tort creditors with any kind of certainty because it is hard to know what possible tort claims may be lurking. [FN23] If a debtor could make gratuitous **988 asset transfers-includ-ing dividends or other distributions-only after it was sure its creditors were paid, it might be nearly impossible for a corporation to reach that kind of certainty about contingent creditors even if it had no other debt.

Thus, while prohibiting all gratuitous transfers would increase debt capacity by better protecting creditors, it probably would reduce firm value, decrease entrepreneurial incentives, and unnecessarily constrain other forms of capital raising, including outside equity. Solvency tests balance the benefits of laws protecting creditors by preventing some gratuitous asset transfers from the firm with the costs of preventing all gratuitous asset transfers or potentially creditor-harming activities.

## II. SOLVENCY TESTS IN BANKRUPTCY AND CORPORATE LAW

Courts variously describe solvency as a question of fact or a mixed question of fact and law. [FN24] Whatever the case, all solvency tests ask, one way or another, whether a particular firm can pay its debts. As will be shown, however, the link between the firm's cash flow or assets and the debts to be repaid from them is often quite different, and therein lie the seeds of confusion. Three different solvency tests appear in bankruptcy and corporate law: the *ability-to-pay solvency test*, the *balance-sheet solvency test*, performed on either a *going concern* or *liquidation* basis, and the *capital-adequacy solvency test*, defined in terms of the other tests.

### A. THE ABILITY-TO-PAY SOLVENCY TEST

The ability-to-pay solvency test asks if the firm can reasonably expect to pay its debts as they come due. In the federal fraudulent conveyance statute, for example, the question is whether the firm "intended to incur, or believed that [it] would incur, debts that would be beyond [its] ability to pay as such debts matured." [FN25] The Uniform Fraudulent Transfer Act states the test similarly, whether the transferor "intended to incur, or be-lieved or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." [FN26] The Uniform Fraudulent Conveyance Act, still the law in the very important jurisdic-tion of New York, asks whether the debtor "intends or believes that he will incur debts beyond his ability to pay as they mature." [FN27] The Uniform Commercial Code **989 defines "insolvent" to include both "having gen-erally ceased to pay debts in the ordinary course of business other than as a result of *bona fide* dispute" and "being unable to pay debts as they become due." [FN28] Sometimes referred to as the "cash flow" solvency test or the "equitable" solvency test, this test asks whether the firm will be able to match its cash sources to its maturing obligations. As one court explains, "[a] broader concept, originating with merchants or traders, is equitable insolvency, or the inability to pay debts as they become due in the ordinary course of business." [FN29] It is a forward-looking test. It is not enough to be able to meet current obligations; the firm must be able to meet its future obligations as well. [FN30]

If the ability-to-pay solvency test sounds simple in theory, it is quite difficult to apply in practice. If a firm's cash flows and debt were not subject to any uncertainty at all, then it would be an easy task to verify if the stream of cash flows that will occur through time can be matched to the firm's maturing debt obligations. Stand-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Exhibit T - Page 680

ing at any single point in time, one could look ahead to any date and ask whether the cash that the firm will have on hand at that date (that is, cash that it has retained after making prior debt payments) will be sufficient when combined with other cash that the firm can generate at that date to pay its debt obligations at the time. If the answer is yes regardless of what future time is chosen, then the firm can be expected to pay its debts as they ma- ture.

The problem is that neither cash flows (sources of assets) nor debt obligations (liabilities) are certain. A firm's future cash flows normally will be subject to some (usually considerable) uncertainty and the firm may have contingent **990 liabilities (e.g., related to corporate guarantees, pending lawsuits, letters of credit, etc.). When future cash flows and liabilities are uncertain, what does it mean to have debts beyond the firms "ability to pay"?

One thing is sure: "Ability to pay" cannot mean simply that the firm's *expected* cash flow-the sum of its possible cash flows rated by their respective probabilities-exceeds its debts in a given period of time, because a firm can have a very large expected cash flow even when it is almost certain *not* to pay its debts as they come due.

Consider, for example, a firm that owes a debt requiring a near-term payment of $100 but has no assets or cash on hand to make that payment. Further, assume that before the payment is due the firm either will receive $1000 with a 15% probability, or will receive $0 with an 85% probability. Clearly, there is an 85% probability that the firm will not pay its debt when it comes due; there is an 85% probability that firm will have $0 next period when its $100 debt is due. In this example, there is only a 15% probability that the firm will pay its debts when they come due. If the 15% likelihood comes to pass, and the firm receives $1000, then it will pay off the $100 debt leaving $900 for the firm's owners. The expected cash flow, nevertheless, is $150 because 15% of $1000 plus 85% of $0 equals $150. The example shows that a firm can have an expected cash flow that is higher than its debt even when it is almost sure (in the example, 85% sure) to be unable to pay its debt when it comes due. Ability-to-pay solvency cannot depend on expected cash flows in a probabilistic sense.

If ability-to-pay solvency is not determined by expected cash flows, what measure of ability to pay does make sense? Surely, "ability to pay" does not mean ability to pay with absolute certainty. Nearly any corporation with debt has some chance of defaulting on that debt depending on what happens to it in the future. Some default risk is par for the course for virtually any debtor (leaving aside governments that may pay their obligations using their own printable currency). One can conclude that "ability to pay" means something less than an ability to pay with absolute certainty, but surely it means something more than a very low probability, such as 15% noted in the example.

Unfortunately, the case law provides no guidance in this regard. A natural starting place, perhaps, is to consider a firm to have the ability to pay its debts as they come due if there is at least a 50% probability that it will be able to pay all of its debts as they mature. That is, such a firm is "more likely than not" to be able to pay its debts as they mature. A "more likely than not" approach to the ability to pay is not quite as lenient as it might at first sound. If a firm has a 10% probability of defaulting in any one year, for example, and those probabilities are independent through time, then there is a greater than 50% chance that the firm will default on its debt within seven years. [FN31] Such a firm would be insolvent under an ability-to-pay solvency test with a 50% probability threshold.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Exhibit T - Page 681

### *991 B. THE BALANCE-SHEET SOLVENCY TEST

The balance-sheet solvency test asks a different question: Are this firm's assets greater than its liabilities? When the United States Bankruptcy Code defines the word "insolvent" it calls it the "financial condition such that the sum of such entity's debts is greater than all such entity's property, at a fair valuation." [FN32] Debts are valued at face value for purposes of the balance-sheet solvency test, [FN33] contingent liabilities are discounted for their probability of occurrence, [FN34] and neither a positive book balance [FN35] nor a positive equity trading price [FN36] implies solvency.

In applying the balance-sheet solvency test, courts struggle with how to value assets and, in particular, whether to value the firm's assets as if the firm continues as a *going concern* (i.e., to assume the firm will continue in operation and generate cash flow from its business) or in *liquidation* (i.e., as if the firm has ceased or will cease doing business and will dispose of its corporate property). [FN37] The standard *992 approach is to determine first whether, in fact, the debtor was a "going concern" or was "on its deathbed" at a relevant date and then to value the assets according to that finding. [FN38] The choice is typically difficult, however, because most litigated solvency tests involve an entity that was, at the test date, "midway between a prosperous going concern and a dead enterprise." [FN39] The choice of going concern or deathbed valuation determines whether the firm is assumed to be sold as a going concern or by piecemeal liquidation.

The cases create an interesting anomaly. By demanding going concern valuation except where a company is about to close its doors, the courts force litigants to construct going concern valuations even where liquidation was the optimal course of conduct on the valuation date. As one court has noted in discussing the fiduciary duties of directors of a distressed firm:

> The maximization of the economic value of the firm might, in circumstances of insolvency, require the directors to undertake the course of action that best preserves value in a situation when the procession of the firm as a going concern would be value-destroying. In other words, the efficient liquidation of an insolvent firm might well be the method by which the firm's value is enhanced in order to meet the legitimate claims of its creditors. [FN40]

It may seem strange to require a going concern assumption even when reasonable projections demonstrate that the business was doomed to eventual failure. Under such circumstances, the going-concern valuation standard is somewhat absurd in the sense that no real buyer would do what the valuation requires: continue to operate the business. [FN41] The solution to the conundrum can be found in *993 the purpose of the solvency test: to prevent gratuitous asset transfers by firms that are to the detriment of creditors. Where a firm actually is operating, it does not make sense to let a going concern insolvent firm make gratuitous asset transfers simply because the firm is liquidation solvent. That is, if liquidation is optimal-in the sense that the firm might even be solvent if liquidated but insolvent if allowed to continue-but the firm chooses not to liquidate, it does not make sense to credit the firm with a higher liquidation value it chooses not to seize for the benefit of its creditors.

