# Exhibit 1

# ***Public Redacted***

# This Exhibit Is Filed Under Seal Pursuant To Protective Order

# Exhibit 2

1   Robert C. O'Brien (SBN 154372)
    ARENT FOX LLP
2   555 West Fifth Street, 48th Floor
    Los Angeles, CA 90013-1065
3   Telephone: 213.629.7400
    Facsimile: 213.629.7401
4   obrien.robert@arentfox.com

5   Discovery Master

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                          EASTERN DIVISION

11

12   CARTER BRYANT, an individual,        Case No. CV 04-09049 SGL (RNBx)

13              Plaintiff,
                                          Consolidated with
14         v.                             Case No. CV 04-09059
                                          Case No. CV 05-2727
15   MATTEL, INC., a Delaware
     corporation,                         **PHASE 2 DISCOVERY MATTER**
16
                Defendant.                **ORDER NO. 21, REGARDING:**
17
                                          **EX PARTE APPLICATION OF
18                                        MATTEL FOR OSC RE: OMNI
                                          808's FAILURE TO COMPLY
19                                        WITH COURT ORDER**

20

21   CONSOLIDATED WITH
     MATTEL, INC. v. BRYANT and
22   MGA ENTERTAINMENT, INC. v.
     MATTEL, INC.
23

24

25

26

27

28

ARENT FOX LLP                                         ORDER NO. 21
ATTORNEYS AT LAW                         [Case No. CV 04-09049 SGL (RNBx)]
LOS ANGELES

EXHIBIT __2__ PAGE __29__

1        The Discovery Master, having been notified of the Court's decision to refer

2   to the Discovery Master for initial disposition Mattel's *ex parte* application for an

3   Order to Show Cause re: the alleged failure of Omni 808 Investors, LLC ("Omni

4   808") to comply with the Discovery Master's March 10, 2009 Order (the "March

5   10 Order") or, alternatively, for an Order shortening time to hear a motion for such

6   relief (the "Application"), and having reviewed the Opposition filed by Omni 808

7   and supporting papers, hereby **ORDERS** as follows:

8        1.      Omni 808 shall produce to Mattel all documents ordered to be

9   produced pursuant to the March 10 Order no later than 5:00 p.m. on April 28, 2009

10  and shall simultaneously serve on the Discovery Master a notice confirming Omni

11  808's compliance.

12       2.      In the event Omni 808 fails to comply in any respect with the

13  provisions of Paragraph 1, above, the Discovery Master shall refer this matter to the

14  Court for further action, and reserves the right to recommend to the Court that the

15  relief requested by Mattel in the Application be granted, in whole or in part.

16       3.      By way of guidance to the parties, and to reduce the likelihood of

17  unnecessary and costly motion practice, the Discovery Master reminds the parties

18  that, until and unless a deadline or other requirement imposed by the Discovery

19  Master is expressly modified by written Order, the parties shall timely comply with

20  all Orders issued by the Discovery Master, including the deadlines by which parties

21  are required to provide supplemental responses or produce documents.

22

23  Dated:        April 23, 2009

24

25                              By:      /s/ Robert C. O'Brien

26                                       ROBERT C. O'BRIEN
                                         Discovery Master

27

28

EXHIBIT __2__ PAGE __30__

# Exhibit 3

1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2 |   johnquinn@quinnemanuel.com
     Michael T. Zeller (Bar No. 196417)
3 |   (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4 |   (joncorey@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
5 | Los Angeles, California  90017-2543
   Telephone:  (213) 443-3000
6 | Facsimile:  (213) 443-3100

7 | Attorneys for Mattel, Inc.

8

9 |             UNITED STATES DISTRICT COURT

10 |           CENTRAL DISTRICT OF CALIFORNIA

11 |                 EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with Case Nos. CV 04-09059 and CV 05-02727 |
| vs. | |
| MATTEL, INC., a Delaware corporation, | Hon. Stephen G. Larson |
| Defendant. | **SUPPLEMENTAL DECLARATION OF MICHAEL T. ZELLER IN SUPPORT OF MATTEL, INC.'S MOTION OBJECTING TO PORTIONS OF DISCOVERY MASTER ORDER NO. 27 RE MATTEL'S MOTION TO COMPEL DOCUMENTS FROM BINGHAM MCCUTCHEN** |
| AND CONSOLIDATED ACTIONS | |
| | Date:  July 6, 2009<br>Time:  1:30 p.m.<br>Place:  Ctrm. 1 |
| | Discovery:  December 11: 2009<br>Pre-trial Conference:  March 1, 2010<br>Trial Date:  March 23, 2010 |

EXHIBIT __3__ PAGE _31_

07975/2995488.1

## DECLARATION OF MICHAEL T. ZELLER

1.     I am a member of the bars of the States of California, New York and Illinois and a partner at Quinn Emanuel Urquhart Oliver & Hedges, LLP, attorneys for Mattel, Inc. I make this declaration of personal, firsthand knowledge, and if called and sworn as a witness, I could and would testify competently thereto.

2.     I am making this supplemental declaration to update the Court on the status of document production in this litigation. In particular, Bingham has argued that it should not have to produce documents in response to Mattel's subpoena because Mattel allegedly has already received relevant documents and that the subpoena to Bingham is "at least partially" duplicative of the subpoenas to Omni 808 Investors, LLC ("Omni 808"), OmniNet Investors, LLC ("OmniNet") and Vision Capital, LLC ("Vision Capital") (Opp. at 15.)

3.     As shown by Mattel previously, however, Mattel has not received key information from any of these entities pursuant to subpoena or from any other source. This still remains true as of the date of this Declaration. Thus, for example, Mattel has not received information regarding even the identities of the principals, members or officers of Lexington Financial Limited ("Lexington"), let alone its source of funding.

4.     Vision Capital, an alleged investor in Omni 808 whose principal is Isaac Larian's brother-in-law, claims to have been funded by Lexington. Vision Capital's production as of this writing consists of only 149 pages of documents, the majority of which consist of previously produced Omni 808 corporate documents and Omni 808 promissory notes. Although it was compelled by prior Order to do so, Vision Capital has produced no documents showing the source or the transfer of the $10 million allegedly provided by Vision Capital to Omni 808 to fund the acquisition of the Wachovia debt. Vision Capital has not even produced any loan agreement between Vision Capital and Lexington, much less any communications,

EXHIBIT __3__ PAGE _32_

07975/2995488.1

-1-

DECLARATION OF MICHAEL T. ZELLER

1  other loan documents, checks, wire transfers or any other information relating to

2  Lexington's alleged loan or other funding to Vision Capital.

3       5.    Although it also was compelled by prior Order to do so, Omni 808 has

4  not produced any documents purporting to document any wire transfers or other

5  fund transfers to Omni 808 from most of Omni 808's alleged investors, including

6  such alleged funding from Vision Capital, Leon Neman, Neil Kadisha, Benjamin

7  Nazarian, David Nazarian or Joseph Moinian.  See Omni 808's Statement of

8  Position Re Order To Show Cause Re Appointment of Permanent Receiver, dated

9  May 14, 2009 at 8:12-18 (identifying Omni 808's alleged investors).

10       6.    For its part, OmniNet has represented that it had no responsive

11  documents to produce beyond those produced by Omni 808.  See Letter from Peter

12  N. Villar to John Quinn, dated June 22, 2009, a true and correct copy of which is

13  attached hereto as Exhibit 1.

14

15         Executed on July 3, 2009, at Los Angeles, California.

16

17                         /s/ Michael T. Zeller

                          Michael T. Zeller

18

19

20

21

22

23

24

25

26

27

28

07975/2995488.1

EXHIBIT __3__ PAGE 33

-2-

DECLARATION OF MICHAEL T. ZELLER

**EXHIBIT 1**

EXHIBIT  3   PAGE 34

# BINGHAM

RECEIVED
JUN 2 2 2009

Peter N. Villar
Direct Phone:  714.830.0640
Direct Fax:  714.830.0719
peter.villar@bingham.com

June 22, 2009

**Via Hand Delivery**

John Quinn, Esq.
Michael Zeller, Esq.
Quinn, Emanuel, Urqhart, Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543

Re:  Mattel, Inc. v. MGA Entertainment, Inc., et al

Counsel:

Pursuant to the Discovery Master's Order No. 27, enclosed is Omni 808 Investors, LLC's supplemental production of documents (Bates Nos. OMNI0010220-OMNI0010382).  Also enclosed are Vision Capital, LLC's production of documents (Bates Nos. VISION000001-VISION000149).  Finally, Omninet Capital, LLC has no responsive documents beyond those already produced by Omni 808 Investors, LLC.

We are in the process of updating and completing our privilege log and will serve it once it's completed.

Sincerely,

Peter N. Villar

Enclosures

Boston
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Walnut Creek
Washington

Bingham McCutchen LLP
Plaza Tower, 18th Floor
600 Anton Boulevard
Costa Mesa, CA
92626-1924

T 714.830.0600
F 714.830.0700
bingham.com

A/73066426.1

Exhibit 1
Page 3

EXHIBIT ___3___ PAGE 35

# Exhibit 4

1  Bingham McCutchen LLP
   TODD E. GORDINIER (SBN 82200)
2  todd.gordinier@bingham.com
   PETER N. VILLAR (SBN 204038)
3  peter.villar@bingham.com
   CRAIG A. TAGGART (SBN 239168)
4  craig.taggart@bingham.com
   600 Anton Boulevard, 18th Floor
5  Costa Mesa, CA  92626-1924
   Telephone:  714.830.0600
6  Facsimile:  714.830.0700

7  Attorneys for Non-party
   Omni 808 Investors, LLC
8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11  | Carter Bryant, an individual, | Case No. CV 04-9049 SGL (RNBx) |
12  | Plaintiff, | Consolidated with |
13  | v. | Case No. CV 04-09059<br>Case No. CV 05-02727 |
14  | Mattel, Inc., a Delaware Corporation, | Hon. Stephen G. Larson |
15  | Defendant. | **OMNI 808 INVESTORS, LLC'S STATEMENT OF POSITION RE ORDER TO SHOW CAUSE RE APPOINTMENT OF PERMANENT RECEIVER** |
16  |  |  |
17  |  |  |
18  |  | **[DECLARATION OF PETER N. VILLAR FILED CONCURRENTLY** |
19  |  |  |
20  | AND CONSOLIDATED ACTIONS. | Date:               May 18, 2009<br>Time:               2:00pm<br>Place:              Courtroom 1 |
21  |  |  |
22  |  | **Phase 2:** |
23  |  | Discovery Cut-off:        Dec. 11, 2009<br>Pre-trial Conference:    March 1, 2010<br>Trial Date:               March 23, 2010 |
24  |  |  |
25
26
27
28

A/73033920.11

EXHIBIT 4   PAGE 36

1

## <u>TABLE OF CONTENTS</u>

2                                                                                              Page

3    I.    INTRODUCTION ...................................................................................1

4    II.   THE TRANSACTION BY WHICH OMNI STEPPED INTO THE
           POSITION OF WACHOVIA WAS STRAIGHTFORWARD AND
5          ARMS LENGTH .....................................................................................4

6          A.    Wachovia Entered Into A Credit Agreement With MGA In
                 October 2006 ..................................................................................4
7          B.    The Credit Crisis Had A Profound Impact On Wachovia ...................5
           C.    Wachovia Declared MGA In Default In July 2008 ...........................5
8          D.    Wachovia Sought To Assign The MGA Loan......................................5
           E.    Omni Offered To Purchase The Wachovia Loan..................................7
9          F.    Wachovia And Omni Reached Agreement To Transfer Interest
                 In The MGA Loan.............................................................................7
10         G.    The Omni-Wachovia Deal Benefited All Parties Including
                 Mattel.............................................................................................9

11   III.  MR. DURKIN'S REPORT, INSOFAR AS IT PURPORTS TO
           ADDRESS THE OMNI-WACHOVIA TRANSACTION, IS BOTH
12         INCOMPLETE AND INACCURATE .......................................................11

13         A.    Wachovia's Assignment of the $313 Million Senior Bank
                 Credit Facility to Omni Was Not A "Related Party Transaction" .....12
14         B.    Wachovia's Assignment of the $313 Million Senior Bank
                 Credit Facility to Omni Did Not Negatively Impact MGA's
15               "Solvency".....................................................................................16
           C.    There Was Nothing Improper Or Harmful About Omni's $6
16               Million Loan to MGA .....................................................................17
           D.    Mr. Durkin's Analysis of MGA's "Solvency" Is Erroneous ............17
17         E.    Mr. Durkin's Analysis of the "Management of MGA's
                 Finances" Is Erroneous...................................................................19
18
     IV.   THERE IS NO LEGAL BASIS FOR APPOINTING A
19         PERMANENT RECEIVER .....................................................................20

20         A.    There Is No Finding Of Fraud Concerning Any Of The Omni-
                 Related Transactions ......................................................................21
21         B.    The Appointment Of A Permanent Receiver Will Do More
                 Harm Than Good And Is Not The Least Drastic Equitable
22               Remedy..........................................................................................23
           C.    The Court's Proposed Order Would Violate Omni's Contractual
23               Rights As A Secured Creditor And Constitutional Due Process .......24

24   V.    CONCLUSION.......................................................................................25

25

26

27

28

EXHIBIT __4__ PAGE _37_

1

## TABLE OF AUTHORITIES

2

Page(s)

3

### CASES

4   *Bird v. Glacier Elec. Coop., Inc.*
      255 F. 3d 1136 (9th Cir. 2001) ................................................................. 13
5
    *Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
6      509 U.S. 579, 113 S. Ct. 2786 (1993)..................................... 11, 12, 22

7   *Hollywood Healthcare Corp., v. Deltec, Inc.,*
      2004 WL 1118610 (D. Minn. May 17, 2004)..................................... 20
8
    *Jinro America, Inc., v. Secure Investments, Inc.,*
9      266 F.3d 993 (9th Cir. 2001) ................................................................ 13

10  *Kuhmo Tire Co., Ltd. v. Carmichael,*
      526 U.S. 137, 119 S. Ct. 1167 (1999)..................................................... 22
11
    *N.Y. Life Ins. Co. v. Watt West Inv. Corp.,*
12     755 F. Supp. 287 (E.D. Cal. 1991) ....................................................... 20

13  *Rosen v. Siegel,*
      106 F.3d 28 (2d Cir. 1997) ..................................................................... 20
14
    *Saluck v. Rosner,*
15     1999 WL 46620 (E.D. Pa. Jan. 6, 1999).............................................. 20

16  *United States v. Cabrera,*
      222 F.3d 590 (9th Cir. 2000) ................................................................. 13
17
    *Waag v. Hamm,*
18     10 F. Supp. 2d 1191 (D. Colo. 1998)..................................................... 20

19  ### RULES

20  Rule 403 ......................................................................................................... 13

21

22

23

24

25

26

27

28

EXHIBIT __4__ PAGE 38

## I.   INTRODUCTION

The transaction by which Omni 808 Investors, LLC ("Omni") acquired title to the debt obligations owned by a syndicate of financial institutions led by Wachovia Bank, NA ("Wachovia") was, as counsel for Omni represented to the Court, an arms-length business transaction between non-parties to the Mattel-MGA Bratz imbroglio.  Beginning in December 2008, Mattel has embarked on what can only be described as a blitzkrieg of attacks directed at Omni, its principals and its counsel, in fora ranging from this Court to the media, whose clear aim and focused goal has been to bury the actual facts beneath a blizzard of incendiary yet unsupportable allegations.

Contrary to the conclusions of the court-appointed forensic auditor, the Omni-Wachovia transaction was not a related party transaction and did not negatively impact MGA's solvency.  Indeed, as will be demonstrated herein, but for the Omni-Wachovia transaction, MGA almost certainly would have been dismantled and liquidated by Wachovia in the fall of 2008 and Mattel, as an unsecured party with a contingent inchoate claim, would have been left with little or nothing.

On September 3, 2008, Omni and Wachovia entered into a written Master Assignment and Exchange Agreement ("Agreement") whereby Omni acquired all right, title and interest in debt obligations then held by Wachovia, which it had, in turn, acquired in October 2006.[1]  As a result of the Agreement, Omni stepped into and presently stands, as successor-in-interest, in the position of Wachovia under the Senior Bank Credit Facility and has a senior perfected security interest in MGA's assets, including, *inter alia,* MGA's inventory and accounts receivable -- only a fraction of which are Bratz-related products.  Omni's rights are identical to

---

[1]   Other than $21,944.769 that was exchanged for unsecured promissory notes issued by MGA to Wachovia Bank, NA and the other original lenders.

EXHIBIT ___4___ PAGE 37

1    those of Wachovia, it acquired nothing more and nothing less. Omni's secured

2    interest is superior to that of any potential unsecured creditors, including Mattel.

3         As represented to this Court, and demonstrated by the contemporaneous

4    written agreements, this transaction was straightforward and common; nothing

5    about it was or is either "suspicious" or improper. Omni's lawfully acquired

6    security interest is now (just as Wachovia's was in 2006) superior to that of the

7    unsecured creditors, including Mattel. Significantly, for all his purported

8    "suspicions" regarding certain aspects of the Omni transaction (which, as will be

9    detailed herein, have no reasonable factual basis and are not justified in light of the

10    macroeconomic business context in which the transaction occurred), Mr. Durkin's

11    report does not identify a single "fraudulent" act, nor even one violation of any

12    law, regulation or accounting principle.

13         As the largest secured creditor of MGA, Omni's most pressing concern is to

14    protect its investment and to ensure repayment of the loan. Accordingly, Omni's

15    position is as follows:

16        •    Omni does not object to Patrick A. Fraioli, Jr.'s continued

17           engagement for a limited period of time to complete any

18           necessary fact-investigation, to implement any necessary

19           internal controls and/or to marshal assets to protect the rights of

20           Omni and other creditors, and it has so-informed him;

21        •    Omni does not object to and, indeed, would like to proceed to

22           implement the appointment of an independent board of

23           directors to, *inter alia*, develop corporate governance guidelines

24           and procedures for MGA and to provide periodic reports on the

25           financial status of the company;

26        •    Omni objects to the Court's continued appointment of a

27           "receiver" designated with that title as that term is negatively

28           associated in the marketplace with bankruptcy or liquidation

A/73033920.11

2

EXHIBIT ___4___ PAGE 40

1    proceedings, and its continued use would have an unintended

2    negative impact on MGA as respects its customers and

3    suppliers, which in turn will harm Omni and MGA's other

4    creditors. Not only is there no inherent benefit to the continued

5    use of such a term but, as the case law now stands, such an

6    appointment is unjustified under these facts. Omni requests

7    that Mr. Fraioli (or any other person appointed in his capacity)

8    be referred to as a "monitor" or "special master";

9    • Omni is very much opposed to the institution of a bankruptcy

10    proceeding at the present time as it believes such a proceeding

11    to be unwarranted but, by the same token, objects to any order

12    purporting to prevent it from exercising its contractual and

13    constitutional rights as a non-party secured creditor of MGA

14    including, without limitation, its rights to initiate any

15    foreclosure or bankruptcy proceedings should future

16    developments warrant such action; and

17    • Omni objects to any order purporting to grant rights to any

18    other parties or third parties (including Mr. Fraioli) that may

19    infringe Omni's rights as the senior secured creditor including,

20    without limitation, any right to initiate bankruptcy proceedings

21    without Omni's consent.

22    It is critically important for the Court to recognize that Omni is the largest

23    secured creditor of MGA and that its secured interest in MGA's inventory and

24    accounts receivable is not only superior to Mattel's unsecured contingent interest

25    but extends well beyond the Bratz-related products that are the subject of this

26    litigation. Indeed, as Mr. Fraioli can attest, Omni has the largest amount at stake at

27    this point and the most to lose if the current "receivership" is continued indefinitely

28    in its present form, with the possible exception of the equity shareholders of MGA.

A/73033920.11                                    3

EXHIBIT  4   PAGE 41

1     As such, Omni implores the Court to protect its interests and not to take any

2   action to Omni's detriment.  The appointment of a permanent receiver, or even the

3   continued use of the term "receiver," particularly in the context of the toy business

4   that MGA is in, is neither necessary nor appropriate and will almost certainly

5   accomplish nothing more than to kill MGA, which will further Mattel's litigation

6   and competitive goals but will trample due process and contract law in the process.

7   **II.    THE TRANSACTION BY WHICH OMNI STEPPED INTO THE**

8           **POSITION OF WACHOVIA WAS STRAIGHTFORWARD AND**

9           **ARMS LENGTH**

10          It is not possible to evaluate the bona fides of the Omni-Wachovia

11   transaction without first understanding the factual background and the business and

12   economic context in which it occurred.

13          **A.    Wachovia Entered Into A Credit Agreement With MGA In**

14                 **October 2006**

15          In October 2006, MGA Entertainment, Inc. ("MGA") entered into a Credit

16   Agreement with Wachovia, pursuant to which Wachovia provided a senior

17   revolving credit facility to MGA in an aggregate available amount for borrowing

18   up to $400 million (the "Senior Bank Credit Facility").[2]  (Durkin Report at 4; Ex.

19   8.)  The Senior Bank Credit Facility was secured by a senior perfected security

20   interest in all of MGA's inventory and accounts receivable including, *inter alia*,

21   Moxi, Little Tikes and Bratz products.  (Omni understands that Bratz-related

22   revenues are only 15% of projected MGA total revenues for 2009.)  As of

23   December 2006, the principal balance of the Senior Bank Credit Facility was $150

24   million.  (Id.)  As of December 2007, the principal balance of the Senior Bank

25   Credit Facility was $313 million.  (Id.)

26

27   _____
     [2]    The Credit Agreement was amended on or about May 23, 2007 to increase
     the available amount for borrowing from $200 million to $400 million. (Id.)

28

EXHIBIT  4   PAGE 42

1       **B.       The Credit Crisis Had A Profound Impact On Wachovia**

2               Beginning in late 2007 and continuing into 2008, the subprime mortgage

3       crises and their attendant aftereffects had a significant negative impact on the

4       financial section of the U.S. economy generally and on national banking

5       associations like Wachovia in particular.  For example, on April 14, 2008,

6       Wachovia reported a first-quarter loss of approximately $400 million (which at

7       least one analyst called "shocking") accompanied by a 41 percent dividend cut,

8       plans to eliminate 500 jobs, and a move to sell $7 billion worth of stock.  (Villar

9       Decl., Ex. A.)

10              By July 2008, most banks and financial institutions were in turmoil.  On July

11      11, 2008, IndyMac Bancorp Inc. became the second-biggest federally insured

12      financial company to be seized by U.S. regulators after a run by depositors left the

13      company short on cash.  (Villar Decl., Ex. B.)

14      **C.       Wachovia Declared MGA In Default In July 2008**

15              On July 21, 2008, Wachovia declared the Senior Bank Credit Facility to be

16      in default and accelerated the maturity of the outstanding debt obligations owed to

17      Wachovia by MGA, demanding full and immediate payment of the entire unpaid

18      $313 million balance.  (Durkin Report; Ex. 11.)  As characterized by Wachovia,

19      the default was based on, *inter alia,* MGA's failure to achieve an adequate ratio of

20      indebtedness to EBITDA, failure to deliver audited financial statements, failure to

21.     disclose the Smoby transaction in a timely manner, and potential exposure in the

22      Mattel litigation.  (Durkin Report at 5.)

23              In connection with that default letter, Wachovia also "swept" away nearly

24      $26 million in cash then in MGA's bank accounts and notified all of MGA's

25      customers that further payments should be made directly to Wachovia.  (Id.)

26      **D.       Wachovia Sought To Assign The MGA Loan**

27              The business/legal options available to Wachovia were fairly clearly defined

28      and, it is important for the Court to understand, neither unique nor unusual in these

A/73033920.11                                              5

EXHIBIT ___7___ PAGE _23_

1   difficult economic times. Indeed, creditors face them daily. Wachovia had two

2   principal options; its first option was to pursue its available foreclosure remedies,

3.  liquidate MGA and recover as much of the $313 million it was owed as possible.

4   Of course, this option involved significant expense, uncertainty and perhaps most

5   critical from Wachovia's perspective, would take time. Alternatively, Wachovia

6   could achieve immediate and badly needed relief for its balance sheet and at the

7   same time receive an infusion of cash, while simultaneously eliminating the

8   expense and uncertainty of pursuing foreclosure/bankruptcy, if it could sell the

9   debt to a third party for a percentage of its face value.

10        MGA was, of course, facing a similarly dire set of alternatives. If it could

11  not find someone willing to purchase the debt from Wachovia it was facing near

12  certain extinction since all of its available cash had been swept away and all future

13  revenue (including sales having nothing whatsoever to do with Bratz) would go

14  directly to Wachovia.

15        For that purpose it engaged a consultant, Tom Allison, Executive Vice

16  President, Senior Managing Director of a prominent financial services firm,

17  Mesirow Financial Consulting LLC, who apparently shopped the transaction to

18  prospective lenders including, without limitation, Bank of Ireland, Cerberus and

19. Silverpoint. (See Durkin Interview Notes, Ex. 14, DFR 14-001.) However, the

20  timing and exigent circumstances made a deal with these institutions unworkable.

21. (Id.) Mr. Allison also suggested that MGA consider filing bankruptcy "since

22  Wachovia wouldn't budge on the repayment amount." (Id.)

23        Mr. Allison eventually approached Neil Kadisha, the Managing Partner of a

24  diversified investment firm, Omninet Capital, LLC. Mr. Kadisha and Omninet

25  Capital, LLC have substantial experience evaluating and investing in distressed

26  debt and distressed companies. Mr. Kadisha considered the proposal, evaluated

27  the risk/reward profile, reviewed available information and developed a proposal

28  which he presented to Wachovia. (Durkin Report at 5, Ex. 14, DFI 14-015-016.)

A/73033920.11                                       6

EXHIBIT ___4___ PAGE _44_

1       Pointedly, as indicated in Mr. Durkin's interview notes, Mr. Larian told Mr.

2    Durkin that MGA's consultant presented this opportunity to several institutional

3    lenders <u>before</u> contacting Mr. Kadisha. Why Mr. Durkin omits these material facts

4    from his report and, instead, misleadingly states that in "addressing this financial

5    situation," Mr. Larian "sought the assistance" <u>only</u> of Mr. Kadisha, a fellow

6    member of "the Persian community" is unclear but telling. (Durkin Report at 5.)

