# EXHIBIT 23

**THE EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 24

# THE EXHIBIT IS FILED UNDER SEAL
# PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 25

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

January 29, 2009

## VIA FACSIMILE AND U.S. MAIL

Thomas Nolan, Esq.
Jason Russell, Esq.
Carl Roth, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Suite 3400
Los Angeles, CA 90071

Patricia Glaser, Esq.
Glaser, Weil, Fink, Jacobs & Shapiro, LLP
10250 Constellation Boulevard
Nineteenth Floor
Los Angeles, California 90067

Re:    Mattel, Inc. v. MGA Entertainment, et al.

Dear Counsel:

I am writing to request a meet and confer pursuant to paragraph 5 of the Discovery Master Order and Local Rule 37-1 in connection with the deposition of Ronald Brawer.

Mr. Brawer's deposition was not completed, and he should be produced for at least another fourteen hours of testimony, without obstruction or interruption. See Brawer Depo. at 245:23-246:4, dated February 5, 2008 ("Mr. Brawer is a very important witness and he overlaps both Mattel and MGA and there's significant documentary examination I haven't done and significant non-documentary examination I haven't done. So it will be our position that the deposition is not closed and we will seek permission to have Mr. Brawer back for a second date."). Mr. Brawer is indisputably an important witness in this case. The scope of his knowledge, at both Mattel and MGA, go to multiple Phase 2 issues, and the fact that he is on many thousands of pages of documents, alone establish that there is good cause that he be produced for additional deposition time.

**quinn emanuel urquhart oliver & hedges, llp**

07209/2753276.3
NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan | TEL +81-3-5561-1711 FAX +81-3-5561-1712

EXHIBIT __25__
PAGE __349__

More specifically, Mr. Brawer has knowledge of several matters directly at issue in this case, including matters which are pertinent both to Mattel's claims and defenses and to MGA's claims. Mattel's counterclaims, for example, allege that Mr. Brawer participated in MGA's trade secret thefts from Mattel that are a basis of Mattel's claims in Phase 2 of this suit. Indeed, Mr. Brawer is the subject of 16 detailed paragraphs in Mattel's Second Amended Answer and Counterclaims. See Mattel, Inc.'s Second Amended Answer In Case No. 05-2727 and Counterclaims, dated July 12, 2007. MGA itself has identified Mr. Brawer as having knowledge regarding claims which MGA has put at issue. See MGA Entertainment, Inc.'s Fourth Supplemental Response to Interrogatory No. 1 of Mattel, Inc.'s First Set of Interrogatories Re Claims of Unfair Competition. There are several plainly relevant topics – such as MGA's trade secret thefts – about which Mattel has not been able to fully question him because of the refusal to afford sufficient time for deposition.

There also still remain thousands of pages of documents, including approximately 500 documents with Mr. Brawer's name on them that were produced only days before and some even after Mr. Brawer's deposition, about which we were not afforded an opportunity to question Mr. Brawer because of the witness' and defendants' refusal to produce him for more than seven hours. See Brawer Depo. at 245:13-19 ("A lot of documents, literally tens of thousands if not hundreds of thousands of pages of documents were produced in the last couple of weeks. We're still trying to get our hands on them. We understand that a lot of them deal with Mr. Brawer and we just haven't been able to go through them all.").

Furthermore, even during the limited time we have been afforded to question Mr. Brawer, counsel for the witness and for defendants made numerous, improper speaking objections and suggestive objections throughout the deposition that both interfered with it and wasted time that counsel then purported to count against the seven hours of his testimony. Mr. Brawer also was improperly instructed and refused to answer questions. For example, counsel instructed the witness not to disclose facts that were allegedly learned from counsel. However, at MGA's own insistence, the Discovery Master has already ruled that the privilege does not protect such matters and that such instructions are not appropriate.

Please let us know whether MGA will produce Mr. Brawer for additional deposition time and withdraw its improper instructions. Should we not be able to resolve these issues through the meet and confer process, Mattel contemplates bringing motions to overrule the improper instructions and to compel Mr. Brawer to appear for additional deposition time.

I look forward to hearing from you.

Very truly yours,

Michael T. Zeller \T.B.

Michael T. Zeller

2

EXHIBIT 25
PAGE 350

# EXHIBIT 26

LAW OFFICES

## GLASER, WEIL, FINK, JACOBS & SHAPIRO, LLP

10250 CONSTELLATION BOULEVARD

NINETEENTH FLOOR

LOS ANGELES, CALIFORNIA 90067

(310) 553-3000

FAX (310) 556-2920

DIRECT·DIAL NUMBER
(310) 556-7865
EMAIL: AKHAN@GLASERWEIL.COM

February 10, 2009

MERITAS LAW FIRMS WORLD WIDE

### VIA EMAIL AND FACSIMILE (213) 443-3100

Jon D. Corey, Esq.
QUINN, EMANUEL, URQUHART,
OLIVER & HEDGES, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543 .

      Re:    *Bryant v. Mattel, Inc. and Consolidated Actions*
            U.S.D.C. Eastern Division, Case No. CV04-09049 SJL(RNBx)

Dear Jon:

    This concerns Mattel's demand to depose MGA executive Ron Brawer on Phase 2 issues
for a second time, this time for at least an additional 14 hours. That demand is not well taken for
at least four reasons.

    First, on February 5, 2008, Mr. Brawer was deposed in London on Phase 2 matters for
seven hours, which satisfied the 7-hour limitation contained in Rule 30 of the Federal Rules of
Civil Procedure. This deposition was taken pursuant to a stipulated order entered into between
the parties on January 28, 2008. Nowhere in that stipulated order is there any agreement or
condition that Mr. Brawer's deposition would be allowed to last for longer than the seven-hour
limit imposed by FRCP 30.

    Second, Mattel's claim that it needs additional time to examine Mr. Brawer because
MGA produced documents shortly before his deposition is without merit and misstates the
dealings of the parties up until this point. Before Mr. Brawer's deposition, MGA offered to
postpone Mr. Brawer's deposition *to give Mattel time to review those exact documents.* Mattel
refused MGA's offer. Neither Mr. Brawer nor MGA should bear the burden for Mattel's tactical
litigation decision. Mattel knew of the documents MGA was producing, but chose to depose Mr.
Brawer immediately instead of postponing the deposition and first reviewing the documents.
MGA is not required to produce Mr. Brawer again because Mattel now regrets its decision.

    Third, Mattel's claim that it had no opportunity to question Mr. Brawer about key Phase
2 issues is erroneous. The Court did not put any subject matter restrictions on Mr. Brawer's
deposition. Mr. Brawer's relevance to this case is in relation to Phase 2 issues and it was

666191

EXHIBIT **26**
PAGE **357**

Jon D. Corey, Esq.
February 10, 2009
Page 2

Mattel's responsibility to question Mr. Brawer on these Phase 2 issues in the time prescribed by FRCP 30. It is not MGA's responsibility to produce Mr. Brawer again just because Mattel chose not to examine him on certain issues.

Fourth, your claim that Mattel did not have enough time to properly depose Mr. Brawer due to allegedly improper objections made by MGA's counsel is without basis. Indeed, the transcript of Mr. Brawer's deposition clearly shows that counsel's objections were relevant, concise, and necessary given the nature of Mattel's questions.

Accordingly, MGA will not agree to produce Mr. Brawer for an unspecified number of additional hours of deposition as you request.

Very truly yours,

Amman Khan

Amman Khan
of GLASER, WEIL, FINK, JACOBS
& SHAPIRO, LLP

AMM/rs

cc:     Joel N. Klevens, Esq.
        Jason Russell, Esq.
        Patricia Benson, Esq.

666191

EXHIBIT 26
PAGE 352

# EXHIBIT 27

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

July 31, 2009

<u>VIA FACSIMILE AND U.S. MAIL</u>

Annette L. Hurst, Esq.
Warrington Parker, Esq.
Orrick Herrington & Sutcliffe LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105

Re:     Mattel, Inc. v. MGA Entertainment, Inc. et al.

Dear Counsel:

I write to follow up on my letter of January 29, 2009, requesting a meeting of counsel regarding
the deposition of Ronald Brawer. As I explained, Mr. Brawer's deposition was not completed,
and he should be produced for at least another fourteen hours of testimony, without obstruction
or interference. Mr. Brawer is indisputably an important witness in this case. Moreover, there
remain approximately 500 documents with Mr. Brawer's name on them that were produced only
days before and some even after Mr. Brawer's deposition, about which Mattel was not afforded
an opportunity to question Mr. Brawer. Prior counsel for MGA refused to produce Mr. Brawer
for any additional deposition time. <u>See</u> Letter from Amman Khan to Jon Corey, dated February

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100

07975/3035075 1

EXHIBIT ___27___
PAGE ___353___ 

10, 2009. Unless I hear from you, we will assume that Mattel will need to seek the appropriate relief from the Discovery Master.

Very truly yours,

Michael T. Zeller \T.B.

Michael T. Zeller

EXHIBIT __27__
PAGE __354__

# EXHIBIT 28



ORRICK, HERRINGTON & SUTCLIFFE LLP
777 SOUTH FIGUEROA STREET
SUITE 3200
LOS ANGELES, CALIFORNIA 90017-5855

tel +1-213-629-2020
fax +1-213-612-2499

WWW.ORRICK.COM

*VIA EMAIL AND U.S. MAIL*

William A. Molinski
(213) 612-2256
wmolinski@orrick.com

August 4, 2009

Michael T. Zeller, Esq.
QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
865 S. Figueroa St. 10th Floor
Los Angeles, California 90017

Re:     MGA v. Mattel, Inc.

Dear Mr. Zeller:

In response to your letter to Annette Hurst dated July 31, 2009, I am available to meet and confer with you on your request to re-depose Ronald Brawer. I am in the process of reviewing your assertion that "Mattel was not afforded an opportunity to question Mr. Brawer," on certain documents. I am available any time on August 6, 2009 to discuss. Please let me know what works for you.

Very truly yours,

William A. Molinski

WAM/mmn

OHS West:260705809.1

EXHIBIT  28
PAGE  355

# EXHIBIT 29

**THE EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 30

**THE EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 31

# THE EXHIBIT IS FILED UNDER SEAL
# PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 32

**THE EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 33

**THE EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 34

**THE EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 35

**THE EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 36

**THE EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 37

**THE EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 38

**THE EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 39

1  Hon. Edward A. Infante (Ret.)
   JAMS
2  Two Embarcadero Center
   Suite 1500
3  San Francisco, California 94111
   Telephone:    (415) 774-2611
4  Facsimile:    (415) 982-5287

5

6                    UNITED STATES DISTRICT COURT

7                   CENTRAL DISTRICT OF CALIFORNIA

8                          EASTERN DIVISION

9

10

11 CARTER BRYANT, an individual,          CASE NO. C 04-09049 SGL (RNBx)
                                          JAMS Reference No. 1100049530
12        Plaintiff,

13        v.                              Consolidated with
                                          Case No. CV 04-09059
14 MATTEL, INC., a Delaware corporation,  Case No. CV 05-2727

15        Defendant.                      ORDER GRANTING IN PART
                                          BRYANT'S MOTION TO OVERRULE
16                                        INSTRUCTIONS NOT TO ANSWER
                                          DURING THE DEPOSITION OF ALAN
17                                        KAYE, TO COMPEL KAYE TO
                                          ANSWER THOSE QUESTION, AND
18                                        FOR SANCTIONS

19 CONSOLIDATED WITH
   MATTEL, INC. v. BRYANT and
20 MGA ENTERTAINMENT, INC. v. MATTEL,
   INC.
21

22      Having considered Carter Bryant's Motion to Overrule Instructions Not to Answer During

23 the Deposition of Alan Kaye, to Compel Kaye to Answer Those Questions, and for Sanctions (the

24 "Motion"), and all other papers filed in opposition to or in connection therewith, and finding good

25 cause therefore,

26      IT IS HEREBY ORDERED that:

27

28
   Bryant v. Mattel, Inc.,                                         1
   CV-04-09049 SGL (RNBx)

                    EXHIBIT  39
                    PAGE  378

1.    Each of the instructions not to answer or to limit a deposition question marked as "Overruled" in Exhibit "A" to this Order is hereby overruled. Alan Kaye is ordered to answer those questions and reasonable follow up questions at a further deposition.

2.    Although Mattel's counsel is entitled to make evidentiary objections consistent with Rule 32, Fed.R.Civ.P., there were numerous instances in which Mattel's counsel failed to comply with the requirements of Rule 30(d)(1), Fed.R.Civ.P., by failing to state an objection concisely and in a non-argumentative and non-suggestive manner, or by instructing the deponent not to answer based upon an objection other than privilege.

3.    Mattel's counsel impeded, delayed, and frustrated the fair examination of Mr. Kaye. Therefore, Mattel is ordered to re-produce Mr. Kaye for his deposition for an additional four (4) hours so that Bryant's counsel can resume questioning Mr. Kaye on all areas that Bryant's counsel previously attempted to cover in his prior deposition. During the deposition, Mattel's counsel shall strictly comply with Rule 30(d)(1), Fed.R.Civ.P.

4.    Because some, but not all, of counsel's objection and violations of Rule 30(d)(1) were without substantial justification, Bryant's request for sanction is granted in part in the amount of $2,000 pursuant to Rule 30(d)(3), Fed.R.Civ.P. These sanctions shall be paid within fourteen (14) days of the date of this Order by check to be personally delivered to counsel for Bryant.

5.    The parties shall meet and confer to schedule the resumption of Mr. Kaye's deposition, which shall occur at a mutually convenient date and time no later than thirty (30) days of the date of this Order.

6.    Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery Master, Bryant shall file this Order with the Clerk of Court forthwith.

