1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
    John B. Quinn (Bar No. 090378)
2 | johnquinn@quinnemanuel.com
    Michael T. Zeller (Bar No. 196417)
3 | (michaelzeller@quinnemanuel.com)
    Jon D. Corey (Bar No. 185066)
4 | (joncorey@quinnemanuel.com)
    865 South Figueroa Street, 10th Floor
5 | Los Angeles, California  90017-2543
    Telephone:  (213) 443-3000
6 | Facsimile:   (213) 443-3100

7 | Attorneys for Mattel, Inc.

8

9 | UNITED STATES DISTRICT COURT

10 | CENTRAL DISTRICT OF CALIFORNIA

11 | EASTERN DIVISION

| | |
|---|---|
| 12  CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| 13          Plaintiff, | Consolidated with Case Nos. CV 04-9059 and CV 05-02727 |
| 14          vs. | **DISCOVERY MATTER** |
| 15  MATTEL, INC., a Delaware corporation, | **[To Be Heard By Discovery Master Robert O'Brien]** |
| 16          Defendant. | DECLARATION OF B. DYLAN PROCTOR IN SUPPORT OF MATTEL, INC.'S REPLY IN |
| 17 | SUPPORT OF CROSS-MOTION REGARDING THE MGA PARTIES' |
| 18  AND CONSOLIDATED ACTIONS | MOTION TO COMPEL PREVIOUSLY COLLECTED |
| 19 | CUSTODIAN INFORMATION OF PRODUCED DOCUMENTS AND TO |
| 20 | REQUIRE FUTURE COLLECTION AND PRODUCTION OF |
| 21 | CUSTODIAL DATA |
| 22 | |
| 23 | Date:    TBA |
| 24 | Time:   TBA Place:  TBA |
| 25 | **Phase 2** |
| 26 | Discovery Cut-off:        Dec. 11, 2009 Pre-trial Conference:    Mar. 1, 2010 |
| 27 | Trial Date:                  Mar. 23, 2010 |
| 28 | |

07975/3053878.1

1

## DECLARATION OF B. DYLAN PROCTOR

2

3          I, B. Dylan Proctor, declare as follows:

4          1.      I am a member of the bar of the State of California and a partner at

5    Quinn Emanuel Urquhart Oliver & Hedges, LLP, attorneys for Mattel, Inc. ("Mattel").

6    I make this declaration of personal, firsthand knowledge and, if called and sworn as a

7    witness, I could and would testify competently thereto.

8          2.      Attached hereto as Exhibit 1 is a true and correct copy of the Phase

9    2 Discovery Matter Amended Order No. 11, dated March 31, 2009.

10         3.      Attached hereto as Exhibit 2 is a true and correct copy of the Court's

11   July 9, 2009 Order.

12

13         I declare under penalty of perjury under the laws of the United States of

14   America that the foregoing is true and correct.

15         Executed this 13th day of August 2009, at Los Angeles, California.

16

17   _____

                                B. Dylan Proctor
18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

1    Robert C. O'Brien (SBN 154372)
     ARENT FOX LLP
2    555 West Fifth Street, 48th Floor
     Los Angeles, CA 90013-1065
3    Telephone: 213.629.7400
     Facsimile: 213.629.7401
4    obrien.robert@arentfox.com

5    Discovery Master

6

7

8                UNITED STATES DISTRICT COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10                    EASTERN DIVISION

11

| | |
|---|---|
| 12   CARTER BRYANT, an individual, | Case No. CV 04-09049 SGL (RNBx) |
| 13           Plaintiff, | |
| 14           v. | Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-2727 |
| 15   MATTEL, INC., a Delaware<br>    corporation, | **PHASE 2 DISCOVERY MATTER** |
| 16          Defendant. | **AMENDED[1] ORDER NO. 11, REGARDING:** |
| 17 | |
| 18 | **(1) MOTION OF MATTEL, INC. TO COMPEL RESPONSES TO INTERROGATORIES AND** |
| 19 | **PRODUCTION OF DOCUMENTS** |
| 20 | **BY MGA ENTERTAINMENT, INC. AND ISAAC LARIAN; and** |
| 21 | |
| 22   CONSOLIDATED WITH<br>   MATTEL, INC. v. BRYANT and | **(2) MOTION OF MATTEL, INC. TO COMPEL THE DEPOSITIONS OF PABLO VARGAS AND MARIANA TRUEBA** |
| 23    MGA ENTERTAINMENT, INC. v.<br>   MATTEL, INC. | |
| 24 | |

25

26

27     _____
       [1] The only difference between this Amended Order No. 11 and the original order is the language in Section III requiring MGA Entertainment, Inc. and Isaac Larian to produce responsive documents and information within 30 days of the original order.

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

AMENDED ORDER NO. 11
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT   1
PAGE   2

1       This Order sets forth the Discovery Master's ruling on two motions filed by

2    Mattel, Inc. ("Mattel"): (1) a motion to compel responses to interrogatories and

3    production of documents by MGA Entertainment, Inc. ("MGA") and Isaac Larian

4    ("Larian") [Docket No. 4817] (the "Written Discovery Motion"), and (2) a motion

5    to compel the depositions of Pablo Vargas and Mariana Trueba [Docket No. 4799]

6    (the "Deposition Motion") (collectively, the "Motions").

7       The Motions came on regularly for hearing before the Discovery Master on

8    March 19, 2009.  All interested parties were represented by counsel and afforded

9    the opportunity to present oral argument on the Motions.  The Discovery Master,

10   having considered the papers filed in support of and in opposition to the Motions,

11   and having heard oral argument, rules as set forth below.

12  **I.**    **MATTEL'S WRITTEN DISCOVERY MOTION**

13       In its Written Discovery Motion, Mattel seeks to compel MGA to produce

14   documents responsive to 40 separate document requests[2] and provide answers to 12

15   different interrogatories.  (Separate Statement in Support of the Written Discovery

16   Motion, pp. 1 – 41 and 45 – 102).  Mattel further seeks to compel Larian to produce

17   documents responsive to 3 separate document requests and provide answers to 11

18   different interrogatories.[3]   (*Id.*, pp. 41 – 43 and 49 – 102).

19     **A.**    **Document Requests**

20         **1.**    **Document Requests Propounded On MGA**

21       Document Request Nos. 4 through 37 seek financial information from MGA

22

23  [2] Although Mattel purports to compel responses from MGA to Document Request Nos. 4 – 37 and 40 – 45 in its

24  Written Discovery Motion, its Separate Statement does not reference Request for Production No. 42, mislabels Document Request Nos. 43, 44 and 45 (as requests numbered 42, 43 and 44, respectively) and includes Document Request No. 46 (incorrectly numbered as request 45).  (*Compare* Separate Statement in Support of the Written

25  Discovery Motion at pp. 37 – 40 with the Declaration of Scott L. Watson in Support of the Written Discovery Motion ("Watson Decl."), Ex. 1 at pp. 13 and 14).  Because Mattel has in reality moved to compel responses to Document

26  Requests Nos. 4 – 37, 40, 41, and 43 – 46, the Discovery Master's ruling addresses only those requests – not Document Request No. 42.  Moreover, any reference to a document request relating to MGA in this Order shall refer

27  to the actual number of the document request as set forth in Mattel's Second Set of Requests for Production of Documents and Things to MGA dated June 6, 2007 (attached to the Watson Decl. as Exhibit 1).

28  [3] The 11 interrogatories propounded on Larian are the same as 11 of the 12 interrogatories at issue regarding MGA.



EXHIBIT   1
PAGE    3

1 related to sales, revenues, costs, profits, customer returns, customer rebates and

2 customer credits regarding the Bratz Dolls or Bratz Product,[4] as well as documents

3 sufficient to identify customers who purchased any Bratz Product from MGA or its

4 licensees.  (Watson Decl., Ex. 1 at pp. 7 – 12).

5     Document Request Nos. 43, 44 and 46 similarly seek financial information

6 from MGA related to the Bratz product line:

7     • Document Request No. 43 (erroneously numbered in Mattel's Separate

8       Statement as request number 42): "All sales, profit and cash flow

9       projections or forecasts for BRATZ DOLLS, BRATZ PRODUCTS,

10      BRATZ MOVIES, and BRATZ TELEVISION SHOWS." (Id., p. 13).

11    • Document Request No. 44 (erroneously numbered in Mattel's Separate

12      Statement as request number 43): "All DOCUMENTS that REFER

13      OR RELATE TO the value of the Bratz brand." (Id.).

14    • Document Request No. 46 (erroneously numbered in Mattel's Separate

15      Statement as request number 45): "All DOCUMENTS that evidence,

16      reflect, REFER OR RELATE TO the BRATZ DOLL's share of the

17      fashion doll market, including, without limitation, the extent to which

18      Bratz has been or is gaining or losing market share in the fashion doll

19      market." (Id., p. 14).

20    Document Request Nos. 40, 41 and 45, on the other hand, seek financial

21 information from MGA as a whole, not just financial data limited to the Bratz Dolls

22 or Bratz Product:

23    • Document Request No. 40: "All DOCUMENTS that describe YOUR

24 ─────────────

[4] Mattel defines the term "Bratz Product" as follows:

25    'Bratz Product' means any product whether two-dimensional or three-dimensional, and whether in tangible, digital or electronic or other form:  (i) that is or has ever been distributed, marketed or sold under the name 'Bratz' or as part of the 'Bratz'

26    line; (ii) that depicts, incorporates, embodies consists of or REFERS OR RELATES TO BRATZ; and/or (iii) that is or has ever been distributed, marketed or sold in any

27    packaging that includes the name 'Bratz' or depicts, incorporates, embodies, consists of or REFERS OR RELATES TO BRATZ.

28 (Watson Decl., Ex. 1 at p. 3; see also id., Ex. 4 at p. 7).

EXHIBIT 1
PAGE 4

1  cost allocation procedures." (*Id.*, p. 13).

2  - Document Request No. 41: "YOUR general ledgers from January 1,
3  1995 through the present." (*Id.*).

4  - Document Request No. 45 (erroneously numbered in Mattel's Separate
5  Statement as request number 44): "DOCUMENTS sufficient to
6  calculate YOUR net worth on a yearly basis for each year from 1999
7  to the present." (*Id.*).

8  **2.  Document Requests Propounded On Larian**

9  The three document requests propounded on Larian (i.e., Documents Request

10  Nos. 207, 208 and 269) seek information regarding all of Larian's earnings and

11  bank accounts:

12  - Document Request No. 207: "DOCUMENTS sufficient to IDENTIFY
13  each account with any bank or financial institution that YOU have or
14  have had, or that YOU have or have had any legal or beneficial interest
15  in, since January 1, 1999." (Watson Decl., Ex. 4 p. 51).

16  - Document Request No. 208: "Documents sufficient to establish
17  YOUR gross income, and the sources of that gross income, for the
18  years 1999 through the present, inclusive." (*Id.*, p. 52).

19  - Document Request No. 269: "DOCUMENTS sufficient to calculate
20  YOUR net worth on a yearly basis for each year from 1999 to the
21  present." (*Id.*, p. 63).

22  **3.  Phase 1 Rulings**

23  This is not the first time that Mattel has moved to compel responses to the

24  document requests at issue. Mattel previously filed two motions to compel that

25  asked the former discovery master to compel MGA and Larian (collectively, the

26  "MGA Parties") to, among other things, respond to the same 43 document requests

27  in dispute here. (Watson Decl., Exs. 2 and 7). The prior discovery master granted

28  both motions (at least as they relate to the document requests that are the subject of

EXHIBIT ___1___
PAGE ___5___

1   the present dispute).  (*Id.*, Ex. 3 at pp. 1 – 3; *Id.*, Ex. 8 at pp. 15 and 16).

2       Because the prior discovery master compelled MGA to produce information

3   responsive to Document Request Nos. 4 – 37, 40, 41 and 43 – 46, and directed

4   Larian to produce information responsive to Document Request Nos. 207, 208 and

5   269, Mattel argues (1) that the MGA Parties have a duty under Federal Rule of

6   Civil Procedure 26 to supplement their prior productions, and (2) that the

7   information the MGA Parties "are withholding is relevant to the damages Mattel

8   seeks," (Written Discovery Motion, pp. 8 – 9).

9       **4.      Objections Of MGA**

10      In their Opposition, the MGA Parties rely on two grounds for refusing to

11  supplement their prior document productions regarding Document Request Nos. 4 –

12  37, 40, 41, 43 – 46, 207, 208 and 269.  First, the MGA Parties argue that Mattel

13  failed to meet and confer in good faith.  (Opposition, pp. 3 – 5).  Second, the MGA

14  Parties argue that the requested information is not relevant to the claims and

15  defenses at issue in Phase 2.  (*Id.*, 5 – 7).

16      **a.      Purported Failure To Meet And Confer**

17      Because it could dispose of the outstanding discovery issues related to the

18  document requests that are the subject of the present dispute, the Discovery Master

19  first addresses the MGA Parties' argument that Mattel failed to meet and confer

20  properly prior to filing its Written Discovery Motion.

21      The MGA Parties argue that Mattel's motion to compel should be denied

22  because Mattel failed to comply with the meet and confer requirements of Local

23  Rule 37-1.  (*Id.*, pp. 3 – 5).  As the Discovery Master has previously ruled,

24  however, Local Rule 37 (as distinguished from Federal Rule 37) does not apply to

25  discovery disputes in this case.  The applicable meet and confer procedures are set

26  forth in the Court's order appointing a discovery master dated December 6, 2006

27  ("Discovery Master Order") and in the Federal Rules of Civil Procedure, (Fed. R.

28  Civ. Proc. 37(a); Discovery Master Order, p. 4), the latter of which expressly

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 4 -

AMENDED ORDER NO. 11
[Case No. CV 04-09049 SGL (RNBx)]



EXHIBIT ___1___
PAGE ___6___

1   requires that, before filing a motion to compel, the moving party must meet and

2   confer in "good faith." (Fed. R. Civ. Proc. 37(a)).

3       Because Rule 37 and the Discovery Master Order govern the meet and confer

4   process in this case, the Discovery Master construes the MGA Parties' meet and

5   confer argument in light of the good faith requirement embedded in Rule 37.  The

6   MGA Parties claim that Mattel did not meet and confer in good faith because its

7   counsel sent them "a meet and confer letter inviting [them] to further meet and

8   confer on February 11, 2009" and then filed a motion to compel one "day before

9   the proposed meet and confer session" was scheduled to occur (i.e., on February 10,

10  2009). (Opposition, pp. 3 – 5; *see also* Declaration of Amman Khan, Ex. H at p. 2

11  [wherein Mattel's counsel asked counsel for the MGA Parties to "be in a position to

12  provide us with MGA and Larian's position by Wednesday, February 11, 2009."]).

13  However, the record available to the Discovery Master demonstrates that Mattel

14  made several prior attempts to meet and confer with the MGA Parties, including

15  engaging in the following:

16      • On January 6, 2009, Mattel's counsel sent a letter demanding that the

17          MGA Parties supplement their production concerning the document

18          requests by February 1, 2009, (Watson Decl., Ex. 17);

19      • Counsel for the MGA Parties never responded to Mattel's January 6,

20          2009 letter, (Written Discovery Motion, p. 6);

21      • Counsel for Mattel sent counsel for the MGA Parties a second copy of

22          the January 6, 2009 letter on February 5, 2009, (Watson Decl., Ex. 30);

23      • Counsel for Mattel and counsel for the MGA Parties then spoke on

24          February 6, 2009, and were supposed to discuss, among other things,

25          the document requests at issue, but counsel for the MGA Parties was

26          not prepared to discuss the requests at the appointed time, (Watson

27          Decl., ¶ 22); and

28      • Counsel for Mattel and the MGA Parties then spoke *again* on February

EXHIBIT ___/___
PAGE ___/___

1     9, 2009 to discuss the document requests but counsel for the MGA

2     Parties was still not prepared to discuss the issues, (*Id.*).

3     In light of foregoing facts (which are not disputed by the MGA Parties), it is

4 clear that Mattel satisfied Rule 37's "good faith" meet and confer requirement.  The

5 plain language of Federal Rule of Civil Procedure 37(a)(1) permits a party to "move

6 for an order compelling . . . discovery . . . [if] the movant has in good faith

7 conferred or *attempted to confer* with the" the non-moving party." (Fed. R. Civ. P.

