# EXHIBIT 1

COPY

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 90378)
2     Michael T. Zeller (Bar No. 196417)
      865 South Figueroa Street, 10th Floor
3   Los Angeles, California 90017
      Telephone:    (213) 443-3000
4   Facsimile:    (213) 443-3100

5   Attorneys for Plaintiff
    Mattel, Inc.

6

7

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

APR 27 2004

John A. Clarke, Executive Officer/Clerk
By _____ Deputy
        SUE GABB

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    FOR THE COUNTY OF LOS ANGELES

10

11   MATTEL, INC., a Delaware corporation,      )   CASE NO.   BC314398
                                                 )
12                         Plaintiff,            )
                                                 )   COMPLAINT FOR:
13                                               )
                                                 )   (1)  BREACH OF CONTRACT;
14              v.                               )   (2)  BREACH OF FIDUCIARY
                                                 )        DUTY;
15   CARTER BRYANT, an individual; and           )   (3)  BREACH OF DUTY OF
16   DOES 1 through 10, inclusive,               )        LOYALTY;
                                                 )   (4)  UNJUST ENRICHMENT; AND
17                         Defendants.           )   (5)  CONVERSION
                                                 )
18                                               )

19

20

21

22

23

24

25

26

27

28

07209/579342.1

EXHIBIT ____1____

PAGE ____8____

COMPLAINT

1   Plaintiff Mattel, Inc. ("Mattel") brings this action against defendants Carter
2   Bryant ("Bryant") and Does 1 through 10 (all defendants being collectively referred to as
3   "defendants") and alleges as follows:

4

5   Parties

6

7   1.   Mattel is a corporation organized and existing under the laws of the
8   State of Delaware and has its principal place of business in El Segundo, California.

9   2.   Mattel is informed and believes, and on that basis alleges, that defendant
10   Bryant is an individual currently residing in Springfield, Missouri.

11   3.   The true names and capacities of defendants sued herein as Does 1
12   through 10, inclusive, are unknown to Mattel, which therefore sues said defendants by such
13   fictitious names. Mattel will amend this Complaint to allege their true names and capacities
14   when the same are ascertained.

15   4.   Mattel is informed and believes, and on that basis alleges, that at all
16   times relevant herein, defendants, and each of them, were acting in concert and active
17   participation with each other in committing the wrongful acts alleged herein, and were the
18   agents of each other, and in doing the things alleged herein, each defendant was acting
19   within the course and scope of his, her or its agency and was subject to and under the
20   supervision of, and was acting with the knowledge of, his, her or its co-defendants.

21

22   Jurisdiction and Venue

23

24   5.   During the time of the acts complained of herein, Bryant was employed
25   by Mattel in, and was a resident of, Los Angeles County. Bryant's contracts with Mattel that
26   are at issue in this action were executed, performed and breached by Bryant in Los Angeles
27   County. In addition, defendants committed the tortious conduct alleged herein while
28   physically located in Los Angeles County, and Mattel felt the effects of Bryant's breach and

1  defendants' other wrongful acts in Los Angeles County. Accordingly, this Court has
2  personal jurisdiction over defendants.

3       6.  Venue is proper pursuant to Code of Civil Procedure §§ 393 and 395(a),
4  as the causes of action arose in Los Angeles County, the contractual obligations at issue were
5  incurred, were to be performed and were breached by Bryant in Los Angeles County, and
6  Bryant does not currently reside in California.

7

8                      Factual Background

9

10       7.  Mattel is a long standing and successful independent manufacturer and
11  marketer of toys, dolls, games and stuffed toys and animals. Mattel was founded in 1945 by
12  Elliot and Ruth Handler and Harold "Matt" Mattson. The name of the company was created
13  by incorporating the names of two of its founders, "MATT-son" and "EL-liot." Originating
14  from the Handlers' garage in Southern California, the company greatly expanded its
15  operations following World War II and soon began to thrive as its reputation for producing
16  high-quality toys spread. During the next several decades, Mattel became world famous for
17  producing high-quality products at reasonable prices. Today, some of Mattel's most famous
18  brands include BARBIE, HOT WHEELS, MATCHBOX and FISHER-PRICE.

19       8.  Critical to Mattel's success, and to the livelihood of its employees, is
20  Mattel's ability to design and develop new products. Mattel invests many millions of dollars
21  in product design and development annually, and it introduces hundreds of new products
22  each year. In El Segundo, California alone, Mattel maintains a 180,000 square-foot design
23  center that houses more than 850 designers, sculptors, painters and other artists, whom
24  Mattel pays to work exclusively and full-time to create the products that Mattel sells and on
25  which Mattel's business depends.

26       9.  Defendant Bryant was employed by Mattel from September 1995
27  through April 1998, and then again from January 1999 through October 2000, as a product
28  designer at Mattel's design center in El Segundo, California.

07209/579342.1

-3-

EXHIBIT ____1____

PAGE ____10____

COMPLAINT

1       10.    On January 4, 1999, upon starting his second term of employment by

2  Mattel, and as a condition of and in consideration for his employment, Bryant executed an

3  Employee Confidential Information and Inventions Agreement (the "Employee

4  Agreement"). Among other things, Bryant agreed that he would not, without Mattel's

5  express written consent, "engage in any employment or business other than for [Mattel], or

6  invest in or assist (in any manner) any business competitive with the business or future

7  business plans of [Mattel]." Bryant further acknowledged that he held a position of trust

8  with Mattel. In addition, Bryant assigned to Mattel all rights, title and interest in

9  "inventions," including without limitation "designs," that he conceived or reduced to practice

10  during his employment by Mattel. A true and correct copy of Bryant's Employee Agreement

11  with Mattel is attached as Exhibit A.

12       11.    Also on January 4, 1999, Bryant executed Mattel's Conflict of Interest

13  Questionnaire (the "Conflict Questionnaire"). Among other things, Bryant certified in the

14  Conflict Questionnaire that, other than as disclosed, he had not worked for any competitor

15  of Mattel in the prior twelve months and had not engaged in any business venture or

16  transaction involving a Mattel competitor that could be construed as a conflict of interest.

17  Bryant specifically agreed that he would immediately notify his supervisor of any change

18  in his situation that would cause him to change any of the foregoing certifications. The only

19  conflict disclosure that Bryant made on the Conflict Questionnaire (or at any time

20  subsequently) concerned freelance work that is unrelated to the conduct alleged herein. A

21  true and correct copy of the Conflict Questionnaire executed by Bryant is attached as

22  Exhibit B.

23       12.    In late November 2003, Mattel learned that Bryant had secretly aided,

24  assisted and worked for a Mattel competitor, including without limitation by entering into

25  an agreement with the competitor, during the time Bryant was employed by Mattel pursuant

26  to the above-referenced agreements and was being paid by Mattel as a product designer.

27  Bryant's agreement with the competitor obligated Bryant to provide product design services

28  to the competitor on a "top priority" basis. Bryant's agreement also provided, among other

-4-

EXHIBIT  1

PAGE  11

COMPLAINT

1    things, that Bryant would receive royalties and other consideration for sales of products on

2    which Bryant provided aid or assistance; that all work and services furnished by Bryant to

3    the competitor under the agreement purportedly would be considered "works for hire"; and

4    that all intellectual property rights to preexisting work by Bryant purportedly would be

5    assigned to the competitor. In addition, while Bryant was employed by Mattel, Bryant and

6    the other defendants converted, misappropriated and misused Mattel property and resources

7    for the benefit of, and to aid and assist, Bryant personally and Mattel's competitor.

8           13.    During the time that he was employed by Mattel and thereafter, Bryant

9    concealed these actions from Mattel, including without limitation by failing to notify his

10   supervisor of his conflict of interest regarding the competitor and by making affirmative

11   misrepresentations to Mattel management upon his departure from Mattel.  Because of

12   Bryant's acts of concealment and his misrepresentations to Mattel, Mattel had no reason to

13   suspect that Bryant had worked for the competitor while still employed by Mattel until late

14   November 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's

15   agreement with the competitor and saw that the date of the agreement predated Bryant's

16   departure from Mattel.

17          14.    As a consequence, Bryant breached his contracts with Mattel and

18   violated his duty of loyalty and his fiduciary duties to Mattel; the other defendants have

19   unlawfully aided and abetted his violation of such duties; and each of the defendants has

20   been unjustly enriched and engaged in acts of conversion.

21

22                           FIRST CLAIM FOR RELIEF

23                               (Breach of Contract)

24

25          15.    Mattel repeats and realleges each and every allegation set forth in

26   paragraphs 1 through 14, above, as though fully set forth at length.

27          16.    Pursuant to his Mattel Employment Agreement, and for good and

28   valuable consideration, Bryant agreed that he would not, without Mattel's express written

-5-

EXHIBIT ___1___

PAGE ___12___

COMPLAINT

1   consent, engage in any employment or business other than for Mattel or assist in any manner

2   any business competitive with the business or future business plans of Mattel during his

3   employment with Mattel.  Pursuant to his Mattel Employment Agreement, Bryant further

4   assigned to Mattel all right, title and interest in "inventions," including without limitation

5   "designs," that he conceived or reduced to practice during his employment by Mattel.  In

6   addition, pursuant to the Conflict Questionnaire, Bryant certified that, other than as

7   disclosed, he had not worked for any competitor of Mattel and had not engaged in any

8   business venture or transaction involving a Mattel competitor that could be construed as a

9   conflict of interest.  Bryant further promised that he would notify his superior immediately

10  of any change in his situation that would cause him to change any of the foregoing

11  certifications or representations.

12          17.     The Employment Agreement and the Conflict Questionnaire are valid,

13  enforceable contracts, and Mattel has performed each and every term and condition of the

14  Employment Agreement and Conflict Questionnaire required to be performed by Mattel.

15          18.     Bryant materially breached the foregoing contracts with Mattel, in that,

16  among other things, he secretly aided, assisted and worked for a Mattel competitor during

17  his employment with Mattel, without the express written consent of Mattel.

18          19.     As a consequence of Bryant's breach, Mattel has suffered and will in

19  the future continue to suffer damages in an amount to be proven at trial.  Such damages

20  include, without limitation, the amounts paid by the competitor to Bryant during his Mattel

21  employment; the amounts paid by the competitor to Bryant as a result of the work he

22  performed for the competitor during his Mattel employment; the amount that Mattel paid

23  Bryant during the time he wrongfully worked for the competitor; the value of information

24  and intellectual property owned by Mattel which Bryant provided to the competitor; the

25  value of the benefits the competitor obtained from Bryant during the time he was employed

26  by Mattel; and the value of the benefits the competitor obtained from Bryant as a result of

27  the work he performed for the competitor during his Mattel employment.

28

07209/579342.1

EXHIBIT _____1_____

PAGE _____13_____

COMPLAINT

1    20.    Furthermore, Bryant's conduct has caused, and unless enjoined will
2  continue to cause, irreparable injury to Mattel that cannot be adequately compensated by
3  money damages and for which Mattel has no adequate remedy at law. Bryant specifically
4  acknowledged in his Employment Agreement that his breach of the Agreement "likely will
5  cause irreparable harm" to Mattel and that Mattel "will be entitled to injunctive relief to
6  enforce this Agreement, in addition to damages and other available remedies." Accordingly,
7  Mattel is entitled to orders mandating Bryant's specific performance of his contracts with
8  Mattel and restraining Bryant from further breach.

9

10                              SECOND CLAIM FOR RELIEF

11                                 (Breach of Fiduciary Duty)

12

13    21.    Mattel repeats and realleges each and every allegation set forth in
14  paragraphs 1 through 20, above, as though fully set forth at length.

15    22.    Bryant held a position of trust and confidence with Mattel. In his
16  position, Bryant had access to and was entrusted with Mattel's proprietary and confidential
17  information, supervised the work of others, exercised discretion and worked independently
18  in many of his job assignments and duties. In his position, Bryant also represented Mattel
19  in its dealings with third parties and, in his actions in the course and scope of his
20  employment with Mattel, was an agent of Mattel. Bryant confirmed his relationship of trust
21  with Mattel in the Employee Agreement. Bryant thus owed Mattel a fiduciary duty that
22  included, but was not limited to, an obligation not to take any action that would be contrary
23  to Mattel's best interests or that would deprive Mattel of any opportunities, profit or
24  advantage which Bryant might bring to Mattel.

25    23.    Bryant breached his fiduciary duty to Mattel in that, while employed
26  by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including
27  without limitation by entering into an agreement with a Mattel competitor. As alleged
28

07209/579342.1

-7-

EXHIBIT    1

PAGE _____ 14

COMPLAINT

1   above, Bryant also breached the aforementioned duty by using Mattel property and resources

2   for the benefit of, and to aid and assist, himself personally and the competitor of Mattel.

3       24.     The other defendants, acting with full knowledge of Bryant's obligations

4   to Mattel, aided and abetted Bryant in such conduct.

5       25.     As a direct and proximate result of defendants' wrongful conduct,

6   Mattel has incurred damages in an amount to be determined at trial.

7       26.     Defendants acted with malice, fraud and oppression, and in conscious

8   disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages

9   against defendants in an amount to be determined at trial.

10      27.     Furthermore, defendants' conduct has caused, and unless enjoined will

11  continue to cause, irreparable injury to Mattel that cannot be adequately compensated by

12  money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel

13  is entitled to an order restraining further breach of Bryant's fiduciary duty to Mattel and/or

14  restraining defendants from continuing to benefit from such breach.

15

16                  THIRD CLAIM FOR RELIEF

17                  (Breach of Duty of Loyalty)

18

19      28.     Mattel repeats and realleges each and every allegation set forth in

20  paragraphs 1 through 27, above, as though fully set forth at length.

21      29.     As an employee of Mattel, Bryant owed a duty of undivided loyalty to

22  Mattel, his employer. Pursuant to this duty, Bryant could not compete with Mattel or assist

23  a competitor of Mattel during his employment with Mattel. Pursuant to this duty, Bryant

24  was required to always give preference to Mattel's business over his own, similar interests

25  during the course of his employment with Mattel.

26      30.     Bryant breached his duty of loyalty to Mattel in that, while employed

27  by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including

28  without limitation by entering into an agreement with a Mattel competitor. As alleged

07209/579342.1

-8-

EXHIBIT ___1___

PAGE ___15___

COMPLAINT

1   above, Bryant also breached the aforementioned duty by using Mattel property and resources

2   for the benefit of, and to aid and assist, himself personally and the competitor of Mattel.

3          31.     The other defendants, acting with full knowledge of Bryant's obligations

4   to Mattel, aided and abetted Bryant in such wrongful conduct.

5          32.     As a direct and proximate result of defendants' wrongful conduct,

6   Mattel has incurred damages in an amount to be determined at trial.

7          33.     Defendants acted with malice, fraud and oppression, and in conscious

8   disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages

9   against defendants in an amount to be determined at trial.

10         34.     Furthermore, defendants' conduct has caused, and unless enjoined will

11  continue to cause, irreparable injury to Mattel that cannot be adequately compensated by

12  money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel

13  is entitled to an order restraining further breach of Bryant's duty of loyalty to Mattel and/or

14  restraining defendants from continuing to benefit from such breach.

15

16                         FOURTH CLAIM FOR RELIEF

17                              (Unjust Enrichment)

18

19         35.     Mattel repeats and realleges each and every allegation set forth in

20  paragraphs 1 through 34, above, as though fully set forth at length.

21         36.     Defendants, by the aforementioned conduct, unfairly used and diverted

22  Mattel property, resources and opportunities for the benefit of, and to aid and assist,

23  themselves, all without authorization by or payment to Mattel for the same. Defendants have

24  been unjustly enriched as a result.

25         37.     Mattel is entitled to an award of all such amounts by which defendants

26  have been unjustly enriched in an amount to be determined at trial.

27

28

07209/579342.1

-9-

EXHIBIT _____1_____

PAGE _____16_____

COMPLAINT

38.   Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

39.   Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel is entitled to an order restraining defendants from any further unjust enrichment.

### FIFTH CLAIM FOR RELIEF

(Conversion)

40.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 39, above, as though fully set forth at length.

41.   Mattel was entitled to, inter alia, Bryant's exclusive services and the exclusive ownership of his inventions as a Mattel product designer. However, Bryant provided such services, and purported to grant rights to such inventions, to a competitor during the time of his exclusive Mattel employment. All such services and the inventions and work product resulting from such services, including without limitation ideas, concepts, rights, designs, proprietary information, and other intellectual property and intangible property created by Bryant during the term of the aforesaid agreements, were the property of Mattel. Such services and property were provided by Bryant to others, including defendants, and used by them.

42.   Defendants wrongfully converted Mattel property and resources by asserting ownership thereto and by appropriating and using Mattel's property and resources for their own benefit and gain and for the benefit and gain of others, without the permission of Mattel.

07209/579342.1

-10-

COMPLAINT

EXHIBIT ____ 1

PAGE ____ 17

43.     As a direct and proximate result of defendants' wrongful conversion of Mattel's property and resources, Mattel has incurred damages.  Mattel is entitled to recover compensatory damages against defendants in an amount to be determined at trial.

44.     Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

45.     Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel is entitled to an order restraining defendants from further conversion of Mattel property and resources and/or restraining defendants from continuing to benefit from such conversion.

## PRAYER FOR RELIEF

WHEREFORE, Mattel hereby respectfully requests that this Court:

A.     Award Mattel its damages;

B.     Order defendants to disgorge to Mattel all payments, revenue, profits, monies, royalties and any other benefits derived or obtained by defendants as a result of the conduct described herein;

C.     Order specific performance by Bryant to comply with and satisfy Bryant's contractual obligations to Mattel;

D.     Enter an injunction restraining defendants, and all those acting in concert or participation with them, from engaging in further wrongful conduct and/or from continuing to benefit from their wrongful conduct;

E.     Order defendants to pay Mattel the full cost of this action and Mattel's reasonable attorneys' fees;

F.     Award Mattel punitive damages in an amount sufficient to punish defendants and deter such misconduct in the future; and

07209/579342.1

-11-

COMPLAINT

EXHIBIT  1

PAGE  18

1        G.       Award such other and further relief as this Court deems just and proper.

2

3   DATED:  April 27, 2004              QUINN EMANUEL URQUHART OLIVER &
                                        HEDGES, LLP
4

5

6                                       By _____
                                            Michael T. Zeller
7                                           Attorneys for Plaintiff
                                            Mattel, Inc.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07209/579342.1                              -12-

EXHIBIT _____1_____

PAGE _____19_____

# EXHIBIT 2

RECEIVED

DEC 07 2004

1   M. RANDALL OPPENHEIMER (S.B. #77649)
2   DIANA M. TORRES (S.B. #162284)
    O'MELVENY & MYERS LLP
3   400 South Hope Street
    Los Angeles, California 90071-2899
4   Telephone:  (213) 430-6000
    Facsimile:   (213) 430-6407

5
6   Attorneys for Applicant-Intervenor
    MGA ENTERTAINMENT, INC.

7

8                   UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  MATTEL, INC., a Delaware          Case No. CV 04-9059 NM (RNBx)
    Corporation,
12                                    STIPULATION PERMITTING MGA
                     Plaintiff,       TO INTERVENE AS A PARTY TO
13                                    THIS ACTION
          v.
14                                    Hon. Nora Manella
    CARTER BRYANT, an individual;
15  and DOES 1 through 10, inclusive,

16                   Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT ____2____          STIPULATION PERMITTING MGA TO
                                     INTERVENE AS A PARTY
PAGE ____20____

1    WHEREAS, on April 27, 2004, Plaintiff Mattel, Inc. ("Mattel") filed suit
2    against Carter Bryant ("Bryant") and ten unnamed "Does" alleging breach of
3    contract, breach of the duty of loyalty, breach of fiduciary duty, conversion and
4    unjust enrichment.

5    WHEREAS, MGA, believes, at this time, that it has a significantly
6    protectable interest relating to the subject matter of the action, that the disposition
7    of the action may impair or impede MGA's ability to protect its interest absent
8    intervention, and that MGA's interest is not adequately represented by the existing
9    parties.

10   WHEREAS, Mattel is agreeable to the filing of the Answer in Intervention as
11   a procedural matter pursuant to this Stipulation, without waiver of, or prejudice to,
12   its rights, defenses or positions in this or any other action or to the Answer in
13   Intervention, including without limitation to Mattel's jurisdictional objections;

14   WHEREAS, Bryant is agreeable to the filing of the Answer in Intervention as
15   a procedural matter pursuant to this Stipulation, without waiver of, or prejudice to,
16   his rights, defenses or positions in this or any other action;

17   NOW THEREFORE, MGA, Mattel and Bryant hereby stipulate, subject to
18   this Court's approval, as follows:

19   1.    MGA may intervene as a party to this action; and
20   //
21   //
22   //
23   //
24   //
25   //
26   //
27   //
28   //

- 1 -

EXHIBIT ___2___
PAGE ___21___

1      2.     MGA shall be permitted to file its Answer in Intervention, lodged

2   concurrently with this Stipulation.

3

4     Dated:     December 3, 2004     O'MELVENY & MYERS LLP

5

6                                    By:

7                                        Diana M. Torres
                                       Attorneys for Applicant-Intervenor
                                       MGA ENTERTAINMENT, INC.

8

9     Dated:     December___, 2004     QUINN EMANUEL URQUHART

10                                          OLIVER & HEDGES LLP

11

12                                      By:

13                                        Michael T. Zeller
                                       Attorneys for Plaintiff
                                       MATTEL, INC.

14

15     Dated:     December___, 2004     LITTLER MENDELSON, P.C.

16

17                                      By:

18                                        Keith A. Jacoby
                                       Attorneys for Defendant
                                       CARTER BRYANT

19   IT IS SO ORDERED.

20

21

22     Dated:     December_____, 2004

23                                        Hon. Nora M. Manella
                                       United States District Judge

24

25

26

27

28

EXHIBIT    2      - 2 -

PAGE     22

Dec-09-04   02:20pm   From-QUINN EM                    2136240643        T-966   P.004/004   F-947

2.      MGA shall be permitted to file its Answer in Intervention, lodged concurrently with this Stipulation.

Dated:        December____, 2004        O'MELVENY & MYERS LLP


                                        By:_____
                                           Diana M. Torres
                                        Attorneys for Applicant-Intervenor
                                        MGA ENTERTAINMENT, INC.

