EXHIBIT 1

## Andrea Hoeven

| | |
|---|---|
| **From:** | Marshall Searcy |
| **Sent:** | Friday, July 31, 2009 7:11 PM |
| **To:** | cchaudoir@orrick.com |
| **Subject:** | MGA/Mattel |
| **Attachments:** | 2995434_Ltr re Protocol for Inspection of Hard Drives of Machado et al.DOC |

Dear Mr. Chaudoir:

I was surprised to see today that, attached to MGA's Motion to Compel Further Responses to MGA's First Set of Phase 2 Requests for Production, was a letter from you to me dated July 16. I never received this letter, and I note that on the face of the letter, it does not indicate that it was faxed or e-mailed to me. In any event, rather than quarrel about transmission or receipt of the letter, I attach our own proposed protocol for review of the former Mattel employees' hard drives. Please let me know your thoughts on this protocol, so that we may dispose of this issue, as well as others in MGA's unnecessary motion.

I look forward to hearing from you.

8/7/2009

EXHIBIT ____ 1 ____ PAGE 5

1.      On a mutually agreeable date, Mattel, Inc. ("Mattel") will make the following hard drives available for inspection by a consultant of MGA Entertainment, Inc.'s ("MGA") choosing:

- [LIST OF DRIVES]

2.      The hard drives and will be made available at 42 LLC, 2596 Mission Street, Suite 203, San Marino, CA 91108, ("42 LLC") which is a consultant identified by Mattel.

3.      Mattel's consultant shall make EnCase images of the hard drives available for inspection at a time that is mutually convenient for MGA's consultant so that it may perform  an analysis of the images. Mattel's consultant shall also provide essentials for the analysis to occur, such as electrical power, lighting, reasonable work space, and internet access. MGA's consultant shall provide any hardware necessary for the inspection. MGA's consultant shall not, however, remove any such hardware from 42 LLC until after the inspection has been completed and 42 LLC has inspected the hardware to ensure no privileged or confidential information is inadvertently removed from 42 LLC's possession.

4.      Mattel's consultant shall be allowed to observe the inspection of the images of the hard drives. At no time shall Mattel's consultant interfere with or otherwise hinder the inspection and, if at any time, MGA's consultant is not present and a search or inspection is being run (such as overnight), then Mattel's consultant shall not take any steps to interfere with, affect, inspect, access or use the hardware or software running any search.

5.      In order to determine whether any information on the hard drives was moved, copied, exported or otherwise transferred from the hard drives, MGA's consultant may, under the supervision of 42 LLC, inspect the images of the hard drives in their entirety.

      (a)      So that Mattel may identify privileged and/or confidential documents, if any, and prepare a privilege log and/or appropriately designate documents under the Protective Order, MGA's consultant shall export to drives in 42 LLC's possession all information it has inspected, identified or otherwise relied upon in conducting its analysis or reaching its conclusions (the "Information"). MGA's consultant shall not remove the Information from 42 LLC and shall not disclose any Information to the MGA Parties or their attorneys.

      (b)      When MGA's consultant has concluded its inspection, 42 LLC will provide the Information to Mattel for review. Within thirty (30) days of the time that Mattel receives the Information, Mattel will provide MGA with all such Information, except for any such Information for which privilege is asserted. Mattel will also serve MGA with a privilege log identifying the Information, if any, withheld on privilege grounds.

      (c)      Prior to disclosing the Information to MGA, Mattel will designate the Information, where appropriate, as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" as provided in Paragraph 2 of the Protective Order.

EXHIBIT ___1___ PAGE _5.001_

6.    The Parties agree that the actions described herein shall not constitute a waiver of any claim of attorney-client privilege or work product privilege with respect to (a) the information on any hard drive, or (b) the conduct, notes, searches, search terms, communications or any other act performed by any consultant or attorney in connection with these hard drives.

EXHIBIT ____1____
PAGE ____6____

EXHIBIT 2

## Andrea Hoeven

**From:** Marshall Searcy

**Sent:** Wednesday, August 05, 2009 3:02 PM

**To:** MGA / Bryant Team

**Subject:** Fw: MGA/Mattel


Marshall Searcy
Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP
865 South Figueroa Street, 2nd Floor
Los Angeles, CA 90017

Direct: (213) 443-3152
Main Phone: (213) 443-3000
Main Fax: (213) 443-3100

E-mail: marshallsearcy@quinnemanuel.com
Web: www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.


**From:** Chaudoir, Christopher <cchaudoir@orrick.com>
**To:** Marshall Searcy
**Sent:** Wed Aug 05 14:45:15 2009
**Subject:** RE: MGA/Mattel

Mr. Searcy,

We agree that there is no need to argue about the transmission of the two letters dated July 16, 2009. Both letters were mailed to you on that day.

Regardless, the first letter, which you now claim not to have received, was merely a courtesy to remind you of your promise that you would respond to the outstanding discovery disputes related to MGA's First Set of Phase 2 RFPs, as described in Ms. Mankey's July 7, 2009 letter and our July 8, 2009 meet and confer call, within a "couple of days" from that call. The obligation to respond was yours and yours alone. Having not received assurances that you would produce responsive documents, supplement your deficient responses and confirm that certain documents did not exist, we were required to file the motion to compel. The matters are now before the Discovery Master.

With respect to your proposed protocol, it is unacceptable. Should you wish to accept MGA's protocol as proposed in my July 16, 2009 letter, that issue can be resolved. Otherwise, the matter is also now before the Discovery Master and can be addressed by him.

Chris


8/7/2009

EXHIBIT ___2___ PAGE ___7___

**From:** Marshall Searcy [mailto:marshallsearcy@quinnemanuel.com]
**Sent:** Friday, July 31, 2009 7:11 PM
**To:** Chaudoir, Christopher
**Subject:** MGA/Mattel

Dear Mr. Chaudoir:

I was surprised to see today that, attached to MGA's Motion to Compel Further Responses to MGA's First Set of Phase 2 Requests for Production, was a letter from you to me dated July 16. I never received this letter, and I note that on the face of the letter, it does not indicate that it was faxed or e-mailed to me. In any event, rather than quarrel about transmission or receipt of the letter, I attach our own proposed protocol for review of the former Mattel employees' hard drives. Please let me know your thoughts on this protocol, so that we may dispose of this issue, as well as others in MGA's unnecessary motion.

I look forward to hearing from you.

```
"EMF <orrick.com>" made the following annotations.
---------------------------------------------------------------------------
============================================================

IRS Circular 230 disclosure:
To ensure compliance with requirements imposed by the IRS,
we inform you that any tax advice contained in this
communication, unless expressly stated otherwise, was not
intended or written to be used, and cannot be used, for
the purpose of (i) avoiding tax-related penalties under
the Internal Revenue Code or (ii) promoting, marketing or
recommending to another party any tax-related matter(s)
addressed herein.



============================================================

NOTICE TO RECIPIENT:  THIS E-MAIL IS  MEANT FOR ONLY THE
INTENDED RECIPIENT OF THE TRANSMISSION, AND MAY BE A
COMMUNICATION PRIVILEGED BY LAW.   IF YOU RECEIVED THIS E-
MAIL IN ERROR, ANY REVIEW, USE, DISSEMINATION,
DISTRIBUTION, OR COPYING OF THIS E-MAIL IS STRICTLY
PROHIBITED.   PLEASE NOTIFY US IMMEDIATELY OF THE ERROR BY
RETURN E-MAIL AND PLEASE DELETE THIS MESSAGE FROM YOUR
SYSTEM. THANK YOU IN ADVANCE FOR YOUR COOPERATION.

For more information about Orrick, please visit
http://www.orrick.com/
============================================================
============================================================
```

EXHIBIT ___2___ PAGE ___8___

EXHIBIT 3

## Andrea Hoeven

| | |
|---|---|
| **From:** | Curran Walker |
| **Sent:** | Thursday, August 06, 2009 12:04 PM |
| **To:** | cchaudoir@orrick.com |
| **Cc:** | Marshall Searcy |
| **Subject:** | Mattel v. MGA |
| **Attachments:** | 8-6-09 Ltr to Chaudoir re Inspection Protocol.pdf |

Counsel,

Please see the attached correspondence from Marshall Searcy.

