Page 5098

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

---

MATTEL, INC.,                          :  PAGES:  5098 - 5215
                                       :
          PLAINTIFF,                   :
                                       :
     VS.                               :  NO. ED CV04-09049-SGL
                                       :  [CONSOLIDATED WITH
MGA ENTERTAINMENT, INC.,               :  CV04-9059 & CV05-2727]
ET AL.,                                :
                                       :
          DEFENDANTS.                  :


REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

FRIDAY, JULY 18, 2008




MARK SCHWEITZER, CSR, RPR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
181-H ROYBAL FEDERAL BUILDING
255 EAST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012
(213) 663-3494

Page 5099

```
 1     Appearances of Counsel:

 2

 3     On Behalf of Mattel:

 4         Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
           By John B. Quinn, Esq.
 5             B. Dylan Proctor, Esq.
               Michael T. Zeller, Esq.
 6             Harry Olivar, Esq.
               John Corey, Esq.
 7             Diane Hutnyan, Esq.
               William Price, Esq.
 8             Scott Kidman, Esq.
           855 South Figueroa Street
 9         10th Floor
           Los Angeles, CA 90017
10         (213) 624-7707

11

12     On Behalf of MGA Entertainment:

13         Skadden, Arps, Slate, Meagher & Flom LLP
           By Thomas J. Nolan, Esq.
14             Carl Alan Roth, Esq.
               Jason Russell, Esq.
15             Lauren Aguiar, Esq.
               David Hansen, Esq.
16             Matthew Sloan, Esq.
               Robert Herrington, Esq.
17         300 South Grand Avenue
           Los Angeles, CA 90071-3144
18         (213) 687-5000

19

20

21

22

23

24

25
```

44af2635-c89f-4e3b-b992-cb9bd2674275

Page 5100

1                            I N D E X

2

3          MATTER:  1-B CONFERENCE......................... 5100

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

44af2635-c89f-4e3b-b992-cb9bd2674275

1          Riverside, California; Friday, July 18, 2008

2                        12:05 P.M.

3          WHEREUPON THE CASE HAVING BEEN CALLED AND

4          APPEARANCES GIVEN, THE FOLLOWING PROCEEDINGS

5          WERE HELD:

6          THE COURT:  Good afternoon, Counsel.  I asked

7    counsel to come together at noon today to basically go over

8    any pretrial matters that we need to take up to prepare for

9    next week.  And I also asked counsel to submit to the Court

10   copies of any motions that they believe might still be

11   outstanding, and I've received those, and I appreciate that.

12         What I'd like to do in this first part of the

13   hearing this afternoon is get a sense, pin down on both sides

14   what exactly it is counsel intends to do with the trial, what

15   we need to get resolved now, and figure out where we are.

16         I'll begin with plaintiff Mattel.  I trust that we

17   have a witness list at this point.

18         MR. ZELLER:  If I could get some guidance from the

19   Court as to what is the best way of summarizing what we

20   intend to do.  We have provided witness lists, which is our

21   best effort as of today, to put in order what we expect to

22   do.

23         THE COURT:  Can I get a copy of that?

24         MR. ZELLER:  Yes, I'm sure we have an extra copy of

25   that, your Honor.  We may have E-filed it.

Page 5102

1          THE COURT:  Very good.

2          MR. ZELLER:  This was our best effort, of course,

3   and I think, as we flagged for the Court yesterday, some of

4   these witnesses we do expect to fall off, subject to

5   stipulations that we're pursuing, both parties are pursuing.

6   And in the event that that's reached, then some of these

7   people will fall off.

8          THE COURT:  Why don't you go down the 17 and just

9   tell me very brief one line statement or two what you are

10  calling them for, what you anticipate their testimony is,

11  just to give me some understanding of what to expect in this

12  phase.

13         MR. ZELLER:  Certainly, your Honor.  Daphne

14  Gronich, I think one of the main reasons we would call her

15  would be to put into evidence certain statements that MGA has

16  made in prior litigation.  These go to originality,

17  protectability, comparison, substantial similarity, other

18  copyright type issues.

19         The same is true for Mr. Kamarck, and the same is

20  true for No. 3, which is Larry McFarland.

21         THE COURT:  Okay.  So these are all from prior

22  litigation involving copyright and trademark; correct?

23         MR. ZELLER:  That's correct, your Honor.  And one

24  issue that I'm not sure has been resolved is we certainly, I

25  know on summary judgment, have raised the issue that in some

1   respects, which -- I think in some respects, we have -- we

2   raised on summary judgment the issue of judicial estoppel,

3   because our view is that in some of those cases, MGA had

4   asserted that the very works that the jury has now ruled were

5   created during the term of Bryant's employment were copyright

6   protectable, that they were original.  They have sued other

7   parties on those exact works.

8          So from our perspective, they should not be allowed

9   to argue anything to the contrary in this case.

10          The next witness we have is Paula Garcia.  In the

11  main, her -- how we're envisioning her potential testimony

12  would be to get into evidence products that we believe are

13  infringing.  And then we will argue to the jury they are

14  infringing.  Dolls, licensed product, other accused works.

15          THE COURT:  How are we doing in that area?  That

16  was something you flagged yesterday as being a concern in

17  terms of the exhibits you wanted to introduce.

18          MR. ZELLER:  I know that there has been discussion,

19  and I know that even draft stipulations have been passed back

20  and forth.  I can get additional information as to exactly

21  where we are in that process, but I know that there had been

22  continued discussions among the parties as to a stipulation

23  that would hopefully obviate the need to put in a lot of

24  product through a witness.  We did, by the way, too, your

25  Honor, we did prepare and serve an exhibit list.  I know MGA

1    did as well.  I think it's probably fair to say on both

2    parties' sides, obviously things will get more refined and

3    more accurate certainly by the end of the weekend on the

4    exhibit list.  That's obviously just a larger task.

5              THE COURT:  Very good.

6              MR. ZELLER:  Number 5 is Kenneth Hollander.  He is

7    our survey expert.

8              THE COURT:  Okay.  And this is one of the -- this

9    is one of the ones that is not subject to a motion to exclude

10   testimony; is that correct?

11             MS. AGUIAR:  Actually, it very much is, your Honor.

12             THE COURT:  He is?

13             MS. AGUIAR:  Yes.

14             THE COURT:  Where is that?  I'm sorry?

15             MS. AGUIAR:  It's our Motion in Limine No. 8.

16             THE COURT:  Number 8.  Your Motion No. 8?  Or

17   Mattel's motion --

18             MS. AGUIAR:  It should be MGA parties' Motion in

19   Limine No. 8.

20             THE COURT:  Got it.  I'm sorry.  I was looking in

21   the wrong place.  Thank you, Counsel.  Very good.  Okay.

22   There's Kenneth Hollander, motion to strike expert rebuttal

23   report of Mr. Hollander.  Very well.

24             Okay.  Next?

25             MR. ZELLER:  Number 6 on our list is Frank Keiser.

1          THE COURT:  Okay.

2          MR. ZELLER:  He's a little hard to describe.  What

3    he does is he does digital imaging of three-dimensional

4    objects which really allows for a 3D comparison between

5    various objects, whether it's doll to doll, but basically

6    it's like digital mapping of three-dimensional objects.

7          THE COURT:  Okay.  Do we have a motion that's

8    attendant to him?

9          MR. NOLAN:  Well, your Honor, it's not a formal

10   motion.  We've asked them to disclose to them the actual

11   exhibits that they intend to use with him.  We have not had

12   that provided to us.  So we -- although we understand this

13   description, we've not actually seen the 3D comparisons, and

14   until we do that, we can't really tell whether or not we're

15   going to have a foundational objection to that.  We're

16   expecting to get them, I think, shortly.  Maybe they are in

17   the mail.  We've been talking about it.

18         MR. ZELLER:  What Mr. Nolan described is not

19   consistent with my understanding, but I'm not that close to

20   the situation.  I understand that we had produced previously

21   basically all the digital data.  And I'm sure that Mr. Nolan

22   is correct that there have been on-going discussions as to

23   attempting to narrow down the universe of things.

24         THE COURT:  There's not a particular motion

25   addressed to Mr. Keiser, though?

1          MS. AGUIAR:  There is not a motion, your Honor.

2     There's just a discovery dispute that has arisen because they

3     haven't provided the actual 3D images.  All we have is the

4     underlying data.

5          THE COURT:  Got it.

6          Isaac Larian?

7          MR. ZELLER:  Mr. Larian would be potentially called

8     to deal with issues pertaining to finances for punitive

9     damages purposes and damages purposes.  He would be

10    potentially called to address allocation issues that MGA is

11    raising basically in defense or in response to disgorgement

12    of profits.

13         THE COURT:  Very good.

14         Michael Moore?

15         MR. ZELLER:  Mr. Moore, as the Court will recall,

16    is in-house counsel for Mattel.  He would testify as to the

17    circumstances under which Mattel first learned of Carter

18    Bryant's activities that are relevant.  This goes essentially

19    to the fraudulent concealment issue on the two state law tort

20    claims where the statute of limitations defenses still lie.

21    Presumably would go to laches as well, assuming this is

22    something that goes to trial.  We do intend to ask the Court,

23    based on its prior rulings, to make certain rulings with

24    respect to laches and even potentially on the two remaining

25    statute of limitations issues.

Page 5107

1      THE COURT:  Prior to the trial?

2      MR. ZELLER:  Yes, your Honor.

3      THE COURT:  Okay.  Carol Scott?

4      MR. ZELLER:  Carol Scott is a professor of

5  marketing.  She will be testifying essentially to issues such

6  as causation for damages.

7      THE COURT:  And that's Motion in Limine No. 10.

8      MR. ROTH:  That's correct, your Honor.

9      THE COURT:  By MGA.  Okay.

10      MR. ZELLER:  Michael Wagner is Mattel's damages

11  expert.

12      THE COURT:  I'm sorry.  One second.

13      MR. ZELLER:  Number 11 is Ralph Oman.

14      THE COURT:  One second.

15      MR. ROTH:  Just for the purpose of your notes, your

16  Honor, that is subject to Motion in Limine No. 7.

17      THE COURT:  I see that.  MGA No. 7.  Okay.  Ralph

18  Oman?

19      MR. ZELLER:  He is the former registrar of

20  copyrights.  He would testify to two subjects.  I'll try and

21  put them briefly.  The first relates to the significance of

22  certain MGA copyright registrations.  And the second aspect

23  of it would be in response to what we expect to be MGA's

24  argument that some of the statements that MGA made in prior

25  litigation in Hong Kong really doesn't have anything to do

Page 5108

1  with the U.S., that somehow it's only an idiosyncratic

2  expression of what goes on in Hong Kong.  And he is the

3  subject of a motion in limine.

4          THE COURT:  Number 9; right?

5          MR. ZELLER:  Yes.

6          THE COURT:  All right.  Carter Bryant?

7          MR. ZELLER:  If I could group Carter Bryant, Janet

8  Bryant, Edmond Lee, and Sarah Chui together.  Very generally

9  speaking what we would expect is that they have testimony

10 that we believe shows that the dolls are based on the

11 drawings and other intellectual property that is owned by

12 Mattel.

13         THE COURT:  Very good.  I expect with respect to

14 each of these video depositions, we have a designated

15 transcript from both sides?

16         MR. ZELLER:  I don't know if it's that refined yet,

17 your Honor.  We, of course, are going into the entire trial

18 designated video.

19         THE COURT:  Right.  I'm talking about having

20 something that's specific for this phase.

21         MR. ZELLER:  That's in process, your Honor.  That,

22 I expect to be done fairly shortly.  And also with respect to

23 these video witnesses, I know that they are going to be very

24 short clips.  Because obviously, for example, Janet Bryant

25 was played previously.  There may be just a few clips that

Page 5109

1   need to be played now.  We're obviously not going to repeat

2   what's already been played to the jury.

3            THE COURT:  Very good.  I just want to make sure

4   that I have those designated video depositions in the same

5   form that they were provided before.

6            MR. ZELLER:  We will, your Honor.

7            THE COURT:  All right.  Lisa Tonnu.

8            MR. ZELLER:  Lisa Tonnu is an MGA person.  We would

9   expect to call her on subjects relating to MGA's finances and

10  Isaac Larian's finances potentially.

11           THE COURT:  All right.  And Lee Loetz?

12           MR. ZELLER:  Loetz, L-O-E-T-Z, for the record.  He

13  is a designer.  Both parties have design experts who will

14  testify on issues of similarity, and there's certainly an

15  issue, I know.

16           THE COURT:  MGA No. 12.

17           MR. ZELLER:  Right.  And we have a corresponding

18  motion for their design expert that they have put forth,

19  Mr. Vilppu.

20           THE COURT:  So you are not planning to call

21  Professor Lind; is that correct?

22           MR. ZELLER:  That is our intention, your Honor.

23  What we're assuming, of course, is that this list doesn't

24  have rebuttal --

25           THE COURT:  I understand that.  I'm more focusing

Page 5110

1   on what I need to prepare for for 1-B case in chief.

2            MR. ZELLER:  Right.  And I will say, however, I'm

3   not sure that the fact that Professor Lind is not on this

4   list sort of obviates the issue.  To the extent that MGA

5   really intends to call Professor Menell, then I think the

6   Court is going to have to consider both issues as to really

7   the admissibility of these witnesses.

8            I think I've said before to the Court that from our

9   perspective, neither of them should, frankly, come in.  We

10  only designated Professor Lind because they had somebody who

11  they were fronting as a copyright law expert, and to the

12  extent he comes in, then we wanted an opportunity to respond.

13           THE COURT:  Very good.  All right.  What I'd like

14  to do is the same thing now with MGA.

15           MR. NOLAN:  Your Honor, I share Mr. Zeller's

16  comments that we worked last night to put together a

17  constructive list that anticipates as much as we can, but it

18  is our best effort right now.  There may be some additions,

19  and we've been adding and advising Mattel as we add.

20           And a lot will depend on how Mattel decides to try

21  its part of the case.  And also some additional guidance from

22  the Court with respect to the scope of the copyright issues,

23  how the Court intends to try that in front of the jury,

24  statute of limitations, laches.  So if I sound defensive, I'm

25  not.  I don't expect that we'd be calling all of these

Page 5111

1    witnesses, but let me walk through them, if I might.

2              Margaret Leahy, just to add and fill out the story

3    line on the development of the Bratz sculpt.

4              Veronica Marlow is the seamstress, fashion designer

5    for many of the fashions.  And she'll talk and complete the

6    time line if we went beyond the October 19th date.

7              Aileen Storer, same issue with respect to filling

8    out the time line on the development of Bratz.  In

9    particular, the packaging of the Bratz product.  Same way

10   with Steffan Smith.

11             Paula Garcia --

12             THE COURT:  Steffan Smith is also involved with

13   packaging?

14             MR. NOLAN:  Yes, your Honor.  And depending on the

15   overlap, this is an area where we may not put both on.

16             Paula Garcia, obviously, to fill out the time line

17   beyond October 19th and what was done with the development of

18   the doll.

19             Ann Driskill, Mattel employee, statute of

20   limitations, knowledge of Carter Bryant's involvement.

21             Glenn Vilppu is our counterpart to Mr. Loetz.

22             THE COURT:  Hold on a second.

23             MR. NOLAN:  I apologize.

24             THE COURT:  Okay.  So Glenn Vilppu is the

25   counterpart to who?

Page 5112

1          MR. NOLAN:  Loetz, L-O-E-T-Z.

2          THE COURT:  Their designer?

3          MR. NOLAN:  Their designer, virtual identity,

4   substantial similarity, however that issue develops.

5          Your Honor, we have Robert Tonner down here.  I

6   just want to be heard for just a moment on that.

7          THE COURT:  Sure.

8          MR. NOLAN:  Mr. Tonner was the expert that the

9   Court had an evidentiary hearing with and struck him from

10  Phase 1-A.

11         THE COURT:  Yes.

12         MR. NOLAN:  And the Court's comments were broad and

13  sweeping, and, for the record, I just wanted to note that

14  Mr. Tonner was deposed, and his expert report submitted on a

15  totally different area than what we were proposing for him in

16  1-A.  And he was and is a doll expert that we believe is

17  qualified to offer testimony with respect to different

18  generations of the Bratz dolls and the development of the

19  doll separate and apart from the comparison that he was going

20  to offer with respect to Toon Teens.

21         I know the Court struck him as a witness at that

22  point in time.  We would ask your Honor to clarify that

23  ruling to see whether or not we could continue to use him for

24  the designated point that he was going to be used in 1-B.

25  He's been fully deposed on that.  He's got a report.  There's

Page 5113

1    nothing different, new knowledge on that, but it goes to a

2    different issue than we offered him during 1-A.

3              THE COURT:  Very well.  Debbie Middleton.

4              MR. NOLAN:  And Debbie Middleton is, again,

5    copyright issues.  Goes to the similarity.

6              Daphne Gronich will go to the copyright --

7              THE COURT:  Is Debbie Milton an expert like Glenn

8    Vilppu?

9              MR. NOLAN:  Yes, your Honor.  She will also offer

10   some fact evidence, your Honor, but she's been qualified as

11   an expert.  She's been deposed and submitted a report.

12             Daphne Gronich for the same reason that Mattel

13   would use her.  She's the former general counsel having to do

14   with legal pleadings and positions taken.  We've added Lily

15   Martinez.  They have Lily Martinez on theirs.

16             THE COURT:  Actually, they don't.

17             MR. NOLAN:  They don't?

18             THE COURT:  They don't.

19             MR. NOLAN:  I thought I saw that last night.

20             MR. ZELLER:  I'm sorry to interrupt.  I apologize,

21   your Honor.  She was supposed to be on our list.  So I do

22   apologize.  But you're right.  She is not on the list that

23   apparently we filed.  So I apologize for that.  We would

24   intend to call her just for a limited purpose.  Basically

25   responding to some of the issues that were raised in 1-A, for

44af2635-c89f-4e3b-b992-cb9bd2674275

Page 5114

1    example, the My Scene 360 document that MGA introduced near

2    the end of Phase 1.

