Page 5650

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

---

MATTEL, INC.,                    :  PAGES 5650 - 5799
                                 :
        PLAINTIFF,               :
                                 :
    VS.                          :  NO. ED CV04-09049-SGL
                                 :  [CONSOLIDATED WITH
MGA ENTERTAINMENT, INC.,         :  CV04-9059 & CV05-2727]
ET AL.,                          :
                                 :
        DEFENDANTS.              :

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

TUESDAY, AUGUST 5, 2008

JURY TRIAL - DAY 29

AFTERNOON SESSION

MARK SCHWEITZER, CSR, RPR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
181-H ROYBAL FEDERAL BUILDING
255 EAST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012
(213) 663-3494

1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4        Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
         By John B. Quinn, Esq.
5            B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
6            Harry Olivar, Esq.
             John Corey, Esq.
7            Diane Hutnyan, Esq.
             William Price, Esq.
8        855 South Figueroa Street
         10th Floor
9        Los Angeles, CA 90017
         (213) 624-7707

10

11

12   On Behalf of MGA Entertainment:

13       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
             Robert Herrington, Esq.
17       300 South Grand Avenue
         Los Angeles, CA 90071-3144
18       (213) 687-5000

19

20

21

22

23

24

25

Page 5652

1                          I N D E X

2

3    MITCHELL KAMARCK, PREVIOUSLY SWORN.................... 5654

4    DIRECT EXAMINATION (CONTINUED) BY MR. QUINN: .......... 5654
     CROSS-EXAMINATION BY MR. NOLAN:  ..................... 5721
5

6    DAPHNE GRONICH, PREVIOUSLY SWORN..................... 5739

7    DIRECT EXAMINATION BY MR. QUINN: ..................... 5739

8    CROSS-EXAMINATION BY MR. HANSEN:..................... 5761

9                        E X H I B I T S

10    (Exhibit 13709 received.)............................ 5654

11    (Exhibit 13730 received.)............................ 5655

12    (Exhibit 13729 received.)............................ 5657

13    (Exhibit 13731 received.)............................ 5676

14    (Exhibit 13732 received.)............................ 5676

15    (Exhibit 13901 received.)............................ 5676

16    (Exhibit 13572 received.)............................ 5688

17    (Exhibit 13862 received.)............................ 5698

18    (Exhibit 13784 received.)............................ 5701

19    (Exhibit 13856 received.)............................ 5702

20    (Exhibit 13867 received.)............................ 5713

21    (Exhibit 13785 received.)............................ 5714

22    (Exhibit 13725 received.)............................ 5716

23    (Exhibit 13691 received.)............................ 5719

24    (Exhibit 13706 received.)............................ 5743

25    (Exhibit 13119 received.)............................ 5745

Page 5653

1              E X H I B I T S (CONTINUED)

2

3      (Exhibit 13783 received.)............................... 5751

4      (Exhibit 13742 received.)............................... 5752

5      (Exhibit 505 received.)................................. 5754

6      (Exhibit 507 received.)................................. 5760

7      (Exhibit 509 received.)................................. 5760

8      (Exhibit 511 received.)................................. 5760

9      (Exhibit 10877 received.)............................... 5772

10     (Exhibit 18812 received.)............................... 5776

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5654

1    Riverside, California; Tuesday, August 5, 2008

2                    1:26 P.M.

3              (WHEREUPON THE JURY ENTERS.)

4         THE COURT:  Good afternoon, members of the jury.

5         Counsel, you may proceed.

6            MITCHELL KAMARCK, PREVIOUSLY SWORN.

7              DIRECT EXAMINATION (CONTINUED)

8    BY MR. QUINN:

9    Q.   Mr. Kamarck, if I could ask you just to turn to

10   Exhibit 13709, Volume 2.  And we'll wrap up with City World

11   here.  Does that appear to be a photocopy of that -- of the

12   doll that's in evidence that's in front of you,

13   Exhibit 13708?

14   A.   Yes, it does.

15            MR. QUINN:  We'd offer that, your Honor.

16            MR. NOLAN:  No objection.

17            THE COURT:  It's admitted.

18            (Exhibit 13709 received.)

19            MR. QUINN:  If we could publish 13709.

20            THE COURT:  You may.

21   Q.   BY MR. QUINN:  All right.  New subject.  Mr. Kamarck, if

22   you could turn to Exhibit 13730.  And that is in volume 3.

23   13730.  And this is an e-mail which you wrote, sir?

24   A.   I don't have someone helping me getting notebooks.  So

25   let me get it here.  30, did you say?

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5655

1    Q.   Yes, 13730, Volume 3.

2    A.   Yes.

3    Q.   And this is an e-mail that you wrote to Cynthia

4    Nishimoto at Bandai?

5             MR. NOLAN:  Your Honor, I just object.  I don't

6    believe that the document Mr. Kamarck is looking at is the

7    document that's being published.

8             THE COURT:  Clarify, Counsel.

9             MR. QUINN:  We can take that down.

10   Q.   Have you found 13730?

11   A.   Yes, I'm looking at it.  Yes, this appears to be an

12   e-mail from myself to Cynthia Nishimoto.

13             MR. QUINN:  We'd offer that, your Honor.

14             THE COURT:  Any objection?

15             MR. NOLAN:  No objection, your Honor.

16             THE COURT:  It's admitted.  You may publish.

17             (Exhibit 13730 received.)

18             MR. QUINN:  Thank you.

19   Q.   And what had happened here is that another company

20   called Bandai was offering for sale some dolls they called

21   the Glamma Jammaz dolls, which MGA objected to; is that

22   correct?

23   A.   Yes, that appears to be the subject of this e-mail.

24   Q.   And you wrote this -- Cynthia Nishimoto, she was at

25   Bandai; correct?

3e29859c-69da-4e15-a91f-81c2e862516a

1   A.    I believe so.

2   Q.    And what you wrote there in the first paragraph is:  "As

3   we discussed, MGA maintains that the overall look and feel of

4   the Glamma Jammaz dolls are substantially similar to the

5   Bratz dolls.  It is clear to MGA that Bandai used the Bratz

6   dolls as a model for their Glamma Jammaz dolls and copied the

7   detail down to even a birth mark in the identical spot on

8   your Mya doll as our Yasmin Bratz."

9            Do you see that?

10  A.    Yes.

11  Q.    And the next paragraph, you have some additional details

12  about specific factual similarities.  Do you see that?  The

13  body.  You say:  "Both the head and feet are substantially

14  out of proportion for the body.  The face, the overall shape

15  is the same as Bratz.  The nose shape is the same as Bratz.

16  Lips shape is the same as Bratz.  Eyes shape is the same as

17  Bratz.  And face painting is the same as Bratz.  These are

18  all similarities I pointed out in our earlier conversation

19  and are obvious to the casual observer."  Correct?

20  A.    Yes, I wrote that.

21  Q.    And what you're trying to do is persuade the folks at

22  Bandai that they should not be offering this doll because it

23  was too similar to an MGA product; correct?

24  A.    I was trying to convince them of doing that, yes.

25  Q.    And, in fact, MGA was trying to prevent -- convince them

1    not to offer this or not to display this at the New York Toy

2    Fair.

3               Do you recall that?

4    A.   I don't recall it offhand.

5    Q.   If I could ask you to look at the exhibit just before

6    this.  13729-1.  And do you recognize this as an e-mail from

7    Mr. Isaac Larian to the same lady that you were corresponding

8    with, Ms. Nishimoto?

9    A.   Yes, it appears to be an e-mail from Isaac to Cynthia.

10              MR. QUINN:  We'd offer Exhibit 13729, your Honor.

11              THE COURT:  Any objection?

12              MR. NOLAN:  No objection.

13              THE COURT:  It's admitted.  And you may publish.

14              (Exhibit 13729 received.)

15   Q.   BY MR. QUINN:  And if we go to the second to last

16   paragraph beginning with "please note."  Mr. Larian writes:

17   "Please note that if Bandai does not voluntarily withdraw

18   these infringing dolls from the market and agree not to show

19   them to the New York Toy Fair."

20              Does that refresh your recollection now that one of

21   the things that MGA was trying to do was to persuade the

22   folks at Bandai to withdraw these from the market and not

23   show them to the New York Toy Fair?

24   A.   I don't have an independent recollection of that, but

25   that appears to be what Isaac wrote.

Page 5658

1    Q.    So let's go back to your letter, 13730.

2          And you identify here -- in here some specific

3    factual similarities.  And let me just ask you, did you

4    undertake any type of scientific analysis to see how similar

5    these two dolls were before you sent this e-mail?

6    A.    No, I don't believe I had the other doll.

7    Q.    Do you know whether anybody at MGA did?

8    A.    No.

9    Q.    How was it that you reached the conclusion that these

10   dolls seemed so similar in the particulars that you point

11   out?

12   A.    You know, I was basically sending out a letter to warn

13   Bandai that I thought that we would have a problem with this

14   particular doll based on -- I think it was a picture on a

15   website.  So it was basically, as I said, a nonexhaustive

16   list just to say look, we're looking into this, and this is

17   our position right now and subsequently hoping to get an

18   actual copy of the doll to do a more incentive thing.

19   Q.    And you felt comfortable doing that without actually

20   having a copy of the doll and doing some type of scientific

21   comparison?

22   A.    Yeah, that's partly what lawyers do.

23   Q.    All right.  And in other words, you didn't need to

24   actually have copies and scan them and do an overlay over one

25   of the other.  You sort of looked at it and said, as I think

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5659

1    you said here, that these similarities exist even to the most

2    casual observer?

3                MR. NOLAN:   Objection, your Honor.   Relevance to

4    the question.   Foundation.   This goes to a different

5    jurisdiction.

6                THE COURT:   Rephrase your question.   It's a

7    legitimate point of inquiry in terms of his understanding of

8    what he meant.

9    Q.   BY MR. QUINN:   When you said that it was obvious --

10   these similarities are obvious to the casual observer, you

11   meant -- you didn't have to do some type of scientific study.

12   Anybody looking at this Mya doll and looking at the Bratz

13   product would see these similarities that you're pointing at.

14   Is that fair to say?

15   A.   Yes.

16   Q.   And obviously, you thought that this birthmark in

17   particular was very important because you mention it twice,

18   once in that first paragraph where you say that even a

19   birthmark is in the identical spot on your Mya doll as our

20   Yasmin doll.

21                Do you see that?

22   A.   Yes.

23   Q.   And then you mention again in the second to the last

24   paragraph, in the last sentence, you say:   "You copied a

25   Bratz doll down to the smallest detail such as the position

Page 5660

1   of a birthmark."

2            Do you see that?

3   A.   Yes.

4   Q.   And at the end, your parting words are:   "Do not test

5   MGA's resolve in this matter."

6            So I mean you thought the birthmark here was

7   particularly important, I take it?

8   A.   Yes, because of my work on copyright infringement, the

9   fact that there's an identical birthmark, I thought, was

10  something that was worthwhile to show the copying.

11  Q.   So even a small detail can be important in deciding

12  whether things are similar, whether you could try to put a

13  stop to them legally?

14           MR. NOLAN:   Objection, your Honor.   Vague and

15  ambiguous, lack of foundation, which jurisdiction.

16           THE COURT:   Rephrase it to reflect the foundation,

17  Counsel.   You are basing this on his experience?

18           MR. QUINN:   Yes.

19           THE COURT:   Let's lay a bit of a foundation on

20  that.

21  Q.   BY MR. QUINN:   You made reference to the fact that you

22  are experienced in copyright matters.   Can you give us a

23  summary of what experience you have?

24  A.   I've done a number of copyright infringement matters

25  dealing with motion pictures, automobile handbooks, pictures,

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5661

1    things such as that.

2    Q.   And based on your experience, you felt comfortable

3    pointing out this birthmark because you knew, based on your

4    experience, that even a small detail, the copying of a

5    similar small detail can be significant from a copyright

6    standpoint.

7    A.   From a copyright standpoint, the copying of one small

8    detail in total of another would be significant, yes.

9    Q.   And which jurisdiction was your experience in?

10   A.   Ninth Circuit.

11   Q.   Let's take a look at the doll, the Mya doll that you are

12   writing the folks at Bandai about here.  If I can show you a

13   copy of 13731.  It's been pointed out, and it may not be

14   obvious to everyone.  Where is the Ninth Circuit?

15   A.   We're in the Ninth Circuit.

16   Q.   It's California and some adjacent states?

17   A.   Yes.

18   Q.   All right.  So we've handed you Exhibit 13731.  And you

19   see that's identified as Mya.

20        Do you see that?

21   A.   Yes.

22   Q.   And you see it says Bandai?

23   A.   It does.

24   Q.   On the box.  And you are writing this e-mail we were

25   just looking at, it's dated back in 2003.  The e-mail we just

Page 5662

1    looked at.

2    A.   Okay.

3    Q.   And you see that's 2003.  Do you see that date at the

4    bottom there, on the bottom of the package?  Actually, on

5    actually the literal bottom.

6    A.   Okay.  Where I was looking.  Yes, I see 2003.

7    Q.   All right.  Now, does that appear to you to be a copy of

8    the Bandai Mya doll that you were corresponding about?

9    A.   Honestly, I don't think I saw it on packaging.  And as I

10   sit here today, I don't recall.  I didn't have a doll.  It

11   was from a website, as I recall, that had a picture.  You

12   know, and that's -- I honestly can't say definitively that

13   this is it, though it has the same name.  And it does have

14   the birthmark.

15   Q.   All right.  So it does have the birthmark that you were

16   calling Bandai's attention to; correct?

17   A.   Oh, I was calling Bandai's attention to a birthmark.

18   Q.   And it's the same name?

19   A.   It's the same name.

20   Q.   Same year?

21   A.   Yeah.

22   Q.   And it's a Bandai product?

23   A.   It is a Bandai product.

24   Q.   Does it look like the image of the doll that you saw on

25   the website?

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5663

1   A.   Honestly, I can't recall what I was seeing on the

2   website, whether this is a subsequent permutation or whether

3   they changed it in response to a letter or what happened.

4   We're talking, God, like five --

5   Q.   Several years ago.

6   A.   Yeah.

7   Q.   Do you have any reason to think, just looking at that,

8   that that in fact is not the Bandai Mya doll that you were

9   objecting to --

10           MR. NOLAN:   Objection, your Honor.   Lack of

11   foundation.   Calls for speculation.

12           MR. QUINN:   There's no reason to believe it isn't.

13           THE COURT:   Overruled.

14           THE WITNESS:   Can you read the question back?

15   Q.   BY MR. QUINN:   Do you have any reason to believe that

16   Exhibit 13731 that you are holding is not a copy of that Mya

17   doll that you were corresponding with Bandai about back in

18   2003?

19   A.   I honestly thought -- and again, because I was looking

20   at a website -- that it was a much taller doll, more in the

21   fashion doll range, not one of these kind of small miniature

22   dolls.   So that's the reason I'm kind of confused about it,

23   too.

24   Q.   Of course, from the website, you couldn't necessarily

25   tell how tall the doll was.

3e29859c-69da-4e15-a91f-81c2e862516a

1    A.    Right.   That's probably true.   Though again, I have no

2    recollection.   I just remember thinking that it was more in

3    the same class of Bratz doll.

4    Q.   So bearing in mind that you can't really tell from

5    looking at the website how tall the doll was, do you have any

6    reason to think that that Mya doll made by Bandai in 2003

7    with the birthmark isn't the one you were corresponding with

8    them about?

9    A.    You know, I -- you could put almost any doll in front of

10   me and say that, because I am just not really certain that

11   this is the doll.   I can't say that it's not the doll.   It

12   has the same and a birthmark and a year.   But I'm not

13   comfortable saying it is or it isn't.

14   Q.   What I'm trying to find out is whether there's any

15   reason that you can -- whether you can identify anything that

16   indicates to you that it isn't what you saw.

17   A.    The only reason I would exclude it, again, is the height

18   thing.   And as you point out, I might be wrong about that,

19   but I might be wrong about many things.

20   Q.   And do you remember whether or not Bandai actually

21   withdrew the doll or at least eliminated the birthmark after

22   2003, after you corresponded with them?

23   A.    I don't recall what was the -- what was resolved on

24   that.

25   Q.   If I could ask you to take a look, please, at

Page 5665

1   Exhibits 13735 and 13736.

2   A.   Okay.

3   Q.   If you would just take a moment to look at those, and my

4   question to you will be do you recall that you reached an

5   agreement with Bandai where in 2003 they agreed to stop

6   producing these dolls?

7   A.   It's not a signed agreement that I'm looking at.  So

8   obviously we were trying to resolve it.  You know, it's

9   funny.  I've dealt with Cynthia since then, but I don't have

10  a recollection of this actually being resolved.  But it looks

11  like we were coming close or had resolved it.

12  Q.   These are -- what we're looking at is some

13  correspondence and a draft of a settlement agreement?

14  A.   Yeah, yeah.  And I don't know why there's not a signed

15  one if it was resolved.

16  Q.   And those are dated in 2003?

17  A.   Well, it says, yes, the settlement agreement says it has

18  until May 15th to stop selling, and yeah, the e-mail is --

19  looks like February 2003.

20        MR. QUINN:  Your Honor, on this basis, I'd

21  offer Exhibit 13731 in evidence.  It's a product,

22  self-authenticating.

23        THE COURT:  Any objection?

24        MR. NOLAN:  I apologize, your Honor.  Just one

25  moment.

Page 5666

1          THE COURT:  Take your time.

2          MR. NOLAN:  Your Honor, objection to the admission

3     of the doll.  Lack of foundation.  Not self-authenticating.

4          THE COURT:  I'm having trouble finding 13731.

5          MR. QUINN:  That's actually the tangible.  There's

6     a photograph, your Honor, which is 13732.

7          THE COURT:  And you want to introduce this as?

8          MR. QUINN:  The tangible.

9          THE COURT:  Glamma Jammaz doll?

10         MR. QUINN:  Yes.

11         THE COURT:  That is the subject of?

12         MR. QUINN:  Yes, that's referred to here.

13         THE COURT:  And your objection is foundation.

14         MR. NOLAN:  Yes, your Honor.

15         THE COURT:  Let me see you at sidebar on this.

16         (SIDEBAR CONFERENCE HELD.)

17         THE COURT:  The witness has indicated that he has

18    no reason not to believe it.  Is there any question that this

19    is the Glamma Jammaz doll?

20         MR. NOLAN:  Oh, yes.  Your Honor, we don't --

21    we don't know if it is or not.  I could represent that

22    Mr. Kamarck has testified, as you know, that although it has

23    the name -- his recollection was that it was larger.  And he

24    also testified that he doesn't know whether or not this is a

25    modification of it after their letters were sent because his

Page 5667

1    recollection is that what he saw was a larger doll.  And so I

2    think the lack of foundation, the fact that he can't say that

3    it's not -- he also said that he --

4              THE COURT:  Has MGA been asked in discovery to

5    produce the doll that was underlying the litigation?

6              MR. QUINN:  You can answer that.

7              MR. ZELLER:  Yes, your Honor.  We did.  Yes.

8              THE COURT:  I mean, if I have to get to the bottom

9    of this, I suppose we could set this aside and have a

10   hearing.

11             But, Mr. Zeller, was this requested?

12             MR. ZELLER:  We have.  And also, your Honor, we

13   have requested that MGA, and there's a trial subpoena for

14   Custodian of Records to come in and say this is the doll

15   that --

16             THE COURT:  This shouldn't be an exercise of having

17   to hunt around and trying to find.  If this was duly

18   requested and accepting Mr. Zeller's representation for a

19   minute, this isn't, you know, sorting through toy stores

20   trying to find the doll that was referred to in litigation.

21   This is something that MGA is going to have to come forward

22   with.

23             MS. AGUIAR:  Mr. Zeller is correct that it was

24   requested.  What he didn't tell you was that it was requested

25   on July 25th, which was last week.  There is a motion to

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5668

1    quash those subpoenas on a number of grounds.

2              THE COURT:  This is the subsubject of those.

3              MS. AGUIAR:  And so it was requested, but it was

4    only requested recently.

5              THE COURT:  Very well.

6              MS. AGUIAR:  It was the subject of discovery

7    requests before, which were objected to and overruled.  So I

8    just wanted to give the other side of it, your Honor.

9              MR. NOLAN:  Before you respond, Mr. Zeller, but in

10   addition to that, your Honor, as a follow-up, we have not

11   been able to locate this doll.  You know, in other words, in

12   all of the discovery that was taken in this case over four

13   years, this request was never made until just a little while

14   ago.  We've looked.  We've done a diligent search.  It's been

15   reported back to us that we do not have a copy of this doll.

16             We'll continue to look for it, Judge, but

17   Mr. Kamarck is the only one that could provide a basis, and

18   when we showed it to him, he said no, I think it's a larger

19   one.

20             THE COURT:  Mr. Zeller?

21             MR. ZELLER:  A couple points, your Honor.  Number

22   one, these particular dolls, we went out and we got -- we

23   have produced these to MGA ages ago.  They have these

24   samples.  They have these.  They understood that these were

25   the ones that we said that we believed where it's this

Page 5669

1  particular instance that these were the dolls that were the

2  subject of that cease-and-desist letter without any

3  contradiction or any other clarification by MGA at any point.

4           Number two, we did ask for these things during

5  discovery.  The Court will recall that in May it ordered MGA

6  to produce pleadings.  It also ordered MGA to produce

7  documents that are going to show us what do they accuse of

8  infringement.  It would have made no sense for the Court to

9  have ordered them to produce pleadings without also showing

10 what the products were.

11          THE COURT:  How is it that you discerned that that

12 was the doll that is the subject of this?

13          MR. ZELLER:  Because those are the only ones we can

14 find, and they have the same year.  They are from Bandai.

