Page 6856

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

---

| | | |
|---|---|---|
| MATTEL, INC., | : | PAGES 6856 - 7046 |
| | : | |
| PLAINTIFF, | : | |
| | : | |
| VS. | : | NO. ED CV04-09049-SGL |
| | : | [CONSOLIDATED WITH |
| MGA ENTERTAINMENT, INC., | : | CV04-9059 & CV05-2727] |
| ET AL., | : | |
| | : | |
| DEFENDANTS. | : | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

TUESDAY, AUGUST 12, 2008

JURY TRIAL - DAY 33

AFTERNOON SESSION

MARK SCHWEITZER, CSR, RPR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
181-H ROYBAL FEDERAL BUILDING
255 EAST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012
(213) 663-3494

Page 6857

1   Appearances of Counsel:

2

3   On Behalf of Mattel:

4       Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
        By John B. Quinn, Esq.
5           B. Dylan Proctor, Esq.
            Michael T. Zeller, Esq.
6           Harry Olivar, Esq.
            John Corey, Esq.
7           Diane Hutnyan, Esq.
            William Price, Esq.
8       855 South Figueroa Street
        10th Floor
9       Los Angeles, CA 90017
        (213) 624-7707

10

11

12  On Behalf of MGA Entertainment:

13      Skadden, Arps, Slate, Meagher & Flom LLP
        By Thomas J. Nolan, Esq.
14          Carl Alan Roth, Esq.
            Jason Russell, Esq.
15          Lauren Aguiar, Esq.
            David Hansen, Esq.
16          Matthew Sloan, Esq.
            Robert Herrington, Esq.
17      300 South Grand Avenue
        Los Angeles, CA 90071-3144
18      (213) 687-5000

19

20

21

22

23

24

25

afaf730e-bdbe-4545-af08-157421413e63

Page 6858

1                          I N D E X

2

3   PAULA DIANTHE GARCIA, SWORN........................... 6859

4   DIRECT EXAMINATION BY MS. AGUIAR:..................... 6859

5

6                        E X H I B I T S

7

8   (Exhibit 16418-002 received.)........................ 6949

9   (Exhibit 951-B, Pages 002-007, received.)............ 6960

10  (Exhibits 17712-17715 received.)..................... 6961

11  (Exhibit 18633 received.)............................ 7021

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6859

1          Riverside, California; Tuesday, August 12, 2008

2                              11:30 A.M.

3          THE COURT:  All right, Counsel, we're ready for you

4     to call your next witness.

5               MS. AGUIAR:  MGA calls Paula Garcia.

6          THE CLERK:  Please raise your right hand.

7                    PAULA DIANTHE GARCIA, SWORN.

8          THE CLERK:  Please take the stand.  Please state

9     your full name for the record, and spell your last name.

10         THE WITNESS:  Paula Dianthe Garcia.

11                     DIRECT EXAMINATION

12    BY MS. AGUIAR:

13    Q.   Good morning, Ms. Garcia.

14    A.   Good morning.

15    Q.   Welcome back.

16    A.   Thanks.

17    Q.   Let's talk about Carter Bryant's pitch book drawings for

18    a moment.  I've put a copy of them in front of you.  You'll

19    see that on the front.

20              Do you have it?

21    A.   Yes.

22    Q.   And I also laid a copy of them on the table.  It's

23    basically a package of about 14 or 15 drawings; is that

24    right?

25    A.   Yes.

1   Q.   Is it correct that Mr. Bryant was the one who approached

2   MGA with his concept drawings and pitched these drawings to

3   MGA?

4   A.   Yes.

5   Q.   Did MGA seek him out at Mattel and ask him to bring

6   those drawings to MGA?

7            MR. PRICE:   Object.   Irrelevant to this phase.

8            THE COURT:   Overruled.

9   Q.   BY MS. AGUIAR:   At the time Mr. Bryant brought those

10  drawings to MGA and showed them to you, pitched them to MGA,

11  did you believe those drawings belonged to Mr. Bryant?

12  A.   Yes, I did.

13  Q.   In other words, did you believe that MGA made those

14  drawings -- in other words, at the time did you believe that

15  he made those drawings, that he owned them, and he could

16  pitch them to MGA?

17           MR. PRICE:   Objection.   Irrelevant to this phase.

18           THE COURT:   It's the same question again.

19  Overruled again.   But it is cumulative.   Let's move along,

20  Counsel.

21  Q.   BY MS. AGUIAR:   When Mr. Bryant signed the consulting

22  contract with MGA -- and this is my last question on that

23  point -- when he signed the contract with MGA and MGA started

24  to explore the concept of whether his drawings could play

25  themselves out in any way in a three-dimensional doll, did

Page 6861

1    you have any reason to believe that you were working with the

2    property of MGA?

3                    MR. PRICE:  Objection.  Irrelevant at this phase.

4                    THE COURT:  Counsel, what legal issue does it go

5    to?  Don't make a speaking objection.

6                    MS. AGUIAR:  That was my last question.

7                    THE COURT:  What does it go to?

8                    MS. AGUIAR:  It goes to her state of mind and

9    damages, your Honor.

10                    THE COURT:  First, is it relevant.  I'll see you at

11   sidebar, Counsel.

12                    (SIDEBAR CONFERENCE HELD.)

13                    THE COURT:  Let me hear you.

14                    MS. AGUIAR:  I didn't want to say in front of the

15   jury, but I believe it goes to punitive damages and any

16   other --

17                    THE COURT:  So it goes to malice and -- right.

18                    MS. AGUIAR:  That was my last question.

19                    THE COURT:  Okay.

20                    MR. PRICE:  Well --

21                    THE COURT:  Unless you don't want to argue in

22   close --

23                    MR. PRICE:  That they knew?  I think the jury has

24   already found that.  That they knowingly converted --

25                    THE COURT:  Yeah, but -- yeah, you're right.

Page 6862

1          MR. PRICE:  So that's my problem, is that we're
2     now --
3          THE COURT:  That wasn't your objection.  It was
4     relevance.
5          MR. PRICE:  I know, because I couldn't say
6     inconsistent with the verdict.
7          THE COURT:  Counsel, this is the difficulty in a
8     bifurcated trial like this.  The issue of malice is fresh in
9     this phase.  I understand there's evidence from before which
10    goes to that issue and there's an argument to be made, but
11    certainly the argument views that the level of intent
12    necessary to find the state tort claims is not sufficient by
13    itself to qualify for the punitive damage phase.
14         So I do think it's fair game for them.  I'm going
15    to give them some leeway to ask these questions and for you
16    to cross.  It's -- technically, you're correct, it's
17    cumulative, and let's not ask too many questions.  I'll give
18    you some leeway.  But I think counsel is correct.
19         MS. AGUIAR:  And just to point out, your Honor,
20    they asked Mr. Larian similar questions on their direct exam.
21         THE COURT:  They did.
22         MS. AGUIAR:  So if I could ask the Court for an
23    indication --
24         THE COURT:  All right.  So the objection is
25    overruled.

Page 6863

1          (CONCLUSION OF SIDEBAR CONFERENCE.)

2    Q.   BY MS. AGUIAR:  Ms. Garcia, my last question was when

3    Mr. Bryant signed the agreement with MGA, and MGA began to

4    develop the three-dimensional doll that later became Bratz,

5    did you believe that you were using property at the time that

6    belonged to Mattel?

7              MR. PRICE:  Objection.  Assumes facts --

8              THE COURT:  As phrased.  Rephrase, Counsel.

9    Q.   BY MS. AGUIAR:  In September of 2000, when Mr. Bryant

10   brought these drawings to MGA and MGA began to explore

11   whether those drawings could form the basis of a

12   three-dimensional doll, did you believe you were working with

13   the property of Mattel?

14   A.   No, I did not.

15   Q.   Before Mr. Bryant came to you, so let's take it prior to

16   early September of 2000.  Had you seen or were you aware of

17   any sort of trend or characteristics in the popular culture

18   or popular media that were consistent with the look that you

19   were already thinking about for a fashion doll?

20             MR. PRICE:  Objection.  Relevance.

21             THE COURT:  Counsel, this goes to?

22             MS. AGUIAR:  It goes to protectability, your Honor.

23   It goes to the state law claims and to protectability.

24             THE COURT:  I'll permit this question.  You may

25   answer.

afaf730e-bdbe-4545-af08-157421413e63

Page 6864

1          MS. AGUIAR:  You need it back again?

2          THE WITNESS:  Yes, I'm sorry.

3   Q.   BY MS. AGUIAR:  Before Mr. Bryant brought his drawings

4   to MGA, had you already been aware of or personally seen a

5   trend or characteristic in the popular press or --

6          THE COURT:  I'm sorry, Counsel.  I'm going to have

7   to see you at sidebar.

8          (SIDEBAR CONFERENCE HELD.)

9          THE COURT:  What element of protectability is this

10  going to?

11         MS. AGUIAR:  Your Honor, Ms. Garcia will testify

12  that she saw several magazine ads which had the

13  characteristics of big head, oversized eyes, large feet, that

14  prior to Mr. Bryant bringing his drawings to MGA she had seen

15  and she had envisioned wanting in a doll.  So this goes to

16  the idea that a big head is not protectable.  Oversized eyes

17  are not protectable.  The particular eye that Mr. Bryant did

18  your Honor has found would be protectable if --

19         THE COURT:  The jury is going to be instructed on

20  that.

21         MS. AGUIAR:  And on the state law claims, if I

22  could just add, I think it goes to whether they can show, as

23  Mr. Price said in his opening, whether the profits that we

24  made were attributable to his drawings.  They are clearly

25  going to argue to this jury in closing that we shouldn't get

Page 6865

1    a penny of profits because we had his drawings.  And we need

2    to be able to show that not only after he brought his

3    drawings, but before he brought them, Ms. Garcia and others

4    at MGA had an idea of what they would want to see in a doll.

5              MR. ZELLER:  She's conflating at least three

6    separate issues.  Number one, protectability, as the Court

7    has already ruled, is a matter of law that the Court is going

8    to instruct the jury on.  That's just not proper to be in

9    front of a jury.  In fact, it's going to cause confusion.

10             THE COURT:  Goes to the State Court claims.

11             MR. ZELLER:  If I miss on the copyright, it's

12   shading to independent creation, which is an issue they are

13   not allowed to raise in front of the jury.  In terms of the

14   state tort claim, they are misunderstanding what it is that

15   their damages claims are based upon.

16             THE COURT:  Your damages --

17             MR. ZELLER:  I'm sorry.  That damages claim.  So we

18   will stick with that.

19             MS. AGUIAR:  I know you're trying to shift the

20   burden to us, but let's get real.

21             MR. ZELLER:  It is our burden.  But if I understand

22   what she's saying correctly, the notion seems to be that

23   because they could have obtained from some other source and

24   because those are publicly available elements, that somehow

25   that goes to apportionment.  And that's not what

afaf730e-bdbe-4545-af08-157421413e63

Page 6866

1   apportionment is at all.

2           THE COURT:  Is that what you're saying?  Because

3   I'm not getting it either.  How is this a damages defense?

4           MS. AGUIAR:  I'm trying to show, your Honor, that

5   for purposes of the state law claims -- and we will do more

6   of this later in her testimony -- that there were ideas that

7   MGA brought to the table, ideas that Paula Garcia had about

8   what she wanted this doll to look like, the market she wanted

9   it to appeal to, the overall look that she wanted it to have

10  but didn't all come from Mr. Bryant's drawings.

11          So if they are going to argue to the jury in

12  closing you should award a gazillion dollars because they

13  took the drawings and that was it, the drawings were the

14  inspiration for what ended up being the doll, we need to be

15  able to show that that's not right.

16          THE COURT:  This gets back to a list of five

17  elements on apportionment.  We've already gone through this,

18  two and a half hours arguing part of this.  If you're going

19  to ask questions about those five, and here you're going to

20  the heart of the drawings themselves, and I think the only

21  way -- my first question at sidebar is what element does it

22  go to, and it clearly goes to originality.  And that is

23  absolutely off the table at this point in time.

24          The Court has already found, as a matter of law,

25  based on judicial estoppel, not to mention a whole host of

Page 6867

1    other reasons, that you cannot get into that at this point.

2              So the only issues with respect to apportionment

3    are the ones that Mr. Nolan stood up and represented -- I

4    have them written down on a little yellow stick-it up there,

5    and those are the questions you can address, not the drawings

6    themselves.

7              MS. AGUIAR:  And by those elements of

8    apportionment, you're referring to accessories, fashions,

9    packaging, themes?  Is that --

10             THE COURT:  Right.  That's the list.

11             MS. AGUIAR:  I just want to make sure we're on the

12   same page.

13             THE COURT:  Those are the questions that Paula

14   Garcia certainly is qualified to talk about.  But what you're

15   doing right now is trying to revisit this issue, again, of

16   originality.  That's how it sounds anyway.

17             MS. AGUIAR:  I'll move on from this.  But we would

18   like an opportunity, not here and not while the jury is here,

19   to address the tentative list that you gave the parties

20   regarding what was protectable and not protectable and make

21   a --

22             THE COURT:  I've given you leave to do that at any

23   time.

24             MS. AGUIAR:  Of course, and we would like to do

25   that.

Page 6868

1      THE COURT:  Absolutely.  Objection is sustained.

2      (CONCLUSION OF SIDEBAR CONFERENCE.)

3  Q.  BY MS. AGUIAR:  Ms. Garcia, we were talking about the

4  pitch book drawings before.  Let me ask you something.  Did

5  the idea of hip, edgy characters in Mr. Bryant's drawings

6  provide a source of inspiration for the Bratz dolls?

7  A.  Yes.

8  Q.  Did it provide the only source?

9      MR. PRICE:  Objection as phrased.

10      THE COURT:  Sustained.

11  Q.  BY MS. AGUIAR:  When MGA was creating and developing the

12  Bratz dolls, did others at MGA provide inspiration and

13  creativity for the creation of those dolls?

14  A.  Absolutely.

15  Q.  Give me some names of those people, and we'll go back in

16  detail in a moment and go through them.

17  A.  Veronica Marlow, Margaret Leahy, myself, just to name a

18  few.

19  Q.  There was also a face painter involved; is that right?

20  A.  Yes.

21  Q.  Who was that?

22  A.  Anna Rhee.

23  Q.  There was someone at MGA who had a lot of involvement in

24  packaging for the dolls that you developed; is that right?

25  A.  That's right.

Page 6869

1  Q.   Were there quite a few people involved in packaging?

2  A.   Yes.

3  Q.   Is there one in particular that had a prominent role?

4  A.   Yes.

5  Q.   And who is that?

6  A.   Aileen Storer.

7  Q.   So we'll come back to each of those folks.  You

8  mentioned Ms. Leahy, and since we have some of these sculpts

9  up on the stand, why don't we start there.  Where we left off

10  the last time you were here, when we were talking about

11  sculpting, I believe you had already given some testimony

12  regarding the gray casting that is standing in front of you

13  that's been marked as Exhibit 1136 A.

14          Do you recall that?

15  A.   Yes.

16  Q.   Do you recognize that as an early casting that Margaret

17  was working on in October of 2000?

18  A.   Yes.

19          THE COURT:  Excuse me, Counsel, one second.

20  Q.   BY MS. AGUIAR:  Were you aware that the jury's verdict

21  in Phase 1-A of this trial found that Mr. Bryant had created

22  that sculpt either solely or jointly with others?

23  A.   Yes.

24  Q.   Were you involved in the process of meeting about this

25  sculpt and commenting on it?

Page 6870

1    A.   Yes.

2             MR. PRICE:  Objection.  Irrelevant to this phase.

3             THE COURT:  It's foundation.  Overruled.

4    Q.  BY MS. AGUIAR:  Was this exhibit, 1136 A, something that

5    Mr. Bryant created solely on his own?

6             MR. PRICE:  Objection.  Irrelevant.

7             THE COURT:  Overruled.

8             THE WITNESS:  No.

9    Q.  BY MS. AGUIAR:  What's your basis for saying that?

10   A.  Because there were so many people who contributed to the

11   development of this sculpt.  I personally was involved.  I

12   had many comments and revisions.  You know, even Veronica

13   Marlow had her comments.  There were certainly people who

14   inputted into the sculpt development.  Excuse me.  I also --

15   later in later developments, Mercedeh Ward --

16   Q.  But that was limited just to this sculpt?  You mentioned

17   yourself and Veronica Marlow.  Were there any other MGA --

18   either MGA employees or vendors who specifically were

19   involved in the creation of this 1136 A?

20   A.   Certainly Margaret as a vendor personally created,

21   influenced the development of the sculpt.

22            THE COURT:  Just to make this consistent with

23   earlier testimony, you're not using creation in a legal

24   sense; correct?

25            MS. AGUIAR:  That's correct, your Honor.  Gave

Page 6871

1    comments for how I was using it.

2    Q.    So did you understand, when I said create, that had

3    input into bringing this into being?

4    A.    That's correct, yes.

5    Q.    Who had ultimate control over whether this was the

6    sculpt that was approved or that you moved forward on?

7    A.    Me.

8    Q.    And again, what's your basis for saying?

9    A.    Well, it was my responsibility to ultimately make a

10   manufactured doll, a doll that I would be accountable for,

11   you know, for its hopeful success.  So absolutely if I had a

12   decision to make or if I was uncomfortable about a decision

13   that may have been suggested by others, I would feel very

14   comfortable, and I would overrule those decisions.

15   Q.    So let's move past 1136 and move past it in time.  Do

16   you recall a meeting at MGA around October 25th to review a

17   new sculpt?

18   A.    Yes, I do.

19   Q.    And do you recall who attended that meeting?

20   A.    I attended, Carter Bryant, Margaret Leahy, Veronica

21   Marlow was present, Mercedeh Ward.

22   Q.    And we've heard the name Mercedeh Ward.  Can you tell us

23   very briefly what -- who was Mercedeh Ward?

24   A.    Mercedeh Ward was an MGA employee.  She was hired to be

25   responsible and accountable for development and sort of the

Page 6872

1   counterpart in L.A. with Hong Kong for manufacturing.

2   Q.   Did Ms. Ward suggest some engineering or some structural

3   changes to the doll?

4   A.   Yes.

5   Q.   Do engineering changes and structural changes impact the

6   look and the aesthetic of the doll?

7   A.   Yes, they very much can.

8   Q.   If you take a look at one of the bags that's in front of

9   you there, and we have the little bodies in the bags.   One is

10  marked 1141.

11          Do you see that?

12  A.   Yes.

13  Q.   Okay.   And if you could take that out and tell me

14  whether you recognize it?

15  A.   Yes, I recognize it.

16  Q.   What is it?

17  A.   This is the -- a cast of the sculpt that Margaret

18  presented in the October 25th meeting.

19  Q.   Was this the next sculpt after 1136 A?

20  A.   Yes.

21  Q.   At this October 25th meeting, where you were looking at

22  this new sculpt, did you have Carter Bryant's drawings with

23  you there at the meeting?

24  A.   No.

25  Q.   Do you recall providing any comments at the October 25th

afaf730e-bdbe-4545-af08-157421413e63

Page 6873

1    meeting on the sculpt that's there in front of you?

2    A.   Yes, I do.

3    Q.   Let me ask you to look at --

4            And, your Honor, this is in evidence.  It's trial

5    Exhibit 1137-18.

6            THE COURT:  You may proceed.

7    Q.   BY MS. AGUIAR:  And I believe there should be a copy of

8    it in your binder, Ms. Garcia, if you'd like to look at a

9    hard copy.  And probably better for you to look at it in hard

10   copy because the one on the screen is extremely difficult to

11   read.

12           Do you recognize this?

13   A.   Yes, I do.

14   Q.   And whose handwriting do you recognize it to be?

15   A.   I recognize it to be Margaret Leahy's handwriting.

16   Q.   In this list of changes here that were indicated at the

17   October 25th meeting, do you recognize any of them as being

18   one specifically made by you?

19   A.   Yes.

20   Q.   And which ones are those that you recognize as being

21   comments that you suggested?

22           MR. PRICE:  Your Honor, objection.  It's irrelevant

23   to issues in this phase.

24           THE COURT:  I'm going to stop the trial for right

25   now and take a lunch break.  I'll see the jury back here at

Page 6874

1     1:15.  We'll take this up outside the presence of the jury.

2              (WHEREUPON THE JURY WITHDRAWS.)

3              THE COURT:  Please be seated.  You may step down,

4     Ms. Garcia.

5              All right, Counsel, let me hear you on this.

6              MS. AGUIAR:  May I actually understand the basis

7     for the objection?  Because my understanding --

8              THE COURT:  The basis is that it's not relevant,

9     that this whole area of collaborative work essentially is not

10    relevant to this phase or to any issue before the court or

11    before the jury.

12             MS. AGUIAR:  I was moving on to a different point,

13    your Honor, which is that on this particular sculpt,

14    Ms. Garcia gave specific comments.  So there were changes

15    made.  I mean, this is testimony that's in evidence.

16    Margaret Leahy testified about these changes.  This is where

17    the change came from.  Ms. Garcia actually wanted these

18    changes made and suggested them to Ms. Leahy.  So it actually

19    doesn't go to collaboration, your Honor.  It goes to what you

20    have said we can get into, which is what changes were made.

21             THE COURT:  Let's back up for a moment and talk

22    about this collaboration evidence.  Is there going to be any

23    more of this evidence?

24             MS. AGUIAR:  Let me think about that for a moment.

25    I don't believe so.  I was just trying to think in my head

afaf730e-bdbe-4545-af08-157421413e63

Page 6875

1    who was at these meetings and whether or not they were going

2    to be testifying.  I believe the answer is that there would

3    not be other witnesses that would address this.

4                    THE COURT:  Very well.  All right.

5                    MS. AGUIAR:  But I do think I've moved on here

6    specifically to talk about the changes in the sculpt rather

7    than this going to a collaboration point.  And Ms. Garcia

8    will testify that some of the specific -- she recognized some

9    of these as comments that she made and changes that she

10   wanted made in the aesthetic look of the sculpt.

11                   THE COURT:  Very well.

12                   MR. ZELLER:  I think the Court knows, from looking

13   at the brief that we filed on the joint authorship issue,

14   that she's going right down the factors.  Control was a

15   question asked.  Who had control of this.

16                   She's trying to parse the comments.  What's

17   relevant to be the changes that were well outside the scope

18   of this.  And as the Court knows, number one, this was

19   something that could have, should have been and must have

20   been raised in 1-A if they were going to make this assertion.

21   And in addition, it was not in the final pretrial conference

22   order.  So all of this is waived.

23                   And it also just fails as a matter of law.  Now,

24   truth be told, I'm half tempted, your Honor, to simply ask

25   for a jury instruction, submit it to the jury with an

Page 6876

1    instruction that says --

2            THE COURT:  I think that might be the best -- the

3    joint authorship issue is what you're talking about.

4            MR. ZELLER:  With an instruction, your Honor, that

5    makes it very clear that if they acted illegally in producing

6    this sculpt, that it cannot be a work of joint authorship.  I

7    mean, it is obviously -- there's only one result, and in

8    fact, no other result could even survive a JMOL, given the

9    findings already made in Phase 1-A about their illegal

10   conduct.

11           So, I mean, I know I'm not there yet, your Honor,

12   but honestly, that she has asked now a series of questions,

13   both now of Ms. Garcia as well as previously the questions

14   that were asked of Ms. Leahy that really just transparently

15   go only to joint authorship and this theory that they want to

16   espouse.  We've objected at every stage of this.  It was not

17   raised, hasn't been properly preserved.

18           And, you know, if the Court is going to entertain

19   relitigating additional ownership issues, then there are

20   probably some things that they are now saying that frankly we

21   would potentially want to put on the table and say that the

22   jury ought to determine whether Mattel owns those as well,

23   given the time period, given some of the differences we're

24   hearing between 1-A and 1-B.

25           THE COURT:  Let me ask you, are you seeking joint

1    authorship?  I need a definitive answer to that.  Because

2    there are a host of legal issues, including a very incomplete

3    treatment of derivative law in MGA's brief, that need to be

4    picked up if this is the route that we're going on.

5           MS. AGUIAR:  And in terms of arguing that brief, if

6    you'd like to do that now, Mr. Hansen is --

7           THE COURT:  The first question is the question I

8    have pending.  I want that question answered.  Are you

9    seeking joint authorship of the works in question?

10          MS. AGUIAR:  I believe the answer is yes, and let

11   me explain where that comes from, which is that in the first

12   phase, I'm kind of -- I was kind of amazed by the brief that

13   Mattel filed because they said that Phase 1 established their

14   copyright ownership of that sculpt.  And I was really

15   surprised when I read that in their brief.

16          THE COURT:  I disagree with that assessment.

17   Obviously, copyright infringement issues were reserved

18   expressly for Phase 1-B.  Everybody knows that.

19          MS. AGUIAR:  Right.  So when they said that their

20   ownership of that sculpt had been established, we think

21   that's wrong.  We think that the jury verdict --

22          THE COURT:  Well, the issue -- and this is a

23   surprise to this Court in the sense that joint authorship

24   never saw the light of day that I can recall in summary

25   judgment practice.  This never saw the light of day in the

Page 6878

1   pretrial conference order.  This is an entirely new one to

2   the Court.  This takes me entirely aback.

3         There's a whole host of legal issues that we now

4   need to brief on joint authorship.  I need to reconsider the

5   undisputed evidence.  I think this certainly brings up a

6   number of the issues that Mr. Zeller just made allusion to.

7   But this really is a change in direction from just -- just

8   the Court was not prepared for it.  The last thing I thought

9   you were going to be seeking is joint authorship based on the

10  facts of this case.

11        I've heard apportionment over and over again on

12  damages, and the focus has been on the damages and all of

13  that.  And that was what came up with Mr. Nolan at sidebar

14  repeatedly throughout Phase 1-A.  Not once did I hear -- we

15  can check the transcript.  I'm sure someone did do it, if the

16  phrase joint authorship or joint author was ever used at any

17  point in time up until the last couple days.

18        MS. AGUIAR:  And I think that this is largely a

19  function of the verdict form and the jury's verdict.  The

20  verdict form merely establishes that he created it either by

21  himself or jointly with other people at a certain time.  So

22  because we don't know whether the jury found for any

23  particular item whether he created it by himself, solely, or

24  whether he created it jointly, we don't have the question

25  established of the owner --

afaf730e-bdbe-4545-af08-157421413e63

Page 6879

1          THE COURT:  Yes, because it wasn't in dispute.

2   Nobody in this courtroom thought that somehow anybody at MGA,

3   from Mr. Larian on down, had any thought about Bratz or the

4   Bratz drawings prior to Carter Bryant doing all of the Bratz

5   drawings and bringing them to MGA; correct?

6          MS. AGUIAR:  That's correct, but let's talk about

7   the specific example that we're dealing with here.  We're

8   dealing with a sculpt that was created and -- that's a loaded

9   word.  A sculpt that was made by Margaret Leahy.

10          THE COURT:  Yes.

11          MS. AGUIAR:  So I have to say that --

12          THE COURT:  But there's no question that it was

13   made as a result of someone saying these drawings look great.

14   Namely, Paula Garcia saying these drawings look great.  Here,

15   make a sculpt.  They were trying to make a doll to reflect

16   the drawings; correct?

17          MS. AGUIAR:  They were trying to make a doll, and

18   they were trying to figure out whether -- and this sort of

19   goes to some of the evidence that's going to come out in this

20   phase, whether making a doll that looked just like those

21   drawings would make any sense.  Whether it would sell.

22   Whether it would be appropriate.  And so actually, I disagree

23   that the ultimate goal was to make a doll that looked exactly

24   like the drawings.  That's Mattel's argument, and I

25   understand that.  But --

afaf730e-bdbe-4545-af08-157421413e63

Page 6880

1          THE COURT:  Can you point to this argument being

2     raised before the Court any time prior to this last few days?

3          MS. AGUIAR:  We have always argued, your Honor,

4     that we didn't copy those drawings, that we designed away

5     from them.

6          THE COURT:  Counsel, please answer my question.

7          MS. AGUIAR:  I'm sorry.  I thought I was.

8          THE COURT:  Joint authorship.  We all know the

9     phrase joint authorship.  We're all familiar with copyright

10    law.  That has joint authorship been proffered as a defense

11    or argument at any point in time prior to the last few days?

