Page 7163

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

---

MATTEL, INC.,                          :   PAGES 7163 - 7323
                                       :
          PLAINTIFF,                   :
                                       :
     VS.                               :   NO. ED CV04-09049-SGL
                                       :   [CONSOLIDATED WITH
MGA ENTERTAINMENT, INC.,               :   CV04-9059 & CV05-2727]
ET AL.,                                :
                                       :
          DEFENDANTS.                  :


REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

WEDNESDAY, AUGUST 13, 2008

JURY TRIAL - DAY 34

AFTERNOON SESSION


MARK SCHWEITZER, CSR, RPR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
181-H ROYBAL FEDERAL BUILDING
255 EAST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012
(213) 663-3494

Page 7164

```
1     Appearances of Counsel:

2

3     On Behalf of Mattel:

4         Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
          By John B. Quinn, Esq.
5             B. Dylan Proctor, Esq.
              Michael T. Zeller, Esq.
6             Harry Olivar, Esq.
              John Corey, Esq.
7             Diane Hutnyan, Esq.
              William Price, Esq.
8         855 South Figueroa Street
          10th Floor
9         Los Angeles, CA 90017
          (213) 624-7707

10

11

12    On Behalf of MGA Entertainment:

13        Skadden, Arps, Slate, Meagher & Flom LLP
          By Thomas J. Nolan, Esq.
14            Carl Alan Roth, Esq.
              Jason Russell, Esq.
15            Lauren Aguiar, Esq.
              David Hansen, Esq.
16            Matthew Sloan, Esq.
              Robert Herrington, Esq.
17        300 South Grand Avenue
          Los Angeles, CA 90071-3144
18        (213) 687-5000

19

20

21

22

23

24

25
```

I N D E X

DEBORA MIDDLETON, SWORN............................... 7187

DIRECT EXAMINATION BY MR. NOLAN: ..................... 7187
CROSS-EXAMINATION BY MR. PRICE:....................... 7199

LEON DJIGUERIAN, SWORN............................... 7200

DIRECT EXAMINATION BY MS. AGUIAR ..................... 7201

CROSS-EXAMINATION BY MR. PRICE:....................... 7218

LUI DOMINGO, SWORN................................... 7222

DIRECT EXAMINATION BY MS. AGUIAR:..................... 7223

CROSS-EXAMINATION BY MR. PRICE: ...................... 7267

TIMOTHY KILPIN, SWORN................................ 7273

DIRECT EXAMINATION BY MR. NOLAN: ..................... 7273

E X H I B I T S

 (Exhibit 18320-003 received.)....................... 7195

 (Exhibit 18320-005 received.)....................... 7196

(Exhibits 18870, 18869, 18863, 18862, 18865,
18866, 18860, 18861, 18864, 18868, 18867, 18857,
18858, 18859, 18871-73 received.)..................... 7218

(Exhibit 18929 received.)............................ 7226

(Exhibit 18921 received.)............................ 7233

Page 7166

1          Riverside, California; Wednesday, August 13, 2008

2                           1:10 P.M.

3          (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

4              THE COURT:  I want to take up the issue of Kevin

5      Farr first.

6              As they are coming in, is there an issue you want

7      to take up?

8              MR. NOLAN:  I'd like a sidebar on Jury Note 6, if I

9      might.

10             THE COURT:  All right.

11             (SIDEBAR CONFERENCE HELD.)

12             THE COURT:  Yes.

13             MR. NOLAN:  I had a thought about Juror No. 6.

14     This happened in another case I had.  It involves a little

15     bit of deception.  So I just wanted to warn you ahead of

16     time.

17             THE COURT:  All right.  I spent 10 years in the

18     U.S. Attorney's Office.  I understand deception is sometimes

19     used for a good purpose.

20             MR. NOLAN:  I don't know if it was Judge Walter who

21     suggested this one time, but there was a juror who had a

22     financial issue.  And what happened was that parties, without

23     the jury knowing it, contributed money to the fund and the

24     Court --

25             THE COURT:  I've heard of this before.  I don't

Page 7167

1    know if it was this case.

2            MR. NOLAN:  And the Court more or less said to the

3    jury, listen, I'll write a letter saying we have a special

4    fund so you would not lose any money.  And then we would, if

5    Mattel would agree, would contribute money anonymously, and

6    they would never know the parties did it.

7            THE COURT:  That's a good idea, actually.  But you

8    know, I don't want to create any -- a run on the fund.  So

9    perhaps this might be something I'll take up with Juror No. 6

10   separately.  And just indicate -- well, let me see what he

11   does.  Because if it's no moment to him and he doesn't ask

12   for a letter, but if he asks for a letter, at that time what

13   I might do is I'll let you know that I'm doing this, but I'll

14   pull him aside and indicate to him that --

15           MR. QUINN:  In principle, we have no problem with

16   that.  That's fine.

17           THE COURT:  All right.  That's a good idea.

18           (CONCLUSION OF SIDEBAR CONFERENCE.)

19           MR. NOLAN:  Your Honor, the right person is here.

20           THE COURT:  Let me talk about this a little bit

21   before I make these rulings.  This has been yet another river

22   to navigate.  I'm mindful of Motion in Limine No. 9.  And I'm

23   also mindful of the apportionment arguments.  On the one

24   hand, what these rulings reflect is the Court's attempt to

25   balance relevant evidence as to the significance of

c82378c4-88ea-4514-b582-e8043d481e71

1   packaging, of themes, of certain of the elements that MGA

2   wants to apportion.  And I certainly thinking having someone

3   from Mattel as the leading toy company talking about those

4   elements is relevant evidence in that regard.

5          On the other hand, a lot of this evidence is of a

6   nature that gets into the type of 403 issues upon which the

7   Court ruled in its motion in limine.  So I've tried to go

8   through this and let the evidence in that is most probative

9   of the issue of the importance of branding and themes and the

10  like to Mattel or any other responsible toy manufacturer,

11  while at the same time preclude evidence that runs afoul of

12  the 403 ruling.

13         So just with that overview in mind, that's what the

14  Court is attempting to accomplish here in balancing this.

15  Let me get into the specifics.  And then after I've gone

16  through these rulings, if there's any particular rulings that

17  the Court has made that the parties feel don't strike that

18  right balance, I think it's best to wait until after the

19  Court has ruled on all of it and you see everything that's

20  coming in and everything that's not coming in before you make

21  your comments as opposed to hearing argument on each

22  individual one.  Because I think a lot of this has to be

23  taken as a whole.

24         All right.  And again, also, if I skip over any

25  objections, please let me know.  I think I caught them all.

1    All right.  Beginning on page 20 and 21, the

2  objections are overruled.

3    I think we now next go to 83.  And I'll sustain the

4  602 objection which is right in the middle of a page.  Lines

5  11 through 13.  It's fair enough to ask this witness what he

6  means by the word fashionable and his explanation.  There's

7  certainly a 602 problem, given how he responds to the

8  question on line 11.  So I'm going to strike that particular

9  sentence.

10    Turning to page 109, I'm going to overrule the

11  objections on 109, 110, and 111.  With respect to

12  Exhibit 2502, however, the only part that comes in, and it's

13  basically for reference by the witness, is the line that's

14  identified for the witness here in this transcript.  This is

15  not bringing in the entire exhibit.

16    So our tech people are going to have to work on

17  that.

18    So everything is overruled up to page 113, and then

19  I'm going to sustain the objection starting on line 21 of 113

20  through line 6 of 114.

21    I'll overrule the objections beginning on line 7 of

22  114 through line 8 of 115.

23    I'll then sustain the objections beginning on line

24  12 of page 115 through line 7 of 116.  Because there we get

25  into the whole Mattel is a struggling brand, et cetera,

Page 7170

1    et cetera.

2            Turning to page 138, I'll overrule the objections

3    to lines 21 through 25.  Again, Exhibit 2504 just comes in to

4    have reference to the line on page 7 which provides context

5    to the questions, not for the substance of the document

6    itself.

7            Overrule the objections on 139, lines 15 through

8    20, but sustain the objections starting on page 139, line 23,

9    through 140, line 21.

10           We then move, I believe, to page 229.  Oh, no.  I'm

11   skipping something here.  214 I think it is.  Turning to page

12   214.  Okay.  I'll again overrule the objections on pages 214

13   and 215, but the only portion of this 10K that's coming in is

14   the line that talks about the worlds of strategy within the

15   Barbie brand.  This lays foundation for some of the questions

16   that I'm going to permit coming up.

17           And the objections are overruled through page 218.

18           Then when we get to page 229, I'm going to sustain

19   the objections on 229, on 230, through line 1 of 231.

20           I'll overrule the objections on 231 beginning at

21   line 2, through 232, line 15.

22           I'll sustain the objection on page 233.  It doesn't

23   make any sense to me.  The question doesn't make any sense.

24           Turning to page 275, I will sustain the objections.

25           On 276, I'll sustain the objections on lines 1

Page 7171

1   through 6, overrule the objections on lines 22 through 25 of

2   page 276, and lines 1 through 17 of 277.

3          Sustain all objections on 278 and 279.

4          Sustain the objections on 285.

5          Sustain the objections on 281 from lines 1 through

6   13.

7          Overrule the objections from line 14 through the

8   bottom of the page.

9          Overrule the objections on 282 through the top of

10  283, line 1.

11         And I think that takes us to the end.  So those are

12  the Court's tentative rulings where I've tried to strike this

13  balance as I indicate.  I've tried to keep out any irrelevant

14  evidence about the Barbie brand or Mattel or what's going on

15  at Mattel, while at the same time permit evidence in

16  concerning the importance of themes and packaging and various

17  things that go to the apportionment.

18         I'll hear from either, both, or neither sides.

19         MR. COREY:  One question first, your Honor.

20         THE COURT:  Yes.

21         MR. COREY:  Going back to page 139.

22         THE COURT:  Very well.

23         MR. COREY:  The Court sustained the objection to

24  139 starting at line 23.

25         THE COURT:  That's correct.

1        MR. COREY:  And there's a reference there to

2    Exhibit 2505.  I just want to make sure that the Court is not

3    admitting that.

4        THE COURT:  That is not being admitted.  That's

5    correct.  And the only -- I mean, the only extent -- because

6    I think these exhibits are largely irrelevant, but they are

7    intertwined into the question.  And it's going to be hard to

8    ask the question without that reference in the exhibit, and

9    that's the only portion that's going to be shown or published

10   to the jury, is just that portion to give context to the

11   questions that follow.

12       MR. COREY:  And I appreciate that, your Honor.  I

13   just wanted to make sure that we were clear on that.  I think

14   with respect to -- and this may be unfortunately a little bit

15   late.  With respect to Mr. Farr, Mr. Farr is the Chief

16   Financial Officer.  I think there's kind of a fundamental

17   foundational problem with respect to any of his testimony

18   relating to these things because he's a financial person.

19   He's not a product design, marketing, or planning person, and

20   I think we are going to have to people on stand, including

21   this afternoon, who are going to be more well versed and more

22   qualified to speak to these particular issues than Mr. Farr

23   in his particular position as the Chief Financial Officer.

24       THE COURT:  And you know, you may be right in terms

25   of him being a financial officer, and he may not be the most

Page 7173

1    qualified, but as the Chief Financial Officer of a company,

2    and given the interconnectedness of understanding the

3    importance of the themes and accessories and packaging to the

4    bottom line, that's particularly the context of which this is

5    relevant.  Because this is the impact that these elements

6    have on damages that makes it relevant to MGA's defense in

7    this case.

8            So I think the CFO, even though he is in the

9    financial aspect of the company, he's at a high enough level,

10   and he's got to understand the relationship between these

11   elements and the impact that they have on the financial

12   success of the product in question.  And that's ultimately

13   the relevance of this, it goes to damages.

14           MR. COREY:  And I think the Court would be exactly

15   right if that were the question or that were the type of

16   question that Mr. Farr was asked.  But he was not asked these

17   questions.  He was asked design and marketing questions.  I

18   think -- and I can find this in a minute.  I think what he

19   said was that Mattel does not quantify.

20           THE COURT:  As a general objection I'm going to

21   overrule it.  If there's a particular question that you think

22   that you want to focus on, Counsel, I will consider it.  When

23   I say that objection, I'm not going to use that objection

24   basically to strike all of his testimony.  If there's

25   particular questions that you think that he lacks foundation

c82378c4-88ea-4514-b582-e8043d481e71

Page 7174

1    on in -- questions where I've overruled your foundational

2    objection, I'll consider it at this time.

3              MR. COREY:  I don't have the specific question in

4    front of me, your Honor.

5              THE COURT:  Very well.

6              MR. HERRINGTON:  Your Honor, Robert Herrington on

7    behalf of MGA.  Just one note.  Pages 115 and 116.

8              THE COURT:  Yes.

9              MR. HERRINGTON:  You sustained the objection

10   beginning at line 12 on page 115.

11             THE COURT:  Right.  Through line 7 on 116.

12             MR. HERRINGTON:  I would ask your Honor, if you

13   could take a look starting at 25 of page 115 through line 7

14   of 116.  And if we could have that portion entered.  It

15   doesn't go to the 402.

16             THE COURT:  The problem I have with this, and it

17   really wasn't fleshed out or designated, I don't understand

18   the answer from lines 4 through 7.  I think it's the

19   execution of an individual SKU basis.  I know what a SKU is,

20   but what does that mean?

21             MR. HERRINGTON:  The point of this section is

22   differentiating again between the product.

23             THE COURT:  I understand the point.  But what does

24   that answer mean?

25             MR. HERRINGTON:  As I understand what he is

c82378c4-88ea-4514-b582-e8043d481e71

Page 7175

1    basically saying is that you can have a product that itself

2    is not a good product, but the brand is doing well and can

3    still carry the product along.  It's the differentiation

4    between the product and the brand that we're trying to have

5    the CFO of Mattel actually acknowledge here.

6              THE COURT:  You know, I'll give you line 25 and

7    lines 1 and 2, but this answer just doesn't make any sense to

8    me.  So line 25 on page 115 and lines 1 and 2, the question,

9    "Is it possible to have a strong brand and a weak product at

10   the same time?"  "Yes."  But as far as this answer, it

11   doesn't make any sense.  And the rest of what I sustained

12   there is designed towards talking about Mattel's -- it's so

13   intertwined with this whole notion of Mattel struggling, and

14   it runs into that 403 issue I described.

15             MR. HERRINGTON:  I understand.

16             MR. COREY:  And this is the kind of foundational

17   commentary I was talking about.  There's not an

18   identification of the brand.  They are really just asking him

19   to speculate about whether this is possible.  It's not in the

20   context of his experience.

21             THE COURT:  It's not the most convincing evidence.

22   I assume it's based on his experience, Counsel --

23             MR. COREY:  He is the CFO of Mattel.  And I didn't

24   finish my sentence.

25             THE COURT:  I'm sorry.

1          MR. COREY:  His experience with respect to specific

2    products at Mattel.  You can speculate about anything.  Is it

3    possible?  Of course, anything is possible.  But it's not

4    tethered to anything specific in his experience.

5          THE COURT:  Well, actually we know, based on what

6    the Court has kept out, exactly what he's talking about.  So

7    you are correct.  He's talking about the Mattel brand.  If

8    you look at the lines preceding this, and I'm striking that

9    because of the 403 issues, but I'm not concerned that this is

10   just a speculative statement.  He's actually talking about

11   the Mattel brand.  In context.  But I'm not allowing that in,

12   and this is part of the balancing that goes on.

13         MR. COREY:  Thank you, your Honor.

14         THE COURT:  Anything else on this?  Any other

15   questions?

16         Very well.  And please be careful on those

17   documents.  Only that portion that is referenced in the

18   statement here.

19         Okay.  You said I don't need to deal with Nordquist

20   now?

21         MS. AGUIAR:  Well, actually, your Honor, when you

22   had asked, at the beginning of the lunch break, if we had a

23   response, I had said if you wouldn't mind taking up at the

24   end of the lunch break, because Mr. Sloan is here, and if he

25   could address that.

Page 7177

1          THE COURT:  Mr. Sloan.

2          MR. SLOAN:  Do you want me to address the

3   objections now?

4          THE COURT:  I received the objections to the MGA

5   parties Phase 1-B designations of Jill Nordquist.  Before I

6   get into ruling on the individuals, I want to get an answer

7   to the general objection.

8          MR. SLOAN:  Your Honor, two general objections.

9   First is the 403 objection with respect to the issue that we

10  dealt with before, which is they are claiming that unless we

11  show a direct nexus between the knowledge of Ms. Nordquist

12  that Carter Bryant actually was working for MGA or drawing

13  the Bratz drawings while he was still at Mattel, that this

14  whole thing should be precluded on 403 grounds.  And our

15  argument is simply that that's -- that the inclusion of that

16  information is consistent with your Honor's July 24th order.

17         We understand the 403 considerations, but we

18  believe that this is appropriate.  It goes to Mattel's state

19  of knowledge as to the fact that Carter Bryant, they learned

20  fairly early on that Carter Bryant was working at MGA, and

21  that should have caused them to begin investigating.

22         THE COURT:  Are we ever going to get -- we're

23  further along now, of course, than we were when I ruled

24  previously about this in the trial.  And we're not quite done

25  yet, and I understand there's more we're -- we're going to

1    hear from more witnesses.  Are we going to get to the point

2    where we hear any evidence at all that Mattel had any

3    knowledge or reason to believe that Carter Bryant did in fact

4    do any of these drawings while he was at Mattel prior to

5    2003?

6              MR. SLOAN:  Well, your Honor, to some extent it's

7    circumstantial evidence.  It's a number of building blocks.

8    I think one of the main building blocks -- and I confess I

9    wasn't here for Margaret Leahy's testimony yesterday -- but

10   my understanding of what she said, although I haven't read

11   it, is that one of the things that she spoke to certain

12   Mattel employees just after Bratz was released in the summer

13   of 2001.  Those employees knew, for instance, that she had

14   left Mattel in approximately September of 2000.

15             THE COURT:  I know you're expecting to get that in,

16   but that never came in, did it?

17             MR. NOLAN:  Your Honor, I -- I'll go back to the

18   transcript.

19             THE COURT:  Would you?  I'd like to see that.

20   You're right about the building blocks, and I understand the

21   circumstantial case, but I just don't want to continue down

22   this road if the building blocks -- if the circle is never

23   going to be completed.  And I don't recall that testimony.

24             MR. NOLAN:  Your Honor, we'll go back to the

25   testimony.  But my recollection is that she -- in the

c82378c4-88ea-4514-b582-e8043d481e71

Page 7179

1    conversations that she was having, she was talking about how

2    each of them knew that she had left in September of 2000, her

3    employment at Mattel, that the Bratz was the first free-lance

4    project while at Mattel.  And so that combined indicates that

5    the work that she was doing --

6              THE COURT:  Mr. Sloan just said that there was a

7    communication made.  Maybe I misunderstood you.

8              MR. SLOAN:  Your Honor, my understanding is that

9    she had communications with -- I think there was two or three

10   employees from Mattel who at that time weren't Mattel

11   employees, who were friends of hers.  They knew that she had

12   left Mattel in approximately September of 2001.  She told

13   them that she was working on Bratz.  I believe she told them

14   that Carter Bryant was working on Bratz and that this was the

15   first project she had worked on afterwards.

16             THE COURT:  Submit that testimony to the Court.

17   Let me take a look at that when you get a chance.

18             Moving on to the second issue.  Basically they are

19   saying it exceeds the scope of her 30(b)(6) designation and

20   that she's a local witness here.  So just call her as a

21   witness.

22             MR. SLOAN:  Your Honor, our response to that is

23   first of all, I think under the rule she does qualify as a

24   managing agent of the company under Rule 32.  She has -- the

25   standards that the courts look at, it's a fairly flexible

Page 7180

1    standard.

2            But they look at whether she has the employee's

3    rank or title, whether she has supervisory powers.  She

4    testified that if she were Carter Bryant's supervisor in this

5    particular situation, she would have asked him to leave

6    immediately when he refused to disclose where he was going.

7            The extent of the corporate employee's power to

8    exercise judgment and discretion in dealing with corporate

9    matters.  I think the fact that they put her up as a 30(b)(6)

10   witness on very closely related issues suggests that they

11   felt she had the ability to bond the corporation.

12           THE COURT:  But you do concede some of the

13   testimony that you've designated here does go beyond the

14   scope of those designations?

15           MR. SLOAN:  Your Honor, if you're going to read

16   them very strictly, I think it does.  I think there's an

17   argument to be made that they are very closely connected.

18   For instance, topic 55, all acts, omissions, circumstances,

19   and/or evidence showing or tending to show that Bryant made

20   affirmative misrepresentations to Mattel employees upon his

21   departure.

22           There are two elements of affirmative

23   misrepresentation.  The first is what Mattel is actually

24   trying to introduce, which we didn't designate, which was the

25   fact that Mr. Bryant refused to disclose where he was going.

Page 7181

1   But part of the -- you know, when they are claiming that it's

2   a misrepresentation, it's only a misrepresentation if in fact

3   they find out at some point that he has in fact lied.  And

4   they found that out in part when they found out he had gone

5   over to MGA to work on Bratz.

6           So it goes to Mattel's knowledge that in fact this

7   statement, which they had suspected might not be accurate,

8   was a misrepresentation.  At some later point, Jill Nordquist

9   found out that it was in fact inaccurate, that he had gone

10  over to MGA.  So I think it's closely related.  I won't

11  claim, your Honor, that it's on all fours --

12          THE COURT:  That other question.  The fraudulent

13  concealment is on MGA's part allegedly.

14          MR. SLOAN:  Correct, your Honor.

15          THE COURT:  That Mattel figured out.  An element of

16  concealment isn't that the other person necessarily bought

17  off on the concealment; right?  You're guilty of lying to

18  someone even if the other person doesn't believe --

19          MR. SLOAN:  Actually, with respect to fraudulent

20  concealment, that's not the case.  If you in fact know, and

21  that's sort of what we're arguing on.  If Mattel knew in fact

22  that he was, assuming was lying about something, if they knew

23  in fact that he was working on Bratz drawings or he was going

24  over to MGA, that would defeat their fraudulent concealment

25  claim.  They have to prove both that there was an affirmative

Page 7182

1   concealment on behalf of MGA and that it succeeded actually.

2   And this goes directly to the fact that, you know, when she

3   was put on notice that perhaps --

4           THE COURT:  Assuming that MGA was lying or

5   concealing that Mattel had figured out.  Okay.  Well, find

6   that stuff from Margaret Leahy's transcript.

7           MR. NOLAN:  I have it.  And as a courtesy to

8   Mr. Price, let me show it to him.

9           THE COURT:  Show it to Mattel and hand it up.

10          MR. NOLAN:  Your Honor, let me say for the record

11  I've shown it to Mr. Price, and we're going to be directing

12  your attention to pages 6828, starting at line 20, through

13  6832, ending at line 12.  And then Mr. Price in his

14  cross-examination would point to page 6833, lines 18 through

15  24, and for the Court's convenience, I'm going to bring up a

16  little bit of a tab.

17          THE COURT:  Thank you.

18          2001; right?

19          MR. NOLAN:  Summer of 2001 she's having the

20  conversation.

21          MR. PRICE:  Your Honor, the first time Ms. Leahy

22  testified, she testified that when she left Mattel, she told

23  Mattel that she was leaving to become a mom, not to work.  So

24  that attenuates it even further.

