Page 8172

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

---

MATTEL, INC.,                    : PAGES 8172 - 8274
                                 :
          PLAINTIFF,             :
                                 :
     VS.                         : NO. ED CV04-09049-SGL
                                 : [CONSOLIDATED WITH
MGA ENTERTAINMENT, INC.,         : CV04-9059 & CV05-2727]
ET AL.,                          :
                                 :
          DEFENDANTS.            :


REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

WEDNESDAY, AUGUST 20, 2008

JURY TRIAL - DAY 37

AFTERNOON SESSION


                    MARK SCHWEITZER, CSR, RPR, CRR
                    OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    181-H ROYBAL FEDERAL BUILDING
                    255 EAST TEMPLE STREET
                    LOS ANGELES, CALIFORNIA 90012
                    (213) 663-3494

```
1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4        Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
         By John B. Quinn, Esq.
5            B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
6            Harry Olivar, Esq.
             John Corey, Esq.
7            Diane Hutnyan, Esq.
             William Price, Esq.
8        855 South Figueroa Street
         10th Floor
9        Los Angeles, CA 90017
         (213) 624-7707

10

11

12   On Behalf of MGA Entertainment:

13       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
             Robert Herrington, Esq.
17       300 South Grand Avenue
         Los Angeles, CA 90071-3144
18       (213) 687-5000

19

20

21

22

23

24

25
```

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8174

1                        I N D E X

2

3   CLOSING ARGUMENT BY COUNSEL FOR THE DEFENSE............ 8175

4   FURTHER CLOSING ARGUMENT BY COUNSEL FOR THE DEFENSE.... 8209

5   REBUTTAL ARGUMENT BY COUNSEL FOR THE PLAINTIFF......... 8247

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           Riverside, California; Wednesday, August 20, 2008

2                           1:30 P.M.

3                   (WHEREUPON THE JURY ENTERS.)

4           THE COURT:  We're back on the record in the

5     presence of the jury.  Good afternoon, members of the jury.

6           Mr. Nolan, you may proceed.

7           CLOSING ARGUMENT BY COUNSEL FOR THE DEFENSE

8           MR. NOLAN:  Thank you, your Honor.

9           Good afternoon.  I want to start with a comment

10    that I thought was probably so right on that Mr. Quinn ended

11    with.  You know, there's only been two successful fashion

12    dolls, even according to Mattel.  Barbie, that Mattel made,

13    and Bratz, that MGA made.

14          Now, I suspect that there have been concept

15    drawings that have been creative where a lot of people within

16    Mattel thought they were going to turn out to be great but

17    never ever happened to.  In fact, you know that.  The

18    evidence shows that.

19          Lily Martinez, the talented artist, draws a concept

20    drawing for Toon Teens.  It doesn't see the light of day.

21    Diva Starz, a project, big head, big feet, pronounced lips,

22    big eyes, geared towards the tweens market, gets past concept

23    drawings to a doll.  It's not successful.

24          My Scene, Flavas, they were both fashion dolls made

25    by Mattel and not successful.

Page 8176

1          We've been here for 15 weeks.  Your dedication has

2     been remarkable.  But I will say this, that the emotions in

3     this case, which I submit from the opening statement and the

4     closing argument from Mattel, throwing around that you have

5     found that we stole confidential and proprietary information,

6     that Mr. Larian is a thief that needs to be punished, that

7     the lawyers are liars, that we changed position from time to

8     time, and that every witness that comes up there, if they are

9     for MGA or for Bratz, they are lying.

10          You took a solemn oath to weigh this case on the

11     evidence and not by passion, not by prejudice, not by who you

12     like, who's a better company to work for, to base your case

13     on the facts.  You know, parties come to courtrooms looking

14     for justice, not vengeance.  And your verdict in this case

15     will measure whether or not it was rendered on the basis of

16     justice or vengeance.

17          We have complete confidence that your decision will

18     be on the side of justice.

19          As a reality check, as I was sitting there and

20     listening to the presentation of Mattel, I went back in my

21     mind to one of the questions that you are going to be asked,

22     which is really to assess the fair value, market value of

23     Carter Bryant's drawings.  And I want to take you just for a

24     moment to September 2000.

25          Carter Bryant, an employee at Mattel, who had

Page 8177

1    previously free-lanced, never made more than $800 from

2    free-lancing for Ashton Drake, but a talented artist, no

3    doubt, comes into a meeting and presents 16 drawings.

4    Exhibit 302.

5            Aaron, let's show it on the screen.  And just page

6    through this, if you don't mind.

7            Mattel is now asking you to assess the fair market

8    value of those drawings at $1.3 billion.  I worked it out.

9    It's about $97 million per sketch on concept drawings that

10   Mattel never brought a single witness from their own design

11   center to say these drawings are the Bratz doll.

12           We've never changed our position in this case, with

13   all due respect to Mr. Quinn.  From day one we drew a

14   distinction between the drawings and the dolls.  These

15   drawings, when you are in the deliberations, I'd ask you to

16   take a look at them.  And I'd ask you to compare it to the

17   Bratz product.  And one of the questions that you could ask

18   yourself is was Carter Bryant's idea for removable hair so

19   electrifying that it set the world on fire to make the

20   biggest fashion doll, the only that successfully competed

21   against Barbie?

22           Or what are the age appropriateness of the lip

23   features or the big eyes or the eyebrows?  How many mothers

24   do you think would go into Toys-R-Us with these concept

25   drawings and say I want to order 10 of these for my

Page 8178

1    grandchildren?

2            The look doesn't translate to a doll.  I thought it

3    was interesting that Mr. Quinn dismisses the designer Lui

4    Domingo.  You talk about concept drawings and dolls, that's a

5    distinction, ladies and gentlemen.  Mr. Quinn told you Lui

6    Domingo came in and that was his concept drawing for Tokyo a

7    Go-Go on the left.  And then with the back of his hand, he

8    goes, but of course, you couldn't make that into a doll that

9    was sellable.

10           So that's what it turned out to be, Tokyo a Go-Go

11   as sold as retail, successful product.  That's the same point

12   that we have been making from day one in this case.  Carter

13   Bryant was paid about $500 more per month than Mattel was

14   paying him to work at MGA.

15           In retrospect, we do accept your verdict.  We

16   understand that mistakes were made with Carter Bryant working

17   at Mattel and also working at MGA.  But, ladies and

18   gentlemen, what Mattel is asking to you to do is to say all

19   right, MGA had this package and nothing more.  Oh, I

20   apologize.  They had one more thing.  They had a Devil Angel

21   ad from the Steve Madden series.  And from that they hired a

22   sculptor.  They didn't hire the sculptor until the end of

23   September.

24           So for the period of the end of September to

25   October 19th, those were the times that Mr. Bryant worked for

Page 8179

1   about 40 minutes with Margaret Leahy, gave his drawings, and

2   said do your magic.

3            Not one witness from Mattel, and Mattel has the

4   burden of proof, mind you.  They can bring lawyers from

5   Hong Kong.  They can bring businessmen from Hong Kong and

6   have them testify to you.  But from El Segundo to here, to

7   Riverside, to have a witness come in and tell you that the

8   sculpts that Margaret Leahy made from this are actually a 3D

9   replication of these drawings?  They couldn't do that.

10           They couldn't do that because nobody would testify

11  to that.  Margaret Leahy testified at length as to the

12  changes that were made.  And I will tell you, much will be

13  written about this case.  Much will be remembered about this

14  case, but one of the most remarkable statements made to you

15  from the largest toy manufacturer in the world is that kids

16  can't tell the difference.  That minor changes don't matter.

17           So when you're back there and you're looking at

18  302, do one other thing for me.  Look at this and tell me

19  does it inspire a jump rope?  Does it inspire subbrands?

20  Does it inspire helmets?  Because what Mattel says is this is

21  all you needed.  This is the map to the Holy Grail.  But

22  Mattel has never put on any evidence to suggest that this was

23  ever a Mattel project.

24           They are presuming that you found that it was

25  stolen, that it was proprietary, and that it was confidential

Page 8180

1    at Mattel.  I don't presume to understand what led to the

2    decision, whether or not the rationale is based on the fact

3    that Carter Bryant did this in off hours, that he started

4    some of the drawings early but didn't complete it until the

5    weekends or something at Mattel.  But there's been not a

6    single witness in this case who has ever said that these

7    drawings were ever presented to Mattel.

8            There is not a single piece of evidence that

9    suggests that at no time was Mattel precluded from competing

10   fairly in the marketplace.

11           Mr. Quinn said this is a case that will allow you

12   to set the mark as to how to compete fairly.  Remember this.

13   There's been competition.  They introduced My Scene and

14   Flavas.  The leading toy manufacturer in the world introduced

15   in the marketplace their own version of the concept that's

16   not protectable of big heads, big feet, pronounced lips,

17   geared toward the tweens market.  They missed it.  MGA hit

18   it.  MGA executed.  But it wasn't based on this.  It wasn't

19   based on 302.

20           So the question that you are going to be asked as a

21   reality check, is this all you needed?  Did it all come from

22   16 drawings?  Was the brand made from the period of September

23   18th through October 19th?  I think the evidence will show

24   that it's not.

25           I'm splitting up the argument today with my

Page 8181

1   colleague Raul Kennedy.  He's going to be talking about

2   damages.  I'm going to be talking about copyright

3   infringement.  I want to go right to the question of who made

4   Bratz.  I think the evidence is overwhelming in this case,

5   and frankly, uncontroverted, that MGA made Bratz.  Paula

6   Garcia and the team at MGA took every step to make certain

7   that the doll that was made would be marketable.

8           None of us in this courtroom, with the exception of

9   two parties, are doll manufacturers.  I don't think from

10  anything I read or remember asking you in jury selection that

11  any of you made a doll.  I've not made a doll.  I couldn't

12  make a doll.  I couldn't make a doll that would sell three.

13          But you know what?  The gentleman to my right, my

14  client and his team, and Paula Garcia sitting back there,

15  they made a doll that sold.  And so does Mattel.  They make

16  Barbie.  But they don't sell drawings.

17          The Carter Bryant drawings gave MGA no idea with

18  respect to dimensions of the doll, the height of the dolls,

19  the age of the dolls.  In fact, the evidence is

20  uncontroverted that the drawings depict older, edgier, more

21  sexualized, what Paula Garcia thought was more inappropriate

22  for the tweens market, 8 to 12 years.

23          Sure, they were hip, cool, and edgy, but the

24  eyebrows were way too aggressive, the lips, way too

25  pronounced.  The face, way too harsh.  What they did was they

ef1e656c-63f2-4fc2-a73d-cf5532f92131

1    made a prettier doll that could compete.  And I believe, when

2    you go back there and you apply the test under the copyright

3    statute, you will say that there are differences and

4    differences matter.  And you don't have to accept the closing

5    argument of a lawyer for MGA.  Accept the vote, if you would,

6    of the young consumer, time and time again buying another

7    product.

8            Think about all of the debates that could go on,

9    mother, dad.  Dads go shopping with their daughters, too, I'm

10   proud to say.  I want that Bratz.  You've got one just like

11   that.  No, no, dad, it's different.  It's different.

12           Mr. Kilpin, the senior vice-president of the girls

13   division in charge of Barbie, came in and admitted the same

14   thing.  Changes year after year after year drive sales.

15   There are differences, and those differences mean something.

16           And the sculpt is different.  Margaret Leahy -- if

17   I could have up B 526, please -- Margaret Leahy's background

18   is interesting.  Former Mattel employee, leaves on good

19   terms.  Her husband is still employed at Mattel.  Explains

20   her assignment.  "I was excited because it was a new project.

21   I had artistic license.  I had so much artistic license to

22   put it in, it was like a treat."

23           B1 550 and B1 555.  We walk through all of the

24   changes that are made from this first sculpt, 1136 sculpt,

25   that you've already determined was done by Carter Bryant

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8183

1  while employed at Mattel.  But look at all the changes that

2  were done by Margaret Leahy not to do anything other than to

3  make it an MGA product.  To make it distinctly different.

4  Changing the head smaller, younger looking, making it more

5  appealable.

6        Let's go to the next one.  Here is the summary of

7  the changes.  You have notes.  She was up there for several

8  days.  Changes that were making significant differences in

9  the appearance of the sculpt.  Making it smaller, less

10  mature, a younger, sweeter, more human, more believable head

11  and face structure.

12        She prepared the canvass.  The face painters made

13  the changes.  The lip structure was different, the eyes were

14  different.  She testified to that.  But, ladies and

15  gentlemen, that evidence is uncontroverted.  Mattel did not

16  come in.  They did not bring a face painter in.  They did not

17  bring a sculptor in.  They did not bring a fashion person in

18  to say the eyes are the same.  It's the same fashions.  The

19  packaging is the same.  The themes are the same.  The lips

20  are the same.  The expression is the same.  Doll after doll.

21  They could have.  They could have taken that, and that was

22  their burden.

23        But rather, what they do is they try to take

24  shortcuts.  Mr. Quinn -- and by the way, the test that you

25  will have to do that was not done in this courtroom is to

Page 8184

1    make a comparison of all of the dolls, of all of the toys in

2    the jury room over there.  And the test is not going to be

3    does this doll look like this doll.  The test will always be

4    does this doll look substantially similar to Carter Bryant's

5    concept drawings.

6           Mr. Quinn showed you comparisons today of doll on

7    doll.  That's not the test.  The test you have to go through,

8    ladies and gentlemen, is to determine whether or not on the

9    later generation dolls -- and I'll just hold up one for you

10   for just a moment.  Adventure girls, Bratz.  This is Yasmin.

11   Is it substantially similar?  Are the eyes, the lips

12   substantially similar not to an earlier version of the doll,

13   but to the concept drawing that Carter Bryant made?

14          Can I have up B 015 through B 20.  These are the

15   themes by year.  Each year we came out with different themes.

16   You know this.  The problem with closing argument sometimes

17   is you wish you could just sit down and talk because so much

18   of this has already been repeated for you, and I understand

19   you have followed this very carefully.

20          Bratz themes in 2004, in 2005, in 2006, in 2007.

21   Why?  Why the need for new themes?  Do those themes change

22   the overall look and expression?  Absolutely they do.  And

23   Barbie does the same thing.  That's how you compete.

24          Mr. Quinn says we do it just to sell more fashions.

25   That's the nature of the fashion doll.  It may be the nature

Page 8185

1    of the fashion doll, but that's what the evidence is.  These

2    changes made a difference.  But for each one of the themes,

3    for each one of the dolls, the test, ladies and gentlemen, is

4    to compare it to the drawings, not doll to doll.

5            Let's go to B 588 for a moment.  Mr. Kennedy will

6    be addressing this for a moment, but if you accept the

7    concept and the premise that 302, the concept drawings, were

8    the Holy Grail, each worth from $93 million, it doesn't

9    explain --

10           MR. PRICE:  I'm sorry.  I have to object.  This was

11   excluded by the Court.  They just changed it.  They changed

12   it.  What was previously displayed --

13           THE COURT:  I didn't see it as it was displayed.

14           MR. NOLAN:  Your Honor --

15           THE COURT:  Is the correct display on now?

16           MR. PRICE:  Yes.

17           THE COURT:  Very well.  Proceed, Counsel.

18           MR. NOLAN:  If this is the Holy Grail, and this is

19   all you need, then how do you explain this?  No Mattel expert

20   and no Mattel lawyer can explain why there are variations.

21           The later generation had face design changes, hair

22   changes.  Let's go to B 108 for a moment.  You're going to

23   have to make this comparison, ladies and gentlemen.  Are

24   these face paints the same?  Mattel says they are.  They want

25   every single dollar, every profit that was ever earned on

Page 8186

1   this.

