# EXHIBIT 17

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No. CV 04-09049 SGL(RNBx)                    Date: July 9, 2009
Title:      MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

       Cindy Sasse                                    None Present
       Courtroom Deputy                               Court Reporter

ATTORNEYS PRESENT FOR                   ATTORNEYS PRESENT FOR
PLAINTIFFS:                             DEFENDANTS:

None Present                            None Present

**PROCEEDINGS:**  **ORDER GRANTING EX PARTE APPLICATION RE TEMPORARY
RECEIVERSHIP (DOCKET #5728)**

**ORDER GRANTING EX PARTE APPLICATION RE COST
SHIFTING (DOCKET #5865)**

**ORDER GRANTING IN PART EX PARTE APPLICATION FOR
RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)**

**ORDER GRANTING IN PART MATTEL'S MOTION RE
DISCOVERY MASTER ORDER NO 27 AND REMANDING
DISCOVERY MASTER ORDER NO. 27 FOR
RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT
OF THE FILING OF THE TAAC (DOCKET #5561)**

**ORDER DENYING MOTION TO STRIKE THE FORENSIC
AUDITOR'S REPORTS (DOCKET #5705)**

Initials of Deputy Clerk __cls_____

EXHIBIT 17
PAGE 274

## I. ORDER GRANTING EX PARTE APPLICATION
## RE TEMPORARY RECEIVERSHIP (DOCKET #5728)

Because the only opposition to the Ex Parte Application regarding the winding up of the Temporary Receivership involves the issue of cost-shifting, which is addressed separately, below, the Court **GRANTS** the Ex Parte Application. A separate order addressing this Ex Parte Application has been concurrently filed.

## II. ORDER GRANTING EX PARTE APPLICATION RE
## COST SHIFTING (DOCKET #5865)

The MGA parties' opposition to the Temporary Receiver's Ex Parte Application argued that the costs of the Temporary Receivership should be shifted to Mattel (as the party who sought appointment of a Temporary Receiver). However, the Court has previously ruled that, at some yet-to-be defined date in the future, the Court will consider whether to shift the costs of both the Temporary Receivership and the Forensic Audit. Therefore, Mattel filed an Ex Parte Application seeking either to be relieved of the responsibility to respond to the MGA parties' argument or, alternatively, for an order setting a briefing schedule on the issue. It is not the intention of the Court to address the cost-shifting issue at this time; rather, as the Court has stated previously on the record, that issue is more efficiently resolved at a later date, most likely a date after completion of Phase 2 of the trial. Accordingly, the Court **GRANTS** Mattel's Ex Parte Application re Cost Shifting. Mattel is relieved of any duty to respond to MGA's argument regarding the appropriate allocation of costs arising from the Temporary Receiver that is set forth in the MGA parties's June 26, 2009 Opposition to the Temporary Receiver's Ex Parte Application.

## III. ORDER GRANTING IN PART EX PARTE APPLICATION FOR
## RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

The Court has received and reviewed the MGA Parties' Ex Parte Application For Partial Release of *In Camera* Juror Interview Transcripts, as well as the Opposition, the Reply, and the accompanying exhibits. The Court **GRANTS IN PART** the Ex Parte Application. Although the Court declines to award the relief sought, the Court will take steps to ensure that the transcript of the juror interviews are provided to the Ninth Circuit for its consideration of the appeal filed by the MGA parties.

The relevant *in camera* juror interviews were conducted on July 25, 2008; the findings made by the Court on the basis of those interviews are set forth in detail in the Court's Order Denying Motion for Mistrial, dated August 8, 2008. Counsel for the parties agreed that the juror interviews, which were conducted mid-trial, should be conducted *in camera*, and the MGA parties did not request that the Court grant them access to the transcripts to prepare their Motion for Mistrial. The Court indicated on the

EXHIBIT 17
PAGE 275

record around the time of the filing of the Motion for Mistrial that it was not the Court's intent to grant the parties access to the transcripts.

After the conclusion of the trial, the MGA parties did not at any time request this Court grant access to the transcripts. To the contrary, some ten months passed between the date of the Order Denying Motion for Mistrial and the MGA parties' first post-trial request for access to those transcripts. That request was made to the Ninth Circuit, not this Court, on June 10, 2009. When the Ninth Circuit denied the request in favor of the MGA's presentation of the issue to this Court in the first instance, the MGA parties thereafter filed the present Ex Parte Application in a expeditious manner.

Ostensibly, as set forth in both the Motion filed before the Ninth Circuit and the Ex Parte Application before this Court, the reason the MGA parties seek access to those transcripts is so that they may use them to challenge the Court's Order Denying Motion for Mistrial. Although the MGA parties filed its Notice of Appeal on May 4, 2009, and although that Notice clearly indicated that the Order Denying Motion for Mistrial would be implicated in the appeal, the MGA parties failed to file its Motion seeking release of the transcripts until June 10, 2009. The MGA parties' failure to seek this relief until a month after they filed their Notice of Appeal and a month before their opening brief was due, and their decision to present the issue of release of the transcripts to the appellate court (rather than this Court) in the first instance, created the very urgency that cause them to seek ex parte relief from this Court. As such, the Court declines to grant the relief sought.

Nevertheless, in the interest of due process and in order to facilitate the full consideration of the issue by the Ninth Circuit, the Court will take steps to ensure that the transcripts of the *in camera* interviews are provided to the Ninth Circuit for *in camera* filing.

## IV. ORDER GRANTING IN PART MATTEL'S MOTION RE DISCOVERY MASTER ORDER NO 27 AND REMANDING DISCOVERY MASTER ORDER NO. 27 FOR RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT OF THE FILING OF THE TAAC (DOCKET #5561)

In the challenged portion of Discovery Master Order No. 27 ("DM Order No. 27"), the Discovery Master denied Mattel's Motion to Compel discovery sought by service of a subpoena on non-party Bingham McCutchen LLP ("Bingham"), a law firm that represents Intervenor Omni 808, as well as a number of non-party entities that are familiar to those involved in this litigation: OmniNet Capital, LLC ("OmniNet"), Vision Capital, LLC ("Vision"), IGWT Group, LLC ("IGWT"), and IGWT 826 Investments, LLC ("IGWT 826"). Broadly categorized, the subpoena sought production of (1) fee agreements relating to Vision and Omni 808; (2) documents regarding the formation, control, and financing of Omni 808, Vision, and Lexington Financial Limited

EXHIBIT **17**

PAGE _V76_

("Lexington"); (3) documents identifying stakeholders and officers of Omni 808, Vision, and Lexington; (4) all contracts relating to Omni 808, Vision Capital, and Lexington; (5) all communications relating to Omni 808, Vision Capital, and Lexington, excluding attorney-client privileged documents; and (6) Bingham's representation of MGAE and certain named individuals who have some connection with MGAE, including a number of Mr. Larian's family members.

The Discovery Master correctly recognized the essential legal standard in assessing whether a subpoena may be enforced. The information must satisfy the discovery relevance standard, i.e., it must be "'reasonably calculated to lead to the discovery of admissible evidence.'" DM Order No. 27 at 19 (quoting Fed. R. Civ. P. 26(b)(1)). The decision of whether to enforce a subpoena ultimately implicates a balancing test that pits relevance of the materials sought and need to the requesting party against hardship to the party resisting the subpoena. DM Order No. 27 at 20. Non-parties are generally required to bear lesser burdens than parties in responding to subpoenas. Exxon Shipping Co. v. United States Dept. of Interior, 34 F.3d 774, 779 (9th Cir. 1994) ("The Federal Rules also afford nonparties special protection against the time and expense of complying with subpoenas.").

However, the Discovery Master overstated the burden of proof allocated to Mattel, as the party seeking discovery. See DM Order No. 27 at 20 ("As the party moving to compel compliance with the subpoena, Mattel bears the initial burden of establishing that the information sought is relevant and necessary to the claims or defenses at issue.") This standard is both overstated and incomplete. It is overstated in that Mattel need not show that the evidence sought is "necessary to the claims or defenses." Although Mattel indeed bears the burden of establishing relevancy, that showing is not one of "necessity." Rather, Mattel must bear the burden of establishing the discovery relevancy standard -- that the materials sought are "reasonably calculated to lead to the discovery of admissible evidence" -- is met. It need not establish that the materials sought are "necessary" to its case.

This point leads to the manner in which the stated burden is incomplete. As clearly articulated by cases cited by Bingham, although Mattel bears an initial burden of establishing relevancy, the party resisting discovery thereafter has the burden of establishing that discovery should be denied. See Bryant v. Ochoa, 2009 WL 1390794 at *1 (S.D. Cal. 2009) ("The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1). . . . Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections."); DIRECTV, Inc. v. Trone, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (same); see also Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975) (reversing the district court's issuance of a protective order based on a failure of the party resisting discovery to meet its burden by asserting that the defendant's deposition would merely yield cumulative evidence).

EXHIBIT 17
PAGE 277

The effect of this subtle variation on the burden of proof from that stated by the Discovery Master is magnified by the recent filing of the TAAC, which significantly heightens the relevancy of the issue of how the MGA parties and the parties represented by Bingham may be related, the formation of certain of those entities, and other issues implicated by Mattel's requests. Because the question of relevance is featured so prominently in the quintessential balancing test to which the present discovery motion was subjected, the filing of the TAAC dramatically altered the calculus that underlies the conclusions reached in DM No. 27.

For reasons related to judicial economy and preservation of scarce judicial resources (which this case has stretched to the outer limits), the Court defers decision, in light of the changed calculus that has occurred as the result of the filing of the TAAC, of the issues presented in the challenged portions of DM No. 27 to the Discovery Master. For that reason, the Court **REMANDS** the challenged portions of DM No. 27 to the Discovery Master for his reconsideration and re-balancing in light of the recently filed TAAC. The Discovery Master may, in his discretion, set the matter for further briefing and/or hearing, he may take the matter under submission based on the existing record, or he may take other action as he deems appropriate to resolve the present issues.

