# EXHIBIT 1

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

.

# EXHIBIT 2

451

```
 1                  UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                      EASTERN DIVISION

 4                          -  -  -

 5         HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 6                          -  -  -

 7   MATTEL, INC.,                  )  PAGES 451-577
                                    )
 8                   PLAINTIFF,     )
                                    )
 9          VS.                     )  NO. CV 04-09049
                                    )
10   MGA ENTERTAINMENT, INC., ET. AL.,  )
                                    )
11                   DEFENDANTS.    )  TRIAL DAY 3,
                                    )  AFTERNOON SESSION
12   AND CONSOLIDATED ACTIONS,      )
                                    )
13   _____

14

15          REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                   RIVERSIDE, CALIFORNIA

17                 WEDNESDAY, MAY 28, 2008

18                      1:18 P.M.

19

20

21

22

23               THERESA A. LANZA, RPR, CSR
              FEDERAL OFFICIAL COURT REPORTER
24               3470 12TH STREET, RM. 134
              RIVERSIDE, CALIFORNIA  92501
25                   951-274-0844
                 WWW.THERESALANZA.COM
```

CERTIFIED
COPY

MAY 28TH, 2008          TRIAL DAY 3, AFTERNOON SESSION

EXHIBIT _____ 2

PAGE _____ 8

452

```
 1   APPEARANCES:

 2

 3   ON BEHALF OF MATTEL, INC.:

 4                          QUINN EMANUEL
                           BY:  JOHN QUINN
 5                               JON COREY
                                 MICHAEL T. ZELLER
 6                               HARRY OLIVAR
                                 TIMOTHY ALGER
 7                          865 S. FIGUEROA STREET,
                           10TH FLOOR
 8                          LOS ANGELES, CALIFORNIA  90017
                           213-624-7707
 9

10   ON BEHALF OF MGA ENTERTAINMENT:

11                          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                           BY:  THOMAS J. NOLAN
12                               JASON RUSSELL
                                 RAOUL KENNEDY
13                               LAUREN AGUIAR
                           300 SOUTH GRAND AVENUE
14                          LOS ANGELES, CALIFORNIA  90071-3144
                           213-687-5000
15

16

17

18

19

20

21

22

23

24

25
```

MAY 28TH, 2008          TRIAL DAY 3, AFTERNOON SESSION

EXHIBIT 2

PAGE 9

453

```
 1                        I N D E X

 2                                              PAGE

 3   PLAINTIFF CASE (CONTINUED).................. 463

 4

 5   PLAINTIFF
     WITNESS         DIRECT      CROSS    REDIRECT    RECROSS
 6   LILIANA MARTINEZ (CONTINUED)

 7   BY MR. QUINN     463                  515
     BY MR. NOLAN                474                  518
 8

 9

10   PLAINTIFF
     WITNESS         DIRECT      CROSS    REDIRECT    RECROSS
11   PAULA GARCIA (TREANTAFELLES)

     BY MR. PRICE     522
12

13

14

15
            EXHIBITS         RECEIVED
16
            276-1             466
17          17246             504
            193               506
18          115               507
            126               509
19          320               536
            1116              541
20          1117              545
            301               549
21          201 (FIRST PAGE)  554
            402-B             557
22          402               557
            400               565
23          11328             565
            302               566
24          305               572
            18                574
25   / / /
```

EXHIBIT _____ 2

PAGE _____ 10

541

1    A    YES.

2    Q    WHILE YOU WERE AT MATTEL, DO YOU RECALL YOU SIGNED

3    SOMETHING CALLED AN INVENTIONS AGREEMENT?

4            I'LL REPHRASE THAT?

5            TO MAKE IT SIMPLER, JUST LOOK AT EXHIBIT 1116, WHICH    03:58

6    IS IN VOLUME II, IF YOU WOULD LOOK AT THAT.

7            IS THIS THE EMPLOYEE CONFIDENTIAL INFORMATION AND

8    INVENTIONS AGREEMENT THAT YOU SIGNED WHEN YOU STARTED WORK AT

9    MATTEL?

10   A    YES.
                                                                    03:59
11           MR. PRICE:  MOVE EXHIBIT 1116 INTO EVIDENCE, YOUR

12   HONOR.

13           THE COURT:  ANY OBJECTION?

14           MS. AGUIAR:  NO OBJECTION.

15           THE COURT:  ADMITTED.  YOU MAY PUBLISH.
                                                                    03:59
16   BY MR. PRICE:

17   Q    IS THIS YOUR SIGNATURE HERE ON THE SECOND PAGE WHERE IT

18   SAYS "JULY 4, '97"?

19   A    YES.

20   Q    THERE WAS SOMEONE THERE WHO SIGNED AT THE SAME TIME YOU

21   DID.                                                           03:59

22   A    IT APPEARS SO.

23   Q    DO YOU RECALL THAT, OR...

24   A    NO.

25   Q    DO YOU RECALL WHO IT WAS?
                                                                    03:59

EXHIBIT _____ 2

PAGE _____ 11

542

1    A    NO.

2    Q    DO YOU RECOGNIZE THE SIGNATURE HERE?  DO YOU KNOW WHO THAT

3    IS?

4    A    NO.

5    Q    IN ANY EVENT, OF COURSE YOU READ THIS BEFORE YOU SIGNED          03:59

6    IT.

7    A    I DID NOT READ IT IN GREAT DETAIL.

8    Q    YOU READ IT IN ENOUGH DETAIL TO GET THE GIST OF WHAT IT

9    SAID; CORRECT?

10   A    YES.                                                            04:00

11   Q    AND ONE OF THE THINGS THAT IT SAID, GOING BACK TO THE

12   FIRST PAGE, YOU UNDERSTOOD THAT IF YOU CAME UP WITH ANY

13   INVENTIONS OR DESIGNS WHILE YOU WERE AT MATTEL, WORKING FOR

14   MATTEL, THAT RELATED TO MATTEL'S BUSINESS WHILE YOU WERE

15   WORKING THERE, GETTING PAID BY THEM, THOSE DESIGNS AND             04:00

16   INVENTIONS WERE MATTEL'S.

17   A    YES.

18   Q    AND WHAT YOU ALSO KNEW WAS YOU WERE SUPPOSED TO DEVOTE

19   YOUR EFFORTS TO MATTEL AND NOT WORK FOR ANOTHER COMPANY AT THE

20   SAME TIME.

                                                                          04:00
21   A    I GENERALLY UNDERSTOOD THAT, YES.

22   Q    I MEAN, YOU WOULD HAVE UNDERSTOOD THAT WITHOUT SIGNING

23   THAT DOCUMENT; RIGHT?

24   A    YES.

25   Q    YOU KNEW IT WOULD BE DISHONEST OF YOU TO BE TAKING A            04:00

EXHIBIT _____ 2

PAGE _____ 12

543

1    PAYCHECK FROM MATTEL BUT WORKING FOR ONE OF THEIR COMPETITORS

2    AT THE SAME TIME; RIGHT?

3    A    I'M NOT SURE IF IT'S NECESSARILY DISHONEST.   I WOULD --

4    Q    LET'S SAY WRONG.   YOU WOULD KNOW THAT IT WAS WRONG TO WORK

5    FOR MATTEL AND AT THE SAME TIME, BEHIND THEIR BACK, WORK FOR          04:01

6    ONE OF THEIR COMPETITORS.

7    A    YES.

8    Q    IF YOU KNEW SOMEONE WAS DOING THAT, THAT, IN YOUR MIND,

9    WOULD CAST SOME DOUBT ON THEIR HONESTY AND THEIR CREDIBILITY;

10   RIGHT?   IF THEY WERE WORKING FOR ONE COMPANY, BUT AT THE SAME        04:01

11   TIME, BEHIND THAT COMPANY'S BACK, WORKING FOR ONE OF THEIR

12   COMPETITORS?

13   A    YES.

14   Q    IT WOULD MEAN PERHAPS YOU SHOULDN'T TRUST THAT PERSON;

15   CORRECT?                                                             04:01

16   A    YES.

17   Q    AND, IN FACT, IF WE GO TO THE SECOND PAGE OF THIS, YOU SEE

18   IT SAYS "CONFLICTS WITH OTHER ACTIVITIES," WHERE IT SAYS "MY

19   EMPLOYMENT WITH THE COMPANY REQUIRES MY UNDIVIDED ATTENTION AND

20   EFFORT.   THEREFORE, DURING MY EMPLOYMENT WITH THE COMPANY, I        04:02

21   WILL FULLY COMPLY WITH THE COMPANY'S CONFLICT OF INTEREST

22   POLICY, AS IT MAY BE AMENDED FROM TIME TO TIME.   I SHALL NOT,

23   WITHOUT THE COMPANY'S EXPRESS WRITTEN CONSENT, ENGAGE IN ANY

24   EMPLOYMENT OR BUSINESS OTHER THAN FOR THE COMPANY, OR INVEST IN

25   OR ASSIST IN ANY MANNER ANY BUSINESS COMPETITIVE WITH THE            04:02

MAY 28TH, 2008          TRIAL DAY 3, AFTERNOON SESSION        2

EXHIBIT _____

PAGE _____  13

544

| | |
|---|---|
| 1 | BUSINESS OR FUTURE BUSINESS PLANS OF THE COMPANY." |
| 2 | YOU UNDERSTOOD THAT YOU HAD THAT OBLIGATION WHILE AT |
| 3 | MATTEL; CORRECT? |
| 4 | A    YES. |
| 5 | Q    NOW, YOU ALSO UNDERSTOOD THAT THIS SORT OF AGREEMENT WAS |
| 6 | TYPICAL IN THE TOY INDUSTRY. |
| 7 | A    I EXPECTED SO.  I DIDN'T KNOW FOR SURE. |
| 8 | Q    IT WAS YOUR UNDERSTANDING THAT OTHER MATTEL EMPLOYEES HAD |
| 9 | TO SIGN THIS SAME TYPE OF AGREEMENT, SAYING THAT IF THEY |
| 10 | INVENTED SOMETHING WHILE AT MATTEL, IT BELONGED TO MATTEL AND |
| 11 | THEY WEREN'T SUPPOSED TO WORK FOR COMPETITORS WHILE THEY WERE |
| 12 | BEING PAID FOR MATTEL. |
| 13 | A    YES. |
| 14 | Q    NOW YOU ALSO UNDERSTOOD THAT YOU WERE AN AT-WILL EMPLOYEE; |
| 15 | CORRECT? |
| 16 | A    I'M NOT SURE WHAT AT-WILL EMPLOYEE MEANS. |
| 17 | Q    THEN, DID YOU UNDERSTAND THAT YOU COULD QUIT MATTEL FOR |
| 18 | ANY REASON; THAT YOU DIDN'T HAVE TO HAVE SOME EXCUSE FOR |
| 19 | QUITTING; THAT YOU WERE FREE TO QUIT WHENEVER YOU WANTED? |
| 20 | A    YES. |
| 21 | Q    AND YOU UNDERSTOOD THAT MATTEL COULD END YOUR EMPLOYMENT |
| 22 | FOR ANY REASON, AS LONG AS IT WASN'T FOR SOME ILLEGAL REASON. |
| 23 | A    YES. |
| 24 | Q    BUT THAT WHILE YOU WERE AT MATTEL, IT WAS YOUR |
| 25 | UNDERSTANDING THAT YOU WERE REQUIRED TO COMPLY WITH |

04:02
04:03
04:03
04:03
04:03

EXHIBIT _____ 2
PAGE _____ 14

545

1   EXHIBIT 1116, THIS EMPLOYEE CONFIDENTIAL INFORMATION AND

2   INVENTIONS AGREEMENT; CORRECT?

3   A    YES.

4   Q    NOW, WE TALKED ABOUT, I THINK YOU SAID YOU EXPECTED THAT

5   OTHERS IN THE TOY INDUSTRY WOULD HAVE THE SAME SORTS OF

6   AGREEMENTS.  YOU CAME TO LEARN THAT MGA HAD THE SAME TYPE OF

7   AGREEMENT; CORRECT?

8   A    YES.

9   Q    AND IF YOU COULD LOOK AT EXHIBIT 1117, THE NEXT ONE RIGHT

10  THERE.  DO YOU RECOGNIZE EXHIBIT 1117 AS THE AGREEMENT YOU

11  SIGNED WHEN YOU WENT TO MGA?

12  A    YES.

13          MR. PRICE:  I'D MOVE EXHIBIT 1117 INTO EVIDENCE.

14          THE COURT:  ANY OBJECTION?

15          MS. AGUIAR:  NO OBJECTION.

16          THE COURT:  ADMITTED.  YOU MAY PUBLISH.

17          MR. PRICE:  THANK YOU, YOUR HONOR.

18  BY MR. PRICE:

19  Q    IF WE COULD GO TO THE FIFTH PAGE.

20          THIS IS YOUR SIGNATURE, IN PRINTED NAME, ON APRIL 17,

21  2000; CORRECT?

22  A    CORRECT.

23  Q    AND YOU SEE THERE'S SOMETHING CALLED AN INVENTIONS

24  ASSIGNMENT?

25  A    YES.

MAY 28TH, 2008          TRIAL DAY 3, AFTERNOON SESSION

EXHIBIT _____ 2

PAGE _____ 15

546

1   Q    AND YOU UNDERSTOOD THAT BASICALLY THIS WAS SAYING THE SAME

2   THING THAT YOUR MATTEL AGREEMENT SAID, WHICH IS THAT IF YOU

3   INVENT SOMETHING WHILE YOU'RE AT MGA THAT PERTAINS TO MGA'S

4   BUSINESS, THAT WOULD BELONG TO MGA; CORRECT?

5   A    YES.                                                           04:05

6   Q    SO LET ME THEN MOVE FROM THESE CONTRACTS AND DISCUSSIONS

7   ABOUT YOUR OBLIGATIONS AND TALK ABOUT WHEN YOU TALKED WITH

8   CARTER BRYANT ABOUT THE CONCEPT WHICH WE'RE TERMING BRATZ.

9   OKAY?

10       ARE YOU WITH ME SO FAR?                                        04:06

11  A    YES.

12  Q    AND I HESITATE TO DO THIS, AFTER MS. MARTINEZ DREW ON

13  SOMETHING, BUT I'M GOING TO TRY TO DO THE BEST I CAN TO PUT UP

14  A TIMELINE HERE SO WE CAN FOLLOW WHEN YOU SAY CERTAIN THINGS

15  HAPPENED.                                                           04:06

16       OKAY?

17  A    YES.

18  Q    NOW, I BELIEVE YOUR TESTIMONY IS THAT THE FIRST MEETING

19  THAT YOU HAD WITH MR. CARTER ABOUT BRATZ WAS SEPTEMBER 1ST; IS

20  THAT RIGHT?                                                         04:06

21  A    THAT'S RIGHT.

22  Q    AND I BELIEVE YOUR TESTIMONY WAS THAT YOU WERE HAVING A

23  DISCUSSION WITH VERONICA MARLOW WHO WAS A FORMER MATTEL

24  EMPLOYEE AND A VENDOR; CORRECT?

25  A    CORRECT.                                                       04:06

MAY 28TH, 2008          TRIAL DAY 3, AFTERNOON SESSION

EXHIBIT            2

PAGE            16

547

1    Q    AND THAT IN MID AUGUST, YOU WERE ON YOUR WAY TO DO A PHOTO

2    SHOOT.

3    A    YES.

4    Q    SO MS. MARLOW, THEN, IS IN MID AUGUST.

5         IS THERE AN E ON MARLOW?

6    A    YES.

7    Q    AND THAT AT THIS PHOTO SHOOT, YOU MENTIONED TO HER THAT

8    YOU HAD SOME INTERESTS IN GETTING INTO THE FASHION DOLL MARKET.

9    A    YES.

10   Q    SHE DIDN'T BRING IT UP TO YOU, YOU BROUGHT IT UP TO HER;

11   THAT'S YOUR TESTIMONY; CORRECT?

12   A    CORRECT.

13   Q    NOW, IT'S TRUE, IS IT NOT, THAT THERE WAS NEVER AN

14   INSTANCE PRIOR TO SEPTEMBER 1ST WHEN ISAAC LARIAN EVER ASKED

15   YOU TO LOOK INTO FASHION DOLL IDEAS; CORRECT?

16   A    NOT THAT I CAN REMEMBER, NO.

17   Q    I MEAN, YOUR RECOLLECTION IS THAT NO ONE OTHER THAN YOU

18   EVER EXPRESSED AN INTEREST IN THE FASHION DOLL MARKET PRIOR TO

19   YOU MEETING WITH MS. MARLOW; CORRECT?

20   A    THAT'S MY MEMORY.

21   Q    AND IT WAS A COUPLE OF DAYS BEFORE THIS SEPTEMBER 1ST

22   MEETING WHEN YOU MENTIONED TO MR. LARIAN THAT YOU WERE

23   INTERESTED IN MGA ENTERING THIS FASHION DOLL MARKET; CORRECT?

24   A    I BELIEVE SO, YES.

25   Q    SO IF THAT'S SEPTEMBER 1ST, IT WAS SOME TIME IN THAT WEEK

04:08
04:09
04:09
04:09
04:10

577

1    Q    AND WITH RESPECT TO THE HAIR VENDOR, IN SEPTEMBER HE

2    ACTUALLY CONTACTED THE HAIR VENDOR ON YOUR BEHALF TO TALK ABOUT

3    WHAT HAIR TO USE FOR THE BRATZ DOLLS; CORRECT?

4    A    HE CONTACTED THE SARAN HAIR MATERIAL MANUFACTURER, BUT NOT

5    THROUGH MY REQUEST; THAT WAS HIS DECISION.                          05:00

6    Q    SO YOU DIDN'T KNOW HE WAS ACTUALLY GOING OUT AND FINDING

7    THE HAIR VENDOR THAT YOU WOULD THEN RECOMMEND TO HONG KONG?

8    A    IT'S MY MEMORY THAT I ONLY ASKED HIM FOR HIS

9    RECOMMENDATION.

10             THE COURT:   MR. PRICE, WE'RE AT THE END OF THE DAY.       05:00

11             THE JURY IS EXCUSED FOR THIS EVENING.  REMEMBER THE

12   ADMONITION NOT TO DISCUSS THIS CASE OR RESEARCH OR READ

13   ANYTHING ABOUT IT.

14             I'LL SEE YOU BACK TOMORROW MORNING AT 9:00.

15             (WHEREUPON JURORS DEPART COURTROOM.)                       05:01

16             THE COURT:   COUNSEL, I'LL SEE YOU TOMORROW MORNING AT

17   8:30.  WE'RE IN RECESS FOR THE DAY.

18                            CERTIFICATE

19

20   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
21   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
22   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.
23

24   _____          5-29-08
                                           _____
25   THERESA A. LANZA, RPR, CSR            DATE
     FEDERAL OFFICIAL COURT REPORTER


MAY 28TH, 2008              TRIAL DAY 3, AFTERNOON SESSION

EXHIBIT _____ 2

PAGE _____ 18

1255

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3                       EASTERN DIVISION

 4                          - - -

 5           HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 6                          - - -

 7   MATTEL, INC.,                  )
                                    )
 8                   PLAINTIFF,     )
                                    )
 9           VS.                    )   NO. CV 04-09049
                                    )
10   MGA ENTERTAINMENT, INC., ET. AL., )
                                    )
11                   DEFENDANTS.    )   TRIAL DAY 7
     _____)   PAGES 1255-1390
12   AND CONSOLIDATED ACTIONS,       )
     _____)

13

14

15           REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                    RIVERSIDE, CALIFORNIA

17                 WEDNESDAY, JUNE 4TH, 2008

18                       8:28 A.M.

19

20

21

22

23                THERESA A. LANZA, RPR, CSR
             FEDERAL OFFICIAL COURT REPORTER
24                 3470 12TH STREET, RM. 134
              RIVERSIDE, CALIFORNIA  92501
25                    951-274-0844
                  WWW.THERESALANZA.COM
```

CERTIFIED
COPY

EXHIBIT _____ 2

PAGE _____ 19

1256

1   APPEARANCES:

2

    ON BEHALF OF MATTEL, INC.:
3

4                         QUINN EMANUEL
                          BY:   JOHN QUINN
5                               JON COREY
                                MICHAEL T. ZELLER
6                               HARRY OLIVAR
                                TIMOTHY ALGER
7                         865 S. FIGUEROA STREET,
                          10TH FLOOR
8                         LOS ANGELES, CALIFORNIA  90017

9

10  ON BEHALF OF MGA ENTERTAINMENT:

11                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                          BY:   THOMAS J. NOLAN
12                              JASON RUSSELL
                                RAOUL KENNEDY
13                              LAUREN AGUIAR
                                CARL ROTH
14                        300 SOUTH GRAND AVENUE
                          LOS ANGELES, CALIFORNIA  90071-3144
15                        213-687-5000

16

17

18

19

20

21

22

23

24

25                                      EXHIBIT ___2___

                                        PAGE ___20___

WEDNESDAY, JUNE 4, 2008                          TRIAL DAY 7

1257

```
 1              I N D E X

 2                                        PAGE

 3   PLAINTIFF CASE (CONTINUED)...................  1293

 4

 5

 6   PLAINTIFF  .
     WITNESS          DIRECT      CROSS      REDIRECT     RECROSS
 7   DENISE O'NEAL( VIA VIDEOTAPED DEPOSITION)

 8                    1293

 9

10   PLAINTIFF
     WITNESS          DIRECT      CROSS      REDIRECT     RECROSS
11   VICTORIA O'CONNOR

12   BY MR. QUINN     1308
     BY MR. NOLAN                 1335       1369

13                                                         1377

14

15           EXHIBITS         RECEIVED

16             927             1304
               15              1326
17           13383             1330
             16995             1378
18

19

20

21

22

23       .

24

25                                    EXHIBIT _____ 2
```

EXHIBIT _____ 2

PAGE _____ 21

WEDNESDAY, JUNE 4, 2008                    TRIAL DAY 7

1326

1  Q    WERE YOU STILL UNCOMFORTABLE THAT MR. BRYANT WAS STILL

2  WORKING FOR A MATTEL COMPETITOR?

3  A    YES.

4  Q    DID YOU SPEAK WITH MR. LARIAN OR MS. TREANTAFELLES OR

5  ANYONE ELSE ABOUT THAT FACT?

6  A    YES.

7  Q    WHO DID YOU SPEAK TO?

8  A    FOR CERTAIN, I SPOKE TO ISAAC LARIAN, AND I'M SURE I SPOKE

9  TO PAULA AS WELL.

10  Q    DID YOU CALL ATTENTION TO THE FACT THAT YOU RECEIVED THIS

11  SIGNED CONTRACT AND IT HAD THIS FAX HEADER ON THE TOP?

12  A    I DID.

13  Q    IF YOU COULD LOOK AT EXHIBIT 15.

14        I'M GOING TO ASK YOU IF YOU CAN IDENTIFY THAT

15  DOCUMENT.

16  A    OKAY.

17  Q    CAN YOU IDENTIFY IT?

18  A    YES.

19  Q    WHAT IS IT?

20  A    IT'S THE LICENSE AGREEMENT BETWEEN MGA AND CARTER BRYANT.

21  Q    AND IS THAT THE FINAL SIGNED AGREEMENT?

22  A    YES, IT APPEARS TO BE.

23        MR. QUINN:  I'D OFFER EXHIBIT 15, YOUR HONOR.

24        MR. NOLAN:  NO OBJECTION, YOUR HONOR.

25        THE COURT:  IT'S ADMITTED.  YOU MAY PUBLISH.

09:57
09:57
09:58
09:58
09:58

WEDNESDAY, JUNE 4, 2008          TRIAL DAY 4

EXHIBIT _____ 2

PAGE _____ 22

1327

**BY MR. QUINN:**

1   Q    AND THIS IS THE AGREEMENT THAT YOU RECEIVED FROM

2   MR. BRYANT BY FAX.

3

4   A    I BELIEVE SO.

5   Q    IT SHOWS THERE, IN THE UPPER RIGHT, THAT IT'S DATED AS OF    09:58

6   SEPTEMBER 18, 2000.

7        DO YOU SEE THAT?

8   A    YES.

9   Q    WAS THAT DATE THERE WHEN YOU RECEIVED THIS DOCUMENT FROM

10  MR. BRYANT?    09:59

11  A    I BELIEVE SO, BUT I COULDN'T SAY FOR CERTAIN.

12  Q    BUT YOU DID NOTICE THAT A DATE WAS MISSING THERE.

13       THIS APPEARS TO BE THE DOCUMENT YOU GOT FROM

14  MR. BRYANT.

15  A    YES.    09:59

16  Q    AND YOU UNDERSTOOD THAT MR. BRYANT WAS STILL WORKING FOR

17  MATTEL AT THE TIME.

18  A    CORRECT.

19  Q    AND DID YOU RECEIVE THIS AROUND OR ABOUT SEPTEMBER 18,

20  2000?    09:59

21  A    I BELIEVE SO, BUT IT WAS A LONG TIME AGO.

22  Q    SURE.

23       I'D LIKE YOU TO JUMP FORWARD NOW TO SOME TIME LATER

24  IN THE NEXT YEAR, IN 2001, WERE YOU EVER ASKED TO SEND THIS

25  CONTRACT TO ANYONE?    09:59

EXHIBIT _____ 2

PAGE _____ 23

1328

1   A    YES.

2   Q    WHO WERE YOU ASKED TO SEND IT TO?

3   A    PATTIE GLASER.

4   Q    WHO'S PATTIE GLASER?

5   A    OUTSIDE COUNSEL FOR MGA ENTERTAINMENT.                    10:00

6   Q    SHE'S A LAWYER WHO DID WORK FOR MGA?

7   A    YES.

8   Q    WHO ASKED YOU TO SEND THAT AGREEMENT TO MS. GLASER?

9   A    ISAAC LARIAN.

10  Q    WHEN HE ASKED YOU TO SEND THAT AGREEMENT TO HIS OUTSIDE   10:00

11  LAWYER, DID HE GIVE YOU ANY PARTICULAR INSTRUCTIONS?

12  A    NO; NOT THAT I REMEMBER; JUST TO FAX IT TO HER.

13  Q    DID HE GIVE YOU ANY INSTRUCTIONS WITH RESPECT TO THE FAX

14  HEADER?

15  A    I WAS ASKED TO WHITE OUT THE FAX HEADER AT SOME POINT, AND   10:00

16  I DON'T RECALL IF THAT WAS UPON RECEIVING THE EXECUTED CONTRACT

17  OR AT THE TIME I SENT THE FAX TO PATTIE GLASER.

18  Q    I MAY HAVE GOTTEN THAT WRONG.  LET ME BACK UP.

19        AT SOME POINT YOU WERE ASKED TO WHITE OUT THE FAX

20  HEADER THAT SAID "BARBIE COLLECTIBLES"?                        10:00

21  A    YES.

22  Q    YOU'RE JUST NOT SURE WHEN THAT WAS.

23  A    CORRECT.

24  Q    ARE THERE A COUPLE OF POSSIBILITIES YOU'RE THINKING OF AS

25  TO WHAT THAT WAS?                                             10:01

WEDNESDAY, JUNE 4, 2008

EXHIBIT  2

TRIAL DAY 7

PAGE  24

1329

1         **MR. NOLAN:**  I THINK IT'S LEADING; AND IT'S ALSO

2    TESTIFYING.

3         **THE COURT:**  SUSTAINED.

4    BY MR. QUINN:

5    Q    WHAT'S YOUR BEST RECOLLECTION AS TO WHEN IT WAS YOU WERE          10:01

6    ASKED TO WHITE OUT THAT FAX HEADER?

7    A    I BELIEVE IT WAS UPON FIRST RECEIVING IT.

8    Q    AND WHO WAS IT THAT ASKED YOU TO DO THAT?

9    A    ISAAC LARIAN.

10   Q    DID HE DO THAT AFTER YOU CALLED HIS ATTENTION TO IT?             10:01

11   A    YES.

12   Q    DO YOU RECALL WHEN IT WAS THAT HE LATER ASKED YOU TO SEND

13   IT TO HIS OUTSIDE LAWYER?

14   A    IT WAS SOME TIME IN 2001.

15   Q    DID HE TELL YOU WHY HE WANTED YOU TO SEND IT TO HIS              10:01

16   OUTSIDE LAWYER?

17   A    NOT THAT I RECALL.

18   Q    PUTTING ASIDE THE ISSUE OF THE HEADER, DID HE TELL YOU TO

19   MAKE ANY OTHER CHANGES BEFORE FAXING THIS TO MS. GLASER?

20   A    NOT THAT I RECALL.                                               10:02

21   Q    WHEN YOU SENT IT TO MS. GLASER, DID YOU HAVE A COPY OF THE

22   CONTRACT OR DID YOU HAVE TO GET A COPY OF THE CONTRACT?

23   A    I BELIEVE THE CONTRACT WAS HANDED TO ME AND TOLD TO FAX IT

24   TO HER.

25   Q    WHO HANDED IT TO YOU AND TOLD YOU TO FAX IT TO HER?             10:02

WEDNESDAY, JUNE 4, 2008                    TRIAL DAY 7

EXHIBIT 2

PAGE 25

, 1330

```
 1   A    ISAAC LARIAN.

 2   Q    DID YOU DO THAT?

 3   A    I DID.

 4   Q    WOULD YOU TAKE A LOOK AT EXHIBIT 13383, WHICH IS IN YOUR

 5   BINDER.  MY QUESTION TO YOU IS WHETHER YOU CAN IDENTIFY THAT          10:02

 6   DOCUMENT?

 7   A    YES.

 8   Q    WHAT IS THAT?

 9   A    THIS IS THE FAX THAT I SENT TO PATTIE GLASER WITH THE

10   LICENSE AGREEMENT BETWEEN CARTER BRYANT AND MGA.                      10:03

11   Q    THAT YOU SENT IN RESPONSE TO MR. LARIAN'S REQUEST.

12   A    YES.

13             MR. QUINN:   WE'D OFFER THAT, YOUR HONOR.

14             MR. NOLAN:   NO OBJECTION, YOUR HONOR.

15             THE COURT:   IT'S ADMITTED.  YOU MAY PUBLISH.              10:03

16             MR. QUINN:   IF WE COULD JUST ENLARGE THIS FIRST PAGE,

17   HERE.

18   BY MR. QUINN:

19   Q    IS THIS THE FAX COVER PAGE THAT YOU USED TO TRANSMIT THE

20   CONTRACT TO MS. GLASER?                                              10:03

21   A    YES.

22   Q    AND DOES SEEING THIS REFRESH YOUR RECOLLECTION AS TO WHEN

23   IT WAS YOU SENT IT TO MS. GLASER?

24   A    YES.

25   Q    IF WE COULD SEE THE NEXT PAGE.                                  10:03
```

WEDNESDAY, JUNE 4, 2008                         TRIAL EXHIBIT _____ 2

                                                PAGE _____ 26

1390

```
 1   THE COURT HAS NOT RULED ON.

 2            THE COURT:  OKAY.  THANK YOU.

 3

 4

 5

 6

 7

 8

 9

10

11                         CERTIFICATE

12

13   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
14   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
15   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.
16

17   _____          6-4-08
     THERESA A. LANZA, CSR, RPR                 DATE
18   FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25
```

WEDNESDAY, JUNE 4, 2008                    TRIAL DAY 7

EXHIBIT 2
27

1550

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    - - -

4    **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5    - - -

6    MATTEL, INC.,                    :    PAGES 1550 - 1668

7          PLAINTIFF,                 :

8        VS.                          :    NO. ED CV04-09049-SGL
                                       :    [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,         :    CV04-9059 & CV05-2727]
     ET AL.,                          :

10                                     :

11         DEFENDANTS.                 :

12

13

14

15    REPORTER'S TRANSCRIPT OF PROCEEDINGS

16    RIVERSIDE, CALIFORNIA

17    THURSDAY, JUNE 5, 2008

18    JURY TRIAL - DAY 8

19    AFTERNOON SESSION

20

21

22    CERTIFIED        MARK SCHWEITZER, CSR, RPR, CRR
                        OFFICIAL COURT REPORTER
23    COPY             UNITED STATES DISTRICT COURT
                        181-H ROYBAL FEDERAL BUILDING
24                      255 EAST TEMPLE STREET
                        LOS ANGELES, CALIFORNIA 90012
25                      (213) 663-3494

EXHIBIT 2
PAGE 28

1551

```
 1   Appearances of Counsel:

 2

 3   On Behalf of Mattel:

 4        Quinn Emanuel
          By John B. Quinn, Esq.
 5           B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
 6           Harry Olivar, Esq.
             John Corey, Esq.
 7           Diane Hutnyan, Esq.
             William Price, Esq.
 8        855 South Figueroa Street
          10th Floor
 9        Los Angeles, CA 90017
          (213) 624-7707
10

11

12   On Behalf of MGA Entertainment:

13        Skadden, Arps, Slate, Meagher & Flom LLP
          By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
          300 South Grand Avenue
17        Los Angeles, CA 90071-3144
          (213) 687-5000
18

19

20

21

22

23

24

25
```

EXHIBIT ___ 2

PAGE ___ 29

1552

1    **I N D E X**

2

3    MAUREEN TKACIC, VIA VIDEOTAPED DEPOSITION.............. 1559

4    ISAAC LARIAN, SWORN................................... 1572

5    DIRECT EXAMINATION BY MR. PRICE:...................... 1573

6

7

8    **E X H I B I T S**

9    (Exhibit 1-A received.)............................... 1559

10   (Exhibit 11856 received.)............................. 1588

11   (Exhibit 5713 received.).............................. 1591

12   (Exhibit 5715 received.).............................. 1592

13   (Exhibit 13619 received.)............................. 1594

14   (Exhibit 8 received.)................................. 1609

15   (Exhibit 13382 received.)............................. 1618

16   (Exhibit 13620 received.)............................. 1624

17   (Exhibit 11907 received.)............................. 1648

18   (Exhibit 12842 received.)............................. 1651

19   (Exhibit 11248 received.)............................. 1655

20

21

22

23

24

25

EXHIBIT _____ 2

PAGE _____ 30

1646

1    T-shirt; correct?

2    **A.**    That's what it says.

3    **Q.**    And you notice that if you look at the drawing, it's

4    kind of showing her midriff here?

5    **A.**    That's correct.

6    **Q.**    And let's go to the fifth page of the exhibit.  Another

7    drawing where he shows a character showing there a bare

8    midriff?

9    **A.**    Yes.

10   **Q.**    Same if you look at the next page.  Number 6.

11   **A.**    Yes.

12   **Q.**    Also have these hiphugger pants and a bare midriff?

13   **A.**    Yes.

14   **Q.**    So certainly these were sort of fashion statements that

15   were shown to you in September of 2000?

16   **A.**    These are drawings that were shown to me in September

17   2000.

18   **Q.**    And I believe you testified that according to you, I

19   guess, there was no one who worked on Bratz in September

20   because there was no contract?

21   **A.**    I'm sorry.  Can you repeat the question?

22   **Q.**    Is it true -- is it your testimony that after this

23   meeting, no one did work on Bratz in September because there

24   was no contract?

25             MR. NOLAN:  Objection, your Honor.  Vague and

EXHIBIT _____ 2

31

PAGE

1647

1    ambiguous as to drawings for the doll.

2            THE COURT:  Rephrase, Counsel.

3    Q.   BY MR. PRICE:   In September 2000, was there any work at

4    all done on these drawings or on doll designs or anything

5    pertaining to Bratz after this meeting?

6            MR. NOLAN:  Compound, your Honor.

7            THE COURT:  Overruled.

8            THE WITNESS:  I don't know if there was or not.

9    It's possible that there was.

10   Q.   BY MR. PRICE:   It's your belief, however, that it's in

11   this month of September 2000 that, to use your words, Bratz

12   was born?

13   A.   In September of 2000 Bratz was born?  What do you mean

14   by Bratz?  Bratz drawings or Bratz dolls?  Bratz dolls did

15   not come to the market until 2001.

16   Q.   Well, if you look at Exhibit 11907.

17   A.   Exhibit?

18   Q.   11907.

19   A.   Yes, go ahead.

20   Q.   You recognize that as an e-mail that includes you and

21   Victoria O'Connor and Sandrine de Raspide?

22   A.   Your pronunciation is better than mine.

23   Q.   You recognize it as one of your e-mails?

24   A.   That's correct.

25           MR. PRICE:  Your Honor, move Exhibit 11907 into

EXHIBIT  2

PAGE  32

1648

1    evidence.

2            MR. NOLAN:  No objection, your Honor.

3            THE COURT:  It's admitted.

4            **(Exhibit 11907 received.)**

5    **Q.**    BY MR. PRICE:  This is one of those e-mails where

6    someone else has written you an e-mail and you're going

7    through and typing your comments or responses?

8    **A.**    That's correct.

9    **Q.**    So, for example, where it has this e-mail from Nathalie

10   Riesen to -- it says to ILarian at MGAE dot com.  Is that

11   you?

12   **A.**    That was my e-mail address at the time.

13   **Q.**    And you see it says:  "I have some questions about the

14   story of the Bratz.  I'd ask if you would" --

15   **A.**    I see that.

16   **Q.**    And one of the questions was date of birth of the Bratz,

17   time of development, first launch in the United States.

18           Do you see that?

19   **A.**    Yes.

20   **Q.**    And you've got -- what is typed here is your response;

21   correct?

22   **A.**    I'm sorry?  The one in capital is mine.

23   **Q.**    And your response is:  "Born September 2000.  Nine

24   months to develop, like a baby.  Launched in the USA in July

25   2001 and Spain June 2001, before USA."

EXHIBIT  2

PAGE  33

1649

1    Do you see that?

2  **A.**  I do.

3  **Q.**  And I take it that for this birth in September of 2000,

4  you're not taking credit for the paternity of that; right?

5  **A.**  I'm sorry?

6  **Q.**  That is, where it says born in September 2000, you are

7  not the one who bore it?

8  **A.**  I personally?

9  **Q.**  Yes.

10  **A.**  No, I have not given birth to anybody yet.

11  **Q.**  Notify me if you do.  We can make a lot of money.

12    So you're talking about born in September 2000, the

13  person who you're referring to who gave birth to Bratz in

14  September of 2000 was Carter Bryant?

15  **A.**  MGA Entertainment gave birth to Bratz dolls and Bratz

16  brand.  Carter Bryant came up with the drawings that became

17  the inspiration for Bratz.

18  **Q.**  My understanding is you weren't aware of anything being

19  done in September 2000 regarding Bratz except Mr. Carter

20  Bryant presented to you Exhibit 302.  Isn't that right?

21  **A.**  No.  My testimony was that there could have been some

22  work done on the Bratz to see if it could be done, could be

23  made to a doll or not in September or October.  I just don't

24  know the detail of that.

25  **Q.**  Well, you certainly would agree that the date that --

EXHIBIT ___2___

PAGE ___34___

1650

1   using your word here, Bratz, the date that Bratz was created

2   was in September of 2000.

3   **A.**   No.   You should refer back to the date of the e-mail.

4   That's October 31st, 2002.   And Bratz dolls were in the

5   market already for about a year when I wrote that e-mail.

6   **Q.**   Well, if you'd look at Exhibit 551.

7   **A.**   I'm sorry?

8   **Q.**   Look at Exhibit 551.

9   **A.**   Should I put this away?

10  **Q.**   Yes, we're going to 551 now, a different document.

11         And that's already in evidence, your Honor.

12         THE COURT:   Very well.

13  **Q.**   BY MR. PRICE:   Mr. Larian, you're aware of this e-mail

14  between Nana Ashong and Victoria O'Connor, Paula

15  Treantafelles, now known as Paula Garcia, and Martin Hitch?

16  **A.**   I'm not.

17  **Q.**   You've never seen this before this trial?

18  **A.**   Only through this trial I have.

19  **Q.**   Who is Nana Ashong?

20  **A.**   She was product manager, to the best of my recollection,

21  at MGA at one time.

22  **Q.**   And I think you said Martin Hitch, was he in charge of

23  sales?

24  **A.**   He was in charge of international sales.

25  **Q.**   And how about Jackie Bielke?

EXHIBIT _____ 2

PAGE _____ 35

1651

1    A.    I have no recollection of her.

2    Q.    Do you know why Ms. Ashong, in September of 2001, was

3    sending an e-mail saying that the date of creation for Bratz

4    was September 18, 2000?

5    A.    I have no idea.

6    Q.    Do you recall that you sent an e-mail saying for legal

7    purposes, let's say it's October of 2000?

8    A.    I don't recall that.  I might have.  I don't recall.

9    Q.    All right.  If you'd look at Exhibit 12842.

10   A.    I'm sorry.  Can you repeat the number?

11   Q.    12842.  Do you recognize this as an e-mail that you

12   wrote sometime around June 27, 2002?

13   A.    It's an e-mail that I wrote.  I don't remember the date.

14             MR. PRICE:  Move Exhibit 12842 into evidence.

15             MR. NOLAN:  No objection, your Honor.

16             THE COURT:  It's admitted, and you may publish.

17             **(Exhibit 12842 received.)**

18   Q.    BY MR. PRICE:  There's an e-mail from Caymohr,

19   C-A-Y-M-O-H-R, at AOL dot com.

20             Do you have any idea who that is?

21   A.    I have no idea.

22   Q.    The "To," that's your e-mail address; correct?

23   A.    It is.

24   Q.    Do you know whose e-mail addresses are in the CC?

25   A.    Ricardo Cruz, I think, is one of them, and the other one

EXHIBIT  2

PAGE  36

1668

```
 1   topic.

 2           THE COURT:  Very well.  We'll adjourn for the day.

 3   We'll have the jury back tomorrow at 9:00.

 4

 5           (Proceedings concluded at 4:55 P.M.)

 6

 7

 8                   C E R T I F I C A T E

 9

10

11           I hereby certify that pursuant to Title 28,

12   Section 753 United States Code, the foregoing is a true and

13   correct transcript of the stenographically reported

14   proceedings in the above Mattel.

15           Certified on June 5, 2008.

16

17

18   MARK SCHWEITZER, CSR, RPR, CRR
     Official Court Reporter
19   License No. 10514

20

21

22

23

24

25
```

EXHIBIT  2

PAGE  37

2118

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3            EASTERN DIVISION

4               - - -

5    HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6               - - -

7  MATTEL, INC.,                    )
                                    )
8              PLAINTIFF,           )
                                    )
9         VS.                       )   NO. CV 04-09049
                                    )
10  MGA ENTERTAINMENT, INC., ET. AL., )
                                    )
11             DEFENDANTS.          )   TRIAL DAY 11
   _____)   MORNING SESSION
12  AND CONSOLIDATED ACTIONS,       )   PAGES 2118-2225
   _____)

13

14

15      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16            RIVERSIDE, CALIFORNIA

17          WEDNESDAY, JUNE 11, 2008

18               9:02 A.M.

19

20

21

22

23            THERESA A. LANZA, RPR, CSR
          FEDERAL OFFICIAL COURT REPORTER
24            3470 12TH STREET, RM. 134
          RIVERSIDE, CALIFORNIA  92501
25               951-274-0844
             WWW.THERESALANZA.COM

EXHIBIT ___2___

PAGE ___38___

2119



```
 1   APPEARANCES:

 2
     ON BEHALF OF MATTEL, INC.:
 3
                            QUINN EMANUEL
 4                          BY:   JOHN QUINN
                                  JON COREY
 5                                MICHAEL T. ZELLER
                                  HARRY OLIVAR
 6                                TIMOTHY ALGER
                            865 S. FIGUEROA STREET,
 7                          10TH FLOOR
                            LOS ANGELES, CALIFORNIA  90017
 8

 9

10   ON BEHALF OF MGA ENTERTAINMENT:

11                          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                            BY:   THOMAS J. NOLAN
12                                JASON RUSSELL
                                  RAOUL KENNEDY
13                                LAUREN AGUIAR
                                  CARL ROTH
14                          300 SOUTH GRAND AVENUE
                            LOS ANGELES, CALIFORNIA  90071-3144
15                          213-687-5000

16

17

18

19

20

21

22

23

24
                                      EXHIBIT ____ 2
25
                                      PAGE ____ 39
```

WEDNESDAY, JUNE 11, 2008                    TRIAL DAY 11, MORNING SESSION

2120

```
1                        I N D E X

2                                               PAGE

3   PLAINTIFF CASE (CONTINUED)...................... 2133

4

5

6
    WITNESS          DIRECT      CROSS      REDIRECT     RECROSS
7   JEFFREY WEISS

8   BY MR. NOLAN      2123                   2132
    BY MR. QUINN                 2131
9

10  PLAINTIFF
    WITNESS          DIRECT      CROSS      REDIRECT     RECROSS
11  ISAAC LARIAN (CONTINUED)

12  BY MR. NOLAN                 2133
    BY MR. PRICE                             2165
13

14

15        EXHIBITS        RECEIVED

16        16914           2142
          18508           2156
17        11036           2199

18

19

20

21

22

23

24                                 EXHIBIT    2

25                                          40
                                     PAGE
```

WEDNESDAY, JUNE 11, 2008              TRIAL DAY 11, MORNING SESSION

1    Q    AND, IN FACT, YOU'VE GOT A PROVISION HERE THAT "EMPLOYEE

2    AGREES TO MAINTAIN THE SAME LEVEL OF CONFIDENTIALITY REGARDING

3    CO-WORKERS."

4         DO YOU SEE THAT?

5    A    YES.                                                              11:26

6    Q    AND YOUR COMPANY TOOK THE POSITION THAT BECAUSE OF THIS

7    CONTRACT, IF SOMEONE LEFT MGA, THEY COULD NOT THEN APPROACH MGA

8    TO TRY AND HIRE SOMEONE FOR THEIR COMPANY.

9    A    I DON'T RECALL IF WE DID THAT OR NOT.  BUT IF WE DID, IT'S

10   ILLEGAL, IT'S NOT ENFORCEABLE.                                        11:26

11   Q    WELL, YOU SAID IT'S OKAY TO DO THAT; RIGHT?  IT'S OKAY FOR

12   AN EMPLOYEE TO LEAVE A COMPANY AND THEN TRY AND HIRE EMPLOYEES

13   FROM THE COMPANY THAT THEY LEFT; RIGHT?

14   A    THAT'S MY BELIEF; THAT IN CALIFORNIA, OR IN THE UNITED

15   STATES, YOU CAN HIRE EMPLOYEES FROM ONE COMPANY TO ANOTHER.          11:26

16   Q    BUT YOU ACTUALLY WOULD SEND OUT LETTERS TO FORMER

17   EMPLOYEES WHO TRIED TO DO THAT AND SAY 'THAT'S ILLEGAL, WE'LL

18   SUE YOU IF YOU DO IT.'

19   A    WE MIGHT HAVE SAID THAT, YES, BUT THAT'S NOT LEGAL, AND WE

20   HAVE NOT SUED ANYBODY OVER THAT.                                      11:27

21   Q    IF YOU WOULD LOOK AT EXHIBIT 10036, THAT'S IN THE SMALLER

22   BINDER, YOU SEE ON THE FIRST PAGE, THERE IS A LETTER ON MGA

23   LETTERHEAD, WRITTEN BY YOU.

24   A    GO AHEAD.

25   Q    DO YOU RECOGNIZE THAT?           EXHIBIT ___2___                  11:27
                                                      41
                                           PAGE _____

2199

```
 1   A    I DO.

 2   Q    THAT'S YOUR SIGNATURE?

 3   A    IT IS.

 4   Q    IT'S A LETTER SENT TO KAMI GILLMORE; CORRECT?

 5   A    IT IS.                                              11:27

 6   Q    AFTER SHE LEFT MGA.

 7   A    I DON'T KNOW.  IT MUST BE AFTER SHE LEFT MGA; RIGHT.

 8   Q    AND IT'S SENT TO HER TO TELL HER YOU CANNOT RECRUIT

 9   EMPLOYEES AT MGA.

10   A    HOLD ON ONE SECOND.                                 11:27

11        IT SAYS SOMETHING TO THAT EFFECT IN PARAGRAPH TWO,

12   YES.

13        MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 11036 INTO

14   EVIDENCE.

15        THE COURT:  ANY OBJECTION?                          11:28

16        MR. NOLAN:  NO OBJECTION, YOUR HONOR.

17        THE COURT:  ADMITTED.  YOU MAY PUBLISH.

18        MR. PRICE:  JUST ADMITTING THE FIRST PAGE AT THIS

19   POINT.

20   BY MR. PRICE:                                            11:28

21   Q    SO THIS IS NOVEMBER 10, 2000; CORRECT?

22   A    YES.

23   Q    AND LOOK AT THE SECOND PARAGRAPH:  "I WAS TOLD BY

24   MATT HEDRICK THAT YOU SUGGESTED THAT HE HAD ATTEMPT TO RECRUIT

25   COLLEEN O'HIGGINS TO WORK FOR PLAY HUT."  EXHIBIT ___ 2   11:28
```

PAGE ___ 42

WEDNESDAY, JUNE 11, 2008                 TRIAL DAY 11, MORNING SESSION

2200

1           DO YOU SEE THAT?

2    A    YES.

3    Q    "ANY SUCH ATTEMPT TO SOLICIT THE COMPANY'S PERSONNEL

4    REPRESENTS SERIOUS INTERFERENCE WITH THE COMPANY'S BUSINESS AND

5    FINANCIAL INTERESTS AND, IF TRUE, WOULD VIOLATE THAT PART OF          11:28

6    THE AGREEMENT IN WHICH YOU AGREED TO, QUOTE, 'MAINTAIN THE SAME

7    LEVEL OF CONFIDENTIALITY' REGARDING CO-WORKERS, EMPLOYEE

8    RELATION MATTERS, AND COMPANY OPERATIONS AS REGARDS TO TRADE

9    SECRETS AND CONFIDENTIAL INFORMATION."

10          THAT'S WHAT YOU WROTE TO HER.                                  11:29

11   A    I DID.

12   Q    WERE YOU TRYING TO SCARE HER?

13   A    I DON'T RECALL WHAT I WAS TRYING TO DO.  ALL I KNOW IS

14   THAT WE GOT A LETTER FROM HER ATTORNEY AFTERWARD SAYING THAT

15   THIS IS ILLEGAL, AND WE DROPPED THE WHOLE THING.  WE NEVER SUED       11:29

16   OR TOOK ACTION AGAINST KAMI GILLMORE.

17   Q    WELL, HERE YOU TOLD HER ON NOVEMBER 2000, "PLEASE BE AWARE

18   THAT I WILL TAKE ANY APPROPRIATE ACTION WITH REGARD TO SAFE-

19   GUARDING THE COMPANY'S CONFIDENTIAL INFORMATION AND IMPROPER

20   ATTEMPTS TO SOLICIT CURRENT EMPLOYEES."                              11:29

21          THAT'S WHAT YOU TOLD HER IN NOVEMBER OF 2000;

22   CORRECT?

23   A    IT APPEARS SO, YES.

24   Q    SO THEN, YOUR BELIEF, THEN, PRIOR TO THIS, OBVIOUSLY, IN

25   1999, WAS -- THIS IS NOVEMBER 2000 -- AS OF NOVEMBER 2000, MGA       11:29

WEDNESDAY, JUNE 11, 2008              TRIAL DAY 11, MORNING SESSION  2
                                                      EXHIBIT

                                                                    43

2201

1    TOOK THE POSITION, YOU KNOW, IF YOU LEAVE MGA, YOU CAN'T

2    SOLICIT ANY EMPLOYEES FOR MGA; RIGHT?

3    A    WE TOOK THAT POSITION.  THAT POSITION IS WRONG.  YOU

4    CANNOT STOP EMPLOYEES TO MOVE FROM ONE COMPANY TO ANOTHER IN

5    CALIFORNIA.

6    Q    I UNDERSTAND THAT YOU NOW SAY THAT WAS WRONG.

7         BUT MY QUESTION IS, IN 1999 AND AT LEAST AS OF UP TO

8    NOVEMBER 10, 2000, THAT'S THE POSITION YOU TOOK; RIGHT?

9    A    YES.

10   Q    AND AT THE SAME TIME YOU TOOK THAT POSITION, AS IN

11   EXHIBIT 5715, YOU WERE ENCOURAGING FORMER MATTEL EMPLOYEES TO

12   RECRUIT EMPLOYEES FROM MATTEL; CORRECT?

13   A    WE WERE ENCOURAGING EX-MATTEL EMPLOYEES WHO WERE AT MGA TO

14   LOOK FOR OTHER PEOPLE, AND WE WERE ALSO ASKING MATTEL HUMAN

15   RESOURCES IF THEY HAD PEOPLE TO COME TO US.

16   Q    AND FOCUSING ON NOW HAVING FORMER MATTEL EMPLOYEES CONTACT

17   CURRENT MATTEL EMPLOYEES TO RECRUIT THEM, IN THIS AREA YOU

18   WEREN'T APPLYING THE SAME RULES TO BOTH COMPANIES; RIGHT?  YOU

19   WERE SAYING 'MY FORMER EMPLOYEES CAN'T DO THAT, BUT I'M GOING

20   TO ASK MATTEL EMPLOYEES TO DO THAT.'

21   A    I DON'T UNDERSTAND YOUR QUESTION.  CAN YOU CLARIFY?

22   Q    I'LL TRY TO CLARIFY.  THIS IS 5715.

23        WHERE YOU'RE ASKING KAMI, WHO YOU KNOW AS A FORMER

24   MATTEL EMPLOYEE, TO COME UP WITH NAMES OF PEOPLE WHO WORK AT

25   MATTEL.                        EXHIBIT _____ 2
                                                    44

11:30
11:30
11:30
11:30
11:31

2225

```
1   FURTHER INTO THAT.

2              MR. NOLAN:  I UNDERSTAND.

3              THE CLERK:  COURT STANDS IN RECESS.

4

5

6

7

8

9

10

11

12                          CERTIFICATE

13

14   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
15   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
16   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.
17

18

19   THERESA A. LANZA, RPR, CSR          6-12-08
     OFFICIAL COURT REPORTER                DATE
20

21

22

23

24

25                          EXHIBIT _____2____

                            PAGE _____45____
```

WEDNESDAY, JUNE 11, 2008              TRIAL DAY 11, MORNING SESSION

2428

1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                      ---

4      **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                      ---

6  MATTEL, INC.,                 :   PAGES 2428 - 2524
                                 :
7          PLAINTIFF,            :
                                 :
8      VS.                       :   NO. ED CV04-09049-SGL
                                 :   [CONSOLIDATED WITH
9  MGA ENTERTAINMENT, INC.,      :   CV04-9059 & CV05-2727]
   ET AL.,                       :
10                               :
           DEFENDANTS.           :
11  _____

12

13

14

15         REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             RIVERSIDE, CALIFORNIA

17          THURSDAY, JUNE 12, 2008

18             JURY TRIAL - DAY 12

19             AFTERNOON SESSION

20

21

22                          MARK SCHWEITZER, CSR, RPR, CRR
                            OFFICIAL COURT REPORTER
23                          UNITED STATES DISTRICT COURT
                            181-H ROYBAL FEDERAL BUILDING
24                          255 EAST TEMPLE STREET
                            LOS ANGELES, CALIFORNIA 90012
25                          (213) 663-3494

CERTIFIED COPY

EXHIBIT ___2___

PAGE ___46___

2429

1    **Appearances of Counsel:**

2

3    On Behalf of Mattel:

4        Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
         By John B. Quinn, Esq.
5           B. Dylan Proctor, Esq.
            Michael T. Zeller, Esq.
6           Harry Olivar, Esq.
            John Corey, Esq.
7           Diane Hutnyan, Esq.
            William Price, Esq.
8        855 South Figueroa Street
         10th Floor
9        Los Angeles, CA 90017
         (213) 624-7707

10

11   On Behalf of MGA Entertainment:

12       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
13          Carl Alan Roth, Esq.
            Jason Russell, Esq.
14          Lauren Aguiar, Esq.
            David Hansen, Esq.
15          Matthew Sloan, Esq.
         300 South Grand Avenue
16       Los Angeles, CA 90071-3144
         (213) 687-5000

17

18   For Carter Bryant:

19       Keker & Van Nest
         By Christa Anderson, Esq.
20          Michael H. Page, Esq.
         710 Sansome Street
21       San Francisco, CA 94111-1704
         (415) 391-5400

22

23

24

25

EXHIBIT _____ 2

PAGE _____ 47

2430

1                      I N D E X

2

3    CARTER BRYANT, PREVIOUSLY SWORN...................... 2433

4    DIRECT EXAMINATION (CONTINUED) BY MR. PRICE........... 2433

5

6

7                    E X H I B I T S

8
     (Exhibit 2201 received.)............................ 2518
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT ___2___

PAGE ___48___

2517

1   Q.   Mr. Larian?

2   A.   Yes.  Sorry.

3   Q.   And Mr. Larian was excited?

4   A.   He seemed to be.

5   Q.   He mentioned, when he talked to you, how successful he

6   thought this might be; correct?

7   A.   Are we talking about this first conversation that we

8   had?

9   Q.   Let's say -- well, let me ask you, how many

10  conversations did you have with Mr. Larian in September?

11  A.   Oh, I don't recall.  More than one.

12  Q.   And those discussions, you talked about, for example,

13  how you might be paid?

14  A.   Yes.

15  Q.   You talked about the fact that you wanted a royalty?

16  A.   Yes, I think so.

17  Q.   You talked about how fiscally and successfully you could

18  become rich?

19  A.   I don't remember ever saying that.  That's not something

20  I really recall.

21  Q.   I'm not talking about you saying that.  I'm talking

22  about during these conversations, didn't Mr. Larian say

23  something to the effect of, with the deal we're talking

24  about, you could be rich?

25  A.   Yeah, he might have said something like that.

EXHIBIT ____ 2
PAGE ____ 49

2518

1   Q.   And that was kind of -- because he was kind of excited
2   about this, and he was getting you excited about it; right?
3   A.   Well, sure.
4   Q.   Because he wanted you to become a consultant at MGA to
5   make this Bratz a reality; right?
6   A.   Yes.
7   Q.   And in doing that, you had to have some discussions with
8   MGA's counsel; right?
9   A.   Yes.
10  Q.   If you'd look at Exhibit 2201.  And this is not in the
11  drawings book.  It would be in the other black book.
12  A.   Okay.
13  Q.   Do you recognize 2201 as a communication you had with a
14  Mr. Rosembaum sometime around September 14 of 2000?
15  A.   Yes.
16        MR. PRICE:  Your Honor, move Exhibit 2201 in
17  evidence.
18        MR. NOLAN:  No objection, your Honor.
19        THE COURT:  It's admitted.  You may publish.
20        (Exhibit 2201 received.)
21  Q.   BY MR. PRICE:  You see this is the first page?
22  A.   Yes.
23  Q.   Was this something -- how did you send this to
24  Mr. Rosembaum?
25  A.   I don't remember exactly.

EXHIBIT ___2___
PAGE ___56___

2519

1   Q.   Did you send a letter in the mail?

2   A.   I don't -- I don't remember.

3   Q.   You weren't communicating by mail in September with MGA,

4   were you?

5   A.   It's possible.  I don't remember.

6   Q.   Do you recall using a messenger service?

7   A.   Well, again, it's possible.  But no, I don't remember

8   that.

9   Q.   Do you know if you faxed it from Mattel?

10   A.   Again, it's possible.  But I don't remember.  There's no

11   fax heading or anything like that.  So I don't know.

12   Q.   Did you fax documents from Mattel to MGA between

13   September 1st and the time that you left Mattel October 19th?

14   A.   Yes.

15   Q.   What documents do you specifically remember faxing?

16   A.   Well, I think the only thing that I can remember faxing

17   was the final page of the contract agreement.

18   Q.   Where did you fax it from?

19   A.   One of the fax machines at Mattel.

20   Q.   Is that when you were in Barbie collectibles?

21   A.   Yes.

22   Q.   Do you know that it was just the last page?

23   A.   No, I'm not sure.

24   Q.   Let's look at the next page on this document.  September

25   14.  "Enclosed is a copy of my original offer of employment

EXHIBIT ___2___

PAGE ___51___

2524

1

2

3

4

5

6                        C E R T I F I C A T E

7

8

9          I hereby certify that pursuant to Title 28,

10   Section 753 United States Code, the foregoing is a true and

11   correct transcript of the stenographically reported

12   proceedings in the above matter.

13          Certified on June 12, 2008.

14

15

16        MARK SCHWEITZER, CSR, RPR, CRR
          Official Court Reporter
17        License No. 10514

18

19

20

21

22

23

24

25

EXHIBIT ___2___

PAGE ___52___

# EXHIBIT 3

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 4

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 5

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 6

Case 2:04-cv-09049-DOC-RNB   Document 6458-2   Filed 08/27/09   Page 56 of 80   Page ID
#:215000
Case 2:04-cv-09049-SGL-RNB      Document 4439      Filed 12/03/2008      Page 1 of 17

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.   CV 04-09049 SGL(RNBx)                          Date: December 3, 2008
Title:     MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
================================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

          James Holmes                          None Present
          Courtroom Deputy Clerk                Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:       ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                            None Present

PROCEEDINGS:

**ORDER FINDING IN FAVOR OF MATTEL AS TO THE MGA PARTIES' AFFIRMATIVE
DEFENSES**

**ORDER GRANTING MATTEL'S MOTION FOR DECLARATORY JUDGMENT (DOCKET #4303)**

**ORDER GRANTING MATTEL'S MOTION FOR CONSTRUCTIVE TRUST AND § 17200
INJUNCTIVE RELIEF (DOCKET #4305)**

**ORDER GRANTING MATTEL'S MOTION FOR PERMANENT INJUNCTION (DOCKET #4306)**

**ORDER DENYING AS MOOT MOTION TO STRIKE PORTIONS OF HUTNYAN DECLARATIONS
AND EXHIBITS THERETO (DOCKET #4351)**

**ORDER DENYING MOTION TO STRIKE THE PROCTOR, KEISER, AND HOLLANDER
DECLARATIONS (DOCKET #4352)**

**ORDER DENYING AS MOOT MOTION TO STRIKE MEYER DECLARATION (DOCKET #4377)**

**ORDER STAYING COURT'S ORDER PENDING CONSIDERATION OF THE PARTIES' POST-**

EXHIBIT ____ 6 ____

PAGE ____ 77 ____

Case 2:04-cv-09049-DOC-RNB  Document 6458-2  Filed 08/27/09  Page 57 of 80  Page ID
#:215001
Case 2:04-cv-09049-SGL-RNB  Document 4439  Filed 12/03/2008  Page 2 of 17

**TRIAL MOTIONS**

**ORDER SETTING FORTH FURTHER BRIEFING SCHEDULE**

**ORDER REGARDING DISCOVERY MASTER PROPOSALS FOR PHASE 2**

**ORDER REGARDING JOINTLY LODGED LAPTOP COMPUTER**

**ORDER REGARDING SERVICE OF PERMANENT INJUNCTION**

**FILED CONCURRENTLY HEREWITH:**

**(1) MATTEL'S PROPOSED ORDER (AS MODIFIED BY THE COURT) GRANTING
DECLARATORY JUDGMENT**

**(2) MATTEL'S PROPOSED ORDER (AS MODIFIED BY THE COURT) GRANTING MATTEL'S
MOTION FOR CONSTRUCTIVE TRUST AND FOR FINDING LIABILITY AND INJUNCTIVE
RELIEF PURSUANT TO CAL. BUS. & PROF. CODE § 17200**

**(3) MATTEL'S PROPOSED ORDER (AS MODIFIED BY THE COURT) GRANTING MATTEL'S
MOTION FOR PERMANENT INJUNCTION**

These matters were heard on November 10, 2008, after extensive briefing by the parties.
After a two-phase jury trial, the Court considers certain equitable issues (referred to as Phase 1C
of the trial) and enters the following Order. Filed concurrently herewith are: (1) Mattel's Proposed
Order (as modified by the Court) Granting Declaratory Judgment; (2) Mattel's Proposed Order (as
modified by the Court) Granting Mattel's Motion for Constructive Trust and for Finding Liability and
Injunctive Relief Pursuant to Cal. Bus. & Prof. Code § 17200; and (3) Mattel's Proposed Order (as
modified by the Court) Granting Mattel's Motion for Permanent Injunction.

In reaching the rulings set forth herein, the Court has considered the parties' briefs and
exhibits submitted during Phase 1C of the trial, the arguments of counsel, as well as the entire
record (including the evidence properly submitted in Phase 1A and Phase 1B of the trial) and its
previous Orders.

The Court refers collectively to all defendants herein, including MGA CEO Isaac Larian
("Larian"), as "the MGA parties". MGA Entertainment, Inc., is referred to as "MGAE".

The Court has carefully and deliberately considered the parties' well-presented legal and
equitable arguments, authorities, and evidence concerning the motions identified above. In its
final analysis, the Court finds, as did the jury, that the preponderance of evidence establishes that
Carter Bryant ("Bryant") created and developed the name, the concept, and, together with
Margaret Leahy, the prototypical sculpt for the hugely-successful Bratz brand of female fashion

MINUTES FORM 90
CIVIL -- GEN                                    2                          Initials of Deputy Clerk: jh

EXHIBIT _____ 6 _____

PAGE _____ 78 _____

Case 2:04-cv-09049-DOC-RNB   Document 6458-2   Filed 08/27/09   Page 58 of 80   Page ID
#:215002
Case 2:04-cv-09049-SGL-RNB      Document 4439      Filed 12/03/2008      Page 3 of 17

dolls while working as an employee of Mattel and while bound by the terms of an Inventions
Agreement, which provided that all rights to such property, and the property itself, belong to Mattel.
Moreover, the Court further finds, as did the jury, that the preponderance of the evidence
establishes that Isaac Larian and MGAE intentionally interfered with Bryant's contractual relations
with Mattel, aided and abetted Bryant's breach of fiduciary duty to Mattel, aided and abetted
Bryant's breach of his duty of loyalty to Mattel, and unlawfully converted certain property of Mattel.
Finally, the Court finds, as did the jury, that the preponderance of the evidence establishes that the
MGA parties, in further developing, producing, and marketing its Bratz brand of female fashion
dolls, are liable to Mattel for copyright infringement.

## I. The MGA Parties' Affirmative Defenses

Through its "Statement of Position Regarding Phase 1C Issues" (docket #4308), the MGA
parties seek the Court's verdict in their favor as to their affirmative defenses of laches, estoppel,
and waiver. As set forth below, the Court rules in favor of Mattel, and against the MGA parties as
to these three remaining affirmative defenses.[1]

### A.    Laches

Laches is an equitable defense that may bar a claim where a defendant establishes "(1)
lack of diligence by the plaintiff, and (2) prejudice to the defendant." Grand Canyon Trust v.
Tucson Elec. Power Co., 391 F.3d 979, 987 (9th Cir. 2004). The MGA parties establish neither
element.

Because the Court has already found that all the claims asserted against the MGA parties
were filed within the applicable limitations periods, the Court starts with the presumption that
laches is inapplicable. Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 835 (9th Cir.
2002).

Mattel has not delayed in bringing its claims against the MGA parties. The Court has
already found, based on the undisputed evidence, that Mattel had no reason to know of its claims
against Bryant until November 23, 2003, and that it had no knowledge of its claims against MGA
and Larian until Bryant was deposed approximately a year later on November 4, 2004. MGAE
intervened in Mattel's suit against Bryant approximately one month later on December 7, 2004.
See Dec. 7, 2004, Stip. & Order (04-9059 docket #36) ("MGA[] believes . . . that it has a
significantly protectable interest relating to the subject matter of the action, . . . and that MGA's
interest is not adequately represented by the existing parties."). Thereafter, the parties briefed
Mattel's motion to remand (filed on December 1, 2004, and denied on March 4, 2005), before a
stay was entered in the case on May 20, 2005, pending the Ninth Circuit's consideration of an

---

[1]    By advancing only the affirmative defenses of laches, estoppel, and waiver in their Phase
1C brief, the MGA parties have implicitly waived the right to pursue any other affirmative defenses
that they have not already expressly waived.

Initials of Deputy Clerk: jh

EXHIBIT _____6_____

PAGE _____79_____

interlocutory appeal. After MGAE's intervention and before the stay was entered, the parties, including MGAE, engaged in discovery, and the Court considered certain discovery motions, including a motion to compel the deposition of Isaac Larian filed on March 17, 2005. The stay remained in place until after the Ninth Circuit affirmed the Court's denial of the motion to remand; it was lifted on May 16, 2006. Six months later, on November 17, 2006, Mattel sought leave to file its claims against the MGA parties. On this record, the Court finds no lack of diligence by Mattel.

Nor have the MGA parties shown they suffered resulting prejudice. MGAE was permitted to intervene in the lawsuit filed by Mattel against Carter Bryant only one month after it became evident that its rights could potentially be affected, and it did so with the express purpose of protecting its own rights. The other MGA parties have not shown that they suffered any prejudice unique to them or that the intervention by MGAE was not designed to protect their rights.

Moreover, the record does not support the evidentiary prejudice claimed by the MGA parties, and the record is devoid of any expectation-based prejudice (i.e., evidence of what MGA would have done differently had the claims against them been asserted sooner). Indeed, to the contrary, the record reveals that the MGA entities have continued to promote (and profit from) the Bratz brand during the entire pendency of the current litigation.

Because of the presumption that laches will not bar timely claims, and because the Court finds that the MGA parties have failed to establish either element of laches, the Court finds in favor of Mattel as to the affirmative defense of laches.

## B.  Estoppel

For equitable estoppel to preclude Mattel's claims here, the MGA parties must establish four elements:

> (1) [T]he party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.

Strong v. County of Santa Cruz, 15 Cal.3d 720, 725 (1975).

The MGA parties cannot establish the first element because, as noted above, the Court has already found, based on the undisputed evidence, that Mattel had no reason to know of its claims against Bryant until November 23, 2003, and that it had no knowledge of its claims against MGA and Larian until Bryant was deposed almost a year later.

The MGA parties have produced no evidence that Mattel intended them to act upon any apparent intention to refrain from asserting any claims against them. To the contrary, MGAE quickly intervened in Mattel's suit against Bryant to protect its interests.

MINUTES FORM 90
CIVIL -- GEN                                                  4                           Initials of Deputy Clerk: jh

EXHIBIT _____ 6
PAGE _____ 80

Moreover, the MGA parties had no basis upon which to rely on Mattel's conduct. As found by the jury, they had superior knowledge regarding Bryant's creation of the Bratz drawings (and the timing of that creation).

Because the Court finds that the MGA parties cannot establish all the elements of estoppel, the Court finds in favor of Mattel as to the affirmative defense of estoppel.

### C.    Waiver

"Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it." United States v. King Features Entertainment, Inc., 843 F.2d 394, 399 (1988).

Here, the MGA parties contend that Mattel's tolerance of its employees' "moonlighting" for its competitors was so widespread as to constitute such a relinquishment. Although such implied waivers may be found where a plaintiff's conduct "is so inconsistent with the intent to enforce the right in question as to induce a reasonable belief that such right has been relinquished," Medico-Dental etc. Co. v. Horton & Converse, 21 Cal.2d 411, 432 (1942), no such conduct is present here.

No evidence of record suggests that Mattel tolerated the type of conduct in which Bryant engaged. The Court has previously addressed, and will not belabor here, the distinctions to be made between the limited evidence regarding "moonlighting" in the record and the conduct in which Bryant engaged. The evidence establishes, and the jury found, that while employed by Mattel as a fashion designer, Bryant preliminarily developed designs for and pitched a line of fashion dolls to Mattel's direct competitor. There is no evidence that Mattel has ever tolerated this type of conduct. Instead, several witness testified to their belief that such conduct would result in immediate termination of the offending employees. Indeed, the record is replete with details of the steps taken by Bryant, the MGA parties, and MGA employees to conceal the extent of Bryant's involvement in the Bratz project while he was employed by Mattel.

The Court finds in favor of Mattel as to the affirmative defense of waiver.

### II. Declaratory Relief Motion (docket #4303)

In its motion for declaratory judgment, Mattel seeks, pursuant to its thirteenth cause of action, a declaration of its rights (and the MGA parties' lack of rights) regarding the Bratz-related works, including certain drawings, sculpts, and ideas.[2] Mattel also seeks imposition of a

---

[2]  The parties and the Court are all equally aware that ideas are not copyrightable. However, they are, as set forth in the Court's summary judgment order, assignable under California state law. As noted in the Court's summary judgment order, such an assignment was made by Bryant to Mattel.

MINUTES FORM 90
CIVIL -- GEN                                5                          Initials of Deputy Clerk: jh

EXHIBIT _____ 6

PAGE _____ 81

Case 2:04-cv-09049-DOC-RNB   Document 6458-2   Filed 08/27/09   Page 61 of 80   Page ID
#:215005
Case 2:04-cv-09049-SGL-RNB       Document 4439       Filed 12/03/2008       Page 6 of 17

constructive trust as to MGA's copyright registrations in certain Bratz drawings. As detailed in the concurrently filed Order, the Court **GRANTS** Mattel's Motion for Declaratory Judgment (docket #4303).

In opposition, the MGA parties contend that the relief sought by Mattel should not be granted because it is preempted by the Copyright Act. The Court rejects this argument. The Court's ruling regarding preemption is set forth in the Court's summary judgment order, which the Court does not here modify.

Declaratory relief is generally granted "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Bilbrey by Bilbrey v. Brown, 738 F.2d 1462, 1470 (1984).

Here, considering this legal standard and based on the relationship among the parties, the jury's verdicts, the Court's previous Orders, and the entire record, the Court finds that the declaratory relief sought by Mattel is appropriate.[3] Concurrently herewith, the Court has entered, as modified, Mattel's proposed order for declaratory relief.

### III. Motion for Constructive Trust and § 17200 Injunctive Relief (docket #4505)

As set forth more fully in its Motion, Mattel seeks, pursuant to California state law, imposition of a constructive trust over the trademarks "Bratz" and "Jade." Mattel also seeks, pursuant to its twelfth cause of action, a finding that the MGA parties violated Cal. Bus. & Prof. Code § 17200 on the basis of the jury's findings that the MGA parties converted Mattel's property, tortiously interfered with Mattel's contractual relations, and aided and abetted Bryant's breaches of his fiduciary duty and the duty of loyalty. Pursuant to this finding, and in addition to imposition of a constructive trust as to the Bratz and Jade marks, Mattel seeks an injunction prohibiting the MGA parties from using these marks. As detailed in the concurrently filed Order, the Court **GRANTS** Mattel's Motion for Constructive Trust and § 17200 Injunctive Relief (docket #4305).

### A.    Constructive Trust

Cal. Civ. Code § 2223 provides that "[o]ne who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner." Cal. Civ. Code § 2224 explicitly addresses things gained by wrongful acts: "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." The parties agree on the resulting elements, which may be stated as

---

[3]   The appropriateness of the constructive trust remedy is discussed below, in a separate section, but applies equally here.

Initials of Deputy Clerk: jh

EXHIBIT _____ 6 _____

PAGE _____ 82 _____

follows: "(1) the existence of a *res* (property or some interest in property); (2) the right of a complaining party to that *res*; and (3) some wrongful acquisition or detention of the *res* by another party who is not entitled to it. Communist Party v. 522 Valencia, Inc., 35 Cal.App.4th 980, 990 (1995).

Significantly, because the purpose of a constructive trust is to prevent unjust enrichment, enhancement of value is given to the beneficiary of the constructive trust. Haskel Engineering & Supply Co. v. Hartford Acc. & Indem. Co., 78 Cal.App.3d 371, 375 (1978)

Here, the jury found that the MGA parties wrongfully acquired the idea for the name "Bratz" along with the idea and preliminary drawings for a line of fashion dolls. The same is true for the one Bratz character who retained the name given her by Carter Bryant: "Jade."[4]  In addition to wrongfully acquiring them, the MGA parties continue to wrongfully retain them. The MGA parties enhanced the value of the names by acquiring trademark rights to them. California law requires, in this instance, that a constructive trust be imposed as to these marks. Mattel is the beneficiary of the constructive trust and MGA's trademarks in "Bratz" and "Jade" inure to Mattel's benefit.

In making this conclusion, the Court has considered, and rejected, the MGA parties' argument that Mattel has disavowed an intention to seek this remedy or waited too long to seek it. Mattel has conceded that it is not asserting a trademark infringement claim. It cannot, because it has not used the relevant marks in commerce, and one must do so to acquire trademark rights. Conversive, Inc. v. Conversagent, Inc., 433 F.Supp.2d 1079, 1089 (C.D. Cal. 2006) (citing Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1046 (9th Cir. 1999)). However, Mattel has not disavowed its intent to seek a constructive trust over the marks that were created by Bryant, with rights thereto acquired by the MGA parties through registration and use in commerce. This remedy is well within the scope of relief that is sought in Mattel's second amended answer and counterclaims, see SAAC at 73 ¶ 9 (Prayer for Relief) (seeking "imposition of a constructive trust over Bratz, including without limitations registrations and applications for registrations relating thereto made or filed by [the MGA parties] and third parties, and all profits, monies, royalties and any other benefits derived or obtained from [the MGA parties'] exercise of ownership, use, sale, distribution and licensing of Bratz"), and the Court has rejected all timeliness challenges to Mattel's claims.

### B.    § 17200 Violation

The record reveals sufficient evidence of injury-in-fact to Mattel to confer standing upon it to assert its § 17200 claim. Specifically, as testified to by Mattel officers (and acknowledged by MGAE officers and attorneys), Mattel has suffered lost market share as a result of the sales of the Bratz dolls. Moreover, the jury was instructed that "harm" to Mattel was a necessary element of a number of state law claims. See Final Jury Instructions as Given [Phase 1A], docket #4115, at

---

[4]    Bryant's other characters were re-named before they were marketed:  Zoe became the now-familiar Cloe, Hallidae became Sasha, and Lupe became Yasmin.

EXHIBIT _____ 6

PAGE _____ 83

Case 2:04-cv-09049-DOC-RNB   Document 6458-2   Filed 08/27/09   Page 63 of 80   Page ID
#:215007
Case 2:04-cv-09049-SGL-RNB      Document 4439      Filed 12/03/2008      Page 8 of 17

Instruction Nos. 22, 25-27, and 29 (intentional interference with contractual relations, aiding and abetting breaches of fiduciary duty and the duty of loyalty, and conversion). The jury's finding in favor of Mattel as to those claims necessarily implies a factual finding by the jury as to the specified element of harm to Mattel and, as explained in more detail below, the Court is bound by that implicit factual finding. Los Angeles Police Protective League v. Gates, 995 F.2d 1469, 1473 (9th Cir. 1993) (finding that by awarding damages on a specific claim, the jury implicitly found that the plaintiff had proven one particular element of that claim).

As set forth in a previous Order, this claim is only partially preempted by the Copyright Act. The preempted portion of Mattel's § 17200 claim did not survive summary judgment and is not at issue here.

Based on the jury's findings that the MGA parties converted Mattel's property, tortiously interfered with its contractual relations, and aided and abetted Bryant's breaches of his fiduciary duty and the duty of loyalty, the Court finds that the MGA parties also violated Cal. Bus. & Prof. Code § 17200.

### C.    § 17200 Injunctive Relief

Where a Court finds violation of § 17200, it has broad powers to shape appropriate injunctive relief:

> Any person who . . . has engaged . . . in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, . . . as may be necessary to prevent the use or employment by any person of any practice which [either] constitutes unfair competition, . . . or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

Cal. Bus. & Prof. § 17203.

The injunction sought by Mattel's proposed order (as modified by the Court) is necessary to restore to Mattel the property acquired as a result of the MGA parties' unfair competition.

For the reasons set forth above, concurrently herewith, the Court has entered, as modified, Mattel's proposed order for constructive trust and § 17200 injunctive relief.

### IV.  Motion for Permanent Injunction (docket #4306)

### A.    Facts Supporting Injunctive Relief

The present motions, to varying degrees, implicate the question of to what extent a Court trying equitable claims is bound by a jury's factual findings related to the same underlying conduct.

MINUTES FORM 90
CIVIL -- GEN                                    8                    Initials of Deputy Clerk: jh

EXHIBIT _____ 6

PAGE _____ 84

Case 2:04-cv-09049-DOC-RNB   Document 6458-2   Filed 08/27/09   Page 64 of 80   Page ID
#:215008
Case 2:04-cv-09049-SGL-RNB      Document 4439      Filed 12/03/2008      Page 9 of 17

The question comes into sharpest focus in Mattel's Motion for Permanent Injunction.

"[W]here legal claims are tried by a jury and equitable claims are tried by a judge, and the claims are based on the same facts, the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations." Los Angeles Police Protective League v. Gates, 995 F.2d 1469, 1473 (9th Cir. 1993) (internal quotation marks and citation omitted). In the absence of an express finding, a court must determine whether implicit factual determinations by the jury can be inferred, and should consult the jury's verdict and the jury instructions to make this determination. Id. (finding, based on an examination of the jury instructions and the jury's verdict awarding damages as to a specific claim, that the jury implicitly found that plaintiff had proven one particular element of that claim).

The Court is certainly aware that the jury returned an award of damages that was far less than that sought by Mattel. Moreover, the Court is aware that a controversy exists as to the actual amount of the jury's verdict. See Mattel's Submission Regarding Email from Juror No. 7 and Request to Recall the Jury, docket #4288 (denied by Order dated September 3, 2008, docket #4295).

MGA has argued that the jury has found that only the so-called "first generation" Bratz dolls were infringing. The jury made no express finding on this issue; the general verdict form they were provided did not request such a detailed finding. Thus, in accordance with Gates, the Court looks to the jury instructions to determine any implicit findings.

The jury was instructed that "Mattel is entitled to recover any profits attributed to the infringement." MGA attempts to equate the $10 million figure awarded by the jury for copyright infringement to the amount of profits related to the first generation Bratz dolls. The difficulty with this "equation" is that it is woefully unbalanced. To be sure, MGA's damages expert presented evidence that the first generation Bratz dolls netted approximately $4 million in profits; had the jury awarded this amount as copyright damages, then the Court might be persuaded that the jury implicitly found that the infringement was limited to the first generation Bratz dolls. But that is not the case. The factual finding advanced by MGA cannot be inferred from the jury award.

In making this ruling, the Court is mindful of the jury's note that queried whether they could find infringement as to the first generation dolls and no other dolls. The Court, without objection from counsel, answered that question affirmatively. Although this note reveals that the jury considered limiting their finding of infringement to the first generation, it does not reveal that they ultimately chose that conclusion. Again, had the jury awarded an amount equal to the amount of profits generated by the first generation Bratz dolls, the Court would find, based on the award and the jury's note, that the jury implicitly found infringement as to the first generation Bratz dolls only.

Alternatively, counsel posited at oral argument, that the jury found that a large portion of the

EXHIBIT _____ 6 _____
PAGE _____ 85 _____

Case 2:04-cv-09049-DOC-RNB  Document 6458-2  Filed 08/27/09  Page 65 of 80  Page ID
#:215009
Case 2:04-cv-09049-SGL-RNB    Document 4439    Filed 12/03/2008    Page 10 of 17

Bratz dolls infringed Mattel's copyrights, but only in very minute ways.[5]  Counsel likened the jury's
damage award to a rug that, no matter which way one moved it, simply would not cover the floor.
See Nov. 10, 2008, Tr. at 100-101.  Counsel explained that the jury's findings led to one conclusion
or the other and, regardless of which conclusion was chosen, the jury's finding did not support an
injunction:

> The rug is too small for an injunction, regardless of how you allocate
> that money.  You either come up with a vanishingly small subset of
> infringing products, or you come up with a vanishingly small percentage
> of infringement by all of the products.  And the jury has put that cap for
> us.

Id.  Although colorful, counsel's metaphor is not helpful.  Assuming that the Court would be bound
by a jury's factual finding in a case where only two possible inferences -- both of which would lead
the Court to the same conclusion -- were possible, this is not that case.

Where a jury returns a monetary award based on a particular piece of evidence such as an
expert report, the Court will infer the factual findings that necessarily flow from it.  But where, as
here, the Court and the parties are left to hazard various guesses as to the jury's intentions, the
Court can make no principled inferences and must therefore engage in its own fact-finding.[6]

The Court has carefully examined each of the exhibits attached to the proposed preliminary
injunction, as well as the actual exhibits being stored in Courtroom Four of the U.S. Courthouse in
Riverside, and finds that the dolls depicted in Exs. 3 and 4, and the products depicted in Exs. 5 and
6, are, pursuant to the standard set forth in the Court's Orders dated July 24, 2008, and August 15,
2008, substantially similar to Mattel's registered copyrighted drawings and are embodiments of the
sculpts depicted in Exs. 1 and 2.  In doing so, the Court has first examined the specific expressive
elements of the works at issue and has compared them to those found in the exhibits referenced

---

[5]  This argument was not raised in the opposition papers filed by the MGA parties, and is
rejected for that reason as well.  See Opp. at 21 ("Here, the circumstances clearly show that the
only reasonable conclusion to draw is that the jury's infringement finding was limited to a small
universe of products, specifically the first generation Bratz dolls as clothed and packaged.")
(emphasis added).

[6]  The MGA parties hazard such a guess in their opposition, wherein they attempt to
explain how, in the jury's mind, $4 million in first-generation profits could equate to $10 million total
copyright infringement award: "The jury's decision to award $6 million against MGA[E] (and $10
million total) rather than simply the $4 million] argued by MGA as profits for the first generation
may be due to the jury believing that MGA's proffer of $4 million in profits on nearly $80 million
revenue was a bit low."  Opp. at 21 n.30.  This guessing game illustrates why no factual findings
can be inferred from the jury's copyright infringement award and why the Court is obligated to
make its own factual findings.

EXHIBIT _____ 6
PAGE _____ 86

Case 2:04-cv-09049-DOC-RNB   Document 6458-2   Filed 08/27/09   Page 66 of 80   Page ID
#:215010
Case 2:04-cv-09049-SGL-RNB   Document 4439   Filed 12/03/2008   Page 11 of 17

above, and the Court has then further examined the overall similarity of the expression in various works from the perspective of the ordinary observer. Although the Court recognizes that there are differences between the works, the Court ultimately finds that those dolls and products set forth in the above-referenced exhibits are **substantially similar** to Mattel's registered copyrighted drawings and are embodiments of the sculpts depicted in Exs. 1 and 2. Especially important to the Court's conclusion is the consistency of the particularized expression of the dolls' heads, lips, eyes, eyebrows, eye features, noses, as well as the particularized expression of certain anatomical features relative to others (most notably the doll lips, doll eyes, doll eyebrows, and certain other doll eye features) and de-emphasis of certain anatomical features (most notably the minimalized doll nose and thin, small doll bodies). Also important to the Court is the particularized, synergistic compilation and expression of the human form and anatomy that quite clearly expresses a unique style and conveys a distinct look or attitude, especially as perceived by the intended consumer market (7-12 year old girls). The evidence on this latter point is particularly compelling, supported by both analytical and market analysis. Together, these features clearly give each of the dolls the particularized expression to which the Court referred in its July 24, 2008, and August 15, 2008, Orders.

## B.    Standard for Awarding Permanent Injunctive Relief

The Supreme Court recently announced the standard for granting a permanent injunction:

> According to well-established principles of equity, a plaintiff
> seeking a permanent injunction must satisfy a four-factor test before a
> court may grant such relief. A plaintiff must demonstrate: (1) that it has
> suffered an irreparable injury; (2) that remedies available at law, such
> as monetary damages, are inadequate to compensate for that injury; (3)
> that, considering the balance of hardships between the plaintiff and
> defendant, a remedy in equity is warranted; and (4) that the public
> interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

### 1.    Irreparable Injury

The Court begins, then, by looking to whether Mattel has established that it will suffer irreparable injury if an injunction is not granted.

Prior to the eBay decision, where a plaintiff sought a preliminary injunction, irreparable injury was presumed in intellectual property cases; in light of the eBay decision, some doubt has been cast on whether courts should continue to apply that presumption. See Broadcom Corp. v. Qualcomm Inc., 543 F.3d 683, 702 (Fed. Cir. 2008) (noting that the continuing viability of the presumption is "an open question").

Mattel has established its exclusive rights to the Bratz drawings, and the Court has found

MINUTES FORM 90                                          Initials of Deputy Clerk: jh
CIVIL -- GEN                              11

EXHIBIT ___6___

PAGE ___87___

Case 2:04-cv-09049-DOC-RNB   Document 6458-2   Filed 08/27/09   Page 67 of 80   Page ID
#:215011
Case 2:04-cv-09049-SGL-RNB      Document 4439      Filed 12/03/2008      Page 12 of 17

that hundreds of the MGA parties' products -- including all the currently available core female fashion dolls Mattel was able to locate in the marketplace -- infringe those rights. The MGA parties have evinced an intention to continue marketing those dolls. This represents a wholesale inability on the part of Mattel to enforce its exclusive rights under the Copyright Act, amounting to irreparable harm. Taylor Corp. v. Four Seasons Greetings, LLC, 403 F.3d 958, 968 (8th Cir. 2005).

MGA criticizes Mattel's reliance on Taylor, citing Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 518 F.Supp.2d 1197, 1211 n.13 (C.D. Cal. 2007) (Wilson, J.). The Grokster case holds that, in copyright permanent injunction cases, a presumption of irreparable injury is not permitted in light of eBay. In Grokster, the court rejected the rationale of Taylor, stating:

> [T]his Court is not persuaded by the Eighth Circuit's pre-eBay conclusion in Taylor Corp. v. Four Seasons Greetings, LLC, 403 F.3d 958, 968 (8th Cir. 2005), that because "[a plaintiff] certainly has the right to control the use of its copyrighted materials, . . . irreparable harm inescapably flows from the denial of that right." In substance, such language is nothing more than a disguised presumption, particularly with the use of the word "inescapably." After eBay, Plaintiffs cannot rely on the pure fact of infringement in order to establish irreparable harm.

Grokster, 518 F. Supp.2d at 1211 n.13. Judge Wilson's point is well-taken. Although the Taylor court did not purport to apply a presumption of irreparable harm, its use of the word "inescapably" in this phrase certainly could indicate that it was merely presuming irreparable harm. However, a review of the Taylor case makes clear that the Eighth Circuit considered the implications of allowing an infringer to continue to infringe: "[I]n copyright infringement actions, the denial of a request for injunctive relief could otherwise "amount to a forced license to use the creative work of another." Taylor Corp., 403 F.3d at 967-68. This rationale removes Taylor further from the application of a "disguised presumption" of irreparable harm and closer to an actual finding of irreparable harm.

At least one district court within the Ninth Circuit is in accord with the Court's decision today, as it has decided, post-eBay, that a plaintiff who establishes past infringement and the threat of future infringement amounts to irreparable harm. Designer Skin, LLC v. S & L Vitamins, Inc., 2008 WL 4174882 at *5 (D. Ariz. 2008) (Teilborg, J.). Judge Teilborg's rationale is well articulated:

> Whatever else might be said against the propriety of a rule that holds that past infringement plus the threat of future infringement equals irreparable harm, it seems clear to this Court that such a rule would not run afoul of eBay's directives. First of all, the eBay Court did not address the showing necessary to establish "irreparable harm." It merely held that the plaintiff has the burden of proving it. Second, this two-part test does not resurrect the presumption of irreparable harm impliedly laid to rest by the eBay court. It simply recognizes that a

EXHIBIT _____ 6

PAGE _____ 64

> plaintiff meets the burden of proving irreparable harm by making this two-part showing. And finally, the two-part test does not represent a rule [prohibited by eBay] that an injunction automatically follows a determination that a copyright has been infringed. . . . In exercising their equitable discretion, courts would still have the freedom to deny injunctive relief when the public interest or the balance of hardships weighs against such relief.

Designer Skin, 2008 WL 4174882 at *5 (citation omitted).

Indeed, this is not so complex an issue as applied to the facts of this particular case. The statutory directive to the Court is clear: "Any court having jurisdiction of a civil action arising under this title may, . . . grant temporary and final injunctions on such terms as it may deem reasonable *to prevent or restrain infringement of a copyright*." 17 U.S.C. § 502 (emphasis added). The Court can envision no case more appropriate for a finding of irreparable harm. Here, as the record shows and as the jury found, an employee bound by contract and fiduciary duty to communicate to his employer (and keep confidential from all others) all copyrightable works he creates during the term of his employment, not only fails to so communicate but actually secretly purports to convey the rights thereto to a direct competitor of his employer. The rights to those works are actively concealed from their true owner (by both the employee and the competitor) for years while the competitor exploits the works, reaping profits therefrom totaling hundreds of millions of dollars. After millions of pages of discovery are produced, thousands of filings are submitted, scores and scores of motions are decided by the Court, and after months of trial and two jury verdicts in favor of the plaintiff, defendants remain steadfast in their intention to continue to produce their infringing products. Viewed in this light, Mattel has established irreparable injury on the basis of the MGA parties' past infringement and the high probability of continued acts of infringement.

## 2. Inadequate Legal Remedies

Unless MGA is enjoined, Mattel would be forced to sue each retailer and distributor to stop the sale and distribution of the infringing dolls; therefore, the legal remedies are inadequate. See Continental Airlines, Inc. v. Intra Brokers, Inc., 24 F.3d 1099, 1105 (9th Cir. 1994).

## 3. Balance of Equities

Factually, the hardship on MGA weighs very heavily upon the Court. The Court has expressed its concerns in this regard on the record. The evidence at trial showed that, at least historically, Bratz is the brand that has made MGA profitable. And the proposed injunction addresses the core of that brand -- most notably, the female fashion dolls.

However, where, as here, the only hardship that will be suffered is lost profits from the cessation of its infringing activities, the Court, in the final analysis, must afford this very little -- if any -- weight. Triad Systems Corp. v. Southeastern Exp. Co., 64 F.3d 1330, 1338 (9th Cir. 1995) ("Where the only hardship that the defendant will suffer is lost profits from an activity which has

EXHIBIT ____ 6
PAGE ____ 89

been shown likely to be infringing, such an argument in defense merits little equitable consideration . . . .") (internal quotation marks and citations omitted), accord, Cadence Design Systems, Inc. v. Avant! Corp., 125 F.3d 824, 829-30 (9th Cir. 1997) (collecting cases). The balance of equities favor Mattel.

### 4.    Public Interest

There is a strong economic interest, especially in these troubled economic times, in maintaining a profitable enterprise as a going concern. However, there is also a strong public interest in enforcing copyright laws in a uniform manner. Indeed, nothing is more essential to long-term economic prosperity than the stability provided by the rule of law. Although the MGA parties raise excellent points in their opposition, in the end, the public interest is served by precluding defendants from engaging in copyright infringement. The injunction issued by the Court does no more than that.

### C.    Scope of Injunction

The scope of the permanent injunction is set forth in a separate order. Four issues raised in the parties' papers warrant the brief discussion that follows.

### 1.    Impoundment and Destruction

As set forth more fully in its motion, Mattel seeks impoundment of Bratz dolls and destruction of the specialized plates, molds, and matrices used to make them. Impoundment of existing infringing products and the destruction of the means to make those products are clearly remedies contemplated by the Copyright Act. See 17 U.S.C. § 503(a). The MGA parties argue that these remedies are inappropriate because there is no ongoing infringement or, at the very least, its products infringe very little. In its findings supporting the issuance of a permanent injunction, the Court has rejected this premise, and the Court finds that the requested impoundment and destruction is an appropriate remedy.[7]

### 2.    Recall

In light of the scope of infringement found by the Court, and in light of the fact that the injunction addresses products that directly compete with Mattel's products, the Court has ordered the recall of infringing products from retailers. See CyberMedia, Inc. v. Symantec Corp., 19 F.Supp.2d 1070, 1079 (N.D. Cal.1998); Patry on Copyright, § 22:81.

---

[7]    No party shall destroy any of the implements used to make the Bratz dolls that are the subject of the permanent injunction absent a specific order of this Court authorizing such destruction.

MINUTES FORM 90
CIVIL -- GEN                                    14                     Initials of Deputy Clerk: jh

EXHIBIT _____ 6

PAGE _____ 90

### 3. Royalty

The MGA parties argue that the more appropriate remedy to be imposed here is for the Court to order a royalty instead of an injunction. The difficulty in this proposal is that it is premised on the idea that the ongoing infringement, if any, is minute. See Opp. at 29-32 (suggesting a royalty of .3% would be appropriate). As noted above, the Court has rejected this premise. Moreover, although the Court has been hopeful that an out-of-court resolution involving such a remedy may have been obtained, and has gone to great lengths to encourage both sides to pursue such a resolution in good faith, their failure so far to do so underscores the Court's present view, which is based on the evidence and argument of record, that the hostility between these parties is such that this form of remedy is unworkable.

### 4. Appointment of a Special Master

Mattel suggests that the Court appoint a special master to "monitor implementation of the relief granted by the Court." Motion at 28. The MGA parties have not indicated their position on this issue. The appointment of a special master to monitor implementation of the permanent injunction is warranted; this task could easily overwhelm the Court's resources. Subject to the Court's consideration of any in camera objections submitted to the Court by the parties, the Court will select a Special Master from the list submitted below.

### V. Motion to Strike Portions of Hutnyan Declarations and Exhibits Thereto (docket #4351)

The MGA parties move to strike certain evidence offered by Mattel on the issue of harm suffered by Mattel, contending the evidence is inadmissible. This motion is **DENIED AS MOOT.** Although Mattel has offered additional evidence of harm, the Court has found the evidence of harm to Mattel offered during Phases 1A and 1B sufficient to resolve the issues presented in the current motions.

### VI. Motion to Strike the Proctor, Keiser, and Hollander Declarations (docket #4352)

The motion is **DENIED** as to the Proctor declaration. The declaration is a helpful presentation of appropriate argument and/or observations of counsel for the Court's consideration.

The motion is **DENIED** as to the Keiser declaration. The Keiser declaration authenticates two-dimensional depictions of three-dimensional models he scanned using a sophisticated scanning machine.

The motion is **DENIED** as to the Hollander declaration. This declaration was the subject of extensive briefing in MGA's motion in limine 8, which the Court has reviewed. Hollander's declaration, which presents survey evidence of the target market, is relevant to application of the

EXHIBIT _____ 6

PAGE _____ 91

Case 2:04-cv-09049-DOC-RNB   Document 6458-2   Filed 08/27/09   Page 71 of 80   Page ID
#:215015
Case 2:04-cv-09049-SGL-RNB      Document 4439      Filed 12/03/2008      Page 16 of 17

intrinsic test. The Court, in fact, instructed the jury to consider how girls 7 to 12 would view the Bratz dolls. Hollander's survey attempts to determine just that. The Court has considered the methodological flaws pointed out by MGA in weighing the evidence Hollander presents.

### VII. Motion to Strike Meyer Declaration (docket #4377)

Mattel moves to strike the Meyer declaration. This motion is **DENIED AS MOOT.** This declaration sets forth a calculation justifying the proposed .3% royalty. The Court has rejected the proposal that a royalty be imposed.

### VIII. Stay of this Order

This Order, and the three concurrently filed orders, are stayed pending the Court's consideration of the parties' post-trial motions. This stay shall remain in place until lifted by further Order of this Court.

### IX. Briefing Schedule for Post-Trial Motions

Notwithstanding the Court's earlier order, the motions referred to in ¶ 3 of the Court's September 2, 2008, Order may be filed no later than December 22, 2008. Response briefs may be filed no later than January 12, 2009. Replies may be filed no later than January 19, 2009. A hearing on this matter is set for Wednesday, February 11, 2009, at 10:00 a.m., in Courtroom One of the above-referenced Court.

### X. Discovery Master Proposals for Phase 2

The Court previously stated that it would submit for counsel's consideration the names of potential Discovery Masters for Phase 2 that possess both the resources to handle the scope of the anticipated discovery disputes as well as the personal confidence of this Court. The Discovery Master would serve pursuant to the same terms and conditions of the Phase 1 Discovery Master. In addition, as noted above, the Court also intends to appoint a Special Master to oversee implementation of the permanent injunction. The Court provides for counsels' consideration the following individuals who meet the Court's requirements, and have indicated to the Court a willingness and an ability to serve in one or both of these roles. Counsel are directed to file any objections to any or all of the proposed Masters on or before December 22, 2008. Any such objections are to be submitted *in camera* and under seal with the Court. After considering any objections, as well as any preferences expressed by the parties, the Court will make an appointment at the appropriate time.

EXHIBIT _____ 6
PAGE _____ 92

Case 2:04-cv-09049-DOC-RNB   Document 6458-2   Filed 08/27/09   Page 72 of 80   Page ID
#:215016
Case 2:04-cv-09049-SGL-RNB      Document 4439      Filed 12/03/2008      Page 17 of 17

Patrick A. Fraioli, Jr.
Moldo Davidson et al LLP
2029 Century Park East, 21st Fl.
Los Angeles, CA 90067
310-551-3100
pfraioli@mdfslaw.com

Jan L. Handzlik
Howrey LLP
550 S. Hope Street, Suite 1100
Los Angeles, CA 90071
213-892-1802
handzlikj@howrey.com

Kendall H. MacVey
Best Best & Krieger LLP
P.O. Box 1028
Riverside, CA 92502-1028
951-686-1450

David G. Moore
Reid & Hellyer
P.O. Box 1300
Riverside, CA 92502
951-682-1771
dmoore@rhlaw.com

Robert C. O' Brien
Arent Fox LLP
555 W. 5th Street, 48th fl.
Los Angeles, CA 90013
213-629-7400
obrien.robert@arentfox.com

C. Michael Zweiback
Alston & Bird LLP
333 S. Hope Street, 16th Fl.
Los Angeles, CA 90071
213-576-1000
michael.zweiback@alston.com

## XI. Jointly Lodged Laptop Computer

The Court is in possession of a jointly lodged laptop computer used to access the Phases 1A and 1B trial transcripts maintained by the parties. The Court will retain possession of the laptop computer until after its ruling on the motions referred to in section IX, above, and the parties are directed to follow the procedure outlined in the Court's September 9, 2008, Order regarding the e-filing of excerpts of transcripts cited in their anticipated motions.

## XII. Service of Permanent Injunction

The service of Mattel's proposed permanent injunction by the Clerk presents challenges given the limited resources of the Court. The permanent injunction, for reasons explained by Mattel on the record, attaches to it approximately 900 color copies. Accordingly, although the Court directs the Clerk to serve on all parties a copy of the permanent injunction, the Court directs Mattel, no later than ten days after the entry of this Order, to serve a copy of the permanent injunction, together with the color exhibits, on all parties.

**IT IS SO ORDERED.**

MINUTES FORM 90
CIVIL -- GEN

17

Initials of Deputy Clerk: jh

EXHIBIT ____ 6
PAGE ____ 93

# EXHIBIT 7

# REDACTED


# SUBJECT TO


# PROTECTIVE ORDER

# EXHIBIT 8

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 9

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 10

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER