# EXHIBIT 6

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 7

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 8

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No. CV 04-09049 SGL(RNBx)                    Date: July 9, 2009
Title:      MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
================================================================

PRESENT: HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

Cindy Sasse                         None Present
Courtroom Deputy                    Court Reporter

ATTORNEYS PRESENT FOR               ATTORNEYS PRESENT FOR
PLAINTIFFS:                         DEFENDANTS:

None Present                        None Present

PROCEEDINGS:    ORDER GRANTING EX PARTE APPLICATION RE TEMPORARY
                RECEIVERSHIP (DOCKET #5728)

                ORDER GRANTING EX PARTE APPLICATION RE COST
                SHIFTING (DOCKET #5865)

                ORDER GRANTING IN PART EX PARTE APPLICATION FOR
                RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

                ORDER GRANTING IN PART MATTEL'S MOTION RE
                DISCOVERY MASTER ORDER NO 27 AND REMANDING
                DISCOVERY MASTER ORDER NO. 27 FOR
                RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT
                OF THE FILING OF THE TAAC (DOCKET #5561)

                ORDER DENYING MOTION TO STRIKE THE FORENSIC
                AUDITOR'S REPORTS (DOCKET #5705)

MINUTES FORM 90                              Initials of Deputy Clerk __cls_____
CIVIL -- GEN                    1

EXHIBIT __8__

PAGE ___223___

## I. ORDER GRANTING EX PARTE APPLICATION
## RE TEMPORARY RECEIVERSHIP (DOCKET #5728)

Because the only opposition to the Ex Parte Application regarding the winding up of the Temporary Receivership involves the issue of cost-shifting, which is addressed separately, below, the Court **GRANTS** the Ex Parte Application. A separate order addressing this Ex Parte Application has been concurrently filed.

## II. ORDER GRANTING EX PARTE APPLICATION RE
## COST SHIFTING (DOCKET #5865)

The MGA parties' opposition to the Temporary Receiver's Ex Parte Application argued that the costs of the Temporary Receivership should be shifted to Mattel (as the party who sought appointment of a Temporary Receiver). However, the Court has previously ruled that, at some yet-to-be defined date in the future, the Court will consider whether to shift the costs of both the Temporary Receivership and the Forensic Audit. Therefore, Mattel filed an Ex Parte Application seeking either to be relieved of the responsibility to respond to the MGA parties' argument or, alternatively, for an order setting a briefing schedule on the issue. It is not the intention of the Court to address the cost-shifting issue at this time; rather, as the Court has stated previously on the record, that issue is more efficiently resolved at a later date, most likely a date after completion of Phase 2 of the trial. Accordingly, the Court **GRANTS** Mattel's Ex Parte Application re Cost Shifting. Mattel is relieved of any duty to respond to MGA's argument regarding the appropriate allocation of costs arising from the Temporary Receiver that is set forth in the MGA parties's June 26, 2009 Opposition to the Temporary Receiver's Ex Parte Application.

## III. ORDER GRANTING IN PART EX PARTE APPLICATION FOR
## RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

The Court has received and reviewed the MGA Parties' Ex Parte Application For Partial Release of *In Camera* Juror Interview Transcripts, as well as the Opposition, the Reply, and the accompanying exhibits. The Court **GRANTS IN PART** the Ex Parte Application. Although the Court declines to award the relief sought, the Court will take steps to ensure that the transcript of the juror interviews are provided to the Ninth Circuit for its consideration of the appeal filed by the MGA parties.

The relevant *in camera* juror interviews were conducted on July 25, 2008; the findings made by the Court on the basis of those interviews are set forth in detail in the Court's Order Denying Motion for Mistrial, dated August 8, 2008. Counsel for the parties agreed that the juror interviews, which were conducted mid-trial, should be conducted *in camera*, and the MGA parties did not request that the Court grant them access to the transcripts to prepare their Motion for Mistrial. The Court indicated on the

MINUTES FORM 90
CIVIL – GEN

2

Initials of Deputy Clerk __cls_____

EXHIBIT 8

PAGE 224

record around the time of the filing of the Motion for Mistrial that it was not the Court's intent to grant the parties access to the transcripts.

After the conclusion of the trial, the MGA parties did not at any time request this Court grant access to the transcripts. To the contrary, some ten months passed between the date of the Order Denying Motion for Mistrial and the MGA parties' first post-trial request for access to those transcripts. That request was made to the Ninth Circuit, not this Court, on June 10, 2009. When the Ninth Circuit denied the request in favor of the MGA's presentation of the issue to this Court in the first instance, the MGA parties thereafter filed the present Ex Parte Application in a expeditious manner.

Ostensibly, as set forth in both the Motion filed before the Ninth Circuit and the Ex Parte Application before this Court, the reason the MGA parties seek access to those transcripts is so that they may use them to challenge the Court's Order Denying Motion for Mistrial. Although the MGA parties filed its Notice of Appeal on May 4, 2009, and although that Notice clearly indicated that the Order Denying Motion for Mistrial would be implicated in the appeal, the MGA parties failed to file its Motion seeking release of the transcripts until June 10, 2009. The MGA parties' failure to seek this relief until a month after they filed their Notice of Appeal and a month before their opening brief was due, and their decision to present the issue of release of the transcripts to the appellate court (rather than this Court) in the first instance, created the very urgency that cause them to seek ex parte relief from this Court. As such, the Court declines to grant the relief sought.

Nevertheless, in the interest of due process and in order to facilitate the full consideration of the issue by the Ninth Circuit, the Court will take steps to ensure that the transcripts of the *in camera* interviews are provided to the Ninth Circuit for *in camera* filing.

## IV. ORDER GRANTING IN PART MATTEL'S MOTION RE DISCOVERY MASTER ORDER NO 27 AND REMANDING DISCOVERY MASTER ORDER NO. 27 FOR RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT OF THE FILING OF THE TAAC (DOCKET #5561)

In the challenged portion of Discovery Master Order No. 27 ("DM Order No. 27"), the Discovery Master denied Mattel's Motion to Compel discovery sought by service of a subpoena on non-party Bingham McCutchen LLP ("Bingham"), a law firm that represents Intervenor Omni 808, as well as a number of non-party entities that are familiar to those involved in this litigation: OmniNet Capital, LLC ("OmniNet"); Vision Capital, LLC ("Vision"), IGWT Group, LLC ("IGWT"), and IGWT 826 Investments, LLC ("IGWT 826"). Broadly categorized, the subpoena sought production of (1) fee agreements relating to Vision and Omni 808; (2) documents regarding the formation, control, and financing of Omni 808, Vision, and Lexington Financial Limited

EXHIBIT $\underset{\sim}{\subset}$

PAGE_____ 225

("Lexington"); (3) documents identifying stakeholders and officers of Omni 808, Vision, and Lexington; (4) all contracts relating to Omni 808, Vision Capital, and Lexington; (5) all communications relating to Omni 808, Vision Capital, and Lexington, excluding attorney-client privileged documents; and (6) Bingham's representation of MGAE and certain named individuals who have some connection with MGAE, including a number of Mr. Larian's family members.

The Discovery Master correctly recognized the essential legal standard in assessing whether a subpoena may be enforced. The information must satisfy the discovery relevance standard, i.e., it must be "'reasonably calculated to lead to the discovery of admissible evidence.'" DM Order No. 27 at 19 (quoting Fed. R. Civ. P. 26(b)(1)). The decision of whether to enforce a subpoena ultimately implicates a balancing test that pits relevance of the materials sought and need to the requesting party against hardship to the party resisting the subpoena. DM Order No. 27 at 20. Non-parties are generally required to bear lesser burdens than parties in responding to subpoenas. Exxon Shipping Co. v. United States Dept. of Interior, 34 F.3d 774, 779 (9th Cir. 1994) ("The Federal Rules also afford nonparties special protection against the time and expense of complying with subpoenas.").

However, the Discovery Master overstated the burden of proof allocated to Mattel, as the party seeking discovery. See DM Order No. 27 at 20 ("As the party moving to compel compliance with the subpoena, Mattel bears the initial burden of establishing that the information sought is relevant and necessary to the claims or defenses at issue.") This standard is both overstated and incomplete. It is overstated in that Mattel need not show that the evidence sought is "necessary to the claims or defenses." Although Mattel indeed bears the burden of establishing relevancy, that showing is not one of "necessity." Rather, Mattel must bear the burden of establishing the discovery relevancy standard -- that the materials sought are "reasonably calculated to lead to the discovery of admissible evidence" -- is met. It need not establish that the materials sought are "necessary" to its case.

This point leads to the manner in which the stated burden is incomplete. As clearly articulated by cases cited by Bingham, although Mattel bears an initial burden of establishing relevancy, the party resisting discovery thereafter has the burden of establishing that discovery should be denied. See Bryant v. Ochoa, 2009 WL 1390794 at *1 (S.D. Cal. 2009) ("The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1). . . . Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections."); DIRECTV, Inc. v. Trone, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (same); see also Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975) (reversing the district court's issuance of a protective order based on a failure of the party resisting discovery to meet its burden by asserting that the defendant's deposition would merely yield cumulative evidence).

MINUTES FORM 90                                          Initials of Deputy Clerk __cls_____
CIVIL -- GEN                              4

EXHIBIT 8

PAGE 226

The effect of this subtle variation on the burden of proof from that stated by the Discovery Master is magnified by the recent filing of the TAAC, which significantly heightens the relevancy of the issue of how the MGA parties and the parties represented by Bingham may be related, the formation of certain of those entities, and other issues implicated by Mattel's requests. Because the question of relevance is featured so prominently in the quintessential balancing test to which the present discovery motion was subjected, the filing of the TAAC dramatically altered the calculus that underlies the conclusions reached in DM No. 27.

For reasons related to judicial economy and preservation of scarce judicial resources (which this case has stretched to the outer limits), the Court defers decision, in light of the changed calculus that has occurred as the result of the filing of the TAAC, of the issues presented in the challenged portions of DM No. 27 to the Discovery Master. For that reason, the Court **REMANDS** the challenged portions of DM No. 27 to the Discovery Master for his reconsideration and re-balancing in light of the recently filed TAAC. The Discovery Master may, in his discretion, set the matter for further briefing and/or hearing, he may take the matter under submission based on the existing record, or he may take other action as he deems appropriate to resolve the present issues.

Notwithstanding the remand of DM Order No. 27, one issue raised by Mattel requires further consideration by the Court. At page 25 of DM Order No. 27, the Discovery Master appears to impose a blanket prohibition on discovery of materials that are in the possession of a subpoena recipient, but that are related to a non-party over whom the Court has not been shown to have jurisdiction. The Discovery Master cites no legal authority for such a blanket prohibition, and the Court, in its own research, has found none. Such a blanket prohibition precludes the application of the balancing test that applies almost universally to discovery motions; accordingly, and because this blanket prohibition is unprecedented, the Court finds that it is contrary to law. As to this narrow issue, the Court **GRANTS** Mattel's Motion. The issue of discovery of materials relating to Lexington is **REMANDED** to the Discovery Master for reconsideration in light of this ruling and in light of the filing of the TAAC.

## V. ORDER DENYING MOTION TO STRIKE
## THE FORENSIC AUDITOR'S REPORTS (DOCKET #5705)

In an unsealed filing that has since been ordered sealed by the Court, counsel for Omni 808 Investors, LLC ("Omni 808"), Todd E. Gordinier, made unwarranted, unsubstantiated personal attacks against the Court-Appointed Forensic Auditor, Ronald L. Durkin. Mr. Gordinier's selective public disclosure of portions of the Forensic Auditor's Summary Report, coupled with the maintenance of the Summary Report, as well as the later-filed Responsive Report and Final Report, under seal in their entirety, has led to an unbalanced public presentation of the issues discussed therein. In an

MINUTES FORM 90
CIVIL -- GEN                                    5                    Initials of Deputy Clerk __cls_____

EXHIBIT 8

PAGE ____227

attempt to cure this deficiency, the Court has considered the possibility that it should simply unseal the relevant Reports and allow those Reports to speak for themselves.

Because the MGA entities were the primary subject of the Forensic Audit, the MGA parties have, quite understandably, objected to the proposed unsealing. Mattel, for its part, advocates quite emphatically, and not unreasonably, that the Reports should be unsealed in light of the selective disclosure. See Tr. at 31-32 ("It's the underlying analysis that refutes the selective disclosures that MGA and Omni made in a public forum to smear . . . both Mr. Durkin and Mattel.") At the other end of the spectrum, Omni 808 has moved to strike the Reports in their entirety.

In the end, although the Court does not order the unsealing of the Reports, it **DENIES** the Motion to Strike. The Court ordered the Forensic Audit to evaluate whether a receiver should be appointed; as the record bears witness, the Court eventually rejected the suggestion that it should appoint a permanent receiver, and the Court has instead appointed an MGA Monitor with more limited powers than a receiver. Nevertheless, the fact that the Reports were intended to serve a very limited purpose does not mean that there is no possibility that the Forensic Auditor's Reports will not serve any purpose henceforth.

As it currently stands, the Court **ORDERS** that no party shall cite to or rely upon the Reports for any purpose absent further Order of this Court.[1] However, the documents attached to the Reports, to the extent they are otherwise discoverable, are not insulated from discovery on the basis that they have been made part of the Reports. Conversely, documents, such as charts and interview notes, that were prepared by the Forensic Auditor are the property of the Court and are not subject to discovery or use in this or any other litigation by any party or non-party.[2]

Had it been counsel for the MGA parties who mounted the unwarranted, unsubstantiated, and public personal attacks on Mr. Durkin, the Court would find, notwithstanding the sensitive information contained therein, the unsealing of the Reports was an appropriate remedy for the selective disclosure.[3] However, here, it is

---

[1] This Order does not supersede the Court's Order permitting the Forensic Auditor to share information with the Court-Appointed Monitor.

[2] Toward that end, the Court **CLARIFIES** to the parties that the work papers, drafts, notes, detailed time records, and any other materials prepared by or at the direction of the Forensic Auditor are the property of the Court. The Court **ORDERS** the Forensic Auditor, as the custodian of those records on behalf of the Court, to retain those materials, whether maintained in electronic, hard copy, or any other medium, until further order of the Court.

[3] As it stands, counsel for MGAE, James I. Stang, wisely sought, and was granted, leave to file his more restrained, but just as unwarranted and unsubstantiated, personal attacks on Mr. Durkin under seal. See MGA Entertainment, Inc.'s Response to Final In Camera Report of Forensic Auditor Ronald L.

MINUTES FORM 90
CIVIL -- GEN

6

Initials of Deputy Clerk __cls_____

EXHIBIT ⑧

PAGE____228

counsel for Omni 808 who made those attacks public, and although Mattel maintains
that both the MGA parties and Omni 808 are jointly responsible for the selective
disclosure, see July 6, 2009, Tr. at 33, whether, or to what extent, the MGA parties act
or have acted in concert is an issue to be decided in Phase 2 of this action.

Nevertheless, Mr. Gordinier's attack on Mr. Durkin cannot pass without comment
by the Court. The Court's comments are directed toward Mr. Gordinier personally,
which is not the Court's usual practice. Although the irony of this form of address is not
lost on the Court (given the subject of this Order), it is appropriate. Mr. Gordinier signed
all three filings in which the personal attacks appear, and continues to stand behind
those filings. Moreover, Mr. Gordinier expressly and unabashedly claimed personal
responsibility for the brief that was not filed under seal, by both stating that he gave it a
lot of thought before filing it and by implicitly acknowledging that although he considered
filing his brief under seal, he ultimately rejected that course of action. See May 18,
2009 Tr. at 46-47 ("My brief speaks for itself.  We have nothing to hide. . . . I didn't feel it
appropriate, necessary, or desirable to file my brief under seal.  And I don't have a
problem with the Court or anybody reading what I have to say, because I gave it a lot of
thought, and I gave it at lot of consideration.").

At the July 6, 2009, hearing, the Court outlined its concerns that while the attacks
on Mr. Durkin were public, the Reports are not, and that "it doesn't seem fair" to the
Court to allow those allegations to stand alone without a chance to respond to them.
July 6, 2009, Tr. at 25-26.  In response, Mr. Gordinier contended that his comments
"respond[ed] to the report," and that "[w]hat we said was that there were problems with
that report."  July 6, 2009, Tr. at 28.  This statement is an implicit denial that any
personal attacks were made; however, as set forth in great detail below, the record
belies Mr. Gordinier's *post hoc* protestations.

Lest Mr. Gordinier's statement reflecting his implicit denial that he engaged in
personal attacks be perceived as one being made at oral argument without ample time
to reflect upon its significance, the statement is also made by Mr. Gordinier in Omni
808's Reply Memorandum, a document upon which he had ample time to reflect: "Each
and all of the references in Omni's Statement of Position refer to the contents of Mr.
Durkin's Reports and the shortcomings contained therein and omitted therefrom, not to
his person."  Id. at 2 n.1.  To be sure, the criticisms leveled at Mr. Durkin are framed in

---

Durkin (docket #5918) at 4 (accusing Mr. Durkin of "making McCarthy-like statements of non-existent
buybacks and unsupported insinuations of conflicts of interest"); id. at 9 (suggesting that Mr. Durkin's
formulation of certain search terms relating to criminal acts in Farsi without a concurrent formulation of
those terms in English demonstrated a "predisposition that Persian members of MGA's management and
staff (and only the Persian members) might be engaged in illegal conduct").  Mr. Stang's attacks pale in
comparison to those advanced by Mr. Gordinier, and they were filed under seal.  Thus, although the
Court's analysis and conclusions regarding the Forensic Auditor's Reports applies with equal force to Mr.
Stang's statements, his are not the focus of the Court's attention at this time.

MINUTES FORM 90                                                   Initials of Deputy Clerk __cls_____
CIVIL -- GEN                          7

EXHIBIT 8
PAGE _____ 229

terms of his Reports. Still other criticisms are, as counsel maintains, addressed to the
Reports themselves; those must be analyzed based on their substance. However, as
aptly demonstrated by the cited and quoted portions of Mr. Gordinier's filings that
appear below, his criticisms do not, by any measure, confine themselves to those
Reports, and instead reach out in a highly personal manner to attack the author, his
professionalism, his competence, his objectivity, and his integrity.[4]

Indeed, in a display the likes of which have not been previously witnessed by this
Court, Mr. Gordinier strayed far afield of legitimate criticism of the discussions,
analyses, and conclusions reached in the Summary Report and the Reports that
followed. To be sure, there are instances in which Mr. Gordinier addressed the
message found in those Reports; just as surely, however, as detailed below, Mr.
Gordinier attacked the messenger. Specifically, the papers filed by Mr. Gordinier on
behalf of Omni 808 call into question Mr. Durkin's professionalism and competence, as
well as his objectivity and integrity. Moreover, and alarmingly, they falsely accuse Mr.
Durkin of being influenced by an ethnocentric bias against Mr. Larian and Mr. Kadisha.
Such attacks, aimed at Mr. Durkin personally rather than the discussion, analyses, and
conclusions set forth in his Reports, appear throughout Omni 808's papers. See Omni
808 Investors, LLC's Statement of Position re Order to Show Cause re Appointment of a
Permanent Receiver (docket #5446) ("SOP"), filed May 14, 2009, at 11 (referring to Mr.
Durkin's "irresponsible" analysis); id. (noting that Mr. Durkin is "far too experienced" to
believe that he "produced . . . a balanced presentation"); id. (stating that "Mr. Durkin's
report is a polemic" and "a piece of advocacy"); id. at 12 n.9 (calling into question Mr.
Durkin's "objectivity" based on the fact that the Court ordered Mr. Durkin's fees be paid
(at least in the first instance) by Mattel); id. (suggesting that Mr. Durkin's ex parte
communications with Mattel were improper); id. at 13 n.10 (characterizing Mr. Durkin's
quotation of Mr. Larian's and Mr. Kadisha's account of how the two men were
acquainted, from "the Persian community," as "at best, unprofessional" and, "at worst,

---

[4] Adding still further to the mounting irony, in the same footnote that Mr. Gordinier disclaims
engaging in improper personal attacks, he falsely accuses counsel for Mattel of advancing their own
improper ad hominen attacks against Neil Kadisha, who has been referred to as a "common thief" in
certain unspecified Mattel filings. Mr. Kadisha is the Managing Partner of a diversified investment firm,
Omninet Capital, LLC, and an investor in Omni 808. To call someone a "common thief" is, undoubtably, by
any measure, a highly personal attack, therefore an attack addressed "to the man," or ad hominen.
However, in the same manner Mr. Gordinier accuses Mr. Durkin of failing to provide appropriate context to
the Court in his Reports, Mr. Gordinier himself fails to acknowledge that counsel for Mattel's use of the
term "common thief" in connection with Mr. Kadisha merely quotes Los Angeles County Superior Court
Judge Henry W. Shatford's conclusion regarding Mr. Kadisha, as set forth in his 191-page Statement of
Decision, dated October 24, 2006, which was issued after a 200-day trial, which is currently pending
appeal, and which conferred upon Mr. Kadisha the oft-repeated moniker of "common thief," as well as
"embezzler," and "perjurer." See Uzyel v. Kadisha, Cal. App. Nos. B196045, B203804, B198007,
B199850, B201425, 2009 WL 646096 (Mar. 4, 2009) (appellate brief). As always, context is key. The use
by counsel for Mattel of another court's findings and conclusions to advance an argument is not
inappropriate. Those findings and conclusions may, or may not, be relevant to matters presented to the
Court. Used in this manner, although undoubtably addressed "to the man" (and his credibility), it is not an
improper ad hominen attack.

Initials of Deputy Clerk __cls_____

EXHIBIT 8
PAGE _____ 230

evidence of improper cultural bias"); id. (in the same footnote, referring to the same
quotation, stating that "[t]he tone [of the report] itself is compelling proof that Mr. Durkin
had no intention of providing an 'objective' report to the Court."); id. at 23 (referring to
the Summary Report as "Mr. Durkin's ill-concealed advocacy piece"); id. (noting that
advocacy, rather than objectivity, "is certainly the posture [Mr. Durkin] is most
comfortable with"); Omni 808 Investors, LLC's Memorandum in Support of Its Requests
to Strike Summary and Responsive Reports of Ronald L. Durkin (docket #5705)
("Motion to Strike"), filed June 8, 2009, at 4 (noting Omni's "doubts that the Court or any
party would benefit further by continuing this façade of Mr. Durkin's 'impartiality'"); id. at
7 (calling Mr. Durkin's explanation of his conclusion regarding the relatedness of certain
parties as "not only fatuous[,] but [also] intellectually dishonest"); id. at 9 (suggesting
that Mr. Durkin intentionally concealed from the Court the fact that Mr. Larian sought
other funding sources before turning to Mr. Kadisha); id. at 10 (noting that "Mr. Durkin's
repeated references to Mr. Larian's and Mr. Kadisha's common 'Persian' heritage can
only be viewed as an attempt to draw some nefarious ethnic connection between
them"); id. at 12 (calling the reference to Mr. Larian's and Mr. Kadisha's ethnicity
"unprofessional symptoms of improper cultural bias [that] have no place in a supposedly
objective report"); Omni 808 Investors, LLC's Reply Memorandum (docket #5809)
("Reply Memo") at 14 (suggesting that not only Mr. Durkin, but also counsel for Mattel,
harbor "cultural biases" that lead them to "suggest[] that [Mr. Larian's and Mr. Kadisha's]
common heritage makes [them] more likely to act contrary to their own interests); id. at
15 (stating that, according to his own interview notes, Mr. Durkin "misrepresented" to
the Court in his Summary Report how Mr. Larian and Mr. Kadisha portrayed their
relationship with each other).

As alluded to, Omni 808's criticisms have not been limited to personal attacks;
some of the criticisms are in fact aimed at the Reports themselves. See e.g., SOP at 16
("Mr. Durkin's conclusion that the Wachovia-Omni transaction impacted 'MGAEI's
solvency and ability to continue conducting operations' is simply wrong."). Any
comment by the Court regarding the substance of the discussions, analyses, and
conclusions presented to the Court in the Forensic Auditor's Summary, Responsive,
and Final Reports is inadvisable at this time. With the filing of the Third Amended
Answer and Counterclaims, much of the subject matter of the Forensic Auditor's
Reports have been incorporated into the claims at issue in this action. As such, it would
be premature for the Court to comment upon the substance of issues that are yet to be
adjudicated, and that are subject to a trial by jury. Nevertheless, the Court has
reviewed the Forensic Auditor's Summary, Responsive, and Final Reports, and the
exhibits attached thereto. The Court has also reviewed and considered the criticisms
aimed at the Forensic Auditor, cited and quoted above, as well as the entirety of all the
papers responding to the Forensic Auditor's Reports filed to date. After this review, the
Court is firmly convinced that all the personal criticisms of Mr. Durkin are unwarranted
and unsubstantiated.

At best, the criticism of Mr. Durkin's performance and presentation represents a

MINUTES FORM 90                                         Initials of Deputy Clerk __cls_____
CIVIL -- GEN                        9

EXHIBIT 8

PAGE____231

different interpretation of available evidence. That such disagreements would arise
between the analyses offered by a Court-Appointed Forensic Auditor and that offered by
counsel for a party whose transactions have been a subject of that audit is by no means
surprising. A jury considering the relevant evidence might ultimately make factual
determinations that tend to agree with Mr. Durkin's assessment, it might ultimately tend
to agree with Mr. Gordinier's assessment, or it may very well reject both positions in
favor of another. The answer to the merits of the claims at issue in this action must
await another day. Today, the Court merely notes that its examination of the Forensic
Auditor's Reports reveal that Mr. Gordinier's personal attacks aimed at their author were
unjustified.

        Some specific attacks directed toward Mr. Durkin – relating to his background as
a law enforcement officer, his communications with counsel for Mattel, and specific (but
baseless) allegations of ethnocentric bias -- are worthy of more specific comment by the
Court.

        Stopping short of explicitly stating such, Mr. Gordinier appears to labor under the
assumption that Mr. Durkin has been unable to put behind him the prosecutorial
mindset under which he presumably operated during his former service to this Nation as
an agent of the Federal Bureau of Investigation ("FBI"). At the outset, the Court notes
that Mr. Gordinier's unstated assumptions do a disservice to the prosecutors and the
law enforcement officers who work with those prosecutors, both of whom conduct their
work under the clearly delineated duty to ferret out not only evidence of guilt but also
"evidence favorable to the accused." See e.g., Berger v. United States, 295 U.S. 78, 88
(1935) (noting that the role of the prosecutor is not to win at all costs and observing that
the prosecutor "is the representative not of an ordinary party to a controversy, but of a
sovereignty whose obligation to govern impartially is as compelling as its obligation to
govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall
win a case, but that justice shall be done."); Brady v. Maryland, 373 U.S. 83, 87 (1963)
(imposing a duty on prosecutors to provide to the defense exculpatory evidence when
requested to do so).

        Secondly, even if prosecutorial duties were not so defined, the Court finds no
suggestion that Mr. Durkin skewed the evidence in favor of any particular viewpoint.
Undoubtedly, there is a *complete absence* of any evidence that, as Mr. Gordinier has
suggested, Mr. Durkin has embarked upon a campaign to purposely mislead the Court.

        Mr. Gordinier also suggests that, because Mr. Durkin's bills are being paid by
Mattel, Mattel has, through this payment or through other communications with Mr.
Durkin, bought Mr. Durkin's loyalty. This is utter nonsense. As demonstrated by the
Court's communications with him, Mr. Durkin is a Court-Appointed Officer who
understands that his role is to work on behalf of the Court and not on behalf of any
party. In any event, the Court's Order of January 7, 2009, which appointed Mr. Durkin,
imposed the costs of the audit on Mattel "in the first instance," but expressly provided for

MINUTES FORM 90                                          Initials of Deputy Clerk __cls_____
CIVIL – GEN                                10

EXHIBIT $\underline{\mathcal{Q}}$

PAGE _____232

the possibility that the audit expenses be shared or shifted to the MGA parties.
Moreover, to suggest, however subtly, that ex parte communications with counsel for
Mattel were improper ignores the Court's mandate to the Forensic Auditor in the
January 7, 2009, Order, which states that Mr. Durkin was provided with attorney contact
information and that he "shall direct his initial communications to counsel." At no time
has the Court precluded the Forensic Auditor's communications with Mattel or its
counsel; in fact, because the Forensic Audit was undertaken based on evidence
gathered by and presented to the Court by Mattel, Mr. Durkin would have been remiss
in his duties if he failed to communicate with Mattel and its counsel.

Mr. Durkin was vested with powers and discretion to complete a Court-ordered
Forensic Audit. Pursuant to an Order of this Court, he undertook this task and
exercised those powers and that discretion, presenting his Reports in conformity with
the Court's instructions. Despite counsel's attacks, the Court's review of the evidence
before it discerns no abuse of those powers or of that discretion.

Particularly troubling to the Court is that counsel speculates that, because Mr.
Durkin noted in his report that Mr. Larian knew Mr. Kadisha from "the Persian
Community," Mr. Durkin could be "of the view that this common heritage makes Mr.
Kadisha more likely to act contrary to his own interests or to do something via third-
parties that he wouldn't otherwise do?" See SOP at 13-14 n.10 (appearing to pose this
thought as a rhetorical question). There is no indication in the record, or otherwise, that
Mr. Durkin holds such a view. To the contrary, Mr. Durkin's comment regarding the
acquaintanceship of Mr. Larian and Mr. Kadisha from "the Persian Community" (which
is noted in the report within quotation marks and is expressly attributed to a reference
made by Mr. Larian himself) is clearly predicated on interviews with these two
individuals, each of whom related independently to Mr. Durkin and his colleagues that
they knew each other from "the Persian Community." See Durkin Summary Report, Ex.
14, at 2 ¶ 3 (Notes re March 25, 2009, interview with Mr. Larian: "He indicated that he
knew Kadisha from the Persian community.") and Ex. 14, at 15 ¶ 2 (Notes re March 26,
2009, interview with Mr. Kadisha: "Kadisha stated that he knows Larian from the
Persian community."). The purpose for this reference is made clear in the footnote set
forth at the end of the sentence in which the reference appears; namely, the Report
discusses evidence that the relationship between Mr. Larian and Mr. Kadisha is
stronger and more personal than either man claimed it was. See Summary Report at 5
n.18; Ex. 15 (personal emails).

In the Reply Memo, Mr. Gordinier takes issue with this explanation, this time
including not only Mr. Durkin but also counsel for Mattel as the targets for his
unsubstantiated allegations of "cultural bias." Mr. Gordinier first mischaracterizes an
argument made by Mattel. Mattel argued, and quite correctly, both that how well Mr.
Larian and Mr. Kadisha knew each other was relevant to a determination of whether
certain transactions between the two were arms-length transactions, and that this point
was likely not lost on either of these two very sophisticated and successful

MINUTES FORM 90                                                    Initials of Deputy Clerk __cls_____
CIVIL -- GEN                                    11

EXHIBIT  $\mathbf{8}$
PAGE _____ 233

businessmen.[5] As noted previously, both Mr. Larian and Mr. Kadisha stated that they knew each other from "the Persian community" which, in the Forensic Auditor's view, was intended to, or at least had the tendency to minimize the existing relationship between the two. Mr. Gordinier incorrectly characterizes this argument as Mattel's contention that Mr. Larian's and Mr. Kadisha's "Persian relationship" and "common Persian heritage" was somehow relevant to a determination of whether the Omni 808 transaction was an arms-length transaction. Mattel made no such argument. Neither counsel for Mattel nor Mr. Durkin have implied that Mr. Larian's and Mr. Kadisha's ethnicity factors into the analysis. Other than to point to Mr. Larian's and Mr. Kadisha's separate, but identical, accounts of how they knew each other which, in turn, suggests how well they know each other, neither counsel for Mattel nor Mr. Durkin have stated or implied that Mr. Larian's and Mr. Kadisha's shared ethnicity is relevant to any matter currently or potentially before the Court. Compare Opposition at 8-9 with Reply Memo at 14-15.

Moreover, Mr. Gordinier's substantive point, that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha told him about the closeness of their relationship, fares no better. See Reply Memo at 15. On this point, it is important to set this stage properly. Counsel for all parties have attempted to glean far too much from two sterile paragraphs of interview notes taken by Mr. Durkin. Much can be inferred from conversations and interviews through not only what is said, but what is not said, by the interviewee's demeanor, by the tone of the speaker, by the length and placement of pauses, and by non-verbal gestures and body language. With all these variables, much of what is communicated does not find its way into notes.[6] For instance, Mr. Durkin's interview of Mr. Larian lasted over two and a half hours; however, the interview notes are a mere five and a half pages. Similarly, a one-hour and ten minute interview of Mr. Kadisha yielded only three and a half pages of interview notes. This is not to suggest that the notes should have been longer or that the interviews should have been recorded or transcribed; rather, it is to suggest that counsel's arguments based on another's notes are not particularly probative.

In contrast, Mr. Durkin's assessment, based on his interviews with both of them,

---

[5] In fact, the Court just this week issued a 30-page, single-spaced opinion resolving a 10-day bench trial conducted over the sole issue of whether a transaction between "closely related" entities reflected its fair market value, one of the more significant arguments ultimately rejected by the Court in that case being that the close relationship between the parties necessarily rendered the transaction a "sweetheart deal." See July 6, 2009, Order, Siegel v. Warner Bros. Entertainment, Inc., et al., CV 04-08400 SGL (RZ) (docket #554).

[6] Indeed, the interview notes upon which the parties rely concede as much. See Summary Report, Ex. 14 at 2, 15 ("This interview memorandum is a factual representation of the topics discussed during the interview and is not intended to be a word for word or exact transcription of the conversation."). Thus, in addition to not taking into account all non-verbal communication, the notes do not even represent everything that was said during the interview.

MINUTES FORM 90
CIVIL -- GEN                                    12                    Initials of Deputy Clerk __cls_____

EXHIBIT $\mathbf{5}$

is that Mr. Larian and Mr. Kadisha attempted to minimize their relationship because both of them understand the relevance of any friendship or other connection between them to the assessment of the arms-length nature of any transactions in which they have engaged. Mr. Durkin's assessment does not come from the gentle teasing of a strained meaning from two sterile paragraphs of brief notes taken by another person; rather, his assessment springs from his participation in the interview process, the entirety of the interviews he conducted of Mr. Larian and Mr. Kadisha, and his review of all of the evidence. As such, the Court defers to his assessment, at least insofar as how Mr. Larian and Mr. Kadisha portrayed their relationship to him.

As for that scant language from which the parties glean so much meaning, the entirety of which is set forth below, it in no way supports the contention made by Mr. Gordinier that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha conveyed to him about the closeness of their relationship. On this topic, the notes of Mr. Larian's interview merely state the following:

> Larian decided to contact Neil Kadisha of OmniNet as
> he knew his company was in the distressed loan business.
> He indicated that he knew Kadisha from the Persian
> community. Kadisha said he wouldn't do the deal alone in
> today's environment and wanted Larian and their other
> friends to invest in the deal with MGA. Larian stated that
> Kadisha negotiated the debt with Wachovia and got it down
> significantly, Larian said he is not bitter about Kadisha
> getting a good deal on buying the loan.

Summary Report, Ex. 14, at 2 ¶ 3 (emphasis added). This paragraph contains the word "friends," and perhaps could even be read as an implicit statement by Mr. Larian that he and Mr. Kadisha are "friends." But the language does not compel such an inference. Moreover, it does not comport with the notes of Mr. Kadisha's interview, which on this topic state only the following:

> Larian and Kadisha have never been to dinner
> together. Kadisha stated that he knows Larian from the
> Persian community and he sees him often at religious
> events, etc. He has no investments with Larian. Kadisha
> did not talk with Larian last night, this morning or in the last two days.

Summary Report, Ex. 14, at 15, ¶ 2. Mr. Durkin's assessment that Mr. Larian and Mr. Kadisha sought to minimize the extent of their relationship is not contradicted by these short passages.

The criticism that Mr. Durkin was acting pursuant to an ethnic or cultural bias is clearly baseless. The allegations are irresponsible, and they are made to capitalize on

MINUTES FORM 90
CIVIL -- GEN

13

Initials of Deputy Clerk __cls_____

EXHIBIT **2**

PAGE _____235

their inherent sensational nature for counsel's own purposes of diverting attention away
from the substance of the Reports. Sensationalism aside, when viewed in context, the
Reports' reference to Mr. Larian and Mr. Kadisha knowing each other from "the Persian
community" was plainly innocuous. The reference was a direct quotation from both Mr.
Larian and Mr. Kadisha. It was used in a broader discussion regarding how (and thus,
impliedly, how well) the two knew each other, which is itself relevant to the issue of
whether certain transactions relevant to the present litigation were made at arms length.

This is a most unfortunate incident. The Court certainly understands, in a case
as hotly contested as this one -- with such high stakes, with such complex legal issues,
and with such truly extraordinary legal talent on all sides -- that lawyers, however ethical
and committed to the highest standards of professionalism (as the Court presumes and
has found all counsel of record here to be), make statements or commit acts in haste
that they subsequently regret. All of the players to this drama, are, after all is said and
done, human. As such, all of us are vulnerable to all-too-common human frailties. The
Court would place itself at the very top of any list of lawyers who have spoken
improvidently at one time or another in this case (and any number of others). What the
Court has witnessed here, however, in both manner and substance, for the reasons
noted above, goes beyond what the Court can let pass without some manner of
reprobation. So let the Court be clear: Nothing excuses the attempted character
assassination in which Mr. Gordinier has engaged.

   **IT IS SO ORDERED.**

MINUTES FORM 90                                   Initials of Deputy Clerk __cls__ __ __
CIVIL -- GEN                          14

EXHIBIT 8
PAGE _____ 236

# EXHIBIT 9

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 10

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 11

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 12

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 13

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 14

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 15

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 16

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 17

```
 1              UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF CALIFORNIA
 3                   EASTERN DIVISION
 4
 5   MATTEL, INC., a Delaware        )   Certified Copy
     Corporation,                    )
 6                                    )
                Plaintiff,           )
 7                                    )
                vs.                  )   No. CV 04-9059 NM
 8                                    )   (RNBx)
     CARTER BRYANT, an individual;   )
 9   and DOES 1 through 10,          )
     Inclusive,                      )
10                                    )
                Defendants.          )
11   ------------------------------- )
     (COMPLETE CAPTION ON NEXT PAGE.)
12
13
14
15      Videotaped Deposition of LLOYD W. CUNNINGHAM,
16      taken on behalf of Defendants, at 300 South
17      Grand Street, Los Angeles, California,
18      beginning at 9:59 A.M. and ending at 5:25 P.M.,
19      on Monday, March 31, 2008, before Wendy S.
20      Schreiber, CSR No. 3558, RPR, CLR.
21
22
23
24
25   PAGES 1 - 223
                                                        1
```

EXHIBIT  17
PAGE  781

```
 1      A.   Oh, I've taken college courses pursuant to

 2   my career in law enforcement and prior to law

 3   enforcement career, but I never earned a degree.

 4      Q.   You entered the San Francisco Police

 5   Department in 1963?                              10:03AM

 6      A.   Yes, sir.

 7      Q.   Was that immediately after high school?

 8      A.   No.

 9      Q.   What did you do between -- when did you

10   graduate from high school?                       10:03AM

11      A.   1957.

12      Q.   And what did you do between 1957 and 1963?

13      A.   I served in the military.

14      Q.   What branch?

15      A.   Army.                                     10:04AM

16      Q.   Were you in the Army that entire period from

17   1957 until 1963?

18      A.   No, no.  I was discharged from the Army I

19   believe in 1961, I believe, and while awaiting and

20   preparing for the police department examination    10:04AM

21   testing I then worked for the Pacific Gas & Electric

22   Company.

23      Q.   Were you -- you weren't doing any forensic

24   document examination work for the Pacific Gas &

25   Electric Company, were you?                       10:04AM
                                                          9
```

EXHIBIT _17_

PAGE ___782___

```
 1              IN WITNESS WHEREOF, I have subscribed my

 2    name this 7th day of April, 2008.

 3

 4

 5

 6    _____

 7         WENDY S. SCHREIBER, CSR No. 3558, RPR

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                      221
```

EXHIBIT 17
783
PAGE _____

# EXHIBIT 18

# LIVENOTE | **World Service**™

*A new perspective on court reporting.*

CONFIDENTIAL

## United States District Court
## Central Division of California

### Deposition of

### Liliana Martinez

### May 20, 2005

## Mattel, Inc.,

## V.

## Carter Bryant, an individual
## and MGA Entertainment

ORIGINAL

*A LiveNote World Service Transcript. Reported by CLSP, Network Deposition Services*
*LiveNote Inc. • 221 Main Street, Suite # 1250, San Francisco, California 94105 • 1-800-LIVENOTE*

EXHIBIT _18_

PAGE _784_

Martinez, Liliana 5/20/2005

1   that you don't understand one of my questions, I'm

2   going to assume that you do understand?

3       A.   Right.

4       Q.   Okay.  Could you please state your full

5   name for the record?

6       A.   Liliana Martinez.

7       Q.   Is Martinez your married name?

8       A.   Yes, it is.

9       Q.   When did you get married?

10      A.   I got married July 14, 2001.

11      Q.   Prior to that time, did you use a different

12  last name?

13      A.   Yes.

14      Q.   What was that?

15      A.   Sarinana.

16      Q.   Could you spell that.

17    · A.   S-A-R-I-N-A-N-A.

18      Q.   When were you born?

19      A.   May 11th, 1977.

20      Q.   Where were you born?

21      A.   In Mexico.

22      Q.   Are you fluent in English?

23      A.   Yes.

24      Q.   Do you have any problem with me asking you

25  questions in English and you responding in English?

Page 14

EXHIBIT _18_ 785

PAGE _____

Martinez, Liliana 5/20/2005

1    Q.    When was that?

2    A.    I believe that was of '99.

3    Q.    Did anything in particular happen in or

4  around of '99 that led to your change in status?

5    A.    No.   There was a req opening.

6    Q.    Did your job title change in September of

7  1999?

8    A.    Yes.

9    Q.    What did it change to?

10   A.    I was a designer.

11   Q.    And what were your duties and

12 responsibilities at that time?

13   A.    Pretty much the same thing.  I just was

14 able to have my own projects as well, too, 'cause I

15 was still supporting.

16        MR. ZELLER:  If I can just interject for a

17 second, this is fine because it's background and

18 it's fairly straightforward, but you want to make

19 sure that she finishes the question before you begin

20 your answer.  It makes it easier on the court

21 reporter, too.

22        THE WITNESS:  Sorry.

23   Q.    BY MS. CENDALI:  What was your starting

24 salary at Mattel?

25   A.    I think 40,000 a year.

Martinez, Liliana 5/20/2005

1    Q.    And just to be clear, was that when you

2 became in September 1999 a full-time employee?

3    A.    Yes.

4    Q.    When you were a temp, what were you paid?

5    A.    I was paid $15 an hour.

6    Q.    Did you do any trial projects for Mattel

7 prior to being hired?

8          MR. ZELLER:  Object.  The question is

9 vague.

10         THE WITNESS:  Can you rephrase the

11 question?

12   Q.    BY MS. CENDALI:  Sure.  Before you were

13 hired as a temp, did they ask you to do any try-out

14 projects before they hired you?

15   A.    No.

16   Q.    Who did you report to after you became a

17 full-time employee in September 1999?

18   A.    Debbie Meyer.

19   Q.    Were you in a particular group at Mattel?

20   A.    Debbie Meyer's group.

21   Q.    And what did that group work on?

22   A.    We worked on a variety of products.

23   Q.    Did you work on both Barbie and non-Barbie

24 products?

25   A.    Yes.

Page 18

EXHIBIT __18__

PAGE ___787___

Martinez, Liliana 5/20/2005

1  Teens?

2      A.   I don't recall.

3      Q.   Were you ever asked to put anything in

4  writing about Mr. Bryant?

5      A.   I don't recall ever.

6      Q.   Were you ever asked to sign anything about

7  Mr. Bryant?

8      A.   I don't recall.

9      Q.   What is your current salary at Mattel?

10     A.   Um, I think it's 88,000.

11     Q.   And when did it go up to that level?

12     A.   I think in March, March or April.  Just

13  recently.

14     Q.   What happened in March or April to lead to

15  an increase?

16     A.   There was a 3 percent increase.  What do

17  you call that?  The annual increase.

18     Q.   Have you received any bonuses in this year?

19     A.   Like the, the yearly.  What do you call?  I

20  don't know what it's called.  The MIP.

21     Q.   Do you know Anna Rhee?

22     A.   Anna Rhee, I know her as Anna Rhee.

23     Q.   Anna Rhee, forgive me.

24     A.   I don't know.  I've always called her Rhee,

25  but yeah, I do know who she is.

EXHIBIT __18__

PAGE____788

1          I further certify that I am not a relative or

2   employee or attorney or counsel of any of the parties,

3   nor am I a relative or employee of such attorney or

4   counsel, nor am I financially interested in the outcome

5   of this action.

6

7          IN WITNESS WHEREOF, I have subscribed my name

8   this 5th day of June , 2005 .

9

10

11

12   JUDITH SCHLUSSEL, CSR No. 4307

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 18

PAGE 789

# EXHIBIT 19

```
 1              UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3                    EASTERN DIVISION
 4       ---------------------------          Certified Copy
 5   CARTER BRYANT, an individual,   )
 6                 Plaintiff,         )
 7            vs.                     ) No. CV 04-09049 SGL
 8   MATTEL, INC., a Delaware         ) (RNBx) (c/w CV
 9   Corporation,                     ) 04-9059 & 05-2727)
10                 Defendant.         ).
11       ----------------------------)
12   CONSOLIDATED WITH MATTEL, INC.,)
13   v. BRYANT and MGA               )
14   ENTERTAINMENT, INC., v. MATTEL,)
15   INC.                            )
16       ----------------------------
17
18          Videotaped 30(b)(6) deposition of
19       FRED T. KAWASHIMA, taken at 400 South
20       Hope Street, Los Angeles, California,
21       commencing at 10:27 A.M., Wednesday,
22       January 17, 2007, before Wendy S.
23       Schreiber, CSR No. 3558, RPR, CLR.
24
25   PAGES 1 - 280
```

EXHIBIT 19
PAGE 790

```
1      A.    Disney, DreamWorks, TRW, Northrop Grumman.

2      Q.    I don't need an exhaustive.  I just want to

3    get an idea of the kinds of folks that you were

4    working for.  It is probably more accurate to say

5    working with rather than working for, right, insofar   11:17AM

6    as you were working for Microsoft, correct?

7      A.    That's correct.

8      Q.    Who did you work for prior to Microsoft?

9            MR. COREY:  His employer?

10           MR. JENAL:  Yes.                                11:17AM

11     Q.    Your employer prior to Microsoft?

12     A.    Los Angeles Times.

13     Q.    How long were you at the L.A. Times?

14     A.    Over ten years.

15     Q.    And what was your position at the L.A. Times   11:17AM

16   or positions?

17     A.    During the entire ten years?

18     Q.    What was your final position?

19     A.    It was systems architect.

20     Q.    Did you ever work in geography?                11:17AM

21     A.    Yes.

22     Q.    When did you work in geography?

23     A.    Between 1990 -- 1980 through '86, I believe.

24     Q.    Where was that?

25     A.    It was with two companies.                     11:18AM
                                                               44
```

```
 1      Q.    What were the two companies?

 2      A.    The first one was Southern Cal Edison.

 3      Q.    And then the second?

 4      A.    U. S. Army Corps of Engineers.

 5      Q.    As much as I'd love to delve into that I'm   11:18AM

 6   going to let it pass for present purposes.

 7            MR. COREY:  You didn't have anything to do

 8   with the levies in New Orleans, did you?  Don't

 9   answer that question.

10   BY MR. JENAL:                                          11:18AM

11      Q.    So in the '98 to 2000 time frame when you

12   were working with Mattel for Microsoft your title

13   would have been infrastructure consultant?

14      A.    It changed.

15      Q.    What were your titles during that time      11:19AM

16   period?

17      A.    The infrastructure consultant, senior

18   infrastructure consultant I, senior infrastructure

19   consultant II.

20      Q.    Fair enough.  Is it -- and your             11:19AM

21   responsibilities with those changes in title, did

22   they change dramatically or is it mostly just a

23   seniority sort of thing?

24      A.    They changed.

25      Q.    When you started in '97, what types of work 11:19AM
                                                            45.
```

EXHIBIT  19
          792
PAGE_____

```
 1    were you doing for Mattel as an infrastructure

 2    consultant?

 3       A.    In '97?

 4       Q.    I believe that's when you said you started.

 5    So what sort of things were you assigned to work on     11:20AM

 6    in -- starting in 1997?

 7       A.    It was migrating E-mail systems -- Legacy

 8    E-mail systems to Microsoft Exchange E-mail systems.

 9       Q.    Was that part of the Mesa project that you

10    described or that you alluded to earlier?           11:20AM

11       A.    Can you ask the question, I'm sorry, one

12    more time?

13       Q.    Sure.  This process of migrating E-mail

14    systems from Legacy systems to Microsoft Exchange

15    systems, was that part of this Mesa program that you   11:20AM

16    alluded to earlier?

17       A.    Yes.

18       Q.    And how long did the Mesa project last?

19             MR. COREY:  Objection:  vague and ambiguous.

20    I think it would be easier to answer if you ask him    11:20AM

21    the E-mail part.

22             THE WITNESS:  I can't -- I don't know when

23    it ended precisely.

24    BY MR. JENAL:

25       Q.    Your best estimate?                        11:21AM
                                                            46
```

```
 1      A.    Best estimate?  I'm sorry, you have to ask

 2  the question more specifically.

 3      Q.    Well, I think you said that the Mesa project

 4  had numerous facets to it, correct?

 5      A.    Yes.                                    11:21AM

 6      Q.    And part of that was E-mail migration from

 7  Legacy systems to Exchange; is that correct?

 8      A.    Yes.

 9      Q.    To your understanding were you involved in

10  more than just the E-mail aspects of the Mesa      11:21AM

11  project?

12      A.    No.

13      Q.    So your involvement was strictly on the

14  E-mail migration; is that correct?

15      A.    The component, yes.                      11:21AM

16      Q.    And how long did that -- how long did that

17  component of the Mesa project last?

18      A.    I was only involved in that for three to

19  four months.

20      Q.    When was that?                           11:21AM

21      A.    In '97.

22      Q.    Was the project ongoing at the time when you

23  came to work with Mattel in '97?

24      A.    Yes.

25      Q.    Do you know when the project began?  I mean  11:22AM
                                                          47
```

EXHIBIT _19_
794
PAGE____



1   I declare under penalty of perjury under the laws of the United States of

2   America that the foregoing is true and correct.

3   Executed this 14th day of October, 2004, at El Segundo, California.

4

5

6                                              Sergio Hernandez

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07209/608837.1
10/14/04  0:14

-2-

DECLARATION OF SERGIO HERNANDEZ ISO MOTION TO QUASH

EXHIBIT _19_

PAGE _795_

# EXHIBIT 20

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 21

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 22

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an individual,

    Plaintiff,

    vs.

MATTEL, INC., a Delaware
corporation,

        Defendants.

No. CV 04-9049 SGL (RNBx)
Consolidated with
Nos. CV 04-9405 and
05-2727

**CERTIFIED
COPY**

AND CONSOLIDATED ACTIONS.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Wednesday, March 4, 2009

Volume 1

Reported by:
CHERYL R. KAMALSKI
CSR No. 7113

Job No. 106479

EXHIBIT 22

PAGE 825



877.955.3855
www.sarnoffcourtreporters.com

IRVINE ● LOS ANGELES ● SAN FRANCISCO ● LAS VEGAS ● SAN DIEGO

SARNOFF
Court Reporters and
Legal Technologies

TRANSCRIPT OF PROCEEDINGS                03/04/09

1     abusive fishing expedition, which is what we've got going

2     on.

3              MR. O'BRIEN:  And I understand your position.

4     I'm not negotiating with you on MGA's behalf and I'm not

5     suggesting that you -- I'm just trying to get an idea of

6     where you think the law -- what the parameters of

7     discovery are with respect to your client.  So I'm not

8     telling you you should, on the record or otherwise, offer

9     to give them documents if you don't think they're due.

10    I'm not trying to push you into that position and hold

11    it -- the point of this isn't to meet and confer.  I'm

12    just trying to get an idea of where you see the contours

13    of the law with respect to your client as to what

14    discovery might or might not be proper.

15             And I understand your position that on this

16    record you don't think any of the current discovery is

17    proper, but --

18             MR. GORDINIER:  Right.  Assuming they can't get,

19    from MGA, the payments from MGA on the loan, I have no

20    problem with that.  I have no problem with the loan

21    documents.

22             Now, it's true MGA was not a party directly to

23    the transaction between Omni 808 and Wachovia.  They had

24    to sign some guarantees, I think, or some

25    indemnifications, I'm not sure exactly, I'm not a

55

EXHIBIT _22_

PAGE _826_

1    corporate guy.  But that deal was negotiated between

2    Omni 808 and Wachovia.  And so -- let's make sure that I'm

3    communicating with you, and that is on this record they're

4    not entitled to anything.  However, what I want more than

5    anything out of today is efficiency and economy and peace

6    and you guys in the front of this table go on and do your

7    thing leading to the trial between all the MGA entities

8    and the Mattel entities and leave me and my clients alone.

9    And if that will cut it off, I'd be happy to do that.

10   That's my position.  Do you see what I'm saying?

11          MR. O'BRIEN:  I do.  I understand.  Mr. Zeller

12   took the position that in the Ninth Circuit the law that

13   we're dealing with here, unlike New York, a party isn't

14   required to go to their adversary before going to a third

15   party to seek discovery.  Do you have a -- you seem to be

16   taking a different position --

17          MR. GORDINIER:  It's ironic --

18          MR. O'BRIEN:  -- as a practical matter.  Is there

19   a case cite or.

20          MR. GORDINIER:  Absolutely.  It's ironic that

21   Mr. Zeller would cite the Ninth Circuit.  Google

22   Mr. Zeller and Mattel and read the Ninth Circuit's opinion

23   on why a subpoena like this should be quashed, and why

24   sanctions against an attorney can be granted.  The case

25   name is Mattel versus Walking Mountain Productions.  So

EXHIBIT 22

PAGE 827

TRANSCRIPT OF PROCEEDINGS                    03/04/09

1   that's the case I'd cite to you.

2            MR. O'BRIEN:  All right.

3            MR. GORDINIER:  Here it is, it's 353 F 3rd 792.

4   If you want, I can hand it up to you.

5            MR. O'BRIEN:  I can take a look at it.  One --

6            MR. GORDINIER:  Most of it is not related.  Go to

7   the end where they're upholding -- Judge Lew found that

8   what Mr. Zeller was doing was improper, and sanctioned

9   him, and the Ninth Circuit affirmed it.  So if you want

10  the authority I'm relying on, that's it.

11           MR. O'BRIEN:  Okay.  I'll take it -- if that's

12  the authority you're relying on for that position, I'll

13  take it.

14           The one thing that I do want to caution here is

15  that we're not litigating that case.  I don't know what

16  the discovery issues were in that case.  We're going to be

17  together for a fair amount of time.  I know you may not --

18           MR. GORDINIER:  Hopefully not me.

19           MR. O'BRIEN:  I understand that.

20           MR. GORDINIER:  No offense, Mr. O'Brien.

21           MR. O'BRIEN:  None taken.  But I do -- I don't

22  want to have, unless it's directly relevant, and I'm

23  sure you weren't intending to do so, but I don't want any

24  sort of ad hominum attacks on counsel and question their

25  motives and that sort of thing.  My feeling here is that

57

EXHIBIT 22
828

PAGE_____

1   everybody comes to this table in good faith. We've got

2   excellent lawyers here. And so I just caution that. I

3   don't think you were attacking Mr. Zeller personally.

4   I'll certainly take a look at the case.

5          The point that I was trying to get to is this

6   issue in the Ninth Circuit, do you have to go first, is it

7   a requirement that you go first to the party to obtain the

8   discovery, and then to the third party. It may make

9   practical sense from a litigation standpoint, but is

10  that -- is it your position that that is not the law?

11         MR. GORDINIER: No. You, trial courts, you, as

12  Discovery Master, trial courts have discretion. However,

13  it is a higher burden when you're going to a third party.

14  And if it's cumulative and duplicative of what can be and

15  should be and already has been sought from a party,

16  there's no reason to -- and the court should quash the

17  subpoena to the third party. But I'm not telling you that

18  it's a requirement under the Ninth Circuit. I'm not

19  telling you that.

20         MR. O'BRIEN: Okay.

21         MR. GORDINIER: I don't have anything else on the

22  substance, since you don't want to hear about the

23  procedure, other than to say the lack of procedure here so

24  colored the substance, we didn't have a chance to properly

25  present this to you. And I was optimistic, as I am

58

1    sitting here, that with the appropriate guidance, this

2    could be tailored, but at this point, this motion needs to

3    be denied and the subpoenas need to be quashed.  And if

4    they want to tailor subpoenas, if they want to tailor

5    requests along the lines that they've set out here today,

6    they should be instructed to do so.

7              MR. O'BRIEN:  All right.  Thank you.  Mr. Valle.

8              MR. VALLE:  I represent two nonparties, and we

9    find ourselves in the middle of this, obviously

10   contentious, dispute.

11             We were served with a document request that is

12   extremely broad, as Mr. Russell points out, essentially

13   asked for every document relating to the company, is in no

14   way limited to the financial condition of Mattel -- I

15   mean, of MGA, which Mr. Zeller indicated was the purpose

16   of the discovery.

17             And let me pick up on the legal issue of whether

18   it's appropriate to start with nonparties rather than with

19   parties.

20             At page 6 of our brief we cite very recent case

21   law coming out of the Ninth Circuit, the NIDEK case,

22   Northern District of California, 2007, denied discovery

23   from a nonparty, stating, quoting now,

24                  "There is typically no reason to

25                  burden nonparties when the documents

59

EXHIBIT 22

PAGE 830

1      I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3      That the foregoing proceedings were taken

4   before me at the time and place herein set forth; that

5   any witnesses in the foregoing proceedings, prior to

6   testifying, were duly sworn; that a record of the

7   proceedings was made by me using machine shorthand

8   which was thereafter transcribed under my direction;

9   that the foregoing transcript is a true record of the

10   testimony given.

11      Further, that if the foregoing pertains to

12   the original transcript of a deposition in a Federal

13   Case, before completion of the proceedings, review of

14   the transcript [  ] was [  ] was not requested.

15      I further certify I am neither financially

16   interested in the action nor a relative or employee

17   of any attorney or party to this action.

18      IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20

21   Dated:        MAR 0 9 2009

22

23      _Cheryl R. Kamalski_

24   CHERYL R. KAMALSKI
     CSR No. 7113

25

EXHIBIT 22
831
PAGE _____

# EXHIBIT 23

CONFORMED COPY

FILED

Hon. Edward A. Infante (Ret.)
JAMS
Two Embarcadero Center
Suite 1500
San Francisco, CA 94111
415-774-2611
415-982-5287 (fax)

'07 JAN 25 PM 12: 25

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>     Plaintiff,<br><br>   v.<br><br>MATTEL, INC., a Delaware corporation,<br><br>     Defendant.<br><br><br>CONSOLIDATED WITH<br>MATTEL, INC. v. BRYANT and<br>MGA ENTERTAINMENT, INC. v. MATTEL,<br>INC. | CASE NO. C 04-09049 SGL (RNBx)<br>JAMS Reference No. 1100049530<br><br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-2727<br><br>**ORDER GRANTING MATTEL'S<br>MOTION TO COMPEL PRODUCTION<br>OF DOCUMENTS** |

## I. INTRODUCTION

On January 3, 2007, Mattel, Inc. ("Mattel") submitted its Motion to Compel Production of Documents to the undersigned Discovery Master for disposition.[1]  On January 11, 2007, Carter Bryant ("Bryant") submitted his opposition brief, and on January 18, 2007, Mattel submitted a reply brief.  The matter was heard via telephonic conference call on January 24, 2007.  Having

---

[1]  Pursuant to a stipulation and order filed December 6, 2006, the undersigned was designated Discovery Master in accordance with Rule 53 of the Federal Rules of Civil Procedure.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

1

EXHIBIT  23

PAGE  832

1-26

EXHIBIT 23

PAGE 833

1    considered the motion papers and comments of counsel at the hearing, Mattel's Motion to Compel

2    Production of Documents is GRANTED.

3                                    II. BACKGROUND

4        At the heart of this lawsuit is a dispute over the rights to the "Bratz" dolls. This highly

5
6    lucrative line of dolls was first conceived by Bryant, a former Mattel employee, and made

7    commercially available by MGA Entertainment, Inc. ("MGA") in the summer of 2001. Sales of

8    Bratz dolls now rival Mattel's Barbie doll.

9        A.  Mattel's Original Complaint

10
11       On April 27, 2004, Mattel, the world's largest manufacturer and marketer of toys, filed

12   suit against its former employee Bryant in state court asserting claims for breach of contract,

13   breach of fiduciary duty, breach of duty of loyalty, unjust enrichment, and conversion. Mattel

14   employed Bryant as a product designer from September 1995 through April 1998, and from

15
16   January 1999 through October 2000. Upon starting his second term, Bryant signed an Employee

17   Confidential Information and Inventions Agreement which required him not to engage in any

18   employment or business other than for Mattel, or invest or assist in any manner any business

19   competitive with the business or future business plans of Mattel. Bryant also assigned to Mattel

20   all rights, title, and interest in the "inventions" he conceived of, or reduced to practice, during his

21
22   employment.

23       In addition, Bryant completed Mattel's Conflict of Interest Questionnaire, certifying that

24   he had not worked for any of Mattel's competitors in the prior twelve months and had not

25   engaged in any business dealings creating a conflict of interest. Bryant agreed to notify Mattel of

26   any future events raising a conflict of interest.

27
28       Mattel alleges that during his employment, Bryant secretly aided, assisted and worked for

29   a Mattel competitor (later identified as MGA). Bryant entered into an agreement with MGA to

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                          2

EXHIBIT 23

PAGE 834

provide product design services on a "top priority" basis.[2]  The agreement further provided that

Bryant would receive royalties and other consideration for sales of products on which he provided

aid or assistance; that all work and services furnished by Bryant to MGA under the agreement

would be considered "works for hire"; and that all intellectual property rights to preexisting work

by Bryant purportedly would be assigned to MGA.  Mattel further alleges that Bryant converted,

misappropriated and misused Mattel property and resources while he was employed at Mattel.  In

the complaint, Mattel claims ownership of all inventions and works created by Bryant during his

Mattel employment and seeks to recover all benefits obtained as a result of his alleged breach of

duties.

In May of 2004, Bryant removed the state court action to the U.S. District Court, asserting

subject matter jurisdiction under both 28 U.S.C. §1331 (federal question jurisdiction) and 28

U.S.C. §1332 (diversity jurisdiction).  Mattel filed a motion to remand and submitted a copy of

Bryant's agreement with Mattel's competitor, namely MGA.  The agreement was dated

September 18, 2000 – a time when Bryant was still employed by Mattel — and required Bryant to

provide MGA with design services for the Bratz dolls.  In return, MGA agreed to compensate

Bryant at a monthly rate for a period of time and to pay Bryant a 3% royalty on sales of Bratz

dolls.  In August of 2004, the district court remanded the action.

B. Bryant's Cross-complaint

In September of 2004, after the case was returned to state court, Bryant filed a cross-

complaint against Mattel to challenge the legality of Mattel's Employee Confidential Information

and Inventions Agreement.  Bryant's cross-complaint included claims for unfair competition,

rescission, declaratory relief, and fraud.

//

---

[2] Bryant has already produced his agreement with MGA.  Therefore, the existence of the agreement does not appear to be in dispute.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

3

EXHIBIT 23

PAGE 835

C. Bryant's Second Notice of Removal (CV 04-9059)

In November of 2004, Bryant filed a second notice of removal, once again invoking federal question and diversity jurisdiction. Bryant asserted that Mattel's complaint presented a federal question because events occurring since the first removal and remand demonstrated that Mattel's conversion claim involved the rights to the Bratz dolls, and therefore was preempted by the Copyright Act. Bryant also contended that there was diversity jurisdiction because he and Mattel were citizens of different states and the amount in controversy exceeded the $75,000 jurisdictional limit because the rights to the Bratz dolls were at stake. After the second notice of removal, MGA intervened as a defendant pursuant to a stipulation and order.

D. Bryant's Declaratory Relief Action Against Mattel (CV 04-9049)

On the same day that Bryant filed his second notice of removal, he also filed a complaint in federal court seeking a declaratory judgment that the Bratz dolls do not infringe Mattel's copyrights in a project known as "Toon Teens."

E. MGA's Complaint Against Mattel (CV 05-2727)

In April of 2005, MGA filed suit against Mattel alleging essentially unfair competition claims. MGA alleged that Mattel engaged in "serial copycatting" of Bratz dolls, Bratz "pets" and other Bratz products, Bratz television commercials, and Bratz packaging.

F. Mattel's Second Motion to Remand its Complaint against Bryant

Mattel filed another motion to remand its suit against Bryant. In March of 2005, the district court issued an order denying the motion to remand and certifying the order for interlocutory review. Mattel filed an appeal, and the district court stayed discovery in May of 2005. Discovery did not resume until May 2006, when the Ninth Circuit affirmed the district court ruling. After the stay was lifted the district court consolidated all three actions for all purposes. There is no scheduling order currently in place.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

4

EXHIBIT 23

PAGE 836

G. Court Dismisses Bryant's Cross-claims and Declaratory Relief Action

In July of 2006, the district court dismissed Bryant's cross-claims pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief may be granted. The district court also dismissed Bryant's declaratory relief action, finding there existed no reasonable apprehension of an imminent copyright infringement claim against him by Mattel based upon Mattel's Toon Teen intellectual property.

H. Mattel's Counterclaims against MGA

Mattel sought leave to file an amended complaint in case no. CV 05-9059 to add five defendants and nine new legal claims alleging a wide range of commercial disputes. For example, Mattel's proposed amended complaint contains RICO claims, a trade secret misappropriation claim, and aiding and abetting claims predicated on allegations that MGA cherry-picked certain high ranking Mattel executives or designers and then enticed them to steal Mattel's trade and proprietary secrets and deliver them to MGA before beginning work with MGA. Mattel also sought leave to add a copyright infringement claim. Mattel has recently filed copyright registrations with the U.S. Copyright Office claiming ownership in various Bratz doll designs created by Bryant.

On January 11, 2007, the district court granted Mattel leave to file its proposed amendments, but only insofar as they are pled in the form of an amended answer and counterclaim in the case MGA filed against Mattel, CV 05-2727. The next day, Mattel filed its amendments as ordered in case no. CV 05-2727.

I. Mattel's Requests for Production of Documents

Mattel served the requests for production of documents at issue in this motion on June 14, 2004. Bryant served objections and responses on July 16, 2004. The parties met and conferred, but ultimately Mattel moved to compel production in January of 2005. That motion, however,

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

5

EXHIBIT _23_·

PAGE ___837___

1    was not heard before the district court stayed all discovery pending resolution of Mattel's appeal

2    to the Ninth Circuit on subject matter jurisdiction issues.

3         After the stay of discovery was lifted, the parties met and conferred on June 20, 2006, at

4    the courthouse, and were able to achieve apparent agreement on the bulk of the present motion to

5    compel. The parties informed the court that they would submit a stipulation and order. See

6    Minutes dated June 20, 2006, Zeller Dec. Ex. 6 ("With respect to Mattel's Motion to Compel

7    Production of Documents, counsel will be submitting a stipulation and order which will be

8    dispositive of all the issues in dispute.").

9

10        Over the next several months, the parties exchanged draft stipulations and orders to

11   memorialize the parties' meet and confer session, but were unable to reach final agreement

12   because Bryant insisted upon including the following sentence in the stipulation: "The stipulation

13   resolves all issues raised in Mattel's motion to compel, which is hereby withdrawn." Bryant's

14   Opposition at 1:18-20. By including this sentence, Bryant intended to prevent further law and

15   motion regarding the requests at issue in Mattel's original motion to compel. Id. at 1:21-23.

16   From Mattel's perspective, however, the proposed sentence amounted to a demand that Mattel

17   waive its right to all further discovery in connection with its requests. Mattel proposed the

18   following provision as an alternative:

19

20            Except as, and only as set forth in the terms of Paragraph One above, nothing in
             this Stipulation shall preclude or limit Mattel from seeking further discovery on
21           any matter, including as to matter on which the parties could not reach complete
             agreement, or preclude or limit any right of Bryant to object or resist to such
22           discovery.

23   Bryant's Opposition at 7:5-11. Apparently Mattel's alternative language was

24   unacceptable to Bryant. At the direction of the Discovery Master, the parties met and

25   conferred again in late December 2006, but to no avail.

26        Despite the parties' inability to reach final agreement, Bryant produced approximately

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                                    6

EXHIBIT 23

PAGE _____ 838

1,600 pages of documents to date. Mattel contends, however, that the production is inadequate and consistent with a pattern of stonewalling.[3] Accordingly, Mattel filed the instant motion to compel responsive documents, which includes a request for sanctions in the amount of $7,805.

    J.  Mattel's Motion to Compel Production of Documents

       Mattel's motion has three parts. First, Mattel seeks an order compelling Bryant to produce the following categories of requested documents: (a) documents relating to Bratz designs created by Bryant while employed by Mattel; (b) doll prototypes created by Bryant while working for Mattel; (c) documents that refer to the conception, creating or development of Bratz; (d) Mattel-related documents that Bryant disclosed to MGA; (e) communications between Bryant and MGA that relate to Mattel or Mattel employees; and (f) documents showing what dolls Bryant was exposed to while working at Mattel. Mattel's Motion at 6. Mattel asserts that these categories of documents are relevant to establish Bryant's liability and would reveal works rightfully owned by Mattel.

       Second, as to other categories of documents which Bryant has agreed to produce, Mattel contends that Bryant has imposed unjustified limitations. According to Mattel, Bryant will not produce any responsive documents that were created after the suit was filed; Bryant will not produce any communications with MGA "created" after the end of his Mattel employment; Bryant is limiting production of Bratz-related documents to designs that, in Bryant's view, "resulted in" the first line of Bratz dolls released in June 2001; Bryant has not produced known contracts between him and MGA and refuses to produce non-privileged communications relating to those contracts; and Bryant has withheld all but one category of financial documents relating to

---

[3]  According to Mattel, Bryant evaded a deposition until Mattel obtained a court order compelling him to appear. Similarly, MGA allegedly refused to permit its CEO, Isaac Larian, from being deposed. Mattel again obtained a court order compelling the deposition and sanctions. To date, only Bryant and Larian have been deposed.

Bryant v. Mattel, Inc.,
CV-04-09049 SOL (RNBx)

7

EXHIBIT 23

PAGE 839

his earnings from his work for MGA. Mattel's Motion at 7. Mattel seeks full production of responsive documents without any of the limitations described above.

Third, Mattel contends that the documents Bryant has produced are inadequate for a number of reasons: the financial documents are so heavily redacted they are useless; faxed documents are missing fax header information, including the sending and receiving parties[4]; e-mails and other electronic documents that are known to exist have not been produced; Bryant refuses to inspect, and refuses to permit Mattel to inspect, the hard drive of a computer he used during the relevant period; and Bryant's privilege log is facially incomplete and lists only four documents.

K. Bryant's Opposition to Mattel's Motion to Compel

Bryant opposes Mattel's motion to compel. He views the motion as nothing more than Mattel's unwillingness to allow closure on any discovery matter after a lengthy meet and confer process which began back in 2004. Bryant emphasizes that the document requests at issue were first propounded at a time when Mattel was attempting to remand the case, making the claim that it did not know whether $75,000 was in controversy and insisting that it was asserting solely state law claims. Bryant explains that given Mattel's view of the case in 2004, he took the position that discovery should be limited to what occurred in his last days at Mattel and shortly thereafter. See Bryant's Opposition at 4-5 ("Bryant's activities and earnings in connection with Bratz in later years could have no conceivable relevance to the case because if those activities and earnings were at stake, the case was worth millions, not pennies."). Accordingly, in the summer and fall of 2004, he produced the following categories of documents: documents evidencing the artwork used to create the "First Generation" of Bratz dolls – the first dolls sold to the public in the summer of 2001; hundreds of pieces of artwork he was permitted to retain from his employment

---

[4] There is evidence that MGA's CEO instructed an employee to obliterate the fax header on a fax Bryant sent to MGA from Mattel's Design Center. MGA denies the accusation.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

8

EXHIBIT 23

PAGE   840

1   at Mattel; MGA statements revealing his earnings connected with the sale of the First Generation

2   Bratz dolls and his 2000 contract with MGA; personal phone records and bank records; and

3   hundreds of three dimensional doll parts and toy accessories that came into his possession over

4   the years, including a prototype of the First Generation "Jade" doll.

5

6           Bryant generally agrees with Mattel's description of the meet and confer session held at

7   the courthouse on June 20, 2006 and the parties' exchange of draft stipulations.  According to

8   Bryant, all the requests addressed in Mattel's original motion to compel and the instant motion led

9   to agreement on the following points: (a) Bryant would produce all agreements for work he

10  performed with or on behalf of MGA prior to June 30, 2001 (the approximate date the First

11  Generation Bratz dolls were released to the public); (b) Bryant would waive the attorney-client

12  privilege with respect to communications with the attorney who assisted him in negotiating his

13  contract with MGA, so long as that waiver would be limited and in no way waive the privilege

14  with respect to litigation counsel; (c) Bryant would produce any documents relating to any

15  payments he received from MGA while employed at Mattel, irrespective of the date of creation;

16  (d) Bryant agreed to make a diligent search for all computers referenced in his deposition and

17  search them for responsive documents; (e) Bryant agreed to produce all documents and tangible

18  things obtained from Mattel during the course of his employment at Mattel; (f) Bryant agreed to

19  conduct a search and produce any patent, trademark or copyright applications, registrations and

20  other non-privileged documents in his possession in connection with his work with MGA prior to

21  June 2001; (g) Bryant agreed to identify documents responsive to particular requests if Mattel

22  could demonstrate that the requests asked for such identification of documents; (h) Bryant agreed

23  to sign a verification that none of the information redacted from his phone records related to Bratz

24  or his work for MGA prior to June 30, 2001; (i) Bryant agreed to supplement his privilege log;

25  and (j) the parties agreed that the stipulation modified Bryant's prior response to the discovery

26

27

28

29

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                                          9

EXHIBIT _23_

PAGE ___ 841

requests and that the stipulation controlled to the extent they were inconsistent. Bryant's Opposition at 5:22-6:21.

Bryant emphasizes that the parties have engaged in an extensive meet and confer process and asks the Discovery Master to order the disposition of this motion in a manner consistent with the parties' draft stipulation. If the draft stipulation is not adopted, Bryant fears the parties will have no incentive to compromise in the future. Bryant's Opposition at 1:24-2:3. Bryant also asks the Discovery Master to order Mattel not to revisit any of the requests that were the subject of Mattel's original motion to compel or the instant motion to compel. Id. at 2:11-13 and 10:9-10.

Furthermore, Bryant asserts that Mattel's requests are overbroad in numerous respects. In particular, Bryant asserts that Mattel is not entitled to all communications with MGA relating to Mattel employees. Bryant also asserts that Mattel is not entitled to unredacted personal phone records and financial information because these records are protected by privacy rights. Lastly, Bryant asserts that Mattel is not entitled to all Bratz related documents created after the lawsuit was filed.

### III. DISCUSSION

A. The Parties Did Not Reach a Stipulation to Resolve the Instant Motion

The parties' extensive submissions make it clear that the parties did not resolve the issues raised in the instant motion. The parties met and conferred extensively and in good faith, reaching compromises on virtually all categories of documents in dispute. Despite their efforts, however, the parties were ultimately unable to execute a binding stipulation because they were unable to agree on any provision to govern Mattel's future right to pursue additional discovery from Bryant. It is clear that the parties deemed it necessary to include such a provision in the draft stipulation in order to protect their respective positions. Because the parties did not execute a binding stipulation, there is no legal basis to enforce the terms contained in the draft stipulation.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

10

EXHIBIT 23
PAGE 842

Therefore, Mattel's right to the discovery it seeks in the instant motion to compel is governed by the familiar guidelines set forth in Rule 26 of the Federal Rules of Civil Procedure.

Furthermore, because the parties met and conferred in good faith and because they had a legitimate dispute over language governing Mattel's future right to pursue additional discovery from Bryant, the Discovery Master denies Mattel's request for sanctions.

B. Rule 26 of the Federal Rules of Civil Procedure

Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Fed.R.Civ.P. 26(b)(1). "Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Id. Discovery shall, however, be limited by the court if it determines that: "(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Fed.R.Civ.P. 26(b)(2).

C. Mattel's Requests for Production

Request Nos. 2, 13, 48: Documents Relating to Bryant's Agreements with MGA

Mattel seeks documents relating to Bryant's agreements with MGA, including doll-related agreements. Bryant is withholding responsive documents, including (a) documents relating to his Bratz agreements with MGA other than final signed agreements, including communications exchanged by the parties and drafts of the agreements, (b) documents relating to doll-related

EXHIBIT 23

PAGE 843

1   agreements discussed or negotiated by Bryant and third parties while he was employed by Mattel

2   other than signed agreements that were "reached" while Bryant was employed by Mattel, and (c)

3   documents relating to Bryant's fee agreements with MGA or other indemnity agreements relating

4   to this action.

5
6       The Discovery Master finds that the withheld documents are relevant to Mattel's claims.

7   Among other things, the withheld documents could establish the timing, nature and scope of

8   Bryant's work for MGA (or others), ongoing acts of copyright infringement, and damages.  In

9   addition, the withheld documents could be used for impeachment purposes.  Further, documents

10
11  relating to fee or indemnity agreements between MGA and Bryant are relevant to demonstrate

12  bias and lack of credibility.  Bryant has failed to establish that the requested discovery is barred

13  by Rule 26(b)(2), Fed.R.Civ.P.  Accordingly, Bryant is ordered to produce all non-privileged

14  documents responsive to Request Nos. 2, 13, and 48.

15
16      Request Nos. 11, 12, 19, 37, 40, 41, 42, 43, 53, 54, 55:  Documents Relating to Bratz's

17      Development and Other Projects that Bryant Worked on for MGA

18      Mattel seeks documents relating to the Bratz project and any other projects Bryant worked

19  on for MGA.  Bryant produced documents relating only to the First Generation Bratz dolls.

20
21  Bryant is prepared to produce additional documents relating to work he performed for MGA prior

22  to June 30, 2001, acknowledging that those documents are relevant to Mattel's claim that Bryant

23  breached his employee agreement by allegedly performing services for Mattel and MGA at the

24  same time.  Bryant objects to the requests to the extent they seek any additional documents on

25  relevancy and overbreadth grounds.

26
27      The Discovery Master finds that Mattel's requests seek relevant information and are not

28  overbroad.  The lawsuit is much broader than the First Generation Bratz dolls issued in June 30,

29  2001.  For example, Mattel alleges that it is entitled all works created by Bryant during his Mattel

Bryant v. Mattel, Inc.,                                                                          12
CV-04-09049 SGL (RNBx)

EXHIBIT 23

PAGE   844

employment, regardless of whether they resulted in a Bratz doll released in June of 2001. Mattel
also alleges that Bryant has breached his ongoing contractual duties not to use any of Mattel's
confidential and proprietary information, not just information relating to the Bratz dolls released
in June of 2001. Mattel also alleges that Bryant has infringed Mattel's alleged copyrights in Bratz
works – works that are allegedly owned by Mattel because they were created while Bryant was
employed by Mattel – through his ongoing conduct of reproducing and creating derivative works.
Accordingly, Bryant is ordered to produce all non-privileged documents responsive to Request
Nos. 11, 12, 19, 37, 40, 41, 42, 43, 53, 54, and 55.

> Request Nos. 29, 30, 31, 32, 33, 34, 35, 36, 45, 46: Documents Relating to Bryant's
>
> Payments from MGA

Mattel seeks documents relating to Bryant's payments from MGA. Bryant acknowledges
that Mattel is entitled to know how much money Bryant has earned from MGA, and represents
that he has produced, in redacted form, all royalty statements he has received related to the First
Generation Bratz dolls and his 2000 contract with MGA. Bryant asserts that his redactions are
justified as a means to avoid disclosing the breakdown of MGA's revenue by particular product,
which information Bryant believes constitutes MGA's trade secret information. Bryant also
objects to producing tax returns, asserting that Mattel cannot show a "compelling need" for the
returns. Bryant's Opposition at 29:21-27.

The Discovery Master finds that documents relating to MGA's payments to Bryant,
including royalty statements and other payment information, are relevant to several Mattel claims.
First, Mattel's claims against Bryant include breach of contract, breach of fiduciary duty, breach
of duty of loyalty, unjust enrichment, and conversion. Mattel seeks to recover all benefits Bryant
received as a result of his alleged violations of duties to Mattel. Payments to Bryant from MGA
and others might be traceable to work Bryant performed while employed by Mattel, regardless of

Bryant v. Mattel, Inc.,
CV-04-09049 SOL (RNBx)

13

when the payments were actually made. Such payments might also lead to evidence to support Mattel's allegation that Bryant converted, misappropriated, or misused Mattel information.

Second, the payments are relevant to Mattel's recently added claim for copyright infringement. Mattel alleges that Bryant, MGA, and others have infringed Mattel's rights in the Bratz drawings and works by copying and preparing derivative works from those works. Under the Copyright Act, a plaintiff is entitled to recover profits from infringement as well as actual damages. 17 U.S.C. §504(b). The works that potentially infringe Mattel's copyrights, therefore, include all Bratz doll products that MGA released to the market. For this reason, and for reasons already discussed in the previous subsection, Bryant's limited production of documents relating to only the First Generation of Bratz dolls is inadequate.

Third, payments to Bryant are relevant to Mattel's recently added claims for trade secret misappropriation. Payments could show when and what trade secret information Bryant and other defendants allegedly misappropriated from Mattel. Any proof of trade secret theft is also relevant to Mattel's defense against MGA's unfair competition claims.

Lastly, the breakdown of gross royalty payments may be required to prove actual causation of damages.

The protective order filed on January 4, 2005, is sufficient to address any confidentiality concerns raised by Bryant. Among other things, the protective order provides protection for confidential trade secret information. It has two tiers of protection, allowing a party to designate documents as either "Confidential" or "Confidential – Attorney's Eyes Only." The protective order also requires the parties to use information produced in discovery only for purposes of this litigation and not for any other purpose.

Accordingly, Bryant is ordered to produce, without redactions, all non-privileged documents responsive to Request Nos. 29, 30, 31, 32, 33, 34, 35, 36, 45, and 46. Bryant,

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

14

EXHIBIT 23

PAGE 846

1    however, is not required to produce tax returns, provided that he otherwise fully complies with

2    these requests as ordered.

3         Request Nos. 20, 23, 27, 28: Communications Between Bryant and MGA

4         Mattel seeks production of Bratz-related communications and communications with

5
6    MGA. More specifically, Mattel seeks production of four categories of documents Bryant has

7    refused to produce: (1) communications between Bryant and MGA or third parties that explicitly

8    relate to designs Bryant created while employed by Mattel; (2) communications between Bryant

9    and MGA that relate to Mattel employees; (3) communications between Bryant and MGA relating

10
11   to Bryant's Mattel employment or work Bryant performed for Mattel, except those

12   communications "created" prior to the close of Bryant's Mattel employment; and (4)

13   communications between Bryant and MGA that post-date Bryant's Mattel employment. Bryant

14   contends that the discovery requests for communications between Bryant and MGA are

15
16   overbroad. Bryant asserts that there are many former Mattel employees and friends of his who

17   have privacy rights that would be impinged upon if he were to disclose his communications.

18   Bryant also asserts that he has his own confidentiality interest regarding any information that he

19   shared with MGA. In particular, he objects to Mattel's discovery requests to the extent they

20   would require him to reveal the identity of current Mattel employees seeking employment with

21
22   MGA or Bryant.

23        The Discovery Master finds that Mattel's requests for all communications between Bryant

24   and MGA unquestionably seek information relevant to Mattel's claims: they will reveal what

25   Mattel information Bryant shared with MGA, if any, and when. The protective order is sufficient

26
27   to address Bryant's confidentiality concerns. It allows parties to designate as "Confidential"

28   private information about current or former employees, contractors or vendors (including

29   employee, contractor and personnel records). Therefore, Bryant is ordered to produce all non-

EXHIBIT 23

PAGE____847

privileged documents responsive to Request Nos. 20, 23, 27, and 28. However, Bryant may continue to redact his telephone records, and shall provide a signed verification that none of the telephone calls that were redacted relate or refer in any way to MGA, Bratz, or any other project that Bryant worked on, with, for, or on behalf of MGA. Telephone calls that do not relate or refer in any way to MGA or Bratz are irrelevant.

Request Nos. 49, 51: Mattel-Related Documents

Mattel seeks production of Mattel-related documents, and Bryant agrees to produce them. Accordingly, Bryant is ordered to produce all documents responsive to Request Nos. 49 and 51.

Request No. 9: Documents re Registrations and Applications for Registrations

Lastly, in Request No. 9 Mattel seeks production of documents registrations and registrations and applications for registration. Bryant deems the motion moot with respect to Request No. 9 because he agrees to produce any patent, copyright and trademark applications, registrations or other non-privileged documents in his possession, custody or control that constitute or relate to such applications and registrations obtained or applied in connection with (1) work on Bratz prior to January 1, 2001; (2) work related to the release of the First Generation Bratz dolls; and (3) work related to any work Bryant performed with, for or on behalf of MGA during the term of Bryant's employment with Mattel.

As discussed previously, the Discovery Master finds that the First Generation Bratz limitation is improper. Therefore, Bryant is ordered to produce all non-privileged documents responsive to Request No. 9.

IV. CONCLUSION

For the reasons set forth above, the Discovery Master orders as follows:

1. Mattel's motion to compel production of documents responsive to its First Set of Requests for Production, Request Nos. 2, 9, 11, 12, 13, 19, 20, 23, 27, 28, 29, 30, 31, 32, 33, 34,

1  35, 36, 37, 40, 41, 42. 43. 45, 46, 48, 49, 51, 53, 54, and 55, is GRANTED. However, Bryant

2  need not produce his tax returns, on the condition that he complies fully with Request Nos. 29, 30,

3  31, 32, 33, 34, 35, 36, 45, and 46.

4      2. Bryant shall produce all redacted documents in un-redacted form, except for redactions

5
6  that are justified by the attorney-client privilege or work product doctrine or his telephone records

7  pursuant to the terms of this Order.

8      3. Bryant shall serve a complete privilege log in conformity with Rule 26(b)(5),

9  Fed.R.Civ.P.

10
11     4. Pursuant to Rule 34, Fed.R.Civ.P., Bryant shall produce the hard drives of his

12 computers for forensic imaging.

13     5. Bryant shall complete his production by producing missing attachments, fax cover

14 pages and all other missing responsive documents.

15     6. Mattel's request for an award of sanctions in the amount of $7,805 is DENIED.

16
17     7. Bryant shall comply with this Order no later than February 23, 2007.

18 Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery Master,

19 Mattel shall file this Order with the Clerk of Court forthwith.

20
21
22 IT IS SO ORDERED.

23
24 Dated: January 25, 2007

25

HON. EDWARD A. INFANTE (Ret.)
Discovery Master

26
27
28
29

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

17

EXHIBIT 23
849
PAGE _____

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on January 25,

2007, I served the attached ORDER GRANTING MATTEL'S MOTION TO COMPEL

PRODUCTION OF DOCUMENTS in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| Robert Millman Esq. | Littler Mendelson | rfmillman@littler.com |
| Douglas Wickham Esq. | Littler Mendelson | dwickham@littler.com |
| Keith Jacoby Esq. | Littler Mendelson | kjacoby@littler.com |
| Dominic Messiha Esq | Littler Mendelson | dmessiha@littler.com |
| Diba Restagar Esq. | Littler Mendelson | drestagar@littler.com |
| Michelle Park Esq. | Littler Mendelson | mpark@littler.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | jbq@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Valerie Nannery Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | valerienannery@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Morris Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgetmorris@quinnemanuel.com |
| Tamar Buchjakian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchjakjian@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendall@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| Benjamin Kim Esq. | O'Melveny & Myers LLP | bjkim@omm.com |
| Hamid Jabbar Esq. | O'Melveny & Myers LLP | hjabbar@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrismill.com |

EXHIBIT _23_

PAGE ___ 850