# EXHIBIT 24

CONFORMED COPY
LODGED

FILED

2007 MAY 16  PM 1:59   2007 MAY 16  PM 2:00

CLERK U.S. DISTRICT COURT   CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.     CENTRAL DIST. OF CALIF.
        RIVERSIDE                   RIVERSIDE

BY_____          BY_____

1   Hon. Edward A. Infante (Ret.)
    JAMS
2   Two Embarcadero Center
    Suite 1500
3   San Francisco, California 94111
    Telephone:   (415) 774-2611
4   Facsimile:   (415) 982-5287

5

6

7                    UNITED STATES DISTRICT COURT

8                   CENTRAL DISTRICT OF CALIFORNIA

9                          EASTERN DIVISION

10

11  CARTER BRYANT, an individual,          CASE NO. C 04-09049 SGL (RNBx)
                                           JAMS Reference No. 1100049530
12         Plaintiff,

13         v.                              Consolidated with
                                           Case No. CV 04-09059
14  MATTEL, INC., a Delaware corporation,  Case No. CV 05-2727

15         Defendant.                      ORDER GRANTING MATTEL'S
                                           MOTION TO COMPEL PRODUCTION
16                                         OF DOCUMENTS AND
                                           INTERROGATORY RESPONSES BY
17  CONSOLIDATED WITH                      MGA
    MATTEL, INC. v. BRYANT and
18  MGA ENTERTAINMENT, INC. v. MATTEL,
    INC.
19

20                       I.  INTRODUCTION

21       On February 2, 2007, Mattel, Inc. ("Mattel") submitted its Motion To Compel Production

22  of Documents and Interrogatory Answers by MGA Entertainment, Inc. ("MGA").  On February

23  20, 2007, MGA submitted its opposition brief, and on February 26, 2007, Mattel submitted a

24  reply brief.  The matter was heard on March 5, 2007.  Thereafter the motion was taken under

25  submission pending the parties' submission of a proposed protective order, which was received

26

27

28  Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)                                                    1

EXHIBIT  24
851

PAGE_____

1   on April 23, 2007. Having considered the motion papers and comments of counsel at the hearing,

2   Mattel's motion to compel is granted.

3                          II. BACKGROUND

4      A. Requests for Documents

5        In June of 2004, two months after Mattel filed suit against Bryant, and before MGA

6   became a party to the action, Mattel served MGA with an eight-page subpoena for twenty-one

7   categories of documents, to be produced in ten days. MGA filed a motion to quash, which the

8   court granted because of the short amount of time provided for compliance with the subpoena.

9   The parties met and conferred in July of 2004, and reached an agreement to limit the scope of

10   some of Mattel's requests. In particular, the parties agreed to limit production to the "first

11   generation" Bratz dolls. On August 12, 2004, MGA produced documents.

12        In 2005, the parties stipulated to supplementing their document productions on May 16,

13   2005. Mattel agreed to continue limiting its discovery requests to "first generation" Bratz dolls.

14        In September of 2006, MGA made a supplemental production of documents. On February

15   5, 2007, MGA produced about 2,300 pages of documents to replace earlier produced documents

16   with legibility problems. On February 20, 2007, MGA produced an additional 224 pages of

17   documents to replace earlier produced documents with legibility problems.

18        Mattel now moves to compel MGA to produce documents responsive to its requests. As a

19   preliminary matter, Mattel contends that MGA's production is deficient because it contains

20   redactions and cut-off text. Further, Mattel contends that MGA's production is incomplete with

21   respect to essentially five categories of documents. First, Mattel contends that MGA is

22   withholding documents relating to the origins of Bratz and Bryant's work for MGA. Mattel

23   believes that MGA's production is incomplete based upon its review of documents that have been

24   produced by third party Steven Linker. According to Mattel, Linker's documents from October

25   of 2000 show that Bratz was much farther along before Bryant left Mattel than MGA or Bryant

26   previously represented. Mattel also contends that MGA's responses to the document requests

27

28   Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)
                                2

EXHIBIT 24

PAGE 852

1  contain inappropriate limitations, such as MGA's statement that it will produce "relevant and

2  responsive non-objectionable documents" or only that it will produce documents "sufficient" to

3  show when certain dates relating to Bratz occurred. Mattel contends that these "carve outs

4  purport to allow MGA to cherry-pick what it will and will not produce to Mattel." Mattel's

5  Separate Statement at 17:11-13. Mattel also contends that the carve-outs fail to provide notice of

6  what is or is not being withheld. Mattel also contends that MGA's objections based upon its

7  confidentiality concerns or the privacy rights of third parties are unwarranted in light of the

8  protective order in place. In addition, Mattel contends that MGA's objection to producing

9  documents relating to activities or conduct in foreign countries is wholly improper because those

10  documents may contain information relevant to Mattel's claims.

11       ·     Second, Mattel seeks documents relating to the origins of Bratz, regardless of whether

12  such documents relate to the "first generation" Bratz dolls. Mattel argues that whether the work

13  ultimately resulted in Bratz dolls that were released at a particular time does not matter for

14  discovery purposes. Mattel contends that the works created by Bryant during his Mattel

15  employment are highly relevant because Mattel owns them, regardless of whether they resulted in

16  a Bratz doll released at a particular time.[1]

17       Mattel next contends that MGA is improperly withholding documents about designs

18  Bryant created on Bratz dolls that were released after June 2001, even though such designs may

19  be derivative of work he did when employed by Mattel. Mattel contends that it is entitled to

20  explore whether such works and the profits from Bratz dolls other than the "first generation"

21  Bratz dolls were derived from works owned by Mattel both for purposes of establishing liability

22  and damages. Furthermore, Mattel asserts that the "first generation" limitation on discovery is

23  improper in light of Bryant's continuing duty not to use Mattel's confidential and proprietary

24  information as well as MGA's unfair competition claims.

25

26       [1] Mattel also reiterates many of the arguments it made previously in connection with its earlier filed motion to compel Bryant to produce documents.

27

28  Bryant v. Mattel, Inc.,
   CV-04-09049 SGL (RNBx)

                                    3

EXHIBIT 24

PAGE 853

1    Mattel also asserts that MGA is improperly withholding documents relating to products,
2  services and matters other than those relating to "dolls." According to Mattel, it has evidence that
3  Bryant conceived of marketing and advertising ideas for the Bratz line while he was employed by
4  Mattel. Mattel contends that any such ideas or contributions may belong to it pursuant to the
5  Inventions Agreement.

6    Third, Mattel seeks documents relating to all of MGA's payments to Bryant, and not just
7  payments for the "first generation" Bratz dolls. Mattel asserts that such information is relevant
8  because (1) Mattel seeks all benefits Bryant received as a result of violating his duties to Mattel;
9  (2) under the Copyright Act, Mattel is entitled to all profits from infringement as well as actual
10  damages; and (3) payments may show when and what trade secret information Bryant and other
11  defendants allegedly misappropriated from Mattel.

12    Fourth, Mattel seeks documents relating to MGA's agreements with Bryant. Mattel
13  contends that all agreements between Bryant and MGA are relevant, not just the original
14  September 18, 2000 agreement. In particular, Mattel contends that it is entitled to discover all
15  documents relating to MGA and Bryant's alleged joint defense agreement because such
16  information would be relevant to demonstrate bias and lack of credibility.

17    Fifth, Mattel seeks production of all declarations, affidavits and other sworn written
18  statements from other cases that refer or relate to Bratz or Angel. Mattel contends that such
19  information may reveal relevant information about the date of creation of Bryant's Bratz
20  drawings.

21    In response, MGA denies withholding responsive documents and asserts that it has
22  produced volumes of documents responsive to Mattel's requests. In particular, MGA represents
23  that it has produced all responsive and relevant documents that it was able to locate in response to
24  request nos. 6, 7, 9, 26, 27, 32, 33, 34, 35, 36, 55, 69, and 70. Further, MGA asserts that even
25  before the motion was filed, it had agreed to address the vast majority of the issues raised in this
26  motion. In particular, MGA represents that it is diligently working to produce documents related
27
28

1  to Bratz other than "first generation" Bratz in response to request nos. 1, 2, 8, 10, 11, 43, 45, 46,

2  49, 50, 51, 53, 57, 59, 61, 63, 64, 66, 96, 97, 98, 99 and 100.  MGA represents that it informed

3  Mattel that it would produce documents pertaining to subsequent generations of Bratz dolls that

4  have been released on the market. In addition, MGA represents that it has agreed to produce

5  documents relevant to Bratz or Prayer Angels that it received from Union Bank.  More

6  specifically, MGA represents that it agreed to review and produce documents provided to it by

7  Union Bank for the years 1999 – 2001 concerning payments that it could identify as being for

8  Bratz or Prayer Angels.  MGA also represents that it has agreed to produce royalty statements.

9  Therefore, MGA views the motion as unnecessary.

10         MGA next contends that Mattel's motion should be denied for the following additional

11  reasons.  First, MGA contends that Mattel is not entitled to MGA's product design documents for

12  unreleased products.  MGA asserts that its product design documents for its unreleased toy

13  concepts are among its most highly valuable trade secrets.  Furthermore, MGA contends that

14  designs and drawings for products currently under development, over six years after Bryant first

15  created his original Bratz drawings, have no relevance to any of Mattel's claims.  In the event that

16  documents relating to unreleased products are ordered produced, MGA requests a protective order

17  under Rule 26(c), Fed.R.Civ.P., that limits the dissemination of its documents more drastically

18  than the current protective order provides.  In the alternative, MGA requests that any order

19  compelling production of documents relating to unreleased products should essentially be stayed

20  until after MGA's products are publicly released.

21         Second, MGA contends that Mattel is not entitled to information concerning Bryant's

22  attorneys' fees because the information is privileged.  Furthermore, MGA contends that the

23  information is not relevant to demonstrate bias because "there is no dispute that Bryant's interests

24

25

26

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

5

EXHIBIT 24

PAGE _____ 855

1  in this case are aligned with those of MGA, and that Bryant is 'biased' in that sense." MGA's

2  Opposition at 24:9-12.[2]

3       Third, MGA asserts that Mattel is not entitled to review all non-public witness statements

4  and litigation documents concerning Bratz for a variety of reasons, including because Mattel has

5  refused to produce similar types of documents. More significantly, MGA contends that Mattel's

6  requests for non-public witness statements are "a blatant attempt to avoid the discovery

7  limitations imposed by both the Federal Rules of Civil Procedure and those additional limitations

8  imposed by this Court." MGA's Opposition at 25:6-7. MGA explains its position as follows.

9  MGA is involved in litigation against a number of counterfeiters and infringers in Asia. In 2003,

10  Mattel allegedly began feeding documents concerning "Toon Teens" to those defendants in an

11  attempt to prove that Bryant created Bratz while working at Mattel, even though Mattel

12  abandoned its claims based upon "Toon Teens" in this court. Thereafter, those defendants took

13  the position that MGA did not own, and therefore could not enforce, the rights to Bratz. MGA

14  was thus forced to litigate the issue of ownership. MGA contends that "[i]n effect, by prompting

15  foreign counterfeiters to espouse a theory that Mattel now admits has no merit, Mattel has created

16  a situation in which MGA has been forced to give testimony and provide evidence related to

17  issues in this case that Mattel now seeks to obtain wholesale." MGA's Opposition at 25:5-24.

18       Fourth, MGA contends that Mattel is not entitled to documents concerning a family

19  dispute between MGA's chief executive officer and his brother because such documents are in no

20  way relevant to this lawsuit. MGA explains that the brothers were involved in an arbitration

21  proceeding relating to MGA's CEO's purchase of his brother's interest in MGA. Moreover,

22  MGA contends that the brothers were bound by a protective order prohibiting the use of any

23  documents or testimony for any purpose other than the arbitration.

24

25

26      [2] Nevertheless, MGA represents that it has produced the only non-privileged document responsive to the
request.

27

28  Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

        6

EXHIBIT 24

PAGE 856

1       Fifth, MGA contends that Mattel is not entitled to its chief executive officer's personnel

2  files because they contain confidential information and are not relevant to the lawsuit. Sixth,

3  MGA contends that Mattel is not entitled to obtain documents from MGA that belong to, and are

4  in the possession, custody and control of, its indirect foreign subsidiary, MGA HK Ltd. Lastly,

5  MGA objects to producing documents relating to any testing performed to determine the date that

6  Bratz documents were created. MGA contends that such discovery is premature and should not

7  proceed until experts are designated.

8      B. Interrogatories

9      On April 28, 2005, Mattel served its Second Set of Interrogatories. On May 20, 2005,

10  however, the district court stayed the action. On May 17, 2006, the district court lifted the stay.

11  On May 30, 2006, MGA responded to the interrogatories.

12      Mattel contends that MGA's responses to the interrogatories were untimely. Further,

13  Mattel contends that the interrogatory responses to numbers five through eleven are deficient

14  because they lack substantive information and consist almost entirely of objections. MGA

15  responds that the motion is moot because it is prepared to provide supplemental responses to its

16  interrogatories. MGA does not otherwise assert any additional grounds for opposing Mattel's

17  motion to compel responses to interrogatories.

18                  III. DISCUSSION

19     A. Rule 26 of the Federal Rules of Civil Procedure

20      Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain

21  discovery regarding any matter, not privileged, that is relevant to the claim or defense of any

22  party." Fed.R.Civ.P. 26(b)(1). "Relevant information need not be admissible at trial if the

23  discovery appears reasonably calculated to lead to the discovery of admissible evidence." Id.

24  Discovery shall, however, be limited by the court if it determines that: "(i) the discovery sought is

25  unreasonably cumulative or duplicative, or is obtainable from some other source that is more

26  convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample

27

28  Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)                           7

EXHIBIT 24

PAGE 857

1  opportunity by discovery in the action to obtain the information sought; or (iii) the burden or
2  expense of the proposed discovery outweighs its likely benefit, taking into account the needs of
3  the case, the amount in controversy, the parties' resources, the importance of the issues at stake in
4  the litigation, and the importance of the proposed discovery in resolving the issues." Fed.R.Civ.P.
5  26(b)(2).

6      B. Document Requests

7        1. Requests re Origins of Bratz and Bryant's Work for MGA (Nos. 6, 26, 27, 32, 33,
8        34, 35, 51, 53, 55, 64, 69, 96, 97, 98, 99, 100

9      The requests above seek discoverable information regarding the origins of Bratz and
10  Bryant's work for MGA. MGA represents that it has produced all responsive documents in
11  response to request nos. 6, 26, 27, 32, 33, 34, 35, 55,and 69 (MGA's Opposition at 13:4-5), and is
12  "diligently working to produce documents in response to" request nos. 51, 53, 64, 96, 97, 98, 99,
13  and 100, including documents related to Bratz other than "first generation" (MGA's Opposition at
14  14:1-4 and note 39). MGA does, however, object to producing design documents for unreleased
15  products and documents from MGA Hong Kong.

16      As a threshold matter, MGA's responses are inadequate to the extent MGA has restricted
17  its production to "relevant and responsive non-objectionable documents" or documents
18  "sufficient" to show when events relating to Bratz occurred. These restrictions suggest that MGA
19  might be excluding documents that are responsive to the request based upon its unilateral
20  determination of what is "relevant" or "sufficient." Mattel shall provide the responses to
21  document requests ordered herein without these restrictions.

22          Design Documents for Unreleased Products

23      MGA's design documents for unreleased products are relevant to Mattel's claims and
24  defenses and must be produced. See Order Modifying Protective Order. On April 23, 2007, the
25  parties submitted a stipulation to modify the existing protective order to limit the disclosure of
26  design documents for unreleased products that constitute trade secret information. See Stipulation

27

28
Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

8

EXHIBIT _24_

PAGE _____ 858

1  to Modify Protective Order; And Proposed Order Thereon ("stipulation").  The parties' stipulation

2  has been approved and entered as an order of the court.  MGA is ordered to produce design

3  documents for unreleased products that are responsive to Mattel's document requests in

4  accordance with the terms of the stipulation and order.

5  Documents from MGA Hong Kong

6       Documents relating to activities or conduct in foreign countries are relevant and

7  discoverable because Mattel has evidence indicating that MGA Hong Kong was involved with

8  Bratz.  Nevertheless, MGA objects to producing documents from Hong Kong unless Mattel

9  provides reciprocal discovery from its subsidiaries.

10       Whether MGA is entitled to discovery from Mattel's subsidiaries has not been briefed in

11  the context of this motion, and therefore is not addressed herein.  MGA is ordered to produce

12  documents from MGA Hong Kong.

13       Mattel's motion is granted with respect to request nos. 6, 26, 27, 32, 33, 34, 35, 51, 53, 55,

14  64, 69, 96, 97, 98, 99, 100.

15       2. Additional Requests re Origins of Bratz (Nos. 7, 8, 9, 10, 11, 12, 13, 36, 46, 57, 59,

16           61, 63, 66, 67, 70, 88, 90, 91

17       Mattel contends that MGA is improperly limiting its document production to the "first

18  generation" Bratz dolls.  MGA represents, however, that it has agreed to produce subsequent

19  generations of Bratz products (MGA's Opposition at 9:20-25, 13:6-14:1), except design

20  documents for yet unreleased products.

21       As stated previously, design documents for yet unreleased products are relevant and

22  discoverable.  See Order Modifying Protective Order.  Accordingly, MGA is ordered to produce

23  all non-privileged documents that are responsive to request nos. 7, 8, 9, 10, 11, 12, 13, 36, 46, 57,

24  59, 61, 63, 66, 67, 70, 88, 90, and 91.

25      //

26      //

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

9

EXHIBIT 24

PAGE 859

1        3. MGA's Payments to Bryant (Nos.43, 45)

2        MGA represents that it has already agreed to produce documents related to Bratz, without

3    limiting its production to "first generation" Bratz. MGA's motion at 13:7-14:3. Nevertheless,

4    Mattel is entitled to an order compelling production of such documents by a date certain. Mattel's

5    motion is granted with respect to request nos. 43 and 45.

6        4. MGA's Agreements with Bryant (Nos. 1, 2, 49, 50)

7        MGA represents that it has already agreed to produce non-privileged documents

8    responsive to request nos. 1, 2, 49, and 50, even though it believes that such documents are not

9    relevant (MGA's motion at 13:7-14:3). These requests seek documents relating to fee or

10   indemnity agreements between MGA and Bryant .

11       Fee or indemnity agreements are relevant to demonstrate bias and lack of credibility.

12   Accordingly, Mattel's motion is granted with respect to request nos. 1, 2, 49, and 50. Any

13   responsive documents withheld on the basis of a privilege must be properly identified in a

14   privilege log.

15       5. Declarations, Affidavits & Other Sworn Written Statements (Nos. 37, 38, 39, 40,

16       41.

17       In request nos. 37, 38, 390, 40, and 41, Mattel seeks production of declarations, affidavits,

18   and other sworn written statements from cases that refer or relate to Bratz or Angel. Mattel

19   anticipates that these documents could provide evidence relating to the conception date for Bratz.

20       Request nos. 37, 38, 39, 40, and 41 seek relevant information regarding the conception

21   date for Bratz. MGA admits in its opposition brief that this issue was litigated in its suits against

22   alleged counterfeiters and infringers.[3] The issue also appears to have been raised in the

23   arbitration proceedings between MGA's chief executive officer, Isaac Larian, and his brother

24   Farhad Larian. In those proceedings, Farhad Larian alleged that Isaac Larian concealed from him

25   
_____

26      [3] Although MGA questions the propriety of Mattel providing assistance to the alleged counterfeiters and infringers in raising ownership of Bratz as a defense against MGA's claims, MGA has not cited to any legal authority that prohibits Mattel's conduct.

27   

28   Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)

    10

EXHIBIT 24

PAGE _____ 860

1   that MGA was developing Bratz by early 2000.  Nevertheless, MGA objects to producing

2   documents from the Larians' arbitration on the grounds that the arbitration was governed by a

3   protective order that prohibits the use of any documents or testimony for any purpose other than

4   the arbitration.  MGA, however, has not provided any evidence of the protective order.

5   Accordingly, Mattel's motion to compel is granted as to request nos. 37, 38, 39, 40 and 41.[4]

6         6. Documents Regarding Date-Testing (Request No. 92)

7         Mattel's request no. 92 seeks documents that refer or relate to "any testing of or sampling

8   from any documents that refer or relate to Bratz or Bryant, including without limitation any such

9   testing or sampling in connection with ink, paper or chemical analysis to date any such documents

10   and including without limitation all results and reports relating thereto."  MGA contends that the

11   request is premature, and should proceed in the course of expert discovery.

12         The request calls for relevant discovery and there is no basis for delaying production of

13   responsive documents, other than expert reports.  The timing of expert reports is governed by

14   Rule 26(a)(2)(C), Fed.R.Civ.P.  Accordingly, Mattel's motion is granted as to request no. 92.

15         C. Interrogatories

16         Mattel contends that MGA's responses to interrogatories were untimely, and therefore

17   MGA has waived its objections to the interrogatories.  Pursuant to Rule 33(b)(3), Fed.R.Civ.P.,

18   responses to interrogatories are due thirty days after service.  In this case, Mattel served its

19   interrogatories on April 28, 2005, and responses were initially due May 31, 2005.  The district

20   court, however, issued a stay on May 20, 2005, twenty-two days after the interrogatories were

21   served.  The district court lifted the stay on May 17, 2006.

22

23

24

25

26         [4]   In its discussion of the arbitration proceedings, MGA raises an objection to producing Isaac Larian's
     personnel file based upon privacy grounds.  The personnel file may have documents relevant to Bratz, and therefore
27   should be produced.  The protective order is sufficient to alleviate Mr. Isaac Larian's privacy concerns.

28

EXHIBIT  24

PAGE _____ 861

1    Neither party has cited to any caselaw governing the calculation of the 30-day period
2 when there is an intervening stay in discovery. In the absence of any caselaw, MGA's responses
3 will be treated as timely in order to preserve any valid objections MGA may have asserted.

4    Interrogatory No. 5 seeks the identity of each and every person who was involved in the
5 conception, origin, creation, design, development, sculpting, engineering, reduction to practice,
6 tooling or painting of, or who otherwise produced or contributed to any embodiment of Bratz
7 before December 31, 2001, including a description of each person's role and the start and end
8 dates of each person's involvement. In response, MGA asserted numerous objections, but did
9 provide the names of five individuals.

10    The interrogatory clearly seeks information relevant to the claims at issue. MGA's
11 objections are without merit. The interrogatory is not vague, ambiguous, compound or overbroad.
12 Nor has MGA carried its burden of establishing that the interrogatory is unduly burdensome, calls
13 for confidential, proprietary or commercially sensitive information, or seeks information
14 protected by the attorney-client privilege. Furthermore, MGA's response is incomplete insofar as
15 it fails to provide the description of each person's role and the start and end dates of each person's
16 involvement. Accordingly, MGA is ordered to provide a complete response to Interrogatory No.
17 5 and identify documents in compliance with Rule 33(d), Fed.R.Civ.P.

18    Interrogatory No. 6 seeks the same information as Interrogatory No. 5 with respect to any
19 embodiment of Angel. MGA is ordered to provide a complete response to Interrogatory No. 6 for
20 the reasons previously discussed in connection with Interrogatory No. 5.

21    Interrogatory No. 7 asks MGA to identify each and every embodiment of Bratz prior to
22 December 31, 2001. In response, MGA asserted numerous objections and did not provide any
23 substantive information.

24    MGA's objections are without merit. The interrogatory clearly seeks information relevant
25 to establishing when Bryant first conceived Bratz. The interrogatory is not vague, ambiguous,
26 compound or overbroad. Nor has MGA carried its burden of establishing that the interrogatory is

27

28
Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

12

EXHIBIT __24__

PAGE____862

1  unduly burdensome, calls for confidential, proprietary or commercially sensitive information, or

2  seeks information protected by the attorney-client privilege. Accordingly, MG is ordered to

3  provide a complete response to Interrogatory No. 7.

4      Interrogatory No.8 asks MGA to identify each and every embodiment of Angel. MGA is

5  ordered to provide a complete response to Interrogatory No. 8 for the reasons previously

6  discussed in connection with Interrogatory No. 7.

7      Interrogatory No. 9 requires MGA to identify each and every sworn statement that refers

8  or relates to the conception, origin, creation, design, development, sculpting, engineering, tooling

9  or painting of Bratz. In response, MGA asserted numerous objections and did not provide any

10  substantive information.

11      The interrogatory seeks information relevant to establishing when Bryant first conceived

12  Bratz. Furthermore, MGA's boiler-plate objections are unsubstantiated. Accordingly, MGA is

13  ordered to provide a complete response to Interrogatory No. 9.

14      Interrogatory No. 10 requires MGA to identify each and every instance in which Bratz

15  was shown, displayed, or exhibited prior to June 1, 2001, including by stating the date(s) on

16  which each such instance occurred, the location of each show or exhibit, and the identity of

17  persons with knowledge of the shows or exhibits. In response, MGA asserted numerous

18  objections and provided the following information: Hong Kong Toy Fair in Hong Kong in or

19  about January 2001 and New York Toy Fair, New York, in or about February 2001.

20      Once again, MGA's boiler-plate objections are unsubstantiated. The information is

21  potentially relevant to establish when Bryant conceived Bratz. Further, the response is

22  incomplete insofar as it fails to identify any persons with knowledge. Therefore, MGA is ordered

23  to provide a complete response to Interrogatory No. 10.

24      Interrogatory No. 11 requires MGA to state the "number for each and every telephone,

25  including without limitation each office, home and cell phone number, in the name of, for the

26  benefit of or for the account of Isaac Larian and any other telephone that Isaac Larian used from

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

13

EXHIBIT 24

863

PAGE

1   January 1, 1998 through the present, and IDENTIFY each and every carrier (including without

2   limitation any long-distance carrier) for each such number.  In response, MGA asserted numerous

3   boiler-plate objections.

4          Once again, MGA has failed to substantiate any of its objections with supporting

5   declarations or legal authorities.  Accordingly, all objections are overruled and MGA is ordered to

6   provide a full response to Interrogatory No. 11.

7                                    IV. CONCLUSION

8          For the reasons set forth above, Mattel's motion to compel production of documents is

9   granted.  MGA shall produce all non-privileged documents that are responsive to the requests

10  identified in this Order.  Further, MGA shall produce all documents in un-redacted form, except

11  for redactions that are justified by the attorney-client privilege or work product doctrine.  Mattel's

12  motion to compel interrogatory answers is also granted.  MGA shall produce documents and

13  provide responses to interrogatories consistent with this Order, and produce a privilege log in

14  compliance with Rule 26(b)(5), Fed.R.Civ.P., no later than May 31, 2007.  Mattel's request for

15  sanctions is denied.

16         Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery

17  Master, Mattel shall file this Order with the Clerk of Court forthwith.

18

19

20

21  Dated: May 15, 2007

22                                    HON. EDWARD A. INFANTE (Ret.)
                                      Discovery Master

23

24

25

26

27

28
    Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)

                                                                                    14

EXHIBIT 24

PAGE _____ 864

# EXHIBIT 25

## CONFORMED COPY

FILED

2007 JUN 20   PM 1:12

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

BY ___

1  Hon. Edward A. Infante (Ret.)
   JAMS
2  Two Embarcadero Center
   Suite 1500
3  San Francisco, California 94111
   Telephone:    (415) 774-2611
4  Facsimile:    (415) 982-5287

5

6

7                UNITED STATES DISTRICT COURT

8                CENTRAL DISTRICT OF CALIFORNIA

9                        EASTERN DIVISION

10

11 CARTER BRYANT, an individual,                    CASE NO. C 04-09049 SGL (RNBx)
                                                    JAMS Reference No.1100049530
12        Plaintiff,

13    v.                                            Consolidated with
                                                    Case No. CV 04-09059
14 MATTEL, INC., a Delaware corporation,            Case No. CV 05-2727

15        Defendant.                                **ORDER GRANTING IN PART AND
                                                    DENYING IN PART MATTEL'S
16                                                  MOTION TO ENFORCE THE
                                                    COURT'S ORDER OF JANUARY 25,
17                                                  2007, TO COMPEL PRODUCTION OF
                                                    DOCUMENTS BY CARTER BRYANT
18                                                  AND FOR SANCTIONS**

19 CONSOLIDATED WITH
   MATTEL, INC. v. BRYANT and
20 MGA ENTERTAINMENT, INC. v. MATTEL,
   INC.
21

22

23

24                        I. INTRODUCTION

25        On May 15, 2007, Mattel, Inc. ("Mattel") submitted its "Motion to Enforce the Court's

26 Order of January 25, 2007, to Compel Production of Documents by Carter Bryant and for

27

28 Bryant v. Mattel, Inc.,                                                    1
   CV-04-09049 SGL (RNBx)

EXHIBIT 25
                                                    865          4|19|07
PAGE ___

1   Sanctions." On May 18, 2007, Carter Bryant ("Bryant") submitted his opposition brief, and on

2   May 23, 2007, Mattel submitted a reply brief. Mattel essentially seeks an order compelling

3   Bryant to produce copies of a document identified on Bryant's privilege log that has been

4   withheld on the basis of the attorney-client privilege.[1] Having considered all the papers submitted

5   by the parties, Mattel's motion to produce the two documents withheld under a claim of privilege

6   is granted and the request for sanctions is denied.

II. BACKGROUND

7

8       In early January of 2007, Mattel filed a motion to compel Bryant to produce, among other

9   things, his fee agreement with MGA in response to Request Nos. 2, 13, and 48. Bryant argued

10  that such agreements are irrelevant and privileged. The Discovery Master held that the

11  documents relating to fee or indemnity agreements between MGA and Bryant are relevant to

12  demonstrate bias and lack of credibility. Accordingly, the Discovery Master ordered Bryant to

13  produce, among other things, all non-privileged documents responsive to Request Nos. 2, 13, and

14  48, and to produce a privilege log in compliance with Rule 26(b)(5), Fed.R.Civ.P. See Discovery

15  Master's Order Granting Mattel's Motion to Compel Production of Documents, dated January 25,

16  2007 (the "January 25, 2007 Order").

17      On March 16, 2007, Bryant served a privilege log that listed as items Nos. 9 and 10 copies

18  of a fee agreement between MGA and the law firm of Littler Mendelson, P.C. ("Littler"). Littler

19  is counsel of record for Bryant in this action. Notably, however, the privilege log indicates that

20  the author of the fee agreement is "Robert F. Millman, Esq. (attorney with Littler Mendelson,

21  P.C., counsel for MGA Entertainment, Inc., and acting in his capacity as counsel for MGA

    Entertainment, Inc.)." Proctor Decl., Ex. 5. The recipient is identified as "Daphne Gronich, Esq.

22

23

24  _____

    [1] The parties were able to resolve a portion of the motion during the briefing process. In addition to the fee
    agreements, Mattel originally sought production of a communication between MGA's patent counsel to Mr. Bryant
    regarding a patent for interchangeable doll footgear and feet. A day before the opposition brief was due, Bryant
25  offered to produce the communication if Mattel agreed that doing so would not constitute a waiver of privilege as to
    any other document or testimony. Mattel accepted Bryant's offer. See Bryant's Opposition at 1 and Mattel's Reply
26  at 1. Mattel continues to assert, however, that Bryant's conduct warrants sanctions because Bryant should have
    offered to produce the communication during the meet and confer process.

27

28
    Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)                                                              2

EXHIBIT 25

PAGE 866

(general counsel for MGA Entertainment, Inc.)." Id.  Privilege Log Entry Nos. 9 and 10 are both described as an "addendum to retainer agreement between Littler Mendelson, P.C. and MGA Entertainment, Inc." Id.  The only difference in the description is that Privilege Log Entry No. 9 is "executed," whereas No. 10 is a "draft." Id.  In his opposition brief, Bryant represents that items No. 9 and No. 10 are "the same document, save that one copy has two signatures and the other only one." Id.  Bryant is not a party to the fee agreement.  MGA, however, has apparently asserted the attorney-client privilege as to item Nos. 9 and 10 and Bryant is withholding the document pursuant to their joint defense agreement.  Bryant's Opposition at 3.

Mattel contends that the fee agreement identified as items No. 9 and 10 should be produced pursuant to the January 25, 2007 Order.  Mattel contends that although Bryant was not a party to that agreement, the agreement between MGA and Littler is nevertheless an agreement for MGA to pay Bryant's legal fees and is relevant to show Bryant's bias and lack of credibility. Mattel further contends that the agreement between MGA and Littler is not privileged under Ninth Circuit law.  See e.g. United States v. Blackman, 72 F.3d 1418, 1424 (9th Cir. 1995) ("[a]s a general rule, client identity and the nature of the fee arrangement between attorney and client are not protected from disclosure by the attorney-client privilege."); Clarke v. American Commerce Natl. Bank, 974 F.2d 127, 129 (9th Cir. 1992) ("Our decisions have recognized that the identity of the client, the amount of the fee, the identification of payment by case file name, and the general purpose of the work performed are usually not protected from disclosure by the attorney-client privilege.").

Bryant contends that the documents at issue are in his possession solely because they were provided to his counsel under a joint defense agreement.  He contends that this joint defense agreement prevents him from waiving the attorney-client privilege asserted by MGA.  He further asserts that if Mattel wants to challenge the privilege asserted, Mattel should seek the document directly from MGA.

### III. DISCUSSION

For reasons already set forth in the January 25, 2007 Order, the documents at issue are relevant to the claims and defenses in the case.  Pursuant to the terms of the January 25, 2007

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

3

EXHIBIT _25_
                867
PAGE _____

1   Order, Bryant was required to either produce the documents or identify them on a privilege log.

2   As the party withholding the documents, Bryant was required to substantiate the claim of

3   privilege under Federal Rule of Civil Procedure 26(b)(5).  He has failed to do so.  Bryant has not

4   made any attempt to submit affidavits or other admissible evidence to establish that, for instance,

5   the withheld documents contain confidential attorney-client communications made for the

6   purpose of giving legal advice.  Nor has he made any challenge to the caselaw cited by Mattel

7   holding that, in general, fee agreements are not privileged under Ninth Circuit law.  That Bryant

8   and MGA are parties to a joint defense agreement does not excuse Bryant from substantiating the

9   underlying claim of attorney-client privilege.  See Griffin v. Davis, 161 F.R.D. 687, 691 (C.D.

10  Cal. 1995).

11        Moreover, MGA, which participated in the meet and confer on this motion and was served

12  with the motion[2], has not made any attempt to substantiate its claim of the attorney-client

13  privilege other than the unsupported assertions in Bryant's privilege log.  Therefore, the claim of

14  privilege is overruled as to privilege log items Nos. 9 and 10 and the documents are ordered

    produced.

15                              IV. CONCLUSION

16        For the reasons set forth above, Bryant is ordered to produce privilege log items Nos. 9

17  and 10 forthwith.  Mattel's motion for sanctions is denied.

18        Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery

19  Master, Bryant shall file this Order with the Clerk of Court forthwith.

20

21  Dated:  June 19, 2007

22                                    /s/Edward A. Infante

23                                    _____
                                      HON. EDWARD A. INFANTE (Ret.)
24                                    Discovery Master

25

26        [2] See Mattel's Reply at 1.

27

28  Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)

                                                EXHIBIT _25_

                                                PAGE _____ 868

                                                              4

# EXHIBIT 26

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority ___ ✓ Send ___ ✓
Entered ___ ✓ Closed ___
JS-5/JS-6 ___ JS-2/JS-3 ___
Scan Only___ Docketed on CM ___
____THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)
       JUN 2 7 2007
EASTERN DIVISION
BY ___ DEPUTY

FILED - EASTERN DIVISION
CLERK, U.S. DISTRICT COURT

JUN 2 7 2007

CENTRAL DISTRICT OF CALIFORNIA
BY    JIM HOLMES    DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT, | CASE NO. CV 04-09049 SGL |
| Plaintiff, | CONSOLIDATED WITH |
| v. | CV 04-09059 SGL |
| MATTEL, INC., | CV 05-02727 SGL |
| Defendant, | ORDER RE MOTIONS HEARD ON JUNE 11, 2007 |
| AND CONSOLIDATED ACTIONS | |

Presently before the Court is a multitude of motions filed by a number of parties in these consolidated cases. The factual allegations underlying the present actions are expansive and complex. They are set forth below only to the extent necessary for the Court's consideration of the present motions. At their essence, although involving a number of other legal and factual issues, these cases involve the rights to certain fashion dolls.

The present motions, six in total, focus on four basic issues: Two of the motions, filed by certain counter-defendants, address the sufficiency of the allegations made by Mattel, Inc. ("Mattel") in its counterclaims; most notably, these motions challenge the sufficiency of the allegations which underlie Mattel's claims based on the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.

Docket No. 577

EXHIBIT 26

PAGE 869

06|27|07

1  §§ 1961-1968 ("RICO"). Another motion challenges the Court's exercise of

2  personal jurisdiction over a foreign corporation, MGAE de México, S.R.L. de C.V.

3  ("MGA Mexico"). Two additional motions seek review of a ruling, issued by a court-

4  appointed discovery master, overruling objections made during a party's deposition

5  that were based on the attorney-client and joint-defense privileges. A final motion

6  heard on June 11, 2007, addresses the Court's scheduling order that divided the

7  issues to be tried in these consolidated cases into two phases. This last motion will

8  be addressed in a separate order.

9       The Court has reviewed the parties' filings regarding these motions and held

10  a hearing on June 11, 2007. For the reasons and in the manner set forth more fully

11  herein, the Court makes the following rulings regarding these motions:

12       1.    Motion of MGA Entertainment, Inc., ("MGA") and Issac Larian

13  ("Larian") to Dismiss Mattel's Amended Answer and Counterclaims (docket # 189):[1]

14  **GRANTED IN PART AND DENIED IN PART.**

15       2.    Motion of Carter Bryant to Dismiss Counterclaims II, III, V, VII, IX, and

16  XI (docket # 191): **GRANTED IN PART AND DENIED IN PART.**

17       3.    Motion of MGA Mexico to Dismiss Mattel's Amended Answer and

18  Counterclaims (docket # 266): **DENIED.**

19       4.    Motion of MGA Objecting to Discovery Master's March 7, 2007, Order

20  (docket # 308): **GRANTED IN PART AND DENIED IN PART.**

21       5.    Motion of Carter Bryant Objecting to Discovery Master's March 7,

22  2007, Order (docket # 306): **GRANTED IN PART AND DENIED IN PART.**

23

24

25

26

27

28       [1] Joining in this Motion were MGA Entertainment (HK) Ltd. ("MGA Hong
Kong"), Carter Bryant ("Bryant"), and MGA Mexico.

2

EXHIBIT 26

PAGE 870

## I. Factual Allegations

The following allegations appear in the Amended Answer and Counterclaims ("AAC"):

### A.   Bryant's Employment by Mattel

Carter Bryant was hired by Mattel as a Barbie product designer in January 1999. (AAC ¶ 21.) At that time, Bryant signed an "Employee Confidential Information and Inventions Agreement," wherein he agreed not to assist or work for a Mattel competitor while employed by Mattel and that the designs and inventions he created while employed by Mattel were Mattel property. (AAC ¶¶ 22-23.) Bryant also executed a "Conflict of Interest Questionnaire" wherein he certified that, other than as disclosed, he had not worked for a Mattel competitor in the past year, had not engaged in a business transaction with a Mattel competitor that could create a conflict of interest, and that he would inform Mattel immediately if such an event occurred. (AAC ¶¶ 24-25.) While still employed by Mattel, Bryant used Mattel property and resources to develop and design the Bratz concept. (AAC ¶ 26.) Bryant also allegedly enlisted other Mattel employees to perform work on the Bratz line, in some cases, falsely informing those employees that they were working on a Mattel project. (AAC ¶ 27.)

### B.   MGA's Involvement in Bryant's Conduct

MGA knew of and encouraged Bryant's misappropriation of Mattel property and resources. (AAC ¶ 33). Bryant made affirmative misrepresentations to Mattel, including that he was leaving Mattel for "non-competitive" pursuits. (AAC ¶ 28.) Bryant and MGA concealed from Mattel that Bryant developed Bratz while employed by Mattel, that Bryant worked with MGA during the time he was employed by Mattel, and that Larian and others, not Bryant, were the creators of Bratz. (AAC ¶ 35.) Prior to his departure from MGA, Bryant entered into a contract with MGA to provide design services to MGA on a "top priority" basis. (AAC ¶ 36.)

Bryant left Mattel's employ on October 20, 2000; three weeks later, MGA

3

EXHIBIT 26

PAGE _____ 871

1  showed the Bratz prototypes to focus groups and retailers. (AAC ¶ 29.) Soon

2  thereafter, MGA showed the Bratz line to retailers at the Hong Kong Toy Fair in

3  January, 2001, and then began manufacturing and selling the dolls to retailers for

4  an annual revenue in the excess of $500 million. (AAC ¶¶ 31-32.)

5  C.    **Proprietary Information**

6       1.    **Mexico**

7       Counter-defendant Carlos Gustavo Machado Gomez ("Machado"), nonparty

8  Mariana Trueba Almada ("Trueba"), and nonparty Pablo Vargas San Jose

9  ("Vargas") were upper-level employees at Mattel Mexico. (AAC ¶¶ 38-40.) In the

10 three months before all three simultaneously resigned from Mattel Mexico on April

11 19, 2004, they were in contact with MGA via an email account with the address

12 "plot04@aol.com". (AAC ¶ 42.) The three former employees allegedly used this

13 account to supply MGA with confidential and proprietary Mattel information. (AAC

14 ¶ 42.) The three also copied various proprietary Mattel documents onto USB flash

15 drives prior to resigning. (AAC ¶ 44-46.) Shortly before her departure, Trueba

16 increased her access to Mattel's confidential information and attended a meeting at

17 which Mattel personnel analyzed Barbie programs for the United States, Canada,

18 and South America. (AAC ¶ 47.)

19      Among them, Machado, Trueba, and Vargas stole documents containing

20 information regarding Mattel's future products, production and shipping costs, sales

21 information, customer information, marketing information, and strategic research

22 information both in Mexico and worldwide. (AAC ¶ 48.) The stolen data was not

23 limited to the Mexican market; rather, the information stolen had the potential, and

24 in fact did, give MGA an unfair competitive advantage in the United States and

25 around the world. (AAC ¶ 49.)

26      In an attempt to conceal his actions, Machado ran a software program on his

27 Mattel computer in order to erase information pertaining to his contact with MGA.

28 (AAC ¶ 51.) When Mattel alerted Mexican authorities about the theft, they seized

4

EXHIBIT _26_

PAGE _____ 872

1  from MGA's Mexico City offices, pursuant to a search warrant, a large number of

2  documents containing Mattel trade secrets and confidential information. (AAC

3  ¶ 53.)

4       Shortly after the theft, Machado, Trueba, and Vargas traveled to Los

5  Angeles to meet face-to-face with MGA personnel. (AAC ¶ 52.)

6       **2.    Canada**

7       Jane Brisbois was the Director of Sales for the Girls Division in Canada.

8  (AAC ¶ 71.) When she was hired in 1999, she agreed to preserve and not disclose

9  Mattel's proprietary information. (AAC ¶ 71.) While still employed by Mattel,

10 Brisbois spoke with Larian on September 22, 2005. (AAC ¶ 74.) That same day,

11 Brisbois copied approximately 45 Mattel documents containing Mattel trade secret

12 information into a USB flash drive that she took from the Mattel Canada office.

13 (AAC ¶ 74.) The files taken by Brisbois included documents regarding Mattel sales,

14 advertising strategies, market analyses, product launch dates, and profit margins in

15 Canada, Mexico, and the United States. (AAC ¶ 74.) Four days later, she resigned

16 from Mattel. (AAC ¶ 74.)

17      When Mattel learned of Brisbois' misappropriation of Mattel documents, it

18 notified Canadian law enforcement officials, who were able to recover the flash

19 drive and the documents from Brisbois. (AAC ¶ 75.)

20      **3.    United States**

21      Ron Brawer was Mattel's Senior Vice President and General Manager.

22 (AAC ¶ 55.) On September 17, 2004, Brawer informed Mattel that he was leaving

23 Mattel to work for MGA. (AAC ¶ 63.) During Brawer's exit interview, he falsely

24 represented that he had returned all proprietary information to Mattel; specifically,

25 Brawer took the information in his contacts file which included contact information

26 for Mattel customers and Mattel employees. (AAC ¶ 68.) Brawer has since used

27 the contact information to induce certain Mattel employees to join MGA and

28 misappropriate Mattel trade secrets. (AAC ¶ 69.)

5

EXHIBIT 26

PAGE 873

1    MGA has also allegedly hired at least 25 other Mattel employees, some of
2    whom have provided MGA with Mattel's confidential information.  (AAC ¶ 77.)
3    **D.    Larian's Communications Regarding Mattel's New Product Line**
4          On May 12, 2006, Larian sent an email message to an email distribution list
5    that included a reference to a new Mattel Barbie line ("MY SCENE MY BLING
6    BLING") which Mattel had not yet made public.  (AAC ¶ 79.)  The distribution of the
7    email included members of the media and many of Mattel's most significant
8    customers.  (AAC ¶ 78.)  Soon after sending the email, Larian began calling these
9    significant customers and making false representations about the product;
10   specifically, Larian told each that it was the only retailer to purchase the product
11   and that Mattel would not be supporting the product with television advertising.
12   (AAC ¶ 80.)
13   **E.    Exhibit C**
14         In Exhibit C to the AAC, Mattel references a number of communications,
15   numbering well over one hundred, that it contends constitutes predicate acts of mail
16   fraud or wire fraud.  Exhibit C does not describe the contents of those
17   communications.
18                        **II. Counterclaims Asserted**
19         Based on these allegations, Mattel asserts the following counterclaims:
20   (1) Copyright Infringement, including willful, vicarious, and contributory
21   infringement, asserted against MGA, MGA Hong Kong, Larian and Bryant;
22   (2) violation of RICO's substantive prohibition, 18 U.S.C. § 1962(c), asserted as
23   authorized by 18 U.S.C. § 1964(c) against all defendants, which alleges predicate
24   acts of, *inter alia*, mail fraud, wire fraud, and criminal copyright infringement; (3) a
25   violation of RICO's prohibition against conspiracies, 18 U.S.C. § 1962(d), asserted
26   against all defendants; (4) state-law misappropriation of trade secrets against MGA,
27   MGA Mexico, Larian, and Machado; (5) breach of contract, asserted against Bryant
28   only and based on certain employment agreements between Bryant and Mattel;

                              6

EXHIBIT 26
PAGE _____
874

1   (6) intentional interference with contract, asserted against MGA and Larian and

2   based on Bryant's employment agreements; (7) breach of fiduciary duty, asserted

3   against Bryant and Machado; (8) aiding and abetting breach of fiduciary duty,

4   asserted against MGA and Larian; (9) breach of the duty of loyalty, asserted

5   against Bryant and Machado; (10) aiding and abetting breach of the duty of loyalty,

6   asserted against MGA and Larian; (11) conversion, asserted against all counter-

7   defendants; (12) violation of California's unfair competition law, Cal. Bus. & Prof.

8   Code § 17200, asserted against all counter-defendants; and finally, (13) a claim for

9   declaratory relief.

10     **III. Counter-Defendants' Motions to Dismiss for Failure to State a Claim**

11          The parties have moved to dismiss a number of Mattel's counterclaims on

12   various grounds.  The Court addresses each claim in turn, considering at all times

13   the standard for dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

14   A.    <u>Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)</u>

15          In lieu of an answer, a party may, as the counter-defendants have here, file a

16   motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), which provides that such a

17   motion may be made where the pleader has "fail[ed] to state a claim upon which

18   relief can be granted."  <u>Id.</u>  In deciding a Rule 12(b)(6) motion, the Court must also

19   consider the requirements of Fed. R. Civ. P. 8(a), which requires only a "short and

20   plain statement of the claim showing that the pleader is entitled to relief" or, when

21   the claim at issue avers fraud or mistake, the motion must be considered in

22   conformity with Fed. R. Civ. P. 9(b), which requires fraud and mistake to be pleaded

23   with particularity.  <u>See</u> 5A Charles A. Wright & Arthur Miller, <u>Federal Practice and</u>

24   <u>Procedure</u>, §1356 (1990); James Wm. Moore, <u>Moore's Federal Practice</u>, Vol. 2

25   § 12.34[1][c].

26          In bringing a motion pursuant to Rule 12(b)(6), the moving party has the

27   burden of persuading the Court that the complaint has failed to state a claim upon

28   which relief can be granted.  <u>Kehr Packages, Inc. v. Fidelcor, Inc.</u>, 926 F.2d 1406,

7

EXHIBIT 26

PAGE ___  875

1  1409 (3d Cir.), cert. denied, 501 U.S. 1222 (1991). In considering the motion,

2  "courts must consider the complaint in its entirety," and read it in the light most

3  favorable to the plaintiff, accepting as true all factual allegations in the complaint, as

4  well as reasonable inferences to be drawn therefrom.  Tellabs, Inc. v. Makor Issues

5  & Rights, Ltd., __ U.S. __, No. 06-484, 2007 WL 1773208, at *9 (June 21, 2007);

6  Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998).  However, the Court need not

7  accept any unwarranted deductions of fact, or conclusory legal statements cast in

8  the form of factual allegations.  See Western Mining Council v. Watt, 643 F.2d 618,

9  624 (9th Cir.), cert. denied, 454 U.S. 1031 (1981).

10  Generally, a court cannot consider evidence in deciding a Rule 12(b)(6)

11  motion; however, a court may consider exhibits attached to the complaint as well as

12  documents that are not physically attached to the complaint but "whose contents

13  are alleged in [the] complaint and whose authenticity no party questions." Branch v.

14  Tunnell, 14 F.3d 449, 453-54 (9th Cir. 1994), cert. denied, 512 U.S. 1219 (1994).

15  Facts of which a court may take judicial notice pursuant to Fed. R. Evid. 201 are

16  also properly considered.  Mir v. Little Company of Mary Hospital, 844 F.2d 646,

17  649 (9th Cir. 1988).

18  **B.    RICO Claims**

19  The counter-defendants devote most of their motions to the sufficiency of the

20  allegations regarding Mattel's RICO claims. The Court's analysis begins, as it must

21  when considering a federal statute, with the language of that statute.  The

22  substantive RICO prohibition at issue is found in 18 U.S.C. § 1962(c):

23  It shall be unlawful for any person employed by or associated

24  with any enterprise engaged in, or the activities of which affect,

25  interstate or foreign commerce, to conduct or participate, directly or

26  indirectly, in the conduct of such enterprise's affairs through a pattern

27  of racketeering activity or collection of unlawful debt.

28  Id. Conspiracies to violate this substantive prohibition are themselves prohibited by

8

EXHIBIT 26

PAGE 876

1  § 1962(d), which states that "[i]t shall be unlawful for any person to conspire to

2  violate any of the provisions of subsection (a), (b), or (c) of this section." Id. Many

3  of these terms are defined by the statutory language, including "racketeering

4  activity," "enterprise," and "pattern of racketeering activity":

5  　　　　　(1) "racketeering activity" means . . . (B) any act which is

6  indictable under any of the following provisions of title 18, United

7  States Code: . . . section 1341 (relating to mail fraud), section 1343

8  (relating to wire fraud), . . . section 1512 (relating to tampering with a

9  witness, victim, or an informant), . . . section 1952 (relating to

10  [interstate and foreign travel or transportation in aid of racketeering

11  enterprises]), [and] section 2319 (relating to criminal infringement of a

12  copyright)[.]

13  　　　　　　　　　　　. . . .

14  　　　　　(4) "enterprise" includes any individual, partnership,

15  corporation, association, or other legal entity, and any union or group

16  of individuals associated in fact although not a legal entity;

17  　　　　　(5) "pattern of racketeering activity" requires at least two acts of

18  racketeering activity, one of which occurred after the effective date of

19  this chapter and the last of which occurred within ten years (excluding

20  any period of imprisonment) after the commission of a prior act of

21  racketeering activity[.]

22  18 U.S.C. § 1961.

23  　　　In considering a Rule 12(b)(6) motion seeking to dismiss a RICO claim, the

24  Court measures the sufficiency of alleged predicate acts of wire fraud and mail

25  fraud by the Rule 9(b) "pleading-with-particularity" standard; however, the Court

26  measures the sufficiency of all other predicate acts by the more lenient standard set

27  forth in Rule 8(a). Compare Fed. R. Civ. P. 9(b) ("In all averments of fraud or

28  mistake, the circumstances constituting fraud or mistake shall be stated with

9

EXHIBIT  26
PAGE ____ 877

1  particularity. Malice, intent, knowledge, and other condition of mind of a person

2  may be averred generally.") with Fed. R. Civ. P. 8(a) ("A pleading which sets forth a

3  claim for relief, . . . shall contain . . . (2) a short and plain statement of the claim

4  showing that the pleader is entitled to relief . . . ."); see Lancaster Community Hosp.

5  v. Antelope Valley Hosp. Dist., 940 F.2d 397, 405 (9th Cir. 1991) (applying Rule

6  9(b) standard to allegations of mail fraud and noting that "[t]he Ninth Circuit has

7  repeatedly insisted that [Rule 9(b)] be followed in RICO actions alleging the

8  predicate act of mail fraud."), cert. denied, 502 U.S. 1094 (1992).

9        In order to state its claim under § 1962(c), Mattel "must allege (1) conduct

10  (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing

11  injury to [its] business or property." Ove v. Gwinn, 264 F.3d 817, 825 (9th Cir.

12  2001) (internal quotation marks and citation omitted). Here, counter-defendants'

13  motions challenge the first, second, fourth, and fifth elements.

14        1.    "Conduct or Participate"

15        Bryant contends that his role in any alleged scheme or enterprise is too

16  tenuous to constitute the "conduct" necessary to impose RICO liability. In order to

17  have RICO liability imposed upon him, a defendant must "conduct or participate,

18  directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of

19  racketeering activity . . . ." 18 U.S.C. § 1962(c). The United States Supreme Court

20  has elaborated on this statutory language in Reves v. Ernst & Young, 507 U.S. 170,

21  179 (1993), wherein it noted:

22        ·    [T]he word "participate" makes clear that RICO liability is not limited to

23            those with primary responsibility for the enterprise's affairs, just as the

24            phrase "directly or indirectly" makes clear that RICO liability is not

25            limited to those with a formal position in the enterprise, but some part

26            in directing the enterprise's affairs is required.

27  Id. Here, Mattel has alleged that Bryant secretly developed Bratz while employed

28  by Mattel and using Mattel's resources and employees, that he concealed that fact

10

EXHIBIT 26
878

PAGE____

1  when he had a duty to disclose it, and that he did these things in order to facilitate
2  the development of the Bratz concept by Mattel's direct competitor, in violation of,
3  *inter alia*, criminal copyright law. These allegations, if proven to be true, are
4  sufficient to impose RICO liability on Bryant.

5       **2.    Enterprise**

6       Bryant's motion challenges the sufficiency of the allegations regarding a
7  RICO enterprise. That enterprise is alleged to be an "association-in-fact" enterprise
8  comprised of the counter-defendants, Brawer, Trueba, Vargas, Brisbois, and
9  others. (AAC ¶ 89.) Mattel alleges that counter-defendants participated in or
10  conducted the affairs of the association-in-fact enterprise through a pattern of
11  racketeering activities, including, as detailed in the AAC, predicate acts of mail
12  fraud, wire fraud, evidence tampering, interstate and foreign travel to aid
13  racketeering activities, and criminal copyright infringement. (AAC ¶ 90.) The
14  counter-defendants' goal is alleged to have been to "execut[e] or attempt to
15  execut[e] [a] scheme to improperly defraud Mattel and steal its trade secret or
16  otherwise confidential and proprietary information . . . ." (AAC ¶ 90.)

17       A recent *en banc* decision of the Ninth Circuit sets forth a comprehensive
18  analysis of the sufficiency of allegations regarding a RICO enterprise necessary to
19  state a claim. See Odom v. Microsoft Corp., 486 F.3d 541, 2007 WL 1297249 (9th
20  Cir. 2007) (designated for publication). That decision provides the blueprint for the
21  Court's present analysis.

22       Odom involved an alleged scheme involving consumers who purchased
23  computers from Best Buy retail stores. Id. at 543. The computers would include a
24  Microsoft compact disc that the cashier would scan; the consumer's credit card was
25  also scanned for purchase. Id. The credit card information was transmitted to
26  Microsoft, and Microsoft would, at some point, begin making unauthorized charges
27  to the credit card used to purchase the computer, ostensibly for Microsoft's
28  provision of Internet services. Id. Odom brought substantive RICO and RICO

                                11

EXHIBIT 26 879

PAGE _____

1  conspiracy claims based on these allegations. Id. at 544.

2      The Ninth Circuit first noted the evidenced judicial resistance to RICO in the

3  lower courts, contrasted with the Supreme Court's four reversals of such narrow

4  readings of RICO. Id. at 545-47 (citing United States v. Turkette, 452 U.S. 576

5  (1981) (rejecting notion that RICO prohibited only the infiltration of legitimate

6  businesses by organized crime); Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 481

7  (1985) (rejecting notion that RICO could be used to impose civil liability only where

8  the defendant had been criminally convicted and that such liability was limited to a

9  narrow measure of damages); National Organization for Women v. Scheidler, 510

10  U.S. 249 (1994) (rejecting the notion that RICO liability could be imposed only when

11  the acts of a RICO enterprise had an economic motive); and Cedric Kushner

12  Promotions v. King, 533 U.S. 158 (2001) (reversing lower court's ruling that no

13  RICO claim was stated where president and sole shareholder of a corporation was

14  alleged to have associated with his wholly owned corporation as a RICO

15  "enterprise," and relying on fact that person and corporation were separate legal

16  entities). In Odom, the Ninth Circuit understandably viewed these four holdings as

17  a "general instruction that we should not read the statutory terms of RICO

18  narrowly." Odom, 486 F.3d at 547 (internal citation omitted).

19      In Odom, the Ninth Circuit clarified -- and relaxed -- the standard for pleading

20  and proving an "associated-in-fact" enterprise such as the one alleged here:

21          The definition of "enterprise" in the text of RICO is fairly

22      straightforward. In its entirety, the definition is as follows: "'enterprise'

23      includes any individual, partnership, corporation, association, or other

24      legal entity, and any union or group of individuals associated in fact

25      although not a legal entity." 18 U.S.C. § 1961(4). As is evident from

26      the text, this definition is not very demanding. A single "individual" is

27      an enterprise under RICO. Similarly, a single "partnership," a single

28      "corporation," a single "association," and a single "other legal entity"

12

EXHIBIT 26

PAGE _____ 880

1       are all enterprises. At issue in this case is the last kind of enterprise

2       listed in the definition -- a "group of individuals associated in fact." It is

3       undisputed that a corporation can be an "individual" for purposes of

4       an associated-in-fact enterprise.

5  Id. at 548.

6       The Ninth Circuit acknowledged that "enterprise" must be something greater

7  than merely a pattern of racketeering activity; however, the court rejected the notion

8  that an enterprise must have a particular ascertainable organizational structure. Id.

9  at 551 ("We take this opportunity to join the circuits that hold that an

10  associated-in-fact enterprise under RICO does not require any particular

11  organizational structure, separate or otherwise.") (citations omitted). A party need

12  only set forth factual allegations of "a group of persons associated together for a

13  common purpose of engaging in a course of conduct," "evidence of an ongoing

14  organization, formal or informal," and "evidence that the various associates function

15  as a continuing unit." Id. at 552 (internal citations and quotation marks omitted).

16       As for the common purpose, it was met in Odom, where the plaintiff had

17  alleged the following:

18            [D]efendants had the common purpose of increasing the

19       number of people using Microsoft's Internet Service, and doing so by

20       fraudulent means. Best Buy furthered this common purpose by

21       distributing Microsoft Internet Trial CD's and conveying its customers'

22       debit and credit card information to Microsoft. Microsoft then used the

23       information to activate customer accounts.

24  Id. Here, Mattel has alleged the common purpose of attempting to defraud Mattel

25  and steal its trade secrets. Mattel's many factual allegations, detailed herein,

26  support this alleged common purpose.

27       As for the "ongoing organization" requirement, the Ninth Circuit in Odom

28  noted that the plaintiffs had met that element, which was met where the

                                13

EXHIBIT  26

PAGE  881

1   organization was alleged to be "a vehicle for the commission of two or more

2   predicate crimes." Id. (internal quotation marks and citation omitted). The Ninth

3   Circuit noted the following factual allegations:

4            · Microsoft and Best Buy established mechanisms for

5       transferring plaintiffs' personal and financial information from Best Buy

6       to Microsoft. That information then allowed Microsoft to activate

7       plaintiffs' Internet accounts without their knowledge or permission.

8       These mechanisms enabled Microsoft to bill plaintiffs improperly for

9       MSN services in 2001, 2002 and 2003.

10  Id. Here, plaintiffs have alleged that the counter-defendants coordinated their many

11  efforts at depriving Mattel of its proprietary information and its intellectual property.

12  The allegations regarding common use of the "plot04@aol.com" email address to

13  transfer confidential Mattel information to MGA support the finding of an "ongoing

14  organization." So, too, do the allegations regarding the repeated communications

15  between Bryant and MGA.

16       The "continuing unit" requirement does not appear to the Court to mandate

17  that the organization continues to this day;[2] rather, the requirement is related to the

18  notion that RICO was not meant to address discrete instances of fraud or criminal

19  conduct. "[T]he continuity requirement focuses on whether the associates'

20  behavior was 'ongoing' rather than isolated activity." Id. at 553 (internal quotation

21  marks and citation omitted). Related to that concern, it is also clear to the Court

22  that this requirement is related to the duration of the racketeering activities. See id.

23  ("An almost two-year time span is far more than adequate to establish that Best

24  Buy and Microsoft functioned as a continuing unit."). Here, the allegations do not

25  reveal that the conduct complained of was mere isolated activity; rather, Mattel sets

26  forth allegations of racketeering activity that spanned a period of three years. The

27

28       [2] Nevertheless, Mattel alleges that the enterprise exists to this day by virtue
of its continued use of Mattel's information and property.

14

EXHIBIT __26__

PAGE ___882___

1   allegations describe a scheme consisting of corporate warfare between competitors
2   that has been waged over a long period of time and waged on a number of fronts,
3   both foreign and domestic. The "continuing unit" requirement is therefore satisfied.
4        Accordingly, the Court finds that Mattel has sufficiently pleaded the existence
5   of a RICO enterprise.
6        **3.   Predicate Acts of Racketeering Activity**
7             **a.   Mail Fraud and Wire Fraud**
8        The criminal prohibition against mail fraud is found at 18 U.S.C. § 1341:
9             Whoever, having devised or intending to devise any scheme or
10           artifice to defraud, . . . for the purpose of executing such scheme or
11           artifice or attempting so to do, places in any post office or authorized
12           depository for mail matter, any matter or thing whatever to be sent or
13           delivered by the Postal Service, or deposits or causes to be deposited
14           any matter or thing whatever to be sent or delivered by any private or
15           commercial interstate carrier, or takes or receives therefrom, any such
16           matter or thing, . . . shall be fined under this title or imprisoned not
17           more than 20 years, or both.
18   Id.: The Ninth Circuit has described the elements of mail fraud as "(1) proof of a
19   scheme to defraud; (2) using or causing the use of the mails to further the
20   fraudulent scheme; and (3) specific intent to defraud." United States v. Rogers, 321
21   F.3d 1226, 1229 (9th Cir. 2003) (internal citation omitted).
22       The criminal prohibition against wire fraud is similar:
23           Whoever, having devised or intending to devise any scheme or
24           artifice to defraud, . . . transmits or causes to be transmitted by means
25           of wire, radio, or television communication in interstate or foreign
26           commerce, any writings, signs, signals, pictures, or sounds for the
27           purpose of executing such scheme or artifice, shall be fined under this
28           title or imprisoned not more than 20 years, or both.

EXHIBIT __26__
           __883__
PAGE _____

1   18 U.S.C. § 1343. The Ninth Circuit has described the elements of wire fraud as

2   "(1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and

3   (3) a specific intent to deceive or defraud." United States v. Shipsey, 363 F.3d 962,

4   971 (9th Cir. 2004) (citations omitted).

5          As all parties acknowledge, the predicate acts of mail fraud and wire fraud

6   must be pleaded with particularity pursuant to Fed. R. Civ. P. 9(b). Specifically,

7   Mattel must detail "the time, place, and manner of each act of fraud, [and it must

8   set forth] the role of each defendant in each scheme." Lancaster Community

9   Hosp., 940 F.2d at 405. This standard applies in RICO actions alleging predicate

10  acts of mail fraud. Id.

11         Here, Mattel sets forth allegations of predicate acts of mail fraud and wire

12  fraud referenced in Exhibit C to the AAC. However, these alleged predicate acts

13  are insufficiently pleaded because they fail to adequately describe the contents of

14  the communications; specifically, they fail to detail time, place and manner of "each

15  act of fraud." The substantive RICO claim is therefore dismissed to the extent it is

16  premised on those communications. Mattel is **GRANTED** leave to amend the RICO

17  claim based on this insufficiency; Mattel must attach to the Second Amended

18  Answer and Counterclaims ("SAAC") copies of the referenced communications.

19  The contents of packages referenced in Exhibit C must be described in order to

20  meet the Rule 9(b) requirements.

21         At oral argument, counsel for MGA argued that the substance of many, if not

22  all of the communications, cannot be read to further a scheme to defraud. That

23  argument will be considered another day, after Mattel files the SAAC. However, the

24  Court takes the opportunity today to note that, given the broad scope of the alleged

25  scheme to defraud, including the criminal copyright infringement allegations,

26  otherwise innocuous and routine communications regarding day-to-day operations

27  and product development may be found to be in furtherance of that scheme. See

28  Tellabs, Inc. v. Makor Issues & Rights, Ltd., ___ U.S. ___, No. 06-484, 2007 WL

16

EXHIBIT 26
884

PAGE _____

1  1773208, at *9 (June 21, 2007) (noting that, in considering a Rule 12(b)(6) motion,

2  "courts must consider the complaint in its entirety").

3      Counter-defendants also argue that Mattel failed to plead each defendant's

4  role in furtherance of the scheme to defraud. As interpreted by the Ninth Circuit,

5  the Rule 9(b) standard clearly requires that a plaintiff so plead. Lancaster

6  Community Hosp., 940 F.2d at 405. However, the Court will view the

7  communications alleged to constitute mail and wire fraud in conjunction with all the

8  allegations set forth regarding the alleged scheme in the counterclaims. See Flood

9  v. Makowski, No. 3:CV-03-1803, 2004 WL 1908221, at *14 (M.D. Pa., Aug. 24,

10  2004) (applying the principle that reasonable inferences in favor of a plaintiff must

11  be made when considering a Rule 12(b)(6) motion and noting that "[a]lthough

12  Plaintiffs' Complaint does not expressly identify how each particular mail or wire

13  communication furthered the scheme, the Complaint clearly alleges facts which

14  create an unquestionable inference that the alleged communications furthered the

15  scheme.").

16      Counter-defendants also argue that, because the emails alleged to

17  constitute wire fraud were sent among individuals physically located in the same

18  state, Mattel will not be able to establish the interstate nature of the

19  communications. See 18 U.S.C. § 1343 (setting forth the requirement that

20  communications be transmitted "in interstate or foreign commerce"). Mattel has

21  alleged that the communications were transmitted in interstate or foreign

22  commerce. (AAC ¶ 93(b).) This suffices at the pleadings stage; however,

23  eventually Mattel will be called upon to support these allegations with evidence.

24  See First Pacific Bancorp, Inc. v. Bro, 847 F.2d 542, 547 (9th Cir. 1988) (implicitly

25  holding that wire fraud must be supported, at the summary judgment stage, by

26  evidence of interstate wire fraud).

27      The Court dismisses the RICO claim to the extent it is based on the alleged

28  predicate acts of mail fraud and wire fraud because those acts are not pleaded with

17

EXHIBIT $\underline{26}$

885

PAGE _____

1   particularity as required by Rule 9(b). Mattel is **GRANTED** ten days' leave to file a

2   SAAC that incorporates and attaches and/or describes the communications and the

3   contents of packages referenced in Exhibit C.

                **b.   Evidence Tampering**

5       Unlike the mail fraud and wire fraud allegations, the allegations regarding the

6   remaining predicate acts are governed by the more lenient pleading standards of

7   Rule 8(a). See Slade v. Gates, No. 01-8244-RMT, 2002 WL 31387263, at *6 (C.D.

8   Cal., Oct. 11, 2002). The Court considers the sufficiency of those remaining

9   allegations pursuant to this Rule.

10      The criminal prohibition against tampering with evidence is found at 18

11  U.S.C. § 1512:

12          Whoever corruptly . . . alters, destroys, mutilates, or conceals a

13      record, document, or other object, or attempts to do so, with the intent

14      to impair the object's integrity or availability for use in an official

15      proceeding . . . shall be fined under this title or imprisoned not more

16      than 20 years, or both.

17  Id. Mattel's opposition makes clear that its evidence tampering allegations are

18  based upon two categories of documents: The first category of documents,

19  perhaps composed of only one multi-page document, involves the alleged alteration

20  of Bryant's contract with MGA to remove a fax header showing that the date of its

21  execution, which predated the effective date of Bryant's resignation from Mattel.[3]

22  The second category of documents are those filed with the United States Copyright

23  Office, which are alleged to omit the disclosure that certain Bratz drawings were

24  "works for hire," and which are alleged to have had alterations made to certain

25

26          [3] The AAC merely alleges that counter-defendants Bryant and MGA
27  "tamper[ed] with and defac[ed] documents which showed that . . . Bryant was a
    Mattel employee while he was working for and with MGA . . . ." (AAC ¶ 35.)
28  However, it is clear from other filings by the parties that, at a minimum, this
    allegation refers to MGA's contract with Bryant.

                        18

EXHIBIT 26
                                                886
PAGE ____

1   relevant dates. (See AAC ¶ 35; Mattel Opp. to MGA's Motion at 9.)

2        As to the first category, a predicate act is sufficiently alleged. Mattel has

3   alleged that a document was altered in a manner designed to conceal critical

4   evidence, highly relevant to the present official proceeding, regarding the timing of

5   the execution of the document.

6        Conversely, it is unclear whether Mattel has alleged a predicate act with

7   respect to the second category of documents. The issue of whether submitting

8   fraudulent registrations and "altering relevant dates" on documents submitted to the

9   United States Copyright Office has not been fully briefed by the parties; the issue

10   was framed in this manner only upon the filing of the reply.[4] Therefore, the Court

11   reserves this issue for a later date, and anticipates that it will be addressed by the

12   parties in a motion to dismiss the SAAC.

13        **c.**    **Travel Act Violation**

14        Federal criminal law prohibits interstate or foreign travel to aid in

15   racketeering activities. 18 U.S.C. § 1952; see also 18 U.S.C. § 1961 (defining a

16   violation of § 1962 as a RICO predicate act). In relevant part, the criminal

17   prohibition states:

18        Whoever travels in interstate or foreign commerce or uses the

19        mail or any facility in interstate or foreign commerce, with intent to . . .

20        promote, manage, establish, carry on, or facilitate the promotion,

21        management, establishment, or carrying on, of any unlawful activity,

22        and thereafter performs or attempts to perform . . . [such an act,] shall

23        be fined under this title, imprisoned not more than 5 years, or

24        both . . . .

25             . . . .

26        As used in this section . . . "unlawful activity" means . . .

27

28      [4] The Court does not view this failure as the fault of any party.

19

EXHIBIT 26

1    extortion, bribery, or arson in violation of the laws of the State in which
2    committed or of the United States . . . .
3    Id. Mattel alleges that Bryant and others traveled in interstate commerce to commit
4    commercial bribery in violation of California's prohibition against commercial
5    bribery, which in relevant part provides:

6            (a) Any employee who solicits, accepts, or agrees to accept
7        money or any thing of value from a person other than his or her
8        employer, other than in trust for the employer, corruptly and without
9        the knowledge or consent of the employer, in return for using or
10       agreeing to use his or her position for the benefit of that other person,
11       and any person who offers or gives an employee money or any thing
12       of value under those circumstances, is guilty of commercial bribery.

13   Cal. Penal Code § 641.3. Several allegations support a violation of § 641.3(a),
14   which in turn supports a violation of 18 U.S.C. § 1952. Mattel has alleged that
15   Bryant, while still employed by Mattel, entered into a contract with MGA to provide
16   design services to MGA on a "top priority" basis, and used Mattel property,
17   employees, and resources to develop and design the Bratz concept.

18           Counter-defendants argue that the requirement under California's
19   commercial bribery statute that a violator act "corruptly" is not met because Bryant
20   did not intend to injure Mattel. Such an intent is not required; rather it is sufficient
21   that Bryant is alleged to have intended to defraud Mattel. See Cal. Penal Code
22   § 341.3(d)(3) (defining "corruptly" as involving the intent "to injure or defraud")
23   (emphasis added).

24           d.    **Criminal Copyright Violations**

25           The parties dispute the relevant pleading standard that governs the
26   allegations which underlie the criminal copyright violation claim. Counter-
27   defendants would have the Court apply the more exacting Rule 9(b) standards
28   because, in their assessment, the claim "sounds in fraud." Mattel, however,

20

EXHIBIT 26
888

PAGE _____

1  contends that there is no reason to depart from the more lenient Rule 8(a) standard

2  generally applied to copyright claims because, in its assessment, the claims "sound

3  in copying, not fraud." (Mattel Opposition to MGA's Motion at 4.)

4       The recent Ninth Circuit case on this issue, cited by both parties, stands for

5  the unremarkable proposition that, consistent with Rule 9(b), all *averments* of fraud

6  must be pleaded with particularity, regardless of whether fraud is an essential

7  element of the claim to which the averment relates. See Vess v. Ciba-Geigy Corp.

8  USA, 317 F.3d 1097, 1103 (9th Cir. 2003); Fed. R. Civ. P. 9(b) ("In all *averments*

9  of fraud or mistake, the circumstances constituting fraud or mistake shall be stated

10  with particularity.") (emphasis added).

11      Considering Rules 8(a), 9(b), and the teachings of Vess, a spectrum

12  emerges. At the left end of this spectrum are claims that do not involve any

13  allegations of fraud. Those need only satisfy Rule 8(a)'s "short and plain

14  statement" standard. At the opposite end of the spectrum are claims based solely

15  on fraud, and the facts underlying such a claim must be alleged with particularity

16  pursuant to Rule 9(b). Lying closer to the Rule 9(b) end of the spectrum is a

17  category of claims discussed in Vess:

18           In cases where fraud is not a necessary element of a claim, a

19      plaintiff may choose nonetheless to allege in the complaint that the

20      defendant has engaged in fraudulent conduct. In some cases, the

21      plaintiff may allege a unified course of fraudulent conduct and rely

22      entirely on that course of conduct as the basis of a claim. In that

23      event, the claim is said to be "grounded in fraud" or to "sound in

24      fraud," and the pleading of that claim as a whole must satisfy the

25      particularity requirement of Rule 9(b).

26  Vess, 317 F.3d at 1103-04 (internal citations omitted). It is into this category MGA

27  contends that the allegations of criminal copyright claims fit, and MGA therefore

28  contends that all allegations regarding the criminal copyright claims must be

                                 21

EXHIBIT 26
                                        889
PAGE _____

1  pleaded with particularity.

2  However, <u>Vess</u> sets up another category, lying closer to the Rule 8(a) part of

3  the spectrum (but nevertheless requiring pleading with some particularity):

4  In other cases, however, a plaintiff may choose not to allege a

5  unified course of fraudulent conduct in support of a claim, but rather

6  to allege some fraudulent and some non-fraudulent conduct.  In such

7  cases, only the allegations of fraud are subject to Rule 9(b)'s

8  heightened pleading requirements. . . . The rule does not require that

9  allegations supporting a claim be stated with particularity when those

10  allegations describe non-fraudulent conduct.

11  [In other words,] in a case where fraud is not an essential

12  element of a claim, only allegations ("averments") of fraudulent

13  conduct must satisfy the heightened pleading requirements of Rule

14  9(b).  Allegations of non-fraudulent conduct need satisfy only the

15  ordinary notice pleading standards of Rule 8(a).

16  <u>Id.</u> at 1104-05.

17  Whether fraud is an essential element of criminal copyright infringement

18  must be determined by reference to the statutory language and any interpretative

19  case law.  In relevant part, the prohibition against criminal copyright infringement

20  provides: "Any person who violates section 506(a) (relating to criminal offenses) of

21  title 17 shall be punished as provided [herein] in and such penalties shall be in

22  addition to any other provisions of title 17 or any other law." 18 U.S.C. § 2319.  In

23  turn, the relevant provision in 17 U.S.C. § 506 states that "[a]ny person who willfully

24  infringes a copyright shall be punished as provided under section 2319 of title 18, if

25  the infringement was committed . . . for purposes of commercial advantage or

26  private financial gain . . . ." 17 U.S.C. § 506(a)(1)(A).  The elements of the offense

27  are easily gleaned from the straightforward statutory language: "Criminal

28  infringement of copyright has three elements: (1) infringement of a copyright

22

EXHIBIT 26
890
PAGE ____

1   (2) done wilfully (3) for purposes of commercial advantage or private financial gain."

2   United States v. Goss, 803 F.2d 638, 642 (11th Cir. 1986).

3        Clearly, fraud is not an essential element of a criminal copyright claim, taking

4   it out of the category at the far end of the spectrum described above, and

5   necessitating an inquiry into whether Mattel has chosen to incorporate a fraud

6   element into its criminal copyright claim. The AAC at ¶ 93(e) reveals that the

7   criminal copyright claim is premised upon the "willfull[] infringe[ment of] Mattel's

8   copyrights, including with respect to documents containing Mattel trade secret and

9   confidential information . . . ." The Opposition fills in more details regarding this

10  claim, noting that the criminal copyright claim is premised upon the Bratz-related

11  works, Bratz-derivative works, and works contained within Mattel's allegedly

12  purloined trade secrets and confidential information. (Mattel Opposition to MGA's

13  Motion at 5).

14       These allegations do not "allege a unified course of fraudulent conduct and

15  rely entirely on that course of conduct as the basis of a claim" such that the claim

16  could be said to "sound in fraud" and therefore require pleading with particularity as

17  to the entire claim. The allegations establish that much of the conduct complained

18  of consists of simple copying of the Bratz-related works or the creation of Bratz-

19  derivative works. Such allegations are unrelated to allegations of fraud. Therefore,

20  if this claim falls anywhere on the spectrum other than the Rule 8(a) category, it

21  falls in the category described by Vess as those claims in which a claimant chooses

22  to "allege some fraudulent and some non-fraudulent conduct." Id. at 1104.

23       When one considers that the alleged predicate acts of criminal copyright

24  infringement are but a small part of a larger, and singular, claim brought pursuant to

25  RICO, it is evident that the RICO claim falls neatly into the category of claims that

26  are based partly on fraudulent and partly on non-fraudulent conduct. The Court

27  has already found that certain fraudulent conduct -- that supporting the alleged

28  predicate acts of mail fraud and wire fraud -- is insufficiently pleaded. The current

23

EXHIBIT 26

89

PAGE

●                              ●

1  focus, however, is whether the allegations supporting the predicate acts of criminal
2  copyright infringement involve fraudulent conduct.

3      Here, there are two types of works allegedly infringed. The first type is the
4  Bratz-related and Bratz-derivative works. The second type is Mattel's other trade
5  secrets and confidential information. Both types are alleged -- with particularity -- to
6  have been procured by MGA through fraudulent conduct, but the criminal copyright
7  infringement predicate acts do not implicate that fraudulent conduct. Rather, they
8  implicate only questions of whether counter-defendants wilfully infringed Mattel's
9  works for commercial advantage or private financial gain. Here, Mattel has
10 sufficiently alleged predicate acts of criminal copyright infringement by alleging that
11 MGA and other counter-defendants willfully infringed its copyrights for purposes of
12 gaining commercial advantage and private financial gain. As Mattel correctly
13 contends, state of mind, in this instance willfulness, may be pleaded generally. See
14 Ferguson Beauregard/Logic Controls v. Mega systems, LLC, 350 F.3d 1327, 1343
15 (Fed. Cir. 2003).

16      **4.    Injury to Business or Property**

17      "Recovery under RICO is limited to those injuries flowing from predicate
18 acts . . . ." Resolution Trust Corp. v. Keating, 186 F.3d 1110, 1117 (9th Cir. 1999)
19 (citing Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 497 (1985)). Here, Mattel
20 has alleged damages flowing from the alleged acts of racketeering activity. (AAC
21 ¶ 96). Damages easily flow from theft of trade secrets and confidential information
22 committed by a direct competitor and from infringement of copyrights that are
23 alleged to have been used to make millions -- if not billions -- of dollars.

24      Counter-defendants argue that Mattel lacks standing to sue on behalf of its
25 subsidiaries. This issue arises because many of the allegations of the thefts of
26 trade secrets involve actions taken in Mexico or Canada by employees of Mattel's
27 foreign subsidiaries. Mattel argues that it is not attempting to sue for damages
28 incurred by its subsidiaries; rather, Mattel alleges that much of the confidential

24

EXHIBIT 26
892

PAGE ____

●                                        ●

1    information stolen by the employees of Mattel's subsidiaries belonged not to

2    Mattel's subsidiaries, but to Mattel itself. Based on these allegations, Mattel may

3    sue for damages it sustained. Mattel may not sue for damages incurred by its

4    foreign subsidiaries.

5              5.    **Ruling on Motions to Dismiss**

6         The Motions to Dismiss the RICO claims are **GRANTED** in part. As set forth

7    herein, the alleged predicate acts of mail fraud and wire fraud are insufficiently

8    alleged, and Mattel is **GRANTED** leave to amend the AAC.

9    **C.    Trade Secrets**

10        MGA contends that Mattel has failed to plead its trade secrets with sufficient

11   particularity to comply with its duties under Cal. Code Civ. P. § 2019.210, which

12   provides:

13             In any action alleging the misappropriation of a trade secret

14        under the Uniform Trade Secrets Act . . . , before commencing

15        discovery relating to the trade secret, the party alleging the

16        misappropriation shall identify the trade secret with reasonable

17        particularity subject to any orders that may be appropriate under

18        Section 3426.5 of the Civil Code [involving in camera reviews and

19        sealing of court documents].

20   Id. Based on the unambiguous language of the statute, the Court agrees with

21   Mattel's characterization of this requirement as one related to discovery rather than

22   related to pleading.

23        The Court also agrees that, by identifying documents in discovery by Bates-

24   stamp number, Mattel has complied with the dictates of § 2019.210. See

25   Advanced Modular Sputtering, Inc. v. Superior Court, 132 Cal.App.4th 826, 835-36,

26   (2005) (internal quotation marks and citations omitted) ("[Reasonable particularity]

27   means that the plaintiff must make some showing that is reasonable, i.e., fair,

28   proper, just and rational[,] . . . under all of the circumstances to identify its alleged

25

EXHIBIT 26

PAGE 893

1  trade secret in a manner that will allow the trial court to control the scope of

2  subsequent discovery, protect all parties' proprietary information, and allow them a

3  fair opportunity to prepare and present their best case or defense at a trial on the

4  merits."). MGA's complaints regarding the volume of documents so identified, and

5  their skepticism of Mattel appropriately attaching such an identification to many of

6  those identified documents, are not properly addressed at this stage of the

7  proceedings.

8         The motion to dismiss the trade secrets claim on this basis is therefore

9  **DENIED.**

10 **D.     Duplicative State-Law Claims**

11        Bryant's motion to dismiss Mattel's duplicative state-law claims is **DENIED.**

12 The state-law counterclaims asserted against Bryant in the AAC admittedly overlap

13 with the claims asserted against him in the 04-9059 case, however, the factual

14 allegations underlying the claims asserted in the AAC are broader in scope than

15 those underlying the claims asserted in the 04-9059 case.

16               **IV. Motion to Dismiss for Lack of Personal Jurisdiction**

17        MGA Mexico challenges this Court's exercise of personal jurisdiction over it.

18 As set forth below, the Court concludes that it may, consistent with California law

19 and the federal Due Process Clause, exercise specific personal jurisdiction over

20 this admittedly foreign corporation.

21 **A.     The Constitutional Exercise of Personal Jurisdiction**

22        Where a party moves to dismiss a claim for lack of personal jurisdiction, the

23 party asserting the claim bears the burden of demonstrating that jurisdiction is

24 appropriate. Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800 (9th Cir.

25 2004). However, in opposing a motion to dismiss for lack of personal jurisdiction,

26 the party asserting the claim need only make a *prima facie* showing of jurisdictional

27 facts. Id. Disputed facts are to be resolved in favor of the exercise of personal

28 jurisdiction. Id.

26

EXHIBIT 26

PAGE _____ 894

●                                    ●

1    Because there is no applicable federal statute governing personal

2    jurisdiction, the Court applies the law of the state in which the district court sits. Id.

3    (citations omitted). "Because California's long-arm jurisdictional statute is

4    coextensive with federal due process requirements, the jurisdictional analyses

5    under state law and federal due process are the same." Id. at 800-01 (citations

6    omitted). In order for a court's exercise of personal jurisdiction over a nonresident

7    defendant to be constitutionally permissible, the defendant must have "minimum

8    contacts" with the forum state "such that the exercise of jurisdiction does not offend

9    traditional notions of fair play and substantial justice." Id. at 801 (internal quotation

10   marks and citation omitted).

11   Personal jurisdiction may be either general or specific. For general personal

12   jurisdiction to apply, a defendant (or here, a counter-defendant) "must engage in

13   continuous and systematic general business contacts . . . that approximate a

14   physical presence in the forum state." Id. (internal quotation marks and citations

15   omitted).

16   To determine whether it has specific personal jurisdiction over a nonresident

17   defendant, the Court employs a three-part test:

18        (1) The non-resident defendant must purposefully direct his

19        activities or consummate some transaction with the forum or resident

20        thereof; or perform some act by which he purposefully avails himself

21        of the privilege of conducting activities in the forum, thereby invoking

22        the benefits and protections of its laws; (2) the claim must be one

23        which arises out of or relates to the defendant's forum-related

24        activities; and (3) the exercise of jurisdiction must comport with fair

25        play and substantial justice, i.e. it must be reasonable.

26   Id. at 802.

27   The party asserting the claim bears the burden of establishing the first two

28   parts of the test. Id. If that party establishes the first two parts, then the burden

27

EXHIBIT 26
895

PAGE _____

1   shifts to the party resisting the Court's exercise of personal jurisdiction "to present a

2   *compelling case* that the exercise of jurisdiction would not be reasonable." Id.

3   (emphasis added).

4          The first part of the test is satisfied by either "purposeful availment" or

5   "purposeful direction." Id. Purposeful availment is shown when a defendant avails

6   itself of the privilege of doing business in a forum state, usually met when the

7   defendant took some action in the forum, such as executing or performing a

8   contract there. Id. By virtue of such actions, a defendant "purposefully avails itself

9   of the privilege of conducting activities within the forum State, thus invoking the

10  benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958).

11  When taking advantage of these "benefits and protections," a defendant must also

12  "submit to the burdens of litigation in that forum." Burger King Corp. v. Rudzewicz,

13  471 U.S. 462, 476 (1985).

14          By contrast, purposeful direction, involves actions by the defendant outside

15  of the forum state but that are directed at the forum. Schwarzenegger, 374 F.3d at

16  803. The purposeful direction analysis is derived from a three-part "effects test"

17  that finds its roots in the Supreme Court's decision in Calder v. Jones, 465 U.S. 783

18  (1984). Pursuant to this analysis, the defendant must "have (1) committed an

19  intentional act, (2) expressly aimed at the forum state, (3) causing harm that the

20  defendant knows is likely to be suffered in the forum state." Id.; Schwarzenegger,

21  374 F.3d at 803. All three parts of the test must be satisfied. The second part of

22  the effects test is described by the Ninth Circuit as the "express aiming"

23  requirement, and requires that the counter-defendants "expressly aimed" its

24  intentional act at California. See Schwarzenegger, 374 F.3d at 806. Specifically,

25  "express aiming" is found where the defendant is alleged to have engaged in

26  wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident

27  of the forum state." Bancroft & Masters, Inc. v. Augusta Nat. Inc., 223 F.3d 1082,

28

28

EXHIBIT 26

PAGE      896

1087 (9th Cir. 2000).[5]

Assuming that the party asserting a claim can establish that the party resisting the Court's exercise of personal jurisdiction has met either the purposeful availment or express aiming part of the three-part test regarding the exercise of specific personal jurisdiction, courts next consider whether the claim arises out of or relates to the forum-related activities.  In making this determination, the Court considers whether the contacts with the forum gave rise to the claims asserted, employing a "but for" standard.  See Doe v. Unocal Corp., 248 F.3d 915, 924 (9th Cir. 2001).

Once the purposeful availment/express aiming and relatedness requirements are established, the burden shifts to the party resisting the Court's exercise of jurisdiction to show that exercise of jurisdiction is unreasonable.  In determining reasonableness, the Court considers seven factors:

> 1) the extent of the defendant's purposeful interjection into the forum
> state's affairs; 2) the burden on the defendant; 3) conflicts of law
> between the forum and defendant's home jurisdiction; 4) the forum's
> interest in adjudicating the dispute; 5) the most efficient judicial
> resolution of the dispute; 6) the plaintiff's interest in convenient and
> effective relief; and 7) the existence of an alternative forum.

---

[5] What constitutes, or doesn't constitute, "express aiming" is best illustrated by example.  For instance, in Pebble Beach Co. v. Caddy, 453 F.3d 1151 (9th Cir. 2006), no express aiming was found where the owner of a bed-and-breakfast in England (overlooking a pebbly beach) used the term "pebblebeach," the name of a famous golf course located in California, on its web site. Id. at 1153, 1156-57.  The Ninth Circuit acknowledged that it might be foreseeable that the defendant's use of the web site might have some effect on California, but noted that mere foreseeability of effect in a forum state is not enough to constitute express aiming. Id. at 1157.  In contrast to Pebble Beach is the case of Panavision Intern., L.P. v. Toeppen, 141 F.3d 1316, 1321 (9th Cir. 1998), in which the Ninth Circuit found that the express aiming requirement was met where the defendant registered plaintiff's marks as Internet domain names in order to force a California plaintiff to pay him money.

29

EXHIBIT 26

897

PAGE ____

1  Roth v. Garcia Marquez, 942 F.2d 617, 623 (9th Cir. 1991) (internal citation
2  omitted).  No factor is dispositive and the Court must balance all seven.  Id.
3  (internal citation omitted).

4  **B.     MGA Mexico's Contacts with the Forum State**

5       The AAC alleges that Issac Larian and other MGA officers, while in
6  California, executed a plot to target three high-level employees of Mattel Mexico,
7  and entice them to steal Mattel's trade secrets.  In written offers of employment to
8  these three individuals, Issac Larian held himself out to be the CEO of MGA
9  Mexico.  This plot was facilitated by a number of cross-border communications
10 among the participants as well as travel to the United States by the targeted
11 employees.

12 **C.     The Court May Exercise Personal Jurisdiction over MGA Mexico**

13       The AAC repeatedly alleges that Larian, who held himself out to be MGA
14 Mexico's CEO, and who was designated as MGA Mexico's "legal agent" in Mexican
15 registration document actively sought to induce others to access and steal Mattel's
16 trade secrets while located in the California.  See Velázquez Decl. Exs. A-C; Salem
17 Decl. Ex. B.  This constitutes purposeful availment.

18       To the extent that any of the actions taken in Mexico by the three Mexican
19 employees may be imputed to Mattel Mexico, there is also purposeful direction.
20 The alleged actions taken on behalf of MGA Mexico were specifically engineered to
21 result in the alleged illegal acquisition of trade secrets belonging to Mattel, a
22 California resident.[6]

23       The relatedness requirement is also clearly met.  The contacts with
24 California involve actions allegedly taken in order to further the illegal acquisition of
25 Mattel's trade secrets, leading to the present claims against MGA Mexico for
26 misappropriation of trade secrets and the related RICO claims.

27

28       [6]  The AAC alleges the theft of trade secrets belonging not only to Mattel's
     Mexican subsidiary, but also to Mattel itself, which is a California corporation.

30

EXHIBIT 26  898

PAGE _____  899

1    The burden, therefore, is on MGA Mexico to show that the exercise of

2  jurisdiction is unreasonable.[7]  As noted previously, the Court considers seven

3  factors.  The first factor the Court considers is the defendant's purposeful

4  interjection.  For the reasons the Court has found purposeful availment and

5  purposeful direction, this factor favors the exercise of personal jurisdiction.

6    MGA Mexico argues, without elaboration, that the burden of defending itself

7  in California is "significant."  However, the assumption underlying this argument is

8  that the present action is more properly litigated by MGA's and Mattel's Mexican

9  subsidiaries.  This assumption misses the point of Mattel's claim against MGA

10  Mexico; Mattel, the parent company, was itself injured by MGA's Mexico's alleged

11  misappropriation of its own trade secrets because the alleged misappropriation was

12  not limited to trade secrets belonging to its Mexican subsidiary.  The argument

13  based on this faulty assumption is therefore unconvincing.  In order to show

14  unreasonableness, the burden on the defendant must be great.  See Panavision,

15  141 F.3d at 1323 ("A defendant's burden in litigating in the forum is a factor in the

16  assessment of reasonableness, but unless the inconvenience is so great as to

17  constitute a deprivation of due process, it will not overcome clear justifications for

18  the exercise of jurisdiction.") (internal quotation marks and citation omitted).

19    As to the third and seventh factors, regarding conflicts of law and the

20

21    [7]  In its reply, MGA Mexico declares that it "made a 'compelling case' in
support of its motion to dismiss that it would be unreasonable to force it to litigate
22  in this forum."  MGA Mexico Reply at 10.  However, MGA Mexico's motion papers
fail to acknowledge that they bear the burden on this issue.  See MGA Mexico's
23  Memorandum of Points and Authorities at 10 ("Finally, Mattel has failed to satisfy
the third element required for specific jurisdiction – that the exercise of jurisdiction
24  over the defendant would be reasonable.").  As Mattel accurately predicted in its
opposition papers, MGA Mexico implicitly acknowledged its burden in the reply,
25  and used the occasion to improperly present additional arguments for the first
time.  Although the Court ordinarily would not consider such arguments, it does so
26  here because it does not change the Court's ultimate conclusion.  See In re Intuit
Privacy Litigation, 138 F.Supp.2d 1272, 1275 n.3 (C.D. Cal. 2001) ("this court
27  does not consider arguments raised anew for the first time in a reply brief as to do
so would unfairly deny the non-moving party an opportunity to respond.").

28

31

EXHIBIT _26_
          900
PAGE _____

1    existence of an alternative forum, MGA Mexico makes veiled references to the

2    criminal action in Mexico as constituting a choice of forum made by Mattel,

3    apparently implying that Mattel, having chosen to pursue criminal charges in

4    Mexico, should be precluded from invoking the power of this Court. It appears to

5    the Court that MGA Mexico has failed to fully and clearly articulate this argument

6    because it is untenable. Whether Mexican authorities pursue criminal charges

7    based on the same conduct underlying the claims in this action is irrelevant to

8    whether this Court may constitutionally exercise personal jurisdiction over MGA

9    Mexico. Therefore, MGA Mexico's argument on this issue is unpersuasive.

10        The fourth factor, the interest in adjudicating the dispute, weighs in favor of

11   the exercise of personal jurisdiction, as does the sixth, the plaintiff's interest in

12   convenient and effective relief.

13        MGA Mexico argues that the fifth factor weighs in its favor when the Court

14   considers that the site of injury, which it does not believe is California, is the most

15   efficient forum. However, this argument is premised on the rejected assumption

16   that the present action is more properly litigated between MGA's and Mattel's

17   Mexican subsidiaries.

18        On balance, a consideration of the reasonableness factors reveals that MGA

19   Mexico has fallen far short of establishing the "compelling case" necessary to

20   render the Court's exercise of personal jurisdiction unreasonable.

21        The Court concludes that Mattel has established the first two parts of the

22   specific personal jurisdiction test, and that MGA Mexico has failed to establish that

23   the Court's exercise of personal jurisdiction over it is otherwise unreasonable.

24   Accordingly, the Court **DENIES** MGA Mexico's motion to dismiss.

25                    **V. MGA's and Bryant's Motions Regarding**

26                    **the Discovery Master's March 7, 2007, Order**

27        MGA and Bryant seek review of a decision that resolved discovery disputes

28   that arose during Bryant's deposition, and that was rendered by the Court-

EXHIBIT 26

PAGE 901

1 appointed discovery master, Judge Edward A. Infante (Ret.), on March 7, 2007.

2 The Court's order appointing Judge Infante provides that his orders resolving

3 discovery disputes shall be reviewed in the same manner as those made by a

4 magistrate judge of this Court.

5     Pursuant to Fed. R. Civ. P. 72(a), when the parties object to the ruling of a

6 magistrate judge on a non-dispositive manner, such as a discovery dispute, the

7 district judge may modify or set aside only those portions of the magistrate judge's

8 order that are "clearly erroneous or contrary to law." Id.

9     The "clearly erroneous" language refers to factual findings. See e.g.,

10 Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension

11 Trust, 508 U.S. 602, 622 (1993) (discussing the clearly erroneous standard). Here,

12 there were no explicit factual findings or legal conclusions made by Judge Infante

13 regarding the relevant rulings; therefore, the Court reviews the record presented to

14 Judge Infante to determine whether his rulings are contrary to law. See March 7,

15 2007, Order.

16     Questions that do not seek the substance of attorney-client communications

17 generally do not implicate the attorney-client privilege. United States v. Carrillo,16

18 F.3d 1046, 1050 (9th Cir. 1994) (finding no violation of the attorney-client privilege

19 where prosecutor, who asked whether a criminal defendant had consulted with his

20 attorney during a recess in order to raise an inference of attorney coaching of

21 testimony during the trial, stopped short of asking defendant the substance of

22 defendant's communications with his attorney). Therefore, questions such as the

23 one addressed by objection No. 38, asking whether Bryant talked to counsel for

24 MGA during a break from his deposition, are not subject to objection based on the

25 attorney-client privilege. This conclusion is consistent with Judge Infante's Order.

26     Mattel's question regarding who is paying Bryant's legal fees, addressed by

27 objection No. 42, is likewise not objectionable. MGA and Bryant argue that state

28 law applies; however, because the present consolidated actions involve both

33

EXHIBIT 26

PAGE 902

1  federal and state-law claims, the federal law of privilege applies. Agster v.

2  Maricopa County, 422 F.3d 836, 839-40 (9th Cir. 2005) ("Where there are federal

3  question claims and pendent state law claims present, the federal law of privilege

4  applies."). To that end, consistent with federal privilege law, fee-payment

5  arrangements are relevant to credibility and bias, and if asked in discovery, Bryant

6  must disclose who is paying his legal fees. See United States v. Blackman, 72 F.3d

7  1418, 1424 (9th Cir. 1995) ("As a general rule, client identity and the nature of the

8  fee arrangement between attorney and client are not protected from disclosure by

9  the attorney-client privilege."). This conclusion is also consistent with Judge

10 Infante's Order.

11      However, in this case, the joint-defense privilege protects from disclosure the

12 substance of certain statements made by Bryant and his attorneys in the presence

13 of attorneys representing MGA. "The joint defense privilege protects

14 communications between an individual and an attorney for another when the

15 communications are 'part of an on-going and joint effort to set up a common

16 defense strategy.'" United States v. Bay State Ambulance and Hosp. Rental

17 Service, Inc., 874 F.2d 20, 28 (1st Cir. 1989) (internal quotation marks and citation

18 omitted). Generally, to rely on the joint-defense privilege, a party must establish

19 three elements: "(1) [T]he communications were made in the course of a joint

20 defense effort, (2) the statements were designed to further the effort, and (3) the

21 privilege has not been waived." Id.

22      The Court finds the first element was met. The Court, based on its review of

23 the record pending before Judge Infante, is satisfied that the parties had in place at

24 the time of Bryant's deposition, and have in place today, a valid joint-defense

25 agreement. The Court also finds that the second element was met. Mattel cannot

26 seriously contend that MGA's interests are not aligned with Bryant's in this action,

27 or that counsels' thorough preparation of Bryant for his deposition was not designed

28 to further the joint defense effort. Finally, as for the third element, there is no

34

EXHIBIT 26

PAGE 903

1 | suggestion in the record that any party has waived the attorney-client privilege.

2 | Accordingly, the Court holds that Judge Infante's rulings on Objection Nos.

3 | 39 and 50 are contrary to law to the extent those rulings require Bryant to divulge

4 | the substance of his communications with counsel for MGA.

5 | **VII. Conclusion**

6 | In the manner set forth more fully herein, the Court makes the following

7 | rulings:

8 | 1.    Motion of MGA Entertainment, Inc., ("MGA") and Issac Larian

9 | ("Larian") to Dismiss Mattel's Amended Answer and Counterclaims (docket # 189):

10 | **GRANTED IN PART AND DENIED IN PART.**

11 | 2.    Motion of Carter Bryant to Dismiss Counterclaims II, III, V, VII, IX, and

12 | XI (docket # 191): **GRANTED IN PART AND DENIED IN PART.**

13 | 3.    Motion of MGA Mexico to Dismiss Mattel's Amended Answer and

14 | Counterclaims (docket # 266): **DENIED.**

15 | 4.    Motion of MGA Objecting to Discovery Master's March 7, 2007, Order

16 | (docket # 308): **GRANTED IN PART AND DENIED IN PART.**

17 | 5.    Motion of Carter Bryant Objecting to Discovery Master's March 7,

18 | 2007, Order (docket # 306): **GRANTED IN PART AND DENIED IN PART.**

19 | Mattel is **GRANTED** ten days' leave to amend the AAC in conformity with

20 | this Order. The Counter-defendants shall answer or otherwise respond to the

21 | SAAC no later than thirty days after the filing of the SAAC.

22

23

24

25

26

27

28

35

EXHIBIT 264

PAGE _____

1       The Motion Re Trial Structure (docket #462) has been the subject of further

2   briefing by the parties and is set for further oral argument on July 2, 2007.  Ruling

3   on that matter is **DEFERRED** pending oral argument.

4         DATE:  June 27, 2007

5

6           STEPHEN G. LARSON
            UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

36

EXHIBIT 26

PAGE _____ 905

# EXHIBIT 27

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 28

1   Bingham McCutchen LLP
    TODD E. GORDINIER (SBN 82200)
2   todd.gordinier@bingham.com
    PETER N. VILLAR (SBN 204038)
3   peter.villar@bingham.com
    CRAIG A. TAGGART (SBN 239168)
4   craig.taggart@bingham.com
    600 Anton Boulevard, 18th Floor
5   Costa Mesa, CA 92626-1924
    Telephone: 714.830.0600
6   Facsimile: 714.830.0700

7   Attorneys Specially Appearing For Non-party
8   LEXINGTON FINANCIAL LIMITED

9                UNITED STATES DISTRICT COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11  | Carter Bryant, an individual, | Case No. CV 04-9049 SGL (RNBx) |
12  | Plaintiff, | [To Be Heard By Discovery Master Robert C. O'Brien] |
13  | v. | |
14  | Mattel, Inc., a Delaware Corporation, | DECLARATION OF FRED F. MASHIAN IN OPPOSITION TO MATTEL, INC.'S EX PARTE |
15  | Defendant. | APPLICATION FOR AN ORDER DEEMING LEXINGTON |
16  | | FINANCIAL, LLC SERVED, OR IN THE ALTERNATIVE, TO (1) |
17  | | COMPEL AN AUTHORIZED REPRESENTATIVE OF |
18  | | LEXINGTON FINANCIAL, LLC TO APPEAR TO ACCEPT SERVICE OF |
19  | | SUBPOENA, OR (2) ISSUE AN ORDER AUTHORIZING |
20  | | LEXINGTON FINANCIAL, LLC TO BE SERVED THROUGH THE |
21  | | CALIFORNIA SECRETARY OF STATE |
22  | | |
23  | AND CONSOLIDATED ACTIONS. | Phase 2: Discovery Cut-off:     Dec. 11, 2009 |
24  | | Pre-trial Conference:   March 1, 2010 Trial Date:           March 23, 2010 |

25
26
27
28

EXHIBIT 28
912
PAGE _____

1    I, Fred F. Mashian, hereby declare as follows:

2        1.    I am an attorney certified to practice law in the State of California. I

3    make this declaration in opposition to Mattel, Inc.'s *ex parte* application for an

4    order deeming Lexington Financial, LLC to be served with a subpoena purportedly

5    issued by Mattel, Inc. on or about January 30, 2009 (the "Subpoena"). I have

6    personal knowledge of the matters stated herein, and if called upon could and

7    would testify competently to them.

8        2.    I am a business attorney, with a focus on international and domestic

9    tax and estate planning.

10       3.    From time to time, I have been retained to provide legal services for

11   LEXINGTON FINANCIAL LIMITED. I am not, and never have been, an officer,

12   director, partner, member, employee or agent of LEXINGTON FINANCIAL

13   LIMITED. I am not, and have never been, the agent for service of process for

14   LEXINGTON FINANCIAL LIMITED. I was not authorized to accept service of

15   the Subpoena on behalf of LEXINGTON FINANCIAL LIMITED, nor have I ever

16   been authorized to accept service of a subpoena on behalf of LEXINGTON

17   FINANCIAL LIMITED.

18       4.    I also have no knowledge of, affiliation with, or relationship to the

19   entity referenced on the Subpoena, "Lexington Financial, LLC." I have never been

20   authorized to accept service of the Subpoena on behalf of any such entity. In fact,

21   to my knowledge, no such entity exists.

22       5.    LEXINGTON FINANCIAL LIMITED was duly formed under the

23   laws of Nevis on or about March 3, 2006, and is in good standing. Its business

24   address is located in London, England. It has no offices in the United States or in

25   California. The correct name and address of LEXINGTON FINANCIAL

26   LIMITED is set forth in Exhibits 1 and 3 to the Declaration of Jon Corey filed in

27   support of Mattel, Inc.'s ex parte application.

28

-1-

EXHIBIT _28_

PAGE _913_

6.     In 2008, LEXINGTON FINANCIAL LIMITED made a loan to Vision Capital, LLC, a Delaware Limited Liability Company. I prepared the loan documents in connection with that loan transaction, and I filed a UCC Financing Statement (attached as Exhibit 1 to the Declaration of Jon Corey).

7.     LEXINGTON FINANCIAL LIMITED has no affiliation with or relationship to MGA Entertainment, Inc. or Isaac Larian. I have no affiliation with or relationship to MGA Entertainment, Inc. or Isaac Larian.

8.     On the morning of Saturday, January 31, 2009, a man came to my door and handed me two subpoenas. One of the subpoenas was addressed to me personally and the other was addressed to "Lexington Financial, LLC." I told the man that I was not an agent for service of process for Lexington Financial, LLC and that I did not believe that any such entity even existed. I refused to accept service of the Subpoena to Lexington Financial, LLC. In fact, the Declaration of Mark Shurlock filed in support of Mattel's ex parte application even confirms my refusal to accept service of the Lexington Subpoena (though Mr. Shurlock does not provide a complete or accurate account of all of the facts).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on March 8, 2009.

_____
Fred Mashian

-2-

EXHIBIT 28

PAGE 914

# EXHIBIT 29

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 30

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER