# EXHIBIT 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.    CV 04-09049 SGL(RNBx)                    Date: April 27, 2009
Title:      MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

         Cindy Sasse                          None Present
         Courtroom Deputy                     Court Reporter

ATTORNEYS PRESENT FOR                 ATTORNEYS PRESENT FOR
PLAINTIFFS:                           DEFENDANTS:

None Present                          None Present

PROCEEDINGS:    ORDER DENYING MATTEL'S MOTION FOR JUDGMENT AS A
                MATTER OF LAW (DOCKET #4498)

                ORDER GRANTING IN PART AND DENYING IN PART MGA'S
                MOTION FOR JUDGMENT AS A MATTER OF LAW (DOCKET
                #4496)

                ORDER AMENDING IN PART ORDER RE FINDING OF
                LIABILITY PURSUANT TO CAL. BUS. & PROFS. CODE § 17200
                (DOCKET #4441);

                ORDER GRANTING IN PART AND DENYING IN PART MGA'S
                MOTION FOR REMITTITUR (DOCKET #4495, #4523)

                ORDER LIFTING STAY ON PERMANENT INJUNCTION (#4443)

                ORDER FOR ACCOUNTING OF PROFITS OF
                BRATZ PRODUCTS

                ORDER REGARDING RETRIEVAL OF PREVIOUSLY LODGED

MINUTES FORM 90                              Initials of Deputy Clerk __cls_____
CIVIL -- GEN                     1

EXHIBIT ___1___
PAGE ___4___

LAPTOP COMPUTER WITH PHASE 1A AND 1B TRIAL
TRANSCRIPT

ORDER REGARDING UNSEALING OF DOCUMENTS FILED
UNDER SEAL FROM MAY 28, 2008, THROUGH FEBRUARY 11,
2009

ORDER RE PHASED, UNDER SEAL RELEASE OF FORENSIC
AUDITOR'S REPORT TO COUNSEL AND PARTIES

ORDER GRANTING IN PART AND DENYING IN PART
MOTION TO INTERVENE (DOCKET #4761)

ORDER APPOINTING TEMPORARY RECEIVER

ORDER SETTING HEARING ON APPOINTMENT OF
PERMANENT RECEIVER

## I. MATTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW
(DOCKET #4498)

A motion for judgment as a matter of law after trial is granted only when there is
not a "legally sufficient evidentiary basis [for a reasonable jury] to find for that party on
[an] issue." Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002). Sufficient evidence is
"evidence adequate to support the jury's conclusion, even if it is also possible to draw a
contrary conclusion." Id.

Mattel, Inc. ("Mattel") moves for judgment as a matter of law on the issue of the
scope of infringement of the Bratz dolls. Specifically, Mattel argues that "[e]ach core
Bratz fashion doll sold by MGA infringes Mattel's copyrights." Motion at 4. Mattel
acknowledges that the judgment it seeks would alter neither the jury's damages award
nor the Court-awarded equitable relief; however, Mattel seeks this judgment as an
alternative basis for the relief it has already been awarded. Without ruling on the merits
of the argument, the Court declines to adopt this alternative basis because it is not
necessary to support the relief awarded to Mattel. The jury, in the Phase 1B verdict,
found that the Bratz dolls infringed Mattel's copyrights, but the scope of that
infringement was not explicitly found by the jury. Even if the Court were to grant the
relief sought by Mattel, the amount the jury awarded for copyright infringement, $10
million, would be unchanged. Moreover, the Court, sitting in equity, made an express
factual finding, set forth more fully in its December 3, 2008, Order that the core Bratz
fashion dolls infringed Mattel's copyrights. This portion of Mattel's motion is therefore
DENIED.

EXHIBIT ___1___
PAGE ___5___

In a similar fashion, Mattel seeks judgment as a matter of law on the issue that sculptor Margaret Leahy's contributions cannot, as a matter of law, support a claim of independent creation of the Bratz fashion doll sculpt, TX 1136A.[1]  In Phase 1A of the trial, the jury found that the sculpt was "'conceived or reduced to practice' -- that is, created -- by Carter Bryant, alone or jointly with others," during his employment with Mattel.  Phase 1A Verdict Form at 5.  This finding, when viewed in conjunction with the Court's summary judgment order, was sufficient to place the sculpt within the assignment clause of the Inventions Agreement which, in turn, conferred the rights to the sculpt to Mattel.  Therefore, as with the previous issue, this judgment is sought merely as an alternative basis for the relief Mattel has been awarded, which the Court, without deciding the merits, declines to adopt.  This portion of Mattel's motion is therefore similarly **DENIED.**

Finally, Mattel seeks judgment as a matter of law that both Isaac Larian and MGA HK engaged in acts of fraudulent concealment.  As to Isaac Larian, although there was evidence suggesting that he engaged in a cover-up as to *who* created Bratz (and later, as to *when* Bratz was created), he testified at trial that he did nothing to keep Carter Bryant's *role* in the creation of Bratz hidden.  Even in the face of evidence to the contrary, the jury could have believed him; thus, judgment as a matter of law on this point is not appropriate.  Credibility determinations are for the jury, and the jury could have made this credibility determination in favor of Isaac Larian.  Winarto v. Toshiba America Electronics Components, Inc., 274 F.3d 1276, 1294 (9th Cir. 2001).  As for MGA HK, Mattel did not cite any evidence that suggests that MGA HK should be found to have fraudulently concealed the basis for Mattel's claims, and therefore judgment as a matter of law is not appropriate.  This portion of Mattel's motion is therefore also **DENIED.**

For the reasons set forth above, Mattel's Motion for Judgment as a Matter of Law is **DENIED** in its entirety.

## II. MGA'S MOTION FOR JUDGMENT AS A MATTER OF LAW (DOCKET #4496)

The MGA parties[2] seek judgment as a matter of law that federal copyright law

---

[1] For their part, the MGA parties seek judgment as a matter of law of the mirror image of Mattel's claim; specifically, as discussed more fully below, the MGA parties seek judgment as a matter of law that Margaret Leahy's contribution to the creation of the sculpt amounted to independent creation.

[2] The Court herein refers to all three MGA parties collectively and individually as follows:  MGA Entertainment, Inc., is referred to as "MGAE."  MGA Entertainment (HK) Limited (also referred to in the record as "MGA Hong Kong") is referred to herein as "MGA HK."  All three defendants, Isaac Larian, MGAE, and MGA HK are collectively referred to as "the MGA parties."  When necessary to distinguish them further, the subset of entity defendants, MGAE and MGA HK, are collectively referred to as "the MGA entities."

MINUTES FORM 90
CIVIL -- GEN                            3                    Initials of Deputy Clerk __cls_____

EXHIBIT ___1___
PAGE ___6___

preempts Mattel's claims for aiding and abetting breach of fiduciary duty and the duty of loyalty. Relatedly, they also seek judgment as a matter of law that the damages awarded as to the state-law claims are precluded as preempted because they represent damages awarded under the theory of disgorgement, which was also awarded as part of copyright damages. The Court has previously rejected the argument that copyright law preempts the two aiding and abetting claims, and the Court leaves undisturbed its previous holding on this issue. As for the related argument regarding damages, to accept the MGA parties' argument, the Court would have to reject the current, firmly established standard for determining if a state-law claim is preempted in favor of a new standard that would find preemption any time the relief sought by the state-law claim is also redressable by a copyright claim. This Court must follow the enunciated standard for copyright law preemption, and it therefore rejects the MGA parties' argument regarding this issue. This portion of the motion is **DENIED**.

The MGA parties seek judgment as a matter of law that Mattel's claims for aiding and abetting breach of fiduciary duty and the duty of loyalty is preempted by the California Uniform Trade Secrets Act. This issue was not raised in the parties' pretrial conference order and, accordingly, was waived. See e.g., El-Hakem v. BJY Inc., 415 F.3d 1068, 1077 (9th Cir. 2005). This portion of the motion is **DENIED**.

The MGA parties seek judgment as a matter of law that Mattel failed to prove its damages as to each of its state-law claims. Mattel proceeded on a theory of recovery that sought disgorgement of the MGA parties' profits rather than another measure of damages; there was ample evidence presented by both sides regarding the MGA parties' profits. The Court has previously rejected, and does not now revisit, the MGA parties' contention that the proper measure of damages for aiding and abetting Carter Bryant's breaches of fiduciary duty and the duty of loyalty should be measured by Carter Bryant's profits, rather than the MGA parties' profits. As for the conversion claim, as set forth infra, the Court has remitted the monetary damages awarded by the jury in favor of the equitable relief awarded by the Court in the form of return of the original drawings.[3] This portion of the motion is **DENIED**.

The MGA parties seek judgment as a matter of law that Mattel failed to prove that the MGA parties had actual knowledge of Carter Bryant's fiduciary duty or breach thereof. Admittedly, there is an absence of direct evidence, such as an admission by Isaac Larian, that any of the MGA parties had actual knowledge of Carter Bryant's fiduciary duty or breach thereof. But the indirect evidence relevant to this issue admitted at trial clearly supports the jury's verdict that both MGAE and Isaac Larian had an understanding that Carter Bryant had such an obligation as well as the parameters of such an obligation. This portion of the motion is **DENIED**.

---

[3] Those original drawings are currently in the custody of the Court as part of the Court record.

4

Initials of Deputy Clerk __cls_____

EXHIBIT ___/___
PAGE ___7___

The MGA parties seek judgment as a matter of law as to MGA HK's liability for unfair competition. The Court's summary judgment Order held that Mattel had raised a triable issue of fact as to whether the MGA parties tortiously interfered with Bryant and Mattel's contractual relationship and whether they engaged in commercial bribery. However, the tortious interference claim was not asserted against MGA HK, and there was no evidence presented at trial to support a statutory unfair competition claim against MGA HK for commercial bribery.  See Court's June 4, 2009, Final Pretrial Conference Order.  Accordingly, the Court **GRANTS** the motion on this issue, and the Court **ORDERS** that the following **AMENDMENTS** be made to its Order Granting Mattel's Motion for Finding Liability and Injunctive Relief Pursuant to Cal. Bus. & Profs. Code § 17200, filed December 3, 2008 (docket #4441):

- At page 1, line 6:  Delete "GRANTS" and substitute "GRANTS IN PART AND DENIES IN PART"

- At page 3, line 7:  Delete "the MGA Defendants" and substitute "MGA and Larian"

The MGA parties seek judgment as a matter of law that Mattel is not entitled to base any claims on ownership to the name "Bratz."  To the extent that the MGA parties' argument is based on the construction of the Inventions Agreement, it was not raised in the Rule 50(a) motion for judgment as a matter of law and, therefore, may not be raised for the first time in a Rule 50(b) motion for judgment as a matter of law.[4]  The Court finds wavier.

In any event, the argument fails on its merits.  The name "Bratz," which the jury found Carter Bryant conceived of during the period of his employment with Mattel, is within the scope of the assignment clause of the Inventions Agreement.  California law allows the assignment of an idea; thus, the name "Bratz" is, by virtue of the Inventions Agreement, the Court's summary judgment order construing that Agreement, and the jury's finding regarding the origin of the name, Mattel's property (even if it was not a proper trademark at the time it was conveyed and even though it is not subject to being copyrighted).  This portion of the motion is **DENIED.**

The MGA parties seek judgment as a matter of law that copyright infringement is limited to the first-generation Bratz dolls.  Essentially, the MGA parties seek a ruling that no reasonable jury could have found that any Bratz dolls, other than the first-generation

---

[4] The Court rejects the MGA parties' contention that this issue was raised in the Rule 50(a) motion and that the Rule 50(b) motion merely expands upon the argument.  The MGA parties' point in the Rule 50(a) motion was that there was a lack of intellectual property protection for the name Bratz (because it was not a valid trademark because it had not ever been used in commerce and because it could not be copyrighted); conversely, their point here is that the name "Bratz" is not within the scope of the Inventions Agreement.

Initials of Deputy Clerk __cls_____

EXHIBIT __1__
PAGE __8__

Bratz dolls, infringe Mattel's copyrights. The Court has already found that this is not the case; specifically, the Court has found, for the reasons set forth in its December 3, 2008, Order, that hundreds of Bratz female fashion dolls infringe Mattel's copyrights. This portion of the motion is **DENIED.**

The MGA parties seek judgment as a matter of law that Bryant was not an author of the Bratz sculpt. The Court previously observed, at trial, that this is an affirmative defense that was not asserted and was therefore waived. Moreover, this issue was not raised in the pretrial conference order; thus, it was waived for that reason as well. Furthermore, it was not raised in the MGA parties' Rule 50(a) motion, and therefore may not be raised for the first time in the Rule 50(b) motion.

In fact, this issue was not raised until ***after*** the jury's verdict in Phase 1A, in which the jury determined that Bryant created the sculpt (alone, or jointly with others). Recognizing this fact as a potential impediment to the relief they now seek, the MGA parties contend that in Phase 1A, the jury was not instructed on how to determine – and thus its express factual finding does not address – authorship as a matter of copyright law. Nevertheless, the Phase 1A verdict established the jury's finding that the sculpt was "'conceived or reduced to practice' – that is, created – by Carter Bryant, alone or jointly with others," during his employment with Mattel. Phase 1A Verdict Form at 5. This finding, when viewed in conjunction with the Court's summary judgment order, was sufficient to place the sculpt within the assignment clause of the Inventions Agreement which, in turn, conferred the rights to the sculpt to Mattel.

In any event, this argument also fails on its merits. A reasonable jury could have readily found that Carter Bryant was the author of the sculpt based on Paula Garcia's testimony that Margaret Leahy was tasked with creating the three-dimensional object equivalent of Carter Bryant's two-dimensional drawings. Trial Tr. at 800. When asked if she looked back to Carter Bryant's two-dimensional drawings during her review of the sculpt, Ms. Garcia stated that it was possible (although she had no specific recollection of doing so), "because the exercise was to create a 3D version of those 2D drawings, it was very likely that those drawings were there to then compare its 3D version with those relationships." Id.; see also Trial Tr. at 797 (Garcia's testimony as to the purpose of the sculpt, which was to determine how the "2D image" would "translate" to "3D"). This final portion of the motion is therefore **DENIED.**

As set forth herein, the Court **GRANTS** that portion of the MGA parties' Motion for Judgment as a matter of law that challenges the Court's finding of a violation of §§ 17200 et seq. on the part of MGA HK. The Court **DENIES** the remainder of the MGA parties' Motion for Judgment as a matter of law.

MINUTES FORM 90
CIVIL -- GEN                           6          Initials of Deputy Clerk __cls_____

EXHIBIT ___1___
PAGE ___9___

### III. MGA'S MOTION FOR REMITTITUR
### (DOCKET #4495, #4523)

On its face, the jury's Phase 1 verdict awards Mattel $100,031,500.00. The jury verdict was a round $100 million (allocated among a total of four claims and three defendants) except for $31,500, which was awarded to Mattel as damages for conversion of the original Bratz drawings. The MGA parties seek remittitur of this amount, arguing that, at most, Mattel should be awarded $20 million.

The Ninth Circuit enunciated its remittitur standard in 1982, when it noted that other circuits "consistently approve remitting the judgment to the maximum amount sustainable by the proof," before stating, "[w]e adopt this standard." D & S Redi-Mix v. Sierra Redi-Mix and Contracting Co., 692 F.2d 1245, 1249 (9th Cir. 1982). One of the cases cited with approval by the Redi-Mix court stated the standard in greater detail:

> The defendants' final contention is that the verdict was excessive, justifying a new trial or, in the alternative, a remittitur. Our review of this issue is limited to an examination of the plaintiff's injuries to determine whether the damage award is beyond the maximum possible award supported by the evidence in the record.

Keyes v. Lauga, 635 F.2d 330, 336 (5th Cir. 1981)

Since 1981, the Ninth Circuit has elaborated on this standard:

> Even a total inadequacy of proof on isolated elements of damages claims submitted to a jury will not undermine a resulting aggregated verdict which is nevertheless reasonable in light of the totality of the evidence. If we find that a jury's damages award exceeds the maximum amount sustainable by the probative evidence, we will not hesitate to order a remission of the excess by the plaintiff or, in the alternative, a new trial. . . . But where, as here, the jury's verdicts find substantial support in the record and lie within the range sustainable by the proof, we will not "play Monday morning quarterback" and supplant the jury's evaluation of the complex and conflicting evidence with our own.

Los Angeles Memorial Coliseum Com'n v. National Football League, 791 F.2d 1356,

MINUTES FORM 90
CIVIL -- GEN                                    7                    Initials of Deputy Clerk __cls_____

EXHIBIT ___/___
PAGE ___/0___

1366 (9th Cir. 1986) (internal citations omitted).[5]  Cf. In re First Alliance Mortg. Co., 471
F.3d 977, 1001 (9th Cir. 2006) (using the above-quoted standard, but noting that before
the Court was "the rare case in which it is sufficiently certain that the jury award was not
based on proper consideration of the evidence" but was instead "based on improperly
considered evidence, directly traceable to an error that was cured too little, too late").
Generally, courts are cautioned to "undertake only limited review of jury damages
awards, in order to avoid encroaching upon the jury's proper function under the
Constitution." Memorial Coliseum at 1365.  The standard is exceptionally deferential to
the jury's findings.  If the damages award is supported by the evidence, it must be
upheld even if the Court would have awarded a different amount of damages.

    It is through this very narrowly focused lens that the Court must consider the
present motion.

    The MGA parties argue that Mattel had a singular theory of recovery –
disgorgement of profits – and the amounts set forth by the jury as to each of the three
state-law claims are duplicative.  This is not a completely unappealing argument.  For
each of three state law claims – intentional interference with contractual relations, aiding
and abetting breach of fiduciary duty, and aiding and abetting the duty of loyalty – the
jury indicated that Mattel should be awarded $20 million as to MGAE and $10 million as
to Isaac Larian.  Totaled, this award is $90 million.  Viewed pursuant to the MGA
parties' theory, it would be the same $30 million awarded three times.  Relatedly, the
MGA parties contend that the copyright damages of $10 million (allocated among three
defendants) are also duplicative of this $30 million, even though the number is not
exactly the same.[6]

    However, these explanations as to what the jury intended are purely speculative.
The remittitur standard is exceptionally deferential to the jury's verdict, and the Court
cannot disturb it based on speculation.  The fact is the evidence not only supported a
verdict of $100 million, this Court could have, under the remittitur standard, easily
sustained a verdict many times this amount.  The jury may have meant to award only a
total of $30 million, or they may have simply decided they could all agree on a round
figure $100 million and then set about allocating that $100 million among multiple
claims and defendants.

---

[5] A number of district court cases in the Ninth Circuit have recently applied this standard.  Paul v.
Asbury Automotive Group, LLC  2009 WL 188592, at *2 (D. Ore. 2009); Hall v. North American Indus.
Services, Inc., 2008 WL 789895, at *2 (E.D. Cal. 2008); Lucky Break Wishbone Corp. v. Sears, Roebuck
and Co., 2008 WL 4742206, at *4 (W.D. Wash. 2008); Eldorado Stone, LLC v. Renaissance Stone, Inc.,
2007 WL 2403572, at *1 (S.D. Cal. 2007).

[6] The MGA parties' explanation for why these damages are duplicative even though they are not
exactly the same is that the jury reduced the $30 million for apportionment based on the expert testimony
of Professor Joachimsthaler, who testified that MGA's branding efforts could be responsible for
approximately 50% to 70% of Bratz-related profits.

EXHIBIT ___1___
PAGE ___11___

In any event, the Court must return to the standard by which its conclusion is governed. Here, a district court *must* leave undisturbed a jury's verdict that is "reasonable in light of the totality of the evidence," where the verdict does not "exceed[] the maximum amount sustainable by the probative evidence," and where the verdict "lie[s] within the range sustainable by the proof." The jury's verdict of $100 million is well within the range of possible awards based on the evidence of record, and therefore the Court must leave it undisturbed.

What the MGA parties are careful not to encroach upon, but what they in essence really seek, is an inquiry into what the jury *meant* by its verdict. As the Court and the parties to this case are aware, this inquiry is squarely within that which is prohibited by Fed. R. Evid. 606(b):

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.

Id. Of course, if that inquiry were permissible in this instance, the results seem clear. Counsel for the MGA parties has not thus far denied that at least one juror, possibly more, stated to them that the jury in fact intended a $100 million award of damages.

Separately, the MGA parties contend that, of that $100 million award, the $1 million awarded as defendant MGA HK's liability for copyright infringement is duplicative because of certain consolidated financial reporting that occurs between MGAE and MGA HK. This evidence was not before the jury; the jury made its award based on the evidence before it. In any event, because the evidence presented supports the $1 million award made against MGA HK, under the Memorial Coliseum standard, it must be left undisturbed.

The MGA parties also contend that the damages against Mr. Larian for intentional interference with contractual relations is barred by the statute of limitations. The Court previously held that the intentional interference with contractual relations claim was not subject to the discovery rule, so unless Mattel was able to establish a sufficient period of fraudulent concealment, the interference claim would be time barred. June 2, 2008, Order at 3. In its Phase 1B verdict, the jury answered in the negative a specific interrogatory regarding whether a requisite period of fraudulent concealment could be attributed to Mr. Larian.[7] Therefore, a combination of the Court's June 2, 2008,

---

[7] Conversely, the jury answered the same question regarding MGAE affirmatively.

MINUTES FORM 90
CIVIL -- GEN                                   9                    Initials of Deputy Clerk __cls_____

EXHIBIT  1
PAGE  12

Order and the jury's specific findings supports the MGA parties' position that the $10
million awarded as to Isaac Larian for the claim of intentional interference with
contractual relations should be remitted because, in the absence of a fraudulent
concealing finding by the jury, the claim is time barred.

However, at the hearing on this issue, counsel for Mattel suggested to the Court
that its legal conclusion regarding the non-application of the discovery rule to tortious
interference claims was in error and was, in fact, not an argument advanced by the
parties in their summary judgment papers.  Only very rarely will a court entertain an oral
motion for reconsideration; rarer still are those occasions when such a motion is
granted.  However, such a result is warranted here where the Court's previous legal
conclusion was simply wrong.

In their summary judgment motion, the MGA parties argued that a claim for
"intentional interference with a contract accrues no later than the date of the contract's
breach," implying – at least in the Court's view at the time of its review of the motion –
that the discovery rule did not apply.  See MGA SJ Mot. at 21 (docket #2572).  The
authority they cite supports the general rule regarding the accrual date of a tortious
interference claim, but the authority does not support the Court's more specific
conclusion that the discovery rule is inapplicable to claims for tortious interference.  See
Knoell v. Petrovich, 76 Cal.App.4th 164, 168 (1999) (refusing to apply the discovery rule
to a tortious interference claim but doing so on the basis that the plaintiff made judicial
admissions that were inconsistent with the application of the rule); Trembath v. Digardi,
43 Cal.App.3d 834, 836 (1974) (refusing to hold that the accrual of a claim for tortious
interference claim as to an attorney-client contingency fee contract extended beyond
the date of the breach to the suggested accrual date of the client's actual recovery, but
not discussing the discovery rule); Forcier v. Microsoft Corp., 123 F.Supp.2d 520, 531
(N.D. Cal. 2000) (refusing to apply the discovery rule to a tortious interference claim
because the facts presented in the case did not warrant it); Charles Lowe Co. v. Xomox
Corp., 1999 WL 1293362 at *9 (N.D. Cal. 1999) (defining accrual of a tortious
interference claim in relation to when damages are incurred and when a plaintiff may
seek a legal remedy, but not discussing the discovery rule); Menefee v. Ostawari, 228
Cal.App.3d 239, 245 (1991) (discussing neither tortious interference claims nor the
discovery rule).

At best, these cases represent examples of cases in which courts refuse to apply
the discovery rule because the facts of the case do not warrant it; these cases do not
stand for the broader conclusion reached by the Court in its prior order that the
discovery rule is inapplicable to *all* tortious interference claims, regardless of the factual
circumstances related to the claim's discovery.  Cf. AmerUS Life Ins. Co. v. Bank of
America, N.A., 143 Cal.App.4th 631, 639 (2006) (explicitly stating, regarding conversion
claims, that "[t]o the extent our courts have recognized a 'discovery rule' exception to
toll the statute, it has only been when the defendant in a conversion action fraudulently
conceals the relevant facts or where the defendant fails to disclose such facts in

MINUTES FORM 90
CIVIL -- GEN                                10                    Initials of Deputy Clerk __cls_____

EXHIBIT _____/_____
PAGE _____/3_____

violation of his or her fiduciary duty to the plaintiff."). Indeed, by examining the facts of
the case and discussing the discovery rule standard before concluding the rule does not
apply in that instance, rather than noting a wholesale rejection of the application of the
discovery rule to tortious interference claims, these courts have implicitly held that the
discovery rule may, in certain undefined instances, permit otherwise time-barred claims
to proceed.[8]

        The Court has previously discussed at length why the discovery rule delayed the
accrual of Mattel's claims in this case. That rationale applies with equal force to the
intentional interference with contractual relations claim, which was timely asserted
against Mr. Larian. Thus, it becomes irrelevant that the jury failed to attribute any
fraudulent concealment to Mr. Larian, and the Court DENIES the motion on issue of
timeliness of the tortious interference claim.

        Finally, the MGA parties correctly contend that the damages awarded for
conversion, totaling $31,500, should be remitted because the Court's declaratory
judgment orders the MGA parties to return the drawings. The Court GRANTS the
motion on this issue. However, the drawings shall remain in the Court's custody
pending completion of Phase 2, pending appeal, and/or pending further order of this
Court.

## IV. LIFTING STAY, AS MODIFIED AND SUPPLEMENTED, ON PERMANENT INJUNCTION (#4443)

        Subject to the modification set forth in the Court's January 7, 2009, Order (docket
#4657) (relating to distributors and retailers), the Court VACATES the stay on
enforcement of its December 3, 2008, Order Granting Mattel, Inc.'s Motion for
Permanent Injunction (docket #4443) ("Permanent Injunction Order"). Specifically, the
Court VACATES the stay set forth in its Omnibus Order of December 3, 2008 (docket
#4439) at 16 (which was imposed pending resolution of the three post-trial motions
upon which the Court today rules); however, the Court leaves undisturbed the more
limited stay set forth in the Court's January 7, 2009, Order, which relates to the
purchase of Bratz products by retailers and distributors up to and including December
31, 2009. This limited stay is supplemented as set forth below.

---

        [8] Had those courts not wished to make this implication, they could have, but did not, set forth a
qualification that the court was assuming without deciding that the discovery rule could be applied to a
tortious interference claim. Cf. Grisham v. Philip Morris U.S.A., Inc., 40 Cal.4th 623, 634 n.7 (2007) ("We
assume for purposes of this discussion that the delayed discovery rule applies to unfair competition
claims. We note that this point is currently not settled under California law . . . and we do not address it.")
(citations omitted).

MINUTES FORM 90
CIVIL -- GEN                                     11                  Initials of Deputy Clerk __cls_____

EXHIBIT ___1___
PAGE ___14___

The Permanent Injunction Order contemplates the Court's appointment of a Special Master to resolve issues and disputes relating to the enforcement of the Permanent Injunction Order. At this point, in the absence of any such disputes, the Court reserves such an appointment.

## V. ACCOUNTING OF BRATZ PROFITS SINCE AUGUST 26, 2008

In light of the Court's interpretation of what has been referred to in this litigation as the Inventions Agreement (especially the Court's April 25, 2008, summary judgment Order), in light of the two jury verdicts returned in this case on July 17, 2008, and on August 26, 2008, in light of the Court's December 3, 2008, Orders regarding the parties' equitable claims and equitable relief (especially the Court's Omnibus Order defining the parameters of the scope of copyright infringement, the Court's Order Granting Mattel's Motion for Permanent Injunction, and the Court's Order Granting Mattel's Motion for Constructive Trust), and in light of this Order rejecting in all material respects the MGA parties' post-trial challenges to the jury's findings, the Court's findings, and the Court's legal and equitable rulings, the Court **ORDERS** the MGA entities to file with the Court, and serve on all parties, no later than thirty days from the entry of this Order, a full accounting of all profits that have resulted from all sales, occurring after August 26, 2008, of all products that fall within any of the Court's December 3, 2008, Orders referenced above.

Within ten days of the filing of that accounting, the interested parties shall file a joint status report setting forth the position of all interested parties on how they wish to proceed on this issue.

## VI. ORDER RE RETRIEVAL OF JOINTLY LODGED LAPTOP COMPUTER

On September 11, 2008, for the Court's convenience and pursuant to its Order, Mattel and the MGA parties jointly lodged a laptop computer from which the Court could easily access the Phase 1A and 1B trial transcripts. Counsel are advised to contact the courtroom deputy clerk to arrange to retrieve the computer from the Court.

## VII. ORDER RE REVIEW OF UNDER SEAL FILINGS

On June 24, 2008, this Court ordered unsealed vast portions of the previously sealed record in these consolidated cases. That Order related only to documents filed on or before May 27, 2008. Certain specific documents, identified by the parties by docket number and found by the Court to have good cause to remain sealed, were not unsealed; similarly, certain Orders of this Court were not unsealed.

Counsel for all the parties are **ORDERED** to engage in a review and meet and confer process to significantly narrow, if not eliminate the under seal nature of the filings

MINUTES FORM 90
CIVIL -- GEN                               12              Initials of Deputy Clerk __cls_____

EXHIBIT __1__
PAGE ___15___

dated May 28, 2008, through the date of the lifting of the stay on Phase 2 discovery,
which occurred on February 11, 2009. The parties are **ORDERED** to file with the Court,
no later than forty-five days from the entry of this Order, a joint report that identifies by
docket number and pinpoint citation all materials the parties agree should remain under
seal, as well as the materials any party contends should remain under seal. In all
instances, all materials that are contemplated by any party to be maintained by the
Court under seal shall specify the reasons therefor.

Counsel should anticipate the narrowest possible information to be maintained
under seal. For example, if there is good cause for maintaining under seal only a small
portion of an attachment, counsel should anticipate that they may be required to e-file a
public redacted version of that document.

### VIII. ORDER RE PHASED, UNDER SEAL RELEASE OF
### FORENSIC AUDITOR'S REPORT TO COUNSEL AND PARTIES

The Court received *in camera* on April 23, 2009, and has since reviewed, the
Forensic Auditor's Report. Concurrently served, under seal, on each parties' counsel of
record, is a copy of the Forensic Auditor's preliminary report to the Court. The Court
reserves at this time release of the supporting documentation that is attached to the
report. This document is, until further Order of the Court, designated as a highly
restricted attorney-eyes-only document. It may be reviewed, and its contents shared,
only with *counsel of record* in this case and the Court-appointed Temporary Receiver
appointed below; it may not be shared with either the parties or attorneys who are not
counsel of record, including in-house counsel for the parties.

The parties are advised that they must file any objections on the basis of
privilege within forty-eight hours of the entry of this Order. Failure to do may result in
waiver of that privilege. After the expiration of this forty-eight hour period, the Court will
make further Orders regarding the scope of the release of the report, including its
attachments.

The Court understands that certain requested information has only recently been
produced to the Forensic Auditor. For that reason, and because he has represented to
the Court that certain analyses are ongoing, the Court continues the appointment of the
Forensic Auditor until further Order of this Court.

### IX. ORDER GRANTING IN PART AND DENYING IN PART
### MOTION TO INTERVENE (DOCKET #4761)

Non-party Omni 808 Investors, LCC ("Omni 808"), has filed an ex parte
application to intervene for the limited purposes of responding to Mattel's ex parte
application for a receiver for MGA and to address "all other issues related to Omni's

MINUTES FORM 90
CIVIL -- GEN                          13                Initials of Deputy Clerk __cls_____ .

EXHIBIT ___/____
PAGE ____/6____

status as a secured creditor of MGA." See Ex Parte Application to Intervene (docket #4761) at 1. This motion was heard on February 11, 2009, at which time the Court expressly held the motion in abeyance, along with the Mattel's ex parte application for appointment of a receiver (docket #4540), which is addressed in the following section, to allow the preparation of an audit report by the Court-appointed Forensic Auditor.

For the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** the motion to intervene. The motion is granted to the extent it seeks intervention to address the potential receivership issues; the motion is **HELD IN ABEYANCE** as to the other, broader, but unspecified issues raised by Omni 808.

In the absence of a federal statute conferring a right to intervene, Rule 24(a)(2) provides as follows:

> (a) Intervention of Right. On timely motion, the court must permit anyone to intervene who: . . . (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Id. The Ninth Circuit has identified four separate elements that must be met in order to qualify for intervention under this rule; specifically, a would-be intervenor must show the following:

> (1) [I]t has a significant protectable interest relating to the property or transaction that is the subject of the action; (2) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; (3) the application is timely; and (4) the existing parties may not adequately represent the applicant's interest.

United States Alisal Water Corp., 370 F.3d 915, 919 (9th Cir. 2004).

Omni 808 has met both the first and second elements. Where a party has a non-speculative economic interest that is both concrete and related to the underlying subject matter of the action, this element is met. Id. Mattel has correctly argued that, generally, the issues regarding the collectability of a party's debt does not confer an interest on the part of the creditor to justify intervention pursuant to Rule 24(a)(2). See id. (denying intervention where the interest of the would-be intervenor was "several degrees removed from the overriding public health and environmental policies that are the backbone of this litigation."). However, this particular request for intervention is not one that falls into this general category. Rather, it is an intervention for a very limited

MINUTES FORM 90
CIVIL -- GEN                                    14                    Initials of Deputy Clerk __cls_____

EXHIBIT ____1____
PAGE ____17____

purpose – to address the issue of the appointment of a receiver – which is directly
related to debt collectability. By virtue of this case, Mattel claims a significant interest in
the assets of the MGA parties, including both money damages and rights to intellectual
property previously held by the MGA parties. Omni 808 now claims a superior interest
by virtue of a transaction that occurred after the jury returned its verdict as to ownership
of certain Bratz property. This interest is directly related to this litigation.

The second element is met because the relief sought by Mattel is to take control
of the Bratz assets, as that term is at length defined by its proposed order submitted
with its motion for appointment of a receiver. According to the testimony the Court
heard at trial, the Bratz assets are, at least historically, the most significant ones owned
by the MGA parties. Resolution of the disputes over the priority to these assets may
have to take into account the claimed superiority of Omni 808's interest in MGAE.

The third element is met, at least as to the receivership issue, which is the only
ground upon which the Court grants the motion to intervene at this time.

The fourth element has been described as presenting a "minimal burden."
Trbovich v. United Mine Workers of America, 404 U.S. 528, 538 n.10 (1972). It is
sufficient that the would-be intervenor shows that the representation "may be
inadequate." Id. Here, although both the MGA parties and Omni 808 may oppose in
general the appointment of a receiver, their positions could differ significantly because
MGAE is Omni 808's debtor. Because all that is required is a minimal showing, and
because Omni 808 has represented that it is an MGAE secured creditor, the Court finds
that the fourth element is met because of the vastly different roles played by MGAE and
Omni 808 vis-à-vis Mattel: One is an anticipated judgment debtor and the other is a
competing creditor.

Accordingly, the Court **GRANTS IN PART** the motion to intervene. Omni 808 is
a party to these consolidated cases for the limited purpose of addressing the
receivership issues. As such, it may file briefing in accordance with the schedule set
forth below, and it may appear and argue at the hearing set as specified below.

For just cause and in order to preserve the status quo and address the
allegations set forth in Mattel's application for the appointment of a receiver and in its
opposition to the present motion to intervene, the Court **ORDERS** that Omni 808 and its
counsel are restrained and enjoined, absent further order from this Court, from taking
any action to assert or enforce any purported rights against the MGA parties, including
but not limited to commencing an action against the MGA parties, taking any action to
foreclose on any collateral of the MGA parties, committing any act that interferes with
the Temporary Receiver's possession, control or use of the assets of the MGA entities,
or commencing or participating in any involuntary bankruptcy proceedings against any
MGA party pending further hearing on this matter on May 18, 2009, at 1:30 p.m. At that
hearing, the Court will consider whether, as counsel for Omni 808 represented to this

MINUTES FORM 90
CIVIL -- GEN                                    15                    Initials of Deputy Clerk __cls_____

EXHIBIT ___1___
PAGE ___18___

Court, "Omni's purchase of the Senior Bank Credit Facility from Wachovia was a
straightforward, arms-length business deal between non-parties to this action," or
whether, as counsel for Mattel contends, the purchase was by entities formed for "the
improper purpose of attempting to leapfrog over Mattel's claims and shield their assets
from creditors and other rights-holders such as Mattel." Counsel for all parties,
including the intervenors, are afforded leave to file a final position on this issue no later
than May 14, 2009.

## X. ORDER RE APPOINTMENT OF TEMPORARY RECEIVER PENDING HEARING ON APPOINTMENT OF PERMANENT RECEIVER

Mattel has filed an application for the appointment of a receiver or for alternative
relief. The Court has considered all papers submitted in support of the application and
all opposition and reply papers thereto, the arguments of counsel at the hearing on the
application, and the entire record in this action, and finds that just cause exists for the
appointment of a Temporary Receiver purusant to L.R. 66.[9] Specifically, the Court finds
as follows:

1.    The MGA entities, MGAE and MGA HK, are domiciled in California, have
      their principal place of business in the Central District of California, and
      have the majority of their assets located within the Central District of
      California;

2.    As the Court has previously found, the Bratz Assets (as defined below and
      in that order) are and have been the property of Mattel and not any of the
      MGA parties;

3.    Good cause exists to believe that the MGA parties, defined as MGAE,
      MGA HK, and Isaac Larian, and each of them, have engaged in, are
      engaging in, or are about to engage in transactions, acts, practices and
      courses of business that constitute fraudulent transfers of assets and
      violations of Mattel's ownership and other rights in and to the Bratz Brand
      and Bratz Assets, as defined below;

4.    Mattel has demonstrated the possibility of dissipation of assets and, from
      the entire record herein, it appears likely that the MGA parties, agents,

---

[9] The interim report of the Court-appointed Forensic Auditor recommends, for the reasons stated
in the report, the appointment of a Receiver.  Although the report is fully consistent with the findings made
herein, the Court is not relying upon this recommendation, or the information set forth in the Forensic
Auditor's report, in making these findings because the parties have not yet had an opportunity to object or
otherwise respond to the report.  The Court will consider the Forensic Auditor's report, and any objections
or responses thereto, in determining whether or not to extend the appointment of the Temporary Receiver
after the OSC hearing scheduled for May 18, 2009.

EXHIBIT ___1___
PAGE ___19___

and related entities (as defined below) are engaged in a course of conduct with related parties designed to frustrate the Court's Orders, Findings and Injunction herein;

5.  Good cause exists to believe that the MGA parties, agents, and related entities (as defined below) will continue to engage in such transactions, acts, practices, and courses of conduct and business to the immediate and irreparable loss and damage to Mattel, and contrary to the interests of justice, unless restrained and enjoined.

6.  It is appropriate and in the interests of justice that, pursuant to L.R. 66, that a Temporary Receiver be appointed and that an Order to Show Cause be issued why a permanent receiver should not be appointed.

Accordingly, the Court **ORDERS** as follows:

1.  Patrick A. Fraioli, Jr., is hereby appointed Temporary Receiver pursuant to L.R. 66 for the MGA entities to manage, supervise and oversee the assets of the MGA entities and the Bratz Brand and all Bratz Assets as these terms are defined herein (the "Temporary Receiver").

2.  The Temporary Receiver is appointed and is hereby directed and ordered to take full and exclusive control over, and to manage, preserve, and maximize the profits of, the MGA entities and the Bratz Brand and Bratz Assets as of the date hereof, including, without limitation, by locating, taking possession and ownership of, preserving, protecting, managing, supervising and overseeing the Bratz Assets.

3.  The Temporary Receiver is further directed to investigate the financial affairs of the MGA entities, and specifically investigate transfers and transactions made by the MGA entities from and after July 17, 2008.

4.  The Temporary Receiver shall have the power to take any and all action which may be necessary, appropriate or advisable to effectuate the purposes of the Temporary Receivership, including, but not limited to, the power to:

    a.  take custody, control and possession of the assets of the MGA entities and Bratz Assets in the possession, custody or control of the MGA entities, and/or any person or entity acting at their behest or direction or pursuant to their control, including, but not limited to, Isaac Larian and any successor-in-interest, subsidiary, corporate affiliate, agent, servant, attorney, accountant, officer, director, employee or other confederate (collectively, "the MGA parties,

MINUTES FORM 90
CIVIL -- GEN

17

Initials of Deputy Clerk __cls_____

EXHIBIT ___1___
PAGE ___20___

agents, and related entities") whether or not claimed to be encumbered by any security interest;

b.     preserve, hold and manage the assets of the MGA entities and the Bratz Assets and perform all acts necessary or advisable to preserve and/or enhance the value of these assets;

c.     exploit, license, distribute and sell the assets of the MGA entities and the Bratz Assets and products for profit, including, without limitation, by selling Bratz-branded dolls and other goods through appropriate channels of trade and distribution;

d.     market, promote and/or advertise the assets of the MGA entities and the Bratz Assets and/or Bratz-branded products;

e.     hire and employ individuals and entities as necessary or advisable to carry out the Temporary Receiver's mandate under this order;

f.     disburse funds as needed to satisfy and pay the reasonable and ordinary expenses incurred by the receivership, provided, however, that the Temporary Receiver shall maintain and shall not distribute, disburse or pay to anyone any receivership funds except as needed to satisfy the reasonable and ordinary expenses incurred by the receivership;

g.     open bank accounts in the name of the Temporary Receiver and transfer funds to, from and/or between those accounts;

h.     collect and maintain, and take all necessary or advisable actions to collect and maintain, monies owed by virtue of the sale, licensing, or other exploitation of the Bratz Assets;

i.     sell, compromise or assign debts for purposes of collection upon such terms and conditions as the Temporary Receiver deems necessary or advisable to carry out the Temporary Receiver's mandate under this order;

j.     enter into such agreements or contracts, and seek and enter into modifications to or amendments of such agreements and contracts, as the Temporary Receiver deems necessary or advisable to carry out the Temporary Receiver's mandate under this order;

k.     prepare, execute, acknowledge and deliver any and all deeds, assignments or other instruments necessary or advisable to carry

MINUTES FORM 90
CIVIL -- GEN

18

Initials of Deputy Clerk __cls_____

EXHIBIT ___1___
PAGE ___21___

out the Temporary Receiver's mandate under this Order;

l.      protect and preserve all Bratz-related intellectual property, including, without limitation, by commencing, prosecuting, and/or renewing intellectual property registrations and/or filings of any type and in any jurisdiction or forum;

m.     retain and/or engage the services of advisors and/or professionals, including, without limitation, accountants, attorneys, consultants and experts to assist the Temporary Receiver in carrying out the Temporary Receiver's mandate under this Order. The Temporary Receiver, without further order of this Court, is authorized to employ Ervin, Cohen & Jessup LLP, Dr. Lynne Phillips and the firm of Reinventures, Inc., to assist the Temporary Receiver in carrying out the Temporary Receiver's mandate under this Order;

n.     retain and/or engage the services of vendors, suppliers, distributors and other persons and/or entities to assist the Temporary Receiver in carrying out the Temporary Receiver's mandate under this Order;

o.     record this Order in any jurisdiction;

p.     the Temporary Receiver may for any lawful purpose use any federal or state taxpayer identification number previously used by the MGA parties, agents, and related entities;

q.     take all actions the Temporary Receiver deems necessary or advisable to marshal, collect, preserve or protect the Bratz Assets, including, without limitation, the institution of inquiries and investigations into the conduct of any of the MGA parties, agents, and related entities to uncover concealed Bratz Assets and/or fraudulent conveyances and/or attempts to dispose of Bratz Assets;

r.     institute, defend, intervene in and/or substitute as, and/or otherwise become a party to any or all actions in local, state, federal or foreign courts, including, without limitation, bankruptcy court, and any other proceedings before any governmental tribunal or arbitration panels, and take any and all necessary or advisable steps and measures in such actions as necessary or advisable to carry out the Temporary Receiver's mandate under this Order; provided, however, notwithstanding the foregoing, the MGA parties have all the requisite authority to assert all rights in this ongoing litigation between Mattel and the MGA parties in this action and the Temporary Receiver shall not assert a position in such litigation,

MINUTES FORM 90
CIVIL -- GEN

19

Initials of Deputy Clerk __cls_____

EXHIBIT ___1___
PAGE ___22___

except insofar as the Court orders or invites the Temporary Receiver to do so; and,

s.    perform such further and additional acts as the Temporary Receiver deems necessary or advisable to preserve the Bratz Assets, maximizing the profits derived therefrom, ensure the successful manufacture, delivery and marketing of Bratz-branded dolls and products for the spring and fall 2009 seasons and otherwise carry out the Temporary Receiver's mandate under this Order, including, without limitation, any acts which could be lawfully carried out by a corporation in the state of California.

5.    The Temporary Receiver, the Temporary Receiver's employees and agents as well as any and all of the professionals employed by the Temporary Receiver, are entitled to compensation for services rendered at their normal hourly rates and reimbursement for all expenses incurred by them on behalf of the receivership estate. The Temporary Receiver shall serve written notice upon counsel of record for the parties of the amount to be paid to each payee, with an itemization of the services rendered or expenses incurred. Upon service of said notice, the itemized fees and expenses may be paid by the Temporary Receiver on an interim basis. In the event that extraordinary services are performed by the Temporary Receiver, he shall be entitled to extraordinary compensation according to proof and approval of this Court. All interim fees paid shall be subject to final review and approval by this Court. This Court retains jurisdiction to award a greater or lesser amount as the full, fair and final value of such services. In the event there are insufficient funds in the receivership estate to fully compensate the Temporary Receiver and his professionals, the Court retains jurisdiction to allocate the costs and expenses of this receivership against Mattel, as the party who sought the appointment of the Temporary Receiver, and/or Isaac Larian, as the principal owner and beneficiary of the MGA entities.

6.    Upon service of a copy of this Order, all banks, broker-dealers, savings and loans, escrow agents, title companies, commodity trading companies, or other financial institutions shall cooperate with all reasonable requests of the Temporary Receiver regarding implementation of this Order, including transferring funds at his direction and producing records related to the assets of the MGA entities.

7.    The Bratz Assets include all tangible or intangible assets, including,

MINUTES FORM 90
CIVIL -- GEN

20

Initials of Deputy Clerk __cls_____

EXHIBIT ____1____

PAGE ____23____

without limitation, all intellectual property necessary or materially
useful for the design, manufacture, marketing, distribution and sale
of any Bratz doll or other Bratz-branded product in the possession,
custody or control (whether or not claimed to be encumbered by
any security interest) of any of the MGA parties, agents, and related
entities.  The Bratz Assets include, without limitation:

a.   All Bratz-related intellectual property rights, including, without
limitation, copyrights (whether or not registered); copyright
registrations; moral rights; design rights; patents (issued and
pending); service marks; trademarks; trade dress; designs;
slogans; characters; product packaging in any medium; product
names; product illustrations; product designs; product concepts;
conceptual drawings; engineering drawings; engineering
specifications; processes; methods; trade secrets; know-how;
product ideas; prototypes; line extensions; domain names;
marketing and advertising materials; commercials; style guides;
theme songs; soundtracks; scripts; screenplays; computer
programming; digital and internet rights; video games; theatrical,
television, video and DVD rights and masters; and rights in future
technologies.

b.   All Bratz-related tooling for all past, current and future lines,
including without limitation tools, tooling, in process tools, molds,
sculptures, models, dies, and mock-ups, as well as other
Bratz-related tangible items.

c.   All Bratz-related marketing and sales assets for all past, current
and future lines, including, without limitation, consumer lists,
marketing plans, account plans, focus group studies, marketing
databases, and other consumer and marketing research.

d.   All Bratz-related records, including, without limitation, contracts,
manufacturing records, inventory records and data, sales records
and data, product testing data and records, vendor list and records,
customer communications, and invoices and purchase orders.

e.   All Bratz-related contracts and agreements, including, without
limitation, assignments, work-for-hire agreements and licensing
agreements.

f.   All other Bratz-related rights, including, without limitation,
distribution rights, licensing rights, exploitation rights, accounts
receivable, and all choses in action relating to Bratz or the Bratz

MINUTES FORM 90                                         Initials of Deputy Clerk __cls_____
CIVIL -- GEN                        21

EXHIBIT ___1___
PAGE ___24___

brand.

g.    All Bratz-related items referenced at Paragraph 3 and Paragraph 8 (at lines 15-19) of the Court's Order granting Mattel's Motion for Permanent Injunction (docket #4443).

8.    The Temporary Receiver shall hereby be vested with, and is authorized, directed and empowered to exercise, all of the rights, powers or authorizations of the MGA entities, their officers, directors, general partners or persons who exercise similar powers and perform similar duties, including without limitation the sole authority and power to file or cause to be filed any suit or action in any court or arbitration tribunal other than this court, and filing, or causing to be filed, a petition for relief under the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. for the MGA entities, their officers, agents, employees, representatives, directors, successors-in-interest, attorneys in fact and all persons acting in concert or participating with them are hereby divested of, restrained, enjoined, and barred from exercising, any of the rights, powers or authorities vested herein in the Temporary Receiver, including but not limited to filing, or causing to be filed, any suit or action in any court or arbitration tribunal other than this court, and/or filing, or causing to be filed, a petition for relief under the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. for the MGA entities, except as otherwise specified herein or by further order of this Court.

9.    As set forth above, the Court leaves undisturbed the stay set forth in the Court's January 7, 2009, Order. Moreover, the stay is hereby supplemented (a) to enable the Temporary Receiver to take the actions specified herein, and (b) to permit retailers who receive Bratz products pursuant to the authority of the Temporary Receiver, and who pay the Temporary Receiver monies due and owing for such Bratz products, to not remove such products from the shelves until January 10, 2010, at which time the mandatory provisions of Paragraphs 4, 6 and 7 of the Court's December 3, 2008, Order granting Mattel's Motion for Permanent Injunction (docket #4443) shall become effective as to such retailers. The supplemental stay provisions shall not eliminate, alter or amend the obligations of any retailer, distributor, seller or other person or entity, including, without limitation, the MGA parties, who do not meet the foregoing requirements, to earlier recall or earlier obtain the recall of Bratz products as required by the mandatory provisions of Paragraphs 4, 6 and 7 the Court's Order granting Mattel's Motion for Permanent Injunction (docket #4443). The supplemental stay provisions shall not apply to permit, enable or authorize enjoined conduct by any enjoined party, except as to actions taken by the Temporary Receiver and/or any

MINUTES FORM 90
CIVIL -- GEN

22

Initials of Deputy Clerk __cls_____

EXHIBIT ___|___
PAGE ___2 5___

authorized agents working for and under the auspices of the Temporary Receiver pursuant to the terms of this Order.

10.   Additional Provisions.

a.   In the event that any person or entity or fails to refuses to deliver or transfer any of the assets of the MGA entities or Bratz Assets or otherwise fails to comply with any provision of this Order, the Temporary Receiver is instructed to file ex parte an affidavit setting forth the failures.  Upon the filing of such affidavit, the Court may authorize repossession or sequestration or other equitable relief as requested by Temporary Receiver.

b.   The Temporary Receiver shall maintain and shall not disburse, distribute or pay anyone any receivership funds or proceeds earned from exploitation of Bratz-branded dolls and products except as needed to satisfy the reasonable and ordinary cost and expenses incurred by the receivership.

c.   The Temporary Receiver shall have the status of officers and agents of this Court, and as such shall be vested with the same immunities as vested with this Court.  Neither the Temporary Receiver nor any person or entity acting at the direction of the Court or pursuant to agreements with the Temporary Receiver (whether employees, vendors, contractors or otherwise) may be held liable to the MGA parties whether for claims of alleged copyright infringement, trademark infringement, or other alleged causes of action for any acts taken in good faith in compliance with this Order.

d.   During the course of the receivership, and pending further order of the Court, the MGA parties shall not have any right, title, or interest and/or power as to the Bratz Assets or Bratz brand.  All ownership of all Bratz Assets, Bratz Brands and Bratz-related copyrights and other intellectual property are hereby vested in the Temporary Receiver and the MGA parties are divested of all such ownership. Nothing herein shall alter or affect the right of Mattel to take any and all actions relating to the Bratz Assets or the Bratz brand which it otherwise lawfully could take, including, without limitation, the institution, maintenance and prosecution of legal proceedings anywhere in the world or other proceedings before any governmental or tribunal or arbitration panel.

e.   Effective as of the date of this Order, the MGA parties, agents, and

MINUTES FORM 90
CIVIL -- GEN

23

Initials of Deputy Clerk __cls_____

EXHIBIT ___1
PAGE

related entities shall turn over to the Temporary Receiver any and all revenues they receive or obtain relating to the MGA entities and Bratz in any manner and for any reason, including, without limitation, in connection with any sale, distribution and/or licensing thereof. These revenues shall not be released pending further order of the Court. The MGA entities shall account for all such revenues and interest paid thereon, and shall present to the Court, the Temporary Receiver and Mattel reports reflecting such accounting every ten days, commencing ten days from the date of this Order.

f.      To the extent that the proceeds are insufficient at any point to fund the cost of the receivership, the MGA entities are ordered to provide the Temporary Receiver with such additional funds as the Temporary Receiver requires to accomplish the purposes of the receivership.

g.      The Court shall retain jurisdiction over the receivership for the duration of its existence.

h.      No bond shall be required in connection with the appointment of the Temporary Receiver. Except for acts of gross negligence, the Temporary Receiver, and his agents and employees shall not be liable for loss or damage incurred by the MGA entities, its officers, agents, servants, employees, attorneys or others by virtue of any act performed or omitted to be performed by the Temporary Receiver in connection with the discharge of his duties and responsibilities.

i.      It is further ordered that no officer, director, agent, servant, employee or attorney of the MGA entities shall take any action in the name of or on behalf of the MGA entities before any court of any jurisdiction without the prior written consent of the Temporary Receiver or Order of the Court. However, notwithstanding the foregoing, nothing herein shall be deemed to deny the MGA parties the right to appeal from the Order Granting Preliminary Injunction or this Order. Moreover, this provision is subject to the right of the MGA parties with respect to the current litigation, as set forth in ¶ 4.r.

j.      In light of the appointment of a Temporary Receiver, the MGA entities, their officers, directors, agents, employees and attorneys are hereby prohibited from filing, or causing to be filed, a petition for relief under the United States Bankruptcy Code, 11 U.S.C. §§ 101

EXHIBIT ___/___
PAGE ___ ∂7

et seq. for the MGA entities without prior permission of this Court.

    k.    The MGA entities are ordered to cooperate fully with the Temporary Receiver, including without limitation providing all  financial and other documentation requested by the Temporary Receiver.

    l.    The Temporary Receiver is authorized to contact the Court-appointed Forensic Auditor, Ronald Durkin, and may utilize the findings and conclusions reached by Mr. Durkin as the Temporary Receiver deems appropriate.

    m.    The Temporary Receiver is hereby ordered and directed to prepare and provide to this court a report setting forth preliminary conclusions, findings and recommendations in accordance with the schedule set forth below.

11.    Order to Show Cause.  All interested parties, and any interested creditor, shall appear before this Court on Monday, May 18, 2009, at 2:00 p.m. to show cause, if there be any, why a permanent receiver should not be appointed in the same scope and manner as the Court's appointment of the Temporary Receiver.  Any declarations, affidavits, points and authorities or other submissions in support of, or in opposition to, the appointment of a Permanent Receiver shall be filed with the Court and served on all parties no later than May 14, 2009.

12.    Pursuant to L.R. 66-4, Mattel is ORDERED to cause this Order to be served on all known creditors of the MGA entities within three days of the date of this Order.

13.    The Temporary Receiver shall file a report and recommendation concerning all actions taken as well as recommendations for further action no later than Monday, May 11, 2009.  This report shall be filed with the Court and served on all parties.

**IT IS SO ORDERED THIS 27th DAY OF APRIL, 2009**

*[signature]*

**STEPHEN G. LARSON**
**UNITED STATES DISTRICT JUDGE**

25

Initials of Deputy Clerk __cls_____

EXHIBIT ___/___
PAGE ___28___

Tiffany Garcia

From:         Cyrus Naim
Sent:         Monday, April 27, 2009 4:37 PM
To:           MGA / Bryant Team
Subject:      FW: Activity in Case 2:04-cv-09049-SGL-RNB Carter Bryant v. Mattel Inc Order on Motion for Judgment as a Matter of Law
Attachments:  Final Order.pdf

Final order on Phase 1 issues.  We have a temporary receiver.

From: cacd_ecfmail@cacd.uscourts.gov [cacd_ecfmail@cacd.uscourts.gov]
Sent: Monday, April 27, 2009 4:12 PM
To: ecfnef@cacd.uscourts.gov
Subject: Activity in Case 2:04-cv-09049-SGL-RNB Carter Bryant v. Mattel Inc Order on Motion for Judgment as a Matter of Law

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se
litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all
other users. To avoid later charges, download a copy of each document during this later viewing. However, if the referenced document is a transcript, the free copy
and 30 page limit do not apply.

                    UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Notice of Electronic Filing

The following transaction was entered on 4/27/2009 at 4:12 PM PDT and filed on 4/27/2009
Case Name:         Carter Bryant v. Mattel Inc
Case Number:       2:04-cv-9049
Filer:
Document Number: 5273
Docket Text:
MINUTES (IN CHAMBERS): ORDER DENYING MATTELS MOTION FOR JUDGMENT AS A MATTER OF LAW (DOCKET #4498); ORDER GRANTING IN
PART AND DENYING IN PART MGASMOTION FOR JUDGMENT AS A MATTER OF LAW (DOCKET #4496); ORDER AMENDING IN PART ORDER RE
FINDING OF LIABILITY PURSUANT TO CAL. BUS. & PROFS. CODE § 17200(DOCKET #4441); ORDER GRANTING IN PART AND DENYING IN PART
MGAS MOTION FOR REMITTITUR (DOCKET #4495, #4523); ORDER LIFTING STAY ON PERMANENT INJUNCTION (#4443); ORDER FOR
ACCOUNTING OF PROFITS OF BRATZ PRODUCTS ORDER REGARDING RETRIEVAL OF PREVIOUSLY LODGED by Judge Stephen G. Larson:
[4496][4498][4523]. Patrick A. Fraioli, Jr., is hereby appointed Temporary Receiver pursuant toL.R. 66 for the MGA entities to manage, supervise
and oversee the assetsof the MGA entities and the Bratz Brand and all Bratz Assets as thesetermus are defined herein (the "Temporary Receiver").
All interested parties, and any interested creditor, shall appear before this Court on Monday, May 18, 2009, at 2:00 p.m. to show cause, if there be
any, why a permanent receiver should not be appointed in the same scope and manner as the Courts appointment of the Temporary Receiver. The
Temporary Receiver shall file a report and recommendation concerning all actions taken as well as recommendations for further action no later
than Monday, May 11, 2009. This report shall be filed with the Court and served on all parties. (am)

2:04-cv-9049 Notice has been electronically mailed to:

Joel N Klevens    jklevens@glaserweil.com

Patricia L Glaser    pglaser@glaserweil.com

John B Quinn    johnquinn@quinnemanuel.com

Russell J Frackman    rjf@msk.com,krs@msk.com,rbs@msk.com,mem@msk.com,phb@msk.com,jpn@msk.com

Jeffrey B Valle    jvalle@valleassociates.com

Jerome B Falk    jfalk@howardrice.com

Todd E Gordinier
todd.gordinier@bingham.com,julie.valenzuela@bingham.com,craig.taggart@bingham.com,michael.mortenson@bingham.com,lan.ly@bingham.com,karina.ward@bingham.com

Randa A F Osman    randaosman@quinnemanuel.com

Patricia H Benson    phb@msk.com,mxb@msk.com

David C Scheper    dscheper@obsklaw.com,feseroma@obsklaw.com_sumry

Alisa Morgenthaler Lever    amorgenthaler@chrisglase.com

Larry W McFarland    lmcfarland@kmwlaw.com

Robert C O'Brien    obrien.robert@arentfox.com

Raoul D Kennedy    rkennedy@skadden.com

Mark E Overland    moverland@obsklaw.com

Thomas J Nolan    tnolan@skadden.com,carl.roth@skadden.com,marcus.mumford@skadden.com

Emil W Herich    eherich@kmwlaw.com

Jason D Russell    jrussell@skadden.com,allison.velkes@skadden.com_sumry

Jean P Nogues    jpn@msk.com

4/27/2009

EXHIBIT ___1___
PAGE ___29___

Sandra L Tholen    tholen@caldwell-leslie.com,mejia@caldwell-leslie.com,wilson@caldwell-leslie.com

Nicole S Pelletier    npelletier@glaserweil.com

Jon D Corey    joncorey@quinnemanuel.com

Caroline H Mankey    cmankey@glaserweil.com

Douglas Andrew Winthrop    dwinthrop@howardrice.com

Michael T Zeller    michaelzeller@quinnemanuel.com

Linda M Burrow    burrow@caldwell-leslie.com,wilson@caldwell-leslie.com,popescu@caldwell-leslie.com_sumry

Amman A Khan    akhan@glaserweil.com

Peter N Villar    peter.villar@bingham.com,paul.mcconnell@bingham.com

Diane C Hutnyan    dianehutnyan@quinnemanuel.com,andreshoeven@quinnemanuel.com

Kenneth A Plevan    kenneth.plevan@skadden.com,drogosa@skadden.com,sumelaug@skadden.com

Alexander H Cote    acote@obsklaw.com,feseroma@obsklaw.com

Marina Vladimir Bogorad    marina.bogorad@skadden.com

Brett Dylan Proctor    dylanproctor@quinnemanuel.com,westonreid@quinnemanuel.com

Sophia S Lau    slau@glaserweil.com

Stan Karas    stankaras@quinnemanuel.com,gayleduran@quinnemanuel.com,westonreid@quinnemanuel.com

Richard Giles Stoll    rstoll@glaserweil.com

Scott E Gizer    sgizer@glaserweil.com

David W Hansen    dhansen@skadden.com

Robyn Aronson    robynaronson@dwt.com,frankromero@dwt.com

Oleg Stolyar    alexstolyar@quinnemanuel.com,rlorch@bwgfirm.com

Jennifer A Lopez    jennifer.lopez@bingham.com

Christian C Dowell    cdowell@kmwlaw.com

Cyrus S Naim    cyrusnaim@quinnemanuel.com

Leah Chava Gershon    leah@spertuslaw.com

Adil M Khan    amkhan@glaserweil.com

Michael P Kelly    mikelly@skadden.com

David W Foster    david.foster@skadden.com

Sanford I Weisburst    sandyweisburst@quinnemanuel.com

Ilan Wisnia    iwisnia@valleassociates.com

**2:04-cv-9049 Notice has been delivered by First Class U. S. Mail or by fax to: :**
Kien C Tiet
Stern and Goldberg
6345 Balboa Boulevard, Suite 200
Encino CA 91316

Cheryl Plambeck
Davis & Gilbert LLP
1740 Broadway
New York NY 10019
US

Amy R Sabrin
Skadden Arps Slate Meagher & Flom LLP
1440 New York Avenue NW
Washington DC 20005-2111
US

Peter H Bonis
Peter H. Bonis Law Offices
1990 N. California Blvd, 8th Floor
Walnut Creek CA 94596
US

4/27/2009

EXHIBIT ___ 1
PAGE ___ 3()

Page 3 of 3

4/27/2009

EXHIBIT ___1___
PAGE ___21___

# EXHIBIT 2

1

 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                    EASTERN DIVISION

 4                       - - -

 5       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 6                       - - -

 7    MATTEL, INC.,                   )
                                      )
 8                      Plaintiff,    )
                                      )
 9            vs.                     )   No. CV 04-09049
                                      )
10    MGA ENTERTAINMENT, INC., ET. Al., )
                                      )
11                     Defendants.    )   MOTIONS
      _____)
12    AND CONSOLIDATED ACTIONS,       )
      _____)
13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               RIVERSIDE, CALIFORNIA

17               MONDAY, MAY 18, 2009

18                    1:52 P.M.

19

20

21

22

23            THERESA A. LANZA, RPR, CSR
             Federal Official Court Reporter
24             3470 12th Street, Rm. 134
             Riverside, California  92501
25                 951-274-0844
              www.theresalanza.com

EXHIBIT  2

PAGE  32

43

1   you wanted to address today is whether, as I represented to

2   you, this was a straightforward transaction or whether, as

3   Mattel has alleged, it was something else.

4           If the Court is still pondering that and wants to

5   come back at a different time and hear argument about that, I'm        02:48

6   fine with that.  But I don't want this issue festering anymore,

7   and --

8           **THE COURT:**  Well, let me say a few things to,

9   perhaps, address that festering aspect of it.

10          I've read the parties' extensive pleadings on this            02:48

11  particular issue.  I would hope that everybody concerned

12  understands what the Court is saying or is not saying.

13          The Court has never suggested, as I think maybe some

14  people have taken, that there is any criminal act with respect

15  to the transaction.  First of all, it's not a criminal case,         02:49

16  and the Court has not concluded in any sense that anything

17  criminally has taken place.  In fact, each and every one of the

18  individual transactions which make up what has come to be

19  referred to as the "Omni 808 transaction" may in itself be

20  completely legal.                                                    02:49

21          Whether or not a series of legal transactions can

22  have the effect of undermining or frustrating, or defeating

23  even, a court order, is an entirely separate matter from

24  whether or not any of those transactions are unlawful, or even

25  unethical.                                                           02:49

EXHIBIT __2__

PAGE __33__

Monday, May 18, 2009                    Mattel vs. MGA, et. Al.

44

1        So it's important to keep in mind that, even though

2    the language used with respect to these allegations might be

3    quite broad, from the Court's perspective anyway, the concern

4    has been and remains only whether or not any of these financial

5    transactions are in any way obstructing or affecting the        02:50

6    Court's orders.  That's my only concern.

7        My only concern here, with respect to Mr. Larian,

8    with respect to Omni 808, with respect to any of these

9    entities, is whether or not what the Court has found and what

10   the Court has ordered can be effectively implemented.  If       02:50

11   something is frustrating that, the Court is of concern.  If

12   it's not frustrating that, that is for other entities and other

13   authorities to be concerned with.

14       Do you understand what I'm saying?

15       MR. GORDINIER:   I do understand what you're saying,         02:50

16   Your Honor.  But Mattel has called it unlawful, and the Court

17   has expressed a concern about whether something that Omni 808

18   was involved in was intended to or have the effect of

19   frustrating any of the Court's orders.  And I want to assure

20   the Court today that it did not.                                 02:50

21       And I'm prepared here to describe to the Court, in

22   however much detail the Court wants to hear, about how that

23   transaction was prepared, executed, and is operating today, to

24   satisfy yourself.

25       The short answer, Your Honor, is, it doesn't                 02:51

EXHIBIT  2

PAGE  34

Monday, May 18, 2009          Mattel vs. MGA, et. Al.

1    implicate the IP at all.  And I don't think that's something

2    that's been made clear.

3          What happened was that Omni stepped into the shoes of

4    Wachovia.  It got nothing more and nothing less.  And that did

5    not include the IP; that did not include the intellectual          02:51

6    property.

7          THE COURT:  I think the concern is not so much -- I

8    don't think anybody disputes what you just said, other than --

9          MR. GORDINIER: ·Actually, Mattel does.

10         THE COURT:  Well, the question, I think, that Mattel      02:51

11   raises is, first of all, who is Omni 808?

12         MR. GORDINIER:  They do raise that.

13         THE COURT:  Right.

14         And the second question is not so much that

15   directly -- that the IP, including part of their intellectual     02:51

16   property, is part and parcel of the security that has been

17   encumbered by that transaction.

18         MR. GORDINIER:  That's what I'm just telling you,

19   Your Honor.  It is not.  The security did not include the

20   intellectual property.                                           02:52

21         THE COURT:  Okay.  Well --

22         MR. GORDINIER:  I mean, that's -- so there was

23   nothing involved in that transaction that either was intended

24   to or had the effect of either trying to evade or alter or

25   obstruct any of the Court's orders.                              02:52

EXHIBIT   2
PAGE   35

Monday, May 18, 2009                    Mattel vs. MGA, et. Al.

46

1           **THE COURT:**  I appreciate your statements, Counsel.

2    The Court is not prepared -- I literally just received the

3    supplemental report, which responds to the reports that were

4    made last week.  Again, this is the subject of potentially a

5    third amended answer and counterclaim.  The Court is not going          02:52

6    to make a definitive statement.

7           I'm not going to fall into the mistake of prejudging

8    an issue which may very well be the subject of a trial; it may

9    be the subject of summary judgment motions.  I'm not prepared

10   to go there, given where this fits in to the litigation at this         02:53

11   point.

12          Do you understand that?

13          **MR. GORDINIER:**  I do understand it.  And I appreciate

14   it, Your Honor.

15          **THE COURT:**  We probably need to take -- the Court --         02:53

16   particularly with respect to the report, the forensic auditor's

17   report, I tried to take great care to keep that under seal.

18   And MGA, in responding to it, filed under seal; and Mattel did

19   as well.  You didn't.  Omni 808 did not place -- so I take it,

20   from your perspective, you're waiving any confidential issues           02:53

21   with respect to the contents of the forensic auditor's report.

22          **MR. GORDINIER:**  My brief speaks for itself.

23          We have nothing to hide.  I did not, as part of that,

24   attach the auditor's brief.  I read the Court's order, in fact,

25   to restrict me from even showing it to an expert or two that I          02:53

EXHIBIT  2

PAGE  36

55

1    Mr. Larian is considering bringing on line, or is in the

2    process of bringing on line.  I'm not sure exactly where that

3    is.

4           I get the impression, or the distinct impression,

5    from Mattel's perspective, that they have a view that these new          03:04

6    lines, which all I have seen was the one black-and-white

7    photograph or copy that was submitted in the papers -- and,

8    like, Omni 808, I'm certainly not expressing any view on this

9    at this point -- I gather, though, that Mattel takes the

10   position that these may or may not be infringing their                   03:05

11   copyright, not just in terms of a potential copyright, but in

12   terms of the Court's actual December 3, 2008 order.

13          I describe that as kind of the white elephant in the

14   room, because I certainly can see that as a potential roadblock

15   to any resolution of this matter.  I can see that just as this           03:05

16   big issue looming out there that needs to be addressed at some

17   point in time.  I'd like to see that issue addressed sooner as

18   opposed to later, and that would be all part of this.

19          And the last thing -- and this is going to pick up on

20   something Mr. Gordinier pointed out -- he characterized the              03:05

21   appointment of the forensic auditor as a waste of money.  And I

22   understand from his perspective why he says that.  From other

23   perspectives, that might not be the case.  But in any event,

24   the Court has attempted, through making its various court

25   appointments, whether it has been a settlement officer or a             03:06

EXHIBIT ___2___

PAGE ___37___

56

```
 1   discovery master, to split the costs as appropriate.

 2            With respect to the temporary receiver and

 3   Mr. Fraioli, I impose those costs on MGA.  As far as the

 4   monitor, I will probably impose those costs on Mattel.  I want

 5   all of the parties to know that when the dust finally settles      03:06

 6   in this case, and we have a clear sense of whether or not

 7   Mr. Gordinier or Mr. Zeller is right on Omni 808, whoever is

 8   right on all of this, the Court will be affording leave to all

 9   of the parties to file motions related to potential cost

10   shifting, for any of the costs that were incurred as a result     03:06

11   of court appointments, when we can kind of sit back in

12   hindsight and assess the equities of who paid what and when.

13            And I mention that now -- obviously, for

14   court-appointed officials, whether it be a temporary receiver

15   or a discovery master, they need to have the certainty, of        03:07

16   course, of where to submit their bills.  But at the end of the

17   day, the Court will certainly afford leave to revisit those

18   decisions and ensure that equity governs an appropriate

19   allocation of those resources.

20            All right.  Those are my thoughts on this general         03:07

21   issue of receivership.  I've heard from Omni 808.  I'd like to

22   hear from Mattel and MGA.

23            So whoever would like to go first.  I think my

24   tentative is probably someplace in the middle between both of

25   you, so I don't think it necessarily favors one side.  So         03:07
```

EXHIBIT ___2___

PAGE ___38___

1    whoever wishes to speak first.

2         Why don't we take a 10-minute break for the court

3    reporter.

4         (Brief recess taken.)

5         **THE COURT:**  We're back on the record.                    03:19

6         Counsel?

7         **MR. ZELLER:**  Thank you, Your Honor.

8         I guess I see three general issues as to where we are

9    at the moment.  There at least appears to be general agreement,

10   and I think the evidence supports this amply, that MGA simply   03:22

11   cannot be left to its own devices with respect to Bratz going

12   forward.  This is Mattel's property.  Contrary to what

13   Mr. Gordinier is suggesting, there is, in fact, evidence that

14   Isaac Larian made efforts to incumber the Bratz property after

15   it was determined to be Mattel's.  That is in writing.  That is  03:23

16   in writing with Isaac Larian, in an e-mail, saying in September

17   of 2008.

18        Now, it's certainly gratifying to hear OMNI 808

19   concede that there in fact, is no security interests over Bratz

20   that they have, or, frankly, that anyone could have at this     03:23

21   juncture.  But to suggest that somehow it's no harm, no foul

22   because it wasn't an accomplished, I think misses the mark.  It

23   is documented there was this effort to thwart the Court's

24   rulings, the jury's verdict, and Mattel's rights; and I don't

25   think there can be any reasonable dispute about that, and I     03:23

EXHIBIT ___2___
PAGE ___39___

Monday, May 18, 2009                    Mattel vs. MGA, et. Al.

79

```
1            THE COURT:  What is MGA's position as to what this

2    Court should do at this point, at this juncture, regarding

3    Moxie?

4            You understand the issue that it's creating for

5    Mattel.                                                      03:55

6            Is there somebody else who will be arguing that?

7            MR. STANG:  I'm going to get hooked here in a minute.

8            THE COURT:  Very well.

9            Hold on, Mr. Nolan, and let counsel here get through

10   his thoughts, and then we'll take that up.                   03:55

11           MR. STANG:  Well, Your Honor, from an operating

12   perspective, the Court shouldn't do anything about Moxie.

13   Isaac Larian should be the one running the company.

14           From the issue of whether it's substantially similar

15   or not, I think I'm about to get hooked, because I'm aware of 03:55

16   its existence; I have read Mattel's papers regarding it.  The

17   company is very concerned that the monitor be really restricted

18   to what was awarded to Mattel in December and not have rights

19   beyond that.

20           I want to make one other comment, and then I'll let   03:56

21   counsel come up.

22           You talked about the allocation of costs and that

23   that should get resolved at some point as to who bears the

24   costs of the receiver beyond what you've already ordered;

25   whether there would be a reallocation of those costs.        03:56
```

EXHIBIT  2

PAGE  40

1          The receiver process has probably cost in excess of

2   six to $700,000 to date, based on what amounts have been paid

3   over to a receivership and an administration account.

4          I'm not asking you to rule on anything today, but it

5   may be that we would ask that from the receivership cost                03:56

6   perspective, that that be re-allocated sooner than later.

7          It seems like just driving down here, I think there

8   were motions being filed by Blackberry -- my Blackberry nearly

9   died of exhaustion.  It's something like I've rarely seen in my

10   28 years of practice.  So I know we can file whatever we want          03:56

11   to file.  That is something of a discreet matter and defined

12   now in terms of its costs -- it may be something we will bring

13   to you on the basis earlier at the end of this litigation.

14          THE COURT:  The concern I would have of doing that

15   earlier as opposed to later is that, to me, doing it later, the        03:57

16   Court will have the benefit of reflecting on what actually has

17   happened, what actually has played out.  I've received a lot of

18   representations; I've received a lot of statements as to what

19   things are, what things aren't.  But I don't know at this

20   point.  And I would think that would be a better decision.             03:57

21          At the same time, I'm not setting a time for that at

22   this point.  I'm just suggesting that, too, might be premature.

23          MR. STANG:  Then I'm going to surrender the

24   microphone and let counsel talk about the Moxie issue.

25          THE COURT:  Very well.        EXHIBIT ___2___                   03:57
                                           PAGE ___41___

Monday, May 18, 2009                 Mattel vs. MGA, et. Al.

1      Mr. Nolan?

2          **MR. NOLAN:**  Good afternoon.

3          Part of this will also deal, in responding to certain

4   assertions that Mr. Zeller made, we think without any support,

5   that may touch upon the stay request that's filed.                    03:58

6          **THE COURT:**  That's the last issue I was going to take

7   up.

8          **MR. NOLAN:**  So if the Court wants, I think I can

9   compartmentalize Moxie and deal with it right now.

10         **THE COURT:**  Why don't you deal with Moxie now, and      03:58

11  let me get into the stay issue.  Again, you can hear my

12  thoughts on that, which might make moot, or not, some of that.

13         **MR. NOLAN:**  Okay.

14         Your Honor, I came in here today and I was reminded

15  of the Verizon commercial, where you turn around and you have a    03:58

16  whole group of people supporting you.  Let me make it really

17  clear on the record.  MGA does not want to file bankruptcy.

18  Isaac Larian does not want to file bankruptcy.  Isaac Larian

19  intends to compete against Mattel, day in and day out, for the

20  conceivable future, whether or not it is with Bratz after the      03:59

21  dust settles, as the Court described it earlier, or in a

22  completely different fashion line that does not compete with

23  Bratz and does not infringe upon any copyrights owned by

24  Mattel.

25         I was particularly struck that Mr. Zeller made a            03:59

EXHIBIT __2__

PAGE __42__

Monday, May 18, 2009                    Mattel vs. MGA, et. Al.

125

1          MS. GLASER:   And we haven't had the benefit of that.
2     I think if we're paying -- at least temporarily, we at least
3     ought to see --
4          THE COURT:   Part of what will occur at this point is
5     a complete accounting of all money spent during the 20-day          05:05
6     temporary receivership.  You will be receiving that shortly
7     from Mr. Fraioli, which will account for all of the money
8     spent.  And on a going-forward basis, the Court will specify
9     how future payments are to be made.
10          And as I indicated before, at the end of the day,              05:05
11     everyone will have the opportunity to revisit the issue of cost
12     sharing.
13          MS. GLASER:   Thank you very much.
14          THE COURT:   Is there anything further?
15          MR. QUINN:   No, Your Honor.                                   05:06
16          THE COURT:   Have a good evening.
17          (Court is adjourned.)
18                         CERTIFICATE
19
20     I hereby certify that pursuant to section 753, title 28, United
21     States Code, the foregoing is a true and correct transcript of
       the stenographically recorded proceedings held in the above-
22     entitled matter and that the transcript page format is in
       conformance with the regulations of the Judicial Conference of
23     the United States.
24     THERESA A. LANZA, CSR, RPR                    May 29, 2009
25     Federal Official Court Reporter                    Date

EXHIBIT ___

PAGE ___

# EXHIBIT 3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No. CV 04-09049 SGL(RNBx)                    Date: July 9, 2009
Title:        MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
==================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

|  | |
|---|---|
| Cindy Sasse | None Present |
| Courtroom Deputy | Court Reporter |

ATTORNEYS PRESENT FOR                ATTORNEYS PRESENT FOR
PLAINTIFFS:                          DEFENDANTS:

None Present                         None Present

PROCEEDINGS:   ORDER GRANTING EX PARTE APPLICATION RE TEMPORARY
               RECEIVERSHIP (DOCKET #5728)

               ORDER GRANTING EX PARTE APPLICATION RE COST
               SHIFTING (DOCKET #5865)

               ORDER GRANTING IN PART EX PARTE APPLICATION FOR
               RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

               ORDER GRANTING IN PART MATTEL'S MOTION RE
               DISCOVERY MASTER ORDER NO 27 AND REMANDING
               DISCOVERY MASTER ORDER NO. 27 FOR
               RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT
               OF THE FILING OF THE TAAC (DOCKET #5561)

               ORDER DENYING MOTION TO STRIKE THE FORENSIC
               AUDITOR'S REPORTS (DOCKET #5705)

MINUTES FORM 90                                    Initials of Deputy Clerk __cls_____
CIVIL -- GEN                      1

EXHIBIT   3
PAGE   44

## I. ORDER GRANTING EX PARTE APPLICATION
## RE TEMPORARY RECEIVERSHIP (DOCKET #5728)

Because the only opposition to the Ex Parte Application regarding the winding up of the Temporary Receivership involves the issue of cost-shifting, which is addressed separately, below, the Court **GRANTS** the Ex Parte Application. A separate order addressing this Ex Parte Application has been concurrently filed.

## II. ORDER GRANTING EX PARTE APPLICATION RE
## COST SHIFTING (DOCKET #5865)

The MGA parties' opposition to the Temporary Receiver's Ex Parte Application argued that the costs of the Temporary Receivership should be shifted to Mattel (as the party who sought appointment of a Temporary Receiver). However, the Court has previously ruled that, at some yet-to-be defined date in the future, the Court will consider whether to shift the costs of both the Temporary Receivership and the Forensic Audit. Therefore, Mattel filed an Ex Parte Application seeking either to be relieved of the responsibility to respond to the MGA parties' argument or, alternatively, for an order setting a briefing schedule on the issue. It is not the intention of the Court to address the cost-shifting issue at this time; rather, as the Court has stated previously on the record, that issue is more efficiently resolved at a later date, most likely a date after completion of Phase 2 of the trial. Accordingly, the Court **GRANTS** Mattel's Ex Parte Application re Cost Shifting. Mattel is relieved of any duty to respond to MGA's argument regarding the appropriate allocation of costs arising from the Temporary Receiver that is set forth in the MGA parties's June 26, 2009 Opposition to the Temporary Receiver's Ex Parte Application.

## III. ORDER GRANTING IN PART EX PARTE APPLICATION FOR
## RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

The Court has received and reviewed the MGA Parties' Ex Parte Application For Partial Release of *In Camera* Juror Interview Transcripts, as well as the Opposition, the Reply, and the accompanying exhibits. The Court **GRANTS IN PART** the Ex Parte Application. Although the Court declines to award the relief sought, the Court will take steps to ensure that the transcript of the juror interviews are provided to the Ninth Circuit for its consideration of the appeal filed by the MGA parties.

The relevant *in camera* juror interviews were conducted on July 25, 2008; the findings made by the Court on the basis of those interviews are set forth in detail in the Court's Order Denying Motion for Mistrial, dated August 8, 2008. Counsel for the parties agreed that the juror interviews, which were conducted mid-trial, should be conducted *in camera*, and the MGA parties did not request that the Court grant them access to the transcripts to prepare their Motion for Mistrial. The Court indicated on the

EXHIBIT 3
PAGE 45

record around the time of the filing of the Motion for Mistrial that it was not the Court's intent to grant the parties access to the transcripts.

After the conclusion of the trial, the MGA parties did not at any time request this Court grant access to the transcripts. To the contrary, some ten months passed between the date of the Order Denying Motion for Mistrial and the MGA parties' first post-trial request for access to those transcripts. That request was made to the Ninth Circuit, not this Court, on June 10, 2009. When the Ninth Circuit denied the request in favor of the MGA's presentation of the issue to this Court in the first instance, the MGA parties thereafter filed the present Ex Parte Application in a expeditious manner.

Ostensibly, as set forth in both the Motion filed before the Ninth Circuit and the Ex Parte Application before this Court, the reason the MGA parties seek access to those transcripts is so that they may use them to challenge the Court's Order Denying Motion for Mistrial. Although the MGA parties filed its Notice of Appeal on May 4, 2009, and although that Notice clearly indicated that the Order Denying Motion for Mistrial would be implicated in the appeal, the MGA parties failed to file its Motion seeking release of the transcripts until June 10, 2009. The MGA parties' failure to seek this relief until a month after they filed their Notice of Appeal and a month before their opening brief was due, and their decision to present the issue of release of the transcripts to the appellate court (rather than this Court) in the first instance, created the very urgency that cause them to seek ex parte relief from this Court. As such, the Court declines to grant the relief sought.

Nevertheless, in the interest of due process and in order to facilitate the full consideration of the issue by the Ninth Circuit, the Court will take steps to ensure that the transcripts of the *in camera* interviews are provided to the Ninth Circuit for *in camera* filing.

### IV. ORDER GRANTING IN PART MATTEL'S MOTION RE DISCOVERY MASTER ORDER NO 27 AND REMANDING DISCOVERY MASTER ORDER NO. 27 FOR RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT OF THE FILING OF THE TAAC (DOCKET #5561)

In the challenged portion of Discovery Master Order No. 27 ("DM Order No. 27"), the Discovery Master denied Mattel's Motion to Compel discovery sought by service of a subpoena on non-party Bingham McCutchen LLP ("Bingham"), a law firm that represents Intervenor Omni 808, as well as a number of non-party entities that are familiar to those involved in this litigation: OmniNet Capital, LLC ("OmniNet"), Vision Capital, LLC ("Vision"), IGWT Group, LLC ("IGWT"), and IGWT 826 Investments, LLC ("IGWT 826"). Broadly categorized, the subpoena sought production of (1) fee agreements relating to Vision and Omni 808; (2) documents regarding the formation, control, and financing of Omni 808, Vision, and Lexington Financial Limited

MINUTES FORM 90
CIVIL -- GEN                                    3                    Initials of Deputy Clerk __cls_____

EXHIBIT     3
PAGE     46

("Lexington"); (3) documents identifying stakeholders and officers of Omni 808, Vision, and Lexington; (4) all contracts relating to Omni 808, Vision Capital, and Lexington; (5) all communications relating to Omni 808, Vision Capital, and Lexington, excluding attorney-client privileged documents; and (6) Bingham's representation of MGAE and certain named individuals who have some connection with MGAE, including a number of Mr. Larian's family members.

The Discovery Master correctly recognized the essential legal standard in assessing whether a subpoena may be enforced.  The information must satisfy the discovery relevance standard, i.e., it must be "'reasonably calculated to lead to the discovery of admissible evidence.'" DM Order No. 27 at 19 (quoting Fed. R. Civ. P. 26(b)(1)).  The decision of whether to enforce a subpoena ultimately implicates a balancing test that pits relevance of the materials sought and need to the requesting party against hardship to the party resisting the subpoena. DM Order No. 27 at 20. Non-parties are generally required to bear lesser burdens than parties in responding to subpoenas. Exxon Shipping Co. v. United States Dept. of Interior, 34 F.3d 774, 779 (9th Cir. 1994) ("The Federal Rules also afford nonparties special protection against the time and expense of complying with subpoenas.").

However, the Discovery Master overstated the burden of proof allocated to Mattel, as the party seeking discovery. See DM Order No. 27 at 20 ("As the party moving to compel compliance with the subpoena, Mattel bears the initial burden of establishing that the information sought is relevant and necessary to the claims or defenses at issue.")  This standard is both overstated and incomplete.  It is overstated in that Mattel need not show that the evidence sought is "necessary to the claims or defenses."  Although Mattel indeed bears the burden of establishing relevancy, that showing is not one of "necessity."  Rather, Mattel must bear the burden of establishing the discovery relevancy standard -- that the materials sought are "reasonably calculated to lead to the discovery of admissible evidence" -- is met.  It need not establish that the materials sought are "necessary" to its cause.

This point leads to the manner in which the stated burden is incomplete.  As clearly articulated by cases cited by Bingham, although Mattel bears an initial burden of establishing relevancy, the party resisting discovery thereafter has the burden of establishing that discovery should be denied.  See Bryant v. Ochoa, 2009 WL 1390794 at *1 (S.D. Cal. 2009) ("The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1). . . . Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections."); DIRECTV, Inc. v. Trone, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (same); see also Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975) (reversing the district court's issuance of a protective order based on a failure of the party resisting discovery to meet its burden by asserting that the defendant's deposition would merely yield cumulative evidence).

EXHIBIT ___3___
PAGE ___47___

The effect of this subtle variation on the burden of proof from that stated by the Discovery Master is magnified by the recent filing of the TAAC, which significantly heightens the relevancy of the issue of how the MGA parties and the parties represented by Bingham may be related, the formation of certain of those entities, and other issues implicated by Mattel's requests. Because the question of relevance is featured so prominently in the quintessential balancing test to which the present discovery motion was subjected, the filing of the TAAC dramatically altered the calculus that underlies the conclusions reached in DM No. 27.

For reasons related to judicial economy and preservation of scarce judicial resources (which this case has stretched to the outer limits), the Court defers decision, in light of the changed calculus that has occurred as the result of the filing of the TAAC, of the issues presented in the challenged portions of DM No. 27 to the Discovery Master. For that reason, the Court **REMANDS** the challenged portions of DM No. 27 to the Discovery Master for his reconsideration and re-balancing in light of the recently filed TAAC. The Discovery Master may, in his discretion, set the matter for further briefing and/or hearing, he may take the matter under submission based on the existing record, or he may take other action as he deems appropriate to resolve the present issues.

Notwithstanding the remand of DM Order No. 27, one issue raised by Mattel requires further consideration by the Court. At page 25 of DM Order No. 27, the Discovery Master appears to impose a blanket prohibition on discovery of materials that are in the possession of a subpoena recipient, but that are related to a non-party over whom the Court has not been shown to have jurisdiction. The Discovery Master cites no legal authority for such a blanket prohibition, and the Court, in its own research, has found none. Such a blanket prohibition precludes the application of the balancing test that applies almost universally to discovery motions; accordingly, and because this blanket prohibition is unprecedented, the Court finds that it is contrary to law. As to this narrow issue, the Court **GRANTS** Mattel's Motion. The issue of discovery of materials relating to Lexington is **REMANDED** to the Discovery Master for reconsideration in light of this ruling and in light of the filing of the TAAC.

## V. ORDER DENYING MOTION TO STRIKE
## THE FORENSIC AUDITOR'S REPORTS (DOCKET #5705)

In an unsealed filing that has since been ordered sealed by the Court, counsel for Omni 808 Investors, LLC ("Omni 808"), Todd E. Gordinier, made unwarranted, unsubstantiated personal attacks against the Court-Appointed Forensic Auditor, Ronald L. Durkin. Mr. Gordinier's selective public disclosure of portions of the Forensic Auditor's Summary Report, coupled with the maintenance of the Summary Report, as well as the later-filed Responsive Report and Final Report, under seal in their entirety, has led to an unbalanced public presentation of the issues discussed therein. In an

EXHIBIT ___3___
PAGE ___48___

attempt to cure this deficiency, the Court has considered the possibility that it should simply unseal the relevant Reports and allow those Reports to speak for themselves.

Because the MGA entities were the primary subject of the Forensic Audit, the MGA parties have, quite understandably, objected to the proposed unsealing. Mattel, for its part, advocates quite emphatically, and not unreasonably, that the Reports should be unsealed in light of the selective disclosure. See Tr. at 31-32 ("It's the underlying analysis that refutes the selective disclosures that MGA and Omni made in a public forum to smear . . . both Mr. Durkin and Mattel.") At the other end of the spectrum, Omni 808 has moved to strike the Reports in their entirety.

In the end, although the Court does not order the unsealing of the Reports, it **DENIES** the Motion to Strike. The Court ordered the Forensic Audit to evaluate whether a receiver should be appointed; as the record bears witness, the Court eventually rejected the suggestion that it should appoint a permanent receiver, and the Court has instead appointed an MGA Monitor with more limited powers than a receiver. Nevertheless, the fact that the Reports were intended to serve a very limited purpose does not mean that there is no possibility that the Forensic Auditor's Reports will not serve any purpose henceforth.

As it currently stands, the Court **ORDERS** that no party shall cite to or rely upon the Reports for any purpose absent further Order of this Court.[1] However, the documents attached to the Reports, to the extent they are otherwise discoverable, are not insulated from discovery on the basis that they have been made part of the Reports. Conversely, documents, such as charts and interview notes, that were prepared by the Forensic Auditor are the property of the Court and are not subject to discovery or use in this or any other litigation by any party or non-party.[2]

Had it been counsel for the MGA parties who mounted the unwarranted, unsubstantiated, and public personal attacks on Mr. Durkin, the Court would find, notwithstanding the sensitive information contained therein, the unsealing of the Reports was an appropriate remedy for the selective disclosure.[3] However, here, it is

---

[1] This Order does not supersede the Court's Order permitting the Forensic Auditor to share information with the Court-Appointed Monitor.

[2] Toward that end, the Court **CLARIFIES** to the parties that the work papers, drafts, notes, detailed time records, and any other materials prepared by or at the direction of the Forensic Auditor are the property of the Court. The Court **ORDERS** the Forensic Auditor, as the custodian of those records on behalf of the Court, to retain those materials, whether maintained in electronic, hard copy, or any other medium, until further order of the Court.

[3] As it stands, counsel for MGAE, James I. Stang, wisely sought, and was granted, leave to file his more restrained, but just as unwarranted and unsubstantiated, personal attacks on Mr. Durkin under seal. See MGA Entertainment, Inc.'s Response to Final In Camera Report of Forensic Auditor Ronald L.

MINUTES FORM 90                                        Initials of Deputy Clerk __cls_____
CIVIL -- GEN                        6

EXHIBIT    3
PAGE      49

counsel for Omni 808 who made those attacks public, and although Mattel maintains that both the MGA parties and Omni 808 are jointly responsible for the selective disclosure, see July 6, 2009, Tr. at 33, whether, or to what extent, the MGA parties act or have acted in concert is an issue to be decided in Phase 2 of this action.

Nevertheless, Mr. Gordinier's attack on Mr. Durkin cannot pass without comment by the Court. The Court's comments are directed toward Mr. Gordinier personally, which is not the Court's usual practice. Although the irony of this form of address is not lost on the Court (given the subject of this Order), it is appropriate. Mr. Gordinier signed all three filings in which the personal attacks appear, and continues to stand behind those filings. Moreover, Mr. Gordinier expressly and unabashedly claimed personal responsibility for the brief that was not filed under seal, by both stating that he gave it a lot of thought before filing it and by implicitly acknowledging that although he considered filing his brief under seal, he ultimately rejected that course of action. See May 18, 2009 Tr. at 46-47 ("My brief speaks for itself. We have nothing to hide. . . . I didn't feel it appropriate, necessary, or desirable to file my brief under seal. And I don't have a problem with the Court or anybody reading what I have to say, because I gave it a lot of thought, and I gave it at lot of consideration.").

At the July 6, 2009, hearing, the Court outlined its concerns that while the attacks on Mr. Durkin were public, the Reports are not, and that "it doesn't seem fair" to the Court to allow those allegations to stand alone without a chance to respond to them. July 6, 2009, Tr. at 25-26. In response, Mr. Gordinier contended that his comments "respond[ed] to the report," and that "[w]hat we said was that there were problems with that report." July 6, 2009, Tr. at 28. This statement is an implicit denial that any personal attacks were made; however, as set forth in great detail below, the record belies Mr. Gordinier's *post hoc* protestations.

Lest Mr. Gordinier's statement reflecting his implicit denial that he engaged in personal attacks be perceived as one being made at oral argument without ample time to reflect upon its significance, the statement is also made by Mr. Gordinier in Omni 808's Reply Memorandum, a document upon which he had ample time to reflect: "Each and all of the references in Omni's Statement of Position refer to the contents of Mr. Durkin's Reports and the shortcomings contained therein and omitted therefrom, not to his person." Id. at 2 n.1. To be sure, the criticisms leveled at Mr. Durkin are framed in

---

Durkin (docket #5918) at 4 (accusing Mr. Durkin of "making McCarthy-like statements of non-existent buybacks and unsupported insinuations of conflicts of interest"); id. at 9 (suggesting that Mr. Durkin's formulation of certain search terms relating to criminal acts in Farsi without a concurrent formulation of those terms in English demonstrated a "predisposition that Persian members of MGA's management and staff (and only the Persian members) might be engaged in illegal conduct"). Mr. Stang's attacks pale in comparison to those advanced by Mr. Gordinier, and they were filed under seal. Thus, although the Court's analysis and conclusions regarding the Forensic Auditor's Reports applies with equal force to Mr. Stang's statements, his are not the focus of the Court's attention at this time.

EXHIBIT ___3___
PAGE ___50___

terms of his Reports. Still other criticisms are, as counsel maintains, addressed to the
Reports themselves; those must be analyzed based on their substance. However, as
aptly demonstrated by the cited and quoted portions of Mr. Gordinier's filings that
appear below, his criticisms do not, by any measure, confine themselves to those
Reports, and instead reach out in a highly personal manner to attack the author, his
professionalism, his competence, his objectivity, and his integrity.[4]

Indeed, in a display the likes of which have not been previously witnessed by this
Court, Mr. Gordinier strayed far afield of legitimate criticism of the discussions,
analyses, and conclusions reached in the Summary Report and the Reports that
followed. To be sure, there are instances in which Mr. Gordinier addressed the
message found in those Reports; just as surely, however, as detailed below, Mr.
Gordinier attacked the messenger. Specifically, the papers filed by Mr. Gordinier on
behalf of Omni 808 call into question Mr. Durkin's professionalism and competence, as
well as his objectivity and integrity. Moreover, and alarmingly, they falsely accuse Mr.
Durkin of being influenced by an ethnocentric bias against Mr. Larian and Mr. Kadisha.
Such attacks, aimed at Mr. Durkin personally rather than the discussion, analyses, and
conclusions set forth in his Reports, appear throughout Omni 808's papers. See Omni
808 Investors, LLC's Statement of Position re Order to Show Cause re Appointment of a
Permanent Receiver (docket #5446) ("SOP"), filed May 14, 2009, at 11 (referring to Mr.
Durkin's "irresponsible" analysis); id. (noting that Mr. Durkin is "far too experienced" to
believe that he "produced . . . a balanced presentation"); id. (stating that "Mr. Durkin's
report is a polemic" and "a piece of advocacy"); id. at 12 n.9 (calling into question Mr.
Durkin's "objectivity" based on the fact that the Court ordered Mr. Durkin's fees be paid
(at least in the first instance) by Mattel); id. (suggesting that Mr. Durkin's ex parte
communications with Mattel were improper); id. at 13 n.10 (characterizing Mr. Durkin's
quotation of Mr. Larian's and Mr. Kadisha's account of how the two men were
acquainted, from "the Persian community," as "at best, unprofessional" and, "at worst,

---

[4] Adding still further to the mounting irony, in the same footnote that Mr. Gordinier disclaims
engaging in improper personal attacks, he falsely accuses counsel for Mattel of advancing their own
improper ad hominen attacks against Neil Kadisha, who has been referred to as a "common thief" in
certain unspecified Mattel filings. Mr. Kadisha is the Managing Partner of a diversified investment firm,
Omninet Capital, LLC, and an investor in Omni 808. To call someone a "common thief" is, undoubtably, by
any measure, a highly personal attack, therefore an attack addressed "to the man," or ad hominen.
However, in the same manner Mr. Gordinier accuses Mr. Durkin of failing to provide appropate context to
the Court in his Reports, Mr. Gordinier himself fails to acknowledge that counsel for Mattel's use of the
term "common thief" in connection with Mr. Kadisha merely quotes Los Angeles County Superior Court
Judge Henry W. Shatford's conclusion regarding Mr. Kadisha, as set forth in his 191-page Statement of
Decision, dated October 24, 2006, which was issued after a 200-day trial, which is currently pending
appeal, and which conferred upon Mr. Kadisha the oft-repeated moniker of "common thief," as well as
"embezzler," and "perjurer." See Uzyel v. Kadisha, Cal. App. Nos. B196045, B203804, B198007,
B199850, B201425, 2009 WL 646096 (Mar. 4, 2009) (appellate brief). As always, context is key. The use
by counsel for Mattel of another court's findings and conclusions to advance an argument is not
inappropriate. Those findings and conclusions may, or may not, be relevant to matters presented to the
Court. Used in this manner, although undoubtedly addressed "to the man" (and his credibility), it is not an
improper ad hominen attack.

EXHIBIT ___3___
PAGE ___51___

evidence of improper cultural bias"); id. (in the same footnote, referring to the same quotation, stating that "[t]he tone [of the report] itself is compelling proof that Mr. Durkin had no intention of providing an 'objective' report to the Court."); id. at 23 (referring to the Summary Report as "Mr. Durkin's ill-concealed advocacy piece"); id. (noting that advocacy, rather than objectivity, "is certainly the posture [Mr. Durkin] is most comfortable with"); Omni 808 Investors, LLC's Memorandum in Support of Its Requests to Strike Summary and Responsive Reports of Ronald L. Durkin (docket #5705) ("Motion to Strike"), filed June 8, 2009, at 4 (noting Omni "doubts that the Court or any party would benefit further by continuing this façade of Mr. Durkin's 'impartiality'"); id. at 7 (calling Mr. Durkin's explanation of his conclusion regarding the relatedness of certain parties as "not only fatuous[,] but [also] intellectually dishonest"); id. at 9 (suggesting that Mr. Durkin intentionally concealed from the Court the fact that Mr. Larian sought other funding sources before turning to Mr. Kadisha); id. at 10 (noting that "Mr. Durkin's repeated references to Mr. Larian's and Mr. Kadisha's common 'Persian' heritage can only be viewed as an attempt to draw some nefarious ethnic connection between them"); id. at 12 (calling the reference to Mr. Larian's and Mr. Kadisha's ethnicity "unprofessional symptoms of improper cultural bias [that] have no place in a supposedly objective report"); Omni 808 Investors, LLC's Reply Memorandum (docket #5809) ("Reply Memo") at 14 (suggesting that not only Mr. Durkin, but also counsel for Mattel, harbor "cultural biases" that lead them to "suggest[] that [Mr. Larian's and Mr. Kadisha's] common heritage makes [them] more likely to act contrary to their own interests); id. at 15 (stating that, according to his own interview notes, Mr. Durkin "misrepresented" to the Court in his Summary Report how Mr. Larian and Mr. Kadisha portrayed their relationship with each other).

As alluded to, Omni 808's criticisms have not been limited to personal attacks; some of the criticisms are in fact aimed at the Reports themselves. See e.g., SOP at 16 ("Mr. Durkin's conclusion that the Wachovia-Omni transaction impacted 'MGAEI's solvency and ability to continue conducting operations' is simply wrong."). Any comment by the Court regarding the substance of the discussions, analyses, and conclusions presented to the Court in the Forensic Auditor's Summary, Responsive, and Final Reports is inadvisable at this time. With the filing of the Third Amended Answer and Counterclaims, much of the subject matter of the Forensic Auditor's Reports have been incorporated into the claims at issue in this action. As such, it would be premature for the Court to comment upon the substance of issues that are yet to be adjudicated, and that are subject to a trial by jury. Nevertheless, the Court has reviewed the Forensic Auditor's Summary, Responsive, and Final Reports, and the exhibits attached thereto. The Court has also reviewed and considered the criticisms aimed at the Forensic Auditor, cited and quoted above, as well as the entirety of all the papers responding to the Forensic Auditor's Reports filed to date. After this review, the Court is firmly convinced that all the personal criticisms of Mr. Durkin are unwarranted and unsubstantiated.

At best, the criticism of Mr. Durkin's performance and presentation represents a

MINUTES FORM 90                                          Initials of Deputy Clerk __cls_____
CIVIL -- GEN                                    9

EXHIBIT ___3___
PAGE ___5ᴰ___

different interpretation of available evidence. That such disagreements would arise
between the analyses offered by a Court-Appointed Forensic Auditor and that offered by
counsel for a party whose transactions have been a subject of that audit is by no means
surprising. A jury considering the relevant evidence might ultimately make factual
determinations that tend to agree with Mr. Durkin's assessment, it might ultimately tend
to agree with Mr. Gordinier's assessment, or it may very well reject both positions in
favor of another. The answer to the merits of the claims at issue in this action must
await another day. Today, the Court merely notes that its examination of the Forensic
Auditor's Reports reveal that Mr. Gordinier's personal attacks aimed at their author were
unjustified.

Some specific attacks directed toward Mr. Durkin – relating to his background as
a law enforcement officer, his communications with counsel for Mattel, and specific (but
baseless) allegations of ethnocentric bias -- are worthy of more specific comment by the
Court.

Stopping short of explicitly stating such, Mr. Gordinier appears to labor under the
assumption that Mr. Durkin has been unable to put behind him the prosecutorial
mindset under which he presumably operated during his former service to this Nation as
an agent of the Federal Bureau of Investigation ("FBI"). At the outset, the Court notes
that Mr. Gordinier's unstated assumptions do a disservice to the prosecutors and the
law enforcement officers who work with those prosecutors, both of whom conduct their
work under the clearly delineated duty to ferret out not only evidence of guilt but also
"evidence favorable to the accused." See e.g., Berger v. United States, 295 U.S. 78, 88
(1935) (noting that the role of the prosecutor is not to win at all costs and observing that
the prosecutor "is the representative not of an ordinary party to a controversy, but of a
sovereignty whose obligation to govern impartially is as compelling as its obligation to
govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall
win a case, but that justice shall be done."); Brady v. Maryland, 373 U.S. 83, 87 (1963)
(imposing a duty on prosecutors to provide to the defense exculpatory evidence when
requested to do so).

Secondly, even if prosecutorial duties were not so defined, the Court finds no
suggestion that Mr. Durkin skewed the evidence in favor of any particular viewpoint.
Undoubtedly, there is a **complete absence** of any evidence that, as Mr. Gordinier has
suggested, Mr. Durkin has embarked upon a campaign to purposely mislead the Court.

Mr. Gordinier also suggests that, because Mr. Durkin's bills are being paid by
Mattel, Mattel has, through this payment or through other communications with Mr.
Durkin, bought Mr. Durkin's loyalty. This is utter nonsense. As demonstrated by the
Court's communications with him, Mr. Durkin is a Court-Appointed Officer who
understands that his role is to work on behalf of the Court and not on behalf of any
party. In any event, the Court's Order of January 7, 2009, which appointed Mr. Durkin,
imposed the costs of the audit on Mattel "in the first instance," but expressly provided for

MINUTES FORM 90
CIVIL -- GEN                                        10                    Initials of Deputy Clerk __cls_____

EXHIBIT ___3___
PAGE ___53___

the possibility that the audit expenses be shared or shifted to the MGA parties. Moreover, to suggest, however subtly, that ex parte communications with counsel for Mattel were improper ignores the Court's mandate to the Forensic Auditor in the January 7, 2009, Order, which states that Mr. Durkin was provided with attorney contact information and that he "shall direct his initial communications to counsel." At no time has the Court precluded the Forensic Auditor's communications with Mattel or its counsel; in fact, because the Forensic Audit was undertaken based on evidence gathered by and presented to the Court by Mattel, Mr. Durkin would have been remiss in his duties if he failed to communicate with Mattel and its counsel.

Mr. Durkin was vested with powers and discretion to complete a Court-ordered Forensic Audit. Pursuant to an Order of this Court, he undertook this task and exercised those powers and that discretion, presenting his Reports in conformity with the Court's instructions. Despite counsel's attacks, the Court's review of the evidence before it discerns no abuse of those powers or of that discretion.

Particularly troubling to the Court is that counsel speculates that, because Mr. Durkin noted in his report that Mr. Larian knew Mr. Kadisha from "the Persian Community," Mr. Durkin could be "of the view that this common heritage makes Mr. Kadisha more likely to act contrary to his own interests or to do something via third-parties that he wouldn't otherwise do?" See SOP at 13-14 n.10 (appearing to pose this thought as a rhetorical question). There is no indication in the record, or otherwise, that Mr. Durkin holds such a view. To the contrary, Mr. Durkin's comment regarding the acquaintanceship of Mr. Larian and Mr. Kadisha from "the Persian Community" (which is noted in the report within quotation marks and is expressly attributed to a reference made by Mr. Larian himself) is clearly predicated on interviews with these two individuals, each of whom related independently to Mr. Durkin and his colleagues that they knew each other from "the Persian Community." See Durkin Summary Report, Ex. 14, at 2 ¶ 3 (Notes re March 25, 2009, interview with Mr. Larian: "He indicated that he knew Kadisha from the Persian community.") and Ex. 14, at 15 ¶ 2 (Notes re March 26, 2009, interview with Mr. Kadisha: "Kadisha stated that he knows Larian from the Persian community."). The purpose for this reference is made clear in the footnote set forth at the end of the sentence in which the reference appears; namely, the Report discusses evidence that the relationship between Mr. Larian and Mr. Kadisha is stronger and more personal than either man claimed it was. See Summary Report at 5 n.18; Ex. 15 (personal emails).

In the Reply Memo, Mr. Gordinier takes issue with this explanation, this time including not only Mr. Durkin but also counsel for Mattel as the targets for his unsubstantiated allegations of "cultural bias." Mr. Gordinier first mischaracterizes an argument made by Mattel. Mattel argued, and quite correctly, both that how well Mr. Larian and Mr. Kadisha knew each other was relevant to a determination of whether certain transactions between the two were arms-length transactions, and that this point was likely not lost on either of these two very sophisticated and successful

MINUTES FORM 90
CIVIL -- GEN                                  11                Initials of Deputy Clerk __cls_____

EXHIBIT ____3____
PAGE ____54____

businessmen.[5]  As noted previously, both Mr. Larian and Mr. Kadisha stated that they knew each other from "the Persian community" which, in the Forensic Auditor's view, was intended to, or at least had the tendency to minimize the existing relationship between the two.  Mr. Gordinier incorrectly characterizes this argument as Mattel's contention that Mr. Larian's and Mr. Kadisha's "Persian relationship" and "common Persian heritage" was somehow relevant to a determination of whether the Omni 808 transaction was an arms-length transaction.  Mattel made no such argument.  Neither counsel for Mattel nor Mr. Durkin have implied that Mr. Larian's and Mr. Kadisha's ethnicity factors into the analysis.  Other than to point to Mr. Larian's and Mr. Kadisha's separate, but identical, accounts of how they knew each other which, in turn, suggests how well they know each other, neither counsel for Mattel nor Mr. Durkin have stated or implied that Mr. Larian's and Mr. Kadisha's shared ethnicity is relevant to any matter currently or potentially before the Court.  Compare Opposition at 8-9 with Reply Memo at 14-15.

Moreover, Mr. Gordinier's substantive point, that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha told him about the closeness of their relationship, fares no better.  See Reply Memo at 15.  On this point, it is important to set this stage properly.  Counsel for all parties have attempted to glean far too much from two sterile paragraphs of interview notes taken by Mr. Durkin.  Much can be inferred from conversations and interviews through not only what is said, but what is not said, by the interviewee's demeanor, by the tone of the speaker, by the length and placement of pauses, and by non-verbal gestures and body language.  With all these variables, much of what is communicated does not find its way into notes.[6]  For instance, Mr. Durkin's interview of Mr. Larian lasted over two and a half hours; however, the interview notes are a mere five and a half pages.  Similarly, a one-hour and ten minute interview of Mr. Kadisha yielded only three and a half pages of interview notes.  This is not to suggest that the notes should have been longer or that the interviews should have been recorded or transcribed; rather, it is to suggest that counsel's arguments based on another's notes are not particularly probative.

In contrast, Mr. Durkin's assessment, based on his interviews with both of them,

_____

[5]  In fact, the Court just this week issued a 30-page, single-spaced opinion resolving a 10-day bench trial conducted over the sole issue of whether a transaction between "closely related" entities reflected its fair market value, one of the more significant arguments ultimately rejected by the Court in that case being that the close relationship between the parties necessarily rendered the transaction a "sweetheart deal."  See July 6, 2009, Order, Siegel v. Warner Bros. Entertainment, Inc., et al., CV 04-08400 SGL (RZ) (docket #554).

[6]  Indeed, the interview notes upon which the parties rely concede as much.  See Summary Report, Ex. 14 at 2, 15 ("This interview memorandum is a factual representation of the topics discussed during the interview and is not intended to be a word for word or exact transcription of the conversation.").  Thus, in addition to not taking into account all non-verbal communication, the notes do not even represent everything that was said during the interview.

EXHIBIT  3
PAGE  55

is that Mr. Larian and Mr. Kadisha attempted to minimize their relationship because both
of them understand the relevance of any friendship or other connection between them
to the assessment of the arms-length nature of any transactions in which they have
engaged. Mr. Durkin's assessment does not come from the gentle teasing of a strained
meaning from two sterile paragraphs of brief notes taken by another person; rather, his
assessment springs from his participation in the interview process, the entirety of the
interviews he conducted of Mr. Larian and Mr. Kadisha, and his review of all of the
evidence. As such, the Court defers to his assessment, at least insofar as how Mr.
Larian and Mr. Kadisha portrayed their relationship to him.

As for that scant language from which the parties glean so much meaning, the
entirety of which is set forth below, it in no way supports the contention made by Mr.
Gordinier that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr.
Kadisha conveyed to him about the closeness of their relationship. On this topic, the
notes of Mr. Larian's interview merely state the following:

> Larian decided to contact Neil Kadisha of OmniNet as
> he knew his company was in the distressed loan business.
> He indicated that he knew Kadisha from the Persian
> community. Kadisha said he wouldn't do the deal alone in
> today's environment and wanted Larian and their other
> friends to invest in the deal with MGA. Larian stated that
> Kadisha negotiated the debt with Wachovia and got it down
> significantly, Larian said he is not bitter about Kadisha
> getting a good deal on buying the loan.

Summary Report, Ex. 14, at 2 ¶ 3 (emphasis added). This paragraph contains the word
"friends," and perhaps could even be read as an implicit statement by Mr. Larian that he
and Mr. Kadisha are "friends." But the language does not compel such an inference.
Moreover, it does not comport with the notes of Mr. Kadisha's interview, which on this
topic state only the following:

> Larian and Kadisha have never been to dinner
> together. Kadisha stated that he knows Larian from the
> Persian community and he sees him often at religious
> events, etc. He has no investments with Larian. Kadisha
> did not talk with Larian last night, this morning or in the last two days.

Summary Report, Ex. 14, at 15, ¶ 2. Mr. Durkin's assessment that Mr. Larian and Mr.
Kadisha sought to minimize the extent of their relationship is not contradicted by these
short passages.

The criticism that Mr. Durkin was acting pursuant to an ethnic or cultural bias is
clearly baseless. The allegations are irresponsible, and they are made to capitalize on

MINUTES FORM 90
CIVIL -- GEN                               13                   Initials of Deputy Clerk __cls_____

EXHIBIT ___3___
PAGE ___56___

their inherent sensational nature for counsel's own purposes of diverting attention away from the substance of the Reports. Sensationalism aside, when viewed in context, the Reports' reference to Mr. Larian and Mr. Kadisha knowing each other from "the Persian community" was plainly innocuous. The reference was a direct quotation from both Mr. Larian and Mr. Kadisha. It was used in a broader discussion regarding how (and thus, impliedly, how well) the two knew each other, which is itself relevant to the issue of whether certain transactions relevant to the present litigation were made at arms length.

This is a most unfortunate incident. The Court certainly understands, in a case as hotly contested as this one -- with such high stakes, with such complex legal issues, and with such truly extraordinary legal talent on all sides -- that lawyers, however ethical and committed to the highest standards of professionalism (as the Court presumes and has found all counsel of record here to be), make statements or commit acts in haste that they subsequently regret. All of the players to this drama, are, after all is said and done, human. As such, all of us are vulnerable to all-too-common human frailties. The Court would place itself at the very top of any list of lawyers who have spoken improvidently at one time or another in this case (and any number of others). What the Court has witnessed here, however, in both manner and substance, for the reasons noted above, goes beyond what the Court can let pass without some manner of reprobation. So let the Court be clear: Nothing excuses the attempted character assassination in which Mr. Gordinier has engaged.

**IT IS SO ORDERED.**

MINUTES FORM 90
CIVIL -- GEN                                    14                     Initials of Deputy Clerk __cls_____

EXHIBIT ___3___
PAGE ___57___

# EXHIBIT 4

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
CIVIL MINUTES -- GENERAL

Case No.   CV 04-09049 SGL(RNBx)                                    Date: May 21, 2009
Title:     MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
==============================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

            Cindy Sasse                        None Present
            Courtroom Deputy                   Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:     ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                          None Present

PROCEEDINGS:    ORDER DENYING MOTION TO MODIFY DISCOVERY MASTER ORDER
                NO. 11 (DOCKET #5185)

                ORDER GRANTING MOTION FOR LEAVE TO FILE A THIRD AMENDED
                ANSWER AND COUNTERCLAIMS (DOCKET #5143)

                ORDER DENYING EX PARTE APPLICATION FOR STAY PENDING
                APPEAL (DOCKET #5396)

                ORDER DENYING EX PARTE APPLICATION RE DISCLOSURE OF 2009
                PRODUCT LINE INFORMATION (DOCKET #5425)

                ORDER RE EXPIRATION OF TEMPORARY RECEIVERSHIP AND ORDER
                APPOINTING MGA MONITOR

                ORDER IMPOSING LIMITED AND TEMPORARY STAY OF PHASE 2 AND
                REQUIRING MANDATORY SETTLEMENT CONFERENCE

        These matters were heard on May 18, 2009.

MINUTES FORM 90                                    Initials of Deputy Clerk __cls_____
CIVIL -- GEN                      1                 Time: 03/02

EXHIBIT ___4___
PAGE ___58___

## I. MOTION TO MODIFY DISCOVERY MASTER ORDER NO. 11

Mattel moves to overrule that portion of the Discovery Master's Order No. 11 ("Order No. 11") that concludes that witnesses Pablo Vargas San Jose ("Vargas") and Mariana Trueba ("Trueba") (collectively, "the witnesses") are not "managing agents" within the scope of Fed. R. Civ. P. 30(b)(1). The Court has reviewed Order No. 11, Mattel's Motion, the MGA parties' opposition thereto, and Mattel's reply. Applying the "clearly erroneous or contrary to law" standard of review that all parties agree is applicable here, the Court **DENIES** Mattel's Motion.

In Order No. 11, the Discovery Master acknowledged the so-called <u>Sugarhill</u> factors, <u>see</u> <u>Sugarhill Records Ltd. v. Motown Record Corp.</u>, 105 F.R.D. 166, 170 (D.C.N.Y. 1985), which the parties agreed applied. After an ancillary discussion that concluded the witnesses were not managing agents as measured by a test similar to the <u>Sugarhill</u> factors, the Discovery Master either applied, or explained why his conclusion would not change if he did apply, the <u>Sugarhill</u> factors.[1] Those factors are:

> 1) [W]hether the individual is invested with general powers allowing him to exercise judgment and discretion in corporate matters; 2) whether the individual can be relied upon to give testimony, at his employer's request, in response to the demand of the examining party; 3) whether any person or persons are employed by the corporate employer in positions of higher authority than the individual designated in the area regarding which information is sought by the examination; 4) the general responsibilities of the individual "respecting the matters involved in the litigation," . . . and 5) whether the individual can be expected to identify with the interests of the corporation.

105 F.R.D. at 170 (internal citation omitted). The Discovery Master found that although the second and fourth factors favor designating the witnesses as managing agents, the first, third, and fifth do not.

As to the first factor, Mattel argues that the Discovery Master should have focused more on

---

[1] In the relevant portion of Order No. 11, the Discovery Master first discussed, and then rejected for reasons set forth therein, an argument advanced by Mattel that the most important <u>Sugarhill</u> factor was the fifth factor, the so-called "loyalty factor." He next applied an alternative test articulated by <u>Libbey Glass, Inc. v. Oneida, Ltd.</u>, 197 F.R.D. 342, 350 (N.D. Ohio 1999), which was originally adopted by the D.C. Circuit. <u>See id.</u> (quoting <u>Founding Church of Scientology of Washington, D.C., Inc. v. Webster</u>, 802 F.2d 1448, 1452 (D.C. Cir.1986)). That test is set forth in Order No. 11 at 31, and is not repeated here. It focuses on the character of the employee's control, the convergence of interest of the employee and the corporation, and the employee's area of expertise in relation to others associated with the corporation. <u>Libbey Glass</u>, 197 F.R.D. at 350. This test appears to the Court to implicate, to varying degrees, all of the <u>Sugarhill</u> factors except the second. Because the two tests are similar, and because neither is controlling, adoption of either could not be said to be contrary to law. Notwithstanding language that may be so read, the Court does not accept the notion that Order No. 11 rejected outright the <u>Sugarhill</u> factors. The Court does so based on the acknowledgment that the parties agreed those factors were applicable, the similarity between the two alternative tests, and the Discovery Master's articulation regarding each <u>Sugarhill</u> factor. <u>See</u> Order No. 11 at 29-36.

MINUTES FORM 90                                   Initials of Deputy Clerk __cls_____
CIVIL -- GEN                          2             Time: 03/02

EXHIBIT ___4___
PAGE ___59___

whether the witnesses were managing agents as to the particular matters at issue in the lawsuit rather than their general powers and that, in any event, the relevant time period to measure managing agent status is not at the time of deposition but is rather at the time of the events giving rise to the lawsuit. Although these arguments find some support, the Discovery Master's conclusion regarding this first Sugarhill factor (and its Libbey Glass analog) is not contrary to law. The first Sugarhill factor is clearly concerned with an employee's general power; the fourth factor, which the Discovery Master found in favor of Mattel, focuses on the witnesses' responsibilities regarding matters involved in the litigation. The cases cited by Mattel support its timing argument; however, cases cited by the MGA parties establish that other cases favor a contrary position. Neither side's authority is controlling, and the Court therefore concludes the position adopted by the Discovery Master is not contrary to law.

As to the third factor, Mattel argues that it was clear error for the Discovery Master to conclude that Kuemmerle, to whom Vargas reported directly and to whom Trueba's supervisor reported, could provide substitute testimony to them is clear error. Mattel's ultimate point is that no one can testify more accurately and more on point than can the two witnesses regarding their alleged trade secret theft. Again, this is not an invalid point. Indeed, it is possible that if such theft occurred (the MGA parties deny that it did), then the witnesses did not proceed at the behest of the MGA parties and instead acted on their own accord (the MGA parties alternatively contend).    The fact is that if the MGA parties' alternative contention is true, then the witnesses' testimony regarding any theft would not be on behalf of MGA at all. Who can or cannot testify about these events that may or may not have occurred on behalf of any MGA party -- let alone who can testify best -- is far from clear. This area of inquiry is fraught with uncertainty. The Discovery Master's conclusion one way or another on this issue, therefore, cannot be said to be clear error. See Wolpin v. Philip Morris Inc., 189 F.R.D. 418, 422 (C.D. Cal.1999) ("To conclude that a magistrate judge's decision is clearly erroneous, the District Court must arrive at a definite and firm conviction that a mistake has been committed.").

As to the fifth factor, it was not clearly erroneous for the Discovery Master to conclude that MGA Mexico's interests and the witnesses' interests are at odds. The witnesses are currently employed by MGA Mexico, weighing in favor of a finding of alignment, but they have also been subjected to criminal investigations regarding the allegations asserted in this lawsuit, and they have separately retained counsel to represent their interests. Additionally, the MGA parties have maintained that if any trade secret theft occurred, it occurred without their knowledge or consent. These facts support the Discovery Master's finding.

Weighing these factors, and taking into account the mixed burden of proof, as the Discovery Master did, the Court cannot find that the Discovery Master's conclusion was clearly erroneous or contrary to law, and the Court therefore DENIES Mattel's Motion (docket #5185).

## II. MOTION FOR LEAVE TO FILE THIRD AMENDED ANSWER AND COUNTERCLAIMS

Mattel has filed a motion seeking leave to file its proposed Third Amended Answer and

MINUTES FORM 90
CIVIL -- GEN

3

Initials of Deputy Clerk ___cls_____
Time: 03/02

EXHIBIT ___4___
PAGE ___60___

Counterclaims ("TAAC"). In substance, the TAAC adds one additional claim and a number of additional allegations. First, Mattel asserts an additional claim pursuant to California's version of the Uniform Fraudulent Transfers Act, found at Cal. Civ. Code §§ 3439 et seq. Second, Mattel avers facts that fall into the following broad categories: (1) Allegations regarding certain 2008 financial transactions that were the subject of the Forensic Auditor's Report ("the Wachovia/Omni 808 transactions"); (2) allegations regarding acts of commercial bribery relating to three Mattel seamstresses who were employed by MGA contractor Veronica Marlow; (3) allegations regarding evidence tampering, including the alleged destruction by Isaac Larian's brother Farhad of boxes of documents relating to the development of Bratz and Farhad's deletion of emails from a USB device; (4) allegations that Isaac Larian and MGA perjured themselves during their Phase 1 testimony; and (5) allegations setting forth additional predicate acts of racketeering activities, including money laundering, concealing assets, engaging in monetary transactions involving property derived from unlawful activity, commercial bribery, destruction of evidence, and obstruction of justice.

The parties, quite understandably, disagree on whether the Fed. R. Civ. P. 15(a) liberal standard or the Rule 16(b) "good cause" standard applies to the present motion. Upon the lifting of the stay on Phase 2 discovery, the Court set new dates for Phase 2 proceedings, but neglected to set a deadline for amending the pleadings related to Phase 2, leading to the present dispute. The Court now sets that deadline for three months prior to the discovery cutoff date of December 11, 2009, or September 11, 2009. Accordingly, the present motion is governed by the standard for amendments to the pleadings that are sought prior to the deadline set in the Court's Scheduling Order, which is set forth in Rule 15(a).

Pursuant to Rule 15(a), leave to amend a pleading is granted "freely . . . when justice so requires." Id.; See Foman v. Davis, 371 U.S. 178, 182 (1962). However, leave need not be granted where the proposed amendment "(1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." AmerisourceBergen Corp. v. Dialysist West, Inc., 465 F.3d 946, 951 (9th Cir. 2006).

Allegations relating to events occurring after the filing of the Second Amended Answer and Counterclaims ("SAAC") are governed not by the Rule 15(a) standard; rather, those amendments are governed by the Rule 15(d) standard. Rule 15(d) provides:

> On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

Id. This standard, like the Rule 15(a) standard, is liberal, and leave to file a supplemental pleading is favored. Planned Parenthood of S. Ariz. v. Neely, 130 F.3d 400, 402 (9th Cir.1997). It should not, however, be used to introduce a separate, distinct, and new cause of action. Id. The goal of

MINUTES FORM 90
CIVIL -- GEN

4

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT ___4__
PAGE ___61__

Rule 15(d) is to promote judicial efficiency, permitting "a court to award complete relief, or more nearly complete relief, in one action, and to avoid the cost, delay and waste of separate actions which must be separately tried and prosecuted." Keith v. Volpe, 858 F.2d 467, 473 (9th Cir.1988) (internal quotation marks and citation omitted).

The MGA parties contend the perjury allegations should not be permitted because there can be no present RICO injury (because Mattel prevailed in Phase 1) and/or no judgment has yet been entered and upheld on appeal. Additionally, they contend that perjury is not a predicate act of racketeering activity. The Court disagrees. Case law makes clear that what Mattel must show is injury as a result of the pattern of racketeering activity; Mattel need not prove that each and every predicate act itself caused harm. Corley v. Rosewood Care Center, Inc. of Peoria, 388 F.3d 990, 1004 (7th Cir. 2004) (improper for district court to hold that a RICO plaintiff be injured by every predicate act); Virden v. Graphics One, 623 F.Supp. 1417, 1425 (C.D. Cal. 1985) (a RICO plaintiff must be harmed by either a predicate act or the pattern of racketeering activity). As to the propriety of perjury as a predicate act, although perjury may not always rise to the level of a RICO predicate act, perjury in the course of a judicial proceeding, as is alleged here, is a predicate act of racketeering activity because it is obstruction of justice. See Streck v. Peters, 855 F.Supp. 1156, 1162 (D. Hawai'i,1994) (perjury during federal court proceedings is a RICO predicate act because it is indictable under the federal obstruction of justice statute).[2]

The MGA parties also that the allegations regarding the theft of trade secrets are improper because Mattel failed to include them in the SAAC although the claims were known to them at that time. Mattel counters that, in light of the Rule 8(a) pleading standards, the Castilla allegations are already within the scope of the SAAC. See SAAC ¶¶ 79, 89-93. All that is required by Fed. R. Civ. P. 8(a) is a "a short and plain statement of the claim showing that the pleader is entitled to relief." The details are filled in by discovery, as has already occurred in this case, including Mr. Castilla's deposition. Accordingly, as the Court finds that these allegations are already within the scope of

---

[2] The MGA parties contend that this case is "unhelpful" to Mattel on this point: "The Streck court, in *dismissing* a RICO claim, simply noted that 'acts of perjury may, *under the appropriate circumstances*, constitute RICO predicate acts,' but did not discuss what those circumstances might be." Opp. at 12 n.11 (emphasis in the original) (citing Streck, 855 F. Supp. at 1162). The quotation from the Streck case is correct, and the Streck court did indeed dismiss the RICO claim (or, more precisely, granted summary judgment in favor of defendants as to the RICO claim); however, the MGA parties incorrectly state that the Streck case did not discuss under what circumstances perjury might constitute the RICO predicate act of obstruction of justice. The four sentences following the quoted portion clearly do exactly what the MGA parties claim the Streck court did not: Specifically, the Streck court distinguishes between perjury occurring in state-court proceedings (which it notes is *not* a RICO predicate act) and perjury occurring in federal-court proceedings (which it notes *is* a RICO predicate act):

[T]his Court finds that the acts of perjury which the defendants in the case at bar are alleged to have committed do not constitute RICO predicate acts. [The obstruction statute] applies only to perjury offered in federal court proceedings. Here, all of the alleged perjury took place in state court, not federal court. Thus, [the obstruction statute] is not implicated by Streck's perjury allegations.

Id. (internal citations and footnote omitted). Thus, the Streck case's relevance to the present issue is unmistakable.

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT ___4___
PAGE ___62___

the SAAC, the Court finds that the proposed amendments are not untimely; instead, they are in the nature of "clean up" amendments that succinctly state existing issues fairly stated in the SAAC when measured by the requirements of Rule 8(a).

The amendments setting forth additional copyright registrations come as a result of the jury's Phase 1 verdict. Although in most respects the issue of copyright infringement was resolved in Phase 1, allegations regarding criminal copyright infringement, cast in the form of RICO predicate acts, are relevant to Phase 2.

The MGA parties correctly point out, and the Court is fully aware, that the proposed amendments will dramatically expand the scope of the present litigation. Admittedly, the allegations set forth in the SAAC are already varied enough in nature and broad enough in scope to strain the Court's resources and to challenge a jury's powers of comprehension; nevertheless, this is not atypical of a successfully pleaded RICO claim, which the Court has already found was stated in the SAAC, and which has the tendency to draw together a multitude of seemingly unrelated acts into one litigation.[3]

In applying the relevant standards to the present motion, the Court's decision is not influenced by a lack of evidence supporting a particular allegation. Although Mattel attaches an unprecedented amount of evidence to the proposed TAAC, it is not required to do so. See Fed. R. Civ. P. 8(a). Accordingly, Mattel's failure (in the MGA parties' eyes) to provide evidentiary support for its allegations that Jorge Castilla stole its trade secrets, that Farhad Larian destroyed evidence, and that the MGA parties engaged in commercial bribery of certain Mattel employees is not relevant to the present inquiry.[4]

Accordingly, because the Court discerns no prejudice to the MGA parties, no bad faith or undue delay on Mattel's part, and no futility as to the present amendments, the Court **GRANTS** Mattel's Motion for Leave to File the Proposed Third Amended Answer and Counterclaims (docket #5143). To ensure proper filing, Mattel is directed to, within two days of the entry of this Order, provide the Courtroom Deputy Clerk for manual filing (1) an original and a copy of the public redacted version of the TAAC, and (2) an original and a copy of the under seal version of the TAAC.

---

[3] The allegations regarding the Wachovia/Omni 808 financial transactions illustrate this potential, and the Court has considered whether the amendments should be rejected based on the notion that Rule 15(d) should not be used to introduce a separate, distinct, and new cause of action. Here, however, the Wachovia/Omni 808 financial transactions are alleged as new predicate acts in an ongoing RICO conspiracy; as such, rejection of amendments as comprising a separate, distinct, and new cause of action is not warranted.

[4] Of course, in making factual allegations, all parties remain bound by their Rule 11(b)(3) obligation to ensure that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Moreover, whether there is evidence sufficient for a reasonable jury to find in favor of the complaining party as to a particular claim is determined after discovery, pursuant to a Rule 56 motion for summary judgment.

MINUTES FORM 90                                                    Initials of Deputy Clerk ___cls_____
CIVIL -- GEN                          6                            Time: 03/02

EXHIBIT __4__
PAGE  63

### III. EX PARTE APPLICATION TO STAY PENDING APPEAL

The standard for granting a stay pending appeal is similar to that for a preliminary injunction. Lopez v. Heckler, 713 F.2d 1432, 1435 (9th Cir.1983). Thus, a party seeking a stay must show either (1) a likelihood of success on the merits of its appeal and the possibility of irreparable harm, or (2) that serious questions regarding the merits exist and the balance of hardships tips sharply in its favor. See Lands Council v. McNair, 494 F.3d 771, 775 (9th Cir. 2007) (noting that the alternative tests "are extremes of a single continuum in which the greater the relative hardship to the party seeking the [stay], the less probability of success must be shown.").

As the Court explained on the record, there is the potential for harm, possibly irreparable harm, to both sides, but that balance favors Mattel, for the reasons set forth in its opposition brief. See Opp. at 16-18. For reasons set forth at length in the Court's orders that are purportedly implicated by the appeal, see Notice of Appeal at 1-2 & Exs. A-R (docket #5340), the Court does not find a likelihood of success on the merits of its appeal.

Accordingly, the Court **DENIES** the MGA parties' Ex Parte Application and Motion to Stay.

The Court understands from the report of the Temporary Receiver that its previous Orders regarding a partial stay of enforcement of the Court's December 3, 2008, need clarification, as does the issue of the scope of the profits that are subject to the constructive trust imposed by the Court on December 3, 2008.[5]   Accordingly, to assist the newly appointed Monitor, see infra, the Court provides the following guidance regarding its rulings and sets a briefing schedule as detailed below:

(1) **Older Inventory**: The MGA parties and others in the distribution chain may sell all 2009 Bratz products up through and including January 21, 2010. The older inventory of Bratz products may likewise be sold, unless the Monitor determines that those sales tend to, in his reasoned judgment, diminish the value of the Bratz brand, in which case he should so report to the Court in an expeditious manner.

(2) **Profits**: The Court's Permanent Injunction Order found that all the female fashion dolls that use the "core Bratz fashion doll production sculpt" or the "Bratz movie sculpt" were subject to the injunction; the Courts' Constructive Trust imposed a constructive trust over, inter alia, "all trademarks, service marks and domain names[,] . . . that include the terms 'Bratz' or 'Jade.'"  In order to provide meaningful guidance to the parties, the Monitor, and their accountants, the parties may brief, and the Court will resolve, the issue of the profits that must be turned over by MGA and held by the Monitor pursuant to these Orders and any other Order of this Court. The parties' simultaneous opening briefs (not to exceed 25 pages) shall be filed no later than

---

[5]  This is largely due to the fact that, in issuing its December 3, 2008, order providing injunctive relief, the Court did not foresee that it would be subsequently modified by the January 7, 2009, Order staying enforcement pending sale of the 2009 Bratz line.

EXHIBIT ___4___
PAGE ___64___

Wednesday, May 27, 2009; simultaneous responsive briefs (not to exceed 25 pages) shall be filed no later than Friday, May 29, 2009, at which time the Court will take the matter under submission and issue an order as expeditiously as possible.

### IV. EX PARTE APPLICATION RE DISCLOSURE OF 2009 PRODUCT LINE INFORMATION (DOCKET #5425)

In light of the Court's denial of the Ex Parte Application for Stay Pending Appeal, the ex parte application seeking production of the 2009 Bratz line and the new MGA products is moot, and it is **DENIED** for that reason. Nevertheless, because it is in the interest of all parties to expeditiously resolve outstanding issues regarding MGA's new "Moxie" line of dolls, counsel for Mattel and the MGA parties are directed to meet and confer in an expeditious manner regarding those dolls.

### V. ORDER RE EXPIRATION OF TEMPORARY RECEIVERSHIP AND ORDER APPOINTING MGA MONITOR

The Court previously issued, on April 27, 2009, an Order to Show Cause re Appointment of Permanent Receiver. In response, the Temporary Receiver, the parties and the Court-appointed Forensic Auditor have filed, and the Court has reviewed, the following documents: (1) The Report and Recommendations of Patrick A. Fraioli, Jr., Temporary Receiver; (2) the Responsive Report of Court-appointed Forensic Auditor Ronald Durkin; and (3) all documents filed in support of the Appointment of a Permanent Receiver and in opposition thereto, including the Statement of Position filed by Omni 808. In consideration of these filings, and after hearing on these matters, as detailed in the following subsections, the Court declines to appoint a Permanent Receiver, confirms the expiration of the temporary receivership, orders the filing of an accounting of the temporary receivership, and appoints an MGA Monitor to effectuate the Court's prior Orders.

#### A.    Expiration of Temporary Receivership

**IT IS ORDERED THAT:**

1. The period of the Temporary Receivership imposed by this Court on April 27, 2009 has expired;

2. The Court declines to appoint a Permanent Receiver over MGA Entertainment, Inc. or MGA Hong Kong ("MGA");

3. The Court reserves jurisdiction to appoint a Receiver in the future, as it deems appropriate;

4. The Temporary Receiver, Patrick A. Fraioli, Jr., is hereby directed to prepare and file with the Court a final report including a final accounting and application for fees and

MINUTES FORM 90
CIVIL -- GEN

8

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT ___4___
PAGE ___65___

costs, on or before May 28, 2009;

5.   The Court hereby lifts the Injunction against Omni 808's enforcement of its rights as a
creditor against MGA, and **ORDERS** that should Omni 808 take any action to enforce
its rights as a creditor against MGA, such action shall be filed and heard in the
Central District of California;

6.   Based on MGA's representations to the Court that, should MGA file for bankruptcy
protection under Title 11 of the United States Code, it shall do so in the Central
District of California, and having previously found in its April 27, 2009, Order
appointing a Temporary Receiver that MGA is domiciled in California and have their
principal place of business in the Central District of California and have the majority
of their assets located within the Central District of California, the Court hereby lifts
the Injunction against MGA filing bankruptcy without permission of the Court, but
**ORDERS** that any bankruptcy filing by MGA or any of its affiliates shall be filed in the
Central District of California.

**B.    Appointment of MGA Monitor**

1.   For good cause shown, pursuant to the alternative recommendation of the MGA
parties, and in lieu of appointing a Permanent Receiver at this time, the Court
appoints Patrick A. Fraioli, Jr., Monitor, who shall have the power to take any and all
action that he deems necessary, appropriate, or advisable to effectuate the purposes
of the Monitorship, including but not limited to the following:

   a.   The Monitor shall maintain monitoring, supervisory, and oversight
   responsibilities over the Bratz Assets;[6]

---

[6] In light of the issue regarding the scope of profits that must be accounted for, see supra section III, and
because the amount of access that must be given to the Monitor almost certainly extends beyond the materials that
must be turned over to Mattel and may, depending on the resolution of the issue identified above, extend beyond the
products for which profits must be held in constructive trust as a result of the Court's December 3, 2008, Orders, setting
forth a workable definition of "Bratz Assets" that applies in all instances is challenging.  Nonetheless, the Court so
defines that term at this time in order to provide to the Monitor and the parties meaningful guidance on the issue of
Monitor access to facilities and information. The Court admonishes all counsel that this definition should not be taken
out of its current context and may very well be further modified, for purposes of both turn-over and the constructive
trust, following resolution of the issue identified above.

   Bratz Assets include all tangible or intangible assets, including, without limitation, all intellectual property
necessary or materially useful for the design, manufacture, marketing, distribution and sale of any Bratz doll or other
Bratz-branded product in the possession, custody or control (whether or not claimed to be encumbered by any security
interest) of any of the MGA Defendants.  The Bratz Assets include, without limitation:

   a. All Bratz-related intellectual property rights, including, without limitation, copyrights (whether or not
registered); copyright registrations; moral rights; design rights; patents (issued and pending); service marks;
trademarks; tradedress; designs; slogans; characters; product packaging in any medium; product names; product

MINUTES FORM 90                                              Initials of Deputy Clerk __cls_____
CIVIL -- GEN                        9                        Time: 03/02

EXHIBIT ___4___
PAGE ___66___

b.     The Monitor shall monitor, supervise, and oversee the exploitation of the Bratz
Assets;

c.     The Monitor shall have the power and authority to monitor the financial affairs
and operations[7] of MGA Entertainment, Inc. and MGA Hong Kong (collectively,
"MGA") as the Monitor deems appropriate in order to carry out the duties
specified herein;

d.     The Monitor shall monitor compliance by the parties with this Court's Injunction
and other Orders as directed by the Court, specifically this Court's December
3, 2008, Order Granting Mattel, Inc.'s Motion for Permanent Injunction,
January 7, 2009, Order re Modification and Stay of Permanent Injunction
Order, and April 27, 2009, Omnibus Order (the "Injunction Orders");

---

illustrations; product designs; product concepts; conceptual drawings; engineering drawings; engineering specifications;
processes; methods; trade secrets; know-how; product ideas; prototypes; line extensions; domain
names; marketing and advertising materials; commercials; style guides; theme songs; soundtracks; scripts;
screenplays; computer programming; digital and internet rights; video games; theatrical, television, video and DVD
rights and masters; and rights in future technologies.

b. All Bratz-related tooling for all past, current and future lines, including without limitation tools, tooling, in
process tools, molds, sculptures, models, dies, and mock-ups, as well as other Bratz-related tangible items.

c. All Bratz-related marketing and sales assets for all past, current and future lines, including, without limitation,
consumer lists, marketing plans, account plans, focus group studies, marketing databases, and other consumer and
marketing research.

d. All Bratz-related records, including, without limitation, contracts, manufacturing records, inventory records
and data, sales records and data, product testing data and records, vendor list and records, customer communications,
and invoices and purchase orders.

e. All Bratz-related contracts and agreements, including, without limitation, assignments, work-for-hire
agreements and licensing agreements.

f. All other Bratz-related rights, including, without limitation, distribution rights, licensing rights, exploitation
rights, accounts receivable, and all choses in action relating to Bratz or the Bratz brand.

g. All Bratz-related items referenced at Paragraph 3 and Paragraph 8 (at lines 15-19) of the Court's Order
granting Mattel's Motion for Permanent Injunction (Docket No. 4443).

h. "Bratz-related" as used in this definition, is a broad term, that applies to all products, property, and
information that bears the "Bratz" trademark. It is expressly not limited to the Bratz female fashion dolls, and includes
such products as the Bratz boy dolls, Baby Bratz, and Bratz Kidz.

[7] Toward that end, the Monitor shall have full and complete access to all Bratz assets (wherever they may be
found), all MGA business premises, all MGA facilities (including manufacturing and storage facilities), all real and
personal MGA property (including computers), all MGA employees, all MGA information (including financial and
operational information), and all MGA books and records.

MINUTES FORM 90                                                  Initials of Deputy Clerk __cls_____
CIVIL -- GEN                              10                      Time: 03/02

EXHIBIT ___4___
PAGE ___67___

e.    At the appropriate time, the Monitor shall direct the MGA turnover to Mattel of any of the Bratz Assets subject to recall, impoundment, or destruction, as set forth in this Court's Injunction Orders of December 3, 2008, and as otherwise directed by the Court;

f.    The Monitor shall establish such bank accounts as the Monitor deems necessary or convenient to carry out the Monitor's duties under this Order;

g.    The Monitor shall collect from MGA, on a monthly basis, the amount of net profits derived by MGA from exploitation of the Bratz Assets during the preceding month, as well as an accounting setting forth the basis for the calculation of the net profits and the supporting documentation establishing such basis.  The Monitor shall retain these funds pending further order of this Court;[8]

h.    The Monitor is ordered and directed to obtain from MGA, and to make available to Mattel, as set forth herein, such of the Bratz Assets, and related information about the content of the Fall, 2009 Bratz line being produced and sold by MGA pursuant to this Court's Injunction Orders, as are necessary to enable Mattel to begin preparation of its own Bratz line for the Spring, 2010 sales season;

I.    The Monitor shall monitor, supervise and oversee, with authority to approve or disapprove, the following categories of financial transactions of MGA: Inter-company transfers of any amount, payments by MGA or any MGA affiliate to any related parties in excess of $50,000.00 per payment, and any payments to Omni 808;

j.    The Monitor shall file monthly reports with the Court, under seal (but served on all parties), setting forth the Monitor's activities, actions and recommendations. Nothing herein shall prevent the Monitor from filing other reports, as he deems appropriate.  As in the case of the Court-appointed Settlement Officer and Discovery Master (and as previously with the Court-appointed Temporary Receiver), the Monitor may report orally to Court concerning matters of procedure; however, any substantive inquiries or reports shall be submitted in the first instance to the Court in writing.  The Court shall determine, whether and, if so, with what restrictions, the Monitor's reports shall be served on parties and their counsel;

---

[8] The Court recognizes that resolution of the issue identified in section III, supra, will greatly impact on the amount of profits that must be turned over by MGA (see infra ¶ 2) and retained by the Monitor; accordingly, it is the Court's intention to resolve the issue as expeditiously as possible and, in any event, prior to the first turnover of profits on June 22, 2009.

EXHIBIT ___4___
PAGE ___68___

k.    The Monitor may retain and/or engage the services of advisors and/or professionals, including, without limitation, accountants, attorneys, consultants and experts to assist the Monitor in carrying out his duties and responsibilities under this Order. The Monitor, without further order of this Court, is authorized to employ Ervin, Cohen & Jessup LLP, and the accounting firm of Crowe Horwath LLP, to assist him in his duties. Nothing herein shall prevent the Monitor from utilizing the same advisors and professionals as rendered services to the Temporary Receiver before the appointment of the Monitor;

l.    The Monitor may hire and employ individuals and entities as necessary or advisable to carry out the Monitor's duties under this Order;

m.    The Monitor, his employees and agents, as well as any and all of the professionals employed by the Monitor, are entitled to compensation for services rendered at their normal hourly rates and reimbursement for all expenses incurred by them in providing services to the Monitor. The Monitor shall submit to the Court, *in camera*, monthly requests for approval of payment. Upon Court approval, the Monitor shall serve on the Parties, but not file, Notice of Court Approval of Request for Payment of Interim Fees and Costs of Monitorship, along with a summary statement of the fees and costs;

n.    The Monitor shall have the status of an officer and agent of this Court, and as such shall be vested with the same immunities as enjoyed by this Court. Neither the Monitor nor any person or entity acting at the direction of the Court or pursuant to agreements with the Monitor (whether employees, vendors, contractors or otherwise) may be held liable to any party for any acts taken in good faith in compliance with this Order, including but not limited to claims of alleged copyright infringement, trademark infringement, or other alleged causes of action;

o.    Nothing herein shall alter or affect the right of Mattel to take any and all actions relating to the Bratz Assets or the Bratz brand which it otherwise lawfully could take, including, without limitation, the institution, maintenance and prosecution of legal proceedings anywhere in the world or other proceedings before any governmental or tribunal or arbitration panel;

p.    The Court shall retain jurisdiction over the Monitorship for the duration of its existence.

q.    No bond shall be required in connection with the appointment of the Monitor. Except for acts of gross negligence, the Monitor and his agents and employees shall not be liable for loss or damage incurred by any party to this action or their officers, agents, servants, employees, attorneys or others by virtue of any act performed or omitted to be performed by the Monitor in connection with the discharge of his duties and responsibilities.

EXHIBIT ___4___
PAGE ___69___

2.    Unless otherwise directed by the Court, MGA is **ORDERED** to turn over to the
      Monitor, on a monthly basis, the amount of net profits derived by MGA from
      exploitation of the Bratz Assets during that month, as well as an accounting setting
      forth the basis for the calculation of the net profits and the supporting documentation
      establishing such basis. The Monitor and his accountants shall review the
      accountings, and any related submissions of the Court or Monitor by Mattel, and shall
      report and recommend to the Court as directed on any disputes arising therefrom.
      MGA shall make its first turnover and accounting by June 22, 2009, which shall cover
      the period from the return of the jury verdict in this case through May 31, 2009, and
      this shall constitute compliance with section V of the Court's April 27, 2009, Order.
      Each month thereafter, the turnover and accounting shall be made by the 10th day of
      the month, for the prior month period.

3.    MGA shall immediately make available to the Monitor, for transfer to Mattel, such
      portion of the Bratz Assets necessary to enable Mattel to begin preparation of its own
      Bratz line for the Spring, 2010 sales season.  MGA shall also provide to the Monitor
      for delivery to Mattel such related information about the content of the Fall, 2009,
      Bratz line being produced and sold by MGA pursuant to this Court's Injunction Orders
      to enable Mattel to make appropriate commercial determinations about the content of
      its own Spring, 2010, Bratz line.

4.    No action may be filed against the Monitor, or any of his agents or employees, for
      any actions taken in this case, without prior permission of this Court.

5.    For the duration of Monitorship, Mattel is directed to pay to the Monitor, in the
      manner directed by the Monitor, the fees and costs of the Monitorship within five (5)
      days of receipt of the Notice of Court Approval of Request for Payment of Interim
      Fees and Costs of Monitorship. All interim fees paid shall be subject to final review
      and approval by this Court.  This Court retains jurisdiction to award a greater or
      lesser amount as the full, fair, and final value of such services.

6.    Any party may later apply to the Court for relief related to any profit calculations or
      profits turned over to the Monitor, or for relief related to the allocation of payment of
      the fees and costs of the Monitorship, as well as for the previously imposed
      Temporary Receivership.

7.    All Parties and their employees, agents and attorneys are ordered to cooperate fully
      with the Monitor.

## VI.  IMPOSING LIMITED AND TEMPORARY STAY OF PHASE 2

At the May 18, 2009, hearing, the Court heard from the Court-appointed Settlement Officer,
who advised the Court that a settlement conference was scheduled for June 1, 2009.  The
Settlement Officer believes that settlement negotiations continue to be of value, and has
recommended that the Court consider the judicial officer's participation in those settlement

MINUTES FORM 90                                         Initials of Deputy Clerk __cls_____
CIVIL -- GEN                        13                  Time: 03/02

EXHIBIT ___4___
PAGE ___70___

negotiations -- a proposal to which no party offered objection.

The Court heard from the parties regarding whether a stay of Phase 2 discovery should be imposed to assist in settlement efforts. Counsel for MGA advocated for a four-month stay. Counsel for Mattel cautioned against a stay, outlining for the Court the various positions taken by the MGA parties as to how the Court's previous stay limited or altered their responsibility to comply with previously set deadlines.

Mindful of the concerns expressed by Mattel, the Court nevertheless imposes a stay of Phase 2 discovery that is strictly limited in scope and duration. The parties shall, notwithstanding the stay, meet and confer regarding the Moxie issue set forth in section IV. Moreover, notwithstanding any other provision of this Order, the MGA parties are not relieved of their responsibility to produce, on or before the currently imposed deadline, their responses the Interrogatories to which counsel for Mattel referred during the hearing.

The stay of discovery, as limited, is imposed up to and including June 12, 2009. Unless otherwise extended by the Court or the Discovery Master, the deadlines for all discovery responses that have previously been ordered are extended for a period, measured by calendar days, not longer than the total number of calendar days the stay of discovery is imposed. For purposes of this date calculation, both the beginning date of the stay (May 18, 2009) and the ending date (June 12, 2009) are to be included. Similarly, the deadline for responding to discovery requests that have been propounded, but to which responses are not yet due, is extended for the same period of calendar days. If depositions are scheduled during this time period, they must be rescheduled for a date certain no later than the currently scheduled date plus the number of calendar days for which the stay of discovery is imposed.

The Court further **ORDERS** the parties to participate in a Mandatory Settlement Conference ("MSC") on or about June 1, 2009 (to be coordinated by the Court-appointed Settlement Officer). Those attending the MSC shall include the chief executive officers or equivalent of Mattel, MGA, and Omni 808; the chief financial officers or equivalent of Mattel, MGA, and Omni 808; in-house counsel of Mattel and MGA; and lead counsel of record for each party. Following the MSC, the Settlement Officer shall report to the Court on the status of settlement efforts. If the parties fail to reach a full and complete settlement, the Court shall, pursuant to the parties' agreement and waiver of any conflict issues, conduct a settlement conference beginning on June 10, 2009, at 10:00 am.

## VII. NOTICE OF INTENT TO UNSEAL FORENSIC AUDITOR REPORTS

In light of Omni 808's emphatic public criticism of the Court-ordered Forensic Auditor's April 23, 2009, Report, the contents of which were expressly ordered by this Court to be maintained by the parties under seal, and the contents of which, to the Court's knowledge, were in fact maintained under seal with the filing of The Statement of Position of Omni 808 Investors, LLC, filed on May 14, 2009, it is the Court's intention to release the April 23, 2009, Summary Report (together with its Exhibits that have been redacted for privilege), absent sustained objections

MINUTES FORM 90
CIVIL -- GEN

14

Initials of Deputy Clerk __cls_____
Time: 03/02

EXHIBIT ___4___
PAGE ___71___

thereto by the MGA parties.[9]

At this time, the Court **ORDERS** that the May 17, 2009, Responsive Forensic Auditor Report, maintained by the Court until this time *in camera* be released under seal to the parties.[10] The May 17, 2009, Responsive Report shall, pending resolution of any objections to its disclosure by the MGA parties, remain under seal, and distribution shall be limited to parties, their attorneys (whether or not the attorneys are of record), any Court-appointed officers, and, as necessary, the parties', attorneys', and officers' staff.

Within five days of the entry of this Order, the MGA parties, including Mr. Larian, may file, under seal, specific and supported objections to the release of the Summary Report or the Responsive Report. In the same time frame and manner, any party may object to the release of specific identifying information contained in the exhibits of the report than have the tendency to reveal personal identifying information such as social security numbers, tax identification numbers, or bank account numbers. Within two days, any party may respond to these objections. No hearing will be held unless the Court orders otherwise.

**IT IS SO ORDERED.**

---

[9] Despite an express Order of this Court to maintain the Summary Report and its exhibits under seal, counsel for Omni 808 revealed the Report's contents in Omni 808's Statement of Position. Similarly, counsel for Mattel also revealed certain contents of the Receiver's Report and Recommendation regarding MGAE's liquidity and solvency, also released under seal. All counsel are reminded of their responsibilities to maintain information under seal. Unless otherwise ordered, the Court's hearings are open to the public. The Court does not close hearings unless and until requested to do so by one or more of the parties, and only then does so when and to the extent that such closure is justified when counterbalanced with important First Amendment concerns.

[10] Sua sponte, the Court has already redacted certain portions of the Forensic Auditor's Responsive Report on the basis that the emails reflect highly personal electronic conversations between Mr. Larian, Mr. Kadisha, and their spouses.

MINUTES FORM 90                                                          Initials of Deputy Clerk __cls_____
CIVIL -- GEN                              15                         Time: 03/02

EXHIBIT ___4___
PAGE ___72___

# EXHIBIT 5

Case 2:04-cv-09049-SGL-RNB      Document 4657      Filed 01/07/2009      Page 1 of 10

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
<u>CIVIL MINUTES — GENERAL</u>

Date: January 7, 2009

Case No.     CV 04-09049 SGL(RNBx)

Title:      MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
==================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

Jim Holmes                              None Present
Courtroom Deputy                        Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:       ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                            None Present

PROCEEDINGS:    **ORDER MODIFYING STAY OF PERMANENT INJUNCTION**

**ORDER APPOINTING FORENSIC AUDITOR**

After an initial hearing on December 30, 2008, and a sealed hearing on January 5, 2009, and after consideration of the parties' papers relating to the MGA parties' motion for stay pending appeal (which specific relief the Court denied for the reasons stated on the record), and after consideration of the parties' papers relating to Mattel's ex parte application to appoint a receiver, the Court issues the following Order modifying the stay set forth in the Court's December 3, 2008, Order, and appointing a forensic auditor.

**MODIFYING STAY OF PERMANENT INJUNCTION**

Notwithstanding any previous Order of the Court, the December 3, 2008, Order Granting Mattel, Inc.'s Motion for Permanent Injunction (docket #4439), shall remain **STAYED**, ineffective and non-final, until further order of the Court.  Specifically, retailers and distributors will be permitted to purchase the Spring and Fall 2009 lines of Bratz and Bratz-related products from MGA and MGA licensees, up to and including December 31, 2009.

In the event that the Court awards control over the rights to the Bratz products referenced in the Court's December 3, 2008, Order and the January 7, 2009 Stipulation and Order (regarding

MINUTES FORM 90                      1                Initials of Deputy Clerk __jh_____
CIVIL -- GEN

EXHIBIT      5
PAGE    73

the Spring and Fall 2009 lines) to a Court-appointed receiver or to Mattel, Inc., that award will be subject to a requirement that retailers and distributors be permitted to purchase the Spring and Fall 2009 lines up to and including December 31, 2009.

## APPOINTMENT OF FORENSIC AUDITOR

As discussed on the record, the Court **HOLDS IN ABEYANCE** Mattel's ex parte application for appointment of a receiver pending a forensic audit of MGA Entertainment, Inc., Isaac Larian, and MGA Entertainment Hong Kong.

For good cause shown, the Court hereby **APPOINTS** Ronald L. Durkin to serve as the Court's forensic auditor (hereinafter referred to as "the Auditor"). Mr. Durkin's qualifications appear in an attachment to this Order. The Court has provided the Auditor with the parties' attorneys' contact information. The Auditor shall direct his initial communications to counsel.

Defendants MGA Entertainment, Inc., Isaac Larian, and MGA Entertainment Hong Kong, shall provide the Auditor with access to any and all MGA records, regardless of the medium or media of the maintenance of those records, **including but not limited to the "Document/Information Request List" attached to this Order,** that the Auditor deems necessary to enable him to provide the Court with a report, in camera, regarding MGA's finances sufficient to enable the Court to determine whether or not appointment of a receiver is warranted. The audit shall extend to any and all related entities as the Auditor deems necessary. Defendants shall also make available for interview individuals identified to them by the Auditor. Defendants shall make its computer systems, physical premises, and offices, available to the Auditor upon his reasonable request during normal business hours. Defendants shall permit the Auditor's reasonable use of its office machines, such as copiers and fax machines, as may be necessary to complete the audit.

The Auditor shall have the authority to seek the services of fellow professionals (as well as para-professionals and support staff) necessary to accomplish the Court-appointed audit. The provisions of this Order extend to the Auditor's delegatees as he so directs. The Auditor and his delegatees shall be compensated at their reasonable customary hourly rates.

The expense of the forensic audit shall be borne, in the first instance, by Mattel. After the Court considers the Auditor's report[s], the Court will consider whether the audit expenses should be shared with, or shifted completely to, defendants, based on the equities. The Auditor and his team shall submit periodic billing statements to Mattel to an address specified by Mattel's counsel.

All parties (and individuals and entities under their control) shall cooperate with the Auditor so that he may report to the Court in an expeditious manner.

**IT IS SO ORDERED.**

EXHIBIT ___5___
PAGE ___74___

Case 2:04-cv-09049-SGL-RNB    Document 4657    Filed 01/u//2009    Page 3 of 10

**FORENSIC AUDITOR**
**DOCUMENT/INFORMATION REQUEST LIST**
**January 7, 2009**

1.    Audited financial statements for the last three years.  If audited financial statements are not available, then the most current draft of financial statements for the last three years.

2.    Quarterly financial statements for the last three years.

3.    Detailed electronic monthly general ledgers and trial balances for the last three years. If electronic files are not available, then please produce in hard copies.

4.    Detailed electronic revenue or sales subsidiary ledgers for the last three years.  If electronic files are not available, then please produce the request in hard copies.

5.    Detailed electronic receipts or cash subsidiary ledgers for the last three years.  If electronic files are not available, then please produce in hard copies.

6.    Detailed electronic accounts payables and disbursements subsidiary ledgers for the last three years.  Details should include, but should not be limited to, vendor/payee ID, vendor/payee name, check/payment number, payment date (Standard Mask, i.e. MM/DD/YY, MM/DD/YYYY; not Jan 1, 2005), payment amount, currency indicator (if other than US dollars), foreign exchange rate (if other than US dollars), invoice number, invoice date (Standard Mask, i.e. MM/DD/YY, MM/DD/YYYY; not Jan 1, 2005), invoice amount, comment or description, and any other information contained in the file.  If electronic files are not available, then please produce in hard copies.

7.    Detailed electronic vendor master files of all active and inactive vendors for the last three years.  Details should include, but should not be limited to, vendor ID, vendor name, status (active/inactive), vendor address (including City, State, Zip, Country), date created, created by user ID.  If electronic files are not available, then please produce in hard copies.

8.    Detailed electronic payroll files for the last three years.  Details should include, but not be limited to, employee ID, employee name, payment date, payment number, deductions (e.g. tax, contributions, etc.), gross payment amount, net payment amount, and any other information contained in the file.  If electronic files are not available, then please produce in hard copies.

9.    Any and all records that substantiate transfers of assets to other entities, individuals, and/or parties, within the US and outside of the US.

10.    Copies of all bank statements, canceled checks, wire instructions, and all other information and notices sent with bank statements for the last three years.

MINUTES FORM 90                                         Initials of Deputy Clerk __jh_____
CIVIL -- GEN                          3

EXHIBIT ___5___
PAGE ___75___

Case 2:04-cv-09049-SGL-RNB    Document 4657    Filed 01/07/2009    Page 4 of 10

11.    Federal and state tax returns for the last three years.

12.    A summary of all contributions, loans and any sources of funding during the last twelve months.  Copies of agreements and/or contracts supporting these transactions.

13.    A summary of all related party transactions detailing any compensation, loans, advances, payments, fees or any other form of consideration paid to Isaac Larian, family members, or affiliates, or any other related party.

14.    Detail of all loan facilities with an indication of creditor and relevant terms.

15.    Copies of any notices from federal or state tax authorities regarding audits or audit adjustments during the last 3 years.

16.    All detailed corporate credit card statements for the last three years.  If electronic files are not available, then please produce in hard copies.

17.    Information and documents regarding expense reimbursement of owners, officers, employees, family members, or affiliates.

18.    Detailed human resources files (electronic) of all employee information (for all current and terminated employees to date) including but not limited to employee name, employee number, address, phone number, start date, termination date, status, position, social security number, and any other information contained in the files.  If electronic files are not available, then please produce in hard copies.

19.    Electronic files of all emails including attachments to the emails from the network server and from backup tapes (please identify dates of backup tapes in order for selection of time period).

20.    Forensic images of personal computer hard drives and PDAs of selected individuals.

MINUTES FORM 90
CIVIL -- GEN                                    4                      Initials of Deputy Clerk __jh_____

EXHIBIT ___5___
PAGE   ı   76





Ronald L. Durkin
CPA/CFF, CFE, CIRA

**Senior Managing Director**

619 481 5201

rdurkin@durkinforensic.com

701 B Street Suite 1310
San Diego, CA 92101

Ronald L. Durkin is a CPA with over 30 years combined experience in public accounting and as a Special Agent with the FBI. He has testified in accounting, financial, and bankruptcy matters in U.S. District Court, U.S. Bankruptcy Court, U.S. Tax Court and in various State courts. During his tenure with the FBI, Ron was responsible for investigations involving white collar crime, political and public corruption, money laundering, organized crime, labor racketeering, racketeer-influenced and corrupt organization statute (RICO) violations, and narcotics matters. Since leaving the FBI, he has assisted clients in matters involving fraud prevention, detection, and internal investigations. He has worked on cases involving Foreign Corrupt Practices Act, employee embezzlement, management fraud, financial statement fraud, conflict-of-interest, check kiting, bankruptcy fraud, money laundering, and Ponzi schemes.

In 2008 Ron retired from KPMG. While at KPMG, Ron was the National Partner in Charge of the Fraud and Misconduct Investigations practice and served as the Western Region's forensic practice leader as well as the office coordinating partner for the Los Angeles office's forensic practice.

EXHIBIT    5
PAGE    ι77



## Service Lines

Fraud & Misconduct Investigations

Fraud Risk Management

Forensic in the Audit/Shadow Procedures

## Education and Certifications

Bachelor of Science, Accounting,
California State University, Sacramento

Masters of Business Administration
(Emphasis in Accounting), California
State University, Sacramento

Certified Public Accountant,
licensed in California, Arizona,
Nevada, and Washington

Certified in Financial Forensics

Certified Fraud Examiner

Certified Insolvency and
Restructuring Advisor

He is a frequent speaker at the FBI Academy and at the AIC-PA National Fraud Conference, California and other State CPA Societies, and he has made presentations to the IRS Criminal Investigative Division and the U.S. Postal Inspectors CPA seminars. He is a member of the AICPA National Accreditation Commission and a former member of the Business Valuation and Forensic Litigation Services Executive Committee. He is the former chair of the AICPA Anti-Fraud Programs and Controls Task Force and past chair of the AICPA Litigation and Dispute Resolution Services Subcommittee. Ron is also the Chair of the California Society of CPA's Litigation Services Steering Committee and the past Chair of the California Society of CPAs Fraud Section.

Ron was a 2003 AICPA Volunteer of the Year. Ron was also honored with the Distinguished Achievement Award by the AICPA in 2006 for his long time commitment to the AICPA. In 2007, Ron was awarded the first-ever FLS Lifetime Achievement Award by the AICPA.



EXHIBIT        5
PAGE      78



## Professional Associations

American Institute of Certified Public
Accountants (Immediate Past Chair of
Litigation & Dispute Resolution Services
Subcommittee) – member since 1995

California Society of Certified Public
Accountants (member of Steering Com-
mittee for statewide Litigation Services
Sections and Chair of Fraud Section)

Association of Certified Fraud Examiners
(Member of Faculty since 1995)

Association of Insolvency and
Restructuring Advisors

Society of Former Special Agents
of the FBI

Institute of Internal Auditors

## Investigative and
## Integrity Advisory Experience

On an International level, he has worked on a number of mat-
ters involving alleged Foreign Corrupt Practices Act (FCPA)
violations. Working on behalf of U.S. based companies, Ron in-
vestigated allegations that members of management of foreign
subsidiaries were involved in either bribing foreign officials, di-
verting corporate opportunities and funds, or conspiring with
others to defraud U.S. based victims.

Conducted an investigation of certain allegations of political
and public corruption surrounding an International sporting
event that was to be held in the US. The allegations involved
FCPA, bribery, and public corruption.

Conducted an investigation of an alleged kickback scheme on the
part of a purchasing manager of a global technology company.

Conducted an internal investigation with a multi-national corpo-
ration regarding corruption involving a former manager in the
accounts receivable department. The case was referred to the
United States Attorney's Office and the FBI for prosecution.



EXHIBIT    5
PAGE    79



Conducted an internal investigation, on behalf of a publicly
traded company, regarding alleged diversion of funds with the
accounts payable department. The case was referred to the
United States Attorney's Office and the FBI for prosecution.

Investigated allegations of fraud in the real estate industry, in-
cluding new construction projects, as well as management and
operation of office buildings, apartment buildings and shop-
ping centers.

Investigated allegations of corruption by certain members of a
County Board of Supervisors who were indicted by a Federal
Grand Jury.

Served as an undercover agent in a case involving 35 State
Court judges who were indicted and convicted of public corruption.

Conducted a number of investigations of cases involving Pyra-
mid and Ponzi schemes. He also has testified in U.S. District Court,
State Court, and Bankruptcy Court in several of these cases.

During career with the FBI and as a bankruptcy trustee, inves-
tigated allegations of fraud, corruption and organized crime
within the solid waste industry.



EXHIBIT    5
PAGE       80



As the Chapter 11 Trustee of two failed insurance agencies, he conducted investigations into allegations of fraud and mismanagement on the part of senior management.

As a Chapter 7 Trustee, Chapter 11 Trustee, and Examiner in bankruptcy matters, has conducted hundreds of investigations where allegations of fraud have been alleged.

Served as a "keeper" for the Department of Corporations, investigated a State securities fraud matter.

Served as trustee of the parent of one of the largest financial institutions in California where securities fraud and other actions were alleged against senior management.

EXHIBIT  ᒑ
PAGE    ᵢ 8/



## Publications

One of the principal authors of the AICPA Practice Aid 07-1 – "Forensic Accounting – Fraud Investigations" (2007)

Chair of the AICPA Forensic Procedures Task Force responsible for the writing of the "Forensic Procedures and Specialists: Useful Tools and Techniques" – AICPA Special Report, 2006

Chair of the AICPA Antifraud Programs and Controls Task Force responsible for the writing of "Management Override of Internal Controls: The Achilles' Heel of Fraud Prevention" – AICPA Practice Aid, 2005

Principal author – AICPA Technical Consulting Practice Aid 97-1 "Fraud Investigations in Litigation and Dispute Resolution Services"

Co-author – California Society of CPA "The Witness Chair" – SAS 99 – Is It Enough To Help Close the Expectation Chasm? (2003)

Author – "A Systematic Approach to Fraud Investigation" – The CPA Expert, Spring 2000 (AICPA Newsletter for providers of Business Valuation and Litigation Services)

Co-author – "Defining the Practice of Forensic Accounting" The CPA Expert, 1999 Special Issue (AICPA Newsletter for providers of Business Valuation and Litigation Services)

Contributing and Reviewing author to Guide to Fraud Investigations published by Practitioners Publishing Company

Contributing author to Handbook of Litigation Services for John Wiley and Sons. The chapter written by Mr. Durkin is entitled "Criminal Cases and the Investigative Accountant."

Book review of Investigating White Collar Crime: Embezzlement and Financial Fraud for "CPA Management Consultant".

EXHIBIT    5
PAGE      82

# EXHIBIT 6

# Exhibit Filed

# Under Seal

# Pursuant to Protective order

# EXHIBIT 7

# Exhibit Filed

# Under Seal

# Pursuant to Protective order

# EXHIBIT 8

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.    CV 04-09049 SGL(RNBx)                          Date: August 6, 2009

Title:      MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

          Cindy Sasse                            None Present
          Courtroom Deputy                       Court Reporter

ATTORNEYS PRESENT FOR                     ATTORNEYS PRESENT FOR
PLAINTIFFS:                               DEFENDANTS:

None Present                              None Present

PROCEEDINGS:   ORDER REGARDING MONITOR REPORTS; ORDER GRANTING
               IN PART EX PARTE APPLICATION; ORDER RE SCHEDULING
               MATTERS

## I. MONITOR REPORTS

     The Court has received and reviewed the Second Report of the Monitor, to be
filed under seal today.  The Court has also received and reviewed *in camera* the
document referenced in the Second Report of the Monitor at 15:12-13, which the Court
designates as Exhibit B to the Monitor's report.  That document, as the Court
understands it, was the initial accounting provided to the Monitor; Exhibit A is an
accounting that was subsequently provided to the Monitor.

     The Clerk shall file, under seal, the Second Report of the Monitor, as submitted
to the Court; in so doing, the Clerk shall attach Exhibit B thereto.

     The Monitor shall serve on all counsel of record the Second Report of the
Monitor, attaching both Exhibits A and B.  The Report and its Exhibits are designated
"Attorney Eyes Only."

MINUTES FORM 90
CIVIL -- GEN                          1          Initials of Deputy Clerk __cls_____

EXHIBIT __8__
PAGE __115__

All future reports of the Monitor shall be filed under seal and designated "Attorney Eyes Only."

All future accountings provided to the Monitor shall, in the form and manner specified by the Monitor, be accompanied by the certification of the professional who prepared them.

## II. MGA EX PARTE APPLICATION REGARDING ESCROW OF PROFITS

The Court has also received and reviewed the Ex Parte Application for Clarification of the Court's Order Regarding Escrow of Profits (docket #6140). Essentially, the MGA parties seek a declaration that they are required to escrow profits previously defined by this Court only if a profit is shown on an annual basis. They contend that the profits shown for June, 2009, are mere "phantom" profits (as the previous monthly periods showed no profits, only losses). The MGA parties therefore seek return of approximately $650,000, which has been placed in escrow.

The Court previously ordered accounting "on a monthly basis." See May 21, 2009, Court Order, sections V.B.1.g. and V.B.2. For that reason, the Court **DENIES** the ex parte application. The MGA parties are **ORDERED** to comply with the Monitor's demand for the Bratz-related profits initially reported to him: $1,738,442.

Existing and further disputes regarding this issue shall be directed to the Monitor in the first instance, following the procedure set forth in section V.B.2. of the Court's May 21, 2009, Order. The Court will await the Monitor's Report and Recommendation regarding the escrowed amount and any other accounting-related matters. Upon service of any Report and Recommendation, any party may file under seal, within ten days of service of the Report and Recommendation, any objections to any portion of the Report and Recommendation.

## III. SCHEDULING MATTERS

The Court has in addition received and reviewed the following filings:

1.  Stipulation for Continuance on Mattel's Motion (from August 10 to August 17) (docket #5975)

2.  Ex Parte Application for Expedited Hearing Date regarding Motion to Modify Scheduling Order (docket #6051).

The Court is unable to accommodate counsel's chosen date of August 17, 2009, due to congestion of the Court's calendar. Nevertheless, in consideration of these requests, the Court makes the following order:

MINUTES FORM 90
CIVIL -- GEN                                    2                    Initials of Deputy Clerk __cls_____

EXHIBIT _____8____
PAGE ___116___

The hearing set for August 10, 2009, is hereby **VACATED**.

The matters list below are set for hearing on August 31, 2009, at 1:30 p.m., in Courtroom One of the above-referenced Court. To the extent that the relevant briefs have not been filed (in which case no supplemental briefing is meant to be suggested by the Court), the August 31, 2009, matters are subject to the briefing schedule set forth below:

|  |  |
|---|---|
| Oppositions: | August 17 |
| Replies (if any): | August 24 |

Mattel's Motion for Preclusive Relief (docket #5760)

Mattel's Motion to Modify Scheduling Order (docket #6050)

Mattel's Motion for Clarification (docket #5783)

**IT IS SO ORDERED.**

MINUTES FORM 90
CIVIL -- GEN                                    3                     Initials of Deputy Clerk __cls_____

EXHIBIT   8
PAGE   777

**Tiffany Garcia**

| | |
|---|---|
| **From:** | Dylan Proctor |
| **Sent:** | Thursday, August 06, 2009 5:21 PM |
| **To:** | MGA / Bryant Team |
| **Subject:** | FW: Minute Order in Case CV 04-9049 SGL Re: Scheduling, etc. |
| **Importance:** | High |
| **Attachments:** | CV 04-09049 SGL Minute Order re monitor reports, scheduling, etc..pdf |



CV 04-09049 SGL
Minute Order r...

B. Dylan Proctor
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Direct: (213) 443-3112
Main Phone: (213) 443-3000
Main Fax: (213) 443-3100
E-mail: dylanproctor@quinnemanuel.com
Web: www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

-----Original Message-----
From: Cindy_Sasse@cacd.uscourts.gov [mailto:Cindy_Sasse@cacd.uscourts.gov]
Sent: Thursday, August 06, 2009 5:18 PM
To: jennifer.lopez@bingham.com; peter.villar@bingham.com; todd.gordinier@bingham.com; iwisnia@valleassociates.com; jvalle@valleassociates.com; cdowell@kmwlaw.com; lmcfarland@kmwlaw.com; robynaronson@dwt.com; Dylan Proctor; John Quinn; Randa Osman; Cyrus Naim; Diane Hutnyan; Jon Corey; akhan@glaserweil.com; cmankey@glaserweil.com; david.foster@skadden.com; dhansen@skadden.com; dwinthrop@howardrice.com; jrussell@skadden.com; jpn@msk.com; jfalk@howardrice.com; jklevens@glaserweil.com; kenneth.plevan@skadden.com; marina.bogorad@skadden.com; mikelly@skadden.com; npelletier@glaserweil.com; rkennedy@skadden.com; rstoll@glaserweil.com; rjf@msk.com; slau@glaserweil.com; tnolan@skadden.com; phb@msk.com; pglaser@glaserweil.com; burrow@caldwell-leslie.com; Sandy Weisburst; Stan Karas; Shane McKenzie; acote@obsklaw.com;

1

EXHIBIT 8
PAGE 118

dscheper@obsklaw.com; leah@spertuslaw.com; moverland@obsklaw.com;
dwinthrop@howardrice.com; jstang@pszjlaw.com; Prosper.Pierre@Arentfox.com;
silva.roy@arentfox.com; hansen.drew@arentfox.com; obrien.robert@arentfox.com;
rdurkin@durkinforensic.com; pfraioli@ecjlaw.com; bmoldo@ecjlaw.com; dseror@ecjlaw.com;
pdavidson@ecjlaw.com; mbidart@sbd-law.com; recheverria@sbd-law.com;
catherine.rivard@mendes.com; heeyoung.lee@mendes.com; rene.daley@mendes.com;
kkarelis@ropers.com; marriandiaga@ropers.com; j.kokes@mpglaw.com; s.field@mpglaw.com;
jim.wagoner@mccormickbarstow.com
Subject: Minute Order in Case CV 04-9049 SGL Re: Scheduling, etc.
Importance: High


(See attached file: CV 04-09049 SGL Minute Order re monitor reports, scheduling, etc..pdf)

EXHIBIT 8
PAGE 119

# EXHIBIT 9

# Exhibit Filed

# Under Seal

# Pursuant to Protective order

# EXHIBIT 10

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.    CV 04-09049 SGL(RNBx)                           Date: June 18, 2009
Title:      MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
==================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

          Cindy Sasse                          None Present
          Courtroom Deputy                     Court Reporter

ATTORNEYS PRESENT FOR              ATTORNEYS PRESENT FOR
PLAINTIFFS:                        DEFENDANTS:

None Present                       None Present

**PROCEEDINGS:    ORDER AFTER JUNE 15, 2009, HEARING ON ACCOUNTING
                  ISSUES**

     The parties have briefed the issue regarding the proper scope of accounting and
escrow of profits relating to Bratz products, and the Court heard argument on June 15,
2009. In fashioning the equitable relief of an accounting, and the resulting escrow, the
Court is guided by the proper measure of damages available to an infringement
plaintiff.[1]  It is the intent of the Court, by the issuance of this Order, to provide guidance
to the parties, the Monitor, and their accountants to arrive at an appropriate accounting.

     The following events are relevant to the Court's analysis:

06/30/08    Date of last evidence regarding profits of Bratz presented to jury.

07/17/08    Date of Phase 1A jury verdict which, along with the Court's summary

-------------------------

     [1] At issue here, as discussed more fully below, are both copyright and trademark infringement.
As the Court and the parties are aware, Mattel asserted no trademark infringement claim in this action for
reasons understood by the Court and by parties (which the Court does not belabor here). However,
damages as measured by profits related to trademark are relevant to the present discussion because of
the Court's imposition of a constructive trust, on December 3, 2008, over the "Bratz" and "Jade" marks.

MINUTES FORM 90                                  Initials of Deputy Clerk __cls_____
CIVIL -- GEN                          1

EXHIBIT    10
PAGE    135

|          | judgment orders, established (1) that Carter Bryant created (alone or jointly with others) the Bratz sculpt which has been designated as TX 1136A; and (2) that Mattel owned the name "Bratz." |
|----------|----------|
| 08/26/08 | Date of Phase 1B jury verdict which, in addition to awarding $10 million in copyright damages, also found no willful copyright infringement. |
| 12/03/08 | Date of issuance of permanent injunction, which expressly found hundreds of Bratz core female fashion dolls infringed Mattel's copyrights.[2]  Date of imposition of constructive trust.  All orders were stayed pending the Court's consideration of the post-trial motions. |
| 12/11/08 | MGA sought a stay pending appeal of the Court's December 3, 2008, Orders. |
| 12/30/08 | Court denied MGA's ex parte application to stay pending appeal, but allowed further briefing on a limited stay to address retailer concerns. |
| 01/07/09 | After briefing and hearing, Court modified the stay in light of retailer concerns:  "Specifically, retailers and distributors will be permitted to purchase the Spring and Fall 2009 lines of Bratz and Bratz-related products from MGA and MGA licensees, up to and including December 31, 2009.  In the event the Court awards control over the rights to the Bratz products referenced in the Court's December 3, 2008, Order, and the January 7, 2009 Stipulation and Order (regarding the Spring and Fall 2009 lines) to a Court-appointed receiver or to Mattel, Inc., that award will be subject to a requirement that retailers and distributors be permitted to purchase the Spring and Fall 2009 lines up to an including December 31, 2009."  This stay was later modified to be in effect until January 21, 2010. |
| 04/29/09 | Court decided the post-trial motions.  Court lifted the stay imposed in the |

---

[2] In doing so, the Court examined the dolls depicted in photographs and lodged with the Court and found them to be "substantially similar to Mattel's registered copyrighted drawings."  The Court described its analysis:

Especially important to the Court's conclusion is the consistency of the particularized expression of certain anatomical features relative to others (most notably the doll lips, doll eyes, doll eyebrows, and certain other doll eye features) and de-emphasis of certain anatomical features (most notably the minimalized doll nose and thin, small doll bodies).  Also important to the Court is the particularized, synergistic compilation and expression of the human form and anatomy that quite clearly expresses a unique style and conveys a distinct look or attitude, especially as perceived by the intended consumer market (7-12 year old girls).

Court's 12/03/08 Omnibus Order.

EXHIBIT ___10___
PAGE ___136___

December 3, 2008, Order, but preserved the limited stay set forth in the
January 7, 2009, Order.

These events must be considered in connection with the relevant legal
standards.

As measured by an infringement defendant's profits, damages for copyright
infringement and trademark infringement are subject to the same shifting burden-of-
proof scheme.  A plaintiff has the burden with respect to defendant's sales, but a
defendant bears the burden of proving deductions from sales to arrive at profits.  17
U.S.C. § 504(b) (copyright); 15 U.S.C. § 1117(a) (trademark).  Doubts regarding
calculation of costs or profits are resolved in the plaintiff's favor; a failure by the
defendant to meet its burden of proof can result in an award of gross revenue.  Frank
Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 514 (9th Cir. 1985) (citations
omitted).

In both copyright and trademark cases, adjustments may be made to gross
revenue based on apportionment, i.e., a reduction for amounts of "an infringer's profits
[that] are attributable to factors in addition to use of plaintiff's work."  Frank Music Corp.
v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 518 (9th Cir. 1985) (internal citation
omitted) (copyright); accord Nintendo of America, Inc. v. Dragon Pacific Intern., 40 F.3d
1007, 1012 (9th Cir. 1994) (copyright and trademark).

In addition to apportionment, and subject to proof, direct costs, including, most
significantly, cost of goods sold, are generally deducted from gross revenues to arrive at
profits, even where the infringement is willful.[3]  Beyond direct costs, however, case law
severely limits the deductions that may be made to gross revenue in cases of willful
infringement.  Most significantly, where infringement is willful, a proportional share of
overhead (including salaries) is not deductible, and taxes are not deductible.[4]  See
Kamar International, Inc. v. Russ Berrie & Co., 752 F.2d 1326, 1331 (9th Cir.1984)
(overhead not deductible in case of willful copyright infringement); Three Boys Music
Corp. v. Bolton, 212 F.3d 477, 487 (9th Cir. 2000) (taxes not deductible in case of willful
copyright infringement but are deductible in cases of non-willful infringement); Wolfe v.
National Lead Co., 272 F.2d 867 (9th Cir.1959) (salaries not deductible in case of willful

---

[3] Mattel has identified other items which it concedes are "arguably" direct costs, including
production costs, royalty expense, advertisement production and media expenses, mold depreciation
expense, other sales and marketing expense, and product development expense.  Mattel's Memo. re
Escrow of Bratz Profits at 8 n.16.

[4] Mattel contends a number of items found on the MGA parties' financial statements fall into this
category, including travel and entertainment expenses, salaries and related expenses, professional fees,
premises-related expenses, equipment-related expenses, supplies, postage delivery expenses, and other
expenses and distribution expenses.  Id.

EXHIBIT  10
PAGE  137

trademark infringement), overruled on other grounds by Maier Brewing Co. v.
Fleischmann Distilling Corp., 359 F.2d 156 (9th Cir.1966) (en banc); L.P. Larson, Jr.,
Co. v. Wm. Wrigley, Jr., Co., 277 U.S. 97, 99 (1928) (taxes not deductible in case of
willful trademark infringement).

    In applying these principles, the Court is guided by the purpose of the provisions
authorizing awards of defendants' profits to copyright and trademark infringement
plaintiffs, which is to remove any economic incentive of infringement and to avoid an
infringing defendant's unjust enrichment.  See Polar Bear Productions, Inc. v. Timex
Corp., 384 F.3d 700, 718 (9th Cir. 2004) ("[T]he purpose of § 504(b) is to compensate
fully a copyright owner for the misappropriated value of its property and to avoid unjust
enrichment by defendants, who would otherwise benefit from this component of profit
through their unlawful use of another's work.") (internal quotation marks and citation
omitted); Polo Fashions, Inc. v. Dick Bruhn, Inc., 793 F.2d 1132, 1135 (9th Cir.1986)
("Section 1117(a)'s primary purpose is to 'take all the economic incentive out of
trademark infringement.") (internal quotation marks and citation omitted).

    The Court must also consider what it means to willfully infringe another's
copyright or trademark.  "[T]he term 'willful' refers to conduct that occurs with knowledge
that the defendant's conduct constitutes copyright infringement."  Danjaq LLC v. Sony
Corp., 263 F.3d 942, 957 (9th Cir. 2001).  By the same token, "[w]illful infringement
carries a connotation of deliberate intent to deceive. Courts generally apply forceful
labels such as 'deliberate,' 'false,' 'misleading,' or 'fraudulent' to conduct that meets this
standard." Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1406 (9th Cir. 1993)
(citations omitted).

    Against this background, and in accordance with the legal standards articulated
herein, the Court considers whether production of the core female fashion dolls
constituted willful copyright infringement, and does so with reference to specific time
periods. Profits based on trademark infringement, also discussed below, are relevant
because of the constructive trust imposed by the Court over the marks "Bratz" and
"Jade."

#### Prior to 07/01/08

    For all periods of time prior to July 1, 2008, the jury's verdict, which found no
willful copyright infringement controls.  No accounting is necessary for this period of
time, as it is included in the amount awarded by the jury.

#### 07/01/08 - 12/02/08

    Because there was no trademark claim asserted by Mattel, and because this
period of time occurred before imposition of the constructive trust over the trademark,
the accounting for this period shall include only profits associated with the core Bratz

EXHIBIT ___10___
PAGE ___138___

female fashion dolls, or profits related to other products that may infringe Mattel's copyright, and not any other Bratz product that may be subject only to the constructive trust.[5] In the event that a dispute should arise over whether profits associated with any particular core Bratz female fashion doll should be included in the accounting, the parties, the Monitor, and their accountants shall in good faith consult the Court's July 24, 2008, Order at 2-3; December 3, 2008, Omnibus Order at 10-11; December 3, 2008, Permanent Injunction (including the exhibits attached thereto). In any event, the accounting shall include any doll that is the embodiment of the sculpts referenced in the Permanent Injunction Order at Exhs. 1 and 2. See December 3, 2008, Permanent Injunction at 2, ¶ 1(a)-(b) (enjoining production and sale of any doll utilizing the "core Bratz doll production sculpt" (aka TX 1136A) and the "Bratz movie sculpt").

The MGA parties have contended that the jury's finding of non-willful copyright infringement carries into this period and beyond. The Court disagrees. After the jury's Phase 1A verdict, the issue of the timing of the Bryant drawings was resolved in favor of Mattel, as was the issue of the ownership of the Bratz sculpt designated TX 1136A. This adjudication changed the landscape dramatically and, absent a successful appeal, the MGA parties are not free to continue to dispute the validity of Mattel's copyright in the Bryant drawings (which it registered well in advance of the Phase 1A trial).[6]

Nonetheless, and although it is a very close call, the Court finds no willful copyright infringement during this time period. The Court is cognizant of the well-articulated arguments advanced by counsel for the MGA parties regarding the limiting scope of the jury's verdict, likened to a small rug too inadequate to cover a large floor, no matter how it was moved about. Although the Court ultimately rejected this argument, the Court nevertheless concludes that the MGA parties could have, in good faith, relied on their position regarding the jury's verdict, and could have reasonably believed that the Court's ultimate finding regarding the scope of infringement would have been more limited.[7]

Accordingly, although the MGA parties must account for the profits resulting from all core Bratz female fashion dolls that use the "core Bratz doll production sculpt" and the "Bratz movie sculpt," from the time period July 1, 2008, through December 2, 2008, the MGA parties may deduct, subject to proof, both direct and indirect costs, as well as the taxes, associated with the production of these dolls.

---

[5] See, for example, the Court's discussion regarding the "hero shot," infra.

[6] Shortly after the Phase 1A verdict, on July 25, 2008, Mattel also registered its copyright interest in the Bratz sculpt designated TX 1136A. Hutnyan Decl. (filed 09/29/08) Ex. 122.

[7] Significantly, the Court's finding on this point is limited to the equitable issue of the scope of an appropriate accounting, and should not be construed to any circumstances beyond the scope of an appropriate accounting.

EXHIBIT     10
PAGE       139

**12/03/08 - 01/21/2010**

Immediately upon issuing its series of Orders on December 3, 2008, the Court stayed them pending its consideration of the parties' post-trial motions. That stay was eventually modified, as set forth above, to provide certain economic stability to retailers that sell MGAE's products. The language of the stay specifically "permitted" retailers and distributors to purchase "Bratz and Bratz-related products" through the 2009 retail season. A necessary corollary to the granting of that permission "to purchase" products is the granting of permission to the MGA parties "to sell" them. Admittedly, it was never the intention of the Court to grant a "license to infringe" such that the profits associated with Bratz products continue to enure to the benefit of the MGA parties. Nevertheless, the Court finds that reliance on the Court's imposition of the stay is sufficient to negate an inference of willfulness for the duration of the stay.

Profits for the period of December 3, 2008, through January 21, 2010, therefore, must be accounted for and escrowed; however, the MGA parties may deduct, subject to proof, both direct and indirect costs, as well as the taxes, associated with the production of these products.

Implicit in this discussion, by reference to "Bratz-related products," is a recognition that December 3, 2008, marks the date for which the scope of the products whose profits are subject to accounting and escrow dramatically expands. Before this date, it was limited essentially to the core Bratz female fashion dolls; after this date, in light of the Court's Constructive Trust Order, it includes any and all products that bear the "Bratz" or "Jade" trademarks.

The Court recognizes that certain disputes regarding the accounting may remain unresolved even after the issuance of this Order. For instance, it is unknown to the Court the extent to which the so-called "hero shot," the original version of which was registered by Mattel, appears on products other than the core Bratz female fashion dolls. The Court has not had the occasion to consider, and thus the parties have not presented and the Court has not definitively decided, the issue of whether any such depiction constitutes copyright infringement, and whether and/or to what extent apportionment based on that depiction alone is appropriate. The Court also recognizes that disputes may occur regarding whether and/or to what extent apportionment is appropriate, and whether and/or the MGA parties have meet their burden of proof regarding deductions of direct and indirect costs.

In light of these anticipated disputes, and in light of the burden already placed on the judicial resources of this Court, it is the intent of this Court to assign to the Monitor the responsibility to investigate disputes that arise regarding the accounting and escrow and to file with the Court, under seal but served on all the parties and Court-appointed

MINUTES FORM 90
CIVIL -- GEN

6

Initials of Deputy Clerk __cls_____

EXHIBIT  _10_
PAGE  _140_

Officers, a Report and Recommendation regarding the resolution of such disputes, if,
and only if, the Monitor is unsuccessful in informally resolving such disputes.

      **IT IS SO ORDERED.**

cc:    Ronald Durkin
       Patrick Fraoli
       Robert O'Brien
       Pierre Prosper

Initials of Deputy Clerk __cls_____

EXHIBIT ___/0___
PAGE ___/U/

# EXHIBIT 11

**Exhibit Filed**

**Under Seal**

**Pursuant to Protective order**

# EXHIBIT 12

1

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3                     EASTERN DIVISION

 4                       -  -  -

 5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 6                       -  -  -

 7   MATTEL, INC.,                  )
                                    )        COPY
 8                  Plaintiff,      )
                                    )
 9        vs.                       )    No. CV 04-09049
                                    )
10   MGA ENTERTAINMENT, INC., ET. AL.,)
                                    )
11                  Defendants.     )
     _____)
12   AND CONSOLIDATED ACTIONS,      )   Motions
     _____)
13                                  )

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  Riverside, California

17              Wednesday, February 11, 2009

18                     10:03 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
                Federal Official Court Reporter
24                3470 12th Street, Rm. 134
                Riverside, California  92501
25                    951-274-0844
                   WWW.THERESALANZA.COM
```

EXHIBIT  12
PAGE  155

1   follow the logical reason, their full amount of damages, based

2   on the instructions that they were provided and the evidence

3   that they were given, comes out to a consistent verdict.

4          THE COURT:  I do understand your argument.  Thank

5   you, Counsel.

6          MR. ZELLER:  Your Honor --

7          THE COURT:  No.  I've allowed the moving party to

8   speak first and last, and let's stick to that.  You have well

9   briefed these things.

10          I next want to take up Omni 808's ex-parte          01:34

11   application to intervene for limited purposes.

12          Mr. Gordinier.

13          MR. GORDINIER:  Thank you for offering me the

14   opportunity to address the Court.

15          We've set out in our papers, really, what we're      01:34

16   looking for here.  The transaction by which Omni 808 acquired

17   its interest and stepped into the shoes of Wachovia was

18   straightforward and it was at arm's length.  And I, frankly,

19   although naively, believed that if we would get stipulated to

20   be a party to the proceeding going forward, to the extent the   01:35

21   Court --

22          THE COURT:  Where do those funds come from?

23          MR. GORDINIER:  Mr. Kadisha, Your Honor, is a very

24   substantial individual.  Mr. Kadisha, Neil Kadisha, who is the

25   president and CEO of Omni 808, was one of the founders of      01:35

EXHIBIT  12

PAGE  156

```
 1    Qualcomm.  With everything that's gone on in the market in the
 2    last six or seven months, I don't want to make any
 3    representations, but Mr. Kadisha has from time to time appeared
 4    on the Forbes 400 list.  I don't know what his net worth is.
 5          What happened, Your Honor, is, Wachovia called the        01:35
 6    note.  I don't know why.  I've been involved in these cases
 7    where everybody feels like the world revolves around what's
 8    happening in this courtroom.  As the Court knows, Wachovia had
 9    other issues.
10          Wachovia and its syndicate wanted it off its balance      01:35
11    sheet, and MGA needed relief from the immediate need to pay
12    money they did not have.  And my client was approached and put
13    together people and bought the indebtedness and assumed the
14    debt at a discount, at a substantial discount; and he expects
15    to make money.                                                  01:36
16          THE COURT:  You're representing to the Court, though,
17    that this was not MGA's money; that this was -- from wherever
18    it came from, it came from someplace else.
19          MR. GORDINIER:  Your Honor, two things.  I've never
20    met Mr. Larian, and I know less about MGA than almost everybody  01:36
21    else.
22          THE COURT:  I'm not asking about what you know from
23    MGA but of what you know from your client.
24          MR. GORDINIER:  What I know from my client is, he put
25    in many millions of dollars.  He had a couple of investors with  01:36
```

EXHIBIT ___12___

PAGE ___157___

72

```
1    him to put in many millions of dollars.

2           THE COURT:  Those investors and that money did not

3    come from MGA?

4           MR. GORDINIER:  That's the best of my understanding,

5    Your Honor.  That's true.                                      01:36

6           And the best way to resolve that is what the Court

7    has already done.  The Court did exactly the right thing and

8    set up Mr. Durkin, who's very accomplished, to look at MGA's

9    books.  Step number one, he can tell the Court what their

10   balance sheet is, what their income statement is, and also the 01:37

11   sources and uses of cash.

12          And if there are any issues -- and, by the way, I'm

13   happy to talk to Mr. Durkin or have Mr. Durkin talk to my

14   client.  This is not intended to be -- this wasn't a fraudulent

15   transaction, Your Honor.  We negotiated -- we -- I didn't do    01:37

16   it -- Omni 808 negotiated with Davis Polk on behalf of Wachovia

17   and bought at a discount; and Omni 808 expects to and would

18   like to make money on its investment, and will not be able to

19   do so, obviously, if MGA goes out of business.  So our interest

20   here is in protecting Omni 808's investment.  And part of that  01:38

21   is wanting a say in how MGA's business on this receiver issue

22   is dealt with.

23          THE COURT:  The interest to intervene is focused, as

24   you indicate in your papers, on the receivership issue?

25          MR. GORDINIER:  That's correct, Your Honor.  That's      01:38
```

EXHIBIT __12__

PAGE __158__

1    correct.

2           THE COURT:  Very well.

3           Does anyone wish to be heard in opposition to the

4    ex-parte application?

5           MR. ZELLER:  Yes, Your Honor.                              01:38

6           I don't know that we've been -- and maybe the Court

7    heard it differently, but I still do not hear anything that

8    certainly approaches evidence that this was, in fact, an arm's

9    length transaction.

10          THE COURT:  I have a representation from respected        01:38

11   counsel.

12          MR. ZELLER:  Well, he said -- Your Honor, the

13   Court -- all he said was to the best of his knowledge.  He

14   didn't say it didn't come from it.

15          Second, the Court asked MGA; it didn't ask from          01:39

16   Larian, Larian's brother-in-law, his wife --. there are other

17   family members involved in this, and their fingerprints are on

18   this.  So, certainly, I want to be very clear, Your Honor, we

19   have not gone so far as to say, this is a fraud, this is a

20   sham, or so on.  The fact is that there are substantial         01:39

21   questions here as to the bona fides of this transaction and

22   whether or not this has been papered in a way to basically

23   create debt and credit, where, in fact, it would simply be

24   treated by the tax code, by the bankruptcy code, by the courts,

25   for every other purpose, as, in fact, being nothing but a loan,  01:39

EXHIBIT ___/2-

PAGE ___/59

1   we'll go from there.

2           **MR. ZELLER:**  Thank you.

3           **THE COURT:**  Anything further?

4           Thank you.  Good day.

5

6

7

8

9

10                          CERTIFICATE

11

12   I hereby certify that pursuant to section 753, title 28, United
     States Code, the foregoing is a true and correct transcript of
13   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
14   conformance with the regulations of the Judicial Conference of
     the United States.

15

16   _____        _2-13-09_____
     THERESA A. LANZA, CSR, RPR                  Date
17   Federal Official Court Reporter

18

19

20

21

22

23

24

25                                        EXHIBIT __12__
                                          PAGE ___160___

# EXHIBIT 13

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION


CARTER BRYANT, an individual,

      Plaintiff,

    vs.

MATTEL, INC., a Delaware
corporation,

      Defendants.

No. CV 04-9049 SGL (RNBx)
Consolidated with
Nos. CV 04-9405 and
05-2727

**CERTIFIED COPY**

_____

AND CONSOLIDATED ACTIONS.

_____


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Wednesday, March 4, 2009

Volume 1


Reported by:
CHERYL R. KAMALSKI
CSR No. 7113

Job No. 106479

EXHIBIT _13_
PAGE _161_

877.955.3855
www.sarnoffcourtreporters.com

IRVINE ¤ LOS ANGELES ¤ SAN FRANCISCO ¤ LAS VEGAS ¤ SAN DIEGO

**SARNOFF**
*Court Reporters and
Legal Technologies*

TRANSCRIPT OF PROCEEDINGS                03/04/09

1   compel is improper and should be denied for both serious

2   substantive and procedural reasons.  If we're going to

3   have these rules, they have a purpose, they have to be

4   followed.  And the Court's very order, the Court's

5   standing order says if this isn't done, it won't be

6   considered.  They now are walking away from these other

7   orders and they want to rely on the discovery stipulation

8   and order which, of course, I had no knowledge of when we

9   were having this discussion.  As you're well aware of,

10  they didn't even comply with that.  Perhaps if they had,

11  and set out, as they're required to do in writing, what it

12  is they want, why they want it, let's talk about it, let's

13  sit down and discuss it, we could, perhaps, have narrowed

14  it.  In fact, both I and my colleague told Mr. Corey we

15  were pretty sure we could satisfy himself with respect to

16  the bona fides of the transaction.  That was rejected.

17       MR. O'BRIEN:  Let me ask you this question.

18  You've said the discovery's overbroad.  What narrow

19  request could Mattel make that you believe would be proper

20  under the circumstances here?  In other words, what kind

21  of request do you think would be, as a third party?  I

22  mean, I understand you don't want to respond to anything,

23  it's a burden.  But assuming there's always a burden in

24  responding to discovery, what narrow request, based on

25  your understanding of the issues in phase 2, would be

EXHIBIT ___/�毛___

PAGE ____/6Y___   50

1  proper for your -- that you wouldn't come in here and file

2  a motion to quash?

3          MR. GORDINIER:  What documents do we have that

4  show that either Mr. Larian or MGA paid money into this to

5  purchase this debt?  I can tell you there are none.  This

6  is a ready, fire, aim situation.  The allegations that

7  were made and were made publicly are unconscionable and

8  can't be undone.

9          MR. O'BRIEN:  What other areas?  For example,

10 would the payment history with respect to the debt from

11 MGA to 808, assuming there is one, I don't know if this is

12 a balloon payment or that sort of thing --

13         MR. GORDINIER:  I assume that's in MGA's

14 financial statements, but -- I mean, I assume that they've

15 made payments.  I don't know the answer to that, that's

16 reflected on their financial statements, which I'm

17 assuming have been exchanged, but I don't know that.

18         MR. O'BRIEN:  Mr. Russell said that there was

19 discovery that was taken of Wachovia in phase 1.  I was

20 not involved in the case.  I don't know what discovery was

21 taken of Wachovia.  But, presumably -- but it sounds like,

22 and I'll let Mr. Zeller answer this and Mr. Russell

23 address it as well, but if there was discovery in phase 1

24 that was proper as to Wachovia in establishing the debt

25 and looking at the payment terms, and all that sort of

EXHIBIT __13__

PAGE __163__                    51

1   thing, would that same sort of discovery be proper

2   vis-a-vis 808 --

3           MR. GORDINIER:  We absolutely offered -- we

4   offered, without knowing any of this, to give them the

5   deal documents.  Absolutely.  I don't know that it's

6   proper.  I think it's overbroad and I think it's

7   premature, but I'll just tell you, we offered to give them

8   the deal documents.  There's no secret there.  We did buy

9   the debt at a discount.  You've read the transcript.  I

10  told Judge Larson my client wants to make money at this,

11  and so he made a business decision that -- you know,

12  Wachovia has its own reasons for doing what it's doing

13  that we all can kind of guess -- but I don't know.  My

14  client had his own reasons for doing what he's doing.  The

15  only thing that seems to relate to all this is do they

16  have -- are there any documents that show the disgorgement

17  thing, or whatever he's trying to argue, and I'm not

18  familiar with the phase 2 -- but I have no problem

19  conceptually giving them the deal documents.  None at all.

20  But that doesn't entitle them to look at all records that

21  reflect all my nonparty entities, all documents detailing

22  or setting forth.  Read through them; they're overbroad

23  and they're improper.

24          MR. O'BRIEN:  What about performance, the

25  performance of the loan.

EXHIBIT ___13___
PAGE ___164___

52

1          I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby certify:

3         That the foregoing proceedings were taken

4  before me at the time and place herein set forth; that

5  any witnesses in the foregoing proceedings, prior to

6  testifying, were duly sworn; that a record of the

7  proceedings was made by me using machine shorthand

8  which was thereafter transcribed under my direction;

9  that the foregoing transcript is a true record of the

10  testimony given.

11         Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [  ] was [  ] was not requested.

15         I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or party to this action.

18         IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated:   MAR 0 9 2009 _____

22

23                *Cheryl R. Kamalski*
                  CHERYL R. KAMALSKI

24                  CSR No. 7113

25                  EXHIBIT 13
                  PAGE 165

# EXHIBIT 14

# Exhibit Filed

# Under Seal

# Pursuant to Protective order