1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                 EASTERN DIVISION

4                    - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6

7   MATTEL, INC.,                    )
                                     )
8                     Plaintiff,     )
                                     )
9            vs.                     )   No. CV 04-09049
                                     )
10  MGA ENTERTAINMENT, INC., ET. AL.,  )
                                     )
11                    Defendants.    )
    _____)   Motions

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                Riverside, California

16               Monday, August 31, 2009

17                    2:14 P.M.

18

19

20

21

22

23            THERESA A. LANZA, RPR, CSR
           Federal Official Court Reporter
24            3470 12th Street, Rm. 134
           Riverside, California  92501
25                951-274-0844
              WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2

     ON BEHALF OF MATTEL, INC.:
 3
                         QUINN EMANUEL
 4                       By:  JOHN QUINN
                              MICHAEL T. ZELLER
 5                            B. DYLAN PROCTOR
                         865 S. Figueroa Street,
 6                       10th Floor
                         Los Angeles, California  90017
 7                       213-624-7707

 8

 9   ON BEHALF OF MGA ENTERTAINMENT/ISAAC LARIAN:

10                       ORRICK, HERRINGTON & SUTCLIFFE, LLP
                         BY:  ANNETTE L. HURST
11                       BY:  WARRINGTON S. PARKER III
                         405 Howard Street
12                       San Francisco, California  90071-3144
                         213-687-5000
13
                         ORRICK, HERRINGTON & SUTCLIFFE, LLP
14                       BY:  WILLIAM A. MOLINSKI
                         405 777 South Figueroa Street,
15                       Suite 3200
                         Los Angeles, California  90017-5855
16                       213-612-2256

17

18   ON BEHALF OF OMNI 808:

19                       BINGHAM McCUTCHEN LLP
                         BY:  Peter N. Villar
20                       600 Anton Boulevard
                         Costa Mesa, CA  92626-1924
21                       714-830-0640

22

23

24

25
```

1                              I N D E X

2                                                        Page

3     Proceedings...................................    4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        Riverside, California; Monday, August 31, 2009; 2:14 P.M.

 2                              -oOo-

 3        THE CLERK:  Calling calendar item 11, case number CV

 4   zero 4-9049-SGL, Mattel, Inc., versus MGA Entertainment, Inc.

 5        May we have counsel please come forward and state        02:14

 6   your appearances for the record.

 7        MS. HURST:  Good afternoon, Your Honor.

 8   Annette Hurst from Orrick for plaintiff/counter defendant MGA

 9   Entertainment and the other MGA parties.

10        MR. PARKER:  Warrington Parker of Orrick for MGA.       02:15

11        MR. MOLINSKI:  Bill Molinski, also appearing for MGA,

12   with Orrick.

13        MR. QUINN:  John Quinn, Mike Zeller, and

14   Dylan Proctor, for plaintiff Mattel.

15        THE COURT:  Good afternoon to you all.                  02:15

16        The Court has before it the three motions; I have the

17   preclusive relief related to Mr. Larian's hard drives; I have

18   the motion for clarification of the Court's order earlier this

19   summer; and a motion to amend the scheduling order.

20        I want to deal with the motion that's easiest off the   02:15

21   top, and that's the clarification.  The Court has in mind what

22   it meant, and I'll issue a clarifying order to that effect this

23   week.  I should have worded that carefully.  The footnote in

24   question certainly applied to both findings with respect to

25   willful infringement, and I did not mean to intend that it only  02:15
```

```
 1   applied to one; that is to say, that I was limiting that to the
 2   purposes of the order itself and not as a finding that would
 3   apply for all purposes.  But I'll make that clear in the
 4   Court's next order.  So I do not need to hear anything really
 5   on that.  But I do need to hear on this motion for preclusive      02:16
 6   relief and certainly the motion to amend the scheduling order,
 7   so let me begin with the motion for preclusive relief.
 8            I'll start by just giving you my sense, having read
 9   the papers.  I did receive the surreply and I did receive the
10   sur-surreply.  I read them, for what it's worth.  It is a          02:16
11   problem that these sur- and sur-surreplies are coming in
12   without leave of court, so I'm just going to ask on a going-
13   forward basis that we get leave of court to file those.  I
14   certainly understand that there are instances where there is a
15   need to file one, and this may very well be one of those          02:17
16   instances, to bring the Court's attention to the May 2008
17   protocol.  However, just go through the formality.  I certainly
18   know that everybody knows how to file in this courtroom, Lord
19   knows; so just do that on a going-forward basis.
20            So I have considered all of the papers.                  02:17
21            My sense is that on the issue of the hard drives, I
22   certainly don't believe there was anything wrong in the
23   Discovery Master's order not affording access to the hard drive
24   or the active files or the active drivers.  The problem,
25   though, does result -- a problem results when both sides'          02:17
```

```
 1   experts don't have access to the same information.
 2           There's got to be a level playing field here.  I'm
 3   open to any creative solution to level that playing field.  If
 4   both experts don't have access to the active hard drives, or if
 5   both do, I understand there's problems no matter which way we        02:18
 6   go.  If we get access, then there are all kinds of privilege
 7   issues, all kinds of issues related to ongoing information on
 8   there which would have to be screened.
 9           I suppose in some sense the easier approach is to
10   just exclude access to that for both sides.  But then, the MGA      02:18
11   expert has already had that access, and that's, I suppose, the
12   basis or part of their conclusion, as I understand it.  But
13   perhaps my understanding is mistaken on that.  And in the
14   interest of making sure that the jury and whoever is the
15   fact-finder has all of the truth before them, I suppose the         02:18
16   interest would be in favor of giving both sides that
17   information and then hashing it out and seeing where we are.
18           My tentative thought is that there seems to be an
19   imbalance right now which needs to be addressed somehow.
20           Those are my initial thoughts.                              02:19
21           MS. HURST:  Thank you, your Honor.
22           Your Honor, there is a simple remedy to the problem
23   the Court has identified, which is a document request for the
24   files upon which the expert has relied.  Such a document
25   request was served and the MGA parties answered that they would     02:19
```

1    produce such responsive documents; so in a sense, this is sort

2    of a mountain out of a molehill.

3          **THE COURT:**  I don't know if I see that as a solution,

4    though.

5          You're suggesting that they get what your experts                    02:19

6    have actually relied upon?

7          **MS. HURST:**  Sure.

8          So, for example, the whole purpose for this

9    inspection was to determine whether there had been spoliation.

10          **THE COURT:**  Deletions, right.                                    02:19

11          **MS. HURST:**  So if the information exists in another

12    file, an active file, and if our expert has relied on that --

13    and I think there is a substantial dispute about that, because

14    there's the issue of simply running the hash algorithm, which

15    is not looking at the content as opposed to looking at the       02:20

16    content -- but if our expert goes and looks at the content in

17    response to their expert's report that says "it appears to us

18    from the deleted files that this user-generated content has

19    been deleted," if our expert looks at that and then he goes and

20    finds it somewhere else, then we can simply print those files    02:20

21    out and give it to them with all of the custodial information

22    about where it was found on the drive.  And if they need to

23    inspect, for the limited purpose of confirming that it's found

24    there --

25          **THE COURT:**  That's where I was going to go.              02:20

1        **MS. HURST:**  -- we can do that.  But you don't need to

2   give access to the whole thing in order to accomplish that.

3        **THE COURT:**  That address and what was found, might it

4   not also be important for them to know what's not there?

5        **MS. HURST:**  I would think the burden would be on us                02:21

6   to address everything they assert has been deleted.

7        **THE COURT:**  Mr. Zeller, what's your thought on this

8   solution?

9        **MR. ZELLER:**  I don't know if I would call it

10  creative, but this is along the lines of at least one proposal           02:21

11  that we had made in order to try and resolve this.  And to pick

12  up on the Court's last point, one problem in the kind of

13  limited or limitations that MGA's counsel is suggesting here is

14  that we still won't know if there's a criticism being leveled

15  against our expert for not looking.                                        02:21

16        Certainly, it's one thing if their expert goes so far

17  as to say, "Look, I looked in the active files, I found 90 out

18  of 100, and here they are."

19        But what it doesn't cover is something of the --

20  whether it's exactly the same or a variation, I guess one can            02:21

21  have different opinions about what their expert has already

22  done.  But, one, he could just simply say "Mattel did not look

23  at the active files."

24        **THE COURT:**  I certainly accept your -- it would be

25  very unfair for any expert to come in here and criticize an              02:22

Monday, August 31, 2009                    CV 04-09049-SGL

```
 1   opposing party for not looking at something that the parties

 2   successfully precluded them from looking at.

 3            You would agree with that.

 4        MS. HURST:  Yes, certainly, your Honor.  And I would

 5   think a motion in limine would be the remedy for that.        02:22

 6        THE COURT:  Right.  That's something that we

 7   understand that here and now that that's not going to happen.

 8            So putting that issue aside then, Mr. Zeller, what

 9   about this proposal dealing with the rest of your --

10        MR. ZELLER:  I think that is substantially along the   02:22

11   lines of what we had been proposing.

12            We've never said that we want to see every single

13   active file on those drivers; that has never been our position.

14        THE COURT:  What I like about this solution is that

15   it doesn't go down that road of getting into all of the active  02:22

16   files and all of the potential privilege and the quagmire that

17   I can see erupting if that was all turned over.  So this sounds

18   good.

19        MR. ZELLER:  I think so.  And obviously, subject

20   to -- ultimately, once we get information in hard copy printout  02:23

21   form, then if we need access to actually look at the data or

22   whatever it is that's actually associated with those particular

23   files, that is also along the lines of what we were

24   contemplating, just so that that's clear.

25        THE COURT:  Okay.                                       02:23
```

1        Anything further?

2            **MS. HURST:**  No thank you, your Honor.

3            **THE COURT:**  Very good.  That takes care of that

4    motion.

5            So the motion is basically resolved by the                    02:23

6    stipulation of the parties, and the record here reflects that

7    agreement.  If there's any concern about what that entails, the

8    Court will take that up, but I trust that we can go forward,

9    then, with this understanding in mind.

10           As far as the motion to amend the scheduling order,         02:23

11   the Court has given a lot of thought to this; it has a lot of

12   concern about this.

13           The biggest initial concern I have is that I know

14   that there is harboring over the case a fourth amended answer

15   and cross claim, and my concern is what impact that might have     02:24

16   on the case if the Court were to grant that motion to amend.

17           I guess I'm concerned about even discussing a

18   scheduling order now, or modifications to the scheduling

19   order -- you have to excuse me, I've got a terrible head cold

20   right now -- the Court is concerned about modifying that          02:24

21   schedule now, only to be facing potentially a much different or

22   expanded or larger case.  And frankly, my concern is

23   underscored by my recollection that Mattel was quite emphatic

24   that the third amended answer and cross claim would not expand

25   this case dramatically, and now here we are seeking an 8-month    02:25

```
 1   continuation of discovery, which, frankly, I'm really not
 2   inclined to grant, certainly at this point.  But this kind of
 3   plays into the fourth amended answer.
 4           I mean, this case has got to come to a head at some
 5   point in time.                                                    02:25
 6           Part of the concern I have is that we seem to be --
 7   I'm going to be oversimplistic here in trying to describe
 8   this -- but the RICO claim, the phase two, while it was
 9   certainly not just related to Bratz, my understanding that the
10   gravamen of the allegation there was that in addition to the     02:25
11   copyright infringement alleged in phase one, that MGA, as a
12   company and through its other affiliates, was engaged in acts
13   that were designed to compromise Mattel's integrity, either by
14   stealing ideas or stealing employees or what have you; that it
15   was all related to this notion of theft, of commercial theft.    02:26
16   Those were the allegations, and it was brought together in a
17   RICO claim.
18           Now we seem to have added these perjury counts, or
19   perjury claims, that stem from the trial, and now this whole
20   Wachovia debt transaction, which is a post-trial act, seems to   02:26
21   be getting us farther afield from what was the core of that
22   second phase.  And while I'm certainly reluctant to suggest
23   that we somehow sever that out into a third phase -- something
24   about the myth of hydra comes to mind -- but I really want to
25   make sure that we get a handle on what it is that we're          02:26
```

1    supposed to be trying now, as opposed to -- I don't want to

2    call it a moving target, because I don't want to suggest that

3    the claims that have been brought as a matter of law are not

4    properly brought.  It's just that from a case management

5    perspective, I'm developing some concerns about where this all          02:27

6    is going.

7              So that's where I'm at on that.

8              I'll hear from counsel in response to some of those

9    thoughts.

10             **MR. QUINN:**  Good afternoon, your Honor.                    02:27

11             **THE COURT:**  Good afternoon, Mr. Quinn.

12             **MR. QUINN:**  I understand the Court's concern.  Phase

13   two has transmuted, to some degree.

14             **THE COURT:**  Yes.

15             **MR. QUINN:**  I think, though, that that's in response       02:27

16   to subsequent events, from things that happened last year and

17   from things that we've come to learn as time has gone by.

18             In terms of the fourth amended complaint, that will

19   add some additional parties, but it's all within the scope of

20   the existing allegations.                                               02:27

21             **THE COURT:**  As I understand it -- I really have not

22   focused on it a whole lot, but as I understand it, that largely

23   relates to the Wachovia debt transaction and the spillout, the

24   aftermath of that.  Is that correct?

25             **MR. QUINN:**  Yes; that's correct, your Honor.              02:28

1          If the Court's preference is to address this issue

2     about whether the present schedule should be modified, to defer

3     that until the pleadings are settled on that, we would not have

4     any objection to that.

5          My burden is to demonstrate to the Court that based          02:28

6     on the existing complaint, but notwithstanding the fact that

7     we've been diligent, we cannot, for reasons which are not our

8     fault, be fairly expected to be ready to try the case under the

9     existing schedule.  And demonstrating that to the Court

10    requires that I engage in kind of a tedious process of talking          02:28

11    to the Court about specific things we've been trying to do and

12    the difficulties we've faced in trying to do that.

13          If the Court would bear with me, I'm prepared to do

14    that.

15          **THE COURT:**  I have certainly read your papers, and          02:29

16    I've gone through the long list of concerns.  I've also been

17    following along as the Discovery Master has been dealing with a

18    number of these issues that have come up, and reading his

19    orders; so I know that it should be of no surprise to anybody

20    that this has been, on both sides, a protracted litigation.          02:29

21          **MR. QUINN:**  It's protracted, Your Honor, and --

22          **THE COURT:**  You certainly did not expect, when we

23    agreed to the times set on this, that somehow this was going to

24    be smooth sailing.

25          **MR. QUINN:**  Smooth sailing?  No.  But there have been          02:29

```
 1    some, I would say, kind of unique events that have happened.

 2            If I could call the Court's attention, just by way of

 3    example, to one specific document.

 4            THE COURT:  Yes.

 5            MR. QUINN:  This is Exhibit 2 to Mr. Proctor's                02:29

 6    declaration.

 7            THE COURT:  I have it here.

 8            MR. QUINN:  It is Page 12.  The Court will see that

 9    it says "Anderson, Diane" at the top.

10            THE COURT:  Yes.                                              02:30

11            MR. QUINN:  This is a document that we received ten

12    days ago, on August 21st.  This was a document that was

13    identified in a privilege log which Mattel has been trying to

14    get for 23 months.  The only thing that was produced was

15    everything below the "FYI" that the Court can see there.           02:30

16    What's up there at the top, the e-mail between Mr. Larian and

17    Victoria O'Connor, was withheld on the grounds of privilege.

18            We had to get two orders, and ultimately there was an

19    order that was entered that it would be produced to the

20    Discovery Master for his in-camera review.  A deadline was set    02:30

21    for doing that.  They got an extension on that deadline.  The

22    deadline came and went, two or three weeks went by, and then

23    finally they said "the Discovery Master does not have to review

24    this; we'll simply produce the document."

25            Your Honor, on the face of this, I don't see any           02:31
```

1    arguments that this was ever a privileged document.  This is a

2    very damaging document.

3            There are another 400 documents that the Discovery

4    Master has on his plate right now to review in camera.  This is

5    the result, we finally got this after 23 months, and they          02:31

6    coughed it up.  They did not want the Discovery Master to see

7    it and to focus on whether or not it's privileged.

8            Your Honor, there are other motions similar.

9            Just talking now about privileged logs, the Discovery

10   Master has entered an order requiring that documents relating     02:31

11   to the alleged crime fraud -- which I think the Court will

12   recall that issue -- be produced to the Discovery Master for

13   his in-camera review.  They have moved for reconsideration and

14   they have said that no matter what, the Discovery Master -- if

15   the Discovery Master doesn't go their way on reconsideration,     02:31

16   they are going to appeal that to Your Honor, and they have also

17   announced that they will take it mandamus to the Ninth Circuit,

18   which is their right to seek all these things.

19           The point is, Your Honor, there have been a total of

20   over 40 -- over 50 discovery motions since January.               02:32

21           Now, that in itself doesn't tell the Court anything

22   in terms of the merits of the position being taken.  I can tell

23   the Court that of those motions, Mattel thus far has won 32 of

24   them; has lost 18 of them; and there's 18 of them pending.

25           We did not get a single deposition until -- since         02:32

```
 1   this motion was filed, there have now been two depositions,

 2   phase two; that's it.  Not withstanding our motion practice,

 3   our efforts at diligence.

 4           It took two orders to get Mr. Kadisha to finally

 5   appear.  Similarly, with respect to the other witness,          02:32

 6   Mr. Neman, we still have no documents.  No documents,

 7   Your Honor, from MGA Mexico.  Notwithstanding we've been

 8   seeking them for a couple of years.  They say in their

 9   opposition that, "Well, we produced MGA Mexico documents in the

10   MGA production.  The Discovery Master found" -- and I'm using    02:33

11   the Discovery Master's words in his order -- "that was not

12   credible."  He's ordered them to produce those documents.

13   There are some 200 RFP's directed to MGA Mexico that they are

14   now under Discovery Master order to produce.

15           The trust that provided some of this financing for       02:33

16   OMNI 808, they have not identified to us, notwithstanding the

17   Discovery Master's order, any information about those trusts;

18   who the beneficiaries are; who the grantors are; who the

19   trustees are.  We've been blocked in getting that kind of most

20   basic information.                                               02:33

21           The answers to contention interrogatories addressed

22   in their affirmative defenses, we still do not have them.

23   Maybe we will get them today.  We were promised them by the end

24   of the month, but we haven't gotten any of that.

25           After this schedule was set, the Court will remember,    02:34
```

```
 1    there have been stays; there was a one-month stay that the
 2    Court entered while settlement discussions took place in the
 3    May/June time frame.  There were also stays that MGA took as a
 4    matter of self-help.  The Court may recall that in January,
 5    they took the position that because the Court had appointed a      02:34
 6    forensic auditor to look at MGA's books and records, that we
 7    were barred from ever taking any discovery.  The Court may
 8    recall that.  And it came up at the appropriate time, and the
 9    Court made it clear, that was not the Court's intention.  That
10    blocked us for a month.  That was the second month in this         02:34
11    discovery period that the Court set aside where we did not get
12    any discovery.
13            For four months, four months, Your Honor, we did not
14    get any discovery on their claims against Mattel.  They said we
15    were not entitled to any discovery because we had indicated we     02:35
16    intended to move for summary judgment.  Their position was,
17    "Well, there's no disputed -- apparently you believe there's no
18    issue of disputed fact.  Therefore, you don't need any
19    discovery; you should bring your motion."  That was their
20    position.                                                          02:35
21            Ultimately we had to go to the Discovery Master on
22    that.  Ultimately they were sanctioned for taking that
23    position.  But for four months we did not get any discovery on
24    their claims.
25            I could go on, Your Honor.                                 02:35
```

```
 1              I don't take any pleasure in going through this 'who

 2    did what to whom,' but again, as I started out, it's my

 3    obligation to prove that notwithstanding our due diligence,

 4    we're not going to be in a position to try the case on the

 5    existing schedule.  And I think the record clearly shows we've      02:35

 6    been diligent.  Everything requires a motion, oftentimes

 7    multiple motions, because of the aggressive positions that are

 8    taken on very many of these issues and aspects of this case,

 9    perhaps most of them.

10              I'm sorry to report to the Court, we're at the very       02:36

11    beginning of discovery now.

12              THE COURT:  How many more depositions are you

13    planning to take?

14              MR. QUINN:  I think there was some information in our

15    papers on that.  If I could defer to Mr. Zeller, Your Honor.        02:36

16              THE COURT:  Mr. Zeller.

17              MR. ZELLER:  I can get the Court the exact number

18    that we currently understand.  But we have made a motion to the

19    Discovery Master for additional depositions.  It's in the

20    multiples of tens; it's certainly less than 100; but I know         02:36

21    there's a particular number on it.

22              THE COURT:  You've taken three; correct?

23              MR. ZELLER:  We've taken two.  And we have also asked

24    for leave beyond the limit of ten that the Court will recall --

25    the Court said that for this phase we should go to the              02:37
```

 1    Discovery Master to make a showing for excess depositions.

 2            There is at least another one that I'm recalling

 3    offhand that has been ordered, which is that of Mr. Mashian.

 4            **THE COURT:**  Mr. Zeller, of the whatever number, the

 5    multiple of ten --                                            02:37

 6            **MR. ZELLER:**  I apologize, Your Honor.  It's 30.

 7            **THE COURT:**  Of the 30 depositions, how many of those

 8    depositions would you say are related to what the Court has

 9    termed the Wachovia debt transaction?

10            **MR. ZELLER:**  I would estimate that about a dozen of   02:37

11    those are related to the Wachovia debt acquisition.  Then there

12    also, of course, are some such as Mr. Larian's, for example,

13    where we are certainly seeking that deposition; and that would,

14    of course, relate to a whole host of issues beyond that.

15            **THE COURT:**  So there's 24, then, or 18.              02:37

16            **MR. ZELLER:**  I mean, this is rough justice,

17    Your Honor.  To be perfectly accurate, I'd have to go and add

18    them up, but that's my best estimate standing here.  I think

19    that's about right.

20            We have, for example, ones that are clearly related     02:38

21    to what we'll call the "old phase two issues."  Say, for

22    example, the trade secret misappropriation.  We have MGA Canada

23    that's still outstanding; Jeanine Brisbois, who's associated

24    with MGA Canada, still outstanding; those were the subject of

25    those letters of request a few months ago.                     02:38

1          **THE COURT:**  Speaking of MGA Canada, just while it's

2    fresh in my mind, what is this nonsense about the head of

3    security of Mattel's giving gifts to the Canadian Police?

4          **MR. ZELLER:**  I would say that is a fair amount of

5    hyperbole on MGA's part that is not substantiated by the        02:38

6    record.

7          **THE COURT:**  I don't know whether it's substantiated

8    or not.  Did it happen?

9          **MR. ZELLER:**  No.

10         What happened, Your Honor, is that Mr. Deanda spoke     02:38

11   to the police.  They gave him a token of a pen and perhaps a

12   coffee mug.  He gave them in return a few toy police cars, like

13   less than ten.  That's what this is.

14         **THE COURT:**  He must be mindful of that.

15         I trust you'll have a talk with him about that on a     02:39

16   going-forward basis.

17         Yes?

18         **MR. ZELLER:**  Yes, your Honor, absolutely.

19         I was nodding in agreement.

20         **THE COURT:**  All right.  Back to the bigger issue of   02:39

21   this.

22         If you have these 30 depositions to take and you've

23   only taken two, when do you plan on taking these other

24   depositions?

25         **MR. ZELLER:**  As soon as these individuals are       02:39

1    produced.

2          Right now, we have had to go to the Discovery Master

3    to get leave.

4          THE COURT:  Have you proposed dates for these 28

5    depositions that you want?                                    02:39

6          MR. ZELLER:  No, your Honor.

7          THE COURT:  You have not even proposed dates yet?

8          MR. ZELLER:  When we talk about all 28, that's kind

9    of a big category.

10          Some of them, we have certainly asked dates for; say,  02:40

11   MGA Canada; Jeanine Brisbois; Vargas in Mexico.  There are

12   others clearly related to phase two, we've asked for those

13   dates for literally months and years; so as to those people,

14   yes.

15          There are others who, no, we have not asked for dates  02:40

16   because we don't know whether we have leave to take them.  And

17   also -- and the courts have been very clear about this -- we

18   are entitled to know, before we use up our remaining eight or

19   seven depositions, whatever the case will be after Mr. Mashian,

20   as to whether or not we're going to have leave for those other 02:40

21   ones.  Because if we end up being constrained to some smaller

22   number, we're entitled to know that before making those final

23   choices.

24          So in terms of where we are in the stream of our

25   efforts to get those depositions, we've asked for them; we've  02:40

```
 1   made a motion for leave; it is in the process of being briefed;
 2   the briefing may actually already be done or substantially
 3   done.  But that is the first step.
 4          We have an instance here, Your Honor, where MGA did
 5   not agree to a single one of those additional depositions.        02:41
 6   Justified or not, but that is a fact that it is going to
 7   require time to work those issues through.
 8          THE COURT:  How many depositions of your people have
 9   they taken?
10          MR. ZELLER:  Throughout the case?                           02:41
11          THE COURT:  Not throughout the case.
12          MR. ZELLER:  Right now?
13          THE COURT:  Yes.
14          MR. ZELLER:  There have been none taken.  The only
15   two depositions that have been taken were by us so far since      02:41
16   the beginning of the year.  They have taken none.
17          THE COURT:  Thank you, Mr. Zeller.
18          MR. ZELLER:  Thank you.
19          THE COURT:  Counsel.
20          MS. HURST:  Not for lack of trying, Your Honor.            02:41
21          THE COURT:  So you have sought to take depositions?
22          MS. HURST:  We have, Your Honor, and they did not
23   show up.  We noticed a 30(b)(6) on communications with
24   governmental authorities pertaining specifically to this
25   document, in part where they sent gifts to the Canadian police,   02:42
```

```
 1   and about two days before the deposition, I got an e-mail

 2   saying "We're not going to show up."  We had to file a motion

 3   to compel on that; so that's the one deposition that we've

 4   noticed that we've not been able to take.

 5           But, I frankly think, Your Honor, the way to approach      02:42

 6   this motion is not with some litany of past transgressions.

 7   The focus should be on the future.  We have three months until

 8   the discovery cutoff in this case, and what I have not heard

 9   either Mr. Quinn or Mr. Zeller say is what can't be done in

10   three months.                                                     02:42

11       THE COURT:  Tell me, what do you think, do you think

12   this -- you have a sense, now, and I know you're still new to

13   the case and all, but you've done a fabulous job of getting up

14   to speed; that is reflected in your papers.

15           What is your sense of the possibility of this being       02:42

16   completed, given what you know about just the status of the

17   case right now?  Without the fourth amended, just based on the

18   third amended, do you believe this can be done in the next

19   three months?

20       MS. HURST:  I believe it can, Your Honor, if it's             02:43

21   done with focus and efficiency, which has been lacking,

22   frankly; and on both sides, Your Honor.  I don't mean to just

23   say on Mattel.

24       THE COURT:  I appreciate that.

25       MS. HURST:  And let me say why.  Because the vast             02:43
```

1    majority of those 32 depositions related to the Wachovia debt

2    transaction, it's more like 22, 24 of the 32 depositions.  And,

3    Your Honor, not just the people who actually participated in

4    that transaction, but the companies to whom MGA went to try to

5    get them to buy out the Wachovia debt who didn't take part in          02:43

6    the transaction.  That's the long list.  They don't just want

7    Mr. Neman; they also want the person most knowledgeable of

8    Vision Capital.  They don't just want Mr. Kadisha; they want

9    also the person most knowledgeable of OMNI 808.

10            Mr. Villar is here; he sent them an e-mail before          02:43

11   they took those depositions, saying "these witnesses will be

12   our 30(b)(6) witnesses.  Please give us the chance to prepare

13   them on whatever topics you might want to propound before you

14   take their depositions, and let's do it all at once."

15            Mr. Zeller said no.                                        02:44

16            That's the lack of focus and efficiency.  And

17   frankly, Your Honor, if the Court forces the parties to do

18   this, we will get it done.

19            We did not refuse to agree to any deposition in

20   excess of ten.  We said it's crazy to take more than 30            02:44

21   depositions at seven hours a pop.

22            And to be clear, Your Honor, the 32 they have asked

23   for does not include a number of party depositions that they

24   have told us are coming.  It does not include Mr. Larian; it

25   doesn't include Mr. Brewer; it doesn't include what Mr. Proctor    02:44

proposed, that this Court rejected during phase one as an

endless number of hours of 30(b)(6) depositions.

So what we proposed in response was an hour's limit.

We said "Let's set an hour's limit; that will force, just like

trial, force everybody to be efficient, to go get what they                    02:45

really need.  Let's do it that way instead."

So that's the issue that is presently pending before

Discovery Master O'Brien.

**THE COURT:**  What about my thoughts concerning

separating out the remainder of this case?  What's your initial        02:45

reaction?

And I know that puts you on the spot, but what's your

initial reaction?

**MS. HURST:**  As the Court knows, we did suggest a stay

of the case pending resolution by the Ninth Circuit.  We               02:45

obviously did not include within that a request for stay of the

Court's injunctive relief, or anything like that.  That's been

addressed repeatedly before.  We're not going there,

Your Honor.

The problem is now these RICO claims are kind of a                  02:45

house of cards.  And if you take away the Wachovia debt

transaction, which was characterized in their reply brief on

this motion as a "scheme whose essence is deception"; that's

the quote on this motion.  In the clarification reply brief,

Your Honor, they called it "an attempted encumbrance of the            02:46

1    Bratz intellectual property."

2           I think the people writing those two briefs need to

3    meet each other over there at the Quinn law firm.

4           This is crazy.  It's crazy out of control on this

5    Wachovia debt transaction thing.                          02:46

6           On Friday when Mr. Kadisha testified, Your Honor, he

7    said he's known Bob Eckert, the CEO for Mattel, for years

8    through their participation in the Young President's

9    Organization and the World President's Organization, and that

10   when he, in leading the OMNI 808 buyout of the Wachovia debt   02:46

11   transaction, when he did that, he called Mr. Eckert to tell him

12   that he was going to engage or had just engaged in that

13   transaction.

14          Your Honor, that means that Mr. Kadisha's testimony

15   turns out to be accurate with his recollection, and everything   02:47

16   else, that Mattel has come in here in the last ten months with

17   emergency applications for receivers, forensic auditors,

18   permanent receivers, monitors, you name it, every act they have

19   taken to put the Court's close supervision of MGA's daily

20   business activity was founded on a false premise that somehow   02:47

21   MGA had tried to conceal this transaction, to which,

22   Your Honor, it wasn't even a party.  All of that was done after

23   Mr. Kadisha called Bob Eckert and told him about this

24   transaction.

25          **THE COURT:**  Getting back to the Court's question...   02:47

```
 1              MS. HURST:  Apologies, your Honor.

 2              It can be done, Your Honor.

 3              THE COURT:  Your sense is that it should stay

 4    unified.

 5              MS. HURST:  Well, my sense is that there should not      02:48

 6    be an amendment permitted, Your Honor.  Not for this case.

 7    Adding defendants, Your Honor, I don't think in fairness I

 8    could say anything other than that adding defendants would

 9    force a continuance of the trial.  I mean, of course they would

10    want to have adequate time to prepare themselves.              02:48

11              THE COURT:  But we've already had this one amendment

12    that has brought in, at least in part, the Wachovia debt

13    transaction.  I use that phrase, and I'm trying to be as

14    neutral as I can in terms of my characterization, because I do

15    know that you both characterize this transaction vastly          02:48

16    differently, and I'm trying to go to great lengths to make sure

17    it's understood that nothing has been established, at least in

18    this courtroom.

19              MS. HURST:  Thank you, Your Honor.

20              THE COURT:  But the thought would be is there some       02:48

21    value in taking that out for the time being?  Let's get through

22    what I think Mr. Quinn referred to as the older RICO claims,

23    getting that done and behind us, and then focus just on this

24    Wachovia debt transaction.

25              Perhaps not.  If it is the house of cards, as you're     02:49
```

1    suggesting, perhaps it is so inextricably intertwined that it

2    would not be prudent to separate them.  I'm just trying to come

3    up with the best way to go forward at this point, given where

4    we're at.

5         **MS. HURST:**  Your Honor, I appreciate the Court's          02:49

6    inquiry.  I think the problem is that it's a terrible catch-22

7    for MGA.  The burden and expense of this litigation is so

8    enormous that when MGA makes its motion for summary judgment on

9    the RICO claims, we'd like to dispose of them entirely,

10   Your Honor.                                                        02:49

11        **THE COURT:**  Okay.

12        **MS. HURST:**  I think that's probably a fair answer to

13   your question.

14        **THE COURT:**  Fair enough.

15        I would be remiss if I did not raise the issue of           02:49

16   settlement.  I know there was a lot of talk about this over the

17   course of the summer.  I have not heard anything about that

18   since.  I know that Ambassador Prosper made some efforts;

19   Judge Tevrizian has been involved; the Court had a brief

20   conversation with both principal CEOs.                            02:50

21        Is there any sense of trying to resolve this case at

22   this point?  Is there anything that can be done along those

23   lines?  Is there anything that the Court can do to help

24   facilitate that?

25        **MS. HURST:**  Yes.  And, Your Honor, that is --            02:50

1    **MR. ZELLER:**  I'm sorry, but if we're going to talk

2    about this, I would prefer to do it at side-bar or off the

3    record.  Because once we get into it, there's a little bit in

4    terms of some personal scheduling for people, and that kind of

5    thing, which I think is better not said in open court.                    02:50

6        **THE COURT:**  Fair enough.  When it comes to

7    settlement, I'm willing to be -- I want to be comfortable in

8    what we are doing.

9        **MS. HURST:**  I was not going to get into any details,

10   other than to say that part of MGA's frustration is that the              02:50

11   ball was in Mattel's court.

12       **THE COURT:**  That's precisely the type of public

13   statement that I think Mr. Zeller was asking for you not to

14   make.  We need to be respectful of that when we go down this

15   road.                                                                     02:51

16       **MS. HURST:**  Thank you, your Honor.

17       **THE COURT:**  I'm going to strike that last statement

18   from the record.  Let's not do that.  We've had trouble with

19   that before; people just making statements that they --

20       **MS. HURST:**  I'm happy to approach for side-bar,                   02:51

21   Your Honor.  I did not understand that was the focus of

22   Mr. Zeller's comments.

23       **THE COURT:**  I don't know for sure if it was or it was

24   not.

25       **MR. ZELLER:**  It absolutely was, because I knew this              02:51

```
 1   exact accusation was --

 2            THE COURT:  This is not constructive, so let's stop

 3   this.

 4            Is there anything further on this motion, on the

 5   motion to amend the scheduling order, from MGA's perspective?        02:51

 6            MS. HURST:  No.  Thank you, your Honor.  We would

 7   submit.

 8            THE COURT:  Is there anything further from Mattel?

 9            MR. QUINN:  Your Honor, in terms of carving out the

10   Wachovia part of the case, it sounds like that's something they      02:51

11   would prefer not to do.

12            It could be done, I think.  We would face some of the

13   same issues that we've now faced in carving out the present

14   phase one and phase two; I mean, some overlap; some witnesses

15   being asked to appear a second time.  I think it probably could      02:52

16   be done.  It's something that frankly we have not thought of

17   before the Court raised it.

18            If it's something that the Court would like to see a

19   proposal on, what that might look like, I'm sure we could meet

20   and confer, if the other side is interested, and try to put          02:52

21   something forward.

22            It would require some disentangling, and I think we

23   would have to confront the fact going in that potentially there

24   would be duplicate testimony, because they do overlap to some

25   degree, particularly in the RICO claims.                             02:52
```

 1          THE COURT:  We had some of those problems when we

 2     first tried to distance phase one and phase two.  If it doesn't

 3     make sense, it doesn't make sense.  But both of you should

 4     think about that between now and our next hearing.

 5          Our next hearing is October -- when did I say it was?     02:53

 6          MR. ZELLER:  I believe it was October 1st,

 7     Your Honor.

 8          THE COURT:  So the 1st of October.  And we set that

 9     for a Thursday, keeping it away from a Monday, because I assume

10     everyone will have lots to say on October 1st.                 02:53

11          MR. QUINN:  To get back to the motion to amend the

12     schedule, Your Honor.  Even if nothing else is done with the

13     case, even if the existing complaint is not amended at all, I

14     do come back to the predicament we find ourselves in.

15          The Court had set a schedule.  We had actually asked      02:53

16     for more time when the Court set the schedule originally.  We

17     sort of bit our lips and said "We're going to have to do what

18     we have to do to meet these deadlines."  And we've encountered

19     what we've encountered:  The stays; the requirement that we

20     make these motions.  And we find ourselves where we are now, at 02:53

21     a very preliminary stage.

22          There's an obligation to disclose expert witnesses, I

23     think, on October 16th, and we're just -- given where we are,

24     that frankly is not realistic, Your Honor, even on the existing

25     complaint.                                                     02:54

1          **THE COURT:**  Okay.

2          Thank you, counsel.

3          **MS. HURST:**  There's just one thing that I wanted to

4     add.

5          We are trying to keep this within the current scope      02:54

6     of the claims, but if the Court were to permit amendment and to

7     vacate dates, then MGA also would likely have supplementation

8     and/or amendment of its claims, Your Honor.

9          **THE COURT:**  It would be very helpful to have that --

10    it would be nice to consider that all at once.                02:54

11         Would you be in a position to --

12         **MS. HURST:**  I think we can get it on file for the

13    October 1st hearing date.

14         **THE COURT:**  That would make a lot of sense to have --

15    if there are going to be more claims being brought in against  02:54

16    Mattel, to have those considered all at once.

17         **MS. HURST:**  All right, Your Honor.  Thank you.

18         **THE COURT:**  Very good.

19         I am going to deny at this point the motion to amend

20    the scheduling order.  Neither side should take too much solace  02:55

21    in that.  Mattel needs to understand that they cannot bank on a

22    continuance, and MGA has to understand that I really take you

23    at your word that any inefficiencies -- you referred to the

24    inefficiencies -- any inefficiencies in the past will be set

25    aside.  You really hold the ability to keep this thing under    02:55

Monday, August 31, 2009                    CV 04-09049-SGL

```
 1   control in your hands by getting the discovery that Mattel is

 2   entitled to.  And, of course, vice versa.

 3         I just don't think right now is the time to amend the

 4   scheduling order.

 5         I will look forward to seeing you on October 1st.        02:55

 6         I do want to speak to you briefly at side-bar about

 7   the settlement issue; so Mr. Zeller or Mr. Quinn, and whoever

 8   would like to come forward.

 9         Is there anything else we need to take up at this

10   time?                                                          02:56

11         MS. HURST:  No, your Honor.

12         MR. QUINN:  No, your Honor.

13         THE COURT:  Very well.

14         We'll go off the record.  I'll speak briefly with

15   counsel off the record at side-bar.                           02:56

16         (Off the record discussion.)

17         (Proceedings are concluded.)

18                        CERTIFICATE

19

20   I hereby certify that pursuant to section 753, title 28, United
     States Code, the foregoing is a true and correct transcript of
21   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
22   conformance with the regulations of the Judicial Conference of
     the United States.

23

24   _____          _____
     THERESA A. LANZA, CSR, RPR                  Date
25   Federal Official Court Reporter
```

Monday, August 31, 2009                CV 04-09049-SGL