# Exhibit B

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2    John B. Quinn (Bar No. 90378)
     (johnquinn@quinnemanuel.com)
3    Michael T. Zeller (Bar No. 196417)
     (michaelzeller@quinnemanuel.com)
4    Jon D. Corey (Bar No. 185066)
     (joncorey@quinnemanuel.com)
5    Duane R. Lyons (Bar No. 125091)
     (duanelyons@quinnemanuel.com)
6  865 South Figueroa Street, 10th Floor
   Los Angeles, California  90017-2543
7  Telephone: (213) 443-3000
   Facsimile: (213) 443-3100

8  Attorneys for Plaintiff Mattel, Inc.

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11 | MATTEL, INC., a Delaware | CASE NO. CV 04-9049 SGL (RNBx)
   | corporation,
12 |                          | Consolidated With Case No. 04-9059 and
   |             Plaintiff,   | Case No. 05-2727
13 |
   |      v.                  | MATTEL, INC.'S FIRST AMENDED
14 |                          | COMPLAINT FOR:
   | MGA ENTERTAINMENT, INC., a
15 | California corporation; ISAAC | 1.  COPYRIGHT INFRINGEMENT;
   | LARIAN, an individual; CARTER | 2.  VIOLATION OF THE
16 | BRYANT, an individual; MGA    |     RACKETEER INFLUENCED AND
   | ENTERTAINMENT (HK) LIMITED,   |     CORRUPT ORGANIZATIONS
17 | a Hong Kong Special Administrative |  ACT;
   | Region business entity; MGAE DE | 3.  CONSPIRACY TO VIOLATE THE
18 | MEXICO, S.R.L. DE C.V., a      |     RACKETEER INFLUENCED AND
   | Mexico business entity; CARLOS |     CORRUPT ORGANIZATIONS
19 | GUSTAVO MACHADO GOMEZ, an      |     ACT;
   | individual; and DOES 4 through 10, | 4.  MISAPPROPRIATION OF TRADE
20 |                          |     SECRETS;
   |             Defendants.   | 5.  BREACH OF CONTRACT;
21 |                          | 6.  INTENTIONAL INTERFERENCE
   |                          |     WITH CONTRACT;
22 | AND CONSOLIDATED CASES   | 7.  BREACH OF FIDUCIARY DUTY;
   |                          | 8.  AIDING AND ABETTING
23 |                          |     BREACH OF FIDUCIARY DUTY;
   |                          | 9.  BREACH OF DUTY OF
24 |                          |     LOYALTY;
   |                          | 10. AIDING AND ABETTING
25 |                          |     BREACH OF DUTY OF
   |                          |     LOYALTY;
26 |                          | 11. CONVERSION;
   |                          | 12. UNFAIR COMPETITION; AND
27 |                          | 13. DECLARATORY RELIEF.
28 |                          | DEMAND FOR JURY TRIAL

/7934/2001691.1

## Preliminary Statement

1.     For years defendant MGA Entertainment, Inc. has engaged in a pattern of stealing and using Mattel, Inc.'s property and trade secrets. MGA's use of the stolen property and trade secrets caused and continues to cause significant harm to Mattel. MGA first stole "Bratz," a fashion doll, from Mattel, and then continued stealing Mattel's confidential and proprietary information to fuel MGA's growth.

2.     Defendant Carter Bryant conceived, created and developed Bratz designs while he was employed by Mattel as a doll designer. He concealed his Bratz work from Mattel and wrongfully sold Bratz to MGA while time that he was a Mattel employee. As MGA knows, Mattel owns the Bratz designs that Bryant made. As the rightful owner of those Bratz designs, Mattel has registered copyrights for them and seeks damages arising from MGA's repeated infringement of those copyrights.

3.     Emboldened by the success of its illegal conduct, MGA has repeated—and even expanded—its pattern of theft on numerous occasions. For example, in or about 2004, MGA decided to expand into Mexico. To do so, and operating from its Southern California offices, MGA hired away three key Mattel employees in Mexico, who, on their way out, stole virtually every category of Mattel's sensitive and trade secret business plans and information for the Mexican market, as well as a significant quantity of sensitive and trade secret information for Mattel's U.S. and worldwide businesses, and took them to MGA. Armed with Mattel's confidential business plans and methods, MGA claimed to have increased its market share in Mexico alone by 90% in a single year.

4.     In 2005, MGA needed help in Canada. So MGA, again operating from its Southern California headquarters, hired Janine Brisbois from Mattel. At that time, Ms. Brisbois was responsible for Mattel's account with Toys 'R Us ("TRU") and Wal-Mart. MGA gave her responsibility for those same

FIRST AMENDED COMPLAINT

1  accounts, and she took from Mattel documents containing proprietary advertising,

2  project, sales, customer and strategy information for not only Canada, but for the

3  United States.  Eliminating any doubt that MGA then proceeded to use those stolen

4  materials, Brisbois subsequently accessed and modified certain of those Mattel

5  documents while employed by MGA.

6          5.      These are not the only instances of such misconduct, which

7  MGA orchestrated and carried out from its headquarters in this District.

8  Defendants have engaged in an ongoing, widespread pattern of illegal acts,

9  consisting of inducing Mattel employees to steal Mattel's confidential information

10  or other property and take it with them to MGA to further MGA's business interests

11  and to harm Mattel.

12                          **Jurisdiction**

13          6.      This Court has federal question jurisdiction over this action

14  pursuant to 28 U.S.C. §§ 1331, 17 U.S.C. §§ 101 *et seq.*, and 18 U.S.C. § 1964(c).

15  This Court has supplemental jurisdiction over Mattel's state law claims pursuant to

16  28 U.S.C. § 1367.

17                          **Venue**

18          7.      Venue is proper in this District pursuant to 28 U.S.C.

19  §§ 1391(b)-(d), 1391(f) and 1400(a) and 18 U.S.C. § 1965.

20                          **Parties**

21          8.      Mattel is a corporation organized and existing under the laws of

22  the State of Delaware, with its principal place of business in El Segundo,

23  California.

24          9.      Defendant MGA Entertainment, Inc. ("MGA") is a corporation

25  organized and existing under the laws of the State of California, with its principal

26  place of business in Van Nuys, California.  Mattel is informed and believes, and on

27  that basis alleges, that ABC International Traders, Inc. is a predecessor corporation

28  to MGA and that until September 16, 2002, MGA was incorporated and known as

7934/2001691.1

-2-

1  ABC International Traders, Inc.  Upon the filing of the Complaint, Mattel, being
2  ignorant of the nature, extent and scope of MGA Entertainment, Inc.'s involvement
3  and complicity in the conduct alleged therein and having designated MGA
4  Entertainment, Inc. in the Complaint as Doe 1 and having discovered its
5  involvement and complicity, Mattel hereby amends this Complaint by substituting
6  MGA Entertainment, Inc. for the fictitious Doe name Doe 1.

7         10.    Defendant Carter Bryant ("Bryant") is an individual who
8  formerly was employed by Mattel and has worked for and continues to work as a
9  contactor for MGA.  Mr. Bryant currently resides in the State of Missouri.

10        11.    Defendant MGA Entertainment (HK) Limited is a business entity
11  organized and existing under the laws of the Hong Kong Special Administrative
12  Region, with its principal place of business in Hong Kong.  Upon the filing of the
13  Complaint, Mattel, being ignorant of the nature, extent and scope of involvement
14  and complicity of MGA Entertainment (HK) Limited in the conduct alleged therein
15  and having designated MGA Entertainment (HK) Limited in the Complaint as Doe
16  2 and having discovered its involvement and complicity, Mattel hereby amends this
17  Complaint by substituting MGA Entertainment (HK) Limited for the fictitious Doe
18  name Doe 2.

19        12.    Defendant MGAE de Mexico, S.R.L. de C.V. ("MGA de
20  Mexico") is a business entity organized and existing under the laws of Mexico,
21  with its principal place of business in Mexico City, Mexico.

22        13.    Mattel is informed and believes, and on that basis alleges, that
23  defendant Larian is the President and CEO of MGA and an individual residing in
24  the County of Los Angeles.   Upon the filing of the Complaint, Mattel, being
25  ignorant of the nature, extent and scope of involvement and complicity of Larian in
26  the conduct alleged therein and having designated Larian in the Complaint as Doe 3
27  and having discovered his involvement and complicity, Mattel hereby amends this
28  Complaint by substituting Larian for the fictitious Doe name Doe 3.

07934/2001691.1

-3-

FIRST AMENDED COMPLAINT

14.   Defendant Carlos Gustavo Machado Gomez is an individual who is employed by defendant MGA and who, on information and belief, currently resides in the County of Los Angeles.

15.   The true names and capacities of defendants sued herein as DOES 4 through 10, inclusive, are unknown to Mattel, which therefore sues said defendants by such fictitious names. Mattel will amend this First Amended Complaint to allege their true names and capacities when the same are ascertained.

**Factual Background**

**I.   MATTEL**

16.   Mattel manufactures and markets toys, games, dolls and other consumer products. Harold Mattson and Eliot and Ruth Handler founded Mattel in 1945. The name of the company was created by incorporating the names of two of its founders, "MATT-son" and "EL-liot." Originating from the Handlers' garage in Southern California, the company greatly expanded its operations following World War II. During the next several decades, Mattel became famous for producing high-quality products at reasonable prices.

17.   Critical to Mattel's success is its ability to design and develop new products. Mattel invests millions of dollars in product design and development and introduces hundreds of new products each year. Mattel maintains a 180,000 square-foot design center in El Segundo, California, that houses hundreds of designers, sculptors, painters and other artists, who work exclusively to create the products on which Mattel's business depends.

18.   Mattel also has invested substantial amounts over many years to develop its business methods and practices, including, without limitation, its marketing and advertising research, plans, methods and processes; its business research and forecasts; its costs, budgets, pricing, credit terms, deal terms and finances; its manufacturing, distribution, and sales methods and processes; and its

-4-

inventory methods and processes.  These represent a material part of the intellectual infrastructure of Mattel and are highly valuable.

## II.    MGA ENTERTAINMENT

19.    Defendant MGA is also a toy manufacturer.  MGA began as a consumer electronics business, but expanded into the toy business with licenses to sell handheld electronic games.  By approximately late 1999 or early 2000, MGA developed a strategy to expand its business and compete directly with Mattel by launching a fashion doll line, so it stole a fashion doll that was owned by Mattel -- "Bratz."

20.    MGA intentionally stole not just specific Mattel property, such as Bratz designs, prototypes and related materials, but also a vast array of trade secrets and other confidential information that comprise Mattel's intellectual infrastructure.  MGA's rapid growth was not organic, but rather was based upon its theft of Bratz.  As a result, MGA lacked an appropriate intellectual infrastructure for a company of its size and it became increasingly difficult to manage.  To deal with these problems, as detailed below, time and time again MGA simply stole Mattel's proprietary business methods, practices and information.  This not only allowed MGA to avoid expending time, money and effort necessary to build a legitimate business, but also allowed MGA to unfairly compete against Mattel by taking Mattel's playbook.

## III.    MGA STEALS A NEW LINE OF FASHION DOLLS FROM MATTEL

21.    Defendant Carter Bryant is a former Mattel employee.  Bryant joined Mattel in September 1995, where he worked in Mattel's Design Center as a BARBIE product designer.  In or about April 1998, Bryant resigned his position with Mattel and moved to Missouri to live with his parents.  Late in 1998, Bryant applied to Mattel to be rehired.  On January 4, 1999, he began working at Mattel in Mattel's Design Center, again as a product designer, for Mattel's BARBIE collectibles line.

22.   Upon his return to Mattel in January 1999, Bryant executed an Employee Confidential Information and Inventions Agreement (the "Employment Agreement"), a true and correct copy of which is attached hereto as Exhibit A.

23.   Pursuant to his Employment Agreement and as a condition of and in consideration for his employment, Bryant agreed, among other things, that he held a position of trust with Mattel, that the designs and inventions he created during his Mattel employment (with certain exceptions not relevant here) were owned by Mattel, and that he would be loyal to the company by agreeing not to assist or work for any competitor of Mattel while he was employed by Mattel.

24.   On January 4, 1999, Bryant also executed Mattel's Conflict of Interest Questionnaire (the "Conflict Questionnaire"). Among other things, Bryant certified in the Conflict Questionnaire that, other than as disclosed, he had not worked for any competitor of Mattel in the prior twelve months and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest. Bryant understood what the Conflict Questionnaire required because, among other things, he disclosed on it the freelance work he had performed while in Missouri for Ashton-Drake, which is unrelated to the conduct alleged herein. A true and correct copy of the Conflict Questionnaire executed by Bryant is attached hereto as Exhibit B.

25.   Pursuant to the Conflict Questionnaire, Bryant also agreed that he would immediately notify his supervisor of any change in his situation that would cause him to change any of the foregoing certifications. Despite this obligation, at no time did Bryant disclose to Mattel that he was engaging in any business venture or transaction with MGA or any other Mattel competitor.

26.   More specifically, while Bryant was employed by Mattel, Bryant and other defendants misappropriated and misused Mattel property and Mattel resources for the benefit of Bryant and MGA. Such acts included, but are not limited to, the following:

FIRST AMENDED COMPLAINT

07934/2001691.1

1          a.     using his exposure to Mattel development programs to
2  create the concept, design and name of Bratz;

3          b.     using Mattel resources, and while employed by Mattel,
4  Bryant worked by himself and with other Mattel employees and contractors to
5  design and develop Bratz, including without limitation by creating drawings and
6  three-dimensional models of Bratz dolls, and fashion designs for the dolls'
7  associated clothing and accessories; and

8          c.     using Mattel resources, and while employed by Mattel,
9  Bryant took steps to assist MGA to produce Bratz dolls.

10      27.   During the time that he was employed by Mattel and thereafter,
11  Bryant concealed these actions from Mattel, including by failing to notify his
12  supervisor of the conflict of interest he created when he began working on MGA's
13  behalf and when he began receiving payments from MGA. Bryant additionally
14  enlisted other Mattel employees to perform work on Bratz during the time he was
15  employed by Mattel and, by all indications, in at least some cases led them to
16  believe that they were performing work on a project for Mattel.

17      28.   Bryant also made affirmative misrepresentations to Mattel
18  management and employees immediately before his departure from Mattel on
19  October 20, 2000. For example, during Bryant's exit interview in October 2000, he
20  told the Mattel Human Resources representative who conducted the interview that
21  he was leaving Mattel to engage in non-competitive work. During his last few
22  weeks at Mattel, Bryant told his co-workers and supervisors that he was going to
23  leave Mattel for "non-competitive" pursuits. Bryant's representations to his
24  supervisors and his co-workers were false. Bryant knew at the time that those
25  representations were false and made those false statements to conceal from Mattel
26  the fact that he was already working with MGA and that he had contracted with
27  MGA to assign Bratz works to MGA and to provide design and development
28  services to MGA, a Mattel competitor.

-7-

29.   As a result of the efforts of Bryant and other Mattel employees working on Bratz (which were done without Mattel's knowledge), the Bratz dolls had been designed and were far along in development during the time that Bryant was employed by Mattel and prior to the time that Bryant left Mattel on October 20, 2000.  Not only did Bryant create and develop designs for the dolls as well as other aspects of the products such as their fashion accessories during the time he was employed by Mattel, but MGA showed finished Bratz prototypes and/or product to both focus groups and retailers in November 2000, less than three weeks after Bryant left Mattel.  Bryant, Larian and others at MGA arranged these meetings and focus groups while Bryant was still employed by Mattel.

30.   Bryant and MGA employees also repeatedly and continuously communicated with employees of MGA Entertainment (HK) Limited on subjects such as design and manufacturing of Bratz.  On information and belief, at all material times, MGA Entertainment (HK) Limited has maintained regular and continuous contacts with persons in the County of Los Angeles; it regularly has shipped products that it manufactures, or that are manufactured for it, to the County of Los Angeles; and such products have been distributed to retailers and sold to consumers in the County of Los Angeles.

31.   Bratz also were shown to retailers at the Hong Kong Toy Fair in January 2001.  By early 2001, only a few months after Bryant resigned from Mattel, MGA began having the Bratz fashion doll line and accessories manufactured and then, shortly thereafter, began selling them at retail.

32.   Since 2001, MGA has distributed and sold Bratz and Bratz-related products throughout the world.  Mattel is informed and believes that MGA also licenses Bratz to third parties.  Mattel is also informed and believes that MGA derives annual revenue from its sales and licenses of Bratz in excess of $500 million.  Mattel is further informed and believes that MGA and Bryant claim current ownership of Bratz, and all copyrights and copyright registrations attendant

7934/2001691.1

-8-

1 thereto. MGA continues to market, sell and license Bratz and has expressed an

2 intention to continue to do so.

3        33.    Mattel is informed and believes that MGA and Larian

4 encouraged, aided and financed Bryant to develop Bratz, knowing full well that

5 Bryant was still employed by Mattel at the time and that by performing such work,

6 including design-related work, for his own benefit and/or the benefit of MGA,

7 Bryant would be, and was, in breach of his contractual, statutory and common law

8 duties to Mattel. Mattel is also informed and believes that MGA proceeded to aid

9 and encourage Bryant to develop Bratz with the goal of obtaining a valuable

10 fashion doll line that would be commercially successful in the competitive, multi-

11 billion dollar market for fashion dolls.

12        34.    Pursuant to Bryant's contract with Mattel, among other things,

13 Mattel is the true owner of Bratz designs and works, including those specifically

14 that were conceived, created or reduced to practice during Bryant's Mattel

15 employment as well as all designs and works that are or have been derived

16 therefrom. Defendants' continued use, sale, distribution and licensing of Bratz thus

17 infringes upon Mattel's rights, injures Mattel and unlawfully enriches the

18 defendants.

19        35.    Bryant and MGA deliberately and intentionally concealed facts

20 sufficient for Mattel to suspect or to know that it was the true owner of Bratz.

21 Their acts of concealment include, but are not limited to, concealing the fact that

22 Bryant conceived, created, designed and developed Bratz while employed by

23 Mattel, including by tampering with and defacing documents which showed that, in

24 fact, Bryant was a Mattel employee while he was working for and with MGA;

25 concealing the fact that Bryant worked with and assisted MGA during the time

26 Bryant was employed by Mattel and was compensated for that assistance;

27 concealing that Bryant was providing consulting services to MGA; concealing

28 Bryant's role in Bratz by falsely claiming that Larian and others were the creators

of Bratz; and concealing the fact that Mattel was the true owner of Bratz by, among other things, filing fraudulent registrations and/or amendments to registrations with the United States Copyright Office claiming MGA as the author of Bratz as a work for hire and altering relevant dates on such documents to further obscure the true facts of when the works were created.

36.   Because of Bryant's and MGA's acts of concealment and Bryant's misrepresentations to Mattel, Mattel had no reason to suspect that Bryant had worked with MGA, or assisted MGA, while he still employed by Mattel until approximately November 24, 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's agreement with MGA which showed that the date of Bryant's agreement with MGA predated Bryant's departure from Mattel.  It was then, as a result, that Mattel learned for the first time that Bryant had secretly aided, assisted and worked for and with MGA while employed at Mattel and in violation of his Mattel Employment Agreement.  Specifically, Bryant's agreement with MGA obligated Bryant to provide product design services to MGA on a "top priority" basis.  Bryant's agreement with MGA also provided that Bryant would receive royalties and other consideration for sales of products on which Bryant provided aid or assistance; that all works and services furnished by Bryant under the agreement, including those he purportedly provided while still a Mattel employee, purportedly would be considered "works for hire" of MGA; and that all intellectual property rights to preexisting works by Bryant, including Bratz designs, purportedly were assigned to MGA.

## IV.  MGA STEALS MATTEL TRADE SECRETS IN MEXICO

37.   On information and belief, in or about late 2003 or early 2004, MGA decided to open business operations in Mexico.  Faced with the difficult task of developing an overall strategy for expanding into a market in which it had only a nominal presence and no operations, MGA elected to steal Mattel's plans, strategy and business information for the Mexican market and materials related to Mattel's

worldwide business strategies. As detailed below, MGA and Larian approached three employees of Mattel's Mexican subsidiary ("Mattel Mexico"), enticed them to steal Mattel's most sensitive business planning materials, and then hired them to assist in establishing and running MGA's new Mexican subsidiary.

**A.    MGA Hires Three Senior Mattel Employees in Mexico**

38.    Carlos Gustavo Machado Gomez ("Machado") was the Senior Marketing Manager, Boys Division, for Mattel Mexico, a position of trust and confidence. He was employed at Mattel Mexico from April 1, 1997 until April 19, 2004. His duties included short, medium and long-term marketing planning, generating product sales projections, and assisting in creation of the media plan. In his position, Machado had access to highly confidential and sensitive marketing and product development information. Machado had an employment agreement with Mattel in which he agreed to maintain the confidentiality of Mattel's protected information. Mattel's policies also required Machado to protect Mattel's proprietary information and not to disclose it to competitors.

39.    Mariana Trueba Almada ("Trueba") was the Senior Marketing Manager, Girls Division, for Mattel Mexico, a position of trust and confidence. She was employed at Mattel Mexico from November 3, 1997 until April 19, 2004. Like Machado, her duties included short, medium and long-term marketing planning, generating product sales projections, and assisting in creation of the media plan. In her position, Trueba had access to highly confidential and sensitive marketing and product development information. Trueba had an employment agreement with Mattel in which she agreed to maintain the confidentiality of Mattel's protected information. Mattel's policies also required Trueba to protect Mattel's proprietary information and not to disclose it to competitors.

40.    Pablo Vargas San Jose ("Vargas") was a Senior Trade Marketing Manager with Mattel Mexico, a position of trust and confidence. He was employed at Mattel Mexico from March 29, 2001 until April 19, 2004. Vargas was

1  responsible for ensuring that point-of-sale promotions were carried out, analyzing

2  the results of such promotions, negotiating promotion budgets, and generally

3  managing promotional activities.  Vargas also had access to highly confidential and

4  sensitive marketing and product development information.  Vargas had an

5  employment agreement with Mattel in which he agreed to maintain the

6  confidentiality of Mattel's protected information.  Mattel's policies also required

7  Vargas to protect Mattel's proprietary information and not to disclose it to

8  competitors.

9       41.  Beginning in late 2003 or early 2004, Machado, Trueba and

10  Vargas began planning to leave Mattel Mexico to join MGA.  In connection with

11  that plan, and with the encouragement of Larian and other MGA officers operating

12  in the United States, they began accessing, copying and collecting proprietary

13  Mattel documents to take with them.  On April 19, 2004, Machado, Trueba and

14  Vargas each resigned their positions with Mattel, effective immediately.  They

15  stated that they had been hired by a Mattel competitor, but refused to identify that

16  competitor.  In fact, they had been offered and accepted employment by MGA to

17  establish and run MGA's new operation in Mexico.

18  **B.  Machado, Trueba and Vargas Stole Dozens of Confidential Trade**

19       **Secret Marketing and Sales Documents for MGA's Benefit**

20       42.  Following these resignations, Mattel discovered that Machado,

21  Trueba and Vargas had been in frequent telephonic and e-mail contact with MGA

22  personnel, including Larian, for over three months prior to their resignations.  The

23  primary vehicle for these communications in furtherance of their "plot" was an

24  America Online e-mail account with the address <plot04@aol.com>.  On

25  information and belief, during this time, Machado, Trueba and Vargas supplied

26  Larian with certain Mattel confidential and proprietary information in order to

27  prove their value to MGA and to improve their negotiating position vis-à-vis their

28  respective employment contracts with MGA.

FIRST AMENDED COMPLAINT

Exhibit B - Page 18

43.   In March 2004, Machado, Trueba and Vargas were making plans to travel from Mexico to Los Angeles to meet with MGA personnel in person prior to resigning their positions at Mattel. Also, by at least March 3, 2004, Machado, Trueba and Vargas were discussing with MGA personnel, including Larian, specific details regarding setting up MGA offices in Mexico City. On information and belief, prior to their resignations, Larian and others at MGA directed Machado, Trueba and Vargas to steal virtually all Mattel confidential and proprietary information that they could access and bring it with them to MGA. This was reflected in, among things, e-mail messages that Mattel had discovered after Machado, Trueba and Vargas had resigned. For example, on March 22, 2006, approximately one month before they resigned, Machado, Trueba and Vargas wrote an e-mail message from the <plot04@aol.com> e-mail account addressed to Larian, MGA's General Manager Susan Kuemmerle and another MGA officer Thomas Park. In that e-mail message, Machado, Trueba and Vargas sought to prove their value in this endeavor to MGA by writing: "Attached you will find our analysis for future discussion. We will be available during the nights of the week after 16:30 Los Angeles time . . . ." In another e-mail message, showing that the participants intentionally sought to maximize the damage to Mattel from their conduct, Kuemmerle wrote to Larian and Park: "Gustavo, Mariana and Pablo want to resign (all at the same time, and you can believe my smile!) next Wednesday."

44.   Beginning on April 12, 2004, a week before his resignation and after numerous communications and meetings with Larian and other MGA personnel, Machado began transferring additional Mattel confidential and proprietary information to a portable USB storage device (also know as a "thumb drive") that he connected to his Mattel computer. On Friday, April 16, 2004, the last business day before he gave notice, Machado copied at least 70 sensitive documents to the portable USB storage device.

45. Starting on April 12, 2004, Vargas also copied a host of confidential and proprietary materials to a portable USB storage device, including sales plans, sales projections and customer profiles.

46. On April 16, 2004, Trueba also copied Mattel confidential and proprietary information to a portable USB storage device connected to her Mattel computer.

47. With full knowledge that she was going to leave Mattel for a competitor, Trueba also took steps to increase further her access to Mattel's confidential information shortly before her resignation. For example, just four days before leaving, Trueba went out of her way to seek to attend a meeting at which Mattel personnel analyzed BARBIE programs for the United States, Canada and South America. Two days before her resignation, she contacted both a Mattel employee located in El Segundo, California and Mattel's advertising agency to request updated confidential information about advertising plans for BARBIE. On information and belief, Trueba acted at the direction of MGA and Larian and did so in order to obtain further information that would allow MGA to obtain unfair competitive advantage over Mattel.

48. Machado, Trueba and Vargas stole virtually every type of document a competitor would need to enter the Mexican market and to unlawfully compete with Mattel in Mexico, in the United States, and elsewhere. They stole global internal future line lists that detailed anticipated future products, production and shipping costs for Mattel products; daily sales data for Mattel products; customer data; sales estimates and projections; marketing projections; documents analyzing changes in sales performance from 2003 to 2004; budgets for advertising and promotional expenses; strategic research reflecting consumer responses to products in development; media plans; consumer comments regarding existing Mattel products customer discounts and terms of sale; customer inventory level data; assessments of promotional campaign success; market size historical data and

1  projections; marketing plans and strategies; merchandising plans; retail pricing and

2  marketing strategies; and other similar materials.

3         49.   The stolen data was not limited to the Mexican market.  The

4  information stolen would, and did, give MGA an unfair competitive advantage in

5  the United States and around the world.  Further, the stolen information was not

6  located exclusively in Mexico, but included confidential and proprietary

7  information that resided on Mattel computers in Phoenix, Arizona and El Segundo,

8  California, and/or documents which were originally created by personnel in El

9  Segundo.  Included among these stolen documents was one of Mattel's earliest

10  internal global line lists, which included information for BARBIE products for the

11  upcoming year and included, for each product, the expected profit margin,

12  advertising expenditures, expected volume and marketing strategy.  On information

13  and belief, Machado, Trueba or Vargas delivered that internal line list to Larian or

14  another MGA officer during their negotiations with MGA.

15         50.   MGA has used the information taken from Mattel to obtain an

16  unfair advantage over Mattel, including in both the United States and Mexico.  In

17  fact, MGA later publicized its claim that, in 2005, it had increased its Mexican

18  market share by 90 percent over the prior year.  This increase came at the expense

19  of Mattel, which lost market share during 2004 in Mexico and was forced to

20  increase its advertising and promotional spending to offset further losses.

21         51.   Machado, Trueba and Vargas attempted to conceal their

22  widespread theft of Mattel's proprietary information.  For example, Machado ran a

23  software program on his Mattel personal computer in an attempt to erase

24  information, including information that would reveal the addresses to which he had

25  sent, or from which he had received, e-mail messages.  On information and belief,

26  for the same purpose Machado also damaged the hard drive of the personal

27  computer that he used at Mattel.

28

-15-

52.    On information and belief, on April 19, 2004, immediately after Machado, Trueba and Vargas simultaneously resigned, they traveled from Mexico to Los Angeles to meet with MGA personnel, including Larian, in person.

53.    Mattel notified Mexican authorities about the theft of its trade secret and confidential information.  On October 27, 2005, the Mexican Attorney General Office obtained a search warrant from the Mexican Federal Criminal Courts for MGA's facilities in Mexico City.  In that search, the Mexican authorities found and seized from MGA's offices both electronic and paper copies of a large number of documents containing Mattel trade secrets, including those that Mattel discovered through its forensic investigations, plus many others that Mattel had not known had been stolen.

54.    Based on Machado's "performance" in Mexico, Isaac Larian subsequently promoted Machado and he was transferred to MGA's main office in Van Nuys, California.  On information and belief, Machado currently resides in the County of Los Angeles, California.

V.    **MGA HIRES MATTEL'S SENIOR VICE PRESIDENT AND GENERAL MANAGER TO FACILITATE ITS THEFT AND USE OF MATTEL'S HIGHLY VALUABLE BUSINESS METHODS AND PRACTICES**

55.    On October 1, 2004, Mattel's Senior Vice President and General Manager, Ron Brawer, left Mattel and joined MGA.  Tyco Toys, Inc. ("Tyco"), a predecessor to Mattel, had hired Brawer on April 22, 1996.  The same day, Brawer entered into an Employee Invention & Trade Secret Agreement with Tyco.  On April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel, New Jersey, and remained bound by his Employee Invention & Trade Secret Agreement.

56.  In January 2003, while Brawer held a position of trust and confidence at Mattel, Mattel's "Code of Conduct" was circulated to all Mattel employees worldwide.  Included in the Code of Conduct were statements that:

> Employees and Directors have an obligation to protect the confidentiality of Mattel's proprietary information.  Proprietary information is any information not generally known to the public that is useful to Mattel, that would be useful to its competitors or other third parties or that would be harmful to Mattel or its customers if disclosed.  Proprietary information includes trade secrets, revenue and profit information and projections, new product information, marketing plans, design and development efforts, manufacturing processes and any information regarding potential acquisitions, divestitures and investments.

> We can protect the security of Mattel's proprietary information by limiting access to it.  Confidential information should not be discussed with those who are not obligated to maintain the information in confidence and in public places where the information is not likely to be kept secret, such as planes, restaurants and elevators.  The obligation to preserve confidential information continues even after employment ends.

The Code of Conduct applied to Brawer and required that he meet his obligations under the Code of Conduct.

57.  By 2003, Brawer had advanced within Mattel to a Senior Vice President position over customer marketing, a position of trust and confidence.  In his executive position, Brawer was provided access to information that was both sensitive and confidential, including, but not limited to, detailed information related to development, manufacture, marketing, pricing, shipping, and performance of

07934/2001691.1

1 Mattel's then-current and anticipated future product lines, and other confidential

2 business plans between Mattel and its most significant retail customers.

3     58.  In December 2003, Alan Kaye, Mattel's Senior Vice President of

4 Human Resources, asked Brawer whether he was discussing potential employment

5 with MGA. Brawer denied that he had been in contact with MGA and represented

6 that he would not talk to MGA. Throughout 2004, Mattel reminded and stressed to

7 its employees, including Brawer, the importance of protecting Mattel's confidential

8 and proprietary materials and information.

9     59.  On March 18, 2004, in response to a survey from the President of

10 Mattel Brands, Matt Bousquette, confirming compliance with Mattel's Code of

11 Conduct, Brawer wrote back that he "applaud[ed] the company's vigorous

12 protection of it's [sic] intellectual property," reflecting Brawer's clear

13 understanding that Mattel required its proprietary information to be kept

14 confidential.

15     60.  In April 2004, Mattel promoted Brawer to Senior Vice

16 President/General Manager. The General Manager position also is an executive

17 position of trust and confidence. The role of a General Manager is to lead a cross-

18 functional "Customer Business Team." Each General Manager is accountable for a

19 strategic partnership with a key Mattel retailer, covering all aspects of the business,

20 including both traditional toy sales and retail development of licensed products.

21     61.  In or about late May 2004, Brawer began performing General

22 Manager duties, working with one of Mattel's major retail customer accounts.

23 Thereafter, Brawer began receiving information related not only to the Senior Vice

24 President, Customer Marketing position that he still formally held, but also began

25 receiving detailed information related to his role as General Manager. Brawer

26 began requesting and analyzing detailed information related to Mattel and its four

27 key retail accounts.

28

62.   On September 15, 2004, Brawer left work at noon for observance of Rosh Hashanah.  As Brawer left, he carried a large cardboard box with binders and other materials.  Several hours after his departure, Brawer instructed his assistant to print Mattel's 2004 Sales Plan for one of Mattel's significant customers and to provide it to him, falsely claiming he needed it for a meeting

63.   On September 17, 2004, Brawer returned to Mattel and immediately informed his supervisor that he was leaving Mattel, effective October 1, 2004, to work for competitor MGA.

64.   On September 20, 2004, Mattel hand-delivered a letter to Brawer reminding him of his continuing obligation to preserve the confidentiality of Mattel's proprietary information and trade secrets not only through October 1, 2004, but continuing beyond the termination of his employment.

65.   At his exit interview on September 29, 2004, Mattel reminded Brawer that he had ongoing duties of confidentiality to Mattel, even after the termination of his employment.  Brawer was given a copy of his Original Confidentiality Agreement, which he had signed on April 22, 1996, and another copy of the Code of Conduct.  During the exit interview, however, Brawer noted that he had not signed the Code of Conduct, which he intended and Mattel understood to mean that Brawer believed he was not bound by Mattel's policy because he had not signed it.  Brawer was unwilling to complete or sign the form that sought to confirm that Brawer understood his ongoing obligations under the Code of Conduct, which included the obligation to preserve the confidentiality of Mattel's proprietary and trade secret information.

66.   On October 1, 2004, Brawer's final day of employment with Mattel, Mattel hand-delivered to Brawer a letter that, among other things, reminded Brawer of his confidentiality obligations to Mattel under the Code of Conduct.

67.   Upon joining MGA, Brawer became its Executive Vice-President of Sales and Marketing.  In that role he was responsible for MGA's sales

-19-

1   worldwide.  As part of those responsibilities, Brawer had and continues to have
2   responsibility for MGA's accounts with the same retailers that he worked with
3   while at Mattel.

4        68.    Brawer represented during his Mattel exit interview that he had
5   returned all proprietary information to Mattel.  That representation was false.  On
6   information and belief, Brawer removed proprietary and trade secret information
7   from Mattel that he did not return.  Mattel is informed and believes that Brawer did
8   not return to Mattel, for example, the information contained in his contacts file.
9   The contacts file included contact information for Mattel customers, most notably
10  TRU, and extensive contact information for Mattel employees, including titles, e-
11  mail addresses and telephone numbers.

12       69.    Mattel has recently learned that Brawer has been using that
13  contact information on a regular basis, including within recent months.  Since
14  leaving Mattel, Brawer has had contacts with Mattel employees, both by telephone
15  and by electronic mail.  Based on his knowledge of Mattel's operations and the
16  roles of certain Mattel employees, he has targeted certain Mattel employees who
17  have broad access to Mattel proprietary information in an effort to induce and
18  encourage them to join MGA and to steal or otherwise wrongfully misappropriate
19  Mattel confidential information and trade secrets.  Brawer has done so by
20  promising these Mattel employees salaries 25 percent or more higher than they earn
21  at Mattel and stating to them that they should not be concerned by legal action
22  taken by Mattel to protect its trade secrets and its rights because such claims are
23  hard to prove and easy to defeat.

24  **VI.  MGA STEALS MATTEL TRADE SECRETS IN CANADA**

25       70.    In an effort to increase its market share and sales in Canada and
26  elsewhere, MGA stole Mattel trade secrets regarding Mattel's customers, sales,
27  projects, advertising and strategy, not only for Canada, but the United States and
28  the rest of the world.

71.    Janine Brisbois was a Director of Sales for the Girls Division in Canada.  Mattel hired her as a National Account Manager in August 1999.  When she was hired as a Mattel employee, Brisbois agreed that she would preserve and would not disclose Mattel's proprietary or confidential information.  For example, Brisbois agreed:

> You must keep Mattel's Proprietary Information confidential, and you may only use or disclose such information as necessary to perform your job responsibilities in accordance with Mattel policies.  Your obligation to keep Mattel's Proprietary Information confidential will continue even after any termination of your employment with your employer.
>
> . . .
>
> Mattel takes steps to maintain the secrecy and confidential nature of Mattel's Proprietary Information and, if a competitor discovered Mattel's Proprietary Information, it could significantly damage Mattel and your Employer.

72.    While with Mattel, Brisbois had responsibility for Mattel's account with TRU and later had responsibility for Mattel's Wal-Mart account.  In her capacity as Sales Director-Wal-Mart/CTC/Girls Team, Brisbois had access to Mattel confidential and proprietary information regarding Mattel's future product lines, advertising and promotional campaigns and product profitability.

73.    On September 26, 2005, Brisbois resigned from Mattel to take a position as Vice President of Sales at MGA.  Mattel is informed and believes that in that position Brisbois has responsibility for MGA's accounts with both TRU and Wal-Mart.  During Brisbois' exit interview she was specifically asked whether she was "taking anything."  Brisbois responded, "No."  Both during and after her exit interview, Brisbois was advised by Mattel of her obligations to preserve Mattel's confidential and proprietary information.

74.    Mattel is informed and believes that Brisbois spoke with Isaac Larian, MGA's CEO, on September 22, 2005 at approximately 8:30 p.m., when he called Ms. Brisbois at her home.  Mattel subsequently learned that on the same day that she spoke with Mr. Larian and four days before she resigned, Brisbois copied approximately 45 Mattel documents on to a USB or "thumb" drive with the volume label "BACKPACK."  On information and belief, Brisbois removed the thumb drive from Mattel Canada's office by concealing it in her backpack or gym bag the last time that she left that office.  These documents contained Mattel trade secret and proprietary information, and included:

- a document containing the price, cost, sales plan and quantity of every Mattel product ordered by every Mattel customer in 2005 and 2006;
- the BARBIE television advertising strategy and information concerning sales increases generated by television advertisements;
- competitive analysis of Mattel vis-à-vis its competitors in Canada;
- an analysis of Mattel's girls business sales beginning in 2003 and forecasts through 2006;
- profit and loss reviews for Mattel's products being sold in Wal-Mart, including margins and profit in not only Canada, but in the United States and Mexico; and
- a document containing the product launch dates and related advertising for all Mattel new products between Fall 2005 and Spring 2006.

75.    After Mattel discovered that Brisbois had copied these sensitive documents to a thumb drive, Mattel notified Canadian law enforcement authorities. Canadian law enforcement authorities recovered from Brisbois a thumb drive with the volume label "BACKPACK" containing the documents that Brisbois had copied from Mattel's computer system.  Mattel later learned that while she was working as a Vice President of Sales at MGA, Brisbois accessed and modified documents on that thumb drive.

76.   After joining MGA, Brisbois repeatedly traveled to MGA's offices in Van Nuys, California and met with Larian and Brawer. In February, 2006, knowing that Mattel trade secrets had been seized from MGA's Mexico City offices and that at least three MGA employees were under criminal investigation, MGA nonetheless issued a press release trumpeting its 2005 performance, with Larian himself concluding, "Our international teams in Mexico and Canada have done a fantastic job."

## VII. MGA PERSUADES OTHER EMPLOYEES LEAVING MATTEL TO JOINT MGA TO MISAPPROPRIATE MATTEL TRADE SECRETS FOR THE BENEFIT OF MGA

77.   In the past few years, MGA has hired directly from Mattel's United States operations at least 25 employees, from Senior Vice-President level to lower level employees. On information and belief, many of these employees were specifically targeted and recruited by MGA, including by Larian and Brawer, based on the Mattel confidential and proprietary information they could access. Many of these employees had access to information that Mattel considers to be highly proprietary and confidential. Mattel believes that some of those former Mattel employees may be observing their obligations not to misappropriate, disclose or use Mattel's confidential and proprietary information. Mattel is informed and believes, however, that certain additional employees accessed, copied and took from Mattel confidential and proprietary information, including Mattel's strategic plans; business operations, methods and systems; marketing and advertising strategies and plans; future product lines; product profit margins; and customer requirements. The misappropriated confidential and proprietary information included information that these Mattel employees were not authorized to access. On information and belief, the misappropriated confidential and proprietary information taken from Mattel is being disclosed to and used by MGA for the benefit of MGA and to the detriment of Mattel.

## VIII. LARIAN MAKES MISREPRESENTATIONS TO RETAILERS ABOUT MATTEL'S PRODUCTS

78.   Defendants have engaged in other illegal practices in their efforts to compete unfairly with Mattel.  Larian has a practice of sending e-mail messages to a "Bratz News" distribution list that Larian created or that was created for him. Mattel is informed and believes that the recipients of e-mail messages sent to the "Bratz News" distribution list include members of the media as well as representatives of many of Mattel's most significant customers.

79.   On May 12, 2006, Larian sent an e-mail message to the "Bratz News" distribution list that included a reference to Mattel's updated MY SCENE MY BLING BLING product with real gems.  Mattel had not publicly announced this product at the time that Larian sent his May 12, 2006 e-mail.  In fact, Mattel had guarded the identification of this particular product.

80.   Shortly thereafter, Larian engaged in a campaign of calling Mattel's most significant customers, including but not limited to Target and TRU, regarding the MY SCENE MY BLING BLING product with real gems.  In an effort to dissuade these retailers from purchasing Mattel's MY SCENE MY BLING BLING product with real gems, Larian knowingly made false factual statements about that product to each retailer.  As of the writing of this First Amended Complaint, Mattel is aware that Larian represented to each retailer that each was the only retailer to purchase the product and that Mattel would not be supporting the product with television advertising.  At the time that Larian made these statements, he knew them to be false.  As a result of Larian's misrepresentations, at least one retailer cancelled its order for 75,000 units of the MY SCENE MY BLING BLING product with real gems.  Only after Mattel learned of Larian's misrepresentations and was able to correct them was Mattel able to assure the retailer that Larian's representations were false and to persuade the retailer to reinstate the order.

81.   Such conduct is not an isolated incident.  MGA and Larian, in an effort to gain an unfair competitive advantage, repeatedly issued false and misleading press releases.  In these press releases, MGA and Larian have misrepresented Bratz's sales, Bratz's market share, Bratz's position vis-à-vis Mattel's BARBIE products, sales of Mattel's BARBIE products, and the market share of Mattel's BARBIE products.

## CLAIMS FOR RELIEF

### First Claim

## Copyright Infringement

## (Against MGA, MGA Entertainment (HK) Limited,

## Larian, Bryant and Does 4 through 10)

82.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 81, above, as though fully set forth at length.

83.   Mattel is the owner of copyrights in works that are fixed in tangible media of expression and that are the subject of valid, and subsisting, copyright registrations owned by Mattel.  These include, without limitation, the works that are the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-378-650, VA 1-378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-378-655, VA 1-378-656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-378-660, VAu 715-270, VAu 715-271 and VAu 715-273.

84.   Defendants have reproduced, created derivative works from and otherwise infringed upon the exclusive rights of Mattel in its protected works without Mattel's authorization.  Defendants' acts violate Mattel's exclusive rights under the Copyright Act, including without limitation Mattel's exclusive rights to reproduce its copyrighted works and to create derivative works from its copyrighted works, as set forth in 17 U.S.C. §§ 106 and 501.

85.   Defendants' infringement (and substantial contributions to the infringement) of Mattel's copyrighted works is and has been knowingly made

1   without Mattel's consent and for commercial purposes and the direct financial

2   benefit of defendants.  Defendants, moreover, have deliberately failed to exercise

3   their right and ability to supervise the infringing activities of others within their

4   control to refrain from infringing Mattel's copyrighted works and have failed to do

5   so in order to deliberately further their significant financial interest in the

6   infringement of Mattel's copyrighted works.  Accordingly, defendants have

7   engaged in direct, contributory and vicarious infringement of Mattel's copyrighted

8   works.

9          86.   By virtue of defendants' infringing acts, Mattel is entitled to

10   recover Mattel's actual damages plus defendants' profits, Mattel's costs of suit and

11   attorneys' fees, and all other relief permitted under the Copyright Act.

12          87.   Defendants' actions described above have caused and will

13   continue to cause irreparable damage to Mattel, for which Mattel has no remedy at

14   law.  Unless defendants are restrained by this Court from continuing their

15   infringement of Mattel's copyrights, these injuries will continue to occur in the

16   future.  Mattel is accordingly entitled to injunctive relief restraining defendants

17   from further infringement.

18                              **Second Claim**

19   **Violation of the Racketeer Influenced and Corrupt Organizations Act**

20                  **18 U.S.C. §§ 1962(c) and 1964(c)**

21                        **(Against All Defendants)**

22          88.   Mattel repeats and realleges each and every allegation set forth in

23   paragraphs 1 through 87, above, as though fully set forth at length.

24          89.   Beginning at various times from approximately 1999 through the

25   filing of this First Amended Complaint, in the Central District of California and

26   elsewhere, defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico

27   Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas and

28   Brisbois were employed by and associated-in-fact with an enterprise engaging in,

-26-

1  and the activities of which affect, interstate and foreign commerce (the "MGA

2  Criminal Enterprise").  The MGA Criminal Enterprise is made up of the MGA

3  Group (MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian,

4  certain of the Doe defendants and Brawer), the Bryant Group (Bryant and certain of

5  the Doe defendants), the Mexican Group (Machado, Trueba and Vargas) and the

6  Canadian Group (Brisbois).

7       90.   MGA, MGA Entertainment (HK) Limited, MGA de Mexico,

8  Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas,

9  Brisbois, and the Other Former Employees, and each of them, for the purpose of

10 executing and attempting to execute the scheme to improperly defraud Mattel and

11 steal its trade secret or otherwise confidential and proprietary information, by

12 means of tortious, fraudulent and criminal conduct, did and do unlawfully, willfully

13 and knowingly conduct and participate, directly and indirectly, in the conduct of

14 the MGA Criminal Enterprise's affairs through a pattern of racketeering activity.

15 Their actions include multiple, related acts in violation of:  18 U.S.C. § 1341 (mail

16 fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1512 (tampering with a witness

17 victim, or informant), 18 U.S.C. § 1952 (interstate and foreign travel to aid

18 racketeering), and 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A) (criminal

19 copyright infringement).

20       91.   MGA, MGA Entertainment (HK) Limited, MGA de Mexico,

21 Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas,

22 Brisbois, and the Other Former Employees, and each of them, shared the common

23 purpose of enabling MGA to obtain confidential, proprietary and otherwise

24 valuable Mattel property through improper means in order to assist MGA in

25 illegally competing with Mattel domestically and throughout the world.

26       92.   The MGA Criminal Enterprise as described herein is at all

27 relevant times a continuing enterprise because, among obvious reasons, it is

28 designed and did unlawfully acquire the confidential business information and

1  property of Mattel and incorporated this information and property into MGA's

2  ongoing business, marketing strategies and business methods, practices and

3  processes. The conduct of the enterprise continues through the date of this First

4  Amended Complaint and is ongoing by virtue of MGA's continuing use of Mattel's

5  information and property, all to the detriment of Mattel.

6       93.   The pattern of racketeering activity, as defined by 18 U.S.C.

7  §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat

8  of continuing criminal activity. This activity consists of multiple acts of

9  racketeering by each member of the MGA Criminal Enterprise, is interrelated, not

10  isolated and is perpetrated for the same or similar purposes by the same persons.

11  This activity extends over a substantial period of time, up to and beyond the date of

12  this First Amended Complaint. These activities occurred after the effective date of

13  18 U.S.C. §§ 1961 *et seq.,* and the last such act occurred within 10 years after the

14  commission of a prior act of racketeering activity. These racketeering activities

15  included repeated acts of:

16       (a)   Mail Fraud:  Defendants MGA, MGA Entertainment (HK)

17            Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4

18            through 10, aided and abetted by each other and some or all of the

19            remaining members of the MGA Criminal Enterprise, having

20            devised a scheme or artifice to defraud Mattel of its confidential

21            trade secret information and property by conversion, false

22            representations, concealment and breaches of fiduciary duty, did

23            for the purpose of furthering and executing such a scheme or

24            artifice to defraud, deposited or caused to be deposited matters or

25            things to be sent or delivered by the Postal Service, or any private

26            or commercial interstate carrier, or took or received matters or

27            things therefrom, or knowingly caused matters or things to be

28            delivered by mail or such carrier according to the direction

17934/2001691.1

thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs and as set forth in Exhibit C;

(b) Wire Fraud: Defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, having devised a scheme or artifice to defraud Mattel of its confidential and trade secret information and property by conversion, false representations, concealment and breaches of fiduciary duty, did for the purpose of furthering and executing such a scheme or artifice to defraud, transmit and cause to be transmitted by means of wire communications in interstate or foreign commerce, writing, signs, signals, pictures or sound, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs and as set forth in Exhibit C;

(c) Tampering With a Witness, Victim or Informant: Defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, did corruptly alter, destroy, mutilate, or conceal a record, document, or other object, or attempted to do so, with the intent to impair the object's integrity or availability for use in an official proceeding. Such actions are in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

-29-

1        (d)    <u>Interstate and Foreign Travel in Aid of Racketeering Enterprises</u>:

2              Defendants MGA, MGA Entertainment (HK) Limited, MGA de

3              Mexico, Larian, Bryant, Machado and Does 4 through 10, aided

4              and abetted by each other and some or all of the remaining

5              members of the MGA Criminal Enterprise, traveled in interstate

6              and foreign commerce, or used the mail or any facility in

7              interstate or foreign commerce, with the intent to promote,

8              manage, establish, carry on and facilitate the promotion,

9              management, establishment and carrying on of unlawful activity,

10            *i.e.* bribery, in violation of the laws of the State of California,

11            *Cal. Penal Code* § 641.3, all in violation of 18 U.S.C. § 1952 and

12            18 U.S.C. § 2, as alleged with greater particularity in the

13            foregoing paragraphs;

14        (e)    <u>Criminal Copyright Infringement</u>: Defendants MGA, MGA

15            Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant,

16            Machado and Does 4 through 10, aided and abetted by each other

17            and some or all of the remaining members of the MGA Criminal

18            Enterprise, willfully infringed Mattel's copyrights, including with

19            respect to documents containing Mattel trade secret and

20            confidential information, for purposes of commercial advantage

21            and private financial gain, all in violation of 18 U.S.C. § 2319(a)

22            and 17 U.S.C. § 506(a)(1)(A), as alleged with greater

23            particularity in the foregoing paragraphs.

24        94.    The persons alleged herein to have violated 18 U.S.C. § 1962(c)

25  are separate from, though employed by or associated with, MGA, the MGA Group,

26  the Bryant Group, the Mexican Group and the Canadian Group.

27        95.    MGA had a role in the racketeering activity that was distinct

28  from the undertaking of those acting on its behalf.  MGA also attempted to benefit,

1   the Mexican Group and the Canadian Group, constituting a group of individuals

2   associated-in-fact, did unlawfully, willfully, and knowingly participate in and

3   conduct, directly and indirectly, the MGA Criminal Enterprise's affairs through a

4   pattern of racketeering activity.

5          101.  The pattern of racketeering activity, as defined by 18 U.S.C.

6   §§ 1961(1) and (5), including acts of mail fraud in violation of 18 U.S.C. § 1341

7   and 18 U.S.C. § 2; acts of wire fraud in violation of 18 U.S.C. § 1343 and 18

8   U.S.C. § 2; acts of tampering with witnesses, victims or informants in violation of

9   18 U.S.C. § 1512 and 18 U.S.C. § 2; acts of interstate and foreign travel in aid of

10  racketeering enterprises in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2; and

11  acts of criminal copyright infringement in violation of 18 U.S.C. § 2319(a) and 17

12  U.S.C. § 506(a)(1)(A).

13         102.  Defendants and the other members of the MGA Criminal

14  Enterprise schemed to defraud Mattel and steal its property and trade secret

15  information by means of false representation, breaches of fiduciary duty,

16  conversation and concealment, as more fully set forth in the foregoing paragraphs.

17         103.  In furtherance of this unlawful conspiracy, and to effect its

18  objectives, defendants and various co-conspirators committed numerous overt acts,

19  including but not limited to those set forth in the foregoing paragraphs.

20         104.  Mattel has been injured in its business or property as a direct and

21  proximate result of the defendants' and the other enterprise members' violations of

22  18 U.S.C. § 1962(d), including injury by reason of the predicate acts constituting

23  the pattern of racketeering activity.

24         105.  As a result of the conspiracies between and among all defendants

25  and the other conspirators to violate 18 U.S.C. § 1962(c), Mattel has suffered

26  substantial damages, in an amount to be proved at trial.  Pursuant to 18 U.S.C.

27  § 1964(c), Mattel is entitled to recover treble its general and special compensatory

28

1   damages, plus interest, costs and attorneys, fees, incurred by reason of defendants'
2   violations of 18 U.S.C. § 1962(d).

### Fourth Claim

### Misappropriation of Trade Secrets

### (Against Defendants MGA, MGA de Mexico,
### Larian, Machado and Does 4 through 10)

7   106. Mattel repeats and realleges each and every allegation set forth in
8   paragraphs 1 through 105, above, as though fully set forth at length.

9   107. As used herein, "Trade Secret Material" shall mean the
10  documents, materials and information stolen by Machado, Trueba, Vargas,
11  Brisbois, the Other Former Employees, and other persons acting for, on behalf of or
12  at the direction of MGA and/or Larian.  Prior to their theft by defendants, the Trade
13  Secret Materials gave Mattel a significant competitive advantage over its existing
14  and would-be competitors, including MGA.  This advantage, as to MGA, has now
15  been compromised as a result of defendants' unlawful activities.

16  108. Mattel made reasonable efforts under the circumstances to
17  maintain the confidentiality of the Trade Secret Materials, including by having
18  employees and consultants who may have access the Trade Secret Materials sign
19  confidentiality agreements that oblige them not to disclose the Trade Secret
20  Materials or characteristics of the Trade Secret Materials; by limiting the
21  circulation of said materials within Mattel; by protecting and limiting access to
22  computers with log-in identifications and passwords; by limiting each employee's
23  access to electronic files to those that the particular employee needs to access; by
24  educating employees on the nature of Mattel's information that is confidential and
25  proprietary; and by reminding employees on a regular and periodic basis of their
26  obligation to protect and maintain Mattel's confidential and proprietary
27  information.

28

034/2001691.1

-33-

109. Mattel's Trade Secret Materials derive independent economic value from not being generally known to the public or to other persons who can obtain economic benefit from their disclosure.

110. Defendants have illegally obtained the trade secret materials, as set forth above, and through other means of which Mattel is presently unaware.

111. Defendants have used and disclosed Mattel's Trade Secret Materials without Mattel's consent and without regard to Mattel's rights, and without compensation, permission, or licenses for the benefit of themselves and others.

112. Defendants' conduct was, is, and remains willful and wanton, and was taken with blatant disregard for Mattel's valid and enforceable rights.

113. Defendants' wrongful conduct has caused and, unless enjoined by this Court, will continue in the future to cause irreparable injury to Mattel. Mattel has no adequate remedy at law for such wrongs and injuries. Mattel is therefore entitled to a permanent injunction restraining and enjoining defendants, and each of them, as well as their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from further using in any manner Mattel's trade secrets.

114. In addition, as a proximate result of defendants' misconduct, Mattel has suffered actual damages, and defendants have been unjustly enriched.

115. The aforementioned acts of the defendants were willful and malicious, including in that defendants misappropriated Mattel's trade secrets with the deliberate intent to injure Mattel's business and improve their own. Mattel is therefore entitled to enhanced damages. Mattel is also entitled to reasonable attorney's fees.

### Fifth Claim

### Breach of Contract

### (Against Bryant)

116. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 115, above, as though fully set forth at length.

117. Pursuant to his Employment Agreement, Bryant agreed that he would not, without Mattel's express written consent, engage in any employment or business other than for Mattel or assist in any manner any business competitive with the business or future business plans of Mattel during his employment with Mattel. Pursuant to his Mattel Employment Agreement, Bryant further assigned to Mattel all right, title and interest in "inventions," including without limitation "designs" and other works that he conceived, created or reduced to practice during his employment by Mattel. In addition, pursuant to the Conflict Questionnaire, Bryant certified that, other than as disclosed, he had not worked for any competitor of Mattel and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest. Bryant further promised that he would notify his supervisor immediately of any change in his situation that would cause him to change any of the foregoing certifications or representations.

118. The Employment Agreement and the Conflict Questionnaire are valid, enforceable contracts, and Mattel has performed each and every term and condition of the Employment Agreement and Conflict Questionnaire required to be performed by Mattel.

119. Bryant materially breached the foregoing contracts with Mattel, in that, among other things, he secretly aided, assisted and worked for a Mattel competitor during his employment with Mattel without the express written consent of Mattel.

-35-

120. As a consequence of Bryant's breach, Mattel has suffered and will, in the future, continue to suffer damages in an amount to be proven at trial. Such damages include, without limitation, the amounts paid by the competitor to Bryant during his Mattel employment; the amounts paid by MGA to Bryant during his Mattel employment; the amount that Mattel paid Bryant during the time he wrongfully worked with MGA; the value of information and intellectual property owned by Mattel which Bryant provided to MGA; the value of the benefits that MGA obtained from Bryant during the time he was employed by Mattel; and the value of the benefits that MGA obtained from Bryant as a result of the work he performed for or with MGA during his Mattel employment.

121. Bryant's conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Bryant specifically acknowledged in his Employment Agreement that his breach of the Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies." Accordingly, Mattel is entitled to orders mandating Bryant's specific performance of his contracts with Mattel and restraining Bryant from further breach.

### Sixth Claim

### Intentional Interference with Contract

### (Against MGA, Larian and Does 4 through 10)

122. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 121, above, as though fully set forth at length.

123. Valid agreements existed between Mattel and Bryant, Brawer, Machado, Trueba, Vargas, Brisbois and the Other Former Employees (collectively, the "Mattel Employees")

34/2001691.1

-36-

124. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees had a duty under their agreements not to work for or assist any competitor of Mattel, such as MGA. In addition, at all times mentioned herein, MGA, Larian and Does 4 through 10 knew that Bryant had assigned to Mattel, and was obligated to disclose to Mattel all inventions, including designs and other works, created, conceived or reduced to practice during their employment with Mattel.

125. Despite such knowledge, defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, induced and encouraged the Mattel Employees to breach their contracts with Mattel.

126. As a direct and proximate result of defendants' efforts and inducements, the Mattel Employees did breach their contracts with Mattel.

127. As a result of said breaches, Mattel has suffered damages and will imminently suffer further damages, including the loss of its competitive position and lost profits, in an amount to be proven at trial.

128. Defendants performed the aforementioned conduct with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from defendants in an amount to be determined at trial.

### Seventh Claim

### Breach of Fiduciary Duty

### (Against Bryant and Machado)

129. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 128, above, as though fully set forth at length.

130. Bryant and Machado held positions of trust and confidence with Mattel. In their positions, Bryant and Machado had access to and were entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of their job

FIRST AMENDED COMPLAINT

Exhibit B - Page 42

assignments and duties.  In their positions, Bryant and Machado also represented Mattel in its dealings with third parties and, in actions in the course and scope of their employment with Mattel, were agents of Mattel.  They confirmed their relationship of trust with Mattel in respective employee agreements.  Bryant and Machado thus owed Mattel a fiduciary duty that included, but was not limited to, an obligation not to take any action that would be contrary to Mattel's best interests or that would deprive Mattel of any opportunities, profit or advantage which Bryant or Machado might bring to Mattel.

131.  Bryant breached his fiduciary duty to Mattel in that, while employed by Mattel, he secretly aided and assisted a competitor of Mattel, including without limitation by entering into an agreement with a Mattel competitor.  As alleged above, Bryant also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, himself personally and MGA.

132.  Machado breached his fiduciary duty to Mattel, in that while employed by Mattel, he secretly aided and assisted a competitor of Mattel by, among other things, misappropriating Mattel trade secret and proprietary information and providing said information to officers of MGA.  Machado also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, himself personally and MGA.

133.  As a direct and proximate result of defendants' wrongful conduct, Mattel has incurred damages in an amount to be determined at trial.

134.  Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an award of exemplary damages against defendants in an amount to be determined at trial.

135.  Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate

1   remedy at law.  Accordingly, Mattel is entitled to an order restraining further
2   breach of Bryant's fiduciary duty to Mattel and/or restraining defendants from
3   continuing to benefit from such breach.

### Eighth Claim

### Aiding and Abetting Breach of Fiduciary Duty

### (Against MGA, Larian and Does 4 through 10)

7   136.  Mattel repeats and realleges each and every allegation set forth in
8   paragraphs 1 through 135, above, as though fully set forth at length.

9   137.  At all times herein mentioned, MGA, Larian and Does 4 through
10  10 knew that Bryant held a position of trust and confidence at Mattel.  At all times
11  herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant owed a
12  fiduciary duty to Mattel not to take any action that would be contrary to Mattel's
13  best interests, including but not limited to secretly developing and designing Bratz
14  while employed by Mattel and by secretly assisting Larian and MGA .

15  138.  At all times herein mentioned, MGA, Larian and Does 4 through
16  10 knew that the Mattel Employees (excluding Bryant) held positions of trust and
17  confidence at Mattel.  At all times herein mentioned, MGA, Larian and Does 4
18  through 10 knew that the Mattel Employees (excluding Bryant) owed a fiduciary
19  duty to Mattel not to take any action that would be contrary to Mattel's best
20  interests, including but not limited to taking confidential trade secret information
21  from Mattel's premises and providing that information to a competitor.

22  139.   Despite such knowledge, defendants MGA, Larian and Does 4
23  through 10 intentionally and without justification solicited, encouraged, aided and
24  abetted and gave substantial assistance to the Mattel Employees to breach their
25  fiduciary duties to Mattel, knowing that their conduct would constitute breaches of
26  their fiduciary duties to Mattel.

27  140.  As a direct and proximate result of defendants' efforts, the Mattel
28  Employees did breach their fiduciary duties to Mattel and Mattel has incurred

1  damages in an amount to be proven at trial. Mattel, therefore, is entitled to recover

2  compensatory damages in an amount to be determined at trial.

3     141. In taking the aforesaid actions, MGA, Larian and Does 4 through

4  10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

5  rights. Accordingly, Mattel is entitled to recover exemplary damages from

6  defendants in an amount to be determined at trial.

7  **Ninth Claim**

8  **Breach of Duty of Loyalty**

9  **(Against Bryant and Machado)**

10     142. Mattel repeats and realleges each and every allegation set forth in

11  paragraphs 1 through 141, above, as though fully set forth at length.

12     143. As employees of Mattel, Bryant and Machado owed a duty of

13  undivided loyalty to Mattel. Pursuant to this duty, Bryant and Machado could not

14  compete with Mattel or assist a competitor of Mattel during their employment with

15  Mattel. Pursuant to this duty, Bryant and Machado were required to always give

16  preference to Mattel's business over their own, similar interests during the course of

17  their employment with Mattel.

18     144. Bryant and Machado breached their duty of loyalty to Mattel in

19  that, while employed by Mattel, they secretly aided, assisted and worked for a

20  competitor of Mattel, including without limitation by entering into agreements with

21  a Mattel competitor. As alleged above, they also breached the aforementioned duty

22  by using Mattel property and resources for the benefit of, and to aid and assist,

23  themselves personally and the competitor of Mattel.

24     145. As a direct and proximate result of defendants' wrongful conduct,

25  Mattel has incurred damages in an amount to be determined at trial.

26     146. Defendants acted with malice, fraud and oppression, and in

27  conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an award

28  of punitive damages against defendants in an amount to be determined at trial.

-40-

147. Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel is entitled to an order restraining further breach of defendants' duty of loyalty to Mattel and/or restraining defendants from continuing to benefit from such breach.

148. In breaching their duty of loyalty to Mattel, Bryant and Machado acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to recover exemplary damages from defendants in an amount to be determined at trial.

## Tenth Claim

### Aiding and Abetting Breach of Duty of Loyalty

### (Against MGA, Larian and Does 4 through 10)

149. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 148, above, as though fully set forth at length.

150. MGA, Larian and Does 4 through 10 knew that Bryant, as an employee of Mattel, owed a duty of loyalty to his employer.  MGA, Larian and Does 4 through 10 knew that this duty included an obligation on the part of Bryant not to compete with Mattel or assist a competitor of Mattel during the term of his employment with Mattel.  MGA, Larian and Does 4 through 10 also knew that Bryant was required to give preference to Mattel's business over his own, similar interests or those of Mattel's competitors. or those of Mattel's competitors during the course of his employment with Mattel.

151. MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) were employed by Mattel, and, as employees of Mattel, that they owed duties of loyalty to Mattel.  MGA, Larian and Does 4 through 10 knew that these duties included an obligation on the part of the Mattel

934/2001691.1

-41-

1   Employees (excluding Bryant) not to compete with Mattel or assist a competitor of

2   Mattel during their Mattel employment.

3         152.  Despite such knowledge, defendants MGA, Larian and Does 4

4   through 10 intentionally and without justification solicited, encouraged, aided and

5   abetted and gave substantial assistance to the Mattel Employees to breach their

6   duties of loyalty to Mattel, knowing that their conduct would constitute breaches of

7   their duties of loyalty to Mattel.

8         153.  As a further consequence of defendants' efforts, Mattel has

9   suffered injury and is entitled to compensatory damages in an amount to be proven

10  at trial.

11        154.  In taking the aforesaid actions, MGA, Larian and Does 4 through

12  10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

13  rights.  Accordingly, Mattel is entitled to recover exemplary damages from

14  defendants in an amount to be determined at trial.

15                   **Eleventh Claim**

16                   **Conversion**

17            **(Against All Defendants)**

18        155.  Mattel repeats and realleges each and every allegation set forth in

19  paragraphs 1 through 154, above, as though fully set forth at length.

20        156.  Defendants wrongfully converted Mattel property and resources

21  by appropriating and using them for their own benefit and gain and for the benefit

22  and gain of others, without the permission of Mattel.

23        157.  Mattel was entitled to, among other things, the exclusive right

24  and enjoyment in property and tangible materials owned by Mattel, including

25  without limitation such proper and materials that were created by Bryant while he

26  was a Mattel product designer.  Such property was taken by Bryant from Mattel to

27  further his own interests and, in at least some instances, provided by Bryant to

28  Larian and MGA in furtherance of the interests of Bryant, Larian and MGA.

34/2001691.1

FIRST AMENDED COMPLAINT

158. In addition, defendants wrongfully converted Mattel's property by removing the Trade Secret Materials in electronic and paper form from Mattel's offices. Defendants did so without Mattel's permission and continue to possess them.

159. As a direct and proximate result of defendants' wrongful conversion of Mattel property, including those relating to Bratz and Mattel's Trade Secret Materials, Mattel has incurred damages. Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial.

160. As a result of defendants' acts of conversion, Mattel is entitled to damages in an amount sufficient to indemnify Mattel for the loss suffered, which is not measured by the value of the property misappropriated, but includes the lost profits that Mattel suffered as a result of the conversion or, alternatively, the profits generated by the defendants that would not have been generated but for the conversion. Only such a measure of damages would fully and fairly compensate Mattel for the injury it suffered due to defendants' acts of conversion.

161. Defendants performed the aforementioned conduct with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from defendants in an amount to be determined at trial.

162. Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel is entitled to an order restraining defendants from further conversion of Mattel property and resources and/or restraining defendants from continuing to benefit from such conversion.

**Twelfth Claim**

**Unfair Competition**

**(Common Law and *Cal. Bus. & Prof. Code* § 17200)**

**(Against All Defendants)**

163.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 162, above, as though fully set forth at length.

164.  Section 17200 of the California Business and Professions Code prohibits unfair competition, including "any unlawful, unfair or fraudulent business act or practice . . . ."

165.  By engaging in the foregoing conduct, defendants have, individually and in combination, engaged in unlawful, unfair and/or fraudulent acts of unfair competition in violation of both the common law of the state of California and *Cal. Bus. & Prof. Code* § 17200 *et seq.*  Such conduct included, without limitation, MGA's commercial bribery of Bryant in violation of *Cal. Penal Code* § 641.3 and misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a).  Such conduct also included, without limitation, MGA's and Larian's disparagement of Mattel's products and misrepresentations as alleged above.

166.  As a result of the aforementioned conduct, Mattel has suffered damages and will imminently suffer further damages, including but not limited to lost profits in an amount to be proven at trial.  No adequate remedy at law exists for the wrongs and injuries Mattel has suffered and will continue to suffer, and Mattel is entitled to an injunction enjoining defendants' continued wrongful acts.  Mattel is also entitled to recover compensatory and exemplary damages pursuant to the doctrine of common law unfair competition and *Cal. Civ. Code* § 3294.

### Thirteenth Claim

### Declaratory Relief

### (Against All Defendants)

167. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 166, above, as though fully set forth at length.

168. As shown in the foregoing paragraphs above, an actual controversy exists between Mattel and defendants regarding defendants' lack of ownership interests in Bratz and Mattel's rights in the same.

169. Accordingly, Mattel seeks a declaration of the Court that defendants have no valid or protectable ownership rights or interests in Bratz, and that Mattel is the true owner of the same, and further seeks an accounting and imposition of a constructive trust over Bratz, including without limitation registrations and applications for registrations relating thereto made or filed by defendants and third parties, and over all revenues and other monies or benefits derived or obtained from MGA's and Bryant's purported ownership, use, sale, distribution and licensing of Bratz.

170. Mattel seeks a declaration of the Court that any and all agreements between Bryant, on the one hand, and MGA, on the other hand, in which Bryant purports to assign to MGA any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to the Bratz designs, is void and of no effect, including without limitation because Bryant had previously assigned said right, title or interest to Mattel and because Mattel was otherwise the owner of said right, title or interest.

### Prayer for Relief

WHEREFORE, Mattel respectfully requests judgment:

1. For a declaration that defendants have no valid or protectable ownership interests or rights in Bratz designs and works conceived, created or

-45-

1   reduced to practice by Bryant during the term of his Mattel employment and/or by

2   any others then-employed by Mattel, as well as in all derivatives prepared

3   therefrom, and that Mattel is the true owner of the foregoing;

4          2.     For a declaration that any agreement between Bryant, on the one

5   hand, and MGA or any person or entity, on the other hand, in which Bryant

6   purported to assign any right, title or interests in any work that he conceived,

7   created or reduced to practice while a Mattel employee, including but not limited to

8   the Bratz designs, is void and of no effect;

9          3.     For an Order enjoining and restraining defendants, their agents,

10  servants and employees, and all persons in active concert or participation with

11  them, from further wrongful conduct, including without limitation from imitating,

12  copying, distributing, importing, displaying, preparing derivatives from and

13  otherwise infringing Mattel's copyright-protected works;

14         4.     For an Order, pursuant to 17 U.S.C. § 503(a) and other

15  applicable law, impounding all of defendants' products and materials that infringe

16  Mattel's copyrights, as well as all plates, molds, matrices and other articles by

17  which copies of the works embodied in Mattel's copyrights may be reproduced or

18  otherwise infringed;

19         5.     For an Order mandating that defendants return to Mattel all

20  tangible items, documents, designs, diagrams, sketches or any other

21  memorialization of inventions created or reduced to practice during Bryant's

22  employment with Mattel as well as all Mattel property converted by defendants;

23         6.     For an Order mandating specific performance by Bryant to

24  comply with and satisfy Bryant's contractual obligations to Mattel;

25         7.     That Mattel be awarded, and defendants be ordered to disgorge,

26  all payments, revenues, profits, monies and royalties and any other benefits derived

27  or obtained as a result of the conduct alleged herein, including without limitation of

28

1    all revenues and profits attributable to defendants' infringement of Mattel's

2    copyrights under 17 U.S.C. § 504;

3           8.    For an accounting of all profits, monies and/or royalties from the

4    exercise of ownership, use, distribution, sales and licensing of Bratz;

5           9.    For the imposition of a constructive trust over Bratz, including

6    without limitation registrations and applications for registrations relating thereto

7    made or filed by defendants and third parties, and all profits, monies, royalties and

8    any other benefits derived or obtained from defendant's exercise of ownership, use,

9    sale, distribution and licensing of Bratz;

10         10.    That Mattel recover its actual damages and lost profits;

11         11.    That defendants be ordered to pay exemplary damages in a sum

12   sufficient to punish and to make an example of them, and deter them and others

13   from similar wrongdoing;

14         12.    That defendants be ordered to pay treble its general and special

15   damages, plus interest, costs and attorney's fees incurred by reason of defendants'

16   violations of 18 U.S.C. §§ 1962(c)-(d).

17         13.    That defendants be ordered to pay double damages due to their

18   willful and malicious misappropriation of Mattel's trade secrets with deliberate

19   intent to injure Mattel's business and improve its own;

20         14.    That defendants pay to Mattel the full cost of this action and

21   Mattel's attorneys' and investigators' fees; and

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

34/2001591.1

FIRST AMENDED COMPLAINT

Exhibit B - Page 52

1        15.   That Mattel have such other and further relief as the Court may

2 deem just and proper.

3

4 DATED:  November 19, 2006     QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

5

6                  By _John B Quinn /sac_

7                    John B. Quinn

8                    Attorneys for Plaintiff Mattel, Inc.

34/2001691.1

-48-

# DEMAND FOR JURY TRIAL

Plaintiff Mattel, Inc. respectfully requests a jury trial on all issues triable thereby.

DATED:  November 19, 2006

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By _____

John B. Quinn
Attorneys for Plaintiff
Mattel, Inc.

'34/2001691.1

-49-

FIRST AMENDED COMPLAINT