# EXHIBIT 12

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No. CV 04-09049 SGL(RNBx)                    Date: July 9, 2009
Title:      MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

<table>
<tr><td>Cindy Sasse<br>Courtroom Deputy</td><td>None Present<br>Court Reporter</td></tr>
</table>

ATTORNEYS PRESENT FOR
PLAINTIFFS:

ATTORNEYS PRESENT FOR
DEFENDANTS:

None Present

None Present

**PROCEEDINGS:**   **ORDER GRANTING EX PARTE APPLICATION RE TEMPORARY RECEIVERSHIP (DOCKET #5728)**

**ORDER GRANTING EX PARTE APPLICATION RE COST SHIFTING (DOCKET #5865)**

**ORDER GRANTING IN PART EX PARTE APPLICATION FOR RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)**

**ORDER GRANTING IN PART MATTEL'S MOTION RE DISCOVERY MASTER ORDER NO 27 AND REMANDING DISCOVERY MASTER ORDER NO. 27 FOR RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT OF THE FILING OF THE TAAC (DOCKET #5561)**

**ORDER DENYING MOTION TO STRIKE THE FORENSIC AUDITOR'S REPORTS (DOCKET #5705)**

EXHIBIT 12

PAGE___141

## I. ORDER GRANTING EX PARTE APPLICATION RE TEMPORARY RECEIVERSHIP (DOCKET #5728)

Because the only opposition to the Ex Parte Application regarding the winding up of the Temporary Receivership involves the issue of cost-shifting, which is addressed separately, below, the Court **GRANTS** the Ex Parte Application. A separate order addressing this Ex Parte Application has been concurrently filed.

## II. ORDER GRANTING EX PARTE APPLICATION RE COST SHIFTING (DOCKET #5865)

The MGA parties' opposition to the Temporary Receiver's Ex Parte Application argued that the costs of the Temporary Receivership should be shifted to Mattel (as the party who sought appointment of a Temporary Receiver). However, the Court has previously ruled that, at some yet-to-be defined date in the future, the Court will consider whether to shift the costs of both the Temporary Receivership and the Forensic Audit. Therefore, Mattel filed an Ex Parte Application seeking either to be relieved of the responsibility to respond to the MGA parties' argument or, alternatively, for an order setting a briefing schedule on the issue. It is not the intention of the Court to address the cost-shifting issue at this time; rather, as the Court has stated previously on the record, that issue is more efficiently resolved at a later date, most likely a date after completion of Phase 2 of the trial. Accordingly, the Court **GRANTS** Mattel's Ex Parte Application re Cost Shifting. Mattel is relieved of any duty to respond to MGA's argument regarding the appropriate allocation of costs arising from the Temporary Receiver that is set forth in the MGA parties's June 26, 2009 Opposition to the Temporary Receiver's Ex Parte Application.

## III. ORDER GRANTING IN PART EX PARTE APPLICATION FOR RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

The Court has received and reviewed the MGA Parties' Ex Parte Application For Partial Release of *In Camera* Juror Interview Transcripts, as well as the Opposition, the Reply, and the accompanying exhibits. The Court **GRANTS IN PART** the Ex Parte Application. Although the Court declines to award the relief sought, the Court will take steps to ensure that the transcript of the juror interviews are provided to the Ninth Circuit for its consideration of the appeal filed by the MGA parties.

The relevant *in camera* juror interviews were conducted on July 25, 2008; the findings made by the Court on the basis of those interviews are set forth in detail in the Court's Order Denying Motion for Mistrial, dated August 8, 2008. Counsel for the parties agreed that the juror interviews, which were conducted mid-trial, should be conducted *in camera*, and the MGA parties did not request that the Court grant them access to the transcripts to prepare their Motion for Mistrial. The Court indicated on the

EXHIBIT 12

PAGE___142

record around the time of the filing of the Motion for Mistrial that it was not the Court's intent to grant the parties access to the transcripts.

After the conclusion of the trial, the MGA parties did not at any time request this Court grant access to the transcripts. To the contrary, some ten months passed between the date of the Order Denying Motion for Mistrial and the MGA parties' first post-trial request for access to those transcripts. That request was made to the Ninth Circuit, not this Court, on June 10, 2009. When the Ninth Circuit denied the request in favor of the MGA's presentation of the issue to this Court in the first instance, the MGA parties thereafter filed the present Ex Parte Application in a expeditious manner.

Ostensibly, as set forth in both the Motion filed before the Ninth Circuit and the Ex Parte Application before this Court, the reason the MGA parties seek access to those transcripts is so that they may use them to challenge the Court's Order Denying Motion for Mistrial. Although the MGA parties filed its Notice of Appeal on May 4, 2009, and although that Notice clearly indicated that the Order Denying Motion for Mistrial would be implicated in the appeal, the MGA parties failed to file its Motion seeking release of the transcripts until June 10, 2009. The MGA parties' failure to seek this relief until a month after they filed their Notice of Appeal and a month before their opening brief was due, and their decision to present the issue of release of the transcripts to the appellate court (rather than this Court) in the first instance, created the very urgency that cause them to seek ex parte relief from this Court. As such, the Court declines to grant the relief sought.

Nevertheless, in the interest of due process and in order to facilitate the full consideration of the issue by the Ninth Circuit, the Court will take steps to ensure that the transcripts of the *in camera* interviews are provided to the Ninth Circuit for *in camera* filing.

## IV. ORDER GRANTING IN PART MATTEL'S MOTION RE DISCOVERY MASTER ORDER NO 27 AND REMANDING DISCOVERY MASTER ORDER NO. 27 FOR RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT OF THE FILING OF THE TAAC (DOCKET #5561)

In the challenged portion of Discovery Master Order No. 27 ("DM Order No. 27"), the Discovery Master denied Mattel's Motion to Compel discovery sought by service of a subpoena on non-party Bingham McCutchen LLP ("Bingham"), a law firm that represents Intervenor Omni 808, as well as a number of non-party entities that are familiar to those involved in this litigation: OmniNet Capital, LLC ("OmniNet"), Vision Capital, LLC ("Vision"), IGWT Group, LLC ("IGWT"), and IGWT 826 Investments, LLC ("IGWT 826"). Broadly categorized, the subpoena sought production of (1) fee agreements relating to Vision and Omni 808; (2) documents regarding the formation, control, and financing of Omni 808, Vision, and Lexington Financial Limited

MINUTES FORM 90
CIVIL -- GEN                          3                    Initials of Deputy Clerk __cls_____

EXHIBIT 12

PAGE 143

("Lexington"); (3) documents identifying stakeholders and officers of Omni 808, Vision, and Lexington; (4) all contracts relating to Omni 808, Vision Capital, and Lexington; (5) all communications relating to Omni 808, Vision Capital, and Lexington, excluding attorney-client privileged documents; and (6) Bingham's representation of MGAE and certain named individuals who have some connection with MGAE, including a number of Mr. Larian's family members.

The Discovery Master correctly recognized the essential legal standard in assessing whether a subpoena may be enforced. The information must satisfy the discovery relevance standard, i.e., it must be "'reasonably calculated to lead to the discovery of admissible evidence.'" DM Order No. 27 at 19 (quoting Fed. R. Civ. P. 26(b)(1)). The decision of whether to enforce a subpoena ultimately implicates a balancing test that pits relevance of the materials sought and need to the requesting party against hardship to the party resisting the subpoena. DM Order No. 27 at 20. Non-parties are generally required to bear lesser burdens than parties in responding to subpoenas. Exxon Shipping Co. v. United States Dept. of Interior, 34 F.3d 774, 779 (9th Cir. 1994) ("The Federal Rules also afford nonparties special protection against the time and expense of complying with subpoenas.").

However, the Discovery Master overstated the burden of proof allocated to Mattel, as the party seeking discovery. See DM Order No. 27 at 20 ("As the party moving to compel compliance with the subpoena, Mattel bears the initial burden of establishing that the information sought is relevant and necessary to the claims or defenses at issue.") This standard is both overstated and incomplete. It is overstated in that Mattel need not show that the evidence sought is "necessary to the claims or defenses." Although Mattel indeed bears the burden of establishing relevancy, that showing is not one of "necessity." Rather, Mattel must bear the burden of establishing the discovery relevancy standard -- that the materials sought are "reasonably calculated to lead to the discovery of admissible evidence" -- is met. It need not establish that the materials sought are "necessary" to its case.

This point leads to the manner in which the stated burden is incomplete. As clearly articulated by cases cited by Bingham, although Mattel bears an initial burden of establishing relevancy, the party resisting discovery thereafter has the burden of establishing that discovery should be denied. See Bryant v. Ochoa, 2009 WL 1390794 at *1 (S.D. Cal. 2009) ("The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1). . . . Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections."); DIRECTV, Inc. v. Trone, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (same); see also Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975) (reversing the district court's issuance of a protective order based on a failure of the party resisting discovery to meet its burden by asserting that the defendant's deposition would merely yield cumulative evidence).

MINUTES FORM 90
CIVIL -- GEN                                      4                    Initials of Deputy Clerk __cls_____

EXHIBIT 12

PAGE ____144

The effect of this subtle variation on the burden of proof from that stated by the Discovery Master is magnified by the recent filing of the TAAC, which significantly heightens the relevancy of the issue of how the MGA parties and the parties represented by Bingham may be related, the formation of certain of those entities, and other issues implicated by Mattel's requests. Because the question of relevance is featured so prominently in the quintessential balancing test to which the present discovery motion was subjected, the filing of the TAAC dramatically altered the calculus that underlies the conclusions reached in DM No. 27.

For reasons related to judicial economy and preservation of scarce judicial resources (which this case has stretched to the outer limits), the Court defers decision, in light of the changed calculus that has occurred as the result of the filing of the TAAC, of the issues presented in the challenged portions of DM No. 27 to the Discovery Master. For that reason, the Court **REMANDS** the challenged portions of DM No. 27 to the Discovery Master for his reconsideration and re-balancing in light of the recently filed TAAC. The Discovery Master may, in his discretion, set the matter for further briefing and/or hearing, he may take the matter under submission based on the existing record, or he may take other action as he deems appropriate to resolve the present issues.

Notwithstanding the remand of DM Order No. 27, one issue raised by Mattel requires further consideration by the Court. At page 25 of DM Order No. 27, the Discovery Master appears to impose a blanket prohibition on discovery of materials that are in the possession of a subpoena recipient, but that are related to a non-party over whom the Court has not been shown to have jurisdiction. The Discovery Master cites no legal authority for such a blanket prohibition, and the Court, in its own research, has found none. Such a blanket prohibition precludes the application of the balancing test that applies almost universally to discovery motions; accordingly, and because this blanket prohibition is unprecedented, the Court finds that it is contrary to law. As to this narrow issue, the Court **GRANTS** Mattel's Motion. The issue of discovery of materials relating to Lexington is **REMANDED** to the Discovery Master for reconsideration in light of this ruling and in light of the filing of the TAAC.

## V. ORDER DENYING MOTION TO STRIKE
## THE FORENSIC AUDITOR'S REPORTS (DOCKET #5705)

In an unsealed filing that has since been ordered sealed by the Court, counsel for Omni 808 Investors, LLC ("Omni 808"), Todd E. Gordinier, made unwarranted, unsubstantiated personal attacks against the Court-Appointed Forensic Auditor, Ronald L. Durkin. Mr. Gordinier's selective public disclosure of portions of the Forensic Auditor's Summary Report, coupled with the maintenance of the Summary Report, as well as the later-filed Responsive Report and Final Report, under seal in their entirety, has led to an unbalanced public presentation of the issues discussed therein. In an

EXHIBIT 12

PAGE ____145

attempt to cure this deficiency, the Court has considered the possibility that it should
simply unseal the relevant Reports and allow those Reports to speak for themselves.

Because the MGA entities were the primary subject of the Forensic Audit, the
MGA parties have, quite understandably, objected to the proposed unsealing. Mattel,
for its part, advocates quite emphatically, and not unreasonably, that the Reports should
be unsealed in light of the selective disclosure. See Tr. at 31-32 ("It's the underlying
analysis that refutes the selective disclosures that MGA and Omni made in a public
forum to smear . . . both Mr. Durkin and Mattel.")  At the other end of the spectrum,
Omni 808 has moved to strike the Reports in their entirety.

In the end, although the Court does not order the unsealing of the Reports, it
**DENIES** the Motion to Strike.  The Court ordered the Forensic Audit to evaluate whether
a receiver should be appointed; as the record bears witness, the Court eventually
rejected the suggestion that it should appoint a permanent receiver, and the Court has
instead appointed an MGA Monitor with more limited powers than a receiver.
Nevertheless, the fact that the Reports were intended to serve a very limited purpose
does not mean that there is no possibility that the Forensic Auditor's Reports will not
serve any purpose henceforth.

As it currently stands, the Court **ORDERS** that no party shall cite to or rely upon
the Reports for any purpose absent further Order of this Court.[1]  However, the
documents attached to the Reports, to the extent they are otherwise discoverable, are
not insulated from discovery on the basis that they have been made part of the Reports.
Conversely, documents, such as charts and interview notes, that were prepared by the
Forensic Auditor are the property of the Court and are not subject to discovery or use in
this or any other litigation by any party or non-party.[2]

Had it been counsel for the MGA parties who mounted the unwarranted,
unsubstantiated, and public personal attacks on Mr. Durkin, the Court would find,
notwithstanding the sensitive information contained therein, the unsealing of the
Reports was an appropriate remedy for the selective disclosure.[3]  However, here, it is

_____

[1]  This Order does not supersede the Court's Order permitting the Forensic Auditor to share
information with the Court-Appointed Monitor.

[2]  Toward that end, the Court **CLARIFIES** to the parties that the work papers, drafts, notes,
detailed time records, and any other materials prepared by or at the direction of the Forensic Auditor are
the property of the Court.  The Court **ORDERS** the Forensic Auditor, as the custodian of those records on
behalf of the Court, to retain those materials, whether maintained in electronic, hard copy, or any other
medium, until further order of the Court.

[3]  As it stands, counsel for MGAE, James I. Stang, wisely sought, and was granted, leave to file
his more restrained, but just as unwarranted and unsubstantiated, personal attacks on Mr. Durkin under
seal.  See MGA Entertainment, Inc.'s Response to Final In Camera Report of Forensic Auditor Ronald L.

EXHIBIT 12

PAGE 146

counsel for Omni 808 who made those attacks public, and although Mattel maintains that both the MGA parties and Omni 808 are jointly responsible for the selective disclosure, see July 6, 2009, Tr. at 33, whether, or to what extent, the MGA parties act or have acted in concert is an issue to be decided in Phase 2 of this action.

Nevertheless, Mr. Gordinier's attack on Mr. Durkin cannot pass without comment by the Court. The Court's comments are directed toward Mr. Gordinier personally, which is not the Court's usual practice. Although the irony of this form of address is not lost on the Court (given the subject of this Order), it is appropriate. Mr. Gordinier signed all three filings in which the personal attacks appear, and continues to stand behind those filings. Moreover, Mr. Gordinier expressly and unabashedly claimed personal responsibility for the brief that was not filed under seal, by both stating that he gave it a lot of thought before filing it and by implicitly acknowledging that although he considered filing his brief under seal, he ultimately rejected that course of action. See May 18, 2009 Tr. at 46-47 ("My brief speaks for itself. We have nothing to hide. . . . I didn't feel it appropriate, necessary, or desirable to file my brief under seal. And I don't have a problem with the Court or anybody reading what I have to say, because I gave it a lot of thought, and I gave it at lot of consideration.").

At the July 6, 2009, hearing, the Court outlined its concerns that while the attacks on Mr. Durkin were public, the Reports are not, and that "it doesn't seem fair" to the Court to allow those allegations to stand alone without a chance to respond to them. July 6, 2009, Tr. at 25-26. In response, Mr. Gordinier contended that his comments "respond[ed] to the report," and that "[w]hat we said was that there were problems with that report." July 6, 2009, Tr. at 28. This statement is an implicit denial that any personal attacks were made; however, as set forth in great detail below, the record belies Mr. Gordinier's post hoc protestations.

Lest Mr. Gordinier's statement reflecting his implicit denial that he engaged in personal attacks be perceived as one being made at oral argument without ample time to reflect upon its significance, the statement is also made by Mr. Gordinier in Omni 808's Reply Memorandum, a document upon which he had ample time to reflect: "Each and all of the references in Omni's Statement of Position refer to the contents of Mr. Durkin's Reports and the shortcomings contained therein and omitted therefrom, not to his person." Id. at 2 n.1. To be sure, the criticisms leveled at Mr. Durkin are framed in

_____

Durkin (docket #5918) at 4 (accusing Mr. Durkin of "making McCarthy-like statements of non-existent buybacks and unsupported insinuations of conflicts of interest"); id. at 9 (suggesting that Mr. Durkin's formulation of certain search terms relating to criminal acts in Farsi without a concurrent formulation of those terms in English demonstrated a "predisposition that Persian members of MGA's management and staff (and only the Persian members) might be engaged in illegal conduct"). Mr. Stang's attacks pale in comparison to those advanced by Mr. Gordinier, and they were filed under seal. Thus, although the Court's analysis and conclusions regarding the Forensic Auditor's Reports applies with equal force to Mr. Stang's statements, his are not the focus of the Court's attention at this time.

Initials of Deputy Clerk ___cls_____

EXHIBIT 12

PAGE_____

terms of his Reports. Still other criticisms are, as counsel maintains, addressed to the
Reports themselves; those must be analyzed based on their substance. However, as
aptly demonstrated by the cited and quoted portions of Mr. Gordinier's filings that
appear below, his criticisms do not, by any measure, confine themselves to those
Reports, and instead reach out in a highly personal manner to attack the author, his
professionalism, his competence, his objectivity, and his integrity.[4]

Indeed, in a display the likes of which have not been previously witnessed by this
Court, Mr. Gordinier strayed far afield of legitimate criticism of the discussions,
analyses, and conclusions reached in the Summary Report and the Reports that
followed. To be sure, there are instances in which Mr. Gordinier addressed the
message found in those Reports; just as surely, however, as detailed below, Mr.
Gordinier attacked the messenger. Specifically, the papers filed by Mr. Gordinier on
behalf of Omni 808 call into question Mr. Durkin's professionalism and competence, as
well as his objectivity and integrity. Moreover, and alarmingly, they falsely accuse Mr.
Durkin of being influenced by an ethnocentric bias against Mr. Larian and Mr. Kadisha.
Such attacks, aimed at Mr. Durkin personally rather than the discussion, analyses, and
conclusions set forth in his Reports, appear throughout Omni 808's papers. See Omni
808 Investors, LLC's Statement of Position re Order to Show Cause re Appointment of a
Permanent Receiver (docket #5446) ("SOP"), filed May 14, 2009, at 11 (referring to Mr.
Durkin's "irresponsible" analysis); id. (noting that Mr. Durkin is "far too experienced" to
believe that he "produced . . . a balanced presentation"); id. (stating that "Mr. Durkin's
report is a polemic" and "a piece of advocacy"); id. at 12 n.9 (calling into question Mr.
Durkin's "objectivity" based on the fact that the Court ordered Mr. Durkin's fees be paid
(at least in the first instance) by Mattel); id. (suggesting that Mr. Durkin's ex parte
communications with Mattel were improper); id. at 13 n.10 (characterizing Mr. Durkin's
quotation of Mr. Larian's and Mr. Kadisha's account of how the two men were
acquainted, from "the Persian community," as "at best, unprofessional" and, "at worst,

---

[4] Adding still further to the mounting irony, in the same footnote that Mr. Gordinier disclaims
engaging in improper personal attacks, he falsely accuses counsel for Mattel of advancing their own
improper ad hominem attacks against Neil Kadisha, who has been referred to as a "common thief" in
certain unspecified Mattel filings. Mr. Kadisha is the Managing Partner of a diversified investment firm,
Omninet Capital, LLC, and an investor in Omni 808. To call someone a "common thief" is, undoubtably, by
any measure, a highly personal attack, therefore an attack addressed "to the man," or ad hominem.
However, in the same manner Mr. Gordinier accuses Mr. Durkin of failing to provide appropriate context to
the Court in his Reports, Mr. Gordinier himself fails to acknowledge that counsel for Mattel's use of the
term "common thief" in connection with Mr. Kadisha merely quotes Los Angeles County Superior Court
Judge Henry W. Shatford's conclusion regarding Mr. Kadisha, as set forth in his 191-page Statement of
Decision, dated October 24, 2006, which was issued after a 200-day trial, which is currently pending
appeal, and which conferred upon Mr. Kadisha the oft-repeated moniker of "common thief," as well as
"embezzler," and "perjurer." See Uzyel v. Kadisha, Cal. App. Nos. B196045, B203804, B198007,
B199850, B201425, 2009 WL 646096 (Mar. 4, 2009) (appellate brief). As always, context is key. The use
by counsel for Mattel of another court's findings and conclusions to advance an argument is not
inappropriate. Those findings and conclusions may, or may not, be relevant to matters presented to the
Court. Used in this manner, although undoubtedly addressed "to the man" (and his credibility), it is not an
improper ad hominem attack.

EXHIBIT 12

PAGE _____   147

evidence of improper cultural bias"); id. (in the same footnote, referring to the same quotation, stating that "[t]he tone [of the report] itself is compelling proof that Mr. Durkin had no intention of providing an 'objective' report to the Court."); id. at 23 (referring to the Summary Report as "Mr. Durkin's ill-concealed advocacy piece"); id. (noting that advocacy, rather than objectivity, "is certainly the posture [Mr. Durkin] is most comfortable with"); Omni 808 Investors, LLC's Memorandum in Support of Its Requests to Strike Summary and Responsive Reports of Ronald L. Durkin (docket #5705) ("Motion to Strike"), filed June 8, 2009, at 4 (noting Omni's "doubts that the Court or any party would benefit further by continuing this façade of Mr. Durkin's 'impartiality'"); id. at 7 (calling Mr. Durkin's explanation of his conclusion regarding the relatedness of certain parties as "not only fatuous[,] but [also] intellectually dishonest"); id. at 9 (suggesting that Mr. Durkin intentionally concealed from the Court the fact that Mr. Larian sought other funding sources before turning to Mr. Kadisha); id. at 10 (noting that "Mr. Durkin's repeated references to Mr. Larian's and Mr. Kadisha's common 'Persian' heritage can only be viewed as an attempt to draw some nefarious ethnic connection between them"); id. at 12 (calling the reference to Mr. Larian's and Mr. Kadisha's ethnicity "unprofessional symptoms of improper cultural bias [that] have no place in a supposedly objective report"); Omni 808 Investors, LLC's Reply Memorandum (docket #5809) ("Reply Memo") at 14 (suggesting that not only Mr. Durkin, but also counsel for Mattel, harbor "cultural biases" that lead them to "suggest[] that [Mr. Larian's and Mr. Kadisha's] common heritage makes [them] more likely to act contrary to their own interests); id. at 15 (stating that, according to his own interview notes, Mr. Durkin "misrepresented" to the Court in his Summary Report how Mr. Larian and Mr. Kadisha portrayed their relationship with each other).

As alluded to, Omni 808's criticisms have not been limited to personal attacks; some of the criticisms are in fact aimed at the Reports themselves. See e.g., SOP at 16 ("Mr. Durkin's conclusion that the Wachovia-Omni transaction impacted 'MGAEI's solvency and ability to continue conducting operations' is simply wrong."). Any comment by the Court regarding the substance of the discussions, analyses, and conclusions presented to the Court in the Forensic Auditor's Summary, Responsive, and Final Reports is inadvisable at this time. With the filing of the Third Amended Answer and Counterclaims, much of the subject matter of the Forensic Auditor's Reports have been incorporated into the claims at issue in this action. As such, it would be premature for the Court to comment upon the substance of issues that are yet to be adjudicated, and that are subject to a trial by jury. Nevertheless, the Court has reviewed the Forensic Auditor's Summary, Responsive, and Final Reports, and the exhibits attached thereto. The Court has also reviewed and considered the criticisms aimed at the Forensic Auditor, cited and quoted above, as well as the entirety of all the papers responding to the Forensic Auditor's Reports filed to date. After this review, the Court is firmly convinced that all the personal criticisms of Mr. Durkin are unwarranted and unsubstantiated.

At best, the criticism of Mr. Durkin's performance and presentation represents a

MINUTES FORM 90
CIVIL – GEN                                      9                    Initials of Deputy Clerk __cls_____

EXHIBIT 12

PAGE _____148

different interpretation of available evidence.  That such disagreements would arise between the analyses offered by a Court-Appointed Forensic Auditor and that offered by counsel for a party whose transactions have been a subject of that audit is by no means surprising.  A jury considering the relevant evidence might ultimately make factual determinations that tend to agree with Mr. Durkin's assessment, it might ultimately tend to agree with Mr. Gordinier's assessment, or it may very well reject both positions in favor of another.  The answer to the merits of the claims at issue in this action must await another day.  Today, the Court merely notes that its examination of the Forensic Auditor's Reports reveal that Mr. Gordinier's personal attacks aimed at their author were unjustified.

Some specific attacks directed toward Mr. Durkin – relating to his background as a law enforcement officer, his communications with counsel for Mattel, and specific (but baseless) allegations of ethnocentric bias -- are worthy of more specific comment by the Court.

Stopping short of explicitly stating such, Mr. Gordinier appears to labor under the assumption that Mr. Durkin has been unable to put behind him the prosecutorial mindset under which he presumably operated during his former service to this Nation as an agent of the Federal Bureau of Investigation ("FBI").  At the outset, the Court notes that Mr. Gordinier's unstated assumptions do a disservice to the prosecutors and the law enforcement officers who work with those prosecutors, both of whom conduct their work under the clearly delineated duty to ferret out not only evidence of guilt but also "evidence favorable to the accused."  See e.g., Berger v. United States, 295 U.S. 78, 88 (1935) (noting that the role of the prosecutor is not to win at all costs and observing that the prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.");  Brady v. Maryland, 373 U.S. 83, 87 (1963) (imposing a duty on prosecutors to provide to the defense exculpatory evidence when requested to do so).

Secondly, even if prosecutorial duties were not so defined, the Court finds no suggestion that Mr. Durkin skewed the evidence in favor of any particular viewpoint.  Undoubtedly, there is a *complete absence* of any evidence that, as Mr. Gordinier has suggested, Mr. Durkin has embarked upon a campaign to purposely mislead the Court.

Mr. Gordinier also suggests that, because Mr. Durkin's bills are being paid by Mattel, Mattel has, through this payment or through other communications with Mr. Durkin, bought Mr. Durkin's loyalty.  This is utter nonsense.  As demonstrated by the Court's communications with him, Mr. Durkin is a Court-Appointed Officer who understands that his role is to work on behalf of the Court and not on behalf of any party.  In any event, the Court's Order of January 7, 2009, which appointed Mr. Durkin, imposed the costs of the audit on Mattel "in the first instance," but expressly provided for

the possibility that the audit expenses be shared or shifted to the MGA parties. Moreover, to suggest, however subtly, that ex parte communications with counsel for Mattel were improper ignores the Court's mandate to the Forensic Auditor in the January 7, 2009, Order, which states that Mr. Durkin was provided with attorney contact information and that he "shall direct his initial communications to counsel." At no time has the Court precluded the Forensic Auditor's communications with Mattel or its counsel; in fact, because the Forensic Audit was undertaken based on evidence gathered by and presented to the Court by Mattel, Mr. Durkin would have been remiss in his duties if he failed to communicate with Mattel and its counsel.

Mr. Durkin was vested with powers and discretion to complete a Court-ordered Forensic Audit. Pursuant to an Order of this Court, he undertook this task and exercised those powers and that discretion, presenting his Reports in conformity with the Court's instructions. Despite counsel's attacks, the Court's review of the evidence before it discerns no abuse of those powers or of that discretion.

Particularly troubling to the Court is that counsel speculates that, because Mr. Durkin noted in his report that Mr. Larian knew Mr. Kadisha from "the Persian Community," Mr. Durkin could be "of the view that this common heritage makes Mr. Kadisha more likely to act contrary to his own interests or to do something via third-parties that he wouldn't otherwise do?" See SOP at 13-14 n.10 (appearing to pose this thought as a rhetorical question). There is no indication in the record, or otherwise, that Mr. Durkin holds such a view. To the contrary, Mr. Durkin's comment regarding the acquaintanceship of Mr. Larian and Mr. Kadisha from "the Persian Community" (which is noted in the report within quotation marks and is expressly attributed to a reference made by Mr. Larian himself) is clearly predicated on interviews with these two individuals, each of whom related independently to Mr. Durkin and his colleagues that they knew each other from "the Persian Community." See Durkin Summary Report, Ex. 14, at 2 ¶ 3 (Notes re March 25, 2009, interview with Mr. Larian: "He indicated that he knew Kadisha from the Persian community.") and Ex. 15 at 15 ¶ 2 (Notes re March 26, 2009, interview with Mr. Kadisha: "Kadisha stated that he knows Larian from the Persian community."). The purpose for this reference is made clear in the footnote set forth at the end of the sentence in which the reference appears; namely, the Report discusses evidence that the relationship between Mr. Larian and Mr. Kadisha is stronger and more personal than either man claimed it was. See Summary Report at 5 n.18; Ex. 15 (personal emails).

In the Reply Memo, Mr. Gordinier takes issue with this explanation, this time including not only Mr. Durkin but also counsel for Mattel as the targets for his unsubstantiated allegations of "cultural bias." Mr. Gordinier first mischaracterizes an argument made by Mattel. Mattel argued, and quite correctly, both that how well Mr. Larian and Mr. Kadisha knew each other was relevant to a determination of whether certain transactions between the two were arms-length transactions, and that this point was likely not lost on either of these two very sophisticated and successful

EXHIBIT 12
PAGE _____ 150

businessmen.[5]  As noted previously, both Mr. Larian and Mr. Kadisha stated that they knew each other from "the Persian community" which, in the Forensic Auditor's view, was intended to, or at least had the tendency to minimize the existing relationship between the two.  Mr. Gordinier incorrectly characterizes this argument as Mattel's contention that Mr. Larian's and Mr. Kadisha's "Persian relationship" and "common Persian heritage" was somehow relevant to a determination of whether the Omni 808 transaction was an arms-length transaction.  Mattel made no such argument.  Neither counsel for Mattel nor Mr. Durkin have implied that Mr. Larian's and Mr. Kadisha's ethnicity factors into the analysis.  Other than to point to Mr. Larian's and Mr. Kadisha's separate, but identical, accounts of how they knew each other which, in turn, suggests how well they know each other, neither counsel for Mattel nor Mr. Durkin have stated or implied that Mr. Larian's and Mr. Kadisha's shared ethnicity is relevant to any matter currently or potentially before the Court.  Compare Opposition at 8-9 with Reply Memo at 14-15.

Moreover, Mr. Gordinier's substantive point, that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha told him about the closeness of their relationship, fares no better.  See Reply Memo at 15.  On this point, it is important to set this stage properly.  Counsel for all parties have attempted to glean far too much from two sterile paragraphs of interview notes taken by Mr. Durkin.  Much can be inferred from conversations and interviews through not only what is said, but what is not said, by the interviewee's demeanor, by the tone of the speaker, by the length and placement of pauses, and by non-verbal gestures and body language.  With all these variables, much of what is communicated does not find its way into notes.[6]  For instance, Mr. Durkin's interview of Mr. Larian lasted over two and a half hours; however, the interview notes are a mere five and a half pages.  Similarly, a one-hour and ten minute interview of Mr. Kadisha yielded only three and a half pages of interview notes.  This is not to suggest that the notes should have been longer or that the interviews should have been recorded or transcribed; rather, it is to suggest that counsel's arguments based on another's notes are not particularly probative.

In contrast, Mr. Durkin's assessment, based on his interviews with both of them,

---

[5]  In fact, the Court just this week issued a 30-page, single-spaced opinion resolving a 10-day bench trial conducted over the sole issue of whether a transaction between "closely related" entities reflected its fair market value, one of the more significant arguments ultimately rejected by the Court in that case being that the close relationship between the parties necessarily rendered the transaction a "sweetheart deal."  See July 6, 2009, Order, Siegel v. Warner Bros. Entertainment, Inc., et al., CV 04-08400 SGL (RZ) (docket #554).

[6]  Indeed, the interview notes upon which the parties rely concede as much.  See Summary Report, Ex. 14 at 2, 15 ("This interview memorandum is a factual representation of the topics discussed during the interview and is not intended to be a word for word or exact transcription of the conversation.").  Thus, in addition to not taking into account all non-verbal communication, the notes do not even represent everything that was said during the interview.

EXHIBIT 12
PAGE 151

is that Mr. Larian and Mr. Kadisha attempted to minimize their relationship because both of them understand the relevance of any friendship or other connection between them to the assessment of the arms-length nature of any transactions in which they have engaged. Mr. Durkin's assessment does not come from the gentle teasing of a strained meaning from two sterile paragraphs of brief notes taken by another person; rather, his assessment springs from his participation in the interview process, the entirety of the interviews he conducted of Mr. Larian and Mr. Kadisha, and his review of all of the evidence. As such, the Court defers to his assessment, at least insofar as how Mr. Larian and Mr. Kadisha portrayed their relationship to him.

As for that scant language from which the parties glean so much meaning, the entirety of which is set forth below, it in no way supports the contention made by Mr. Gordinier that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha conveyed to him about the closeness of their relationship. On this topic, the notes of Mr. Larian's interview merely state the following:

> Larian decided to contact Neil Kadisha of OmniNet as he knew his company was in the distressed loan business. He indicated that he knew Kadisha from the Persian community. Kadisha said he wouldn't do the deal alone in today's environment and wanted Larian and their other friends to invest in the deal with MGA. Larian stated that Kadisha negotiated the debt with Wachovia and got it down significantly, Larian said he is not bitter about Kadisha getting a good deal on buying the loan.

Summary Report, Ex. 14, at 2 ¶ 3 (emphasis added). This paragraph contains the word "friends," and perhaps could even be read as an implicit statement by Mr. Larian that he and Mr. Kadisha are "friends." But the language does not compel such an inference. Moreover, it does not comport with the notes of Mr. Kadisha's interview, which on this topic state only the following:

> Larian and Kadisha have never been to dinner together. Kadisha stated that he knows Larian from the Persian community and he sees him often at religious events, etc. He has no investments with Larian. Kadisha did not talk with Larian last night, this morning or in the last two days.

Summary Report, Ex. 14, at 15, ¶ 2. Mr. Durkin's assessment that Mr. Larian and Mr. Kadisha sought to minimize the extent of their relationship is not contradicted by these short passages.

The criticism that Mr. Durkin was acting pursuant to an ethnic or cultural bias is clearly baseless. The allegations are irresponsible, and they are made to capitalize on

MINUTES FORM 90
CIVIL -- GEN                                    13                    Initials of Deputy Clerk __cls_____

EXHIBIT 12
PAGE 152

their inherent sensational nature for counsel's own purposes of diverting attention away from the substance of the Reports. Sensationalism aside, when viewed in context, the Reports' reference to Mr. Larian and Mr. Kadisha knowing each other from "the Persian community" was plainly innocuous. The reference was a direct quotation from both Mr. Larian and Mr. Kadisha. It was used in a broader discussion regarding how (and thus, impliedly, how well) the two knew each other, which is itself relevant to the issue of whether certain transactions relevant to the present litigation were made at arms length.

This is a most unfortunate incident. The Court certainly understands, in a case as hotly contested as this one -- with such high stakes, with such complex legal issues, and with such truly extraordinary legal talent on all sides -- that lawyers, however ethical and committed to the highest standards of professionalism (as the Court presumes and has found all counsel of record here to be), make statements or commit acts in haste that they subsequently regret. All of the players to this drama, are, after all is said and done, human. As such, all of us are vulnerable to all-too-common human frailties. The Court would place itself at the very top of any list of lawyers who have spoken improvidently at one time or another in this case (and any number of others). What the Court has witnessed here, however, in both manner and substance, for the reasons noted above, goes beyond what the Court can let pass without some manner of reprobation. So let the Court be clear: Nothing excuses the attempted character assassination in which Mr. Gordinier has engaged.

**IT IS SO ORDERED.**

MINUTES FORM 90
CIVIL -- GEN                                    14                    Initials of Deputy Clerk __cls_____

EXHIBIT 12

PAGE 153

# EXHIBIT 13



1   Robert C. O'Brien (SBN 154372)
    ARENT FOX LLP
2   555 West Fifth Street, 48th Floor
    Los Angeles, CA  90013-1065
3   Telephone:  213.629.7400
    Facsimile:  213.629.7401
4   obrien.robert@arentfox.com

5   Discovery Master

6

7

8                    UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10                       EASTERN DIVISION

11

12  CARTER BRYANT, an individual,         Case No.  CV 04-09049 SGL (RNBx)

13                Plaintiff,
                                          Consolidated with
14          v.                            Case No. CV 04-09059
                                          Case No. CV 05-2727
15  MATTEL, INC., a Delaware
    corporation,                          **PHASE 2 DISCOVERY MATTER**
16
                Defendant.                **ORDER NO. 52, REGARDING:**
17
                                          **(1)  MOTION TO COMPEL MGA**
18                                        **MEXICO TO PRODUCE**
                                          **DOCUMENTS RESPONSIVE TO**
19                                        **FIRST, SECOND AND THIRD SETS**
                                          **OF PHASE 1 REQUESTS FOR**
20                                        **PRODUCTION;**

21                                        **(2)  MOTION TO COMPEL MGA**
                                          **MEXICO TO PRODUCE**
22                                        **DOCUMENTS RESPONSIVE TO**
                                          **FIRST SET OF PHASE 2**
23                                        **REQUESTS FOR PRODUCTION;**
                                          **and**
24
                                          **(3)  MOTION FOR ISSUANCE OF**
25  CONSOLIDATED WITH                     **LETTERS OF REQUEST FOR**
    MATTEL, INC. v. BRYANT and            **VARGAS AND TRUEBA**
26  MGA ENTERTAINMENT, INC. v.
    MATTEL, INC.
27

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT 13

PAGE ___154___

                                          ORDER NO. 52
                            [Case No. CV 04-09049 SGL (RNBx)]

1    This Order sets forth the Discovery Master's ruling on the following

2    discovery matters: (1) the motion to compel MGA de Mexico, S.R.L. de C.V.

3    ("MGA Mexico") to produce documents in response to first, second and third sets

4    of Phase 1 requests for production filed by Mattel, Inc. ("Mattel") ("Motion to

5    Compel") [Docket No. 5971]; (2) the motion to compel production of documents in

6    response to Mattel's first set of Phase 2 requests for production to MGA Mexico

7    ("Second Motion to Compel") [Docket No. 5982]; and (3) the motion for issuance

8    of letters of request for Vargas and Trueba filed by Mattel and request for

9    amendment filed by MGA Entertainment, Inc. ("MGA") ("Letter of Request

10   Motion") [Docket Nos. 5994 and 6090] (collectively, the "Motions").

11       The Discovery Master, having considered the papers filed in support of and

12   in opposition to the Motions, and having determined that oral argument was

13   unnecessary, rules as set forth below.

14   **I.    MOTION TO COMPEL**

15       **A.    Factual Background**

16            **1.    MGA Mexico Objects To The First Set Of Requests For**

17                 **Production Propounded By Mattel**

18       On November 21, 2007, Mattel served its First Set of Requests for

19   Documents and Things on MGA Mexico, which included 148 separate requests for

20   production ("First Set of RFPs"). (Declaration of Marshall M. Searcy III in

21   Support of Mattel, Inc.'s Motion to Compel MGA Mexico to Produce Documents

22   and Things in Response to Mattel's First, Second and Third Sets of Requests for

23   Production to MGA Mexico ("Searcy Decl."), Ex. 1). MGA Mexico objected to the

24   First Set of RFPs thirty days later without agreeing to produce any responsive

25   documents. (*Id.*, Ex. 2 [Reponses to Requests 1 – 148]).

26   //

27   //

28   //

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT 13    - 1 -        ORDER NO. 52
                          [Case No. CV 04-09049 SGL (RNBx)]

PAGE _____ 155

    **2.**    **MGA Mexico Agrees To Produce Responsive Documents To 318 Of The Second Set Of Requests For Production Propounded By Mattel But Stands On Its Objections To The Remaining 102 Requests**

On December 12, 2007, Mattel served its Second Set of Requests for Documents and Things on MGA Mexico ("Second Set of RFPs"). (*Id.*, Ex. 3). The Second Set of RFPs contained 420 separate requests for production. (*Id.*).

On January 11, 2008, MGA Mexico served its responses to the Second Set of RFPs. (*Id.*, Ex. 4). With respect to 318 of the requests, it agreed to "produce all, non-privileged, responsive documents in its possession, custody or control."[1] (*Id.*, Ex. 4 [Responses to Request Nos. 1 – 8, 13 – 22, 25 – 35, 42 – 45, 54 – 58, 61, 71 – 85, 89 – 96, 101 – 104, 106, 117 – 147, 151 – 167, 174, 175, 177 – 179, 181 – 192, 194 – 199, 201 – 219, 221, 222, 227 – 248, 253 – 268, 277 – 299, 302 – 316, 329 – 342, 345 – 385, 387 – 397, 400 – 410, and 412 – 417]). As for the remaining 102 requests, it stood on its objections and refused to produce any responsive documents. (*Id.*, Ex. 4 [Responses to Request Nos. 9 – 12, 23, 24, 36 – 41, 46 – 53, 59, 60, 62 – 70, 86 – 88, 97 – 100, 105, 107 – 116, 148 – 150, 168 – 173, 176, 180, 193, 200, 220, 223 – 226, 249 – 252, 269 – 276, 300, 301, 317 – 328, 343, 344, 386, 398, 399, 411, and 418 – 420]).

    **3.**    **MGA Mexico Objects To The Third Set Of Requests For Production Propounded By Mattel**

On January 22, 2008, Mattel served six additional requests for production on MGA Mexico ("Third Set of RFPs"). (*Id.*, Ex. 5). MGA Mexico objected to this Third Set of RFPs on February 21, 2008 and, once again, did not agree to produce any responsive documents. (*Id.*, Ex. 6 [Responses to Request Nos. 1 – 6]).

---

[1] In its Opposition to the Motion to Compel, MGA Mexico asserts that it agreed to produce documents in response to 309 of the requests. However, this figure is inconsistent with the actual responses to the Second Set of RFPs. (Compare Opposition to Motion to Compel at p. 4 fn. 9 with Ex. 4 to the Searcy Decl.).

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 2 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT **13**

PAGE **156**

**B.    The Relief Sought By Mattel**

Mattel requests that the Discovery Master (1) overrule all of MGA Mexico's objections to Mattel's First Set of RFPs, Second Set of RFPs and Third Set of RFPs, (2) compel MGA Mexico to produce all relevant, non-privileged documents in its possession, custody or control which are responsive to Mattel's First Set of RFPs, Second Set of RFPs and Third Set of RFPs, (3) compel MGA Mexico to provide Mattel with a privilege log, and (4) impose sanctions in the amount of $5000.  (Motion to Compel, pp. 32 – 33).

Mattel claims that such relief is warranted for the following reasons.  First, Mattel argues that MGA Mexico's general objections do not provide a basis to withhold any documents.  (*Id.*, pp. 11 – 13).  Second, Mattel argues that MGA Mexico's specific objections are boilerplate and improper.  (*Id.*, pp. 5 – 6).  Third, Mattel argues that MGA Mexico's definitional objections are unfounded.  (*Id.*, pp. 14 – 17).  Fourth, Mattel argues that MGA Mexico's relevance objections are conclusory and should be overruled because the requests are relevant to Phase 2 issues.  (*Id.*, pp. 6 – 7 and 18 – 31).  Fifth, Mattel argues that the production of documents by other parties does not relieve MGA Mexico of its obligation to produce documents.  (*Id.*, pp. 10 – 11).  Sixth, Mattel argues that MGA Mexico may not avoid producing documents within its possession, custody or control by requiring Mattel to seek documents from other sources.  (*Id.*, pp. 7 – 8).  Seventh, Mattel argues that that the requests describe the categories of documents to be produced with reasonable particularity.  (*Id.*, pp. 8 – 9).  Eighth, Mattel argues that the protective order is sufficient to protect any privacy rights and commercially sensitive information.  (*Id.*, pp. 9 – 10).  Ninth, Mattel argues that MGA Mexico's mere agreement to produce documents regarding some of the requests does not foreclose an order compelling production.  (*Id.*, pp. 13 – 14).  Finally, Mattel argues that MGA Mexico should be sanctioned for its refusal to comply with its discovery obligations.  (*Id.*, pp. 31 – 32).

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT 13

PAGE 157

-3-

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

## C.   MGA Mexico's Opposition

MGA Mexico opposes the Motion to Compel on six grounds.  First, MGA Mexico argues that the Motion to Compel is procedurally defective because there is no separate statement, Mattel has not provided the necessary information for the Discovery Master to evaluate each of the 574 requests at issue, and "[i]t simply is not enough for Mattel to broadly categorize its requests and summarily dismiss each of MGA Mexico's detailed objections and responses to the requests." (Opposition to Motion to Compel, pp. 7 – 8).  Second, MGA Mexico argues that the Motion to Compel is unreasonable and improper because (1) Mattel is seeking to compel production with respect to 574 document requests and refuses to narrow or limit even a single request, (2) the Motion to Compel ignores the thousand pages of detailed objections to the 574 requests, (3) MGA Mexico has agreed to produce documents in response to more than 300 of the requests at issue, (4) many of the requests are duplicative of those served on other MGA Parties, (5) the MGA Parties have produced 4.2 million pages of documents, (6) Mattel has refused to conduct simple searches that would demonstrate MGA Mexico has produced documents, (7) Mattel has not given any consideration to whether the specific requests at issue are still relevant or necessary, (8) it is irrelevant in most instances whether an MGA-created document is in the possession of MGA Mexico, (9) it is clear from the face of many documents whether it was in the possession of MGA Mexico, and (10) Mattel's representation that more than 400 requests are relevant to the issue of unclean hands demonstrates the "absurdity of its position." (*Id.*, pp. 4 – 7).  Third, MGA Mexico argues that a number of defined terms embedded in the requests are objectionable. (*Id.*, pp. 9 – 12).  Fourth, MGA Mexico argues that the requests seek irrelevant information, are overbroad and unduly burdensome. (*Id.*, pp. 12 – 16). Fifth, MGA Mexico argues that its objections to the requests are not boilerplate but have been specifically tailored to each request. (*Id.*, pp. 16 – 17).  Finally, MGA Mexico argues that Mattel should be sanctioned for filing "an omnibus motion to

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

-4-

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 13

PAGE ___158

1   compel" without agreeing to limit its requests in any fashion and with the

2   knowledge that MGA Mexico agreed to provide documents in response to more

3   than 300 requests at issue.[2]  (*Id.*, pp. 17 – 18).

4        **D.    Analysis**

5            **1.    Federal Rules Of Civil Procedure 26 And 34**

6         Pursuant to Federal Rule of Civil Procedure 26(b), "[p]arties may obtain

7   discovery regarding any matter, not privileged, that is relevant to the claim or

8   defense of any party. . . . Relevant information need not be admissible at trial if the

9   discovery appears reasonably calculated to lead to the discovery of admissible

10  evidence." (Fed. R. Civ. P. 26(b)(1)).

11        Federal Rule of Civil Procedure 34 further allows a party to

12           serve on any other party a request within the scope of

13           Rule 26(b): (1) to produce and permit the requesting party

14           or its representative to inspect [or] copy . . .  the following

15           items in the responding party's possession, custody, or

16           control: (A) any designated documents or electronically

17           stored information--including writings, drawings, graphs,

18           charts, photographs, sound recordings, images, and other

19           data or data compilations--stored in any medium from

20           which information can be obtained either directly or, if

21           necessary, after translation by the responding party into a

22           reasonably usable form . . . .

23  (Fed. R. Civ. P. 34(a)).

24

25  [2] The parties filed several supplemental declarations (two by MGA Mexico and one by Mattel) after the Discovery Master ruled that the Motions would be decided on the papers (collectively, the "Supplemental Papers"). Mattel

26  objected to the second supplemental declaration filed by MGA Mexico. Because the Supplemental Papers are untimely, I exercise my discretion not to consider them. (*See, e.g., Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 520

27  (9th Cir. 1990) [district court may disregard untimely opposing affidavits]; *Russell v. Harms*, 397 F.3d 458, 467 (7th Cir. 2005) [not abuse of discretion for district court to refuse to consider late filed affidavit]). Regardless, the

28  Supplemental Papers do not alter the conclusions reached herein in any way.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 5 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 13

PAGE _____ 159

1   A request served in connection with Rule 34(a) "must describe with

2 reasonable particularity each item or category of items to be inspected" and

3 "specify a reasonable time, place, and manner for the inspection and for performing

4 the related acts."  (Fed. R. Civ. P. 34(b)).

5   "The party to whom the request is directed must respond in writing within 30

6 days after being served" and "either state that inspection and related activities will

7 be permitted as requested or state an objection to the request, including the

8 reasons."  (*Id.*).  Where the responding party indicates that it will produce

9 documents, it must produce them "as they are kept in the usual course of business

10 or must organize and label them to correspond to the categories in the request."

11 (*Id.*).

12   **2.  The Motion To Compel Is Proper With Respect To 318**

13      **Requests**

14   As an initial matter, MGA Mexico asserts in its Opposition that the Motion to

15 Compel is at least partially moot because it "has agreed to produce document in

16 response to more than 300 of the requests at issue." (Opposition to Motion to

17 Compel, p. 4 and fn. 9).  However, there is an important distinction between

18 promising to produce documents and actually producing them.  Unless the promise

19 is fulfilled, stating that documents will be produced means nothing.  As Mattel

20 notes, "[e]ither information has been disclosed or it has not been disclosed.  If it has

21 not been disclosed, then, plainly, it remains to be compelled." (Motion to Compel,

22 p. 13 [quoting *Lamoureux v. Genesis Pharmacy Servs., Inc.*, 226 F.R.D. 154, 159

23 (D.Conn. 2004)]).  Accordingly, Mattel's Motion to Compel is not moot unless

24 MGA lived up to its promise to "produce all, non-privileged, responsive documents

25 in its possession, custody or control" concerning 318 requests set forth in the

26 Second Set of RFPs. (Searcy Decl., Ex. 4 [Responses to Request Nos. 1 – 8, 13 –

27 22, 25 – 35, 42 – 45, 54 – 58, 61, 71 – 85, 89 – 96, 101 – 104, 106, 117 – 147, 151

28 – 167, 174, 175, 177 – 179, 181 – 192, 194 – 199, 201 – 219, 221, 222, 227 – 248,

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

-6-

1   253 – 268, 277 – 299, 302 – 316, 329 – 342, 345 – 385, 387 – 397, 400 – 410, and

2   412 – 417]).

3       a.   **Even If It Produced Documents Previously, MGA**

4            **Mexico Has Not Produced Materials In Compliance**

5            **With Federal Rule Of Civil Procedure 34**

6       While MGA Mexico argues "that documents from [it] ha[ve], in fact, been

7   previously produced in th[is] action," (Opposition to Motion to Compel, p. 3), it has

8   not satisfied its obligation under Rule 34 to produce documents "as they are kept in

9   the usual course of business or . . . [alternatively] organize and label them to

10  correspond to the categories in the request." (Fed. R. Civ. P. 34(b)). Indeed, even

11  assuming the Discovery Master found MGA Mexico's assertion that it has

12  previously produced documents credible (which I do not for the reasons discussed

13  below in Section I.A.2.b.), the most favorable interpretation of MGA Mexico's

14  position is that it produced responsive materials at the same time as other MGA

15  Parties. (Opposition to Motion to Compel, p. 2 ["[T]he MGA Parties have

16  produced more than 4.2 million documents. However, Mattel wants . . . to badger

17  MGA Mexico into reproducing thousands of documents already produced in this

18  action, either by MGA Mexico or by another MGA party."]). But a production that

19  commingles MGA Mexico's documents along with the documents of other MGA

20  Parties is not a production of documents "as they are kept in the usual course of

21  business." (Fed. R. Civ. P. 34(b)). Nor has MGA Mexico organized and labeled

22  any alleged documents that it produced to correspond to the categories in Mattel's

23  requests. (*Id.*). Accordingly, the Discovery Master finds that, even assuming MGA

24  Mexico previously produced responsive documents, it has not complied with Rule

25  34. For this reason alone, the Motion to Compel must be granted with respect to

26  the 318 requests for which MGA Mexico promised to provide all non-privileged

27  responsive documents.

28  //

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT 13

PAGE 161

- 7 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

1
2
3
4

      **b.**    **MGA Mexico Has Not Established That It Has Produced Any Documents Responsive To The 318 Requests For Which It Promised To Provide All Non-Privileged Materials**

5        The Discovery Master also finds that the contention that MGA Mexico has

6    already produced responsive documents is not supported by the record.  The lone

7    production MGA Mexico references in its Opposition as potentially having been

8    produced is a CD, (*see* Opposition to Motion to Compel, p. 5), which is "Bates

9    numbered *MGA* 3815506,"[3] (Reply in Support of Motion to Compel, p. 3; *see also*

10   Declaration of William A. Molinski, Ex. C at p.1).  That *MGA* may have produced

11   a CD, however, is not the same as *MGA Mexico* satisfying its independent

12   discovery obligations unless MGA Mexico is claiming that certain documents were

13   actually produced by MGA on its behalf.  But there is no such allegation set forth

14   anywhere in MGA Mexico's Opposition.

15        Nor does the Opposition ever reference any correspondence in which MGA

16   Mexico allegedly transmitted a document production to Mattel, let alone point to

17   any documents bearing a MGA Mexico bates number.  Rather than simply

18   identifying the documents it produced, MGA Mexico has ignored multiple requests

19   from Mattel for this basic information. In fact, in its meet and confer efforts leading

20   up to this motion, Mattel sent MGA Mexico's counsel a letter that claimed "MGA

21   Mexico has not produced any documents in response to Mattel's First, Second, and

22   Third Sets of Request." (Searcy Decl., Ex. 7).  MGA responded one week later by

23   stating that it "will not re-produce the **millions** of documents it has already

24   produced." (*Id.*, Ex. 8 at p. 1 [emphasis in original]).  Mattel then informed MGA

25

26   [3] MGA Mexico claims that "it is clear from the face of many documents produced whether it was in the possession of MGA Mexico" because they are in Spanish and/or provide sufficient information for Mattel do determine whether

27   the documents were in MGA Mexico's possession. (Opposition to Motion to Compel, p. 7).  However, the critical inquiry regarding production is not whether the documents were in MGA Mexico's possession at some point in time

28   but rather whether MGA Mexico in fact produced the document(s).

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 8 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 13

PAGE 162

1   Mexico that

2           None of the '4.2 million pages' you refer to has a

3           distinctive Bates number or other identifier which would

4           indicate that any of them were produced by MGA

5           Mexico.  Moreover, your letter does not identify a single

6           document produced by MGA Mexico.  Nor does your

7           letter identify a single document request for which MGA

8           Mexico has produced documents. . . . *As part of the meet*

9           *and confer, we would expect that, if MGA Mexico has*

10          *indeed produced responsive documents, it should be*

11          *prepared to identify by Bates number the responsive*

12          *documents it claims to have produced . . .*

13  (*Id.*, Ex. 9 at pp. 1 and 2 [emphasis added]).  After receiving this correspondence

14  from Mattel, MGA Mexico reiterated that it did not have any obligation to indicate

15  which of the millions of documents produced by the MGA Parties were actually

16  produced by MGA Mexico.[4]  (*Id.*, Ex. 10 at p. 1).  This statement is not only in

17  violation of Federal Rule of Civil Procedure 34's requirements regarding how

18  documents must be produced, (*see Mancini v. Insurance Corp. of New York*, 2009

19  WL 1765295 *5 (S.D.Cal., June 18, 2009) [concluding that a party is required to

20  produce documents as they are kept in the ordinary course of business or respond to

21  document requests by specifying which documents respond to which requests, such

22  as by bates number]), but fails to even identify what documents were produced.

23  Because MGA Mexico has not sufficiently identified any documents that it has

24  //

25  //

26

27  [4] The parties further had a conversation on April 23, 2009 wherein, at least according to Mattel's counsel, MGA
    Mexico again took the "position that it will not identify the documents, if any, that it has produced in this
28  litigation. . . . [and that it] did not have any record of the documents it produced." (*Id.*, Ex. 11 at p. 1).

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

                                                    - 9 -                    ORDER NO. 52
                                                                  [Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 13

PAGE _____ 163

1   allegedly produced to Mattel,[5] the Discovery Master grants Mattel's Motion to

2   Compel for all 318 requests where MGA Mexico promised to provide responsive

3   documents and orders all non-privileged materials produced within (20) days of this

4   Order.  In the alternative, MGA Mexico may specifically identify by bates number

5   the "millions" of documents it claims to have already produced.

6         **3.    The Format Of The Motion To Compel Is Inadequate To**

7                 **Permit An Efficient Analysis Of The Remaining 256**

8                 **Document Requests**

9         In Order No. 3, I overruled an objection arguing that Mattel's motion to

10  compel documents from several non-parties should be denied because it filed a

11  separate statement that may have included duplicative arguments.  (Order No. 3, pp.

12  9 – 10).  In so doing, I explained that "where there are numerous discovery requests

13  in dispute [I] would prefer for a separate statement to be submitted by the moving

14  party."  (*Id.*, p. 10 fn. 10).

15        With respect to the Motion to Compel, there are 256 document requests at

16  issue to which MGA Mexico has not agreed to produce any responsive documents.

17  (Searcy Decl., Ex. 2 [Responses to Request Nos. 1 – 148], Ex. 4 [Responses to

18  Request Nos. 9 – 12, 23, 24, 36 – 41, 46 – 53, 59, 60, 62 – 70, 86 – 88, 97 – 100,

19  105, 107 – 116, 148 – 150, 168 – 173, 176, 180, 193, 200, 220, 223 – 226, 249 –

20  252, 269 – 276, 300, 301, 317 – 328, 343, 344, 386, 398, 399, 411, and 418 – 420],

21  and Ex. 6 [Responses to Request Nos. 1 – 6).  Mattel also acknowledges—as it

22

23  ⁵ MGA Mexico's refusal to identify the documents it purportedly produced is likewise not excused because other
    MGA Parties may have produced documents.  MGA Mexico and MGA are separate defendants with independent
24  obligations to respond to discovery.  (Fed. R. Civ. P. 34).  While MGA Mexico argues that compelling discovery
    from it is unnecessary and duplicative because MGA has already responded to similar document requests,
25  (Opposition to Motion to Compel, p. 5), discovery requests that are similar may nonetheless lead to the discovery of
    different information because documents "actually maintained in the files of each entity may not be identical."  (*See,*
26  *e.g., Diamond State Ins. Co. v. Rebel Oil Co., Inc.,* 157 F.R.D. 691, 697 (D.Nev. 1994)).  Furthermore, Mattel is
    entitled to have MGA Mexico produce documents for purposes of authentication and because MGA Mexico's
27  possession of particular documents is at issue.  Indeed, Mattel has alleged that MGA Mexico persuaded Mattel
    employees to steal confidential information so that it could unfairly compete with Mattel.  Therefore, MGA Mexico's
28  possession of Mattel's information is a relevant fact and discoverable.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 10 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 13

PAGE 164

Case 2:04-cv-09049-DOC-RNB  Document 6651-5  Filed 09/11/09  Page 28 of 70  Page ID
#:219189
Case 2:04-cv-09049-SGL-RNB    Document 6437    Filed 08/26/2009    Page 12 of 36

1    must—that MGA Mexico has asserted a litany of objections to every single request.

2    (Motion to Compel, p. 6 fn. 14).  Nevertheless, Mattel declined to file a separate

3    statement in support of its Motion to Compel because it thought a separate

4    statement "would not aid the Discovery Master in the resolution of this Motion

5    since it would consist of lengthy, unhelpful repetitions of the same MGA Mexico

6    objections over and over again." (*Id.*).

7        I disagree.  Given the voluminous nature of the document requests at issue,

8    the individual requests and responses must be submitted in a format that permits me

9    to review them side by side in a single document along with the parties' respective

10   positions.

11       In addition to failing to provide the necessary information in a usable format,

12   Mattel has not demonstrated how each of the document requests at issue is relevant

13   to a Phase 2 issue. (*See Bryant v. Ochoa*, 2009 WL 1390794 at *1 (S.D.Cal. 2009)

14   ["The party seeking to compel discovery has the burden of establishing that its

15   request satisfies the relevancy requirements of Rule 26(b)(1). . . . Thereafter, the

16   party opposing the discovery has the burden of showing that the discovery should

17   be prohibited, and the burden of clarifying, explaining or supporting its

18   objections."]).  To the contrary, it has grouped its requests into categories and

19   broadly alleged that they relate to general issues in this case, including claiming

20   that 420 requests relate to MGA Mexico's affirmative defense of unclean hands.

21   (Motion to Compel, pp. 18 – 31).

22       Because it is Mattel's burden to apprise me of the issues in dispute and

23   demonstrate why the documents it seeks to compel are reasonably calculated to lead

24   to the discovery of admissible evidence, I find that the Motion to Compel is

25   procedurally defective at this time with respect to the remaining 256 document

26   requests and, therefore, deny it without prejudice.

27   //

28   //

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT 13

PAGE _____ 165

- 11 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

1          **4.**     **The Parties Are Ordered To Meet And Confer In Person**

2                  **Regarding The 256 Document Requests And Submit A Joint**

3                  **Statement Concerning Any Issues That Cannot Be Resolved**

4         Prior to the filing of any subsequent motion addressing the 256 document

5  requests, Mattel and MGA Mexico shall comply with Local Rule 37-1 (as modified

6  herein). Specifically, counsel for the parties (who possess authority to enter into

7  discovery agreements on behalf of their clients) shall meet and confer *in person* in a

8  good faith effort to eliminate the necessity for hearing the motion or to eliminate as

9  many of the disputes as possible. This conference shall take place at a mutually

10 convenient time within five (5) calendar days after Mattel serves a letter requesting

11 such conference on MGA Mexico's counsel.

12        If the parties are unable to settle their differences at the aforementioned

13 conference, they shall formulate a joint statement. The statement shall contain all

14 issues in dispute and, with respect to each such issue, the contentions and points

15 and authorities of each party. The statement shall not refer the Discovery Master to

16 any other documents. The specification of the issues in dispute, and the parties'

17 contentions and points and authorities with respect to such issues, may be preceded

18 by an introductory statement from each party, provided that no party's introductory

19 statement shall exceed twenty-five (25) pages in length. When a party states its

20 contentions with respect to a particular issue, such party shall also state how it

21 proposed to resolve the dispute over that issue at the conference of counsel. The

22 stipulation should present the disputed issues as concisely as the subject matter

23 permits and should be accompanied by an indexed table of contents setting forth the

24 headings or subheadings contained in the body thereof, but need not be

25 accompanied by a table of authorities.

26        Following the conference of counsel, counsel for Mattel shall personally

27 deliver, e-mail or fax to counsel for MGA Mexico Mattel's portion of the statement,

28 together with all declarations and exhibits to be offered in support of its position.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 12 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 13
PAGE 166

1  Within fourteen (14) days, counsel for MGA Mexico shall personally deliver, e-

2  mail, or fax to counsel for Mattel MGA Mexico's portion of the stipulation,

3  together with all declarations and exhibits to be offered in support of its position.

4  After MGA Mexico's papers are added to the stipulation, it can be filed.

5        **E.**    **Summary Of Ruling Regarding The Motion To Compel**

6        The Discovery Master grants the Motion to Compel in part and orders MGA

7  Mexico to produce all non-privileged documents responsive to the 318 requests for

8  production for which it previously stated it would produce responsive materials

9  along with a privilege log.  The Discovery Master denies the Motion to Compel

10  without prejudice regarding the remaining 256 document requests, instructs the

11  parties to meet and confer in person to determine if any issues can be eliminated

12  regarding any subsequent motion involving the 256 requests, and orders the parties

13  to submit a joint stipulation in the event their differences cannot be resolved.

14        **F.**    **The Parties' Respective Requests For Sanctions**

15        Both parties contend that they are entitled to sanctions.  (Motion to Compel,

16  pp. 31 and 32; Opposition to Motion to Compel, pp. 17 and 18).  However, each

17  side advanced some meritorious arguments and partially prevailed in connection

18  with the Motion to Compel.  Accordingly, the Discovery Master concludes that an

19  award of sanctions against either side is inappropriate.

20  **II.**    **SECOND MOTION TO COMPEL**

21        **A.**    **Factual Background**

22              **1.**    **Mattel Serves Its First Set Of Phase 2 Requests, And MGA**

23                    **Mexico Responds By Objecting To All Categories**

24        On April 16, 2009, Mattel served its First Set of Requests for Documents

25  (Phase 2) on MGA Mexico (the "Requests").  (Declaration of Marshall M. Searcy

26  III in Support of Mattel, Inc.'s Motion to Compel Production of Documents and

27  Things in Response to Mattel's 1st Set of (Phase 2) RFPs to MGA Mexico

28  ("Second Searcy Decl."), Ex. 4).  The Requests consist of 83 categories seeking,

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT __13__

PAGE ___167___

- 13 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

1  among other things, documents concerning the involvement of Marianna Trueba

2  and Pablo Vargas ("Trueba and Vargas") in almost every aspect of the operation of

3  MGA Mexico.

4      MGA Mexico responded to the Requests on May 18, 2009. The responses

5  consisted entirely of objections and did not state that MGA Mexico would produce

6  documents in response to any of the 83 categories. Among other things, MGA

7  Mexico objected that the requests were overly broad and unduly burdensome on the

8  grounds "that the post-March 1, 2007 time period is beyond the scope of Mattel's

9  Second Amended Answer and Counterclaims and is irrelevant to this action." (*See,*

10  *e.g.,* Second Searcy Decl., Ex. 5 [Response to Request Nos. 1 – 47]). MGA

11  Mexico also objected that the requests were duplicative of prior requests (but did

12  not identify the supposedly duplicative requests), sought trade secret information,

13  and "violate[d] the privacy rights of third parties to their confidential, proprietary or

14  trade secret information." (*Id.* [Response to Request Nos. 1 – 83]).

## 2.     The Meet And Confer Process

16     On June 18, 2009, counsel for Mattel wrote to MGA Mexico to request a

17  meet and confer regarding the objections and Mattel's anticipated motion to compel

18  ("June 18, 2009 Letter"). (Second Searcy Decl., Ex. 6).

19     According to Mattel, the Requests relating to Trueba and Vargas are proper

20  because MGA Mexico had placed "at issue their duties, responsibilities and roles

21  for MGA Mexico" by claiming that they "are . . . low-level employees without

22  meaningful responsibility." (*Id.* at p. 1). Mattel asserted that the documents sought

23  could enable Mattel to rebut that claim. Mattel also argued that the documents

24  sought bear on the issue of whether Vargas and Trueba's actions could be imputed

25  to MGA Mexico. (*Id.* at pp. 1 and 2).

26     With respect to the Requests involving MGA Mexico's communications with

27  law enforcement officials, Mattel noted that MGA Mexico had successfully sought

28  an order compelling such documents from Mattel. Consequently Mattel should be

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT 13
PAGE 168

- 14 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

1 able to obtain any such documents in MGA Mexico's possession. (*Id.* at p. 2).

2 With respect to information relating to MGA Mexico's trade secrets and contracts

3 between it and third parties which were negotiated by Trueba and Vargas, Mattel

4 asserted that any privacy concerns are obviated by the existence of the Protective

5 Order. (*Id.*) Mattel did not offer any discussion of specific Requests in its June 18,

6 2009 Letter.

7  Before MGA Mexico responded to the June 18, 2009 letter, counsel for

8 Mattel wrote a follow up letter asking for "available dates for a meet and confer."

9 (Second Searcy Decl., Ex. 7).

10  The next day (i.e., June 25, 2009), MGA Mexico responded ("June 25, 2009

11 Letter"). It began by asserting that 43 of the Requests (i.e., Request Nos. 1 – 21, 24

12 – 26, 29 – 32, 37, 39 – 50, 55 and 56) "all purport to seek information to establish

13 that [Trueba and Vargas] are managing agents of MGA Mexico," which "is only

14 conceivably relevant to determine whether [they] may be compelled to attend

15 depositions based on mere notice." (Second Searcy Decl., Ex. 8 at p. 1). MGA

16 Mexico asserted that, given the rulings by the Court and the Discovery Master

17 adjudicating that issue, such Requests are moot. (*Id.*).

18  MGA Mexico next turned to a group of 14 Requests (Nos. 22, 23, 33 – 36,

19 57, 59, 61, 63, 65, 69, 77 and 78). Quoting four of those Requests (i.e., Nos. 36,

20 59, 77, and 78) MGA Mexico discussed each individually to illustrate its contention

21 that the entire group seeks information about MGA Mexico's internal policies with

22 respect to trade secrets, expenditures and other matters which, according to MGA

23 Mexico, "bear no relation" to the parties' claims and defenses. (*Id.* at pp. 1 and 2).

24  Lastly, MGA Mexico argued that seven of the requests (Request Nos. 22, 23,

25 57, 65, 69, 77, and 78) are overly broad. (*Id.* at pp. 2 and 3).

26  Despite the foregoing objections, MGA Mexico agreed to produce "all

27 relevant, non-privileged documents responsive to Request Nos. 27, 28, 38, 51 – 54,

28 58, 60, 62, 64, 66 – 68, 70 – 76, and 79 – 83. (*Id.* at p. 3). Among these are three

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 15 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 13

PAGE 169

1  categories (Request Nos. 51 – 53) relating to the alleged theft of trade secrets and

2  criminal investigation arising therefrom.  However, as of this date, MGA Mexico

3  has not produced any of the promised documents.

4        In the June 25, 2009 Letter, MGA Mexico's counsel also offered to meet the

5  next day to try to reach an agreement on these issues.  (*Id.*).  Mattel did not respond

6  to this offer.

7        **3.    Mattel Files The Second Motion To Compel**

8        On July 15, 2009, Mattel filed its Second Motion to Compel against MGA

9  Mexico.  Mattel did not file a Separate Statement setting forth the individual

10  Requests and an explanation as to why each was appropriately tailored to seek

11  information relevant to Phase 2 issues.  Nor did Mattel discuss the text of a single

12  one of the Requests in its motion.  Instead, Mattel grouped the Requests in

13  categories and summarized the general subject matter of those categories, without

14  quoting any specific language actually contained in the Requests or linking that

15  language to Phase 2 issues.

16        With respect to the 26 Requests for which MGA Mexico agreed during the

17  meet and confer process to produce "relevant" documents, Mattel pointed out that

18  MGA Mexico has failed to produce a single page of these promised documents.

19  Mattel also argued that MGA Mexico's agreement to produce only documents

20  which it deems relevant is improper in that Mattel is entitled to all responsive

21  documents, not just those MGA Mexico cherry picks pursuant to its own

22  undisclosed, subjective criteria.  (Second Motion to Compel, p. 22 and Reply in

23  Support of Second Motion to Compel, pp. 3 – 4).

24        **4.    MGA Mexico's Opposition To The Second Motion To**

25             **Compel**

26        In its Opposition to the Second Motion to Compel, MGA Mexico argues that

27  Mattel failed to adequately meet and confer by, among other things, refusing to

28  clarify or narrow the scope of even a single one of the Requests.  MGA Mexico also

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT  13

PAGE  170

- 16 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

1  argues that Mattel ignored MGA Mexico's proposal to further meet and confer on

2  June 26, 2009 and instead rushed headlong into premature motion practice.

3  (Opposition to Second Motion to Compel, pp. 5 and 6).

4       With respect to the substance of the motion, MGA Mexico notes that Mattel

5  did not discuss the actual text of a single one of the Requests in its Second Motion

6  to Compel or supply the Discovery Master with a Separate Statement.  MGA

7  Mexico then quotes and discusses several of the Requests to support its contention

8  that the Requests are overbroad and unduly burdensome.  (*Id.*, pp. 6 – 13).

9  However, it did not support its claim of burden by providing any declaration

10 indicating that the Requests would, in practice, force MGA Mexico to review and

11 produce an unduly voluminous amount of documents.

12      **B.    The Relief Sought By the Parties**

13      Mattel seeks to compel immediate compliance with all 83 categories as

14 written, without narrowing, clarifying or qualifying the scope of any of them.

15 Mattel also seeks sanctions in the amount of $5,000, representing the attorneys'

16 fees incurred in preparing the Second Motion to Compel, but has not provided a

17 declaration attesting to the amount of fees incurred.

18      MGA Mexico claims that the Second Motion to Compel should be denied for

19 the reasons discussed above and seeks sanctions based on Mattel's alleged failure to

20 meet and confer in good faith.  However, MGA Mexico has not specified the

21 amount of sanctions sought by it nor submitted a declaration attesting to the amount

22 of fees it incurred in opposing the Second Motion to Compel.

23      **C.    Analysis**

24           **1.    Neither Side Has Fulfilled Its Discovery Obligations**

25      As demonstrated by the facts set forth above, the parties have made virtually

26 no progress in narrowing – or even defining – their disputes in a manner that would

27 enable the Discovery Master to efficiently adjudicate the Second Motion to

28 Compel.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT 13

PAGE 171

1    As the moving party, Mattel bears the burden of: (1) demonstrating that it
2  has made a good faith attempt to resolve, or at least narrow, the dispute, and
3  (2) presenting the issues to the Discovery Master in a format that will enable me to
4  address the dispute in an orderly and efficient manner. Mattel has not sufficiently
5  accomplished either of these necessary prerequisites.

6    Mattel has also not sufficiently addressed the merits of MGA Mexico's
7  relevance objections. Moreover, while Mattel is correct that a Separate Statement
8  is not required with respect to every motion to compel filed in this matter, that fact
9  does not absolve the moving party from presenting the issues in *some* readily-
10  usable format. Nor does it conform with the pronouncement in Order No. 3,
11  indicating that "where there are numerous discovery requests in dispute [I] would
12  prefer for a separate statement to be submitted by the moving party." (Order No. 3,
13  p. 10 fn. 10).

14    Here, Mattel never discussed the actual language of a single one of the 83
15  Requests in its moving papers. Instead, Mattel opted to summarize the general
16  subject matter of groups of Requests. Such an approach is of very little use where,
17  as here, the responding party is objecting to the specific language of numerous
18  individual Requests.

19    For its part, MGA Mexico has failed to adequately respond to the Requests.
20  While many of the Requests may be overbroad, they clearly encompass some
21  relevant documents. Accordingly, MGA Mexico had the obligation to promptly
22  produce responsive documents which do relate to the parties' claims and defenses
23  (for instance, the law-enforcement related files sought in Requests 51 – 53). MGA
24  Mexico has failed to produce any such documents. Further, MGA Mexico has, as
25  more fully discussed below, taken the position that it is entitled to unilaterally
26  revise the scope of the Requests, without providing any basis for Mattel or the
27  Discovery Master to determine whether MGA Mexico's interpretation of the
28  subject Requests is appropriate.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 18 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 13
PAGE 172

Case 2:04-cv-09049-DOC-RNB   Document 6651-5   Filed 09/11/09   Page 36 of 70   Page ID
#:219197
Case 2:04-cv-09049-SGL-RNB   Document 6437   Filed 08/26/2009   Page 20 of 36

1       **2.**    **MGA Mexico Must Produce Documents Responsive To The**

2           **26 Categories Identified In Its June 25, 2009 Letter and**

3           **Must Serve Supplemental Responses Explaining How It**

4           **Determined "Relevance" As To Each Category**

5       MGA Mexico emphasizes that it has "offered" to produce documents

6   "relevant" to 26 of the Requests.  (Opposition to Second Motion to Compel, pp. 4 –

7   6).  However, as explained in Section I.D.2 above, an offer is not compliance.

8   MGA Mexico must promptly comply with its discovery obligations and produce

9   documents it agreed to produce along with a privilege log.

10       Mattel argues that, even if MGA Mexico produces the subject documents,

11   such production is inadequate because it has improperly qualified its statement of

12   compliance.  Specifically, in its June 25, 2009 letter, MGA Mexico agreed to

13   produce "all *relevant*, non-privileged documents responsive to Request Nos. 27, 28,

14   38, 51 – 54, 58, 60, 62, 64, 66 – 68, 70 – 76, and 79 – 83."  (Second Searcy Decl.,

15   Ex. 8 at p. 3 [emphasis added]).  It did not, however, agree to produce all

16   *responsive* and non-privileged documents to those requests, and did not give any

17   explanation as to which documents it intended to withhold as not "relevant."

18   As Mattel points out, this practice has already been rejected by the prior discovery

19   master.  Specifically, in 2007, MGA responded to Mattel documents requests by

20   stating only that it would "produce relevant and responsive non-objectionable

21   documents," and claimed that this response was sufficient.  The prior discovery

22   master ruled those responses were improper because "[t]hese restrictions suggest

23   that MGA might be excluding documents that are responsive to the request based

24   upon its unilateral determination of what is 'relevant' or sufficient.'"  (Order

25   Granting Mattel's Motion to Compel Production of Documents and Interrogatory

26   Responses By MGA, dated May 15, 2007).

27       A party propounding discovery is entitled to a plain understanding of what is

28   being produced, and what is not.  A party may not make a vague statement that it is

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 19 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 13
PAGE 173

1    producing relevant documents – and withholding irrelevant ones – without any

2    indication of what documents it believes relevant or irrelevant. (*See Athridge v.*

3    *Aetna Cas. and Sur. Co.*, 184 F.R.D. 181, 190 (D.D.C. 1998) ["Asserting a

4    relevance objection, then proceeding to agree to produce 'relevant, non-privileged'

5    documents '[s]ubject to and without waiving' that objection, serves only to obscure

6    potentially discoverable information and provides no mechanism for either

7    plaintiffs or the Court to review defendant's decisions."]).

8        In light of this case law and the prior discovery master's May 15, 2007 order,

9    the Discovery Master agrees that allowing MGA Mexico to determine which

10   documents are "relevant" would permit MGA Mexico to produce only what it

11   wants to, and withhold anything it does not. Normally, the appropriate remedy in

12   this situation would be to order the responding party to produce all *responsive*

13   documents. However, given the fact that, as discussed more fully below, MGA

14   Mexico has made an initial showing that many of the Requests are overbroad, and

15   given Mattel's refusal to clarify, narrow, or even discuss the language of, any of the

16   Requests, the Discovery Master finds that the appropriate remedy at this time is to

17   compel only the production of the documents MGA Mexico has offered to produce,

18   subject to further production if and when Mattel demonstrates that such production

19   is warranted.

20        To enable Mattel to evaluate the sufficiency of MGA Mexico's production of

21   documents and determine whether further production is warranted, MGA Mexico

22   shall serve on Mattel supplemental verified responses to the 26 Requests identified

23   in MGA Mexico's June 25, 2009 letter (the "Supplemental Responses"). In each of

24   the Supplemental Responses, MGA Mexico shall: (a) explain in detail how it has

25   defined the scope of "relevant" documents being produced in response to the

26   particular Request; (b) cite any facts or allegations of the parties supporting its

27   definition of "relevance," (c) describe, in general terms, the types of documents

28   being produced pursuant to its definition of "relevance," and (d) describe the types

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT 13
PAGE 174

- 20 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

Case 2:04-cv-09049-DOC-RNB    Document 6651-5    Filed 09/11/09    Page 38 of 70    Page ID
#:219199
Case 2:04-cv-09049-SGL-RNB    Document 6437    Filed 08/26/2009    Page 22 of 36

1    of documents excluded from production pursuant to its definition of "relevance."

2    The description must be sufficient to enable Mattel and the Discovery Master to

3    evaluate whether the documents not produced may be discoverable and therefore

4    subject to a further motion to compel by Mattel.

5          **3.    The Parties Must Meet And Confer In Person Regarding**

6                  **Each Of The Requests And Then File A Joint Statement (In**

7                  **The Form Set Forth In Section I.D.4.) Addressing Each**

8                  **Disputed Request**

9          As noted above, Mattel has failed to address the specific language of any of

10   the Requests or to demonstrate how that language is tailored to the scope of the

11   allegations in the parties' pleadings.

12         Instead, Mattel argues that the "substance" of the Requests relate to

13   legitimate Phase 2 issues.  Because the Discovery Master requires the parties to

14   meet and confer further to, among other things, discuss the specific language of the

15   individual Requests, I do not address all of Mattel's arguments at this point.

16   However, by way of guidance, and in the hope of focusing the meet and confer

17   process, I take this opportunity to address the parties' chief point of disagreement

18   regarding the scope of the Requests.

19         According to Mattel, 58 of the Requests (Nos. 1 – 50, 55 – 58, 65, 70, 77 and

20   78) relate to the roles of Trueba and Vargas at MGA Mexico.  In its June 18, 2009

21   Letter, Mattel offered two rationales for the Requests involving Trueba and Vargas'

22   employment by MGA Mexico.  First, Mattel argued that the requested documents

23   are relevant to rebut MGA Mexico's assertion that Trueba and Vargas "are . . . low-

24   level employees without meaningful responsibility."  Mattel elaborated on this

25   point in its moving papers:

26              Documents relating to contracts negotiated, signed, or entered

27              into by Vargas and Trueba on behalf of MGA Mexico are

28              relevant to show (a) that [MGA Mexico] indeed authorized

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 21 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 13
PAGE 175

1    Vargas and Trueba to bind it; and (b) exactly what MGA Mexico

2    operations are managed by Vargas and Trueba. . . . [T]he

3    documents may show that Vargas and Trueba are heavily

4    involved in or manage MGA Mexico operations that *specifically*

5    *relate to the trade secrets stolen from Mattel, including price lists*

6    *and costing information. . . . [S]uch facts . . . would be*

7    *circumstantial evidence that MGA Mexico used Mattel's trade*

8    *secrets stolen by Vargas and Trueba.*

9   (Second Motion to Compel, pp. 12 – 13 [emphasis added]).

10       Second, Mattel argued that the requested documents are relevant to show

11  whether Vargas and Trueba's actions can be imputed to MGA Mexico.  In its

12  moving papers, Mattel explains this point as follows:

13       Such documents are central to establishing Vargas' and Trueba's

14       role at MGA Mexico, and hence relevant to show that their acts

15       are imputable to [it] and that defendants are liable for punitive

16       damages. ... [¶].  MGA Mexico has repeatedly attempted to

17       minimize its own role in the wrongdoing by Vargas and Trueba,

18       representing without evidence or detail that they were mere mid-

19       level employees without significant responsibility or authority.

20       According to MGA Mexico, they stole Mattel's trade secrets on

21       their own, and without MGA Mexico's knowledge.

22  (*Id.*, p. 11).

23       Neither during the meet and confer process nor in its briefs does Mattel

24  provide support for its first rationale for production.  Specifically, Mattel has not

25  addressed MGA Mexico's objection on the ground that all of the Requests

26  specifying the post-March 1, 2007 time period are beyond the scope of the

27  pleadings.  Although Mattel argues that these issues have been properly raised in

28  Mattel's Third Amended Answer and Counterclaims dated May 22, 2009

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT 13

PAGE 176

- 22 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

1    ("TAAC") (*id.*, pp. 15 – 16), the three paragraphs of the TAAC cited by Mattel do

2    not support Mattel's assertion that the TAAC alleges that "Vargas and Trueba have

3    used and continue to use their positions to exploit Mattel's trade secrets up to and

4    through the present," (*id.*, p. 16).  In fact, only one of the three passages (all of

5    which are from Mattel's RICO counterclaim), even mentions Trueba and Vargas

6    (*see* TAAC, ¶ 134) and that one allegation does not allege any specific acts by them

7    other than being "employed by and associated in fact with" an alleged criminal

8    enterprise.

9        The other portions of the TAAC cited by Mattel do contain some specific

10   allegations regarding Trueba and Vargas, but those passages all allege conduct

11   occurring in 2004.[6]  Moreover, those passages specifically involve the theft of trade

12   secrets relating to 2003 and 2004 data (*see, e.g.,* TAAC, ¶ 55 [referring to

13   "marketing projections[,] documents analyzing changes in sales performance from

14   2003 to 2004[,] budgets for advertising and promotional expenses," and so forth]).

15   Mattel does not point to any allegation in the TAAC that suggests that Trueba and

16   Vargas had access to or stole Mattel trade secrets any time after 2004.

17       In short, Mattel does not link these allegations to the specific language of the

18   Requests seeking documents for the time period after March 1, 2007.  Further,

19   Mattel does not explain how Trueba and Vargas' responsibilities and functions after

20   March 1, 2007 relate to the quoted allegations of the TAAC or constitute

21   "circumstantial evidence that MGA Mexico used Mattel's [2004] trade secrets

22   stolen by Vargas and Trueba." (Second Motion to Compel, p. 16).

23       Likewise, with respect to Mattel's second argument (i.e., that the Requests

24   relate to Trueba and Vargas' status as "managing agents" and may therefore

25   support imputing their conduct to MGA Mexico for purposes of punitive damages),

26   Mattel does not respond to MGA Mexico's contention that the information sought

---

[6] The one allegation that mentions 2006 in Paragraph 50 of the TAAC appears from the context to be a typographical error intended to refer to 2004.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 23 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 13
PAGE 177

1   by specific Requests is largely outside the scope of the legal elements comprising

2   the definition of "managing agent." (Opposition to Second Motion to Compel, p. 9).

3   Throughout the meet and confer process, and in its briefs, Mattel has remained

4   silent as to how the specific language of these 58 Requests (Nos. 1 – 50, 55 – 58,

5   65, 70, 77 and 78) relates to the "managing agent" status of Trueba and Vargas *at*

6   *the time* they committed the alleged conduct which Mattel seeks to impute to MGA

7   Mexico.

8         Rather than deny the Second Motion to Compel responses to these Requests

9   outright, the Discovery Master will give Mattel an opportunity to resume the meet

10   and confer process to address these issues.  Specifically, Mattel and MGA Mexico

11   are ordered to meet and confer in person to discuss the specific language of the

12   Requests for the purpose of determining whether that language can be clarified or

13   narrowed in a manner that would result in a mutually agreeable production of

14   responsive documents by MGA Mexico.

15        **D.    Summary Of Ruling Regarding The Second Motion To Compel**

16        The Discovery Master grants the Second Motion to Compel in part and

17   orders MGA Mexico to produce responsive documents to Request Nos. 27, 28, 38,

18   51 – 54, 58, 60, 62, 64, 66 – 68, 70 – 76, and 79 – 83, and (b) serve verified

19   Supplemental Responses for each of these 26 requests that (1) explain in detail how

20   it has defined the scope of "relevant" documents being produced in response to the

21   particular Request; (2) cite any facts or allegations of the parties supporting its'

22   definition of "relevance," (3) describe, in general terms, the types of documents

23   being produced pursuant to its definition of "relevance;" and (4) describe the types

24   of documents excluded from production pursuant to its definition of "relevance."

25   The Discovery Master denies the Second Motion to Compel without prejudice in all

26   other respects, instructs the parties to meet and confer in person to determine if any

27   issues can be eliminated regarding any subsequent motion involving the Requests,

28   and orders the parties to submit a joint statement in the event their differences

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 24 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 13
PAGE 178

1    cannot be resolved.

2        **E.**    **Neither Party Is Entitled To Sanctions At This Time**

3          Because both sides have failed to comply with their discovery obligations as

4    described above, the Discovery Master concludes that sanctions are not appropriate

5    at this time.  However, in the event that Mattel renews any aspect of its Second

6    Motion to Compel after receiving the Supplemental Responses and production of

7    documents, either side may request sanctions so long as the request is supported by

8    a declaration setting forth the factual basis therefor, including the fees incurred in

9    making or opposing any further motion.

10   **III.**   **LETTER OF REQUEST MOTION**

11       **A.**    **Factual Background**

12           **1.**    **The Proposed Deponents' Background And Nature of**

13                     **Examination  Sought**

14         In its Letter of Request Motion, Mattel seeks to depose two witnesses, Pablo

15   Vargas San Jose ("Mr. Vargas") and Mariana Trueba Almada ("Ms. Trueba")

16   (collectively, the "Witnesses").  The Witnesses are former employees of Mattel and

17   are or were employees of MGA Mexico.[7]  Mattel alleges in its TAAC that the

18   Witnesses were induced by MGA and Isaac Larian to resign from their positions at

19   Mattel, steal Mattel's trade secrets and confidential business planning materials,

20   and provide Mattel's stolen information to MGA.  (*See* Mattel's Third Amended

21   Answer and Counterclaims, ¶¶ 44 – 60).

22           **2.**    **Procedural History**

23         Mattel previously sought to depose the Witnesses as managing agents by

24   noticing their depositions pursuant to Federal Rule of Civil Procedure 30(b)(1).  In

25

26     [7] Mattel frames its Letter of Request Motion as if the Witnesses are current employees of MGA Mexico. (*See* Letter of Request Motion, p. 6).  MGA, in contrast, states without elaboration that the individuals "are no longer employed

27   by MGA [Mexico]." (*See* MGA's Non-Opposition to Letter of Request Motion, p. 2).  There is no dispute, however, that both individuals were employed by MGA Mexico subsequent to their employment by Mattel and remained as

28   MGA Mexico employees for some significant period, including times relevant to the claims made in this action.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 25 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 13
PAGE ____
179

1   response, MGA and its affiliated parties to this action, including MGA Mexico

2   (collectively, the "MGA Defendants"), objected to the deposition notices asserting

3   that neither Mr. Vargas nor Ms. Trueba was an officer, director or managing agent

4   of the MGA Defendants and therefore Mattel's deposition notices were insufficient

5   to command the appearance of the requested deponents.

6          On February 9, 2009, Mattel filed a motion to compel the depositions of the

7   Witnesses ("Motion to Compel Depositions"). (*See* Declaration of Marshall M.

8   Searcy in Support of Mattel, Inc.'s Motion for Issuance of Letters of Request for

9   Vargas and Trueba, Ex. 3). The MGA Defendants opposed the Motion to Compel

10  Depositions on February 13, 2009. (*Id.*, Ex. 4).

11         On March 31, 2009, I issued Amended Order No. 11 denying Mattel's

12  Motion to Compel Depositions on the ground that the evidence presented was

13  insufficient to allow me to determine that either Mr. Vargas or Ms. Trueba was a

14  managing agent of the MGA Defendants  (Amended Order No. 11, pp. 26 – 36).  In

15  Amended Order No. 11, I also expressly noted that

16         it is clear to the Discovery Master that the Witnesses have information

17         relating to several Phase 2 issues and that Mattel is entitled to take their

18         depositions.  Accordingly, Mattel may promptly prepare letters rogatory and

19         submit them to the Discovery Master, who will see that the letters rogatory

20         are expeditiously issued by the Court.

21  (*Id.*, p. 36).

22         On April 13, 2009, Mattel filed a motion objecting to the portions of

23  Amended Order No. 11 relating to the Witnesses ("Appeal"). (*See* Mattel's Motion

24  Objecting to Portions of Discovery Master Order No. 11 dated April 13, 2009).  On

25  May 21, 2009, the Court denied Mattel's Appeal.  Mattel then filed the instant

26  Letter of Request Motion on July 22, 2009.

27  //

28  //

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT 13
PAGE 180

- 26 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

**B.**     **The Relief Sought By Mattel**

Mattel requests that I issue an order recommending that the Court execute a letter of request for international judicial assistance. Specifically, Mattel seeks a letter of request "for the purpose of taking the deposition under oath of Pablo Vargas San Jose and Mariana Trueba Almada in Mexico City, Mexico." (Letter of Request Motion, p.1). A Proposed Letter of Request for Judicial Assistance was submitted by Mattel along with its Letter of Request Motion ("Mattel's Proposed Letter of Request").

**C.**     **MGA's Non-Opposition And Request For Amendment Of Mattel's Proposed Letter Of Request To Add An Additional Topic**

In its Opposition, MGA concedes that it does not oppose issuance of Mattel's Proposed Letter of Request. (*See* MGA's Non-Opposition to the Letter of Request Motion And Request For Amendment, p. 1). MGA requests, however, that an additional topic be added to Mattel's Proposed Letter of Request to allow for questioning of the Witnesses by MGA on MGA's claims and defenses against Mattel. (*Id.*, pp.1 – 2). Specifically, MGA seeks to depose the Witnesses on "Mattel's tortious, unfair, and anti-competitive practices to banish MGA from the market as described in MGA's complaint against Mattel." (*Id.*, p. 1). MGA also requests that the Court extend the seven hour limit for each of the requested depositions to allow for questioning by MGA. (*Id.*, p. 2).

**D.**     **Mattel's Reply Brief**

In its Reply, Mattel claims that MGA's request to amend Mattel's Proposed Letter of Request is inappropriate for three reasons. First, Mattel argues that the additional topic is vague and could delay approval of Mattel's Proposed Letter of Request. (Reply in Support of Letter of Request Motion, p. 1). Second, Mattel argues that if MGA wishes to depose the Witnesses, the depositions should count toward their Phase 2 deposition limits. (*Id.*, p. 2). Finally, Mattel argues that the request to extend the length of the depositions for questioning by MGA is

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT 13
PAGE _____ 181

- 27 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

1   inappropriate because it assumes that the depositions are governed by the Federal

2   Rules of Civil Procedure when, in reality, the deposition procedure will be

3   determined by the Mexican judicial authorities. (*Id.*).

E.   **MGA's Supplemental Declaration And Mattel's Objections Thereto**

6   Nearly three weeks after MGA filed its Opposition and two weeks after

7   Mattel filed its Reply, MGA filed a supplemental declaration that attached a revised

8   version of the proposed letter of request ("MGA's Proposed Letter of Request").

9   (*See* Declaration of William A. Molinski in Response to Motion for Issuance of

10  Letters of Request for Vargas and Trueba And Request for Amendment of Letters

11  dated August 17, 2009 ("Molinski Decl."), ¶ 4 and Ex. A). MGA's Proposed Letter

12  of Request modifies Mattel's Proposed Letter of Request in a variety of ways,

13  including by deleting information, adding information and inserting new topics that

14  were never discussed in MGA's Opposition. (*Id.*).

15  Mattel objects to the supplemental declaration on at least seven grounds.

16  (*See* Mattel's Objections to the Supplemental Declaration of William A. Molinski

17  in Response to Motion for Issuance of Letters of Request for Vargas and Trueba

18  and Request for Amendment of Letters dated August 18, 2009, pp. 1 – 5). First, it

19  argues that MGA has not filed any motion seeking the issuance of a letter of

20  request. (*Id.*, p. 1). Second, it argues that MGA's request to add additional topics

21  (other than the one identified in its Opposition) or otherwise modify Mattel's

22  Proposed Letter of Request is untimely and has been waived. (*Id.*, pp. 1 and 2).

23  Third, it argues that the supplemental declaration is an improper sur-reply. (*Id.*, p.

24  2). Fourth, it argues that MGA's Proposed Letter of Request is inconsistent with

25  prior orders. (*Id.*). Fifth, it argues that MGA's Proposed Letter of Request is

26  argumentative and the Discovery Master should not permit potentially unacceptable

27  topics to infect Mattel's Proposed Letter of Request. (*Id.*, p. 3). Sixth, it argues

28  that MGA's Proposed Letter of Request improperly requires Mattel to pay for the

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 28 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 13
PAGE 182

1   entirety of the deposition costs. (*Id.*, pp. 3 and 4). Finally, it argues that MGA's

2   Proposed Letter of Request should not delay the issuance of Mattel's Proposed

3   Letter of Request. (*Id.*, pp. 4 and 5).

**F.   Analysis**

    **1.   Legal Standard**

6       Federal Rule of Civil Procedure 28(b)(1) permits a "deposition [to] be taken

7   in a foreign country . . . under a letter of request, whether or not captioned a 'letter

8   rogatory.'" Rule 28 further provides for the issuance of a letter of request "on

9   appropriate terms after an application and notice of it . . ." (Fed. R. Civ. P.

10   28(b)(2)).

    **2.   Mattel's Proposed Letter Of Request Asks That All Parties**
        **Be Allowed To Fully Examine And Cross-Examine The**
        **Witnesses On The Subject Matter Of This Case**

14       In its Proposed Letter of Request, Mattel seeks to depose Mr. Vargas and Ms.

15   Trueba "as to their knowledge of the facts which are relevant to the claims and

16   defenses of these consolidated cases." (*See* Mattel's Proposed Letter of Request, p.

17   10:19-20). It further asks the Mexican judicial authorities to permit "Mr. Vargas

18   and Ms. Trueba to be examined under oath by counsel for all parties in this matter,

19   allowing full examination and cross-examination on the subject matter of this case,

20   including the topics delineated in Schedules B and C to this Letter of Request."

21   (*Id.*, p. 13:24-27). The depositions sought by the Letter of Request Motion are,

22   therefore, within the scope of permissible discovery for Phase 2 because Federal

23   Rule of Civil Procedure 26 allows litigants to "obtain discovery regarding any

24   matter, not privileged, that is relevant to the claim or defense of any party."

25   (Fed.R.Civ.P. 26(b)(1)).

26   //

27   //

28   //

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 29 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT _13_

PAGE _183_

### 3.   MGA Concedes Mattel's Proposed Letter of Request Is Proper

In its Opposition, MGA does not question the authority of the Court to issue Mattel's Proposed Letter of Request under Rule 28, and concedes the depositions of Mr. Vargas and Ms. Trueba are each proper under the circumstance of this case. Nor does MGA oppose the form of Mattel's Proposed Letter of Request, other than to request the addition of one topic. In fact, MGA's Opposition is captioned "Non-Opposition To Mattel's Motion for Issuance of Letters of Request for Vargas and Trueba and Request for Amendment of Letters." (*See* caption page to MGA's Non-Opposition to the Letter of Request Motion and Request For Amendment). The Opposition further expressly states that MGA "does not oppose Mattel's Motion for Issuance of Letters of Request for Vargas and Trueba" so long as "an additional topic [is] added to the Letters to allow for questioning by MGA on MGA's claims and defenses against Mattel" and MGA is provided time to conduct "its own examination" of the Witnesses. (*Id.*, pp. 1 and 2). Therefore, the only issues left to be decided are (1) whether the additional topic requested by MGA should be added to Mattel's Proposed Letter of Request and (2) if the time limit for the depositions should be extended.

The supplemental declaration filed by MGA on August 17, 2009 does not alter this conclusion. While MGA claims that its "Non-Opposition" to the Letter of Request Motion objected to "the one-sided Letters of Request that Mattel sought to have issued," (Molinski Decl., ¶ 2), and that the supplemental declaration merely "responds to new arguments raised in Mattel's Reply," (*see* email from William Molinski to Robert O'Brien dated August 17, 2009 at 4:36 p.m.), the modifications MGA proposes by way of its supplemental declaration to Mattel's Proposed Letter of Request were never raised in MGA's Opposition. In fact, they are contrary to MGA's express statement in its Opposition that it "does not oppose Mattel's Motion for Issuance of Letters of Request for Vargas and Trueba" except for

EXHIBIT 13
PAGE 184

1    requesting the addition of one topic. (*See* MGA's Non-Opposition to the Letter of

2    Request Motion And Request For Amendment, pp. 1 – 2). The supplemental

3    declaration further does not relate to any new arguments raised by Mattel in its

4    Reply. Accordingly, the Discovery Master finds that the arguments set forth in the

5    supplemental declaration are inconsistent with MGA's position in its Opposition,

6    have been waived, are untimely and constitute an improper sur-reply. (*See, e.g.,*

7    *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir.

8    1992) [objections waived when not made in opposition to motion to compel];

9    *Diapulse Corp. of America v. Curtis Publishing Co.*, 374 F.2d 442, 445 (2d Cir.

10   1967) [arguments not raised in initial opposition to motion to compel were "clearly

11   afterthoughts" and were waived]). The Discovery Master, therefore, declines to

12   consider them in connection with this motion.

13                    **4.    MGA's Proposed Additional Topic Is Already Encompassed**

14                    **Within The Scope Of Mattel's Proposed Letter Of Request**

15           As for the issues MGA did raise in its Opposition, MGA first requests that an

16   additional topic be added to Mattel's Proposed Letter of Request to allow for

17   questioning of the Witnesses by MGA on MGA's claims and defenses against

18   Mattel. (*See* MGA's Non-Opposition to the Letter of Request Motion And Request

19   For Amendment, p. 1). Specifically, MGA proposes the following additional topic:

20   "Mattel's tortious, unfair and anti-competitive practices to banish MGA from the

21   market as described in MGA's complaint against Mattel." (*Id.*).

22           Mattel claims that this requested topic is vague and that inserting it into

23   Mattel's Proposed Letter of Request may provide grounds for the Mexican judicial

24   authorities or the Witnesses to object to Mattel's Proposed Letter of Request.

25   (Reply in Support of Letter of Request Motion, p. 1). However, this argument is

26   unavailing, since Mattel's Proposed Letter of Request already encompasses this

27   topic and more. Indeed, notwithstanding certain statements that the deposition will

28   be limited to the topics set forth in Schedules B and C, (*see, e.g.,* Mattel's Proposed

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT 13
PAGE 185

- 31 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

Case 2:04-cv-09049-DOC-RNB   Document 6651-5   Filed 09/11/09   Page 49 of 70   Page ID
#:219210
Case 2:04-cv-09049-SGL-RNB   Document 6437   Filed 08/26/2009   Page 33 of 36

1   Letter of Request, pp. 10, 12 and 15), Mattel's Proposed Letter of Request

2   explicitly asks the Mexican judicial authorities on page 13 to "permit Mr. Vargas

3   and Ms. Trueba to be examined under oath by counsel for all parties in this matter,

4   allowing full examination and cross-examination on the *subject matter of this case*,

5   including the topics delineated in Schedules B and C to this Letter of Request."

6   (*See* Mattel's Proposed Letter of Request, p. 13:24-27 [emphasis added]).

7   Similarly, on page 10 of Mattel's Proposed Letter of Request, Mattel states that it

8   will "further the interests of justice" if Mr. Vargas and Ms. Trueba "are examined,

9   under oath, as to their knowledge of the facts which are relevant to the *claims and*

10   *defenses of these consolidated cases*." (*Id.* at p. 10:18-20).  Given that Mattel's

11   Proposed Letter of Request already seeks permission for "all parties" to fully

12   examine the Witnesses as to the entire "subject matter of this case," including the

13   parties' "claims and defenses of these consolidated cases," the topic proposed by

14   MGA is squarely within the areas of examination already requested by Mattel.[8]

15   Accordingly, it is not necessary to add the additional topic requested by MGA in its

16   Opposition to Mattel's Proposed Letter of Request.[9]

17        **5.**    **MGA's Request For An Extension Of Time Is Also**

18             **Unnecessary Given The Language Of Mattel's Proposed**

19             **Letter Of Request**

20        MGA's request that the seven-hour time limit imposed by the Federal Rules

21   of Civil Procedure be extended for the depositions of Mr. Vargas and Ms. Trueba is

22   likewise unnecessary in light of the language of Mattel's Proposed Letter of

23

24   [8] Mattel itself references MGA's claims in Mattel's Proposed Letter of Request, noting that MGA filed a case against

25   Mattel "alleging trade dress infringement, delusion (sic) and unfair competition," and alleging that the witnesses have information relevant to "Mattel's defense against MGA's unfair competition claims . . ." (Mattel's Proposed Letter of Request, pp. 5 and 10).

26

27   [9] In the event MGA wants its additional topic to proceed on a separate track or is concerned that the Mexican judicial authorities or the Court might not enforce a sufficiently broad reading of Mattel's request that the examination

28   include the entire "subject matter of this case," MGA has the option of filing a separate letter of request motion of its own, specifying any area of examination it seeks.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT 13

PAGE 186

- 32 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

1   Request. Mattel has requested that the Mexican judicial authorities "permit Mr.

2   Vargas and Ms. Trueba to be examined under oath *by counsel for all parties* in this

3   matter, *allowing full examination and cross-examination* on the subject matter of

4   this case . . ." (*See* Mattel's Proposed Letter of Request, p. 13:24-26 [emphasis

5   added]). Mattel's Proposed Letter of Request further requests that the Witnesses'

6   examinations "continue day to day until completion and conducted in accordance

7   with the Federal Rules of Civil Procedure or as permitted by [the Mexican judicial

8   authorities]." (*Id.*, p. 13:15-17). The plain language of Mattel's Proposed Letter of

9   Request, therefore, already entitles MGA to a full and fair cross-examination of the

10  Witnesses continuing day to day until completion. Consequently, it is not

11  necessary to amend Mattel's Proposed Letter of Request regarding the duration of

12  the deposition.[10]

13          **G.      Summary of Discovery Master's Findings Regarding The Letter**

14                    **Of Request Motion**

15          For the foregoing reasons, Mattel's Letter of Request Motion is granted and

16  the Discovery Master will forthwith recommend that Mattel's Proposed Letter of

17  Request be issued by the Court.

18  **IV.    DISPOSITION**

19          **A.      Mattel's Motion to Compel is GRANTED** in part and **DENIED** in

20  part, as follows:

21                    1.      The Discovery Master orders MGA Mexico to produce to Mattel

22  all non-privileged documents responsive to Request Nos. 1 – 8, 13 – 22, 25 – 35, 42

---

[10] In its Reply, Mattel also argues that if MGA wants to examine the Witnesses, the depositions should be counted against both Mattel's and MGA's existing ten deposition limit rather than just against Mattel's limit only, and that under no circumstance should MGA be permitted to conduct "free" depositions of the witnesses noticed by Mattel. (Reply in Support of Motion to Compel, p. 2). However, this position in inconsistent with Mattel's Proposed Letter of Request, since it affirmatively asks the Mexican judicial authorities to "permit Mr. Vargas and Ms. Trueba to be examined under oath by counsel *for all parties* in this matter, allowing full examination *and cross-examination* on the subject matter of this case . . ." (*See* Mattel's Proposed Letter of Request, p. 13:24-26 [emphasis added]). Regardless, depositions are generally charged against the party noticing the deposition and the Discovery Master sees no basis to deviate from this general practice here, as both sides have the right to cross-examine any individual noticed for deposition by the other party.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT 13

PAGE 187

- 33 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

1  – 45, 54 – 58, 61, 71 – 85, 89 – 96, 101 – 104, 106, 117 – 147, 151 – 167, 174, 175,

2  177 – 179, 181 – 192, 194 – 199, 201 – 219, 221, 222, 227 – 248, 253 – 268, 277 –

3  299, 302 – 316, 329 – 342, 345 – 385, 387 – 397, 400 – 410, and 412 – 417 of

4  Mattel's Second Set of RFPs that are within its possession, custody or control

5  within twenty (20) days of this Order along with a privilege log.

6        2.    The Discovery Master denies the Motion to Compel without

7  prejudice to the extent it relates to the 148 requests for production in Mattel's First

8  Set of RFPs, Request Nos. 9 – 12, 23, 24, 36 – 41, 46 – 53, 59, 60, 62 – 70, 86 – 88,

9  97 – 100, 105, 107 – 116, 148 – 150, 168 – 173, 176, 180, 193, 200, 220, 223 –

10  226, 249 – 252, 269 – 276, 300, 301, 317 – 328, 343, 344, 386, 398, 399, 411, and

11  418 – 420 in Mattel's Second Set of RFPs, and the six document requests in

12  Mattel's Third Set of RFPs.

13        3.    The parties are ordered to meet and confer in person to

14  determine if any issues can be eliminated regarding any subsequent motion

15  involving the 256 requests referenced in the preceding paragraph.  In the event any

16  differences cannot be resolved, the parties are ordered to submit a joint statement in

17  the form set forth in Section I.D.4. above.

18      **B.**    The Second Motion to Compel is **GRANTED** in part and **DENIED** in

19  part, as follows.

20        1.    Within twenty (20) days hereof, MGA Mexico is ordered to (a)

21  produce documents responsive to Request Nos. 27, 28, 38, 51 – 54, 58, 60, 62, 64,

22  66 – 68, 70 – 76, and 79 – 83 along with a privilege log, and (b) serve verified

23  Supplemental Responses for each of these 26 requests that (1) explain in detail how

24  it has defined the scope of "relevant" documents being produced in response to the

25  particular Request; (2) cite any facts or allegations of the parties supporting its'

26  definition of "relevance," (3) describe, in general terms, the types of documents

27  being produced pursuant to its definition of "relevance;" and (4) describe the types

28  of documents excluded from production pursuant to its definition of "relevance."

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT 13
PAGE 188

- 34 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

1   The description must be sufficient to enable Mattel and the Discovery Master to

2   evaluate whether the documents not produced may be discoverable and therefore

3   subject to a further motion to compel by Mattel.

4        2.    Except as provided above, Mattel's Second Motion to Compel is

5   denied without prejudice.

6        3.    The parties are ordered to meet and confer in person to

7   determine if the remaining issues involving the 83 requests can be eliminated.  In

8   the event any differences cannot be resolved, the parties are ordered to submit a

9   joint statement in the form set forth in Section I.D.4. above.

10       **C.**    The Letter of Request Motion is **GRANTED**.  The Discovery Master

11   will, therefore, issue a separate order, similar to Order No. 35 that recommends the

12   Court execute Mattel's Proposed Letter of Request.

13

14   Dated:     August 26, 2009

15             By:     /s/ Robert C. O'Brien

16                  ROBERT C. O'BRIEN
               Discovery Master

17

18

19

20

21

22

23

24

25

26

27

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT 13
PAGE 189

- 35 -

ORDER NO. 52
[Case No. CV 04-09049 SGL (RNBx)]

# EXHIBIT 14

[Main article text - page 61]



**Isaac Larian, the Jewish father of dolls in Israel, is unperturbed by the legal battles with the manufacturer of Barbie. He has appealed a court ruling to remove his dolls from the shelves, and meanwhile he is planning new ones. As revenge.**
Shoshana Chen // Photos: Moshe Shai

Whoever said that hell hath no fury like a woman scorned obviously didn't know about the war between Barbie and Bratz, the most publicized battle in the history of the toy world, featuring emotions, jealousy, stubbornness, aggression, and accusations of forgery and fraud. It involves lawyers and publicity, and obviously big money. It's the most expensive toy war ever and the last word has not yet been pronounced on it. "Until now the two sides have spent more than a hundred million dollars on the fight. and I spent the pocket change: only fifty to sixty million, because I don't have the financial resources of Mattel, the manufacturers of Barbie."

The speaker, Isaac Larian, 55, the Jewish CEO of the American company MGA Entertainment, and father of Bratz, speaks calmly even though he took a serious blow last summer, when the federal court in California fined his company a hundred million dollars and ordered it to take down all Bratz products from the shelves, causing him enormous losses. "Sales of Bratz and its accessories were down 60% because retailers and buyers don't like uncertainty," he said during a recent visit to Israel. Now he is preoccupied with the appeal he filed against the court ruling. "As a first stage, the court has already suspended removal of the dolls from the shelves until January 2010.    [Page 62]    The grounds for our appeal run to 8,500 pages." He expects that part of the legal dispute to be concluded by the end of 2009. Meanwhile, he is planning new samples of dolls, which are already making a buzz in the toy world, even though most of their details remain confidential. He is also examining the possibility of bringing out collectors' editions of Bratz if he is forced to remove them from the shelves.

His problem is that in the meantime children are finding other attractions on the shelves, chief among them Webkinz, a winning combination of domestic pets made of fur and a virtual world on a Internet site devoted to the insatiable craving of enthusiasts. In toy circles they say that the Webkinz hysteria is breaking records and is hurting sales of both Bratz and Barbie. Will Webkinz kill off the traditional dolls?

Larian is convinced that they won't. "Girls will always play with dolls," says someone who has made his mark with a long line of international hits in the toy sector: not just Bratz, but also Cozy Coupes, a plastic car that's all the rage in America. "We sold half a million units in the last year, more than any other car in America, and this is a product that has been in the stores for many years. It belonged to a long-established company named "Little Tykes" that we acquired. What made it such a sudden success? We made the car human; we added eyes to it and connected with today's children."

He intends to link the new series of dolls, Moxie Girlz and BFC Ink, to the virtual world. The dolls are softer than Bratz, "Because mother and daughter fashion has changed," he explains. When we launched Bratz, Madonna and Britney Spears were at their peak, and fashion was more frenetic. Girls and their mothers are more conservative these days. The economic situation also has an effect. These two dolls are the kind of thing girls are looking for now and they sell for between 17 and 40 dollars, like Bratz."

He aims them at the 5-11 year olds, although toy psychologist Yael Katz claims that the age for playing with dolls has dropped to 7-8. "If your design is right, girls of 11-12 will also turn to dolls. Both Moxie Girlz and BFC Ink are different from the dolls we've seen up until now. BFC Ink, for example, will come with a book. Both of them will be linked to an Internet site. Later on there will be television series as well as cellular telephones and laptop computers. It's impossible nowadays to bring out a line of dolls without getting into the world of electronics. There are laptops in the USA for girls of 5-6, and when they are 11-12 they have their own cellular phones. Girls will be able to design clothes for the new dolls and send them to us through Internet sites. The company will choose the most successful designs and will perhaps even manufacture them. Consumer research on 600 girls and 600 mothers conducted in the USA yielded fantastic results. Both the girls and their mothers preferred the Moxie Girlz to all other dolls, including Barbie, Hannah Montana, High School Musical and Bratz."

EXHIBIT 45
PAGE 564

EXHIBIT 14
PAGE 190

Are you adopting the Harry Potter strategy – pique curiosity and develop strict launch rules to create demand?

"We will work in a similar way, but we will not create an artificial shortage. I already expect that there will be a shortage of dolls because we are manufacturing a limited number, and demand is higher than we expected. I don't want to reveal numbers, but I am sure that in time these two dolls will be bigger than Bratz."

## Hitting back

Meanwhile, Bratz is his leading brand with a sales volume of 500 million dollars in peak years and revenues of 15% from franchisees that have a turnover of 2.5 billion dollars a year. Larian refuses to confirm the numbers since the matter is still sub judice.

"Look what is happening with the franchised brands of Bratz," says Ofer Baram, merchandising director of "Toy Village". "When girls reach the age of eight and stop playing with dolls they have an entire wall of products. Wherever Bratz can be printed, it's there: watches, chairs, schoolbags, clothes, pencils, pens, pencil cases, backpacks. I thought girls were already fed up with Bratz by Purim, but it was the leading costume."

According to Baram, Barbie is considered conservative in comparison with Bratz and stuck in a groove. Even the celebrations for her 50th birthday which were held last March did nothing to boost sales. From the beginning of 2008 and until now 12,000 Barbie dolls have been sold in Israel according to reports by the franchisee Sakal – hardly an impressive number compared with sales of Webkinz that exceeded 150,000 units in less than six months.

For his part, Larian is aware of all the competitors and will do whatever it takes to get back on top. He attributes his determination to his personal background as an Iranian Jew. "We lived in a poor area of Teheran," he says. "There were only three Jewish families in our neighborhood, the same neighborhood Ahmadinejad also grew up in. I'll never forget when I was a kid of 7-8 years old and had to come back from school on rainy days, the neighbors' children and the adults themselves used to run to get in front of me and shout that they had to get past me because 'after the raindrops hit me they pollute the ground'. When I got home, crying bitterly, my mother would say to me "If you come home again crying that they made fun of you for being a Jew or because they hit you – I'll hit you. If somebody hits you, you have to hit him back." That's what I did when I was a kid, and they respected me."

His uncle, 87, still lives in Teheran ("I speak with him now and again"). The rest of the family emigrated to the USA and Israel.

"I didn't have any toys when I was a kid," he says, "apart from wooden ones that I made for myself in our back yard. My wife says I like toys because subconsciously I am reliving my childhood and compensating myself for the ones I didn't have then."

From an early age he dreamed of America, and when he turned 17 he was accepted as an engineering student at the University of Missouri.      [page 64]      His father gave him a one-way ticket and 750 dollars. He meant to go to Missouri, but a chance meeting at a stopover in Los Angeles changed his life. A Jewish immigrant from Iran warned him that he wouldn't find work in Missouri. Larian decided to stay in Los Angeles, where he lives to this day. His first job there was washing dishes in a café. He worked there for six months before being promoted to busboy and then waiter. In his free time he studied engineering and when he completed his studies he entered the business world through a small company that imported gifts from Korea. From there he moved on to toys.

Would you like to visit Iran?

"Yes, Iran is a beautiful country, and most of the people there were nice to us. Only the uneducated extremists believe the stories. I remember the kind of stories that were going around on the eve of Passover, for example. We had neighbors who believed that the Jews take a Muslim child, slaughter him and use his blood to bake matzos. We had neighbors who used to come to my parents and plead with them: 'Don't take our child.' "

EXHIBIT __45__
PAGE __565__

EXHIBIT __14__
191
PAGE

# Racism in court

When his daughter Jasmin was 11, she saw a drawing in his office of a new doll that had been given the name "Bratz." She was addicted to Barbie at the time but the new doll brought a gleam to her eye. The success of Bratz brought harsh criticism from sociologists and psychologists who were opposed to the provocativeness and sexuality radiated by the dolls. There was also the lawsuit by Mattel, the manufacturers of Barbie, who claimed that the large-eyed Bratz was a copy of their doll, and that the person who sketched the first illustrations for the new doll and brought them to Larian, Carter Bryant, was a Mattel employee when he presented himself to Larian with the new design. Larian's company, MGA, denied everything, but the court ruled that Larian intentionally violated Bryant's contractual obligation with Mattel and was an accomplice in his breach of trust.

"No one in the toy industry wages as many legal battles as Mattel," he explains. "When they sued doll maker Goldberger, the ruling stated that anyone who decides to compete with Barbie should know that he's a marked man. The have a lot of clout and money. Our appeal contains evidence from Roy Brower [translator's note: possibly Brauer - English spelling is uncertain], who was a senior VP in the company, stating that "Lawsuits are used by Mattel as a commercial tool." For almost fifty years no one dared to take on Barbie. They never thought that a poor Jew from Iran would fight back."

But you're also an old warhorse.

"I dislike legal battles, but I defend myself. You can't just sit by and let everyone take away your business and your life. But I have never sued anyone in order to stop competition."

You accused the trial with Mattel of being tainted by racism.

"It wasn't an accusation; as I understand it, it's a fact, and we're also bringing it up in our appeal. For me it was something unbelievable. I knew about racism from Iran, and I never thought it would happen to me in the U.S., but it happened during the trial when the jurors were required to decide to whom the original drawings of Bratz belonged and the extent of the damage caused to Mattel. One day, one of the jurors told the judge that during the hearings, one of the female jurors had said that "Iranian Jews are aggressive, and they are all thieves". We demanded a retrial. In the end the judge dismissed her and called her a racist, but at the same time he ruled that she was not a racist in the legal sense. That's like saying that Hitler was an anti-Semite, but not in the legal sense. Our argument was that if she was not a racist in the legal sense, why was she dismissed?"

How involved are you in the legal battle?

"More than I would like to be, and I intend to cut down. I am too emotional and I don't have enough time to do what I'm really best at – developing products and marketing – and this is what Mattel really wants. It's no coincidence that sales of Bratz have fallen this year. Our customers don't know what's going on. Customers like Toys R Us in the USA tell us, "We would like to buy, but we don't know what to do." They've cut back on orders because retailers don't like uncertainty. They prefer to wait. Our sales of Bratz dolls and accessories in 2009 will be down 60% from 2008."

The damage to Bratz sales in Israel is actually less serious, says local franchisee Doron Peled, CEO of Ilanit. In Toy Village, for example, the doll and its accessories are in the top ten of sales hits. Barbie hasn't been in the running for a long time.

# Calluses on his hands

Barbie in all its reincarnations, from doctor to astronaut, which was dressed by the greatest designers in the world, remains the most successful doll in history. Larian has challenged it for understandable commercial reasons, but not solely for these.

"From the very first day of the trial they were saying, "Isaac Larian started MGA with money from his rich family in Iran." I sat and listened to them, but I couldn't believe it. What rich family in Iran? I still have the marks of calluses on my hands from the time I washed dishes when I came to America to study engineering. We had to take the dishes out of the dishwasher when they were burning hot. This racism is the hardest part of the battle against Mattel, and it reminds me, unfortunately, that it's impossible to escape racism even in the 21st century and even in California."

Does it make you think about emigrating?

"To be perfectly honest, we are thinking about Israel. Only last evening I was talking with my wife and I said that the time had come to buy a house in Israel."

EXHIBIT __45__
PAGE __566__

EXHIBIT __14__

PAGE ____192____

**Will your children agree?**

"You would be surprised, they love Israel. When my daughter Jasmin was 17, she took part in the 'March of the Living' project and visited Poland and Israel. I still have tear-filled emails she sent me from there. She still says it was the most important thing in her life, the thing that made her more Jewish than anything else. When Ahmadinejad says the Holocaust never happened I don't understand why they don't take him for a tour of Germany and Poland."

His wife Angela, an Iranian Jew he met in America, is not involved in the business. The couple has three children: Jason, 22, who is studying business management in Boston ("I don't know if he's going to join the company"), Jasmin, 19, and Cameron, 15. "I don't give them everything, and they sometimes complain," he says, "but I think that the story of us all is the story of wandering Jews. What if something happens in America and they need to go somewhere else? If you don't have the experience and the determination, you won't survive."

Yediot Aharonot, 7 Days, , July 17, 2009.

EXHIBIT _45_
PAGE _566_

EXHIBIT _14_
PAGE _____  193

[captions and callouts]

[photograph caption – page 60]
"Girls will always play with dolls." Larian with the variations.

[photograph caption – page 62]
For almost fifty years no one dared to take on Barbie. They never thought that a poor Jew from Iran would declare war on them. The Barbies.

[Callouts – page 62]
"I knew about racism from Iran, and I never thought I would be a victim of it in the U.S., but one of the jurors in our trial said during one of the hearings that Iranian Jews are aggressive, and they are all thieves."

"I didn't have any toys when I was a kid," he says, "apart from wooden ones that I made for myself in our back yard. My wife says I like toys because subconsciously I am reliving my childhood and compensating myself for the ones I didn't have then."

[Photograph caption – page 64]
"I dislike legal battles, but I defend myself." Larian and the dolls.

[Callouts – page 64]

"We had neighbors in Iran who believed that the Jews take a Muslim child, slaughter him and use his blood to bake matzos. We had neighbors who used to come to my parents and plead with them: 'Don't take our child.' "

"When we launched Bratz, Madonna and Britney Spears were at their peak, and fashion was more frenetic. Girls and their mothers are more conservative these days, and our new dolls are more the kind of thing they want."

## Barbie's manufacturer: We are fair and not racist

Lisa Marie Bongiovanni, a VP, Mattel International, responded to Fairness issues and financial value in the composed services, emphasizing its marketing activities. Mattel grants equal employment opportunity to everyone irrespective of race, color, religion or nationality. The court concluded that Mattel's claim against MGA was justified, and rejected MGA's claim that there was an element of anti-competition in Mattel's decision to sue.

Sharon Marie Bell, CEO of Sokal Toys, importer and distributor of Barbie in Israel, said that "Sales of the Barbie, and in Israel last year were up 2%, in comparison with sales for 2006-2007." Responding to Larian's statements on the subject of racism she says, "There are quite a few Jews in the senior management of Mattel, and Ruth Handler, the creator of Barbie, was a Jew. It is a ridiculous accusation and unworthy of attention."

EXHIBIT **45**
PAGE **567**

EXHIBIT **14**
**194**
PAGE ____



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

City of New York, State of New York, County of New York

I, Marina Yoffe, hereby certify that the document "ART7_17" is, to the best of my knowledge and belief, a true and accurate translation from Hebrew into English.

Marina Yoffe

Sworn to before me on

August 3, 2009

Signature, Notary Public

Katharine L Perekslis
Notary Public, State of New York
No. 01PE6181423
Qualified in QUEENS County
Commission Expires Jan 28, 2012

Stamp, Notary Public

EXHIBIT 45
PAGE 568

EXHIBIT 14
PAGE 195



EXHIBIT 45
PAGE 569

EXHIBIT 14
196
PAGE _____



EXHIBIT ___45___
PAGE ___570___

EXHIBIT ___14___
197
PAGE ___





"הכרתי גזענות
באירלנד וחשבתי
שבארה"ב זה לא
יהיה לי, אבל מתברר
שאחת המוסברות
במבט שלנו אמרה
באחד הדיונים
שהיהודים האירליים
הם אמריקאים
ושכולם גנבים".

"כילד לא היו לי
צעצועים, פרט
לצעצועי עץ שהייתי
מייצר בעצמי.
אשתי טוענת שאני
אוהב צעצועים כי
בתת־ההכרה אני חי
מחדש את ילדותי
ומוצא את עצמי על
המתחשר עד אז"



בובה.

EXHIBIT   45
PAGE   571

EXHIBIT   14
PAGE   198



"אני לא יוהר מלהויחה המשפחה, וגל אני נעו לו צער לייא הגוונה"

"באיראן היו לנו שכנים שהאמינו שהיהודים לוקחים ילד מוסלמי, שוחטים אותו ומשתמשים בדמו לצורך אפיית מצות. הם היו באים לחורייי ומתחננים: 'אל תיקחו את הילד שלנו'"

"כשהשקנו את בראץ, מדונה ובריוני ספירס היו בשיאו והאופנה היתה יותר חזקיית. היום הילדות והאמהות שלנו מתאיינות למה שהן רוצות"

## יבלות על הידיים



## גזענות בבית המשפט



### ציצנות ואמנות אמנות הגוונה אמנא

EXHIBIT   45
PAGE   572

EXHIBIT   14
PAGE   199

# EXHIBIT 15

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                  EASTERN DIVISION

4                    - ~ -

5      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                    - - -

7    MATTEL, INC.,                    )

8              PLAINTIFF,             )

9         VS.                         )    NO. CV 04-09049

10   MGA ENTERTAINMENT, INC., ET. AL., )

11              DEFENDANTS.           )    TRIAL DAY 14
                                      )    MORNING SESSION
12   AND CONSOLIDATED ACTIONS,        )    PAGES 2708-2817
                                      )
13

14

15      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17              TUESDAY, JUNE 17, 2008

18                   8:47 A.M.

19

20

21

22

23            THERESA A. LANZA, RPR, CSR
           FEDERAL OFFICIAL COURT REPORTER
24            3470 12TH STREET, RM. 134
           RIVERSIDE, CALIFORNIA  92501
25               951-274-0844
              WWW.THERESALANZA.COM

**CERTIFIED COPY**

EXHIBIT 15

PAGE 200

2724

1   CASE.

2           THE COURT:  VERY GOOD.

3           COUNSEL?

4           MR. WERDEGAR:  I JUST WANTED TO ALERT THE COURT THAT

5   I WAS HERE TODAY ON BEHALF OF THE WITNESS AND NOT MY COLLEAGUE.   09:04

6   MS. ANDERSON HAD A SCHEDULING CONFLICT; SO THAT THE COURT

7   WOULDN'T BE SURPRISED.

8           THE COURT:  VERY WELL.

9           I BELIEVE IT WAS INTRODUCED MR. PAGE AND MS. ANDERSON

10  TO THE JURY.  I'M HAPPY TO DO THE SAME FOR YOU, IF YOU WISH TO   09:04

11  BE INTRODUCED AS MR. BRYANT'S ATTORNEY.

12          MR. WERDEGAR:  IF IT'S BEEN DONE BEFORE, JUST TO BE

13  CONSISTENT, YOUR HONOR.

14          THE COURT:  VERY WELL.

15          AND ALSO, MR. HOLMES WILL PROVIDE YOU WITH A            09:05

16  MICROPHONE.  I KNOW YOU'RE SITTING OUT THERE, BUT IN CASE YOU

17  DO HAVE AN OBJECTION TO MAKE, I ASK THAT YOU USE THE

18  MICROPHONE, FOR THE BENEFIT OF THE COURT REPORTER.

19          MR. WERDEGAR:  VERY GOOD, YOUR HONOR.

20          THE COURT:  JUST TO RECAP, THEN, IT SOUNDS LIKE         09:05

21  MATTEL AND MGA COUNSEL WILL DISCUSS THESE VARIOUS DOCUMENT

22  ISSUES, THE ONES WHICH ARE SUBJECT TO STIPULATION OR PARTIAL

23  STIPULATION, THE ONES THAT MR. QUINN SUGGESTS ARE SUBJECT TO

24  THE CRIME FRAUD EXCEPTION OR SUBJECT MATTER WAIVER ON THE

25  ATTORNEY-CLIENT PRIVILEGE, AND ANY OTHER DOCUMENTS.  LET'S      09:05

1    EXPLORE THOSE BEFORE THE COURT HAS TO MAKE A RULING ON THEM.

2              **MS. AGUIAR:**  SO THAT WE CAN GO AHEAD AND BRING IN THE

3    JURY NOW, IF I CAN JUST RAISE ONE OR TWO OTHER THINGS AT THE

4    MORNING BREAK.  THEY'RE NOT INCREDIBLY TIME SENSITIVE, BUT I

5    DID WANT TO RAISE THEM TODAY.                                     09:05

6              **THE COURT:**  VERY GOOD.

7         IF THE JURY IS READY, LET'S BRING THEM IN.  IT'S MY

8    UNDERSTANDING THAT THEY ARE.

9              (WHEREUPON, JURORS ENTER COURTROOM.)

10             **THE COURT:**  GOOD MORNING, MEMBERS OF THE JURY.       09:07

11        A COUPLE OF THINGS BEFORE WE RESUME WITH THE

12   TESTIMONY OF MR. BRYANT.

13             FIRST OF ALL, THE COURT NEEDS TO PROVIDE AN

14   INSTRUCTION TO YOU CONCERNING SOME TESTIMONY FROM MR. LARIAN.

15             EARLIER IN THE TRIAL, YOU HEARD TESTIMONY FROM          09:08

16   ISAAC LARIAN.  LAST WEDNESDAY, YOU HEARD MR. LARIAN TESTIFY

17   THAT A FEDERAL JUDGE HAD, QUOTE, "SPECIFICALLY SAID IT'S

18   PUBLISHED THAT ANYBODY WHO DECIDED IN THE TOY BUSINESS TO GET

19   INTO THE FASHION DOLL BUSINESS, THEY HAVE A TARGET PAINTED ON

20   THEIR BACK BY MATTEL," CLOSED QUOTE.                             09:08

21             I'M INSTRUCTING YOU THAT IT WAS A CALIFORNIA STATE

22   COURT CASE.  NOT A FEDERAL CASE.  THE JUDGE IN THAT CASE DID

23   NOT MAKE THE RULING THAT MR. LARIAN REFERENCED.  RATHER, IN

24   THAT CASE, QUOTE, "MATTEL'S FORMER EMPLOYEE TESTIFIED THAT

25   MATTEL AGGRESSIVELY DEFENDS AGAINST ANY ENTRIES IN THE FASHION   09:08

1    DOLL BUSINESS, AND ANYONE WHO MAKES AN ELEVEN-AND-ONE-HALF-INCH

2    FASHION DOLL PAINTS A TARGET ON THEIR BACK," CLOSED QUOTE.

3            THE COURT IN THAT CASE FOUND THAT IT WAS

4    SUBSTANTIALLY TRUE THAT THE WITNESS HAD GIVEN THE TESTIMONY,

5    BUT NOT THAT THE ALLEGATION ITSELF WAS TRUE.                    09:09

6            BECAUSE ALL OF THIS IS AN OUT-OF-COURT STATEMENT OR

7    OUT-OF-COURT STATEMENTS THAT HAVE NOT BEEN INTRODUCED INTO THIS

8    TRIAL, YOU ARE INSTRUCTED NOT TO CONSIDER ANY OF THIS.  I'M

9    ALSO INSTRUCTING YOU THAT IN THIS CASE, YOU ARE TO FOLLOW THE

10   INSTRUCTIONS AND DIRECTIONS OF THIS COURT AND NO OTHER COURT.   09:09

11           I ALSO, AT THIS POINT, WANT TO INTRODUCE

12   MR. WERDEGAR.

13           IF YOU WOULD STAND UP.

14           MR. WERDEGAR IS MR. BRYANT'S ATTORNEY FOR TODAY.  YOU

15   HAD PREVIOUSLY MET MR. PAGE AND MS. ANDERSON, BUT MR. WERDEGAR  09:09

16   IS HERE TODAY.  HE'S BEEN GIVEN LEAVE TO MAKE OBJECTIONS TO

17   ANYTHING ON BEHALF OF MR. BRYANT THAT HE WISHES.

18           MR. PRICE, I BELIEVE THAT YOU'RE --

19           MR. NOLAN:  MY ONLY POINT WOULD BE, DOES THE COURT

20   MIND POINTING OUT THAT MR. WERDEGAR IS PART OF THE SAME LAW     09:09

21   FIRM AS THE OTHER TWO?

22           THE COURT:  VERY WELL.

23           MR. WERDEGAR IS A PARTNER, I BELIEVE, OF MR. PAGE AND

24   MS. ANDERSON.

25           MR. WERDEGAR:  THAT'S CORRECT, YOUR HONOR.             09:10

| 1 | THE COURT: AND HE IS NOT ASSOCIATED WITH THE LAW |
| 2 | FIRM OF SKADDEN ARPS, MR. NOLAN AND HIS COLLEAGUES. |
| 3 | MR. NOLAN: THANK YOU, YOUR HONOR. |
| 4 | THE COURT: ANYTHING FURTHER, MR. NOLAN? |
| 5 | MR. NOLAN: NO. THANK YOU VERY MUCH. |
| 6 | THE COURT: MR. PRICE, YOU MAY RESUME YOUR |
| 7 | EXAMINATION. |
| 8 | DIRECT EXAMINATION (CONTINUED) |
| 9 | BY MR. PRICE: |
| 10 | Q MR. BRYANT, THIS MORNING I NEED TO GO OVER SOME DRAWINGS |
| 11 | WITH YOU, JUST TO GET YOUR TESTIMONY ABOUT THEIR CREATION, SO |
| 12 | THAT WE'LL KNOW WHAT THE TESTIMONY IS. |
| 13 | IN FRONT OF YOU, THERE'S THE BINDER WHICH IS THE |
| 14 | DRAWINGS BINDER. |
| 15 | ON THE FIRST ONE, I'M GOING TO BE ASKING YOU ABOUT |
| 16 | THE DRAWINGS THAT ARE EXHIBIT 5. |
| 17 | A OKAY. |
| 18 | Q WE'VE BEEN USING TWO NUMBERS TO HELP YOU FIND THESE. |
| 19 | THERE'S A BATES NUMBER, AND THERE'S AN EXHIBIT NUMBER AT THE |
| 20 | BOTTOM. IT WILL SAY, LIKE, 5-40 OR SOMETHING LIKE THAT. |
| 21 | DO YOU SEE THOSE NUMBERS? |
| 22 | A YES. |
| 23 | Q THERE'S ALSO A BRYANT BATES NUMBER. |
| 24 | DO YOU SEE THOSE AS WELL? |
| 25 | A YES. |

09:10
09:10
09:10
09:11
09:11

1

2

3                          CERTIFICATE

4

5    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
6    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
7    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

8

9    _____          6-18-08
                                                _____
10   THERESA A. LANZA, RPR, CSR                      DATE
     OFFICIAL COURT REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TUESDAY, JUNE 17, 2008              TRIAL DAY 14, MORNING SESSION

EXHIBIT 15

205