# EXHIBIT 6

RightFAX                6/?  2007 3:04    PAGE 002/037         Server

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority ____ ✓ Send ____
Entered ____ ✓ Closed ____
JS-5/JS-6 ____ JS-2/JS-3 ____
Scan Only ____ Docketed on CM ____ ✓
____ THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)
JUN 2 7 2007
EASTERN DIVISION
BY ____ DEPUTY



FILED - EASTERN DIVISION
CLERK, U.S. DISTRICT COURT

JUN 27 2007

CENTRAL DISTRICT OF CALIFORNIA
BY JIM HOLMES DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT, | CASE NO. CV 04-09049 SGL |
| Plaintiff, | CONSOLIDATED WITH |
| v. | CV 04-09059 SGL |
| | CV 05-02727 SGL |
| MATTEL, INC., | ORDER RE MOTIONS HEARD ON |
| Defendant, | JUNE 11, 2007 |
| | |
| AND CONSOLIDATED ACTIONS | |

Presently before the Court is a multitude of motions filed by a number of parties in these consolidated cases. The factual allegations underlying the present actions are expansive and complex. They are set forth below only to the extent necessary for the Court's consideration of the present motions. At their essence, although involving a number of other legal and factual issues, these cases involve the rights to certain fashion dolls.

The present motions, six in total, focus on four basic issues: Two of the motions, filed by certain counter-defendants, address the sufficiency of the allegations made by Mattel, Inc. ("Mattel") in its counterclaims; most notably, these motions challenge the sufficiency of the allegations which underlie Mattel's claims based on the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.

Docket No. 577

EXHIBIT 6
PAGE 117

1    §§ 1961-1968 ("RICO"). Another motion challenges the Court's exercise of

2    personal jurisdiction over a foreign corporation, MGAE de México, S.R.L. de C.V.

3    ("MGA Mexico"). Two additional motions seek review of a ruling, issued by a court-

4    appointed discovery master, overruling objections made during a party's deposition

5    that were based on the attorney-client and joint-defense privileges. A final motion

6    heard on June 11, 2007, addresses the Court's scheduling order that divided the

7    issues to be tried in these consolidated cases into two phases. This last motion will

8    be addressed in a separate order.

9         The Court has reviewed the parties' filings regarding these motions and held

10   a hearing on June 11, 2007. For the reasons and in the manner set forth more fully

11   herein, the Court makes the following rulings regarding these motions:

12        1.    Motion of MGA Entertainment, Inc., ("MGA") and Issac Larian

13   ("Larian") to Dismiss Mattel's Amended Answer and Counterclaims (docket # 189):[1]

14   **GRANTED IN PART AND DENIED IN PART.**

15        2.    Motion of Carter Bryant to Dismiss Counterclaims II, III, V, VII, IX, and

16   XI (docket # 191): **GRANTED IN PART AND DENIED IN PART.**

17        3.    Motion of MGA Mexico to Dismiss Mattel's Amended Answer and

18   Counterclaims (docket # 266): **DENIED.**

19        4.    Motion of MGA Objecting to Discovery Master's March 7, 2007, Order

20   (docket # 308): **GRANTED IN PART AND DENIED IN PART.**

21        5.    Motion of Carter Bryant Objecting to Discovery Master's March 7,

22   2007, Order (docket # 306): **GRANTED IN PART AND DENIED IN PART.**

23

24

25

26

27

---

28        [1] Joining in this Motion were MGA Entertainment (HK) Ltd. ("MGA Hong Kong"), Carter Bryant ("Bryant"), and MGA Mexico.

EXHIBIT ___6___
PAGE ___118___

## I. Factual Allegations

The following allegations appear in the Amended Answer and Counterclaims ("AAC"):

### A.    Bryant's Employment by Mattel

Carter Bryant was hired by Mattel as a Barbie product designer in January 1999. (AAC ¶ 21.) At that time, Bryant signed an "Employee Confidential Information and Inventions Agreement," wherein he agreed not to assist or work for a Mattel competitor while employed by Mattel and that the designs and inventions he created while employed by Mattel were Mattel property. (AAC ¶¶ 22-23.) Bryant also executed a "Conflict of Interest Questionnaire" wherein he certified that, other than as disclosed, he had not worked for a Mattel competitor in the past year, had not engaged in a business transaction with a Mattel competitor that could create a conflict of interest, and that he would inform Mattel immediately if such an event occurred. (AAC ¶¶ 24-25.) While still employed by Mattel, Bryant used Mattel property and resources to develop and design the Bratz concept. (AAC ¶ 26.) Bryant also allegedly enlisted other Mattel employees to perform work on the Bratz line, in some cases, falsely informing those employees that they were working on a Mattel project. (AAC ¶ 27.)

### B.    MGA's Involvement in Bryant's Conduct

MGA knew of and encouraged Bryant's misappropriation of Mattel property and resources. (AAC ¶ 33.) Bryant made affirmative misrepresentations to Mattel, including that he was leaving Mattel for "non-competitive" pursuits. (AAC ¶ 28.) Bryant and MGA concealed from Mattel that Bryant developed Bratz while employed by Mattel, that Bryant worked with MGA during the time he was employed by Mattel, and that Larian and others, not Bryant, were the creators of Bratz. (AAC ¶ 35.) Prior to his departure from MGA, Bryant entered into a contract with MGA to provide design services to MGA on a "top priority" basis. (AAC ¶ 36.) Bryant left Mattel's employ on October 20, 2000; three weeks later, MGA

3

EXHIBIT ___6___
PAGE ___119___

1   showed the Bratz prototypes to focus groups and retailers. (AAC ¶ 29.)  Soon

2   thereafter, MGA showed the Bratz line to retailers at the Hong Kong Toy Fair in

3   January, 2001, and then began manufacturing and selling the dolls to retailers for

4   an annual revenue in the excess of $500 million. (AAC ¶¶ 31-32.)

5   C.    **Proprietary Information**

6          1.    **Mexico**

7          Counter-defendant Carlos Gustavo Machado Gomez ("Machado"), nonparty

8   Mariana Trueba Almada ("Trueba"), and nonparty Pablo Vargas San Jose

9   ("Vargas") were upper-level employees at Mattel Mexico. (AAC ¶¶ 38-40.)  In the

10  three months before all three simultaneously resigned from Mattel Mexico on April

11  19, 2004, they were in contact with MGA via an email account with the address

12  "plot04@aol.com". (AAC ¶ 42.) The three former employees allegedly used this

13  account to supply MGA with confidential and proprietary Mattel information. (AAC

14  ¶ 42.)  The three also copied various proprietary Mattel documents onto USB flash

15  drives prior to resigning. (AAC ¶ 44-46.) Shortly before her departure, Trueba

16  increased her access to Mattel's confidential information and attended a meeting at

17  which Mattel personnel analyzed Barbie programs for the United States, Canada,

18  and South America. (AAC ¶ 47.)

19          Among them, Machado, Trueba, and Vargas stole documents containing

20  information regarding Mattel's future products, production and shipping costs, sales

21  information, customer information, marketing information, and strategic research

22  information both in Mexico and worldwide. (AAC ¶ 48.) The stolen data was not

23  limited to the Mexican market; rather, the information stolen had the potential, and

24  in fact did, give MGA an unfair competitive advantage in the United States and

25  around the world. (AAC ¶ 49.)

26          In an attempt to conceal his actions, Machado ran a software program on his

27  Mattel computer in order to erase information pertaining to his contact with MGA.

28  (AAC ¶ 51.) When Mattel alerted Mexican authorities about the theft, they seized

4

EXHIBIT ___6___
PAGE ___120___

1   from MGA's Mexico City offices, pursuant to a search warrant, a large number of

2   documents containing Mattel trade secrets and confidential information. (AAC

3   ¶ 53.)

4        Shortly after the theft, Machado, Trueba, and Vargas traveled to Los

5   Angeles to meet face-to-face with MGA personnel. (AAC ¶ 52.)

6       **2.**   <u>**Canada**</u>

7       Jane Brisbois was the Director of Sales for the Girls Division in Canada.

8   (AAC ¶ 71.) When she was hired in 1999, she agreed to preserve and not disclose

9   Mattel's proprietary information. (AAC ¶ 71.) While still employed by Mattel,

10   Brisbois spoke with Larian on September 22, 2005. (AAC ¶ 74.) That same day,

11   Brisbois copied approximately 45 Mattel documents containing Mattel trade secret

12   information into a USB flash drive that she took from the Mattel Canada office.

13   (AAC ¶ 74.) The files taken by Brisbois included documents regarding Mattel sales,

14   advertising strategies, market analyses, product launch dates, and profit margins in

15   Canada, Mexico, and the United States. (AAC ¶ 74.) Four days later, she resigned

16   from Mattel. (AAC ¶ 74.)

17        When Mattel learned of Brisbois' misappropriation of Mattel documents, it

18   notified Canadian law enforcement officials, who were able to recover the flash

19   drive and the documents from Brisbois. (AAC ¶ 75.)

20       **3.**   <u>**United States**</u>

21       Ron Brawer was Mattel's Senior Vice President and General Manager.

22   (AAC ¶ 55.) On September 17, 2004, Brawer informed Mattel that he was leaving

23   Mattel to work for MGA. (AAC ¶ 63.) During Brawer's exit interview, he falsely

24   represented that he had returned all proprietary information to Mattel; specifically,

25   Brawer took the information in his contacts file which included contact information

26   for Mattel customers and Mattel employees. (AAC ¶ 68.) Brawer has since used

27   the contact information to induce certain Mattel employees to join MGA and

28   misappropriate Mattel trade secrets. (AAC ¶ 69.)

EXHIBIT   6
PAGE   121

MGA has also allegedly hired at least 25 other Mattel employees, some of whom have provided MGA with Mattel's confidential information. (AAC ¶ 77.)

**D.    Larian's Communications Regarding Mattel's New Product Line**

On May 12, 2006, Larian sent an email message to an email distribution list that included a reference to a new Mattel Barbie line ("MY SCENE MY BLING BLING") which Mattel had not yet made public. (AAC ¶ 79.) The distribution of the email included members of the media and many of Mattel's most significant customers. (AAC ¶ 78.) Soon after sending the email, Larian began calling these significant customers and making false representations about the product; specifically, Larian told each that it was the only retailer to purchase the product and that Mattel would not be supporting the product with television advertising. (AAC ¶ 80.)

**E.    Exhibit C**

In Exhibit C to the AAC, Mattel references a number of communications, numbering well over one hundred, that it contends constitutes predicate acts of mail fraud or wire fraud. Exhibit C does not describe the contents of those communications.

## II. Counterclaims Asserted

Based on these allegations, Mattel asserts the following counterclaims: (1) Copyright Infringement, including willful, vicarious, and contributory infringement, asserted against MGA, MGA Hong Kong, Larian and Bryant; (2) violation of RICO's substantive prohibition, 18 U.S.C. § 1962(c), asserted as authorized by 18 U.S.C. § 1964(c) against all defendants, which alleges predicate acts of, *inter alia*, mail fraud, wire fraud, and criminal copyright infringement; (3) a violation of RICO's prohibition against conspiracies, 18 U.S.C. § 1962(d), asserted against all defendants; (4) state-law misappropriation of trade secrets against MGA, MGA Mexico, Larian, and Machado; (5) breach of contract, asserted against Bryant only and based on certain employment agreements between Bryant and Mattel;

EXHIBIT ___6___
PAGE ___122___

1    (6) intentional interference with contract, asserted against MGA and Larian and

2    based on Bryant's employment agreements; (7) breach of fiduciary duty, asserted

3    against Bryant and Machado; (8) aiding and abetting breach of fiduciary duty,

4    asserted against MGA and Larian; (9) breach of the duty of loyalty, asserted

5    against Bryant and Machado; (10) aiding and abetting breach of the duty of loyalty,

6    asserted against MGA and Larian; (11) conversion, asserted against all counter-

7    defendants; (12) violation of California's unfair competition law, Cal. Bus. & Prof.

8    Code § 17200, asserted against all counter-defendants; and finally, (13) a claim for

9    declaratory relief.

10    **III. Counter-Defendants' Motions to Dismiss for Failure to State a Claim**

11         The parties have moved to dismiss a number of Mattel's counterclaims on

12    various grounds.  The Court addresses each claim in turn, considering at all times

13    the standard for dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

14    **A.    Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)**

15         In lieu of an answer, a party may, as the counter-defendants have here, file a

16    motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), which provides that such a

17    motion may be made where the pleader has "fail[ed] to state a claim upon which

18    relief can be granted." Id.  In deciding a Rule 12(b)(6) motion, the Court must also

19    consider the requirements of Fed. R. Civ. P. 8(a), which requires only a "short and

20    plain statement of the claim showing that the pleader is entitled to relief" or, when

21    the claim at issue avers fraud or mistake, the motion must be considered in

22    conformity with Fed. R. Civ. P. 9(b), which requires fraud and mistake to be pleaded

23    with particularity. See 5A Charles A. Wright & Arthur Miller, Federal Practice and

24    Procedure, §1356 (1990); James Wm. Moore, Moore's Federal Practice, Vol. 2

25    § 12.34[1][c].

26         In bringing a motion pursuant to Rule 12(b)(6), the moving party has the

27    burden of persuading the Court that the complaint has failed to state a claim upon

28    which relief can be granted. Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406,

7

EXHIBIT ___6___

PAGE ___/2?___

1409 (3d Cir.), cert. denied, 501 U.S. 1222 (1991). In considering the motion, "courts must consider the complaint in its entirety," and read it in the light most favorable to the plaintiff, accepting as true all factual allegations in the complaint, as well as reasonable inferences to be drawn therefrom. Tellabs, Inc. v. Makor Issues & Rights, Ltd., __ U.S. __, No. 06-484, 2007 WL 1773208, at *9 (June 21, 2007); Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998). However, the Court need not accept any unwarranted deductions of fact, or conclusory legal statements cast in the form of factual allegations. See Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir.), cert. denied, 454 U.S. 1031 (1981).

       Generally, a court cannot consider evidence in deciding a Rule 12(b)(6) motion; however, a court may consider exhibits attached to the complaint as well as documents that are not physically attached to the complaint but "whose contents are alleged in [the] complaint and whose authenticity no party questions." Branch v. Tunnell, 14 F.3d 449, 453-54 (9th Cir. 1994), cert. denied, 512 U.S. 1219 (1994). Facts of which a court may take judicial notice pursuant to Fed. R. Evid. 201 are also properly considered. Mir v. Little Company of Mary Hospital, 844 F.2d 646, 649 (9th Cir. 1988).

**B.    RICO Claims**

       The counter-defendants devote most of their motions to the sufficiency of the allegations regarding Mattel's RICO claims. The Court's analysis begins, as it must when considering a federal statute, with the language of that statute. The substantive RICO prohibition at issue is found in 18 U.S.C. § 1962(c):

> It shall be unlawful for any person employed by or associated
> with any enterprise engaged in, or the activities of which affect,
> interstate or foreign commerce, to conduct or participate, directly or
> indirectly, in the conduct of such enterprise's affairs through a pattern
> of racketeering activity or collection of unlawful debt.

Id. Conspiracies to violate this substantive prohibition are themselves prohibited by

8

EXHIBIT    6
PAGE      134

§ 1962(d), which states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Id. Many of these terms are defined by the statutory language, including "racketeering activity," "enterprise," and "pattern of racketeering activity":

> (1) "racketeering activity" means . . . (B) any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), . . . section 1512 (relating to tampering with a witness, victim, or an informant), . . . section 1952 (relating to [interstate and foreign travel or transportation in aid of racketeering enterprises]), [and] section 2319 (relating to criminal infringement of a copyright)[.]

> . . . .

> (4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

> (5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity[.]

18 U.S.C. § 1961.

In considering a Rule 12(b)(6) motion seeking to dismiss a RICO claim, the Court measures the sufficiency of alleged predicate acts of wire fraud and mail fraud by the Rule 9(b) "pleading-with-particularity" standard; however, the Court measures the sufficiency of all other predicate acts by the more lenient standard set forth in Rule 8(a). Compare Fed. R. Civ. P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with

EXHIBIT 6
PAGE 105

1   particularity.  Malice, intent, knowledge, and other condition of mind of a person

2   may be averred generally.") with Fed. R. Civ. P. 8(a) ("A pleading which sets forth a

3   claim for relief, . . . shall contain . . . (2) a short and plain statement of the claim

4   showing that the pleader is entitled to relief . . . ."); see Lancaster Community Hosp.

5   v. Antelope Valley Hosp. Dist., 940 F.2d 397, 405 (9th Cir. 1991) (applying Rule

6   9(b) standard to allegations of mail fraud and noting that "[t]he Ninth Circuit has

7   repeatedly insisted that [Rule 9(b)] be followed in RICO actions alleging the

8   predicate act of mail fraud."), cert. denied, 502 U.S. 1094 (1992).

9          In order to state its claim under § 1962(c), Mattel "must allege (1) conduct

10  (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing

11  injury to [its] business or property."  Ove v. Gwinn,  264 F.3d 817, 825 (9th Cir.

12  2001) (internal quotation marks and citation omitted).  Here, counter-defendants'

13  motions challenge the first, second, fourth, and fifth elements.

14         1.    "Conduct or Participate"

15         Bryant contends that his role in any alleged scheme or enterprise is too

16  tenuous to constitute the "conduct" necessary to impose RICO liability.  In order to

17  have RICO liability imposed upon him, a defendant must "conduct or participate,

18  directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of

19  racketeering activity . . . ."  18 U.S.C. § 1962(c).  The United States Supreme Court

20  has elaborated on this statutory language in Reves v. Ernst & Young, 507 U.S. 170,

21  179 (1993), wherein it noted:

22         [T]he word "participate" makes clear that RICO liability is not limited to

23         those with primary responsibility for the enterprise's affairs, just as the

24         phrase "directly or indirectly" makes clear that RICO liability is not

25         limited to those with a formal position in the enterprise, but some part

26         in directing the enterprise's affairs is required.

27  Id.  Here, Mattel has alleged that Bryant secretly developed Bratz while employed

28  by Mattel and using Mattel's resources and employees, that he concealed that fact

EXHIBIT   6
PAGE   176

1    when he had a duty to disclose it, and that he did these things in order to facilitate

2    the development of the Bratz concept by Mattel's direct competitor, in violation of,

3    *inter alia*, criminal copyright law.  These allegations, if proven to be true, are

4    sufficient to impose RICO liability on Bryant.

5        2.    **Enterprise**

6        Bryant's motion challenges the sufficiency of the allegations regarding a

7    RICO enterprise.  That enterprise is alleged to be an "association-in-fact" enterprise

8    comprised of the counter-defendants, Brawer, Trueba, Vargas, Brisbois, and

9    others.  (AAC ¶ 89.)  Mattel alleges that counter-defendants participated in or

10   conducted the affairs of the association-in-fact enterprise through a pattern of

11   racketeering activities, including, as detailed in the AAC, predicate acts of mail

12   fraud, wire fraud, evidence tampering, interstate and foreign travel to aid

13   racketeering activities, and criminal copyright infringement.  (AAC ¶ 90.)  The

14   counter-defendants' goal is alleged to have been to "execut[e] or attempt to

15   execut[e] [a] scheme to improperly defraud Mattel and steal its trade secret or

16   otherwise confidential and proprietary information . . . ."  (AAC ¶ 90.)

17       A recent *en banc* decision of the Ninth Circuit sets forth a comprehensive

18   analysis of the sufficiency of allegations regarding a RICO enterprise necessary to

19   state a claim.  See Odom v. Microsoft Corp., 486 F.3d 541, 2007 WL 1297249 (9th

20   Cir. 2007) (designated for publication).  That decision provides the blueprint for the

21   Court's present analysis.

22       Odom involved an alleged scheme involving consumers who purchased

23   computers from Best Buy retail stores.  Id. at 543.  The computers would include a

24   Microsoft compact disc that the cashier would scan; the consumer's credit card was

25   also scanned for purchase.  Id.  The credit card information was transmitted to

26   Microsoft, and Microsoft would, at some point, begin making unauthorized charges

27   to the credit card used to purchase the computer, ostensibly for Microsoft's

28   provision of internet services.  Id.  Odom brought substantive RICO and RICO

11

EXHIBIT   6
PAGE   127

1   conspiracy claims based on these allegations. Id. at 544.

2       The Ninth Circuit first noted the evidenced judicial resistance to RICO in the

3   lower courts, contrasted with the Supreme Court's four reversals of such narrow

4   readings of RICO. Id. at 545-47 (citing United States v. Turkette, 452 U.S. 576

5   (1981) (rejecting notion that RICO prohibited only the infiltration of legitimate

6   businesses by organized crime); Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 481

7   (1985) (rejecting notion that RICO could be used to impose civil liability only where

8   the defendant had been criminally convicted and that such liability was limited to a

9   narrow measure of damages); National Organization for Women v. Scheidler, 510

10  U.S. 249 (1994) (rejecting the notion that RICO liability could be imposed only when

11  the acts of a RICO enterprise had an economic motive); and Cedric Kushner

12  Promotions v. King, 533 U.S. 158 (2001) (reversing lower court's ruling that no

13  RICO claim was stated where president and sole shareholder of a corporation was

14  alleged to have associated with his wholly owned corporation as a RICO

15  "enterprise," and relying on fact that person and corporation were separate legal

16  entities). In Odom, the Ninth Circuit understandably viewed these four holdings as

17  a "general instruction that we should not read the statutory terms of RICO

18  narrowly." Odom, 486 F.3d at 547 (internal citation omitted).

19      In Odom, the Ninth Circuit clarified -- and relaxed -- the standard for pleading

20  and proving an "associated-in-fact" enterprise such as the one alleged here:

21          The definition of "enterprise" in the text of RICO is fairly

22      straightforward. In its entirety, the definition is as follows: "'enterprise'

23      includes any individual, partnership, corporation, association, or other

24      legal entity, and any union or group of individuals associated in fact

25      although not a legal entity." 18 U.S.C. § 1961(4). As is evident from

26      the text, this definition is not very demanding. A single "individual" is

27      an enterprise under RICO. Similarly, a single "partnership," a single

28      "corporation," a single "association," and a single "other legal entity"

12

EXHIBIT   6
PAGE   /78

1    are all enterprises.  At issue in this case is the last kind of enterprise

2    listed in the definition -- a "group of individuals associated in fact."  It is

3    undisputed that a corporation can be an "individual" for purposes of

4    an associated-in-fact enterprise.

5  Id. at 548.

6         The Ninth Circuit acknowledged that "enterprise" must be something greater

7  than merely a pattern of racketeering activity; however, the court rejected the notion

8  that an enterprise must have a particular ascertainable organizational structure.  Id.

9  at 551 ("We take this opportunity to join the circuits that hold that an

10  associated-in-fact enterprise under RICO does not require any particular

11  organizational structure, separate or otherwise.") (citations omitted).  A party need

12  only set forth factual allegations of "a group of persons associated together for a

13  common purpose of engaging in a course of conduct," "evidence of an ongoing

14  organization, formal or informal," and "evidence that the various associates function

15  as a continuing unit."  Id. at 552 (internal citations and quotation marks omitted).

16         As for the common purpose, it was met in Odom, where the plaintiff had

17  alleged the following:

18         [D]efendants had the common purpose of increasing the

19         number of people using Microsoft's Internet Service, and doing so by

20         fraudulent means.  Best Buy furthered this common purpose by

21         distributing Microsoft Internet Trial CD's and conveying its customers'

22         debit and credit card information to Microsoft.  Microsoft then used the

23         information to activate customer accounts.

24  Id.  Here, Mattel has alleged the common purpose of attempting to defraud Mattel

25  and steal its trade secrets.  Mattel's many factual allegations, detailed herein,

26  support this alleged common purpose.

27         As for the "ongoing organization" requirement, the Ninth Circuit in Odom

28  noted that the plaintiffs had met that element, which was met where the

EXHIBIT   6
PAGE   129

1   organization was alleged to be "a vehicle for the commission of two or more

2   predicate crimes." Id. (internal quotation marks and citation omitted). The Ninth

3   Circuit noted the following factual allegations:

4           Microsoft and Best Buy established mechanisms for

5           transferring plaintiffs' personal and financial information from Best Buy

6           to Microsoft. That information then allowed Microsoft to activate

7           plaintiffs' Internet accounts without their knowledge or permission.

8           These mechanisms enabled Microsoft to bill plaintiffs improperly for

9           MSN services in 2001, 2002 and 2003.

10  Id. Here, plaintiffs have alleged that the counter-defendants coordinated their many

11  efforts at depriving Mattel of its proprietary information and its intellectual property.

12  The allegations regarding common use of the "plot04@aol.com" email address to

13  transfer confidential Mattel information to MGA support the finding of an "ongoing

14  organization." So, too, do the allegations regarding the repeated communications

15  between Bryant and MGA.

16          The "continuing unit" requirement does not appear to the Court to mandate

17  that the organization continues to this day;[2] rather, the requirement is related to the

18  notion that RICO was not meant to address discrete instances of fraud or criminal

19  conduct. "[T]he continuity requirement focuses on whether the associates'

20  behavior was 'ongoing' rather than isolated activity." Id. at 553 (internal quotation

21  marks and citation omitted). Related to that concern, it is also clear to the Court

22  that this requirement is related to the duration of the racketeering activities. See id.

23  ("An almost two-year time span is far more than adequate to establish that Best

24  Buy and Microsoft functioned as a continuing unit."). Here, the allegations do not

25  reveal that the conduct complained of was mere isolated activity; rather, Mattel sets

26  forth allegations of racketeering activity that spanned a period of three years. The

27

28          [2] Nevertheless, Mattel alleges that the enterprise exists to this day by virtue
    of its continued use of Mattel's information and property.

14

EXHIBIT     6
PAGE        130

allegations describe a scheme consisting of corporate warfare between competitors that has been waged over a long period of time and waged on a number of fronts, both foreign and domestic. The "continuing unit" requirement is therefore satisfied.

Accordingly, the Court finds that Mattel has sufficiently pleaded the existence of a RICO enterprise.

### 3.   Predicate Acts of Racketeering Activity

#### a.   Mail Fraud and Wire Fraud

The criminal prohibition against mail fraud is found at 18 U.S.C. § 1341:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, . . . shall be fined under this title or imprisoned not more than 20 years, or both.

Id. The Ninth Circuit has described the elements of mail fraud as "(1) proof of a scheme to defraud; (2) using or causing the use of the mails to further the fraudulent scheme; and (3) specific intent to defraud." United States v. Rogers, 321 F.3d 1226, 1229 (9th Cir. 2003) (internal citation omitted).

The criminal prohibition against wire fraud is similar:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, . . . transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

EXHIBIT   6
PAGE   13'

1  18 U.S.C. § 1343.  The Ninth Circuit has described the elements of wire fraud as

2  "(1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and

3  (3) a specific intent to deceive or defraud."  United States v. Shipsey, 363 F.3d 962,

4  971 (9th Cir. 2004) (citations omitted).

5       As all parties acknowledge, the predicate acts of mail fraud and wire fraud

6  must be pleaded with particularity pursuant to Fed. R. Civ. P. 9(b).  Specifically,

7  Mattel must detail "the time, place, and manner of each act of fraud, [and it must

8  set forth] the role of each defendant in each scheme."  Lancaster Community

9  Hosp., 940 F.2d at 405.  This standard applies in RICO actions alleging predicate

10  acts of mail fraud.  Id.

11       Here, Mattel sets forth allegations of predicate acts of mail fraud and wire

12  fraud referenced in Exhibit C to the AAC.  However, these alleged predicate acts

13  are insufficiently pleaded because they fail to adequately describe the contents of

14  the communications; specifically, they fail to detail time, place and manner of "each

15  act of fraud."  The substantive RICO claim is therefore dismissed to the extent it is

16  premised on those communications.  Mattel is **GRANTED** leave to amend the RICO

17  claim based on this insufficiency; Mattel must attach to the Second Amended

18  Answer and Counterclaims ("SAAC") copies of the referenced communications.

19  The contents of packages referenced in Exhibit C must be described in order to

20  meet the Rule 9(b) requirements.

21       At oral argument, counsel for MGA argued that the substance of many, if not

22  all of the communications, cannot be read to further a scheme to defraud.  That

23  argument will be considered another day, after Mattel files the SAAC.  However, the

24  Court takes the opportunity today to note that, given the broad scope of the alleged

25  scheme to defraud, including the criminal copyright infringement allegations,

26  otherwise innocuous and routine communications regarding day-to-day operations

27  and product development may be found to be in furtherance of that scheme.  See

28  Tellabs, Inc. v. Makor Issues & Rights, Ltd., __ U.S. __, No. 06-484, 2007 WL

EXHIBIT  6
PAGE  132

1   1773208, at *9 (June 21, 2007) (noting that, in considering a Rule 12(b)(6) motion,

2   "courts must consider the complaint in its entirety").

3          Counter-defendants also argue that Mattel failed to plead each defendant's

4   role in furtherance of the scheme to defraud.  As interpreted by the Ninth Circuit,

5   the Rule 9(b) standard clearly requires that a plaintiff so plead.  Lancaster

6   Community Hosp., 940 F.2d at 405.  However, the Court will view the

7   communications alleged to constitute mail and wire fraud in conjunction with all the

8   allegations set forth regarding the alleged scheme in the counterclaims.  See Flood

9   v. Makowski, No. 3:CV-03-1803, 2004 WL 1908221, at *14 (M.D. Pa., Aug. 24,

10  2004) (applying the principle that reasonable inferences in favor of a plaintiff must

11  be made when considering a Rule 12(b)(6) motion and noting that "[a]lthough

12  Plaintiffs' Complaint does not expressly identify how each particular mail or wire

13  communication furthered the scheme, the Complaint clearly alleges facts which

14  create an unquestionable inference that the alleged communications furthered the

15  scheme.").

16         Counter-defendants also argue that, because the emails alleged to

17  constitute wire fraud were sent among individuals physically located in the same

18  state, Mattel will not be able to establish the interstate nature of the

19  communications.  See 18 U.S.C. § 1343 (setting forth the requirement that

20  communications be transmitted "in interstate or foreign commerce").  Mattel has

21  alleged that the communications were transmitted in interstate or foreign

22  commerce.  (AAC ¶ 93(b).)  This suffices at the pleadings stage; however,

23  eventually Mattel will be called upon to support these allegations with evidence.

24  See First Pacific Bancorp, Inc. v. Bro, 847 F.2d 542, 547 (9th Cir. 1988) (implicitly

25  holding that wire fraud must be supported, at the summary judgment stage, by

26  evidence of interstate wire fraud).

27         The Court dismisses the RICO claim to the extent it is based on the alleged

28  predicate acts of mail fraud and wire fraud because those acts are not pleaded with

EXHIBIT ___6___
PAGE ___139___

1   particularity as required by Rule 9(b).  Mattel is **GRANTED** ten days' leave to file a

2   SAAC that incorporates and attaches and/or describes the communications and the

3   contents of packages referenced in Exhibit C.

4              **b.     Evidence Tampering**

5         Unlike the mail fraud and wire fraud allegations, the allegations regarding the

6   remaining predicate acts are governed by the more lenient pleading standards of

7   Rule 8(a).  See Slade v. Gates, No. 01-8244-RMT, 2002 WL 31387263, at *6 (C.D.

8   Cal., Oct. 11, 2002).  The Court considers the sufficiency of those remaining

9   allegations pursuant to this Rule.

10        The criminal prohibition against tampering with evidence is found at 18

11  U.S.C. § 1512:

12              Whoever corruptly . . . alters, destroys, mutilates, or conceals a

13         record, document, or other object, or attempts to do so, with the intent

14         to impair the object's integrity or availability for use in an official

15         proceeding . . . shall be fined under this title or imprisoned not more

16         than 20 years, or both.

17  Id.  Mattel's opposition makes clear that its evidence tampering allegations are

18  based upon two categories of documents:  The first category of documents,

19  perhaps composed of only one multi-page document, involves the alleged alteration

20  of Bryant's contract with MGA to remove a fax header showing that the date of its

21  execution, which predated the effective date of Bryant's resignation from Mattel.[3]

22  The second category of documents are those filed with the United States Copyright

23  Office, which are alleged to omit the disclosure that certain Bratz drawings were

24  "works for hire," and which are alleged to have had alterations made to certain

25

26  ───────────────

27  [3]  The AAC merely alleges that counter-defendants Bryant and MGA
    "tamper[ed] with and defac[ed] documents which showed that . . . Bryant was a
    Mattel employee while he was working for and with MGA . . . ."  (AAC ¶ 35.)

28  However, it is clear from other filings by the parties that, at a minimum, this
    allegation refers to MGA's contract with Bryant.

                          18

EXHIBIT   6
PAGE   134

1  relevant dates. (See AAC ¶ 35; Mattel Opp. to MGA's Motion at 9.)

2      As to the first category, a predicate act is sufficiently alleged. Mattel has

3  alleged that a document was altered in a manner designed to conceal critical

4  evidence, highly relevant to the present official proceeding, regarding the timing of

5  the execution of the document.

6      Conversely, it is unclear whether Mattel has alleged a predicate act with

7  respect to the second category of documents. The issue of whether submitting

8  fraudulent registrations and "altering relevant dates" on documents submitted to the

9  United States Copyright Office has not been fully briefed by the parties; the issue

10  was framed in this manner only upon the filing of the reply.[4] Therefore, the Court

11  reserves this issue for a later date, and anticipates that it will be addressed by the

12  parties in a motion to dismiss the SAAC.

13      **c.    Travel Act Violation**

14      Federal criminal law prohibits interstate or foreign travel to aid in

15  racketeering activities. 18 U.S.C. § 1952; see also 18 U.S.C. § 1961 (defining a

16  violation of § 1962 as a RICO predicate act). In relevant part, the criminal

17  prohibition states:

18          Whoever travels in interstate or foreign commerce or uses the

19      mail or any facility in interstate or foreign commerce, with intent to . . .

20      promote, manage, establish, carry on, or facilitate the promotion,

21      management, establishment, or carrying on, of any unlawful activity,

22      and thereafter performs or attempts to perform . . . [such an act,] shall

23      be fined under this title, imprisoned not more than 5 years, or

24      both . . . .

25                              . . . .

26          As used in this section . . . "unlawful activity" means . . .

27      ───────────────

28      [4] The Court does not view this failure as the fault of any party.

19

EXHIBIT  6
PAGE  135

1    extortion, bribery, or arson in violation of the laws of the State in which

2    committed or of the United States . . . .

3    Id. Mattel alleges that Bryant and others traveled in interstate commerce to commit

4    commercial bribery in violation of California's prohibition against commercial

5    bribery, which in relevant part provides:

6        (a) Any employee who solicits, accepts, or agrees to accept

7        money or any thing of value from a person other than his or her

8        employer, other than in trust for the employer, corruptly and without

9        the knowledge or consent of the employer, in return for using or

10       agreeing to use his or her position for the benefit of that other person,

11       and any person who offers or gives an employee money or any thing

12       of value under those circumstances, is guilty of commercial bribery.

13   Cal. Penal Code § 641.3. Several allegations support a violation of § 641.3(a),

14   which in turn supports a violation of 18 U.S.C. § 1952. Mattel has alleged that

15   Bryant, while still employed by Mattel, entered into a contract with MGA to provide

16   design services to MGA on a "top priority" basis, and used Mattel property,

17   employees, and resources to develop and design the Bratz concept.

18       Counter-defendants argue that the requirement under California's

19   commercial bribery statute that a violator act "corruptly" is not met because Bryant

20   did not intend to injure Mattel. Such an intent is not required; rather it is sufficient

21   that Bryant is alleged to have intended to defraud Mattel. See Cal. Penal Code

22   § 341.3(d)(3) (defining "corruptly" as involving the intent "to injure *or* defraud")

23   (emphasis added).

24       **d.    Criminal Copyright Violations**

25       The parties dispute the relevant pleading standard that governs the

26   allegations which underlie the criminal copyright violation claim. Counter-

27   defendants would have the Court apply the more exacting Rule 9(b) standards

28   because, in their assessment, the claim "sounds in fraud." Mattel, however,

20

EXHIBIT ___6___

PAGE ___136___

contends that there is no reason to depart from the more lenient Rule 8(a) standard generally applied to copyright claims because, in its assessment, the claims "sound in copying, not fraud." (Mattel Opposition to MGA's Motion at 4.)

The recent Ninth Circuit case on this issue, cited by both parties, stands for the unremarkable proposition that, consistent with Rule 9(b), all *averments* of fraud must be pleaded with particularity, regardless of whether fraud is an essential element of the claim to which the averment relates. See Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103 (9th Cir. 2003); Fed. R. Civ. P. 9(b) ("In all *averments* of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.") (emphasis added).

Considering Rules 8(a), 9(b), and the teachings of <u>Vess</u>, a spectrum emerges. At the left end of this spectrum are claims that do not involve any allegations of fraud. Those need only satisfy Rule 8(a)'s "short and plain statement" standard. At the opposite end of the spectrum are claims based solely on fraud, and the facts underlying such a claim must be alleged with particularity pursuant to Rule 9(b). Lying closer to the Rule 9(b) end of the spectrum is a category of claims discussed in <u>Vess</u>:

> In cases where fraud is not a necessary element of a claim, a plaintiff may choose nonetheless to allege in the complaint that the defendant has engaged in fraudulent conduct. In some cases, the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be "grounded in fraud" or to "sound in fraud," and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b).

<u>Vess</u>, 317 F.3d at 1103-04 (internal citations omitted). It is into this category MGA contends that the allegations of criminal copyright claims fit, and MGA therefore contends that all allegations regarding the criminal copyright claims must be

EXHIBIT   6
PAGE   137

1   pleaded with particularity.

2       However, Vess sets up another category, lying closer to the Rule 8(a) part of

3   the spectrum (but nevertheless requiring pleading with some particularity):

4           In other cases, however, a plaintiff may choose not to allege a

5           unified course of fraudulent conduct in support of a claim, but rather

6           to allege some fraudulent and some non-fraudulent conduct.  In such

7           cases, only the allegations of fraud are subject to Rule 9(b)'s

8           heightened pleading requirements. . . . The rule does not require that

9           allegations supporting a claim be stated with particularity when those

10          allegations describe non-fraudulent conduct.

11          [In other words,] in a case where fraud is not an essential

12          element of a claim, only allegations ("averments") of fraudulent

13          conduct must satisfy the heightened pleading requirements of Rule

14          9(b).  Allegations of non-fraudulent conduct need satisfy only the

15          ordinary notice pleading standards of Rule 8(a).

16  Id. at 1104-05.

17      Whether fraud is an essential element of criminal copyright infringement

18  must be determined by reference to the statutory language and any interpretative

19  case law.  In relevant part, the prohibition against criminal copyright infringement

20  provides: "Any person who violates section 506(a) (relating to criminal offenses) of

21  title 17 shall be punished as provided [herein] in and such penalties shall be in

22  addition to any other provisions of title 17 or any other law." 18 U.S.C. § 2319.  In

23  turn, the relevant provision in 17 U.S.C. § 506 states that "[a]ny person who willfully

24  infringes a copyright shall be punished as provided under section 2319 of title 18, if

25  the infringement was committed . . . for purposes of commercial advantage or

26  private financial gain . . . ." 17 U.S.C. § 506(a)(1)(A).  The elements of the offense

27  are easily gleaned from the straightforward statutory language: "Criminal

28  infringement of copyright has three elements: (1) infringement of a copyright

22

EXHIBIT    6
PAGE      138

1    (2) done wilfully (3) for purposes of *commercial advantage or private financial gain.*"

2    United States v. Goss, 803 F.2d 638, 642 (11th Cir. 1986).

3         Clearly, fraud is not an essential element of a criminal copyright claim, taking

4    it out of the category at the far end of the spectrum described above, and

5    necessitating an inquiry into whether Mattel has chosen to incorporate a fraud

6    element into its criminal copyright claim.  The AAC at ¶ 93(e) reveals that the

7    criminal copyright claim is premised upon the "willfull[] infringe[ment of] Mattel's

8    copyrights, including with respect to documents containing Mattel trade secret and

9    confidential information . . . ."  The Opposition fills in more details regarding this

10   claim, noting that the criminal copyright claim is premised upon the Bratz-related

11   works, Bratz-derivative works, and works contained within Mattel's allegedly

12   purloined trade secrets and confidential information.  (Mattel Opposition to MGA's

13   Motion at 5).

14        These allegations do not "allege a unified course of fraudulent conduct and

15   rely entirely on that course of conduct as the basis of a claim" such that the claim

16   could be said to "*sound in fraud*" and therefore require pleading with particularity as

17   to the entire claim.  The allegations establish that much of the conduct complained

18   of consists of simple copying of the Bratz-related works or the creation of Bratz-

19   derivative works.  Such allegations are unrelated to allegations of fraud.  Therefore,

20   if this claim falls anywhere on the spectrum other than the Rule 8(a) category, it

21   falls in the category described by Vess as those claims in which a claimant chooses

22   to "allege some fraudulent and some non-fraudulent conduct."  Id. at 1104.

23        When one considers that the alleged predicate acts of criminal copyright

24   infringement are but a small part of a larger, and singular, claim brought pursuant to

25   RICO, it is evident that the RICO claim falls neatly into the category of claims that

26   are based partly on fraudulent and partly *on non-fraudulent conduct.*  The Court

27   has already found that certain fraudulent conduct -- that supporting the alleged

28   predicate acts of mail fraud and wire fraud -- is insufficiently pleaded.  The current

EXHIBIT __6__
PAGE __139__

1   focus, however, is whether the allegations supporting the predicate acts of criminal

2   copyright infringement involve fraudulent conduct.

3         Here, there are two types of works allegedly infringed. The first type is the

4   Bratz-related and Bratz-derivative works. The second type is Mattel's other trade

5   secrets and confidential information. Both types are alleged -- with particularity -- to

6   have been procured by MGA through fraudulent conduct, but the criminal copyright

7   infringement predicate acts do not implicate that fraudulent conduct. Rather, they

8   implicate only questions of whether counter-defendants wilfully infringed Mattel's

9   works for commercial advantage or private financial gain. Here, Mattel has

10  sufficiently alleged predicate acts of criminal copyright infringement by alleging that

11  MGA and other counter-defendants willfully infringed its copyrights for purposes of

12  gaining commercial advantage and private financial gain. As Mattel correctly

13  contends, state of mind, in this instance willfulness, may be pleaded generally. <u>See</u>

14  <u>Ferguson Beauregard/Logic Controls v. Mega systems, LLC</u>, 350 F.3d 1327, 1343

15  (Fed. Cir. 2003).

16        **4.    Injury to Business or Property**

17        "Recovery under RICO is limited to those injuries flowing from predicate

18  acts . . . ." <u>Resolution Trust Corp. v. Keating</u>, 186 F.3d 1110, 1117 (9th Cir. 1999)

19  (citing <u>Sedima, S.P.R.L. v. Imrex Co., Inc.</u>, 473 U.S. 479, 497 (1985)). Here, Mattel

20  has alleged damages flowing from the alleged acts of racketeering activity. (AAC

21  ¶ 96). Damages easily flow from theft of trade secrets and confidential information

22  committed by a direct competitor and from infringement of copyrights that are

23  alleged to have been used to make millions -- if not billions -- of dollars.

24        Counter-defendants argue that Mattel lacks standing to sue on behalf of its

25  subsidiaries. This issue arises because many of the allegations of the thefts of

26  trade secrets involve actions taken in Mexico or Canada by employees of Mattel's

27  foreign subsidiaries. Mattel argues that it is not attempting to sue for damages

28  incurred by its subsidiaries; rather, Mattel alleges that much of the confidential

EXHIBIT     6
PAGE     170

1   information stolen by the employees of Mattel's subsidiaries belonged not to

2   Mattel's subsidiaries, but to Mattel itself. Based on these allegations, Mattel may

3   sue for damages it sustained. Mattel may not sue for damages incurred by its

4   foreign subsidiaries.

5          5.       **Ruling on Motions to Dismiss**

6          The Motions to Dismiss the RICO claims are **GRANTED** in part. As set forth

7   herein, the alleged predicate acts of mail fraud and wire fraud are insufficiently

8   alleged, and Mattel is **GRANTED** leave to amend the AAC.

9   **C.   Trade Secrets**

10         MGA contends that Mattel has failed to plead its trade secrets with sufficient

11  particularity to comply with its duties under Cal. Code Civ. P. § 2019.210, which

12  provides:

13              In any action alleging the misappropriation of a trade secret

14         under the Uniform Trade Secrets Act . . . , before commencing

15         discovery relating to the trade secret, the party alleging the

16         misappropriation shall identify the trade secret with reasonable

17         particularity subject to any orders that may be appropriate under

18         Section 3426.5 of the Civil Code [involving in camera reviews and

19         sealing of court documents].

20  Id. Based on the unambiguous language of the statute, the Court agrees with

21  Mattel's characterization of this requirement as one related to discovery rather than

22  related to pleading.

23         The Court also agrees that, by identifying documents in discovery by Bates-

24  stamp number, Mattel has complied with the dictates of § 2019.210. See

25  Advanced Modular Sputtering, Inc. v. Superior Court, 132 Cal.App.4th 826, 835-36,

26  (2005) (internal quotation marks and citations omitted) ("[Reasonable particularity]

27  means that the plaintiff must make some showing that is reasonable, i.e., fair,

28  proper, just and rational[,] . . . under all of the circumstances to identify its alleged

EXHIBIT 6
PAGE 141

1   trade secret in a manner that will allow the trial court to control the scope of

2   subsequent discovery, protect all parties' proprietary information, and allow them a

3   fair opportunity to prepare and present their best case or defense at a trial on the

4   merits."). MGA's complaints regarding the volume of documents so identified, and

5   their skepticism of Mattel appropriately attaching such an identification to many of

6   those identified documents, are not properly addressed at this stage of the

7   proceedings.

8          The motion to dismiss the trade secrets claim on this basis is therefore

9   DENIED.

10  **D.     Duplicative State-Law Claims**

11         Bryant's motion to dismiss Mattel's duplicative state-law claims is **DENIED**.

12  The state-law counterclaims asserted against Bryant in the AAC admittedly overlap

13  with the claims asserted against him in the 04-9059 case, however, the factual

14  allegations underlying the claims asserted in the AAC are broader in scope than

15  those underlying the claims asserted in the 04-9059 case.

16         **IV. Motion to Dismiss for Lack of Personal Jurisdiction**

17         MGA Mexico challenges this Court's exercise of personal jurisdiction over it.

18  As set forth below, the Court concludes that it may, consistent with California law

19  and the federal Due Process Clause, exercise specific personal jurisdiction over

20  this admittedly foreign corporation.

21  **A.     The Constitutional Exercise of Personal Jurisdiction**

22         Where a party moves to dismiss a claim for lack of personal jurisdiction, the

23  party asserting the claim bears the burden of demonstrating that jurisdiction is

24  appropriate. Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800 (9th Cir.

25  2004). However, in opposing a motion to dismiss for lack of personal jurisdiction,

26  the party asserting the claim need only make a *prima facie* showing of jurisdictional

27  facts. Id. Disputed facts are to be resolved in favor of the exercise of personal

28  jurisdiction. Id.

26

EXHIBIT   6
PAGE   142

Because there is no applicable federal statute governing personal jurisdiction, the Court applies the law of the state in which the district court sits. Id. (citations omitted). "Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." Id. at 800-01 (citations omitted). In order for a court's exercise of personal jurisdiction over a nonresident defendant to be constitutionally permissible, the defendant must have "minimum contacts" with the forum state "such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." Id. at 801 (internal quotation marks and citation omitted).

Personal jurisdiction may be either general or specific. For general personal jurisdiction to apply, a defendant (or here, a counter-defendant) "must engage in continuous and systematic general business contacts . . . that approximate a physical presence in the forum state." Id. (internal quotation marks and citations omitted).

To determine whether it has specific personal jurisdiction over a nonresident defendant, the Court employs a three-part test:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

Id. at 802.

The party asserting the claim bears the burden of establishing the first two parts of the test. Id. If that party establishes the first two parts, then the burden

EXHIBIT ___6___
PAGE ___143___

shifts to the party resisting the Court's exercise of personal jurisdiction "to present a *compelling case* that the exercise of jurisdiction would not be reasonable." Id. (emphasis added).

The first part of the test is satisfied by either "purposeful availment" or "purposeful direction." Id. Purposeful availment is shown when a defendant avails itself of the privilege of doing business in a forum state, usually met when the defendant took some action in the forum, such as executing or performing a contract there. Id. By virtue of such actions, a defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958). When taking advantage of these "benefits and protections," a defendant must also "submit to the burdens of litigation in that forum." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985).

By contrast, purposeful direction, involves actions by the defendant outside of the forum state but that are directed at the forum. Schwarzenegger, 374 F.3d at 803. The purposeful direction analysis is derived from a three-part "effects test" that finds its roots in the Supreme Court's decision in Calder v. Jones, 465 U.S. 783 (1984). Pursuant to this analysis, the defendant must "have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." Id.; Schwarzenegger, 374 F.3d at 803. All three parts of the test must be satisfied. The second part of the effects test is described by the Ninth Circuit as the "express aiming" requirement, and requires that the counter-defendants "expressly aimed" its intentional act at California. See Schwarzenegger, 374 F.3d at 806. Specifically, "express aiming" is found where the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." Bancroft & Masters, Inc. v. Augusta Nat. Inc., 223 F.3d 1082,

28

EXHIBIT   6
PAGE   144

1087 (9th Cir. 2000).[5]

Assuming that the party asserting a claim can establish that the party resisting the Court's exercise of personal jurisdiction has met either the purposeful availment or express aiming part of the three-part test regarding the exercise of specific personal jurisdiction, courts next consider whether the claim arises out of or relates to the forum-related activities.  In making this determination, the Court considers whether the contacts with the forum gave rise to the claims asserted, employing a "but for" standard.  See Doe v. Unocal Corp., 248 F.3d 915, 924 (9th Cir. 2001).

Once the purposeful availment/express aiming and relatedness requirements are established, the burden shifts to the party resisting the Court's exercise of jurisdiction to show that exercise of jurisdiction is unreasonable.  In determining reasonableness, the Court considers seven factors:

> 1) the extent of the defendant's purposeful interjection into the forum state's affairs; 2) the burden on the defendant; 3) conflicts of law between the forum and defendant's home jurisdiction; 4) the forum's interest in adjudicating the dispute; 5) the most efficient judicial resolution of the dispute; 6) the plaintiff's interest in convenient and effective relief; and 7) the existence of an alternative forum.

---

[5] What constitutes, or doesn't constitute, "express aiming" is best illustrated by example.  For instance, in Pebble Beach Co. v. Caddy, 453 F.3d 1151 (9th Cir. 2006), no express aiming was found where the owner of a bed-and-breakfast in England (overlooking a pebbly beach) used the term "pebblebeach," the name of a famous golf course located in California, on its web site. Id. at 1153, 1156-57. The Ninth Circuit acknowledged that it might be foreseeable that the defendant's use of the web site might have some effect on California, but noted that mere foreseeability of effect in a forum state is not enough to constitute express aiming. Id. at 1157.  In contrast to Pebble Beach is the case of Panavision Intern., L.P. v. Toeppen, 141 F.3d 1316, 1321 (9th Cir. 1998), in which the Ninth Circuit found that the express aiming requirement was met where the defendant registered plaintiff's marks as Internet domain names in order to force a California plaintiff to pay him money.

EXHIBIT  6
PAGE  145

1  Roth v. Garcia Marquez, 942 F.2d 617, 623 (9th Cir. 1991) (internal citation

2  omitted).  No factor is dispositive and the Court must balance all seven.  Id.

3  (internal citation omitted).

4  **B.   MGA Mexico's Contacts with the Forum State**

5          The AAC alleges that Issac Larian and other MGA officers, while in

6  California, executed a plot to target three high-level employees of Mattel Mexico,

7  and entice them to steal Mattel's trade secrets.  In written offers of employment to

8  these three individuals, Issac Larian held himself out to be the CEO of MGA

9  Mexico.  This plot was facilitated by a number of cross-border communications

10 among the participants as well as travel to the United States by the targeted

11 employees.

12 **C.   The Court May Exercise Personal Jurisdiction over MGA Mexico**

13         The AAC repeatedly alleges that Larian, who held himself out to be MGA

14 Mexico's CEO, and who was designated as MGA Mexico's "legal agent" in Mexican

15 registration document actively sought to induce others to access and steal Mattel's

16 trade secrets while located in the California.  See Velázquez Decl. Exs. A-C; Salem

17 Decl. Ex. B.  This constitutes purposeful availment.

18         To the extent that any of the actions taken in Mexico by the three Mexican

19 employees may be imputed to Mattel Mexico, there is also purposeful direction.

20 The alleged actions taken on behalf of MGA Mexico were specifically engineered to

21 result in the alleged illegal acquisition of trade secrets belonging to Mattel, a

22 California resident.[6]

23         The relatedness requirement is also clearly met.  The contacts with

24 California involve actions allegedly taken in order to further the illegal acquisition of

25 Mattel's trade secrets, leading to the present claims against MGA Mexico for

26 misappropriation of trade secrets and the related RICO claims.

27 _____

28     [6]  The AAC alleges the theft of trade secrets belonging not only to Mattel's
    Mexican subsidiary, but also to Mattel itself, which is a California corporation.

                                30                    EXHIBIT    6
                                                      PAGE      146

1   The burden, therefore, is on MGA Mexico to show that the exercise of

2   jurisdiction is unreasonable.[7]  As noted previously, the Court considers seven

3   factors.  The first factor the Court considers is the defendant's purposeful

4   interjection.  For the reasons the Court has found purposeful availment and

5   purposeful direction, this factor favors the exercise of personal jurisdiction.

6   MGA Mexico argues, without elaboration, that the burden of defending itself

7   in California is "significant."  However, the assumption underlying this argument is

8   that the present action is more properly litigated by MGA's and Mattel's Mexican

9   subsidiaries.  This assumption misses the point of Mattel's claim against MGA

10  Mexico; Mattel, the parent company, was itself injured by MGA's Mexico's alleged

11  misappropriation of its own trade secrets because the alleged misappropriation was

12  not limited to trade secrets belonging to its Mexican subsidiary.  The argument

13  based on this faulty assumption is therefore unconvincing.  In order to show

14  unreasonableness, the burden on the defendant must be great.  See Panavision,

15  141 F.3d at 1323 ("A defendant's burden in litigating in the forum is a factor in the

16  assessment of reasonableness, but unless the inconvenience is so great as to

17  constitute a deprivation of due process, it will not overcome clear justifications for

18  the exercise of jurisdiction.") (internal quotation marks and citation omitted).

19  As to the third and seventh factors, regarding conflicts of law and the

20

21      [7]  In its reply, MGA Mexico declares that it "made a 'compelling case' in

22  support of its motion to dismiss that it would be unreasonable to force it to litigate in this forum."  MGA Mexico Reply at 10.  However, MGA Mexico's motion papers

22  fail to acknowledge that they bear the burden on this issue.  See MGA Mexico's Memorandum of Points and Authorities at 10 ("Finally, Mattel has failed to satisfy

23  the third element required for specific jurisdiction -- that the exercise of jurisdiction over the defendant would be reasonable.").  As Mattel accurately predicted in its

24  opposition papers, MGA Mexico implicitly acknowledged its burden in the reply,

25  and used the occasion to improperly present additional arguments for the first time.  Although the Court ordinarily would not consider such arguments, it does so

26  here because it does not change the Court's ultimate conclusion.  See In re Intuit Privacy Litigation, 138 F.Supp.2d 1272, 1275 n.3 (C.D. Cal. 2001) ("this court

27  does not consider arguments raised anew for the first time in a reply brief as to do

28  so would unfairly deny the non-moving party an opportunity to respond.").

EXHIBIT    6
PAGE    147

existence of an alternative forum, MGA Mexico makes veiled references to the criminal action in Mexico as constituting a choice of forum made by Mattel, apparently implying that Mattel, having chosen to pursue criminal charges in Mexico, should be precluded from invoking the power of this Court. It appears to the Court that MGA Mexico has failed to fully and clearly articulate this argument because it is untenable. Whether Mexican authorities pursue criminal charges based on the same conduct underlying the claims in this action is irrelevant to whether this Court may constitutionally exercise personal jurisdiction over MGA Mexico. Therefore, MGA Mexico's argument on this issue is unpersuasive.

The fourth factor, the interest in adjudicating the dispute, weighs in favor of the exercise of personal jurisdiction, as does the sixth, the plaintiff's interest in convenient and effective relief.

MGA Mexico argues that the fifth factor weighs in its favor when the Court considers that the site of injury, which it does not believe is California, is the most efficient forum. However, this argument is premised on the rejected assumption that the present action is more properly litigated between MGA's and Mattel's Mexican subsidiaries.

On balance, a consideration of the reasonableness factors reveals that MGA Mexico has fallen far short of establishing the "compelling case" necessary to render the Court's exercise of personal jurisdiction unreasonable.

The Court concludes that Mattel has established the first two parts of the specific personal jurisdiction test, and that MGA Mexico has failed to establish that the Court's exercise of personal jurisdiction over it is otherwise unreasonable. Accordingly, the Court DENIES MGA Mexico's motion to dismiss.

### V. MGA's and Bryant's Motions Regarding the Discovery Master's March 7, 2007, Order

MGA and Bryant seek review of a decision that resolved discovery disputes that arose during Bryant's deposition, and that was rendered by the Court-

EXHIBIT   6
PAGE   148

1  appointed discovery master, Judge Edward A. Infante (Ret.), on March 7, 2007.

2  The Court's order appointing Judge Infante provides that his orders resolving

3  discovery disputes shall be reviewed in the same manner as those made by a

4  magistrate judge of this Court.

5      Pursuant to Fed. R. Civ. P. 72(a), when the parties object to the ruling of a

6  magistrate judge on a non-dispositive manner, such as a discovery dispute, the

7  district judge may modify or set aside only those portions of the magistrate judge's

8  order that are "clearly erroneous or contrary to law." Id.

9      The "clearly erroneous" language refers to factual findings. See e.g.,

10  Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension

11  Trust, 508 U.S. 602, 622 (1993) (discussing the clearly erroneous standard).  Here,

12  there were no explicit factual findings or legal conclusions made by Judge Infante

13  regarding the relevant rulings; therefore, the Court reviews the record presented to

14  Judge Infante to determine whether his rulings are contrary to law. See March 7,

15  2007, Order.

16      Questions that do not seek the substance of attorney-client communications

17  generally do not implicate the attorney-client privilege. United States v. Carrillo,16

18  F.3d 1046, 1050 (9th Cir. 1994) (finding no violation of the attorney-client privilege

19  where prosecutor, who asked whether a criminal defendant had consulted with his

20  attorney during a recess in order to raise an inference of attorney coaching of

21  testimony during the trial, stopped short of asking defendant the substance of

22  defendant's communications with his attorney).  Therefore, questions such as the

23  one addressed by objection No. 38, asking whether Bryant talked to counsel for

24  MGA during a break from his deposition, are not subject to objection based on the

25  attorney-client privilege.  This conclusion is consistent with Judge Infante's Order.

26      Mattel's question regarding who is paying Bryant's legal fees, addressed by

27  objection No. 42, is likewise not objectionable.  MGA and Bryant argue that state

28  law applies; however, because the present consolidated actions involve both

EXHIBIT   6
PAGE    149

1    federal and state-law claims, the federal law of privilege applies.  Agster v.

2    Maricopa County, 422 F.3d 836, 839-40 (9th Cir. 2005) ("Where there are federal

3    question claims and pendent state law claims present, the federal law of privilege

4    applies.").  To that end, consistent with federal privilege law, fee-payment

5    arrangements are relevant to credibility and bias, and if asked in discovery, Bryant

6    must disclose who is paying his legal fees.  See United States v. Blackman, 72 F.3d

7    1418, 1424 (9th Cir. 1995) ("As a general rule, client identity and the nature of the

8    fee arrangement between attorney and client are not protected from disclosure by

9    the attorney-client privilege.").  This conclusion is also consistent with Judge

10   Infante's Order.

11          However, in this case, the joint-defense privilege protects from disclosure the

12   substance of certain statements made by Bryant and his attorneys in the presence

13   of attorneys representing MGA.  "The joint defense privilege protects

14   communications between an individual and an attorney for another when the

15   communications are 'part of an on-going and joint effort to set up a common

16   defense strategy.'"  United States v. Bay State Ambulance and Hosp. Rental

17   Service, Inc., 874 F.2d 20, 28 (1st Cir. 1989) (internal quotation marks and citation

18   omitted).  Generally, to rely on the joint-defense privilege, a party must establish

19   three elements: "(1) [T]he communications were made in the course of a joint

20   defense effort, (2) the statements were designed to further the effort, and (3) the

21   privilege has not been waived."  Id.

22          The Court finds the first element was met.  The Court, based on its review of

23   the record pending before Judge Infante, is satisfied that the parties had in place at

24   the time of Bryant's deposition, and have in place today, a valid joint-defense

25   agreement.  The Court also finds that the second element was met.  Mattel cannot

26   seriously contend that MGA's interests are not aligned with Bryant's in this action,

27   or that counsels' thorough preparation of Bryant for his deposition was not designed

28   to further the joint defense effort.  Finally, as for the third element, there is no

EXHIBIT  6
PAGE  150

suggestion in the record that any party has waived the attorney-client privilege.

Accordingly, the Court holds that Judge Infante's rulings on Objection Nos. 39 and 50 are contrary to law to the extent those rulings require Bryant to divulge the substance of his communications with counsel for MGA.

## VII. Conclusion

In the manner set forth more fully herein, the Court makes the following rulings:

1.     Motion of MGA Entertainment, Inc., ("MGA") and Issac Larian ("Larian") to Dismiss Mattel's Amended Answer and Counterclaims (docket # 189): **GRANTED IN PART AND DENIED IN PART.**

2.     Motion of Carter Bryant to Dismiss Counterclaims II, III, V, VII, IX, and XI (docket # 191): **GRANTED IN PART AND DENIED IN PART.**

3.     Motion of MGA Mexico to Dismiss Mattel's Amended Answer and Counterclaims (docket # 266): **DENIED.**

4.     Motion of MGA Objecting to Discovery Master's March 7, 2007, Order (docket # 308): **GRANTED IN PART AND DENIED IN PART.**

5.     Motion of Carter Bryant Objecting to Discovery Master's March 7, 2007, Order (docket # 306): **GRANTED IN PART AND DENIED IN PART.**

Mattel is **GRANTED** ten days' leave to amend the AAC in conformity with this Order. The Counter-defendants shall answer or otherwise respond to the SAAC no later than thirty days after the filing of the SAAC.

EXHIBIT 6
PAGE 151

1   The Motion Re Trial Structure (docket #462) has been the subject of further

2   briefing by the parties and is set for further oral argument on July 2, 2007.  Ruling

3   on that matter is **DEFERRED** pending oral argument.

4       DATE:  June 27, 2007

5                                                STEPHEN G. LARSON
                                                 UNITED STATES DISTRICT JUDGE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

36

EXHIBIT    6
PAGE    152

'om:    Name:       United States District Court
                    312 North Spring Street
                    Los Angeles, CA 90012
        Voice Phone:  (213) 894-5474


):      Name:       Michael Zeller
        Company:

                    865 S Figueroa St, 10th Floor,
        City/State:  Los Angeles, CA 90017-2543
        Fax Number:  213-443-3100

                    **UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA**



## Automated Document Delivery Service
*Notice pursuant to Rule 77(d) FRCiv.P*
*The attached copy is hereby served upon you pursuant to Federal Rule of Civil Procedure 77(d).*

x Notes:

se 2:04-CV-09049 : CARTER BRYANT V. MATTEL INC


*rsuant to General Order 06-07, Section F, the following documents shall be submitted in the traditional manner: Pen Registers, Search
larrants, Seizure Warrants, Wire Taps, Bond Related Documents, Under Seal and In-Camera Documents, and All Charging Documents
(Complaints, Informations, Indictments, and Superseding Charging Documents).  All other documents filed in cases unassigned to a
judge shall be filed electronically with a copy e-mailed to the criminal intake mailbox for the appropriate division.  The proper e-mail
address for each division is as follows:*

*Western Division:  CrimIntakeCourtDocs-LA@cacd.uscourts.gov
Southern Division:  CrimIntakeCourtDocs-SA@cacd.uscourts.gov
Eastern Division:  CrimIntakeCourtDocs-RS@cacd.uscourts.gov*

*For additional information and assistance, please refer to the CM/ECF page on the Court website at www.cacd.uscourts.gov.*

**Switch to e-mail delivery and get these documents sooner!
To switch, complete and submit
Optical Scanning Enrollment / Update form G-76.
Call 213-894-5474 for help and free technical support.**

*you received this document in error because the attorney with whom this document is directed is no longer the attorney on the case,
a Notice of Change of Attorney Information, form G-6, must be filed.  If there are other cases which you've received documents for
hich you are no longer the attorney, separate notices must be filed for each case. Failure to do so will result in the continued sending
of documents to you. Form G-6 is available on the court's website at www.cacd.uscourts.gov or at the Clerk's Office.*

te and time of transmission:       Wednesday, June 27, 2007 3:04:20 PM
mber of pages including this cover sheet:  37

EXHIBIT 6
PAGE 153

# EXHIBIT 7

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
CIVIL MINUTES – GENERAL

Case No.    CV 04-09049 SGL(RNBx)                                    Date:  April 14, 2008

Title:       CARTER BRYANT -v- MATTEL, INC.

Consolidated With Related Actions:
CASE NO. CV 04-09059 SGL(RNBx):  MATTEL, INC.,  v. CARTER BRYANT,
CASE NO. CV 05-02727 SGL (RNBx): MGA ENTERTAINMENT, INC., v. MATTEL, INC.,
==================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

              Jim Holmes                                    Theresa Lanza
              Courtroom Deputy Clerk                        Court Reporter

ATTORNEYS PRESENT FOR CARTER BRYANT:        ATTORNEYS PRESENT FOR MATTEL:
None present                                  Timothy L. Alger
                                              Michael J. Niborski


ATTORNEYS PRESENT FOR MGA                   Attorney for Non-Party Chris Palmeri
Robert J. Herrington                          Alonzo Wickers, IV


PROCEEDINGS:    Mattel's Motion Objecting to Discovery Master's February 26, 2008, Denying
                Mattel's Motion to Compel Deposition of Christopher Palmeri. (See Docket
                2859); Mattel's Ex Parte Application to file Supplemental Expert Reports

       The Court adopts the parties joint stipulation regarding pre-voir dire screening of the
prospective jury pool.

       The Court also **GRANTS** Mattel's ex parte application to file supplemental expert reports by
William Flynn and Lloyd Cunningham regarding certain Bryant originals within seven (7) days of
the completion of testing, provided that the Discovery Master authorizes said testing beforehand.
Nothing in this Order shall be construed as indicating whether or not there is cause to authorize
said testing; such a determination shall be made in the first instance by the Discovery Master.

MINUTES FORM 90                                              Initials of Deputy Clerk:  jh
CIVIL – GEN                          Page 1                  Time:  0/40

EXHIBIT ___7___
PAGE ___154___

Case 2:04-cv-09049-DOC-RNB   Document 6788-3   Filed 09/21/09   Page 41 of 95   Page ID
#:222190
Case 2:04-cv-09049-SGL-RNB      Document 3086      Filed 04/14/2008      Page 2 of 3

Finally, the Court **DENIES** Mattel's Motion Objecting to the Discovery Master's February 26, 2008, Order Denying Mattel's Motion to Compel the Deposition of Christopher Palmeri.  The Discovery Master's order was not contrary to law or clearly erroneous <u>at the time</u> it was entered. Mattel has subsequently produced <u>new</u> evidence and <u>new</u> theories for why deposition of Mr. Palmeri is warranted, none of which were presented to the Discovery Master prior to his ruling. Rather than allowing Mattel to call into question the correctness of the Discovery Master's order by submitting newly discovered information that was not presented to him, the Court finds the better practice is to require Mattel to first present that newly discovered information to the Discovery Master in the form of a motion for reconsideration.

**IT IS SO ORDERED.**

MINUTES FORM 90
CIVIL -- GEN

Page 2

Initials of Deputy Clerk: jh
Time:  0/40

EXHIBIT ___7___
PAGE ___/5ठ___

## NOTICE PARTY SERVICE LIST

**Case No.**  CV 04-09049 SGL(RNBx)   **Case Title**  Carter Bryant v. Mattel, Inc.

**Title of Document**   Minute Order of April 14, 2008

| | |
|---|---|
| | Atty Sttlmnt Officer Panel Coordinator |
| | BAP (Bankruptcy Appellate Panel) |
| – | Beck, Michael J (Clerk, MDL Panel) |
| | BOP (Bureau of Prisons) |
| | CA St Pub Defender (Calif. State PD) |
| | CAAG (California Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) |
| | Case Asgmt Admin (Case Assignment Administrator) |
| | Catterson, Cathy (9th Circuit Court of Appeal) |
| | Chief Deputy Admin |
| | Chief Deputy Ops |
| | Clerk of Court |
| | Death Penalty H/C (Law Clerks) |
| | Dep In Chg E Div |
| | Dep In Chg So Div |
| | Federal Public Defender |
| | Fiscal Section |
| | Intake Section, Criminal LA |
| | Intake Section, Criminal SA |
| | Intake Supervisor, Civil |
| | PIA Clerk - Los Angeles (PIALA) |
| | PIA Clerk - Riverside (PIAED) |
| | PIA Clerk - Santa Ana (PIASA) |
| | PSA - Los Angeles (PSALA) |
| | PSA - Riverside (PSAED) |
| | PSA - Santa Ana (PSASA) |
| | Schnack, Randall (CJA Supervising Attorney) |
| | Statistics Clerk |

| | |
|---|---|
| | US Attorneys Office - Civil Division -L.A. |
| | US Attorneys Office - Civil Division - S.A. |
| | US Attorneys Office - Criminal Division -L.A. |
| | US Attorneys Office - Criminal Division -S.A. |
| | US Bankruptcy Court |
| | US Marshal Service - Los Angeles (USMLA) |
| | US Marshal Service - Riverside (USMED) |
| | US Marshal Service -Santa Ana (USMSA) |
| | US Probation Office (USPO) |
| | US Trustee's Office |
| | Warden, San Quentin State Prison, CA |

---

| ✓ | ***ADD NEW NOTICE PARTY*** (if sending by fax, mailing address must also be provided) |
|---|---|

Name: Ambassador Pierre-Richard Prosper

Firm:

Address (*include suite or floor*):  P.O. Box 581103

Salt Lake City,  UT   84158

*E-mail: Prosper.Pierre@Arentfox.com

*Fax No.:

\* For CIVIL cases only

| ***JUDGE / MAGISTRATE JUDGE (list below):*** |
|---|
| |
| |
| |
| |

**Initials of Deputy Clerk** jh

EXHIBIT ___7___
PAGE ___156___

# EXHIBIT 8

Case 2:04-cv-09049-SGL-RNB    Document 5934    Filed 07/09/2009    Page 1 of 14

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No. CV 04-09049 SGL(RNBx)                           Date: July 9, 2009
Title:      MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
======================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

          Cindy Sasse                           None Present
          Courtroom Deputy                      Court Reporter

ATTORNEYS PRESENT FOR                   ATTORNEYS PRESENT FOR
PLAINTIFFS:                             DEFENDANTS:

None Present                            None Present

PROCEEDINGS:   **ORDER GRANTING EX PARTE APPLICATION RE TEMPORARY
               RECEIVERSHIP (DOCKET #5728)**

               **ORDER GRANTING EX PARTE APPLICATION RE COST
               SHIFTING (DOCKET #5865)**

               **ORDER GRANTING IN PART EX PARTE APPLICATION FOR
               RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)**

               **ORDER GRANTING IN PART MATTEL'S MOTION RE
               DISCOVERY MASTER ORDER NO 27 AND REMANDING
               DISCOVERY MASTER ORDER NO. 27 FOR
               RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT
               OF THE FILING OF THE TAAC (DOCKET #5561)**

               **ORDER DENYING MOTION TO STRIKE THE FORENSIC
               AUDITOR'S REPORTS (DOCKET #5705)**

MINUTES FORM 90
CIVIL -- GEN                          1          Initials of Deputy Clerk __cls_____

EXHIBIT __8__
PAGE __157__

## I. ORDER GRANTING EX PARTE APPLICATION
## RE TEMPORARY RECEIVERSHIP (DOCKET #5728)

Because the only opposition to the Ex Parte Application regarding the winding up of the Temporary Receivership involves the issue of cost-shifting, which is addressed separately, below, the Court **GRANTS** the Ex Parte Application. A separate order addressing this Ex Parte Application has been concurrently filed.

## II. ORDER GRANTING EX PARTE APPLICATION RE
## COST SHIFTING (DOCKET #5865)

The MGA parties' opposition to the Temporary Receiver's Ex Parte Application argued that the costs of the Temporary Receivership should be shifted to Mattel (as the party who sought appointment of a Temporary Receiver). However, the Court has previously ruled that, at some yet-to-be defined date in the future, the Court will consider whether to shift the costs of both the Temporary Receivership and the Forensic Audit. Therefore, Mattel filed an Ex Parte Application seeking either to be relieved of the responsibility to respond to the MGA parties' argument or, alternatively, for an order setting a briefing schedule on the issue. It is not the intention of the Court to address the cost-shifting issue at this time; rather, as the Court has stated previously on the record, that issue is more efficiently resolved at a later date, most likely a date after completion of Phase 2 of the trial. Accordingly, the Court **GRANTS** Mattel's Ex Parte Application re Cost Shifting. Mattel is relieved of any duty to respond to MGA's argument regarding the appropriate allocation of costs arising from the Temporary Receiver that is set forth in the MGA parties's June 26, 2009 Opposition to the Temporary Receiver's Ex Parte Application.

## III. ORDER GRANTING IN PART EX PARTE APPLICATION FOR
## RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

The Court has received and reviewed the MGA Parties' Ex Parte Application For Partial Release of *In Camera* Juror Interview Transcripts, as well as the Opposition, the Reply, and the accompanying exhibits. The Court **GRANTS IN PART** the Ex Parte Application. Although the Court declines to award the relief sought, the Court will take steps to ensure that the transcript of the juror interviews are provided to the Ninth Circuit for its consideration of the appeal filed by the MGA parties.

The relevant *in camera* juror interviews were conducted on July 25, 2008; the findings made by the Court on the basis of those interviews are set forth in detail in the Court's Order Denying Motion for Mistrial, dated August 8, 2008. Counsel for the parties agreed that the juror interviews, which were conducted mid-trial, should be conducted *in camera*, and the MGA parties did not request that the Court grant them access to the transcripts to prepare their Motion for Mistrial. The Court indicated on the

MINUTES FORM 90
CIVIL -- GEN

2

Initials of Deputy Clerk __cls_____

EXHIBIT ___8___
PAGE ___153___

record around the time of the filing of the Motion for Mistrial that it was not the Court's intent to grant the parties access to the transcripts.

After the conclusion of the trial, the MGA parties did not at any time request this Court grant access to the transcripts. To the contrary, some ten months passed between the date of the Order Denying Motion for Mistrial and the MGA parties' first post-trial request for access to those transcripts. That request was made to the Ninth Circuit, not this Court, on June 10, 2009. When the Ninth Circuit denied the request in favor of the MGA's presentation of the issue to this Court in the first instance, the MGA parties thereafter filed the present Ex Parte Application in a expeditious manner.

Ostensibly, as set forth in both the Motion filed before the Ninth Circuit and the Ex Parte Application before this Court, the reason the MGA parties seek access to those transcripts is so that they may use them to challenge the Court's Order Denying Motion for Mistrial. Although the MGA parties filed its Notice of Appeal on May 4, 2009, and although that Notice clearly indicated that the Order Denying Motion for Mistrial would be implicated in the appeal, the MGA parties failed to file its Motion seeking release of the transcripts until June 10, 2009. The MGA parties' failure to seek this relief until a month after they filed their Notice of Appeal and a month before their opening brief was due, and their decision to present the issue of release of the transcripts to the appellate court (rather than this Court) in the first instance, created the very urgency that cause them to seek ex parte relief from this Court. As such, the Court declines to grant the relief sought.

Nevertheless, in the interest of due process and in order to facilitate the full consideration of the issue by the Ninth Circuit, the Court will take steps to ensure that the transcripts of the *in camera* interviews are provided to the Ninth Circuit for *in camera* filing.

## IV. ORDER GRANTING IN PART MATTEL'S MOTION RE DISCOVERY MASTER ORDER NO 27 AND REMANDING DISCOVERY MASTER ORDER NO. 27 FOR RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT OF THE FILING OF THE TAAC (DOCKET #5561)

In the challenged portion of Discovery Master Order No. 27 ("DM Order No. 27"), the Discovery Master denied Mattel's Motion to Compel discovery sought by service of a subpoena on non-party Bingham McCutchen LLP ("Bingham"), a law firm that represents Intervenor Omni 808, as well as a number of non-party entities that are familiar to those involved in this litigation: OmniNet Capital, LLC ("OmniNet"), Vision Capital, LLC ("Vision"), IGWT Group, LLC ("IGWT"), and IGWT 826 Investments, LLC ("IGWT 826"). Broadly categorized, the subpoena sought production of (1) fee agreements relating to Vision and Omni 808; (2) documents regarding the formation, control, and financing of Omni 808, Vision, and Lexington Financial Limited

MINUTES FORM 90
CIVIL -- GEN                                    3                    Initials of Deputy Clerk __cls_____

EXHIBIT ___8___
PAGE ___159___

("Lexington"); (3) documents identifying stakeholders and officers of Omni 808, Vision, and Lexington; (4) all contracts relating to Omni 808, Vision Capital, and Lexington; (5) all communications relating to Omni 808, Vision Capital, and Lexington, excluding attorney-client privileged documents; and (6) Bingham's representation of MGAE and certain named individuals who have some connection with MGAE, including a number of Mr. Larian's family members.

The Discovery Master correctly recognized the essential legal standard in assessing whether a subpoena may be enforced. The information must satisfy the discovery relevance standard, i.e., it must be "'reasonably calculated to lead to the discovery of admissible evidence.'" DM Order No. 27 at 19 (quoting Fed. R. Civ. P. 26(b)(1)). The decision of whether to enforce a subpoena ultimately implicates a balancing test that pits relevance of the materials sought and need to the requesting party against hardship to the party resisting the subpoena. DM Order No. 27 at 20. Non-parties are generally required to bear lesser burdens than parties in responding to subpoenas. Exxon Shipping Co. v. United States Dept. of Interior, 34 F.3d 774, 779 (9th Cir. 1994) ("The Federal Rules also afford nonparties special protection against the time and expense of complying with subpoenas.").

However, the Discovery Master overstated the burden of proof allocated to Mattel, as the party seeking discovery. See DM Order No. 27 at 20 ("As the party moving to compel compliance with the subpoena, Mattel bears the initial burden of establishing that the information sought is relevant and necessary to the claims or defenses at issue.") This standard is both overstated and incomplete. It is overstated in that Mattel need not show that the evidence sought is "necessary to the claims or defenses." Although Mattel indeed bears the burden of establishing relevancy, that showing is not one of "necessity." Rather, Mattel must bear the burden of establishing the discovery relevancy standard -- that the materials sought are "reasonably calculated to lead to the discovery of admissible evidence" -- is met. It need not establish that the materials sought are "necessary" to its case.

This point leads to the manner in which the stated burden is incomplete. As clearly articulated by cases cited by Bingham, although Mattel bears an initial burden of establishing relevancy, the party resisting discovery thereafter has the burden of establishing that discovery should be denied. See Bryant v. Ochoa, 2009 WL 1390794 at *1 (S.D. Cal. 2009) ("The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1). . . . Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections."); DIRECTV, Inc. v. Trone, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (same); see also Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975) (reversing the district court's issuance of a protective order based on a failure of the party resisting discovery to meet its burden by asserting that the defendant's deposition would merely yield cumulative evidence).

MINUTES FORM 90
CIVIL -- GEN                                    4                 Initials of Deputy Clerk ___cls_____

EXHIBIT ___8___
PAGE ___160___

The effect of this subtle variation on the burden of proof from that stated by the
Discovery Master is magnified by the recent filing of the TAAC, which significantly
heightens the relevancy of the issue of how the MGA parties and the parties
represented by Bingham may be related, the formation of certain of those entities, and
other issues implicated by Mattel's requests.  Because the question of relevance is
featured so prominently in the quintessential balancing test to which the present
discovery motion was subjected, the filing of the TAAC dramatically altered the calculus
that underlies the conclusions reached in DM No. 27.

For reasons related to judicial economy and preservation of scarce judicial
resources (which this case has stretched to the outer limits), the Court defers decision,
in light of the changed calculus that has occurred as the result of the filing of the TAAC,
of the issues presented in the challenged portions of DM No. 27 to the Discovery
Master.  For that reason, the Court **REMANDS** the challenged portions of DM No. 27 to
the Discovery Master for his reconsideration and re-balancing in light of the recently
filed TAAC.  The Discovery Master may, in his discretion, set the matter for further
briefing and/or hearing, he may take the matter under submission based on the existing
record, or he may take other action as he deems appropriate to resolve the present
issues.

Notwithstanding the remand of DM Order No. 27, one issue raised by Mattel
requires further consideration by the Court.  At page 25 of DM Order No. 27, the
Discovery Master appears to impose a blanket prohibition on discovery of materials that
are in the possession of a subpoena recipient, but that are related to a non-party over
whom the Court has not been shown to have jurisdiction.  The Discovery Master cites
no legal authority for such a blanket prohibition, and the Court, in its own research, has
found none.  Such a blanket prohibition precludes the application of the balancing test
that applies almost universally to discovery motions; accordingly, and because this
blanket prohibition is unprecedented, the Court finds that it is contrary to law.  As to this
narrow issue, the Court **GRANTS** Mattel's Motion.  The issue of discovery of materials
relating to Lexington is **REMANDED** to the Discovery Master for reconsideration in light
of this ruling and in light of the filing of the TAAC.

## V. ORDER DENYING MOTION TO STRIKE
## THE FORENSIC AUDITOR'S REPORTS (DOCKET #5705)

In an unsealed filing that has since been ordered sealed by the Court, counsel for
Omni 808 Investors, LLC ("Omni 808"), Todd E. Gordinier, made unwarranted,
unsubstantiated personal attacks against the Court-Appointed Forensic Auditor, Ronald
L. Durkin.  Mr. Gordinier's selective public disclosure of portions of the Forensic
Auditor's Summary Report, coupled with the maintenance of the Summary Report, as
well as the later-filed Responsive Report and Final Report, under seal in their entirety,
has led to an unbalanced public presentation of the issues discussed therein.  In an

Initials of Deputy Clerk __cls_____

EXHIBIT ___8___
PAGE ____161___

attempt to cure this deficiency, the Court has considered the possibility that it should simply unseal the relevant Reports and allow those Reports to speak for themselves.

Because the MGA entities were the primary subject of the Forensic Audit, the MGA parties have, quite understandably, objected to the proposed unsealing. Mattel, for its part, advocates quite emphatically, and not unreasonably, that the Reports should be unsealed in light of the selective disclosure. See Tr. at 31-32 ("It's the underlying analysis that refutes the selective disclosures that MGA and Omni made in a public forum to smear . . . both Mr. Durkin and Mattel.") At the other end of the spectrum, Omni 808 has moved to strike the Reports in their entirety.

In the end, although the Court does not order the unsealing of the Reports, it **DENIES** the Motion to Strike. The Court ordered the Forensic Audit to evaluate whether a receiver should be appointed; as the record bears witness, the Court eventually rejected the suggestion that it should appoint a permanent receiver, and the Court has instead appointed an MGA Monitor with more limited powers than a receiver. Nevertheless, the fact that the Reports were intended to serve a very limited purpose does not mean that there is no possibility that the Forensic Auditor's Reports will not serve any purpose henceforth.

As it currently stands, the Court **ORDERS** that no party shall cite to or rely upon the Reports for any purpose absent further Order of this Court.[1] However, the documents attached to the Reports, to the extent they are otherwise discoverable, are not insulated from discovery on the basis that they have been made part of the Reports. Conversely, documents, such as charts and interview notes, that were prepared by the Forensic Auditor are the property of the Court and are not subject to discovery or use in this or any other litigation by any party or non-party.[2]

Had it been counsel for the MGA parties who mounted the unwarranted, unsubstantiated, and public personal attacks on Mr. Durkin, the Court would find, notwithstanding the sensitive information contained therein, the unsealing of the Reports was an appropriate remedy for the selective disclosure.[3] However, here, it is

---

[1] This Order does not supersede the Court's Order permitting the Forensic Auditor to share information with the Court-Appointed Monitor.

[2] Toward that end, the Court **CLARIFIES** to the parties that the work papers, drafts, notes, detailed time records, and any other materials prepared by or at the direction of the Forensic Auditor are the property of the Court. The Court **ORDERS** the Forensic Auditor, as the custodian of those records on behalf of the Court, to retain those materials, whether maintained in electronic, hard copy, or any other medium, until further order of the Court.

[3] As it stands, counsel for MGAE, James I. Stang, wisely sought, and was granted, leave to file his more restrained, but just as unwarranted and unsubstantiated, personal attacks on Mr. Durkin under seal. See MGA Entertainment, Inc.'s Response to Final In Camera Report of Forensic Auditor Ronald L.

Initials of Deputy Clerk __cls_____

EXHIBIT ___8___
PAGE ___162__

counsel for Omni 808 who made those attacks public, and although Mattel maintains
that both the MGA parties and Omni 808 are jointly responsible for the selective
disclosure, see July 6, 2009, Tr. at 33, whether, or to what extent, the MGA parties act
or have acted in concert is an issue to be decided in Phase 2 of this action.

Nevertheless, Mr. Gordinier's attack on Mr. Durkin cannot pass without comment
by the Court. The Court's comments are directed toward Mr. Gordinier personally,
which is not the Court's usual practice. Although the irony of this form of address is not
lost on the Court (given the subject of this Order), it is appropriate. Mr. Gordinier signed
all three filings in which the personal attacks appear, and continues to stand behind
those filings. Moreover, Mr. Gordinier expressly and unabashedly claimed personal
responsibility for the brief that was not filed under seal, by both stating that he gave it a
lot of thought before filing it and by implicitly acknowledging that although he considered
filing his brief under seal, he ultimately rejected that course of action. See May 18,
2009 Tr. at 46-47 ("My brief speaks for itself. We have nothing to hide. . . . I didn't feel it
appropriate, necessary, or desirable to file my brief under seal. And I don't have a
problem with the Court or anybody reading what I have to say, because I gave it a lot of
thought, and I gave it a lot of consideration.").

At the July 6, 2009, hearing, the Court outlined its concerns that while the attacks
on Mr. Durkin were public, the Reports are not, and that "it doesn't seem fair" to the
Court to allow those allegations to stand alone without a chance to respond to them.
July 6, 2009, Tr. at 25-26. In response, Mr. Gordinier contended that his comments
"respond[ed] to the report," and that "[w]hat we said was that there were problems with
that report." July 6, 2009, Tr. at 28. This statement is an implicit denial that any
personal attacks were made; however, as set forth in great detail below, the record
belies Mr. Gordinier's post hoc protestations.

Lest Mr. Gordinier's statement reflecting his implicit denial that he engaged in
personal attacks be perceived as one being made at oral argument without ample time
to reflect upon its significance, the statement is also made by Mr. Gordinier in Omni
808's Reply Memorandum, a document upon which he had ample time to reflect: "Each
and all of the references in Omni's Statement of Position refer to the contents of Mr.
Durkin's Reports and the shortcomings contained therein and omitted therefrom, not to
his person." Id. at 2 n.1. To be sure, the criticisms leveled at Mr. Durkin are framed in

---

Durkin (docket #5918) at 4 (accusing Mr. Durkin of "making McCarthy-like statements of non-existent
buybacks and unsupported insinuations of conflicts of interest"); id. at 9 (suggesting that Mr. Durkin's
formulation of certain search terms relating to criminal acts in Farsi without a concurrent formulation of
those terms in English demonstrated a "predisposition that Persian members of MGA's management and
staff (and only the Persian members) might be engaged in illegal conduct"). Mr. Stang's attacks pale in
comparison to those advanced by Mr. Gordinier, and they were filed under seal. Thus, although the
Court's analysis and conclusions regarding the Forensic Auditor's Reports applies with equal force to Mr.
Stang's statements, his are not the focus of the Court's attention at this time.

EXHIBIT    8
PAGE      163

terms of his Reports. Still other criticisms are, as counsel maintains, addressed to the
Reports themselves; those must be analyzed based on their substance. However, as
aptly demonstrated by the cited and quoted portions of Mr. Gordinier's filings that
appear below, his criticisms do not, by any measure, confine themselves to those
Reports, and instead reach out in a highly personal manner to attack the author, his
professionalism, his competence, his objectivity, and his integrity.[4]

Indeed, in a display the likes of which have not been previously witnessed by this
Court, Mr. Gordinier strayed far afield of legitimate criticism of the discussions,
analyses, and conclusions reached in the Summary Report and the Reports that
followed. To be sure, there are instances in which Mr. Gordinier addressed the
message found in those Reports; just as surely, however, as detailed below, Mr.
Gordinier attacked the messenger. Specifically, the papers filed by Mr. Gordinier on
behalf of Omni 808 call into question Mr. Durkin's professionalism and competence, as
well as his objectivity and integrity. Moreover, and alarmingly, they falsely accuse Mr.
Durkin of being influenced by an ethnocentric bias against Mr. Larian and Mr. Kadisha.
Such attacks, aimed at Mr. Durkin personally rather than the discussion, analyses, and
conclusions set forth in his Reports, appear throughout Omni 808's papers. See Omni
808 Investors, LLC's Statement of Position re Order to Show Cause re Appointment of a
Permanent Receiver (docket #5446) ("SOP"), filed May 14, 2009, at 11 (referring to Mr.
Durkin's "irresponsible" analysis); id. (noting that Mr. Durkin is "far too experienced" to
believe that he "produced . . . a balanced presentation"); id. (stating that "Mr. Durkin's
report is a polemic" and "a piece of advocacy"); id. at 12 n.9 (calling into question Mr.
Durkin's "objectivity" based on the fact that the Court ordered Mr. Durkin's fees be paid
(at least in the first instance) by Mattel); id. (suggesting that Mr. Durkin's ex parte
communications with Mattel were improper); id. at 13 n.10 (characterizing Mr. Durkin's
quotation of Mr. Larian's and Mr. Kadisha's account of how the two men were
acquainted, from "the Persian community," as "at best, unprofessional" and, "at worst,

---

[4] Adding still further to the mounting irony, in the same footnote that Mr. Gordinier disclaims
engaging in improper personal attacks, he falsely accuses counsel for Mattel of advancing their own
improper ad hominen attacks against Neil Kadisha, who has been referred to as a "common thief" in
certain unspecified Mattel filings. Mr. Kadisha is the Managing Partner of a diversified investment firm,
Omninet Capital, LLC, and an investor in Omni 808. To call someone a "common thief" is, undoubtably, by
any measure, a highly personal attack, therefore an attack addressed "to the man," or ad hominen.
However, in the same manner Mr. Gordinier accuses Mr. Durkin of failing to provide appropriate context to
the Court in his Reports, Mr. Gordinier himself fails to acknowledge that counsel for Mattel's use of the
term "common thief" in connection with Mr. Kadisha merely quotes Los Angeles County Superior Court
Judge Henry W. Shatford's conclusion regarding Mr. Kadisha, as set forth in his 191-page Statement of
Decision, dated October 24, 2006, which was issued after a 200-day trial, which is currently pending
appeal, and which conferred upon Mr. Kadisha the oft-repeated moniker of "common thief," as well as
"embezzler," and "perjurer." See Uzyel v. Kadisha, Cal. App. Nos. B196045, B203804, B198007,
B199850, B201425, 2009 WL 646096 (Mar. 4, 2009) (appellate brief). As always, context is key. The use
by counsel for Mattel of another court's findings and conclusions to advance an argument is not
inappropriate. Those findings and conclusions may, or may not, be relevant to matters presented to the
Court. Used in this manner, although undoubtably addressed "to the man" (and his credibility), it is not an
improper ad hominen attack.

EXHIBIT ___8___
PAGE ___164___

evidence of improper cultural bias"); id. (in the same footnote, referring to the same quotation, stating that "[t]he tone [of the report] itself is compelling proof that Mr. Durkin had no intention of providing an 'objective' report to the Court."); id. at 23 (referring to the Summary Report as "Mr. Durkin's ill-concealed advocacy piece"); id. (noting that advocacy, rather than objectivity, "is certainly the posture [Mr. Durkin] is most comfortable with"); Omni 808 Investors, LLC's Memorandum in Support of Its Requests to Strike Summary and Responsive Reports of Ronald L. Durkin (docket #5705) ("Motion to Strike"), filed June 8, 2009, at 4 (noting Omni's "doubts that the Court or any party would benefit further by continuing this façade of Mr. Durkin's 'impartiality'"); id. at 7 (calling Mr. Durkin's explanation of his conclusion regarding the relatedness of certain parties as "not only fatuous[,] but [also] intellectually dishonest"); id. at 9 (suggesting that Mr. Durkin intentionally concealed from the Court the fact that Mr. Larian sought other funding sources before turning to Mr. Kadisha); id. at 10 (noting that "Mr. Durkin's repeated references to Mr. Larian's and Mr. Kadisha's common 'Persian' heritage can only be viewed as an attempt to draw some nefarious ethnic connection between them"); id. at 12 (calling the reference to Mr. Larian's and Mr. Kadisha's ethnicity "unprofessional symptoms of improper cultural bias [that] have no place in a supposedly objective report"); Omni 808 Investors, LLC's Reply Memorandum (docket #5809) ("Reply Memo") at 14 (suggesting that not only Mr. Durkin, but also counsel for Mattel, harbor "cultural biases" that lead them to "suggest[] that [Mr. Larian's and Mr. Kadisha's] common heritage makes [them] more likely to act contrary to their own interests); id. at 15 (stating that, according to his own interview notes, Mr. Durkin "misrepresented" to the Court in his Summary Report how Mr. Larian and Mr. Kadisha portrayed their relationship with each other).

As alluded to, Omni 808's criticisms have not been limited to personal attacks; some of the criticisms are in fact aimed at the Reports themselves. See e.g., SOP at 16 ("Mr. Durkin's conclusion that the Wachovia-Omni transaction impacted 'MGAEI's solvency and ability to continue conducting operations' is simply wrong."). Any comment by the Court regarding the substance of the discussions, analyses, and conclusions presented to the Court in the Forensic Auditor's Summary, Responsive, and Final Reports is inadvisable at this time. With the filing of the Third Amended Answer and Counterclaims, much of the subject matter of the Forensic Auditor's Reports have been incorporated into the claims at issue in this action. As such, it would be premature for the Court to comment upon the substance of issues that are yet to be adjudicated, and that are subject to a trial by jury. Nevertheless, the Court has reviewed the Forensic Auditor's Summary, Responsive, and Final Reports, and the exhibits attached thereto. The Court has also reviewed and considered the criticisms aimed at the Forensic Auditor, cited and quoted above, as well as the entirety of all the papers responding to the Forensic Auditor's Reports filed to date. After this review, the Court is firmly convinced that all the personal criticisms of Mr. Durkin are unwarranted and unsubstantiated.

At best, the criticism of Mr. Durkin's performance and presentation represents a

EXHIBIT ___8___
PAGE ___165___

different interpretation of available evidence. That such disagreements would arise between the analyses offered by a Court-Appointed Forensic Auditor and that offered by counsel for a party whose transactions have been a subject of that audit is by no means surprising. A jury considering the relevant evidence might ultimately make factual determinations that tend to agree with Mr. Durkin's assessment, it might ultimately tend to agree with Mr. Gordinier's assessment, or it may very well reject both positions in favor of another. The answer to the merits of the claims at issue in this action must await another day. Today, the Court merely notes that its examination of the Forensic Auditor's Reports reveal that Mr. Gordinier's personal attacks aimed at their author were unjustified.

Some specific attacks directed toward Mr. Durkin – relating to his background as a law enforcement officer, his communications with counsel for Mattel, and specific (but baseless) allegations of ethnocentric bias -- are worthy of more specific comment by the Court.

Stopping short of explicitly stating such, Mr. Gordinier appears to labor under the assumption that Mr. Durkin has been unable to put behind him the prosecutorial mindset under which he presumably operated during his former service to this Nation as an agent of the Federal Bureau of Investigation ("FBI"). At the outset, the Court notes that Mr. Gordinier's unstated assumptions do a disservice to the prosecutors and the law enforcement officers who work with those prosecutors, both of whom conduct their work under the clearly delineated duty to ferret out not only evidence of guilt but also "evidence favorable to the accused." See e.g., Berger v. United States, 295 U.S. 78, 88 (1935) (noting that the role of the prosecutor is not to win at all costs and observing that the prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."); Brady v. Maryland, 373 U.S. 83, 87 (1963) (imposing a duty on prosecutors to provide to the defense exculpatory evidence when requested to do so).

Secondly, even if prosecutorial duties were not so defined, the Court finds no suggestion that Mr. Durkin skewed the evidence in favor of any particular viewpoint. Undoubtedly, there is a **complete absence** of any evidence that, as Mr. Gordinier has suggested, Mr. Durkin has embarked upon a campaign to purposely mislead the Court.

Mr. Gordinier also suggests that, because Mr. Durkin's bills are being paid by Mattel, Mattel has, through this payment or through other communications with Mr. Durkin, bought Mr. Durkin's loyalty. This is utter nonsense. As demonstrated by the Court's communications with him, Mr. Durkin is a Court-Appointed Officer who understands that his role is to work on behalf of the Court and not on behalf of any party. In any event, the Court's Order of January 7, 2009, which appointed Mr. Durkin, imposed the costs of the audit on Mattel "in the first instance," but expressly provided for

EXHIBIT __8__
PAGE __166__

the possibility that the audit expenses be shared or shifted to the MGA parties.
Moreover, to suggest, however subtly, that ex parte communications with counsel for
Mattel were improper ignores the Court's mandate to the Forensic Auditor in the
January 7, 2009, Order, which states that Mr. Durkin was provided with attorney contact
information and that he "shall direct his initial communications to counsel." At no time
has the Court precluded the Forensic Auditor's communications with Mattel or its
counsel; in fact, because the Forensic Audit was undertaken based on evidence
gathered by and presented to the Court by Mattel, Mr. Durkin would have been remiss
in his duties if he failed to communicate with Mattel and its counsel.

Mr. Durkin was vested with powers and discretion to complete a Court-ordered
Forensic Audit. Pursuant to an Order of this Court, he undertook this task and
exercised those powers and that discretion, presenting his Reports in conformity with
the Court's instructions. Despite counsel's attacks, the Court's review of the evidence
before it discerns no abuse of those powers or of that discretion.

Particularly troubling to the Court is that counsel speculates that, because Mr.
Durkin noted in his report that Mr. Larian knew Mr. Kadisha from "the Persian
Community," Mr. Durkin could be "of the view that this common heritage makes Mr.
Kadisha more likely to act contrary to his own interests or to do something via third-
parties that he wouldn't otherwise do?" See SOP at 13-14 n.10 (appearing to pose this
thought as a rhetorical question). There is no indication in the record, or otherwise, that
Mr. Durkin holds such a view. To the contrary, Mr. Durkin's comment regarding the
acquaintance of Mr. Larian and Mr. Kadisha from "the Persian Community" (which
is noted in the report within quotation marks and is expressly attributed to a reference
made by Mr. Larian himself) is clearly predicated on interviews with these two
individuals, each of whom related independently to Mr. Durkin and his colleagues that
they knew each other from "the Persian Community." See Durkin Summary Report, Ex.
14, at 2 ¶ 3 (Notes re March 25, 2009, interview with Mr. Larian: "He indicated that he
knew Kadisha from the Persian community.") and Ex. 14, at 15 ¶ 2 (Notes re March 26,
2009, interview with Mr. Kadisha: "Kadisha stated that he knows Larian from the
Persian community."). The purpose for this reference is made clear in the footnote set
forth at the end of the sentence in which the reference appears; namely, the Report
discusses evidence that the relationship between Mr. Larian and Mr. Kadisha is
stronger and more personal than either man claimed it was. See Summary Report at 5
n.18; Ex. 15 (personal emails).

In the Reply Memo, Mr. Gordinier takes issue with this explanation, this time
including not only Mr. Durkin but also counsel for Mattel as the targets for his
unsubstantiated allegations of "cultural bias." Mr. Gordinier first mischaracterizes an
argument made by Mattel. Mattel argued, and quite correctly, both that how well Mr.
Larian and Mr. Kadisha knew each other was relevant to a determination of whether
certain transactions between the two were arms-length transactions, and that this point
was likely not lost on either of these two very sophisticated and successful

MINUTES FORM 90
CIVIL -- GEN                                    11                    Initials of Deputy Clerk __cls_____

EXHIBIT ___8___
PAGE ___167___

businessmen.[5]  As noted previously, both Mr. Larian and Mr. Kadisha stated that they
knew each other from "the Persian community" which, in the Forensic Auditor's view,
was intended to, or at least had the tendency to minimize the existing relationship
between the two.  Mr. Gordinier incorrectly characterizes this argument as Mattel's
contention that Mr. Larian's and Mr. Kadisha's "Persian relationship" and "common
Persian heritage" was somehow relevant to a determination of whether the Omni 808
transaction was an arms-length transaction.  Mattel made no such argument.  Neither
counsel for Mattel nor Mr. Durkin have implied that Mr. Larian's and Mr. Kadisha's
ethnicity factors into the analysis.  Other than to point to Mr. Larian's and Mr. Kadisha's
separate, but identical, accounts of how they knew each other which, in turn, suggests
how well they know each other, neither counsel for Mattel nor Mr. Durkin have stated or
implied that Mr. Larian's and Mr. Kadisha's shared ethnicity is relevant to any matter
currently or potentially before the Court.  Compare Opposition at 8-9 with Reply Memo
at 14-15.

Moreover, Mr. Gordinier's substantive point, that Mr. Durkin "misrepresented" to
the Court what Mr. Larian and Mr. Kadisha told him about the closeness of their
relationship, fares no better.  See Reply Memo at 15.  On this point, it is important to set
this stage properly.  Counsel for all parties have attempted to glean far too much from
two sterile paragraphs of interview notes taken by Mr. Durkin.  Much can be inferred
from conversations and interviews through not only what is said, but what is not said, by
the interviewee's demeanor, by the tone of the speaker, by the length and placement of
pauses, and by non-verbal gestures and body language.  With all these variables, much
of what is communicated does not find its way into notes.[6]  For instance, Mr. Durkin's
interview of Mr. Larian lasted over two and a half hours; however, the interview notes
are a mere five and a half pages.  Similarly, a one-hour and ten minute interview of Mr.
Kadisha yielded only three and a half pages of interview notes.  This is not to suggest
that the notes should have been longer or that the interviews should have been
recorded or transcribed; rather, it is to suggest that counsel's arguments based on
another's notes are not particularly probative.

In contrast, Mr. Durkin's assessment, based on his interviews with both of them,

---

[5]  In fact, the Court just this week issued a 30-page, single-spaced opinion resolving a 10-day
bench trial conducted over the sole issue of whether a transaction between "closely related" entities
reflected its fair market value, one of the more significant arguments ultimately rejected by the Court in
that case being that the close relationship between the parties necessarily rendered the transaction a
"sweetheart deal."  See July 6, 2009, Order, Siegel v. Warner Bros. Entertainment, Inc., et al., CV 04-
08400 SGL (RZ) (docket #554).

[6]  Indeed, the interview notes upon which the parties rely concede as much.  See Summary
Report, Ex. 14 at 2, 15 ("This interview memorandum is a factual representation of the topics discussed
during the interview and is not intended to be a word for word or exact transcription of the conversation.").
Thus, in addition to not taking into account all non-verbal communication, the notes do not even represent
everything that was said during the interview.

Initials of Deputy Clerk __cls_____

EXHIBIT ___8___
PAGE ___/68___

is that Mr. Larian and Mr. Kadisha attempted to minimize their relationship because both of them understand the relevance of any friendship or other connection between them to the assessment of the arms-length nature of any transactions in which they have engaged. Mr. Durkin's assessment does not come from the gentle teasing of a strained meaning from two sterile paragraphs of brief notes taken by another person; rather, his assessment springs from his participation in the interview process, the entirety of the interviews he conducted of Mr. Larian and Mr. Kadisha, and his review of all of the evidence. As such, the Court defers to his assessment, at least insofar as how Mr. Larian and Mr. Kadisha portrayed their relationship to him.

As for that scant language from which the parties glean so much meaning, the entirety of which is set forth below, it in no way supports the contention made by Mr. Gordinier that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha conveyed to him about the closeness of their relationship. On this topic, the notes of Mr. Larian's interview merely state the following:

> Larian decided to contact Neil Kadisha of OmniNet as he knew his company was in the distressed loan business. He indicated that he knew Kadisha from the Persian community. Kadisha said he wouldn't do the deal alone in today's environment and wanted Larian and their other friends to invest in the deal with MGA. Larian stated that Kadisha negotiated the debt with Wachovia and got it down significantly, Larian said he is not bitter about Kadisha getting a good deal on buying the loan.

Summary Report, Ex. 14, at 2 ¶ 3 (emphasis added). This paragraph contains the word "friends," and perhaps could even be read as an implicit statement by Mr. Larian that he and Mr. Kadisha are "friends." But the language does not compel such an inference. Moreover, it does not comport with the notes of Mr. Kadisha's interview, which on this topic state only the following:

> Larian and Kadisha have never been to dinner together. Kadisha stated that he knows Larian from the Persian community and he sees him often at religious events, etc. He has no investments with Larian. Kadisha did not talk with Larian last night, this morning or in the last two days.

Summary Report, Ex. 14, at 15, ¶ 2. Mr. Durkin's assessment that Mr. Larian and Mr. Kadisha sought to minimize the extent of their relationship is not contradicted by these short passages.

The criticism that Mr. Durkin was acting pursuant to an ethnic or cultural bias is clearly baseless. The allegations are irresponsible, and they are made to capitalize on

MINUTES FORM 90
CIVIL -- GEN                                    13                    Initials of Deputy Clerk __cls_____

EXHIBIT ___8___
PAGE ___169___

their inherent sensational nature for counsel's own purposes of diverting attention away
from the substance of the Reports.  Sensationalism aside, when viewed in context, the
Reports' reference to Mr. Larian and Mr. Kadisha knowing each other from "the Persian
community" was plainly innocuous.  The reference was a direct quotation from both Mr.
Larian and Mr. Kadisha.  It was used in a broader discussion regarding how (and thus,
impliedly, how well) the two knew each other, which is itself relevant to the issue of
whether certain transactions relevant to the present litigation were made at arms length.

       This is a most unfortunate incident.  The Court certainly understands, in a case
as hotly contested as this one -- with such high stakes, with such complex legal issues,
and with such truly extraordinary legal talent on all sides -- that lawyers, however ethical
and committed to the highest standards of professionalism (as the Court presumes and
has found all counsel of record here to be), make statements or commit acts in haste
that they subsequently regret.  All of the players to this drama, are, after all is said and
done, human.  As such, all of us are vulnerable to all-too-common human frailties.  The
Court would place itself at the very top of any list of lawyers who have spoken
improvidently at one time or another in this case (and any number of others).  What the
Court has witnessed here, however, in both manner and substance, for the reasons
noted above, goes beyond what the Court can let pass without some manner of
reprobation.  So let the Court be clear:  Nothing excuses the attempted character
assassination in which Mr. Gordinier has engaged.

       **IT IS SO ORDERED.**

MINUTES FORM 90
CIVIL -- GEN                              14                    Initials of Deputy Clerk __cls_____

EXHIBIT __8__
PAGE __170__

# EXHIBIT 9

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(D).

**PRIORITY SEND**
& ENTERED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES – GENERAL</u>

Case No.   CV 04-09049 SGL(RNBx)                    Date: July 2, 2007

Title:   CARTER BRYANT -v- MATTEL, INC.
         AND CONSOLIDATED ACTIONS

======================================================================

PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

        Jim Holmes                        Theresa Lanza
        Courtroom Deputy Clerk            Court Reporter

ATTORNEYS PRESENT FOR CARTER        ATTORNEYS PRESENT FOR MATTEL:
BRYANT:

John W. Keker                       John B. Quinn
                                    Brett Dylan Proctor
                                    Michael T. Zeller

ATTORNEYS PRESENT FOR MGA:

Dale M. Cendali
Patricia Glaser

PROCEEDINGS:   MINUTE ORDER

ENTERED
CLERK, U.S. DISTRICT COURT

JUL – 5 2007

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION     BY DEPUTY

DOCKETED ON CM

JUL – 5 2007

BY _____ 164

        As set forth more fully herein, the Court hereby makes the following ruling regarding matters
heard on July 2, 2007:

(1)    The Court **GRANTS** Mattel's Motion re Trial Structure (docket #462);

(2)    The Court **GRANTS IN PART AND DENIES IN PART** MGA's Motion re Discovery Master's
       May 15, 2007, Order (docket #505);

(3)    The Court **GRANTS IN PART AND DENIES IN PART** MGA's Ex Parte Application

MINUTES FORM 90
CIVIL – GEN

1

Initials of Deputy Clerk  Jh
Time: 01/15



EXHIBIT 9
PAGE 674217

regarding date of production of documents (docket #545); and

(4)   The Court **DENIES** MGA's Motion re Discovery Master's May 16, 2007, Order (docket
#508).

(5)   The Court **DENIES** the parties' oral request for modification of pretrial and trial dates.


(1)   Motion re Trial Structure (docket #462)

Previous orders of the Court specified that the claims and counterclaims brought in this
action will be tried in two phases. The parties have agreed, in large part, to a refinement of the
Court's mandate that all issues regarding the ownership of Bratz shall be tried in Phase 1. Where
the parties differ is upon a proposal by Mattel that the Phase 1 be bifurcated into two sub-phases,
with Mattel's copyright infringement claim (its first counterclaim in the 05-02727 case) and all
Phase 1 damages being tried after all the other issues. Phase 1(a) would be limited to issues
surrounding Carter Bryant's employment with Mattel, and how those issues impact the ownership
of certain original Bratz drawings, while Phase 1(b) would address approximately two-hundred
Bratz products that are potentially derivative of the original drawings. This approach has the
appeal of limiting Phase 1(a) to discrete issue of the ownership of the original Bratz drawings. A
finding that Bryant owns these original drawings in Phase 1(a) has the potential to eliminate the
need for Phase 1(b).

Accordingly, **THE COURT ADOPTS MATTEL'S MODIFICATION OF DEFENDANTS'
PROPOSAL**, as set forth at 8-9 of its Memorandum Regarding Trial Structure, filed June 20, 2007.
Phase 1(a) and Phase 1(b) (if necessary) will be tried to the same jury.

(2)   MGA's Motion re Discovery Master's May 15, 2007, Order (docket #505), and
(3)   MGA's Ex Parte Application regarding date of production of documents (docket #545).

The Discovery Master's May 15, 2007, Order compels production of documents regarding
ink, paper, and chemical analysis and documents relating to unreleased MGA products. The order
required that documents be produced no later than the end of May.

The Court reviews the Discovery Master's orders under the "clearly erroneous" or "contrary
to law" standard set forth in Fed. R. Civ. P. 72(a).

The Discovery Master's order compels the production of only non-privileged documents.
Therefore, MGA's arguments that the Discovery Master's order requires production of documents
in violation of the attorney-client privilege are misplaced. If the only responsive documents are
privileged, then MGA need not produce them, but must produce a privilege log.

MGA acknowledges that it has raised an argument before the Court that was not raised

Initials of Deputy Clerk __jh_____
Time: 01/15

EXHIBIT ___9____
PAGE ___172___

before the Discovery Master, namely, that Mattel has failed to establish that there are "exceptional circumstances" that allow Mattel to "discover facts known or opinions held by an expert . . . who is not expected to be called as a witness at trial." Fed. R. Civ. P. 26(b)(4)(B). MGA contends that the Discovery Master's order is contrary to law based on this standard, and that it was incumbent upon Mattel to raise it below. The Court disagrees. Mattel would be required to establish that exceptional circumstances existed if MGA objected to production on that grounds. A party seeking production cannot be expected to rebut all arguments that could possibly be raised by a party resisting production. MGA has not convinced the Court that the Discovery Master's failure to require Mattel to rebut an argument that was not raised by MGA is contrary to law.

MGA contends that the Discovery Master's order compelling production of documents regarding unreleased products is contrary to law. Relevant to that determination is a balancing test required to be applied by the Ninth Circuit when trade secrets are requested by a competitor in discovery. See Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1470 (9th Cir. 1992) ("Specifically, in this case we must balance the risk to [defendant] of inadvertent disclosure of trade secrets to competitors against the risk to [plaintiff] that protection of [defendant's] trade secrets [will] impair[] prosecution of [plaintiff's] claims.").

Here, the documents sought are of a particularly sensitive nature. They represent some of the most secretive documents maintained by MGA, and they are being ordered to be produced to MGA's fierce competitor. The Discovery Master recognized the sensitive nature of the documents and entered a strict protective order that severely limits access to those documents and that goes well beyond the normal "attorney eyes only" designation.

MGA argues that unreleased products are irrelevant to the issue of who owns the original Bratz drawings. That is clear. However, MGA's argument attempts to limit the discovery to issues involved in Phase 1 of the trial. There has been no bifurcation of discovery.

Mattel correctly points out that these documents are relevant to a number of its other claims. Specifically, if they show unreleased products that are similar to Mattel's unreleased products, the documents would be highly probative of Mattel's misappropriation of trade secrets claim. Moreover, these documents could be relevant to Mattel's RICO claims based on alleged acts of criminal copyright infringement.

Balancing tests are inherently subjective and particularly susceptible to varying interpretation by individual judicial officers. This Court, upon considering this issue from the outset, may very well have weighed the evidence differently and reached a contrary result. However, this Court is bound by the standard of review, and MGA's motion falls far short of convincing the Court that the Discovery Master's order is contrary to law.

The parties have a long history regarding the production of documents ordered in the May 15, 2007, Order, which is set forth in their papers and which need not be repeated here. Counsel for MGA represented that the remaining documents could be produced no later than July 31, 2007, with the exception of the documents from MGA Hong Kong, which could be produced no

MINUTES FORM 90
CIVIL -- GEN

Initials of Deputy Clerk __jh_____
Time: 01/15

EXHIBIT        9
PAGE          173

later than two weeks after that date. Accordingly, the Court **ORDERS** that MGA complete the document production set forth in the Discovery Master's May 15, 2007, order no later than July 31, 2007, with the exception of the documents from MGA Hong Kong, which shall be produced no later than August 14, 2007.

Accordingly, the Court **GRANTS** in part MGA's motion re the Discovery Master's May 15, 2007, Order, extending the document production date as set forth above. The Motion is **DENIED** in all other respects.

Likewise, the Court **GRANTS** in part MGA's ex parte application re date of production of documents, extending the document production date as set forth above. The application is **DENIED** in all other respects.

(4)    MGA's Motion re Discovery Master's May 16, 2007, Order (docket #508)

The Discovery Master's May 16, 2007, Order compelled the Rule 30(b)(6) depositions of witnesses on the topics of MGA's net worth, prior sworn statements, and ink, paper, and chemical analysis performed by MGA.

> A party may in the party's notice and in a subpoena name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. . . . The persons so designated shall testify as to matters *known or reasonably available* to the organization.

Fed. R. Civ. P. 30(b)(6) (emphasis added). "The purpose behind Rule 30(b)(6) is to create testimony that will bind the corporation." Sanders v. Circle K Corp., 137 F.R.D. 292, 294 (D. Ariz. 1991) (internal citation omitted). Another purpose of Rule 30(b)(6) is aptly described by the District Court for the District of Columbia:

> [The purpose of Rule 30(b)(6) is to] prevent[] serial depositions of various witnesses without knowledge within an organization and eliminating 'bandying', which is the name given to the practice in which people are deposed in turn but each disclaims knowledge of facts that are clearly known to persons in the organization and thereby to the organization itself.

Alexander v. F.B.I., 186 F.R.D. 148, 152 (D.D.C. 1999) (citing the 1970 Advisory Committee Notes to Rule 30(b)(6)).

The Discovery Master's order compelling Rule 30(b)(6) depositions in the specified

Initials of Deputy Clerk __jh_____
Time: 01/15

EXHIBIT ___9___
PAGE ___124___

categories serve both these purposes and is not contrary to law.

Although MGA's net worth may not be known to it, MGA does not contend that the information is not readily available. That net worth is generally the subject of expert testimony at trial -- a proposition disputed by neither Mattel nor the Court -- does not render it an improper subject for a Rule 30(b)(6). Therefore, the Discovery Master's ruling on this issue is not contrary to law.

MGA likewise does not contend that information regarding prior sworn statements are not readily available to it. Although contending that this is not an appropriate subject for a Rule 30(b)(6) deposition, MGA fails to cite authority in support of that contention. Therefore, the Discovery Master's ruling on this issue is not contrary to law.

The ink, paper, and chemical analysis topic is likewise a proper subject of a Rule 30(b)(6) deposition. To the extent that such a deposition has the potential to encroach upon information protected by the work-product privilege, then that objection must be made on a question-by-question basis. MGA may not make a blanket objection and justify its refusal to produce a Rule 30(b)(6) designee on this topic based on that blanket objection. Therefore, the Discovery Master's ruling on this issue is not contrary to law.

Accordingly, the Court **DENIES** MGA's motion re the Discovery Master's May 16, 2007, Order.

(5)    Oral Request for Modification of pretrial and trial dates.

Although no motion or ex parte application on the subject was pending before the Court, the parties made an oral request at the hearing to continue certain pretrial and trial dates. A discussion ensued and it became apparent that no final agreement was reached by the parties regarding extending these dates. Accordingly, the Court **DENIES** the parties' oral request for modification of pretrial and trial dates. The Court will consider counsels' stipulation regarding extensions of those dates only where all counsel unqualifiedly stipulate to those dates. Until the scheduling order is modified by the Court, the dates previously set by the Court remain in effect. In addition, the Court is unlikely to entertain a continuance of the Phase 1 trial past April, 2008.

IT IS SO ORDERED.

MINUTES FORM 90
CIVIL -- GEN

5

Initials of Deputy Clerk __jh_____
Time: 01/15

EXHIBIT ___9____
PAGE ___175___

# EXHIBIT 10

1   Robert C. O'Brien (SBN 154372)
    ARENT FOX LLP
2   555 West Fifth Street, 48th Floor
    Los Angeles, CA  90013-1065
3   Telephone:   213.629.7400
    Facsimile:   213.629.7401
4   obrien.robert@arentfox.com

5   Discovery Master

6

7

8                    UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10                        EASTERN DIVISION

11

12   CARTER BRYANT, an individual,        Case No.  CV 04-09049 SGL (RNBx)

13              Plaintiff,
                                          Consolidated with
14         v.                             Case No. CV 04-09059
                                          Case No. CV 05-2727
15   MATTEL, INC., a Delaware
     corporation,                         PHASE II DISCOVERY MATTER
16
                Defendant.                ORDER NO. 3, REGARDING:
17
                                              (1)  MOTION OF MGA
18                                            ENTERNTAINMENT, INC.,
                                              ISAAC LARIAN AND MGA
19                                            ENTERTAINMENT (HK)
                                              LIMITED TO QUASH
20                                            NON-PARTY SUBPOENAS; and

21                                            (2)  MOTION OF MATTEL, INC.
                                              TO COMPEL PRODUCTION OF
22                                            DOCUMENTS RESPONSIVE TO
                                              THE SAME NON-PARTY
23                                            SUBPOENAS

24   ┌──────────────────────────────┐
     │ CONSOLIDATED WITH            │
25   │ MATTEL, INC. v. BRYANT and   │
     │ MGZ ENTERTAINMENT, INC. v.   │
26   │ MATTEL, INC.                 │
     └──────────────────────────────┘
27

28
─────────────────────────────────────────────────────────────────
ARENT FOX LLP                         1              ORDER NO. 3
ATTORNEYS AT LAW                           [Case No. CV 04-09049 SGL (RNBx)]
LOS ANGELES

EXHIBIT  10
PAGE  176

1    This Order sets forth the Discovery Master's ruling on: (1) the motion of

2    MGA Entertainment, Inc., Isaac Larian, and MGA Entertainment (HK) Limited

3    (collectively "MGA") to quash certain non-party subpoenas [Docket Number 4779]

4    and (2) the corresponding motion of Mattel, Inc. ("Mattel") to compel production of

5    documents responsive to the same non-party subpoenas [Docket Numbers 4769 and

6    4788] (collectively, the "Motions").

7         The Motions came on regularly for hearing before the Discovery Master on

8    March 4, 2009. All interested parties were represented by counsel and afforded the

9    opportunity to present oral argument on the Motions. The Discovery Master,

10   having considered the papers filed in support of and in opposition to the Motions,

11   and having heard oral argument thereon, rules as set forth below.

12   **I.    INTRODUCTION**

13

14        **A.    The Court's February 11, 2009 Ruling**

15        On February 11, 2009, the Court heard oral argument on various motions

16   filed by the parties. During the proceedings, counsel took the opportunity to orally

17   request clarification by the Court regarding whether the parties' respective motions

18   relating to the subpoenas served by Mattel on various entities allegedly related to

19   MGA (the "Subpoenas") are in any way stayed or precluded by any of the Court's

20   prior orders.

21        In response, the Court stated: "I will instruct the Discovery Master this

22   afternoon, in no uncertain terms, that there is no stay on any discovery related to

23   this case at all." (Reporter's Transcript of Proceedings, February 11, 2009 ["Tr."],

24   99:8 – 10). Counsel for MGA then referred to the fact that the Court had

25   previously declined to allow Mattel to serve certain discovery accompanying

26   Mattel's motion for a receiver and characterized the third-party subpoenas as an

27   attempt to circumvent the Court's ruling. (Tr., 101:12 – 17). In response, the Court

28   stated:

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 2 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT   10
PAGE   177

1

2      Then the question becomes – and this is a question for the
       Discovery Master, not for this Court – whether or not the
3      discovery is related to Phase 2. If it is, it is. I'm not going to
4      pass any judgment whatsoever. I'm going to leave that
       completely up to the Discovery Master. ... The question for the
5      [D]iscovery [M]aster will be whether or not the disputed
6      discovery request is related or relevant to the trial that has now
       been scheduled for March [2010] or not.
7

8   (Tr., 101:18 – 22; 103:1 – 3).

9          The Discovery Master understands the Court's ruling as indicating that, in

10   deciding the motions relating to the Subpoenas, the Discovery Master should

11   consider whether there is a nexus between the information sought by the

12   Subpoenas, on the one hand, and the Phase 2 claims and counterclaims set for trial

13   in March 2010, on the other hand. If the information sought by the Subpoenas is, to

14   use the Court's words, "related to Phase 2" or "related or relevant to the [Phase 2]

15   trial," then that information could potentially be the subject of appropriate

16   discovery requests by Mattel.[1]

17      **B.   Information Sought By The Subpoenas**

18          The information sought by Mattel's Subpoenas falls into two broad

19   categories. First, Mattel seeks documents from third parties Omni 808 Investors,

20   LLC, OmniNet Capital, LLC and Vision Capital, LLC (collectively, the "Financing

21   Entities") involving, among other things, their internal ownership and operations

22   and their role in providing financing to MGA during the summer of 2008 (the

23   _____
     [1] Even prior to the Court's February 11, 2009 ruling, Mattel acknowledged that it had the burden of demonstrating a
24   nexus between the information sought by the Subpoenas and the Phase 2 issues, as demonstrated by Mattel's
     inclusion of a section in its Motion to Compel summarizing the claims to be adjudicated in Phase 2, (Motion, pp. 5 –
25   8), and a section arguing that the information sought by the third-party subpoenas is relevant to Mattel's Phase 2
     claims, (Id., pp. 18 - 24 and 24 – 25). However, Mattel also argued that the information sought might be appropriate
26   regardless of any nexus to Phase 2. (See id., pp. 14 – 17 [arguing that MGA's prior statements regarding its finances
     in Phase 1 "opened the door" to discovery on this issue] and id., p. 23 [arguing that the information sought is relevant
     to MGA's credibility]). Based on the Court's subsequent ruling on February 11, 2009, as well as the Discovery
27   Master's own independent evaluation of those arguments, the Discovery Master concludes, as discussed more fully
     below, that these arguments are insufficient, standing alone, to justify the non-party discovery Mattel seeks. Rather,
28   Mattel must demonstrate some link between the information sought and the issues to be adjudicated by the Court at
     the Phase 2 trial.

EXHIBIT   10
PAGE   178

1  "Financing Discovery"). Based on the information presented at the February 11,

2  2009 hearing and in connection with the pending motions, it does not appear that

3  either MGA Entertainment, Inc., MGA Entertainment (HK) Limited, or Larian have

4  an ownership interest in the Financing Entities.[2] (*See* Tr., 70:22 – 72:5; 78:9 -25).

5      Second, Mattel seeks documents from third parties IGWT Group, LLC and

6  IGWT 826 Investments, LLC (collectively, the "Transferee Entities") regarding

7  MGA's sale to them of infringing MGA inventory, namely Bratz dolls (the

8  "Transferee Discovery"). MGA does not dispute that the Transferee Entities are

9  owned and/or controlled by Larian. (*See, e.g.,* MGA's Reply in support of its

10  Motion to Quash, at p. 5, fn. 6, where MGA refers to the purchase of Bratz

11  inventory by the Transferee Entities as "Larian's purchase of those . . .

12  products . . . .").[3]

13  **II.   MGA's Motion To Quash**

14      Because it could dispose of all outstanding discovery issues related to the

15  Subpoenas, the Discovery Master first addresses MGA's Motion to Quash filed on

16  February 3, 2009.

17      **A.   Legal Standard**

18      As the party moving to quash the Subpoenas, MGA bears the burden of

19  satisfying the standard set forth in Rule 45(b), which provides that the court may

20  "quash or modify the subpoena if it is unreasonable and oppressive." (Fed. R. Civ.

21  P. 45(b); *see also Wiwa v. Royal Dutch Petroleum Co.,* 392 F.3d 812, 818 (5th Cir.

22  2004) ["The moving party has the burden of proof to demonstrate that compliance

23

---

24  [2] Of course, this is one of the facts Mattel seeks to investigate through the Subpoenas to the Financing Entities. The
25  Discovery Master's ruling denying Mattel's Motion to Compel the Financing Parties to comply with the Subpoenas
  does not address – and should not be construed as deciding – whether Mattel could, upon establishing a nexus to a
26  legitimate Phase 2 issue, seek to obtain this information from MGA.

  [3] Moreover, MGA does not dispute the assertions made by Mattel in its Motion to Compel at pp. 11– 12, including
27  that Larian created IGWT Group during the Phase 1 trial and registered its place of business as his home address, and
  that Larian created IGWT 826 Investments the day after the Phase 1 trial ended and registered it at the home address
28  of his sister.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 4 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___10___
PAGE ___179___

1    with the subpoena would be unreasonable and oppressive" (internal quotations
2    omitted)]; *Linder v. Department of Defense*, 133 F.3d 17, 24 (D.C. Cir. 1998) [The
3    burden of proving that a subpoena is oppressive is on the party moving to quash];
4    *Washington v. Thurgood Marshall Academy*, 230 F.R.D. 18, 21 (D.D.C. 2005) [the
5    burden is on the movant to establish that a subpoena duces tecum should be
6    quashed]). "The burden is particularly heavy to support a 'motion to quash as
7    contrasted to some more limited protection.'" (*Westinghouse Electric Corp. v. City
8    of Burlington*, 351 F.2d 762, 766 (D.C.Cir.1965) [denying a motion to quash
9    supported by two affidavits]).

10    **B.    Arguments Made By MGA In Support Of Its Motion To Quash**
11    The sole argument set forth in MGA's Motion to Quash is that the Court's
12    January 7, 2009 order appointing a forensic auditor bars Mattel from seeking the
13    information sought by the Subpoenas. (*See* MGA's Motion to Quash, pp. 1 - 6).
14    But that argument fails for the reasons set forth above. The Court made it clear at
15    the hearing on February 11, 2009 that:

16        There is no stay on discovery. Period. . . . . [The forensic auditor
17        appointed by the Court] is acting at the Court's discretion to
18        inform the Court of information. . . . That's an entirely separate
         matter. And I have not stayed any discovery and there should be
19        no reliance on that. If that was misunderstood, it's clarified now.
20    (Tr., 97:15, 98:8 - 9, and 98:13 - 15).

21    Recognizing that its only argument has been rejected by the Court, MGA
22    argues for the first time in its Reply that its Motion to Quash should be granted
23    because the Subpoenas are not relevant to any of Mattel's Phase 2 claims. (*See*
24    MGA's Reply Brief in Support of the Motion to Quash, pp. 1 and 5 - 12).
25    However, MGA did not make this argument in its opening brief. It instead declared
26    in its moving papers that whether the Subpoenas are related to any "Phase 2 issues
27    is beside the point." (*Id.*, p. 5). Because MGA did not address the relevance of the
28    subject discovery until the filing of its Reply, the Discovery Master declines to

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 5 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___10___
PAGE ___180___

1   consider the argument in connection with the Motion to Quash.

2       The Discovery Master, like the Court,[4] disfavors the insertion of new

3   arguments at the reply stage that could have been raised in the moving papers.  A

4   party filing a motion is required to raise all of its arguments in its opening brief to

5   prevent "sandbagging" of the non-moving party and to provide opposing counsel

6   the chance to respond.  This rule is routinely adhered to by courts in the Ninth

7   Circuit.  (*See, e.g., United States v. Boyce*, 148 F.Supp .2d 1069, 1085

8   (S.D.Cal.2001); *Leick v. Hartford Life and Acc. Ins. Co.*, 2007 WL 1847635 at *1,

9   n. 1 (E.D.Cal. 2007); *Stewart v. Wachowski*, 2004 WL 2980783, at *11 (C.D.Cal.

10   Sept. 28, 2004); *Hamilton v. Willms*, 2007 WL 2558615, *11 (E.D.Cal.2007); *see

11   also United States v. Cox*, 7 F.3d 1458, 1463 (9th Cir.1993); *United States v.

12   Wright*, 215 F.3d 1020, 1030 n. 3 (9th Cir.2000)).

13       Furthermore, MGA will not suffer any prejudice from this decision because

14   the issue it raised in its Reply (i.e., are the Subpoenas seeking information related to

15   any Phase 2 claims) has been fully briefed by the parties and is ruled upon by the

16   Discovery Master in connection with Mattel's Motion to Compel.[5]  (*See* Section III

17   below).

18       Accordingly, MGA's Motion to Quash is **DENIED**.

19   //

20   //

21   //

22   //

23

24   [4] In *Bryant v. Mattel, Inc.*, 573 F.Supp.2d 1254, 1273 n.7 (C.D. Cal. 2007), the Court noted that it "ordinarily would not consider" arguments made for the first time on reply but did so only "because [undertaking the analysis did] not change [its] ultimate conclusion."

25   

26   [5] That the arguments raised in the Reply are the same as those in MGA's Opposition to the Motion to Compel is conceded by Mattel.  Indeed, Mattel admitted in its Request to Consolidate MGA's Motion to Quash and Motion to Compel (which was denied as untimely by the Discovery Master at the hearing on March 4, 2009) that the "MGA

27   Parties' Opposition to Mattel's Motion to Compel Production of Documents Responsive to Third Party Subpoenas . . . makes the same arguments as the MGA Parties' Reply in support of their Motion to Quash."  (Mattel's Request to

28   Consolidate MGA's Motion to Quash and Mattel's Motion to Compel, p. 2).

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT   10
PAGE   181

## III.   Mattel's Motions To Compel

### A.   The Purported Procedural Defects Barring Mattel's Motions To Compel

MGA, the Financing Entities, and the Transferee Entities all argue that that Mattel's Motion to Compel should be denied on several different procedural grounds.

#### 1.   The Court's January 7, 2009 Order

As an initial matter, the Transferee Entities and the Financing Entities repeat the argument made by MGA in its Motion to Quash that the Court's January 7, 2009 Order appointing a forensic auditor barred Mattel from seeking the discovery sought by the Subpoenas. (Financing Entities' Opposition to Mattel's Motion to Compel at p. 3; Transferee Entities' Opposition to Mattel's Motion to Compel at pp. 5 - 7). But that argument fares no better here than it did with respect to MGA's Motion to Quash and is rejected for the reasons discussed in Section II above.

#### 2.   Local Rule 37

The Financing Entities and the Transferee Entities also argue that Mattel's Motion to Compel should be denied because Mattel failed to comply with Local Rule 37 by, among other things, failing to meet and confer and failing to file a joint stipulation. (Financing Entities' Opposition to Mattel's Motion to Compel, pp. 1 and 7 - 10; Transferee Entities' Opposition to Mattel's Motion to Compel, p. 2 [referencing Local Rule 37 in passing]). However, Local Rule 37 (as distinguished from Federal Rule 37, which is discussed in subsection 7a, below) does not apply to discovery disputes in this case. Rather, the applicable procedure is the one adopted by the Court in its order appointing a discovery master dated December 6, 2006 ("Discovery Master Order").[6] Because the Discovery Master Order provides that

---

[6] The Discovery Master Order is incorporated by reference into the Court's January 6, 2009 Order appointing a discovery master for Phase 2 of this litigation. (*See* Court's Order dated January 6, 2009, p. 2 ["The Discovery Master will serve under the terms and conditions of the Stipulation and Order dated December 6, 2006"]).

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 7 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT _10_
PAGE _182_

1    "all third parties subject to discovery requests . . . in this litigation shall be bound

2    by the terms of this Stipulation and Order," (Discovery Master Order, p. 6), that

3    order applies to the Financing Entities as well as the Transferee Entities, and its

4    procedures replace those set forth in Local Rule 37. (*Id.*, p. 4).

5              ### 3.     Local Rule 11-6 And Paragraph 4(b) Of The Court's

6                        Standing Order

7              The Financing Entities and MGA further argue that Mattel's Motion to

8    Compel should be denied because it exceeds the page limitations set forth in Local

9    Rule 11-6 and Paragraph 4(b) of the Court's Standing Order. (*See* Financing

10   Entities' Opposition to Mattel's Motion to Compel, p. 9; MGA's Opposition to

11   Mattel's Motion to Compel, pp. 18 - 19). Each of these contentions is unavailing.

12   The Discovery Master Order (not the Local Rules or the Court's Standing Order)

13   governs discovery disputes in this case, and it does not impose any page limit on

14   such motions.[7]   In fact, the Discovery Master Order dispenses with the formatting

15   requirements of the Local Rules in certain ways, such as allowing letter briefs, and

16   even permits the parties to agree to alternative procedures, including, presumably,

17   filing briefs that are more than 25 pages in length. (*See* Discovery Master Order, p.

18   4). Thus, while the Discovery Master encourages the parties to be as efficient as

19   possible in their briefing, he recognizes that briefs in excess of 25 pages are either

20   directly permitted under the Discovery Master Order (since no page limitation was

21   imposed by the Court) or implicitly allowed (since the parties may agree to

22   alternate procedures). He further recognizes that the complex nature of this case

23   may periodically necessitate the filing of briefs that exceed 25 pages.[8]   For all of

24

25   [7] Even assuming the 25 page limitation for briefs did apply, Mattel had the option of filing separate motions to
     compel for each of the subpoenas at issue and could have easily extended the page limitation well beyond the 30

26   pages it filed in connection with its combined motion that addressed multiple subpoenas propounded on the
     Transferee Entities and the Financing Entities.

27   [8] In fact, the parties to this lawsuit have filed multiple discovery motions in this case that contained more than 25
     pages. (*See* Supplemental Declaration of Jon D. Corey in Support of Mattel, Inc.'s Reply in Response to The MGA

28   Parties' Opposition to Motion to Compel, ¶ 7).

EXHIBIT    /0
PAGE    /83

1    these reasons, filings in excess of 25 pages are permitted.[9]

2            **4.**     **Local Rule 6-1**

3        The Financing Entities argue in passing that Mattel's motion to compel

4    should be denied because it violates Local Rule 6-1. (Financing Entities'

5    Opposition to Mattel's Motion to Compel, p. 6).   However, the Discovery Master

6    Order adopts a completely different set of deadlines than the Local Rules for the

7    filing of motions, oppositions and replies, and a different schedule for noticing

8    hearing dates. (Discovery Master Order, p. 4). Therefore, Local Rule 6-1 has no

9    applicability here.

10           **5.**     **Failure To Name MGA In The Motion To Compel**

11        MGA next argues that Mattel's motion to compel is procedurally improper

12    because MGA was not named in the Motion to Compel and Mattel should not be

13    allowed to respond to MGA's objections.   (MGA's Opposition to Mattel's Motion

14    to Compel, p. 18). But MGA has cited no legal authority, and the Discovery

15    Master has found none, standing for the proposition that a party must name in its

16    motion to compel all parties who have objected to an underlying subpoena even if

17    they are not actually the target of the subpoena. In fact, the contention that Mattel's

18    Motion to Compel should have been brought against MGA makes no sense given

19    that it could not possibly comply with any order compelling a response to the

20    Subpoenas.

21           **6.**     **Mattel's Separate Statement**

22        MGA also contends that Mattel's Motion to Compel should be denied

23    because its' separate statement "is another classic example of . . . inefficiency."

24    (*Id.*, p. 19). Once again, nothing in the Discovery Master Order prevents a party

25    from filing a separate statement that first identifies the request in dispute and then

26

27    _____

28    [9] In the event the length of briefs ever becomes excessive, the Discovery Master will issue an order setting a specific page limitation.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT /0
PAGE /84

1   sets forth the various contentions of the parties, even if the information regarding

2   the various requests happens to be repetitive.  Regardless, MGA has not cited any

3   legal authority in support of its position and the Discovery Master finds no reason

4   to dispose of Mattel's Motion to Compel merely because it filed a separate

5   statement that contains duplicative arguments.[10]

6           **7.     Meeting And Conferring**

7       As their final procedural argument in opposition to the Motion to Compel,

8   the Transferee Entities and the Financing Entities assert that the motion should be

9   denied because Mattel failed to adequately meet and confer prior to filing the

10  motion.  (Financing Entities' Opposition to Mattel's Motion to Compel, pp. 7 - 8;

11  Transferee Entities' Opposition to Mattel's Motion to Compel, pp. 2 - 5).

12          **a.     Applicable Procedure**

13      Prior to filing its motion to compel, Mattel had an obligation to comply with

14  both the Federal Rules of Civil Procedure and the Discovery Master Order.  Federal

15  Rule of Civil Procedure 37(a) expressly requires that a party filing a motion to

16  compel discovery first meet and confer in "good faith."  (Fed. R. Civ. Proc. 37(a)).

17  Similarly, the Discovery Master Order states that unless an "alternative procedure"

18  is agreed upon or otherwise ordered by the Discovery Master, the

19          moving party shall first identify each dispute, state the relief
            sought, and identify the authority supporting the requested relief
20          in a meet and confer letter that shall be served on all parties by
            facsimile or electronic mail.  The parties shall have five court
21          days from the date of service of that letter to conduct an in-person
            conference to attempt to resolve the dispute.  If the dispute has
22          not been resolved within five court days after such service, the
            moving party may seek relief from the Discovery Master by
23          formal motion or letter brief . . .

24  (Discovery Master Order, p. 4).

25  //

26

27  ───────────────
    [10] The Discovery Master notes that where there are numerous discovery requests in dispute he would prefer for a
28  separate statement to be submitted by the moving party.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 10 -                    ORDER NO. 3
                         [Case No. CV 04-09049 SGL (RNBx)]



EXHIBIT   10
PAGE   185

b.  **Mattel's Meet And Confer Regarding The Financing Entities**

In challenging Mattel's meet and confer effort, the Financing Entities first claim that Mattel violated the Discovery Master Order because no "in-person meeting occurred." (Financing Entities' Opposition to Mattel's Motion to Compel, p. 8). But that argument is without merit, since Mattel and the Financing Entities agreed to an alternative procedure that disposed of the in-person meet and confer requirement.[11] Indeed, MGA's counsel sent counsel for Mattel, counsel for the Transferee Entities and counsel for the *Financing Entities* a letter on January 23, 2009 memorializing the parties' agreement and establishing a schedule whereby the parties would "meet and confer on January 29 and 30 . . ." (Mattel's Reply in Support of its Motion to Compel filed on February 13, 2009, pp. 9 - 10; Supplemental Declaration of Jon D. Corey in Support of Mattel's Reply to the Motion to Compel filed on February 13, 2009, ¶ 4 and Ex. 2). That the Financing Entities' counsel received this letter and acted in accordance with its terms is evidenced by, among other things, the fact that they served objections to the Subpoenas on January 28, 2009 (which was the deadline specified in the January 23 letter) and started meeting and conferring with Mattel's counsel telephonically on January 30. (Financing Entities' Opposition to Mattel's Motion to Compel, pp. 3 and 4). Accordingly, Mattel did not have any obligation to meet with the Financing Entities in person since the parties had agreed to waive that obligation.

Nevertheless, Mattel still had an obligation to meet and confer with the Financing Entities in good faith. Good faith cannot be shown merely through perfunctory efforts; rather Federal Rule of Civil Procedure 37 mandates a genuine attempt to resolve the discovery dispute through non-judicial means. (Fed. R. Civ.

---

[11] To promote efficiency and minimize the necessity for counsel to travel between their respective offices, the Discovery Master shall deem Paragraph 5 of the Discovery Master Order (mandating that the parties have an in person conference to attempt to resolve discovery disputes) to be sufficiently satisfied if the parties and non-parties involved in a discovery dispute meet and confer telephonically or by video conference. However, the Discovery Master emphasizes that this accommodation in no way lessens the parties' obligation to meet and confer in good faith.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 11 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT _10_
PAGE _186_

1   Proc. 37(a)(1)).

2        Because the evidence and declarations submitted by Mattel and the Financing

3   Entities are in conflict regarding what transpired during their respective meet and

4   confer communications, (Cf. Financing Entities' Opposition to Mattel's Motion to

5   Compel, pp. 3 – 5; Mattel's Reply Brief in Support of its Motion to Compel filed on

6   February 13, 2009, pp. 9-10), the Discovery Master gives Mattel the benefit of the

7   doubt and concludes that it adequately met and conferred with respect to Omni 808

8   Investors, LLC and Vision Capital, LLC.

9        By contrast, Mattel arguably did not even begin the meet and confer process

10  with OmniNet Capital, LLC prior to filing its motion to compel, because counsel

11  for the Financing Entities informed Mattel that they did not receive that Subpoena

12  until the afternoon of February 2, 2009 and filed objections to the Subpoena on that

13  date. (Financing Entities' Opposition to Mattel's Motion to Compel at p. 5).  No

14  "good faith" meeting could therefore have taken place.

15       Although the meet and confer with respect to OmniNet Capital, LLC was

16  inadequate, the Discovery Master will nonetheless address the merits of Mattel's

17  Motion to Compel in all respects, including concerning the Subpoena served on

18  OmniNet Capital, LLC.  The Discovery Master does so for purposes of efficiency

19  (i.e., the issues to be decided regarding the subpoena served on OmniNet Capital,

20  LLC are essentially identical to those that must be addressed in connection with the

21  subpoenas served on Omni 808 Investors, LLC and Vision Capital, LLC) and

22  because addressing the merits of the motion does not alter the outcome.[12]

23            c.      **Mattel's Efforts To Meet And Confer Regarding The**

24                    **Transferee Entities**

25       Like the Financing Entities, the Transferee Entities contend that Mattel's

26  motion to compel should be denied because it did not meet and confer in good faith.

27

28  _____

[12] As noted above, the parties are admonished to abide by the provisions of the Discovery Master Order requiring a good faith attempt to meet and confer regarding discovery disputes prior to the filing of any discovery motion.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 12 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT    10
PAGE    187

1   (Transferee Entities' Opposition to Mattel's Motion to Compel, pp. 2 - 5). Yet, the

2   Transferee Entities concede that their counsel engaged in multiple meet and confer

3   teleconferences. (*Id.* at pp. 3 - 4). Several emails and letters were also exchanged

4   between the parties as part of the meet and confer process. (*Id.*). In light of these

5   interactions, the Discovery Master again gives Mattel the benefit of the doubt in

6   favor of resolving the issues on the merits and concludes that it adequately met and

7   conferred with the Transferee Entities.

8   **B.    Legal Standard Governing Enforcement Of The Subpoenas**

9       Federal Rule of Civil Procedure 26(b)(1) provides for discovery in civil

10   actions of "any matter, not privileged, which is relevant to the subject matter

11   involved . . .. The information sought need not be admissible at the trial if the

12   information sought appears reasonably calculated to lead to the discovery of

13   admissible evidence." Rule 26(b) is liberally interpreted to permit wide-ranging

14   discovery of all information reasonably calculated to lead to discovery

15   of admissible evidence; but the discoverable information need not be admissible at

16   the trial. (*Jones v. Commander, Kansas Army Ammunitions Plant*, 147 F.R.D. 248,

17   250 (D.Kan.1993)).

18       The broad scope of discovery described in subsection (b)(1) is tempered by

19   provisions protecting the responding party from undue burden. Rule 26(b)(2)

20   provides that the frequency or extent of discovery otherwise allowed by the Rules

21   must be limited if the court determines that "(i) the discovery sought is

22   unreasonably cumulative or duplicative, or is obtainable from some other source

23   that is more convenient, less burdensome, or less expensive; (ii) the party seeking

24   discovery has had ample opportunity by discovery in the action to obtain the

25   information sought; or (iii) the burden or expense of the proposed discovery

26   outweighs its likely benefit, taking into account the needs of the case, the amount in

27   controversy, the parties' resources, the importance of the issues at stake in the

28   litigation, and the importance of the proposed discovery in resolving the issues."

EXHIBIT   _10_

PAGE   _188_

1    Moreover, the Federal Rules distinguish between discovery from non-parties
2    to a lawsuit (governed under Rule 45) and discovery from parties (governed
3    generally by Rule 26), based in part on the recognition that the former is inherently
4    more burdensome and less convenient than the latter. (*See, e.g., Solarex v. Arco*
5    *Solar, Inc.*, 121 F.R.D. 163, 179 (E.D.N.Y. 1988) [The status of a non-party is
6    significant when determining whether compliance with a discovery demand would
7    constitute an undue burden]; *Katz v. Batvia Marine and Sporting Supplies, Inc.*, 984
8    F.2d 422, 424 (Fed. Cir. 1993) [The fact that discovery is sought from a non-party
9    is one factor that the Court may weigh in determining whether the discovery
10   requested is necessary, relevant, or burdensome]. Courts applying Rules 26 and 45
11   have interpreted these rules to afford non-parties special heightened protection
12   against burdensome discovery. (*See, e.g., Exxon Shipping Co. v. U.S. Dept of*
13   *Interior*, 34 F.3d 774, 779 (9th Cir. 1994)).

14   Accordingly, requests for documents that pertain to a party and that can be
15   more easily and inexpensively obtained from that party also impose an undue
16   burden. (*Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 638 (C.D. Cal. 2005)).
17   Further, if the documents sought are neither relevant nor calculated to lead to the
18   discovery of admissible evidence, "then any burden whatsoever imposed upon the
19   non-party would be by definition undue." (*Compaq Computer Corp. v. Packard*
20   *Bell Electronics, Inc.*, 163 F.R.D. 329, 335-336 (N.D.Cal. 1995)).

21   Each of the moving parties bears the burden of establishing the basis for the
22   relief it seeks. As the party moving to compel compliance with the Subpoenas,
23   Mattel bears the burden of "establishing that the information sought is relevant and
24   necessary to its lawsuit." (*Cytodyne Technologies, Inc. v. Biogenic Technologies,*
25   *Inc.*, 216 F.R.D. 533, 534 (M.D.Fla. 2003)).

26   Finally, in deciding whether to enforce a subpoena, the Discovery Master
27   must balance "the relevance of the discovery sought, the requesting party's need,
28   and the potential hardship to the party subject to the subpoena." (*Heat & Control,*

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT    10
PAGE       189

1    *Inc. v. Hester Industries, Inc.*, 785 F.2d 1017, 1024 (Fed.Cir.1986) citing

2    *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 560, 564 (7th Cir.1984)).

3    **C.    Mattel's Contention That MGA Has Placed Its Finances At Issue**

4    As its first ground for moving to compel production of the documents sought

5    by the Subpoenas, Mattel argues that MGA has misrepresented its finances, thereby

6    making it necessary and appropriate for Mattel "to obtain an accurate understanding

7    of MGA's and Larian's finances." (Motion to Compel, p. 14). According to

8    Mattel, MGA's supposed misrepresentations have placed its financial condition at

9    issue, and have opened the door to discovery of any information bearing on MGA's

10   finances. (*Id.* ["Discovery on MGA's financials is amply warranted by MGA's

11   own statements *alone*."] (emphasis added)).

12   However, after Mattel filed its Motion, the Court made it clear that the

13   validity of the Subpoenas must be evaluated with reference to whether they relate to

14   the matters to be adjudicated in Phase 2.  As the Discovery Master understands the

15   Court's ruling, the Subpoenas cannot be justified merely because they seek

16   information regarding some contention made during Phase 1, without regard to

17   Phase 2. In other words, putting a fact at issue in Phase 1, cannot, standing alone,

18   suffice to render that fact the proper subject of discovery in Phase 2.

19   Thus, to the extent Mattel's first argument asserts that MGA's statements,

20   standing alone, warrant discovery from the Subpoena recipients, that argument is

21   rejected. Rather, the Discovery Master will evaluate whether discovery of MGA's

22   finances is warranted in light of the issues to be adjudicated in Phase 2.

23   Further, even if Mattel were not required to demonstrate some nexus between

24   the Subpoenas and the issues to be adjudicated in Phase 2, the argument that the

25   Subpoenas are justified because MGA placed its financial condition at issue would

26   still fail for the simple reason that Mattel is not seeking discovery from MGA but

27   rather *non- parties*. Mattel does not cite any statements or conduct by the

28   //

EXHIBIT    10
PAGE    190

1    Financing Entities putting their financial affairs at issue in this litigation.[13]

2    Rather, Mattel argues that the statements and conduct of *MGA* should be attributed

3    to the Financing Entities and construed as their consent to discovery of their

4    internal financial affairs.  Such an assumption is unwarranted.

5    **D.    Mattel's Contention That The Subject Discovery Is Relevant To**

6    **Phase 2**

7    **1.    Subpoenas To The Financing Entities**

8    Mattel next argues that the Subpoenas to the Financing Entities seek

9    information relevant to a variety of Phase 2 issues.[14]

10    **a.    Mattel's RICO Counterclaim**

11    Mattel first asserts in its Motion to Compel that the discovery it seeks is

12    relevant to its RICO counterclaim because "Mattel alleges that the counter-

13    defendants have operated a widespread criminal enterprise that has engaged in

14    numerous acts of mail and wire fraud and other predicate acts in violation of the

15    RICO statute" and that "MGA's mid-trial transactions with Omni 808 and the other

16    non-operating entities" is "a continuation of that pattern of racketeering activity."

17    (Motion, p. 18).

18

19    [13] In its Reply to the Financing Entities' Opposition to its Motion to Compel, Mattel argues that the Financing

20    Entities (referred to by Mattel as the "Omni Parties") have injected themselves into the litigation because one of them, Omni 808 Investors, LLC, applied to intervene. (Reply, p. 8).  However, a decision on that application has

21    been deferred by the Court, (Tr., 80:15 – 17), and therefore Omni 808 Investors, LLC and the other Financing Entities remain outsiders to the litigation entitled to the heightened protection from discovery normally afforded non-

22    parties.

23    [14] Mattel argues in one of its reply briefs filed on February 25, 2009 that the Discovery Master should strike MGA's Opposition to the Motion to Compel because: (1) MGA indicated that it would not be filing an Opposition and

24    (2) the Opposition was filed a week late. (See Mattel's Reply in Response to MGA's Opposition to the Motion to Compel, p. 4).  The Discovery Master declines that request.  The assertion that MGA would not file an Opposition is

25    based on an alleged oral conversation which counsel for Mattel apparently did not confirm in writing. (See Supplemental Declaration of Jon D. Corey in Support of Mattel's Reply in Response to MGA's Opposition to the

26    Motion to Compel, ¶ 4).  Even assuming such a statement had been made, MGA was entitled to change its mind.  As for Mattel's argument that the Opposition was untimely, the Discovery Master notes that he was only recently

27    appointed.  This fact combined with the backlog of discovery motions may have resulted in some confusion as to when various briefs were due to be filed.  The Discovery Master prefers to address issues on the merits and declines

28    to strike the Opposition as untimely.  Notwithstanding the foregoing, the Discovery Master urges the parties to strictly comply with the briefing schedule set forth under the Discover Master Order for all future discovery motions unless an alternative procedure is agreed upon by the parties and approved by the Discovery Master or the Court.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 16 -

EXHIBIT  *10*

PAGE  *191*

1    But Mattel's allegations in support of its RICO counterclaim turn on

2 misappropriation of trade secrets and confidential information, and make no

3 mention of improper transfers of funds or any other predicate act similar to MGA's

4 purported business transactions with any of the Financing Entities.[15] Accordingly,

5 these financial transactions are not a "continuation" of the "pattern" of conduct

6 Mattel alleges in very precise detail in its RICO counterclaim. (*Asdourian v.*

7 *Konstantin*, 77 F. Supp. 2d 349, 358 (E.D.N.Y. 1999) [cited by Mattel and stating

8 RICO claimant must show "[a]n interrelationship between acts, suggesting the

9 existence of a pattern, [which] may be established...[by] proof of their temporal

10 proximity, or common goals, or similarity of methods, or repetitions' (citation

11 omitted)]; *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238-39 (1989) [RICO claims

12 must be supported by a "pattern" of activity and "the mere fact that there are a

13 number of predicates is no guarantee that they fall into any arrangement or order.

14 A pattern is not formed by sporadic activity ... Instead, the term 'pattern' itself

15 requires the showing of a relationship between the predicates" (quotations and

16 internal citations omitted)]).

17    At this stage, Mattel has failed to demonstrate a relationship between the

18 predicate acts alleged by Mattel in its Counterclaims – which were bound together

19 by a purported scheme to misappropriate Mattel's trade secrets – and the

20 //

21 //

22 //

---

23 [15] *See* Mattel's Second Amended Answer and Counterclaims ("Counterclaims"), p. 55-62, ¶ 90 [alleging the MGA
24 Parties and other counter-defendants "for the purpose of executing and attempting to execute the scheme to
improperly defraud Mattel and steal its trade secret or otherwise confidential and proprietary information" committed
25 various predicate acts], ¶ 91 [alleging the MGA Parties and other counter-defendants "shared the common purpose of
enabling MGA to obtain confidential, proprietary and otherwise valuable Mattel property through improper means in
26 order to assist MGA in illegally competing with Mattel"], ¶ 92 [alleging the enterprises are continuing enterprises
because they are "designed to and did unlawfully acquire the confidential business information and property of
Mattel and incorporated this information and property into MGA's ongoing business, marketing strategies and
27 business methods, practices, and processes"], ¶ 93(a) [alleging mail fraud committed in furtherance of scheme to
"defraud Mattel of its confidential trade secret information and property"], ¶ 93(b) [alleging wire fraud "defraud
28 Mattel of its confidential and trade secret information and property"], and ¶ 102 [the MGA Parties and other counter-
defendants "schemed to defraud Mattel and steal its property and trade secret information"].

EXHIBIT    10
PAGE      192

1   transactions Mattel seeks to investigate here.[16]

2       Also, the RICO counterclaim (like the other counterclaims to be adjudicated

3   in Phase 2) was asserted in July, 2007 – more than a year before either Omni 808

4   Investors, LLC or Vision Capital, LLC came into existence – and therefore

5   apparently did not encompass the activities of those entities or the transactions

6   which are the subject of the Financing Discovery.  While that fact might be

7   overcome by a showing that the Financing Entities were created or used to further a

8   scheme to carry on misconduct that is the subject of Phase 2, Mattel did not

9   demonstrate that such is the case in its briefs and supporting evidence.

10      In sum, absent some argument or evidence demonstrating a nexus between

11  the predicate activities alleged in the RICO counterclaim, on the one hand, and the

12  transactions and other matters which are the subject of the Financing Discovery, on

13  the other hand, there has been no showing by Mattel that the Subpoenas to the

14  Financing Entities are reasonably calculated to lead to the discovery of admissible

15  evidence regarding the RICO counterclaim.

16              **b.    Mattel's Disgorgement Remedy**

17      Next, Mattel asserts that the Subpoenas to the Financing Entities seek

18  information relevant to its remedy of disgorgement, which is an available remedy

19  for Mattel's Phase 2 counterclaim for misappropriation of trade secrets.  Mattel

20  argues:

21

22  [16] This conclusion is consistent with the case cited by Mattel – *Eastman Kodak Co. v. Camarata*, 238 F.R.D. 372
    (W.D.N.Y. 2006).  There, the plaintiffs "asserted broad civil RICO claims against the Nicolo defendants predicated,
23  among other violations, upon alleged money laundering violations.  Specifically, the Complaint alleges that the
    Nicolo defendants and the other named defendants constituted an enterprise as defined in the RICO statute that was
24  engaged in a pattern of racketeering activity, including mail and wire fraud and, more importantly for purposes of
    this motion, money laundering." (*Id.*, at 375).  "The alleged money laundering consisted of repeated deposits into
25  various financial institutions in order both to promote and carry on the unlawful activity – that is, by paying and
    depositing kickbacks to certain members of the enterprise – and to conceal and attempt to conceal the proceeds, their
26  nature, source and location – that is, by transferring funds between defendants and between various accounts
    maintained by those defendants." (*Id.* [emphasis added]).  Thus, inquiry into the defendants' finances was
27  appropriate as it was likely to reveal activity related to the alleged predicate acts.  Here, on the other hand, Mattel has
    not alleged any sort of financial scheme which would support inquiry into the MGA Parties' financial transactions
28  with third parties.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 18 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]


EXHIBIT 10
PAGE 193

> For purposes of establishing disgorgement, Mattel must take into account money transferred from MGA and Isaac Larian, regardless of the manner in which it was transferred. Mattel is entitled to discovery that shows all assets siphoned from MGA or Isaac Larian . . . . By these subpoenas, Mattel seeks evidence to prove the amount the defendants must disgorge. Money that properly belonged to Mattel was transferred from MGA or Isaac Larian to an entity controlled by them.

(Motion, pp. 20:1 – 4, 21:12 – 14).

While the foregoing statements may be true as a general proposition, none of the Financing Entities is alleged to have "received money that properly belonged to Mattel." To the contrary, Mattel asserts that the Financing Entities are creditors of MGA. Therefore, Mattel has not demonstrated how any of the categories of documents sought from the Financing Entities would aid it in ascertaining the amount defendants must disgorge.

### c.    Phase 2 Damages

Mattel's third argument in favor of enforcement of the Subpoenas is that they "seek documents relevant to MGA's financial condition" and other "factors relevant to an award of punitive damages." (Motion to Compel, p. 21:19 – 22). Depending on the particular scope of the document request, such discovery from Omni 808 Investors, LLC may be appropriate in connection with Phase 2 because any information evidencing MGA's indebtedness to Omni 808 Investors, LLC from the purchase of the alleged Wachovia debt or direct loans to MGA is relevant to MGA's net worth (and hence punitive damages).[17] As the Court noted in its February 11, 2009 ruling:

> I can see tremendous overlap between, for example, discovery on

[17] The Discovery Master's analysis is fundamentally different for OmniNet Capital, LLC and Vision Capital, LLC because neither entity is alleged by Mattel to be a creditor of MGA Entertainment, Inc. (Motion to Compel, pp. 9 and 10). To the contrary, Mattel concedes that "OmniNet [Capital, LLC] is not the secured party, and thus presumably not the actual debt purchaser/lender. Rather, the company holding the security interest is Omni 808 [Investors, LLC] . . . [which] appears to be owned funded by a company called Vision Capital, LLC." (Id.) Because it admits that OmniNet Capital, LLC and Vision Capital, LLC are not creditors of MGA, Mattel has failed to show that the information sought from those entities has any bearing on MGA's financial condition.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 19 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT   10
PAGE      194

1   financial condition of the company as it relates to damages in the
    Phase 2 and also issues that the receiver is looking at.  And
2   without making a ruling on any of this, I would not suggest for a
    moment that these are mutually exclusive categories.
3
    (Tr., 101:3 - 8)
4
5       Mattel argues that the necessary connection between the Financing

6   Discovery and Phase 2 damages exists because the Financing Entities have acquired

7   a security interest in MGA's assets, which, in turn, affects MGA's financial

8   condition.  Specifically, Mattel argues that Omni 808 Investors, LLC is:

9       directly involved in providing funding to MGA in exchange for a
        security interest.  Such funding, and security interests, are in and
10      of themselves directly relevant to the financial condition of the
        MGA Parties, including the amount of the security interests, the
11      terms and conditions of the funding, and the rate of funding. . . .

12  (Motion to Compel, p. 22: 13 – 17).

13      The Discovery Master agrees that such limited information, as it relates to

14  the purchase by Omni 808 Investors, LLC of the debt obligation previously held by

15  Wachovia Bank, is reasonably calculated to lead to the discovery of admissible

16  evidence concerning Phase 2 issues, including the calculation of MGA's net worth

17  for purposes of calculating punitive damages.[18]  Accordingly, Mattel's motion to

18  compel responses from Omni 808 Investors, LLC is granted with respect to

19  documents relating to (1) the existence of any debt owed by MGA Entertainment,

20  Inc. to Omni 808 Investors, LLC and (2) any communications between Omni 808

21  Investors, LLC and the MGA parties regarding any such indebtedness.

22      The problem, however, is the vast majority of the document requests set forth

23  in the Subpoena propounded on Omni 808 Investors, LLC are not narrowly tailored

24  to obtain information demonstrating the amount and nature of MGA's indebtedness

25  (and hence net worth) or communications regarding any such debt,[19] but instead

26  _____
    [18] During oral argument, counsel for MGA represented (and counsel for Mattel seemed to agree) that the Court
27  deferred discovery regarding the Wachovia debt until the middle of the Phase 1 trial.  (Reporter's Transcript of
    Proceedings, March 4, 2009, pp. 72, 85 and 86).  The extent to which that damages information was obtained directly
28  from Wachovia, as opposed to MGA, is not clear from the record provided to the Discovery Master.

    [19] Nor did Mattel move to compel MGA to produce this information in the first instance.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES                                                                     ORDER NO. 3
                                    - 20 -            [Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT    10
PAGE       195

1    would require the Financing Entities to produce virtually every document in their

2    possession regarding their formation, operations, and history of transactions.

3    Among other things, the Subpoenas to the Financing Entities seek:

4    •    All records that "substantiate transfers of assets" by the Financing

5         Entities "to other entities, individuals, and/or parties, within the U.S.

6         and outside of the U.S." (Exhibits 27-29 to Supplemental Declaration

7         of Jon D. Corey In Support Of Mattel, Inc.'s Reply In Support Of

8         Motion To Compel Production of Documents Responsive to Third-

9         Party Subpoenas, Attachment A, ¶ 16);

10   •    All documents "detailing or setting forth the relationship" between

11        each of the Financing Entities and other non-parties (*Id.* at ¶¶ 6-10);

12   •    All documents referring or relating to the "all contributions, loans and

13        any sources of funding" for the Financing Entities (*Id.* at ¶ 13);

14   •  •  All documents referring or relating to the "source of funding" of other

15        non-parties (*Id.* at ¶ 16);

16   •    All documents showing detail of "all loan facilities" referring or

17        relating to the Financing Entities and other non-parties (*Id.* at ¶ 14);

18   •    All documents referring or relating to "transactions involving any

19        compensation, loans, advances, payments, fees or any other form of

20        consideration" paid to other non-parties (*Id.* at ¶ 15);

21   •    All "communications" referring or relating to the Financing Entities

22        and other non-parties (*Id.* at ¶ 17).

23        Accordingly, the Discovery Master concludes that most of the categories of

24   documents in the Subpoenas are overbroad and not reasonably calculated to lead to

25   the discovery of admissible evidence with respect to Phase 2 issues, as detailed in

26   Section IV below (entitled "Disposition").

27   //

28

EXHIBIT   10
PAGE    196

### d.   Credibility Of MGA Witnesses

Mattel's fourth argument consists of a single, conclusory paragraph asserting that it is entitled to its discovery in order to determine the credibility of MGA's witnesses. To support this argument, Mattel first states that information is discoverable "if it relates to 'the credibility of any witness.'" (Motion to Compel, p. 23 (citing *Cable & Computer Tech., Inc. v. Lockheed Sanders, Inc.*, 175 F.R.D. 646, 650 (C.D. Cal. 1997)).[20] Next, Mattel asserts that "MGA and Larian made statements under oath about their financial condition as well as about the role of Omni 808 and the other non-operating entities in providing MGA with additional funding." (*Id.*) But that is the full extent of Mattel's argument. Mattel does not attempt to show that the specific discovery that it has propounded is reasonably calculated to lead to the discovery of the evidence that it contends would be admissible.

Discoverable information generally includes evidence relevant to the credibility of a party or a key witness. (See *Paulsen v. Case Corp.*, 168 F.R.D. 285, 287-288 (C.D. Cal. 1996); see also *Ragge v. MCA/Universal Studios*, 165 F.R.D. 601, 603-604 (C.D. Cal. 1995); *U.S. v. City of Torrance*, 164 F.R.D. 493, 495 (C.D. Cal. 1995)). If Mattel's discovery were reasonably calculated to lead to the discovery of such information, then it might be permissible. (*Id.* ["Rule 26 is liberally interpreted to permit wide ranging discovery of all information reasonably calculated to lead to discovery of admissible evidence."]) But Mattel has not taken any steps to connect its discovery to such evidence. As discussed above, Mattel bears the burden of demonstrating that its discovery is reasonably calculated to lead to the discovery of admissible evidence. Here, Mattel has only stated that credibility evidence can be admissible and that credibility is at issue in this case – without referring at all to specific categories of documents in the Subpoenas or

---

[20] The Discovery Master notes that the case cited by Mattel does not actually discuss or apply this proposition.

EXHIBIT  10
PAGE  197

1    linking those categories of documents to prior or anticipated testimony of MGA's

2    witnesses. Simply stating that credibility evidence is discoverable does nothing

3    toward meeting Mattel's burden to demonstrate that the particular discovery at issue

4    here is reasonably calculated to lead to the discovery of such evidence.

5                    e.      **MGA's Unclean Hands**

6        Mattel next argues in its Motion to Compel that MGA has asserted an

7    unclean hands defense in response to Mattel's Phase 2 claims, and consequently

8    Mattel is entitled to discover whether the MGA Parties are currently "engaging in

9    sham and fraudulent financial transactions such as concealing profits" to preclude

10   MGA "from invoking the unclean hands defense themselves." (Motion, pp. 23 -

11   24.) But this argument does not apply to the Financing Entities because, as

12   discussed above, Mattel does not claim that the Financing Entities have "received

13   money that properly belonged to Mattel" or otherwise used those entities to conceal

14   profits. To the contrary, Mattel asserts that the Financing Entities are creditors of

15   MGA.

16       Regardless, Mattel's theory is that, even if Mattel has unclean hands, MGA

17   may not assert that defense unless MGA itself is blameless. (*Id.*, at 24 [a "party

18   asserting an equitable defense, however, must itself have 'clean hands.'"]).

19   Mattel's statement of the law is correct as far as it goes. But, as the Ninth Circuit

20   has stated, "'unclean hands does not constitute 'misconduct in the abstract,

21   unrelated to the claim to which it is asserted as a defense.'" (*Jarrow Formulas, Inc.*

22   *v. Nutrition Now, Inc.*, 304 F.3d 829, 841 (9th Cir. 2002)). "It is fundamental to

23   [the] operation of the doctrine that the alleged misconduct . . . relate directly to the

24   transaction concerning which the complaint is made." (*Dollar Sys., Inc. v. Avcar*

25   *Leasing Sys., Inc.* 13 F.2d 165, 173 (9th Cir. 1989)). Accordingly, courts will not

26   allow discovery based on an unclean hands defense where the "allegations of

27   misconduct do not relate to the transactions... forming the basis for the

28   []complaint." "(*Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948, 952 (S.D.Cal.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

                                             - 23 -        ORDER NO. 3
                                                    [Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT   10
PAGE   198

1    1996)).

2         Here, Mattel does not link any of the categories of documents referenced in

3    the Subpoenas (which involve the creation and operation of the Financing Entities

4    beginning with their formation in the summer of 2008) to any of the conduct at

5    issue in Phase 2 (which involves such matters as the alleged theft of trade secrets in

6    Mexico in 2004 and other conduct unrelated to the relationship between the

7    Financing Entities and MGA). Accordingly, the Financing Discovery is not

8    reasonably calculated to lead to the discovery of admissible evidence regarding

9    MGA's alleged unclean hands in connection with the matters to be adjudicated in

10   Phase 2.

11               **f.    Mattel's Unfair Competition Counterclaim**

12        As Mattel acknowledges, California's Unfair Competition Law, Business &

13   Professions Code §§ 17200 et seq. (the "Unfair Competition Law") encompasses

14   "'anti–competitive business practices as well as injuries to consumers, and has as a

15   major purpose the preservation of fair business competition.'" (Opp. at 24:25 –

16   25:2, quoting *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone

17   Co.* (1999) 20 Cal.4th 163, 180)). However, Mattel's papers do not sufficiently

18   demonstrate that the documents sought from the Financing Entities involve "anti-

19   competitive business practices," "injuries to consumers," or anything affecting

20   consumers or the public at all. Instead, Mattel simply asserts, without any

21   supporting analysis, that MGA has violated the Unfair Competition Law by

22   "manipulating the sources of [its own] funding" (presumably the Financing

23   Entities). That allegation, even if true, does not appear to involve the "unlawful,

24   unfair or fraudulent" marketing or sale of anything and therefore does not fall

25   within the ambit of the Unfair Competition Law.

26   //

27   //

28   //

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 24 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT   10
PAGE   199

g.  **Summary Of The Discovery Master's Findings With Respect To The Subpoenas Directed To The Financing Entities**

For the foregoing reasons, the Discovery Master finds that, based on the record before him, Mattel has failed to sufficiently articulate the necessary connection between most of the Financing Discovery and any Phase 2 issue. Moreover, while there is a connection between the Financing Discovery and some of the Phase 2 issues referenced (i.e., MGA's financial condition and its bearing on Mattel's claim for punitive damages), Mattel has failed to demonstrate that the Subpoenas meet the standard set forth in Rule 26(b)(2) and that all of the requested discovery is permissible in light of the case law interpreting Rules 26 and 45.

Accordingly, Mattel's motion to compel the Financing Entities to comply with the Subpoenas is **GRANTED** in part and **DENIED** in part.

2.  **Subpoenas To The Transferee Entities**

In their briefs regarding the enforceability of the Subpoenas, Mattel and MGA do not, as a general rule, make a distinction between the Financing Entities and the Transferee Entities, but rather direct the same arguments to both groups collectively. However, there are important distinctions between the two groups, including, without limitation, that: (1) the Transferee Entities appear to be affiliated with – if not wholly owned by – Larian; (2) the Transferee Discovery involves the sale of MGA assets (i.e., Bratz products) in which Mattel has an ownership interest pursuant to the Court's December 3, 2008 ruling; and (3) the Subpoenas seek some documents relevant to Phase 2 issues which presumably cannot be obtained from MGA, namely the Transferee Entities' contracts with, and records of sales to, third parties purchasing the Bratz products. Accordingly, in ruling on the Subpoenas directed to the Transferee Entities, the Discovery Master's analysis of certain of the parties' above-referenced arguments differs, as follows.

//

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]



EXHIBIT __/0__
PAGE __200__

1              a.    **Non-Party Considerations**

2          To begin with, the distinction between a party and non-party here is less

3   compelling given the MGA parties' apparent admission that the Transferee Entities

4   are single purpose entities created and controlled by Larian (who is, of course,

5   himself a party) to dispose of inventory that is the subject of this litigation. Further,

6   the MGA parties presumably do not have custody of the sales contracts whereby

7   IGWT Group LLC sold Bratz products to third parties. The Discovery Master also

8   notes that counsel for the Transferee Entities has submitted a declaration stating

9   that there are "hundreds of sales contracts at issue, and as such, thousands of

10  documents responsive to Mattel's requests." (Declaration of Jeffrey B. Valle dated

11  February 17, 2009 ["Valle Decl."], ¶ 7). The unavailability of these relevant

12  documents from any other source weighs heavily in favor of enforcing the

13  Subpoena to IGWT Group LLC.

14             b.    **Relevance To Phase 2 Issues**

15                   1.    **Phase 2 Damages**

16         As mentioned above, Mattel argues that the Subpoenas "seek documents

17  relevant to MGA and Larian's financial condition, net worth, and ability to pay" on

18  the ground that such information is relevant to Mattel's Phase 2 damages claims,

19  including Mattel's claim for punitive damages.

20  For the reasons previously discussed, the Discovery Master finds that, with respect

21  to the Financing Entities, the discovery requests were, for the most part overbroad,

22  and/or not sufficiently linked to Phase 2 issues. However, the Discovery Master's

23  analysis is necessarily different with respect to entities which were created and

24  apparently wholly owned and/or controlled by Larian (a defendant in Phase 2), and

25  which are admittedly selling inventory which generate revenues in which Mattel

26  has an interest. Specifically, Mattel contends that Larian has caused MGA to sell

27  the inventory at a deep (80%) discount to the Transferee Entities. This practice, if

28  true, limits MGA's profits (which go to MGA's balance sheet, and ultimately

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 26 -                     ORDER NO. 3
                    [Case No. CV 04-09049 SGL (RNBx)]


EXHIBIT  10
PAGE  201

1    affects MGA's net worth) while at the same time allowing Larian to capture

2    additional profits which otherwise would have been realized by MGA and reflected

3    on MGA's balance sheet). Accordingly, the Discovery Master finds that most of

4    the documents Mattel seeks to subpoena from the Transferee Entities properly

5    relate to Phase 2 issues, as specified in Section IV below.[21]

6                    **2.    Mattel's Unfair Competition Counterclaim**

7         Given MGA's admissions regarding Larian's ownership/control of the

8    Transferee Entities, coupled with their sale of inventory purchased from MGA, the

9    Discovery Master finds that many of the documents requested from the Transferee

10   Entities are also arguably related to a "fraudulent," "unlawful," or "unfair" business

11   practice within the meaning of the Unfair Competition Law and the scope of

12   Mattel's Counterclaims. Among other things, the Court's December 3, 2008 order

13   imposes a constructive trust on the proceeds of MGA's sale of the subject

14   inventory. If, as Mattel argues, MGA's sale of that inventory to the Transferee

15   Entities constitutes a scheme on the part of Larian to enrich himself by depriving

16   Mattel of the true profits to be paid to Mattel pursuant to the Court's order, then

17   such conduct would constitute an unlawful attempt to circumvent the Court's order

18   and arguably render the transaction between MGA and the Transferee Entities an

19   anti-competitive business practice that is unlawful, unfair or fraudulent to other toy

20   manufacturers, including Mattel. Therefore, such alleged misconduct, if proven,

21   could violate the Unfair Competition Law.

22        Moreover, although Mattel asserted its counterclaim for violation of the

23   Unfair Competition Law prior to the alleged misconduct (and long before the

24   Transferee Entities came into existence), Mattel phrased its allegations broadly

25

26   [21] The Discovery Master notes that IGWT 826 Investments is registered at the home address of Larian's sister and
     brother-in-law, indicating that some of Larian's relatives may be involved in the ownership or operation of the
27   Transferee Entities. Accordingly, the Discovery Master has specified in some instances that the production of
     documents shall include those referencing not only Larian, but also his spouse, his children, his siblings, or their
28   spouses, or any entity or person affiliated with them. However, the Discovery Master has stopped short of ordering
     the production of documents relating to any other entities, individuals "within the U.S. and outside the U.S.," as
     requested in Category 6 of each of the Subpoenas directed to the Transferee Entities.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

ORDER NO. 3
                                [Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT ___10___
PAGE ___202___

1    enough to potentially encompass subsequent acts of unfair competition which

2    perpetuate or extend the misconduct alleged in the Counterclaims.  Unlike Mattel's

3    RICO counterclaim, Mattel's Twelfth Counterclaim for Unfair Competition does

4    not purport to rest on a list of enumerated, factually detailed and carefully defined

5    acts, but rather is phrased broadly to cover "unlawful, unfair and/or fraudulent acts

6    of unfair competition" which include, "without limitation" certain illustrative

7    examples. (Counterclaims, p. 74, ¶ 165).

8         Of course, the Discovery Master cannot predict whether the Court will

9    ultimately deem Mattel's unfair competition counterclaim to be sufficiently elastic

10   to encompass MGA's alleged misuse of the Transferee Entities or whether Mattel

11   will seek (and the Court permit) amendment of the counterclaim to expressly

12   reference such alleged misconduct.  Nevertheless, in light of the fact that the

13   discovery need only appear reasonably calculated to lead to the discovery of

14   admissible evidence, the Discovery Master finds that certain aspects of the

15   Subpoenas are sufficiently related to Mattel's Phase 2 unfair competition claim.

16              **c.      Summary Of The Discovery Master's Findings With**

17                        **Respect To The Subpoenas Directed To The**

18                        **Transferee Entities**

19        As set forth above, the Discovery Master finds that Mattel has sufficiently

20   articulated a connection between some of the Transferee Discovery and its Phase 2

21   claims.  Accordingly, Mattel's motion to compel the Transferee Entities to comply

22   with the Subpoenas is **GRANTED** in part and **DENIED** in part.

23   **IV.   Disposition**

24        1.      The Motion to Quash filed by MGA is **DENIED.**

25        2.      Mattel's Motion to Compel the Financing Entities to produce

26   documents responsive to the Subpoenas is **DENIED** with respect to OmniNet

27   Capital, LLC and Vision Capital, LLC.

28        3.      Mattel's Motion to Compel Omni 808 Investors, LLC to produce

EXHIBIT    10
PAGE       203

1    documents responsive to the Subpoena propounded on it is **GRANTED** in part and

2    **DENIED** in part, as follows:

3            a.      Requests 1 through 3, 13, 15, and 17: The Motion is granted

4    with respect to documents relating to (1) the existence of any debt owed by MGA

5    Entertainment, Inc. to Omni 808 Investors, LLC, including any debt purchased

6    from Wachovia Bank, and (2) any communications between Omni 808 Investors,

7    LLC and the MGA parties regarding any such indebtedness. The motion is denied

8    regarding any other documents sought by these requests.

9            b.      Requests 4 through 12, 14 and 18: The Motion is denied.

10       4.      Mattel's Motion to Compel the Transferee Entities to produce

11   documents responsive to the Subpoenas is **DENIED** as to Request 6 propounded to

12   IGWT Group LLC and Request 6 propounded to IGWT 826 Investments, LLC.

13       5.      Mattel's Motion to Compel the Transferee Entities to produce

14   documents responsive to the Subpoenas is **GRANTED**, as follows:

15                          **Subpoena To IGWT Group LLC**

16           a.      Request 1: The Motion is granted with respect to documents

17   relating to the purchase by, or transfer to, IGWT Group LLC of any items of value,

18   including Bratz products, from MGA, Larian, his spouse, his children, his siblings,

19   or their spouses, or any entity or person affiliated with them.

20           b.      Request 2: The Motion is granted

21           c.      Request 3: The Motion is granted with respect to documents

22   relating to any ownership interest by Larian, his spouse, his children, his siblings,

23   or their spouses, or any entity or person affiliated with them.

24           d.      Request 4: The Motion is granted with respect to documents

25   relating to any sources of funding by Larian, his spouse, his children, his siblings,

26   or their spouses, or any entity or person affiliated with them.

27           e.      Request 5: The Motion is granted with respect to documents

28   relating to any compensation, loans, advances, payments, fees or any other form of

EXHIBIT    10
PAGE    204

1  consideration paid by IGWT Group LLC to Larian, his spouse, his children, his

2  siblings, or their spouses, or any entity or person affiliated with them.

3         f.    Request 7:  The Motion is granted.

4         **Subpoena To IGWT 826 Investments LLC**

5         a.    Request 1: The Motion is granted with respect to documents

6  relating to the purchase by, or transfer to, IGWT 826 Investments LLC of any items

7  of value, including Bratz products, from MGA, Larian, his spouse, his children, his

8  siblings, or their spouses, or any entity or person affiliated with them.

9         b.    Request 2:  The Motion is granted

10        c.    Request 3:  The Motion is granted with respect to documents

11 relating to any ownership interest by Larian, his spouse, his children, his siblings,

12 or their spouses, or any entity or person affiliated with them.

13        d.    Request 4:  The Motion is granted with respect to documents

14 relating to any sources of funding by Larian, his spouse, his children, his siblings,

15 or their spouses, or any entity or person affiliated with them.

16        e.    Request 5:  The Motion is granted with respect to documents

17 relating to any compensation, loans, advances, payments, fees or any other form of

18 consideration paid by IGWT 826 Investments LLC to Larian, his spouse, his

19 children, his siblings, or their spouses, or any entity or person affiliated with them.

20        f.    Request 7:  The Motion is granted.

21     5.    All non-privileged documents referenced in Paragraphs 3 and 5, above,

22 shall be produced within 30 days of this Order, subject to any applicable

23 confidentiality designations available under the Protective Order.

24     6.    Nothing in this Order should be deemed to prevent Mattel from

25 seeking discovery from the MGA parties of documents encompassed by the

26 Subpoenas upon the showing of a sufficient nexus between the particular discovery

27 requests and legitimate Phase 2 issues, and subject to any applicable objections.

28 //

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 30 -



EXHIBIT    10
PAGE    205

Dated:  March 10, 2009

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

By:        /s/ Robert C. O'Brien
           ROBERT C. O'BRIEN
           Discovery Master

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT   10
PAGE   206