# EXHIBIT 11

7652

1              UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                     ---

4    **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                     ---

6  MATTEL, INC.,              :  PAGES 7652 - 7873

7        PLAINTIFF,      :

8    VS.                 :  NO. ED CV04-09049-SGL
                        :  [CONSOLIDATED WITH

9  MGA ENTERTAINMENT, INC.,  :  CV04-9059 & CV05-2727]
  ET AL.,               :

10                     :
        DEFENDANTS.       :

11

12

13

14

15       REPORTER'S TRANSCRIPT OF PROCEEDINGS

16          RIVERSIDE, CALIFORNIA

17         FRIDAY, AUGUST 15, 2008

18           JURY TRIAL - DAY 36

19          AFTERNOON SESSION

20

21

22                  MARK SCHWEITZER, CSR, RPR, CRR
                      OFFICIAL COURT REPORTER

23                      UNITED STATES DISTRICT COURT
                      181-H ROYBAL FEDERAL BUILDING

24                      255 EAST TEMPLE STREET
                      LOS ANGELES, CALIFORNIA 90012

25                      (213) 663-3494

CERTIFIED COPY

EXHIBIT _11_
PAGE _207_

7759

1    He's not going to give the number.  It's exactly what I told

2    the Court that our expert would be saying.  He's not going to

3    give the precise number.

4            THE COURT:  Well, what's the answer?  What is he

5    going to say?

6            MR. ROTH:  He's going to say given the

7    uncertainties of the company, he cannot place a value on it

8    today.

9            THE COURT:  He cannot place a value?

10           MR. ROTH:  Right.

11           THE COURT:  Okay.

12           MR. COREY:  But that's the answer.  If he says you

13   can't put a value on it, they are going to say --

14           THE COURT:  If all he says is I can't place a

15   value, there are uncertainties.  I mean, the Court is going

16   to instruct the jury to do their best job to come up with a

17   value.

18           MR. PRICE:  But he's going to go further.

19           THE COURT:  I thought this was going to --

20           MR. PRICE:  I did, too.  But I think what he's

21   suggesting is that no one could.  So --

22           MR. ROTH:  Well, I will tell you --

23           THE COURT:  You know, this is fine.  That's

24   overruled.

25           (CONCLUSION OF SIDEBAR CONFERENCE.)

EXHIBIT 11
PAGE 208

1  Q.   BY MR. KENNEDY:   Given everything you've learned in this

2  case about sales performance of Bratz, including the first

3  half of 2008 and taking into account the jury's verdict

4  that's already been returned in this case, and taking into

5  account the fact that we are still in trial in this case, and

6  taking into account the monetary amounts that Mattel is

7  seeking in this phase of the case, do you have an opinion as

8  to whether it is presently possible to place a value on

9  Mr. Larian's interest in the Bratz line portion of MGA?

10  A.   With all those issues, it would be my opinion that you

11  could not place a value on Mr. Larian's interest at this

12  point in time.   You just could not do that.

13  Q.   And is that also true of MGA's interest in the Bratz

14  line?

15  A.   It would be my opinion with all those issues and

16  uncertainties, you could not place a value on MGA at this

17  point in time.

18  Q.   And finally, did you prepare a graphic providing a

19  breakdown of profits according to segments of the overall

20  revenue for the Bratz line?

21  A.   Yes, I have.

22       MR. KENNEDY:   Aaron, could we see Exhibit 162.

23  Q.   And knowing we're short on time here, is what you've

24  done here taking the 3.1 billion in revenues, when you round

25  it up and broken that down into at least five of the overall

EXHIBIT __11__
PAGE __209__

 1   components that go to make it up?

 2   A.   That's right.  If you go back to the prior schedules,

 3   you'll see how this summary aligns with those schedules that

 4   I've grouped together for the jury, the revenues and profits

 5   from the various products and subbrands for the Bratz line,

 6   and the total is the 3.1 billion.  Revenue, the total

 7   profits, 405, and you'll see that spread amongst the various

 8   categories.

 9           MR. KENNEDY:  Thank you very much.  I have no

10   further questions, your Honor.  And I would move in all of

11   the exhibits except for the ones that Mr. Price has objected

12   to.  I think he and I can reach closure on that.

13           THE COURT:  Very well.  Why don't you confer

14   afterwards.

15           Thank you, Mr. Kennedy.

16           Mr. Price?

17                    CROSS-EXAMINATION

18   BY MR. PRICE:

19   Q.   Mr. Meyer, I want to ask you a little bit about your

20   testimony about Stanford.  Do you recall about teaching

21   there?

22   A.   At Stanford?

23   Q.   And Stanford has a terrific business school.  Do you

24   teach in the business school?

25   A.   I teach in the engineering school.  I teach business to

EXHIBIT  11
PAGE  210

7873

1
2
3
4
5
6
7                    C E R T I F I C A T E
8
9
10            I hereby certify that pursuant to Title 28,

11   Section 753 United States Code, the foregoing is a true and

12   correct transcript of the stenographically reported

13   proceedings in the above matter.

14            Certified on August 15, 2008.

15
16
17          _____
             MARK SCHWEITZER, CSR, RPR, CRR
18           Official Court Reporter
             License No. 10514
19
20
21
22
23
24
25

EXHIBIT __11__
PAGE __2-11__

# EXHIBIT 12

1

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION

4                - - -

5     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                - - -

7   MATTEL, INC.,                    )
                                     )
8                  Plaintiff,        )
                                     )
9           vs.                      )   No. CV 04-09049
                                     )
10   MGA ENTERTAINMENT, INC., ET. AL., )
                                     )
11                 Defendants.       )
    _____)   HEARING
12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               Riverside, California

17            Tuesday, December 30, 2008

18                 10:04 A.M.

19

20

21

22

23          THERESA A. LANZA, RPR, CSR
         Federal Official Court Reporter
24          3470 12th Street, Rm. 134
         Riverside, California  92501
25              951-274-0844
           WWW.THERESALANZA.COM

14

1    evidence and our interpretation of the submission is that

2    clearly -- and it makes sense -- decisions are being made.  The

3    Hong Kong toy fair starts in January.  In fact, it starts next

4    Monday; important meetings, products are being shown; decisions

5    are being made for the spring season; retailers are committing          00:34

6    space for that period of time.

7            What the retailers were saying to us, given the

8    import of the injunction and the terms of the injunction, and

9    the recall in particular -- which we believe may be the largest

10   toy recall ever ordered by a court -- is that retailers were            00:34

11   hesitant, are hesitant, and have cancelled orders in certain

12   respects; in other respects, they said, We will give you the

13   benefit of at least going to the court in an effort to

14   determine whether or not there can be some clarity as to what

15   happens after February.  And if the stay were extended beyond           00:34

16   February, then purchasing decisions could be made, the sales

17   could go forward, et cetera, et cetera, which we've allowed in

18   our papers.

19           We have indicated, and we've described the injunction

20   in its present setting, whether or not it terminates in                 00:35

21   February or whatever, the injunction is, in essence, a death

22   warrant for the Bratz brand.  There is no showing that Mattel

23   has any desire or any interest in pursuing the Bratz brand.

24           **THE COURT:**  Well, you raise a critical point.  It's a

25   death nail provided if, and only if, Mattel does not decide to          00:35

Tuesday, December 30, 2008        EXHIBIT ___12___        Mattel vs. MGA
                                  PAGE ___213___

15

1   pursue it.  And one of the questions that I have for Mattel --

2   and I don't know if they're prepared to answer that today, but

3   at some point, Mattel is going to have to make a decision, and

4   I think the time for making that decision is probably sooner as

5   opposed to later.  Because whether I accept Mattel's

6   declarations or your declarations, I think it's well understood

7   in the industry that a decision on this needs to be made

8   relatively soon.  And I've done everything I can short of

9   standing on my head to try to get the parties to work this out.

10  But barring that, and barring some agreement, I understand what

11  you're saying.

12          MR. NOLAN:  And so given that information, which was

13  a new reaction by retailers and licensees, we then needed to

14  make the decision as to how we bring this information and get

15  the relief that we need, to see whether or not we can get

16  clarity.

17          The permanent injunction was entered.  It was Phase 3

18  of the trial.  The permanent injunction is appealable in order

19  to effectuate the rights of MGA, which all of us have talked

20  about and made the analogy of a death warrant in this case, and

21  it certainly is, depending on what Mattel wants to do.  But

22  it's certainly a death warrant for Mr. Larian's interest in the

23  Bratz brand.

24          We were very much like in a situation where you're

25  trying to protect the property rights and the profound interest

00:35

00:36

00:36

00:36

00:37

Tuesday, December 30, 2008          EXHIBIT _12_          Mattel vs. MGA
                                    PAGE _214_

16

1    of either 750 employees that are related only to the Bratz or

2    the --

3          THE COURT:   That's the part I don't get.   I

4    understand that the -- the injunction is certainly appealable,

5    and you have a right to appeal the injunction, although I         00:37

6    specifically stayed the injunction until February 11th because,

7    depending on what happens on February 11th, the injunction may

8    or may not have its current form.  And I certainly understand

9    and appreciate you bringing to this Court's attention the

10   necessity, from your perspective, of modifying the stay.          00:37

11         But the whole running up to the Ninth Circuit on the

12   stay at the same time is where you really throw me.

13         MR. NOLAN:   Okay.

14         THE COURT:   Just in case I don't get it?

15         MR. NOLAN:   You get it.  Let me just try to explain         00:38

16   where we were at.

17         Let's go back in history a little bit.

18         We get the injunction December 3rd.  I believe that's

19   a Thursday.  That Monday, the next Monday, after we process and

20   get information and the press is all over it -- it's on CNN;       00:38

21   it's on the Today Show -- retailers are contacting us and

22   telling us what their reaction is:  Hey, congratulations on the

23   stay until February; it doesn't help us; you've got a lot of

24   costs here, and you've got your spring line coming out.

25         That Monday we advise Mattel that we are going to go         00:38

Tuesday, December 30, 2008          EXHIBIT ___12___          Mattel vs. MGA
                                    PAGE ___215___

1          Good day.   And Happy New Year.

2

3

4                         CERTIFICATE

5

6   I hereby certify that pursuant to section 753, title 28, United
    States Code, the foregoing is a true and correct transcript of
7   the stenographically recorded proceedings held in the above-
    entitled matter and that the transcript page format is in
8   conformance with the regulations of the Judicial Conference of
    the United States.

9

10    _____        1-7-09
      THERESA A. LANZA, CSR, RPR             _____
11    Federal Official Court Reporter            Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Tuesday, December 30, 2008        EXHIBIT  12          Mattel vs. MGA
                                  PAGE  216

# EXHIBIT 13

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an individual,

     Plaintiff,

    vs.

MATTEL, INC., a Delaware
corporation,

       Defendants.

No. CV 04-9049 SGL (RNBx)
Consolidated with
Nos. CV 04-9405 and
05-2727

# CERTIFIED
# COPY

AND CONSOLIDATED ACTIONS.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Thursday, August 6, 2009

Reported by:
CHERYL R. KAMALSKI
CSR No. 7113

Job No. 116947

EXHIBIT __13__
PAGE __217__

1    meet-and-confer process is supposed to be let's get

2    together, meet and confer about what you really want.  And

3    I look at the paper prepared by MGA, the letter that said

4    we object, we do this, we do that, all the boilerplate

5    objections, but at the end of the day, tell us what it is

6    you want that's substantively related to MGA and

7    temporally limited to the things that might be at issue in

8    the case and we'll give it to you.  And the response back

9    was, everything's okay, we're fine, we're going to move to

10   compel.

11          So, I mean, we're here now, you know, because we

12   filed, or they filed a motion, we responded, but the issue

13   is -- the meet-and-confer process fell apart, near as I

14   can tell, because we're sitting here paying a lot of money

15   to have us agree oh, yeah, let's provide information

16   that's limited in some respect, which would be great if we

17   didn't have to include you as the person who's part of the

18   meet-and-confer process.  Again, I wasn't part of this, I

19   don't know if these folks were part of it either, but at

20   the end of the day these interrogatories go beyond not

21   only -- we take a position that they're confusing, but

22   they ask for information that has nothing to do with MGA,

23   which, at the end of the day, the dispute is -- I think

24   they argue that it would show the transactions -- there's

25   an allegation of money laundering, there's an allegation

60

EXHIBIT __13__
PAGE __218__

1  of fraudulent conveyances, but they all relate to MGA

2  assets, which these interrogatories are not limited to.

3  So that's a difficulty for us going forward to respond to

4  something like that that isn't tied to anything in the

5  third amended complaint.

6          MR. O'BRIEN:  Thank you.  You don't want to

7  subcontract on your argument?  You're good?  Okay.

8          MR. McCONVILLE:  I'm good for now.

9          MR. O'BRIEN:  I just want to make sure I'm fair

10  to everyone.

11          All right.  Thank you.

12          Mr. Quinn, response?

13          MR. QUINN:  Yeah, just briefly.

14          Part of the problem here is that -- I mean, we do

15  have a history and we do have some transactions that have

16  clearly involved these trusts and money going from trust

17  to IGWT, et cetera.  It's not pure speculation to suggest

18  that assets from these trusts have been used for MGA's

19  benefit.  So part of the problem, in saying -- in trying

20  to respond to a request that you need to limit it to just

21  what's MGA, is it's kind of hard to tell what monies have

22  been used for MGA's benefit, how they've been used, and

23  it's part of the discovery process.  I think we have to

24  have an opportunity to test, by looking at the con- -- the

25  actual business records, an opportunity to test assertions

EXHIBIT  _13_
PAGE  _219_

1    about what entities or trusts are separate and have

2    nothing to do with MGA.  Certainly we've met an initial

3    hurdle that this is relevant to the subject matter.  If

4    you look at the existing third amended complaint on file,

5    in particular paragraph 120, I would call the

6    Discovery Master's attention to, I mean, the allegations

7    go well beyond Mr. Larian's personal assets or MGA's

8    assets.  That's part and parcel of the alleged RICO

9    conspiracy, that you have an enterprise that consists of

10   Mr. Larian, family members, MGA, and trusts that have

11   engaged in fraudulent transfers, transfers to -- in

12   anticipation of bankruptcy, have engaged in money

13   laundering, these allegations are squarely made in the

14   complaint.  So what's at issue goes well beyond, quote,

15   unquote, MGA.

16          So I think, on this existing record, we really do

17   need to be able to see these -- see the documents and the

18   evidence concerning -- or see the evidence concerning what

19   the ownership is of the trusts and of Mr. Larian and of

20   these various entities that are alleged to be a part of

21   the RICO enterprise in order to prove our claims.  It's

22   relevant to the subject matter.

23          MR. O'BRIEN:  Thank you.  Great.  I think that

24   wraps up all three motions.  I'll take these issues under

25   consideration.  I'll try and get an order, or orders, out

EXHIBIT __13__
PAGE __220__

REPORTER'S TRANSCRIPT OF PROCEEDINGS          08/06/09

1   very promptly, because I know it affects your scheduling,

2   both for witnesses and for scheduling your work, and that

3   sort of thing during what will -- for most people is a

4   vacation period, although my expectation is that there

5   won't be a lot of vacationing going on for folks in this

6   room in August and September, but I'll get these orders

7   out right away.

8        Thank you all for your arguments.  They were

9   excellent.  This is the first time we've heard from

10   Mr. Villar and also from you, so -- I think -- so I

11   appreciate your professionalism.  And everyone go have a

12   great week.  Take care.

13   ///

14   ///

15

16

17

18

19

20

21

22

23

24

25

63

EXHIBIT ___13___

PAGE ___221___

1    I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby certify:

3    That the foregoing proceedings were taken

4  before me at the time and place herein set forth; that

5  any witnesses in the foregoing proceedings, prior to

6  testifying, were duly sworn; that a record of the

7  proceedings was made by me using machine shorthand

8  which was thereafter transcribed under my direction;

9  that the foregoing transcript is a true record of the

10  testimony given.

11    Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [  ] was [  ] was not requested.

15    I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or party to this action.

18    IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated:    AUG 0 7 2009

22

23    _Cheryl R. Kamalski._

     CHERYL R. KAMALSKI

24    CSR No. 7113

25



EXHIBIT 12
PAGE 222

# EXHIBIT 14

EXHIBIT FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 15

6191

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                 EASTERN DIVISION

4                   - - -

5       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                   - - -

7   MATTEL, INC.,                    )

8                PLAINTIFF,          )

9        VS.                         )    NO. CV 04-09049

10  MGA ENTERTAINMENT, INC., ET. AL.,)

11               DEFENDANTS.         )    TRIAL DAY 31
                                     )    MORNING SESSION
12  AND CONSOLIDATED ACTIONS,        )    PAGES 6191-6350
                                     )
13

**CERTIFIED COPY**

14

15     REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16            RIVERSIDE, CALIFORNIA

17          THURSDAY, AUGUST 7, 2008

18               8:13 A.M.

19

20

21

22

23          THERESA A. LANZA, RPR, CSR
          FEDERAL OFFICIAL COURT REPORTER
24          3470 12TH STREET, RM. 134
          RIVERSIDE, CALIFORNIA  92501
25             951-274-0844
          WWW.THERESALANZA.COM

EXHIBIT 15
PAGE 281

6277

1    COMPETITIVE PRODUCTS BECAME SUCCESSFUL IN THE U.S.A. THAT TOOK

2    AWAY FROM BRATZ.  HANNAH MONTANA DOLL WAS ONE.  HIGH SCHOOL

3    MUSICAL WAS ANOTHER ONE.  WEBKINZ, WHO --

4            MR. PRICE:  YOUR HONOR, BEYOND THE SCOPE OF THE

5    QUESTION, WHICH WAS A DATE.

6            THE COURT:  LISTEN CAREFULLY TO THE QUESTION.  LET'S

7    NOT ADD ADDITIONAL INFORMATION.

8            THE WITNESS:  I THINK I DID SAY 2007.

9            THE COURT:  THANK YOU.

10   BY MR. PRICE:

11   Q    NOW THAT WE'VE GOT THE DATE, I'D LIKE YOU TO LOOK AT

12   EXHIBIT 4947.

13   A    YES.

14   Q    AND IF WE TURN TO THE LAST PAGE OF THIS, 4947, PAGE 4,

15   THIS WAS INFORMATION THAT WAS CREATED ON OCTOBER 25TH OF 2007;

16   CORRECT?

17   A    THAT'S THE DATE OF THAT DOCUMENT, YES.

18   Q    AND THIS WAS CREATED BY SOMEONE AT MGA AT YOUR REQUEST SO

19   MGA COULD RESPOND TO MATTEL AND GIVE US ALL DOCUMENTS RELATING

20   TO YOUR NET WORTH; CORRECT?

21   A    I KNOW THAT AT MY DEPOSITION, MR. ZELLER ASKED ME THAT

22   QUESTION.  I THOUGHT THAT WAS PREPARED IN REGARDS TO THIS

23   LITIGATION.  I SUBSEQUENTLY FOUND OUT THAT WAS NOT THE CASE,

24   AND I ALSO SUBSEQUENTLY FOUND OUT THAT SOME OF THIS INFORMATION

25   IN THIS PAPER IS INACCURATE AND RELATES BACK TO YEARS BEFORE.

EXHIBIT __15__
PAGE __382__

6278

1   Q    IN ANY EVENT, THIS WAS WHAT WAS PRODUCED BY MGA IN

2   RESPONSE TO THAT REQUEST FOR INFORMATION CONCERNING YOUR NET

3   WORTH; CORRECT?

4   A    TO THE BEST OF MY RECOLLECTION, YES.

5   Q    AND ON THIS DATE, OCTOBER 25, 2007 -- AND THIS IS FAR

6   ALONG INTO 2007 THAT YOU HAD NOTICED TRENDS AND WHAT WAS

7   HAPPENING WITH THE MARKET; CORRECT?

8   A    YES.

9   Q    SO AS OF THIS DATE, WHAT YOU GAVE TO MATTEL, IN JANUARY OF

10  2008, WAS THIS FIGURE HERE OF A NET WORTH OF $1.9 BILLION AND

11  THE VALUE OF MGA ENTERTAINMENT, YOUR PORTION, OF $1.6 BILLION;

12  CORRECT?

13          MR. NOLAN:   OBJECTION.  AND ALSO THE CHARACTERIZATION

14  THAT THIS WAS PREPARED FOR PURPOSES OF THIS LITIGATION.

15          THE COURT:   REPHRASE YOUR QUESTION.

16          MR. NOLAN:   IT'S ARGUMENTATIVE AND IT'S LACK OF

17  FOUNDATION.

18  BY MR. PRICE:

19  Q    WHAT WAS GIVEN TO MATTEL IN RESPONSE TO A REQUEST FOR

20  DOCUMENTS CONCERNING YOUR NET WORTH IN JANUARY OF 2008 WAS THIS

21  DOCUMENT, CORRECT, WHICH LISTED MGA'S VALUE -- YOUR PERCENTAGE

22  AS $1.6 BILLION AND YOUR NET ASSETS AS $1.9 BILLION?  THAT'S

23  WHAT YOU GAVE US; RIGHT?

24  A    YES.  AND I SAID THAT FIGURE IS A MISTAKE.

25          MAY I EXPLAIN?

EXHIBIT __/5__

PAGE __283__

6279

1  Q    YOU WANT TO EXPLAIN SOMETHING NOW AS TO WHY THIS IS

2  INACCURATE.

3         HAVE YOU EXPLAINED TO MATTEL PRIOR TO 10:25 A.M. THIS

4  DATE WHY THE DOCUMENT YOU GAVE US, WHICH REFLECTED YOUR NET

5  WORTH, IS NOT ACCURATE?

6  A    I BELIEVE OUR ATTORNEYS HAVE; AND YOU KNOW ABOUT IT.

7  Q    SIR, I'M TALKING ABOUT EVENTS OCCURRING PRIOR TO THE START

8  OF THIS TRIAL -- LET ME ASK YOU, YOU'RE SAYING THAT THIS IS NOT

9  ACCURATE AS OF OCTOBER 25, 2007; RIGHT?

10 A    I'M SAYING THAT DOCUMENT, THAT VALUE OF MGA ENTERTAINMENT,

11 INC., AS OF 2007, IS INACCURATE.

12        AND IF YOU WANT THE JURY TO KNOW WHY, I WILL BE HAPPY

13 TO EXPLAIN IT.

14 Q    LET ME GIVE YOU A PRECISE QUESTION.

15        PRIOR TO RIGHT NOW, HAVE YOU EVER GIVEN ANY

16 EXPLANATION AS TO WHY, AS OF OCTOBER 25, 2007, THE DOCUMENT YOU

17 PREPARED, OR WAS PREPARED AT MGA, IS NOT ACCURATE?

18 A    I BELIEVE AUDITOR GAVE YOU FULL EXPLANATION AND

19 DOCUMENTATION WHY THAT THING IS NOT ACCURATE.  AND THOSE

20 HAPPENED WAY PRIOR TO 10:25 OR 10:30 TODAY.

21 Q    I'M SAYING NOT ACCURATE AS OF OCTOBER 25, 2007, NOT

22 CHANGES SINCE THEN.

23        I'M SAYING, HAVE YOU EVER, IN WRITING OR UNDER OATH

24 OR IN A PAPER, SAID ANYTHING AS TO WHY THIS NUMBER, AS OF THIS

25 DATE, WAS NOT ACCURATE?

EXHIBIT _15_
PAGE _284_

1   A   BESIDES WHAT I TESTIFIED, I CANNOT ADD ANYTHING MORE.

2   AND, AGAIN, I WOULD LIKE TO GIVE AN EXPLANATION SO THE JURY

3   KNOWS THE FACTS.

4   Q   AND MR. NOLAN CAN ASK YOU, AND I CAN EXAMINE YOU ON THAT.

5           THE COURT:   MR. PRICE, WE'RE GOING TO TAKE A BREAK

6   HERE FOR THE COURT REPORTER.

7           (BRIEF RECESS TAKEN.)

8           (WHEREUPON, JURORS ENTER COURTROOM.)

9           THE COURT:   COUNSEL, YOU MAY CONTINUE.

10          MR. PRICE:   I'VE RUN OUT OF TIME, SO YOU CAN HIT

11  MGA'S SIDE NOW.

12          THE COURT:   MR. NOLAN.

13          MR. NOLAN:   THANK YOU.

14                   RECROSS-EXAMINATION

15  BY MR. NOLAN:

16  Q   JUST VERY BRIEFLY, MR. LARIAN.

17          THE LIST OF ASSETS, NET WORTH, THAT MR. PRICE WAS

18  ASKING YOU ABOUT, DO YOU BELIEVE THAT IS AN ACCURATE REFLECTION

19  OF YOUR NET WORTH AS OF TODAY?

20  A   IT IS NOT.

21          MR. NOLAN:   THANK YOU.  NOTHING FURTHER.

22          THE COURT:   ANYTHING FURTHER?

23          MR. PRICE:   NO.

24          THE COURT:   YOU MAY STEP DOWN.

25          PLAINTIFF'S NEXT WITNESS?

EXHIBIT _15_
PAGE _885_

THURSDAY, AUGUST 7, 2008            TRIAL DAY 31, MORNING SESSION

6281

1        **MR. QUINN:**  YOUR HONOR, MATTEL CALLS MIKE WAGNER.

2        (CLERK GIVES OATH.)

3        **THE CLERK:**  DO YOU SOLEMNLY STATE THAT THE TESTIMONY

4   YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL

5   BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO

6   HELP YOU GOD.

7        **THE WITNESS:**  YES, I DO.

8        **THE CLERK:**  PLEASE STATE YOUR FULL NAME AND SPELL

9   YOUR LAST NAME FOR THE RECORD.

10        **THE WITNESS:**  MICHAEL JOSEPH WAGNER, W-A-G-N-E-R.

11                    **DIRECT EXAMINATION**

12   BY MR. QUINN:

13   Q    GOOD MORNING, MR. WAGNER.

14   A    GOOD MORNING.

15   Q    WHAT IS IT THAT YOU DO?

16   A    I'M A MANAGEMENT CONSULTANT SPECIALIZING IN ANALYZING

17   FINANCIAL ISSUES, MATTERS THAT ARE IN DISPUTE.

18   Q    AS A FINANCIAL EXPERT, LITIGATION CONSULTANT, WHAT KINDS

19   OF THINGS DO YOU DO?

20   A    THE THINGS I NORMALLY DO ARE CALCULATE COMMERCIAL DAMAGES

21   IN CIVIL LITIGATION OR I VALUE BUSINESSES IN CASES THAT ARE IN

22   DISPUTE.

23   Q    HOW LONG HAVE YOU BEEN A FINANCIAL EXPERT?

24   A    FOR 31 YEARS.

25   Q    HAVE YOU TESTIFIED IN COURT AS AN EXPERT IN FINANCIAL

EXHIBIT _/5_

PAGE _766_

# EXHIBIT 16

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION

4                 - - -

5      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                 - - -

7   MATTEL, INC.,                    )

8                    PLAINTIFF,       )

9           VS.                       )   NO. CV 04-09049

10  MGA ENTERTAINMENT, INC., ET. AL., )

11                   DEFENDANTS.      )   TRIAL DAY 31
                                          MORNING SESSION
12  AND CONSOLIDATED ACTIONS,         )   PAGES 6191-6350

13

14

15     REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17            THURSDAY, AUGUST 7, 2008

18                 8:13 A.M.

19

20

21

22

23            THERESA A. LANZA, RPR, CSR
          FEDERAL OFFICIAL COURT REPORTER
24           3470 12TH STREET, RM. 134
          RIVERSIDE, CALIFORNIA  92501
25             951-274-0844
          WWW.THERESALANZA.COM

**CERTIFIED COPY**

EXHIBIT __16__
PAGE __288__

6246

1    NET WORTH; CORRECT?

2    A    AGAIN, TO THE BEST OF MY KNOWLEDGE, YES.

3    Q    AND THIS IS THE ONLY CALCULATION PROVIDED TO MATTEL PRIOR

4    TO THE START OF THIS TRIAL; CORRECT?

5    A    I DO NOT KNOW THAT.

6    Q    BY THE WAY, I WAS PREVIOUSLY ASKING ABOUT AUDITED

7    FINANCIAL RECORDS, AND I THINK THE LAST YEAR WE HAD WAS

8    EXHIBIT 659, WHICH WAS THE YEAR 2006.

9         THAT IS THE LAST INDEPENDENTLY-AUDITED FINANCIAL

10   RECORD THAT MGA HAS; IS THAT CORRECT?

11   A    I WOULD NOT KNOW IF THAT'S CORRECT OR NOT.  AGAIN, I DO

12   MOST OF THE CREATIVE WORK, AND WE HAVE AN ACCOUNTING

13   DEPARTMENT, SO I DON'T KNOW IF WE HAVE AN AUDITED FINANCIAL

14   STATEMENT AFTER THIS OR NOT.  I DO NOT KNOW.

15   Q    THANK YOU, MR. LARIAN.

16         MR. PRICE:  NO FURTHER QUESTIONS, YOUR HONOR.

17         THE COURT:  CROSS-EXAMINATION?

18              CROSS-EXAMINATION

19   BY MR. NOLAN:

20   Q    GOOD MORNING, MR. LARIAN.

21         I WANT TO GO BACK TO WHAT MR. PRICE JUST SHOWED YOU.

22   THAT WAS EXHIBIT 4947, A LIST OF YOUR PERSONAL ASSETS.

23         DO YOU HAVE THAT?

24   A    GO AHEAD.

25   Q    DO YOU HAVE THAT IN FRONT OF YOU?

EXHIBIT _16_
PAGE _789_

6247

1    A    I DO.

2    Q    4947 WAS PRODUCED AS PART OF THIS LITIGATION; CORRECT?

3    A    I DON'T KNOW IF IT WAS OR NOT.

4    Q    DID YOU PERSONALLY PREPARE THIS LIST OF ASSETS?

5    A    I DID NOT.

6    Q    I WANT TO DRAW YOUR ATTENTION, IF I MIGHT, TO THE LINE

7    ITEM ON THIS REFERRING TO THE VALUE OF MGA.

8         DO YOU SEE THAT?

9    A    I DO SEE IT ON MY PAPER.

10   Q    WE'LL HIGHLIGHT THAT.

11        NOW, FIRST OF ALL, IT REFERS TO MGA ENTERTAINMENT AS

12   AN S-CORP.

13        DO YOU SEE THAT?

14   A    YES, I DO.

15   Q    AND THEN THE VALUE THAT'S ATTACHED IS $1.2 BILLION;

16   CORRECT?

17   A    YES.

18   Q    TOTAL ASSETS OF ABOUT $1,347,000,000.

19        DO YOU SEE THAT?

20   A    I DO.

21   Q    SO THE GREATEST PERCENTAGE OF YOUR NET WORTH IS TIED TO

22   THE VALUE OF MGA; CORRECT?

23   A    CORRECT.

24   Q    NOW, DO YOU NOW HAVE KNOWLEDGE -- WELL, FIRST OF ALL, IS

25   THAT WHAT YOUR VALUE OF MGA WAS AS OF 2007?

EXHIBIT _16_
PAGE _290_

6248

```
 1   A    I WOULD NOT KNOW.

 2   Q    HAVE YOU HAD CONVERSATIONS WITH LISA TONNU ABOUT WHAT

 3   INFORMATION WAS USED TO PREPARE THIS CALCULATION?

 4   A    YES.

 5   Q    AND DO YOU KNOW NOW WHAT THE $1.2 BILLIONS VALUE OF MGA

 6   WAS BASED ON, WHAT YEAR?

 7           MR. PRICE:   OBJECTION.  THAT'S HEARSAY.

 8           THE COURT:   LAY A FOUNDATION, COUNSEL.

 9   BY MR. NOLAN:

10   Q    I'LL GO BACK IN TIME.

11           IS IT TRUE, MR. LARIAN -- LET'S APPROACH IT THIS WAY:

12   THE FINANCIAL PERFORMANCE OF THE BRATZ LINE --

13   A    YES.

14   Q    -- AT THE END OF 2007, WAS IT YOUR UNDERSTANDING THAT THE

15   BRATZ LINE WAS PERFORMING, THAT IS SELLING, AS PROFITABLY AS IT

16   HAD IN THE YEAR 2005?

17   A    IT WAS NOT.

18   Q    AND CAN YOU EXPLAIN THE DIFFERENCE BETWEEN THE PERFORMANCE

19   OF BRATZ IN 2005 AND 2007.

20   A    TO THE BEST OF MY KNOWLEDGE, THE BRATZ LINE DROPPED ABOUT

21   30 TO 40 PERCENT IN 2007, DUE TO SEVERAL FACTORS.

22   Q    WHAT WERE THOSE FACTORS?

23           MR. PRICE:   OBJECTION.  SPECULATION; LACK OF

24   FOUNDATION.

25           THE COURT:   SUSTAINED.
```

EXHIBIT _16_
PAGE _291_

THURSDAY, AUGUST 7, 2008          TRIAL DAY 31, MORNING SESSION

6249

1          LAY A FURTHER FOUNDATION, COUNSEL.

2    **BY MR. NOLAN:**

3    Q    AS THE CEO AND THE LARGEST MAJOR SHAREHOLDER OF AN

4    S CORPORATION KNOWN AS MGA, DO YOU HAVE INFORMATION WITH

5    RESPECT TO THE FINANCIAL PERFORMANCE AT VARIOUS TIMES?

6    A    I DO.

7    Q    AND DO YOU RECEIVE REGULAR REPORTS WITH RESPECT TO

8    REVENUES BY MGA, AND IN PARTICULAR, THE BRATZ LINE?

9    A    I DO.

10    Q    AND YOU REVIEW THAT INFORMATION?

11    A    SOMETIMES I DO.

12    Q    AND DO YOU MAKE ANY ATTEMPT TO DETERMINE WHETHER OR NOT

13    THE BRATZ LINE IS SELLING AT A CERTAIN LEVEL OR DECLINING OR

14    INCREASING?

15    A    I DO THAT REGULARLY.

16    Q    SO BASED ON YOUR REVIEW OF AVAILABLE FINANCIAL REPORTS, DO

17    YOU ALSO TRY TO ANALYZE WHAT IS CONTRIBUTING EITHER TO THE

18    SUCCESS OF THE LINE OR TO THE DECLINING NATURE OF THE LINE?

19    A    I DO ON A REGULAR BASIS.

20    Q    AND CAN YOU EXPLAIN TO THE JURY WHAT YOU DO IN THAT

21    REGARD.  WHAT DO YOU DO TO TRY TO FIGURE OUT WHAT'S AFFECTING

22    YOUR BUSINESS?

23    A    I LOOK AT COMPETITION, WHAT COMES IN THE MARKET.  I LOOK

24    AT WHAT WE CALL POS, RATE OF SALES AT RETAIL.  I LOOK AT THOSE

25    REGULARLY, AND THEN COMPARE IT TO THE YEAR BEFORE.  I LOOK AT

EXHIBIT 16
PAGE 292

THURSDAY, AUGUST 7, 2008              TRIAL DAY 31, MORNING SESSION

6350

1

2   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED

3   STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-

4   ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

5   THE UNITED STATES.

6      8-8-08

7   THERESA A. LANZA, CSR, RPR                    DATE
    FEDERAL OFFICIAL COURT REPORTER

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   EXHIBIT ___16___
25   PAGE ___293___

THURSDAY, AUGUST 7, 2008                TRIAL DAY 31, MORNING SESSION

# Exhibit 17

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 090378)
2      johnquinn@quinnemanuel.com
      Michael T. Zeller (Bar No. 196417)
3      (michaelzeller@quinnemanuel.com)
      Jon D. Corey (Bar No. 185066)
4      (joncorey@quinnemanuel.com)
      865 South Figueroa Street, 10th Floor
5   Los Angeles, California 90017-2543
    Telephone: (213) 443-3000
6   Facsimile: (213) 443-3100

7   Attorneys for Plaintiff Mattel, Inc.

8

9                  UNITED STATES DISTRICT COURT

10                CENTRAL DISTRICT OF CALIFORNIA

11                       EASTERN DIVISION

12   CARTER BRYANT, an              CASE NO. CV 04-9049 SGL (RNBx)
     individual,
13                                  Consolidated with Case Nos. CV 04-09059
              Plaintiff,            and CV 05-02727
14
         vs.                        **DISCOVERY MATTER**
15
     MATTEL, INC., a Delaware       **[To Be Heard By Discovery Master Robert**
16   corporation,                   **O'Brien]**

17            Defendant.            MATTEL, INC.'S REPLY IN SUPPORT OF
                                    MOTION TO COMPEL RESPONSES TO
18                                  MATTEL, INC.'S FIRST SET OF
     AND CONSOLIDATED               INTERROGATORIES (PHASE 2) TO
19   ACTIONS                        ISAAC LARIAN

20
                                    Date:  TBD
21                                  Time:  TBD
                                    Place: TBD
22
                                    Discovery cut-off: December 11, 2009
23                                  Pre-trial Conference: March 1, 2010
                                    Trial Date: March 23, 2010
24

25

26

27

28

00505.07975/2992111.2
                                              Case No. CV 04-9049 SGL (RNBx)

EXHIBIT __17__
PAGE __294__

# <u>TABLE OF CONTENTS</u>

| | | <u>Page</u> |
|---|---|---|
| PRELIMINARY STATEMENT | | 1 |
| ARGUMENT | | 3 |
| I. | MATTEL'S TWO INTERROGATORIES ARE DIRECTLY RELEVANT TO ITS PHASE 2 CLAIMS AND ARE NOT OVERBROAD | 3 |
| | A. Larian Concedes That The Interrogatories Are Relevant To Mattel's RICO Claims | 3 |
| | B. The Interrogatories Are Also Relevant to Mattel's Other Claims | 5 |
| | C. The Interrogatories Are Not Overbroad | 7 |
| II. | THE INTERROGATORIES ARE NOT VAGUE, AMBIGUOUS, OR UNDULY BURDENSOME | 10 |
| | A. Interrogatory No. 1 Is Perfectly Understandable. | 11 |
| | B. Interrogatory No. 2 Is Not Vague and Ambiguous | 11 |
| | C. The Interrogatories Are Not Unduly Burdensome | 13 |
| III. | THE INTERROGATORIES ARE NOT COMPOUND | 13 |
| IV. | MATTEL MET AND CONFERRED IN GOOD FAITH CONCERNING THE INTERROGATORIES | 15 |
| CONCLUSION | | 15 |

EXHIBIT 17
PAGE 895

# TABLE OF AUTHORITIES

**Page**

## Cases

Allwaste, Inc. v. Hecht,
  65 F.3d 1523 (9th Cir. 1995)................................................................8

Branco v. Life Care Centers of America, Inc.,
  2006 WL 4484727 (W.D. Wash. May 6, 2006)..........................10

Del Campo v. Am. Corrective Counseling Servs., Inc., Slip op.,
  2008 WL 4858502 (N.D. Cal. Nov. 10, 2008)...................4, 10

Deutsch v. Flannery,
  823 F.2d 1361 (9th Cir. 1987)..........................................6

Floyd-Mayers v. American Cab Co.,
  1990 WL 116855 (D.D.C. July 30, 1990).............................8

Halperin v. Berlandi,
  114 F.R.D. 8 (D. Mass. 1986).......................................8

Jackson v. Montgomery Ward & Co., Inc.,
  173 F.R.D. 524 (D. Nev. 1997)....................................13

Mead Corp. v. Riverwood Natural Res. Corp.,
  145 F.R.D. 512 (D. Minn. 1992)...................................12

Monaghan v. SZS 33 Assocs., L.P.,
  1992 WL 135821 (S.D.N.Y. June 1, 1992).......................12

Oakes v. Halvorsen Marine Ltd.,
  179 F.R.D. 281 (C.D. Cal. 1998)...................................8

Pulsecard, Inc. v. Discover Card Servs., Inc.,
  168 F.R.D. 295 (D. Kan. 1996)................................11, 12

Ramirez v. Nicholson,
  2007 WL 2990283 (S.D. Cal. 2007)...............................3

Southern Cal. Housing Rights Center v. Krug,
  2006 WL 4122148 (C.D. Cal. Sept. 5, 2006).....................7

United States v. Estacio,
  64 F.3d 477 (9th Cir. 1995)(i).......................................4

United States v. Richard,
  234 F.3d 763 (1st Cir. 2000).........................................4

EXHIBIT _17_
PAGE _296_

 1   Warfield v. AdVnt Biotechnologies, LLC, Slip Op.,
 2        2008 WL 4163248 (D. Ariz. Sept. 5, 2008) ........................................... 9

 3   Zatkin v. Primuth,
          551 F. Supp. 39 (S.D. Cal. 1982) ........................................................ 6
 4

 5                                       **Statutes**

 6   18 U.S.C. § 152(7) ...................................................................................... 4

 7   18 U.S.C. § 1956(a) .................................................................................... 4

 8   18 U.S.C. § 1957(a) .................................................................................... 4

 9   Cal. Bus. & Prof. Code § 17200 ................................................................ 7

10   Cal. Civil Code § 3439 ............................................................................... 5

11   Fed. R. Civ. P. 26 ....................................................................................... 5

12   Fed. R. Civ. P. 26(b)(1) .......................................................................... 3, 10

13   Fed. R. Civ. P. 33(a) ................................................................................. 13

14   Fed. R. Civ. P. 33(b)(1) ................................................................. 10, 11, 12

15   Fed. R. Civ. P. 37(a)(1) ............................................................................ 15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT   17
PAGE   297

## Preliminary Statement

The financial transactions in which Larian and his alter egos have engaged are unquestionably directly at issue in Phase 2. The two interrogatories at issue in this motion are designed to elicit crucial information about those transactions -- much of the responsive investment information would constitute not just evidence but, in and of themselves, acts of liability. Although Larian does not dispute that Mattel is entitled to information concerning transactions he has carried out or that others have carried out on his behalf or at his direction, nor that the two interrogatories at issue will elicit such information, he has refused to provide any responsive information at all. That refusal is unjustifiable.

Larian argues that his obstructionism should be condoned because the interrogatories hypothetically might require disclosure of a small subset of inadmissible information (along with, of course, much relevant information). Discovery is not nearly so limited -- interrogatories are not overbroad merely because not every bit of responsive information would be admissible at trial. The allegations in Mattel's Third Amended Answer and Counterclaims ("TAAC") directly place at issue the financial dealings of Larian, his family members and the trusts and other entities they control, many of whom are specifically named in the TAAC as members of an ongoing RICO enterprise. Larian does not even argue, let alone show, that the information sought by the interrogatories is irrelevant to Mattel's RICO allegations. Although he half-heartedly asserts that the interrogatories are not relevant to Mattel's fraudulent transfer and unfair competition claims, Larian's real complaint seems to be that it is unfair for Mattel's TAAC to place Larian's wide-ranging unlawful financial schemes directly at issue.[1] This discovery motion is not the place for that argument which was, in any event,

---

[1] See, e.g., Opp. at 20. (arguing that "Mattel's objective in filing its TAC seems to have been to manufacture a basis for its harassing discovery").

EXHIBIT 17
PAGE 298

1  rejected when Judge Larson granted Mattel leave to file the Third Amended Answer

2  and Counterclaims ("TAAC").

3        Larian's financial dealings being plainly relevant, the Opposition

4  strains to create supposed "vagueness," going so far as to argue that Mattel's "use of

5  the word 'it'" is "grammatically and logically unintelligible."[2] Firstly, Larian is

6  obligated to respond to the extent he understands the requests -- and considering that

7  some trusts are identified by name in the definition Larian quibbles with, most of

8  the definition is not even arguably unclear to a reasonable person.   Larian

9  nevertheless has failed to provide any information even to that extent. Moreover,

10  some degree of ambiguity -- even if there were any -- is scarcely fatal to discovery

11  requests.   If a party can apply common sense and understand what is being

12  requested, the party is obligated to respond.  Courts have long held that semantic

13  skirmishes such as Larian's are improper.   Mattel's interrogatories are easily

14  understood; "vagueness" does not justify Larian's blanket stonewalling.

15        Lastly, rehashing defendants' now stereotyped justification for refusing

16  any discovery, Larian offers a five-page missive on Mattel's purported failure to

17  meet and confer in good faith prior to filing its motion. But Mattel's decision not to

18  narrow proper interrogatories does not constitute a failure to meet and confer.  To

19  the contrary, Larian admits that the parties exchanged *six* letters and held two

20  lengthy telephone calls with multiple attorneys attempting to resolve the matter.  It

21  is Larian's repeated refusal to provide *any* response whatsoever that precipitated

22  Mattel's motion and prevented any narrowing of the issues now before the

23  Discovery Master.

24

25

26

27

28    [2] Opp. at 6:22-23.

EXHIBIT  17
PAGE  299

<u>**Argument**</u>

I.    <u>**MATTEL'S TWO INTERROGATORIES ARE DIRECTLY**</u>
      <u>**RELEVANT TO ITS PHASE 2 CLAIMS AND ARE NOT**</u>
      <u>**OVERBROAD**</u>

      "The Federal Rules allow for broad discovery in civil actions. Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." <u>Ramirez v. Nicholson</u>, 2007 WL 2990283, at *2 (S.D. Cal. 2007) (quoting <u>Fed. R. Civ. P.</u> 26(b)(1)).

    A.    <u>**Larian Concedes That The Interrogatories Are Relevant To**</u>
         <u>**Mattel's RICO Claims**</u>

      Larian's 24-page opposition does not dispute that Mattel's interrogatories are directly relevant to its RICO claims. The interrogatories seek information concerning transactions carried out by Larian, his family members and trust entities that are specifically alleged to be Larian alter egos,[3] virtually all of whom are specifically named as RICO enterprise members in Mattel's Third Amended Answer and Counterclaims ("TAAC").[4] Mattel's RICO claims allege a pattern of financial fraud involving these individuals and trusts, including allegations that they have transferred the ill-gotten funds they have obtained by virtue of their unlawful conduct against Mattel, siphoned assets out of MGA, laundered their profits, attempted to conceal their assets and attempted to obscure that wrongful conduct.[5]

      Information concerning financial transactions in which these individuals and trusts have engaged is plainly relevant to these allegations. In fact, this discovery is crucial -- more than just evidence, the transactions Mattel seeks to

---

[3] TAAC. at 32-33, ¶¶ 17, 19, Zeller Decl., Exh. 8.
[4] <u>Id.</u>, at 71-73, ¶¶ 136, 138, Zeller Decl., Exh. 8.
[5] <u>Id.</u>, at 60-68, ¶¶ 105-126, at 70-80, ¶¶ 133-145, at 95-96, ¶¶ 217-222, Zeller Decl., Exh. 8.

EXHIBIT __17__
PAGE __300__

1   discover are themselves predicate acts giving rise to liability. Sec, e.g., 18 U.S.C. §

2   1956(a) (liability for money laundering, including conducting financial transactions

3   involving proceeds of unlawful activity); 18 U.S.C. § 1957(a) (liability for engaging

4   in monetary transactions with property derived from unlawful conduct); see also

5   United States v. Richard, 234 F.3d 763, 767 (1st Cir. 2000) (A violation of section

6   1957(a) is proven when defendant "(1) knowingly engaged or attempted to engage

7   in a monetary transaction (2) in criminally derived property (3) of a value greater

8   than $10,000, and (4) derived from specified unlawful activity"); United States v.

9   Estacio, 64 F.3d 477, 480 (9th Cir. 1995) (Money laundering under 1956(a)(1)(A)(i)

10  is proven where "the defendant (1) was involved in an actual or attempted financial

11  transaction, (2) which the defendant then knew involved the proceeds of unlawful

12  activity, (3) with the intent to promote specified unlawful activity").[6] The discovery

13  now at issue calls for the disclosure of acts of liability which more than meets the

14  standards for relevance under the Federal Rules.

15          Moreover, discovery into Larian's and his alter egos' financial

16  transactions is very likely to provide admissible evidence on the RICO claims even

17  where the transactions do not themselves constitute criminal acts. For example,

18  Mattel has alleged predicate acts of asset concealment, which includes unlawful

19  transfers of assets in contemplation of bankruptcy. See 18 U.S.C. § 152(7).[7] Mattel

20  is clearly entitled to take discovery into Larian's and his alter egos' investments, and

21  the timing thereof, to develop a link in the chain showing that assets siphoned from

22  MGA were then transferred to other entities (including Omni 808) in contemplation

23  of bankruptcy. See Del Campo v. Am. Corrective Counseling Servs., Inc., Slip op.,

24  2008 WL 4858502, at *3-4 (N.D. Cal. Nov. 10, 2008) (granting party's motion to

25  compel on the grounds that under the broad scope of discovery, evidence of

26

27  [6]  See TAAC, at 70-80, ¶¶ 133-145 (pleading such predicate acts), Zeller Decl., Exh. 8.
    [7]  TAAC at 78-79 ¶ 141(h), Zeller Decl., Exh. 8.
28

EXHIBIT  17
PAGE  301

1   siphoning corporate assets, misuse of assets of individual by corporation, and

2   commingling of funds was reasonably calculated to lead to the discovery of

3   admissible evidence regarding a determination of defendant corporation's alter ego

4   status).

5           Larian does not dispute that the interrogatories are relevant to Mattel's

6   RICO claims.  The Discovery Master should overrule his relevance objections.

7         **B.**    <u>**The Interrogatories Are Also Relevant to Mattel's Other Claims**</u>

8           The interrogatories are also relevant to numerous other Phase 2 claims

9   and issues.  Larian complains, as to Mattel's fraudulent transfer claims, that Mattel

10  has not sufficiently explained "*how* the information requested by the Interrogatories

11  will enable" Mattel to prove these claims.  Opp. at 18:22-24 (emphasis in original).

12  Mattel need only show that the interrogatories are "reasonably calculated to lead to

13  the discovery of admissible evidence," <u>Fed. R. Civ. P.</u> 26, and they plainly are.

14  Mattel's claims target the unlawful transfers of assets out of MGA to IGWT, Larian

15  and others, including his alter ego trusts.  <u>Cal. Civil Code</u> § 3439 *et seq.*[8]  The

16  investments made by Larian and his alter egos, and the timing and amounts thereof,

17  are plainly material to these claims -- only through discovery of such investments

18  can Mattel trace the funds that Larian siphoned from MGA.  Indeed, these

19  investments themselves may be subject to unwinding under the fraudulent transfer

20  claim.  <u>Cal. Civil Code</u> § 3439.07.  Larian erroneously states that the interrogatories

21  are not relevant to the fraudulent transfer claims because they seek information from

22  "a host of persons and entities *other than* Larian."  Opp. at 19:1 (emphasis in

23  original).  But of course, Mattel's TAAC is not limited to Larian; Larian has used

24  his trusts and other alter egos to conduct the unlawful conduct at issue in Phase 2.[9]

25  Those are the persons and entities about which information is sought.

26

27  [8] <u>See, e.g.</u>, TAAC, at 32-33, ¶¶ 17-19, Zeller Decl., Exh. 8.

28  [9] <u>Id.</u>

EXHIBIT __17__
PAGE __302__

1    Citing no authority, Larian suggests that the <u>pleading</u> requirements of

2    <u>Rule</u> 9(b) somehow restrict the fraudulent transfer discovery to which Mattel is

3    entitled. Given that Judge Larson has approved Mattel's TAAC, and the MGA

4    Parties have filed an answer, the argument is meritless. It is also legally incorrect.

5    By its terms, <u>Rule</u> 9(b) applies to allegations of fraud or mistake in pleadings, not to

6    the scope of discovery. Where, as here, fraud evidence lies in the hands of

7    defendants, discovery is essential to discover the full extent of the fraud; discovery

8    is not limited to matters strictly alleged in the pleadings. <u>See, e.g.</u>, <u>Deutsch v.</u>

9    <u>Flannery</u>, 823 F.2d 1361, 1366 (9th Cir. 1987) ("<u>Rule</u> 9(b) does not ... require

10   plaintiffs in a securities fraud case to set forth facts which, because no discovery has

11   yet occurred, are in the exclusive possession of the defendants") (internal quotations

12   omitted); <u>Zatkin v. Primuth</u>, 551 F. Supp. 39, 42 (S.D. Cal. 1982) (stating that <u>Rule</u>

13   9(b) does not apply "where, as in cases of corporate fraud, the plaintiffs cannot be

14   expected to have personal knowledge of the facts constituting the wrongdoing"). In

15   any case, <u>Rule</u> 9(b)'s particularity requirements do not apply to Mattel's other claims

16   arising out of these illegal transactions, including its RICO claims, so Larian's

17   contention cannot preclude discovery for this independent reason.

18   The interrogatories are also relevant to other issues. Larian hardly

19   disputes the relevance of his and his alter egos' unlawful investments to Mattel's

20   unfair competition claims either. Larian argues that the Discovery Master

21   previously erred in granting discovery concerning Larian's ownership and control of

22   the IGWT entities based on the Court's December 3, 2008, Constructive Trust

23

24

25

26

27

28

00505.07975/2992111.2

EXHIBIT ___17___
PAGE ___303___

1  Order, Opp. at 20-21, but that is both wrong[10] and immaterial -- Mattel is entitled to

2  target, and take discovery into, Larian's "unlawful" conduct in any event.  Cal. Bus.

3  & Prof. Code § 17200.  Larian also concedes that it is at least "partially true" that

4  the interrogatories seek relevant information because Larian's ownership interests

5  are part of his net worth.  Opp. at 16:13-16.  Indeed, courts routinely compel

6  multiple years' worth of financial data to establish net worth.  See Southern Cal.

7  Housing Rights Center v. Krug, 2006 WL 4122148 (C.D. Cal. Sept. 5, 2006)

8  (ordering production of financial documents – including all properties owned in

9  whole or part, profit and loss statements, financial statements and balance sheets –

10  related to defendants' net worth and current assets going back three years).

11         Larian and his alter egos' financial transactions are central to Phase 2.

12  Dozens of Mattel's allegations and several of its claims are focused on them.  The

13  two interrogatories now at issue are directly designed to uncover these transactions,

14  revealing not only evidence but acts of liability.  They are highly relevant.

15         **C.    The Interrogatories Are Not Overbroad**

16         Larian's overbreadth objections ignore the nature of the unlawful

17  conduct Mattel has alleged.  Mattel alleges not only unlawful financial transactions,

18  but also their concealment.[11]   Where defendants have engaged in conduct that

19  obscures their financial condition -- as Mattel has alleged and as the Court has

20

21

22

23

---

24  [10]  Larian argues that "the Court's Constructive Trust Order did *not* impose a
constructive trust over the proceeds of the sale of Bratz products," Opp. at 21, but the

25  Court has expressly stated otherwise.  See Order After June 15, 2009 Hearing on
Accounting Issues ("[T]he scope of the products whose profits are subject to accounting

26  and escrow . . . in light of the Court's Constructive Trust Order, [] includes any and all
products that bear the 'Bratz' and 'Jade' trademarks").  Declaration of Young Ra Lee in

27  Support of Mattel, Inc's Reply ("Lee Decl.") filed concurrently, Exh. 1.
        See, e.g., TAAC, at 65-66, ¶¶ 119-120, at 68, ¶ 126, Zeller Decl., Exh. 8.

28

EXHIBIT _17_

PAGE _304_

1  expressly found as to defendants here[12] -- courts allow broad financial inquiries so
2  that accurate information may be obtained. Oakes v. Halvorsen Marine Ltd., 179
3  F.R.D. 281, 286 (C.D. Cal. 1998) ("The discovery of financial information relevant
4  to a punitive damages claim is permissible under the Federal Rules of Civil
5  Procedure, whether or not such evidence would be admissible at trial"); Floyd-
6  Mayers v. American Cab Co., 1990 WL 116855 (D.D.C. July 30, 1990) (granting
7  motion to compel broad discovery into defendant's finances where defendant's
8  conduct had placed accuracy of information in doubt).  Moreover, as noted in
9  Mattel's Motion (and as Larian does not dispute), the definition of "LARIAN
10 TRUST" is consistent with the breadth of requests the Discovery Master has already
11 compelled.  See Order No. 3, Regarding Motion of Mattel, Inc. to Compel
12 Production of Documents Responsive to the Same Non-Party Subpoenas, dated
13 March 10, 2009, at 29-30 (compelling production of documents relating to any
14 ownership interest by Larian, his spouse, his children, his siblings, or their spouses,
15 or any entity or person affiliated with them in IGWT Group or IGWT 826 and the
16 dates of such person's affiliation).

17         Given the nature of the allegations at issue in Phase 2, Larian's
18 overbreadth objections clearly fail.  Thus, it is no answer to point out, as Larian
19 does, that the interrogatories seek information going back to 2005.  Mattel's RICO
20 claims require proof of a pattern of unlawful activity.  See, e.g., Allwaste, Inc. v.
21 Hecht, 65 F.3d 1523, 1527 (9th Cir. 1995) (noting that a valid RICO claim may be
22 proved by establishing prior "long-term criminal conduct"); Halperin v. Berlandi,
23 114 F.R.D. 8 (D. Mass. 1986) (compelling eight years of prior tax returns because

24 _____

25   [12]  See Court's Omnibus Order, dated April 27, 2009, at 16 (stating that "[g]ood cause
     exists to believe that the MGA parties, defined as MGAE, MGA HK, and Isaac Larian, and
26   each of them, have engaged in, are engaging in, or are about to engage in transactions,
     acts, practices and courses of business that constitute fraudulent transfers of assets and
27   violations of Mattel's ownership and other rights"), Lee Decl., Exh. 2.

28

EXHIBIT  17
PAGE  305

1  plaintiff's RICO "pattern is best proven by linking as many acts together over as

2  long a period of time as possible"). Far from being overbroad, discovery into

3  financial transactions from a few years ago is proper and necessary.

4  Larian also argues that Interrogatory No. 1 is overbroad because,

5  hypothetically, it would require him to describe a 2005 transaction in which he

6  purchased and then later sold $2,000 in publicly traded stock. Opp. at 16:21-22.

7  But the interrogatory is already substantially limited to avoid overbreadth. It

8  requests only information from January 1, 2005 to the present and only transactions

9  in excess of $1000. In any event, if Larian acquired $2000 worth of stock in 2005

10  with profits earned from selling Bratz, and then sold that stock a few weeks later at a

11  500% profit, that transaction would indeed be directly relevant here, including as a

12  predicate act of money laundering.

13  Nor is it any answer to assert that the interrogatories are not limited to

14  investments derived from MGA assets, as Larian protests. Opp. at 18-19. Mattel's

15  claims are not so limited -- Mattel's RICO and other claims are alleged against

16  Larian individually, and he is liable for his and his alter egos' unlawful transactions

17  regardless of the source of funding.[13] Thus, even transactions not derived from

18  MGA property -- assuming any such responsive transactions exist -- can constitute

19  not only evidence but acts of liability. Mattel need not phrase its discovery such that

20  Larian's provision of responsive information would be an actual admission of

21  liability -- e.g., an admission that Larian's alter egos' investments were, in fact, made

22  with assets siphoned from MGA; indeed, Larian would complain mightily if the

23  requests had been so defined. Since the information sought here is also relevant to

24

25  [13] See, e.g., TAAC, at 31-33, ¶¶ 15-20, 60-68, ¶¶ 105-126, Zeller Decl., Exh. 8.
26  Warfield v. AdVnt Biotechnologies, LLC, Slip Op., 2008 WL 4163248 at *3 (D. Ariz. Sept. 5, 2008) ("[a] corporate officer or director is, in general, personally liable for all torts
27  which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf").

28

EXHIBIT 17
PAGE 306

1    Larian's net worth, Mattel is entitled to information about the transactions regardless
2    of the monies' sources.  Discovery is not overbroad merely because some responsive
3    information may not be actionable, as Larian's objection assumes.[14]

4

5    ## II.    THE INTERROGATORIES ARE NOT VAGUE, AMBIGUOUS, OR
6    UNDULY BURDENSOME

7           Larian concedes the interrogatories themselves are "simple," but argues
8    that the definitions of various terms are too difficult to understand.  But Larian is
9    required to respond to the extent possible, even if portions of the interrogatories are
10   purportedly vague or otherwise objectionable.  Fed. R. Civ. Proc. 33(b)(1) (a party
11   "shall answer to the extent the interrogatory is not objectionable").  Larian has
12   refused to provide *any* response.  For this reason alone, an order compelling
13   responses should issue.

14          Moreover, Larian's claims of "ambiguities" in the definitions used by
15   Mattel are meritless.   In fact, counsel for Larian has propounded interrogatories on
16   Mattel using *identical* definitions to the ones now claimed to be unintelligible.  See,
17   e.g., MGA Entertainment, Inc.'s First Set of Phase 2 Interrogatories to Mattel, Inc.
18   (defining PERSON as "all natural persons, partnerships, corporations, joint venture
19   and any kind of business, legal or public entity or organization, as well as its, his or
20   her agents, representatives, employees, officers and directors and any one else acting
21   on its, his or her behalf, pursuant to its, his or her authority or subject to its, his or
22   her control").[15]  Similarly, Larian claims Mattel's definition of "IDENTIFY" is
23   confusing, yet it does not approach the length and complexity of the seven-part

24

25      [14] "In the context of discovery, relevance has a very broad meaning."  Del Campo,
26   2008 WL 4858502, at *4.  "Relevance" under Rule 26(b)(1) is defined more broadly than
     relevance for evidentiary purposes, and discoverable information need not be admissible at
27   trial. Branco v. Life Care Centers of America, Inc.  2006 WL 4484727, at *2 (W.D. Wash.
     May 6, 2006).
28      [15]  Lee Decl., Exh. 3.

EXHIBIT 17
PAGE 307

1   definition for "IDENTIFY" used by Larian's counsel in MGA's First Set of Phase 2

2   Interrogatories to Mattel, Inc. <u>Id.</u> Far from justifying his stonewalling, Larian's

3   weak objections to Mattel's definitions illuminate his gamesmanship, and the need

4   for an order compelling compliance.

5          A.    <u>Interrogatory No. 1 Is Perfectly Understandable.</u>

6                Larian's only apparent complaint concerning Interrogatory No. 1 is its

7   use of the defined term "OWNERSHIP INTEREST." Specifically, Larian claims

8   that he cannot understand the meaning of the phrase "may possess." Opp. at 8:22-

9   26. This frivolous argument should be rejected. <u>See</u> <u>Pulsecard, Inc. v. Discover</u>

10  <u>Card Servs., Inc.</u>, 168 F.R.D. 295, 310 (D. Kan. 1996) (overruling vague and

11  ambiguous objections because "[r]espondents should exercise reason and common

12  sense to attribute ordinary definitions to terms and phrases utilized in

13  interrogatories.="").

14         B.    <u>Interrogatory No. 2 Is Not Vague and Ambiguous</u>

15                Larian again does not argue that the interrogatory itself is vague or

16  ambiguous, but rather complains that the definition of "LARIAN TRUST" is not

17  sufficiently clear. "LARIAN TRUST" is defined by the interrogatory as including

18  "the Isaac and Angela Larian Trust, Isaac Larian Grantor Annuity Trust, Angela

19  Larian Grantor Annuity Trust, Larian Family Trust and any other trust of which

20  Isaac Larian is a trustee or of which any member of Isaac Larian's family, whether

21  by blood or marriage, is a beneficiary, the current or former trustees, beneficiaries,

22  attorneys, agents, representatives, accountants, vendors, consultants or any other

23  PERSON acting on its behalf, subject to its authority and control."[16] The meaning

24  of "LARIAN TRUST" is readily ascertainable. At the outset, there can be no

25  argument that the first part of the definition is fully understood by Larian. After all,

26

27  [16]   Mattel's First Set of Interrogatories (Phase 2), at 2, Zeller Decl., Exh. 1.

28

EXHIBIT ___17___
PAGE ___308___

1   the definition begins by specifically <u>naming</u> certain known trusts.  Yet, Larian

2   refuses to answer the interrogatories even as to those.  Further, as counsel for Larian

3   postulates, the final clause, "the current or former trustees, beneficiaries, attorneys,

4   agents, representatives, accountants, vendors, consultants or any other PERSON

5   acting on its behalf, subject to its authority and control," is intended to capture

6   individuals or entities "acting on [the trusts'] behalf, [or] subject to [the trusts']

7   authority and control."[17]  Thus, the clause simply makes clear that the interrogatory

8   seeks information concerning not only the named and described trusts, but also all

9   individuals or entities who act (or have acted) on behalf of those trusts.

10           Regardless, even if there were some ambiguity, Larian is obligated to

11  use common sense and respond to the degree possible.  <u>Fed. R. Civ. Proc.</u> 33(b)(1)

12  (a party "shall answer to the extent the interrogatory is not objectionable");

13  <u>Pulsecard</u>, 168 F.R.D. at 310 (overruling vague and ambiguous objections because

14  "[r]espondents should exercise reason and common sense to attribute ordinary

15  definitions to terms and phrases utilized in interrogatories").   Indeed, courts

16  repeatedly have held that such semantic quibbling as Larian's here is not a valid

17  basis for refusing discovery.  Courts look "askance at total resistance to discovery

18  predicated upon semantic games."  <u>Mead Corp. v. Riverwood Natural Res.</u>

19  <u>Corp.</u>, 145 F.R.D. 512, 516 (D. Minn. 1992) ("Granted that the Interrogatories, read

20  literally, seek disclosure [of nonexistent information], and are to that extent, ineptly

21  phrased; but the Interrogatories should be reasonably interpreted in light of both

22  letter and spirit of the discovery rules"); <u>Monaghan v. SZS 33 Assocs., L.P.</u>, 1992

23  WL 135821, at *4 (S.D.N.Y. June 1, 1992) ("[Defendant] contends that these

24  documents were not within the scope of the original document demand.  Such

25  semantic niceties have no place in federal discovery matters. The documents were

26  arguably within the scope of the request and definitely relevant to the subject matter

27  _____

28  [17]  Opp. at 7:8-10.

EXHIBIT 17
PAGE 309

1  involved").  Larian's feigned confusion over part of a definition -- especially one

2  that tracks definitions used by both sides in prior discovery requests -- is no reason

3  to stonewall.

4      **C.**    **The Interrogatories Are Not Unduly Burdensome**

5           Larian's burden objections are premised solely on the interrogatories'

6  alleged ambiguity and lack of relevance.  Opp. at 21:24-25; 22:10-13.  For the

7  reasons discussed, those objections fail.  In any event, Larian has not produced

8  sufficient evidence to sustain a burden objection.  See <u>Jackson v. Montgomery Ward</u>

9  <u>& Co., Inc.</u>, 173 F.R.D. 524, 528-9 (D. Nev. 1997) ("The party claiming that a

10  discovery request is unduly burdensome must allege specific facts which indicate

11  the nature and extent of the burden, usually by affidavit or other reliable

12  evidence").[18]  There is undoubtedly good reason why Larian has not even tried to

13  meet this burden:  he cannot.  A person of Larian's means surely has accountants

14  and other professionals who maintain records and statements memorializing the very

15  transactions that Mattel seeks information about.

16  **III.**   **THE INTERROGATORIES ARE NOT COMPOUND**

17           Pursuant to <u>Fed. R. Civ. P.</u> 33(a), "discrete subparts" of an

18  interrogatory are to be counted as separate interrogatories for purposes of the limits

19  on the number of interrogatories a party may serve.  The Discovery Master has

20  repeatedly ruled that interrogatories with subparts are not compound where "the

21  questions in each interrogatory refer to one common theme."[19]  Larian's arguments

22  ignore that rule.

23           Larian argues that through its definitions of IDENTIFY and LARIAN

24  TRUST, Mattel has sought responses to "innumerable discrete questions" about

25

26     [18]  See also Amended Discovery Master Order No. 11, at 16-18 (overruling MGA and

27  Larian's burden objections because the discovery sought was critical to Phase 2 issues, especially in light of "the vast scope of this litigation."). Zeller Decl., Exh. 10.

28     [19]  Amended Discovery Master Order No. 11, at 21. Zeller Decl., Exh. 10.

EXHIBIT 17
PAGE 310

1   "numerous, discrete, and unrelated persons and entities."[20]   Interrogatory No. 1
2   seeks the identity of entities owned by Larian since January 1, 2005 and information
3   about those entities.   Interrogatory No. 2 seeks the identity of entities owned by the
4   Larian Trusts since January 1, 2005 and information about those entities.   Larian
5   suggests that because Mattel seeks different types of information about these entities
6   (name, taxpayer identification number, place of incorporation, ownership interests
7   in, e.g.), the interrogatories contain discrete questions.   But the interrogatories
8   clearly address a single, common theme -- what Larian (or his trusts) own or have
9   owned since 2005.   The interrogatories simply make clear the level of detail of the
10  information sought.

11          Indeed, the Discovery Master has rejected comparable "compound"
12  objections previously.   For example, the prior Discovery Master outright rejected
13  the argument that interrogatories seeking different types of information referring to
14  one common theme are compound.   In that Order, the prior Discovery Master
15  concluded that interrogatories "with subparts seeking facts supporting a contention,
16  the identity of persons with knowledge, and documents are not counted separately
17  for the purposes of applying the   . . . interrogatory limit."[21]   And the current
18  Discovery Master's Order No. 11, filed March 30, 2009, states explicitly that the fact
19  that "interrogatories ask MGA to identify witnesses, facts and documents . . . does
20  not render the interrogatories compound because the questions in each interrogatory
21  refer to one common theme and count as a single interrogatory."[22]

22

23

24

25

26

27   [20] Opp. at 22-24.
     [21] See September 5, 2007 Discovery Master Order, at 5-7, Zeller Decl., Exh. 17.
28   [22] Amended Discovery Master Order No. 11 at 21, Zeller Decl., Exh 10.

EXHIBIT ___17___
PAGE ___311___

1  IV.  **MATTEL MET AND CONFERRED IN GOOD FAITH CONCERNING**
2      **THE INTERROGATORIES**

3          Larian devotes five pages of his opposition to attacking Mattel's alleged

4  failure to properly meet and confer.  Counsel for Mattel and Larian exchanged six

5  letters and two phone calls, far more than a "perfunctory" effort.[23]  The purpose of

6  the meet and confer process is to attempt to obtain the discovery sought before

7  resorting to motion practice.  Fed. R. Civ. P. 37(a)(1).  Mattel genuinely tried to

8  persuade Larian to provide answers -- or even partial answers -- and failed.  It was

9  entitled to then ask the Court to intervene, as it now has.  The Discovery Master

10 should reach the merits and compel responses.

11                            **Conclusion**

12         For the foregoing reasons, Mattel respectfully requests that the

13 Discovery Master: (1) compel Larian to provide full and complete answers to

14 Mattel, Inc.'s First Set of Interrogatories (Phase 2), and (2) to overrule all of Larian's

15 objections to the Interrogatories.

16

17 DATED: July 1, 2009          QUINN EMANUEL URQUHART OLIVER &
18                              HEDGES, LLP

19

20                            By /s/ Michael T. Zeller
                                 Michael T. Zeller
21                               Attorneys for Mattel, Inc.

22

23

24

25

26

27 [23]  A detailed discussion of the meet and confer process is contained in ¶¶ 5-10 of the
28 Lee Decl.

EXHIBIT  17
PAGE     312

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   John B. Quinn (Bar No. 90378)
2  (johnquinn@quinnemanuel.com)
   Michael T. Zeller (Bar No. 196417)
3  (michaelzeller@quinnemanuel.com)
   Jon D. Corey (Bar No. 185066)
4  (joncorey@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
6  Facsimile: (213) 443-3100

7  Attorneys for Mattel, Inc.

8
                    UNITED STATES DISTRICT COURT
9
                   CENTRAL DISTRICT OF CALIFORNIA
10
                          EASTERN DIVISION
11

| | |
|---|---|
| 12  CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| 13              Plaintiff, | Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727 |
| 14       vs. | **DISCOVERY MATTER** |
| 15  MATTEL, INC., a Delaware | **[To Be Heard By Discovery Master Robert O'Brien]** |
| 16  corporation, | |
| 17              Defendant. | DECLARATION OF YOUNG RA LEE IN SUPPORT OF MATTEL, INC.'S REPLY IN SUPPORT OF MOTION TO COMPEL RESPONSES TO MATTEL, INC.'S FIRST SET OF INTERROGATORIES (PHASE 2) TO ISAAC LARIAN |
| 18 | |
| 19  AND CONSOLIDATED ACTIONS | |
| 20 | |
| 21 | |
| 22 | Hearing Date:      TBD<br>Time:              TBD<br>Place:             TBD |
| 23 | |
| 24 | **Phase 2** |
| 25 | Discovery Cutoff:   Dec. 11, 2009<br>Pre-trial Conference: March 1, 2010<br>Trial:             March 23, 010 |
| 26 | |
| 27 | |
| 28 | |

00505.07209/2992416.2

DECLARATION OF YOUNG RA LEE ISO REPLY ISO MOTION TO COMPEL RESPONSE TO MATTEL, INC'S
FIRST SET OF INTERROGATORIES (PHASE 2)

EXHIBIT  17
PAGE  313

### DECLARATION OF YOUNG RA LEE

I, **Young Ra Lee**, declare as follows:

1.      I am a member of the bar of the State of California. I am an attorney at Quinn Emanuel Urquhart Oliver & Hedges, LLP, counsel for Mattel, Inc. ("Mattel"). I make this declaration of personal, firsthand knowledge and, if called and sworn as a witness, I could and would testify competently thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the Court's Order After June 15, 2009 Hearing on Accounting Issues, dated June 18, 2009.

3.      Attached hereto as Exhibit 2 is a true and correct copy of the Court's Omnibus Order, dated April 27, 2009.

4.      Attached hereto as Exhibit 3 is a true and correct copy of MGA Entertainment, Inc.'s First Set of Phase 2 Interrogatories to Mattel, Inc., dated April 15, 2009.

5.      Tamar Buchakjian is currently out of the country and unable to respond to Larian's claims that she failed to meet and confer in good faith regarding this motion. I was present for, and took notes during, both meet and confer teleconferences with Richard Sheldon and Daniel M. Hayes on April 21, 2009 and April 23, 2009.

6.      On April 21, 2009, Ms. Buchakjian met and conferred telephonically with Mr. Hayes and Mr. Sheldon. Mr. Hayes and Mr. Sheldon asked Ms. Buchakjian to clarify the language of the interrogatories and the accompanying definitions. Ms. Buchakjian asked them what, specifically, they did not understand. Ms. Buchakjian then went through the interrogatories and their definitions line-by-line asking Mr. Hayes and Mr. Sheldon to identify what parts they did not understand. Mr. Hayes and Mr. Sheldon said that they understood each phrase.

-2-
DECLARATION OF YOUNG RA LEE ISO REPLY ISO MOTION TO COMPEL RESPONSE TO MATTEL, INC'S
FIRST SET OF INTERROGATORIES (PHASE 2)

EXHIBIT   17
PAGE   3/4

1    7.    Mr. Hayes and Mr. Sheldon suggested omitting the following

2  language from the interrogatory: "the current or former trustees, beneficiaries,

3  attorneys, agents, representatives, accountants, vendors, consultants or any other

4  PERSON acting on its behalf, subject to its authority and control." They also

5  suggested limiting Interrogatory No. 2 so that they would not include "insignificant

6  transactions" by limiting the transactions as of a date certain. Ms. Buchakjian stated

7  that Mattel would consider a proposal raising the minimum monetary amount to

8  something above $1000, but Mr. Hayes and Mr. Sheldon did not propose an

9  alternate minimum amount (or appear to care about the dollar amount). As for the

10  other discussed limitations, Ms. Buchakjian told Mr. Hayes and Mr. Sheldon that

11  she did not believe that her client would agree to them because the scope of the

12  interrogatories was already limited in time and subject matter, but agreed to consult

13  with the client.

14    8.    On April 23, 2009, Ms. Buchakjian again met and conferred

15  telephonically with Mr. Hayes and Mr. Sheldon. She confirmed that Mattel already

16  considered the Interrogatories properly limited in time and subject matter. When

17  Mr. Hayes asked Ms. Buchakjian for Mattel's definition of "LARIAN TRUST,"

18  again Ms. Buchakjian walked through the definition of "LARIAN TRUST" line-by-

19  line and asked both Mr. Hayes and Mr. Sheldon to specify the parts that they did not

20  understand. Ms. Buchakjian offered further explanation of the definition in the

21  same manner discussed in Mattel's reply brief here. Mr. Hayes and Mr. Sheldon did

22  not ask Ms. Buchakjian to clarify "LARIAN TRUST" beyond the definition, and

23  raised no further questions or specific inquiry, which indicated that they understood

24  every line in the definition. Instead, they wanted Ms. Buchakjian to change what

25  the interrogatory was actually seeking, but Ms. Buchakjian explained that Mattel

26  believed that the information sought was appropriate.

27    9.    Ms. Buchakjian also explained to Mr. Hayes and Mr. Sheldon

28  that the definition of "LARIAN TRUST" was consistent with the information that

00505.07209/2992416.2

-3-

EXHIBIT  17
PAGE  3/5

1   the Discovery Master ordered pursuant to Order Nos. 11 and 3 in regard to the

2   subpoena to IGWT -- information related to net worth, financial condition and

3   ability to pay.  Mr. Hayes and Mr. Sheldon did not dispute that the interrogatories

4   sought relevant information, but responded that the Order was narrower because it

5   was directed only to IGWT.  Ms. Buchakjian stated that Interrogatory No. 2 was

6   narrow as well because it was directed to Larian.

7          10.   Ms. Buchakjian asked Mr. Hayes and Mr. Sheldon what they

8   would be willing to respond to, and Mr. Hayes and Mr. Sheldon did not concede that

9   Larian would respond to anything.  Mr. Hayes and Mr. Sheldon indicated that

10  Larian was unwilling to withdraw any of his objections to the interrogatories and

11  was unwilling to suggest any specific limitations to the interrogatories.  Mr. Hayes

12  and Mr. Sheldon then accused Ms. Buchakjian of not meeting and conferring in

13  good faith because she would not narrow the scope of the interrogatories.

14

15          I declare under penalty of perjury under the laws of the United States

16  that the foregoing is true and correct.

17          Executed on July 1, 2009 at Los Angeles, California.

18

19                              /s/  Young Ra Lee
                                Young Ra Lee
20

21

22

23

24

25

26

27

28

00505.07209/2992416.2

-4-

DECLARATION OF YOUNG RA LEE ISO REPLY ISO MOTION TO COMPEL RESPONSE TO MATTEL, INC'S
FIRST SET OF INTERROGATORIES (PHASE 2)

EXHIBIT __17__

PAGE __316__