# EXHIBIT 13

EXHIBIT _/3_

PAGE _/// _

1

1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                EASTERN DIVISION

4                  - - -

5      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6

7   MATTEL, INC.,                    )
                                     )
8                     Plaintiff,     )
                                     )
9            vs.                     )   No. CV 04-09049
                                     )
10  MGA ENTERTAINMENT, INC., ET. AL.,)
                                     )
11                    Defendants.    )
    _____)   Status Hearing
12  AND CONSOLIDATED ACTIONS,        )
                                     )
13  _____)

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               Riverside, California

17            Tuesday, September 22, 2009

18                 10:19 A.M.

19

20

21

22

23           THERESA A. LANZA, RPR, CSR
             Federal Official Court Reporter
24           3470 12th Street, Rm. 134
             Riverside, California  92501
25               951-274-0844
             WWW.THERESALANZA.COM


Tuesday, September 22, 2009                    Status Hearing

EXHIBIT  13
PAGE     112

```
 1   APPEARANCES:

 2   ON BEHALF OF MATTEL, INC.:

 3                        QUINN EMANUEL
                         By:  JOHN QUINN
 4                             MICHAEL T. ZELLER
                               B. DYLAN PROCTOR
 5                        865 S. Figueroa Street,
                         10th Floor
 6                        Los Angeles, California  90017
                         213-624-7707
 7

 8   ON BEHALF OF MGA ENTERTAINMENT/ISAAC LARIAN:

 9                        ORRICK, HERRINGTON & SUTCLIFFE, LLP
                         BY:  ANNETTE L. HURST
10                        BY:  WARRINGTON S. PARKER III
                         BY:  WALTER F. BROWN, JR.
11                        405 Howard Street
                         San Francisco, California  90071-3144
12                        213-687-5000

13                        ORRICK, HERRINGTON & SUTCLIFFE, LLP
                         BY:  WILLIAM A. MOLINSKI
14                        405 777 South Figueroa Street,
                         Suite 3200
15                        Los Angeles, California  90017-5855
                         213-612-2256
16

17   ON BEHALF OF SKADDEN ARPS:

18                        SKADDEN, ARPS, SLATE
                          MEAGHER & FLOM, LLP
19                        BY:  THOMAS J. NOLAN
                         BY:  JASON D. RUSSELL
20                        300 South Grand Avenue
                         Los Angeles, California  90071
21                        213-687-5250

22

23

24   / / /

25   / / /
```

Tuesday, September 22, 2009

EXHIBIT _13_ Status Hearing
PAGE _113_

```
 1    APPEARANCES (continued):

 2


 3    ON BEHALF OF DEFENDANT GUSTAVO MACHADO:

 4                        OVERLAND BORENSTEIN SCHEPER & KIM LLP
                          BY:  ALEXANDER H. COTE
 5                        601 West Fifth Street,
                          12th Floor
 6                        Los Angeles, California  90071
                          213-613-4660
 7


 8
      ON BEHALF OF O'MELVENY & MEYERS:
 9
                          GIBSON, DUNN & CRUTCHER, LLP
10                        BY:  J. CHRISTOPHER JENNINGS
                          333 South Grand Avenue
11                        Los Angeles, California  90071-3197
                          213-229-7836
12

13
      Also present:       Richard de Anda
14

15

16

17

18

19

20

21

22

23

24

25
```

Tuesday, September 22, 2009                              Status Hearing

EXHIBIT _13_
PAGE _779_

1

# I N D E X

2                                                            Page

3    Proceedings.....................................    5

4

5

6           <u>EXHIBITS</u>        <u>RECEIVED</u>

7              3                 29
               7                 48
8              2                 66
               4                 66

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Tuesday, September 22, 2009                    Status Hearing

EXHIBIT __13__
PAGE ____115____

```
 1    Riverside, California; Tuesday, September 22, 2009; 10:19 A.M.

 2                              -oOo-

 3             THE CLERK:  Calling Item Number 1 on calendar,

 4    Case Number CV 04-09049-SGL, Mattel, Inc., versus

 5    MGA Entertainment, Inc.                                    03:47

 6             Counsel, please come forward and state your

 7    appearances for the record.

 8             MR. QUINN:  John Quinn, Mike Zeller, Dylan Proctor

 9    for Mattel.

10             MS. HURST:  Annette Hurst, Warrington Parker, and  10:19

11    Bill Molinski for MGA parties.

12             THE COURT:  Good morning to you all.

13             MR. JENNINGS:  Chris Jennings from Gibson, Dunn &

14    Crutcher for O'Melveny & Meyers.

15             MR. COTE:  Alexander Cote from Scheper, Kim &      10:19

16    Overland for counter-defendant Gustavo Machado.

17             MR. RUSSELL:  Jason Russell, Tom Nolan, Jose Allen,

18    for Skadden Arps.

19             THE COURT:  Good morning to you all.

20             We're on calendar this morning for a status        10:19

21    conference on various matters.  The Court issued two orders,

22    one on August 31st, and part of that was the Order to Show

23    Cause concerning a matter on the attorney-client privilege log,

24    and then the other was an order on September 3rd asking

25    Mr. Richard de Anda to come in from the Mattel office.  The   10:19
```

Status Hearing

EXHIBIT _13_
PAGE _116_

1    Court wants to resolve these two issues, if possible, today.

2         We're going to be conducting a portion of this

3    hearing here in the courtroom, we're going to be conducting a

4    portion of this hearing in camera in chambers; so we'll have

5    some musical chairs to conduct.  I see there's already been          10:20

6    some musical chairs.  I guess we've resolved which side we're

7    sitting on now.

8         **MS. HURST:**  I don't think we have, your Honor, but...

9         **THE COURT:**  I'm going to put that dispute in the same

10   category as the hotel dispute and just kind of defer that at        10:20

11   this time.  I've referred to this case for some period of time

12   as Mattel versus MGA.  When we consolidated, I think there was

13   some indication that that would be the title of it.  Then I

14   started looking at the Court's own orders and, just for

15   example, the August 31st order I titled this as Carter Bryant        10:20

16   versus Mattel and on September 3rd, I entitled this as Mattel

17   versus MGA.  We have multiple default things which print up the

18   minute orders, and depending which one we use, it comes up

19   accordingly.  I certainly cannot fault anyone for that.  That's

20   going to have to await wiser minds to decide who should sit         10:21

21   where.  What I will try to resolve today are these two issues

22   that the Court has brought up.

23         Let's begin with the issue with respect to the e-mail

24   that was sent that MGA submitted to the Court concerning

25   Mr. de Anda and the Canadian law enforcement officials.            10:21

Tuesday, September 22, 2009                          Status Hearing

EXHIBIT __13__
PAGE __117__

1          I trust Mr. De Anda is present today.

2          **MR. QUINN:**  Yes, he is, Your Honor.

3          **THE COURT:**  Okay.

4          MGA has raised concerns about this.  It's unclear

5     what -- Mr. Zeller made a proffer at the last hearing          10:21

6     concerning what was done, but I think even Mr. Zeller wasn't

7     exactly sure what all that was; so I thought the best way is to

8     have Mr. de Anda come down and explain what happened.

9          **MR. QUINN:**  Mr. De Anda is here, Your Honor.

10         **THE COURT:**  Mr. Quinn, since he is an officer of          10:22

11    Mattel, I'll give you the first opportunity, if you wish to

12    have Mr. de Anda come up and you can directly examine him.  If

13    you would prefer to have MGA go first with their examination,

14    that's fine.  But since it's your witness...

15         **MR. QUINN:**  I'd be pleased to do a direct          10:22

16    examination, Your Honor.

17         **THE COURT:**  Why don't you do that, and then MGA can

18    conduct a cross-examination.

19         Is that okay?

20         **MS. HURST:**  Thank you, your Honor.          10:22

21         **THE COURT:**  All right.  That's how we're going to do

22    it.

23         **THE CLERK:**  Do you solemnly state that the testimony

24    you may give in the cause now pending before this court shall

25    be the truth, the whole truth, and nothing but the truth, so

Tuesday, September 22, 2009                          Status Hearing

EXHIBIT __13__
PAGE __118__

8

```
1    help you God?

2              THE WITNESS:  Yes, I do.

3              THE CLERK:  Please state your full name and spell

4    your last name for the record.

5              THE WITNESS:  Richard de Anda, d-e-A-n-d-a.          10:22

6                        DIRECT EXAMINATION

7    BY MR. QUINN:

8    Q    Mr. de Anda, are you presently employed by Mattel?

9    A    Yes.  I'm employed as a consultant.

10   Q    And are you an employee in that capacity, or do you act as  10:23

11   a contractor?

12   A    As a contractor.

13   Q    And at what point did you cease to be a Mattel employee?

14   A    Last December.

15   Q    In 2006 were you a Mattel employee?                      10:23

16   A    Yes.

17   Q    What position did you hold at that time?

18   A    I was the vice president of global security and

19   investigations.

20   Q    In 2006 did you become involved in an investigation in   10:23

21   Canada relating to a former Mattel employee by the name of

22   Janine Brisbois?

23   A    Yes.

24   Q    Can you tell us just briefly what that investigation

25   concerned.                                                    10:23
```

Tuesday, September 22, 2009                    EXHIBIT 13 Status Hearing
                                               PAGE 119

1   A    Yes; the theft of intellectual property from Mattel.

2   Q    How did you first learn about this issue regarding

3   Ms. Brisbois?

4   A    I believe I was contacted by either Jeff Massingberd,

5   who's the general manager of Mattel Canada, or Alberto Morales,    10:24

6   who's the HR representative for that area, and had informed me

7   that the employee was leaving for a competitor, MGA, at the

8   time.

9   Q    And did you learn anything about -- you say theft of

10  intellectual property.  What are you referring to?              10:24

11  A    I'm referring to confidential files or files that are

12  proprietary to Mattel.  What transpired is that we seized the

13  employee's computer and had an external company do an analysis.

14  We had determined that files had been downloaded that were

15  proprietary to Mattel upon her -- during her notice of leaving   10:24

16  for a competitor.

17  Q    As head of security at the time, did you have anything to

18  do with following up on this report?

19  A    Yes.

20  Q    What was your involvement in the followup?                 10:25

21  A    What had happened -- while I was in east Aurora, New York,

22  after the initial investigation was completed, we had

23  determined that information had been taken.  I was in contact

24  with the Peel Regional Police Department in Toronto where the

25  Mattel Canada facility is based and I had contacted them and    10:25

```
 1    told them that I would like to meet with them.
 2              While in east Aurora on an unrelated matter, I
 3    received a phone call and we set up to arrange a spontaneous
 4    meeting.  I proceeded to the Peel Police Department to present
 5    the evidence that I had at the time.                            10:25
 6    Q    And this was in Toronto.
 7    A    Yes.
 8    Q    What was your purpose in going there to present evidence?
 9    A    To show them that a crime had been committed.
10    Q    And were you looking for them to do something?            10:26
11    A    Yes; to followup and investigate the crime and to
12    determine if it warranted prosecution or not.
13    Q    Had you had any previous contact with anyone who was at
14    the Peel Police Department prior to this?
15    A    Yes.                                                       10:26
16    Q    Who was that?
17    A    Well, probably two decades prior, I had a murder case that
18    involved the Peel Police Department.  And I believe we have had
19    other issues in that area where Mattel has filed crime reports
20    with the local Peel Police Department.                         10:26
21    Q    This episode, the two decades earlier, you were not at
22    Mattel at that time.
23    A    No, I was not.
24    Q    What was your position then?
25    A    I was managing a homicide unit for the Los Angeles Police  10:26
```

Tuesday, September 22, 2009

EXHIBIT [ Status Hearing

PAGE ___ 12 ___

1    Department.

2    Q    And was there an individual there at the Peel Police

3    Department who you knew based on your prior contact?

4    A    Yes.

5    Q    Do you recall that person's name?                        10:27

6    A    I only recall his first name as Ron.

7    Q    Based on your prior contacts with Ron and anyone else at

8    the Peel Police Department, did you have any reason to think

9    that anyone in that department could be corrupted by gifts?

10            MS. HURST:  Objection.  Leading; argumentative.       10:27

11            THE COURT:  Sustained.

12            Rephrase.

13   BY MR. QUINN:

14   Q    Had anything at all come to your attention concerning the

15   reputation of that police department in your dealings with     10:27

16   them?

17   A    No.  None whatsoever.

18   Q    Had you ever had any untoward incidents in your dealings

19   with the police department?

20            MS. HURST:  Objection.  Leading; argumentative.       10:27

21            THE COURT:  Sustained.

22   BY MR. QUINN:

23   Q    So you proceeded to the Peel Police Department in Toronto.

24            What happened?

25   A    I was introduced -- well, if I may, prior to, I had       10:28

Tuesday, September 22, 2009


EXHIBIT ___ Status Hearing
PAGE ___ 122

1   communications with a detective by the name of Rodney Jones,

2   and when I arrived I met the individual at the police facility.

3   I then was brought into a conference room where there were

4   three other individuals that I was introduced to; I can only

5   remember one of their names as Vincent Pucci.  And then I had I          10:28

6   believe it was an 8-page report with regards to the matter, and

7   I presented it to them; and that was basically it.

8   Q    How much time did you spend there?

9   A    Totally, probably less than two hours, I would say,

10  totally; probably more like an hour and a half totally.                  10:28

11  Q    And how were matters left at the conclusion of the

12  meeting?

13  A    That they thought the case had some merit and they would

14  investigate it.

15  Q    Is that what they told you?                                         10:29

16  A    Yes; that was basically what they told me.  I don't recall

17  the exact words.

18  Q    Did they give you anything before you left?

19  A    Yes.

20  Q    What did they give you?                                             10:29

21  A    A ceramic coffee mug with their insignia, a logo for the

22  Peel Regional Police Department; a writing pen; and, like, a

23  lapel pin, I think.  That's the best of my recollection.

24            I remember the cup.

25            MR. QUINN:  Your Honor, I have a dark blue or purple           10:29

Tuesday, September 22, 2009                    EXHIBIT  13  Status Hearing
                                               PAGE     123

1    cup with the writing on it "Peel Regional Police Department,

2    I'd request permission to approach the witness to hand this to

3    the witness.

4            **THE COURT:**   Show it to Ms. Hurst first.

5            Now you may.                                          10:30

6    **BY MR. QUINN:**

7    Q    Can you identify that cup?

8    A    Yes; that is the cup that was given to me by the Peel

9    Police Department.

10   Q    And you said that they gave you some something else as   10:30

11   well.

12   A    Yes.

13   Q    And that was a pen?

14   A    A writing pen, and I believe a lapel pin.  I can vaguely

15   recall the lapel pin, but I'm certain that they did.          10:30

16   Q    And had you asked them to give you either one of those

17   things?

18   A    No.

19   Q    Did you ask them to give you anything?

20   A    Nothing whatsoever.                                      10:30

21   Q    All right.

22          When did they give you these things in relation to

23   your departure from the police department?

24   A    To the best of my recollection, it was after the meeting

25   in the conference room; that's when I believe they gave this to  10:31

Tuesday, September 22, 2009                        Status Hearing

EXHIBIT  13
PAGE  124

14

1   me.

2   Q    Did they give you these things before or after they told

3   you they thought that the case you had presented had merit and

4   they were going to look into it?

5   A    It was after.  It was at the conclusion of our meeting.      10:31

6   As I recall, somebody had left the room after the end of our

7   meeting and then came in with the items.

8   Q    Did you say anything in response?

9   A    I said "thank you very much."

10  Q    Did they ask you for anything?                              10:31

11  A    No, they did not.

12  Q    All right.

13       After that, did you return to your office in

14  El Segundo?

15  A    I did.                                                      10:31

16  Q    And did you send anything to the Peel Police Department?

17  A    I did.

18  Q    What did you send?

19  A    It was a handful -- basically, it was -- to the best of my

20  recollection, it was a handful of Matchbox-type cars, blister    10:31

21  packs; they were little police cars, little cars that had the

22  police insignia.  I asked my assistant at the time if she could

23  throw a few handful of police cars, Matchbox-type cars, in a

24  box and ship it to them as a reciprocating gift.  And that was

25  the end of it.  And I just glanced at it, at the box.           10:32

Tuesday, September 22, 2009

EXHIBIT   Status Hearing
PAGE      125

15

```
 1   Q     How many cars were sent?
 2             MS. HURST:  Objection.  Lacks foundation.
 3             THE COURT:  Lay a foundation.
 4   BY MR. QUINN:
 5   Q     Do you know how many cars were sent?           10:32
 6   A     I don't know the exact amount, no.
 7   Q     Did you see the box before it went out?
 8   A     As I recall, it was a small box, I would say smaller than
 9   a shoe box, and to the best of my recollection there were just
10   a handful, probably a half-dozen, of these little blister     10:33
11   packs; that's the best of my recollection.
12   Q     Do you know what the approximate retail value of these toy
13   cars was?
14             MS. HURST:  Objection.  Lacks foundation.
15             THE COURT:  Sustained.                       10:33
16             Lay a foundation.
17   BY MR. QUINN:
18   Q     You worked at Mattel at the time.
19   A     Yes.
20   Q     Did you have knowledge concerning the prices of various   10:33
21   Mattel products?
22   A     Yes.
23   Q     Including the approximate prices of these toy cars.
24   A     If they were retail, I would say they were probably a
25   dollar each, if that.  They were basically samples that -- I    10:33
```

Tuesday, September 22, 2009

Status Hearing

EXHIBIT    13
PAGE       126

1    have a drawer full of samples.

2    Q    How did you get this drawer full of samples?

3    A    They were given to us by other departments who viewed the

4    product in its completed form, and basically my assistant would

5    end up with a drawer full of samples.                           10:34

6    Q    Is this something that you had all of the time there?

7    A    Yes.

8    Q    And the toys that were sent to the Peel Police Department,

9    did this come from this collection that your secretary had?

10   A    Yes.  They were police-type vehicles.  I know people would  10:34

11   send us the police-type vehicles.

12   Q    And did you personally pack them up and arrange for the

13   shipment of this package?

14   A    No, I did not.

15   Q    Who handled that?                                           10:34

16   A    My assistant.

17   Q    What was your reason for sending these toy cars to the

18   Peel Police Department?

19   A    To reciprocate for the mug and the pins that they had

20   given me.                                                        10:34

21   Q    Did it enter your mind at all that you were attempting to

22   influence the Peel Police Department in any decision they might

23   make concerning the case that you had presented to them?

24   A    Not at all.

25        MR. QUINN:  Nothing further, Your Honor.                    10:34

Tuesday, September 22, 2009

Status Hearing

EXHIBIT ___13___
PAGE ___127___

| | | |
|---|---|---|
| 1 | **THE COURT:**  Cross-examination. | |
| 2 | **MS. HURST:**  Thank you, your Honor. | |
| 3 | **CROSS-EXAMINATION** | |
| 4 | BY MS. HURST: | |
| 5 | Q     What's your date of birth, Mr. de Anda? | 10:35 |
| 6 | A     October 17, 1945. | |
| 7 | Q     I'm sorry.  I should have introduced myself. | |
| 8 | My name is Annette Hurst, and I represent the MGA | |
| 9 | parties.  Good morning. | |
| 10 | A     Good morning. | 10:35 |
| 11 | Q     You held the position of Mattel's vice president of global | |
| 12 | security in investigations for approximately 20 years; is that | |
| 13 | correct? | |
| 14 | A     No, that's not. | |
| 15 | Q     Ten years.  Pardon me. | 10:36 |
| 16 | A     Yes. | |
| 17 | Q     And you retired from that position in December of 2008. | |
| 18 | A     Yes. | |
| 19 | Q     From May 1968 through November 1988, you were a police | |
| 20 | officer with the Los Angeles Police Department. | 10:36 |
| 21 | A     Yes. | |
| 22 | Q     When you retired from the L.A.P.D., you were a detective, | |
| 23 | grade three; correct? | |
| 24 | A     Yes. | |
| 25 | Q     And that was a detective supervisor. | 10:36 |

Tuesday, September 22, 2009

Status Hearing

EXHIBIT ___13___

PAGE ___128___

18

1   A     That's correct.

2   Q     An L.A.P.D. officer is an employee of the City of Los

3   Angeles; correct?

4   A     Yes.

5   Q     And you were also a licensed private investigator in the          10:36

6   State of California.

7   A     Correct.

8   Q     And are you still today?

9   A     Yes.

10  Q     You were a member of the California Peace Officers'                10:37

11  Association while you were a police officer.

12  A     I was a member of the -- yes.

13  Q     And you have testified on numerous prior occasions;

14  correct?

15  A     That is correct.                                                   10:37

16  Q     As part of your duties and responsibilities as a police

17  officer, you were required to familiarize yourself with the

18  ethics governing your profession; is that correct?

19  A     Correct.

20  Q     And in fact, as a detective supervisor, you were                   10:37

21  responsible for enforcing ethical requirements; isn't that

22  true?

23  A     That is true.

24        **MS. HURST:**  Your Honor, if I may approach the witness

25  to hand up what we have premarked as Exhibit 1, the City of Los         10:38

Tuesday, September 22, 2009

EXHIBIT Status Hearing

PAGE   /29

1   Angeles code of ethics.

2          THE COURT:  Have you shared this with Mattel?

3          (Mattel is provided a copy.)

4   BY MS. HURST:

5   Q   Mr. de Anda, was the City of Los Angeles code of ethics          10:38

6   one of the ethics requirements with which you familiarized

7   yourself as an L.A.P.D. police officer?

8   A   I'm certain that it was part of the documentation that was

9   given to us, but I -- it's been so long.

10  Q   All right.          10:39

11         And you see there, Article Three is "Acceptance of

12  Favors and Gratuities."

13         MR. QUINN:  I object.  There is no foundation.  No

14  foundation has been laid that this was in effect at the time

15  that Mr. de Anda was employed by the L.A. Police Department.          10:39

16  In fact, there is a date on it which would indicate to the

17  contrary.

18         THE COURT:  It indicates that it was adopted by

19  counsel resolution on July 21, 1959 and amended August 23,

20  1979.  But the objection is well taken.          10:39

21         Let's lay a foundation for this.

22         MS. HURST:  All right.

23  BY MS. HURST:

24  Q   Mr. de Anda, you were an L.A.P.D. police officer in 1979;

25  correct?          10:39

EXHIBIT __13__
PAGE __130__

Tuesday, September 22, 2009                    Status Hearing

```
 1   A     Correct.
 2   Q     And you previously indicated that one of your
 3   responsibilities was to familiarize yourself with the ethics
 4   governing your office and, indeed, to enforce them; is that
 5   correct?                                                        10:39
 6   A     Yes.
 7   Q     And you were an employee of the City of Los Angeles.
 8   A     That's correct.
 9   Q     Would you consider yourself to have been a person in the
10   public service in 1979?                                         10:40
11   A     Yes.
12   Q     Do you have any reason to doubt that you were, when you
13   were an L.A.P.D. officer, familiar with and responsible for the
14   City of Los Angeles Code of Ethics as it governed your
15   position?                                                       10:40
16   A     I'm sorry.  Could you repeat that.
17   Q     Sure.
18         In 1979 when you were a Los Angeles police detective,
19   do you have any reason to doubt, as you sit here today, that
20   you were not familiar with the Code of Ethics governing your    10:40
21   employment at that time?
22   A     I am certain that I was familiar with the generalities of
23   the Code of Ethics.
24   Q     In fact, you understood that there were ethical
25   requirements concerning police officers' acceptance of gifts,   10:41
```

EXHIBIT ___13___
PAGE ___131___

21

1    weren't you?

2    A    Yes.

3    Q    Could I direct your attention to Article Three of

4    Exhibit 1.

5          MR. QUINN:  Your Honor, there' still been no          10:41

6    foundation laid as to this document.

7          In the bottom right, it says "Updated July of 2005."

8    So we don't know what, if any, part of this document was in

9    effect when he was last employed by the L.A. Police Department

10   a decade or more before.                                     10:41

11         MS. HURST:  May I respond, Your Honor?

12         THE COURT:  Please.

13         MS. HURST:  Your Honor, I think if one reads the

14   document, it is apparent that provisions regarding equal

15   employment important were recently updated to include sexual  10:41

16   orientations, transgender, status, and other sorts of things.

17   But based on Mr. de Anda's testimony, I've established that

18   there were provisions governing regulating the acceptance of

19   gifts in effect in 1979 when he was a police officer and,

20   accordingly, we should be permitted to examine regarding that  10:42

21   provision.

22         THE COURT:  I understand, Mr. Quinn.

23         Mr. Quinn's point is that we're not certain.

24         I suspect you're absolutely correct, and I would be

25   very surprised if all of Article Three was not in.            10:42

Tuesday, September 22, 2009                    Status Hearing

EXHIBIT  13
PAGE  132

1          The point that Mr. Quinn is making is that we have no

2     basis to know that one way or the other.

3          The section that you're focusing on, I trust, is "Nor

4     shall any such person accept any gifts, gratuities, or favors

5     of any kind which might reasonably be interpreted as an attempt        10:42

6     to influence their actions with respect to City business."

7               MS. HURST:  That's correct, your Honor.

8          Why don't I just ask the witness that question.

9               THE COURT:  Yes.  Why don't you focus on that.

10         Thank you.        10:42

11              MS. HURST:  Thank you, your Honor.

12    BY MS. HURST:

13    Q    Is it true that while you were a Los Angeles police

14    officer for 20 years, you understood that you should not accept

15    any gift, gratuity, or favor of any kind which might reasonably        10:43

16    be interpreted as an attempt to influence your actions?

17    A    Yes.

18    Q    As a Los Angeles police officer, were you familiar with

19    the Code of Profession Conduct and Responsibilities for peace

20    officers developed by the California Peace Officers'        10:43

21    Association?

22    A    I don't recall.  It's been so long.  I'm sorry.  I

23    don't --

24              MS. HURST:  If I may, Your Honor, approach to show it

25    to the witness.        10:43

Tuesday, September 22, 2009                    Status Hearing

EXHIBIT ____13____
PAGE ____133____

23

1          THE COURT:  As long as you show it to Mr. Quinn

2     first.

3              (Counsel is provided document.)

4          THE COURT:  You may approach the clerk and give her a

5     copy of the document.                                          10:44

6          MS. HURST:  Your Honor, I've handed the witness a

7     document entitled "Code of Profession Conduct and

8     Responsibilities for Peace Officers" which was premarked as

9     Exhibit 2.

10    BY MS. HURST:                                                  10:44

11    Q    Mr. de Anda, would you turn to the first page inside the

12    cover of the document.

13              Do you see there, it has a copyright date of 1979 by

14    the California Peace Officers' Association?

15    A    Yes.                                                      10:44

16    Q    And you were a Los Angeles police officer in 1979.

17    A    Yes.

18    Q    Sir, would you turn, please, to the page numbered eight,

19    where canon eight appears.

20         MR. QUINN:  Your Honor, before the witness is             10:44

21    questioned about the document, I think we ought to have the

22    foundation that he's seen it before.

23         THE COURT:  Sustained.  This is foundational.

24    Although I trust that is what she's trying to do at this point.

25              Before we get into the substance, though, lay the    10:45

Tuesday, September 22, 2009                    Status Hearing

                                        EXHIBIT ____ 13
                                        PAGE ____ 134

24

1    foundation that he's familiar with this.

2           MS. HURST:  Thank you.

3    BY MS. HURST:

4    Q    Mr. de Anda, have you had an opportunity to examine

5    Exhibit 2?                                                    10:45

6    A    Exhibit 2?  Yes.

7    Q    And you're familiar with its provisions establishing

8    minimum standards of ethical conduct for police officers;

9    correct?

10   A    I vaguely recall this, yes.                              10:45

11          Like I said, it's been 20-plus years.

12   Q    All right.

13          In particular, while you were a Los Angeles police

14   officer, you were familiar with canon eight of these standards

15   which states "Peace officers shall not compromise their        10:46

16   integrity nor that of their agency or profession by accepting,

17   giving or soliciting any gratuity"?

18   A    Yes.

19   Q    And you understand that to be an ethical cannon that

20   applied to your conduct throughout your tenure as a Los Angeles 10:46

21   police officer; correct?

22   A    That's correct.

23          MS. HURST:  Your Honor, I'd now like to offer to the

24   witness Exhibit 3, a document entitled "Mattel, Inc. Code of

25   Conduct," dated November 2003.  'Do the Right Thing' Code of   10:47

Tuesday, September 22, 2009                     Status Hearing

EXHIBIT ___13___
PAGE _____135___

25

```
 1    Conduct, Bates number M0258446 through 459.
 2              Mr. Quinn has no objection.
 3              THE COURT:  You may.
 4              (Document is provided to witness.)
 5    BY MS. HURST:                                          10:47
 6    Q    Mr. de Anda, do you have Exhibit 3 before you?
 7    A    I do.
 8    Q    When you were Mattel's vice president of global security
 9    and investigations in November 2003, did you have familiarity
10    with Mattel's Code of Conduct?                         10:47
11    A    I did.
12    Q    In fact, you were responsible for enforcing that code of
13    conduct from time to time; isn't that correct?
14    A    That's correct.
15    Q    If you could turn to Page 2 of the document; you'll see  10:48
16    there's a little footer at the bottom, Page 2 of 14.
17    A    Yes.
18    Q    Do you see there the header "To Whom Does the Code Apply"?
19    A    Yes.
20    Q    And the code applied to all Mattel employees; correct?   10:48
21    A    That's correct.
22    Q    And that included you.
23    A    Yes.
24    Q    And that included your assistant as well.
25    A    Yes.                                              10:48
```

Tuesday, September 22, 2009                    Status Hearing

EXHIBIT ___13___
PAGE ___136___

26

1   Q    Who was the assistant, by the way, who sent the box?

2   A    Oany Rebalo.

3   Q    How do you spell that?

4   A    O-a-n-y is her first name; R-e-b-a-l-o.

5   Q    Is that a woman or a man?                                    10:48

6   A    It's a woman.

7   Q    Was Ms. Rebalo still employed by Mattel when you retired?

8   A    I don't recall.  She left approximately the same time; I

9   don't recall who left first.

10  Q    How long had she worked for you?                            10:49

11  A    Probably the better part of eight years.

12  Q    Now, also on Page 2 of Exhibit 3, there's a bullet point

13  there.  Do you see it?  "Those with leadership roles have

14  additional responsibilities."

15  A    Yes.                                                        10:49

16  Q    And that section of the code of conduct goes on to point

17  out that those who are leaders within Mattel have a special

18  responsibility to observe the code of conduct; correct?

19  A    Yes.

20  Q    And you were one such leader while you were employed at     10:49

21  Mattel as a vice president; correct?

22  A    Yes.

23  Q    Would you turn, please, to Page 4 of 14 in Exhibit 3.

24       Do you have that before you, Mr. de Anda?

25  A    I do.                                                       10:50

Tuesday, September 22, 2009                    Status Hearing

EXHIBIT ___13___
PAGE ___137___

28

| | |
|---|---|
| 1 | the country of Canada. |
| 2 | A    Yes. |
| 3 | Q    And that was true in 2006; correct? |
| 4 | A    That's correct. |
| 5 | Q    Would you turn, please, to Page 12 of Exhibit 3; Page 12 |
| 6 | of 14. |
| 7 | A    I'm there. |
| 8 | Q    Do you see there, there's a little carat there with |
| 9 | anti-corruption laws? |
| 10 | A    I do. |
| 11 | Q    There's a paragraph beginning "Bribery of public officials |
| 12 | is absolutely prohibited." |
| 13 |         Do you see that? |
| 14 | A  . Oh.  Yes. |
| 15 | Q    Would you read that paragraph. |
| 16 | A    Sure. |
| 17 |         "Bribery of public officials is absolutely |
| 18 | prohibited.  We should not offer, directly or indirectly, |
| 19 | anything of value to government authorities, including |
| 20 | political parties or candidates, to obtain an improper |
| 21 | advantage or to retain or obtain business.  No gifts, |
| 22 | contributions, or entertainment are to be offered of which |
| 23 | might create an appearance of impropriety.  We should |
| 24 | immediately report to the law department any suspected |
| 25 | violations of this requirement." |

10:51 (line 5)
10:51 (line 10)
10:52 (line 15)
10:52 (line 20)
10:52 (line 25)

Tuesday, September 22, 2009

Status Hearing

EXHIBIT  13
PAGE  139

29

1    Q    Now, both of these provisions that you have just read on

2    pages 4 and 12, you understood to apply to you in 2006; is that

3    correct?

4    A    That's correct.

5              MS. HURST:   Move for the admission of Exhibit 3,          10:53

6    Your Honor.

7              THE COURT:   Any objection?

8              MR. QUINN:   No objection.

9              THE COURT:   It's admitted.

10             (Exhibit 3 is received.)                                   10:53

11             MS. HURST:   Your Honor, Exhibit 4 is Mattel's Code of

12   Ethical Business Conduct, dated April 2005, M0924257 through

13   70.

14             THE COURT:   Very well.

15             (Witness is handed document.)                             10:54

16   BY MS. HURST:

17   Q    Mr. de Anda, on the third page of Exhibit 4 is the date on

18   the document; I didn't find it on the prior two pages.

19             Do you see that?  "Mattel, Inc. Code of Conduct,

20   April 2005"?                                                        10:54

21   A    Yes.

22   Q    And you were at Mattel in April of 2005.

23   A    Yes.

24   Q    And you understood the code of conduct to apply to

25   governing your conduct in 2005 at Mattel?                          10:54

Tuesday, September 22, 2009

Status Hearing

EXHIBIT ___ _13_

PAGE ___ _190_

30

1    A    That's correct.

2    Q    And, in fact, you were responsible for enforcing the 2005

3    Code of Conduct; correct?

4    A    Correct.

5    Q    Again, I direct your attention to Page 5 of Exhibit 4.    10:54

6    Towards the bottom you'll see the heading entitled "Gifts."

7         Do you see that?

8    A    Yes.

9    Q    And the 2005 Code of Conduct, like the 2003 Code of

10   Conduct, had a prohibition on giving gifts to government    10:55

11   officials without prior approval from the law department;

12   correct?

13   A    Correct.

14   Q    If you would turn to Page 11 of 14, please.  On Page 11 of

15   14, the last bullet point is entitled "Our Responsibility to    10:55

16   the Government in Compliance With the Law."

17         Do you see that?

18   A    Yes.

19   Q    And that portion of the code of conduct directed employees

20   to comply with all applicable laws, rules and regulations;    10:55

21   correct?

22   A    Yes.

23   Q    And it was your intention to follow the law in your role

24   as vice president of global security and investigations;

25   correct?    10:56

Tuesday, September 22, 2009                      Status Hearing

EXHIBIT ___ 13 ___
PAGE ___ 141 ___

1   A    Absolutely.

2   Q    And that included the foreign corrupt practices act;

3   correct?

4   A    Correct.

5   Q    And you were familiar with the foreign corrupt practices                10:56

6   act while you were the vice president of global security and

7   investigations at Mattel; correct?

8   A    Yes.

9   Q    And you had training on its requirements.

10  A    Yes.                                                                      10:56

11  Q    Turn, please, to Page 12 of Exhibit 4.

12       You see there's a heading there, "Anti-Corruption

13  Laws".

14  A    Yes.

15  Q    And the 2005 Code of Conduct, again, prohibited any gift                 10:56

16  which might create an appearance of impropriety; correct?

17  A    Correct.

18  Q    And you understood that to govern your conduct in 2006 as

19  well.

20  A    Correct.                                                                  10:57

21       **MS. HURST:**  Your Honor, Exhibit 5 is 15 USC, section

22  78(d)(d)-1.

23       (Document provided to witness.)

24  **BY MS. HURST:**

25  Q    Mr. de Anda, as part of your training on the foreign                     10:58

Tuesday, September 22, 2009                          Status Hearing

EXHIBIT ___13___

PAGE ___142___

1    corrupt practices act, you were provided a copy of the statute;

2    is that correct?

3    A    I don't recall, to be very honest with you.

4    Q    You familiarized yourself with its requirements.

5    A    I don't recall.  I'm certain somewhere down the line, but     10:58

6    I don't recall.  I'm certain I have, but I read so much that I

7    don't recall specifically reading this item.

8    Q    As the vice president of global security, global security

9    and investigations, you were responsible for interacting with

10   government officials in many countries worldwide; isn't that      10:59

11   true?

12   A    That's correct.

13   Q    And you were uniquely in a position to be interacting with

14   foreign officials worldwide as part of your position; isn't

15   that correct?                                                      10:59

16   A    Yes.

17   Q    But it's your testimony here today that you do not really

18   remember whether you familiarized yourself with the provisions

19   of the foreign corrupt practices act.

20   A    I read it generally.  As far as retaining everything it       10:59

21   says, I don't know that I have.

22   Q    You understood that it applied to public companies like

23   Mattel; correct?

24   A    Oh, yes.

25   Q    And you understood that in 2006 when you were at Mattel.       10:59

Tuesday, September 22, 2009                          Status Hearing

EXHIBIT _____ 13

PAGE _____ 743

```
1   A     Correct.

2   Q     And you understood that it applied to employees of public

3   companies.

4   A     Yes.

5   Q     Including you.                                              11:00

6   A     Yes.

7   Q     You understood that the foreign corrupt practices act

8   covered gifts, didn't you?

9   A     Yes.

10  Q     Gifts made to foreign officials under particular           11:00

11  circumstances; correct?

12  A     Yes.

13  Q     And you knew that in 2006.

14  A     Yes.

15  Q     Did you go to the law department in advance of sending the 11:00

16  package to the Peel Police?

17  A     Did I go to the law department?

18  Q     Yes.

19        You'll recall the Mattel Code of Conduct admonished

20  you to go to the law department prior to sending any gifts to    11:00

21  foreign officials?

22        Did you do so?

23  A   I did not.

24        MS. HURST:  Your Honor, Exhibit 6 marked for

25  identification is a document entitled "Investigation Into the    11:01
```

Tuesday, September 22, 2009                          Status Hearing

EXHIBIT      13

PAGE        144

34

1   Conduct of Janine Brisbois," M0926385 through 6799.

2               (Document is provided to witness.)

3          **MR. QUINN:**  Your Honor, if I may, this document is

4   marked "Attorneys Eyes Only".  It does contain proprietary and

5   confidential information.  To the extent counsel intends to go          11:02

6   into the substance of it, we might want to go to side-bar.  I

7   don't know where she's going with this, and I don't want

8   something blurted out, if we can avoid it.

9          **THE COURT:**  Just be mindful of that, counsel.

10          **MS. HURST:**  I will, Your Honor.                              11:02

11          Although, there's no foundation that any of this

12   information was provided to the Peel Police subject to any

13   obligation of confidentiality; so I'm not sure that the

14   predicate for maintaining confidentiality can be established on

15   Mattel's part.                                                          11:02

16          **THE COURT:**  Right.  But what we have done, to avoid a

17   pitfall that is not uncommon in this case, is, it's always

18   better to take care and not blurt something out; go to

19   side-bar.  Let's be mindful of that.

20          We have members of the press in the courtroom here.             11:03

21   Mr. Quinn has .advised you there's a concern.  Just take it

22   easy.

23          **MS. HURST:**  Thank you, Your Honor.

24   BY MS. HURST:

25   Q    You were responsible for the overall conduct of the               11:03

Tuesday, September 22, 2009                    Status Hearing
                                          EXHIBIT  _13_
                                          PAGE  _145_

```
 1    investigation into Janine Brisbois's departure; is that
 2    correct?  Within Mattel, I mean.
 3    A    I was responsible, I think, along -- to be as precise as
 4    possible, along with the law department, who also had a part in
 5    the investigation.                                                11:03
 6    Q    In September 2005, Janine Brisbois was an employee of
 7    Mattel in Canada, in Mississauga; is that correct?
 8    A    I believe so, yes.
 9    Q    She was the director of sales for the girls' business
10    team.                                                             11:04
11    A    I believe so.
12    Q    And that included the responsibility for selling Barbie,
13    Polly Pocket, and other girl toys.
14    A    Yes.
15    Q    And she had particular responsibility for the Wal-Mart      11:04
16    account; correct?
17    A    I believe so, yes.
18    Q    She resigned on September 26, 2005.
19    A    I don't remember the exact date, but that sounds about
20    right.                                                           11:04
21    Q    And she informed her supervisor that she was going to go
22    to work for MGA as its vice president of sales for Canada;
23    correct?
24    A    That's my understanding.
25    Q    At that time, MGA was Mattel's number one competitor in     11:04
```

Tuesday, September 22, 2009                    Status Hearing

EXHIBIT ___13___
PAGE ___146___

36

1    Canada; correct?

2    A    I don't know the status of that.  I'm sorry.

3    Q    Would you turn, please, to Page 3 of Exhibit 6, which has

4    the Bates number M0926392.

5    A    Yes.                                                          11:05

6    Q    If you'll review the first sentence on Page 3,

7    Mr. de Anda.

8         **MS. HURST:**  I've confirmed with Mr. Quinn that he has

9    no confidentiality issues, Your Honor.

10        **THE COURT:**  You may proceed.                              11:05

11   **BY MS. HURST:**

12   Q    The report provides that "the accused" -- that was

13   Ms. Brisbois; correct?

14   A    Yes.

15   Q    "Advised Mr. Totzke" -- that was her boss; correct?          11:05

16   A    Yes.

17   Q    That she was "going to leave Mattel and take up the

18   position with MGA Entertainment, Inc., Mattel's number one

19   competitor, as vice president of sales"; correct?

20   A    Yes, that's correct.                                          11:06

21   Q    Does that refresh your recollection that in late 2005, MGA

22   was Mattel's number one competitor in Canada?

23   A    It doesn't refresh my memory because I didn't know at the

24   time, and I still didn't know until right now reading this,

25   that they were our number one competitor.  I'm in the security   11:06

Tuesday, September 22, 2009                          Status Hearing

EXHIBIT _____ 13

PAGE _____ 147

37

```
 1  business, not in the sales or marketing business.
 2  Q    You knew MGA was a competitor in 2006.
 3  A    Yes, I did.
 4  Q    You knew it was selling Bratz dolls.
 5  A    Yes.                                                    11:06
 6  Q    You knew the sales of Bratz dolls competed with the sales
 7  of Barbie dolls?
 8  A    Yes.
 9  Q    Barbie dolls were sold by Mattel.
10  A    Yes.                                                    11:06
11  Q    And all of that was happening in Canada as well as in the
12  United States.
13  A    Yes.
14  Q    As the director of sales for Mattel, Ms. Brisbois was
15  responsible for obtaining business on behalf of Mattel;        11:07
16  correct?
17  A    I would assume so.  I don't know her -- I'm not in that
18  part of the business, but I would assume, yes.
19  Q    Making sales.
20  A    Yes.                                                    11:07
21  Q    And as a BP of sales for MGA, it would be reasonable to
22  believe that she had the same responsibility; correct?
23          MR. QUINN:  Speculation, Your Honor; lacks
24  foundation.
25          THE COURT:  Sustained.                              11:07
```

Tuesday, September 22, 2009                    Status Hearing

EXHIBIT  13
PAGE  148

38

1          Rephrase.

2    **BY MS. HURST:**

3    Q    At the time you were investigating Ms. Brisbois's

4    departure and you learned that she was to become or had become

5    the vice president of sales for MGA, you understood that she          11:07

6    was likely to be responsible for generating sales of MGA

7    products; correct?

8    A    To be very honest with you, that never entered my mind

9    because I'm not in that part of the business.  Her title and

10   capacity, her duties and responsibilities, I didn't really           11:07

11   focus, so I didn't really -- how do I say this -- have a

12   complete understanding.  But if she was in sales, she was in

13   sales.

14   Q    You provided information to the Peel Police about what her

15   responsibilities had been at Mattel.                                  11:08

16   A    I don't recall.  I may have said that -- I don't recall

17   that I identified her responsibilities; maybe her title; but I

18   don't recall knowing her duties and responsibilities to that

19   extent.

20   Q    You said you presented an 8-page, I believe, document, on       11:08

21   questioning for Mr. Quinn, to the Peel Police when you met with

22   them in the spring of 2006.

23   A    Right.  I believe it to be eight pages.  I remember it

24   was -- for some reason, eight sticks in my mind, and I believe

25   it to be about that thick, eight pages worth.                        11:09

Tuesday, September 22, 2009                    Status Hearing

EXHIBIT    13
PAGE       149

39

```
1   Q    Would you turn to -- its going to be about the middle of
2   Exhibit 6 that you have there in front of you.
3   A    What page number?
4   Q    The Bates number is on the lower right-hand corner that
5   ends in 477.  You should be able to find it.                    11:09
6   A    Yes.
7   Q    M0926477.  Do you see that?
8   A    Yes.
9   Q    Is that the document you presented to the Peel Police?
10          THE COURT:  Counsel, what page?                          11:09
11          MS. HURST:  M0926477.
12          THE COURT:  Thank you.
13          THE WITNESS:  I believe so.
14          And I stand corrected, it's nine pages.
15  BY MS. HURST:                                                   11:10
16  Q    I'm sorry?
17  A    I stand corrected; it's nine pages.
18  Q    That's pretty good.
19          Did you also provide statements by Mattel employees
20  to the Peel Police?                                             11:10
21  A    You know, I only recall supplying them this report.
22  Q    Did someone else acting pursuant to your supervision or
23  acting with you provide statements of Mattel employees to the
24  Peel Police?
25  A    I don't recall that was done.                              11:11
```

1   Q    Could I direct your attention, please, to the Bates number

2   ending in 434.

3   A    I have it.

4   Q    That's a page entitled "Anticipated Evidence of

5   Steve Totzke, October 17, 2006."                                11:11

6        Do you see that?

7   A    Oh, yes, I do.

8   Q    Did you provide this to the Peel Police?

9   A    I don't recall ever doing so.

10  Q    Did Mr. Totzke inform you during the course of your         11:12

11  investigation that when Ms. Brisbois handed in her letter of

12  resignation she informed him she was going to MGA and would

13  have their top sales title?

14  A    I don't have a recollection talking to Mr. Totzke, for

15  some reason.  I remember talking to Jeff Massingberd and        11:12

16  Roberto Morales, but for some reason I don't have a

17  recollection of that.

18  Q    When you talked to Morales, did he tell you that he had

19  told Ms. Brisbois in her exit interview that she handled one of

20  the biggest accounts, Wal-Mart, and that she should not do      11:13

21  anything stupid?

22  A    He may have, but I just have no recollection.  I'm sorry.

23  Q    Mattel opened an investigation into Ms. Brisbois

24  immediately upon learning that she was going to depart for MGA;

25  is that correct?                                                11:13

Tuesday, September 22, 2009

1   A     Pretty much immediately.

2   Q     Just the fact that she was leaving for MGA was sufficient

3   for you to open an investigation; isn't that right?

4   A     Yes.

5   Q     You mentioned that you engaged a forensic analyst to look          11:14

6   at her hard drive; correct?

7   A     Yes.

8   Q     The hard drive was shipped from Mattel, Canada first to

9   your global security department; correct?

10  A     I don't recall if that was the process.  I'm sorry.              11:14

11  Q     Would you turn to Page 481, please.

12  A     Yes.

13  Q     In the second paragraph there, "Elias requested that the

14  hard disk drive..."

15        Do you see that?                                                 11:14

16  A     Yes.

17  Q     Jamie Elias -- is that the right way to pronounce it?

18  A     It's Jaime.

19  Q     Jaime Elias, he worked for you; is that correct?

20  A     Yes.                                                             11:15

21  Q     He was one of your investigators.

22  A     Yes.

23  Q     He requested that "the hard disc drive from the Mattel

24  computer assigned to Brisbois be sent to Mattel global

25  security."                                                            11:15

Tuesday, September 22, 2009                          Status Hearing

EXHIBIT _____13_____
PAGE _____152_____

1        Do you see that?

2    A    Yes.

3    Q    And in the remainder of that paragraph, it goes on to say

4    "it was then shipped to the forensic analyst evidence data";

5    correct?                                                            11:15

6    A    Yes.

7    Q    And in each instance, Mattel kept a record of the manner

8    in which the hard drive was shipped and the tracking

9    information related to that shipment; is that correct?

10   A    Correct.                                                       11:15

11   Q    And your global security department maintained other

12   records of its shipments as well, didn't it?

13           MR. QUINN:  Vague with what's referred to,

14   Your Honor; shipment of the hard disc drive.

15           THE COURT:  Clarify, counsel.                              11:16

16   BY MS. HURST:

17   Q    When you made shipments in connection with your

18   investigations, you maintained records of them; is that

19   correct?

20   A    Yes.                                                          11:16

21           MR. QUINN:  Your Honor, I still think it's vague and

22   overbroad.

23           THE COURT:  Yes.  Please specify.

24   BY MS. HURST:

25   Q    When you shipped things by Federal Express in connection      11:16

Tuesday, September 22, 2009                          Status Hearing

EXHIBIT  13
PAGE  153

43

```
 1   with your investigations, you maintained copies of those labels

 2   related to those shipments in your department; isn't that

 3   correct?

 4          MR. QUINN:  Related to this investigation,

 5   Your Honor, or, like, forever, concerning every subject?          11:16

 6          THE COURT:  It's a more general question.

 7          Overruled.

 8          If you can answer.

 9          THE WITNESS:  I think I can answer.

10          With regard to shipping of evidence, yes, we keep          11:16

11   documentation to show that the evidence has been shipped.

12   BY MS. HURST:

13   Q    In fact, it was your practice to maintain records of

14   shipments of any type of shipment until you could confirm that

15   they were delivered; isn't that right?                            11:17

16          MR. QUINN:  Is this just evidence, Your Honor, or any

17   Federal Express sent at all?

18          MS. HURST:  It's just a practice; the question is the

19   practice.

20          THE COURT:  Overruled.                                     11:17

21          THE WITNESS:  I'm sorry.

22   BY MS. HURST:

23   Q    Was it your practice to maintain records of shipments that

24   your department made at least until you could confirm that they

25   had been delivered?                                               11:17
```

Tuesday, September 22, 2009

Status Hearing

EXHIBIT  _13_

PAGE  _154_

44

```
 1   A     Of any item?

 2   Q     Yes.

 3   A     I'm not certain, because I did not do it, but I would

 4   assume so.

 5   Q     That would be good practice, wouldn't it?           11:17

 6   A     Well, it depends.  I mean, all shipments now have tracking

 7   numbers, so I'm certain -- I don't know, to be very honest with

 8   you.  I did not handle the shipping.

 9   Q     Your assistant handled that.

10   A     Yes.  It's hard for me to answer the questions.  I didn't  11:18

11   ship.

12   Q     Do you ever have anything go awry and you had to ask your

13   assistant what happened to it and she was able to confirm for

14   you?

15   A     Not that I recall.                                   11:18

16   Q     When was your meeting with the Peel Police in -- was it in

17   Mississauga?

18   A     Yes.  I believe so, yes.

19   Q     When was that meeting?

20   A     The exact date, I don't recall, but it was cold so it was  11:18

21   the early part of 2006; probably January of 2006, January or

22   February of 2006.

23   Q     You presented the document that I identified as part of

24   Exhibit 6 to them when you went there; correct?

25   A     That's the document I recall.  I think it's a 9-page  11:19
```

Tuesday, September 22, 2009

Status Hearing

EXHIBIT  13

PAGE  155

45

1   document.

2   Q    If you would like to refresh your recollection, it's got a

3   Bates number 477.

4   A    I recall this to be the document, yes.

5   Q    It's got a March 17, 2006, date on it.                    11:19

6        Do you see that?

7   A    Yes.

8   Q    So your meeting with the Peel Police would have been some

9   time after March 17, 2006.

10  A    Right; it would have been.                                11:19

11  Q    Had Mattel already initiated any kind of investigation

12  with the Peel Police prior to the time that you went there for

13  a meeting?

14        MR. QUINN:  Concerning Ms. Brisbois?

15        MS. HURST:  Concerning Ms. Brisbois.  Thank you.        11:19

16        THE COURT:  Very well.

17        THE WITNESS:  There were communications.  I don't

18  know if you would call it an investigation.  There was just

19  contact made.

20  BY MS. HURST:                                                  11:20

21  Q    Did you ever make a formal complaint on behalf of Mattel

22  concerning Mrs. Brisbois's departure from Mattel or any of the

23  conduct surrounding that?

24  A    No.  That was my purpose of visiting with the Peel Police

25  Department to present this matter to them.                     11:20

Status Hearing
EXHIBIT ___13___
PAGE ___156___