1   Q     So it was your purpose to make a formal complaint when you

2   went there.

3   A     It was -- yes.

4   Q     And you understood that Mattel was the complaining

5   witness; correct?                                                    11:20

6   A     Yes.

7   Q     And you, on behalf of Mattel, were the complaining

8   witness; correct?

9   A     That's correct.

10  Q     Was there a written confidentiality agreement concerning    11:20

11  what happened at that meeting?

12  A     No.

13  Q     When you went to the meeting, did you believe that

14  Ms. Brisbois had committed a crime under Canadian law?

15  A     Yes.                                                          11:21

16  Q     What crime did you believe she had committed?

17  A     Stolen intellectual property.

18  Q     Theft of trade secrets is not a crime under Canadian law;

19  correct?

20         MR. QUINN:   Your Honor, he's not a lawyer of any           11:21

21  kind, Canadian or otherwise.  We can argue about that; we can

22  look it up.

23         THE COURT:   To his knowledge.

24  BY MS. HURST:

25  Q     To your knowledge, Mr. de Anda, is there such a thing as     11:21

Tuesday, September 22, 2009                    Status Hearing

EXHIBIT ___13___
PAGE ___157___

1   criminal theft of trade secrets under Canadian law that governs

2   the Mississauga geographic area?

3   A    I don't believe there is exactly in that terminology.

4   Q    Your objective for the meeting with the Peel Police

5   included persuading them to open a criminal investigation into        11:21

6   Ms. Brisbois's conduct; isn't that correct?

7   A    No.

8   Q    No?

9   A    No.  Not persuade.  I think that is the wrong word.

10         I was simply there to present the facts as I knew        11:22

11   them.  In a criminal matter, the evidence is the evidence, and

12   all I was doing was presenting the evidence as I knew it.

13   Q    You hoped that they would open an investigation; isn't

14   that true?

15   A    If there was a criminal violation, yes.        11:22

16         **MS. HURST:**  Your Honor, Exhibit 7 is the e-mail

17   exchange with Bates number M0925945 and 46.

18         (Document provided to witness.)

19         **THE COURT:**  This is Exhibit 7?

20         **MS. HURST:**  Yes, Your Honor.        11:23

21   **BY MS. HURST:**

22   Q    By the way, Mr. de Anda, have you spoken to anyone from

23   the Peel Police in the last six weeks or so?

24   A    Oh, no.

25   Q    Mr. de Anda, on the bottom of Exhibit 7, there is an        11:23

Tuesday, September 22, 2009                    Status Hearing

EXHIBIT  13
PAGE  158

1  e-mail from Rodney Jones to de Anda, Richard, dated April 25,

2  2006.

3          Do you see that?

4  A    Yes.

5  Q    And did you receive that e-mail from Mr. Jones on or about    11:24

6  April 25, 2006, in the course of your business as Mattel's vice

7  president for global security and investigations?

8  A    I did.

9  Q    And you responded to the e-mail; is that correct?

10 A    I did.                                                        11:24

11 Q    And that is your response as indicated at the top of the

12 first page of Exhibit 7, from de Anda, Richard, sent Tuesday,

13 April 25, 2006, to Jones, Rodney; is that correct?

14 A    Yes.

15 Q    And you sent that e-mail in the course of your ordinary      11:24

16 duties as Mattel's vice president of global security and

17 investigations; is that correct?

18 A    Yes.

19         **MS. HURST:**  Your Honor, I'd move for the admission of

20 Exhibit 7.                                                        11:24

21         **THE COURT:**  Any objection?

22         **MR. QUINN:**  No objection.

23         **THE COURT:**  It's admitted.

24         (Exhibit 7 is received.)

25 / / /                                                             11:25

Tuesday, September 22, 2009                        Status Hearing

EXHIBIT  13
PAGE  159

49

**BY MS. HURST:**

1

2   Q    Did you review this document in your preparation to

3   testify here today?

4   A    I did not.  I have not seen it since -- several years.

5   Q    In the third paragraph of Mr. Jones's e-mail, he wrote,          11:25

6   "We received the package you sent and made the distributions to

7   the officers with young children."

8        Do you see that?

9   A    Yes.

10  Q    "Okay.  I admit to having a couple on my desk."               11:25

11       Right?

12  A    Oh.  Yes.  I'm sorry.

13  Q    How many officers with young children were there at the

14  Peel Police?

15       **MR. QUINN:**  Foundation.                                   11:25

16       **THE COURT:**  Foundation, counsel.

17  **BY MS. HURST:**

18  Q    How many officers were there in the department that you

19  met with in the spring of 2006?

20  A    I would just have to take a rough guess.                       11:26

21       **MR. QUINN:**  Your Honor, I think the question is

22  ambiguous as to how many officers in the whole department,

23  or --

24       **THE COURT:**  We don't want a guess.

25       And that's not foundation.                                    11:26

Tuesday, September 22, 2009                        Status Hearing

                                                   EXHIBIT  _13_
                                                   PAGE  _160_

50

**BY MS. HURST:**

1

2 Q    When you met with the Peel Police in the spring of 2006,

3 you had prior familiarity with them as a result of your time as

4 an L.A.P.D. police detective and also in your role as Mattel's

5 vice president of global security and investigations; is that        11:26

6 correct?

7 A    With the Peel Police Department, yes.

8 Q    And they were the police department responsible for the

9 Mississauga area.

10 A    Yes.                                                            11:26

11 Q    And the Mississauga area was where Mattel, Canada was

12 located.

13 A    Yes.

14 Q    So whenever you had a complaint to deal with on behalf of

15 Mattel, Canada, it was the Peel Police that you went to.            11:26

16 A    Yes.

17 Q    In the course of your duties as Mattel vice president, did

18 you familiarize yourself with the capabilities of the Peel

19 Police Department in the Mississauga area?

20 A    I don't understand what you mean by capabilities.             11:27

21 Q    Did you gain some understanding in the course of your

22 duties as Mattel's vice president as to approximately how many

23 police officers there were in the Peel Police Department?

24 A    I know that it was a medium-sized police department.   It

25 could have several hundred police officers.   I don't know the     11:27

Tuesday, September 22, 2009                           Status Hearing

EXHIBIT ___13___

PAGE _____161___

51

1  exact count.

2  Q    Okay.

3        Now, Exhibit 7 indicates that it's redacted on the

4  top.

5        Do you see that?                                    11:27

6  A    Yes, I do.

7  Q    And that was redacted because there was attorney-client

8  privileged information there on the top of the original

9  document; is that correct?

10        **MR. QUINN:**  Lacks foundation.                   11:28

11        **THE COURT:**  Sustained.

12        **THE WITNESS:**  I don't know the --

13        **THE COURT:**  Sustained.

14  **BY MS. HURST:**

15  Q    You forwarded your e-mail exchange with Mr. Jones to  11:28

16  attorneys at Mattel; is that correct?

17  A    Are you asking if I forwarded -- can you give me a time

18  period?  At this time, or...

19  **BY MS. HURST:**

20  Q    Sure.  At that time, at approximately the time that the  11:28

21  exchange occurred that's depicted in Exhibit 7, you forwarded

22  this exchange to attorneys at Mattel; isn't that correct?

23  A    It doesn't indicate, so I don't know if I did or I didn't.

24  Q    Exhibit 8 is "Mattel versus Carter Bryant and consolidated

25  cases supplemental privilege log, dated April 13, 2009,      11:29

Tuesday, September 22, 2009                    Status Hearing

                                               EXHIBIT  /3
                                               PAGE  /62

52

| | |
|---|---|
| 1 | Page 181 of 182." |
| 2 | (Document provided to witness.) |
| 3 | **BY MS. HURST:** |
| 4 | Q    Mr. de Anda, I'm going to direct your attention down at |
| 5 | the bottom of Exhibit 8, there's an entry, 981. |
| 6 | Do you see that? |
| 7 | A    Yes. |
| 8 | Q    And it's document type "e-mail" with redacted in |
| 9 | parentheses. |
| 10 | **MR. QUINN:**  Your Honor, there's a foundation |
| 11 | objection to question the witness about this document. |
| 12 | **THE COURT:**  That's what she's trying to do.  She's |
| 13 | just showing the document at this point. |
| 14 | **MS. HURST:**  Thank you, your Honor. |
| 15 | **BY MS. HURST:** |
| 16 | Q    And in the document type, there is a Bates number. |
| 17 | Do you see that? |
| 18 | A    Yes. |
| 19 | Q    And it's the same Bates number that appears on the first |
| 20 | page of Exhibit 7; is that correct? |
| 21 | A    Yes. |
| 22 | Q    And the date is the same, April 25, 2006, as the date on |
| 23 | Exhibit 7; correct? |
| 24 | A    Yes. |
| 25 | Q    And it indicates from Richard de Anda. |

11:29 (line 5)
11:30 (line 10)
11:30 (line 15)
11:30 (line 20)
11:30 (line 25)

Tuesday, September 22, 2009

Status Hearing
EXHIBIT _13_
PAGE _163_

53

```
 1              Do you see that on the privilege log?
 2   A    Yes.
 3   Q    And two recipients:  Brian O'Connor, Jaime Elias,
 4   Jill Thomas.  Do you see that?
 5   A    Yes.
 6   Q    And Jaime Elias, you've already mentioned, was an
 7   investigator in your department; correct?
 8   A    Correct.
 9   Q    And Jill Thomas was an attorney at Mattel; is that
10   correct?                                                    11:30
11   A    Correct.
12   Q    And Brian O'Connor was an attorney at Mattel; is that
13   correct?
14   A    Correct.
15   Q    Having reviewed this privilege log entry, does that    11:31
16   refresh your recollection that you forwarded this e-mail
17   exchange to Mr. O'Connor, Mr. Elias, and Ms. Thomas?
18   A    I'm sorry.  I have no independent recollection at all.  I
19   send hundreds of e-mails per day, unfortunately; so to have
20   exclusive memory of this, I don't.                          11:31
21   Q    Was Mr. O'Connor working with you on the Janine Brisbois
22   investigation?
23   A    Yes.
24   Q    Was Ms. Thomas?
25   A    Yes.                                                    11:31
```

Tuesday, September 22, 2009                    Status Hearing

EXHIBIT ___13___
PAGE ___164___

54

| | |
|---|---|
| 1 | Q    And was Mr. Elias? |
| 2 | A    Yes. |
| 3 | Q    Do you have any reason to doubt that you forwarded the |
| 4 | e-mail exchange in Exhibit 7 to Mr. O'Connor, Mr. Elias and |
| 5 | Ms. Thomas as indicated on Exhibit 8? |

11:31

6  A    I have no doubt, but I have no recollection.

7  Q    All right.

8         Did you ever receive any kind of communication from

9  Mr. O'Connor, an attorney for Mattel, indicating to you that

10 you should not have sent a package with gifts to the Peel

11 Police?

11:32

12        MR. QUINN:  Objection.  Privilege.

13        THE COURT:  It seems to call for privileged

14 communication, counsel.  Sustain the objection.

15        MS. HURST:  Thank you, your Honor.

11:32

16 BY MS. HURST:

17 Q    Were you instructed by Mr. O'Connor not to send any

18 further gifts to the Peel Police?

19        MR. QUINN:  Same objection.

20        THE COURT:  Mr. O'Connor is an attorney; correct?

11:33

21        MS. HURST:  Yes.

22        THE COURT:  It seems to go to direction by counsel.

23        MS. HURST:  The Mattel's code of conduct specifically

24 prohibited giving gifts to law enforcement authorities and made

25 the law department the enforcer of that provision.

11:33

Tuesday, September 22, 2009                          Status Hearing

EXHIBIT  13
PAGE     165

55

```
 1              THE COURT:  I understand that, but I don't know how
 2     that gets beyond the attorney-client privilege, though.
 3     BY MS. HURST:
 4     Q    Are you following counsel's instruction and refusing to
 5     answer that question?                                          11:33
 6              MR. QUINN:  I think the objection was sustained.
 7              THE COURT:  That's not proper, counsel.
 8              The attorney has objected.  I've sustained it before
 9     you even get to the witness on this.
10              MS. HURST:  All right.                                 11:33
11     BY MS. HURST:
12     Q    You said your assistant sent the package.
13     A    Yes.
14     Q    From your offices in El Segundo.
15     A    Yes.                                                       11:34
16     Q    What were the means of conveyance of the package?
17     A    It would obviously go through our mail room and whatever
18     mail service we had at that time would have been utilized, be
19     it DHL or UPS or FedEx.  I'm not certain.
20     Q    Usually those services require the preparation of a weigh  11:34
21     bill of some sort; correct?
22     A    That's my understanding.
23     Q    Who filled that out?
24     A    My assistant would have.
25     Q    To whom was the package addressed?                        11:34
```

Tuesday, September 22, 2009                          Status Hearing

EXHIBIT _____13_____
PAGE _____166_____

56

1    A    I believe it was to Rodney Jones.

2    Q    Did Mattel pay for the shipping on the package?

3    A    They would have, yes.

4    Q    Was the package insured?

5    A    I would doubt it.  I don't know, but I would doubt that.      11:34

6    Q    Who signed the customs declaration?

7              MR. QUINN:  Objection.  It assumes that there was

8    one, Your Honor.

9              THE COURT:  Sustained.

10             Lay a foundation.      11:35

11   BY MS. HURST:

12   Q    You sent the package to Canada; correct?

13   A    Yes.

14   Q    Ordinarily that requires a customs declaration when you

15   send a package to a foreign country; correct?      11:35

16             MR. QUINN:  Lacks foundation.

17             THE COURT:  She's asking if he knows.

18             Do you know, sir?

19             THE WITNESS:  No.  I do not know.

20             MS. HURST:  Okay.      11:35

21   BY MS. HURST:

22   Q    You said the contents of the package were toy police cars;

23   correct?

24   A    To the best of my recollection.  Like I said, I just

25   glanced at it in passing, and I saw what was just a handful of      11:35

Tuesday, September 22, 2009                    Status Hearing

EXHIBIT __13__
PAGE ____167____

57

```
 1   cars and I maybe only saw one or two being a police car.
 2            THE COURT:  You said you saw the open box before it
 3   was sealed?
 4            THE WITNESS:  It was just an open box, but the way
 5   that they -- they were just thrown in so they were on top of      11:35
 6   each other.
 7            THE COURT:  You saw it, though, before it was sealed
 8   up?
 9            THE WITNESS:  As I recall, yes, Your Honor.  I just
10   glanced at it.  It was of no consequence.  It just looked like    11:36
11   little police cars in blister packs.
12            THE COURT:  Did there appear to be anything else
13   besides some police cars?
14            THE WITNESS:  I doubt it, your Honor.
15            I don't know.  I didn't dig down through the package,    11:36
16   but it was just a handful.  There's like a small -- smaller
17   than a shoe box, as I recall.
18            It's been a long time.  That's to the best of my
19   recollection.
20   BY MS. HURST:                                                     11:36
21   Q    You did not examine fully the contents of the package
22   before it was sent; is that correct?
23   A    I didn't go through it and sort through it; I didn't
24   inventory it.
25   Q    You didn't count the contents.                              11:36
```

Tuesday, September 22, 2009                     Status Hearing

EXHIBIT ___13___
PAGE ___168___

58

1   A    No, I did not.

2   Q    Which of Mattel's brand of toy cars was included in the

3   package?

4   A    To the best of my recollection, I remember the little

5   police cars and I think they were Matchbox; they were just      11:37

6   little blister packs of police vehicles.

7   Q    Matchbox, Hot Wheels or Tyco brand?

8   A    I would have to see them again, but my best recollection

9   is that they were little Matchbox-type vehicles.

10  Q    Did they have any logos on them?                             11:38

11  A    I'm certain that they had Mattel logos; that was the whole

12  purpose.

13  Q    That was the whole purpose of what?

14  A    It was just a reciprocal gift; like police departments

15  give patches to their agencies; it was just to give them police  11:38

16  cars for reciprocating for their mug; kind of a swap; that's

17  all.

18  Q    After you sent the package, the Canadian police

19  interviewed Janine Brisbois; is that correct?

20  A    That's my understanding.                                     11:39

21  Q    And they reported to you regarding the results of that

22  interview; correct?

23  A    Somewhere down the line.  I was on vacation during that

24  period of time out of state.

25  Q    By the way, the investigation materials that you gave to     11:39

Tuesday, September 22, 2009                          Status Hearing

EXHIBIT ___13___
PAGE ___169___

59

1    the Peel Police identified MGA employees and Isaac Larian as

2    people involved in your investigation; isn't that correct?

3    A    If the report states so, yes.

4    Q    Would you turn to Exhibit 6, the page ending in 479.

5    A    Exhibit 6 is the --                                          11:39

6    Q    The big fat one; 479.

7    A    I'm there.

8    Q    And this is part of the report you provided to the Peel

9    Police; correct?

10   A    Correct.                                                     11:40

11   Q    And your report identified Diane Goveia Gordon of MGA as

12   someone involved, as a person involved; is that correct?

13   A    Yes.

14   Q    And it identified Mark Robinson of MGA Entertainment,

15   Canada, as a person involved?                                     11:40

16   A    Yes.

17   Q    And it identified Isaac Larian, president and CEO of MGA

18   Entertainment, as a person involved.

19   A    Yes.

20   Q    Now, when you went to meet with the Peel Police, had you    11:40

21   formed a belief that any of those persons had committed a

22   crime?

23   A    I don't believe I had formed an opinion, no.

24   Q    You didn't know one way or the other.

25   A    At the time, no.  Not that I recall.                         11:41

Tuesday, September 22, 2009                    Status Hearing

                                        EXHIBIT    13
                                        PAGE       170

60

```
 1   Q    And when the police interviewed Ms. Brisbois, she told

 2   them that she had not forwarded anything to anyone else; isn't

 3   that correct?

 4           MR. QUINN:   Foundation, Your Honor.

 5           THE COURT:   Sustained.                                    11:41

 6   BY MS. HURST:

 7   Q    After the police interviewed Ms. Brisbois, they reported

 8   to you on the contents of that interview; correct?

 9   A    Somewhere along the line, I did receive some information

10   that there was an interview, and I don't recall the exact       11:41

11   context of the information or the conversation.

12           It's been so long.  I'm sorry.  I just don't have...

13           MS. HURST:   Exhibit 9 is an e-mail exchange between

14   Mr. Pucci and Mr. de Anda, M0925943 and 44.

15           (Document provided to witness.)                           11:42

16   BY MS. HURST:

17   Q    When you went to the Peel Police Department in the spring

18   of 2006, did you ask them to investigate MGA as well as

19   Ms. Brisbois?

20   A    I don't recall that I asked them to investigate MGA.  I     11:43

21   asked them to pursue the information, the evidence, that I had

22   in the report that I had passed on to them.

23   Q    And what was your expectation as to whether that

24   investigation would involve MGA, when you met with them?

25   A    I did not know -- as far as expectations, the expectations  11:43
```

Status Hearing

EXHIBIT ___13___
PAGE ___171___

1   were that Ms. Brisbois would be charged if there was a crime.

2   And if MGA had solicited her to take this, then they would

3   pursue that.  That's what I assumed.  I assumed they would do a

4   complete, thorough investigation.

5   Q    Were there less than ten cars in the package?                11:44

6   A    You know, once again, I remember there just being a

7   handful, and I'm thinking the number at a half dozen because

8   more of the size of the container or the package than anything

9   else.  Like I said, I did not dig down through it.  I just

10  glanced, maybe, at what was on top.                                11:44

11        And I'll be very honest with you, it's just vague.

12  Q    Your recollection is vague on this issue.

13  A    On the contents -- not of the entire incident, just the

14  contents, because I didn't dig through it; I didn't give it

15  much attention at all.                                             11:45

16  Q    Have you had a chance to look at Exhibit 9?

17  A    I have, yes.

18  Q    And the e-mail at the bottom of the first page of

19  Exhibit 9 is sent to you by Mr. Pucci on or about May 31, 2006

20  in the course of your duties as Mattel's vice president of        11:45

21  global security and investigations; is that correct?

22  A    Yes.

23  Q    And you responded to Mr. Pucci with a copy to Jaime Elias

24  on or about June 2, 2006, in the course of your duties as

25  Mattel's vice president of global security and investigations;    11:45

Tuesday, September 22, 2009                        Status Hearing

EXHIBIT  13
PAGE  172

1  is that correct?

2  A    Yes.

3  Q    In your response, you noted, about four sentences in, "per

4  our earlier conversation, you indicate she stated that she did

5  not forward the information on."                                    11:46

6         Do you see that?

7  A    Yes.

8  Q    So Mr. Pucci told you that Janine Brisbois told him that

9  she had not forwarded the information; correct?

10 A    Yes.                                                           11:46

11 Q    And then you requested that he attempt to establish

12 whether that was true or not by way of forensic analysis;

13 correct?

14        MR. QUINN:   Your Honor, the document speaks for

15 itself.                                                             11:46

16        THE COURT:   It does.

17        If you have a question on anything that he said in

18 terms of his understanding, you may question him on that.

19 BY MS. HURST:

20 Q    Did you request of Mr. Pucci that the Peel Police attempt   11:46

21 to establish whether Ms. Brisbois's statement was true by using

22 forensic analysis?

23 A    Yes, I did.  Like it says here, "Were you able to

24 establish that by way of forensic analyst?"

25        In other words, did they do anything other than just      11:47

Tuesday, September 22, 2009                          Status Hearing

EXHIBIT ___/3___

PAGE ___/73___

63

1    take her statement and word for it.

2    Q    Do you have any idea, as you sit here today, why Mattel

3    does not possess a single document concerning the package that

4    was sent to the Peel Police other than your e-mail exchange

5    with Mr. Jones?                                              11:47

6    A    Yes.

7    Q    Why is that?

8    A    Actually, I tried to look for -- once I understood what

9    the issue was, I went to the mail room and actually e-mailed

10   them, asking them, and I had a conversation with the individual   11:48

11   in charge of the mail room, and I asked them the approximate

12   time and where the package was going; they said they only

13   retain shipping documents for a year, and they were purged.

14         So then I said, Well, can you contact whatever

15   carrier we had?  And I forgot what carrier it was, but they   11:48

16   did.  And they said, no, they purge theirs after a year also;

17   so the time had passed; so there was no document.

18   Q    So the mail department no longer had any record of the

19   package.

20   A    Right; and neither did the carrier.                      11:48

21   Q    How large was your supply of toy police cars that you kept

22   on hand in your office?

23   A    Police cars?  I don't know how many police cars, but

24   there's a file, a lateral file drawer, in a file cabinet that

25   has cars in it.                                               11:49

64

1   Q     Still today?

2   A     The last time I looked, there was a few cars, sure;

3   there's probably half a drawer.

4   Q     You still maintain your office at Mattel?

5   A     I still maintain my office.                                    11:49

6   Q     Same office that you had when you retired?

7   A     Yes.

8   Q     When you sent the package to the Peel Police with toy cars

9   in it with the Mattel logo on them, you hoped to create a

10  positive feeling towards you and Mattel; isn't that right?      11:49

11  A     That wasn't my intent.  My intent was to reciprocate for

12  the gift they had given me.  That was all.  I had no motive or

13  any intent other than that.

14  Q     With a gift that would put the Mattel logo in front of the

15  Peel Police.                                                         11:50

16  A     I don't know that it would have -- well, I don't

17  understand the question.  You mean put the Mattel logo in front

18  of them...

19  Q     It was on the cars, correct, as you testified earlier?

20  A     It was on the packaging.                                       11:50

21  Q     Okay.

22        It wasn't on the cars?

23  A     It is on the car; you turn the car over.  I need glasses,

24  personally, to see it.

25  Q     The toy cars -- strike that.                                   11:50

Tuesday, September 22, 2009

Status Hearing
EXHIBIT ___13___
PAGE ___175___

65

```
 1            When you obtained the mug from the Peel Police, where

 2   did you keep it?

 3   A    I put it in a drawer.

 4   Q    Mr. Jones informed you that he kept your gift sitting out

 5   on his desk.                                                        11:51

 6            THE COURT:  Is that a question?

 7            MS. HURST:  Yes.  Exhibit 7.

 8            THE COURT:  What's the question?

 9            You just said "Mr. Jones informed you that he kept

10   your car sitting out on the desk."                                  11:51

11            Is there a question there?

12            MS. HURST:  Yes.

13   BY MS. HURST:

14   Q    Isn't that correct?

15   A    I vaguely recall something similar to that, yes.              11:51

16            MS. HURST:  I'm sorry, Your Honor.  I favor the

17   declarative style of cross-examination.

18            THE COURT:  I didn't know if that was a statement

19   or...

20   BY MS. HURST:                                                       11:51

21   Q    And when sitting on Mr. Jones's desk during the course of

22   his investigation, those toy cars were constant visible

23   reminders of Mattel; isn't that correct?

24            MR. QUINN:  Speculation; foundation.

25            THE COURT:  It seems to be.  You'd have to ask            11:51
```

Tuesday, September 22, 2009                          Status Hearing

EXHIBIT _____13_____
PAGE _____176_____

1    Mr. Jones about that.

2            **MS. HURST:**  Your Honor, I'd also move for the

3    admission of Exhibit 2, the Peace Officers' Association Ethical

4    Manual, and Exhibit 4, the 2005 Code of Conduct.

5            **THE COURT:**  Any objection?                    11:53

6            **MR. QUINN:**  No objection.

7            **THE COURT:**  They are admitted.

8            (Exhibit 2 and Exhibit 4 are received.)

9    **BY MS. HURST:**

10   Q    Mr. de Anda, did your responsibilities as vice president    11:53

11   of global security and investigations also include overseeing

12   the investigation of Mexican Mattel employees' departure of

13   Pablo Vargas, Marina Trueva Almeda, and Gustavo Machado?

14   A    Yes.

15           **MS. HURST:**  No further questions, Your Honor.    11:53

16           **THE COURT:**  Thank you, Counsel.

17           Any redirect examination?

18           **MR. QUINN:**  Yes, just briefly, Your Honor.

19                    **REDIRECT EXAMINATION**

20   **BY MR. QUINN:**                                        11:53

21   Q    Mr. de Anda, in your 20 years of law enforcement, have you

22   had the experience of personnel and law enforcement giving each

23   other caps?  Hats?

24   A    Yes.

25   Q    Pins?                                               11:54

Tuesday, September 22, 2009                    Status Hearing

EXHIBIT ___ 13
PAGE ___ 177

67

```
 1   A    Yes.

 2   Q    Cups?

 3   A    I've never had a cup, but I've seen others with them, yes.

 4   Q    All right.

 5        That's something, in your experience, folks involving     11:54

 6   law enforcement do from time to time.

 7   A    Yes; patches.

 8   Q    You were asked some questions about the Mattel Code of

 9   Conduct Policy.

10        Would you turn, please, to the policy date              11:54

11   April 2005, which is Exhibit 4.  And I'd ask you to please turn

12   to Page 5 of 14 there.

13   A    Yes.

14   Q    And under the heading "Business Gifts and Entertainment,"

15   I'm just going to read to you that first sentence there.  It    11:54

16   says:  "Business gifts and entertainment can be used to

17   strengthen business relationships.  However, no gift, favor, or

18   entertainment should be accepted or provided if it will

19   obligate or appear to obligate the recipient."

20        Did you feel like you had been obligated or an           11:55

21   obligation had been created on your part when these Peel police

22   officers gave you the cup and the pen?

23        MS. HURST:  Objection.  Vague.

24        THE COURT:  Overruled.

25        You may answer.                                          11:55
```

Tuesday, September 22, 2009

Status Hearing
EXHIBIT _13_
PAGE _178_

68

1            THE WITNESS:   I just felt a little awkward and wanted

2    to respond.   That's all.   I reciprocated back; that's all.

3    BY MR. QUINN:

4    Q    Why did you feel awkward?

5    A    Because I was given a gift and I had nothing to give them    11:55

6    as far as swapping, like what is done typically with police

7    departments.

8    Q    But did you feel that created some obligation on your

9    part?

10   A    No.                                                          11:55

11   Q    In sending them the package, the toy cars, was it your

12   intent to create some obligation?

13   A    Not at all.

14           THE COURT:   I understood from what you were saying

15   there, you felt a social obligation, however, to reciprocate    11:56

16   the gift.

17           THE WITNESS:   Yes.   That's all.   Nothing further than

18   that.

19   BY MR. QUINN:

20   Q    The last sentence counsel quoted to you on that same page,   11:56

21   it says "Special restrictions apply to government officials in

22   most countries, and we should always consult the law department

23   before offering gifts to any government officials.   See the

24   discussion on anti-corruption laws."

25           And you told counsel that you did not consult the law    11:56

Tuesday, September 22, 2009

EXHIBIT _____13_____
                Status Hearing
PAGE _____179_____

69

```
 1   department before sending these toys.
 2            I'll just ask you, why didn't you consult the law
 3   department?
 4   A    Because I felt that it wasn't done to influence anyone; it
 5   was just basically reciprocating what they gave me.  It was       11:56
 6   absolutely -- I found it to be of no value.
 7   Q    If you would turn to Page 12, please, under
 8   "anti-corruption laws," counsel asked you, pointed this section
 9   out to you, in the second paragraph that begins "Bribery of
10   public officials is absolutely prohibited."                       11:57
11            Do you see that?
12   A    Yes.
13   Q    And it says in the Mattel policy, "We should not offer,
14   directly or indirectly, anything of value to government
15   authorities, including political parties or candidates, to        11:57
16   obtain an improper advantage or to retain or obtain business."
17            When you sent these toys to the Peel Police, were you
18   attempting to obtain an improper advantage?
19   A    No.
20   Q    It goes on to say "No gift, contributions, or               11:57
21   entertainment are to be offered which might create an
22   appearance of impropriety."
23            In sending these toys, this handful of toys that you
24   referred to, did you think you were creating an appearance of
25   impropriety?                                                      11:57
```

Tuesday, September 22, 2009                    Status Hearing

EXHIBIT        13
PAGE          180

70

```
1    A    No, I did not.

2    Q    If you would look at Exhibit 7, that's the e-mail exchange

3    where, in the first e-mail, Mr. Jones confirms receipt of your

4    package.

5         Do you have that before you?                              11:58

6         I'm not sure you need it to answer my question.

7    A    Here it is.  I have it here.

8    Q    In your 20-plus years in law enforcement, are you familiar

9    with any example where a government official in writing

10   confirmed receipt of a bribe and thanked the sender for sending  11:58

11   a bribe?

12        MS. HURST:   Objection.  Beyond the scope.

13        MR. QUINN:   Has that ever happened?

14        THE COURT:   Sustained.

15        Counsel, you said this was going to be short.            11:58

16   BY MR. QUINN:

17   Q    What happened with the investigation in Canada?

18        MS. HURST:   Objection.  Beyond the scope.

19        THE COURT:   I think we're getting into an area --

20   certainly there are aspects of the investigation that were     11:59

21   explored in some detail on direct examination, so it's not

22   beyond the scope.

23        MR. QUINN:   It's just a question.  Did anything

24   happen?  Did it go anywhere, Your Honor?

25        THE COURT:   Rephrase your question.                     11:59
```

Tuesday, September 22, 2009                                   Status Hearing

EXHIBIT _13_
PAGE _181_

71

1    BY MR. QUINN:

2    Q    What was the result of the investigation in Canada?

3    A    Basically, the thumb drive that contained the information

4    was recovered by the Peel Police Department, and there were

5    never any criminal charges pursued or filed.                    11:59

6    Q    You indicated some uncertainty about the contents when you

7    were being questioned about police cars.

8         Is your uncertainty about the contents as to whether

9    the contents were all cars or whether the contents were cars

10   and all police cars, if you understand what I'm saying?         12:00

11   A    I think I do.

12        All I saw basically was just the few on top.  And as

13   I remember, they were laying flat, so there was only maybe two

14   that I saw; two that I could see, because of the box the way it

15   was.  So I don't know.  They were just cars that were taken     12:00

16   from my stash.

17   Q    Are you confident that whether they were police cars or

18   not police cars, they were all toy cars?

19   A    I'm pretty certain they were all toy cars, because we

20   wanted to send police cars because they were police officers.   12:00

21   Q    What was your instructions to your assistant that caused

22   her to put this together?

23   A    "Would you please just send some police cars to Rodney

24   Jones."

25        MR. QUINN:  Thank you, Your Honor.                         12:01

72

```
 1            THE COURT:  Anything further?
 2            MS. HURST:  Very briefly.
 3                       RECROSS-EXAMINATION
 4    BY MS. HURST:
 5    Q    At the time you sent the package to the Peel Police, you    12:01
 6    were not a police officer; is that correct?
 7    A    That's correct.
 8    Q    In fact, you were a complaining witness; correct?
 9    A    Yes.
10            MS. HURST:  Thank you.                                   12:01
11            THE COURT:  Very well.
12            You may step down, Mr. de Anda.
13            Before hearing argument on this issue, does either
14    party wish to present any further evidence or call any
15    additional witnesses?                                           12:01
16            Mattel?
17            MR. QUINN:  No, your Honor.
18            THE COURT:  MGA?
19            MS. HURST:  I'll move for the admission of Exhibit 6.
20    I think there's confidentiality concerns, so I wasn't sure what 12:01
21    procedure the Court --
22            THE COURT:  What I'd like you to do is, those
23    portions that you reviewed with the witness which there were no
24    objections to, perhaps we can create a second exhibit,
25    Exhibit 6-A, which would simply have those portions redacted    12:02
```

Tuesday, September 22, 2009                    Status Hearing

EXHIBIT ___13___
PAGE ___183___

73

1   and that will be part of the record in this proceeding.

2           MS. HURST:  Thank you, your Honor.

3           There are also statements in the document with

4   respect to which the witness didn't have foundation but would

5   be admissions that I believe would also be relevant to this          12:02

6   proceeding in terms of how Mattel itself viewed Janine Brisbois

7   at the time.

8           THE COURT:  Again, let's meet and confer and come up

9   with a document Exhibit 6-A which would have that.

10          MS. HURST:  Thank you.                                        12:02

11          THE COURT:  Is there any further evidence or

12  witnesses?

13          MS. HURST:  No, thank you.

14          Well, I should say this.

15          I was not given an opportunity to depose the witness         12:02

16  before today.  There may be other issues here about which we

17  don't have information, but we simply do not know.  And that

18  matter is before the Discovery Master now for hearing on

19  Friday.

20          So as to the broader topic, we're simply not prepared        12:02

21  to address that any more than has been done today.

22          THE COURT:  I wanted to address the specific topic as

23  soon as it was raised, and that's what we're doing today.  I'm

24  going to have to make my decision today based on what's before

25  me today, and you're going to have to make your argument based       12:03

Tuesday, September 22, 2009                          Status Hearing

EXHIBIT ____13____
PAGE ____184____

1   on what's before us.

2           But with that in mind, I'll hear argument.

3           And I'm going to ask MGA to go first, because part of

4   what I think Mattel will need to respond to is it's not clear

5   to me what it is that you're seeking.  It was characterized as          12:03

6   an issue of concern or an area of concern in your brief; that's

7   what prompted the Court to issue the order, because the Court,

8   too, was concerned.  But I guess I need to know what it is that

9   you are seeking, what relief you're seeking, and what is the

10  basis of that relief.                                                    12:03

11          I need to know how to style this order, so it came

12  out a few days after the other order because I was not sure

13  what the "there" was.

14          **MS. HURST:**  I think that's fair, Your Honor.

15          Let me address that first.                                       12:03

16          The first thing we're seeking is the opportunity to

17  conduct a full investigation into that; that has been the

18  subject of the 30(b)(6) deposition regarding all communications

19  of any kind, including tangible things with law enforcement

20  officials, related to all of the investigations that have               12:04

21  occurred in connection with this case.  But that motion to

22  compel is pending before the Discovery Master now for hearing

23  on Friday, so I think the Court need not concern itself with

24  that at this point in time, unless the Court chooses to be

25  involved in that for some reason.                                        12:04

Tuesday, September 22, 2009

Status Hearing

EXHIBIT ___13___
PAGE ___185___

1     I think, frankly, Your Honor, we wanted to bring this

2   to your attention because we were very concerned, given that

3   there are ongoing criminal investigations, to be able to verify

4   that there are not practices or procedures in place at Mattel

5   that would be improperly influencing those investigations.          12:04

6   Particularly, frankly, Your Honor, with respect to the country

7   of Mexico where we have gotten almost no visibility, through

8   the document production and otherwise, as to what's going on

9   down there.

10     But, Your Honor, I have to say, frankly, I don't              12:05

11   believe there's a noticed motion before the Court on this

12   today.

13          **THE COURT:**  The Court did this sua sponte.

14          **MS. HURST:**  Yes.  And we have made this part of MGA's

15   affirmative defenses as part of the case in terms of              12:05

16   interrogatory responses and otherwise, and I think really at

17   this point all we want is a full and fair opportunity to

18   investigate all matters that bear on Mattel's communications

19   with law enforcement officers.

20     As the Court knows, bringing the power of the state          12:05

21   to bear on a competitor is a fearsome thing, and I think we are

22   fairly concerned, given this e-mail, about how that has

23   occurred.  I think at this point -- I'll move to the substance

24   of the argument and not just the remedies, Your Honor.

25     Whatever Mr. de Anda subjectively believed at the            12:06

EXHIBIT _____  Status Hearing
PAGE _____  186

```
 1   time he accepted the gifts, it was a violation of Mattel's code
 2   of conduct to do that without prior approval by the law
 3   department, and it was done in connection with an investigation
 4   of the director of sales for Mattel.  And part of that
 5   Exhibit 6, Your Honor, there are various statements in there          12:06
 6   from Mattel's employees saying that she had particular
 7   responsibility for the Wal-Mart account; that they knew she was
 8   going to their chief competitor.
 9          And, Your Honor, frankly, this is a situation where
10   you have a salesperson who's directly responsible at one            12:07
11   company for obtaining or retaining business, moving to the
12   principal competitor where she will again be responsible for
13   obtaining or retaining business in direct competition.
14          THE COURT:  I can understand under those
15   circumstances how the company losing the employee might be         12:07
16   concerned.
17          MS. HURST:  Yes.  Although, initiating a forensic
18   analysis of the hard drive simply on the basis of someone who
19   is going to a competitor strikes me as a bit overweening, but,
20   you know, what do I know.                                          12:07
21          THE COURT:  I've certainly seen overreactions by all
22   kinds of different companies in all different contexts, but
23   there's certainly nothing illegal or unlawful or even unethical
24   about a company being concerned about the potential theft of
25   trade secrets.  Correct?                                           12:07
```

Tuesday, September 22, 2009

Status Hearing

EXHIBIT _____ *13*
PAGE _____ *187*

1          **MS. HURST:**  Presuming that Canadian privacy law

2     permits the kind of -- I don't want --

3          Putting that aside, of course not.

4          **THE COURT:**  And there's nothing wrong with a company

5     going to law enforcement if they subjectively believe that a          12:08

6     crime may have been committed against them.

7          **MS. HURST:**  They need to have an objective basis, I

8     think, as well, Your Honor.  But with that caveat, I would

9     agree, obviously.

10          **THE COURT:**  I didn't say anything about a subjective          12:08

11     basis.  If somebody subjectively believes that they have been

12     victimized, they have a right to call up the police and say

13     help.  Right?

14          **MS. HURST:**  Subject to the restrictions of malicious

15     prosecution and so forth, if they turn out -- that's all I          12:08

16     meant.

17          **THE COURT:**  Of course.

18          That's why it gets to this subjectiveness because of

19     malicious prosecution involving using or abusing the system to

20     prosecute.          12:08

21          So let's put that aside.

22          I'm trying to deal with what I have before me right

23     now.  So there's nothing wrong with Mattel saying "We're

24     concerned," assuming of course there's a good faith basis for

25     that.          12:08

Tuesday, September 22, 2009

EXHIBIT _____  Status Hearing

PAGE _____  *188*

1          I have nothing before me right now to suggest to the
2    contrary.
3          Right?
4          **MS. HURST:**  Well --
5          **THE COURT:**  Before me right now.                          12:09
6          **MS. HURST:**  No, Your Honor.
7          **THE COURT:**  Okay.
8          And it does appear that there is something in the
9    Mattel handbook about any contact, which seems to be pretty
10   straightforward, with a public official from another country    12:09
11   that there should have been contact with the law department or
12   with a lawyer.  Whether that was done or not or whether it was
13   done before or after -- we've got redactions.  I don't know
14   what was or was not discussed with the attorneys, but that's
15   not fully before me.                                            12:09
16         **MS. HURST:**  Right.
17         **THE COURT:**  But as far as the gift itself, it seems
18   to be, based on the testimony, that Mr. de Anda received a
19   relatively de minimis gift.  I don't know what the value of
20   that mug is.  If it was made in China, like most of those mugs  12:09
21   are -- I've seen quite a few of them.  I'm sure any number of
22   us have received mugs from law enforcement officers from time
23   to time, or depending on the different professions that we get
24   in.  As a prosecutor, that was something I remember going on;
25   you would get mugs or you would get little plaques; you would   12:10

Tuesday, September 22, 2009

EXHIBIT _13_  Status Hearing
PAGE ___189___

```
 1   get something de minimis of that sort.  Some people would have

 2   a whole series of mugs; some people in the office would just

 3   have rows and rows of these mugs; so we're talking about

 4   something valued at $5, $10, $15.

 5           And Mr. de Anda indicated that he felt he had a          12:10

 6   social obligation to reciprocate, and he provided some toy cars

 7   that were, I think, a half a dozen is the highest number that I

 8   have heard, at a dollar a car; so he sent something that was

 9   worth maybe $6.

10           Looking at all of these ethical standards that you       12:10

11   have submitted, for example, the first one, the code of ethics

12   for Los Angeles, it says that "the gift must be of a sort that

13   might reasonably be interpreted as an attempt to influence the

14   actions with respect to City business."  Here in the context of

15   this case, it would be reasonably expected to influence the      12:11

16   actions of the Peel Regional Police Department.

17           I don't know much about the Peel Regional Police

18   Department, but I just can't imagine that they would be

19   influenced or that they would do something illegal or wrongful

20   in exchange for $6 worth of toy cars.  I mean, unless these      12:11

21   cars were gold or something, I just don't.

22           And I certainly understand why you wanted to look

23   into this, because you get this e-mail and it talks about

24   gifts.  I guess this strikes me -- and I'm laying this out

25   because I'd like to hear your response to this -- because my     12:11
```

Tuesday, September 22, 2009                                    Status Hearing

EXHIBIT ___13___
PAGE ___190___

1    tentative, after hearing the evidence, is that it was probably

2    unadvisable.  And it was certainly inadvisable not to comply

3    with their internal procedure, if, in fact, that was the case.

4    Again, I don't have enough evidence to know whether it was not.

5            But the gift was de minimis, it was responsive, and    12:11

6    it was somewhat proportionate.  It's hard to see that rises to

7    the ethical level of the type of gift that would be designed or

8    intended to influence criminal law enforcement activities in a

9    foreign country.

10           Do you think that these toy cars were intended to    12:12

11   influence?  Is that what MGA thinks?

12       **MS. HURST:**  I think I'd like to get the transcript.

13   But my recollection of Mr. de Anda's testimony was that part of

14   the purpose of the gift was to reciprocate with something that

15   had a Mattel logo on it.    12:12

16       **THE COURT:**  Right.  The practice is, I give you my

17   "tuit" or my coffee mug with my logo on it; you don't go down

18   to the store and buy something that had someone else's logo on

19   it.  You'd give them something -- and I had these little

20   Matchbox cars, these toy cars, when I was a kid; they have the    12:13

21   name on the bottom of the car.

22       **MS. HURST:**  Your Honor, we would like, especially

23   given the number of investigations and especially given the

24   Mexican investigation and the lack of documents that we have

25   seen about how that investigation came about, to be able to    12:13

Tuesday, September 22, 2009                          Status Hearing

EXHIBIT  13
PAGE  191

1    just conduct full and fair discovery regarding communications

2    with law enforcement officers.

3            THE COURT:  And that's fine; that's before the

4    Discovery Master.  I'm asking about this instance here.

5            MS. HURST:  I believe there is a strong -- I                    12:13

6    understand Mr. de Anda has come here today and told the story,

7    which we've heard for the first time and haven't otherwise had

8    the opportunity to investigate, and he's indicated that he felt

9    a social sense of obligation.

10           The facts also show that he met with the police; he        12:14

11   was the complaining witness; shortly after that he sent them a

12   gift at the time while they were investigating the matter that

13   he was a complaining witness about.

14           THE COURT:  You just left out something in your

15   chronology.                                                                12:14

16           MS. HURST:  That they gave him a gift as well.

17           That's why the law and the code of conduct is there,

18   Your Honor.

19           THE COURT:  I understand that.

20           MS. HURST:  Because a sense of social obligation        12:14

21   should take back seat to the ethical requirements and the legal

22   requirements.

23           THE COURT:  Quite the contrary, counsel.

24           The code of conduct, the one that you provided,

25   actually recognizes those social obligations.                        12:14

EXHIBIT   13
PAGE    192

1        If I remember correctly going through these when you

2   were showing these, for example, the one that you introduced,

3   Exhibit No. 2, the code of professional conduct and

4   responsibilities for the peace officers, cannon eight, the part

5   you read was "peace officers shall not compromise their          12:14

6   integrity nor that of their agency or profession by accepting,

7   giving or soliciting any gratuity."

8        That is clear.  But what you did not read was the

9   very next line or two lines down, 8.1, the standard for this,

10  which says "Peace officers shall refuse to offer or give or      12:15

11  receive gifts, favors or gratuities, either large or small,

12  which can be reasonably interpreted as capable of influencing

13  official acts or judgments.  This standard is not intended to

14  isolate peace officers' from normal social practices."

15       And I think the sense here, at least the sense that I      12:15

16  got from listening to Mr. de Anda -- and frankly, part of this

17  Court's own experience back when I was a prosecutor and dealt

18  with law enforcement was that part of the social practice

19  between law enforcement is to exchange these trinkets or their

20  patches or whatever as just part of polite discourse.           12:15

21       In foreign countries, it's not uncommon for small

22  trinkets to be given just as a matter of politeness.  It's

23  considered quite rude to refuse those and not to have something

24  on hand to reciprocate.  And it's the same type of thing.

25       I really think, based on what I have before me, this      12:16

Tuesday, September 22, 2009                    Status Hearing

EXHIBIT  13
PAGE  193

1   seems to be a lot of -- much about nothing or very little.

2            **MS. HURST:**   I appreciate that it sounds like the

3   Court has some knowledge of its own regarding these practices,

4   and certainly in the law enforcement community, more generally.

5            Your Honor, I think at this point that, as mentioned,   12:16

6   we wanted -- the reason we raised this in the first place, I

7   think, frankly, was just in the context of the Court's

8   examination of various issues about how discovery was going in

9   the case, and so forth.

10           As the Court has indicated, the full discovery   12:16

11  regarding these issues is before the Discovery Master at this

12  point.

13           Fairly, I think, Your Honor, the Court sees this as

14  an exchange with regard to a social obligations.  We remain

15  very concerned that complaining witnesses should not give gifts   12:17

16  to law enforcement officers who are investigating their

17  complaints.  And certainly I agree with the Court that officers

18  on the beat should be able to accept cups of coffee and so

19  forth.  But I think that the complaining witness law

20  enforcement relationship is one where there is a unique   12:17

21  opportunity for difficulties.

22           In this instance, Mattel's code of conduct did

23  require consultation with the law department.  I think

24  Mr. de Anda pretty fairly admitted that he did not do that.

25           **THE COURT:**  Excuse me, counsel.   12:17

Tuesday, September 22, 2009                           Status Hearing

EXHIBIT __13__
PAGE ____194____

84

```
1           I do agree that it was inadvisable on that basis and
2    that it appears that he did not comply with the internal
3    requirement.  However, that record is incomplete and
4    necessarily limited by the attorney-client privilege in terms
5    of what was communicated between Mr. de Anda and the attorneys   12:18
6    internally.
7           MS. HURST:  Thank you, your Honor.
8           THE COURT:  All right.  Very well.
9           MS. HURST:  I think I'll submit.
10          THE COURT:  Very good.                                    12:18
11          Anything further from Mattel on this point here?
12          MR. QUINN:  No.
13          THE COURT:  The next issue that the Court wants to
14   take up is the issue of the attorney-client privilege log.
15   Given the nature of this, most of this discussion has to take    12:18
16   place in camera.  Most.  But there was one question that I
17   wanted to address to MGA just to clear up now.
18          The document in question that current counsel for MGA
19   produced was listed as number 381.  It appears, or at least
20   Mattel suggests, and I don't know if this is true or not, that   12:19
21   Document 557 on the log has not been produced, and it appears
22   to be the same or similar document.
23          What is the status of that?
24          MS. HURST:  It's the same document, Your Honor.
25          THE COURT:  Okay.                                         12:19
```

Tuesday, September 22, 2009        EXHIBIT  13        Status Hearing
                                   PAGE  195

85

```
 1              MS. HURST:  It's exactly the same.

 2              THE COURT:  It just got recorded twice?

 3              MS. HURST:  Correct.

 4              THE COURT:  Very good.  The Court will accept that

 5     representation.                                              12:19

 6              What I'm going to do at this point is meet with

 7     counsel in chambers concerning this.

 8              Why don't we go ahead, since we've been going for two

 9     hours now, let's take a ten-minute break.  Let's resume at

10     12:30.  And I'll have my courtroom deputy give you instructions  12:19

11     in terms of who's to come back and all of the musical chairs.

12     We'll set things up there, and that will give the court

13     reporter a chance to get set up as well.

14              We're in recess.

15              (Whereupon a brief recess was held.)                12:19

16              (In-chambers proceedings occurred

17               which are not a part of this record.)

18              (Proceedings held after resuming in open court:)

19              THE COURT:  We're back on the record outside of the

20     in-camera proceedings.                                       01:53

21              The Court at this point in time is simply going to

22     summarize essentially the elements of the order that will be

23     going out today in greater detail.

24              First, as indicated, the Court is going to vacate the

25     pretrial and trial dates that are presently set.            01:54
```

Tuesday, September 22, 2009                        Status Hearing



EXHIBIT ___13___

PAGE ___78 196___

1          Second, the Court is going to continue the discovery

2     cutoff date to June 1, 2010; that order is made without

3     prejudice to reconsideration before the judge to whom this case

4     is going to be assigned, but I think it's important that we

5     have a discovery cutoff date.  I know in its previous motion,                01:54

6     Mattel was seeking an 8-month continuance.  The Court believes

7     that at least the continuance from December to June is in

8     order.  And I'll leave it up to Judge David Carter who will be

9     taking over this case to make a final decision on that.  But

10    pending any change by Judge Carter, the discovery cutoff date          01:54

11    will be June 1, 2010.

12          The Court will also be vacating -- I believe there

13    are two pending motions before the Court right now, and those

14    will be reassigned for hearing by Judge Carter.

15          The order to show cause set forth in the August 31st,          01:55

16    2009 order is deemed satisfied.

17          The request for stay made by MGA in camera is denied.

18          Again, of course, that can be submitted for

19    reconsideration before Judge Carter, but this Court does not

20    find any basis to stay the proceedings or recall at this time.          01:55

21          The Court has made itself available for settlement

22    proceedings; this is at the urging of Judge Carter; and counsel

23    for Mattel has indicated that they anticipate, and the Court

24    hereby directs them, to provide to MGA their written settlement

25    position within ten days of today's date.  After receipt, the          01:56

Tuesday, September 22, 2009          EXHIBIT ___13___          Status Hearing
                                                  PAGE ___197___

87

1    Court will organize a telephonic conference in which we will

2    set dates for settlement prior to this Court's departure.

3           I think the Court previously indicated its findings

4    with respect to Mr. de Anda.

5           Is there anything else that I have not covered that I     01:56

6    needed to cover today?

7           First, from Mattel's perspective.

8           **MR. ZELLER:**  One thing that I would ask at this

9    juncture, particularly in light of Your Honor's leaving the

10   bench and the transfer of the case, the Court will recall that   01:56

11   -- and I don't recall exactly when this ruling was made, but it

12   was made during the course of the hearing, and Your Honor

13   indicated this from the bench -- that basically Mr. Durkin's

14   report could not be used.

15          We are in a position where we don't have all of the       01:57

16   source documents that Mr. Durkin attached to his report,

17   including such matters as e-mails and financials and the like,

18   which is causing some problems in terms of, number one,

19   refuting statements that MGA has been making in briefs even as

20   recently as Friday to Your Honor.  And I give some specific       01:57

21   examples.  But, number two, just the inconvenience of this in

22   trying to take depositions without these documents.

23          So I would ask Your Honor to allow us to at least use

24   the source documents, the actual documents; not Mr. Durkin's

25   work product, not his report, not demonstratives that he          01:57

Tuesday, September 22, 2009              EXHIBIT _13_    Status Hearing
                                         PAGE _198_

88

1    generated, but, rather, those actual documents.  Because we are

2    now getting into territory where -- and the example I would

3    give is that in the Friday submission, MGA argued about how,

4    "Well, Leon Farahnik is a completely irrelevant witness."  But

5    the documents attached, these are MGA/Isaac Larian e-mails to          01:58

6    Leon Farahnik to show exactly the opposite.  So I'm troubled by

7    the fact that we're in a position where we know of evidence,

8    documents, that are in MGA's position that would refute these

9    kinds of statements and also that we're not being allowed to

10   use them.  I'm just unaware of any realistic objection that          01:58

11   could be made.

12          And since Your Honor had made that order from the

13   bench, I think it would be really ideal for Your Honor to

14   reassess that decision as to whether or not we can use those

15   source documents.          01:58

16          **THE COURT:**  Anything else from Mattel?

17          **MR. ZELLER:**  No, Your Honor.

18          **THE COURT:**  Very well.

19          From MGA?

20          **MS. HURST:**  Your Honor, the issue of the production          01:58

21   of financial documents was the subject of a motion before the

22   Discovery Master which was ruled upon and continues to be the

23   subject of ongoing meet and confer between the parties.

24          I have in my possession the hard drive that was

25   supplied to Mr. Durkin.  We're making a forensic image of it so          01:59

Tuesday, September 22, 2009                                       Status Hearing

EXHIBIT  _13_
PAGE  _199_

89

1   we can review and call out the privileged documents.  It's a

2   time-consuming process.  We're in the process with the client

3   right now collecting additional documents.  It's all being done

4   in the ordinary course.  And given the dates that the Court

5   just set, I see no reason for urgency or reopening the                    01:59

6   difficult can of worms regarding Mr. Durkin's report.

7              That is just to respond to what Mr. Zeller said.

8              **THE COURT:**  Very well.

9              **MS. HURST:**  Your Honor, are the hearings in front of

10  the Discovery Master -- do they remain on calendar as a result          01:59

11  of the Court's orders today?

12             **THE COURT:**  Yes.

13             There will not be an interruption in a district judge

14  having responsibility for this case.

15             **MS. HURST:**  All right.  Thank you, your Honor.           02:00

16             **MR. NOLAN:**  Briefly, your Honor.

17             This will be the last time I think all of us will be

18  in this room, and I for one have had the pleasure of taking up

19  a lot of the Court's time, but more importantly, the time of

20  your staff.  And I think this is just as important to put on           02:00

21  the record.

22             From the moment you walk into the Federal District

23  Court in Riverside, from the guards that you meet in the

24  beginning to the people who stayed in court, the marshals and

25  everything else, they were always incredibly respectful and           02:00

Tuesday, September 22, 2009     EXHIBIT ___13___     Status Hearing
                                PAGE _____200_____

1    friendly and helpful.  And your staff, you were completely

2    blessed throughout these proceedings.  And I know that we

3    tasked them tremendously, so maybe this is one motion that I

4    can get full agreement on.

5            I personally want to thank each one of those                    02:00

6    individuals for all of the hard work in this case.  It really

7    was phenomenal.

8            MR. QUINN:  Join.

9            THE COURT:  All right.  Very well.  So stipulated.

10           MR. COTE:  I hate to bring the harsh light of case            02:01

11   litigation issues after those kind words from Mr. Nolan, but

12   one point of clarification.

13           When Mattel prepares the settlement position, could

14   we be copied on that and included in whatever settlement

15   position it is?                                                          02:01

16           I represent Gustavo Machado, who's a defendant in the

17   case.

18           THE COURT:  Absolutely.  That would make a lot of

19   sense, I presume.  We're talking about a potentially global

20   settlement here.                                                        02:01

21           Is there a concern, Mr. Zeller?

22           MR. ZELLER:  I'm not aware of any reason we would not

23   provide it to Mr. Machado's counsel.  But to be blunt, about

24   Mr. Machado's participation, we've asked for it all along, and

25   Mr. Machado and his counsel have not participated.  So the            02:01

EXHIBIT ____13____
PAGE ____201____

91

```
1    written settlement proposals have, frankly, nothing to do with
2    Mr. Machado or resolving it.
3         Now, obviously we're amenable and open to resolving
4    those issues to the extent that we can, but just understand
5    that this whole process, from our perspective, even though we     02:02
6    requested it -- and the Court can certainly inquire of
7    Ambassador Prosper and get more details on this -- but
8    Mr. Machado has not been a participant in any of this to-date;
9    so I just wanted to alert the Court to that.
10        THE COURT:  Very well.                                       02:02
11        But on a going-forward basis, I gather he does want
12   to be a participant.
13        MR. COTE:  Yes.  And Ambassador Prosper actually
14   asked us to be on-call but not attend the previous settlement
15   conferences.  We were just across the street from his offices;   02:02
16   so we were there if he needed us, and he didn't.
17        THE COURT:  The Court will certainly want you.  If we
18   are going to have settlement conferences in October, we'll
19   certainly want you present.  Thank you.
20        MR. JENNINGS:  Chris Jennings for O'Melveny & Meyers.        02:02
21        One matter arising from the OSC is an outstanding
22   ex-parte application in which sanctions have been sought
23   against my client.  I just want to get clarification on that.
24   I assume the Court will deny that as moot, but I would ask that
25   it be resolved.  Our client does not want that outstanding.      02:02
```

Tuesday, September 22, 2009        EXHIBIT ___13___        Status Hearing
                                   PAGE ___202___

1    **THE COURT:**  I will be issuing an order later today or

2    first thing tomorrow which will address all of these issues.

3    But the OSC at this point, based on the information before the

4    Court, is deemed satisfied.

5    **MR. JENNINGS:**  Thank you.                                    02:03

6    **THE COURT:**  Court is adjourned.

7

8

9

10

11

12

13

14

15

16                          CERTIFICATE

17

18   I hereby certify that pursuant to section 753, title 28, United
     States Code, the foregoing is a true and correct transcript of
19   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
20   conformance with the regulations of the Judicial Conference of
     the United States.

21

22   _____          _____
     THERESA A. LANZA, CSR, RPR                      Date
23   Federal Official Court Reporter

24

25