# EXHIBIT 14

EXHIBIT __14__
PAGE __204__

2708

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3        EASTERN DIVISION

4        - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6        - - -

7    MATTEL, INC.,                    )
                                      )      **CERTIFIED COPY**
8                    PLAINTIFF,       )
                                      )
9        VS.                          )   NO. CV 04-09049
                                      )
10   MGA ENTERTAINMENT, INC., ET. AL., )
                                      )
11                   DEFENDANTS.      )   TRIAL DAY 14
                                      )   MORNING SESSION
12   AND CONSOLIDATED ACTIONS,        )   PAGES 2708-2817
                                      )

13

14

15        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16        RIVERSIDE, CALIFORNIA

17        TUESDAY, JUNE 17, 2008

18        8:47 A.M.

19

20

21

22

23        THERESA A. LANZA, RPR, CSR
          FEDERAL OFFICIAL COURT REPORTER
24        3470 12TH STREET, RM. 134
          RIVERSIDE, CALIFORNIA  92501
25        951-274-0844
          WWW.THERESALANZA.COM

2709

1    APPEARANCES:

2

     ON BEHALF OF MATTEL, INC.:

3

                          QUINN EMANUEL
4                    BY:   JOHN QUINN
                          JON COREY
5                          MICHAEL T. ZELLER
                          HARRY OLIVAR
6                          TIMOTHY ALGER
                     865 S. FIGUEROA STREET,
7                    10TH FLOOR
                     LOS ANGELES, CALIFORNIA   90017
8

9

10   ON BEHALF OF MGA ENTERTAINMENT:

11                         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                     BY:   THOMAS J. NOLAN
12                         JASON RUSSELL
                          RAOUL KENNEDY
13                         LAUREN AGUIAR
                          CARL ROTH
14                   300 SOUTH GRAND AVENUE
                     LOS ANGELES, CALIFORNIA   90071-3144
15                   213-687-5000

16

17

18

19

20

21

22

23

24

25

---

TUESDAY, JUNE 17, 2008              TRIAL DAY 14, MORNING SESSION

EXHIBIT _____ 14
PAGE _____ 206

2724

1   CASE.

2          THE COURT:  VERY GOOD.

3          COUNSEL?

4          MR. WERDEGAR:  I JUST WANTED TO ALERT THE COURT THAT

5   I WAS HERE TODAY ON BEHALF OF THE WITNESS AND NOT MY COLLEAGUE.     09:04

6   MS. ANDERSON HAD A SCHEDULING CONFLICT; SO THAT THE COURT

7   WOULDN'T BE SURPRISED.

8          THE COURT:  VERY WELL.

9          I BELIEVE IT WAS INTRODUCED MR. PAGE AND MS. ANDERSON

10  TO THE JURY.  I'M HAPPY TO DO THE SAME FOR YOU, IF YOU WISH TO     09:04

11  BE INTRODUCED AS MR. BRYANT'S ATTORNEY.

12         MR. WERDEGAR:  IF IT'S BEEN DONE BEFORE, JUST TO BE

13  CONSISTENT, YOUR HONOR.

14         THE COURT:  VERY WELL.

15         AND ALSO, MR. HOLMES WILL PROVIDE YOU WITH A                09:05

16  MICROPHONE.  I KNOW YOU'RE SITTING OUT THERE, BUT IN CASE YOU

17  DO HAVE AN OBJECTION TO MAKE, I ASK THAT YOU USE THE

18  MICROPHONE, FOR THE BENEFIT OF THE COURT REPORTER.

19         MR. WERDEGAR:  VERY GOOD, YOUR HONOR.

20         THE COURT:  JUST TO RECAP, THEN, IT SOUNDS LIKE             09:05

21  MATTEL AND MGA COUNSEL WILL DISCUSS THESE VARIOUS DOCUMENT

22  ISSUES, THE ONES WHICH ARE SUBJECT TO STIPULATION OR PARTIAL

23  STIPULATION, THE ONES THAT MR. QUINN SUGGESTS ARE SUBJECT TO

24  THE CRIME FRAUD EXCEPTION OR SUBJECT MATTER WAIVER ON THE

25  ATTORNEY-CLIENT PRIVILEGE, AND ANY OTHER DOCUMENTS.  LET'S         09:05

EXHIBIT ___14___
PAGE ___207___

2725

1   EXPLORE THOSE BEFORE THE COURT HAS TO MAKE A RULING ON THEM.

2          MS. AGUIAR:  SO THAT WE CAN GO AHEAD AND BRING IN THE

3   JURY NOW, IF I CAN JUST RAISE ONE OR TWO OTHER THINGS AT THE

4   MORNING BREAK.  THEY'RE NOT INCREDIBLY TIME SENSITIVE, BUT I

5   DID WANT TO RAISE THEM TODAY.                                    09:05

6          THE COURT:  VERY GOOD.

7          IF THE JURY IS READY, LET'S BRING THEM IN.  IT'S MY

8   UNDERSTANDING THAT THEY ARE.

9          (WHEREUPON, JURORS ENTER COURTROOM.)

10          THE COURT:  GOOD MORNING, MEMBERS OF THE JURY.          09:07

11          A COUPLE OF THINGS BEFORE WE RESUME WITH THE

12   TESTIMONY OF MR. BRYANT.

13          FIRST OF ALL, THE COURT NEEDS TO PROVIDE AN

14   INSTRUCTION TO YOU CONCERNING SOME TESTIMONY FROM MR. LARIAN.

15          EARLIER IN THE TRIAL, YOU HEARD TESTIMONY FROM          09:08

16   ISAAC LARIAN.  LAST WEDNESDAY, YOU HEARD MR. LARIAN TESTIFY

17   THAT A FEDERAL JUDGE HAD, QUOTE, "SPECIFICALLY SAID IT'S

18   PUBLISHED THAT ANYBODY WHO DECIDED IN THE TOY BUSINESS TO GET

19   INTO THE FASHION DOLL BUSINESS, THEY HAVE A TARGET PAINTED ON

20   THEIR BACK BY MATTEL," CLOSED QUOTE.                           09:08

21          I'M INSTRUCTING YOU THAT IT WAS A CALIFORNIA STATE

22   COURT CASE.  NOT A FEDERAL CASE.  THE JUDGE IN THAT CASE DID

23   NOT MAKE THE RULING THAT MR. LARIAN REFERENCED.  RATHER, IN

24   THAT CASE, QUOTE, "MATTEL'S FORMER EMPLOYEE TESTIFIED THAT

25   MATTEL AGGRESSIVELY DEFENDS AGAINST ANY ENTRIES IN THE FASHION  09:08

TUESDAY, JUNE 17, 2008            TRIAL DAY 14, MORNING SESSION

EXHIBIT ___14___
PAGE ___208___

2726

1    DOLL BUSINESS, AND ANYONE WHO MAKES AN ELEVEN-AND-ONE-HALF-INCH

2    FASHION DOLL PAINTS A TARGET ON THEIR BACK," CLOSED QUOTE.

3          THE COURT IN THAT CASE FOUND THAT IT WAS

4    SUBSTANTIALLY TRUE THAT THE WITNESS HAD GIVEN THE TESTIMONY,

5    BUT NOT THAT THE ALLEGATION ITSELF WAS TRUE.                    09:09

6          BECAUSE ALL OF THIS IS AN OUT-OF-COURT STATEMENT OR

7    OUT-OF-COURT STATEMENTS THAT HAVE NOT BEEN INTRODUCED INTO THIS

8    TRIAL, YOU ARE INSTRUCTED NOT TO CONSIDER ANY OF THIS.   I'M

9    ALSO INSTRUCTING YOU THAT IN THIS CASE, YOU ARE TO FOLLOW THE

10   INSTRUCTIONS AND DIRECTIONS OF THIS COURT AND NO OTHER COURT.   09:09

11         I ALSO, AT THIS POINT, WANT TO INTRODUCE

12   MR. WERDEGAR.

13         IF YOU WOULD STAND UP.

14         MR. WERDEGAR IS MR. BRYANT'S ATTORNEY FOR TODAY.   YOU

15   HAD PREVIOUSLY MET MR. PAGE AND MS. ANDERSON, BUT MR. WERDEGAR   09:09

16   IS HERE TODAY.   HE'S BEEN GIVEN LEAVE TO MAKE OBJECTIONS TO

17   ANYTHING ON BEHALF OF MR. BRYANT THAT HE WISHES.

18         MR. PRICE, I BELIEVE THAT YOU'RE --

19         MR. NOLAN:  MY ONLY POINT WOULD BE, DOES THE COURT

20   MIND POINTING OUT THAT MR. WERDEGAR IS PART OF THE SAME LAW   09:09

21   FIRM AS THE OTHER TWO?

22         THE COURT:  VERY WELL.

23         MR. WERDEGAR IS A PARTNER, I BELIEVE, OF MR. PAGE AND

24   MS. ANDERSON.

25         MR. WERDEGAR:  THAT'S CORRECT, YOUR HONOR.   09:10

TUESDAY, JUNE 17, 2008          TRIAL DAY 14, MORNING SESSION

EXHIBIT ___14___
PAGE ___209___

2727

1          THE COURT:  AND HE IS NOT ASSOCIATED WITH THE LAW

2    FIRM OF SKADDEN ARPS, MR. NOLAN AND HIS COLLEAGUES.

3          MR. NOLAN:  THANK YOU, YOUR HONOR.

4          THE COURT:  ANYTHING FURTHER, MR. NOLAN?

5          MR. NOLAN:  NO.  THANK YOU VERY MUCH.                    09:10

6          THE COURT:  MR. PRICE, YOU MAY RESUME YOUR

7    EXAMINATION.

8                DIRECT EXAMINATION (CONTINUED)

9    BY MR. PRICE:

10   Q    MR. BRYANT, THIS MORNING I NEED TO GO OVER SOME DRAWINGS   09:10

11   WITH YOU, JUST TO GET YOUR TESTIMONY ABOUT THEIR CREATION, SO

12   THAT WE'LL KNOW WHAT THE TESTIMONY IS.

13          IN FRONT OF YOU, THERE'S THE BINDER WHICH IS THE

14   DRAWINGS BINDER.

15          ON THE FIRST ONE, I'M GOING TO BE ASKING YOU ABOUT      09:10

16   THE DRAWINGS THAT ARE EXHIBIT 5.

17   A    OKAY.

18   Q    WE'VE BEEN USING TWO NUMBERS TO HELP YOU FIND THESE.

19   THERE'S A BATES NUMBER, AND THERE'S AN EXHIBIT NUMBER AT THE

20   BOTTOM.  IT WILL SAY, LIKE, 5-40 OR SOMETHING LIKE THAT.       09:11

21          DO YOU SEE THOSE NUMBERS?

22   A    YES.

23   Q    THERE'S ALSO A BRYANT BATES NUMBER.

24          DO YOU SEE THOSE AS WELL?

25   A    YES.                                                      09:11

TUESDAY, JUNE 17, 2008              TRIAL DAY 14, MORNING SESSION

EXHIBIT  14        EXHIBIT  5
PAGE  210         PAGE  44

2817

1

2

3                          CERTIFICATE

4

5    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
6    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
7    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

8

9                                          6-18-08

10   THERESA A. LANZA, RPR, CSR              DATE
     OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TUESDAY, JUNE 17, 2008              TRIAL DAY 14, MORNING SESSION

EXHIBIT        14
PAGE           211

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No. CV 04-09049 SGL(RNBx)                    Date: July 9, 2009
Title:    MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
========================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

       Cindy Sasse                              None Present
       Courtroom Deputy                         Court Reporter

ATTORNEYS PRESENT FOR              ATTORNEYS PRESENT FOR
PLAINTIFFS:                        DEFENDANTS:

None Present                       None Present

PROCEEDINGS:      **ORDER GRANTING EX PARTE APPLICATION RE TEMPORARY
                  RECEIVERSHIP (DOCKET #5728)**

                  **ORDER GRANTING EX PARTE APPLICATION RE COST
                  SHIFTING (DOCKET #5865)**

                  **ORDER GRANTING IN PART EX PARTE APPLICATION FOR
                  RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)**

                  **ORDER GRANTING IN PART MATTEL'S MOTION RE
                  DISCOVERY MASTER ORDER NO 27 AND REMANDING
                  DISCOVERY MASTER ORDER NO. 27 FOR
                  RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT
                  OF THE FILING OF THE TAAC (DOCKET #5561)**

                  **ORDER DENYING MOTION TO STRIKE THE FORENSIC
                  AUDITOR'S REPORTS (DOCKET #5705)**

EXHIBIT __15__
PAGE __213__

## I. ORDER GRANTING EX PARTE APPLICATION
## RE TEMPORARY RECEIVERSHIP (DOCKET #5728)

Because the only opposition to the Ex Parte Application regarding the winding up of the Temporary Receivership involves the issue of cost-shifting, which is addressed separately, below, the Court **GRANTS** the Ex Parte Application. A separate order addressing this Ex Parte Application has been concurrently filed.

## II. ORDER GRANTING EX PARTE APPLICATION RE
## COST SHIFTING (DOCKET #5865)

The MGA parties' opposition to the Temporary Receiver's Ex Parte Application argued that the costs of the Temporary Receivership should be shifted to Mattel (as the party who sought appointment of a Temporary Receiver). However, the Court has previously ruled that, at some yet-to-be defined date in the future, the Court will consider whether to shift the costs of both the Temporary Receivership and the Forensic Audit. Therefore, Mattel filed an Ex Parte Application seeking either to be relieved of the responsibility to respond to the MGA parties' argument or, alternatively, for an order setting a briefing schedule on the issue. It is not the intention of the Court to address the cost-shifting issue at this time; rather, as the Court has stated previously on the record, that issue is more efficiently resolved at a later date, most likely a date after completion of Phase 2 of the trial. Accordingly, the Court **GRANTS** Mattel's Ex Parte Application re Cost Shifting. Mattel is relieved of any duty to respond to MGA's argument regarding the appropriate allocation of costs arising from the Temporary Receiver that is set forth in the MGA parties's June 26, 2009 Opposition to the Temporary Receiver's Ex Parte Application.

## III. ORDER GRANTING IN PART EX PARTE APPLICATION FOR
## RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

The Court has received and reviewed the MGA Parties' Ex Parte Application For Partial Release of *In Camera* Juror Interview Transcripts, as well as the Opposition, the Reply, and the accompanying exhibits. The Court **GRANTS IN PART** the Ex Parte Application. Although the Court declines to award the relief sought, the Court will take steps to ensure that the transcript of the juror interviews are provided to the Ninth Circuit for its consideration of the appeal filed by the MGA parties.

The relevant *in camera* juror interviews were conducted on July 25, 2008; the findings made by the Court on the basis of those interviews are set forth in detail in the Court's Order Denying Motion for Mistrial, dated August 8, 2008. Counsel for the parties agreed that the juror interviews, which were conducted mid-trial, should be conducted *in camera*, and the MGA parties did not request that the Court grant them access to the transcripts to prepare their Motion for Mistrial. The Court indicated on the

EXHIBIT __15__
PAGE __214__

Case 2:04-cv-09049-DOC-RNB   Document 6857-7   Filed 09/25/09   Page 11 of 33   Page ID
#:228247
Case 2:04-cv-09049-SGL-RNB   Document 5934   Filed 07/09/2009   Page 3 of 14

record around the time of the filing of the Motion for Mistrial that it was not the Court's intent to grant the parties access to the transcripts.

After the conclusion of the trial, the MGA parties did not at any time request this Court grant access to the transcripts. To the contrary, some ten months passed between the date of the Order Denying Motion for Mistrial and the MGA parties' first post-trial request for access to those transcripts. That request was made to the Ninth Circuit, not this Court, on June 10, 2009. When the Ninth Circuit denied the request in favor of the MGA's presentation of the issue to this Court in the first instance, the MGA parties thereafter filed the present Ex Parte Application in a expeditious manner.

Ostensibly, as set forth in both the Motion filed before the Ninth Circuit and the Ex Parte Application before this Court, the reason the MGA parties seek access to those transcripts is so that they may use them to challenge the Court's Order Denying Motion for Mistrial. Although the MGA parties filed its Notice of Appeal on May 4, 2009, and although that Notice clearly indicated that the Order Denying Motion for Mistrial would be implicated in the appeal, the MGA parties failed to file its Motion seeking release of the transcripts until June 10, 2009. The MGA parties' failure to seek this relief until a month after they filed their Notice of Appeal and a month before their opening brief was due, and their decision to present the issue of release of the transcripts to the appellate court (rather than this Court) in the first instance, created the very urgency that cause them to seek ex parte relief from this Court. As such, the Court declines to grant the relief sought.

Nevertheless, in the interest of due process and in order to facilitate the full consideration of the issue by the Ninth Circuit, the Court will take steps to ensure that the transcripts of the *in camera* interviews are provided to the Ninth Circuit for *in camera* filing.

## IV. ORDER GRANTING IN PART MATTEL'S MOTION RE DISCOVERY MASTER ORDER NO 27 AND REMANDING DISCOVERY MASTER ORDER NO. 27 FOR RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT OF THE FILING OF THE TAAC (DOCKET #5561)

In the challenged portion of Discovery Master Order No. 27 ("DM Order No. 27"), the Discovery Master denied Mattel's Motion to Compel discovery sought by service of a subpoena on non-party Bingham McCutchen LLP ("Bingham"), a law firm that represents Intervenor Omni 808, as well as a number of non-party entities that are familiar to those involved in this litigation: OmniNet Capital, LLC ("OmniNet"), Vision Capital, LLC ("Vision"), IGWT Group, LLC ("IGWT"), and IGWT 826 Investments, LLC ("IGWT 826"). Broadly categorized, the subpoena sought production of (1) fee agreements relating to Vision and Omni 808; (2) documents regarding the formation, control, and financing of Omni 808, Vision, and Lexington Financial Limited

EXHIBIT  15
PAGE  215

("Lexington"); (3) documents identifying stakeholders and officers of Omni 808, Vision, and Lexington; (4) all contracts relating to Omni 808, Vision Capital, and Lexington; (5) all communications relating to Omni 808, Vision Capital, and Lexington, excluding attorney-client privileged documents; and (6) Bingham's representation of MGAE and certain named individuals who have some connection with MGAE, including a number of Mr. Larian's family members.

The Discovery Master correctly recognized the essential legal standard in assessing whether a subpoena may be enforced. The information must satisfy the discovery relevance standard, i.e., it must be "reasonably calculated to lead to the discovery of admissible evidence.'" DM Order No. 27 at 19 (quoting Fed. R. Civ. P. 26(b)(1)). The decision of whether to enforce a subpoena ultimately implicates a balancing test that pits relevance of the materials sought and need to the requesting party against hardship to the party resisting the subpoena. DM Order No. 27 at 20. Non-parties are generally required to bear lesser burdens than parties in responding to subpoenas. Exxon Shipping Co. v. United States Dept. of Interior, 34 F.3d 774, 779 (9th Cir. 1994) ("The Federal Rules also afford nonparties special protection against the time and expense of complying with subpoenas.").

However, the Discovery Master overstated the burden of proof allocated to Mattel, as the party seeking discovery. See DM Order No. 27 at 20 ("As the party moving to compel compliance with the subpoena, Mattel bears the initial burden of establishing that the information sought is relevant and necessary to the claims or defenses at issue.") This standard is both overstated and incomplete. It is overstated in that Mattel need not show that the evidence sought is "necessary to the claims or defenses." Although Mattel indeed bears the burden of establishing relevancy, that showing is not one of "necessity." Rather, Mattel must bear the burden of establishing the discovery relevancy standard – that the materials sought are "reasonably calculated to lead to the discovery of admissible evidence" -- is met. It need not establish that the materials sought are "necessary" to its case.

This point leads to the manner in which the stated burden is incomplete. As clearly articulated by cases cited by Bingham, although Mattel bears an initial burden of establishing relevancy, the party resisting discovery thereafter has the burden of establishing that discovery should be denied. See Bryant v. Ochoa, 2009 WL 1390794 at *1 (S.D. Cal. 2009) ("The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1). . . . Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections."); DIRECTV, Inc. v. Trone, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (same); see also Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975) (reversing the district court's issuance of a protective order based on a failure of the party resisting discovery to meet its burden by asserting that the defendant's deposition would merely yield cumulative evidence).

EXHIBIT ___15___
PAGE ___216___

Case 2:04-cv-09049-DOC-RNB    Document 6857-7    Filed 09/25/09    Page 13 of 33    Page ID
#:228249
Case 2:04-cv-09049-SGL-RNB    Document 5934    Filed 07/09/2009    Page 5 of 14

The effect of this subtle variation on the burden of proof from that stated by the Discovery Master is magnified by the recent filing of the TAAC, which significantly heightens the relevancy of the issue of how the MGA parties and the parties represented by Bingham may be related, the formation of certain of those entities, and other issues implicated by Mattel's requests. Because the question of relevance is featured so prominently in the quintessential balancing test to which the present discovery motion was subjected, the filing of the TAAC dramatically altered the calculus that underlies the conclusions reached in DM No. 27.

For reasons related to judicial economy and preservation of scarce judicial resources (which this case has stretched to the outer limits), the Court defers decision, in light of the changed calculus that has occurred as the result of the filing of the TAAC, of the issues presented in the challenged portions of DM No. 27 to the Discovery Master. For that reason, the Court **REMANDS** the challenged portions of DM No. 27 to the Discovery Master for his reconsideration and re-balancing in light of the recently filed TAAC. The Discovery Master may, in his discretion, set the matter for further briefing and/or hearing, he may take the matter under submission based on the existing record, or he may take other action as he deems appropriate to resolve the present issues.

Notwithstanding the remand of DM Order No. 27, one issue raised by Mattel requires further consideration by the Court. At page 25 of DM Order No. 27, the Discovery Master appears to impose a blanket prohibition on discovery of materials that are in the possession of a subpoena recipient, but that are related to a non-party over whom the Court has not been shown to have jurisdiction. The Discovery Master cites no legal authority for such a blanket prohibition, and the Court, in its own research, has found none. Such a blanket prohibition precludes the application of the balancing test that applies almost universally to discovery motions; accordingly, and because this blanket prohibition is unprecedented, the Court finds that it is contrary to law. As to this narrow issue, the Court **GRANTS** Mattel's Motion. The issue of discovery of materials relating to Lexington is **REMANDED** to the Discovery Master for reconsideration in light of this ruling and in light of the filing of the TAAC.

## V. ORDER DENYING MOTION TO STRIKE
## THE FORENSIC AUDITOR'S REPORTS (DOCKET #5705)

In an unsealed filing that has since been ordered sealed by the Court, counsel for Omni 808 Investors, LLC ("Omni 808"), Todd E. Gordinier, made unwarranted, unsubstantiated personal attacks against the Court-Appointed Forensic Auditor, Ronald L. Durkin. Mr. Gordinier's selective public disclosure of portions of the Forensic Auditor's Summary Report, coupled with the maintenance of the Summary Report, as well as the later-filed Responsive Report and Final Report, under seal in their entirety, has led to an unbalanced public presentation of the issues discussed therein. In an

MINUTES FORM 90
CIVIL -- GEN                                          5                    Initials of Deputy Clerk __cls_____

EXHIBIT ___15___
PAGE _____217___

Case 2:04-cv-09049-DOC-RNB   Document 6857-7   Filed 09/25/09   Page 14 of 33   Page ID
#:228250
Case 2:04-cv-09049-SGL-RNB   Document 5934   Filed 07/09/2009   Page 6 of 14

attempt to cure this deficiency, the Court has considered the possibility that it should simply unseal the relevant Reports and allow those Reports to speak for themselves.

Because the MGA entities were the primary subject of the Forensic Audit, the MGA parties have, quite understandably, objected to the proposed unsealing. Mattel, for its part, advocates quite emphatically, and not unreasonably, that the Reports should be unsealed in light of the selective disclosure. See Tr. at 31-32 ("It's the underlying analysis that refutes the selective disclosures that MGA and Omni made in a public forum to smear . . . both Mr. Durkin and Mattel.") At the other end of the spectrum, Omni 808 has moved to strike the Reports in their entirety.

In the end, although the Court does not order the unsealing of the Reports, it **DENIES** the Motion to Strike. The Court ordered the Forensic Audit to evaluate whether a receiver should be appointed; as the record bears witness, the Court eventually rejected the suggestion that it should appoint a permanent receiver, and the Court has instead appointed an MGA Monitor with more limited powers than a receiver. Nevertheless, the fact that the Reports were intended to serve a very limited purpose does not mean that there is no possibility that the Forensic Auditor's Reports will not serve any purpose henceforth.

As it currently stands, the Court **ORDERS** that no party shall cite to or rely upon the Reports for any purpose absent further Order of this Court.[1] However, the documents attached to the Reports, to the extent they are otherwise discoverable, are not insulated from discovery on the basis that they have been made part of the Reports. Conversely, documents, such as charts and interview notes, that were prepared by the Forensic Auditor are the property of the Court and are not subject to discovery or use in this or any other litigation by any party or non-party.[2]

Had it been counsel for the MGA parties who mounted the unwarranted, unsubstantiated, and public personal attacks on Mr. Durkin, the Court would find, notwithstanding the sensitive information contained therein, the unsealing of the Reports was an appropriate remedy for the selective disclosure.[3]  However, here, it is

---

[1] This Order does not supersede the Court's Order permitting the Forensic Auditor to share information with the Court-Appointed Monitor.

[2] Toward that end, the Court **CLARIFIES** to the parties that the work papers, drafts, notes, detailed time records, and any other materials prepared by or at the direction of the Forensic Auditor are the property of the Court. The Court **ORDERS** the Forensic Auditor, as the custodian of those records on behalf of the Court, to retain those materials, whether maintained in electronic, hard copy, or any other medium, until further order of the Court.

[3] As it stands, counsel for MGAE, James I. Stang, wisely sought, and was granted, leave to file his more restrained, but just as unwarranted and unsubstantiated, personal attacks on Mr. Durkin under seal. See MGA Entertainment, Inc.'s Response to Final In Camera Report of Forensic Auditor Ronald L.

Initials of Deputy Clerk __cls_____

EXHIBIT ____15____
PAGE ____218____

Case 2:04-cv-09049-DOC-RNB   Document 6857-7   Filed 09/25/09   Page 15 of 33   Page ID
#:228251
Case 2:04-cv-09049-SGL-RNB   Document 5934   Filed 07/09/2009   Page 7 of 14

counsel for Omni 808 who made those attacks public, and although Mattel maintains that both the MGA parties and Omni 808 are jointly responsible for the selective disclosure, see July 6, 2009, Tr. at 33, whether, or to what extent, the MGA parties act or have acted in concert is an issue to be decided in Phase 2 of this action.

Nevertheless, Mr. Gordinier's attack on Mr. Durkin cannot pass without comment by the Court. The Court's comments are directed toward Mr. Gordinier personally, which is not the Court's usual practice. Although the irony of this form of address is not lost on the Court (given the subject of this Order), it is appropriate. Mr. Gordinier signed all three filings in which the personal attacks appear, and continues to stand behind those filings. Moreover, Mr. Gordinier expressly and unabashedly claimed personal responsibility for the brief that was not filed under seal, by both stating that he gave it a lot of thought before filing it and by implicitly acknowledging that although he considered filing his brief under seal, he ultimately rejected that course of action. See May 18, 2009 Tr. at 46-47 ("My brief speaks for itself. We have nothing to hide. . . . I didn't feel it appropriate, necessary, or desirable to file my brief under seal. And I don't have a problem with the Court or anybody reading what I have to say, because I gave it a lot of thought, and I gave it at lot of consideration.").

At the July 6, 2009, hearing, the Court outlined its concerns that while the attacks on Mr. Durkin were public, the Reports are not, and that "it doesn't seem fair" to the Court to allow those allegations to stand alone without a chance to respond to them. July 6, 2009, Tr. at 25-26. In response, Mr. Gordinier contended that his comments "respond[ed] to the report," and that "[w]hat we said was that there were problems with that report." July 6, 2009, Tr. at 28. This statement is an implicit denial that any personal attacks were made; however, as set forth in great detail below, the record belies Mr. Gordinier's post hoc protestations.

Lest Mr. Gordinier's statement reflecting his implicit denial that he engaged in personal attacks be perceived as one being made at oral argument without ample time to reflect upon its significance, the statement is also made by Mr. Gordinier in Omni 808's Reply Memorandum, a document upon which he had ample time to reflect: "Each and all of the references in Omni's Statement of Position refer to the contents of Mr. Durkin's Reports and the shortcomings contained therein and omitted therefrom, not to his person." Id. at 2 n.1. To be sure, the criticisms leveled at Mr. Durkin are framed in

---

Durkin (docket #5918) at 4 (accusing Mr. Durkin of "making McCarthy-like statements of non-existent buybacks and unsupported insinuations of conflicts of interest"); id. at 9 (suggesting that Mr. Durkin's formulation of certain search terms relating to criminal acts in Farsi without a concurrent formulation of those terms in English demonstrated a "predisposition that Persian members of MGA's management and staff (and only the Persian members) might be engaged in illegal conduct"). Mr. Stang's attacks pale in comparison to those advanced by Mr. Gordinier, and they were filed under seal. Thus, although the Court's analysis and conclusions regarding the Forensic Auditor's Reports applies with equal force to Mr. Stang's statements, his are not the focus of the Court's attention at this time.

EXHIBIT ___15___
PAGE ____219___

Case 2:04-cv-09049-DOC-RNB   Document 6857-7   Filed 09/25/09   Page 16 of 33   Page ID
#:228253
Case 2:04-cv-09049-SGL-RNB   Document 5934   Filed 07/09/2009   Page 8 of 14

terms of his Reports.  Still other criticisms are, as counsel maintains, addressed to the
Reports themselves; those must be analyzed based on their substance.  However, as
aptly demonstrated by the cited and quoted portions of Mr. Gordinier's filings that
appear below, his criticisms do not, by any measure, confine themselves to those
Reports, and instead reach out in a highly personal manner to attack the author, his
professionalism, his competence, his objectivity, and his integrity.[4]

Indeed, in a display the likes of which have not been previously witnessed by this
Court, Mr. Gordinier strayed far afield of legitimate criticism of the discussions,
analyses, and conclusions reached in the Summary Report and the Reports that
followed.  To be sure, there are instances in which Mr. Gordinier addressed the
message found in those Reports; just as surely, however, as detailed below, Mr.
Gordinier attacked the messenger.  Specifically, the papers filed by Mr. Gordinier on
behalf of Omni 808 call into question Mr. Durkin's professionalism and competence, as
well as his objectivity and integrity.  Moreover, and alarmingly, they falsely accuse Mr.
Durkin of being influenced by an ethnocentric bias against Mr. Larian and Mr. Kadisha.
Such attacks, aimed at Mr. Durkin personally rather than the discussion, analyses, and
conclusions set forth in his Reports, appear throughout Omni 808's papers.  See Omni
808 Investors, LLC's Statement of Position re Order to Show Cause re Appointment of a
Permanent Receiver (docket #5446) ("SOP"), filed May 14, 2009, at 11 (referring to Mr.
Durkin's "irresponsible" analysis); id. (noting that Mr. Durkin is "far too experienced" to
believe that he "produced . . . a balanced presentation"); id. (stating that "Mr. Durkin's
report is a polemic" and "a piece of advocacy"); id. at 12 n.9 (calling into question Mr.
Durkin's "objectivity" based on the fact that the Court ordered Mr. Durkin's fees be paid
(at least in the first instance) by Mattel); id. (suggesting that Mr. Durkin's ex parte
communications with Mattel were improper); id. at 13 n.10 (characterizing Mr. Durkin's
quotation of Mr. Larian's and Mr. Kadisha's account of how the two men were
acquainted, from "the Persian community," as "at best, unprofessional" and, "at worst,

---

[4] Adding still further to the mounting irony, in the same footnote that Mr. Gordinier disclaims
engaging in improper personal attacks, he falsely accuses counsel for Mattel of advancing their own
improper ad hominem attacks against Neil Kadisha, who has been referred to as a "common thief" in
certain unspecified Mattel filings. Mr. Kadisha is the Managing Partner of a diversified investment firm,
Omninet Capital, LLC, and an investor in Omni 808. To call someone a "common thief" is, undoubtedly, by
any measure, a highly personal attack, therefore an attack addressed "to the man," or ad hominem.
However, in the same manner Mr. Gordinier accuses Mr. Durkin of failing to provide appropriate context to
the Court in his Reports, Mr. Gordinier himself fails to acknowledge that counsel for Mattel's use of the
term "common thief" in connection with Mr. Kadisha merely quotes Los Angeles County Superior Court
Judge Henry W. Shatford's conclusion regarding Mr. Kadisha, as set forth in his 191-page Statement of
Decision, dated October 24, 2006, which was issued after a 200-day trial, which is currently pending
appeal, and which conferred upon Mr. Kadisha the oft-repeated moniker of "common thief," as well as
"embezzler," and "perjurer." See Uzyel v. Kadisha, Cal. App. Nos. B196045, B203804, B198007,
B199850, B201425, 2009 WL 646096 (Mar. 4, 2009) (appellate brief).  As always, context is key.  The use
by counsel for Mattel of another court's findings and conclusions to advance an argument is not
inappropriate. Those findings and conclusions may, or may not, be relevant to matters presented to the
Court. Used in this manner, although undoubtably addressed "to the man" (and his credibility), it is not an
improper ad hominem attack.

EXHIBIT ___15___
PAGE ___220___

evidence of improper cultural bias"); id. (in the same footnote, referring to the same quotation, stating that "[t]he tone [of the report] itself is compelling proof that Mr. Durkin had no intention of providing an 'objective' report to the Court."); id. at 23 (referring to the Summary Report as "Mr. Durkin's ill-concealed advocacy piece"); id. (noting that advocacy, rather than objectivity, "is certainly the posture [Mr. Durkin] is most comfortable with"); Omni 808 Investors, LLC's Memorandum in Support of Its Requests to Strike Summary and Responsive Reports of Ronald L. Durkin (docket #5705) ("Motion to Strike"), filed June 8, 2009, at 4 (noting Omni's "doubts that the Court or any party would benefit further by continuing this façade of Mr. Durkin's 'impartiality'"); id. at 7 (calling Mr. Durkin's explanation of his conclusion regarding the relatedness of certain parties as "not only fatuous[,] but [also] intellectually dishonest"); id. at 9 (suggesting that Mr. Durkin intentionally concealed from the Court the fact that Mr. Larian sought other funding sources before turning to Mr. Kadisha); id. at 10 (noting that "Mr. Durkin's repeated references to Mr. Larian's and Mr. Kadisha's common 'Persian' heritage can only be viewed as an attempt to draw some nefarious ethnic connection between them"); id. at 12 (calling the reference to Mr. Larian's and Mr. Kadisha's ethnicity "unprofessional symptoms of improper cultural bias [that] have no place in a supposedly objective report"); Omni 808 Investors, LLC's Reply Memorandum (docket #5809) ("Reply Memo") at 14 (suggesting that not only Mr. Durkin, but also counsel for Mattel, harbor "cultural biases" that lead them to "suggest[] that [Mr. Larian's and Mr. Kadisha's] common heritage makes [them] more likely to act contrary to their own interests); id. at 15 (stating that, according to his own interview notes, Mr. Durkin "misrepresented" to the Court in his Summary Report how Mr. Larian and Mr. Kadisha portrayed their relationship with each other).

As alluded to, Omni 808's criticisms have not been limited to personal attacks; some of the criticisms are in fact aimed at the Reports themselves. See e.g., SOP at 16 ("Mr. Durkin's conclusion that the Wachovia-Omni transaction impacted 'MGAEI's solvency and ability to continue conducting operations' is simply wrong."). Any comment by the Court regarding the substance of the discussions, analyses, and conclusions presented to the Court in the Forensic Auditor's Summary, Responsive, and Final Reports is inadvisable at this time. With the filing of the Third Amended Answer and Counterclaims, much of the subject matter of the Forensic Auditor's Reports have been incorporated into the claims at issue in this action. As such, it would be premature for the Court to comment upon the substance of issues that are yet to be adjudicated, and that are subject to a trial by jury. Nevertheless, the Court has reviewed the Forensic Auditor's Summary, Responsive, and Final Reports, and the exhibits attached thereto. The Court has also reviewed and considered the criticisms aimed at the Forensic Auditor, cited and quoted above, as well as the entirety of all the papers responding to the Forensic Auditor's Reports filed to date. After this review, the Court is firmly convinced that all the personal criticisms of Mr. Durkin are unwarranted and unsubstantiated.

At best, the criticism of Mr. Durkin's performance and presentation represents a

EXHIBIT ___15___
PAGE ___221___

different interpretation of available evidence. That such disagreements would arise between the analyses offered by a Court-Appointed Forensic Auditor and that offered by counsel for a party whose transactions have been a subject of that audit is by no means surprising. A jury considering the relevant evidence might ultimately make factual determinations that tend to agree with Mr. Durkin's assessment, it might ultimately tend to agree with Mr. Gordinier's assessment, or it may very well reject both positions in favor of another. The answer to the merits of the claims at issue in this action must await another day. Today, the Court merely notes that its examination of the Forensic Auditor's Reports reveal that Mr. Gordinier's personal attacks aimed at their author were unjustified.

Some specific attacks directed toward Mr. Durkin – relating to his background as a law enforcement officer, his communications with counsel for Mattel, and specific (but baseless) allegations of ethnocentric bias – are worthy of more specific comment by the Court.

Stopping short of explicitly stating such, Mr. Gordinier appears to labor under the assumption that Mr. Durkin has been unable to put behind him the prosecutorial mindset under which he presumably operated during his former service to this Nation as an agent of the Federal Bureau of Investigation ("FBI"). At the outset, the Court notes that Mr. Gordinier's unstated assumptions do a disservice to the prosecutors and the law enforcement officers who work with those prosecutors, both of whom conduct their work under the clearly delineated duty to ferret out not only evidence of guilt but also "evidence favorable to the accused." See e.g., Berger v. United States, 295 U.S. 78, 88 (1935) (noting that the role of the prosecutor is not to win at all costs and observing that the prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."); Brady v. Maryland, 373 U.S. 83, 87 (1963) (imposing a duty on prosecutors to provide to the defense exculpatory evidence when requested to do so).

Secondly, even if prosecutorial duties were not so defined, the Court finds no suggestion that Mr. Durkin skewed the evidence in favor of any particular viewpoint. Undoubtedly, there is a **complete absence** of any evidence that, as Mr. Gordinier has suggested, Mr. Durkin has embarked upon a campaign to purposely mislead the Court.

Mr. Gordinier also suggests that, because Mr. Durkin's bills are being paid by Mattel, Mattel has, through this payment or through other communications with Mr. Durkin, bought Mr. Durkin's loyalty. This is utter nonsense. As demonstrated by the Court's communications with him, Mr. Durkin is a Court-Appointed Officer who understands that his role is to work on behalf of the Court and not on behalf of any party. In any event, the Court's Order of January 7, 2009, which appointed Mr. Durkin, imposed the costs of the audit on Mattel "in the first instance," but expressly provided for

EXHIBIT _15_
PAGE _222_

Case 2:04-cv-09049-DOC-RNB   Document 6857-7   Filed 09/25/09   Page 19 of 33   Page ID
#:228255
Case 2:04-cv-09049-SGL-RNB   Document 5934   Filed 07/09/2009   Page 11 of 14

the possibility that the audit expenses be shared or shifted to the MGA parties. Moreover, to suggest, however subtly, that ex parte communications with counsel for Mattel were improper ignores the Court's mandate to the Forensic Auditor in the January 7, 2009, Order, which states that Mr. Durkin was provided with attorney contact information and that he "shall direct his initial communications to counsel." At no time has the Court precluded the Forensic Auditor's communications with Mattel or its counsel; in fact, because the Forensic Audit was undertaken based on evidence gathered by and presented to the Court by Mattel, Mr. Durkin would have been remiss in his duties if he failed to communicate with Mattel and its counsel.

Mr. Durkin was vested with powers and discretion to complete a Court-ordered Forensic Audit. Pursuant to an Order of this Court, he undertook this task and exercised those powers and that discretion, presenting his Reports in conformity with the Court's instructions. Despite counsel's attacks, the Court's review of the evidence before it discerns no abuse of those powers or of that discretion.

Particularly troubling to the Court is that counsel speculates that, because Mr. Durkin noted in his report that Mr. Larian knew Mr. Kadisha from "the Persian Community," Mr. Durkin could be "of the view that this common heritage makes Mr. Kadisha more likely to act contrary to his own interests or to do something via third-parties that he wouldn't otherwise do?" See SOP at 13-14 n.10 (appearing to pose this thought as a rhetorical question). There is no indication in the record, or otherwise, that Mr. Durkin holds such a view. To the contrary, Mr. Durkin's comment regarding the acquaintanceship of Mr. Larian and Mr. Kadisha from "the Persian Community" (which is noted in the report within quotation marks and is expressly attributed to a reference made by Mr. Larian himself) is clearly predicated on interviews with these two individuals, each of whom related independently to Mr. Durkin and his colleagues that they knew each other from "the Persian Community." See Durkin Summary Report, Ex. 14, at 2 ¶ 3 (Notes re March 25, 2009, interview with Mr. Larian: "He indicated that he knew Kadisha from the Persian community.") and Ex. 14, at 15 ¶ 2 (Notes re March 26, 2009, interview with Mr. Kadisha: "Kadisha stated that he knows Larian from the Persian community."). The purpose for this reference is made clear in the footnote set forth at the end of the sentence in which the reference appears; namely, the Report discusses evidence that the relationship between Mr. Larian and Mr. Kadisha is stronger and more personal than either man claimed it was. See Summary Report at 5 n.18; Ex. 15 (personal emails).

In the Reply Memo, Mr. Gordinier takes issue with this explanation, this time including not only Mr. Durkin but also counsel for Mattel as the targets for his unsubstantiated allegations of "cultural bias." Mr. Gordinier first mischaracterizes an argument made by Mattel. Mattel argued, and quite correctly, both that how well Mr. Larian and Mr. Kadisha knew each other was relevant to a determination of whether certain transactions between the two were arms-length transactions, and that this point was likely not lost on either of these two very sophisticated and successful

EXHIBIT ___15___
PAGE ___223___

businessmen.[5] As noted previously, both Mr. Larian and Mr. Kadisha stated that they knew each other from "the Persian community" which, in the Forensic Auditor's view, was intended to, or at least had the tendency to minimize the existing relationship between the men. Mr. Gordinier incorrectly characterizes this argument as Mattel's contention that Mr. Larian's and Mr. Kadisha's "Persian relationship" and "common Persian heritage" was somehow relevant to a determination of whether the Omni 808 transaction was an arms-length transaction. Mattel made no such argument. Neither counsel for Mattel nor Mr. Durkin have implied that Mr. Larian's and Mr. Kadisha's ethnicity factors into the analysis. Other than to point to Mr. Larian's and Mr. Kadisha's separate, but identical, accounts of how they knew each other which, in turn, suggests how well they know each other, neither counsel for Mattel nor Mr. Durkin have stated or implied that Mr. Larian's and Mr. Kadisha's shared ethnicity is relevant to any matter currently or potentially before the Court. Compare Opposition at 8-9 with Reply Memo at 14-15.

Moreover, Mr. Gordinier's substantive point, that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha told him about the closeness of their relationship, fares no better. See Reply Memo at 15. On this point, it is important to set this stage properly. Counsel for all parties have attempted to glean far too much from two sterile paragraphs of interview notes taken by Mr. Durkin. Much can be inferred from conversations and interviews through not only what is said, but what is not said, by the interviewee's demeanor, by the tone of the speaker, by the length and placement of pauses, and by non-verbal gestures and body language. With all these variables, much of what is communicated does not find its way into notes.[6] For instance, Mr. Durkin's interview of Mr. Larian lasted over two and a half hours; however, the interview notes are a mere five and a half pages. Similarly, a one-hour and ten minute interview of Mr. Kadisha yielded only three and a half pages of interview notes. This is not to suggest that the notes should have been longer or that the interviews should have been recorded or transcribed; rather, it is to suggest that counsel's arguments based on another's notes are not particularly probative.

In contrast, Mr. Durkin's assessment, based on his interviews with both of them,

---

[5] In fact, the Court just this week issued a 30-page, single-spaced opinion resolving a 10-day bench trial conducted over the sole issue of whether a transaction between "closely related" entities reflected its fair market value, one of the more significant arguments ultimately rejected by the Court in that case being that the close relationship between the parties necessarily rendered the transaction a "sweetheart deal." See July 6, 2009, Order, Siegel v. Warner Bros. Entertainment, Inc., et al., CV 04-08400 SGL (RZ) (docket #554).

[6] Indeed, the interview notes upon which the parties rely concede as much. See Summary Report, Ex. 14 at 2, 15 ("This interview memorandum is a factual representation of the topics discussed during the interview and is not intended to be a word for word or exact transcription of the conversation."). Thus, in addition to not taking into account all non-verbal communication, the notes do not even represent everything that was said during the interview.

EXHIBIT ___15___
PAGE ___224___

is that Mr. Larian and Mr. Kadisha attempted to minimize their relationship because both of them understand the relevance of any friendship or other connection between them to the assessment of the arms-length nature of any transactions in which they have engaged.  Mr. Durkin's assessment does not come from the gentle teasing of a strained meaning from two sterile paragraphs of brief notes taken by another person; rather, his assessment springs from his participation in the interview process, the entirety of the interviews he conducted of Mr. Larian and Mr. Kadisha, and his review of all of the evidence.  As such, the Court defers to his assessment, at least insofar as how Mr. Larian and Mr. Kadisha portrayed their relationship to him.

As for that scant language from which the parties glean so much meaning, the entirety of which is set forth below, it in no way supports the contention made by Mr. Gordinier that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha conveyed to him about the closeness of their relationship.  On this topic, the notes of Mr. Larian's interview merely state the following:

> Larian decided to contact Neil Kadisha of OmniNet as he knew his company was in the distressed loan business. He indicated that he knew Kadisha from the Persian community.  Kadisha said he wouldn't do the deal alone in today's environment and wanted Larian and their other friends to invest in the deal with MGA.  Larian stated that Kadisha negotiated the debt with Wachovia and got it down significantly, Larian said he is not bitter about Kadisha getting a good deal on buying the loan.

Summary Report, Ex. 14, at 2 ¶ 3 (emphasis added).  This paragraph contains the word "friends," and perhaps could even be read as an implicit statement by Mr. Larian that he and Mr. Kadisha are "friends."  But the language does not compel such an inference. Moreover, it does not comport with the notes of Mr. Kadisha's interview, which on this topic state only the following:

> Larian and Kadisha have never been to dinner together.  Kadisha stated that he knows Larian from the Persian community and he sees him often at religious events, etc.  He has no investments with Larian.  Kadisha did not talk with Larian last night, this morning or in the last two days.

Summary Report, Ex. 14, at 15, ¶ 2.  Mr. Durkin's assessment that Mr. Larian and Mr. Kadisha sought to minimize the extent of their relationship is not contradicted by these short passages.

The criticism that Mr. Durkin was acting pursuant to an ethnic or cultural bias is clearly baseless.  The allegations are irresponsible, and they are made to capitalize on

EXHIBIT ___15___
PAGE _____225_____

their inherent sensational nature for counsel's own purposes of diverting attention away from the substance of the Reports. Sensationalism aside, when viewed in context, the Reports' reference to Mr. Larian and Mr. Kadisha knowing each other from "the Persian community" was plainly innocuous. The reference was a direct quotation from both Mr. Larian and Mr. Kadisha. It was used in a broader discussion regarding how (and thus, impliedly, how well) the two knew each other, which is itself relevant to the issue of whether certain transactions relevant to the present litigation were made at arms length.

This is a most unfortunate incident. The Court certainly understands, in a case as hotly contested as this one -- with such high stakes, with such complex legal issues, and with such truly extraordinary legal talent on all sides -- that lawyers, however ethical and committed to the highest standards of professionalism (as the Court presumes and has found all counsel of record here to be), make statements or commit acts in haste that they subsequently regret. All of the players to this drama, are, after all is said and done, human. As such, all of us are vulnerable to all-too-common human frailties. The Court would place itself at the very top of any list of lawyers who have spoken improvidently at one time or another in this case (and any number of others). What the Court has witnessed here, however, in both manner and substance, for the reasons noted above, goes beyond what the Court can let pass without some manner of reprobation. So let the Court be clear: Nothing excuses the attempted character assassination in which Mr. Gordinier has engaged.

**IT IS SO ORDERED.**

Initials of Deputy Clerk __cls_____

EXHIBIT ____15____
PAGE ____226____

# EXHIBIT 16

EXHIBIT ___16___
PAGE _____227_____

EXHIBIT _____16_____
PAGE _____228



# באבא בובה

איזיק לריאן, האבא היהודי
של בובות הבראץ, לא מתרגש
מהמאבקים המשפטיים מול
יצרנית בארבי. הוא עירער על
החלטת בית המשפט להסיר את
הבובות שלו מהמדפים, ובינתיים
מתכנן בובות חדשות. כנקמה

**שושנה חן** // צילומים: משה שי

מי שאומר טוצק דעם שמשתונה
לזעמה של אישה נבגדה, מחזור
לא הכיר את המלחמה בין בארבי
ובראץ, המאבק המתוקשר ביותר
בהיסטוריה של עולם הצעצועים.
שים נו יצחם, נקנה, נהיצאה, כי
תנוית והאשמות בדיף ובברקה. ספולדינים ט ששור רק,
פרטום וכמונד כסף גדול, חזר מלחמא הצעצועים הים-
רה ביותר שהיתה אי פעם, ועד לא נאמרה כה מלילה
התארזת. "עד היום הדואר שני הבדדיים של האשבע
יותר נמאצרים סילית ולות, ואני הבצצו את הכפי
הסטנד רק תמים טדיסיים סלילין וזולל, כי אין לי את
המסמרות תתיגנסיצ של טאטל, יצרנית בארבי".

הדואר, איזיק לריאן, 65, המנכ"ל היהודי של חברת
אבני-לירי האמטיקאית האבא של בארב, מדקני בשלוחה
לטיית השמפ בורץ שאצר מהה כסה, ייספרת נוטפם
פרולי בעל מדינה קצה אבא הבצה שלו בנפה סיליין
חילר וחורה לטירי מומתשים אה נל מצצר בראץ, מה
שנופס לו נהל גדול. "המברנת של בהוק ואבישים ירד
בסקה המחזוני כסיסים אתר מי כמטאטרו ועסיסים
לא מתנבו אי כ"אמד, וזה אצמ במסילי ניפד נאיץ
שקיים לאחרונה, עכשיו חוש שקט בצרישר שהניש
על החלטת ביח נאשפטַ. "סקליב ראשת כנד עיצב
בית,בשפים את הברץ וכובות מהמדשים טר ינואר <



"הכרתי גזענות
באירה וחשבתי
שבארה״ב זה לא
יקרה לי, אבל מתברר
שאחת המשבעות
במשפט שלנו אמרה
באחד הדיונים
שהיהודים האיראנים
הם אגרסיבים
ושכולם גנבים"

"כילד לא היו לי
צעצועים, פרט
לצעצוע עץ שהייתי
מייצר בעצר.
אשתי טוענת שאני
אוהב צעצועים כי
בתת־הכהרה אני חי
מחדש את ילדותי
ומפצה את עצמי על
המחסור של אז"

להריץ בחזרה



# בובה.

EXHIBIT 16
PAGE 230

17.7.2009   7 עמ׳   62



"אני לא אוהב פמיניזם ושטיפות, אבל אני נגד עינוי דראל והגזמה"

"בְּאירן היו לנו שכנים שתאמינו שהיהודים לוקחים ילד מוסלמי, שוחטים אותו ומשתמשים בדמו לצורך אפיית מצות. הם היו באים להוריי ומתחננים: 'אל תיקחו את הילד שלנו'"

"כשהשכנו את בראץ, מדינה ובריתני ספיריס היו בשיא והאמנית הייתה יותר תחזיתית. היום הילדות והאמהות יותר שמרניות, והבובות החדשות שלנו מתאימות למה שהן רוצות"

## יבלות על הידיים

בארכי לנגלונית, מרמאת קי אומנ•י• נמוהית, שמנה לבעגל מנולי" המעצבים במילים, היא ערי. הוביה המעליית. ביתהו המישמורה. לריאל קי א ומעך שמ• מים מימושיית שוכבית, שלי את ...

[טקסט המשך בעמודות בעברית — חלק מהמילים אינן קריאות בבירור]

## גזענות בבית המשפט

כשמריהיה בטיר יסמין בת 11, ראתה מו שדרה שרשמו של בובה מריטה שמנה לבי• נד "בראבי". היא ריישה את ממורה לאמורי• אבל נמסרה המוגחמ חלל המה ...

## יצרנית בארבי: אנחנו הגזנים ולא גזענים





# מומ בובה

EXHIBIT 16
PAGE 231

[Main article text - page 61]

# Baba Buba

## Isaac Larian, the Jewish father of dolls in Israel, is unperturbed by the legal battles with the manufacturer of Barbie. He has appealed a court ruling to remove his dolls from the shelves, and meanwhile he is planning new ones. As revenge.
### Shoshana Chen // Photos: Moshe Shai

Whoever said that hell hath no fury like a woman scorned obviously didn't know about the war between Barbie and Bratz, the most publicized battle in the history of the toy world, featuring emotions, jealousy, stubbornness, aggression, and accusations of forgery and fraud. It involves lawyers and publicity, and obviously big money. It's the most expensive toy war ever and the last word has not yet been pronounced on it. "Until now the two sides have spent more than a hundred million dollars on the fight. and I spent the pocket change: only fifty to sixty million, because I don't have the financial resources of Mattel, the manufacturers of Barbie."

The speaker, Isaac Larian, 55, the Jewish CEO of the American company MGA Entertainment, and father of Bratz, speaks calmly even though he took a serious blow last summer, when the federal court in California fined his company a hundred million dollars and ordered it to take down all Bratz products from the shelves, causing him enormous losses. "Sales of Bratz and its accessories were down 60% because retailers and buyers don't like uncertainty," he said during a recent visit to Israel. Now he is preoccupied with the appeal he filed against the court ruling. "As a first stage, the court has already suspended removal of the dolls from the shelves until January 2010.    [Page 62]     The grounds for our appeal run to 8,500 pages." He expects this part of the legal dispute to be concluded by the end of 2009. Meanwhile, he is planning new samples of dolls, which are already making a buzz in the toy world, even though most of their details remain confidential. He is also examining the possibility of bringing out collectors' editions of Bratz if he is forced to remove them from the shelves.

His problem is that in the meantime children are finding other attractions on the shelves, chief among them Webkinz, a winning combination of domestic pets made of fur and a virtual world on a Internet site devoted to the insatiable craving of enthusiasts. In toy circles they say that the Webkinz hysteria is breaking records and is hurting sales of both Bratz and Barbie. Will Webkinz kill off the traditional dolls?

Larian is convinced that they won't. "Girls will always play with dolls," says someone who has made his mark with a long line of international hits in the toy sector: not just Bratz, but also Cozy Coupes, a plastic car that's all the rage in America. "We sold half a million units in the last year, more than any other car in America, and this is a product that has been in the stores for many years. It belonged to a long-established company named "Little Tykes" that we acquired. What made it such a sudden success? We made the car human; we added eyes to it and connected with today's children."

He intends to link the new series of dolls, Moxie Girlz and BFC Ink, to the virtual world. The dolls are softer than Bratz, "Because mother and daughter fashion has changed," he explains. When we launched Bratz, Madonna and Britney Spears were at their peak, and fashion was more frenetic. Girls and their mothers are more conservative these days. The economic situation also has an effect. These two dolls are the kind of thing girls are looking for now and they sell for between 17 and 40 dollars, like Bratz."

He aims them at the 5-11 year olds, although toy psychologist Yael Katz claims that the age for playing with dolls has dropped to 7-8. "If your design is right, girls of 11-12 will also turn to dolls. Both Moxie Girlz and BFC Ink are different from the dolls we've seen up until now. BFC Ink, for example, will come with a book. Both of them will be linked to an Internet site. Later on there will be television series as well as cellular telephones and laptop computers. It's impossible nowadays to bring out a line of dolls without getting into the world of electronics. There are laptops in the USA for girls of 5-6, and when they are 11-12 they have their own cellular phones. Girls will be able to design clothes for the new dolls and send them to us through Internet sites. The company will choose the most successful designs and will perhaps even manufacture them. Consumer research on 600 girls and 600 mothers conducted in the USA yielded fantastic results. Both the girls and their mothers preferred the Moxie Girlz to all other dolls, including Barbie, Hannah Montana, High School Musical and Bratz."

EXHIBIT 16
PAGE 232

**Are you adopting the Harry Potter strategy – pique curiosity and develop strict launch rules to create demand?**

"We will work in a similar way, but we will not create an artificial shortage. I already expect that there will be a shortage of dolls because we are manufacturing a limited number, and demand is higher than we expected. I don't want to reveal numbers, but I am sure that in time these two dolls will be bigger than Bratz."

# Hitting back

Meanwhile, Bratz is his leading brand with a sales volume of 500 million dollars in peak years and revenues of 15% from franchisees that have a turnover of 2.5 billion dollars a year. Larian refuses to confirm the numbers since the matter is still sub judice.

"Look what is happening with the franchised brands of Bratz," says Ofer Baram, merchandising director of "Toy Village". "When girls reach the age of eight and stop playing with dolls they have an entire wall of products. Wherever Bratz can be printed, it's there: watches, chairs, schoolbags, clothes, pencils, pens, pencil cases, backpacks. I thought girls were already fed up with Bratz by Purim, but it was the leading costume."

According to Baram, Barbie is considered conservative in comparison with Bratz and stuck in a groove. Even the celebrations for her 50th birthday which were held last March did nothing to boost sales. From the beginning of 2008 and until now 12,000 Barbie dolls have been sold in Israel according to reports by the franchisee Sakal – hardly an impressive number compared with sales of Webkinz that exceeded 150,000 units in less than six months.

For his part, Larian is aware of all the competitors and will do whatever it takes to get back on top. He attributes his determination to his personal background as an Iranian Jew. "We lived in a poor area of Teheran," he says. "There were only three Jewish families in our neighborhood, the same neighborhood Ahmadinejad also grew up in. I'll never forget when I was a kid of 7-8 years old and had to come back from school on rainy days, the neighbors' children and the adults themselves used to run to get in front of me and shout that they had to get past me because 'after the raindrops hit me they pollute the ground'. When I got home, crying bitterly, my mother would say to me "If you come home again crying that they made fun of you for being a Jew or because they hit you – I'll hit you. If somebody hits you, you have to hit him back." That's what I did when I was a kid, and they respected me."

His uncle, 87, still lives in Teheran ("I speak with him now and again"). The rest of the family emigrated to the USA and Israel.

"I didn't have any toys when I was a kid," he says, "apart from wooden ones that I made for myself in our back yard. My wife says I like toys because subconsciously I am reliving my childhood and compensating myself for the ones I didn't have then."

From an early age he dreamed of America, and when he turned 17 he was accepted as an engineering student at the University of Missouri.      [page 64]      His father gave him a one-way ticket and 750 dollars. He meant to go to Missouri, but a chance meeting at a stopover in Los Angeles changed his life. A Jewish immigrant from Iran warned him that he wouldn't find work in Missouri. Larian decided to stay in Los Angeles, where he lives to this day. His first job there was washing dishes in a café. He worked there for six months before being promoted to busboy and then waiter. In his free time he studied engineering and when he completed his studies he entered the business world through a small company that imported gifts from Korea. From there he moved on to toys.

**Would you like to visit Iran?**

"Yes, Iran is a beautiful country, and most of the people there were nice to us. Only the uneducated extremists believe the stories. I remember the kind of stories that were going around on the eve of Passover, for example. We had neighbors who believed that the Jews take a Muslim child, slaughter him and use his blood to bake matzos. We had neighbors who used to come to my parents and plead with them: 'Don't take our child.' "

EXHIBIT _____ 16
PAGE _____ 253

# Racism in court

When his daughter Jasmin was 11, she saw a drawing in his office of a new doll that had been given the name "Bratz." She was addicted to Barbie at the time but the new doll brought a gleam to her eye. The success of Bratz brought harsh criticism from sociologists and psychologists who were opposed to the provocativeness and sexuality radiated by the dolls. There was also the lawsuit by Mattel, the manufacturers of Barbie, who claimed that the large-eyed Bratz was a copy of their doll, and that the person who sketched the first illustrations for the new doll and brought them to Larian, Carter Bryant, was a Mattel employee when he presented himself to Larian with the new design. Larian's company, MGA, denied everything, but the court ruled that Larian intentionally violated Bryant's contractual obligation with Mattel and was an accomplice in his breach of trust.

"No one in the toy industry wages as many legal battles as Mattel," he explains. "When they sued doll maker Goldberger, the ruling stated that anyone who decides to compete with Barbie should know that he's a marked man. The have a lot of clout and money. Our appeal contains evidence from Roy Brower [translator's note: possibly Brauer - English spelling is uncertain], who was a senior VP in the company, stating that "Lawsuits are used by Mattel as a commercial tool." For almost fifty years no one dared to take on Barbie. They never thought that a poor Jew from Iran would fight back."

**But you're also an old warhorse.**

"I dislike legal battles, but I defend myself. You can't just sit by and let everyone take away your business and your life. But I have never sued anyone in order to stop competition."

**You accused the trial with Mattel of being tainted by racism.**

"It wasn't an accusation; as I understand it, it's a fact, and we're also bringing it up in our appeal. For me it was something unbelievable. I knew about racism from Iran, and I never thought it would happen to me in the U.S., but it happened during the trial when the jurors were required to decide to whom the original drawings of Bratz belonged and the extent of the damage caused to Mattel. One day, one of the jurors told the judge that during the hearings, one of the female jurors had said that "Iranian Jews are aggressive, and they are all thieves". We demanded a retrial. In the end the judge dismissed her and called her a racist, but at the same time he ruled that she was not a racist in the legal sense. That's like saying that Hitler was an anti-Semite, but not in the legal sense. Our argument was that if she was not a racist in the legal sense, why was she dismissed?"

**How involved are you in the legal battle?**

"More than I would like to be, and I intend to cut down. I am too emotional and I don't have enough time to do what I'm really best at – developing products and marketing – and this is what Mattel really wants. It's no coincidence that sales of Bratz have fallen this year. Our customers don't know what's going on. Customers like Toys R Us in the USA tell us, "We would like to buy, but we don't know what to do." They've cut back on orders because retailers don't like uncertainty. They prefer to wait. Our sales of Bratz dolls and accessories in 2009 will be down 60% from 2008."

The damage to Bratz sales in Israel is actually less serious, says local franchisee Doron Peled, CEO of Ilanit. In Toy Village, for example, the doll and its accessories are in the top ten of sales hits. Barbie hasn't been in the running for a long time.

# Calluses on his hands

Barbie in all its reincarnations, from doctor to astronaut, which was dressed by the greatest designers in the world, remains the most successful doll in history. Larian has challenged it for understandable commercial reasons, but not solely for these.

"From the very first day of the trial they were saying, "Isaac Larian started MGA with money from his rich family in Iran." I sat and listened to them, but I couldn't believe it. What rich family in Iran? I still have the marks of calluses on my hands from the time I washed dishes when I came to America to study engineering. We had to take the dishes out of the dishwasher when they were burning hot. This racism is the hardest part of the battle against Mattel, and it reminds me, unfortunately, that it's impossible to escape racism even in the 21st century and even in California."

**Does it make you think about emigrating?**

"To be perfectly honest, we are thinking about Israel. Only last evening I was talking with my wife and I said that the time had come to buy a house in Israel."

EXHIBIT _16_
PAGE _234_

**Will your children agree?**

"You would be surprised, they love Israel. When my daughter Jasmin was 17, she took part in the 'March of the Living' project and visited Poland and Israel. I still have tear-filled emails she sent me from there. She still says it was the most important thing in her life, the thing that made her more Jewish than anything else. When Ahmadinejad says the Holocaust never happened I don't understand why they don't take him for a tour of Germany and Poland."

His wife Angela, an Iranian Jew he met in America, is not involved in the business. The couple has three children: Jason, 22, who is studying business management in Boston ("I don't know if he's going to join the company"), Jasmin, 19, and Cameron, 15. "I don't give them everything, and they sometimes complain," he says, "but I think that the story of us all is the story of wandering Jews. What if something happens in America and they need to go somewhere else? If you don't have the experience and the determination, you won't survive."

**Yediot Aharonot, 7 Days, , July 17, 2009.**

EXHIBIT _16_
PAGE _235_

[captions and callouts]

[photograph caption – page 60]
"Girls will always play with dolls." Larian with the variations.

[photograph caption – page 62]
For almost fifty years no one dared to take on Barbie. They never thought that a poor Jew from Iran would declare war on them. The Barbies.

[Callouts – page 62]
**"I knew about racism from Iran, and I never thought I would be a victim of it in the U.S., but one of the jurors in our trial said during one of the hearings that Iranian Jews are aggressive, and they are all thieves."**

**"I didn't have any toys when I was a kid," he says, "apart from wooden ones that I made for myself in our back yard. My wife says I like toys because subconsciously I am reliving my childhood and compensating myself for the ones I didn't have then."**

[Photograph caption – page 64]
"I dislike legal battles, but I defend myself." Larian and the dolls.

[Callouts – page 64]

**"We had neighbors in Iran who believed that the Jews take a Muslim child, slaughter him and use his blood to bake matzos. We had neighbors who used to come to my parents and plead with them: 'Don't take our child.' "**

**"When we launched Bratz, Madonna and Britney Spears were at their peak, and fashion was more frenetic. Girls and their mothers are more conservative these days, and our new dolls are more the kind of thing they want."**



## Barbie's manufacturer: We are fair and not racist

EXHIBIT ___16___
PAGE ___236___



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

City of New York, State of New York, County of New York

I, Marina Yoffe, hereby certify that the document "ART7_17" is, to the best of my knowledge and belief, a true and accurate translation from Hebrew into English.

Marina Yoffe

Sworn to before me on

August 3, 2009

Signature, Notary Public

Katharine L Perekslis
Notary Public, State of New York
No. 01PE6181423
Qualified in QUEENS County
Commission Expires Jan 28, 2012

Stamp, Notary Public

EXHIBIT _16_
PAGE _237_

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016   T 212.689.5555   F 212.689.1059   WWW.TRANSPERFECT.COM