# EXHIBIT 1

Exhibit Filed Under Seal Pursuant to Protective Order

# EXHIBIT 2

Exhibit Filed Under Seal Pursuant to Protective Order

# EXHIBIT 3

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2     John B. Quinn (Bar No. 90378)
      (johnquinn@quinnemanuel.com)
3     Michael T. Zeller (Bar No. 196417)
      (michaelzeller@quinnemanuel.com)
4     Jon D. Corey (Bar No. 185066)
      (joncorey@quinnemanuel.com)
5   865 South Figueroa Street, 10th Floor
    Los Angeles, California 90017-2543
6   Telephone: (213) 443-3000
    Facsimile: (213) 443-3100

7   Attorneys for Mattel, Inc.

8                   UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10                        EASTERN DIVISION

11

12   | CARTER BRYANT, an individual, | CASE NO. CV 04-09049 SGL (RNBx) |
13   |                   Plaintiff,    | Consolidated with Case Nos. CV 04-9059 and CV 05-2727 |
14   |            v.                   |                                |
15   | MATTEL, INC., a Delaware        | NOTICE OF SUBPOENA ISSUED TO BINGHAM MCCUTCHEN LLP |
16   | Corporation,                    |                                |
17   |                   Defendant,    |                                |
18   | AND CONSOLIDATED CASES          |                                |

19

20

21

22

23

24

25

26

27                                    EXHIBIT ___3___
28                                    PAGE ___63___

07975/2794934.1                    2-12

1      TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2      PLEASE TAKE NOTICE that, pursuant to Rule 45 of the <u>Federal Rules of</u>

3 <u>Civil Procedure</u>, Mattel, Inc., has issued a subpoena attached as Exhibit 1 requesting

4 the production of specified documents to the following witness:

5      Bingham McCutchen LLP, 355 South Grand Avenue, Suite 4400, Los

6 Angeles, CA 90071-3106.

7

8 DATED: February 12, 2009      QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

9

10

11                 By <u>/s/ Michael T. Zeller</u>
                      Michael T. Zeller
                      Attorneys for Mattel, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT __3__
PAGE __64__

07975/2794934.1

-2-

# EXHIBIT 1

EXHIBIT __3__
PAGE __65__

AO88 (Rev. 12/07) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

_____ CENTRAL _____     CALIFORNIA _____

CARTER BRYANT, an individual,

             V.

MATTEL, INC., a Delaware corporation,

### SUBPOENA IN A CIVIL CASE

Case Number: <sup>1</sup> CV 04-9049 SGL (RNBx)
Consolidated with cases 04-9059
and 05-2727

TO: Bingham McCutchen, LLP
     355 South Grand Avenue, Suite 4400
     Los Angeles, CA 90071-3106

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment A

| PLACE | DATE AND TIME |
|---|---|
| Quinn Emanuel Urquhart Oliver & Hedges, LLP | February 26, 2009 |
| 865 S. Figueroa Street, 10th Floor | 9:00 a.m. |
| Los Angeles, CA 90017 | |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Michael T. Zeller* /sh  Attorney for Plaintiff, Mattel, Inc. | February 12, 2009 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Michael T. Zeller, QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
865 S. Figueroa Street, 10th Floor, Los Angeles, CA 90017 (213) 443-3000

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

<sup>1</sup> If action is pending in district other than district of issuance, state district under case number.

AO-88

EXHIBIT ___3___
PAGE ___66___

AO88 (Rev. 12/07) Subpoena in a Civil Case (Page 2)

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|

**SERVED**

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                              DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA.

(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) Command to Produce Materials or Permit Inspection.

(A) Appearance Not Required. A person commanded to produce documents, not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) Quashing or Modifying a Subpoena.

(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

(d) DUTIES IN RESPONDING TO A SUBPOENA.

(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:

(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.

(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) Claiming Privilege or Protection.

(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT.

The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

EXHIBIT ___3___
PAGE ___67___

## ATTACHMENT A

1.      All documents referring or relating to any fee agreement or fee arrangement referring or relating to Bingham McCutchen LLP's ("Bingham") representation of Vision Capital, LLC ("Vision Capital") and/or Omni 808 Investors, LLC ("Omni 808"), and any amendments or modifications thereto, and any communications referring or relating to any such agreements or arrangements.

2.      Documents sufficient to identify each and every person or entity billed for, liable to pay, responsible for payment of, or who has paid or promised to pay, whether directly or indirectly, Bingham's fees in connection with Bingham's representation of Omni 808 or Vision Capital.

3.      All documents referring or relating to the formation, governance, ownership, capitalization and/or funding of, or credit for, Omni 808, Vision Capital and/or Lexington Financial Limited ("Lexington"), including the source(s) and terms of such capitalization, funding and/or credit.

4.      All documents identifying any member, managing member, shareholder, holder of any ownership interest in, officer, director, employee and/or agent of, or investor in, Omni 808, Vision Capital and/or Lexington.

5.      All contracts and agreements, and proposed or offered contracts or agreements, referring or relating to Omni 808, Vision Capital and/or Lexington, including without limitation all drafts thereof disclosed to, shared with, exchanged with or received from Wachovia, MGA Entertainment, Inc., Fred Mashian, Leon Neman, Isaac Larian and/or any other person or entity other than Omni 808.

6.      All communications referring or relating to Omni 808, Vision Capital and/or Lexington. For purposes of this Request, Bingham may exclude (a) privileged communications with its client Omni 808 after its attorney-client relationship arose; (b) privileged communications with its client Vision Capital after its attorney-client relationship arose; and (c) communications with Mattel's counsel or the Court in the matter of Carter Bryant v. Mattel, No. CV 04-9059, and consolidated cases.

7.      Documents sufficient to identify any instances in which Bingham has represented MGA Entertainment, Inc., any affiliate of MGA Entertainment, Inc., Fred Mashian, Leon Neman, any entity associated with Leon Neman, Yoel Neman, Monia Neman (aka Monia Mashian), Angela Larian, Farhad Larian, Isaac Larian and/or any entity associated with Isaac Larian at any time since June 1, 2001.

EXHIBIT  3
PAGE  68

AO88  (Rev. 12/07) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

_____CENTRAL_____            _____CALIFORNIA_____

CARTER BRYANT, an individual,

                V.                              **SUBPOENA IN A CIVIL CASE**

MATTEL, INC., a Delaware corporation,           Case Number: [1] CV 04-9049 SGL (RNBx)
                                                Consolidated with cases 04-9059
                                                and 05-2727

TO: Bingham McCutchen, LLP
    355 South Grand Avenue, Suite 4400
    Los Angeles, CA 90071-3106

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment A

| PLACE<br>Quinn Emanuel Urquhart Oliver & Hedges, LLP<br>865 S. Figueroa Street, 10th Floor<br>Los Angeles, CA 90017 | DATE AND TIME<br>February 26, 2009<br>9:00 a.m. |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>Attorney for Plaintiff, Mattel, Inc. | DATE<br>February 12, 2009 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Michael T. Zeller, QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
865 S. Figueroa Street, 10th Floor, Los Angeles, CA 90017 (213) 443-3000

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO-88

EXHIBIT _3_
PAGE _69_

AO88 (Rev. 12/07) Subpoena in a Civil Case (Page 2)

## PROOF OF SERVICE

| DATE | PLACE |
|------|-------|
|      |       |

SERVED

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|------------------------|-------------------|
|                        |                   |

| SERVED BY (PRINT NAME) | TITLE |
|------------------------|-------|
|                        |       |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA.

(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) Command to Produce Materials or Permit Inspection.

(A) Appearance Not Required. A person commanded to produce documents, not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) Quashing or Modifying a Subpoena.

(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial

(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

(d) DUTIES IN RESPONDING TO A SUBPOENA.

(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:

(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.

(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) Claiming Privilege or Protection.

(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT.

The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

EXHIBIT ___3___
PAGE ___70___

## ATTACHMENT A

1.      All documents referring or relating to any fee agreement or fee arrangement referring or relating to Bingham McCutchen LLP's ("Bingham") representation of Vision Capital, LLC ("Vision Capital") and/or Omni 808 Investors, LLC ("Omni 808"), and any amendments or modifications thereto, and any communications referring or relating to any such agreements or arrangements.

2.      Documents sufficient to identify each and every person or entity billed for, liable to pay, responsible for payment of, or who has paid or promised to pay, whether directly or indirectly, Bingham's fees in connection with Bingham's representation of Omni 808 or Vision Capital.

3.      All documents referring or relating to the formation, governance, ownership, capitalization and/or funding of, or credit for, Omni 808, Vision Capital and/or Lexington Financial Limited ("Lexington"), including the source(s) and terms of such capitalization, funding and/or credit.

4.      All documents identifying any member, managing member, shareholder, holder of any ownership interest in, officer, director, employee and/or agent of, or investor in, Omni 808, Vision Capital and/or Lexington.

5.      All contracts and agreements, and proposed or offered contracts or agreements, referring or relating to Omni 808, Vision Capital and/or Lexington, including without limitation all drafts thereof disclosed to, shared with, exchanged with or received from Wachovia, MGA Entertainment, Inc., Fred Mashian, Leon Neman, Isaac Larian and/or any other person or entity other than Omni 808.

6.      All communications referring or relating to Omni 808, Vision Capital and/or Lexington. For purposes of this Request, Bingham may exclude (a) privileged communications with its client Omni 808 after its attorney-client relationship arose; (b) privileged communications with its client Vision Capital after its attorney-client relationship arose; and (c) communications with Mattel's counsel or the Court in the matter of Carter Bryant v. Mattel, No. CV 04-9059, and consolidated cases.

7.      Documents sufficient to identify any instances in which Bingham has represented MGA Entertainment, Inc., any affiliate of MGA Entertainment, Inc., Fred Mashian, Leon Neman, any entity associated with Leon Neman, Yoel Neman, Monia Neman (aka Monia Mashian), Angela Larian, Farhad Larian, Isaac Larian and/or any entity associated with Isaac Larian at any time since June 1, 2001.

EXHIBIT ___3___
PAGE ___71___

# EXHIBIT 4

Exhibit Filed Under Seal Pursuant to Protective Order

# EXHIBIT 5

Exhibit Filed Under Seal Pursuant to Protective Order

# EXHIBIT 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
CIVIL MINUTES -- GENERAL

Case No. CV 04-09049 SGL(RNBx)                          Date: July 9, 2009
Title:      MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

            Cindy Sasse                       None Present
            Courtroom Deputy                  Court Reporter

ATTORNEYS PRESENT FOR               ATTORNEYS PRESENT FOR
PLAINTIFFS:                         DEFENDANTS:

None Present                        None Present

PROCEEDINGS:    ORDER GRANTING EX PARTE APPLICATION RE TEMPORARY
                RECEIVERSHIP (DOCKET #5728)

                ORDER GRANTING EX PARTE APPLICATION RE COST
                SHIFTING (DOCKET #5865)

                ORDER GRANTING IN PART EX PARTE APPLICATION FOR
                RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

                ORDER GRANTING IN PART MATTEL'S MOTION RE
                DISCOVERY MASTER ORDER NO 27 AND REMANDING
                DISCOVERY MASTER ORDER NO. 27 FOR
                RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT
                OF THE FILING OF THE TAAC (DOCKET #5561)

                ORDER DENYING MOTION TO STRIKE THE FORENSIC
                AUDITOR'S REPORTS (DOCKET #5705)

EXHIBIT    6
PAGE    132

## I. ORDER GRANTING EX PARTE APPLICATION
## RE TEMPORARY RECEIVERSHIP (DOCKET #5728)

Because the only opposition to the Ex Parte Application regarding the winding up of the Temporary Receivership involves the issue of cost-shifting, which is addressed separately, below, the Court **GRANTS** the Ex Parte Application. A separate order addressing this Ex Parte Application has been concurrently filed.

## II. ORDER GRANTING EX PARTE APPLICATION RE
## COST SHIFTING (DOCKET #5865)

The MGA parties' opposition to the Temporary Receiver's Ex Parte Application argued that the costs of the Temporary Receivership should be shifted to Mattel (as the party who sought appointment of a Temporary Receiver). However, the Court has previously ruled that, at some yet-to-be defined date in the future, the Court will consider whether to shift the costs of both the Temporary Receivership and the Forensic Audit. Therefore, Mattel filed an Ex Parte Application seeking either to be relieved of the responsibility to respond to the MGA parties' argument or, alternatively, for an order setting a briefing schedule on the issue. It is not the intention of the Court to address the cost-shifting issue at this time; rather, as the Court has stated previously on the record, that issue is more efficiently resolved at a later date, most likely a date after completion of Phase 2 of the trial. Accordingly, the Court **GRANTS** Mattel's Ex Parte Application re Cost Shifting. Mattel is relieved of any duty to respond to MGA's argument regarding the appropriate allocation of costs arising from the Temporary Receiver that is set forth in the MGA parties's June 26, 2009 Opposition to the Temporary Receiver's Ex Parte Application.

## III. ORDER GRANTING IN PART EX PARTE APPLICATION FOR
## RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

The Court has received and reviewed the MGA Parties' Ex Parte Application For Partial Release of *In Camera* Juror Interview Transcripts, as well as the Opposition, the Reply, and the accompanying exhibits. The Court **GRANTS IN PART** the Ex Parte Application. Although the Court declines to award the relief sought, the Court will take steps to ensure that the transcript of the juror interviews are provided to the Ninth Circuit for its consideration of the appeal filed by the MGA parties.

The relevant *in camera* juror interviews were conducted on July 25, 2008; the findings made by the Court on the basis of those interviews are set forth in detail in the Court's Order Denying Motion for Mistrial, dated August 8, 2008. Counsel for the parties agreed that the juror interviews, which were conducted mid-trial, should be conducted *in camera*, and the MGA parties did not request that the Court grant them access to the transcripts to prepare their Motion for Mistrial. The Court indicated on the

MINUTES FORM 90
CIVIL -- GEN                                      2                    Initials of Deputy Clerk __cls_____

EXHIBIT __6__
PAGE __133__

record around the time of the filing of the Motion for Mistrial that it was not the Court's intent to grant the parties access to the transcripts.

After the conclusion of the trial, the MGA parties did not at any time request this Court grant access to the transcripts. To the contrary, some ten months passed between the date of the Order Denying Motion for Mistrial and the MGA parties' first post-trial request for access to those transcripts. That request was made to the Ninth Circuit, not this Court, on June 10, 2009. When the Ninth Circuit denied the request in favor of the MGA's presentation of the issue to this Court in the first instance, the MGA parties thereafter filed the present Ex Parte Application in a expeditious manner.

Ostensibly, as set forth in both the Motion filed before the Ninth Circuit and the Ex Parte Application before this Court, the reason the MGA parties seek access to those transcripts is so that they may use them to challenge the Court's Order Denying Motion for Mistrial. Although the MGA parties filed its Notice of Appeal on May 4, 2009, and although that Notice clearly indicated that the Order Denying Motion for Mistrial would be implicated in the appeal, the MGA parties failed to file its Motion seeking release of the transcripts until June 10, 2009. The MGA parties' failure to seek this relief until a month after they filed their Notice of Appeal and a month before their opening brief was due, and their decision to present the issue of release of the transcripts to the appellate court (rather than this Court) in the first instance, created the very urgency that cause them to seek ex parte relief from this Court. As such, the Court declines to grant the relief sought.

Nevertheless, in the interest of due process and in order to facilitate the full consideration of the issue by the Ninth Circuit, the Court will take steps to ensure that the transcripts of the *in camera* interviews are provided to the Ninth Circuit for *in camera* filing.

## IV. ORDER GRANTING IN PART MATTEL'S MOTION RE DISCOVERY MASTER ORDER NO 27 AND REMANDING DISCOVERY MASTER ORDER NO. 27 FOR RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT OF THE FILING OF THE TAAC (DOCKET #5561)

In the challenged portion of Discovery Master Order No. 27 ("DM Order No. 27"), the Discovery Master denied Mattel's Motion to Compel discovery sought by service of a subpoena on non-party Bingham McCutchen LLP ("Bingham"), a law firm that represents Intervenor Omni 808, as well as a number of non-party entities that are familiar to those involved in this litigation: OmniNet Capital, LLC ("OmniNet"), Vision Capital, LLC ("Vision"), IGWT Group, LLC ("IGWT"), and IGWT 826 Investments, LLC ("IGWT 826"). Broadly categorized, the subpoena sought production of (1) fee agreements relating to Vision and Omni 808; (2) documents regarding the formation, control, and financing of Omni 808, Vision, and Lexington Financial Limited

MINUTES FORM 90
CIVIL -- GEN                                         3                    Initials of Deputy Clerk __cls_____

EXHIBIT   6
PAGE   134

("Lexington"); (3) documents identifying stakeholders and officers of Omni 808, Vision, and Lexington; (4) all contracts relating to Omni 808, Vision Capital, and Lexington; (5) all communications relating to Omni 808, Vision Capital, and Lexington, excluding attorney-client privileged documents; and (6) Bingham's representation of MGAE and certain named individuals who have some connection with MGAE, including a number of Mr. Larian's family members.

The Discovery Master correctly recognized the essential legal standard in assessing whether a subpoena may be enforced. The information must satisfy the discovery relevance standard, i.e., it must be "'reasonably calculated to lead to the discovery of admissible evidence.'" DM Order No. 27 at 19 (quoting Fed. R. Civ. P. 26(b)(1)). The decision of whether to enforce a subpoena ultimately implicates a balancing test that pits relevance of the materials sought and need to the requesting party against hardship to the party resisting the subpoena. DM Order No. 27 at 20. Non-parties are generally required to bear lesser burdens than parties in responding to subpoenas. Exxon Shipping Co. v. United States Dept. of Interior, 34 F.3d 774, 779 (9th Cir. 1994) ("The Federal Rules also afford nonparties special protection against the time and expense of complying with subpoenas.").

However, the Discovery Master overstated the burden of proof allocated to Mattel, as the party seeking discovery. See DM Order No. 27 at 20 ("As the party moving to compel compliance with the subpoena, Mattel bears the initial burden of establishing that the information sought is relevant and necessary to the claims or defenses at issue.") This standard is both overstated and incomplete. It is overstated in that Mattel need not show that the evidence sought is "necessary to the claims or defenses." Although Mattel indeed bears the burden of establishing relevancy, that showing is not one of "necessity." Rather, Mattel must bear the burden of establishing the discovery relevancy standard -- that the materials sought are "reasonably calculated to lead to the discovery of admissible evidence" -- is met. It need not establish that the materials sought are "necessary" to its case.

This point leads to the manner in which the stated burden is incomplete. As clearly articulated by cases cited by Bingham, although Mattel bears an initial burden of establishing relevancy, the party resisting discovery thereafter has the burden of establishing that discovery should be denied. See Bryant v. Ochoa, 2009 WL 1390794 at *1 (S.D. Cal. 2009) ("The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1). . . . Therefore, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections."); DIRECTV, Inc. v. Trone, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (same); see also Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975) (reversing the district court's issuance of a protective order based on a failure of the party resisting discovery to meet its burden by asserting that the defendant's deposition would merely yield cumulative evidence).

EXHIBIT    6
PAGE    135

The effect of this subtle variation on the burden of proof from that stated by the Discovery Master is magnified by the recent filing of the TAAC, which significantly heightens the relevancy of the issue of how the MGA parties and the parties represented by Bingham may be related, the formation of certain of those entities, and other issues implicated by Mattel's requests. Because the question of relevance is featured so prominently in the quintessential balancing test to which the present discovery motion was subjected, the filing of the TAAC dramatically altered the calculus that underlies the conclusions reached in DM No. 27.

For reasons related to judicial economy and preservation of scarce judicial resources (which this case has stretched to the outer limits), the Court defers decision, in light of the changed calculus that has occurred as the result of the filing of the TAAC, of the issues presented in the challenged portions of DM No. 27 to the Discovery Master. For that reason, the Court **REMANDS** the challenged portions of DM No. 27 to the Discovery Master for his reconsideration and re-balancing in light of the recently filed TAAC. The Discovery Master may, in his discretion, set the matter for further briefing and/or hearing, he may take the matter under submission based on the existing record, or he may take other action as he deems appropriate to resolve the present issues.

Notwithstanding the remand of DM Order No. 27, one issue raised by Mattel requires further consideration by the Court. At page 25 of DM Order No. 27, the Discovery Master appears to impose a blanket prohibition on discovery of materials that are in the possession of a subpoena recipient, but that are related to a non-party over whom the Court has not been shown to have jurisdiction. The Discovery Master cites no legal authority for such a blanket prohibition, and the Court, in its own research, has found none. Such a blanket prohibition precludes the application of the balancing test that applies almost universally to discovery motions; accordingly, and because this blanket prohibition is unprecedented, the Court finds that it is contrary to law. As to this narrow issue, the Court **GRANTS** Mattel's Motion. The issue of discovery of materials relating to Lexington is **REMANDED** to the Discovery Master for reconsideration in light of this ruling and in light of the filing of the TAAC.

## V. ORDER DENYING MOTION TO STRIKE
## THE FORENSIC AUDITOR'S REPORTS (DOCKET #5705)

In an unsealed filing that has since been ordered sealed by the Court, counsel for Omni 808 Investors, LLC ("Omni 808"), Todd E. Gordinier, made unwarranted, unsubstantiated personal attacks against the Court-Appointed Forensic Auditor, Ronald L. Durkin. Mr. Gordinier's selective public disclosure of portions of the Forensic Auditor's Summary Report, coupled with the maintenance of the Summary Report, as well as the later-filed Responsive Report and Final Report, under seal in their entirety, has led to an unbalanced public presentation of the issues discussed therein. In an

EXHIBIT     6
PAGE      136

attempt to cure this deficiency, the Court has considered the possibility that it should simply unseal the relevant Reports and allow those Reports to speak for themselves.

Because the MGA entities were the primary subject of the Forensic Audit, the MGA parties have, quite understandably, objected to the proposed unsealing. Mattel, for its part, advocates quite emphatically, and not unreasonably, that the Reports should be unsealed in light of the selective disclosure. See Tr. at 31-32 ("It's the underlying analysis that refutes the selective disclosures that MGA and Omni made in a public forum to smear . . . both Mr. Durkin and Mattel.") At the other end of the spectrum, Omni 808 has moved to strike the Reports in their entirety.

In the end, although the Court does not order the unsealing of the Reports, it **DENIES** the Motion to Strike. The Court ordered the Forensic Audit to evaluate whether a receiver should be appointed; as the record bears witness, the Court eventually rejected the suggestion that it should appoint a permanent receiver, and the Court has instead appointed an MGA Monitor with more limited powers than a receiver. Nevertheless, the fact that the Reports were intended to serve a very limited purpose does not mean that there is no possibility that the Forensic Auditor's Reports will not serve any purpose henceforth.

As it currently stands, the Court **ORDERS** that no party shall cite to or rely upon the Reports for any purpose absent further Order of this Court.[1] However, the documents attached to the Reports, to the extent they are otherwise discoverable, are not insulated from discovery on the basis that they have been made part of the Reports. Conversely, documents, such as charts and interview notes, that were prepared by the Forensic Auditor are the property of the Court and are not subject to discovery or use in this or any other litigation by any party or non-party.[2]

Had it been counsel for the MGA parties who mounted the unwarranted, unsubstantiated, and public personal attacks on Mr. Durkin, the Court would find, notwithstanding the sensitive information contained therein, the unsealing of the Reports was an appropriate remedy for the selective disclosure.[3] However, here, it is

---

[1] This Order does not supersede the Court's Order permitting the Forensic Auditor to share information with the Court-Appointed Monitor.

[2] Toward that end, the Court **CLARIFIES** to the parties that the work papers, drafts, notes, detailed time records, and any other materials prepared by or at the direction of the Forensic Auditor are the property of the Court. The Court **ORDERS** the Forensic Auditor, as the custodian of those records on behalf of the Court, to retain those materials, whether maintained in electronic, hard copy, or any other medium, until further order of the Court.

[3] As it stands, counsel for MGAE, James I. Stang, wisely sought, and was granted, leave to file his more restrained, but just as unwarranted and unsubstantiated, personal attacks on Mr. Durkin under seal. See MGA Entertainment, Inc.'s Response to Final In Camera Report of Forensic Auditor Ronald L.

Initials of Deputy Clerk __cls_____

EXHIBIT ___6___
PAGE ___137___

counsel for Omni 808 who made those attacks public, and although Mattel maintains that both the MGA parties and Omni 808 are jointly responsible for the selective disclosure, see July 6, 2009, Tr. at 33, whether, or to what extent, the MGA parties act or have acted in concert is an issue to be decided in Phase 2 of this action.

Nevertheless, Mr. Gordinier's attack on Mr. Durkin cannot pass without comment by the Court. The Court's comments are directed toward Mr. Gordinier personally, which is not the Court's usual practice. Although the irony of this form of address is not lost on the Court (given the subject of this Order), it is appropriate. Mr. Gordinier signed all three filings in which the personal attacks appear, and continues to stand behind those filings. Moreover, Mr. Gordinier expressly and unabashedly claimed personal responsibility for the brief that was not filed under seal, by both stating that he gave it a lot of thought before filing it and by implicitly acknowledging that although he considered filing his brief under seal, he ultimately rejected that course of action. See May 18, 2009 Tr. at 46-47 ("My brief speaks for itself. We have nothing to hide. . . . I didn't feel it appropriate, necessary, or desirable to file my brief under seal. And I don't have a problem with the Court or anybody reading what I have to say, because I gave it a lot of thought, and I gave it at lot of consideration.").

At the July 6, 2009, hearing, the Court outlined its concerns that while the attacks on Mr. Durkin were public, the Reports are not, and that "it doesn't seem fair" to the Court to allow those allegations to stand alone without a chance to respond to them. July 6, 2009, Tr. at 25-26. In response, Mr. Gordinier contended that his comments "respond[ed] to the report," and that "[w]hat we said was that there were problems with that report." July 6, 2009, Tr. at 28. This statement is an implicit denial that any personal attacks were made; however, as set forth in great detail below, the record belies Mr. Gordinier's *post hoc* protestations.

Lest Mr. Gordinier's statement reflecting his implicit denial that he engaged in personal attacks be perceived as one being made at oral argument without ample time to reflect upon its significance, the statement is also made by Mr. Gordinier in Omni 808's Reply Memorandum, a document upon which he had ample time to reflect: "Each and all of the references in Omni's Statement of Position refer to the contents of Mr. Durkin's Reports and the shortcomings contained therein and omitted therefrom, not to his person." Id. at 2 n.1. To be sure, the criticisms leveled at Mr. Durkin are framed in

---

Durkin (docket #5918) at 4 (accusing Mr. Durkin of "making McCarthy-like statements of non-existent buybacks and unsupported insinuations of conflicts of interest"); id. at 9 (suggesting that Mr. Durkin's formulation of certain search terms relating to criminal acts in Farsi without a concurrent formulation of those terms in English demonstrated a "predisposition that Persian members of MGA's management and staff (and only the Persian members) might be engaged in illegal conduct"). Mr. Stang's attacks pale in comparison to those advanced by Mr. Gordinier, and they were filed under seal. Thus, although the Court's analysis and conclusions regarding the Forensic Auditor's Reports applies with equal force to Mr. Stang's statements, his are not the focus of the Court's attention at this time.

MINUTES FORM 90
CIVIL -- GEN                               7                    Initials of Deputy Clerk __cls_____

EXHIBIT ___6___
PAGE ___138___

terms of his Reports. Still other criticisms are, as counsel maintains, addressed to the Reports themselves; those must be analyzed based on their substance. However, as aptly demonstrated by the cited and quoted portions of Mr. Gordinier's filings that appear below, his criticisms do not, by any measure, confine themselves to those Reports, and instead reach out in a highly personal manner to attack the author, his professionalism, his competence, his objectivity, and his integrity.[4]

Indeed, in a display the likes of which have not been previously witnessed by this Court, Mr. Gordinier strayed far afield of legitimate criticism of the discussions, analyses, and conclusions reached in the Summary Report and the Reports that followed. To be sure, there are instances in which Mr. Gordinier addressed the message found in those Reports; just as surely, however, as detailed below, Mr. Gordinier attacked the messenger. Specifically, the papers filed by Mr. Gordinier on behalf of Omni 808 call into question Mr. Durkin's professionalism and competence, as well as his objectivity and integrity. Moreover, and alarmingly, they falsely accuse Mr. Durkin of being influenced by an ethnocentric bias against Mr. Larian and Mr. Kadisha. Such attacks, aimed at Mr. Durkin personally rather than the discussion, analyses, and conclusions set forth in his Reports, appear throughout Omni 808's papers. See Omni 808 Investors, LLC's Statement of Position re Order to Show Cause re Appointment of a Permanent Receiver (docket #5446) ("SOP"), filed May 14, 2009, at 11 (referring to Mr. Durkin's "irresponsible" analysis); id. (noting that Mr. Durkin is "far too experienced" to believe that he "produced . . . a balanced presentation"); id. (stating that "Mr. Durkin's report is a polemic" and "a piece of advocacy"); id. at 12 n.9 (calling into question Mr. Durkin's "objectivity" based on the fact that the Court ordered Mr. Durkin's fees be paid (at least in the first instance) by Mattel); id. (suggesting that Mr. Durkin's ex parte communications with Mattel were improper); id. at 13 n.10 (characterizing Mr. Durkin's quotation of Mr. Larian's and Mr. Kadisha's account of how the two men were acquainted, from "the Persian community," as "at best, unprofessional" and, "at worst,

---

[4] Adding still further to the mounting irony, in the same footnote that Mr. Gordinier disclaims engaging in improper personal attacks, he falsely accuses counsel for Mattel of advancing their own improper ad hominen attacks against Neil Kadisha, who has been referred to as a "common thief" in certain unspecified Mattel filings. Mr. Kadisha is the Managing Partner of a diversified investment firm, Omninet Capital, LLC, and an investor in Omni 808. To call someone a "common thief" is, undoubtably, by any measure, a highly personal attack, therefore an attack addressed "to the man," or ad hominen. However, in the same manner Mr. Gordinier accuses Mr. Durkin of failing to provide appropriate context to the Court in his Reports, Mr. Gordinier himself fails to acknowledge that counsel for Mattel's use of the term "common thief" in connection with Mr. Kadisha merely quotes Los Angeles County Superior Court Judge Henry W. Shatford's conclusion regarding Mr. Kadisha, as set forth in his 191-page Statement of Decision, dated October 24, 2006, which was issued after a 200-day trial, which is currently pending appeal, and which conferred upon Mr. Kadisha the oft-repeated moniker of "common thief," as well as "embezzler," and "perjurer." See Uzyel v. Kadisha, Cal. App. Nos. B196045, B203804, B198007, B199850, B201425, 2009 WL 646096 (Mar. 4, 2009) (appellate brief). As always, context is key. The use by counsel for Mattel of another court's findings and conclusions to advance an argument is not inappropriate. Those findings and conclusions may, or may not, be relevant to matters presented to the Court. Used in this manner, although undoubtably addressed "to the man" (and his credibility), it is not an improper ad hominen attack.

EXHIBIT ___6___
PAGE ___139___

evidence of improper cultural bias"); id. (in the same footnote, referring to the same quotation, stating that "[t]he tone [of the report] itself is compelling proof that Mr. Durkin had no intention of providing an 'objective' report to the Court."); id. at 23 (referring to the Summary Report as "Mr. Durkin's ill-concealed advocacy piece"); id. (noting that advocacy, rather than objectivity, "is certainly the posture [Mr. Durkin] is most comfortable with"); Omni 808 Investors, LLC's Memorandum in Support of Its Requests to Strike Summary and Responsive Reports of Ronald L. Durkin (docket #5705) ("Motion to Strike"), filed June 8, 2009, at 4 (noting Omni's "doubts that the Court or any party would benefit further by continuing this façade of Mr. Durkin's 'impartiality'"); id. at 7 (calling Mr. Durkin's explanation of his conclusion regarding the relatedness of certain parties as "not only fatuous[,] but [also] intellectually dishonest"); id. at 9 (suggesting that Mr. Durkin intentionally concealed from the Court the fact that Mr. Larian sought other funding sources before turning to Mr. Kadisha); id. at 10 (noting that "Mr. Durkin's repeated references to Mr. Larian's and Mr. Kadisha's common 'Persian' heritage can only be viewed as an attempt to draw some nefarious ethnic connection between them"); id. at 12 (calling the reference to Mr. Larian's and Mr. Kadisha's ethnicity "unprofessional symptoms of improper cultural bias [that] have no place in a supposedly objective report"); Omni 808 Investors, LLC's Reply Memorandum (docket #5809) ("Reply Memo") at 14 (suggesting that not only Mr. Durkin, but also counsel for Mattel, harbor "cultural biases" that lead them to "suggest[] that [Mr. Larian's and Mr. Kadisha's] common heritage makes [them] more likely to act contrary to their own interests); id. at 15 (stating that, according to his own interview notes, Mr. Durkin "misrepresented" to the Court in his Summary Report how Mr. Larian and Mr. Kadisha portrayed their relationship with each other).

As alluded to, Omni 808's criticisms have not been limited to personal attacks; some of the criticisms are in fact aimed at the Reports themselves. See e.g., SOP at 16 ("Mr. Durkin's conclusion that the Wachovia-Omni transaction impacted 'MGAEI's solvency and ability to continue conducting operations' is simply wrong."). Any comment by the Court regarding the substance of the discussions, analyses, and conclusions presented to the Court in the Forensic Auditor's Summary, Responsive, and Final Reports is inadvisable at this time. With the filing of the Third Amended Answer and Counterclaims, much of the subject matter of the Forensic Auditor's Reports have been incorporated into the claims at issue in this action. As such, it would be premature for the Court to comment upon the substance of issues that are yet to be adjudicated, and that are subject to a trial by jury. Nevertheless, the Court has reviewed the Forensic Auditor's Summary, Responsive, and Final Reports, and the exhibits attached thereto. The Court has also reviewed and considered the criticisms aimed at the Forensic Auditor, cited and quoted above, as well as the entirety of all the papers responding to the Forensic Auditor's Reports filed to date. After this review, the Court is firmly convinced that all the personal criticisms of Mr. Durkin are unwarranted and unsubstantiated.

At best, the criticism of Mr. Durkin's performance and presentation represents a

EXHIBIT ___6___
PAGE ___140___

different interpretation of available evidence.  That such disagreements would arise
between the analyses offered by a Court-Appointed Forensic Auditor and that offered by
counsel for a party whose transactions have been a subject of that audit is by no means
surprising.  A jury considering the relevant evidence might ultimately make factual
determinations that tend to agree with Mr. Durkin's assessment, it might ultimately tend
to agree with Mr. Gordinier's assessment, or it may very well reject both positions in
favor of another.  The answer to the merits of the claims at issue in this action must
await another day.  Today, the Court merely notes that its examination of the Forensic
Auditor's Reports reveal that Mr. Gordinier's personal attacks aimed at their author were
unjustified.

        Some specific attacks directed toward Mr. Durkin -- relating to his background as
a law enforcement officer, his communications with counsel for Mattel, and specific (but
baseless) allegations of ethnocentric bias -- are worthy of more specific comment by the
Court.

        Stopping short of explicitly stating such, Mr. Gordinier appears to labor under the
assumption that Mr. Durkin has been unable to put behind him the prosecutorial
mindset under which he presumably operated during his former service to this Nation as
an agent of the Federal Bureau of Investigation ("FBI").  At the outset, the Court notes
that Mr. Gordinier's unstated assumptions do a disservice to the prosecutors and the
law enforcement officers who work with those prosecutors, both of whom conduct their
work under the clearly delineated duty to ferret out not only evidence of guilt but also
"evidence favorable to the accused."  See e.g., Berger v. United States, 295 U.S. 78, 88
(1935) (noting that the role of the prosecutor is not to win at all costs and observing that
the prosecutor "is the representative not of an ordinary party to a controversy, but of a
sovereignty whose obligation to govern impartially is as compelling as its obligation to
govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall
win a case, but that justice shall be done.");  Brady v. Maryland, 373 U.S. 83, 87 (1963)
(imposing a duty on prosecutors to provide to the defense exculpatory evidence when
requested to do so).

        Secondly, even if prosecutorial duties were not so defined, the Court finds no
suggestion that Mr. Durkin skewed the evidence in favor of any particular viewpoint.
Undoubtedly, there is a **complete absence** of any evidence that, as Mr. Gordinier has
suggested, Mr. Durkin has embarked upon a campaign to purposely mislead the Court.

        Mr. Gordinier also suggests that, because Mr. Durkin's bills are being paid by
Mattel, Mattel has, through this payment or through other communications with Mr.
Durkin, bought Mr. Durkin's loyalty.  This is utter nonsense.  As demonstrated by the
Court's communications with him, Mr. Durkin is a Court-Appointed Officer who
understands that his role is to work on behalf of the Court and not on behalf of any
party.  In any event, the Court's Order of January 7, 2009, which appointed Mr. Durkin,
imposed the costs of the audit on Mattel "in the first instance," but expressly provided for

EXHIBIT ___6___
PAGE ___/4/___

the possibility that the audit expenses be shared or shifted to the MGA parties. Moreover, to suggest, however subtly, that ex parte communications with counsel for Mattel were improper ignores the Court's mandate to the Forensic Auditor in the January 7, 2009, Order, which states that Mr. Durkin was provided with attorney contact information and that he "shall direct his initial communications to counsel."  At no time has the Court precluded the Forensic Auditor's communications with Mattel or its counsel; in fact, because the Forensic Audit was undertaken based on evidence gathered by and presented to the Court by Mattel, Mr. Durkin would have been remiss in his duties if he failed to communicate with Mattel and its counsel.

Mr. Durkin was vested with powers and discretion to complete a Court-ordered Forensic Audit.  Pursuant to an Order of this Court, he undertook this task and exercised those powers and that discretion, presenting his Reports in conformity with the Court's instructions.  Despite counsel's attacks, the Court's review of the evidence before it discerns no abuse of those powers or of that discretion.

Particularly troubling to the Court is that counsel speculates that, because Mr. Durkin noted in his report that Mr. Larian knew Mr. Kadisha from "the Persian Community," Mr. Durkin could be "of the view that this common heritage makes Mr. Kadisha more likely to act contrary to his own interests or to do something via third-parties that he wouldn't otherwise do?"  See SOP at 13-14 n.10 (appearing to pose this thought as a rhetorical question).  There is no indication in the record, or otherwise, that Mr. Durkin holds such a view.  To the contrary, Mr. Durkin's comment regarding the acquaintanceship of Mr. Larian and Mr. Kadisha from "the Persian Community" (which is noted in the report within quotation marks and is expressly attributed to a reference made by Mr. Larian himself) is clearly predicated on interviews with these two individuals, each of whom related independently to Mr. Durkin and his colleagues that they knew each other from "the Persian Community."  See Durkin Summary Report, Ex. 14, at 2 ¶ 3 (Notes re March 25, 2009, interview with Mr. Larian:  "He indicated that he knew Kadisha from the Persian community.") and Ex. 14, at 15 ¶ 2 (Notes re March 26, 2009, interview with Mr. Kadisha:  "Kadisha stated that he knows Larian from the Persian community.").  The purpose for this reference is made clear in the footnote set forth at the end of the sentence in which the reference appears; namely, the Report discusses evidence that the relationship between Mr. Larian and Mr. Kadisha is stronger and more personal than either man claimed it was. See Summary Report at 5 n.18; Ex. 15 (personal emails).

In the Reply Memo, Mr. Gordinier takes issue with this explanation, this time including not only Mr. Durkin but also counsel for Mattel as the targets for his unsubstantiated allegations of "cultural bias."  Mr. Gordinier first mischaracterizes an argument made by Mattel.  Mattel argued, and quite correctly, both that how well Mr. Larian and Mr. Kadisha knew each other was relevant to a determination of whether certain transactions between the two were arms-length transactions, and that this point was likely not lost on either of these two very sophisticated and successful

EXHIBIT ___6___
PAGE ___142___

businessmen.[5] As noted previously, both Mr. Larian and Mr. Kadisha stated that they knew each other from "the Persian community" which, in the Forensic Auditor's view, was intended to, or at least had the tendency to minimize the existing relationship between the two. Mr. Gordinier incorrectly characterizes this argument as Mattel's contention that Mr. Larian's and Mr. Kadisha's "Persian relationship" and "common Persian heritage" was somehow relevant to a determination of whether the Omni 808 transaction was an arms-length transaction. Mattel made no such argument. Neither counsel for Mattel nor Mr. Durkin have implied that Mr. Larian's and Mr. Kadisha's ethnicity factors into the analysis. Other than to point to Mr. Larian's and Mr. Kadisha's separate, but identical, accounts of how they knew each other which, in turn, suggests how well they know each other, neither counsel for Mattel nor Mr. Durkin have stated or implied that Mr. Larian's and Mr. Kadisha's shared ethnicity is relevant to any matter currently or potentially before the Court. Compare Opposition at 8-9 with Reply Memo at 14-15.

Moreover, Mr. Gordinier's substantive point, that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha told him about the closeness of their relationship, fares no better. See Reply Memo at 15. On this point, it is important to set this stage properly. Counsel for all parties have attempted to glean far too much from two sterile paragraphs of interview notes taken by Mr. Durkin. Much can be inferred from conversations and interviews through not only what is said, but what is not said, by the interviewee's demeanor, by the tone of the speaker, by the length and placement of pauses, and by non-verbal gestures and body language. With all these variables, much of what is communicated does not find its way into notes.[6] For instance, Mr. Durkin's interview of Mr. Larian lasted over two and a half hours; however, the interview notes are a mere five and a half pages. Similarly, a one-hour and ten minute interview of Mr. Kadisha yielded only three and a half pages of interview notes. This is not to suggest that the notes should have been longer or that the interviews should have been recorded or transcribed; rather, it is to suggest that counsel's arguments based on another's notes are not particularly probative.

In contrast, Mr. Durkin's assessment, based on his interviews with both of them,

---

[5] In fact, the Court just this week issued a 30-page, single-spaced opinion resolving a 10-day bench trial conducted over the sole issue of whether a transaction between "closely related" entities reflected its fair market value, one of the more significant arguments ultimately rejected by the Court in that case being that the close relationship between the parties necessarily rendered the transaction a "sweetheart deal." See July 6, 2009, Order, Siegel v. Warner Bros. Entertainment, Inc., et al., CV 04-08400 SGL (RZ) (docket #554).

[6] Indeed, the interview notes upon which the parties rely concede as much. See Summary Report, Ex. 14 at 2, 15 ("This interview memorandum is a factual representation of the topics discussed during the interview and is not intended to be a word for word or exact transcription of the conversation."). Thus, in addition to not taking into account all non-verbal communication, the notes do not even represent everything that was said during the interview.

MINUTES FORM 90
CIVIL -- GEN                              12                Initials of Deputy Clerk __cls_____

EXHIBIT   6
PAGE   143

is that Mr. Larian and Mr. Kadisha attempted to minimize their relationship because both of them understand the relevance of any friendship or other connection between them to the assessment of the arms-length nature of any transactions in which they have engaged. Mr. Durkin's assessment does not come from the gentle teasing of a strained meaning from two sterile paragraphs of brief notes taken by another person; rather, his assessment springs from his participation in the interview process, the entirety of the interviews he conducted of Mr. Larian and Mr. Kadisha, and his review of all of the evidence. As such, the Court defers to his assessment, at least insofar as how Mr. Larian and Mr. Kadisha portrayed their relationship to him.

As for that scant language from which the parties glean so much meaning, the entirety of which is set forth below, it in no way supports the contention made by Mr. Gordinier that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha conveyed to him about the closeness of their relationship. On this topic, the notes of Mr. Larian's interview merely state the following:

> Larian decided to contact Neil Kadisha of OmniNet as he knew his company was in the distressed loan business. He indicated that he knew Kadisha from the Persian community. Kadisha said he wouldn't do the deal alone in today's environment and wanted Larian and their other friends to invest in the deal with MGA. Larian stated that Kadisha negotiated the debt with Wachovia and got it down significantly, Larian said he is not bitter about Kadisha getting a good deal on buying the loan.

Summary Report, Ex. 14, at 2 ¶ 3 (emphasis added). This paragraph contains the word "friends," and perhaps could even be read as an implicit statement by Mr. Larian that he and Mr. Kadisha are "friends." But the language does not compel such an inference. Moreover, it does not comport with the notes of Mr. Kadisha's interview, which on this topic state only the following:

> Larian and Kadisha have never been to dinner together. Kadisha stated that he knows Larian from the Persian community and he sees him often at religious events, etc. He has no investments with Larian. Kadisha did not talk with Larian last night, this morning or in the last two days.

Summary Report, Ex. 14, at 15, ¶ 2. Mr. Durkin's assessment that Mr. Larian and Mr. Kadisha sought to minimize the extent of their relationship is not contradicted by these short passages.

The criticism that Mr. Durkin was acting pursuant to an ethnic or cultural bias is clearly baseless. The allegations are irresponsible, and they are made to capitalize on

EXHIBIT    6
PAGE      144

their inherent sensational nature for counsel's own purposes of diverting attention away from the substance of the Reports. Sensationalism aside, when viewed in context, the Reports' reference to Mr. Larian and Mr. Kadisha knowing each other from "the Persian community" was plainly innocuous. The reference was a direct quotation from both Mr. Larian and Mr. Kadisha. It was used in a broader discussion regarding how (and thus, impliedly, how well) the two knew each other, which is itself relevant to the issue of whether certain transactions relevant to the present litigation were made at arms length.

This is a most unfortunate incident. The Court certainly understands, in a case as hotly contested as this one -- with such high stakes, with such complex legal issues, and with such truly extraordinary legal talent on all sides -- that lawyers, however ethical and committed to the highest standards of professionalism (as the Court presumes and has found all counsel of record here to be), make statements or commit acts in haste that they subsequently regret. All of the players to this drama, are, after all is said and done, human. As such, all of us are vulnerable to all-too-common human frailties. The Court would place itself at the very top of any list of lawyers who have spoken improvidently at one time or another in this case (and any number of others). What the Court has witnessed here, however, in both manner and substance, for the reasons noted above, goes beyond what the Court can let pass without some manner of reprobation. So let the Court be clear: Nothing excuses the attempted character assassination in which Mr. Gordinier has engaged.

**IT IS SO ORDERED.**

MINUTES FORM 90
CIVIL -- GEN

14

Initials of Deputy Clerk __cls_____

EXHIBIT    6
PAGE ___145

# EXHIBIT 7

Exhibit Filed Under Seal Pursuant to Protective Order

# EXHIBIT 8

1

1   UNITED STATES DISTRICT COURT

2   CENTRAL DISTRICT OF CALIFORNIA

3   EASTERN DIVISION

4   - - -

5   HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6   - - -

7   MATTEL, INC.,                          )

8                   Plaintiff,             )
                                           )
9          vs.                             )   No. CV 04-09049
                                           )
10  MGA ENTERTAINMENT, INC., ET. AL.,      )
                                           )
11                  Defendants.            )
                                           )   Motions
12  AND CONSOLIDATED ACTIONS,              )
                                           )
13  _____    )

14

15   REPORTER'S TRANSCRIPT OF PROCEEDINGS

16   Riverside, California

17   Wednesday, February 11, 2009

18   10:03 A.M.

19

20

21

22

23   THERESA A. LANZA, RPR, CSR
     Federal Official Court Reporter
24   3470 12th Street, Rm. 134
     Riverside, California  92501
25   951-274-0844
     WWW.THERESALANZA.COM

EXHIBIT 8
PAGE 172

1    follow the logical reason, their full amount of damages, based

2    on the instructions that they were provided and the evidence

3    that they were given, comes out to a consistent verdict.

4            THE COURT:  I do understand your argument.  Thank

5    you, Counsel.

6            MR. ZELLER:  Your Honor --

7            THE COURT:  No.  I've allowed the moving party to

8    speak first and last, and let's stick to that.  You have well

9    briefed these things.

10           I next want to take up Omni 808's ex-parte              01:34

11   application to intervene for limited purposes.

12           Mr. Gordinier.

13           MR. GORDINIER:  Thank you for offering me the

14   opportunity to address the Court.

15           We've set out in our papers, really, what we're        01:34

16   looking for here.  The transaction by which Omni 808 acquired

17   its interest and stepped into the shoes of Wachovia was

18   straightforward and it was at arm's length.  And I, frankly,

19   although naively, believed that if we would get stipulated to

20   be a party to the proceeding going forward, to the extent the  01:35

21   Court --

22           THE COURT:  Where do those funds come from?

23           MR. GORDINIER:  Mr. Kadisha, Your Honor, is a very

24   substantial individual.  Mr. Kadisha, Neil Kadisha, who is the

25   president and CEO of Omni 808, was one of the founders of      01:35

EXHIBIT    8
PAGE    /73

1    Qualcomm.  With everything that's gone on in the market in the

2    last six or seven months, I don't want to make any

3    representations, but Mr. Kadisha has from time to time appeared

4    on the Forbes 400 list.  I don't know what his net worth is.

5         What happened, Your Honor, is, Wachovia called the                01:35

6    note.  I don't know why.  I've been involved in these cases

7    where everybody feels like the world revolves around what's

8    happening in this courtroom.  As the Court knows, Wachovia had

9    other issues.

10        Wachovia and its syndicate wanted it off its balance           01:35

11   sheet, and MGA needed relief from the immediate need to pay

12   money they did not have.  And my client was approached and put

13   together people and bought the indebtedness and assumed the

14   debt at a discount, at a substantial discount; and he expects

15   to make money.                                                          01:36

16        THE COURT:  You're representing to the Court, though,

17   that this was not MGA's money; that this was -- from wherever

18   it came from, it came from someplace else.

19        MR. GORDINIER:  Your Honor, two things.  I've never

20   met Mr. Larian, and I know less about MGA than almost everybody      01:36

21   else.

22        THE COURT:  I'm not asking about what you know from

23   MGA but of what you know from your client.

24        MR. GORDINIER:  What I know from my client is, he put

25   in many millions of dollars.  He had a couple of investors with      01:36

EXHIBIT 8
PAGE 124

1   him to put in many millions of dollars.

2          THE COURT:   Those investors and that money did not

3   come from MGA?

4          MR. GORDINIER:   That's the best of my understanding,

5   Your Honor.   That's true.                                  01:36

6          And the best way to resolve that is what the Court

7   has already done.   The Court did exactly the right thing and

8   set up Mr. Durkin, who's very accomplished, to look at MGA's

9   books.   Step number one, he can tell the Court what their

10  balance sheet is, what their income statement is, and also the  01:37

11  sources and uses of cash.

12         And if there are any issues -- and, by the way, I'm

13  happy to talk to Mr. Durkin or have Mr. Durkin talk to my

14  client.   This is not intended to be -- this wasn't a fraudulent

15  transaction, Your Honor.   We negotiated -- we -- I didn't do   01:37

16  it -- Omni 808 negotiated with Davis Polk on behalf of Wachovia

17  and bought at a discount; and Omni 808 expects to and would

18  like to make money on its investment, and will not be able to

19  do so, obviously, if MGA goes out of business.   So our interest

20  here is in protecting Omni 808's investment.   And part of that   01:38

21  is wanting a say in how MGA's business on this receiver issue

22  is dealt with.

23         THE COURT:   The interest to intervene is focused, as

24  you indicate in your papers, on the receivership issue?

25         MR. GORDINIER:   That's correct, Your Honor.   That's   01:38

EXHIBIT   8

PAGE   175

 1   correct.

 2          THE COURT:   Very well.

 3          Does anyone wish to be heard in opposition to the

 4   ex-parte application?

 5          MR. ZELLER:   Yes, Your Honor.                              01:38

 6          I don't know that we've been -- and maybe the Court

 7   heard it differently, but I still do not hear anything that

 8   certainly approaches evidence that this was, in fact, an arm's

 9   length transaction.

10          THE COURT:   I have a representation from respected       01:38

11   counsel.

12          MR. ZELLER:   Well, he said -- Your Honor, the

13   Court -- all he said was to the best of his knowledge.  He

14   didn't say it didn't come from it.

15          Second, the Court asked MGA; it didn't ask from          01:39

16   Larian, Larian's brother-in-law, his wife -- there are other

17   family members involved in this, and their fingerprints are on

18   this.  So, certainly, I want to be very clear, Your Honor, we

19   have not gone so far as to say, this is a fraud, this is a

20   sham, or so on.  The fact is that there are substantial         01:39

21   questions here as to the bona fides of this transaction and

22   whether or not this has been papered in a way to basically

23   create debt and credit, where, in fact, it would simply be

24   treated by the tax code, by the bankruptcy code, by the courts, 

25   for every other purpose, as, in fact, being nothing but a loan, 01:39

EXHIBIT   8

PAGE   176

105

1   we'll go from there.

2           MR. ZELLER:   Thank you.

3           THE COURT:   Anything further?

4           Thank you.   Good day.

5

6

7

8

9

10                          CERTIFICATE

11

12   I hereby certify that pursuant to section 753, title 28, United
     States Code, the foregoing is a true and correct transcript of
13   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
14   conformance with the regulations of the Judicial Conference of
     the United States.

15

16   _Theresa A. Lanza_                      _2-13-09_
     THERESA A. LANZA, CSR, RPR                 Date
17   Federal Official Court Reporter

18

19

20

21

22

23

24

25                                      EXHIBIT ___8___
                                        PAGE ___177___

dnesday, February 11, 2009                    Mattel vs. MGA Entertainme

# EXHIBIT 9

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an individual,

     Plaintiff,

   vs.

MATTEL, INC., a Delaware
corporation,

     Defendants.

No. CV 04-9049 SGL (RNBx)
Consolidated with
Nos. CV 04-9405 and
05-2727

**CERTIFIED
COPY**

AND CONSOLIDATED ACTIONS.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Wednesday, March 4, 2009

Volume 1

Reported by:
CHERYL R. KAMALSKI
CSR No. 7113

Job No. 106479

EXHIBIT 9
PAGE 178

877.955.3855
www.sarnoffcourtreporters.com

IRVINE ▪ LOS ANGELES ▪ SAN FRANCISCO ▪ LAS VEGAS ▪ SAN DIEGO

**SARNOFF**
Court Reporters and
Legal Technologies

1   compel is improper and should be denied for both serious

2   substantive and procedural reasons.  If we're going to

3   have these rules, they have a purpose, they have to be

4   followed.  And the Court's very order, the Court's

5   standing order says if this isn't done, it won't be

6   considered.  They now are walking away from these other

7   orders and they want to rely on the discovery stipulation

8   and order which, of course, I had no knowledge of when we

9   were having this discussion.  As you're well aware of,

10   they didn't even comply with that.  Perhaps if they had,

11   and set out, as they're required to do in writing, what it

12   is they want, why they want it, let's talk about it, let's

13   sit down and discuss it, we could, perhaps, have narrowed

14   it.  In fact, both I and my colleague told Mr. Corey we

15   were pretty sure we could satisfy himself with respect to

16   the bona fides of the transaction.  That was rejected.

17          MR. O'BRIEN:  Let me ask you this question.

18   You've said the discovery's overbroad.  What narrow

19   request could Mattel make that you believe would be proper

20   under the circumstances here?  In other words, what kind

21   of request do you think would be, as a third party?  I

22   mean, I understand you don't want to respond to anything,

23   it's a burden.  But assuming there's always a burden in

24   responding to discovery, what narrow request, based on

25   your understanding of the issues in phase 2, would be

EXHIBIT    9

PAGE    179    50

1   proper for your -- that you wouldn't come in here and file

2   a motion to quash?

3        MR. GORDINIER:  What documents do we have that

4   show that either Mr. Larian or MGA paid money into this to

5   purchase this debt?  I can tell you there are none.  This

6   is a ready, fire, aim situation.  The allegations that

7   were made and were made publicly are unconscionable and

8   can't be undone.

9        MR. O'BRIEN:  What other areas?  For example,

10   would the payment history with respect to the debt from

11   MGA to 808, assuming there is one, I don't know if this is

12   a balloon payment or that sort of thing --

13        MR. GORDINIER:  I assume that's in MGA's

14   financial statements, but -- I mean, I assume that they've

15   made payments.  I don't know the answer to that, that's

16   reflected on their financial statements, which I'm

17   assuming have been exchanged, but I don't know that.

18        MR. O'BRIEN:  Mr. Russell said that there was

19   discovery that was taken of Wachovia in phase 1.  I was

20   not involved in the case.  I don't know what discovery was

21   taken of Wachovia.  But, presumably -- but it sounds like,

22   and I'll let Mr. Zeller answer this and Mr. Russell

23   address it as well, but if there was discovery in phase 1

24   that was proper as to Wachovia in establishing the debt

25   and looking at the payment terms, and all that sort of

EXHIBIT   9

PAGE  180        51

```
 1    thing, would that same sort of discovery be proper
 2    vis-a-vis 808 --
 3              MR. GORDINIER:  We absolutely offered -- we
 4    offered, without knowing any of this, to give them the
 5    deal documents.  Absolutely.  I don't know that it's
 6    proper.  I think it's overbroad and I think it's
 7    premature, but I'll just tell you, we offered to give them
 8    the deal documents.  There's no secret there.  We did buy
 9    the debt at a discount.  You've read the transcript.  I
10    told Judge Larson my client wants to make money at this,
11    and so he made a business decision that -- you know,
12    Wachovia has its own reasons for doing what it's doing
13    that we all can kind of guess -- but I don't know.  My
14    client had his own reasons for doing what he's doing.  The
15    only thing that seems to relate to all this is do they
16    have -- are there any documents that show the disgorgement
17    thing, or whatever he's trying to argue, and I'm not
18    familiar with the phase 2 -- but I have no problem
19    conceptually giving them the deal documents.  None at all.
20    But that doesn't entitle them to look at all records that
21    reflect all my nonparty entities, all documents detailing
22    or setting forth.  Read through them; they're overbroad
23    and they're improper.
24              MR. O'BRIEN:  What about performance, the
25    performance of the loan.
```

EXHIBIT  9
PAGE  181

52

1          I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4   before me at the time and place herein set forth; that

5   any witnesses in the foregoing proceedings, prior to

6   testifying, were duly sworn; that a record of the

7   proceedings was made by me using machine shorthand

8   which was thereafter transcribed under my direction;

9   that the foregoing transcript is a true record of the

10  testimony given.

11         Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [  ] was [  ] was not requested.

15         I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or party to this action.

18         IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated: ___MAR 0 9 2009_____

22

23         ___Cheryl R. Kamalski_____
           CHERYL R. KAMALSKI
24         CSR No. 7113

25                          EXHIBIT ___9___
                            PAGE ___182___

# EXHIBIT 10

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL, )
                        )
         PLAINTIFF, )
                        )     CASE NO.
     V.                     )     CV 04-9049 SGL (RNBX)
                        )
MATTEL, INC., A DELAWARE )
CORPORATION,           )
                        )
       DEFENDANT.     )
                        )
                        )
AND CONSOLIDATED ACTIONS.     )
                        )

# DEPOSITON OF NEIL KADISHA

# AUGUST 28, 2009



REPORTED BY:
J'ANA SIEGERS
CSR NO. 10845
JOB NO. 09AE607-JS

515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

EXHIBIT ___10___
PAGE ___183___

| 03:15:57 | 1 | I will come to conclusion that there is no hope, we |
|---|---|---|
| 03:16:05 | 2 | will take a step forward to get our money based on |
| 03:16:10 | 3 | the agreement and legal rights that we have. |
| 03:16:19 | 4 | Q. During that first phone conversation that |
| 03:16:21 | 5 | you had with Isaac Larian that you described earlier |
| 03:16:23 | 6 | in which you and he talked about the Wachovia debt, |
| 03:16:26 | 7 | did Mr. Larian say at that time that MGA was already |
| 03:16:30 | 8 | deemed to be in default of the loans by Wachovia? |
| 03:16:37 | 9 | A. I believe he did tell me that Wachovia is |
| 03:16:39 | 10 | unreasonable in the way they are handling this loan |
| 03:16:42 | 11 | and they are nitpicking and they are basically |
| 03:16:52 | 12 | calling technical default, whereas their loan has |
| 03:16:56 | 13 | been paid and the company is not really in actual |
| 03:17:02 | 14 | default of not paying what they have to pay to |
| 03:17:06 | 15 | Wachovia. I think he was defensive about it and he |
| 03:17:13 | 16 | thought he's right and the bank is wrong. |
| 03:17:20 | 17 | Q. Speaking of today, is it true that, in |
| 03:17:23 | 18 | your view, the approximately $300 million in debt is |
| 03:17:30 | 19 | owned entirely by Omni 808? |
| 03:17:33 | 20 | A. Of course. |
| 03:17:34 | 21 | Q. There is a -- |
| 03:17:38 | 22 | A. Of course when I say "of course" -- I |
| 03:17:39 | 23 | mean you are asking if all the debt is owned by |
| 03:17:44 | 24 | Omni 808. The answer is yes. |
| 03:17:47 | 25 | Q. And has any of that debt been transferred |

183

EXHIBIT   10
PAGE   184

| | | |
|---|---|---|
| 03:17:52 | 1 | or sold or otherwise transferred to any other person |
| 03:18:00 | 2 | or entity other than 808? |
| 03:18:07 | 3 | A.    No. |
| 03:18:07 | 4 | Q.    Has MGA paid Omni 808 any money on the |
| 03:18:11 | 5 | loan for any reason? |
| 03:18:12 | 6 | A.    Yes. |
| 03:18:13 | 7 | Q.    What's it paid? |
| 03:18:16 | 8 | A.    I don't know the exact amount, but MGA |
| 03:18:19 | 9 | has paid some interest in millions of dollars, and |
| 03:18:27 | 10 | they paid some legal fees under the agreement.  They |
| 03:18:31 | 11 | are obligated to pay Omni 808's legal fees which |
| 03:18:39 | 12 | relates to the litigation.  They are not obligated to |
| 03:18:44 | 13 | pay legal fees of establishing Omni 808 or |
| 03:18:50 | 14 | acquisition of the debt.  I just distinguish between |
| 03:18:55 | 15 | the two because clearly our agreement calls for them |
| 03:18:59 | 16 | to pay legal fees that Omni 808 incurs based on this |
| 03:19:08 | 17 | litigation. |
| 03:19:09 | 18 | By the way, this is not our provision. |
| 03:19:11 | 19 | This is Wachovia's provision which we took over. |
| 03:19:16 | 20 | Under Wachovia agreement, they were obligated to pay |
| 03:19:21 | 21 | legal fees of the lender if they were to become in |
| 03:19:26 | 22 | any way or shape involved with the litigation as a |
| 03:19:34 | 23 | result of patent, copyright, and -- you know, the |
| 03:19:40 | 24 | causes that "Mattel versus MGA" has. |
| 03:19:46 | 25 | Q.    So if I understand correctly, then, the |

184

EXHIBIT   10
PAGE   185

| | | |
|---|---|---|
| 03:19:51 | 1 | Wachovia loan agreement -- |
| 03:19:53 | 2 | A.    Yes. |
| 03:19:54 | 3 | Q.    -- which Omni 808 took over at least in |
| 03:19:56 | 4 | some respects is the provision that requires MGA to |
| 03:20:00 | 5 | pay the legal fees of Omni 808 as it relates to the |
| 03:20:05 | 6 | "Mattel versus MGA" litigation? |
| 03:20:07 | 7 | A.    Correct. |
| 03:20:08 | 8 | Q.    Now, has MGA paid legal fees to Omni 808 |
| 03:20:14 | 9 | or on behalf of Omni 808 for any reason, or is it |
| 03:20:17 | 10 | just in connection with the "Mattel versus MGA" case? |
| 03:20:22 | 11 | A.    Okay.  First, MGA has not paid any legal |
| 03:20:31 | 12 | fees on behalf of Omni 808.  Secondly, MGA has paid |
| 03:20:35 | 13 | legal fees to Omni 808 only in relation to "Mattel |
| 03:20:46 | 14 | versus MGA" case, and they never are on time.  We |
| 03:20:52 | 15 | always have to do arm-twisting and pull their ears |
| 03:20:55 | 16 | and twist their arms to get money. |
| 03:21:01 | 17 | Q.    Other than the provision under the |
| 03:21:02 | 18 | Wachovia agreement -- |
| 03:21:03 | 19 | A.    Mm-hmm. |
| 03:21:04 | 20 | Q.    -- that we were talking about, is there |
| 03:21:06 | 21 | any other agreement of any kind between MGA and |
| 03:21:12 | 22 | anyone else to pay for the legal fees of Omni 808? |
| 03:21:18 | 23 | A.    I really don't understand your question. |
| 03:21:20 | 24 | Q.    Well, what you identified previously as |
| 03:21:24 | 25 | being the reason or the agreement under which MGA is |

185

EXHIBIT   10
PAGE      186

Deposition of Neil Kadisha

| | | |
|---|---|---|
| 03:21:27 | 1 | paying those legal fees -- |
| 03:21:29 | 2 | A.    Mm-hmm. |
| 03:21:29 | 3 | Q.    -- in connection with "Mattel versus |
| 03:21:30 | 4 | MGA" -- |
| 03:21:32 | 5 | A.    Yes. |
| 03:21:32 | 6 | Q.    --- was the Wachovia loan agreement |
| 03:21:35 | 7 | provision. |
| 03:21:36 | 8 | A.    Correct. |
| 03:21:36 | 9 | Q.    And so my question is:  Apart from that |
| 03:21:38 | 10 | Wachovia loan agreement provision -- |
| 03:21:41 | 11 | A.    Mm-hmm. |
| 03:21:41 | 12 | Q.    -- is there any other agreement by which |
| 03:21:44 | 13 | MGA has paid or is obligated to pay any legal fees |
| 03:21:48 | 14 | for Omni 808, or is that Wachovia loan provision the |
| 03:21:52 | 15 | only agreement on that subject? |
| 03:21:55 | 16 | MS. HURST:  Objection.  Calls for a legal |
| 03:21:55 | 17 | conclusion.  Lacks foundation. |
| 03:21:59 | 18 | BY MR. ZELLER: |
| 03:22:00 | 19 | Q.    By your understanding. |
| 03:22:02 | 20 | A.    By my understanding, we are under |
| 03:22:04 | 21 | umbrella of Wachovia agreement.  And it's a very |
| 03:22:10 | 22 | comprehensive agreement, and I think it does cover |
| 03:22:15 | 23 | our legal fees in respect to this litigation, and I |
| 03:22:20 | 24 | think it's unreasonable for us to expect to be paid |
| 03:22:23 | 25 | on legal fees which has nothing to do with this |

186

EXHIBIT __10__
PAGE __187__

| 03:22:26 | 1 | litigation. |
| 03:22:30 | 2 | So did I answer your question? |
| 03:22:33 | 3 | Q. I think so. |
| 03:22:36 | 4 | Now, is MGA either paid or, in your view, |
| 03:22:40 | 5 | obligated to pay all of Omni 808's legal fees with |
| 03:22:45 | 6 | respect to the "Mattel versus MGA" litigation, or is |
| 03:22:48 | 7 | it a portion of it? |
| 03:22:50 | 8 | A. I believe all of it. |
| 03:22:55 | 9 | Q. One thing I'm going to have to clarify is |
| 03:22:57 | 10 | that earlier you said that these payment of fees were |
| 03:23:00 | 11 | not on behalf of Omni 808. If you can please tell me |
| 03:23:05 | 12 | what you mean by that. |
| 03:23:06 | 13 | MR. GORDINIER: He was, I think, |
| 03:23:07 | 14 | responding to your question. |
| 03:23:08 | 15 | BY MR. ZELLER: |
| 03:23:09 | 16 | Q. I was making it a very broad question. I |
| 03:23:11 | 17 | wasn't trying to suggest that it was, I just wanted |
| 03:23:13 | 18 | to make sure I included everything, so -- |
| 03:23:15 | 19 | A. I will clarify it for you. |
| 03:23:16 | 20 | Q. Yeah. |
| 03:23:17 | 21 | A. I think "on behalf of Omni 808" could |
| 03:23:19 | 22 | mean that MGA would write a check to Bingham or |
| 03:23:25 | 23 | another entity on behalf of Omni 808. They do not |
| 03:23:32 | 24 | write any checks on behalf of Omni 808 to anybody. |
| 03:23:36 | 25 | Any check they write is to Omni 808, and Omni 808 |

187

EXHIBIT   10
PAGE   188

| | | |
|---|---|---|
| 03:23:42 | 1 | basically forwards to any law firm that provides |
| 03:23:50 | 2 | service on this specific issue. |
| 03:24:00 | 3 | Q.    Do you have a general sense or estimate |
| 03:24:01 | 4 | of the amount of legal fees that MGA has paid or is |
| 03:24:06 | 5 | obligated to pay to or for Omni 808? |
| 03:24:12 | 6 | A.    Obviously you mean to date? |
| 03:24:16 | 7 | Q.    Yes, to date. |
| 03:24:17 | 8 | A.    I cannot tell you.  I'm sorry.  I don't |
| 03:24:19 | 9 | know the amount. |
| 03:24:22 | 10 | Q.    Now, is it -- encompassed in this |
| 03:24:28 | 11 | obligation of MGA to pay -- reimburse, essentially, |
| 03:24:32 | 12 | Omni 808 for those legal fees, I assume that includes |
| 03:24:37 | 13 | legal fees incurred on your behalf.  Is that true? |
| 03:24:44 | 14 | MR. GORDINIER:  When you say "you," you |
| 03:24:45 | 15 | mean -- |
| 03:24:47 | 16 | MR. ZELLER:  Him personally. |
| 03:24:47 | 17 | MR. GORDINIER:  -- him personally? |
| 03:24:49 | 18 | THE DEPONENT:  Obviously are you having |
| 03:24:51 | 19 | me to do interpretation of what I believe the |
| 03:24:53 | 20 | agreement covers? |
| 03:24:54 | 21 | BY MR. ZELLER: |
| 03:24:54 | 22 | Q.    What I'm asking for is your expectation |
| 03:24:57 | 23 | or understanding. |
| 03:24:59 | 24 | A.    If you are asking me if you were to sue |
| 03:25:03 | 25 | me, does MGA has to pay for that legal fees, the |

188

EXHIBIT  10
PAGE  189



| | | |
|---|---|---|
| 03:25:12 | 1 | answer is heck, yes. |
| 03:25:15 | 2 | MS. HURST:  Objection. |
| 03:25:19 | 3 | BY MR. ZELLER: |
| 03:25:19 | 4 | Q.    That's a fair restatement of my question, |
| 03:25:21 | 5 | yes. |
| 03:25:22 | 6 | A.    Okay. |
| 03:25:23 | 7 | Q.    But part of it also has to do with the |
| 03:25:25 | 8 | fact that it's your expectation that MGA pays legal |
| 03:25:38 | 9 | fees, also in the past, that have been incurred in |
| 03:25:38 | 10 | connection with defending you personally, your |
| 03:25:39 | 11 | interests personally in the "Mattel versus MGA" case? |
| 03:25:42 | 12 | MS. HURST:  Objection.  Vague. |
| 03:25:43 | 13 | THE DEPONENT:  I don't think there has |
| 03:25:44 | 14 | been anything personally.  I'm here as a shareholder |
| 03:25:48 | 15 | of Omni 808 which, in a way, relates to "Mattel |
| 03:25:52 | 16 | versus MGA," so any involvement that I have here or I |
| 03:26:02 | 17 | will have is in connection to Omni 808.  So |
| 03:26:08 | 18 | although -- it could be personal, but it's in a |
| 03:26:10 | 19 | capacity of a shareholder of Omni 808.  It is not |
| 03:26:15 | 20 | Neil Kadisha as a separate entity. |
| 03:26:19 | 21 | I mean, that's what I think.  I mean, you |
| 03:26:20 | 22 | know, my lawyer is sitting here, and I'm not giving |
| 03:26:24 | 23 | you legal opinion.  I'm just telling you that's my |
| 03:26:26 | 24 | understanding. |
| 03:26:28 | 25 | Q.    Right.  That's all I'm looking for.  I |

189

EXHIBIT 10
PAGE 190

03:26:30  1  certainly am not looking for legal opinions or
03:26:34  2  anything like that.  I'm just trying to understand
03:26:35  3  and asking about your expectations.
03:26:41  4          Now, you had also mentioned that payments
03:26:43  5  that MGA has made to Omni 808 are interest payments;
03:26:46  6  is that true?
03:26:48  7      A.      Correct.
03:26:48  8      Q.      Now, has it made any payments of any kind
03:26:53  9  to Omni 808 other than as interest payments on the
03:26:57  10  debt or in the form of the legal fees that it's
03:27:02  11  obligated to pay for Omni 808?
03:27:07  12      A.      The only payments that MGA can pay to
03:27:11  13  Omni 808 is either principal or interest because
03:27:16  14  that's what we are entitled to, or reimbursement of
03:27:21  15  legal fees which are related.  I explained about the
03:27:24  16  legal fee.
03:27:26  17          On principle, there is no principal
03:27:28  18  payment, has not been, and I don't think in the near
03:27:32  19  future will be, so it will leave only interest
03:27:36  20  payment which was -- which has been the payments that
03:27:41  21  they have provided to Omni 808.
03:27:44  22          Since I'm sure your coffee is cold by
03:27:47  23  now, I think we should just take a break so you can
03:27:50  24  heat it up.
03:27:52  25      Q.      I'm fine, but, you know, you're not

                                                          190

EXHIBIT   10
PAGE      191

1        <u>DEPOSITION OFFICER'S CERTIFICATE</u>

2

3   STATE OF CALIFORNIA        )
                              )   SS.
4   COUNTY OF ORANGE          )

5

6        I, J'ANA SIEGERS, HEREBY CERTIFY:

7        I AM A DULY QUALIFIED CERTIFIED SHORTHAND

8   REPORTER IN THE STATE OF CALIFORNIA, HOLDER OF

9   CERTIFICATE NUMBER CSR 10845 ISSUED BY THE COURT

10  REPORTERS BOARD OF CALIFORNIA AND WHICH IS IN FULL

11  FORCE AND EFFECT.  [FED. R. DIV. P. 28(A)]

12       I AM AUTHORIZED TO ADMINISTER OATHS OR

13  AFFIRMATIONS PURSUANT TO CALIFORNIA CODE OF CIVIL

14  PROCEDURE, SECTION 2093(B) AND PRIOR TO BEING

15  EXAMINED, THE DEPONENT WAS FIRST DULY SWORN BY ME.

16  [FED. R. CIV. P. 28(A), 30(F)(1)]

17       I AM NOT A RELATIVE OR EMPLOYEE OR ATTORNEY OR

18  COUNSEL OF ANY OF THE PARTIES, NOR AM I A RELATIVE

19  OR EMPLOYEE OF SUCH ATTORNEY OR COUNSEL, NOR AM I

20  FINANCIALLY INTERESTED IN THIS ACTION.

21  [FED. R. CIV. P. 28]

22       I AM THE DEPOSITION OFFICER THAT

23  STENOGRAPHICALLY RECORDED THE TESTIMONY IN THE

24  FOREGOING DEPOSITION AND THE FOREGOING TRANSCRIPT IS

25  A TRUE RECORD OF THE TESTIMONY GIVEN BY THE

A & E Court Reporters        (213) 955-0070        Fax: (213) 955-0077

EXHIBIT  10

PAGE  192

1   DEPONENT.  [FED. R. CIV. P. 30(F)(1)]

2        BEFORE COMPLETION OF THE DEPOSITION, REVIEW OF

3   THE TRANSCRIPT [ ] WAS [ ] WAS NOT REQUESTED.   IF

4   REQUESTED, ANY CHANGES MADE BY THE DEPONENT (AND

5   PROVIDED TO THE REPORTER) DURING THE PERIOD ALLOWED

6   ARE APPENDED HERETO.  [FED. R. CIV. P. 30(E)]

7

8

9   DATED: _____8/30/09_____

10

11

12

13

14            _____

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT  10
PAGE  192

# EXHIBIT 11

Exhibit Filed Under Seal Pursuant to Protective Order