1  reducing its reliance on "Barbie" and on traditional retailers, such as Toys-R-Us

2  and Wal-Mart.  Mattel spent a reported $881 million in March 1997 to purchase

3  Tyco Toys and acquire the "Matchbox" toy car brand.  Just more than a year later,

4  it spent $700 million for the Pleasant Co., a mail-order doll company and maker of

5  the "American Girl" doll collection.  And in December 1998, Mattel announced

6  plans to fork out a monumental $3.5 billion to buy the Learning Company,

7  followed quickly by Mattel's purchase, in March 1999, of a software company,

8  Purple Moon.

9       14.    Despite these acquisitions, the company continued to struggle.  The

10  retail environment and buying patterns had unquestionably changed, but Mattel had

11  not kept up.  Despite Mattel's feverish acquisitions, Mattel's mainstay and primary

12  profit-generator was still "Barbie."  But "Barbie" had grown stale, and sales

13  languished.  Posting additional losses in the first quarter of 1999, Mattel announced

14  that it would lay off 3,000 employees – 10% of its work force.

15       15.    Mattel's stock plummeted again in late 1999, dropping 30% on

16  Mattel's announcement that it would fall as much as 55% short of analysts' earning

17  estimates for the third quarter.  Mattel blamed its troubles primarily on its

18  expensive, $3.5 billion acquisition of the Learning Company, which had turned out

19  to be a disaster fraught with licensing and distribution problems, bad debt, high

20  product returns and high advertising costs.

21       16.    By early 2000, Mattel's stock had crashed to as low as $8 per share,

22  and some analysts considered Mattel vulnerable to a takeover.  Investors clamored

23  for Ms. Barad's resignation, and got their wish.

24       17.    Jill Barad resigned from Mattel in February 2000.

25       18.    For three months, the company was without a permanent chief

26  executive until Robert Eckert took the helm in May 2000.  Mr. Eckert had spent 23

27  years at Kraft Foods, a subsidiary of Altria Group, Inc., and was widely credited

28

5

EXHIBIT 25
PAGE 333

1    with reviving its ailing cheese business.  Investors looked for him to do the same

2    for Mattel.

3        19.    Upon his arrival at Mattel, Mr. Eckert's promise, according to *Wall*

4    *Street Journal* reports, was to deliver a "leaner and meaner" Mattel.

5        20.    The "leaner" Mattel came quickly.  Mr. Eckert laid off hundreds,

6    closed factories in the United States, shipped production to Mexico, and sold off the

7    Learning Company at a fraction of what Mattel had paid for it.  It helped Mattel's

8    bottom-line, but did nothing to spur sales growth.  Even under Mr. Eckert's "leaner

9    meaner" leadership, domestic "Barbie" sales remained in a slump into 2001.  In an

10   industry that had become increasingly driven by consumer whims and fads, and the

11   hot, must-have toys of the moment, Mattel remained disinterested in devoting its

12   resources to searching for or developing a new blockbuster toy.  Mr. Eckert's

13   business plan was not to diversify, but to build upon and expand sales of its existing

14   brands.  Mattel was, after all, still generating billions in revenue despite the decline

15   of "Barbie."  And so, Mattel remained committed to its age-worn icon and its two

16   other core brands, Fisher-Price and Hot Wheels, with each of the three accounting

17   for approximately a third of the company's sales.

18       21.    Then came the competition – MGA's "BRATZ".

19

20   **"BRATZ" Dolls Revolutionize The Fashion Doll Market**

21       22.    "BRATZ" challenged "Barbie's" half-century domination of the

22   fashion-doll market like nothing ever before had been able to do.

23       23.    MGA unveiled a preliminary sample of the "BRATZ" doll at the Hong

24   Kong Toy Fair in January 2001, while continuing to finalize the product throughout

25   that spring.  Finished products were first shipped in May 2001.  MGA introduced

26   the line to consumers in June 2001.

27

28

EXHIBIT 25
PAGE 334

24.     Unlike "Barbie" dolls, the "BRATZ" line of dolls and branded products sported a hip, multi-ethnic urban look that appealed to contemporary teenage and pre-teen girls.

### MGA's "BRATZ"



25.     At approximately 9.5 to 10 inches tall, the "BRATZ" dolls were intentionally shorter than "Barbie" dolls and looked like no other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which requires a stand), and up-to-date fashions.

7

EXHIBIT 25
PAGE 335

26.   Indeed, the classic "Barbie" look was nowhere to be seen in these dolls; they would never be confused with "Barbie".

**MGA's "BRATZ"**          **Mattel's "Barbie"**

    

27.   Featuring and embodying the slogan "The Girls With a Passion for Fashion!", "BRATZ" dolls revitalized, transformed and expanded the fashion doll market, in particular proving popular among "tween" age girls – those between childhood and adolescence – who had been all but abandoned as a market by Mattel.

28.   The "BRATZ" line – with its unique and distinctive look – is well recognized and has been critically acclaimed and praised by consumers, retailers and toy industry analysts alike. In 2001, the "BRATZ" line won the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award. In 2002, the "BRATZ" line again won the TIA People's Choice Toy of the Year Award and the Family Fun Toy of the Year Award. LIMA, the licensing industry's official arm, awarded MGA's "BRATZ" the best character license of the year as well as the overall best licensed property of the year for 2003. MGA's "BRATZ" also earned the coveted TIA "Property of the Year" and "Girl Toy of the Year" for 2003, as well as the Family Fun Toy of the Year Award. MSNBC named "BRATZ" the "Hottest Toy of the Year," and both MGA and "BRATZ" received several other accolades in

8

EXHIBIT 25
PAGE 336

1    2004, including the Suppliers Performance Award by Retail Category (the
2    "SPARC" award) in the Girls' Toys category sponsored by DSN Retailing
3    Today/Apparel Merchandising.

4        29.    Although but a tiny fraction of Mattel's size, with "BRATZ", MGA
5    was able to chip away at Mattel's stranglehold on the fashion doll market, gaining
6    shelf space and market share as "Barbie" sales remained flat or, at times, declined.

7        30.    The competition that MGA (once a licensee of Mattel!) and "BRATZ"
8    posed to Mattel was unexpected and unwelcomed by Mattel.  Where "Barbie" had
9    once enjoyed a 90% share of the fashion doll market in 1997, that share had already
10   slipped to 85% or less by the time of the release of "BRATZ".  With the company
11   still struggling under Mr. Eckert to overcome prior years of declining sales and
12   mounting debt, "Barbie," Mattel – and Mr. Eckert – simply could not afford the
13   untimely competition.  Mr. Eckert's "leaner" Mattel was not enough to battle more
14   potential erosion in "Barbie's" market share.  Mattel had to combat "BRATZ" and
15   MGA, and in the process revealed Mr. Eckert's "meaner" Mattel.

16

17   **Mattel's Response to "BRATZ" and Efforts to Thwart MGA's Competition**

18       31.    Mattel was not poised to nimbly respond to "BRATZ" with a new,
19   creative product of its own – indeed, it had been antithetical to Mattel's corporate
20   culture and mentality for Mattel to even conceive that a product might vie for shelf
21   space with "Barbie", let alone be available for sale to consumers mere months after
22   first being shown to retailers.  Mattel had to take a more expeditious route.

23       32.    Instead of fairly competing, Mattel waged war against MGA using a
24   wide-array of tortious, unfair and anti-competitive practices including systematic,
25   serial copycatting and intellectual property infringement, aided by intimidation,
26   threats and other acts of unfair competition and anti-competitive conduct, all with
27   one goal in mind – to banish MGA from the market – or minimize its ability to
28   capture any meaningful share before it could do any real harm to Mattel.

9

EXHIBIT 25
PAGE 337

**Mattel's serial copycatting and intellectual property infringement**

33.    Mattel's serial copycatting of MGA's product lines began with the "BRATZ" dolls themselves, but quickly extended to MGA's packaging, themes, accessories, advertising and even other product lines.

34.    The first four "BRATZ" dolls that MGA launched in 2001, named Jade, Yasmin, Cloe and Sasha, met their wannabe "BRATZ PACK" members in October 2002 with Mattel's launch of three "My Scene" dolls named Madison, Chelsea and "Barbie." This was no ordinary "Barbie", however. Indeed, not even close. Mattel designed its "My Scene" dolls to evoke the unique and distinctive look of the "BRATZ" – also with disproportionately oversized heads, artfully made-up almond-shaped eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and over-sized feet.

| **Mattel's Traditional "Barbie"** | **Mattel's "My Scene" Doll** |
|---|---|




circa 2002


circa 2004





EXHIBIT 25
PAGE 338

35.     These confusingly similar "BRATZ" imitators may have been originally intended to buy Mattel time while it worked to release another product the following summer, called "Flavas". MGA's founder, Isaac Larian, was quoted by the media as having predicted that the move would backfire on Mattel, and it did. Released in July 2003, Mattel's "Flavas" dolls took the urban, "hip-hop" look too far, and were widely viewed as portraying a trampy, "bad-girl" image. The dolls were not well-received, and rumor has it that Mattel had to sell them at below cost prices to get rid of inventory. Most apparently wound up in discount bins, and Mattel has seemingly abandoned the line.

36.     Realizing that "My Scene" was its best bet for riding MGA's successful coattails and capitalizing on the unique and inherently distinctive look that MGA had developed in its "BRATZ" dolls – and MGA's substantial goodwill – Mattel has systematically proceeded to modify the "My Scene" dolls since their original release, particularly their eyes, to increase their similarity to "BRATZ" more and more over time.

37.     Indeed, when Mattel found out that its initial line of "My Scene" dolls had trouble competing with "BRATZ", they simply *became* "BRATZ", in every version, whether blonde, brunette or African American. A few pictures here are worth a thousand words.

**BLONDE**

| **Mattel's Traditional "Barbie"** | **Mattel's Original "My Scene"** | **Mattel's Recent "My Scene"** |
|---|---|---|
|  |  |  |

11

EXHIBIT 25
PAGE 339

**Mattel's Traditional "Barbie"**    **Mattel's Original "My Scene"**    **Mattel's Recent "My Scene"**

  

**BRUNETTE**

**Mattel's Traditional "Theresa"**    **Mattel's Original "My Scene"**    **Mattel's Recent "My Scene"**

  

 

12

EXHIBIT 2<u>5</u>
PAGE <u>340</u>

## AFRICAN AMERICAN

| **Mattel's Traditional "Barbie"** | **Mattel's Original "My Scene"** | **Mattel's Recent "My Scene"** |
|:---:|:---:|:---:|








38.   The original "My Scene" eye, as shown here, for example, has recently turned into a virtual carbon-copy of the "BRATZ" eye.

### Original Mattel "My Scene" Eye




13

EXHIBIT 25
PAGE 341

39.    The "My Scene" eye pictured above, for instance, has lashes that radiate almost straight out, circumferentially, from the eyelids and, although the eye is more almond shaped than a "Barbie" eye, the eye is not so sleepy and heavy lidded as a "BRATZ" eye and is only lightly shadowed. The new "My Scene" eye, in contrast, is dramatically more similar to a "BRATZ" eye, as shown below in a side-by-side comparison. The doe-eyed innocent look of the "My Scene" eye shown above is gone; replaced with a sultrier look, characteristic of "BRATZ." The new "My Scene" eye, as shown below, boasts lashes that sweep out and away from the outer corner of the eye, just like the "BRATZ" eye. The new "My Scene" eye is also more heavy lidded and thickly lined, and the make-up is more markedly pronounced and dramatic.

**MGA's "BRATZ" Eye**                    **New Mattel "My Scene" Eye**

        

40.    Indeed, the progression of the "My Scene" eye, as it has departed from "Barbie" and edged closer and closer to "BRATZ", is readily apparent from virtually every angle, as shown here:

14

EXHIBIT 25
PAGE 342

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## BLONDE

**Mattel's Traditional "Barbie"**  **Mattel's Original "My Scene"**  **Mattel's Recent "My Scene"**



## BRUNETTE

**Mattel's Traditional "Theresa"**  **Mattel's Original "My Scene"**  **Mattel's Recent "My Scene"**



15

**EXHIBIT 25**
**PAGE 343**

| Mattel's Traditional "Theresa" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|



## AFRICAN AMERICAN

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|



16

EXHIBIT 25
PAGE 344

41.    Mattel has not stopped at the eyes, however.  Mattel has also incrementally but steadily modified its "My Scene" packaging, and the manner in which the dolls are displayed, to more closely mimic the packaging, trade-dress and overall look and total image of MGA's "BRATZ".

42.    To illustrate, Mattel's "My Scene" dolls were initially marketed like this:

### Mattel's Early "My Scene" Packaging



43.    Little by little, however, the packaging has changed, creeping ever closer and closer to the open and transparent style of the "BRATZ" packaging. First, the panels seen running down each side of the front of the "My Scene" box shown above, framing the doll and giving the packaging a closed-in look, were changed as shown here:

### Intermediate Mattel "My Scene" Packaging



17

EXHIBIT 25
PAGE 345

44.   Mattel replaced this intermediate packaging style with another that looked even more similar to the "BRATZ" packaging, as shown here in a side-by-side comparison:

**MGA's "BRATZ"**
**"Wintertime Wonderland" Packaging**



**Mattel's "My Scene"**
**"Chillin' Out" Packaging**



45.   Then later, Mattel changed its packaging and product display yet again to look even more closely and confusingly similar to MGA's packaging and "*tout ensemble,*" as shown here

**MGA's "BRATZ"**
**"SPORTZ" Packaging**



**Mattel's Recent "My Scene"**
**"MIAMI GETAWAY" Packaging**



18

EXHIBIT 25
PAGE 396

46.    In this incarnation, Mattel notably abandoned the signature figure-eight style design that had appeared on its prior "My Scene" packaging, making this recent version clearer and more transparent on the front and sides than ever before, and much more like "BRATZ", accordingly.  Mattel also discarded its traditional, rectangular shaped box and, like "BRATZ", adopted an unusual, non-rectangular shaped box.  Mattel even adopted the "flying banner" ribbon-style slogan running across the middle of the box, similar to that used on the "BRATZ" packaging.

47.    As if these pointed and deliberate efforts to confuse and mislead consumers were not enough, Mattel exacerbated the confusion, and furthered the impression that the "My Scene" line and the "BRATZ" line are related, by taking up MGA's practice of regularly releasing new dolls in connection with a theme – but not just *any* theme, often *MGA's theme.*

48.    For example, when MGA released its "Wintertime Wonderland" theme in Fall 2003, Mattel released its "Chillin Out!" theme.  Each doll in MGA's line came with winter-sports accessories, such as a snowboard or skis and ski boots.  Each doll in Mattel's line featured winter sports accessories, also including snowboards or ski and ski boots.  Even MGA's color schemes and some of the clothing styles seemed to have made their way into the Mattel products.

49.    When MGA released its "Formal Funk" theme, Mattel released its "Night on the Town" theme.  "BRATZ Formal Funk" was an elaborately themed line with its dolls in hip formalwear; so was Mattel's "Night on the Town."

50.    When MGA released its distinctive "Sun-Kissed Summer" theme, Mattel released its confusingly similar "Jammin' in Jamaica" theme.  Each line featured a bright blue-and-orange color scheme, beach accessories, such as surfboards, and beachwear clothing.  Mattel's "Jammin' in Jamaica" "Guava Gulch Tiki Lounge" playset also contained elements remarkably similar to MGA's "Sun-Kissed Summer" playset.

EXHIBIT 25
PAGE 347

51.   Mattel also began running television commercials for its "My Scene" dolls bearing a remarkable similarity to "BRATZ" commercials, combining live action with animated sequences set to similar sounding pop music and lyrics.

52.   Mattel even stooped so low as to mimic "BRATZ" accessories and related products in order to further create consumer confusion in the marketplace.

53.   For instance, when MGA came up with its distinctive "BRATZ" "Runway Disco", Mattel came out with a "My Scene" Sound Lounge with packaging that imitated MGA's trapezoidal box.

54.   Mattel's conduct cannot be explained by sheer coincidence, nor is it merely fair competition.  It is a calculated and intentional effort unquestionably designed to trade off of MGA's hard work and goodwill, create confusion in the marketplace, steal MGA's thunder and momentum, and dilute and blur away the novelty and distinctiveness of MGA's products.  Out of the seemingly endless possibilities that Mattel could have chosen for a new line of dolls, packaging, themes, color schemes, commercials, accessories and playsets, Mattel deliberately chose *not* to come out with something unique, new or different and has, instead, focused its efforts and resources on flooding the market with something so close to "BRATZ" that the public will, can, and does, simply mistake it for "BRATZ".

55.   As yet another example of this, when MGA came out with a "BRATZ" "Funky Fashion Makeover Head," Mattel came out with a confusingly similar – indeed, practically identical – "My Scene" styling head.

20

EXHIBIT 25
PAGE 348

| | |
|---|---|
| **MGA's "BRATZ"**<br>**"Funky Fashion Makeover Head"** | **Mattel's "My Scene"**<br>**"Stylin' Head"** |

  

 

56.    Indeed, Mattel's "My Scene" styling head is so close to the "BRATZ" styling head that even the press have mistakenly pictured and identified it as MGA's "BRATZ".  The picture of Mattel's "My Scene" styling head shown below, for instance, appeared in the press with a caption indicating that the child was trying out different hairstyles "on a ***Bratz*** hair and makeup doll head."

Hairstyle practice



21

EXHIBIT 25
PAGE 349

57.   Creating further confusion, Mattel's television commercial for its "My Scene" styling head was like watching a re-run of MGA's commercial for its "Funky Fashion Makeover Head".

58.   At one point in time, Mattel also used a portion of the "BRATZ" dolls' now-famous trademarked tag line "The Girls With a Passion for Fashion" on Mattel's website for its "Diva Starz" dolls, asking its website users: "Do you have a passion for fashion?"

59.   Mattel has even recently come out with a confusingly similar line of "My Scene" plush pets, which adopt the distinctive look of MGA's "BRATZ" line. The "My Scene" pets feature large, humanlike eyes and wear clothing making them remarkably and confusingly similar to "BRATZ" products, including "BRATZ PETZ", as seen in this example where the pets each wear a jacket, a cap and carry a purse:

| **MGA's "BRATZ Dogz"** | **Mattel's "My Scene" dog** |
| --- | --- |
|  |  |

60.   And here too, Mattel chose to package its pets the same way that MGA packaged its "BRATZ PETZ", sitting in an open box, with no top and with partial side panels that slope from a narrow front panel to a higher back panel.

61.   Indeed, the similarity of the "My Scene" pets to "BRATZ PETZ" has confused even sophisticated retailers who have mistakenly merchandised "My Scene" dogs in the middle of the "BRATZ" section of a retail display, next to and as if they were part of MGA's "BRATZ Petz" line.  It comes as no surprise that

EXHIBIT 25
PAGE 350

1  customers too have been confused.

2      62.   Indeed, Mattel's television commercials and "My Scene" products

3  have become so confusingly similar to MGA's that even advertising executives

4  have expressed concern.  One went so far as to say that although imitation is the

5  best form of flattery, what the individual had seen at Mattel's showroom, and how

6  its "My Scene" dolls now look so confusingly similar to "BRATZ", was

7  "shocking."  This person further opined that it was clear that Mattel is intending to

8  confuse customers and capture "BRATZ" market share, and even asked MGA if it

9  was considering legal action.

10      63.   The press also has taken notice of Mattel's attempts to confuse

11  consumers.  On or about February 18, 2005, a visitor to MGA's showroom from a

12  prominent news publication stated, "Oh my, I just came from Mattel's showroom

13  and their new 'My Scene' packaging is just like 'BRATZ' minus the handle."

14  Another member of the press visiting MGA's showroom offered the unsolicited

15  comment, "have you seen the new 'My Scene' dolls eyes are exactly like

16  'BRATZ'?"  Yet another opined that Mattel's "My Scene" line was exactly like

17  "BRATZ", indeed, so much so that the reporter confusingly thought that Mattel had

18  bought "BRATZ", and still another has commented on Mattel's imitation of MGA.

19  On or about February 16, 2005, during an interview of a Mattel representative on

20  local network news in New York, "My Scene Barbie" was displayed by a Mattel

21  representative.  During conversation about the dolls, the interviewer exclaimed that

22  they looked like "BRATZ".  The Mattel representative just laughed – but this is no

23  laughing matter.  This colloquy was available for replay and viewing, and was even

24  transcribed, on the internet.

25      64.   Customers too have been similarly confused.  Some actually contacted

26  MGA seeking to purchase "My Scene" dolls.

27      65.   Mattel's conduct is planned, deliberate and intentional.  Mattel has

28  systematically, copied, imitated and liberally borrowed many of the distinctive,

EXHIBIT 25
PAGE 351

essential elements that identify and make "BRATZ" dolls "BRATZ" dolls, diluting the brand, creating customer confusion, and unfairly stifling competition.

66.    Ironically, Mattel sued one of its other competitors in Europe for doing much the same thing: "systematically copying and borrowing elements" from "My Scene", on grounds that "this conduct constitutes unfair competition and passing off." Indeed it does.

67.    What is more, Mattel's conduct has reached beyond "BRATZ" and "BRATZ"-related products to include other new MGA toy lines.

68.    For example, MGA's "4-Ever Best Friends" line was the obvious, and well-recognized model for Mattel's "Wee 3 Friends" line. Mattel even adopted changes to the color scheme of its similarly-shaped packaging to create confusion with MGA's distinctive packaging.

**MGA's "4-Ever Best Friends"**    **Mattel's "Wee 3 Friends"**

    

    

EXHIBIT 25
PAGE 351

69.    In the second half of 2002, MGA's "Mommy's Little Patient," originally designed as the first in a series of "Mommy's Little . . ." dolls, was followed by Mattel's "Little Mommy" doll.

**MGA's**
**"Mommy's Little Patient"**      **Mattel's**
**"Little Mommy Potty Training Baby Doll"**

70.    Sparing nothing, Mattel has also extended its monkey-see monkey-do behavior into its boys' line.  When MGA came out with its "Alien Racers" line of toy racing vehicles, for instance, Mattel rushed to revamp and rename one of its "Hot Wheels" lines.  Although well-known and clearly branded for decades as "Hot Wheels", Mattel's answer to MGA's "Alien Racers" was to re-brand and market its Hot Wheels Highway 35 line under an "AcceleRacerS" logo.  MGA's line consists of "extreme" radio controlled racing vehicles marketed in connection with a strong, almost battle-like, science fiction theme.  MGA's logo accentuates the "A", "R", and "S" in compressed block lettering.  Mattel's line also consists of extreme racing vehicles marketed in connection with a strong, almost battle-like, theme.  Mattel's logo too accentuates the "A", "R", and "S" in compressed block lettering.

EXHIBIT 25
PAGE 353

71.   Here, too, Mattel's mimicry has spilled over into Mattel's advertising and thematic presentation and marketing of this toy line.  In particular, Mattel has adopted MGA's "other-worldly" theme in its commercials.  For instance, in Mattel's commercials, the product, whose logo appears as "AcceleRacerS", now compete against alien-like Cyborgs engaged in a "race to save the world," mimicking MGA's alien theme and commercials in which MGA's "Alien Racers" are engaged in a "race to save the universe."

72.   None of this is coincidence.  Mattel has deliberately adopted a pattern and practice of coming out with variations of MGA's products to create confusion in the marketplace, interfere with MGA's business and divert profits away from MGA.  Mattel says, on its website, that it is in the business of creating "[t]he world's premier toy brands [of] today and tomorrow."  It seemingly does so, however, by borrowing liberally from its competitors, even when it refreshes its own existing brands and products.

73.   MGA has suffered extensive injury from Mattel's conduct.  Mattel's habitual, serial simulation of MGA's products, product lines and trade dress has allowed Mattel to take a free ride on the extensive amount of time, expense and creative development MGA expends on developing new products, product packaging and presentation, giving Mattel an unfair advantage, and making it virtually impossible for MGA to compete with Mattel on a level playing field.

**Mattel's additional unfair, manipulative, anti-competitive conduct**

74.   This already substantial injury has been exacerbated by the strong-arm tactics, and other illegitimate, unfair and anti-competitive means that Mattel has used to manipulate the market and ensure that its control and domination of the industry can continue unabated.

26

EXHIBIT 25
PAGE 354

75.   For example, wielding the litigation privilege as a potential shield for intimidating conduct, Mattel has sent threatening letters to several of its former employees who now work for MGA warning them not to disclose *even publicly available information* about Mattel, including the names and positions of Mattel employees.  Mattel even went so far as to sue one of its former senior executives, after he had the temerity to resign and join MGA in October 2004.  Not only was Mattel's lawsuit dismissed for failure to state a viable claim, but Mattel thereafter seemingly could not muster up a shred of evidence sufficient to support an amended complaint.  As a result, Mattel's case against its former executive was dismissed with prejudice.

76.   Mattel has also warned a number of companies, including the biggest publishing entity in the United Kingdom, not to license MGA products, or risk retribution.  The threats are not idle.  In May 2004, Mattel terminated one of its licensees, apparently in retribution for licensing "BRATZ".  While some companies have been courageous enough to take the risk, others have not, and MGA has lost valuable licensing opportunities as a result.

77.   Mattel has used similar intimidation to pressure distributors and retailers, particularly in foreign countries, not to distribute "BRATZ", to reduce shelf and display space for "BRATZ" and to place "BRATZ" in unfavorable locations at retail outlets.

78.   When MGA faced a shortage of doll hair in October 2002, MGA is informed and believes that the reason for that shortage was that Mattel had locked MGA out by buying up the supply from the two main hair supply companies.

79.   Mattel has also manipulated the retail market.  For instance, Mattel merchandisers have been caught tampering with MGA's retail displays, replacing favorably located MGA merchandise with Mattel merchandise instead.  MGA is also informed and believes that Mattel has falsely told a major United States retailer that MGA was giving another major United States retailer below-market pricing

27

EXHIBIT 25
PAGE 355

and falsely told a United Kingdom retailer that MGA was discontinuing one of its lines, in order to make such line less attractive to buyers and thereby attempt to increase sales of the competitive Mattel product and improve its own sales, at MGA's expense.

80.     Even supposedly unbiased and impartial industry organizations have fallen prey to Mattel's abusive wield of power, to MGA's detriment.

81.     NPD Funworld ("NPD"), for one, is the leading supplier of sales statistics in the toy industry. Accurate NPD statistics are essential for efficient product-line management. Without these statistics, it is difficult, if not impossible, for toy companies to assess and measure the relative success of their products in key categories. It is, however, a subscription service, and NPD restricts the manner in which its subscribers may use the data it provides.

82.     Mattel has regularly ignored the restrictions – using NPD data about Mattel's comparative standing relative to other companies in press releases and in communications with retailers and financial investors who are not NPD subscribers.

83.     Mattel generates substantially more annual subscription revenue for NPD than does MGA, and carries more clout.

84.     After MGA had subscribed to the service for more than 12 years, NPD terminated MGA's subscription in 2003 theoretically on the grounds that MGA misused NPD data in a press release.

85.     MGA is informed and believes that the termination was the result of pressure from Mattel, notwithstanding Mattel's own frequent violations of NPD's restrictions.

86.     In addition to this, the market share numbers that NPD generates are heavily dependent on the category in which NPD places a particular product. MGA is informed and believes that Mattel also pressured NPD into changing certain product classifications for its "BRATZ" products in order to manipulate the data

28

EXHIBIT 25
PAGE 356

1    and preserve Mattel's market share rankings in the critical fashion doll category –
2    and thereby lower MGA's.

3        87.   The Children's Advertising Review Unit ("CARU") is another
4    organization that, upon information and belief, appears to have been subject to
5    improper influence by Mattel. CARU is the toy industry's supposedly independent
6    self-regulatory body in charge of maintaining standards in advertising. CARU's
7    approval is considered critical within the toy industry to avoiding regulatory action
8    by the Federal Trade Commission.

9        88.   CARU is heavily subsidized by Mattel.

10       89.   Upon information and belief, Mattel has used its influence as a major
11   contributor to CARU's budget to induce CARU to place onerous restrictions on
12   MGA advertisements, and require MGA to amend aspects of commercials that have
13   gone unchallenged in other parties' commercials.

14       90.   As a result of CARU's restrictions, MGA has been forced to incur
15   unnecessary costs for reshooting and producing or re-editing its commercials.

16       91.   On several occasions, CARU has also either strongly suggested, if not
17   also required, that MGA respond to inquiries about its website policies and make
18   substantial changes to the "BRATZ" website notably and significantly in excess of
19   restrictions imposed on Mattel and others.

20       92.   Even TIA, the toy industry's trade association, is apparently not
21   untainted by Mattel's influence and power. Each year, TIA presents the Toy-of-
22   the-Year Awards, the most prestigious of which had been the award for Toy of the
23   Year. Winning the Toy of the Year Award is a significant achievement that not
24   only very likely increases the sales of the winning toy, but also denotes the winning
25   company as a leader in toy innovation and generates substantial goodwill with
26   retailers, distributors, licensees, and customers.

27       93.   For the years 2000 (the first year of the award), 2001 and 2002, the
28   Toy of the Year award was chosen by consumer vote. The awards ceremony was

29

EXHIBIT 25
PAGE 357

1   then held the following year, at a dinner in New York. (For example, the awards

2   dinner for the year 2000 award was held in February 2001). Leap Frog won the

3   2000 People's Choice Toy of the Year Award and MGA won the 2001 and 2002

4   People's Choice Toy of the Year Awards. With the 2003 Toy of the Year Award,

5   however, the rules suddenly changed. Now, the award is selected by members of

6   the industry.

7       94. Upon information and belief, this change was orchestrated by a Fisher

8   Price (a Mattel subsidiary) executive who, until recently, served as the Chairman of

9   TIA.

10      95. Perhaps not surprisingly given this change in the winner selection

11   procedures, "Hokey Pokey Elmo" ("Elmo"), a Fisher Price toy, won for the year

12   2003 (awarded in 2004), beating out the other leading nominee, "BRATZ Formal

13   Funk Super Stylin' Runway Disco."

14      96. TIA has refused to provide MGA with the vote count procedure and

15   totals for this award, despite repeated requests.

16      97. MGA is also informed and believes that Mattel was instrumental in

17   attempting to keep MGA from participating as a sponsor in this year's "Kids'

18   Choice Awards."

19      98. Mattel has clearly engaged in tortious, illegal and unethical behavior in

20   its unfettered efforts to disrupt, if not destroy, MGA. Indeed, this is apparently

21   Mattel's current *modus operandi* when it comes to "competing" in the industry.

22   The once immensely successful "LeapFrog" interactive learning product, for

23   example, has apparently been one of Mattel's other recent victims.

24      99. Mattel may not shield its illegal, unfair and unethical business practices

25   from the public eye. It is time for the truth to be told, and the world to know of

26   Mattel's unfair, unethical and illegal business practices and unfair competition.

27   "Barbie" does not "play nice" with others (particularly her competitors), and needs

28   to be taught how "to share" (at least in the fashion doll marketplace). She cannot be

EXHIBIT 25
PAGE 358

1   allowed to continue to be the playground bully and trample on the rights of others,

2   including MGA.

3       100.  As a result of Mattel's manipulative, illegal, unfair, unethical and anti-

4   competitive conduct, MGA has suffered and, unless abated, will continue to suffer

5   lost sales, lost licensing fees, lost contracts, lost relationships, lost business

6   opportunities and other damages and harm for which there is no adequate remedy at

7   law. Its ability to enter new markets and product lines has been hampered and

8   delayed.  Its production costs have increased, its reputation and relationships with

9   important players in the industry have been negatively impacted, the value of its

10  business has been diminished, and its ability to attract, hire and retain employees

11  has been affected.

12

13  **FIRST CLAIM FOR RELIEF**

14  **(False Designation of Origin or Affiliation in Violation of 15 U.S.C. § 1125 (a))**

15      101.  MGA repeats and realleges the allegations contained in paragraphs 1

16  through 100 of this Complaint and incorporates them by reference as though fully

17  and completely set forth herein.

18      102.  MGA's "BRATZ" line has a unique and distinctive style and

19  distinctive characteristics, such as the disproportionately large head, large dramatic

20  eyes with a distinctive presentation (including the eye shape, make-up and lashes),

21  pouty, plump lips with a distinctive presentation (including the lip shape and make-

22  up), small, thin bodies, oversized feet, and up-to-date fashions.  MGA's "BRATZ"

23  line is known for and recognized by the total image that is presented by its product

24  and the style and arrangement of the packaging and display.  This "*tout ensemble*"

25  is representatively described and depicted herein.  The characteristics of MGA's

26  "BRATZ" line, alone or in combination, have come to identify the "BRATZ" line

27  and its source, MGA, and thus serve as protectable trade dress.  MGA's trade dress

28  in its "BRATZ" line is purely aesthetic and non-functional or, if any utility exists, it

31

EXHIBIT 25
PAGE 359

1   is not essential to the purpose, quality or source identifying attributes of the

2   aesthetics. MGA's trade dress in its "BRATZ" line is inherently distinctive or has

3   acquired distinction within the meaning of the Lanham Act.

4        103.  Similarly, MGA's "BRATZ PETZ," part of the "BRATZ" line, also

5   has its own unique and distinctive characteristics, such as the humanlike eye and

6   unusual appearance of the animals dressed in clothing. MGA's "BRATZ PETZ"

7   line has become known for and recognized by the total image that is presented by

8   the product and the style and arrangement of its packaging. This "*tout ensemble*" is

9   representatively described and depicted herein. The characteristics of MGA's

10  "BRATZ PETZ", alone or in combination, have come to identify the "BRATZ

11  PETZ" line and its source, MGA, and thus serve as protectable trade dress. MGA's

12  trade dress in its "BRATZ PETZ" line is purely aesthetic and non-functional or, if

13  any utility exists, it is not essential to the purpose, quality or source identifying

14  attributes of the aesthetics. MGA's trade dress in its "BRATZ PETZ" line is

15  inherently distinctive or has acquired distinction within the meaning of the Lanham

16  Act.

17        104.  Mattel's production, sale and marketing of "My Scene" dolls,

18  including styling heads and doll heads, and "My Scene" pets that are confusingly

19  similar to MGA's "BRATZ" line (including its "BRATZ PETZ"), without MGA's

20  permission or consent, constitutes designation and use of a term, symbol, device or

21  combination thereof that is false or misleading within the meaning of 15 U.S.C.

22  Section 1125 and is likely to cause confusion, or to cause mistake, or to deceive as

23  to the affiliation, connection, or association, or as to the origin, sponsorship, or

24  approval of Mattel's goods or commercial activities, within the meaning of 15

25  U.S.C. Section 1125. MGA has been damaged by Mattel's acts.

26        105.  Mattel's conduct has been intentional and willful, and is calculated

27  specifically to trade off the goodwill that MGA has developed in its successful

28  "BRATZ" line. By its aforesaid acts, particularly its imitation of the distinctive

EXHIBIT  25
PAGE 360

1  features of MGA's "BRATZ" line in connection with goods sold and distributed in

2  interstate commerce, Mattel has infringed and is likely to continue to infringe on

3  MGA's substantial rights in and to the "BRATZ" line trade dress.  In so doing,

4  Mattel has falsely represented and designated to the public generally and consumers

5  of fashion doll products specifically the source and origin of Mattel's "My Scene"

6  fashion doll products in violation of 15 U.S.C. § 1125(a).

7       106.  MGA has been damaged by, and Mattel has profited from, Mattel's

8  wrongful conduct in an amount to be proven at trial.

9       107.  For each act of infringement, MGA is entitled to recover its actual

10 damages as well as Mattel's profits from such infringement.

11      108.  Monetary relief alone, however, is not adequate to address fully the

12 irreparable injury that Mattel's illegal actions have caused and will continue to

13 cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and

14 permanent injunctive relief to stop Mattel's ongoing infringement of MGA's trade

15 dress.

16              **SECOND CLAIM FOR RELIEF**

17     **(Unfair Competition in Violation of 15 U.S.C. § 1125 (a) and Unfair**

18  **Competition and Unfair Business Practices in Violation of Cal. Bus. & Prof.**

19              **Code § 17200 *et seq.* and California Common Law)**

20      109.  MGA repeats and realleges the allegations contained in paragraphs 1

21 through 108 of this Complaint and incorporates them by reference as though fully

22 and completely set forth herein.

23      110.  Mattel has deliberately and, indeed, repeatedly adopted, imitated and

24 mimicked the make-up, appearance, features, trade dress, and image of MGA's

25 products, packaging and advertising, including its repackaging and refreshing of

26 older Mattel toys.  Mattel's actions were and are done with the intent to deceive

27 consumers, cause confusion and mistake, and interfere with the ability of

28 consumers to identify the source of goods by appearance and packaging.  By this

**EXHIBIT 25**
**PAGE 361**

1    conduct, Mattel pirates and exploits, by subliminal or conscious association with

2    MGA, the goodwill and reputation of MGA and derives benefit therefrom.

3        111.   Mattel has particularly and deliberately poached upon the commercial

4    magnetism of MGA's "BRATZ" and the success of "BRATZ". Mattel's conduct

5    has been intentional and willful, and is calculated specifically to trade off the

6    goodwill that MGA has developed in its successful "BRATZ" line.

7        112.   By its acts, including its intentional imitation of the distinctive features

8    of MGA's "BRATZ" dolls, which has progressively become closer and closer, as

9    well as its imitation of "BRATZ" themes, packaging and the overall look, feel and

10   total image of the "BRATZ" line, imitation of other MGA products, packaging and

11   advertising, and other conduct alleged herein, Mattel has engaged in unfair

12   competition under both federal and California state law.

13       113.   Mattel has also willfully and maliciously used its power, influence and

14   intimidation to threaten certain retailers, suppliers, licensees, distributors and

15   manufacturers so as to limit, if not prevent, MGA from doing business with these

16   retailers, suppliers, licensees, distributors and manufacturers, using its power and

17   influence to intimidate and manipulate industry bodies. Mattel has further used its

18   power and influence to attempt to, if not actually, intimidate and threaten MGA's

19   current and potential employees so as to cause MGA competitive injury.

20       114.   Alone, in combination, or in totality, Mattel's actions discussed and

21   alleged herein constitute unfair competition and unfair business practices within the

22   meaning of federal law, California statutory law and/or California common law.

23       115.   As a result of its conduct, Mattel has derived substantial monetary and

24   non-monetary benefit and business advantage. Mattel has also wrongfully diverted

25   profits away from MGA and to Mattel and, on information and belief, deprived

26   MGA of the patronage of a large number of actual and potential customers.

27       116.   MGA has been damaged by, and Mattel has profited from, Mattel's

28   wrongful conduct in an amount to be proven at trial.

34

EXHIBIT 25
PAGE 362

117.   Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel, and all persons acting in concert with Mattel, from engaging in acts of unfair competition and unfair business practices.

118.   MGA is further entitled to relief whereby Mattel is ordered to pay restitution for damages resulting from Mattel's unfair competition and unfair business practices.

## THIRD CLAIM FOR RELIEF

### (Dilution in Violation of 15 U.S.C. § 1125 (c); Cal. Bus. & Prof. Code § 14330 and California Common Law)

119.   MGA repeats and realleges the allegations contained in paragraphs 1 through 118 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

120.   The look and trade dress of the MGA products referenced herein are distinctive and famous, and have been since before Mattel launched its similar versions.  By its aforesaid acts, Mattel caused and continues to cause blurring and dilution of the distinctive look of MGA's products and trade dress, which previously served as a unique source identifier for MGA, within the meaning of the Lanham Act, California Business and Professions Code § 14330 and/or California common law.

121.   Mattel's conduct has been intentional and willful, calculated specifically to trade on MGA's goodwill and reputation and to cause dilution of MGA's famous marks, particularly those connected with MGA's famous and successful "BRATZ" doll head, "BRATZ" doll product line, "BRATZ Funky Fashion Makeover Head" and "BRATZ PETZ" line.

122.   MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

EXHIBIT 25
PAGE 363

1    123.    Monetary relief alone, however, is not adequate to address fully the

2    irreparable injury that Mattel's actions have caused and will continue to cause

3    MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent

4    injunctive relief to stop Mattel's ongoing dilution.

5                    **FOURTH CLAIM FOR RELIEF**

6                         **(Unjust Enrichment)**

7    124.    MGA repeats and realleges the allegations contained in paragraphs 1

8    through 123 of this Complaint and incorporates them by reference as though fully

9    and completely set forth herein.

10   125.    As a result of the conduct alleged herein, Mattel has been unjustly

11   enriched to MGA's detriment.  MGA seeks a worldwide accounting and

12   disgorgement of all ill-gotten gains and profits resulting from Mattel's inequitable

13   activities.

14

15                        **PRAYER FOR RELIEF**

16   WHEREFORE, MGA prays for relief, as follows:

17   1.    That Mattel, its agents, servants and employees and all persons acting

18   in concert be restrained preliminarily and permanently from directly or indirectly:

19        a.    using confusingly similar trade dress;

20        b.    improperly influencing, or attempting to improperly influence,

21             standard-setting and industry organizations;

22        c.    engaging in unfair competition and unfair business practices;

23             and

24        d.    diluting MGA's trade dress;

25   2.    For general and actual damages, according to proof at trial but

26   believed to reach or exceed tens of millions of dollars;

27   3.    For the disgorgement of all profits derived by Mattel for its acts of:

28        a.    false designation of origin or affiliation;

36

EXHIBIT 25
PAGE 364

1    b. unfair competition and unfair business practices; and

2    c. dilution;

3   4. For costs of suit and reasonable attorneys' fees;

4   5. For punitive and/or exemplary damages as a result of Mattel's willful

5 and malicious conduct to the extent allowable by law; and

6   6. For such other and further relief as the Court deems just and proper.

7

8 Dated:  April 13, 2005    PATRICIA GLASER

9               CHRISTENSEN, MILLER, FINK, JACOBS, GLASER, WEIL & SHAPIRO LLP

10

11              DALE M. CENDALI

               DIANA M. TORRES

12              PAULA E. AMBROSINI

               O'MELVENY & MYERS LLP

13

14

15            By:

16              Diana M. Torres

              Attorneys for Plaintiff

              MGA ENTERTAINMENT, INC.

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 25
PAGE 365

1

## DEMAND FOR JURY TRIAL

2

3        MGA hereby demands a jury trial on all triable issues.

4

5    Dated:        April 13, 2005              PATRICIA GLASER
                                              CHRISTENSEN, MILLER, FINK,
6                                             JACOBS, GLASER, WEIL &
                                              SHAPIRO LLP
7
                                              DALE M. CENDALI
8                                             DIANA M. TORRES
                                              PAULA E. AMBROSINI
9                                             O'MELVENY & MYERS LLP

10

11                                            By:
                                                 Diana M. Torres
12                                            Attorneys for Plaintiff
                                              MGA ENTERTAINMENT, INC.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

38

EXHIBIT 25
PAGE 366

EXHIBIT 26

1   Robert C. O'Brien (SBN 154372)
    ARENT FOX LLP
2   555 West Fifth Street, 48th Floor
    Los Angeles, CA 90013-1065
3   Telephone: 213.629.7400
    Facsimile: 213.629.7401
4   obrien.robert@arentfox.com

5   Discovery Master

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                          EASTERN DIVISION

11

12   CARTER BRYANT, an individual,        Case No. CV 04-09049 SGL (RNBx)

13                 Plaintiff,
                                          **Consolidated with**
14         v.                             **Case No. CV 04-09059**
                                          **Case No. CV 05-2727**
15   MATTEL, INC., a Delaware
     corporation,                         **PHASE II DISCOVERY MATTER**
16
                   Defendant.             **ORDER NO. 3, REGARDING:**
17
                                             **(1) MOTION OF MGA**
18                                           **ENTERRNTAINMENT, INC.,**
                                             **ISAAC LARIAN AND MGA**
19                                           **ENTERTAINMENT (HK)**
                                             **LIMITED TO QUASH**
20                                           **NON-PARTY SUBPOENAS; and**

21                                           **(2) MOTION OF MATTEL, INC.**
                                             **TO COMPEL PRODUCTION OF**
22                                           **DOCUMENTS RESPONSIVE TO**
                                             **THE SAME NON-PARTY**
23                                           **SUBPOENAS**

24   ┌─────────────────────────────────┐
25   │ CONSOLIDATED WITH               │
     │ MATTEL, INC. v. BRYANT and      │
26   │ MGZ ENTERTAINMENT, INC. v.      │
     │ MATTEL, INC.                    │
27   └─────────────────────────────────┘

28
                                    1                ORDER NO. 3
ARENT FOX LLP                              [Case No. CV 04-09049 SGL (RNBx)]
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT 24
PAGE 367

This Order sets forth the Discovery Master's ruling on: (1) the motion of MGA Entertainment, Inc., Isaac Larian, and MGA Entertainment (HK) Limited (collectively "MGA") to quash certain non-party subpoenas [Docket Number 4779] and (2) the corresponding motion of Mattel, Inc. ("Mattel") to compel production of documents responsive to the same non-party subpoenas [Docket Numbers 4769 and 4788] (collectively, the "Motions").

The Motions came on regularly for hearing before the Discovery Master on March 4, 2009. All interested parties were represented by counsel and afforded the opportunity to present oral argument on the Motions. The Discovery Master, having considered the papers filed in support of and in opposition to the Motions, and having heard oral argument thereon, rules as set forth below.

## I.   INTRODUCTION

### A.   The Court's February 11, 2009 Ruling

On February 11, 2009, the Court heard oral argument on various motions filed by the parties. During the proceedings, counsel took the opportunity to orally request clarification by the Court regarding whether the parties' respective motions relating to the subpoenas served by Mattel on various entities allegedly related to MGA (the "Subpoenas") are in any way stayed or precluded by any of the Court's prior orders.

In response, the Court stated: "I will instruct the Discovery Master this afternoon, in no uncertain terms, that there is no stay on any discovery related to this case at all." (Reporter's Transcript of Proceedings, February 11, 2009 ["Tr."], 99:8 – 10). Counsel for MGA then referred to the fact that the Court had previously declined to allow Mattel to serve certain discovery accompanying Mattel's motion for a receiver and characterized the third-party subpoenas as an attempt to circumvent the Court's ruling. (Tr., 101:12 – 17). In response, the Court stated:

> Then the question becomes – and this is a question for the Discovery Master, not for this Court – whether or not the discovery is related to Phase 2. If it is, it is. I'm not going to pass any judgment whatsoever. I'm going to leave that completely up to the Discovery Master. ... The question for the [D]iscovery [M]aster will be whether or not the disputed discovery request is related or relevant to the trial that has now been scheduled for March [2010] or not.

(Tr., 101:18 – 22; 103:1 – 3).

The Discovery Master understands the Court's ruling as indicating that, in deciding the motions relating to the Subpoenas, the Discovery Master should consider whether there is a nexus between the information sought by the Subpoenas, on the one hand, and the Phase 2 claims and counterclaims set for trial in March 2010, on the other hand. If the information sought by the Subpoenas is, to use the Court's words, "related to Phase 2" or "related or relevant to the [Phase 2] trial," then that information could potentially be the subject of appropriate discovery requests by Mattel.[1]

**B.    Information Sought By The Subpoenas**

The information sought by Mattel's Subpoenas falls into two broad categories. First, Mattel seeks documents from third parties Omni 808 Investors, LLC, OmniNet Capital, LLC and Vision Capital, LLC (collectively, the "Financing Entities") involving, among other things, their internal ownership and operations and their role in providing financing to MGA during the summer of 2008 (the

---

[1] Even prior to the Court's February 11, 2009 ruling, Mattel acknowledged that it had the burden of demonstrating a nexus between the information sought by the Subpoenas and the Phase 2 issues, as demonstrated by Mattel's inclusion of a section in its Motion to Compel summarizing the claims to be adjudicated in Phase 2, (Motion, pp. 5 – 8), and a section arguing that the information sought by the third-party subpoenas is relevant to Mattel's Phase 2 claims, (Id., pp. 18 - 24 and 24.– 25). However, Mattel also argued that the information sought might be appropriate regardless of any nexus to Phase 2. (See id., pp. 14 – 17 [arguing that MGA's prior statements regarding its finances in Phase 1 "opened the door" to discovery on this issue] and id., p. 23 [arguing that the information sought is relevant to MGA's credibility]). Based on the Court's subsequent ruling on February 11, 2009, as well as the Discovery Master's own independent evaluation of those arguments, the Discovery Master concludes, as discussed more fully below, that these arguments are insufficient, standing alone, to justify the non-party discovery Mattel seeks. Rather, Mattel must demonstrate some link between the information sought and the issues to be adjudicated by the Court at the Phase 2 trial.

EXHIBIT 2U
PAGE 369

1 "Financing Discovery"). Based on the information presented at the February 11,

2 2009 hearing and in connection with the pending motions, it does not appear that

3 either MGA Entertainment, Inc., MGA Entertainment (HK) Limited, or Larian have

4 an ownership interest in the Financing Entities.[2] (*See* Tr., 70:22 – 72:5; 78:9 -25).

5   Second, Mattel seeks documents from third parties IGWT Group, LLC and

6 IGWT 826 Investments, LLC (collectively, the "Transferee Entities") regarding

7 MGA's sale to them of infringing MGA inventory, namely Bratz dolls (the

8 "Transferee Discovery"). MGA does not dispute that the Transferee Entities are

9 owned and/or controlled by Larian. (*See, e.g.*, MGA's Reply in support of its

10 Motion to Quash, at p. 5, fn. 6, where MGA refers to the purchase of Bratz

11 inventory by the Transferee Entities as "Larian's purchase of those . . .

12 products . . . .").[3]

13 **II.** **MGA's Motion To Quash**

14   Because it could dispose of all outstanding discovery issues related to the

15 Subpoenas, the Discovery Master first addresses MGA's Motion to Quash filed on

16 February 3, 2009.

17   **A.** **Legal Standard**

18   As the party moving to quash the Subpoenas, MGA bears the burden of

19 satisfying the standard set forth in Rule 45(b), which provides that the court may

20 "quash or modify the subpoena if it is unreasonable and oppressive." (Fed. R. Civ.

21 P. 45(b); *see also Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir.

22 2004) ["The moving party has the burden of proof to demonstrate that compliance

23

24 [2] Of course, this is one of the facts Mattel seeks to investigate through the Subpoenas to the Financing Entities. The

25 Discovery Master's ruling denying Mattel's Motion to Compel the Financing Parties to comply with the Subpoenas does not address – and should not be construed as deciding – whether Mattel could, upon establishing a nexus to a legitimate Phase 2 issue, seek to obtain this information from MGA.

26 [3] Moreover, MGA does not dispute the assertions made by Mattel in its Motion to Compel at pp. 11– 12, including

27 that Larian created IGWT Group during the Phase 1 trial and registered its place of business as his home address, and that Larian created IGWT 826 Investments the day after the Phase 1 trial ended and registered it at the home address

28 of his sister.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 4 -

EXHIBIT *N*
PAGE 370

1   with the subpoena would be unreasonable and oppressive" (internal quotations

2   omitted)]; *Linder v. Department of Defense*, 133 F.3d 17, 24 (D.C. Cir. 1998) [The

3   burden of proving that a subpoena is oppressive is on the party moving to quash];

4   *Washington v. Thurgood Marshall Academy*, 230 F.R.D. 18, 21 (D.D.C. 2005) [the

5   burden is on the movant to establish that a subpoena duces tecum should be

6   quashed]). "The burden is particularly heavy to support a 'motion to quash as

7   contrasted to some more limited protection.'" (*Westinghouse Electric Corp. v. City*

8   *of Burlington*, 351 F.2d 762, 766 (D.C.Cir.1965) [denying a motion to quash

9   supported by two affidavits]).

10      **B.   Arguments Made By MGA In Support Of Its Motion To Quash**

11      The sole argument set forth in MGA's Motion to Quash is that the Court's

12   January 7, 2009 order appointing a forensic auditor bars Mattel from seeking the

13   information sought by the Subpoenas. (*See* MGA's Motion to Quash, pp. 1 - 6).

14   But that argument fails for the reasons set forth above. The Court made it clear at

15   the hearing on February 11, 2009 that:

16          There is no stay on discovery. Period. . . . . [The forensic auditor
17          appointed by the Court] is acting at the Court's discretion to
            inform the Court of information. . . . That's an entirely separate
18          matter. And I have not stayed any discovery and there should be
19          no reliance on that. If that was misunderstood, it's clarified now.

20   (Tr., 97:15, 98:8 - 9, and 98:13 - 15).

21      Recognizing that its only argument has been rejected by the Court, MGA

22   argues for the first time in its Reply that its Motion to Quash should be granted

23   because the Subpoenas are not relevant to any of Mattel's Phase 2 claims. (*See*

24   MGA's Reply Brief in Support of the Motion to Quash, pp. 1 and 5 - 12).

25   However, MGA did not make this argument in its opening brief. It instead declared

26   in its moving papers that whether the Subpoenas are related to any "Phase 2 issues

27   is beside the point." (*Id.*, p. 5). Because MGA did not address the relevance of the

28   subject discovery until the filing of its Reply, the Discovery Master declines to

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 5 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 20
PAGE 371

1    consider the argument in connection with the Motion to Quash.

2         The Discovery Master, like the Court,[4] disfavors the insertion of new

3    arguments at the reply stage that could have been raised in the moving papers.  A

4    party filing a motion is required to raise all of its arguments in its opening brief to

5    prevent "sandbagging" of the non-moving party and to provide opposing counsel

6    the chance to respond.  This rule is routinely adhered to by courts in the Ninth

7    Circuit. (*See, e.g., United States v. Boyce*, 148 F.Supp .2d 1069, 1085

8    (S.D.Cal.2001); *Leick v. Hartford Life and Acc. Ins. Co.,* 2007 WL 1847635 at *1,

9    n. 1 (E.D.Cal. 2007); *Stewart v. Wachowski*, 2004 WL 2980783, at *11 (C.D.Cal.

10   Sept. 28, 2004); *Hamilton v. Willms*, 2007 WL 2558615, *11 (E.D.Cal.2007); *see*

11   *also United States v. Cox*, 7 F.3d 1458, 1463 (9th Cir.1993); *United States v.*

12   *Wright*, 215 F.3d 1020, 1030 n. 3 (9th Cir.2000)).

13        Furthermore, MGA will not suffer any prejudice from this decision because

14   the issue it raised in its Reply (i.e., are the Subpoenas seeking information related to

15   any Phase 2 claims) has been fully briefed by the parties and is ruled upon by the

16   Discovery Master in connection with Mattel's Motion to Compel.[5]  (*See* Section III

17   below).

18        Accordingly, MGA's Motion to Quash is **DENIED**.

19   //

20   //

21   //

22   //

23

24   [4] In *Bryant v. Mattel, Inc.*, 573 F.Supp.2d 1254, 1273 n.7 (C.D. Cal. 2007), the Court noted that it "ordinarily would
     not consider" arguments made for the first time on reply but did so only "because [undertaking the analysis did] not
25   change [its] ultimate conclusion."

26   [5] That the arguments raised in the Reply are the same as those in MGA's Opposition to the Motion to Compel is
     conceded by Mattel. Indeed, Mattel admitted in its Request to Consolidate MGA's Motion to Quash and Motion to
27   Compel (which was denied as untimely by the Discovery Master at the hearing on March 4, 2009) that the "MGA
     Parties' Opposition to Mattel's Motion to Compel Production of Documents Responsive to Third Party Subpoenas
28   . . makes the same arguments as the MGA Parties' Reply in support of their Motion to Quash."  (Mattel's Request to
     Consolidate MGA's Motion to Quash and Mattel's Motion to Compel, p. 2).

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT  20
PAGE 372

III.   **Mattel's Motions To Compel**

    A.   **The Purported Procedural Defects Barring Mattel's Motions To Compel**

        MGA, the Financing Entities, and the Transferee Entities all argue that that Mattel's Motion to Compel should be denied on several different procedural grounds.

          1.   **The Court's January 7, 2009 Order**

        As an initial matter, the Transferee Entities and the Financing Entities repeat the argument made by MGA in its Motion to Quash that the Court's January 7, 2009 Order appointing a forensic auditor barred Mattel from seeking the discovery sought by the Subpoenas. (Financing Entities' Opposition to Mattel's Motion to Compel at p. 3; Transferee Entities' Opposition to Mattel's Motion to Compel at pp. 5 - 7). But that argument fares no better here than it did with respect to MGA's Motion to Quash and is rejected for the reasons discussed in Section II above.

          2.   **Local Rule 37**

        The Financing Entities and the Transferee Entities also argue that Mattel's Motion to Compel should be denied because Mattel failed to comply with Local Rule 37 by, among other things, failing to meet and confer and failing to file a joint stipulation. (Financing Entities' Opposition to Mattel's Motion to Compel, pp. 1 and 7 - 10; Transferee Entities' Opposition to Mattel's Motion to Compel, p. 2 [referencing Local Rule 37 in passing]). However, Local Rule 37 (as distinguished from Federal Rule 37, which is discussed in subsection 7a, below) does not apply to discovery disputes in this case. Rather, the applicable procedure is the one adopted by the Court in its order appointing a discovery master dated December 6, 2006 ("Discovery Master Order").[6] Because the Discovery Master Order provides that

---

[6] The Discovery Master Order is incorporated by reference into the Court's January 6, 2009 Order appointing a discovery master for Phase 2 of this litigation. (*See* Court's Order dated January 6, 2009, p. 2 ["The Discovery Master will serve under the terms and conditions of the Stipulation and Order dated December 6, 2006"]).

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 7 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 𝑛
PAGE 373

1    "all third parties subject to discovery requests . . . in this litigation shall be bound

2    by the terms of this Stipulation and Order," (Discovery Master Order, p. 6), that

3    order applies to the Financing Entities as well as the Transferee Entities, and its

4    procedures replace those set forth in Local Rule 37.  (*Id.*, p. 4).

### 3.    Local Rule 11-6 And Paragraph 4(b) Of The Court's Standing Order

7         The Financing Entities and MGA further argue that Mattel's Motion to

8    Compel should be denied because it exceeds the page limitations set forth in Local

9    Rule 11-6 and Paragraph 4(b) of the Court's Standing Order.  (*See* Financing

10   Entities' Opposition to Mattel's Motion to Compel, p. 9; MGA's Opposition to

11   Mattel's Motion to Compel, pp. 18 - 19).  Each of these contentions is unavailing.

12   The Discovery Master Order (not the Local Rules or the Court's Standing Order)

13   governs discovery disputes in this case, and it does not impose any page limit on

14   such motions.[7]  In fact, the Discovery Master Order dispenses with the formatting

15   requirements of the Local Rules in certain ways, such as allowing letter briefs, and

16   even permits the parties to agree to alternative procedures, including, presumably,

17   filing briefs that are more than 25 pages in length.  (*See* Discovery Master Order, p.

18   4).  Thus, while the Discovery Master encourages the parties to be as efficient as

19   possible in their briefing, he recognizes that briefs in excess of 25 pages are either

20   directly permitted under the Discovery Master Order (since no page limitation was

21   imposed by the Court) or implicitly allowed (since the parties may agree to

22   alternate procedures).  He further recognizes that the complex nature of this case

23   may periodically necessitate the filing of briefs that exceed 25 pages.[8]  For all of

---

[7] Even assuming the 25 page limitation for briefs did apply, Mattel had the option of filing separate motions to compel for each of the subpoenas at issue and could have easily extended the page limitation well beyond the 30 pages it filed in connection with its combined motion that addressed multiple subpoenas propounded on the Transferee Entities and the Financing Entities.

[8] In fact, the parties to this lawsuit have filed multiple discovery motions in this case that contained more than 25 pages.  (*See* Supplemental Declaration of Jon D. Corey in Support of Mattel, Inc.'s Reply in Response to The MGA Parties' Opposition to Motion to Compel, ¶ 7).

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

-8-

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 26
PAGE 374

1    these reasons, filings in excess of 25 pages are permitted.[9]

2         **4.     Local Rule 6-1**

3         The Financing Entities argue in passing that Mattel's motion to compel

4    should be denied because it violates Local Rule 6-1. (Financing Entities'

5    Opposition to Mattel's Motion to Compel, p. 6).     However, the Discovery Master

6    Order adopts a completely different set of deadlines than the Local Rules for the

7    filing of motions, oppositions and replies, and a different schedule for noticing

8    hearing dates. (Discovery Master Order, p. 4). Therefore, Local Rule 6-1 has no

9    applicability here.

10        **5.     Failure To Name MGA In The Motion To Compel**

11        MGA next argues that Mattel's motion to compel is procedurally improper

12   because MGA was not named in the Motion to Compel and Mattel should not be

13   allowed to respond to MGA's objections. (MGA's Opposition to Mattel's Motion

14   to Compel, p. 18). But MGA has cited no legal authority, and the Discovery

15   Master has found none, standing for the proposition that a party must name in its

16   motion to compel all parties who have objected to an underlying subpoena even if

17   they are not actually the target of the subpoena. In fact, the contention that Mattel's

18   Motion to Compel should have been brought against MGA makes no sense given

19   that it could not possibly comply with any order compelling a response to the

20   Subpoenas.

21        **6.     Mattel's Separate Statement**

22        MGA also contends that Mattel's Motion to Compel should be denied

23   because its' separate statement "is another classic example of . . . inefficiency."

24   (*Id.*, p. 19). Once again, nothing in the Discovery Master Order prevents a party

25   from filing a separate statement that first identifies the request in dispute and then

26

27   ───────────────────────
     [9] In the event the length of briefs ever becomes excessive, the Discovery Master will issue an order setting a specific
28   page limitation.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

                                   - 9 -              ORDER NO. 3
                                           [Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 11
PAGE 375

1   sets forth the various contentions of the parties, even if the information regarding

2   the various requests happens to be repetitive.  Regardless, MGA has not cited any

3   legal authority in support of its position and the Discovery Master finds no reason

4   to dispose of Mattel's Motion to Compel merely because it filed a separate

5   statement that contains duplicative arguments.[10]

6            **7.**    **Meeting And Conferring**

7        As their final procedural argument in opposition to the Motion to Compel,

8   the Transferee Entities and the Financing Entities assert that the motion should be

9   denied because Mattel failed to adequately meet and confer prior to filing the

10   motion. (Financing Entities' Opposition to Mattel's Motion to Compel, pp. 7 - 8;

11   Transferee Entities' Opposition to Mattel's Motion to Compel, pp. 2 - 5).

12            **a.**    **Applicable Procedure**

13        Prior to filing its motion to compel, Mattel had an obligation to comply with

14   both the Federal Rules of Civil Procedure and the Discovery Master Order.  Federal

15   Rule of Civil Procedure 37(a) expressly requires that a party filing a motion to

16   compel discovery first meet and confer in "good faith."  (Fed. R. Civ. Proc. 37(a)).

17   Similarly, the Discovery Master Order states that unless an "alternative procedure"

18   is agreed upon or otherwise ordered by the Discovery Master, the

19           moving party shall first identify each dispute, state the relief
20           sought, and identify the authority supporting the requested relief
              in a meet and confer letter that shall be served on all parties by
21           facsimile or electronic mail.  The parties shall have five court
              days from the date of service of that letter to conduct an in-person
22           conference to attempt to resolve the dispute.  If the dispute has
              not been resolved within five court days after such service, the
23           moving party may seek relief from the Discovery Master by
              formal motion or letter brief . . .

24   (Discovery Master Order, p. 4).

25   //

26

27

28

---

[10] The Discovery Master notes that where there are numerous discovery requests in dispute he would prefer for a separate statement to be submitted by the moving party.

EXHIBIT 76
PAGE 376

**b.    Mattel's Meet And Confer Regarding The Financing Entities**

In challenging Mattel's meet and confer effort, the Financing Entities first claim that Mattel violated the Discovery Master Order because no "in-person meeting occurred." (Financing Entities' Opposition to Mattel's Motion to Compel, p. 8). But that argument is without merit, since Mattel and the Financing Entities agreed to an alternative procedure that disposed of the in-person meet and confer requirement.[11]  Indeed, MGA's counsel sent counsel for Mattel, counsel for the Transferee Entities and counsel for the *Financing Entities* a letter on January 23, 2009 memorializing the parties' agreement and establishing a schedule whereby the parties would "meet and confer on January 29 and 30 . . ." (Mattel's Reply in Support of its Motion to Compel filed on February 13, 2009, pp. 9 - 10; Supplemental Declaration of Jon D. Corey in Support of Mattel's Reply to the Motion to Compel filed on February 13, 2009, ¶ 4 and Ex. 2).  That the Financing Entities' counsel received this letter and acted in accordance with its terms is evidenced by, among other things, the fact that they served objections to the Subpoenas on January 28, 2009 (which was the deadline specified in the January 23 letter) and started meeting and conferring with Mattel's counsel telephonically on January 30. (Financing Entities' Opposition to Mattel's Motion to Compel, pp. 3 and 4).  Accordingly, Mattel did not have any obligation to meet with the Financing Entities in person since the parties had agreed to waive that obligation.

Nevertheless, Mattel still had an obligation to meet and confer with the Financing Entities in good faith.  Good faith cannot be shown merely through perfunctory efforts; rather Federal Rule of Civil Procedure 37 mandates a genuine attempt to resolve the discovery dispute through non-judicial means. (Fed. R. Civ.

---

[11] To promote efficiency and minimize the necessity for counsel to travel between their respective offices, the Discovery Master shall deem Paragraph 5 of the Discovery Master Order (mandating that the parties have an in person conference to attempt to resolve discovery disputes) to be sufficiently satisfied if the parties and non-parties involved in a discovery dispute meet and confer telephonically or by video conference.  However, the Discovery Master emphasizes that this accommodation in no way lessens the parties' obligation to meet and confer in good faith.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 11 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 26
PAGE 377

1  Proc. 37(a)(1)).

2      Because the evidence and declarations submitted by Mattel and the Financing

3  Entities are in conflict regarding what transpired during their respective meet and

4  confer communications, (*Cf.* Financing Entities' Opposition to Mattel's Motion to

5  Compel, pp. 3 – 5; Mattel's Reply Brief in Support of its Motion to Compel filed on

6  February 13, 2009, pp. 9-10), the Discovery Master gives Mattel the benefit of the

7  doubt and concludes that it adequately met and conferred with respect to Omni 808

8  Investors, LLC and Vision Capital, LLC.

9      By contrast, Mattel arguably did not even begin the meet and confer process

10  with OmniNet Capital, LLC prior to filing its motion to compel, because counsel

11  for the Financing Entities informed Mattel that they did not receive that Subpoena

12  until the afternoon of February 2, 2009 and filed objections to the Subpoena on that

13  date. (Financing Entities' Opposition to Mattel's Motion to Compel at p. 5).  No

14  "good faith" meeting could therefore have taken place.

15      Although the meet and confer with respect to OmniNet Capital, LLC was

16  inadequate, the Discovery Master will nonetheless address the merits of Mattel's

17  Motion to Compel in all respects, including concerning the Subpoena served on

18  OmniNet Capital, LLC.  The Discovery Master does so for purposes of efficiency

19  (i.e., the issues to be decided regarding the subpoena served on OmniNet Capital,

20  LLC are essentially identical to those that must be addressed in connection with the

21  subpoenas served on Omni 808 Investors, LLC and Vision Capital, LLC) and

22  because addressing the merits of the motion does not alter the outcome.[12]

23             c.    **Mattel's Efforts To Meet And Confer Regarding The**

24                        **Transferee Entities**

25      Like the Financing Entities, the Transferee Entities contend that Mattel's

26  motion to compel should be denied because it did not meet and confer in good faith.

27

28  [12] As noted above, the parties are admonished to abide by the provisions of the Discovery Master Order requiring a good faith attempt to meet and confer regarding discovery disputes prior to the filing of any discovery motion.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 12 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 26
PAGE 378

1   (Transferee Entities' Opposition to Mattel's Motion to Compel, pp. 2 - 5). Yet, the

2   Transferee Entities concede that their counsel engaged in multiple meet and confer

3   teleconferences. (*Id.* at pp. 3 - 4). Several emails and letters were also exchanged

4   between the parties as part of the meet and confer process. (*Id.*). In light of these

5   interactions, the Discovery Master again gives Mattel the benefit of the doubt in

6   favor of resolving the issues on the merits and concludes that it adequately met and

7   conferred with the Transferee Entities.

8           **B.      Legal Standard Governing Enforcement Of The Subpoenas**

9           Federal Rule of Civil Procedure 26(b)(1) provides for discovery in civil

10   actions of "any matter, not privileged, which is relevant to the subject matter

11   involved . . .. The information sought need not be admissible at the trial if the

12   information sought appears reasonably calculated to lead to the discovery of

13   admissible evidence." Rule 26(b) is liberally interpreted to permit wide-ranging

14   discovery of all information reasonably calculated to lead to discovery

15   of admissible evidence; but the discoverable information need not be admissible at

16   the trial. (*Jones v. Commander, Kansas Army Ammunitions Plant*, 147 F.R.D. 248,

17   250 (D.Kan.1993)).

18           The broad scope of discovery described in subsection (b)(1) is tempered by

19   provisions protecting the responding party from undue burden. Rule 26(b)(2)

20   provides that the frequency or extent of discovery otherwise allowed by the Rules

21   must be limited if the court determines that "(i) the discovery sought is

22   unreasonably cumulative or duplicative, or is obtainable from some other source

23   that is more convenient, less burdensome, or less expensive; (ii) the party seeking

24   discovery has had ample opportunity by discovery in the action to obtain the

25   information sought; or (iii) the burden or expense of the proposed discovery

26   outweighs its likely benefit, taking into account the needs of the case, the amount in

27   controversy, the parties' resources, the importance of the issues at stake in the

28   litigation, and the importance of the proposed discovery in resolving the issues."

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES



EXHIBIT ___
PAGE 379

1    Moreover, the Federal Rules distinguish between discovery from non-parties

2    to a lawsuit (governed under Rule 45) and discovery from parties (governed

3    generally by Rule 26), based in part on the recognition that the former is inherently

4    more burdensome and less convenient than the latter.  (*See, e.g., Solarex v. Arco*

5    *Solar, Inc.*, 121 F.R.D. 163, 179 (E.D.N.Y. 1988) [The status of a non-party is

6    significant when determining whether compliance with a discovery demand would

7    constitute an undue burden]; *Katz v. Batvia Marine and Sporting Supplies, Inc.*, 984

8    F.2d 422, 424 (Fed. Cir. 1993) [The fact that discovery is sought from a non-party

9    is one factor that the Court may weigh in determining whether the discovery

10   requested is necessary, relevant, or burdensome].  Courts applying Rules 26 and 45

11   have interpreted these rules to afford non-parties special heightened protection

12   against burdensome discovery.  (*See, e.g., Exxon Shipping Co. v. U.S. Dept of*

13   *Interior*, 34 F.3d 774, 779 (9th Cir. 1994)).

14   Accordingly, requests for documents that pertain to a party and that can be

15   more easily and inexpensively obtained from that party also impose an undue

16   burden.  (*Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 638 (C.D. Cal. 2005)).

17   Further, if the documents sought are neither relevant nor calculated to lead to the

18   discovery of admissible evidence, "then any burden whatsoever imposed upon the

19   non-party would be by definition undue."  (*Compaq Computer Corp. v. Packard*

20   *Bell Electronics, Inc.*, 163 F.R.D. 329, 335-336 (N.D.Cal. 1995)).

21   Each of the moving parties bears the burden of establishing the basis for the

22   relief it seeks.  As the party moving to compel compliance with the Subpoenas,

23   Mattel bears the burden of "establishing that the information sought is relevant and

24   necessary to its lawsuit."  (*Cytodyne Technologies, Inc. v. Biogenic Technologies,*

25   *Inc.*, 216 F.R.D. 533, 534 (M.D.Fla. 2003)).

26   Finally, in deciding whether to enforce a subpoena, the Discovery Master

27   must balance "the relevance of the discovery sought, the requesting party's need,

28   and the potential hardship to the party subject to the subpoena."  (*Heat & Control,*

EXHIBIT _76_
PAGE _380_

1 | *Inc. v. Hester Industries, Inc.*, 785 F.2d 1017, 1024 (Fed.Cir.1986) citing

2 | *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 560, 564 (7th Cir.1984)).

3 |     **C.    Mattel's Contention That MGA Has Placed Its Finances At Issue**

4 |     As its first ground for moving to compel production of the documents sought

5 | by the Subpoenas, Mattel argues that MGA has misrepresented its finances, thereby

6 | making it necessary and appropriate for Mattel "to obtain an accurate understanding

7 | of MGA's and Larian's finances." (Motion to Compel, p. 14). According to

8 | Mattel, MGA's supposed misrepresentations have placed its financial condition at

9 | issue, and have opened the door to discovery of any information bearing on MGA's

10 | finances. (*Id.* ["Discovery on MGA's financials is amply warranted by MGA's

11 | own statements *alone*."] (emphasis added)).

12 |     However, after Mattel filed its Motion, the Court made it clear that the

13 | validity of the Subpoenas must be evaluated with reference to whether they relate to

14 | the matters to be adjudicated in Phase 2.   As the Discovery Master understands the

15 | Court's ruling, the Subpoenas cannot be justified merely because they seek

16 | information regarding some contention made during Phase 1, without regard to

17 | Phase 2. In other words, putting a fact at issue in Phase 1, cannot, standing alone,

18 | suffice to render that fact the proper subject of discovery in Phase 2.

19 |     Thus, to the extent Mattel's first argument asserts that MGA's statements,

20 | standing alone, warrant discovery from the Subpoena recipients, that argument is

21 | rejected.  Rather, the Discovery Master will evaluate whether discovery of MGA's

22 | finances is warranted in light of the issues to be adjudicated in Phase 2.

23 |     Further, even if Mattel were not required to demonstrate some nexus between

24 | the Subpoenas and the issues to be adjudicated in Phase 2, the argument that the

25 | Subpoenas are justified because MGA placed its financial condition at issue would

26 | still fail for the simple reason that Mattel is not seeking discovery from MGA but

27 | rather *non- parties*.  Mattel does not cite any statements or conduct by the

28 | //

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 15 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 71
PAGE 381

1    Financing Entities putting their financial affairs at issue in this litigation.[13]

2    Rather, Mattel argues that the statements and conduct of *MGA* should be attributed

3    to the Financing Entities and construed as their consent to discovery of their

4    internal financial affairs.  Such an assumption is unwarranted.

5        **D.**    **Mattel's Contention That The Subject Discovery Is Relevant To**

6                  **Phase 2**

7                **1.**    **Subpoenas To The Financing Entities**

8    Mattel next argues that the Subpoenas to the Financing Entities seek

9    information relevant to a variety of Phase 2 issues.[14]

10                   **a.**    **Mattel's RICO Counterclaim**

11   Mattel first asserts in its Motion to Compel that the discovery it seeks is

12   relevant to its RICO counterclaim because "Mattel alleges that the counter-

13   defendants have operated a widespread criminal enterprise that has engaged in

14   numerous acts of mail and wire fraud and other predicate acts in violation of the

15   RICO statute" and that "MGA's mid-trial transactions with Omni 808 and the other

16   non-operating entities" is "a continuation of that pattern of racketeering activity."

17   (Motion, p. 18).

18

19   [13] In its Reply to the Financing Entities' Opposition to its Motion to Compel, Mattel argues that the Financing Entities (referred to by Mattel as the "Omni Parties") have injected themselves into the litigation because one of

20   them, Omni 808 Investors, LLC, applied to intervene. (Reply, p. 8).  However, a decision on that application has been deferred by the Court, (Tr., 80:15 – 17), and therefore Omni 808 Investors, LLC and the other Financing

21   Entities remain outsiders to the litigation entitled to the heightened protection from discovery normally afforded non-parties.

22   [14] Mattel argues in one of its reply briefs filed on February 25, 2009 that the Discovery Master should strike MGA's

23   Opposition to the Motion to Compel because: (1) MGA indicated that it would not be filing an Opposition and (2) the Opposition was filed a week late.  (*See* Mattel's Reply in Response to MGA's Opposition to the Motion to

24   Compel, p. 4).  The Discovery Master declines that request.  The assertion that MGA would not file an Opposition is based on an alleged oral conversation which counsel for Mattel apparently did not confirm in writing.  (*See*

25   Supplemental Declaration of Jon D. Corey in Support of Mattel's Reply in Response to MGA's Opposition to the Motion to Compel, ¶ 4).  Even assuming such a statement had been made, MGA was entitled to change its mind.  As

26   for Mattel's argument that the Opposition was untimely, the Discovery Master notes that he was only recently appointed.  This fact combined with the backlog of discovery motions may have resulted in some confusion as to

27   when various briefs were due to be filed.  The Discovery Master prefers to address issues on the merits and declines to strike the Opposition as untimely.  Notwithstanding the foregoing, the Discovery Master urges the parties to

28   strictly comply with the briefing schedule set forth under the Discover Master Order for all future discovery motions unless an alternative procedure is agreed upon by the parties and approved by the Discovery Master or the Court.

EXHIBIT 24
PAGE 382

1    But Mattel's allegations in support of its RICO counterclaim turn on

2    misappropriation of trade secrets and confidential information, and make no

3    mention of improper transfers of funds or any other predicate act similar to MGA's

4    purported business transactions with any of the Financing Entities.[15]   Accordingly,

5    these financial transactions are not a "continuation" of the "pattern" of conduct

6    Mattel alleges in very precise detail in its RICO counterclaim.   (*Asdourian v.*

7    *Konstantin*, 77 F. Supp. 2d 349, 358 (E.D.N.Y. 1999) [cited by Mattel and stating

8    RICO claimant must show "[a]n interrelationship between acts, suggesting the

9    existence of a pattern, [which] may be established...[by] proof of their temporal

10    proximity, or common goals, or similarity of methods, or repetitions' (citation

11    omitted)]; *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238-39 (1989) [RICO claims

12    must be supported by a "pattern" of activity and "the mere fact that there are a

13    number of predicates is no guarantee that they fall into any arrangement or order.

14    A pattern is not formed by sporadic activity ... Instead, the term 'pattern' itself

15    requires the showing of a relationship between the predicates" (quotations and

16    internal citations omitted)]).

17    At this stage, Mattel has failed to demonstrate a relationship between the

18    predicate acts alleged by Mattel in its Counterclaims – which were bound together

19    by a purported scheme to misappropriate Mattel's trade secrets – and the

20    //

21    //

22    //

23    [15] *See* Mattel's Second Amended Answer and Counterclaims ("Counterclaims"), p. 55-62, ¶ 90 [alleging the MGA

24    Parties and other counter-defendants "for the purpose of executing and attempting to execute the scheme to improperly defraud Mattel and steal its trade secret or otherwise confidential and proprietary information" committed

25    various predicate acts], ¶ 91 [alleging the MGA Parties and other counter-defendants "shared the common purpose of enabling MGA to obtain confidential, proprietary and otherwise valuable Mattel property through improper means in

26    order to assist MGA in illegally competing with Mattel"], ¶ 92 [alleging the enterprises are continuing enterprises because they are "designed to and did unlawfully acquire the confidential business information and property of

27    Mattel and incorporated this information and property into MGA's ongoing business, marketing strategies and business methods, practices, and processes"], ¶ 93(a) [alleging mail fraud committed in furtherance of scheme to

28    "defraud Mattel of its confidential trade secret information and property"], ¶ 93(b) [alleging wire fraud "defraud Mattel of its confidential and trade secret information and property"], and ¶ 102 [the MGA Parties and other counter-defendants "schemed to defraud Mattel and steal its property and trade secret information"].

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 17 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT *26*
PAGE 383

1   transactions Mattel seeks to investigate here.[16]

2        Also, the RICO counterclaim (like the other counterclaims to be adjudicated

3   in Phase 2) was asserted in July, 2007 – more than a year before either Omni 808

4   Investors, LLC or Vision Capital, LLC came into existence – and therefore

5   apparently did not encompass the activities of those entities or the transactions

6   which are the subject of the Financing Discovery.  While that fact might be

7   overcome by a showing that the Financing Entities were created or used to further a

8   scheme to carry on misconduct that is the subject of Phase 2, Mattel did not

9   demonstrate that such is the case in its briefs and supporting evidence.

10       In sum, absent some argument or evidence demonstrating a nexus between

11  the predicate activities alleged in the RICO counterclaim, on the one hand, and the

12  transactions and other matters which are the subject of the Financing Discovery, on

13  the other hand, there has been no showing by Mattel that the Subpoenas to the

14  Financing Entities are reasonably calculated to lead to the discovery of admissible

15  evidence regarding the RICO counterclaim.

16            **b.    Mattel's Disgorgement Remedy**

17       Next, Mattel asserts that the Subpoenas to the Financing Entities seek

18  information relevant to its remedy of disgorgement, which is an available remedy

19  for Mattel's Phase 2 counterclaim for misappropriation of trade secrets.  Mattel

20  argues:

21

22  ─────────────

    [16] This conclusion is consistent with the case cited by Mattel – *Eastman Kodak Co. v. Camarata*, 238 F.R.D. 372

23  (W.D.N.Y. 2006).  There, the plaintiffs "asserted broad civil RICO claims against the Nicolo defendants predicated, among other violations, upon alleged money laundering violations.  Specifically, the Complaint alleges that the

24  Nicolo defendants and the other named defendants constituted an enterprise as defined in the RICO statute that was engaged in a pattern of racketeering activity, including mail and wire fraud and, more importantly for purposes of

25  this motion, money laundering." (*Id.*, at 375).  "The alleged money laundering consisted of repeated deposits into various financial institutions in order both to promote and carry on the unlawful activity – that is, by paying and

26  depositing kickbacks to certain members of the enterprise – and to conceal and attempt to conceal the proceeds, their nature, source and location – that is, by transferring funds between defendants and between various accounts

27  maintained by those defendants." (*Id.* [emphasis added]).  Thus, inquiry into the defendants' finances was appropriate as it was likely to reveal activity related to the alleged predicate acts.  Here, on the other hand, Mattel has

28  not alleged any sort of financial scheme which would support inquiry into the MGA Parties' financial transactions with third parties.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 18 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 24
PAGE 384

1   For purposes of establishing disgorgement, Mattel must take into
2   account money transferred from MGA and Isaac Larian,
    regardless of the manner in which it was transferred. Mattel is
3   entitled to discovery that shows all assets siphoned from MGA or
4   Isaac Larian . . . . By these subpoenas, Mattel seeks evidence to
    prove the amount the defendants must disgorge. Money that
5   properly belonged to Mattel was transferred from MGA or Isaac
6   Larian to an entity controlled by them.

7   (Motion, pp. 20:1 – 4, 21:12 – 14).

8       While the foregoing statements may be true as a general proposition, none of

9   the Financing Entities is alleged to have "received money that properly belonged to

10  Mattel." To the contrary, Mattel asserts that the Financing Entities are creditors of

11  MGA. Therefore, Mattel has not demonstrated how any of the categories of

12  documents sought from the Financing Entities would aid it in ascertaining the

13  amount defendants must disgorge.

14              c.     **Phase 2 Damages**

15      Mattel's third argument in favor of enforcement of the Subpoenas is that they

16  "seek documents relevant to MGA's financial condition" and other "factors

17  relevant to an award of punitive damages." (Motion to Compel, p. 21:19 – 22).

18  Depending on the particular scope of the document request, such discovery from

19  Omni 808 Investors, LLC may be appropriate in connection with Phase 2 because

20  any information evidencing MGA's indebtedness to Omni 808 Investors, LLC from

21  the purchase of the alleged Wachovia debt or direct loans to MGA is relevant to

22  MGA's net worth (and hence punitive damages).[17] As the Court noted in its

23  February 11, 2009 ruling:

24      I can see tremendous overlap between, for example, discovery on

25  ─────────────────────
    [17] The Discovery Master's analysis is fundamentally different for OmniNet Capital, LLC and Vision Capital, LLC
26  because neither entity is alleged by Mattel to be a creditor of MGA Entertainment, Inc. (Motion to Compel, pp. 9
    and 10). To the contrary, Mattel concedes that "OmniNet [Capital, LLC] is not the secured party, and thus
27  presumably not the actual debt purchaser/lender. Rather, the company holding the security interest is Omni 808
    [Investors, LLC] . . . [which] appears to be owned funded by a company called Vision Capital, LLC." (Id.) Because
    it admits that OmniNet Capital, LLC and Vision Capital, LLC are not creditors of MGA, Mattel has failed to show
28  that the information sought from those entities has any bearing on MGA's financial condition.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 19 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT **76**
PAGE **385**

1     financial condition of the company as it relates to damages in the
2     Phase 2 and also issues that the receiver is looking at. And without making a ruling on any of this, I would not suggest for a moment that these are mutually exclusive categories.

3 (Tr., 101:3 - 8)

4     Mattel argues that the necessary connection between the Financing

5 Discovery and Phase 2 damages exists because the Financing Entities have acquired

6 a security interest in MGA's assets, which, in turn, affects MGA's financial

7 condition. Specifically, Mattel argues that Omni 808 Investors, LLC is:

8
9     directly involved in providing funding to MGA in exchange for a security interest. Such funding, and security interests, are in and of themselves directly relevant to the financial condition of the
10     MGA Parties, including the amount of the security interests, the terms and conditions of the funding, and the rate of funding. . . .
11

12 (Motion to Compel, p. 22: 13 – 17).

13     The Discovery Master agrees that such limited information, as it relates to

14 the purchase by Omni 808 Investors, LLC of the debt obligation previously held by

15 Wachovia Bank, is reasonably calculated to lead to the discovery of admissible

16 evidence concerning Phase 2 issues, including the calculation of MGA's net worth

17 for purposes of calculating punitive damages.[18] Accordingly, Mattel's motion to

18 compel responses from Omni 808 Investors, LLC is granted with respect to

19 documents relating to (1) the existence of any debt owed by MGA Entertainment,

20 Inc. to Omni 808 Investors, LLC and (2) any communications between Omni 808

21 Investors, LLC and the MGA parties regarding any such indebtedness.

22     The problem, however, is the vast majority of the document requests set forth

23 in the Subpoena propounded on Omni 808 Investors, LLC are not narrowly tailored

24 to obtain information demonstrating the amount and nature of MGA's indebtedness

25 (and hence net worth) or communications regarding any such debt,[19] but instead

---

26 [18] During oral argument, counsel for MGA represented (and counsel for Mattel seemed to agree) that the Court
27 deferred discovery regarding the Wachovia debt until the middle of the Phase I trial. (Reporter's Transcript of Proceedings, March 4, 2009, pp. 72, 85 and 86). The extent to which that damages information was obtained directly from Wachovia, as opposed to MGA, is not clear from the record provided to the Discovery Master.
28

[19] Nor did Mattel move to compel MGA to produce this information in the first instance.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 20 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 76
PAGE 386

1   would require the Financing Entities to produce virtually every document in their

2   possession regarding their formation, operations, and history of transactions.

3   Among other things, the Subpoenas to the Financing Entities seek:

   •   All records that "substantiate transfers of assets" by the Financing
       Entities "to other entities, individuals, and/or parties, within the U.S.
       and outside of the U.S." (Exhibits 27-29 to Supplemental Declaration
       of Jon D. Corey In Support Of Mattel, Inc.'s Reply In Support Of
       Motion To Compel Production of Documents Responsive to Third-
       Party Subpoenas, Attachment A, ¶ 16);

   •   All documents "detailing or setting forth the relationship" between
       each of the Financing Entities and other non-parties (*Id.* at ¶¶ 6-10);

   •   All documents referring or relating to the "all contributions, loans and
       any sources of funding" for the Financing Entities (*Id.* at ¶ 13);

   •   All documents referring or relating to the "source of funding" of other
       non-parties (*Id.* at ¶ 16);

   •   All documents showing detail of "all loan facilities" referring or
       relating to the Financing Entities and other non-parties (*Id.* at ¶ 14);

   •   All documents referring or relating to "transactions involving any
       compensation, loans, advances, payments, fees or any other form of
       consideration" paid to other non-parties (*Id.* at ¶ 15);

   •   All "communications" referring or relating to the Financing Entities
       and other non-parties (*Id.* at ¶ 17).

23   Accordingly, the Discovery Master concludes that most of the categories of

24   documents in the Subpoenas are overbroad and not reasonably calculated to lead to

25   the discovery of admissible evidence with respect to Phase 2 issues, as detailed in

26   Section IV below (entitled "Disposition").

27   //

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 21 -

ORDER NO. 3
[Case No. CV 04-09049 SGL (RNBx)]

EXHIBIT 26
PAGE 387

### d.   Credibility Of MGA Witnesses

1       Mattel's fourth argument consists of a single, conclusory paragraph asserting that it is entitled to its discovery in order to determine the credibility of MGA's witnesses.  To support this argument, Mattel first states that information is discoverable "if it relates to 'the credibility of any witness.'"  (Motion to Compel, p. 23 (citing *Cable & Computer Tech., Inc. v. Lockheed Sanders, Inc.*, 175 F.R.D. 646, 650 (C.D. Cal. 1997)).[20]  Next, Mattel asserts that "MGA and Larian made statements under oath about their financial condition as well as about the role of Omni 808 and the other non-operating entities in providing MGA with additional funding."  (*Id.*)  But that is the full extent of Mattel's argument.  Mattel does not attempt to show that the specific discovery that it has propounded is reasonably calculated to lead to the discovery of the evidence that it contends would be admissible.

Discoverable information generally includes evidence relevant to the credibility of a party or a key witness.  (See *Paulsen v. Case Corp.*, 168 F.R.D. 285, 287-288 (C.D. Cal. 1996); see also *Ragge v. MCA/Universal Studios*, 165 F.R.D. 601, 603-604 (C.D. Cal. 1995); *U.S. v. City of Torrance*, 164 F.R.D. 493, 495 (C.D. Cal. 1995)).  If Mattel's discovery were reasonably calculated to lead to the discovery of such information, then it might be permissible.  (*Id.* ["Rule 26 is liberally interpreted to permit wide ranging discovery of all information reasonably calculated to lead to discovery of admissible evidence."])  But Mattel has not taken any steps to connect its discovery to such evidence.  As discussed above, Mattel bears the burden of demonstrating that its discovery is reasonably calculated to lead to the discovery of admissible evidence.  Here, Mattel has only stated that credibility evidence can be admissible and that credibility is at issue in this case – without referring at all to specific categories of documents in the Subpoenas or

---

[20] The Discovery Master notes that the case cited by Mattel does not actually discuss or apply this proposition.

EXHIBIT 20
PAGE 388

1   linking those categories of documents to prior or anticipated testimony of MGA's

2   witnesses. Simply stating that credibility evidence is discoverable does nothing

3   toward meeting Mattel's burden to demonstrate that the particular discovery at issue

4   here is reasonably calculated to lead to the discovery of such evidence.

5             e.   **MGA's Unclean Hands**

6        Mattel next argues in its Motion to Compel that MGA has asserted an

7   unclean hands defense in response to Mattel's Phase 2 claims, and consequently

8   Mattel is entitled to discover whether the MGA Parties are currently "engaging in

9   sham and fraudulent financial transactions such as concealing profits" to preclude

10  MGA "from invoking the unclean hands defense themselves." (Motion, pp. 23 -

11  24.) But this argument does not apply to the Financing Entities because, as

12  discussed above, Mattel does not claim that the Financing Entities have "received

13  money that properly belonged to Mattel" or otherwise used those entities to conceal

14  profits. To the contrary, Mattel asserts that the Financing Entities are creditors of

15  MGA.

16       Regardless, Mattel's theory is that, even if Mattel has unclean hands, MGA

17  may not assert that defense unless MGA itself is blameless. (*Id.*, at 24 [a "party

18  asserting an equitable defense, however, must itself have 'clean hands.'"]).

19  Mattel's statement of the law is correct as far as it goes. But, as the Ninth Circuit

20  has stated, "'unclean hands does not constitute 'misconduct in the abstract,

21  unrelated to the claim to which it is asserted as a defense.'" (*Jarrow Formulas, Inc.*

22  *v. Nutrition Now, Inc.*, 304 F.3d 829, 841 (9th Cir. 2002)). "It is fundamental to

23  [the] operation of the doctrine that the alleged misconduct . . . relate directly to the

24  transaction concerning which the complaint is made." (*Dollar Sys., Inc. v. Avcar*

25  *Leasing Sys., Inc.* 13 F.2d 165, 173 (9th Cir. 1989)). Accordingly, courts will not

26  allow discovery based on an unclean hands defense where the "allegations of

27  misconduct do not relate to the transactions... forming the basis for the

28  []complaint." "(*Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948, 952 (S.D.Cal.

EXHIBIT 24
PAGE 389

1  1996)).

2      Here, Mattel does not link any of the categories of documents referenced in

3  the Subpoenas (which involve the creation and operation of the Financing Entities

4  beginning with their formation in the summer of 2008) to any of the conduct at

5  issue in Phase 2 (which involves such matters as the alleged theft of trade secrets in

6  Mexico in 2004 and other conduct unrelated to the relationship between the

7  Financing Entities and MGA). Accordingly, the Financing Discovery is not

8  reasonably calculated to lead to the discovery of admissible evidence regarding

9  MGA's alleged unclean hands in connection with the matters to be adjudicated in

10  Phase 2.

11          **f.**    **Mattel's Unfair Competition Counterclaim**

12      As Mattel acknowledges, California's Unfair Competition Law, Business &

13  Professions Code §§ 17200 et seq. (the "Unfair Competition Law") encompasses

14  "'anti–competitive business practices as well as injuries to consumers, and has as a

15  major purpose the preservation of fair business competition.'" (Opp. at 24:25 –

16  25:2, quoting *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone*

17  *Co.* (1999) 20 Cal.4th 163, 180)). However, Mattel's papers do not sufficiently

18  demonstrate that the documents sought from the Financing Entities involve "anti-

19  competitive business practices," "injuries to consumers," or anything affecting

20  consumers or the public at all. Instead, Mattel simply asserts, without any

21  supporting analysis, that MGA has violated the Unfair Competition Law by

22  "manipulating the sources of [its own] funding" (presumably the Financing

23  Entities). That allegation, even if true, does not appear to involve the "unlawful,

24  unfair or fraudulent" marketing or sale of anything and therefore does not fall

25  within the ambit of the Unfair Competition Law.

26  //

27  //

28  //

EXHIBIT 7U
PAGE 400