MELINDA HAAG (State Bar No. 132612)
mhaag@orrick.com
ANNETTE L. HURST (State Bar No. 148738)
ahurst@orrick.com
WARRINGTON S. PARKER III (State Bar No. 148003)
wparker@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105-2669
Tel: (415) 773-5700/Fax: (415) 773-5759

WILLIAM A. MOLINSKI (State Bar No. 145186)
wmolinski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA  90017
Tel. (213) 629-2020/Fax: (213) 612-2499

THOMAS S. MCCONVILLE (State Bar No. 155905)
tmcconville@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
4 Park Plaza, Suite 1600
Irvine, CA 92614-2258
Tel: (949) 567-6700/Fax: (949) 567-6710

Attorneys for MGA Parties

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>v.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS.<br><br>**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER** | Case No. CV 04-9049-DOC (RNBx)<br><br>Consolidated with: Case No. CV 04-9059 and Case No. CV 05-2727<br><br>**MOTIONS TO VACATE RECALL PROVISIONS OF INJUNCTION, OR, IN THE ALTERNATIVE TO CLARIFY AND/OR MODIFY SUCH RECALL PROVISIONS; MOTION TO CLARIFY AND/OR LIMIT MONITOR'S AUTHORITY AS AN ADJUDICATIVE OFFICER OF THE COURT**<br><br>Date:        November 9, 2009<br>Time:        8:30 a.m.<br>Courtroom: 9D (Hon. David O. Carter)<br><br>[Declarations of Ninette Pembleton, Larry Falcon, Jason Russell, Annette Hurst filed concurrently] |

1  **NOTICE OF MOTIONS AND MOTIONS**

2  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3        PLEASE TAKE NOTICE that on November 9, 2009 at 8:30 a.m., before the

4  Honorable David O. Carter, United States District Court for the Central District of

5  California, Southern Division, 411 West Fourth Street, Santa Ana, California

6  92701-4516, Counter-Defendants MGA Entertainment, Inc., MGA Entertainment

7  HK Ltd., and Isaac Larian (collectively "MGA Defendants" or "MGA"), will, and

8  hereby do, move pursuant to Federal Rule of Civil Procedure 62 to vacate, or, in the

9  alternative, to clarify and/or modify the recall provisions of the Court's

10  interlocutory injunction dated December 3, 2008, as subsequently modified.  The

11  MGA Defendants also move for an order clarifying the scope of the Monitor's

12  authority with respect to adjudicative procedures.

13        <u>Motion to Vacate</u>

14        On September 28, 2009, Mattel admitted for the first time that it will not

15  have Bratz products on the shelf prior to at least ███████.  Also recently, the

16  Ninth Circuit has for the first time made clear that a heightened standard for

17  mandatory injunctions ordering recalls in intellectual property cases applies in this

18  Circuit.  In light of Mattel's concession that it will not have product on the retail

19  shelves until ███████ at the soonest, it is apparent that the recall is no longer

20  appropriate from any perspective.  There is no public safety issue.  The recall will

21  be of no benefit to Mattel where MGA will stop selling product this Fall pursuant to

22  the prohibitory injunction, where, based on historical sales patterns, retailers are

23  likely to sell most of the remaining inventory through to customers during the

24  fourth quarter, and where Mattel will not be in a position to place any Bratz product

25  of its own into the retail marketplace until ███████, at the very earliest.  In

26  contrast, the economic burden of the recall to MGA will be enormous.

27  Accordingly, the heightened standards required by the Ninth Circuit cannot be met

28  here to justify the recall order in this case.

Alternative Motion to Clarify and/or Modify

If the recall provisions are not vacated in their entirety, then MGA moves in the alternative to clarify and/or modify the recall provisions in the following respects.  The necessity for these clarifications and/or modifications has arisen because the Court-appointed Monitor has expressed views concerning the required scope of the recall provisions which MGA demonstrates herein are not warranted by the order, particularly in light of background law.  Since the Monitor has supervisory authority over MGA, the issues must be addressed by the Court so that MGA does not bear an unwarranted and unnecessary risk of contempt.  MGA comes to the Court with the completely above-board goal of seeking permission first, rather than forgiveness later, so that it is not caught in an untenable Catch-22 situation.

First, MGA seeks an order confirming that it is not required to "sweep the shelves" of retailers for Bratz products.  Such a requirement would be inconsistent with the text of the order and also with law, since the recall order cannot bind non-parties.  Requiring MGA to do this would be an extreme economic burden that makes absolutely no sense, particularly in light of Mattel's planned timing for the introduction of its Bratz product for no sooner than ▮▮▮▮▮▮

Second, MGA seeks an order confirming that the recall is not extraterritorial in effect because extraterritorial injunctive orders are not authorized under the United States Copyright Act (17 U.S.C. §§ 502, 503) and violate notions of international comity and sovereignty.  No reported case has ever authorized an extraterritorial recall order and the only reported case addressing the issue (upon which the Court previously relied in issuing its recall order) specifically declined to do so.

Third, MGA seeks modification as to certain timing and other requirements of the recall provisions.  In light of Mattel's damages award through July 1, 2008, MGA requests that the Court confirm that the recall notices need not be directed to

- 2 -

1    purchasers who purchased product only prior to that date, so that MGA may avoid

2    the prospect of a punitive double recovery.  Additionally, MGA requests a variety

3    of other minor modifications to the terms of the Order necessitated by the year-long

4    stay and modifications, in order to conform the order to present circumstances.

5              Motion to Clarify and/or Modify Monitor's Authority as an Adjudicative

6    Officer of the Court

7              Finally, MGA seeks confirmation, as expressed by the Monitor, that he is not

8    a Special Master pursuant to paragraphs 10-13 of the injunction, that such

9    provisions should therefore be deleted, and that he does not wield adjudicative

10   power pursuant to Rule 53 of the Federal Rules of Civil Procedure.

11             These Motions are based on this Notice of Motions and Motions, the

12   accompanying Memorandum of Points and Authorities, the Declarations of Ninette

13   Pembleton, Larry Falcon, Jason Russell, and Annette Hurst filed concurrently, the

14   records and files of this Court specified herein, and all further pleadings and papers

15   and argument presented prior to or at the hearing of these Motions.

16                        **Certificate of Compliance**

17             MGA met with the Monitor regarding the issues set forth herein as detailed in

18   the declaration of Jason Russell, including discussing some of the issues in the

19   presence of counsel for Mattel.  MGA sent a detailed letter to the Monitor raising

20   its concerns, as also identified in the declaration of Jason Russell.  MGA discussed

21   the issues raised herein with counsel for Mattel prior to filing the Motion.  Hurst

22   Decl. ¶ 64.  As set out in the accompanying Ex Parte Application, given the

23   exigencies of timing associated with the implementation of the recall orders and the

24   Monitor's recently expressed concern regarding the potential scope of the orders,

25   these Motions were necessary prior to the expiration of the period provided for

26   meet and confer under Local Rule 7-3 so that MGA can confirm the scope of the

27   order with which it must comply ██████████████████████████

28   ████████████████████████████████████

MOTION TO VACATE OR MODIFY RECALL ORDER
CV 04-9049 DOC (RNBx)

1

2      Dated:  October 19, 2009         ORRICK, HERRINGTON & SUTCLIFFE LLP

3

4                           By: _____

5                                    Annette L. Hurst
                                 Attorneys for MGA Parties

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................... 1

STATEMENT OF FACTS .................................................................................. 4

    A.    Procedural Background Of The Consolidated Cases ........................... 4

    B.    Facts Pertinent To The Phase 1 Proceedings. ..................................... 5

    C.    The December 3, 2008 Orders And Subsequent Stays And Modifications Thereof .............................................................................. 8

    D.    Mattel's Failure To Exploit Bratz In Early 2010 .............................. 11

    E.    MGA's Recall Plan ............................................................................. 13

ARGUMENT ..................................................................................................... 13

I.    CHANGES IN THE LAW AND FACTS WARRANT VACATING THE RECALL ORDER ................................................................................ 13

    A.    The Ninth Circuit Recently Articulated A New Standard For Recall Orders In IP Cases ................................................................. 14

    B.    The Marlyn Factors Cannot Justify A Recall Here .......................... 16

        1.    There Is No Risk of Danger to the Public ............................... 16

        2.    The Willfulness Factor Does Not Justify A Recall ................. 17

        3.    The Burdens Of The Recall Are Far Greater Than The Benefit to Mattel ................................................................... 17

II.    IF NOT VACATED, THE COPYRIGHT RECALL ORDER SHOULD BE CLARIFIED AND/OR MODIFIED ...................................... 19

    A.    The Order Does Not Require MGA To "Sweep The Shelves." ......... 19

    B.    The Court Should Confirm That No Foreign Recall Is Required ...... 22

    C.    Clarification And Modification Is Needed To Address Timing Requirements ..................................................................................... 23

        1.    MGA Should Not Be Required To Send Recall Notices For Sales Prior To July 1, 2008 On Which Mattel Was Already Awarded Damages ...................................................... 23

        2.    The Deadlines Should Be Conformed To Present Circumstances In Light Of The Stays And Modifications ...... 24

III.    THE COURT SHOULD CONFIRM THAT THE MONITOR DOES NOT WIELD ADJUDICATIVE POWERS ............................................... 24

CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Amoco Prod. Co. v. Village of Gambell*,
    480 U.S. 531 (1987)....................................................... 16

*Benham Jewelry Corp. v. Aron Basha Corp.*,
    1997 WL 639037 (S.D.N.Y. Oct. 14, 1997)......................... 20

*Bosley Med. Inst. v. Kremer*,
    403 F.3d 672 (9th Cir. 2005) .......................................... 17

*Burndy Corp. v. Teledyne Industries, Inc.*,
    584 F. Supp. 656 (D. Conn. 1984).................................... 16

*CyberMedia, Inc. v. Symantec Corp.*,
    19 F. Supp. 2d 1070 (N.D. Cal. 1998)......................... 3, 10, 22

*Danjaq LLC v. Sony Corp.*,
    1998 WL 957033 (C.D. Cal. 1998) ................................... 22

*eBay, Inc. v. MercExch., LLC*,
    547 U.S. at 388 (2006).................................................. 15

*EEOC v. Arabian Am. Oil Co.*,
    499 U.S. 244 (1991)..................................................... 22

*Granville v. Suckafree Records, Inc.*,
    2006 WL 2520909 (S.D. Tex. June 28, 2006) ..................... 18

*Gucci Am., Inc. v. Daffy's, Inc.*,
    354 F.3d 228 (3d Cir. 2003)...................................... 15, 18

*Jack Lenor Larsen, Inc. v. Dakotah, Inc.*,
    452 F. Supp. 99 (S.D.N.Y. 1978) .................................... 18

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
    571 F.3d 873 (9th Cir. July 2, 2009)................... 2, 11, 14, 15, 16, 17

*Merit Diamond Corp. v. Frederick Goldman, Inc.*,
    376 F. Supp. 2d 517 (S.D.N.Y. 2005) ............................... 20

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
    518 F. Supp. 2d 1197 (C.D. Cal. 2007) ............................. 16

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) ..................................................... 15

*Momento, Inc. v. Seccion Amarilla USA*,
    2009 WL 1974798 (N.D. Cal. July 8, 2009)........................ 16

# TABLE OF AUTHORITIES
## (continued)

Page

*Natural Resources Defense Council v. Southwest Marine Inc.*,
   242 F.3d 1163 (9th Cir. 2001) ............................................................ 14

*Perfect Fit Indus., Inc. v. Acme Quilting Co.*,
   646 F.2d 800 (2d Cir. 1981).................................................... 17, 20

*Peter Letterese and Assocs. v. World Institute of Scientology Enterps.*,
   533 F.3d 1287 (11th Cir. 2008) ..................................................... 16

*Playskool, Inc. v. Product Development Group, Inc.*,
   699 F. Supp. 1056 (E.D.N.Y. 1988) ................................................ 16

*Primavera Labs., Inc. v. Elizabeth Arden Co.*,
   1993 WL 319214 (S.D.N.Y. Aug. 13, 1993)................................. 19

*Reno Air Racing Ass'n, Inc. v. McCord*,
   452 F.3d 1126 (9th Cir. 2006) ......................................................... 16

*Sierra Club v. Penfold*,
   857 F.2d 1307 (9th Cir. 1988) ........................................................ 16

*Societe Civile Succession Richard Guino v. Int'l Found. for Anticancer Drug Discovery*,
   460 F. Supp. 2d 1105 (D. Ariz. 2006) .............................. 3, 20, 21

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984)........................................................................... 15

*Stanley v. Univ. of S. California*,
   13 F.3d 1313 (9th Cir. 1994) .......................................................... 14

*Subafilms, Ltd. v. MGM-Pathe Comm'cs Co.*,
   24 F.3d 1088 (9th Cir. 1994) ..................................................... 3, 22

# FEDERAL STATUTES

17 U.S.C. § 502  ............................................................... 2, 9, 22

17 U.S.C. § 502(a)............................................................... 14

17 U.S.C. § 503 ................................................................... 2

17 U.S.C. § 503(a).............................................................. 14

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION AND SUMMARY OF ARGUMENT

Carter Bryant, a former Mattel employee, had an idea for a doll which he shared with MGA and then was hired to create and bring to market. On the basis of a boilerplate contract, Mattel claimed to exclusively own the idea for the name of that doll—Bratz—and the copyright in Bryant's drawings of that doll. The Court accepted this view, and then, based on a finding that certain of MGA's Bratz dolls were substantially similar to those drawings, on December 3, 2008, the Court granted three injunctive orders. Those orders required MGA to transfer certain Bratz trademarks and copyrights to Mattel, enjoined MGA under the Copyright Act from further exploitation of those copyrights, and, under Section 17200 of the Business and Professions Code, enjoined MGA from further exploitation of the trademarks. In the meantime, the Court issued a stay and several modifications to the injunctive orders, appointed a Monitor to supervise the accounting of profits, and MGA appealed the injunctive orders. The appeal was expedited and ordered calendared before the next available panel, and we expect argument in either December 2009 or January 2010.

The copyright injunction contains provisions requiring MGA to recall infringing Bratz products. Originally, the injunction required an immediate recall, but, in orders dated January 7, April 27, and May 21, 2009, the Court postponed the recall to take effect until January 21, 2010. MGA has been planning carefully for that process and has engaged an expert vendor to assist it in conducting the recall. As part of that planning process, several issues have arisen that necessitate Court intervention. Accordingly, MGA brings these motions to vacate, or, in the alternative, clarify and/or modify the Court's recall order. These motions are brought irrespective of the outcome on appeal—in other words, MGA accepts the correctness of the injunctive orders for purposes of these Motions, but respectfully sets forth herein why it nonetheless is entitled to the requested relief.

1      ***Motion to Vacate.*** At the end of September 2009, Mattel admitted that it will

2 not have Bratz product on retail shelves prior to ███████ at the soonest. A recall

3 in January therefore serves no good purpose, will harm the Bratz brand as shelves

4 sit empty for a quarter, and will cost MGA millions of dollars to no benefit of

5 Mattel. From any practical perspective, a recall under such conditions makes no

6 sense. Meanwhile, since the Court first issued its injunctive orders, the Ninth

7 Circuit adopted a new, heightened standard for recall orders in intellectual property

8 cases. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873,

9 879 (9th Cir. July 2, 2009). That heightened standard requires the Court to consider

10 with respect to a recall order several factors that, for obvious reasons, were never

11 considered in this case. Once those additional factors are considered in light of

12 Mattel's recent timing concession, it is apparent that the recall order can no longer

13 be justified even assuming that copyright infringement occurred. MGA therefore

14 respectfully seeks to have the recall order vacated. Part I, *infra*.

15      ***Alternative Motion to Clarify/Modify.*** Alternatively, if the Court does not

16 vacate the recall provisions, MGA respectfully requests that they be clarified and/or

17 modified. There are three key issues to be addressed in the alternative motion:

18 whether MGA must "sweep the shelves" of product, whether it must do so on a

19 "worldwide" basis, and what are the timing requirements applicable to the recall in

20 light of the Court's subsequent stay and modification to the original injunctive

21 orders.

22      As part of the Monitor's supervision of the recall planning process, the

23 Monitor has expressed certain views regarding the scope of the required recall

24 under the Court's order: namely, that MGA is required to (1) "sweep the shelves"

25 of Bratz product, and (2) that it must do so on a "worldwide" basis. The Monitor

26 has indicated that the recall provisions of the injunction might require the MGA

27 Defendants to physically go out and remove Bratz dolls from the shelves of retailers

28 and distributors all over the world. Because the Monitor, who has court-appointed

1  supervisory authority over MGA, has expressed these views which MGA

2  respectfully believes are legally incorrect, without this Court's guidance, MGA

3  faces an unacceptable risk of contempt on the one hand, or being forced to adopt an

4  unjustified interpretation of the order on the other.  Accordingly, MGA presents

5  herein its alternative motion for clarification and/or modification.

6      ***Sweep the Shelves***.  The recall order requires MGA to notify its channels of

7  trade of the recall and pay for shipping and refunds.  A requirement to sweep the

8  shelves—that is, physically go and obtain the product—would be inconsistent with

9  this language and the entire structure of the recall contemplated by the order.  It

10  would also be inconsistent with many legal requirements, including due process.

11  *Societe Civile Succession Richard Guino v. Int'l Found. for Anticancer Drug*

12  *Discovery*, 460 F. Supp. 2d 1105, 1112-13 (D. Ariz. 2006).  The order does not

13  require MGA to sweep the shelves, and the Court should so confirm.  Part II(A),

14  *infra*.

15      ***Extraterritoriality.***  Copyright laws are territorial.  They do not authorize

16  extraterritorial injunctive relief, a fact noted by the Ninth Circuit en banc,

17  *Subafilms, Ltd. v. MGM-Pathe Comm'cs Co.*, 24 F.3d 1088, 1095 (9th Cir. 1994),

18  and in the case relied upon by Judge Larson in adopting the original recall

19  provisions.  *CyberMedia, Inc. v. Symantec Corp.*, 19 F.Supp.2d 1070, 1079 (N.D.

20  Cal. 1998) (declining to order extraterritorial recall).  And, in contrast to the

21  constructive trust orders, which by their terms apply "anywhere in the world," the

22  recall order has no geographic reference other than a shipment destination within

23  this District.  The Court should confirm that the order does not require a worldwide

24  recall.  Part II(B), *infra*.

25      ***Timing.***  As noted above, there have been various modifications to the

26  injunction orders since they were issued.  The deadlines set forth in the order no

27  longer make sense in light of the stay and modifications.  MGA therefore seeks a

28  variety of changes to the timing requirements as set forth in the accompanying

[Proposed] Order, the most significant of which is to limit the requirement to send the recall notices to purchasers since July 1, 2008, rather than everyone who has ever purchased Bratz product in the eight years since its introduction.  Mattel has been awarded damages for all sales occurring prior to that date, so requiring a recall of earlier product (even assuming there is any still in the channels of distribution) would result in a double recovery and would be punitive to MGA.  Part II(C), *infra*.

   ***Motion to Limit Monitor's Authority.***  Finally, the injunctive orders originally contemplated the appointment of a Special Master, but that never occurred.  The Monitor is presently holding hearings, taking evidence and making findings, but, as he acknowledges, he is not a Special Master.  MGA requests that the Court clarify that the Court Monitor is not a Special Master appointed pursuant to Federal Rule of Civil Procedure 53, and asks that the Court remove those paragraphs of the injunction calling for the appointment of a Special Master and confirm that the Monitor is not an adjudicative officer of the Court entitled to hold trials.

## STATEMENT OF FACTS

### A.  Procedural Background Of The Consolidated Cases.

   Mattel initiated these consolidated cases on April 27, 2004 by filing a complaint in Los Angeles County Superior Court against its former employee and creator of the BRATZ dolls concept, Carter Bryant.  Case No. 2:04-cv-09059 Docket #1.  Since then, MGA intervened in the original suit, 09059 Dkt. # 36, and filed its own suit alleging trade dress infringement and unfair competition concerning Bratz and several other products.  2:05-cv-02727 Dkt. # 1.  Mattel filed counterclaims in MGA's suit, which it has amended several times.  2:04-cv-09049 Dkt. # 142, 143, 5565.  Mattel's Motion for Leave to File Fourth Amended Answer and Counterclaims is pending, but is not fully briefed and has not been set for hearing since reassignment of these consolidated cases.  Dkt. # 6311.[1]

---

[1] A fuller recitation of the procedural history can be found at Dkt. ## 6375, 6778.

The consolidated case were bifurcated. Phase 1 has been tried and is the subject of an appeal. *See* Notice of Lodging of Ninth Circuit Briefs. The Phase 2 Proceedings consist of Plaintiff MGA's trade dress infringement and unfair competition claims pending since 2005, and the remainder of Defendant and Counter-claimant Mattel's counterclaims (primarily trade secret misappropriation and civil RICO) that were not tried in Phase 1.

## B.   Facts Pertinent To The Phase 1 Proceedings.

The Phase 1 proceedings concerned Mattel's claims that it owned Carter Bryant's work product under his Inventions Agreement with Mattel, that MGA had improperly interfered with that contractual interest, and that MGA infringed Mattel's copyrights therein. A summary of the most pertinent evidence concerning those issues as pertains to the injunctive orders that are the subject of the present Motions is set forth below.

***MGA Develops Bratz.*** Carter Bryant approached MGA in August 2000 through a mutual acquaintance. Hurst Decl. Ex. 1 at 11. At the time, Bryant was a low-level "fashion designer" at Mattel—an at-will employee. His job was to design clothes and accessories for Barbie Collectibles, a line of higher-end dolls for the discriminating adult collector. *Id.* Ex. 2 at 14, 20; Ex. 3 at 24; Ex. 4 at 28.

In late August 2000, Bryant met with MGA product manager Paula Garcia and licensing head Victoria O'Connor to pitch a concept for a new line of fashion dolls. *Id.* Ex. 1 at 9, 11; Ex. 4 at 29; Ex. 6 at 39-41. He showed them sketches and descriptions of four edgy, hip, multiethnic dolls called "Bratz." The MGA executives scheduled a follow-up pitch with MGA president Isaac Larian, which occurred on September 1, 2000. *Id.* Ex. 6 at 42-44. Larian was enthusiastic. *Id.* Ex. 6 at 46-47.

Conversation immediately turned to verifying that Bryant had full rights to the Bratz sketches and concept. *Id.* Ex. 6 at 44; Ex. 8 at 53. Larian "asked … are these something that you came up with on your own and … on your own time." *Id.*

MOTION TO VACATE OR MODIFY RECALL ORDER
CV 04-9049 DOC (RNBx)

Ex. 6 at 44.  Bryant assured Larian and the other MGA personnel that they were. *Id.* Ex. 8 at 54.  Bryant explained that "he did [the drawings] in 1998," before taking his current job at Mattel, while he was freelancing back home in Missouri. *Id.* Ex. 8 at 54-55.  MGA's attorney David Rosenbaum confirmed the 1998 conception date for Bratz with Bryant's attorney. *Id.* Ex. 60.  MGA insisted on, and Bryant made, a contractual warranty that Bryant was not violating any contractual obligation by conveying the drawings to MGA.  *Id.* Ex. 9 at 56-57.  Bryant signed the contract with MGA on October 4, 2000, just one month after meeting with Larian. *Id.* Ex. 3 at 25; Ex. 9 at 61.[2]

MGA took Bryant's idea and "ran with it," just as Bryant said it should do. *Id.* Ex. 12 at 71.  MGA changed the age, the body structure, the head shape, the facial features, the ears, nose, eyes, lips, face color and hair.  *Id.* Ex. 16 at 86-102; Ex. 17 at 105-09B; Ex. 18 at 112-22.  MGA also registered the Bratz trademark, which required it to secure rights from another.  *Id.* Ex. 19 at 125; Dkt. # 4309 (Req. for Judicial Notice) at 1-33.  In June 2001, more than half a year after Bryant began working for MGA, the first generation of Bratz dolls, four girls named Yasmin (after CEO Larian's daughter), Cloe, Jade, and Sasha, hit the U.S. market. Hurst Decl. Ex. 13 at 74.

Bratz had a modest start.  *Id.* Ex. 20.  But with perseverance, great energy, and more investment in marketing, it became a blockbuster.  *Id.* Ex. 8 at 54A. MGA added more characters to the Bratz line each year, including under the Bratz moniker, a line of "Bratz Boyz" and of younger dolls, including "L'il Bratz," "Bratz Kidz," "Itsy Bitsy Bratz," and "Bratz Babyz."  *Id.* Ex. 13 at 74-75; Ex. 21 at 129-33.  MGA complemented the dolls with a universe of accessories of all sorts, from clothes to furniture to cars—some 14,000 in all; none bearing any relationship

---

[2] Larian insisted that Bryant quit his job at Mattel the moment he signed and work fulltime on Bratz.  Hurst Decl. Ex. 10 at 63; Ex. 11 at 65-68.  Bryant assured Larian he would.  *Id.* Ex. 1 at 9-10; Ex. 11 at 68.  Instead, that day he gave Mattel the standard two weeks' notice and continued to work at Mattel until October 19.  *Id.* Ex. 3 at 25A.

1    to Bryant's original drawings and sculpt. *Id.* Ex. 14 at 78-79; Ex. 15 at 82-83; Ex.

2    22 at 135.

3        ***Mattel Sues.*** As Bratz thrived, Mattel panicked. Despondent Mattel

4    executives confessed, "We have been out-thought and out-executed." Dkt. # 3172

5    (Proctor Decl. ISO Motions In Limine) at 2742. Mattel resorted to a plan to "kill

6    BRATZ." *Id.* at 2747. In the words of one Mattel executive, "[o]ne of the

7    strategies for trying to defeat Bratz was to litigate them to death." Dkt. # 2499

8    (Russell Decl. ISO Summary Judgment) at 311.[3]

9        The crux of Mattel's suit is that it owns Bryant's drawings and MGA's

10    original sculpt and the idea for the name "Bratz"—because Bryant was a Mattel

11    employee when he developed them. Dkt. # 143 (Mattel Counterclaims); Dkt. # 635

12    (Mattel's Second Am. Counterclaims). Mattel based these ownership claims on an

13    "Inventions Agreement," a pre-printed form signed by thousands of employees.

14    Dkt. # 635 at 34-35; Dkt. # 2468 (Freed Decl.); Hurst Decl. Ex. 23 at 204-05. In

15    Paragraph 2, entitled "Ownership of Inventions," the employee "agree[s] to

16    communicate to the Company ... all inventions" he comes up with "at any time

17    during my employment by the Company." *Id.* Ex. 61 at 509. It further requires that

18    "I hereby assign to the Company ... all my right, title and interest in such

19    inventions." *Id.*; *see also id.* ¶ 2(b) (defining "inventions"). Bryant testified that he

20    understood the Inventions Agreement to assign to Mattel only those "designs that I

21    had been assigned by Mattel, any drawings that I had been assigned to work on"—

22    and not work, like Bratz, done on his own initiative and his own time. Hurst Decl.

23    Ex. 2 at 15-19; Ex. 6 at 36-38. It is undisputed that no one at Mattel had ever

24    assigned Bryant the Bratz project; creating a new line of dolls was above his

25    paygrade. *Id.* Ex. 2 at 20-21.

26        ***The Phase 1 Verdicts.*** The Phase 1 trial was bifurcated. In Phase 1A, the

27    ───────────────

        [3] While the District Court excluded these facts from trial, in part because they were

28    too prejudicial, they do form a more complete context for a less impressionable judicial audience.

jury heard evidence on liability for the state law claims.  The jury found MGA liable on all the state law claims.  Dkt. # 4125 (Phase A Verdict Form).  The jury found that 74 of the 78 contested Bratz drawings, as well as a preliminary doll sculpt and the dummy doll Bryant made for the pitch, were "'conceived or reduced to practice'—that is, created—by Carter Bryant, alone or jointly with others, during the period in which he was employed by Mattel." Dkt. # 4125; Hurst Decl. Exs. 24-49 at 207-358 (Exhibits Corresponding to Verdict); *see id.* Ex. 50 at 360.

Phase 1B concerned the extent to which the Bratz dolls infringed the Bryant sketches and the resultant damages.  The jury found MGA liable for copyright infringement, but it concluded that the infringement was not willful.  Dkt. # 4279 (Phase B Verdict Form).  At Mattel's behest, the Court denied MGA's request for a special verdict form listing each doll separately, *see* Dkt. # 4253, so there was no way to know exactly which dolls were found infringing and which were not.  Hurst Decl. Ex. 51 at 363-64.  But the jury awarded $10 million in damages on the copyright claims—a tiny fraction of the $1.4 billion dollar damages figure Mattel demanded.  Dkt. # 4279; Hurst Decl. Ex. 52 at 366-70; Ex. 53 at 377-79.[4]

**C.    The December 3, 2008 Orders And Subsequent Stays And Modifications Thereof.**

In Phase 1C, the Court considered the equitable relief to be granted Mattel.  On December 3, 2008, three orders issued, two requiring the transfer of intellectual property and one setting forth an injunction.  The Court explained its reasoning with respect to these orders and on a number of other motions in an omnibus order entered therewith.  Dkt. # 4439 ("Omnibus Order").

The Court granted Mattel a constructive trust over the MGA Defendants worldwide BRATZ trademark portfolio pursuant to Mattel's state law tort claims,

---

[4] On each of the two aiding and abetting claims and the interference claim, the jury verdict form appears to reflect an award of $30 million against Larian and MGA Entertainment on each claim for a total of $90 million in combined damages.  It also awarded $31,500 for conversion of the physical drawings.  Dkt. # 4279.

1   and prohibited the MGA Defendants from further use of those marks pursuant to

2   section 17200 of the California Business and Professions Code. Dkt. # 4441 ¶¶ 1, 2

3   (ordering transfer of trademarks "anywhere in the world"). The Court declared

4   Mattel the owner of certain United States copyright registrations and imposed a

5   constructive trust on those as well. Dkt. # 4442 (Order Granting Declaratory

6   Judgment). The Court further issued its Order Granting Mattel's Motion for

7   Permanent Injunction, which paragraphs 1-2 prohibited and restrained the MGA

8   Defendants from further use of such copyrighted material pursuant to 17 U.S.C.

9   502 ("Copyright Injunction"), paragraphs 3-7 also affirmatively required MGA to

10  recall certain dolls and doll products (the "Copyright Recall Order"), and

11  paragraphs 10-13 provided for the possibility of appointment of a Special Master to

12  address disputes concerning the injunction. Dkt. # 4443. The parties subsequently

13  agreed that no final judgment should be entered until completion of the case.

14      In issuing its Copyright Injunction, the Court re-assessed the scope of

15  copyright infringement (finding that the jury's verdict was inscrutable on that point

16  despite Mattel's earlier assurances that a general verdict form would be sufficient)

17  and discussed the factors set forth in *eBay v. MercExchange*, concluding that an

18  injunction should issue restraining the MGA Defendants from further exploitation

19  of the Bratz copyrighted material in the form of various specified dolls and doll

20  products. Omnibus Order at 8-14. In entering the prohibitory Copyright

21  Injunction, the Court made certain modifications to Mattel's proposed form of order

22  to delete specified products that the Court found were not properly subject thereto.

23  *Compare* Dkt. 4316 *with* Dkt. 4443 (¶¶ 1(c), (d), (e), (g), (h)); *see also* Hurst Decl.

24  Ex. 54 at 380.

25      In entering the mandatory injunction set forth in the Copyright Recall Order,

26  however, the Court offered little additional gloss to its *eBay* analysis. Mattel

27  argued that the standard was exactly the same. Dkt. # 4306 (Motion for Permanent

28  Injunction) at 27. Relying upon two sentences reiterating factors it found justified

MOTION TO VACATE OR MODIFY RECALL ORDER
CV 04-9049 DOC (RNBx)

the Copyright Injunction ("scope of infringement" and "products that directly compete with Mattel's products") (Omnibus Order at 14), the Court entered Mattel's proposed Copyright Recall Order verbatim. *Compare* Dkt. 4316 *with* Dkt. 4443 (¶¶ 3-9). The only case cited by the Court in support of the issuance of the Copyright Recall Order was *CyberMedia, Inc. v. Symantec Corp.*, 19 F.Supp.2d 1070, 1079 (N.D. Cal. 1998). Omnibus Order at 14.

Paragraphs 3-7 of the December 3, 2008 Copyright Injunction spell out the acts required of the MGA Defendants in order to effectuate the recall. Paragraph 3 requires the MGA Defendants to deliver the goods and means of manufacture in their possession to "such location in the Central District as counsel for Mattel shall direct." Paragraphs 4-6 require identification of purchasers of the enjoined goods, provide for the recall procedures and the form of notice of the recall, and require MGA to issue refunds and bear the costs of shipping for return of goods in response to the notice. The shipping address for returns set forth in the prescribed form of notice is MGA's address in Van Nuys, California. There is no other geographic reference in either the Copyright Injunction or the Copyright Recall Order.

Beginning in January 2009, the Court issued a series of orders that modified the Copyright Injunction, ultimately allowing for the sale of BRATZ dolls through and including January 21, 2010, subject to an accounting of profits for Mattel's benefit.

**January 7, 2009 Order.** The Court stayed all three orders in their entirety and expressly authorized retailers and distributors "to purchase the Spring and Fall 2009 lines of Bratz and Bratz-related products from MGA and MGA licensees, up to and including December 31, 2009." Dkt. # 4657 at 1.

**April 27, 2009 Order.** The Court lifted the stay but confirmed that the MGA Defendants and their licensees could continue to sell Bratz products. Dkt. # 5237 at 11. On May 4, 2009, the MGA Defendants filed a Notice of Appeal of the interlocutory injunctions. Dkt. # 5340.

***May 21, 2009 Order.***  The Order extended the date through which sales could occur from December 31, 2009 to January 21, 2010, and confirmed that the authorized sales included all Bratz products of any vintage unless the Monitor made a determination to the contrary (which did not subsequently occur).  Dkt. # 5565 at 7.  The District Court also appointed a Monitor to supervise and ensure compliance with the constructive trust orders and injunction and to collect and escrow the net profits from the sale of Bratz products covered by the constructive trust orders.  *Id.* at 10-11.

***Appellate Proceedings.***  On June 10, 2009, the Ninth Circuit denied a further stay of the injunction orders pending appeal, finding that the arguments briefed on the motion did not demonstrate a sufficient likelihood of success on the merits.  The Ninth Circuit expedited the appeal, however, and ordered it assigned to the first available panel upon completion of briefing.  Hurst Decl. Ex. 55 at 392.  Thereafter, new counsel appeared for MGA, and MGA briefed a materially different set of arguments on the merits in the Ninth Circuit.  Copies of all of the Ninth Circuit briefs are lodged herewith for the Court's convenience.  Briefing was completed on October 13, 2009, and the appeal therefore should be assigned to the next available panel.

On July 2, 2009, the Ninth Circuit issued its decision in *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009).  In that decision, the Ninth Circuit for the first time enunciated the standard that it will apply for mandatory injunctions requiring product recalls in intellectual property cases.  Under this heightened standard, several factors, in addition to the traditional balancing of equities, must be met in order to justify a recall order—even where likely success has been established.

D.    **Mattel's Failure To Exploit Bratz In Early 2010.**

On September 28, 2009, in a declaration submitted to the Monitor in conjunction with briefing on the issue of which Bratz products are subject to the

1   Copyright Recall Order, Mattel's Senior Vice President of Boys and Girls

2   Marketing and Design, Timothy Kilpin, testified that █████████████████

    ████████████████████████████████████████████████████████████████████

    ███████████████████████████████ Dkt. # 6935 (Decl. of Timothy Kilpin

5   ISO Mattel Submission on Scope of Recall dated September 28, 2009) ¶ 4

6   (emphasis added).  This was a material change from Mattel's position just last May,

7   when, in a different declaration, Mr. Kilpin stated that ████████████████████

    ██████████████████████████████████████████████████████████████

    ██████████Dkt. # 5496 (Decl. of Timothy Kilpin ISO Mattel, Inc.'s Opp'n to Mot. for

10  Stay Pending Appeal dated May 13, 2009) ¶ 5 (emphasis added).

11          As Mr. Kilpin's first declaration indicated, it is not typical industry practice

12  to bring a product for the Spring 2010 season to retail shelves ████████ – products

13  for spring are delivered to retailers in the fall.  Indeed, █████████████████

    ████████████████████████████████████████████████████████████████████

    ████████████████████████████████████████████. Pembleton

16  Decl. ¶¶ 17-19; Falcon Decl. ¶¶ 5-6.  ████████████████████████

    ████████████████████████████████████████████████████████████████████

    ████████████████████████████████████. Pembleton Decl. ¶ 22; Falcon

19  Decl. ¶ 7.  ████████████████████████████████████████████.

20  Pembleton Decl. ¶ 22.

21          Mr. Kilpin's September 29 declaration, however, indicates that Mattel's 2009

22  product will come to retail shelves ████████████████████████████

23  ████████████████  In light of the fact that MGA's enjoined Bratz products will be

24  off the shelves on January 21, 2010, as discussed below, Mattel's delay until ████

25  ████████████████ and the resulting absence of Bratz from the marketplace may

26  have serious consequences for the viability of Bratz as a brand.  As a result of this

27  absence, Bratz is likely to lose the attention of its consumer base, ████████████

    ████████████████████████████████████████████████████████████████████

MOTION TO VACATE OR MODIFY RECALL ORDER
CV 04-9049 DOC (RNBx)

1   █████. Pembleton Decl. ¶¶ 23-24; Falcon Decl. ¶ 7. ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Pembleton Decl. ¶¶ 23-24.

4   ████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████. Falcon Decl. ¶ 6.

7   **E.    MGA's Recall Plan.**

8          The MGA Parties have been taking the necessary steps to comply with the

9   Copyright Recall Order.  MGA has been collecting and vetting the data necessary

10  to comply with paragraph 5 and to send the required notices.  It has engaged and is

11  working with a vendor highly experienced in conducting product recalls, Stericycle,

12  to build the infrastructure for the recall, including databases for issuing and tracking

13  the notices, developing call center materials and staffing and training call center

14  personnel to handle inquiries regarding the notices and relevant procedures,

15  developing shipping and refund reimbursement plans, and identifying fraud

16  prevention issues and strategies.  Pembleton Decl. ¶¶ 3-11.  A plan for conducting

17  the recall has been adopted.  *Id.* ¶ 4 Ex. 1. Unfortunately, in this process, substantial

18  issues have arisen with regard to the scope, mechanics and deadlines associated

19  with the recall.  Those issues are addressed below and are the subject of the relief

20  requested herein.

21                          **ARGUMENT**

22  **I.    CHANGES IN THE LAW AND FACTS WARRANT VACATING THE
23        RECALL ORDER.**

24         The MGA Defendants wish to emphasize at the outset that they fully intend

25  to comply with the prohibitory Copyright Injunction absent further stay or reversal,

26  and are also carefully planning the recall process with a view to compliance on

27  January 21, 2010. *See generally* Pembleton Declaration.  Nonetheless, MGA

28  respectfully submits that the Copyright Recall Order should be vacated pursuant to

Rule 62 because of changed factual and legal circumstances.[5]  As noted above, Mattel recently admitted for the first time that it will not bring Bratz product to market ███████████████████████████, well after MGA's current Bratz products can be expected to sell in light of its compliance with the prohibitory injunction.  A recall will therefore cost MGA millions of dollars without any avoidance of harm to Mattel.  The legal standard in the Ninth Circuit for granting a recall in intellectual property cases recently has been heightened in a decision issued after the Court's original recall order was entered.  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873 (9th Cir. 2009).  From any perspective, ██████████████████████████ makes no sense, and under the new standard in *Marlyn*, a recall is not warranted.

### A.   The Ninth Circuit Recently Articulated A New Standard For Recall Orders In IP Cases.

On July 2, 2009 the Ninth Circuit decided *Marlyn*.  That case expressly established a new standard for recall orders in the Ninth Circuit.  571 F.3d at 873 ("Given the nature of the requested remedy, we conclude that the Third Circuit's formulation is sound, and we join it in requiring the district court to consider these factors . . . .").

In *Marlyn*, the Ninth Circuit emphasized the historically significant distinction between prohibitory and mandatory forms of injunction.  While a prohibitory injunction prevents or restrains a defendant from engaging in certain conduct (*see, e.g.*, 17 U.S.C. §502(a)), a mandatory injunction requires *affirmative action* on the part of a defendant (*see, e.g.*, 17 U.S.C. § 503(a)).  *Marlyn*, 571 F.3d at 879.  Mandatory injunctions have always required a higher standard than prohibitory ones.  *Id.*; *see also Stanley v. Univ. of S. California*, 13 F.3d 1313, 1320 (9th Cir. 1994) (mandatory injunctions are "subject to a higher degree of

---

[5] *See Natural Resources Defense Council v. Southwest Marine Inc.,* 242 F. 3d 1163, 1166-67 (9th Cir.  2001) (district court had subject matter jurisdiction to make modifications to an injunction during pendency of appeal).

- 14 -

1   scrutiny because such relief is particularly disfavored under the law of this

2   circuit").[6]

3        Because it requires a party to turn over products in its possession and

4   endeavor to obtain them from third parties, a recall order is mandatory relief.

5   *Marlyn*, 571 F.3d at 872-73.  Thus, relying on the Third Circuit opinion in *Gucci*

6   *Am., Inc. v. Daffy's, Inc.*, 354 F.3d 228 (3d Cir. 2003), the Ninth Circuit held in

7   *Marlyn* that a recall order is only appropriate in this Circuit when the party seeking

8   the recall can establish *both* the factors necessary to obtain an ordinary prohibitory

9   injunction *and* has prevailed with respect to three additional factors:

> (1) the willful or intentional infringement by the defendant; (2) whether the risk of confusion to the public and injury to the . . . owner  is greater than the burden of the recall to the defendant; and (3) substantial risk of danger to the public due to the defendant's infringing activity.

14   *Marlyn,* 571 F.3d  at 880 (quoting *Gucci,* 354 F.3d  at 233).

15        *Marlyn* concerned a request for preliminary injunctive relief in a trademark

16   case brought under the Lanham Act, but there is no reason to conclude that the

17   analysis for a mandatory injunction under the Copyright Act, or for a permanent (as

18   opposed to preliminary) injunction would be any more forgiving.  To the contrary,

19   the Supreme Court has repeatedly emphasized that the federal courts should

20   harmonize their understanding of comparable requirements of federal intellectual

21   property laws, including the injunctive relief provisions thereof.  *See eBay, Inc.*,

22   547 U.S. at 392-93 (injunction standard same for copyright and patent law); *Metro-*

23   *Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005)

24   (inducement of infringement standard same for the copyright and patent law); *Sony*

25   *Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439-40 (1984)

26

27   [6] This recognition of historical equitable principles was precisely in line with the Supreme Court's commandment in *eBay v. MercExchange* that the federal courts should read the injunctive provisions of the intellectual property statutes against the

28   backdrop of common law.  547 U.S. 388, 391-92 (2006).

- 15 -

1   (contributory infringement standard same for copyright and patent law).

2       The standards set forth for the permanent injunction in *eBay*, a patent case,

3   have been widely applied in copyright and trademark cases, and also have been

4   applied in the preliminary injunction context. *See, e.g., Peter Letterese and Assocs.*

5   *v. World Institute of Scientology Enterps.*, 533 F.3d 1287, 1323 (11th Cir. 2008)

6   (copyright); *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1137 (9th Cir.

7   2006) (same); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp.

8   2d 1197, 1212 (C.D. Cal. 2007) (preliminary injunction); *Momento, Inc. v. Seccion*

9   *Amarilla USA*, 2009 WL 1974798 * 3 (N.D. Cal. July 8, 2009) (same).  Indeed,

10   apart from the consideration of likely success, the substantive standard does not

11   materially differ for evaluating the award of permanent versus preliminary

12   injunctions. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12

13   (1987); *Sierra Club v. Penfold*, 857 F.2d 1307, 1318 (9th Cir. 1988).

14       Thus, the Ninth Circuit's rationale in *Marlyn* requiring the application of

15   additional factors for the issuance of mandatory relief is fully applicable here.

16       **B.**    **The *Marlyn* Factors Cannot Justify A Recall Here.**

17       For obvious reasons, the *Marlyn* factors were not considered in December

18   2008 when the Omnibus Order explaining the copyright recall provisions issued.

19   Indeed, Judge Larson recently reiterated that he was not concerned about any

20   special harm to Mattel when granting the recall order. Dkt. # 6851 (9/22/09 Order)

21   at 2.  When the three *Marlyn* factors are considered, however, it is apparent that the

22   recall cannot be legally justified in this case.

23       **1.**    **There Is No Risk of Danger to the Public.**

24       To establish this factor requires proof that there is a public health hazard, an

25   actual threat to public safety. *Marlyn*, 571 F.3d at 879 (noting that the district court

26   on remand should consider whether "the infringing product causes a substantial risk

27   of danger to the public"); *see also Playskool, Inc. v. Product Development Group,*

28   *Inc.* 699 F. Supp. 1056, 1063 (E.D.N.Y. 1988); *Burndy Corp. v. Teledyne*

1     *Industries, Inc.*, 584 F. Supp. 656, 670 (D. Conn. 1984).  It is beyond cavil that the

2     contemplated Bratz product recall is not a recall for the purpose of ensuring public

3     health or safety, or even to address a product defect.  This is not even a recall to

4     protect the public from the likely confusion engendered by trademark infringement,

5     one purpose of the Lanham Act.  *See, e.g., Bosley Med. Inst. v. Kremer*, 403 F.3d

6     672, 676 (9th Cir. 2005).  There is no arguable public interest at stake other than an

7     attenuated general interest in enforcement of the Copyright Act.  Mattel's inability

8     to satisfy this important factor dooms the recall order under *Marlyn*.

9               **2.**     **The Willfulness Factor Does Not Justify A Recall.**

10     Second, the jury found that the MGA Defendants did not willfully infringe.

11     Rejecting Mattel's claims of willful infringement, the jury answered "No" to the

12     questions "Was MGA's copyright infringement willful?" and "Was Mr. Larian's

13     copyright infringement willful?"  Dkt. # 4279 (Phase B Verdict Form) Nos., 6, 8,

14     10 at 4-5.  The Court recently reaffirmed this conclusion in its accounting of profits

15     order.  Dkt. # 5740 (Order re Accounting).

16               **3.**     **The Burdens Of The Recall Are Far Greater Than The**

17                   **Benefit to Mattel.**

18     Finally, regarding the relative burden/benefit analysis associated with the

19     recall, it is apparent that the economic burden to MGA of the recall far outweighs

20     any marginal benefit to Mattel, particularly in light of Mattel's late market entry

21     with its Bratz product.  *Marlyn*, 571 F.3d at 880; *see also Perfect Fit Indus., Inc. v.*

22     *Acme Quilting Co.*, 646 F.2d 800, 807 (2d Cir. 1981).

23     When all is said and done, the Copyright Recall Order could cost MGA

24     anywhere ███████████████ or even more in out-of-pocket expenses and

25     product reimbursement costs, depending upon the geographic scope of the recall (as

26     addressed herein) and the rate of compliance by third parties with the recall notices.

27     Pembleton Decl. ¶¶ 12-16.  This does not even include the element of lost revenues

28     and profits that would otherwise benefit not only MGA but Mattel, as well as those

1  in MGA's chain of distribution.  *Id.*; Falcon Decl. ¶¶ 8-11.  Moreover, the burdens

2  of this litigation ███████████████████████ and the recall

3  order is exacerbating that circumstance.  In other cases such economic injury has

4  been sufficient basis for denial of a recall order.  *See Jack Lenor Larsen, Inc. v.*

5  *Dakotah, Inc.*, 452 F. Supp. 99, 99 (S.D.N.Y. 1978).  ██████████████

6  ███████████████████████████████████████████

7  ████████████████████████████  Pembleton Decl. ¶ 14; Falcon

8  Decl. ¶ 12; *Gucci Am., Inc.*, 354 F.3d at 234-35 (crediting harm to defendant's

9  goodwill).  Indeed, the harm from a recall is not merely inflicted upon MGA.  *See*

10 Omnibus Order at 13.  Recalls are inherently disruptive.  "To recall and require

11 destruction of the infringing . . . would cause general disruption in the marketplace

12 and inflict burden and expense upon unknown numbers of other persons." *Granville*

13 *v. Suckafree Records, Inc.*, 2006 WL 2520909 *7 (S.D. Tex. June 28, 2006).

14    Mattel has no Bratz product on the shelves now, and has not definitively

15 committed to the Court under oath that it is certain ever to market a Bratz product.

16 In response to document requests served upon it, Mattel has refused to provide any

17 evidence to MGA (or even MGA's outside counsel) concerning its plans to market

18 Bratz.  Hurst Decl. Ex. 56 (Objs. to Document Request) at 468-77.  Mattel has

19 disclosed only vague references to a Bratz product that, by Mattel's current

20 estimation, might by on the shelves by ████████  Dkt. # 6935 ¶ 4 (Mattel

21 ████████ ████████████████████████████

22 (emphasis added)).  ████████ should be ample time for the trade channels to

23 sell through any remaining material quantities of MGA Bratz product.

24    Injury to Mattel thus is not a factor that weighs in favor of a recall.  The need

25 to clear the shelves for Mattel's vision of Bratz was not the basis for the recall order

26 in the first instance, Dkt. # 6851 (9/22/09 Order) at 2, and in all events won't be

27 necessary given even the small amount of information Mattel has been willing to

28 dribble out concerning its expected product introduction.  Where, as here, Mattel

- 18 -

has no product on the market, this is a "decisive factor in the burden/benefit analysis" and warrants against a recall even if the burden is slight because "the benefit of a recall to [Mattel] would be even less than the slight burden a recall would impose on defendant." *Primavera Labs., Inc. v. Elizabeth Arden Co.*, 1993 WL 319214 *1 (S.D.N.Y. Aug. 13, 1993).

No matter who ends up owning Bratz, all parties have agreed that having Bratz off the market for any material amount of time will be devastating to the brand. Perhaps this is Mattel's ultimate objective if it hopes to capture these consumers for its other product lines and not really to exploit Bratz—a serious detriment to consumer welfare as consumer choice will be materially diminished as a result. ███████████████████████████

███████████████████████████████. Falcon Decl. ¶¶ 8-12. And, even by Mattel's calculations, shelves will sit empty—from late January 2010 ██████████████████

## II. IF NOT VACATED, THE COPYRIGHT RECALL ORDER SHOULD BE CLARIFIED AND/OR MODIFIED.

████████████████████████████████

███████████████████████████████████

████████████████. Russell Decl. ¶¶ 2-3, 6. Such requirements would be inconsistent with the law and text of the Order. Additionally, the order appears to require everyone who ever purchased a Bratz product to be sent a recall notice, even though Mattel has already been granted a damages award for all sales prior to July 1, 2008. The Court should clarify and modify the order to address these issues.

### A.   The Order Does Not Require MGA To "Sweep The Shelves."

The Copyright Recall Order sets forth the recall procedure to be employed. Under the terms of paragraphs 4 and 6, the MGA Defendants are to 1) send out notices of the injunction, 2) request an immediate return of the products covered by the Copyright Recall Order, and 3) refund monies paid for the products and to pay

1  the cost of shipping the returned products.  This is fully consistent with the ordinary

2  meaning of the word "recall," which is "to ask or order to return."  Websters II New

3  College Dictionary 924 (2001).

4  ███████████  ████████████████████████████████████████

   █████████████████████████████████████████████████████████"

6  Russell Decl. ¶¶ 2-3.  The Monitor has not specified the basis for this view, but

7  apparently it is the direction in paragraph 4 of the Order that MGA "procure the

8  return" of the Bratz product.  Copyright Recall Order ¶4.  "Sweeping," however,

9  would not be a request to return, but would instead be a direct effectuation of

10  impoundment by removing the product from the shelves and taking possession of it.

11      That is not a recall.  Indeed, other courts have upheld recall orders only

12  because they did *not* impose such a requirement.  *See Benham Jewelry Corp. v.*

13  *Aron Basha Corp.*, 1997 WL 639037 at *19 (S.D.N.Y. Oct. 14, 1997) (write a letter

14  and pay the cost of returns); *Merit Diamond Corp. v. Frederick Goldman, Inc.*, 376

15  F. Supp. 2d 517, 527 (S.D.N.Y. 2005) (same); *see also Perfect Fit Indus., Inc.*, 646

16  F.2d. at 807.

17      Moreover, since MGA no longer has title to the Bratz product once sold to

18  distributors, never had title to product sold by licensees, and certainly has no claim

19  to the product in the hands of third parties, there would be serious due process

20  issues if MGA sought to force third parties to return such goods.  Courts have thus

21  specifically rejected the notion that a copyright recall order can be enforced against

22  non-parties.  In *Societe Civile Succession Richard Guino v. Int'l Found. for*

23  *Anticancer Drug Discovery*, 460 F. Supp. 2d 1105, 1112-13 (D. Ariz. 2006), the

24  Court identified a number of statutory and Constitutional issues with a contrary

25  approach, noting "[a]t times, innocent purchasers have been subject to judicially

26  mandated recalls administered by infringing defendants," but clarified that "the

27  defendants were required to make reasonable efforts to recall [the infringing

28  items]," and noted that such efforts did not apply to the defendant's customers and

- 20 -

1   the Court's order could not "order them to comply with the recall." *Id.*

2   Moreover, a requirement to "sweep the shelves" would render surplusage the

3   other parts of the recall provisions.  The requirements as to *how* MGA is to procure

4   the return are set forth in the second sentence of paragraph 4 and in paragraph 6;

5   that is, to send a notice and pay for shipping and refunds.  If the "procure the

6   return" language of the first sentence of paragraph 4 required MGA to go and

7   obtain the product, there would be no reason to impose a requirement to "reimburse

8   for shipping charges," or to prescribe a form of notice directing shipment

9   immediately to Van Nuys.  Not only would there be surplusage, but asking

10  distributors and retailers to ship Bratz product back would be inconsistent with

11  MGA's purported obligations.

12  Moreover, since there is no means of enforcing the Court's order against

13  non-parties, the only way for MGA to even begin to "sweep the shelves" would be

14  for MGA to go around and purchase all of the product on store shelves at the stated

15  retail price as would any other consumer.  Of course, this would entirely ignore the

16  product in the stockroom or distribution centers, to which MGA has no access.

17  Moreover, requiring MGA to pay retail price to sweep the shelves is hardly the

18  "refund" contemplated by the recall provisions.  A refund is defined as "to give

19  back" or "to repay."  Websters II New College Dictionary 932 (2001).  In other

20  words, MGA is required to repay for the goods at the price it sold them—the

21  wholesale cost of the distributor or retailer, not their retail price.  If MGA is

22  required to pay retail price to sweep the shelves, it would be making not only a

23  refund, but would be the guarantor of economic success of its entire distribution

24  chain.  This is absurd.

25  An interpretation of the Order requiring MGA to "sweep the shelves" is

26  inconsistent with law and the terms of the Order.  The Court should confirm that the

27  Copyright Recall Order has no such requirement.

28

MOTION TO VACATE OR MODIFY RECALL ORDER
CV 04-9049 DOC (RNBx)

**B.**   **The Court Should Confirm That No Foreign Recall Is Required.**

Similarly inconsistent with law and textual analysis is the view that MGA is required to conduct the recall on a worldwide basis.  An order for an extraterritorial recall would be unprecedented.  As noted in the only case cited by Judge Larson in support of the recall order, the Court in *Cybermedia, Inc. v. Symantec Corp.*, limited its recall to the U.S. because "[t]here appear to be no reported cases . . . in which the extraterritorial manufacture and distribution of infringing products was *enjoined* on the basis of copyright infringement occurring within the United States." 19 F. Supp. 2d 1070, 1079 (N.D. Cal. 1998).

Such an order would be and is unprecedented because copyright laws are territorial.  4 Nimmer, Nimmer on Copyright §17.02 at 17-19 (rev. ed. 2009) ("[c]opyright laws do not have any extraterritorial operation.")  What infringes in the United States may not infringe in other countries where Bratz are sold, such as Serbia, Japan, Spain or Kazakhstan.  By its express terms, 17 U.S.C. § 502 is limited to orders to prevent or restrain infringement "throughout the United States." Accordingly, the Copyright Act does not authorize a court to give an injunction "extraterritorial reach."  *Subafilms, Ltd. v. MGM-Pathe Comm'cs Co.*, 24 F.3d 1088, 1095 (9th Cir. 1994) (en banc); *Danjaq LLC v. Sony Corp.*, 1998 WL 957033 (C.D. Cal. 1998), *aff'd*, 165 F.3d 915 (9th Cir. 1998); *CyberMedia,* 19 F.Supp.2d at 1079.  Issues of national sovereignty and comity foreclose such a reach. *Subafilms*, 24 F.3d at 1098; *see also EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991).  In short, to extend the recall order to reach beyond the borders of the U.S. would require the overturning of "over eighty years of consistent jurisprudence."  *Id.* at 1095.

Moreover, as a practical matter, MGA will face serious obstacles obtaining international compliance.  Putting aside that there is no meaningful method to enforce against non-parties *even in the United States* (*see Guino*), this situation is unlike a health and safety recall, where distributors and retailers are independently

- 22 -

1   motivated to send the product back because they may be held liable if it injures

2   people.  Here there is no such incentive.  Interpreting the order to require

3   international compliance is simply an invitation to failure (and concomitant

4   assertions of contempt).

5          Finally, the only geographic references in the Order are to require shipment

6   or delivery to places within the Central District.  The Order does not use the words

7   "worldwide" or "extraterritorial," in direct contrast to the Constructive Trust Order

8   issued on the same day, which repeatedly uses the phrase "anywhere in the world."

9   Dkt. # 4441 (Constructive Trust Order) ¶¶ 1, 2.  Thus, the Copyright Recall Order,

10  by its terms, does not require the unlawful and futile act of an extraterritorial recall.

11  ███████████████████████████████, the Court should so confirm.

12  **C.     Clarification And Modification Is Needed To Address Timing
        Requirements.**

13

14       **1.     MGA Should Not Be Required To Send Recall Notices For
                Sales Prior To July 1, 2008 On Which Mattel Was Already
                Awarded Damages.**

15          In addition to being overbroad in its extraterritoriality, the Copyright Recall

16  Order is also inappropriately expansive in the time period it seeks to cover.

17  Paragraphs 5 and 6 of the Copyright Recall Order seemingly require the MGA

18  Parties to identify, contact, and recall product from every retailer and distributor to

19  whom they have sold Bratz products during the eight year history of the brand.

20  ████████████████████████████████████████████████████████

21  ████     Hurst Decl. Ex. 57 at 500 (████████████████████████████████

    ████████████████████████████); Dkt. # 5495 (Mattel's Opp'n

    to Stay Pending Appeal) at 6 (████████████████████); *see also* Hurst

24  Decl. Ex. 58 (August 2009 Accounting).  Thus, many entities to be identified and

25  contacted for periods prior to July 1, 2008 have not purchased Bratz products

26  recently.  Moreover, it is also highly unlikely that product purchased before 2007

27  has not been sold, making the burden of sending notices to those purchasers far

28

- 23 -

outweigh any marginal benefit to Mattel.

Most importantly, Mattel has already completed discovery regarding, concluded a trial on, and been awarded damages for all products sold by the MGA Parties prior to July 1, 2008.  As the Court explained with respect to the accounting, "For all periods of time prior to July 1, 2008, the jury's verdict … controls.  No accounting is necessary for this period of time, as it is included in the amount awarded by the jury."  Dkt. # 5740 (Accounting Order) at 5.  This same logic applies to the recall.  Mattel has already been awarded its portion of the profits from all sales by the MGA Defendants prior to July 1, 2008.  To the extent that any entity that purchased Bratz products prior to that date returns them now for a refund, the MGA Defendants will be doubly penalized – they will have to refund money for which Mattel has already received its share.  Accordingly, the MGA Defendants ask that the Court modify Paragraphs 5 and 6.

### 2.   The Deadlines Should Be Conformed To Present Circumstances In Light Of The Stays And Modifications.

The Copyright Recall Order was originally drafted with the expectation that the injunction was going to go into effect immediately and that retailers and distributors would receive no advance notice that they needed to return their products to MGA as quickly as possible.  In light of the year-long stay and deadline modifications, many of the deadlines in paragraph 8 of the Copyright Recall Order no longer make sense.  Accordingly, the MGA Defendants also seek to adjust the timing of those deadlines as set forth in the [Proposed] Order submitted herewith.

## III.   THE COURT SHOULD CONFIRM THAT THE MONITOR DOES NOT WIELD ADJUDICATIVE POWERS.

Paragraphs 10-13 of the original injunction order contemplated the appointment of a Special Master pursuant to Federal Rule of Civil Procedure 53 in order to address disputes arising from the injunction order.  The Court did not appoint that Special Master.  Omnibus Order at 15.  The May 21 Order appointing

1    the Monitor makes no mention of Rule 53, does not use the designation "Special

2    Master," and does not invoke paragraphs 10-13 of the original order.  Consistent

3    with this history, i█████████████████████████████████████████████████████

4    ████████" Hurst Decl. Ex. 62 at 511; Ex. 59 at 505; Russell Decl. ¶ 4.

5        The MGA Defendants raise this because it is this Court's obligation to assess

6    these issues using a *de novo* standard of review and irrespective of any views

7    expressed by the Monitor as to the scope or meaning of the Court's prior orders.

8    To avoid any further confusion on this point, along with the other clarifications

9    and/or modifications requested herein, the Court should strike paragraphs 10-13 of

10   the Copyright Injunction.  In doing so, the Court should also make clear that since

11   the Monitor is not a Special Master, he is not entitled to conduct trials and

12   otherwise act in an adjudicative capacity, or otherwise to receive the deference to

13   which a Special Master is entitled under Rule 53.

## CONCLUSION

15       For all of the foregoing reasons, the Court should grant the foregoing

16   requested relief as set out in the accompanying [Proposed] Order.

17   Dated: October 19, 2009          ORRICK, HERRINGTON & SUTCLIFFE LLP

19   By: _____
                              Annette L. Hurst
20                            Attorneys for MGA Defendants

- 25 -

MOTION TO VACATE OR MODIFY RECALL ORDER
CV 04-9049 DOC (RNBx)