If the entity's condition on the test date warrants a liquidation assumption, then that same condition will define the *speed* with which such a hypothetical liquidation takes place. Because the sales price of an asset generally increases when additional time is spent marketing the asset, [FN42] courts usually avoid assuming that assets are liquidated in fire sale auctions presumably on the assumption that they are never value-maximizing. [FN43] In *In re Trans World Airlines, Inc.*, [FN44] for example, the Third Circuit Court of Appeals upheld the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Exhibit T - Page 682

finding that 12 to 18 months was a "reasonable" time period over which to assume the sale of an airline's assets:

> The reasonable time should be an estimate of the time that a typical creditor would find optimal: not so short a period that the value of the goods is substantially impaired via a forced sale, but not so long a time that a typical creditor would receive less satisfaction of its claim, as a result of the time value of money and typical business needs, by waiting for the possibility of a higher price. [The 12 to 18 month time frame for TWA's assets] satisfies the requirement of a fair valuation because it identifies, as best it can, the equilibrium point between the two competing concerns of creditors: the desire to maximize the dollar figure from the assets to be sold, and the desire to have the assets sold off quickly to satisfy creditors' claims sooner rather than later. [FN45]

**\*994** Where circumstances dictate, however, courts will allow the assumption of a fairly quick and harsh liquidation. [FN46]

> It is well-settled that if a company is only nominally extant, to treat it as a going concern would be misleading and would fictionalize the company's true financial condition. 'Liquidation value is appropriate if at the time in question the business is so close to shutting its doors that a going concern standard is unrealistic.' [FN47]

Interestingly, however, the value of the firm's assets are defined by some measure of the *present value* of its future cash flows while the firm's debts are valued at *face value*. Debts must be valued at face value for the solvency test to have any meaning at all:

> If holders of claims are fully informed of the debtor's affairs and the asset values are less than the face amount of the claims, they would never value their claims at more than the value of the assets. Likewise, the fully informed debtor would never be willing to pay claimants more than claimants would be willing to take. Thus, the value of the claims would never exceed the value of the assets and insolvency could never occur. If [debts were valued at market value], insolvency could never occur, which is an absurd result. [FN48]

It is possible that the firm's expected cash flows will be enough to pay the firm's maturing debt obligations but the *present value* of those cash flows is less than the undiscounted *face amount* of the debt. Consider the following example: a firm that will be in business one year. It has $100 face amount of debt that must be repaid **\*995** at the end of the year along with $5 of interest. It has no cash or other assets on hand except a project that will generate end of year, one-time, and certain cash flow of $108. After repaying its debt, the firm will pay a dividend of $3 and close its doors. The firm is solvent under the ability-to-pay test. However, suppose that the interest rate necessary to reflect the time value of money is 10%. Then the discount factor- 1 divided by 1.10-is approximately 0.91. The present value of $108 (the amount available to pay the debt before the dividend payment is made) is therefore $108 x 0.91 = $98.28, which is less than the $100 face value of debt meaning the firm is balance-sheet insolvent even though it has the ability to pay its debts as they come due.

How can this be? The problem is that there is an important difference between the amount of future cash flows and their present value. Present value must take into account the time value of money and discounts for risk. Here, the future cash flow is high enough to pay the debt at the maturity date but the discount rate makes that future cash flow worth less than the undiscounted face amount of the debt today. There are two disconnects between the value of assets and the face amount of debt. The first disconnect is time. Comparing the present value of anything to the future value of anything else is bound to lead to trouble; it is an apples to oranges com-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

parison. The second disconnect is the possible additional discounting for risk. Firms pay their debts with actual cash flows, not cash flows discounted to reflect their present value given the time to their occurrence and the possible risk that the cash flow will not be realized. The balance-sheet test, while perhaps the most intuitive of solvency tests, is thus plainly imperfect.

## C. THE CAPITAL-ADEQUACY SOLVENCY TEST

A capital-adequacy solvency test, while less precisely defined in the law, essentially asks whether the firm is *unlikely* to become insolvent-under the balance-sheet test or the ability-to-pay test. Courts sometimes describe capital inadequacy as something connoting "a condition of financial debility short of insolvency (in either the bankruptcy or equity sense) but which makes insolvency reasonably foreseeable. In other words, a transaction leaves a company with unreasonably small capital when it creates an unreasonable risk of insolvency ...." [FN49] Inadequate capital "encompasses difficulties which are short of *996 insolvency in any sense but are likely to lead to insolvency at some time in the future." [FN50]

Financial projections are especially important in evaluating capital adequacy. [FN51] The financial projections should demonstrate that the firm has an ability to withstand a reasonable range of business and economic fluctuations. [FN52] "Moreover, the test for unreasonably small 'capital' should include ... all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans over the relevant time period." [FN53] However, "[w]hile a company must be adequately capitalized, it does not need resources sufficient to withstand any and all setbacks." [FN54] Unfortunately, there is no clear answer to the question, "how much 'capital' is enough"? The question requires a normative judgment regarding the probability of insolvency that a given entity (and its creditors) should be forced to bear. This judgment in turn may depend on several factors including the degree of information asymmetry between debtor and lender or regulatory goals.

Capital adequacy can be defined in terms of either the ability-to-pay test or the balance-sheet test, and for the balance-sheet test in either going-concern or liquidation terms. This simply requires us to add a measure of the variability of key items like future cash flows and liquidation values and to set some level of excessive risk. In that case, the firm has adequate capital if it can withstand enough variability to the bad side and still remain solvent. Capital-adequacy tests ask simply whether a firm can withstand some perturbation to the bad side and still remain solvent.

## *997 III. THE RELATION AMONG ABILITY-TO-PAY SOLVENCY, BALANCE-SHEET SOLVENCY (GOING-CONCERN AND LIQUIDATION), AND CAPITAL ADEQUACY

By far the most confusing thing about solvency tests is the fact that different solvency tests can indicate that the same firm is both solvent and insolvent. Most of this confusion goes away when it is acknowledged that ability-to-pay and balance-sheet solvency tests measure different things about the firm. [FN55] Getting comfortable with these potential inconsistencies is the key to a better understanding of solvency tests as applied in bankruptcy and corporate law.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

62 BUSLAW 983
62 Bus. Law. 983

## A.   ABILITY-TO-PAY   SOLVENCY   DOES   NOT   IMPLY   GOING-CONCERN   BALANCE-SHEET SOLVENCY, LIQUIDATION BALANCE-SHEET SOLVENCY, OR ANY FORM OF CAPITAL ADEQUACY

### 1. Ability-to-Pay Solvency Does Not Imply Going-Concern Balance-Sheet Solvency

In general, the ability to pay debts as they come due does not imply that the firm is solvent based upon a going-concern balance-sheet approach. The ability-to-pay solvency test asks simply whether cash flow can be matched to the face value of the maturing debt obligations *in the period that the debt obligation matures*. There is, in essence, no impact of the time value of money, nor are cash flows in a given period reduced in value because of the risk characteristics that investors might attach to them. The test simply is whether cash is likely (where the likelihood necessary to pass the test is of course open to debate) to be sufficient to pay the face value of the debts when they mature.

By contrast, the going-concern balance-sheet test involves *valuation*. Valuation requires both that future cash flows be discounted to present value to reflect a time value of money and that future cash flows be reduced to reflect the value that these risky cash flows have to an investor who might otherwise invest in a risk-free asset. Thus the value of the firm as a going concern reflects future cash flows that are reduced for both the time value of money and risk. [FN56] It is obvious, then, that the cash flow of a firm which might in *future periods* match maturing debt obligations could nevertheless be reduced to a sufficient degree (to reflect the time value of money and risk) such that the value of the firm will be below the face value of its debt.

Thus, a firm that has the ability to pay its debts in all future periods under the ability-to-pay solvency test may still be deemed insolvent under the going-concern **\*998** balance-sheet test. This highlights a little understood problem with going-concern balance-sheet solvency tests. The going-concern balance-sheet solvency test mixes the ability of a firm to pay its debt obligations-the paramount concern of a solvency test-with the value that a particular firm has at a particular point in time given the current price of risk and the time value of money. There may be no good reason to prevent a firm from taking an action that might gratuitously make it going-concern balance-sheet insolvent, provided that it remains able to pay its debts as they come due under the ability-to-pay solvency test.

### 2. Ability-to-Pay Solvency Does Not Imply Liquidation Balance-Sheet Solvency

Perhaps more obviously than with going-concern balance-sheet solvency, ability-to-pay solvency does not imply liquidation balance-sheet solvency. First, of course, one possible liquidation value for the firm's assets is its going-concern value. As has just been shown, the going-concern value of the firm's assets can be below the face value of its debts even when the firm has the ability to pay its debts as they mature. To the extent that liquidation value may be equivalent to going-concern value, ability-to-pay solvency does not imply liquidation balance-sheet solvency either.

Second, liquidation values in particular industries may be low during times when firms are temporarily cash constrained. That is, because the highest valuing buyers of the firm's assets in liquidation may be other firms in its industry, and because industries may experience downturns or credit constraints at the same time, liquidation values may be temporarily low even for a firm that may otherwise expect to pay its debts as they come due.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Exhibit T - Page 685

When industries are in recession, large potential gains are available to those who would purchase those assets at distressed prices and sell them when the industry recovers. This effect should drive prices up, but those in a position to detect and/or exploit such bargains are those with the specialized industry knowledge who are, by definition, in a poor position to purchase the assets because of the industry downturn. Thus, prices can remain low in equilibrium, because those with money to buy lack the knowledge to detect the (existing) good buying opportunities. Indeed, any sale-based solvency test will bias toward insolvency if assets are already in the hands of their highest valuing users. [FN57] Any restriction on the marketability of the firm's assets can also have a large effect on liquidation value. [FN58]

### 3. Ability-to-Pay Solvency Does Not Imply Capital Adequacy Under Any Test

Because ability-to-pay solvency does not imply either going-concern balance-sheet solvency or liquidation balance-sheet solvency, ability-to-pay solvency necessarily**999** cannot imply capital adequacy whether the capital adequacy is for ability-to-pay or balance-sheet solvency. Capital adequacy is a *stricter* test, whether framed in going-concern balance-sheet or liquidation balance-sheet terms. Similarly, ability-to-pay solvency does not imply capital adequacy under the ability-to-pay capital-adequacy test. A firm might have the ability to pay debts as they come due but only barely so. Such a firm can have inadequate capital-judged from the perspective of the ability-to-pay solvency test-even though it is ability-to-pay solvent. [FN59]

### B.   GOING-CONCERN   BALANCE-SHEET   SOLVENCY   DOES   NOT   IMPLY   ABILITY-TO-PAY SOLVENCY, LIQUIDATION BALANCE-SHEET SOLVENCY, OR CAPITAL ADEQUACY UNDER ANY TEST

### 1. Going-Concern Balance-Sheet Solvency Does Not Imply Ability-to-Pay Solvency

Ability-to-pay solvency requires that the firm be able to match cash in a particular period with the amount of debt maturing in that period. A going-concern balance-sheet solvency test, however, requires only that the *discounted sum of future expected cash flows exceed the sum or total amount of debt at face value.* For example, a firm that requires heavy investment in its early-to-intermediate term but which generates cash flows in only the long-term (consider, for example, biotechnology companies that must invest in research and development for long periods of time looking for marketable products) might have a substantial going concern value but no ability to pay debts as they come due.

Put simply, a going-concern balance-sheet solvency test does not concern itself with the possible mismatch between cash flows that make up the discounted sum and cash flows that must be paid to meet maturing debt obligations. This can hide a liquidity problem. That is, a firm may be going-concern balance-sheet solvent but still unable to turn its going concern value into cash as needed at particular points in time to pay a particular debts as they mature. Here again is a problem with going-concern balance-sheet solvency. It can be disconnected from what creditors care most about: getting their debts paid at the contracted amounts on the contracted dates. A firm that was allowed to make a gratuitous asset transfer that left it with a solvent going-concern balance sheet but was then unable to pay its debts as they came due would clearly make creditors even worse off. This will be discussed in detail later, but for now the important thing is to realize the going-concern balance-sheet solvency test

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Exhibit T - Page 686

does not imply ability-to-pay solvency if the going concern value is illiquid. [FN60]

### *1000 2. Going-Concern Balance-Sheet Solvency Does Not Imply Liquidation Balance-Sheet Solvency

As has been demonstrated, in discussing the ability-to-pay solvency test, going-concern balance-sheet solvency does not necessarily imply liquidation balance-sheet solvency. [FN61] When asset values are depressed in a particular industry, it may be impossible to sell the going concern value of a firm because the highest valuing users of the firm's assets are likely to be those in the firm's same industry who are unable to pay for the assets because their own fortunes have been affected as well. Of course, this circumstance need not be the case. Vast amounts of money are invested by private equity firms and similar investment funds willing to buy and hold depressed assets, waiting to sell the assets when industry fortunes improve. [FN62] In general, however, a firm may have a high going-concern balance-sheet value because it has high discounted expected cash flows even while it would be unable to find a buyer for that going-concern value. Indeed, if the firm is already managed by its highest capability manager who might not continue managing were the firm purchased, liquidation value may remain strictly below the current going-concern value simply because the going-concern value in the hands of the purchaser will necessarily be lower than going-concern value in the hands of the current owner, the highest valuing user.

### 3. Going-Concern Balance-Sheet Solvency Does Not Imply Capital Adequacy Under Any Test

Going-concern balance-sheet solvency does not imply capital adequacy under any capital-adequacy test. A firm may be going-concern balance-sheet solvent but only barely so, [FN63] and thus will not have capital adequacy under a going-concern balance-sheet based capital-adequacy test. Further, because going-concern balance-sheet solvency does not imply ability-to-pay solvency, it immediately follows that going-concern balance-sheet solvency does not imply the stricter condition of ability-to-pay based capital adequacy. The same is true for capital adequacy based on liquidation balance-sheet solvency. Going-concern balance-sheet solvency does not imply liquidation balance-sheet solvency, and therefore cannot imply the stricter condition of liquidation balance-sheet based capital adequacy.

### *1001 C. LIQUIDATION BALANCE-SHEET SOLVENCY DOES NOT IMPLY ABILITY-TO-PAY SOLVENCY, GOING-CONCERN BALANCE-SHEET SOLVENCY, OR CAPITAL ADEQUACY UNDER ANY TEST

### 1. Liquidation Balance-Sheet Solvency Does Not imply Ability-to-Pay Solvency

In general, liquidation balance-sheet solvency does not imply ability-to-pay solvency. But it is useful to consider a special case where it does. Consider the case where all the firm's obligations have zero interest rates so that the face value on the firm's balance sheet captures the full value of the firm's future debt obligations. In that particular case liquidation balance-sheet solvency implies ability-to-pay solvency. If the firm's assets can be converted to cash in an amount today that exceeds the face value of its debt, then it follows that the firm can pay those debts as they come due, because at a minimum the firm could simply sell the assets, hold the cash, and pay the face amount of debt as it matures.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Exhibit T - Page 687

Of course, a simplifying fact has been assumed, i.e., that the contracted rate of interest is also a debt obliga-
tion and matures on the date interest is due and which may not (and under current accounting rules, will not) ap-
pear on the balance sheet as debt. If interest payments on the firm's debt obligations are high enough, then it is
possible that the liquidation value of the firm's assets will exceed the face value of debt but the firm will be un-
able to cover both the face amount of the debt and the large interest payments. [FN64]

In general, however, the problem is that unless the firm actually does seize on the high liquidation value and
hold the cash proceeds to pay off debts as they come due, the implied ability-to-pay solvency may be fleeting.
Liquidation values change through time. A firm may have the ability to liquidate its assets today for an amount
that would be sufficient to pay its debts as they came due in the future, that does not seize on high liquidation
values today it may no longer have that opportunity tomorrow.

Because the ability-to-pay solvency test requires that one look ahead to future time periods, variations in fu-
ture liquidation values must be simultaneously considered. Unless the liquidation value will be sufficiently high
in every period to allow the firm to liquidate its assets and pay off its remaining debts, then liquidation balance-
sheet solvency will not imply ability-to-pay solvency. This consideration may explain why the law requires go-
ing concern valuation until the firm is on its deathbed; it is unwise to give a firm the benefit of a (potentially
temporarily) high liquidation value where the firm does not, in fact, seize that value through liquidation.

### 2. Liquidation Balance-Sheet Solvency Does Not Imply Going-Concern Balance-Sheet Solvency

Liquidation values are typically viewed as being less than going concern values. But liquidation values need
not be lower than going concern values. Any *1002 firm whose assets are worth more if owned and operated by
other users is a firm whose liquidation value will exceed its going concern value. A going-concern balance-sheet
test values assets based on some measure of cash flow to their current user. These two valuations need not lead
to the same answer and therefore a firm that is liquidation balance-sheet solvent may be going-concern balance-
sheet insolvent.

### 3. Liquidation Balance-Sheet Solvency Does Not Imply Capital Adequacy

For similar reasons as described above, liquidation balance-sheet solvency does not imply capital adequacy
under any capital-adequacy test. First, of course, the firm may be liquidation balance-sheet solvent but only
barely so, and thus could not withstand even a small perturbation of liquidation value. This means that the firm
may be liquidation balance-sheet solvent and not solvent under a liquidation balance-sheet-based capital-ad-
equacy **solvency** test.

Second, because a firm may be liquidation balance-sheet solvent but **insolvent** under either a going-concern
balance-sheet **solvency** test or an ability-to-pay **solvency** test, it necessarily follows that the firm may be liquida-
tion balance-sheet solvent but **insolvent** under either a going-concern balance-sheet-based capital-adequacy test
or ability-to-pay-based capital-adequacy test.

### D. CAPITAL ADEQUACY IMPLIES SOLVENCY UNDER THE TEST ON WHICH IT IS BASED BUT DOES NOT IMPLY SOLVENCY OR CAPITAL ADEQUACY UNDER ANY OTHER TEST

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit T - Page 688**

Capital adequacy under the test on which it is based will always imply **solvency** under that particular **solvency** test, because capital adequacy is simply a requirement that the firm be a little more than solvent under that particular test. For the reasons described above, however, capital adequacy under that particular test will not imply **solvency** or capital adequacy of any other sort. For example, if a firm has adequate capital under an ability-to-pay-based capital-adequacy test, then that implies ability-to-pay **solvency** because capital adequacy is a stricter test. That is, the firm must be more than solvent under the ability-to-pay **solvency** test to have adequate capital under an ability-to-pay-based capital-adequacy test.

However, because **solvency** under one test does not imply **solvency** under another (and so necessarily does not imply capital adequacy under a capital-adequacy test based on that **solvency** test), capital adequacy based on that test also does not imply **solvency** or capital adequacy under any other test. For example, because ability-to-pay **solvency** does not imply **solvency** under any other test, and necessarily does not imply capital adequacy under a capital-adequacy test based on that other **solvency** test, it is also true that ability-to-pay-based capital adequacy does not imply **solvency** or capital adequacy under either a going-concern or liquidation balance-sheet-based test.

## *1003 IV. THE OPTIMAL SOLVENCY TEST (AND ITS LIMITATIONS)

### A. ABILITY-TO-PAY SOLVENCY MATTERS MOST TO CREDITORS

This Article has demonstrated that there are many ways that **solvency** tests may give inconsistent diagnoses of **solvency**. This circumstance is troubling, because laws invoking **solvency** tests nearly always invoke more than one version. For example, both federal and state fraudulent conveyance laws invoke all three **solvency** tests and consider the firm to be **insolvent** for purposes of the fraudulent transfer when it fails any one of them. [FN65] Even where the law uses only a balance-sheet test-as is the case in federal preference law [FN66]-there have been two versions of that test the going-concern and liquidation balance-sheet tests, that can give different indications of solvency. [FN67] Is there a better way to test for solvency? Is it necessary to have this many solvency tests to address the problem that solvency testing seems generally designed to solve: preventing value destroying behavior by those in control of the firm's assets to the detriment of the firm's creditors where the possibility of such behavior will destroy debt capacity?

When one looks at the individual solvency tests-the ability-to-pay solvency test, the going-concern balance-sheet solvency test, the liquidation balance-sheet solvency test, and the various capital-adequacy tests-the answer appears almost obvious, at least from the perspective of maximizing debt capacity. The ability-to-pay solvency test is the "best" or "optimal" solvency test. The ability-to-pay solvency test addresses head on what creditors care most about: the likelihood that the firm will have the cash available to pay debts as they mature at the contracted dates in the contracted amounts. The ability-to-pay capital-adequacy test is, of course, almost the fraternal twin of the ability-to-pay solvency test: a little more severe, not quite identical, but essentially the same test with a slightly higher hurdle.

The remaining tests are suboptimal compared to the ability-to-pay solvency test because they lose information that is important to a creditor while replacing it with information that is less important. Consider first how the other solvency tests lose information that is important to a creditor. A creditor cares most that the firm will

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Exhibit T - Page 689

have the cash it owes at the time and in the amounts that it has contracted for repayment. This is the simple beauty of the ability-to-pay solvency test which asks only if there is a sufficiently high likelihood that the firm will be able to generate that cash on the dates and the amounts that it has promised to pay.

But whether one looks at the going-concern balance-sheet solvency test or the liquidation balance-sheet solvency test, that information is lost. As has been demonstrated, a firm may be going-concern balance-sheet solvent when it does not have the ability to pay debts as they come due. Recall that this situation may occur *1004 when the firm has cash flows that are mismatched with maturing debt obligations and where the firm does not have the ability to turn going-concern solvency into cash at the times it needs to pay its debts, that is, the going-concern solvency margin is not sufficiently liquid to allow the firm to pay its debts as they mature. But the liquidity of the going-concern solvency margin is a *critical* piece of information for a creditor. A creditor cares primarily about the firm's ability to match cash flows and maturing debt obligations in a time consistent manner that matches cash flows to the creditor's expectations of repayment.

The same information is lost in a liquidation balance-sheet solvency test. For example, a firm may be insolvent under a liquidation balance-sheet solvency test simply because liquidation values are temporarily depressed in the firm's industry. At the same time, however, the firm may still be reasonably expected to generate sufficient cash flow with a sufficiently high likelihood that the firm has the ability to pay its debts as they come due. Again, it is the latter and not the former about which the creditor cares most. The liquidation balance-sheet solvency test may indicate insolvency, but it does so by abstracting from the firm's ability to generate cash flow when that cash is needed to pay the firm's debt obligations, the information that the creditor cares most about. The same is obviously true for both capital-adequacy tests (that is, the going-concern balance-sheet-based and liquidation balance-sheet-based capital-adequacy tests) for the same reasons.

Consider next the lower relevance of the information that the going-concern balance-sheet test and liquidation balance-sheet test give to the creditor in exchange for taking away information about the time consistency of cash flows and maturing debt obligations. A firm may be going-concern balance-sheet insolvent because the necessary adjustments for time value of money and risk reduce the present value of the firm's future cash flows to an amount that is below the face value of its debt. But again this information does not tell the creditor what it needs to know: regardless of the time value and risk-adjusted "present value" of those cash flows, are those cash flows nonetheless sufficiently high with sufficiently high likelihood to meet the firm's obligations under the debt contract? That is, information about valuation (given the current prices of time value and risk in the financial markets) is far less relevant to a creditor than the basic information (unavailable in a going-concern balance-sheet test alone) of whether the firm can match cash flows to maturing debt obligations when it has the obligation to do so.

The same problems apply to the liquidation balance-sheet solvency test. A high current liquidation value is of no solace to a creditor if the firm does not intend to liquidate at the present liquidation value and otherwise is not reasonably expected to pay its debts as they come due. In general, liquidation values will vary over time. Holding constant the firm's inability to pay its debts as they come due, a decline in liquidation value will leave the creditor no better off and probably worse. Here again the liquidation balance-sheet **solvency** test gives a creditor information that is far less relevant to it than information about the firm's ability to pay its debts as they come due. Liquidation balance-sheet **solvency** is of little comfort to a creditor with no power to force liquidation (and debt repayment) and who otherwise cannot expect the firm to pay its debts as they come due.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit T - Page 690**

62 BUSLAW 983                                                                        Page 15
62 Bus. Law. 983

*1005 B. THE VALUE OF MULTIPLE SOLVENCY TESTS

As has been shown, there are good reasons to deemphasize balance-sheet **solvency** tests (and corresponding balance-sheet-based capital-adequacy tests) in favor of a much stronger emphasis on the ability-to-pay **solvency** test. Nevertheless, **solvency**-test-invoking laws such as fraudulent transfer law essentially deem the firm **insolvent** any time it fails any one of the tests. How can the overabundance of applied **solvency** tests be justified when there are good arguments for the use of a single **solvency** test-the ability-to-pay **solvency** test-and a single capital-adequacy test-an ability-to-pay **solvency**-based capital-adequacy test?

Consider what is assumed when one confidently asserts that a creditor could make do with the ability-to-pay **solvency** test. First, it is implicitly assumed that it is not too difficult to discern the likelihood of future cash flows, even if those cash flows are quite distant in time from the **solvency determination** date. In fact, however, cash flow projection can be difficult at best and speculative at worst. Empirical evidence on the accuracy of cash flow projections in contexts relevant for **solvency** testing is not encouraging. [FN68]

Second, it is assumed that a creditor gains little useful information from a diagnosis of balance-sheet **insolvency** (whether going-concern or liquidation-based). In fact, there may be considerable useful information in a diagnosis of balance-sheet **insolvency** even apart from knowledge of ability-to-pay **insolvency**. Liquidation balance-sheet **insolvency** has a particular advantage over ability-to-pay **solvency** tests and going-concern balance-sheet **solvency** tests when it is based on current market information about liquidation values that is less dependent on particular projections of distant cash flows than are the ability-to-pay **solvency** test and a going-concern balance-sheet **solvency** test. To the extent that tools for **solvency** testing are crude and potentially inaccurate, there may be little confidence in resulting **solvency** diagnoses. [FN69] Given the difficulty of cash flow projection, the availability of market prices can be incrementally informative.

Of course, because of measurement error (misestimating cash flows, discount factors, and liquidation values), any of the three non-capital-adequacy **solvency** tests can give an incorrect diagnosis of **insolvency**, that is, a given **solvency** test might correctly classify a firm as solvent when it is in fact solvent, or **insolvent** when it is in fact **insolvent**, but it may also give an incorrect measurement: indicating **insolvency** *1006 when the firm is in fact solvent (a false positive for **insolvency**) or **solvency** when the firm is **insolvent** (a false negative for **insolvency**).

It is much better, in terms of maximizing debt capacity, to mistakenly conclude that a firm is **insolvent** than to mistakenly conclude that a firm is solvent. If multiple **solvency** tests are available that are less than perfectly correlated in their measurement error, then it is better to use multiple **solvency** tests and to pronounce a firm **insolvent** when any one of those tests indicates **insolvency**. The costs of preventing gratuitous asset transfers are low for firms that are nearly **insolvent** (as firms are likely to be those which fail any one of the tests), because they likely have less asset value to waste in the first place. By adding the plausible assumption that the probability of false positives decreases across all candidate tests the further from insolvency the firm is, an interesting result emerges: It may be best to employ several, potentially conflicting solvency tests (including capital-adequacy tests, which are essentially just "perturbations" of other solvency tests), and to prevent gratuitous asset transfers when *any* of these tests is violated.

**CONCLUSION**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Exhibit T - Page 691

This Article sorts out some of the confusion that surrounds solvency tests. It explains the basic economic function of solvency tests in bankruptcy and corporate law, the relations among the three dominant solvency tests-the ability-to-pay test, the balance-sheet test, and the capital-adequacy test-and explains why the diagnosis of insolvency can differ depending upon the solvency test that is applied. Although one of these tests-the ability-to-pay test- appears superior, it may suffer from significant measurement error in practice. Because the costs of failing to detect insolvency when it exists exceed the costs of detecting insolvency when it does not exist, applying multiple solvency tests might be beneficial even though they may give conflicting indications of insolvency.

[FNa1]. Partner, Bartlit Beck Herman Palenchar & Scott LLP (Chicago). Please address correspondence to Heaton at Bartlit Beck Herman Palenchar & Scott LLP, 54 West Hubbard Street. Chicago, Illinois 60610, phone 312-494-4425, email: jb.heaton@bartlit-beck.com. The opinions expressed here are the author's own and do not reflect the position of Bartlit Beck Herman Palenchar & Scott LLP, its attorneys or clients. For helpful comments I thank John Byars, Chris Culp, David Evans, Renee McMahon. Adam Mortara, David Parker, Jordan Siev, Joe Smith, Cindy Sobel, and Jamie Sprayregan.

[FN1]. References are made to "firm" throughout but nothing prevents the application of this Article's ideas to natural persons.

[FN2]. See infra notes 25-31 and accompanying text.

[FN3]. See infra notes 32-48 and accompanying text.

[FN4]. See infra notes 49-54 and accompanying text.

[FN5]. See, e.g., In re WorldCom, Inc., No. 02-13533 (AJG), 2003 Bankr. LEXIS 1401, *120 (Bankr. S.D.N.Y. Oct. 31, 2003) ("There are various tests used to determine insolvency under the [New York Debtor and Creditor Law], none of which is generally accepted as the correct test.") (citation omitted); cf. United States v. Whitehead, 176 F.3d 1030, 1040 (8th Cir. 1999) (reversing conviction where district court failed to instruct jury on definition of "insolvent" because "the term 'insolvent' encompasses distinctly different meanings in the law"); Parkway/Lamar Partners, L.P. v. Tom Thumb Stores, Inc., 877 S.W.2d 848, 849 (Tex. App. 1994) ("The meaning of 'insolvency' is not definitely fixed and it is not always used in the same sense, but its definition depends rather on the business or fact situation to which the term applies.").

[FN6]. James C. Bonbright & Charles Pickett, Valuation to Determine Solvency Under the Bankruptcy Act, 29 COLUM. L. REV. 582, 620 (1929).

[FN7]. Prod. Res. Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772, 790 (Del. Ch. 2004).

[FN8]. See, e.g., Richard M. Cieri, Lyle G. Ganske & Heather Lennox, Breaking Up Is Hard To Do: Avoiding the Solvency-Related Pitfalls In Spinoff Transactions, 54 BUS. LAW. 533 (1999).

[FN9]. 2-101 COLLIER ON BANKRUPTCY ¶ 101.32 [4] (15th rev. ed. 2007).

[FN10]. For a technical economic treatment of the role that fraudulent conveyance law plays in increasing debt

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit T - Page 692**

62 BUSLAW 983
62 Bus. Law. 983

capacity, see J.B. Heaton, *Incomplete Financial Contracts and Non-Contractual Legal Rules: The Case of Debt Capacity and Fraudulent Conveyance Law*, 9 J. FIN. INTERMEDIATION 169 (2000) (demonstrating how fraudulent conveyance law increases debt capacity *ex ante* by protecting creditors *ex post*).

[FN11]. *See generally* Israel Treiman, *Escaping the creditor in the middle ages*, 43 LAW QUART. REV. 230 (1927).

[FN12]. *See, e.g.*, French v. Liebmann (*In re* French). 440 F.3d 145 (4th Cir.), *cert. denied*, 127 S.Ct. 72 (2006) (fraudulent transfer of Bahamian property on the eve of bankruptcy).

[FN13]. *See, e.g.*, Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003 (*In re* Freuhauf Trailor Corp.), 444 F.3d 203 (3d Cir. 2006) (large pension benefit conferred on executives on the eve of bankruptcy was a fraudulent transfer).

[FN14]. *See, e.g.*, Wieboldt Stores, Inc. v. Schottenstein, 131 B.R. 655 (N.D. Ill. 1991) (payments made to selling shareholders in leveraged buyout could constitute fraudulent transfers).

[FN15]. *Cf.* Kendall v. Sorani (*In re* Richmond Produce Co.), 195 B.R. 455 (N.D. Cal. 1996) (bankruptcy trustee could recover, as fraudulent transfer, amount that company provided to secure letter of credit allowing new buyer to purchase stock from company's former owners).

[FN16]. *See, e.g.*, Acequia, Inc. v. Clinton (*In re* Acequia, Inc.), 34 F.3d 800 (9th Cir. 1994) (amounts that corporate founder claimed were personal loans or reimbursements were avoidable fraudulent transfers made by corporation).

[FN17]. *Cf.* RTC Mortg. Trust 1995-S/N1 v. Sopher, 171 F. Supp. 2d 192 (S.D.N.Y. 2001) (insolvent company transferred its assets to newly formed company in exchange for stock in the new company that was then distributed to the shareholders of the insolvent company).

[FN18]. *See, e.g.*, Breeden v. L.I. Bridge Fund. LLC (*In re* Bennett Funding Group. Inc.), 232 B.R. 565 (Bankr. N.D.N.Y. 1999) (sale of stock warrants to longtime affiliate of debtor at much lower price than value of underlying stock was fraudulent transfer).

[FN19]. *See, e.g.*, 11 U.S.C.A. § 548 (West 2004 & Supp. 2007); Uniform Fraudulent Conveyance Act, 7A Pt. 11 U.L.A. 245 (2006) (promulgated in 1918); Uniform Fraudulent Transfer Act, 7A Pt. II U.L.A. 1 (2006) (promulgated in 1984).

[FN20]. *See* 11 U.S.C.A. § 547(b) (West 2004 & Supp. 2007); Freedom Group, Inc. v. Lapham-Hickey Steel Corp. (*In re* Freedom Group), 50 F.3d 408, 411 (7th Cir. 1995) ("The statute reduces the debtor's ability to play favorites, and hence the anxiety of creditors, and hence the costly melee that such anxiety can engender, by telling the favored creditor that if the debtor goes broke within ninety days after the transfer, the transfer will be undone and the favored creditor tossed back in the pool with the rest of the creditors."); Cent. Va. Cmty. Coll. v. Katz, 126 S. Ct. 990, 1002 (2006) (stating that authority to recover preferences "has been a core aspect of the administration of bankrupt estates since at least the 18th century.").

[FN21]. *See, e.g.*, DEL. CODE ANN. tit. 8, §§ 160 and 174(a) (2001) (prohibiting payment of dividends while

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the corporation is insolvent or which will render it insolvent); N.Y. BUS. CORP. LAW § 510(a) (McKinney 2003) ("A corporation may declare and pay dividends or make other distributions in cash or its bonds or its property, including the shares or bonds of other corporations, on its outstanding shares, except when currently the corporation is insolvent or would thereby be made insolvent...."); CAL. CORP. CODE § 501 (West 1990) ("Neither a corporation nor any of its subsidiaries shall make any distribution to the corporation's shareholders (Section 166) if the corporation or the subsidiary making the distribution is, or as a result thereof would be, likely to be unable to meet its liabilities (except those whose payment is otherwise adequately provided for) as they mature."); ABA MODEL. BUS. CORP. ACT § 6.40(c) (2005) ("No distribution may be made if, after giving it effect: (1) the corporation would not be able to pay its debts as they become due in the usual course of business; or (2) the corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.").

[FN22]. *See generally* Prod. Res. Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772 (Del. Ch. 2004).

[FN23]. *See e.g.*, Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. & Cryovac, Inc. (*In re* W.R. Grace & Co.), 281 B.R. 852, 867-68 (Bankr. D. Del. 2002) (holding that tort claims as they actually existed must be used for purposes of calculating insolvency, even though evidence of the actual level of tort claims was not available at the time of the allegedly fraudulent transfer of company's most profitable division and contemporaneous reasonable estimates supported the inference of solvency.).

[FN24]. *See, e.g.*, Lawson v. Ford Motor Co. (*In re* Roblin Indus., Inc.), 78 F.3d 30, 35 (2d Cir. 1996) (insolvency is a question of fact); Brown v. Shell Can. Ltd. (*In re* Tennessee Chem. Co.), 112 F.3d 234, 236 (6th Cir. 1997) (same); Plankinton Bldg. Co. v. Grossman (*In re* Plankinton Bldg. Co.), 148 F.2d 119, 125 (7th Cir.), *cert. denied*, 326 U.S. 729 (1945) (same); Merkel v. Comm'r of Internal Revenue. 192 F.3d 844, 852 (9th Cir. 1999) (same); Cavanaugh v. Comm'r of Internal Revenue, No. 92-9004, 1993 U.S. App. LEXIS 2186. *2 (10th Cir. Feb. 9, 1993) (same). Occasionally, courts describe solvency testing as a mixed question of fact and law, see, e.g., Consove v. Cohen (*In re* Roco Corp.), 701 F.2d 978, 981 (1st Cir. 1983); Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1063 (3d Cir. 1992).

[FN25]. 11 U.S.C.A. §548(a)(1)(B)(III) (West 2004 & Supp. 2007).

[FN26]. Unif. Fraudulent Transfer Act, *supra* note 19, § 4(a)(i).

[FN27]. Unif. Fraudulent Conveyance Act, *supra* note 19, § 6.

[FN28]. U.C.C. § 1-201(b)(23)(A) and (B) (2006). Subparagraph (C) adds "being insolvent within the meaning of federal bankruptcy law," the balance-sheet test discussed below.

[FN29]. Cellar Lumber Co. v. Holley, 224 N.E.2d 360, 363 (Ohio Ct. App. 1967).

[FN30]. In *Pereira v. Farace*, 413 F.3d 330, 343 (2d Cir. 2005), *cert. denied*, 126 S.Ct. 2286 (2006), the Second Circuit Court of Appeals seems recently to have made the mistake of reading the ability-to-pay test as dependent on meeting only *current* obligations. The court rejected a finding of insolvency that rested on the debtor's inabil-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Exhibit T - Page 694

ity to meet its *future* debt repayment obligations and stated:

> The Cash Flow test does not accord exactly with either Delaware definition. The Cash Flow test projects into the future to determine whether capital will remain adequate over time while the Delaware test looks solely at whether the corporation has been paying bills on a timely basis and/or whether its liabilities exceed its assets. Therefore, the Cash Flow test cannot assist a trier of fact in determining whether a corporation is insolvent under the applicable Delaware law.

*Id.* at 343. This is surely an incorrect reading of Delaware law. The court's reasoning eventually traces to a dictionary definition of insolvency that the Delaware Court of Chancery cited in *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 789 (Del. Ch. 1992) ("An entity is insolvent when it is unable to pay its debts as they fall due in the usual course of business. Webster's Ninth New Collegiate Dictionary 626 (1988)."). Nothing in that definition limits the definition of insolvency to the current payment of bills. This is unsurprising because an ability-to-pay test that looked at only the entity's historical rather than prospective ability to pay its debts has little value in deterring credit-harming activities before they happen. Corporations may be balance-sheet insolvent but liquid enough to pay creditors for quite some time. *Cf.* Angelo, Gordon & Co. L.P. v. Allied Riser Commc'ns Corp., 805 A.2d 221 (Del. Ch. 2002) (corporation had sold off all its assets, and although balance-sheet insolvent, had sufficient cash to pay its currently maturing obligations); Harry DeAngelo, Linda DeAngelo & Karen H. Wruck, *Asset Liquidity, Debt Covenants, and Managerial Discretion In Financial Distress: The Collapse of L.A. Gear*, 64 J. FIN. ECON. 3 (April 2002) (high asset liquidity may temporarily give insolvent firms the ability to continue operations by paying current obligations).

[FN31]. The probability of defaulting is 1 minus the probability of not defaulting: $1 - 0.90^7 = 1 - 0.48 = 0.52$.

[FN32]. *See* 11 U.S.C.A. § 101(32)(A) (West 2004 & Supp. 2007); Briden v. Foley, 776 F.2d 379, 382 (1st Cir. 1985) (bankruptcy code definition of insolvency applied in preference case is a "balance-sheet test" that "focuses on the fair market value of the debtor's assets and liabilities within a reasonable time of the transfers"); Orix Credit Alliance, Inc. v. Harvey *ex rel.* Lamar Haddox Contractor, Inc. (*In re* Lamar Haddox Contractor, Inc.), 40 F.3d 118, 121 (5th Cir. 1994) ("Courts often refer to this test as a balance-sheet test, and then engage in the 'fair valuation' of the debts and property shown on the balance-sheet, as required by the statute."). This is the same definition of balance-sheet insolvency used in the Uniform Fraudulent Transfer Act, *supra* note 26. *See* Paragon Health Servs., Inc. v. Cent. Palm Beach Cmty. Mental Health Ctr., Inc., 859 So. 2d 1233, 1236-37 (Fla. Dist. Ct. App. 2003) ("The Uniform Fraudulent Transfer Action defines insolvency as follows: 'A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.' This is referred to as the 'balance sheet test.") (citations omitted).

[FN33]. *See, e.g.*, Hanna v. Crenshaw (*In re* ORBCOMM Global L.P.), Adv. No. 02-1914 (MFW), 2003 Bankr. LEXIS 759, *8 (Bankr. D. Del. June 12, 2003) (holding that "for purposes of determining whether a debtor is insolvent under section 547, the liabilities of the debtor must be valued at face value.").

[FN34]. *In re* Xonics Photochemical, Inc., 841 F.2d 198, 200-01 (7th Cir. 1988); Covey v. Commercial Nat'l Bank of Peoria, 960 F.2d 657, 660 (7th Cir. 1992).

[FN35]. *See, e.g.*, DeRosa v. Buildex Inc. (*In re* F & S Cent. Mfg. Corp.), 53 B.R. 842, 849 (Bankr. E.D.N.Y. 1985) ("'Asset values carried on a balance sheet, even if derived in accordance with 'generally accepted accounting principles,' do not necessarily reflect fair value: 'Generally accepted accounting principles' are not syn-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit T - Page 695**

onymous with any specific [valuation] policy.'"'); *In re Lamar Haddox Contractor*, 40 F.3d at 121 ("Needless to say, a fair valuation may not be equivalent to the values assigned on a balance sheet. Financial statements reflect the book value of assets, ordinarily the cost of the property reduced by accumulated depreciation. The rate of depreciation is usually the maximum allowed by income tax regulations."); *but cf.* Zeta Consumer Prods. Corp. v. Equistar Chem. L.P. (*In re Zeta Consumer Prods. Corp.*), 291 B.R. 336, 347 (Bankr. D.N.J. 2003) ("Nevertheless, while book value may understate or fail to reflect the fair value of a debtor's assets, it provides some competent evidence as to insolvency and forms a starting point for purposes of the insolvency analysis."); Indus., Commercial Elec., Inc. v. Babineau (*In re Indus. Commercial Elec. Inc.*), Adv. No. 02-4591-JBR, 2004 Bankr. LEXIS 438, *22 (Bankr. D. Mass. April 8, 2004) ("In making factual determinations of solvency, it is appropriate to adjust the asset values shown on the most contemporaneous balance sheet available to reflect 'the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts.'").

[FN36]. *See, e.g., Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d at 661 (Easterbrook, J.) ("A stumblebum would pay 1 cent for the most hopelessly insolvent firm, as the deal puts none of the bum's nonexistent assets at risk and could pay off if the debtor unexpectedly strikes it rich.").

[FN37]. *See, e.g.*, Chaim J. Fortgang & Thomas Moers Mayer, *Valuation in Bankruptcy*, 32 UCLA L. REV. 1061, 1063 (1985) ("The choice between 'liquidation values' and 'going concern values' lies at the heart of most disputes over asset valuation in bankruptcy."); *In re PWS Holding Corp.*, 228 F.3d 224, 233 (3d Cir. 2000) ("The test of solvency is whether, at the time of the recapitalization, the company's assets exceeded its liabilities. There are two basic approaches to this evaluation: asset by asset evaluation, which ascribes value to each asset and determines solvency by comparing the sum of those assets to total liabilities, and enterprise valuation, which values the business as a going concern and includes intangibles such as relationships with customers and suppliers, and the name, profile, and reputation of the business. The Examiner concluded that it was likely (i.e., that there was a 60-80% chance) that a court would apply the business enterprise analysis.").

[FN38]. Sherman v. FSC Realty LLC (*In re* Brentwood-Lexford Partners, LLC), 292 B.R. 255, 268 (Bankr. N.D. Tex. 2003) (citing *In re* DAK Indus. Inc., 170 F.3d 1197, 1199-1200 (9th Cir. 1999) and *In re* Taxman Clothing Co., Inc., 905 F.2d 166, 169-70 (7th Cir. 1990)).

[FN39]. Bonbright & Pickett, *supra* note 6, at 582. Generally, where a firm is operating at the valuation date and generally paying its bills, courts appear to adopt a going concern standard. *In re DAK Indus. Inc.*, 170 F.3d at 1200 ("In this case, the bankruptcy court determined that DAK was a going concern during the preference period, relying primarily on the fact that DAK continued to conduct business under Chapter 11 protection for two and one-half years. In light of the amount of business transacted by DAK during the preference period and the years that followed, as well as DAK's ability to pay its operating expensing during the same period, this finding was not erroneous."); Diamond v. Osborne, 102 Fed. Appx. 544, 548 (9th Cir. 2004) (company was to be evaluated as a going concern in a preference case where corporation "continued to operate for twenty months after the first transfer in January 1996, and for five months after the last transfer on September 3, 1996; and that during the transfer period ADF had substantial cash flow and over one hundred employees").

[FN40]. Prod. Res. Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772, 791 n.60 (Del Ch. 2004).

[FN41]. The timeless words of one judge state the situation well:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The effort [in such valuations] is to find out not what a real buyer and a real seller, under the conditions actually surrounding them, do, but what a purely imaginary buyer will pay a make believe seller, under conditions which do not exist. You are forced to wonder what would have happened if everything had been different from what it was. It is not easy to guess what will take place in Wonderland, as other people than Lewis Carroll's heroine have found out.

McGill v. Commercial Credit Co., 243 Fed. 637, 647 (D. Md. 1917).

[FN42]. See generally Steven A. Lippman & John J. McCall, An Operational Measure of Liquidity, 76 AM. ECON. REV. 43 (Mar. 1986). Of course, courts tend to use the language of lawyers, not economists. See In re F & S Cent. Mfg. Corp., 53 B.R. at 849 ("Fair value is determined by estimating what the debtor's assets would realize if sold in *a prudent* manner in current market conditions.") (emphasis added); Briden v. Foley, 776 F.2d at 382 (asset valuation need not be exact but should be reduced by value of assets not readily susceptible to liquidation and payment of debts).

[FN43]. In re Taxman Clothing Co., Inc. 905 F.2d 166 (7th Cir. 1990) presents a leading example (and explanation) of this approach. The primary issue involved the proper valuation of a clothing company's inventory. The inventory was liquidated at auction for $110,000, but evidence suggested that its going concern value net of selling expenses was $215,000. Choosing the latter value for solvency purposes, the court found that the proper value of the inventory was the profit that could be obtained through sale in the usual course of business. Id. at 170-71.

[FN44]. Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 134 F.3d 188 (3d Cir.), cert. denied, 523 U.S. 1138 (1998).

[FN45]. Id. at 195. Courts sometimes go to considerable lengths to justify the going concern assumption. Atlanta Knitting Mills v. Nathanson Bros. Co. (In re Nathanson Bros. Co.), 64 F.2d 912 (6th Cir. 1933) provides a particularly vivid illustration of the lengths to which a court will go to maintain the going concern assumption:

The evidence clearly establishes, we think, that prior to the appointment of the receiver [Nathanson Bros.] was confronted with a practical collapse of its lines of credit necessary for the operation of the business. Like many other companies during the same period, it could not borrow except on the assignment of accounts receivable and trade acceptances at ruinous rates of discount. However, the business had not been discontinued, and the receiver was authorized to continue it.... We do not think that the financial outlook of the debtor corporation, or the intention of its stockholders and directors to continue business or to liquidate at an early date, is determinative of the question. If the business is in fact being conducted at the time of alleged bankruptcy, then the items of property constituting its assets must receive a fair valuation, not as isolated articles separated from the whole, but as parts of the whole and as useful in that relationship. This is all that is meant by going concern value.

Id. at 913.
[FN46]. Schwinn Plan Committee v. AFS Cycle & Co., Ltd. (In re Schwinn Bicycle Co.), 192 B.R. 477, 487 (Bankr. N.D. Ill. 1996) (finding that Schwinn "was not financially viable, was in severe financial distress and was on its 'deathbed' when it filed for bankruptcy and during the prior ninety days"); WRT Creditors Liquidation Trust v. WRT Bankruptcy Litig. Master File (In re WRT Energy Corp.), 282 B.R. 343, 369 (Bankr. W.D. La. 2001) ("A liquidation analysis is used to determine 'fair valuation' of assets where the debtor is 'financially

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Exhibit T - Page 697

dead or mortally wounded.' Liquidation or scrap value of assets must be used because, if the entity is not a going concern at the time of the transfer, 'it would not be proper for the assets to be valued at a going concern value.'") (quoting Langham, Langston & Burnett v. Blanchard, 246 F.2d 529, 532-33 (5th Cir. 1957)).

[FN47]. Gillman v. Scientific Research Prods. Inc. of Delaware (*In re* Mama D'Angelo, Inc.), 55 F.3d 552, 555-56 (10th Cir. 1995) (quoting *In re* Vadnais Supply, Inc., 100 B.R. 127, 131 (Bankr. D. Mass. 1989)) (citations omitted).

[FN48]. Hanna v. Crenshaw (*In re* ORBCOMM Global L.P.), Adv. No. 02-1914 (MFW), 2003 Bankr. LEXIS 759, *8 (Bankr. D. Del. June 12, 2003) (quoting *In re* Transworld Airlines, Inc., 134 F.3d 188, 197 n.7 (3d Cir. 1998)).

[FN49]. Brandt v. Hicks, Muse & Co., Inc. (*In re* Healthco Intern., Inc.), 208 B.R. 288, 302 (Bankr. D. Mass. 1997) (citing Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1073 (3d Cir. 1992)); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d at 1070 ("Viewed in this light, an 'unreasonably small capital' would refer to the inability to generate sufficient profits to sustain operations. Because an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they become due, unreasonably small capital would seem to encompass financial difficulties short of equitable insolvency."); *see also* Bruce A. Markell, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital*, 21 IND. L. REV. 469 (1988).

[FN50]. Vadnais Lumber Supply, Inc. v. Byrne (*In re* Vadnais Lumber Supply, Inc.), 100 B.R. 127, 137 (Bankr. D. Mass. 1989) (citations omitted); *see also* Salisbury v. Tex. Commerce Bank-Houston, N.A. (*In re* WCC Holding Corp.), 171 B.R. 972, 985 (Bankr. N.D. Tex. 1994) ("Unreasonably small assets signifies an inability to generate enough cash flow from operations and the sale of assets to remain financially stable."); Murphy v. Meritor Sav. Bank (*In re* O'Day Corp.), 126 B.R. 370, 407 (Bankr. D. Mass. 1991) ("Unreasonably small capitalization encompasses financial difficulties which are short of equitable insolvency or bankruptcy insolvency....") (internal quotations omitted).

[FN51]. See, e.g., MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co., 910 F. Supp. 913, 944 (S.D.N.Y. 1995) ("In order to determine the adequacy of capital, a court will look to such factors as the company's debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry at issue.") (citations omitted); *In re WRT Energy Corp.*, 282 B.R. at 411 ("In determining unreasonably small capital, courts generally examine cash flow, focusing on whether the debtor was left in a position in which it was unable after the transfer to generate sufficient profits to sustain operations. The test is whether the unreasonably small capital condition and consequent cash flow problems were reasonably foreseeable when viewed objectively at the time of the transaction at issue.") (citation omitted); Garrick A. Hollander, *Defining 'Unreasonably Small Capital' in Fraudulent Conveyance Cases: Ratio Analysis May Provide An Answer*, 49 BUS. LAW. 1185 (1994).

[FN52]. *See, e.g., Moody*, 971 F.2d at 1073 ("To a degree, parties must also account for difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for error.").

[FN53]. *Id.* at 1072 n.24. *See also id.* at 1073 ("Because projections tend to be optimistic, their reasonableness

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

must be tested by an objective standard anchored in the company's actual performance. Among the relevant data are cash flow, net sales, gross profit margins, and net profits and losses...."). On the optimism of managerial perceptions of the firm's prospects, see J.B. Heaton, *Managerial Optimism and Corporate Finance*, 31 FIN. MGMT. 33 (Summer 2002).

[FN54]. MFS/*Sun Life*, 910 F. Supp. at 944 (citations and quotations omitted).

[FN55]. Even leading cases seem to miss this point, suggesting instead that different solvency tests measure the same thing. *See, e.g.*, Geyer v. Ingersoll Publ'ns Co., 621 A.2d 784, 789 (Del. Ch. 1992) ("An entity is insolvent when it is unable to pay its debts as they fall due in the usual course of business. WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 626 (1988). That is, an entity is insolvent when it has liabilities in excess of a reasonable market value of assets held."). "That is" suggested that the ability-to-pay test and the balance-sheet test are equivalent. As we shall see below, they are not.

[FN56]. *See generally* TOM COPELAND, TIM KOLLER & JACK MURRIN, VALUATION: MEASURING AND MANAGING THE VALUE OF COMPANIES (3d ed. 2000).

[FN57]. *See* Andrei Shleifer & Robert W. Vishny, *Liquidation Values and Debt Capacity: A Market Equilibrium Approach*, 47 J. FIN. 1343 (Sept. 1992).

[FN58]. *See, e.g.*, Francis A. Longstaff, *How Much Can Marketability Affect Security Values?*, 50 J. FIN. 1767 (Dec. 1995).

[FN59]. *See* Lee B. Shepard, Note, *Beyond Moody: A Re-Examination of Unreasonably Small Capital*, 57 HASTINGS L.J. 891, 895 (2006) ("[I]f a company's projected future cash flow were just enough to pay its debts as they came due and no more, it would be equitably solvent and pass the cash flow test. In either case, the company's creditors would be exposed to a high, and arguably unreasonable, degree of risk. Although some companies left in this condition may prosper and pay its creditors, most will be 'doomed to failure.' Involuntary creditors of such companies are unprotected against the slightest adverse development, foreseen or unforeseen.").

[FN60]. For an interesting case study in the interaction between balance-sheet solvency and ability-to-pay insolvency, see Harry DeAngelo, Linda DeAngelo & Stuart C. Gilson, *The Collapse of First Executive Corporation: Junk Bonds, Adverse Publicity, and the "Run On the Bank" Phenomenon*, 36 J. FIN. ECON. 287 (1994).

[FN61]. *See supra* notes 55-60 and accompanying text.

[FN62]. *See, e.g.*, Karen Richardson and Serena Ng, *Why Flush Financiers Court Unloved Businesses*, WALL ST. J., April 9, 2007, at C1 ("While financiers are betting they can outsmart the public markets by taking on their rejects, the success of these long-shot turnarounds relies on revived interest by public shareholders.").

[FN63]. *See* Shepard, *supra* note 59, at 894-95 ("Fraudulent conveyance laws would not be effective if they only applied to debtors rendered insolvent by asset transfers. If so, a company could transfer just enough assets to leave it barely solvent. For example, if a company's assets exceeded its liabilities by $ 1.00, it would be deemed balance sheet solvent and pass the balance sheet test.").

[FN64]. This, of course, also requires that the firm cannot "call" the debt.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit T - Page 699**

62 BUSLAW 983                                                                    Page 24
62 Bus. Law. 983

[FN65]. *See supra* notes 24-54 and accompanying text.

[FN66]. *See, e.g.*, 11 U.S.C.A. § 547(b) (West 2004 & Supp. 2007) (employing bankruptcy code's definition of "insolvent," defined in 11 U.S.C.A. § 101(32) (West 2004 & Supp. 2007) to be the "condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation").

[FN67]. *See supra* notes 37-48 and accompanying text.

[FN68]. Evidence of upward biased cash flow forecasts abounds in contexts important for solvency testing. Steven N. Kaplan and Richard S. Ruback, *The Valuation of Cash Flow Forecasts: An Empirical Analysis*, 50 J. FIN. 1059 (Sept. 1995) (finding statistically significant upward bias of both operating income and operating margins in connection with leveraged buyouts and recapitalizations); Steven N. Kaplan, *The Effects of Management Buyouts on Operating Performance and Value*, 24 J. FIN. ECON. 217 (1989) (same); Edith Shwalb Hotchkiss, *Postbankruptcy Performance and Management Turnover*, 50 J. FIN. 3 (Mar. 1995) (finding statistically significant upward bias of forecasts for the performance of firms exiting bankruptcy).

[FN69]. *See, e.g.*, Stuart Gilson, Edith S. Hotchkiss & Richard S. Ruback, *Valuation of Bankrupt Firms*, 13 REV. FIN. STUD. 43 (2000) (finding very large valuation errors in their study of discounted cash flow methods in bankruptcy); Constructora Maza, Inc. v. Banco de Ponce, 616 F.2d 573, 577 (1st Cir. 1980) ("The determination of the 'fair valuation' of the debtor's assets at a specific time is at best an inexact science, and may often be impossible.").
62 Bus. Law. 983

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Exhibit T - Page 700