7       **E.**    **Omni Offered To Purchase The Wachovia Loan**

8       On July 29, 2008, Mr. Kadisha made an offer to acquire the Senior Bank

9    Credit Facility, including the outstanding debt obligations from Wachovia for

10   approximately $110 million (representing 35% of the $313 million principal

11   amount of the debt obligations outstanding as of the acceleration date).

12      There was and is nothing either unusual or improper about banks agreeing to

13   sell assets at a steep discount (including debt obligations they carry on their

14   balance sheet at face value) when the realization of 100% of face value is in

15   substantial doubt. That has always been true (although to read his report one

16   would conclude that this comes as news to Mr. Durkin) and was nowhere more

17   common than in 2008 when so many financial institutions badly needed cash.

18      Indeed, on the same day that Mr. Kadisha made his initial offer, it was

19   reported that Merrill Lynch agreed to sell $30.6 billion of subprime mortgage-

20   related assets for $6.7 billion -- approximately 20 cents on the dollar. Lest the

21   Court doubt the relevance of that transaction to Wachovia, financial expert, Jim

22   Cramer, opined on that date that Merrill's "fire sale" could "pave the way for other

23   financially plagued institutions such as Citigroup, Wachovia, and Washington

24   Mutual" to use a similar approach to "save themselves." (Villar Decl., Ex. C.)

25      **F.**    **Wachovia And Omni Reached Agreement To Transfer Interest In**

26          **The MGA Loan**

27      As counsel for Omni has represented to the Court, the Omni-Wachovia

28   transaction was heavily negotiated, albeit in a compressed time frame given the

A/73033920.11             7

EXHIBIT _4_ PAGE _45_

1    exigent circumstances,[3] by Davis Polk on behalf of Wachovia and Bingham

2    McCutchen on behalf of Omni.  An agreement was negotiated and the transaction

3    was entered into on September 3, 2008.  (Durkin Report at 5-6, Ex. 12.)

4          A special purpose entity, Omni 808 Investors, LLC, a California limited

5    liability company, was created for the acquisition.  (Id.)  The formation of a special

6    purpose entity is very common for these types of transactions and is neither

7    suspicious nor improper.  The Omni members entered into a Limited Liability

8    Company Agreement.  (Id.; Ex. 16.)  As amended, the Omni members will forfeit

9    their interest if they attempt to transfer their interest.

10         As represented to the Court, the Omni members invested $50 million and did

11    so with the hope and expectation of making a profit on their investment.  (Durkin

12    Report at 6; Ex. 14, DFR 14-018.)  The owners of Omni, Neil Kadisha ($15

13    million), Benjamin Nazarian ($10 million), Leon Neman ($10 million), David

14    Nazarian ($5 million), and Joseph Moinian ($10 million) are all successful and

15    experienced businessman in their own right and have made this investment, as

16    represented to the Court on February 11, with the intention of taking advantage of

17    a perceived business opportunity that was presented to Mr. Kadisha and with the

18    hope and expectation of making a profit in the process.[4]

19         Given Omni's desire for leverage, the impossibly tight credit market for

20    financing, the compressed time schedule, and the belief that it should maximize

21    MGA's incentive and ability to repay the debt, Omni asked IGWT 826 Investment,

22    ———————————

      [3]    Since MGA had no cash and no prospect of future revenue in the wake of

23    Wachovia's decision to institute foreclosure either a transaction had to be
    consummated or Wachovia would continue to liquidate MGA to satisfy the debt.

24    [4]    Mr. Kadisha has purchased Mr. Gozini's interest in Omni.  Mr. Durkin's

25    assertion that Mr. Larian invested any money in Omni or bought out Mr. Gozini
    based on email traffic to which Omni was not a party was, as he conceded,

26    speculation.  There was never any basis for it.  Mr. Larian does not now and never
    has had any interest in or ability to control Omni and the pages spent in Mr.

27    Durkin's report engaging in such musing, without bothering to circle back with
    Mr. Kadisha to ask what actually occurred, is telling.

28

A/73033920.11                   8

EXHIBIT __4__ PAGE __46__

1  LLC ("IGWT") to finance the remaining amount needed to acquire the debt. (Id.

2  at 6; Ex. 14, DFI -016.) There was and is nothing either improper or suspicious

3  about this and Mr. Durkin did not and cannot cite any accounting or regulatory

4  problem with the transaction as structured. Neither MGA, nor Mr. Larian, nor

5  IGWT, or indeed anybody but the members listed in the Omni Operating

6  Agreement, have any ownership in or ability to control Omni. (Id. at 6; Ex. 14,

7  DFI 14-002; Ex. 16.)[5]

8      **G.    The Omni-Wachovia Deal Benefited All Parties Including Mattel**

9          As a result of the Omni-Wachovia transaction, MGA not only got back the

10  nearly $26 million in cash that Wachovia had seized but also received an interest

11  "holiday" of six months intended to give it breathing room to get back on its feet

12  and move forward.[6] (Durkin Report, Ex. 14, DFI 14-003.)

13          As Wachovia no doubt had foreseen, it did not have either the time or capital

14  to finish the foreclosure it had embarked on in July 2008. Rather, it needed to

15  position itself as a viable acquisition target and before the month of September was

16  over it would have no choice. On September 26, 2008, Wachovia's stock price

17  plunged 27 percent due to the U.S. government's seizure of Washington Mutual

18  the previous night. (Villar Decl., Ex. D.) On September 29, 2008, the FDIC

19  announced that Citigroup would acquire Wachovia's banking operations. On

20  October 3, 2008, Wells Fargo announced that it would acquire Wachovia for $15

21  billion ($7 per share), nullifying the Citigroup deal. On October 22, 2008,

22  Wachovia reported a staggering third-quarter loss of nearly $24 billion, then a

23

24  [5]    Notably, Mr. Durkin's report, at a minimum, puts to rest Mattel's previous
      repeated, baseless accusations that MGA or Larian had an "ownership interest" in
25  Omni. It also puts to rest Mattel's prior unsupported assertion that MGA or Larian
      are "affiliates" of Omni, based on Mattel's misinterpretation of certain Wachovia
26  documents deliberately taken out of context.

27  [6]    The interest during this six-month period was not forgiven by Omni. The
      accrued interest during this period was added to the principal obligation.

28

A/73033920.11                                   9

EXHIBIT __4__ PAGE __43__

1    record quarterly deficit for a banking company in the global credit crisis. (Villar

2    Decl., Ex. E.)

3         Nor was that the last macroeconomic shock to impact MGA or the Omni-

4    Wachovia transaction. In September 2008, MGA engaged Goldman Sachs to help

5    it pursue alternative financing or restructuring alternatives, but the spiraling credit

6    crisis effectively froze not only the M&A market but imperiled Goldman Sachs

7    itself and no such transaction could be consummated. Omni has no idea why Mr.

8    Durkin did not bring this to the Court's attention.

9         By the end of 2008, the subprime mortgage crisis had inflicted severe

10   damage on banks and other financial institutions resulting in a global credit crisis

11   that is still far from resolved. The five largest U.S. investment banks either went

12   bankrupt (Lehman Brothers), were taken over by other companies (Bear Stearns

13   and Merrill Lynch), or were bailed-out by the U.S. government (Goldman Sachs

14   and Morgan Stanley).[7]

15        In sum, the Omni-Wachovia transaction was NOT, in any sense, intended to

16   evade any Court Order in this action or, indeed, driven by anything in this action at

17   all. It was driven entirely by Wachovia's decision on July 21, 2008 to foreclose on

18   the debt which, in turn, was no doubt impelled at least in part by its own internal

19   issues but which in any event had nothing to do with Omni. Moreover, had Mr.

20   Kadisha and Omni not stepped in to consummate the Omni-Wachovia transaction,

21   MGA would have been dismantled and liquidated in 2008. As a potential

22   judgment creditor, Mattel is far better off as a result of the transaction unless, of

23   course, Mattel's real objective is to drive MGA out of business.

24

25

26   ───────────────
     [7]     It was these subsequent events that necessitated MGA approaching Omni for
27   a further cash loan of $6 million.

28

A/73033920.11                           10

**III.   MR. DURKIN'S REPORT, INSOFAR AS IT PURPORTS TO ADDRESS THE OMNI-WACHOVIA TRANSACTION, IS BOTH INCOMPLETE AND INACCURATE**

In this section, Omni will, as requested by the Court in its April 27, 2009 Order, respond to Mr. Durkin's report to the extent that he purports to characterize its involvement in this matter.[8] Omni has no knowledge of, nor involvement with, many of the issues and events referenced in Mr. Durkin's report and cannot comment on their veracity or significance.

Omni assumes, and fervently hopes and believes, that the Court asked Mr. Durkin to present a balanced and objective report based on accepted accounting principles. Regrettably, that is not what was produced. Mr. Durkin's analysis, at least as it relates to the Omni-Wachovia transaction, is at best sloppy, includes serious errors both of omission and commission and, in some instances, is simply irresponsible.

Omni and its counsel know Mr. Durkin's extensive background as a party plaintiff on occasion and as an advocate as well, and he is far too experienced to mistake the report that was produced for a balanced presentation, and we trust the Court will not do so either. Mr. Durkin's report is a polemic, it is a piece of advocacy which this Court would never admit as work product professing to be an objective expert report if it knew what actually occurred. This Court and the parties deserved much better; *Daubert* requires much more. *Daubert v. Merrell*

---

[8]      In its Order dated April 27, 2009, the Court granted Omni's motion to intervene for the limited purpose of addressing the receivership issues. The Court also stated that it "will consider whether, as counsel for Omni 808 represented to this Court, 'Omni's purchase of the Senior Bank Credit Facility from Wachovia was a straightforward, arm's-length business deal between non-parties to this action,' or whether, as counsel for Mattel contends, the purchase was by entities formed for the 'improper purpose of attempting to leapfrog over Mattel's claims and shield their assets from creditors and other rights-holders such as Mattel.'"

EXHIBIT __4__ PAGE __49__

1     *Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786 (1993).[9]

2         **A.**    **Wachovia's Assignment of the $313 Million Senior Bank Credit**

3                **Facility to Omni Was <u>Not</u> A "Related Party Transaction"**

4         Mr. Durkin asserts that "It appears from the evidence that MGAEI has

5   regularly engaged in related party transactions" and of those that "most impact

6   MGAEI's solvency" the first transaction that he lists at page 4 of his report is

7   Omni's purchase of the $313 million Wachovia loan. (Durkin Report at 4.)

8   Contrary to Mr. Durkin's assertion, not only was this <u>not</u> a "related party

9   transaction" but, perhaps more importantly, it did not negatively impact MGA's

10   solvency.

11        Wachovia's assignment of the $313 million Senior Bank Credit Facility to

12   Omni was not a "related party transaction." There is simply no evidence that the

13   purchaser, Omni, and the seller, Wachovia, are or ever were <u>related parties</u> in any

14   sense. Omni is owned by the signatories to its Operating Agreement and Mr.

15   Durkin offers no explanation for why that document should be ignored. It is, in

16   fact, unfortunate that for all of his "suspicions" that Mr. Durkin declined to provide

17   the Court with a definition of a related party transaction, which is found, *inter alia*,

18   at FASB Statement No. 57. (Villar Decl., Ex. F.) Had he done so, it would be

19   abundantly clear that the Omni-Wachovia transaction cannot be categorized as a

20   related party transaction.

21        Further, the fact that a portion of the proceeds used by Omni to purchase the

22   Senior Bank Credit Facility from Wachovia came from a loan from IGWT (a

23

24   ――――――――――――――――――
    [9]     Omni understands that Mr. Durkin has been paid by Mattel for his

25   investigation and report, which, if true, alone raises questions about his objectivity.
  Omni has no idea what communications Mr. Durkin had with Mattel or what

26   materials were supplied to him by Mattel. Moreover, the terms of this Court's
  Orders regarding this matter did not permit Omni to have an independent expert

27   review the report at all. Omni hereby objects to the report on these grounds and
  urges that the Court Order is sealed and inadmissible for any purpose going

28   forward.

EXHIBIT __4__ PAGE __50__

1  Larian-affiliated entity), does not make the Wachovia-Omni deal a "related party

2  transaction." Nor does Mr. Durkin contend that IGWT's loan to Omni was

3  improper. Neither Mr. Durkin nor Mattel has identified <u>any</u> legal or accounting

4  issue with the IGWT loan.

5      Indeed, at the March 4, 2009 hearing, the Discovery Master correctly

6  questioned why it even <u>mattered</u> "whether the debt is owned by Wachovia or Isaac

7  Larian or anybody else ...." (March 4, 2009 Hearing Trans. at 31.) Mattel's

8  counsel acknowledged that "if Isaac Larian came in and bought up the $300

9  million in debt and paid $100 million for it, the -- certainly that is -- that would be

10  a transaction that would potentially be permissible if, of course, it were aboveboard

11  and everything else ...." (<u>Id.</u> at 32-33.) There is no evidence nor finding by Mr.

12  Durkin, nor could there be, that IGWT's loan to Omni was in any way improper.

13      Nor does the fact that Mr. Larian and Mr. Kadisha previously knew each

14  other and share a common Persian/Jewish heritage make the Wachovia-Omni deal

15  a "related party transaction." In fact, this "personal relationship" between Mr.

16  Larian and Mr. Kadisha would not even make the <u>IGWT-Omni loan agreement</u> a

17  "related party transaction" under the applicable accounting literature. Nor is there

18  anything wrong with Mr. Larian's broker presenting this opportunity to an

19  acquaintance. The manner in which Mr. Kadisha's relationship with Mr. Larian is

20  presented in the report is, unfortunately, very telling nonetheless. [10]

21  _____

[10]  Most troubling is that Mr. Durkin felt this to be probative of anything at all.
22  Is he of the view that this common heritage makes Mr. Kadisha more likely to act
    contrary to his own interests or to do something via third-parties that he wouldn't
23  otherwise do? It is, at best, unprofessional, and at worst, evidence of an improper
    cultural bias. <i>See Jinro America, Inc., v. Secure Investments, Inc.,</i> 266 F.3d 993,
24  1006 (9th Cir. 2001) (expert testimony that is "so tinged with ethnic bias and
    stereotyping" should be excluded under Rule 403); <i>Bird v. Glacier Elec. Coop.,</i>
25  <i>Inc.</i> 255 F. 3d 1136, 1151 (9th Cir. 2001) (racial stereotyping is not condoned in
    civil cases); <i>United States v. Cabrera,</i> 222 F.3d 590, 594 (9th Cir. 2000) ("appeals
26  to racial, ethnic, or religious prejudice during the course of a trial violate a
    defendant's Fifth Amendment right to a fair trial."). Just imagine, for example, the
27  phrase "Persian community" substituted with "black community" or any similar
    such irrelevant but charged identifying term. The tone itself is compelling proof
28                                                    (Footnote Continued on Next Page.)

A/73033920.11                          13

1    Curiously, Mr. Durkin's report neglects to inform the Court, as he was told

2   by Mr. Kadisha, that Mr. Kadisha actually had more contact with Mattel's CEO,

3   Bob Eckert, through common business organizations than he did with Mr. Larian,

4   and had hoped to act as a go-between to help the parties resolve their business

5   differences. (Cf. Durkin Report, Ex. 14, DFI 14-017.)

6    Mr. Durkin spends several pages of his report speculating about the meaning

7   of emails Mr. Larian sent to various investors which he deems "suspicious." First,

8   Omni was not a party to any such discussions, and no purpose is served by further

9   speculation. However, the evidentiary support which Mr. Durkin was charged

10   with adducing does not, apparently, include notifying the Court that the terms of

11   the Operating Agreement for Omni and the proceeds of the investors provides no

12   indication that either MGA or Mr. Larian has any interest in or ability to control

13   the business of Omni (and the Operating Agreement, as amended, provides that

14   any alienation by a member operates to forfeit his interest in Omni).

15    Indeed, Mr. Kadisha told Mr. Durkin that he was unaware of any "buy-back"

16.   agreement and, as explained above, at least with respect to Mr. Gozini, Mr.

17   Durkin's "suspicions" were untrue. Mr. Larian did not buy back Mr. Gozini's

18   interest and, in fact, it was Mr. Kadisha who has done so. That is why "suspicion"

19   doesn't constitute evidence either in a court of law or in the accounting literature.

20   Mr. Durkin never bothered to ask Mr. Kadisha about the emails he finds so

21   suspicious or, indeed, what Mr. Gozini's current position is. More fundamentally,

22   Mr. Durkin nowhere explains how any such buy back agreements would either

23   have been improper or negatively affected MGA, let alone Mattel.

24    Mr. Durkin also suggests, without citing any legal, regulatory or accounting

25   (Footnote Continued from Previous Page.)

26   that Mr. Durkin had no intention of providing an "objective" report to the Court.

27   The Report is replete with speculative "conclusions" that fall far outside the
     province of a CPA to express a proper opinion on.

28

EXHIBIT ___4___ PAGE _52_

1   principle, that there was something "suspicious" about the fact that Omni

2   purchased the $313 million obligation for a significant discount.  However, as

3   explained above, such transactions are not uncommon -- particularly in this credit

4   market.  In fact, at about the same time, Merrill Lynch agreed to sell $30.6 billion

5   of subprime mortgage-related assets for $6.7 billion, approximately 20 cents on the

6   dollar.

7        The decision to sell was made by Wachovia for what it presumably believed

8   was a fair price and to serve its best business interests and there can be no doubt it

9   would enter into the identical transaction today.  Although nowhere referenced in

10  Mr. Durkin's report, the admittedly brief overview of the business context in which

11  Wachovia made its decision to sell, offered herein, provides the clearest

12  explanation for why it chose to take the certainty of immediate cash, albeit at a

13  discount, rather than deal with the inherent expense or uncertainty of

14  bankruptcy/foreclosure proceedings.

15       Significantly, Mattel has never even <u>alleged</u> that the Omni-Wachovia

16  transaction was improper or unlawful.  As the Discovery Master correctly stated in

17  his May 6, 2009 Order, "**Mattel does not contend, and has presented no**

18  **evidence, that the purchase of that debt was in any way collusive or**

19  **fraudulent as between Wachovia and the Financing Entities.**"  (Phase 2

20  Discovery Master Order No. 27 at 5, fn 3.)[11]

21

22

23  _____
    [11]     In what can only be construed as an attempt to attack Mr. Kadisha's
24  credibility, Mr. Durkin claims that Mr. Kadisha's alleged statement that "he had no
    investments with Mr. Larian," somehow conflicts with evidence that Larian
25  invested in Omninet Biofuels II LP.  (Durkin Report at 10.)  That gratuitous
    "observation" is not only unnecessary but it is simply erroneous.  The fact that
26  Larian made an investment in an entity managed by a partner of Mr. Kadisha (in
    which Mr. Kadisha also invested but had no management or other role) is neither
27  inconsistent with Mr. Kadisha's truthful statement that he had no investments with
    Mr. Larian nor does it relate to MGA's solvency.  If he is going to discuss it at all,
28  the least Mr. Durkin could have done was correctly describe it.

EXHIBIT ___4___ PAGE 53

1         **B.**    **Wachovia's Assignment of the $313 Million Senior Bank Credit**

2               **Facility to Omni Did <u>Not</u> Negatively Impact MGA's "Solvency"**

3         Mr. Durkin's conclusion that the Wachovia-Omni transaction impacted

4 "MGAEI's solvency and ability to continue conducting operations" is simply

5 wrong. As a matter of basic accounting, the Wachovia loan had exactly <u>zero</u> <u>effect</u>

6 on the "solvency" of MGA. Wachovia extended a line of credit to MGA in the

7 sum of $400 million. MGA borrowed $313 million. The only impact of the Omni-

8 Wachovia transactions on MGA's balance sheet was to change the identity of the

9 creditor from Wachovia to Omni.

10         Mr. Durkin fails to acknowledge that Wachovia's assignment of the debt

11 obligation to Omni, if anything, <u>improved</u> MGA's solvency and liquidity situation.

12 Before the assignment, Wachovia had "called the note ... swept $25.8 million in

13 cash from MGAEI's bank accounts and notified MGAEI's customers that all

14 payments should be made to Wachovia." (Durkin Report at 4-5.) As a result of

15 the Omni-Wachovia transaction, MGA not only got back the nearly $26 million in

16 cash that Wachovia had seized but also received an interest "holiday" of six

17 months intended to give it breathing room to get back on its feet and move

18 forward. (<u>Id.</u>; Ex. 14, DFI 14-003.) Had Omni not gotten involved, MGA would

19 have been liquidated, gone bankrupt and Wachovia would have obtained all of its

20 assets. Mattel likely would have gotten nothing and certainly would be in worse

21 position than it is now.

22         In the same vein, Mattel's often-repeated allegation that Mr. Kadisha and his

23 colleagues "gifted" their $50 million and do not expect to be repaid is <u>utterly</u>

24 baseless and there is absolutely <u>no</u> evidence that any such "agreement" exists. In

25 fact, both Mr. Durkin's report and interview notes clearly demonstrate that Omni

26 expects to be repaid and expects to make a profit -- and there is <u>no evidence</u> to

27 suggest otherwise. (Durkin Report at 6-7, 17-18, Ex. 14, DFI 14-018.) Incredibly,

28 Mr. Durkin seems to accept the fact that Omni expects repayment in his analysis of

A/73033920.11             16

EXHIBIT ___4___ PAGE 54

1   MGA's "solvency," yet he fails to refute Mattel's baseless allegation (which is a

2   principal basis of its request for a receiver) anywhere in his report.

3          This Court does not and should not have to check its common sense at the

4   door; there is no reason to believe the Omni-Wachovia transaction is anything

5   other than what all the related documents, i.e., evidence, establish that it is, a

6   straightforward, arms-length transaction.

7          **C.    There Was Nothing Improper Or Harmful About Omni's $6**

8                  **Million Loan to MGA**

9          Mr. Durkin also references Omni's loan of $6 million to MGA separate and

10  apart from the original Wachovia transaction. Mr. Durkin correctly indicates that

11  the funds for this loan were provided by IGWT. However, Mr. Durkin does not

12  suggest any manner in which he feels that there was anything improper about this

13  loan beyond his amorphous feeling that it is somehow "suspicious." He doesn't

14  even opine how this loan hypothetically could be improper. Principals of private

15  close corporations often make loans to their companies, and the 9% interest rate

16  was the same rate charged by Wachovia.

17         More importantly, and directly contrary to Mr. Durkin's statement, this loan

18  did not negatively effect MGA's solvency. The amount of cash into the company

19  (+$6 million) was exactly equal to the amount of debt reported on its balance sheet

20  (-$6 million). Most pertinently, it would seem, this entire matter directly

21  undercuts, indeed it contradicts, the premise behind Mattel's allegations and the

22  Court's concerns about MGA's finances. Mr. Larian seems to be INJECTING

23  MONEY INTO MGA, not removing it or otherwise improperly draining MGA of

24  its operating capital.

25         **D.    Mr. Durkin's Analysis of MGA's "Solvency" Is Erroneous**

26         Mr. Durkin asserts that "MGAEI appears to be insolvent and has been so for

27  some time." (Durkin Report at 15.) Mr. Durkin bases his conclusion on his

28  application of the balance sheet test, the capital test and the cash flow test. (Id.)

A/73033920.11                                    17

EXHIBIT ___4___ PAGE 55

1   Since Omni has not had an opportunity to conduct its own investigation and

2   analysis, Omni cannot comment on MGA's solvency. However, Mr. Durkin's

3   application of the three tests is erroneous, on its face, at least as far as they relate to

4   Omni.

5           Mr. Durkin asserts that there are "a number of transfers, transactions and

6   obligations, which appear to have caused MGAEI's insolvency" including, *inter*

7   *alia*, Wachovia's assignment of the $313 million Senior Bank Credit Facility to

8   Omni and Omni's $6 million loan to MGA. (Id.)

9           As an initial matter, it is important to note that for the purposes of analyzing

10  the "related party transactions," Mr. Durkin questions the validity of these loans,

11  but for purposes of analyzing MGA's "solvency," Mr. Durkin assumes they are

12  perfectly legitimate and require repayment. Aside from this internal inconsistency,

13  as explained above, as a matter of basic accounting, these loans did not affect

14  MGA's solvency.

15          Moreover, Mr. Durkin's application of the cash flow test fails to take into

16  account the positive impact of Wachovia's assignment of the Senior Bank Credit

17  Facility to Omni on MGA's cash flow. Mr. Durkin acknowledges that, in July

18  2008, Wachovia "called the note ... swept $25.8 million in cash from MGAEI's

19  bank accounts and notified MGAEI's customers that all payments should be made

20  to Wachovia." Wachovia's actions caused a liquidity crisis at MGA, placing in

21  question MGA's ability to continue as a going concern. The Omni transaction

22  effectively saved MGA by infusing much needed liquidity and increasing MGA's

23  cash flows. Mr. Durkin's report, however, fails to point out that, as a result of the

24  Omni transaction, MGA not only got back the nearly $26 million in cash that

25  Wachovia had seized but also received an interest "holiday" of six months

26  intended to give it breathing room to get back on its feet and move forward.

27

28

A/73033920.11                                   18

EXHIBIT __4__ PAGE 56

1  **E.     Mr. Durkin's Analysis of the "Management of MGA's Finances"**
2  **Is Erroneous**

3       In discussing this final aspect of MGA's finances, Mr. Durkin briefly
4  addresses the Omni transactions. Mr. Durkin starts this subsection by stating, "As
5  discussed above, MGAEI's transactions with Omni 808 may have damaged
6  MGAEI and its creditors." (Durkin Report at 26.) However, curiously, there is <u>no</u>
7  <u>prior discussion</u> in the report about how MGA's transactions with Omni may have
8  "damaged" MGA, and certainly not its creditors. In fact, as explained above,
9  Wachovia's assignment of the $313 million Senior Bank Credit Facility to Omni
10 and Omni's $6 million loan to MGA had no negative effect on MGA or its
11 creditors. To the contrary, it likely was MGA's only chance to survive.

12       Mr. Durkin then states, "The Larian Parties' loan to Omni 808 of $60
13 million for Omni 808's use in purchasing the Wachovia Loan, coupled with the $6
14 million loan to MGAEI through Omni 808, raises serious questions regarding
15 management decisions by Mr. Larian." (<u>Id.</u>) Mr. Durkin fails to articulate
16 anywhere in his report what those purported "serious questions" may be. Mr.
17 Durkin has failed to cite a <u>single violation</u> of any law, regulation or accounting
18 principle in connection with these loans, and he cannot do so because they were
19 entirely proper and intended to assist MGA. That is certainly why his report does
20 not even attempt to show any nexus between those transactions and any harm to
21 MGA. Moreover, under the dire circumstances MGA was facing, these
22 transactions demonstrated not only sound management decisions by Mr. Larian but
23 a willingness to put money <u>into</u> the enterprise rather than remove it. The very best
24 one can say about Mr. Durkin's recitation of these circumstances is that he utterly
25 ignores the actual agreements, relevant accounting principles and the relevant
26 macroeconomic background and business context in which the transactions
27 occurred.

28       Mr. Durkin then repeats his unsupported suspicions regarding Larian's

A/73033920.11                                    19

EXHIBIT __4__ PAGE 52

1   alleged "buy back" agreements with various Omni investors. He claims that these

2   alleged agreements raise unspecified "suspicions," but he fails to explain how Mr.

3   Larian's alleged agreements with these investors were improper or, more

4   importantly, how they had any negative effect on MGA's finances. According to

5   Mr. Durkin, these were potential agreements between Mr. Larian personally and

6   certain investors that did not involve MGA or its funds. In fact, Mr. Durkin

7   expressly found that there were no improper transfers of MGA funds. (Durkin

8   Report at 3.) Mr. Durkin thoroughly investigated these matters for more than three

9   months, reviewed thousands of documents and interviewed dozens of witnesses

10  and yet found no acts of wrongdoing.

11  **IV.   THERE IS NO LEGAL BASIS FOR APPOINTING A PERMANENT**

12  **RECEIVER**

13          "The appointment of a receiver is considered to be an **extraordinary**

14  **remedy**, and should be employed cautiously and granted **only when clearly**

15  **necessary** to protect plaintiff's interest in the property." *Rosen v. Siegel*, 106 F.3d

16  28, 34 (2d Cir. 1997) (emphasis added). "A receiver is an extraordinary equitable

17  remedy that is only justified in extreme situations. *Hollywood Healthcare Corp.*,

18  *v. Deltec, Inc.*, 2004 WL 1118610, at *10 (D. Minn. May 17, 2004) (emphasis

19  added); *see also Waag v. Hamm*, 10 F. Supp. 2d 1191, 1193 (D. Colo. 1998).

20  Moreover, "the appointment of a receivership of a solvent corporation is a drastic

21  remedy." *Saluck v. Rosner*, 1999 WL 46620, at *2 (E.D. Pa. Jan. 6, 1999).

22          Additionally, courts impose a heavy burden of a party seeking appointment

23  of a receiver and look to a number of factors, including, *inter alia*, a finding of

24  fraudulent conduct that will impair plaintiff's interests; the probability that harm to

25  plaintiff by denial of appointment would outweigh injury to parties opposing

26  appointment; imminent danger of property being lost, impaired or destroyed; the

27  lack of a less drastic equitable remedy; and the likelihood that appointment of a

28  receiver will do more harm than good. *See N.Y. Life Ins. Co. v. Watt West Inv.*

EXHIBIT __4__ PAGE __50__

1    *Corp.*, 755 F. Supp. 287, 292 (E.D. Cal. 1991); *Waag*, 10 F. Supp. 2d at 1193.

2    Since none of these factors weigh in Mattel's favor of appointing a permanent

3    receiver, its application for the appointment of a receiver should be denied.

   **A.    There Is No Finding Of Fraud Concerning Any Of The Omni-
       Related Transactions**

6        Mr. Durkin conducted an investigation of, *inter alia*, the Omni-related

7    transactions that lasted three months. He claims to have reviewed thousands of

8    documents, including all agreements and correspondence between the parties, and

9    interviewed dozens of percipient witnesses. Having now completed his

10   investigation, without citing to a <u>single</u> "fraudulent" act or violation of any law,

11   regulation or accounting principle, he nonetheless recommended that the Court

12   appoint a permanent receiver.

13       Mr. Durkin's purported "suspicions" regarding certain aspects of the Omni

14   transactions are solely based on his admitted speculation and are neither reasonable

15   nor justified within the macroeconomic business context in which the transactions

16   occurred -- which is entirely ignored in Mr. Durkin's report. As explained in detail

17   above, the most fundamental premises of Mr. Durkin's report, at least as they

18   relate to Omni, are fatally flawed.

19       Perhaps most glaring is Mr. Durkin's repeated erroneous assertion that

20   Wachovia's assignment of the $313 Senior Bank Credit Facility to Omni was a

21   "related party transaction" that negatively impacted "MGAEI's solvency."

22   Contrary to Mr. Durkin's statements, there is simply no evidence that the

23   purchaser, Omni, and the seller, Wachovia, are or ever were related parties in any

24   sense. <u>See</u> FASB Statement No. 57.

25       Not only was this not a "related party transaction" but, perhaps more

26   importantly, it did not negatively impact MGA's solvency. As a matter of basic

27   accounting, the Wachovia loan had exactly <u>zero effect</u> on the "solvency" of MGA.

28   Wachovia extended a line of credit to MGA in the sum of $400 million. MGA

A/73033920.11                              21

EXHIBIT __4__ PAGE _59_

1  borrowed $313 million. The only impact of the Omni-Wachovia transactions on

2  MGA's balance sheet was to change the identity of the creditor from Wachovia to

3  Omni.

4        Mr. Durkin also fails to acknowledge that Wachovia's assignment of the

5  debt obligation to Omni, if anything, improved MGA's solvency and liquidity

6  situation. Before the assignment, Wachovia had "called the note … swept $25.8

7  million in cash from MGAEI's bank accounts and notified MGAEI's customers

8  that all payments should be made to Wachovia." (Durkin Report at 4-5.) As a

9  result of the Omni-Wachovia transaction, MGA not only got back the nearly $26

10  million in cash that Wachovia had seized but also received an interest "holiday" of

11  six months intended to give it breathing room to get back on its feet and move

12  forward. (Id.; Ex. 14, DFI 14-003.) Had Omni not gotten involved, MGA would

13  have been liquidated, gone bankrupt and Wachovia would have obtained all of its

14  assets. Mattel likely would have gotten nothing and certainly would be in worse

15  position than it is now.

16        Additionally, as demonstrated above, the fact that IGWT made a loan to

17  Omni does not make the Wachovia-Omni deal a "related party transaction." Nor

18  does Mr. Durkin contend that IGWT's loan to Omni was fraudulent or otherwise

19  improper or harmful. Neither Mr. Durkin nor Mattel has identified any legal or

20  accounting issue with the IGWT loan.

21        Because Mr. Durkin has made no finding of fraudulent or wrongful conduct,

22  and since his analysis regarding the "related party transactions," MGA's

23  "solvency" and "management of MGA's finances" is fundamentally flawed, his

24  recommendation to appoint a receiver cannot be relied upon. See Daubert v.

25  Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597, 113 S. Ct. 2786 (1993);

26  Kuhmo Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141, 152, 119 S. Ct. 1167

27  (1999) (holding that the objective of Daubert's "gatekeeping requirement" is "to

28  ensure the reliability and relevancy of expert testimony" and "to make certain that

A/73033920.11            22

EXHIBIT  4  PAGE 60

1    an expert, whether basing testimony upon professional studies or personal

2    experience, employs in the courtroom the same level of intellectual rigor that

3    characterizes the practice of an expert in the relevant field.").

4         Mr. Durkin's ill-concealed advocacy piece is certainly the posture he is most

5    comfortable with, and with which he has considerable experience, but serves only

6    Mattel's purposes here; it does not begin to constitute a balanced, objective report

7    to this Court.  Indeed, he does not even pretend to consider the legitimate concerns

8    raised by Omni, the largest and only secured creditor of MGA, or its members

9    who, as represented to this Court on February 11 and corroborated by Mr. Durkin,

10   have invested $50 million dollars and have lawfully assumed the debt position first

11   held by Wachovia in 2006.

12        **B.      The Appointment Of A Permanent Receiver Will Do More Harm**

13                  **Than Good And Is Not The Least Drastic Equitable Remedy**

14        The appointment of a permanent receiver, particularly in the context of the

15   toy business that MGA is in, will almost certainly accomplish nothing more than to

16   kill MGA, which will certainly advance Mattel's litigation and competitive goals

17   but will trample due process and contract law in the process.  Omni has proposed a

18   less drastic equitable remedy that will both protect creditors and allow MGA to

19   continue to operate efficiently.

20        As explained above, Omni does not object to Patrick A. Fraioli, Jr.'s

21   continued engagement for a limited period of time to complete any necessary fact-

22   investigation, to implement any necessary internal controls and/or to marshal assets

23   to protect the rights of Omni and other creditors, and it has so-informed him.

24   Omni also does not object to and, indeed, would like to proceed to implement the

25   appointment of an independent board of directors to, *inter alia*, develop corporate

26   governance guidelines and procedures for MGA and to provide periodic reports on

27   the financial status of the company.

28        However, Omni objects to the Court's continued appointment of a "receiver"

A/73033920.11                                 23

EXHIBIT ___4___  PAGE 6 /

1    designated with that title as that term is negatively associated in the marketplace

2    with bankruptcy or liquidation proceedings and its continued use will have an

3    unintended negative impact on MGA as respects its customers and suppliers,

4    which in turn will harm Omni and MGA's other creditors.  There is no inherent

5    benefit to the continued use of such a term and the applicable case law and these

6    facts do not justify it.  Omni also believes that the time for such intrusive,

7    expensive and distracting interference in MGA's business has come and gone.

8    Apparently, despite all the time and effort expended there is no indication that Mr.

9    Larian is improperly diverting MGA funds.  Indeed, to Omni's knowledge, he has

10   been infusing cash over the last several months.

11        Omni requests that Mr. Fraioli (or any other person appointed in his

12   capacity) be referred to as a "monitor" or "special master," his role be carefully

13   circumscribed and a tight "sunset" provision be built in as well.

14        **C.    The Court's Proposed Order Would Violate Omni's Contractual**

15             **Rights As A Secured Creditor And Constitutional Due Process**

16        It is critically important for the Court to recognize that Omni is the largest

17   secured creditor of MGA and that its secured interest in MGA's inventory and

18   accounts receivable is not only superior to Mattel's unsecured contingent interest

19   but extends well beyond the Bratz-related products that are the subject of this

20   litigation.

21        The Senior Bank Credit Facility was secured by a senior perfected security

22   interest in all of MGA's inventory and accounts receivable including, *inter alia*,

23   Moxi, Little Tikes and Bratz products.  (Omni understands that Bratz-related

24   revenues are only 15% of projected MGA total revenues for 2009.)  Indeed, Omni

25   has the largest amount at stake at this point, with the possible exception of the

26   equity shareholders of MGA.  As such, Omni implores the Court to protect its

27   interests and not to take any action to Omni's detriment.

28        Omni is very much opposed to the institution of a bankruptcy proceeding at

A/73033920.11                                    24

EXHIBIT   4   PAGE  62

1   the present time as it believes such a proceeding to be unwarranted but, by the

2   same token, objects to any order purporting to prevent it from exercising its

3   contractual and constitutional rights as a non-party secured creditor of MGA

4   including, without limitation, its rights to initiate any foreclosure or bankruptcy

5   proceedings should future developments warrant such action.

6       Omni also objects to any order purporting to grant rights to any other parties

7   or third parties (including Mr. Fraioli) that may infringe Omni's rights as the senior

8   secured creditor including, without limitation, any right to initiate bankruptcy

9   proceedings without Omni's consent.

10       Prior to this Court's April 27, 2009 Order, Omni was a non-party and even

11   now is only a party for the limited purpose of this motion, has not had a chance to

12   conduct any discovery in this action, and was not permitted to have an independent

13   expert review or respond to Mr. Durkin's report.  Therefore, any order that

14   infringes on Omni's rights as the senior secured creditor of MGA would violate

15   constitutional due process.

16   **V.     CONCLUSION**

17       Omni has a compelling interest in the financial health and stability of MGA

18   and its assets.  If MGA fails, MGA's ability to repay the outstanding debt

19   obligation on $313 million owed to Omni will certainly be imperiled.  The

20   appointment of a permanent receiver to "oversee and control all financial and

21   business aspects" of MGA, or indeed any continued use of the term "receiver,"

22   solely to satisfy Mattel's litigation and competitive interests, would certainly harm

23   MGA's ability to operate independently and efficiently and would similarly

24   operate to improperly infringe upon the interests of Omni and other creditors.

25       Accordingly, Omni objects to the appointment of a permanent receiver.  If

26   the Court deems it appropriate, as described herein, Omni would not be opposed to

27   the continued engagement of Mr. Fraioli for a limited period of time as a "monitor"

28   or "special master" to complete any necessary further fact-investigation, to

A/73033920.11                                          25

EXHIBIT __4__ PAGE 63

1   implement any necessary internal controls and/or to marshal assets to protect the

2   rights of Omni and other creditors.  However, Omni objects to any Order

3   purporting to prevent it from exercising its contractual and constitutional rights as

4   a non-party secured creditor of MGA, or purporting to grant rights to any other

5   party or non-party (including any receiver) that would infringe upon Omni's rights

6   as a senior secured creditor.

7   DATED:  May 14, 2009                Bingham McCutchen LLP

8

9                                      By: _____

10                                          Todd E. Gordinier

11                                          Attorneys for Non-party
                                            Omni 808 Investors, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A/73033920.11                              26

EXHIBIT __4__ PAGE 64

# Exhibit 5

# ***Public Redacted***

# This Exhibit Is Filed Under Seal Pursuant To Protective Order

# Exhibit 6

1   Robert C. O'Brien (SBN 154372)
    ARENT FOX LLP
2   555 West Fifth Street, 48th Floor
    Los Angeles, CA 90013-1065
3   Telephone: 213.629.7400
    Facsimile: 213.629.7401
4   obrien.robert@arentfox.com

5   Discovery Master

6

7

8               UNITED STATES DISTRICT COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10                    EASTERN DIVISION

11

12   CARTER BRYANT, an individual,        Case No. CV 04-09049 SGL (RNBx)

13              Plaintiff,
                                          Consolidated with
14        v.                              Case No. CV 04-09059
                                          Case No. CV 05-2727
15   MATTEL, INC., a Delaware
     corporation,                         **PHASE 2 DISCOVERY MATTER**
16
                Defendant.                **ORDER NO. 43, REGARDING:**
17
                                             **DEPOSITIONS OF NEIL**
18                                           **KADISHA AND LEON NEMAN**

19

20   CONSOLIDATED WITH
     MATTEL, INC. v. BRYANT and
21   MGA ENTERTAINMENT, INC. v.
     MATTEL, INC.
22

23

24

25

26

27

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

                                          ORDER NO. 43
                                          [Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___6___ PAGE _126_

1     As part of Order No. 33, the Discovery Master ordered Neil Kadisha and

2   Leon Neman to sit for their depositions "before the end of July." (Letter from Peter

3   Villar to Robert C. O'Brien dated July 24, 2009, p. 1).   Prior to the expiration of

4   this deadline, Messrs. Kadisha and Neman requested that the Discovery Master

5   extend it to September, 2009. (*Id.*, p. 2; Letter from Todd Gordinier to Robert C.

6   O'Brien dated July 29, 2009, p. 1).  They claim a continuance of their depositions is

7   justified for two reasons.

8     First, they assert that "efficiency, judicial economy and fundamental

9   fairness" warrant an extension because they may have to be re-deposed again in the

10   future. (Letter from Peter Villar to Robert C. O'Brien dated July 24, 2009, p. 1).

11   Put another way, they argue that other pending discovery disputes and the

12   possibility that Mattel, Inc. ("Mattel") may seek leave to file a Fourth Amended

13   Answer and Counterclaim "have the potential to require the production of

14   additional information or documents or otherwise alter the scope of the

15   depositions." (*Id.*; Letter from Todd Gordinier to Robert C. O'Brien dated July 29,

16   2009, p. 1).  These arguments are unsupported by any legal authority.  Federal Rule

17   of Civil Procedure 26(d)(2) makes clear that "methods of discovery may be used in

18   any sequence" by a party, including Mattel.  Therefore, Mattel may proceed with

19   the depositions at a time of its choosing, not when Messrs. Kadisha and Neman

20   believe that all pending discovery matters have been resolved to their satisfaction.

21   A rule to the contrary would create discovery gridlock.  The Discovery Master and

22   Court in this action will not allow multiple depositions of the same individual

23   without good cause, so if Mattel seeks to re-depose these witnesses at some future

24   point, the witnesses are free to seek a protective order.

25     Second, Messrs. Kadisha and Neman argue that "there are a number of . . .

26   scheduling problems that unfortunately require flexibility on the part of all parties

27   in scheduling these depositions," including Mr. Neman's unavailability due to an

28   unspecified medical issue involving his mother and scheduling conflicts in July and

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 1 -

ORDER NO. 43
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT __6__ PAGE _127_

1   August for Mr. Kadisha, Todd Gordinier and MGA's counsel. (Letter from Peter
2   Villar to Robert C. O'Brien dated July 24, 2009, p. 1). While the Discovery Master
3   is sympathetic to any legitimate medical issue involving Mr. Neman's mother, the
4   mere assertion of a "serious medical condition" without specifying what days her
5   situation would render Mr. Neman unavailable is insufficient to allow proper
6   evaluation of the issue and set a date for his deposition. Further, with respect to
7   Mr. Kadisha's schedule as well as that of his counsel, the Discovery Master ordered
8   his deposition to proceed on May 18, 2009 and granted him forty-five days in
9   which to appear. This amount of time should have been more than sufficient for
10  any scheduling conflicts to have been avoided. Of course, counsel on both sides are
11  requested to work together in good faith to avoid undue burdens to each others' and
12  the witnesses' schedules.

13        Accordingly, the Discovery Master **ORDERS** as follows:

14        1.    Neil Kadisha shall sit for his deposition within ten (10) court days of
15  this Order and comply with Order No. 33 in all other respects. Counsel for Neil
16  Kadisha shall immediately meet and confer with Mattel's counsel to determine a
17  mutually agreeable date within the foregoing period for Mr. Kadisha's deposition.
18  If no such agreement can be reached, Mattel may seek *ex parte* relief from the
19  Discovery Master, who will then set a date for the deposition.

20        2.    Counsel for Leon Neman shall immediately meet and confer with
21  Mattel's counsel to determine a mutually agreeable date for Mr. Neman's
22  deposition. If no such agreement can be reached, Mattel may seek *ex parte* relief
23  from the Discovery Master, who will then set a date for the deposition.

24  Dated:      July 30, 2009

25

26                              By:        /s/ Robert C. O'Brien
27                                         ROBERT C. O'BRIEN
                                           Discovery Master
28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 2 -

ORDER NO. 43
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT __6__ PAGE _128_

# Exhibit 7

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

- - -

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

- - -

| | | |
|---|---|---|
| MATTEL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CV 04-09049 |
| | ) | |
| MGA ENTERTAINMENT, INC., ET. AL., | ) | |
| | ) | |
| Defendants. | ) | Motions |
| ———————————————— | ) | |
| AND CONSOLIDATED ACTIONS, | ) | |
| ———————————————— | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Riverside, California

Wednesday, February 11, 2009

10:03 A.M.

THERESA A. LANZA, RPR, CSR
Federal Official Court Reporter
3470 12th Street, Rm. 134
Riverside, California  92501
951-274-0844
WWW.THERESALANZA.COM

EXHIBIT __7__ PAGE 129

96

1   even as to things that were compelled before the stay.  They

2   have been taking the position that the Court's orders of

3   January 6th and January 7th effectively stayed our ability to

4   get financial discovery.

5              I would ask the Court to make a ruling on this.        02:36

6              I regret having to raise it, but we are going to lose

7   at least another month, if not another two months, in getting

8   financial information which is absolutely critical for our

9   ability to prepare for this.  And this is one reason why I was

10  suggesting as long as I was.                                      02:36

11             THE COURT:  I understand, Counsel.

12             MR. ZELLER:  But, the idea that there's a stay in

13  place is --

14             THE COURT:  I thought I made it clear that I lifted

15  all stays on discovery, but perhaps not.                          02:36

16             MR. KLEVENS:  The system the Court has set up cannot

17  work if counsel are allowed to come to the Court and give some

18  distorted view of what they think the dispute is about and not

19  leave it to the Discovery Master to look at and resolve and

20  give the parties the opportunity to brief.                        02:36

21             I'm not going to respond to what he says.  I don't

22  agree with a word that he said.  But I'm not going to

23  respond to it.

24             THE COURT:  I think you have responded, Counsel, and

25  I take your response at its value.                                02:37

EXHIBIT ___7___ PAGE _130_

1           For the record, I previously indicated that all stays

2   on discovery have been lifted.  All discovery matters should

3   rightfully be referred to the Discovery Master.  And I'll let

4   it go at that.

5           MR. ZELLER:  And that no discovery issues or no                02:37

6   requests for discovery are premature at this point, because

7   that's the other term they are using on this.

8           THE COURT:  I will instruct the Discovery Master this

9   afternoon, in no uncertain terms, that there is no stay on any

10  discovery related to this case at all.  There's no longer a         02:37

11  Phase 1/Phase 2 distinction.

12          As I indicated, I thought that I made this clear

13  before.  If it's not, it will be expressly set forth in the

14  minutes coming out of today's hearing.

15          There is no stay on discovery.  Period.                      02:37

16          MR. ZELLER:  And we're fully entitled to the

17  financial information that --

18          THE COURT:  Lets leave it at that, Counsel.

19          Thank you, Mr. Zeller.

20          MR. RUSSELL:  Could I say one thing, since                   02:38

21  Mr. Zeller injected this.

22          When he's talking about this stay -- and this is the

23  twilight between Phase 1 and Phase 2 counsel -- they

24  promulgated a series of receiver-related discovery which we

25  contend and run your Honor's orders saying let's talk it out of     02:38

EXHIBIT __7__ PAGE _131_

98

1   discovery, let's let Mr. Durkin handle this.  And that's what

2   he's talking about.

3          There may be other issues, but a major component --

4   and I would not want Your Honor to paint with too broad a

5   brush -- it is MGA's position as to Phase 1 receiver-related          02:38

6   issues, that Your Honor appropriately, at our request, took out

7   of discovery the financial discovery issues.

8          THE COURT:  Mr. Durkin is acting at the Court's

9   direction to inform the Court of information.  I may or may not

10  release any of the information that Mr. Durkin provides; so no        02:38

11  one, neither side, should be relying upon the information that

12  Mr. Durkin is gathering for purposes of litigating this case.

13  That's an entirely separate matter.  And I have not stayed any

14  discovery, and there should be no reliance on that.

15         If that was misunderstood, it's clarified now.               02:39

16         MR. RUSSELL:  Just so I can make sure I'm clear, Your

17  Honor, because I really, since we were the ones at the hearing

18  when this was discussed, and we asked Your Honor for this

19  precise relief, which is to say the financial discovery; the

20  allegations against Omni and IGWT and the like, and I thought I      02:39

21  heard Your Honor to say that it made sense for Mr. Durkin to

22  get to the base of it.  And if, then, there were any merit to

23  it, we could allow this discovery to go forward.

24         THE COURT:  Wait a second.

25         You're adding something in there.  I didn't say             02:39

Wednesday, February 11, 2009                     Mattel vs. MGA Entertainment

EXHIBIT ___7___ PAGE 132

1    anything about discovery not going forth.  I have not ruled on

2    any discovery issues.  I ruled on the ex-parte application for

3    the appointment of the receiver that before I ruled on that,

4    that I wanted to have Mr. Durkin's report.  That's exactly what

5    I'm doing.  I took an interim report last night.  I'll await          02:39

6    the final report.  But that's for the Court's purposes.

7            Depending on how the receivership issue plays out, it

8    may or may not be released to some or all of the attorneys.  It

9    may very well be that at the end of the day, after my final

10   meeting with Mr. Durkin, that it never reaches the light of         02:40

11   day.

12           MR. RUSSELL:  Just so we're clear, Your Honor, Mattel

13   attached the very discovery they are now promulgating to other

14   parties to their receiver application and asked for leave to

15   serve it.  Your Honor did not grant that leave.  And then what       02:40

16   happened was they said, Well, we can't go down this avenue,

17   we'll launch a series of subpoenas.

18           THE COURT:  Then the question becomes -- and this is

19   a question for the Discovery Master, not for this Court --

20   whether or not the discovery is related to Phase 2.  If it is,       02:40

21   it is.  I'm not going to pass any judgment whatsoever.  I'm

22   going to leave that completely up to the Discovery Master.

23           MR. RUSSELL:  That's all we're asking for.  Rather

24   than painting with a broad brush, saying all discovery is

25   permitted, there's some discovery that does fall within the          02:40

EXHIBIT ___7___ PAGE _133_

100

1   scope of what Your Honor refused to give them.  Let's let the
2   discovery master rule on it.  It can always come back to you.
3          THE COURT:  Okay.
4          But I guess, Mr. Russell, I'm not sure of the
5   characterization that you're making.                          02:41
6          I handled the receivership application and request
7   made thereunder in the way that I'm handling the receivership
8   application; that should not be taken one way or the other as a
9   discovery ruling.
10         MR. RUSSELL:  I guess, Your Honor, the question is if   02:41
11  there was, as part of that application, and there's an
12  assumption built in that we'd like to have the Discovery Master
13  resolve, is it just receiver discovery or is it Phase 2?  That
14  seems like a question that Mr. O'Bryan should answer.  But I
15  assume, since you don't have any of the briefs and you don't    02:41
16  have the discovery and this has just been dropped on you,
17  assume for the sake of this discussion, that it is solely
18  related to the receiver; that it is, as we pause it, identical
19  to the discovery submitted.
20         THE COURT:  I guess where I would distinguish,          02:41
21  counsel, is this notion of receiver discovery, or that phrase,
22  that's not a phrase the Court has used.  Not that I can recall
23  using.  If I did, I certainly did not intend to.  I'm not
24  designating that as a separate and severable part of the
25  discovery.                                                     02:42

EXHIBIT ___7___ PAGE 13 4

1    we'll go from there.

2              MR. ZELLER:   Thank you.

3              THE COURT:   Anything further?

4              Thank you.   Good day.

5

6

7

8

9

10                        CERTIFICATE

11

12   I hereby certify that pursuant to section 753, title 28, United
     States Code, the foregoing is a true and correct transcript of
13   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
14   conformance with the regulations of the Judicial Conference of
     the United States.

15

16   _____        2-13-09
     THERESA A. LANZA, CSR, RPR                   Date
17   Federal Official Court Reporter

18

19

20

21

22

23

24

25

Wednesday, February 11, 2009                    Mattel vs. MGA Entertainment

EXHIBIT ___7___ PAGE 135

# Exhibit 8

<div style="columns: display">

1  Robert C. O'Brien (SBN 154372)
   ARENT FOX LLP
2  555 West Fifth Street, 48th Floor
   Los Angeles, CA 90013-1065
3  Telephone: 213.629.7400
   Facsimile: 213.629.7401
4  obrien.robert@arentfox.com

5  Discovery Master

6

7

8                  UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10                      EASTERN DIVISION

11

12  CARTER BRYANT, an individual,        Case No. CV 04-09049 SGL (RNBx)

13                  Plaintiff,
                                         **Consolidated with**
14           v.                          **Case No. CV 04-09059**
                                         **Case No. CV 05-2727**
15  MATTEL, INC., a Delaware
    corporation,                         **PHASE II DISCOVERY MATTER**
16
                    Defendant.           **ORDER NO. 3, REGARDING:**
17
                                            **(1) MOTION OF MGA**
18                                          **ENTERNTAINMENT, INC.,**
                                            **ISAAC LARIAN AND MGA**
19                                          **ENTERTAINMENT (HK)**
                                            **LIMITED TO QUASH**
20                                          **NON-PARTY SUBPOENAS; and**

21                                          **(2) MOTION OF MATTEL, INC.**
                                            **TO COMPEL PRODUCTION OF**
22                                          **DOCUMENTS RESPONSIVE TO**
                                            **THE SAME NON-PARTY**
23                                          **SUBPOENAS**

24
    ┌────────────────────────────────┐
25  │ CONSOLIDATED WITH              │
    │ MATTEL, INC. v. BRYANT and     │
26  │ MGZ ENTERTAINMENT, INC. v.     │
    │ MATTEL, INC.                   │
27  └────────────────────────────────┘

28
</div>

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

                                   1                        ORDER NO. 3
                                          [Case No. CV 04-09049 SGL (RNBx)]

                                   EXHIBIT __8__ PAGE /36

1        This Order sets forth the Discovery Master's ruling on: (1) the motion of
2   MGA Entertainment, Inc., Isaac Larian, and MGA Entertainment (HK) Limited
3   (collectively "MGA") to quash certain non-party subpoenas [Docket Number 4779]
4   and (2) the corresponding motion of Mattel, Inc. ("Mattel") to compel production of
5   documents responsive to the same non-party subpoenas [Docket Numbers 4769 and
6   4788] (collectively, the "Motions").

7        The Motions came on regularly for hearing before the Discovery Master on
8   March 4, 2009.  All interested parties were represented by counsel and afforded the
9   opportunity to present oral argument on the Motions.  The Discovery Master,
10  having considered the papers filed in support of and in opposition to the Motions,
11  and having heard oral argument thereon, rules as set forth below.

12  **I.**    **INTRODUCTION**

13
14      **A.**    **The Court's February 11, 2009 Ruling**

15       On February 11, 2009, the Court heard oral argument on various motions
16  filed by the parties.  During the proceedings, counsel took the opportunity to orally
17  request clarification by the Court regarding whether the parties' respective motions
18  relating to the subpoenas served by Mattel on various entities allegedly related to
19  MGA (the "Subpoenas") are in any way stayed or precluded by any of the Court's
20  prior orders.

21       In response, the Court stated: "I will instruct the Discovery Master this
22  afternoon, in no uncertain terms, that there is no stay on any discovery related to
23  this case at all." (Reporter's Transcript of Proceedings, February 11, 2009 ["Tr."],
24  99:8 – 10).  Counsel for MGA then referred to the fact that the Court had
25  previously declined to allow Mattel to serve certain discovery accompanying
26  Mattel's motion for a receiver and characterized the third-party subpoenas as an
27  attempt to circumvent the Court's ruling.  (Tr., 101:12 – 17).  In response, the Court
28  stated:

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 2 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT __8__ PAGE /37

1

2
> Then the question becomes – and this is a question for the
> Discovery Master, not for this Court – whether or not the
> discovery is related to Phase 2. If it is, it is. I'm not going to
> pass any judgment whatsoever. I'm going to leave that
> completely up to the Discovery Master. ... The question for the
> [D]iscovery [M]aster will be whether or not the disputed
> discovery request is related or relevant to the trial that has now
> been scheduled for March [2010] or not.

3

4

5

6

7
(Tr., 101:18 – 22; 103:1 – 3).

8
The Discovery Master understands the Court's ruling as indicating that, in

9
deciding the motions relating to the Subpoenas, the Discovery Master should

10
consider whether there is a nexus between the information sought by the

11
Subpoenas, on the one hand, and the Phase 2 claims and counterclaims set for trial

12
in March 2010, on the other hand. If the information sought by the Subpoenas is, to

13
use the Court's words, "related to Phase 2" or "related or relevant to the [Phase 2]

14
trial," then that information could potentially be the subject of appropriate

15
discovery requests by Mattel.[1]

16
**B.    Information Sought By The Subpoenas**

17
The information sought by Mattel's Subpoenas falls into two broad

18
categories. First, Mattel seeks documents from third parties Omni 808 Investors,

19
LLC, OmniNet Capital, LLC and Vision Capital, LLC (collectively, the "Financing

20
Entities") involving, among other things, their internal ownership and operations

21
and their role in providing financing to MGA during the summer of 2008 (the

22

---

23
[1] Even prior to the Court's February 11, 2009 ruling, Mattel acknowledged that it had the burden of demonstrating a nexus between the information sought by the Subpoenas and the Phase 2 issues, as demonstrated by Mattel's inclusion of a section in its Motion to Compel summarizing the claims to be adjudicated in Phase 2, (Motion, pp. 5 – 8), and a section arguing that the information sought by the third-party subpoenas is relevant to Mattel's Phase 2 claims, (*Id.*, pp. 18 - 24 and 24 – 25). However, Mattel also argued that the information sought might be appropriate regardless of any nexus to Phase 2. (*See id.*, pp. 14 – 17 [arguing that MGA's prior statements regarding its finances in Phase 1 "opened the door" to discovery on this issue] and *id.*, p. 23 [arguing that the information sought is relevant to MGA's credibility]). Based on the Court's subsequent ruling on February 11, 2009, as well as the Discovery Master's own independent evaluation of those arguments, the Discovery Master concludes, as discussed more fully below, that these arguments are insufficient, standing alone, to justify the non-party discovery Mattel seeks. Rather, Mattel must demonstrate some link between the information sought and the issues to be adjudicated by the Court at the Phase 2 trial.

24

25

26

27

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 3 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT  8  PAGE 138

1    "Financing Discovery"). Based on the information presented at the February 11,

2    2009 hearing and in connection with the pending motions, it does not appear that

3    either MGA Entertainment, Inc., MGA Entertainment (HK) Limited, or Larian have

4    an ownership interest in the Financing Entities.[2]  (*See* Tr., 70:22 – 72:5; 78:9 -25).

5          Second, Mattel seeks documents from third parties IGWT Group, LLC and

6    IGWT 826 Investments, LLC (collectively, the "Transferee Entities") regarding

7    MGA's sale to them of infringing MGA inventory, namely Bratz dolls (the

8    "Transferee Discovery"). MGA does not dispute that the Transferee Entities are

9    owned and/or controlled by Larian. (*See, e.g.*, MGA's Reply in support of its

10   Motion to Quash, at p. 5, fn. 6, where MGA refers to the purchase of Bratz

11   inventory by the Transferee Entities as "Larian's purchase of those . . .

12   products . . . .").[3]

13   **II.    MGA's Motion To Quash**

14         Because it could dispose of all outstanding discovery issues related to the

15   Subpoenas, the Discovery Master first addresses MGA's Motion to Quash filed on

16   February 3, 2009.

17         **A.    Legal Standard**

18         As the party moving to quash the Subpoenas, MGA bears the burden of

19   satisfying the standard set forth in Rule 45(b), which provides that the court may

20   "quash or modify the subpoena if it is unreasonable and oppressive." (Fed. R. Civ.

21   P. 45(b); *see also Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir.

22   2004) ["The moving party has the burden of proof to demonstrate that compliance

23

---

24   [2] Of course, this is one of the facts Mattel seeks to investigate through the Subpoenas to the Financing Entities. The

25   Discovery Master's ruling denying Mattel's Motion to Compel the Financing Parties to comply with the Subpoenas does not address – and should not be construed as deciding – whether Mattel could, upon establishing a nexus to a legitimate Phase 2 issue, seek to obtain this information from MGA.

26   [3] Moreover, MGA does not dispute the assertions made by Mattel in its Motion to Compel at pp. 11– 12, including

27   that Larian created IGWT Group during the Phase 1 trial and registered its place of business as his home address, and that Larian created IGWT 826 Investments the day after the Phase 1 trial ended and registered it at the home address

28   of his sister.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 4 -                                        ORDER NO. 3
                                   [Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___8___ PAGE _139_

1   with the subpoena would be unreasonable and oppressive" (internal quotations

2   omitted)]; *Linder v. Department of Defense*, 133 F.3d 17, 24 (D.C. Cir. 1998) [The

3   burden of proving that a subpoena is oppressive is on the party moving to quash];

4   *Washington v. Thurgood Marshall Academy*, 230 F.R.D. 18, 21 (D.D.C. 2005) [the

5   burden is on the movant to establish that a subpoena duces tecum should be

6   quashed]).  "The burden is particularly heavy to support a 'motion to quash as

7   contrasted to some more limited protection.'"  (*Westinghouse Electric Corp. v. City*

8   *of Burlington*, 351 F.2d 762, 766 (D.C.Cir.1965) [denying a motion to quash

9   supported by two affidavits]).

10      **B.    Arguments Made By MGA In Support Of Its Motion To Quash**

11      The sole argument set forth in MGA's Motion to Quash is that the Court's

12   January 7, 2009 order appointing a forensic auditor bars Mattel from seeking the

13   information sought by the Subpoenas.  (*See* MGA's Motion to Quash, pp. 1 - 6).

14   But that argument fails for the reasons set forth above.  The Court made it clear at

15   the hearing on February 11, 2009 that:

16          There is no stay on discovery.  Period. . . . . [The forensic auditor
17          appointed by the Court] is acting at the Court's discretion to
            inform the Court of information. . . . That's an entirely separate
18          matter.  And I have not stayed any discovery and there should be
19          no reliance on that.  If that was misunderstood, it's clarified now.

20   (Tr., 97:15, 98:8 - 9, and 98:13 - 15).

21      Recognizing that its only argument has been rejected by the Court, MGA

22   argues for the first time in its Reply that its Motion to Quash should be granted

23   because the Subpoenas are not relevant to any of Mattel's Phase 2 claims.  (*See*

24   MGA's Reply Brief in Support of the Motion to Quash, pp. 1 and 5 - 12).

25   However, MGA did not make this argument in its opening brief.  It instead declared

26   in its moving papers that whether the Subpoenas are related to any "Phase 2 issues

27   is beside the point."  (*Id.*, p. 5).  Because MGA did not address the relevance of the

28   subject discovery until the filing of its Reply, the Discovery Master declines to

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 5 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___8___ PAGE 140

1   consider the argument in connection with the Motion to Quash.

2       The Discovery Master, like the Court,[4] disfavors the insertion of new

3   arguments at the reply stage that could have been raised in the moving papers.  A

4   party filing a motion is required to raise all of its arguments in its opening brief to

5   prevent "sandbagging" of the non-moving party and to provide opposing counsel

6   the chance to respond.  This rule is routinely adhered to by courts in the Ninth

7   Circuit.  (*See, e.g., United States v. Boyce*, 148 F.Supp .2d 1069, 1085

8   (S.D.Cal.2001); *Leick v. Hartford Life and Acc. Ins. Co.,* 2007 WL 1847635 at *1,

9   n. 1 (E.D.Cal. 2007); *Stewart v. Wachowski*, 2004 WL 2980783, at *11 (C.D.Cal.

10  Sept. 28, 2004); *Hamilton v. Willms*, 2007 WL 2558615, *11 (E.D.Cal.2007); *see

11  also United States v. Cox,* 7 F.3d 1458, 1463 (9th Cir.1993); *United States v.

12  Wright,* 215 F.3d 1020, 1030 n. 3 (9th Cir.2000)).

13      Furthermore, MGA will not suffer any prejudice from this decision because

14  the issue it raised in its Reply (i.e., are the Subpoenas seeking information related to

15  any Phase 2 claims) has been fully briefed by the parties and is ruled upon by the

16  Discovery Master in connection with Mattel's Motion to Compel.[5]  (*See* Section III

17  below).

18      Accordingly, MGA's Motion to Quash is **DENIED**.

19  //
20  //
21  //
22  //
23

---

[4] In *Bryant v. Mattel, Inc.*, 573 F.Supp.2d 1254, 1273 n.7 (C.D. Cal. 2007), the Court noted that it "ordinarily would not consider" arguments made for the first time on reply but did so only "because [undertaking the analysis did] not change [its] ultimate conclusion."

[5] That the arguments raised in the Reply are the same as those in MGA's Opposition to the Motion to Compel is conceded by Mattel.  Indeed, Mattel admitted in its Request to Consolidate MGA's Motion to Quash and Motion to Compel (which was denied as untimely by the Discovery Master at the hearing on March 4, 2009) that the "MGA Parties' Opposition to Mattel's Motion to Compel Production of Documents Responsive to Third Party Subpoenas . . . makes the same arguments as the MGA Parties' Reply in support of their Motion to Quash."  (Mattel's Request to Consolidate MGA's Motion to Quash and Mattel's Motion to Compel, p. 2).

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 6 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT __8__ PAGE __141__

III.   **Mattel's Motions To Compel**

    A.    **The Purported Procedural Defects Barring Mattel's Motions To Compel**

          MGA, the Financing Entities, and the Transferee Entities all argue that that Mattel's Motion to Compel should be denied on several different procedural grounds.

          1.    **The Court's January 7, 2009 Order**

          As an initial matter, the Transferee Entities and the Financing Entities repeat the argument made by MGA in its Motion to Quash that the Court's January 7, 2009 Order appointing a forensic auditor barred Mattel from seeking the discovery sought by the Subpoenas. (Financing Entities' Opposition to Mattel's Motion to Compel at p. 3; Transferee Entities' Opposition to Mattel's Motion to Compel at pp. 5 - 7). But that argument fares no better here than it did with respect to MGA's Motion to Quash and is rejected for the reasons discussed in Section II above.

          2.    **Local Rule 37**

          The Financing Entities and the Transferee Entities also argue that Mattel's Motion to Compel should be denied because Mattel failed to comply with Local Rule 37 by, among other things, failing to meet and confer and failing to file a joint stipulation. (Financing Entities' Opposition to Mattel's Motion to Compel, pp. 1 and 7 - 10; Transferee Entities' Opposition to Mattel's Motion to Compel, p. 2 [referencing Local Rule 37 in passing]). However, Local Rule 37 (as distinguished from Federal Rule 37, which is discussed in subsection 7a, below) does not apply to discovery disputes in this case. Rather, the applicable procedure is the one adopted by the Court in its order appointing a discovery master dated December 6, 2006 ("Discovery Master Order").[6] Because the Discovery Master Order provides that

---

[6] The Discovery Master Order is incorporated by reference into the Court's January 6, 2009 Order appointing a discovery master for Phase 2 of this litigation. (*See* Court's Order dated January 6, 2009, p. 2 ["The Discovery Master will serve under the terms and conditions of the Stipulation and Order dated December 6, 2006"]).

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 7 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___9___ PAGE 142

1   "all third parties subject to discovery requests . . . in this litigation shall be bound

2   by the terms of this Stipulation and Order," (Discovery Master Order, p. 6), that

3   order applies to the Financing Entities as well as the Transferee Entities, and its

4   procedures replace those set forth in Local Rule 37.  (*Id.*, p. 4).

### 3.      Local Rule 11-6 And Paragraph 4(b) Of The Court's Standing Order

7          The Financing Entities and MGA further argue that Mattel's Motion to

8   Compel should be denied because it exceeds the page limitations set forth in Local

9   Rule 11-6 and Paragraph 4(b) of the Court's Standing Order.  (*See* Financing

10  Entities' Opposition to Mattel's Motion to Compel, p. 9; MGA's Opposition to

11  Mattel's Motion to Compel, pp. 18 - 19).  Each of these contentions is unavailing.

12  The Discovery Master Order (not the Local Rules or the Court's Standing Order)

13  governs discovery disputes in this case, and it does not impose any page limit on

14  such motions.[7]  In fact, the Discovery Master Order dispenses with the formatting

15  requirements of the Local Rules in certain ways, such as allowing letter briefs, and

16  even permits the parties to agree to alternative procedures, including, presumably,

17  filing briefs that are more than 25 pages in length.  (*See* Discovery Master Order, p.

18  4).  Thus, while the Discovery Master encourages the parties to be as efficient as

19  possible in their briefing, he recognizes that briefs in excess of 25 pages are either

20  directly permitted under the Discovery Master Order (since no page limitation was

21  imposed by the Court) or implicitly allowed (since the parties may agree to

22  alternate procedures).  He further recognizes that the complex nature of this case

23  may periodically necessitate the filing of briefs that exceed 25 pages.[8]  For all of

---

[7] Even assuming the 25 page limitation for briefs did apply, Mattel had the option of filing separate motions to compel for each of the subpoenas at issue and could have easily extended the page limitation well beyond the 30 pages it filed in connection with its combined motion that addressed multiple subpoenas propounded on the Transferee Entities and the Financing Entities.

[8] In fact, the parties to this lawsuit have filed multiple discovery motions in this case that contained more than 25 pages. (*See* Supplemental Declaration of Jon D. Corey in Support of Mattel, Inc.'s Reply in Response to The MGA Parties' Opposition to Motion to Compel, ¶ 7).

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 8 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT __8__  PAGE _143_

1    these reasons, filings in excess of 25 pages are permitted.[9]

2             **4.**    **Local Rule 6-1**

3         The Financing Entities argue in passing that Mattel's motion to compel

4    should be denied because it violates Local Rule 6-1. (Financing Entities'

5    Opposition to Mattel's Motion to Compel, p. 6).   However, the Discovery Master

6    Order adopts a completely different set of deadlines than the Local Rules for the

7    filing of motions, oppositions and replies, and a different schedule for noticing

8    hearing dates. (Discovery Master Order, p. 4).   Therefore, Local Rule 6-1 has no

9    applicability here.

10            **5.**    **Failure To Name MGA In The Motion To Compel**

11         MGA next argues that Mattel's motion to compel is procedurally improper

12    because MGA was not named in the Motion to Compel and Mattel should not be

13    allowed to respond to MGA's objections.   (MGA's Opposition to Mattel's Motion

14    to Compel, p. 18).  But MGA has cited no legal authority, and the Discovery

15    Master has found none, standing for the proposition that a party must name in its

16    motion to compel all parties who have objected to an underlying subpoena even if

17    they are not actually the target of the subpoena.  In fact, the contention that Mattel's

18    Motion to Compel should have been brought against MGA makes no sense given

19    that it could not possibly comply with any order compelling a response to the

20    Subpoenas.

21            **6.**    **Mattel's Separate Statement**

22         MGA also contends that Mattel's Motion to Compel should be denied

23    because its' separate statement "is another classic example of . . . inefficiency."

24    (*Id.*, p. 19).  Once again, nothing in the Discovery Master Order prevents a party

25    from filing a separate statement that first identifies the request in dispute and then

26

27

28

---

[9] In the event the length of briefs ever becomes excessive, the Discovery Master will issue an order setting a specific page limitation.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 9 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 8  PAGE 141

1    sets forth the various contentions of the parties, even if the information regarding

2    the various requests happens to be repetitive.  Regardless, MGA has not cited any

3    legal authority in support of its position and the Discovery Master finds no reason

4    to dispose of Mattel's Motion to Compel merely because it filed a separate

5    statement that contains duplicative arguments.[10]

6                    **7.    Meeting And Conferring**

7           As their final procedural argument in opposition to the Motion to Compel,

8    the Transferee Entities and the Financing Entities assert that the motion should be

9    denied because Mattel failed to adequately meet and confer prior to filing the

10   motion.  (Financing Entities' Opposition to Mattel's Motion to Compel, pp. 7 - 8;

11   Transferee Entities' Opposition to Mattel's Motion to Compel, pp. 2 - 5).

12                    **a.    Applicable Procedure**

13          Prior to filing its motion to compel, Mattel had an obligation to comply with

14   both the Federal Rules of Civil Procedure and the Discovery Master Order.  Federal

15   Rule of Civil Procedure 37(a) expressly requires that a party filing a motion to

16   compel discovery first meet and confer in "good faith."  (Fed. R. Civ. Proc. 37(a)).

17   Similarly, the Discovery Master Order states that unless an "alternative procedure"

18   is agreed upon or otherwise ordered by the Discovery Master, the

19              moving party shall first identify each dispute, state the relief
              sought, and identify the authority supporting the requested relief
20            in a meet and confer letter that shall be served on all parties by
              facsimile or electronic mail.  The parties shall have five court
21            days from the date of service of that letter to conduct an in-person
              conference to attempt to resolve the dispute.  If the dispute has
22            not been resolved within five court days after such service, the
              moving party may seek relief from the Discovery Master by
23            formal motion or letter brief . . .

24   (Discovery Master Order, p. 4).

25   //

26

27   _____

     [10] The Discovery Master notes that where there are numerous discovery requests in dispute he would prefer for a
28   separate statement to be submitted by the moving party.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 10 -                                    ORDER NO. 3
                                         [Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT __8__ PAGE 145

1

              **b.**      **Mattel's Meet And Confer Regarding The Financing**

2

                     **Entities**

3
       In challenging Mattel's meet and confer effort, the Financing Entities first

4
claim that Mattel violated the Discovery Master Order because no "in-person

5
meeting occurred."  (Financing Entities' Opposition to Mattel's Motion to Compel,

6
p. 8).  But that argument is without merit, since Mattel and the Financing Entities

7
agreed to an alternative procedure that disposed of the in-person meet and confer

8
requirement.[11]  Indeed, MGA's counsel sent counsel for Mattel, counsel for the

9
Transferee Entities and counsel for the *Financing Entities* a letter on January 23,

10
2009 memorializing the parties' agreement and establishing a schedule whereby the

11
parties would "meet and confer on January 29 and 30 . . ." (Mattel's Reply in

12
Support of its Motion to Compel filed on February 13, 2009, pp. 9 - 10;

13
Supplemental Declaration of Jon D. Corey in Support of Mattel's Reply to the

14
Motion to Compel filed on February 13, 2009, ¶ 4 and Ex. 2).  That the Financing

15
Entities' counsel received this letter and acted in accordance with its terms is

16
evidenced by, among other things, the fact that they served objections to the

17
Subpoenas on January 28, 2009 (which was the deadline specified in the January 23

18
letter) and started meeting and conferring with Mattel's counsel telephonically on

19
January 30. (Financing Entities' Opposition to Mattel's Motion to Compel, pp. 3

20
and 4).  Accordingly, Mattel did not have any obligation to meet with the Financing

21
Entities in person since the parties had agreed to waive that obligation.

22
       Nevertheless, Mattel still had an obligation to meet and confer with the

23
Financing Entities in good faith.  Good faith cannot be shown merely through

24
perfunctory efforts; rather Federal Rule of Civil Procedure 37 mandates a genuine

25
attempt to resolve the discovery dispute through non-judicial means. (Fed. R. Civ.

26

27

28

---

[11] To promote efficiency and minimize the necessity for counsel to travel between their respective offices, the Discovery Master shall deem Paragraph 5 of the Discovery Master Order (mandating that the parties have an in person conference to attempt to resolve discovery disputes) to be sufficiently satisfied if the parties and non-parties involved in a discovery dispute meet and confer telephonically or by video conference. However, the Discovery Master emphasizes that this accommodation in no way lessens the parties' obligation to meet and confer in good faith.

- 11 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT __8__ PAGE _146_

1    Proc. 37(a)(1)).

2        Because the evidence and declarations submitted by Mattel and the Financing

3    Entities are in conflict regarding what transpired during their respective meet and

4    confer communications, (*Cf.* Financing Entities' Opposition to Mattel's Motion to

5    Compel, pp. 3 – 5; Mattel's Reply Brief in Support of its Motion to Compel filed on

6    February 13, 2009, pp. 9-10), the Discovery Master gives Mattel the benefit of the

7    doubt and concludes that it adequately met and conferred with respect to Omni 808

8    Investors, LLC and Vision Capital, LLC.

9        By contrast, Mattel arguably did not even begin the meet and confer process

10   with OmniNet Capital, LLC prior to filing its motion to compel, because counsel

11   for the Financing Entities informed Mattel that they did not receive that Subpoena

12   until the afternoon of February 2, 2009 and filed objections to the Subpoena on that

13   date.  (Financing Entities' Opposition to Mattel's Motion to Compel at p. 5).  No

14   "good faith" meeting could therefore have taken place.

15       Although the meet and confer with respect to OmniNet Capital, LLC was

16   inadequate, the Discovery Master will nonetheless address the merits of Mattel's

17   Motion to Compel in all respects, including concerning the Subpoena served on

18   OmniNet Capital, LLC.  The Discovery Master does so for purposes of efficiency

19   (i.e., the issues to be decided regarding the subpoena served on OmniNet Capital,

20   LLC are essentially identical to those that must be addressed in connection with the

21   subpoenas served on Omni 808 Investors, LLC and Vision Capital, LLC) and

22   because addressing the merits of the motion does not alter the outcome.[12]

23                c.    **Mattel's Efforts To Meet And Confer Regarding The**

24                      **Transferee Entities**

25       Like the Financing Entities, the Transferee Entities contend that Mattel's

26   motion to compel should be denied because it did not meet and confer in good faith.

27

28   _____

    [12] As noted above, the parties are admonished to abide by the provisions of the Discovery Master Order requiring a good faith attempt to meet and confer regarding discovery disputes prior to the filing of any discovery motion.

EXHIBIT ___8___ PAGE 242

1    (Transferee Entities' Opposition to Mattel's Motion to Compel, pp. 2 - 5). Yet, the

2    Transferee Entities concede that their counsel engaged in multiple meet and confer

3    teleconferences. (*Id.* at pp. 3 - 4). Several emails and letters were also exchanged

4    between the parties as part of the meet and confer process. (*Id.*). In light of these

5    interactions, the Discovery Master again gives Mattel the benefit of the doubt in

6    favor of resolving the issues on the merits and concludes that it adequately met and

7    conferred with the Transferee Entities.

8         **B.    Legal Standard Governing Enforcement Of The Subpoenas**

9         Federal Rule of Civil Procedure 26(b)(1) provides for discovery in civil

10   actions of "any matter, not privileged, which is relevant to the subject matter

11   involved . . .. The information sought need not be admissible at the trial if the

12   information sought appears reasonably calculated to lead to the discovery of

13   admissible evidence." Rule 26(b) is liberally interpreted to permit wide-ranging

14   discovery of all information reasonably calculated to lead to discovery

15   of admissible evidence; but the discoverable information need not be admissible at

16   the trial. (*Jones v. Commander, Kansas Army Ammunitions Plant*, 147 F.R.D. 248,

17   250 (D.Kan.1993)).

18        The broad scope of discovery described in subsection (b)(1) is tempered by

19   provisions protecting the responding party from undue burden. Rule 26(b)(2)

20   provides that the frequency or extent of discovery otherwise allowed by the Rules

21   must be limited if the court determines that "(i) the discovery sought is

22   unreasonably cumulative or duplicative, or is obtainable from some other source

23   that is more convenient, less burdensome, or less expensive; (ii) the party seeking

24   discovery has had ample opportunity by discovery in the action to obtain the

25   information sought; or (iii) the burden or expense of the proposed discovery

26   outweighs its likely benefit, taking into account the needs of the case, the amount in

27   controversy, the parties' resources, the importance of the issues at stake in the

28   litigation, and the importance of the proposed discovery in resolving the issues."

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 13 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT __8__ PAGE _148_

1      Moreover, the Federal Rules distinguish between discovery from non-parties

2  to a lawsuit (governed under Rule 45) and discovery from parties (governed

3  generally by Rule 26), based in part on the recognition that the former is inherently

4  more burdensome and less convenient than the latter. (*See, e.g., Solarex v. Arco*

5  *Solar, Inc.*, 121 F.R.D. 163, 179 (E.D.N.Y. 1988) [The status of a non-party is

6  significant when determining whether compliance with a discovery demand would

7  constitute an undue burden]; *Katz v. Batvia Marine and Sporting Supplies, Inc.*, 984

8  F.2d 422, 424 (Fed. Cir. 1993) [The fact that discovery is sought from a non-party

9  is one factor that the Court may weigh in determining whether the discovery

10  requested is necessary, relevant, or burdensome]. Courts applying Rules 26 and 45

11  have interpreted these rules to afford non-parties special heightened protection

12  against burdensome discovery. (*See, e.g., Exxon Shipping Co. v. U.S. Dept of*

13  *Interior*, 34 F.3d 774, 779 (9th Cir. 1994)).

14      Accordingly, requests for documents that pertain to a party and that can be

15  more easily and inexpensively obtained from that party also impose an undue

16  burden. (*Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 638 (C.D. Cal. 2005)).

17  Further, if the documents sought are neither relevant nor calculated to lead to the

18  discovery of admissible evidence, "then any burden whatsoever imposed upon the

19  non-party would be by definition undue." (*Compaq Computer Corp. v. Packard*

20  *Bell Electronics, Inc.*, 163 F.R.D. 329, 335-336 (N.D.Cal. 1995)).

21      Each of the moving parties bears the burden of establishing the basis for the

22  relief it seeks. As the party moving to compel compliance with the Subpoenas,

23  Mattel bears the burden of "establishing that the information sought is relevant and

24  necessary to its lawsuit." (*Cytodyne Technologies, Inc. v. Biogenic Technologies,*

25  *Inc.*, 216 F.R.D. 533, 534 (M.D.Fla. 2003)).

26      Finally, in deciding whether to enforce a subpoena, the Discovery Master

27  must balance "the relevance of the discovery sought, the requesting party's need,

28  and the potential hardship to the party subject to the subpoena." (*Heat & Control,*

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 14 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

**EXHIBIT ___8___ PAGE _149_**

1   *Inc. v. Hester Industries, Inc.*, 785 F.2d 1017, 1024 (Fed.Cir.1986) citing

2   *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 560, 564 (7th Cir.1984)).

3       **C.     Mattel's Contention That MGA Has Placed Its Finances At Issue**

4         As its first ground for moving to compel production of the documents sought

5   by the Subpoenas, Mattel argues that MGA has misrepresented its finances, thereby

6   making it necessary and appropriate for Mattel "to obtain an accurate understanding

7   of MGA's and Larian's finances."  (Motion to Compel, p. 14).  According to

8   Mattel, MGA's supposed misrepresentations have placed its financial condition at

9   issue, and have opened the door to discovery of any information bearing on MGA's

10  finances.   (*Id.* ["Discovery on MGA's financials is amply warranted by MGA's

11  own statements *alone.*"] (emphasis added)).

12        However, after Mattel filed its Motion, the Court made it clear that the

13  validity of the Subpoenas must be evaluated with reference to whether they relate to

14  the matters to be adjudicated in Phase 2.   As the Discovery Master understands the

15  Court's ruling, the Subpoenas cannot be justified merely because they seek

16  information regarding some contention made during Phase 1, without regard to

17  Phase 2.  In other words, putting a fact at issue in Phase 1, cannot, standing alone,

18  suffice to render that fact the proper subject of discovery in Phase 2.

19        Thus, to the extent Mattel's first argument asserts that MGA's statements,

20  standing alone, warrant discovery from the Subpoena recipients, that argument is

21  rejected.  Rather, the Discovery Master will evaluate whether discovery of MGA's

22  finances is warranted in light of the issues to be adjudicated in Phase 2.

23        Further, even if Mattel were not required to demonstrate some nexus between

24  the Subpoenas and the issues to be adjudicated in Phase 2, the argument that the

25  Subpoenas are justified because MGA placed its financial condition at issue would

26  still fail for the simple reason that Mattel is not seeking discovery from MGA but

27  rather *non- parties*.  Mattel does not cite any statements or conduct by the

28  //

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

                                               - 15 -              ORDER NO. 3
                                 [Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT __8__ PAGE _150_

1    Financing Entities putting their financial affairs at issue in this litigation.[13]

2    Rather, Mattel argues that the statements and conduct of *MGA* should be attributed

3    to the Financing Entities and construed as their consent to discovery of their

4    internal financial affairs.  Such an assumption is unwarranted.

5    **D.    Mattel's Contention That The Subject Discovery Is Relevant To**

6    **Phase 2**

7    **1.    Subpoenas To The Financing Entities**

8    Mattel next argues that the Subpoenas to the Financing Entities seek

9    information relevant to a variety of Phase 2 issues.[14]

10    **a.    Mattel's RICO Counterclaim**

11    Mattel first asserts in its Motion to Compel that the discovery it seeks is

12    relevant to its RICO counterclaim because "Mattel alleges that the counter-

13    defendants have operated a widespread criminal enterprise that has engaged in

14    numerous acts of mail and wire fraud and other predicate acts in violation of the

15    RICO statute" and that "MGA's mid-trial transactions with Omni 808 and the other

16    non-operating entities" is "a continuation of that pattern of racketeering activity."

17    (Motion, p. 18).

18

19    [13] In its Reply to the Financing Entities' Opposition to its Motion to Compel, Mattel argues that the Financing

20    Entities (referred to by Mattel as the "Omni Parties") have injected themselves into the litigation because one of them, Omni 808 Investors, LLC, applied to intervene. (Reply, p. 8).  However, a decision on that application has been deferred by the Court, (Tr., 80:15 – 17), and therefore Omni 808 Investors, LLC and the other Financing

21    Entities remain outsiders to the litigation entitled to the heightened protection from discovery normally afforded non-parties.

22    [14] Mattel argues in one of its reply briefs filed on February 25, 2009 that the Discovery Master should strike MGA's

23    Opposition to the Motion to Compel because: (1) MGA indicated that it would not be filing an Opposition and (2) the Opposition was filed a week late. (*See* Mattel's Reply in Response to MGA's Opposition to the Motion to

24    Compel, p. 4).  The Discovery Master declines that request.  The assertion that MGA would not file an Opposition is based on an alleged oral conversation which counsel for Mattel apparently did not confirm in writing. (*See*

25    Supplemental Declaration of Jon D. Corey in Support of Mattel's Reply in Response to MGA's Opposition to the Motion to Compel, ¶ 4).  Even assuming such a statement had been made, MGA was entitled to change its mind. As

26    for Mattel's argument that the Opposition was untimely, the Discovery Master notes that he was only recently appointed.  This fact combined with the backlog of discovery motions may have resulted in some confusion as to

27    when various briefs were due to be filed.  The Discovery Master prefers to address issues on the merits and declines to strike the Opposition as untimely. Notwithstanding the foregoing, the Discovery Master urges the parties to

28    strictly comply with the briefing schedule set forth under the Discover Master Order for all future discovery motions unless an alternative procedure is agreed upon by the parties and approved by the Discovery Master or the Court.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 16 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT __8__ PAGE _151_

1       But Mattel's allegations in support of its RICO counterclaim turn on

2   misappropriation of trade secrets and confidential information, and make no

3   mention of improper transfers of funds or any other predicate act similar to MGA's

4   purported business transactions with any of the Financing Entities.[15]   Accordingly,

5   these financial transactions are not a "continuation" of the "pattern" of conduct

6   Mattel alleges in very precise detail in its RICO counterclaim.  (*Asdourian v.*

7   *Konstantin*, 77 F. Supp. 2d 349, 358 (E.D.N.Y. 1999) [cited by Mattel and stating

8   RICO claimant must show "[a]n interrelationship between acts, suggesting the

9   existence of a pattern, [which] may be established...[by] proof of their temporal

10  proximity, or common goals, or similarity of methods, or repetitions' (citation

11  omitted)]; *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238-39 (1989) [RICO claims

12  must be supported by a "pattern" of activity and "the mere fact that there are a

13  number of predicates is no guarantee that they fall into any arrangement or order.

14  A pattern is not formed by sporadic activity ...  Instead, the term 'pattern' itself

15  requires the showing of a relationship between the predicates" (quotations and

16  internal citations omitted)]).

17      At this stage, Mattel has failed to demonstrate a relationship between the

18  predicate acts alleged by Mattel in its Counterclaims – which were bound together

19  by a purported scheme to misappropriate Mattel's trade secrets – and the

20  //

21  //

22  //

---

23  [15] *See* Mattel's Second Amended Answer and Counterclaims ("Counterclaims"), p. 55-62, ¶ 90 [alleging the MGA
24  Parties and other counter-defendants "for the purpose of executing and attempting to execute the scheme to
    improperly defraud Mattel and steal its trade secret or otherwise confidential and proprietary information" committed
25  various predicate acts], ¶ 91 [alleging the MGA Parties and other counter-defendants "shared the common purpose of
    enabling MGA to obtain confidential, proprietary and otherwise valuable Mattel property through improper means in
    order to assist MGA in illegally competing with Mattel"], ¶ 92 [alleging the enterprises are continuing enterprises
26  because they are "designed to and did unlawfully acquire the confidential business information and property of
    Mattel and incorporated this information and property into MGA's ongoing business, marketing strategies and
27  business methods, practices, and processes"], ¶ 93(a) [alleging mail fraud committed in furtherance of scheme to
    "defraud Mattel of its confidential trade secret information and property"], ¶ 93(b) [alleging wire fraud "defraud
28  Mattel of its confidential and trade secret information and property"], and ¶ 102 [the MGA Parties and other counter-
    defendants "schemed to defraud Mattel and steal its property and trade secret information"].

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 17 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT __8__ PAGE _152_

1    transactions Mattel seeks to investigate here.[16]

2    Also, the RICO counterclaim (like the other counterclaims to be adjudicated

3    in Phase 2) was asserted in July, 2007 – more than a year before either Omni 808

4    Investors, LLC or Vision Capital, LLC came into existence – and therefore

5    apparently did not encompass the activities of those entities or the transactions

6    which are the subject of the Financing Discovery. While that fact might be

7    overcome by a showing that the Financing Entities were created or used to further a

8    scheme to carry on misconduct that is the subject of Phase 2, Mattel did not

9    demonstrate that such is the case in its briefs and supporting evidence.

10    In sum, absent some argument or evidence demonstrating a nexus between

11    the predicate activities alleged in the RICO counterclaim, on the one hand, and the

12    transactions and other matters which are the subject of the Financing Discovery, on

13    the other hand, there has been no showing by Mattel that the Subpoenas to the

14    Financing Entities are reasonably calculated to lead to the discovery of admissible

15    evidence regarding the RICO counterclaim.

16    **b.    Mattel's Disgorgement Remedy**

17    Next, Mattel asserts that the Subpoenas to the Financing Entities seek

18    information relevant to its remedy of disgorgement, which is an available remedy

19    for Mattel's Phase 2 counterclaim for misappropriation of trade secrets. Mattel

20    argues:

21

22    [16] This conclusion is consistent with the case cited by Mattel – *Eastman Kodak Co. v. Camarata*, 238 F.R.D. 372
      (W.D.N.Y. 2006). There, the plaintiffs "asserted broad civil RICO claims against the Nicolo defendants predicated,
23    among other violations, upon alleged money laundering violations. Specifically, the Complaint alleges that the
      Nicolo defendants and the other named defendants constituted an enterprise as defined in the RICO statute that was
24    engaged in a pattern of racketeering activity, including mail and wire fraud and, more importantly for purposes of
      this motion, money laundering." (*Id.*, at 375). "The alleged money laundering consisted of repeated deposits into
25    various financial institutions in order both to promote and carry on the unlawful activity – that is, by paying and
      depositing kickbacks to certain members of the enterprise – and to conceal and attempt to conceal the proceeds, their
26    nature, source and location – that is, by transferring funds between defendants and between various accounts
      maintained by those defendants." (*Id.* [emphasis added]). Thus, inquiry into the defendants' finances was
27    appropriate as it was likely to reveal activity related to the alleged predicate acts. Here, on the other hand, Mattel has
      not alleged any sort of financial scheme which would support inquiry into the MGA Parties' financial transactions
28    with third parties.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 18 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___8___ PAGE _153_

1      For purposes of establishing disgorgement, Mattel must take into
account money transferred from MGA and Isaac Larian,
regardless of the manner in which it was transferred. Mattel is
entitled to discovery that shows all assets siphoned from MGA or
Isaac Larian . . . . By these subpoenas, Mattel seeks evidence to
prove the amount the defendants must disgorge. Money that
properly belonged to Mattel was transferred from MGA or Isaac
Larian to an entity controlled by them.

(Motion, pp. 20:1 – 4, 21:12 – 14).

      While the foregoing statements may be true as a general proposition, none of

the Financing Entities is alleged to have "received money that properly belonged to

Mattel." To the contrary, Mattel asserts that the Financing Entities are creditors of

MGA. Therefore, Mattel has not demonstrated how any of the categories of

documents sought from the Financing Entities would aid it in ascertaining the

amount defendants must disgorge.

### c.    Phase 2 Damages

      Mattel's third argument in favor of enforcement of the Subpoenas is that they

"seek documents relevant to MGA's financial condition" and other "factors

relevant to an award of punitive damages." (Motion to Compel, p. 21:19 – 22).

Depending on the particular scope of the document request, such discovery from

Omni 808 Investors, LLC may be appropriate in connection with Phase 2 because

any information evidencing MGA's indebtedness to Omni 808 Investors, LLC from

the purchase of the alleged Wachovia debt or direct loans to MGA is relevant to

MGA's net worth (and hence punitive damages).[17] As the Court noted in its

February 11, 2009 ruling:

      I can see tremendous overlap between, for example, discovery on

---

[17] The Discovery Master's analysis is fundamentally different for OmniNet Capital, LLC and Vision Capital, LLC because neither entity is alleged to be a creditor of MGA Entertainment, Inc. (Motion to Compel, pp. 9 and 10). To the contrary, Mattel concedes that "OmniNet [Capital, LLC] is not the secured party, and thus presumably not the actual debt purchase/lender. Rather, the company holding the security interest is Omni 808 [Investors, LLC] . . . [which] appears to be owned funded by a company called Vision Capital, LLC." (Id.) Because it admits that OmniNet Capital, LLC and Vision Capital, LLC are not creditors of MGA, Mattel has failed to show that the information sought from those entities has any bearing on MGA's financial condition.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 19 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT  8  PAGE 154

1    financial condition of the company as it relates to damages in the
     Phase 2 and also issues that the receiver is looking at.  And
2    without making a ruling on any of this, I would not suggest for a
     moment that these are mutually exclusive categories.
3
     (Tr., 101:3 - 8)
4
5        Mattel argues that the necessary connection between the Financing

6    Discovery and Phase 2 damages exists because the Financing Entities have acquired

7    a security interest in MGA's assets, which, in turn, affects MGA's financial

     condition.  Specifically, Mattel argues that Omni 808 Investors, LLC is:
8
9        directly involved in providing funding to MGA in exchange for a
         security interest.  Such funding, and security interests, are in and
10       of themselves directly relevant to the financial condition of the
         MGA Parties, including the amount of the security interests, the
11       terms and conditions of the funding, and the rate of funding. . . .

12   (Motion to Compel, p. 22: 13 – 17).

13       The Discovery Master agrees that such limited information, as it relates to

14   the purchase by Omni 808 Investors, LLC of the debt obligation previously held by

15   Wachovia Bank, is reasonably calculated to lead to the discovery of admissible

16   evidence concerning Phase 2 issues, including the calculation of MGA's net worth

17   for purposes of calculating punitive damages.[18]  Accordingly, Mattel's motion to

18   compel responses from Omni 808 Investors, LLC is granted with respect to

19   documents relating to (1) the existence of any debt owed by MGA Entertainment,

20   Inc. to Omni 808 Investors, LLC and (2) any communications between Omni 808

21   Investors, LLC and the MGA parties regarding any such indebtedness.

22       The problem, however, is the vast majority of the document requests set forth

23   in the Subpoena propounded on Omni 808 Investors, LLC are not narrowly tailored

24   to obtain information demonstrating the amount and nature of MGA's indebtedness

25   (and hence net worth) or communications regarding any such debt,[19] but instead

26   _____
     [18] During oral argument, counsel for MGA represented (and counsel for Mattel seemed to agree) that the Court
27   deferred discovery regarding the Wachovia debt until the middle of the Phase I trial.  (Reporter's Transcript of
     Proceedings, March 4, 2009, pp. 72, 85 and 86).  The extent to which that damages information was obtained directly
28   from Wachovia, as opposed to MGA, is not clear from the record provided to the Discovery Master.

     [19] Nor did Mattel move to compel MGA to produce this information in the first instance.

ARENT FOX LLP
ATTORNEYS AT LAW                                              ORDER NO. 3
LOS ANGELES                          - 20 -          [Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___8___ PAGE _155_

1   would require the Financing Entities to produce virtually every document in their
2   possession regarding their formation, operations, and history of transactions.
3   Among other things, the Subpoenas to the Financing Entities seek:

4       •   All records that "substantiate transfers of assets" by the Financing
5           Entities "to other entities, individuals, and/or parties, within the U.S.
6           and outside of the U.S." (Exhibits 27-29 to Supplemental Declaration
7           of Jon D. Corey In Support Of Mattel, Inc.'s Reply In Support Of
8           Motion To Compel Production of Documents Responsive to Third-
9           Party Subpoenas, Attachment A, ¶ 16);

10      •   All documents "detailing or setting forth the relationship" between
11          each of the Financing Entities and other non-parties (*Id.* at ¶¶ 6-10);

12      •   All documents referring or relating to the "all contributions, loans and
13          any sources of funding" for the Financing Entities (*Id.* at ¶ 13);

14      •   All documents referring or relating to the "source of funding" of other
15          non-parties (*Id.* at ¶ 16);

16      •   All documents showing detail of "all loan facilities" referring or
17          relating to the Financing Entities and other non-parties (*Id.* at ¶ 14);

18      •   All documents referring or relating to "transactions involving any
19          compensation, loans, advances, payments, fees or any other form of
20          consideration" paid to other non-parties (*Id.* at ¶ 15);

21      •   All "communications" referring or relating to the Financing Entities
22          and other non-parties (*Id.* at ¶ 17).

23      Accordingly, the Discovery Master concludes that most of the categories of
24  documents in the Subpoenas are overbroad and not reasonably calculated to lead to
25  the discovery of admissible evidence with respect to Phase 2 issues, as detailed in
26  Section IV below (entitled "Disposition").

27  //

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 21 -                                ORDER NO. 3
                          [Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___8___ PAGE _156_

1          **d.    Credibility Of MGA Witnesses**

2          Mattel's fourth argument consists of a single, conclusory paragraph asserting

3   that it is entitled to its discovery in order to determine the credibility of MGA's

4   witnesses.  To support this argument, Mattel first states that information is

5   discoverable "if it relates to 'the credibility of any witness.'"  (Motion to Compel,

6   p. 23 (citing *Cable & Computer Tech., Inc. v. Lockheed Sanders, Inc.,* 175 F.R.D.

7   646, 650 (C.D. Cal. 1997)).[20]  Next, Mattel asserts that "MGA and Larian made

8   statements under oath about their financial condition as well as about the role of

9   Omni 808 and the other non-operating entities in providing MGA with additional

10  funding."  (*Id.*)  But that is the full extent of Mattel's argument.  Mattel does not

11  attempt to show that the specific discovery that it has propounded is reasonably

12  calculated to lead to the discovery of the evidence that it contends would be

13  admissible.

14         Discoverable information generally includes evidence relevant to the

15  credibility of a party or a key witness.  (See *Paulsen v. Case Corp.,* 168 F.R.D. 285,

16  287-288 (C.D. Cal. 1996); see also *Ragge v. MCA/Universal Studios,* 165 F.R.D.

17  601, 603-604 (C.D. Cal. 1995); *U.S. v. City of Torrance,* 164 F.R.D. 493, 495 (C.D.

18  Cal. 1995)).  If Mattel's discovery were reasonably calculated to lead to the

19  discovery of such information, then it might be permissible.  (*Id.* ["Rule 26 is

20  liberally interpreted to permit wide ranging discovery of all information reasonably

21  calculated to lead to discovery of admissible evidence."])  But Mattel has not taken

22  any steps to connect its discovery to such evidence.  As discussed above, Mattel

23  bears the burden of demonstrating that its discovery is reasonably calculated to lead

24  to the discovery of admissible evidence.  Here, Mattel has only stated that

25  credibility evidence can be admissible and that credibility is at issue in this case –

26  without referring at all to specific categories of documents in the Subpoenas or

27

28
_____
[20] The Discovery Master notes that the case cited by Mattel does not actually discuss or apply this proposition.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT __8__ PAGE _152_

1   linking those categories of documents to prior or anticipated testimony of MGA's

2   witnesses.  Simply stating that credibility evidence is discoverable does nothing

3   toward meeting Mattel's burden to demonstrate that the particular discovery at issue

4   here is reasonably calculated to lead to the discovery of such evidence.

5               e.      **MGA's Unclean Hands**

6          Mattel next argues in its Motion to Compel that MGA has asserted an

7   unclean hands defense in response to Mattel's Phase 2 claims, and consequently

8   Mattel is entitled to discover whether the MGA Parties are currently "engaging in

9   sham and fraudulent financial transactions such as concealing profits" to preclude

10  MGA "from invoking the unclean hands defense themselves." (Motion, pp. 23 -

11  24.)  But this argument does not apply to the Financing Entities because, as

12  discussed above, Mattel does not claim that the Financing Entities have "received

13  money that properly belonged to Mattel" or otherwise used those entities to conceal

14  profits.  To the contrary, Mattel asserts that the Financing Entities are creditors of

15  MGA.

16         Regardless, Mattel's theory is that, even if Mattel has unclean hands, MGA

17  may not assert that defense unless MGA itself is blameless.  (*Id.*, at 24 [a "party

18  asserting an equitable defense, however, must itself have 'clean hands.'"]).

19  Mattel's statement of the law is correct as far as it goes.  But, as the Ninth Circuit

20  has stated, "'unclean hands does not constitute 'misconduct in the abstract,

21  unrelated to the claim to which it is asserted as a defense.'" (*Jarrow Formulas, Inc.

22  v. Nutrition Now, Inc.*, 304 F.3d 829, 841 (9th Cir. 2002)).  "It is fundamental to

23  [the] operation of the doctrine that the alleged misconduct . . . relate directly to the

24  transaction concerning which the complaint is made." (*Dollar Sys., Inc. v. Avcar

25  Leasing Sys., Inc.* 13 F.2d 165, 173 (9th Cir. 1989)).  Accordingly, courts will not

26  allow discovery based on an unclean hands defense where the "allegations of

27  misconduct do not relate to the transactions... forming the basis for the

28  []complaint." (*Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948, 952 (S.D.Cal.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 23 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT __8__ PAGE 158

1  1996)).

2      Here, Mattel does not link any of the categories of documents referenced in

3  the Subpoenas (which involve the creation and operation of the Financing Entities

4  beginning with their formation in the summer of 2008) to any of the conduct at

5  issue in Phase 2 (which involves such matters as the alleged theft of trade secrets in

6  Mexico in 2004 and other conduct unrelated to the relationship between the

7  Financing Entities and MGA).  Accordingly, the Financing Discovery is not

8  reasonably calculated to lead to the discovery of admissible evidence regarding

9  MGA's alleged unclean hands in connection with the matters to be adjudicated in

10  Phase 2.

11                  **f.    Mattel's Unfair Competition Counterclaim**

12      As Mattel acknowledges, California's Unfair Competition Law, Business &

13  Professions Code §§ 17200 et seq. (the "Unfair Competition Law") encompasses

14  "'anti–competitive business practices as well as injuries to consumers, and has as a

15  major purpose the preservation of fair business competition.'"  (Opp. at 24:25 –

16  25:2, quoting *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone*

17  *Co.* (1999) 20 Cal.4th 163, 180)).  However, Mattel's papers do not sufficiently

18  demonstrate that the documents sought from the Financing Entities involve "anti-

19  competitive business practices," "injuries to consumers," or anything affecting

20  consumers or the public at all.  Instead, Mattel simply asserts, without any

21  supporting analysis, that MGA has violated the Unfair Competition Law by

22  "manipulating the sources of [its own] funding" (presumably the Financing

23  Entities).  That allegation, even if true, does not appear to involve the "unlawful,

24  unfair or fraudulent" marketing or sale of anything and therefore does not fall

25  within the ambit of the Unfair Competition Law.

26  //

27  //

28  //

EXHIBIT __8__ PAGE __59__

g.   **Summary Of The Discovery Master's Findings With Respect To The Subpoenas Directed To The Financing Entities**

For the foregoing reasons, the Discovery Master finds that, based on the record before him, Mattel has failed to sufficiently articulate the necessary connection between most of the Financing Discovery and any Phase 2 issue. Moreover, while there is a connection between the Financing Discovery and some of the Phase 2 issues referenced (i.e., MGA's financial condition and its bearing on Mattel's claim for punitive damages), Mattel has failed to demonstrate that the Subpoenas meet the standard set forth in Rule 26(b)(2) and that all of the requested discovery is permissible in light of the case law interpreting Rules 26 and 45.

Accordingly, Mattel's motion to compel the Financing Entities to comply with the Subpoenas is **GRANTED** in part and **DENIED** in part.

### 2.   Subpoenas To The Transferee Entities

In their briefs regarding the enforceability of the Subpoenas, Mattel and MGA do not, as a general rule, make a distinction between the Financing Entities and the Transferee Entities, but rather direct the same arguments to both groups collectively. However, there are important distinctions between the two groups, including, without limitation, that: (1) the Transferee Entities appear to be affiliated with – if not wholly owned by – Larian; (2) the Transferee Discovery involves the sale of MGA assets (i.e., Bratz products) in which Mattel has an ownership interest pursuant to the Court's December 3, 2008 ruling; and (3) the Subpoenas seek some documents relevant to Phase 2 issues which presumably cannot be obtained from MGA, namely the Transferee Entities' contracts with, and records of sales to, third parties purchasing the Bratz products. Accordingly, in ruling on the Subpoenas directed to the Transferee Entities, the Discovery Master's analysis of certain of the parties' above-referenced arguments differs, as follows.

//

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 25 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT _8__ PAGE _160_

1        **a.**  **Non-Party Considerations**

2      To begin with, the distinction between a party and non-party here is less

3    compelling given the MGA parties' apparent admission that the Transferee Entities

4    are single purpose entities created and controlled by Larian (who is, of course,

5    himself a party) to dispose of inventory that is the subject of this litigation.  Further,

6    the MGA parties presumably do not have custody of the sales contracts whereby

7    IGWT Group LLC sold Bratz products to third parties.  The Discovery Master also

8    notes that counsel for the Transferee Entities has submitted a declaration stating

9    that there are "hundreds of sales contracts at issue, and as such, thousands of

10   documents responsive to Mattel's requests."  (Declaration of Jeffrey B. Valle dated

11   February 17, 2009 ["Valle Decl."], ¶ 7).  The unavailability of these relevant

12   documents from any other source weighs heavily in favor of enforcing the

13   Subpoena to IGWT Group LLC.

14       **b.**  **Relevance To Phase 2 Issues**

15        **1.**  **Phase 2 Damages**

16     As mentioned above, Mattel argues that the Subpoenas "seek documents

17   relevant to MGA and Larian's financial condition, net worth, and ability to pay" on

18   the ground that such information is relevant to Mattel's Phase 2 damages claims,

19   including Mattel's claim for punitive damages.

20   For the reasons previously discussed, the Discovery Master finds that, with respect

21   to the Financing Entities, the discovery requests were, for the most part overbroad,

22   and/or not sufficiently linked to Phase 2 issues.  However, the Discovery Master's

23   analysis is necessarily different with respect to entities which were created and

24   apparently wholly owned and/or controlled by Larian (a defendant in Phase 2), and

25   which are admittedly selling inventory which generate revenues in which Mattel

26   has an interest.  Specifically, Mattel contends that Larian has caused MGA to sell

27   the inventory at a deep (80%) discount to the Transferee Entities.  This practice, if

28   true, limits MGA's profits (which go to MGA's balance sheet, and ultimately

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 26 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT __8__ PAGE _161_

1    affects MGA's net worth) while at the same time allowing Larian to capture

2    additional profits which otherwise would have been realized by MGA and reflected

3    on MGA's balance sheet).  Accordingly, the Discovery Master finds that most of

4    the documents Mattel seeks to subpoena from the Transferee Entities properly

5    relate to Phase 2 issues, as specified in Section IV below.[21]

6                      **2.    Mattel's Unfair Competition Counterclaim**

7            Given MGA's admissions regarding Larian's ownership/control of the

8    Transferee Entities, coupled with their sale of inventory purchased from MGA, the

9    Discovery Master finds that many of the documents requested from the Transferee

10   Entities are also arguably related to a "fraudulent," "unlawful," or "unfair" business

11   practice within the meaning of the Unfair Competition Law and the scope of

12   Mattel's Counterclaims.  Among other things, the Court's December 3, 2008 order

13   imposes a constructive trust on the proceeds of MGA's sale of the subject

14   inventory.  If, as Mattel argues, MGA's sale of that inventory to the Transferee

15   Entities constitutes a scheme on the part of Larian to enrich himself by depriving

16   Mattel of the true profits to be paid to Mattel pursuant to the Court's order, then

17   such conduct would constitute an unlawful attempt to circumvent the Court's order

18   and arguably render the transaction between MGA and the Transferee Entities an

19   anti-competitive business practice that is unlawful, unfair or fraudulent to other toy

20   manufacturers, including Mattel.  Therefore, such alleged misconduct, if proven,

21   could violate the Unfair Competition Law.

22           Moreover, although Mattel asserted its counterclaim for violation of the

23   Unfair Competition Law prior to the alleged misconduct (and long before the

24   Transferee Entities came into existence), Mattel phrased its allegations broadly

25

26   [21] The Discovery Master notes that IGWT 826 Investments is registered at the home address of Larian's sister and brother-in-law, indicating that some of Larian's relatives may be involved in the ownership or operation of the Transferee Entities.  Accordingly, the Discovery Master has specified in some instances that the production of

27   documents shall include those referencing not only Larian, but also his spouse, his children, his siblings, or their spouses, or any entity or person affiliated with them.  However, the Discovery Master has stopped short of ordering

28   the production of documents relating to any other entities, individuals "within the U.S. and outside the U.S.," as requested in Category 6 of each of the Subpoenas directed to the Transferee Entities.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 27 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT _8_ PAGE _162_

1   enough to potentially encompass subsequent acts of unfair competition which

2   perpetuate or extend the misconduct alleged in the Counterclaims.  Unlike Mattel's

3   RICO counterclaim, Mattel's Twelfth Counterclaim for Unfair Competition does

4   not purport to rest on a list of enumerated, factually detailed and carefully defined

5   acts, but rather is phrased broadly to cover "unlawful, unfair and/or fraudulent acts

6   of unfair competition" which include, "without limitation" certain illustrative

7   examples.  (Counterclaims, p. 74, ¶ 165).

8       Of course, the Discovery Master cannot predict whether the Court will

9   ultimately deem Mattel's unfair competition counterclaim to be sufficiently elastic

10  to encompass MGA's alleged misuse of the Transferee Entities or whether Mattel

11  will seek (and the Court permit) amendment of the counterclaim to expressly

12  reference such alleged misconduct.  Nevertheless, in light of the fact that the

13  discovery need only appear reasonably calculated to lead to the discovery of

14  admissible evidence, the Discovery Master finds that certain aspects of the

15  Subpoenas are sufficiently related to Mattel's Phase 2 unfair competition claim.

16              c.      **Summary Of The Discovery Master's Findings With**

17                      **Respect To The Subpoenas Directed To The**

18                      **Transferee Entities**

19      As set forth above, the Discovery Master finds that Mattel has sufficiently

20  articulated a connection between some of the Transferee Discovery and its Phase 2

21  claims.  Accordingly, Mattel's motion to compel the Transferee Entities to comply

22  with the Subpoenas is **GRANTED** in part and **DENIED** in part.

23  **IV.    Disposition**

24      1.      The Motion to Quash filed by MGA is **DENIED**.

25      2.      Mattel's Motion to Compel the Financing Entities to produce

26  documents responsive to the Subpoenas is **DENIED** with respect to OmniNet

27  Capital, LLC and Vision Capital, LLC.

28      3.      Mattel's Motion to Compel Omni 808 Investors, LLC to produce

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 28 -

EXHIBIT __8__ PAGE _163_

1   documents responsive to the Subpoena propounded on it is **GRANTED** in part and

2   **DENIED** in part, as follows:

3          a.      Requests 1 through 3, 13, 15, and 17: The Motion is granted

4   with respect to documents relating to (1) the existence of any debt owed by MGA

5   Entertainment, Inc. to Omni 808 Investors, LLC, including any debt purchased

6   from Wachovia Bank, and (2) any communications between Omni 808 Investors,

7   LLC and the MGA parties regarding any such indebtedness. The motion is denied

8   regarding any other documents sought by these requests.

9          b.      Requests 4 through 12, 14 and 18: The Motion is denied.

10    4.      Mattel's Motion to Compel the Transferee Entities to produce

11   documents responsive to the Subpoenas is **DENIED** as to Request 6 propounded to

12   IGWT Group LLC and Request 6 propounded to IGWT 826 Investments, LLC.

13    5.      Mattel's Motion to Compel the Transferee Entities to produce

14   documents responsive to the Subpoenas is **GRANTED,** as follows:

15                        **Subpoena To IGWT Group LLC**

16          a.      Request 1: The Motion is granted with respect to documents

17   relating to the purchase by, or transfer to, IGWT Group LLC of any items of value,

18   including Bratz products, from MGA, Larian, his spouse, his children, his siblings,

19   or their spouses, or any entity or person affiliated with them.

20          b.      Request 2: The Motion is granted

21          c.      Request 3: The Motion is granted with respect to documents

22   relating to any ownership interest by Larian, his spouse, his children, his siblings,

23   or their spouses, or any entity or person affiliated with them.

24          d.      Request 4: The Motion is granted with respect to documents

25   relating to any sources of funding by Larian, his spouse, his children, his siblings,

26   or their spouses, or any entity or person affiliated with them.

27          e.      Request 5: The Motion is granted with respect to documents

28   relating to any compensation, loans, advances, payments, fees or any other form of

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 29 -                                     ORDER NO. 3
                                  [Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT __8__ PAGE _164_

1    consideration paid by IGWT Group LLC to Larian, his spouse, his children, his

2    siblings, or their spouses, or any entity or person affiliated with them.

3              f.       Request 7: The Motion is granted.

4                   **Subpoena To IGWT 826 Investments LLC**

5              a.      Request 1: The Motion is granted with respect to documents

6    relating to the purchase by, or transfer to, IGWT 826 Investments LLC of any items

7    of value, including Bratz products, from MGA, Larian, his spouse, his children, his

8    siblings, or their spouses, or any entity or person affiliated with them.

9              b.      Request 2: The Motion is granted

10             c.      Request 3: The Motion is granted with respect to documents

11   relating to any ownership interest by Larian, his spouse, his children, his siblings,

12   or their spouses, or any entity or person affiliated with them.

13             d.      Request 4: The Motion is granted with respect to documents

14   relating to any sources of funding by Larian, his spouse, his children, his siblings,

15   or their spouses, or any entity or person affiliated with them.

16             e.      Request 5: The Motion is granted with respect to documents

17   relating to any compensation, loans, advances, payments, fees or any other form of

18   consideration paid by IGWT 826 Investments LLC to Larian, his spouse, his

19   children, his siblings, or their spouses, or any entity or person affiliated with them.

20             f.       Request 7: The Motion is granted.

21        5.    All non-privileged documents referenced in Paragraphs 3 and 5, above,

22   shall be produced within 30 days of this Order, subject to any applicable

23   confidentiality designations available under the Protective Order.

24        6.    Nothing in this Order should be deemed to prevent Mattel from

25   seeking discovery from the MGA parties of documents encompassed by the

26   Subpoenas upon the showing of a sufficient nexus between the particular discovery

27   requests and legitimate Phase 2 issues, and subject to any applicable objections.

28   //

EXHIBIT ___8___ PAGE _165_

1    Dated:  March 10, 2009

2

3

4                                             By:        /s/ Robert C. O'Brien

5                                                          ROBERT C. O'BRIEN
                                                           Discovery Master
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 31 -                                      ORDER NO. 3
                                [Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT __8__ PAGE _166_

# Exhibit 9

6191

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                   EASTERN DIVISION

4                     - - -

5      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                     - - -

7   MATTEL, INC.,                    )

8                  PLAINTIFF,        )

9         VS.                        )    NO. CV 04-09049

10  MGA ENTERTAINMENT, INC., ET. AL., )

11                 DEFENDANTS.       )    TRIAL DAY 31
                                     )    MORNING SESSION
12  AND CONSOLIDATED ACTIONS,        )    PAGES 6191-6350
                                     )

13

14

15       REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                 RIVERSIDE, CALIFORNIA

17              THURSDAY, AUGUST 7, 2008

18                   8:13 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
             FEDERAL OFFICIAL COURT REPORTER
24              3470 12TH STREET, RM. 134
             RIVERSIDE, CALIFORNIA  92501
25                  951-274-0844
                WWW.THERESALANZA.COM

EXHIBIT ___9___ PAGE/6 7

6276

1    BY MR. PRICE:

2    Q    I'M NOT ASKING ABOUT 2000.  I JUST WANT A DATE.  YOU TOLD

3    HIM YOU CAME TO THESE CONCLUSIONS ABOUT THERE'S REASONS WHY THE

4    FASHION MARKET IS DECREASING.

5         DO YOU HAVE A DATE WHERE YOU FIRST FIGURED THAT OUT?

6    2004?  2005?

7    A    EVERY YEAR I'VE BEEN MONITORING IT.  SINCE 2001, BARBIE

8    HAD OVER 90 PERCENT MARKET SHARE; SO I MONITORED THAT IN 2001.

9    AND I MONITORED IT EVER SINCE.  BARBIE HAD THE MONOPOLY.

10        MR. PRICE:  YOUR HONOR, MOVE TO STRIKE.

11        THE COURT:  IT'S STRICKEN.

12   BY MR. PRICE:

13   Q    MR. LARIAN, YOU TOLD THE JURY THAT THE FASHION DOLL MARKET

14   WAS DECREASING BECAUSE OF HANNAH MONTANA, BECAUSE OF ALL OF

15   THESE THINGS.  I'M TRYING TO FIND OUT WHEN YOU FIGURED THAT

16   OUT.  JUST GIVE ME DATE.

17   A    I'M TRYING TO GIVE YOU -- THAT HANNAH MONTANA, IT

18   SPECIFICALLY STARTED --

19   Q    MR. NOLAN ASKED YOU ABOUT THESE FACTORS, AND YOU SAID YOU

20   FIGURED OUT A BUNCH OF FACTORS THAT RESULTED IN MGA NOT MAKING

21   AS MUCH AS IT HAD.  I'M TRYING TO ASK WHEN YOU FIGURED THAT

22   OUT.

23   A    MR. NOLAN, TO THE BEST OF MY RECOLLECTION, ASKED IN 2007

24   WHAT WERE THE REASONS FOR THE DECLINE IN BRATZ, IF I UNDERSTOOD

25   HIS QUESTIONS CORRECTLY.  AND MY ANSWER WAS, IN 2007 OTHER

THURSDAY, AUGUST 7, 2008              TRIAL DAY 31, MORNING SESSION

EXHIBIT __9__ PAGE _168_

6277

1    COMPETITIVE PRODUCTS BECAME SUCCESSFUL IN THE U.S.A. THAT TOOK

2    AWAY FROM BRATZ. HANNAH MONTANA DOLL WAS ONE. HIGH SCHOOL

3    MUSICAL WAS ANOTHER ONE. WEBKINZ, WHO --

4            MR. PRICE: YOUR HONOR, BEYOND THE SCOPE OF THE

5    QUESTION, WHICH WAS A DATE.

6            THE COURT: LISTEN CAREFULLY TO THE QUESTION. LET'S

7    NOT ADD ADDITIONAL INFORMATION.

8            THE WITNESS: I THINK I DID SAY 2007.

9            THE COURT: THANK YOU.

10   BY MR. PRICE:

11   Q    NOW THAT WE'VE GOT THE DATE, I'D LIKE YOU TO LOOK AT

12   EXHIBIT 4947.

13   A    YES.

14   Q    AND IF WE TURN TO THE LAST PAGE OF THIS, 4947, PAGE 4,

15   THIS WAS INFORMATION THAT WAS CREATED ON OCTOBER 25TH OF 2007;

16   CORRECT?

17   A    THAT'S THE DATE OF THAT DOCUMENT, YES.

18   Q    AND THIS WAS CREATED BY SOMEONE AT MGA AT YOUR REQUEST SO

19   MGA COULD RESPOND TO MATTEL AND GIVE US ALL DOCUMENTS RELATING

20   TO YOUR NET WORTH; CORRECT?

21   A    I KNOW THAT AT MY DEPOSITION, MR. ZELLER ASKED ME THAT

22   QUESTION. I THOUGHT THAT WAS PREPARED IN REGARDS TO THIS

23   LITIGATION. I SUBSEQUENTLY FOUND OUT THAT WAS NOT THE CASE,

24   AND I ALSO SUBSEQUENTLY FOUND OUT THAT SOME OF THIS INFORMATION

25   IN THIS PAPER IS INACCURATE AND RELATES BACK TO YEARS BEFORE.

6278

1   Q    IN ANY EVENT, THIS WAS WHAT WAS PRODUCED BY MGA IN

2   RESPONSE TO THAT REQUEST FOR INFORMATION CONCERNING YOUR NET

3   WORTH; CORRECT?

4   A    TO THE BEST OF MY RECOLLECTION, YES.

5   Q    AND ON THIS DATE, OCTOBER 25, 2007 -- AND THIS IS FAR

6   ALONG INTO 2007 THAT YOU HAD NOTICED TRENDS AND WHAT WAS

7   HAPPENING WITH THE MARKET; CORRECT?

8   A    YES.

9   Q    SO AS OF THIS DATE, WHAT YOU GAVE TO MATTEL, IN JANUARY OF

10  2008, WAS THIS FIGURE HERE OF A NET WORTH OF $1.9 BILLION AND

11  THE VALUE OF MGA ENTERTAINMENT, YOUR PORTION, OF $1.6 BILLION;

12  CORRECT?

13          MR. NOLAN:  OBJECTION.  AND ALSO THE CHARACTERIZATION

14  THAT THIS WAS PREPARED FOR PURPOSES OF THIS LITIGATION.

15          THE COURT:  REPHRASE YOUR QUESTION.

16          MR. NOLAN:  IT'S ARGUMENTATIVE AND IT'S LACK OF

17  FOUNDATION.

18  BY MR. PRICE:

19  Q    WHAT WAS GIVEN TO MATTEL IN RESPONSE TO A REQUEST FOR

20  DOCUMENTS CONCERNING YOUR NET WORTH IN JANUARY OF 2008 WAS THIS

21  DOCUMENT, CORRECT, WHICH LISTED MGA'S VALUE -- YOUR PERCENTAGE

22  AS $1.6 BILLION AND YOUR NET ASSETS AS $1.9 BILLION?  THAT'S

23  WHAT YOU GAVE US; RIGHT?

24  A    YES.  AND I SAID THAT FIGURE IS A MISTAKE.

25          MAY I EXPLAIN?

6350

1

2  I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
   STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
3  THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
   ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
4  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
   THE UNITED STATES.

5

6                                                    8-8-08

7  THERESA A. LANZA, CSR, RPR                        . DATE
   FEDERAL OFFICIAL COURT REPORTER

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

THURSDAY, AUGUST 7, 2008              TRIAL DAY 31, MORNING SESSION

EXHIBIT ___9___ PAGE ⎿7⎾

# Exhibit 10

7652

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                              ---

4          HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                              ---

6    MATTEL, INC.,                :   PAGES 7652 - 7873
                                  :
7              PLAINTIFF,         :
                                  :
8        VS.                      :   NO. ED CV04-09049-SGL
                                  :   [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,     :   CV04-9059 & CV05-2727]
     ET AL.,                      :
10                                :
               DEFENDANTS.        :
11   _____:

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                   RIVERSIDE, CALIFORNIA

17                  FRIDAY, AUGUST 15, 2008

18                   JURY TRIAL - DAY 36

19                   AFTERNOON SESSION

20

21

22                                  MARK SCHWEITZER, CSR, RPR, CRR
                                    OFFICIAL COURT REPORTER
23                                  UNITED STATES DISTRICT COURT
                                    181-H ROYBAL FEDERAL BUILDING
24                                  255 EAST TEMPLE STREET
                                    LOS ANGELES, CALIFORNIA 90012
25                                  (213) 663-3494

CERTIFIED
COPY

EXHIBIT _10_ PAGE _122_

7759

1  He's not going to give the number. It's exactly what I told

2  the Court that our expert would be saying. He's not going to

3  give the precise number.

4          THE COURT: Well, what's the answer? What is he

5  going to say?

6          MR. ROTH: He's going to say given the

7  uncertainties of the company, he cannot place a value on it

8  today.

9          THE COURT: He cannot place a value?

10          MR. ROTH: Right.

11          THE COURT: Okay.

12          MR. COREY: But that's the answer. If he says you

13  can't put a value on it, they are going to say --

14          THE COURT: If all he says is I can't place a

15  value, there are uncertainties. I mean, the Court is going

16  to instruct the jury to do their best job to come up with a

17  value.

18          MR. PRICE: But he's going to go further.

19          THE COURT: I thought this was going to --

20          MR. PRICE: I did, too. But I think what he's

21  suggesting is that no one could. So --

22          MR. ROTH: Well, I will tell you --

23          THE COURT: You know, this is fine. That's

24  overruled.

25          (CONCLUSION OF SIDEBAR CONFERENCE.)



EXHIBIT _10_ PAGE _123_

7760

1    Q.    BY MR. KENNEDY:   Given everything you've learned in this

2    case about sales performance of Bratz, including the first

3    half of 2008 and taking into account the jury's verdict

4    that's already been returned in this case, and taking into

5    account the fact that we are still in trial in this case, and

6    taking into account the monetary amounts that Mattel is

7    seeking in this phase of the case, do you have an opinion as

8    to whether it is presently possible to place a value on

9    Mr. Larian's interest in the Bratz line portion of MGA?

10   A.    With all those issues, it would be my opinion that you

11   could not place a value on Mr. Larian's interest at this

12   point in time.  You just could not do that.

13   Q.    And is that also true of MGA's interest in the Bratz

14   line?

15   A.    It would be my opinion with all those issues and

16   uncertainties, you could not place a value on MGA at this

17   point in time.

18   Q.    And finally, did you prepare a graphic providing a

19   breakdown of profits according to segments of the overall

20   revenue for the Bratz line?

21   A.    Yes, I have.

22         MR. KENNEDY:   Aaron, could we see Exhibit 162.

23   Q.    And knowing we're short on time here, is what you've

24   done here taking the 3.1 billion in revenues, when you round

25   it up and broken that down into at least five of the overall

EXHIBIT __10__ PAGE __174__

7761

1   components that go to make it up?

2   A.   That's right.  If you go back to the prior schedules,

3   you'll see how this summary aligns with those schedules that

4   I've grouped together for the jury, the revenues and profits

5   from the various products and subbrands for the Bratz line,

6   and the total is the 3.1 billion.  Revenue, the total

7   profits, 405, and you'll see that spread amongst the various

8   categories.

9         MR. KENNEDY:  Thank you very much.  I have no

10  further questions, your Honor.  And I would move in all of

11  the exhibits except for the ones that Mr. Price has objected

12  to.  I think he and I can reach closure on that.

13        THE COURT:  Very well.  Why don't you confer

14  afterwards.

15        Thank you, Mr. Kennedy.

16        Mr. Price?

17                    CROSS-EXAMINATION

18  BY MR. PRICE:

19  Q.   Mr. Meyer, I want to ask you a little bit about your

20  testimony about Stanford.  Do you recall about teaching

21  there?

22  A.   At Stanford?

23  Q.   And Stanford has a terrific business school.  Do you

24  teach in the business school?

25  A.   I teach in the engineering school.  I teach business to

EXHIBIT 16  PAGE 125

7873

1

2

3

4

5

6

7                    C E R T I F I C A T E

8

9

10          I hereby certify that pursuant to Title 28,

11   Section 753 United States Code, the foregoing is a true and

12   correct transcript of the stenographically reported

13   proceedings in the above matter.

14          Certified on August 15, 2008.

15

16

17   MARK SCHWEITZER, CSR, RPR, CRR
     Official Court Reporter
18   License No. 10514

19

20

21

22

23

24

25

EXHIBIT __16__ PAGE __176__

# Exhibit 11

1

```
 1                 UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                      EASTERN DIVISION

 4                        - - -

 5       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 6                        - - -

 7   MATTEL, INC.,                 )
                                   )
 8                  Plaintiff,     )
                                   )
 9            vs.                  )   No. CV 04-09049
                                   )
10   MGA ENTERTAINMENT, INC., ET. AL.,  )
                                   )
11                  Defendants.    )
     _____)   HEARING
12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  Riverside, California

17               Tuesday, December 30, 2008

18                      10:04 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
               Federal Official Court Reporter
24                 3470 12th Street, Rm. 134
                Riverside, California  92501
25                     951-274-0844
                   WWW.THERESALANZA.COM
```

CERTIFIED COPY

EXHIBIT _11_ PAGE _122_

1  evidence and our interpretation of the submission is that
2  clearly -- and it makes sense -- decisions are being made. The
3  Hong Kong toy fair starts in January. In fact, it starts next
4  Monday; important meetings, products are being shown; decisions
5  are being made for the spring season; retailers are committing          00:34
6  space for that period of time.

7          What the retailers were saying to us, given the
8  import of the injunction and the terms of the injunction, and
9  the recall in particular -- which we believe may be the largest
10 toy recall ever ordered by a court -- is that retailers were              00:34
11 hesitant, are hesitant, and have cancelled orders in certain
12 respects; in other respects, they said, We will give you the
13 benefit of at least going to the court in an effort to
14 determine whether or not there can be some clarity as to what
15 happens after February. And if the stay were extended beyond            00:34
16 February, then purchasing decisions could be made, the sales
17 could go forward, et cetera, et cetera, which we've allowed in
18 our papers.

19         We have indicated, and we've described the injunction
20 in its present setting, whether or not it terminates in                  00:35
21 February or whatever, the injunction is, in essence, a death
22 warrant for the Bratz brand. There is no showing that Mattel
23 has any desire or any interest in pursuing the Bratz brand.

24         THE COURT: Well, you raise a critical point. It's a
25 death nail provided if, and only if, Mattel does not decide to           00:35

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT  11   PAGE 178

15

1  pursue it.  And one of the questions that I have for Mattel --
2  and I don't know if they're prepared to answer that today, but
3  at some point, Mattel is going to have to make a decision, and
4  I think the time for making that decision is probably sooner as
5  opposed to later.  Because whether I accept Mattel's                    00:35
6  declarations or your declarations, I think it's well understood
7  in the industry that a decision on this needs to be made
8  relatively soon.  And I've done everything I can short of
9  standing on my head to try to get the parties to work this out.
10 But barring that, and barring some agreement, I understand what          00:36
11 you're saying.
12         MR. NOLAN:  And so given that information, which was
13 a new reaction by retailers and licensees, we then needed to
14 make the decision as to how we bring this information and get
15 the relief that we need, to see whether or not we can get           00:36
16 clarity.
17         The permanent injunction was entered.  It was Phase 3
18 of the trial.  The permanent injunction is appealable in order
19 to effectuate the rights of MGA, which all of us have talked
20 about and made the analogy of a death warrant in this case, and     00:36
21 it certainly is, depending on what Mattel wants to do.  But
22 it's certainly a death warrant for Mr. Larian's interest in the
23 Bratz brand.
24         We were very much like in a situation where you're
25 trying to protect the property rights and the profound interest    00:37

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT _11_ PAGE _179_

16

1   of either 750 employees that are related only to the Bratz or

2   the --

3          THE COURT:  That's the part I don't get.  I

4   understand that the -- the injunction is certainly appealable,

5   and you have a right to appeal the injunction, although I    00:37

6   specifically stayed the injunction until February 11th because,

7   depending on what happens on February 11th, the injunction may

8   or may not have its current form.  And I certainly understand

9   and appreciate you bringing to this Court's attention the

10  necessity, from your perspective, of modifying the stay.    00:37

11         But the whole running up to the Ninth Circuit on the

12  stay at the same time is where you really throw me.

13         MR. NOLAN:  Okay.

14         THE COURT:  Just in case I don't get it?

15         MR. NOLAN:  You get it.  Let me just try to explain    00:38

16  where we were at.

17         Let's go back in history a little bit.

18         We get the injunction December 3rd.  I believe that's

19  a Thursday.  That Monday, the next Monday, after we process and

20  get information and the press is all over it -- it's on CNN;    00:38

21  it's on the Today Show -- retailers are contacting us and

22  telling us what their reaction is:  Hey, congratulations on the

23  stay until February; it doesn't help us; you've got a lot of

24  costs here, and you've got your spring line coming out.

25         That Monday we advise Mattel that we are going to go    00:38

Tuesday, December 30, 2008                    Mattel vs. MGA

EXHIBIT _11_  PAGE _180_

59

1          Good day.  And Happy New Year.

2

3

4                       CERTIFICATE

5

6   I hereby certify that pursuant to section 753, title 28, United
    States Code, the foregoing is a true and correct transcript of
7   the stenographically recorded proceedings held in the above-
    entitled matter and that the transcript page format is in
8   conformance with the regulations of the Judicial Conference of
    the United States.

9

10  _____          _1-7-09_____
    THERESA A. LANZA, CSR, RPR                  Date
11  Federal Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Tuesday, December 30, 2008                        Mattel vs. MGA

EXHIBIT __11__ PAGE _181_

# Exhibit 12

# ***Public Redacted***

# This Exhibit Is Filed Under Seal
# Pursuant To Protective Order

# Exhibit 13

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No. CV 04-09049 SGL(RNBx)                    Date: July 9, 2009
Title:        MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
=====================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

        Cindy Sasse                            None Present
        Courtroom Deputy                       Court Reporter

ATTORNEYS PRESENT FOR            ATTORNEYS PRESENT FOR
PLAINTIFFS:                      DEFENDANTS:

None Present                     None Present

PROCEEDINGS:    ORDER GRANTING EX PARTE APPLICATION RE TEMPORARY
                RECEIVERSHIP (DOCKET #5728)

                ORDER GRANTING EX PARTE APPLICATION RE COST
                SHIFTING (DOCKET #5865)

                ORDER GRANTING IN PART EX PARTE APPLICATION FOR
                RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

                ORDER GRANTING IN PART MATTEL'S MOTION RE
                DISCOVERY MASTER ORDER NO 27 AND REMANDING
                DISCOVERY MASTER ORDER NO. 27 FOR
                RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT
                OF THE FILING OF THE TAAC (DOCKET #5561)

                ORDER DENYING MOTION TO STRIKE THE FORENSIC
                AUDITOR'S REPORTS (DOCKET #5705)

MINUTES FORM 90                                  Initials of Deputy Clerk __cls_____
CIVIL -- GEN                         1

EXHIBIT __/3__ PAGE _206_

## I. ORDER GRANTING EX PARTE APPLICATION
## RE TEMPORARY RECEIVERSHIP (DOCKET #5728)

Because the only opposition to the Ex Parte Application regarding the winding up of the Temporary Receivership involves the issue of cost-shifting, which is addressed separately, below, the Court **GRANTS** the Ex Parte Application. A separate order addressing this Ex Parte Application has been concurrently filed.

## II. ORDER GRANTING EX PARTE APPLICATION RE
## COST SHIFTING (DOCKET #5865)

The MGA parties' opposition to the Temporary Receiver's Ex Parte Application argued that the costs of the Temporary Receivership should be shifted to Mattel (as the party who sought appointment of a Temporary Receiver). However, the Court has previously ruled that, at some yet-to-be defined date in the future, the Court will consider whether to shift the costs of both the Temporary Receivership and the Forensic Audit. Therefore, Mattel filed an Ex Parte Application seeking either to be relieved of the responsibility to respond to the MGA parties' argument or, alternatively, for an order setting a briefing schedule on the issue. It is not the intention of the Court to address the cost-shifting issue at this time; rather, as the Court has stated previously on the record, that issue is more efficiently resolved at a later date, most likely a date after completion of Phase 2 of the trial. Accordingly, the Court **GRANTS** Mattel's Ex Parte Application re Cost Shifting. Mattel is relieved of any duty to respond to MGA's argument regarding the appropriate allocation of costs arising from the Temporary Receiver that is set forth in the MGA parties's June 26, 2009 Opposition to the Temporary Receiver's Ex Parte Application.

## III. ORDER GRANTING IN PART EX PARTE APPLICATION FOR
## RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

The Court has received and reviewed the MGA Parties' Ex Parte Application For Partial Release of *In Camera* Juror Interview Transcripts, as well as the Opposition, the Reply, and the accompanying exhibits. The Court **GRANTS IN PART** the Ex Parte Application. Although the Court declines to award the relief sought, the Court will take steps to ensure that the transcript of the juror interviews are provided to the Ninth Circuit for its consideration of the appeal filed by the MGA parties.

The relevant *in camera* juror interviews were conducted on July 25, 2008; the findings made by the Court on the basis of those interviews are set forth in detail in the Court's Order Denying Motion for Mistrial, dated August 8, 2008. Counsel for the parties agreed that the juror interviews, which were conducted mid-trial, should be conducted *in camera*, and the MGA parties did not request that the Court grant them access to the transcripts to prepare their Motion for Mistrial. The Court indicated on the

MINUTES FORM 90
CIVIL -- GEN                                       2                    Initials of Deputy Clerk __cls_____

EXHIBIT __13__ PAGE _207_

record around the time of the filing of the Motion for Mistrial that it was not the Court's intent to grant the parties access to the transcripts.

After the conclusion of the trial, the MGA parties did not at any time request this Court grant access to the transcripts. To the contrary, some ten months passed between the date of the Order Denying Motion for Mistrial and the MGA parties' first post-trial request for access to those transcripts. That request was made to the Ninth Circuit, not this Court, on June 10, 2009. When the Ninth Circuit denied the request in favor of the MGA's presentation of the issue to this Court in the first instance, the MGA parties thereafter filed the present Ex Parte Application in a expeditious manner.

Ostensibly, as set forth in both the Motion filed before the Ninth Circuit and the Ex Parte Application before this Court, the reason the MGA parties seek access to those transcripts is so that they may use them to challenge the Court's Order Denying Motion for Mistrial. Although the MGA parties filed its Notice of Appeal on May 4, 2009, and although that Notice clearly indicated that the Order Denying Motion for Mistrial would be implicated in the appeal, the MGA parties failed to file its Motion seeking release of the transcripts until June 10, 2009. The MGA parties' failure to seek this relief until a month after they filed their Notice of Appeal and a month before their opening brief was due, and their decision to present the issue of release of the transcripts to the appellate court (rather than this Court) in the first instance, created the very urgency that cause them to seek ex parte relief from this Court. As such, the Court declines to grant the relief sought.

Nevertheless, in the interest of due process and in order to facilitate the full consideration of the issue by the Ninth Circuit, the Court will take steps to ensure that the transcripts of the *in camera* interviews are provided to the Ninth Circuit for *in camera* filing.

## IV. ORDER GRANTING IN PART MATTEL'S MOTION RE DISCOVERY MASTER ORDER NO 27 AND REMANDING DISCOVERY MASTER ORDER NO. 27 FOR RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT OF THE FILING OF THE TAAC (DOCKET #5561)

In the challenged portion of Discovery Master Order No. 27 ("DM Order No. 27"), the Discovery Master denied Mattel's Motion to Compel discovery sought by service of a subpoena on non-party Bingham McCutchen LLP ("Bingham"), a law firm that represents Intervenor Omni 808, as well as a number of non-party entities that are familiar to those involved in this litigation: OmniNet Capital, LLC ("OmniNet"), Vision Capital, LLC ("Vision"), IGWT Group, LLC ("IGWT"), and IGWT 826 Investments, LLC ("IGWT 826"). Broadly categorized, the subpoena sought production of (1) fee agreements relating to Vision and Omni 808; (2) documents regarding the formation, control, and financing of Omni 808, Vision, and Lexington Financial Limited

MINUTES FORM 90
CIVIL -- GEN

3

Initials of Deputy Clerk __cls_____

EXHIBIT  13  PAGE 208

("Lexington"); (3) documents identifying stakeholders and officers of Omni 808, Vision, and Lexington; (4) all contracts relating to Omni 808, Vision Capital, and Lexington; (5) all communications relating to Omni 808, Vision Capital, and Lexington, excluding attorney-client privileged documents; and (6) Bingham's representation of MGAE and certain named individuals who have some connection with MGAE, including a number of Mr. Larian's family members.

The Discovery Master correctly recognized the essential legal standard in assessing whether a subpoena may be enforced.  The information must satisfy the discovery relevance standard, i.e., it must be "'reasonably calculated to lead to the discovery of admissible evidence.'" DM Order No. 27 at 19 (quoting Fed. R. Civ. P. 26(b)(1)).  The decision of whether to enforce a subpoena ultimately implicates a balancing test that pits relevance of the materials sought and need to the requesting party against hardship to the party resisting the subpoena.  DM Order No. 27 at 20. Non-parties are generally required to bear lesser burdens than parties in responding to subpoenas.  Exxon Shipping Co. v. United States Dept. of Interior, 34 F.3d 774, 779 (9th Cir. 1994) ("The Federal Rules also afford nonparties special protection against the time and expense of complying with subpoenas.").

However, the Discovery Master overstated the burden of proof allocated to Mattel, as the party seeking discovery. See DM Order No. 27 at 20 ("As the party moving to compel compliance with the subpoena, Mattel bears the initial burden of establishing that the information sought is relevant and necessary to the claims or defenses at issue.")  This standard is both overstated and incomplete.  It is overstated in that Mattel need not show that the evidence sought is "necessary to the claims or defenses."  Although Mattel indeed bears the burden of establishing relevancy, that showing is not one of "necessity."  Rather, Mattel must bear the burden of establishing the discovery relevancy standard -- that the materials sought are "reasonably calculated to lead to the discovery of admissible evidence" -- is met.  It need not establish that the materials sought are "necessary" to its case.

This point leads to the manner in which the stated burden is incomplete.  As clearly articulated by cases cited by Bingham, although Mattel bears an initial burden of establishing relevancy, the party resisting discovery thereafter has the burden of establishing that discovery should be denied.  See Bryant v. Ochoa, 2009 WL 1390794 at *1 (S.D. Cal. 2009) ("The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1). . . . Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections."); DIRECTV, Inc. v. Trone, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (same); see also Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975) (reversing the district court's issuance of a protective order based on a failure of the party resisting discovery to meet its burden by asserting that the defendant's deposition would merely yield cumulative evidence).

MINUTES FORM 90                                          Initials of Deputy Clerk __cls_____
CIVIL -- GEN                          4

EXHIBIT __13__ PAGE 209

The effect of this subtle variation on the burden of proof from that stated by the Discovery Master is magnified by the recent filing of the TAAC, which significantly heightens the relevancy of the issue of how the MGA parties and the parties represented by Bingham may be related, the formation of certain of those entities, and other issues implicated by Mattel's requests. Because the question of relevance is featured so prominently in the quintessential balancing test to which the present discovery motion was subjected, the filing of the TAAC dramatically altered the calculus that underlies the conclusions reached in DM No. 27.

For reasons related to judicial economy and preservation of scarce judicial resources (which this case has stretched to the outer limits), the Court defers decision, in light of the changed calculus that has occurred as the result of the filing of the TAAC, of the issues presented in the challenged portions of DM No. 27 to the Discovery Master. For that reason, the Court **REMANDS** the challenged portions of DM No. 27 to the Discovery Master for his reconsideration and re-balancing in light of the recently filed TAAC. The Discovery Master may, in his discretion, set the matter for further briefing and/or hearing, he may take the matter under submission based on the existing record, or he may take other action as he deems appropriate to resolve the present issues.

Notwithstanding the remand of DM Order No. 27, one issue raised by Mattel requires further consideration by the Court. At page 25 of DM Order No. 27, the Discovery Master appears to impose a blanket prohibition on discovery of materials that are in the possession of a subpoena recipient, but that are related to a non-party over whom the Court has not been shown to have jurisdiction. The Discovery Master cites no legal authority for such a blanket prohibition, and the Court, in its own research, has found none. Such a blanket prohibition precludes the application of the balancing test that applies almost universally to discovery motions; accordingly, and because this blanket prohibition is unprecedented, the Court finds that it is contrary to law. As to this narrow issue, the Court **GRANTS** Mattel's Motion. The issue of discovery of materials relating to Lexington is **REMANDED** to the Discovery Master for reconsideration in light of this ruling and in light of the filing of the TAAC.

## V. ORDER DENYING MOTION TO STRIKE
## THE FORENSIC AUDITOR'S REPORTS (DOCKET #5705)

In an unsealed filing that has since been ordered sealed by the Court, counsel for Omni 808 Investors, LLC ("Omni 808"), Todd E. Gordinier, made unwarranted, unsubstantiated personal attacks against the Court-Appointed Forensic Auditor, Ronald L. Durkin. Mr. Gordinier's selective public disclosure of portions of the Forensic Auditor's Summary Report, coupled with the maintenance of the Summary Report, as well as the later-filed Responsive Report and Final Report, under seal in their entirety, has led to an unbalanced public presentation of the issues discussed therein. In an

EXHIBIT __13__ PAGE 210

attempt to cure this deficiency, the Court has considered the possibility that it should simply unseal the relevant Reports and allow those Reports to speak for themselves.

Because the MGA entities were the primary subject of the Forensic Audit, the MGA parties have, quite understandably, objected to the proposed unsealing. Mattel, for its part, advocates quite emphatically, and not unreasonably, that the Reports should be unsealed in light of the selective disclosure. See Tr. at 31-32 ("It's the underlying analysis that refutes the selective disclosures that MGA and Omni made in a public forum to smear . . . both Mr. Durkin and Mattel.")  At the other end of the spectrum, Omni 808 has moved to strike the Reports in their entirety.

In the end, although the Court does not order the unsealing of the Reports, it **DENIES** the Motion to Strike.  The Court ordered the Forensic Audit to evaluate whether a receiver should be appointed; as the record bears witness, the Court eventually rejected the suggestion that it should appoint a permanent receiver, and the Court has instead appointed an MGA Monitor with more limited powers than a receiver. Nevertheless, the fact that the Reports were intended to serve a very limited purpose does not mean that there is no possibility that the Forensic Auditor's Reports will not serve any purpose henceforth.

As it currently stands, the Court **ORDERS** that no party shall cite to or rely upon the Reports for any purpose absent further Order of this Court.[1]  However, the documents attached to the Reports, to the extent they are otherwise discoverable, are not insulated from discovery on the basis that they have been made part of the Reports. Conversely, documents, such as charts and interview notes, that were prepared by the Forensic Auditor are the property of the Court and are not subject to discovery or use in this or any other litigation by any party or non-party.[2]

Had it been counsel for the MGA parties who mounted the unwarranted, unsubstantiated, and public personal attacks on Mr. Durkin, the Court would find, notwithstanding the sensitive information contained therein, the unsealing of the Reports was an appropriate remedy for the selective disclosure.[3]  However, here, it is

_____

[1] This Order does not supersede the Court's Order permitting the Forensic Auditor to share information with the Court-Appointed Monitor.

[2] Toward that end, the Court **CLARIFIES** to the parties that the work papers, drafts, notes, detailed time records, and any other materials prepared by or at the direction of the Forensic Auditor are the property of the Court.  The Court **ORDERS** the Forensic Auditor, as the custodian of those records on behalf of the Court, to retain those materials, whether maintained in electronic, hard copy, or any other medium, until further order of the Court.

[3] As it stands, counsel for MGAE, James I. Stang, wisely sought, and was granted, leave to file his more restrained, but just as unwarranted and unsubstantiated, personal attacks on Mr. Durkin under seal.  See MGA Entertainment, Inc.'s Response to Final In Camera Report of Forensic Auditor Ronald L.

EXHIBIT __13__ PAGE _211_

counsel for Omni 808 who made those attacks public, and although Mattel maintains that both the MGA parties and Omni 808 are jointly responsible for the selective disclosure, see July 6, 2009, Tr. at 33, whether, or to what extent, the MGA parties act or have acted in concert is an issue to be decided in Phase 2 of this action.

Nevertheless, Mr. Gordinier's attack on Mr. Durkin cannot pass without comment by the Court. The Court's comments are directed toward Mr. Gordinier personally, which is not the Court's usual practice. Although the irony of this form of address is not lost on the Court (given the subject of this Order), it is appropriate. Mr. Gordinier signed all three filings in which the personal attacks appear, and continues to stand behind those filings. Moreover, Mr. Gordinier expressly and unabashedly claimed personal responsibility for the brief that was not filed under seal, by both stating that he gave it a lot of thought before filing it and by implicitly acknowledging that although he considered filing his brief under seal, he ultimately rejected that course of action. See May 18, 2009 Tr. at 46-47 ("My brief speaks for itself. We have nothing to hide. . . . I didn't feel it appropriate, necessary, or desirable to file my brief under seal. And I don't have a problem with the Court or anybody reading what I have to say, because I gave it a lot of thought, and I gave it at lot of consideration.").

At the July 6, 2009, hearing, the Court outlined its concerns that while the attacks on Mr. Durkin were public, the Reports are not, and that "it doesn't seem fair" to the Court to allow those allegations to stand alone without a chance to respond to them. July 6, 2009, Tr. at 25-26. In response, Mr. Gordinier contended that his comments "respond[ed] to the report," and that "[w]hat we said was that there were problems with that report." July 6, 2009, Tr. at 28. This statement is an implicit denial that any personal attacks were made; however, as set forth in great detail below, the record belies Mr. Gordinier's post hoc protestations.

Lest Mr. Gordinier's statement reflecting his implicit denial that he engaged in personal attacks be perceived as one being made at oral argument without ample time to reflect upon its significance, the statement is also made by Mr. Gordinier in Omni 808's Reply Memorandum, a document upon which he had ample time to reflect: "Each and all of the references in Omni's Statement of Position refer to the contents of Mr. Durkin's Reports and the shortcomings contained therein and omitted therefrom, not to his person." Id. at 2 n.1. To be sure, the criticisms leveled at Mr. Durkin are framed in

---

Durkin (docket #5918) at 4 (accusing Mr. Durkin of "making McCarthy-like statements of non-existent buybacks and unsupported insinuations of conflicts of interest"); id. at 9 (suggesting that Mr. Durkin's formulation of certain search terms relating to criminal acts in Farsi without a concurrent formulation of those terms in English demonstrated a "predisposition that Persian members of MGA's management and staff (and only the Persian members) might be engaged in illegal conduct"). Mr. Stang's attacks pale in comparison to those advanced by Mr. Gordinier, and they were filed under seal. Thus, although the Court's analysis and conclusions regarding the Forensic Auditor's Reports applies with equal force to Mr. Stang's statements, his are not the focus of the Court's attention at this time.

MINUTES FORM 90
CIVIL -- GEN

7

Initials of Deputy Clerk __cls_____

EXHIBIT 13 PAGE 2/2

terms of his Reports. Still other criticisms are, as counsel maintains, addressed to the Reports themselves; those must be analyzed based on their substance. However, as aptly demonstrated by the cited and quoted portions of Mr. Gordinier's filings that appear below, his criticisms do not, by any measure, confine themselves to those Reports, and instead reach out in a highly personal manner to attack the author, his professionalism, his competence, his objectivity, and his integrity.[4]

Indeed, in a display the likes of which have not been previously witnessed by this Court, Mr. Gordinier strayed far afield of legitimate criticism of the discussions, analyses, and conclusions reached in the Summary Report and the Reports that followed. To be sure, there are instances in which Mr. Gordinier addressed the message found in those Reports; just as surely, however, as detailed below, Mr. Gordinier attacked the messenger. Specifically, the papers filed by Mr. Gordinier on behalf of Omni 808 call into question Mr. Durkin's professionalism and competence, as well as his objectivity and integrity. Moreover, and alarmingly, they falsely accuse Mr. Durkin of being influenced by an ethnocentric bias against Mr. Larian and Mr. Kadisha. Such attacks, aimed at Mr. Durkin personally rather than the discussion, analyses, and conclusions set forth in his Reports, appear throughout Omni 808's papers. See Omni 808 Investors, LLC's Statement of Position re Order to Show Cause re Appointment of a Permanent Receiver (docket #5446) ("SOP"), filed May 14, 2009, at 11 (referring to Mr. Durkin's "irresponsible" analysis); id. (noting that Mr. Durkin is "far too experienced" to believe that he "produced . . . a balanced presentation"); id. (stating that "Mr. Durkin's report is a polemic" and "a piece of advocacy"); id. at 12 n.9 (calling into question Mr. Durkin's "objectivity" based on the fact that the Court ordered Mr. Durkin's fees be paid (at least in the first instance) by Mattel); id. (suggesting that Mr. Durkin's ex parte communications with Mattel were improper); id. at 13 n.10 (characterizing Mr. Durkin's quotation of Mr. Larian's and Mr. Kadisha's account of how the two men were acquainted, from "the Persian community," as "at best, unprofessional" and, "at worst,

---

[4] Adding still further to the mounting irony, in the same footnote that Mr. Gordinier disclaims engaging in improper personal attacks, he falsely accuses counsel for Mattel of advancing their own improper ad hominen attacks against Neil Kadisha, who has been referred to as a "common thief" in certain unspecified Mattel filings. Mr. Kadisha is the Managing Partner of a diversified investment firm, Omninet Capital, LLC, and an investor in Omni 808. To call someone a "common thief" is, undoubtably, by any measure, a highly personal attack, therefore an attack addressed "to the man," or ad hominen. However, in the same manner Mr. Gordinier accuses Mr. Durkin of failing to provide appropriate context to the Court in his Reports, Mr. Gordinier himself fails to acknowledge that counsel for Mattel's use of the term "common thief" in connection with Mr. Kadisha merely quotes Los Angeles County Superior Court Judge Henry W. Shatford's conclusion regarding Mr. Kadisha, as set forth in his 191-page Statement of Decision, dated October 24, 2006, which was issued after a 200-day trial, which is currently pending appeal, and which conferred upon Mr. Kadisha the oft-repeated moniker of "common thief," as well as "embezzler," and "perjurer." See Uzyel v. Kadisha, Cal. App. Nos. B196045, B203804, B198007, B199850, B201425, 2009 WL 646096 (Mar. 4, 2009) (appellate brief). As always, context is key. The use by counsel for Mattel of another court's findings and conclusions to advance an argument is not inappropriate. Those findings and conclusions may, or may not, be relevant to matters presented to the Court. Used in this manner, although undoubtably addressed "to the man" (and his credibility), it is not an improper ad hominen attack.

Initials of Deputy Clerk __cls_____

EXHIBIT __13__ PAGE _213_

evidence of improper cultural bias"); id. (in the same footnote, referring to the same
quotation, stating that "[t]he tone [of the report] itself is compelling proof that Mr. Durkin
had no intention of providing an 'objective' report to the Court."); id. at 23 (referring to
the Summary Report as "Mr. Durkin's ill-concealed advocacy piece"); id. (noting that
advocacy, rather than objectivity, "is certainly the posture [Mr. Durkin] is most
comfortable with"); Omni 808 Investors, LLC's Memorandum in Support of Its Requests
to Strike Summary and Responsive Reports of Ronald L. Durkin (docket #5705)
("Motion to Strike"), filed June 8, 2009, at 4 (noting Omni's "doubts that the Court or any
party would benefit further by continuing this façade of Mr. Durkin's 'impartiality'"); id. at
7 (calling Mr. Durkin's explanation of his conclusion regarding the relatedness of certain
parties as "not only fatuous[,] but [also] intellectually dishonest"); id. at 9 (suggesting
that Mr. Durkin intentionally concealed from the Court the fact that Mr. Larian sought
other funding sources before turning to Mr. Kadisha); id. at 10 (noting that "Mr. Durkin's
repeated references to Mr. Larian's and Mr. Kadisha's common 'Persian' heritage can
only be viewed as an attempt to draw some nefarious ethnic connection between
them"); id. at 12 (calling the reference to Mr. Larian's and Mr. Kadisha's ethnicity
"unprofessional symptoms of improper cultural bias [that] have no place in a supposedly
objective report"); Omni 808 Investors, LLC's Reply Memorandum (docket #5809)
("Reply Memo") at 14 (suggesting that not only Mr. Durkin, but also counsel for Mattel,
harbor "cultural biases" that lead them to "suggest[] that [Mr. Larian's and Mr. Kadisha's]
common heritage makes [them] more likely to act contrary to their own interests); id. at
15 (stating that, according to his own interview notes, Mr. Durkin "misrepresented" to
the Court in his Summary Report how Mr. Larian and Mr. Kadisha portrayed their
relationship with each other).

As alluded to, Omni 808's criticisms have not been limited to personal attacks;
some of the criticisms are in fact aimed at the Reports themselves. See e.g., SOP at 16
("Mr. Durkin's conclusion that the Wachovia-Omni transaction impacted 'MGAEI's
solvency and ability to continue conducting operations' is simply wrong."). Any
comment by the Court regarding the substance of the discussions, analyses, and
conclusions presented to the Court in the Forensic Auditor's Summary, Responsive,
and Final Reports is inadvisable at this time. With the filing of the Third Amended
Answer and Counterclaims, much of the subject matter of the Forensic Auditor's
Reports have been incorporated into the claims at issue in this action. As such, it would
be premature for the Court to comment upon the substance of issues that are yet to be
adjudicated, and that are subject to a trial by jury. Nevertheless, the Court has
reviewed the Forensic Auditor's Summary, Responsive, and Final Reports, and the
exhibits attached thereto. The Court has also reviewed and considered the criticisms
aimed at the Forensic Auditor, cited and quoted above, as well as the entirety of all the
papers responding to the Forensic Auditor's Reports filed to date. After this review, the
Court is firmly convinced that all the personal criticisms of Mr. Durkin are unwarranted
and unsubstantiated.

At best, the criticism of Mr. Durkin's performance and presentation represents a

EXHIBIT __13__ PAGE _2/4_

different interpretation of available evidence. That such disagreements would arise
between the analyses offered by a Court-Appointed Forensic Auditor and that offered by
counsel for a party whose transactions have been a subject of that audit is by no means
surprising. A jury considering the relevant evidence might ultimately make factual
determinations that tend to agree with Mr. Durkin's assessment, it might ultimately tend
to agree with Mr. Gordinier's assessment, or it may very well reject both positions in
favor of another. The answer to the merits of the claims at issue in this action must
await another day. Today, the Court merely notes that its examination of the Forensic
Auditor's Reports reveal that Mr. Gordinier's personal attacks aimed at their author were
unjustified.

Some specific attacks directed toward Mr. Durkin – relating to his background as
a law enforcement officer, his communications with counsel for Mattel, and specific (but
baseless) allegations of ethnocentric bias -- are worthy of more specific comment by the
Court.

Stopping short of explicitly stating such, Mr. Gordinier appears to labor under the
assumption that Mr. Durkin has been unable to put behind him the prosecutorial
mindset under which he presumably operated during his former service to this Nation as
an agent of the Federal Bureau of Investigation ("FBI"). At the outset, the Court notes
that Mr. Gordinier's unstated assumptions do a disservice to the prosecutors and the
law enforcement officers who work with those prosecutors, both of whom conduct their
work under the clearly delineated duty to ferret out not only evidence of guilt but also
"evidence favorable to the accused." See e.g., Berger v. United States, 295 U.S. 78, 88
(1935) (noting that the role of the prosecutor is not to win at all costs and observing that
the prosecutor "is the representative not of an ordinary party to a controversy, but of a
sovereignty whose obligation to govern impartially is as compelling as its obligation to
govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall
win a case, but that justice shall be done."); Brady v. Maryland, 373 U.S. 83, 87 (1963)
(imposing a duty on prosecutors to provide to the defense exculpatory evidence when
requested to do so).

Secondly, even if prosecutorial duties were not so defined, the Court finds no
suggestion that Mr. Durkin skewed the evidence in favor of any particular viewpoint.
Undoubtedly, there is a *complete absence* of any evidence that, as Mr. Gordinier has
suggested, Mr. Durkin has embarked upon a campaign to purposely mislead the Court.

Mr. Gordinier also suggests that, because Mr. Durkin's bills are being paid by
Mattel, Mattel has, through this payment or through other communications with Mr.
Durkin, bought Mr. Durkin's loyalty. This is utter nonsense. As demonstrated by the
Court's communications with him, Mr. Durkin is a Court-Appointed Officer who
understands that his role is to work on behalf of the Court and not on behalf of any
party. In any event, the Court's Order of January 7, 2009, which appointed Mr. Durkin,
imposed the costs of the audit on Mattel "in the first instance," but expressly provided for

MINUTES FORM 90
CIVIL -- GEN                                    10                    Initials of Deputy Clerk __cls_____

EXHIBIT __13__ PAGE 2/5

the possibility that the audit expenses be shared or shifted to the MGA parties. Moreover, to suggest, however subtly, that ex parte communications with counsel for Mattel were improper ignores the Court's mandate to the Forensic Auditor in the January 7, 2009, Order, which states that Mr. Durkin was provided with attorney contact information and that he "shall direct his initial communications to counsel." At no time has the Court precluded the Forensic Auditor's communications with Mattel or its counsel; in fact, because the Forensic Audit was undertaken based on evidence gathered by and presented to the Court by Mattel, Mr. Durkin would have been remiss in his duties if he failed to communicate with Mattel and its counsel.

Mr. Durkin was vested with powers and discretion to complete a Court-ordered Forensic Audit. Pursuant to an Order of this Court, he undertook this task and exercised those powers and that discretion, presenting his Reports in conformity with the Court's instructions. Despite counsel's attacks, the Court's review of the evidence before it discerns no abuse of those powers or of that discretion.

Particularly troubling to the Court is that counsel speculates that, because Mr. Durkin noted in his report that Mr. Larian knew Mr. Kadisha from "the Persian Community," Mr. Durkin could be "of the view that this common heritage makes Mr. Kadisha more likely to act contrary to his own interests or to do something via third-parties that he wouldn't otherwise do?" See SOP at 13-14 n.10 (appearing to pose this thought as a rhetorical question). There is no indication in the record, or otherwise, that Mr. Durkin holds such a view. To the contrary, Mr. Durkin's comment regarding the acquaintanceship of Mr. Larian and Mr. Kadisha from "the Persian Community" (which is noted in the report within quotation marks and is expressly attributed to a reference made by Mr. Larian himself) is clearly predicated on interviews with these two individuals, each of whom related independently to Mr. Durkin and his colleagues that they knew each other from "the Persian Community." See Durkin Summary Report, Ex. 14, at 2 ¶ 3 (Notes re March 25, 2009, interview with Mr. Larian: "He indicated that he knew Kadisha from the Persian community.") and Ex. 14, at 15 ¶ 2 (Notes re March 26, 2009, interview with Mr. Kadisha: "Kadisha stated that he knows Larian from the Persian community."). The purpose for this reference is made clear in the footnote set forth at the end of the sentence in which the reference appears; namely, the Report discusses evidence that the relationship between Mr. Larian and Mr. Kadisha is stronger and more personal than either man claimed it was. See Summary Report at 5 n.18; Ex. 15 (personal emails).

In the Reply Memo, Mr. Gordinier takes issue with this explanation, this time including not only Mr. Durkin but also counsel for Mattel as the targets for his unsubstantiated allegations of "cultural bias." Mr. Gordinier first mischaracterizes an argument made by Mattel. Mattel argued, and quite correctly, both that how well Mr. Larian and Mr. Kadisha knew each other was relevant to a determination of whether certain transactions between the two were arms-length transactions, and that this point was likely not lost on either of these two very sophisticated and successful

MINUTES FORM 90
CIVIL -- GEN                                    11

Initials of Deputy Clerk __cls_____

EXHIBIT __13__ PAGE 2/6

businessmen.[5]  As noted previously, both Mr. Larian and Mr. Kadisha stated that they knew each other from "the Persian community" which, in the Forensic Auditor's view, was intended to, or at least had the tendency to minimize the existing relationship between the two.  Mr. Gordinier incorrectly characterizes this argument as Mattel's contention that Mr. Larian's and Mr. Kadisha's "Persian relationship" and "common Persian heritage" was somehow relevant to a determination of whether the Omni 808 transaction was an arms-length transaction.  Mattel made no such argument.  Neither counsel for Mattel nor Mr. Durkin have implied that Mr. Larian's and Mr. Kadisha's ethnicity factors into the analysis.  Other than to point to Mr. Larian's and Mr. Kadisha's separate, but identical, accounts of how they knew each other which, in turn, suggests how well they know each other, neither counsel for Mattel nor Mr. Durkin have stated or implied that Mr. Larian's and Mr. Kadisha's shared ethnicity is relevant to any matter currently or potentially before the Court.  Compare Opposition at 8-9 with Reply Memo at 14-15.

Moreover, Mr. Gordinier's substantive point, that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha told him about the closeness of their relationship, fares no better.  See Reply Memo at 15.  On this point, it is important to set this stage properly.  Counsel for all parties have attempted to glean far too much from two sterile paragraphs of interview notes taken by Mr. Durkin.  Much can be inferred from conversations and interviews through not only what is said, but what is not said, by the interviewee's demeanor, by the tone of the speaker, by the length and placement of pauses, and by non-verbal gestures and body language.  With all these variables, much of what is communicated does not find its way into notes.[6]  For instance, Mr. Durkin's interview of Mr. Larian lasted over two and a half hours; however, the interview notes are a mere five and a half pages.  Similarly, a one-hour and ten minute interview of Mr. Kadisha yielded only three and a half pages of interview notes.  This is not to suggest that the notes should have been longer or that the interviews should have been recorded or transcribed; rather, it is to suggest that counsel's arguments based on another's notes are not particularly probative.

In contrast, Mr. Durkin's assessment, based on his interviews with both of them,

---

[5]  In fact, the Court just this week issued a 30-page, single-spaced opinion resolving a 10-day bench trial conducted over the sole issue of whether a transaction between "closely related" entities reflected its fair market value, one of the more significant arguments ultimately rejected by the Court in that case being that the close relationship between the parties necessarily rendered the transaction a "sweetheart deal."  See July 6, 2009, Order, Siegel v. Warner Bros. Entertainment, Inc., et al., CV 04-08400 SGL (RZ) (docket #554).

[6]  Indeed, the interview notes upon which the parties rely concede as much.  See Summary Report, Ex. 14 at 2, 15 ("This interview memorandum is a factual representation of the topics discussed during the interview and is not intended to be a word for word or exact transcription of the conversation.").  Thus, in addition to not taking into account all non-verbal communication, the notes do not even represent everything that was said during the interview.

EXHIBIT __13__ PAGE _217_

is that Mr. Larian and Mr. Kadisha attempted to minimize their relationship because both of them understand the relevance of any friendship or other connection between them to the assessment of the arms-length nature of any transactions in which they have engaged. Mr. Durkin's assessment does not come from the gentle teasing of a strained meaning from two sterile paragraphs of brief notes taken by another person; rather, his assessment springs from his participation in the interview process, the entirety of the interviews he conducted of Mr. Larian and Mr. Kadisha, and his review of all of the evidence. As such, the Court defers to his assessment, at least insofar as how Mr. Larian and Mr. Kadisha portrayed their relationship to him.

As for that scant language from which the parties glean so much meaning, the entirety of which is set forth below, it in no way supports the contention made by Mr. Gordinier that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha conveyed to him about the closeness of their relationship. On this topic, the notes of Mr. Larian's interview merely state the following:

> Larian decided to contact Neil Kadisha of OmniNet as he knew his company was in the distressed loan business. He indicated that he knew Kadisha from the Persian community. Kadisha said he wouldn't do the deal alone in today's environment and wanted Larian and their other friends to invest in the deal with MGA. Larian stated that Kadisha negotiated the debt with Wachovia and got it down significantly, Larian said he is not bitter about Kadisha getting a good deal on buying the loan.

Summary Report, Ex. 14, at 2 ¶ 3 (emphasis added). This paragraph contains the word "friends," and perhaps could even be read as an implicit statement by Mr. Larian that he and Mr. Kadisha are "friends." But the language does not compel such an inference. Moreover, it does not comport with the notes of Mr. Kadisha's interview, which on this topic state only the following:

> Larian and Kadisha have never been to dinner together. Kadisha stated that he knows Larian from the Persian community and he sees him often at religious events, etc. He has no investments with Larian. Kadisha did not talk with Larian last night, this morning or in the last two days.

Summary Report, Ex. 14, at 15, ¶ 2. Mr. Durkin's assessment that Mr. Larian and Mr. Kadisha sought to minimize the extent of their relationship is not contradicted by these short passages.

The criticism that Mr. Durkin was acting pursuant to an ethnic or cultural bias is clearly baseless. The allegations are irresponsible, and they are made to capitalize on

MINUTES FORM 90
CIVIL -- GEN                              13                    Initials of Deputy Clerk __cls_____

EXHIBIT _13_ PAGE 2/8

their inherent sensational nature for counsel's own purposes of diverting attention away from the substance of the Reports. Sensationalism aside, when viewed in context, the Reports' reference to Mr. Larian and Mr. Kadisha knowing each other from "the Persian community" was plainly innocuous. The reference was a direct quotation from both Mr. Larian and Mr. Kadisha. It was used in a broader discussion regarding how (and thus, impliedly, how well) the two knew each other, which is itself relevant to the issue of whether certain transactions relevant to the present litigation were made at arms length.

This is a most unfortunate incident. The Court certainly understands, in a case as hotly contested as this one -- with such high stakes, with such complex legal issues, and with such truly extraordinary legal talent on all sides -- that lawyers, however ethical and committed to the highest standards of professionalism (as the Court presumes and has found all counsel of record here to be), make statements or commit acts in haste that they subsequently regret. All of the players to this drama, are, after all is said and done, human. As such, all of us are vulnerable to all-too-common human frailties. The Court would place itself at the very top of any list of lawyers who have spoken improvidently at one time or another in this case (and any number of others). What the Court has witnessed here, however, in both manner and substance, for the reasons noted above, goes beyond what the Court can let pass without some manner of reprobation. So let the Court be clear: Nothing excuses the attempted character assassination in which Mr. Gordinier has engaged.

**IT IS SO ORDERED.**

EXHIBIT __13__ PAGE _217_

# Exhibit 14

LAW OFFICES

# GLASER, WEIL, FINK, JACOBS & SHAPIRO, LLP

10250 CONSTELLATION BOULEVARD

NINETEENTH FLOOR

LOS ANGELES, CALIFORNIA 90067

(310) 553-3000

FAX (310) 556-2920

DIRECT-DIAL NUMBER
(310) 556-7865
EMAIL: AKHAN@GLASERWEIL.COM

February 10, 2009

🏛 MERITAS LAW FIRMS WORLDWIDE

**VIA EMAIL AND FACSIMILE (213) 443-3100**

Jon D. Corey, Esq.
QUINN, EMANUEL, URQUHART,
   OLIVER & HEDGES, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543

Re:      *Bryant v. Mattel, Inc. and Consolidated Actions*
         U.S.D.C. Eastern Division, Case No. CV04-09049 SJL(RNBx)

Dear Jon:

This concerns Mattel's demand to depose MGA executive Ron Brawer on Phase 2 issues for a second time, this time for at least an additional 14 hours. That demand is not well taken for at least four reasons.

First, on February 5, 2008, Mr. Brawer was deposed in London on Phase 2 matters for seven hours, which satisfied the 7-hour limitation contained in Rule 30 of the Federal Rules of Civil Procedure. This deposition was taken pursuant to a stipulated order entered into between the parties on January 28, 2008. Nowhere in that stipulated order is there any agreement or condition that Mr. Brawer's deposition would be allowed to last for longer than the seven-hour limit imposed by FRCP 30.

Second, Mattel's claim that it needs additional time to examine Mr. Brawer because MGA produced documents shortly before his deposition is without merit and misstates the dealings of the parties up until this point. Before Mr. Brawer's deposition, MGA offered to postpone Mr. Brawer's deposition *to give Mattel time to review those exact documents.* Mattel refused MGA's offer. Neither Mr. Brawer nor MGA should bear the burden for Mattel's tactical litigation decision. Mattel knew of the documents MGA was producing, but chose to depose Mr. Brawer immediately instead of postponing the deposition and first reviewing the documents. MGA is not required to produce Mr. Brawer again because Mattel now regrets its decision.

Third, Mattel's claim that it had no opportunity to question Mr. Brawer about key Phase 2 issues is erroneous. The Court did not put any subject matter restrictions on Mr. Brawer's deposition. Mr. Brawer's relevance to this case is in relation to Phase 2 issues and it was

666191

EXHIBIT __14__ PAGE __220__

Jon D. Corey, Esq.
February 10, 2009
Page 2

Mattel's responsibility to question Mr. Brawer on these Phase 2 issues in the time prescribed by FRCP 30. It is not MGA's responsibility to produce Mr. Brawer again just because Mattel chose not to examine him on certain issues.

Fourth, your claim that Mattel did not have enough time to properly depose Mr. Brawer due to allegedly improper objections made by MGA's counsel is without basis. Indeed, the transcript of Mr. Brawer's deposition clearly shows that counsel's objections were relevant, concise, and necessary given the nature of Mattel's questions.

Accordingly, MGA will not agree to produce Mr. Brawer for an unspecified number of additional hours of deposition as you request.

Very truly yours,

Amman Khan
of GLASER, WEIL, FINK, JACOBS
& SHAPIRO, LLP

AMM/rs

cc:     Joel N. Klevens, Esq.
        Jason Russell, Esq.
        Patricia Benson, Esq.

666191

EXHIBIT __14__ PAGE __221__

# Exhibit 15

# In The Matter Of:

*CARTER BRYANT v.*
*MATTEL, INC.*

---

## RONALD BRAWER
*February 5, 2008*

---

# CONFIDENTIAL
# ATTORNEYS' EYES ONLY
# MERRILL LEGAL SOLUTIONS
### 25 West 45th Street - Suite 900
### New York, NY 10036
PH: 212-557-7400 / FAX: 212-692-9171

BRAWER, RONALD - Vol. 1

CONFIDENTIAL - ATTORNEYS' EYES ONLY
RONALD BRAWER

Page 1

```
 1              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
 2
 3    - - - - - - - - - - - - - - - -X
      IN THE MATTER OF                )
 4                                    )
      CARTER BRYANT                   )
 5                      Plaintiff,    )
                                      ) Case No:
 6    v.                              ) CV 04-9049 SGL (RNBX)
                                      )
 7    MATTEL, INC.                    )
                        Defendant.    )
 8    - - - - - - - - - - - - - - - -X
 9                C O N F I D E N T I A L
10    VIDEOTAPED DEPOSITION OF MR. RONALD BRAWER
11                      VOLUME I
12            Tuesday, February 5, 2008
13                 AT:  9:54 a.m.
14                    Taken at:
15        Skadden, Arps, Slate, Meagher & Flom
                    40 Bank Street
16                   Canary Wharf
                  London, E14 5DS
17                 United Kingdom
18
19
20
21
22
23    Court Reporter:
24    MRS. CHANELLE MALLIFF
      Accredited Real-time Reporter
25
```

Exhibit _21_
P. _300_

EXHIBIT _15_ PAGE _223_

CONFIDENTIAL - ATTORNEYS' EYES ONLY
RONALD BRAWER

Page 2

```
 1                    A P P E A R A N C E S
 2   Appearing for the Plaintiff:
 3            JACK P. DICANIO
              SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
 4            300 South Grand Avenue
              Los Angeles, CA 90071-3144
 5            Telephone:  (213) 687-5000
 6   Also Present:
              CRAIG HOLDEN - In-house Counsel, MGA
 7
 8
     Appearing for the Defendant:
 9
              DOMINIC SURPRENANT
10            QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
              865 S. Figueroa Street
11            10th Floor
              Los Angeles, CA 90017
12            Telephone:  (213) 443-3166
13
14   Videographer:
15            PHILLIP HILL
16
17
18
19
20
21
22
23
24
25
```

Exhibit 21,
P. 309

EXHIBIT 15 PAGE 224

CONFIDENTIAL - ATTORNEYS' EYES ONLY
RONALD BRAWER

Page 232

1    coming at MGA.

2        Q.  Other than the fact that Mattel sued you when you

3    left and the fact that they've pursued claims against MGA,

4    do you have any other basis for your testimony that Mattel

5    has pursued litigation as a business strategy?

6        A.  I believe that -- well, while I was at Mattel the

7    term -- the terminology or the phrase "litigation" as a

8    business strategy was often bantered about.

9        Q.  And who were the banterers?

10       A.  The one that used it the most was Matt Bousquette.

11   The person I know who echoed him quite often would be

12   Drew Vollero who was our chief -- he wasn't the chief

13   financial officer.  He was head of financing in our

14   division, but he obviously had a good grasp of what was

15   going on.

16       Q.  What was the second gentleman's name?

17       A.  D-r-e-w and his second name is Vollero,

18   V-o-l-l-e-r-o.

19       Q.  What specifically have you heard Mr. Bousquette say

20   on the topic of using litigation as a business strategy?

21       A.  Let me think about.  You're saying specifically.

22   When we would sit in staff meetings, which happened weekly

23   and for hours and hours at end with Matt, we would review

24   the business and the dynamics going on in the business.

25   This would be taking place 2002, 2003, 2004.  I can't

CONFIDENTIAL - ATTORNEYS' EYES ONLY
RONALD BRAWER

Page 233

1   differentiate between the meetings because there were

2   probably in that time period alone over a hundred.  But in

3   some of the meetings we would review what our market share

4   and situation was with girls and with Barbie and we would

5   talk about different efforts the company was making to try

6   and fight the loss of share of Barbie and the declining

7   sales of Barbie.

8       There would always be two sides in the room.  There

9   would be the sales-oriented people: myself, Milt Zablow.  We

10  would get blamed for the fact that not every store had every

11  doll exactly on the shelf exactly at the time and that was

12  hurting our sales.  There was push-back from another side

13  that would say, "Hey, the issue goes well beyond just

14  distribution."  There was competitive issues such as Bratz

15  that were forcing the decline of Barbie.  Some of the

16  comments around what the company was doing over and above

17  our distribution problems were to face off with MGA with

18  litigation as a business strategy.  That would be -- it

19  wouldn't be discussed much beyond that, but one of the

20  strategies for trying to defeat Bratz was to litigate them

21  to death.  To litigate the owners or to litigate MGA to

22  death and that was one of the business strategies.

23      Q.  You have a specific recollection of Mr. Bousquette

24  stating what you've just stated in sum or substance at

25  meetings?

CONFIDENTIAL - ATTORNEYS' EYES ONLY
RONALD BRAWER

Page 248

1             CERTIFICATE OF COURT REPORTER

2

3    I, MRS. CHANELLE MALLIFF, an Accredited Real-time Reporter,

4    hereby certify that the testimony of the witness MR. RONALD

5    BRAWER in the foregoing transcript, numbered pages 1 through

6    246, taken on this 5th day of February, 2008 was recorded by

7    me in machine shorthand and was thereafter transcribed by

8    me; and that the foregoing transcript is a true and accurate

9    verbatim record of the said testimony.

10

11

12    I further certify that I am not a relative, employee,

13    counsel or financially involved with any of the parties to

14    the within cause, nor am I an employee or relative of any

15    counsel for the parties, nor am I in any way interested in

16    the outcome of the within cause.

17

18

19    Signed: ......................

20    Name:   MRS. CHANELLE MALLIFF

21    Date: ......................

22

23

24

25

Exhibit 21 ,
P. 312

EXHIBIT 15 PAGE 227

# Exhibit 16

# ***Public Redacted***

# This Exhibit Is Filed Under Seal
# Pursuant To Protective Order