Dated:    May 4          , 2007

                                    /s/Edward A. Infante
                                    HON. Edward Infant (Ret.)
                                    Discovery Master

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                    2

EXHIBIT   39
PAGE   379

# EXHIBIT "A"

## INSTRUCTIONS NOT TO ANSWER

## BASED ON ATTORNEY-CLIENT PRIVILEGE

| | PAGE/LINE | ASSERTED BASIS FOR BLANKET INSTRUCTION OR LIMITING INSTRUCTION | RULING |
|---|---|---|---|
| 1. | 24:25-25:11 | Attorney-Client Privilege | Sustained |
| 2. | 26:16-27:8 | Attorney-Client Privilege | Overruled |
| 3. | 30:6-31:14 | Attorney-Client Privilege | Sustained |
| 4. | 32:19-33:18 | Attorney-Client Privilege | Sustained |
| 5. | 35:25-36:10 | Attorney-Client Privilege | There is no question pending. |
| 6. | 41:14-24 | Attorney-Client Privilege | Overruled |
| 7. | 43:2-19 | Attorney-Client Privilege | Withdrawn from Bryant's motion. |
| 8. | 170:20-171:8 | Attorney-Client Privilege | Overruled |
| 9. | 218:2-10 | Attorney-Client Privilege | The witness answered the question later in the deposition. |
| 10. | 103:25-106:23 | Attorney-Client Privilege | Sustained |
| 11. | 366:5-366:13 | Attorney-Client Privilege | Overruled |
| 12. | 48:17-49:6 | Attorney-Client Privilege and Work Product | Overruled |
| 13. | 49:8-53:16 | Attorney-Client Privilege | Overruled |
| 14. | 45:16-47:8 | Attorney-Client Privilege | Overruled |
| 15. | 80:3-21 | Attorney-Client Privilege | Overruled |
| 16. | 96:18-25 | Attorney-Client Privilege | Overruled |
| 17. | 98:5-19 | Attorney-Client Privilege | Overruled |
| 18. | 106:2-23 | Attorney-Client Privilege | This excerpt is a duplicate of excerpt number 10. |

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

3

EXHIBIT ___39___
PAGE ___380___

| | | | |
|---|---|---|---|
| 19. | 116:11-19 | Attorney-Client Privilege | Sustained |
| 20. | 114:25-115:6 | Attorney-Client Privilege | Overruled |
| 21. | 298:11-300:6 | Attorney-Client Privilege | Overruled |
| 22. | 128:4-129:4 | Attorney-Client Privilege and Work Product | Overruled |
| 23. | 139:2-16 | Attorney-Client Privilege and Work Product | Overruled |
| 24. | 240:9-243:22 | Attorney-Client Privilege | Overruled |
| 25. | 279:23-280:10 | Attorney-Client Privilege | The witness gave an adequate response to the question later in the deposition. |
| 26. | 307:24-310:25 | Attorney-Client Privilege and Work Product | Overruled |
| 27. | 328:1-12 | Attorney-Client Privilege | Overruled |
| 28. | 135:25-137:3 | Attorney-Client Privilege | Overruled |
| 29. | 197:9-198:5 | Attorney-Client Privilege | Overruled |
| 30. | 267:16-268:4 | Attorney-Client Privilege | Withdrawn from Bryant's motion. |
| 31. | 156:1-158:20 | Attorney-Client Privilege | Withdrawn from Bryant's motion. |
| 32. | 328:16-329:9 | Attorney-Client Privilege | Overruled |

EXHIBIT __39__
PAGE __381__

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on April 24, 2007,

I served the attached ORDER GRANTING IN PART BRYANT'S MOTION TO

OVERRULE INSTRUCTIONS NOT TO ANSWER DURING THE DEPOSITION OF

ALAN KAYE, TO COMPEL KAYE TO ANSWER THOSE QUESTIONS, AND FOR

SANCTIONS in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| Robert Millman Esq. | Littler Mendelson | rfmillman@littler.com |
| Douglas Wickham Esq. | Littler Mendelson | dwickham@littler.com |
| Keith Jacoby Esq. | Littler Mendelson | kjacoby@littler.com |
| Dominic Messiha Esq | Littler Mendelson | dmessiha@littler.com |
| Diba Rastegar Esq. | Littler Mendelson | drastegar@littler.com |
| Michelle Park Esq. | Littler Mendelson | mpark@littler.com |
| Alaya B. Meyers, Esq. | Littler Mendelson | ameyers@littler.com |
| Brady Mitchell, Esq. | Littler Mendelson | bmitchell@littler.com |
| Carol Miller, Esq. | Littler Mendelson | cmiller@littler.com |
| Ryan P. Eskin, Esq. | Littler Mendelson | reskin@littler.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | jbq@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Morris Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgetmorris@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| David Hurwitz, Esq. | O'Melveny & Myers LLP | dhurwitz@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Well & Shapiro, LLP | pglaser@chrisglase.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on May 4, 2007, at San Francisco, California.

Sandra Chan

EXHIBIT 39
PAGE 382

# EXHIBIT 40

CONFORMED COPY

1   Hon. Edward A. Infante (Ret.)
    JAMS
2   Two Embarcadero Center
    Suite 1500
3   San Francisco, California 94111
    Telephone:    (415) 774-2611
4   Facsimile:    (415) 982-5287

5

6                       UNITED STATES DISTRICT COURT

7                       CENTRAL DISTRICT OF CALIFORNIA

8                             EASTERN DIVISION

9

10

11  CARTER BRYANT, an individual,          CASE NO. C 04-09049 SGL (RNBx)
                                           JAMS Reference No. 1100049530
12          Plaintiff,

13      v.                                 Consolidated with
                                           Case No. CV 04-09059
14  MATTEL, INC., a Delaware corporation,  Case No. CV 05-2727

15          Defendant.                     ORDER GRANTING MATTEL'S
                                           MOTION FOR AN EXTENSION OF
16                                         TIME TO DEPOSE PAULA GARCIA
                                           IN HER INDIVIDUAL CAPACITY
17                                         AND AS A 30(b)(6) DESIGNEE;
                                           DENYING REQUEST FOR
18  CONSOLIDATED WITH                      SANCTIONS
    MATTEL, INC. v. BRYANT and
19  MGA ENTERTAINMENT, INC. v. MATTEL,
    INC.
20

21

22                          I. INTRODUCTION

23      On June 15, 2007, Mattel, Inc. ("Mattel") submitted its "Motion To Enforce The Court's

24  Order To Compel, And For Sanctions."  Specifically, Mattel moves (1) to enforce the Discovery

25  Master's May 16, 2007 Order Granting Mattel's Motion to Compel MGA to Produce Witnesses

26  for Deposition Pursuant to Rule 30(b)(6) by compelling MGA Entertainment, Inc. ("MGA") to

27  produce Paula Garcia for further deposition testimony, or in the alternative, by granting leave for

28  Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)

EXHIBIT  40
PAGE  383

additional time to depose Ms. Garcia on the topics set forth in Mattel's Rule 30(b)(6) notices[1];
(2) to compel Ms. Garcia to answer the questions MGA's counsel instructed her not to answer
during her deposition; and (3) for sanctions against MGA in the amount of $5,315. MGA
submitted an opposition on June 25, 2007; and Mattel submitted a reply on June 29, 2007. The
motion was heard on August 13. Having considered the motion papers and the comments of
counsel, Mattel's motion for additional time to depose Ms. Garcia is granted, and the request for
sanctions is denied.

## II. BACKGROUND

In February of 2005 Mattel served a notice of deposition of MGA pursuant to Rule
30(b)(6), Fed.R.Civ.P. (the "First Notice"). The parties met and conferred, and by May of 2005
MGA named Ms. Garcia as one of the witnesses who would testify on six of the eight topics in
the First Notice. Ms. Garcia has been MGA's product manager for Bratz since the product's
inception at MGA, and is, in Mattel's view, one of the most important witnesses in its case.

The action was stayed from mid-May of 2005 to mid-May of 2006. Thereafter, Mattel
renewed its attempts to schedule a 30(b)(6) deposition. In a telephonic conference with the
Discovery Master, MGA represented that it would provide Mattel with dates for the deposition.
In January of 2007, Mattel was able to depose one of MGA's designees on the First Notice, but
not Ms. Garcia due to her unavailability. For the next couple of months, Mattel continued its
efforts to schedule Ms. Garcia's deposition without success.

In the interim, in February of 2007, Mattel served its Second Notice of Deposition of
MGA pursuant to Rule 30(b)(6), Fed.R.Civ.P. (the "Second Notice"). The parties met and
conferred, and MGA identified designees for some but not all of the forty-six topics in the
Second Notice.

After a couple of months had passed without any witnesses being produced for deposition
pursuant to the First and Second Notices, Mattel brought a motion to compel. On May 16, 2007,

[1] Mattel does not specify in its motion papers how much additional time it seeks.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT 40
PAGE 384

1  the Discovery Master granted Mattel's motion to compel and ordered MGA to, *inter alia,* (1)

2  produce Ms. Garcia for deposition on or before June 15, 2007, in her individual capacity and as a

3  designee on Topics 1-3 and 6-8 of Mattel's First Notice; and (2) make its designees available for

4  deposition for all Topics except Nos. 25 and 26 in Mattel's Second Notice on or before June 30,

5  2007 (the "Order").[2]  This is the Order that is the subject of Mattel's motion.

6      After the Court's Order, MGA confirmed Ms. Garcia's designation on the following

7  Topics in Mattel's Second Notice:  Topic Nos. 1-8, 9 (to the extent not covered by previously

8  designated testimony), 10, 12, 13 (with respect to manufacturers only), 16 (to the extent not

9  covered by designated portions of Isaac Larian's and Carter Bryant's depositions), 17, 29, 30, 35,

10  and 36.  MGA offered to produce Ms. Garcia for her deposition on May 24 and 25, 2007, or else

11  not until the end of June.  Mattel accepted the May 24 and 25 dates.  The parties agreed that the

12  this deposition would cover Bryant-related issues, and that they would make separate

13  arrangements to depose Ms. Garcia on the unfair competition, trade secrets and RICO issues in

14  the MGA v. Mattel and Mattel v. MGA suits.  Zeller Decl., Ex. 10; see also MGA's Opposition

15  at p.6, n. 19.

16      Two days before Ms. Garcia's deposition, MGA produced approximately 7,600 pages of

17  documents.  MGA's counsel, Diana Torres, advised Mattel that MGA was willing to defer her

18  deposition in light of the document production.  Ms. Torres also informed Mattel that by

19  proceeding with the deposition as scheduled, Mattel was "choosing to do so at the risk that later

20  discovery (including the [7,600 pages of documents] may be relevant to her deposition and will

21  not be entitled to call her back for that reason."[3]  Zeller Decl., Ex. 10.  Mattel's counsel

22

23  [2] During the hearing, the undersigned stated that he did not think the seven-hour limitation on depositions
24  applied to Rule 30(b)(6) depositions, but also commented that it did not make sense to be focusing on such a "theoretical" issue, as Ms. Garcia had not yet been deposed. Zeller Decl., Ex. 8. Mattel's assertion that the Discovery Master "ruled" on this issue is erroneous.
25
26  [3] As stated previously, the parties have an agreement, however, that MGA will make Ms. Garcia available for a separate deposition on the unfair competition, trade secrets and RICO issues in the MGA v. Mattel and Mattel v. MGA cases. Zeller Decl., Ex. 10; see also MGA's Opposition at p.6, n. 19.
27
28
Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                3

EXHIBIT 40
PAGE 385

1    responded by accusing MGA of delaying its document production for tactical reasons. Mattel's

2    counsel also advised MGA that it was proceeding with Ms. Garcia's deposition as scheduled,

3    and furthermore, that it did not believe it was "waiving" its rights to obtain further discovery

4    regarding the 7,600 pages of documents.

5         Mattel began the deposition of Ms. Garcia in her individual and corporate capacity on

6    Thursday, May 24, 2007. The next day, MGA's counsel offered to delay the deposition from

7    Friday, May 25, 2007, to Tuesday, May 29, 2007, in light of the recent document production.

8    Mattel's counsel rejected the offer because Mattel did not want to delay Ms. Garcia's deposition

9    any further and because Mattel was prepared to question Ms. Garcia about other documents

10   already produced in the case.

11        Mattel deposed Ms. Garcia for a total of 14 hours and 18 minutes. Mattel asked MGA to

12   produce Ms. Garcia for at least one more day of deposition, however, MGA refused unless

13   Mattel agreed not to "revisit" topics that had already been covered. Mattel's Motion at p.3.

14   MGA also indicated that even if it were to produce Ms. Garcia for further questioning, it would

15   probably not agree to produce her for an additional full day.

16        Mattel seeks additional time to depose Ms. Garcia. Mattel contends that 14 hours and 18

17   minutes was not enough time to cover the 24 topics on which Ms. Garcia was designated, much

18   less to cover Ms. Garcia's personal knowledge of facts central to Mattel's claims against Bryant.

19   According to Mattel, the Discovery Master has ruled that the 7-hour rule does not apply to Rule

20   30(b)(6) depositions, and that MGA's refusal to produce Ms. Garcia for further questioning

21   violates the Order.

22        Even if the 7-hour rule applies, Mattel contends that there is good cause to extend the

23   deposition of Ms. Garcia for a number of reasons. First, Mattel contends that the deposition

24   progressed slowly because Ms. Garcia regularly asked for questions to be repeated or rephrased

25   and often took long pauses before answering. Mattel also contends that there were lengthy

26   breaks, after which Ms. Garcia returned with clarifications of her prior testimony that required

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT   40
PAGE      386

4

1  further questioning.  Mattel also contends that Ms. Garcia was not prepared to answer questions

2  regarding personnel involved in the early phases of the Bratz project.

3      Second, Mattel contends that MGA's counsel improperly instructed Ms. Garcia not to

4  answer questions regarding facts she ostensibly learned from counsel.  Third, Mattel contends

5  that MGA's counsel improperly instructed Ms. Garcia not to answer questions about MGA

6  Mexico.  Mattel admits that the parties had an agreement to limit the scope of Ms. Garcia's

7  deposition to Bryant-related issues; however, Mattel believes that this agreement did not bar

8  questions about MGA Mexico's contacts with the United States in light of MGA's then-pending

9  motion to dismiss MGA Mexico for lack of personal jurisdiction.[4]

10      Fourth, Mattel contends that it should be permitted to resume the deposition of Ms.

11 Garcia because just two days prior to the deposition, MGA produced approximately 7,600 pages

12 of documents, the bulk of which have Ms. Garcia's name on them and relate to the 2000 and

13 2001 time period.  Mattel contends that MGA had no legitimate basis for withholding the

14 documents.  Mattel also contends that the production was incomplete insofar as it did not include

15 documents that the Discovery Master ordered MGA to produce.  Lastly, Mattel contends that it

16 should be given more time to depose Ms. Garcia because MGA has demanded more deposition

17 time for witnesses on topics that are far less central to this litigation.

18      MGA opposes the motion on numerous grounds.  As a preliminary matter, MGA accuses

19 Mattel of using 30(b)(6) depositions as a means to circumvent the district court's order limiting

20 the number of depositions to be taken by each side.  At present, the parties are limited to 24

21 depositions per side for the entire consolidated action, including both individual and 30(b)(6)

22 depositions.  In MGA's view, Mattel is using 30(b)(6) depositions with excessive numbers of

23 topics to avoid noticing witnesses to testify in their individual capacity.  MGA further contends

24 that Rule 30(b)(6) depositions are indeed limited to one seven-hour day, and furthermore, that

25

26      _____

       [4]  The district court has since denied MGA's motion to dismiss MGA Mexico.

27

28
   Bryant v. Mattel, Inc.,
   CV-04-09049 SGL (RNBx)                                                                    5

EXHIBIT ___40___

PAGE ___387___

1    the district court must have intended the limit to apply when he restricted each side to 24

2    depositions.

3        Next MGA contends that Ms. Garcia was deposed on time and in compliance with the

4    Order. According to MGA, Ms. Garcia testified at length about the early development of Bratz,

5    the persons involved in that development process, as well as the other topics for which she had

6    been designated. MGA acknowledges that Ms. Garcia could not recall the names of some of the

7    individuals involved in Bratz; however, MGA believes Mattel could have remedied the situation

8    by simply showing Ms. Garcia documents to refresh her recollection rather than treating the

9    deposition as a memory test.

10       MGA denies engaging in any delay tactics or other forms of obstruction during the

11   deposition. According to MGA, Ms. Garcia requested to have questions rephrased when she did

12   not understand the question. MGA also contends that pauses are appropriate to allow counsel to

13   interject any necessary objections. Furthermore, MGA contends that it properly instructed Ms.

14   Garcia not to answer only when necessary to preserve the attorney-client privilege. MGA also

15   defends its instructions not to answer questions about MGA Mexico because those questions

16   exceeded the agreed upon scope of the deposition. The parties agreed that Ms. Garcia would be

17   made available for one deposition regarding Bryant-related matters and a separate deposition

18   regarding Mattel's counterclaims. MGA considers questions regarding MGA Mexico as

19   irrelevant to Bryant-related matters, and relevant only to Mattel's counterclaims.

20       In MGA's view, Mattel, not MGA is to blame for not completing Ms. Garcia's

21   deposition. MGA asserts that Mattel wasted time by questioning Ms. Garcia on topics not

22   relevant to the litigation, including her addresses for the past year, whether she had any

23   roommates during that time and who they were, and her cell phone bills.

24       MGA also contends that Mattel caused the document production delay by insisting that

25   MGA produce all color documents in a different electronic format than previously requested.

26   Furthermore, MGA contends that it made multiple offers to postpone the deposition to allow

27

28

6

EXHIBIT __40__
PAGE __388__

1 Mattel additional time to review the document production.  MGA contends that Mattel chose to

2 move forward with the deposition, and therefore Mattel "has no basis for asserting that MGA's

3 document production was an attempt to prevent Mattel from deposing Ms. Garcia on the topics

4 for which she was designated nor that it had any impact on Mattel's ability to do so."  MGA's

5 Opposition, p.6.

6       Lastly, MGA contends Mattel filed the instant motion without meeting and conferring in

7 good faith.  MGA points out that during the meet and confer process, it agreed to produce Ms.

8 Garcia for additional time without the need to resort to motion practice.  More specifically, MGA

9 is prepared to make Ms. Garcia available for an additional four hours, provided that any further

10 questioning "does not revisit already questioned areas of inquiry."  MGA's Opposition at p.3.

11                                    III. STANDARDS

12       Rule 30(d) of the Federal Rules of Civil Procedure provides the following with respect to

13 the schedule and duration of depositions:

14          (1) Any objection during a deposition must be stated concisely and in a non-
            argumentative and non-suggestive manner.  A person may instruct a deponent
15          not to answer only when necessary to preserve a privilege, to enforce a limitation
            directed by the court, or to present a motion under Rule (d)(4).
16
            (2) Unless otherwise authorized by the court or stipulated by the parties, a
17          deposition is limited to one day of seven hours.  The court must allow additional
            time consistent with Rule 26(b)(2) if needed for a fair examination of the
18          deponent or if the deponent or another person, or other circumstance, impedes or
            delays the examination.
19
            (3) If the court finds that any impediment, delay, or other conduct has
20          frustrated the fair examination of the deponent, it may impose upon the persons
            responsible an appropriate sanction, including the reasonable costs and attorney's
21          fees incurred by any parties as a result thereof.

22

23 The Advisory Committee Notes for Rule 30(d)(2) provide the following guidelines for

24 compliance:

25          Paragraph (2) imposes a presumptive durational limitation of one day of seven
            hours for any deposition.  The Committee has been informed that the overlong
26          depositions can result in undue costs and delays in some circumstances.  This
            limitation contemplates that there will be reasonable breaks during the day for
27          lunch and other reasons, and that the only time to be counted is the time occupied

28
Bryant v. Mattel, Inc.,                                                              7
CV-04-09049 SGL-(RNBx)

EXHIBIT __40__

PAGE __389__

1    by the actual deposition. For purposes of this durational limit, the deposition of
2    each person designated under Rule 30(b)(6) should be considered a separate
     deposition. The presumptive duration may be extended, or otherwise altered, by
3    agreement. Absent agreement, a court order is needed. The party seeking a
     court order to extend the examination, or otherwise alter the limitations, is
4    expected to show good cause to justify such an order.

5         Parties considering extending the time for deposition – and courts asked to
     order an extension – might consider a variety of factors. For example, if the
6    witness needs an interpreter, that may prolong the examination. If the
     examination would cover events occurring over a long period of time, that may
7    justify allowing additional time. . . .

8         It is expected that in most instances the parties and the witness will make
     reasonable accommodations to avoid the need for resort to the court. The
9    limitation is phrased in terms of a single day on the assumption that ordinarily a
     single day would be preferable to a deposition extending over multiple days; if
10   alternative arrangements would better suit the parties, they may agree to them. It
     is also assumed that there will be reasonable breaks during the day.
11   Preoccupation with timing is to be avoided.

12        The rule directs the court to allow additional time where consistent with Rule
     26(b)(2) if needed for a fair examination of the deponent. In addition, if the
13   deponent or another person impedes or delays the examination, the court must
     authorize extra time. The amendment makes clear that additional time should
14   also be allowed where the examination is impeded by an "other circumstance,"
     which might include a power outage, a health emergency, or other event.

15                                    *    *    *

16        Paragraph (3) includes sanctions provisions formerly included in paragraph (2).
     It authorizes the court to impose an appropriate sanction on any person
17   responsible for an impediment that frustrated the fair examination of the
     deponent. This could include the deponent, any party, or any other person
18   involved in the deposition. If the impediment or delay results from an "other
     circumstance" under paragraph (2), ordinarily no sanction would be appropriate.

19
20   See Advisory Committee Notes on the 2000 Amendments to Fed.R.Civ.P. 30(d).

21                              IV.  DISCUSSION

22   A.  There Is Good Cause For An Extension Of Time To Depose Ms. Garcia

23        As a preliminary matter, MGA is in compliance with the Order insofar as it has

     produced Ms. Garcia for deposition in her individual and corporate capacity by the June 30th
24
     deadline.[5]  Therefore, Mattel's motion, although styled as motion to compel compliance with
25

26   _____

27        [5]  Mattel, however, has filed a separate motion to compel compliance with other portions of the Order.

28
     Bryant v. Mattel, Inc.,                                                                      8
     CV-04-09049 SGL (RNBx)
                              EXHIBIT __40__
                              PAGE ___390___

1  the Order, is treated herein as motion for additional time to complete the deposition of Ms.

2  Garcia pursuant to Rule 30(d)(2), Fed.R.Civ.P.

3       Applying the standards above, Mattel has demonstrated the requisite good cause to

4  warrant an extension of the "presumptive" 7-hour time limit for depositions. Ms. Garcia is,

5  without question, one of the most important witnesses in this case. She has been the product

6  manager for Bratz since the product's inception at MGA. Therefore, she has considerable

7  knowledge regarding the timing and origins of Bratz, Bryant's involvement with MGA, and the

8  development of Bratz. Ms. Garcia was the first person at MGA with whom Bryant spoke. Ms.

9  Garcia was present when Bryant first presented the idea of Bratz to Mr. Larian. Ms. Garcia also

10  met with Bryant and Margaret Leahy to discuss doll sculpting at a time when Bryant was still

11  employed at Mattel. In addition, another witness, Steve Linker, testified that Ms. Garcia

12  contacted him in September of 2000 to create packaging for Bratz and gave him art boards and

13  illustrations in October of 2000. Ms. Garcia was also involved in naming the Bratz characters.

14       Furthermore, MGA has designated Ms. Garcia on numerous topics. MGA designated

15  Ms. Garcia to testify regarding Topics 1-3 and 6-8 of the First Notice, which are set forth below.

16      Topic 1: The identity of each person involved in the MGA Projects, and the
    nature and time period(s) of each such person's involvement therein.

17

18      Topic 2: The conception, design and development of the MGA Projects,
    including without limitation the chronology thereof.

19      Topic 3: The identity of, and the design, development and first sale of, any
    products resulting from the MGA Projects.

20

21      Topic 6: The identity of documents and tangible items that relate to the MGA
    Projects.

22      Topic 7: The identity, source and current location of each head that was
    provided by, for, on behalf of MGA or any of its representatives to Anna Rhee

23      for painting prior to October 21, 2000.

24      Topic 8: The identity of each person involved in the conception, design,
    development, production, sculpting, rotocasting, molding, modeling or

25      prototyping of each head that was provided by, for or on behalf of MGA or any
    of its representatives to Anna Rhee for painting prior to October 21, 2000.

26  //

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

9

EXHIBIT ___40___
PAGE ___391___

1   Zeller Decl., Ex. 1. MGA also designated Ms. Garcia to testify regarding the following

2   topics in the Second Notice:

3       Topic 1: The origin, conception, creation, design, sculpting, development,
        engineering, rotocasting, modeling and prototyping of BRATZ and BRATZ

4       DESIGNS CREATED prior to June 30, 2001 (regardless of when or whether
        such was released in any form to the public), including without limitation the

5       timing thereof, the IDENTITY of each PERSON with knowledge thereof, the
        IDENTITY of each PERSON involved therein, and the nature, extent and time

6       period(s) of each such PERSON's involvement.

7       Topic 2: The circumstances under which BRATZ or any BRATZ DESIGN first
        came to YOUR attention, including without limitation the timing, method and

8       manner thereof and the IDENTITY of each PERSON with knowledge thereof.

9       Topic 3: The identity of each doll, product, work or item produced, developed,
        manufactured, licensed, sold or offered for sale by or for YOU or on YOUR

10      behalf that was BASED ON any BRATZ DESIGN which BRYANT CREATED.

11      Topic 4: To the extent not covered by Topic 3, each EMBODIMENT of any
        doll, doll accessory or toy that BRYANT CREATED prior to June 30, 2001.

12

13      Topic 5: The work, activities and/or services that BRYANT performed for or
        with YOU or on YOUR behalf prior to June 30, 2001.

14      Topic 6: The origin, conception and creation of DESIGNS that BRYANT
        CREATED prior to June 30, 2001 and in which YOU claim to have, or have ever

15      claimed to have, any right, title or interest (whether in whole or in part).

16      Topic 7: The identity of, and the design, development, sculpting, development,
        engineering, rotocasting, modeling, prototyping and first sale of, any doll,

17      product, work or item that has been produced, developed, manufactured,
        licensed, sold or offered for sale by, for or on behalf of YOU and that was

18      BASED ON any DESIGN referenced in Topic 6.

19      Topic 8: Each EMBODIMENT of BRATZ that was CREATED prior to June
        30, 2001 or that was at any time BASED ON any BRATZ DESIGN which was

20      CREATED prior to June 30, 2001.

21      Topic 9: The DRAWINGS, including without limitation the authorship,
        creation, dissemination and use thereof and the source, meaning, authenticity and

22      timing of any dates thereof.

23      Topic 10: The IDENTITY of each vendor or third party who performed or
        contributed, or who was considered, solicited, requested, proposed or

24      contemplated by YOU or BRYANT to perform or contribute, any activities,
        work or services in connection with BRATZ or BRATZ DESIGNS prior to June

25      30, 2001, YOUR COMMUNICATIONS therewith, and the nature, extent and
        timing of such activities, work or services.

26

27      Topic 12: The actual, proposed, requested or contemplated manufacture,
        fabrication or tooling (including the production of molds) of BRATZ, including

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

10

EXHIBIT   40
PAGE   392

1    without limitation the timing thereof and the IDENTITY of each manufacturer
     and potential manufacturer used, proposed or considered.

2

3    Topic 13: COMMUNICATIONS prior to June 30, 2001 between YOU and any
     manufacturer, distributor, wholesaler, retailer, or any contemplated, proposed or
     potential manufacturer, distributor, wholesaler or retailer, that REFER OR
4    RELATE TO BRATZ or any BRATZ DESIGN.

5    Topic 16: COMMUNICATIONS BETWEEN YOU AND BRYANT prior to
     January 1, 2001, including without limitation the content, means and timing of
6    such COMMUNICATIONS, the IDENTITY of the PERSONS who were parties
     thereto and the DOCUMENTS that REFER OR RELATE TO such
7    COMMUNICATIONS.

8    Topic 17: COMMUNICATIONS that BRYANT made for YOU or on YOUR
     behalf with any PERSON other than YOU that REFER OR RELATE TO
9    BRATZ prior to June 30, 2001.

10   Topic 29: COMMUNICATIONS made by, for or on behalf of YOU, whether
     directly or indirectly, with Anna Rhee, including without limitation since
11   February 2005(but not including any such COMMUNICATIONS with her legal
     counsel).

12
     Topic 30: COMMUNICATIONS between YOU and Veronica Marlow,
13   Margaret Hatch (also known as Margaret Leahy and/or Margaret Hatch-Leahy),
     Sarah Halpern, Steve Linker, Liz Hogan and/or Jesse Ramirez that REFER OR
14   RELATE TO BRYANT, MATTEL, BRATZ and/or Anna Rhee, including
     without limitation all DOCUMENTS that REFER OR RELATE TO such
15   COMMUNICATIONS.

16   Topic 35: COMMUNICATIONS between YOU and Universal Commerce
     Corp., Ltd. prior to June 30, 2001.
17
     Topic 36: The source, meaning and authenticity of SL00013-14, including
18   without limitation the timing of its creation and the handwriting thereon.

19
     Zeller Decl., Ex. 3. The specific topics identified above for which Ms. Garcia has been
20
     designated are relevant and proper. It is unrealistic to require Mattel to cover the number and
21
     breadth of topics for which Ms. Garcia has been designated to testify in a matter of fourteen
22
     hours.
23
          In addition, just two days prior to the scheduled deposition, MGA produced
24
     approximately 7,600 pages of documents. Mattel has reviewed these documents and
25
     determined that Ms. Garcia's name appears on the bulk of the documents. Mattel also
26
     determined that a significant portion of the documents pertain to a key period (2000 or the first
27

28

1    half of 2001) and that some deal with the early development of Bratz while Carter Bryant was

2    still with Mattel. Regardless of where the fault lies for the belated document production, Mattel

3    is entitled to a fair examination of the deponent regarding these 7,600 pages of documents.[6] .

4          Mattel is also entitled to additional time to depose Ms. Garcia because MGA improperly

5    instructed her not to answer questions regarding MGA Mexico. See Zeller Decl., Ex. 9 at

6    439:10-442:6 and 445:14-18. Although the parties had an agreement to limit the scope of Ms.

7    Garcia's deposition to Bryant-related issues, that agreement was never presented to the court for

8    approval and therefore does not have the force and effect of a court order. In the absence of a

9    court order, an instruction not to answer is improper unless necessary to preserve a privilege.

10   See Fed.R.Civ.P. 30(d)(1).

11         In summary, the four factors above provide ample good cause to justify additional time

12   to depose Ms. Garcia.

13   B.  Instructions Not To Answer Deposition Questions

14         Mattel next contends that counsel improperly asserted the attorney-client privilege as to

15   certain deposition questions. In opposition, MGA contends that counsel properly instructed Ms.

16   Garcia not to answer to avoid revealing the substance of protected attorney-client

17   communications.

18         The attorney-client privilege protects an attorney's communication of legal advice to his

19   client, as well as the client's communication of information to the attorney "to enable him to give

20   sound and informed advice." Upjohn Co. v. United States, 449 U.S. 383, 390 (1981). The

21   protection extends only to communications; however, it does not extend to the facts underlying

22   privileged communications. Id. at 395-96. The Ninth Circuit has described the elements of the

23   attorney-client privilege as follows: "(1) When legal advice of any kind is sought (2) from a

24

25        [6]  Furthermore, during the hearing, Mattel indicated that MGA produced more than 100,000 documents

26   after Ms. Garcia's deposition. This production of documents provides additional justification for resuming Ms.
     Garcia's deposition.

27

28

EXHIBIT 40
PAGE 394

1  professional legal adviser in his or her capacity as such, (3) the communications relating to that

2  purpose; (4) made in confidence (5) by the client, (6) are, at the client's instance, permanently

3  protected (7) from disclosure by the client or by the legal adviser (8) unless the protection be

4  waived." United States v. Martin, 278 F.3d 988, 999 (9th Cir.2002). The party asserting the

5  privilege has the burden of establishing that the privilege applies. In re Grand Jury Investigation,

6  974 F.2d 1068, 1070 (9th Cir. 1992).

7       In the first excerpt at issue, counsel, Ms. Torres, interjected an objection and instruction

8  not to answer:

9       Q: How is it that you learned Carter Bryant was employed by Mattel as of the
        time that he had this meeting with you and others that you reference as occurring
10      on September 1, 2000?

11      Ms. Torres: I object and instruct the witness not to answer if her answer involves
        communications with counsel.
12
        The Witness: Then I can't answer the question.
13

14  Garcia Depo. at 273:6-14, Zeller Decl., Ex. 9.  This objection is sustained because a response

15  would have necessarily revealed the substance of a protected attorney-client communication.

16      In the next excerpt at issue, Mattel posed another question regarding Mr. Bryant's

17  employment with Mattel:

18      Q: What facts are you aware of from any source as to whether or not Mr. Bryant
        was still working for Mattel as of September 1, 2000?
19
        Ms. Torres: I am going to caution the witness not to disclose attorney-client
20      communications. If you can answer that otherwise, go ahead.

21      The Witness: Then I can't

22      (Instruction not to answer.)

23      Mr. Page: I pose an objection as to form.

24      The Witness: I can't answer the question.

25      Mr. Zeller: Because of the instruction?

26      The Witness: Yes.

27  //

28
    Bryant v. Mattel, Inc.,                                              13
    CV-04-09049.SGL (RNBx)

    EXHIBIT  40
    PAGE  395

1   Garcia Depo. at 273:20-275:2, Zeller Decl., Ex. 9. The objection is sustained because of the

2   way the question is phrased. If the question had been posed differently, without reference to the

3   source of information and called for disclosure of facts only, the objection would have been

4   improper.

5       In the following excerpt, Ms. Garcia was asked how she learned of the arbitration

6   between Isaac and Fred Larian:

7       Q: At some point, did you come to learn that there was an arbitration or
        litigation between Isaac Larian and Fred Larian?
8
        A: Yes.
9
        Q: How did you learn that?
10
        (Ms. Torres): Objection, I'm going to instruct the witness not to answer if she
11      learned from counsel.

12      The Witness: I believe it was – I believe it was through his – Isaac's assistant.

13      Mr. Zeller: Was it – I'm blanking on her name. Was it still Dede Brown? Was
        it still Dede Brown at that time?
14
        A: I don't think so, but I'm not sure.
15
    Garcia Depo. at 349:7-21; Zeller Decl., Ex. 9. Ms. Garcia answered the question posed to her
16
    and therefore the objection is moot.
17
        In the next section, Ms. Garcia also gave a response to the question posed:
18
        Q: So is it fair to say that you don't have any knowledge or information as to
19      when it is that Mr. Bryant first created Bratz in any form?

20      Ms. Torres: Objection, vague, calls for a legal conclusion.

21      The Witness: Outside of privileged and confidential?

22      Ms. Torres: I will instruct you not to answer to the extent you have knowledge
        that comes solely from counsel.
23
        The Witness: No.
24
25  Garcia Depo. at 291:12-22, Zeller Decl., Ex. 9. Because Ms. Garcia gave a response, the

26  objection is moot.

27

28
                                                                              14

    EXHIBIT __40__
    PAGE ___396___

1       In the following excerpts, Mattel sought to question Ms. Garcia about what caused her to

2   change her testimony after returning from a break in the deposition;

3       A: I don't mean to interrupt. I want to state something before we got started.
        With some more thought during our break, I just wanted to state for the record

4       that I am very sure that Margaret Leahy received the armature engineering
        drawings that I mentioned in my earlier testimony. I originally mentioned I

5       wasn't sure, but I'm very sure she received that sketch.

6       Q: What's your basis for how being very sure of that?

7       A: Taking a few minutes with fresh air and thinking through my memory more
        clearly. My memory is more sharp and more clear.

8

9       Q: Between the time that you gave your prior answers about that particular
        drawing and now, you obviously had discussions with MGA's counsel, is that
        correct?

10
       A: Yes.

11
       Q: Did you discuss with them that particular drawing?

12
       Ms. Torres: I instruct the witness not to answer on the grounds of attorney-client

13       privilege.

14       (Instruction not to answer.)

15       The Witness: I can't answer that question.

16       (By Mr. Zeller)
        Q: Did you look at the armature drawing that you're referring to?

17

18       A: During the break?

19       Q: Yes.

20       A: No.

21       Q: It's fair to say what you learned about that drawing was told to you by MGA's
        lawyers during the break?

22       Ms. Torres: Objection, misstates the witness' testimony and calls for attorney-
        client privilege communications. If you can answer without revealing attorney-

23       client privileged communications, go ahead.

24       The Witness: I can't answer the question.

25       (By Mr. Zeller)
        Q: Based upon the instruction that your counsel is giving you?

26
       A: Yes.

27

28  Bryant v. Mattel, Inc.,                                       15
    CV-04-09049 SOL (RNBx)

EXHIBIT 40
PAGE 397

1    Garcia Depo. at 617:16-619:2. The objections are overruled. The questions did not require Ms.

2    Garcia to reveal the content of an attorney-client communication. Rather, the questions posed

3    called for disclosure of underlying facts to which Mattel is entitled.

4                                    IV. CONCLUSION

5         For the reasons set forth above, additional time to depose Paula Garcia in her individual

6    capacity and as a Rule 30(b)(6) designee is necessary for a fair examination pursuant to Rule

7    30(d)(2) and Rule 26(b)(2), Fed.R.Civ.P. MGA shall make Ms. Garcia available for deposition

8    for an additional fourteen hours.[7] Upon resumption of her deposition, Ms. Garcia shall provide

9    answers to the two questions where counsel's objections have been overruled. The deposition

10   shall be held at a mutually agreeable date and time, and shall be completed no later than

11   September 28, 2007. The motion for sanctions is denied.

12        Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery

13   Master, Mattel shall file this Order with the Clerk of Court forthwith.

14

15   Dated: August 14, 2007

16                                                   HON. EDWARD A. INFANTE (Ret.)
                                                     Discovery Master
17

18

19

20

21

22

23

24
     _____
25        [7]   During oral argument, MGA implied it may de-designate Ms. Garcia as to some topics. Without
     determining whether such a practice is proper or improper, if MGA does de-designate Ms. Garcia as to some topics,
26   it will have no bearing on the finding that fourteen hours are necessary for a full and fair examination of Ms. Garcia
     in her individual and corporate capacities.
27

28
     Bryant v. Mattel, Inc.,                                                                    16
     CV-04-09049 SGL (RNBx)

                              EXHIBIT  40
                              PAGE  398

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on August 14, 2007, I served the attached ORDER GRANTING MATTEL'S MOTION FOR AN EXTENSION OF TIME TO DEPOSE PAULA GARCIA IN HER INDIVIDUAL CAPACITY AS A 30(b)(6) DESIGNEE; DENYING REQUEST FOR MONETARY SANCTIONS in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| David Hurwitz, Esq. | O'Melveny & Myers LLP | dharwitz@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Michael C. Keats, Esq. | O'Melveny & Myers LLP | mkeats@omm.com |
| Kendall Burr, Esq. | O'Melveny & Myers LLP | kburr@omm.com |
| Melanie Bradley, Esq. | O'Melveny & Myers LLP | mbradley@omm.com |
| Marvin Putnam, Jr., Esq. | O'Melveny & Myers LLP | mputnam@omm.com |
| William Charron, Esq. | O'Melveny & Myers LLP | wcharron@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrisglase.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on August 14, 2007, at San Francisco, California.

*Sandra Chan*
Sandra Chan

EXHIBIT   40
PAGE   399

# EXHIBIT 41

76875/2796154.1

**THE EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 42

# THE EXHIBIT IS FILED UNDER SEAL
# PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 43

Westlaw.

12/23/06 ABCNIGHTLINE (No Page)

12/23/06 ABC Nightline (Pg. Unavail. Online)
2006 WLNR 22434503

ABC Nightline
Copyright 2006 American Broadcasting Company

December 23, 2006

NIGHTLINE

[SHOW: ABC Nightline] [AIRDATE: 12/22/06] [AIRTIME: 23:35] [ANCHOR: MARTIN BASHIR]
[ANCHOR LOCATION: NEW YORK, NY USA] [STORY: NIGHTLINE]

TOPIC:

CONTENT:

GRAPHICS: NIGHTLINE

GRAPHICS: BRAWL IN THE DOLLHOUSE

MARTIN BASHIR (ABC NEWS): Tonight on 'Nightline," brawl in the dollhouse.  After
almost 50 years of domination, Barbie is facing brash new competition from the
Bratz dolls.  Billions of dollars are on the line.  It's a toy story where nobody
is playing nice.

GRAPHICS: CHRISTMAS JOURNEY

MARTIN BASHIR (ABC NEWS): A Christmas journey.  Retracing the root historians say
Joseph and Mary would have taken from Nazareth to Bethlehem.  The dangers, the
difficulties, then and today.

GRAPHICS: FANTASY VS REALITY

MARTIN BASHIR (ABC NEWS): Fantasy versus reality.  It seems like the perfect gift
for a romantic holiday season.  So why do so many of us get it wrong?  Tonight, we
take you inside one store that thinks it has the answer.

MATT NEELY (STOCKING FELLA): The 34B should look good.

ANNOUNCER: From the global resources of ABC News, with Terry Moran in Washington,
Martin Bashir and Cynthia McFadden in New York City, this is 'Nightline," December
22nd, 2006.

GRAPHICS: NIGHTLINE: DECEMBER 22, 2006

REPORTER: JOHN BERMAN
REPORTER LOCATION: LOS ANGELES, CA USA

TOPIC:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 43
PAGE 539

M 0062148

Case 2:04-cv-09049-DOC-RNB Document 6217-5 Filed 08/07/09 Page 66 of 90 Page ID #:205855

CONTENT: BARBIE, BRATZ, MATTEL, MICRO GAMES OF AMERICA, CHUCK SCOTHON

MARTIN BASHIR (ABC NEWS): (Off-camera)  Good evening.  Many of us have spent at
least part of today rushing around the shops looking for that perfect Christmas
present particularly for our children.  Toys are now big business.  Almost $11
billion will be spent on them during the holiday season alone.  And nowhere is the
business more competitive than in the world of dolls.  Yes.  Barbie has long been
the biggest-selling toy doll of all, but now there's a serious challenger.  And in
the fight to be number one nobody's backing down.  Here's ABC's John Berman.

JOHN BERMAN (ABC NEWS): (Voiceover)  In this corner, measuring nine inches tall
with big eyes and even bigger bling, the challenger, Bratz.  And in this corner,
with flowing blond hair and impossibly disproportionate bust, a 47-year undisputed,
undefeated champion from Mattel, Barbie.  Now you might think the world of dolls
isn't the kind of place for a knock down, drag out brawl but you'd be wrong.

ISAAC LARIAN (CEO: Ken is not gonna save Barbie.  Barbie is not gonna save Barbie.
And the leadership that they have at Mattel right now, it's not gonna save Barbie.

JOHN BERMAN (ABC NEWS): (Off-camera)  You sound like a linebacker on a football
team.  You're like taunting Mattel.

ISAAC LARIAN (CEO: It's good.  It's good for the business.

JOHN BERMAN (ABC NEWS): (Off-camera)  It's good?  Trash talking in the doll
business is good?

ISAAC LARIAN (CEO: I'm not trash talking.  I'm telling - I'm talking about the
facts.

JOHN BERMAN (ABC NEWS): (Voiceover)  Meet Isaac Larian.  The seemingly nice man who
wants to pummel Barbie.  He is the CEO of Micro Games of America, which makes the
Bratz doll.  He might not strike you as the doll kind of guy.  He came to the US
from Iran with nothing.

ISAAC LARIAN (CEO: I came here in 1971 with a one-way ticket and $750 in my pocket
and a big American dream.  And I have lived the American dream.

JOHN BERMAN (ABC NEWS): (Voiceover)  Larian went from washing dishes to building a
toy company to the American dream on steroids.  Largely due to this big-eyed, big-
headed cartoonish doll.  When Larian first saw the Bratz design in 2001, he thought
they looked like aliens.

JOHN BERMAN (ABC NEWS): (Off-camera)  Do you still they look like aliens?

ISAAC LARIAN (CEO: No.  I think now they look beautiful.  I've grown to like them.

JOHN BERMAN (ABC NEWS): (Voiceover)  Last year's $2 billion in sales can make many
things beautiful.  Larian now says Bratz has a 40% market share and is the number
two doll in the US market.  Number two for now.  Larian claims his Bratz girls are
breathing down the lanky plastic neck of number one.  That would be Barbie.

JOHN BERMAN (ABC NEWS): (Off-camera)  What's wrong with Barbie?

ISAAC LARIAN (CEO: It's time for her to retire.  She's been around for too long.

JOHN BERMAN (ABC NEWS): (Voiceover)  And you want to help Barbie retire?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __43__
PAGE __540__

M 0062149

ISAAC LARIAN (CEO: Yes, I would help her retire.  I would throw a party for her.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): He's welcome to
throw a party for Barbie any time he wants, but it won't be a retirement party.
She has been and will remain the number one fashion doll in the industry.

JOHN BERMAN (ABC NEWS): (Voiceover)  Meet Chuck Scothon.  A senior Mattel executive
and former high school offensive lineman.  His product is the long-legged goliath
of the toy business.  Since she was first created in 1959, Barbie has been an icon
among icons with almost absurd success.  One study found that 90% of American girls
between 3 and 10-years-old owns a Barbie doll.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): Now, we're traveling
through the world of fairytopia.

JOHN BERMAN (ABC NEWS): (Voiceover)  Scothon doesn't like to talk about Bratz.  Let
alone the fact that they might pose a challenge.

JOHN BERMAN (ABC NEWS): (Off-camera)  How was it, do you think, this become a
story?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): I think a lot of
people like to talk about the underdog and the leadership positions.  I think at
the end of the day it's really about making more out of something than there really
is.

JOHN BERMAN (ABC NEWS): (Voiceover)  But last year, Barbie might have started to
show her age.  Sales dropped 13%, just as Bratz were getting white hot.

JOHN BERMAN (ABC NEWS): (Off-camera)  Is Barbie in danger?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): Not in the least.
Barbie has been and will continue to be the number one fashion doll.

JOHN BERMAN (ABC NEWS): (Voiceover)  Barbie has rebounded a bit this year, but
Isaac Larian is not impressed.  He says he has the key to cool.  A multicultural
doll with the edgy sassy attitude girls want these days.

ISAAC LARIAN (CEO: The kids look at Bratz dolls and they think they are teenagers.
And we ask them how old do you think Bratz dolls are?  They say they are teenagers.
And when they look at Barbie doll they think it's old mom.

JOHN BERMAN (ABC NEWS): (Off-camera)  They think mom when they look at Barbie
dolls?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): What I would suggest
and say to that is, first of all if Barbie, for some girls, reminds them of their
mothers, I would think of nothing better.  The most important job a woman can have
in many ways is being a mom.

JOHN BERMAN (ABC NEWS): (Voiceover)  There is no mistaking a Bratz doll for a mom.

JOHN BERMAN (ABC NEWS): (Off-camera)  I look at that Bratz doll.  She's wearing,
you know, the leopard skin top, she's got the sequins, she's got the hairs, I mean,
you know, people have compared them to street walkers.  They look a little, you
know, trashy.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 43
PAGE 541

M 0062150

ISAAC LARIAN (CEO: They don't look trashy to me. And this is - I think trashy is in the eye of the adults. When we show these to the little girls, and we have done that over and over, everybody said they're beautiful. They never say they look like a streetwalker.

JOHN BERMAN (ABC NEWS): (Voiceover) Barbie is clearly going for a different image. What image, you ask?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): First and foremost, I would say the Barbie doll is truly based on some great values for little girls. The courage, inspiration, imaginative play.

JOHN BERMAN (ABC NEWS): (Voiceover) Whatever that means exactly, Barbie is famous for having careers like Doctor Barbie and Astronaut Barbie. The Bratz dolls? Well, they like...

CARTOON VOICEOVER (GROUP): Shopping.

JOHN BERMAN (ABC NEWS): (Voiceover) This is their motto.

ISAAC LARIAN (CEO: The girls with the passion for fashion.

JOHN BERMAN (ABC NEWS): (Off-camera) The girls with the passion for fashion.

ISAAC LARIAN (CEO: Right.

JOHN BERMAN (ABC NEWS): (Off-camera) What's that about?

ISAAC LARIAN (CEO: They have good fashion. It's okay to look good. It's okay, who said that you have to, who said that girls don't have to look good?

JOHN BERMAN (ABC NEWS): (Off-camera) And Barbie doesn't look good? I could tell you, there are a lot of people who think Barbie looks good.

ISAAC LARIAN (CEO: I don't know. The consumers who are buying Bratz doll don't think Barbie is good.

JOHN BERMAN (ABC NEWS): (Voiceover) If all this is true why hasn't Bratz yet overtaken Barbie as number one? According to Larian...

ISAAC LARIAN (CEO: We would have beaten them up this year and year before if they had not engaged in, what I call, really unfair competition.

JOHN BERMAN (ABC NEWS): (Off-camera) Really unfair competition? Those are fighting words.

ISAAC LARIAN (CEO: They are fighting words.

JOHN BERMAN (ABC NEWS): (Voiceover) The Barbie-Bratz battle has moved beyond the Barbie dream house to the courthouse. Round one. Mattel filed a lawsuit alleging that the designer of the Bratz concept came up with the idea when he was working at Mattel. Round two, Isaac Larian sued back saying that Mattel tried to corner the market on doll hair, and more seriously that Mattel ripped off the Bratz concept for a new line of Barbie dolls. The MyScene dolls.

JOHN BERMAN (ABC NEWS): (Off-camera) This is, the MyScene Barbies are what has, to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __43__
PAGE __542__

M 0062151

12/23/06 ABCNIGHTLINE (No Page)                                    Page 5

some extent, they're in the center of a little bit of a controversy now because Bratz says these look just like their dolls.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): Okay.

JOHN BERMAN (ABC NEWS): (Off-camera)  I mean, don't you see the resemblance between MyScene Barbie and the Bratz doll?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): What we see is an evolution to the Barbie brand. And again, the Barbie brand is made up of dolls that target girls of every age because it's really an evolution of where the Barbie doll has been with a little bit more animated look, but not necessarily something that's been inspired by the competition at all.

JOHN BERMAN (ABC NEWS): (Voiceover)  The cases are still pending, but both companies say they are confident they will win the legal battle, though they say it differently.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): I'm not really gonna talk about the legal piece of this. I have all the confidence in the world that the justice system and that, that our attorneys can work through those issues.

ISAAC LARIAN (CEO: When we're done with Mattel, we will get them for billions of dollars, not only for this, but for defamation.

JOHN BERMAN (ABC NEWS): (Voiceover)  Who will prevail in this doll brawl?  It's one thing to be hot.  Bratz are hot, but another to be iconic.

ISAAC LARIAN (CEO: We're gonna become number one.  I promise you that.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): I can't speak to his guarantee.  What I can speak to is I believe that Barbie will continue to be the number fashion doll around the globe.

JOHN BERMAN (ABC NEWS): (Off-camera)  We're talking about dolls.  I mean, shouldn't everyone be able to play nice?

ISAAC LARIAN (CEO: They have gotten away too much with bullying everybody around. And somebody has to stand up to them.  I will.

JOHN BERMAN (ABC NEWS): (Off-camera)  So you're gonna fight them on the schoolyard?

ISAAC LARIAN (CEO: I'm gonna fight, I'm gonna, not in the school schoolyard.  I'm gonna fight them in the courthouse.

JOHN BERMAN (ABC NEWS): (Off-camera)  And with this thing?

ISAAC LARIAN (CEO: With this thing and many other things.  But all 100% the old American fashion way.

JOHN BERMAN (ABC NEWS): (Voiceover)  Merry Christmas.  I'm John Berman for 'Nightline" in Los Angeles.

MARTIN BASHIR (ABC NEWS): (Off-camera)  The doll wars in a store near you.

GRAPHICS: ROAD TO BETHLEHEM

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT  43
PAGE  543

M 0062152

12/23/06 ABCNIGHTLINE (No Page)                                                    Page 6

MARTIN BASHIR (ABC NEWS): (Voiceover) And just ahead on 'Nightline," retracing the
journey that has inspired millions for centuries. In the footsteps of Joseph and
Mary.

GRAPHICS: STOCKING FELLAS

MARTIN BASHIR (ABC NEWS): (Voiceover) And stocking fellas. One store's solution
to the challenge of buying lingerie. It's a 'Sign of the times."

ANNOUNCER: ABC News 'Nightline," brought to you by...

COMMERCIAL BREAK

REPORTER: WILF DINNICK
REPORTER LOCATION: NAZARETH, ISRAEL

TOPIC:

CONTENT: CHRISTMAS STORY, CHURCH OF NATIVITY, JESUS, MARY, JOSEPH, ISRAEL

MARTIN BASHIR (ABC NEWS): (Off-camera) It's easy and commonplace to sentimentalize
the Christmas story. Mary and Joseph, traveling for days on a donkey from their
home in Nazareth to Bethlehem. Mary eventually giving birth to Jesus in a stable
because there was no room for them at the inn. It wasn't an easy journey back
then, but imagine making the same trek today in 2006. Here's ABC's Wilf Dinnick.

WILF DINNICK (ABC NEWS): (Voiceover) A heavily pregnant woman, traveling across
deserts, through ancient cities and river crossings. The story of a trip inspiring
Christians around the world. The gospel according to Luke says it began in
Nazareth, a city where it's believed an angel told Mary she would have a son named
Jesus.

WILF DINNICK (ABC NEWS): (Off-camera) Today, Nazareth is a city of about 70,000
people. But back in Joseph and Mary's day, it was only a small village of about
1,000. Now, to get to Bethlehem, it's actually only 65 miles, as the crow flies
but Joseph and Mary, they had a complicated route. We're gonna take the exact same
route. Well, they had a donkey. We've got this car.

WILF DINNICK (ABC NEWS): (Voiceover) The Bible does not have details of the
journey. But historians told us, Mary and Joseph probably did not take the direct
way to Bethlehem because then, like today, the Middle East was a complicated,
sometimes dangerous, place. From Nazareth they headed east to the Jordan River to
avoid hostile territory controlled by the Samaritans who hated Jews. They crossed
the river by foot by the ancient city of Bet She'an. Then through the Jordan
Valley, land that was controlled by Jewish kings, back into Israel, over the Jordan
River again and through the ancient city of Jericho passed Jerusalem and then on to
Bethlehem. Steve Pfann sees similarities between today and 2,000 years ago.

STEPHEN PFANN (PRESIDENT: There is an interesting parallel that can be drawn with
border crossings, and police at the border, soldiers at the border, questions of
taxation and other types of things put more into a modern context.

WILF DINNICK (ABC NEWS): (Voiceover) So, we drove from Nazareth to the Jordan
River. It was in shallow areas like this where Mary and Joseph simply walked
across the river.

ISRAELI SECURITY PERSONNEL (MALE): But you don't understand. Hey, I'm telling you,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __43__
PAGE __544__

M 0062153

12/23/06 ABCNIGHTLINE (No Page)                                                          Page 7

there is a problem.

WILF DINNICK (ABC NEWS): (Voiceover)  But today, crossing the Jordan is not so
simple.  We were greeted by Israeli security.

WILF DINNICK (ABC NEWS): (Off-camera)  The security here is so tight in fact that
they won't even let us shoot here, even though we have permission.  This is the
Jordan Valley and this as far as we can come here because this is now an
international border.

WILF DINNICK (ABC NEWS): (Voiceover)  So from here on in, it was hidden cameras
only.  Passport checks, departure tax and duty-free.

WILF DINNICK (ABC NEWS): (Off-camera)  And then we have to get on a bus to make the
very short trip from Israel to Jordan.  This is how you have to do it in 2006.

WILF DINNICK (ABC NEWS): (Voiceover)  I did manage to sneak a few shots as we
crossed the Jordan River.  On the other side, Jordanians were also nervous about
our cameras.

WILF DINNICK (ABC NEWS): (Off-camera)  We face yet another delay here.  This is now
on the Jordanian side and the security here says we can't actually use the camera,
even though we applied for permission weeks ago, they somehow have lost our
permission.  So we're trying to go down to the Jordan Valley now, as quickly as we
can, and then we'll cross over to the Israeli side.

WILF DINNICK (ABC NEWS): (Voiceover)  The Jordan Valley is flat, perfect for
traveling.  In Joseph and Mary's day there would have been hardly anything here.
Today, plenty of busy Arab towns.

WILF DINNICK (ABC NEWS): (Off-camera)  Okay, let's go in.  A lot has changed over
the last 2,000 years but one thing that has remained the same is the type of bread
made almost exactly the same way as when Joseph and Mary made their journey.

WILF DINNICK (ABC NEWS): (Voiceover)  Then back into Israel, just before the border
closes.

WILF DINNICK (ABC NEWS): (Off-camera)  We're now gonna cross the Jordan River for
the second time here, where Mary and Joseph would have waded across on their way to
Bethlehem.

WILF DINNICK (ABC NEWS): (Voiceover)  Then on to the ancient town of Jericho, it is
Palestinian and the Israeli army demands special ID to enter.

WILF DINNICK (ABC NEWS): (Off-camera)  Could I get a falafel with hummus and pita?
Pita, yeah.  Okay.

WILF DINNICK (ABC NEWS): (Voiceover)  This was a chance for Mary and Joseph to rest
before the final, grueling leg of the trip, which was a treacherous road that was
yet again blocked for us by the Israeli army.

WILF DINNICK (ABC NEWS): (Off-camera)  This is the part of the trip we cannot do by
car.  This is the ancient route between Jericho and Bethlehem.  The silence here is
amazing, the view is stunning, but it must have been a daunting part of the journey
for Mary and Joseph.

WILF DINNICK (ABC NEWS): (Voiceover)  The last stretch of the journey that Mary and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT  43
PAGE  545

M 0062154

12/23/06 ABCNIGHTLINE (No Page)                                                 Page 8

Joseph took into Bethlehem is now impossible. Blocked by Israel's security wall.
Even Bethlehem itself is cut off by the wall. We had to drive through this gate
controlled by Israeli soldiers.

WILF DINNICK (ABC NEWS): (Off-camera) We finally arrive in Bethlehem, and that's
the church of the nativity behind us. Now our trip took 15 hours, we crossed two
international borders and dozens of military checkpoints. Joseph and Mary's trip
took about a week.

WILF DINNICK (ABC NEWS): (Voiceover) But on our trip, we met at least one
historian who believes Joseph and Mary's journey never happened. The gospel
according to Luke says the couple made the trip to Bethlehem for a Roman census,
but historians now know there was no census at the time.

REVEREND JEROME MURPHY-O'CONNOR (ECOLE BIBLIQUE: I have no problem with the
divinity of Christ. I have no problem with his birth in Bethlehem. It's just the
colorful little bits that writers, storytellers, felt inclined to add. Those, we
can legitimately question.

WILF DINNICK (ABC NEWS): (Voiceover) He also believes, like many other historians,
the couple already lived in Bethlehem and went to Nazareth later to look for work.
But don't tell that to anyone here. In the Church of the Nativity, in this small
spot where it's believed Mary gave birth to Jesus. For the faithful, a miracle,
after such a grueling journey.

REVEREND JEROME MURPHY-O'CONNOR (ECOLE BIBLIQUE: It's an extremely good yarn, and
that's why it has survived because people prefer good yarns to the truth.

WILF DINNICK (ABC NEWS): (Voiceover) And it is a good story. And for us, an
amazing journey. Wilf Dinnick for "Nightline" in Bethlehem.

MARTIN BASHIR (ABC NEWS): (Off-camera) The Christmas journey then and now. And
when we come back, Santa's little helpers like you've never seen them before. It's
a "Sign of the Times."

GRAPHICS: SIGN OF THE TIMES

COMMERCIAL BREAK

ANNOUNCER: 'Nightline" continues from New York City with Martin Bashir.

REPORTER: NICK WATT
REPORTER LOCATION: LONDON, ENGLAND

TOPIC:

CONTENT: LINGERIE, STOCKING FELLA, MARKS AND SPENCER, MYLA

MARTIN BASHIR (ABC NEWS): (Off-camera) It seems like the perfect gift, the sexy
little outfit for the one we love this Christmas. If only it were that simple.
According to experts, men are simply hopeless at choosing lingerie. So now, a
department store in Britain is employing Santa's little helpers to guide men away
from any lingerie land mines and, according to ABC's Nick Watt, it's a "Sign of the
Times."

MATT NEELY (STOCKING FELLA): (Inaudible) nice, actually. You guys doing okay?
Finding everything you want? Yeah?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 43
546

M 0062155

CUSTOMER (MALE): Yeah, we're fine.

CUSTOMER (FEMALE): Yes, thank you.

CUSTOMER (MALE): Thank you, sir.

MATT NEELY (STOCKING FELLA): Give me a shout if you need any more help.

NICK WATT (ABC NEWS): (Voiceover) Here at Marks and Spencer they noticed a lot of
lingerie returned by women after Christmas. The problem? Men were buying it.
Matt Neely is part of the solution.

MATT NEELY (STOCKING FELLA): We were given all sorts of training about the styles
of bra and what function it performs in terms pushing it together or lifting up, or
squashing it down.

MATT NEELY (STOCKING FELLA): There we are.

NICK WATT (ABC NEWS): (Voiceover) Two hundred stocking fellas were sent out to
help hapless husbands.

MATT NEELY (STOCKING FELLA): That's quite sweet.

CUSTOMER (MALE): Mm-hmm.

MATT NEELY (STOCKING FELLA): Okay?

CUSTOMER (MALE): No.

MATT NEELY (STOCKING FELLA): You know, if the guys are wandering around not really
know what they're doing, or kind of skirting around the outside too afraid to step
in.

NICK WATT (ABC NEWS): (Voiceover) He helps the unromantic.

NICK WATT (ABC NEWS): (Off-camera) Do you always buy underwear for Christmas?

CUSTOMER (MALE): No.

NICK WATT (ABC NEWS): (Off-camera) So why this year?

CUSTOMER (MALE): Because I've run out of ideas.

MATT NEELY (STOCKING FELLA): Yeah.

NICK WATT (ABC NEWS): (Voiceover) He helps the clueless.

MATT NEELY (STOCKING FELLA): What color are you looking for?

CUSTOMER (MALE): Well...

NICK WATT (ABC NEWS): (Voiceover) He even helps those who think they know better.

NICK WATT (ABC NEWS): (Off-camera) Do you have the right size?

CUSTOMER (MALE): I have the right size, yeah.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __43__
PAGE __547__

M 0062156

NICK WATT (ABC NEWS): (Off-camera)  Color?

CUSTOMER (MALE): Well, color is my, my choice really, actually.

MATT NEELY (STOCKING FELLA): Hopefully, the presence of another man in the
department will put them at ease.

NICK WATT (ABC NEWS): (Off-camera)  Now, this is Myla, an upmarket lingerie
boutique where they have a very different philosophy.  Here, they only employ
women.

TAMARA DAVIES (MANAGER: I would say 75% of my customers are men.

NICK WATT (ABC NEWS): (Off-camera)  Are men?

TAMARA DAVIES (MANAGER: Are men.  Male.

NICK WATT (ABC NEWS): (Voiceover)  Men, like Anatoly (PH).

TAMARA DAVIES (MANAGER: Do you know what she likes?  Do you know what color?

CUSTOMER (MALE): Colors, yeah, yeah.

TAMARA DAVIES (MANAGER: Size?

CUSTOMER (MALE): Size, yeah.  I think, it's a must if you - you have to know your
woman.

NICK WATT (ABC NEWS): (Voiceover)  But even at Myla, some men aren't quite so sure
about the size.

TAMARA DAVIES (MANAGER: So they're like this, or, I mean, as a woman, you know,
female working here, we have men come in and said, 'She's your size, what size are
you?"

NICK WATT (ABC NEWS): (Voiceover)  So, there's one bonus of a female assistant but
it's not male bonding.

NICK WATT (ABC NEWS): (Off-camera)  And how do you put them at ease?

TAMARA DAVIES (MANAGER: Smiling, 'Hello, how are you today?"  Talk about the
weather.

NICK WATT (ABC NEWS): (Off-camera)  Bit of humor?

TAMARA DAVIES (MANAGER: A bit of humor, yes.  We do that.

NICK WATT (ABC NEWS): (Off-camera)  Do you flirt a little bit?

TAMARA DAVIES (MANAGER: Yes, a little.

NICK WATT (ABC NEWS): (Off-camera)  Apparently a lot of men end up buying two
pairs, something safe and something saucy that they're both gonna enjoy.

NICK WATT (ABC NEWS): (Voiceover)  As Bridget Jones found out in the movie, safe
can also be sexy.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT  43
PAGE  548

M 0062157

12/23/06 ABCNIGHTLINE (No Page)                                Page 11

CLIP FROM "BRIDGET JONES'S DIARY"

HUGH GRANT (ACTOR): Oh, absolutely enormous panties. No, no, don't apologize. I like them. Hello, mommy.

TAMARA DAVIES (MANAGER: Men don't wanna leave here. I got a guy here in yesterday, and he was looking around. He spent about half an hour, and he said to me, 'I just, I just don't wanna leave. I wanna stay here forever."

MATT NEELY (STOCKING FELLA): It's a 34B, which will be no good.

NICK WATT (ABC NEWS): (Voiceover) I wonder if any one's ever said that...

MATT NEELY (STOCKING FELLA): Yeah.

NICK WATT (ABC NEWS): (Voiceover) ...to a stocking fella? I'm Nick Watt for "Nightline" in Lingerie Land.

MARTIN BASHIR (ABC NEWS): (Off-camera) And in case you're wondering, I bought my wife a rather fetching handbag. And when we come back, a special look at the achievements and events of the past year.

COMMERCIAL BREAK

MARTIN BASHIR (ABC NEWS): (Off-camera) Next week on "Nightline," a look at some memorable moments and provocative people we've covered during 2006. The year in entertainment, power, money and love. It's all part of our special series beginning on Christmas Day with the 'Year in Jesus." We hope you'll join us. But that's our report for tonight. I'm Martin Bashir. For Cynthia McFadden, Terry Moran, and all of us at ABC News, good night America and have a very happy and peaceful Christmas.

FOR INFORMATION ON ORDERING A VIDEO OR TRANSCRIPT COPY OF ABC NEWS OR ABC NEWS NOW PROGRAMMING, PLEASE VISIT THE SECURE ONLINE ORDER FORM LOCATED AT WWW.TRANSCRIPTS.TV

---- INDEX REFERENCES ----

COMPANY: MATTEL INC; ABC NEWS; BRATZ F C; REACH TRADE AND MARKETING; ABC

INDUSTRY:  (TV (1TV19); Underwear (1UN06); Entertainment (1EN08); Gen Y Entertainment (1GE14); TV Programming (1TV26); Games & Toys (1GA85); Gen Y TV (1GE33); Apparel (1AP19); Consumer Products & Services (1CO62); Children's Apparel (1CH40); Apparel & Textiles (1AP20))

REGION:  (Americas (1AM92); North America (1NO39); Mediterranean (1ME20); Middle East (1MI23); USA (1US73); Palestine (1PA37); New York (1NE72); Israel (1IS16); Arab States (1AR46))

Language: EN

OTHER INDEXING:  (MARTIN BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS); MATT NEELY (STOCKING FELLA); ANNOUNCER; MARTIN BASHIR (ABC NEWS); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 43
PAGE 549

M 0062158

BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC
NEWS); ISAAC LARIAN (CEO; CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS
DIVISION); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL -
GIRLS DIVISION); JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON
(SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); JOHN
BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION);
JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); CHUCK SCOTHON
(SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); JOHN
BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR
VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); CARTOON VOICEOVER
(GROUP); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC
LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS);
ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC
NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); CHUCK
SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS);
CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC
NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); ISAAC LARIAN
(CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; CHUCK SCOTHON (SENIOR VICE
PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN
BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO;
JOHN BERMAN (ABC NEWS); MARTIN BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS); MARTIN
BASHIR (ABC NEWS); ANNOUNCER; MARTIN BASHIR (ABC NEWS); WILF DINNICK (ABC NEWS);
WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); STEPHEN PFANN (PRESIDENT; WILF
DINNICK (ABC NEWS); ISRAELI SECURITY PERSONNEL (MALE); WILF DINNICK (ABC NEWS);
WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF
DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK
(ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC
NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS);
WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); WILF DINNICK (ABC NEWS); REVEREND
JEROME MURPHY-O'CONNOR (ECOLE BIBLIQUE; WILF DINNICK (ABC NEWS); REVEREND JEROME
MURPHY-O'CONNOR (ECOLE BIBLIQUE; WILF DINNICK (ABC NEWS); MARTIN BASHIR (ABC NEWS);
ANNOUNCER; MARTIN BASHIR (ABC NEWS); MATT NEELY (STOCKING FELLA); CUSTOMER (MALE);
CUSTOMER (FEMALE); CUSTOMER (MALE); MATT NEELY (STOCKING FELLA); NICK WATT (ABC
NEWS); MATT NEELY (STOCKING FELLA); MATT NEELY (STOCKING FELLA); NICK WATT (ABC
NEWS); MATT NEELY (STOCKING FELLA); CUSTOMER (MALE); MATT NEELY (STOCKING FELLA);
CUSTOMER (MALE); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); NICK WATT (ABC
NEWS); CUSTOMER (MALE); NICK WATT (ABC NEWS); CUSTOMER (MALE); MATT NEELY (STOCKING
FELLA); NICK WATT (ABC NEWS); MATT NEELY (STOCKING FELLA); CUSTOMER (MALE); NICK
WATT (ABC NEWS); NICK WATT (ABC NEWS); CUSTOMER (MALE); NICK WATT (ABC NEWS);
CUSTOMER (MALE); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); TAMARA DAVIES
(MANAGER; NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS);
TAMARA DAVIES (MANAGER; CUSTOMER (MALE); TAMARA DAVIES (MANAGER; CUSTOMER (MALE);
NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); NICK WATT (ABC
NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK
WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); NICK WATT (ABC
NEWS); HUGH GRANT (ACTOR); TAMARA DAVIES (MANAGER; MATT NEELY (STOCKING FELLA);
NICK WATT (ABC NEWS); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); MARTIN
BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS)) (ABC; ABC NEWS; BASHIR; BETHLEHEM;
BIBLE; BRATZ; BRAWL; CHRISTMAS; CHRISTMAS JOURNEY; CHUCK; CONTENT; CONTENT: BARBIE;
CONTENT: CHRISTMAS; CONTENT: LINGERIE; CYNTHIA MCFADDEN TERRY MORAN; DIARY;
DIVISION; DOLLHOUSE; FANTASY; FELLAS; GRAPHICS; GRAPHICS: BRAWL; GRAPHICS:
CHRISTMAS; GRAPHICS: FANTASY; GRAPHICS: SIGN; HUGH; ISAAC; JEWISH; JOSEPH; JOURNEY;
KEN; LUKE; MARTIN BASHIR; MARY GRAPHICS: STOCKING; MATT; MATTEL; NICK; NIGHTLINE;
NIGHTLINE: DECEMBER; PALESTINIAN; SIGN; STOCKING; TAMARA; TERRY MORAN; TOPIC; USA)
(Astronaut Barbie; Barbie; Barbies; BRATZ; BRATZ DOLL WARS; Cynthia McFadden;
Doctor Barbie; Finding; Hey; Isaac; Isaac Larian; JOHN BERMAN; Jordanians; Largely;
Larian; Mary; Matt Neely; MyScene Barbie; Passport; Round; Steve Pfann)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT  43
PAGE  550

M 0062159

12/23/06 ABCNIGHTLINE (No Page)                                    Page 13

Word Count: 5025
12/23/06 ABCNIGHTLINE (No Page)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 43
PAGE 551

M 0062160

# EXHIBIT 44

**THE EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 45

[Main article text - page 61]



### Isaac Larian, the Jewish father of dolls in Israel, is unperturbed by the legal battles with the manufacturer of Barbie. He has appealed a court ruling to remove his dolls from the shelves, and meanwhile he is planning new ones. As revenge.

Shoshana Chen // Photos: Moshe Shai

Whoever said that hell hath no fury like a woman scorned obviously didn't know about the war between Barbie and Bratz, the most publicized battle in the history of the toy world, featuring emotions, jealousy, stubbornness, aggression, and accusations of forgery and fraud. It involves lawyers and publicity, and obviously big money. It's the most expensive toy war ever and the last word has not yet been pronounced on it. "Until now the two sides have spent more than a hundred million dollars on the fight. and I spent the pocket change: only fifty to sixty million, because I don't have the financial resources of Mattel, the manufacturers of Barbie."

The speaker, Isaac Larian, 55, the Jewish CEO of the American company MGA Entertainment, and father of Bratz, speaks calmly even though he took a serious blow last summer, when the federal court in California fined his company a hundred million dollars and ordered it to take down all Bratz products from the shelves, causing him enormous losses. "Sales of Bratz and its accessories were down 60% because retailers and buyers don't like uncertainty," he said during a recent visit to Israel. Now he is preoccupied with the appeal he filed against the court ruling. "As a first stage, the court has already suspended removal of the dolls from the shelves until January 2010.  [Page 62]  The grounds for our appeal run to 8,500 pages." He expects this part of the legal dispute to be concluded by the end of 2009. Meanwhile, he is planning new samples of dolls, which are already making a buzz in the toy world, even though most of their details remain confidential. He is also examining the possibility of bringing out collectors' editions of Bratz if he is forced to remove them from the shelves.

His problem is that in the meantime children are finding other attractions on the shelves, chief among them Webkinz, a winning combination of domestic pets made of fur and a virtual world on a Internet site devoted to the insatiable craving of enthusiasts. In toy circles they say that the Webkinz hysteria is breaking records and is hurting sales of both Bratz and Barbie. Will Webkinz kill off the traditional dolls?

Larian is convinced that they won't. "Girls will always play with dolls," says someone who has made his mark with a long line of international hits in the toy sector: not just Bratz, but also Cozy Coupes, a plastic car that's all the rage in America. "We sold half a million units in the last year, more than any other car in America, and this is a product that has been in the stores for many years. It belonged to a long-established company named "Little Tykes" that we acquired. What made it such a sudden success? We made the car human; we added eyes to it and connected with today's children."

He intends to link the new series of dolls, Moxie Girlz and BFC Ink, to the virtual world. The dolls are softer than Bratz, "Because mother and daughter fashion has changed," he explains. When we launched Bratz, Madonna and Britney Spears were at their peak, and fashion was more frenetic. Girls and their mothers are more conservative these days. The economic situation also has an effect. These two dolls are the kind of thing girls are looking for now and they sell for between 17 and 40 dollars, like Bratz."

He aims them at the 5-11 year olds, although toy psychologist Yael Katz claims that the age for playing with dolls has dropped to 7-8. "If your design is right, girls of 11-12 will also turn to dolls. Both Moxie Girlz and BFC Ink are different from the dolls we've seen up until now. BFC Ink, for example, will come with a book. Both of them will be linked to an Internet site. Later on there will be television series as well as cellular telephones and laptop computers. It's impossible nowadays to bring out a line of dolls without getting into the world of electronics. There are laptops in the USA for girls of 5-6, and when they are 11-12 they have their own cellular phones. Girls will be able to design clothes for the new dolls and send them to us through Internet sites. The company will choose the most successful designs and will perhaps even manufacture them. Consumer research on 600 girls and 600 mothers conducted in the USA yielded fantastic results. Both the girls and their mothers preferred the Moxie Girlz to all other dolls, including Barbie, Hannah Montana, High School Musical and Bratz."

EXHIBIT 45
PAGE 564

Are you adopting the Harry Potter strategy – pique curiosity and develop strict launch rules to create demand?

"We will work in a similar way, but we will not create an artificial shortage. I already expect that there will be a shortage of dolls because we are manufacturing a limited number, and demand is higher than we expected. I don't want to reveal numbers, but I am sure that in time these two dolls will be bigger than Bratz."

## Hitting back

Meanwhile, Bratz is his leading brand with a sales volume of 500 million dollars in peak years and revenues of 15% from franchisees that have a turnover of 2.5 billion dollars a year. Larian refuses to confirm the numbers since the matter is still sub judice.

"Look what is happening with the franchised brands of Bratz," says Ofer Baram, merchandising director of "Toy Village". "When girls reach the age of eight and stop playing with dolls they have an entire wall of products. Wherever Bratz can be printed, it's there: watches, chairs, schoolbags, clothes, pencils, pens, pencil cases, backpacks. I thought girls were already fed up with Bratz by Purim, but it was the leading costume."

According to Baram, Barbie is considered conservative in comparison with Bratz and stuck in a groove. Even the celebrations for her 50th birthday which were held last March did nothing to boost sales. From the beginning of 2008 and until now 12,000 Barbie dolls have been sold in Israel according to reports by the franchisee Sakal – hardly an impressive number compared with sales of Webkinz that exceeded 150,000 units in less than six months.

For his part, Larian is aware of all the competitors and will do whatever it takes to get back on top. He attributes his determination to his personal background as an Iranian Jew. "We lived in a poor area of Teheran," he says. "There were only three Jewish families in our neighborhood, the same neighborhood Ahmadinejad also grew up in. I'll never forget when I was a kid of 7-8 years old and had to come back from school on rainy days, the neighbors' children and the adults themselves used to run to get in front of me and shout that they had to get past me because 'after the raindrops hit me they pollute the ground'. When I got home, crying bitterly, my mother would say to me "If you come home again crying that they made fun of you for being a Jew or because they hit you – I'll hit you. If somebody hits you, you have to hit him back." That's what I did when I was a kid, and they respected me."

His uncle, 87, still lives in Teheran ("I speak with him now and again"). The rest of the family emigrated to the USA and Israel.

"I didn't have any toys when I was a kid," he says, "apart from wooden ones that I made for myself in our back yard. My wife says I like toys because subconsciously I am reliving my childhood and compensating myself for the ones I didn't have then."

From an early age he dreamed of America, and when he turned 17 he was accepted as an engineering student at the University of Missouri.    [page 64]    His father gave him a one-way ticket and 750 dollars. He meant to go to Missouri, but a chance meeting at a stopover in Los Angeles changed his life. A Jewish immigrant from Iran warned him that he wouldn't find work in Missouri. Larian decided to stay in Los Angeles, where he lives to this day. His first job there was washing dishes in a café. He worked there for six months before being promoted to busboy and then waiter. In his free time he studied engineering and when he completed his studies he entered the business world through a small company that imported gifts from Korea. From there he moved on to toys.

**Would you like to visit Iran?**

"Yes, Iran is a beautiful country, and most of the people there were nice to us. Only the uneducated extremists believe the stories. I remember the kind of stories that were going around on the eve of Passover, for example. We had neighbors who believed that the Jews take a Muslim child, slaughter him and use his blood to bake matzos. We had neighbors who used to come to my parents and plead with them: 'Don't take our child.' "

EXHIBIT   4 5

PAGE   5 6 5

## Racism in court

When his daughter Jasmin was 11, she saw a drawing in his office of a new doll that had been given the name "Bratz." She was addicted to Barbie at the time but the new doll brought a gleam to her eye. The success of Bratz brought harsh criticism from sociologists and psychologists who were opposed to the provocativeness and sexuality radiated by the dolls. There was also the lawsuit by Mattel, the manufacturers of Barbie, who claimed that the large-eyed Bratz was a copy of their doll, and that the person who sketched the first illustrations for the new doll and brought them to Larian, Carter Bryant, was a Mattel employee when he presented himself to Larian with the new design. Larian's company, MGA, denied everything, but the court ruled that Larian intentionally violated Bryant's contractual obligation with Mattel and was an accomplice in his breach of trust.

"No one in the toy industry wages as many legal battles as Mattel," he explains. "When they sued doll maker Goldberger, the ruling stated that anyone who decides to compete with Barbie should know that he's a marked man. The have a lot of clout and money. Our appeal contains evidence from Roy Brower *[translator's note: possibly Brauer - English spelling is uncertain]*, who was a senior VP in the company, stating that "Lawsuits are used by Mattel as a commercial tool." For almost fifty years no one dared to take on Barbie. They never thought that a poor Jew from Iran would fight back."

**But you're also an old warhorse.**

"I dislike legal battles, but I defend myself. You can't just sit by and let everyone take away your business and your life. But I have never sued anyone in order to stop competition."

**You accused the trial with Mattel of being tainted by racism.**

"It wasn't an accusation; as I understand it, it's a fact, and we're also bringing it up in our appeal. For me it was something unbelievable. I knew about racism from Iran, and I never thought it would happen to me in the U.S., but it happened during the trial when the jurors were required to decide to whom the original drawings of Bratz belonged and the extent of the damage caused to Mattel. One day, one of the jurors told the judge that during the hearings, one of the female jurors had said that "Iranian Jews are aggressive, and they are all thieves". We demanded a retrial. In the end the judge dismissed her and called her a racist, but at the same time he ruled that she was not a racist in the legal sense. That's like saying that Hitler was an anti-Semite, but not in the legal sense. Our argument was that if she was not a racist in the legal sense, why was she dismissed?"

**How involved are you in the legal battle?**

"More than I would like to be, and I intend to cut down. I am too emotional and I don't have enough time to do what I'm really best at – developing products and marketing – and this is what Mattel really wants. It's no coincidence that sales of Bratz have fallen this year. Our customers don't know what's going on. Customers like Toys R Us in the USA tell us, "We would like to buy, but we don't know what to do." They've cut back on orders because retailers don't like uncertainty. They prefer to wait. Our sales of Bratz dolls and accessories in 2009 will be down 60% from 2008."

The damage to Bratz sales in Israel is actually less serious, says local franchisee Doron Peled, CEO of Ilanit. In Toy Village, for example, the doll and its accessories are in the top ten of sales hits. Barbie hasn't been in the running for a long time.

## Calluses on his hands

Barbie in all its reincarnations, from doctor to astronaut, which was dressed by the greatest designers in the world, remains the most successful doll in history. Larian has challenged it for understandable commercial reasons, but not solely for these.

"From the very first day of the trial they were saying, "Isaac Larian started MGA with money from his rich family in Iran." I sat and listened to them, but I couldn't believe it. What rich family in Iran? I still have the marks of calluses on my hands from the time I washed dishes when I came to America to study engineering. We had to take the dishes out of the dishwasher when they were burning hot. This racism is the hardest part of the battle against Mattel, and it reminds me, unfortunately, that it's impossible to escape racism even in the 21st century and even in California."

**Does it make you think about emigrating?**

"To be perfectly honest, we are thinking about Israel. Only last evening I was talking with my wife and I said that the time had come to buy a house in Israel."

EXHIBIT _45_

PAGE _566_

**Will your children agree?**

"You would be surprised, they love Israel. When my daughter Jasmin was 17, she took part in the 'March of the Living' project and visited Poland and Israel. I still have tear-filled emails she sent me from there. She still says it was the most important thing in her life, the thing that made her more Jewish than anything else. When Ahmadinejad says the Holocaust never happened I don't understand why they don't take him for a tour of Germany and Poland."

His wife Angela, an Iranian Jew he met in America, is not involved in the business. The couple has three children: Jason, 22, who is studying business management in Boston ("I don't know if he's going to join the company"), Jasmin, 19, and Cameron, 15. "I don't give them everything, and they sometimes complain," he says, "but I think that the story of us all is the story of wandering Jews. What if something happens in America and they need to go somewhere else? If you don't have the experience and the determination, you won't survive."

Yediot Aharonot, 7 Days, , July 17, 2009.

EXHIBIT 45
PAGE 566

[captions and callouts]

[photograph caption – page 60]
"Girls will always play with dolls." Larian with the variations.


[photograph caption – page 62]
For almost fifty years no one dared to take on Barbie. They never thought that a poor Jew from Iran
would declare war on them. The Barbies.


[Callouts – page 62]
"I knew about racism from Iran, and I never thought I would be a victim
of it in the U.S., but one of the jurors in our trial said during one of the
hearings that Iranian Jews are aggressive, and they are all thieves."

"I didn't have any toys when I was a kid," he says, "apart from wooden
ones that I made for myself in our back yard. My wife says I like toys
because subconsciously I am reliving my childhood and compensating
myself for the ones I didn't have then."


[Photograph caption – page 64]
"I dislike legal battles, but I defend myself." Larian and the dolls.


[Callouts – page 64]

"We had neighbors in Iran who believed that the Jews take a Muslim
child, slaughter him and use his blood to bake matzos. We had
neighbors who used to come to my parents and plead with them: 'Don't
take our child.' "

"When we launched Bratz, Madonna and Britney Spears were at their
peak, and fashion was more frenetic. Girls and their mothers are more
conservative these days, and our new dolls are more the kind of thing
they want."


## Barbie's manufacturer: We are fair and not racist

Lisa Marie Bongiovanni, VP, Mattel International, responded: "Fairness is a fundamental
value in the company's activities, including its marketing activities. Mattel grants equal
employment opportunities to everyone irrespective of race, color, religion, or nationality. The
court ruled that Mattel's claim against MGA was justified and rejected MGA's claim that there
was an element of anti-competition in Mattel's decision to sue."

Sharon Adjoubel, CEO of Sakal Toys, importers and distributors of Barbie in Israel, said that
"Sales of the Barbie brand in Israel last year were up 28% in comparison with sales for 2006-
2007." Responding to Larian's statements on the subject of racism, she says, "There are quite a
few Jews in the senior management of Mattel, and Ruth Handler, the creator of Barbie, was a Jew.
It is a ridiculous accusation and unworthy of attention."


EXHIBIT  45
PAGE  567



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

City of New York, State of New York, County of New York

I, Marina Yoffe, hereby certify that the document "ART7_17" is, to the best of my knowledge and belief, a true and accurate translation from Hebrew into English.

Marina Yoffe

Sworn to before me on

August 3, 2009

Signature, Notary Public
Katharine L Perekslis
Notary Public, State of New York
No. 01PE6181423
Qualified in QUEENS County
Commission Expires Jan 28, 2012

Stamp, Notary Public

EXHIBIT 45
PAGE 568

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 T 212.689.5555 F 212.689.1059 WWW.TRANSPERFECT.COM



EXHIBIT 45
PAGE 569


PAGE 570
EXHIBIT 45



# באבא בומבה

אייזיק לדריאן, האבא היהודי
של בובות הבראץ, לא מתורגש
מהמאבקים המשפטיים מול
יצרנית בארבי. הוא עירער על
החלטת בית המשפט להסיר את
הבובות שלו מהמדפים, ובינתיים
מתכנן בובות חדשות. כנקמה

**שושנה חן** // צילומים: משה שי



מי שזכר שאין זעם שפיטתית
לייעסה של אישה נבגדת, מוזמן
לא הביר את המלחמה בין בארבי
לבראץ. הבחנה המסוערת ביותר
בהיסטוריה של עולם הצעצועים
שיש שיש "נזיית, תגבה, ורושות, מד
זה אופי...

[המשך הטקסט במדור, קשה לקריאה]

[illegible]

"הכרתי גזענות באיראן וחשבתי שבארה"ב זה לא יקרה לי, אבל מתברר שאחת המושבעות במשפט שלנו אמרה באחד הדיונים שהיהודים האיראנים הם אגרסיבים ושכולם גנבים"

"כילד לא היו לי צעצועים, פרט לצעצועי עץ שהייתי מייצר בחצר. אשתי טוענת שאני אוהב צעצועים כי בתת-ההכרה אני חי מחדש את ילדותי ומפצה את עצמי על התחסור של אז"

2010. ניתוקי הצרעור שלנו כוללים 6,500 עמודים". את סיום החלק הזה של המאבק המשפטי הוא צופה עד סוף 2009. בינתיים הוא מתכנן דגמים חדשים של בובות, שכבר עושים כאן בעולם הצעצועים לגיות שרוב פרטיהם עדיין חסויים. הוא גם בוחן אפשרות להביא בהולדות לאפליקציות של בראץ אם יהיה צורך להסדיר מתפרים.

הנעיה שלו היא סביבתיים הילדים שנצאים על המדפים אמריקניות אחרות, יבראטו ומבקינז, שילוב מנצח בין חיות בחמד מפוריה עם עולם וירטואלי באתר אינטרנט ייעודי להאוית איסוף בלתי נגמרת של המעריצים. בענף הצעצועים אומרים שהיסטריית הבקינז שוברת שיאים ופוגעת במכירות בראץ ובארבי גם יחד. האם יקדש הוובקינז את הבובה המסורתית?

לריאן משוכנע שלא. "ילדות תמיד ישחקו בבובות", קובע מי שוהתם על שורה להיטים עולמיים בתחום הצעצועים: לא רק בראץ, אלא גם קווי קופס, מכונית פלסטיק שמשגעת את אמריקה. "מכרנו בשנה האחרונה כחצי מיליון יחידות, יותר מכל מכונית אחרת בארצות הברית, והרולר במיצר שנמצא בחנויות שנים רבות. היא הפך לתפיה חיקה בשם 'ליטל טייקס' שנרכשה על ידינו. מה גרם להצלחה הפתאומית? הגשנו את המכונית, הוספנו לה עיניים והתחברנו עם הילדים של היום".

את הסדרה של הבובות החדשות, מוקסי וביאפיס, הוא מתכוון לחבר לעולם הווירטואלי. הבובות רזות יותר מבראץ, "כי האופנה של הילדות והאמהות השתנתה", הוא מסביר. "כשהשקנו את בראץ, כרונה הדריטנג' ספייס היו בשיאן והאופנה הייתה יותר הנוית. היום הילדות והאמהות יותר שמרניות. גם המצב הכלכלי השפיע. שתי הבובות האלה מתאימות למה שהילדות רוצות היום, והן יימכרו במחירים שבין 17 ל-40 דולר, כמו בראץ".

הוא מייעד אותן לגילאי חמש עד 11-12. למנהה, פסיכולוגית הצעצועים יעל בן פורנה סגיל המשחק בבובות ירד לשבע שמונה. "אם אתה מייצר נכון, גם בטוח 11-12 יפנו לבובות. זו ההתמחות שלנו. גם מוקסי וגם ביאפיס הן בובות שונות ממה שראינו עד היום. ביאפיס, לטפל, תגיע עם ספר, שתיהן יתחברו לאתרי אינטרנט. בהמשך יהיו בהדרות טלוויזיה וגם טלפונים סלולריים ומחשבים נישאים. אי אפשר היום לצאת עם סט של בובות בלי כניסה לעולם האלקטרוניקה. בארצות הברית יש כמחשבים נישאים לילדות בנות חמש-שש, ובגיל 11-12 יש להן את מכשירי הטלפון הניידים שלהן. למובות החדשות יוכלו הילדות לעצב בגדים ולשלוח אותם אלינו באמצעות אתרי האינטרנט. החברה תמכור את עיצובי הבגדים המצליחים ביותר ואולי גם תייצר אותם. בדיקות צרכנים בקל 600 ילדות ו-600 אמהות שנערכו ברחבי ארצות הברית הביאו תוצאות פנטסטיות. גם הילדות וגם האמהות העדיפו את מוקסי על פני כל בובה אחרת, כולל בארבי, האנה מונטנה, היי סקול מיוזיקל ובראץ".

אתה נוקט אסטרטגיה של "הארי פוטר" — נעתח סקרנות ופלפלי השקה קפדניים כדי לייצר ביקוש?

"בערך באופן דומה, אבל לא נוצב כחוסר מלאכותי. כבר עכשיו אני צופה מחסור בבובות, כי אנחנו מייצרים מספר מוגבל והביקוש גבוה יותר מהמצופה. מספרים אני לא רוצה לחשוף, אבל אני בטוח שעם הזמן שתי הבובות האלה יהיו גדולות יותר מבראץ".

## להרביץ בחזרה

בינתיים בראץ היא המותג המוביל שלו. מדובר על מחזור מכירות של 500 מיליון דולר לשנה בשנת השיא ועל קופונים של כינגו אחד מעסקי הזכיינות שגלגלו עוד בשניים וחצי מיליארד דולר בשנה. לריאן מסרב לאשר את המספרים, שכן הפרשה עדיין נדונה בערכאות.

"תסתכלי מה קורה עם מוצרי הזכיינות של בראץ", אומר עופר ברעם, מנהל סחר כרטיס "כפר השעשועים". "אחרי שהילדות מגיעות לגיל שמונה ומפסיקות לשחק בבובה, יש להן קיר שלם של [illegible]. בכל מקום שאפשר להשיג את בראץ, היא שם: שעונים, כיסאות, תיקים, בגדים, [illegible] עטים, קלמרים, ילקוטים, [illegible] שהילדות כבר באות [illegible] ההתבגרות המוכרת".

[illegible]

מתחילת 2008 ועד היום נמכרו בישראל 12 אלף בובות בארבי, [illegible] 150 אלף יחידות [illegible]

לריאן, מצדו, מודע לכל המתחים ועושה הכל כדי להחזיר לעצמו את [illegible]. הוא תולה את [illegible] שלו כיהודי יליד איראן. "היינו באזור עני [illegible]", הוא אומר. "היו רק שלוש משפחות יהודיות בשכונה שלנו, [illegible]

[illegible]

בטהרן חי עדיין דוד שלו, בן 87 ("מפעם לפעם אני מדבר איתו"). שאר המשפחה היגרה לארצות הברית ולישראל.

"כילד לא היו לי צעצועים", הוא מספר, "פרט לצעצועי עץ שהייתי מייצר לעצמי בחצר האחורית של הבית שבו גרנו. אשתי טוענת שאני אוהב צעצועים כי בתת-ההכרה אני חי מחדש את ילדותי ומפצה את עצמי על המחסור בצעצועים של אז".

[illegible] לו 17 [illegible]

בובה

EXHIBIT 45
PAGE 571





"באיראן היו לנו שכנים שהאמינו שהיהודים לוקחים ילד מוסלמי, שוחטים אותו ומשתמשים בדמו לצורך אפיית מצות. הם היו באים להורי ומתחננים: 'אל תיקחו את הילד שלנו'"

באוניברסיטת מיאמי. אביו צייד אותו בכרטיס לביתן אחר וכשנגז דינר, הוא התכוון להגיע למיאמי, אבל פגישה אקראית בהבניה כיירים בלוס־אנג'לס שינתה את חייו. יהודי יוצא איראן הזהיר אותו שלא ימצא עבודה במיאמי. לרייאן החליט להישאר בלוס־אנג'לס, ושם הוא מתגורר עד היום. מתי פילה רבני סס קנף כלים לבית קפה. שישה חודשים עסק בכך עד שקודם לתפקיד מנקה שולחנות ואחר כך למלצר. בין לבין למד יצרשה, ובסיסים את הלימודים נכנס לעולם העסקים באמצעות חברה קטנה ליבוא מתנות מקוריאה. בסוף הוא עבר לצעצועים.

היית רוצה לבקר באיראן?

"כן. איראן ארץ יפה, ורוב האנשים שם כדי נחמדים אלינו, רק הפיזונים הלא מתנכים מאמינים לסיפורים. אני זוכר איזה סיפורים היו רצים בליבנו בערב פלת, למשל. היו לנו שכנים שהאמינו שהיהודים לוקחים ילד מוסלמי, שוחטים אותו ומשתמשים בדמו לצורך אפיית המצות. היו לנו שכנים שהיו באים להורי ומתחננים: 'אל תיקחו את הילד שלנו'".

## גזענות בבית המשפט

כשהייתה בתו יסמין בת 11, ראתה במי שהיו סרטוט של גובה גדולה שדומה לכי ני "בראץ". היא הייתה אז מסורה לבארבי, אבל הבובה החדשה העלתה ניצוץ בעיניה. עם ההצלחה של בראץ באה ביקורת קשה מצד סוציולוגים ופסיכולוגים, שיצאו נגד הפרובוקטיביות והמיניות שהבובה משדרת. הייתה גם תביעה משפטית של מאטל, יצרנית בארבי, שטענה שקראיט גזלה הקניין מהם את הבובה שלהם, וכי מי ששרטט את האיורים הראשונים לבובה החדשה והביא אותם ללריאן, בריאן קרטר, היה עובד של מאטל כשהתייצב אצל לריאן עם הרעיון. חברת אמ־ג'י־איי של לריאן הכחישה הכל, אבל בית המשפט קבע שלריאן הפר במכוון את ההתחייבות החוזית של קרטר מול מאטל וסייע בהפרת אמונים.

"כתעשיית הצעצועים אין שום גורם שיצא לכל כך הרבה קרבות משפטיים כמו מאטל", הוא אומר. "כשהם תבעו את יצרנית הבובות שלהבונות, נבהל בסוף הדין שכל אחד שמתחיל להתחרות בבארבי צריך לדעת שהוא הולך לשאת כזה מטרה על גבו. יש להם הרבה כוח וכסף. בעדויות שהגנו יש עדות של דר בראואר, שהיה סגן נשיא בכיר בחברה, שאמרו: 'במאטל משתמשים בתביעות משפטיות ככלי עסקי. תובעים, במשך קרוב לחמישים שנה אף אחד לא העז להילחם בבארבי'. הם מעולם לא חשבו שיהודי עני שהגיע מאיראן ישיב להם מלחמה".

אבל גם אתה שהעל קרבות ותיק.

"אני לא אוהב מלחמה משפטיות, אבל אני מגן על עצמי. אתה לא יכול סתם לשבת ולתת לכל אחד לקחת את עסקך ואת חייך. אבל מעולם לא תבעתי אף אחד כדי לעצור תחרות".

האשמת שהמשפט עם מאטל אינו נקי מגזענות.

"זה לא הייתה האשמה להבנתי, זאת עובדה ואבחנו גם מצלים אותה בקלטת. בשבילי זה היה דבר שלא יאומן. הכרתי כד ענות באיראן וחשבתי שבארצות הברית זה לא יקרה לי. אבל זה קרה במסגרת המשפט, כשהמושבעים נדרשו להכריע למי שייכים השרטוטים המקוריים של בראץ ומה הנזק שנגרם למאטל. יום אחד סיפר אחד המושבעים לשופט שבעת הדיונים אחרת אחת הקושבעות שהיהודים האיראנים הם אנשים ושמסלים נגנבים. דרשנו משפט חוזר. בסופו של דבר השופט זרק אותה, קרא לה גזענית. אבל במקביל קבע שהיא לא נגעיה בסוכן המשפטי. שזה כמו לומר שהיטלר היה אנטישמי אבל לא נגעני בסוכן המשפטי. אנחנו טוענים שאם היא לא נגעיה בסוכן המשפטי, למה זרקת אותה?"

עד כמה אתה מעורב במאבק המשפטי כעת?

"יותר מדי לטעמי, ואני מתכוון להתרחק. אני יותר מדי רגשי. ואין לי מספיק זמן לעסוק במה שאני באמת אוהב – פיתוח מוצרים ושיווק – וזה בעצם מה שמאטל באמת רוצה. זה לא מקרי שהמכירות של בראץ ירדו השנה. הלקוחות שלנו לא יודעים מה קורה. לקוחות כמו טויס־אר־אס [illegible]

## יבלות על הידיים

[illegible]

"כשהשקנו את בראץ, מדונה ובריטני שפירס היו בשיאן והאופנה הייתה יותר תזזיתית. היום הילדות והאמהות יותר שמרניות, והבובות החדשות שלנו מתאימות למה שהן רוצות"

## [illegible]

ליזה מרי [illegible], סגן נשיא מאטל הבין־לאומית, מסרה בתגובה: "הגינות היא ערך יסוד מרכזי בפעילות החברה, כולל בפעילות השיווקית. מאטל מעניקה הזדמנויות תעסוקה שוות לכל אדם בלי קשר לגזע, צבע, דת או לאום. בית המשפט קבע כי יש [illegible] שמאטל [illegible] להגיש הגנה [illegible] בית [illegible] אמונים".

שרון אבנבל, מנכ"ל מאטל ישראל, [illegible]

EXHIBIT 45
PAGE 572