8 37(a) [emphasis added]).  Because it attempted to meet and confer with counsel for

9 the MGA Parties on at least two occasions (but was unable to do so because the

10 MGA Parties were not prepared to meet and confer during either of the agreed upon

11 times), Mattel satisfied its meet and confer obligations under Rule 37.[5]

12     **b.    Relevance Of The Document Requests To Phase 2**

13     The MGA Parties also oppose Mattel's demand for a supplemental

14 production on the ground that none of the document requests as issue seek

15 information reasonably calculated to lead to the discovery of admissible evidence.

16 (Opposition, pp. 5 – 7).

17     **(1)    Document Request Nos. 207, 208 And 269**

18     With respect to the three document requests directed to Larian (i.e.,

19 Document Request Nos. 207, 208 and 269), the Opposition contends that they are

20 not relevant to any Phase 2 claims.  (Opposition, p. 6).

21     Each of the requests seeks information related to Larian's financial condition,

22 Mattel's damages, and/or whether the facts alleged in Mattel's Second Amended

23 Answer and Counterclaim ("SAAC") are true.  For example, Document Request

24

25

---

[5] The Discovery Master's ruling is also supported by the fact that the MGA Parties refused to produce any of the requested information following the filing of the Written Discovery Motion.  It is, therefore, unclear what could have been accomplished by an additional meet and confer on these issues.  Moreover, Mattel's counsel stated at oral argument that they met with MGA's counsel again on February 11, 2009 regarding the document requests and they still "had no answer to this question."  (Transcript of March 19, 2009 hearing before the Discovery Master ("Tr.") p. 68:7-9).  Regardless, Mattel attempted to meet and confer twice before filing its current motion to compel (i.e., on February 6 and 9, 2009) and that is all that is required by the Federal Rules of Civil Procedure and the discovery procedures governing this case.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 6 -

AMENDED ORDER NO. 11
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT _____1_____
PAGE _____8_____

1   Nos. 208 and 269 seek documents sufficient to identify Larian's net worth (Request

2   No. 269) and gross income (Request No. 208).  Such information relates to Phase 2

3   damages issues, including, among other things, damages sought against Larian in

4   connection with Mattel's unfair competition cause of action as well as the

5   calculation of Larian's net worth for purposes of litigating the propriety of any

6   "exemplary damages under Cal. Civ. Code § 3294."[6]  (SAAC, ¶¶ 163 – 166).  It is

7   therefore discoverable.

8        In its SAAC, Mattel also alleges that MGA, Larian and others hired former

9   Mattel's employees for the express purpose of misappropriating Mattel's

10   confidential and proprietary information, and that the MGA Parties promised such

11   individuals increased salaries at MGA.  (*See, e.g.,*  SAAC, ¶¶ 69 and 77).  Mattel's

12   request for documents sufficient to identify Larian's bank accounts (i.e., Request

13   No. 207) is, therefore, reasonably calculated to lead to the discovery of admissible

14   evidence regarding the source of any payments that may have been made by Larian

15   to former Mattel employees.[7]

16        **(2)   Document Request Nos. 4 – 37, 40, 41 And 43 –**

17             **46**

18        Regarding the requests directed to MGA (i.e., Document Request Nos. 4 –

19   37, 40, 41 and 43 – 46), MGA argues that they are improper because they seek

20   financial information "related to Bratz dolls, which was a Phase 1 issue,"

21   (Opposition, p. 5).  Specifically, the MGA parties argue that:

22        [a]ny claim by Mattel that it needs [supplemental] Bratz-

23   ────────────────────────

24   [6] While the Discovery Master agrees that Document Request Nos. 208 and 269 are relevant to Phase 2 issues, he concludes that Larian should not be required to provide updated information concerning his net worth and gross income every few months.  Yet, Mattel is entitled to obtain this financial information at least once prior to the Phase

25   2 trial so that it can assess the veracity of the information provided by Larian through the discovery process, question deponents about the figures provided, and give the data to its experts.  Further, acquiring updated financial

26   information from Larian is appropriate because his net worth and gross income could, in theory, have been altered by the verdict rendered in Phase 1 or recent economic conditions.

27   [7] Any imposition resulting from Document Request No. 207 should be minimal because Larian was ordered to

28   produce documents identifying his bank accounts as part of Phase 1.

EXHIBIT ___1___
PAGE ___9___

1         related financial information in order to establish its Phase

2         2 damages ignores the jury's Phase 1 damages award . . . .

3         Mattel sought disgorgement of all Bratz profits during

4         Phase 1 and the jury made its award.  Mattel may not

5         relitigate this issue in Phase 2.

6 (*Id.*, p. 6).

7         However, Document Request Nos. 40, 41 and 45[8] make no mention of

8 financial information related to the Bratz Dolls or Bratz Product.  They instead seek

9 (1) "All DOCUMENTS that describe [MGA's] cost allocation procedures,"

10 (Watson Decl., Ex. 1 at p. 13), (2) MGA's "general ledgers from January 1, 1995

11 through the present," (*id.*), and (3) "DOCUMENTS sufficient to calculate [MGA's]

12 net worth on a yearly basis for each year from 1999 to the present," (*id.*).

13 Therefore, MGA's argument does not apply to these document requests.

14         Document Request Nos. 40, 41 and 45 (erroneously numbered in Mattel's

15 Separate Statement as request number 44) are further reasonably calculated to lead

16 to the discovery of admissible evidence.  As the Discovery Master previously ruled,

17 the touchstone for determining whether a particular discovery request is reasonably

18 calculated to lead to the discovery of admissible evidence in this case is whether the

19 request bears some relation to the issues to be tried in Phase 2.  That standard is met

20 here, since MGA's general ledgers, net worth, and cost allocation procedures all

21 bear on Mattel's Phase 2 damages claims, including Mattel's claim for punitive

22 damages.

23         As for the remainder of the document requests directed to MGA (i.e.,

24 Document Request Nos. 4 – 37, 43,[9] 44,[10] and 46),[11] they are admittedly linked to

---

25  [8]  Document Request No. 45 is erroneously numbered in Mattel's Separate Statement as request number 44.

26  [9]  Document Request No. 43 is erroneously numbered in Mattel's Separate Statement as request number 42.

27  [10]  Document Request No. 44 is erroneously numbered in Mattel's Separate Statement as request number 43.

28  [11]  Document Request No. 46 is erroneously numbered in Mattel's Separate Statement as request number 45.

EXHIBIT _____1_____
PAGE _____10_____

1   financial information related to the Bratz Dolls/Bratz Product.  While the Discovery

2   Master recognizes that many, if not all, of the issues related to the theft of the Bratz

3   Dolls as well as any damages that may be recoverable by Mattel relating to such

4   misconduct were litigated and resolved in Phase 1 that does not necessarily mean

5   the information sought by Mattel is irrelevant.

6        As an initial matter, the Court's December 3, 2008 order imposes a

7   constructive trust on the proceeds of MGA's sale of Bratz dolls.  Continued sale of

8   any such inventory is thus relevant to the Court's injunction and presumably must

9   be made available to Mattel on that basis alone.[12]

10       Document Request Nos. 4 – 37, 43 (erroneously numbered in Mattel's

11   Separate Statement as request number 42), 44 (erroneously numbered in Mattel's

12   Separate Statement as request number 43), and 46 (erroneously numbered in

13   Mattel's Separate Statement as request number 45) also relate to Mattel's Phase 2

14   claims.  The counterclaims to be litigated in Phase 2 (e.g., Mattel's RICO causes of

15   action, misappropriation of trade secrets claim, and unfair competition cause of

16   action) all incorporate by reference the allegation that "MGA first stole 'Bratz,' a

17   fashion doll, from Mattel, and then continued stealing Mattel's confidential and

18   proprietary information to fuel MGA's growth." (SAAC, ¶¶ 1, 88, 98, 106, and

19   163).  The SAAC later alleges that "[b]y engaging in the foregoing conduct, [MGA

20   has, among other things,] . . . engaged in unlawful, unfair or fraudulent business

21   act[s] or practice[s]" in violation of California Business and Professions Code

22   section 17200 *et seq.*  (SAAC, ¶ 165).  Therefore, in addition to the alleged

23   misappropriation of other trade secrets, Mattel's Phase 2 counterclaims at least

24   arguably include evidence relating to the purported theft of the Bratz Dolls as well.

25       Mattel's two RICO claims also both refer explicitly to a "Bratz Criminal

26

27   _____
   [12] MGA also has a continuing duty to supplement its production under the Federal Rules of Civil Procedure.  (*See*

28   Fed. R. Civ. P. 26(e)(1) ["A party who has . . . responded to . . . [a] request for production . . . must supplement or
   correct its disclosure or response . . . in a timely manner").

EXHIBIT ___1___
PAGE ___11___

1    Enterprise." (SAAC, ¶¶ 89 and 100). The SAAC further expressly alleges that one

2    of the purported racketeering activities was the "altering [of] numerous original

3    Bratz drawings created by Bryant . . ." (SAAC, ¶ 93(c)(ii)). These allegations are

4    sufficient to render Document Request Nos. 4 – 37, 43, 44 and 46 reasonably

5    calculated to lead to the discovery of admissible evidence in Phase 2.

6        The Discovery Master cannot predict whether the Court will ultimately

7    construe Mattel's Phase 2 claims as broad enough to encompass MGA's alleged

8    misappropriation of the Bratz Dolls, or whether Mattel will be barred from

9    presenting any evidence that it has been damaged by such misconduct at the Phase

10   2 trial on the ground that the issue was previously litigated and resolved in Phase 1.

11   Given that the discovery here need only appear reasonably calculated to lead to the

12   discovery of admissible evidence concerning the Phase 2 claims, the Discovery

13   Master finds that the aforementioned document requests are sufficiently related to

14   Mattel's Phase 2 claims to be discoverable at this time.

15          **5.**      **Conclusion**

16        For all of the foregoing reasons, Mattel's motion to compel responses to

17   Document Request Nos. 4 – 37, 40, 41, 43 – 46 (erroneously numbered in Mattel's

18   Separate Statement as requests numbered 42 – 45), 207, 208 and 269 is granted.

19      **B.**     **Interrogatories Propounded On MGA And Larian**

20        The second part of Mattel's Written Discovery Motion addresses various

21   interrogatories propounded on the MGA Parties.

22          **1.**      **Interrogatory No. 45 Propounded On MGA**

23   Interrogatory No. 45 asks MGA[13] to:

24        IDENTIFY each BRATZ PRODUCT that has been

25        SOLD by [MGA] or [its] licensees and, for each such

26

27

28

---

[13] Although Interrogatory No. 45 was propounded on Larian as well, (*see* Watson Decl., Ex. 9), Mattel's Written Discovery Motion seeks an order compelling just "MGA TO SUPPLEMENT ITS RESPONSES TO INTERROGATORY NO. 45." (Written Discovery Motion, p. 9:8-9 [emphasis omitted]).

EXHIBIT _____1_____
PAGE _____12_____

1    BRATZ PRODUCT, state . . . (a) the number of units of

2    each such BRATZ PRODUCT SOLD by [MGA] or [its]

3    licensees, (b) the gross and net revenue received by

4    [MGA] from such SALES of each such BRATZ

5    PRODUCT, (c) all costs [MGA] incurred in connection

6    with each such BRATZ PRODUCT, including but not

7    limited to [MGA's] costs of goods sold, and (d) [MGA's]

8    gross and net profits from each such BRATZ PRODUCT.

9    (Separate Statement in Support of the Written Discovery Motion, p. 45; *see also*

10   Written Discovery Motion, p. 9).

11             **a.    Phase 1 Rulings**

12        As with the document requests discussed above, Mattel concedes that "MGA

13   identified and produced documents responsive to [Interrogatory No. 45] in

14   December 2007, and later supplemented th[at] production mid-trial . . ." (Written

15   Discovery Motion, p. 9).  Nonetheless, Mattel argues that "MGA now . . . refuses to

16   supplement its response" without justification.  (*Id.*)

17             **b.    Objections Of MGA**

18        In its Opposition, MGA argues that it does not have to provide the

19   information requested by Interrogatory No. 45 for two reasons.  First, it claims that,

20   like the document requests propounded on MGA, "Mattel's entitlement to gross and

21   net profits from sales of Bratz products was an issue adjudicated in Phase 1, and

22   Mattel fails to explain how this discovery is relevant to or proper in Phase 2."

23   (Opposition, p. 7).  The information sought by Interrogatory No. 45 is virtually

24   identical to the documents sought by Document Request Nos. 21 (requesting

25   "DOCUMENTS sufficient to show the number of units of each BRATZ

26   PRODUCT sold by [MGA] or [its] licensees"), 22 (requesting "DOCUMENTS

27   sufficient to show the revenue received by [MGA] from the sale of each BRATZ

28   PRODUCT sold by [MGA] or [its] licensees"), 23 (requesting "DOCUMENTS

EXHIBIT ____1____

PAGE ____13____

1   sufficient to show [MGA's] cost of goods sold, unit cost and other cost for each

2   BRATZ PRODUCT sold by [MGA] or [its] licensees"), and 24 (requesting

3   "DOCUMENTS that evidence, reflect or REFER OR RELATE TO [MGA's]

4   profits from the sale of each BRATZ PRODUCT sold by [MGA] or [its]

5   licensees"), discussed above.  Accordingly, MGA's relevancy argument regarding

6   Interrogatory No. 45 is not persuasive for the same reasons discussed in Section

7   I.A.4.b.2 above, namely that the information is relevant to the constructive trust

8   imposed by the Court on the proceeds of MGA's sale of Bratz dolls and is also

9   arguably relevant to Mattel's Phase 2 claims.[14]

10        MGA also argues that it should not be required to provide the information

11   requested by Interrogatory No. 45 because it "has already provided information that

12   is current through the second fiscal quarter of 2008" and it would be unduly

13   burdensome to gather the documents necessary to update that information.

14   (Opposition, pp. 7 – 8).  MGA did not argue, however, in its Opposition that it

15   would be unduly burdensome to respond to Document Request Nos. 21, 22, 23 and

16   24 discussed above in Section I.A.4.b.2.  Therefore, MGA can gather the

17   documents responsive to those requests and refer Mattel to those materials.  (*See*

18   Fed. R. Civ. P. 33(d) [If the answer to an interrogatory may be determined by

19   examining . . . a party's business records . . . the responding party may answer by

20   specifying the records that must be reviewed . . ."]).

21        The MGA Parties' argument that it is overly burdensome to require MGA to

22   spend 320 hours to inform Mattel of the most recent sales figures concerning the

23   Bratz products, (Opposition, p. 7), is also unpersuasive, given the importance of the

24

25   [14] Again, the Discovery Master cannot predict whether the Court will ultimately deem Mattel's Phase 2 claims broad
     enough to encompass MGA's alleged misappropriation of the Bratz dolls or whether Mattel will be barred from
26   presenting any evidence that it has been damaged by such misconduct at the Phase 2 trial on the ground that the issue
     was previously litigated and resolved in Phase 1.  Nevertheless, in light of the fact that the discovery need only
27   appear reasonably calculated to lead to the discovery of admissible evidence concerning the Phase 2 claims, the
     Discovery Master finds that Interrogatory No. 45 is sufficiently related to Mattel's Phase 2 claims to be discoverable
28   at this time.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT ___1___
PAGE ___14___

- 12 -

AMENDED ORDER NO. 11
[Case No. CV 04-09049 SGL (RNBx)]

1    information requested and the wide-ranging extent of the discovery to date. As

2    explained above, the information sought is relevant to the constructive trust

3    imposed by the Court's December 3, 2008 ruling and relevant to Mattel's Phase 2

4    claims. Also, while 320 hours may be unduly burdensome in certain

5    circumstances, it is not unreasonable on its face here given that the MGA Parties

6    have already produced more than 4 million documents.[15] (*See Cappacchione v.*

7    *Charlotte-Mecklenburg Schools*, 182 F.R.D. 486, 491 (W.D.N.C. 1998)

8    ["Requiring a responding party to perform extensive research or to compile

9    substantial amounts of data and information does not automatically constitute an

10   undue burden . . . Imposing such a burden is particularly proper where, as here, the

11   information sought is crucial to the ultimate determination of a crucial issue and

12   where the location of the documents is best known by the responding party."]).

**c.    Conclusion**

13

14        For all of the foregoing reasons, Interrogatory No. 45 is reasonably

15   calculated to lead to the discovery of admissible evidence regarding Mattel's

16   Phase 2 claims and must be answered by MGA.

**2.    Interrogatory Nos. 56 – 63 Propounded On MGA And Larian**

17

18

19        Mattel propounded Interrogatory Nos. 56 – 63 on both MGA and Larian.

20   These interrogatories ask the MGA Parties to provide information regarding their

21   alleged theft of certain Mattel documents:

22        • Interrogatory No. 56: "IDENTIFY all MATTEL DOCUMENTS that

23              MGA has obtained, received, reviewed, copied, reproduced,

24              transmitted, requested, or used at any time since January 1, 1999, and

25              IDENTIFY all PERSONS with knowledge of such facts and all

26              DOCUMENTS that REFER OR RELATE TO such MATTEL

27

---

28   [15] *See* Opposition at p. 4 n. 1 [stating that "the MGA Defendants [have] produced four million, two hundred thousand (4,200,000) pages of documents"].

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 13 -

AMENDED ORDER NO. 11
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___1___
PAGE ___15___

1    DOCUMENTS." (Separate Statement in Support of Written
2    Discovery Motion, p. 49).

3    • Interrogatory No. 57: "IDENTIFY all DOCUMENTS that REFER
4    OR RELATE TO any MATTEL product or plan that any of the
5    FORMER MATTEL EMPLOYEES provided, transmitted or disclosed
6    to, shared with or used on behalf of MGA at any time since January 1,
7    1999, and IDENTIFY all PERSONS with knowledge of such facts."
8    (*Id.*, p. 52).

9    • Interrogatory No. 58: "State all facts which support YOUR
10   contention, if YOU so contend, that YOU and/or MGA did not obtain
11   any MATTEL DOCUMENTS through improper means, and
12   IDENTIFY all PERSONS with knowledge of such facts and all
13   DOCUMENTS that REFER OR RELATE TO such facts." (*Id.*, p.
14   54).

15   • Interrogatory No. 59: "State all facts which support YOUR
16   contention, if YOU so contend, that any information in the MATTEL
17   DOCUMENTS does not and/or did not derive independent economic
18   value from not being generally known to the public or other
19   PERSONS who can obtain economic value from its disclosure or use,
20   and IDENTIFY all PERSONS with knowledge of such facts and all
21   DOCUMENTS that REFER OR RELATE TO such facts." (*Id.*, p.
22   57).

23   • Interrogatory No. 60: "State all facts which support YOUR
24   contention, if YOU so contend, that any information in the MATTEL
25   DOCUMENTS was known to the public or to PERSONS who can
26   obtain economic value from its disclosure or use, and IDENTIFY all
27   PERSONS with knowledge of the foregoing and All DOCUMENTS
28   that REFER OR RELATE TO the foregoing." (*Id.*, p. 61).

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 14 -

AMENDED ORDER NO. 11
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___1___
PAGE ___16___

1  • Interrogatory No. 61: "State all facts which support YOUR
2     contention, if YOU so contend, that YOU and/or MGA independently
3     developed, or did not otherwise use or disclose, any information in the
4     MATTEL DOCUMENTS, and IDENTIFY all PERSONS with
5     knowledge of such facts and all DOCUMENTS that REFER OR
6     RELATE TO such facts." (*Id.*, pp. 64 – 65).
7  • Interrogatory No. 62: "State all facts which support YOUR contention
8     that YOUR use or disclosure of information in the MATTEL
9     DOCUMENTS neither benefited YOU nor harmed MATTEL, and
10    IDENTIFY all PERSONS with knowledge of such facts and all
11    DOCUMENTS that REFER OR RELATE TO such facts." (*Id.*, p.
12    69).
13 • Interrogatory No. 63: "State all facts which support YOUR
14    contention, if YOU so contend, that YOU and/or MGA had, has or
15    have any right to copy, possess, use or disclose any MATTEL
16    DOCUMENT, and IDENTIFY all PERSONS with knowledge of such
17    facts and all DOCUMENTS that REFER OR RELATE TO such
18    facts." (*Id.*, p. 73).

19            a.      **Objections Of MGA And Larian**

20         In their Opposition, the MGA Parties rely on four basic grounds for refusing
21 to provide responses to Interrogatory Nos. 56 – 63.  First, the MGA Parties argue
22 that Interrogatory Nos. 56 and 58 – 63 are unduly burdensome.  (Opposition, pp. 9
23 – 10).   Second, the MGA Parties argue that the interrogatories presuppose facts
24 that are not true.  (*Id.*, p. 8).  Third, the MGA Parties argue that all 8 interrogatories
25 are impermissibly compound and exceed the number of allotted interrogatories.
26 (*Id.*, pp. 10 – 11).  Finally, the MGA Parties argue that Interrogatory Nos. 58, 59
27 and 62 improperly ask them to establish a negative proposition.  (*Id.*, pp. 11 – 12).

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 15 -

AMENDED ORDER NO. 11
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___1___
PAGE ___17___

**(1)   Unduly Burdensome Objection**

The MGA Parties' primary argument in opposition to Interrogatory Nos. 56 – 63 is that each of the seven interrogatories that references the term "MATTEL DOCUMENTS" (i.e., Interrogatories Nos. 56 and 58 – 63) is unduly burdensome. (Opposition, p. 9 – 10). While the MGA Parties do concede that the interrogatories "relate to Phase 2" issues, (Tr., p. 57:13), they object to the interrogatories because they claim that the interrogatories require them "to state all facts, identify all documents and identify all witnesses, supporting contentions for over 8 boxes of documents . . ." (Opposition, pp. 9 – 10). Whether an undue burden exists, however, depends on, among other things, the value of the information sought versus the burden alleged by the responding party. (*See King v. Georgia Power Co.*, 50 F.R.D. 134, 136 (N.D. Ga. 1970) ["Although preparation of a direct answer will be time-consuming, and probably costly, the information is crucial to the issues of this suit, and is in the exclusive custody of the defendant."]).

Applying this test here, the Discovery Master finds that Interrogatory Nos. 56 and 58 – 63, at least as he understands them, go to the core of Mattel's Phase 2 trade secret claims. (Tr., 37:9-12 ["We're not asking for something of marginal importance. We're asking for . . . their core contentions related to the trade secret claims."]). As the Discovery Master has previously explained, the issues to be litigated in Phase 2 include, among other things, Mattel's claim that the MGA Parties stole "a vast array of trade secrets and other confidential information that comprise Mattel's intellectual infrastructure," including, among other things, stealing "Mattel's proprietary business methods, practices and information." (SAAC, ¶ 20). Indeed, Mattel alleges in its SAAC that the MGA Parties:

- "engaged in an ongoing, widespread pattern of . . . inducing Mattel employees to steal Mattel's confidential information or other property and take it with them to MGA," (*Id.*, ¶ 5);

//

EXHIBIT ___1___
PAGE ___18___

1
2
3

- stole "Mattel's plans, strategy and business information for the Mexican market and materials related to Mattel's worldwide business strategies," (*Id.*, ¶ 37);

4
5
6
7
8
9

- "directed [certain Mattel employees'] to steal virtually all Mattel confidential and proprietary information that they could access and bring it with them to MGA," (*Id.*, ¶ 43), including "virtually every type of document a competitor would need to enter the Mexican market, and to unlawfully compete with Mattel in Mexico, in the United States and elsewhere . . ." (*Id.*, ¶ 48);

10
11
12
13
14
15
16
17

- "targeted certain Mattel employees who have broad access to Mattel proprietary information in an effort to induce and encourage them to join MGA and to steal or otherwise wrongfully misappropriate Mattel confidential information and trade secrets," including by "promising these employees salaries 25 percent or more higher than they earn at Mattel and stating to them that they should not be concerned by legal action taken by Mattel to protect its trade secrets and its rights because such claims are hard to prove and easy to defeat," (*Id.*, ¶ 69); and

18
19
20
21
22
23
24

- "hired directly from Mattel's United States operations at least 25 employees, from Senior Vice-President level to lower level employees," and that some of these individuals misappropriated "Mattel confidential and proprietary information, including Mattel's strategic plans; business operations; methods and systems; marketing and advertising strategies and plans; future product lines; product profit margins, and customer requirements." (*Id.*, ¶ 77).

25
26
27
28

Therefore, this is not a situation where Mattel has alleged that the MGA Parties stole a handful of documents. The SAAC instead alleges that the MGA Parties engaged in the wholesale theft of Mattel's trade secrets, including stealing "virtually every type of document a competitor would need to enter the Mexican

EXHIBIT    1
PAGE    19

1  market, and to unlawfully compete with Mattel in Mexico, in the United States and
2  elsewhere . . ." (*Id.*, ¶ 48). Because Mattel alleges that its claims against the MGA
3  Parties relate to "a massive and pervasive theft of Mattel information," (Tr., 33:18-
4  19), including all of the documents that have been identified as the MATTEL
5  DOCUMENTS, Mattel is entitled to ask what the MGA Parties' contentions are
6  regarding whether or not those documents constitute trade secrets, particularly
7  given that such information is exclusively within the control of the MGA Parties.
8  As Mattel's counsel expressed at oral argument, Mattel is "going to go to trial
9  accusing MGA and the other defendants of stealing all of these documents . . . and
10 [the MGA Parties are] going to have to articulate what their contentions are with
11 respect to whether or not these are trade secrets . . ." (Tr., 36:24-37:3; *see also id.*
12 81:9-10 [wherein Mattel's counsel states that these documents "are the ones that
13 Mattel is going to be proceeding to trial on."]).

14      Also, the MGA Parties' claim of undue burden does not take into account the
15 vast scope of this litigation to date. (*Cf.* Opposition at p. 4 n. 1 [stating that Mattel
16 propounded 4,647 requests for admission, 2,889 requests for production, and 71
17 interrogatories in Phase 1]). The MGA Parties do not provide any supporting
18 declaration or specific evidence to support their assertion of burden beyond their
19 statement that the term "MATTEL DOCUMENTS" refers to 8 boxes of documents.
20 For example, the MGA Parties have not provided the Discovery Master with details
21 regarding: (1) a time estimate as to how long it would take to respond to the
22 Interrogatories; (2) the anticipated costs of responding to the Interrogatories; (3) the
23 extent to which any facts that must be set forth in answering the Interrogatories are
24 voluminous; or (4) an estimate of the number of documents and/or persons that may
25 have knowledge of such responsive facts. Therefore, the Discovery Master finds
26 that the MGA Parties have not met their burden of demonstrating that answering
27 //
28 //

EXHIBIT ___1___
PAGE ___20___

1   the requested interrogatories is overly burdensome.[16]   (*See Jackson v. Montgomery*

2   *Ward & Co., Inc.*, 173 F.R.D. 524, 528-9 (D.Nev. 1997) ["The party claiming that a

3   discovery request is unduly burdensome must allege specific facts which indicate

4   the nature and extent of the burden, usually by affidavit or other reliable

5   evidence."]).

6        While there is no specific evidence in the record demonstrating that the MGA

7   Parties will inevitably suffer an undue burden in responding to Interrogatory Nos.

8   56 and 58 – 63, the Discovery Master is nonetheless cognizant of the fact that a

9   demand for "all facts" relating to what could be thousands of different documents

10   could be construed by Mattel in a manner that could place an unreasonable burden

11   on the MGA Parties, particularly when that information is requested via a written

12   interrogatory.  The Discovery Master, thus, limits six of the interrogatories at

13   issue[17] and requires that the MGA Parties identify all facts, documents and

14   witnesses that they currently intend to rely on at summary judgment or trial to

15   demonstrate (i) they did not obtain any MATTEL DOCUMENTS through improper

16   means (i.e., Interrogatory No. 58), (ii) that the information in the MATTEL

17   documents did not derive independent economic value (i.e., Interrogatory No. 59),

18   (iii) any information in the MATTEL DOCUMENTS was known to the public,

19   (i.e., Interrogatory No. 60), (iv) the MGA Parties independently developed, or did

20   not otherwise use or disclose, any information in the MATTEL DOCUMENTS

21   (i.e., Interrogatory No. 61), (v) that the MGA Parties have not benefited by their use

22   of the information in the MATTEL DOCUMENTS nor harmed Mattel

23   (Interrogatory No. 62), and (vi) the MGA Parties had or have a right to copy,

24   possess, use or disclose any MATTEL DOCUMENT (Interrogatory No. 63).

25        The Discovery Master finds that this limitation is appropriate because Mattel

26

27   [16] The Discovery Master also notes that the MGA Parties did not provide any legal authority in support of their position on this issue. (Opposition, pp. 9 – 10).

28   [17] Interrogatory Nos. 56 and 57 must be answered as phrased.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

AMENDED ORDER NO. 11
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___1___
PAGE ___21___

1   conceded in its Reply that it was not asking the MGA Parties "to provide

2   facts they have no knowledge of,"[18] (Reply, p. 17), but rather wanted to assess the

3   "specific contentions Defendants may make regarding the [allegedly] stolen

4   documents," (*id.*, p. 17).  Mattel's counsel reiterated this position again at oral

5   argument, wherein he declared that Mattel was not necessarily interested in "a

6   parsing document by document," (Tr., 34:14-15), but instead "what [the MGA

7   Parties'] trial positions are going to be, before the jury is seated," (*id.*, p. 81:14-15).

8             (2)     **Purported Presuppositions Regarding**

9                      **Interrogatory Nos. 56 and 58 – 63.**

10          The MGA Parties next assert that Interrogatory Nos. 60, 61 and 63 are

11   objectionable because they require the MGA Parties to presuppose that they are "in

12   possession of documents stolen or taken from Mattel by former employees – a fact

13   that MGA denies." (Opposition, p. 8).  The MGA Parties further assert that "each

14   of the interrogatories using the term 'MATTEL DOCUMENTS' [which includes

15   Interrogatory Nos. 56 and 58 – 63] requires MGA to assume . . . unfounded

16   assertions . . . which make the interrogatories unanswerable and incomprehensible."

17   (*Id.*, p. 9).  However, the MGA Parties cite no legal authority, and the Discovery

18   Master has found none, standing for the proposition that a party may refuse to

19   respond to an interrogatory merely because the interrogatory assumes a fact the

20   responding party disputes.

21             (3)     **Compound And Excessive Objections**

22          The MGA Parties next assert that Interrogatory Nos. 56 – 63 are

23   impermissibly compound and exceed the allotted number of interrogatories.

24   (Opposition, pp. 10 and 11).  Each of these contentions is unavailing.

25          As an initial matter, the MGA Parties did not object to Interrogatory Nos. 56

26   ───────────────

[18] Of course, if the MGA Parties subsequently wish to present other facts, witnesses or documents at summary

27   judgment or trial, they must supplement their response to these interrogatories accordingly and include the additional information.  (*See* Fed. R. Civ. P. 26(e)(1) ["A party who has . . . responded to an interrogatory . . . must supplement

28   its . . . response[] in a timely manner if the party learns that in some material respect the . . . response is incomplete . . ."]).

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 20 -

AMENDED ORDER NO. 11
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___1___
PAGE ___22___

1   and 58 – 60 on the ground that they are compound.  Nor did they object to any of

2   the interrogatories as exceeding the allotted limit, except for Interrogatory No. 63.

3   Therefore, the MGA Parities waived any such objections to those interrogatories.

4   (*See, e.g., Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th

5   Cir. 1992) [stating that "failure to object to discovery requests within the time

6   period required constitutes a waiver of any objection."]).

7        As for the interrogatories where the objections were asserted, the MGA

8   Parties have not demonstrated that the interrogatories are compound or exceed the

9   allotted limit.  The fact that the interrogatories ask MGA to identify witnesses, facts

10  and documents related to the MATTEL DOCUMENTS does not render the

11  interrogatories compound because the questions in each interrogatory refer to one

12  common theme and count as a single interrogatory.  (*See Swackhammer v. Sprint

13  Corp. PCS*, 225 F.R.D. 658, 644 (D. Kan. 2004) ["[A]n interrogatory containing

14  subparts directed at eliciting details concerning a 'common theme' should generally

15  be considered a single question"]).  The prior discovery master applied this precise

16  rule in Phase 1, concluding that interrogatories "with subparts seeking facts

17  supporting a contention, the identity of persons with knowledge, and documents are

18  not counted separately for the purposes of applying the . . . interrogatory limit."

19  (Prior Discover Master Order dated September 15, 2007, pp. 5 – 7).

20                     **(4)    Establishing A Negative Proposition Objection**

21        As their final argument in opposing Interrogatory Nos. 56 – 63, the MGA

22  Parties assert that three of the interrogatories improperly ask them to establish a

23  negative proposition (i.e., Interrogatory Nos. 58, 59 and 62).  (Opposition, pp. 11 –

24  12).  The relevant question, however, is not whether an interrogatory may require a

25  party to prove a negative.  Rather, all of the cases cited by the parties concerning

26  this issue examine whether the interrogatory in question imposes an unreasonable

27  //

28  //

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 21 -

AMENDED ORDER NO. 11
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___1___
PAGE ___23___

1  burden on the responding party.[19]  For the reasons explained above, there has been

2  no showing by the MGA Parties that an undue burden exists here.  (*See* Opposition,

3  pp. 11 – 12).

4               **b.      Conclusion**

5        For all of the foregoing reasons, the objections to Interrogatory Nos. 56 – 63

6  are overruled and Mattel's motion to compel responses to the interrogatories is

7  granted, subject to the limitations discussed above.

8         **3.     Interrogatory Nos. 67 – 69 Propounded On MGA And**

9              **Larian**

10       Mattel also propounded Interrogatory Nos. 67 – 69 on both MGA and Larian.

11  These interrogatories ask the MGA Parties to provide information regarding any

12  payments they may have made to former Mattel employees and any persons

13  identified in the parties' initial disclosures:

14       • Interrogatory No. 67:  "IDENTIFY fully and separately each and every

15            payment of money or other item of value that YOU have made or

16            given, or any promise, agreement, proposal [o]r offer by YOU to pay

17            money or given any item of value, to or on behalf of any PERSON

18            identified in any of the parties' initial disclosures in this ACTION at

19            any time when such person was not an employee of MGA, including

20            without limitation with respect to legal fees incurred by or on behalf of

21            such PERSON."  (Separate Statement in Support of Written Discovery

22            Motion, p. 88).

23       • Interrogatory No. 68:  "To the extent not disclosed in prior

24  ─────────────────────────────

25  [19] The two cases cited by MGA in support of its argument (*Safeco of America v. Rawstron*, 181 F.R.D. 441, 447 - 448 (C.D.Cal.1998) and *Lawrence v. First Kansas Bank & Trust Co.*, 169 F.R.D. 657, 662-663 (D.Kan.1996)), both address the question of whether interrogatories are overly burdensome.  The same analysis is applied in the cases

26  cited by Mattel.  (*See Dang v. Cross*, 2002 WL 432197, *4 (C.D. Cal. 2002) [affirming magistrate judge's holding that interrogatories request "all facts" in support of a denial of a statement were not unduly burdensome]; *Tennison*

27  *v. San Francisco*, 226 F.R.D. 615, 618 (N.D. Cal. 2005) [concluding an interrogatory requiring plaintiff to provide all facts supporting the denial of an allegation was not unduly burdensome]; *Chapman v. California Dep't of Education*,

28  2002 WL 32854376, *2 (N.D. Cal. 2002) [same]].

EXHIBIT     1
PAGE        24

1   Interrogatories, IDENTIFY fully and separately each and every

2   payment of money or other item of value that MGA has made, or any

3   promise, agreement, proposal or offer by MGA to pay money or given

4   any item of value, to or on behalf of any of the FORMER MATTEL

5   EMPLOYEES, including without limitation with respect to legal fees

6   incurred by or on behalf of any of the FORMER MATTEL

7   EMPLOYEES." (*Id.*, p. 91).

8   • Interrogatory No. 69: "To the extent not disclosed in prior

9   Interrogatories, IDENTIFY fully and separately each and every

10   payment of money or other item of value that YOU have made, or any

11   promise, agreement, proposal or offer by YOU to pay money or given

12   any item of value, since January 1, 1998 to or on behalf of any

13   PERSON who has been employed by MATTEL (excluding ordinary

14   salary and benefits paid to such PERSON while an MGA employee),

15   including without limitation with respect to legal fees incurred by or

16   on behalf of such PERSON and bonuses paid to such PERSON." (*Id.*,

17   p. 92).

18            **a.     Objections Of MGA And Larian**

19   In their Opposition, the MGA Parties rely on two basic grounds for refusing

20   to provide responses to these three interrogatories. First, the MGA Parties argue

21   that the interrogatories are impermissibly compound and exceed the number of

22   allotted interrogatories. (*Id.*, pp. 10 – 11). Second, the MGA Parties argue that

23   interrogatories are overly broad. (*Id.*, pp. 12 – 14).

24            **(1)     Compound And Excessive Objections**

25   Like their objections to Interrogatory Nos. 56 – 63, the MGA Parties contend

26   that Interrogatory Nos. 67 – 69 are impermissibly compound and exceed the

27   allotted number of interrogatories. (Opposition, pp. 10 and 11). But those

28   arguments are not persuasive for reasons discussed in Section I.B.2.a.3 above.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

                                - 23 -                 AMENDED ORDER NO. 11
                                                         [Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT _____1_____
PAGE _____25_____

### (2)   Overly Broad Objection

The MGA Parties' second argument regarding Interrogatory Nos. 67 – 69 is that they are overly broad.  The MGA Parties complain that Interrogatory No. 67 is overbroad because it seeks information regarding payments by MGA to any persons identified in the initial disclosures, not just former Mattel employees.  (Opposition, pp. 12 – 13).

While a payment to a potential witness could be relevant to the issue of bias and, therefore, discoverable, (*See Oakes v. Halvorsen Marine Ltd.*, 179 F.R.D. 281, 283 (C.D. Cal. 1998) ["Rule 26 further permits the discovery of information which may simply relate to the credibility of a witness or other evidence in the case."]), the SAAC merely alleges that the MGA Parties bribed former Mattel employees — not every single witness in this case.  In the absence of an allegation suggesting that other witnesses may have been bribed, Interrogatory No. 67 is overly broad and not relevant at this time.[20]  Accordingly, Mattel's motion to compel a response to Interrogatory No. 67 is denied at this stage.

As for Interrogatory Nos. 68 and 69, the MGA Parties first argue that the "burden and expense of determining whether each individual contemplated by these interrogatories was ever paid by MGA . . . far outweighs the interrogatories' likely benefit."  (*Id.*, pp. 13 and 14).  Once again, however, the MGA Parties provide no evidence to support such a claim.  (*See Jackson,* 173 F.R.D. at 528-9 ["The party claiming that a discovery request is unduly burdensome must allege specific facts which indicate the nature and extent of the burden, usually by affidavit or other reliable evidence."]).

The MGA Parties only remaining complaint is that Interrogatory No. 69 seeks information regarding payments to "or on behalf of" any person who has been

---

[20] Mattel's request for information regarding payments by the MGA Parties to all individuals identified in the parties' initial disclosures presumably extends to all former Mattel employees identified therein as well.  To the extent Interrogatory No. 67 seeks such information, it is plainly relevant to Mattel's Phase 2 claims.  Nevertheless, the Discovery Master denies Mattel's motion to compel a response to Interrogatory No. 67 in its entirety because any payments by the MGA Parties to former Mattel employees is duplicative of Interrogatory Nos. 68 and/or 69.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 24 -

AMENDED ORDER NO. 11
[Case No. CV 04-09049 SGL (RNBx)]



EXHIBIT ____1____
PAGE ____26____

1   employed by Mattel and that Interrogatory No. 68 defines FORMER MATTEL

2   EMPLOYEES as including specific individuals as well as each such person's

3   "current or former employees, agents, representatives, attorneys, accountants,

4   vendors, consultants, independent contractors, predecessors-in-interest and

5   successors-in-interest, and any other Person acting on [his or her] behalf, pursuant

6   to [his or her] authority or subject to [his or her] control." (Opposition, p. 13).

7   While they assert these definitional objections, counsel for the MGA Parties

8   nevertheless conceded at oral argument that to the extent "MGA paid . . . former

9   Mattel employees, for other than their salary as MGA employees, I think that is a

10  fair inquiry." (Tr., 63:17-20; *id.*, 61:21 - 64:4).

11        Therefore, the Discovery Master orders the MGA Parties to identify fully and

12  separately each and every payment of money or other item of value that they have

13  made or offered to pay to or on behalf of any "former employee of Mattel" since

14  January 1, 1998 but limits the definition of former Mattel employees to "all

15  individuals that the MGA Parties are aware of that worked for Mattel and who

16  received any payment (excluding ordinary salary and benefits paid to such person

17  while an MGA employee) from the MGA Parties."[21]

18                    **b.    Conclusion**

19        For all of the foregoing reasons, Mattel's motion to compel is denied with

20  respect to Interrogatory No. 67.  Regarding Interrogatory Nos. 68 and 69, Mattel's

21  motion to compel responses to the interrogatories is granted, subject to the

22  limitations discussed above.

23        **C.    Summary Of Ruling Regarding The Written Discovery Motion**

24        Mattel's Written Discovery Motion is **DENIED in part** and **GRANTED in**

25  **part**.

26  _____

27  [21] While Interrogatory Nos. 68 and 69 both seek information regarding payments made by the MGA Parties to former Mattel employees for "legal fees," the MGA Parties did not argue in their Opposition or at oral argument that such a request is improper for that specific reason, but instead merely relied on the definitional argument discussed above.

28  Accordingly, the Discovery Master does not need to resolve that particular issue.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 25 -

AMENDED ORDER NO. 11
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___/___
PAGE ___27___

## II.   MATTEL'S DEPOSITION MOTION

### A.   Introduction

As indicated above, the Deposition Motion addresses the motion of Mattel to compel the depositions of Pablo Vargas San Jose ("Vargas") and Mariana Trueba Almada ("Trueba") (collectively, the "Witnesses").

#### 1.   Background

The Witnesses are former employees of Mattel in Mexico[22] who, along with another former Mattel manager and named defendant, Carlos Gustavo Machado Gomez ("Machado") left Mattel to establish and run MGA's newly formed Mexico operation, defendant MGA De Mexico ("MGA Mex"), in 2004. Mattel alleges that Machado and the Witnesses stole Mattel trade secrets.

The Witnesses are Mexican nationals who reside in Mexico, where MGA Mex has its principal place of business. Vargas currently serves as the Director of Sales for MGA Mex. In that capacity, he supervises approximately 8 or 9 employees and reports to Susan Kuemmerle ("Kuemmerle"), the Vice President of MGA Mex. Trueba currently serves as the Marketing Manager of Special Projects for MGA Mex. She does not manage or supervise any employees of MGA Mex. Trueba reports directly to Machado, who is MGA Mex's Director of Marketing. Machado, in turn, reports to Kuemmerle.

#### 2.   Procedural History

On January 10, 2008, Mattel served deposition notices pursuant to Federal Rule of Civil Procedure 30(b)(1) setting the depositions of Vargas and Trueba for January 24, 2008 in Los Angeles. In response, MGA and its affiliated parties to this action (the "MGA Defendants") asserted that neither of the Witnesses is a "managing agent," and therefore Mattel must subpoena the Witnesses. On January 28, 2008, Mattel filed an *ex parte* application to compel the depositions of

---

[22] Vargas was the Senior Marketing Manager, Boys Division, for Mattel Mexico and Trueba was the Senior Marketing Manager, Girls Division, for Mattel Mexico.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 26 -

AMENDED ORDER NO. 11
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT   1
PAGE   28

1   the Witnesses (as well as others). Mattel's application was stayed with other Phase

2   2 discovery and then denied without prejudice on September 23, 2008. After the

3   Court lifted the stay on Phase 2 discovery on January 6, 2009, Mattel noticed the

4   depositions of Vargas on January 27, 2009 and of Trueba on January 28, 2009.

5   Once again, the MGA Defendants objected on the ground that neither of the

6   Witnesses is an officer, director or managing agent of MGA Mex. After the parties

7   were unable to resolve their dispute, Mattel filed the Deposition Motion.

8   **B.   Discussion**

9        Mattel argues that (1) the Witnesses are directors and/or managing agents of

10   MGA Mex, and (2) that MGA Mex must produce them for deposition in Los

11   Angeles. Mattel also seeks sanctions on the ground that the MGA Defendants are

12   acting in bad faith and without justification to frustrate Mattel's legitimate

13   discovery rights. In response, the MGA Defendants argue that (1) the Witnesses

14   are merely mid-level employees who cannot be deemed to act for MGA Mex, and

15   (2) even if the Witnesses could be deposed pursuant to Federal Rule of Civil

16   Procedure 30(b) ("Rule 30(b)"), the depositions must be conducted in Mexico. The

17   MGA Defendants seek sanctions against Mattel, contending that Mattel failed to

18   adequately meet and confer with one of the attorneys for MGA Mex, Amman Khan

19   ("Khan") and then served a redacted version of the Deposition Motion on a

20   different attorney for the MGA Defendants, Patricia Glaser ("Glaser") while she

21   was out of town.[23] According to MGA Mex, Mattel only served a complete,

22   unredacted copy of the Deposition Motion on counsel for the MGA Defendants two

23   days before the deadline for the Opposition.

24       **1.   Legal Standard**

25        If a corporation is a party to an action, any other party may take the

26   deposition of that corporation by identifying a specific officer, director, or

27

28   [23] Both Khan and Glaser are partners at Glaser Weil, Phase 2 attorneys of record for the MGA Defendants, including MGA Mex.

AMENDED ORDER NO. 11
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___1___
PAGE ___29___

1    managing agent to be deposed and noticing that person's deposition under Rule

2    30(b)(1). Notice alone is enough to compel the managing agent to attend the

3    deposition. (*JSC Foreign Econ. Ass'n Technostroyexport v. International Dev. &*

4    *Trade Services, Inc.*, 220 F.R.D. 235, 237 (S.D.N.Y. 2004)). For purposes of

5    compelling a corporate officer's deposition, courts do not recognize a distinction

6    between an "apex" official or director and other high corporate officials. (*Resort*

7    *Properties of America v. El-Ad Properties N.Y. LLC*, 2008 WL 2741131 at *2 (D.

8    Nev. July, 10 2008) citing Fed. R. Civ. Proc. 37(d) advisory committee's notes

9    ["There is slight warrant for the present distinction between officers and managing

10   agents on the one hand and directors on the other."]).

11        The case law provides somewhat ambiguous guidance with respect to the

12   burden of proof for demonstrating managing agent status. Generally, the burden is

13   on the discovering party to establish the status of the witness. (See *Sugarhill*

14   *Records Ltd. v. Motown Record Corp.*, 105 F.R.D. 166, 170 (S.D.N.Y. 1985);

15   *Proseus v. Anchor Line, Ltd.*, 26 F.R.D. 165, 167 (S.D.N.Y.1960)). At the same

16   time, however (and as Mattel points out in its papers), courts resolve doubts in

17   favor of the examining party, at least during the discovery phase. (See *Sugarhill*,

18   105 F.R.D. at 171; *Tomingas v. Douglas Aircraft Co.*, 45 F.R.D. 94, 97

19   (S.D.N.Y.1968)). "Thus, it appears that the examining party has the burden of

20   providing enough evidence to show that it is at least a close question whether the

21   proposed deponent is a managing agent." (*United States of America v. Afram Lines*

22   *(USA) Ltd.*, 159 F.R.D. 408, 413 (S.D.N.Y. 1994)).

23        The identification of a managing agent in any given case is fact-sensitive.

24   "[B]ecause of the vast variety of factual circumstances to which the concept must

25   be applied, the standard . . . remains a functional one to be determined largely on a

26   case-by-case basis." (*Founding Church of Scientology of Washington, D.C., Inc. v.*

27   *Webster*, 802 F.2d 1448, 1452 (D.C.Cir. 1986) (citation omitted)). "Thus, 'the

28   question of whether a particular person is a 'managing agent' is to be answered

EXHIBIT ___1___
PAGE ___30___

1    pragmatically on an ad hoc basis . . . .'" (*Afram Lines*, 159 F.R.D. at 413 quoting 8

2    C. Wright & A. Miller, *Federal Practice and Procedure* § 2103, at 376 (1970) and

3    citing 4A *Moore's Federal Practice* ¶ 30.51, at 30-47 to 30-48 (1994)).  Whether a

4    proposed deponent falls into a particular category of employee or agent is therefore

5    less relevant than the individual's specific functions and authority.

6         As both parties acknowledge, federal courts have formulated a set of factors

7    to assist in determining whether person is a party's "managing agent," and therefore

8    subject to deposition under Rule 30(b)(1):

9         1)   whether the individual is invested with general powers allowing him to

10             exercise judgment and discretion in corporate matters;

11        2)   whether the individual can be relied upon to give testimony, at his

12             employer's request, in response to the demands of the examining

13             party;

14        3)   whether any person or persons are employed by the corporate

15             employer in positions of higher authority than the individual

16             designated in the area regarding which the information is sought by the

17             examination;

18        4)   the general responsibilities of the individual "respecting the matters

19             involved in the litigation;" and

20        5)   whether the individual can be expected to identify with the interests of

21             the corporation.

22   (*Sugarhill*, 105 F.R.D. at 170).

23        According to Mattel, the most important of these factors is "whether the

24   witness can be expected to identify with the employer corporation's interest as

25   opposed to an adversary's." (Deposition Motion, p. 12, quoting *In re Honda*

26   *American Motor Co.*, 168 F.R.D. 535, 541 (D. Md. 1996)).  Applying that test,

27   Mattel argues that the Witnesses are presumptively loyal to MGA Mex, given that

28   they helped to found the company and part of the "tight" group that manages its

EXHIBIT ___1___
PAGE ___31___

1    day-to-day operations. (Deposition Motion, p. 13). Accordingly (Mattel reasons),

2    the Witnesses are managing agents of MGA Mex.

3         Mattel's emphasis on the employee's loyalty as the main test for determining

4    his or her status is unwarranted. Federal courts have effectively challenged the

5    notion that the employee's loyalty to the employer is entitled to special weight.

6    (*Libbey Glass, Inc. v. Oneida, Ltd.*, 197 F.R.D. 342, 350 (N.D.Oh. 1999)). As the

7    *Libbey Glass* court explained, that view "overstates the role of the deponent's . . .

8    apparent fidelity to the principal's interests, because it would apply to many agents

9    and employees who do not function with the degree of authority over a company's

10   affairs connoted by the term 'managing' agent." (*Id.,* at 350). Moreover, the

11   *Libbey Glass* court demonstrated that the approach followed in *Honda* is based on a

12   rationale that no longer applies. Specifically, the court traced the rule to *Newark*

13   *Ins. Co. v. Sartain*, 20 F.R.D. 583, 586 (N.D. Cal. 1957), which sets forth the

14   analytical underpinning of the "loyalty" factor.

15        In that case, the court was concerned with the evidentiary problem facing a

16   litigant seeking to obtain and use the testimony of an adversary corporation's most

17   senior employees. Under the then-existing rule, a litigant could not call such an

18   employee to testify at trial in his or her individual capacity without waiving the

19   right to impeach the witness. This presented a problem for the party seeking to

20   elicit the testimony, because, as the court reasoned, a corporation's ranking

21   employee having possession of pertinent information will always "give his

22   testimony in the light most favorable to the principal," but would, at the same time,

23   be immune from impeachment at trial. (*Id.*) On that basis, the court concluded that

24   an adversary should be able to obtain such testimony from the employee in his or

25   her capacity as the representative of the corporation (who could, therefore, be

26   subject to impeachment).

27        However, as the court in *Libbey Glass* noted, the concerns expressed in

28   *Newark Ins.* were rendered moot by the enactment of Federal Rule of Evidence 607

EXHIBIT ___1___
PAGE ___32___

1   ("Rule 607").[24]  Under that rule, a party may take the deposition of a senior

2   employee of an adversary corporation in his individual capacity and may

3   nonetheless still seek to impeach that testimony.  In other words, characterizing a

4   particular witness as a "managing agent" no longer provides any substantive

5   advantage to the deposing party, only procedural advantages (i.e., the ability to take

6   the deposition without a subpoena).

7        Having discarded the notion that the witness' loyalty to his employer is the

8   main factor to be considered in ascertaining his status as a managing agent, the

9   court in *Libbey Glass* instead focused on "the nature of the deponent's activities on

10  behalf of the corporation, rather than his loyalty to its interests." (*Libbey Glass*,

11  197 F.R.D. at 350).  The court reasoned:

12           For the purpose of determining whether an individual is a

13           'managing agent' within the meaning of the discovery rules, the

14           alter ego theory provides a useful analogy.  As in the arena of

15           corporate liability, the focus begins with the character of the

16           individual's control.  In addition, we can profitably examine both

17           the degree to which the interests of the individual and the

18           corporation converge, and how helpful the individual will be in

19           fact finding on the matter at issue, in comparison to others

20           associated with the corporation.  As in all matters appertaining to

21           discovery, it is the ends of justice that are to be served.

22  (*Id.*, quoting *Founding Church of Scientology of Washington, D.C., Inc. v. Webster*,

23  802 F.2d 1448, 1453 (D.C. Cir. 1986)).  The Discovery Master finds that the

24  analysis set forth in *Libbey Glass* and the authorities cited therein to be the most

25  practical and well-reasoned test for determining whether the Witnesses are

26  managing agents of MGA Mex, and applies that test below.

27  _____

28  [24] Rule 607 provides "The credibility of a witness may be attacked by any party, including the party calling the witness."

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 31 -

AMENDED ORDER NO. 11
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___1___
PAGE ___33___

2.   **Analysis Of The Witnesses' Job Functions And Managerial Authority**

a.   **The Nature Of The Witnesses' Activities On Behalf Of, And Control Over, MGA Mex.**

In accordance with the approach outlined in *Libbey Glass*, the Discovery Master begins his analysis by examining the Witnesses' activities on behalf of, and managerial control over the operations of, MGA Mex.

Mattel relies heavily on documentary evidence regarding the role of Machado and the Witnesses in establishing MGA Mex in 2004, but the Discovery Master finds that this evidence, which is limited to events that occurred five years ago, to be only minimally probative of the *current scope* of the Witnesses' activities and authority.[25]   The only evidence presented by the parties concerning the Witnesses' current role in the company is the testimony of Kuemmerle.  That testimony derives from three sources:  (1) her declaration filed on February 27, 2007 ("First Kuemmerle Decl.") (attached as Exh. 12 to Zeller Decl.); (2) her deposition testimony on January 28, 2008 ("Kuemmerle Tr.") (attached as Exh. 9 to Zeller Decl.); and (3) her declaration filed on February 12, 2009 in support of the Opposition to the Deposition Motion ("Second Kuemmerle Decl.").

The relevant portion of Kuemmerle's first declaration is Paragraph 6, which states in its entirety:

> All of the day to day operations of MGA Mexico are managed locally in Mexico.  For example, MGA Mexico's Finance Director, Sales Director and Marketing Director are all based in Mexico and all of the marketing and finance functions are handled in Mexico.

(First Kuemmerle Decl., ¶ 6).

---

[25] As counsel for the MGA Defendants noted at oral argument, the critical question is "when do we look at this question as to whether these [Witnesses] are managing agents?  And the answer, of course, is now." (Tr., 21:14-16).

EXHIBIT   1
PAGE   34

1    There are two main excerpts from Kuemmerle's deposition transcript cited
2  by Mattel in support of its Deposition Motion. In the first, Kuemmerle testifies that
3  pricing for the products sold by MGA Mex is set by means of a "combined team
4  effort" among a group that counsel refers to as "the four of you." (Kuemmerle Tr.,
5  p. 91:8 – 14, [Exh. 9 to Zeller Decl., p. 154]).[26] Kuemmerle testifies that these
6  individuals (which apparently include the Witnesses) continue to set the pricing of
7  MGA Mex products in the same manner to this day. (Id.).

8    Second, Mattel relies on a passage of Kuemmerle's deposition in which she
9  testified that, at the time the Witnesses joined MGA Mex in 2004, "we were so
10 tight of a group, not enough employees, that we were all forced to multitask."
11 (Kuemmerle Tr., p. 135:24 - 136:1, [Exh. 9 to Zeller Decl., pp. 169 - 170]).

12   In her second declaration, Kuemmerle testifies regarding the chain of
13 command at MGA Mex. Specifically, she testifies that Vargas reports directly to
14 her and that Trueba reports to Machado, who in turn reports to Kuemmerle.
15 (Second Kuemmerle Decl., ¶¶ 3 – 4). Kuemmerle is entirely silent regarding the
16 functions performed by, or general authority exercised by, either of the Witnesses.
17 Instead, she simply states that Ms. Trueba "does not manage or supervise anyone at
18 all at MGA De Mexico." (Id., ¶ 4). Kuemmerle does not state whether Vargas
19 supervises anyone. (Id., ¶ 3).

20   In the absence of any evidence directly addressing the Witnesses' current
21 role in MGA Mex, Mattel asks the Discovery Master to infer that the Witnesses are
22 managing agents based on the Witnesses' job titles and past participation in the
23 "tight group" that made operational decisions for the fledgling company several
24 years ago. However, such an inference is not supported by the scant evidence
25 before the Discovery Master. For instance, the Discovery Master cannot attribute

---

[26] None of the prior passages of the deposition transcript provided by Mattel reflect the individuals to whom counsel is referring. However, later, counsel asks Kuemmerle a question beginning with "When you and Mr. Machado and Mr. Vargas and Ms. Trueba were determining the prices for MGA products . . ." (Kuemmerle Tr., p. 93:2 – 6 [Exh. 9 to Zeller Decl., p. 156]).

EXHIBIT ___1___
PAGE ___35___

1  such status to Trueba, who supervises no employees, and whose scope of
2  responsibility is circumscribed to public relations.[27]
3      Likewise, although Mattel emphasizes that Vargas supervises approximately
4  8 or 9 MGA Mex employees (Kuemmerle Tr., p. 97:5 – 11, [Exh. 9 to Zeller Decl.,
5  p. 159]), that fact, alone, is ambiguous at best, because Mattel does not provide the
6  necessary context by identifying the number of total MGA Mex employees.  If, for
7  instance, MGA Mex employs 100 persons, then Vargas' oversight of 8 or 9
8  employees would tend to indicate he does not have such authority.[28]  Because the
9  necessary contextual information is not provided, the Discovery Master is unable to
10 assess the significance (if any) of the evidence that is provided regarding Vargas'
11 current role at MGA Mex.
12     In sum, the evidence currently before the Discovery Master is insufficient to
13 allow him to determine that the Witnesses' functions on behalf of, and control over,
14 MGA Mex is such that they can be deemed its "managing agents."

15              **b.    Other Factors**

16     Since there is virtually no evidence addressing the critical factor governing
17 whether the Witnesses are managing agents of their employer (see Section II.B.2.a,
18 above), the five factors enumerated by the *Sugarhill* Court have marginal relevance,
19 at best.  Even if all those factors were satisfied – which they are not – the record
20 would still be insufficient to enforce the deposition notices at issue here.  However,
21 in order to create a complete record and to address the arguments made by the
22 parties, the Discovery Master nonetheless briefly discusses those factors below.
23     As set forth above, the first factor identified by the *Sugarhill* Court bearing

---

24  [27] Mattel also argues that the Discovery Master should infer that Ms. Trueba is a managing agent because she
25  submitted a declaration on behalf of MGA Mex two years ago (April 11, 2007) in connection with its motion to
    dismiss for lack of personal jurisdiction in which she identified her job title as "Director of Marketing."  (Deposition
26  Motion, p. 4 fn. 4 and Exh. A to Suppl. Zeller Decl.).

27  [28] At oral argument, Mattel's counsel asserted that MGA Mex presently employs 34 or 35 individuals, (Tr., pp. 15 –
    16), but there is no admissible evidence before the Discovery Master to support such an assertion.  Further, such a
28  contention (if true) merely demonstrates that Vargas supervises, at most, approximately 25 percent of the employees
    at MGA Mex, and is insufficient to show that he can be deemed its "managing agent."

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 34 -

AMENDED ORDER NO. 11
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___1___
PAGE ___36___

1   on the issue of whether an employee is a managing agent is whether he or she "is
2   invested with *general* powers allowing him to exercise judgment and discretion in
3   corporate matters." (*Sugarhill*, 105 F.R.D. at 170 [emphasis added]).  Here, the
4   current scope of Trueba's authority appears to be the opposite of "general:" she is
5   responsible for handling media and public relations. (Kuemmerle Tr., p. 97:14 – 15
6   attached as Exh. 9 to Kahn Decl.).  Likewise, Vargas' authority, although somewhat
7   broader than that of Trueba, appears to be confined primarily to sales. (Second
8   Kuemmerle Decl., ¶ 3).  There is no evidence that either of the Witnesses has any
9   authority over such things as internal administrative functions, budgeting, contracts
10  with vendors, and various other aspects of running a business.

11          The second *Sugarhill* factor (whether the individual can be relied upon to
12  give testimony at the employer's request) is satisfied, since the Witnesses are
13  current employees of MGA Mex who will presumably cooperate in their
14  employer's defense of Mattel's counterclaims by providing testimony at a
15  deposition.

16          Turning to the third *Sugarhill* factor (whether there are other MGA Mex
17  employees in positions of higher authority than the Witnesses in the area regarding
18  which the information is sought), the Discovery Master finds that the undisputed
19  testimony of Kuemmerle demonstrates that there are such MGA Mex employees:
20  Kuemmerle supervises Vargas and (through Machado) Trueba. (Second
21  Kuemmerle Decl., ¶¶ 3 and 4).  Accordingly, this factor weighs against finding that
22  the Witnesses are "managing agents."

23          With respect to fourth factor (the general responsibilities of the Witnesses
24  respecting the matters involved in the litigation), Mattel's papers demonstrate that
25  the Witnesses do oversee aspects of MGA Mex which are directly addressed by
26  Mattel's Phase 2 counterclaims, namely sales and public relations (which, Mattel
27  contends, MGA Mex conducts using stolen Mattel trade secrets). (Deposition
28  Motion, pp. 4 – 7).  Accordingly, this factor weighs in favor of deeming the

EXHIBIT ___1___
PAGE ___31___

1   Witnesses to be managing agents.

2   The last factor is the "loyalty" inquiry discussed above, namely whether the

3   Witnesses can be expected to identify with the interests of MGA Mex. Because

4   they are being subjected to investigation in Mexico, have their own lawyers and the

5   MGA Defendants may take the position that if any Mattel documents were taken,

6   the Witnesses did it on their own, Vargas and Trueba's interests do not necessarily

7   align with the MGA Defendants in this matter. It is unclear on this record whether

8   this factor weighs in favor of or against deeming the Witnesses to be managing

9   agents.

### C.   Summary Of The Discovery Master's Findings In Connection With The Deposition Motion

12   At this stage, Mattel has not met its initial burden to demonstrate that the

13   Witnesses are managing agents of MGA Mex. The presumption in favor of the

14   party seeking discovery only applies (as Mattel itself acknowledges) in *close* cases.

15   (*Honda*, 168 F.R.D. at 540). Given the current state of the evidence presented, this

16   is not such a case.[29]

17   Nevertheless, it is clear to the Discovery Master that the Witnesses have

18   information relating to several Phase 2 issues and that Mattel is entitled to take their

19   depositions.[30] Accordingly, Mattel may promptly prepare letters rogatory and

20   submit them to the Discovery Master, who will see that the letters rogatory are

21   expeditiously issued by the Court.

### D.   Sanctions

#### 1.   Mattel's Request For Sanctions

24   Having found that the MGA Defendants have articulated a meritorious legal

---

[29] In light of the Discovery Master's finding that the Witnesses are not managing agents of MGA Mex, it is unnecessary for him to reach the question of where the depositions may be taken.

[30] The Discovery Master would not hesitate to enforce subpoenas propounded on the Witnesses if they resided in the United States and were being deposed in their individual capacities. However, since they are foreign nationals who are not managing agents of MGA Mex (at least on the evidence presented), the Discovery Master does not have authority to compel the depositions under Rule 30(b)(1).

EXHIBIT ___1___
PAGE ___38___

1   and factual basis for their objections to the subject deposition notices, the Discovery

2   Master concludes that the refusal of the MGA Defendants to produce the Witnesses

3   was justified.  Accordingly, Mattel's request for sanctions is **DENIED**.

4           **2.**    **The MGA Defendants' Request For Sanctions**

5         The MGA Defendants request an award of sanctions against Mattel for

6   conduct related to Mattel's service of the Deposition Motion.  First, the MGA

7   Defendants contend that Mattel should have served the Deposition Motion on

8   Amman A. Kahn ("Kahn"), the main attorney at Glaser Weil with whom Mattel's

9   counsel had been communicating regarding the subject depositions.  The MGA

10   Defendants complain that, instead of doing so, Mattel served the Deposition Motion

11   on Kahn's colleague, Glaser, while the latter was out of town.  However, the MGA

12   Defendants do not explain why other attorneys in their office who were assigned to

13   the matter were not notified of the delivery of the Deposition Motion given Ms.

14   Glaser's absence.  Further, Mattel has submitted the declaration of its counsel,

15   Michael T. Zeller ("Zeller") attaching a proof of service reflecting that Mattel

16   served the Deposition Motion on all three law firms representing the MGA

17   Defendants at the same time (February 6, 2009) that the motion was filed.  (See

18   Suppl. Zeller Decl., Exh. E).

19         Second, the MGA Defendants argue that Mattel only served a redacted

20   version of the Deposition Motion on them at some later point, leaving them only

21   two days to draft and file opposing papers, and refused Kahn's request for a

22   reasonable extension of time.  (Kahn Decl., ¶¶ 3 - 4).  However, the Kahn Decl. is

23   vague regarding the date and manner in which Mattel is alleged to have belatedly

24   served the unredacted version of the Deposition Motion, (*id.*), and so the Discovery

25   Master is unable to ascertain whether Kahn's belated receipt of the motion was

26   caused by some conduct of Mattel, or instead, caused by internal delays within

27   Glaser Weil in routing the papers to the appropriate attorney.

28         Accordingly, the MGA Defendants' request for sanctions is **DENIED**.

EXHIBIT ____1____
PAGE ____39____

III.   **DISPOSITION**

    **A.**   Mattel's Written Discovery Motion is **DENIED in part** and **GRANTED in part**, as follows:

    1.   Document Request Nos. 207, 208 and 269 directed to Larian:  The Motion is **GRANTED**.  All non-privileged documents, responsive to these document requests shall be produced by Larian within 30 days of the original Order No. 11, subject to any applicable confidentiality designations available under the Protective Order.

    2.   Document Request Nos. 4 – 37, 40, 41, 43 (erroneously numbered in Mattel's Separate Statement as request number 42), 44 (erroneously numbered in Mattel's Separate Statement as request number 43), 45 (erroneously numbered in Mattel's Separate Statement as request number 44), and 46 (erroneously numbered in Mattel's Separate Statement as request number 45) directed to MGA: The Motion is **GRANTED**.  All non-privileged documents, responsive to these document requests shall be produced by MGA within 30 days of the original Order No. 11, subject to any applicable confidentiality designations available under the Protective Order.

    3.   Interrogatory No. 45 directed to MGA:  The Motion is **GRANTED**.  MGA's response to this interrogatory shall be served within 30 days of the original Order No. 11, subject to any applicable confidentiality designations available under the Protective Order.

    4.   Interrogatory Nos. 56 – 63 directed to MGA and Larian:

        a.   The Motion is **GRANTED** with respect to Interrogatory Nos. 56 and 57.

        b.   Regarding Interrogatory Nos. 58 – 63, the Motion is **GRANTED** subject to the following limitations:  The Discovery Master orders the MGA Parties to identify all facts, documents or witnesses that they currently intend to rely on at summary judgment or trial to demonstrate (i) they did not obtain any

EXHIBIT ___1___
PAGE ___40___

1   MATTEL DOCUMENTS through improper means (i.e., Interrogatory No. 58),

2   (ii) that the information in the MATTEL documents did not derive independent

3   economic value (i.e., Interrogatory No. 59), (iii) any information in the MATTEL

4   DOCUMENTS was known to the public, (i.e., Interrogatory No. 60), (iv) the MGA

5   Parties independently developed, or did not otherwise use or disclose, any

6   information in the MATTEL DOCUMENTS (i.e., Interrogatory No. 61), (v) that

7   the MGA Parties have not benefited by their use of the information in the MATTEL

8   DOCUMENTS nor harmed Mattel (Interrogatory No. 62), and (vi) the MGA

9   Parties had or have a right to copy, possess, use or disclose any MATTEL

10   DOCUMENT (Interrogatory No. 63).

11          c.      The MGA Parties responses to interrogatories numbered

12   56 – 63 shall be served within 30 days of the original Order No. 11, subject to any

13   applicable confidentiality designations available under the Protective Order.

14          5.      Interrogatory No. 67 directed to MGA and Larian:  The Motion

15   is **DENIED**.

16          6.      Regarding Interrogatory Nos. 68 and 69 directed to MGA and

17   Larian, the Motion is **GRANTED** subject to the following limitations:  The MGA

18   Parties are ordered to identify fully and separately each and every payment of

19   money or other item of value that they have made or offered to pay to or on behalf

20   of any former employee of Mattel since January 1, 1998, with the definition of

21   former Mattel employees re-defined as "all individuals that the MGA Parties are

22   aware of that worked for Mattel and who received any payment (excluding ordinary

23   salary and benefits paid to such person while an MGA employee) from the MGA

24   Parties."  The MGA Parties responses to these interrogatories shall be served within

25   30 days of the original Order No. 11, subject to any applicable confidentiality

26   designations available under the Protective Order.

27   **B.**    Mattel's Deposition Motion:

28          1.      Mattel's Deposition Motion is **DENIED**.

EXHIBIT ___1___
PAGE ___41___

1          2.    Mattel's request for sanctions is **DENIED**.

2          3.    The MGA Defendants' request for sanctions is **DENIED**.

3

4    Dated:  March 31, 2009

5

6                                        By:      /s/ Robert C. O'Brien

7                                                 ROBERT C. O'BRIEN
                                                  Discovery Master

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 40 -

AMENDED ORDER NO. 11
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___1___
PAGE ___42___

# EXHIBIT 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No. CV 04-09049 SGL(RNBx)                          Date: July 9, 2009
Title:       MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
====================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

|  |  |
|---|---|
| Cindy Sasse | None Present |
| Courtroom Deputy | Court Reporter |

ATTORNEYS PRESENT FOR              ATTORNEYS PRESENT FOR
PLAINTIFFS:                        DEFENDANTS:

None Present                       None Present

PROCEEDINGS:   ORDER GRANTING EX PARTE APPLICATION RE TEMPORARY
               RECEIVERSHIP (DOCKET #5728)

               ORDER GRANTING EX PARTE APPLICATION RE COST
               SHIFTING (DOCKET #5865)

               ORDER GRANTING IN PART EX PARTE APPLICATION FOR
               RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

               ORDER GRANTING IN PART MATTEL'S MOTION RE
               DISCOVERY MASTER ORDER NO 27 AND REMANDING
               DISCOVERY MASTER ORDER NO. 27 FOR
               RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT
               OF THE FILING OF THE TAAC (DOCKET #5561)

               ORDER DENYING MOTION TO STRIKE THE FORENSIC
               AUDITOR'S REPORTS (DOCKET #5705)

MINUTES FORM 90                                Initials of Deputy Clerk __cls_____
CIVIL -- GEN                    1

EXHIBIT __2__
PAGE __43__

## I. ORDER GRANTING EX PARTE APPLICATION
## RE TEMPORARY RECEIVERSHIP (DOCKET #5728)

Because the only opposition to the Ex Parte Application regarding the winding up of the Temporary Receivership involves the issue of cost-shifting, which is addressed separately, below, the Court **GRANTS** the Ex Parte Application. A separate order addressing this Ex Parte Application has been concurrently filed.

## II. ORDER GRANTING EX PARTE APPLICATION RE
## COST SHIFTING (DOCKET #5865)

The MGA parties' opposition to the Temporary Receiver's Ex Parte Application argued that the costs of the Temporary Receivership should be shifted to Mattel (as the party who sought appointment of a Temporary Receiver). However, the Court has previously ruled that, at some yet-to-be defined date in the future, the Court will consider whether to shift the costs of both the Temporary Receivership and the Forensic Audit. Therefore, Mattel filed an Ex Parte Application seeking either to be relieved of the responsibility to respond to the MGA parties' argument or, alternatively, for an order setting a briefing schedule on the issue. It is not the intention of the Court to address the cost-shifting issue at this time; rather, as the Court has stated previously on the record, that issue is more efficiently resolved at a later date, most likely a date after completion of Phase 2 of the trial. Accordingly, the Court **GRANTS** Mattel's Ex Parte Application re Cost Shifting. Mattel is relieved of any duty to respond to MGA's argument regarding the appropriate allocation of costs arising from the Temporary Receiver that is set forth in the MGA parties's June 26, 2009 Opposition to the Temporary Receiver's Ex Parte Application.

## III. ORDER GRANTING IN PART EX PARTE APPLICATION FOR
## RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

The Court has received and reviewed the MGA Parties' Ex Parte Application For Partial Release of *In Camera* Juror Interview Transcripts, as well as the Opposition, the Reply, and the accompanying exhibits. The Court **GRANTS IN PART** the Ex Parte Application. Although the Court declines to award the relief sought, the Court will take steps to ensure that the transcript of the juror interviews are provided to the Ninth Circuit for its consideration of the appeal filed by the MGA parties.

The relevant *in camera* juror interviews were conducted on July 25, 2008; the findings made by the Court on the basis of those interviews are set forth in detail in the Court's Order Denying Motion for Mistrial, dated August 8, 2008. Counsel for the parties agreed that the juror interviews, which were conducted mid-trial, should be conducted *in camera*, and the MGA parties did not request that the Court grant them access to the transcripts to prepare their Motion for Mistrial. The Court indicated on the

MINUTES FORM 90
CIVIL -- GEN

2

Initials of Deputy Clerk __cls_____

EXHIBIT  2
PAGE  44

record around the time of the filing of the Motion for Mistrial that it was not the Court's intent to grant the parties access to the transcripts.

After the conclusion of the trial, the MGA parties did not at any time request this Court grant access to the transcripts.  To the contrary, some ten months passed between the date of the Order Denying Motion for Mistrial and the MGA parties' first post-trial request for access to those transcripts.  That request was made to the Ninth Circuit, not this Court, on June 10, 2009.  When the Ninth Circuit denied the request in favor of the MGA's presentation of the issue to this Court in the first instance, the MGA parties thereafter filed the present Ex Parte Application in a expeditious manner.

Ostensibly, as set forth in both the Motion filed before the Ninth Circuit and the Ex Parte Application before this Court, the reason the MGA parties seek access to those transcripts is so that they may use them to challenge the Court's Order Denying Motion for Mistrial.  Although the MGA parties filed its Notice of Appeal on May 4, 2009, and although that Notice clearly indicated that the Order Denying Motion for Mistrial would be implicated in the appeal, the MGA parties failed to file its Motion seeking release of the transcripts until June 10, 2009.  The MGA parties' failure to seek this relief until a month after they filed their Notice of Appeal and a month before their opening brief was due, and their decision to present the issue of release of transcripts to the appellate court (rather than this Court) in the first instance, created the very urgency that cause them to seek ex parte relief from this Court.  As such, the Court declines to grant the relief sought.

Nevertheless, in the interest of due process and in order to facilitate the full consideration of the issue by the Ninth Circuit, the Court will take steps to ensure that the transcripts of the *in camera* interviews are provided to the Ninth Circuit for *in camera* filing.

### IV. ORDER GRANTING IN PART MATTEL'S MOTION RE DISCOVERY MASTER ORDER NO 27 AND REMANDING DISCOVERY MASTER ORDER NO. 27 FOR RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT OF THE FILING OF THE TAAC (DOCKET #5561)

In the challenged portion of Discovery Master Order No. 27 ("DM Order No. 27"), the Discovery Master denied Mattel's Motion to Compel discovery sought by service of a subpoena on non-party Bingham McCutchen LLP ("Bingham"), a law firm that represents Intervenor Omni 808, as well as a number of non-party entities that are familiar to those involved in this litigation: OmniNet Capital, LLC ("OmniNet"), Vision Capital, LLC ("Vision"), IGWT Group, LLC ("IGWT"), and IGWT 826 Investments, LLC ("IGWT 826").  Broadly categorized, the subpoena sought production of (1) fee agreements relating to Vision and Omni 808; (2) documents regarding the formation, control, and financing of Omni 808, Vision, and Lexington Financial Limited

MINUTES FORM 90
CIVIL -- GEN

3

Initials of Deputy Clerk __cls_____

EXHIBIT __2__
PAGE __45__

("Lexington"); (3) documents identifying stakeholders and officers of Omni 808, Vision, and Lexington; (4) all contracts relating to Omni 808, Vision Capital, and Lexington; (5) all communications relating to Omni 808, Vision Capital, and Lexington, excluding attorney-client privileged documents; and (6) Bingham's representation of MGAE and certain named individuals who have some connection with MGAE, including a number of Mr. Larian's family members.

The Discovery Master correctly recognized the essential legal standard in assessing whether a subpoena may be enforced. The information must satisfy the discovery relevance standard, i.e., it must be "'reasonably calculated to lead to the discovery of admissible evidence.'" DM Order No. 27 at 19 (quoting Fed. R. Civ. P. 26(b)(1)). The decision of whether to enforce a subpoena ultimately implicates a balancing test that pits relevance of the materials sought and need to the requesting party against hardship to the party resisting the subpoena. DM Order No. 27 at 20. Non-parties are generally required to bear lesser burdens than parties in responding to subpoenas. Exxon Shipping Co. v. United States Dept. of Interior, 34 F.3d 774, 779 (9th Cir. 1994) ("The Federal Rules also afford nonparties special protection against the time and expense of complying with subpoenas.").

However, the Discovery Master overstated the burden of proof allocated to Mattel, as the party seeking discovery. See DM Order No. 27 at 20 ("As the party moving to compel compliance with the subpoena, Mattel bears the initial burden of establishing that the information sought is relevant and necessary to the claims or defenses at issue.") This standard is both overstated and incomplete. It is overstated in that Mattel need not show that the evidence sought is "necessary to the claims or defenses." Although Mattel indeed bears the burden of establishing relevancy, that showing is not one of "necessity." Rather, Mattel must bear the burden of establishing the discovery relevancy standard -- that the materials sought are "reasonably calculated to lead to the discovery of admissible evidence" -- is met. It need not establish that the materials sought are "necessary" to its case.

This point leads to the manner in which the stated burden is incomplete. As clearly articulated by cases cited by Bingham, although Mattel bears an initial burden of establishing relevancy, the party resisting discovery thereafter has the burden of establishing that discovery should be denied. See Bryant v. Ochoa, 2009 WL 1390794 at *1 (S.D. Cal. 2009) ("The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1). . . . Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections."); DIRECTV, Inc. v. Trone, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (same); see also Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975) (reversing the district court's issuance of a protective order based on a failure of the party resisting discovery to meet its burden by asserting that the defendant's deposition would merely yield cumulative evidence).

Initials of Deputy Clerk __cls_____

EXHIBIT __2__
PAGE __46__

The effect of this subtle variation on the burden of proof from that stated by the Discovery Master is magnified by the recent filing of the TAAC, which significantly heightens the relevancy of the issue of how the MGA parties and the parties represented by Bingham may be related, the formation of certain of those entities, and other issues implicated by Mattel's requests. Because the question of relevance is featured so prominently in the quintessential balancing test to which the present discovery motion was subjected, the filing of the TAAC dramatically altered the calculus that underlies the conclusions reached in DM No. 27.

For reasons related to judicial economy and preservation of scarce judicial resources (which this case has stretched to the outer limits), the Court defers decision, in light of the changed calculus that has occurred as the result of the filing of the TAAC, of the issues presented in the challenged portions of DM No. 27 to the Discovery Master. For that reason, the Court **REMANDS** the challenged portions of DM No. 27 to the Discovery Master for his reconsideration and re-balancing in light of the recently filed TAAC. The Discovery Master may, in his discretion, set the matter for further briefing and/or hearing, he may take the matter under submission based on the existing record, or he may take other action as he deems appropriate to resolve the present issues.

Notwithstanding the remand of DM Order No. 27, one issue raised by Mattel requires further consideration by the Court. At page 25 of DM Order No. 27, the Discovery Master appears to impose a blanket prohibition on discovery of materials that are in the possession of a subpoena recipient, but that are related to a non-party over whom the Court has not been shown to have jurisdiction. The Discovery Master cites no legal authority for such a blanket prohibition, and the Court, in its own research, has found none. Such a blanket prohibition precludes the application of the balancing test that applies almost universally to discovery motions; accordingly, and because this blanket prohibition is unprecedented, the Court finds that it is contrary to law. As to this narrow issue, the Court **GRANTS** Mattel's Motion. The issue of discovery of materials relating to Lexington is **REMANDED** to the Discovery Master for reconsideration in light of this ruling and in light of the filing of the TAAC.

## V. ORDER DENYING MOTION TO STRIKE
## THE FORENSIC AUDITOR'S REPORTS (DOCKET #5705)

In an unsealed filing that has since been ordered sealed by the Court, counsel for Omni 808 Investors, LLC ("Omni 808"), Todd E. Gordinier, made unwarranted, unsubstantiated personal attacks against the Court-Appointed Forensic Auditor, Ronald L. Durkin. Mr. Gordinier's selective public disclosure of portions of the Forensic Auditor's Summary Report, coupled with the maintenance of the Summary Report, as well as the later-filed Responsive Report and Final Report, under seal in their entirety, has led to an unbalanced public presentation of the issues discussed therein. In an

MINUTES FORM 90
CIVIL -- GEN                                    5                    Initials of Deputy Clerk __cls_____

EXHIBIT __2__
PAGE __47__

attempt to cure this deficiency, the Court has considered the possibility that it should simply unseal the relevant Reports and allow those Reports to speak for themselves.

Because the MGA entities were the primary subject of the Forensic Audit, the MGA parties have, quite understandably, objected to the proposed unsealing. Mattel, for its part, advocates quite emphatically, and not unreasonably, that the Reports should be unsealed in light of the selective disclosure. See Tr. at 31-32 ("It's the underlying analysis that refutes the selective disclosures that MGA and Omni made in a public forum to smear . . . both Mr. Durkin and Mattel.") At the other end of the spectrum, Omni 808 has moved to strike the Reports in their entirety.

In the end, although the Court does not order the unsealing of the Reports, it **DENIES** the Motion to Strike. The Court ordered the Forensic Audit to evaluate whether a receiver should be appointed; as the record bears witness, the Court eventually rejected the suggestion that it should appoint a permanent receiver, and the Court has instead appointed an MGA Monitor with more limited powers than a receiver. Nevertheless, the fact that the Reports were intended to serve a very limited purpose does not mean that there is no possibility that the Forensic Auditor's Reports will not serve any purpose henceforth.

As it currently stands, the Court **ORDERS** that no party shall cite to or rely upon the Reports for any purpose absent further Order of this Court.[1] However, the documents attached to the Reports, to the extent they are otherwise discoverable, are not insulated from discovery on the basis that they have been made part of the Reports. Conversely, documents, such as charts and interview notes, that were prepared by the Forensic Auditor are the property of the Court and are not subject to discovery or use in this or any other litigation by any party or non-party.[2]

Had it been counsel for the MGA parties who mounted the unwarranted, unsubstantiated, and public personal attacks on Mr. Durkin, the Court would find, notwithstanding the sensitive information contained therein, the unsealing of the Reports was an appropriate remedy for the selective disclosure.[3] However, here, it is

---

[1] This Order does not supersede the Court's Order permitting the Forensic Auditor to share information with the Court-Appointed Monitor.

[2] Toward that end, the Court **CLARIFIES** to the parties that the work papers, drafts, notes, detailed time records, and any other materials prepared by or at the direction of the Forensic Auditor are the property of the Court. The Court **ORDERS** the Forensic Auditor, as the custodian of those records on behalf of the Court, to retain those materials, whether maintained in electronic, hard copy, or any other medium, until further order of the Court.

[3] As it stands, counsel for MGAE, James I. Stang, wisely sought, and was granted, leave to file his more restrained, but just as unwarranted and unsubstantiated, personal attacks on Mr. Durkin under seal. See MGA Entertainment, Inc.'s Response to Final In Camera Report of Forensic Auditor Ronald L.

MINUTES FORM 90
CIVIL -- GEN                                     6                  Initials of Deputy Clerk __cls_____

EXHIBIT __2__
PAGE __48__

counsel for Omni 808 who made those attacks public, and although Mattel maintains
that both the MGA parties and Omni 808 are jointly responsible for the selective
disclosure, see July 6, 2009, Tr. at 33, whether, or to what extent, the MGA parties act
or have acted in concert is an issue to be decided in Phase 2 of this action.

Nevertheless, Mr. Gordinier's attack on Mr. Durkin cannot pass without comment
by the Court. The Court's comments are directed toward Mr. Gordinier personally,
which is not the Court's usual practice. Although the irony of this form of address is not
lost on the Court (given the subject of this Order), it is appropriate. Mr. Gordinier signed
all three filings in which the personal attacks appear, and continues to stand behind
those filings. Moreover, Mr. Gordinier expressly and unabashedly claimed personal
responsibility for the brief that was not filed under seal, by both stating that he gave it a
lot of thought before filing it and by implicitly acknowledging that although he considered
filing his brief under seal, he ultimately rejected that course of action. See May 18,
2009 Tr. at 46–47 ("My brief speaks for itself. We have nothing to hide. . . . I didn't feel it
appropriate, necessary, or desirable to file my brief under seal. And I don't have a
problem with the Court or anybody reading what I have to say, because I gave it a lot of
thought, and I gave it at lot of consideration.").

At the July 6, 2009, hearing, the Court outlined its concerns that while the attacks
on Mr. Durkin were public, the Reports are not, and that "it doesn't seem fair" to the
Court to allow those allegations to stand alone without a chance to respond to them.
July 6, 2009, Tr. at 25-26. In response, Mr. Gordinier contended that his comments
"respond[ed] to the report," and that "[w]hat we said was that there were problems with
that report." July 6, 2009, Tr. at 28. This statement is an implicit denial that any
personal attacks were made; however, as set forth in great detail below, the record
belies Mr. Gordinier's post hoc protestations.

Lest Mr. Gordinier's statement reflecting his implicit denial that he engaged in
personal attacks be perceived as one being made at oral argument without ample time
to reflect upon its significance, the statement is also made by Mr. Gordinier in Omni
808's Reply Memorandum, a document upon which he had ample time to reflect: "Each
and all of the references in Omni's Statement of Position refer to the contents of Mr.
Durkin's Reports and the shortcomings contained therein and omitted therefrom, not to
his person." Id. at 2 n.1. To be sure, the criticisms leveled at Mr. Durkin are framed in

---

Durkin (docket #5918) at 4 (accusing Mr. Durkin of "making McCarthy-like statements of non-existent
buybacks and unsupported insinuations of conflicts of interest"); id. at 9 (suggesting that Mr. Durkin's
formulation of certain search terms relating to criminal acts in Farsi without a concurrent formulation of
those terms in English demonstrated a "predisposition that Persian members of MGA's management and
staff (and only the Persian members) might be engaged in illegal conduct"). Mr. Stang's attacks pale in
comparison to those advanced by Mr. Gordinier, and they were filed under seal. Thus, although the
Court's analysis and conclusions regarding the Forensic Auditor's Reports applies with equal force to Mr.
Stang's statements, his are not the focus of the Court's attention at this time.

MINUTES FORM 90
CIVIL -- GEN                               7                 Initials of Deputy Clerk __cls_____

EXHIBIT __2__
PAGE __49__

terms of his Reports. Still other criticisms are, as counsel maintains, addressed to the Reports themselves; those must be analyzed based on their substance. However, as aptly demonstrated by the cited and quoted portions of Mr. Gordinier's filings that appear below, his criticisms do not, by any measure, confine themselves to those Reports, and instead reach out in a highly personal manner to attack the author, his professionalism, his competence, his objectivity, and his integrity.[4]

Indeed, in a display the likes of which have not been previously witnessed by this Court, Mr. Gordinier strayed far afield of legitimate criticism of the discussions, analyses, and conclusions reached in the Summary Report and the Reports that followed. To be sure, there are instances in which Mr. Gordinier addressed the message found in those Reports; just as surely, however, as detailed below, Mr. Gordinier attacked the messenger. Specifically, the papers filed by Mr. Gordinier on behalf of Omni 808 call into question Mr. Durkin's professionalism and competence, as well as his objectivity and integrity. Moreover, and alarmingly, they falsely accuse Mr. Durkin of being influenced by an ethnocentric bias against Mr. Larian and Mr. Kadisha. Such attacks, aimed at Mr. Durkin personally rather than the discussion, analyses, and conclusions set forth in his Reports, appear throughout Omni 808's papers. See Omni 808 Investors, LLC's Statement of Position re Order to Show Cause re Appointment of a Permanent Receiver (docket #5446) ("SOP"), filed May 14, 2009, at 11 (referring to Mr. Durkin's "irresponsible" analysis); id. (noting that Mr. Durkin is "far too experienced" to believe that he "produced . . . a balanced presentation"); id. (stating that "Mr. Durkin's report is a polemic" and "a piece of advocacy"); id. at 12 n.9 (calling into question Mr. Durkin's "objectivity" based on the fact that the Court ordered Mr. Durkin's fees be paid (at least in the first instance) by Mattel); id. (suggesting that Mr. Durkin's ex parte communications with Mattel were improper); id. at 13 n.10 (characterizing Mr. Durkin's quotation of Mr. Larian's and Mr. Kadisha's account of how the two men were acquainted, from "the Persian community," as "at best, unprofessional" and, "at worst,

---

[4] Adding still further to the mounting irony, in the same footnote that Mr. Gordinier disclaims engaging in improper personal attacks, he falsely accuses counsel for Mattel of advancing their own improper ad hominem attacks against Neil Kadisha, who has been referred to as a "common thief" in certain unspecified Mattel filings. Mr. Kadisha is the Managing Partner of a diversified investment firm, Omninet Capital, LLC, and an investor in Omni 808. To call someone a "common thief" is, undoubtably, by any measure, a highly personal attack, therefore an attack addressed "to the man," or ad hominem. However, in the same manner Mr. Gordinier accuses Mr. Durkin of failing to provide approprate context to the Court in his Reports, Mr. Gordinier himself fails to acknowledge that counsel for Mattel's use of the term "common thief" in connection with Mr. Kadisha merely quotes Los Angeles County Superior Court Judge Henry W. Shatford's conclusion regarding Mr. Kadisha, as set forth in his 191-page Statement of Decision, dated October 24, 2006, which was issued after a 200-day trial, which is currently pending appeal, and which conferred upon Mr. Kadisha the oft-repeated moniker of "common thief," as well as "embezzler," and "perjurer." See Uzyel v. Kadisha, Cal. App. Nos. B196045, B203804, B198007, B199850, B201425, 2009 WL 646096 (Mar. 4, 2009) (appellate brief). As always, context is key. The use by counsel for Mattel of another court's findings and conclusions to advance an argument is not inappropriate. Those findings and conclusions may, or may not, be relevant to matters presented to the Court. Used in this manner, although undoubtedly addressed "to the man" (and his credibility), it is not an improper ad hominem attack.

MINUTES FORM 90
CIVIL -- GEN                           8                    Initials of Deputy Clerk __cls_____

EXHIBIT _2_
PAGE _50_

evidence of improper cultural bias"); id. (in the same footnote, referring to the same quotation, stating that "[t]he tone [of the report] itself is compelling proof that Mr. Durkin had no intention of providing an 'objective' report to the Court."); id. at 23 (referring to the Summary Report as "Mr. Durkin's ill-concealed advocacy piece"); id. (noting that advocacy, rather than objectivity, "is certainly the posture [Mr. Durkin] is most comfortable with"); Omni 808 Investors, LLC's Memorandum in Support of Its Requests to Strike Summary and Responsive Reports of Ronald L. Durkin (docket #5705) ("Motion to Strike"), filed June 8, 2009, at 4 (noting Omni's "doubts that the Court or any party would benefit further by continuing this façade of Mr. Durkin's 'impartiality'"); id. at 7 (calling Mr. Durkin's explanation of his conclusion regarding the relatedness of certain parties as "not only fatuous[,] but [also] intellectually dishonest"); id. at 9 (suggesting that Mr. Durkin intentionally concealed from the Court the fact that Mr. Larian sought other funding sources before turning to Mr. Kadisha); id. at 10 (noting that "Mr. Durkin's repeated references to Mr. Larian's and Mr. Kadisha's common 'Persian' heritage can only be viewed as an attempt to draw some nefarious ethnic connection between them"); id. at 12 (calling the reference to Mr. Larian's and Mr. Kadisha's ethnicity "unprofessional symptoms of improper cultural bias [that] have no place in a supposedly objective report"); Omni 808 Investors, LLC's Reply Memorandum (docket #5809) ("Reply Memo") at 14 (suggesting that not only Mr. Durkin, but also counsel for Mattel, harbor "cultural biases" that lead them to "suggest[] that [Mr. Larian's and Mr. Kadisha's] common heritage makes [them] more likely to act contrary to their own interests); id. at 15 (stating that, according to his own interview notes, Mr. Durkin "misrepresented" to the Court in his Summary Report how Mr. Larian and Mr. Kadisha portrayed their relationship with each other).

As alluded to, Omni 808's criticisms have not been limited to personal attacks; some of the criticisms are in fact aimed at the Reports themselves. See e.g., SOP at 16 ("Mr. Durkin's conclusion that the Wachovia-Omni transaction impacted 'MGAEI's solvency and ability to continue conducting operations' is simply wrong."). Any comment by the Court regarding the substance of the discussions, analyses, and conclusions presented to the Court in the Forensic Auditor's Summary, Responsive, and Final Reports is inadvisable at this time. With the filing of the Third Amended Answer and Counterclaims, much of the subject matter of the Forensic Auditor's Reports have been incorporated into the claims at issue in this action. As such, it would be premature for the Court to comment upon the substance of issues that are yet to be adjudicated, and that are subject to a trial by jury. Nevertheless, the Court has reviewed the Forensic Auditor's Summary, Responsive, and Final Reports, and the exhibits attached thereto. The Court has also reviewed and considered the criticisms aimed at the Forensic Auditor, cited and quoted above, as well as the entirety of all the papers responding to the Forensic Auditor's Reports filed to date. After this review, the Court is firmly convinced that all the personal criticisms of Mr. Durkin are unwarranted and unsubstantiated.

At best, the criticism of Mr. Durkin's performance and presentation represents a

EXHIBIT __2__
PAGE __51__

different interpretation of available evidence.  That such disagreements would arise
between the analyses offered by a Court-Appointed Forensic Auditor and that offered by
counsel for a party whose transactions have been a subject of that audit is by no means
surprising.  A jury considering the relevant evidence might ultimately make factual
determinations that tend to agree with Mr. Durkin's assessment, it might ultimately tend
to agree with Mr. Gordinier's assessment, or it may very well reject both positions in
favor of another.  The answer to the merits of the claims at issue in this action must
await another day.  Today, the Court merely notes that its examination of the Forensic
Auditor's Reports reveal that Mr. Gordinier's personal attacks aimed at their author were
unjustified.

Some specific attacks directed toward Mr. Durkin – relating to his background as
a law enforcement officer, his communications with counsel for Mattel, and specific (but
baseless) allegations of ethnocentric bias -- are worthy of more specific comment by the
Court.

Stopping short of explicitly stating such, Mr. Gordinier appears to labor under the
assumption that Mr. Durkin has been unable to put behind him the prosecutorial
mindset under which he presumably operated during his former service to this Nation as
an agent of the Federal Bureau of Investigation ("FBI").  At the outset, the Court notes
that Mr. Gordinier's unstated assumptions do a disservice to the prosecutors and the
law enforcement officers who work with those prosecutors, both of whom conduct their
work under the clearly delineated duty to ferret out not only evidence of guilt but also
"evidence favorable to the accused."  See e.g., Berger v. United States, 295 U.S. 78, 88
(1935) (noting that the role of the prosecutor is not to win at all costs and observing that
the prosecutor "is the representative not of an ordinary party to a controversy, but of a
sovereignty whose obligation to govern impartially is as compelling as its obligation to
govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall
win a case, but that justice shall be done."); Brady v. Maryland, 373 U.S. 83, 87 (1963)
(imposing a duty on prosecutors to provide to the defense exculpatory evidence when
requested to do so).

Secondly, even if prosecutorial duties were not so defined, the Court finds no
suggestion that Mr. Durkin skewed the evidence in favor of any particular viewpoint.
Undoubtedly, there is a *complete absence* of any evidence that, as Mr. Gordinier has
suggested, Mr. Durkin has embarked upon a campaign to purposely mislead the Court.

Mr. Gordinier also suggests that, because Mr. Durkin's bills are being paid by
Mattel, Mattel has, through this payment or through other communications with Mr.
Durkin, bought Mr. Durkin's loyalty.  This is utter nonsense.  As demonstrated by the
Court's communications with him, Mr. Durkin is a Court-Appointed Officer who
understands that his role is to work on behalf of the Court and not on behalf of any
party.  In any event, the Court's Order of January 7, 2009, which appointed Mr. Durkin,
imposed the costs of the audit on Mattel "in the first instance," but expressly provided for

EXHIBIT __2__
PAGE __52__

the possibility that the audit expenses be shared or shifted to the MGA parties. Moreover, to suggest, however subtly, that ex parte communications with counsel for Mattel were improper ignores the Court's mandate to the Forensic Auditor in the January 7, 2009, Order, which states that Mr. Durkin was provided with attorney contact information and that he "shall direct his initial communications to counsel." At no time has the Court precluded the Forensic Auditor's communications with Mattel or its counsel; in fact, because the Forensic Audit was undertaken based on evidence gathered by and presented to the Court by Mattel, Mr. Durkin would have been remiss in his duties if he failed to communicate with Mattel and its counsel.

Mr. Durkin was vested with powers and discretion to complete a Court-ordered Forensic Audit. Pursuant to an Order of this Court, he undertook this task and exercised those powers and that discretion, presenting his Reports in conformity with the Court's instructions. Despite counsel's attacks, the Court's review of the evidence before it discerns no abuse of those powers or of that discretion.

Particularly troubling to the Court is that counsel speculates that, because Mr. Durkin noted in his report that Mr. Larian knew Mr. Kadisha from "the Persian Community," Mr. Durkin could be "of the view that this common heritage makes Mr. Kadisha more likely to act contrary to his own interests or to do something via third-parties that he wouldn't otherwise do?" See SOP at 13-14 n.10 (appearing to pose this thought as a rhetorical question). There is no indication in the record, or otherwise, that Mr. Durkin holds such a view. To the contrary, Mr. Durkin's comment regarding the acquaintanceship of Mr. Larian and Mr. Kadisha from "the Persian Community" (which is noted in the report within quotation marks and is expressly attributed to a reference made by Mr. Larian himself) is clearly predicated on interviews with these two individuals, each of whom related independently to Mr. Durkin and his colleagues that they knew each other from "the Persian Community." See Durkin Summary Report, Ex. 14, at 2 ¶ 3 (Notes re March 25, 2009, interview with Mr. Larian: "He indicated that he knew Kadisha from the Persian community.") and Ex. 14, at 15 ¶ 2 (Notes re March 26, 2009, interview with Mr. Kadisha: "Kadisha stated that he knows Larian from the Persian community."). The purpose for this reference is made clear in the footnote set forth at the end of the sentence in which the reference appears; namely, the Report discusses evidence that the relationship between Mr. Larian and Mr. Kadisha is stronger and more personal than either man claimed it was. See Summary Report at 5 n.18; Ex. 15 (personal emails).

In the Reply Memo, Mr. Gordinier takes issue with this explanation, this time including not only Mr. Durkin but also counsel for Mattel as the targets for his unsubstantiated allegations of "cultural bias." Mr. Gordinier first mischaracterizes an argument made by Mattel. Mattel argued, and quite correctly, both that how well Mr. Larian and Mr. Kadisha knew each other was relevant to a determination of whether certain transactions between the two were arms-length transactions, and that this point was likely not lost on either of these two very sophisticated and successful

Initials of Deputy Clerk __cls_____

EXHIBIT __2__
PAGE __53__

businessmen.[5] As noted previously, both Mr. Larian and Mr. Kadisha stated that they knew each other from "the Persian community" which, in the Forensic Auditor's view, was intended to, or at least had the tendency to minimize the existing relationship between the two. Mr. Gordinier incorrectly characterizes this argument as Mattel's contention that Mr. Larian's and Mr. Kadisha's "Persian relationship" and "common Persian heritage" was somehow relevant to a determination of whether the Omni 808 transaction was an arms-length transaction. Mattel made no such argument. Neither counsel for Mattel nor Mr. Durkin have implied that Mr. Larian's and Mr. Kadisha's ethnicity factors into the analysis. Other than to point to Mr. Larian's and Mr. Kadisha's separate, but identical, accounts of how they knew each other which, in turn, suggests how well they know each other, neither counsel for Mattel nor Mr. Durkin have stated or implied that Mr. Larian's and Mr. Kadisha's shared ethnicity is relevant to any matter currently or potentially before the Court. Compare Opposition at 8-9 with Reply Memo at 14-15.

Moreover, Mr. Gordinier's substantive point, that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha told him about the closeness of their relationship, fares no better. See Reply Memo at 15. On this point, it is important to set this stage properly. Counsel for all parties have attempted to glean far too much from two sterile paragraphs of interview notes taken by Mr. Durkin. Much can be inferred from conversations and interviews through not only what is said, but what is not said, by the interviewee's demeanor, by the tone of the speaker, by the length and placement of pauses, and by non-verbal gestures and body language. With all these variables, much of what is communicated does not find its way into notes.[6] For instance, Mr. Durkin's interview of Mr. Larian lasted over two and a half hours; however, the interview notes are a mere five and a half pages. Similarly, a one-hour and ten minute interview of Mr. Kadisha yielded only three and a half pages of interview notes. This is not to suggest that the notes should have been longer or that the interviews should have been recorded or transcribed; rather, it is to suggest that counsel's arguments based on another's notes are not particularly probative.

In contrast, Mr. Durkin's assessment, based on his interviews with both of them,

---

[5] In fact, the Court just this week issued a 30-page, single-spaced opinion resolving a 10-day bench trial conducted over the sole issue of whether a transaction between "closely related" entities reflected its fair market value, one of the more significant arguments ultimately rejected by the Court in that case being that the close relationship between the parties necessarily rendered the transaction a "sweetheart deal." See July 6, 2009, Order, Siegel v. Warner Bros. Entertainment, Inc., et al., CV 04-08400 SGL (RZ) (docket #554).

[6] Indeed, the interview notes upon which the parties rely concede as much. See Summary Report, Ex. 14 at 2, 15 ("This interview memorandum is a factual representation of the topics discussed during the interview and is not intended to be a word for word or exact transcription of the conversation."). Thus, in addition to not taking into account all non-verbal communication, the notes do not even represent everything that was said during the interview.

Initials of Deputy Clerk ___cls_____

EXHIBIT ___2____
PAGE ___54____

is that Mr. Larian and Mr. Kadisha attempted to minimize their relationship because both of them understand the relevance of any friendship or other connection between them to the assessment of the arms-length nature of any transactions in which they have engaged. Mr. Durkin's assessment does not come from the gentle teasing of a strained meaning from two sterile paragraphs of brief notes taken by another person; rather, his assessment springs from his participation in the interview process, the entirety of the interviews he conducted of Mr. Larian and Mr. Kadisha, and his review of all of the evidence. As such, the Court defers to his assessment, at least insofar as how Mr. Larian and Mr. Kadisha portrayed their relationship to him.

As for that scant language from which the parties glean so much meaning, the entirety of which is set forth below, it in no way supports the contention made by Mr. Gordinier that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha conveyed to him about the closeness of their relationship. On this topic, the notes of Mr. Larian's interview merely state the following:

> Larian decided to contact Neil Kadisha of OmniNet as he knew his company was in the distressed loan business. He indicated that he knew Kadisha from the Persian community. Kadisha said he wouldn't do the deal alone in today's environment and wanted Larian and their other friends to invest in the deal with MGA. Larian stated that Kadisha negotiated the debt with Wachovia and got it down significantly, Larian said he is not bitter about Kadisha getting a good deal on buying the loan.

Summary Report, Ex. 14, at 2 ¶ 3 (emphasis added). This paragraph contains the word "friends," and perhaps could even be read as an implicit statement by Mr. Larian that he and Mr. Kadisha are "friends." But the language does not compel such an inference. Moreover, it does not comport with the notes of Mr. Kadisha's interview, which on this topic state only the following:

> Larian and Kadisha have never been to dinner together. Kadisha stated that he knows Larian from the Persian community and he sees him often at religious events, etc. He has no investments with Larian. Kadisha did not talk with Larian last night, this morning or in the last two days.

Summary Report, Ex. 14, at 15, ¶ 2. Mr. Durkin's assessment that Mr. Larian and Mr. Kadisha sought to minimize the extent of their relationship is not contradicted by these short passages.

The criticism that Mr. Durkin was acting pursuant to an ethnic or cultural bias is clearly baseless. The allegations are irresponsible, and they are made to capitalize on

MINUTES FORM 90
CIVIL -- GEN

13

Initials of Deputy Clerk __cls_____

EXHIBIT __2____
PAGE __55____

their inherent sensational nature for counsel's own purposes of diverting attention away from the substance of the Reports. Sensationalism aside, when viewed in context, the Reports' reference to Mr. Larian and Mr. Kadisha knowing each other from "the Persian community" was plainly innocuous. The reference was a direct quotation from both Mr. Larian and Mr. Kadisha. It was used in a broader discussion regarding how (and thus, impliedly, how well) the two knew each other, which is itself relevant to the issue of whether certain transactions relevant to the present litigation were made at arms length.

This is a most unfortunate incident. The Court certainly understands, in a case as hotly contested as this one -- with such high stakes, with such complex legal issues, and with such truly extraordinary legal talent on all sides -- that lawyers, however ethical and committed to the highest standards of professionalism (as the Court presumes and has found all counsel of record here to be), make statements or commit acts in haste that they subsequently regret. All of the players to this drama, are, after all is said and done, human. As such, all of us are vulnerable to all-too-common human frailties. The Court would place itself at the very top of any list of lawyers who have spoken improvidently at one time or another in this case (and any number of others). What the Court has witnessed here, however, in both manner and substance, for the reasons noted above, goes beyond what the Court can let pass without some manner of reprobation. So let the Court be clear: Nothing excuses the attempted character assassination in which Mr. Gordinier has engaged.

**IT IS SO ORDERED.**

EXHIBIT __2__
PAGE __56__