Dated:        December____, 2004        QUINN EMANUEL URQUHART
                                        OLIVER & HEDGES LLP


                                        By:_____
                                           Michael T. Zeller
                                        Attorneys for Plaintiff
                                        MATTEL, INC.

Dated:        December____, 2004        LITTLER MENDELSON, P.C.


                                        By:_____
                                           Keith A. Jacoby
                                        Attorneys for Defendant
                                        CARTER BRYANT

IT IS SO ORDERED.


Dated:        December____, 2004


                                        _____
                                           Hon. Nora M. Manella
                                        United States District Judge

- 2 -

EXHIBIT _____2_____

PAGE _____23_____

1        2.    MGA shall be permitted to file its Answer in Intervention, lodged

2    concurrently with this Stipulation.

3

4    Dated:    December____, 2004    O'MELVENY & MYERS LLP

5

6        By:_____

7        Diana M. Torres
    Attorneys for Applicant-Intervenor

8        MGA ENTERTAINMENT, INC.

9    Dated:    December____, 2004    QUINN EMANUEL URQUHART

10       OLIVER & HEDGES LLP

11

12       By:_____

13       Michael T. Zeller
    Attorneys for Plaintiff

14       MATTEL, INC.

15   Dated:    December_3_, 2004    LITTLER MENDELSON, P.C.

16

17       By:_____

18       Keith A. Jacoby
    Attorneys for Defendant

19       CARTER BRYANT

    IT IS SO ORDERED.

20

21

22   Dated:    December____, 2004

23       _____
    Hon. Nora M. Manella

24       United States District Judge

25

26

27

28

    - 2 -

EXHIBIT __2__

PAGE __24__

# EXHIBIT 3

1  DALE M. CENDALI
   (of counsel, not admitted in California)
2  DIANA M. TORRES (S.B. #162284)
   PAULA E. AMBROSINI (S.B. #193126)
3  O'MELVENY & MYERS LLP
   400 South Hope Street
4  Los Angeles, CA  90071-2899
   Telephone:  (213) 430-6000
5  Facsimile:  (213) 430-6407
   email:     dtorres@omm.com
6
   PATRICIA GLASER (S.B. # 55668)
7  CHRISTENSEN, MILLER, FINK,
   JACOBS, GLASER, WEIL &
8  SHAPIRO LLP
   10250 Constellation Boulevard, 19th Floor
9  Los Angeles, CA  90067
   Telephone:  (310) 553-3000
10 Facsimile:  (310) 556-2920

11 Attorneys for Plaintiff
   MGA Entertainment, Inc.
12

13

14                    UNITED STATES DISTRICT COURT

15                   CENTRAL DISTRICT OF CALIFORNIA

16                          CV 05 - 02727  CBM (RZx)

17 MGA ENTERTAINMENT, INC.,        Case No.

18              Plaintiff,         COMPLAINT FOR FALSE
                                   DESIGNATION OF ORIGIN,
19       v.                        AFFILIATION, ASSOCIATION OR
                                   SPONSORSHIP (15 U.S.C. § 1125
20 MATTEL, INC., a Delaware        (a)); UNFAIR COMPETITION (15
   Corporation, and DOES 1-10,     U.S.C. § 1125 (a), Cal. Bus. & Prof.
21                                 Code § 17200 et seq. and California
              Defendants.          Common Law); DILUTION (15
22                                 U.S.C. § 1125 (c), Cal. Bus. & Prof
                                   Code § 14330 and California Common
23                                 Law); AND UNJUST ENRICHMENT

24                                 DEMAND FOR JURY TRIAL

25

26

27

28

EXHIBIT ___3___

PAGE ___25___

Plaintiff MGA Entertainment, Inc. for its complaint against

Defendants Mattel, Inc. and DOES 1-10 alleges and avers as follows:

## PARTIES

1.     Plaintiff MGA Entertainment, Inc. ("MGA") is a California corporation organized and existing under the laws of the State of California, with a principal place of business in Van Nuys, California.

2.     MGA is informed and believes, and based thereon alleges, that Defendant Mattel, Inc. ("Mattel") is a Delaware corporation with a principal place of business in El Segundo, California.

3.     MGA is ignorant of the true names and capacities of the defendants sued herein under the fictitious names DOES 1 through 10 inclusive. MGA will seek leave of court to amend this complaint to allege such names and capacities when they are ascertained. MGA is informed and believes, and based thereon alleges, that each of the fictitiously named DOE defendants is responsible in some manner for the wrongful conduct alleged herein. MGA further alleges that each defendant acted in concert with, as agent or representative for, or at the request or on behalf of another or Mattel. Each charging allegation contained herein is, therefore, also hereby alleged against each fictitiously named DOE defendant.

## JURISDICTION AND VENUE

4.     Through this action MGA asserts claims against Mattel arising under the Lanham Act, 15 U.S.C. Sections 1125 (a) and (c), California Business and Professions Code Sections 17200 *et seq.*, California Business and Professions Code Section 14330 and California common law. This Court has original subject matter jurisdiction over MGA's federal claims pursuant to 15 U.S.C. Sections 1116 and 1121, 28 U.S.C. Section 1338(a), and 28 U.S.C. Section 1331, and supplemental

EXHIBIT _____3_____

PAGE _____26_____

1   subject matter jurisdiction over MGA's state law claims pursuant to 28 U.S.C.

2   Section 1367(a).

3       5.    This Court has specific personal jurisdiction over Mattel, as it has

4   purposefully committed, within the State of California, the acts from which these

5   claims arise and/or has committed tortious acts outside California, knowing and

6   intending that such acts would cause injury to MGA within the state.  The Court

7   also has general personal jurisdiction over Mattel, as it conducts continuous,

8   systematic and routine business within the State of California and the County of

9   Los Angeles.

10       6.    Venue is proper in the United States District Court for the Central

11   District of California pursuant to 28 U.S.C. Sections 1391(b) and 1391(c).

12

13   **FACTUAL BACKGROUND**

14       7.    MGA seeks by this action to halt Mattel's habitual and unfair tactics of

15   competition-by-intimidation and serial copycatting of MGA's products, which

16   Mattel has used in an unbridled effort to cause confusion in the market place and

17   eliminate MGA as a competitor in the toy and fashion doll market long dominated

18   and controlled by Mattel.

19       8.    MGA is a privately-held company in the San Fernando Valley that

20   began in 1979 as a small consumer electronics business.  In 1987, the company

21   made its first foray into the toy business when it secured rights to market handheld

22   LCD games featuring licensed Nintendo® characters.  Building on that small

23   success, the company began marketing products for popular licensed properties

24   such as the "Power Rangers"® and "Hello Kitty"®.  This little-known but

25   successful company, however, was propelled into the limelight after its daring

26   release in June 2001 of an innovative line of fashion dolls called "BRATZ".

27   "BRATZ" are multi-ethnic fashion dolls that sport a fresh new urban and

28   contemporary look and fashion.  At the time of the release of "BRATZ", "Barbie"

2

EXHIBIT _____ 3

PAGE _____ 27

1  sales were in a slump, Mattel was in turmoil, and the market was ripe for something

2  new, exciting and inventive. "BRATZ" fit the bill. It is the first fashion doll that

3  has been able to seriously challenge "Barbie" for market share, and begin to loosen

4  Mattel's 50-year iron-fisted grip on the fashion doll market.

5    9. Mattel has not taken kindly to the challenge. Either unable or

6  unwilling to compete against "BRATZ" fairly, and on a level-playing field, Mattel

7  has, instead, taken a more expeditious approach, resorting to unfair and anti-

8  competitive business practices. Wielding its substantial clout and influence in the

9  toy industry, Mattel has tried to muscle MGA out of business. MGA is informed

10  and believes that Mattel has intimidated, coerced and threatened retailers, licensees,

11  suppliers and others in the industry – both in the U.S. and internationally – in order

12  to inhibit and stifle MGA's ability to compete with Mattel and to prevent MGA

13  from obtaining licensees, contracts and supplies for its products. Mattel has also

14  serially imitated and copy-catted the look of MGA products, trade dress,

15  trademarks, themes, ideas, advertising and packaging, including for the "BRATZ"

16  line of dolls. MGA brings this action to stop Mattel's tortious, unfair and anti-

17  competitive conduct and to recover the extensive damage that Mattel's illicit

18  behavior has caused, and continues to cause, MGA. Mattel's own website states:

19  "As the global leader in the toy industry, we believe that how we achieve success is

20  just as important as the success itself." It also proclaims that "unwavering integrity

21  defines our corporate culture on every level, guiding how we work and how we do

22  business." Mattel's own corporate governance standards require it to "play by the

23  rules," complete fairly and be a good corporate citizen. Mattel's actions, however,

24  speak louder than its words.

25

26

27

28

3

EXHIBIT _____3_____

PAGE _____28_____

**Mattel History and Performance**

10.    Mattel is the world's largest toy company, but it owes its immense
success chiefly to a single product: "Barbie." Since her debut in 1959, "Barbie"
has been the fuel for Mattel's growth and success, turning Mattel into an
international powerhouse. By the late 1990's, Mattel's annual sales of the doll
approached or topped $1.8 billion and Mattel stock reached a record high of
approximately $45.00 a share. At that time, the average American girl had eight
"Barbie" dolls, and "Barbie" was the world's best-selling toy.

11.    Mattel's reliance on a single, 40-year old product for as much as 50%
of its business turned out to be a risky business model, however. Resting on its
laurels, Mattel failed to react to the shifting tastes of consumers, changing dynamics
in the industry, and an increasing focus on technologically advanced and interactive
toys. "Barbie's" record sales fell into a tailspin. According to one report, Adrienne
Fontanella, Mattel's "Barbie" brand president, would later be quoted as saying that,
"The world changed very quickly, and we missed a beat. . . Barbie wasn't talking
to girls. She just wasn't hitting it."

12.    Sales began to plunge in 1997, and Mattel began posting a series of net
income losses. In the first quarter of 1998, sales of the "Barbie" brand dropped
17%. This steep slide was followed by another in the second quarter, when sales
fell again, down by 15%. By the end of 1998, Mattel reported an overall 14%
decline in "Barbie" sales for the year and analysts were using words such as
"devastating" and "a catastrophe" to describe Mattel's earnings. The company's
stock fell as much as 27% in a single day. "Barbie" was having a crisis.

13.    Jill Barad, who had taken over as Mattel's chairman and chief
executive in January 1997, at the height of Mattel's success, had to do something
fast. Instead of focusing on and investing in new product development, however,
Mattel embarked on a series of acquisitions that
were seemingly aimed at quickly diversifying the company's product line and

4

EXHIBIT _____ 3

PAGE _____ 29

1   reducing its reliance on "Barbie" and on traditional retailers, such as Toys-R-Us

2   and Wal-Mart. Mattel spent a reported $881 million in March 1997 to purchase

3   Tyco Toys and acquire the "Matchbox" toy car brand. Just more than a year later,

4   it spent $700 million for the Pleasant Co., a mail-order doll company and maker of

5   the "American Girl" doll collection. And in December 1998, Mattel announced

6   plans to fork out a monumental $3.5 billion to buy the Learning Company,

7   followed quickly by Mattel's purchase, in March 1999, of a software company,

8   Purple Moon.

9       14.     Despite these acquisitions, the company continued to struggle. The

10  retail environment and buying patterns had unquestionably changed, but Mattel had

11  not kept up. Despite Mattel's feverish acquisitions, Mattel's mainstay and primary

12  profit-generator was still "Barbie." But "Barbie" had grown stale, and sales

13  languished. Posting additional losses in the first quarter of 1999, Mattel announced

14  that it would lay off 3,000 employees – 10% of its work force.

15      15.     Mattel's stock plummeted again in late 1999, dropping 30% on

16  Mattel's announcement that it would fall as much as 55% short of analysts' earning

17  estimates for the third quarter. Mattel blamed its troubles primarily on its

18  expensive, $3.5 billion acquisition of the Learning Company, which had turned out

19  to be a disaster fraught with licensing and distribution problems, bad debt, high

20  product returns and high advertising costs.

21      16.     By early 2000, Mattel's stock had crashed to as low as $8 per share,

22  and some analysts considered Mattel vulnerable to a takeover. Investors clamored

23  for Ms. Barad's resignation, and got their wish.

24      17.     Jill Barad resigned from Mattel in February 2000.

25      18.     For three months, the company was without a permanent chief

26  executive until Robert Eckert took the helm in May 2000. Mr. Eckert had spent 23

27  years at Kraft Foods, a subsidiary of Altria Group, Inc., and was widely credited

28

5

EXHIBIT ___3___

PAGE _____30_____

1  with reviving its ailing cheese business. Investors looked for him to do the same
2  for Mattel.

3      19.     Upon his arrival at Mattel, Mr. Eckert's promise, according to *Wall*
4  *Street Journal* reports, was to deliver a "leaner and meaner" Mattel.

5      20.     The "leaner" Mattel came quickly. Mr. Eckert laid off hundreds,
6  closed factories in the United States, shipped production to Mexico, and sold off the
7  Learning Company at a fraction of what Mattel had paid for it. It helped Mattel's
8  bottom-line, but did nothing to spur sales growth. Even under Mr. Eckert's "leaner
9  meaner" leadership, domestic "Barbie" sales remained in a slump into 2001. In an
10 industry that had become increasingly driven by consumer whims and fads, and the
11 hot, must-have toys of the moment, Mattel remained disinterested in devoting its
12 resources to searching for or developing a new blockbuster toy. Mr. Eckert's
13 business plan was not to diversify, but to build upon and expand sales of its existing
14 brands. Mattel was, after all, still generating billions in revenue despite the decline
15 of "Barbie." And so, Mattel remained committed to its age-worn icon and its two
16 other core brands, Fisher-Price and Hot Wheels, with each of the three accounting
17 for approximately a third of the company's sales.

18     21.     Then came the competition – MGA's "BRATZ".

19

20 **"BRATZ" Dolls Revolutionize The Fashion Doll Market**

21     22.     "BRATZ" challenged "Barbie's" half-century domination of the
22 fashion-doll market like nothing ever before had been able to do.

23     23.     MGA unveiled a preliminary sample of the "BRATZ" doll at the Hong
24 Kong Toy Fair in January 2001, while continuing to finalize the product throughout
25 that spring. Finished products were first shipped in May 2001. MGA introduced
26 the line to consumers in June 2001.

27

28

EXHIBIT ___3___

PAGE ____31___

24.    Unlike "Barbie" dolls, the "BRATZ" line of dolls and branded products sported a hip, multi-ethnic urban look that appealed to contemporary teenage and pre-teen girls.

### MGA's "BRATZ"



25.    At approximately 9.5 to 10 inches tall, the "BRATZ" dolls were intentionally shorter than "Barbie" dolls and looked like no other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which requires a stand), and up-to-date fashions.

7

EXHIBIT ____3____

PAGE ____32____

26.   Indeed, the classic "Barbie" look was nowhere to be seen in these dolls; they would never be confused with "Barbie".

**MGA's "BRATZ"**        **Mattel's "Barbie"**



27.   Featuring and embodying the slogan "The Girls With a Passion for Fashion!", "BRATZ" dolls revitalized, transformed and expanded the fashion doll market, in particular proving popular among "tween" age girls – those between childhood and adolescence – who had been all but abandoned as a market by Mattel.

28.   The "BRATZ" line – with its unique and distinctive look – is well recognized and has been critically acclaimed and praised by consumers, retailers and toy industry analysts alike.  In 2001, the "BRATZ" line won the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award.  In 2002, the "BRATZ" line again won the TIA People's Choice Toy of the Year Award and the Family Fun Toy of the Year Award.  LIMA, the licensing industry's official arm, awarded MGA's "BRATZ" the best character license of the year as well as the overall best licensed property of the year for 2003.  MGA's "BRATZ" also earned the coveted TIA "Property of the Year" and "Girl Toy of the Year" for 2003, as well as the Family Fun Toy of the Year Award.  MSNBC named "BRATZ" the "Hottest Toy of the Year," and both MGA and "BRATZ" received several other accolades in

8

EXHIBIT ___3___

PAGE ___33___

1   2004, including the Suppliers Performance Award by Retail Category (the
2   "SPARC" award) in the Girls' Toys category sponsored by DSN Retailing
3   Today/Apparel Merchandising.

4       29.    Although but a tiny fraction of Mattel's size, with "BRATZ", MGA
5   was able to chip away at Mattel's stranglehold on the fashion doll market, gaining
6   shelf space and market share as "Barbie" sales remained flat or, at times, declined.

7       30.    The competition that MGA (once a licensee of Mattel!) and "BRATZ"
8   posed to Mattel was unexpected and unwelcomed by Mattel. Where "Barbie" had
9   once enjoyed a 90% share of the fashion doll market in 1997, that share had already
10  slipped to 85% or less by the time of the release of "BRATZ". With the company
11  still struggling under Mr. Eckert to overcome prior years of declining sales and
12  mounting debt, "Barbie," Mattel -- and Mr. Eckert -- simply could not afford the
13  untimely competition. Mr. Eckert's "leaner" Mattel was not enough to battle more
14  potential erosion in "Barbie's" market share. Mattel had to combat "BRATZ" and
15  MGA, and in the process revealed Mr. Eckert's "meaner" Mattel.

16

17  **Mattel's Response to "BRATZ" and Efforts to Thwart MGA's Competition**

18      31.    Mattel was not poised to nimbly respond to "BRATZ" with a new,
19  creative product of its own – indeed, it had been antithetical to Mattel's corporate
20  culture and mentality for Mattel to even conceive that a product might vie for shelf
21  space with "Barbie", let alone be available for sale to consumers mere months after
22  first being shown to retailers. Mattel had to take a more expeditious route.

23      32.    Instead of fairly competing, Mattel waged war against MGA using a
24  wide-array of tortious, unfair and anti-competitive practices including systematic,
25  serial copycatting and intellectual property infringement, aided by intimidation,
26  threats and other acts of unfair competition and anti-competitive conduct, all with
27  one goal in mind – to banish MGA from the market – or minimize its ability to
28  capture any meaningful share before it could do any real harm to Mattel.

9

EXHIBIT ___3___

PAGE ____34____

**Mattel's serial copycatting and intellectual property infringement**

33.    Mattel's serial copycatting of MGA's product lines began with the "BRATZ" dolls themselves, but quickly extended to MGA's packaging, themes, accessories, advertising and even other product lines.

34.    The first four "BRATZ" dolls that MGA launched in 2001, named Jade, Yasmin, Cloe and Sasha, met their wannabe "BRATZ PACK" members in October 2002 with Mattel's launch of three "My Scene" dolls named Madison, Chelsea and "Barbie." This was no ordinary "Barbie", however. Indeed, not even close. Mattel designed its "My Scene" dolls to evoke the unique and distinctive look of the "BRATZ" – also with disproportionately oversized heads, artfully made-up almond-shaped eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and over-sized feet.

**Mattel's Traditional "Barbie"**          **Mattel's "My Scene" Doll**



circa 2002          circa 2004

35. These confusingly similar "BRATZ" imitators may have been originally intended to buy Mattel time while it worked to release another product the following summer, called "Flavas". MGA's founder, Isaac Larian, was quoted by the media as having predicted that the move would backfire on Mattel, and it did. Released in July 2003, Mattel's "Flavas" dolls took the urban, "hip-hop" look too far, and were widely viewed as portraying a trampy, "bad-girl" image. The dolls were not well-received, and rumor has it that Mattel had to sell them at below cost prices to get rid of inventory. Most apparently wound up in discount bins, and Mattel has seemingly abandoned the line.

36. Realizing that "My Scene" was its best bet for riding MGA's successful coattails and capitalizing on the unique and inherently distinctive look that MGA had developed in its "BRATZ" dolls – and MGA's substantial goodwill -- Mattel has systematically proceeded to modify the "My Scene" dolls since their original release, particularly their eyes, to increase their similarity to "BRATZ" more and more over time.

37. Indeed, when Mattel found out that its initial line of "My Scene" dolls had trouble competing with "BRATZ", they simply *became* "BRATZ", in every version, whether blonde, brunette or African American. A few pictures here are worth a thousand words.

### BLONDE

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |

  

11

EXHIBIT ___3___

PAGE ___36___

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Mattel's Traditional "Barbie"**



**Mattel's Original "My Scene"**



**Mattel's Recent "My Scene"**



**BRUNETTE**

**Mattel's Traditional "Theresa"**



**Mattel's Original "My Scene"**





**Mattel's Recent "My Scene"**





12

EXHIBIT ___3___

PAGE _____37_____

## AFRICAN AMERICAN

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|

38.   The original "My Scene" eye, as shown here, for example, has recently turned into a virtual carbon-copy of the "BRATZ" eye.

### Original Mattel "My Scene" Eye

 

13

EXHIBIT ___ 3

PAGE _____ 38

39.     The "My Scene" eye pictured above, for instance, has lashes that radiate almost straight out, circumferentially, from the eyelids and, although the eye is more almond shaped than a "Barbie" eye, the eye is not so sleepy and heavy lidded as a "BRATZ" eye and is only lightly shadowed. The new "My Scene" eye, in contrast, is dramatically more similar to a "BRATZ" eye, as shown below in a side-by-side comparison. The doe-eyed innocent look of the "My Scene" eye shown above is gone; replaced with a sultrier look, characteristic of "BRATZ." The new "My Scene" eye, as shown below, boasts lashes that sweep out and away from the outer corner of the eye, just like the "BRATZ" eye. The new "My Scene" eye is also more heavy lidded and thickly lined, and the make-up is more markedly pronounced and dramatic.

**MGA's "BRATZ" Eye**              **New Mattel "My Scene" Eye**

          

40.     Indeed, the progression of the "My Scene" eye, as it has departed from "Barbie" and edged closer and closer to "BRATZ", is readily apparent from virtually every angle, as shown here:

14

EXHIBIT ___3___

PAGE ___39___



**BLONDE**

Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene"

**BRUNETTE**

Mattel's Traditional "Theresa" | Mattel's Original "My Scene" | Mattel's Recent "My Scene"

15

EXHIBIT ___3___

PAGE ___40___



**Mattel's Traditional "Theresa"**

**Mattel's Original "My Scene"**

**Mattel's Recent "My Scene"**

**AFRICAN AMERICAN**

**Mattel's Traditional "Barbie"**

**Mattel's Original "My Scene"**

**Mattel's Recent "My Scene"**

16

EXHIBIT _____3_____

PAGE _____41_____

41.    Mattel has not stopped at the eyes, however.  Mattel has also incrementally but steadily modified its "My Scene" packaging, and the manner in which the dolls are displayed, to more closely mimic the packaging, trade-dress and overall look and total image of MGA's "BRATZ".

42.    To illustrate, Mattel's "My Scene" dolls were initially marketed like this:

### Mattel's Early "My Scene" Packaging

 

43.    Little by little, however, the packaging has changed, creeping ever closer and closer to the open and transparent style of the "BRATZ" packaging. First, the panels seen running down each side of the front of the "My Scene" box shown above, framing the doll and giving the packaging a closed-in look, were changed as shown here:

### Intermediate Mattel "My Scene" Packaging



17

EXHIBIT ___3___

PAGE _____42_____

44.    Mattel replaced this intermediate packaging style with another that looked even more similar to the "BRATZ" packaging, as shown here in a side-by-side comparison:

**MGA's "BRATZ"**
**"Wintertime Wonderland" Packaging**



**Mattel's "My Scene"**
**"Chillin' Out" Packaging**



45.    Then later, Mattel changed its packaging and product display yet again to look even more closely and confusingly similar to MGA's packaging and "*tout ensemble*," as shown here

**MGA's "BRATZ"**
**"SPORTZ" Packaging**



**Mattel's Recent "My Scene"**
**"MIAMI GETAWAY" Packaging**



18

EXHIBIT _3_

PAGE _43_

46.   In this incarnation, Mattel notably abandoned the signature figure-eight style design that had appeared on its prior "My Scene" packaging, making this recent version clearer and more transparent on the front and sides than ever before, and much more like "BRATZ", accordingly.  Mattel also discarded its traditional, rectangular shaped box and, like "BRATZ", adopted an unusual, non-rectangular shaped box.  Mattel even adopted the "flying banner" ribbon-style slogan running across the middle of the box, similar to that used on the "BRATZ" packaging.

47.   As if these pointed and deliberate efforts to confuse and mislead consumers were not enough, Mattel exacerbated the confusion, and furthered the impression that the "My Scene" line and the "BRATZ" line are related, by taking up MGA's practice of regularly releasing new dolls in connection with a theme – but not just *any* theme, often *MGA's theme.*

48.   For example, when MGA released its "Wintertime Wonderland" theme in Fall 2003, Mattel released its "Chillin Out!" theme.  Each doll in MGA's line came with winter-sports accessories, such as a snowboard or skis and ski boots.  Each doll in Mattel's line featured winter sports accessories, also including snowboards or ski and ski boots.  Even MGA's color schemes and some of the clothing styles seemed to have made their way into the Mattel products.

49.   When MGA released its "Formal Funk" theme, Mattel released its "Night on the Town" theme.  "BRATZ Formal Funk" was an elaborately themed line with its dolls in hip formalwear; so was Mattel's "Night on the Town."

50.   When MGA released its distinctive "Sun-Kissed Summer" theme, Mattel released its confusingly similar "Jammin' in Jamaica" theme.  Each line featured a bright blue-and-orange color scheme, beach accessories, such as surfboards, and beachwear clothing.  Mattel's "Jammin' in Jamaica" "Guava Gulch Tiki Lounge" playset also contained elements remarkably similar to MGA's "Sun-Kissed Summer" playset.

19

EXHIBIT _____3_____

PAGE _____44_____

51. Mattel also began running television commercials for its "My Scene" dolls bearing a remarkable similarity to "BRATZ" commercials, combining live action with animated sequences set to similar sounding pop music and lyrics.

52. Mattel even stooped so low as to mimic "BRATZ" accessories and related products in order to further create consumer confusion in the marketplace.

53. For instance, when MGA came up with its distinctive "BRATZ" "Runway Disco", Mattel came out with a "My Scene" Sound Lounge with packaging that imitated MGA's trapezoidal box.

54. Mattel's conduct cannot be explained by sheer coincidence, nor is it merely fair competition. It is a calculated and intentional effort unquestionably designed to trade off of MGA's hard work and goodwill, create confusion in the marketplace, steal MGA's thunder and momentum, and dilute and blur away the novelty and distinctiveness of MGA's products. Out of the seemingly endless possibilities that Mattel could have chosen for a new line of dolls, packaging, themes, color schemes, commercials, accessories and playsets, Mattel deliberately chose *not* to come out with something unique, new or different and has, instead, focused its efforts and resources on flooding the market with something so close to "BRATZ" that the public will, can, and does, simply mistake it for "BRATZ".

55. As yet another example of this, when MGA came out with a "BRATZ" "Funky Fashion Makeover Head," Mattel came out with a confusingly similar -- indeed, practically identical – "My Scene" styling head.

20

EXHIBIT ___3___

PAGE ___45___

| | |
|---|---|
| 1 | MGA's "BRATZ" | Mattel's "My Scene" |
| 2 | "Funky Fashion Makeover Head" | "Stylin' Head" |

**MGA's "BRATZ"**
**"Funky Fashion Makeover Head"**

**Mattel's "My Scene"**
**"Stylin' Head"**

   

   

56.   Indeed, Mattel's "My Scene" styling head is so close to the "BRATZ" styling head that even the press have mistakenly pictured and identified it as MGA's "BRATZ".  The picture of Mattel's "My Scene" styling head shown below, for instance, appeared in the press with a caption indicating that the child was trying out different hairstyles "on a *Bratz* hair and makeup doll head."

Hairstyle practice



21

EXHIBIT ___3___

PAGE ___46___

57.   Creating further confusion, Mattel's television commercial for its "My Scene" styling head was like watching a re-run of MGA's commercial for its "Funky Fashion Makeover Head".

58.   At one point in time, Mattel also used a portion of the "BRATZ" dolls' now-famous trademarked tag line "The Girls With a Passion for Fashion" on Mattel's' website for its "Diva Starz" dolls, asking its website users:  "Do you have a passion for fashion?"

59.   Mattel has even recently come out with a confusingly similar line of "My Scene" plush pets, which adopt the distinctive look of MGA's "BRATZ" line. The "My Scene" pets feature large, humanlike eyes and wear clothing making them remarkably and confusingly similar to "BRATZ" products, including "BRATZ PETZ", as seen in this example where the pets each wear a jacket, a cap and carry a purse:

**MGA's "BRATZ Dogz"**          **Mattel's "My Scene" dog**

          

60.   And here too, Mattel chose to package its pets the same way that MGA packaged its "BRATZ PETZ", sitting in an open box, with no top and with partial side panels that slope from a narrow front panel to a higher back panel.

61.   Indeed, the similarity of the "My Scene" pets to "BRATZ PETZ" has confused even sophisticated retailers who have mistakenly merchandised "My Scene" dogs in the middle of the "BRATZ" section of a retail display, next to and as if they were part of MGA's "BRATZ Petz" line.  It comes as no surprise that

22

EXHIBIT ____3____

PAGE ____47____

1  customers too have been confused.

2      62.   Indeed, Mattel's television commercials and "My Scene" products
3  have become so confusingly similar to MGA's that even advertising executives
4  have expressed concern. One went so far as to say that although imitation is the
5  best form of flattery, what the individual had seen at Mattel's showroom, and how
6  its "My Scene" dolls now look so confusingly similar to "BRATZ", was
7  "shocking." This person further opined that it was clear that Mattel is intending to
8  confuse customers and capture "BRATZ" market share, and even asked MGA if it
9  was considering legal action.

10      63.   The press also has taken notice of Mattel's attempts to confuse
11  consumers. On or about February 18, 2005, a visitor to MGA's showroom from a
12  prominent news publication stated, "Oh my, I just came from Mattel's showroom
13  and their new 'My Scene' packaging is just like 'BRATZ' minus the handle."
14  Another member of the press visiting MGA's showroom offered the unsolicited
15  comment, "have you seen the new 'My Scene' dolls eyes are exactly like
16  'BRATZ'?" Yet another opined that Mattel's "My Scene" line was exactly like
17  "BRATZ", indeed, so much so that the reporter confusingly thought that Mattel had
18  bought "BRATZ", and still another has commented on Mattel's imitation of MGA.
19  On or about February 16, 2005, during an interview of a Mattel representative on
20  local network news in New York, "My Scene Barbie" was displayed by a Mattel
21  representative. During conversation about the dolls, the interviewer exclaimed that
22  they looked like "BRATZ". The Mattel representative just laughed – but this is no
23  laughing matter. This colloquy was available for replay and viewing, and was even
24  transcribed, on the internet.

25      64.   Customers too have been similarly confused. Some actually contacted
26  MGA seeking to purchase "My Scene" dolls.

27      65.   Mattel's conduct is planned, deliberate and intentional. Mattel has
28  systematically, copied, imitated and liberally borrowed many of the distinctive,

EXHIBIT _____3_____

PAGE _____48_____

1  essential elements that identify and make "BRATZ" dolls "BRATZ" dolls, diluting

2  the brand, creating customer confusion, and unfairly stifling competition.

3      66.   Ironically, Mattel sued one of its other competitors in Europe for doing

4  much the same thing: "systematically copying and borrowing elements" from "My

5  Scene", on grounds that "this conduct constitutes unfair competition and passing

6  off." Indeed it does.

7      67.   What is more, Mattel's conduct has reached beyond "BRATZ" and

8  "BRATZ"-related products to include other new MGA toy lines.

9      68.   For example, MGA's "4-Ever Best Friends" line was the obvious, and

10  well-recognized model for Mattel's "Wee 3 Friends" line. Mattel even adopted

11  changes to the color scheme of its similarly-shaped packaging to create confusion

12  with MGA's distinctive packaging.

13

14  **MGA's "4-Ever Best Friends"**    **Mattel's "Wee 3 Friends"**







24

EXHIBIT _3_

PAGE _49_

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

69.   In the second half of 2002, MGA's "Mommy's Little Patient," originally designed as the first in a series of "Mommy's Little . . ." dolls, was followed by Mattel's "Little Mommy" doll.

| **MGA's**<br>**"Mommy's Little Patient"** | **Mattel's**<br>**"Little Mommy Potty Training Baby Doll"** |
| --- | --- |
|  |  |

70.   Sparing nothing, Mattel has also extended its monkey-see monkey-do behavior into its boys' line.  When MGA came out with its "Alien Racers" line of toy racing vehicles, for instance, Mattel rushed to revamp and rename one of its "Hot Wheels" lines.  Although well-known and clearly branded for decades as "Hot Wheels", Mattel's answer to MGA's "Alien Racers" was to re-brand and market its Hot Wheels Highway 35 line under an "AcceleRacerS" logo.  MGA's line consists of "extreme" radio controlled racing vehicles marketed in connection with a strong, almost battle-like, science fiction theme.  MGA's logo accentuates the "A", "R", and "S" in compressed block lettering.  Mattel's line also consists of extreme racing vehicles marketed in connection with a strong, almost battle-like, theme.  Mattel's logo too accentuates the "A", "R", and "S" in compressed block lettering.

25

EXHIBIT ____3____

PAGE ____50____

71.    Here, too, Mattel's mimicry has spilled over into Mattel's advertising and thematic presentation and marketing of this toy line.  In particular, Mattel has adopted MGA's "other-worldly" theme in its commercials.  For instance, in Mattel's commercials, the product, whose logo appears as "AcceleRacerS", now compete against alien-like Cyborgs engaged in a "race to save the world," mimicking MGA's alien theme and commercials in which MGA's "Alien Racers" are engaged in a "race to save the universe."

72.    None of this is coincidence.  Mattel has deliberately adopted a pattern and practice of coming out with variations of MGA's products to create confusion in the marketplace, interfere with MGA's business and divert profits away from MGA.  Mattel says, on its website, that it is in the business of creating "[t]he world's premier toy brands [of] today and tomorrow."  It seemingly does so, however, by borrowing liberally from its competitors, even when it refreshes its own existing brands and products.

73.    MGA has suffered extensive injury from Mattel's conduct.  Mattel's habitual, serial simulation of MGA's products, product lines and trade dress has allowed Mattel to take a free ride on the extensive amount of time, expense and creative development MGA expends on developing new products, product packaging and presentation, giving Mattel an unfair advantage, and making it virtually impossible for MGA to compete with Mattel on a level playing field.

**Mattel's additional unfair, manipulative, anti-competitive conduct**

74.    This already substantial injury has been exacerbated by the strong-arm tactics, and other illegitimate, unfair and anti-competitive means that Mattel has used to manipulate the market and ensure that its control and domination of the industry can continue unabated.

26

EXHIBIT ____ 3
PAGE _____ 51

75.    For example, wielding the litigation privilege as a potential shield for intimidating conduct, Mattel has sent threatening letters to several of its former employees who now work for MGA warning them not to disclose *even publicly available information* about Mattel, including the names and positions of Mattel employees.  Mattel even went so far as to sue one of its former senior executives, after he had the temerity to resign and join MGA in October 2004.  Not only was Mattel's lawsuit dismissed for failure to state a viable claim, but Mattel thereafter seemingly could not muster up a shred of evidence sufficient to support an amended complaint.  As a result, Mattel's case against its former executive was dismissed with prejudice.

76.    Mattel has also warned a number of companies, including the biggest publishing entity in the United Kingdom, not to license MGA products, or risk retribution.  The threats are not idle.  In May 2004, Mattel terminated one of its licensees, apparently in retribution for licensing "BRATZ".  While some companies have been courageous enough to take the risk, others have not, and MGA has lost valuable licensing opportunities as a result.

77.    Mattel has used similar intimidation to pressure distributors and retailers, particularly in foreign countries, not to distribute "BRATZ", to reduce shelf and display space for "BRATZ" and to place "BRATZ" in unfavorable locations at retail outlets.

78.    When MGA faced a shortage of doll hair in October 2002, MGA is informed and believes that the reason for that shortage was that Mattel had locked MGA out by buying up the supply from the two main hair supply companies.

79.    Mattel has also manipulated the retail market.  For instance, Mattel merchandisers have been caught tampering with MGA's retail displays, replacing favorably located MGA merchandise with Mattel merchandise instead.  MGA is also informed and believes that Mattel has falsely told a major United States retailer that MGA was giving another major United States retailer below-market pricing

27

EXHIBIT ___3___

PAGE ___52___

1   and falsely told a United Kingdom retailer that MGA was discontinuing one of its

2   lines, in order to make such line less attractive to buyers and thereby attempt to

3   increase sales of the competitive Mattel product and improve its own sales, at

4   MGA's expense.

5       80.   Even supposedly unbiased and impartial industry organizations have

6   fallen prey to Mattel's abusive wield of power, to MGA's detriment.

7       81.   NPD Funworld ("NPD"), for one, is the leading supplier of sales

8   statistics in the toy industry. Accurate NPD statistics are essential for efficient

9   product-line management. Without these statistics, it is difficult, if not impossible,

10  for toy companies to assess and measure the relative success of their products in

11  key categories. It is, however, a subscription service, and NPD restricts the manner

12  in which its subscribers may use the data it provides.

13      82.   Mattel has regularly ignored the restrictions – using NPD data about

14  Mattel's comparative standing relative to other companies in press releases and in

15  communications with retailers and financial investors who are not NPD subscribers.

16      83.   Mattel generates substantially more annual subscription revenue for

17  NPD than does MGA, and carries more clout.

18      84.   After MGA had subscribed to the service for more than 12 years, NPD

19  terminated MGA's subscription in 2003 theoretically on the grounds that MGA

20  misused NPD data in a press release.

21      85.   MGA is informed and believes that the termination was the result of

22  pressure from Mattel, notwithstanding Mattel's own frequent violations of NPD's

23  restrictions.

24      86.   In addition to this, the market share numbers that NPD generates are

25  heavily dependent on the category in which NPD places a particular product. MGA

26  is informed and believes that Mattel also pressured NPD into changing certain

27  product classifications for its "BRATZ" products in order to manipulate the data

28

28

EXHIBIT ___3___

PAGE ___53___

1   and preserve Mattel's market share rankings in the critical fashion doll category –

2   and thereby lower MGA's.

3       87.    The Children's Advertising Review Unit ("CARU") is another

4   organization that, upon information and belief, appears to have been subject to

5   improper influence by Mattel.  CARU is the toy industry's supposedly independent

6   self-regulatory body in charge of maintaining standards in advertising.  CARU's

7   approval is considered critical within the toy industry to avoiding regulatory action

8   by the Federal Trade Commission.

9       88.    CARU is heavily subsidized by Mattel.

10      89.    Upon information and belief, Mattel has used its influence as a major

11  contributor to CARU's budget to induce CARU to place onerous restrictions on

12  MGA advertisements, and require MGA to amend aspects of commercials that have

13  gone unchallenged in other parties' commercials.

14      90.    As a result of CARU's restrictions, MGA has been forced to incur

15  unnecessary costs for reshooting and producing or re-editing its commercials.

16      91.    On several occasions, CARU has also either strongly suggested, if not

17  also required, that MGA respond to inquiries about its website policies and make

18  substantial changes to the "BRATZ" website notably and significantly in excess of

19  restrictions imposed on Mattel and others.

20      92.    Even TIA, the toy industry's trade association, is apparently not

21  untainted by Mattel's influence and power.  Each year, TIA presents the Toy-of-

22  the-Year Awards, the most prestigious of which had been the award for Toy of the

23  Year.  Winning the Toy of the Year Award is a significant achievement that not

24  only very likely increases the sales of the winning toy, but also denotes the winning

25  company as a leader in toy innovation and generates substantial goodwill with

26  retailers, distributors, licensees, and customers.

27      93.    For the years 2000 (the first year of the award), 2001 and 2002, the

28  Toy of the Year award was chosen by consumer vote.  The awards ceremony was

29

EXHIBIT _____3_____

PAGE _____54_____

1   then held the following year, at a dinner in New York. (For example, the awards
2   dinner for the year 2000 award was held in February 2001). Leap Frog won the
3   2000 People's Choice Toy of the Year Award and MGA won the 2001 and 2002
4   People's Choice Toy of the Year Awards. With the 2003 Toy of the Year Award,
5   however, the rules suddenly changed. Now, the award is selected by members of
6   the industry.

7   94.   Upon information and belief, this change was orchestrated by a Fisher
8   Price (a Mattel subsidiary) executive who, until recently, served as the Chairman of
9   TIA.

10   95.   Perhaps not surprisingly given this change in the winner selection
11   procedures, "Hokey Pokey Elmo" ("Elmo"), a Fisher Price toy, won for the year
12   2003 (awarded in 2004), beating out the other leading nominee, "BRATZ Formal
13   Funk Super Stylin' Runway Disco."

14   96.   TIA has refused to provide MGA with the vote count procedure and
15   totals for this award, despite repeated requests.

16   97.   MGA is also informed and believes that Mattel was instrumental in
17   attempting to keep MGA from participating as a sponsor in this year's "Kids'
18   Choice Awards."

19   98.   Mattel has clearly engaged in tortious, illegal and unethical behavior in
20   its unfettered efforts to disrupt, if not destroy, MGA. Indeed, this is apparently
21   Mattel's current *modus operandi* when it comes to "competing" in the industry.
22   The once immensely successful "LeapFrog" interactive learning product, for
23   example, has apparently been one of Mattel's other recent victims.

24   99.   Mattel may not shield its illegal, unfair and unethical business practices
25   from the public eye. It is time for the truth to be told, and the world to know of
26   Mattel's unfair, unethical and illegal business practices and unfair competition.
27   "Barbie" does not "play nice" with others (particularly her competitors), and needs
28   to be taught how "to share" (at least in the fashion doll marketplace). She cannot be

30

EXHIBIT ___3___

PAGE ___55___

1   allowed to continue to be the playground bully and trample on the rights of others,

2   including MGA.

3      100.   As a result of Mattel's manipulative, illegal, unfair, unethical and anti-

4   competitive conduct, MGA has suffered and, unless abated, will continue to suffer

5   lost sales, lost licensing fees, lost contracts, lost relationships, lost business

6   opportunities and other damages and harm for which there is no adequate remedy at

7   law. Its ability to enter new markets and product lines has been hampered and

8   delayed. Its production costs have increased, its reputation and relationships with

9   important players in the industry have been negatively impacted, the value of its

10  business has been diminished, and its ability to attract, hire and retain employees

11  has been affected.

12

13              **FIRST CLAIM FOR RELIEF**

14  **(False Designation of Origin or Affiliation in Violation of 15 U.S.C. § 1125 (a))**

15     101.   MGA repeats and realleges the allegations contained in paragraphs 1

16  through 100 of this Complaint and incorporates them by reference as though fully

17  and completely set forth herein.

18     102.   MGA's "BRATZ" line has a unique and distinctive style and

19  distinctive characteristics, such as the disproportionately large head, large dramatic

20  eyes with a distinctive presentation (including the eye shape, make-up and lashes),

21  pouty, plump lips with a distinctive presentation (including the lip shape and make-

22  up), small, thin bodies, oversized feet, and up-to-date fashions. MGA's "BRATZ"

23  line is known for and recognized by the total image that is presented by its product

24  and the style and arrangement of the packaging and display. This "*tout ensemble*"

25  is representatively described and depicted herein. The characteristics of MGA's

26  "BRATZ" line, alone or in combination, have come to identify the "BRATZ" line

27  and its source, MGA, and thus serve as protectable trade dress. MGA's trade dress

28  in its "BRATZ" line is purely aesthetic and non-functional or, if any utility exists, it

31

EXHIBIT ___3___

PAGE ___56___

1   is not essential to the purpose, quality or source identifying attributes of the

2   aesthetics. MGA's trade dress in its "BRATZ" line is inherently distinctive or has

3   acquired distinction within the meaning of the Lanham Act.

4       103. Similarly, MGA's "BRATZ PETZ," part of the "BRATZ" line, also

5   has its own unique and distinctive characteristics, such as the humanlike eye and

6   unusual appearance of the animals dressed in clothing. MGA's "BRATZ PETZ"

7   line has become known for and recognized by the total image that is presented by

8   the product and the style and arrangement of its packaging. This *tout ensemble* is

9   representatively described and depicted herein. The characteristics of MGA's

10  "BRATZ PETZ", alone or in combination, have come to identify the "BRATZ

11  PETZ" line and its source, MGA, and thus serve as protectable trade dress. MGA's

12  trade dress in its "BRATZ PETZ" line is purely aesthetic and non-functional or, if

13  any utility exists, it is not essential to the purpose, quality or source identifying

14  attributes of the aesthetics. MGA's trade dress in its "BRATZ PETZ" line is

15  inherently distinctive or has acquired distinction within the meaning of the Lanham

16  Act.

17      104. Mattel's production, sale and marketing of "My Scene" dolls,

18  including styling heads and doll heads, and "My Scene" pets that are confusingly

19  similar to MGA's "BRATZ" line (including its "BRATZ PETZ"), without MGA's

20  permission or consent, constitutes designation and use of a term, symbol, device or

21  combination thereof that is false or misleading within the meaning of 15 U.S.C.

22  Section 1125 and is likely to cause confusion, or to cause mistake, or to deceive as

23  to the affiliation, connection, or association, or as to the origin, sponsorship, or

24  approval of Mattel's goods or commercial activities, within the meaning of 15

25  U.S.C. Section 1125. MGA has been damaged by Mattel's acts.

26      105. Mattel's conduct has been intentional and willful, and is calculated

27  specifically to trade off the goodwill that MGA has developed in its successful

28  "BRATZ" line. By its aforesaid acts, particularly its imitation of the distinctive

32

EXHIBIT _____3_____

PAGE _____57_____

features of MGA's "BRATZ" line in connection with goods sold and distributed in interstate commerce, Mattel has infringed and is likely to continue to infringe on MGA's substantial rights in and to the "BRATZ" line trade dress. In so doing, Mattel has falsely represented and designated to the public generally and consumers of fashion doll products specifically the source and origin of Mattel's "My Scene" fashion doll products in violation of 15 U.S.C. § 1125(a).

106. MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

107. For each act of infringement, MGA is entitled to recover its actual damages as well as Mattel's profits from such infringement.

108. Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's illegal actions have caused and will continue to cause MGA, if not enjoined. MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing infringement of MGA's trade dress.

## SECOND CLAIM FOR RELIEF

### (Unfair Competition in Violation of 15 U.S.C. § 1125 (a) and Unfair Competition and Unfair Business Practices in Violation of Cal. Bus. & Prof. Code § 17200 *et seq.* and California Common Law)

109. MGA repeats and realleges the allegations contained in paragraphs 1 through 108 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

110. Mattel has deliberately and, indeed, repeatedly adopted, imitated and mimicked the make-up, appearance, features, trade dress, and image of MGA's products, packaging and advertising, including its repackaging and refreshing of older Mattel toys. Mattel's actions were and are done with the intent to deceive consumers, cause confusion and mistake, and interfere with the ability of consumers to identify the source of goods by appearance and packaging. By this

33

EXHIBIT ___3___

PAGE ___56___

1  conduct, Mattel pirates and exploits, by subliminal or conscious association with
2  MGA, the goodwill and reputation of MGA and derives benefit therefrom.

3      111.  Mattel has particularly and deliberately poached upon the commercial
4  magnetism of MGA's "BRATZ" and the success of "BRATZ". Mattel's conduct
5  has been intentional and willful, and is calculated specifically to trade off the
6  goodwill that MGA has developed in its successful "BRATZ" line.

7      112.  By its acts, including its intentional imitation of the distinctive features
8  of MGA's "BRATZ" dolls, which has progressively become closer and closer, as
9  well as its imitation of "BRATZ" themes, packaging and the overall look, feel and
10 total image of the "BRATZ" line, imitation of other MGA products, packaging and
11 advertising, and other conduct alleged herein, Mattel has engaged in unfair
12 competition under both federal and California state law.

13     113.  Mattel has also willfully and maliciously used its power, influence and
14 intimidation to threaten certain retailers, suppliers, licensees, distributors and
15 manufacturers so as to limit, if not prevent, MGA from doing business with these
16 retailers, suppliers, licensees, distributors and manufacturers, using its power and
17 influence to intimidate and manipulate industry bodies. Mattel has further used its
18 power and influence to attempt to, if not actually, intimidate and threaten MGA's
19 current and potential employees so as to cause MGA competitive injury.

20     114.  Alone, in combination, or in totality, Mattel's actions discussed and
21 alleged herein constitute unfair competition and unfair business practices within the
22 meaning of federal law, California statutory law and/or California common law.

23     115.  As a result of its conduct, Mattel has derived substantial monetary and
24 non-monetary benefit and business advantage. Mattel has also wrongfully diverted
25 profits away from MGA and to Mattel and, on information and belief, deprived
26 MGA of the patronage of a large number of actual and potential customers.

27     116.  MGA has been damaged by, and Mattel has profited from, Mattel's
28 wrongful conduct in an amount to be proven at trial.

34

EXHIBIT _____3_____

PAGE _____59_____

117.  Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel, and all persons acting in concert with Mattel, from engaging in acts of unfair competition and unfair business practices.

118.  MGA is further entitled to relief whereby Mattel is ordered to pay restitution for damages resulting from Mattel's unfair competition and unfair business practices.

### THIRD CLAIM FOR RELIEF

**(Dilution in Violation of 15 U.S.C. § 1125 (c); Cal. Bus. & Prof. Code § 14330 and California Common Law)**

119.  MGA repeats and realleges the allegations contained in paragraphs 1 through 118 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

120.  The look and trade dress of the MGA products referenced herein are distinctive and famous, and have been since before Mattel launched its similar versions.  By its aforesaid acts, Mattel caused and continues to cause blurring and dilution of the distinctive look of MGA's products and trade dress, which previously served as a unique source identifier for MGA, within the meaning of the Lanham Act, California Business and Professions Code § 14330 and/or California common law.

121.  Mattel's conduct has been intentional and willful, calculated specifically to trade on MGA's goodwill and reputation and to cause dilution of MGA's famous marks, particularly those connected with MGA's famous and successful "BRATZ" doll head, "BRATZ" doll product line, "BRATZ Funky Fashion Makeover Head" and "BRATZ PETZ" line.

122.  MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

35

EXHIBIT ___3___

PAGE ___60___

123. Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined. MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing dilution.

## FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment)

124. MGA repeats and realleges the allegations contained in paragraphs 1 through 123 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

125. As a result of the conduct alleged herein, Mattel has been unjustly enriched to MGA's detriment. MGA seeks a worldwide accounting and disgorgement of all ill-gotten gains·and profits resulting from Mattel's inequitable activities.

## PRAYER FOR RELIEF

WHEREFORE, MGA prays for relief, as follows:

1. That Mattel, its agents, servants and employees and all persons acting in concert be restrained preliminarily and permanently from directly or indirectly:

    a. using confusingly similar trade dress;

    b. improperly influencing, or attempting to improperly influence, standard-setting and industry organizations;

    c. engaging in unfair competition and unfair business practices; and

    d. diluting MGA's trade dress;

2. For general and actual damages, according to proof at trial but believed to reach or exceed tens of millions of dollars;

3. For the disgorgement of all profits derived by Mattel for its acts of:

    a. false designation of origin or affiliation;

36

EXHIBIT ___3___

PAGE ___61___

1           b.     unfair competition and unfair business practices; and

2           c.     dilution;

3       4.    For costs of suit and reasonable attorneys' fees;

4       5.    For punitive and/or exemplary damages as a result of Mattel's willful

5   and malicious conduct to the extent allowable by law; and

6       6.    For such other and further relief as the Court deems just and proper.

7

8   Dated:    April 13, 2005          PATRICIA GLASER

9                                     CHRISTENSEN, MILLER, FINK, JACOBS, GLASER, WEIL & SHAPIRO LLP

10

11                                    DALE M. CENDALI

12                                    DIANA M. TORRES
                                      PAULA E. AMBROSINI
                                      O'MELVENY & MYERS LLP

13

14

15                                    By:

16                                      Diana M. Torres
                                      Attorneys for Plaintiff

17                                    MGA ENTERTAINMENT, INC.

18

19

20

21

22

23

24

25

26

27

28

                                37

EXHIBIT    3

PAGE    62

1

## DEMAND FOR JURY TRIAL

2

3          MGA hereby demands a jury trial on all triable issues.

4

5     Dated:          April 13, 2005                PATRICIA GLASER
                                                    CHRISTENSEN, MILLER, FINK,
6                                                   JACOBS, GLASER, WEIL &
                                                    SHAPIRO LLP

7                                                   DALE M. CENDALI
                                                    DIANA M. TORRES
8                                                   PAULA E. AMBROSINI
                                                    O'MELVENY & MYERS LLP
9

10

11                                                  By:
                                                       Diana M. Torres
12                                                  Attorneys for Plaintiff
                                                    MGA ENTERTAINMENT, INC.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

38

EXHIBIT _____3_____

PAGE _____63_____

# EXHIBIT 4

CALENDARED   RECEIVED

JUN 2 3 2006

**PRIORITY SEND &
ENTER JS-6**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.     CV 05-02727 SGL(RNBx)                          Date: June 19, 2006

Title:     MGA ENTERTAINMENT, INC. -v- MATTEL, INC.
==============================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

           Jim Holmes                          None Present
           Courtroom Deputy                    Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:     ATTORNEYS PRESENT FOR DEFENDANTS:

None present                          None present

PROCEEDINGS:     MINUTE ORDER (IN CHAMBERS) RE CONSOLIDATION

        On May 16, 2006, this Court issued orders to show cause why the following three cases
should not be consolidated: Bryant v. Mattel, Inc., CV 04-09049; Mattel, Inc. v. Bryant, CV 04-
09059; MGA Entertainment, Inc. v. Mattel, Inc., CV 05-02727. All parties have responded, and the
Court has reviewed those responses. Because the Court has determined that these actions
involve a number of common issues of law and fact, the Court orders that these three cases be
consolidated for all purposes.

        Mattel's request that the Court stay MGA Entertainment, Inc. v. Mattel, Inc., CV 05-02727,
pending the outcome of the other two cases. The Court denies this request.

        For ease of record keeping, the Court **ORDERS** that all further documents and proceedings
occur under Bryant v. Mattel, 04-09049 SGL, and that Case Number CV 04-09059 and 05-02727
be **CLOSED** by the Clerk. Counsel are directed to file all further documents under Case Number
CV 04-09049. The first paragraph of any document filed with the Court shall inform the Court to
which case(s) the document relates.

        IT IS SO ORDERED.

MINUTES FORM 90
CIVIL -- GEN

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority ✔   Send ✔
Entered_____   Closed_____
JS-5/JS-6 ✔   JS-2/JS-3_____
Scan Only_____   Docketed on CM_____   /Initials of Deputy Clerk __jh__
_____THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)

JUN 20 2006
EASTERN DIVISION

EXHIBIT _____ 4
PAGE _____ 64

# EXHIBIT 5

CALENDARED

RECEIVED

JAN 16 2007

P-Send

ENTERED
CLERK, U.S. DISTRICT COURT

JAN 12 2006

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION    BY DEPUTY

FILED

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(D).

1
2
3
4
5
6
7

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

8
9
10   CARTER BRYANT,
11                        Plaintiff,
12   v.
13
14   MATTEL, INC.,
15                        Defendant.
16   and related actions.
17
18

CASE NO. CV-04-9049-SGL

(Consolidated with cases CV-04-9059 and CV-05-2727)

ORDER REGARDING MATTEL'S MOTION FOR LEAVE TO AMEND

18       This case has, increasingly, become one of the proverbial tail wagging the
19   proverbial dog.
20       Back in April, 2004, Mattel, Inc., ("Mattel") filed a complaint in Los Angeles
21   County Superior Court against its former employee and the reputed creator of the
22   BRATZ dolls, Carter Bryant.  The complaint pressed five separate state-law
23   theories relating to certain agreements Bryant signed while an employee with
24   Mattel, namely, an Employee Confidential Information and Inventions Agreement
25   ("Inventions Agreement") and a Conflict of Interest Questionnaire ("COI
26   Questionnaire").  Although couched in state law terms and ostensibly pled as a
27   simple employment action, lurking beneath the allegations in the complaint was
28   whether Bryant had either misappropriated Mattel's intellectual property or

EXHIBIT _____5_____

PAGE _____65_____

1-12

1   resources in creating and/or developing the BRATZ dolls or whether he continued
2   to develop his BRATZ design while still working in Mattel's employ.  In either event,
3   the rights to the BRATZ dolls could become the property of Mattel, either through
4   infringement or through operation of the agreements noted above.  The case was
5   later removed to this Court and was assigned the case number CV-04-9059.  MGA
6   Entertainment, Inc. ("MGA"), the maker of the BRATZ doll line, then intervened "to
7   protect its rights to Bratz dolls" that were at stake in the action.  Mattel, Inc. v.
8   Bryant, 446 F.3d 1011, 1012 (9th Cir. 2006); see also id. at 1013 ("Mattel argues, 'a
9   significant risk of prejudice' to MGA [exists] if the ownership of rights to intellectual
10  property, i.e., the Bratz creations, were decided in the absence of MGA").

11       In the interim, Bryant filed a declaratory judgment action in this Court,
12  seeking for the Court to declare that his BRATZ doll creations did not infringe
13  Mattel's copyright in its Toon Teens products.  See Court's July 18, 2006, Order at
14  3 (noting that, although "Bryant's complaint . . . makes reference to 'other Mattel
15  products,' . . . the substance of his allegations all address the product 'Toon
16  Teens'").  The declaratory judgment action was assigned the case number CV-04-
17  9049.

18       MGA then filed an action against Mattel in this Court broadening the scope
19  of the controversy beyond that concerned with the ownership rights to the BRATZ
20  doll line.  MGA's complaint asserted various Lanham Act claims and their California
21  state law equivalent arising out of Mattel's alleged "habitual and unfair tactics of
22  competition-by-intimidation and serial copycatting of MGA's products."  (Compl.
23  ¶ 7).  In essence, although the prior actions were concerned with ownership in the
24  rights to the BRATZ doll line, the allegations in 05-2727 concerned whether there
25  had been unlawful efforts to block the marketing of those rights in the BRATZ dolls.
26  MGA's complaint did make mention of other products that were affected by Mattel's
27  alleged predatory business practices, but by far the largest portion of its complaint
28  concerned Mattel's conduct in undermining (or seeking to undermine) MGA's rival

EXHIBIT __2__ 5

PAGE __66__

1   line of BRATZ dolls.[1]

2          By Order dated June 19, 2006, the Court consolidated all three cases "for all

3   purposes" as they "involve[d] a number of common issues of law and fact." As the

4   Court later noted in its August 10, 2006, Order: "At its heart, this case asks the

5   question: Who owns the rights to the Bratz dolls?" Resolution of this question lies

6   at the heart of or, at the very least, affects many of the other claims set forth in

7   each of the three respective cases. For instance, even though the allegations in

8   05-2727 concern Mattel's alleged efforts at defeating the marketing of the BRATZ

9   dolls, resolution of who owned the rights to the BRATZ dolls could serve to moot

10  many of those allegations. It is hard to imagine how it is unlawful for a company to

11  thwart or otherwise undermine the marketing of a product it owns. Thus, if Mattel

12  owned the rights to the BRATZ dolls, many of the allegations in the 05-2727

13  complaint would become moot. That said, such consolidation did not do away with

14  the distinctions that do exist between the three cases. As the Court highlighted in

15  its consolidation order, when either party files a pleading in the case, "the first

16  paragraph of [that] document . . . shall inform the Court to which case(s) the

17  document relates."

18         On July 18, 2006, the Court dismissed Bryant's declaratory judgment action,

19  04-9049, finding there existed no reasonable apprehension of an imminent

20  copyright infringement claim being filed against him by Mattel based on Mattel's

21  Toon Teen intellectual property. See Court's July 18, 2006, Order at 4. The

22  Court's Order was predicated entirely upon counsel for Mattel's representation

23  during oral argument that it "will not maintain that Bratz infringes the copyright in

24  Toon Teens." Owing to this representation, the Court, in dismissing the declaratory

25  judgment action, made clear that any future "claim by Mattel of copyright

26  _____

27         [1] That the marketing of the BRATZ dolls lies at the heart of the issues
    between the rival doll makers in the 05-2727 case is best illustrated by the Court's
28  discussion of those allegations in its August 26, 2005, Order, Granting in Part and
    Denying Part Mattel's Motion to Strike portions of MGA's complaint.

3

EXHIBIT ____5____

PAGE ____67____

infringement based on the Toon Teens product is barred by counsel's representation." July 18, 2006, Order at 4.

Presently before the Court is Mattel's request for leave to file an amended complaint in the 04-9059 action. The complaint broadens considerably the nature of the action from its genesis in state court. Whereas before the complaint simply sought to litigate alleged contractual and fiduciary breaches by Bryant while in the employ of Mattel (no doubt geared toward procuring a legal basis for Mattel to lay claim to the BRATZ doll line), the amended complaint adds five more defendants and nine new legal claims, alleging a wide range of commercial disputes between the rival doll makers that spans three countries. For instance, the amended complaint now contains RICO claims, a misappropriation of trade secrets claim, and various aiding and abetting claims all stemming from allegations that MGA cherry-picked certain high-ranking Mattel executives in foreign markets (many also named as defendants in the amended complaint) or designers (namely, Bryant), and then enticed or encouraged those same individuals to steal various trade and proprietary secrets (be it sales plans, sales projections, customer profiles, or intellectual property) from Mattel and hand them over to MGA before going to work at MGA.

Moreover, the amended complaint expands upon the existing breaches of contract and fiduciary duty claims in the original complaint by expanding the universe of former employees (namely, the cherry-picked executives) to whom those claims now apply.

Finally, Mattel now makes plain what was always lurking in its original complaint — a copyright claim, but one directed not only to Bryant but also to MGA, MGA's Hong Kong subsidiary, and MGA's President and CEO Isaac Larian. Moreover, Mattel characterizes its copyright claim somewhat differently from that at issue in Bryant's declaratory relief action: "The Amended Complaint does not include a claim for infringement of copyrights in Toon Teens, but rather

EXHIBIT ___5___ ⁴

PAGE ___68___

1   infringement of copyrights in Bratz." (Reply to MGA Opp. at 11).  Toward that end,

2   Mattel has recently filed copyright registrations with the U.S. Copyright Office

3   claiming ownership in various BRATZ doll design drawings penned by Bryant.

4   A.     ANALYSIS

5        Federal Rule of Civil Procedure 15(a) provides that, once a responsive

6   pleading has been served, "a party may amend the party's pleading only by leave of

7   court or by written consent of the adverse party; and leave shall be freely given

8   when justice so requires."  With no consent to Mattel's proposed filing proffered by

9   MGA and Bryant, determining whether to grant Mattel leave to file an amended

10  complaint is gauged by looking to the familiar formulation of factors set forth by the

11  Supreme Court in Forman v. Davis:

12
13          In the absence of any apparent or declared
            reason—such as undue delay, bad faith or dilatory
14          motive on the part of the movant, repeated failure to
            cure deficiencies by amendments previously allowed,
15          undue prejudice to the opposing party by virtue of
            allowance of the amendment, futility of amendment,
16          etc.—the leave sought should, as the rules require, be
            'freely given.' Of course, the grant or denial of an
17          opportunity to amend is within the discretion of the
            District Court, but outright refusal to grant the leave
18          without any justifying reason appearing for the denial is
            not an exercise of discretion; it is merely abuse of that
19          discretion and inconsistent with the spirit of the Federal
            Rules.
20
    371 U.S. 178, 182 (1962).

21       MGA and Bryant offer the following reasons for denying Mattel leave to

22  amend:  (1) Mattel has long known of the factual predicates underlying its copyright

23  and intentional interference claims but delayed in asserting them; (2) the proposed

24  amendment to add the copyright claim and the intentional interference claims

25  (against the new defendants) are futile because they are barred by the applicable

26  statute of limitations; (3) the copyright claim had been brought in bad faith by Mattel

27  because of its prior public disavowal of an intent to assert such a claim; and (4)

28  MGA and Bryant would incur undue prejudice were the copyright claim added to the

5

EXHIBIT  5
69

1   suit because of alleged spoilation of evidence issues involving Mattel's ZEUS
2   computer system used by doll designers at Mattel and its e-mail system.  None of
3   these arguments are persuasive.

4        1.    Awareness of Factual Predicate for Copyright and Intentional
5              Interference Claims

6        MGA argues that Mattel has long known about the factual predicate for its
7   recently added copyright claim, observing that, "[o]ver four years ago, in August
8   2002, Mattel CEO Bob Eckert received an anonymous letter stating that Bryant
9   created the project that became the 'Bratz' dolls — and worked with MGA to 'steal'
10  that project — while still employed at Mattel." (MGA Opp. at 9).  Similarly, MGA
11  argues that Mattel has long known of the factual predicate for its intentional
12  interference claim with respect to Bryant's contract given that, "[b]y Mattel's own
13  admission, it learned in November 2003 — more than three years ago — that
14  Bryant had signed a contract with MGA 'dated as of' a month prior to his final day at
15  Mattel." (MGA Opp. at 11-12).

16       At the outset it must be observed that "[m]ere delay in proffering an
17  amendment does not justify denying leave to amend." Sierra Club v. Union Oil Co.
18  of California, 813 F.2d 1480, 1493 (9th Cir. 1987), vacated on other grounds by,
19  485 U.S. 931 (1988), and reinstated by, 853 F.2d 667 (9th Cir. 1988).  Seizing upon
20  this point of law, Mattel argues that "only in . . . cases" when "granting leave would
21  require discovery to be reopened after summary judgment motions have been filed"
22  has the Ninth Circuit found the denial of leave "justified" based on the passage of
23  time alone. (Reply to MGA Opp. at 3).  That is incorrect.  There is a line of cases
24  from the Ninth Circuit finding that, if a "party seeking amendment knows or should
25  know of the facts underlying the amendment when the original complaint is filed,
26  the motion to amend may be denied." Sierra Club, 813 F.2d at 1493 (citing Jordan
27  v. County of Los Angeles, 669 F.2d 1311, 1324 (9th Cir. 1982)).  And, recently, the
28  Ninth Circuit upheld the denial of leave to amend based on the passage of time

EXHIBIT _____ 5    6

PAGE _____ 10

1   even though the requested leave to amend was tendered <u>before</u> the time, as set

2   forth in a Rule 16(b) pre-trial scheduling order, for amending pleadings had expired.

3   See <u>AmerisourceBergen Corp. v. Dialysist West, Inc.</u>, 465 F.3d 946 (9th Cir. 2006).

4   The Ninth Circuit observed that, even when a request for leave to amend is timely

5   under a Rule 16(b) schedule for pretrial motions, the district court may nonetheless

6   still deny the request based on any of the <u>Forman</u> factors. <u>Id</u>. at 951-52. The Ninth

7   Circuit then noted that the issue of untimeliness (regardless of whether the

8   amendment is tendered "within the period of time allotted by the district court in a

9   Rule 16 scheduling order") in seeking to amend can constitute a justification for

10  denying leave to amend if "the moving party knew or should have known the facts

11  and theories raised by the amendment in the original pleading." <u>Id</u>. at 953.

12  Toward that end, the Ninth Circuit observed that "an eight month delay between the

13  time of obtaining a relevant fact and seeking a leave to amend is unreasonable."

14  <u>Id</u>. In this regard, the Ninth Circuit in <u>Dialysist</u> was unpersuaded by the fact that,

15  even though the moving party had known of the facts prompting the amendment for

16  a long period of time, there still remained eight more months of discovery for the

17  parties to marshal facts against the allegations raised by the amended pleading:

18  "Even though eight months of discovery remained, requiring the parties to scramble

19  and attempt to ascertain whether the Procrit purchased by AmerisourceBergen was

20  tainted, would have unfairly imposed potentially high, additional litigation costs on

21  Dialysist West that could have easily been avoided had AmerisourceBergen

22  pursued its 'tainted product' theory in its original complaint or reply." <u>Id</u>. Thus,

23  absent "a satisfactory explanation" for the delay in amending the complaint, the

24  Court is well within its rights to deny leave to amend. <u>Id</u>.

25          Mattel proffers the following reasons for taking the time that it did before

26  presenting its amended complaint: (1) Acting out of an abundance of caution to its

27  obligations under Rule 11 to present "factual contentions [that] have evidentiary

28  support," Mattel waited until its claims were better supported by evidence

7

EXHIBIT _____ 5 _____

PAGE _____ 71

1    uncovered in discovery; and (2) the delay in the proceedings caused by "the year-
2    long stay and the parties' prior jurisdictional disputes" have left the case still in its
3    "nascent stage." (Reply to MGA Opp. at 2, 4).

4          The first reason is not well-founded. Rule 11 specifically allows parties to
5    aver factual allegations that "are likely to have evidentiary support after a
6    reasonable opportunity for further investigation or discovery" so long as the party
7    makes clear in its pleading that its factual contentions on those points are with the
8    caveat that they are based on a good faith belief that further discovery would
9    unearth evidence to support them. See FED. R. CIV. P. 11(b)(3). Simply put, Rule
10    11 did not stand in the way of Mattel averring the factual contentions it now claims it
11    "merely suspected" as being the case based on the limited information before it.
12    Mattel could have gone ahead and made such suspected factual allegations so
13    long as it caveated those claims with the declaration that it reasonably believed that
14    those allegations would be borne out by further discovery. Perhaps the time by
15    which Mattel could have reasonably believed such allegations would be borne out
16    by further discovery occurred after the dates noted by MGA, but it is hard to fathom
17    that such materialization took three or four years to occur.

18          The second reason would have some merit to it but for the fact that the
19    information that alerted (or should have alerted) Mattel to the existence of its now
20    asserted copyright and intentional interference claims was brought to Mattel's
21    attention well before the case was stayed on May 20, 2005. The stay, therefore,
22    did not operate as an obstacle to Mattel asserting its claims; nor even if it did, the
23    stay does not explain why Mattel waited nearly six months after the stay was lifted
24    on May 16, 2006, to present those claims now.

25          All of that being said, the one thing that gives the Court pause in denying
26    leave based on the tardiness in Mattel's presentation is the lack of any evidence
27    that MGA or Bryant have been prejudiced by the delay. Delay unconnected to
28    some showing of prejudice, be it prejudice to the parties or disruption in judicial

EXHIBIT _____ 5 _____ 8

PAGE _____ 72 _____

1   management of the case, does not suffice to deny granting leave to amend.  The

2   Ninth Circuit has noted that, "where a defendant is on notice of the facts contained

3   in an amendment to a complaint, there is no serious prejudice to defendant in

4   allowing the amendment" even if it is made tardily.  Sierra Club, 813 F.2d at 1493.

5   Indeed, the denial of leave was proper in the Dialysist case not simply because of

6   the length of the delay, but because the delay itself was "detrimental" in that it

7   would entail the opposing party to have "unfairly" incurred "potentially high,

8   additional litigation costs" that could have been avoided if the moving party had

9   made clear its intentions earlier.  465 F.3d at 953.

10          Here, as well demonstrated in Mattel's papers, it is readily apparent from the

11   pleadings filed by MGA and Bryant in this case that both have been aware for some

12   time of the factual predicates now underlying Mattel's copyright claim and

13   intentional interference claim.  (See MGA Opp. at 5 ("As Bryant and MGA

14   suspected at the time of filing — and Mattel now concedes by conduct — those

15   deceptively-pled state-law claims [in 04-9059] were copyright infringement claims all

16   along")(emphasis added)).  The parties have engaged in meaningful discovery

17   regarding many of the facts touched upon by these new claims, be it tracking down

18   experts in various forensic fields or taking depositions of various of the key players

19   to those claims.   In point of fact, in their papers filed with this Court before this

20   present motion, both Bryant and MGA have made it abundantly clear that they have

21   long suspected that a copyright infringement claim was in the offing as evidenced

22   by Bryant's filing of the declaratory judgment action and MGA's intervention in the

23   05-9059 matter to protect its rights to the BRATZ dolls.  Similarly, MGA and Bryant

24   have been on notice to the facts comprising the interference claim concerning

25   Bryant's contract as evidenced by the identity of the individuals who have been

26   deposed by Mattel, as well as the nature of the questions posed and the testimony

27   proffered at those depositions.  MGA's argument that, with the amendments, it

28   faces the prospect of defending "against stale claims" owing to faded memories and

EXHIBIT ___5___   9

PAGE ___13___

1   loss of documents caused by the great passage of time, (see MGA Opp. at 3, 13),

2   is diminished by the fact that (no doubt owing to the sophistication of all counsel

3   involved) discovery on these very issues have been proceeding apace by both

4   sides long before Mattel filed its proposed amendments.  This is simply not a case

5   where "additional litigation costs" will be "unfairly" visited upon Bryant and MGA by

6   allowing the proposed amendments; much of those costs have already been borne

7   by the parties for some time.

8        2.    Spoliation of Evidence

9        MGA next argues that Mattel's delay in bringing the amended complaint has

10  caused it prejudice as, in the interim, critical pieces of evidence have been or are

11  suspected of having become lost.· For instance, MGA asserts that Mattel's Rule

12  30(b)(6) witness concerning its Zeus computer system, Julia Marine, testified that,

13  "although Mattel identified and segregated its most relevant backup tapes available

14  for Zeus, Mattel allowed its tape backup system to expire the database for those

15  backup tapes, thereby eliminating all information about what was actually stored on

16  those backup tapes." (MGA Opp. at 9-10).  Information on the Zeus computer

17  system is critical because of Mattel's assertion that part of its copyright claim rests

18  on Bryant's exposure to Mattel development programs.  (First Am. Compl. ¶ 26(a)).

19  As explained by MGA: "[C]oncept data and drawings created by [Mattel] design

20  center personnel are stored on Zeus.  Thus, the electronic documents stored on

21  Zeus – which should include the metadata showing who created, edited and

22  accessed Mattel's concept drawings and designs – during the time Bryant worked

23  in the design center at Mattel is vitally important to defending against Mattel's

24  claims." (MGA Opp. at 14).  MGA's argument is neither an accurate

25  characterization of Ms. Marine's testimony nor of the nature of Mattel's exposure

26  claim.

27        Ms. Marine did not testify that the information on the backup tapes (some

28  fifty in total) was lost, but rather that Mattel no longer carried the type of hardware

10

EXHIBIT _____5_____

PAGE _____74_____

1  that could restore the information still found on those tapes:

2         Q.    So if you wanted to restore that 2002 backup tape[s] then, how would you go about doing that?

3

4                . . . .

       A.    You need the hardware so if we don't have the
5              hardware — if [the technology used by the tape is] DLT we don't have the hardware and you've
6              got to buy it and — well, first you have to find a place to put it with adequate power which we
7              don't have in the design center. You need to have a tape library. You need to have the tape
8              drives that carried those tapes. You need a server that has the capability to — that's big
9              enough to handle all of the hardware. You need the software — the license for the backup
10              software[, Net Backup]. You need the disk space to restore it to and then you have to start reading
11              in all those tapes.

12         Q.    You said that you don't have that in the design center. Do you have that hardware anywhere
13              else in the company?

14         A.    DLT? No, no.

15         Q.    At what point did you get rid of the hardware?

16         A.    Once the last backups — DLT backups expired so it would have been a couple years ago
17              probably.

18  (Decl. Diana Torres, Ex. K at 118-119).

19       The above testimony clearly denotes the difficulty in restoring what was on

20  Mattel's Zeus computer system during the relevant time frame, but it certainly does

21  not demonstrate that the information on those backup tapes has been "eliminated"

22  or forever lost. Undoubtedly it will be a costly endeavor to recover that information

23  (not to mention to later search and sort through it); but to argue, as MGA does, that

24  the information is "unavailable" or "lost", (MGA Opp. at 9, 14), exaggerates its

25  plight. Indeed, Ms. Marine's testimony indicates that the difficulty in retrieving the

26  information on the Zeus backup tapes has been present for some time (maybe

27  since 2004 or perhaps even earlier). This is important because it undermines

28  MGA's claim that Mattel's undue delay in bringing its amended complaint will cause

11

EXHIBIT _____5_____

PAGE _____75_____

1   it to suffer prejudice it otherwise would not have faced if the amendments were

2   brought sooner.  Such prejudice has been present for years, and Mattel's failure to

3   bring its amended complaint sooner would not have changed this situation.

4            Similarly, MGA's point that access to what was on the Zeus computer

5   system is vital in demonstrating that Bryant was not exposed to or otherwise did not

6   hack the system to steal other designers work is diminshed to some extent by the

7   fact that Bryant himself testified that he did not use the Zeus computer system and

8   was "pretty much computer illiterate" while employed at Mattel.  Admittedly, the

9   ability to point to information on the Zeus system backup tapes to prove that Bryant

10  did not access other designers drawings or to prove the date those drawings were

11  created by those other designers would be useful evidence to negate Mattel's

12  factual claims.  Nonetheless, such evidence still would not discount other avenues

13  outside of the Zeus computer system by which Mattel could seek to prove that

14  Bryant was exposed to its copyrighted works, _e.g._, witness testimony that Bryant

15  saw drawings of the same posted on other designers' cubicles.

16           MGA next surmises that Mattel's e-mail records have disappeared, not

17  because it has any proof on that point, but simply because Mattel has postponed

18  the deposition of the individual most knowledgeable of Mattel's e-mail records until

19  after the hearing on Mattel's motion for leave to amend.  (MGA Opp. at 10).

20  Speculation of spoilation does not suffice.  That MGA's argumentation on this point

21  is nothing more than speculation is best exhibited by the evidence it has proffered

22  in support of its argument: "[I]f the sole retained backup for Zeus is no longer

23  available, it is not hard to imagine that Mattel's electronic mail archives are similarly

24  out of reach." (MGA Opp. at 15 (emphasis added)).  MGA then makes much of a

25  deposition from a Mattel executive, Alan Kaye, who testified that e-mails in his

26  inbox would be automatically deleted if they had remained there for more than a

27  certain time period. (Decl. Diana Torres, Ex. H at 292-93).  MGA takes from this

28  acknowledgment that Mattel has an "automatic email deletion system" that has

EXHIBIT _____ 5 _____ 12

PAGE _____ 76 _____

1  compromised Mattel's "duty to preserve documents." (MGA's Opp. at 14).

2  Noticeably absent from MGA's argument is any evidence that the e-mails so

3  deleted from a Mattel employee's inbox are forever lost or, as is far more likely,

4  whether such information remains or is otherwise archived on some backup file on

5  Mattel's computer system. Absent concrete proof that spoliation has occurred,

6  nothing in MGA's argument forms a basis for denying Mattel its requested leave to

7  amend.

8      3.    Statute of Limitations

9      MGA next argues that Mattel's copyright and intentional interference claims

10  are futile as both are barred by the applicable statute of limitations. This argument

11  was pressed emphatically at oral argument. With respect to the copyright claim,

12  MGA argues that the applicable statute of limitations is three years, with the

13  limitations period accruing from when a party has knowledge of a violation or when

14  a reasonably diligent person would have been put on inquiry of the infringement.

15  (MGA Opp. at 16 (citing Roley v. New World Pictures, 19 F.3d 479, 481 (9th Cir.

16  1994)). MGA argues that Mattel was put on notice about its copyright claim in

17  August, 2002, upon the receipt of the anonymous letter to Mattel's CEO that Bryant

18  had stolen the idea for BRATZ while working at Mattel. Thus, according to MGA,

19  the limitations period on Mattel's claim expired in August, 2005, rendering Mattel's

20  current copyright claim stale.

21      The problem with MGA's analysis is it fails to take into account the relations-

22  back principles found in Rule 15(c), which provides that "[a]n amendment of a

23  pleading relates back to the date of the original pleading when "the claim . . . in the

24  amended pleading arose out of the conduct, transaction, or occurrence set forth . . .

25  in the original pleading," or if such relation back is otherwise permissible by the

26  state "law that provides the statute of limitations applicable to the action." By

27  MGA's own admission Mattel's copyright claim arises out of the same conduct or

28  transaction contained in the original complaint filed in April, 2004, well within the

EXHIBIT ___5___    13

PAGE ___77___

1  applicable limitations period.[2] (MGA Opp. at 12 ("These very same allegations

2  [contained in the original complaint] underlie the copyright infringement and

3  intentional interference contract claims Mattel now seeks to allege against MGA,

4  Mr. Larian and Bryant")).

5      MGA's statute of limitations argument with respect to the intentional

6  interference claims fares no better.  According to MGA, the applicable statute of

7  limitations is two years for an intentional interference with contract claim and Mattel

8  was aware of the facts alerting it to this claim (insofar as Bryant's contract is

9  concerned) on November 24, 2003, when it learned "that Bryant worked with MGA

10  to develop the 'Bratz' dolls prior to his last day of employment by Mattel and, hence,

11  prior to the expiration of his contractual relationship with Mattel."[3]  (MGA Opp. at 18

12  (citing Knoell v. Petrovich, 76 Cal. App.4th 164, 168 (1999)) .  Such a time line

13  would, according to MGA, mean that the applicable limitations period expired on

14  Mattel's interference with Bryant's contract claim on November 24, 2005, well

15  before Mattel sought leave to file its amended complaint.  (Id).  The problem again

16  with MGA's argument is that it ignores that through Rule 15(c) Mattel's intentional

17  interference claim would relate back to when it filed its original complaint in April,

18

19

20      [2] The same would appear to be true — that the amendments would be timely

21  — if the amendments related back to Mattel's answer (filed on May 13, 2005) to

22  MGA's complaint in the 05-2727 case.

23      [3] With respect to Mattel's interference with contract claim as to one of its

    former executives, Ron Brawer, MGA claims Mattel was put on notice of that claim

24  on September 17, 2004, when Brawer informed Mattel that he leaving to go to work

    for MGA.  (MGA Opp. at 19-20).  The problem with this argument is that nothing from

25  that simple event — Brawer's declaration of his intent to leave — in any way would

    apprise Mattel that MGA had encouraged Brawer to engage in nefarious conduct

26  (the stealing of proprietary information) causing Brawer to breach his contract with

    Mattel that he would not do anything to help a competitor while working for them.

27  MGA's contention that Mattel must have known of those misdeeds in mid-September

    is nothing more than speculation.  Futility cannot be founded on what might or might

28  not be the case; either a claim is futile to bring or it is not.

14

EXHIBIT _____ 5

PAGE _____ 78

1   2004, well before the limitations period expired.[4]

2           Accordingly, MGA's futility argument is not well-founded.

3       4.      Prior Disavowals of Asserting a Copyright Claim

4           Finally, MGA takes umbrage with the cageyness to which Mattel has taken in

5   this case as to whether or not it is asserting a copyright infringement claim against

6   it. To MGA, such ducking and weaving on Mattel's part renders its effort to now

7   bring such a copyright claim as one done in bad faith. No doubt the Court itself has

8   been subjected to Mattel's overly vague statements on this point, but in the end

9   nothing in those statements has ever foreclosed the possibility that such a claim

10  may be in the offing. Indeed, during the oral argument on Mattel's motion to

11  dismiss Bryant's declaratory judgment action, the Court pressed Mattel's counsel as

12  to whether it would assert such a copyright claim against Bryant as it is currently

13  seeking to do. The most that Mattel's counsel would proffer was that Mattel would

14  not assert a copyright claim against Bryant based on Mattel's copyright rights in

15  TOON TEENS. At that point, the Court directed the parties to engage in a meet

16  and confer based on counsel for Mattel's representation and to provide a report to

17  the Court based on those discussions. The report submitted to the Court made

18  clear that, although Mattel was willing to accede that it would not bring a copyright

19  claim based on TOON TEENS, it refused to accede to Bryant's broader request

20  that "Bryant 'never copied anything' and that no Mattel product has any 'relevance'

21  to any claim that Mattel has or ever will assert against Bryant." This by itself should

22  have dispelled any illusion either Bryant or MGA was operating under that Mattel's

23  prior statements had foreclosed any potential copyright claim against them.[5]

24  _____

25      [4] Again the relations-back principle would also seem to render its claim timely

26  if it were filed as an amended answer (the original having been filed in May, 2005) in
    the 05-2727 case.

27      [5] MGA also argues that Mattel's effort to substitute MGA and its CEO, Isaac

28  Larian, for the "Doe" defendants listed in its original complaint is improper because
    Mattel knew of their identity when it filed the original complaint. The argument is

15

EXHIBIT ___5___

PAGE ___79___

1    That said, Mattel's allegation in the amended complaint as to how it is

2    seeking to lay claim to the copyright in BRATZ is disconcerting.  Paragraph 26,

3    subsection a, in the amended complaint alleges that Bryant "misappropriated and

4    misused Mattel property" by "using his exposure to Mattel development programs to

5    create the concept, design and name of Bratz."  (First Am. Compl. ¶ 26(a)).  Such

6    "exposure" could include Bryant misappropriating the Mattel design concept in

7    TOON TEENS in drawing his inspiration for the BRATZ doll.  Were Mattel's

8    copyright claim so predicated it would be barred by this Court's July, 2006, Order,

9    dismissing Bryant's declaratory judgment action.  Mattel was pressed on this point

10   during oral argument and conceded that such "exposure" to Mattel "development

11   programs" did not include TOON TEENS.  With this representation, nothing in

12   Mattel's proposed copyright claim is barred under the rubric of bad faith.

13        5.    Judicial Economy Considerations

14        In his opposition, Bryant adds an additional reason for denying leave beyond

15   those contained in MGA's papers — the amendment would muddy the waters in the

16   04-9059 by adding "tangential" issues that would only serve to delay resolution of

17   the key issue lying at the heart of the complaint: Who owns the rights to the

18   BRATZ line of dolls.  (Bryant Opp. at 2 ).  Bryant notes that the case has proceeded

19   apace in moving toward resolving that issue, and the amendment would "transform

20

21   ───────────────────────────────

     misplaced.  As made clear by Mattel, California law allows a plaintiff to substitute in a
22   defendant for a "Doe" if the plaintiff was ignorant of that defendant's identity or
     ignorant of the basis for liability at the time the complaint was filed.  See Miller v.
23   Thomas, 121 Cal.App.3d 440 (1981).  MGA does not dispute this legal contention
     but at oral argument disputed that Mattel did not know the basis for liability against
24   itself or Mr. Larian due to the "uncanny" similarity between the allegations averred in
     the original complaint and those now proffered against the two in the amended
25   complaint.  Specifically, MGA notes that the original complaint spoke of Bryant
     working for one of Mattel's competitiors and of that employee's theft of Mattel's
26   intellectual property before leaving to work for that competitior.  At most, all this
     shows is that Mattel knew that Bryant went to work for MGA, not that MGA or Mr.
27   Larian encouraged Bryant's alleged unlawful behavior recited in the original
     complaint.
28

                          16
              EXHIBIT _____5_____

              PAGE _____80_____

1   what Mattel has always claimed was a straightforward employment action against

2   an individual defendant into a global commercial dispute against Mattel's primary

3   competitor, MGA," that "will last years" thereby "delay[ing]" resolution of who owns

4   BRATZ.[6]  (Bryant Opp. at 2).  Mattel argues that "the law does not deny leave to

5   amend because claims are 'tangential'" and then reiterates its point that some

6   showing of prejudice, namely, seeking leave after expiration of discovery, is

7   necessary.  (Reply to Bryant Opp. at 3).  That is not entirely correct.

8       As noted previously, the Ninth Circuit recently upheld a denial for leave to

9   amend because the amendment would have "drastically changed" the litigation,

10   even though the leave request was tendered <u>before</u> the time, as set forth in a Rule

11   16(b) pre-trial scheduling order, for filing a motion to amend had expired and well

12   before the discovery cut-off.  <u>See AmerisourceBergen Corp. v. Dialysist West, Inc.</u>,

13   465 F.3d 946, 953 (9th Cir. 2006).  In justifying its reasoning the Ninth Circuit cited

14   approvingly to the following statement from a well-respected treatise: "If an

15   amendment substantially changes the theory on which the case has been

16   proceeding and is proposed late enough so that the opponent would be required to

17   engage in significant new preparation, the court may deem it prejudicial."  <u>Id.</u> at 953

18   n.2 (quoting 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE,

19   FEDERAL PRACTICE AND PROCEDURE § 1487 (2nd ed. 1990)).  Thus, <u>Dialysist</u>

20   recognized that the introduction of "different legal theories" and/or proof of

21   materially different facts well into the litigation can itself be a basis for finding

22   prejudice regardless of whether the period for discovery has expired (or is even

23   close to expiring) or the parties have already filed summary judgment motions.  <u>Id.</u>

24   at 953-54.

25       Although the parties can safely be said to be at this point well into the

26

27   ───────────────

28       [6]  Bryant also brings intricate legal arguments about the sufficiency of the
allegations Mattel has averred in building its RICO claims against him.  Such
considerations are best left to be resolved on a properly filed motion to dismiss.

EXHIBIT _____5_____

PAGE _____81_____

1  litigation in this consolidated action (as evidenced by the protracted discovery

2  disputes contained in the docket sheet that the parties have had before the

3  magistrate judge and now the special master, and the litigation of motions to

4  dismiss in both the 04-9049 and 04-9059 cases), the fact remains that, as Mattel

5  has made painfully clear in its papers, no scheduling order has been entered in this

6  case.[7] This takes away somewhat from the prejudice Dialysist found to exist when

7  a "drastic change [in a party's] litigation theory" takes place mid-stream in the

8  litigation process. Id. at 953. Simply put, without a schedule for the filing of pre-trial

9  motions and other matters (e.g., discovery cutoff), the parties have been given free

10  reign in how to conduct the litigation in this case.

11       That the delay in bringing the proposed amendments and the relative length

12  of time into the litigation when those amendments were brought may not neatly fold

13  into Dialysist's reasoning does not mean that leave must nonetheless be granted.

14  The 04-9059 action, as it is presently constituted, is not a complex one.  It asks a

15  rather narrow and straightforward question — Did anything from Bryant's

16  employment at Mattel during the 1999-2000 period give Mattel ownership rights to

17  the BRATZ doll line?  The proposed amendments would radically alter the litigation

18  in that case to include far ranging disputes involving multiple parties and concerning

19  events not connected with the BRATZ ownership issue.  That the original action

20  was a relatively simple and straight-forward matter raises another point beyond the

21  change in the action's litigation posture — whether entangling the rival doll makers'

22  other commercial disputes into this particular case would serve to muddy the waters

23  and make the matter that much more difficult to manage from the Court's

24  perspective.

25       ───────────────

26       [7] Mattel's repeated refrain that the matter is in its nascent stage as evidenced by the fact that the parties only just recently exchanged in initial disclosures is misleading.  The exchange of initial disclosures referred to by Mattel is in the 05-2727 case.  With respect to the 04-9059 case it appears that such initial disclosures were completed long ago as evidenced by the fact that discovery disputes appeared in that case as far back as January, 2005.

27

28

18

EXHIBIT _____5_____

PAGE _____82_____

1    As has long been recognized, equally important in determining whether to

2    grant such leave is what impact such amendments would have on the court's ability

3    to manage the case. See 3 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE

4    § 15.15[1] at 15-42.1 to 15-43 (3rd ed. 2006)("A court should also consider judicial

5    economy and its ability to manage the case. . . . The court should also temper the

6    policy favoring freely granting leave to amend with consideration of the ability of the

7    district court to manage the case adequately if amendment is allowed"). As Judge

8    Clark for the Fifth Circuit once observed: "In keeping with the purposes of the rule,

9    the court should consider judicial economy and whether the amendments would

10   lead to expeditious disposition of the merits of the litigation. Finally, the court

11   should consider whether the amendment adds substance to the original allegations,

12   and whether it is germane to the original case of action." Chitimacha Tribe of

13   Louisiana v. Harry L. Laws Co., 690 F.2d 1157, 1163 (5th Cir. 1982); see also

14   Sierra Club v. Union Oil Co. of California, 813 F.2d 1480, 1493 (9th Cir.

15   1987)("General considerations of judicial economy also justify allowing the

16   amendments. The violations included in the proposed amendment relate to the

17   same subject matter as the original complaint. Allowing the amendment will further

18   the federal policy of 'wrapping in one bundle all matters concerning the same

19   subject matter.'").

20       Mattel's amendments do not add substance to the claims contained in its

21   original complaint. Rather, they would expand the universe of claims and

22   defendants stretching well-beyond the questions raised in the original complaint

23   over whether Bryant's conduct while in the employ of Mattel subjected his later

24   attributed creation of the BRATZ dolls to the provisions in Mattel's Inventions

25   Agreement or otherwise rendered his creation subject to an infringement action.

26   Nowhere does Mattel seek to reconcile the breadth of its present amendments with

27   the narrowness of the allegations contained in its original complaint.  In fact, the

28   precise opposite is true.  Mattel acknowledges that its proposed amendments bear

19

EXHIBIT _____5_____

PAGE _____83_____

1    more congruity to the allegations leveled against it in MGA's Lanham Act case than

2    to those in the action to which it seeks to add them:

3                    [M]any of the matters raised by Mattel's proposed
4            Amended Complaint are and will remain at issue
             because of MGA's Complaint, whether or not leave to
5            amend is granted.  MGA's claims allege that a broad
             array of purported Mattel conduct across the globe,
6            starting at least as early as 1999, has violated the
             Lanham Act and unfair competition law.  This includes
7            Mattel's alleged infringement of Bratz and other MGA
             products.  As a result, issues in the proposed Amended
8            Complaint are already part and parcel of Mattel's
             defenses to MGA's unfair competition claims, including
9            because they show that MGA and Bryant, and not
             Mattel, are ones who stole the products and other
10           properties involved.

11   (Reply to Bryant Opp. at 7 (emphasis added)).  Mattel apparently finds this

12   discongruity unimportant because "all of these matters have been consolidated with

13   the Bryant case." (Id. at 7).  As noted earlier, the fact that the cases have been

14   consolidated does not mean that the parties can ignore the distinctions that still

15   exist between them.  If, as Mattel acknowledges, the present amendments are

16   nothing more than re-formulated defenses and counterclaims it presently has to

17   MGA's complaint against it in the 05-2727 case, then such amendments should be

18   brought in the form of an amended answer and counterclaim in that case.

19           Consideration of the distinctions between the two cases is wise as it serves

20   as a useful tool in providing the Court a better means to manage the cases now

21   that they have been consolidated.  The proverbial dog (ownership in BRATZ)

22   should be wagging the proverbial tail (the remaining commercial disputes), not the

23   other way around.  Admittedly, the dog's tail has grown in size both by MGA's filing

24   of its complaint in the 05-2727 action and Mattel's response thereto through its

25   proposed amendments.  Nonetheless, it is readily apparent to the Court that the

26   crown jewel in this action still remains the ownership rights to the BRATZ dolls.  The

27   parties have engaged in extensive and undoubtedly expensive discovery on this

28   very issue (from hiring world-renowned experts to test the age of Bryant's design

                                        20

EXHIBIT ___5___

PAGE   84

1  drawings to technically complex discovery of what is on each other's computers).

2  Indeed the separateness of the two matters is reflected in how the cases are

3  currently structured, namely, the narrowness of the issue involved in 04-9059 and

4  the expansiveness of the facts at issue in 05-2727. In light of this fact, the Court

5  believes a two-track scheduling order wherein the 04-9059 matter's discovery cut

6  off and trial date are set well-ahead of those in 05-2727 makes the most sense. As

7  noted earlier, many of the legal claims being pressed in 05-2727 will be affected by

8  the result of the litigation in 04-9059. If, for instance, Mattel does own the rights to

9  the BRATZ dolls (either owing to Bryant's stealing his idea from one of Mattel's

10  "development programs" or by way of the Inventions Agreement because he

11  continued to work on his designs while at Mattel), then large portions of MGA's

12  Lanham Act infringement claims may become moot. By the same token, if Mattel

13  does not own rights to BRATZ, then some of the defenses and counterclaims set

14  forth as independent claims in the present amended complaint may become moot,

15  including Mattel's copyright infringement claim as well as portions of its remaining

16  RICO, misappropriation, and aiding and abetting claims. If, however, the Court

17  were to allow the amended complaint to be filed in the 04-9059 action, such case

18  management would be difficult, if not impossible as many of the issues being

19  litigated in the 05-2727 case would have been poured into the 04-9059 case by the

20  amendment. Due to this substantial overlap in claims and facts, a two-track

21  scheduling order utilizing the case number distinctions would be impossible to craft.

22  When pressed by the Court at oral argument as to which of its proposed claims it

23  believed would not undermine the BRATZ ownership posture of the 04-9059 case,

24  Mattel cited to its copyright and RICO claims. However, upon further questioning

25  by the Court, counsel for Mattel acknowledged that much of those claims were, like

26  the claims at issue in 05-2727, dependent upon resolution of the ownership issue.

27  In light of the burden allowing Mattel's amendment to proceed would have on

28  this Court's ability to efficiently manage these consolidated matters denial of

21

EXHIBIT ___5___

PAGE ___85___

Mattel's request to amend its complaint in the 04-9059 matter is justified. See Perrian v. O'Grady, 958 F.2d 192, 195 (7th Cir. 1992)("The burden to the judicial system can justify a denial of a motion to amend 'even if the amendment would cause no hardship at all to the opposing party'"). Buttressing the Court's decision is the fact that, even with such a denial, Mattel may file (and the Court provides leave to Mattel to so file) an amended answer and counterclaim in the 05-2727 case raising all the new claims and defendants presently sought to be achieved through amendment of its complaint in the 04-9059 action. None of the substantive concerns raised by MGA and Bryant to the present amended complaint, e.g., statutes of limitations, would appear to be affected if the new claims and defendants were brought as defenses and counterclaims in the 05-2727 case as opposed to the 04-9059 one.

Accordingly, the Court GRANTS Mattel's motion for leave to file its proposed amendments, but only insofar as they are pled in the form of an amended answer and counterclaim in the 05-2727 case.

Finally, the lack of a scheduling order in this case is problematic; one should have been entered long ago. See Fed. R. Civ. P. 16(b)(noting that a scheduling "order shall issue as soon as practicable but in any event within 90 days after the appearance of a defendant and within 120 days after the complaint has been served on a defendant"). In light of the fact that entry of a scheduling order is woefully overdue in this case, the Court hereby ORDERS that a Rule 16(b) scheduling conference be held in this consolidated matter on February 12, 2007, at 1:30 p.m. in Courtroom One. The parties are directed to file a Joint Rule 26(f) report with the Court by February 5, 2007.

IT IS SO ORDERED.

DATE: _/- //- 0 7_

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE

EXHIBIT ___5___ 22

PAGE ___86___

# EXHIBIT 6

1

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                  EASTERN DIVISION

4                     - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                     - - -

7   CARTER BRYANT,                    )
                                      )
8                      PLAINTIFF,     )
                                      )
9          VS.                        )   NO. ED CV 04-09049
                                      )   (LEAD LOW NUMBER)
10  MATTEL, INC.,                     )
                                      )
11                     DEFENDANTS.    )   STATUS/SCHEDULING
    _____    )        CONFERENCE
12  AND RELATED ACTIONS,             )
    _____    )

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               RIVERSIDE, CALIFORNIA

17              MONDAY, FEBRUARY 12, 2007

18                    1:49 P.M.

19                                    **CERTIFIED**

20                                    **COPY**

21

22

23              THERESA A. LANZA, RPR, CSR
             FEDERAL OFFICIAL COURT REPORTER
24              3470 12TH STREET, RM. 134
             RIVERSIDE, CALIFORNIA   92501
25                  (951) 274-0844
               CSR11457@SBCGLOBAL.NET

2

```
 1   APPEARANCES:

 2

 3   ON BEHALF OF PLAINTIFF/COUNTER DEFENDANT MATTEL, INC.:

 4
                         QUINN EMANUEL
 5                       BY:   JOHN B. QUINN
                         865 S. FIGUEROA STREET,
 6                       10TH FLOOR
                         LOS ANGELES, CALIFORNIA   90017
 7                       (213) 624-7707

 8

 9   ON BEHALF OF PLAINTIFF/COUNTER COMPLAINANT/DEFENDANT,
     CARTER BRYANT:
10
                         LITTLER MENDELSON
11                       BY:   KEITH A. JACOBY
                         2049 CENTURY PARK EAST,
12                       FIFTH FLOOR
                         LOS ANGELES, CALIFORNIA   90067
13                       (310) 553-0308

14

15   ON BEHALF OF MGA ENTERTAINMENT:

16                       O'MELVENY & MYERS LLP
                         BY:   DIANA M. TORRES
17                       400 SOUTH HOPE STREET
                         LOS ANGELES, CA   90071-2899
18                       (213) 430-6556

19

20

21

22

23

24

25
```

2-12-07                          CV 04-09049 EXHIBIT ____6____

                                              PAGE ____88____

```
 1        RIVERSIDE, CALIFORNIA; MONDAY, FEBRUARY 12, 2007; 1:49 P.M.

 2                             -oOo-

 3        THE CLERK:  CALLING CALENDAR ITEM 13, CARTER BRYANT

 4   VERSUS MATTEL, INC., CV 04-09049.

 5        MAY WE HAVE COUNSEL PLEASE COME FORWARD AND STATE

 6   YOUR APPEARANCES FOR THE RECORD.

 7        MR. QUINN:  JOHN QUINN, MIKE ZELLER FOR MATTEL.

 8        MR. ZELLER:  GOOD AFTERNOON.

 9        MS. TORRES:  DIANA TORRES FOR MGA.

10        MR. JACOBY:  KEITH JACOBY FOR CARTER BRYANT.

11        THE COURT:  GOOD AFTERNOON.  WE'RE ON CALENDAR FOR A

12   STATUS/SCHEDULING CONFERENCE TODAY.  I'VE RECEIVED THE REPORTS

13   SUBMITTED BY COUNSEL REGARDING THE CASES.

14        I'VE ALSO, JUST AS A SIDE NOTE, RECEIVED A

15   STIPULATION AND ORDER REGARDING THE REQUEST TO EXTEND THE

16   DEADLINE WITHIN WHICH TO FILE A MOTION FOR REVIEW OF THE

17   DISCOVERY SPECIAL MASTER'S ORDER, WHICH I WILL SIGN.

18        I'VE SEEN, FROM ALL OF THE VARIOUS UNDER-SEAL

19   MATTERS, THAT YOU HAVE CERTAINLY NOT BEEN SHY ABOUT USING THE

20   SPECIAL MASTER.

21        I'D LIKE TO HEAR YOUR FINAL THOUGHTS ON THIS BEFORE I

22   MAKE A FINAL DECISION, BUT I'M EVEN MORE CONVINCED TODAY THAN I

23   WAS WHEN I FIRST SUGGESTED IT THAT, IN MY VIEW, THE

24   9059-CASE -- THE CASE THAT, FROM MY ASSESSMENT OF IT, WILL

25   HOPEFULLY ANSWER THE QUESTION AS TO WHO OWNS BRATZ BETWEEN
```

01:49

01:50

01:50

01:50

01:51

EXHIBIT ___6___

PAGE ___89___

4

1   MATTEL AND CARTER BRYANT -- IS THE CASE THAT SHOULD GO FIRST.

2   IN MY VIEW, IT'S THE DOG THAT KIND OF WAGS THE TAIL HERE, THE

3   TAIL BEING THE 2727-CASE.  NOT TO SUGGEST THAT ONE CASE IS ANY

4   MORE OR ANY LESS IMPORTANT THAN THE OTHER.  I JUST THINK IT

5   MAKES MORE SENSE, IN TERMS OF THE SEQUENCE, THAT IF WE CAN          01:51

6   RESOLVE WHO OWNS THE DOLL IN QUESTION, THAT MANY OF THE ISSUES

7   IN THE OTHER CASE MAY BE RESOLVED, AND IT'S JUST A CLEANER WAY

8   OF PROCEEDING.  THAT'S WHAT I'M INCLINED TO DO.

9         AND I APPRECIATE COUNSEL PUTTING ALTERNATIVE DATES

10  OUT, BUT BEFORE I MAKE THAT FINAL, I THOUGHT YOU MIGHT HAVE        01:52

11  SOME ADDITIONAL THOUGHTS AS YOU PREPARED FOR THE STATUS

12  CONFERENCE.

13        MR. QUINN?

14        MR. QUINN:  THANK YOU, YOUR HONOR.

15        WHEN WE WERE LAST HERE BEFORE YOUR HONOR, THE COURT          01:52

16  RAISED THE ISSUE ABOUT 'WOULD IT MAKE SENSE TO TRY THE ISSUE OF

17  BRATZ' OWNERSHIP FIRST.'  AND WHAT THE COURT JUST SAID, I

18  HEARD, TO DESCRIBE SOMETHING A LITTLE BIT DIFFERENT; THE COURT

19  REFERRED TO THE FIRST-FILED COMPLAINT, WHICH IS SOMEWHAT

20  BROADER.                                                          01:52

21        THE COURT:  SOMEWHAT, YES.

22        MR. QUINN:  BECAUSE THAT DOES ANSWER SOME OF OUR

23  CONCERNS ABOUT THAT, BECAUSE THE BREACH OF FIDUCIARY DUTIES,

24  INTERFERENCE CLAIMS AND OTHERS, ALL KIND OF AROSE FROM THE SAME

25  FACTS.                                                            01:52

```
 1            THE COURT:  YES.

 2            MR. QUINN:  I GUESS THERE ARE STILL -- I THINK THERE

 3   ARE SOME ISSUES, YOUR HONOR, WITH TRYING TO BIFURCATE TRIAL

 4   THAT WAY, OR AT LEAST TO TRY TO MAKE THAT DECISION NOW.

 5            FOR EXAMPLE, IN THAT FIRST COMPLAINT, THERE ARE NO        01:53

 6   CLAIMS ASSERTED AGAINST MGA.  THESE CASES EVOLVED AS ADDITIONAL

 7   FACTS CAME TO LIGHT.  MGA INTERVENED IN THAT FIRST CASE BEFORE

 8   THERE WAS AN AMENDMENT TO OUR PLEADING; SO IF WE WERE JUST TO

 9   TRY THAT CASE, I GUESS WE HAVE MGA THERE AS AN

10   INTERVENOR-DEFENDANT, NEITHER ASSERTING ANY CLAIMS, NOR ON THE    01:53

11   RECEIVING END OF ANY CLAIMS.  IN EFFECT, WE HAVE TWO SETS OF

12   LAWYERS AT EVERY STAGE SPEAKING FOR THE DEFENDANTS.

13            THE COURT:  BUT DO WE EVER REALLY GET AWAY FROM THAT?

14            MR. QUINN:  WELL, I THINK WE DO GET AWAY FROM THAT IF

15   WE INCLUDE THE CLAIMS AGAINST MGA THAT NATURALLY GROW OUT OF      01:53

16   THAT FIRST COMPLAINT.

17            FOR EXAMPLE, THERE ARE CLAIMS FOR -- AND THESE ARE

18   NOW IN THE AMENDED PLEADING WHICH IS PRESENTLY FRAMED AS A

19   COUNTERCLAIM --

20            THE COURT:  RIGHT.                                       01:54

21            MR. QUINN -- CLAIMS FOR TORTIOUS INTERFERENCE; CLAIMS

22   FOR CONSPIRACY TO BREACH EMPLOYMENT OBLIGATIONS.  THOSE CLAIMS

23   MADE AGAINST MGA THAT ARISE OUT OF THOSE SAME SET OF FACTS,

24   YOUR HONOR, IT SEEMS TO ME QUITE LOGICALLY OUGHT TO BE TRIED

25   WITH THOSE OTHER CLAIMS AGAINST CARTER BRYANT.                    01:54
```

1    THERE'S NO DISPUTE, BECAUSE MR. BRYANT HAS TESTIFIED

2  TO IT, THAT HE WAS, IN FACT, WORKING FOR MGA; THAT HE WAS PAID

3  BY MGA; THAT HE DID ASSIGNMENTS FOR MGA; ALL WHILE HE WAS STILL

4  EMPLOYED BY MATTEL.  SO TO SORT OF PRETEND THOSE CLAIMS AREN'T

5  THERE AND ALLOW MGA TO PARTICIPATE WITH A SECOND SET OF LAWYERS        01:54

6  THERE ON THE DEFENSE SIDE WITHOUT INCLUDING THOSE CLAIMS SEEMS

7  BOTH IN EFFICIENT AND PARTICULARLY UNFAIR BECAUSE THOSE CLAIMS

8  ARE ALL THERE.

9    WHATEVER HAPPENS IN THAT FIRST TRIAL, YOU WOULD STILL

10  HAVE -- I MEAN, IF THE ISSUE IS BRATZ OWNERSHIP, THAT'S NOT          01:55

11  GOING TO RESOLVE THE QUESTION OF DID HE BREACH HIS FIDUCIARY

12  DUTIES.  AND EVEN IF HE DIDN'T CREATE SOMETHING THAT MATTEL NOW

13  OWNS, AND THE JURY FINDS MATTEL DOESN'T OWN IT, FOR WHATEVER

14  REASON, THAT DOESN'T DISPOSE OF THE REASON OF WAS IT RIGHT FOR

15  HIM TO RECEIVE MONEY FROM MGA AND DO WORK FOR MGA WHETHER OR          01:55

16  NOT HE CREATED SOMETHING THAT WE OWN?  THOSE CLAIMS ARE ALL NOT

17  GOING TO BE DISPOSED OF IN ANY EVENT.

18    SO IF WE'RE GOING TO FOCUS ON THOSE FIRST SET OF

19  ISSUES ABOUT BRYANT AND WHAT HE DID WHEN HE WAS EMPLOYED BY

20  MATTEL UNNECESSARILY, I THINK WE'RE GOING TO HAVE TO ADDRESS          01:55

21  MGA'S INVOLVEMENT, AND IT DOESN'T MAKE A WHOLE LOT OF SENSE, IT

22  SEEMS, TO SORT OF KEEP THOSE OUT FOR A SECOND TRIAL.

23    THE OTHER THING I WOULD SAY, YOUR HONOR, AND REALLY

24  WITH RESPECT TO THE RICO CLAIM, I WOULD SUBMIT, YOUR HONOR,

25  THAT IT'S FAIR AND APPROPRIATE THAT MATTEL SHOULD BE PERMITTED        01:56

```
 1    TO PRESENT TO THE JURY ALL THE RACKETEERING ACTS AT ONCE.
 2            FOR EXAMPLE, IF THIS WERE A CASE THAT INVOLVED SIX
 3    BROKEN WINDOWS OR SIX ACTS OF THEFT, IT WOULD BE APPROPRIATE
 4    THAT THE PLAINTIFF BE ABLE TO BE PERMITTED TO PRESENT TO THE
 5    JURY ALL SIX ACTS AT ONCE.  THE JURY IS ENTITLED TO -- I'M SURE    01:56
 6    WE'RE GOING TO HEAR A DEFENSE OF 'WE DIDN'T DO ANYTHING
 7    INTENTIONALLY; WE ACTED IN GOOD FAITH.'
 8            THE COURT:  COUNSEL, IF YOU'RE CORRECT, THOUGH, THAT
 9    MATTEL OWNS BRATZ, YOU'LL STILL BE ABLE TO PRESENT THAT AT THE
10    SECOND TRIAL.                                                     01:56
11            MR. QUINN:  THEN WHAT WILL WE HAVE?  A JURY
12    INSTRUCTION ON THE ISSUE?  OR ARE WE GOING TO PRESENT THE SAME
13    EVIDENCE AGAIN?  OR EXACTLY HOW WILL THAT PROCEED?
14            THE COURT:  IT WILL HAVE BEEN DECIDED, I PRESUME, BY
15    THAT POINT.  OR NOT.                                              01:57
16            MR. QUINN:  I THINK THE JURY IS ENTITLED -- MATTEL
17    SHOULD BE PERMITTED TO PRESENT TO THE JURY THE FACTS AND
18    CIRCUMSTANCES CONCERNING THAT THEFT.  UNLESS THE JURY IS SIMPLY
19    GOING TO BE INSTRUCTED THAT IT HAS ALREADY BEEN DETERMINED THAT
20    THIS WAS STOLEN.                                                  01:57
21            THE COURT:  OR, ALTERNATIVELY, IF IT'S ALREADY BEEN
22    DETERMINED THAT IT WAS NOT STOLEN.
23            MR. QUINN:  PRESUMABLY THEN IT WON'T BE AN ISSUE AT
24    ALL.
25            THE COURT:  THAT'S THE EFFICIENCY, BUT THAT'S JUST        01:57
```

8

1   HARD TO SOLVE AT THIS POINT.

2           MR. QUINN:   BECAUSE THE OTHER ACTS OF THEFT REALLY --

3   THE RACKETEERING ACTS, THE PATTERN -- ALL RELATE TO THEFT OF

4   TRADE SECRETS THAT DON'T FALL ONE WAY OR ANOTHER ON THE ISSUE

5   OF WHO OWNS BRATZ.                                              01:58

6           THAT WOULD BE MY PITCH, YOUR HONOR, TO THE EXTENT THE

7   COURT IS INCLINED TO MAKE A DECISION NOW.

8           AND AS WE INDICATED IN OUR PAPERS, WE REALLY THINK

9   IT'S KIND OF PREMATURE AT THIS STAGE TO TRY TO STRUCTURE THE

10  TRIAL; THAT THERE ISN'T A REASON TO TRY TO DECIDE THAT RIGHT    01:58

11  NOW.   BOTH SIDES HAVE SUBMITTED PROPOSALS THAT DISCOVERY ON

12  BOTH CASES GO FORWARD FOR THE TIME BEING.

13          THE DEFENDANTS HAVE A DIFFERENT VIEW ON WHEN

14  DISCOVERY OUGHT TO CUT OFF AS TO THE FIRST STAGE, BUT BOTH

15  SIDES HAVE PRESENTED PROPOSALS THAT DISCOVERY SHOULD GO FORWARD 01:58

16  ON BOTH CASES AT THE SAME TIME.   AND WE WOULD SUGGEST, YOUR

17  HONOR, THAT THERE REALLY ISN'T A GOOD REASON RIGHT NOW TO TRY

18  TO BIFURCATE THE TRIAL.

19          THE COURT:   SPEAKING OF DISCOVERY -- AND THIS IS PART

20  OF WHAT GIVES THE COURT SO MUCH PAUSE IN TERMS OF CONTINUING TO 01:58

21  LET THIS CASE GO ON WITHOUT SOME KIND OF PARAMETERS -- THAT IS

22  THE MUTUAL REQUEST FOR NO LIMIT ON THE NUMBER OF EXPERT

23  DEPOSITIONS.   YOU'RE ASKING FOR 40 NONEXPERT DEPOSITIONS WITH

24  NO LIMIT ON THE NUMBER OF RULE 30(B) WITNESSES.

25          THAT IS DISCONCERTING.                                  01:59

9

```
 1          MR. QUINN:  I UNDERSTAND WHY THAT WOULD BE
 2   DISCONCERTING TO THE COURT, YOUR HONOR.
 3          THE COURT:  WE'VE GOT A SPECIAL MASTER NOW.  I HAVE
 4   THESE VISIONS OF THIS CASE, AND HAVING SEEN WHAT'S GONE THROUGH
 5   TO THE SPECIAL MASTER, I --                               01:59
 6          MR. QUINN:  THINGS ARE MOVING NOW.
 7          JUDGE INFANTE, ALTHOUGH HE'S VERY MUCH IN DEMAND AND
 8   HE HAS A BUSY CALENDAR, WE CAN GET ON HIS CALENDAR AND HE MAKES
 9   DECISIONS; SO WE'RE OPTIMISTIC NOW THAT WE ARE AT LAST GOING TO
10   BE ABLE TO MOVE FORWARD IN DISCOVERY.                     01:59
11          BUT THIS IS A CASE THAT, IF WE'RE LOOKING AT ALL OF
12   THE PLEADINGS AND ALL OF THE CLAIMS, COVER A VERY, VERY BROAD
13   SCOPE OF ACTIVITY.  I DON'T THINK EITHER SIDE IS GRATUITOUSLY
14   REQUESTING --
15          THE COURT:  AND I'M NOT SUGGESTING THAT, COUNSEL, BUT  02:00
16   I AM GOING TO PUT A LIMIT ON THEM, AND I DON'T LIKE TO JUST
17   COME UP WITH A NUMBER.  I'D RATHER ONE BE SUGGESTED.
18          AT THIS POINT, YOU CERTAINLY HAVE TO HAVE SOME SENSE
19   OF GENERAL AREAS WHERE YOU'RE GOING TO HAVE EXPERT WITNESSES.
20   AN OUTER LIMIT OF THAT WOULD BE WHAT?                     02:00
21          INFINITY JUST DOESN'T WORK.
22          MR. QUINN:  YOUR HONOR, I'M SURE WE COULD COME UP
23   WITH AN OUTER LIMIT.  WE HAVE EVERYTHING FROM VARIOUS TYPES OF
24   MARKETING EXPERTS, TRADE SECRET EXPERTS, TO VALUING OF TRADE
25   SECRET INFORMATION; SEVERAL DIFFERENT CATEGORIES OF         02:00
```

```
1   INFORMATION.  AS THE COURT KNOWS, WE HAVE INK-QUESTIONED
2   DOCUMENT-ANALYSIS-TYPE EXPERTS.  I THINK THERE ARE GOOD REASONS
3   TO THINK THAT THERE MIGHT BE, ON BOTH SIDES, SOME
4   SIGNIFICANT -- WHAT THE NUMBER IS, FIVE TO TEN?  SOMEWHERE IN
5   THERE.                                                              02:01
6            THE COURT:  MY LAW CLERK AND I DURING THE LUNCH HOUR
7   WERE ABLE TO COME UP WITH A NUMBER IN THE HIGH TEENS, BUT IT'S
8   STILL NOT AN INFINITE NUMBER.
9            MR. QUINN:  I'M SURE WE COULD COME UP WITH A
10  NOT-TO-EXCEED NUMBER, IF THAT WOULD BE HELPFUL AT THIS POINT.       02:01
11  BUT THIS IS A CASE WHERE, IN A RECENT INTERROGATORY ANSWER
12  ABOUT PERSONS KNOWLEDGEABLE, THERE WERE SOME 70 PERSONS
13  IDENTIFIED IN AN ANSWER TO AN INTERROGATORY.
14           THIS IS REALLY NOT A CASE WHERE --
15           THE COURT:  I PRESUME THOSE WERE THE PERSONS              02:01
16  KNOWLEDGEABLE AND NOT NECESSARILY THE PERSONS MOST
17  KNOWLEDGEABLE.
18           MR. QUINN:  NOT NECESSARILY PERSONS MOST
19  KNOWLEDGEABLE, BUT FACT WITNESSES; PERSONS HAVING KNOWLEDGE OF
20  CERTAIN KINDS OF FACTS.                                            02:01
21           PART OF THE PROBLEM IN THIS CASE, YOUR HONOR -- AND I
22  KNOW THIS IS THE LAST THING THE COURT WANTS TO HEAR OR GET INTO
23  AT THIS POINT, AND IT'S NOT SOMETHING I TAKE ANY PLEASURE IN
24  BRINGING UP, BUT I'LL JUST SAY THAT IT HAS BEEN VERY, VERY
25  DIFFICULT TO GET DISCOVERY GOING IN THIS CASE.                     02:01
```

2-12-07                    CV 04-09049  EXHIBIT _____ 6

PAGE _____ 96

1      THE DEFENDANTS SO FAR HAVE PRODUCED THREE WITNESSES

2  FOR DEPOSITION.  TWO OF THEM, MR. BRYANT AND MR. LARIAN, IT

3  REQUIRED TWO COURT ORDERS TO GET THEM TO APPEAR.  MR. BRYANT

4  WAS INSTRUCTED NOT TO ANSWER QUESTIONS ALMOST ONE HUNDRED

5  TIMES.  WE'VE MOVED ON 67 OF THOSE AND THAT'S GOING TO BE      02:02

6  BEFORE JUDGE INFANTE.  THE ONE WITNESS THEY VOLUNTARILY

7  PRODUCED BY THE NAME OF BRODEY THAT MGA PRODUCED, WE HAD TO

8  TERMINATE THE DEPOSITION WITHIN ONE HOUR BECAUSE THE WITNESS

9  WAS INSTRUCTED NOT TO ANSWER QUESTIONS REGARDING E-MAILS THAT

10  THIS WITNESS WROTE.  IT WASN'T A CLAIM OF PRIVILEGE.  THEY JUST  02:02

11  SAID IT'S IRRELEVANT.  SO WE TERMINATED THAT, AND THAT'S NOW

12  TEED UP BEFORE JUDGE INFANTE.

13      THE COURT KNOWS THERE'S AN ISSUE ABOUT EXAMINATION

14  AND TESTING OF ORIGINAL QUESTIONED DOCUMENTS.  YOUR HONOR, WE

15  STILL DON'T HAVE ALL THOSE DOCUMENTS, NOTWITHSTANDING THE FACT  02:02

16  THAT THERE WAS -- THE REPRESENTATION WAS MADE IN JUDGE BLOCK'S

17  COURTROOM THAT THOSE WOULD BE PRODUCED WITHIN 15 DAYS, MANY

18  MANY MONTHS AGO.  THAT DIDN'T HAPPEN.  THAT'S NOW GOING TO BE

19  DECIDED TOMORROW BEFORE JUDGE INFANTE.

20      THERE WERE VOLUMINOUS DOCUMENTS, MANY DIFFERENT     02:03

21  DOCUMENTS, THAT WE WERE SEEKING AND HAVE SOUGHT FOR A LONG

22  TIME.  JUDGE INFANTE, WE FINALLY GOT THAT BEFORE HIM.  HE

23  GRANTED OUR MOTION ALMOST IN ITS ENTIRETY.  I THINK THINGS ARE

24  GOING TO CHANGE NOW.  I'M OPTIMISTIC THAT THINGS WILL CHANGE

25  NOW.     02:03

1   BUT THE IMPORTANT POINT IS, THAT I WOULD HOPE THE

2   COURT WOULD APPRECIATE, IS THAT NOTWITHSTANDING THE AMOUNT OF

3   TIME THAT'S GONE BY SINCE THIS CASE WAS FILED, DISCOVERY IS

4   NOWHERE NEAR AS FAR ALONG AS ONE MIGHT EXPECT.  IN PART, IT'S

5   BECAUSE OF THE STAY.  BUT IT'S, IN PART, BECAUSE OF JUST THE          02:03

6   INABILITY TO GET ANYWHERE.  AND I DO THINK THAT'S GOING TO

7   CHANGE NOW.

8   WE HAVE NO INTEREST IN TAKING DISCOVERY GRATUITOUSLY

9   OR JUST TO TAKE DISCOVERY, BUT THERE ARE A LOT OF DIFFERENT

10  SUBJECTS THAT NEED TO BE COVERED AND WE'RE STILL AT A PRETTY          02:04

11  EARLY STAGE IN THAT REGARD.

12  THE COURT:  LET ME HEAR FROM MS. TORRES FROM MGA.

13  MS. TORRES:  THANK YOU, YOUR HONOR.

14  AT A CERTAIN POINT, THE LITIGATION DOES HAVE TO GO

15  FORWARD.  AND I WILL SUBMIT TO YOU THAT MATTEL NEVER REALLY           02:04

16  SOUGHT TO MAKE IT GO FORWARD UNTIL JANUARY WHEN THIS COURT SAID

17  'I WANT A SCHEDULE.'

18  MR. QUINN JUST WENT THROUGH A LAUNDRY LIST OF

19  HORRIBLES ABOUT WHAT TYPE OF DISCOVERY-OBSTRUCTIONIST TACTICS

20  WE'VE ENGAGED IN, AND THE FACT OF THE MATTER IS HIS INFORMATION       02:04

21  IS INCOMPLETE, SUFFICE IT TO SAY; THINGS LIKE THE MOTION TO

22  COMPEL CARTER BRYANT FOR DEPOSITION.

23  YES, THEY MOVED TO COMPEL CARTER BRYANT FOR

24  DEPOSITION, AND THEY WERE ABLE TO COMPEL HIM.  BUT NOT UNTIL

25  AFTER WE GOT A PROTECTIVE ORDER REQUIRING THEM TO PRODUCE             02:05

13

1    DOCUMENTS.

2            THERE HAS BEEN A DELAY FOR A START-UP TIME IN GETTING

3    DISCOVERY GOING, BUT FRANKLY IT HAS BEEN MORE BECAUSE WHAT THEY

4    WANT IN DISCOVERY IS SCORCHED-EARTH DISCOVERY TO BE ABLE TO

5    FIND THEIR THEORIES.                                             02:05

6            THE COURT:  THE COURT HAS TAKEN A LOOK, A GANDER, A

7    PERUSAL, OF SOME OF THE DOCUMENTS THAT HAVE BEEN GOING UP TO

8    JUDGE INFANTE.  ADMITTEDLY, I HAVE BEEN CONCERNED AT SOME OF

9    THE THINGS THAT I HAVE OBSERVED THE FIGHT GOING ON OVER.  AND

10   JUST SINCE YOU'RE THE ONE THAT HAS THE LECTERN RIGHT NOW, A      02:05

11   RECENT EXAMPLE, THE COURT SAW THAT THERE WERE DRAWINGS THAT

12   MR. BRYANT DID OF BRATZ DOLLS THAT WERE NOT TURNED OVER, AND

13   SOME OF THIS STUFF JUST SEEMS LIKE IT WOULD BE PRETTY OBVIOUS

14   THAT THIS WOULD BE THE TYPE OF THING THAT WOULD BE RELEVANT

15   THAT WOULD HAVE TO BE TURNED OVER UP FRONT.                      02:06

16           MS. TORRES:  THE ISSUE OF THE BRATZ DRAWINGS IS

17   WHETHER OR NOT THEY WERE FIRST-GENERATION BRATZ OR SUBSEQUENT-

18   GENERATION BRATZ.  AND WHEN THE CASE WAS SIMPLY THE MATTEL V.

19   BRYANT CASE, WE -- AND EARLY IN THIS CASE IT WAS MR. BRYANT,

20   BUT ALSO MGA -- AGREED TO PRODUCE FIRST-GENERATION BRATZ         02:06

21   DOCUMENTS, AND WE DID.

22           WHAT THEY MOVED TO COMPEL ON WERE POST-FIRST-

23   GENERATION BRATZ DOCUMENTS, AND THE REASON JUDGE INFANTE

24   GRANTED THAT WAS BECAUSE NOW SUBSEQUENT-GENERATION BRATZ ARE AT

25   ISSUE.  BUT THEY WEREN'T AT ISSUE IN THE ORIGINAL CASE THAT WAS  02:06

2-12-07                    CV 04-09049        EXHIBIT___6___

                                              PAGE___99___

14

1   FILED, MATTEL VERSUS CARTER BRYANT.

2          THE COURT:  THE INITIAL CASE.

3          MS. TORRES:  YES.

4          THEREFORE, NOW THAT THERE IS MORE IN THE CASE, THOSE

5   DOCUMENTS ARE RELEVANT AND THEY ARE BEING PRODUCED.                    02:07

6          THAT IS A NEW DEVELOPMENT THAT THEY HAD AGREED IN

7   FRONT OF JUDGE BLOCK, AND WE HAVE A TRANSCRIPT OF IT, THAT WE

8   ONLY NEEDED TO PRODUCE FIRST GENERATION.  AND IN DECEMBER THEY

9   RAISED THE ISSUE OF ALL BRATZ DRAWINGS.  SO WHEN THEY SAY THAT

10  CRITICAL BRATZ DRAWINGS HAVE NOT BEEN PRODUCED, IT'S MISLEADING      02:07

11  BECAUSE THEY MAY BE RELEVANT TO THE SECOND ROUND OF CLAIMS BUT

12  THEY WEREN'T RELEVANT TO THE MATTEL V. BRYANT CASE.  AND

13  DISCOVERY IN THE SECOND ROUND OF CASES OR CLAIMS DID NOT START

14  UNTIL DECEMBER.

15         THE COURT:  ALL RIGHT.  THAT WAS JUST ONE THAT KIND           02:07

16  OF STRUCK ME AS -- AND LIKE I SAY, I DIDN'T THOROUGHLY REVIEW

17  THESE PLEADINGS IN DETAIL.  I JUST KIND OF WANTED TO GET A

18  SENSE OF WHAT I WAS SIGNING THE UNDER-SEAL ORDER ON, AND I JUST

19  REVIEWED THEM TO GET A GENERAL SENSE OF THAT.

20         MS. TORRES:  YES.  AND WE HAVE NOT BEEN FILING -- MGA         02:08

21  AND CARTER BRYANT HAVEN'T BEEN FILING THEIR MOTIONS TO COMPEL

22  WITH THIS COURT BECAUSE WE THOUGHT THAT WAS IMPROPER.  AND

23  RECENTLY JUDGE INFANTE AGREED THAT THE MOTIONS TO COMPEL SHOULD

24  NOT BE FILED WITH THIS COURT.

25         THE COURT:  WELL, THE MOTIONS DON'T NEED TO BE FILED          02:08

2-12-07                          CV 04-09049 EXHIBIT _____ 6

                                              PAGE _____ 100

1    WITH THIS COURT, BUT THE UNDER-SEALING -- I ASSUME THAT YOU

2    WANT TO HAVE --

3           SO YOU'RE NOT FILING YOUR MOTIONS WITH THE COURT AT

4    ALL, EVEN UNDER SEAL?

5           MS. TORRES:  CORRECT.                                    02:08

6           THE COURT:  I'LL SPEAK TO JUDGE INFANTE ABOUT THAT.

7    THAT'S SOMETHING THAT HE PROBABLY SHOULD HAVE CONSULTED THIS

8    COURT ON.

9           MS. TORRES:  IN ANY EVENT, THE ISSUE THAT WE HAVE

10   HERE IS THE SCHEDULE AND WHETHER OR NOT --                      02:08

11          THE COURT:  YES.

12          I THINK YOU PROBABLY KNOW THE GENERAL SENSE OF WHERE

13   THE COURT IS GOING ON THIS.

14          WHAT ARE YOUR THOUGHTS?

15          MS. TORRES:  WE PROPOSED TWO SCHEDULES THAT WE           02:08

16   BELIEVED WERE IN KEEPING WITH THE COURT'S JANUARY 12TH ORDER.

17          THE COURT:  WHAT ABOUT THE WISDOM OF THE COURT'S

18   TENTATIVE THOUGHTS ON THAT?  DO YOU AGREE OR DISAGREE?

19          MS. TORRES:  I BELIEVE A LOT OF THE CASE WILL SHAKE

20   OUT WITH RESOLUTION OF THE ISSUES THAT WERE FIRST BROUGHT IN    02:09

21   STATE COURT AND REMOVED TO THIS COURT IN MATTEL V. BRYANT.

22   THAT IS THE HEART OF THE CASE.  I'M NOT SAYING THAT THERE WON'T

23   BE OTHER CLAIMS LEFT.  THERE WILL BE, MOST LIKELY.  BUT IT IS

24   THE MOST IMPORTANT ISSUE.  AND IT IS THE ONLY ISSUES THAT HAVE

25   BEEN IN THIS COURT FOR TWO AND A HALF YEARS, NOW ALMOST THREE   02:09

16

1   YEARS.  IT'S AN IMPORTANT ISSUE THAT SHOULD BE DECIDED IN

2   ISOLATION.  IT SHOULD NOT BE DECIDED IN CONNECTION WITH

3   ALLEGATIONS ABOUT, YOU KNOW, AN MGA EMPLOYEE IN CANADA WHO

4   DOESN'T KNOW CARTER BRYANT FROM ADAM, OR AN ALLEGATION ABOUT AN

5   MGA EMPLOYEE IN MEXICO WHO ALSO PRIOR TO WORKING AT MGA NEVER            02:09

6   KNEW CARTER BRYANT.

7           WHAT THEY WOULD LIKE TO DO IS MUDDY THE WATERS ON

8   THAT PARTICULAR ISSUE, WHICH IS THE KEY ISSUE.  AND I THINK THE

9   COURT IS RIGHT, IF YOU ISOLATE THAT ISSUE, IT WILL DETERMINE A

10  LOT OF THE REST OF THE CASE.                                           02:10

11          THE COURT:  THANK YOU, COUNSEL.

12          MR. JACOBY?

13          MR. JACOBY:  JUST TO ADDRESS THE ISSUE THAT YOU

14  RAISED WITH MS. TORRES ABOUT THE DISCOVERY MASTER FILINGS.  I

15  WAS ACTUALLY ON THE CALL WITH JUDGE INFANTE.                           02:10

16          THE COURT:  PLEASE.

17          MR. JACOBY:  IN THE FIRST ROUND OF MOTIONS THAT

18  MATTEL FILED, THEY DID FILE THEM WITH THE COURT AS WELL AS

19  JUDGE INFANTE, AND THAT'S WHY THERE WERE SEALING ORDERS.  WE

20  RAISED THAT WITH JUDGE INFANTE, AND HE INDICATED THAT IN THE           02:10

21  ABSENCE OF AN APPEAL IN WHICH CASE THERE WAS AN APPEAL TO THIS

22  COURT THAT ALL OF THE BRIEFS WOULD GO TO YOU AND YOU WOULD

23  DECIDE THE APPEAL; THAT THE WHOLE PURPOSE OF THE DISCOVERY

24  MASTER IS TO TAKE THIS OFF THE PLATE OF THE MAGISTRATE JUDGE

25  AND, TO THE EXTENT THE PARTIES LIVE WITH THE ORDER OF THE              02:11

2-12-07                          CV 04-09049   EXHIBIT ____ 6

                                                PAGE ____ 102

1  DISCOVERY MASTER, YOU.

2         AND WE, IN PARTICULAR, FOUND IT TROUBLING THAT MATTEL

3  WAS FILING THEIR PAPERS WITH THE COURT FOR PRECISELY THE REASON

4  THAT YOU ARTICULATED TODAY; THAT YOU READ THEIR PAPERS AND NOT

5  OURS AND HAD A SENSE OF HOW THINGS WERE GOING BASED ON HEARING    02:11

6  HALF THE STORY.

7         THE COURT:  I APPRECIATE JUDGE INFANTE'S THOUGHTS ON

8  THAT, BUT I GUESS THE REASON WHY I WOULD LIKE TO HAVE THOSE

9  FILED IS NOT BECAUSE I'M READING THEM, LIKE I SAY, FOR ANY

10  SUBSTANTIVE RESOLUTION OF THE MATTER.  I APPRECIATE THE SPECIAL   02:11

11  MASTER'S INVOLVEMENT IN THAT.  I LIKE TO KEEP A SENSE OF WHAT'S

12  GOING ON.  IT GIVES ME AN IDEA OF HOW MUCH DISCOVERY IS TAKING

13  PLACE; WHAT THE ISSUES ARE.  IT'S JUST A WAY OF ME TO MONITOR

14  THE CASE THAT I HAVE ULTIMATE RESPONSIBILITY FOR.

15         SO I THINK IT DOES MAKE SENSE TO FILE THOSE WITH THE       02:1:

16  COURT UNDER SEAL.  THEY ARE THERE THEN IF THERE IS AN APPEAL.

17  IF THERE'S ANY ISSUES DOWN THE ROAD, I'LL HAVE ACCESS TO THOSE.

18  AND IT ALSO GIVES ME A GENERAL SENSE OF WHERE THINGS ARE GOING.

19         JUST LIKE WITH THE MAGISTRATE JUDGE, RESOLVING THE

20  DISCOVERY DISPUTE, THERE ARE STILL COPIES OF THOSE CASES PLACED   02:1:

21  IN THE DISTRICT COURT'S FILE; AGAIN, NOT TO MICROMANAGE WHAT

22  THE MAGISTRATE JUDGE IS DOING, BUT JUST TO BE ABLE TO HAVE A

23  SENSE OF WHAT'S HAPPENING IN THE CASE.

24         IT'S ALL THE MORE IMPORTANT WHEN IT'S A SPECIAL

25  MASTER OUTSIDE OF THE COURT WHO'S HANDLING THESE THINGS.  I'D     02:1:

18

1    JUST LIKE TO KEEP TABS ON WHAT'S HAPPENING.

2         MR. JACOBY:  WE'RE HAPPY TO DO THAT.

3         I WOULD AGREE WITH MR. QUINN, THAT THE DISCOVERY

4    MASTER PROCESS SEEMS TO BE WORKING SO FAR.  AND SO YOU HAVE A

5    SENSE OF IT, MGA AND BRYANT HAVE BROUGHT TWO MOTIONS AND WON          02:12

6    THEM BOTH.  MATTEL HAS BROUGHT ONE MOTION, AND THAT MOTION WAS

7    GRANTED AS WELL.  THERE ARE TWO MORE SCHEDULED FOR TOMORROW.

8         THE COURT:  LIKE I SAY, I DIDN'T RAISE THAT FOR ANY

9    OTHER REASON THAN JUST TO RAISE THE ISSUE.  I'M SURE THAT YOU

10   BOTH ARE VERY CAPABLE OF EXERCISING YOUR RIGHTS WITH THE              02:12

11   SPECIAL MASTER.  AND THAT'S PART OF MY POINT HERE, I SUPPOSE,

12   IS THAT I KNOW I HAVE THREE INCREDIBLY SOPHISTICATED LAW FIRMS

13   LITIGATING THIS CASE, AND SOPHISTICATED LAWYERS, SO I HAVE

14   CONFIDENCE THAT WE CAN ACCOMPLISH THIS.

15        DO YOU HAVE ANY THOUGHTS ON THE PARTICULAR ISSUE OF             02:13

16   BIFURCATION?

17        MR. JACOBY:  YES.

18        MR. BRYANT FEELS THAT -- THERE'S NO QUESTION THAT NO

19   MATTER HOW THE BRYANT CASE IS DECIDED, THE FIRST CASE, IT WILL

20   LIMIT THE ISSUES IN THE SECOND CASE BY DEFINITION.  IF               02:13

21   MR. BRYANT PREVAILS ON HIS CASES, IT WILL LIMIT THE ISSUES IN

22   THE SUBSEQUENT CASE.  IF MR. BRYANT DOES NOT PREVAIL, IT WILL

23   NARROW THE ISSUES; SO I THINK IT MAKES AN ABUNDANCE OF SENSE TO

24   TRY THE BRYANT ISSUES FIRST.

25        AND FOR HIS PART, I THINK MR. BRYANT IS ENTITLED TO            02:13

2-12-07                    CV 04-09049  EXHIBIT _____ 6

                                        PAGE _____ 104

1   THIS ADJUDICATION. HE'S THE ONE PERSON IN THIS MIX WHO'S NOT A

2   CORPORATION, AND HE HAS THIS CLOUD OVER HIS WELL-BEING THAT'S

3   BEEN THERE FOR A PRETTY LONG TIME NOW, AND HE WOULD LIKE TO SEE

4   IT DISPOSED OF, IN ONE WAY OR THE OTHER, AS QUICKLY AS

5   POSSIBLE.                                                           02:14

6           AND I THINK THAT AT THE LAST HEARING, THE COURT

7   ALREADY SORTED THESE ISSUES WHEN IT SAID THAT THE CLAIMS -- AND

8   THERE WERE CLAIMS AGAINST LARIAN AND CLAIMS AGAINST BRYANT IN

9   THE AMENDED COMPLAINT THAT MATTEL MOVED TO FILE, AND THOSE WERE

10  MOVED OVER TO THE OTHER CASE. AND I THINK THAT TO BLEED THEM      02:14

11  BACK IN TO THE ORIGINAL CASE WOULD JUST CREATE A LOT OF

12  CONFUSION.

13          WITHOUT ARGUING THE CASE HERE NOW, MR. BRYANT

14  OBVIOUSLY DISPUTES THAT THE ACTIVITIES THAT HE DID, WHAT HE DID

15  AND DIDN'T DO, IN SEPTEMBER AND OCTOBER OF 2000 IS GOING TO       02:14

16  ENTITLE MATTEL TO THE RELIEF THEY ARE SEEKING. BUT WE'LL

17  DECIDE THAT AT THE TRIAL. AND WHEN THAT HAPPENS, I THINK THE

18  ISSUES WILL BE NARROWED. SO WE AGREE WITH YOU, VERY

19  SOPHISTICATED LAWYERS ON ALL SIDES, THAT YOU CAN WRAP THE CASE

20  UP IN A YEAR.                                                     02:14

21          SURE, IT'S A BIG CASE, BUT THEY HAVE 13 LAWYERS

22  WORKING ON THEIR CASE; 13 LAWYERS GET COPIES OF WHAT THE

23  DISCOVERY MASTER IS SENDING OUT EVERY DAY. IT'S AN AMAZINGLY

24  LONG LIST. THEY HAVE THE RESOURCES TO BRING THIS CASE TO TRIAL

25  BY THE END OF THIS YEAR, AND THAT'S EXACTLY WHAT I THINK SHOULD   02:15

1    BE DONE.

2            THE COURT:  THANK YOU, ALL THREE OF YOU.

3            MR. QUINN, YOU SEEM TO BE ANXIOUS TO SAY SOMETHING; A

4    VERY, BRIEF RESPONSE.

5            MR. QUINN:  THE CLAIMS AGAINST MGA, WHICH I THINK GO      02:15

6    HAND IN HAND WITH THESE CLAIMS REGARDING MR. BRYANT -- THE

7    INDUCEMENT AND THE AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

8    ARE -- IN THE COUNTERCLAIM THEY ARE CLAIM SIX, INTENTIONAL

9    INTERFERENCE; CLAIM EIGHT, AIDING AND ABETTING; BREACH OF

10   FIDUCIARY DUTY; CLAIM TEN, BREACH OF DUTY OF LOYALTY.          02:15

11           AND THEN, YOUR HONOR, TO THE EXTENT THAT WE WANT TO

12   FOCUS ON OWNERSHIP OF BRATZ, THERE IS NOT A CLAIM IN THE

13   ORIGINAL COMPLAINT THAT ADDRESSES OWNERSHIP OF BRATZ.  AT THAT

14   POINT WHEN THIS WAS FIRST STARTED AGAINST MR. BRYANT, MATTEL

15   WASN'T SURE WHAT IT WAS HE HAD BEEN WORKING ON OR WHAT HE HAD   02:15

16   CREATED.  THAT CLAIM IS A DEC RELIEF CLAIM THAT IS IN COUNT 13

17   NOW IN THE COUNTERCLAIM; SO IF WE WERE GOING TO FOCUS ON THOSE

18   BRATZ ISSUES AND MR. BRYANT, I'D SUBMIT THAT THOSE CLAIMS ALL

19   OUGHT TO GO IN THE FIRST TRIAL.

20           THANK YOU, YOUR HONOR.                                 02:16

21           THE COURT:  ALL RIGHT.  VERY WELL.

22           THIS IS WHAT WE'RE GOING TO DO.  I'M GOING TO SET TWO

23   SCHEDULING MATTERS; ONE FOR CASE 04-9059, AND A SEPARATE

24   SCHEDULING ORDER FOR 05-2727, AND MY SENSE IS TO BIFURCATE THEM

25   ALONG THOSE LINES.                                             02:16

21

1          MR. QUINN, I WILL ENTERTAIN A MOTION FROM THE

2     PLAINTIFFS IN -9059 FROM MATTEL THAT SOME OF THOSE LIMITED

3     CLAIMS, AS YOU JUST IDENTIFIED, ARE MORE APPROPRIATELY

4     CONSIDERED IN THAT FIRST CASE.  AND THEN OF COURSE THE DEFENSE

5     MAY OPPOSE THAT.                                                 02:17

6          I CAN SEE HOW ONE OR MORE OF THOSE CLAIMS MIGHT BE,

7     BUT THEY MIGHT NOT BE AS WELL.  I'M NOT GOING TO DECIDE THAT

8     TODAY.  I'LL GIVE YOU LEAVE TO BRING THAT MOTION ON THAT NARROW

9     ISSUE IF THERE SHOULD BE CERTAIN CLAIMS THAT WE SHOULD DO IN

10    THIS FIRST PHASE AS OPPOSED TO THE SECOND PHASE.  BUT ABSENT AN  02:17

11    ORDER FROM THE COURT, THE ONLY CLAIMS THAT WE ARE GOING TO SET

12    IN THE FIRST TRIAL ARE THOSE SET FORTH IN 04-9059, AND THE ONLY

13    CLAIMS IN THE SECOND ARE GOING TO BE THE CLAIMS AND

14    COUNTERCLAIMS IN 05-2727.  I WILL GIVE YOU THAT OPPORTUNITY.

15         I'M GOING TO SET A JURY TRIAL DATE FOR FEBRUARY 12,         02:17

16    2008, ONE YEAR FROM TODAY, AT 9:30 A.M. IN 04-9049.  A HEARING

17    ON ANY MOTIONS IN LIMINE WILL BE SCHEDULED FOR FEBRUARY 4,

18    2008, 10:00 A.M., AND A FINAL PRE-TRIAL CONFERENCE WILL BE

19    CONDUCTED JANUARY 14, 2008, AT 11:00 A.M.

20         LAST DATE TO CONDUCT A SETTLEMENT CONFERENCE IN THAT        02:18

21    CASE WILL BE DECEMBER 3, 2007; THE LAST DATE FOR HEARING ANY

22    DISPOSITIVE MOTIONS WILL BE NOVEMBER 19, 2007 AT 10:00 A.M.;

23    THE COMPLETE DISCOVERY CUTOFF ON THE FIRST CASE WILL BE

24    OCTOBER 22ND, 2007.

25         I'LL SPEAK IN A FEW MOMENTS ABOUT LIMITS IN TERMS OF        02:18

2-12-07                    CV 04-09049     EXHIBIT ____ 6

                                           PAGE ____ 107

22

1 WITNESSES AND INTERROGATORIES AND THE LIKE.

2 AS FAR AS 05-2727, THE JURY TRIAL DATE WILL BE

3 JULY 1, 2008; THE HEARING ON ANY MOTIONS IN LIMINE WILL BE

4 JUNE 23, 2008, 10:00 A.M.; THE FINAL PRE-TRIAL CONFERENCE WILL

5 BE JUNE 2, 2008, 11:00 A.M.; THE LAST DATE TO CONDUCT A          02:18

6 SETTLEMENT CONFERENCE IN THAT CASE WILL BE APRIL 21, 2008; THE

7 LAST DATE FOR HEARING DISPOSITIVE MOTIONS IN THAT CASE WILL BE

8 APRIL 7, 2008, 10:00 A.M.; DISCOVERY CUTOFF WILL BE MARCH 3,

9 2008.

10 ANY FURTHER AMENDMENTS OR THE ADDITION OF PARTIES IN          02:19

11 EITHER OF THESE CASES IS GOING TO REQUIRE LEAVE OF COURT.

12 THESE ARE THE LIMITS I'M GOING TO PUT ON EXPERT

13 DEPOSITIONS AND INTERROGATORIES. NOW, THESE LIMITS ARE -- I

14 DON'T WANT TO SAY THEY ARE SOFT LIMITS, BUT THEY ARE LIMITS

15 WHICH THE COURT WOULD CERTAINLY UNDERSTAND OR WOULD INVITE          02:20

16 COUNSEL TO SUBMIT A MOTION TO EXPAND, IF THERE'S REASON TO.

17 BUT I JUST WANT TO HAVE SOME PARAMETERS PLACED ON THIS AT THE

18 OUTSET.

19 AS FAR AS NONEXPERT DEPOSITIONS, I'M GOING TO LIMIT

20 EACH SIDE TO 24; SO THAT WILL BE A TOTAL OF 48 BETWEEN THE TWO          02:20

21 SIDES, WHICH WOULD HOPEFULLY CAPTURE MOST OF THE INDIVIDUALS

22 WHO HAVE SOME INFORMATION TO PROVIDE IN THIS CASE. I'M GOING

23 TO LIMIT THE NUMBER OF EXPERT WITNESSES TO 20 ON EACH SIDE, AND

24 THEN THE TOTAL NUMBER OF INTERROGATORIES TO A TOTAL NUMBER OF

25 50 TO EACH SIDE.          02:20

EXHIBIT ___6___

PAGE ___108___

23

1          AGAIN, IF YOU GET TO THE POINT WHERE YOU NEED 21

2     EXPERT WITNESSES FOR SOME REASON, OR YOU NEED 25 FACT

3     WITNESSES, YOU CAN MAKE APPLICATION TO THIS COURT AND THE COURT

4     WILL CONSIDER THAT AFTER YOU, OF COURSE, HAVE MET AND CONFERRED

5     AND TRIED TO WORK THAT OUT ON YOUR OWN.  BUT WE HAVE TO HAVE          02:2(

6     SOME PARAMETERS ON THIS.

7          ARE THERE ANY QUESTIONS?

8          THE COURT WILL BE ISSUING ITS SCHEMATIC WHICH WILL

9     HAVE ALL THESE DATES AND THE COURT'S SCHEDULING ORDERS AND

10    CALCULATIONS, BUT ARE THERE ANY GENERAL QUESTIONS ABOUT WHAT         02:21

11    THE COURT IS TRYING TO ACCOMPLISH HERE?

12          MS. TORRES:  YOUR HONOR, YOU JUST SAID 50

13    INTERROGATORIES EACH SIDE.  THE FEDERAL RULES ORDINARILY

14    PROVIDE FOR INTERROGATORIES TO PARTIES, AND THERE ARE A NUMBER

15    OF PARTIES THAT THEY ARE TRYING TO SERVE, WHO THEY MAY HAVE          02:21

16    ALREADY SERVED, I DON'T KNOW.

17          ARE THOSE PARTIES INCLUDED IN THAT 50 LIMIT?

18          THE COURT:  THERE'S ONE PARTY, ESSENTIALLY, ON THE

19    OTHER SIDE, AND YOU HAVE TWO PARTIES.

20          MS. TORRES:  WELL, THEY HAVE ALSO NAMED -- ACTUALLY           02:21

21    WE HAVE THREE PARTIES NOW; THEY SUED OUR CEO ISAAC LARIAN AND

22    THEY HAVE NAMED ANOTHER EMPLOYEE AND TWO INDIRECT SUBSIDIARIES.

23          THE COURT:  WELL, MR. JACOBY, YOU'RE HERE ON BEHALF

24    OF MR. BRYANT.  WOULD YOU REALLY NEED ANOTHER 50

25    INTERROGATORIES BEYOND WHAT MGA WOULD BE SUBMITTING ON THESE         02:2?

2-12-07                    CV 04-09049

EXHIBIT ___6___

PAGE ___109___

1   CLAIMS CONCERNING BRATZ OWNERSHIP?

2          MR. JACOBY:  PROBABLY NOT.  BUT, I MEAN, I THINK IT

3   IS A CONCERN THAT THERE ARE POTENTIALLY FOUR PARTIES WHO AREN'T

4   EVEN HERE TODAY.

5          THE COURT:  LET'S TRY TO WORK WITHIN THE CONFINES OF       02:22

6   THE 50 INTERROGATORIES, AND IF YOU NEED MORE, AGAIN, THE COURT

7   IS GOING TO BE FORTHCOMING, IF THERE'S A NEED FOR IT.  AND IT'S

8   THE TYPE OF ORDER THAT IF YOU CAN STIPULATE AMONGST YOURSELVES,

9   YOU'RE NOT GOING TO NEED AN ORDER FROM THE COURT.

10         BUT IF YOU'RE NOT AGREEING AMONGST YOURSELVES, THEN        02:22

11  YOU'RE GOING TO HAVE TO COME BACK TO THE COURT BEFORE YOU BUST

12  THOSE LIMITS.  UNLIKE EVERY OTHER ORDER THE COURT ISSUES, WHERE

13  ONCE THE COURT ISSUES AN ORDER AND YOU NEED AN ORDER FROM THE

14  COURT TO ALTER THAT, THIS IS ONE THAT I WILL GIVE YOU AUTHORITY

15  AMONGST YOURSELVES TO STIPULATE TO A GREATER NUMBER.  BUT LETS   02:22

16  BE REASONABLE.  I CAN'T IMAGINE YOU CAN'T WORK THIS OUT.  I

17  JUST DON'T WANT TO HAVE OPEN-ENDED NUMBERS OF INTERROGATORIES

18  AND EXPERTS.

19         MS. TORRES:  WE DON'T EITHER, AND I DON'T THINK WE'LL

20  NEED 50 PER PARTY.                                               02:23

21         MR. QUINN:  IN THE UNLIKELY EVENT THERE WERE A

22  DISAGREEMENT ON THAT, DOES THAT COME TO YOU?

23         THE COURT:  YES, THAT COMES TO ME.

24         MR. QUINN:  THANK YOU, YOUR HONOR.

25         THE COURT:  BUT GIVEN THE SIGNIFICANCE OF THIS CASE        02:23

2-12-07                    CV 04-09049   EXHIBIT   6

                                         PAGE   110

25

1    AND THE RESOURCES THAT QUINN EMANUEL AND O'MELVENY & MYERS AND

2    LITTLER ARE ALL DEVOTING TO THIS, THESE DATES ARE PRETTY FIRM;

3    SO PLAN ACCORDINGLY.

4              MR. JACOBY:  THANK YOU, YOUR HONOR.

5              MR. QUINN:  THANK YOU, YOUR HONOR.                    02:23

6              THE COURT:  ALL RIGHT.  GOOD LUCK.

7

8

9

10

11

12

13

14

15

16

17                        CERTIFICATE

18

19   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
20   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
21   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

22

23   _____          _2-22-07_
     THERESA A. LANZA, CSR, RPR                   DATE
24   FEDERAL OFFICIAL COURT REPORTER

25

2-12-07                          CV 04-09049

EXHIBIT _6_

PAGE _111_