Best regards,

**Curran M. Walker | Quinn Emanuel Urquhart Oliver & Hedges, LLP** | 865 S. Figueroa Street, 10th Floor,
Los Angeles, CA 90017
Direct: +1.213.443.3702 | Main Phone: +1.213.443.3000 | Main Fax: +1.213.443.3100 | E-mail:
curranwalker@quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the
recipient(s) named above.  This message may be an attorney-client communication and/or work product and as
such is privileged and confidential.  If the reader of this message is not the intended recipient or agent
responsible for delivering it to the intended recipient, you are hereby notified that you have received this
document in error and that any review, dissemination, distribution, or copying of this message is strictly
prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete
the original message.

EXHIBIT __3__ PAGE __9__

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL: (213) 443-3000 FAX: (213) 443-3100

August 6, 2009

<u>VIA E-MAIL</u>

Christopher J. Chaudoir, Esq.
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017-5855

Re:    <u>Mattel v. MGA</u>

Dear Mr. Chaudoir:

I write in response to your August 5 email, in which you claim that MGA has not received Mattel's assurance that it would produce additional documents, if any, responsive to MGA's First Set of (Phase 2) Requests for Production of Documents and Things ("First Set").

Though I do recognize that you only participated for a few minutes in only one of the conferences, you should be aware that Mattel provided exactly such an assurance during our conferences with MGA. Indeed, Mattel informed MGA during those meetings that it believed it had already produced all responsive documents in response to the First Set. At MGA's insistence, however, Mattel agreed to check for further responsive documents and produce any that it found. As promised, Mattel checked and, aside from the images of the hard drives belonging to Vargas, Trueba, Machado and Castilla at the time of their resignations from Mattel, it does not have any additional documents to produce. Had MGA simply called or e-mailed Mattel, rather than waiting in silence after dropping a letter in the mail, a great deal of unnecessary briefing could have been avoided.

With respect to the inspection protocol, Mattel has proposed a protocol that provides MGA full access to all files on Mattel computers. In light of MGA's refusal to provide Mattel similar access to Isaac Larian's computers, it is curious that MGA would find this protocol at all

quinn emanuel urquhart oliver & hedges, llp

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, NY 10010 | TEL (212) 849-7000 FAX (212) 849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, CA 94111 | TEL (415) 875-6600 FAX (415) 875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, CA 94065 | TEL (650) 801-5000 FAX (650) 801-5100
CHICAGO | 250 South Wacker Drive, Suite 230, Chicago, IL 60606 | TEL (312) 463-2961 FAX (312) 463-2962
LONDON | 16 Old Bailey, London EC4M 7EG United Kingdom | TEL +44(0) 20 7653 2000 FAX +44(0) 20 7653 2100
TOKYO | Akasaka Twin Tower Main Bldg., 6th Fl., 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052 Japan | TEL +81 3 5561-1711 FAX +81 3 5561-1712

EXHIBIT ___3___ PAGE ___10___

problematic.  Furthermore, MGA's unilateral rejection of the protocol on the sole grounds that it is "unacceptable" without explanation is not productive.  Nor does it constitute meeting and conferring in good faith as required by both the <u>Federal Rules</u> and the Discovery Master Order. Please let us know what issues MGA has with Mattel's proposed protocol so Mattel can meaningfully address any legitimate concerns MGA may have.  <u>See</u> Discovery Master Order, dated December 6, 2006, at 4.

I look forward to hearing from you.

 Very truly yours,

/s/ Marshall M. Searcy III

Marshall M. Searcy III

07975/3042261.1

07975/3042261.1                                                    2

EXHIBIT ___3___ PAGE __11__

EXHIBIT 4

ORIGINAL

LODGED

*Send*

FILED

2006 DEC -6 PM 4:39

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2    John B. Quinn (Bar No. 090378)
     (johnquinn@quinnemanuel.com)
3    Michael T. Zeller (Bar No. 196417)
     (michaelzeller@quinnemanuel.com)
4    Jon D. Corey (Bar No. 185066)
     (joncorey@quinnemnauel.com)
5  865 South Figueroa Street, 10th Floor
   Los Angeles, California 90017-2543
6  Telephone:  (213) 443-3000
   Facsimile:   (213) 443-3100
7
8  Attorneys for Mattel, Inc.
   [Additional counsel listed on following page]
9
10              UNITED STATES DISTRICT COURT
11             CENTRAL DISTRICT OF CALIFORNIA
12  CARTER BRYANT, an individual,      )  Case No. CV 04-09049 SGL (RNBx)
13              Plaintiff,             )  Consolidated with
                                       )  Case No. CV 04-09059
14       v.                            )  Case No. CV 05-02727
15  MATTEL, INC., a Delaware           )  STIPULATION FOR APPOINTMENT
    corporation,                       )  OF A DISCOVERY MASTER; AND
16                                     )
                Defendant.             )  [PROPOSED] ORDER
17                                     )
18  _____)  Discovery Cutoff Date:  Not Set
                                          Trial Date:  Not Set
19
20
21
22
23
24
25
26
27
28

EXHIBIT 4
PAGE 12

Case No. CV 04-09049 SGL (RNBx)
STIPULATION FOR APPOINTMENT OF A DISCOVERY
MASTER AND [PROPOSED] ORDER

1 | LITTLER MENDELSON
     Robert F. Millman (Bar No. 062152)
2 |   Douglas A. Wickham (Bar No. 127268)
     Keith A. Jacoby (Bar No. 150233)
3 | 2049 Century Park East, 5th Floor
   Los Angeles, California 90067-3107
4 | Telephone:  (310) 553-0308
   Facsimile:  (310) 553-5583
5 |
   Attorneys for Carter Bryant
6 |
   O'MELVENY & MYERS LLP
7 |   Diana M. Torres (Bar No. 162284)
   400 S. Hope Street
8 | Los Angeles, California 90017
   Telephone:  (213) 430-6000
9 | Facsimile:  (213) 430-6407

10 | O'MELVENY & MYERS LLP
      Dale Cendali
11 | Times Square Tower
   7 Times Square
12 | New York, NY 10036

13 | CHRISTENSEN, GLASER, FINK, JACOBS WEIL & SHAPIRO, LLP
      Patricia Glaser (Bar No. 55668)
14 | 10250 Constellation Boulevard - 19th Floor
   Los Angeles, CA 90067
15 | Telephone: (310) 553-3000
   Facsimile: (310) 556-2920
16 |
   Attorneys for MGA Entertainment, Inc.
17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

EXHIBIT ___4___
PAGE ___13___

STIPULATION FOR APPOINTMENT OF A DISCOVERY
MASTER AND [PROPOSED] ORDER

1    WHEREAS, the parties are in agreement that a discovery master should be
2  appointed in this matter to resolve any discovery disputes and to minimize the
3  burden on the Court; and

4    WHEREAS, the parties have agreed upon a nominee, Hon. Edward A. Infante
5  (Ret.), and he has agreed to serve as a discovery master in this matter;

6    NOW, THEREFORE, to facilitate the fair and efficient completion of pre-
7  trial discovery, the parties Mattel, Inc. and Carter Bryant and MGA Entertainment,
8  Inc., by and through their respective counsel of record, hereby stipulate and agree as
9  follows:

10    1.    The Discovery Master shall be appointed to assure and provide cost-
11  effective discovery and to minimize the burden of discovery disputes upon the
12  Court.  Any and all discovery motions and other discovery disputes in the above
13  captioned action shall be decided by a master ("Discovery Master") pursuant to
14  Federal Rule of Civil Procedure 53.  Any motions currently pending before
15  Magistrate Judge Block shall be transferred to the Discovery Master.  The moving
16  party shall provide to the Discovery Master all papers associated with each pending
17  motion.

18    2.    The Discovery Master shall be Hon. Edward A. Infante (Ret.).  His
19  business address is: Two Embarcadero Center, Suite 1500, San Francisco, CA
20  94111.

21    3.    Judge Infante shall serve as the Discovery Master until all issues herein
22  have been finally disposed of or determined, or until he shall withdraw in
23  accordance with applicable law.  If at any time he becomes unable to serve as the
24  Discovery Master, the parties shall confer to present an alternative agreed-upon
25  designee to the Court.  In the event that the parties cannot agree to an alternate
26  designee, then the Court shall appoint a Discovery Master.

27    4.    The Discovery Master shall have the authority to set the date, time, and
28  place for all hearings determined by the Discovery Master to be necessary; to

EXHIBIT ___4___
PAGE ___14___      -3-

1  preside over hearings (whether telephonic or in-person); to take evidence in
2  connection with discovery disputes; to issue orders resolving discovery motions
3  submitted to the Discovery Master; to conduct telephonic conferences to resolve
4  discovery disputes arising during depositions; to issue orders awarding non-
5  contempt sanctions, including, without limitation, the award of attorney's fees, as
6  provided by Rules 37 and 45; and to prepare, file and serve other orders, reports and
7  recommendations, as appropriate.

8        5.      All discovery disputes shall be resolved by motion (except those arising
9  during a deposition which the Discovery Master determines can be resolved by
10 telephonic conference during the deposition). The moving party shall first identify
11 each dispute, state the relief sought, and identify the authority supporting the
12 requested relief in a meet and confer letter that shall be served on all parties by
13 facsimile or electronic mail. The parties shall have five court days from the date of
14 service of that letter to conduct an in-person conference to attempt to resolve the
15 dispute. If the dispute has not been resolved within five court days after such
16 service, the moving party may seek relief from the Discovery Master by formal
17 motion or letter brief, at the moving party's option. The opposing party shall have
18 five court days from the date of service of the motion or letter brief to submit a
19 formal opposition or response. Any reply brief or letter brief shall be served within
20 three court days from the date of service of a formal opposition or response. The
21 hearing on the motion shall take place within five court days of the service of any
22 reply brief or letter unless (a) the parties agree to another hearing date or agree that
23 no hearing is necessary; (b) the Discovery Master determines that no hearing is
24 necessary; or (c) the Discovery Master is not available, in which case the hearing
25 shall take place on the Discovery Master's first available date. The foregoing shall
26 not prohibit (i) the parties from agreeing to alternate procedures, or (ii) a party from
27 seeking the Discovery Master's immediate resolution of a dispute or resolution of a
28 dispute upon shortened time upon a showing of good cause why a party would be

EXHIBIT ___4___
PAGE ___15___     - 4 -

1    prejudiced absent prompt resolution.  Service of any document by fax or electronic

2    mail prior to 6:00 p.m. shall constitute service on that day.

3        6.    The Discovery Master's orders resolving discovery disputes, reports, or

4    recommendations pursuant to Rule 53(e) or (f) shall be treated as rulings made by a

5    Magistrate Judge of the United States District Court.  The Discovery Master shall

6    file each order, report, or recommendation pursuant to Rule 53(e) or (f) and serve

7    the parties within five court days of his/her decision on a matter.

8        7.    A court reporter shall transcribe any hearing or other proceeding before

9    the Discovery Master.

10       8.    The cost of any proceeding before the Discovery Master, including the

11   fees of the Discovery Master, the fees of court reporters who transcribe hearings or

12   other proceedings before the Discovery Master, and the fees of any other person

13   necessary to the efficient administration of the proceeding before the Discovery

14   Master, shall be paid one-half by Mattel, Inc., and one-half by MGA Entertainment,

15   Inc. and Carter Bryant unless, consistent with the Federal Rules of Civil Procedure,

16   the Discovery Master Orders otherwise.  By agreeing to share costs among the

17   parties, no party waives its right to seek recovery or reimbursement for such costs

18   from any other party.

19       9.    The Discovery Master shall be compensated according to his regular

20   hourly rate of $750.

21       10.   Pursuant to Federal Rule of Civil Procedure 53(b)(2), the Discovery

22   Master shall proceed with all reasonable diligence.

23       11.   Based on an affidavit filed by Hon. Edward A. Infante pursuant to

24   28 U.S.C. § 455 and Federal Rule of Civil Procedure 53(b)(3), the parties are not

25   aware that he has a relationship to the parties, to counsel, to the action, or to the

26   Court that would require disqualification of a judge under 28 U.S.C. § 455, and

27   based thereon the parties expressly waive any ground for disqualification disclosed

28   therein of Hon. Edward A. Infante to serve as master in these proceedings.

EXHIBIT ___4___

PAGE ___10___    - 5 -

1    12.    The Discovery Master shall not have ex parte communications with ~~the~~
2    ~~Court~~, a party or counsel.

3    13.    The Discovery Master shall preserve and maintain all documents and
4    materials submitted by the parties as well as all orders, reports, and
5    recommendations issued by the Discovery Master.  These documents, materials,
6    orders, reports and recommendations shall be the record of the Discovery Master's
7    activities, and shall be maintained in chronological order until the Discovery Master
8    is informed by the parties that all issues herein have been finally disposed of and
9    determined.

10    14.    The Discovery Master is hereby authorized to receive and consider
11    information and documents designated "CONFIDENTIAL" and "CONFIDENTIAL-
12    ATTORNEYS EYES ONLY" pursuant to the January 4, 2005 Stipulated Protective
13    Order.  The Discovery Master agrees to be bound by the January 4, 2005 Order.

14    15.    All third parties subject to discovery requests or deposition in this
15    litigation shall be bound by the terms of this Stipulation and Order.

16

17    Dated: November 22, 2006                O'MELVENY & MYERS LLP
18
19                                            By: _____
20                                               Diana Torres
21                                               Attorneys for MGA Entertainment, Inc.

22    Dated: November 29, 2006                LITTLER MENDELSON
23
24                                            By: _____
25                                               Douglas A. Wickham
26                                               Attorneys for Carter Bryant
27
28

STIPULATION FOR APPOINTMENT OF A DISCOVERY
MASTER AND [PROPOSED] ORDER

- 6 -

EXHIBIT ___4___
PAGE ___17___

1  Dated: ~~November~~ December 4, 2006

2

3                                      QUINN EMANUEL URQUHART
                                       OLIVER & HEDGES, LLP
4
                                       By: _Jon D. Corey_____
5                                          Jon D. Corey
                                           Attorneys for Mattel, Inc.
6

                              **ORDER**

7      The foregoing Stipulation for Appointment of a Discovery Master is SO

8  ORDERED *as modified.*

9

10 Dated: __12-6-06.__               _S. G. Larson_____

11                                   Hon. Stephen G. Larson
                                     United States District Court Judge
12

13

14                    **CONSENT OF DISCOVERY MASTER**

15     If appointed by the Court, I, the undersigned, consent to serve as Discovery

16 Master in the above referenced proceeding consistent with this Order.

17

18 Dated: __12-5-06__               _Edward A. Infante_____

19                                   Hon. Edward A. Infante (Ret.)

20

21

22

23

24

25

26

27

28

                                        STIPULATION FOR APPOINTMENT OF A DISCOVERY
                                        MASTER AND [PROPOSED] ORDER
                            - 7 -

EXHIBIT ___4___
PAGE ___18___

## PROOF OF SERVICE

1013A(3) CCP Revised 5/1/88

**STATE OF CALIFORNIA )**
**COUNTY OF LOS ANGELES )**

I am employed in the county of Los Angeles  State of California.  I am over the age of 18 and not a party to the within action; my business address is: 865 South Figueroa Street, 10th Floor, Los Angeles, CA 90012.

On December 5, 2006, I served the foregoing document described as **STIPULATION FOR APPOINTMENT OF A DISCOVERY MASTER; AND [PROPOSED ORDER** on all interested parties in this action.

| | |
|---|---|
| Keith A. Jacoby, Esq. | Diana M. Torres, Esq. |
| Douglas Wickham, Esq. | O'Melveney & Meyers |
| Littler Mendelson | 400 S. Hope Street |
| A Professional Corporation | Los Angeles, CA 90071 |
| 2049 Century Park East, 5th Floor | Phone: 213-430-6000 |
| Los Angeles, California 90067-3107 | Fax: 213-430-6407 |
| Phone: 310-553-0308 | |
| Fax: 310-553-5583 | |

[ ]     By placing [ ] the original [X ] true copies thereof enclosed in sealed envelopes addressed as follows:

**[X]     BY MAIL**

[ ]     I deposited such envelope in the mail at Los Angeles, California.  The envelope was mailed with postage thereon fully prepaid.

[ ]     As follows:  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ]     **BY TELECOPIER** By transmitting the above listed document(s) to the fax number(s) set forth above on this date.

[ ]     **BY PERSONAL SERVICE** I delivered such envelope by hand to the addressee.

Executed on December 5, 2006, at Los Angeles, California.

[ ]     (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

[X]     (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Cheri Hatch
Print Name

Signature

EXHIBIT __4__
PAGE __19__

EXHIBIT 5

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No. CV 04-09049 SGL(RNBx)                          Date: July 9, 2009
Title:        MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

            Cindy Sasse                            None Present
            Courtroom Deputy                       Court Reporter

ATTORNEYS PRESENT FOR                  ATTORNEYS PRESENT FOR
PLAINTIFFS:                            DEFENDANTS:

None Present                           None Present

PROCEEDINGS:    ORDER GRANTING EX PARTE APPLICATION RE TEMPORARY
                RECEIVERSHIP (DOCKET #5728)

                ORDER GRANTING EX PARTE APPLICATION RE COST
                SHIFTING (DOCKET #5865)

                ORDER GRANTING IN PART EX PARTE APPLICATION FOR
                RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

                ORDER GRANTING IN PART MATTEL'S MOTION RE
                DISCOVERY MASTER ORDER NO 27 AND REMANDING
                DISCOVERY MASTER ORDER NO. 27 FOR
                RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT
                OF THE FILING OF THE TAAC (DOCKET #5561)

                ORDER DENYING MOTION TO STRIKE THE FORENSIC
                AUDITOR'S REPORTS (DOCKET #5705)

MINUTES FORM 90                                    Initials of Deputy Clerk __cls_____
CIVIL -- GEN                      1

EXHIBIT 5 PAGE 20

## I. ORDER GRANTING EX PARTE APPLICATION
## RE TEMPORARY RECEIVERSHIP (DOCKET #5728)

Because the only opposition to the Ex Parte Application regarding the winding up of the Temporary Receivership involves the issue of cost-shifting, which is addressed separately, below, the Court **GRANTS** the Ex Parte Application. A separate order addressing this Ex Parte Application has been concurrently filed.

## II. ORDER GRANTING EX PARTE APPLICATION RE
## COST SHIFTING (DOCKET #5865)

The MGA parties' opposition to the Temporary Receiver's Ex Parte Application argued that the costs of the Temporary Receivership should be shifted to Mattel (as the party who sought appointment of a Temporary Receiver). However, the Court has previously ruled that, at some yet-to-be defined date in the future, the Court will consider whether to shift the costs of both the Temporary Receivership and the Forensic Audit. Therefore, Mattel filed an Ex Parte Application seeking either to be relieved of the responsibility to respond to the MGA parties' argument or, alternatively, for an order setting a briefing schedule on the issue. It is not the intention of the Court to address the cost-shifting issue at this time; rather, as the Court has stated previously on the record, that issue is more efficiently resolved at a later date, most likely a date after completion of Phase 2 of the trial. Accordingly, the Court **GRANTS** Mattel's Ex Parte Application re Cost Shifting. Mattel is relieved of any duty to respond to MGA's argument regarding the appropriate allocation of costs arising from the Temporary Receiver that is set forth in the MGA parties's June 26, 2009 Opposition to the Temporary Receiver's Ex Parte Application.

## III. ORDER GRANTING IN PART EX PARTE APPLICATION FOR
## RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

The Court has received and reviewed the MGA Parties' Ex Parte Application For Partial Release of *In Camera* Juror Interview Transcripts, as well as the Opposition, the Reply, and the accompanying exhibits. The Court **GRANTS IN PART** the Ex Parte Application. Although the Court declines to award the relief sought, the Court will take steps to ensure that the transcript of the juror interviews are provided to the Ninth Circuit for its consideration of the appeal filed by the MGA parties.

The relevant *in camera* juror interviews were conducted on July 25, 2008; the findings made by the Court on the basis of those interviews are set forth in detail in the Court's Order Denying Motion for Mistrial, dated August 8, 2008. Counsel for the parties agreed that the juror interviews, which were conducted mid-trial, should be conducted *in camera*, and the MGA parties did not request that the Court grant them access to the transcripts to prepare their Motion for Mistrial. The Court indicated on the

EXHIBIT 5 PAGE 21

record around the time of the filing of the Motion for Mistrial that it was not the Court's intent to grant the parties access to the transcripts.

After the conclusion of the trial, the MGA parties did not at any time request this Court grant access to the transcripts. To the contrary, some ten months passed between the date of the Order Denying Motion for Mistrial and the MGA parties' first post-trial request for access to those transcripts. That request was made to the Ninth Circuit, not this Court, on June 10, 2009. When the Ninth Circuit denied the request in favor of the MGA's presentation of the issue to this Court in the first instance, the MGA parties thereafter filed the present Ex Parte Application in a expeditious manner.

Ostensibly, as set forth in both the Motion filed before the Ninth Circuit and the Ex Parte Application before this Court, the reason the MGA parties seek access to those transcripts is so that they may use them to challenge the Court's Order Denying Motion for Mistrial. Although the MGA parties filed its Notice of Appeal on May 4, 2009, and although that Notice clearly indicated that the Order Denying Motion for Mistrial would be implicated in the appeal, the MGA parties failed to file its Motion seeking release of the transcripts until June 10, 2009. The MGA parties' failure to seek this relief until a month after they filed their Notice of Appeal and a month before their opening brief was due, and their decision to present the issue of release of the transcripts to the appellate court (rather than this Court) in the first instance, created the very urgency that cause them to seek ex parte relief from this Court. As such, the Court declines to grant the relief sought.

Nevertheless, in the interest of due process and in order to facilitate the full consideration of the issue by the Ninth Circuit, the Court will take steps to ensure that the transcripts of the *in camera* interviews are provided to the Ninth Circuit for *in camera* filing.

## IV. ORDER GRANTING IN PART MATTEL'S MOTION RE DISCOVERY MASTER ORDER NO 27 AND REMANDING DISCOVERY MASTER ORDER NO. 27 FOR RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT OF THE FILING OF THE TAAC (DOCKET #5561)

In the challenged portion of Discovery Master Order No. 27 ("DM Order No. 27"), the Discovery Master denied Mattel's Motion to Compel discovery sought by service of a subpoena on non-party Bingham McCutchen LLP ("Bingham"), a law firm that represents Intervenor Omni 808, as well as a number of non-party entities that are familiar to those involved in this litigation: OmniNet Capital, LLC ("OmniNet"), Vision Capital, LLC ("Vision"), IGWT Group, LLC ("IGWT"), and IGWT 826 Investments, LLC ("IGWT 826"). Broadly categorized, the subpoena sought production of (1) fee agreements relating to Vision and Omni 808; (2) documents regarding the formation, control, and financing of Omni 808, Vision, and Lexington Financial Limited

EXHIBIT 5 PAGE 72

("Lexington"); (3) documents identifying stakeholders and officers of Omni 808, Vision, and Lexington; (4) all contracts relating to Omni 808, Vision Capital, and Lexington; (5) all communications relating to Omni 808, Vision Capital, and Lexington, excluding attorney-client privileged documents; and (6) Bingham's representation of MGAE and certain named individuals who have some connection with MGAE, including a number of Mr. Larian's family members.

The Discovery Master correctly recognized the essential legal standard in assessing whether a subpoena may be enforced. The information must satisfy the discovery relevance standard, i.e., it must be "'reasonably calculated to lead to the discovery of admissible evidence.'" DM Order No. 27 at 19 (quoting Fed. R. Civ. P. 26(b)(1)). The decision of whether to enforce a subpoena ultimately implicates a balancing test that pits relevance of the materials sought and need to the requesting party against hardship to the party resisting the subpoena. DM Order No. 27 at 20. Non-parties are generally required to bear lesser burdens than parties in responding to subpoenas. Exxon Shipping Co. v. United States Dept. of Interior, 34 F.3d 774, 779 (9th Cir. 1994) ("The Federal Rules also afford nonparties special protection against the time and expense of complying with subpoenas.").

However, the Discovery Master overstated the burden of proof allocated to Mattel, as the party seeking discovery. See DM Order No. 27 at 20 ("As the party moving to compel compliance with the subpoena, Mattel bears the initial burden of establishing that the information sought is relevant and necessary to the claims or defenses at issue.") This standard is both overstated and incomplete. It is overstated in that Mattel need not show that the evidence sought is "necessary to the claims or defenses." Although Mattel indeed bears the burden of establishing relevancy, that showing is not one of "necessity." Rather, Mattel must bear the burden of establishing the discovery relevancy standard -- that the materials sought are "reasonably calculated to lead to the discovery of admissible evidence" -- is met. It need not establish that the materials sought are "necessary" to its case.

This point leads to the manner in which the stated burden is incomplete. As clearly articulated by cases cited by Bingham, although Mattel bears an initial burden of establishing relevancy, the party resisting discovery thereafter has the burden of establishing that discovery should be denied. See Bryant v. Ochoa, 2009 WL 1390794 at *1 (S.D. Cal. 2009) ("The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1). . . . Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections."); DIRECTV, Inc. v. Trone, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (same); see also Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975) (reversing the district court's issuance of a protective order based on a failure of the party resisting discovery to meet its burden by asserting that the defendant's deposition would merely yield cumulative evidence).

MINUTES FORM 90                                          Initials of Deputy Clerk __cls_____
CIVIL -- GEN                          4

EXHIBIT 5 PAGE 23

The effect of this subtle variation on the burden of proof from that stated by the Discovery Master is magnified by the recent filing of the TAAC, which significantly heightens the relevancy of the issue of how the MGA parties and the parties represented by Bingham may be related, the formation of certain of those entities, and other issues implicated by Mattel's requests. Because the question of relevance is featured so prominently in the quintessential balancing test to which the present discovery motion was subjected, the filing of the TAAC dramatically altered the calculus that underlies the conclusions reached in DM No. 27.

For reasons related to judicial economy and preservation of scarce judicial resources (which this case has stretched to the outer limits), the Court defers decision, in light of the changed calculus that has occurred as the result of the filing of the TAAC, of the issues presented in the challenged portions of DM No. 27 to the Discovery Master. For that reason, the Court **REMANDS** the challenged portions of DM No. 27 to the Discovery Master for his reconsideration and re-balancing in light of the recently filed TAAC. The Discovery Master may, in his discretion, set the matter for further briefing and/or hearing, he may take the matter under submission based on the existing record, or he may take other action as he deems appropriate to resolve the present issues.

Notwithstanding the remand of DM Order No. 27, one issue raised by Mattel requires further consideration by the Court. At page 25 of DM Order No. 27, the Discovery Master appears to impose a blanket prohibition on discovery of materials that are in the possession of a subpoena recipient, but that are related to a non-party over whom the Court has not been shown to have jurisdiction. The Discovery Master cites no legal authority for such a blanket prohibition, and the Court, in its own research, has found none. Such a blanket prohibition precludes the application of the balancing test that applies almost universally to discovery motions; accordingly, and because this blanket prohibition is unprecedented, the Court finds that it is contrary to law. As to this narrow issue, the Court **GRANTS** Mattel's Motion. The issue of discovery of materials relating to Lexington is **REMANDED** to the Discovery Master for reconsideration in light of this ruling and in light of the filing of the TAAC.

## V. ORDER DENYING MOTION TO STRIKE
## THE FORENSIC AUDITOR'S REPORTS (DOCKET #5705)

In an unsealed filing that has since been ordered sealed by the Court, counsel for Omni 808 Investors, LLC ("Omni 808"), Todd E. Gordinier, made unwarranted, unsubstantiated personal attacks against the Court-Appointed Forensic Auditor, Ronald L. Durkin. Mr. Gordinier's selective public disclosure of portions of the Forensic Auditor's Summary Report, coupled with the maintenance of the Summary Report, as well as the later-filed Responsive Report and Final Report, under seal in their entirety, has led to an unbalanced public presentation of the issues discussed therein. In an

MINUTES FORM 90
CIVIL -- GEN                                    5

Initials of Deputy Clerk __cls_____

EXHIBIT 5 PAGE 24

attempt to cure this deficiency, the Court has considered the possibility that it should simply unseal the relevant Reports and allow those Reports to speak for themselves.

Because the MGA entities were the primary subject of the Forensic Audit, the MGA parties have, quite understandably, objected to the proposed unsealing. Mattel, for its part, advocates quite emphatically, and not unreasonably, that the Reports should be unsealed in light of the selective disclosure. See Tr. at 31-32 ("It's the underlying analysis that refutes the selective disclosures that MGA and Omni made in a public forum to smear . . . both Mr. Durkin and Mattel.")  At the other end of the spectrum, Omni 808 has moved to strike the Reports in their entirety.

In the end, although the Court does not order the unsealing of the Reports, it **DENIES** the Motion to Strike.  The Court ordered the Forensic Audit to evaluate whether a receiver should be appointed; as the record bears witness, the Court eventually rejected the suggestion that it should appoint a permanent receiver, and the Court has instead appointed an MGA Monitor with more limited powers than a receiver. Nevertheless, the fact that the Reports were intended to serve a very limited purpose does not mean that there is no possibility that the Forensic Auditor's Reports will not serve any purpose henceforth.

As it currently stands, the Court **ORDERS** that no party shall cite to or rely upon the Reports for any purpose absent further Order of this Court.[1]  However, the documents attached to the Reports, to the extent they are otherwise discoverable, are not insulated from discovery on the basis that they have been made part of the Reports. Conversely, documents, such as charts and interview notes, that were prepared by the Forensic Auditor are the property of the Court and are not subject to discovery or use in this or any other litigation by any party or non-party.[2]

Had it been counsel for the MGA parties who mounted the unwarranted, unsubstantiated, and public personal attacks on Mr. Durkin, the Court would find, notwithstanding the sensitive information contained therein, the unsealing of the Reports was an appropriate remedy for the selective disclosure.[3]  However, here, it is

---

[1] This Order does not supersede the Court's Order permitting the Forensic Auditor to share information with the Court-Appointed Monitor.

[2] Toward that end, the Court **CLARIFIES** to the parties that the work papers, drafts, notes, detailed time records, and any other materials prepared by or at the direction of the Forensic Auditor are the property of the Court. The Court **ORDERS** the Forensic Auditor, as the custodian of those records on behalf of the Court, to retain those materials, whether maintained in electronic, hard copy, or any other medium, until further order of the Court.

[3] As it stands, counsel for MGAE, James I. Stang, wisely sought, and was granted, leave to file his more restrained, but just as unwarranted and unsubstantiated, personal attacks on Mr. Durkin under seal.  See MGA Entertainment, Inc.'s Response to Final *In Camera* Report of Forensic Auditor Ronald L.

Initials of Deputy Clerk __cls_____

**EXHIBIT 5 PAGE 25**

counsel for Omni 808 who made those attacks public, and although Mattel maintains
that both the MGA parties and Omni 808 are jointly responsible for the selective
disclosure, see July 6, 2009, Tr. at 33, whether, or to what extent, the MGA parties act
or have acted in concert is an issue to be decided in Phase 2 of this action.

Nevertheless, Mr. Gordinier's attack on Mr. Durkin cannot pass without comment
by the Court. The Court's comments are directed toward Mr. Gordinier personally,
which is not the Court's usual practice. Although the irony of this form of address is not
lost on the Court (given the subject of this Order), it is appropriate. Mr. Gordinier signed
all three filings in which the personal attacks appear, and continues to stand behind
those filings. Moreover, Mr. Gordinier expressly and unabashedly claimed personal
responsibility for the brief that was not filed under seal, by both stating that he gave it a
lot of thought before filing it and by implicitly acknowledging that although he considered
filing his brief under seal, he ultimately rejected that course of action. See May 18,
2009 Tr. at 46-47 ("My brief speaks for itself. We have nothing to hide. . . . I didn't feel it
appropriate, necessary, or desirable to file my brief under seal. And I don't have a
problem with the Court or anybody reading what I have to say, because I gave it a lot of
thought, and I gave it at lot of consideration.").

At the July 6, 2009, hearing, the Court outlined its concerns that while the attacks
on Mr. Durkin were public, the Reports are not, and that "it doesn't seem fair" to the
Court to allow those allegations to stand alone without a chance to respond to them.
July 6, 2009, Tr. at 25-26. In response, Mr. Gordinier contended that his comments
"respond[ed] to the report," and that "[w]hat we said was that there were problems with
that report." July 6, 2009, Tr. at 28. This statement is an implicit denial that any
personal attacks were made; however, as set forth in great detail below, the record
belies Mr. Gordinier's post hoc protestations.

Lest Mr. Gordinier's statement reflecting his implicit denial that he engaged in
personal attacks be perceived as one being made at oral argument without ample time
to reflect upon its significance, the statement is also made by Mr. Gordinier in Omni
808's Reply Memorandum, a document upon which he had ample time to reflect: "Each
and all of the references in Omni's Statement of Position refer to the contents of Mr.
Durkin's Reports and the shortcomings contained therein and omitted therefrom, not to
his person." Id. at 2 n.1. To be sure, the criticisms leveled at Mr. Durkin are framed in

---

Durkin (docket #5918) at 4 (accusing Mr. Durkin of "making McCarthy-like statements of non-existent
buybacks and unsupported insinuations of conflicts of interest"); id. at 9 (suggesting that Mr. Durkin's
formulation of certain search terms relating to criminal acts in Farsi without a concurrent formulation of
those terms in English demonstrated a "predisposition that Persian members of MGA's management and
staff (and only the Persian members) might be engaged in illegal conduct"). Mr. Stang's attacks pale in
comparison to those advanced by Mr. Gordinier, and they were filed under seal. Thus, although the
Court's analysis and conclusions regarding the Forensic Auditor's Reports applies with equal force to Mr.
Stang's statements, his are not the focus of the Court's attention at this time.

Initials of Deputy Clerk __cls_____

EXHIBIT 5 PAGE 26

terms of his Reports. Still other criticisms are, as counsel maintains, addressed to the Reports themselves; those must be analyzed based on their substance. However, as aptly demonstrated by the cited and quoted portions of Mr. Gordinier's filings that appear below, his criticisms do not, by any measure, confine themselves to those Reports, and instead reach out in a highly personal manner to attack the author, his professionalism, his competence, his objectivity, and his integrity.[4]

Indeed, in a display the likes of which have not been previously witnessed by this Court, Mr. Gordinier strayed far afield of legitimate criticism of the discussions, analyses, and conclusions reached in the Summary Report and the Reports that followed. To be sure, there are instances in which Mr. Gordinier addressed the message found in those Reports; just as surely, however, as detailed below, Mr. Gordinier attacked the messenger. Specifically, the papers filed by Mr. Gordinier on behalf of Omni 808 call into question Mr. Durkin's professionalism and competence, as well as his objectivity and integrity. Moreover, and alarmingly, they falsely accuse Mr. Durkin of being influenced by an ethnocentric bias against Mr. Larian and Mr. Kadisha. Such attacks, aimed at Mr. Durkin personally rather than the discussion, analyses, and conclusions set forth in his Reports, appear throughout Omni 808's papers. See Omni 808 Investors, LLC's Statement of Position re Order to Show Cause re Appointment of a Permanent Receiver (docket #5446) ("SOP"), filed May 14, 2009, at 11 (referring to Mr. Durkin's "irresponsible" analysis); id. (noting that Mr. Durkin is "far too experienced" to believe that he "produced . . . a balanced presentation"); id. (stating that "Mr. Durkin's report is a polemic" and "a piece of advocacy"); id. at 12 n.9 (calling into question Mr. Durkin's "objectivity" based on the fact that the Court ordered Mr. Durkin's fees be paid (at least in the first instance) by Mattel); id. (suggesting that Mr. Durkin's ex parte communications with Mattel were improper); id. at 13 n.10 (characterizing Mr. Durkin's quotation of Mr. Larian's and Mr. Kadisha's account of how the two men were acquainted, from "the Persian community," as "at best, unprofessional" and, "at worst,

---

[4] Adding still further to the mounting irony, in the same footnote that Mr. Gordinier disclaims engaging in improper personal attacks, he falsely accuses counsel for Mattel of advancing their own improper *ad hominen* attacks against Neil Kadisha, who has been referred to as a "common thief" in certain unspecified Mattel filings. Mr. Kadisha is the Managing Partner of a diversified investment firm, Omninet Capital, LLC, and an investor in Omni 808. To call someone a "common thief" is, undoubtably, by any measure, a highly personal attack, therefore an attack addressed "to the man," or *ad hominen*. However, in the same manner Mr. Gordinier accuses Mr. Durkin of failing to provide approprate context to the Court in his Reports, Mr. Gordinier himself fails to acknowledge that counsel for Mattel's use of the term "common thief" in connection with Mr. Kadisha merely quotes Los Angeles County Superior Court Judge Henry W. Shatford's conclusion regarding Mr. Kadisha, as set forth in his 191-page Statement of Decision, dated October 24, 2006, which was issued after a 200-day trial, which is currently pending appeal, and which conferred upon Mr. Kadisha the oft-repeated moniker of "common thief," as well as "embezzler," and "perjurer." See Uzyel v. Kadisha, Cal. App. Nos. B196045, B203804, B198007, B199850, B201425, 2009 WL 646096 (Mar. 4, 2009) (appellate brief). As always, context is key. The use by counsel for Mattel of another court's findings and conclusions to advance an argument is not inappropriate. Those findings and conclusions may, or may not, be relevant to matters presented to the Court. Used in this manner, although undoubtedly addressed "to the man" (and his credibility), it is not an improper *ad hominen* attack.

MINUTES FORM 90
CIVIL -- GEN                                    8                    Initials of Deputy Clerk __cls_____

EXHIBIT 5 PAGE 27

evidence of improper cultural bias"); id. (in the same footnote, referring to the same quotation, stating that "[t]he tone [of the report] itself is compelling proof that Mr. Durkin had no intention of providing an 'objective' report to the Court."); id. at 23 (referring to the Summary Report as "Mr. Durkin's ill-concealed advocacy piece"); id. (noting that advocacy, rather than objectivity, "is certainly the posture [Mr. Durkin] is most comfortable with"); Omni 808 Investors, LLC's Memorandum in Support of Its Requests to Strike Summary and Responsive Reports of Ronald L. Durkin (docket #5705) ("Motion to Strike"), filed June 8, 2009, at 4 (noting Omni's "doubts that the Court or any party would benefit further by continuing this façade of Mr. Durkin's 'impartiality'"); id. at 7 (calling Mr. Durkin's explanation of his conclusion regarding the relatedness of certain parties as "not only fatuous[,] but [also] intellectually dishonest"); id. at 9 (suggesting that Mr. Durkin intentionally concealed from the Court the fact that Mr. Larian sought other funding sources before turning to Mr. Kadisha); id. at 10 (noting that "Mr. Durkin's repeated references to Mr. Larian's and Mr. Kadisha's common 'Persian' heritage can only be viewed as an attempt to draw some nefarious ethnic connection between them"); id. at 12 (calling the reference to Mr. Larian's and Mr. Kadisha's ethnicity "unprofessional symptoms of improper cultural bias [that] have no place in a supposedly objective report"); Omni 808 Investors, LLC's Reply Memorandum (docket #5809) ("Reply Memo") at 14 (suggesting that not only Mr. Durkin, but also counsel for Mattel, harbor "cultural biases" that lead them to "suggest[] that [Mr. Larian's and Mr. Kadisha's] common heritage makes [them] more likely to act contrary to their own interests); id. at 15 (stating that, according to his own interview notes, Mr. Durkin "misrepresented" to the Court in his Summary Report how Mr. Larian and Mr. Kadisha portrayed their relationship with each other).

As alluded to, Omni 808's criticisms have not been limited to personal attacks; some of the criticisms are in fact aimed at the Reports themselves. See e.g., SOP at 16 ("Mr. Durkin's conclusion that the Wachovia-Omni transaction impacted 'MGAEI's solvency and ability to continue conducting operations' is simply wrong."). Any comment by the Court regarding the substance of the discussions, analyses, and conclusions presented to the Court in the Forensic Auditor's Summary, Responsive, and Final Reports is inadvisable at this time. With the filing of the Third Amended Answer and Counterclaims, much of the subject matter of the Forensic Auditor's Reports have been incorporated into the claims at issue in this action. As such, it would be premature for the Court to comment upon the substance of issues that are yet to be adjudicated, and that are subject to a trial by jury. Nevertheless, the Court has reviewed the Forensic Auditor's Summary, Responsive, and Final Reports, and the exhibits attached thereto. The Court has also reviewed and considered the criticisms aimed at the Forensic Auditor, cited and quoted above, as well as the entirety of all the papers responding to the Forensic Auditor's Reports filed to date. After this review, the Court is firmly convinced that all the personal criticisms of Mr. Durkin are unwarranted and unsubstantiated.

At best, the criticism of Mr. Durkin's performance and presentation represents a

MINUTES FORM 90
CIVIL -- GEN                              9                Initials of Deputy Clerk __cls_____

EXHIBIT_5_ PAGE_28

different interpretation of available evidence.  That such disagreements would arise between the analyses offered by a Court-Appointed Forensic Auditor and that offered by counsel for a party whose transactions have been a subject of that audit is by no means surprising.  A jury considering the relevant evidence might ultimately make factual determinations that tend to agree with Mr. Durkin's assessment, it might ultimately tend to agree with Mr. Gordinier's assessment, or it may very well reject both positions in favor of another.  The answer to the merits of the claims at issue in this action must await another day.  Today, the Court merely notes that its examination of the Forensic Auditor's Reports reveal that Mr. Gordinier's personal attacks aimed at their author were unjustified.

Some specific attacks directed toward Mr. Durkin -- relating to his background as a law enforcement officer, his communications with counsel for Mattel, and specific (but baseless) allegations of ethnocentric bias -- are worthy of more specific comment by the Court.

Stopping short of explicitly stating such, Mr. Gordinier appears to labor under the assumption that Mr. Durkin has been unable to put behind him the prosecutorial mindset under which he presumably operated during his former service to this Nation as an agent of the Federal Bureau of Investigation ("FBI").  At the outset, the Court notes that Mr. Gordinier's unstated assumptions do a disservice to the prosecutors and the law enforcement officers who work with those prosecutors, both of whom conduct their work under the clearly delineated duty to ferret out not only evidence of guilt but also "evidence favorable to the accused."  See e.g., Berger v. United States, 295 U.S. 78, 88 (1935) (noting that the role of the prosecutor is not to win at all costs and observing that the prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."); Brady v. Maryland, 373 U.S. 83, 87 (1963) (imposing a duty on prosecutors to provide to the defense exculpatory evidence when requested to do so).

Secondly, even if prosecutorial duties were not so defined, the Court finds no suggestion that Mr. Durkin skewed the evidence in favor of any particular viewpoint.  Undoubtedly, there is a *complete absence* of any evidence that, as Mr. Gordinier has suggested, Mr. Durkin has embarked upon a campaign to purposely mislead the Court.

Mr. Gordinier also suggests that, because Mr. Durkin's bills are being paid by Mattel, Mattel has, through this payment or through other communications with Mr. Durkin, bought Mr. Durkin's loyalty.  This is utter nonsense.  As demonstrated by the Court's communications with him, Mr. Durkin is a Court-Appointed Officer who understands that his role is to work on behalf of the Court and not on behalf of any party.  In any event, the Court's Order of January 7, 2009, which appointed Mr. Durkin, imposed the costs of the audit on Mattel "in the first instance," but expressly provided for

EXHIBIT _5_ PAGE _?7_

the possibility that the audit expenses be shared or shifted to the MGA parties. Moreover, to suggest, however subtly, that ex parte communications with counsel for Mattel were improper ignores the Court's mandate to the Forensic Auditor in the January 7, 2009, Order, which states that Mr. Durkin was provided with attorney contact information and that he "shall direct his initial communications to counsel." At no time has the Court precluded the Forensic Auditor's communications with Mattel or its counsel; in fact, because the Forensic Audit was undertaken based on evidence gathered by and presented to the Court by Mattel, Mr. Durkin would have been remiss in his duties if he failed to communicate with Mattel and its counsel.

    Mr. Durkin was vested with powers and discretion to complete a Court-ordered Forensic Audit. Pursuant to an Order of this Court, he undertook this task and exercised those powers and that discretion, presenting his Reports in conformity with the Court's instructions. Despite counsel's attacks, the Court's review of the evidence before it discerns no abuse of those powers or of that discretion.

    Particularly troubling to the Court is that counsel speculates that, because Mr. Durkin noted in his report that Mr. Larian knew Mr. Kadisha from "the Persian Community," Mr. Durkin could be "of the view that this common heritage makes Mr. Kadisha more likely to act contrary to his own interests or to do something via third-parties that he wouldn't otherwise do?" See SOP at 13-14 n.10 (appearing to pose this thought as a rhetorical question). There is no indication in the record, or otherwise, that Mr. Durkin holds such a view. To the contrary, Mr. Durkin's comment regarding the acquaintanceship of Mr. Larian and Mr. Kadisha from "the Persian Community" (which is noted in the report within quotation marks and is expressly attributed to a reference made by Mr. Larian himself) is clearly predicated on interviews with these two individuals, each of whom related independently to Mr. Durkin and his colleagues that they knew each other from "the Persian Community." See Durkin Summary Report, Ex. 14, at 2 ¶ 3 (Notes re March 25, 2009, interview with Mr. Larian: "He indicated that he knew Kadisha from the Persian community.") and Ex. 14, at 15 ¶ 2 (Notes re March 26, 2009, interview with Mr. Kadisha: "Kadisha stated that he knows Larian from the Persian community."). The purpose for this reference is made clear in the footnote set forth at the end of the sentence in which the reference appears; namely, the Report discusses evidence that the relationship between Mr. Larian and Mr. Kadisha is stronger and more personal than either man claimed it was. See Summary Report at 5 n.18; Ex. 15 (personal emails).

    In the Reply Memo, Mr. Gordinier takes issue with this explanation, this time including not only Mr. Durkin but also counsel for Mattel as the targets for his unsubstantiated allegations of "cultural bias." Mr. Gordinier first mischaracterizes an argument made by Mattel. Mattel argued, and quite correctly, both that how well Mr. Larian and Mr. Kadisha knew each other was relevant to a determination of whether certain transactions between the two were arms-length transactions, and that this point was likely not lost on either of these two very sophisticated and successful

MINUTES FORM 90                                                    Initials of Deputy Clerk __cls_____
CIVIL -- GEN                              11

EXHIBIT 5 PAGE 30

businessmen.[5] As noted previously, both Mr. Larian and Mr. Kadisha stated that they knew each other from "the Persian community" which, in the Forensic Auditor's view, was intended to, or at least had the tendency to minimize the existing relationship between the two. Mr. Gordinier incorrectly characterizes this argument as Mattel's contention that Mr. Larian's and Mr. Kadisha's "Persian relationship" and "common Persian heritage" was somehow relevant to a determination of whether the Omni 808 transaction was an arms-length transaction. Mattel made no such argument. Neither counsel for Mattel nor Mr. Durkin have implied that Mr. Larian's and Mr. Kadisha's ethnicity factors into the analysis. Other than to point to Mr. Larian's and Mr. Kadisha's separate, but identical, accounts of how they knew each other which, in turn, suggests how well they know each other, neither counsel for Mattel nor Mr. Durkin have stated or implied that Mr. Larian's and Mr. Kadisha's shared ethnicity is relevant to any matter currently or potentially before the Court. <u>Compare</u> Opposition at 8-9 <u>with</u> Reply Memo at 14-15.

Moreover, Mr. Gordinier's substantive point, that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha told him about the closeness of their relationship, fares no better. <u>See</u> Reply Memo at 15. On this point, it is important to set this stage properly. Counsel for all parties have attempted to glean far too much from two sterile paragraphs of interview notes taken by Mr. Durkin. Much can be inferred from conversations and interviews through not only what is said, but what is not said, by the interviewee's demeanor, by the tone of the speaker, by the length and placement of pauses, and by non-verbal gestures and body language. With all these variables, much of what is communicated does not find its way into notes.[6] For instance, Mr. Durkin's interview of Mr. Larian lasted over two and a half hours; however, the interview notes are a mere five and a half pages. Similarly, a one-hour and ten minute interview of Mr. Kadisha yielded only three and a half pages of interview notes. This is not to suggest that the notes should have been longer or that the interviews should have been recorded or transcribed; rather, it is to suggest that counsel's arguments based on another's notes are not particularly probative.

In contrast, Mr. Durkin's assessment, based on his interviews with both of them,

---

[5] In fact, the Court just this week issued a 30-page, single-spaced opinion resolving a 10-day bench trial conducted over the <u>sole</u> issue of whether a transaction between "closely related" entities reflected its fair market value, one of the more significant arguments ultimately rejected by the Court in that case being that the close relationship between the parties necessarily rendered the transaction a "sweetheart deal." <u>See</u> July 6, 2009, Order, <u>Siegel v. Warner Bros. Entertainment, Inc., et al.</u>, CV 04-08400 SGL (RZ) (docket #554).

[6] Indeed, the interview notes upon which the parties rely concede as much. <u>See</u> Summary Report, Ex. 14 at 2, 15 ("This interview memorandum is a factual representation of the topics discussed during the interview and is not intended to be a word for word or exact transcription of the conversation."). Thus, in addition to not taking into account all non-verbal communication, the notes do not even represent everything that was said during the interview.

MINUTES FORM 90                                      Initials of Deputy Clerk __cls_____
CIVIL -- GEN                          12

EXHIBIT 5 PAGE 31

is that Mr. Larian and Mr. Kadisha attempted to minimize their relationship because both of them understand the relevance of any friendship or other connection between them to the assessment of the arms-length nature of any transactions in which they have engaged. Mr. Durkin's assessment does not come from the gentle teasing of a strained meaning from two sterile paragraphs of brief notes taken by another person; rather, his assessment springs from his participation in the interview process, the entirety of the interviews he conducted of Mr. Larian and Mr. Kadisha, and his review of all of the evidence. As such, the Court defers to his assessment, at least insofar as how Mr. Larian and Mr. Kadisha portrayed their relationship to him.

As for that scant language from which the parties glean so much meaning, the entirety of which is set forth below, it in no way supports the contention made by Mr. Gordinier that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha conveyed to him about the closeness of their relationship. On this topic, the notes of Mr. Larian's interview merely state the following:

> Larian decided to contact Neil Kadisha of OmniNet as
> he knew his company was in the distressed loan business.
> He indicated that he knew Kadisha from the Persian
> community. Kadisha said he wouldn't do the deal alone in
> today's environment and wanted Larian and their other
> friends to invest in the deal with MGA. Larian stated that
> Kadisha negotiated the debt with Wachovia and got it down
> significantly, Larian said he is not bitter about Kadisha
> getting a good deal on buying the loan.

Summary Report, Ex. 14, at 2 ¶ 3 (emphasis added). This paragraph contains the word "friends," and perhaps could even be read as an implicit statement by Mr. Larian that he and Mr. Kadisha are "friends." But the language does not compel such an inference. Moreover, it does not comport with the notes of Mr. Kadisha's interview, which on this topic state only the following:

> Larian and Kadisha have never been to dinner
> together. Kadisha stated that he knows Larian from the
> Persian community and he sees him often at religious
> events, etc. He has no investments with Larian. Kadisha
> did not talk with Larian last night, this morning or in the last two days.

Summary Report, Ex. 14, at 15, ¶ 2. Mr. Durkin's assessment that Mr. Larian and Mr. Kadisha sought to minimize the extent of their relationship is not contradicted by these short passages.

The criticism that Mr. Durkin was acting pursuant to an ethnic or cultural bias is clearly baseless. The allegations are irresponsible, and they are made to capitalize on

MINUTES FORM 90
CIVIL -- GEN                                    13                    Initials of Deputy Clerk __cls_____

EXHIBIT 5 PAGE 32

their inherent sensational nature for counsel's own purposes of diverting attention away from the substance of the Reports. Sensationalism aside, when viewed in context, the Reports' reference to Mr. Larian and Mr. Kadisha knowing each other from "the Persian community" was plainly innocuous. The reference was a direct quotation from both Mr. Larian and Mr. Kadisha. It was used in a broader discussion regarding how (and thus, impliedly, how well) the two knew each other, which is itself relevant to the issue of whether certain transactions relevant to the present litigation were made at arms length.

This is a most unfortunate incident. The Court certainly understands, in a case as hotly contested as this one -- with such high stakes, with such complex legal issues, and with such truly extraordinary legal talent on all sides -- that lawyers, however ethical and committed to the highest standards of professionalism (as the Court presumes and has found all counsel of record here to be), make statements or commit acts in haste that they subsequently regret. All of the players to this drama, are, after all is said and done, human. As such, all of us are vulnerable to all-too-common human frailties. The Court would place itself at the very top of any list of lawyers who have spoken improvidently at one time or another in this case (and any number of others). What the Court has witnessed here, however, in both manner and substance, for the reasons noted above, goes beyond what the Court can let pass without some manner of reprobation. So let the Court be clear: Nothing excuses the attempted character assassination in which Mr. Gordinier has engaged.

**IT IS SO ORDERED.**

EXHIBIT 5 PAGE 33