3              THE COURT:  You're going to be calling her for what

4    purpose?

5              MR. NOLAN:  Also with respect to copyright issues

6    arising out of similarities, taking back maybe to Toon Teens,

7    based on the way the testimony came in in Toon Teens.  We

8    want to reserve the right of the possibility of going back

9    and reserving that issue about originality in light of the

10   jury's findings.

11             THE COURT:  Okay.

12             MR. NOLAN:  Your Honor, there may be other --

13             THE COURT:  I'm sorry.  The originality of Toon

14   Teens?

15             MR. NOLAN:  Originality of the Bratz drawings, what

16   elements in the Bratz drawings did she see as being similar

17   to Toon Teens and the origin of that going back to whether or

18   not those are really protectable elements.

19             THE COURT:  Okay.

20             MR. NOLAN:  And I think that area has been invited

21   the way they tried the Toon Teens issue.

22             I should add, your Honor, that there may be other

23   issues that some of these witnesses will talk about.

24             THE COURT:  And I'm not -- I'm just trying to get a

25   general sense of what the --

Page 5115

1          MR. NOLAN:  That will stop some of the notes that

2   I'm getting.

3          THE COURT:  You're not being locked into anything.

4          MR. NOLAN:  It's tough going back to the office

5   sometimes after these exercises.

6          Jill Nordquist goes to statute of limitations,

7   first notice by Mattel.

8          Richard De Anda, same, statute of limitations.

9          Bob Eckert, same, statute of limitations/receipt of

10   the anonymous letter.

11          Tim Kilpin has to do with laches and

12   proportionality of damages.

13          Martin Hitch, same issue with respect to statute of

14   limitations.

15          THE COURT:  Who is Martin Hitch?

16          MR. NOLAN:  Martin Hitch is an employee of MGA who

17   was at the New York Toy Fair in January of 2001, and there

18   were discussions with Mattel personnel with respect to Bratz

19   and possible potential licensing by Mattel.  We raised it in

20   1-A, but I think it was reserved for a 1-B issue going to a

21   different question.

22          THE COURT:  Right.

23          MR. NOLAN:  Edmond Lee is a Hong Kong employee of

24   MGA.  May be played by video or live.  They have him on their

25   list.

44af2635-c89f-4e3b-b992-cb9bd2674275

1          Kathleen Simpson-Taylor is a 30(b)(6) witness by
2     Mattel, offered up on statute of limitations issues, first
3     knowledge by Mattel.

4          Michael Moore, they have him on his list -- their
5     list.  We have him for the same reason on ours.  That is the
6     statute of limitations, what they knew.

7          Matt Bousquette is former president of Mattel
8     brands.  He may be offered with respect to apportionment of
9     damages.  Importance of certain ways of branding dolls as
10    opposed to just the sheer sale of a plastic doll.  He'll also
11    go to statute of limitations.

12         Bruce Stein is one of their experts, your Honor.  I
13    think he's a former vice-president of Mattel, and he gives
14    testimony that we believe is relevant to the apportionment of
15    damages in the case.  And we've thrown in a Mattel Custodian
16    of Records, which is really a make hold, place holder, in
17    case we can't work out a stipulation.

18         Kevin Farr is a CFO individual for Mattel.  And
19    he's offered relevant testimony, I think, on apportionment of
20    damages.  I think he has offered testimony on apportionment
21    of damages.

22         Tina Patel, marketing manager now, employed at
23    Mattel.  Also issues with respect to the apportionment of
24    damages.  And then Deborah Haag, H-A-A-G.  I may be
25    mispronouncing that.

Page 5117

1          Heather Polk.

2          And Russell Arons.  They are really Mattel document

3    type witnesses.  They go to apportionment, trying to get in

4    some relevant documents.  We think that sets up the

5    apportionment argument as relied on by the experts.

6          Lisa Tonnu is on their list.  She is a financial

7    person at MGA, would go to damages.

8          Tom Gruca is damages and apportionment.  He's also

9    provided survey.  He's a survey person.

10          THE COURT:  Okay.

11          MR. NOLAN:  And then Eric Joachimsthaler is

12   branding.  Our branding expert, apportionment damages.

13          Paul Meyer is a typical damage expert, numbers

14   cruncher.  And we've set forth a number of other witnesses

15   below that may be on our --

16          THE COURT:  I assume these are all contingent on

17   how Mattel's case in chief plays out.

18          MR. NOLAN:  Exactly.  So in that respect, I don't

19   have to go into detail of those.

20          THE COURT:  Right.  So I'm trying to see which ones

21   of these are still in play in terms of Mattel's motions in

22   limine.  Vilppu is on the list; right?  And that's Motion in

23   Limine No. 10 by Mattel.

24          Peter Menell is not on the list, is he?

25          MR. NOLAN:  Peter Menell is not on the list.  He

Page 5118

1  falls on the category -- we took from the hearing, I think,

2  on May 21st your desire or strong indication that you were

3  not going to have experts testify before the jury.  I suppose

4  there's a footnote that could be dropped here, and I think it

5  provides -- applies to Professor Lind.  If the Court were

6  entertaining some type of a hearing where that evidence would

7  be relevant outside of the presence of the jury, obviously.

8  But that's why he's not on our list.

9            THE COURT:  Mary Bergstein is not on the list;

10 correct?

11           MR. NOLAN:  That's correct, your Honor.

12           THE COURT:  Robert Tonner is.

13           Debora Middleton is.

14           Maybe I'm missing it.  Ran Kivetz?  That's the --

15 there's a --

16           MR. ZELLER:  That's a Mattel witness.  Kivetz.

17           THE COURT:  But he's not on your list, is he?

18           MR. ZELLER:  No, your Honor.  Pending the Court's

19 ruling on the oral motion that we discussed yesterday, he is

20 somebody who would be a responsive expert.  And we were

21 asking for leave to file an expert report on his behalf.  So

22 we didn't put him on our list --

23           THE COURT:  Depending on how the Court rules on

24 MGA's motion.

25           MR. ROTH:  I think they had connected a thing to

Page 5119

1    their Motion in Limine No. 11 on Mr. Gruca, I believe.   And

2    it's my understanding they have made an oral motion to have

3    an expert report, a surrebuttal report filed, should the

4    Court deny their Motion in Limine No. 11 on Mr. Gruca.

5              THE COURT:   Their Motion No. 11 is to preclude

6    defendants from offering improperly disclosed evidence.

7              MR. ROTH:   That is a motion directed at, among

8    other things, Mr. Gruca.

9              THE COURT:   I see.

10             MR. ROTH:   Who is an MGA expert.

11             THE COURT:   All right.   Well, that takes care of

12   the -- gives the Court an understanding of the witnesses.

13             Let me begin with Mattel's outstanding motions, and

14   then I'll go through MGA's outstanding motions.

15             Motion in Limine No. 8, motion to exclude evidence

16   related to whether Mattel would have marketed Bratz.

17             Counsel, are you prepared to argue that at this

18   time?

19             MR. ZELLER:   We are, your Honor.

20             THE COURT:   All right.   Motion in Limine No. 9,

21   motion to exclude evidence regarding Barbie and other Mattel

22   dolls.

23             The Court had previously ruled on that in the

24   context of 1-A.   We need to revisit now in the context of

25   1-B, or is it your position that we don't?

Page 5120

1      MR. ZELLER:  We have that on the list, your Honor,

2  of some issues that may need to be addressed.

3      THE COURT:  Okay.  And you are prepared to proceed

4  with that today?

5      MR. ZELLER:  Yes, your Honor.

6      THE COURT:  Okay.  Then we have Motion in Limine

7  No. 10, Mr. Vilppu.

8      Motion in Limine No. 11.  All right.  This is the

9  motion in limine to preclude defendants from offering

10  improperly disclosed evidence.

11      You're ready to proceed on that today as well?

12      MR. ZELLER:  That's correct.

13      THE COURT:  Number 12 is off the table.

14      13 relates to the two witnesses.

15      Where does Motion in Limine No. 15 play in at this

16  point?  This is related to Christine Tomiyama?

17      MR. ZELLER:  Your Honor, that really goes to the

18  preclusion that the Court had a tentative on at one point.

19      THE COURT:  Which witnesses does that go to in

20  terms of --

21      MR. ZELLER:  Well, it would potentially go to any

22  number of witnesses.  Because what we were asking for was

23  really -- calling it issue preclusion may be a little strong,

24  but it goes to a concept or a subject or an argument that MGA

25  would make.  So it would cut across witnesses who they may

Page 5121

1   potentially call and say well, we translated from 2D to 3D,

2   and those things are just worlds apart.

3           THE COURT:  And lastly, your motion for leave to

4   serve expert report of Ran Kivetz.  That's what we just

5   discussed.  That's a responsive report; is that correct?

6           MR. ZELLER:  That's correct.

7           THE COURT:  And that again is keyed to what?  Keyed

8   to whether the Court grants the motion -- MGA's motion?

9           MR. ZELLER:  I think that they are all somewhat

10  interdependent, the Hollander motion, the Gruca motion, and

11  then the oral motion we're now making to file a responsive

12  report with Mr. Kivetz.

13          So they are all related in the sense of -- they are

14  survey experts, and so it could very well be that one issue

15  as to really the propriety of this kind of evidence is going

16  to have a bearing, at least some degree, on all of them.

17          THE COURT:  So where would you suggest the Court

18  start on this?  Basically I'm trying to structure how I will

19  address the motions.

20          MR. ZELLER:  I think starting with Mr. Hollander

21  makes the most sense, the motion dealing with Mr. Hollander,

22  because it may very well have an impact.

23          THE COURT:  All right.

24          MR. NOLAN:  Your Honor, on that point very briefly,

25  with respect to how you approach that decision and argument,

Page 5122

1    it might make sense to start with Hollander, but this oral

2    motion that was just raised for the first time yesterday, I

3    think, brings unique issues, separate and apart from the

4    issues that have been framed for so long.  Because it seems

5    to us really late in the ballgame to bring this on to us and

6    spring it.

7            They have had this expert report, I believe, since

8    March 17th.  Depositions have been take in this case.  We've

9    had a lot of stuff going on, and then all of a sudden

10   yesterday to hear for the first time that they wanted leave

11   to do another survey.  So I'm just saying that there may be a

12   separate issue in that regard, your Honor.

13           THE COURT:  Very good.

14           Now turning to the MGA motions.

15           MR. ZELLER:  I apologize, your Honor, for

16   interrupting.  There were certain summary judgment issues,

17   too.

18           THE COURT:  I'm going to get to that right now.

19   That's the first tab on MGA.  Do you have additional summary

20   judgment motion -- issues that are not raised?

21           MR. ZELLER:  Yes, we do, your Honor.

22           THE COURT:  Statute of limitations.

23           MR. ZELLER:  Yes, your Honor.  The statute of

24   limitations issue I mentioned.  It really goes to laches

25   issues as well.  And some of the implications of the Court's

44af2635-c89f-4e3b-b992-cb9bd2674275

1    prior rulings.

2           THE COURT:  What's your sense?  In a nutshell, and

3    I'm just -- again, I'm just trying to get an idea of what I

4    have before me at this point.  What is the basis for you to

5    suggest that the Court could decide this at this point?

6    Because obviously, this would cut across the number of

7    witnesses.

8           MR. ZELLER:  And I think that there are two

9    distinct answers to that, your Honor.  One deals with statute

10   of limitations itself on the two tort claims where the

11   statute of limitations is alive, intentional interference and

12   the conversion claim, actually, your Honor.

13          The Court will recall that in the summary judgment

14   ruling that the Court made, it basically found that there was

15   a disputed issue of fact as to when Mattel knew or should

16   have known under the statute of limitations issue.  But it

17   also found that there was only a pretty small range --

18          THE COURT:  Yes.

19          MR. ZELLER:  -- of what that was.  And I believe

20   that there were four time periods.

21          What we were contemplating, your Honor, is

22   potentially just simply saying Mattel will accept for

23   purposes of Phase 1-B trial that its notice period began at

24   the earliest one that the Court had identified as there being

25   a potential disputed factual issue, which would be

Page 5124

1    essentially The Wall Street Journal article.  And from that

2    premise, essentially saying with respect to statute of

3    limitations, really what's left for the jury to decide, then,

4    would be the issue of fraudulent concealment on those two

5    state law tort claims.

6              THE COURT:  So the jury did not find fraudulent

7    concealment.  The claims would be barred.  If they did find

8    fraudulent concealment, they would not be.

9              MR. ZELLER:  Right.  And as a matter of law, I

10   think that would follow.  Because even if the jury took the

11   earliest time period -- I mean, I'm not suggesting that

12   Mattel doesn't have the right to dispute if it wants, to go,

13   you know, in Phase 1-B and say in fact it's the later time

14   period.  But in some ways, it's of not really any legal

15   consequence on that really what are the two essential

16   elements for fraudulent concealment for purposes of statute

17   of limitations on those two claims.

18             The one issue that would still be alive is

19   fraudulent concealment, and the jury would decide that, and

20   then if Mattel prevails on the fraudulent concealment aspect,

21   as a matter of law, our claims would be timely because even

22   taking the earliest time period, it would still be within the

23   limitations period as to when we sued.

24             The second issue, and this goes to laches, and it's

25   a different issue, but sort of the same premise that I was

Page 5125

1   discussing earlier, which is taking and assuming for present

2   purposes that the earliest time period that Mattel had notice

3   of its claims, being the one that the Court identified as The

4   Wall Street Journal article, that could not be unreasonable

5   delay as a matter of law.  And that is, of course, one of the

6   essential elements of laches.

7           THE COURT:  Very good.  Any other issues related to

8   summary judgment?

9           MR. ZELLER:  Yes, your Honor.  The issue of

10   originality/protectability of copyright.  The Court will

11   recall that Mattel moved for summary judgment on those, and

12   there's, I believe, a related motion in limine, although

13   maybe I'm misrecalling.

14           Where this ended up is that we did have argument on

15   that issue.  One position that Mattel was advancing and

16   asking the Court to do was essentially decide that as a

17   matter of law.  And, in fact, we think that really those

18   issues are appropriately decided by the Court as a matter of

19   law.  It's not an issue for the jury to be deciding in this

20   context and in this case, particularly given the judicial

21   estoppel issues that we've raised.

22           So we're prepared to argue further on that very

23   issue.  The Court ultimately did not resolve the question

24   whether that's something that's suitable for the jury,

25   whether that's something that the Court should decide, and if

Page 5126

1    so, under what terms should that be decided because we think

2    that this is an issue that certainly would have a potentially

3    significant impact on the shape of Phase 1-B.

4              THE COURT:  The originality.

5              MR. ZELLER:  Yes.  And it certainly cuts across a

6    number of witnesses, including ones that MGA has described.

7    It would potentially have bearing on some of the experts who

8    testify and what they would be allowed to say or not say.

9              THE COURT:  Anything else from your perspective?

10             MR. ZELLER:  Yes.  And then also I don't think that

11   we had this on our list of what the Court was mentioning in

12   terms of the motions in limine that are still in contest.

13   And this would include Motion in Limine No. 13, which is the

14   one about Middleton.  And we may have just missed it on the

15   list.

16             THE COURT:  Yes, No. 13, with respect to Debbie

17   Middleton.  Yes.  I have it.  Very good.

18             MR. ZELLER:  Thank you.

19             THE COURT:  All right.  Let me hear from MGA.

20   Again, basically the same thing.  I want to identify what we

21   have in terms of motions.

22             MR. NOLAN:  They're tab 1 of our notebook.  You

23   have our notebook?

24             THE COURT:  Yes, I do.  I have that.  Specifically

25   what issues do you want the Court to --

44af2635-c89f-4e3b-b992-cb9bd2674275

1          MR. NOLAN:  Your Honor, tab 1, we're just

2     addressing the same issue that Mr. Zeller was addressing with

3     respect to how the Court intends on the copyright issues to

4     deal with what we've argued extensively in the copyright

5     statute -- copyright summary judgment motions as to the scope

6     of the protectability that is afforded Mr. Bryant's drawings

7     and whether or not in particular that protection is broad or

8     thin as defined by, you know, the numerous cases that we've

9     cited to the Court and the Court's very familiar with.

10          There's -- No. 2 is the motion for leave to file

11     the supplemental expert report, which is before you.  That's

12     the damage report.  And it's based on the late 30(b)(6)

13     deposition that was taken shortly -- or may have been taken

14     on the eve of trial.

15          Number 3 is Motion No. 6 to exclude reference to

16     use of Phase 2 evidence.  This is a motion that goes to the

17     question of Mattel's efforts to try to import or export from

18     Phase 2 and import into this phase certain allegations of

19     employee theft and theft of trade secrets, which we think

20     just -- well, the arguments are addressed.

21          THE COURT:  Right.

22          MR. NOLAN:  Tab No. 4 is our Motion in Limine No. 7

23     to exclude references to a use of certain testimony proffered

24     by Michael Wagner.

25          THE COURT:  Where is that?  I see.  Very good.

Page 5128

1    Right.

2              MR. NOLAN:  We have addressed that --

3              THE COURT:  Right, no, I understand.  I got the

4    Motions in Limine 7, 8, 9, 10, and 12.

5              MR. NOLAN:  So we can stip over.  So 7.  8 is the

6    motion to strike the rebuttal report.  We talked about that.

7    Motion No. 9 to trying strike the report of --

8              THE COURT:  John Alex is not being called.

9              MR. NOLAN:  So I guess we'll revisit that.  It will

10   only pertain to Mr. Oman.

11             And then we have Motion in Limine No. 10, which

12   deals with testimony regarding so-called expert testimony

13   offered by Carol Scott.  We've already identified that for

14   the Court.  That has to be dealt with.

15             And with respect to 11, I think that if we have an

16   agreement with counsel for Mattel that we're not going to

17   call Professor Menell if they are not going to call Professor

18   Lind.  And there's no desire for the Court to have them at a

19   hearing.  Then I don't think the Court would have to address

20   that particular issue.

21             There is Motion No. 12 to exclude certain testimony

22   of Loetz.  I think the best way to look at it is, you know,

23   they have issues with Vilppu.  We have issues with Loetz.  I

24   assume that if it was a free for all, all of us would

25   withdraw our objections and just allow the two experts to

Page 5129

1    testify.  But this expert -- I'm sorry.  This motion is

2    directed to certain testimony offered by their artist expert.

3                THE COURT:  Very well.  Anything else?

4                MR. NOLAN:  I did just want to -- there are

5    obviously some JMOL issues.

6                THE COURT:  Right.  And I've indicated on that I'm

7    taking them under submission until after the trial is over.

8    So there's nothing to argue on JMOL.

9                MR. NOLAN:  I understand that.  I just wanted to

10   highlight --

11               THE COURT:  I'm saying that for the benefit of both

12   parties.

13               MR. NOLAN:  I don't want to -- I'm not going to

14   attempt to argue it; however, embedded in those motions are

15   issues that may affect jury instructions and jury verdict

16   form and maybe even scope of damages as we get further into

17   1-B.  And I didn't want you to be sitting there saying you

18   should have raised it when it was embedded in the JMOL

19   motion.

20               THE COURT:  I'm not asking you to speak to jury

21   instructions or the verdict form at this point.

22               MR. NOLAN:  So there are some issues.  We have an

23   issue, your Honor, now in light of the verdicts, two issues I

24   want to flag to the Court in terms of potential motions, but

25   I'm not there yet.  But I just want to alert the Court to it.

Page 5130

1        One is that with respect to the jury's findings on

2    the tort claims, and this does not deal with the earlier

3    arguments on Carter Bryant's confidentiality of the

4    settlement agreement.  But we're reviewing the possibility or

5    the potential, the likelihood that the Carter Bryant

6    settlement may be an offset of damages that would be awarded

7    or assessed against MGA.  I may get this number wrong, but is

8    it -- it's 877 is a term in the state court system as a good

9    faith settlement proceeding whereby courts are allowed to

10   look at and say this represents a good faith settlement based

11   on what their portion of the responsibility is.

12       We're flagging that.  We're doing some research,

13   your Honor, and I'll bring it to your attention as soon as

14   that's framed a little bit better for us right now.

15       The second issue, your Honor, is actually one that

16   is a little bit more troubling to us in light of certain

17   positions that Mattel has taken in this case.  And it ties to

18   some of the arguments on the statute of limitations that

19   Mr. Zeller made this morning or just a few minutes ago.  And

20   that is the role that Toon Teens played in this case.

21       The Court -- I'm not going to argue this, but I

22   would --

23       THE COURT:  Explain your issue.

24       MR. NOLAN:  Well, the issue really is framed I

25   think best at the hearing that was conducted on May 22nd of

1   2008 in the context of summary judgment motions, where

2   Mr. Quinn was giving you a proffer as to what they were

3   intending to do with respect to Toon Teens.  And I'm going to

4   be reading from page 205, lines -- starting at 25 and running

5   on to 206 through line 9.  And it's after Mr. Quinn has made

6   the very proffer that he's going to use Toon Teens for timing

7   purposes.

8           And your Honor's question was how is this anything

9   other than kind of a back-door way to get to a copyright

10  infringement off of Toon Teens?  And Mr. Quinn says we're not

11  suing for copyright infringement, your Honor, but they are

12  close.  They are close enough, and they have very common

13  elements.

14          We have this testimony that Mr. Bryant saw and

15  said, "They are going to be sorry they didn't do that.  And I

16  think anybody who looks at it will see these are, you know,

17  if it's not copyright infringement, these are very, very

18  close."

19          And the Court then has an exchange -- and I don't

20  want to summarize it, but it basically says that's an

21  interesting argument.  I understand the timing, but I need to

22  understand the interplay with the statute of limitations

23  argument.  And because if you are saying, Mr. Quinn, that

24  Toon Teens was similar to Bratz or was inspiring Carter

25  Bryant sitting next to him in the cubicle, and then down to

Page 5132

1   line 25, you say, "One of the issues I'm really struggling

2   with now on the statute of limitations is the interplay

3   between the evidence that Mattel wants to introduce with

4   respect to Toon Teens and I understand that argument" --

5           I understand the argument that Mr. Quinn is making,

6   how Toon Teens is probative to the timing of the issue on the

7   breach of contract and when it was that Carter Bryant came up

8   with the idea.

9           I understand your argument; however -- and then you

10  go on.  And you go, now quoting from page 13 on line -- I

11  think it's 225.  And you say, "But then that plays into the

12  statute of limitations argument.  I can see the relevance to

13  that in terms of the timing on the breach issues.  What I'm

14  struggling with now is to the extent that that is true, that

15  also plays into the timing issues on the statute of

16  limitations."

17          So there's an interplay, we respectfully submit, in

18  light of the heavy evidence, but the other issue I wanted to

19  play out for your Honor is that we respectfully believe that

20  Mattel did exactly what your first question feared.  And that

21  was use Toon Teens as a back-door to do the poor man's

22  copyright analysis, to use a term of how they were using it

23  against Carter Bryant.

24          And we submit, your Honor, it is breathtaking, the

25  amount of evidence and the amount of argument that Mattel

Page 5133

1    offered in front of this jury with respect to the

2    similarities of Toon Teens to Carter Bryant under the guise

3    of a timing argument.

4            And what's most interesting about it is that the

5    Court recognized that potential and said in a transcript --

6    in fact, Mr. Quinn, when the Court said, "Well, isn't that

7    going to be confusing to the jury?  Aren't they going to be

8    wondering or comparing Toon Teens to the drawings of Carter

9    Bryant?"  Mr. Quinn said, "Well, your Honor, we could avoid

10   any confusion by just instructing the jury that that's not

11   their task."

12           What's most interesting about that is that, of

13   course, we know, we know definitely that the jury sent a note

14   back asking whether or not it was their role to make a

15   determination as to whether or not the Bratz drawings were

16   Lily's drawings.  I think that was note 4 or something like

17   that.

18           And interestingly, although Mr. Quinn on the record

19   on May 22nd told you that Mattel would be willing to instruct

20   the jury that that's not what their function was, and in

21   fact, I could cite to the record evidence on the side here

22   where Mr. Price said that they would be willing to stipulate

23   in front of the jury, they did not, and when the note came

24   back, interestingly, about is our responsibility to make this

25   comparison -- you know, I'm sorry that's not true.  Are we

Page 5134

1    supposed to be determining whether or not these drawings are

2    Lily's drawings, we urged the Court to just answer the

3    question no, that's not their role.

4            Interestingly, despite the representations that

5    Mattel made to you before the start of trial and even during

6    the course of the trial, Mr. Price objected to that

7    instruction to the jury, and the Court, based on that

8    objection, I believe, submitted the note that instructed the

9    jury to just follow the answers.

10           Our view now is in mounting this evidence, I want

11   the possibility of submitting something to you that's a

12   little more scholarly than my rambling recitation right now.

13   But I wanted to frame this issue because we're very, very

14   troubled with it.  We frankly believe that what may have been

15   going on is the comparison of Toon Teens with Bratz for

16   purposes of something other than timing.

17           So that's one of the issues I wanted to raise, your

18   Honor.

19           THE COURT:  Thank you, Counsel.  So there's nothing

20   else, though?  I just want to make sure that I have

21   everything that I need to have before me before we start

22   Wednesday morning at 9:00.

23           MR. NOLAN:  That's it, your Honor.

24           THE COURT:  Very good.  I want to take a brief

25   recess here and kind of get my own thoughts together.  What

Page 5135

1    I'm probably going to have to do is do a hearing on Monday

2    just because I'm not going to be able to get through all of

3    this today.  And I'll have to do that telephonically because

4    I'm not going to be here in Riverside, but I will have time

5    this weekend to work on all of this.

6           And then I want to give you an opportunity to have

7    the Court's rulings in advance of having to give your -- to

8    make your decision, to give your opening arguments or

9    statements, not arguments, on Wednesday morning.  So I'll be

10   in transit on Tuesday.  So I'll do it Monday.  But I'm going

11   to go ahead and take a recess here for probably about a half

12   hour and resume at 1:30 this afternoon and provide you

13   guidance in terms of what I will do now and what I'll do on

14   Monday.

15          Court is in recess.

16          (Recess taken.)

17          THE COURT:  Okay.  Well, there's some motions I

18   want to take up this afternoon, and there's some motions that

19   I will review over the weekend.  We'll have a hearing on

20   Monday at 3:00 telephonically for the Court to hear any

21   further argument that it needs and issue rulings.

22          In large measure, the motions in limine related to

23   the individual witnesses I'm going to reserve until Monday.

24          The first motion I want to take up is this scope on

25   protectability that MGA wants the Court to revisit from the

Page 5136

1    Motion for Summary Judgment.  I'll hear from MGA first on

2    that.

3            MR. NOLAN:  Thank you, your Honor.  With respect to

4    the issue that I think is squarely presented to the Court,

5    both by submission of the expert reports and the briefing on

6    the summary judgment, is what is the scope of protection that

7    will be afforded to Carter Bryant's drawings.

8            I think the cases that we've cited set forth that

9    it's the obligation of Mattel in this case to first identify

10   which elements they believe are afforded protection.  Because

11   they are arguing, as I understand the position, that the test

12   ultimately would be one of substantial similarity.  You'll

13   recall that --

14           THE COURT:  And so you need to know what it is that

15   we're -- what is substantially similar to -- what are we

16   comparing the allegedly violating works to.

17           MR. NOLAN:  Correct.  And they have not done that,

18   your Honor.  But we are guided in certain respects by the

19   testimony of their own expert.  And this is Mr. Loetz, who

20   has already in his deposition admitted such things as the

21   following are not subject to protection:  Body proportions,

22   attitude, facial features, and posing.

23           And the reason for that is quite frankly borne out

24   of common sense, and that is in Loetz's rebuttal report and

25   deposition testimony, he shows the alignment with many of the

Page 5137

1    Bryant sketches on the one hand with the Bratz dolls.

2         We're talking about -- I recall back to fonder days

3    where we were having the -- where Mattel had on the screen

4    two examples of lines, horizontal lines over the anatomical

5    features of various dolls.  Well, Mr. Loetz in his report

6    identifies that those lines are similar to the ones we find

7    in the Steve Madden Devil Angel advertisements, as well as

8    Toon types.  So I don't think body portions are --

9         THE COURT:  Let me stop you here, Counsel, for a

10   second.  Because I assume that you're not simply going to

11   accept Professor Loetz's expert opinion as the final

12   determination of what is protectable here.

13        MR. NOLAN:  No, your Honor.

14        THE COURT:  All right.  That's my first -- the

15   first question that needs to be addressed here is how we

16   should go about determining what is and what is not

17   protectable before we get to arguing over whether something

18   substantially is similar to it.  From your perspective, from

19   MGA's perspective, is this a matter of law, or is this a

20   matter of fact?

21        MR. NOLAN:  You've put your finger on the issue.

22   Mattel in its supplemental report, supplemental response to

23   its summary judgment papers suggested to the Court that it

24   was a question of law.

25        THE COURT:  What is MGA's position?

1    MR. NOLAN:  Well, MGA's position is that typically

2   it is a question of fact for the jury to determine what is,

3   you know, I think they call it the intrinsic test.  But your

4   Honor --

5    THE COURT:  I'm not talking about intrinsic and

6   extrinsic tests right now.  We're talking about what is

7   protectable.

8    MR. NOLAN:  We believe that is generally submitted

9   to the jury, but if the Court were willing to conduct a

10   hearing with experts where the experts could present this

11   type of testimony before your Honor in advance of testifying

12   before the jury, that that would be extremely helpful in that

13   respect rather than submitting this in the limited time we

14   have to the jury.  And then I think that was something that

15   we had talked about earlier.

16    THE COURT:  Well, we couldn't do it before because

17   we didn't have the issue of ownership resolved.

18    MR. NOLAN:  I wasn't suggesting that.  I was just

19   bringing the Court back to the type of argument that we were

20   talking about, that it was almost like a quasi-Markman

21   hearing in terms of the copyright issue.  That's where I was

22   going.  And I think that's how I referred to it, your Honor.

23    But I think that at the end of the day, the

24   ultimate question that we have to get to is what is the level

25   of protection that is going to be afforded, whether or not

44af2635-c89f-4e3b-b992-cb9bd2674275

Page 5139

1   it's broad or thin.  That's -- it's my view that's how you

2   get to the identifiable results here.

3           THE COURT:  I've got to pin you down here.  Is this

4   a matter of law, or is this a matter of fact?  I'm not asking

5   you what you think.  But what does the law say?  That's what

6   I was doing back there.  And I was having trouble finding

7   anything particular which defined this.

8           MR. NOLAN:  Right.

9           THE COURT:  Maybe we need some more time to look at

10  this.

11          MR. NOLAN:  I believe our research is the same,

12  that it's not absolutely clear.  There are cases that state

13  that it's fact, and there are other cases.  We submit to your

14  Honor that it's a question of law.  And if Mattel is willing

15  to submit that to you, we think that where we stand in this

16  case in the limited time available, that we would agree that

17  you could make those determinations and give us the Court's

18  indication as to what the scope of the protection is.

19          THE COURT:  Very well.  Let me hear from Mattel on

20  that point.

21          MR. QUINN:  Just on that last point, whether it's a

22  question of --

23          THE COURT:  Yes, just I want to --

24          MR. QUINN:  Your Honor, it's always been our

25  understanding that the question -- the initial question of

Page 5140

1   originality and whether a work is protectable under the

2   copyright law is a question of law for the Court.

3           THE COURT:  We're beyond that.  Both sides have

4   registered this copyright, these copyrights.  So you both

5   have recognized and you are estopped from arguing that there

6   is nothing original in these various drawings, or at least

7   the 17 drawings that MGA -- so we're beyond that.

8           Now the question is what are the elements of that.

9   What are the elements of copyrightability.  What is the

10  scope, as Mr. Nolan suggests.  The question I'm having is is

11  that something that we just turn over to the jury?  Because

12  you have to have that answered before you can get to the

13  substantial similarity.

14          You have to have a basis for comparison.  What are

15  you comparing the other works to to determine whether or not

16  there's been a copyright infringement?  What are the elements

17  of what is protected?  And my question is is that something

18  that the Court should decide before we start this phase?  Is

19  that something I should articulate next week and come up with

20  based on whether it's a brief hearing or just based on what

21  has been submitted, or is that something that goes to the

22  jury as part of this mix?

23          I think it's interesting that the Ninth Circuit

24  Jury Instructions don't come close to defining this.  I'm not

25  suggesting that this is not an issue that goes to the jury.

Page 5141

1    There are certainly instructions on substantial similarity.

2    There's certainly at lot of instructions on the actual

3    infringement.  But in terms of the scope of what is

4    protected, the elements of what is protected, that strikes me

5    as more of a legal issue.  But I'm not sure, and I was unable

6    to find anything definitive in the time that I took.

7         MR. QUINN:  Well, your Honor, I think the effort to

8    try to dissect from a work which is presumed to be original

9    and protectable, which is where we are, given that there's a

10   registration.  I think the effort to try to dissect the

11   visual work and decide what components of a visual work are

12   protectable in subsets and what aren't is misguided and is

13   not supported by the law.

14        For a visual work as opposed to a literary work,

15   where, to give an example, you have a plot line for a play,

16   two warring families that have children who become lovers.

17   You know, it's been done before.  And there is this case law

18   that arises in the context of literary works that says you've

19   got to carve that out.  You can't look at that.  That's not

20   protectable.

21        THE COURT:  You're suggesting that the finding of

22   originality is sufficient, then, to go on to the next step.

23   And that's not so clear to me.

24        MR. QUINN:  For visual works I submit that it is,

25   your Honor.  You cannot dissect a visual work -- say a basket

Page 5142

1   of fruit, a still life -- in the same sense that you can see

2   that for a war movie where there's going to be tanks, people

3   and soldiers in trenches and bombs, or the plot of Romeo and

4   Juliet, any visual work, the idea and the expression merge

5   and the artist's expression of what the artist has put up

6   there.

7           This is discussed in Judge Newman's law review

8   article, which we have submitted to the Court.  And I've also

9   referred the Court to Patry on Copyright, where he says that,

10  quoting now, copyright from section 993.  "Copyrighted works

11  are not onions where one pulls back layer after layer or

12  level after level.  Any approach that exclusively takes a

13  layered or levels analysis is sure to leave out important

14  material."

15          This point was made by Judge Newman in his lecture

16  New Lyrics for an Old Memory:  "One cannot divide a visual

17  work into neat layers of abstraction in precisely the same

18  manner one could do with a text."  Close quote.

19          THE COURT:  What particular works is the jury going

20  to be making the comparison to?  All the drawings for which

21  they have found ownership?  Or are you going to be

22  identifying specific drawings that you believe are at the

23  heart of what is protected?

24          MR. QUINN:  The specific drawings as to which we

25  have filed copyright registrations.

Page 5143

1          THE COURT:  I see.

2          MR. QUINN:  And it's just every artist's

3    interpretation of a centuries-old traditional subject, like a

4    still life or basket of fruit, even though you've had those

5    before.  There's been paintings of oranges and baskets of

6    fruit, every one is a different expression of that idea and

7    is subject to protection.

8          I'd refer the Court to the leading U.S. Supreme

9    Court case on this subject, the Feist case, F-E-I-S-T, where

10   the Court said, and I quote:  "The requisite level of

11   creativity is extremely low.  Even a slight amount will

12   suffice.  The vast majority of works make the grade quite

13   easily as they possess some creative spark, no matter how

14   crude, humble, or obvious."

15         THE COURT:  Well, again, there's no question that

16   you have copyrightable material.  I'm more concerned about --

17         MR. QUINN:  Well, in the case of a visual work,

18   your Honor, you simply cannot dissect it and say, you know,

19   the shoes, the head.  Each one of them is a creative

20   expression of a particular idea, whether it's large feet,

21   large head, large eyes.  We have that Goldberger case where

22   the Court said there's many different ways of doing bowed

23   lips, widely spaced eyes.  Each of them are protectable.

24         THE COURT:  Very well.

25         MR. QUINN:  One final thing, your Honor.

Page 5144

1          THE COURT:  Yes.

2          MR. QUINN:  This concept of thin protection, which

3    MGA refers to, really doesn't apply to visual works.  Courts

4    have applied that to factual works, calendars, compilations

5    of factual material.  It does not apply to creative

6    expressive works where the Ninth Circuit has said in the

7    McCullough case, each one of those because they are creative

8    are entitled to much broader scope of protection than a

9    purely factual work.

10         THE COURT:  Very well.

11         Anything further, Mr. Nolan?

12         MR. NOLAN:  Just very briefly.  It is simply not as

13   clear as Mr. Quinn would argue to the Court that the

14   analytical test that we've been talking about does apply to

15   visual works.  It's interesting, Judge Newman very well

16   respected, they cite to his papers, and, of course, he's in

17   the Second Circuit.  This case is being tried in the

18   Ninth Circuit.

19         I'm not being sarcastic at all by that, your Honor,

20   but it is a striking distinction, as I've learned about

21   copyright issues getting prepared for 1-B.  And I believe

22   that if the Court were to follow Mr. Quinn and Mattel's

23   request, that it would constitute reversible error.

24         I think that the proper standard is set forth in

25   two leading cases that we've cited in our papers.  The first

Page 5145

1    is Apple versus Microsoft, which talks about the screen

2    itself.  It wasn't a work of art.  It wasn't -- it was a

3    visual display that the Ninth Circuit said it was appropriate

4    to use and to do this analysis of what is actually

5    protectable.

6            The other case, your Honor, is Cavalier --

7            THE COURT:  In that case, who did the analysis of

8    what was protectable?

9            MR. NOLAN:  I believe it was the District Court.

10           THE COURT:  It was the Court.  It wasn't a jury.

11           MR. NOLAN:  I believe that that's the case.  And my

12   partner, Dave Hansen, is confirming that.

13           Cavalier versus Random House is another

14   Ninth Circuit case we cite also for the proposition that this

15   process does follow with the visual arts -- and, of course,

16   the Satava Jellyfish case, which is also a well cited case.

17           Your Honor, the other point I would end on is in

18   their moving papers, they cite to a law review article which

19   I think is interesting reading on this purpose.  It's by

20   Michael Murray.  And it was submitted by Mattel in support of

21   its summary judgment papers.

22           It's at the 58 Baylor Law Review at 779, 2006.  And

23   the author clearly disagrees with the Ninth Circuit and is

24   hostile to the Ninth Circuit's view but confirms that the

25   Ninth Circuit requires that visual works are subject to this

Page 5146

1    analysis that we are inviting the Court and suggesting the

2    Court must do under Ninth Circuit law.

3              So I'm just showing the differences between the

4    Second Circuit, and I think that's an important distinction

5    to make.

6              The last one I want to make on this, your Honor, is

7    citing you to Judge Rakoff's decision in the Goldberger case,

8    but again, we've been down this road so many times, and that

9    is that in the Goldberger case, their position that they are

10   taking in this case, your Honor, is directly opposite to the

11   approach that they were arguing before Judge Rakoff in the

12   lower court.

13             Notwithstanding that and that's just an aside,

14   where they stopped reading from in the Goldberger decision is

15   where we want to start, your Honor, and this is at -- this is

16   a decision by the Court of Appeals.  And let me quote for you

17   what they cited to Judge Rakoff in the Mattel opposition to

18   the Motion for Summary Judgment in that case.

19             It says:  "Whereas here we compare fashion dolls

20   that have both protectable and unprotectable elements, we

21   must exclude comparison of the unprotectable elements from

22   our application of the ordinary observer test."

23             And then, of course, in the Goldberger decision,

24   what the Court in Goldberger said at the end was as follows:

25             "The protection that flows from such a copyright

Page 5147

1    is, of course, quite limited.  The copyright does not protect

2    ideas.  It protects only the author's particularized

3    expression of the idea.  Thus, Mattel's copyright in a doll

4    visage with an up-turned nose, bow lips, and widely spaced

5    eyes would not prevent a competitor from making dolls with

6    up-turned noses, bow lips, and widely spaced eyes, even if

7    the competitor has taken the idea from Mattel's example so

8    long as the competitor has not copied Mattel's particularized

9    expression."

10            And I think all this gets to is we have to

11   understand what's protectable.  We believe that you should do

12   that, your Honor, and give guidance on that.  And we could do

13   that in a hearing.  I know that we're going to be dark on

14   Thursday.  I don't know what the Court's skid wall is on

15   Thursday, but because the jury is out, maybe that's a time we

16   could do it, or sometime we could have that unless the Court

17   feels that the issues are sufficiently presented in the

18   moving papers that have already been submitted.

19            THE COURT:  All right.  Very well.

20            Well, that is the first -- anything further,

21   Mr. Quinn?

22            MR. QUINN:  Yes, your Honor.  The Ninth Circuit

23   law, of course, we have to apply the extrinsic and the

24   intrinsic test.  And under the extrinsic test, that's very

25   broad.  You must look at the work as a whole, not as

Page 5148

1    dissected.  You even look at ideas, the idea of the work in

2    assessing the extrinsic -- applying the extrinsic test.

3    That's Smith versus Jackson.

4              THE COURT:  I understand that.

5              MR. QUINN:  And then we embrace the Cavalier case,

6    your Honor, that Mr. Nolan just cited to the Court.  In that

7    case, the Court said precisely what I said, that this

8    dissection analysis which you apply to literary works does

9    not apply to visual works.  The Court said at 297 F.3d 815,

10   and I quote now:

11             "The basic mode of analysis for comparison of the

12   literary elements applies to comparison of the artwork.  As

13   with literary works, unprotectable elements should not be

14   considered when applying the extrinsic test to art; however,

15   the precise factors evaluated for literary works do not

16   readily apply to artworks.  Rather, a court looks to the

17   similarity of the objective details in appearance."

18             And the Ninth Circuit cases, your Honor, which

19   indicate that you don't do this dissection analysis for

20   visual works are that case, Cavalier, and also the McCullough

21   case.

22             So it's impossible to apply that extrinsic evidence

23   without looking at the work as a whole, including considering

24   the ideas embodied in the work.

25             THE COURT:  Very well.  The Court will issue a

Page 5149

1    ruling on this issue with respect to the scope of

2    protectability on Monday at 3:00.  It may very well, after

3    reviewing the papers and the law this weekend, I will decide

4    that a hearing is necessary.  I may decide that I have a

5    sufficient basis on the papers to make a ruling.  But I'll

6    give you clear direction at three o'clock on Monday.

7            Next motion I want to take is motion for leave to

8    file the expert report.

9            MR. ZELLER:  If I may, your Honor.

10           THE COURT:  Is this relating to the first motion?

11           MR. ZELLER:  It does pertain to the Court's last

12   comment, which is the Court will recall that mid-trial, MGA

13   was directed to produce certain pleadings from other cases.

14           THE COURT:  Yes.

15           MR. ZELLER:  We do have additional pleadings which

16   we think potentially would bear on that issue in the event

17   that the Court is going to make a decision on the papers.

18           So I would ask the Court for some guidance as to

19   whether or not we would be permitted to put some of those in

20   front of the Court in terms of the scope of protection and

21   perhaps do a supplemental declaration.  It wouldn't be

22   argument.  It would just be a matter of making sure that the

23   Court has a complete --

24           THE COURT:  These are records which indicate what?

25           MR. ZELLER:  Well, they are records that indicate

Page 5150

1    that these very drawings they sued on, argued that they were

2    fully protectable.  They weren't doing this sort of

3    filtering.  They weren't saying that they were unprotectable

4    elements.  These are prior statements that they have made,

5    some of them in the form of briefs, some of them in the form

6    of statements of claims, some of them in the form of

7    declarations which are really what we would say are prior

8    statements or admissions by MGA that bear on the scope of

9    protectability for these very drawings.

10           THE COURT:  I don't know if it bears on

11   originality --

12           MR. ZELLER:  I understand the distinction the Court

13   is making.  There's very little question that originality is

14   something that -- originality is water under the bridge at

15   this point.

16           THE COURT:  I think it is.

17           MR. ZELLER:  There's registrations, there's RFA

18   responses.  They make it perfectly clear that those are

19   original works of authorship.  So that's not what I'm talking

20   about, your Honor.

21           I'm talking about at least an opportunity to

22   potentially submit to the Court any additional pleadings

23   where we think it does address the scope of protectability.

24   I believe there are some.  We have been evaluating the

25   additional pleadings that have been produced to us during the

Page 5151

1   course of the trial, specifically in preparation for 1-B.

2   And I would like that opportunity to submit something if the

3   Court is going to rule on the papers, or at least have the

4   opportunity at some point to put some additional pleadings

5   in.

6               THE COURT:  You will have an opportunity at some

7   point, not at this point.  Thank you, Counsel.

8               MR. ZELLER:  Thank you.

9               THE COURT:  Mr. Nolan or Mr. Roth?

10              MR. NOLAN:  Mr. Roth will address this.

11              THE COURT:  The primary concern I have in this

12   motion here from MGA's perspective is the -- is Mattel's

13   argument that there was never a request or a motion to compel

14   production of the profit information.

15              MR. ROTH:  Your Honor, there was, as you will

16   recall, for your Honor, the deposition request that was

17   before Judge Infante, where we sought damage information from

18   Mattel, and we understood, given the context of that request,

19   that we would get information relating to the profitability

20   of Mattel's girls division, and Barbie in particular, which

21   would be relevant potentially to our damages calculation.

22              We pressed that before Judge Infante.  That was

23   then returned to this court.  Information was produced at a

24   deposition which actually occurred during trial.  And we

25   believe pursuant to sort of the rules of the road that the

Page 5152

1    Court had already laid down with respect to, you'll recall

2    the 42 LLC expert report, the forensic computer work that was

3    being done, that where there was information that was

4    produced late as a result of the discovery process, and where

5    that information was potentially useful for an expert, that

6    party would have the opportunity to ask the Court for leave

7    to file a supplemental report.

8              The guidance we received from your Honor at that

9    time, frankly, was why don't you work out something with

10   Mattel in terms of a potential responsive report, perhaps

11   depositions.  That was done in that context.  In fact, there

12   was a report that our expert in that context put forward in

13   response to the late report from Mattel.  Both experts were

14   deposed.  And both sides were permitted the opportunity, if

15   they so chose, to present that testimony to the Court.

16             THE COURT:  Very well.

17             MR. ROTH:  So, your Honor, we think, given the

18   rules of the road, given the resistance over time from Mattel

19   for production of that information, that equity provides that

20   we be permitted --

21             THE COURT:  Thank you, Mr. Roth.

22             Mr. Corey?

23             MR. COREY:  I think your Honor has identified the

24   issues.  This has been an issue -- information that they have

25   asked for for a very long time.  And they let it die.  And

44af2635-c89f-4e3b-b992-cb9bd2674275

1    now just there's a happenstance here that they got some

2    sheets of information that were given to a witness to

3    accommodate the witness in connection with a ruling that the

4    Court had made, and now they are using that to try to come

5    back full circle and try to do something that they should

6    have raised with Judge Infante, I guess, in September.

7          THE COURT:  I recognize your argument on all of

8    this.  And let's say I accept all of it.  What, at the end of

9    the day, is the prejudice that Mattel faces at this point?

10          MR. COREY:  Well, the prejudice is --

11          THE COURT:  I mean, I know there's concerns raised

12   about it opens the floodgate for surrebuttal reports and

13   inherent fairness of surrebuttal reports and all of that.

14   But given where we are, the posture at this point in time,

15   and there's not going to be any more surrebuttal reports

16   coming in, what is the prejudice?

17          MR. COREY:  The prejudice is they have the burden

18   of articulating their apportionment theories, and anything

19   that they want to present to this jury should have been

20   originally in Mr. Meyer's original report.  And they can't

21   stand up and say to you we would have articulated a theory

22   related to Mattel's profits in Barbie as a basis for

23   apportionment.  Because that is a theory -- I'm sorry.

24   Mr. Meyer's damage theory have nothing to do with this.  They

25   are not financial.  They are based on contributions by people

Page 5154

1    and things like that.

2         This is not a theory that he's ever articulated or

3    even thought about until he saw Mr. Wagner's report which

4    responded to Mr. Meyer's original report on apportionment.

5    So what they are doing now is they are saying oh, well, we

6    would have thought of this had we seen Mr. Wagner's report.

7    And that doesn't fit into the Court's scheduling order or

8    Rule 26.

9         So the prejudice is it really is a true surrebuttal

10   report.  If this is a theory that they thought about, they

11   should have raised it with Judge Infante, they should have

12   said something about it before the Court entered the pretrial

13   conference order that this was additional discovery that they

14   needed.

15        So what we have here is a true surrebuttal report.

16   They want to put something in to respond to what Mr. Wagner

17   came up with when he was responding to Mr. Meyer's

18   apportionment theories.

19        THE COURT:  Thank you, Counsel.

20        MR. ROTH:  Your Honor, may I?

21        THE COURT:  Briefly.

22        MR. ROTH:  And this implicates a motion that we may

23   be dealing with today.  The initial premise of Mr. Corey's

24   argument that apportionment is something that is required in

25   initial report as opposed to a rebuttal report is simply

Page 5155

1    wrong.  And we've cited, your Honor, the Straus case, which

2    makes it very clear in a circumstance almost identical to

3    this, the Court held that the initial burden is with the

4    copyright holder, Mattel here, to come forward with a gross

5    revenue number.

6            Once that number is identified by the copyright

7    holder, then the alleged infringer -- the burden is shifted.

8    It's very clear in the Lackey case, Ninth Circuit case, other

9    cases, the Bonner case relied on by Mattel.  The burden at

10   that point shifts to the alleged infringer coming forward

11   with an apportionment analysis.  That's relevant, as you may

12   have seen, to the motion that implicates Mr. Gruca.

13           So his fundamental premise, which is that we had

14   the initial burden to come forward with apportionment

15   analysis, is incorrect.

16           Secondly, I think it's sort of illogical.  It is as

17   if to say we should have come forward with an analysis even

18   though we didn't have the information.  So we should have

19   come forward with the analysis without the benefit of the

20   information that we didn't get until early June.  We should

21   have come forward with the analysis in our initial papers

22   because we have no right at this point to do so.

23           So, your Honor, I think the initial premise of

24   Mr. Corey's argument is incorrect.

25           THE COURT:  Very well.

Page 5156

1      MR. COREY:  We're talking about two different

2  things when I'm talking about burden.  They carry the burden

3  of proof on apportionment.  Accordingly, their initial expert

4  report needed to articulate their apportionment theories.

5  When we put that to the jury, Mr. Roth is exactly right.  We

6  have the burden -- we're talking about damages for the jury

7  calculation, we're talking about a different animal.

8      What I'm talking about here is they carry the

9  burden on apportionment.  Their expert in his initial expert

10  report needed to articulate all of the apportionment

11  theories, and he's failed to do that.

12      MR. ROTH:  Your Honor, if I might, I apologize.

13  That exact argument was raised and rejected in Straus.

14      THE COURT:  I'm going to take a look at Straus

15  again.  But I do think that Mr. Corey -- it's like an

16  affirmative defense essentially.  The apportionment is not

17  the -- I understand his argument.  If it was rejected in

18  Straus, I'll consider it and take a look at it.  Thank you,

19  Counsel.

20      All right.  Next motion I want to take up actually

21  now are a series of Mattel motions.  8, 9, 11, and 15.  I

22  don't have any particular strong feeling about the order of

23  these.  I don't know who's arguing these.  Let's begin with

24  No. 8, I suppose, since it's first in order.  This is Motion

25  in Limine No. 8.  This relates to the issue of whether or not

Page 5157

1    Mattel would have marketed the Bratz doll.  Anybody?

2              MR. NOLAN:  I'll object to it, your Honor.

3              THE COURT:  I understand that.  Why don't we have

4    the moving party go first.

5              Nolan seems to be racing to take on this one.  So

6    they send in Mr. Zeller.

7              MR. ZELLER:  Just very briefly, your Honor, I think

8    that the issue is fairly well laid out in the papers.  It's

9    certainly part of the argument that MGA has been making, I

10   think is definitely moot, which is the issue about liability.

11   Obviously, the jury has already found tortious interference

12   and aiding and abetting, and so I think those arguments as to

13   the relevance of whether or not Mattel would have marketed

14   Bratz, I think it's just no longer applicable.

15             So to me it reduces, then, to the following

16   arguments about -- that MGA has made as to relevance.  One

17   really just doesn't seem to make very much sense to me, as to

18   why this would be relevant, but at the end of the day, it's

19   just speculation.

20             I mean, there is just no evidence that bears on the

21   relevant time period that they are pointing to.  I mean, this

22   is not a matter of where Carter Bryant presented Bratz to

23   Mattel and Mattel rejected it.  This is entire premise of

24   MGA's argument on why they want to make this argument, is

25   that it's counterfactual.

44af2635-c89f-4e3b-b992-cb9bd2674275

1          THE COURT:  Your theory of damages is disgorgement.

2          MR. ZELLER:  Correct.  Exactly.  That's why it

3   doesn't go to the damages issue either.  You know, it's sort

4   of underlying that -- I mean, it's not relevant for sure.

5   And that's certainly our viewpoint, is that it's not relevant

6   to any issue that's going to be decided in Phase 1-B.  But

7   even more so, whatever relevance this could have, it's just

8   based on speculation.

9          And while MGA points to what they say somehow makes

10  it more concrete, like, say, for example, the offer, we'll

11  call it, or how they characterize it as being some offer to

12  distribute Bratz that was made to Mr. Mateo in 2001, I mean,

13  that's still speculation.  I mean, the fact is that it is not

14  an analogous situation.

15         Number one, of course, Mattel did not know at the

16  time.  Number two, it's a different time period.  Even under

17  their arguments about damages.  And probably most

18  importantly, number three, it's entirely a different

19  arrangement.  What was being offered under MGA's, you know,

20  view of what occurred in those circumstances was that Mattel

21  was being essentially offered the role as a distributor in

22  international markets.

23         That says nothing as to whether or not had the doll

24  been presented by a designer of Mattel within the Mattel

25  processes, would it have decided to go forward and ultimately

Page 5159

1    manufacture it as a Mattel product.

2             That's just apples and oranges.

3             THE COURT:  I think the best argument here, and

4    I'll let MGA address this, is how this is relevant.  Putting

5    aside the evidentiary value of it, which is something the

6    jury could probably figure out if the Court found it's

7    relevant.  If this was a traditional damage type case, I

8    could certainly see that, but the -- this was something which

9    was addressed earlier on.  And we're doing the motion in

10   limine hearings before.

11            This is a disgorgement of profits.  So I don't see

12   any relevance to damages.  We're addressing the copyright

13   issues.  What does this have to do with 1-B?

14            MR. NOLAN:  Your Honor, we are trying in 1-B

15   affirmative defenses.  I think that a question of fact which

16   this jury needs to focus on and struggle with is the

17   credibility of Mattel's position with respect to this whole

18   concealment idea, and my gosh, we never knew about this.  You

19   know, we would have acted on it right away.

20            We believe the facts are to the contrary and that

21   the only explanation, the only explanation as to why Mattel

22   did not act quicker when they saw in the marketplace Toon

23   Teens -- I'm sorry.  A Toon Teens look-alike and a Bratz name

24   that they tried and the jury now has determined arose while

25   he was employed at Mattel, was while Carter Bryant was

Page 5160

1    employed at Mattel.

2            We are going to be able to demonstrate that they

3    knew early on that Carter Bryant went to MGA and that it was

4    well known within Mattel that he was over there.

5            We have testimony from Mr. Stein, I believe it is,

6    who is quoted in a newspaper, where he says that Mattel would

7    never have done Bratz.  The relevance, your Honor, is that

8    with respect to mitigation, laches, or the statute of

9    limitations, we believe it gives credence to our argument

10   that they knew all along and they made a conscious decision

11   not to go after Bratz because --

12           THE COURT:  Let me stop you.  How does this -- how

13   is this evidence of them knowing all along, the fact that

14   they weren't going to introduce -- that's the disconnect.

15   You're making arguments on your affirmative defenses.  I

16   understand those.  I just don't see any connection between

17   this evidence and the intentional concealment.

18           MR. NOLAN:  Let me position it this way, if I

19   might.  Assume that the evidence will be that a number of

20   people know that Carter leaves and goes to work at MGA.  And

21   assume that a lot of other people will testify that they also

22   knew that he was the illustrator behind Bratz.  They also

23   know that it takes a certain amount of time to make a doll.

24           They are sitting there knowing full well, when

25   Bratz comes out, that they would not have acted on

Page 5161

1    introducing into the line a doll similar to Bratz because

2    they considered Bratz to be a fad.  They don't introduce My

3    Scene for a couple of years into the marketplace.

4         And so our position, your Honor, is that Mattel's

5    state of mind at that point in time, when they rejected the

6    opportunity to distribute Bratz, and this is their own

7    internal statement, was not because they didn't like their

8    position as a distributor or whatever, but that it looked too

9    similar to their products, to their internal products and

10   that it would have taken market share away from Barbie.

11        That confirms for us, I believe, your Honor, our

12   argument to this jury that Mattel sat back and waited while

13   they full well knew about these issues and that finally

14   decided after Bratz became the huge success that it did.  And

15   I can't show that, your Honor, effectively without first

16   giving the jury an explanation as to why it was that Mattel

17   did not act as quickly as we contend they should have if they

18   knew about this violation.  Once they saw Bratz with the name

19   Bratz and a drawing that looked similar to it --

20        THE COURT:  No, I understand your argument,

21   Counsel.  But there's a disconnect here.  The motion in

22   limine is granted.  I find that there's -- it has nothing to

23   do with the fraudulent concealment argument.  That's a cogent

24   argument.  I'm not passing judgment on its truth or validity.

25   That will be for the jury to decide.  It's a cogent argument.

Page 5162

1            But this evidence, it may be marginally relevant,

2    but whatever marginal relevance it has is outweighed by

3    tendency to confuse and, I think, prejudice the issues.

4            So I'm granting Motion in Limine No. 8.  We're not

5    going to have reference to whether Mattel would have or

6    whether they wouldn't have manufactured Bratz.

7            The next Motion in Limine is No. 9.  And this is a

8    motion in limine to exclude argument regarding Barbie and

9    other Mattel dolls.

10           Mr. Corey?

11           MR. COREY:  Thank you, your Honor.  This motion

12   originally was directed -- the motion is directed at some

13   reports submitted by Mary Bergstein and Robert Tonner.  We

14   learned, after we submitted the reports to the Court, that

15   they are not calling Ms. Bergstein as an expert in the case.

16           THE COURT:  So this relates to Mr. Tonner, then?

17           MR. COREY:  Yes.

18           THE COURT:  Why don't we take this up, then, in the

19   context of Mr. Tonner's motion in limine.  Does it relate to

20   anything else?

21           MR. COREY:  The way I understand the ruling on

22   Mr. Tonner that the Court made was that he's not testifying

23   in 1-A or 1-B.

24           THE COURT:  Yes, that is correct.  I found him

25   completely lacking in credibility.

Page 5163

1        MR. COREY:  So my question is do we just resolve it
2   now, and do we need to raise that?
3        THE COURT:  We'll come back to that, and I will
4   make further findings because apparently my findings weren't
5   clear enough the last time.
6        Is that correct, Mr. Nolan, that this applies to
7   Mr. Tonner?
8        MR. NOLAN:  Yes, it does, your Honor, and, your
9   Honor, with respect to the comment about apparently your
10  ruling wasn't clear enough, all we wanted to do is -- I'm not
11  inviting more.  I just want to make certain that we were
12  clear that it applied to 1-B as well.
13        THE COURT:  It's not -- it applies to Mr. Tonner.
14  You know, I'm always very reluctant to call someone -- to
15  find that someone is not speaking the truth in my court.  And
16  I'm very reluctant to do that, but I found his testimony
17  completely lacking in credibility.  And such that under
18  Daubert, for the Court to permit a supposed expert to
19  proceed, when the Court is convinced that the person is
20  essentially tailoring their testimony for one particular
21  side, I don't think that will be proper.  I thought I had
22  indicated that before.
23        MR. NOLAN:  And I think you did, your Honor.  It
24  was -- I raised it this morning myself, that the team
25  clearly, just to get that clarification for the record that

Page 5164

1    it applied to 1-B.  So we don't have to visit Mr. Tonner

2    again.  I accept that, and I think we've made argue arguments

3    to that effect before.

4            THE COURT:  You did.  So Motion in Limine No. 9 is

5    granted to the extent that it applies to Mr. Tonner.  I think

6    it's moot basically by the fact that Mr. Tonner is not going

7    to be called as a witness.

8            The next motion is No. 11 that I want to take up.

9    And this relates to precluding defendants from offering

10   improperly disclosed evidence.  If you could specify -- there

11   was some clarification earlier.  But, Counsel, what evidence

12   in particular are we talking about here?

13           MR. KIDMAN:  Yes, your Honor.  My name is Scott

14   Kidman.  This motion goes primarily to the expert rebuttal

15   report from MGA's survey expert, Mr. Gruca.  There are also a

16   number of paragraphs that we identified in our motion from

17   the rebuttal report of Mr. Meyer.  Both of those we contend

18   are improper rebuttal because they do not respond to any

19   opinion in any initial report offered by Mattel.  Both of

20   those reports -- well, the Gruca report and the paragraphs

21   from the Meyer report, rebuttal report that we identified --

22           THE COURT:  One second, Counsel.  Okay.  So this is

23   basically the Gruca -- the Tom Gruca damages survey; is that

24   correct?

25           MR. KIDMAN:  That's correct.

Page 5165

1          THE COURT:  All right.

2          MR. KIDMAN:  And with respect to Mr. Gruca, the

3    issue is, as we contend, it's improper rebuttal.  Mr. Gruca

4    did a survey that purports to go to the issue of the

5    apportionment of damages.  And Mattel did not offer any

6    expert opinion with respect to the issue of apportionment in

7    any of its initial expert reports.

8          So the Gruca survey is not proper rebuttal.  The

9    Gruca survey, if it had been offered as an initial report, we

10   would have been given an opportunity to respond.  This ties

11   in to the oral motion for leave to submit the Kivetz report.

12         THE COURT:  And I'm probably going to have to take

13   a look at the Straus case to get a better sense and see how

14   they are all connected.

15         MR. KIDMAN:  And regardless of the burden issue,

16   the Gruca argument is still improper rebuttal because it

17   doesn't respond to any opinion regarding the issue of

18   apportionment submitted by Mattel in the initial report.  It

19   purports to rebut an opinion in the report of Mattel's expert

20   Carol Scott.

21         Scott, however, doesn't offer any opinions on the

22   issue of apportionment.  Her opinion is limited to the issue

23   of causation, and that is the relationship between the sale

24   of dolls, which we contend infringes, and the sale of other

25   products, Bratz products, that may not infringe.  We have the

44af2635-c89f-4e3b-b992-cb9bd2674275

Page 5166

1    burden on causation.

2             Ms. Scott addressed the causation issue in her

3    initial report.  She did not speak about apportionment.

4    Gruca purports to respond to Carol Scott and offer a survey

5    that we contend has many methodological flaws that goes to

6    the issue of apportionment.

7             THE COURT:  Thank you, Counsel.

8             Mr. Roth?

9             MR. ROTH:  Your Honor, I hate to be a one-note

10   Johnny here.  But it is the Straus case.  And if I could just

11   take you to a paragraph or so of that case, which I think

12   answers this directly.

13            This is a copyright case there.  The defendant

14   offered an apportionment-related expert opinion on the dates

15   set by the Court for rebuttal reports.  Same exact issue.

16   Plaintiff, just like Mattel, said that's improper.  That

17   needed to be --

18            THE COURT:  In the initial report.

19            MR. ROTH:  In the initial report.  The Court said

20   according to Straus, the defendant had to designate Van

21   Tassel, that's the relevant expert, as an expert on these

22   issues by the January 3rd, 2006, deadline because they had

23   the burden of showing that their revenues were caused by

24   factors other than the infringing acts.  That's

25   apportionment.  Here's the Court's holding.

Page 5167

1          The defendants did not have the burden to show that

2     their revenues are attributable to factors other than the

3     alleged infringement until Straus presented evidence of a

4     causal link between the infringing acts and their revenues.

5     Citing, as I indicated earlier, the Bonner case and other

6     cases.

7          So, your Honor, again, a fundamental flaw.  We

8     don't have an obligation.  We don't have the burden vis-a-vis

9     apportionment until they point to gross revenues.

10          Now, in this case we did put forth, out of an

11     abundance of caution, in our initial report certain

12     apportionment analyses.  We indicated other apportionment

13     analyses would require additional information from Mattel.

14     As you'll recall, obviously Carter Bryant was a defendant

15     here.  They put all of their apportionment analyses for

16     Mr. Bryant in their rebuttal report.

17          There were reports filed by both sides.  In the

18     report filed by Ms. Scott, she specifically said at paragraph

19     12 of her report, she made statements regarding the role of

20     design in the success of license and other branded

21     merchandise, the noninfringing parts of this case

22     essentially.

23          Mr. Gruca's survey was designed to respond

24     precisely to that point, precisely to that paragraph,

25     paragraph 12, and to a certain extent, paragraph 13.  And he

Page 5168

1    did so.  He went out and did a survey to determine the role

2    of design in the success of the doll and doll-related

3    products.

4            So two things.  We didn't have the initial burden.

5    Straus case right on point.

6            Secondly, Mr. Gruca's response is directly

7    responsive to what Mr. -- Ms. Scott had said in her initial

8    report.

9            The paragraphs identified in the Meyer report are

10   paragraphs relating to Mr. Gruca's report, and then in

11   addition, he had a few paragraphs relating to an analysis

12   that he set out in his initial report but said, "I need to

13   find out what Mattel is alleging in terms of the infringing

14   products before I can provide the full analysis."  Got that

15   in Mattel's report.  The full analysis came forward in

16   Mr. Meyer's rebuttal report.

17           So again, your Honor, we think that the Gruca

18   report and the Meyer report in full were proper rebuttal

19   reports.

20           THE COURT:  Thank you, Counsel.  I'll take a look

21   at these cases.

22           Very briefly.

23           MR. KIDMAN:  Very briefly, your Honor.  With

24   respect to Mr. Gruca, it doesn't turn on the issue of burden.

25   The point is that they raised this for the first time in a

Page 5169

1    rebuttal report.  We haven't had the opportunity to respond.

2    If the Gruca report comes in, we should get the opportunity

3    to respond.  Mr. Kivetz will critique the many flaws in the

4    Gruca report and submit his own survey.  The point is that we

5    weren't given that opportunity because they didn't present

6    the Gruca report until a rebuttal report.

7              They are trying to leverage this one statement in

8    Ms. Scott's report, which doesn't talk about apportionment,

9    into a complete full-blown survey on the issue of

10   apportionment.  And we will be prejudiced if we're not -- if

11   the report comes in and we're not given the opportunity to

12   respond.

13             THE COURT:  Mr. Roth, do you object to giving them

14   a chance to respond if the Court comes in?

15             MR. ROTH:  I do, your Honor.  First of all, you'll

16   hear from this again if we get to the Hollander issue --

17             THE COURT:  We won't.

18             MR. ROTH:  Issues have been raised by both sides,

19   properly in their rebuttal report, that the other side has

20   not had the opportunity to respond to.  Now, with respect to

21   the specific request being made today, I think it's worth

22   noting, as Mr. Nolan indicated earlier, we served this

23   report, Mr. Gruca's report, on March 17th, almost four months

24   ago.  Sat for a deposition.  We found out within the last few

25   days that they are considering asking the Court for

44af2635-c89f-4e3b-b992-cb9bd2674275

Page 5170

1    permission to file a survey report in response to a report

2    that they have had for four months.

3         It's worth noting, when I was on the phone with

4    counsel for Mattel last night, I asked them directly, when

5    did you do this report?  They were not prepared to respond to

6    that question at that time.  I think, frankly, they have been

7    waiting until this very moment, the last possible second,

8    when they have had Mr. Gruca's report for four months, to let

9    us know they now have a survey that they would like to offer

10   in response, and we think, frankly.  That's unfair.

11        THE COURT:  Thank you, Counsel.  When was the

12   survey done?

13        MR. KIDMAN:  The survey was done many weeks ago.  I

14   can't give an exact date, but just to address the timing

15   issue, the Gruca report was submitted on March 17th.

16        THE COURT:  Why can't you give me an exact date,

17   Counsel?

18        MR. KIDMAN:  It's -- it was conducted over a period

19   of time.

20        THE COURT:  When did it start, and when did it end?

21        MR. KIDMAN:  It ended -- it started before we filed

22   our motion to strike the Gruca report.  It ended --

23        THE COURT:  Can you be more --

24        MR. KIDMAN:  I just don't have that information

25   personally.

Page 5171

1          THE COURT:  Get it for me.

2          MR. KIDMAN:  I will.  But to respond to the timing

3     issue, we did file a motion to strike the Gruca report when

4     it was served on March 17th.  And if the Gruca report doesn't

5     come in, the Kivetz report doesn't either.  But our motion to

6     strike --

7          THE COURT:  I understand that.  I'm just trying to

8     determine the fairness of allowing the Gruca report in and

9     whether or not I should allow the response.  I'd like to know

10    the timing on that.  So why don't you find out.

11         MR. KIDMAN:  I will.  Thank you.

12         MR. ROTH:  Your Honor, I apologize.  Just in

13    contrast, I know we dealt with Mr. Meyer's supplemental

14    report.  That report was signed July 1.  Mattel had it in

15    their hands within hours of the signing of that report.  We

16    did not delay even a single day.  I don't know when they

17    finished their report, but they didn't get it to us the day

18    they finished that.  I can tell you that.

19         THE COURT:  I'll find out when that was.  Thank

20    you, Counsel.

21         All right.  The last of the series is No. 15, and

22    I'll hear on that right now, and it's the motion in limine

23    concerning the Christina Tomiyama issue.  And the question I

24    have, Mr. Zeller, is the Court's expressed thoughts on this

25    were in the context of basically a sanction, for lack of a

Page 5172

1   better phrase.

2          The Court declined the sanction that you urged, and

3   that was to disqualify Skadden, Arps.  But I was concerned

4   about what happened, and the Court thought a sanction was

5   appropriate.

6          Certainly a factor in -- and I'm not saying it's a

7   dispositive factor -- but a factor is whether or not the 2D,

8   3D, for lack of a better phrase, the 2D, 3D theory from their

9   perspective, there's the two-dimensional drawing has nothing

10  to do with a three-dimensional drawing.  Is that something

11  which they would have had evidence of -- and I'm not saying

12  whether it was right or wrong -- but evidence of, regardless

13  of what happened here with respect to the alleged unethical

14  conduct?

15          MR. ZELLER:  I don't think that they would have,

16  your Honor.  And I think that --

17          THE COURT:  How can you say that?

18          MR. ZELLER:  Well, I think that there are two kinds

19  of factors, or two pieces of evidence that potentially point

20  to this.  Number one is that it was not raised prior to the

21  time that there was some contact with Ms. Tomiyama.  The

22  Court will recall that we never actually got an answer from

23  MGA as to when was the first contact, the people who provided

24  declarations on it.

25          One was an in-house lawyer for MGA, Ms. Tomiyama.

Page 5173

1    They were somewhat vague.  They would put it at times in the

2    summer.  Or there was no precise date that was ever given to

3    us.  But even from what we knew as to when that first -- from

4    that general time period of when that contact occurred, there

5    was no indication that we're aware of from the record, and I

6    don't believe that MGA has come forth with it, you know,

7    something really concrete and said oh, we were already making

8    the 2D to 3D argument.

9           Number two, we, of course, do know that that was a

10   prominent feature of Ms. Tomiyama's report, was that very

11   argument.  And the Court will recall that it was being done

12   in the context of well, Mattel's own law department never

13   does such a thing, clearly relying on what was improperly

14   procured privileged information from our perspective.  And I

15   know that the Court will recall being very troubled about

16   that particular sentence, too, in the report.

17          And ultimately, your Honor, the Court here -- and I

18   think that this is the rationale for imposing what is the

19   equivalent of a sanction, is to eliminate the taint.  I mean,

20   ultimately, because of privilege, because of the fact that we

21   have never gotten a full counting of what occurred, we may

22   never know the exact contours or the exact connection as to

23   how they came up with this 2D to 3D argument that they are

24   making.  But there's certainly enough to suggest that it

25   flows from the taint that was put on this proceeding, the

Page 5174

1    taint that this Court already found was on this proceeding.

2         Absent MGA coming forward with some evidence to

3    really concretely dispositively refute the idea that this

4    argument is based on the very taint that the Court found, I

5    think that's why our motion should be granted.  I mean, we

6    certainly have, I think, put enough here to have this

7    preclusion sanction in.  And it's really necessary to

8    preserve also the appearance that there is a level playing

9    field here as to whether MGA still, whether directly or

10   indirectly, gaining a benefit from something that the Court

11   has ruled was not proper.

12        That, I think, is really where we are on this

13   issue.  The Court had a tentative that was to grant this

14   motion.  The Court certainly did indicate that it thought

15   that short of disqualification, that other sanctions may be

16   appropriate to do exactly this, which is remove the taint and

17   the appearance of any taint stemming from what the Court

18   certainly found was an improper retention of someone who

19   worked hand in glove on these very issues with the Mattel law

20   department and with us, with outside counsel on this very

21   case, by the way, your Honor.

22        THE COURT:  Thank you, Counsel.

23        MS. AGUIAR:  Your Honor addressed this at the

24   May 22nd hearing.  Mr. Quinn and Mr. Nolan argued it at that

25   time.  And your Honor made the comment to Mr. Quinn that you

Page 5175

1    did not believe at that time that you could reasonably find

2    that this was an issue of taint because, as you noted during

3    that hearing, it's something that you, quote, unquote,

4    stumbled across in several different contexts.

5              You said that you had noticed it in case law, I

6    believe.  It certainly is out there in the case law.  It's

7    not just out there in the case law.  It's also out there in

8    the treatises.  I have a -- some information I could provide

9    to your Honor, but there's a section from the Nimmer treatise

10   on copyright, section 2.08(c)(2), where Mr. Nimmer talks

11   about the reproduction in three dimensions of two-dimensional

12   artworks.

13             So we have it in the case law clearly.  We have it

14   in copyright treatises.

15             Mr. Nolan pointed out to your Honor that we have it

16   in our own independent experts who had never met

17   Ms. Tomiyama, never been informed of anything concerning her,

18   and I know probably what Mr. Zeller would say, when he stands

19   back up, is that those experts put in their reports after we

20   had initially met Ms. Tomiyama, but for example, Glenn

21   Vilppu, who has been in this field for many years and had his

22   own ideas about this, put his information in his expert

23   report without any reference to Ms. Tomiyama or without any

24   information from her.  And that's the first thing.

25             The second thing is that there were a number of

Page 5176

1  depositions in this case well before Ms. Tomiyama came on the

2  scene and where we met her that specifically address this

3  issue.  And I'll give you the names and the dates of those

4  depositions.  And they were addressed in varying detail.  The

5  first one is a person, and I will spell the name for Mark.

6  Kislap Ongchango, K-I-S-L-A-P, O-N-G-C-H-A-N-G-O, and that

7  was in April of 2006.

8          THE COURT:  Mr. Zeller's response to this is going

9  to be, well, since we don't know the date that the

10 information was transferred, we won't know whether those

11 deposition questions were prompted by Mr. Nimmer's treaty or

12 information that was provided by someone who was working with

13 Mattel.

14         MS. AGUIAR:  The information that has in fact been

15 provided is that the earliest that there was communication

16 between Ms. Tomiyama and Skadden, Arps was June or July of

17 2007.  So these depositions are before that time.

18         THE COURT:  Refresh my recollection.  What's that

19 based on?

20         MS. AGUIAR:  I believe it's based on a declaration

21 and also Ms. Tomiyama's deposition, but I will check that.

22         THE COURT:  It's based on Ms. Tomiyama.

23         MS. AGUIAR:  I can check this, your Honor, because

24 I don't want to make a representation that's inaccurate.

25         THE COURT:  Fair enough.

Page 5177

1          MS. AGUIAR:  But I believe it's based on both a

2     declaration of a Skadden lawyer and testimony given by

3     Ms. Tomiyama.

4          Ann Driskill gave a deposition in December of 2004,

5     which certainly was long before.

6          Mattel's corporate representative Lily Martinez was

7     deposed in May of 2005 and brought up this issue at her

8     deposition.  With regard to Ms. Martinez, the question was

9     asked of her whether she considered a decal on a particular

10    exhibit to be more cartoony than the features of bar bay, and

11    she answered:

12          "You're asking me to compare them?

13          "QUESTION:  Yes.

14          "ANSWER BY MS. MARTINEZ:  It's not the same

15       thing.

16          "QUESTION:  How do they differ?

17          "ANSWER:  One is 3D and one is 2D."

18          And then she talks about them -- "You can't really

19    compare them because they are completely different."

20          This was taken by MGA's prior counsel of a Mattel

21    witness in 2005, and she's raising 2D to 3D issues.

22          Mr. Larian was deposed in July of 2006.  And in

23    Mr. Larian's deposition, there's also references to 2D, to

24    3D.

25          So you have it in the treatises.  You have it in

44af2635-c89f-4e3b-b992-cb9bd2674275

Page 5178

1    the case law.  You have it in our other experts.  And you

2    have it in depositions in this case prior to the time anyone

3    has suggested that Skadden, Arps was having conversations

4    with Tina Tomiyama.

5            Then you have it in trial testimony from witnesses

6    in this case, and I think it's particularly relevant, your

7    Honor.  These are fact witnesses who, in giving their

8    testimony even in the context of 1-A, talked about the

9    process they went through, the creative process they went

10   through, and we only got to hear about that creative process

11   up until sometime in October of 2000.

12           But even during that window of time, when people

13   like Margaret Leahy, the sculptor, Mr. Nolan had her on the

14   stand, and with no objection by Mattel, because it's

15   understandable.  This person is a professional sculptor who

16   often takes 2D and transfers it to 3D.  In fact, Ivy Ross

17   talked about it on one of the first days of this trial, that

18   Margaret Leahy as a sculptor takes things from 2D to 3D, and

19   Margaret Leahy talked during her 1-A testimony about how the

20   drawings that she received from Mr. Bryant were not what she

21   called turnaround drawings, and they weren't engineering

22   drawings.

23           So this is a concept that's so fundamental and so

24   basic to people who are in this business, whether you are

25   Paula Garcia, who gave testimony both during her deposition

Page 5179

1    and at trial, concerning the process of whether this could be

2    proven out into 3D.

3            So that's one of the first points I wanted to make,

4    your Honor, which is that you recognized at that hearing, and

5    I think we've given you ample evidence that no matter where

6    it is, whether it's in prior depositions, copyright

7    treatises, or case law, this is something that was out there

8    that we would not -- that there's no reasonable conclusion

9    that we only got this -- that this is the only place we could

10   have gotten this was Tina Tomiyama.  In fact, it's exactly

11   opposite.

12           The second point I want to make that you also

13   raised during the hearing is that you're really talking about

14   an issue of evidence preclusion here.  Because that is

15   basically the relief that Mattel is asking you for.  And I

16   think if you go back to your April 8th order, and I have a

17   copy of it in front of me, in the last paragraph -- do you

18   want me to?  This is the April 8th order.

19           At the end of that, you say, "The Court will

20   consider both a motion in limine to preclude Ms. Tomiyama

21   from testifying as a fact witness and a motion in limine to

22   preclude MGA from presenting its legal argument based on the

23   ramifications of comparing two dimensional drawings of Bratz

24   dolls with the three-dimensional products."

25           I would submit, your Honor, that the present

44af2635-c89f-4e3b-b992-cb9bd2674275

Page 5180

1    request to you goes far beyond the reference in your order to

2    a legal argument.  We have jury instructions, both sides have

3    competing jury instructions on what the jury would be told

4    regarding the legal standard here.  In other words, can you,

5    when you are comparing 2D to 3D, this is what you can or you

6    can't do.  And I would submit that that would be something

7    that we could table until jury instructions come up.

8              But what they are now asking for, your Honor, is to

9    basically preclude us from offering any factual evidence to

10   this jury about our doll development process at MGA.

11             THE COURT:  Is it going to be difficult, though, if

12   the factual evidence comes in to limit the legal argument

13   based on that factual evidence?

14             MS. AGUIAR:  What I can tell you is that we are not

15   trying to make a legal argument that you can never convert a

16   2D item to a 3D doll.  We're not making that argument.  And

17   we've said that in our papers.

18             But what we are saying, and I think we absolutely

19   have to be entitled to argue this, is that in the process of

20   taking a two-dimensional drawing and making it into a 3D

21   doll, there are pieces of information that you need that may

22   or may not have been in those drawings.  And there's a

23   creative process that happens in taking that 2D drawing and

24   making it into a 3D doll.  And I don't believe we should be

25   precluded from putting on basically the crux of what would be

Page 5181

1    our defense in this case, which is that when those drawings

2    came to MGA, the process that then ensued for months to

3    create this doll was the creative input of many, many people,

4    of taking that sketch and turning it into a doll.

5          That is what I think we absolutely -- we would be

6    fighting, frankly, your Honor.  Mr. Zeller mentioned the word

7    leveling the playing field, and Mr. Quinn mentioned leveling

8    the playing field when he argued to you in May.

9          I'm not much of a baseball fan, but this would not

10   be leveling the playing field.  This would be the Court

11   digging a massive hole at home plate and asking us to go up

12   to bat in that hole.  And frankly, I don't believe that

13   that's warranted at this point, given the record.

14         THE COURT:  Thank you, Counsel.

15         Mr. Zeller.

16         MR. ZELLER:  The unanswered question is still

17   unanswered, which is when did Ms. Tomiyama start working with

18   MGA?  The only representation you heard here today was when

19   Skadden had contact with Ms. Tomiyama.  What is still missing

20   is when did MGA and its then counsel, including O'Melveny &

21   Myers, have contact with her.  We have absolutely no answer

22   to that question.  And even all these months later, despite

23   the fact we have raised that issue repeatedly, we do not have

24   that answer.

25         There's no question -- and we have no reason to

Page 5182

1    doubt when Skadden first had contact.  We know that Skadden

2    came into the case in October of last year.

3            But Ms. Tomiyama, by her own testimony, was already

4    in contact with MGA at some point prior to that, and we still

5    don't know that date.  That is something that MGA could have

6    come forward with and established when that was.

7            Moreover, these kinds of generalized statements

8    that are now being pointed to in other deposition testimony,

9    well, the fact is that this has not been submitted to the

10   Court, wasn't provided to us.  These are just generalized

11   comments she's making about the deposition testimony as

12   somehow establishing the same point, that Ms. Tomiyama was

13   making an expert report, and I don't think that's been

14   established.

15           We would have to look at the particular testimony,

16   but generalized statements about, well, someone commented,

17   you know, when asked a question, well, how is it different.

18   Well, that's like saying well, they are different objects.  I

19   mean, that's hardly a -- the basis for some factual

20   distinction that would be relevant to copyright, which is the

21   argument they are now making and that was embodied in the

22   Tomiyama report.

23           And what I also would say -- so essentially they

24   are trying to transmogrify these generalized comments that

25   they are characterizing them as into something that was

44af2635-c89f-4e3b-b992-cb9bd2674275

Page 5183

1    really far more specific and something that was being raised

2    now in this particular case.

3           What we're asking for here, your Honor, is the

4    factual aspect of it.  We're asking that they not be allowed

5    to argue this to the jury.  The legal point is something

6    that's separate.  That doesn't have any bearing on the

7    analysis that we're asking for.

8           So their argument about well, you could find the

9    legal argument out in the case law, it really doesn't have

10   any bearing either.  This is the factual issue that we're

11   talking about.  It's a factual issue that was raised in the

12   Tomiyama report, and that is the taint on these proceedings

13   that the Court found.  And what they are essentially saying

14   is that well, because Mattel can't pierce privilege and

15   because we didn't provide the evidence here at MGA, and

16   because Mattel can't establish there's a direct connection

17   between the taint and the remedy that we're asking for and

18   Ms. Tomiyama's report, that I don't think washes.

19          It is the appearance of impropriety that is also

20   relevant here, and we're asking the Court to correct it.  The

21   argument that this somehow creates a nine-foot hole in the

22   case for them, I don't see that at all.  They still have

23   their legal argument they will be free to make to the Court

24   on what the jury instruction should be.

25          To be sure, we completely think it's an

Page 5184

1    inappropriate legal argument.  For legal reasons we think

2    it's inappropriate for them to be arguing, well, we took this

3    two-dimensional drawing and made it into 3D, and therefore,

4    it can't be infringement, or that that even matters to the

5    infringement analysis.

6         We think the law is quite clear that it doesn't

7    matter.

8         But what we're talking about is whether or not they

9    get to argue it as a factual matter to the jury.  And that is

10   what this preclusion motion goes to.  I mean, there's nothing

11   unfair about denying them what is certainly, I think, prima

12   facie, has a connection to the very taint that the Court

13   found was here and their absence of proof to really refute

14   that that's where it came from.  I mean, that's the real

15   problem here I think, your Honor.  And --

16        THE COURT:  I understand both your arguments.  I'll

17   think about this some more.

18        MS. AGUIAR:  Your Honor, may I?  Because I forgot

19   one thing.  I'm sorry.

20        THE COURT:  Very briefly.

21        MS. AGUIAR:  Going back to the hearing briefly on

22   the 22nd, we're retreading old ground because you had said

23   that it's hard for you to conclude that this is really the

24   result of taint, and you had said at that time the question

25   is how far will -- basically how far will this punishment go.

Page 5185

1          THE COURT:  Right.

2          MS. AGUIAR:  And I think that --

3          THE COURT:  That's why I actually -- I'm not any

4    further away than he was back then.  That's why I started my

5    first point.

6          MS. AGUIAR:  And I do think it's relevant, your

7    Honor, that you found in your order, you said any finding of

8    intentional wrongdoing by MGA or its counsel, you said you

9    are unwilling to infer that attorneys have engaged in

10   misconduct here.  And I think the way we responded to it,

11   when this came out, your Honor has said that you do not find

12   bad faith or intentional misconduct here.

13         But just to close on this point, your Honor, that

14   this is such a basic concept that is out there in the world,

15   whether it's in case law or treatises or depositions, that I

16   think it's not reasonable to conclude that she was the source

17   of this argument, your Honor.  Thank you.

18         THE COURT:  I understand your argument.  Thank you,

19   Counsel.

20         All right.  The last thing that I want to go over

21   today now is the affirmative defenses.  And I certainly want

22   to talk about laches and statute of limitations.  But I

23   actually want to start with the other affirmative defenses

24   that are still in play and get a better sense of what it is

25   that -- what we're left with here.  Because it's not really

1    clear to me.  I understand the statute of limitation

2    arguments.  I understand the laches argument.

3              These other affirmative defenses.  So who can speak

4    to that?

5              MR. RUSSELL:  Your Honor, I think it's fair to say

6    at this point we intend to maintain virtually every

7    affirmative defense that was ever addressed in the Mattel

8    summary judgment papers.  But in particular, I think since

9    I've got the list in front of me, Mattel's issues, we've got

10   estoppel --

11             THE COURT:  Well, I have the 12.  In the pretrial

12   conference order that isolated the 12.

13             MR. RUSSELL:  Yes.

14             THE COURT:  I guess my question is -- we can go

15   down the order of laches and statute of limitations are the

16   first two.  205 D and bona fide purchaser for value, how is

17   that going to come out in the trial?

18             MR. RUSSELL:  Well, your Honor, it's not clear yet

19   how that's going to come out.  And I wouldn't be prepared,

20   without consulting Mr. Nolan, to say that definitively that

21   that wouldn't come out.

22             I don't anticipate that taking long, if it does,

23   but I would imagine the way it would come out is, especially

24   since they have a copyright registration expert, we're going

25   to establish through their own expert and probably through

Page 5187

1    our witnesses, that Mattel knew about the fact that these

2    drawings had been publicly registered, and they had notice

3    and didn't do anything for a period of time.  So 205 D would

4    bar their claims.

5            THE COURT:  So this is basically wrapped up in the

6    laches and statute of limitations.

7            MR. RUSSELL:  It's a slightly different argument

8    just because it's a legal defense that if we meet certain

9    conditions, a bona fide purchaser for value and we put off

10   any legal right they might have to enforce the copyright if

11   they own a copyright.

12           THE COURT:  Estoppel and acquiescence along the

13   same lines?

14           MR. RUSSELL:  Absolutely.  But they would be

15   equitable defenses, but not legal.  205 D is a legal defense

16   that we would be entitled to put to the jury.  And I know

17   your Honor has indicated, I know your Honor has put that

18   there are a number of equitable defenses that would be

19   resolved by the Court, but there are a number of legal

20   defenses we would like to put to the jury.

21           THE COURT:  That's what I'm wanting to figure out

22   right now, how this is going to play out.  So...

23           Mitigation.

24           MR. RUSSELL:  Mitigation is a legal defense.

25           THE COURT:  That's part of damages.  There would be

Page 5188

1    an instruction on mitigation.

2                MR. RUSSELL:  Yes.

3                THE COURT:  Waiver.

4                MR. RUSSELL:  Waiver is another equitable defense,

5    clearly.

6                THE COURT:  Again tied up in this -- this whole

7    notion of what Mattel knew and when?

8                MR. RUSSELL:  Exactly.

9                THE COURT:  Same with abandonment?

10               MR. RUSSELL:  They are technically legal defenses.

11               THE COURT:  Legal defenses on copyright that the

12   Court could instruct.  Is there going to be evidence of

13   abandonment?

14               MR. RUSSELL:  I believe there will be, your Honor.

15   I believe that part of our argument will be that they did not

16   pursue their rights when they knew about them.

17               THE COURT:  De minimis use.

18               MR. RUSSELL:  I'm not sure that we're going to have

19   much argument with respect to de minimis use, to be candid.

20   I would like to wait on that, but I don't think that that

21   will be a defense that is pressed hard.  If I might have a

22   little more time to think about that.

23               THE COURT:  Privileged justification?

24               MR. RUSSELL:  I think that's probably the same

25   issue.  If you wouldn't mind giving us a day or two to think

Page 5189

1    about that.  But I don't think those are likely to be pursued

2    because your Honor has rejected the preparation to compete,

3    and I think that is one of the basics that we were going to

4    rely on.

5              THE COURT:  I actually instructed on preparation to

6    compete.

7              MR. RUSSELL:  But you instructed in a way that

8    precluded that defense, in my view.

9              THE COURT:  My silence is not acquiescence,

10   Counsel.

11             MR. RUSSELL:  Is it abandonment?

12             THE COURT:  I'll leave that up to --

13             MR. RUSSELL:  I apologize.

14             THE COURT:  Good faith and consent.

15             MR. RUSSELL:  Again, those would be the same

16   arguments wrapped up in the same basic theories.

17             THE COURT:  Okay.  Legal or equitable?

18             MR. RUSSELL:  Well, good faith, your Honor, as

19   we've argued in our papers, is technically not an affirmative

20   defense at all.  I know it was pled by O'Melveny.  But our

21   view is that's actually something that Mattel would bear the

22   affirmative burden on, and it falls within the scope of

23   certain claims.  And, for example, with respect to copyright

24   damages.

25             THE COURT:  That will not be wrapped up in the

Page 5190

1    instructions to the jury.

2            MR. RUSSELL:  Correct.

3            THE COURT:  What about consent?

4            MR. RUSSELL:  Well, consent, again, I believe would

5    be another legal defense, but it's similar to abandonment.

6    In fact, in many ways it is abandonment.  Abandonment is a

7    copyright specific defense.  Consent is a more general

8    defense with the exact same theory.

9            THE COURT:  All right.  Before we get to laches and

10   statute of limitations, does anyone from Mattel -- does

11   Mattel disagree with any of these characterizations?

12           MR. ZELLER:  I'm not sure if this is a

13   disagreement.  I'm not sure that they were very precise in

14   terms of how this is exactly going to be playing out at

15   trial.

16           THE COURT:  Well, let me summarize, then.  As far

17   as the ones characterized as legal defenses, the bona fide

18   purchaser for value, the abandonment, good faith and consent,

19   to the extent that those will go to the jury in the form of

20   the instructions given on copyright infringement.

21           MR. ZELLER:  I don't know that there is a

22   disagreement about the characterization of them.  I mean, as

23   to whether or not they are proper defenses at all.  So it's a

24   little bit hard to answer the question of is it legal versus

25   equitable.  For example, good faith doesn't seem to be a

44af2635-c89f-4e3b-b992-cb9bd2674275

Page 5191

1    defense, period.

2              So it's a little hard to characterize it from our

3    perspective.  So that's the only caveat.  I'm not sure that

4    there's much of a disagreement about what ultimately should

5    go to the jury and what shouldn't in the event that, you

6    know, it's a proper defense at all.

7              THE COURT:  You would agree that waiver of

8    acquiescence, estoppel are equitable defenses to be decided

9    by the Court?

10             MR. ZELLER:  We believe that they are equitable

11   defenses, yes.

12             THE COURT:  Mitigation, of course, relates to

13   damages.

14             MR. ZELLER:  I mean, mitigation, I think, under

15   normal circumstances would be a legal defense, but again, it

16   gets back to this kind of conundrum.  I'm not sure what the

17   defense is at this point.  We're seeking disgorgement.  So

18   I'm not sure -- and this takes us back to the point we were

19   talking about earlier today, and maybe it will become clear

20   to me at some point, but we're not seeking our lost profits.

21   So mitigation seems to be irrelevant.  So again, it's regard

22   to characterize as to who would decide such a defense.

23             THE COURT:  This is helpful to the Court.

24             Now let's focus on statute of limitations and

25   laches.

1          MR. RUSSELL:  Your Honor, before we move ahead, can

2   I say one thing about the disgorgement and the limitations of

3   damages and how mitigation plays out.  I just wanted to note,

4   given your Honor's preemption rulings, it's my understanding,

5   especially with respect to conversion, the damages theories,

6   that Mattel will bear the burden to prove damages.

7          Certainly with respect to conversion they will have

8   to prove damages, not profits.  There won't be disgorgement.

9   They are limited to the tangible value of the drawings at the

10  time of conversion, and if they can, though I haven't seen

11  any evidence of it, if they can, they will put on a damages

12  theory.

13         THE COURT:  But with respect to that type of

14  damages, though, I don't --

15         MR. RUSSELL:  I agree.  But it would also be true

16  with respect to tortious interference, because your Honor has

17  also held the tortious interference is preempted.  And there

18  are -- we hope, your Honor, that you would consider our 50(a)

19  motion, this would also flow through the duty of loyalty and

20  fiduciary duty claims, and what we believe is the end result

21  is that they are going to have to prove damages unrelated to

22  exploitation of Bratz, which could be, for example, the loss

23  in value of the services of Mr. Bryant.

24         So this is a very much alive issue even with

25  respect to the issue you were addressing to Mr. Nolan when

1   you said, you know, you wondered how "kill Bratz" was

2   relevant because there are no damages.  In fact, your Honor,

3   I would submit there are damages theories here.  So I

4   might -- I know it's late in the day.

5          THE COURT:  It's not late in the day.  I got a

6   whole other case to hear closing arguments on.

7          MR. RUSSELL:  Well, I'll stop there.

8          THE COURT:  Very well.  Let's go to laches and

9   statutes of limitations.  And, Mr. Russell, if you'd begin.

10  Mr. Zeller indicated that determining whether or not the

11  delay was reasonable or unreasonable is a matter of law the

12  Court must decide.  Do you agree with that?

13         MR. RUSSELL:  Well, your Honor, we have submitted

14  briefs to you stating that we believe laches is technically

15  in this instance, particularly with respect to copyright, a

16  legal question for the jury.  It's not an equitable defense.

17  Laches is legal in the context of a copyright case.  So this

18  is a question that should be decided by the jury, and I think

19  it's important to take issue with respect to an assumption

20  that Mr. Zeller builds into his argument about laches.

21         With respect to the statute of limitations, you

22  have found various reasons why the statute didn't begin to

23  run, it was tolled, there was relation.  Various doctrines

24  allow them to survive as a technical matter.  Those doctrines

25  don't apply to laches.  On the face of the complaint, many of

1    their claims are time barred if you took aside these

2    equitable tolling doctrines.

3            So facially there is a presumption that they are

4    time barred, and, your Honor, I'd submit you cannot and

5    should not decide as a matter of law the laches defense.

6    That should go to the jury.  There's ample evidence, at least

7    in our view, that a jury could conclude unreasonable delay.

8            THE COURT:  What about Mr. Zeller's point

9    concerning Mattel stipulates to the earliest possible date,

10   then the only question -- the only question becomes with

11   respect to statute of limitations the issue of fraudulent

12   concealment.

13           MR. RUSSELL:  I guess I have two points.  I

14   certainly haven't tried as many cases as Mr. Nolan, but we

15   are not obligated to stipulate, and I think it's not to MGA's

16   benefit to stipulate.  We want to give context to the jury to

17   understand the statute of limitations.

18           So stipulating that away means the jury will not

19   hear evidence about what Mattel knew and when.  They will

20   simply hear a dry stipulation.  I don't think that would be

21   in my client's best interests, and we certainly think the

22   jury should hear the witnesses in the factual context to

23   understand not only our defense but also to refute the notion

24   of fraudulent concealment.

25           So I think it's safe to say, and I haven't

Page 5195

1    consulted with Mr. Nolan, but we are going to reject that

2    stipulation and put on our own evidence to make clear the

3    date.

4          The second point I guess I would add is certainly,

5    your Honor, we respect your rulings, but we don't know what's

6    going to come out in the trial.  What if a witness on the

7    stand admits Mattel knew.  I mean, there is reason to

8    believe, and we certainly have argued that Mattel knew much

9    earlier.  There are witnesses that could hit the stand that

10   may recant that, may tell the truth under cross-examination.

11   I don't know.  I hope -- your Honor hasn't decided to let it

12   go to the jury.  Let's let the jury hear the evidence and

13   decide.

14          THE COURT:  That may not be a reason to let it go

15   to the jury.

16          MR. RUSSELL:  There's more than a basis in my view

17   for it to go to the jury because we have a factual dispute on

18   this record.  Never mind if a witness were to admit that they

19   want notice even earlier.

20          THE COURT:  I'll hear from Mattel.

21          MR. ZELLER:  On that last point, your Honor, I

22   would respectfully submit that that's exactly an improper

23   purpose for having evidence put in.  I mean, the Court heard

24   summary judgment.  The undisputed evidence is what the record

25   had --

44af2635-c89f-4e3b-b992-cb9bd2674275

Page 5196

1          THE COURT:  That is somewhat disconcerting.

2          MR. ZELLER:  And I would submit that it's quite

3    clear that a party cannot also go to trial on the hopes of

4    creating an issue because someone will recant.  I mean, there

5    are cases that deal with such a scenario, and that's just not

6    proper to attempt to circumvent a summary judgment decision

7    based on those kinds of hopes, well founded or not.  So I

8    would submit that what you just heard really is not a proper

9    purpose at all for allowing this to go to the jury.

10          THE COURT:  Certainly you can see that the

11   fraudulent concealment issue has to go to the jury.

12          MR. ZELLER:  If -- yes, on the --

13          THE COURT:  If not that, you lose a number of your

14   claims.

15          MR. ZELLER:  Well, it's not a number, your Honor.

16   It's two state law claims.  It's the conversion claim and the

17   tortious interference claims, which are the only ones the

18   Court found were not governed by the discovery --

19          THE COURT:  Two is a number.

20          MR. ZELLER:  I'm sorry?

21          THE COURT:  Two is a number.

22          MR. ZELLER:  Okay.  I thought you said many.  I

23   apologize.  I misheard.

24          THE COURT:  That's okay.

25          MR. ZELLER:  But in any event, yes, I think in the

Page 5197

1   context of fraudulent concealment on that statute of

2   limitations issue, I agree that that goes to the jury.  What

3   I don't think goes to the jury is when the period started

4   running in the event that they find fraudulent concealment.

5   I mean, that's really where the rubber meets the road at this

6   point, based upon the Court's findings on summary judgment as

7   to what the undisputed facts were.  And what I would also

8   say --

9           THE COURT:  Isn't this all intertwined, though?  I

10  mean, when the fraudulent concealment began and ends and when

11  Mattel knew or didn't know?  It's going to be very hard to

12  extricate that kind of testimony.  I share the concern

13  that -- it's going to be the same witnesses.  It's going to

14  be the same evidence.

15          MR. ZELLER:  I don't think so, your Honor.  To be

16  perfectly blunt about it, I don't know that we're putting on

17  any additional fraudulent concealment evidence.  We have

18  already put on that evidence, and we did it in Phase 1-A.

19  I'm not promising that there wouldn't be nothing, but the

20  fact is that the Court saw that -- I mean, we have put on

21  certainly the main event concerning fraudulent concealment.

22  And that is what we would say.  And then the only issue --

23  either the jury has found that persuasive or it hasn't.

24          THE COURT:  Right.

25          MR. ZELLER:  So then the only issue beyond that is

Page 5198

1    basically the more subjective when did Mattel know element.

2    And if that can simply be directed as a matter of law, and

3    this is not a stipulation that we're proposing.

4               THE COURT:  I understand.

5               MR. ZELLER:  We're asking for the Court to direct

6    it based upon its findings of undisputed fact on summary

7    judgment.  So this is not -- this is not their call to make.

8    The only call to make would be Mattel's because --

9               THE COURT:  I understand that.

10              MR. ZELLER:  We could dispute that we knew that

11   early.

12              The only final point I would make in response here,

13   your Honor, is that --

14              THE COURT:  The Court made a finding that it was no

15   earlier than a particular date in 2003.  You are simply

16   saying that fine, we'll accept that.  You're not suggesting

17   that there's evidence that it was further.

18              MR. ZELLER:  Precisely.  And the jury could be

19   instructed, if it needs to be instructed at all, or what the

20   Court could do is simply take factual findings from the jury

21   and make that determination based on those factual findings

22   as to fraudulent concealment.  I mean, the jury could be

23   asked a very simple question.  Was it fraudulently concealed,

24   or was it not.  And then, of course, based on the Court's

25   undisputed findings as well as our statements --

Page 5199

1          THE COURT:  What about this argument that laches is

2     a legal argument for the jury, not -- not an equitable

3     defense for the Court.

4          MR. ZELLER:  Frankly, I'm not sure what that's

5     based on.  Laches is quite clearly an equitable defense.  You

6     know, perhaps if there's some specific authority --

7          THE COURT:  Mr. Russell, where is the authority

8     that you were referring to?

9               I'm sorry, Mr. Zeller.

10         MR. RUSSELL:  This is the judge friendly case.  I

11    think it's Leo versus Haas.

12         THE COURT:  You said the Court had it?

13         MR. RUSSELL:  This is in connection with the

14    summary judgment materials, there was extensive briefing on

15    this exact issue.  I argued to your Honor based on the Leo

16    versus Haas case, that not only in that case but indeed many

17    cases thereafter, including Ninth Circuit cases, has been

18    picked up and treated with respect to copyright specifically

19    as a legal defense that can be properly presented to the

20    jury.  But the Leo versus Haas case is the progeny from which

21    most courts agree that was the first time that laches was

22    applied as a legal defense to copyright.

23         THE COURT:  Very well.  I'll take a look at that.

24         MR. ZELLER:  I think on that very point there is a

25    record, which I'm not going to attempt to recite at this

Page 5200

1   point.  But this came up specifically in the context of

2   motions in limine in which this was discussed.  But laches is

3   classically an equitable defense.

4            THE COURT:  I'll take a look at the Haas case, and

5   why don't you do the same thing.  And we'll take it up on

6   Monday.

7            MR. ZELLER:  I would appreciate that, your Honor.

8   But what I would say in terms of at least one legal principle

9   that MGA seems to be hanging its hat on here is that they are

10  basically saying with respect to laches that facially there's

11  a presumption that Mattel's claims are time barred.  I mean,

12  the law is quite the opposite.  The fact is that the Court

13  has already ruled on those very claims, copyright

14  infringement in particular, that as a matter of law, Mattel's

15  claims are timely.

16           It follows from that, and there is -- the law on

17  this is very well settled that presumptively anything that's

18  within the limitations period is not barred by laches.  And

19  in fact, it would be quite anomalous to have situations where

20  something was timely under the statute of limitations but

21  then barred by laches.

22           I don't think that there's been anything put into

23  the record in this case that would suggest that something so

24  anomalous really should occur here.  I mean, there doesn't

25  seem to be any basis for something along those lines.

1        But I think just sort of as the final point, your

2   Honor, which is the original one that I think I started with

3   in talking about this earlier today, which is really the

4   question of unreasonable delay.  Whether one characterizes it

5   as a legal issue or an equitable issue, the fact is that

6   there are rulings that this Court has made, based on

7   undisputed facts that were presented on summary judgment,

8   that regardless of the characterization of the claim, those

9   are the rulings of the Court.

10       We can't have a situation that MGA seems to be

11  agitating for at this point in which they are going to

12  attempt to raise this spectre of trying to put in evidence to

13  pierce those very findings.

14       If they have that evidence, their obligation was to

15  present it on summary judgment.  The law is very clear on

16  this.

17       I think that at least with respect to that element,

18  the Court should consider it being determined as a matter of

19  law based upon Mattel simply saying for present purposes we

20  will concede that was the date that we knew.  It could be

21  dealt with either as an instruction or, as I was mentioning

22  earlier, a finding by the jury that the Court could then

23  apply and make a legal ruling on.

24       But it certainly seems like this idea that this

25  should all be sort of re-litigated in the context of a trial

Page 5202

1    really seems inappropriate.

2            THE COURT:  Thank you, Counsel.

3            Mr. Russell.

4            MR. RUSSELL:  Your Honor, first, I just want to

5    address -- I think Mr. Zeller is attempting to turn a

6    statement that I made into something that it wasn't intended

7    to be.  I misunderstood.  I thought your Honor was attempting

8    to say with respect to the two claims that were still alive

9    on statute of limitations, tortious interference and

10   conversion, you were considering moving as a matter of law on

11   those two claims, not on the other claims.

12           All I was saying is we've already got evidence that

13   there is at least a question of fact, and indeed you found

14   they were time barred, and all I was saying is let's let the

15   jury hear that.

16           I also want to just address really quickly

17   Mr. Zeller said it would be anomalous to find that where

18   claims were found to be timely for statue of limitations

19   purposes, that they would be unreasonably delayed for laches

20   purposes.  But that's precisely what the Jarrow Formulas

21   versus Nutrition Now, a Ninth Circuit case, holds.

22           It holds where you are outside the limitations

23   period but there are other equitable concerns that allow it

24   to survive for statute of limitations purposes, laches can

25   apply.  And it presumes that laches would apply in those

Page 5203

1    circumstances.  The reason being it's only because of

2    equitable concerns, namely, relation back, that the claim

3    survived statute of limitations in the first place.  And

4    that's our point here.

5           We think they shouldn't be entitled to relation

6    back.  We argued that.  We lost that, and I accept that, but

7    laches gives us another chance to argue to the jury

8    unreasonable delay.

9           And I misspoke earlier on the title of a case.

10   It's Haas versus Leo Feist, F-E-I-S-T, 243 Federal 105.

11          MR. ZELLER:  Briefly, one final point.  The Court

12   will recall that MGA intervened in this action.  MGA

13   intervened in this action December of 2004 and became a

14   party.  So the statute of limitations and the other, we'll

15   call them laches issues that pertain to MGA don't rely on

16   relation back.

17          We're still back talking about a time period which

18   would be from the summer of 2003 until 2004, whether it's

19   April or December.  And we're into an area where there just

20   doesn't seem like any reasonable jury or, frankly, anyone

21   else could make a determination that that amount of time

22   really results in a time bar.  Quite clearly not under

23   statute of limitations, and also that it just can't be

24   unreasonable delay as a matter of law.

25          MR. RUSSELL:  Your Honor, that's just simply not

Page 5204

1   true with respect to two out of the three defendants.  They

2   didn't intervene.  Mr. Larian did not intervene.  He was a

3   Doe defendant.  They relied upon state relation back

4   procedures and equitable considerations to save their claims.

5   We spent dozens of pages arguing that.  So that's just simply

6   not accurate.

7          THE COURT:  Thank you, Counsel.

8          MS. AGUIAR:  Your Honor, may I?

9          THE COURT:  Yes, Ms. Aguiar.

10         MS. AGUIAR:  This is on a separate issue, and I

11  wanted to perhaps save you some time this weekend.  With some

12  of what has developed today regarding the witnesses,

13  specifically regarding the experts, one of Mattel's experts

14  and one of the motions in limine relates to Kenneth

15  Hollander.  Mr. Hollander is purely a rebuttal expert.  And

16  he is rebuttal specifically to two of our experts, neither

17  one of which is now going to be testifying in 1-B.  So

18  there's no need for Mr. Hollander.

19         THE COURT:  So the two you are taking off are?

20         MS. AGUIAR:  The two that are off are Tonner, which

21  we just went over again today, and Bergstein, Mary Bergstein.

22  So neither one of them is being called in 1-B, and therefore,

23  the Kenneth Hollander issue is off the table.

24         THE COURT:  Mary Bergstein?

25         MS. AGUIAR:  She wasn't on our list.

Page 5205

1      THE COURT:  Got it.  So they are off.  Does that

2  take Kenneth Hollander off?

3      MR. KIDMAN:  I don't think so.  Just because MGA is

4  choosing not to call one of their experts, I don't think that

5  renders Mr. Hollander's testimony irrelevant.  He was timely

6  disclosed as a rebuttal witness.  He was deposed.  His

7  testimony is relevant.  I don't think that that moots the

8  issue with respect to Mr. Hollander.

9      MS. AGUIAR:  Well, I respectfully wholly disagree.

10  On page 2 of Mr. Hollander's report, in purpose, paragraph 5,

11  that he was asked to respond to certain portions of the

12  expert reports of Robert Tonner and Mary Bergstein.  And then

13  interestingly, in response to the motion in limine on

14  Mr. Hollander that we filed, Mattel makes much of the fact

15  that his survey is rebuttal testimony.  And so if you look at

16  Mattel's opposition --

17      THE COURT:  Hold on one second.  Let me find that.

18      MS. AGUIAR:  It's No. 8.

19      THE COURT:  I'm there.

20      MS. AGUIAR:  Roman II.  That it's proper rebuttal

21  testimony.

22      THE COURT:  Wait a second.  I must be -- you say

23  it's MGA's No. 8.

24      MS. AGUIAR:  Correct.  And it's Mattel's opposition

25  to that.

1        THE COURT:  Tab 8.  What tab is that?  I'm there.

2        MS. AGUIAR:  And they say that it's proper rebuttal

3   testimony.  And then if you look at the top of page 7,

4   Hollander's survey is admissible because it's proper rebuttal

5   to the reports submitted by defendants' experts Mary

6   Bergstein and Robert Tonner.  And then it goes through what

7   they contend in their reports, and then it says Hollander's

8   survey rebuts these opinions by demonstrating the works are

9   highly similar.

10        So, your Honor, Mattel made a decision quite some

11  time ago that they were not going to put in copyright survey

12  expert as an opening salvo.  And they put in Mr. Hollander

13  solely for rebuttal.  There's never been any question about

14  that.  And in fact we said we didn't think it was proper,

15  because we argued it probably didn't technically respond to

16  their reports.  I made that argument.  But, your Honor, I

17  think --

18        THE COURT:  Let me hear from Mattel further on

19  this.  It does appear, at least based on what's being

20  presented to the Court here, that this was rebuttal.  This

21  was not designated as an expert to begin with.

22        MR. KIDMAN:  That's right.  The report was a

23  rebuttal report, but that issue goes to the timeliness of the

24  disclosure.  He was timely disclosed under the disclosure

25  rules of Rule 26.  The issue that his report goes to is still

Page 5207

1   in the case, whether or not Mr. Tonner and Ms. Bergstein

2   testify, and that is the substantial similarity issue.

3          MGA is going to contend, we believe, that the dolls

4   are not based on the drawings, and that's the issue that

5   Mr. Hollander's survey goes to, and it's still relevant.

6   It's still an issue in the case.  This issue about being in

7   the rebuttal report just goes to the issue of the timely

8   disclosure under Rule 26.  He was deposed months ago.  And

9   without getting into the other points of the motion, his

10  survey is certainly relevant to Phase 1-B.

11         THE COURT:  I will consider MGA's motion in limine,

12  mindful about your current contention that it's improper

13  because it was not designated as an expert report.  And I'll

14  rule on that on Monday.

15         MR. KIDMAN:  And, your Honor, regarding the timing

16  of the Kivetz survey, it was conducted over a number of days

17  at the end of May and beginning of June of this year.

18         THE COURT:  After trial began?

19         MR. KIDMAN:  After trial began, your Honor, but it

20  was shortly after we learned that the Gruca motion would not

21  be heard until after Phase 1-A.

22         THE COURT:  Very well.

23         MR. KIDMAN:  And the report, there is also an

24  additional part of his report, which is a critique of

25  Mr. Gruca, which took place, it was written after that.  And

Page 5208

 1   in fact, the report is not even finalized at this point but

 2   certainly could be on a moment's notice.

 3              THE COURT:  Okay.

 4              MR. ROTH:  That goes to my last point.  I would

 5   just note with respect to Mr. Meyer, they have our report.

 6   We don't have Mr. Kivetz's report despite the fact that the

 7   survey was finished over six weeks ago.

 8              MR. KIDMAN:  We can certainly provide that report

 9   and make Mr. Kivetz available for a deposition.

10              THE COURT:  I've heard enough, Counsel, on this.

11              MS. AGUIAR:  I'm sorry to delay the proceedings

12   here.  I did want to come back to you on one issue that was

13   raised during Motion in Limine No. 15 concerning 2D to 3D.

14              THE COURT:  Yes.

15              MS. AGUIAR:  And there was a statement about the

16   fact that there has never been a date put on when

17   Ms. Tomiyama first met with MGA's prior counsel.  And I

18   believe Aaron just found on line a declaration that was filed

19   by Craig Holden, who is MGA's inside counsel in opposition to

20   the motion to disqualify, and in that declaration, and I can

21   provide your Honor a copy of it, which was dated March 30th,

22   2008, Holden says:  "Along with MGA's previous counsel of

23   record, I met Christina Tomiyama for the first time on August

24   2nd of 2000" -- August 2nd, 2007.  I'm sorry.  "I had never

25   spoken with her before."  And he goes through to explain the

1    purpose of the meeting.

2              THE COURT:  That simply says that he met with

3    Ms. Tomiyama with previous counsel.  That doesn't indicate

4    that that was the first time that prior counsel met with

5    Ms. Tomiyama.

6              MS. AGUIAR:  Well, he says --

7              THE COURT:  Unless I misheard that.

8              MS. AGUIAR:  He says the purpose of the meeting was

9    to evaluate whether MGA's outside counsel should retain

10   Ms. Tomiyama as an expert witness.

11             THE COURT:  Right.

12             MS. AGUIAR:  That's pretty clear to me that if that

13   meeting was to evaluate whether to retain her as an expert

14   witness, it was his understanding that that was the first

15   time they were meeting with her.  That is very clear from his

16   declaration.  Frankly, Mr. Holden has been here during the

17   proceedings, and he's here today.  I don't believe that there

18   is any -- I don't believe there's room for doubt here.  And

19   frankly I think it's consistent with what Ms. Tomiyama says

20   in her deposition.  So when they said that there has never

21   been a date given, can I hand a copy of this up to your

22   Honor?

23             THE COURT:  No, no.  The Court has that.

24             MS. AGUIAR:  Okay.  So it's March 30th of '08.

25             MR. ZELLER:  The Holden declaration is not new.

Page 5210

1    And in fact that was precisely what prompted our questions in

2    the first place.  It is very artfully phrased.  It says

3    things like when we first met with her with outside counsel

4    for purposes of retaining her.  It does not say, and MGA has

5    never said when its outside counsel --

6              THE COURT:  I've heard it, Mr. Zeller.  Thank you.

7              MR. ZELLER:  Thank you.

8              THE COURT:  All right.  If there's nothing further

9    at this time, I'll take these motions under submission, and I

10   will -- we will have a telephonic hearing at three o'clock on

11   Monday.  If I need further argument, I'll ask for it, but

12   otherwise, I will simply give a ruling on these motions, and

13   that will tee up further proceedings on Wednesday.

14             MR. NOLAN:  Your Honor, I just wanted to raise, at

15   the end of the day, with respect to the three o'clock time,

16   if I could do it at sidebar, with respect to a personal

17   issue.

18             MR. COREY:  I'm a little loath to raise this, and I

19   don't know if the Court anticipated completing all of the

20   Mattel motions in limine, because Ms. Middleton was on MGA's

21   witness list, and MGA's -- Mattel's Motion in Limine No. 13

22   is directed in part to Ms. Middleton.

23             THE COURT:  Yes.

24             MR. COREY:  And I just wanted to make sure it

25   didn't fall through the cracks.

1          THE COURT:  No, it's on my list.

2          All right.  And then on Wednesday, what I'm

3   planning to do on Wednesday, and I think I mentioned this.

4   You know, I was concerned about that juror note that the

5   Court placed under seal.  And I don't know how to do this.

6   I'm trying to think how best to do this, I suppose I should

7   phrase it.

8          I did indicate I declined Mattel's invitation to

9   interview the juror on the day in question, because I agreed

10  with Mr. Nolan that everyone was tired, and the juror was

11  tired, and it's good to give everyone a chance to stretch and

12  relax, not that any of us are rested and relaxed, but at

13  least the jurors hopefully are resting before we address them

14  on Wednesday.

15         But I am planning to meet with the juror in

16  chambers, and I'm hoping that she gets here a few minutes

17  before 9:00 so that we can do this without much of a moment.

18  I'll, of course, invite counsel into chambers as well.

19         But the focus of the inquiry is going to be simply

20  on that portion of the note in which she describes the

21  physical ailments associated with deliberation and to ensure

22  that this is not a particular hardship.  It will not focus on

23  any other aspect of the note.

24         I just wanted to give counsel a heads up that if

25  the Court were to decide to invite counsel to ask any

Page 5212

1    questions, we would focus strictly on physical ability to

2    deliberate.  And at the end of the day, what I may do is just

3    ask questions myself.  Because I really don't -- I'm very

4    concerned about interviewing a juror in the midst of trial or

5    even in between phases of a trial and having anything

6    questioned or asked to her about her deliberative process as

7    opposed to her physical ability to continue to deliberate and

8    hear this trial.

9         So that's what I intend to explore with the juror

10   before we begin.

11        And certainly the same applies to any other juror.

12   We didn't receive any other notes, thankfully, at the end of

13   the day, except for the one juror who has surgery or whose

14   husband has surgery on Thursday.  But if anyone else

15   obviously raises a concern, the Court will treat them in the

16   same manner.  And hopefully, we'll have sufficient jurors to

17   proceed through the last phase.

18        I think that's the only other issue that I wanted

19   to raise.

20        Mr. Quinn?

21        MR. QUINN:  Your Honor, it does seem to me there's

22   another issue there, and that is the juror's noncompliance

23   with the Court's instruction.

24        THE COURT:  You know, I thought about that, and

25   that could have been harmful had the note preceded the return

44af2635-c89f-4e3b-b992-cb9bd2674275

Page 5213

1    of the verdict by a few days, because then arguably -- it

2    just could have been more problematic.  But given the

3    sequencing there, where her revelation to the Court of that

4    information and the verdict coming in and no decision being

5    made by the Court or by counsel with that information, I

6    don't think there was any significance to it other than the

7    fact that she didn't follow the instruction of the Court.

8             Certainly that's a factor in the Court's mind, but

9    I think that probably can be cured.  My sense, Mr. Nolan made

10   the point that in almost the plaintive way that she wrote the

11   note, she seemed to be just trying to explain herself, and I

12   think probably a repetition of the instruction would probably

13   cure that particular issue.

14            If this that was the only thing, I wouldn't be

15   questioning the juror.  What I truly am concerned about are

16   some of the other statements she made in the note, just about

17   her physical ability to continue on.

18            MR. QUINN:  As I think the Court indicated the

19   other day, when we were in chambers, it's because of what we

20   know about the contents of the note, it's impossible for any

21   of us to discuss the issue without knowing this juror and

22   this juror's feelings.  So that sort of taints anything --

23            THE COURT:  It taints both to a certain extent.

24   And that's why I think the Court may have to make these

25   inquiries itself and make a judgment, and based strictly on

Page 5214

1    my assessment of whether or not, you know, how she answers

2    the questions.

3            MR. QUINN:  And my concern, and I think it's worth

4    asking about, is whether there's something else behind her

5    not complying with the Court's instruction and whether she

6    shouldn't be asked about that.  Because that is kind of

7    unusual.  I don't know about other folks' experience, but

8    I've never had an experience where a juror handed up a note

9    saying where they were in their thinking and explaining it.

10   And it wasn't clear -- it was contrary to what the Court

11   said.

12           THE COURT:  I will consider your position, Counsel.

13   I just -- I haven't looked at it since Thursday, but I

14   thought Mr. Nolan's point was well taken on that.  But I'll

15   certainly consider that in the full context of evaluating

16   whether this juror should sit for the -- for Phase 1-B.

17           Anything else except Mr. Nolan?  Why don't you

18   approach sidebar.  And we don't have to do this on the

19   record.

20           (Discussion held at sidebar off the record.)

21           THE COURT:  Okay.  So the hearing, then, will be at

22   four o'clock on Monday telephonically.  And we'll go from

23   there.

24           All right?  See you on Monday.

25                  (Proceedings concluded at 3:50 P.M.)

Page 5215

1

2

3

4

5

6

7                        C E R T I F I C A T E

8

9

10         I hereby certify that pursuant to Title 28,

11  Section 753 United States Code, the foregoing is a true and

12  correct transcript of the stenographically reported

13  proceedings in the above matter.

14         Certified on July 18, 2008.

15

16

17                    _____
                      MARK SCHWEITZER, CSR, RPR, CRR
                      Official Court Reporter
18                    License No. 10514

19

20

21

22

23

24

25

44af2635-c89f-4e3b-b992-cb9bd2674275