15 They have the same name.

16          THE COURT:  That's what I'm getting at.  I'm

17 getting at is what indicia?  We have an admitted exhibit that

18 describes it in some way, I presume.  Describes the doll.

19          MR. QUINN:  The e-mail.

20          MR. ZELLER:  Yes.

21          MR. QUINN:  The e-mail, Mr. Kamarck's e-mail.

22          THE COURT:  And it's based on that description that

23 you are now offering this doll?

24          MR. QUINN:  Yes.

25          THE COURT:  We don't have that testimony, mind you,

Page 5670

1    but that type of testimony may be a bare bones basis to get
2    that doll in.  I don't know.
3                MS. AGUIAR:  Can I just throw something out there?
4                THE COURT:  Please.
5                MS. AGUIAR:  We looked through a bunch of products
6    this morning, and it shows that Bratz dolls come in about
7    seven different sizes.  I don't know anything about this
8    doll.  But this doll may come in different sizes, too.
9                THE COURT:  Right.  But you, and I'm not saying you
10   personally, but you, MGA, should.  It's your lawsuit that you
11   brought.  And that's why this is not somebody else's product.
12   This is your product.
13               MS. AGUIAR:  Understood, but there was no lawsuit.
14   It was an e-mail.  And Mr. Kamarck just testified that he
15   wrote the e-mail based on the website.
16               MR. QUINN:  Your Honor, he did say that except for
17   the -- he thought it was a taller doll.
18               THE COURT:  That is a good point.  This would be
19   different if this was a lawsuit.
20               MR. QUINN:  Well, they are writing a letter saying
21   do not test our resolve on this matter.  Mr. Larian also
22   writes a letter and threatens to --
23               THE COURT:  There's no question at some point in
24   time MGA saw a doll that they believed infringed.  The
25   question is whether or not this is that doll.  And as the

1    record stands right now, Mr. Nolan's objection is well taken.

2    Having said that, I'm not saying that there's not -- based on

3    the evidence, and you know, the standard for admitting

4    evidence --

5                 MR. QUINN:  Your Honor, Rule 902.

6    Self-authentication.  Sub 7.  Trade inscriptions and the

7    like.  Inscriptions, signs, tags, labels --

8                 THE COURT:  I understand that.

9                 MR. QUINN:  So what we have here is --

10               THE COURT:  This is a Glamma Jammaz doll, and under

11   901, I'm willing to say this is.  Whether this is -- there

12   needs to be something connecting this, though, to the e-mail.

13   And that's --

14               MR. QUINN:  They can cross-examine him.  I think

15   that's for the jury to decide, your Honor.  He cannot

16   identify anything on this that is different than what he

17   remembers seeing.

18               THE COURT:  Let's go through that.  With this in

19   mind, I'm going to sustain the objection right now.  You may

20   attempt to lay further foundation with this in light of that

21   e-mail.

22               MR. QUINN:  All right.

23               MR. ZELLER:  If I may just raise a larger issue.

24   We've come at this any number of ways.  To simply find out a

25   very simple issue ultimately with these lawsuits, which is

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5672

1    what did they sue on?

2              THE COURT:  But the point Ms. Aguiar just made,

3    this wasn't a lawsuit.  So I'm with you more on the lawsuit

4    issue if MGA actually filed a lawsuit on a particular doll,

5    then I'm going to place a greater burden on MGA to come up

6    with whatever it was that they sued on.  That's within their

7    control.  This is something which was apparently seen on a

8    website.

9              MR. NOLAN:  And that's the last point I wanted to

10   make, your Honor.  I think the foundation so far has simply

11   been that he saw it on the website.  He's not physically seen

12   the doll.  That's my recollection.

13             THE COURT:  You need to lay a further foundation.

14   I'll give you leave to do so.  At this point I'll sustain the

15   objection.

16             (CONCLUSION OF SIDEBAR CONFERENCE.)

17             THE COURT:  You may proceed, Counsel.

18             MR. QUINN:  Thank you, your Honor.

19   Q.   If we could go back to your e-mail, Exhibit 13730,

20   Mr. Kamarck.

21   A.   Yes.

22   Q.   And I'd like to ask you to compare what you described,

23   the features that you described in your e-mail with the

24   actual doll you have there, Exhibit 13731.  I think you've

25   already pointed out that it has the birthmark, the doll that

Page 5673

1    you're holding has the birthmark; correct?

2    A.   Yes.

3    Q.   And that birthmark is in the same location as on the

4    Yasmin doll?

5    A.   Yeah, I mean, I haven't seen the Yasmin doll in a while,

6    but I assume it's probably --

7    Q.   I think you'll see that there probably is one there that

8    you can take a look at if you need to confirm that.  You

9    object in your e-mail that their doll has a birthmark in the

10   same place as the Yasmin doll.

11   A.   Actually, I have to say that they aren't in the same

12   place.  They are close but not the same.

13   Q.   Near the same eye?

14   A.   They are near the same eye.  But I thought they were,

15   obviously, by my e-mail, in the identical place.  But go on.

16   Q.   So what you say in your e-mail is that the eye shape and

17   the face painting is the same as Bratz?

18   A.   Yeah, they have similar face paint.  The Bratz doll here

19   that I'm looking at --

20   Q.   Similar face painting?

21   A.   Yeah, just the Bratz doll is more substantial face

22   painting.  Again, I was looking at a picture.

23   Q.   All right.  And the head and the feet are -- you

24   indicate the head and the feet are out of proportion.  The

25   doll that you are holding, the Mya doll, Exhibit 13731, the

Page 5674

1   head and the feet are out of proportion?

2   A.   Yes.

3   Q.   And I think you've already said that based on just

4   looking at this and bearing in mind that this was some time

5   ago that you saw this, you cannot see any differences in the

6   doll that's marked as Exhibit 13731 from the image that you

7   saw on the web page except for the issue of the height, which

8   you said that you couldn't tell from the web page anyway.

9   A.   My only comment on that would be, again, I really

10  thought that the mark was close -- I thought that there was

11  much more substantial face painting on the Mya doll than this

12  one has.  But -- and I thought, obviously, I thought it was a

13  taller doll.  So there are things that make me wonder, but

14  obviously the name is the same and things like that.

15  Q.   And who was it that brought the Mya doll to your

16  attention?  Was it Mr. Larian, or did you find it?  How did

17  it come to your original attention?

18  A.   As I recall, and again, it's going back so long ago, I

19  know I didn't see an actual copy because I know with that we

20  didn't have anything in the U.S. except for one.  Someone

21  sent me a link, as I recall.  I don't know who sent me the

22  link.

23  Q.   All right.  We actually have a photo.  If you'd look at

24  Exhibit 13732.  It's right behind your e-mail.

25          And does that appear to be an image of a Bandai Mya

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5675

1    doll?

2    A.    It appears to be the same as what you gave me before.

3    It's not what I saw -- I don't recall it being in the

4    packaging when I saw it.

5    Q.    Try Exhibit 13734.  We have a photograph of one that's

6    not in packaging.  Let's see if this helps out.

7    A.    Again, I saw it in the context of a promotional website

8    as I recall.

9    Q.    Right.

10   A.    So yeah, this doesn't -- this is not -- this does not

11   refresh my memory.

12            MR. QUINN:  Your Honor, we'd offer Exhibit 13731,

13   the doll.

14            MR. NOLAN:  Lack of foundation, your Honor.

15            THE COURT:  Can I see the doll?

16            THE WITNESS:  Yes.

17            THE COURT:  What was the date of the e-mail?

18            MR. QUINN:  It looks like -- it's 2003, and I can't

19   tell if it's February 6th or June 2nd.  Maybe the witness can

20   help us.

21            THE COURT:  The Court is going to admit this based

22   on 902.  I believe this is a Glamma Jammaz doll that came out

23   in 2003.  Based on self-authentication.  It will be for the

24   jury to decide as to how much weight to give this particular

25   evidence and the connection between the e-mail in question

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5676

1   and the doll.  With that proviso, the Court will admit 13731.

2            (Exhibit 13731 received.)

3            MR. QUINN:  And we would also offer Exhibit 13732,

4   which is the photograph of the same doll.

5            THE COURT:  Any objection to the photograph?  I

6   understand the objection to the doll itself.  Separate and

7   apart from your foundational objection to the doll itself.

8            MR. NOLAN:  It's cumulative.  It's a photograph of

9   the doll that's now in evidence.  Same foundational issues.

10           THE COURT:  I understand the same foundational

11  objection.  Overruled.

12           (Exhibit 13732 received.)

13           MR. QUINN:  If we may display the photograph,

14  13732, the Glamma Jammaz Mya doll.

15  Q.   Now, you indicated in your e-mail that you thought this

16  was -- that the Mya doll was very similar to the Yasmin doll.

17  So similar that you thought they should stop producing it;

18  correct?

19  A.   Yes, I thought they should stop producing it.

20           MR. QUINN:  Your Honor, we have a photograph of the

21  Yasmin doll that we'd like to offer in evidence.  And that's

22  13901.

23           MR. NOLAN:  We have no objection.

24           THE COURT:  It's admitted.

25           (Exhibit 13901 received.)

1    Q.   BY MR. QUINN:  If we could put these side by side, the

2    Yasmin doll and the photo of the Mya doll.  There it is.

3          So this is what you were saying in your e-mail was

4    so close that any casual observer could see how close they

5    were; correct?

6    A.   Well, again, this is not what I was comparing.  I mean,

7    that's --

8    Q.   You were comparing an image on a web page.

9    A.   Right.

10   Q.   But near as you can tell, you have no reason to think

11   that this isn't a copy of that image?

12   A.   Well, I know this is not a copy of that image.

13   Q.   Or an image of the same doll.

14   A.   Yeah, it could be the image of the same doll.  It may

15   have been -- I don't know whether they are permutations of

16   this doll.  You know, that's entirely possible.  But yes,

17   there was an image of the Mya doll on the website, which I

18   compared against the Bratz doll.

19   Q.   Okay.  Now, this birthmark on the Yasmin doll that you

20   thought was very significant and you mentioned twice in your

21   e-mail, which was part of the claim that you made to Bandai,

22   that actually came from the original Carter Bryant's Bratz

23   drawings.

24          Do you recall that?

25   A.   I don't recall that.

Page 5678

1   Q.   Let's take a look at the drawing of Lupe.  You're aware

2   that the doll known as Yasmin was originally known as Lupe?

3   Are you aware of that?

4   A.   No.

5   Q.   Well, take a look at the Bryant drawing of Lupe,

6   Exhibit 10, page 2.  This is the better version.  And you see

7   that birthmark there next to the left ear?

8   A.   Yes.

9   Q.   And that's where it appears on the Yasmin doll, next to

10  the left eye?

11  A.   Yes.

12  Q.   And it appears on the Mya doll, next to the left eye?

13  A.   Yes.

14  Q.   And the overall shape, if we can go back to the -- there

15  are some obvious differences.  If we could put both the Mya

16  and Yasmin doll up there.  There are some obvious

17  differences.  The clothes, for example, are different; right?

18          MR. NOLAN:  I'm going to object to the relevance.

19  He didn't make this comparison.  And I think there's a lack

20  of foundation.

21          MR. QUINN:  He made a comparison in his e-mail,

22  your Honor.

23          THE COURT:  I understand.  I'm going to sustain the

24  foundational objection.  Lay a foundation as to what it is

25  that he was comparing.  I think to go beyond that scope is

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5679

1    confusing, given a variety of issues.  I'll sustain the

2    objection.

3    Q.   BY MR. QUINN:  Well, would you agree there are some

4    differences between the dolls?

5    A.   Between the two dolls that are up on the screen?

6    Q.   Yes.

7            MR. NOLAN:  Same objection, your Honor.  Lack of

8    foundation.  And also relevance.

9            THE COURT:  Overruled.

10   Q.   BY MR. QUINN:  There are some differences?

11   A.   Yes, there are.

12   Q.   And one difference might be that the Mya doll is kind of

13   busty in comparison to the Bratz doll.  Would you agree with

14   that?  More va-va-voom?

15           THE COURT:  To use a legal phrase.

16           THE WITNESS:  You're saying that the Mya doll has

17   more va-va-voom than the Yasmin doll?

18   Q.   BY MR. QUINN:  That area of the body is somewhat larger,

19   more pronounced.

20   A.   Maybe you want to -- I would -- I don't give her more

21   va-va-voom than Yasmin.  Let's put it that way.  Maybe a

22   little more va-va.

23   Q.   We'll stick with one va, but as you said in your e-mail,

24   the feet are out of proportion to the size of the body in

25   both; right?

Page 5680

1    A.   Yeah, though now looking at the real Glamma Jammaz, I

2    don't think -- I think she's wearing kind of platform shoes.

3    So I don't know if I would hold to that now that I see the

4    actual Mya doll.

5    Q.   Somewhat larger than natural size?

6            MR. NOLAN:  Objection, your Honor.  Ambiguous,

7    "somewhat larger."

8            THE COURT:  Sustained.

9    Q.   BY MR. QUINN:  The head is larger in comparison to the

10   size of the body?

11   A.   Yes, the head is over large.

12   Q.   And the eyes are larger?  Would you agree with that?

13   The eyes are larger?

14   A.   The doll is turning away after I started looking at her

15   to see if she had va-va-voom.

16   Q.   You can take it out if you'd like, or you can look at

17   the one on the screen.

18   A.   She doesn't have a lot of va-va-voom.

19   Q.   The eyes are larger than natural size.  Would you agree

20   with that?

21   A.   I don't think I would point that out.  I mean, looking

22   at this doll here, I wouldn't immediately say that, but I

23   mean that's something that you talked about maybe measuring.

24   That's something I might want to do on this doll to figure

25   that out.

1   Q.   You don't think the eyes are a little larger than

2   natural size?

3   A.   You know, the -- you know, my wife is Korean.  So she's

4   got smaller eyes than this.  I've seen bigger eyes.  It's not

5   something -- I would say they are larger.  They don't -- it

6   is not something that, as I look at this in its original

7   form, it's not something that strikes me.

8   Q.   Might be a little larger.

9   A.   Might be a touch larger, yes.

10  Q.   And the lips, little bit larger than --

11  A.   Actually, the lips on this, you know, I don't think her

12  lips have va-va-voom either.

13  Q.   All right.  Nobody said the lips had va-va-voom.

14  A.   I'm taking va-va-voom to mean larger.

15  Q.   The lips are a little bit larger than natural size.

16  Would you agree with that?

17  A.   I honestly don't think I would agree with that.

18  Q.   Okay.  But in any event, there were enough similarities

19  between what you saw on the screen, the Mya doll and the

20  Yasmin doll, that you felt comfortable sending that e-mail

21  and closing it with "don't test our resolve"; right?

22  A.   Yes, that's something I put in a lot of e-mails, don't

23  test my resolve.

24  Q.   And some of these similarities that we've talked about

25  are -- and that you identify in your e-mail are also true of

Page 5682

1   the images in Carter Bryant's drawings; correct?

2   A.   I'd have to look at the drawings.   But I know that they

3   had oversized heads.

4   Q.   Let's take a look at Exhibit 10-2.   Let's go back to the

5   Lupe drawing in evidence.   Some of those features that you

6   talked about, obviously the oversized eyes.

7   A.   I'm sorry.   Can you tell me which one is in the book?

8   Q.   Actually, I don't think it's in your binders.   Oh,

9   Volume 1.   10-2.   Thank you.

10  A.   Volume 1.

11  Q.   Volume 1.   Exhibit 10-2.   If you want to, you can find

12  it; otherwise, you can just look at it on the screen, if

13  that's okay.

14  A.   Okay.   This actually isn't -- these aren't particularly

15  good drawings.   Okay.   Yes.

16  Q.   All right.   So the -- some of these characteristics that

17  you wrote about in objecting to the Mya doll, those are

18  characteristics of the Carter Bryant doll drawings in terms

19  of the eyes, the lips, the oversized head, the oversized

20  feet; correct?

21          MR. NOLAN:   Objection, your Honor.   The e-mail

22  referenced the doll, the Bratz doll, not the drawings.   And

23  lack of foundation, and also irrelevant with respect to his

24  comparison.

25          MR. QUINN:   I'm asking a different question.

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5683

1       THE COURT:  Make it clear, Counsel.

2       MR. QUINN:  All right.

3   Q.   The characteristics that you identified in your letter

4   to Ms. Nishimoto at Bandai are things which are true of the

5   Carter Bryant drawings.  Specifically, the larger feet, the

6   larger head, eyes, lips; correct?

7   A.   Some, but you know, one of the things I point out is the

8   nose shape and unfortunately, I don't think this -- she

9   doesn't have a nose in the drawing.  So there were things

10  that are, yes, some are, and some aren't.

11  Q.   I mean there are similarities.  There are differences.

12  But it was close enough that you thought legally they should

13  stop making this product; correct?

14       MR. NOLAN:  Objection, your Honor.  Lack of

15  foundation as to whether or not he's talking about the

16  drawings or the Bratz dolls.

17       THE COURT:  Overruled.  You may answer.

18       THE WITNESS:  Yeah, I have the confusion because we

19  were talking about the drawings just a moment ago.  My

20  e-mail.  I didn't even have these drawings.  I'd never seen

21  them at the time I wrote this e-mail.

22  Q.   BY MR. QUINN:  I understand, but the similarities

23  between the Mya doll and the Bratz doll, Yasmin, were close

24  enough that you felt comfortable telling them don't test my

25  resolve.  Take this off the market.

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5684

1    MR. NOLAN:  Lack of foundation with respect to

2 referencing the doll.  He referred to the website.  The

3 question is a comparison of doll to doll.

4    THE COURT:  Right.  And I believe that's the

5 question you just asked.

6    MR. NOLAN:  But the lack of foundation, your Honor,

7 is that he didn't testify that he saw the doll.  He's talking

8 about --

9    MR. QUINN:  I'll rephrase my question.

10    THE COURT:  Very well.  I'll sustain the

11 foundation.  I understand your objection.

12 Q.  BY MR. QUINN:  The image that you saw on the website was

13 close enough to the Yasmin doll that you felt comfortable

14 enough saying take this off the market.  Don't test my

15 resolve; correct?

16 A.  Yes, I felt comfortable to take a legal position to ask

17 Bandai to take it off the market.

18 Q.  Based on the similarities that you identified.

19 A.  Based on the similarities in my e-mail, that was my shot

20 across their bow.

21 Q.  All right.  Changing subjects now.  Volume 1.  If you'd

22 turn to Exhibit 10234.  Do you recall a case filed -- this is

23 a case that was filed while you were there, I believe,

24 against a company called Uni-Fortune?

25 A.  Can you just give me a second here?  What notebook?

Page 5685

1  Q.   This is in Volume 1.  Actually, I think we spoke about

2  this when you were here before.

3  A.   Oh, back to that.

4  Q.   Exhibit 10234.

5  A.   Okay.

6  Q.   And this actually is in evidence.  If we could put this

7  on the screen.  10234-1.  This is a complaint -- I'm sorry.

8  It's page 39.  This is a complaint filed in Hong Kong in a

9  case MGA versus Uni-Fortune.

10          Do you see that?

11 A.   Yeah.

12 Q.   And you are general counsel or chief lawyer at MGA at

13 the time this case is filed; correct?

14 A.   Do you have a date for when this was filed?

15 Q.   It says October 16, 2003.

16 A.   Yeah, I believe at that point I had re-become general

17 counsel.

18 Q.   All right.  So this one is done on your watch, near as

19 you can recall.

20 A.   Yes.

21 Q.   And in this complaint, which is in evidence, what MGA --

22 MGA is objecting to a product called Glitter Girls.

23          Do you recall that?

24 A.   If that's what it says.

25 Q.   And if you would take a look at paragraph 4 at page dash

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5686

1    44.  At the bottom of 44.

2    A.    Exhibit 10234-A is what I have.

3    Q.    Just 10234.

4    A.    Okay.  I'm sorry.  Okay.

5    Q.    10234.

6    A.    Yep.

7    Q.    Dash 44 is the page.  And we're looking at paragraph 4

8    there at the bottom.

9    A.    Okay.

10   Q.    And what you allege in this complaint is that the

11   Glitter Girls are a -- are reproductions of or a reproduction

12   of a substantial part of said artistic works; right?

13   Referring to certain MGA artistic works; correct?

14   A.    That's what it says there.

15   Q.    All right.  And we can find out what artistic works are

16   referred to by going to paragraphs 41 and 42.  I'm sorry.

17   Paragraph 3 on page 41.  So three pages back.

18   A.    Okay.

19   Q.    And it there lists a number of artistic works.  The

20   first is the 18 design drawings of the Bratz fashion dolls.

21          Do you see that?

22   A.    Yes.

23   Q.    And then it goes on to list some other things.  Wax

24   models, and the next page, silicone rubber molds.  Four

25   drawings of facial decoration.  Eight drawings, four of which

Page 5687

1    are pantone color guides.  Four hand-painted Deco masters.

2              Do you see that?

3    A.   Yes.

4    Q.   And it identifies other people who worked on the Bratz

5    dolls.

6              Do you see that?

7    A.   Yes, I see those.

8    Q.   At G, it refers to Carter Bryant.  This is on page 42.

9    G.   Just down below.

10   A.   Yes.

11   Q.   It says Carter Bryant made design drawings.  And then on

12   the next page it talks about at the top, I, Margaret Leahy,

13   made certain artistic works, sculpts, and then after that, in

14   K, Jessie Ramirez did some silicone rubber molds.

15             Do you see that?

16   A.   Yes.

17   Q.   But it also says that all these people who did those

18   other things all went back and looked to Mr. Bryant's

19   original drawings for guidance; correct?

20             MR. NOLAN:  Objection, your Honor.  Lack of

21   foundation.

22             THE COURT:  Overruled.

23             THE WITNESS:  I'm sorry.  Where are you reading

24   this?

25   Q.   BY MR. QUINN:  Let's go to 13572.  This is not in

Page 5688

1    evidence.

2    A.    Okay.

3    Q.    And this is another pleading in this case that MGA has

4    brought against Uni-Fortune; correct?

5    A.    I guess, yeah, looks that way.

6             MR. QUINN:  I'd offer that in evidence, your Honor.

7    Exhibit 13572.

8             THE COURT:  Pursuant to the same procedure as

9    before?

10            MR. QUINN:  Yes, your Honor.

11            THE COURT:  Very well.  It's admitted.

12            (Exhibit 13572 received.)

13            MR. QUINN:  And if we could display that, your

14   Honor.

15            THE COURT:  You may.

16   Q.    BY MR. QUINN:  And this is something called an answer

17   for request for particulars.  I guess that's something they

18   do under Hong Kong procedure.  Do you know?

19   A.    I'm not conversant with Hong Kong procedure.

20   Q.    But if you look here at this answer to request for

21   particulars, it goes on to say, you know, it says particular

22   original works.  You're being asked some questions by the

23   defendant regarding these different works.  They are saying

24   they want some more information; right?

25            Why don't you take a moment to look at it.  They

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5689

1    list the works, and then if you go on to the next page,

2    13572-2, up at the top it says give full particulars.

3    A.    Okay.  I see that, yes.

4    Q.    All right.  So the defendant -- you brought a lawsuit

5    against Uni-Fortune, and they are saying -- you've listed all

6    of these artistic works.  Give us full particulars of all

7    facts and matters relied on in support of the allegation that

8    the said artistic works are original, including in

9    particular, they want to know the full particular of each and

10   every antecedent, design, product drawing, or article from

11   which the same was derived.  And it goes on.

12         And then in two little I's there, the full

13   particulars of the part or parts of each of the allegedly

14   original drawing, model, and sculpt relied on which were not

15   present in the antecedent designs.

16         Do you see that?

17   A.    I'm sorry.  I read ahead a little bit.  Where are we?

18   Q.    I've highlighted the language I wanted to call your

19   attention to.  But reading this and with your background in

20   copyright, you are understanding that they asked for some

21   particular information about are there some antecedents, from

22   previous designs, or are these original.

23         MR. NOLAN:  Your Honor, I'm going to object.  Lack

24   of foundation with respect to the issue of Hong Kong law and

25   the definition of these terms.

Page 5690

1          THE COURT:  Overruled.

2          THE WITNESS:  Can you read back the question,

3     please?

4     Q.   BY MR. QUINN:  In a nutshell, they are pointing to the

5     allegation in the complaint that these artistic works that

6     MGA identified in the complaint, they are pointing to the

7     allegation that those are original, and they are asking you

8     for some specific information about that claim.

9     A.   It appears to be like an Interrogatory.

10    Q.   Right.  And they are asking you for some information

11    about that claim that they are original.  Are there

12    antecedent works.  To what extent did these various artistic

13    works -- the drawings, the sculpts, the molds -- to what

14    extent did they rely on each other.  That's basically what

15    they are asking; right?

16    A.   It appears that way.  Let me see.  Yes, it looks like

17    that.

18    Q.   And then we have here, we have MGA's answer to this

19    inquiry about whether these all are original.  Just below

20    that, it says answer.  And what MGA says as far as the

21    plaintiff is aware, there are no antecedent designs,

22    products, drawings, or articles from which the artistic works

23    referred to in subparagraphs A, B, C, D, E, and F -- that's

24    that list we looked at before; right?  The drawings, the

25    molds, the sculpts, all the rest of it.

Page 5691

1          And it says the author of the artistic works

2     pleaded in subparagraphs B, D, E, and F of the particulars of

3     original works referred to the drawings in subparagraph A of

4     the particulars of the original works.

5          Do you see that?

6     A.   Yes, I do.

7     Q.   So what that tells us, subparagraph A is the drawings;

8     right?  The original Carter Bryant drawings.

9     A.   I believe that's correct.

10    Q.   And what that tells us is those other authors, the

11    authors of the mold, the sculpts, and the other things

12    referred to in B, D, E, and F, Ms. Leahy and Mr. Ramirez, in

13    doing their work, they referred to the drawings; correct?

14    A.   Correct.

15    Q.   And it was based on the drawings.

16    A.   It was --

17          MR. NOLAN:  Objection.  Mischaracterization of the

18    document in the pleading.

19          THE COURT:  It's a question.  You may answer.

20          THE WITNESS:  It says it was referred to.

21    Q.   BY MR. QUINN:  Right.  And I left out Ms. Rhee, the face

22    decoration.

23    A.   There were a number of people who worked on the dolls.

24    Q.   And she, the face decoration, the person responsible for

25    that, Ms. Rhee, also referred to the drawings?

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5692

1    A.    That's what the thing says, yes.

2    Q.    That's what MGA said when it went to court in Hong Kong

3    trying to enforce its legal rights; correct?

4    A.    Absolutely.

5    Q.    And so basically this is also telling us, among other

6    things, that there's no antecedent designs, no antecedent

7    designs that preceded the drawings.  The drawings are

8    original works; right?

9    A.    Correct.

10   Q.    So anyone who said that these drawings are not original

11   or that they are things that were already in the public

12   domain and are not unique, you know that's not correct;

13   right?

14   A.    Oh, no, that's everyone.  Now you're way off.  Because

15   when you have copyright, there are images -- like for

16   instance, the pictures have two legs.  Public domain.  You

17   know, they can't claim that.  So that's just an incorrect

18   statement.  I'm sorry.

19   Q.    Well, in terms of -- nobody can copyright the idea of a

20   human being with two legs.  That's your point?

21   A.    My point is there are certain things within the pictures

22   that would constitute scenes a faire.  You know, there are

23   things like that within a picture.  So there are unique

24   elements within the picture, and there would be things that

25   are not protected by copyright law.  But I'm sure you'll have

1    experts to testify on that.

2    Q.   Maybe.  Maybe not.  But in any event, what MGA told the

3    Court in Hong Kong was that there were no antecedent designs,

4    product, drawings, or articles from which Carter Bryant's

5    original drawings same from.

6    A.   Yes and no.  But yes.

7    Q.   Well, yes is what -- there are none.  Yes, there are

8    none is what you told the Court in Hong Kong; correct?

9    A.   But when you think about this in context, if you draw a

10   picture of a cow, it is a unique picture of a cow, but it's

11   based on a cow.

12   Q.   A four-legged animal?

13   A.   A four-legged animal, and you may have seen a cow that

14   has an ear that flops down and put it in yours.  It's still a

15   unique drawing, but it's based on a cow.  And in terms of a

16   drawing of Carter Bryant's drawings, you know, he has -- you

17   know, you have a muse.  That's what people talk about a muse.

18   You have things that come into your world that you then

19   express on the paper.

20          So to say there's no antecedent work, yes, that's

21   true for this particular thing, but it's all based on

22   everything that we live.  That's where our creativity comes

23   from.  So that's why -- I'm sorry.  I didn't mean to have

24   a -- my father was a novelist.  So I take these things

25   very --

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5694

1   Q.   All artists are influenced by things they see around

2   them in the world.

3   A.   Absolutely.

4   Q.   What you told the Court in Hong Kong is that there were

5   no antecedent designs, et cetera, for the Carter Bryant

6   drawings.  We can agree on that.

7   A.   We can agree on that.

8   Q.   And the reason why these other contributors --

9   Mr. Ramirez, Ms. Leahy, and Ms. Rhee -- would refer to the

10  drawings is because they would want the face paint and the

11  sculpt and the other things they do to look like the

12  drawings; right?

13          MR. NOLAN:  Objection.  Lack of foundation.  Calls

14  for speculation.

15          THE COURT:  Sustained as phrased.

16  Q.   BY MR. QUINN:  Well, this is an answer to a request for

17  particulars that was served by MGA at the time that you were

18  general counsel; correct?

19  A.   Correct.

20  Q.   All right.  Do you know of any reason why these folks

21  would refer to the drawings except to make sure that their

22  work looked like the drawings?  Can you identify any other

23  reason?

24  A.   I'm sorry.  I'm not quite getting what it --

25  Q.   Would the folks doing the decorations, the molds, and

Page 5695

1   the sculpts, would they refer to the drawings in order to

2   make sure it didn't look like the drawings in your

3   experience?

4   A.   No, no.

5   Q.   They would do it so --

6           MR. NOLAN:  Your Honor, I'm sorry.  May the witness

7   complete his answer?

8           THE COURT:  Fair enough.

9           THE WITNESS:  I mean, it was -- the drawings were

10  kind of -- as we were talking about muses, think of the

11  drawings as kind like the muse, does that help?

12  Q.   BY MR. QUINN:  They would refer to the drawings in order

13  to make sure that their work looked like the drawings.

14  A.   To get inspiration, to -- from the drawings, to, yeah, I

15  mean, the drawings in essence, as I saw them, were like a

16  muse for Paula and everyone who worked on them.

17  Q.   Did you ever talk to them about why they referred to the

18  drawings?

19  A.   No.

20  Q.   Okay.  Let's take a look at these Glitter Girls that you

21  indicate in the complaint filed while you were chief lawyer

22  at MGA.  You said they were reproductions.

23          If I may approach the witness, your Honor, with

24  Exhibits 13865.

25          THE COURT:  You may.

1    Q.    BY MR. QUINN:   We're going to start with photographs,

2    and this is in Volume 3, Mr. Kamarck.   If you wouldn't mind

3    juggling to another volume.

4    A.    All right.

5    Q.    Do you see, if you look at Exhibit 13865, and there's

6    actually several paragraphs of a Glitter Girl doll behind it.

7    A.    Okay.

8    Q.    Can you recognize these as images of the Glitter Girls

9    which were the subject of the lawsuit that was filed against

10   Uni-Fortune?

11   A.    No, I don't think these ever crossed my desk.

12   Q.    Are you saying that you simply can't recognize these as

13   the Glitter Girl dolls that were the subject of the

14   Uni-Fortune case?

15   A.    Yeah, I don't think, at the time that these came in,

16   that this would have crossed my desk.   At least -- I honestly

17   do not recognize these.

18   Q.    If you'd take a look at 13866.   Same question.   More

19   photographs.   Aren't these copies of the Glitter Girls which

20   were the subject of the Uni-Fortune case?

21   A.    This one I think I would have recognized, if I had seen

22   it before, because I think it's a rather unattractive doll.

23   I don't think I recognize this one.

24   Q.    Same with 13868?

25   A.    I don't think I recognize these.

Page 5697

1    MR. QUINN:  Your Honor, if I may approach the

2    witness with some demonstrative exhibits.

3    THE COURT:  You may.

4    Q.  BY MR. QUINN:  I've put before you three boxes with

5    dolls, and let me ask you if you can identify these as

6    Glitter Girls dolls which were the subject of the Uni-Fortune

7    case, which you said was a reproduction of a Bratz doll?

8    A.  I can tell you this one I've absolutely never seen,

9    because she looks kind of like a bride of Frankenstein.  I'd

10   remember that.  She's got a streak in her hair and stuff.  So

11   I've definitely never seen this one before.  The other two,

12   you know, I don't know.

13   Q.  You can't identify any of those as being the dolls that

14   were the subject of the lawsuit?

15   A.  No.  These are the same ones; right?  Except different

16   color shoes.

17   MR. NOLAN:  Your Honor, these are not in evidence.

18   MR. QUINN:  They are not in evidence.

19   THE COURT:  Don't show them to the jury yet.

20   Q.  BY MR. QUINN:  Can you describe for us the Glitter Girls

21   which Uni-Fortune made which would have caused them -- that

22   lawsuit to be filed?

23   A.  No, absolutely not.

24   Q.  All right.  Let's change subjects now, and let me ask

25   you about another case that MGA filed.  The case called

Page 5698

1   Double Grand.  Do you remember that there was a case brought

2   against a company called Double Grand?

3   A.    Name's familiar.

4   Q.    Let me just see if you could perhaps help us identify --

5   if we could first take a look at Exhibit 13862.  That's in

6   Volume 3.  13862.

7   A.    All right.

8   Q.    And this is another complaint filed in Hong Kong by MGA

9   against Double Grand Corporation.  Do you see that?  While

10  you were chief counsel, and filed by William Fan.

11  A.    I wasn't chief counsel then.

12  Q.    Were you with the company then?

13  A.    I was with the company then.

14  Q.    And William Fan was -- I think you've already indicated

15  he was MGA's Hong Kong lawyer?

16  A.    Correct.

17  Q.    This appeared to be a copy of the complaint filed

18  against Double Grand?

19  A.    It appears to be a copy of a complaint.  It looks like a

20  complaint, or as they say, statement of claim, I guess.

21         MR. QUINN:  We'd offer Exhibit 13862, your Honor.

22         MR. NOLAN:  Your Honor, subject to the same

23  procedures.

24         THE COURT:  Very well.

25         (Exhibit 13862 received.)

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5699

1    Q.    BY MR. QUINN:   If we could publish the first page so the

2    jury can see what we're referring to here.   And on page dash

3    5 of the complaint, paragraph 4, we have the allegation that

4    the defendants are selling fashion dolls known as Trendy

5    Teenz dolls, mini Trendy Teenz dolls, RockerHeads, bobble

6    head fashion dolls, and RockerHeads fashion doll, bobble pens

7    which are reproductions of or a reproduction of a substantial

8    part of said artistic works.

9          Do you see that?

10   A.    Yes.

11   Q.    And the artistic works referred to paragraph 3, page

12   dash 2, identifies the artistic works.   And we have the same

13   list that we just looked at, the models, silicone, rubber

14   molds, et cetera?

15   A.    Absolutely.

16   Q.    I want to see if you can help us identify what these

17   products were that were the occasion for this lawsuit.   If

18   you'd take a look at -- if you could look at 13862 --

19   Exhibit 13561.

20   A.    That's Volume 1?

21   Q.    Yes.   13561.

22   A.    Okay.

23   Q.    And dash 194.   Can you identify those images there of

24   mini Trendy Teenz as being products that you were suing on

25   here, Trendy Teenz?

Page 5700

1    A.   I have no recollection of these at all.

2    Q.   How about dash 208?  If you could just thumb forward a

3    few pages.

4    A.   I definitely have no recollection of this pen.  It's

5    quite amusing, but I have no recollection of that.

6    Q.   How about 210?

7    A.   Wow.  I like bobble heads.  I don't think I -- I've

8    never physically seen any bobble head like this.  Wow.  No.

9    Q.   But these are copies of the products that were included

10   in MGA's filings with the court in Hong Kong?

11   A.   I guess.  Is that what this big document is?

12   Q.   Yes.

13   A.   Wow.

14   Q.   Could you take a look at page 124 and see if that rings

15   a bell?

16   A.   No.

17   Q.   Don't recognize it?

18   A.   No, I'm sorry.  Don't recognize it.  Can I ask a quick

19   question out of curiosity?

20             THE COURT:  Let's not --

21             THE WITNESS:  I'm sorry.  I shouldn't be curious.

22   Q.   BY MR. QUINN:  You just don't remember what these

23   particular articles or dolls were that were the subject of

24   the Double Grand case.  Is that true?

25   A.   Yeah, they don't look like anything that crossed my

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5701

1    desk.

2    Q.    Okay.  Could you turn, then, to Exhibit 13784.  And

3    that's in Volume 3.

4    A.    Okay.

5    Q.    And do you recognize this as being another complaint

6    that MGA filed, this against Hung Lam Toys Company in

7    Hong Kong in July 2003?

8    A.    I'm not sure.

9    Q.    Do you see on page dash 8, it's again Mr. Fan has signed

10   the complaint?  Do you see that?

11   A.    Yeah, it's dated November.  You said -- what did you

12   say?

13   Q.    It's dated November 3, 2003.  I'm sorry.  It says the

14   writ issued July 22nd --

15   A.    Okay.  That's what was getting me.  Yes, I see this.

16              MR. QUINN:  We'd offer Exhibit 13784, your Honor.

17              MR. NOLAN:  Same procedure, your Honor.

18              THE COURT:  Very well.

19              (Exhibit 13784 received.)

20   Q.    BY MR. QUINN:  And page dash 4 and paragraph 4, it

21   identifies here that the defendant is making a doll called

22   Scampz, which it says, if we can put paragraph 4 on dash 4

23   are reproductions of or a reproduction of the substantial

24   part of the artistic works.

25              Do you see that?

Page 5702

1    A.    Yes, I see that.

2    Q.    And there are actually photos of this Scampz doll that

3    are included in the pleadings.   If you'd take a look at

4    paragraph 15.   I'm sorry.   13856.

5    A.    What paragraph do you want me to look at?

6    Q.    Look at paragraph 15.   And this is a witness statement

7    of Sanjay Vaswani that was also filed in the same case?

8    A.    Yes.

9              MR. QUINN:   We'd offer that exhibit, your Honor.

10             MR. NOLAN:   Subject to the same procedure, your

11   Honor.

12             THE COURT:   Very well.   It's admitted.

13             (Exhibit 13856 received.)

14   Q.    BY MR. QUINN:   And if you'd look at page dash 5.

15   A.    Looking at it.

16   Q.    And it identifies a catalog of Scampz dolls which are

17   the subject of the lawsuit.

18             Do you see that?

19   A.    Yes, I do.

20   Q.    And those are at pages 28 to 29.   13856, 28 to 29.   Do

21   you see those?

22   A.    Yes.

23   Q.    If we could put those up on the screen.   These are the

24   Scampz dolls that were sued on that we're looking at here,

25   page 28 and 29?

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5703

1    A.    I haven't seen these before.

2    Q.    But these are what the copies of the products that MGA

3    was trying to stop that were included in MGA's pleadings;

4    correct?

5    A.    You know, I'm looking at this declaration, and it's

6    December 15th, 2005.  So it's well after my time.  So I --

7    this is the first time I've seen this declaration -- the

8    first time I've seen these exhibits.

9    Q.    But these do appear in that declaration that was filed?

10   A.    Yeah, these do appear in this declaration.  But yeah, I

11   mean, I'm just having trouble because the declaration is --

12   it post dates my time at MGA.

13   Q.    And if you'd turn to paragraph 25 of that same

14   declaration.  It says that attached are some additional

15   copies of the Scampz dolls, which are at pages dash 33 to 38.

16   A.    I'm sorry.  Did you say paragraph 25?

17   Q.    Paragraph 25 at dash 9.

18   A.    Okay.  I have paragraph 25 on dash 8.  Are we looking at

19   13856-0008?

20   Q.    13856.  And then dash 0009.

21   A.    There happens to be two paragraphs 25.

22   Q.    There are two paragraphs 25.  The second one.

23   A.    The second one.  25-B.

24   Q.    All right.  You see that the declarant says attached are

25   some copies of these Scampz dolls.

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5704

1              Do you see that?

2    A.   Yes, I do see that.

3    Q.   And then we find those at pages 33 to 38.

4              MR. NOLAN:  Your Honor, there's no foundation that

5    he ever saw these before.  It's beyond the time that he was

6    there.

7              THE COURT:  Counsel, is there a challenge to the

8    authenticity?

9              MR. NOLAN:  No, your Honor.  This I'm just saying

10   for foundation purposes --

11             THE COURT:  Very well.  I understand.  I'll

12   consider that in any further questions.  Objection is

13   overruled at this point.

14   Q.   BY MR. QUINN:  If you'd turn to the pages 33.  If we

15   could publish these.  Those copies that are referenced of the

16   Scampz dolls that MGA sued on.  If we could just go through

17   one at a time.  33 to 39.

18             And those are what was alleged by MGA in this case

19   to be a reproduction of MGA's artistic works, according to

20   these pleadings?

21             MR. NOLAN:  Objection.  Calls for a legal

22   conclusion.

23             THE COURT:  Overruled.

24             THE WITNESS:  Yes.  This is my question.  We went

25   from a document that was in December --

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5705

1      THE COURT:  I'm sorry.  Let's have a sidebar.

2      (SIDEBAR CONFERENCE HELD.)

3      THE COURT:  We're right back to where we were

4  before lunch on the issue of row production.  Nothing's

5  changed.

6      MR. QUINN:  I thought this was different because

7  this was filed during the time that he was with the company.

8  This complaint is filed while he is an attorney there.

9      THE COURT:  But you still need to lay a foundation.

10  I don't know what this word reproduction means.  Now, perhaps

11  you can explore it with him, and if he filed this complaint

12  and used that word, then you can certainly get his

13  understanding of what that word means if there's a foundation

14  for doing it, but I'm no different than I was before lunch.

15      MR. QUINN:  Okay.

16      (CONCLUSION OF SIDEBAR CONFERENCE.)

17  Q.   BY MR. QUINN:  If we could go back to the statement of

18  claim in this case.

19  A.   Okay.

20  Q.   Exhibit 13784, at dash 4, paragraph 4.

21  A.   Yes.

22  Q.   It says that -- where MGA alleged that the Scampz which

23  are reproductions of or a reproduction of a substantial part

24  of the artistic works, what did you understand that to mean?

25  That's a phrase we've seen in several of these complaints.

Page 5706

1   A.   You'd have to ask William Fan.  I relied on him in terms

2   of the phraseology for Hong Kong actions.

3   Q.   Did you ever review any of the complaints before they

4   were filed?

5   A.   Normally I would actually -- I probably reviewed them

6   afterwards.  I'm trying to think here.  Hmm.  I would have

7   reviewed sections of the complaint.  I don't know if I would

8   have reviewed all of the complaint.  Probably just sections

9   because he'd already done a number of them beforehand.  So I

10  would have only reviewed the stuff that would be like the

11  more -- the allegations that were particular to the

12  particular case.

13  Q.   This is a phrase, reproductions of or a reproduction of

14  a substantial part, that we've seen in several of these

15  complaints; correct?

16  A.   Yes, you've read this to me, I think, four or five

17  times.

18  Q.   Did you understand that to mean basically that these

19  were copies, that they copied?  The defendant was copying

20  Bratz products?

21  A.   Well, even --

22          MR. NOLAN:  Objection.  Lack of foundation.

23          THE COURT:  Overruled.

24          THE WITNESS:  Even copies, I mean, even on their --

25  copying is an element of infringement.  So I would say yes,

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5707

1    that they were copying this.

2    Q.   So when you saw reproductions of or a reproduction of,

3    you understand in that sense that they were copying?

4    A.   Yes, but not in the sense like a xerox copy.  That there

5    were elements that were copied from it.  But again, I -- you

6    know, as this was Hong Kong law, I was not -- I was relying

7    on William Fan in terms of what was the test regarding

8    infringements and what was the language that was necessary to

9    basically plead that correctly.

10   Q.   We have a Scampz doll, Exhibit 13721.

11           If I may approach the witness, your Honor.

12           Does Exhibit 13721 appear to you to be a copy of

13   the Scampz dolls which were the subject of this case in the

14   MGA versus Hung Lam matter?

15   A.   Do you want to refer me to a particular picture?

16   Q.   Well, we looked at an Exhibit 13856-28, -29, and 33 to

17   38.

18   A.   I mean, the packaging is obviously identical except it

19   looks like there's some different wrapping around the ones

20   I'm looking at.

21   Q.   Mr. Kamarck, perhaps if you could look at page dash 29.

22   A.   29?

23   Q.   Yes, if you would.

24           If we could put that on the screen.  And enlarge

25   the ones in the box that says summer.

Page 5708

1          Does the Scampz doll 13721, does this appear to

2     correspond to one of these?

3     A.   The summer ones?

4     Q.   Yes.

5     A.   I mean, she's got a ponytail.  Do one of these have a

6     ponytail?

7     Q.   Can't see the back of their heads.

8     A.   I can see their hair over their shoulders, which means

9     to me that none of these have a ponytail.  And they are not

10    wearing the same clothing.  I mean, it's tough, obviously.  I

11    apologize.  It's tough trying to pick it off these pictures.

12    But --

13    Q.   Maybe the one in the upper left perhaps has a ponytail

14    that we can just see part of it on the crown of the head?

15    A.   Yeah, I wouldn't testify to that, let's say.

16              MR. QUINN:  Your Honor, I'd offer Exhibit 13721.

17              MR. NOLAN:  Lack of foundation, your Honor.

18              THE COURT:  Counsel, set forth your foundation.

19    Q.   BY MR. QUINN:  Do you have any reason to think that that

20    doll, Exhibit 13721, that that is not an exemplar of the

21    Scampz dolls that Hung Lam was making for the occasion of

22    that lawsuit?

23              MR. NOLAN:  Objection.  Lack of foundation for the

24    question.  Lay a foundation as to what he knows about it.

25              THE COURT:  Fair enough.  The year of the lawsuit

Page 5709

1    was 2003?

2              MR. QUINN:  Yes, your Honor.  November 2003.

3              THE COURT:  You may proceed, Counsel, with further

4    foundational questions.

5    Q.   BY MR. QUINN:  Do you see any -- can you recall any

6    difference between the doll that's been marked as

7    Exhibit 13721 and the doll that was the subject of the

8    lawsuit?

9              MR. NOLAN:  Objection.  Lack of foundation.  He

10   wasn't there at the time when the exhibits to this

11   declaration were filed.

12             MR. QUINN:  I'm just asking about the doll.

13             THE COURT:  At the time the lawsuit was filed.

14             Mr. Nolan?

15             MR. NOLAN:  I apologize, your Honor.  The

16   photograph, my understanding of the photograph is it's

17   attached to a document --

18             THE COURT:  That's not what when the lawsuit was

19   filed, though, was it?  That's the question as I understood

20   it?

21             MR. QUINN:  Right.

22             THE COURT:  Overruled.

23   Q.   BY MR. QUINN:  Any differences between the doll that was

24   the occasion of the lawsuit, the Scampz doll that resulted in

25   the lawsuit and what we've marked here as Exhibit 13721?

Page 5710

1   A.   From what I gather from the little parts that you showed

2   me, we may not have had a doll at the time.  It sounded like

3   we had a catalog that we relied on, and subsequently the

4   later declaration was when they had purchased it was after my

5   time.  That's my guess as to what happened is that they had a

6   catalog but not a doll at the time it was filed.

7   Q.   This doll is made by the company that MGA sued; isn't

8   that correct?

9   A.   Good question.

10  Q.   On the bottom?

11  A.   Does it say it on the bottom?  It has an import here.

12  Ackerman Group (phonetic).  Manufactured in China.  It

13  doesn't appear to have a -- unless Candies World is the

14  manufacturer.

15  Q.   But in any event, the name on the box is Scampz.

16  A.   The name is Scamps.

17  Q.   And before filing the lawsuit, you presumably did see

18  some images of the --

19  A.   Someone did.

20  Q.   Somebody, either you or somebody who reported to you who

21  was responsible for this?

22  A.   As of December, no, it would not have been someone that

23  reported to me.  It might have been someone else.

24       MR. QUINN:  Again, your Honor, we renew the offer

25  of the Exhibit, 13721, the doll.

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5711

1          THE COURT:   On the last product, there's not a

2     sufficient indicia on the product itself to satisfy the 902

3     requirements.   The foundational objection is sustained at

4     this time.

5     Q.   BY MR. QUINN:   All right.   If you'd take a look at

6     Exhibit 13856-33.   That's the witness statement we were

7     looking at a moment ago.   13856-33.

8     A.   I see it.

9     Q.   And Exhibit 13867 is a copy of the -- Exhibit 13867 is a

10    copy of that image of attached 33; correct?

11          MR. NOLAN:   Objection.   Your Honor, again, lack of

12    foundation.

13          MR. QUINN:   I'm just asking him to compare the two.

14          THE COURT:   Overruled.

15          THE WITNESS:   Yeah, I mean, it appears to be a

16    better photograph of the doll that's in the packaging on

17    13856.

18          MR. QUINN:   I'd offer Exhibit 13867, your Honor.

19          MR. NOLAN:   Your Honor, subject to its -- objection

20    as to the relevance, lack of foundation.

21          THE COURT:   You have to lay a further foundation,

22    Counsel.

23          MR. NOLAN:   Pardon me, your Honor?   All right.

24          MR. QUINN:   I'm sorry, your Honor?

25          THE COURT:   You have to lay a further foundation.

Page 5712

1    Q.   BY MR. QUINN:  If you'd compare the image of the doll

2    that's at 13856-33, which is the image of the doll that MGA

3    was suing over that's included in its papers.

4              Do you see that?

5              MR. NOLAN:  Objection, your Honor.  Again, I think

6    that's a mischaracterization, and lack of foundation for this

7    witness because of the date.

8              THE COURT:  With respect to the image on page

9    13856-33, it's overruled.  You may ask the question.

10   Q.   BY MR. QUINN:  I'm just asking you --

11             THE COURT:  You may answer the question.

12             THE WITNESS:  Okay.  I'm sorry.  What is the

13   question again?

14   Q.   BY MR. QUINN:  I'm asking you to compare the image of

15   the doll which was included in MGA's papers, which it filed

16   with the Court on the screen here, dash 33, to Exhibit 13867.

17   A.   Right.

18   Q.   And my question to you is does Exhibit 13867 appear to

19   you to be a better copy of the image that was in MGA's papers

20   that it filed with the Court?

21   A.   And I think what I said was it appears to be a nice

22   photograph of the doll outside the packaging.

23   Q.   Same doll.

24   A.   It appears to be, yes.

25             MR. QUINN:  All right.  So we'd offer that

Page 5713

1    photograph, your Honor, 13867.

2              THE COURT:  Any objection?

3              MR. NOLAN:  Lack of foundation, your Honor.

4              THE COURT:  Overruled.  It's admitted.

5              (Exhibit 13867 received.)

6              MR. QUINN:  And if I may approach the witness, your

7    Honor.

8              THE COURT:  You may.

9    Q.   BY MR. QUINN:  What I've handed you is a demonstrative.

10   Does that -- the doll I've handed you, does that appear to be

11   a copy of that same doll?

12   A.   In appears to be the doll that was pictured in 13867.

13   Q.   Okay.  And this is what MGA alleged in its complaint

14   was -- this is what MGA was trying to stop from being sold

15   by filing this lawsuit; correct?

16   A.   I don't know that.

17   Q.   This is -- this doll that I've handed you is the same

18   that was the basis for the lawsuit that was filed or one

19   similar to it?

20   A.   Again, the issue I have is that the complaint, as we

21   call it in the bill of particulars or whatever they call it

22   in Hong Kong, was there in December when I was no longer

23   acting as GC.  The image that you showed me was from a

24   declaration that was a couple years after I left.  So it's --

25   I'm going back with things that I have no personal knowledge

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5714

1    about.

2    Q.   So you're just not sure?

3    A.   I'm just not comfortable saying something that happened

4    after I left.

5    Q.   Let's go to another case, MGA versus --

6              THE COURT:  Counsel, why don't we go ahead and take

7    our afternoon break.

8              (WHEREUPON THE JURY WITHDRAWS.)

9              THE COURT:  Mr. Nolan and Mr. Quinn, if I could see

10   you briefly.

11             (Recess taken.)

12             (WHEREUPON THE JURY ENTERS.)

13             MR. QUINN:  May I proceed, your Honor?

14             THE COURT:  You may.

15   Q.   BY MR. QUINN:  Our last lawsuit.  If you could turn to

16   Exhibit 13785, which is in Volume 3.  Mr. Kamarck, does this

17   appear to be a copy of a complaint or a statement of claim

18   that MGA filed against a company called Union Top?

19   A.   Yes, it is.

20             MR. QUINN:  We'd offer Exhibit 13785, your Honor.

21             THE COURT:  Any objection?

22             MR. NOLAN:  Same procedure, your Honor.

23             THE COURT:  Very well.  It's admitted.

24             (Exhibit 13785 received.)

25   Q.   BY MR. QUINN:  And the defendant was making dolls, the

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5715

1    name of their doll, they called it fashion doll.

2              Do you recall that?

3    A.   Can you refer me to a paragraph?

4    Q.   Let's take a look at paragraph 8-H on dash 11.

5    Paragraph 4.

6    A.   I'm sorry.  What page?  13785-0011?

7    Q.   Dash 11.  Right.

8    A.   And what paragraph?

9    Q.   And you'll see in subparagraph H.

10   A.   Okay.

11   Q.   It says -- and then we've redacted some language there,

12   that the dolls are Slavish copies of the Bratz dolls.

13             Do you see that?

14   A.   Yes.

15   Q.   It's the allegation about these defendants' dolls?

16   A.   Yes.

17   Q.   And then we have an affidavit from -- actually, in

18   paragraph 34, it describes particular features.  That's on

19   dash 15.

20   A.   I'm sorry.  What paragraph are we looking at now?

21   Q.   If you could turn to 13725.  It's an affirmation of

22   Mr. Cheung.

23   A.   13725.  That's a big one.  Okay.

24   Q.   And does this appear to be another affirmation of

25   Mr. Cheung that was filed, this one in the Union Top case?

Page 5716

1    A.    Yeah.  It looks like it was filed in August of 2003.

2    Q.    And if you'd turn to page dash 15 of this document.

3    A.    Okay.  Paragraph?

4          MR. QUINN:  I'd offer this, your Honor.

5    Exhibit 13725.

6          THE COURT:  Any objection?

7          MR. NOLAN:  Same procedures, your Honor.

8          THE COURT:  Very well.  Admitted.

9          (Exhibit 13725 received.)

10   Q.  BY MR. QUINN:  And if we could turn to dash 15 at the

11   bottom of the page, it says there that -- I call your

12   attention to that last paragraph.  These dolls that it said

13   were Slavish copies, Mr. Cheung says in his affirmation,

14   most, if not all, the prominent features of the Bratz dolls

15   were taken collectively.

16          Do you see that?

17   A.    I do.

18   Q.    And it refers to the name fashion doll?

19   A.    It says fashion doll in quotes.

20   Q.    Which is apparently what the defendant called their

21   doll; right?

22   A.    Apparently.

23   Q.    And if you'd turn to paragraph 42 of this same document,

24   dash 18 to 19.

25   A.    Yes.

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5717

1  Q.   It particularizes what particular features were taken,

2  and it says the oversize head, the facial decoration, and

3  then the next page, the oversized eyes, the diminished nose,

4  the protrusive and defined mouth, the multi-colored makeup,

5  the few and exaggerated eyelashes, the two-toned lipstick,

6  the disproportionately large feet and shoes, and the snap-on

7  shoes.

8           Do you see that?

9  A.   I do see that.

10  Q.   Let's take a look at these dolls which were Slavish

11  copies.  If you'd turn to Exhibit 13725 at dash 176.

12  Mr. Cheung attaches some photocopies which unfortunately

13  aren't very good.  Do you see that, sir?  These are terrible

14  copies.

15  A.   Yeah.  They should buy American.

16  Q.   And dash 183.  There's a number of photocopies here.

17  But we'll try to look at the ones that you can see best.

18  Dash 183, dash 185.

19  A.   Wow.  Okay.

20  Q.   And dash 186.

21  A.   Okay.

22  Q.   Those were the fashion dolls that MGA contended were the

23  Slavish copies of the Bratz -- correct? -- according to these

24  pleadings.

25  A.   Yes, these appear to be exhibits.

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5718

1   Q.   Now, are you aware at any time in any of the lawsuits

2   that MGA filed, that prior to this case, that MGA to your

3   knowledge ever told a court that Mr. Bryant's drawings were

4   not original or unique?  Are you aware of MGA ever taking

5   that position prior to this case?

6   A.   That they weren't original or unique?

7   Q.   Yes.

8   A.   That he wasn't the creator of a unique piece of work?

9   Q.   Are you aware of any occasion where MGA in any lawsuit,

10  excluding this lawsuit, ever told a court that Mr. Bryant's

11  drawings were not original or were unprotectable?

12  A.   No, I'm not aware of that.

13  Q.   Or that -- are you aware of any occasion prior to this

14  lawsuit where MGA ever told any court that any aspect of

15  Mr. Bryant's drawings were not original or not protectable?

16  A.   I'm not aware of that statement ever being made.

17  Q.   And then finally, if you could take a look at

18  Exhibit 13691, which is in Volume 1, which is an affirmation

19  of Mr. Cheung in the Double Grand case.

20  A.   I'm sorry.  Can you repeat the number?

21  Q.   The number is 13691.  It's another fat one.

22  A.   Ah.

23  Q.   Mr. Cheung does long affirmations.

24  A.   Must be the Hong Kong way.

25  Q.   Can you identify Exhibit 13691 as being an affirmation

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5719

1   of Mr. Cheung that was filed by MGA in the MGA versus Double

2   Grand case?

3   A.   I'm not sure I was involved with this particular one.

4   It's during the middle portion of when I was at MGA.

5   Q.   But looking at this, you don't have any doubt that this

6   is an affirmation that Mr. Cheung signed and that was

7   submitted in this case?

8   A.   No, I would assume it was submitted in this case.  It's

9   definitely signed.  There's a notary or something in here.

10             MR. QUINN:  I'd offer Exhibit 13691, your Honor.

11             THE COURT:  Pursuant to the same procedure?

12             MR. NOLAN:  The same procedure.

13             THE COURT:  Very well.  It's admitted.

14             (Exhibit 13691 received.)

15   Q.   BY MR. QUINN:  If you'd turn, please, to paragraph 9 of

16   Mr. Cheung's affirmation.  That's at dash 4.  It's true,

17   isn't it, that because of the success of the original Bratz

18   dolls and the subsequent Bratz dolls, that MGA, because of

19   that, was able to sell accessories relating to the Bratz

20   dolls and the Bratz brand; correct?

21             MR. NOLAN:  Objection, your Honor.  Lack of

22   foundation.

23             THE COURT:  Sustained.

24   Q.   BY MR. QUINN:  Do you know whether or not, because of

25   the success of the Bratz dolls, MGA was able to sell

Page 5720

1    accessories?

2    A.   Um, yeah, I mean, I knew that they sold accessories, but

3    I don't, you know, I don't know when they first started on

4    the market.  So -- and whether that was part of success.

5    Q.   Let's take a look at the last sentence of

6    Mr. Cheung's -- in this paragraph here.  And then I'm going

7    to ask if you agree or disagree with this.

8         Mr. Cheung says that the success of the Bratz dolls

9    ensured a lucrative business of supplying accessories to the

10   owners of Bratz dolls, creating a steady stream of revenue.

11        Do you see that?

12   A.   I do see that.

13   Q.   Do you disagree with that statement?

14   A.   He would know better than I.

15   Q.   And then if we look at paragraph 25 at dash 10 of

16   Mr. Cheung's statement, he says:  "A major source of revenue

17   generated by the Bratz dolls is income derived from

18   merchandising rights by granting nonexclusive licenses to

19   other companies worldwide."

20        Do you see that?

21   A.   I do.

22   Q.   Do you agree that that was a major source of revenue

23   generated by the Bratz dolls that MGA could do licenses for

24   things like flip-flops, backpacks, beauty kits, you know,

25   bicycle helmets and things like that?  Was that a major

Page 5721

1   source of revenue?

2   A.   I know that there was a substantial amount of licensing.

3   I don't -- I never saw any revenue figures.  So I can't say

4   whether it's a major source.  It was a source of revenue.  I

5   know that.

6   Q.   All right.  But whatever the amount was, would you agree

7   that that licensing revenue was revenue generated by the

8   Bratz dolls?

9   A.   It was generated by the Bratz brand overall.  You know,

10  which was germinated somewhat by the dolls.

11  Q.   Germinated somewhat.  It started with the first

12  generation of Bratz dolls; correct?

13  A.   And then how it was branded and how it was marketed and

14  how it was developed by -- by a variety of people.

15  Q.   It started, the beginning of that was the Bratz dolls.

16  A.   Yeah.

17              MR. QUINN:  Thank you.  Nothing further.

18                      CROSS-EXAMINATION

19  BY MR. NOLAN:

20  Q.   Mr. Kamarck, I want to -- good afternoon.  I want to

21  take you back to something Mr. Quinn was asking you a minute

22  ago as to whether or not you are aware of any filing in

23  Hong Kong where MGA denied that Carter Bryant's drawings were

24  original or protectable.

25              Do you remember that question?

Page 5722

1  A.   Yes, I do.

2  Q.   One of my questions is this:  You testified earlier that

3  you are an attorney; correct?

4  A.   Correct.

5  Q.   And you have copyright experience?

6  A.   I do.

7  Q.   And you identified this area that we're located in as

8  being in the Ninth Circuit; correct?

9  A.   Correct.

10 Q.   Okay.  Is Hong Kong in the Ninth Circuit?

11 A.   No.

12 Q.   Okay.  Do you recall -- I've been on the stand for

13 approximately three hours.  Has Mr. --

14 A.   I can say yes, I've been on the stand about three hours.

15 Q.   I apologize.  Has Mr. Quinn shown you any pleading filed

16 in Hong Kong where MGA attempted to filter out protectable

17 elements in any of Carter Bryant's copyrighted drawings?

18 A.   No.

19 Q.   Have you seen any pleadings, were any pleadings shown to

20 you by Mr. Quinn where MGA was taking a position as to what

21 relative value to the overall success of the Bratz brand

22 Carter Bryant's drawings were?

23 A.   No.

24 Q.   In fact, do you recall ever being shown a document by

25 Mr. Quinn which attempted to place a value, if you would, on

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5723

1    the Bratz brand versus Carter Bryant's concept drawings?

2    A.   No.

3              MR. QUINN:  Vague and ambiguous, your Honor.

4              THE COURT:  Rephrase it, Counsel.

5    Q.   BY MR. NOLAN:  Do you recall in any of the pleadings

6    filed in Hong Kong ever seeing where MGA took a position

7    expressing a value assigned to Carter Bryant's concept

8    drawings in relationship to the actual Bratz drawings?

9              THE COURT:  Counsel, I don't really understand the

10   question.  A value of the dolls?

11             MR. NOLAN:  Of the drawing itself.  I'll rephrase

12   it.

13             THE COURT:  You're going to have to separate those

14   out.

15             MR. NOLAN:  I'm sorry.

16   Q.   I want to focus for a moment on the drawings.

17   A.   Okay.

18   Q.   Is it not true that of all the lawsuits that you were

19   shown by Mr. Quinn today filed in Hong Kong, nowhere in any

20   of those lawsuits was there an attempt by MGA to identify

21   what contributing factor Mr. Bryant's drawings were in fact

22   to the development of the Bratz brand?

23             MR. QUINN:  Lacks foundation.

24             THE COURT:  Sustained.  It's the same objection

25   that you made.  Sustained.

Page 5724

1    Q.   BY MR. NOLAN:  Well, as general counsel in reviewing the

2    pleadings -- and I'm not now asking you to talk about the

3    business operations of MGA.  I'm just simply focused on the

4    legal documents that were presented to you by Mr. Quinn while

5    you were general counsel of MGA -- do you recall in any of

6    those pleadings whether or not there was any position taken

7    by MGA concerning the relative value the Carter Bryant

8    drawings had to the development of and success of the Bratz

9    brand?

10   A.   No.  I don't recall that being in any of the pleadings.

11   Q.   Could you pull Trial Exhibit 13707 in front of you.

12   A.   Okay.

13   Q.   You recall that Mr. Quinn showed this document to you,

14   this is the affirmation of Lee Cheung filed in Hong Kong;

15   correct?

16   A.   Yes.

17   Q.   And Mr. Quinn directed your attention to the statement

18   of claim filed in this case which referred to Carter Bryant's

19   drawings; is that correct?  That would be Exhibit 13705 A.

20        Do you have that in front of you?

21   A.   Yep.

22        MR. NOLAN:  Your Honor, this is in evidence.  Could

23   I have the front page.  This is a statement of claim.

24   Q.   This is a statement of claim filed on behalf of MGA;

25   correct?

Page 5725

1    A.    Correct.

2    Q.    And then Mr. Quinn directed your attention to

3    paragraph 3-A, which were 17 design drawings of various

4    fashion dolls made between the years 1998 and 2000.

5              Do you see that?

6    A.    Yes.

7    Q.    And do you recall that Mr. Quinn asked you, isn't it

8    true that that lawsuit was based only on those drawings;

9    correct?

10   A.    Yeah, I remember him asking me that.

11   Q.    And then I recall your testimony, you said that's not

12   your understanding of how Mr. Fan prosecuted these cases?

13   A.    Correct.

14   Q.    Could you expand on that for me?

15   A.    It was always my understanding, because of what he had

16   on hand and my conversations, that he was basing the lawsuits

17   on, you know, the dolls in particular.  You know, we always

18   talked about dolls and comparisons of dolls --

19              MR. QUINN:  Your Honor, I object to testifying

20   about a privileged communication when a privilege has been

21   asserted.

22              THE COURT:  Counsel, are we waiving privilege?

23              MR. NOLAN:  I was just trying to follow up on a

24   question that Mr. Quinn had asked, but we're not --

25              THE COURT:  That's fine.  But I'm talking about the

Page 5726

1    privileged communication that is now being recounted.  Are we

2    waiving privilege?

3         MR. NOLAN:  No, your Honor, I'll withdraw the

4    question and ask it a different way.

5         THE COURT:  Very well.

6    Q.   BY MR. NOLAN:  Could I ask you to look at 13707-110.

7         Do you see that?

8    A.   I'll be there in a moment.

9    Q.   It should be 13707-0110.

10   A.   Okay.

11   Q.   And do you recognize this as part of the same

12   affirmation that Mr. Quinn was showing you?

13   A.   Yes.

14        MR. NOLAN:  Your Honor, I'd like to have 0110

15   published.

16        THE COURT:  You may.

17        MR. NOLAN:  Thank you.  May we have the lights

18   turned down a little bit?

19        THE COURT:  Yes.

20        MR. NOLAN:  Thank you.

21   Q.   Now, this is actually a photocopy of the eBay listing

22   regarding the sale of the item in issue; correct?

23   A.   Correct.

24   Q.   Do you see the description there as Funky Tweens

25   Brittany Bratz-like doll?

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5727

1   A.   Yes.

2   Q.   And right below that there are two more listings showing

3   the price of $15 each for Funky Tweens Emily and Funky Tweens

4   Alyssa, and the person listing these for sale on e-mail were

5   describing them as Bratz-like dolls; correct?

6   A.   Correct.

7   Q.   And if I could ask you to look at 112, which is another

8   photocopy of an eBay listing.  And under description, a list

9   of Bratz-like doll NIB.

10         Do you know that the term NIB, or acronym, refers

11  to New In Box?

12  A.   I didn't know that.

13  Q.   In any event, do you remember ever authorizing Funky

14  Tweens or anybody to describe a Funky Tweens as a Bratz-like

15  doll?

16  A.   No.

17  Q.   So this again is an exhibit that was attached in

18  Hong Kong?

19  A.   Correct.

20  Q.   And this is a description of the Funky Tweens doll to a

21  Bratz doll; correct?

22  A.   Yes.

23  Q.   And again, could we just look at -- go to page 0115 of

24  13707 just for a moment.

25  A.   Okay.

Page 5728

1    Q.   Again, this is an exhibit that's attached to the

2    document filed as part of the affirmation in Hong Kong;

3    correct?

4    A.   Yes.

5    Q.   All right.  And again, under the description, you see

6    Funky Tweens, Emily Bratz-like doll NIB?

7    A.   Yeah, new in box.

8    Q.   I think that's what it stands for.  I didn't mean to

9    testify.  But in any event, can you now turn to 117.

10   A.   Yes.

11   Q.   Again, do you see this is a copy that was attached to

12   the affirmation filed in Hong Kong where the description is a

13   Bratz-like doll describing the doll as a Funky Tweens?

14   A.   Yes, I see that.

15   Q.   And 118, the next page over.  Do you see that?

16   A.   Yes.

17   Q.   Similar copy of an eBay listing where the seller is

18   listing Funky Tweens Brittany Bratz-like doll?

19   A.   Yes.

20   Q.   Do you see that?

21   A.   I see that.

22   Q.   And again, the last one I want to show you in this

23   sequence would be 121.

24   A.   Okay.

25   Q.   Of this affirmation.

Page 5729

1    A.    Okay.

2    Q.    Again, the seller was listing this Funky Tweens doll

3    which was the subject of the litigation in Hong Kong as

4    Brittany Bratz-like doll; correct?

5    A.    Correct.

6    Q.    Now, in all of these, just to be clear, did you ever

7    authorize or do you know of any instance where MGA had

8    authorized Funky Tweens or anybody to be describing Funky

9    Tweens as being a Bratz-like doll?

10   A.    No.

11   Q.    Now, I want to turn, again, still in the same

12   affirmation.  This is in the same lawsuit in Hong Kong.

13   Again, to 0129.  And if you're on the same page, it appears

14   to be a letter on the letterhead of William Fan.

15   A.    Yes, I see this.

16   Q.    And this is in the Cityworld Limited litigation;

17   correct?

18   A.    I'm sorry.  What?

19   Q.    This is in the Cityworld litigation?

20   A.    Yeah, I believe that's -- yes.

21   Q.    Just to put this into context, this was the litigation

22   where Mr. Quinn had pointed to the statement of claims as

23   only referring to Mr. Bryant's drawings as the artistic

24   works.

25             Do you recall that?

Page 5730

1    A.    Yes.

2    Q.    All right.  Now, this letter is attached as part of the

3    affirmation and was filed in Hong Kong; correct?

4    A.    Correct.

5    Q.    And this is a letter --

6          Your Honor, this is in evidence by the procedure

7    we're outlining.

8          This is a letter by Mr. Fan to City World and dated

9    May 27, 2002; correct?

10   A.    I see that.

11   Q.    I just want you to keep your finger there for a moment,

12   Mr. Kamarck.  Go back to the original statement of claims,

13   Exhibit 13705.  The one Mr. Quinn showed you.

14   A.    Okay.

15   Q.    And looking at page 13705-0009, the date of this is what

16   date?

17   A.    July 3rd, 2002.

18   Q.    Okay.  So that's the date of the claim that's filed;

19   correct?

20   A.    Correct.

21   Q.    Now, we've been looking at the letter that I've asked

22   you to take a look at from Mr. Fan to City World Limited.

23   And the date of this letter is May 27, 2002; correct?

24   A.    Correct.

25   Q.    Okay.  So it's true that before the statement of claim

Page 5731

1    is filed, Mr. Fan had sent a letter on behalf of MGA to City

2    World limited at an address in Hong Kong; correct?

3              MR. QUINN:  Lacks foundation, your Honor.

4              THE COURT:  Lay a further foundation for that,

5    Counsel.

6    Q.   BY MR. NOLAN:  During this period of time, you were --

7    were you counsel in May of 2002 for MGA?

8    A.   I don't believe so.

9    Q.   Okay.

10             In any event, the document and the affirmation is

11   in evidence, your Honor.

12             I would just ask Mr. Kamarck if he could just read

13   a sentence that is contained in the letter that's submitted

14   in Hong Kong.

15   A.   Okay.

16   Q.   Mr. Kamarck, just asking you to go down to one, two,

17   three, four, five.

18   A.   Okay.

19   Q.   And you see, could you read that sentence?

20   A.   Sure.  "It has come to our clients' attention that you

21   have been advertising, promoting, selling, or offering for

22   sale, manufacturing and/or otherwise dealing with a series of

23   dolls called Funky Tweens, the designs of which and of their

24   accessories and packaging are substantially similar to MGA's

25   Bratz dolls and their accessories and packaging.  Copy of an

Page 5732

1    extract of your catalog of such dolls is also enclosed

2    herewith and marked B."

3    Q.   You didn't see any reference to Carter Bryant's

4    drawings?

5    A.   No, I didn't.

6    Q.   I want to go to the last subject, which is the Bandai

7    e-mail that you sent.

8    A.   Yes.

9    Q.   For your reference, Mr. Kamarck, it's 13730.  And this

10   is Volume 3.

11   A.   13730?

12   Q.   Yes.

13   A.   I've got it.

14   Q.   You recognize this.  This is in evidence.  So could we

15   have this on the screen.

16          This is the e-mail that you sent on behalf of MGA;

17   correct?

18   A.   Correct.

19   Q.   And this is sent regarding Glamma Jammaz; is that

20   correct?

21   A.   Yes, it looks like it.

22   Q.   Now, Cynthia Nishimoto, what was her position at Bandai?

23   A.   She was legal.  She was a connection to the licensing

24   group, as I recall.

25   Q.   Was Bandai at this time a distributor for MGA of the

Page 5733

1   Bratz dolls?

2   A.   I believe that is correct.

3   Q.   Now, the first paragraph, you say:  "As discussed, MGA

4   maintains that the overall look and feel of the Glamma Jammaz

5   dolls are substantially similar to the Bratz dolls.  It is

6   clear to MGA that Bandai use the Bratz dolls as a model for

7   their Glamma Jammaz dolls and copied the detail down to even

8   a birthmark in the identical spot on your Mya doll as our

9   Yasmin Bratz."

10  A.   Yes.

11  Q.   "As you know, the fact your doll has such an identical

12  mark is convincing evidence of copying, if not copyright

13  infringement."

14  A.   Correct.

15  Q.   What I was curious about is can you explain the

16  distinction that you're making between copying and copyright

17  infringement?

18  A.   Yeah, when you get into copyright infringement, if there

19  is something that is identical between two works, take, for

20  instance, a book, and you have a passage that is identical,

21  sometimes a defendant will say I didn't have access to your

22  work.  I wasn't actually using your work.  I did this all

23  independently.  So when you have something that is identical,

24  I'm missing the phrase that they have for this, but it's --

25  strikingly similar, that means that the person who had it had

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5734

1    access to your work, which is one of the elements of

2    copyright infringement, is access.  You can copy someone

3    else's work and not --

4              MR. QUINN:  Your Honor, I object.  Legal opinions.

5              THE COURT:  Sustained.

6    Q.  BY MR. NOLAN:  Mr. Quinn --

7              THE COURT:  For the jury's benefit, the Court will

8    be instructing the jury on the law on copyright that you need

9    to make decisions in this case.

10             You may proceed, Counsel.

11   Q.  BY MR. NOLAN:  You, I think, described this letter as a

12   shot across the bow?

13   A.  Yes.

14   Q.  In your position as counsel at MGA, did you think it was

15   one of your responsibilities to aggressively protect the

16   mark?

17   A.  Correct.

18   Q.  And to protect the copyright aspects of the Bratz dolls?

19   A.  Yes.

20   Q.  Now, as I understand it, you never filed a lawsuit or

21   authorized the filing of a lawsuit on behalf of MGA against

22   Bandai arising out of this particular doll; correct?

23   A.  Correct.

24   Q.  And Mr. Quinn showed you two exhibits and asked you to

25   make a comparison.  One was 13732 and 13901.

Page 5735

1   A.    Okay.

2   Q.    Now, as I understand your testimony with respect to the

3   doll depicted on the left, that's --

4   A.    We're not going to start talking about wa-wa-san, are

5   we?

6   Q.    That's not on my hour.

7   A.    Okay.  Go.

8   Q.    This photograph that's depicted on the left, if I

9   understand correctly, when you wrote the e-mail, you were

10  writing based on a picture on a website; correct?

11        MR. QUINN:  Your Honor, this is leading.  They

12  represent him.

13        THE COURT:  Sustained.

14  Q.    BY MR. NOLAN:  Mr. Kamarck, when you wrote the e-mail

15  complaining to Bandai, what were you relying on in making

16  your observations?

17  A.    My recollection is that someone had sent me a link to a

18  website, whether it was a Bandai website or it might have

19  been one of the eBay things that people are always looking

20  on, and that that's what I was looking at, is a picture.  I

21  think it was on the Bandai website.  Though I'm not 100

22  percent certain of that.

23  Q.    Now, comparing the two photographs depicted on the

24  screen right now, and especially the birthmark itself, would

25  you describe the location of the birthmark as being

Page 5736

1    identical?

2    A.    You know, now that I saw the actual doll, I think I

3    pointed out before it's not an identical position.

4    Q.    Now, I know that you did not file a lawsuit based on

5    this, but now looking at the comparison and having the actual

6    doll in your possession, is it your view that you would have

7    authorized a lawsuit against Bandai alleging substantial

8    similarities between the Bratz doll and this doll?

9              MR. QUINN:   Your Honor, this calls for speculation.

10             THE COURT:   You'll have to lay more foundation or

11   rephrase the question.

12   Q.    BY MR. NOLAN:   Now that you have what is represented to

13   be a 3D model, the doll itself, and now comparing it to the

14   Bratz dolls, would you have filed the lawsuit contending that

15   they were substantially similar?

16             MR. QUINN:   Same objections, your Honor.

17             THE COURT:   It sounds like speculation, Counsel.

18   Q.    BY MR. NOLAN:   Do you believe that there is a

19   substantial similarity between the 3D doll and the Bratz

20   doll?

21             MR. QUINN:   Objection.   Legal opinion.

22             THE COURT:   Sustained.

23   Q.    BY MR. NOLAN:   Just as a lay observer, do you think that

24   there are substantial dissimilarities between the 3D doll

25   marked as the Glamma Jammaz doll and the Bratz dolls?

Page 5737

1    A.   Yeah, mainly, you know, having looked at the actual

2    doll, there are definitely a number of pointed

3    dissimilarities.

4    Q.   Do you recall being shown a document by Mr. Quinn, filed

5    in Hong Kong, stating words to the effect that certain

6    employees at MGA, including Margaret Leahy and Anna Rhee,

7    referred to Mr. Bryant's artistic works?

8            Do you recall that?

9    A.   I do.

10   Q.   And I believe that that's Exhibit No. 10234, which

11   should be in 3.

12   A.   10234?

13   Q.   Yes.  And in particular, page -- I think it's 42 and 43.

14   A.   I'm sorry.  I'm still looking for the exhibit.  Okay.  I

15   found the exhibit.  Which page are we looking at?

16   Q.   Directing your attention to paragraph 43.

17   A.   Okay.  We're on Exhibit 10234?

18   Q.   10234, yes.

19   A.   Okay.  And we're looking at page?

20   Q.   0043.

21   A.   Okay.

22   Q.   You see where it says Margaret Leahy was commissioned by

23   the plaintiff to make the artistic works referred to in

24   subparagraph B hereof?

25            Do you see that?

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5738

1    A.    Yes, I do.

2    Q.    Now, just going back to Paragraph B, and Paragraph B is

3    wax models of the head, body, and shoes of the Bratz fashion

4    dolls?

5    A.    Yes.

6    Q.    Come back to 43 and see what it actually says.

7    "Margaret Leahy, hereinafter referred to as Ms. Leahy, was

8    commissioned by the plaintiff to make the artistic works

9    referred to in subparagraph B hereof."

10          Those are the wax models of the head, body, and

11   shoes.  Do you see that?

12   A.    Yes, I do.

13   Q.    Do you see anything in this pleading, Mr. Kamarck, where

14   MGA was taking the position that Margaret Leahy did an

15   identical duplication of the 2D Carter Bryant drawings when

16   she did the final 3D Bratz model?

17   A.    No.

18          MR. NOLAN:  Nothing further.

19          MR. QUINN:  Nothing further, your Honor.

20          THE COURT:  Very well.  You are excused.  Thank

21   you.

22          Plaintiff's next witness.

23          MR. QUINN:  The next witness is Daphne Gronich.

24          THE CLERK:  I just want to remind you that you are

25   still under oath, having been previously sworn.

Page 5739

1          DAPHNE GRONICH, PREVIOUSLY SWORN.

2                   DIRECT EXAMINATION

3   BY MR. QUINN:

4   Q.   Good afternoon, Ms. Gronich.   On the floor behind you

5   should be two binders.

6   A.   No.

7          THE CLERK:   Oh, did I pick them up?   I did.

8   Q.   BY MR. QUINN:   Now, we've heard your testimony before.

9   You were the chief attorney at MGA from about December 2003

10  to November 2007.   Is that roughly correct?

11  A.   That's roughly correct.

12  Q.   I'm sorry?

13  A.   Yes, it is.

14  Q.   There was -- one of the lawsuits that was pending when

15  you became the chief lawyer at MGA was a case involving

16  Cityworld in Hong Kong; correct?

17  A.   That is correct.

18  Q.   And if you can take a look at Exhibit 13705.   That's in

19  Volume 2.   This is in evidence.   And if I could ask you,

20  please, to turn to -- well, let's first look at the first

21  page, 13705-1.   This is the original statement of claim that

22  was filed in Hong Kong in the Cityworld case.   And that was

23  filed before you joined MGA; correct?   It was filed in July

24  2003, I believe.   I'm sorry.   2002.

25  A.   Yes, it says July 2002.

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5740

1   Q.   And if you'd look at page 13705-2, you will see there in

2   paragraph 3-A MGA in the original complaint identified the

3   MGA artistic works that were being sued on.

4            Do you see that?

5   A.   Reading it out of context, I can't say that that's

6   what's being sued on.  I think it justifies original artistic

7   works.

8   Q.   And the original artistic works it identifies are 17

9   design drawings of various fashion dolls; correct?

10  A.   That is what it says, yes.

11  Q.   And below that, if we could just scroll down a little

12  bit, Ken.  It goes then into particulars of ownership and

13  subsistence and talks about Mr. Bryant, et cetera.

14           Do you see that?

15  A.   Yes.

16  Q.   All right.  Now, after that, after that Cityworld case

17  was started where MGA brought this suit on the 17 drawings,

18  Mattel brought this suit where Mattel claimed that it owned

19  the very drawings that MGA was saying was the basis of its

20  suit against Cityworld; correct?

21  A.    I don't know if that's actually correct in terms of my

22  understanding.  My understanding is MGA -- Mattel sued Carter

23  Bryant.  I don't know that I recall any specifics about any

24  design drawings or drawings in particular in connection with

25  the actual lawsuit.

Page 5741

1    Q.   Well, there was for sure a suit against Mr. Bryant.  But

2    you are aware that Mattel brought claims against MGA.  That's

3    why we're all here.  You know that.

4    A.   Yes, I do.

5    Q.   And you know that one of the claims that Mattel asserted

6    was that it owned these very drawings, because Mr. Bryant,

7    Mattel contended and the jury has now found, created those

8    drawings while he was employed by Mattel.

9    A.   Well, I don't know which design drawings are at issue

10   specifically here.  Since this just refers to 17 drawings.

11   Q.   Well, I'll represent to you that's in evidence, and we

12   just went through that.  That it's Mr. Bryant's drawings.  I

13   will just represent that to you.  So my question to you is

14   isn't it true that after MGA brought this lawsuit, Mattel

15   brought a lawsuit, a claim against MGA saying it owned these

16   very drawings; correct?

17   A.   Well, the difficulty I'm having is when you're saying

18   these very drawings, I don't know that on the face of this

19   document.

20   Q.   All right.  Let me ask it this way.  You know that

21   Mattel claimed in this lawsuit, claims in this lawsuit, and

22   the jury has now found, that Mr. Bryant's original drawings

23   are owned by Mattel because they were created while he was

24   employed by Mattel.  You know that; correct?

25   A.   I don't know that for a fact because I have not -- if

Page 5742

1    that's what you are representing, I have to assume that's

2    true.

3    Q.   You were the chief lawyer for MGA right up to December

4    of 2007; correct?

5    A.   November 2007, but I have not been involved in this

6    trial.

7    Q.   All right.

8    A.   Except as a witness.

9    Q.   And as general counsel, as the top lawyer for MGA, you

10   had some responsibility for supervising this lawsuit;

11   correct?

12   A.   That is correct.

13   Q.   In fact, you attended hearings in this courtroom?

14   A.   Some, yes.

15   Q.   And you know that one of Mattel's claims were that it

16   owned certain original Bratz drawings that Mr. Bryant had

17   done.  You know that?

18   A.   Yes, I do.

19   Q.   Now, after Mattel brought that lawsuit saying it owned

20   the drawings, MGA amended its complaint against Cityworld in

21   Hong Kong to say that it was -- its claim was no longer based

22   on those drawings that Mattel claimed.  True?

23   A.   I don't recall that.

24   Q.   All right.  Let's take a look at the amended statement

25   of claim, Exhibit 13706.  It's in the same volume.  And if

Page 5743

1   you look at the page, this is a copy of a re-amended

2   statement of claim in the Cityworld case in Hong Kong?

3   A.   Yes.

4           MR. QUINN:  We'd offer Exhibit 13706.

5           THE COURT:  Pursuant to the same procedure?

6           MR. HANSEN:  Subject to the same procedure, your

7   Honor.

8           THE COURT:  Very well.  It's admitted.

9           (Exhibit 13706 received.)

10  Q.   BY MR. QUINN:  Now, in this amended claim, if we could

11  turn to dash 2.  That's the first page.  If we could turn to

12  dash 2, what they do there in Hong Kong is you kind of have

13  to -- when you amend your claim, you have to kind of red line

14  it to show where the track changes are.  You've seen that in

15  Hong Kong pleadings?

16  A.   Yes, I have.

17  Q.   All right.  And that's what you did in this case when

18  you amended this claim; correct?

19  A.   Yes.

20  Q.   And this claim was amended on January 5th, 2007;

21  correct?

22  A.   I have to look at the papers.  I don't recall.

23  Q.   You can take a look at dash 12.  It's page 12, and

24  you'll see a date there.

25  A.   Yes.

Page 5744

1    Q.    Dated the 5th of --

2    A.    Yes.

3    Q.    So this was done on January 5, 2007; correct?

4    A.    It appears from that, yes.

5    Q.    All right.  So if we can go back to the page that we

6    were just looking at, dash 2 with the track changes.  And one

7    of the things that MGA did after Mattel brought this case, if

8    we look at the track changes, is to delete all reference to

9    the original design drawings in its claim against Cityworld;

10   correct?  That's what it did.

11   A.    Yes.

12   Q.    And it added a number of other works.  It said our claim

13   is not based on the drawings.  It's based on molds.  It's

14   based on wax models.  It's based on four drawings of

15   racial -- of facial decoration, pantone color guides, Deco

16   masters; correct?

17   A.    That's correct.

18   Q.    And MGA did all of that after Mattel asserted its claim

19   that it owned these drawings; correct?

20   A.    In terms of chronologically, yes, that's correct.

21   Q.    It did add one drawing, and that is the second one

22   there.  One drawing of body sketch of the Bratz fashion dolls

23   made in around November 2000.  Do you see that?  That is

24   something that -- a drawing that MGA did add in this

25   amendment; correct?

Page 5745

1  A.   That is correct.

2  Q.   And MGA felt safe adding that because November 2000 was

3  after Mr. Bryant had left Mattel's employment; correct?

4  A.   I don't know of the characterization about feeling safe

5  about adding that.  It made these changes because it believed

6  that it needed to make these changes in connection with this

7  litigation.

8  Q.   Well, you know, based on your involvement with this case

9  and being general counsel of MGA for years as this case was

10 pending, you know that in November 2000, Mr. Bryant was no

11 longer employed by Mattel; correct?

12 A.   That is correct, yes.

13 Q.   And in your -- you filed an affirmation in this case in

14 Hong Kong, and that's Exhibit 13119.  13119.  That's in

15 Volume 1.

16 A.   You want me to turn to that?

17 Q.   If you would, please.  And Exhibit 13119 is a copy of

18 the affidavit of Daphne Gronich filed in the MGA versus

19 Cityworld case; correct?

20 A.   That's correct.

21         MR. QUINN:  We'd offer that, your Honor.

22         THE COURT:  Very well.

23         (Exhibit 13119 received.)

24 Q.   BY MR. QUINN:  And in your affidavit at dash 2, you

25 refer to this body sketch in 5-B, subparagraph 5-B.  You say

Page 5746

1   one drawing of a body sketch of the Bratz fashion dolls now

2   produced and shown to me marked as DG-2 is a true copy of the

3   body sketch.

4           Do you see that?

5   A.   I see that.  I'd like to look at the exhibit, though,

6   please.

7   Q.   Sure.  So let's take a look at DG-2.  And that's at dash

8   27 and 28.  It says DG-2.  Do you see that number?

9   A.   Yes.

10  Q.   And it says there true copy of body sketch.  And date

11  around November 2000.  That's what you said; correct?

12  A.   That's correct.

13  Q.   And then it's attached; correct?

14  A.   Yes.

15  Q.   And that's the body sketch that's referred to in the

16  complaint; right?

17  A.   Yes.

18  Q.   And you realize now that this jury has determined that

19  that body sketch was done by Mr. Bryant while he was employed

20  by Mattel and that it is owned by Mattel.

21          MR. HANSEN:  Your Honor, I would just object.  I

22  think that the verdict form actually has solely or jointly

23  with someone else.  The verdict form is actually stated

24  differently.

25          THE COURT:  Counsel?

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5747

1   Q.   BY MR. QUINN:  You are aware that the jury

2   determination, that the jury determined that this sketch,

3   which is in evidence as Exhibit 323-33, that this was created

4   by Mr. Bryant during the time of his employment at Mattel --

5           THE COURT:  Counsel, the solely or jointly with

6   others.  The jury found that it was done by him or jointly

7   with others.

8           MR. QUINN:  Thank you, your Honor.

9   Q.   Solely or jointly with others during the time of his

10  Mattel employment.  You are aware of that?

11  A.   I actually wasn't specifically aware of that.

12  Q.   Let me ask you about another case.  Are you familiar

13  with a case that MGA brought in this country against a

14  company called Multi Toy?

15  A.   I'm aware of that litigation.  It was against a company

16  called Multi Toy and other defendants.

17  Q.   All right.  And the complaint in that case is

18  Exhibit 13738 in Volume 2.  If I could ask you, please, to

19  turn to Exhibit 13738.  This is going to be real simple.  I'm

20  going to ask you if this is a copy of the complaint filed in

21  this case?

22          MR. HANSEN:  Your Honor, objection.  It's not the

23  entirety of the complaint.  It's missing exhibits.

24          THE COURT:  Counsel?

25          MR. QUINN:  This is how it was produced to us, I

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5748

1   believe, your Honor.  It's a copy of the complaint with two

2   exhibits.

3            THE COURT:  Are there more exhibits?

4            MR. HANSEN:  The copy produced has all the

5   exhibits.  There are multiple.  I have a copy that's maybe

6   three quarters of an inch thick.  I didn't go through this,

7   but I can tell by its size that it's not the complete

8   complaint.  And the entire complaint has been produced.

9            MR. QUINN:  Your Honor, I will offer the entire

10  complaint.  If counsel has a copy of it, I'll offer it with

11  all the exhibits.

12           MR. HANSEN:  And the Bates number and a Mattel

13  production number.  So I don't think it's fair to accuse --

14           THE COURT:  This is a complaint filed in this

15  court.  So we can obtain a copy for purposes of this

16  proceeding.  Let's proceed.

17           MR. HANSEN:  And actually, I have a copy.

18           MR. QUINN:  If there's a Bates number or some way I

19  can refer to it, I'd just like to move it into evidence, and

20  I'm not going to do anything further with it.

21           THE COURT:  The Court is prepared to take judicial

22  notice of it, if necessary.  So let's move along.

23           MR. HANSEN:  That's fine.

24           THE COURT:  Let's make sure we get a copy of the

25  complete complaint that goes to the jury in the exhibit book.

Page 5749

1          MR. HANSEN:  Yes.

2     Q.   BY MR. QUINN:  Could I ask you to turn to Exhibit 13783

3     in Volume 2?  13783.

4               Is this a copy of a complaint filed by MGA in

5     Hong Kong against a company called Wai Man International?

6     A.   I have to look at it.  I don't actually know if this is

7     the complaint itself.  I see that it references a writ of

8     summons, but there's some Chinese handwriting, and I'm not

9     really sure if that is the complaint.

10    Q.   Well, looking at the first page, this appears to be a --

11    it's addressed to the defendant Wai Man International.

12              Do you see that?

13    A.   Yes.

14    Q.   And it says this writ of summons.  So maybe it's a

15    summons or a writ of summons.

16    A.   Yes.

17    Q.   It was issued or entered in that case, MGA versus

18    Wai Man?

19    A.   It is a summons in terms of the first page, yes.

20    Q.   And then if you go forward to 0004, there's a page

21    entitled at the top Endorsement of Claim.

22              Do you see that?

23    A.   I see that, yes.

24    Q.   And it's signed by a William Fan.  That's the name of a

25    lawyer we've heard in Hong Kong.  Was he a lawyer that

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5750

1    represented MGA in Hong Kong?

2    A.    Yes, he was.

3    Q.    And then over on 0006 there's an acknowledgment of

4    service and writ of summons?

5    A.    That's correct.

6    Q.    And on 0012, there's a document, and this may have been

7    lack of facing page that says writ of summons.

8    A.    I'm sorry?

9    Q.    0012.  It says writ of summons?

10   A.    It says that, yes.

11   Q.    So these appear to you to be pleadings entered in the

12   MGA versus Wai Man case in Hong Kong?

13   A.    The difficulty I'm having is the -- I'm not sure that

14   this is the complaint.  You're referring to a complaint.  It

15   has a writ of summons.  I can't read Chinese.  And then the

16   rest of it is acknowledgment, but I don't see any signature.

17   So I don't know that this was actually entered other than

18   your representing it.

19   Q.    I can't read Chinese either.  But do these appear to be

20   various pleadings relating to the Wai Man litigation in

21   Hong Kong?

22   A.    That's what I don't know.  I don't know that they have

23   been filed.

24   Q.    I'm not asking whether they were filed.  You've got 003.

25   It's signed by Mr. Fan.  He's your lawyer in Hong Kong;

Page 5751

1   right?

2   A.   Yes.

3   Q.   And the next page signed by Mr. Fan, your lawyer in

4   Hong Kong?

5   A.   The difficulty I have with the page that's signed by

6   Mr. Fan is that, which is dash 0003, is it has -- it starts

7   partway through the page.  The first paragraph is totally

8   crossed out.  And then it says this writ, and it's signed.

9   So I don't know that this is -- and it says endorsement of

10  claim.  Please see attached.  So I don't know that it's

11  complete.

12  Q.   Ma'am, these appear to be documents, pleadings, legal

13  documents relating to the Wai Man case in Hong Kong?

14  A.   They appear to be related to Wai Man.  That's all I can

15  say for sure.

16           MR. QUINN:  I'd offer this exhibit, your Honor.

17           MR. HANSEN:  Objection.  Foundation.

18           THE COURT:  These were produced by MGA?

19           MR. HANSEN:  Yes.  It's the Chinese part that --

20           THE COURT:  I'm sorry?

21           MR. HANSEN:  Subject to the same stipulation.

22           THE COURT:  Very well.  It's admitted pursuant to

23  that stipulation for procedure.

24           (Exhibit 13783 received.)

25  Q.   BY MR. QUINN:  In that case, we have an affidavit of a

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5752

1   Lam Yuen Chak.  That's Exhibit 13742.  Same volume.  Have you

2   found that?

3   A.   Yes.

4   Q.   And does this appear to be an affirmation of an

5   investigator named Mr. Chak that was filed in the MGA versus

6   Wai Man case?

7   A.   I need to look at it.  I don't recall this name.

8   Q.   In you'll look at dash 6, you'll see signatures and what

9   appears to be like a notarization?

10  A.   Yes.

11             MR. QUINN:  Offer 13742, your Honor.

12             MR. HANSEN:  Same procedure.

13             THE COURT:  Okay.

14             (Exhibit 13742 received.)

15  Q.   BY MR. QUINN:  And if we could look at 13742-15.  This

16  is a copy of -- a photocopy of the dolls that were the

17  subject of this case?

18             Do you see that?

19  A.   I see the photograph.  I honestly don't know if that was

20  the subject of this case.

21  Q.   Now, I'd like to ask you some questions, Ms. Gronich,

22  about some filings with the copyright office, and these are

23  all in the first volume.  And if you could turn, please,

24  first to Exhibit 505.  And let me ask a general question

25  first.

Page 5753

1             You are aware that MGA made copyright filings

2     relating to the Bratz dolls:  Jade, Sasha, Cloe, and Yasmin.

3     You are aware that copyright filings were made related to

4     those dolls?

5     A.   At which point in time?

6     Q.   At any time.

7     A.   Yes.

8     Q.   And at some point after MGA made those copyright

9     filings, MGA made supplemental filings for each doll in which

10    MGA represented that those dolls were derivative of Carter

11    Bryant's drawings.  Isn't that true?

12    A.   I don't believe that's true, no.

13    Q.   All right.  Let's take a look at it.  Exhibit 505.  We

14    can start with that.

15    A.   Yes.

16    Q.   Exhibit 505 is a copy of the certificate of registration

17    with the United States copyright office relating to the

18    drawing for Jade; correct?

19    A.   Yes.

20    Q.   I think if you look at dash 2, item 1, it says Jade

21    drawing.

22             Do you see that?

23    A.   Yes.

24             MR. QUINN:  I'd offer Exhibit 505, your Honor.

25             THE COURT:  Any objection?

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5754

1          MR. HANSEN:  No objection.

2          THE COURT:  It's admitted.  You may publish.

3          (Exhibit 505 received.)

4   Q.   BY MR. QUINN:  And this is the certificate which you get

5   with a ribbon and a seal.

6          And if we could go to the next page.  Just enlarge

7   the top third of that if you can, Ken.

8          And it's for the Jade drawing.  And in the upper

9   right, what is that, where it says VA 1-218-487.  Do you know

10  what that is?

11  A.   That's the copyright registration number for --

12  Q.   For the Jade drawing.  So let's keep that number in

13  mind.  VA 1-218-487.  And I'd now like to look at

14  Exhibit 557.  This is in evidence.

15         Oh, I'm sorry.  If we could go back to Exhibit 505

16  and put up 505-5 on the screen.  Attached to that copyright

17  registration for the Jade drawing is the Jade drawing; right?

18  At dash 5?

19  A.   It appears to be.  By the way, the first page is not a

20  part of the copyright registration.  It's the facing page

21  they give when they give certified copies.

22  Q.   Okay.  That's why you have the ribbon and the seal?

23  A.   That's correct.  But the actual registration certificate

24  starts at dash 02.

25  Q.   That's the page we looked at which had that VA number on

Page 5755

1    it?

2    A.   That's correct.

3    Q.   And if we could now look at Exhibit 557, which is in

4    evidence.  This is the copyright registration for the Jade

5    doll configuration, accessories and packaging.

6            Do you see that?

7    A.   Yes, I do.

8    Q.   And copies are attached of the doll configuration, if we

9    could look at dash 5.

10   A.   That's the original copyright registration and original

11   attachment, yes.

12   Q.   For the doll configuration, accessories, and the

13   packaging?

14   A.   As originally filed, yes.

15   Q.   And if we could go back to page dash 2 and look at the

16   VA number in the upper right-hand corner.  It's VA 1-090-287,

17   is it?

18   A.   Yes.

19   Q.   And after that, MGA submitted a correction to the

20   copyright configuration for this Jade doll configuration.  Do

21   you know that?

22   A.   Yes, I do.

23   Q.   And that's Exhibit 558, which is in evidence.  And if we

24   could blow up C here.  And what do you call this?  Is this an

25   amended filing, a corrected filing?  What would you call

Page 5756

1    this?

2    A.    A correction form.

3    Q.    All right.   You are familiar with this type of form and

4    how it's used?

5    A.    Yes.

6    Q.    And on this correction form, it corrected the previous

7    filings with respect to derivative work where it says line

8    6-A, derivative work.   It identified the Jade drawing as

9    being a derivative work for the Jade doll configuration

10   accessories and packaging; correct?

11   A.    Um, you need to read it in context.   It references back

12   to the original document, but it's -- what was done in this

13   amendment is that we added two-dimensional artwork, and that

14   should have been checked, and if you go up to under B, it

15   says only three-dimensional sculpture box checked.

16   Additional artwork -- additional box two-dimensional artwork

17   should be checked.

18   Q.    Let's first go up to A and make sure we know what we're

19   talking about here.   This is a supplemental filing made with

20   respect to that Jade doll configuration, accessories, and

21   packaging, VA 1-090-287; correct?

22   A.    That's correct.

23   Q.    And that's the registration we looked at just a few

24   moments ago; right?

25   A.    It is.   The only thing I would note on that is it's not

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5757

1    a complete copy of the registration because when you

2    reference boxes and numbers and line numbers, they don't

3    appear on the exhibit that you have.

4    Q.   Okay.  But, ma'am, this is a supplemental filing which

5    was made with respect to that Jade doll; correct?

6    A.   Correct.

7    Q.   All right.  And then if we could go back down to --

8    A.   No, actually, the doll configuration, accessories, and

9    packaging.

10   Q.   Right.  And if we could go back down to C.

11   A.   That's correct, yes.

12   Q.   What is a derivative work?

13   A.   In a legal sense?

14   Q.   Well, what did MGA mean here when it identified that

15   Jade drawing, the first one we looked at VA 1-218-487,

16   derivative work, what did MGA mean by derivative work?

17   A.   What MGA meant was that the artwork that it identifies

18   as two-dimensional artwork was in some fashion derived from

19   the Jade drawing.

20   Q.   Oh, so what you're telling us is that the Jade doll

21   configuration is derivative of the Carter Bryant drawing;

22   correct?

23   A.   No.  It's the Jade doll configuration, accessories, and

24   packaging.  So all of it is the subject of the registration.

25   The only thing that is referenced and is intended to be

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5758

1  referenced by the derivative portion and referencing the Jade

2  drawing is the two-dimensional artwork being derivative of in

3  some fashion the Jade drawing.

4  Q.   Are you saying that MGA paid Carter Bryant over

5  $30 million for some two-dimensional packaging art?  Is that

6  what you're saying?

7           MR. HANSEN:  Object to the form, your Honor.

8           THE COURT:  Overruled.

9           THE WITNESS:  I'm not quite sure I understand your

10  question in relation to this document.  You asked what we

11  meant.

12  Q.   BY MR. QUINN:  My question is did MGA pay Carter Bryant

13  over $30 million just for some two-dimensional packaging art?

14  That's my question.

15  A.   Um, first of all, I don't know exactly how much MGA has

16  paid Carter Bryant.  Secondly, I think a lot goes into why

17  MGA paid Mr. Bryant.  Initially he came in, as I understand,

18  with drawings which were pitched, and those were the

19  inspiration for the dolls and the doll line.

20           So to the extent he participated in those

21  activities, he earned royalties.  So to say that he was paid

22  $30 million for packaging art is not appropriate.  He was

23  paid for his services.

24  Q.   In any event, this addition identifying the doll drawing

25  as a derivative work, this is something that was done with

3e29859c-69da-4e15-a91f-81c2e862516a

1  respect to each of the doll -- each of the registrations for

2  the doll configuration, accessories, and packaging; correct?

3  A.   It was done in conjunction with the additional reference

4  to the two-dimensional artwork being added in each of the

5  amendments or corrections.

6  Q.   Ma'am, this additional filing which identifies

7  derivative work, the drawing as a derivative work, that was

8  done with respect to each of the doll configuration,

9  accessories, and packaging registrations.  True?  Yes, it

10  was, or no, it wasn't?

11  A.   Yes, it was.

12  Q.   And then just to get those into evidence, if you'd turn

13  to Exhibit 507.  507 is the copyright registration for the

14  Sasha drawing; correct?

15  A.   Starting at page 2, yes, it is.

16  Q.   The copyright registration for the Sasha doll

17  configuration, accessories, and packaging is already in

18  evidence as Exhibit 559.  There was a correction filed for

19  Sasha for that registration.  That's Exhibit 560, isn't it?

20  I believe this is already --

21  A.   I'm trying to catch up.  So you need to bear with me one

22  second.

23  Q.   560.

24  A.   Yes.

25  Q.   And then Exhibit 509 is the copyright registration for

Page 5760

1   the Cloe drawing.  I'm not sure I moved into evidence

2   Exhibit 507, your Honor.

3           THE COURT:  Any objection?

4           MR. HANSEN:  No objection.

5           THE COURT:  Admitted.

6           (Exhibit 507 received.)

7   Q.   BY MR. QUINN:  Exhibit 509 is the copyright registration

8   for the Cloe drawing; correct?

9   A.   Starting at page 002.  Yes.

10          MR. QUINN:  We offer Exhibit 509.

11          MR. HANSEN:  No objection.

12          THE COURT:  Admitted.

13          (Exhibit 509 received.)

14  Q.   BY MR. QUINN:  And then Exhibit 511 is the copyright

15  registration for the Yasmin drawing.

16  A.   Yes, again, starting at page 2 of that exhibit.

17          MR. QUINN:  I'd offer that in evidence.

18          MR. HANSEN:  No objection.

19          THE COURT:  Admitted.

20          (Exhibit 511 received.)

21          MR. QUINN:  And I believe all the others are in

22  evidence, and I have nothing further.

23          THE COURT:  Further examination by the defense?

24          MR. HANSEN:  Thank you.

25          MR. QUINN:  I'm sorry, your Honor.  I forgot to

Page 5761

1    offer into evidence Exhibit 511, the copyright registration

2    for the Yasmin drawing.

3                    MR. HANSEN:  No objection.

4                    THE COURT:  It was admitted.

5                            CROSS-EXAMINATION

6    BY MR. HANSEN:

7    Q.    Ms. Gronich, I'm David Hansen, one of the counsel for

8    MGA.  We've met previously; right?

9    A.    That's correct, yes, we have.

10   Q.    I'd like to start with the copyright registrations that

11   we just went through.  Do you have those in front of you

12   still?

13   A.    No, I'll need to get them.

14   Q.    I'd like to do it in a slightly different order, though.

15   A.    Okay.

16   Q.    Ms. Gronich, if you could turn first to 557.  Do you

17   have 557 in front of you?

18   A.    Yes.

19   Q.    And if we could go to the second page of that exhibit,

20   please.  And this is -- if we could focus in on the top part

21   all the way down.  This is the Jade doll configuration,

22   accessories, and packaging registration; is that correct?

23   Excuse me.  Could you identify this for me as the Jade doll

24   configuration, accessories, and packaging registration?

25   A.    That's correct.

Page 5762

1   Q.   Now, if you would look, please, a little further down.

2   The registration here, do you see where it says nature of

3   authorship?

4   A.   Yes.

5   Q.   Can you tell us what is checked in terms of the nature

6   of authorship for this registration?

7   A.   It's three-dimensional sculpture.

8   Q.   Is anything else checked?

9   A.   No.

10  Q.   Do you see the box below that that says two-dimensional

11  artwork?

12  A.   Yes.

13  Q.   Is there a check for that box?

14  A.   No, there's not.

15  Q.   Okay.  And if we could look, please, at the dash 005

16  page, the first pictures.

17  A.   Yes.

18  Q.   And you are focused on -- let's just focus on the one on

19  the left, the picture on the left.

20       Do you see that?

21  A.   Yes.

22  Q.   And can you tell me is there anything in that picture

23  other than a three-dimensional sculpt?

24  A.   Yes, there is.  There's packaging.  There's actually

25  artwork on the front.  There's the Bratz logo, stylized logo.

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5763

1    Accessories for the doll.  So it's essentially the -- if you

2    call it the blister pack of the inside of the package.

3    Q.   And so if --

4    A.   And it doesn't show the back of it.  Excuse me.  So it

5    only shows the front as well.

6    Q.   But does it show a sculpt, a three-dimensional

7    sculpture?

8    A.   Only to the extent it's included as part of the doll.

9    But it doesn't specifically depict a three-dimensional

10   sculpt, no.

11   Q.   But it includes things other than a three-dimensional

12   sculpture?

13   A.   Absolutely.

14   Q.   In terms of registering the additional materials that

15   you referenced in this registration -- in this picture other

16   than the three dimensional sculpture, is this registration

17   accurate?

18   A.   No, it's not because it doesn't make reference to the

19   two-dimensional artwork that we added by the clarification

20   document that I identified previously.

21   Q.   So if we focus just for a moment on the lower right-hand

22   portion of the box.

23   A.   Yes.

24   Q.   Is that what you're referring to?

25   A.   Yes.

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5764

1    Q.    That's two-dimensional artwork?

2    A.    That's two-dimensional artwork, yes.

3    Q.    And as the registration that is submitted as Exhibit 557

4    went to the copyright office, it wouldn't cover that artwork;

5    is that right?

6              MR. QUINN:  Objection.  It's leading.

7              THE COURT:  Sustained.

8    Q.    BY MR. HANSEN:  Would the two-dimensional artwork be

9    covered by the registration that's shown in Exhibit 557 as

10   submitted to the copyright office?

11   A.    Not specifically, no.

12   Q.    All right.  So if we could turn, then, again briefly to

13   Exhibit 558, please.

14   A.    Yes.

15   Q.    And if we could focus in, I think you mentioned you were

16   focused on box B.  If we could focus on that just for a

17   minute.  And you see where -- can you read for us -- it says

18   incorrect information as it appears on basic registration.

19              Do you see that?

20   A.    Yes.

21   Q.    And that lists the only, quote, three-dimensional

22   sculpture box was checked?

23   A.    That is correct.

24   Q.    Can you tell me what the corrected information is shown

25   on this form?

1    A.    It says additional box, quote, two-dimensional artwork,

2    unquote, should be checked.

3    Q.    And in terms of, then, the correction that's found in C

4    that you were shown before, can you tell me what the purpose

5    of this correction was?

6    A.    Excuse me?

7    Q.    Can you tell me what the purpose was of the correction

8    that's shown in box C?  Why -- were you correcting something

9    with this registration?

10   A.    Yes.  The problem I was having before is it references

11   no box checked, 5-C box unchecked.  So when I was looking

12   back, it was hard to tell which was No. 5.  But what it says

13   is that it says previous registrations, no.  And then it

14   references the basic registration for the Jade doll

15   configuration, accessories, and packaging should cite to, and

16   it lists the registration number for the Jade drawing.

17         It lists line 6-A derivative work, Jade drawing,

18   line 6-B, material added, three-dimensional doll sculpt,

19   artwork, and packaging.

20         So as I explained earlier, the point of listing

21   that as -- listing the derivative work was to identify the

22   prior drawing.  But the purpose of it was to, in calling out

23   the two-dimensional artwork, it then was supposed to refer

24   back to the original Jade drawing because that was what was

25   being derived.

Page 5766

1    Q.   And the original Jade drawing is what's shown in the

2    registration number that's Exhibit 505?

3    A.   I'm afraid I don't recall all the numbers by heart.  So

4    I'll have to look at it.

5    Q.   That's all right.

6    A.   Yes, that's correct.

7    Q.   Let me ask you, you were shown a number of documents

8    today, Ms. Gronich.  Are you aware of what the issues are in

9    this part of the trial?

10   A.   I'm actually not because I haven't been involved in it

11   as much.

12   Q.   I'm sorry.  I didn't hear you.  I apologize.

13   A.   I have not been involved in specifically what's been

14   going on here in court.

15   Q.   Did any of the pleadings that you were shown today

16   elaborate at all on the similarities or differences between

17   the Bryant drawings and the Bratz dolls?

18   A.   Not in what I saw, no.

19   Q.   And to your knowledge, did any of the documents that you

20   were shown contradict the assertion that the Bryant drawings

21   served as an inspiration for the Bratz dolls?

22   A.   No.

23   Q.   Does that change your opinion on that at all, anything

24   you saw today?

25   A.   No.

Page 5767

1    Q.   Were you shown anything at all that discusses the value

2    of the Bryant drawings to MGA or Mr. Larian?

3    A.   No.

4    Q.   Are you aware of anything in the Hong Kong pleadings, at

5    least that you were shown, that address the value of the

6    Bryant drawings?

7    A.   No.

8    Q.   How about the profits of the sale of Bratz or

9    Bratz-related products attributable to Bryant's drawing?

10   Was any of that addressed in the materials that you were

11   shown today?

12   A.   No, not at all.

13   Q.   Let me ask you something about -- you were, I think,

14   briefly questioned about -- actually, before I go to that,

15   there's an additional -- here it is.  I apologize.  This is

16   not in the binder because I hadn't anticipated this.  But if

17   I can hand this over.

18            THE COURT:  You may proceed, Counsel.

19   Q.   BY MR. HANSEN:  I've handed you Exhibit 18829.

20            Do you see that?

21   A.   Yes.

22   Q.   Can you just look through that for me and identify it as

23   including a consent summons and then also a re-amended

24   statement of claim in the Cityworld action you were asked

25   about?

Page 5768

1        MR. QUINN:  Your Honor, we have an objection to the

2   use of this document.  We haven't seen it before.

3        THE COURT:  You haven't seen it before?

4        MR. QUINN:  No.

5        THE COURT:  Counsel, was this produced in

6   discovery?

7        MR. HANSEN:  It's got a production number on it,

8   yes.  It was produced in discovery.

9        MR. QUINN:  Your Honor, that doesn't answer the

10  question.

11       THE COURT:  Let's go to sidebar.

12       (SIDEBAR CONFERENCE HELD.)

13       THE COURT:  Mr. Quinn?

14       MR. QUINN:  Your Honor, our concern is that this --

15  it's our recollection that this document was not produced in

16  discovery.  Bates numbers are added to documents that aren't

17  produced in the course of this trial.  The fact that there's

18  a Bates number here doesn't answer the question as to whether

19  it was timely produced in discovery.  And our recollection,

20  our team's recollection is we haven't seen this before.

21       THE COURT:  Was it on your exhibit list?

22       MR. HANSEN:  It's my understanding it was produced.

23  It was added to the exhibit list based on the questioning

24  today in terms of the timing.  This goes to the timing of the

25  addition of materials for artistic works other than the

Page 5769

1    drawings.

2            THE COURT:  It's just that we don't -- this is the

3    first time we've had this.  I assume that you have a way of

4    verifying that it was produced?

5            MR. HANSEN:  I can't say specifically.  I was

6    informed that it's been produced.

7            THE COURT:  I assume somebody on the Skadden Arps

8    team can somehow confirm that?

9            MR. HANSEN:  I can do something else for a minute.

10           THE COURT:  Could you?  We've only got 10 minutes

11   left.

12           MR. QUINN:  The question is when.  It's been

13   produced.  The question is when.

14           MS. AGUIAR:  With due respect, we have been

15   producing, throughout the trial, documents to each of you.

16   We get documents from you guys even a day before testimony.

17   So all I'm saying is we will absolutely go back right now and

18   confirm that it's been produced.  The timing of when it's

19   been produced, as we all know, the practice is that we've

20   been doing a rolling production.  So why don't we go check.

21           MR. HANSEN:  And I didn't know that this issue was

22   going to arise until today, which is also why it wasn't in

23   the binder.

24           THE COURT:  Why don't you finish up the next 10

25   minutes, and we can take this up after hours.

Page 5770

1          MR. HANSEN:  I'll finish her off without this.

2          MS. AGUIAR:  We might be able to confirm that right

3     now.

4          MR. ZELLER:  Then for the record, your Honor, this

5     would have been a document the Court would have compelled

6     them to produce within five days of the May order dealing

7     with the other infringement litigation.  So if it's after

8     that cutoff, then we have a problem with it.

9          THE COURT:  If there was a specific order requiring

10    it to be produced in a specific time frame, that puts it in a

11    different category.  I just don't know.

12         MS. AGUIAR:  We'll try to confirm that.

13         (CONCLUSION OF SIDEBAR CONFERENCE.)

14         MR. HANSEN:  We're working to confirm.

15         THE COURT:  Very well.  Why don't you proceed with

16    another question.

17    Q.   BY MR. HANSEN:  You were asked about the Multi Toy case?

18    A.   Yes.

19    Q.   Are you familiar with that case?

20    A.   Yes, I am.

21    Q.   Can you just generally --

22    A.   In general terms.

23    Q.   Can you generally describe for me what the case was

24    about?

25    A.   The case was brought against three or four stores, as I

1    recall, or entities that were selling knock-offs of the Bratz

2    dolls in downtown Los Angeles.  So Multi Toy, as I recall,

3    was one of the defendants.  And there were others there.  And

4    they were selling dolls in packaging that looked very similar

5    to the Bratz packaging, coloring that looked similar to the

6    Bratz packaging, copying some of the artwork on their

7    counterfeit or knock-off packaging that would also appear on

8    the Bratz packaging of the original dolls.

9    Q.   Did MGA have issues with what you're calling knock-offs?

10   A.   Yes, they did.

11   Q.   Why was that?

12   A.   Well, generally whenever there's a product that's

13   successful in the marketplace, there tend to be imitators,

14   especially in the toy arena.  And there were a number of

15   them -- most of the products were made in China, and, for

16   instance, some of the things that came up in Multi Toy we

17   actually saw in South Africa and the U.K.

18           So the same dolls would appear in different places

19   around the world.  So that they were essentially -- they

20   along with others sort of jumped on the bandwagon to put out

21   dolls in packaging that looked like ours, lettering that

22   looked like ours.  When I say ours, MGA's.  Logos that looked

23   similar in order to capitalize on the popularity of the Bratz

24   brand and the dolls that people were buying.

25   Q.   Could you look, please, Ms. Gronich, in the white binder

Page 5772

1    that is there on the corner.  And it's -- it's the second

2    tab.  It's Exhibit No. 10877.

3    A.   Yes.

4    Q.   Could you identify this document for me, please?

5    A.   It's a declaration that I signed in connection with

6    MGA's application for a temporary restraining order against

7    the defendants in the Multi Toy litigation, and it lists all

8    the defendants.

9              MR. QUINN:  Your Honor, move Exhibit 10877 into

10   evidence.

11             THE COURT:  Any objection to that?

12             MR. QUINN:  No objection, your Honor.

13             THE COURT:  It's admitted.  You may publish.

14             (Exhibit 10877 received.)

15   Q.   BY MR. HANSEN:  So could we look for a second -- if you

16   would flip to page 68 in that stack.  It's about a third of

17   the way in.  And it's actually pages 68 through 72.  And

18   would you please tell me what those pages are?

19   A.   It's a photocopy of the copyright registration

20   certificate for the Sasha doll configuration, accessories,

21   and packaging.

22   Q.   So this is a copyright registration for the Sasha doll

23   configuration, accessories, and packaging?

24   A.   Yes.

25   Q.   Could we have Exhibit 559 on the screen, please.  This

Page 5773

1    is already in evidence.  It's the -- this is the same

2    copyright registration for the Sasha doll packaging and

3    accessories?

4    A.    Yes.

5    Q.    And the -- I would like to use the -- the reason I'm

6    going to the registration is it has a better color picture.

7                If we could look at the -- just briefly, the page 5

8    of that.  Of the registration.  These are pictures of the

9    Sasha doll.

10   A.    Yes.

11   Q.    Okay.

12               And, Aaron, could we put up Exhibit 17558, which is

13   already admitted.

14               And can you identify this for me?

15   A.    The picture on the screen, on the left?

16   Q.    Yes.

17   A.    It's just a better picture of the picture on the right,

18   showing the Sasha packaging and artwork.

19   Q.    And so this is the Sasha doll that's in the copyright

20   registration?

21   A.    That is correct, yes.

22   Q.    Okay.

23   A.    It's the original doll.

24   Q.    Now, if we could look, please, at -- sorry for the

25   jumping around.  Exhibit 6.  Go back to your declaration for

Page 5774

1    a second.  Exhibit 10877.  And if we could look at Exhibit 6,

2    which starts at page 222 a little further in.

3    A.    Yes.

4    Q.    And if we could go to page 223.  Can you tell me what

5    this is?  Identify this photo for us.

6    A.    I don't recall.  I have to look at what my -- what

7    specific entity sold this, but this is one of the dolls that

8    was -- and packaging that was -- one of the products that was

9    the subject of the litigation, the Multi Toy litigation.

10   Q.    So the Musical Trendy Teenies doll shown in this picture

11   was one of the dolls at issue, one of the packages that was

12   at issue in the litigation?

13   A.    Yes.

14   Q.    And if we go to the next page of this, which is page

15   224.  Do you see that?

16   A.    Yes.

17   Q.    And then if we jump to 225, we're basically zooming in

18   on the character art on the left.

19          Do you see that?

20   A.    Yes, I do.

21   Q.    And that is -- can you tell me what this is that's shown

22   in the screen that we're looking at now, page 225 of

23   Exhibit 10877?

24   A.    Right.  It's a closeup of the prior one, and it's the

25   actual character art that's taken directly from the Bratz

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5775

1    packaging that you showed me earlier.  I don't know what the

2    number was.  It was clear on the left, the new exhibit that

3    you showed.  Exhibit 559.

4            So the two-dimensional artwork which is on the

5    bottom right of the Bratz Sasha doll was reproduced exactly

6    on the Musical Trendy Teenies package.  And that shows the

7    closeup of the four girls there.

8    Q.   Could you put up Exhibit TX 18812, and if you could just

9    look in your binder.  It's in the back.  Can you tell me what

10   these are?  Can you identify the three --

11   A.   It's actually a better color copy of Exhibit 6,

12   10877-223.  In slightly reverse order, they are essentially

13   the three pages that you showed me.  Second page is the third

14   page of the black and white, but it looks like from what I

15   can see, it says KMW.

16           So it would also be the lawyer who represented us

17   or the firm that represented us.  So the color pictures that

18   are depicted in this exhibit.

19   Q.   And the second page of Exhibit 18812 is the color

20   version of what's on the screen right now; is that right?

21   A.   Yes, that's correct.

22           MR. HANSEN:  Can we put up the second page of

23   18812, the color picture?  I'd like to move it into evidence.

24           THE COURT:  Any objection?

25           MR. QUINN:  No objection.

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5776

1        THE COURT:  It's admitted.

2        (Exhibit 18812 received.)

3   Q.   BY MR. HANSEN:  This is just a better color version of

4   what's attached to your declaration; right?

5   A.   Yes.

6   Q.   All right.  And if we could also just on the left, if we

7   could replace the black and white one with the picture that

8   we had before from the Sasha package, 17558.  Do you see any

9   relationship between the package art on the left and the

10  package art on the Mini Musical Teenies doll?

11  A.   Yes, that's what I referred to earlier, that they

12  essentially took that two-dimensional character art and just

13  copied it directly onto their product, which is the Musical

14  Trendy Teenies.

15  Q.   And were the other products at issue in that case, did

16  they similarly copy package art from the Bratz packaging?

17  A.   Package art or slogans, like the girls with a passion

18  for fashion, or the package shape and coloring.  Essentially

19  to varying degrees they included lots of different elements

20  from the MGA packaging or logos.

21       THE COURT:  Counsel, I'm going to stop you here.

22  We're past the hour.  We'll resume with this tomorrow morning

23  at 9:00.  Unless you have some further ground.

24       MR. HANSEN:  I have one question.

25       THE COURT:  I know you have further exam, but I'd

Page 5777

1    like to let counsel --

2              MR. QUINN:  I think I can finish in a minute and a

3    half, your Honor.

4              THE COURT:  A minute and a half?  The jury says go

5    for it.

6    Q.   BY MR. HANSEN:  Can you tell me how the Multi Toy

7    litigation ultimately ended?

8              THE COURT:  MGA prevailed.  Some of the defendants

9    entered into a consent judgment early on, that they

10   acknowledged their liability.  And MGA ultimately obtained

11   summary judgment against the remaining defendant and

12   prevailed in the litigation as a result.

13             MR. HANSEN:  I have the letter.  The document's

14   already been produced.  May I?

15             THE COURT:  You may show it to counsel.  I assume

16   that obviates the objection.

17             MR. QUINN:  It does obviate the objection, your

18   Honor.

19             THE COURT:  Very well.

20             MR. QUINN:  But it means I can't finish in a minute

21   and a half, probably.

22             THE COURT:  We'll continue with this in the

23   morning.  Thank you, Counsel.

24             I'll see the jury tomorrow morning at 9:00.

25             (WHEREUPON THE JURY WITHDRAWS.)

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5778

1        THE COURT:  Counsel, I'd like a sense of how you

2   anticipate tomorrow playing out.

3        MR. QUINN:  If I could have one moment, your Honor.

4        THE COURT:  Yes.

5        MR. ZELLER:  What we intend to do is we have some

6   what we're hoping will be brief witnesses to discuss some of

7   these other cases in particular, the Double Grand case and

8   three other of the Hong Kong cases.  Without sounding

9   pejorative about it, obviously the Court has seen some of the

10  challenges we have in terms of trying to get clear, legible

11  copies, samples of the dolls that have been sued upon, and

12  really clear answers on what MGA itself did in some of this

13  litigation.

14       So what we did, because multiple roadblocks were

15  being thrown up within -- really after we had last met, we

16  contacted some of these litigants in Hong Kong and asked them

17  to come and testify briefly so that we can do things like get

18  the dolls admitted and the pleadings that we are unable to

19  get through MGA witnesses.

20       We've also subpoenaed MGA.  We have another

21  Custodian of Records subpoena, which MGA has moved to quash.

22  The topics, as far as we're concerned, are extremely

23  straightforward.  They are basically just saying bring the

24  originals of the dolls or photographs of the dolls that you

25  sued upon in these various cases that are at issue.  And so

Page 5779

1    there's still an issue outstanding on that.

2         It would be our intention to put on a combination

3    of those people to clear up really what is left in terms of

4    MGA's own litigation.  Pleadings, the dolls that were sued

5    upon or photographs, clear legible photographs of the dolls

6    that were being alleged.  And that's a combination of an

7    attorney named Edmond Yeung, Y-E-U-N-G, a representative from

8    Double Grand, which was one of the litigants.  And the

9    Custodian of Records who I referenced.

10        So that would be the index, to put those three

11   people on, and then Mr. Larian.  Unless, of course, we can

12   have something worked out or something stipulated to in terms

13   of what products were at issue in these other cases.  And I

14   understand from e-mails that MGA is in all likelihood taking

15   the position that we can't put any of these Hong Kong people

16   on either.

17        I mean, it's really no exaggeration to say that

18   multiple roadblocks have been put up in terms of our ability

19   to put on very simple evidence about what did MGA do in this

20   prior case, in these prior cases.  And I expect that's going

21   to be an additional issue that's going to have to be

22   resolved.

23        But those are the people we intend to put on.  And

24   I would also say that the Court has seen now the legibility

25   problems that we have faced from some of MGA's production,

Page 5780

1   which was a production required by the Court's order back in

2   May.

3            As far as we're concerned, that's just simply a

4   violation of the Court's order.  We have asked repeatedly for

5   legible copies of photographs attached to MGA's own

6   pleadings, and we still don't have them.

7            MS. AGUIAR:  Can I just get clarification?  Is that

8   the whole day tomorrow?

9            THE COURT:  So Mr. Larian would take up the rest of

10  the day?

11           MR. ZELLER:  That really depends on MGA.  If

12  Mr. Larian is completed, we would expect to put Mr. Wagner

13  on, our damages expert.

14           THE COURT:  Very good.  There's also certainly a

15  number of -- when you say it depends on MGA, if depends on

16  how long MGA cross-examines or examines?

17           MR. ZELLER:  Correct.  And if that takes us to the

18  end of the day, that would be it.

19           MS. AGUIAR:  And it's definitely Mr. Wagner; right?

20  Because the order you've given us was quite different than

21  that.  Can I get clarification that you meant to say Wagner?

22  Because that's different from anything you told me last

23  night.

24           MR. ZELLER:  We're still caucusing a little bit.  I

25  apologize.  There's another witness, Mr. Keiser.  All these

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5781

1    people are on our list that we've shared with MGA as to the

2    potential witnesses for 1-B here.

3            There is a Mr. Keiser who I know MGA has said that

4    it has or intends to make some sort of motion over.  He is

5    an expert who really is involved in digital scanning of

6    three-dimensional items.  His testimony will be relatively

7    brief, at least from our perspective.  But I know that MGA

8    has raised some issues concerning his testimony.

9            THE COURT:  And you intend to call him after

10   Mr. Larian?

11           MR. ZELLER:  I believe so, yes, your Honor.

12           THE COURT:  Very well.  Thank you, Counsel.

13           MR. ZELLER:  Thank you.

14           MS. AGUIAR:  Thank you, your Honor.  When

15   Mr. Zeller says, quote, it's no exaggeration to say that

16   roadblocks have been thrown up, it's not an exaggeration.

17   It's just false.  If we want to argue the motion to quash

18   now, I'm fully prepared to do that, and I'm wondering whether

19   you want to do that.

20           THE COURT:  Why don't we do that and get that

21   resolved now.

22           MS. AGUIAR:  I trust that your Honor has our motion

23   and the response by Mattel?

24           THE COURT:  I do.

25           MS. AGUIAR:  Here's the history.

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5782

1          THE COURT:  Let me just pull it up.  And I'm pretty

2    familiar with the history, Counsel.

3          MS. AGUIAR:  Okay.  I think if I could take 30

4    seconds to just give what I think are the very important

5    highlights, which are that Mattel served, as we all know,

6    both sides have served many document requests in this case.

7    And they served document requests that specifically asked for

8    samples of dolls.  This is in, your Honor, in the declaration

9    that we submitted in connection with our motion.  This is

10   Exhibit 1, page 12.  And these were requests that were

11   propounded back in October.

12         Requests 1 through 4 specifically relate to

13   tangible dolls and photographs of dolls.  We made objections,

14   and as your Honor is familiar with the history, Judge Infante

15   ruled on April 14th that those requests were grossly

16   overbroad and unduly burdensome.

17         Mattel appealed Judge Infante's order.  His order

18   addressed document requests 1 through 30.  They specifically

19   appealed only four of those.  They did not appeal the

20   requests that they made concerning dolls and tangibles and

21   photographs.

22         They appealed item number -- document request

23   Nos. 6, 15, 23, and 25.  That was a motion that they filed in

24   front of your Honor.  You overruled Judge Infante on two of

25   those.  And you ordered us, as we've discussed today, to

Page 5783

1    produce pleadings.  That was document request No. 15 and

2    court orders from the Bratz lawsuit.  That was request

3    No. 23.  And in May, we made an expedited search and

4    production of pleadings and court orders from Hong Kong.

5              There was no mention from the time they made --

6    from the time Judge Infante ruled in April regarding

7    tangibles, dolls, and photographs, until they served trial

8    subpoenas on us on the 24th and 25th of July.

9              In their papers, which they submitted in response

10   to our motion to quash, they don't even -- they don't even go

11   there.  They don't even contest that.  They, I think,

12   implicitly acknowledge, yes, that is what we did.  We didn't

13   appeal it.  Their argument now is well, this is different.

14   Because this is trial.  So now we're asking for stuff at

15   trial.

16             Let me cut right to the chase about whether or not

17   this is going to be practical or even possible.  Mattel says

18   in its papers, well, MGA says these are subject to

19   undertakings, and they make the allegation that they don't

20   know what we're talking about, and this has come out of the

21   blue.

22             I would point your Honor to the transcript of the

23   hearing from February 4th.  During that transcript, Mr. Nolan

24   and Mr. Corey were arguing to you an issue regarding

25   tangibles in Hong Kong.  Your Honor will probably recall

Page 5784

1   that.  The issue of undertakings specifically came up at that

2   hearing.  And Mr. Corey acknowledged that he was aware of

3   this issue at least as of that date.

4           Your Honor, I also have letters from a colleague of

5   mine with another one of the Quinn lawyers starting in

6   December.  December 26th, January 10th, January 15th, and

7   February 7th, all discussing this issue that under Hong Kong

8   law, these items are subject to solicitors' undertakings.

9           So the allegation in Mattel's papers which were

10  filed several days ago, that they don't know from

11  undertakings and they think we're just pulling this out of

12  the blue, I can't quite fathom it.

13          But anyway, they know, and we all know that they

14  can't get this stuff out of Hong Kong.  I provided Mr. Zeller

15  this morning with a declaration from our Hong Kong counsel,

16  which I have copies and I will provide to the Court.  It is a

17  declaration from someone in William Fan's office.  His name

18  is Dexter Lam, L-A-M.

19          And as your Honor will see from that declaration,

20  which is consistent with the representations that we've made

21  to the Court starting as early -- well, certainly

22  representations we made to Mattel starting as early as

23  December of '07 and to your Honor as early as February of

24  '08, that there are solicitors' undertakings that prevent

25  tangible items such as these dolls and photographs from being

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5785

1    taken out of Hong Kong.

2           If such a request was made, a hearing date could be

3    obtained from the Court no earlier than September, given the

4    current circumstances.

5           So where that leaves us is that we have two

6    subpoenas served on MGA U.S. and MGA Hong Kong.  July 24th

7    and July 25th.  Those are in the declaration that we

8    submitted with our motion to quash, Exhibit 6, and it's page

9    165, thereabouts, in case you want to see them.  The

10   Exhibit A to both of those subpoenas is very specific.

11   Please produce originals of the following documents.  And

12   there's eight categories, and it says produce original dolls,

13   original tangibles, and original photographs.

14          It's not legally or practically possible for us to

15   do that at this point.  And so for Mr. Zeller to turn history

16   on its head and say that all of a sudden we are throwing up

17   roadblocks when, with all due respect, I feel like something

18   slipped through the cracks over there and they just didn't

19   ask for the stuff, to then hit us with subpoenas less than 10

20   days ago, when we know we can't get this stuff out of the

21   country, it just doesn't ring true.

22          So that's where we are.  We have since made, just

23   so you know, inquiries with both MGA in the U.S. and then MGA

24   Hong Kong to see if they have the dolls.  In other words,

25   separate and apart from what the solicitors have.  Does MGA

Page 5786

1    have any of those allegedly infringing dolls, and we have

2    confirmation from both of these entities that they do not.

3           So we have made strides to explore whether we can

4    comply with the subpoena since receiving them less than 10

5    days ago, and that's what I have to report to your Honor.  We

6    just don't have them.

7           THE COURT:  Very well.  Thank you, Counsel.

8           MR. ZELLER:  First of all, we certainly didn't

9    accuse them of stonewalling now, just now.  This has been

10   going on literally for months.  The Court ordered MGA to

11   produce all pleadings and other documents, a defined term,

12   filed, submitted, or served by you in the Bratz lawsuits,

13   which were identified.  And there was a list of them that

14   claim, allege, or assert that the appearance or features of

15   any doll or other product, whether in whole or in part,

16   infringes Bratz.  Infringe is a defined term as well.

17          As far as I can understand, the argument here

18   appears to be that they were not obligated to provide legible

19   copies, photos of the product that they were accusing and

20   that somehow that fell outside the scope of that request.  We

21   didn't move on other more narrow requests for the simple

22   reason we didn't have to.

23          That is the request that we thought best captured.

24   And for MGA to say that somehow they have no ability to

25   provide even legible copies of their own photographs that

Page 5787

1    they filed in courts, I think it really belies the excuses

2    that we're hearing here.  We've been asking for legible

3    copies since the time we received these illegible ones.  The

4    Court is aware that we have had to go to extraordinary

5    lengths simply to try and find dolls that we think are the

6    infringing ones and identify them and bring them to court.

7            MGA does not say, and I have heard no

8    representation from MGA that every single sample that they

9    have of those infringing dolls from the other cases are

10   subject to any undertaking.  And, in fact, it's implausible

11   for them to say that that's the case.

12           THE COURT:  I'm of two minds on this issue.  With

13   respect to the dolls themselves, that was not before the

14   Court, as I understand it, in May, or when the Court

15   considered the appeal.

16           As far as -- and I agree with Ms. Aguiar there.  To

17   ask for the actual dolls at this point, to the extent that

18   Dexter Lam is saying that he has them, I have no reason to

19   question Ms. Aguiar's representation that she's inquired of

20   MGA USA and they don't have them.  We're not going to get

21   them.

22           Where I'm more sympathetic with Mattel's argument

23   is with respect to any pleadings, including certainly copies

24   of any exhibits, documents, photographs.  I mean, we talk

25   about a pleading.  We don't just talk about the complaint.

Page 5788

1    It's all pleadings.  It was certainly my intention that, to

2    the extent that MGA had in its possession or control any

3    pleadings related to this, that they would get turned over so

4    that we could avoid this particular problem.

5              So I'm not sympathetic, Mr. Zeller, with respect to

6    the dolls themselves.  I'm much more sympathetic with respect

7    to the photographs.  And I'm hoping that we can work

8    something out here.  Because quite frankly, I think it makes

9    MGA look terrible what's going on right here this afternoon

10   before this jury, before lawyers from MGA, general counsel

11   from MGA stand up here and not recognize what it was that

12   they were supervising.

13             I think MGA has every incentive at this point just

14   to produce the legible copies, and let's move on off of this.

15   This is really -- I don't understand what's going on here.  I

16   don't understand why MGA is not just clearing this up and

17   moving this on.  I mean, they have got some -- I'm hearing in

18   the last half hour here some fairly good responses to this.

19   Let's get this resolved.  I don't get what's happening here,

20   Counsel.  Certainly photographs attached as exhibits to a

21   pleading is part of the pleadings.

22             MS. AGUIAR:  I don't disagree.  Two separate

23   things.  The motion to quash was directed at original dolls

24   and original photographs.

25             THE COURT:  I'm with you -- well, right.

3e29859c-69da-4e15-a91f-81c2e862516a

1           MS. AGUIAR:  Original photographs.  So let me then

2     address --

3           THE COURT:  Unless and to the extent the original

4     photographs were submitted -- I don't want to mince words

5     here.  What was submitted to the Court is what should have

6     been produced to Quinn Emanuel in May.  Period.

7           MS. AGUIAR:  I understand.  And MGA in its May 22nd

8     production -- and there may have been supplements to that --

9     but I do know that there was a large production made on

10    May 22nd.  We did produce the pleadings, and we didn't just

11    produce the complaint, for example.  We produced attachments.

12    The photographs are not of great quality, but the photographs

13    that were up today that we kept seeing are from the

14    production that we made.  These were attachments --

15          THE COURT:  Let me stop you there.  Are they of the

16    same quality that was submitted in the litigation in

17    Hong Kong?

18          MS. AGUIAR:  I can't speak to whether the quality

19    is exactly the same.  What I can say is that we will

20    undertake to figure out if there is somewhere a better

21    quality of that photograph, but we have produced what we were

22    required to produce.

23          THE COURT:  And I'm not faulting you on that.  Like

24    I said, I think this is quite frankly in your interests.

25    Because this, for what it's worth, I think this looks

Page 5790

1   terrible from MGA's perspective.  But who am I?

2          MS. AGUIAR:  I'm not saying it wouldn't be in our

3   best interests.  So we will endeavor to do it.  But there are

4   two very separate issues.

5          THE COURT:  And I've identified them as two

6   separate issues.  And I'm with you on the dolls because that

7   was not -- if Mattel really needed these dolls from their

8   perspective, that aspect of Judge Infante's discovery order

9   should have been appealed, and it wasn't.

10         MS. AGUIAR:  We will inquire -- there's a major

11  time difference, but it may be the next day in Hong Kong

12  already now.  So that may work in our favor.  We will inquire

13  tonight regarding these photographs.  I believe we have in

14  the past, because we've got in the request, but we will do it

15  again.  And so with regard, just to be clear, the subpoenas

16  were directed at these original documents.  So there's

17  nothing for the custodian to --

18         THE COURT:  That's what you're telling me.  There's

19  no blood from a radish.  If you say there's nothing there, I

20  believe you.

21         MS. AGUIAR:  I just want to make sure we don't have

22  to bring the custodian here.

23         THE COURT:  The Court accepts your representation.

24         MR. ZELLER:  I'm certainly glad I made the better

25  argument about the photographs, of course.  And just to focus

Page 5791

1    on that for a moment.  I mean, we have been asking for these

2    for quite some time.  We have never received any

3    representation that, number one, those are the best quality

4    that are available.  Number two, it's not within MGA's

5    possession, custody, or control to provide those.  I mean,

6    the Court saw the quality that we were confronted with.  It

7    forced us to waste time, which frankly, to put it out

8    there --

9               THE COURT:  I'm mindful of that.

10              MR. ZELLER:  Exhibit 13725 was Exhibit A of this.

11   I mean, just look indecipherable.  Almost black.

12              THE COURT:  And in terms of the timing, the Court

13   will take that into account.

14              MR. ZELLER:  I appreciate that, your Honor.  Thank

15   you.

16              MR. QUINN:  I'm wondering if the original dolls

17   can't be moved, whether it's possible to take digital

18   pictures of the original dolls and e-mail them.

19              THE COURT:  I don't know.  And perhaps that's

20   something you can talk with MGA about tonight.  This should

21   have been resolved by the Court's order in May.  To the

22   extent that the pleadings included pictures, legible copies

23   of the pleadings, the most legible copies of the pleadings

24   should have been provided.  And so that aspect of the trial

25   subpoena the Court will insist upon.  I accept counsel's

Page 5792

1   representations.  I accept Dexter Lam's representation.  I

2   have no reason to question any of that, that the dolls

3   themselves are simply not available at this point in time.

4           MR. ZELLER:  I understand.  I wasn't pressing that

5   because I recognize the Court thought that that was the

6   weaker of the two arguments.  But at a bare minimum, we have

7   raised this photograph issue and the quality of these

8   exhibits over and over again.  We have actually on more than

9   one occasion sent specific lists to MGA saying these are

10  illegible.  We need these.

11          So it wasn't just a broad based request to MGA

12  saying oh, your entire production from May 22nd was defective

13  because it's illegible.  We went to the trouble of

14  identifying the very things that we put in front of the jury

15  today and had to slog through because of the quality in large

16  part, too.  And we specifically asked for those, and we never

17  got a response.

18          THE COURT:  All right.  Well, let's see what can be

19  done tonight, tomorrow in Hong Kong.  And we'll take this up

20  again in the morning.  But I do think it's in the interests

21  of everyone to try to resolve this.

22          The other issue, if we're going to get to

23  Mr. Larian's testimony tomorrow, there's the issue of the

24  financial documents.  And I think I may have spoken to

25  Mr. Nolan and Mr. Quinn this morning.  Or Mr. Price, when we

Page 5793

1    were in chambers, to this.  And there's no question that the

2    Court had ordered the production of Mr. Larian's financial

3    documents quite some time ago.

4           To the extent that the documents were in the

5    control, custody, possession of MGA or MGA's agents, and they

6    were not turned over in a timely fashion, they are not coming

7    in.  To the extent that they are documents that were created

8    and were produced contemporaneous with the trial, they come

9    in.  MGA is certainly correct and Mr. Larian is certainly

10   correct that the relevant documents, the relevant time period

11   for his net worth is now.  And that's correct.

12          And so the documents that reflect his net worth now

13   are relevant, and I would expect that they would be produced

14   somewhat contemporaneously with this trial; however, to the

15   extent there are documents that were created back in October

16   of 2007 or January of 2008 or February of 2008 that were not

17   turned over, those documents aren't coming in now.  And

18   that's going to be how I'm going to evaluate that in the

19   context of the trial.  I'll hear further.  But that's my

20   general sense of it after reading the papers on this.

21          MR. PRICE:  We would disagree that his net worth

22   after the verdict is relevant because in that situation,

23   whenever you bifurcate, for example, punitives and actual

24   damages, then the defendant can come in and say the trial has

25   had an effect on me.  And basically that's what they are

Page 5794

1    saying here.  They said because the jury ruled against us, I

2    am now impoverished.  And I'm not aware of any case saying

3    that that's the time period you look at.

4            THE COURT:  And perhaps I slightly misstated it.

5    I'm not saying that it's the post-verdict period.  We're not

6    talking about the last week of July of 2008.  When I say

7    contemporaneous with the trial, it's what Mr. Larian is worth

8    coming into trial, not what he was worth in 2006 or 2007.  Or

9    even in early 2008.  It's what he's worth at the time that

10   the trial is taking place.

11           MR. PRICE:  My fear is that Mr. Larian will blurt

12   out or be asked well, what's happened in the last week.  Or

13   he's going to say because of what this jury did, I'm a

14   pauper.  I think that would be inappropriate.

15           THE COURT:  I would actually like -- I don't think

16   there's any cases particularly on that point.  But I would

17   invite both sides to submit authority to the Court on that

18   particular point, if a change in financial position in a

19   bifurcated trial is relevant to that second phase.

20           I know this is not the first court to bifurcate a

21   case along these lines.  It's kind of an interesting point,

22   and that I don't think is addressed particularly, at least

23   not in any of the cases I took a look at.

24           But I'll invite both parties to provide something

25   to the Court tomorrow morning which addresses that particular

Page 5795

1    issue.  Otherwise, the standard I intend to use is

2    contemporaneous with the trial.  We're talking the May, June

3    period.  I'll certainly give MGA and Mr. Larian leave to

4    introduce evidence of his net worth that has been produced at

5    that time, provided that it has actually been calculated and

6    produced at that time and not -- the allegation, the concern

7    of sandbagging some of these documents, I think, is very real

8    based on at least the allegation of when the dates are.  I

9    don't have them before me.

10            I don't know what they are going to be relying on,

11   but I will exclude, my tentative is to exclude anything that

12   was created that should have been produced pursuant to this

13   Court's orders at a much earlier time period.  So that's --

14            MR. ROTH:  Your Honor, if I could address those two

15   issues.  Certainly, we will submit authorities to your Honor.

16   The one thing I would point out is you'll recall the list of

17   assets that was placed before the jury.  By far the largest

18   piece there is a value for the ownership of the company.  And

19   that value is nothing more than the present value of future

20   expected earnings.  That's the way those valuations are

21   created.  That's the way Mattel's expert has determined value

22   in this case.

23            So obviously, as events change, as the future

24   expectations change, that value changes.  That will affect

25   damage --

1          THE COURT:  It's an interesting question, though.

2     Because normally in a nonbifurcated trial, you wouldn't have

3     the situation develop where there's full financial

4     consequences of the verdict itself.  And, of course, the

5     reality is there were financial consequences of the verdict.

6     Mr. Nolan disclosed certain financial consequences in

7     chambers.  There was reference made to stock prices.  There

8     was -- I understand that there was an impact from the

9     verdict, but I'd like to see some authority on that.

10          Is it that finely tuned to, you know, what does the

11    jury consider, particularly in the context of punitive

12    damages.  How finely tuned is that?  I'll look forward to

13    authority on that.

14          MR. ROTH:  If I could just forecast one bit more.

15    There was a verdict.  About a week later there was an opening

16    statement given by Mr. Price where he offered up an opinion

17    about the value of the company as of the time that he was

18    speaking.  Based on what he said Mr. Wagner would opine.

19          So he has said that there was a value of

20    approximately 605 million as of the time of that opening

21    statement.  So we believe, at least in that context, we have

22    the opportunity to test his expert, whether he agrees with

23    Mr. Price that that was the value as of that moment he was

24    speaking.

25          In the context of punitive damages, your Honor, we

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5797

1    will provide the authority that the Court would like.

2            In terms of --

3            THE COURT:  Well, let me think about that.  I'm

4    trying to recall exactly what Mr. Price said, and I don't

5    recall exactly --

6            MR. ROTH:  I can paraphrase.

7            THE COURT:  Well, why don't you get the transcript

8    in front of me.  In any event, I want to be governed here by

9    what the law requires in terms of damages, compensatory

10   damages and punitive damages, and what do we do in a

11   bifurcated trial like this where the verdict has had an

12   impact.

13           And I'm not questioning that both sides should be

14   entitled to evaluate the impact of that verdict if in fact

15   that is a lawful consideration, or should the Court

16   alternatively just consider this as one trial and that we

17   take the start of the trial as the date.  I mean, I guess

18   that's what I -- we're going to need to come up with a date.

19   And it's an interesting question.

20           MR. ROTH:  Yes, your Honor.  Related to that, the

21   second point that your Honor raised in terms of the

22   timeliness of the production of financial information.  As

23   your Honor knows, the company, MGA, daily, weekly, quarterly

24   basis is ongoing.  We just passed June.  End of second

25   quarter.  We have very recently produced financial

3e29859c-69da-4e15-a91f-81c2e862516a

Page 5798

1    information relating to the first two quarters of this year.

2         THE COURT:  And I'd expect you to have produced

3    that and to be able to use that at a trial like this.  I have

4    no issue with that.

5         What I have an issue with is there's allegations,

6    and I don't know how this is going to play out or exactly

7    what you're going to rely on.  There's allegations that there

8    were documents created as early as October of 2007 that were

9    not produced until the last seven weeks.  That's the type of

10   document that is not going to come in.

11        MR. ROTH:  Understood, and I think I know precisely

12   what you're referring to.  And frankly, at this point I think

13   that may not be so relevant, given the timing of the events.

14        THE COURT:  Let's take this other issue up tomorrow

15   morning.  I have work to do.  You have work to do.  And I'll

16   see you tomorrow morning at 8:00.  It doesn't sound like

17   we're going to get through any of these four.  Although I

18   have gone through and ruled on the objections of the

19   videotapes.

20        MR. QUINN:  Could we have a time count?

21        THE COURT:  I have you have remaining 9 hours and

22   17, 18 minutes and MGA having 19 hours and 20 minutes.

23        MR. QUINN:  Thank you, your Honor.

24        MR. NOLAN:  Your Honor, what time do we start

25   tomorrow?

Page 5799

1          THE COURT:  Let's be here at 8:00.  This financial

2     issue may take some time.  And I'd also like to hear what

3     success you've had with Hong Kong.  So let's see you here

4     tomorrow morning at 8:00.

5

6               (Proceedings concluded at 5:37 P.M.)

7

8

9

10                    C E R T I F I C A T E

11

12

13          I hereby certify that pursuant to Title 28,

14     Section 753 United States Code, the foregoing is a true and

15     correct transcript of the stenographically reported

16     proceedings in the above matter.

17          Certified on August 5, 2008.

18

19

20                    _____
                      MARK SCHWEITZER, CSR, RPR, CRR
                      Official Court Reporter
21                    License No. 10514

22

23

24

25

3e29859c-69da-4e15-a91f-81c2e862516a