12         MS. AGUIAR:  I think it was addressed in the jury

13    instructions.  I want to turn it over to Mr. Hansen because

14    we really are getting into arguing the motion, and I don't

15    want to step outside the bounds of where --

16         THE COURT:  Where in the jury instructions do we

17    mention joint authorship?

18         MR. HANSEN:  Your Honor, it's in our jury

19    instructions that were filed immediately following the 1-A

20    trial.

21         THE COURT:  Okay.  So prior to this point, though,

22    in the pretrial conference order, prior to trial, during

23    summary judgment, and during the entirety of Phase 1-A,

24    there's no mention of joint authorship; correct?

25         MR. HANSEN:  That's correct.  The sculpt that's at

afaf730e-bdbe-4545-af08-157421413e63

Page 6881

1    issue, the blue sculpt, was not in the prior pretrial

2    conference order either.  So the issue only came up as a

3    result of the 1-A verdict.  It's not in the final pretrial

4    conference order.  So as a result of the verdict, once the

5    jury determined that, that raised the issue of joint

6    authorship, which was fully briefed in our papers.

7             THE COURT:  It's not fully briefed in your papers

8    because your papers on derivative works, you stop short of

9    the bottom line.  You indicate, correctly so, that a

10   derivative work, that the owner of the copyright or the

11   originator of the copyright cannot claim a copyright in that

12   work.  However, and this is the however that's missing in

13   that -- in your analysis on the derivative work, they still

14   can control those derivative works.  They still have the

15   right to control those derivative works.  That's the part you

16   leave out in your analysis.

17            MR. HANSEN:  I'm not sure what you're saying, your

18   Honor.  They don't have the right to own it, and therefore,

19   they would not have a right to sue based on it.

20            THE COURT:  But they have a right to control it.

21            MR. HANSEN:  I'm not sure what you mean by control.

22            THE COURT:  Why don't I provide you Patry.  Patry

23   does a much better job of explaining it --

24            MR. HANSEN:  We do cite to Patry in our brief.

25            THE COURT:  I know, but you pick and choose what

Page 6882

1    you cite.  And that's my concern.

2              MR. HANSEN:  I tried to cite to the parts that I

3    thought were relevant.  I'd be happy to look at it.

4              THE COURT:  I respectfully think that you omitted a

5    very important part of the citations to which you made,

6    Counsel.

7              MR. HANSEN:  I apologize if that's true.  I'd be

8    happy to look at it.

9              THE COURT:  Please do.  Let's regroup at -- well,

10   let me hear from Mr. Zeller.

11             MR. ZELLER:  Because some of the factual issues

12   that were raised, if I could just maybe put this before the

13   Court and not so much argue it, but just some of the factual

14   statements that were made in 1-A about the relationship

15   between the drawings, which there could not even remotely be

16   an argument that those are jointly controlled or owned or

17   have any joint authorship.  And the sculpt, 1136 that's now

18   at issue.

19             Paula Garcia testified in 1-A, and this is page

20   612, lines 6 through 20, out in this range:  "So being that

21   those drawings don't belong to MGA, but interested in proving

22   out this 3D version of his sketches, I asked Margaret Leahy

23   to sculpt a rendition of his portfolio sketches."

24             There are very similar statements making it clear

25   that at best what was done was a derivative work.

Page 6883

1        Another place, page 792 of the transcript through

2   793:  "So one of the explorations was to prove out his

3   sketches into a 3D form with Margaret."

4        This is Bryant's testimony from Phase 1-A, pages

5   2747, lines 8 through 20 and thereabouts:  "But when you gave

6   her feedback, you were doing that to try to capture the look

7   that you had created; right?  That's the reason you gave her

8   feedback."  Obviously, talking about the feedback to Margaret

9   Leahy about the sculpt.

10       "Answer:  Well, yeah, I think so."

11       Now, one reason why this is important, your Honor,

12  and this is something that I think is very critical to the

13  derivative analysis.  Not only, of course, the issue that's

14  in the papers in terms of -- because the issue is not -- the

15  issue isn't their ownership.  The issue isn't our ownership,

16  I should say.

17       The issue is whether they can claim some sort of

18  joint authorship, and we think the cases preclude that, but

19  also the Court will recall we looked at the ERG case

20  recently.  The Court found very significant that the idea of

21  ERG could somehow have additional rights in the 3D costumes

22  it created, found very troubling because it meant that this

23  licensee basically would be permitted to stop or interfere

24  with the owner's ability to have others create three

25  dimensional costumes.

1              This is a very similar situation.  If MGA is

2    somehow allowed, and I actually think that there's no

3    authority to support this idea that having induced Carter

4    Bryant to secretly work on this project and to work on

5    preparing a derivative work, that somehow that could give

6    rise to any rights that MGA has, I --

7              THE COURT:  Patry makes it clear.  Certainly the

8    infringer does not have copyright in the work.  Neither does

9    the owner.  It's a derivative work, but they have control

10   over it.  And they have a right to preclude that use.  And

11   that's what Patry goes on to explain.

12             MR. ZELLER:  And there are some technical reasons I

13   would disagree with all of the analyses he makes, but the

14   bottom line is it renders all of this irrelevant.  They

15   cannot assert ownership.  Whether it means that there are no

16   rights in the sculpt, whether both Mattel and MGA, or whether

17   it means that Mattel still has rights in the sculpt but MGA

18   doesn't, the result is the same.  This is irrelevant.

19             THE COURT:  I see how all of this goes to the

20   ownership, the injunctive issues that the Court is going to

21   have to ultimately address.  I think Ms. Aguiar's response

22   would be that at least it goes to damages.

23             MR. ZELLER:  I don't think it goes to damages.

24   What one could potentially argue is that if no one had any

25   rights in that sculpt, that there would be no infringement

Page 6885

1    claim.  That would be the upshot of it.  Now, frankly, the

2    argument, the counter to this notion that somehow --

3              THE COURT:  Why doesn't it also diminish the amount

4    of damages, to the extent that damages can be attributed to

5    the noninfringing elements?

6              MR. ZELLER:  Well, you see, your Honor, I think

7    that gets us back into exactly the kind of quandary that ERG

8    says really you can't have happen, which is that somehow our

9    rights would be interfered with.  The upshot of their

10   argument is fine, Mattel has rights in the drawings, but

11   because we, MGA, procured an unauthorized derivative, we're

12   now able to cut off some aspect of Mattel's rights.  That

13   just cannot be the case.  And that's, I think, exactly the

14   kind of concern --

15             THE COURT:  That's what I circled back to Patry's

16   analysis.  That even the copyright holder has the right to

17   control the work, and obviously Mattel, in controlling that

18   work, would be affording MGA that right to make those -- use

19   it in that derivative fashion.

20             MR. ZELLER:  And what I would say --

21             THE COURT:  And, Mr. Hansen, I'll invite you, but

22   there's nothing in your brief in which you dispute that these

23   are derivative.  You don't even make an attempt to do that.

24   Is that a concession, or do you want to argue that further?

25             MR. HANSEN:  We, in fact, argued in the first part

afaf730e-bdbe-4545-af08-157421413e63

1   that we owned the copyright.  The very first section is based

2   on the standard for being an author under the copyright law.

3   It's our view that we actually own the copyright.  We're not

4   conceding --

5          THE COURT:  I understand that.

6          MR. HANSEN:  I think the whole derivative work

7   thing is a red herring, because just the mere fact that it

8   may have started somewhere with her looking at the drawings,

9   it's only a derivative work if it infringes.  This is the

10  problem with the derivative work in this entire case.  A

11  derivative work isn't something that's just based on

12  something.  A derivative work is something that actually

13  infringes something else.  So we're not conceding the

14  infringement issue or derivative work at any stage.

15         THE COURT:  That's all linked to your argument on

16  joint authorship.

17         MR. HANSEN:  In this brief it is, yes.  And we have

18  the issue of derivative work in the jury instructions.

19  Derivative work is not a shorthand for infringement.

20  Derivative work is --

21         THE COURT:  I understand it's not a shorthand for

22  it.

23         MR. HANSEN:  I know you do.  Yes.

24         THE COURT:  But it's not the end of the analysis,

25  though, either.  I just want to get through this period of

Page 6887

1    the evidence.  When I say that, I mean there's certainly

2    serious issues.  This jury is going to be instructed

3    intensively on what they can and cannot find as a matter of

4    copyright law.  I just want to get through this evidence, and

5    I don't want to have evidence on the one hand that doesn't

6    come in, that MGA needs properly for its argument on damages

7    or copyright infringement.

8              On the other hand, I do not want to unduly confuse

9    a jury that's going to have a complicated task before it in

10   any event.  And that's what I'm trying to strike here.

11             MR. HANSEN:  And all we were trying to get at is to

12   the extent the blue sculpt is going to be used as a work that

13   is now being claimed as a basis for infringement, that's the

14   issue that we have, and the blue sculpt is not one of the

15   works that is part of the final pretrial conference order.

16   It is not -- I don't know whether --

17             THE COURT:  I do need you, Mr. Zeller, to address

18   that.  Because that's a point Mr. Hansen has raised several

19   times now, and it does somewhat rebut this concern the Court

20   has about the new nature of the argument.  Their authorship

21   is focused on the sculpt, and the sculpt itself was not part

22   of the pretrial conference order.

23             MR. ZELLER:  Well, I guess I mean they are the

24   proponents of this joint authorship issue.  I think they are

25   somewhat conflating the issues.  The way I view it -- and by

Page 6888

1      the way, I can cite --

2              THE COURT:  They are not claiming joint authorship

3      on any of the drawings that were at issue in Phase 1-A.  If

4      they were doing that, I would find that even more

5      disconcerting.  This joint authorship issue has arisen in the

6      context of this sculpt which Mattel convinced the Court to

7      include on the jury form, the jury verdict form, but that was

8      not part of the pretrial conference order.  The jury has made

9      the finding, it is a joint or solely created finding.  I

10     guess I am persuaded to a certain extent by the argument that

11     that has invited now the joint authorship analysis, which you

12     may be correct, that ultimately it needs to be instructed to

13     the jury on.

14             But my only question now is to how to navigate the

15     waters in terms of allowing sufficient evidence in that's

16     relevant to the issue.  An issue that's properly going to be

17     before the jury.

18             MR. ZELLER:  First of all, we don't agree that's

19     properly in front of the jury.  The real danger, of course,

20     in having to instruct them on all of this is that, of course,

21     it complicates things.  It may cause confusion.  It's going

22     to open up new areas of testimony in this case.  And I don't

23     agree that somehow, because the sculpt was not in the final

24     pretrial conference order, I actually think it was, but even

25     assuming it's not, I have to go back and look.  I don't

Page 6889

1    recall that part.

2            THE COURT:  I seem to remember the argument being

3    made.  Someone is going to have to take a look here during

4    the lunch break.  I trust Mr. Hansen, you'll correct the

5    Court's misimpression if the sculpt was part of the pretrial

6    conference order.

7            MR. HANSEN:  If it was, we'll correct it.  I

8    believe it's not, but we'll look.

9            MR. ZELLER:  I believe the Court was recalling that

10   the sculpt drawing, that we put a reference to a copyright

11   registration in for.  In fact, when we're talking about this,

12   I am fairly confident, and I'll find it, that we actually

13   said, in the final pretrial conference order, that it was all

14   the sculpts, all the drawings, any other matter, including

15   the name that Carter Bryant created while he was employed by

16   Mattel.

17           But I guess even apart from that, your Honor, I

18   guess I sort of view it this way.  I mean 1136 was on the

19   verdict form.  Clearly ownership, ownership was Phase 1-A.

20   And that's actually in the Court's phasing order.  To the

21   extent that they had --

22           THE COURT:  Ownership under the contract.  You're

23   correct.

24           MR. ZELLER:  And to the --

25           THE COURT:  Not necessarily ownership of copyright

Page 6890

1   rights.  Those are two different things.  That's not going to

2   be determined until the Court makes a decision on copyright.

3   That's actually phase 3.  That's beyond the trial.

4          MR. ZELLER:  Finally, if they had an issue and

5   thought that somehow going into the infringement phase, that

6   the ownership of that sculpt could somehow reside, whether in

7   part or in whole on MGA, I think that was the time for them

8   to raise it.

9          When it was on the verdict form, Exhibit 1136,

10  regardless of what happened with the final pretrial

11  conference order, the fact is once it was on there, it

12  conforms to proof.  It's Rule 15, I think it is.  But it's

13  the one that conforms to proof, and it's gone.

14         THE COURT:  All right.  Putting aside your waiver

15  argument, substantively, Counsel.

16         MR. ZELLER:  Sure.  What I would say is this, your

17  Honor.  And this is the further step, and this is really the

18  response to, I think, the next step in the analysis here.

19  Which is MGA tries to posit that because of their illegal

20  conduct, somehow that means that all the rights in the sculpt

21  were destroyed under derivative works law.

22         But, of course, and I'll set aside Patry for a

23  moment.  But the cases, of course, are involving a situation

24  where it was one person who created the unauthorized

25  derivative.  So, of course, when the Court speaks of there

Page 6891

1    being no rights in the derivative work, that the party

2    preparing it could avert cert, well, that's because they

3    didn't have a situation where there were joint authorship

4    claims being asserted.

5         So they weren't confronted with the situation of

6    where you had kind of a mixed situation here, which is Carter

7    Bryant -- I mean, obviously there's no dispute that if Carter

8    Bryant had by himself mechanically done all of the sculpting,

9    that that would fall within the scope of his contract.  It

10   would be solely owned by Mattel.  Exactly like the drawings.

11        So the issue here is whether or not the fact that

12   there was another party that was interjected into this,

13   Leahy/MGA, and then making a contribution to what was Carter

14   Bryant's work, even assuming that it's the joint authorship

15   situation, that somehow that destroyed Carter Bryant's

16   contributions.  And that, I don't think, is borne out by the

17   cases.

18        I think that the Patry analysis takes it a little

19   too far or overlooked one counter to this, which is that my

20   view would be that in the event that MGA did acquire any

21   rights to that sculpt as a result of some transfer by

22   Margaret Leahy, those rights were held in constructive trust,

23   and they should be ordered back as an equitable remedy to

24   Mattel.

25        THE COURT:  And that's something that we can cross,

Page 6892

1    Counsel, when we get to equitable remedies.  I'm not saying I

2    agree or disagree at this point.  My question is how could

3    the Court be in a position right now to preclude evidence of

4    joint authorship altogether?

5            MR. ZELLER:  Because I think fundamentally joint

6    authorship, on the substance of it, regardless of how you

7    carve it up, is irrelevant.  It is completely irrelevant.

8            THE COURT:  Even if the jury were to find joint

9    authorship at the end of the day, you're saying the Court

10   should award those rights back to Mattel.  But isn't that

11   putting the cart before the horse?

12           MR. ZELLER:  I don't think so, your Honor, because

13   the situation has been created here, because --

14           THE COURT:  You're asking me basically to rule on

15   it right now.

16           MR. ZELLER:  Well, it may have to to the extent

17   that MGA is going to argue that they could not have infringed

18   that sculpt because of their so-called joint authorship

19   issues.  Because what they are going to try and argue, I

20   think, at the end of the day, is that well, if the -- and I

21   think it is kind of the point they are trying to make in the

22   brief or are making in the brief, which is that if it's an

23   unauthorized derivative, there are no rights in it

24   whatsoever, no copyright interest to adhere in this sculpt.

25           Therefore, Mattel could not obtain damages based on

Page 6893

1   the infringement of that sculpt.  My response is well, no,

2   all those rights are owned by us in any event because they

3   are being held in constructive trust.  So it takes us back to

4   the infringement point.  In other words, is this a

5   copyrightable work in which we could obtain copyright

6   infringement damages for.

7           So I hear what the Court is saying.  I think in the

8   normal situation, it would be putting the cart before the

9   horse to make that determination, but we can't go to the

10  jury, at least under MGA's argument on whether or not there

11  could even be infringement of this work, because they are

12  going to claim that it's jointly authored.  But --

13          THE COURT:  This would be an entirely different

14  situation if there was a cognizable argument for independent

15  authorship, it would be severed, but based on the jury

16  findings, it's basically impossible.

17          MR. ZELLER:  That's right.  So that's what creates

18  the issue.  And from my perspective, because regardless of

19  whether you apply what I would say is the more narrow

20  consequences of there being this unauthorized derivative

21  contribution, we'll call it, whatever the case may be,

22  whether it destroys MGA's rights in that sculpt, alleged

23  rights in that sculpt, or whether it destroys both MGA's and

24  Mattel's, that still renders it irrelevant.  That's where I

25  guess I'm thinking that this whole issue of joint authorship,

Page 6894

1   you know, is not really one that ultimately gets determined

2   by the jury in any event.

3            But because if -- and I think the facts bear this

4   out -- if -- well, actually let me start with this.  I mean,

5   there is no argument that they had Mattel's permission to

6   make this derivative.

7            THE COURT:  That's understood.

8            Mr. Hansen, why don't you respond to this last

9   point, that even at the end of the day, if you establish

10  joint authorship, that it goes nowhere in light of the

11  fundamental basis for all of this work, namely, Carter

12  Bryant's drawings, which your client has repeatedly in

13  litigation affirmed and reaffirmed.

14           MR. HANSEN:  The basic response is that we have

15  discussed the Carter Bryant drawings as being the inspiration

16  for the things that followed, including the Bratz doll.

17  There are multiple carts before the horse here, your Honor,

18  and we need to start at the beginning.  The first part is we

19  don't actually believe that the jury verdict in Phase 1-A

20  precludes a finding of sole authorship in the copyright by

21  Ms. Leahy.

22           The first portion of our brief is directed to the

23  issues that need to be determined to decide who is an author

24  of this sculpt.  And the evidence that we've cited in our

25  brief as to copyright ownership, authorship itself, goes to

Page 6895

1    the issue that Mr. Bryant's general comments, here's my

2    drawings, go take and do your magic with them, and then

3    Ms. Leahy has testified that she put the drawings away.

4         She testified that as to other contributions that

5    Mr. Bryant may have made to the sculpt, they arise to the

6    level of essentially one comment during a meeting potentially

7    where he says to make the ankles thinner, and she rejects

8    that for construction purposes.

9         In terms of copyright law, we don't concede,

10   putting aside what exactly the Phase 1 means, we don't

11   concede copyright ownership, and that is the first part of

12   our brief.  The fact that Mr. Bryant may have given some

13   generalized instructions or even the fact that he may have

14   given her the drawings originally, if it's believed, which we

15   think there's no counterevidence that she put those in the

16   drawer and basically started on her own, we don't believe

17   that Mr. Bryant, then, would be an author under the Copyright

18   Act regardless of what the created verdict in Phase 1 means.

19   So that's the first cart.

20        Then the second one, then, is --

21        THE COURT:  How would you ever reconcile a

22   finding -- because essentially this ownership is not a joint

23   authorship on those facts that you are suggesting, that it

24   was an independent creation.

25        MR. HANSEN:  I'm suggesting that she's the sole

Page 6896

1    author.

2              THE COURT:  Therefore, independent creation.

3              MR. HANSEN:  That's correct.

4              THE COURT:  How can that be reconciled with a jury

5    verdict which found that the work in question, namely, the

6    sculpt, was jointly or solely created by Carter Bryant while

7    he was working at Mattel?

8              MR. HANSEN:  Because the creation aspect, the jury

9    could have credited that Mr. Bryant in fact met with

10   Ms. Leahy and gave suggestions as to the sculpts themselves.

11   They could have believed the evidence that she saw the

12   drawings.  We don't know to what extent they felt that

13   Mr. Bryant's contributions to the blue sculpt rows to the

14   level of authorship under the Copyright Act because it was

15   specifically determined in Phase 1 that ownership of

16   copyright would not be resolved and would be reserved for

17   this phase.

18              That's the gist of our argument.  And whether or

19   not they can control something is a different issue as to

20   whether or not they have authorship.  We think at a minimum

21   there is evidence that would suggest that -- on the sculpt,

22   Mr. Bryant essentially had --

23              THE COURT:  You're not making this argument with

24   respect to any of the drawings or anything else.  Just the

25   sculpt; correct?

Page 6897

1        MR. HANSEN:  We haven't yet --

2        THE COURT:  No, now is the time, Counsel.  Pretrial

3    conference was the time.  But now is the time.

4        MR. HANSEN:  We are.  Absolutely.

5        THE COURT:  Which ones?

6        MR. HANSEN:  As to the vendor drawings, the four

7    drawings that were made that were consistently put up as to

8    these slides, our argument is that the contributions -- if

9    you look at the evolution of those drawings, and the evidence

10   will come in, that the participation in terms of authorship

11   as to the copyrightable content of those drawings was

12   participated in by MGA employees or contractors and that at a

13   minimum, there's a colorable argument or a fact question

14   whether or not there is joint authorship.

15       THE COURT:  Are you arguing independent creation --

16   you just told me that you're arguing independent or creation

17   on the sculpt.  Are you arguing independent creation on the

18   four drawings?

19       MR. HANSEN:  It's actually just a shade more

20   complicated than independent creation because it could be

21   found to be -- in order for it to be a derivative work, it

22   has to be infringing.  So Mr. Zeller and Mattel, we

23   understand their arguments are always jumping to its

24   unauthorized derivative work.

25       The question is that we're suggesting that our

1    contribution -- our contribution to the sculpt is essentially

2    all of it.  As to these other drawings, it may be a more

3    difficult question, what we believe our contribution as to

4    the vendor drawings, the ones that are second over from the

5    concept drawings in the slides that they show, are eligible

6    for an argument of joint authorship.  The contribution would

7    be by the MGA people in terms of authorship of those specific

8    drawings.  We're not arguing as to sole authorship as to

9    those, but joint authorship.  And that's one of the reasons

10   we submitted the instructions as soon as the verdict came in.

11             THE COURT:  Very good.  All right.  Well, I need to

12   think about these -- any others, Mr. Hansen?

13             MR. HANSEN:  Any others?

14             THE COURT:  That's it.  The four drawings and the

15   sculpt.

16             MR. HANSEN:  I believe so.  The only qualification

17   is that --

18             MR. NOLAN:  May I?

19             THE COURT:  Please.

20             MR. HANSEN:  The control drawing, the one that is

21   the issue that arose this morning as to whether or not it was

22   based on the sculpt or vice versa are to the extent that it's

23   based on the sculpt.  You know, if the sculpt is not

24   infringing and it's based on the sculpt, then actually it

25   would be an unauthorized derivative work of a work that MGA

Page 6899

1    owns.  So all of this stuff can get a little bit complicated,

2    but this is the only other one.

3              THE COURT:  It would be a -- wait a second.  You're

4    saying that might be --

5              MR. HANSEN:  Im sorry.  It would be authorized.

6              THE COURT:  Carter Bryant was working for Isaac

7    Larian at that time.

8              MR. HANSEN:  We would own the right -- I'm sorry.

9    I apologize.  We would own the copyrights and also the rights

10   to control it.

11             THE COURT:  All right.

12             MR. ZELLER:  I think the Court can appreciate how

13   truly extraordinary this argument is.  So MGA, as found by

14   the jury, illegally induces, aids, and abets Carter Bryant in

15   breaching his fiduciary duty to create, in transferring and

16   disclosing to it what is certainly a group, we will call it,

17   of completely undisputed drawings.  Solely owned by Mattel.

18             So then in secret, still unbeknownst to Mattel,

19   they have other people involved in the process.  And that

20   gives them ownership rights.  I mean, I would defy MGA to

21   cite a single case that even remotely suggests that that is

22   even plausible.  And the Court knows that it's not.  From

23   looking at the ERG case, a point that they have not responded

24   to.

25             Taken to its conclusion, in fact, as part of this

Page 6900

1  argument, it essentially means that they are able to cut off

2  Mattel's rights, its copyright rights, and its solely owned

3  works, undisputedly solely owned works by their own illegal

4  conduct in preparing or having participation in creation of

5  other works that would post those works.

6         That is just not what copyright law even remotely

7  contemplates.  And it's -- that is a policy argument the

8  Ninth Circuit has made perfectly clear in these situations.

9         THE COURT:  Separating what goes to the ultimate

10  issues of ownership from navigating the evidentiary issues in

11  terms of what this jury must hear in order to determine

12  copyright infringement and any damages related thereto, any

13  copyright infringement and any damages related thereto, what

14  do you suggest?

15         MR. ZELLER:  Honestly, your Honor, I think -- I

16  just think it's not an issue at the end of the day.  I don't

17  think it's anything that could be or should be instructed to

18  the jury.  I don't think that there's any point in any of

19  this evidence coming in.  If they want to talk about changes,

20  we have discussed that.

21         But now, of course, they are trying to shove

22  through that loophole this idea that they can talk about who

23  made the contribution.  And, well, Paula, those were your

24  comments, weren't they.  Whether you want to call it joint

25  authorship or however they try and pigeonhole this, it again

afaf730e-bdbe-4545-af08-157421413e63

Page 6901

1  gets back to the point of causing jury confusion, attempting

2  to appeal to the sympathy of the jury that somehow there was

3  work that was done by MGA that ought to be credited beyond

4  what the law allows.  And there's dispute that their costs

5  are going to be deducted.

6          THE COURT:  But at the end of the day, if the jury

7  believes that these works are not substantially similar,

8  based on all of the changes and all of the differences that

9  are pointed out between the dolls and the doll products and

10  the doll packaging and whatever else and the Carter Bryant

11  drawings and the sculpt -- and that is an awkward aspect of

12  the whole thing -- but if they find that there is a

13  dissimilarity, there is not sufficient evidence to establish

14  substantial similarity, the jury finds for MGA.

15          And this evidence of who did the work, whether it

16  was five people or twenty people or one person really is of

17  no moment one way or the other.

18          On the other hand, if the jury does find

19  substantial similarity between the dolls, the products, the

20  accessories and the drawings, whether one person worked on

21  creating the infringement or a hundred people worked on

22  creating the infringement, whether it took them a day or

23  whether they had to really work hard and spend three or four

24  months, that is of no moment.

25          MR. ZELLER:  Right.

1           THE COURT:  What's at issue here is a comparison of

2     the undisputed -- at least from the jury's findings, the

3     undisputed drawings and various items that Carter Bryant

4     created while he was at Mattel with what was done at MGA.

5           The joint ownership issue, though, the joint

6     authorship issue does throw a wrinkle into this if I am not

7     able to resolve it at this point as a matter of law.

8           MR. ZELLER:  Well, I would have to think about

9     that.  I mean, as to what suggestions I --

10          THE COURT:  As do I.

11          MR. ZELLER:  Because I just think that interjecting

12    this issue to belatedly, and what the Court just saw live,

13    real time, them asserting now ownership of new works, joint

14    authorship of new works, we're all hearing about this for the

15    very first time in the last week of trial.  I mean, whatever

16    the rules are, timeliness must provide, the time to have

17    raised that has passed.

18          MR. NOLAN:  Your Honor, very briefly, if I could

19    just close this out.  I just want to point out that in the

20    pretrial conference order, and I think this is where the

21    difficulty has arisen, is that we started this trial on the

22    basis of claims on specific copyrighted works.  The Phase 1-A

23    was defined as simply being -- not simply, I apologize, but a

24    definition of the timing of various drawings, some of which

25    were never copyrighted.  Only 16 of which were ever focused

Page 6903

1    and framed for us in the pretrial conference order.  The

2    sculpt, I have it here.

3              THE COURT:  It's not there.

4              MR. NOLAN:  It's not there.  Now, the difficulty

5    then arises if Mattel now, based on the verdict in 1-A, now

6    takes the timing question and wants to make the argument that

7    the blue sculpt, 1136, which was awarded to them, now forms

8    the basis of copyright material that they can base their

9    infringement claim on because that was never framed in the

10   case as one of the issues.

11             We only get into these issues now by in effect

12   affording credit to the jury's verdict, and I'm not in any

13   way disparaging the jury's verdict, but that's where the real

14   difficulty comes in.

15             And the last point I wanted to make, just in terms

16   of the confusion here, is that I've heard so many times about

17   what this jury has found and what we stole, your Honor, over

18   our objection, Mattel wanted a general verdict form with

19   respect to conversion.  And it just says is MGA liable to

20   Mattel for conversion.  Is Isaac Larian liable for

21   conversion.  Is MGA liable for conversion.

22             THE COURT:  Right.  And by that implicit is the

23   finding that all of the elements of conversion were met.

24             MR. NOLAN:  Yes.  But there is no definition of

25   what the item or proprietary or confidential information was

Page 6904

1    that was converted.  It is entirely conceivable, your Honor,

2    that the issue that -- we don't know what the jury found was

3    converted.

4              THE COURT:  That wouldn't have been cured by your

5    proposed instruction either.  Your specific Interrogatories

6    did not go down and list all of the hundreds of items either.

7    You wanted to break out the elements, not all of the

8    different items and have them make a specific finding.  You

9    did ask for a breakout of the elements.

10             MR. NOLAN:  I may be wrong on this, and I probably

11   was, but I did think early on that we suggested -- I may be

12   wrong on this.  That was Mr. Russell's point at some point in

13   time, that actually to have symmetry and to avoid this issue,

14   that there should be a specific breakout on --

15             THE COURT:  Water under the bridge, Counsel.

16             MR. NOLAN:  I understand, but regardless of whether

17   or not we characterized it as water under the bridge, I don't

18   think it's appropriate for Mattel to naturally conclude other

19   than the elements under the conversion of what items were

20   actually converted.

21             THE COURT:  Well, we have the same jury,

22   fortunately, and the jury knows what they found on.

23             MR. NOLAN:  Well, and I think that's really the

24   issue here.  You know, as you said, you wanted to wade

25   through this evidence.  I understand that.  And I think a lot

Page 6905

1    of it can be dealt with at the time of the charging

2    conference when we have a better understanding --

3         THE COURT:  I think so as well.  I still have to

4    get to that point.  And I don't have a settled barometer of

5    what comes in or what doesn't.  And this joint authorship

6    issue, which really has been sprung on the Court in the last

7    couple days, really throws a monkey wrench into that.  As I

8    say, this is the first I've been hearing on joint authorship.

9    I don't recall you in your opening statement referring to

10   joint authorship.

11        MR. NOLAN:  I don't believe I framed the issue that

12   way in 1136.

13        THE COURT:  I don't think so.  As a term of art,

14   that is a whole -- that's a whole separate ball of wax.  And

15   that's --

16        MR. NOLAN:  And I'm going back, and it's not in

17   terms of blaming anybody.  I'm just trying to put a stake in

18   this, and that is when 1136, which was not previously in the

19   pretrial conference order, was added to the verdict form,

20   that's when the issue became framed only if and when the jury

21   then made a decision as to the timing of it, and then the

22   effect of the timing finding is what triggers these other

23   discussions.  That's the point I was raising, your Honor.

24        THE COURT:  Just to interject a housekeeping

25   matter, I did receive a couple notes from the jury as to

1    timing.  Juror number -- which one is it?  Basically Juror

2    No. 2 requested that we meet on Wednesday, not Monday of next

3    week related to her teaching.  Juror No. 6 indicated that he

4    had a prepaid vacation starting August 19th, but he's willing

5    to forego that for the sake of this case.

6            So what I think we'll do is we will have those

7    closing arguments on the 13th -- on the 20th, on Wednesday.

8    And that will give us Thursday afternoon while Juror No. 1 is

9    at his friend's funeral, to have the charging instruction,

10   and then we will have Monday the 18th and the 19th.

11   Actually, I'll be picking a jury in the criminal case, but

12   we'll have time on both days to work out the final

13   instructions.

14           This is certainly going to be something that we

15   want to get absolutely correct for both sides.  But it still

16   leaves me somewhat uncertain as to how to proceed with some

17   of this evidence that MGA is trying to get in.

18           I need a few moments to think about it myself and

19   do some reading.

20           Mr. Zeller, anything further?

21           MR. ZELLER:  One thing I would ask, your Honor, is

22   that the upshot of MGA's argument appears to be that there

23   are no rights in the Bratz dolls, that those have been

24   destroyed, which, if that is the case, then we really should

25   have an opportunity to have our damages expert get back up

Page 6907

1    there and testify as to what the value of that destruction

2    was.  This is something that, you know, is obviously very

3    serious.  I mean, I can only assume that part of it is a

4    strategy because they think it's going to damage Mattel

5    further.

6            I hate to say that, but that appears to be the

7    implication here.  Which is, well, Mattel acquired nothing

8    because we, MGA, destroyed them as part of our wrongful

9    conduct.

10           THE COURT:  This has a lot of implications, and

11   that's why I need to think some about this myself.

12           Anything further from MGA before I take a recess?

13           MR. HANSEN:  We disagree with that, but nothing

14   else.

15           THE COURT:  All right.  I'll take a recess.

16

17               (Recess taken at 12:40 P.M.)

18                   - - - - -

19                   1:40 P.M.

20           THE COURT:  Okay.  I apologize for the delay, but

21   this is obviously an issue that we need to get right.

22           Is there anything further from the parties?

23           MR. NOLAN:  Nothing further from MGA.

24           THE COURT:  Okay.  The defense, and it's clearly a

25   defense of joint authorship, is something which should have

Page 6908

1   been presented to this Court a long time before Phase 1-B.

2   My sense is that this is something which MGA has come up with

3   after the verdict in 1-A in the middle of trial.  It wasn't

4   presented in the opening statement.  It wasn't presented

5   certainly in Phase 1-A.  It was not presented at the pretrial

6   conference or in the pretrial conference order.  And it was

7   not presented in the motions for summary judgment and

8   responses thereto.

9           At no time that I can find anywhere in this case

10  has MGA taken the position that the sculpt in question or any

11  of the drawings, the four drawings in question, or anything

12  else was a product of joint authorship, let alone independent

13  creation.

14          To interject that issue now completely muddles and

15  muddies the Phase 1-B, and on waiver alone, I can't find any

16  basis to allow this in at this point.

17          Moreover, the jury's finding with respect to

18  conversion in particular, but as well as the other torts,

19  seem to completely vitiate any basis to argue joint ownership

20  at this point -- or joint authorship at this point.  But that

21  aside, this is -- this was clearly waived.

22          This is a -- not an appropriate time to be

23  asserting this defense.  At a minimum, the jury's verdict

24  found that Carter Bryant created solely, or at a minimum, he

25  created the sculpt in question jointly and various other

Page 6909

1    drawings jointly.  There's certainly no basis for independent

2    creation.  All of this is further belied by the position that

3    MGA has taken time and time and time again in other

4    litigation.

5              So the Court is going to preclude at this point, as

6    a matter of law, the introduction of the joint authorship

7    defense at this late stage in the trial.

8              What that leaves, of course, is apportionment.

9    What that leaves, of course, is testimony, as I've already

10   permitted in, concerning changes and differences and other

11   evidence that relates to how the dolls and accessories and

12   products are not similar to or are dissimilar to the drawings

13   and the sculpt that the jury has already found that Carter

14   Bryant created while he was working for Mattel.

15             And it is through that prism going forward that the

16   Court will evaluate the objections made.

17             Are there any objections concerning the Court's

18   order?

19             MR. ZELLER:  No, your Honor.

20             MS. AGUIAR:  I understand your ruling, your Honor.

21   I need to get some guidance on how it may impact some

22   questions that I ask Ms. Garcia.  There are some drawings,

23   1107 through 1110, which are the retailer drawings, that

24   there is some debate.  There had been some debate about when

25   they were done.  I understand we discussed yesterday that the

afaf730e-bdbe-4545-af08-157421413e63

Page 6910

1    jury found they were done in October.  There was some

2    testimony that was played from Carter Bryant's deposition

3    that he did those drawings in November.

4          The different point that I want to get to, though,

5    is to explain why those drawings look different than the

6    pitch book drawings and why those drawings in some ways look

7    more similar to the dolls and elicit that testimony from

8    Ms. Garcia.

9          Because the jury has not heard any testimony

10   regarding why those were made and under what circumstances

11   they were made.

12         Well, actually, what I would suggest is that they

13   play the video deposition of Carter Bryant where he describes

14   that he made changes to the look of the dolls, the look of

15   the drawings, 1107 through 1110, and I think we should be

16   able to elicit testimony from Ms. Garcia on the same subject

17   that Mattel elicited from Carter Bryant through his video

18   deposition regarding why those changes --

19         THE COURT:  Was that their designation or your

20   designation?

21         MS. AGUIAR:  I believe it was a Mattel designation.

22         THE COURT:  I think you may be mistaken, Counsel.

23         MS. AGUIAR:  I'm sorry.  You're saying it was our

24   counter?

25         THE COURT:  I think it was.

1          MS. AGUIAR:  It generated, though, and I appreciate

2     that -- I'm sorry -- from a designation that they made when

3     they wanted to raise the issue of these drawings again.  So

4     by definition, if it was a counter, then they raised the

5     issue in what they played.

6          And if your Honor ruled that it was a valid counter

7     and should come in, then clearly the questions that preceded

8     that pertained to these drawings.

9          And so the jury now has evidence in front of it in

10    this phase from Mr. Bryant regarding those drawings, and I

11    think that we're entitled to have not just Mr. Bryant's

12    testimony on it, because obviously, I don't believe that

13    would be fair.  I think we have to have Ms. Garcia's

14    testimony, and I will proffer to your Honor that --

15         THE COURT:  Do you understand how awkward this is?

16    These are drawings that the jury has already said -- and

17    there was no limitations placed on the timing in this phase.

18    And I'll check that.  They found that these drawings were

19    done by Carter Bryant while he was at Mattel.  You want to

20    describe similarities between those and the allegedly

21    infringing work, which proves their case.

22         MS. AGUIAR:  No.  Differences between the pitch

23    book drawings and the retailer drawings.  And I believe that

24    given the testimony --

25         THE COURT:  But what you are characterizing as

afaf730e-bdbe-4545-af08-157421413e63

Page 6912

1   those and the retailer drawings, the jury has already found

2   were done by Carter Bryant while he was at Mattel.

3          MS. AGUIAR:  Right, but in Mattel's case in chief,

4   video testimony was played of Mr. Bryant where these precise

5   drawings were discussed.

6          THE COURT:  I understand that.  That doesn't

7   address the issue.  I don't care which side is trying to do

8   it.  I'm not going to allow anybody to submit evidence that

9   is inconsistent at this point to unsettle, to render an

10  inconsistent jury verdict.

11         MS. AGUIAR:  I understand that, your Honor.  But

12  that evidence already came in.

13         THE COURT:  Maybe it should be stricken, then.  It

14  was your evidence.  It was your counterdesignation.

15         MS. AGUIAR:  I understand that, your Honor, but it

16  was a counter to a designation that Mattel had affirmatively

17  offered.  We didn't offer the designation in a vacuum.  It

18  was -- we had designated testimony that had followed some

19  testimony that Mattel had designated regarding these

20  drawings.

21         THE COURT:  You're not addressing the Court's major

22  concern.  So you're saying that they have opened the door to

23  basically unsettling the verdict in the first phase.

24         MS. AGUIAR:  No.  They have clearly opened the door

25  to discussing what these drawings are.  And why is it that

afaf730e-bdbe-4545-af08-157421413e63

Page 6913

1    these drawings -- I mean, I don't understand how it would be
2    inconsistent with the verdict to explain, okay, you found
3    when he made them.  But I'm not trying to introduce evidence
4    from her as to when they were done except to just say okay,
5    were these the drawings that were done in connection with the
6    retailer meetings just to identify them.  It's testimony
7    regarding the drawings themselves, why did they look the way
8    they look.  How did they come about.  Not timing.
9              THE COURT:  All right.  Let me hear from Mr. Zeller
10   and Mr. Price.
11             MR. PRICE:  We presented deposition testimony of
12   Carter Bryant that these drawings looked like the dolls.
13   That's one of the issues in this case.  The
14   counterdesignation was these drawings don't look like --
15   there are differences between these drawings and the earlier
16   drugs which were played over our objection, but we didn't
17   open the door to anything except whether these drawings
18   looked like MGA's products, which is the issue in this case.
19             THE COURT:  Right.  And you certainly agree,
20   though, that evidence to the contrary, that evidence that
21   they don't look like the products is admissible.
22             MR. PRICE:  Absolutely.  But evidence that these
23   drawings were created jointly as a result of comments from
24   Ms. Garcia and there was a reason why these drawings --
25             THE COURT:  Ms. Aguiar just committed to the Court

afaf730e-bdbe-4545-af08-157421413e63

Page 6914

1   that there will be no testimony and no evidence as to when

2   they were done.  I'll accept that.

3           MR. PRICE:  Well, it's not just when they were

4   done.  I don't see how Ms. Garcia can toe that line since her

5   testimony is linked with this being done after October 25th.

6   But whether or not how these drawings came into being are

7   irrelevant to the issue in this case, which is whether or not

8   the products infringe the drawings.  Because a jury --

9           THE COURT:  This goes back to the same issue that

10  we had that you objected to with respect to Ms. Leahy.  I

11  understand the why.  Why changes are made are not relevant

12  and it's a danger for confusing.  But how they came into

13  being, how the permutations came about, I can see some

14  relevance to that in terms of underscoring differences.

15          The bigger problem that I have right now is

16  differences between the doll and the drawings are relevant.

17  Differences between drawings and drawings, that's the

18  question that I could never get an answer to from Ms. Aguiar,

19  as to how that's relevant to anything.

20          MR. PRICE:  That's what she's talking about, is

21  having Ms. Garcia --

22          THE COURT:  I understand that.  That's why I need

23  an answer from someone at MGA or the defendants to explain

24  how the drawing-to-drawing testimony is relevant unless

25  there's this element that these drawings were outside, and

1    they are not based on the jury's findings.  That's what I'm

2    looking for.

3              If Ms. Garcia wants to talk all afternoon about how

4    these drawings are not similar or substantially similar to

5    the dolls, she can have at it.

6              MS. AGUIAR:  I understand, your Honor, but I have

7    in front of me the designations that were played already to

8    the jury.  And the questions about these drawings were

9    whether the drawings were used to create the Bratz model that

10   was shown to the Hong Kong toy fair, and in creating them,

11   who made the drawings, and then we played the counters to

12   that.

13             So the jury saw all of that testimony.  And so to

14   not be able to have testimony on the same drawings and

15   commenting on the same drawings as to why they were even

16   made, and there's changes, obviously, in those drawings.  Why

17   are those drawings -- why do those drawings look different?

18             THE COURT:  Why is that relevant?

19             MS. AGUIAR:  It's relevant, and I keep coming back

20   to this, but I think it's an absolutely critical point.  It

21   goes to the state law claims.  It goes to whether our process

22   of creating the doll was done merely from the drawings.  And

23   to go back to the opening statement and to go back to

24   Mattel's questioning of our witnesses and their case in

25   chief, it's Mattel should not -- I'm sorry.  MGA --

Page 6916

1            THE COURT:  I'm with you on that, Ms. Aguiar,

2       whether the dolls were created from the drawings.

3            Again, what this is getting to, you're trying to

4       make drawing-to-drawing comparison, not drawing to doll.  I

5       will let you -- I will let Ms. Garcia go all afternoon on

6       drawing to doll.

7            MS. AGUIAR:  Right.  But what Mattel is saying is

8       that these retailer drawings are so much like the dolls.

9            THE COURT:  Right.

10           MS. AGUIAR:  But there's a reason why those

11      retailer drawings are closer to the dolls.  And we should be

12      able to offer testimony that the reason those retailer

13      drawings are closer to the dolls was because of input from

14      MGA, and that absolutely goes to the state law claims.  We're

15      not contesting timing.  And I understand your Honor's ruling

16      regarding joint authorship.

17           But this goes to whether our development of the

18      doll, how much of it related to Carter Bryant's drawings

19      versus how much of it related to our vision of what the doll

20      should look like, what the fashions should be like, what the

21      audience would be that it would appeal to, the look of the

22      doll in those drawings is different, and the reason the look

23      of the doll in those drawings is different is because they

24      were directed by Paula Garcia.  And they were directed by

25      Paula Garcia because she wanted a different look.

afaf730e-bdbe-4545-af08-157421413e63

Page 6917

1          So that's my direct answer to your question.

2          THE COURT:  This gets back to the conflation of the

3    apportionment issue.  You are conflating apportionment of

4    damages with the --

5          We've identified the elements, Counsel.  Mr. Nolan

6    provided that list to the Court.  The dolls themselves are

7    inextricably intertwined with the protectable elements of

8    copyright.

9          MS. AGUIAR:  But the fashions in those drawings are

10   different than the --

11         THE COURT:  She can speak to the fashions

12   absolutely.

13         MS. AGUIAR:  In the retailer drawings.

14         THE COURT:  She can speak to -- where is that list?

15   Here it is.  Packaging, noncopyrighted accessories, which is

16   fashions, promotional materials, themes, and additional

17   characters.  That's the apportionment.

18         MS. AGUIAR:  Okay.  So she can speak, then, to the

19   fashions that are depicted in the retailer drawings and how

20   those came about and why they look the way they look.

21         I will make sure she restricts her comments and

22   testimony to that.

23         MR. ZELLER:  Your Honor, I hate to quarrel with

24   what the Court has said, but what they represented were

25   noncopyrighted fashions under this heading of accessories.

Page 6918

1  What she is going to be commenting on are Mattel's drawings.

2  There's no question that those are part of what the Court has

3  found to be within the scope of copyright and part of what is

4  pro --

5          THE COURT:  I just stated the second is

6  noncopyrightable accessories.  So if it's a drawing that was

7  done by Carter Bryant, I'm not interested -- Court's not

8  going to -- we're not going to have evidence of that.

9          Ms. Aguiar, if that's your impression, then you are

10  mistaken.  It was noncopyrightable accessories, the second

11  point, not copyrightable accessories.

12          MS. AGUIAR:  Right.  And you are saying fashions

13  are, as I understood it, you said --

14          THE COURT:  Fashions are dresses, clothes.  I've

15  already ruled twice now in orders that they are

16  copyrightable.  Remember the teddy bear case.  We've been

17  through this a couple times.

18          MS. AGUIAR:  I'm not quarreling.  I just want to

19  make sure that we're clear.

20          THE COURT:  I don't know what precise drawings

21  you're referring to right now.

22          MS. AGUIAR:  The drawings 1107 through 1110.

23          THE COURT:  Are those drawings that the jury has

24  found were created by Carter Bryant?

25          MS. AGUIAR:  Yes, those were part of the jury

Page 6919

1    verdict.  But what I'm saying, your Honor, is --

2              THE COURT:  The fashions are copyrightable, if they

3    are copyrightable, they are owned by Mattel at this point in

4    time -- not owned, because the Court hasn't made any findings

5    on that, but the jury has found they were created under the

6    terms of the inventions agreement.  I've already ruled on the

7    inventions agreement transferring ownership.  That is

8    Mattel's.

9              MS. AGUIAR:  Okay.  So even though fashions is one

10   of the elements of apportionment, you're saying --

11             THE COURT:  I have said it, and the record will

12   testify to this.  Noncopyrightable accessories, not

13   copyrightable.  Here on the table and up in the room you've

14   got a lot of noncopyrightable accessories.  A tent.  We had a

15   two-and-a-half-hour hearing on this, and I tried to explain

16   the types of things that are clearly copyrightable

17   accessories.  The tent, the blanket, or whatever.

18             Now there's an issue with respect to drawings that

19   appear on that.  And that's something that we'll need to

20   grapple with probably in instructions.

21             MS. AGUIAR:  But let me raise an issue, then, with

22   regard to the later generation dolls.  After 2001.  After

23   2001, the elements that we are relying on for apportionment

24   and every time they take a totally blank sculpt, this doll

25   right here, it has no hair, no face decoration, no clothes,

Page 6920

1    no accessories.  It's not in a package.  They start from

2    scratch.

3            So that, your Honor, goes absolutely directly to --

4    it goes to so many things.

5            THE COURT:  Well, they don't start from scratch.

6    And that's the whole point of Mattel's case, is that it's not

7    from scratch.  That actually there's a marked, substantial

8    similarity between how the doll comes out and the generation

9    before and before.  Whether that's true or not I don't know.

10   That's going to be for the jury to decide whether there's

11   substantial similarity in all of these permutations and

12   generations of dolls.

13           MS. AGUIAR:  Right.  But this sculpt and what they

14   start with each time.  This blank sculpt.

15           THE COURT:  I'm not saying that I'm disagreeing

16   with you.  But I'm not going to repeat myself.  They start

17   with that, but they also start with the last generation.

18   Dollwise, this is what they start with.  And the look of the

19   doll, arguably, does not differ a whole lot or substantially

20   from this look.

21           It's not like they start with that doll and say

22   willy-nilly now let's come up with something entirely new and

23   different every time.

24           MS. AGUIAR:  Well, they do start with this blank

25   doll, your Honor, and they do decide from scratch let's

Page 6921

1    decide what new doll this is going to be, what theme.  And

2    this is evidence that we were planning to elicit.  We start

3    with a theme.  There was no theme in Carter Bryant's

4    drawings.  Zero.

5              We start with a theme.  They then develop the

6    fashions.  The face paint.  Every time there will be

7    testimony from a face painter and from Ms. Garcia that the

8    face decoration is different.  And the jury will have to make

9    that determination.

10             But in order to show, your Honor, apportionment

11   factors and the fact that we do create -- I mean, I

12   understand that Mattel's -- their theory is that they are the

13   same doll.

14             THE COURT:  Or that they are substantially similar.

15             MS. AGUIAR:  They have actually -- Mr. Quinn almost

16   used those same words, same doll.  But okay, that they are

17   substantially similar.  The test is not whether the doll in

18   2006 is substantially similar to the doll from 2002.  We all

19   know that's not the test.  It's whether the doll from 2006

20   that's in the Winter Wonderland package is substantially

21   similar to the drawings.

22             THE COURT:  That's right.

23             MS. AGUIAR:  So we need to be able --

24             THE COURT:  And that's the question for the jury.

25             MS. AGUIAR:  Right.  And so their theory is --

Page 6922

1           THE COURT:  And I'm not going to allow MGA to

2    confuse the jury that by somehow, because we're starting from

3    scratch in actually physically building the doll, that

4    somehow the similarities or dissimilarities, however the jury

5    may perceive them, are somehow irrelevant and the focus is

6    on, again, how you go about copying it as opposed to the end

7    product and whether or not it's a copy or not.

8           MS. AGUIAR:  But how is it not relevant when they

9    are asking for billions of dollars, for not just the first

10   generation doll, which we've talked a lot about, but for

11   every generation after that, for us to not be able to explain

12   that that doll that came out in 2005 called Rock Angels with

13   different face paint, different clothes, different

14   accessories, different packaging --

15          THE COURT:  Additional characters and themes are on

16   the list here, Counsel, of apportionment.  I agree with you

17   in part.

18          MS. AGUIAR:  I just think with regard to all of

19   those, we need -- Mattel has their story, and we have ours.

20          THE COURT:  And you have your story.

21   Unfortunately, both stories are shaped by legal findings that

22   the Court has made throughout.  And I understand you want to

23   go further than the Court's permitting you to go.  You've

24   made your record of that.  And you've preserved that for

25   appeal.

afaf730e-bdbe-4545-af08-157421413e63

Page 6923

1          I've got to enforce a line here that I believe is

2     required by the law.  And this list of five is not

3     necessarily exhaustive.  There may be something else that you

4     identify.  And that's what I'm going to be working with.  The

5     dolls themselves, though, the dolls themselves, the question

6     is simply one of substantial similarity.

7               MS. AGUIAR:  Back to the drawings.

8               THE COURT:  Yes.

9               MS. AGUIAR:  Right.  And I just think for the state

10    law claims, if they are asking for that much money, we need

11    to be able to show that the profit we made in 2005 on the

12    Rock Angels doll was not due --

13              THE COURT:  To the Rock Angel theme.  You can do

14    that.

15              MS. AGUIAR:  So you're saying I can talk about the

16    Rock Angel theme --

17              THE COURT:  You can talk about these five things

18    here, yes.

19              MS. AGUIAR:  Okay.  And the accessories that are in

20    the package.

21              THE COURT:  The noncopyrightable accessories.

22              MS. AGUIAR:  Okay.

23              MR. ZELLER:  First, let me apologize.  Apparently I

24    wasn't quarreling with the Court.  I was quarreling with MGA,

25    I guess, as usual.  Because I think it is quite clear that

Page 6924

1    those drawings that they want Ms. Garcia to compare really is

2    for the purpose of eliciting her contribution, they will

3    argue, to those particular drawings.

4            THE COURT:  After hearing further argument, that

5    clearly appears to be the case.

6            MR. ZELLER:  And I don't know if it is water under

7    the bridge at this point, but I do have for the Court our

8    designations, and the testimony that MGA has argued opened up

9    the door.  And he simply testifies about creating that range

10   of drawings, 1107, I think it begins, through 1110, 1111, and

11   says he created them for Hong Kong toy fair and for use of

12   the models for Hong Kong toy fair.

13           So it's hard to see how that opened up the door to

14   the kind of comparison that MGA was arguing about.

15           THE COURT:  Are there any questions concerning how

16   we proceed?

17           All right.  Let's take a very brief recess, and

18   then we'll bring the jury in in about five minutes.

19           (Recess taken.)

20           (WHEREUPON THE JURY ENTERS.)

21           THE COURT:  Counsel, you may proceed.

22           MS. AGUIAR:  Thank you.

23   Q.   Ms. Garcia, we were talking about the sculpt that was

24   done and presented to MGA on October 25th.  I just want to

25   bring you back to where we were before lunch, and that is

afaf730e-bdbe-4545-af08-157421413e63

Page 6925

1    Exhibit 1141.

2            Looking at that sculpt, will you tell me what

3    changes were made in that sculpt that you specifically

4    recall?

5    A.   I remember making some specific references to the Bratz

6    and making sure that the breasts appeared more natural.   And

7    I also made comments to the ears.   I felt that the ears

8    looked a little Dumbo-like.

9    Q.   I'm sorry?

10   A.   Dumbo-like.   I'm sorry.   My best reference.   And so it

11   was just to actually make the ears more flush, closer to the

12   head, closer to more of a human-like relation in the ear.

13   And finally, as it relates to the feet, I thought it was sort

14   of strange, the overall size of the feet and the indentations

15   of toenails.

16           So we, you know, one of the comments that I made

17   was to actually make the feet more generic.

18   Q.   Can you -- I believe in that bag that you pulled 1141

19   out of, are there feet, like loose feet in the bag?

20   A.   Yes.

21   Q.   Can you show those to the jury and maybe just sort of

22   stick them onto the bottom of the leg so you can show us what

23   you mean?

24   A.   They actually won't fit into one another, but well, I

25   love the disproportion of the big head, big feet idea, I felt

afaf730e-bdbe-4545-af08-157421413e63

1    that this foot was a little too extreme in terms of size,

2    overall size.  And especially length from toe to the back of

3    the heel.  But also just the toenails themselves almost

4    suggested something too specific and too realistic.  So those

5    were things they wanted to flesh out.

6    Q.   Sticking with the feet for a moment, are those feet on

7    the sculpt, 1141, the same as the feet in the final Bratz

8    sculpt?

9    A.   Definitely not.

10   Q.   And take the head, for example, that was part of 1141.

11   Is the head the same shape and the same size as the head on

12   the final Bratz sculpt?

13   A.   No.

14   Q.   And just closing out on 1141, if you look at one of the

15   arms, I don't know if they are attached to the body, but did

16   that sculpt have real hands at this point?

17   A.   No.  In fact, they were very, very roughed out, meaning

18   that there was not any sculpting specifics or definition in

19   the hands at this point.

20   Q.   Look in your binder, if you would, at tab 17317.  Are

21   you with me?

22   A.   Yeah.

23   Q.   Do you recognize that document?

24   A.   Yes, I do.

25   Q.   What is it?

Page 6927

1    A.    This was an e-mail that I sent to my counterparts in

2    Hong Kong, MGA Hong Kong, as well as Mercedeh, where I detail

3    some comments on the Bratz sculpt.

4            MS. AGUIAR:  Your Honor, I move 17317 into

5    evidence.

6            THE COURT:  Any objection?

7            MR. PRICE:  Object on relevance.

8            THE COURT:  I'm sorry, Counsel.  The exhibit again

9    is?

10           MS. AGUIAR:  17317.

11           THE COURT:  -317?

12           MS. AGUIAR:  17317.

13           THE COURT:  I'm sorry.  Objection sustained.

14   Q.    BY MS. AGUIAR:  Was the sculpt 1141 that we've been

15   looking at being sent to Hong Kong for purposes of final

16   manufacture?

17   A.    No.

18   Q.    Why were you sending this sculpt to Hong Kong at this

19   point?

20           MR. PRICE:  Objection.  Relevance.

21           THE COURT:  Sustained, Counsel.

22   Q.    BY MS. AGUIAR:  Did MGA continue to make changes to the

23   sculpt after October 25th?

24   A.    Absolutely.

25   Q.    If you would look in front of you, another one -- you

afaf730e-bdbe-4545-af08-157421413e63

Page 6928

1   can close up your binder if you want to create a little bit

2   more space up there.

3           If you look at Exhibit 1234, and that should be

4   another one of the sculpts in a bag.

5           Do you recognize this sculpt?

6   A.   I do.

7   Q.   Okay.  And what do you recognize it as, if you could

8   sort of place it in time for us.

9   A.   This represents the cast of the final wax that we

10  released from L.A. to Hong Kong.

11  Q.   And when you say final wax, does final wax mean final

12  sculpt?

13  A.   Yes.  However, I just want to make note that though it

14  was final sculpt when released out of L.A., there were still

15  some changes that were even made further to the sculpt in

16  Hong Kong.

17  Q.   Okay.  So after 1234, did the teams from MGA in the U.S.

18  and in Hong Kong continue to make changes to the sculpt?

19  A.   Yes.

20  Q.   Do you consider the changes that were made to 1234 to be

21  changes that were creative changes?

22           MR. PRICE:  Objection.  Irrelevant.

23           THE COURT:  Sustained.

24  Q.   BY MS. AGUIAR:  Do you consider them to be changes that

25  impacted the look of the doll?

Page 6929

1    A.    Yes.

2    Q.    Were they changes that impacted the way kids would play

3    with the doll?

4              MR. PRICE:   Objection.   Speculation.

5              THE COURT:   Foundation, Counsel.

6    Q.    BY MS. AGUIAR:   Do you have a sense of how children play

7    with Bratz dolls?

8    A.    Yes, I do.

9    Q.    And what is that based on?

10             MR. PRICE:   Object as to time frame.   The question

11   of time.

12             THE COURT:   Clarify the time frame as part of your

13   foundation.

14             MS. AGUIAR:   Let me ask it a different way.

15   Q.    What was your intent in making the changes to the sculpt

16   that were made after October 25th?

17             MR. PRICE:   Object.   That's irrelevant.

18             THE COURT:   Her intent in making the changes is

19   irrelevant.   Sustained.

20   Q.    BY MS. AGUIAR:   Were the changes being made to impact

21   the way the doll -- were the changes made by MGA after

22   October 25th to the sculpt made in order for the doll to be

23   more salable?

24   A.    Yes.

25             MR. PRICE:   Object to relevance.

Page 6930

1          THE COURT:  I think that's not relevant.

2    Sustained.

3          MR. PRICE:  Move to strike.

4          THE COURT:  It is stricken.

5    Q.   BY MS. AGUIAR:  Did MGA have to adjust the look of the

6    sculpt in order to incorporate the changes that were made in

7    Hong Kong after October 25th?

8    A.   Yes.

9    Q.   During the time these changes were being made in

10   November and December of 2000, at any point did you or anyone

11   else to your knowledge refer back to Mr. Bryant's drawings?

12   A.   No.

13   Q.   At any point when you were discussing those changes that

14   were happening in the U.S. and in Hong Kong in November and

15   December, did anyone ever say to your knowledge, or did you

16   ever say well, if we need to figure that out, let's go get

17   Mr. Bryant's drawings, and we'll look to see how we do it.

18   A.   No.

19   Q.   Why is that?

20   A.   To be honest with you, Carter Bryant's portfolio

21   drawings did not give any reference, especially at this point

22   in the sculpt, for our guidance, for our manufacturing.

23   Frankly, Carter Bryant's portfolio drawings referenced a

24   concept for us.  But Carter Bryant's portfolio drawings were

25   not a reference that we used to develop or to generate the

Page 6931

1    sculpt.

2    Q.   I want to pass up to you Exhibit 18845.  Can you

3    identify for us what you're looking at there?

4    A.   This is a Bratz manufactured body.

5    Q.   And I am wondering if Mr. Bryant's drawings referenced

6    anything about how to make the doll's leg work, for example.

7              MR. PRICE:  Objection.  Irrelevant.

8              THE COURT:  Overruled.

9              THE WITNESS:  No.

10             THE COURT:  Maybe you could rephrase your question,

11   Counsel.  Can you rephrase your question?  I think I know

12   where you're going with this in a relevant way.  So why don't

13   you rephrase.  I don't want to sustain it outright.  Just

14   rephrase it.

15   Q.   BY MS. AGUIAR:  Was there anything in Mr. Bryant's

16   drawings that specifically showed MGA how to make the doll's

17   leg?

18   A.   No.

19   Q.   If you rip off the side of that leg there of that doll,

20   which I did by the little surgery the other day with an

21   Exacto knife, and you could show the jury the side of the leg

22   there.  That specific design there, was there anything in

23   Mr. Bryant's drawings that MGA specifically looked at and

24   referred to in making that?

25             MR. PRICE:  That's irrelevant.

Page 6932

1          THE COURT:  Sustained.

2    Q.   BY MS. AGUIAR:  Did the movement of the doll's legs

3    factor into how kids would play with the doll?

4          MR. PRICE:  Speculation.

5          THE COURT:  Sustained.  Speculation.

6    Q.   BY MS. AGUIAR:  When you were deciding how to create the

7    leg on the doll, did you have conversations regarding the

8    interaction between how the leg was built and how the kids

9    would play with the doll?

10   A.   Yes.

11   Q.   And what was your understanding as to why you were --

12   why MGA made the leg the way it did?

13          MR. PRICE:  Objection.  That's irrelevant.

14   Q.   BY MS. AGUIAR:  As it relates to a child playing with

15   the doll.

16          THE COURT:  Overruled.

17          THE WITNESS:  It's very, very important.  Our

18   consumer is 7 to 10.  Our consumer is -- is considered to be

19   quite a savvy consumer even though they are little girls.  As

20   a 7- to 10-year-old little girl, you have to be able to

21   manipulate your fashion doll.  You have to be able to pose it

22   and stance it in a cool attitude.  Because that's what 7- to

23   10-year-old girls do with fashion dolls, especially Bratz.

24          It's also -- so if you were to play with a rock

25   star Bratz fashion doll, it would be important that you would

afaf730e-bdbe-4545-af08-157421413e63

Page 6933

1    be able to move or bend the legs in a rock star position so

2    that you could represent what an attitude of a rock star to

3    look like.  But further, it's very important to be functional

4    as well, meaning that you had to allow for the girl to be

5    comfortable with dressing and undressing the fashions.

6           Our fashions were meant to be tight and fitted,

7    which isn't because they are 7 to 10 year olds and the

8    fashions had to look impeccable.  The truth with that is that

9    if they are tight-fitted, sometimes it's hard to get on and

10   off.  So you needed to be able to move and bend the legs to

11   wiggle and try and jiggle the fashions off, if you will.

12          MS. AGUIAR:  Okay.  Thank you.

13   Q.   Let's move to the final Bratz sculpt.  I was actually

14   going to ask you if you feel comfortable coming up to the

15   screen, because I want to put on the screen, Aaron, a picture

16   of one of Mr. Bryant's concept drawings, which is

17   Exhibit 302-006, and take with you --

18          Actually, Ms. Garcia, if you could just take with

19   you one of the final production Bratz sculpts.  And I think

20   we might be able to get you a microphone that you can use.

21          Aaron, could we put on the screen 17733, which is a

22   photograph of the sculpt here that you have in your hand.

23          Okay.  Back through for us, and tell me -- do we

24   have a laser pointer?  We do.  Okay.  And on the left is

25   302-006.  So if you would describe in your own words the

Page 6934

1   differences between Mr. Bryant's pitch book drawing on the

2   left and the final Bratz manufactured sculpt on the right.

3   And maybe we can work -- if you want to work head down or

4   toes up, whatever you're comfortable with.

5   A.    Okay.  Well, first, one of the big differences is the

6   head size of Carter Bryant's 2D portfolio drawings.  His head

7   is quite a bit larger in proportion -- or quite a bit large

8   in proportion to the rest of the body.  And our Bratz final

9   manufactured doll, you'll see that certainly we went for a

10  large head, but we actually chose to reduce the size of the

11  head, especially relative to the overall size of the body.

12          Another important difference was the ears.  For me,

13  in reading this document or reading the portfolio drawing

14  from Carter Bryant, I felt that the ears were kind of low on

15  the side of the face, a little bit unnatural to what is more

16  human like and felt, again, that the ears were a little --

17          MR. PRICE:  Your Honor, object.  I think the

18  question is one of differences.

19          THE COURT:  Let's get back to how they are

20  different, not why or because.

21  Q.    BY MS. AGUIAR:  So try and restrict your answers to just

22  the changes rather than -- just discussing the changes, if

23  you would.  Thank you.

24  A.    I'll move on to the torso.  The torso in the drawing

25  appeared to be very short, especially in relation to the

1  overall size of the body.  The difference in our manufactured

2  Bratz doll is actually much longer.  Specially relative to

3  the entire body.  So this torso may be more natural.

4          The upper thigh, very short, specially if you look

5  at it from the hip to the knee.  And the manufactured Bratz

6  sculpt, you'll see that the length of the hip to the knee is

7  much longer, again, looking more like a human-like quality.

8  But if you look at the thickness of the upper thigh, the

9  thickness of the thigh was pretty thick.  The adjustment in

10 the manufactured Bratz doll, you'll see the leg is thinner.

11         From Carter Bryant's 2D portfolio sketch, specially

12 from the knee to the ankle is actually quite long, specially

13 in relationship to its upper thigh.  And the actual

14 manufactured Bratz doll, you'll see that the shin from the

15 knee to the ankles actually is more human like, especially

16 more natural in relationship to the upper thigh.

17         The feet, the perception, especially I read when

18 looking at the Carter Bryant 2D sketches, was the feet were

19 large, especially in relation to, again, the overall sketch.

20 Our feet, definitely we have big feet, but we -- our

21 manufactured Bratz sculpt actually has some smaller larger

22 foot, if that makes sense, specially in relationship to the

23 overall body proportion.

24 Q.   And in terms of doing a comparison between the drawing

25 and the sculpt, because the drawing gives -- was there

Page 6936

1    anything in his pitch book that gave you a side view of how

2    Mr. Bryant would have imagined a three-dimensional object

3    looking from the side?

4    A.   No.

5              MR. PRICE:  That's irrelevant, your Honor.

6              THE COURT:  Overruled.  You may answer.

7              THE WITNESS:  No.

8    Q.   BY MS. AGUIAR:  And were there any drawings in his

9    pitch book that showed what he would have imagined that a

10   three-dimensional doll would look like from the back?

11   A.   No.

12   Q.   Let me also just -- I notice that like the little hands

13   have like the thumbs sticking out.  Can you address that

14   change?

15   A.   In fact, I missed two points.  That's one of them.

16   Absolutely a very important revision or difference between

17   Carter Bryant's portfolio drawings and the manufactured

18   Bratz.  In the portfolio drawings, Carter Bryant created a

19   sort of hand gesture, especially with a protruded thumb.  And

20   the manufactured Bratz doll, we removed the protrusion of the

21   thumb, bringing to closer, sort of in the same plane as the

22   rest of the fingers.  That was actually -- our deliberate

23   reason to do that is to make sure that thumb, if you've

24   ever --

25             MR. PRICE:  Objection, your Honor.

Page 6937

1          THE COURT:  Sustained.  As to reason.

2     Q.   BY MS. AGUIAR:  Okay.  Is it easier for a child to take

3     clothes on and off a fashion doll if the thumb is not

4     sticking out?

5          MR. PRICE:  Objection.  Foundation.  It's also

6     irrelevant.

7          THE COURT:  Overruled.

8     Q.   BY MS. AGUIAR:  You may answer.

9     A.   It is very difficult for a little girl to be able to

10    dress fashions on and off, especially on, if a thumb is

11    protruded.

12    Q.   Aaron, if you would flip to, still on Exhibit 302, but

13    page 4.  So if we -- the image on the left, I want to go to

14    302-004.  I see that in Mr. Bryant's drawings, that

15    contemplated a removable hair feature; is that correct?

16    A.   That's correct.

17    Q.   And the actual Bratz dolls that MGA created and released

18    don't have that feature, do they?

19    A.   No, they don't.

20    Q.   Would you agree that that represents a difference,

21    significant difference between the two-dimensional drawing

22    and the three-dimensional doll that MGA created?

23         MR. PRICE:  Objection.  It's improper opinion.

24         THE COURT:  Rephrase, Counsel.

25    Q.   BY MS. AGUIAR:  Do you believe that the drawing, which

Page 6938

1   shows a removable hair feature, is different from the doll

2   which does not show that feature?

3   A.   Yes.

4   Q.   Did you personally believe that the doll should have a

5   removable hair feature?

6            MR. PRICE:   Object.   Irrelevant.

7            THE COURT:   Sustained.   You can rephrase it,

8   Counsel.

9   Q.   BY MS. AGUIAR:   What effect -- did you take into

10  consideration the marketability in the target audience when

11  deciding whether the final doll that MGA created should have

12  a removable hair feature?

13           MR. PRICE:   Objection.   It's irrelevant.

14           THE COURT:   Sustained.

15  Q.   BY MS. AGUIAR:   Given your target audience, did you

16  think that the doll would be as marketable if it had a

17  removable hair feature?

18           MR. PRICE:   Same objection.   It's not one of the

19  five factors.

20           THE COURT:   Let me see you at sidebar, Counsel.

21           (SIDEBAR CONFERENCE HELD.)

22           THE COURT:   Why is this not a dissimilarity from

23  the drawings, I mean, particularly as she phrased it this

24  last time in terms of marketability.   There's a foundational

25  issue, but focusing on your relevancy objection.

afaf730e-bdbe-4545-af08-157421413e63

Page 6939

1          MR. PRICE:  The dissimilarity, she's testified ad

2    nauseam that it's not similar.  It didn't have a pop-off

3    head.

4          THE COURT:  Now she's going -- and that goes to the

5    substantial similarity issue.  But on the marketability,

6    she's going one step further, and this strikes me as an

7    appropriate apportionment argument, that this change from the

8    drawing, or this aspect, which is not copyrightable, actually

9    had an effect on the amount of money or profits generated by

10   the sale of this doll.  This would be one of the factors.

11   This kind of falls within, I don't know, noncopyrighted

12   accessory.

13          I did add a sixth one, functional mechanical

14   maneuverability.  Something like that.  But in any event, why

15   doesn't this go to apportionment?

16          MR. ZELLER:  I don't think it falls within one of

17   the five factors, certainly not as I understood them.

18          THE COURT:  Ever.  But why not, Mr. Zeller?

19          MR. ZELLER:  Well, are we talking about the

20   copyright claims, or are we talking about state law?

21          THE COURT:  Let's start with the copyright.

22          MR. ZELLER:  I think it's absolutely irrelevant.

23   And the reason is because it's a functional -- they are

24   talking about kind of a functional feature, and that just

25   doesn't have anything to do with, you know, because remember,

Page 6940

1   the Court talks about --

2           THE COURT:  You're right.  It has nothing to with

3   the copyright aspect, but why doesn't it go to apportionment

4   as a noncopyright feature that is responsible -- and I don't

5   know if you lay the foundation that this witness --

6           MR. ZELLER:  That's certainly part of the problem,

7   but what we're talking about is an absence of something.  I

8   mean, it would be -- it would be one thing to say that there

9   was some feature that they added that drove sales.

10          THE COURT:  Why doesn't a removal of a feature --

11  that's why I initially -- when you first made the objection,

12  I was with you on that line of analysis, but then when I

13  thought about it, why doesn't a removal of a feature of a

14  drawing have just as much of --

15          MR. ZELLER:  And whether that foundation has been

16  laid is part of the problem.

17          THE COURT:  That's a separate issue.  But I think

18  it is a legitimate question to ask.  Objection is overruled.

19          (CONCLUSION OF SIDEBAR CONFERENCE.)

20  Q.  BY MS. AGUIAR:  We were talking about the pop-off hair.

21          Ms. Garcia, had you -- did you have any information

22  from any source, when you were deciding whether or not the

23  final doll should have removable hair, that informed your

24  decision not to implement that element of the drawing?

25  A.  I certainly had input from -- well, my understanding is

afaf730e-bdbe-4545-af08-157421413e63

Page 6941

1    my reception from our consumers certainly is that

2    especially --

3            MR. PRICE:  Objection.  This is beyond the scope of

4    the question.

5            THE COURT:  Nonresponsive.

6    Q.   BY MS. AGUIAR:  So you did have information regarding --

7    that informed your decision to not implement that feature;

8    correct?

9    A.   Yes.

10   Q.   And what was that information that you had that led you

11   to decide not to implement that feature in Mr. Bryant's

12   drawings?

13   A.   Feedback from little girls.

14   Q.   And what was that feedback?

15   A.   The feedback that I learned is that especially for our

16   consumers 7 to 10, aesthetic was absolutely important.  The 7

17   to 10 consumer doesn't necessarily buy a toy to play with.

18   They are a little older.  Certainly there are 7 to 10 year

19   olds who play.  But primarily our 7 to 10 consumer required a

20   doll that looked awesome, that looked like something they

21   would aspire to.  If we were to implement a play feature that

22   would impede the style or the look of the doll overall, then

23   it would not be worthy of including inside the product.

24   Q.   So based on that, did MGA affirmatively decide to create

25   and manufacture a doll that was different in that respect

Page 6942

1    from Mr. Bryant's drawings?

2    A.   Yes.

3    Q.   Now, if there's anything else you wanted to point out

4    about the differences between the drawing and the sculpt,

5    that's fine.  Otherwise, I was going to move on to a separate

6    area.

7    A.   Ready to move on.

8    Q.   All right.  So you can give back the microphone and head

9    on back.  I'm going to actually back up and give you Trial

10   Exhibit 17385.  Can you identify what you have there in front

11   of you as Trial Exhibit 17385?

12   A.   Yes.

13   Q.   What is it?

14   A.   This is a manufactured Barbie doll.

15   Q.   How tall is Barbie?

16   A.   I believe she's approximately 11 inches, 11 1/2.

17   Q.   And how tall is -- how tall are the Bratz dolls?

18          MR. PRICE:  Object.  Comparison is irrelevant.

19          MS. AGUIAR:  I'm not making a comparison between

20   Barbie and Bratz.

21          THE COURT:  Overruled.

22   Q.   BY MS. AGUIAR:  How tall is Bratz?

23   A.   Bratz is about nine inches.

24   Q.   Did MGA make a conscious decision as to the size to make

25   the Bratz doll?

Page 6943

1  A.   Yes.

2  Q.   Was there anything in Mr. Bryant's drawings, when he

3  originally brought them to MGA in September, that indicated

4  the size that an ultimate doll should be?

5  A.   No.

6  Q.   So was there anything in there that said this should --

7  I'm imagining that this would be an 8-inch doll, or I'm

8  imagining that this would be a 12-inch doll?

9  A.   No.

10  Q.   So that was a decision regarding the creation and

11  manufacture of the doll that was made separate and apart from

12  Mr. Bryant's drawings; is that correct?

13  A.   Objection.  Leading.

14       THE COURT:  Sustained.

15  Q.   BY MS. AGUIAR:  Was that a decision that was made

16  separate and apart from Mr. Bryant's drawings?

17  A.   Yes, absolutely.

18  Q.   Because of the size of the Bratz dolls being nine and a

19  half inches, were Bratz always considered for toy industry

20  purposes to be in the fashion doll category?

21  A.   No.

22  Q.   Okay.  Can you explain how that is, because obviously

23  we've been talking throughout the trial about Bratz as a

24  fashion doll.  So can you explain why it is that Bratz for

25  that purpose was not categorized as a fashion doll?

Page 6944

1          MR. PRICE:  Object.  Irrelevant.

2          MS. AGUIAR:  It goes to marketability and the state

3    law claims, your Honor.

4          THE COURT:  Okay.  I'll give you some background in

5    this.  Overruled.

6          THE WITNESS:  MGA consciously made a decision to go

7    and to build the Bratz doll at approximately nine inches.  It

8    was a conscious decision that we made because frankly, we

9    wanted to be termed a small doll.  Let me back up.  Within

10   the toy industry, we're measured, especially through a system

11   called NPD, which is a POS tracking system.

12   Q.   BY MS. AGUIAR:  Hold on one second.  Too many acronyms.

13   I don't know how relevant it is to your answer, because I'm

14   not sure what the acronyms mean, but if it is relevant, can

15   you explain what you mean by the acronyms that you used?

16   A.   NPD?

17   Q.   Sure.  You used NPD, and I think you used another one?

18   And I want to make sure we all understand what they all mean.

19   A.   NPD.

20   Q.   Describe what that is.

21   A.   NPD is a point of sale tracking system, meaning it is a

22   system that is able to track how sales are performing within

23   a category.  So you're able to see how well within this

24   system you did, especially in relation to the competition

25   within that same category.

Page 6945

1          One of MGA's decisions to actually reduce the size

2    of the doll was to be sure that we, frankly, weren't being

3    tracked in NPD within the fashion doll category.  We intended

4    to be tracked outside of the fashion doll category and in

5    another category, which is termed the small doll category.

6    Q.   So in other words, you have to be a certain height to be

7    a fashion doll.

8    A.   Yeah.  I mean, I think certainly Barbie sort of

9    identified and defined that height certainly, yes.

10   Q.   So it's like when you go on a ride at the amusement

11   park, you have to be a certain height in order to ride the

12   ride.  You have to be a certain height to be a fashion doll?

13   A.   Yes.

14   Q.   And when it says small doll, does that necessarily mean

15   like four inches high?  I mean, what is the small doll

16   category?

17   A.    It's funny, because the small doll category, though it

18   uses and implies the word small, in the category small doll,

19   it's kind of -- and I remember using this term with a buyer.

20   The small doll category is kind of a catchall for a lot of

21   alternative brands, especially within girls' toys.  So small

22   doll doesn't limit it to specifically a size and especially

23   such as four inches.  In this case, especially eight years

24   ago, it sort of references anything other than 11 inches or

25   Barbie.

afaf730e-bdbe-4545-af08-157421413e63

Page 6946

1    Q.   Are the Bratz fashions and clothes interchangeable with

2    11 1/2-inch dolls?

3    A.   No.  And that's a second and very important decision

4    that we consciously made in reducing the size.  And when I

5    mean in height, but also in some of the proportions of the

6    doll as well, was to be sure that our Bratz fashions couldn't

7    be exchanged with Barbie fashions and alternatively.  That

8    they were meant to be built for a Bratz doll and not to be

9    exchanged.

10   Q.   Was that a conscious marketing decision that MGA made in

11   creating the doll?

12   A.   Absolutely.

13   Q.   Let's switch gears.  Is there somebody who works for MGA

14   named Judy Rich who maintains a document that shows the

15   different disciplines at MGA that are involved in creating

16   the Bratz dolls?

17   A.   Yes.  I used to work with her, yes.

18   Q.   If you could turn to Exhibit 16418 in your binder.

19        And, your Honor, before I forget, may I move into

20   evidence the doll that we discussed before, the blank sculpt?

21   I believe it was 18845.

22              THE COURT:  Any objection?

23              MR. PRICE:  No objection.

24              THE COURT:  It's admitted.

25              (Exhibit 18845 received.)

afaf730e-bdbe-4545-af08-157421413e63

Page 6947

1           MS. AGUIAR:  Thank you.

2    Q.   So are you looking at 16418?

3    A.   Yes, I am.

4    Q.   Can you tell us what that is?

5    A.   This is a development schedule that was prepared by Judy

6    Rich, and the development schedule tracks the individual,

7    what we call micromilestones, that ultimately drive you to a

8    manufactured or production start date.

9           MS. AGUIAR:  Your Honor, I move 16418.

10          MR. PRICE:  Object.  Hearsay.

11          THE COURT:  Counsel?

12          MS. AGUIAR:  I think it's a business record, your

13   Honor.

14          THE COURT:  Lay a foundation for it.

15   Q.   BY MS. AGUIAR:  Is this a document that was regularly

16   maintained by MGA in the course of its business?

17   A.   Yes, it was.

18   Q.   And is it a form that you recognize?

19   A.   Yes, I do.

20   Q.   And did you rely on this document in doing your work in

21   being the brand manager at Bratz?

22   A.   Yes.

23          MS. AGUIAR:  Again, I move 16418, your Honor.

24          MR. PRICE:  No foundation, hearsay within hearsay.

25          THE COURT:  What are you referring to, Counsel?

Page 6948

1    The page number.

2                MR. PRICE:  First page is an e-mail.

3                THE COURT:  Very well.

4                MR. PRICE:  And the latter one is foundation as to

5    the source of the information, et cetera.

6                MS. AGUIAR:  I don't need the e-mail.

7    Q.   The questions I was asking you about the document,

8    Ms. Garcia, being used in business and whether it's a form

9    you recognize, let's look at -- let's just focus on page

10   16418-002.

11   A.   Okay.

12   Q.   Is that a document that MGA regularly maintained?

13   A.   Yes.

14   Q.   Do you recognize this form of document?

15   A.   Yes, I do.

16   Q.   And did you use it in connection with the work that you

17   did on Bratz?

18   A.   Yes.

19               MS. AGUIAR:  I think 16418, your Honor, dash 002.

20               MR. PRICE:  No foundation on the source of the

21   information.

22               THE COURT:  Let's identify where the information

23   came from, Counsel.

24   Q.   BY MS. AGUIAR:  The information in 16418, what is the

25   source of the information that was put into this document?

1    A.    I'm sorry.  Do you mean who provided the -- who provided

2    this information?

3    Q.    Yes.

4    A.    Judy Rich provided this information.  She was

5    responsible to input dates and update it.

6    Q.    And where did she get the information?

7    A.    It would have been from team members themselves who

8    would confirm their completion of one of their milestones.

9    It would be information confirmed by Hong Kong in the same

10   way.

11   Q.    And were those people who were all employed by MGA?

12   A.    That's right.

13             MS. AGUIAR:  Your Honor, I move 16418-002.

14             MR. PRICE:  Same objection, your Honor.

15             THE COURT:  Overruled.  It's admitted.

16             (Exhibit 16418-002 received.)

17             THE COURT:  Just -02 through -04.

18             MS. AGUIAR:  Thank you.

19   Q.    And without getting into the details, if you would just

20   describe how this shows the different --

21             And, Aaron, if we could just --

22             I know it's not going to be east to see, but if we

23   can leave most of the document on the screen, I'd just like

24   you to, without getting into line by line, just how this

25   shows some of the different disciplines that were involved in

afaf730e-bdbe-4545-af08-157421413e63

Page 6950

1    creating the doll.

2    A.   Absolutely.  The -- each of the individual boxes

3    represent some function, some part of building the overall

4    manufactured Bratz doll.  For example, and I will say that

5    it's sort of -- there should be more boxes, or we should have

6    built -- there are more disciplines that are gathered within

7    one box.  So if I can break down each box, for example.

8    Q.   Or maybe just use one as an example?

9            MR. PRICE:  Your Honor, a general objection.

10   Relevance on disciplines used to create the doll.

11           THE COURT:  Sustained.

12           MS. AGUIAR:  I don't want to make a --

13           THE COURT:  Focuses on comparisons, Counsel.

14           MS. AGUIAR:  Let's move on to a different topic.

15   Q.   Let's talk about doll names.  In Mr. Bryant's drawings,

16   the characters that he drew had certain names; is that right?

17   A.   Yes.

18   Q.   Did MGA make a conscious decision to change the names of

19   the characters when they actually created the doll?

20   A.   Yes.

21   Q.   So, for example, Zoe was one of the characters.  Did Zoe

22   stay Zoe?

23   A.   No, she did not.

24   Q.   Explain the change that MGA decided to make.

25   A.   Zoe was not a name that MGA preferred.  We chose

afaf730e-bdbe-4545-af08-157421413e63

Page 6951

1    alternatively to use Cloe.  Other characters, such as Lupe,

2    Lupe was a character that Carter Bryant used in his portfolio

3    sketches.  And it was a decision by MGA not to use the name

4    Lupe.  Lupe appeared, and that name was associated to the

5    Hispanic character.  And it was in MGA's conscious decision

6    not to use that name because the name felt a bit stereotyped,

7    and for sort of the ethnic background of the Hispanic

8    culture.

9             So we chose Yasmin as an alternative name.

10            Hallidae, the same.  Hallidae appeared to be sort

11   of, again, sort of a stereotyped African-American name, and

12   you know, we were conscious not to -- we were conscious to

13   change that name, to find a name such as Sasha which still,

14   you know, still felt cool and funky and related, but not to

15   the extreme and not to the stereotype that Hallidae felt.

16   Q.   If you'd just tell me if you know the answer to this.

17   Did MGA then register for trademark purposes those names:

18   Cloe, Sasha, Yasmin, and Jade?

19            MR. PRICE:  Objection.  Irrelevant.

20            THE COURT:  Overruled.

21            THE WITNESS:  Yes.

22   Q.   BY MS. AGUIAR:  So those four names are names that for

23   trademark purposes are owned by MGA; is that correct?

24   A.   Yes.

25   Q.   Let's talk about other developments and changes in the

Page 6952

1   doll.  When you were here testifying in the first phase, we

2   had to talk about things but only up until a certain date, if

3   I recall that.  And now if you'll recall that.  And now I

4   want to go beyond that date in your development of the dolls.

5              Did Mr. Bryant's drawings provide information --

6   and let's talk about fashions first.  Did they provide

7   information regarding what fabrics should be selected for

8   purposes of the fashions?

9              MR. PRICE:  Object.  Vague as to Mr. Bryant's

10  drawings, as to time.

11             MS. AGUIAR:  Okay.  Let me start again.

12             THE COURT:  Rephrase, Counsel.

13  Q.   BY MS. AGUIAR:  The pitch book drawings that he brought

14  to you, which were the ones that you had as you started to

15  develop the doll, did those drawings provide information

16  regarding what fabrics to use to make fashions?

17  A.   No, they did not.

18  Q.   Did the drawings provide information to MGA, these same

19  drawings, employed MGA information on how to construct the

20  patterns for the fashions?

21  A.   No, they did not.

22  Q.   Did you decide to get someone involved in developing the

23  fashions for the Bratz dolls?

24  A.   Yes.

25  Q.   And who was that?

afaf730e-bdbe-4545-af08-157421413e63

Page 6953

1   A.    Veronica Marlow.

2   Q.    And did you consider her to have skills and have

3   creativity as it related to development of fashions?

4   A.    Absolutely.

5   Q.    As you and Ms. Marlow selected the fabrics for the

6   fashions for the first generation, for example, and made the

7   patterns, what effect did that have on the marketability of

8   the doll?

9            MR. PRICE:  Objection regarding the first

10  generation.  If we could do a sidebar, I'll explain.

11  Relevance would be the objection.

12           THE COURT:  It's more of a foundational issue.  Why

13  don't we take it up at sidebar.

14           (SIDEBAR CONFERENCE HELD.)

15           THE COURT:  I guess I'm not following your

16  relevancy objection.

17           MR. PRICE:  They are talking about the fashions.

18  The fashions in 1107 through 1110 on those drawings are

19  protected.

20           THE COURT:  Right.  It's the first generation but

21  not beyond that.  They can go into the -- all the fashions

22  and --

23           MR. PRICE:  And that's why I said I object as to

24  any testimony with respect to the first generation.  Because

25  they are trying to say oh --

Page 6954

1           THE COURT:  To the extent that the first

2     generation, there is a substantial similarity with the

3     drawings, then they are protected.

4           MR. PRICE:  And she's saying oh, but we selected

5     the fabric that looks like that drawing.

6           THE COURT:  Just to be clear on this, I've ruled

7     that doll fashions can be protectable; however, it's Carter

8     Bryant's particularized expression of them.  So it's only

9     those drawings to the extent that they are substantially

10    similar.  And there's a whole bunch of dolls up there with

11    fashions that look nothing like Carter Bryant's drawings.

12    That's where apportionment comes in.  To the extent that you

13    have the foundation to establish marketability, et cetera.

14    So I now understand Mr. Price's point.  You have to

15    distinguish between the first generation and --

16          MS. AGUIAR:  Okay.  And since your Honor has ruled

17    that Mr. Bryant's particularized fashions that he drew would

18    be copyrightable, can you elicit -- would I be able to elicit

19    testimony from her as to why she thinks some of the fabric

20    choices and how they make the patterns were different from

21    what Mr. Bryant drew?

22          THE COURT:  Oh, absolutely because that goes to

23    substantial similarity.

24          MR. PRICE:  That looks terrible to say here's the

25    drawing.  How is the first generation different?

afaf730e-bdbe-4545-af08-157421413e63

Page 6955

1          THE COURT:  She can ask the question how she wants,

2    Counsel.  I'm sure she appreciates your input.

3          You just need to be clear.  However you want to ask

4    the question, that you are severing out the -- those that are

5    potentially copyrightable from those that are clearly

6    indisputably not.

7          MS. AGUIAR:  Okay.  So in asking this particular

8    question, I'm at the first generation.  Is there anything

9    that you did to move away from, make the fashions different

10   from those in Mr. Bryant's drawings?

11         MR. NOLAN:  While we're here, your Honor, a

12   relevant question.  Move for a moment just to the state tort

13   claims.  The selection of the fabric, the quality of the

14   fabric, which affects the price point, which affects the

15   appearability, which affects the --

16         THE COURT:  As long as this is noncopyrightable

17   accessories, you're fine.

18         MR. NOLAN:  I guess what I was saying for the state

19   law claims, we're trying to see what added value they --

20         THE COURT:  I'm with you on that.

21         MR. NOLAN:  I just wanted to --

22         THE COURT:  I know this has been awkward and there

23   have been more objections than normal.  And you've seen

24   where --

25         MS. AGUIAR:  I'm definitely trying, your Honor, and

1   I'm not faulting him necessarily, but I'm getting a lot of

2   objections.

3            THE COURT:  But I hope both sides are understanding

4   that I'm trying to implement the ruling, and it's not an easy

5   thing do, and I'm not faulting either side either for making

6   objections or for running afoul, and if I can make any

7   further guidance, can I do so?  Do you kind of get it?

8            MS. AGUIAR:  I do.  I believe that with respect to

9   this first generation, I'm asking her about differences as

10  they relate to copyright.  As I understand it, you object to

11  our argument that even for first generation, choices that we

12  may have made relate to marketability, just for first

13  generation.

14           MR. NOLAN:  I didn't understand that.

15           THE COURT:  As long as it's noncopyrightable

16  accessories.  But, you know, I guess the gray matter would be

17  if you are taking a -- and this is where we become

18  inextricably intertwined.  If you took a fashion that is

19  substantially similar to one of the ones that Carter Bryant

20  drew and the mere fact that you did it in a special way or

21  used a special fabric, that would be very hard to divorce the

22  copyrightable elements of that from the noncopyrightable

23  elements.

24           So I would find, as a matter of law, that they are

25  inextricably intertwined, and I would sustain a relevancy

Page 6957

1   objection.  As to another fashion doll not based on Carter

2   Bryant's, there you have free rein.

3                MR. NOLAN:  That gives -- she got there quicker

4   than I did.

5                MR. PRICE:  So that we toe this line, that's why I

6   think it has to be linked to the drawings.  The witness

7   doesn't know.

8                THE COURT:  I think that's a cleaner way of doing

9   it, but again, I'm not going to micromanage the actual

10  questions.

11               MS. AGUIAR:  Thank you.

12               (CONCLUSION OF SIDEBAR CONFERENCE.)

13  Q.   BY MS. AGUIAR:  I'm sticking, for purposes of this

14  question, and in a few minutes we're going to move on to

15  dolls beyond the first generation, but specifically with

16  regard to the first generation, would you agree that there

17  are similarities between Mr. Bryant's pitch book drawings and

18  the fashions that are on the actual manufactured dolls?

19  A.   There are some similarities.  There are some important

20  differences, too.

21  Q.   Okay.  And so would you explain to me, as it relates to

22  the fashions, the choices or decisions that you believe were

23  made by MGA that show a difference in those first generation

24  fashions?

25               MR. PRICE:  Objection.  It's too vague unless we

Page 6958

1    know what we're talking about.

2              THE COURT:  Sustained.  Rephrase your question,

3    Counsel.

4    Q.   BY MS. AGUIAR:  For example, if you look at 302.  For

5    purposes of comparison, why don't you find a page on here

6    that you can explain, that you find useful for explaining to

7    me some of the decisions that were made to make alterations

8    for the fashions between the drawing and the manufactured

9    dolls.  Is there a particular page that you'd like to go to?

10   A.   I would go to page 6.

11   Q.   Okay.  And so if you could explain to us some of the

12   reasons -- some of the differences in the changes in the

13   fashions.

14   A.   As I mentioned earlier, not only did I find concern for

15   the use in the name Lupe as sort of a stereotyped name for a

16   specific type of Hispanic young girl, I was also very

17   concerned about the fashions as well.  I was concerned about

18   the fashions for two reasons.  One, primarily that I --

19             MR. PRICE:  Objection.  This is nonresponsive.

20             THE COURT:  Sustained.

21   Q.   BY MS. AGUIAR:  If you could specifically describe the

22   changes that you made to make differences in some of the

23   fashions.

24   A.   When comparing Yasmin and Lupe, Yasmin -- in comparing

25   the Lupe to Yasmin, Yasmin, we chose to use an earth tone

Page 6959

1    fabric for the pants in her -- the pants that she actually

2    wore.  We decided to use a soft velvet lavender corset for

3    her top as opposed to a small, tiny T-shirt and a hoodie.  In

4    exchange for the hoodie, we added a suede brown handkerchief,

5    and that was used as an accessory.

6    Q.   But again, certainly you wouldn't dispute that some of

7    the fashions in his drawings are similar to the fashions that

8    ended up on the first generation dolls.

9    A.   No, I don't dispute that.

10   Q.   All right.  Let's move on to another element.  Let's

11   move on to face paint.  On behalf of MGA, did you hire

12   someone to do the face painting for the first generation?

13   A.   Yes, I did.

14   Q.   And who was that?

15   A.   Anna Rhee.

16   Q.   Did you consider her to be a skilled face painter?

17   A.   Yes, I did.

18   Q.   Did you instruct her, when she was doing the face paint

19   for the first generation dolls, to simply copy what she saw

20   in Mr. Bryant's drawings?

21   A.   No, I did not.

22   Q.   Did you intend for her to bring her skills to bear and

23   her creativity to bear in creating the face paint for the

24   first generation dolls?

25   A.   Yes, I did.

Page 6960

1  Q.   Did you have involvement in overseeing the process or

2  the approval of what the face paint ended up looking like on

3  the dolls?

4  A.   Yes, I did.

5  Q.   If you could turn to Exhibit 951-B in your binder.   Have

6  you got that?

7  A.   Yes.

8  Q.   Do you recognize that?

9  A.   Yes, I do.

10 Q.   What is it?

11 A.   This is the hand-drawn eye artwork that was prepared by

12 Anna Rhee, which was included in our paint master release

13 from Los Angeles to the Hong Kong office.

14      MS. AGUIAR:  And, your Honor, I would move 951-B,

15 pages 002 through 007.

16      THE COURT:  Any objection?

17      MR. PRICE:  No objection.

18      THE COURT:  It's admitted.  You may publish.

19      (Exhibit 951-B, Pages 002-007, received.)

20      MS. AGUIAR:  And put up 951-B-007.

21 Q.   Ms. Garcia, if you could describe what we're looking at

22 here?

23 A.   This is a swatch card or swatch page that also was

24 included in the paint master release that we released from

25 Los Angeles to Hong Kong.  The swatches of color indicate the

Page 6961

1    colors we wanted Hong Kong to match in manufacturing the

2    Bratz doll in China.

3    Q.   And let me also have you look at -- I'm going to bring

4    you up a little box.  A box of heads.  And they are Trial

5    Exhibits 17712 through 17715.

6         Can you tell us what you are looking at there in

7    that box?

8    A.   These are the original paint master faces that were

9    painted by Anna and released to Hong Kong so that Hong Kong

10   could duplicate the same exact eye artwork in manufacturing.

11         MS. AGUIAR:  Your Honor, I want to move into

12   evidence the tangibles 17712 through 17715.

13         MR. PRICE:  No objection.

14         THE COURT:  Admitted.

15         (Exhibits 17712-17715 received.)

16         MS. AGUIAR:  I don't think we are going to be able

17   to put this on the screen.  Do we have a picture -- oh, okay.

18   That's weird.

19   Q.   Do you recognize these images here as photos of the sort

20   of half heads that are in those boxes there?

21   A.   Yes.

22   Q.   And so tell us, describe to us what we're looking at

23   here, then.

24   A.   So these are actually the head.  A roto cast head, which

25   would have been the actual correct manufactured size of a

Page 6962

1   Bratz head, and we released those heads to Anna Rhee.  And

2   Anna Rhee hand painted the eye artwork onto the roto cast

3   head.

4   Q.   Okay.  I'd like to go to some comparisons.  I want to --

5   I'm going to take you through and ask you to compare the

6   drawings from Mr. Bryant's pitch book of the dolls and

7   compare those to the actual painted face on the Bratz dolls

8   themselves.  Okay?

9           So we've made some graphics which will be a little

10  bit easier to do that, which are drawn from trial exhibits.

11          Aaron, I think the first one is No. 500.  That's

12  slide No. 500.  So for those people on the jury who wear

13  makeup, then you may actually dig the next five or ten

14  minutes.  And for those of you who don't, you know, this will

15  be like a trip from hell to the Nordstrom cosmetics counter,

16  but bear with me for a few minutes.

17          So let's not focus for the moment, because we're

18  going to get to that in a few minutes.  Don't talk for now

19  about the shape of the lip, the size of the lip, the size of

20  the eye.  This is all about makeup.

21          If you would compare for us the makeup on the eye

22  area and the lip area as between his drawings and the actual

23  doll for us.

24  A.   May I please have the --

25  Q.   You want the laser?

Page 6963

1    A.    It would help.

2    Q.    Sure.

3    A.    Thank you.  I guess the best place to start is from the

4    top.  So using and pointing to the Carter Bryant 2D portfolio

5    sketch, you'll see that Lupe's eyebrow color is actually -- I

6    also will have to say that this -- the images that they are

7    projected right now don't really represent, you know, the

8    greatest representation of the truest colors, but it's pretty

9    good to represent that Lupe's color in her eyebrows are very,

10   very dark brown.  Almost with some hints of black in them.

11           On the Yasmin manufactured Bratz doll, you'll see

12   that the eyebrows actually have -- certainly they are brown,

13   but it's a lighter brown, a softer brown.  Almost to have a

14   little bit of -- like a violet or a purple tone to it.

15           If you look at Lupe, Carter Bryant's portfolio

16   sketch, her eye shadow color, the color indicated in his

17   drawing was a very, very dark brown.

18           If you look at the manufactured Yasmin doll, you'll

19   see actually that the eye shadow color was adjusted to a

20   lavender or purple brown, softer color.

21           Going into her eye color, Lupe, in Carter Bryant's

22   portfolio sketch, had almost a green eye color.

23           In the manufactured Bratz Yasmin doll, you'll see

24   that the -- while that eye color is dual toned, meaning it

25   has two colors, the primary color in Yasmin's eye is brown.

Page 6964

1    A light brown.

2            Even the lips.  The lipliner on Lupe's drawing in

3    Carter Bryant's portfolio sketches had a very, very dark

4    brown, very dark brown.  And you look on the Yasmin

5    manufactured doll, she has a -- almost like a red tone, a red

6    lipliner.

7            And then further, the lip color of Lupe in the

8    Carter Bryant's 2D portfolio has a -- again, a dark brown, a

9    very, very dark brown as opposed to the manufactured Yasmin

10   doll that has almost a pink tone to it.  All of these

11   revisions were very important to, you know, set the right

12   tone and the right personality about the Bratz to our

13   consumer.

14   Q.   Help me out for a second.  As someone who doesn't wear

15   lipstick, and there's a lot of people in the room who don't,

16   help us out here.  You know someone could be -- thank God;

17   right?

18            I'm just trying to, you know, appeal to everyone in

19   the room.  You are walking down the aisle.  I may walk down

20   the aisle and go to those lipsticks, they kind of look

21   somewhat the same color to me; is that right?  Tell me if I'm

22   wrong.

23   A.   No, you're wrong.

24   Q.   Okay.

25   A.   Those lip colors are very, very different.  And those

Page 6965

1   lip colors, I believe they strongly mean something very, very

2   different to our consumer.  Lip color is a reflection of a

3   mood or a personality in a female.  So you can speak a lot in

4   the color of your lipliner or your lip color.  And that makes

5   a difference.  Absolutely.

6   Q.   In your view, was the face decoration on the Bratz doll

7   copied from the colors of the -- of face colors in

8   Mr. Bryant's drawing?

9   A.   Absolutely not.

10          MR. PRICE:  Object.  That's her understanding.

11          THE COURT:  Rephrase the question.

12   Q.   BY MS. AGUIAR:  In making the manufactured Bratz dolls,

13   in your view the colors used for the face decoration are

14   different?

15   A.   Yes.

16   Q.   Let's go to the next one.  And we have four of these.

17   So we'll try to move through them so this makeup tutorial

18   doesn't last the whole afternoon.

19          So if you could just go through the next three of

20   these and do sort of the major areas of comparison for us.

21   A.   Without getting through so much detail, Hallidae in

22   Carter Bryant's portfolio drawings, the eye shadow here

23   referenced in Hallidae was almost like a burnt orange, kind

24   of a mustardy color.  In the manufactured Bratz doll, you'll

25   see that we adjusted the eye shadow to a more natural brown

Page 6966

1    tone.  The eye color of Hallidae seems to be dual tone, but

2    there's like an orange and also kind a very bright yellow in

3    the highlight of her eye.

4              In the Bratz manufactured Sasha doll, you'll see

5    that the eye color for Sasha is also dual toned.  It was

6    primarily a brown color with an accent of a lighter green.

7              The lip color on Hallidae, if you look at the

8    lipliner, it's a very, very dark brown color.  And then the

9    color within the liner is also a kind of dark reddish sort of

10   burnt orange color.

11             In Bratz manufactured Sasha dolls, certainly we

12   chose a color.  The color is orange, but not in the same

13   value that the Hallidae doll is.  It's softer.  All of these

14   things, you know, intentionally creates a softer, younger,

15   more appropriate character to the consumer.

16   Q.   Why don't we do Jade next.

17   A.   I'll definitely say that there are probably some more

18   similarities in the Jade Carter Bryant portfolio drawing to

19   the Jade manufactured doll; however, there are still some

20   differences.  This image doesn't do it well.  But actually,

21   the eyebrow color used on Carter Bryant's portfolio drawings

22   is actually a little bit darker than the actual manufactured

23   Jade eyebrow.

24             The eye color of Jade in Carter Bryant's portfolio

25   sketch is kind of an olive greenish brownish color.  MGA's

1   Jade color is also dual tones, but we used primarily a

2   lighter brown color.  And even in the lip color, they are

3   similar.  We chose to take a softer pink approach.

4   Q.   And why did you do that?

5   A.   Again, also just doing everything we can to make sure

6   that the characters don't appear harsh or just relevant,

7   appropriate, soft.  Still edgy, though, of course.

8   Q.   And the last one.

9   A.   This is Carter Bryant's Zoe sketch that represents, if

10  you look at the eyebrows, again, in a 2D image, you'll

11  probably see more clearly that the eyebrow color used in the

12  Carter Bryant Zoe drawings is a dark brown color.  Cloe, the

13  manufactured Bratz doll, has a much lighter brown color.  And

14  Zoe's drawing in Carter Bryant's portfolio sketch, you'll see

15  that he used a lot of purple and violet eye shadow, almost

16  like she was made up with a lot of eye shadow.  If you look

17  at the manufactured Cloe doll, you'll see that we removed a

18  lot of the eye shadow.  Actually, the shadows that we used

19  are very mute or natural tone, very deliberate to soften up

20  the face.

21        You'll see the eye color of Zoe is actually a

22  purple, a very violet, intense color.  It almost appeared

23  that she was wearing a contact, like a false eye color.  So

24  we deliberately in the Jade manufactured doll created a light

25  blue color, a more natural blue tone.

afaf730e-bdbe-4545-af08-157421413e63

1          Carter Bryant added a little makeup addition

2    underneath the eye.  We opted not to include that in the

3    manufactured Bratz doll.

4    Q.    You mean that purple butterfly looking thing?

5    A.    Half butterfly sort of.

6    Q.    Okay.

7    A.    And in terms of the lip colors, our colors are pretty

8    similar.  And the closer view of that image, Zoe on Carter

9    Bryant's sketch has a -- kind of a more pink, more intense

10   pink color.  Where our manufactured doll, we actually used a

11   lot of pearlescent paint, to soften up the paint to make it

12   appear a little more natural, a little less made up.

13          One also really important sort of reference that

14   Carter made in all of the characters was if you can see this

15   really strong reference to blush on the face.  It's a

16   reference that starts almost above the ear and almost to the

17   ends of her -- the tips of her lips.  And also kind of

18   indicates that only that big space, but some strength from

19   the color, some intensity to the color.

20          MR. PRICE:  I'm going to object.  Color is

21   irrelevant.  Unprotectable.

22          THE COURT:  Color?

23          MR. PRICE:  What she's described is an

24   unprotectable element.

25          THE COURT:  As is being incorporated into the look,

Page 6969

1    overruled.

2              THE WITNESS:  I'll also point out that the Cloe

3    manufactured doll, we close to use a very, very little amount

4    of blush on the face.  Using a very small area on the face

5    and also to reduce the amount of blush.  Again, doing

6    everything we can to just soften and sweeten up the

7    characters from the portfolio drawings.

8              THE COURT:  Counsel --

9              MS. AGUIAR:  That includes the presentation on

10   makeup for this afternoon.  I was going to move on to another

11   area.

12             THE COURT:  Let's take our afternoon break at this

13   time, Counsel.

14             (WHEREUPON THE JURY WITHDRAWS.)

15             THE COURT:  Please be seated.  Just on that last

16   objection, I agree, Counsel, that color by itself is not

17   relevant, not protectable, but as it's being used in the

18   particularized expression, I think it's fair game.

19             MR. ZELLER:  I'll take responsibility for this one.

20   As I understood the Court's ruling, in fact, it was really at

21   MGA's insistence where they said things like the complexion,

22   the blush, that kind of coloration.

23             THE COURT:  You're talking -- I'm sorry.  Mr. Price

24   just said color is irrelevant.  You're talking about it on

25   the cheeks itself?

1          MR. ZELLER:  Correct.  And the complexion, that's

2     how I understood Ms. Garcia's testimony to be going.

3          THE COURT:  Yes, that's not one of the protectable

4     elements that the Court has identified in its tentative order

5     on that point.  I'm not saying at the end of the day that

6     that's the final.  So the jury will be instructed on that.

7          MR. ZELLER:  Fair enough.

8          THE COURT:  But you're not saying that color is

9     irrelevant.

10          MR. ZELLER:  We'll certainly quote Mr. Nolan as

11     saying that color is irrelevant.

12          THE COURT:  Very well.  I understand.  But the

13     particularized expression in a protectable element --

14          MR. ZELLER:  Right.  And it was specifically

15     because she was talking about blush.  And frankly, I thought

16     MGA was the proponent of saying that that kind of element --

17     complexion, blush, the makeup -- I think Mr. Nolan was using

18     the term, was unprotectable.  Obviously, I recognize there's

19     the distinction if you're talking about, say, the particular

20     face paint for the eyes or the particularized expression.

21          THE COURT:  One thing I left off my order was the

22     mole.  And I haven't really decided on the mole yet.  And

23     that's probably between the two, whether that's part of the

24     eye expression or whether that's not.  But we can cover

25     this --

Page 6971

1        MR. ZELLER:  If I can have leave to submit a

2   10-page brief --

3        THE COURT:  On the mole.  Yeah.  Mr. Zeller, I'm

4   sure you could fill it out.

5        MR. ZELLER:  Thank you.

6        THE COURT:  I have every confidence.

7        MR. NOLAN:  The mole is worth $3 billion.

8        THE COURT:  At a minimum.

9        The Court received an order from the Ninth Circuit

10  moments ago.  It reads as follows:  "Petitioner's motion to

11  file portions of the emergency motion and the petition for

12  writ of mandamus under seal is granted.  The motion to exceed

13  the page limitation on the petition is granted.

14        "The emergency motion for an order suspending the

15  trial is denied.

16        "Petitioners have not demonstrated that this case

17  warrants the intervention of this court by means of the

18  extraordinary remedy of mandamus.  Citing Bauman versus U.S.

19  District Court.  Accordingly, the petition is denied."

20        We'll take a 10-minute break, and then we'll resume

21  with the trial.

22        (Recess taken.)

23        (WHEREUPON THE JURY ENTERS.)

24        MS. AGUIAR:  Your Honor, while we wait for the

25  witness, I neglected to move in 18874.

Page 6972

1        MR. PRICE:  That's demonstrative.  I'd object.

2        THE COURT:  I'm sorry, Counsel.  What was that?

3        MS. AGUIAR:  I neglected, while we are waiting for

4   the witness, to move in 18874.

5        THE COURT:  No objection?

6        MR. PRICE:  That's a demonstrative.

7        THE COURT:  Was that the -- which one is that?

8        MS. AGUIAR:  It's the ones you -- she was just

9   using for the comparisons.  They are comprised of trial

10  exhibits that are in evidence.  And so I think it would

11  assist the jury in making the comparisons, your Honor.

12       THE COURT:  I'm going to take these up at the end

13  of trial, all of these various demonstratives that have been

14  assembled by both sides.  We'll take them up at that time.

15       MS. AGUIAR:  Okay.

16       THE COURT:  Keep a list of any of these that you

17  want to have brought in.

18       MS. AGUIAR:  We'll do that.

19       And, Aaron, can you put back up the Yasmin one that

20  we were looking at.

21  Q.   Before we close out on this, I just wanted to make sure

22  to ask you, looking at these comparisons, when MGA made the

23  manufactured Bratz doll, did you make the eye, for example,

24  different than the particular eye color and eye makeup color

25  in Mr. Bryant's drawings?

Page 6973

1    A.    Yes.

2    Q.    And in choosing and manufacturing the facial colors for

3    the manufactured dolls, did you use different colors than

4    what are depicted, the particular colors that are depicted in

5    Mr. Bryant's drawings?

6    A.    Yes.

7    Q.    All right.  So now we're going to move away from --

8             And you can take that down, Aaron.

9             We're going to move away from makeup.  Now I want

10   to talk about the facial features themselves.

11            And, Aaron, if you could put up -- I think your

12   reference is probably CR 14 or 15.

13            I want to talk about the facial characteristics and

14   ask you a question about whether the eye -- and not the color

15   now -- I'm talking about the other characteristics of the eye

16   in the manufactured doll, are different from the particular

17   eye that Mr. Bryant drew.  Okay?  And you can tell me whether

18   you would prefer to do that from where you are or if you want

19   to go up to the screen.

20   A.    I'd prefer to come to the screen.

21   Q.    Okay.

22            THE COURT:  Yes, absolutely.

23   Q.    BY MS. AGUIAR:  While you're walking, my question for

24   you is going to be let's start with the proposition that

25   we're looking at these two eyes.  We're looking at the

afaf730e-bdbe-4545-af08-157421413e63

Page 6974

1    particular eye that Mr. Bryant drew on the left, and we're

2    looking at the particular eye that MGA manufactured on its

3    dolls.  And I need you to explain to me, if you believe those

4    are different, what the differences are.  Because there may

5    be people in the room who are thinking to themselves, you

6    know, lady, you got to be kidding me.  It's a big, oversized

7    eye.

8              So could you point out --

9              THE COURT:  Counsel, is there a question there?

10             MS. AGUIAR:  Yes.

11             MR. PRICE:  I object to the question as phrased to

12   suggest that that's an appropriate way of looking at it.

13             THE COURT:  It is, Counsel.  Let's avoid that in

14   the future.

15             MS. AGUIAR:  I will.

16   Q.   Do you want the pointer again?

17   A.   I'm fine.

18   Q.   I think -- actually, let's drop down the line

19   extractions, and maybe you can also point to that as you go.

20   A.   Okay.  Again, I guess the best is to start from the top

21   and work our way down.  In particular, in the reference

22   between Carter Bryant's portfolio 2D sketches as it relates

23   to the Bratz manufactured doll, one very, very specific

24   difference is in the shape of the eyebrow.  MGA's deliberate

25   decision as to actually make certainly an arching eyebrow,

Page 6975

1   but not to the same degree, not to the same severe slope

2   coming to a top and coming down.

3           THE COURT:  Can I interject here for a second,

4   Counsel?  Could you describe for the record what you've done

5   here?

6           MS. AGUIAR:  Oh, sure.

7   Q.   Ms. Garcia, can you explain what we're looking at here?

8   A.   Sure.  This -- the images on the bottom represent sort

9   of a black and white, an outline of the characteristics and

10  the facial features of both the 2D Carter Bryant portfolio

11  drawings and the manufactured Bratz doll.

12          MR. PRICE:  My objection is they are not in

13  evidence, obviously.  And this witness didn't prepare them.

14  It's an improper demonstrative.

15          THE COURT:  I'm sorry.  What's not in evidence?

16          MR. PRICE:  What they have done here in the bottom.

17  It's an improper demonstrative for a fact witness.

18          THE COURT:  Just lay a foundation for what we're

19  seeing, Counsel.

20  Q.   BY MS. AGUIAR:  Okay.  Can you explain what the two

21  images are on the top and how the lines -- and how we arrived

22  at what you're looking at on the bottom?  Just explain what

23  the images are on the top.

24  A.   Okay.  So the images on the touch, the first is on the

25  left is the Carter Bryant 2D portfolio sketch of Lupe.

afaf730e-bdbe-4545-af08-157421413e63

Page 6976

1  Focusing in on her head and face.  And then this is the Bratz

2  manufactured Yasmin doll.  Again, cropped into her face.

3  Q.   And on the right-hand side, the Yasmin, is that a first

4  generation doll?

5  A.   Yes, it is.

6  Q.   And then what are we -- just explain, if you would once

7  again, what are we looking at on the bottom, and how did that

8  come about?

9  A.   So the images on the bottom represent outlines as if you

10  were to trace some of the facial features, the structure of

11  the facial features within the two references in the above.

12  So they represent sort of -- removed of the color, since we

13  already went through color -- just kind of the actual

14  structure and dimension and that respect.

15  Q.   So would you go through with us --

16          MR. PRICE:  My objection is the ones on the bottom

17  don't represent the works of anything at issue.

18          MS. AGUIAR:  I don't want to make a speaking

19  objection --

20          THE COURT:  No, let's go to sidebar.

21          (SIDEBAR CONFERENCE HELD.)

22          THE COURT:  The Court said it would do the

23  filtering analysis.  And the Court has filtered out the

24  protectable and nonprotectable elements.  This seems to go

25  one step beyond the Court's filtering by divorcing the

afaf730e-bdbe-4545-af08-157421413e63

Page 6977

1    outlines of, for example, the protectable particularized

2    expression of the eyes from the context, the color, shading,

3    et cetera.  You're taking it one step beyond what the

4    Court -- I'm assuming that's your objection.

5              MR. PRICE:  Yes.

6              MS. AGUIAR:  Let me explain why I think that's not

7    the case.  We are trying to do exactly what your Honor

8    suggested, which is make a direct comparison from the drawing

9    to the doll.  We made it with regard to the particularized

10   colors that he chose, and now we're trying to demonstrate the

11   shape differences in the eye.  And I think it's -- when MGA

12   was developing the doll, they didn't do the color and the

13   shape together.  They did them separately.  They designed it.

14   And then it was separately drawn by Anna Rhee.  So there's

15   been no suggestion that these outlines are not exact outlines

16   of the shape of the eye or the shape of the lip.

17             THE COURT:  The concern is a 403 concern with

18   respect to these particular depictions, that because these

19   depictions, and I'm referring to the outline drawings for the

20   record, on the bottom part of the page, are being divorced or

21   separated from the context in which they appear.  You're

22   taking the filtering analysis one step beyond the filtering

23   that the Court did.  You can certainly point out -- ask every

24   question that you want to ask, but it's just the submission

25   of the creation of these two outline sketches that I have

afaf730e-bdbe-4545-af08-157421413e63

Page 6978

1    concerns about.

2              MS. AGUIAR:  We are trying to show, your Honor --

3    and I think it is a valid comparison -- we're trying to show

4    shape.  And I think for the jury's benefit, this very clearly

5    shows the shape which I think we would be entitled to do.

6              THE COURT:  Right.

7              MS. AGUIAR:  So if they were suggesting that these

8    outlines did not follow the outlines of the eye --

9              THE COURT:  That's not the issue.

10             MR. NOLAN:  Your Honor, I just would add, I think

11   the next step is going to be just take a look, let's say, at

12   the size and shape of the eyes and making a comparison --

13             THE COURT:  And if you wanted to pull out, you

14   know, this and put the -- lay on top of each other.  The

15   problem with the black and white sketching is that it

16   divorces it from what has been found to be all wrapped up.

17   You can narrow in as much as you want, even on one eye or as

18   much as you want, as long as you're still comparing the

19   drawing with the doll.  Not a sketch of a drawing and a

20   sketch of the doll.  No matter how accurate the sketch might

21   be.

22             MR. NOLAN:  Because I'll represent to the Court

23   that I did this in my opening statement without any

24   objection.  In fact, I was doing the lip comparison.  Because

25   see, what would happen --

Page 6979

1      THE COURT:  I'm sure you probably did, Counsel.

2  I'm really not focusing in on this until now.  I didn't issue

3  my ruling on the filtering until a few days ago.

4      MR. NOLAN:  But we did one other thing.  And that

5  is -- because this would be the next step in the process, is

6  just take this lip and overlay it to that lip.  Okay?

7      THE COURT:  If you want to do that with these, you

8  can.  But not with the drawings.  The more I'm looking at

9  this, -- and really the cases that I did on filtering, I

10 think that is something which is particularly not appropriate

11 to do.

12     MR. NOLAN:  But we could highlight the lips, the

13 lines, and the eyes next to each other?

14     THE COURT:  You can manipulate all of that all you

15 want.  And if you want to take a break --

16     MS. AGUIAR:  No, that's fine.

17     MR. NOLAN:  And the last point, for about the fifth

18 time today, these speaking objections are really in front of

19 the jury, it suggests that we're doing something wrong --

20     THE COURT:  Hold on a second.

21     That was a speaking objection, Mr. Price.  You've

22 got to use not relevant.  This is another one that would be

23 not relevant.

24     MR. PRICE:  I apologize.  I'm doing my best.  I'm

25 trying to make eye contact and seeing if my shortcut works.

Page 6980

1           THE COURT:  That's not appropriate.  And I try to

2      avoid that as well.  I don't want eye contact going on

3      between the Court and counsel.

4           MR. PRICE:  I'm just trying to see if there's a

5      puzzled look on your face.

6           THE COURT:  Don't try to read that.  Because

7      oftentimes, if I'm giving an expression, oftentimes it may be

8      something that I'm reading on my screen that has absolutely

9      nothing to do with this case.

10          MS. AGUIAR:  If he looks happy, it's not because of

11     us.

12          MR. NOLAN:  It's more than that.  There's a pattern

13     now that's developing where they are suggesting that what

14     we're doing or attempting to do is wrong.  And that's the

15     problem.  And I think this is about the fifth time this --

16          THE COURT:  I understand.  There have been speaking

17     objections made by both sides throughout this trial.  And I

18     have cautioned both sides.  But I have mentioned this to you,

19     Mr. Price, several times today.  So next time it happens, I'm

20     going to say something to you in front of the jury.  Thank

21     you, Counsel.

22          (CONCLUSION OF SIDEBAR CONFERENCE.)

23          MS. AGUIAR:  Aaron, if you could put back up the 14

24     graphic.

25     Q.   Okay.  So if you want to use the pointer or you want to

Page 6981

1   use your finger, let's -- I think you already commented on

2   the eyebrow.  So if you would move on to the eye and focus

3   your comments on the differences, if any, that were

4   implemented in the doll versus the drawing.

5   A.   Okay.  In referencing the Carter Bryant 2D portfolio

6   sketch, you'll notice that the eye shape is actually quite

7   round.

8        If you look at the actual manufactured MGA Bratz

9   doll, the eye actually takes a wider, more almond, a longer

10  shape, specially in a distance from the tear duct to the edge

11  of the eye.

12       In the pupil area, you'll see that the pupil in

13  Carter Bryant's Lupe portfolio drawings is actually quite

14  small and kind of sort of beady-like.  In the manufactured

15  Bratz Yasmin doll, the pupil is actually opened bigger,

16  wider.  And I'll stop to say that I've been part of the

17  development of dolls now for --

18            MR. PRICE:  Objection, your Honor.

19            THE COURT:  Next question, Counsel.

20  Q.   BY MS. AGUIAR:  Describe for me the effect of the change

21  that was made.

22            MR. PRICE:  Objection.  Irrelevant.

23            THE COURT:  Sustained.  Unless you're asking -- why

24  don't you rephrase your question.

25  Q.   BY MS. AGUIAR:  Was a decision made to change the pupil

Page 6982

1    size, an affirmative decision by MGA?

2    A.    It was a very conscious decision by MGA to change the

3    size of the pupil.  The pupil size --

4              MR. PRICE:  Objection.  Beyond the scope.

5              THE COURT:  Next question.

6    Q.   BY MS. AGUIAR:  And what was the reason for the

7    decision?

8              MR. PRICE:  Objection.  Relevance.

9              THE COURT:  Sustained.

10   Q.   BY MS. AGUIAR:  Was that decision based on your view of

11   the marketability of the doll?

12             MR. PRICE:  Objection.  Leading.

13             THE COURT:  Sustained.

14   Q.   BY MS. AGUIAR:  What was the decision based on?

15             MR. PRICE:  Objection.  Irrelevant.

16             THE COURT:  Well, with respect to marketability,

17   Counsel.  I wish I could do this -- a very quick sidebar.

18             (SIDEBAR CONFERENCE HELD.)

19             THE COURT:  I'm going to sustain or overrule

20   objections going forward at this point.  Reasons why they

21   make a change is not relevant.  That a change was made is

22   relevant.  What change was made is relevant.  And ultimately

23   how that affected marketability or the profits is relevant

24   with respect to apportionment of damages.  Presuming that the

25   change is not related to a protectable -- that's part of the

Page 6983

1   apportionment analysis.

2           MS. AGUIAR:  But, your Honor, so, for example, just

3   speaking here at sidebar, if they made that change because

4   they knew from their experience and from research and from

5   feedback that making a doll with a beady eye and a small

6   pupil would not sell as well, that is absolutely relevant.

7   It was a decision they made to make a change, and it probably

8   ended up in a more successful doll that sold more, and as

9   your Honor put it, captured the imagination of a kid rather

10  than a doll that looked different.

11          MR. PRICE:  If that's what she's going to, there's

12  no foundation at all.

13          THE COURT:  I understand the foundational

14  objection.  But we are all on the board that that's relevant.

15          MR. PRICE:  If there's a foundation.

16          THE COURT:  But the best way to do that is

17  accomplish the -- establish the change.  What is the change.

18  And then if you want to get into the impact of that change in

19  terms of profitability, marketability, assuming that you can

20  lay a foundation for it, that's fine.

21          MS. AGUIAR:  Because I did establish the change.

22  She said it was a smaller pupil and they made it larger.  So

23  I established that the change was made, and now I was trying

24  to go into and what was the effect of that?

25          THE COURT:  The way that the questions were coming

afaf730e-bdbe-4545-af08-157421413e63

Page 6984

1    out, and it's just a -- kind of a form issue as it is, is to

2    get away from the why, the result of the change.  There was a

3    change, and there was an effect on marketability.  And lay

4    the foundation.

5              MR. PRICE:  The problem is there's no way that this

6    witness would have the foundation to testify --

7              THE COURT:  That's why I'm asking you to ask it in

8    that order, because that way you get in the change, and then

9    if there's a question of foundation, it doesn't cut you off

10   at the pass.  You may have to bring up somebody else to deal

11   with the marketability or the impact on damages in the

12   apportionment.  But it's a way of doing the evidence in a way

13   that makes sense.

14             MR. NOLAN:  Real quickly, your Honor, for

15   clarification.  So if I change that she makes, for instance,

16   in the pupil is made to make her appear younger or to appeal

17   to a different audience or idea, that's fair game, as I

18   understand what we've been going through today.

19             THE COURT:  Why she did it is not relevant unless

20   it can be expressed in terms of marketability.

21   Profitability.  She has to lay the foundation.  We have not

22   heard that.  I have not heard that.

23             MR. NOLAN:  I appreciate that.  I guess I'm doing a

24   different point.  If the change was made to make it different

25   than the idea that Carter Bryant had for the expression of

Page 6985

1    the eye, for instance, Carter Bryant's eye express was --

2              THE COURT:  To show that the particularized

3    expression in the doll is different than the particularized

4    expression in the drawing, that goes both to the issue of

5    copyright and to damages, yes.

6              MR. NOLAN:  Okay.

7              MS. AGUIAR:  He's just saying the change goes to

8    both.

9              THE COURT:  Right.  And you have to lay a

10   foundation for that.

11             (CONCLUSION OF SIDEBAR CONFERENCE.)

12   Q.  BY MS. AGUIAR:  Okay.  So let's just go back to the eye

13   and summarize, if you would, for me.

14             What is the difference, if any, between the shape

15   of the eye in the drawing and the shape of the eye that MGA

16   opted to create in the doll?

17             MR. PRICE:  This is asked and answered.

18             THE COURT:  Reorientation.  You may answer.

19   Q.  BY MS. AGUIAR:  You can answer.

20   A.  In the Carter Bryant Lupe 2D portfolio drawing, the eye

21   is quite round and short from the tear duct to the end of the

22   eye.

23             In the Bratz manufactured Yasmin doll, the eye is

24   actually much longer, more almond in shape.

25   Q.  Was there a change made by MGA in the size of the pupil

1   between the drawing and the actual doll?

2   A.   Yes, absolutely.

3   Q.   And what was that change?

4   A.   We chose to make a bigger sized pupil in the Bratz

5   manufactured Yasmin doll.

6   Q.   Does the change in the pupil size make the eye look

7   different?

8   A.   Yes, it does.

9   Q.   In what way?

10  A.   Well, the eye overall, the tone that you receive from an

11  eye with a bigger pupil suggests a character --

12          MR. PRICE:   Your Honor, characterization.

13  Relevance.

14          THE COURT:   Rephrase your question, Counsel.

15  Q.   BY MS. AGUIAR:   Due to the size of the pupil, is the eye

16  on the right that you created in the Bratz dolls different

17  from the eye on the left?

18  A.   Yes.   The pupil on the right is larger in size than the

19  pupil on the left side.   And the larger pupil suggests a

20  sweeter --

21          MR. PRICE:   Objection.   Beyond the scope.

22          THE COURT:   Next question.

23  Q.   BY MS. AGUIAR:   Based on your experience, did you have

24  an understanding that changes such as the one you've just

25  described have an impact --

Page 6987

1            THE COURT:  I'm sorry.  I'm going to retract that

2    ruling.  It's part of the difference.

3            MS. AGUIAR:  Mark, will you please read back the

4    last question and answer?

5            (Record read.)

6            THE WITNESS:  A sweeter, younger, more

7    approachable, more appropriate character.

8    Q.   BY MS. AGUIAR:  Do you have an understanding based on

9    your experience in doll development, that there is a

10   connection between the size of the pupil and the look of the

11   doll generally?

12   A.   Yes, absolutely.  The size of the pupil --

13           MR. PRICE:  Objection.

14           THE COURT:  It was a yes or no question.  Next

15   question.

16   Q.   BY MS. AGUIAR:  And what is that understanding based on?

17   A.   It's based on my experience in developing dolls, and it

18   is my understanding that the size --

19           MR. PRICE:  Objection.  Beyond the scope.

20   Q.   BY MS. AGUIAR:  And what is -- and what is your

21   understanding about that connection?

22           THE COURT:  I'll sustain the foundational

23   objection.  Further foundation, Counsel.

24           MS. AGUIAR:  Okay.

25   Q.   Describe to us how you know what it is you know about

Page 6988

1    the size of the pupil on the eye of a doll?

2           THE COURT:  And its effect.

3    Q.    BY MS. AGUIAR:  Yes.  And its effect on how kids

4    interpret or perceive a doll.

5    A.    It's based on my experience, almost now collective of 10

6    years of doll development, you know, in the past 10 years of

7    my doll development experience.

8    Q.    Have you received results of focus groups on subjects

9    like this?

10          MR. PRICE:  Objection as to time frame.

11          MS. AGUIAR:  I'm asking a general question now,

12   your Honor.

13          THE COURT:  Very well.

14          THE WITNESS:  Not specific focus groups based on

15   the size of a pupil.  It has been through my learning and

16   developing and also then my receiving, my own perception of

17   studying dolls and the size of the pupil.

18   Q.    And what is your understanding regarding the connection

19   between the size and how a child reacts to a doll?

20          MR. PRICE:  Objection.  Lack of foundation.

21          THE COURT:  Insufficient foundation, Counsel.

22          MS. AGUIAR:  I'll move along.

23   Q.    Okay.  So we've talked about the eye.  Is there anything

24   else that you'd like to point out in the way of differences

25   between the drawing and the doll?  Sticking with the eye just

Page 6989

1   for a moment.

2   A.   No, that's it.

3   Q.   And are there any differences that you see moving on to

4   the eyelashes, let's say.  Are there differences between the

5   particular way that Mr. Bryant drew them and the particular

6   way that MGA created them?

7   A.   Yes, in Carter Bryant's 2D portfolio sketch, you'll see

8   that he creates eyelashes, three of them at the end of the

9   eye.  In the Bratz manufactured Yasmin doll, we actually

10  created four eyelashes, and the eyelashes actually span from

11  the center of the pupil all the way to the end of the eye.

12  And I make reference only to the eyelashes on the top lid.

13  Q.   Do you believe that in creating the Bratz dolls, that

14  the particular way that MGA did it is different than the

15  particular way that Mr. Bryant drew them in his pitch book?

16  A.   Yes.

17  Q.   Let's do another facial feature.

18          And, Aaron, maybe we can use number 47 for that

19  one.

20          Let's talk about the lips.

21          Do you see differences between the way that

22  Mr. Bryant drew the lips and the particular way that MGA

23  manufactured the lips on the doll?

24  A.   Yes, absolutely.

25  Q.   And we're looking here, by the way, at the drawing of

afaf730e-bdbe-4545-af08-157421413e63

Page 6990

1    Hallidae on the left and a photograph of the actual first

2    generation Sasha doll on the right; correct?

3    A.    That's correct.

4    Q.    Sorry.  Go ahead.

5    A.    In looking at Carter Bryant's 2D portfolio sketch of

6    Hallidae, you'll notice the shape of the upper lip.  The

7    shape of the upper lip is actually a continuous kind of

8    curving line as opposed to the manufactured Sasha doll where,

9    in fact, we actually created or implemented peaks in the

10   shape of the top of the lip, suggesting a more natural lip

11   shape.

12           If you look at the size of the Hallidae Carter

13   Bryant 2D portfolio sketch and you look at the size from the

14   top of the upper lip to the bottom of the upper lip, it was

15   my personal perception that this was a pretty solid and full

16   lip as opposed to the Bratz manufactured Sasha lip.  The top

17   of the upper lip to the bottom of the upper lip actually is

18   much shorter in distance, meaning the top lip is much smaller

19   in relation to the top lip of Hallidae.

20           You'll see that in Carter Bryant's Hallidae

21   drawing, there is the really strong -- it's not as super

22   clear here, but there's a really strong sort of flip that

23   happens at the ends of the top lip.  And in the Bratz

24   manufactured Sasha, you'll see that the flips were minimized,

25   if not almost completely reduced.

1          And you'll also see in the Hallidae drawing that

2     there's a big sort of crease in the top upper lip which Bratz

3     manufactured Sasha did not include at all.

4          Those were some deliberate revisions to -- let me

5     back up.  I was concerned in reviewing the Hallidae drawing

6     that --

7               MR. PRICE:  Objection.  Beyond the scope.

8               THE COURT:  Next question, Counsel.

9     Q.   BY MS. AGUIAR:  Did the changes that you made to the lip

10    that you've described so far result in a different look, an

11    overall look and feel of the lip on the right?

12    A.   Yes.

13    Q.   And what is that different look and feel of the lip on

14    the right?

15    A.   The look on the right represents a more natural lip, a

16    more modest lip, a more human-like lip.  And frankly, in my

17    opinion, a more appropriate lip.

18    Q.   Is there anything else you want to point out about the

19    lip before we move on?

20    A.   I'd like, if it's acceptable, to point out in the

21    Hallidae drawing.  Is that acceptable?

22    Q.   Sure.  Again, if it's a difference between the drawing

23    and the doll, yeah.

24    A.   Actually, I've actually spoken to the differences.

25    That's enough.

Page 6992

1   Q.   Great.  So with regard to the lips that we're looking at

2   here, did --

3   A.   Actually, I apologize.  I don't mean to interrupt, but I

4   did think of a few more differences, if it's acceptable to

5   speak to them.

6   Q.   All right.  Point out, if there are other differences,

7   what they are.

8   A.   I apologize.  I've sort of been focused on the bottom.

9   But in the Carter Bryant 2D portfolio sketch, you'll notice

10  that the Hallidae's bottom lip is more square in shape, if

11  you will.  And if you look at the manufactured Sasha bottom

12  lip, you'll see that it's actually more like oval or round in

13  shape.  It doesn't create so much of the square.

14          And finally, in the Hallidae Carter Bryant 2D

15  portfolio sketch, you'll see a really, really strong sort of

16  crease in the bottom lip which was -- there's certainly a

17  sculpt relief of sort of material removed from the bottom

18  lip.  But not to the same degree and not to the same

19  intensity.  And not for the same purpose that I believe the

20  Hallidae line was indicated for.

21  Q.   So do you think the lip in the doll that MGA created is

22  different from the particular lip that Mr. Bryant drew?

23  A.   Yes.

24  Q.   Okay.  I was going to -- unless there's anything else

25  about the facial features that you want to point out, then I

afaf730e-bdbe-4545-af08-157421413e63

Page 6993

1    was going to move on.

2    A.    I'm done.

3    Q.    Okay.  You can go back up to the witness stand.

4              I'm going to move past the first generation dolls

5    now.  So the next series of questions that I want to ask you

6    this afternoon, I'm going to be referring to the different

7    Bratz dolls that came out spring 2002 and forward.  Okay?

8    A.    Okay.

9    Q.    After the first generation, when was the next line of

10   dolls released?

11   A.    In spring 2002.

12   Q.    And starting in spring 2002, did the new dolls have

13   themes that went along with them?

14   A.    Yes, they did.

15   Q.    And the jury's heard a bit about themes and maybe if

16   Aaron can put up some of the slides that we showed the jury

17   in the opening statement, and those slides show some of the

18   themes that have been implemented starting 2002.

19              Aaron, maybe you can flip through them.

20              These show 2002 up through the present.  If you can

21   explain to the jury what is meant by theme.

22   A.    A theme is actually another way to term a collection.

23   It's very, very important to create themes.  As themes

24   provide reasons for collectability, another reason for a

25   consumer to purchase another Bratz doll.  A consumer of 7 to

Page 6994

1    10, she's a really fickle girl.

2              MR. PRICE:  This goes beyond the scope.

3              THE COURT:  Sustained.  Next question.

4    Q.   BY MS. AGUIAR:  How does the use of a theme relate to

5    your target consumer?  Why is that important?

6    A.   The themes relate because --

7              MR. PRICE:  Objection.  Foundation.

8              THE COURT:  Sustained.  Lay a foundation, Counsel.

9    Q.   BY MS. AGUIAR:  Do you have an understanding of why

10   themes are important to your consumers?

11   A.   Yes, I do.

12   Q.   What is that based on?

13   A.   Based on focus groups.  Based on bounce-backs of our

14   consumers, based on fan club feedback.

15   Q.   And what is your understanding of the importance of

16   themes to your particular target audience for the Bratz

17   fashion dolls?

18             MR. PRICE:  Objection.  Lack of foundation and

19   relevant time period.

20             THE COURT:  Lay some more foundation.

21   Q.   BY MS. AGUIAR:  We're talking about the time period when

22   MGA was producing lines of dolls with different themes from

23   2002 through 2007.

24             Do you now, as you sit here today, have an

25   understanding of the relevance of themes to your particular

Page 6995

1    target audience?

2              MR. PRICE:  I'll object.  It's irrelevant as to

3    today.  And lack of foundation as to the time frame.

4              THE COURT:  Let's ask a series of questions

5    establishing the time frame, Counsel.

6    Q.   BY MS. AGUIAR:  At some point in time, did you develop

7    an understanding that themes are important to your consumer?

8    A.   Yes.

9    Q.   When did you come to understand that?

10   A.   I came to understand that from spring 2002.  Frankly, in

11   the development of our spring 2002 line and, you know,

12   through the many, I guess the seven or eight years up until

13   today.

14   Q.   Okay.  And what is your understanding as to the

15   importance and relevance of themes to the Bratz target

16   audience?

17             MR. PRICE:  Lack of foundation for 2002.  That's

18   where she doesn't have the foundation.

19             THE COURT:  Just confirm that her previous

20   foundation is connected up to the time frame that you've

21   identified.

22   Q.   BY MS. AGUIAR:  As of 2002, did you already have the

23   understanding of the importance of themes to your consumer

24   that you were targeting?

25   A.   Yes.

Page 6996

1    Q.   And what was that understanding that you had regarding

2    the importance of themes to that consumer?

3    A.   My understanding is through communication or focus group

4    with our consumer type.  It was in studying and reviewing

5    documents like, as I mentioned before, NPV, which is, you

6    know -- recognizes how products or themes may or may not

7    perform.

8    Q.   So how is a theme -- or why, rather, is a theme

9    important to this age range of girls that you were targeting?

10   A.   This age group is -- I have learned through my

11   experience and through research and tons of communication and

12   interaction with these girls.  These girls are starting to

13   find in their life interests even beyond and outside of toys.

14   It can range as much as, you know, magazines, iPods, music.

15   They find interests very much outside of toys.  It is through

16   the theme that we can reinvent ourselves.

17          So we can keep them interested and through the

18   theme that we can reach them emotionally to, you know, to

19   touch sort of some of those interests that they are even

20   finding, you know, beyond and outside of being even seven to

21   ten years old.

22   Q.   Did MGA use or rely on in any way Mr. Bryant's original

23   concept drawings when you were developing themes, any of the

24   themes for the new Bratz dolls?

25   A.   No.

afaf730e-bdbe-4545-af08-157421413e63

Page 6997

1    Q.   Did Mr. Bryant's drawings even have a theme in them?

2    A.   No, they did not.

3    Q.   Do the different Bratz dolls with different themes

4    usually sell at the same rate or the same popularity?

5    A.   No, they do not.

6    Q.   I want to go through one or two that may not have done

7    so well.  I want to first go to Exhibit 17565.

8         So let's start with 17565.  Can you tell the jury

9    what that doll is?

10   A.   This is a Bratz Pretty and Punk doll.

11   Q.   Did that doll sell well?

12   A.   No, this doll did not sell well.

13   Q.   And do you have an understanding as to why that -- why

14   it did not sell well?

15   A.   Yeah.

16   Q.   And why did it not sell well?

17        MR. PRICE:   Objection.  Lack of foundation.

18        THE COURT:   Sustained.

19   Q.   BY MS. AGUIAR:  What's your understanding based on?

20   A.   My understanding is based on interaction and

21   communication with core girls of our consumer set.  We also

22   got feedback from, you know, our fan club, bounce-backs, the

23   like.

24   Q.   And what is your understanding as to why that particular

25   doll did not sell well?

1    MR. PRICE:  Objection.  Foundation and hearsay.

2    THE COURT:  Sustained.  Further foundation,

3    Counsel.

4    Q.  BY MS. AGUIAR:  Did the communication with consumers and

5    bounce-back comments from girls and fan club websites provide

6    you an understanding as to why this doll was not successful,

7    this particular doll?

8    A.  Yes.

9    Q.  And is that the typical way in which you would learn

10   whether a particular doll was or was not successful?

11   A.  Yes.

12   Q.  And is this something you do in the course of being a

13   brand manager for Bratz, is to get feedback like that and

14   gain an understanding as to the reasons a doll is successful?

15   A.  It is a huge responsibility as a brand manager.

16   Q.  And what is your understanding as to why this particular

17   doll did not do as well?

18   MR. PRICE:  Same objections.  Foundation and

19   hearsay.  Also, your Honor, relevance as to her

20   understanding.

21   THE COURT:  Is it being offered for the truth of

22   the matter asserted, Counsel?

23   MS. AGUIAR:  No.  It's to get at her understanding

24   of why it didn't sell as well as another Bratz doll.

25   THE COURT:  Then it becomes -- it runs into the

Page 6999

1    relevance dilemma.  It doesn't matter why she thinks --

2              MS. AGUIAR:  Okay.

3    Q.  Let me ask can you this:  Do you know for a fact that

4    this Bratz doll did not sell as many dolls as other Bratz

5    dolls?

6    A.  Yes, I do.

7    Q.  And turn to the next one.  18690.  Can you tell the jury

8    what we're looking at there?

9    A.  This is -- it's called Fabulous Bratz.

10   Q.  Fabulous Bratz.  And is that the one with the Las Vegas

11   theme?

12   A.  Yes, it is.

13   Q.  Is this a doll that did not do as well as other Bratz

14   dolls?

15   A.  Yes.

16   Q.  And do you know that for a fact?

17   A.  Yes.

18   Q.  Is it your understanding that the theme of these two

19   dolls is one of the reasons that the doll did not sell well?

20             MR. PRICE:  Objection.  Lack of foundation.

21   Hearsay.

22             THE COURT:  Sustained.

23   Q.  BY MS. AGUIAR:  Let's talk about dolls that did sell

24   well.  I'm going to show you two of them.

25             Can you tell the jury what we're look at there?

1   There's two.  18680.  What is that?

2   A.   That's a Bratz Slumber Party.

3   Q.   And 17529.

4   A.   This is a Bratz Formal Funk.

5   Q.   And did these two dolls that we're looking at here,

6   Slumber Party and Formal Funk, sell very well in comparison

7   to other Bratz dolls?

8   A.   Yes, they did.

9   Q.   So what do you say in response to the argument that all

10  the dolls that -- let's say just the four that I've shown you

11  just now within the last five minutes, that those are all

12  basically just the same doll.

13            MR. PRICE:  Objection.  Vague.

14            THE COURT:  Rephrase.

15  Q.   BY MS. AGUIAR:  Are the four exhibits that I just showed

16  you -- 17529, 18680, 18690, and 17565 -- are those the same

17  doll?

18            MR. PRICE:  Objection.  Vague.

19            THE COURT:  You're referring to the body, Counsel?

20            MS. AGUIAR:  I'm referring to the whole thing, the

21  doll as a whole.

22  Q.   In those packages, just as you're looking at them now,

23  are those the same doll?

24            MR. PRICE:  Objection.  Vague.

25            THE COURT:  I'm sorry, Counsel.  You're asking if

Page 7001

1    they are the same?  The exact same?

2              MS. AGUIAR:  Yeah.  Are those the same doll.

3              THE COURT:  Overruled.

4              THE WITNESS:  No, they are not the same doll.

5    Q.   BY MS. AGUIAR:  And why in your view are the dolls that

6    we're looking at in front of us not the same doll?

7    A.   They are not the same doll because they represent

8    different themes, the themes requiring different fashions,

9    accessories, packaging, et cetera.

10             MR. PRICE:  Objection.  Move to strike the opinion.

11   That's irrelevant.

12             THE COURT:  Sidebar, Counsel.

13             MS. AGUIAR:  You want me to just ask a different

14   question?

15             THE COURT:  I want to see you at sidebar.

16             (SIDEBAR CONFERENCE HELD.)

17             THE COURT:  My concern is this.  And that's why I

18   questioned.  I -- I should have sustained the vagueness

19   objection.  What you've done is told the jury basically, I

20   don't really understand how this played out.  You asked her

21   are they the same.  She said no.  Why are they not the same?

22   Because they have different themes.  Ergo, if you have

23   different themes, they are not the same doll, not to mention

24   not being substantially similar.  This is totally irrelevant,

25   and I'm considering an instruction to the jury.  That's why I

afaf730e-bdbe-4545-af08-157421413e63

Page 7002

1    called for the sidebar.  I'll hear argument from both sides.

2              MS. AGUIAR:  She's testified that they develop

3    different themes for the dolls.

4              THE COURT:  That's clear.  But that doesn't make

5    them necessarily different, not the same doll.  There's a

6    conflating of issues.  I should have sustained the vagueness

7    objection.  I made a mistake.

8              MR. NOLAN:  Your Honor, isn't that ultimately the

9    question --

10             THE COURT:  Do you understand the concern the Court

11   has?

12             MR. NOLAN:  I do, your Honor.  Isn't that

13   ultimately the question of fact that this jury will have to

14   make the determination on?  And that is whether or not the

15   facial, the look --

16             THE COURT:  She's not asking about any protectable

17   element.  She is asking about a clearly nonprotectable

18   element and using that as a basis to say that --

19             MS. AGUIAR:  Your Honor, Mr. Quinn in his opening,

20   he basically also, I believe -- and I'd have to go back to

21   the transcript -- asked at least one witness whether these

22   aren't -- and he used that phraseology.  These are just the

23   same doll.  And I believe we're entitled to elicit testimony

24   as to why she believes certain things make the dolls

25   different.

Page 7003

1         THE COURT:  You may be right.  I can't remember

2   exactly what he said or didn't say.  I can only rule on

3   objections that are before me.  But the objection was well

4   taken, and I blew it.

5         Counsel?

6         MR. PRICE:  I believe there should be an

7   instruction.  She's able to testify about differences between

8   the dolls.  That's the infringement element.  Now they are

9   trying to conflate that with apportionment somehow.  Because

10  it's in a box and has accessories, now there's testimony that

11  that makes them not the same doll.  So I think that the jury

12  needs to be instructed.

13        THE COURT:  This is not -- I don't want to give an

14  instruction like this.  Counsel, can you cure this with some

15  questions?

16        MS. AGUIAR:  Yes, I believe I can.

17        THE COURT:  For me to have confidence that you can

18  cure it with a question, I need to have confidence that you

19  understand what went wrong here.

20        MS. AGUIAR:  What if I ask her specifically do the

21  two dolls you're looking at have different themes.  Do the

22  two dolls you're looking at -- are they wearing different

23  fashions.  The two dolls you're looking at, are the

24  accessories in the box different.

25        THE COURT:  That's fine.  All of that is fine.  The

Page 7004

1  problem was the predicate you used to say are these -- it was

2  clever, but it was not proper.

3          MR. PRICE:  We need to strike the answer that's in

4  the evidence.

5          THE COURT:  I will strike that.  I'm not going to

6  give that instruction.

7          MR. PRICE:  And I think we also need a question so

8  there's no confusion.  I want to be clear.  The dolls

9  themselves, those are the same.  Because we need them to know

10 that that's not what they are saying.

11         MS. AGUIAR:  But the dolls themselves are not the

12 same.

13         MR. PRICE:  As a follow-up -- this is a follow-up

14 that the jury just heard.  They are going to think this is

15 just breaking down the differences --

16         THE COURT:  I know.  No, I --

17         MS. AGUIAR:  I will ask about each of the elements

18 that I just set out.  I do believe I understand what you're

19 saying, and I will ask about the fashions, the theme, the

20 packaging, the accessories, and ask if --

21         THE COURT:  And that all goes to apportionment.  It

22 doesn't go to substantial similarity.  These two just got

23 conflated.

24         MS. AGUIAR:  But as we all know, the question on

25 substantial similarity is not from doll to doll.  You've said

afaf730e-bdbe-4545-af08-157421413e63

Page 7005

1    that.  They have agreed with that.

2              THE COURT:  I understand that.

3              MS. AGUIAR:  So the fact that I asked if these two

4    dolls are the same doll doesn't even go to substantial

5    similarity.

6              THE COURT:  Counsel, Counsel, if you can establish

7    in this jury's mind that two dolls are not substantially

8    similar or the same based on different themes, you have made

9    your task on establishing from drawing to doll that much

10   easier.  I'm convinced you understand the argument.  Don't

11   unconvince me.  I think you understand where you run afoul.

12             MS. AGUIAR:  So I will ask the questions.

13             THE COURT:  You do.  I'm going to strike the

14   answer.  I'm not going to instruct at this point.  But I'll

15   be mindful of this.

16             (CONCLUSION OF SIDEBAR CONFERENCE.)

17             THE COURT:  Ladies and gentlemen, just backing up a

18   bit, you are to disregard, and the Court is going to strike

19   the answer with respect to the dolls, whether they are the

20   same or not.  The two dolls in question.  Just completely

21   disregard that.

22             Counsel, next question.

23   Q.   BY MS. AGUIAR:  Sure, the two dolls that you have in

24   front of you, do those two dolls have different themes?

25   A.   Yes, they do.

afaf730e-bdbe-4545-af08-157421413e63

Page 7006

1  Q.   The two dolls in front of you, are they wearing

2  different fashions?

3  A.   Yes, they are.

4  Q.   The two dolls that you have in front of you, are there

5  different accessories in each of the two boxes?

6  A.   Yes.

7  Q.   And the two dolls that you have in front of you, are

8  they both in a different package?

9  A.   Yes, they are.

10  Q.   What are the characters that are depicted in each of the

11  dolls?  Can you tell the jury, for example, in the Slumber

12  Party?

13  A.   In Slumber Party, Yasmin is included in the package.

14  And in Formal Funk, Dana is included in the package.

15  Q.   So the two dolls in front of you, are the characters

16  different?

17  A.   Yes.

18  Q.   And if you look specifically at the face decoration, or

19  what we've been calling the face paint, is the face paint

20  different in the Formal Funk doll versus the Slumber Party

21  doll?

22  A.   Yes, they are very different.

23  Q.   The hair on the two dolls, on Yasmin and on -- did you

24  call her Dana?

25  A.   Dana.

Page 7007

1   Q.   Is the hair different?

2   A.   Yes, they are very different.

3   Q.   So other than the underlying naked sculpt, which you had

4   up there before, are the different elements of the dolls that

5   we just discussed different from one to the next?

6   A.   Yes.

7   Q.   Let's talk about fashions for a moment.

8        For the Bratz dolls -- going past first generation

9   into 2002 and forward.  Did you use Mr. Bryant's pitch book

10  drawings to design the fashions for the other generations of

11  dolls?

12  A.   No, we did not.

13  Q.   Are the fashions in the later dolls the same as the

14  fashions that were drawn by Mr. Bryant in his concept

15  drawings?

16  A.   No, they are not.

17  Q.   Does MGA track information about whether the fashions on

18  different dolls are successful or not?

19  A.   Yes.

20  Q.   Are fashions one of the reasons why the Bratz consumers

21  buy the dolls?

22       MR. PRICE:  Objection.  Lack of foundation.

23       THE COURT:  Sustained.

24  Q.   BY MS. AGUIAR:  Before we get on to that, let me give

25  you -- I would like to have you walk us through an example of

1    how you develop some fashions.  Trial Exhibit 14624.

2              Can you tell us what we're looking at here?

3    A.   This is a Bratz Girls Really Rock Sasha doll.

4    Q.   And are the fashions on this Girls Really Rock Bratz

5    doll the same as the fashions that were depicted in

6    Mr. Bryant's concept drawings?

7    A.   No, they are not.

8    Q.   Can you describe for us, using this -- and is this, by

9    the way, one of the Bratz dolls that hit the shelves about a

10   month or so ago?

11   A.   Yes, they are.

12   Q.   So this is one of the newest ones?

13   A.   Yes.

14   Q.   Can you describe for us how, then, the fashions in this

15   particular doll are different from the fashions in

16   Mr. Bryant's drawings -- concept drawings?

17   A.   In concept, the fashions for Girls Really Rock are

18   expected to look like a hip-hop rock star.  And so the

19   fashions were deliberately designed to represent what a

20   hip-hop star might be wearing.  So we referenced some

21   inspiration, some celebrities.  We reference fashion and

22   fashion trends.  And so we create fashions.  We arrived at

23   the decision to sketch a fashion that looked like this.  From

24   sketch, we actually will pull fabrics and fabric material

25   types and sew the fashion so that they become a 3D form, and

Page 7009

1    make adjustments, of course, along the way and through the

2    process to make sure that we got it just right.

3    Q.   Beyond the first generation of Bratz dolls, including

4    the ones we've been looking at this afternoon up there, did

5    you base the fashions on Mr. Bryant's concept drawings in any

6    of the fashions beyond the first generation?

7    A.   No.

8    Q.   Let's take a look in your binder at Exhibit 4568.

9            Do you recognize 4568?

10   A.   Yes, I do.

11   Q.   Can you tell us what it is?

12   A.   This is a research.  It is a writeup of the results of a

13   research that took place in the U.S., U.K., and Canada on

14   Bratz.

15   Q.   Have you seen this document before?

16   A.   Yes.

17   Q.   So you recognize it?

18   A.   Yes.

19           MS. AGUIAR:  I'd like to move into evidence, your

20   Honor, 4568.

21           MR. PRICE:  Hearsay.

22           THE COURT:  Are you offering it for the truth of

23   the matter asserted?

24           MS. AGUIAR:  I believe it's a business record, your

25   Honor.

Page 7010

1          THE COURT:  Then lay a foundation for it as such.

2     Q.   BY MS. AGUIAR:  Does MGA from time to time engage

3     outside research services to do this type of report for MGA?

4     A.   Absolutely.

5     Q.   And in the course of developing new lines of Bratz

6     dolls, does MGA rely on the information in reports such as

7     these?

8     A.   Yes.

9     Q.   And do you have an understanding of the source of the

10    information that's contained in Exhibit 4568?

11    A.   I'm sorry.  I don't know what you mean.

12    Q.   In other words, where did the information come from

13    that's included in the exhibit?

14    A.   There is a group called CNR Research who developed this

15    report.  They acted as a separate party of MGA to develop the

16    report.

17    Q.   And do you have any reason to believe that the results

18    and the information that they are reporting in here are

19    inaccurate in any way?

20    A.   No.

21    Q.   And did you rely on this document in doing various -- in

22    carrying out your responsibilities as the brand manager for

23    Bratz?

24    A.   Yes.

25          MS. AGUIAR:  Your Honor, I move 4568.

afaf730e-bdbe-4545-af08-157421413e63

Page 7011

1          MR. PRICE:  Objection.  It's hearsay.

2          THE COURT:  Is CNR Research services part of MGA?

3          THE WITNESS:  No, they are not.

4          THE COURT:  Sustained.  Based on business records.

5          MS. AGUIAR:  It was created by -- prepared at the

6    request of MGA.

7          THE COURT:  I understand.

8    Q.   BY MS. AGUIAR:  Through quantitative focus groups,

9    prepared for MGA over the years, have you gained any

10   understanding regarding the importance of specifically the

11   fashions element of the Bratz doll to the consumer?

12   A.   Yes.

13   Q.   And what is the understanding that you have gained in

14   that regard?

15          MR. PRICE:  Objection.  Foundation.  Calls for

16   hearsay.  And irrelevant.

17          THE COURT:  Lay a foundation, Counsel.  I'll

18   consider relevancy after.

19   Q.   BY MS. AGUIAR:  What are the sources of information that

20   you have, as you sit here today, regarding the importance of

21   fashions or the relevance of fashions to the development of

22   the Bratz dolls and to their success?

23   A.   It was through my learning direct from girls and their

24   feedback through bounce-backs, fan club, qualitative

25   research, quantitative research, and even some retailer, like

Page 7012

1    Amazon dot com.   Consumers can actually write up and give

2    their comments and critique, both positive and negative,

3    about the brand.

4    Q.   And is that the typical way someone in your position

5    would gather information in order to determine the importance

6    of an element like fashions to the success of your product?

7    A.   Yes.

8    Q.   And was this knowledge gained over the course of a

9    number of years as the Bratz brand manager?

10   A.   Yes.

11   Q.   And what is your understanding as to the importance of

12   fashions in the sale of the doll?

13              MR. PRICE:   Object.   Hearsay, lack of foundation,

14   and her understanding is irrelevant.   For the truth.

15              THE COURT:   Counsel, is there another area we can

16   get into in that last 10 minutes?

17              MS. AGUIAR:   I'm sorry.   I thought we were going to

18   5:30.

19              THE COURT:   That's right.   We were going to go to

20   5:30.   Sustained on the same basis as before.

21              MS. AGUIAR:   Okay.

22   Q.   Does MGA change the fashions on each of the different

23   Bratz doll lines that it creates and sells?

24   A.   Yes.

25   Q.   Why do you do that?

Page 7013

1            MR. PRICE:  Objection.  Irrelevant.

2            THE COURT:  Overruled.  You may answer.

3            THE WITNESS:  We change the fashions through every

4    Bratz doll and through every theme because it encourages

5    fashions.  The change in fashion.  Encourages the reason for

6    another purchase of a doll.  It also -- fashion is incredibly

7    important because it represents a style, an attitude, and a

8    theme.

9            So it is important to create varieties of themes,

10   create varieties of different fashions to encourage the

11   consumer to want to bite deep into the brand, to aspire deep

12   into the brand.

13   Q.   BY MS. AGUIAR:  And why not just --

14            MR. PRICE:  Your Honor, I would object and move to

15   strike if that's for the truth of the matter.

16            THE COURT:  Is that, Counsel?

17            MS. AGUIAR:  I asked them why they changed

18   fashions.  I think it's relevant -- a relevant question, your

19   Honor, with regard to later generations.

20            THE COURT:  I'll permit it for the state of mind,

21   not necessarily for the truth of the matter.

22   Q.   BY MS. AGUIAR:  If every different doll line that you

23   issued twice a year, if the dolls were wearing the exact same

24   clothes that they were wearing six months before that, would

25   all of those dolls continue to sell?

afaf730e-bdbe-4545-af08-157421413e63

1          MR. PRICE:  Objection.  Lack of foundation.

2          THE COURT:  This is clearly going for the truth of

3     the matter.  Lay a foundation, Counsel.

4     Q.   BY MS. AGUIAR:  Why doesn't MGA just use the fashions

5     that were depicted in Mr. Bryant's concept drawings over and

6     over and over again with each different doll it issues?

7     Surprise?

8          MR. PRICE:  I'll object unless it's just state of

9     mind.  And I'll object to that as to relevance.

10         THE COURT:  If you're going for -- it's a

11    repackaging of the same question, Counsel.  If you're going

12    for the truth of the matter asserted, you have to lay a

13    foundation.  If you're going to state of mind, it's already

14    come in to a limited extent.  What is it relevant to?  The

15    state of mind.

16         MS. AGUIAR:  I think it certainly goes to her state

17    of mind.

18         THE COURT:  Okay.  What is that relevant to?

19         MS. AGUIAR:  The decisions that are made by

20    Ms. Garcia and others at MGA as to why to create different

21    fashions.

22         THE COURT:  Very well.  For that purpose.

23    Q.   BY MS. AGUIAR:  So the question is why not just use the

24    same old fashions that were depicted in Mr. Bryant's concept

25    drawings over and over and over again?

1            THE COURT:  Let me instruct the jury.  We've been

2    going back and forth on state of mind versus truth of the

3    matter asserted.  A hearsay statement cannot be introduced in

4    this fashion for the truth of the matter asserted.  You

5    cannot consider these facts as being true.  This is just an

6    explanation as to why MGA does a certain thing.  Their

7    perceptions or their beliefs, their state of mind, as it

8    were.

9            You may proceed, Counsel.

10           THE WITNESS:  MGA would not choose to release the

11   same fashions every season, season after season, as it would

12   be a detriment to the brand.  The consumer would not find

13   interest after purchasing the first release of doll to

14   therefore find it and purchase it yet a second or third or

15   fourth time.  It would also ruin sort of the reinvention, the

16   relevance, the -- the fresh that comes in with every unique

17   collection and collections theme.

18   Q.   BY MS. AGUIAR:  Let's move off fashions for a moment and

19   talk about accessories.

20   A.   Okay.

21   Q.   In the doll world, just very briefly for the jury, what

22   is meant by accessories?  What can be encompassed within that

23   term?

24   A.   An accessory is something that's sold within the doll

25   package independent of the doll and the fashions she's

Page 7016

1   wearing.  So, for example, in this case, in Girls Really

2   Rock, the accessories would be the guitar, the electric

3   piano, to name two.  Those accessories are important.

4   Q.   Why are they important?

5               MR. PRICE:  Objection.  It's offered for the truth.

6               MS. AGUIAR:  Same, your Honor, why they developed

7   different accessories.

8               THE COURT:  Why are they important to MGA?

9   Q.   BY MS. AGUIAR:  Why are the accessories with each new

10  doll line important to MGA?

11  A.   The accessories are important because they provide

12  pieces to help express or to extend the theme or the

13  experience.  A rock star is -- in this case, a hip-hop star

14  seems to be sort of removed as some of the most important

15  things and kind of defining a hip-hop or a rock star.  They

16  have to have some instruments or at least a microphone at a

17  minimum to express the experience of being a hip-hop star or

18  a rock star.

19  Q.   Remind me what you said.  You said there was a

20  microphone and what else?

21  A.   A guitar and electronic piano.

22  Q.   Were there any guitars or electronic pianos in

23  Mr. Bryant's concept drawings?

24  A.   No.

25  Q.   Other than backpacks or purses that were with the dolls

afaf730e-bdbe-4545-af08-157421413e63

Page 7017

1    in the original concept drawings; is that correct?

2    A.   That's right.

3    Q.   Other than that, has MGA ever referenced for any

4    generation -- has MGA referenced those drawings in developing

5    accessories for the different doll lines?

6    A.   No.

7    Q.   Did you ever get any ideas from Mr. Bryant's concept

8    drawings for any of the accessories for any of the dolls

9    after the first generation?

10   A.   No.

11   Q.   I want to show you just one or two more that have

12   accessories in them.  One of them is the Magic Hair doll,

13   which is Exhibit 17543.

14        So can you tell the jury what we're looking at with

15   the Magic Hair Bratz doll, which is 17543?

16   A.   This was a Bratz Magic Hair doll.

17   Q.   Can you explain the accessories that are included in

18   that package?

19   A.   Sure.  The accessories include two hair creams, one hair

20   glitter, one curling iron, one hair crimper, and one hair

21   brush.

22   Q.   And is it MGA's practice, whenever it issues a new line

23   of Bratz dolls, that accessories are always included with the

24   doll?

25   A.   Yes.

Page 7018

1   Q.   And if we could just go quickly, then, to the Genie

2   Magic, which is 17536.  And if you could describe what we're

3   seeing there in terms of the accessories.

4   A.   In this case, the accessory includes a Magic Genie

5   bottle.  It includes a crystal ball as an accessory, and also

6   a Magic Genie, what we called an 8 Ball, which is in the

7   consumer's size, magic fortunes.

8   Q.   Clarify for me what you meant what you said it was a

9   consumer size?

10  A.   An accessory can be scaled to be in the right size for

11  the doll and for the doll to experience, or it can be

12  enlarged so that it can be an accessory for the consumer to

13  experience.  And in this case, the magic -- excuse me --

14  crystal ball was in size for doll, and the genie bottle was

15  in size for the consumer to experience.

16  Q.   What do you say to the argument that there may have

17  been -- I don't know.  Has there ever been a fashion doll

18  with a genie theme before MGA came out with it?

19  A.   Sure.

20  Q.   Is that possible that -- I don't know.  I won't say

21  particular fashion dolls, but any fashion doll out there in

22  the world had done a genie theme before?

23  A.   Sure.

24  Q.   Okay.  So why, then, is this any different from a prior

25  fashion doll genie theme?

afaf730e-bdbe-4545-af08-157421413e63

Page 7019

1   A.   Well, in the way -- I guess the difference would be in

2   the way that Bratz approached the design and the concept.

3   And the way that we show to, you know, represent the

4   fashions, the way that we included or what accessory we chose

5   to include, the packaging, the handles, the handle that

6   became a necklace for the consumer.

7           So the genie as a theme may not have been unique to

8   market.  It's the way that MGA approached the concept of that

9   genie theme in particular.

10  Q.   Let's talk for a few minutes -- and you can put that

11  away.  I want to talk about -- I want to talk about

12  characters.  Since 2001, since the issuance of the first

13  generation dolls, has MGA created other core fashion doll

14  characters?

15  A.   Yes, we have.

16  Q.   And look in your binder, if you will, at 18633.  Are you

17  there?

18  A.   Yes.

19  Q.   And can you identify the document that you're looking

20  at?

21  A.   This is a list of all of the character names that have

22  been developed within the Bratz brand.

23          MS. AGUIAR:  Your Honor, I move 18633 into

24  evidence.

25          THE COURT:  Any objection?

afaf730e-bdbe-4545-af08-157421413e63

Page 7020

1        MR. PRICE:  I'll object.  It's hearsay.  Lack of

2   foundation.

3        THE COURT:  Counsel, why don't you lay further

4   foundation.

5        MS. AGUIAR:  Sure.

6   Q.   Do you recognize this form of document?

7   A.   Yes, I do.

8   Q.   And is it maintained by an MGA employee at your

9   direction?

10  A.   Yes, it is.

11  Q.   And have you seen it before?

12  A.   Yes, I have.

13  Q.   In what department is this document maintained?

14  A.   It is maintained within the -- currently within the

15  packaging group.

16  Q.   And do you have an understanding as to whether it's

17  updated from time to time?

18  A.   Yes, it is updated.

19  Q.   And if you need to know information in order to perform

20  your functions and you need to know whether you have a

21  particular character's name that's already been used or been

22  out there, would you consult this document?

23  A.   Yes, I would.

24  Q.   And is it your understanding that the information in

25  this document is pulled from the files of the company?

afaf730e-bdbe-4545-af08-157421413e63

Page 7021

1   A.    That's correct.

2              MS. AGUIAR:  Your Honor, I move the exhibit.

3              MR. PRICE:  No objection.

4              THE COURT:  It's admitted.

5              (Exhibit 18633 received.)

6              MS. AGUIAR:  Whew.  I'm getting tired.

7              Let's put that up on the screen, if we could.

8              Oh, my God, after all of that, Aaron doesn't have

9   it.  That's okay.  It's still in evidence.

10             You know what?  Mr. Price was nice enough to remind

11  me I can put this on the Elmo so you guys can see it.

12             THE COURT:  And to think that's the old-fashioned

13  way to do it.

14  Q.   BY MS. AGUIAR:  Can you tell us what we're looking at

15  here?

16  A.   This is the document that MGA prepares and updates and

17  includes all Bratz character names, a collection of all the

18  Bratz branded character names.

19  Q.   And do you know roughly how many there are, if you can

20  give us a range?

21  A.   I think there's approximately 40 characters developed to

22  date.

23  Q.   Are some characters more popular than others?

24  A.   Yes.

25  Q.   And in developing these characters, did MGA rely in any

afaf730e-bdbe-4545-af08-157421413e63

Page 7022

1    way on Carter Bryant's concept drawings?

2    A.    No, he did not.

3    Q.    Did Mr. Bryant concept any characters other than what he

4    called Lupe, Hallidae, Jade, and Zoe?

5    A.    No.

6    Q.    So all of the characters beyond those four which you

7    then created different names for, those were all concepted by

8    MGA; is that correct?

9    A.    That's correct.

10   Q.    Can you describe for us how the different characters are

11   developed?

12   A.    Actually, a character is developed from a personality.

13   So we look at all the different varieties of personalities.

14   Personalities because we want to create dimension and depth

15   within our brand.  We also want to create -- we don't want to

16   be sort of identified as one kind of personality, but to

17   reach multiple personalities, in an effort that we might

18   reach multiple different girls in the marketplace.  So we

19   start with a personality.

20   Q.    Help me out here.  Because a doll is an inanimate

21   object.  Can we agree on that?

22   A.    Yes.

23   Q.    In other words, it can't talk.

24   A.    That's right.

25   Q.    And it can't express its personality verbally; right?

Page 7023

1   A.    That's right.

2   Q.    So how do you give an inanimate object, like a doll, a

3   Bratz doll, how do you give it a personality?

4   A.    It's so involved.  A personality is defined by the

5   character's fashion, the pallet or the colors that we use on

6   our personality.  The soft tones or pink or lavender or light

7   browns indicate a different character as opposed to somebody

8   who wears black and red and like a deep navy or midnight

9   blue.

10          So it can be in the fashions that they wear, the

11   styles of fashion.  So if they are wearing black leather or

12   leather as opposed to a knit cotton can totally separate the

13   personality types.  The way they wear their hair, the way the

14   hair is styled, the accessories that they wear, the jewelry

15   and/or jewelry fashion, those are just to name a few.  It

16   could go on forever.

17   Q.    Tell me if the selection of the name for the character

18   has anything to do with the personality?

19   A.    Absolutely.  We try to line up the character name.  If a

20   character -- if a name has a personality just listening to

21   it, if it has a sound or a tone, like -- well, if a character

22   name has a softer sounding name, than sometimes we'll try to

23   associate that softer sounding name to a softer sounding

24   character.

25   Q.    Have you ever developed after the first generation a

afaf730e-bdbe-4545-af08-157421413e63

Page 7024

1   character that just didn't -- just kind of flopped and you

2   didn't pursue it after it was released?

3   A.   Yes.

4   Q.   And can you think of one or --

5   A.   Yes.  There's a character named -- I believe her name

6   was Dee Dee.

7   Q.   That's a bad name.  Just kidding.  What is your

8   understanding about what happened to Dee Dee?

9         MR. PRICE:  Object.  Lack of foundation unless

10  she's talking about sales figures.

11        THE COURT:  Lay a further foundation, Counsel.

12  Q.   BY MS. AGUIAR:  Let's put it this way:  Did you guys

13  create Dee Dee at one point?

14  A.   Yes, we did.

15  Q.   Do you remember anything about how you created her

16  personality?

17  A.   Yes.

18  Q.   And what was she like?

19  A.   She was meant to be sort of a dark kind of -- kind of

20  angry or aggressive character.

21  Q.   And Dee Dee's no longer with us; is that right?

22  A.   I don't expect that we will manufacture Dee Dee again.

23  Q.   I want to use as an example two other characters so that

24  you can explain this whole character personality idea.  So

25  that's 18689.  Can you tell us what we're looking at here,

Page 7025

1    Trial Exhibit 18689?

2    A.   This is the first release of Bratz twins.  You actually

3    get identical twin sisters.

4    Q.   And are the two Bratz dolls in that box different

5    characters?

6    A.   Yes, they are.

7    Q.   Describe for us, if you would, what the two characters

8    are in the box.

9    A.   The character on the left, her name is Phoebe.  And the

10   character on the right is -- her name is Roxxi.

11   Q.   And how is it, using these two as an example, that you

12   can explain to the jury how these two dolls have -- they are

13   different characters with different personalities.  Can you

14   explain that?

15   A.   Sure.  It's the combination of -- okay.  Let me back up.

16   Phoebe is intended to be sort of a -- they are identical, but

17   they are totally different.  So Phoebe is intended to be

18   sugar, as we referenced it as her nickname.  And Roxxi was

19   meant to be spice, which is the nickname we referenced in the

20   package.

21   Q.   And by the way -- sorry to interject here.  But do most

22   of the dolls, when you give them a name, do they also have a

23   nickname?

24   A.   Most characters have a nickname as well to help define

25   their personalities.

Page 7026

1   Q.   Sorry to interrupt.

2        You were just describing the nicknames.

3   A.   So we've started with nicknames.  We also used pallets

4   of color.  So Phoebe uses like a baby pink.  Roxxi uses, you

5   know, a brighter red.  And if you look at their jackets they

6   wear, even though they both wear jackets, Phoebe wears kind

7   of a fuzzy light pink fur jacket, and Roxxi wears a black

8   leather jacket with zippers and studs.  Even down to their

9   accessories, you'll notice that Phoebe has a little angel key

10  chain meant for the consumer.

11  Q.   You're talking about the things sort of on the left in

12  the middle?

13  A.   Yes.  And you'll notice that Roxxi is sold with a cute

14  little Devil key chain.

15  Q.   And the key chain is not meant for the doll to use.  The

16  consumer is meant to use it?

17  A.   Yes.

18  Q.   I want to talk for a few minutes about packaging.  And

19  so you can put those guys away.

20       And again, in developing the characters after the

21  first generation of Bratz dolls, did you use any idea or any

22  information from Mr. Bryant's concept drawings?

23  A.   No, I did not.

24  Q.   Is it your understanding -- do you have an understanding

25  that consumers who buy Bratz dolls tend to own more than one

Page 7027

1    Bratz doll?

2            MR. PRICE:  Objection.  Lack of foundation.

3            THE COURT:  Sustained.  Lay a foundation.

4    Q.   BY MS. AGUIAR:  Have you ever received information, in

5    the course of your duties as brand manager, that would

6    suggest to you that consumers buy more than one Bratz doll?

7            MR. PRICE:  Object.  Calls for hearsay, lack of

8    foundation.

9            THE COURT:  Sustained.

10   Q.   BY MS. AGUIAR:  Have you ever received information,

11   either way, as to the number of dolls that kids buy?

12           THE COURT:  It's a yes or no question.

13           THE WITNESS:  Yes.

14   Q.   BY MS. AGUIAR:  And what's the source of that

15   information?

16   A.   The source of information includes personal

17   communications with potential core consumers or consumer

18   types.  Direct communication from the consumer direct to MGA

19   through our either fan club and fan club communications,

20   through their writeup and responses to their product likes

21   and dislikes.  You know, websites such as Amazon dot com.

22   And even through some qualitative or quantitative research.

23   Q.   And do you use the information that you get from these

24   different sources in making decisions about how to develop

25   different dolls?

afaf730e-bdbe-4545-af08-157421413e63

Page 7028

1    A.    Yes.

2    Q.    And how does it affect your decision in that regard?

3    A.    I'm sorry.  Can you rephrase it?

4    Q.    How does the information that you get from consumers

5    regarding the different dolls impact how you then develop

6    different dolls?

7    A.    The feedback is -- the consumer is very vocal in

8    communication.  They are very expressive.  So I'm able to

9    differentiate between their likes and appreciations and their

10   dislikes.  And with those learnings, I learn to not recreate

11   their dislikes in the future.  And I do everything I can to

12   recreate their likes in the future.

13   Q.    While we have a couple of the Bratz dolls up there,

14   let's talk for a few minutes about packaging.

15   A.    Okay.

16   Q.    Do you also oversee the development of the packaging for

17   the Bratz dolls?

18   A.    Yes.

19   Q.    What's your involvement in that?

20   A.    My responsibility in packaging is that I communicate

21   with the packaging team, to educate them on the concept, the

22   purpose, the intent of the theme and the inspiration.  I'll

23   give them references of inspiration that inspired me.  I'll

24   give them references of sketches that were provided or

25   developed by my fashion designers so they have a sense of

afaf730e-bdbe-4545-af08-157421413e63

Page 7029

1    what the product looks like.  Once given that information,

2    they will then go into concepting.

3              So they will give me varieties of different

4    concepts that can kind of similarly approach the same theme.

5    And I will lead them down or give comments on which ones I

6    like or dislike for various reasons.  And I'll work with them

7    all the way through what is called a mechanical stage.

8              The mechanical stage is actually getting down into

9    the intricacies of writing the copies and the language and

10   the copy, the tone, the way we use our words is accurate.

11   The character art in making sure the character art represents

12   the right attitude expression.  And I'll oversee all that

13   have until it is perfect, frankly, and then it's released to

14   Hong Kong for manufacturing.

15   Q.   Let's go back to -- and I'm sorry for this, but I'm

16   going to flip back for the next couple of questions to the

17   first generation dolls.  And I put them here on the table.

18             In Mr. Bryant's concept drawings, did he envision

19   any sort of packaging that would go along with whatever doll

20   was eventually developed?

21   A.   No.

22   Q.   So was there anything that MGA used from Mr. Bryant's

23   drawings to develop the Bratz packaging?

24   A.   No.

25   Q.   Was there any idea or concept anywhere in what

1  Mr. Bryant brought to you in September of 2000 regarding the

2  packaging?

3  A.   No.

4  Q.   So I'm going to just hand one of them up to you so you

5  can have one in front of you.

6         How would you describe the physical shape of the

7  package that MGA developed for the Bratz dolls starting with

8  the first generation?

9  A.   I would describe them as a trapezoid shape.

10  Q.   Can you expand on that a little bit?

11  A.   Yeah.  The true intention of the trapezoid shape

12  actually was -- came from a concept of a spotlight.  The idea

13  was we wanted to actually put the characters under a

14  spotlight to sort of highlight them, make them almost like

15  celebrities.  Unfortunately, we couldn't afford the spotlight

16  inside the package.  But you know, a spotlight, if you look

17  at the light, sort of disseminates or brings down or creates

18  sort of a triangle or trapezoid as it reaches the floor.  So

19  that's actually where the trapezoid shape came from.

20         And ultimately, the spotlight molded piece never

21  made it in the package.  The trapezoid became an indication

22  of strength, a specific unique package to separate from the

23  competition.

24  Q.   Was the Bratz packaging developed in house by MGA

25  employees or by someone outside?

afaf730e-bdbe-4545-af08-157421413e63

Page 7031

1   A.   By MGA employees.

2   Q.   And to your knowledge, were there any other fashion

3   dolls that were sold as of 2001, when the Bratz dolls were

4   issued, in packaging of that shape?

5   A.   Not to my knowledge or my memory, no.

6   Q.   So we've talked about the physical shape.  We've talked

7   about the structure of it, that it was a trapezoid.  Now can

8   you tell the jury a little bit about how that -- how you

9   believe that was unique from the beginning, how the actual --

10  the package as a whole, stepping away from just the shape,

11  how that was unique?

12  A.   May I also refer past the first generation package?

13  Q.   You could, but maybe we could just talk about stuff

14  like, for example, could you see the doll from just the

15  front, or what was the impact of the material that you used

16  for the packaging?

17  A.   I understand.  It was important to MGA to be able to

18  create a really special presentation at retail, especially,

19  again, in the interest of, you know, reaching the seven- to

20  ten-year-old consumer.  We wanted to create a quality package

21  because we know that in some cases, in many cases this

22  consumer will want to collect or to display their dolls.

23       It's like the way that they would express

24  themselves by tearing magazines and sticking them all over

25  their walls or putting them on their folder.  It's an

Page 7032

1    expression, something reaches them emotionally, and they

2    start to express it around them.

3          This package was important because we wanted to

4    sort of -- we wanted to open the sides, not only obviously

5    the front, but the other side and top of the package sort of

6    to represent a display case, a really special place that the

7    doll can be posed in as opposed to the traditional toy

8    package which we term as a coffin box, where all the package

9    is covered with packaging or hard material and only the front

10   is exposed.

11         Other unique qualities to the package was the

12   special -- I'll start by saying the logo itself.  The logo

13   and the designing of our logo and the way that we design each

14   one of those letters in the quirky, kind of the crazy way we

15   shape the letters, like the hook on the R, are very specific

16   details that we created to identify this really unique logo.

17         And while the Bratz logo or the word Bratz had a

18   specific meaning we expected for moms, we added very

19   specifically a halo over the R with stars to suggest that,

20   the guys know the term for Bratz, we're actually not so bad.

21   We're kind of angels.

22         The character art and the way we used our character

23   art, very important.  Our dolls cannot communicate or speak.

24   So character art was so important to us to create that stance

25   of four girls, but also their stance, their posture, the way

1    they looked at you, the way they carried themselves, the way

2    they wore their fashion helped us to communicate an attitude

3    and expression that was going to be meaningful to the seven-

4    to ten-year-old consumer.

5    Q.    And just making up on one of the things that you said

6    about character art or package art, the character art on the

7    first generation box, am I right that it's showing sort of

8    the four shot -- the drawing of the four girls together; is

9    that correct?

10   A.    That's right.

11   Q.    And has the character art developed from that first

12   generation character art since that time?

13   A.    Yes.

14   Q.    So in other words, from -- moving on from the first

15   generation, is the character art on Bratz doll packages

16   different from the character art that's on that box there?

17   A.    Absolutely.

18   Q.    And would that carry over for the character art that

19   appears on other Bratz products?

20   A.    Definitely.

21   Q.    In other words, that it's different from the first

22   generation?

23   A.    Correct.

24   Q.    I interrupted you.  Sorry.  Had you already -- have we

25   addressed the handle on the package?

Page 7034

1   A.   No, not yet.

2   Q.   Can you maybe just talk for a moment?  The question is

3   was there anything in MGA's development of the packaging that

4   was special about the handle.

5   A.   It's funny, because as a consumer, the handle is kind of

6   usually the last thing you pay attention to.  It's just that

7   functional thing that helps you take it off the shelf and on

8   to the cash register or to home.  But we wanted to even

9   manipulate the handle to be something meaningful or at least

10  an aesthetic quality to the package and presentation.  We

11  felt the consumer appreciated that.

12       So in Genie, actually it's a handle so you can

13  carry it away from the chain, but actually this became a

14  necklace for the consumer when you open the package.

15       Frankly, what we understand is that there are fan

16  club members who actually collect all of the different

17  varieties of handles because they felt it to be collectible.

18  Or just sometimes we'll add handles -- we'll just add a

19  texture, like a fuzzy little piece of fabric on the top of

20  the Slumber Party just to, you know, denote something unique,

21  just adding some embellishment is super important.

22  Q.   How much -- and there might be a range.  So you can give

23  me a range.  But how much per doll expressed as a percentage

24  of a hundred percent, how much does MGA spend on the

25  packaging?

Page 7035

1          MR. PRICE:  Objection.  It's irrelevant.

2          THE COURT:  As a percentage?

3          MS. AGUIAR:  It goes to the importance of the

4     element, your Honor.

5          THE COURT:  Overruled.

6     Q.   BY MS. AGUIAR:  You can answer.

7     A.   In some cases, like for a package for something like

8     this, it's often that the package could almost represent like

9     40 percent of the total product cost.

10    Q.   And that would be on the high side?

11    A.   Yeah.

12    Q.   And what is the thought at MGA as to why so much is

13    spent?  I mean, why up to 40 percent of the cost of the doll

14    is spent on packaging?  Why is that?

15         MR. PRICE:  Object.  Irrelevant.

16         MS. AGUIAR:  Again, your Honor, it goes to their

17    thought process of why.

18         THE COURT:  Overruled.  You may answer.

19         THE WITNESS:  You know, I'll just go back to the

20    consumer.  This is sort of what I believe to be a savvy

21    consumer, seven to ten.  It's really important to the way

22    that you represent your product.  It has to be special.  It

23    has to be unique.  It has to look expensive.  It has to look

24    special.

25         So we're willing to spend this kind of money in the

afaf730e-bdbe-4545-af08-157421413e63

1    package so that we can send an essence or a pledge to the

2    consumer that she'll feel comfortable about picking this up

3    off the shelf irregardless or separate from the fact that

4    it's a toy.

5    Q.   BY MS. AGUIAR:  Do you know if -- does MGA believe that

6    the consumer has a different reaction -- in determining how

7    you do your packaging and how much you spend on your

8    packaging, do you take into consideration that the consumer

9    has a different reaction to the product inside the box when

10   the box looks different?

11           MR. PRICE:  Objection.  Understanding is

12   irrelevant.

13           THE COURT:  Sustained.

14   Q.   BY MS. AGUIAR:  In deciding how much to spend on

15   packaging and how much emphasis to put on packaging, do you

16   take into consideration, in doing that, the impact that the

17   package has on the consumer?

18   A.   Yes.

19   Q.   And how do you take that into account?

20           MR. PRICE:  Object, if offered for the truth again,

21   your Honor.

22           THE COURT:  There needs to be foundation for this,

23   Counsel.

24           MS. AGUIAR:  I don't think I asked her

25   understanding.  I just asked whether it informs the state of

Page 7037

1   mind at MGA in terms of whether to continue to spend that

2   much on packaging.

3          THE COURT:  Right.  And I understand that.  That's

4   why I indicated to lay a foundation for it.

5   Q.   BY MS. AGUIAR:  Does that type of thing -- does the

6   reaction to the consumer impact MGA's decision as to how much

7   to spend on packaging and how to develop your packaging?

8   A.   Yes.

9   Q.   And how does it do that?

10          MR. PRICE:  Objection.  That's irrelevant.

11  Q.   BY MS. AGUIAR:  What is the impact it has on the

12  decision-making process?

13          It's sort of the same question I was asking, your

14  Honor, for fashions and accessories?

15          THE COURT:  I understand.  I'll overrule on that

16  objection.  The concern I have is foundation, Counsel.

17  That's what I just indicated a moment ago.  How she knows

18  about the impact on the consumers.

19          MS. AGUIAR:  Okay.

20  Q.   Do you have an understanding of the impact on the

21  consumer of the package?

22  A.   Yes, I do.

23  Q.   And what's that based on?

24  A.   Through the same, you know, the same references such as,

25  you know, communicating personally with the consumers,

afaf730e-bdbe-4545-af08-157421413e63

Page 7038

1    listening to their specific feedback and their critique,

2    through fan club, their critique through websites such as

3    Amazon dot com where they can judge or make criticisms or

4    hopefully some thumbs up on some of our aspects.  And those

5    comments are not only specific to the doll product itself but

6    can also relate to the package as well.

7    Q.   One last question on the packaging.  Do you know whether

8    MGA has a design patent for the trapezoidal packaging that

9    MGA developed?

10             MR. PRICE:  Objection.  Irrelevant.

11             THE COURT:  A design?

12             MS. AGUIAR:  A design patent.  It goes to the state

13   law claims, your Honor.

14             THE COURT:  Overruled.  You may answer.

15             THE WITNESS:  Yes, I believe so.

16   Q.   BY MS. AGUIAR:  So it's your understanding that MGA owns

17   a design patent on the trapezoidal shape of its packaging?

18   A.   I'm not a hundred percent sure, but I believe so.

19             MS. AGUIAR:  Your Honor, I was going to move on to

20   my last couple of topics.  Should we do that in the morning?

21             THE COURT:  We'll end for the day now and pick up

22   at 9:00 in the morning.

23             (WHEREUPON THE JURY WITHDRAWS.)

24             THE COURT:  Please be seated.

25             Counsel, is there anything we need to take up at

Page 7039

1    this time?

2            MR. NOLAN:  Your Honor, very briefly.  The Court

3    had indicated, and while it's still today, I wanted to touch

4    real quickly on the summaries that we had prepared for

5    Margaret Leahy that she testified to and that I had moved in

6    under 1006.  For the record, it was 18882-A and -B.  And they

7    are the summary of various changes.

8            Your Honor, I would cite to the Federal Rules of

9    Evidence 1006, which makes specific reference to photographs

10   and allowing, you know, summaries of voluminous points that

11   are raised with the photographs, and I would cite to a case.

12   Actually, if I could read something here, your Honor.

13           THE COURT:  Sure.

14           MR. NOLAN:  This is from Mueller and Kirkpatrick

15   Federal Evidence section 1034.  It says:  "Summary proof

16   offered under Federal Rule Evidence 1006 may include

17   conclusions or interpretations suggested by a competent

18   witness that in effect sums up evidence in effect was already

19   presented to the jury in the case of United States versus

20   Gold."

21           And again, United States versus Robbins, they talk

22   about summaries where not only is it accurate and supported

23   by the competent testimony of a witness, but that the items

24   that are being summarized are rather voluminous.  The example

25   of a photograph that's cited -- the reference to photographs

afaf730e-bdbe-4545-af08-157421413e63

Page 7040

1    in 1006 talks about numerous changes that could have been

2    depicted in a photograph.  For instance, we might have been

3    able to show specific photographs on the cheekbone or the

4    chin or the ear or the nose.  And if we had done that and we

5    had a series of 35, 45 photographs, I would submit that the

6    summaries would be appropriate.

7            And on that analogy, we would ask for the Court to

8    admit those summaries as evidence.

9            THE COURT:  Thank you, Counsel.

10           MR. PRICE:  Your Honor, obviously I haven't looked

11   at those authorities.  We can, and I can respond with

12   authorities tomorrow morning.  But all this does is summarize

13   a couple hours of testimony.  He went through all of -- he

14   said tell me about the changes.  She told him about the

15   changes.  And then today they showed a demonstrative which

16   summarized her testimony.

17           Now, if she can testify about it in that short a

18   period of time is not voluminous, and that would be like me

19   putting in a chart of all the testimony I elicited from

20   Mr. Bryant or Mr. Larian about specific topics as summaries

21   of the points that I made.

22           This is not what 1006 is about.  But if you'd like

23   briefing, we could --

24           THE COURT:  I definitely don't want briefing.  I'll

25   take a look at the case and let you know in the morning.

afaf730e-bdbe-4545-af08-157421413e63

Page 7041

1           We still have that motion to quash the subpoena for

2    the Custodian of Records.

3           MR. NOLAN:  Right.

4           THE COURT:  My sense in reading that is that I

5    assume that the custodian is going to be one of the last

6    people you call, Counsel?

7           MR. NOLAN:  I believe that it would be sometime

8    tomorrow afternoon.  Mr. Roth was actually going to handle

9    that, your Honor.  And maybe he'll give you a better

10   indication, and then the only thing I wanted to add so I

11   don't have to get back up, your Honor, is not that any of us

12   are against working Wednesday, Wednesday evening, but in

13   light of the change in --

14          THE COURT:  In light of the change, we're not going

15   to be working Wednesday evening.  It will be Thursday

16   afternoon.  The way I figure we'll do this is today is

17   Tuesday.  So tomorrow we'll have a full day.  We only have --

18   you have eight hours left.  Mattel has three hours and 15

19   minutes -- 14 minutes.  So that's 11 -- let's say 12 hours.

20   And we'll definitely get through that between Wednesday and

21   half a day Thursday, Friday morning.  So I'm really no longer

22   concerned about time since we're not going to do the closing

23   arguments until next Wednesday.

24          We should have plenty of time to do everything.

25   We'll have Thursday afternoon to do the instructions, and

afaf730e-bdbe-4545-af08-157421413e63

Page 7042

1    we'll have the case wrapped up at least from an evidentiary

2    standpoint by end of the day on Friday, and we'll have

3    closing arguments on Wednesday.

4            So we can do our first cut through the jury

5    instructions on Thursday afternoon.  And I assume it will

6    take most of the afternoon to do that.  And then undoubtedly

7    there will be another cut, I take it, probably on Monday or,

8    if necessary, Tuesday.

9            MR. ZELLER:  And on the subject of scheduling, your

10   Honor, I know offhand of at least one Daubert hearing that's

11   going to have to be had based on the witnesses who MGA

12   currently has in its lineup.  Mr. Vilppu is the one who comes

13   to mind.

14           I know there are certain issues concerning

15   Mr. Meyer.  Whether they will be dealt with in a Daubert

16   hearing is a different issue perhaps.

17           THE COURT:  Why is Mr. Vilppu going to be called?

18           MR. ZELLER:  We'll call him a design expert.  He --

19   his background is actually in animation.

20           THE COURT:  When is he going to be called?

21           MR. ZELLER:  I'm sorry.  When?

22           THE COURT:  I'm familiar with what Mr. Vilppu

23   intends to testify about.  Just when.

24           MR. ZELLER:  In terms of when he's going to be in

25   the lineup, that's somewhat within MGA's control.  I don't

Page 7043

1  know at this point.  He was further into the line.  But where

2  we are, given that we've only had two witnesses today, hard

3  to say.

4        MR. NOLAN:  Your Honor, we had intended to do

5  Mr. Vilppu tomorrow.  But in light of this, I think we will

6  get to it Thursday.  And we'll make decisions as we go along.

7  Obviously everything is in flux as we move forward.

8        THE COURT:  I understand.  All right.

9        MR. ROTH:  Your Honor, to answer your timing

10 question.  The custodian -- and perhaps this will resolve the

11 issue.  There are some witnesses, now given the way the day

12 went, who we think many of the documents that are the subject

13 of the custodian will be a vehicle for getting those

14 documents in.

15       THE COURT:  That's how I read the motion as well.

16 That's why I was hoping that we were going to save the

17 custodian for the end to see what we'll really still have in

18 dispute.

19       MR. ROTH:  If that had come up today, that might be

20 a different question.  But there are some witnesses for

21 form --

22       THE COURT:  Very good.  Let's take that up at that

23 time.

24       MR. ROTH:  One other thing, your Honor.  Just in

25 terms of your workload, which I'm sure is considerable.

Page 7044

1    There's the Farr deposition transcript.  We've been taking a

2    look at that, and we think we can make further withdrawals.

3    And frankly, it would end up being rather smaller than it is

4    now.

5              THE COURT:  Why don't do you that.

6              MR. ROTH:  Why don't we do that and handle that

7    that way.

8              THE COURT:  Excellent.  If there's nothing else, I

9    just want to get this order regarding the previous motions

10   resolved.  I received two different versions.  I want to have

11   one version submitted to the Court that reflects the

12   following.  I'll take No. 1 from -- someone needs to take

13   notes of this.

14             THE REPORTER:  I will.

15             THE COURT:  Thank you, Mark.

16             Number 1 from Mattel.

17             Number 2 from MGA.

18             Number 3 from Mattel.

19             4 and 5, as best I can tell, are identical, except

20   in 5, Mattel refers to the defendants, and MGA refers to MGA.

21   It doesn't include Mr. Larian.  I can't believe that that's

22   actually what you are disputing between the two of you.  But

23   if it is --

24             MS. AGUIAR:  No, no, we weren't disputing that.

25             THE COURT:  Very good.  Number 6 in Mattel needs to

Page 7045

1   go in.  There's no corollary in MGA's.

2          Number 7 in Mattel looks to be identical with No. 6

3   in MGA.  So that's the same.

4          Number 8 is the same as No. 7 in MGA.

5          Mattel's 9 is the same as MGA's No. 8.  So that's

6   fine.

7          Mattel's 10 is the same as MGA's 9.

8          And No. 11 is the same as MGA's 10.

9          And No. 12 is the same as MGA's 11.

10         Number 13 is the same as MGA's 12.

11         14 is the same as the 13.

12         And 15 is the same as the 14.

13         So I really don't see why I got two of these except

14   for there is -- the Mattel 6 was nowhere to be found.  And if

15   words in dispute on the first few.  But let's get those

16   resolved and get a consolidated order for the Court's

17   signature tomorrow morning.

18         And that's all I have.

19         MR. NOLAN:  Thank you, your Honor.

20         THE COURT:  All right.  See you tomorrow morning

21   around 8:30.

22              (Proceedings concluded at 5:39 P.M.)

23

24

25

afaf730e-bdbe-4545-af08-157421413e63

Page 7046

C E R T I F I C A T E

I hereby certify that pursuant to Title 28, Section 753 United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings in the above matter.

Certified on August 12, 2008.

_____
MARK SCHWEITZER, CSR, RPR, CRR
Official Court Reporter
License No. 10514

afaf730e-bdbe-4545-af08-157421413e63