25          THE COURT:  That's what she testified she said when

c82378c4-88ea-4514-b582-e8043d481e71

Page 7183

1   she was leaving Mattel, not what she said in the summer of

2   2001.

3           MR. PRICE:  Summer of 2001, she said, "One of the

4   first projects I worked on when I started working again was

5   Bratz."

6           THE COURT:  So what Mr. Sloan suggests is to

7   connect the dots in order to -- someone at Mattel would have

8   had to have been thinking back essentially, well, wait a

9   second, she left Mattel in September.  The first project she

10  worked on was Bratz.  Carter Bryant was still working for

11  Mattel in September.  Ergo, he could have been involved.

12          MR. PRICE:  And that she was not being honest when

13  she said she was quitting Mattel just to be a mom, not to

14  work.

15          MR. NOLAN:  We'll go back, and it's --

16          THE COURT:  This is a great factual issue for the

17  jury to figure out.

18          MR. NOLAN:  Right.  My only point, your Honor, is

19  the record is going to speak for itself.  I don't believe

20  that her testimony was anything other than she was leaving

21  full-time employment to be able to spend more time at home

22  and do free-lancing work, that she had discussions that she

23  could not work at Mattel as a free-lancer and she was

24  free-lancing out there.

25          THE COURT:  This reaffirms my conviction that this

Page 7184

1    is a good factual issue for the jury to decide.

2              Very well.  That will help me in deciding the

3    Nordquist.  Does Mattel need to say anything further to the

4    general objection?  Response to Mr. Sloan, or are we done

5    with that?

6              MR. COREY:  Just very quickly with respect to the

7    second objection, with regard to the scope of the testimony.

8    The real thrust of the objection is to put the topics in

9    front of the Court so the Court can make a proper ruling on

10   that.  And with respect to the issue of whether she's an

11   officer, director, or managing agent.  She's an employee in

12   the licensing department.  She's not the person or the kind

13   of caliber of person that the Court considers -- that the

14   rules consider binding.

15             THE COURT:  Is Ms. Nordquist available?

16             MR. COREY:  Yes.

17             MR. SLOAN:  Just one thing, your Honor.

18   Ms. Nordquist has been an employee of Mattel for 11 years.

19   She's now a director of the consumer brands division.  I

20   believe at the time that Carter Bryant was working in the

21   second shift at Mattel, she was, I believe, also a director

22   position in the Barbie Collectibles unit where he was

23   working.  She does have some seniority.

24             They obviously felt that she has some experience

25   and ability to bind the company by the fact that they put her

c82378c4-88ea-4514-b582-e8043d481e71

Page 7185

1  up as their 30(b)(6) witness on a lot of these topics, which

2  are very closely related to the topics that we're introducing

3  evidence on.  And if you look at the flexible standards that

4  the courts have employed, I think that she appropriately fits

5  as a managing agent.

6          THE COURT:  Okay.  Very good.  If there was any

7  concern at all that she was not available, I think I probably

8  would go with Mr. Sloan's flexible interpretation and allow

9  in the deposition.  But since she's available, let's have her

10  come in.  Make her available.  You can use the deposition in

11  examining her.  And you can ask her whatever questions you

12  want.

13          MR. NOLAN:  Your Honor, is she available for

14  tomorrow morning?

15          THE COURT:  Mr. Corey gave me an unqualified

16  available.  So she's available whenever you want her,

17  Mr. Nolan.

18          MR. NOLAN:  Thank you, your Honor.

19          MR. ZELLER:  We're happy to have Ms. Nordquist here

20  at a reasonable time.  It's not a question of her

21  availability.  We already have two witnesses.  Mr. Eckert,

22  Mr. Kilpin, who have been waiting around to be called.  We

23  were given an order in which these witnesses with going to be

24  called.  Mr. Kilpin was supposed to be up next and then

25  Mr. Eckert.  In the late morning and over lunch, we were then

1    told there was going to be like three or four MGA employees

2    put on the stand instead.  So I mean --

3              THE COURT:  Mr. Zeller, I'm very sympathetic to

4    this, but this sounds very reminiscent of exactly what I

5    heard of MGA attorneys in Phase 1-A on behalf of

6    Mr. McFarland and on behalf of a number of other attorneys.

7              So I don't want to give short shrift to these

8    individuals because I know they are very busy, and this is a

9    tremendous burden and imposition on them, any more than I

10   wanted to give short shrift to MGA's witnesses and

11   Mr. Larian's witnesses.  But as I think you pointed out, it's

12   the nature of trial.

13             MR. ZELLER:  And I recognize that, your Honor, and

14   I'm not complaining about that.  What I am raising is that

15   there's a suggestion now that we need to have Ms. Nordquist

16   come out here and wait indefinitely.

17             THE COURT:  I am ruling essentially in Mattel's

18   favor in granting that, Counsel.  I mean, the alternative is

19   doing what Mr. Corey has been trying to stop, and that is

20   have the video deposition played.

21             MR. ZELLER:  Right.  I understand, your Honor.  But

22   again, the point is that what is being suggested is that

23   Mr. Nolan just said we want her here tomorrow.  And that

24   means -- we've already had Mr. Kilpin waiting for three days,

25   Mr. Eckert waiting for a period of time, and now we're going

c82378c4-88ea-4514-b582-e8043d481e71

Page 7187

1    to stack up another witness.  I'm just asking for some

2    actual, real reasonable estimate.  We can have her here, but

3    to have her then come tomorrow, not go on, you know, I mean,

4    that's --

5              THE COURT:  The worst case scenario would be that

6    she would have to come back on Friday.  We're done on Friday.

7              MR. ZELLER:  Thank you.

8              THE COURT:  Let's bring the jury in.  Quickly.

9              MR. NOLAN:  Your Honor, our next witness is Debbie

10   Middleton.  Can we have her take the stand?

11             (WHEREUPON THE JURY ENTERS.)

12             THE CLERK:  Please stand and raise your right hand.

13                    DEBORA MIDDLETON, SWORN.

14             THE CLERK:  Please have a seat.

15             THE COURT:  Go ahead and state your name, and spell

16   your last name for the record, please.

17             THE WITNESS:  My name is Debora Middleton,

18   M-I-D-D-L-E-T-O-N.

19                    DIRECT EXAMINATION

20   BY MR. NOLAN:

21   Q.   Ms. Middleton, how are you employed?

22   A.   I work for MGA.

23   Q.   And how long have you worked for MGA?

24   A.   I've worked there since July of 2003.

25   Q.   What is your current position or title?

Page 7188

1   A.    It's director of creative development.

2   Q.    If you could just please explain for the jury's sake

3   what your educational background is, and for those of us who

4   have been here for several months or a lot of weeks, could

5   you speak into the microphone.  It's easier for everybody to

6   hear.  Thank you.

7   A.    I worked in animation for 15 years prior to starting at

8   MGA.  I worked for various companies, starting in, I guess,

9   the biggest company was -- well, the first big company was

10  Don Bluth.  I worked for them for two years in Ireland and

11  then moved to L.A., working for another two years with them.

12  Also did some work for Warner Brothers on a couple of their

13  features.

14        I worked for a company called Rich and Nation on a

15  feature film.  Did a little work for Disney, a little work

16  for Dream Works before going to Klasky-Csupo.  I worked there

17  for two years before starting at MGA.

18  Q.    And briefly explain to us your educational background.

19  A.    I went to Champlain College for a year studying fine

20  arts.  And then I went to Sheridan College in Toronto for

21  three years, studying animation.

22  Q.    Now, you testified that your current position is

23  director of creative development at MGA; correct?

24  A.    Yes.

25  Q.    What was your title when you first started at MGA?

Page 7189

1    A.    It was character art manager.

2    Q.    And do you recall approximately the date of your first

3    employment with MGA?

4    A.    It was July 2003.

5    Q.    Now, when you say you were the character art manager,

6    first of all, what is character art?

7    A.    It's the artwork that we create to go on packages or use

8    in style guides.

9    Q.    Before you arrived at MGA in July of 2003, did MGA have

10   an in-house art department?

11   A.    No, they did not.

12   Q.    So after you joined, how many members were in your

13   department?

14   A.    I was the only person.

15   Q.    Prior to the time that you joined, had any character art

16   been created in by MGA?

17   A.    No, not to my knowledge.

18   Q.    And how long did you serve as character art manager for

19   MGA?

20   A.    For roughly two years.

21   Q.    And then what happened in 2005?

22   A.    I was promoted to director of character art.

23   Q.    And what were your responsibilities as the director of

24   character art at MGA?

25   A.    I was overseeing the character art team in creating all

Page 7190

1    the character art that we used at MGA for packaging, style

2    guides, and at that point we were also into the website.

3    Q.   And what was the date that you assumed your current

4    position as director of creative development?

5    A.   That was the summer of 2007.

6    Q.   And explain to the jury what your -- what are your

7    responsibilities as the director of creative development at

8    MGA?

9    A.   I work on our entertainment properties, our DVD's from

10   the beginning idea to the film is actually delivered to MGA.

11   I also work on our website creating the artwork that's used

12   on our various websites, and I work with our licensing team

13   on approvals for licensed product that get submitted to MGA.

14   Q.   Now, for the period of July 2003 through July 2007, were

15   you the person within MGA in charge of character art for the

16   MGA products?

17   A.   Yes.

18   Q.   And did you work on the Bratz line?

19   A.   Yes.

20   Q.   Did you work on other lines?

21   A.   Yes.

22   Q.   Could you give the jury a little bit of background when

23   we talk about -- first of all, is there a difference between

24   character art and package art for a doll?

25   A.   No.

1  Q.   So could you just very briefly explain to the jury what

2  the purposes of character art or package art on a product?

3  A.   The children can relate to the drawings in the character

4  art.  So -- I'm sorry.  Can you repeat the question?

5  Q.   Sure.  Can you just explain to the jury what the

6  purposes of character art or package art are.

7  A.   So it's something that the children can relate to to see

8  a cartoon character.  It's also a way that we can bring some

9  life to the character, because a doll is very plastic and

10  isn't in a pose, but character art can actually be posed and,

11  you know, in a situation.  It gives it some life and some --

12  I think giving it life is really what it does.

13  Q.   Now, in developing the character art for a particular

14  doll package, do you try to make the character art look like

15  the doll in the box?

16  A.   It looks similar to the doll in the box, yes.

17  Q.   Is it identical?

18  A.   No.

19  Q.   Could you describe for us briefly the steps in

20  developing character art?

21  A.   While --

22  Q.   While at MGA.

23  A.   Paula comes up with a theme that she'd like to create,

24  and that theme is then given to Aileen, who is -- who works

25  on the packaging, and she comes up with the look that she'd

Page 7192

1   like to create for a packaging for that certain theme.

2           Then we're given some information on what the theme

3   idea is.  We're also given usually a tear sheet which has a

4   pose that they'd like us to reproduce.  We're also given a

5   sketch from the fashion designer that shows the fashion that

6   we're supposed to draw onto the character.  And those are the

7   elements we're given to start the process of drawing.

8   Q.   You used a term that we've heard before.  And I want to

9   make certain.  You said tear sheet.  Could you give me an

10  example or definition of a tear sheet?

11  A.   A lot of times it's just a sheet that is torn out of a

12  magazine that is a live action, a person in a certain pose,

13  that they'd like to us draw something similar to that pose.

14  Q.   I think we have in front of you a white notebook.  I'd

15  ask you to look at Trial Exhibit 18320-004.

16          Can you identify that for us?

17  A.   That's a tear sheet.

18  Q.   So this is a sample of a tear sheet used at MGA?

19  A.   Yes.

20          MR. NOLAN:  Your Honor, we'd offer 18320-004.

21          MR. PRICE:  Objection.  Relevance.

22          THE COURT:  Counsel, what is this going to?

23          MR. NOLAN:  It goes to the differentiation and

24  changes and the process of how changes are made with respect

25  to the character art from package to package.  It's

c82378c4-88ea-4514-b582-e8043d481e71

Page 7193

1    foundational.

2              THE COURT:   Lay a further foundation for this,

3    Counsel.

4              MR. NOLAN:   Okay.

5    Q.   The particular tear sheet that you have in front of you,

6    18320, do you see that?

7    A.   Yes.

8    Q.   Are you familiar with this tear sheet?

9    A.   Yes.

10   Q.   And could you explain to us how you are familiar with

11   it?

12   A.   It's one of the pieces of information that I helped

13   gather.

14   Q.   And what was the purpose in gathering the tear sheet?

15   A.   To explain the process of how we create character art.

16   Q.   Was this tear sheet used at MGA to create character art?

17   A.   It was.

18   Q.   And was that character art created -- developed under

19   your supervision?

20   A.   Yes.

21             MR. NOLAN:   Your Honor, with that foundation...

22             THE COURT:   Counsel, may I see you at sidebar?

23             MR. NOLAN:   Sure.

24             (SIDEBAR CONFERENCE HELD.)

25             THE COURT:   I guess I'm struggling on the relevance

c82378c4-88ea-4514-b582-e8043d481e71

1    of this, how this is not kind of like the Shrek thing.

2              MR. NOLAN:  Because one of the components of

3    apportionment, as we've identified it, is marketing,

4    packaging.  This is actually something affixed to the

5    package, and what we want to do is demonstrate that for each

6    of the boxes on the characters that come out, that there is

7    different --

8              THE COURT:  Okay.

9              MR. NOLAN:  And this was only simply, your Honor,

10   to lay -- you know, how artwork is created.  Frankly, I could

11   skip over it, but I thought it would be interesting for the

12   jury to understand the tear sheet process.

13             THE COURT:  Okay.  This is different than the Shrek

14   thing.  Okay.  Counsel?

15             MR. NOLAN:  I'm sorry.  It's completely different.

16             THE COURT:  No, I just wasn't -- yes.  I'll hear

17   your argument.

18             MR. PRICE:  My understanding is that they are

19   saying that the art on the packaging entitles them to certain

20   reduction of damages.  The process for doing that --

21             THE COURT:  I don't have the 403 concerns that I

22   had about Shrek because that was getting into actually how

23   the doll was created.  If he wants to use his time this way,

24   that's fine.  Overruled.

25             (CONCLUSION OF SIDEBAR CONFERENCE.)

Page 7195

1          THE COURT:  The objection is overruled, Counsel.

2          MR. NOLAN:  Thank you.  I'd like to just place it

3     on the screen.

4     Q.   You identified this as a tear sheet coming from a

5     magazine; is that correct?

6     A.   Yes.

7     Q.   And for the jury's benefit, could you walk us through,

8     describe quickly what use is made of the tear sheet and take

9     us through to the development of the artwork.

10    A.   Well, the tear sheet just lets us know that they want us

11    to create a standing pose.  It's more of a profile pose with

12    the head turned towards camera.

13    Q.   And was this tear sheet used for a particular piece of

14    character art?

15    A.   It was.  It was used for the Sweetz line.

16    Q.   You have trial 18320-003 in front of you?

17    A.   Yes.

18    Q.   And what do you recognize that as?

19    A.   That was a -- the rough drawing that was done based on

20    this tear sheet reference.

21          MR. NOLAN:  Your Honor, we'd offer this exhibit.

22          MR. PRICE:  No objection.

23          THE COURT:  It's admitted.

24          (Exhibit 18320-003 received.)

25    Q.   BY MR. NOLAN:  Now asking you to -- what is the next

Page 7196

1   step in terms of developing particular character art?   And

2   let's use this Sweetz line as an example.

3   A.   Based on the first rough sketch, we sometimes have

4   overlays that need to be done if something isn't drawn quite

5   right.   So sometimes an overlay is done on top of this.

6   Q.   Directing your attention to 18320-005.   Can you

7   recognize that for us.

8              What is 18320-005?

9   A.   That's -- I believe that's the color.   The number is cut

10   off a little bit.   But I believe that's the color, the final

11   artwork that was created.

12              MR. NOLAN:   Your Honor, we'd offer this exhibit.

13   Just for my reference, I apologize, what is the number on the

14   bottom of that page?

15              THE WITNESS:   I have 18320-00, and the last number

16   is somewhat cut off.

17              MR. NOLAN:   Okay.   I believe it's 5, your Honor.

18              THE COURT:   Very well.   Admitted.

19              (Exhibit 18320-005 received.)

20   Q.   BY MR. NOLAN:   So that's the third step, adding color;

21   correct?

22   A.   Yes, we do the rough pencil, and then we do a tight

23   pencil line over the rough after any revisions are done, and

24   then the center shot shows the artwork once the line art has

25   been taken into the illustrator program in the computer and

Page 7197

1    created into an illustrator file like this with flat color

2    inside.

3    Q.   Now, for the sweet lines, was the actual doll packaging

4    and character art use in the sweet lines actually made and

5    fully developed before you started doing the rendering?

6    A.   No.

7    Q.   Do you refer to the doll at any point while you're

8    drawing the character art?

9    A.   No.

10   Q.   How many different character art drawings have you been

11   involved in while employed at MGA?

12           MR. PRICE:   Objection.

13   Q.   BY MR. NOLAN:   With respect to Bratz.

14   A.   Hundreds.

15   Q.   Is that hundreds total, or is that on an annual basis?

16   A.   That would be on an annual basis.

17   Q.   Can you explain to the jury very quickly why there are

18   so many character art pieces that you are involved in?

19   A.   In each line there's four dolls or sometimes six dolls

20   with the main four characters and sometimes other characters.

21   So we do one piece of character art for each character.   In

22   our style guides there's often two poses for each character.

23   So there could be eight pieces of character art for one theme

24   or as many as 12 pieces of character art for one theme that

25   we create.   And there are many themes that are done every

1   season, between five and I'd say ten.  So you just multiply

2   it.  It becomes a lot of different poses and pieces of

3   artwork that we create.

4   Q.   So the character art is driven by the various themes?

5   A.   Yes.

6   Q.   Ms. Middleton, so hundreds of character art drawings

7   each year you've been there; correct?

8   A.   Yes.

9   Q.   So there's -- you've been there for approximately five

10  years?

11  A.   Yes.

12  Q.   So is it safe to say that somewhere in the neighborhood

13  of 500 to whatever are the number of character art drawings

14  that you've been involved in and supervised?

15  A.   Yes.

16  Q.   For any one of those character art drawings, did you

17  ever make reference to the concept drawings of Carter Bryant?

18  A.   No, I did not.

19  Q.   Did you ever, in the five years you've been employed at

20  MGA, ever direct one of your employees to go back and look at

21  the concept drawings of Carter Bryant?

22  A.   No.

23  Q.   Do you know Carter Bryant?

24  A.   I've never met him, no.

25  Q.   Have you ever spoken with him?

Page 7199

1    A.    No.

2    Q.    Have you ever seen, in the five years that you've been

3    at MGA, Carter Bryant's concept drawings from 2000?

4    A.    No.

5              MR. NOLAN:   Nothing further.

6                       CROSS-EXAMINATION

7    BY MR. PRICE:

8    Q.    Ms. Middleton, I understand you began working in July of

9    2003?

10   A.    Yes.

11   Q.    By that time there had been some Bratz dolls in the

12   market; right?

13   A.    Yes.

14   Q.    Were you familiar with the Bratz dolls?

15   A.    Somewhat familiar.  I'd seen them in stores.

16   Q.    Did you become familiar with them once you worked at MGA

17   in July of 2003?

18   A.    I saw them.  I was in contact with them.

19   Q.    And in what context did you see these dolls or were you

20   in contact with them?

21   A.    I didn't actually have to use the dolls to do my job.

22   So you know, as you walk through MGA, there's all different

23   stages of production going on.  So we see the dolls around,

24   and oftentimes prototypes of the packaging because our

25   character art was used on packaging.  So I would see the

Page 7200

1   packages occasionally once they were being created with the

2   character art on them.

3   Q.   And I think you said, I wrote it down, that the

4   character art looks similar but not identical to the doll in

5   the box; is that right?

6   A.   That's right.

7            MR. PRICE:  No further questions.

8            THE COURT:  Anything further?

9            MR. NOLAN:  Nothing further, your Honor.

10           You are excused, ma'am.  Thank you.

11           Your next witness.

12           MS. AGUIAR:  That was quite unexpectedly short, but

13   we're going to be ready in a moment.  We need to set up a

14   table.

15           THE CLERK:  Please stand and raise your right hand.

16                   LEON DJIGUERIAN, SWORN.

17           THE CLERK:  Please be seated.

18           Please state your full name, and spell your last

19   name for the record.

20           THE WITNESS:  Leon Djiguerian, D-J-I-G-U-E-R-I-A-N.

21           MS. AGUIAR:  Your Honor, I can certainly wait until

22   we're done, or if it wouldn't be too distracting, we can

23   finish setting up the table --

24           THE COURT:  I don't want to --

25           MS. AGUIAR:  I don't want to distract the jury.

c82378c4-88ea-4514-b582-e8043d481e71

Page 7201

1          THE COURT:  Right.  So we can just wait a moment.

2     That's all right.

3          While we're doing this, Counsel, is there a binder

4     on this?

5          MS. AGUIAR:  There's not.

6          THE COURT:  There's not.  All right.

7                    DIRECT EXAMINATION

8     BY MS. AGUIAR:

9     Q.   Good afternoon.

10    A.   Good afternoon.

11    Q.   Mr. Djiguerian, would you tell us where you work,

12    please?

13    A.   I work at MGA Entertainment.

14    Q.   Okay.  And if you want, you can either move your --

15    scoot your chair up or -- this thing moves, so you can pull

16    it towards you if you want to be more comfortable.

17          Sorry.  You said you work at MGA?

18    A.   Yes.

19    Q.   What is your position?

20    A.   Currently Bratz brand manager.

21    Q.   And how long have you been with the company?

22    A.   Almost eight years.

23    Q.   Without going into each of the specific jobs or years,

24    can you tell us just generally in what areas you have worked

25    over the last seven to eight years?

1   A.   I started off as a graphic designer, and I moved on to

2   structural engineering, production management, project

3   planning, design manager, and now Bratz brand manager.

4   Q.   Through the course of those different areas where you've

5   worked at MGA, have you become familiar with the various

6   Bratz products?

7   A.   Yes.

8   Q.   And do you also have familiarity specifically with the

9   sculpts that were developed at MGA for each of those

10  products?

11  A.   Yes.

12  Q.   Okay.  I'd actually like to go through those with you.

13          And, your Honor, with your permission, it might

14  just be easier, I have the microphone, and instead of going

15  back and forth, may I --

16          THE COURT:  Absolutely.

17          MS. AGUIAR:  Thank you.

18  Q.   Are you familiar with the Bratz Boyz product?

19  A.   Yes.

20  Q.   Okay.  And just for the record, what we've done is we've

21  put one of each of the products -- can you tell us, these

22  are, the things in the back, Bratz subbrands in their

23  packaging; is that correct?

24  A.   That's correct.

25  Q.   Okay.  And then for each of these, we have a sculpt that

Page 7203

1    corresponds to the doll in the box; correct?

2    A.   Yes.

3    Q.   And the sculpt -- can you describe -- in other words,

4    are we seeing sculpts fully decorated and clothed?

5    A.   No, you're seeing the naked sculpt, the raw sculpt.

6    Q.   Okay.  Let's start first with the Bratz boys, then.  Let

7    me hand you --

8         And your Honor, can I just move all of these in at

9    the end?

10        THE COURT:  You may.  I trust you've reviewed

11   these, Counsel?

12        MR. PRICE:  I have not seen the sculpts.  I think

13   everything else is in evidence.

14        MS. AGUIAR:  The products in the boxes are in

15   evidence, and the sculpts, they were given the opportunity to

16   inspect.

17        THE COURT:  Very well.  Why don't we do this.  If

18   you'd do this for the Court, Mr. Price, just take a quick

19   look at those, and let me know if you have any objections,

20   and this way we can get that out of the way and resolve that,

21   and then counsel can operate freely.

22        (Pause.)

23        MR. PRICE:  Your Honor, I don't know if they are

24   the sculpts to those products, but if that's what he's going

25   to testify to, I have no objection.

Page 7204

1        THE COURT:  Very well.  Conditionally, then, I will

2   admit them, and you'll renew your objection if you have any

3   concerns about foundation based on the testimony.

4        You may proceed, Counsel.

5        MS. AGUIAR:  Thank you.

6   Q.   So the first product, do you recognize this as a Bratz

7   Boyz product?

8   A.   Yes, I do.

9   Q.   And this is for the record Trial Exhibit 17477.

10        I'm going to hand you Trial Exhibit 18870.  And

11   when you are talking about these, it would be great if you

12   could hold them up in a way that the jury can see them.

13   Thanks.

14        Can you identify the Trial Exhibit 18870?

15   A.   Yeah, this is the Bratz Boyz body sculpt.  Head sculpt.

16   It's in raw form, not painted or rooted.

17   Q.   Was it a sculpt that was developed by MGA?

18   A.   Yes.

19   Q.   And I'll ask you the same questions for all of these

20   sculpts.  I'm sorry if it becomes a slight bit repetitive.

21   So I'm going to ask you some of the same questions for all of

22   these sculpts.  So is this sculpt the same as the sculpt for

23   the Bratz core fashion doll?

24   A.   No, it's different.

25   Q.   Can you tell us in what ways it's different?

Page 7205

1    A.   Well, first thing is there's a lot of muscular mass on

2    the body defining it as a male figure.   There's muscle

3    definition on the legs, the torso, the shoulders are broader,

4    larger arms, has a six-pack, different head sculpt than the

5    girls' doll.

6    Q.   Let me ask you this threshold question before we go any

7    further.   In the years that you've been working at MGA, have

8    you ever seen before today, have you ever seen Mr. Bryant's

9    original concept drawings for Bratz that were presented to

10   MGA in September of 2000?

11   A.   No, I have not.

12   Q.   To the best of your knowledge, is that sculpt that

13   you're holding in your hand, the Bratz Boyz sculpt, were the

14   drawings used to create that sculpt?   Were the drawings from

15   the pitch book drawings from September 2000 used to create

16   that sculpt?

17   A.   I don't believe so, no.

18   Q.   So you can just leave that one.   And we'll go on to the

19   next one.   The next one is Lil Bratz.   Do you recognize this

20   as a Lil Bratz product?

21   A.   Yes.

22   Q.   And this is Trial Exhibit 17491.   And I'm going to hand

23   you Trial Exhibit 18869.   And can you tell us what we're

24   looking at there?

25   A.   This is a Lil Bratz doll.   In its raw form, the sculpt.

c82378c4-88ea-4514-b582-e8043d481e71

Page 7206

1    Q.   I'm trying to think how to get out of the way so you

2    guys can see the screen.

3              Okay.  And is this the -- I mean, this is a

4    fairly -- this may be an obvious question, but is this the

5    same sculpt as the core fashion doll sculpt?

6    A.   No, it's not.

7    Q.   What are the primary differences?

8    A.   The first thing is the size.  This is a miniature

9    microdoll.  The body sculpt is different.  The head size is

10   different.  The head sculpt is different.  Overall it's a

11   completely different doll.

12   Q.   Were Carter Bryant's drawings from September of 2000

13   used to create that sculpt?

14   A.   No.

15   Q.   The next product I wanted to talk about is Babyz.  And

16   can you explain to the jury, I'm going to show you two

17   different Babyz product.  One you'll see here is Trial

18   Exhibit 17775.  And the next one is 17471.  And can you

19   explain the difference between the two Bratz Babyz products

20   that we just looked at?

21   A.   Well, the first one you showed was the first launch of

22   the Babyz with the molded hair.  It has plastic hair.  And

23   the second one you showed has actual rooted hair.

24   Q.   And when you say rooted hair, I think we probably have

25   heard this already, but what do you mean by that?

Page 7207

1    A.    Actual hair that you can brush and style.

2    Q.    So let me hand you 1863 and 18862.  Can you tell us what

3    we're looking at with 1863?

4    A.    This is the first Babyz sculpt, it's all molded hair.

5    There's no rooted hair.

6    Q.    Is this a sculpt that was created and by MGA?

7    A.    Yes, it was.

8    Q.    To your knowledge was it based in any way on Carter

9    Bryant's drawings from September of 2000?

10   A.    No, it's not.

11   Q.    Can you tell us the ways in which it's different, if at

12   all, from the core fashion doll sculpt?

13   A.    Well, this baby here is much smaller than the Bratz core

14   doll.  It has different proportions of the body, the legs,

15   the torso.  It has a different size head in relation to the

16   Boyz.  It's a completely different sculpt.

17   Q.    And then moving on to the next one in front of you,

18   which should be 18862.  And if you could tell the jury what

19   we're looking at there.

20   A.    And this is another generation of the Bratz Babyz.  And

21   this one here you can actually move the hair and have real

22   hair to style and brush.  Versus this one where it was molded

23   hair.

24   Q.    And so other than the molded versus the rooted hair, is

25   the sculpt the same?

Page 7208

1    A.    The body sculpt is the same.  The only difference is the

2    head.

3    Q.    So it's a different head sculpt?

4    A.    Correct.

5    Q.    Next one.  I'm holding up Trial Exhibit 17466.  Do you

6    recognize this?

7    A.    Yes.

8    Q.    As a Bratz Big Babyz?

9    A.    Yes.

10   Q.    I've just handed you two trial exhibits.  One is 18865

11   and 18866.  Can you tell us what we're looking at with 18865?

12   A.    -65 is this one here.  This is the Big Babyz with the

13   molded hair once again, the plastic hair.  You cannot you

14   brush it or style it.  It's plastic.  And the next one here

15   is the version with the rooted hair where you can actually

16   brush and style the hair that's being applied to the head.

17   Q.    Were both of these sculpts that were developed and

18   manufactured by MGA?

19   A.    Yes.

20   Q.    And to the best of your knowledge, were these sculpts

21   based on Mr. Bryant's drawings from September of 2000?

22   A.    No.

23   Q.    Can you walk us through the nature of these sculpts and

24   how they differ from the core fashion doll sculpts?

25   A.    Well, these are large dolls.  They are large babies.

Page 7209

1    The scale is much different than from the Bratz core.  Once

2    again, the body proportions are different, the legs, the

3    torso, the arms, and the head size is larger.

4    Q.    Okay.  Great.

5    A.    Completely different sculpt.

6    Q.    Thank you.  The next product I'm going to hold up for

7    you is Trial Exhibit No. 17478.  Do you recognize that as a

8    Bratz Kidz product?

9    A.    Yes.

10   Q.    And this particular one is a girl?

11   A.    Yes.

12   Q.    So I'm handing you two more exhibits.  Those are 18860

13   and 18861.  Can you tell us what we're looking at?

14   A.    The 18860 is the Bratz Kidz girls' doll.  And -861 is

15   the Bratz Kidz boys' doll.

16   Q.    And are these two sculpts that were developed and

17   manufactured by MGA?

18   A.    Yes.

19   Q.    To the best of your knowledge, were they based on

20   Mr. Bryant's concept drawings for Bratz pitched to MGA in

21   September of 2000?

22   A.    No.

23   Q.    Can you walk us through the differences between the

24   sculpts that we're looking at here and the Bratz fashion doll

25   sculpt?

c82378c4-88ea-4514-b582-e8043d481e71

Page 7210

1    A.    Well, these dolls are also smaller than the Bratz core

2    fashion doll.  They have skinnier legs, skinnier torso,

3    different head sculpt.  Once again, the proportions are

4    different between the legs, the torso, the arms.  And the

5    boys sculpt is actually different than the girls sculpt.

6    Q.    Are there some ways in which you can tell that it's a

7    boy's body?

8    A.    The boy has little bit broader shoulders and also the

9    head sculpt is different.

10   Q.    Let's move on to -- do you recognize Trial Exhibit 18877

11   as a Bratz Big Kidz?

12   A.    Yes.

13   Q.    And I'm handing you 18864, and if you could tell the

14   jury what that is.

15   A.    That is a large scale of a Bratz Kidz.

16   Q.    And is this a sculpt that was developed by MGA?

17   A.    Yes, it was.

18   Q.    And was it developed based on Mr. Bryant's concept

19   drawings?

20   A.    No, it wasn't.

21   Q.    Can you tell us the differences between this sculpt,

22   18864, and the fashion doll sculpt?

23   A.    This sculpt is much taller than the Bratz fashion doll,

24   and the proportions are different between the legs, the arms,

25   the torso, the head sculpt is completely different.  It's a

Page 7211

1   much larger doll.

2   Q.   Okay.  Let's keep moving here.  Okay.  I'm going to show

3   you two products here.  17486 and 18878.  And do you

4   recognize those as Bratz Lil Angelz?

5   A.   Yes.

6   Q.   Can you tell us the difference between the two Lil

7   Angelz products that I just held up?

8   A.   Well, one has molded hair and the other one has rooted

9   hair where it can actually be styled and brushed.  And they

10  also have different body poses.  Each one is in a different

11  stance.

12  Q.   So it's sort of the rooted versus plastic hair that we

13  you talked about before?

14  A.   Correct.

15  Q.   And let's identify these, then.  The first Trial Exhibit

16  is 18867 and 18868.  And if you could tell us what those two

17  are that you're holding.

18  A.   These are the Bratz Lil Angelz dolls.  This one here,

19  she's sitting in a stance like a little newborn would sit.

20  And it has -- it will have rooted hair.  This is the version

21  where you can actually apply hair to it and brush it and

22  style it.  And the other version here is a different --

23  different stance that the baby sitting in, a different body

24  pose.  And this one here actually has molded hair, plastic

25  hair.

Page 7212

1   Q.   And were these sculpts that were developed and created

2   by MGA?

3   A.   Yes, they were.

4   Q.   And as far as you know, were Mr. Bryant's concept

5   drawings for Bratz referenced in creating these sculpts?

6   A.   No.

7   Q.   This is Trial Exhibit 18875.  Do you recognize that as a

8   Bratz Star Singerz?

9   A.   Yes.

10  Q.   And now I'm bringing you Trial Exhibit 18857.  And if

11  you could explain to the jury what 18857 is.

12  A.   This is a different Bratz body sculpt used for the Bratz

13  Star Singerz.  She's actually a taller doll than our normal

14  Bratz core.  She has more articulation in the knees where you

15  can actually bend her knees and pose her in different ways.

16  Her arms actually raise up when you lift the leg to put her

17  in some dancing features.  And it has pointy feet.

18  Q.   And is the torso the same as the fashion doll sculpt?

19  A.   No, it's completely different.  This is a much taller

20  doll than the Bratz core doll.

21  Q.   Okay.  And the arms themselves, do you know if the arms

22  are different or the same than the core fashion doll?

23  A.   No, the arms are different sculpts, different posture.

24  Q.   And is this a sculpt that was developed by MGA?

25  A.   Yes.

Page 7213

1    Q.   And to the best of your knowledge, were Mr. Bryant's

2    concept drawings used to create this particular sculpt?

3    A.   No.  It wasn't.

4    Q.   I'm holding up -- this is Trial Exhibit 17731.  And do

5    you recognize it as a Bratz -- the movie star doll?

6    A.   Yes, I do.

7    Q.   And I'm going to hand you Trial Exhibit No. 18858.  And

8    if you could describe for the jury that one you have in your

9    hand right now, what is that?

10   A.   This is the Bratz moving body.  And it's in raw form,

11   the sculpt, and the differences between this and the core is

12   the articulation in the torso.  The arms are completely

13   posable.  You have elbow joints, wrist joints, forearm joints

14   and so forth to put her in different stances.  And the torso

15   is also articulated so you can actually move her left and

16   right also in the upper body.

17   Q.   And what about sort of the legs?

18   A.   The legs are similar to the Bratz.

19   Q.   And is this a sculpt that was developed by MGA?

20   A.   Yes, it was.

21   Q.   Were Mr. Bryant's concept drawings for Bratz used to

22   create this particular sculpt?

23   A.   No, it wasn't.

24   Q.   Trial Exhibit No. 17524.  Do you recognize that as a

25   Fashion Pixiez product?

Page 7214

1   A.   Yes.

2   Q.   I'm going to hand you Trial Exhibit No. 18859, and if

3   you can tell us, is this -- tell us what's in your hands.

4   A.   This is the sculpt for the Bratz Pixiez line.  She is a

5   taller sculpt than the Bratz core.  She has different kinds

6   of arm posture where she's actually folding her arms.  In

7   this sculpt she has a different head sculpt, a different

8   face, completely different than the Bratz core.

9   Q.   Do her arms move as well?

10  A.   Yeah, her arms move and her legs also move.  It has

11  articulation in the hip joints and the shoulders.

12  Q.   Okay.  And is this a sculpt that was developed at MGA?

13  A.   Yes.

14  Q.   And to the best of your knowledge, were Mr. Bryant's

15  drawings referenced in order to make this particular sculpt?

16  A.   No.

17  Q.   This one is going to be -- I'm going to leave the fun

18  one for last.  Let's do the -- I'm holding up 17577 and

19  14188.  And do you recognize those as two versions of the

20  talking Bratz?

21  A.   Yes.

22  Q.   And I'm going to hand you two more trial exhibits, 18872

23  and 18876.  And why don't you do 18872 first.  And describe

24  what we're looking at there.

25  A.   This is one of the body sculpts for Bratz talking.

1   She's in a completely unique stance with one arm on the hip

2   and one arm straight down.  They don't have articulated hip

3   joints.  The lower half of the body is fixed.  You can't move

4   it.  They only have articulated shoulder joints.

5   Q.   And why don't we move to the next exhibit.

6   A.   And the next one is a completely different body sculpt.

7   Once again, she's standing in a different pose.  And on this

8   one also, you cannot move her legs.  The hip joints are not

9   articulated, but her arms are, the shoulders.

10  Q.   And are these two sculpts that you have in front of you,

11  18872 and -73, sculpts that were developed at MGA?

12  A.   Yes, they were.

13  Q.   And based on your knowledge working at the company, were

14  these sculpts -- were Mr. Bryant's drawings used to create

15  these sculpts?

16  A.   No.

17  Q.   And last but not least, Trial Exhibit No. 18879.  Do you

18  recognize that as a walking Bratz product?

19  A.   Yes.

20  Q.   And Trial Exhibit 18871, can you tell us what we're

21  looking at there?

22  A.   This is the sculpt for the walking Bratz doll.  She's

23  connected to a walking dog.  And the sculpt is much

24  different.  She has much larger feet here to fit the

25  mechanism inside the shoes to make her walk.  And she has an

Page 7216

1  articulated torso in the top to make her torso move also.

2  Her legs are not as articulated as the Bratz core doll, given

3  that there's mechanism inside.  And the knees, you cannot

4  bend them at the knees.

5  Q.   And I probably should have asked you this at the very

6  beginning, although I suspect that the jury already knows.

7  When you have been using the term articulated or

8  articulation, can you tell us, you know, in your world what

9  that means specifically?

10  A.   Sure.  It's the ability to move a joint or a part of the

11  body.  For instance, this is what we call a shoulder

12  articulation, where you can actually move the arm at the

13  shoulder, and then when we refer to the hip at the joint, the

14  joint at the hip where you can actually make the legs move

15  back and forth.

16  Q.   And is this a sculpt that was developed at MGA?

17  A.   Yes.

18  Q.   And were Mr. Bryant's drawings from September 2000

19  specifically referenced in creating this sculpt?

20  A.   No.

21  Q.   And just because I think it's a little bit funny, can

22  you make it walk?

23  A.   Sure.

24  Q.   I think it has a battery in it.

25  A.   Yes.

c82378c4-88ea-4514-b582-e8043d481e71

1    Q.   Just a little lightheartedness for the afternoon.   Okay.

2    Thank you.

3            Your Honor, I would move into evidence -- shall I

4    read the exhibit numbers?

5            THE COURT:   Please do.

6            MS. AGUIAR:   Okay.   Well, before I do that -- well,

7    should I do that first, or should we find out if there's any

8    objection?

9            MR. PRICE:   There's no objection.

10           THE COURT:   Very well.

11           MS. AGUIAR:   18870.

12               18869.

13               18863.

14               18862.

15               18865.

16               18866.

17               18860.

18               And 18861.

19               18864.

20               18868.

21               18867.

22               18857.

23               18858.

24               18859.

25               18871 through 73.   And I would move all of those

Page 7218

1   into evidence.

2           THE COURT:  Very well.  They are all admitted.

3           (Exhibits 18870, 18869, 18863, 18862, 18865,

4           18866, 18860, 18861, 18864, 18868, 18867, 18857,

5           18858, 18859, 18871-73 received.)

6           MS. AGUIAR:  Thank you.  That's all I have.

7                   CROSS-EXAMINATION

8   BY MR. PRICE:

9   Q.   Mr. Djiguerian?

10  A.   "Djiguerian."

11  Q.   Sir, you mentioned the phrase core information doll

12  sculpt.

13           Do you remember that?

14  A.   Yes.

15  Q.   And how many dolls have been created using that core

16  fashion doll sculpt?

17  A.   Please specify.  I don't understand what you mean by how

18  many dolls.

19  Q.   Well, let's just say how many dolls -- the sculpts used

20  to create dolls which are sold, that core fashion doll

21  sculpt, how many dolls have been created using that sculpt?

22  A.   I don't know.

23  Q.   A lot?

24  A.   I don't know.

25  Q.   Okay.  You referred to the sculpt that was used to

Page 7219

1    create the original Bratz dolls; correct?  The core fashion

2    doll sculpt?

3    A.   As relating to the first -- the first Bratz sculpt.

4    Q.   Yes.

5    A.   Yes.

6    Q.   And that sculpt, other than the movie Bratz has been

7    used for the subsequent generations as well; correct?

8    A.   No.  Each one of these is a completely different sculpt.

9    Q.   I'm not talking about these sculpts.  I'm talking about

10   the core Bratz dolls.  Do you understand?

11   A.   Well, how do you define Bratz core dolls?

12   Q.   The dolls which are, if you look at Cloe, Jade, Yasmin,

13   that Bratz type doll.  There have been subsequent generations

14   of those; correct?

15   A.   Of the sculpt or the dolls?

16   Q.   Of the dolls.

17   A.   Yes.

18   Q.   It's what you referred to as the fashion dolls; right?

19   A.   Correct.

20   Q.   Okay.  And those dolls, except for the movie one, have

21   used that same, what you referred to as core fashion doll

22   sculpt; correct?

23   A.   No, not even the movie.

24   Q.   Pardon?

25   A.   Not even the movie doll.

Page 7220

1    Q.    I know the movie doll.  I'm saying excluding that.

2    A.    I don't quite understand the question.

3    Q.    See behind you where they have these Bratz dolls?

4    A.    Yes.

5    Q.    Okay.  They were created with what you call the core

6    fashion doll sculpt; right?

7    A.    Yes, the sculpt, yes.

8    Q.    And, for example, I'll show you Exhibit 18729, which is

9    Sasha.  That's the core fashion doll sculpt; right?

10   A.    Correct.

11   Q.    So you know the names of these core fashion dolls?

12   A.    The names of the characters or the themes?

13   Q.    The names of the characters.  There are a number of

14   names associated with these core fashion dolls; correct?

15   A.    Correct.

16   Q.    Not just Sasha, Yasmin, Cloe.  And I missed one, but

17   Meegan and other names; correct?

18   A.    Yes.

19   Q.    And they are made all with the same sculpt?

20   A.    Yes.

21   Q.    And you also said you were a brand manager.  So you know

22   something about building a brand; right?

23   A.    Yes.

24   Q.    And the first thing you do is you build your core

25   product.  In this case, the Bratz dolls; right?

Page 7221

1    A.   Well, depends on the brand.   I mean, in this case, the

2    dolls were built first.

3    Q.   And they were called Bratz?

4    A.   Correct.

5    Q.   And you said you worked there for eight years.  Did you

6    work there in September of 2000?

7    A.   No.

8    Q.   In any event, none of these dolls which we're looking at

9    now, which Ms. Aguiar showed you, none of these existed

10   before Carter Bryant went to MGA and shared with MGA Mattel's

11   confidential information about Bratz; correct?

12   A.   Correct.

13   Q.   And certainly, for example, the Bratz boy, there

14   wouldn't have been a Bratz boy if there hadn't been initially

15   the core of the brand which was the Bratz girls; right?

16           MS. AGUIAR:  Objection.  Assumes facts, your Honor.

17           THE COURT:  Rephrase, Counsel.

18           MR. PRICE:  Sure.

19   Q.   Is it correct, your understanding, that the Bratz Boyz

20   was created because it was to be sold to girls who like the

21   Bratz girls, the Bratz dolls?

22   A.   I don't know why it was created back then.

23   Q.   Well, you are in charge, as the brand manager, of

24   strategy for the brand?

25   A.   No, not the strategy.

Page 7222

1    Q.   So you don't decide what is going to be produced by MGA

2    or the types of things that might be associated with the

3    brand; is that right?

4    A.   Well, I mean, I'm aware of what's being done, and I'm

5    asked what I think about things.

6    Q.   Well, let's put it this way.  You have no reason to

7    think that there would have been a Bratz boy or a baby Bratz

8    or a movie Bratz without those Bratz dolls that are the core

9    of the brand; right?

10   A.   I don't agree with that, no.

11            MS. AGUIAR:  I'm sorry.  Objection.  Assumes facts.

12   We can go to sidebar if you'd like.

13            THE COURT:  You may.

14            MR. PRICE:  Your Honor, I'll withdraw the question.

15   I don't have time for a sidebar.

16            THE COURT:  Are you finished?

17            MR. PRICE:  I'm finished.

18            THE COURT:  Very well.  Anything further?

19            MS. AGUIAR:  Nothing further.  Thank you.

20            THE COURT:  You are excused, sir.

21            MS. AGUIAR:  We're getting our next witness, your

22   Honor, who is Lui Domingo.

23            THE CLERK:  Please raise your right hand.

24                         LUI DOMINGO, SWORN.

25            THE CLERK:  Please take the stand.

Page 7223

1          Please state your full name, and spell your last

2     name for the record.

3               THE WITNESS:  Lui Domingo, D-O-M-I-N-G-O.

4                      DIRECT EXAMINATION

5     BY MS. AGUIAR:

6     Q.   Mr. Domingo, are you employed by MGA?

7     A.   Yes.

8     Q.   And before we go any further, I'm going to give you one

9     of the rules of the road to try to speak into the microphone.

10    A.   Okay.

11    Q.   What's your position at MGA?

12    A.   I'm a senior designer at MGA.

13    Q.   How long have you been with the company?

14    A.   Five years.

15    Q.   Are there other doll designers who have your same

16    position at MGA?

17    A.   Yes.

18    Q.   How many?

19    A.   There's --

20              MR. PRICE:  Objection.  That's irrelevant.

21              THE COURT:  I'm sorry, Counsel?

22              MR. PRICE:  That's irrelevant.

23              MS. AGUIAR:  I'll withdraw it.  It was just

24    foundational.  That's fine.

25              THE COURT:  Very well.

Page 7224

1    Q.    BY MS. AGUIAR:   Do you work on dolls other than the

2    Bratz fashion dolls?

3    A.    Currently I do.

4    Q.    Okay.   So what different dolls do you work on?

5    A.    I work on baby dolls for Zaph.   I work on licensed

6    products for top model, and Bratz.

7    Q.    You said you're a doll -- I think you said your position

8    was doll designer.   Senior doll designer.

9    A.    Yes.

10   Q.    Can you explain to the jury what that entails?

11   A.    Um, that's a concept person that generates preliminary

12   ideas and themes for dolls for every season.   So for spring

13   or fall, I come up with the look of the doll, the design of

14   the paint, the design of the hair, the colors that are used

15   for paint and hair, the fashions which I guess we call soft

16   goods in the industry.   Everything that has to do with the

17   product.   Accessories as well, and I even provide some input

18   or suggestions for how the packaging might look like in order

19   to interpret the concept.

20   Q.    So before we get into specific examples, let me just ask

21   you another background question.   Did you ever work at

22   Mattel?

23   A.    Yes, I did.

24   Q.    And for how long did you work there?

25   A.    I worked for five years.

Page 7225

1    Q.    Why did you leave?

2          MR. PRICE:  Objection.  Irrelevant.

3          THE COURT:  Sustained.

4    Q.    BY MS. AGUIAR:  After you left Mattel, did you leave

5    Mattel voluntarily?

6    A.    No.

7    Q.    Where did you go after you left Mattel?

8    A.    I went to a small company that does children's consumer

9    products called Home Inspirations.

10   Q.    And how long did you work at Home Inspirations?

11   A.    I worked at Home Inspirations for two years.

12   Q.    Two years?

13   A.    Yes.

14   Q.    And where did you go after Home Inspirations?

15   A.    I worked for MGA.

16   Q.    And then that takes us to the present; is that correct?

17   A.    Yes, correct.

18   Q.    I've placed in front of you a couple of trial exhibits.

19   The first one, which should be on the top of the pile, is --

20   well, actually, you know what?  Before we do that, I'm sorry.

21   Let me ask a foundational question.

22          Have you designed a number of Bratz fashion dolls

23   over the years?

24   A.    Yes, quite a few.

25   Q.    How many would you say that you have designed in the

Page 7226

1    years that you've been with MGA?

2    A.   Just whole segment.  Each segment might contain four or

3    five dolls.  I must have designed at least about 50 over the

4    course of five years.

5    Q.   Okay.  So when you're saying 50, that's 50 dolls total?

6    A.   No, 50 themes.  And each theme might have three or four

7    dolls of different designs.

8    Q.   So now getting back to Trial Exhibit 18920.  And if you

9    could look through that exhibit and tell us if you recognize

10   what that is.

11   A.   Yes, I do.

12   Q.   And what are the -- what is in Trial Exhibit 18920?

13   A.   This is my original concept sketch for a Bratz segment

14   called Tokyo a Go-Go which I did when I first came to MGA.

15   That was in 2000.  And this is a 2004 product.

16   Q.   Did you create the drawings that are contained within

17   18920?

18   A.   Yes, I did.

19           MS. AGUIAR:  Your Honor, I move 18920 into

20   evidence.

21           THE COURT:  Any objection?

22           MR. PRICE:  No objection.

23           THE COURT:  It's admitted.  You may publish.

24           (Exhibit 18929 received.)

25   Q.   BY MS. AGUIAR:  If we could look at pages 9 and 10 of

Page 7227

1    that exhibit.

2            And, Aaron, if you could place 18920 on the screen.

3            THE COURT:  Counsel, do you have a copy of that by

4    chance?

5            MS. AGUIAR:  Oh, I'm sorry.  I thought I did.

6    Q.   So, Mr. Domingo, can you tell us what we're looking at

7    here on these two pages?

8    A.   Yes.  Those are two of my original concept sketches for

9    a Bratz segment, meaning a group of dolls that I did for MGA,

10   when I first came to work for them in 2003, called Tokyo a

11   Go-Go.  And those are the Bratz dolls wearing, I guess what

12   is called Tokyo funk.  You know, basically fashions that

13   are -- where the Tokyo teenagers or kids in Japan wear

14   T-shirts over another T-shirt.  They wear skirts over pants.

15   They wear leggings.  They kind of wear the whole kitchen

16   sink, so to speak.  And I thought it might be a good idea to

17   do it for Bratz.

18   Q.   So where did the initial idea to do a Tokyo-themed doll

19   come from?

20   A.   Isaac Larian was throwing the idea that probably we

21   should do something related to Tokyo.  And I actually agreed,

22   and I was looking at some pictures of, you know, streets of

23   Tokyo, and I saw some fashions that I thought would be very,

24   very interesting for -- to do for the Bratz dolls.

25   Q.   Were you looking at any other company's product when you

1    started to develop these concept sketches for the Tokyo doll?

2    A.   No.

3    Q.   How would you characterize the look of the doll that you

4    were designing here?

5    A.   It is trendy, it's young, it's funky, but it's also very

6    different from what we're accustomed to looking at in

7    America.  It's a bit more international.  The hair is

8    colored.  And the inspiration, the graphics, the design that

9    I used for the T-shirt is inspired by Japanese animation.

10   Q.   And you're talking about the two T-shirts that the

11   characters are wearing in the drawing?

12   A.   Yes, correct.

13   Q.   And can you just describe them for us?

14   A.   Yes.  These are -- Japanese animation has become very

15   popular in this country, especially for a very specific age

16   group.  And I just used graphics that sort of emulate that

17   look.

18   Q.   So what was the next step in your process of designing

19   this particular doll after the concept drawings?

20   A.   Well, I present my ideas to Paula Garcia and Isaac

21   Larian.  And when they like the idea, I then proceed to

22   building the 3D model.  And I mean by that constructing the

23   little fashions, the garments.  I work with pattern makers,

24   seamstresses.  I work with a face painter, and I give them

25   specific directions by giving them drawings and pictures on

Page 7229

1  how the face should be to correspond with the fashions, and I

2  also work with a hair designer, and I give specific

3  directions on how the hair should look like.

4           So I buy the fabric.  I go out and shop.  I buy the

5  fabric.  I bring it to the sample makers, and we start

6  through a lengthy process.  They first make preliminary

7  samples for me.  And I look at it.  Say that doesn't look

8  quite right.  The sleeves are too long or the pants too big.

9  They make corrections and do it again, and we do this process

10  over and over again until finally we capture the exact look

11  that I was going for.

12  Q.   And when you're talking about developing a look of the

13  face paint, for example, for the doll, and this one

14  specifically, did you have any sources that you looked to for

15  what you wanted the face decoration to look like?

16  A.   Yes, a bunch of things.  One of them, as I mentioned,

17  Japanese animation.  So I even watch cartoons sometimes to

18  look at Japanese animation.  I look at Japanese magazines,

19  among other things.

20  Q.   So we've talked about the fashions, the face paint, and

21  the hair.  Do you also have a role in designing the

22  accessories that go with the doll?

23  A.   Yes, definitely.  And for this particular product, it's

24  not on the sketch, but I wanted them to have electronic pets.

25  So they would have dogs and cats, but they are more robots.

Page 7230

1   And little things that we traditionally associate with Japan

2   as a very technological country.  So little laptops, digital

3   camera, cell phone.  You know, that sort of thing that's kind

4   of very Japanese.

5   Q.   As of the time that you designed this doll, the Tokyo

6   doll, had you been shown Carter Bryant's pitch book drawings

7   for Bratz?

8   A.   No.

9   Q.   I'm going to show you the actual doll.

10  A.   Okay.

11  Q.   This is Trial Exhibit 14018.  Can you tell us what we're

12  looking at here?

13  A.   Yes.  This is one of the finished products of Tokyo a

14  Go-Go.  This particular character is Sasha, I believe.  And

15  so she's wearing Tokyo fashions.  She's wearing a skirt over

16  pants.  She's wearing fur.  She has a little plush animal

17  with her.  She's got a robotic dog.  She comes with extra

18  shoes and extra outfits that are similar to what the Tokyo

19  teenagers wear.  And she has a suitcase.  So she can travel

20  to Tokyo.

21  Q.   That's definitely an important element.

22          So what I wanted to do is maybe flash to another

23  one of the pages back to your drawings.  I was noticing she

24  has this kind of fur thing going on on the top, but that

25  wasn't shown in one of the drawings that we saw before.

Page 7231

1          So if we flip, Aaron, back to 18920, am I right

2    that -- page 5?

3    A.    Yes.

4    Q.    So if we look at page 5, do you sometimes mix and match?

5    A.    Yes, I do.  In fact, this was a preliminary concept.  I

6    then decided that she should wear pants and the skirt should

7    be changed and be made an extra skirt instead.  So the skirt

8    she's wearing on the sketch is actually the one that's packed

9    out to the side of the doll over here.  And I gave her

10   something else to wear.  Sometimes -- certain things work

11   well in a two-dimensional drawing, but when you actually look

12   at it in 3D, it doesn't really work well.  So, you know,

13   drawings are great, but you know, it doesn't always translate

14   well.  So then I make my changes.

15   Q.   So what I'm going to ask Aaron to try to do is

16   Exhibit 302, Trial Exhibit 302, let's leave the one here on

17   the left, if you can, Aaron, the 14018, and then I was going

18   to ask you to look through now Mr. Bryant's pitch book

19   drawings that were presented to MGA in September and then I'm

20   going to ask you a few questions.

21          So if you can maybe put the pitch book on the

22   right-hand side -- if you just want to look at them, and

23   Aaron will flip through them for you.

24          Incidentally, before today or before about an hour

25   ago, had you ever seen the series of drawings that's on the

Page 7232

1    right-hand side there, the Carter Bryant pitch book drawings?

2    A.    No.

3    Q.    So let me ask you, are the fashions that you created for

4    the Tokyo a Go-Go Bratz doll different than the fashions that

5    are depicted in Mr. Bryant's drawings?

6    A.    Yeah, they are very different.

7    Q.    And let me ask you the same question for the face

8    decoration.  The face decoration that you concepted for the

9    Bratz doll, is that the same as what's depicted in

10   Mr. Bryant's drawings?

11   A.    They are not.  They are different.  They are not the

12   same at all.

13   Q.    And the accessories that you designed and created here

14   for the Tokyo a Go-Go doll, well, I guess are there even

15   accessories that you saw other than I guess they were

16   knapsacks or purses?

17   A.    Typically as designers, we are encouraged to use

18   existing molds, existing tools, because the molding process

19   is very costly.  But in the case of this product, Tokyo a

20   Go-Go, I decided to do something very different.  So I

21   sculpted the original items.  We created new molds, even

22   though it was costly.  And I don't know if you're familiar

23   with the process of painting the doll in production, you

24   create masks to mask maybe the lips and then you paint the

25   eyes.

Page 7233

1            So there's a series of metal masks that go on the

2    plastic.  Because of the cost of these masks, we are actually

3    encouraged to use the same mask, but in the case of Tokyo a

4    Go-Go, I went radically different.  I used new masks to make

5    it different than what had been done in the past, in the

6    previous seasons.

7    Q.   All right.  I want to do one other doll with you before

8    I let you go.  If you could look down at the drawings that

9    are Trial Exhibit 18291 and tell us what that is?

10   A.   It's another original concept sketch item done for Bratz

11   when I came in 2003.  It's called Nighty-Nite.  But the

12   working name back then was Bratz Intimates.

13            MS. AGUIAR:  Your Honor, I move 18921.

14            MR. PRICE:  No objection.

15            THE COURT:  It's admitted.  You may publish.

16            (Exhibit 18921 received.)

17            MS. AGUIAR:  Aaron, if we could look at pages 4 and

18   6.

19   Q.   Can you tell us what we're looking at here?

20   A.   Yes, that's actually Cloe and Yasmin, and they are my

21   original concept sketches for a sleep wear set.  We had

22   had -- we had a Bratz segment in the past where the theme was

23   about sleep.  But we wanted to do another sleep theme, but

24   different from the previous one.  And so I did something a

25   little bit more grown up.

Page 7234

1        The previous one was about bunny slippers and bath

2   robes.  And this one was a little bit more like -- like a

3   teenager who is trying to grow up.  So it's, you know, like

4   little camisoles and pajamas that are cargo pants.  A little

5   bit younger ad trendier.

6   Q.   So what happened in your process with creating -- did

7   you say that the final name of the doll was --

8   A.   Nighty-Nite.

9   Q.   Nighty-Nite.  What was the next step in your process?

10  A.   It's the same thing.  At the time that I had come to

11  MGA, the existing face paints were not exactly ones that I

12  thought were appropriate to use.  And so I had brought in my

13  own painter.  And I had asked Paula's permission if I could

14  use my own face painter, and she allowed me, and ultimately

15  they actually hired the painter, and she now works for MGA.

16  But I decided to make the face paint a little bit more

17  delicate, a lot less made up.

18        You know, smaller eye liners, a little bit more

19  expressive, sleepy looking.  And then for the fashions, I

20  actually went out and shopped for fabric, and the difficulty

21  is in that scale of a doll, sometimes a regular print doesn't

22  really work.  It's too big.  You only get two flowers on one

23  top.  So I actually had to look for prints that would be

24  appropriate --

25        MR. PRICE:  Objection.  At this point it's beyond

Page 7235

1    the scope of the question.

2              THE COURT:  It is.

3              MS. AGUIAR:  I can direct a specific question.

4    Q.   With regard to the fashions in particular, what was the

5    process you undertook?

6    A.   I built a 3D.  I worked with the seamstress.  I buy the

7    fabric.  We start with pattern making.  I correct the

8    samples.  We do it over and over again until it's done right.

9    And the same is true for face paint and hair.

10   Q.   When you were concepting this doll and drawing the

11   fashions and developing the other aspects of the doll, were

12   you looking at any other company's product as a specific

13   reference?

14   A.   No.  I was looking at our own products as a reference of

15   departure.

16   Q.   Let me ask you something.  There's been some testimony

17   today about companies sometimes looking to other companies'

18   products, looking to their competition.  Is that consistent

19   with your experience at MGA and at Mattel?

20   A.   Only as a process of research.

21   Q.   Explain what you mean by that.

22   A.   Um, when we're looking to put out a certain doll, we

23   are --

24              MR. PRICE:  Object to lack of foundation for all of

25   MGA.

Page 7236

1          THE COURT:  Further foundation.

2          MS. AGUIAR:  I think I said is it consistent with

3     his experience.

4          THE COURT:  Let's lay a foundation, Counsel.

5     Q.   BY MS. AGUIAR:  You were a doll designer at Mattel;

6     correct?

7     A.   I was, yes.

8     Q.   You were.  You were a doll designer at Mattel, and you

9     have been a doll designer at MGA; correct?

10    A.   Yes.

11    Q.   And you testified that looking at competitors' products

12    is a -- you said is something that you are familiar with,

13    something done at both of those companies; correct?

14    A.   Correct.

15         MR. PRICE:  Objection.  Irrelevant.

16         THE COURT:  Sustained.

17         MR. PRICE:  Move to strike.

18         THE COURT:  Let's get back to the question and the

19    foundation for that question, Counsel.

20         MS. AGUIAR:  If we need to go to sidebar, can I get

21    clarification on the relevance part of that question?

22         THE COURT:  Sure.

23         (SIDEBAR CONFERENCE HELD.)

24         THE COURT:  Counsel.

25         MR. PRICE:  The relevance part is that what Mattel

Page 7237

1    does isn't relevant.  What MGA did is relevant because they

2    are saying unique, it should go to apportionment.

3              Now, we've already told the jury there's nothing

4    wrong with it.  The question is is what MGA is doing unique.

5    So the only relevant question is at MGA what was done.  My

6    objection on foundation is that he can't speak for all of

7    MGA.

8              THE COURT:  I thought it was further than that.  I

9    thought you were saying that all this witness could testify

10   to is what his experience was.

11             MR. PRICE:  Well, absolutely.  But he also worked

12   at Mattel, which is why she's asking about Mattel.

13             THE COURT:  Where this started, Counsel, is you

14   asked him for all of MGA.

15             MS. AGUIAR:  I thought -- I'll correct that, your

16   Honor.  I thought I then said his particular experience based

17   on what he did.  But I will clarify that.

18             THE COURT:  Based on his experience, what did all

19   of MGA do?

20             MS. AGUIAR:  No, just what he did.

21             THE COURT:  Okay.  That's particular aspect.

22             MS. AGUIAR:  Now, with regard to the Mattel

23   argument, that I can't understand.  Because Mr. Price stood

24   before you an hour ago and said that it's relevant that this

25   is something that companies do.  That they -- the competition

c82378c4-88ea-4514-b582-e8043d481e71

Page 7238

1  looks at each other's products, and why do they do that, and

2  he claims there's nothing wrong with it, then it should be

3  relevant.  This particular witness has specific experience

4  having done that at Mattel.

5        The fact that MGA does this, this is a fact that

6  the jury should know through direct -- his direct experience

7  at Mattel specifically having done this particular thing,

8  namely, looking at competitors' products --

9        THE COURT:  But there's no indication that anything

10  is improper here.

11        MS. AGUIAR:  Respectfully, your Honor --

12        THE COURT:  I'm sorry?  I'll give an instruction to

13  the jury, if you want, on that.  I think it was made clear.

14  You asked a series of questions of the witness, of

15  Ms. Garcia.  Was this public information.  There's been no

16  allegation that there's anything improper here.  And I'll

17  give an instruction, if you want, on that.

18        MS. AGUIAR:  I think the implication that Mattel is

19  trying to draw here is fairly clear that this was not

20  something that was okay to do, that we were looking at their

21  products to copy their ideas.

22        THE COURT:  But if that's true, then what you're

23  trying to do is throw that back on Mattel instead of

24  clarifying the record and making it clear to the jury.  I'll

25  give an instruction, but I'm not going to go down a road if

c82378c4-88ea-4514-b582-e8043d481e71

Page 7239

1    you believe, as you're telling me, that somehow -- which I

2    don't see on this record, that there's an allegation that MGA

3    has done something improper.

4          The way to cure that is by telling the jury that

5    they did not do anything improper, not to turn it around and

6    say well, Mattel is doing it too.

7          MS. AGUIAR:  Again, there was no value judgment in

8    the evidence.  I was trying to --

9          THE COURT:  I agree.  There's no value judgment in

10   the evidence.  I agree with that last statement.

11         Mr. Nolan.

12         MR. NOLAN:  Quickly.  I guess my point is that it's

13   one thing for Mattel to say that there's nothing wrong and

14   they are not contending that there's anything wrong, and then

15   they ask a series of questions to Mr. Larian or to Paula

16   Garcia.  And it's something that the Court could instruct

17   saying that there's no allegation of any wrongdoing here.

18   It's another thing, though, for this jury to understand an

19   industry practice without turning this into 403.  I mean,

20   just to show --

21         THE COURT:  It's relevant, and that's why I started

22   this whole thing by asking counsel what was it relevant to.

23   It's relevant for Mattel to introduce evidence that MGA did

24   not originate or come up with this unique particularized

25   expression of whatever we're talking about, the packaging,

Page 7240

1   the themes, or what have you.  It's relevant to the issue of

2   apportionment damages.  It's not relevant just to have

3   testimony about industry practices in general.

4            MR. NOLAN:  Right.

5            THE COURT:  If there is a negative inference -- I

6   agree with Ms. Aguiar, that there's no value suggestion in

7   that testimony.  If you believe there is, I'm willing to

8   clear it up with an instruction.

9            MS. AGUIAR:  Since I said that last, can I?  I'm

10  sorry.  We're the ones being accused here, your Honor, of

11  everything in this phase.  So frankly, I think that when

12  Mattel brings out this evidence, after having asked an hour's

13  worth of questions about stealing information and stealing

14  confidential stuff and then asks questions and shows

15  documents about us having looked at their products, when they

16  do that, your Honor, because of the nature of where we are

17  and that we're the defendants and what they have alleged in

18  their opening and how they have tried this 1-B case, I think

19  there absolutely is when that evidence comes out.  So if it's

20  an instruction --

21           THE COURT:  That's why I offered previously and I

22  offer again to give a clarifying instruction.

23           MR. NOLAN:  What would the Court's instruction be?

24           THE COURT:  That there was nothing illegal,

25  unlawful, unethical about copying elements, designs, themes,

Page 7241

1    that are out in noncopyrighted in the market.  And we can

2    work on some language, but that's the instruction I offered

3    to give earlier, and I'm willing to give it.

4            I would ask counsel to submit some joint language

5    if you can.  If you can't, do what we've done before, and

6    I'll give the instruction.  That's the way to cure a problem

7    you've identified.  It's not to say you, too, and then leave

8    it hanging out there.  Because all that does is ratchet up

9    the concern that somehow there's something wrong about this,

10   and there's nothing wrong about it.  I don't think there's

11   any suggestion that any of this, Mr. Price in his

12   questioning, suggests that they stole the idea from Mattel or

13   anything of that nature.  If there's a concern, though, I'll

14   address it.

15           MR. NOLAN:  Your Honor, just while we're here, and

16   this is the point that I wanted to make, is that perhaps with

17   this witness, it's not particularly relevant, but another

18   witness, when we're going to go to Mr. Kilpin, for instance,

19   on the question of perception of the importance of Bratz

20   branding and packaging, the observations that have been made,

21   the foundation is that they did competitive shopping of Bratz

22   products.

23           We're not going to allege that there's anything

24   wrong with that, but that's going to be the foundation as to

25   how they knew to make the observations and do the research

Page 7242

1     that they were doing.

2            So you know, in that sense I think I'm going to

3     make a proffer that I think in that limited sense,

4     competitive shopping that Mattel engaged in as the foundation

5     for what they were claiming or asserting with respect to the

6     importance of certain attributes of the Bratz product is

7     going to be --

8            THE COURT:  I'm sorry.  I'm not following this.

9     You're talking about competitive shopping by Mattel is

10    relevant to what?

11           MR. NOLAN:  They go out and buy a Bratz product.

12    They buy all the Bratz products.  They bring it into the

13    design center.

14           THE COURT:  I assume MGA does the same thing.

15           MR. NOLAN:  And Hasbro probably does, too.

16           THE COURT:  So what is this relevant to?

17           MR. NOLAN:  It's the basis upon which they then

18    make assessments.

19           THE COURT:  "They" being?

20           MR. NOLAN:  Mattel.

21           THE COURT:  Mattel makes assessments.

22           MR. NOLAN:  With respect to the factors that are

23    making Bratz successful.  Whether or not it's themes,

24    packaging.  It's our apportionment.  It goes back to my

25    argument earlier that if Mattel --

1          THE COURT:  Wait, wait.  Okay.  I'm going to have

2     to see this in context.  I don't understand where this is

3     going.  I don't see how -- this case is not about what Mattel

4     did.  This phase of the case is not about what Mattel did to

5     MGA.  This phase is about what MGA did to Mattel.  You are on

6     the defense side.  They are on the plaintiff's side.  I know

7     that kind of creates a certain landscape.

8          MR. NOLAN:  Let me come back to this when we're not

9     on our time during a break.

10          MR. PRICE:  Your Honor, before, you said you would

11     give an instruction depending upon how I handled it.  And I

12     actually asked Ms. Garcia when I had the documents, I said

13     there's nothing wrong with this.  You're dealing with public

14     information, and you're competing.

15          THE COURT:  I thought it was handled well, and I

16     thought her responses to it made it clear that there was

17     nothing wrong.  I don't see the allegation.  But if there's

18     some confusion at the end of the day, I'll consider an

19     instruction.  I'm not going to make a big deal out of it.  I

20     don't see anything nefarious about this.  You talk about

21     stealing.  Stealing the Bratz drawings?  That's what the jury

22     found in Phase 1-A.  You are painting with a broad brush on

23     this.

24          MS. AGUIAR:  Well, frankly, I can pull out the

25     sections from the opening statement and from the questioning

Page 7244

1   of our witnesses, they don't limit it just to the drawings.

2   I wish I had a dollar at this point for every time Mr. Quinn

3   or Mr. Price said, and when you had Mattel's confidential

4   information and when you stole the confidential information.

5            And frankly, I am not trying to paint with a broad

6   brush.  I know that that is not an appropriate thing to do.

7   I'm going by the questions that they have asked and the

8   allegations that they have made that they are putting in

9   their case in chief.

10           THE COURT:  That reference, and I understand

11  it's -- I mean, it's what former prosecutors do.  I'm sure,

12  Mr. Nolan, you did it yourself when you were a U.S. Attorney.

13           MR. NOLAN:  Never.

14           THE COURT:  Of course not.

15           MR. NOLAN:  I think this goes back to an earlier

16  issue that we raised with the Court with respect to the broad

17  scope of describing this confidential information and how

18  broad it is, and we talked about the effectiveness, and

19  Mr. Price almost wore that out.  And our only problem is the

20  confusion issue here, as Ms. Aguiar points out.  If there's

21  no issue here.

22           THE COURT:  The jury knows what they found and what

23  they didn't find.  At the end of the day, we all do it.  And

24  I'm probably more guilty than anybody.  We all put more stock

25  in what we say than what the evidence says, and we should be

c82378c4-88ea-4514-b582-e8043d481e71

1   mindful that the jury understands what they found and what

2   they didn't find.  And I think I indicated previously that

3   there's a point where that kind of language becomes

4   unproductive if the jury thinks it's being over used.

5          The jury knows whether Mr. Price is or is not

6   accurately conveying what they found or whether you are

7   accurately conveying what they found.  And I trust the jury

8   on this.  My offer regarding the instruction stands.  I will

9   consider what you submit.  If it's appropriate, I'll give it;

10  if I don't think it's appropriate, I won't give it, and we'll

11  move on.

12         MS. AGUIAR:  Fair enough.

13         (CONCLUSION OF SIDEBAR CONFERENCE.)

14         THE COURT:  Counsel, you may proceed.

15         MS. AGUIAR:  Thank you.

16  Q.   I'm trying to get my thought process back.

17         Aaron, can we have back up on the screen, then, the

18  two images that we were looking at?  And I may have asked you

19  this, and I apologize, because I got turned around.

20         In designing this doll, were you looking

21  specifically at another company's product in referencing it?

22  A.   No.

23  Q.   And were you referencing Mr. Bryant's pitch book

24  drawings from September of 2000 when you designed this doll?

25  A.   No.

c82378c4-88ea-4514-b582-e8043d481e71

Page 7246

1   Q.   I'm going to ask Aaron to do the same thing he did

2   before.  Oh, actually, you know what?  Sorry.  First things

3   first.  I got to show you the actual doll.  I'm going to

4   bring up to you Trial Exhibit 18665.

5              Can you tell us what we're look at here?

6   A.   This is the final product of a concept I had done for

7   MGA when I worked for them in 2003.  Or when I first came to

8   work for them in 2003.  It's called Nighty-Nite.  And this is

9   one of the characters.  I believe this is Fianna.  This is

10  one of the characters.

11             She's wearing a pajama and a camisole, and she

12  comes with an extra sleep outfit and bathrobe and sleep

13  accessories like powder puff, hair brush, an extra pillow.

14  Q.   Did you design the fashions that we're looking at for

15  the Nighty-Nite doll?

16  A.   I designed the concept.  So that would include the

17  fashions, the face paint, the hair, the accessories.  And

18  some input and direction on -- or suggestions on packaging.

19  Q.   And we've talked about how you designed the Tokyo a

20  Go-Go doll and designed the Nighty-Nite doll.  When you

21  designed that doll, is it correct that you're working with a

22  sculpt that is the core Bratz fashion doll sculpt?

23  A.   Correct.

24  Q.   And what is your intent in creating the different

25  fashions and the different accessories for each one of those

Page 7247

1    blank sculpts?

2              MR. PRICE:  Object.  It's irrelevant.

3              THE COURT:  Intention.  Yes, rephrase, Counsel.

4    Q.   BY MS. AGUIAR:  When you design different fashions,

5    different face paint, different accessories to create a doll,

6    does that result in a different look?

7    A.   Yes, very much so.

8    Q.   And let me ask you something, too.  When you say that --

9    you mentioned that you are a doll designer.

10   A.   Yes.

11   Q.   And let me go back to that for a second.  Do you

12   actually design the actual three dimensional sculpt?

13   A.   Occasionally.

14   Q.   But is the majority of your responsibility at MGA to

15   design the fashions, the face paint, the accessories, to help

16   with the packaging?

17   A.   Yes.

18   Q.   Okay.  In other words, are you a sculptor?

19   A.   I'm not a sculptor.

20   Q.   And are you a person who works in engineering or

21   manufacturing to actually make the sculpt?

22   A.   No.

23   Q.   Okay.  Thanks.  I just wanted to clarify that.

24              So if we could, Aaron, put up Trial Exhibit 302

25   again.  I think having now seen it once, we won't flip

Page 7248

1    through all of the pages again, but if we could just put up

2    the first page of Exhibit 302.

3                 Are the fashions that you designed for the

4    Nighty-Nite doll different from the fashions in Mr. Bryant's

5    drawings?

6    A.   Very much so.

7    Q.   And is the face paint that you designed for the

8    Nighty-Nite doll different from the face paint in

9    Mr. Bryant's drawings?

10               MR. PRICE:  Object as ambiguous.

11               THE COURT:  Rephrase, Counsel.

12   Q.   BY MS. AGUIAR:  Is the face paint that you designed

13   different from the face paint in Trial Exhibit -- face paint

14   depicted on the dolls in Trial Exhibit 302?

15   A.   Yes, very much so.

16   Q.   And were any of the specific accessories that you

17   designed and developed for the Nighty-Nite doll taken from

18   Mr. Bryant's concept drawings?

19   A.   I have never seen the drawing on the right until about

20   an hour ago.  So I actually designed my own plastic parts for

21   the product.

22   Q.   Just a couple more questions.  You have mentioned that

23   you designed a number of dolls over the years at MGA; is that

24   correct?

25   A.   Yes.

Page 7249

1  Q.  Having now looked at the -- Mr. Bryant's pitch book
2  drawings, are any of the fashions that you have designed for
3  the different lines of Bratz dolls the same fashions that are
4  depicted in Mr. Bryant's drawings?
5  A.  No.
6  Q.  And in any of the face paint on any of the Bratz fashion
7  dolls that you have designed, were you referring to
8  Mr. Bryant's drawings in designing that face paint?
9  A.  No.
10 Q.  And, for example, you are setting down to concept what
11 you want the face decoration to look like, that what you want
12 the eye, let's say, on the Nighty-Nite doll to look like.
13 Were you looking at Mr. Bryant's drawings when you did that?
14 A.  No.
15 Q.  Did you have a specific idea in your mind of the
16 particular eye that you wanted to express in the Nighty-Nite
17 doll?
18 A.  Yes, I did.
19 Q.  And how would you describe what that eye was or the look
20 of the eye that you were going for in the Nighty-Nite doll?
21 A.  I wanted the eyes to be more expressive, to look a
22 little bit sleepier, and I also didn't want a lot of makeup
23 on the eye because she was going to bed.  And I wanted it
24 basically clean and youthful and just sort of healthy
25 looking.  That is what I wanted.

Page 7250

1   Q.   And for any of the accessories that you've designed for

2   any of the Bratz fashion dolls, did you reference

3   Mr. Bryant's concept drawings in designing those accessories?

4   A.   No.

5   Q.   And these same questions that I've asked you about the

6   fashions, the face paint, and the accessories, versus

7   Mr. Bryant's drawings, would that be true for all of the

8   dolls, the Bratz fashion dolls that you have designed for

9   MGA?

10  A.   Yes.

11          MS. AGUIAR:  Your Honor, I don't have anything

12  further.

13          THE COURT:  Very well.

14          MR. PRICE:  Your Honor, would this be a good time

15  for break?

16          THE COURT:  Oh, yes, actually it is.  Thank you,

17  Counsel.

18          All rise for the jury.

19          (Recess taken.)

20          THE COURT:  Okay.  We're on the record outside the

21  presence of the jury.  And, Mr. Nolan, you have something you

22  wanted to take up.  I want the record to clearly reflect that

23  when Mr. Nolan gave the answer "never" at sidebar, he had an

24  enormous smile on his face.

25          You may proceed, Counsel.

Page 7251

1           MR. NOLAN:  It's only because, rest his soul,

2     Judge Byrne is not here anymore.  He would disagree with me.

3           A couple of practical problems that will add to the

4     efficiency of this afternoon.  And we're off the clock.  So

5     it's helpful.

6           First of all, we have our branding expert tomorrow

7     morning.  He has to testify because of a scheduling conflict.

8     And so one of the building blocks, if you would, that we

9     wanted to put in that we attempted to stipulate, but they

10    wouldn't agree to it.

11          So we asked Heather Polk, P-O-L-K, be on our

12    witness list and be available to put in a series of documents

13    simply almost as a custodian, if you would, because she's in

14    a department known as the worldwide consumer research

15    department at Mattel.  And these are internal consumer

16    research reports maintained by Mattel in the ordinary course

17    of business.  And they track attributes of Bratz and, you

18    know, make statistical analysis and track and whatever.

19    Mr. Quinn advised me that she's not here.

20          Now, I'm not casting any aspersions on why she's

21    not here.  That's not where I'm going with this, your Honor,

22    but I needed to raise it with the Court.  One of the thoughts

23    is to talk to them about a potential stipulation to try to

24    get the documents in.  I could raise a potential issue that

25    they are going to have, and that is that these internal

Page 7252

1    research reports, your Honor, they come out on a seasonal

2    basis.  We have about 12 of them.  And what they do is they

3    measure through their own consumer research various scores

4    that they attribute to various products.  Some internal, some

5    external.  But certainly Bratz.  They track Bratz.  And we

6    would attempt to offer them into evidence if Ms. Polk was

7    here from the department.

8            I don't know whether or not there is an objection

9    to the use of these documents.  It would be easier, and then

10   we wouldn't have to call the witness.  But it's a predicament

11   that we have now.  Because we wanted to make reference to

12   them with the expert.  And she was --

13           THE COURT:  Tomorrow morning.

14           MR. NOLAN:  Yes.

15           MR. ZELLER:  Well, your Honor, last night, 8:38

16   P.M., and I can provide the Court with my Blackberry with my

17   e-mail on it providing me with the witness list, the very

18   thing I was complaining about earlier today, or at least

19   raising.  The list I was given was Garcia, Kilpin.

20           THE COURT:  Wait a second.  I want to get this

21   pinned down.  Because we're now down to -- Mattel is down to

22   two hours.  MGA is down to less than six hours.  We're down

23   to less an eight hours to go here.  So we should know how

24   this all -- we have tomorrow morning and Friday.  So

25   basically we're just going to play out tomorrow morning and

c82378c4-88ea-4514-b582-e8043d481e71

1    Friday.  I'd like to get a sense of exactly the lineup at

2    this point.  We're at the very end of the trial.  So everyone

3    should know exactly what's happening at this point.

4              MR. ZELLER:  I actually have a printout now of the

5    e-mail.

6              THE COURT:  Why don't you provide that to the

7    Court.

8              MR. ZELLER:  And this was supposed to be in the

9    order in which people were going to be called.  As the Court

10   can see from this, I mean, there are three more witnesses who

11   are in this order who have not even been called yet:

12   Mr. Eckert, Mr. Kilpin, and Aileen Storer.

13             So we did not -- we sent Ms. Polk home.  She had

14   been waiting, just as Mr. Kilpin and Mr. Eckert had been

15   waiting.  We sent her home for the day.  She can be here

16   tomorrow morning.  But that's kind of the -- where we are on

17   this situation.  And we were --

18             THE COURT:  So you sent Ms. Polk home.

19             MR. ZELLER:  I'm sorry?

20             THE COURT:  You sent Ms. Polk home?

21             MR. ZELLER:  In Los Angeles.

22             THE COURT:  And, Mr. Nolan, this is for Mr. Vilppu?

23             MR. NOLAN:  For Joachimsthaler.

24             THE COURT:  And he has something tomorrow morning?

25             MR. NOLAN:  He's going to testify tomorrow morning.

Page 7254

1    He can't be here on Friday.  That's why we're going to have

2    him testify tomorrow.

3             THE COURT:  All right.  So we could have Polk go

4    first tomorrow morning.  And how long is Mr. Joachimsthaler

5    going to go?

6             MR. NOLAN:  Possibly an hour, hour and a half, your

7    Honor.

8             THE COURT:  And Ms. Polk will take how long?

9             MR. NOLAN:  It shouldn't take very long.  These are

10   just documents.

11            THE COURT:  Why don't we take care of that tomorrow

12   morning?

13            MR. NOLAN:  Well, your Honor --

14            THE COURT:  You have about an hour and half left.

15   Who are you calling this afternoon?

16            MR. NOLAN:  I want to check with respect to a

17   ruling that you made on Mr. Farr, which I think eliminates

18   the need to call Mr. Eckert.  I just need to confirm that,

19   and it would be Mr. Kilpin.  But I wanted to raise with the

20   Court a couple of issues with respect to Mr. Kilpin ahead of

21   time so we had some guidance.  And the next in order, your

22   Honor, would be -- we want to try to put Mr. Larian on --

23            THE COURT:  Not Ms. Storer?

24            MR. NOLAN:  Based on the testimony that came in

25   today, we're not going to put her on.

Page 7255

1          THE COURT:  So Storer is gone.  Eckert, you say,

2  Mr. Eckert is not going to be called, depending on your

3  assessment?

4          MR. NOLAN:  I've just got to confirm that.

5          THE COURT:  And Mr. Kilpin is going to go for a

6  while?

7          MR. NOLAN:  He could, your Honor.

8          THE COURT:  So if we get through Mr. Kilpin today,

9  pick up tomorrow morning Joachimsthaler.  What about Kerner

10  and Mr. Larian?

11          MR. NOLAN:  We need Mr. Kerner for financial

12  documents related to the expert, Mr. Meyer, who will testify

13  on Friday.

14          THE COURT:  Okay.

15          MR. NOLAN:  And, your Honor, on Mr. Kerner, if I

16  could raise one point.  You know, there is a dispute between

17  the way the experts approach how you should make a comparison

18  between companies.  Their expert --

19          THE COURT:  I'm familiar with that.

20          MR. NOLAN:  We contend it should be addressed --

21  the profitability comparison should be made to rather than

22  Mattel as a whole, and all of its product line should be

23  limited to a particular fashion doll line.  So the financial

24  documents that we would be putting in, your Honor, are the

25  profitability numbers with respect to doll lines within

Page 7256

1    Mattel.  But I would submit it's not in any way a violation

2    of the motion in limine because it goes to a core issue on

3    damages.

4              THE COURT:  We'll take that up when we get to

5    Mr. Kerner.

6              Mr. Larian -- how long do you anticipate calling

7    him for?

8              MR. NOLAN:  Probably a half hour.

9              THE COURT:  Okay.  And then you have Mr. Vilppu on

10   Friday?

11             MR. NOLAN:  Yes, your Honor.

12             THE COURT:  And we'll have that hearing early

13   Friday morning.  And how long do you anticipate for

14   Mr. Vilppu?

15             MR. NOLAN:  My best estimate is about a half hour,

16   your Honor.

17             THE COURT:  Mr. Arons?

18             MR. NOLAN:  And Mr. -- it's Ms. Arons.

19             THE COURT:  Ms. Arons.  Okay.  And I believe that

20   would be a short witness.

21             MR. NOLAN:  And then we have a survey expert and

22   Mr. Meyer.  And both of those would be longer.  So I think

23   that we're talking about -- I think last night I was

24   estimating for the expert testimony somewhere in the range of

25   about three hours total.

Page 7257

1          THE COURT:  Okay.

2          MR. NOLAN:  And we have some videos to play.

3          THE COURT:  All right.  Let's have Ms. Polk here

4     first thing tomorrow morning.  She's not here.  She's in

5     Los Angeles.  Obviously, she can't testify.  Let's have her

6     here first thing tomorrow morning.  And you'll have her go

7     before Mr. Joachimsthaler, and I'm going to release the jury

8     at noon tomorrow.  And then we'll have all day Friday to wrap

9     up.

10          MR. NOLAN:  Right.  And may I turn to Mr. Kilpin

11     for a moment?

12          THE COURT:  That's who you're going to be calling

13     next?

14          MR. NOLAN:  But Mr. Price isn't finished with this

15     witness.  But rather than going to sidebar --

16          THE COURT:  How much longer do you have with this

17     witness?

18          MR. PRICE:  I haven't started yet.  But I've got to

19     make it short.

20          THE COURT:  Very well.  Yeah.  I understand.

21          MR. NOLAN:  Why don't we raise the issue at

22     sidebar, then, and let's just get on with the evidence.

23          THE COURT:  No, we can do this now.  What is the

24     issue with respect to Mr. --

25          MR. NOLAN:  Your Honor, I just was a little bit

1   confused by our last sidebar, and I'm sure it's just me,

2   because earlier in the day I thought that we had established

3   that within reason, being able to look to Mattel's comments

4   and observations with respect to Bratz would be relevant with

5   respect to some of the components of apportionment would be

6   relevant.  And what Mr. Kilpin and his department --

7             THE COURT:  What I ruled -- I'm not saying that I'm

8   not going to get there, but let's be careful about what I

9   ruled earlier.  You're talking about my decision on Farr?

10             MR. NOLAN:  My understanding about what the issue

11   would be that we would need to address when we got to

12   Mr. Kilpin, that his testimony would be relevant to the

13   apportionment issues.

14             THE COURT:  Yes.

15             MR. NOLAN:  And that Mattel's statements, if you

16   would, or beliefs or observations with respect to certain of

17   those components of apportionment would be relevant.

18             THE COURT:  Yes, depending on what the statements

19   are, right.

20             MR. NOLAN:  And what I was going to propose with

21   Mr. Kilpin, it's almost like going to Hong Kong for a moment,

22   if you would, and that is that what I would propose is that

23   we would try to be careful in what documents we put up and

24   that only those pages of a particular document that we

25   believe has a relevant statement with respect to Bratz would

Page 7259

1    come in, and then we would later redact and put into

2    evidence.  And I wanted to give the Court a heads up.

3            THE COURT:  Right.  I did that earlier with the

4    Farr deposition because there's really no way of doing the

5    videotaped deposition which has language quoted from a

6    document without having that document language quoted.

7            If the document itself has no relevance other than

8    it has introductory language, then I'm not likely to allow

9    the document in.  If you can ask these questions without

10   reference to the documents that are only coming in to provide

11   a context or a basis to ask the question, kind of your good

12   faith basis to explore the area, that's not going to be a

13   sufficient basis to get the documents in.  I would --

14           MR. NOLAN:  I believe I understand that.

15           THE COURT:  I'm thinking in the abstract of the

16   Farr deposition.  All of those questions that were asked of

17   Mr. Farr could have been asked without a single reference to

18   those 10-K documents or anything else.  And they probably

19   should have been.  But because we're dealing with a video

20   deposition, there's nothing I can do.  Here it's live

21   testimony.  So I'm much less likely to allow documents in

22   that are not relevant.

23           MR. NOLAN:  Right.  Here is the proffer I'll make.

24   Mr. Kilpin is the author of marketing reports within Mattel

25   and that at various times, one purpose for offering this

Page 7260

1    evidence is to show that Mattel at some point in time was

2    recognizing that their brand was in a state of decline

3    similar to what Mr. Eckert was --

4              THE COURT:  It's not coming in.  I can tell you

5    that right now.  If that's what the document says, it's not

6    coming in.

7              MR. NOLAN:  Okay.  Let me just round it off --

8              THE COURT:  What I'm trying to say, it's not

9    relevant what's going on over at Mattel.  Certainly a Mattel

10   employee who is on record or a senior Mattel employee who is

11   on record saying that themes or branding or packaging is

12   important cannot now hide from that statement.  You have a

13   right to bring that out.

14             But in doing so, that doesn't give you a right to

15   bring out documents that go and comment on the state or the

16   condition of Mattel.  That's where we cross that 403 boundary

17   into something that is both confusing and prejudicial.

18             MR. NOLAN:  I understand that.  Your Honor, just so

19   I can make this record and make it in two sentences, I think.

20   One is that we believe that those kinds of comments, and the

21   Court is well aware of those documents because we've referred

22   to them before, are relevant to the weight, if you would, to

23   be given to packaging and promotional efforts and marketing

24   and all of that when Mattel was faced with difficulties in

25   the market concerning their sales.

Page 7261

1           It shows the importance of doing the, what I would

2      describe the apportionment side of the analysis.  And for

3      instance, Mr. Kilpin, and I took his deposition, I believe

4      his testimony would be that at no time while they were trying

5      to address the declining market share did they ever make any

6      changes in the physical appearance of the doll or the face.

7           So my proffer would be that in addressing the

8      issues that they were faced, Mattel did not make any changes

9      to the facial expressions of either Barbie or My Scene or

10     Flavas.

11          THE COURT:  Counsel, I understand your position.

12     You've been urging this on the Court for months now and have

13     made every effort to get this evidence in.  The importance of

14     what you describe as the apportionment side of the analysis

15     can be completely explored with Mr. Kilpin and any number of

16     other witnesses without getting into the underlying Mattel is

17     in crisis.  Mattel is on fire.  Barbie is on fire.  Barbie is

18     a disaster.

19          All of that stuff is irrelevant and prejudicial.

20     You can get into this fully and have them explain what's

21     important and what's not important, why they think it's

22     important, all of that, how it affects the bottom line, how

23     it affects sales, how it affects marketability.  You can get

24     into all of that without getting into what you've been trying

25     to get in since your opening statement in Phase 1-A.

Page 7262

1      And I can't explain how that's not going to come in

2  any more than I have.

3          MR. NOLAN:  No, but this is the last --

4          THE COURT:  This is your last effort.  Okay.

5          MR. NOLAN:  I mean, I just wanted to make

6  absolutely clear.

7          THE COURT:  It's not coming in still.

8          MR. NOLAN:  I understand.  But he would also be

9  available -- I mean, he'd be able to testify to the

10  observations that he made with respect to the success of the

11  Bratz.

12          THE COURT:  I'm not really sure what those are, but

13  I'll consider those in context.

14          MR. NOLAN:  Would the Court entertain possibly a

15  redaction of everything out of the marketing reports,

16  everything out of the marketing reports except what is

17  referenced to Bratz and only Bratz?

18          THE COURT:  I'll have to take a look at that,

19  Counsel, but I think it would be the easier thing to do.

20          Mr. Zeller?

21          MR. ZELLER:  Briefly on the issue of Mr. Kilpin.

22  One thing that was said at sidebar is getting into all of

23  these other things about competitive shopping and that sort

24  of thing, that's obviously from our perspective, that's just

25  403 material.  If they want to ask the kinds of questions

Page 7263

1    that I think the Court has already made clear can be asked, I

2    mean, there's no need to go into that sort of thing.  And it

3    just leads us right back to the same problem of what we were

4    discussing at sidebar.  It's no answer to any of this.

5              THE COURT:  Well, again, it's something that the

6    Court is going to balance.  Part of the relevancy of this

7    might be in terms of foundation.  So the more you stipulate

8    to in terms of foundation, or the less you object to in terms

9    of foundation, the less likely we're going to have to go down

10   this particular road.

11             But you can't have your cake and eat it too, as

12   Mr. Nolan has stated before, and object on foundation,

13   because foundation could rip the covers off of this

14   basically, and then we'd have to get into, well, how do you

15   know this?  Well, we've had experience with Bratz and, you

16   know, et cetera, et cetera.

17             I'm trying to balance these things because I do see

18   the prejudice.  I do see the confusing nature of getting into

19   too much of this statement.  I believe these witnesses are

20   very competent based on precisely their experience with

21   Barbie, based on their experience with all of these other

22   things, to testify on these issues of apportionment which are

23   properly before the jury.  So that's the balancing.  Make

24   your objections, no speaking objections, I will rule on them,

25   and we will move forward.

1        MR. ZELLER:  And what I would say, your Honor, is

2   that Mr. Nolan isn't quite correct when he says that somehow

3   that's based on, you know, looking at the products.  And even

4   if it is, that I do wonder to what degree there is any basis

5   for introducing such evidence, even with an experienced

6   business person.  Saying well, I looked at a product, and I

7   thought that it was successful for X, Y, and Z.  That is, I

8   think, not only 403, it is itself a foundational problem.

9        So I mean the issue wouldn't be so much, gee, you

10  know, you looked at Bratz products.  I mean, that presumably

11  is going to be a question, presumably would be something that

12  as part of the foundation may or may not be discussed.  But I

13  somewhat -- part of my concern is that if that's really the

14  proffer for foundation, I'm highly skeptical that that is

15  really admissible evidence.

16        THE COURT:  No, the foundation goes well beyond

17  that, Mr. Zeller.  It gets into precisely these issues that

18  the Court has found is prejudicial to bring in.  But if we

19  need to have the jury educated on precisely how Mr. Kilpin

20  arrived at his conclusions, I think that would necessarily

21  involve him getting into issues of the various downturns in

22  Mattel and the problems that they have had.  And I think it

23  should be avoided for the 403 grounds, but the conclusion of

24  that is not to keep it out entirely because I think that

25  would be unfair to MGA.

Page 7265

1          MR. ZELLER:  And the other aspect --

2          THE COURT:  You understand the balance I'm trying

3    to strike here?

4          MR. ZELLER:  I absolutely do, your Honor.  I

5    absolutely see it.  And the other issue, your Honor, and if I

6    could have the Court's guidance on this, is the Court is

7    aware that they have determined that they are going down this

8    path that is going to necessarily lead to the jury hearing

9    about MGA's trade secret theft.  They are going to put

10   Mr. Kilpin on, and the questions that they are going to ask

11   him, based on everything that Mr. Nolan has said, is going to

12   put this in front of the jury.

13         So I would like some guidance as to whether, you

14   know, when this happens, you know, should we have a sidebar,

15   should we have further discussion about it, that they are

16   going to ask him questions that are going to elicit this.

17         THE COURT:  I don't know if he is or he's not.

18   Certainly the issue is out there.  You've fronted it.

19   There's not going to be any surprises.  We'll see how the

20   testimony plays out.

21         MR. ZELLER:  It was actually what Mr. Price had

22   explained earlier today, which is when they ask him this

23   question about the document that Mr. Nolan has repeatedly

24   referred to about, you know, out executed and out thought,

25   the phrase that Mr. Nolan uses over and over, that is exactly

c82378c4-88ea-4514-b582-e8043d481e71

Page 7266

1    what's going to lead to it.  And Mr. Price had explained that

2    earlier.  So --

3              THE COURT:  I understand.

4              MR. ZELLER:  I know obviously the Court wouldn't be

5    surprised.

6              THE COURT:  It's on the record.  And I hope we

7    don't go down that road.  I've done everything I can to keep

8    the -- to respect the boundaries of Phase 1 and Phase 2.  And

9    it's up to counsel.

10             MR. ZELLER:  Thank you, your Honor.

11             The last point would I make, and this if it's an

12   administrative matter.  We're certainly hoping that we will

13   save some time for a very short rebuttal case.  We would

14   potentially put our damages expert back up as well as

15   Mr. Hollander.  The Court had made a ruling about

16   Mr. Hollander for purposes of our case in chief.  We think

17   that they have put at issue exactly what it is that that

18   survey goes to.

19             That's all I have.

20             MS. AGUIAR:  Then we need to schedule a time for a

21   hearing on Mr. Hollander because we have a motion in limine.

22             THE COURT:  We're not getting to it today.  We are

23   now eating jury time.  Please, let me bring in the jury.

24   Mr. Proctor, the same to you unless you've got something that

25   has to come up right now.

Page 7267

1          MR. PROCTOR:  There's one objection to Mr. Farr's

2     deposition which I believe may have been overlooked.

3          THE COURT:  Are we playing Mr. Farr's deposition?

4          MR. PROCTOR:  That's up to MGA.

5          MR. NOLAN:  Not this afternoon.

6          THE COURT:  Okay.  Not this afternoon.  So please,

7     let's bring the jury in.  I'll take up all of this at the end

8     of the day.

9          (WHEREUPON THE JURY ENTERS.)

10          THE COURT:  Counsel, you may proceed.

11               CROSS-EXAMINATION

12     BY MR. PRICE:

13     Q.   Mr. Domingo, when did you start working for MGA?

14     A.   That would be July 2003.

15     Q.   So that was a number of years after Mr. Bryant gave to

16     MGA these drawings; right?

17     A.   I'm not sure exactly when Mr. Bryant started.  I would

18     say a couple of years at the least.

19     Q.   And you told us that you didn't see his drawings, but

20     you were familiar with the dolls that MGA had, the Bratz

21     dolls; correct?

22     A.   From having been at the stores, correct.

23     Q.   And then once you started working there, you became

24     familiar with the dolls as well; right?

25     A.   Yes.

1  Q.   And in your designs of the dolls, one thing you had to

2  do is make sure that whatever design you did, it still looked

3  like a Bratz doll; right?

4  A.   That it still fitted the 10-inch doll with the existing

5  sculpt, correct.

6  Q.   Well, and that it didn't look that much different from

7  the other Bratz dolls so that people would say that's not

8  even a Bratz doll.

9  A.   I wouldn't say that's accurate, sir.

10 Q.   For example, you couldn't do -- if you look at

11 Exhibit 13721, that's that big one there.  If we could put up

12 13722.  Assume that was the same size as a Bratz doll, the

13 same height.  If we can put up the photograph.

14          For example, you wouldn't do a face like that for a

15 Bratz doll; right?

16 A.   Well, this is not a pretty face.  So no, I wouldn't,

17 sir.

18 Q.   Well, luckily dolls can't speak.  Let's go to another

19 one.  We'll see if you think that's pretty.  Look at 13695.

20 That Mini Trendy Teens doll.  If we can put up 13696.

21 Assuming this were the same size as a Bratz doll, this is

22 still not something that you would consider doing, pretty or

23 ugly, as a Bratz concept; correct?

24 A.   Not this execution, sir, no.

25 Q.   And, in fact, if we look at your execution, and if we

c82378c4-88ea-4514-b582-e8043d481e71

Page 7269

1    could put up Exhibit 14018, the Tokyo doll.  Do you see that?

2    And you said you drew some concept drawings for that doll;

3    correct?

4    A.    Correct.

5    Q.    And the concept drawings have a much more extreme look

6    than the doll; right?

7    A.    Yes.

8    Q.    So, for example, if we can split this into two, we have

9    14018.  If we can put up 18920, which are your drawings.  We

10   can start with the second page, I think.  Let's start with

11   the fourth page.

12            And if we could flip through here, Ken.

13            I mean, it's fair to say that none of these

14   drawings look substantially similar to the doll that was

15   created by MGA; is that right?

16   A.    Well, let me just explain something.  We use two

17   sketches in the industry.  One is called a conceptual sketch,

18   and one is called a developmental sketch.  My sketches are

19   concept sketches in that it does not contain enough

20   information to be able to execute it exactly like this.  It

21   is not a control drawing, sir.

22   Q.    Let's look at this.  You see how you have these eyes and

23   the very, very large lips here?

24   A.    Yes.

25   Q.    Okay.  I mean, that wasn't the way it was translated to

Page 7270

1    the actual doll; correct?

2    A.   Again, it is a concept sketch, not intended to be inch

3    by inch or quarter inch by quarter inch the exact translation

4    of the 3D.

5    Q.   So the answer to my question is I'm correct.  That none

6    of these drawings here that we have in 18920, which you

7    presented to us, look substantially similar to the Bratz

8    product; correct?

9    A.   It was not intended to be.

10   Q.   You've not answered my question.  They don't look

11   substantially similar, do they?

12   A.   No.

13   Q.   And if you look at the shape of the eyes, the lips, the

14   head, those aren't the eyes and lips and head that are going

15   to go on a Mainline Bratz doll; correct?

16   A.   That's not even the hairstyle.

17   Q.   But I asked you about the others.  That is, you could --

18   you wouldn't put those eyes and that size lips proportionally

19   on a Mainline Bratz doll.

20   A.   It's hard to say, sir.  Because until I actually see

21   what that looks like in 3D, then I can say I wouldn't do it

22   or would do it.  The control point is the process, as you go

23   along.  It's sort of evolutionary.

24   Q.   Well, it's fair to say you didn't do it.  That is, you

25   did not -- when you were doing your designs, you didn't put

Page 7271

1   this look that we have in 18920 on the doll.

2   A.   That's not the outcome.   Correct.   You're right.

3   Q.   And, in fact, I put in front of you up there, I think

4   it's Exhibit 17558.   It's one of the original Sasha dolls.

5   Do you see that?

6   A.   Yes.

7   Q.   And maybe we can put up a picture of that that MGA used

8   this morning.   And then if you would hold up the dolls to the

9   jury.   Maybe they can see the dolls for themselves.   And then

10  put your Tokyo a Go-Go doll up.   And you'll agree that those

11  two dolls look more similar to each other than the Tokyo a

12  Go-Go doll looks to the drawings in 18920.

13  A.   Can I see the drawings of 18920?

14  Q.   I think you have them in front of you.   Those are the

15  ones you did which were the concept drawings.

16  A.   18920 is a boy doll.

17  Q.   You see your concept drawings which your counsel took

18  you through?

19  A.   Okay.   Let me look for that.   I'm sorry, sir.   Could you

20  repeat the question?

21  Q.   You'll agree that those two dolls look much more similar

22  to each other than your Tokyo a Go-Go doll looks to the

23  drawings that you said it was based on.

24  A.   I beg to differ, sir.   Conceptually this is far more

25  similar.   But I can see your point in that as a doll, they

c82378c4-88ea-4514-b582-e8043d481e71

Page 7272

1   are both 10 inches in this size of package.  Yes, they are

2   similar.  They are 3D to 3D.

3   Q.   Just so we have your testimony since you do disagree on

4   some level.  The way you look at it, the doll on the right

5   here is less similar to the Tokyo a Go-Go doll than -- if we

6   can put up 18920 -- than your sketches were, which are 18920;

7   is that right?  Just from your viewpoint?

8   A.   Correct.  In terms of general look and colors and the

9   general feel that when you look at the doll, the sketch is

10  far more similar to the Tokyo a Go-Go doll than this exhibit.

11  Q.   You said that you had designed a lot of dolls at MGA;

12  correct?

13  A.   Yes, sir.

14  Q.   Now, for all of that work to date, have you been paid in

15  the neighborhood of, say, $30 million?

16  A.   No, sir.

17  Q.   More than a million?

18  A.   No, sir.

19            MR. PRICE:  I won't get any further.  Thank you.

20            MS. AGUIAR:  Nothing further, your Honor.  Thank

21  you.

22            THE COURT:  Very well.  You are excused.

23            THE WITNESS:  Thank you.

24            THE COURT:  Next witness.

25            MR. NOLAN:  MGA calls Timothy Kilpin.

Page 7273

1          THE CLERK:  Please remain standing.  Raise your
2     right hand.
3                    TIMOTHY KILPIN, SWORN.
4          THE CLERK:  Please be seated.  Please state your
5     full name, and spell your last name for the record.
6          THE WITNESS:  Tim Kilpin, K-I-L-P-I-N.
7                    DIRECT EXAMINATION
8     BY MR. NOLAN:
9     Q.   Good afternoon, Mr. Kilpin.
10    A.   Hello.
11    Q.   You testified in Phase 1-A, when we went over your
12    background.  I just want to touch upon a couple of things to
13    put this back in perspective for us.  You are currently
14    employed by Mattel?
15    A.   Yes.
16    Q.   And you are currently involved with the boys division;
17    correct?
18    A.   That's right.
19    Q.   But prior to being assigned to the boys division, you
20    were involved in the girls division?
21    A.   That's correct.
22    Q.   And, in fact, your title was senior vice-president,
23    girls marketing and design; is that correct?
24    A.   Yes.
25    Q.   And could you tell the jury during what period of time

Page 7274

1    you served as the senior vice-president, girls marketing and

2    design?

3    A.   That was from October of 2003 to October of '05.

4    Q.   Is it fair to say that before you had the title of

5    senior vice-president of girls marketing design, most of your

6    career has been focused on marketing of various consumer

7    products?

8    A.   Well, I ran for a number of years the Disney business at

9    Mattel, which included marketing, design, engineering, all of

10   those aspects.  And then when I was at Disney, I ran the

11   category management for all of the toy business there.

12   Q.   And you also worked for a period of time for Tonka Toys?

13   A.   Yeah.  For about three years back in the late 80's.

14   Q.   And you were a product manager at Tonka Toys?

15   A.   Yes.

16   Q.   And was one of your areas of responsibility there

17   marketing?

18   A.   Yes.

19   Q.   Now, in total how many years have you worked for Mattel

20   off and on?

21   A.   About 17 years in total.

22   Q.   And would it be fair to say that for those entire seven

23   years, your area of focus has always been marketing?

24   A.   You said seven years?

25   Q.   17.

c82378c4-88ea-4514-b582-e8043d481e71

Page 7275

1    A.    17 years.  Well, actually, from '95 to '99 it was as a

2    general manager.  So that included marketing, design,

3    engineering.  And then from the time that I came back in 2003

4    until today, that's been the same thing, now marketing and

5    design.

6    Q.    One of your responsibilities as senior vice-president

7    girls marketing and design was to oversee the marketing for

8    Barbie?

9    A.    Yes.

10   Q.    And also overseeing the marketing for the doll line My

11   Scene?

12   A.    Yes.

13   Q.    And also overseeing the marketing for a line called

14   Flavas?

15   A.    No.  As a matter of fact, I did not work on that.

16   Q.    Okay.  So that was either before your time or after your

17   time in the girls division?

18   A.    I was not there when that was being done.

19   Q.    Do you know when Flavas was entered into the market?

20   A.    I think it was before my time.

21   Q.    You think it was before 2003?

22   A.    I don't know.

23   Q.    But in any event, to your knowledge it wasn't being

24   sold -- Flavas was not being sold by Mattel during the period

25   of time you served as the senior vice-president of the girls

Page 7276

1    marketing and design; is that correct?

2    A.    Not during my time.

3    Q.    And I assume at various times in your capacity as senior

4    vice-president in charge of girls marketing and design at

5    Mattel, you would prepare marketing reports?

6    A.    Well, usually I didn't prepare marketing reports.  My

7    teams did.

8    Q.    And you would review those?

9    A.    Yes.

10   Q.    And can you just give us some general background on

11   marketing 101 maybe?  And that is why does a company prepare

12   marketing reports or do analysis of marketing plans?

13          MR. ZELLER:  The question is vague.

14          THE COURT:  Overruled.  You may answer.

15          THE WITNESS:  Well, it is a pretty broad question.

16   Generally speaking a company is providing -- supporting a

17   product line with marketing to help sell that product to the

18   customers, the trade, the retailers, and then to sell it

19   through to consumers.

20   Q.    BY MR. NOLAN:  How often would Mattel prepare marketing

21   reports?

22   A.    When I was running that particular group, we didn't have

23   a set process for that.  We probably did it a couple of times

24   a year.

25   Q.    And how many people would be involved in the preparation

Page 7277

1    of the marketing reports?

2    A.   Well, I had a group -- what time frame are we talking

3    about?

4    Q.   During the time that you were the senior vice-president

5    in charge of girls marketing and design for such things as

6    Barbie and My Scene?

7    A.   At that time I had a group that was probably about 10 or

8    12 people that were responsible for marketing.  So they would

9    be the ones working on those plans.

10   Q.   And when did you leave the girls division?

11   A.   October of 2005.

12   Q.   And what were the circumstances by which you were moved

13   out of the girls division?

14        MR. ZELLER:  Relevance.

15        THE COURT:  Sustained.

16   Q.   BY MR. NOLAN:  During the period of time that you were

17   overseeing the marketing for Barbie and My Scene, did you

18   engage in any competitive analysis?  In other words, what

19   your competitors' products were doing?

20   A.   Well, yes.  Typically we would look at the competitive

21   set on a regular basis.

22   Q.   And the competitive set during the period of time that

23   you were there in the girls division, 203 and 2005, included

24   Bratz; correct?

25   A.   Yes, it did.

Page 7278

1   Q.   And when was the first time you heard or learned of the

2   Bratz doll line?

3   A.   Well, I guess that would have been sometime in 2001.

4   That was when I was at Disney.

5   Q.   And what were the circumstances by which you became

6   aware of the Bratz line?

7   A.   I don't remember that specifically in terms of when I

8   first saw it.

9   Q.   When you saw it, where were you?

10   A.   I honestly don't remember.

11   Q.   Do you remember whether or not you visited one of the

12   New York toy shows?

13   A.   Well, yes, I used to go there pretty regularly.

14   Q.   Do you recall seeing the Bratz line for the first time

15   at the New York Toy Fair?

16   A.   I remember visiting the MGA showroom at New York Toy

17   Fair one year.  I don't know if that was the first time I saw

18   it or not.

19   Q.   Okay.  And who were you employed with at that time?

20   A.   Disney.

21   Q.   What was your overall impression of the Bratz line when

22   you first saw it in 2001?

23   A.   I thought the product looked fresh.

24   Q.   What do you mean by the word "fresh"?

25   A.   I thought it looked different.

Page 7279

1   Q.   Different from what?

2   A.   Different from anything else that I had seen in that

3   range before.

4   Q.   Now, prior to 2001, when you were working at Disney, can

5   you give us just a time frame as to when you had previously

6   worked at Mattel?  In other words, you went from Mattel to an

7   Internet company, and then to the Disney company; is that

8   correct?

9   A.   Yes.

10   Q.   So when did you leave Mattel to go to the Internet

11   company?

12   A.   I left Mattel in October of 1999.

13   Q.   So when you said that when you saw Bratz in 2001 and

14   thought it was fresh, is it correct that you had never seen

15   anything like that at Mattel?

16   A.   Not that I could recall, no.

17   Q.   Do you recall having a conversation with Mr. Larian in

18   2001 concerning the Bratz line?

19   A.   No, I don't know that I talked to him in 2001.  I think

20   when I went to Toy Fair it was early to 2002.

21   Q.   In any event, you recall having a conversation with

22   Mr. Larian concerning the Bratz line?

23   A.   Well, Mr. Larian toured me through his showroom.

24   Q.   And what did you tell Mr. Larian while you were looking

25   at the Bratz line?

Page 7280

1        MR. ZELLER:  Hearsay, relevance.

2        THE COURT:  Sustained.

3   Q.   BY MR. NOLAN:  After some period of time working at

4   Disney, were you recruited back to join Mattel?

5   A.   Well, I think we talked about this last time.  I went

6   back to Mattel in October of '03 and left Disney at that

7   time.

8   Q.   And you interviewed with Mr. Eckert for your position,

9   correct, when you returned to Mattel?

10  A.   I actually interviewed -- I recall interviewing with

11  Alan Kaye and with Matt Bousquette.

12  Q.   And when you interviewed with Matt Bousquette and Alan

13  Kaye, you knew you were being considered for a position of

14  senior V.P. for marketing of Barbie and the My Scene line;

15  right?

16  A.   Well, for marketing and design, yes.

17  Q.   And just curious, during any of those interviews, did

18  you have any discussions with respect to the competitive

19  products that Barbie and My Scene were competing with?

20       MR. ZELLER:  Asked and answered.

21       THE COURT:  Curiosity is not a good basis, Counsel.

22  Sustained.

23  Q.   BY MR. NOLAN:  At the time you took the position back at

24  Mattel in October 2003, did you understand that Bratz was

25  competing with a Mattel product?

c82378c4-88ea-4514-b582-e8043d481e71

Page 7281

1    A.    At the time I went back to Mattel?

2    Q.    Yes.

3    A.    Yes.

4    Q.    Did you undertake any analysis, competitive analysis of

5    the Bratz line at that period of time?

6    A.    What I recall doing, when I came back to Mattel, was

7    asking my team for a summary of the business overall, which

8    would include what was happening at retail, what was

9    happening with the product, the marketing, and, you know,

10   what was happening competitively.

11   Q.    Now, in this area of questioning, I'm not asking you

12   about any analysis that you asked your team to do with

13   respect to Barbie or My Scene.  All right?  I'm only limiting

14   my questions to Bratz.  Do you understand that?

15   A.    Okay.

16   Q.    So was one of your tasks to your team to analyze the

17   Bratz line?

18   A.    Well, yes.  As part of what we were competing against,

19   we would have been looking at Bratz.

20   Q.    And what particular elements of Bratz were you looking

21   at?

22   A.    I don't know that I can pinpoint it.  I think we looked

23   at every aspect of what we were competing against.

24   Q.    Well, for instance, did you look at the packaging?

25   A.    We would have looked at every aspect, I would imagine.

Page 7282

1    Q.   So when you say every aspect, from a marketing person

2    employed at Mattel, tell me what all those aspects are.

3    A.   Well, I would have looked at the product first and

4    foremost, in terms of what the product line looked like.  And

5    then from there we would have talked about the other aspects,

6    the advertising, the packaging, its retail presence.

7    Q.   So you would look at the product, advertising,

8    packaging, and something you called retail presence.  I want

9    to get back to that in a moment.  But any other aspects you

10   looked at?

11   A.   Those would have been the main things.

12   Q.   And for what reason did you conduct that type of

13   competitive analysis?

14   A.   Well, we would do that as a matter of course.

15   Q.   And why would you do that as a matter of course?

16   A.   Well, I -- any person competing in any business would

17   look at the competitive set to understand what was going on

18   in the marketplace.  So it was normal practice.

19   Q.   A practice that you had participated in for a number of

20   years while employed at Mattel, Tonka Toys, and Disney;

21   correct?

22   A.   Yes.

23   Q.   You talked about retail presence as one of the aspects.

24   And it's a term that I don't think has come up in the court

25   trial.  So let's just put some context on that.  What do you

Page 7283

1    mean by the retail presence of Bratz?

2    A.    Well, when I say retail presence in general, what I'm

3    talking about is how the product line looks on a shelf, where

4    it's placed in the store, where it's placed on the shelf, how

5    much footage it might have.  We'd look at all those things.

6    Q.    And why are those factors important to consider in

7    marketing?

8                MR. ZELLER:  Relevance.

9                THE COURT:  Seems to be beyond the control of --

10   you're talking about the factors in the --

11               MR. NOLAN:  I can lay a better foundation.

12               THE COURT:  Please do.

13               MR. NOLAN:  Thank you.

14   Q.    You talk about retail presence is where packaging or

15   product are placed on the shelf.  Does Mattel make efforts to

16   try to get the best position in retail stores for its

17   products?

18   A.    We usually don't have much to say about that.  That's

19   usually the choice of the buying staff at a retailer.

20   Q.    And based on your experience, how do the buying staff at

21   the various stores make the decisions with respect to product

22   placement, shelf placement?

23   A.    They usually make those decisions based upon how well

24   the product happens to be selling at that time.

25   Q.    So the fact that -- did your people make a -- come to

Page 7284

1    any conclusions or report anything to you with respect to the

2    retail presence of Bratz during the period of time that you

3    were in charge of the girls division?

4    A.    I don't recall anything specific about any conclusions

5    we reached about that at that time.

6    Q.    Just generally speaking, did you have the view that the

7    Bratz products were enjoying strong retail presence, good

8    shelf positioning?

9    A.    Generally, yeah.

10   Q.    Would you agree with me, sir, that the same product,

11   same consumer toy, could sell differently, depending on its

12   placement in the retail shelf?

13             MR. ZELLER:  Relevance, calls for speculation,

14   vague.

15             THE COURT:  You need to lay a foundation, Counsel.

16   Q.    BY MR. NOLAN:  Do you have -- in your opinion, do you

17   have -- well, let me ask you this:  Does Mattel care, for

18   instance, where Toys-R-Us puts Barbie?

19             MR. ZELLER:  Relevance.

20             MR. NOLAN:  It's foundation.

21             THE COURT:  No.  Sustained.  You are asking whether

22   they care.  That's not foundation, Counsel.  Sustained.

23   Q.    BY MR. NOLAN:  Is the product placement in the retail

24   stores a factor that you consider to be important to track?

25   A.    The placement in the stores is something we certainly

Page 7285

1    discuss with the buyers.  We typically don't have a lot of

2    control over that.  And what we will typically hope for are

3    things like placement on an end cap, for example.  So that

4    it's good placement.  But again, it's usually a buyer's

5    decision.

6              THE COURT:  An end cap being?

7              THE WITNESS:  I'm sorry.  An end cap being the end

8    of an aisle display.

9    Q.   BY MR. NOLAN:  And in your experience, why do you --

10   would you prefer to have your product on an end cap of an

11   aisle or on the bottom shelf of an aisle?

12   A.   Well, typically an end cap or an end of aisle display is

13   better just because there's more traffic.

14   Q.   And does more traffic generally lead to more exposure

15   for a product?

16   A.   Generally, yes.

17   Q.   And so would it be natural that if you had a better

18   position, more traffic, you would likely have more sales?

19   A.   It depends.  Not necessarily all the time.  It depends

20   on the product, of course.

21   Q.   Of course.  Is it your view and your experience that a

22   product that is on the end shelf -- I'm sorry.  The end cap

23   of an aisle generally sells better than a product stuck on a

24   shelf somewhere in the aisle?

25             MR. ZELLER:  Asked and answered.

Page 7286

1    THE COURT:  Sustained.  Move along, Counsel.

2    Q.   BY MR. NOLAN:  So one of the things that you looked at

3    was where Bratz was positioned in the retail stores; correct?

4    A.   It was one of the things, yes.

5    Q.   And you also mentioned the product, that that was one of

6    the aspects that you would study from time to time; is that

7    correct?

8    A.   Yes.

9    Q.   Now, what do you mean by product?

10   A.   The product.  The actual dolls.

11   Q.   The actual dolls themselves or the dolls within the

12   package?

13   A.   We would look at both.

14   Q.   Would you ever just look at the naked mold of the doll?

15   A.   Can you -- what do you mean by naked mold?

16   Q.   I feel like an expert on this one.  I should be able to

17   hit this one out of the park.

18        I'm going to show you Exhibit 18858, which for the

19   record I'll describe generally as a naked mold.

20        Do you see that?

21   A.   Yes.

22   Q.   And I assume in your job, sir, you've seen naked

23   product; correct?

24   A.   Yes.

25   Q.   Nothing to be shy about.  My question, sir, is in any of

1    the assignments where you were asking your people to analyze

2    competitors' product, did you ever ask them to undress the

3    products and look at the naked mold?

4    A.    I can't ever recall doing that, no.

5    Q.    Now, you talk about the doll packaging.  What about

6    fashions?  You used to be in a department that was called the

7    fashion doll department; right?  More or less.  Barbie's

8    fashion doll?

9    A.    That was one of the categories we did, yes.

10   Q.    All right.  Barbie is a fashion doll.  My Scene is a

11   fashion doll.  Bratz is a fashion doll; right?

12   A.    Yes.

13   Q.    Is it your view, when you were the senior

14   vice-president, that fashions on fashion dolls drive sales?

15   A.    I would tend to look at it as the aesthetic of the doll,

16   and you would look at the doll, the shape, the style, the

17   fashions, the hair.  You'd look at all of those elements of

18   the aesthetic of the doll.

19   Q.    So when you use aesthetics, you're referring to all of

20   the elements that you just articulated for us; right?

21   A.    Of the doll, yeah.

22   Q.    Okay.  Now, the idea would be to, I assume, in

23   marketing, to try to develop plans which would cause a

24   consumer to buy more than one doll; correct?

25   A.    Well, that's usually a good thing, yeah.

Page 7288

1   Q.   Let me ask you this:  When you were in the girls

2   division, do you recall ever directing a design change to the

3   naked sculpt of any of the doll products that you were trying

4   to market?

5   A.   No, I don't believe I ever did that.

6   Q.   Let's stay on fashions for a moment.  Fashions are one

7   of the elements of the aesthetic qualities that you were

8   looking at of the competitors; is that correct?

9   A.   I would view that as part of it, yes.

10  Q.   Would you consider fashions to be a significant

11  component of the overall aesthetics of the doll?

12          MR. ZELLER:  The question is vague.

13          THE COURT:  As you define aesthetics.

14  Q.   BY MR. NOLAN:  As you define aesthetics.

15          THE COURT:  Overruled.

16          THE WITNESS:  I tended to look at all of it.  I'd

17  look at the combination.  As a team, we would look at all

18  those elements and talk about the aesthetic and its total

19  impact.

20  Q.   BY MR. NOLAN:  Is that because you believe that the

21  fashions were of equal importance in terms of the overall

22  success of the doll?

23  A.   I don't know that I'd characterize it that way

24  necessarily.

25  Q.   How would you characterize it?

Page 7289

1    A.    Part of the total package, as I said.

2    Q.    Is it an important component of the overall packaging,

3    the fashions?

4    A.    Sure.  Just like the hair and the other elements.

5    Q.    So let's just stay with fashions for just a moment.

6    During the period of time that you were in the girls division

7    at Mattel, did you ever instruct your department to just use

8    the same fashions season after season after season?

9    A.    No.  I don't believe I did.

10   Q.    So if you changed the fashions each season -- did you

11   change the fashions each season?

12   A.    I -- you know, I can't really answer how often we

13   changed the fashions.  We change them all the time.  I don't

14   know exactly how often we do that.

15   Q.    And why would you change the fashions all the time?

16   A.    Well, one of the things we always wanted to do across a

17   product line generally is to always have it look fresh and

18   different on a shelf.  So that every time a girl might come

19   to the shelf, they'd see something fresh and different.

20   Q.    And why did you think that was important?

21   A.    Just made it more interesting to shop.  Made it more

22   likely that a girl might buy more than one.

23   Q.    Is that the ultimate goal, to try to get them to buy

24   more than one?

25   A.    It's not the ultimate goal.  It's one of the goals.

Page 7290

1    Q.   Setting aside fashions for a moment, let's go to another

2    element on the aesthetics.  Give me another element that made

3    up your definition of aesthetics.  We've talked about

4    fashions.

5    A.   Well, I mentioned the hair.

6    Q.   Let's talk about the hair for a moment.  On the doll

7    lines that you were marketing at Mattel, did you change the

8    hairstyles, or did you keep the same hairstyle each year?

9    A.   I'm sure we changed the hairstyles quite a bit.

10   Q.   And why?

11   A.   Well, for the same reasons we were just talking about in

12   terms of the fashions.  Different looks, variety.

13   Q.   Why are different looks and variety important in your

14   mind to the overall success of the doll line?

15   A.   I think it's part of making it look appealing.

16   Different looks for different girls, for example.

17   Q.   You think it's possible that or likely that if you

18   change the hair on the doll, even though other features

19   remain the same, that consumers may buy another doll because

20   of the hair?

21   A.   I don't know about that.  It kind of goes back to what I

22   said before.  The look at all of the elements together.  When

23   you look at the aesthetic that that represents.

24   Q.   But a change in the hair would change the overall

25   aesthetics; is that correct?

c82378c4-88ea-4514-b582-e8043d481e71

Page 7291

1          MR. ZELLER:  Objection.  The question is vague,

2    lacks foundation.

3          THE COURT:  Rephrase that question, Counsel.

4    Q.  BY MR. NOLAN:  In your view, sir, changing the hair

5    color on a particular doll could change the aesthetic look of

6    that doll?

7          MR. ZELLER:  Vague, foundation, relevance.

8          THE COURT:  It is vague.  Sustained.

9    Q.  BY MR. NOLAN:  Well, you identified one of the elements

10   of aesthetics as being the hair on a fashion doll; correct?

11   A.  It's one of the elements, yeah.

12   Q.  And you would agree with me that on fashion dolls, one

13   of the ideas is to have dolls that have hair that girls can

14   play with; correct?

15   A.  Yes.

16          MR. NOLAN:  These are the general questions I

17   usually have Ms. Aguiar handle.

18          THE COURT:  I understand.

19   Q.  BY MR. NOLAN:  But that's one of the ideas, is to have

20   hair that girls can play with; correct?

21   A.  Generally, yes.

22   Q.  And so while you were there, your testimony is that you

23   changed multiple times the hairstyles on the particular dolls

24   that you were in charge of; correct?

25   A.  Generally, speaking, yes.

c82378c4-88ea-4514-b582-e8043d481e71

Page 7292

1    Q.   And you did that to influence the sale of the product?

2    A.   Yes, generally.

3    Q.   So you changed the hair sometimes.  You changed fashions

4    oftentimes; correct?

5    A.   Yes.

6    Q.   Now, let's talk about accessories for a moment.  While

7    you were involved in the marketing of Barbie and My Scene and

8    other products at Mattel, did Mattel offer any accessories

9    with any of their packaging?

10   A.   Are you talking about accessories that come with the

11   doll or accessories that are sold alongside the doll?  I'm

12   not sure I understand.

13   Q.   Thanks.  I'll make that clear.  Sold with the doll.  At

14   the point of sale.

15   A.   Okay.  Sold inside the package.

16   Q.   Yes.

17   A.   So I'm sorry.  Can you ask the question again?

18   Q.   Of course.  Did you offer at Mattel, while you were

19   there, a product that had accessories in the box?

20   A.   Generally, yes.

21   Q.   And would you ever change the accessories from doll to

22   doll?

23   A.   I believe so, yeah.

24   Q.   From season to season?

25   A.   From segment to segment, perhaps, or doll to doll, yes.

Page 7293

1   Q.   Now, what do you mean segment to segment?  What's a

2   segment?

3   A.   Well, it might be a certain type of doll.  A beach doll

4   might come with a towel.  And a different doll might come

5   with a different accessory.  So it depended upon the play

6   pattern for that particular doll.

7   Q.   Did you have a view that accessories played a role in

8   overall sales or success of a particular doll?

9   A.   They played a part in the play pattern that the girl

10  would have with that doll.  I don't know that it's the most

11  important element of it.

12  Q.   Would you agree that it is a significant element in the

13  play pattern?

14  A.   It's an element.  I don't know -- I don't know how

15  important it is, to tell you the truth.

16  Q.   Why do you put the accessories in the box if you don't

17  think they are that important?

18  A.   It adds value for the girl.  It adds to the play.

19            THE COURT:  Could you define play pattern?

20            THE WITNESS:  I'm sorry.  Play pattern is the term

21  we tend to use to describe the way a child plays with a

22  product, what that child might do, whether it's combing the

23  hair, fashion, changing the dresses, things like that.

24  Q.   BY MR. NOLAN:  How important to the overall success of a

25  particular doll is the particular play pattern attributed to

c82378c4-88ea-4514-b582-e8043d481e71

Page 7294

1    that doll?

2    A.   I'm sorry.  Could you ask the question again?

3    Q.   Sure.  Do you have an opinion as to whether or not the

4    play pattern is an important element on whether or not a

5    particular doll will sell?

6    A.   Yes.

7    Q.   Was it your experience that you could have the very same

8    doll with the same facial decorations in one play pattern and

9    the same doll, same facial decorations in a different play

10   theme, and the two dolls, two products would sell at

11   different rates?

12   A.   I don't know that we ever experienced that.  I don't

13   know that we would ever do such a thing where we would have

14   literally the exact same doll with two different play

15   patterns or themes.  We wouldn't -- I don't think we've ever

16   done that.

17   Q.   So when you say that you would never put the same doll

18   on the same box, you agree that you never changed the head

19   sculpt of the dolls while you were there; correct?

20   A.   You know, I don't know that we ever changed the head

21   sculpt.  I don't recall that.

22   Q.   Did you ever change the body sculpts, the torso?

23   A.   You know, I don't know.

24   Q.   So when you say you wouldn't have put the same doll in

25   the same box, how would you make the doll different?

Page 7295

1   A.   Well, the hairstyle might be different, or the face

2   paint might be different.  It's all those -- I kind of go

3   back to what I said before.  It's all of those things

4   combined that helps make the aesthetic work or not for a

5   product.

6   Q.   So a doll, having the same sculpt, both torso and head,

7   would be in your view a different doll depending on the color

8   of hair it had and the color of face paint?

9           MR. ZELLER:  Mischaracterizes the witness's

10  testimony, foundation, relevance.

11          THE COURT:  Sustained.

12  Q.   BY MR. NOLAN:  You made reference to you'd never put the

13  same doll in different play patterns.  Is that your

14  testimony?

15  A.   Well, we would never -- we would always change aspects

16  of a doll's aesthetic, depending upon the theme or the style.

17  Q.   And your view, sir, is by changing those aesthetics, you

18  were changing the overall look of the doll, yes?

19          MR. ZELLER:  Same objections.

20          THE COURT:  Sustained.

21  Q.   BY MR. NOLAN:  What was the purpose in changing the

22  aesthetics from one doll to the other?

23          MR. ZELLER:  Same objections.  Foundation.

24          THE COURT:  As phrased.  Rephrase your question,

25  Counsel.

Page 7296

1   Q.   BY MR. NOLAN:   You are aware that aesthetic changes were

2   made from doll to doll within the Mattel line while you were

3   at Mattel?

4              MR. ZELLER:   Relevance, foundation.

5              THE COURT:   You need to rephrase your question,

6   Counsel.   Your use of the word aesthetic.   Just rephrase your

7   question.

8   Q.   BY MR. NOLAN:   Whenever I use the term aesthetic, I want

9   to use your definition of aesthetic.   Okay?   So let's go back

10  and just make certain that there's a clear definition for the

11  record and for the jury as to what all the elements were that

12  you say make up the aesthetics of the doll.

13             THE COURT:   Counsel, you're using the singular or

14  the plural?   It's making a difference in the way you're using

15  the term in the questions.   So you're now asking for the

16  aesthetics of the doll.

17             MR. NOLAN:   The aesthetics of the doll.

18             THE COURT:   Very good.

19             THE WITNESS:   I'm sorry.   What are you asking me

20  again?

21  Q.   BY MR. NOLAN:   Sure.   Can you just list for us, for the

22  jury, what are the aesthetics in a doll?

23  A.   Well, when I am using that term, I'm using it to

24  describe the look of the doll in terms of its hair, its face,

25  its face paint, its fashions, its accessories.   Those

Page 7297

1    elements go into it.  And again, I'm using that term broadly

2    for how we would design or, you know, look at the appeal of a

3    product.

4    Q.   And then from product to product, you would change

5    certain elements of those aesthetics; correct?

6    A.   Yes, depending upon the theme or the play pattern.

7    Q.   And isn't it true, sir, that you once were interviewed

8    by The Wall Street Journal?

9    A.   Yeah, I think I've been interviewed by them a few times.

10   Q.   And do you recall ever being interviewed by them with

11   respect to the importance of play patterns with respect to

12   the success of sale of fashion dolls?

13   A.   Specifically, no.

14   Q.   Do you have a general recollection of it?

15   A.   I know I talked to them about the doll business.

16   Q.   Do you have your white notebook in front of you?  And

17   I'd ask you to turn to Trial Exhibit 01818.

18   A.   I'm sorry.  018?

19   Q.   01818.

20   A.   Okay.

21   Q.   Do you recognize this as an article that was published

22   by The Wall Street Journal on April 16th, 2004?

23   A.   Yeah.

24   Q.   And do you see the quote attributed to you in the fourth

25   column?

Page 7298

1   A.    Hang on.  Yes, I do.

2   Q.    And I just, if I could read -- is that an accurate

3   quote?  Did you make that statement?

4   A.    Yeah, I recall saying that.

5   Q.    So if I could read the paragraph for just a moment.  It

6   says:  "The plot lines increase the doll's entertainment

7   value and make them more competitive with cartoons, movies,

8   and video games.  Mattel says, quote, it used to be I'd walk

9   into a product meeting and say, quote, show me the toy, says

10  Tim Kilpin, Mattel's senior vice-president in charge of girls

11  toys.  Quote, now I start by saying tell me a story."

12         Did I read that right?

13  A.    Yes.

14  Q.    And that's what you said to The Wall Street Journal?

15  A.    Yeah.

16  Q.    Were you truthful when you said that to The Wall Street

17  Journal?

18  A.    Yeah.

19  Q.    Now, explain to us what you mean by you used to look at

20  the toy, and now your question is tell me the story.  What

21  does that mean?

22         MR. ZELLER:  Misstates the witness's testimony.

23         THE COURT:  Again, the jury just heard what the

24  statement was.  Explain what you mean by that.

25         THE WITNESS:  At the time one of the things that we

Page 7299

1    were talking about was ways in which we would have girls

2    engage in our product line for a longer period of time.  And

3    so one of the things we would talk about is will they want to

4    buy, you know, one doll or buy a doll and an accessory or buy

5    other elements, and if we gave them some context how to play

6    those things out, how to play with the products, like story

7    lines, would that engage the girl even more deeply.  That was

8    sort of the way we were thinking about it at that time.

9    Q.   BY MR. NOLAN:  Did the success of the play patterns lead

10   to more sales of a particular product?

11             MR. ZELLER:  The question is vague.

12             THE COURT:  It is.  Sustained.

13   Q.   BY MR. NOLAN:  Would you develop play themes in an

14   effort to try to increase sales of the doll?

15   A.   Play themes?  What do you mean when you say play themes?

16   Q.   Let's use your term, play patterns.  Would you change

17   the play pattern of a particular doll in order to increase

18   sales of that doll?

19   A.   Well, my view of play pattern, how I use the term, is

20   it's frankly, it's timeless.  It's something that a girl is

21   always going to do with a doll.  Girls are always going to

22   play with a doll's hair, boys are always going to play with

23   cars.  Those are timeless.  That's always the way children

24   play.

25   Q.   But when you use the term tell me a story, where you

c82378c4-88ea-4514-b582-e8043d481e71

Page 7300

1   used to say show me the toy, now I start by saying tell me a

2   story.  What do you mean by having the product tell you a

3   story?

4   A.   What I was asking the designer to do at that time was to

5   find a way to connect the products together so that, again,

6   we could give girls a context for how to play more deeply

7   with those products, so they might do more with them than

8   just march them around.  They might actually create a story

9   around them.  So that was the challenge I was giving to the

10  designers at that time.

11  Q.   And did you ask the designers to change those story

12  patterns on a regular basis?

13  A.   Not really.  What we asked them to do was to think about

14  different ways, different stories which could tell, whether

15  that would be a story based on a beach story or beach theme,

16  or a wedding.  It could vary.  So it wasn't we were asking to

17  change it.  We were asking for different ideas.

18  Q.   So in your mind for this jury, would you say that your

19  story, you know, tell me a story, is similar to developing a

20  theme for the doll product?

21  A.   I guess in some respects, yeah.

22  Q.   Now, during the period of time that you were at Mattel,

23  were you evaluating the Bratz themes?

24  A.   As part of everything else we would look at that Bratz

25  was doing as a competitor, sure.

c82378c4-88ea-4514-b582-e8043d481e71

Page 7301

1    Q.   Do you recall in your view, changing the themes are an

2    important element of keeping the product fresh?

3    A.   Generally speaking, I think keeping the -- girls like to

4    play a lot of different themes out.  And there are a lot of

5    themes that are sort of, again, timeless in terms of they are

6    always going to want to play a beach theme or a wedding

7    theme.  And so how we bring those things to life in different

8    and fresh ways became the challenge.

9    Q.   And the reason you would want to do that, of course, was

10   to try to increase the sale of the product, yes?

11   A.   Generally, yes.

12   Q.   And did you have an overall view of the -- did you know

13   whether or not Bratz had only one theme for their product or

14   multiple themes?

15            MR. ZELLER:  The question is vague.

16            THE COURT:  I'm sorry?

17            MR. ZELLER:  The question is vague.

18            THE COURT:  Sustained.

19   Q.   BY MR. NOLAN:  Do you know whether or not Bratz was

20   trying to tell a story through their product by the

21   introduction of themes?

22   A.   Well, I was aware that they did entertainment around

23   some of their segments.

24   Q.   And what do you mean when you say referred to

25   entertainment?

Page 7302

1   A.   I recall that they did some DVDs that were themed to

2   certain segments.  I recall that.

3   Q.   How many themes do you remember hearing about that Bratz

4   had introduced during that period of time?

5   A.   I don't remember the exact number.  I'm sure there were

6   many.  I don't remember all of them.

7   Q.   Would you, based on your years of experience, expect

8   that each of those themes would sell at about the same rate?

9           MR. ZELLER:  Overbroad, foundation.

10          THE COURT:  Sustained.  For that particular

11  question, Counsel.  You need further foundation.

12  Q.   BY MR. NOLAN:  Did you track competitively the success

13  of the Bratz product?

14  A.   Generally, yes.

15  Q.   And would you track that success with respect to various

16  themes that Bratz was introducing at various times?

17  A.   Yeah, I can recall generally we would look at those --

18  we would look at sort of the depth of the range that they

19  had.

20  Q.   And how would you describe for the jury the depth of the

21  range of themes that Bratz was introducing to the market?

22  A.   We would tend to look at it in terms of how many

23  different dolls were they doing, how many different

24  accessories were they doing to go along with that.  So when I

25  say depth of the range, I'm talking about how many more

Page 7303

1    products did they have in their marketplace.

2    Q.   And during the period of time that you were analyzing

3    Bratz, can you give us an estimate of how many products Bratz

4    had in the marketplace?

5    A.   Dozens.  I don't remember the exact number.

6    Q.   And based on your tracking of the success or lack of

7    success of the Bratz products, did you discern any difference

8    in the volume of sales of a particular Bratz product compared

9    to another product?

10   A.   That, I don't really remember, no.

11   Q.   Did you also look at the commercials, the advertising

12   that Bratz was engaged in?

13   A.   Yeah, we would typically look at those.

14   Q.   And for what purpose would you look at the advertising

15   done by Bratz?

16   A.   We'd want to understand who they are trying to target

17   the commercial to, what age group, perhaps, which features

18   they may play up in a TV commercial versus other features.

19   Q.   Why was that important to you?

20   A.   Well, it's important generally for us to understand, you

21   know, what our competitors doing in terms of what they think

22   is most important about that product, what they think most

23   important about that feature, how they communicate it.

24   Q.   Did you have a general view of the advertising campaigns

25   introduced by Bratz?

Page 7304

1    A.    Not particularly.

2    Q.    So you didn't have a view one way or the other as to the

3    value of TV commercials?

4              MR. ZELLER:  Misstates the witness's testimony.

5              THE COURT:  Sustained.

6    Q.    BY MR. NOLAN:  Do you have a view one way or the other

7    as to the success of any of the TV commercials that Bratz had

8    introduced in the market?

9    A.    Not a specific view, no.

10   Q.    Did you believe that by advertising, Bratz was

11   increasing its sales of products?

12   A.    You know, I'm sure they must have been.  I know they

13   were selling very well before they went on TV.

14   Q.    And the fact that they went on TV, do you recall when

15   they went on TV?

16   A.    No, I don't.

17   Q.    And when you say they went on TV, what do you mean?

18   A.    When they began advertising.

19   Q.    And you know they also were engaged in print

20   advertisement?  Is that true?

21   A.    I don't know that, actually.

22   Q.    Do you recall tracking all of the various media

23   advertisements that Bratz was engaged in?

24   A.    Well, we would have, and I just don't remember any print

25   advertising.

1    Q.    Right.   I know you don't have a specific recollection,

2    but you have a general recollection of tracking that type of

3    information?

4    A.    Tracking their advertising?

5    Q.    Yes.

6    A.    Yes.

7    Q.    Do you know whether or not you would be tracking the

8    various fashions that they were introducing in the market?

9    A.    Well, we were paying attention to the product line, you

10   know, across, as I said, sort of the depth of the range.

11   When you say fashions, do you mean separate -- what do you

12   mean?

13   Q.    What I mean, you know, the clothes that are sold with

14   the dolls.   Is that something that you also looked at?

15   A.    It kind of goes back to what I mentioned before.   That

16   to me was part of the whole aesthetic we were assessing when

17   we looked at the product.

18   Q.    Did you have a view that Bratz fashions were fresh?

19   A.    Well, it goes back to what I said when I first looked at

20   the product line.   I thought the product looked fresh.

21   Q.    And did your opinion stay the same throughout the time

22   that you were monitoring the Bratz products, that is, that

23   their fashions continue to be fresh?

24   A.    I would say, you know, throughout the time that we would

25   pay attention to their product line, I thought their product

Page 7306

1    looked fresh.

2    Q.   So that means that they would be coming out with new

3    fashions each season?

4    A.   Yeah, I believe so.

5    Q.   Now, is another thing that you would look at from your

6    competitors, including Bratz, whether or not they were

7    introducing new characters?

8    A.   What was the question?  I'm sorry.

9    Q.   Sure.  Was one of the other things that you would look

10   at, when analyzing the Bratz line, was various characters

11   that they were introducing in any of their themes, their play

12   patterns?

13   A.   I don't really recall new characters, to tell you the

14   truth.

15   Q.   So is it your understanding that Bratz only sold four of

16   the original characters?

17   A.   Well, I know they sold boy characters as well.

18   Q.   Other than the four original first generation dolls, do

19   you know whether or not they introduced any other characters?

20   A.   I don't, actually.

21   Q.   During your period of time at Mattel, did the Barbie

22   line introduce different characters or friends of Barbie?

23   A.   Well, it depended on which segment or theme we were

24   talking about.  When we would do a new princess movie, for

25   example, we would introduce new characters as part of the

1   princess movie.

2   Q.   Now, would those characters be similar to the Barbie

3   doll?

4   A.   They were different characters that were based upon the

5   movie.

6   Q.   And would you introduce those additional characters to

7   increase the sales of the Barbie doll?

8   A.   Well, they were designed to help increase the sales of

9   the brand.

10  Q.   And that would also increase -- by introducing

11  characters into a doll line, would you agree with me that you

12  increased the play pattern available?

13  A.   I'm not sure how to answer that.  I go back to what I

14  said before.  Different doll segments or different themes

15  would be designed to pay off on different play patterns.  And

16  so not really increasing a play pattern.  That's not how we

17  talk about it.  We talk about it in terms of how each segment

18  might represent a different kind of play pattern.

19  Q.   And the idea would be that on each different segment

20  representing a different play pattern, the hope would be that

21  you drive additional sales of the product?

22          MR. ZELLER:  The question is vague.  Foundation.

23          THE COURT:  Lay a foundation for that, Counsel.

24  Q.   BY MR. NOLAN:  Did you engage in focus groups while at

25  Mattel to determine whether or not the introduction of

c82378c4-88ea-4514-b582-e8043d481e71

Page 7308

1    different elements, like characters, would increase potential

2    sales or play patterns for particular characters?

3    A.    We -- my teams would oversee and do focus groups on a

4    number of elements of the product line on a regular basis.

5    Q.    And why did you engage in focus group analysis?

6    A.    A lot of reasons, but one of the key reasons was to

7    understand what, you know, was going to be most appealing

8    about a product.

9    Q.    And you do that in order to then make changes to try to

10   make the product as appealing as possible?

11   A.    Yeah.

12   Q.    Would you agree with me that in branding a product,

13   advertising is important to grow the brand?

14   A.    Yeah, as one element, sure.

15   Q.    Would you agree that trade promotions would be another

16   way to increase the brand?

17            MR. ZELLER:  Relevance.

18            THE COURT:  Overruled.

19            THE WITNESS:  Yeah, we would -- when we talk about

20   building a brand, we talk about the elements that need to

21   help support it.  The marketing elements.  So that's part of

22   it.

23   Q.    BY MR. NOLAN:  And what are those elements that support

24   marketing the brand?

25   A.    Well, you mentioned advertising.

Page 7309

1   Q.    I came up with one.  Now you come up with a list.

2   A.    Promotions.

3   Q.    So we have advertising and promotions.  What else helps

4   drive the brand?

5   A.    Well, broadly speaking, those are the key things.

6   Q.    Would retail placement be one of the considerations of

7   trying to influence the brand?

8   A.    Well, sure, based upon what we talked about before.

9   It's part of it.

10  Q.    And what about packaging.  Is packaging part of the

11  branding?

12  A.    Sure.

13  Q.    Let's talk about packaging for a moment.  Did you

14  monitor the competitors' packaging?

15  A.    Yeah, we would look at every aspect of it.  We would

16  look at how the product was put in the package, what the

17  product itself looked like.  We'd look at all of it.

18  Q.    And why would you do that?

19  A.    Because that's how a consumer was going to see it on the

20  shelf.

21  Q.    But why would you be looking at a Bratz product?  How

22  would looking at a Bratz product help you understand how a

23  consumer was going to look at a product?

24  A.    We would look at it based upon how a shopper might see

25  it in the store.

c82378c4-88ea-4514-b582-e8043d481e71

Page 7310

1    Q.   Do you have a view that packaging is important in the

2    overall building of the brand?

3    A.   I think what's most important about packaging for toys

4    is that it communicates what the product is about.

5    Q.   And what are the elements of packaging that would aid

6    you in communicating what the product is about?

7    A.   Well, I would typically pay attention to how it

8    communicates the features.

9    Q.   And now you introduced this term features.  What do you

10   mean the features?

11   A.   Well, whether the product has a physical feature or a

12   moving part, something special that it does.

13   Q.   And how does a package communicate?  What are the

14   elements of the packaging that enables a manufacturer to

15   communicate to the consumer?

16   A.   Well, I'm thinking about, you know, when you look at a

17   package and it has a call-out or a display on it that

18   explains to the consumer what it is that the product does.

19   Q.   So one of the elements of the packaging would be the

20   artwork on the package?

21   A.   Sure.

22   Q.   So separate the structure of the package itself.  Are

23   you familiar with something known as character art?

24   A.   Yes.

25   Q.   And how would you describe character art?

c82378c4-88ea-4514-b582-e8043d481e71

Page 7311

1    A.    Well, usually it's an illustration of a character that's

2    represented by that particular product as what it might be.

3    Q.    Do you know whether or not Bratz changed its character

4    art at various times?

5    A.    I don't know that, actually.

6    Q.    Would it surprise you -- well, let me ask you this:  Did

7    you use while at Mattel, on Barbie or My Scene, the same

8    character art for every box you sold?

9    A.    Well, we would differ it by the theme or by the feature.

10   Q.    And why would you do that?

11   A.    Well, to help explain to a consumer what it was.

12   Q.    And did you find that by aiding the communication to the

13   consumer of what was in the box, you were increasing the

14   likelihood of sales of that product?

15   A.    Well, the goal was to be sure that a consumer understood

16   what the product was.  So if it worked, it should.

17   Q.    And so if the box communicated appropriately, it would

18   influence the purchase by the consumer?

19   A.    It should certainly help.

20   Q.    Have you ever heard the term high piece count price

21   value?

22   A.    Yes.

23   Q.    And that would be a slash.  High piece count/price

24   value.  You've heard that phrase?

25   A.    Yes.

Page 7312

1   Q.   And is that something that you tracked on the Bratz

2   products?

3   A.   Yeah, I recall we talked about that.

4   Q.   And generally, let's identify what that actually means.

5   What does high piece count/price value refer to?

6   A.   Well, typically when we talk about a product that has

7   high piece count/price value, it typically means that when a

8   consumer looks at that product and sees a lot of elements in

9   the package, a lot of pieces, that that suggests to the

10  consumer that it's got a good price value.

11  Q.   So the more -- is it true that the more accessories,

12  more pieces within the box related to the price that it was

13  being sold at could increase the value or increase the

14  likelihood of sales?

15           MR. ZELLER:   The question is vague.   Foundation.

16           THE COURT:   Lay a foundation, Counsel.   Again, for

17  this particular question.

18  Q.   BY MR. NOLAN:   Do you know whether or not, one way or

19  the other, if you have a high piece count in comparison to

20  the price value, are you more -- are you likely to sell more

21  product or less product?

22  A.   It's really going to depend upon the product itself.

23  Q.   Does the fact that -- did you believe that Bratz high

24  piece count in comparison to the price value was contributing

25  to the success of Bratz?

Page 7313

1    A.    I think that was part of it.

2    Q.    Do you know whether or not Bratz engaged in any national

3    promotional campaigns to sell its product?

4    A.    When you say -- can you give me an example?

5    Q.    Sure.  Are you aware of any promotional campaigns that

6    Bratz ran for its products?  Such as buy one, get two?

7    A.    I'm not aware of any.

8    Q.    You don't have a specific recollection?  You're not

9    denying that they had such promotions; right?

10   A.    I'm not recalling any.

11   Q.    In your view, would national campaign promotions aid in

12   selling a particular product?

13          MR. ZELLER:  Foundation, vague.

14          THE COURT:  Sustained.

15   Q.    BY MR. NOLAN:  Do you know, based on your experience,

16   sir, whether or not -- well, let me ask you this:  In your

17   experience at Mattel, did you ever engage in national

18   promotional campaigns for your products, either Barbie or My

19   Scene?

20   A.    Well, again, what kind of -- you're talking about what

21   kind of promotional campaign?

22   Q.    Are you familiar with the term promotional campaigns?

23   A.    Yeah, it's very broad.

24   Q.    I understand.  So let's just try to get a working

25   understanding of it.  What type of promotional campaigns did

c82378c4-88ea-4514-b582-e8043d481e71

Page 7314

1    you get involved in with respect to either Barbie or My

2    Scene?

3    A.   We would do things like sweepstakes promotions, where if

4    a child entered a sweepstakes, they might win a trip to

5    Hollywood, for example.   Things like that.

6    Q.   Did you do that to increase the sales of the dolls?

7    A.   Yeah.

8    Q.   Do you believe that Bratz did the same thing?

9    A.   I don't know.

10   Q.   So would you agree with me, sir, that fashions impact

11   sales of product?

12   A.   I'm going to go back to what I said before.   I would

13   look at the aesthetic of the product.   And that would include

14   fashions, but it would be all of the elements.

15   Q.   And packaging would increase the ability to communicate

16   to the consumer the message that you were trying to convey.

17   Is that true?

18             MR. ZELLER:   Asked and answered.

19             MR. NOLAN:   It's just a foundational question, your

20   Honor.

21             THE COURT:   I don't see anything foundational in

22   that, Counsel.

23   Q.   BY MR. NOLAN:   Okay.   Let me ask you this:   So I am

24   effectively --

25             THE COURT:   Anyway, my ruling on that is sustained.

Page 7315

1          MR. NOLAN:  I was anticipating that.

2          THE COURT:  Very well.

3     Q.   BY MR. NOLAN:  Is it your view, you would agree with me

4     that effective packaging can increase the sales of the

5     product?

6     A.   Effective packaging can increase the sales of a product

7     if it's a good product.

8     Q.   And new and effective themes can also increase the

9     overall success of the particular doll product; correct?

10    A.   If the underlying product is appealing, yes.

11    Q.   Did you believe the Bratz doll was appealing?

12    A.   Yes.

13    Q.   Did you believe their packaging was effective?

14    A.   I thought it was really more about the product than

15    anything else.

16    Q.   Did you believe that the commercials contribute anything

17    to the sales?

18    A.   I assume they did.

19    Q.   When you say it was the product itself, what are you

20    referring to?

21    A.   The dolls.

22    Q.   Which dolls?

23    A.   The Bratz dolls.

24    Q.   And how many Bratz dolls are there in the marketplace?

25    Do you know?

Page 7316

1    A.    How many different Bratz dolls?

2    Q.    Yes.

3    A.    I know of the four characters.

4    Q.    So is it your view that as a senior vice-president in

5    charge of the girls division at Barbie, it was your view that

6    Bratz only sold four characters?

7    A.    I mentioned they had boy dolls, too, that I can recall.

8    Q.    But you have no recollection of any other characters

9    being introduced?

10   A.    I'm remembering the four.

11   Q.    And when you refer to the doll, the product itself, that

12   you thought they had good product, are you referring to the

13   naked mold that we are -- that we had in front of you a

14   minute ago?

15   A.    I'm not sure what you're asking.  What are you asking?

16   Q.    Well, you testified a minute ago that you thought the

17   Bratz product was successful because it had a good product.

18   Do you recall that testimony?

19   A.    Yes.

20   Q.    And my question to you, sir, is that when you refer to

21   the Bratz product, are you referring to a naked sculpt?

22   A.    I'm referring to a doll that I talked about that has a

23   certain aesthetic.

24   Q.    That would include hair; correct?

25   A.    Yes.

Page 7317

1   Q.   Face paint?

2   A.   Yes.

3   Q.   Fashion?

4   A.   Yes.

5   Q.   Play themes?

6   A.   Yes.

7   Q.   Packaging?

8   A.   Well, again, I'm talking about the product.

9   Q.   Okay.  So packaging would not be part of the product?

10  A.   To me if it's not a good product, the package doesn't

11  matter.

12  Q.   But if it's a good product, packaging could even make it

13  better; correct?

14  A.   Packaging can help.

15  Q.   And included in the product that you were talking about

16  earlier were the accessories that were sold with the product;

17  correct?

18  A.   Yes.

19  Q.   Do you know of any fashion doll that ever sold

20  successfully in the marketplace without advertising?

21  A.   Well, actually, I recall the Bratz sold very well before

22  it was advertised.

23  Q.   Before it what?

24  A.   Before it was advertised.

25  Q.   And how do you know that?

Page 7318

1    A.    I just recall that the early, early sales were very

2    good.

3    Q.    What were the early sales?

4    A.    I don't know the numbers.   I just though they did well.

5    Q.    What's the basis for coming to that conclusion?

6    A.    I just recall, you know, hearing about it selling well

7    early.

8    Q.    Do you think that Bratz was introduced into the

9    marketplace without any advertising?

10   A.    I thought it was.

11   Q.    Do you think that the Bratz -- would you consider

12   placement in a toy fair as being part of the advertisement?

13   A.    Well, I would consider that to be the advertising to the

14   retailers.

15   Q.    So as you are sitting here, you believe that the first

16   generation Bratz sold exceedingly well without any

17   advertising?   Is that your testimony?

18   A.    I believe that was the case.

19   Q.    Do you know whether or not there was any media coverage

20   of the first generation of Bratz?

21   A.    I don't know that.

22   Q.    Have you done anything, when you came over in 2003, to

23   go back -- you understand that the first generation Bratz

24   came out in June of 2001, yes?

25   A.    Well, I knew it was 2001.

Page 7319

1   Q.   And you were at Disney at the time?

2   A.   Yes.

3   Q.   And what steps did you do to undertake to determine

4   whether or not Bratz made a profit in the first year?

5   A.   I didn't.  I don't know that.

6   Q.   Do you know sitting here whether or not Bratz advertised

7   in the first year?

8   A.   I didn't believe they did, but I don't know that for a

9   fact.

10  Q.   Have you ever seen Carter Bryant's concept drawings?

11  A.   Yes, I have.

12  Q.   When did you see them?

13  A.   Just a few weeks ago.

14  Q.   Just a few weeks ago?

15  A.   Um-hm.

16  Q.   So at any time while you were at Mattel, did you ever

17  have drawings of the dolls at Mattel, the Bratz dolls?

18  A.   Which -- I'm sorry.  Which drawings?

19  Q.   Any drawings of Bratz products.

20  A.   No.

21            MR. NOLAN:  Your Honor, would this be a convenient

22  time?

23            THE COURT:  Yes.

24            MR. NOLAN:  Thank you.

25            THE COURT:  I'll see the jury tomorrow morning at

Page 7320

1    9:00.  And remember, it's a half day tomorrow.  We'll end at

2    noon.

3              (WHEREUPON THE JURY WITHDRAWS.)

4              THE COURT:  Counsel, based on anticipated witnesses

5    tomorrow, is there anything that we need to take up in the

6    early morning hours before we start at 9:00?

7              MR. NOLAN:  Not that I'm aware of, your Honor.

8    We're going to have a discussion with Mr. Quinn before

9    Ms. Polk comes on stand to see whether or not we can work out

10   a stipulation.  There may be some way to approach it the same

11   way we're doing this one.

12             THE COURT:  All right.

13             MR. NOLAN:  Thank you.

14             MR. ZELLER:  I suppose one timing issue we should

15   perhaps address is that there's going to be -- if Mr. Vilppu

16   is going to be offered, there does need to be a hearing in

17   advance of that.  I think the last time we talked about the

18   time, they planned on calling him Thursday.  I don't know if

19   that's changed.  But he was still on the witness list the

20   last time.

21             THE COURT:  Very well.  The Court will be available

22   at 8:00 tomorrow morning.

23             MR. NOLAN:  Your Honor, I just want to relieve you

24   of the concern.  We're not going to put Mr. Vilppu on

25   tomorrow because of a change in commitments.  We had

1    originally said maybe on Thursday.  I think we said that

2    before we knew it was a half day.

3            THE COURT:  Very good.  So anything else that needs

4    to be taken up in the morning?

5            MR. PROCTOR:  I believe there was one objection

6    which the Court may have overlooked on Mr. Farr's transcript.

7            THE COURT:  Oh.

8            MR. PROCTOR:  I will give you this copy if it's

9    helpful.

10           THE COURT:  Here it is, right in front of me.

11           MR. PROCTOR:  Page 252, your Honor.

12           THE COURT:  252?

13           MR. PROCTOR:  Yes.  We didn't catch a ruling on it.

14   It's testimony authenticating one of the earnings call

15   documents but not asking anything beyond authentication.

16           THE COURT:  Very good.  This is not really

17   disputable.  Overruled.  But the 2520 only comes in to the

18   extent that there's going to be a small excerpt from it;

19   right?

20           MR. PROCTOR:  In this particular one, there

21   actually isn't any excerpt from it.

22           THE COURT:  Then it's sustained.

23           MR. PROCTOR:  Thank you.

24           MR. ZELLER:  And I believe that the Court should

25   have the binders, jury instruction binders by now.

Page 7322

1          THE COURT:  Right.  I was noticing that.  I have

2    Mattel's here, and do I have --

3          MS. AGUIAR:  Well, as usual, Becky is more on top

4    of things than anybody else.  Here is ours.

5          THE COURT:  Very good.  So I have the jury

6    instructions, and I'll be taking these up tomorrow afternoon.

7    And you can actually have a decent lunch tomorrow.

8          MS. AGUIAR:  So 1:30?

9          THE COURT:  Yes.  There's a full court meeting, and

10   I'm going to participate by video conference.  And that will

11   go until 1:30.  So it will probably be 1:45 by the time I get

12   back.

13         If there's nothing else, I will see you tomorrow

14   morning.

15         MR. ROTH:  Your Honor, I apologize.  There had been

16   mentioned with respect to Mr. Meyer of potentially doing a

17   hearing.  I don't know whether that's -- whether that remains

18   the intention.

19         THE COURT:  When is -- where is that list?

20         MR. ROTH:  He is set for Friday.

21         THE COURT:  Very well.  We'll take that up on

22   Friday.  We don't need to do that tomorrow.  I've found when

23   we're talking about a witness two days hence that it's going

24   to change so much that there's no point.

25         MR. NOLAN:  Can we have a time count?

c82378c4-88ea-4514-b582-e8043d481e71

Page 7323

1           THE COURT:   Yes, I have -- MGA has about four hours

2     and 35 minutes and Mattel has about an hour and 50 minutes.

3

4               (Proceedings conclude the at 5:35 P.M.)

5

6

7                     C E R T I F I C A T E

8

9

10          I hereby certify that pursuant to Title 28,

11    Section 753 United States Code, the foregoing is a true and

12    correct transcript of the stenographically reported

13    proceedings in the above matter.

14          Certified on August 13, 2008.

15

16

17    _____
      MARK SCHWEITZER, CSR, RPR, CRR
      Official Court Reporter
18    License No. 10514

19

20

21

22

23

24

25