2            Now, you'd have to compare each one of them to the

3   original concept drawings.  They are not substantially

4   similar.

5            The hairstyles.  Let's go to B 110.  Again, these

6   I'm just comparing for you.  First generation, other dolls.

7   You're going to have to take it back to the concept drawing

8   and say are the hairstyles the same?  Are the fashions the

9   same?

10           Mr. Kilpin testified -- let's go to B 594 with

11  respect to the importance of changing fashions.

12           Question.  Remember Mr. Kilpin, he was the senior

13  vice-president in charge of the girls division.

14           "QUESTION:  And why would you change the

15           fashions all the time?

16           "ANSWER:  Well, one of the things we always

17           wanted to do across a product line generally is to

18           always have it look fresh and different on a shelf

19           so that every time a girl might come to the shelf,

20           they'd see something fresh and different.

21           "QUESTION:  And why did you think that was

22           important?

23           "ANSWER:  Just made it more interesting to

24           shop.  Made it more likely that a girl might buy

25           more than one."

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8187

1        Mr. Bryant's concept drawings didn't give us any

2    ideas about accessories other than a backpack with a bunny

3    rabbit on it.  You'll have all of the packages back there.

4    Look at them.  See how many of them have the exact backpack

5    that he drew in his concept drawings.  If they are

6    substantially similar, then they infringe the copyrightable

7    material of the concept drawing.  But if they are different,

8    if each year theme after theme after theme, Mattel is not

9    entitled to that in their copyright claim.

10        Packaging.  Mr. Quinn says nobody buys packages.

11    It's true.  We don't sell empty boxes.  We never contended we

12    do.  But they want to disregard the importance of packaging.

13    Mr. Kilpin testified as to the importance of both accessories

14    and then later on on packaging.  Let's just look at B 596.

15    Mr. Kilpin, on the importance of accessories.

16        "QUESTION:  Did you offer at Mattel, while you

17        were there, a product that had accessories in the

18        box?

19        "ANSWER:  Generally, yes.

20        "QUESTION:  And would you ever change the

21    accessory from doll to doll?

22        "ANSWER:  I believe so, yeah.

23        "QUESTION:  From season to season?

24        "ANSWER:  From segment to segment, perhaps, or

25        doll to doll, yes."

1           Mr. Bryant never gave us a clue on what additional

2    lines to develop, what additional characters to develop, what

3    type of packaging we should use, what type of accessories we

4    should use.  And I told you the test here is that we sold

5    more than one doll.  So they must not have looked

6    substantially similar.  That's the consumer perspective.  But

7    the other thing I want to show you is there was one other

8    test that proved our point that it's just not the concept

9    drawings, and that's B 650 and B 651.  These are the Mattel

10   brand tracking reports produced through Mr. Kilpin.  He

11   received.

12           Go to the next page, please.  Now, these are the

13   attributes being studied on the Bratz products.  No problem

14   with that.  I mean, we're flattered by the fact that they are

15   buying every one of our products and bringing it in and

16   looking at it.  And there's even a jury instruction that says

17   there's nothing wrong with that.  If you but take at face

18   value what they are saying and that all of these dolls are

19   substantially similar, would you please tell me why somebody

20   like Mr. Eckert would say why are we spending so much money

21   on focus groups every month tracking Bratz?  They are

22   substantially the same.  Every month, every product.

23           But every month Mattel was running tests to see are

24   the dolls fun to play with?  Dolls you want to show your

25   friends?  Is it the prettiest doll, the most aspiration

Page 8189

1    fashions, a doll with the best accessories, is it the coolest

2    toy?

3              We're not making this up.  We're not saying oh, you

4    know what?  Because we want a hold on Bratz and we want to

5    compete after tomorrow, and let me make certain you know

6    this.  I want Bratz to compete.  I want there to be two

7    competing fashion dolls out there.  That's the fair way to

8    compete, not by having the Goliath Barbie be able to knock

9    down the only competitors in 40 years she's had.  When

10   Mr. Quinn says if you don't do what we ask, if you don't take

11   every dollar from Mr. Larian, the threat is that Bratz will

12   continue to sell in the marketplace and girls can buy them.

13   That's the evil, that's the threat.  That's what they want to

14   stop.

15             Mr. Kilpin said it best.  Last question and answer.

16   B 881, please.

17             "QUESTION:  And how do you interpret it when

18        it says that Bratz is dominating in such things as

19        play value, coolness, and having appealing fashions

20        and accessories?

21             "ANSWER:  How do I interpret that?

22             "QUESTION:  Yes.

23             "ANSWER:  A very strong product."

24        Not a very strong concept drawing.

25             You'll see all the different product lines.  You'll

Page 8190

1    see all the different characters that we've introduced.  To

2    Mattel it doesn't matter.  They all flow from the concept

3    drawings.  $1.3 billion.  Just transfer the wealth over to

4    Mattel.  Stop this competition out there.  Put it in its

5    tracks.  Because he's a thief, and other family members are

6    thieves.  Everybody at MGA is a thief, according to Mattel,

7    because we have the audacity to take on Mattel and compete in

8    the marketplace, not because we stole something confidential.

9         If we only wanted a drawing, where is the

10   engineering drawings?  Where is the blood pressure?  Where

11   are the memos that say to Margaret Leahy you better nail

12   this, and it better be exactly the concept that Carter Bryant

13   wants.  But that's their theory, ladies and gentlemen.

14        Let's turn to copyright infringement.  I want to go

15   through this test for you.  There's a lot of hurdles in this

16   case, a lot of hurdles that Mattel has to go through.  You

17   cannot take shortcuts.  And a jury being asked to do what

18   Mattel is asking you to do, ladies and gentlemen, award them

19   every single penny and then on top of that, prejudgment

20   interest, and then on top of that punitive damages to punish

21   somebody?  There are no shortcuts in life.

22        This extrinsic test and intrinsic test is well laid

23   out by the Court's Jury Instruction No. 26.  It will set a

24   test for you.  It's a two-step process.  Extrinsic test, you

25   look at what's protectable and what's not protectable.  And

Page 8191

1  if they are not substantially similar, you come to a

2  conclusion.  If they -- if you believe they are substantially

3  similar, you can look at the compilation, make a comparison.

4  That's the intrinsic test.  I only have an hour.  I'm not

5  going to go through it all.  You'll have the jury

6  instruction.

7          The point I want to make is if you can go to a

8  couple of points here for me, if you do, is when you're

9  looking at the concept drawings and the doll, remember what

10  Lily Martinez testified to.  It came in through videotape on

11  the last day.

12          Can we have up slide 554.  And this is the question

13  of the difficulty of comparing 2D to 3D.

14          Answer:  You're asking me to compare them?

15          Remember, she was being asked to compare her tweens

16  decal to the Barbie doll, and she says it's not the same

17  thing.  How do they differ?  One is 3D, and one is 2D.  Do

18  they differ in any way other than one being 2D and one being

19  3D?  One is, I mean, you can't compare something.  Can't

20  compare them.

21          There's a jury instruction that says 2D objects can

22  inspire 3D objects.  What we're saying is when you're back

23  there and trying to compare the concept drawings and the

24  fashion drawings that you found were done while he was

25  employed at Mattel, trying to compare 2D to 3D is very

Page 8192

1   difficult.

2           Let's go to B 504 for a moment.  We're looking at

3   what's protectable and unique about the Carter Bryant concept

4   drawings.

5           So on the left here, and I'm just going to do this

6   by way of example on this.  But this is the example that you

7   would use for each of the dolls.

8           The pitch book trying, that's Carter's concept

9   drawing, and then the vendor drawing, which you have

10  determined in your first verdict was done by Carter while

11  employed at Mattel.

12          And then on the right-hand side is the actual doll

13  that was sold at retail, first generation.

14          Now, this is a point that I was making.  You know,

15  before you came in here, I imagine 15 weeks ago you thought

16  that all dolls looked alike.  You go down to Toys-R-Us, and

17  you wouldn't have really seen much differences.  But

18  differences matter.  And the best test of that, ladies and

19  gentlemen, is not only the themes that I put up there, that

20  each theme doesn't sell equally, but here's another example.

21  Mattel, the best toy company in the world, with all of their

22  designers, when they came out with My Scene to compete with

23  Bratz, it succeeded for a while.  It's no longer offered for

24  sale domestically.

25          Flavas are heralded in The Wall Street Journal

Page 8193

1    article that it was used -- Exhibit 1-A.  It's not even sold

2    anymore.  It didn't make it past the year.  So you need more

3    than a concept drawing.  You need the right market appeal.

4              Paula had the touch.  She understood.  She

5    understood that the eyes are so important.  And so for me as

6    a guy, when I got in this case, I'd look at it, and I'd go I

7    don't understand the difference with the makeup.  I'm just

8    confessing for a moment.  What difference do the eyelashes

9    make?

10             And then I realized that this is what makes a doll

11   sellable.  It's why you don't put concept drawings on the

12   shelves.  It's why you don't mail to your grandchildren

13   copies of a Bratz doll from his concept drawings and say next

14   year I'll get you the actual doll.  In the meantime, enjoy

15   the drawings.

16             The eyes.  Wider, more almond-shaped eye with

17   bigger, larger pupil.  Paula testified that the pupil of the

18   eye is the soul of the doll.  It allows an eight-year-old

19   girl to look into it and understand what is behind that doll,

20   what makes it appealable.

21             Look to the far left.  Different look completely.

22   I suspect for any of us that have daughters, that a daughter

23   going out with the makeup and the look on the far left may

24   not be allowed to get out.

25             The one on the right, much prettier, softer.  The

Page 8194

1  lips, look at the exaggerated lips on the Carter concept.  We

2  adopted the more natural human-like lip shape, eyebrows,

3  softer, more natural.

4         The eyebrows in particular.  Look at the eyebrows

5  on the left on the first two.  High arches.  Ours, the doll

6  itself, softer.

7         Do those changes mean much?  Absolutely.  They make

8  it marketable.  They make it salable.  You didn't have

9  anybody from Mattel coming in and saying you know what?

10 Eyebrows don't matter.  Eyes don't matter.  The makeup

11 doesn't matter.  The shape of the eye doesn't matter.  The

12 pupil doesn't matter.  Come on, it's this.  All you needed to

13 do was an exact copy of that.

14        Well, if that's an exact copy, if that's all we

15 needed to do, why do we have Lui Domingo and the other

16 artists at MGA making doll after doll and character after

17 character without even ever seeing the concept drawings?

18        You know, Lui Domingo testified, as did Debbie

19 Middleton.  She was up for a very short time.  She was the

20 woman that the did the character art for us.  After 2003 she

21 came over.  She used to work at DreamWorks and some other

22 places.  She's been there for five years.

23        She never saw the map, the Holy Grail.  She never

24 saw the concept drawings.  If they are so important and it's

25 all you needed, wouldn't you expect that Lui Domingo in his

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8195

1    cubicle every day would be -- no, no, I got to follow in.

2    That's how Carter wants the eyes.  We got to do it that way.

3              But, ladies and gentlemen, that's the test you have

4    to do.  You always have to go back to Carter's drawings.

5              Let's go to the later generation dolls for just a

6    moment.  And by the way, of the differences that I showed up

7    here just because of the limitation on time, you look at it.

8    The particularized expression and the facial features, it's

9    the same for each of the characters.  There are substantial

10   differences.  And those differences, ladies and gentlemen,

11   make it different.  It made it marketable.  It made it the

12   second successful fashion doll.  We made those changes.

13             The intrinsic test is laid out in a jury

14   instruction.  And it will ask you to take a look at the

15   overall look and feel of the doll.  In doing that, again,

16   it's always the starting point of the concept drawings.  And

17   then you're going to have to make a comparison for each of

18   the dolls and the later generations.

19             And let's have slide 068 up, please.  These are

20   some of the later generation dolls.  Let's go through them.

21   And by the way, Hallidae was a name Carter had.  Sasha is

22   MGA.  Look at the changes.  Are they all substantially

23   similar?  Just keep going through them, please.  Jade.  Same

24   questions you're going to have to be asking yourself.  For

25   each and every later generation doll, Mattel is required to

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8196

1    prove the doll infringes the original protectable elements of

2    the copyrighted drawings.

3          Let's look at the other product lines after we do

4    the core fashion dolls.  There are no shortcuts, ladies and

5    gentlemen, if you're asking for $1.3 billion.  You've got to

6    look at every single one of them.

7          Now, Bratz merchandise licensed products also do

8    not infringe.  Let's just look at some of these licensed

9    products very quickly.  Mr. Quinn held up the helmet.  You'll

10   have all of this information back there.  Look at it.  Look

11   at the concept drawings, and it will be your test.  Are they

12   substantially similar?  Does it look and feel the same?  We

13   respectfully submit it's not.

14         I want to go back to the three-panel comparison

15   that Mr. Quinn used.  This is B 680.  He used this in the

16   opening statement.  And I think he may have used the same

17   example.  Carter's drawing on the left, concept drawings,

18   then the fashion drawings, and the final Bratz doll.  That's

19   the first generation doll.

20         But again, Mattel did not bring in any witness

21   beyond -- to testify about anything beyond the first

22   generation.  And as I stood up in my opening statement and

23   said although I could point out the differences between the

24   fashions, that for the first generation we agree that the

25   fashions are substantially similar to Carter Bryant's concept

Page 8197

1   drawings.

2          And, in fact, that's the context in which my

3   comment was taken out of the opening statement when I said if

4   you add color to the drawings of the fashions in that first

5   generation, you didn't change the attitude.

6          Let's go to G 702 for a moment.  This is the type

7   of comparison that you're going to be asked to make back

8   there.  There's Lupe, Carter Bryant's concept drawing.  This

9   is the fashion drawing that he did, you found he did while he

10  was employed at Mattel.  But even then, compared to later

11  generation Bratz Lil Angelz, it just will not hold up.

12         I'm also pointed out to you already that the sculpt

13  is not the same.  Margaret Leahy made substantial changes

14  between 1136 that you've awarded to Mattel.  But the Bratz

15  doll is not a re-cast.  It's not just a redo.  They had to do

16  it all over again to make it into something that's

17  marketable.

18         There's no infringement based on characters.

19  Mattel argues that because the characters' names, Bratz still

20  says the same.  Three out of the four characters names

21  changed.  Go back to the original concept drawings.  The

22  personalities are not laid out here.  It's a general

23  description of who Cloe is or Zoe is under this.  But not the

24  character development that you see throughout the line.  But

25  yet they want every dollar of every change.

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8198

1          You know, on the verdict form there's a general

2     question asked whether or not Mattel -- by a preponderance of

3     the evidence that MGA is liable to Mattel for copyright

4     infringement, answer yes or no.  And the next question will

5     be how much money, how much profits did they earn?  But

6     behind that, you're going to have to take a look at it, and

7     can I have up B 710, please.  This is going to be that Mattel

8     has the burden to prove that the four infringed copyrighted

9     drawings, and that all of these batches infringed, and all of

10    the other product lines, and all the Bratz branded

11    merchandise to come up with what Mattel is wanting.

12         But even in Mr. Quinn's opening portion of closing

13    argument today, he said -- let's put up 02 for a minute.

14    Regarding the Bratz boys other product lines and the licensed

15    products Mattel now admits -- this is what he says, quote,

16    they, of course, don't look like the original Bratz dolls,

17    don't necessarily look like the Bratz original dolls, but

18    neither do the other extensions or accessories or licensed

19    products, unquote.

20         That's exactly our point.  These differences make a

21    difference.

22         I want to turn to Hong Kong for a moment.  A lot of

23    testimony about Hong Kong.  Bottom line is there's a jury

24    instruction that the Court has given you with respect to what

25    weight, if any, you should give to the Hong Kong litigation.

Page 8199

1        I want to point you to a document that's in

2   evidence.  Again, this is under the rubric of no shortcuts.

3   Mr. Price in his opening statement made a mistake.  He held

4   up the yellow-faced doll.  Can I have up the opening slide,

5   B 647.

6        He held that up and said that was what we were

7   contending over in Hong Kong.  It wasn't.  It was a mistake.

8   But this is the problem with looking at Hong Kong in a

9   vacuum.  We were facing threats in Hong Kong of people

10  ripping us off.  One of the lawyers -- the lawyer that came

11  here admitted that he represented a number of people that had

12  ripped off and copycatted Bratz.  One of his clients had

13  actually had Bratz counterfeit product seized from his

14  office.  We were taking an aggressive position over there.

15  We don't back away from that.  But, ladies and gentlemen,

16  we're not in Hong Kong.  This is this case.  And I expect

17  that you will follow the law as Judge Larson has instructed

18  you.

19       There are just simply no shortcuts.  They talked

20  about testimony of Mr. Kamarck and that he didn't know or

21  couldn't remember what dolls were over there.  We're talking

22  about six or seven years ago.  Is it really remarkable that

23  someone doesn't remember with precision something that

24  occurred seven years ago?  I have a hard time remembering

25  anything that happened before this case.  But yet, every time

Page 8200

1   that someone doesn't have specific recollection, it's like,

2   oh, they must be lying.

3          And the same thing with the copyright application

4   that he put up.  He throws up the testimony that -- or doubt

5   that refers to Daphne Gronich.  Daphne Gronich explained

6   exactly what happened, that a mistake had been made.  It

7   wasn't a statement that it was derivative, that the doll was

8   derivative.  We were talking about the package art was

9   derivative for Jade.  That's the kind of thing that you need

10  to be very careful about.  When you look at this kind of

11  testimony and understand, listen to and catch all of your

12  notes and remember all the testimony and not the snippets

13  that have been played throughout.

14          I want to turn to willfulness.  They say that, you

15  know, we intentionally did this.  We knew it.  They boldly

16  went where nobody else would go.  We took concept drawings.

17  We gave somebody a $500 raise and gave them a standard 3

18  percent royalty.  And we did it willfully because we were

19  going to infringe copyright protection.  It's going to be

20  interesting because one of the tests of intentional

21  willfulness here is whether or not we knew we were infringing

22  the copyrightable protections in the drawings of Carter

23  Bryant.

24          First of all, we didn't know that they belonged to

25  Mattel at the time.  But second of all, this whole trial has

1    been about whether or not these documents infringed.  And

2    they are going to ask you to make a finding that we willfully

3    did it.

4             But I want you to think about this.  First of all,

5    Bryant made legal representations to us.  He signed a

6    contract.  B 564, please.  These are the representations that

7    he made in a legal document.  He was represented by counsel.

8    This is the statement that he gives us, that it was free to

9    be transferred to us.

10            They sued Carter Bryant.  They sued us.  They

11   settled with Carter Bryant.  He's not here.  He's the one

12   that breached his fiduciary duty.  He's the one that breached

13   his duty of loyalty.  It was his contract that was breached.

14   They have settled with him.  They want 1.3 billion from us.

15            On concealment, I want to turn to concealment in

16   the few minutes that I have left.  Mattel has to prove, they

17   have the burden to prove that we fraudulently concealed and

18   kept them from knowing about Carter Bryant.  But, ladies and

19   gentlemen, think about this for a moment.

20            We sent Carter Bryant's drawings to vendors in

21   November of 2000 with Carter Bryant's name on the drawings.

22   We went to the toy fairs in January and February of 2001 with

23   the name Bratz on our product.  They tell you that Bratz was

24   proprietary within Mattel and it was lined up to Diva Starz.

25            Ask yourself if that is true and they walk in and

Page 8202

1    they see as the whole world saw Bratz, why didn't they put

2    two and two together?  We know that Jill Nordquist, when

3    Carter Bryant was leaving, didn't trust Carter Bryant,

4    thought or may have suspected that he was going to a

5    competitor.

6          When they saw the name Bratz, why don't they go

7    back and say wait a minute, Bratz was the name we were using

8    for Diva Starz?  How did MGA find that out?  Carter Bryant,

9    they now find, is working at MGA.  Jill Nordquist has

10   testified that that was common knowledge at Mattel by the

11   summer of 2000.  Summer 2001.  Margaret Leahy testified

12   nobody told her to keep it a secret, and she told three

13   employees at Mattel -- two employees that Carter Bryant was

14   the illustrator behind Bratz.

15         There was no evidence to conceal anything.  When

16   interviewed by The Wall Street Journal, we easily said in The

17   Wall Street Journal article, Mr. Larian, Carter Bryant is the

18   designer behind Bratz.

19         So the question is going to be did they prove that

20   we concealed?  I respectfully submit not, ladies and

21   gentlemen.  There are dates on the verdict form.  I want you

22   to take a look very carefully and say to yourself with some

23   due diligence, with some diligence why didn't they ask.  And

24   when you look at that, I'd ask you to take a look at the

25   investigative report that is submitted in evidence.  1195.

1           This was put in by Mr. De Anda.  You remember

2    Mr. De Anda.  He's head of security, 20 years at L.A.P.D.

3    This is a report that is written in March of 2002 where they

4    are investigating allegations that Carter Bryant plagiarized

5    something at Mattel.  And then you'll have this document.

6    Look at it.  Look how diligent their investigation can be.

7           Why didn't they, when they saw the Bratz name, use

8    the same diligence, go to the telephone records of Carter

9    Bryant in September of 2000, know that he was working at MGA,

10   look at Bratz and say gee, it looks familiar.

11          They contend that Toon Teens was the inspiration.

12   It was so similar that it inspired Carter Bryant, but not so

13   similar that it didn't make them think wait a minute.  He

14   must have gotten the idea when he was here at Mattel.

15          Let's go to 584, slide 584.

16          If we willfully knew we were infringing, if we did

17   all of this intentionally, why at the New York Toy Fair,

18   February 14, 2001, do we invite Mattel into the room.  Mateo

19   Romano and his boss make a visit at three o'clock, February

20   14, 2001.  The name Bratz is on the wall.

21          Following the New York Toy Fair, do you know

22   whether or not MGA and representatives of Mattel ever had

23   discussions about whether or not Mattel would license Bratz

24   dolls in Latin America?  Answer:  We did.

25          I'm out of time.  I'm going to pass it over to

Page 8204

1    Mr. Kennedy.  It's been three months.  It has been a

2    privilege, ladies and gentlemen.  I will not get back up

3    again.  They have the last word.  It's fair.  They have got

4    the burden.  But please, hold on to your beliefs.  And if

5    they come up with arguments, at least think what would Nolan

6    have said?  What's the rest of the story?  What would

7    Mr. Kennedy say?  Because it can't stop just on closing

8    arguments.

9            It's been terrific.  It's still a great country.

10   Thank you.

11           MR. PRICE:  Your Honor, might I ask that you stop

12   their time and have a sidebar?

13           THE COURT:  Actually, why don't we take a brief

14   recess and give everyone a chance, the jury a chance.

15           (WHEREUPON THE JURY WITHDRAWS.)

16           THE COURT:  Let's come to order, please.  Please be

17   seated.  Mr. Price, do you still wish to speak at sidebar?

18           MR. PRICE:  Actually, your Honor, it's been

19   resolved.

20           MS. AGUIAR:  We had something we wanted to raise,

21   and perhaps we could do it at sidebar.

22           THE COURT:  Very well.

23           (SIDEBAR CONFERENCE HELD.)

24           MS. AGUIAR:  Actually, I'm wondering if Mr. Quinn,

25   this does pertain to something said in his opening.  I'll

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8205

1   raise it, and if you want to have him come up here.

2            MR. PRICE:  Sure.

3            MS. AGUIAR:  We did not interrupt their closing,

4   but during Mr. Quinn's closing, page 64 of the rough

5   transcript, lines 17 and 18, he said, quote, the greater the

6   access, the lower Mattel's burden in proving similarity.

7            Now, that is exactly the opposite of what the jury

8   instruction says, and we raised the issue regarding the

9   inverse ratio rule and how difficult it is in the

10  Ninth Circuit.  Courts are struggling with it.  Your Honor

11  mentioned that it is quite confusing.  And I invite the

12  Court, if you need to, to check the transcript.  But

13  Mr. Quinn said something that is absolutely directly opposite

14  of what the instruction says.  And --

15           THE COURT:  What do you want the Court to do?

16           MS. AGUIAR:  I think it would probably be at the

17  very least, it would be appropriate to reread that

18  instruction to the jury and indicate that to the extent

19  anything different was stated in closing, then that was

20  inconsistent with the instruction they got.

21           THE COURT:  Okay.  Well, I have already told the

22  jury numerous times now that if there's anything not

23  consistent with the argument or the law, it's the Court's

24  instruction.  But I will consider rereading the instruction.

25           What is Mattel's position?

Page 8206

1          MR. PRICE:  The position is the jury has heard the

2  instructions.  They will have the instructions with them, and

3  they are not going to rely on the attorneys as to what the

4  law is.  In fact, you told them not to.  It was -- it was a

5  statement that was not precisely obviously what this says,

6  which is that the lower the showing of similarity required --

7  the greater the level of access, the lower the showing of

8  similarity required to support a finding of substantial

9  similarity.

10          THE COURT:  You're saying he used the word

11  "burden"?

12          MR. PRICE:  He used the word burden.

13          THE COURT:  That's not proper.

14          MS. AGUIAR:  That was precisely the issue.

15          THE COURT:  The instruction, however, the Court has

16  given is quite clear.  I'll consider whether to reread the

17  instruction or just to assume that the jury is going to

18  follow the instructions.

19          You had requested a sidebar as well.

20          MR. PRICE:  That issue has been resolved.

21          MR. ZELLER:  The one thing we do have in addition

22  is we would renew our request that the Court read the special

23  instruction about other investigations.  Mr. Nolan did

24  exactly what it is that we discussed yesterday, which is

25  talked about how --

1    THE COURT:  Refresh my recollection on that

2  particular testimony.

3    MR. ZELLER:  I have -- this is the instruction that

4  we had proposed, your Honor.  It was one of the special ones.

5  It's the one that basically says you want to consider

6  evidence of similarity with Diva Starz or Toon Teens for

7  purposes of determining really notice, fraudulent

8  concealment.

9    And, of course, we had the discussion yesterday as

10  well as prior to that.  Mr. Nolan has done precisely that.

11  Said Mattel should have investigated, did investigate, looked

12  at Toon Teens, that that's notice.

13    The Court's rejected that argument as a matter of

14  law --

15    MR. PRICE:  In fact, I can't quote him precisely,

16  but it was, you know, they were -- Mattel was able to

17  conclude that Bratz was inspired by Toon Teens.  It looked

18  similar enough that it looked like it was inspired by it, but

19  they didn't have a diligence team to investigate, et cetera.

20    I mean, that link was pretty, specifically made.

21    MR. NOLAN:  Your Honor, respectfully, I don't think

22  that was the link that was made.  I was linking it to the

23  name Bratz, the proprietary information.  During the course

24  of that, if they saw the name Bratz, and I kept talking about

25  the name Bratz.  I didn't talk about anything else other than

Page 8208

1   when she saw the name Bratz, Jill Nordquist, knowing that he

2   left under questionable circumstances, that he could have

3   come back in and put two and two together and found that he

4   did this while he was at Mattel.  They could have asked

5   questions.

6           And then I pointed out that they already relied on

7   some of the testimony to establish that he did it in 1999.

8   That's all.  We didn't make the link that any of these

9   drawings were based on the copyright claim or anything else

10  like that, your Honor.  I thought I stayed pretty clear to

11  what your earlier indications had been.

12          THE COURT:  Let's see how this plays out in

13  rebuttal.  I think you can make the comparison between what

14  is or is not on the verdict form.  And I'll consider both of

15  these requests for instructions at the end of the closing

16  arguments.

17          MR. PRICE:  And I'd say the issue is I have two

18  hours to rebut.  I'm not sure I'll get to that issue.

19  Mr. Nolan is right.  He did make the argument he just said,

20  but he also made the argument about Toon Teens.

21          THE COURT:  I'll see how this plays out in the

22  closing argument.

23          Thank you, Counsel.

24          (CONCLUSION OF SIDEBAR CONFERENCE.)

25          (Recess taken.)

Page 8209

1          (WHEREUPON THE JURY ENTERS.)

2          THE COURT:  Mr. Kennedy?

3          MR. KENNEDY:  Could we get a time count?

4          THE COURT:  You have one hour and seven minutes

5     left.

6          MR. KENNEDY:  Thank you very much.  Your Honor.

7          FURTHER CLOSING ARGUMENT BY COUNSEL FOR THE DEFENSE

8          MR. KENNEDY:  Counsel, ladies and gentlemen.

9          When Mr. Wagner, the expert witness for Mattel, was

10    here last Friday, remember we discussed with him that this

11    isn't like a lot of damage cases.  Like an auto accident,

12    somebody runs into somebody, somebody's got a back injury,

13    they are suing for lost wages, medical expenses, pain and

14    suffering, things they are out of pocket.

15         As you know by now, this isn't that kind of a

16    damages case.  Mattel isn't here claiming that they lost any

17    profits because of anything that happened here or that they

18    had to lay off people or that they had a Bratz campaign that

19    they had to scrap.

20         Rather, the damages in this case are solely about

21    the profits that Mr. Larian and MGA made and what portion of

22    those profits are due to Carter Bryant's drawings, what

23    you've found to be Mattel's property, and that those profits

24    should be disgorged is the fancy legal word, taken back.

25         So that's the thrust in this case.  And you're

Page 8210

1   going to find, when you get the verdict form, there are a lot

2   of questions on it to be sure, concerning damages.  But I

3   think you're going to find the answer to virtually every one

4   of them, except punitive damages, is going to be exactly the

5   same.  It's going to be your determination of what portion of

6   MGA's total profits are due to Mattel's property and Mattel

7   should get back.

8           So I'm not going to for a minute suggest that this

9   case is simple.  Because it's not, and anybody who has heard

10  the jury instructions knows that.  But there is an

11  overarching question you're going to be called upon to

12  answer, and this is going to be recurring over and over

13  again.  Are Carter Bryant's drawings the sole reason why MGA

14  made profits off of Bratz, as Mattel contends, or were the

15  Bryant drawings one factor among numerous factors that were

16  responsible for those profits.

17          Or stating it an even simpler way, was Carter

18  Bryant the only guy in this case who ever had a good idea.

19          We submit the evidence has shown the answer to that

20  question is no.  Carter Bryant did have a good idea.  Nobody

21  from MGA is denying that.  We wouldn't have bought it from

22  him if we didn't think so.

23          Carter Bryant's drawings undoubtedly made a

24  significant contribution to the success of Bratz.  In fact,

25  in the chain of Bratz success, the Carter Bryant drawings are

Page 8211

1    the first link.  And I think my friend Mr. Price is probably

2    going to get up here in final and go back to the theme of

3    nobody can deny that but for Carter Bryant's showing up on

4    MGA's doorstep, there wouldn't be a Bratz line.

5            And that is the truth; however, it's not the whole

6    truth.  That's one yes, but.  But as the evidence has shown,

7    there are multiple other yes, buts.  As you already heard, if

8    Mr. Larian had taken those drawings and had put them in the

9    top drawer of his deck, and they were still there today,

10   there wouldn't be a Bratz brand.  Those drawings didn't

11   simply transform themselves into dolls and walk down to Kmart

12   and end up on shelves where they were chosen by people.  Or

13   take it a step further.

14           Assume Mr. Larian and MGA had taken those Bratz

15   drawings and had xeroxed them, made nice fancy color copies

16   of them, all kinds of them, and it somehow even convinced

17   Kmart that they ought to sell them.  Can you imagine any

18   little girl down at Kmart saying mommy, mommy, buy me a set

19   of the Carter Bryant drawings.  Everybody on the block has

20   them.  I'll be ostracized from the rest of the kids at

21   school.  And mom is saying well, here's a nice doll.  No, no.

22   It's the Carter Bryant drawings.  Every kid's got to have

23   them.

24           Now, that obviously didn't happen because there

25   were a lot more yes, buts that went on, and Mr. Nolan has

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8212

1    discussed a number of them.

2            I was thinking I'm glad that Mattel aren't the

3    decedents of the Wright brothers, because they'd be here

4    telling us but for the Wright brothers getting airborne at

5    Kitty Hawk in 1903, there would be no aviation industry.  And

6    therefore, all of Boeing's profits and airlines still made

7    profits, all of their profits apparently are attributable

8    because that's what started it all.  Everything has to have a

9    first link, but the Wright brothers -- and we take nothing

10   away from them.  We have monuments to them -- but the

11   aluminum hulled plane, jet engines, even frequent flyer

12   programs, there were some other people besides Orville and

13   Wilbur that had some good ideas.

14           Similarly in this case, there are a number of other

15   people besides Carter Bryant who had good ideas, and that's

16   why we're where we are today.

17           Could we have the hero shot.  I was listening to

18   Mr. Quinn this morning, and I had this image of what it must

19   be like over at MGA when they are trying to do something.

20   They look at the inspiration, that's what I keep hearing.

21   This is the inspiration, and apparently, if you look at that

22   drawing long enough, your mind says talking Bratz.  But where

23   you push a button, and it talks.  If you turn the phone off

24   and really concentrate zen like, really focus in on the

25   drawing, you will say Blind Date.

ef1e656c-63f2-4fc2-a73d-cf5532f92131

1          We have a girl Bratz.  Let's create boy Bratz, and

2     why not obscure one half of the compartment, and it will be

3     like a blind date, and what's more, if you look at the

4     drawing even harder, it turns out you make the guy in a

5     limited edition sometimes like a package in Cracker Jacks,

6     and that's all you have to do.  But apparently the design

7     center at MGA consists of Carter Bryant drawings, and

8     whenever they need more revenue, everybody just focuses

9     really, really hard and the inspiration just flows.

10          Obviously that's not the way it happened.

11     Contribution, yes.  But not the only contribution.

12          And finally, can anybody suggest that anybody

13     looking at that drawing is going to say let's have a Bratz

14     website?  And you've heard about that website.  The only way

15     you can log on is you have to buy a doll.  Because there's a

16     code in the box, and therefore, when your friends come over

17     and see you on line, they go home and tell their parents.

18     They need the code.  They have to go buy a doll, et cetera.

19     That's why Bratz has been successful.  Carter Bryant in 1999

20     or 2000 was not talking about website design or having

21     limited access.

22          So against that background, I submit the threshold

23     question in this case, is Carter Bryant the only guy who had

24     a good idea, is a resounding no.  Not to take anything away

25     from the idea he had, but he's not a solo act.  He's part of

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8214

1    an ensemble.

2         Now, how do we go about trying to come up with a

3    methodology where we can take Mr. Bryant's undeniable

4    valuable contribution and balance it against all the other

5    ideas that other bright people have.

6         And I think it's significant.  Mattel only gives

7    you an all-or-nothing approach.  It's here are our numbers.

8    Here's the prejudgment interest on our numbers.  That's what

9    we want.  Apparently they don't think you're going to go in

10   and deliberate, and if you do deliberate, you couldn't

11   possibly disagree with anything they said.  Maybe it's

12   because we've been through Phase 1-A, that we have a somewhat

13   different view of what we're going to do.  And we think

14   there's a strong likelihood you aren't going to agree fully

15   with what either side says in this case.

16        What I'd like to spend my allotted time doing is

17   talking about methodologies that I would suggest you can

18   apply in the jury room.  You may agree with my numbers; you

19   may not.  But these are methodologies that you can use

20   regardless of how much of either side you do accept or don't.

21        And, Aaron, could we have 901, please.

22        You've seen this before.  We're talking about

23   3.1 billion in revenue.  Everyone agrees on that.  That's

24   for all the Bratz products, the umbrellas, the aluminum

25   scooter, everything else.  3.1 billion total revenue;

1   however, it's not just in a big bag.  It's in various

2   subcategories that we've talked about before, including -- I

3   thought it was significant when Mr. Quinn got up this morning

4   and picked a helmet, which is probably part of outdoor, 2.7

5   up there towards the top.  And Mr. Quinn told you nobody

6   would buy this helmet if it weren't a Bratz.

7           Now, he said that about 10 minutes after his Honor

8   had just gotten through telling you argument of counsel isn't

9   evidence.  So Mr. Quinn can't create universal demand for

10  this product.  Some evidence has to do it.

11          Who was the expert witness for Mattel who got up

12  here and told you that he or she had done a consumer survey,

13  had done interviews, had studied and found that the only

14  reason these helmets sell is because of the Bratz connection?

15          You didn't hear from that person.  Remember,

16  Mr. Wagner told you I do numbers, but I don't sponsor facts.

17  Somebody else is going to have to establish the underlying

18  premises for what's going on.

19          We didn't even have one 8 to 12 year old go up on

20  the stand and say the reason I bought my helmet is because it

21  was a Bratz, and that's what all my friends are doing.  And I

22  see some grins, and it does sound facetious, but when you're

23  asking for -- and I've got to differ with my partner,

24  Mr. Nolan.  It's not 1.3 billion they are asking for.  It's

25  1.8 billion.  And the 1.8 billion supposedly includes every

Page 8216

1   sale of this helmet.

2          They had thousands of products to pick from.  They

3   chose this one, and they can't identify one sale to one

4   person that resulted from this being -- having Bratz on it as

5   opposed to not being on it.

6          This damage presentation is the equivalent of a

7   drive-by shooting.  It's hey, this is all us, 3.1 billion.

8   Let me do a couple subtractions.  We get the rest.  It's

9   obvious the jury doesn't like Isaac Larian.  Just give them a

10  big number, and they will come back with it.

11         And it isn't just the helmet.  It's the umbrella,

12  it's the scooter.  Pick any product on there.  And where was

13  the evidence, you can do consumer surveys and find out why

14  people do things.  You can find an expert to testify to

15  almost anything.

16         That wasn't done here.  Zero evidence as to what

17  drove the demand, let alone anybody coming in and saying oh,

18  it's the Carter Bryant drawings.  That's really what

19  connected it here.

20         That didn't happen.  Even going down the cycle,

21  getting as far as the fashion dolls.  There's no testimony as

22  to the fact that somebody bought Blind Date, who is 100

23  percent, or 90 percent, or 30 percent due to Carter Bryant's

24  original drawings.  Mattel has never presented any of that to

25  you.

1          Now, there were other people, as I say, who had

2     good ideas besides Mr. Bryant.  And I'd like to talk about

3     some of them and the contribution they made.

4          And I want to start with branding.  I think it's a

5     significant one because Mattel itself acknowledges that

6     branding is key to the success and not just products but

7     dolls.  Mr. Quinn told us in opening statement Mattel's

8     success in the fashion doll market didn't just happen.  It

9     required constant innovation.

10          And I agree with him completely.  And Mattel, that

11     probably has the best branding in the toy business, is

12     justifiably proud of it, but it didn't just happen.  They

13     worked at it.  They struggled.

14          Mr. Quinn this morning said oh, Larian -- I think I

15     got the -- he followed the standard play book for developing

16     a brand.  Well, now, where was the evidence that there's a

17     standard play book for developing a brand?  And if Quinn can

18     say it, he can even shout it, but that doesn't make it

19     evidence.  He didn't tell us who the witness was, and as you

20     know, the only real branding expert we had in this case was

21     Dr. Joachimsthaler, and he certainly didn't say there was a

22     standard play book.

23          But if there is, why aren't there more Starbucks?

24     Why aren't other people who like to sell coffee going to

25     Mr. Quinn's standard how to establish a strong brand play

Page 8218

1    book and just setting up shop?  Apparently all you have to do

2    is pour water on it, and it happens.  If there's a standard

3    play book, why, as Dr. Joachimsthaler pointed out, can most

4    of us only name one of the many brands of MP3 players?  How

5    many people can get beyond iPod?

6            There are 10, 20 competent ones on the market.  If

7    there's a standard player, how come the other 18, 19

8    people -- it must be a book of very limited circulation since

9    it doesn't seem to enjoy much of a following in America.

10           The fact is branding is not only a major factor,

11   but it's one you have to look at, and Carter Bryant made zero

12   contribution, according to the evidence, to the Bratz brand

13   as it's come to exist.

14           And what's the effect of having a strong brand?

15           Aaron, can we see 176.

16           I did the arithmetic.  With 57 minutes, I think I'm

17   responsible for $28 million in damages per minute.

18           So, Aaron, you just cost me three quarters of a

19   million dollars worth of argument.  So without delay, keep it

20   moving here, please.

21           You've seen this before.  Doctor Joachimsthaler's

22   statement explaining that when you get to affordable luxuries

23   in particular, there is an incredible price impact.  As he

24   explained, that's why we all know Starbucks, it costs a

25   nickel for the coffee.  We know we can buy a cup next door

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8219

1  for a dollar, but we go spend 3.50 for the Starbucks

2  experience.  It's an affordable luxury.

3          And he showed us with regard to dolls, we've got

4  three or four other factors, for those of you who may be

5  almost as old as me and remember advance packers, the hidden

6  persuaders and the evils of Madison, I think a lot of this

7  resonated with you've got the grandma factor, got to buy

8  something nice for the children, and it can't just be a

9  generic no name.  It's got to be what the kid wants.

10         We've got the family guilt factor going.  I don't

11 spend enough time with my kids.  So maybe I can offer them a

12 tangible in lieu of that.  And you've got peer group pressure

13 coming.  I mean, putting that secret code in the Bratz box is

14 both generous and insidious because once any girl on the

15 block sees that her friend can log on to the Bratz website,

16 and she can't, what is the conversation at dinner going to be

17 that night.  When can I get a Bratz doll?

18         It's like when we were young, buying the Cracker

19 Jacks for the prize.  Here you're selling a 15.99 doll, and

20 that's how you're able to do that.  And I notice that there's

21 absolutely no criticism of those statistics or those numbers

22 in Mr. Quinn's argument this morning.  And for good reason.

23         Those statistics and that 50 to 70 percent price

24 premium is uncontradicted in this case as Dr. Joachimsthaler

25 told you, he's got lots of competitors.  He's not the only

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8220

1   one doing this.  And if there's anybody who would be in a

2   position to find a contrabranding opinion, if they wanted it,

3   it's the folks from Mattel.  And with 7 billion people on the

4   planet at last count, there isn't a one of them who came in

5   here and disagreed either with those numbers or any other

6   portion of Dr. Joachimsthaler's branding analysis.

7         Some people over at MGA had some very good ideas

8   when it came to branding which contributed between 50 and 70

9   percent of those profits that Mattel says are all due to the

10  Carter Bryant drawings.

11        So even if you're being conservative, I take it

12  whatever you find the profits to be and knocking off 50 to 70

13  percent in your discretion.

14        Next idea people had over there.  Themes.

15        And, Aaron, could we see 91, please.  You've seen

16  this graph before.  Remember, this showed MGA had 77

17  different themes for dolls that range from a low of a hundred

18  thousand to as much as 73 million.

19        And, Aaron, could we see 910.  This will be in the

20  jury room.  Showing the revenues all the way from Bratz play

21  sports at 73 million down to Bratz hair play at a hundred

22  thousand.

23        You were all up in the doll room.  Got to look

24  around as long as you wanted.  Did anybody stop at play

25  sports and say whoa, that must have been a biggy.  This is

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8221

1    the $73 million one.

2              Conversely, in 2007, we had two Cloes released at

3    the same time.  Bratz Hot Summer Days, Bratz Magic Hair.

4    Which did better?  3 million, 18 million.  Box is twice the

5    size, but even if you use that, it doesn't account for a

6    sixfold difference.  And how does that one get to 73 million?

7              I don't have the full answer, but I do know this.

8    I know each of these boxes contains or has on it everything

9    that Mattel could possibly claim is their property.  The doll

10   with the design is in there.  The name Bratz is on the box.

11   The bios and information about who the characters are,

12   anything at all that you can think of that Carter Bryant

13   could have brought over with him is reflected in this box and

14   in this box and in each other box.  But yet we get between a

15   hundred thousand and $73 million.  Something else is going on

16   besides Mattel's property that's contributing to sales.

17             If Carter Bryant's drawings or the name Bratz or

18   the concept of edgy dolls, however you want to design

19   Mattel's property here, is really responsible for all of the

20   profits, sales should just be totally flat.

21             Okay.  There may be some variations.  At a minimum

22   maybe we have a line going slightly up.  But this gross sales

23   ought to be within some very narrow range of each other.

24   Here we're talking about something like 7,300-fold difference

25   between a hundred thousand and 73 million.  And what's

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8222

1    happening?  Themes make a difference.

2          We have Mr. Kilpin, who you heard testify, who is

3    from Mattel.  I see he's here with us today.  Remember, he

4    told The Wall Street Journal, it used to be I'd walk into a

5    product meeting and say show me the toy.  Now I begin by

6    saying tell me a story.

7          So it isn't we are claiming that MGA invented the

8    idea of themes.  What we're saying is Carter Bryant didn't

9    invent the idea of themes, and it wasn't Carter Bryant who

10   said after the first generation, the initial four, they are

11   just sold as individuals.  It isn't until 2002 that the

12   themes start coming along.  So Carter's idea of four dolls,

13   $81 million.  Nice as far as it went.

14         After themes come along, we have one theme.  73

15   million.  Almost as much in one theme as in the entire first

16   generation.

17         This is when Bratz skyrockets.  And it's because of

18   smart people other than Carter Bryant.

19         Another factor.  Packaging.  Tokyo a Go-Go.  You've

20   seen that before.  And once again, apparently according to

21   Mattel, somebody over at MGA put the hero shot up on the wall

22   in their office and said hm, think hard, and they just

23   started sketching, inspired by Carter Bryant's drawings, and

24   came up with that box and that concept.

25         That isn't the way it happened.  And that

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8223

1    packaging, although we've heard it downplayed, it isn't just

2    us that think it's important.  Remember the last day of the

3    trial.  Remember last Friday afternoon, when we were all just

4    counting because we could see 5:30 coming around and knew it

5    was the last day, one of the last things we did, and if you

6    weren't paying all that much attention, you get a free pass

7    that day.

8            There was a video from Kevin Farr, executive

9    vice-president of something at Mattel.  He's a honcho.  Trust

10   me.  And he's asked what are the factors over at Mattel?  And

11   this is what Mattel tells you when they are talking real life

12   rather than when they are trying to extract 100 percent of

13   the profits and destroy a competitor in the process.

14           Packaging:  "Yeah, it's part of the element of the

15   product.  Yeah.  It's important."

16           Themes:  "It's an important element of the play

17   pattern."

18           Brand:  "Is it possible to have a strong brand but

19   a weak product?"

20           "Yes."

21           So this isn't just MGA thinking up these factors.

22   Mr. Farr agrees with us.

23           That isn't the end of it, though, as far as other

24   bright ideas and other things that contribute to the profit

25   of Bratz.  We have characters.  Remember we start with four

Page 8224

1    characters.  We're now up to something like 38.  Again,

2    apparently you're supposed to be able to look at the four,

3    and that just inspires you.  A whole group of people,

4    different ideas, et cetera.

5            And then, of course, as you heard, accessories and

6    fashions which everybody agrees, particularly after the first

7    generation, the whole point you've heard is you can't use

8    Carter Bryant's first generation fashions.  This is cutting

9    edge.  This is edgy.  You can't dress edgy dolls in 2007 in

10   stuff from 2000.  Edgy doesn't last very long.

11           So there's got to be a constant replenishing of the

12   ideas.  And Carter isn't sending in new ideas every month.

13   That's a whole different staff at MGA that's coming up with

14   new fashions, new accessories.  Got to keep it young.  Again,

15   putting it in Madison Avenue terms, it's got to be something

16   new every time the girl goes to the store that she hasn't

17   seen before.

18           And can you imagine anybody telling their daughter

19   or saying I want Bratz play sports?  My dear, you have four

20   that are substantially similar at home.  Just go check the

21   eyes.  Check the nose.  They are all substantially similar.

22   Please, don't just contribute to Mr. Larian's profits.

23           The very fact that there are children with five,

24   six, seven says that while the plastic doll may be the same,

25   what's selling it is not substantially the same, or there

Page 8225

1    wouldn't be anybody around who owns more than one Bratz doll.

2    And we know that's not the case.

3            And finally, if the doll itself really is the whole

4    story, how do we explain My Scene and Flavas?  Both edgy,

5    hip, multi-ethnic kinds of dolls.  In fact, I think Mattel

6    maybe even said that they were inspired by Bratz to do that.

7            Clearly, they competed in the same market, but

8    apparently Mattel forgot to buy the play book on how to do

9    it.  If it's all just the dolls, why didn't My Scene and

10   Flavas absolutely crush Bratz with the weight of Mattel

11   behind them?  But that didn't happen.  It didn't happen

12   because Carter Bryant wasn't the sole reason for the success.

13           Returning to the methodology now and picking up

14   with -- if you do happen to agree with me that there's more

15   going on here than just the Bryant drawings and that what we

16   want to do is make a reasoned assessment of what contribution

17   he made, we've seen the pie chart.  We've looked at that

18   already, breaking up the 3.1 billion.

19           Aaron, could we see 902.

20           Again, you've seen this before.  This is the pie

21   chart, but instead of in percentages, it's in dollar amounts

22   that can be broken down.  So total Bratz fashion dolls, 1.2

23   billion.  Other product lines, 761 billion.  Total branded

24   merchandise.

25           And, Aaron, can we see 871.

ef1e656c-63f2-4fc2-a73d-cf5532f92131

1           And again, this you've seen before, but I think it

2      was late Friday afternoon as well.  So if it doesn't look

3      like an old friend, again, that's probably the reason.

4           What we've done here is we've taken the revenues

5      that -- see, it's the 3.1 billion rounded down at the bottom

6      and have broken them down into those -- the components that

7      are on the pie chart.  And then in addition to that -- and

8      Aaron, could we see 904 -- again, an old favorite.  You've

9      seen this before.  We take the 3.1 billion.  And everybody

10     agrees we have to subtract costs of goods, 1.7 billion.  And

11     we had a debate over operating expenses.

12          You recall we had two sets of experts.  Each ran a

13     multiple regression analysis, and Mr. Wagner lost.  And

14     Mr. Quinn, I think, did a great job this morning struggling

15     to defend it.  But remember, Mr. Wagner is the man who ran

16     two analyses, both of which were in his words inadequate and

17     indefensible, at which point he then had to make adjustments.

18     In one case a $126 million adjustment on 4- or $500 million.

19     And remember I asked him.  I said you told me this was

20     science that was involved here.

21          I've been doing this for 41 years, and when I count

22     the great answers I've heard in the courtroom, one was last

23     Friday.  He improves on science.  That's what he brings to

24     the courtroom.  And I don't know whether he lists himself in

25     the yellow pages whether it's S for Science or I for

Page 8227

1   Improvement.  But when you need S for Science, you call

2   Mr. Wagner, and that's his attempt to cover that.

3          And now let me show you.  Undoubtedly, these are my

4   candidates for the two most boring courtroom answers.  No

5   prizes for guessing right.  R squared.  And I'll be quick on

6   it.  Because I think I did a pretty good job of putting you

7   to sleep the first time.  T is technical.  But everybody

8   agrees, including Mr. Wagner, these regression analyses are a

9   little squishy.  I think he said they are soft science, but

10  there are statistical tools.

11         And you'll remember everybody agrees R squared is

12  one of them, and after we finally got our scale at the bottom

13  corrected, the Meyer regression analysis prevails

14  substantially, and I wouldn't be doing justice to statistics

15  if we didn't have 906, the t-stat.  Again, boring as all get

16  out, but it is the objective way to measure them, and as the

17  kids would say, Meyer smokes Wagner either in terms of R

18  squared or t-stats.  And the reason for that -- if we have

19  907, Aaron -- is Mr. Wagner ignored that dolls are a seasonal

20  business.

21         This is pretty close to running a Christmas tree

22  lot.  You aren't going to have even expenses and even

23  revenues all year after running a Christmas tree lot.  It's

24  annual.  It goes in 12-month cycles.  Dolls aren't quite

25  fully annual.  But they are semiannual, and Mr. Wagner

Page 8228

1    insisted on doing month-by-month comparisons, and he ruled

2    the seasonality out, and that's why he ended up having to

3    adjust by 126 million or 40 million and then still manage to

4    go flunk the R squared and t-stat computation.

5            And recognizing that you weren't going to ride

6    Mr. Wagner as your horse in this case, we then got the new

7    Mr. Larian analysis.

8            Could we have slide 908.

9            You'll recall last weekend, Mr. Price, doing one of

10   his typically excellent cross-examinations, pushed Mr. Larian

11   to try to estimate what portion of effort was being expended

12   on Bratz and non-Bratz.  And Mr. Larian talks about I can

13   give you my guess, that's my guess.  That's my best estimate.

14   And as you'll recall, within three hours, Mr. Wagner has now

15   transferred effort into that means 50 percent of the payroll

16   he was working on.  That means 50 percent of all the checks

17   that were being sent out were for and lo and behold, we now

18   have an analysis that agrees with him.

19           I wonder what the R squared is on that examination.

20   What's the t-stat on that for purposes of evaluation?

21   Mr. Larian was doing exactly what he said he was doing.  He

22   was guessing.  And he guessed wrong.  And there's a clear

23   reasoned analysis from Mr. Meyer to the contrary.

24           Finally, on operating -- just a word on taxes.

25   You've heard it all.  I don't have anything new to add.  Our

1   position is your profits can't include money that you sent to

2   the Internal Revenue Service and is now it's in the

3   government's coffers.  And we don't have that money.

4           In a case particularly talking about disgorgement

5   of profits, that we're supposed to somehow go get that money

6   back so we can pay MGA in profits.  Which then brings us to

7   further summary of where we are.

8           Aaron, could we see 872.

9           We've already taken the 3 billion.  Broken it down

10  by revenue.  Now if we use Mr. Meyer's 405 million, and if

11  you disagree with me and don't want to use Mr. Meyer's

12  numbers, you can still do it with whatever numbers you have

13  to calculate the approximate profits for each of those

14  different categories.

15          So we've now got revenue by grouping, and we've got

16  profits by grouping.

17          And, Aaron, take that one down.

18          Now we get to the heart of the case.  How do we go

19  about trying to decide what portion or what percentage of

20  each of those profit areas is due to the Bryant drawings as

21  opposed to all the good ideas that other people had.  And you

22  remember here, and we've got 880.  Mr. Wagner, the man who

23  improves on science, said the way you do it is you go compare

24  the Bratz line, just single out Bratz dolls, and then you

25  compare those with entire toy companies.  And like any

Page 8230

1    company, they are diversified, they are going to have

2    winners.  They are going to have losers.  They have got a

3    whole portfolio of products.

4            He didn't want to compare MGA's profits as a whole

5    but wants to pluck out the doll as a whole and then compare

6    it with other companies, including Hasbro, which I think the

7    evidence was doesn't even have a fashion doll line.  They are

8    making board games like Monopoly.

9            So they are comparing them to what Mr. Meyer

10   pointed out was -- and Aaron, could we have 912 -- a far

11   fairer way of comparing one successful fashion doll with

12   another successful fashion doll would be to go out and find

13   another successful fashion doll.  And that's what Mr. Meyer

14   did.  And what he found was if you compare Bratz -- whoops, I

15   feel an objection.

16           What he did is he compared and found that for

17   Bratz, it's compared with Barbie.  There was a 5.2 percent

18   additional profit factor that if you want to ascribe

19   something to the changes of Carter Bryant, it's there,

20   although it could be ascribed to a lot of other people as

21   well.  And if you compare Bratz with the entire -- what's

22   called Barbie line, which includes My Scene, Diva Starz, you

23   get a 12 percent differential.  And as long as we mention

24   Mr. Meyer, could we see Exhibit 13861 again.

25           Mr. Quinn talked about this graph this morning.

Page 8231

1   And he singled in and said look, there are three whole years

2   in which Mr. Meyer found that doll design didn't make any

3   contribution whatsoever.

4           No, and we covered this again.  It was on Friday

5   afternoon.  So let me try it one more time.  What Mr. Meyer

6   did in this chart was compared the profitability of Bratz

7   with the profitability of Barbie on a year-by-year basis.

8   And he found over the six-year period, Bratz was more

9   profitable than Barbie by 5.2 percent.  He found within

10  certain years Bratz was not more profitable than Barbie.

11          So what those zeros are in this particular year, if

12  you take Bratz profits and Barbie's profits and put them next

13  to each other, there is no excess profit for Bratz.  Has

14  absolutely nothing to do with what contribution doll design

15  makes.  The chart wasn't setting out to do that.  It's purely

16  a -- it's purely which one is more profitable in that

17  particular year, not why is one more profitable than the

18  other.

19          So against that background, now let's turn to 914.

20  And it's complicated, but let me walk through it.  This, I

21  submit -- and you can change the numbers.  I recognize you

22  have the right -- it's your obligation to find what you want,

23  but I suggest if you're trying to come up with a reasoned

24  approach to what contribution Mattel's and Bryant's drawings

25  made, take the revenue, break it down into logical

Page 8232

1    subcategories, as we've done, figure the total profits for

2    those, and then deduct the portion of the properties that

3    reflects branding.

4             And remember Mr. Joachimsthaler's testimony.

5    Between 50 and 70 percent of the profits.  What we've done

6    here is applied those numbers to each category.  So for later

7    generation dolls, 135 million in profits.  And that number

8    seems to be high.  I can -- Aaron -- well, 135 million.

9    Obviously, it should be 62 1/2 million.  It is 50 percent for

10   branding, and that's using the low end.  Somebody may have

11   gotten enthusiastic.  That may be the 70 percent.  We're not

12   saying you should go with the high end of the range.  Be

13   conservative.  Use the low end.

14            But in any event, each of the profit figures gets

15   reduced.  You'll notice we did not make a reduction for first

16   generation.  And that's because there really wasn't a brand

17   yet at that time.  Things were just starting up.  It took

18   time to develop the brand.  So we're not claiming a brand

19   deduction for them.  But I'm suggesting you take revenue,

20   take profits, and then deduct for branding, then for

21   whatever's left.  50 percent, 40 percent, 60 percent,

22   whatever you decide to try to figure out what other factors

23   are responsible.  And what we've suggested is for later

24   generation fashion dolls, we have obviously the design of the

25   doll.

Page 8233

1          We also, however, have themes, characters,

2    packaging, and accessories and fashions.  And I don't know

3    any way to weight those.  So just adding them all together,

4    there are five contributing factors.  Each one is good for 20

5    percent.  Doll design, 20 percent, 18.9 million.  If you

6    think doll design is 30 percent, then 27 million.  If you

7    think there are six factors rather than five, all I'm

8    suggesting is to come up with a reasoned methodology as to

9    how to do it.

10          For other product lines, and when we talk about

11   other products, we're now doing things like the foldable

12   aluminum scooter, the umbrella, Bratz pets, which whatever

13   similarity you find between Carter Bryant's drawings and

14   fashion dolls, whatever percentage you find there, I submit

15   it's got to be significantly lower.

16          Can you imagine, again, looking at the hero shot

17   and somehow conceiving this thing?  The only thing more

18   amazing than that is this thing sold.  But can you imagine

19   conceiving that from looking at Carter Bryant's drawings?

20   What I'm suggesting is I think you're going to find there's a

21   scale that the further you get away from first generation

22   dolls, the further you get away from fashion dolls, the more

23   you get out into backpacks and bedding, the lower

24   contribution you're going to find is attributable to the

25   Carter Bryant original drawings.

Page 8234

1          And just to complete what we've done, again, a

2    suggestion.  You may not want to follow it.  For other

3    product lines, Bratz branded merchandise and licensing, we've

4    used Mr. Meyer's surplus profit factors.  The 5.2 to 12

5    which, for example, for other product lines, would be --

6    would result in the doll design itself being responsible for

7    2 to 4.6 million out of the resulting profits.  The Bratz

8    branded merchandise, and again, why doesn't it sound like

9    very much.

10          How much are the Carter Bryant drawings supposed to

11   factor into whether somebody buys an umbrella that I guess if

12   you open it up has the word Bratz on it somewhere.  It's a

13   vanishingly small number.  Now we're at 2 percent, 8 percent,

14   and I'm being generous at that.  It certainly isn't a hundred

15   percent or double digits certainly.  Using just our

16   numbers -- and as I said, you may want to plug in your own --

17   we found $4 million.  Given the entire profits, first

18   generation dolls.  There were no brands yet.  There were no

19   themes.  Clearly that was more than just the drawings going

20   on, but we -- we didn't figure out any way to allocate it.

21          Then for later generation dolls, 18.9 million,

22   figuring the doll is one in five.  Other product lines, 2 to

23   4.6.  Bratz branded merchandise, 1.6 to 3.7.  Licensing, 3.3

24   to 7.6.  And for all products that would yield a range of,

25   call it 30 million to about 34 million.  And I explained to

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8235

1    you the basis for getting to those numbers.  You may well

2    have different numbers.

3           But I submit that it's something other than just

4    saying it's Carter Bryant a hundred percent, and I'd urge a

5    methodology along these lines is how to get to a just and

6    fair result in this case.

7           Turning next to the valuation of Mr. Larian's

8    interest in the company.  Because up until now we've really

9    been talking about how you just allocate profits and where

10   that should go.  And remember, Mr. Wagner came in and told us

11   that Mr. Larian's interest in Bratz is 81 percent of MGA, is

12   worth $310 million.  You remember he said -- he figured that

13   on the basis of what a willing buyer and a willing seller

14   would do.  And he said fine, Mr. Larian is a willing seller.

15   Who is the willing buyer?  He said well, I don't really deal

16   in reality.  These are hypothetical numbers.

17          Well, if we had a real buyer, what would you

18   remember they pay?  And remember, we had a reverse auction,

19   and we finally got down to $10 million, and Mr. Wagner said

20   yeah, I guess you could find somebody who would be willing to

21   pay $10 million for Mr. Larian's interest in the company.

22   Let me tell you on MGA's side, you can award any hypothetical

23   dollar amount you want in this case, but that's to be

24   distinguished from real numbers that will go on the verdict

25   sheet.

Page 8236

1          So we can have whatever hypothetical valuation

2     anybody would like.  In terms of a real valuation, the only

3     number you've heard anybody express here was 10 million.

4     Mr. Meyer said -- he wasn't sure he could find a buyer, but

5     it would be in that range.  And he told us that, well, that

6     was based on the uncertainty that this verdict was still yet

7     to be resolved.

8          Well, you're going to decide what the numbers from

9     lost profits should be, and you're going to be in a position

10    to determine what impact, whatever you've done just on

11    profits is before we get back to trying to figure

12    Mr. Larian's interest.

13         So again, it will be your determination of -- as

14    his Honor says, damages, if any, are to be award in the case.

15         Let me talk now about a couple of the other causes

16    of action.  And as I said, when what I talked about now, I

17    think you're going to find leads to the answer you need to

18    respond to both the copyright and the breach of loyalty,

19    breach of fiduciary duty causes of action.  Complicated

20    process, but the good news is I submit once you come up with

21    the number one time, you'll be able to fill it in to a whole

22    lot of different lines on the chart.

23         Conversion, it's a cause of action in there.

24    However, we didn't hear it mentioned this morning.  And I

25    think for good reason.  Because his Honor told you the

Page 8237

1    conversion we're talking about are the Carter Bryant

2    drawings.  And the measure of damages for conversion is the

3    value of the drawings at the time of the conversion.

4            So the question is what were Mr. Bryant's sketches

5    worth in 1999?  Mr. Quinn didn't even want to put a figure on

6    it.  I submit if you want to look for one, Exhibit 315, which

7    I know is an old favorite by now, is the agreement between

8    MGA and Bryant.  If you check it, you'll find he got a

9    minimum of $31,500.  That was money that was guaranteed to

10   him.  He then got a percentage based on sales above that, the

11   3 percent.

12           But if you want to put a value on the drawings,

13   31.5, and I think you'd have a hard time in 2000 taking

14   Mr. Bryant's drawings down to an art gallery or art fair and

15   getting even that amount for them.

16           So you may well conclude that it was a lower

17   number, but I submit 31.5 is the highest number that anybody

18   has suggested in this case for the conversion cause of

19   action.

20           Let's talk about prejudgment interest for a moment.

21           And, Aaron, could we see Jury Instruction No. 36.

22   It's part of the instructions his Honor gave this morning and

23   you'll have with you in the jury room.

24           Last paragraph:  Your award must be based upon

25   evidence and not upon speculation, guesswork, or conjecture.

1            Consistent with their all-or-nothing-at-all

2     approach, Mattel has only given you prejudgment interest

3     figures, assuming you buy their numbers lock, stock, and

4     barrel.

5            If you award the full whatever it is, 1.5 or 1.6

6     that they are seeking, they have put in what the prejudgment

7     interest is; however, again, consistent with the idea that

8     how could this jury ever differ with us, they haven't given

9     you any formula or any ability for determining prejudgment

10    interest if you don't award them each and every cent that

11    they have asked for or if you come up with any kind of a

12    compromised verdict in the case.

13           So the only way, unless you go the whole way with

14    them and award the full amount, you will have to resort to

15    speculation, guesswork, and conjecture, because you just

16    don't have anything before you to try to figure out when

17    prejudgment interest started accruing, particularly since

18    we're talking about profits.

19           They want the profits back.  They are saying those

20    profits really should have been ours, but they don't get

21    interest on the profits until they are actually earned.  And

22    what evidence is there here as to when any particular profit

23    was made, let alone how you figure interest on that.

24           So again, it's Mattel's all-or-nothing-at-all

25    approach.  If that's what they want to do, fine, but they

Page 8239

1    haven't given you any rational basis, any tools whatsoever to

2    calculate that.  And I submit you should reject the

3    prejudgment interest on any other number as speculative.

4            Aaron, could we see Jury Instruction 45.

5            I want to spend the remaining time talking about

6    punitive damages, because as you've figured out by now,

7    Mattel is not only interested in collecting a lot of money in

8    this case, they are interested in wiping a competitor off the

9    face of the earth.  Mr. Larian has obviously been a thorn in

10   their side for quite a while.

11           So this is really a way to go the daily double and

12   get a lot of money and get rid of a competitor, and if the

13   jury doesn't work for us one way, we're going to see if they

14   can do it for us another in terms of punitive damages.

15           Aaron, paragraph 2, line 7.  Punitive damages

16   against Mr. Larian only if Mattel proves by clear and

17   convincing evidence that -- and Aaron, could we go to the

18   third paragraph, and we'll come back to this.

19           Whether a party has the burden of proving any claim

20   or defense by clear and convincing evidence, it means you

21   must be persuaded by the evidence that the claim or defense

22   is highly probable.  This is a higher standard of proof than

23   proof by a preponderance of the evidence.  Up until now,

24   everybody has been talking about preponderance means ever so

25   slightly tilting.  If one side has 51 percent and the other

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8240

1   side has 49 percent, that's a preponderance.  Some people use

2   the scales of justice.  If they tilt ever so slightly.

3           That doesn't apply here.  For punitive damages,

4   it's got to be clear and convincing and highly probable, and

5   I suggest you can go check on this yourself.  If, after two

6   hours of deliberation, you are still trying to decide whether

7   punitive damages should be available, it's not highly

8   probable.  It's not clear and convincing.  In fact, if it

9   takes you more than 10 or 15 minutes to get there, I suggest

10  somebody should say hey, if this is really so clear, how come

11  all nine of us aren't seeing it that clearly.

12          But in any event, it's got to be highly probable,

13  not just it's in the bounds.

14          Second paragraph for a minute.  Isaac Larian

15  engaged in conduct with malice, oppression, or fraud.

16          And his Honor has defined all three of those terms

17  for you.

18          Aaron, page 52, line 10, line 12.  Excuse me.

19          Malice means that a defendant acted with intent to

20  cause injury or that a defendant's conduct was despicable and

21  was done with knowing disregard of the rights or safety of

22  another.

23          That's right.  This is not even a rear-ender where

24  somebody was driving too quickly and ended up harming

25  somebody else.  Isaac Larian, MGA, zero evidence that they

Page 8241

1   set out to do harm to Mattel as a result of what was

2   happening, much less they did so in a despicable sort of

3   manner and in terms of despicable, could we go down to line

4   19.  That's defined for you.

5           Despicable conduct is conduct that is so vile,

6   base, or contemptible, that it would be looked down upon and

7   despised by reasonable people.

8           That's the standard that's got to be shown by clear

9   and convincing evidence.  Now, punitive damage instructions

10  make sense if Mr. Larian put out a product that posed a

11  safety hazard to children.  If we were talking about children

12  who played with dolls that now had an increased risk of

13  cancer, if Mr. Larian had put out a product that pieces broke

14  off and children swallowed.

15          But let's talk about what didn't happen in this

16  case.  Nobody died.  Nobody was injured.  Nobody's health is

17  threatened.  The coast of Alaska didn't get polluted when one

18  of our tankers had a drunken captain on board.  Nobody spent

19  a night in a hospital.  Nobody is going to be in a

20  wheelchair.  As far as I know, except for perhaps some of you

21  on a jury, nobody has even had to take a Tylenol because of

22  anything that happened in this case.  This is an economic

23  dispute between competitors.  That's not what this stuff is

24  aimed at.  It just doesn't have anyplace here.

25          But let's continue on.  Over on page 53, line 6, if

Page 8242

1   we could.

2           How reprehensible was that defendant's conduct?

3   Again, fancy lawyer word for how evil, vile, base, or

4   whatever.  And again, this is for you to take a continuum of

5   reprehensible conduct.  I submit we've got rape and murder

6   out on one end, and jaywalking and not stepping to the rear

7   of the elevator on the other end.  And then there are lots of

8   things in between, and your job here is to figure out where

9   on that spectrum Mr. Larian's conduct fits, and it may not

10  quite be down to jaywalking, but it's sure a heck of a lot

11  closer to that than anything else that's involved here when

12  we're talking about threat to safety.

13          Aaron, come down to B, the next paragraph.  Lines

14  14 and 15.

15          Punitive damages may not be used to punish a

16  defendant for the impact of its alleged conduct on persons

17  other than Mattel.

18          I don't know what any of you may be thinking about

19  the people who got sued in Hong Kong or elsewhere.  As

20  anybody that was wrongfully sued there, they can find

21  lawyers.  They can do it.  Mattel doesn't get to count that.

22  This isn't the Academy Awards where Mattel can come in and

23  accept punitive damages on behalf of somebody else.  It

24  doesn't work that way.  They only get to do it on their own

25  behalf.  It's got to be harm to them.

1         And then, finally, can we see paragraph C.

2             In view of the defendant's financial condition, you

3     need to determine what amount is necessary to punish him or

4     discourage future wrongful conduct.  You may not increase the

5     punitive award above an amount that is otherwise appropriate

6     merely because a defendant has substantial financial

7     resources.

8             And it's a matter of taking this level of

9     reprehensibility of conduct.  The law doesn't permit you to

10    just load it up because Mr. Larian may have a higher balance

11    sheet than the rest of us.

12            So I would hope you're never going to get there,

13    but if you do, let's talk for just a minute about what was

14    involved, conduct that supposedly gave rise to being vile,

15    base, despicable.

16            Aaron, could we see 885.

17            We put together here a little time line, I think,

18    of the key events.  This is the despicable conduct.  This is

19    what's at issue in this case.  This is the stuff you've got

20    to sift through.  We know you're reasonable people.  Is this

21    so vile, base, depraved?  August 16, Veronica Marlow tells

22    Paula Garcia this guy Bryant has some drawings.  September 1.

23    Bryant pitches them, meets with Larian.  October 4, Bryant

24    signs a consulting agreement.  October 5, Larian is telling

25    Bryant I want you working on Bratz 16 hours a day.

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8244

1          Now, that doesn't sound like somebody who thinks

2     this guy still has a full-time job at Mattel.  Mr. Larian's

3     testimony was I thought he was resigning immediately when he

4     signed with us.

5          Was Mr. Larian as careful as he should have been or

6     that he would be today?  No, he was not.  Should he have

7     perhaps delegated somebody else on this project and made sure

8     that Carter Bryant was getting a resignation?  We can think

9     of many other things that I think we'd agree he should have

10    done differently and would do differently if it happened

11    again.

12          But, folks, that is not vile, base, despicable

13    conduct that reasonable people are going to say has to be

14    stamped out.  It was less than perfect operation of a

15    business.  It was sloppy.  And if you find that he's profited

16    unfairly from it, you're going to have all the ability to

17    return some very large numbers if you agree with Mattel in

18    this case.

19          But I submit there's absolutely no need to be

20    piling on with this sort of thing.  This isn't what it was

21    intended for.  This is when you hurt people, maim people, put

22    a dangerous toy on the market.

23          In closing, could we put up Jury Instruction

24    No. 47.  And in particular, I'd like to go to lines 12

25    through 16.

Page 8245

1          I'm not suggesting you shouldn't follow the entire

2    instruction.  Obviously, you should.  I'm sorry.  14 through

3    17.  I apologize.

4          It's important you attempt to reach a unanimous

5    verdict, but only if each of you can do so after having made

6    your own conscientious decision.  Do not change an honest

7    belief about the weight and effect of the evidence simply to

8    reach a verdict.

9          Now, I'm certainly not suggesting you shouldn't

10   deliberate fully and shouldn't try, as you did before, to

11   reach consensus.  But in Federal Court, the reason we're here

12   is we get a unanimous jury.  We're entitled to the verdict

13   that has to be supported by each one of you.  Eight out of

14   nine isn't good enough.  Over in State Court nine out of

15   twelve is.  Not here.  And Mattel and Mr. Larian are entitled

16   to your unanimous verdict.

17         And particularly in a case where we're talking

18   about the kind of money that Mattel is seeking here, if

19   that's what's getting involved, that anybody would compromise

20   and say oh, to get out of here, I guess I'll go along with

21   the group.  That would be a significant violation not only of

22   the oath but of the instruction.

23         I'm about out of time.  I appreciate your patience.

24   I now have to sit down.  Mr. Price, my very capable opponent

25   and friend, now gets to get up and will do a rebuttal for

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8246

1    you.   And I don't get to answer.   Mr. Nolan doesn't get to

2    answer.   Mr. Larian doesn't get to answer.

3            They are going to have to count on you to recognize

4    that that's the way it is.   And part of the reason he gets to

5    go last is because of the heavy burden that is faced here by

6    the plaintiff in this case.

7            So they get to go last, but they do get the final

8    word, which, as I say, we don't get to respond.   So I ask you

9    please listen as attentive but sceptical jurors, and try to

10   think about some of the things that Mr. Nolan and I would

11   have said had we been able to have the chance to respond.

12           In summary, if you go down all of this, the only

13   thing I think has been established in this case with absolute

14   certainty is 31,500 for the value of those drawings on a

15   conversion basis back in 2000.   Money above that is for your

16   sound discretion to determine.   I urge you to think about

17   employing the kind of methodology of breaking things down in

18   deciding does this have the same connection with Carter

19   Bryant's drawings as this.   And I think you'll find the

20   answer is no.

21           Thank you very much.

22           THE COURT:   Thank you, Counsel.

23           We'll take our afternoon break at this time.

24           (Recess taken.)

25   ///

1            THE COURT:  Counsel, 33 minutes.  Okay.

2            Mr. Price, your rebuttal.

3        REBUTTAL ARGUMENT BY COUNSEL FOR THE PLAINTIFF

4            MR. PRICE:  Good afternoon, ladies and gentlemen.

5    I kind of wish Mr. Kennedy had been here earlier.  He's an

6    amusing person and a good friend.  But in two hours of

7    conversation, there's an area of topic that wasn't really

8    discussed at all, and that is what are the damages for the

9    wrongdoing that you've already found.  The breach, aiding and

10   abetting breach of fiduciary duty, breach of contract, the

11   willful, wrongful acts of Isaac Larian.

12           Because you heard all this discussion about how

13   similar is generation 7 to generation 2.  What kind

14   apportionment should we get.  You know, MGA really, really

15   helped sell these things.  You heard all of that.  That has

16   nothing to do with the damages that you are to award based on

17   the wrongful conduct that you have found.  Because if you

18   look in those damages instructions, if we can put up

19   Instruction 39, there's nothing about apportionment.  There's

20   nothing about MGA's efforts.  It is simply that Mattel's

21   entitled to obtain disgorgement profits as an element of its

22   damages for the wrongful acts of aiding and abetting breach

23   of fiduciary duty.

24           Going down, if you find MGA and/or Isaac Larian

25   obtained profits or advantages because of those wrongful

1    acts, those profits and advantages should be awarded to

2    Mattel.

3            The law in this is clear on the wrongful conduct

4    you found, simply you've got to put the person in the

5    position they were before they did the wrongful act.  Because

6    it's not fair that they benefit from this in any way in their

7    wrongdoing.  And you heard Isaac Larian take the stand and

8    tell you it would be wrong for him to benefit or profit in

9    any way by looking at Mattel's confidential information,

10   which you have found that he did willfully.

11           It's wrong for him to profit a penny, for him to be

12   inspired and to go forward and make money based upon that

13   event.  So what you've got to ask yourselves, for those

14   causes of action, is where would MGA be if Isaac Larian and

15   MGA had not willfully, wrongfully aided and abetted the

16   breach of fiduciary duty and the breach of loyalty and the

17   breach of converted property.  Where would they be?

18           You've got 13 years of experience prior to them

19   meeting Carter Bryant.  You can tell where they would be.  In

20   13 years they had never come up with a fashion doll.  They

21   had never come up with a doll that could complete with

22   Barbie.  In fact, no toy companies have.  In 13 years, would

23   they have been looking for a doll and failed or just have

24   thought of it?  There's no evidence whatsoever that MGA would

25   be where it is today except for the fact that they met Carter

Page 8249

1  Bryant.

2          Because what did Paula Garcia tell you?  If you

3  look at slide 17-A.  Well, this is what she told their

4  expert.  What she's told him, and I want to concentrate not

5  just on the highlighted part, was that when she saw the

6  designs of Carter Bryant, she was blown away by his ability

7  to look outside the box, his ability to create this amazing

8  trend was very impressive.

9          The idea, the confidential idea that MGA and Isaac

10 Larian got was outside the box.  It was something MGA never

11 would have come up with.  It's something no other toy company

12 has ever come up with.  It was Mattel's confidential

13 information.  And as a result of that, as a result of that

14 willful act, what did Isaac Larian do?  He started the

15 process.  I'm going to build a Bratz doll.  I'm going to

16 build a Bratz line.  I'm going to license.  All of this in

17 September and October of 2000.  He's already planning this,

18 based upon Mattel's confidential information.

19          And so yeah, that's why, for example, he got to the

20 point where he could sell a piece of rope and say it's Bratz.

21 They had never sold a piece of rope before.  Why were they

22 able to do that?  Because of the wrongful conduct that you

23 have found occurred.  They got that confidential information

24 from Carter Bryant, and they -- and they built the brand and

25 made millions and millions of dollars as a result of that.

Page 8250

1          So the question is where should they be?  They

2     should be at the place they were in 2000 before that

3     happened.

4          What kind of company would they be now if that had

5     not happened?  Well, you saw the evidence.  You saw how well

6     their other products had done.  You saw how every product

7     since then has lost money overall.  Carter Bryant's idea and

8     concepts, the designs, you know, if we could dim the lights a

9     little bit, Jim.  By the way.

10          That's what created all of these profits.  You

11     don't apportion those, you don't let them say where they are

12     now or even part.  Keep a few hundred million.  You never

13     would have had that money because you never would have had

14     the Bratz line or the Bratz brand.  You know.  Except for the

15     fact that you saw this confidential information.

16          You're not allowed to keep that.  You have to

17     disgorge it.  It has nothing to do with apportionment.  It

18     has nothing to do with who had great ideas.  It is there was

19     no Bratz to have ideas about until Carter Bryant came along.

20     There was no fashion doll that was so unique, that was so out

21     of the box until Carter Bryant came along with Mattel's

22     confidential information.

23          So when Mr. Nolan said he wants competition, he

24     wants Bratz in the marketplace, well, competition is great.

25     But you don't compete wrongfully.  You don't compete with Ben

Page 8251

1    and Jerry by looking at their confidential secret formula for

2    green tea ice cream and then sell it.

3            You don't compete with Microsoft by taking their

4    code and competing with them.  That's what the law provides.

5    You know that.

6            And you're going to see the jury instructions,

7    you're going to have them in your hands.  And so for the

8    first part of that jury verdict form, you could ignore

9    virtually everything that you have heard in the closing

10   arguments.  They were ignored by MGA because really you've

11   already found the wrongdoing.  The question is what do you

12   have to do to put them in the place where they would have

13   been but for their wrongdoing.

14           And by the way, you've heard suggestions that, you

15   know, it's greed on Mattel's part.  Well, it would be great

16   if you could just take that money and burn it.  Because

17   really that's the purpose of it, to disgorge profits.  But

18   it's so they can't benefit from their wrongdoing.  And the

19   law provides that someone has to sue and someone has to have

20   enough money.

21           Is that greed?  No.  That is justice.  It is

22   putting them where they should be but for their wrongful

23   conduct.  And if you look at the jury form, the verdict form,

24   if we can go to page 2, Ken.  See, there's a question here.

25   And it's going to be you found MGA Entertainment liable for

Page 8252

1    intentional interference with contractual relations, and the

2    numbers are going to be the same.

3          As to MGA, how did they profit?  Well, if you look

4    at Exhibit -- I think it's 13965 -- you'll see that the

5    numbers you should put in there is 104.1 million, which

6    actually is 100 million 4 million, et cetera.  When you write

7    that in, by the way, please member to write in the million;

8    otherwise, we're going to get a thousand and four dollars.

9    And clearly that's not fair.

10         And the way that was calculated is actually

11   relatively simple.  But it involves calculation.  Again, I

12   would ask, if you look at Exhibit 13965, and what they did is

13   they took the revenues, the Bratz revenues, and when we say

14   Bratz revenues, folks, that's how MGA characterized it on its

15   books.  All they did was take what he said was Bratz related,

16   what it would not have sold except for the fact that Carter

17   Bryant came in and gave them this confidential information.

18         As Ms. Pembleton said on the stand, MGA had never

19   sold a tent before.  They had never sold a helmet before.

20   They had never sold any of this stuff before.  And they never

21   would have unless they had this great idea that they could

22   leverage to do that.

23         So those profits, those revenues, the 3.1 billion

24   should not be apportioned at all.  Because all of that

25   started with looking at that confidential information.  You

Page 8253

1    subtract from that the costs.  And this is where Mr. Kennedy

2    did talk to you a little bit about the costs.  You recall he

3    was saying Mr. Meyer smoked Mr. Wagner on how to allocate

4    cost dollars.  I don't know if you recall that.  Well, not

5    exactly.

6            You may have heard Mark Twain's quote, "There are

7    lies, darned lies, and statistics."  I'm paraphrasing with

8    one word here.

9            Well, that was created for exactly the sort of

10   thing Mr. Meyer did.  Because you heard Mr. Meyer get up

11   there on the stand and say, "I used this regression analysis

12   to figure out what overall costs to be apportioned, and my T

13   figures and R figures smoked Mr. Wagner."

14           Well, what he didn't tell you, but Mr. Wagner did

15   when he took the stand, was he didn't use that regression

16   analysis for his, Mr. Meyer's, analysis at all.  All he did

17   was after Mr. Wagner did his analysis, Mr. Meyer said let me

18   run one and see if this helps me confirm what I've already

19   decided to do.  That analysis did not lead to his results of

20   what should be apportioned for profits.

21           The second thing that Mr. Wagner said is that you

22   know, when you're doing your regression analysis, basically

23   what you're doing is you've got data points, and you're

24   trying to find a statistical way of running a line through it

25   so it seems like there's cause and effect.  So that are these

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8254

1    all close to this line in your hypothesis.  That is basically

2    what he said.

3            In fact, that is what he said.  And he said here's

4    what Mr. Meyer did.  He used just really for the years that

5    were relevant five data points for his analysis.  Because he

6    used yearly numbers, and he only used five years where Bratz

7    were actually sold, and then he said well, I've already come

8    up with my method for doing this.  Let me see if he can do a

9    regression analysis to confirm that, and he looked at those

10   points and did an analysis with a line through it so that

11   these five points were close to the line.

12           Mr. Wagner told you that the result of that is

13   going to be able to flatten out that line.  And so you're

14   going to be able to create these R, T numbers that look good

15   for Mr. Meyer.

16           What Mr. Wagner did was he used over 70 data

17   points.  Because he used monthly data points to take into

18   account seasonality and take into account all the factors

19   when he came up with his analysis.  And so what Mr. Meyer did

20   was he did a regression analysis, said well, let me see if

21   that confirms what I did.  Because what he did, Mr. Wagner

22   told you he simply said 80 percent of the revenues are Bratz.

23   I'm going to allocate for overhead 80 percent of the cost

24   dollars.

25           So if, for example, $1 is spent on another

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8255

1    non-Bratz product, say Bouncey Baby or whatever, I'm going to

2    allocate 80 cents of that to Bratz.  Because I'm just using

3    this formula, 80 percent of revenue, 80 percent of costs.

4    And what Mr. Wagner told you, and that's not the way to do

5    it.  And by the way, when Mr. Meyer took the stand, he could

6    have said to you, he only had six and a half minutes, but he

7    would have said what Mr. Wagner said was false.  He didn't

8    say that because he didn't.  It's just a show, it's an

9    illusion created so they can come up here and talk to you

10   about T scores or R scores.

11            No, as Mr. Wagner said, when you have a higher

12   revenue product like Bratz, what companies do, because they

13   want to make a lot of money, is they plow those profits into

14   other products.  Because they want to grow their other

15   products, too.  And that's what he says MGA did.  And that's

16   what Mr. Larian confirmed on the last day we were here.

17   Because I asked him, okay, how much of your time and effort.

18   I asked him time and effort.  That's these overhead expenses.

19   The ones that aren't particularly associated was focused on

20   Bratz versus non-Bratz.

21            He gave those figures, 30 to 50 percent, sometimes

22   70 percent.  When I first asked him, he said they were

23   estimates.  When I asked him later, after they directed him,

24   they then became guesses.

25            So here's the CEO of the company telling you that

Page 8256

1    I, as the CEO directing 30 to 50 percent, sometimes 60

2    percent of our time and effort to non-Bratz products.  And it

3    makes sense.  That's what you do.  You've got your cash cow.

4    You use that, maintain that, but you spend that money on

5    other things as well.

6              And when you use Mr. Larian's statistics, they are

7    just the same.  You do the math as Mr. Wagner.

8              So, you know, we allocated the costs appropriately.

9    And if we could show -- maybe it is a graph, 13965.  Let's do

10   13690, actually.  And so for the first part, it's really

11   simple.  You take the revenues that they earned because they

12   saw the confidential information.  You subtract the cost.

13   You get profits of about $778 million.  And that's what needs

14   to be disgorged from MGA to put them where they were before

15   they were able to sell helmets for the first time ever.

16   Because they built a brand which they never would have tried

17   to build except for Carter Bryant bringing that information

18   to MGA.

19             And it gets the profits of 777.9 million, but in

20   the state causes of action, we get prejudgment interest,

21   which is why that goes up to the 104.1 million.

22             So going back to the jury form then, that's page 2.

23   So as to MGA, 104.1 million.  That is where they need to be

24   disgorged so that they are where they were before the

25   wrongdoing.  That's all that we're asking for.  And if they

Page 8257

1    want to go forward and continue selling the types of products

2    they were and be the type of company they were before the

3    wrongdoing, that's great.  That's fine.  Because that's where

4    they should be.

5                Now, as to Mr. Larian, I think we need to go to

6    13961.  So Larian had two elements of his damages.  And -- or

7    his benefit.  First he had these distributions.  That's just

8    cash that was sent to him.  And Mr. Kennedy says oh, you

9    know, you need to subtract taxes from that.  Mr. Wagner told

10   you that he's been in -- he didn't say a gazillion, but a lot

11   of cases, and he's never seen that happen.  And you know why?

12   Here's why.

13               You know Mr. Larian was given $10 in distribution.

14   Let's assume that as a billionaire he's in the 50 percent tax

15   bracket.  He's given $10, he pays $5 in tax to the

16   government.  He's out $5.  Now we're here.  Okay?  He has to

17   pay compensatory damages.  You're going to decide what those

18   damages are.

19               So of those profits, he now has to give them up

20   because he doesn't deserve them.  So he gives away $10.  What

21   happens?  Mr. Wagner told you.  He's entitled to the tax

22   credit.  He's entitled to go back to the IRS and say I had to

23   give $10 back.  Here's my revised tax returns.  What happens?

24   The government gives him back the $5.

25               That's why you don't take into account taxes

Page 8258

1    because he gets it right back.  But they are paid.  They are

2    paid.  Because when you get compensatory damages, you pay

3    taxes on that when you receive them.  So that's why, as

4    Mr. Wagner said, you've got compensatory damages.  You do not

5    deduct taxes.

6              So this is just in his pocket, the 385.2 million.

7              And then the 82 percent value of MGA stock.

8    Mr. Wagner took the very latest figures that they provided.

9    The tens of thousands of documents after your verdict to come

10   up with that value of this company going forward.

11             And he explained oh, no, there's a jury out.  So

12   you're not going to be able to sell it now, but you can sell

13   it with the proviso that this depends on the jury's verdict.

14   And among those documents Mr. Wagner testified -- and I don't

15   know if we have Wagner's testimony available.  He testified

16   those documents included forecasts from MGA that were created

17   after your verdict.  And they forecast profits going forward.

18   And Mr. Wagner took that into account.  He said I'm using

19   their forecasts with profits going forward.

20             He says does that --

21             "I was asking you about the MGA document that's

22   been provided since the first verdict.  Does that document

23   reflect MGA becoming profitable?

24             "Yes, at the end of the year they are showing that

25   they expect to be profitable again.

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8259

1        "And so that's the assessment of MGA's management?

2        "Yes, it is."

3        So there's a value of this company going forward.

4   And he valued it.  Mr. Meyer didn't even try.  And so when

5   you combine those, that's how you get the second figure

6   there.  779.5 million as to Mr. Larian, and all we're doing

7   is putting them where they would be if they hadn't acted

8   wrongfully.

9        Ask yourselves, when you get back there, would MGA

10  have ever come up with Bratz and built a Bratz brand?  Ask

11  yourself how were they doing before they met Carter Bryant?

12  That's where they should be now.  Because they should not be

13  able to profit from their wrongdoing.

14       So that's going to be the same thing with respect

15  to the rest of the causes of action, too, aiding and

16  abetting, breach of fiduciary duty, and breach of loyalty.

17  The same numbers.

18       But conversion is a little bit different.  That's a

19  longer instruction.  And it explains how you need to take

20  into account -- basically it's really if you were going to

21  sell the drawings and the jury instruction says to a buyer

22  and seller, the buyer knows how the seller is going to use

23  these drawings.

24       Now, they want to use the figure that Mr. Bryant

25  was actually paid, but here's the problem with that.

Page 8260

1   Mr. Bryant didn't have the right to sell them.  And I submit

2   to you Mr. Larian knew he didn't have the right to sell them.

3   Hence your verdict that he willfully, knowingly converted

4   property.  He willfully aided and abetted the breach of

5   fiduciary duty.  So really what you have there is a fence

6   selling to someone who knows it's stolen an item, and that's

7   not the fair market value.

8        The smallest number you should put here on

9   conversion, the absolute smallest, which is just what would a

10  willing buyer pay a willing seller if they knew how they were

11  going to use it, the smallest amount would be Carter Bryant's

12  royalties.  And that's about $36.3 million.

13       If you look at Exhibit 139731 at page 135, one of

14  those long calculations, but -- it's one of those long

15  documents which has how much Carter Bryant got.  And that's

16  the lowest -- that's not a fair market value because they

17  both knew Carter Bryant didn't have the right to sell.

18  Probably Carter Bryant couldn't have told this to any other

19  company because the other companies are honest.

20       So now let's talk about copyright infringement.

21  And here you have -- I have to say an incredible hypocrisy.

22  MGA sued on the drawings that Carter Bryant created, and not

23  just those drawings in Exhibit 302.  Also, for example,

24  Exhibits 1107, 1108, 1109.  Remember those fashion drawings

25  which Mr. Nolan never talked about.  They sued on those in

Page 8261

1  Hong Kong, saying parts of what you're doing look like these

2  drawings.

3             In that particular case, they sued, for example,

4  Funky Tweens, which is substantially similar.  That was --

5  we're talking about factual allegations here.  When they

6  owned these drawings.  And now they are saying look, this is

7  outrageous.  Our dolls don't look like those drawings.  Our

8  dolls aren't substantially similar.  And then they insult

9  your intelligence by saying we had to bring in an expert to

10 tell you that.

11            Look at 18-K.  I asked you to go back there, and

12 you'll have all these drawings with you.

13            And you'll have the dolls with you.  We're blowing

14 them up multifold here.  We're blowing them up eight to ten

15 times so you can see minor differences.  But you don't need

16 an expert to sit there and tell you whether or not they are

17 substantially similar than to the Carter Bryant drawings.

18 You can go through all of them.  I would ask that you

19 actually look at the dolls, the drawings and ask, you know,

20 are those dolls substantially similar to Carter Bryant's

21 drawings.

22            I tell you what Carter Bryant thinks.  Carter

23 Bryant thinks they are.  His testimony at page 6670 of the

24 trial transcript, if you could put that up, Ken.  He was

25 asked, okay?  So this is 1107 through 1110.

Page 8262

1        And by the way, I misspoke.  Those later fashion

2    doll pictures weren't even sued on in Cityworld.  It was the

3    earlier ones which they were comparing to the Funky Tweens.

4        And he says, "Look at these exhibits, are these the

5    drawings that the original release Bratz dolls were based on?

6    Answer:  They reflect the fashions that were released and the

7    basic hair styles, and the basic -- the basic look of the

8    face."

9        That's what he thinks, that those dolls reflect the

10   basic look of the face.  And then he says, of course, the

11   fashions also in those appear to be the final designs that he

12   came up with.

13       And then once you decide that, come on, as

14   Ms. Garcia said, the point was to try to create a 3D

15   representation of Carter Bryant's drawings.  That's what she

16   testified to.  That was the entire exercise.  That's how she

17   tried to stay true to his vision.

18       You know, once you decide that those first

19   generation dolls substantially are similar to those drawings,

20   hence -- again, you'll look at them and consider the

21   testimony.  And trust your own eyes.  Then the dolls after

22   that, and the designers after that, they didn't go back to

23   the drawings.  They went to the dolls.  To the substantially

24   similar dolls.  And they had to be substantially similar to

25   the original dolls that were created from the Carter Bryant

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8263

1   drawings.

2          In fact, the best evidence of that is -- was it

3   Mr. Domingo?  Remember Mr. Domingo who came up with that

4   drawing; right?  That Tokyo a Go-Go drawing.  And he said we

5   want to put this into a Bratz doll.  It ended up looking like

6   Sasha.  Why?  Because the Bratz dolls have to look like

7   Bratz.  I mean, Mr. Nolan was saying oh, you know, the little

8   girl wants dolls that are different.  You know, and it's

9   true, they want differences.  They want differences, but you

10  never saw MGA abandon and replace the fundamental Bratz look

11  and Bratz design.  Because, you see, a company wouldn't do

12  that.  They wouldn't do that because what was essential is

13  the dolls that MGA needed for its business could differ in

14  countless ways.

15         It's easy to make a different doll; right?  You

16  could have made this, for example, if you wanted to look

17  different from the first generation dolls, you could have

18  made Exhibit 13721 if you wanted to look different and not be

19  substantially similar.  But they didn't.

20         Instead, what they did is they had to preserve

21  their Bratzness.  They couldn't be completely different.

22  They had to be recognizable as Bratz dolls.  And you don't do

23  that accidentally.  You do that consciously, carefully, and

24  willfully.  You make your later generation dolls look

25  substantially similar to the earlier ones to Bratz so that

1   they again have their Bratzness.

2          It's like the March business plan you saw, 2001.

3   Bratz dolls are unique.  They are unique because of

4   proportions, because of the oversized heads, the oversized

5   eyes, the hint of anime.  The diminished nose, the larger

6   lips.  MGA knew that that was what was unique.  And when you

7   look at the jury instructions of what you look at for

8   substantial similarity, that's what you look at.

9          They made each one of those look that way instead

10  of looking substantially different.  And that's what children

11  care about.  When they pick up a Bratz doll, they know they

12  are not identical, but they know they are Bratz.  That's what

13  they notice and they love and they want.  And that's what MGA

14  sells.  And that's what the law forbids.

15         And sure, again, Mr. Nolan can get up here and say

16  ah, look at this.  This doesn't look like those drawings,

17  does it?  Well, no, it doesn't, but if you look at

18  Instruction 42, I think it is page 47.  You are entitled to

19  get not just damages, not just the profits from the

20  infringing dolls.  You're entitled to get indirect profits in

21  addition to direct profits as long as there's a causal

22  relationship between the infringement and the profits

23  generated.

24         And that causal relationship is that, again, they

25  wouldn't have sold a single rope or a single helmet except

Page 8265

1   for the fact that they had the infringing dolls.  In fact, if

2   you look at -- it's what they said in Hong Kong.  Let's look

3   at slide 23-B.  This is what they said under oath.  Again,

4   factual statements you can take into consideration.  The

5   success of the Bratz dolls -- we're talking about the dolls

6   that are substantially similar -- ensured a lucrative

7   business of supplying accessories to the owners of Bratz

8   dolls creating a steady stream of revenue the those are the

9   indirect profits.  And you see that pie chart.  You've got

10  the direct infringement, a substantially similar dolls, and

11  you've got how they leveraged it.  The indirect profits.

12          And so they can get up here and joke and say ha-ha,

13  this doesn't look like a Bratz doll.  The law tells you that

14  doesn't matter.  Because otherwise, you get to profit from

15  this wrongdoing.

16          And so now we come to the issue of apportionment.

17  And if you look at the jury instructions, by the way, and

18  that's Instruction 42 at -- I think it's page 47.

19          There are a couple interesting things.  Actually,

20  it's page 48.  If the copyright -- first of all, it's

21  defendant's burden to show apportionment.  Now, what that

22  means is that if -- that they added something.  And, you

23  know, they have talked about packaging, and they have talked

24  about websites.  And they have talked about themes, and you

25  know, all of these things were done by Mattel and other toy

Page 8266

1    companies.  It's the way you sell a doll.  Right?

2          But let me ask you this:  How many -- this is their

3    singing Bouncey Baby.  Okay?  Now, if you used one of their

4    great packages, how many of these packages would you sell if

5    you stuffed a singing Bouncey Baby in it?  How many of these

6    products would you have sold without the infringing doll?

7    I'll tell you how many.  Zero.  Zero.  They wouldn't have

8    sold a single Bratz doll, packaging, whatever, whether it

9    sings, dances, whatever, without the infringing doll.

10         And what the Court tells you is that if the

11   copyrighted portions are intermingled with the rest of the

12   infringing work that they cannot well be distinguished from

13   it, the entire profits will be given to the plaintiff.

14         And the helmets, those sales, driven by the dolls.

15   That's what Ms. Pembleton told you with respect to those

16   dolls and with respect to all those products, they didn't

17   sell a single one until the Bratz dolls.

18         So that's why we're entitled to the entire 3.1

19   billion, and we're entitled to no apportionment because you

20   wouldn't have sold any of this stuff without the

21   infringement.

22         It's not like the eight-song CD where only one of

23   the songs is infringing, and they can say, you know, we would

24   have sold a lot of these CD's even if we hadn't stolen your

25   song.  They might be able to say that.  Maybe one of the CD's

ef1e656c-63f2-4fc2-a73d-cf5532f92131

Page 8267

1    is the Rolling Stones and the Beatles, and the one you sold

2    was something not as popular, maybe John Denver.

3            But they wouldn't have sold a package without this.

4    So you've got to ask yourself apportionment, and their expert

5    who gets up here on apportionment, what does he do?  He says

6    let's look at Barbie, compare it to Bratz, and oh, if Bratz

7    profits are greater, then that's what's attributable to the

8    look of Bratz.

9            Now, that's ridiculous because Mattel's profits --

10    actually, just Barbie profits, a large number of profits do

11    look at Barbie.  And somebody is saying well, somehow you

12    should apportion based on were Bratz profits better than

13    Barbie's?  Think about it.  If makes no sense.  His analysis,

14    we put up the page  -- Exhibit 13861.

15            THE COURT:  Counsel, you have two minutes.

16            MR. PRICE:  Thank you.

17            Well, that's not it.  If you look at the seven-year

18    analysis, he's got three years.  Three years where he says

19    zero.  Zero percent of all Bratz sales were due to how they

20    look.  And they say oh, no.  We were just looking for the

21    overall number, the 35.2 percent, and that was by adding up

22    every year, including those four zeros.  Actually.  There it

23    is.

24            I hope you have great notes.  Because I don't have

25    any time left or very little time left.  There shouldn't be

Page 8268

1   apportionment.  If there is, you should look at Mr. Wagner's

2   numbers.  I think they are in evidence where he says what you

3   do is you look at another company and say if MGA was a so-so

4   company without Bratz, what would their profit have been.  If

5   they are a good company, if they are a medium company, if so,

6   there's a certain apportion you should give to them.

7        But the way you should fill out the financial

8   infringement numbers are if you find willful infringement,

9   you're going to put for copyright by MGA, this is page 5,

10  Ken.  1.213 million because willful means you don't subtract

11  any costs of -- overhead costs at all.  And nonwillful 777.9

12  million.  Mr. Larian, 385.2.  And 310.8, and then MGA

13  Hong Kong would be the same as MGA.

14        If we're going to be put in the same place, we

15  would be without the wrong.  And as for punitive damages,

16  Mr. Kennedy wasn't here for the first part of this case.  So

17  he doesn't know what happened.  He doesn't know the testimony

18  you heard.  He doesn't know the testimony you had to hear and

19  the cross-examinations you had to hear to get to the truth.

20        THE COURT:  Thank you, Counsel.

21        MR. PRICE:  Thank you.

22        THE COURT:  Members of the jury, you -- this case

23  has been well argued to you by both sides.  I believe that

24  you have been well instructed.  I trust that you will very

25  carefully consider and follow the Court's instructions that

Page 8269

1   have been provided to you.  And each of you will have a

2   complete copy of those instructions and that you will very

3   carefully go through the verdict form and consider the

4   evidence as you heard it, as you understand it, and giving it

5   the weight that you believe it deserves and that you will

6   reach a verdict, a unanimous verdict in this case.

7            I'm going to excuse you at this time.  I received a

8   note from you earlier today indicating that because of the

9   interview that was mentioned earlier, that you did not want

10  to convene until noon tomorrow, and that is fine with the

11  Court.

12           So I will direct you to appear at noon, assemble

13  downstairs in the jury assembly room.  You'll be escorted up

14  to the jury room that you're going to be using, which is

15  going to be the jury room attached to courtroom 4.  And

16  you'll be brought up through a secured way to that jury room.

17           You will have available to you both in the jury

18  room and then, of course, in the courtroom associated with

19  that jury room all of the exhibits.  And I'll make sure that

20  those are all available for you.  If you have any questions,

21  fill out the notes, put them in numerical order.  The first

22  note that we'll request from you tomorrow afternoon, though,

23  is your schedule.  And as with the last time, the schedule is

24  up to you.  You can certainly come in on Monday or not.

25  That's your call.  We'll be here as long as you want to

Page 8270

1    deliberate.

2            So just let us know what the timing is, and you are

3    excused until noon.  Of course, do not start deliberating

4    until noon, until you are all together.  I'm going to bring

5    in the bailiff at this time, who will now take charge of you.

6    Go ahead and --

7            Mr. Holmes, will you take care of bringing the

8    notes up to the jury room?

9            THE CLERK:  Yes, I will.

10           THE COURT:  Why don't you leave the notes right on

11   the chair that you're in right now.  Mr. Holmes will secure

12   them, and they will be waiting for you up in the jury

13   deliberation room noon tomorrow.

14           All rise for the jury.

15           (WHEREUPON THE JURY WITHDRAWS.)

16           THE COURT:  Counsel, I understand a stipulation has

17   been reached concerning the exhibits in this case.  Is that

18   accurate?

19           MR. ZELLER:  Yes, your Honor.  I believe that we

20   have worked out -- the one remaining set that I understood

21   really of exhibits that had not been agreed upon were the

22   Hong Kong exhibits.  I believe that we did reach an agreement

23   on that.  I believe that everything should be in order on

24   that.  We were redacting them this afternoon in accordance

25   with the parties' agreement.  But I can double-check to make

Page 8271

1    sure everything is in order.  But I believe it is at this

2    juncture.

3              THE COURT:  Very well.  Why don't we do this.  What

4    I'd like to do is meet with counsel tomorrow morning, say, at

5    8:45 before I start the other trial at 9:00 tomorrow morning.

6    And I'll just get that on the record that all exhibits have

7    been agreed to.  If there are still any outstanding disputes,

8    the Court with resolve them at that time.

9              The jury is not going to be convening until noon,

10   and that will give us the morning hours to make sure that

11   we've collected everything here and it's up in the courtroom

12   and the jury room and that there is no issue.  So that once

13   the jury comes in, everything is completely laid out for

14   them.

15             MR. ZELLER:  Thank you.

16             THE COURT:  Anything further from Mattel?

17             MR. ZELLER:  Yes, your Honor.  I had some requests

18   or some guidance that people would like on the -- really for

19   the technicians.  I understand that they will be breaking

20   down equipment.  They will be doing it today.  It may be that

21   they have to do some of it tomorrow and wanted to make sure

22   that was okay with the Court.  Obviously we now have the

23   morning.  So presumably it should all be done.

24             THE COURT:  That's fine.  I just don't want any

25   interference with the other trial we have going on.  We have

Page 8272

1  a very important criminal trial that's beginning at 9:00.

2  And I don't want to have any disturbances in the courtroom

3  during that trial.

4          MR. ZELLER:  If they are unable to complete it

5  today, can we ask that perhaps it be done over noontime

6  tomorrow?

7          THE COURT:  That makes a lot of sense.  Noon

8  tomorrow will be fine.

9          MR. ZELLER:  We'll plan on doing that.  Thank you,

10  your Honor.  The other issue has to do with the Court's

11  expectations.  I know the last time during deliberations,

12  obviously, we had the technicians at hand in order if there

13  was any playback that was needed or perhaps any other kind of

14  technical assistance.

15          Obviously with the equipment broken down, that

16  would not be -- that's not going to be feasible.  What we

17  were talking about was the prospect -- and I don't

18  necessarily anticipate that it would be that important for

19  this phase, but in the event that somebody wants some video

20  played back or something, we could perhaps have something set

21  up in the other courtroom, a small television or screen or

22  something.  I don't know that it would require a lot of

23  equipment.

24          THE COURT:  That makes sense.  You can work that

25  out together or perhaps have something on standby up there in

Page 8273

1     case that's needed.  Because there's a jury box up there.

2     And I had indicated that I wanted to answer all questions

3     down here.  But something like a playback of a video, that

4     might make sense to do it up there as opposed to interfering

5     with the trial down here.

6                 MR. ZELLER:  Thank you.

7                 THE COURT:  Anything further from Mattel?

8                 MR. ZELLER:  No, your Honor.

9                 THE COURT:  Very well.  Anything from MGA at this

10    time?

11                MR. NOLAN:  No, your Honor.

12                THE COURT:  My compliments to all counsel on their

13    outstanding closing arguments this afternoon.  Very well

14    done.  And throughout the entire case.

15                I will trust counsel will be on standby for any

16    notes or the verdict when it comes in.

17                Good afternoon.

18

19                (Proceedings concluded at 4:37 P.M.)

20

21

22

23

24

25

Page 8274

1

2

3

4

5

6

7                              C E R T I F I C A T E

8

9

10          I hereby certify that pursuant to Title 28,

11   Section 753 United States Code, the foregoing is a true and

12   correct transcript of the stenographically reported

13   proceedings in the above matter.

14          Certified on August 20, 2008.

15

16

17                    _____
                      MARK SCHWEITZER, CSR, RPR, CRR
                      Official Court Reporter
18                    License No. 10514

19

20

21

22

23

24

25

ef1e656c-63f2-4fc2-a73d-cf5532f92131