Notwithstanding the remand of DM Order No. 27, one issue raised by Mattel requires further consideration by the Court. At page 25 of DM Order No. 27, the Discovery Master appears to impose a blanket prohibition on discovery of materials that are in the possession of a subpoena recipient, but that are related to a non-party over whom the Court has not been shown to have jurisdiction. The Discovery Master cites no legal authority for such a blanket prohibition, and the Court, in its own research, has found none. Such a blanket prohibition precludes the application of the balancing test that applies almost universally to discovery motions; accordingly, and because this blanket prohibition is unprecedented, the Court finds that it is contrary to law. As to this narrow issue, the Court **GRANTS** Mattel's Motion. The issue of discovery of materials relating to Lexington is **REMANDED** to the Discovery Master for reconsideration in light of this ruling and in light of the filing of the TAAC.

## V. ORDER DENYING MOTION TO STRIKE
## THE FORENSIC AUDITOR'S REPORTS (DOCKET #5705)

In an unsealed filing that has since been ordered sealed by the Court, counsel for Omni 808 Investors, LLC ("Omni 808"), Todd E. Gordinier, made unwarranted, unsubstantiated personal attacks against the Court-Appointed Forensic Auditor, Ronald L. Durkin. Mr. Gordinier's selective public disclosure of portions of the Forensic Auditor's Summary Report, coupled with the maintenance of the Summary Report, as well as the later-filed Responsive Report and Final Report, under seal in their entirety, has led to an unbalanced public presentation of the issues discussed therein. In an

EXHIBIT 17
PAGE 278

attempt to cure this deficiency, the Court has considered the possibility that it should simply unseal the relevant Reports and allow those Reports to speak for themselves.

Because the MGA entities were the primary subject of the Forensic Audit, the MGA parties have, quite understandably, objected to the proposed unsealing. Mattel, for its part, advocates quite emphatically, and not unreasonably, that the Reports should be unsealed in light of the selective disclosure. See Tr. at 31-32 ("It's the underlying analysis that refutes the selective disclosures that MGA and Omni made in a public forum to smear . . . both Mr. Durkin and Mattel.") At the other end of the spectrum, Omni 808 has moved to strike the Reports in their entirety.

In the end, although the Court does not order the unsealing of the Reports, it **DENIES** the Motion to Strike. The Court ordered the Forensic Audit to evaluate whether a receiver should be appointed; as the record bears witness, the Court eventually rejected the suggestion that it should appoint a permanent receiver, and the Court has instead appointed an MGA Monitor with more limited powers than a receiver. Nevertheless, the fact that the Reports were intended to serve a very limited purpose does not mean that there is no possibility that the Forensic Auditor's Reports will not serve any purpose henceforth.

As it currently stands, the Court **ORDERS** that no party shall cite to or rely upon the Reports for any purpose absent further Order of this Court.[1]  However, the documents attached to the Reports, to the extent they are otherwise discoverable, are not insulated from discovery on the basis that they have been made part of the Reports. Conversely, documents, such as charts and interview notes, that were prepared by the Forensic Auditor are the property of the Court and are not subject to discovery or use in this or any other litigation by any party or non-party.[2]

Had it been counsel for the MGA parties who mounted the unwarranted, unsubstantiated, and public personal attacks on Mr. Durkin, the Court would find, notwithstanding the sensitive information contained therein, the unsealing of the Reports was an appropriate remedy for the selective disclosure.[3]  However, here, it is

---

[1] This Order does not supersede the Court's Order permitting the Forensic Auditor to share information with the Court-Appointed Monitor.

[2] Toward that end, the Court **CLARIFIES** to the parties that the work papers, drafts, notes, detailed time records, and any other materials prepared by or at the direction of the Forensic Auditor are the property of the Court. The Court **ORDERS** the Forensic Auditor, as the custodian of those records on behalf of the Court, to retain those materials, whether maintained in electronic, hard copy, or any other medium, until further order of the Court.

[3] As it stands, counsel for MGAE, James I. Stang, wisely sought, and was granted, leave to file his more restrained, but just as unwarranted and unsubstantiated, personal attacks on Mr. Durkin under seal. See MGA Entertainment, Inc.'s Response to Final In Camera Report of Forensic Auditor Ronald L.

Initials of Deputy Clerk __cls_____

EXHIBIT 17
PAGE 279

counsel for Omni 808 who made those attacks public, and although Mattel maintains that both the MGA parties and Omni 808 are jointly responsible for the selective disclosure, see July 6, 2009, Tr. at 33, whether, or to what extent, the MGA parties act or have acted in concert is an issue to be decided in Phase 2 of this action.

Nevertheless, Mr. Gordinier's attack on Mr. Durkin cannot pass without comment by the Court. The Court's comments are directed toward Mr. Gordinier personally, which is not the Court's usual practice. Although the irony of this form of address is not lost on the Court (given the subject of this Order), it is appropriate. Mr. Gordinier signed all three filings in which the personal attacks appear, and continues to stand behind those filings. Moreover, Mr. Gordinier expressly and unabashedly claimed personal responsibility for the brief that was not filed under seal, by both stating that he gave it a lot of thought before filing it and by implicitly acknowledging that although he considered filing his brief under seal, he ultimately rejected that course of action. See May 18, 2009 Tr. at 46-47 ("My brief speaks for itself. We have nothing to hide. . . . I didn't feel it appropriate, necessary, or desirable to file my brief under seal. And I don't have a problem with the Court or anybody reading what I have to say, because I gave it a lot of thought, and I gave it at lot of consideration.").

At the July 6, 2009, hearing, the Court outlined its concerns that while the attacks on Mr. Durkin were public, the Reports are not, and that "it doesn't seem fair" to the Court to allow those allegations to stand alone without a chance to respond to them. July 6, 2009, Tr. at 25-26. In response, Mr. Gordinier contended that his comments "respond[ed] to the report," and that "[w]hat we said was that there were problems with that report." July 6, 2009, Tr. at 28. This statement is an implicit denial that any personal attacks were made; however, as set forth in great detail below, the record belies Mr. Gordinier's *post hoc* protestations.

Lest Mr. Gordinier's statement reflecting his implicit denial that he engaged in personal attacks be perceived as one being made at oral argument without ample time to reflect upon its significance, the statement is also made by Mr. Gordinier in Omni 808's Reply Memorandum, a document upon which he had ample time to reflect: "Each and all of the references in Omni's Statement of Position refer to the contents of Mr. Durkin's Reports and the shortcomings contained therein and omitted therefrom, not to his person." Id. at 2 n.1. To be sure, the criticisms leveled at Mr. Durkin are framed in

---

Durkin (docket #5918) at 4 (accusing Mr. Durkin of "making McCarthy-like statements of non-existent buybacks and unsupported insinuations of conflicts of interest"); id. at 9 (suggesting that Mr. Durkin's formulation of certain search terms relating to criminal acts in Farsi without a concurrent formulation of those terms in English demonstrated a "predisposition that Persian members of MGA's management and staff (and only the Persian members) might be engaged in illegal conduct"). Mr. Stang's attacks pale in comparison to those advanced by Mr. Gordinier, and they were filed under seal. Thus, although the Court's analysis and conclusions regarding the Forensic Auditor's Reports applies with equal force to Mr. Stang's statements, his are not the focus of the Court's attention at this time.

EXHIBIT _17_

PAGE _280_

terms of his Reports. Still other criticisms are, as counsel maintains, addressed to the Reports themselves; those must be analyzed based on their substance. However, as aptly demonstrated by the cited and quoted portions of Mr. Gordinier's filings that appear below, his criticisms do not, by any measure, confine themselves to those Reports, and instead reach out in a highly personal manner to attack the author, his professionalism, his competence, his objectivity, and his integrity.[4]

Indeed, in a display the likes of which have not been previously witnessed by this Court, Mr. Gordinier strayed far afield of legitimate criticism of the discussions, analyses, and conclusions reached in the Summary Report and the Reports that followed. To be sure, there are instances in which Mr. Gordinier addressed the message found in those Reports; just as surely, however, as detailed below, Mr. Gordinier attacked the messenger. Specifically, the papers filed by Mr. Gordinier on behalf of Omni 808 call into question Mr. Durkin's professionalism and competence, as well as his objectivity and integrity. Moreover, and alarmingly, they falsely accuse Mr. Durkin of being influenced by an ethnocentric bias against Mr. Larian and Mr. Kadisha. Such attacks, aimed at Mr. Durkin personally rather than the discussion, analyses, and conclusions set forth in his Reports, appear throughout Omni 808's papers. See Omni 808 Investors, LLC's Statement of Position re Order to Show Cause re Appointment of a Permanent Receiver (docket #5446) ("SOP"), filed May 14, 2009, at 11 (referring to Mr. Durkin's "irresponsible" analysis); id. (noting that Mr. Durkin is "far too experienced" to believe that he "produced . . . a balanced presentation"); id. (stating that "Mr. Durkin's report is a polemic" and "a piece of advocacy"); id. at 12 n.9 (calling into question Mr. Durkin's "objectivity" based on the fact that the Court ordered Mr. Durkin's fees be paid (at least in the first instance) by Mattel); id. (suggesting that Mr. Durkin's ex parte communications with Mattel were improper); id. at 13 n.10 (characterizing Mr. Durkin's quotation of Mr. Larian's and Mr. Kadisha's account of how the two men were acquainted, from "the Persian community," as "at best, unprofessional" and, "at worst,

---

[4] Adding still further to the mounting irony, in the same footnote that Mr. Gordinier disclaims engaging in improper personal attacks, he falsely accuses counsel for Mattel of advancing their own improper ad hominem attacks against Neil Kadisha, who has been referred to as a "common thief" in certain unspecified Mattel filings. Mr. Kadisha is the Managing Partner of a diversified investment firm, Omninet Capital, LLC, and an investor in Omni 808. To call someone a "common thief" is, undoubtably, by any measure, a highly personal attack, therefore an attack addressed "to the man," or ad hominem. However, in the same manner Mr. Gordinier accuses Mr. Durkin of failing to provide appropriate context to the Court in his Reports, Mr. Gordinier himself fails to acknowledge that counsel for Mattel's use of the term "common thief" in connection with Mr. Kadisha merely quotes Los Angeles County Superior Court Judge Henry W. Shatford's conclusion regarding Mr. Kadisha, as set forth in his 191-page Statement of Decision, dated October 24, 2006, which was issued after a 200-day trial, which is currently pending appeal, and which conferred upon Mr. Kadisha the oft-repeated moniker of "common thief," as well as "embezzler," and "perjurer." See Uzyel v. Kadisha, Cal. App. Nos. B196045, B203804, B198007, B199850, B201425, 2009 WL 646096 (Mar. 4, 2009) (appellate brief). As always, context is key. The use by counsel for Mattel of another court's findings and conclusions to advance an argument is not inappropriate. Those findings and conclusions may, or may not, be relevant to matters presented to the Court. Used in this manner, although undoubtably addressed "to the man" (and his credibility), it is not an improper ad hominem attack.

MINUTES FORM 90
CIVIL -- GEN                                    8                    Initials of Deputy Clerk __cls_____

EXHIBIT _17_
PAGE _281_

evidence of improper cultural bias"); id. (in the same footnote, referring to the same
quotation, stating that "[t]he tone [of the report] itself is compelling proof that Mr. Durkin
had no intention of providing an 'objective' report to the Court."); id. at 23 (referring to
the Summary Report as "Mr. Durkin's ill-concealed advocacy piece"); id. (noting that
advocacy, rather than objectivity, "is certainly the posture [Mr. Durkin] is most
comfortable with"); Omni 808 Investors, LLC's Memorandum in Support of Its Requests
to Strike Summary and Responsive Reports of Ronald L. Durkin (docket #5705)
("Motion to Strike"), filed June 8, 2009, at 4 (noting Omni's "doubts that the Court or any
party would benefit further by continuing this façade of Mr. Durkin's 'impartiality'"); id. at
7 (calling Mr. Durkin's explanation of his conclusion regarding the relatedness of certain
parties as "not only fatuous[,] but [also] intellectually dishonest"); id. at 9 (suggesting
that Mr. Durkin intentionally concealed from the Court the fact that Mr. Larian sought
other funding sources before turning to Mr. Kadisha); id. at 10 (noting that "Mr. Durkin's
repeated references to Mr. Larian's and Mr. Kadisha's common 'Persian' heritage can
only be viewed as an attempt to draw some nefarious ethnic connection between
them"); id. at 12 (calling the reference to Mr. Larian's and Mr. Kadisha's ethnicity
"unprofessional symptoms of improper cultural bias [that] have no place in a supposedly
objective report"); Omni 808 Investors, LLC's Reply Memorandum (docket #5809)
("Reply Memo") at 14 (suggesting that not only Mr. Durkin, but also counsel for Mattel,
harbor "cultural biases" that lead them to "suggest[] that [Mr. Larian's and Mr. Kadisha's]
common heritage makes [them] more likely to act contrary to their own interests"); id. at
15 (stating that, according to his own interview notes, Mr. Durkin "misrepresented" to
the Court in his Summary Report how Mr. Larian and Mr. Kadisha portrayed their
relationship with each other).

         As alluded to, Omni 808's criticisms have not been limited to personal attacks;
some of the criticisms are in fact aimed at the Reports themselves. See e.g., SOP at 16
("Mr. Durkin's conclusion that the Wachovia-Omni transaction impacted 'MGAEI's
solvency and ability to continue conducting operations' is simply wrong."). Any
comment by the Court regarding the substance of the discussions, analyses, and
conclusions presented to the Court in the Forensic Auditor's Summary, Responsive,
and Final Reports is inadvisable at this time. With the filing of the Third Amended
Answer and Counterclaims, much of the subject matter of the Forensic Auditor's
Reports have been incorporated into the claims at issue in this action. As such, it would
be premature for the Court to comment upon the substance of issues that are yet to be
adjudicated, and that are subject to a trial by jury. Nevertheless, the Court has
reviewed the Forensic Auditor's Summary, Responsive, and Final Reports, and the
exhibits attached thereto. The Court has also reviewed and considered the criticisms
aimed at the Forensic Auditor, cited and quoted above, as well as the entirety of all the
papers responding to the Forensic Auditor's Reports filed to date. After this review, the
Court is firmly convinced that all the personal criticisms of Mr. Durkin are unwarranted
and unsubstantiated.

         At best, the criticism of Mr. Durkin's performance and presentation represents a

Initials of Deputy Clerk __cls_____

EXHIBIT 17

PAGE 282

different interpretation of available evidence. That such disagreements would arise
between the analyses offered by a Court-Appointed Forensic Auditor and that offered by
counsel for a party whose transactions have been a subject of that audit is by no means
surprising. A jury considering the relevant evidence might ultimately make factual
determinations that tend to agree with Mr. Durkin's assessment, it might ultimately tend
to agree with Mr. Gordinier's assessment, or it may very well reject both positions in
favor of another. The answer to the merits of the claims at issue in this action must
await another day. Today, the Court merely notes that its examination of the Forensic
Auditor's Reports reveal that Mr. Gordinier's personal attacks aimed at their author were
unjustified.

    Some specific attacks directed toward Mr. Durkin – relating to his background as
a law enforcement officer, his communications with counsel for Mattel, and specific (but
baseless) allegations of ethnocentric bias -- are worthy of more specific comment by the
Court.

    Stopping short of explicitly stating such, Mr. Gordinier appears to labor under the
assumption that Mr. Durkin has been unable to put behind him the prosecutorial
mindset under which he presumably operated during his former service to this Nation as
an agent of the Federal Bureau of Investigation ("FBI"). At the outset, the Court notes
that Mr. Gordinier's unstated assumptions do a disservice to the prosecutors and the
law enforcement officers who work with those prosecutors, both of whom conduct their
work under the clearly delineated duty to ferret out not only evidence of guilt but also
"evidence favorable to the accused." See e.g., Berger v. United States, 295 U.S. 78, 88
(1935) (noting that the role of the prosecutor is not to win at all costs and observing that
the prosecutor "is the representative not of an ordinary party to a controversy, but of a
sovereignty whose obligation to govern impartially is as compelling as its obligation to
govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall
win a case, but that justice shall be done."); Brady v. Maryland, 373 U.S. 83, 87 (1963)
(imposing a duty on prosecutors to provide to the defense exculpatory evidence when
requested to do so).

    Secondly, even if prosecutorial duties were not so defined, the Court finds no
suggestion that Mr. Durkin skewed the evidence in favor of any particular viewpoint.
Undoubtedly, there is a **complete absence** of any evidence that, as Mr. Gordinier has
suggested, Mr. Durkin has embarked upon a campaign to purposely mislead the Court.

    Mr. Gordinier also suggests that, because Mr. Durkin's bills are being paid by
Mattel, Mattel has, through this payment or through other communications with Mr.
Durkin, bought Mr. Durkin's loyalty. This is utter nonsense. As demonstrated by the
Court's communications with him, Mr. Durkin is a Court-Appointed Officer who
understands that his role is to work on behalf of the Court and not on behalf of any
party. In any event, the Court's Order of January 7, 2009, which appointed Mr. Durkin,
imposed the costs of the audit on Mattel "in the first instance," but expressly provided for

MINUTES FORM 90                                      Initials of Deputy Clerk __cls_____
CIVIL -- GEN                         10

EXHIBIT 17
PAGE 283

the possibility that the audit expenses be shared or shifted to the MGA parties. Moreover, to suggest, however subtly, that ex parte communications with counsel for Mattel were improper ignores the Court's mandate to the Forensic Auditor in the January 7, 2009, Order, which states that Mr. Durkin was provided with attorney contact information and that he "shall direct his initial communications to counsel." At no time has the Court precluded the Forensic Auditor's communications with Mattel or its counsel; in fact, because the Forensic Audit was undertaken based on evidence gathered by and presented to the Court by Mattel, Mr. Durkin would have been remiss in his duties if he failed to communicate with Mattel and its counsel.

Mr. Durkin was vested with powers and discretion to complete a Court-ordered Forensic Audit. Pursuant to an Order of this Court, he undertook this task and exercised those powers and that discretion, presenting his Reports in conformity with the Court's instructions. Despite counsel's attacks, the Court's review of the evidence before it discerns no abuse of those powers or of that discretion.

Particularly troubling to the Court is that counsel speculates that, because Mr. Durkin noted in his report that Mr. Larian knew Mr. Kadisha from "the Persian Community," Mr. Durkin could be "of the view that this common heritage makes Mr. Kadisha more likely to act contrary to his own interests or to do something via third-parties that he wouldn't otherwise do?" See SOP at 13-14 n.10 (appearing to pose this thought as a rhetorical question). There is no indication in the record, or otherwise, that Mr. Durkin holds such a view. To the contrary, Mr. Durkin's comment regarding the acquaintanceship of Mr. Larian and Mr. Kadisha from "the Persian Community" (which is noted in the report within quotation marks and is expressly attributed to a reference made by Mr. Larian himself) is clearly predicated on interviews with these two individuals, each of whom related independently to Mr. Durkin and his colleagues that they knew each other from "the Persian Community." See Durkin Summary Report, Ex. 14, at 2 ¶ 3 (Notes re March 25, 2009, interview with Mr. Larian: "He indicated that he knew Kadisha from the Persian community.") and Ex. 14, at 15 ¶ 2 (Notes re March 26, 2009, interview with Mr. Kadisha: "Kadisha stated that he knows Larian from the Persian community."). The purpose for this reference is made clear in the footnote set forth at the end of the sentence in which the reference appears; namely, the Report discusses evidence that the relationship between Mr. Larian and Mr. Kadisha is stronger and more personal than either man claimed it was. See Summary Report at 5 n.18; Ex. 15 (personal emails).

In the Reply Memo, Mr. Gordinier takes issue with this explanation, this time including not only Mr. Durkin but also counsel for Mattel as the targets for his unsubstantiated allegations of "cultural bias." Mr. Gordinier first mischaracterizes an argument made by Mattel. Mattel argued, and quite correctly, both that how well Mr. Larian and Mr. Kadisha knew each other was relevant to a determination of whether certain transactions between the two were arms-length transactions, and that this point was likely not lost on either of these two very sophisticated and successful

MINUTES FORM 90
CIVIL -- GEN                                        11                    Initials of Deputy Clerk __cls_____

EXHIBIT 17
PAGE 284

businessmen.[5] As noted previously, both Mr. Larian and Mr. Kadisha stated that they knew each other from "the Persian community" which, in the Forensic Auditor's view, was intended to, or at least had the tendency to minimize the existing relationship between the two. Mr. Gordinier incorrectly characterizes this argument as Mattel's contention that Mr. Larian's and Mr. Kadisha's "Persian relationship" and "common Persian heritage" was somehow relevant to a determination of whether the Omni 808 transaction was an arms-length transaction. Mattel made no such argument. Neither counsel for Mattel nor Mr. Durkin have implied that Mr. Larian's and Mr. Kadisha's ethnicity factors into the analysis. Other than to point to Mr. Larian's and Mr. Kadisha's separate, but identical, accounts of how they knew each other which, in turn, suggests how well they know each other, neither counsel for Mattel nor Mr. Durkin have stated or implied that Mr. Larian's and Mr. Kadisha's shared ethnicity is relevant to any matter currently or potentially before the Court. Compare Opposition at 8-9 with Reply Memo at 14-15.

Moreover, Mr. Gordinier's substantive point, that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha told him about the closeness of their relationship, fares no better. See Reply Memo at 15. On this point, it is important to set this stage properly. Counsel for all parties have attempted to glean far too much from two sterile paragraphs of interview notes taken by Mr. Durkin. Much can be inferred from conversations and interviews through not only what is said, but what is not said, by the interviewee's demeanor, by the tone of the speaker, by the length and placement of pauses, and by non-verbal gestures and body language. With all these variables, much of what is communicated does not find its way into notes.[6] For instance, Mr. Durkin's interview of Mr. Larian lasted over two and a half hours; however, the interview notes are a mere five and a half pages. Similarly, a one-hour and ten minute interview of Mr. Kadisha yielded only three and a half pages of interview notes. This is not to suggest that the notes should have been longer or that the interviews should have been recorded or transcribed; rather, it is to suggest that counsel's arguments based on another's notes are not particularly probative.

In contrast, Mr. Durkin's assessment, based on his interviews with both of them,

---

[5] In fact, the Court just this week issued a 30-page, single-spaced opinion resolving a 10-day bench trial conducted over the sole issue of whether a transaction between "closely related" entities reflected its fair market value, one of the more significant arguments ultimately rejected by the Court in that case being that the close relationship between the parties necessarily rendered the transaction a "sweetheart deal." See July 6, 2009, Order, Siegel v. Warner Bros. Entertainment, Inc., et al., CV 04-08400 SGL (RZ) (docket #554).

[6] Indeed, the interview notes upon which the parties rely concede as much. See Summary Report, Ex. 14 at 2, 15 ("This interview memorandum is a factual representation of the topics discussed during the interview and is not intended to be a word for word or exact transcription of the conversation."). Thus, in addition to not taking into account all non-verbal communication, the notes do not even represent everything that was said during the interview.

EXHIBIT 17
PAGE 285

is that Mr. Larian and Mr. Kadisha attempted to minimize their relationship because both
of them understand the relevance of any friendship or other connection between them
to the assessment of the arms-length nature of any transactions in which they have
engaged. Mr. Durkin's assessment does not come from the gentle teasing of a strained
meaning from two sterile paragraphs of brief notes taken by another person; rather, his
assessment springs from his participation in the interview process, the entirety of the
interviews he conducted of Mr. Larian and Mr. Kadisha, and his review of all of the
evidence. As such, the Court defers to his assessment, at least insofar as how Mr.
Larian and Mr. Kadisha portrayed their relationship to him.

As for that scant language from which the parties glean so much meaning, the
entirety of which is set forth below, it in no way supports the contention made by Mr.
Gordinier that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr.
Kadisha conveyed to him about the closeness of their relationship. On this topic, the
notes of Mr. Larian's interview merely state the following:

> Larian decided to contact Neil Kadisha of OmniNet as
> he knew his company was in the distressed loan business.
> He indicated that he knew Kadisha from the Persian
> community. Kadisha said he wouldn't do the deal alone in
> today's environment and wanted Larian and their other
> friends to invest in the deal with MGA. Larian stated that
> Kadisha negotiated the debt with Wachovia and got it down
> significantly, Larian said he is not bitter about Kadisha
> getting a good deal on buying the loan.

Summary Report, Ex. 14, at 2 ¶ 3 (emphasis added). This paragraph contains the word
"friends," and perhaps could even be read as an implicit statement by Mr. Larian that he
and Mr. Kadisha are "friends." But the language does not compel such an inference.
Moreover, it does not comport with the notes of Mr. Kadisha's interview, which on this
topic state only the following:

> Larian and Kadisha have never been to dinner
> together. Kadisha stated that he knows Larian from the
> Persian community and he sees him often at religious
> events, etc. He has no investments with Larian. Kadisha
> did not talk with Larian last night, this morning or in the last two days.

Summary Report, Ex. 14, at 15, ¶ 2. Mr. Durkin's assessment that Mr. Larian and Mr.
Kadisha sought to minimize the extent of their relationship is not contradicted by these
short passages.

The criticism that Mr. Durkin was acting pursuant to an ethnic or cultural bias is
clearly baseless. The allegations are irresponsible, and they are made to capitalize on

MINUTES FORM 90
CIVIL -- GEN                                  13                  Initials of Deputy Clerk __cls_____

EXHIBIT 17
PAGE 286

their inherent sensational nature for counsel's own purposes of diverting attention away from the substance of the Reports. Sensationalism aside, when viewed in context, the Reports' reference to Mr. Larian and Mr. Kadisha knowing each other from "the Persian community" was plainly innocuous. The reference was a direct quotation from both Mr. Larian and Mr. Kadisha. It was used in a broader discussion regarding how (and thus, impliedly, how well) the two knew each other, which is itself relevant to the issue of whether certain transactions relevant to the present litigation were made at arms length.

This is a most unfortunate incident. The Court certainly understands, in a case as hotly contested as this one -- with such high stakes, with such complex legal issues, and with such truly extraordinary legal talent on all sides -- that lawyers, however ethical and committed to the highest standards of professionalism (as the Court presumes and has found all counsel of record here to be), make statements or commit acts in haste that they subsequently regret. All of the players to this drama, are, after all is said and done, human. As such, all of us are vulnerable to all-too-common human frailties. The Court would place itself at the very top of any list of lawyers who have spoken improvidently at one time or another in this case (and any number of others). What the Court has witnessed here, however, in both manner and substance, for the reasons noted above, goes beyond what the Court can let pass without some manner of reprobation. So let the Court be clear: Nothing excuses the attempted character assassination in which Mr. Gordinier has engaged.

**IT IS SO ORDERED.**

EXHIBIT 17
PAGE 287

# EXHIBIT 18

1   Robert C. O'Brien (SBN 154372)
    ARENT FOX LLP
2   555 West Fifth Street, 48th Floor
    Los Angeles, CA 90013-1065
3   Telephone:  213.629.7400
    Facsimile:   213.629.7401
4   obrien.robert@arentfox.com

5

6   Discovery Master

7

8                UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                    EASTERN DIVISION

11

12   CARTER BRYANT, an individual,,        Case No.  CV 04-09049 SGL (RNBx)

13              Plaintiff,                  Consolidated with
                                            Case No. CV 04-09059
14        v.                                Case No. CV 05-2727

15   MATTEL, INC., a Delaware              **PHASE 2 DISCOVERY MATTER**
     corporation,
16                                          **ORDER NO. 6, REGARDING:**
                Defendant.
17                                            **(1)  MOTION OF MATTEL, INC.
                                              TO COMPEL PRODUCTION OF
18                                            DOCUMENTS RESPONSIVE
                                              TO ITS FIRST AND THIRD
19                                            SETS OF REQUESTS FOR
                                              PRODUCTION; and**
20
                                              **(2)  MOTION OF MGA TO
21                                            COMPEL PRODUCTION OF
                                              DOCUMENTS RESPONSIVE TO
22                                            THE DOCUMENT REQUEST
                                              NOS. 526 AND 528**
23

24

25   CONSOLIDATED WITH
     MATTEL, INC. v. BRYANT and
26   MGA ENTERTAINMENT, INC. v.
     MATTEL, INC.
27

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

                                            ORDER NO. 6
                                  [Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 18
PAGE 288

## I.    **INTRODUCTION**

This Order sets forth the Discovery Master's ruling on: (1) the motion of Mattel, Inc. ("Mattel") to compel production of documents by MGA Entertainment, Inc. ("MGA Entertainment") responsive to Mattel's First Set of Requests for Production No. 48 and Third Set of Requests for Production Nos. 43 through 75, 87 and 88 [Docket No. 4741] (the "Mattel Motion"), and (2) the motion of MGA Entertainment, Isaac Larian, MGA Entertainment HK Limited, and MGAE De Mexico SRL De Cv (collectively "MGA") to compel Mattel to produce documents responsive to MGA's Requests for Production 526 and 528 [Docket Number 4782] (the "MGA Motion") (collectively, the "Motions").

The Motions came on regularly for hearing before the Discovery Master on March 11, 2009. All interested parties were represented by counsel and afforded the opportunity to present oral argument on the Motions. The Discovery Master, having considered the papers filed in support of and in opposition to the Motions, and having heard oral argument thereon, rules as set forth below.

## II.    **THE MATTEL MOTION**

Mattel seeks to compel MGA Entertainment to produce documents responsive to 36 separate document requests. (Mattel Motion, pp. 9 – 15). However, MGA Entertainment subsequently agreed to produce all non-privileged documents responsive to 34 of the document requests identified by Mattel. (MGA Opposition, p. 6). Therefore, the only document requests that remain at issue are Mattel's Third Set of Requests for Production Nos. 87 and 88. (*Id.*, p. 7).

### A.    **The Discovery Sought**

Document Request No. 87 seeks "all personnel and vendor files for each person identified in Exhibit 664." (Mattel's Sep. Stmt., p. 3).

Document Request No. 88 seeks "all personnel and vendor files for each person who has worked as an employee of or vendor for [MGA Entertainment] and who also has been at any time an employee or vendor for Mattel." (*Id.*, p. 5).

EXHIBIT 18

PAGE 289

**B.     Phase 1 Ruling**

This is not the first time that Mattel has moved to compel responses to
Document Request Nos. 87 and 88.  Mattel previously moved to compel responses
to these requests as part of Phase 1, but its motion was denied because "Request
Nos. 87 and 88 (files for former Mattel employees) . . . relate[d] primarily to Phase
2 issues." (Disc. Master Order, Apr. 14, 2008, p. 7).  The former discovery
master's April 14, 2008 Order denying Mattel's original motion to compel further
held that "[i]n view of the stay on Phase 2 discovery . . . . [n]othing in this Order is
intended to authorize or preclude Mattel from seeking further production of
documents in response to Request Nos. 1 – 88 during Phase 2 discovery." (*Id.*, pp.7
- 8).

**C.     Objections of MGA Entertainment**

In its Opposition, MGA Entertainment relies on three basic grounds for
refusing to produce the requested documents.  First, MGA Entertainment argues
that Mattel failed to meet and confer.  Second, MGA Entertainment argues that the
requests are overbroad.  Finally, MGA Entertainment argues that California's
privacy laws prevent it from producing the requested documents.

**1.     Purported Failure To Meet And Confer**

As indicated above, MGA Entertainment first asserts that Mattel's Motion to
Compel should be denied because Mattel failed to adequately meet and confer.
(MGA Opposition, pp. 9 - 10).  However, MGA Entertainment admits that Mattel
did meet and confer regarding the two requests at issue prior to filing its original
motion to compel in Phase 1.  (*Id.*, p. 2 ["The Renewed Motion is in fact based on
meet and confer discussions held over one year ago with MGA's prior lead
counsel."]; *see also id.*, p. 9 n.2 [Mattel "met and conferred over a year ago"].)
MGA further provides no legal authority, and the Discovery Master has found
none, supporting the proposition that a party must meet and confer again before
renewing a motion to compel that was denied merely because the case had been



EXHIBIT 18

PAGE 290

1    divided into phases and where the order denying the motion expressly noted that

2    nothing in the ruling was intended to "preclude Mattel from seeking further

3    production of documents in response" to the requests as part of Phase 2 discovery.[1]

4    (Order Apr. 14, 2008, pp. 7 - 8).

5        Even assuming such a requirement did exist, Mattel in fact met and conferred

6    with MGA Entertainment for a second time following the filing of its current

7    motion and resolved 34 of the 36 document requests in dispute. (MGA Opposition,

8    pp. 1, 6.) However, the parties were still unable to resolve their differences relating

9    to Document Requests Nos. 87 and 88. (*Id.*, 7–9.) It is, therefore, unclear what

10   could have been accomplished by an additional meet and confer on these issues

11   prior to the filing of the motion.  Regardless, Mattel met and conferred once before

12   filing its current motion to compel and that is all that is required by the Federal

13   Rules of Civil Procedure and the discovery procedures governing this case.

14        **2.     Overbreadth Objection**

15        MGA Entertainment's second argument in opposition to Mattel's Motion is

16   that Document Requests Nos. 87 and 88 are "grossly overbroad." (MGA

17   Opposition, pp. 14 – 15).  Specifically, MGA Entertainment argues that the requests

18   are improper because they are not tied "to any product(s) that Mattel alleged that

19   MGA [Entertainment] stole from Mattel." (*Id.*, 14.)  Without citing any legal

20   authority in support of this position, MGA Entertainment asserts that the current

21   Discovery Master should find that the requests are overbroad because the prior

22   discovery master merely compelled it to produce portions of personnel and vendor

23   files related to the Bratz products as part of Phase 1 discovery. (*Id.*; *see also* Order

24   Apr.14, 2008, pp. 7 - 8).   But MGA Entertainment's argument fails to recognize

25   //

26

27   ---
     [1] The arguments of MGA Entertainment that (1) it has new lead counsel and (2) the case has "changed dramatically"

28   since the initial meet and confer took place in 2008 are not supported by any legal authority, (MGA Opposition, p. 9), and do nothing to alter the fact that Mattel met and conferred on these issues previously.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 3 -

ORDER NO. 6
[Case No. CV 04-09049 SGL (RNBx)]



1    the differences between Mattel's Phase 1 and Phase 2 claims.[2]

2         The touchstone for determining whether a particular discovery request is

3    reasonably calculated to lead to the discovery of admissible evidence in this case is

4    whether the request bears some relation to the issues to be tried in Phase 2.

5    Whereas Phase 1 of this case primarily addressed whether Mattel or MGA

6    Entertainment owned the rights to the Bratz products, Mattel's Phase 2 claims are

7    not linked to a single discrete product or even multiple products.  Instead, the issues

8    to be litigated in Phase 2 include, among other things, Mattel's claim that MGA

9    Entertainment stole "a vast array of trade secrets and other confidential information

10   that comprise Mattel's intellectual infrastructure," including, among other things,

11   stealing "Mattel's proprietary business methods, practices and information."

12   (Second Amended Answer and Counterclaims ["SAAC"], ¶ 20).  Mattel alleges in

13   its Counterclaims, which are to be litigated in Phase 2, that MGA Entertainment :

14   • "engaged in a pattern of stealing and using [Mattel's] property and trade

15        secrets," (*Id.*,    ¶ 1);

16   • "repeated—and even expanded—its pattern of theft [regarding the Bratz

17        dolls] on numerous occasions," including by hiring away three key Mattel

18        employees in Mexico who "stole virtually every category of Mattel's

19        sensitive and trade secret business plans and information for the Mexican

20        market as well as a significant quantity of sensitive and trade secrete

21        information for Mattel's U.S. and worldwide businesses," (*Id.*, ¶ 3);

22   • "stole Mattel trade secrets regarding Mattel's customers, sales, projects,

23        advertising and strategy, not only for Canada, but the United States and the

24        rest of the world," (*Id.*, ¶ 70);

25   //

26

27   [2] MGA Entertainment's claim that the document requests are overbroad is also inconsistent with its statement that it would "produce all requested personnel files in their entirety (except for any medical or health related documents) if

28   Mattel gave notice to the employees and obtained their consent for such disclosure." (MGA Opposition, pp. 8 – 9).

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 4 -

ORDER NO. 6
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 18
PAGE 392

- "took from Mattel documents containing proprietary advertising, project, sales, customer and strategy information for not only Canada, but for the United States," (*Id.*, ¶ 4);
- "engaged in an ongoing, widespread pattern of . . . inducing Mattel employees to steal Mattel's confidential information or other property and take it with them to MGA [Entertainment]," (*Id.*, ¶ 5);
- stole "Mattel's plans, strategy and business information for the Mexican market and materials related to Mattel's worldwide business strategies," (*Id.*, ¶ 37);
- "enticed [Mattel's employees] to steal Mattel's most sensitive business planning materials, and then hired them to assist in establishing and running MGA's new Mexican subsidiary," (*Id.*, ¶ 37);
- "directed [certain Mattel employees'] to steal virtually all Mattel confidential and proprietary information that they could access and bring it with them to MGA," (*Id.*, ¶ 43), including "virtually every type of document a competitor would need to enter the Mexican market, and to unlawfully compete with Mattel in Mexico, in the United States and elsewhere," such as "global internal future line lists that detailed anticipated future products; production and shipping costs for Mattel products, daily sales data for Mattel products; customer data; sales estimates and projections; marketing projections; documents analyzing changes in sales performance from 2003 to 2004; budgets for advertising and promotional expenses; strategic research reflecting consumer responses to products in development; media plans; consumer comments regarding existing Mattel products customer discounts and terms of sale; customer inventory level data; assessments of promotional campaign success; market size historical data and projections; marketing plans and strategies, merchandising plans; retail pricing and marketing strategies; and other similar materials," (*Id.*, ¶ 48);

EXHIBIT 18

PAGE 293


1      •  "targeted certain Mattel employees who have broad access to Mattel

2         proprietary information in an effort to induce and encourage them to join

3         MGA [Entertainment] and to steal or otherwise wrongfully misappropriate

4         Mattel confidential information and trade secrets," including by "promising

5         these employees salaries 25 percent or more higher than they earn at Mattel

6         and stating to them that they should not be concerned by legal action taken

7         by Mattel to protect its trade secrets and its rights because such claims are

8         hard to prove and easy to defeat," (*Id.*, ¶ 69); and

9      •  "hired directly from Mattel's United States operations at least 25 employees,

10        from Senior Vice-President level to lower level employees," and that some of

11        these individuals misappropriated "Mattel confidential and proprietary

12        information, including Mattel's strategic plans; business operations; methods

13        and systems; marketing and advertising strategies and plans; future product

14        lines; product profit margins, and customer requirements." (*Id.*, ¶ 77).

15           In light of the foregoing allegations, the documents requested by Mattel fall

16 within the purview of permissible discovery allowed by Federal Rule of Civil

17 Procedure 26. Rule 26 permits the discovery of information that is "relevant to the

18 claim or defense of any party." Fed.R.Civ.P. 26(b)(1). Accordingly, Mattel's

19 request for "all personnel and vendor files" of individuals who either (1) work at

20 MGA Entertainment and previously used to work for Mattel or (2) who are vendors

21 of MGA Entertainment and used to work with or had contact with Mattel appears to

22 be "reasonably calculated to lead to the discovery of admissible evidence." *Id.*

23           **3.**      **Privacy Rights Objection**

24           MGA Entertainment's final argument is that the records sought by Mattel

25 (i.e., personnel and vendor files) invade the privacy rights of non-parties and cannot

26 be produced under *California law* unless the individuals affected are given advance

27 notice of the requests and afforded an opportunity to object to the production.

28 (MGA's Opposition, pp. 10 – 14). Specifically, MGA Entertainment argues that

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

-6-

ORDER NO. 6
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT **18**

PAGE **294**



1     the California Constitution and California Code of Civil Procedure § 1985.3

2     together constitute a fundamental public policy in California that do not allow

3     MGA Entertainment to "place its employees privacy rights at risk." (*Id.*). But each

4     of these contentions is unavailing.

5        As an initial matter, a protective order has been entered in this case. (Mattel

6     Reply, p. 2). This fact is crucial to analyzing the privacy concerns raised by MGA

7     Entertainment, because courts within the Ninth Circuit have repeatedly held that,

8     where such an order has been (or will be) entered, state-based privacy laws do not

9     bar production of personnel files.[3] *See, e.g., Nakagawa v. Regents of Univ. of Cal.*,

10    2008 WL 1808902, *3 (N.D. Cal. April 22, 2008) (ordering production of

11    personnel files and stating "[a]ny other privacy concerns defendant may have

12    should be addressed by a protective order"); *Grinzi v. Barnes*, 2004 WL 2370639,

13    *1 (N.D. Cal. Oct. 20, 2004) ("The proper mechanism for an employer to use to

14    protect an employee's privacy interest in his personnel file is to obtain, either by

15    stipulation or motion, a properly crafted protective order under Rule 26(c)");

16    *Maldonado v. Cal. Dep't of Corr. & Rehab.*, 2007 WL 4249811, *7 (E.D. Cal. Nov.

17    30, 2007) ("The court has already analyzed these non-party privacy rights, and the

18    protective order should serve to remedy any concern in this regard."); *Walton v. K-*

19    *Mart, Inc.*, 2007 WL 4219395, *2 (N.D. Cal. November 28, 2007) ("In view of the

20    employees' privacy interests, documents shall be produced pursuant to an

21    attorneys' eyes only protective order."); *Keller-McIntrye v. Coll. Of Health &*

22    *Human Servs.*, 2006 WL 3456672, *1-*2 (N.D. Cal. November 29, 2006) (ordering

23    production of employee information, pursuant to a protective order, despite privacy

24    claims under California law).

25        Further, contrary to MGA Entertainment's assertions, the Ninth Circuit has

26
27
28

[3] In fact, some of the California authority relied on by MGA Entertainment contemplates that confidential information may be appropriately disclosed if a protective order is in place. (*See, e.g., Valley Bank of Nev. v. Superior Court*, 15 Cal. 3d 652, 658 (1975) ["[T]he trial court has available certain procedural devices which may be useful in fashioning an appropriate order that will, so far as possible, accommodate considerations of both disclosure and confidentiality."]).

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 7 -

ORDER NO. 6
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 18
PAGE 295

1   held that "personnel files are discoverable in federal question cases . . . despite

2   claims of [state-created] privilege,"[4] (*Garrett v. San Francisco*, 818 F.2d 1515,

3   1519 n. 6 (9th Cir. 1987); *see also Kerr v. District Court*, 511 F.2d 192, 197 (9th

4   Cir. 1975)), and this includes any claim of privilege resulting from California Code

5   of Civil Procedure § 1985.3,[5] (*see Reed v. Williams*, 2007 WL 2140506, *4 (E.D.

6   Cal. July 25, 2007) [holding that the requirements of California Code of Civil

7   Procedure § 1985.3 do not apply in federal question cases because "federal law

8   applies in terms of substantive, privilege and discovery law."]). Accordingly, the

9   privacy concerns raised by MGA Entertainment have no applicability here.

10        Despite the foregoing, and notwithstanding the existence of the protective

11   order as a safeguard, the Discovery Master finds that the requested documents

12   should exclude "health care specific information," because Mattel's counsel

13   conceded that Mattel is not seeking such information in its discussions with counsel

14   for MGA Entertainment. (*See* Decl. of Amman Khan, Ex. G, 2). Counsel for

15   Mattel restated this position at the hearing.

16        The Discovery Master further orders MGA Entertainment to redact any

17   social security numbers, tax identification numbers, dates of birth, indication of

18   sexual orientation, bank account numbers, and checking account numbers that may

19   be included within the requested documents prior to production, as Mattel has not

20   made a showing at this time that such discrete personal information is reasonably

21   calculated to lead to the discovery of admissible evidence.

22   **D.**   **Conclusion**

23        The documents sought by Mattel's Request Nos. 87 and 88 are reasonably

24   calculated to lead to the discovery of admissible evidence regarding Mattel's Phase

---

25   [4] Mattel's SAAC includes, among other things, claims for alleged RICO violations under U.S.C. §§ 1962(c), 1962(d)

26   and 1964(c), (SAAC at ¶¶ 88 – 105) and MGA Entertainment removed this action to federal court on federal question
grounds, (Mattel Reply, p. 5).

27   [5] The same rule may even apply in diversity cases, (see *Corser v. County of Merced*, 2006 WL 2536622, *2 (E.D.

28   Cal. August 31, 2006) [holding that "the extent that Section 1985.3 may provide a California-law privilege [] the
privilege does not apply to this litigation"], but the Discovery Master need not resolve that issue.

EXHIBIT **B**

PAGE 296



1   2 claims, and are not protected from disclosure on the grounds of third-party

2   privacy rights or any other ground cited by MGA Entertainment.

3   **III.    MATTEL'S REQUEST FOR SANCTIONS**

4         In its Reply, Mattel also seeks $1,460 in sanctions relating to the attorneys'

5   fees and costs it incurred in drafting the reply. (Mattel's Reply, pp. 11 – 13; *see*

6   *also* Decl. of Zachary Krug, ¶ 14). As the Discovery Master has previously stated,

7   however, he, like the Court,[6] disfavors the insertion of new arguments at the reply

8   stage that could have been raised in the moving papers.[7] This rule is routinely

9   adhered to by courts in the Ninth Circuit. *See, e.g., United States v. Boyce*, 148

10  F.Supp .2d 1069, 1085 (S.D. Cal. 2001); *Leick v. Hartford Life & Accident Ins. Co.,*

11  2007 WL 1847635, at *1, n. 1 (E.D. Cal. June 27, 2007); *Stewart v. Wachowski,*

12  2004 WL 2980783, at *11 (C.D. Cal. Sept. 28, 2004); *Hamilton v. Willms,* 2007

13  WL 2558615, at *11 (E.D. Cal.2007); *see also United States v. Cox,* 7 F.3d 1458,

14  1463 (9th Cir.1993); *United States v. Wright,* 215 F.3d 1020, 1030 n. 3 (9th

15  Cir.2000).

16        Accordingly, the Discovery Master therefore declines to award sanctions

17  against MGA Entertainment.

18  **IV.    MGA'S MOTION TO COMPEL RESPONSES TO DOCUMENT**

19  **       REQUEST NOS. 526 AND 528**

20        In its motion, MGA seeks an order compelling Mattel to produce documents

21  responsive to two document requests (the "Requests") included in MGA's Fifth Set

22  of Requests for Production of Documents and Things dated August 3, 2007.

23  //

24

25  [6] In *Bryant v. Mattel, Inc.*, 573 F.Supp.2d 1254, 1273 n.7 (C.D. Cal. 2007), the Court noted that it "ordinarily would not consider" arguments made for the first time on reply but did so only "because [undertaking the analysis did] not change [its] ultimate conclusion."

26

27  [7] Mattel was apparently aware of MGA Entertainment's grounds for opposing the motion before it filed its moving papers, since Mattel met and conferred with MGA Entertainment prior to bringing its motion. Mattel nevertheless failed to request a sanctions award in its moving papers, thereby depriving opposing counsel and MGA Entertainment of the chance to oppose the request in the Opposition brief.

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 9 -

ORDER NO. 6
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 18

PAGE 297

1   **A.      The Discovery Sought**

2   The Requests seek copies of Mattel's communications with law enforcement

3   authorities (Request No. 526) and copies of any documents that it has provided to

4   law enforcement authorities (Request No. 528). The complete text of the Requests

5   is as follows:

6   •   **Request No 526**: All DOCUMENTS that constitute

7   COMMUNICATIONS between YOU (including YOUR agents and

8   attorneys) and law enforcement authorities in Mexico, Canada, or the

9   United States, including but not limited to the United States Attorney's

10   Office, the Department of Justice and any national, regional, state or local

11   authorities, concerning any of the allegations in YOUR

12   COUNTERCLAIMS or any other alleged taking of confidential

13   MATTEL information by MGA or persons currently or formerly

14   employed by MGA.

15   •   **Request No. 528**: All DOCUMENTS that you (including YOUR agents

16   and attorneys) provided to law enforcement authorities in Mexico, Canada

17   [*sic*] or the United States, including but not limited to the United States

18   Attorney's Office, the Department of Justice and any national, regional,

19   state or local authorities concerning any of the allegations in YOUR

20   COUNTERCLAIMS or any other alleged taking of confidential

21   MATTEL information by MGA or persons currently or formerly

22   employed by MGA.

23   **B.      Mattel's Objections**

24   In its Opposition, Mattel relies on three basic grounds for refusing to produce

25   the requested documents. First, Mattel argues that the Requests are overbroad and

26   encompass information not reasonably calculated to lead to the discovery of

27   admissible evidence. Second, Mattel argues that the documents are protected by

28   the work product doctrine. Finally, Mattel argues that the documents are



EXHIBIT 18

PAGE 298

1 | privileged.

2 | **1.   Overbreadth Objection**

3 | Among the issues to be adjudicated in Phase 2 are Mattel's counterclaims for

4 | RICO violations, misappropriation of trade secrets and unfair competition.  Mattel's

5 | SAAC alleges that "Mattel notified Mexican authorities about the [alleged] theft of

6 | its trade secret and confidential information." (SAAC, ¶ 53).  The SAAC further

7 | details Mattel's knowledge of the Mexican authorities' activities related to MGAE

8 | de Mexico and suggests that Mattel communicated with the authorities regarding

9 | their seizure of certain documents from MGA's office.  (*Id.*, ¶ 53).  Mattel also

10 | alleges that "Mattel notified Canadian law enforcement authorities" about its belief

11 | that Janine Brisbois copied documents onto a thumb drive when she left Mattel.

12 | (*Id.*, ¶ 75).  Further, Mattel states that it communicated with Canadian authorities

13 | regarding the information allegedly recovered from Brisbois' thumb drive.  (*Id.*, ¶

14 | 75).

15 | Mattel has also acknowledged that at least some of the documents responsive

16 | to Request No. 526 relate to Mattel's claims by producing to MGA "the judicial file

17 | in criminal proceedings in Mexico, relating to the trade secret thefts in that country,

18 | *and some of those materials reflected communications between Mattel and law*

19 | *enforcement*." (Declaration of Timothy L. Alger dated January 24, 2008 ["Alger

20 | Decl."], ¶ 16 (emphasis added).)

21 | Given Mattel's allegations regarding the theft of its trade secrets, its

22 | communications with law enforcement officials, and the overlap between the civil

23 | and criminal claims Mattel is pursuing, the Discovery Master concludes that, as a

24 | threshold matter, MGA has made a prima facie case that the Requests seeking the

25 | documents Mattel provided to law enforcement officials, as well as Mattel's

26 | communications with those officials, are reasonably calculated to lead to the

27 | discovery of admissible evidence regarding the claims to be adjudicated in Phase 2.

28 | Although the Requests on their face relate to Phase 2 issues, Mattel

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 11 -

ORDER NO. 6
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT **18**

PAGE **299**

1   nonetheless argues in its Opposition that Request No. 526 is overbroad because

2   Mattel's civil claims are wholly separate and independent from any criminal relief

3   it is seeking. (Mattel Opposition, p. 4 ["The civil claims stand or fall based on

4   MGA's actions, not Mattel's subsequent communications with law enforcement."]).

5       In so arguing, Mattel misses the point. The issue is not whether Mattel's

6   communications with law enforcement officials constitute the basis of Mattel's

7   claims. Rather, the issue is whether those communications are reasonably

8   calculated to lead to the discovery of admissible evidence regarding what Mattel

9   itself characterizes as the basis of its claims, namely MGA's alleged acts of trade

10  secret misappropriation. Mattel does not dispute that its subsequent

11  communications with law enforcement involve the same conduct that is the basis of

12  the civil claims. On the contrary, Mattel has alleged in its SACC that it is

13  concurrently seeking relief through the criminal justice system and this civil action

14  based on the same documents allegedly stolen by MGA and confirmed that fact

15  during the meet and confer process. (See, e.g., Alger Decl., ¶ 16 [asserting that "the

16  judicial file in the criminal proceedings in Mexico" are among the "documents

17  *relating to Mattel's Counterclaims*."] [emphasis added].)

18      Mattel's communications with law enforcement may, among other things,

19  disclose what Mattel told the investigating authorities about what information was

20  taken, the people who have knowledge of the thefts, and any supposed criminal

21  intent on the part of MGA or the former Mattel employees who supposedly took the

22  information. Given this admitted overlap in subject matter, the communications

23  between Mattel and law enforcement agencies are discoverable. (*See, e.g., In re*

24  *Qwest Commc'ns Intl., Inc.*, 450 F.3d 1179, 1181-82, 1201 (10th Cir. 2006) [private

25  plaintiff permitted discovery of materials provided to law enforcement authorities

26  concerning the same underlying facts]).

27      With respect to Request No. 528 (seeking documents Mattel provided to law

28  enforcement agencies), Mattel argues that it has already provided to MGA tens of


EXHIBIT **18**

PAGE **300**

1    thousands of documents that pertain to the underlying facts of Mattel's

2    counterclaims. (Mattel Opposition p, 5). But, as Mattel admits, that production

3    does not satisfy Request No. 528 which, in Mattel's words "seeks something more

4    and different." (*Id.*). According to Mattel, the "different" information sought by

5    Request No. 528 is information that would enable "MGA's executives to defend

6    against actual or potential criminal charges . . ." (*Id.*). However, since those

7    possible criminal charges are based on the same conduct as Mattel's civil claims, it

8    would be inappropriate to bar MGA from obtaining that information for use in this

9    lawsuit, simply because that same information might also relate to possible future

10   criminal cases (which may or may not ever be filed). Put another way, the

11   information sought by MGA to defend the civil claims does not become

12   "irrelevant" simply because it might have the ancillary effect of facilitating MGA's

13   defense of possible criminal claims.

14        Lastly, Mattel argues that both Requests are overbroad because they are not

15   limited to misconduct expressly alleged in the SAAC but also seek "documents

16   'concerning . . . any other alleged taking of confidential MATTEL information by

17   MGA . . .'" (Mattel Opposition, pp. 5 -6). In response, MGA points out that the

18   SAAC includes a catch-all allegation stating that unidentified "additional

19   employees accessed, copied and took from Mattel confidential and proprietary

20   information." (SAAC, ¶ 77). Mattel's apparent purpose in including such an

21   allegation was to preserve its right to allege and prove other acts of

22   misappropriation besides those expressly alleged in the SAAC. Accordingly, since

23   Mattel reserves the right to seek relief regarding additional, un-alleged acts, MGA

24   should likewise be entitled to conduct discovery to identify those additional acts

25   and to determine what evidence Mattel may have to prove them.

26        **2.    Work Product Objection**

27        Next, Mattel argues that production of Mattel's communications with law

28   enforcement agencies, together with the documents Mattel chose to provide to those

EXHIBIT 18

PAGE 301

1  agencies, would violate the attorney work-product doctrine by revealing counsel's

2  strategy and mental processes. (Mattel Opposition, p. 6).

3       To qualify for work-product protection under Federal Rule Civil Procedure

4  26, documents must meet two requirements: (1) they must be "prepared in

5  anticipation of litigation or for trial," and (2) they must be prepared "by or for

6  another party or by or for that other party's representative." *In re Cal. Pub. Utils.*

7  *Comm'n*, 892 F.2d 778, 780-781 (9th Cir. 1989). In determining whether the

8  doctrine is applicable to a particular document, "the court must consider the

9  *primary purpose* of the work product doctrine, which is to 'prevent exploitation of a

10  party's efforts in *preparing for litigation.*'" *Johnson v. Finn*, 2007 WL 3232253,

11  *1 (E.D. Cal. Oct. 31, 2007) (emphasis added). The authorities Mattel cites agree

12  that the purpose of the work product doctrine is "to establish a zone of privacy for

13  *strategic litigation planning.*" (Opposition, p. 6 quoting *United States v. Adlman*,

14  68 F.3d 1495, 1501 (2d Cir. 1995) [emphasis added].)

15       Here, Mattel does not demonstrate any connection between its

16  communications with law enforcement officials, on the one hand, and its litigation

17  strategy in the present civil case, on the other hand. Rather, it appears that Mattel's

18  primary purpose in communicating with, and disclosing the disputed documents to,

19  various law enforcement officials was to instigate criminal prosecutions by

20  prosecutorial agencies, not pursue its civil claims against MGA. Thus, to the extent

21  the selection of particular documents by Mattel's counsel reveals counsel's

22  impressions and mental processes, the window into counsel's thinking relates to

23  counsel's strategy of encouraging *criminal prosecution* by the relevant authorities.

24  There is no showing that counsel's thinking regarding how best to achieve *that*

25  purpose would also reveal counsel's strategies and impressions in any matter

26  related to the current civil litigation. In short, Mattel has made an insufficient

27  showing that the communications and documents at issue constitute work product

28  in *this* litigation. Accordingly, the work-product doctrine is inapplicable.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 14 -

ORDER NO. 6
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 18

PAGE 302

1        Further, even if the work-product doctrine somehow applied to Mattel's

2   communications with law enforcement agencies, Mattel waived it, in at least two

3   ways.  First, Mattel admits that it has already produced some of those

4   communications to MGA.  (See Alger Decl., ¶ 16.)

5        Second, to the extent Mattel's communications with law enforcement

6   officials disclose its conclusions and theories to law enforcement officials, such a

7   disclosure also constitutes a waiver.  Mattel admits that the work-product doctrine

8   is waived when material is "voluntarily disclosed such that it may become readily

9   accessible to an adversary." (Mattel Opposition, pp. 6 - 7 (citing *Aronson v.*

10  *McKesson HBOC, Inc.*, 2005 WL 934331, *6 (N.D. Cal. Mar. 31, 2005)).  In fact,

11  the courts have specifically held that "disclosing information to governmental

12  authorities in the hope that they will attack an adversary . . . cannot be said to be

13  done 'in the pursuit of . . . trial preparation.'  Thus, disclosure in such a situation

14  results in a waiver of the work product protection." *Bank of America, NA. v. Terra*

15  *Nova Insur. Co.*, 212 F.R.D. 166, 172-73 (S.D.N.Y. 2002).  Therefore, when a party

16  provides information to law enforcement agencies and "harbor[s] the hope, even if

17  un-communicated, that its disclosures would encourage the Government to

18  prosecute" a third party, this disclosure constitutes waiver because it "substantially

19  increase[s] the potential that the information gained during the investigation would

20  be disclosed to [the] adversary." *Id.*

21        Given that Mattel disclosed the documents to these entities with the intention

22  of triggering criminal prosecution of MGA and its representatives, the intended

23  effect of Mattel's disclosure is to make those documents available to MGA under

24  the applicable rules of criminal procedure, which would entitle MGA to the

25  documentary evidence on which any alleged criminal liability is based.  Mattel

26  itself concedes this fact when it acknowledges that MGA can request disclosure of

27  the information provided to law enforcement officials "in accordance with the

28  applicable law in the countries involved." (Mattel Opposition, p. 5).  Mattel knew

EXHIBIT 18

PAGE 202

1  when it provided the documents to law enforcement agencies that such production

2  "substantially increased the opportunities for potential adversaries to obtain the

3  information." (Mattel Opposition, p. 7). Thus, Mattel cannot demonstrate a

4  reasonable expectation this material would remain protected.

### 3.  Privilege Objections

6  Lastly, Mattel asserts that the litigation privilege codified in Cal. Civ. Code §

7  47(b) and/or the *Noerr-Pennington* doctrine bar MGA from seeking any affirmative

8  relief from Mattel based on the latter's communications with law enforcement

9  authorities. Consequently (Mattel reasons), those communications "are not

10  properly discoverable" in this action. (Mattel Opposition, p. 8).

11  That argument is based on a premise for which there is no support in the

12  record, namely that MGA seeks the subject documents in order to assert a claim

13  against Mattel arising from Mattel's allegedly privileged communications.

14  Proceeding from this unsupported assumption, Mattel then argues that such a non-

15  existent claim would be barred.

16  However, that speculative foray is entirely non-responsive to the MGA

17  Motion. The MGA Motion asserts that the documents should be produced not

18  because MGA intends to sue Mattel for communicating with law enforcement

19  authorities, but rather because Mattel itself injected the issue of the criminal

20  proceedings *into this lawsuit* by asserting in its SAAC that Mattel has

21  communicated with criminal authorities in various countries regarding the conduct

22  of MGA upon which Mattel bases its counterclaims. *That* is the reason MGA

23  offers for seeking the subject documents.

24  Accordingly, Mattel's attempt to rely on privilege fails to address the actual

25  position taken by MGA in its Motion or the issues raised in the pleadings. Further,

26  the cases cited by Mattel demonstrate on their face that the subject privileges are

27  restricted to situations not present here. Those cases stand for the proposition that

28  parties who communicate with law enforcement officials may be immune from



EXHIBIT 18
PAGE 304

1  *liability* under California tort law and federal anti-trust law, respectively – not that

2  such parties are immune from *discovery* in civil suits.

### a.    The Litigation Privilege

4  The California Supreme Court described the scope of the litigation privilege

5  in a case cited by Mattel, *Hagberg v. Cal. Fed. Bank FSB*, 32 Cal. 4th 350 (2004).

6  According to Mattel, *Hagberg* stands for the proposition that a communication to

7  law enforcement officials about suspected criminal activity "enjoys an unqualified

8  privilege." (Mattel's Opp'n, 8.)  However, nothing in the *Hagberg* opinion

9  addresses the issue presented here, namely whether communications and documents

10  passed from the reporting party to the law enforcement agency is discoverable in

11  litigation arising out of the same underlying, allegedly criminal, activities.  Rather,

12  in *Hagberg* the question presented was "whether *tort liability* may be imposed for

13  statements made when a citizen contacts law enforcement personnel to report

14  suspected criminal activity...." 32 Cal. 4th at 355 (emphasis added).  The Court

15  answered that question in the affirmative.  *Id.*

16  The other California cases cited by Mattel are in accord.  See *Jacob B. v.*

17  *County of Shasta*, 40 Cal. 4th 948, 955, 956 (2007) ("We have discussed the basic

18  principles underlying section 47(b)'s litigation privilege in many cases.... [P]ublic

19  agencies... must be permitted to provide such information without fear of being

20  harassed by *derivative lawsuits*.") (emphasis added); *Silberg v. Anderson*, 50 Cal.

21  3d 205, 213, 214 (1990) (the "*litigation* privilege" provided by section 47(2)

22  "afford[s] litigants and witnesses... the utmost freedom of access to the courts

23  without fear of being harassed subsequently by *derivative tort actions*") (emphasis

24  added); *Williams v. Taylor*, 129 Cal, App. 3d 745 (1982) (affirming summary

25  judgment against plaintiff's claims for slander and malicious prosecution based on

26  Section 47(b)).

### b.    The *Noerr-Pennington* Doctrine

28  "The Noerr-Pennington doctrine *immunizes from the antitrust laws* anti-

EXHIBIT 18

PAGE 305

1    competitive conduct undertaken to influence or petition government bodies, or to

2    utilize judicial or quasi-judicial mechanisms." (*Forro Precisions, Inc. v. Intl Bus.*

3    *Mach.* 673 F.2d 1045, 1059 (1982) [emphasis added]). In *Forro*, the plaintiff

4    brought suit against IBM for assisting a police search of his business premises.

5    Based in part on the *Noerr-Pennington* doctrine, the court held that the plaintiff's

6    antitrust claim could not be based on IBM's solicitation of aid from the police

7    department that resulted in the police investigation and search of his premises, or on

8    IBM's assistance in these activities. (*Id.* at 1053 ["IBM's actions in assisting the

9    police...were privileged and could not serve as a basis for *civil liability*."] [emphasis

10   added]) . In short, the "privilege" at issue in *Forro* dealt with freedom from

11   antitrust liability, not freedom from discovery.[8]

12              **c.    Application To The Present Case**

13         Here, MGA has not yet asserted any affirmative claim against Mattel arising

14   out of Mattel's communication with law enforcement officials. If and when MGA

15   attempts to do so, it may well be appropriate for Mattel to assert the privileges

16   discussed above in an attempt to defeat any such claims on the merits. In the

17   meantime, MGA is simply defending Mattel's civil claims in the present action, and

18   no privilege cited by counsel prevents MGA from conducting discovery regarding

19   the basis for those claims.

20         **C.    Conclusion**

21         The documents sought by MGA's Request Nos. 526 and 528 are reasonably

22   calculated to lead to the discovery of admissible evidence regarding Mattel's Phase

23   2 claims, and are not protected from disclosure under any of the privileges or

24   doctrines cited by Mattel.

25   //

26

27   [8] Mattel cites only one case in which the Court actually held that a party was protected from the production of
     communications made to government agencies regarding suspected criminal activity. However, in that case (which
     arose under the Annunzio-Wylie Act) the communications were sought to prove a defamation claim based on those

28   communications. *See Whitney Nat'l Bank v. Karam*, 306 F. Supp. 2d 678, 682 (S.D. Tex. 2004).



EXHIBIT 18

PAGE 306

## V.   **DISPOSITION**

1.   The Mattel Motion is **GRANTED**, with the exception of health care specific information, social security numbers, tax identification numbers, dates of birth, bank account numbers, and checking account numbers.

2.   Mattel's request for sanctions is **DENIED**.

3.   The MGA Motion is **GRANTED**.

4.   All non-privileged documents shall be produced within 30 days of this Order, subject to any applicable confidentiality designations available under the Protective Order.

5.   All documents to be produced pursuant to this Order, including employee personnel files and records of communications between Mattel and law enforcement officials, shall be produced in the same format and order as they are maintained in the original files of the parties as required by Federal Rule of Civil Procedure 34(b)(2)(E)(i).

6.   The documents reflecting Mattel's communications with law enforcement officials shall include any and all enclosures, and documents transmitted as a group shall be marked in a manner that permits MGA to ascertain which pages constitute each individual transmittal.

7.   All personnel or vendor documents redacted by MGA in accordance with this Order shall, whenever applicable, retain any letterhead, title, or other header that permits Mattel to ascertain the general nature and source of the document redacted and shall be marked in a manner that permits Mattel to ascertain which pages comprise a single document.

Dated:      March 13, 2009

By:      /s/ Robert C. O'Brien
         ROBERT C. O'BRIEN
         Discovery Master

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 19 -

ORDER NO. 6
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT **18**

PAGE **307**

# EXHIBIT 19

EXHIBIT FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER